# EXHIBIT 1

Brian D. Parker, M.D

```
 1                IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      CHARLESTON DIVISION

 4

 5

 6

 7   IN RE: ETHICON, INC., PELVIC      :   MASTER FILE NO.

     REPAIR SYSTEM PRODUCTS            :   2:12-MD-02327

 8   LIABILITY LITIGATION              :   MDL NO. 2327

     _____      :

 9                                     :

     THIS DOCUMENT RELATES TO ALL      :

10   WAVE 4 AND SUBSEQUENT WAVE CASES  :   JOSEPH R. GOODWIN

     AND PLAINTIFFS:                   :   U.S. DISTRICT JUDGE

11                                     :

     Rebecca Melton                    :

12   CASE NO. 2:12-cv-04094            :

     _____

13

14

15

16          Transcript of deposition of BRIAN D. PARKER, M.D.,

17   taken by Charlene M. Shade, LCR, Notary Public, at the

18   Hilton Garden Inn West, 216 Peregrine Way, Knoxville,

19   Tennessee on Tuesday, March 14, 2017, commencing at 8:30

20   a.m.

21

22

23

24

25
```

Brian D. Parker, M.D

Page 2

1   APPEARANCES:
2   ON BEHALF OF THE PLAINTIFFS:
3       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLC
4       BY: D. RENEE BAGGETT, ESQUIRE
5       17 East Main Street
6       Suite 200
7       Pensacola, Florida 32563
8       850.202.1010
9       Rbaggett@awkolaw.com
10
11  ON BEHALF OF THE DEFENDANTS:
12      BUTLER SNOW
13      BY: JORDAN N. WALKER, ESQUIRE
14      Renaissance at Colony Park
15      1020 Highland Colony Parkway
16      Suite 1400
17      Ridgeland, Mississippi 39157
18      601.948.5711
19      Jordan.walker@butlersnow.com
20
21
22
23
24
25

Page 4

1                E X H I B I T S
2   NUMBER/DESCRIPTION                          PAGE
3
4   1   Deposition Notice                    9
5   2   Expert Report Of Dr. Parker             10
6   3   Curriculum Vitae            10
7   4   General Reliance List           10
8   5   Supplemental Reliance List           10
9   6   Invoices Of Dr. Parker           10
10  7   Exhibit Notebook Prepared By Defendants      10
11  8   Thumb Drive - Reliance List           10
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1               I N D E X
2   WITNESS:  BRIAN D. PARKER, M.D.           PAGE
3
4   Examination By Ms. Baggett            5
5   Examination By Mr. Walker           176
6   Examination By Ms. Baggett          186
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1           (Time 8:30 a.m.)
2               BRIAN D. PARKER, M.D.,
3   having been first duly sworn, was examined and testified as
4   follows:
5               EXAMINATION
6   BY MS. BAGGETT:
7       Q.    Good morning, Dr. Parker.
8       A.    Good morning.
9       Q.    Could you please state your full name for
10  the record.
11      A.    Brian David Parker.
12      Q.    And can you tell us where you're working
13  currently?
14      A.    Tennessee Urology Associates.
15      Q.    And how long have you been with them?
16      A.    Since 2005.
17      Q.    And when did you first become associated
18  with Ethicon with regards to this litigation, if you
19  recall?
20      A.    Around November of 2016.
21      Q.    And what capacity was that in initially?
22      A.    What capacity?
23      Q.    Was it preceptor?  Was it --
24      A.    No.  No.  It was only for the purpose of
25  being an expert witness.

Brian D. Parker, M.D

Page 6

1    Q.    And have you served as an expert before?
2    A.    No.
3    Q.    Have you been involved with Ethicon in any
4  other capacity as a consultant?
5    A.    No.
6    Q.    In looking at your CV, I saw that you may
7  have been involved with another device manufacturer.  What
8  other manufacturers have you been involved with consulting?
9    A.    With Galil Medical.  They have a
10  cryoablation machine for malignancy.  I'm a proctor for
11  Medtronic and for Coloplast.  I'm a proctor for their Altis
12  line.
13    Q.    How long have you been a proctor for
14  Coloplast?
15    A.    Well, probably three years, but, honestly,
16  I've only proctored a few times.  Yeah, probably about
17  three years.
18    Q.    And how long have you been performing
19  procedures that include vaginal mesh products?
20    A.    Since residency, so that would be
21  somewhere around two thousand and -- no.  Let's see.  Yeah,
22  probably around 2001, 2002.
23    Q.    Do you recall what the first mesh product
24  was that you were familiar with?
25    A.    The TVT retropubic.

Page 7

1    Q.    And were you trained in residency on how
2  to use it or did you attend classes that were held by
3  Ethicon?
4    A.    I trained in residency.
5    Q.    And were you provided materials during
6  that training period, do you recall?
7    A.    That's been a long time since then, so I
8  don't recall any materials, no.
9    Q.    Would you have seen the IFU, for instance,
10  potentially in your --
11    A.    In residency?
12    Q.    In training.
13    A.    In the training for TVT retropubic?
14    Q.    Yes, sir.
15    A.    No.
16    Q.    Have you ever been deposed before today?
17    A.    Yes.
18    Q.    How many times?
19    A.    Twice.
20    Q.    In what capacity were you deposed?
21    A.    Malpractice case.
22    Q.    And were you a witness or were you a
23  party?
24    A.    A party.
25    Q.    And we don't have to go deep into details,

Page 8

1  but if you could give me some idea what those cases were
2  about.
3    A.    It was the same case, and I had to be
4  deposed twice because it went to mistrial, and it was about
5  a surgery for renal cell cancer.  We were found not guilty,
6  but that process took three or four years.
7    Q.    So you're somewhat familiar with the
8  deposition process?
9    A.    A little bit.
10    Q.    The main rules, obviously, are to have
11  speaking responses, no nodding of the head.  Let me finish
12  my question so that we don't talk over each other and --
13    A.    Okay.
14    Q.    -- I'll try to do the same for you.  I
15  know time is short, and as we get closer to the end of my
16  time, I talk a lot faster.  I don't do that to mean any
17  disrespect, but we are limited on what time and there's a
18  lot, as you know, to be covered under these circumstances.
19    A.    Uh-huh.
20    Q.    I was provided some invoices.  Let's go
21  ahead and take care of a couple things before we move to
22  that, though.
23        I'm going to hand you what's been marked
24  as Exhibit 1.  This is the notice of deposition in this
25  case.

Page 9

1  (Exhibit 1 - Deposition Notice)
2    A.    Yes.
3    Q.    And I wanted to ask if you recall seeing
4  that before today.
5    A.    I have.
6    Q.    And if you'll turn toward the mid section,
7  I think it's entitled Schedule A.
8    A.    Uh-huh.
9    Q.    Have you seen Schedule A before today?
10    A.    I scanned through the first few pages.  I
11  don't know that I've read through every bit of it, but I
12  did look through some of this.  Schedule A.  Okay.  Yes.
13    Q.    And the Schedule A is a request for the
14  production of documents and things, and I noticed that
15  you've brought both a book binder and a thumb drive.  So
16  are those materials brought in response to Schedule A?
17    A.    Yes.
18        MR. WALKER:  Let me interject and state
19    for the record, we have brought a thumb drive and
20    the thumb drive contains all of his general
21    reliance materials.
22        MS. BAGGETT:  Okay.  You can put that
23    aside for now.  And we're going to mark for
24    Exhibit 2 the expert report that you prepared in
25    this matter.

Brian D. Parker, M.D

Page 10

1    (Exhibit 2 - Expert Report Of Dr. Parker)
2         MS. BAGGETT:  And we'll go ahead and mark
3    as Exhibit 3 the CV.
4    (Exhibit 3 - Curriculum Vitae)
5         MS. BAGGETT:  And 4 and 5 will be your
6    general reliance list and your supplemental
7    reliance list.  And I wanted to do that before I
8    got ahead of myself and forgot to do so.
9    (Exhibit 4 - General Reliance List)
10   (Exhibit 5 - Supplemental Reliance List)
11        MS. BAGGETT:  I'm going to also go ahead
12   and mark as -- I think the last exhibit was
13   Exhibit 5?
14        MR. WALKER:  Yeah.
15        MS. BAGGETT:  As Exhibit 6 we'll mark your
16   invoices.
17   (Exhibit 6 - Invoices Of Dr. Parker)
18        MS. BAGGETT:  Exhibit 7 will be your
19   binder.
20   (Exhibit 7 - Exhibit Notebook Prepared By
21   Defendants)
22        MS. BAGGETT:  And Exhibit 8 will be the
23   thumb drive.
24   (Exhibit 8 - Thumb Drive - Reliance Lists)
25   BY MS. BAGGETT:

Page 11

1         Q.    Okay.  Turning to your invoice -- and I'll
2    pass it back to you if you need to refer to it, but I'm
3    just going to ask you generally about it.
4              It appears that, if my calculations are
5    correct, you spent about 160 hours or so on this project.
6    Does that sound right?
7         A.    That sounds right.
8         Q.    Okay.  And -- well, I'll let you just tell
9    me what some of those things consisted of, and you can use
10   the document to refresh your recollection.
11        A.    Okay.
12        Q.    What did you do to prepare to draft the
13   report in this matter?
14        A.    Well, you know, the first thing I had to
15   do was get an overview of -- or meet Jordan, so there was
16   some time we had to meet.  And then I did quite a bit of
17   review of the medical literature.  Some was supplied by
18   Ethicon, a lot of it was on my own.  I went back and
19   reviewed the company documents, did a lot of thinking, a
20   lot of pondering, did a lot of -- went back and looked at
21   some of the previous depositions, experts and plaintiffs on
22   both sides.  Wrote the general report.
23        Q.    Okay.  I know that's a lot.  That's a very
24   broad question.
25              How much time did you spend, would you

Page 12

1    estimate, doing your own research?
2         A.    At least 30 hours.
3         Q.    What type of research did you do?  What
4    type of search did you perform?
5         A.    Well, PubMed searches, of course.  You
6    know, I had some of my own, you know, old journals,
7    reviewed those.  Some of the stuff from textbooks, chapters
8    that had been written in the past.  So just a
9    conglomeration of a lot of things.  The majority of it was
10   probably PubMed, you know, on-line research.
11        Q.    How much time would you estimate that you
12   spent reviewing materials that were provided to you by
13   Ethicon?
14        A.    I'm going to say probably the same amount,
15   if not more.  Maybe 40 hours, probably.
16        Q.    And in reviewing the materials that were
17   supplied to you from Ethicon, did you look at every
18   document that was supplied to you?
19        A.    I made a good effort.  I mean, you can ask
20   my wife; I wasn't around a whole lot.  I mean, I spent a
21   lot of time reviewing everything I could.  Could I remember
22   everything?  Probably not right now, but I tried.
23        Q.    But you think you've at least put your
24   hands on everything that was in your reliance list?
25        A.    Some form or another.  There may be areas

Page 13

1    I may not have been able to get all of, because that was a
2    large amount.  There was a lot of volume of this.  I may
3    not have seen every little bit of everything, but the
4    majority of it I did.
5         Q.    So each one of the -- if you want to take
6    a look at the first reliance list.  Can you tell me if you
7    know the difference between what was in the first reliance
8    list that is different to what was added -- or I got that
9    backwards.
10             Can you tell me what was added to the
11   supplemental reliance list that is different to what was
12   originally submitted in the --
13        A.    Yeah, I think those would be the things
14   that I've -- some of the on-line things that I did that I
15   needed the full articles pulled on.  Some extra -- you
16   know, as new studies come out, getting the new studies,
17   those type of things.
18        Q.    And did you compile the reliance list
19   yourself?
20        A.    No, I didn't type this up.
21        Q.    And did you have any -- did you offer any
22   assistance with the supplemental list?
23        A.    Yes.  I didn't type it up, but, again, I
24   did want to make sure I had everything in there.
25        Q.    And I think you've mentioned that you read

Brian D. Parker, M.D

Page 14

1 some depositions and maybe you said -- maybe I may be
2 misstating, but did you also review the expert reports in
3 this case by other experts?
4     A.    Yes.
5     Q.    Do you recall which expert reports you
6 read?
7     A.    I remember Rosenzweig I think. Is that
8 one of the guys? That sounds familiar. Sepulveda maybe.
9 Honestly, I can't remember the names of the others. I'm
10 sorry.
11    Q.    That's okay. Did you rely in any way on
12 the information you read in these reports?
13    A.    Did I rely on it?
14    Q.    Yes, sir, or any of them. Were there any
15 reports that you read that you relied on in drafting your
16 own report?
17    A.    Well, I relied on everything I read, and
18 that was part of it. And it helps in a way that -- you
19 know, you want to take an objective view of this as best
20 you can, and so one way you can do that is by seeing both
21 sides of the story. And so, yes, it's all part of my
22 mental formulation of things.
23    Q.    Let's jump over to your background with
24 the sling usage, and you've already told me that you
25 learned about the TVT product when you were in residency --

Page 15

1     A.    Yes, ma'am.
2     Q.    -- back in approximately 2005, did you
3 say? 2002?
4     A.    2002. Yeah, that would be about right.
5     Q.    Did you begin immediately implanting
6 devices after your initial training?
7     A.    Yes.
8     Q.    Did you continue to use the TVT device as
9 your primary device that you implanted?
10    A.    No. TVT obturator.
11    Q.    And so if I understand, you were trained
12 on the TVT-R. Were you at some point also trained on the
13 TVT-O?
14    A.    Yes.
15    Q.    And when was that approximately?
16    A.    2004, 2005.
17    Q.    And after being trained on both of the
18 products, you chose to continue to implant the TVT-O; is
19 that correct?
20    A.    Yes, ma'am.
21    Q.    And what were your reasons for wanting to
22 use the O versus the retropubic?
23    A.    I feel like it was -- I was getting good
24 results. I felt like it was something that was pretty
25 straightforward as far as placement of it. I wasn't seeing

Page 16

1 a lot of problems with it. And I felt like that I could
2 have less -- I feel like by doing the TVT-O I could really
3 treat most of my patients satisfactorily with that.
4     Q.    How many TVT retropubic devices would you
5 estimate that you've implanted in your --
6     A.    Retropubic?
7     Q.    Yes.
8     A.    Less than 20.
9     Q.    And maybe -- I think it is in your report,
10 but can you tell me approximately how many TVT-O devices
11 you've implanted?
12    A.    Around 200, I would suspect.
13    Q.    Other than the TVT-R and the TVT-O, were
14 you trained on any other devices?
15    A.    Yes. Monarc, SPARC. I can't remember all
16 the names of them, but through residency, as far as, you
17 know, devices, we did pubovaginal slings, Burches, the
18 whole gamut of things, but I can't remember all the names
19 of them. They all had specific names, but I can't remember
20 all the names of all the different products. But the guys
21 I trained with were very open -- because that was kind of
22 the beginning of all these slings, is they really wanted to
23 see the difference in the different material, the different
24 slings, the different placement. So, yeah, I got a good
25 experience in residency with those.

Page 17

1     Q.    After you learned to use each of these
2 other devices you mentioned, did you also use any of those
3 devices in your procedures treating your patients?
4     A.    I'm sorry. Say that again.
5     Q.    I want to find out if you ever implanted
6 any of these other devices into patients you were treating.
7     A.    Out of residency? Like in practice or in
8 residency?
9     Q.    Just in general. At this point I'm just
10 wanting to see how many different devices that you've
11 implanted in --
12    A.    Honestly, I don't know that I can give you
13 a number because there was just a small sample size of each
14 one, and so I don't really know. The majority of what we
15 did, after a period of time, was either retropubic or TVT-O
16 in residency.
17    Q.    Is it fair to say that of those other
18 devices, you learned enough to decide whether or not you
19 wanted to use them and went with something that you were
20 more comfortable with?
21    A.    Yeah. I mean, for better or worse, I
22 mean, that's -- you have to make a decision, right?
23    Q.    Right.
24    A.    And so that was the one that I felt the
25 most comfortable with.

Brian D. Parker, M.D

Page 18

1    Q.    Do you recall any of the other qualities
2  of those devices that may or may not have been as appealing
3  to you as a surgeon performing these procedures?
4        MR. WALKER:  Object to form.
5    A.    I mean, the only one that I felt -- no,
6  there was nothing uncomfortable.  There was nothing really,
7  like I say, that didn't jibe with my skill set.  It was
8  really just needing to pick something I felt comfortable
9  with, had some durability, had some long-term results,
10 there were some studies on.  And so that's what eventually
11 led to my decision to continue to pursue that.
12   Q.    Do you still continue to implant the TVT-O
13 device today in your practice?
14   A.    No.
15   Q.    What device do you implant today?
16   A.    Altis slings.
17   Q.    I'm sorry?
18   A.    Altis by Coloplast.
19   Q.    Do you recall when you switched to the
20 Altis device?
21   A.    After Secur got off the market.
22   Q.    Approximately when did you begin
23 implanting the TVT-Secur device?
24   A.    When it came on the market.  Well, let's
25 see.  It was going to be probably around 2007 when I

Page 19

1  started implanting that.
2    Q.    And when you were trained on the Secur
3  device, were you trained in your residency or was this
4  something --
5    A.    It wasn't done in residency.  It was
6  trained by a proctor.
7    Q.    So someone with Ethicon?
8    A.    Yes.
9    Q.    Do you recall who your proctor was?
10   A.    Yes.
11   Q.    Who was your proctor?
12   A.    Dr. Christopher Ramsey.
13   Q.    How long did you train on the TVT device
14 before you began implanting?
15       MR. WALKER:  Object to form.  Which TVT
16 device?
17 BY MS. BAGGETT:
18   Q.    Other than Secur.  I'm sorry.
19   A.    How long did I train?  I don't recall
20 exactly.  I do remember there was kind of a step-wise
21 approach I went through.  I mean, I observed him putting in
22 some, watched a video, read material, was then proctored
23 on, I would say, somewhere around five cases of my own
24 until the proctor felt like I had the technique down.
25       And when you implant a mesh device, how

Page 20

1  long do you generally follow up with your patients?
2    A.    Usually see them at six weeks and then the
3  majority of them I see in six months, a year, oftentimes,
4  you know, many years afterwards.  It seems to me that if
5  the patient is doing well, they'll miss their appointments,
6  but we try to get them back in to see how they are doing.
7    Q.    What's the longest you've followed a
8  patient that you've implanted a sling device in?
9    A.    What's the longest?
10   Q.    Yes.
11   A.    Oh, I had a patient the other day I
12 implanted in 2005, right when I got in residency.  So it's
13 been however many years now, 12 years.
14   Q.    Are you still treating her for her sling?
15   A.    No, I'm not treating her for that.  The
16 reason I saw her specifically was because she also has
17 kidney stones.
18   Q.    Is it also the situation that some
19 patients switch doctors after their initial implant
20 procedures?  Is that something that happens frequently in
21 this?
22       MR. WALKER:  Object to form.
23   A.    It may.  You know, I'm sure that happens
24 for a lot of different reasons, moves or whatever.  It may.
25 I'm not aware of how many or how often it happens, but I

Page 21

1  know I see other -- you know, some other colleagues'
2  patients later, for whatever reason, so I'm sure it
3  happens.
4    Q.    And that was my next question.  Do you
5  treat complications that arise with patients that were
6  implanted by other doctors?
7        MR. WALKER:  Object to form.
8    A.    Well, here's how I would answer that
9  really more specifically.  The way that my practice is now
10 is I'm kind of known within the community to help with more
11 complicated incontinence issues, neurogenic type of bladder
12 problems, incontinence of different types.  So I see a wide
13 variety of patients for all different reasons of
14 incontinence.  It may not necessarily be stress.  It could
15 be urge incontinence.
16       Unique to Knoxville, though, I will say
17 is -- well, is that the gynecologists tend to not do any of
18 the sling procedures.  They end up sending them to the
19 urologist.  And so that's kind of a unique setup that we
20 have here.
21   Q.    So do you treat mesh-related complications
22 in your practice today?
23       MR. WALKER:  Object to form.
24   A.    If a patient has had a sling placed and
25 they feel like they are having some issues with their bowel

Brian D. Parker, M.D

Page 22

1  or bladder or incontinence, whatever, then I'll see them,
2  just like I would see any patient.
3      Q.   Do you ever refer them to another doctor
4  to treat their complications related to mesh products?
5      MR. WALKER:  Object to form.
6      A.   You're assuming I'm having a lot of
7  complications here.
8      Q.   I'm saying if someone comes into your
9  office that was implanted by another doctor, would you
10  refer them on or would you treat them?
11     A.   That's a good question.  I mean,
12  complications arise for -- well, you know, problems with
13  any surgery, whether it be incontinence surgery, whether it
14  be Interstim, whatever.
15         If I'm getting to a point where I feel
16  like we're not making progress, then I'm not going to beat
17  my head against the wall and I'm going to try to get
18  another set of eyes to then see this patient.  So the
19  bottom line is, if we're not making progress with the
20  patient, I want the patient to get better.  So whatever
21  that takes to get better, you know, we'll make that happen.
22  It doesn't happen very often.  And in all honesty, I just
23  don't see a lot of my patients back that are having
24  problems after putting these in.
25     Q.   Have you, on any occasion, treated a

Page 23

1  patient that you have implanted one of these sling devices
2  in -- let me start that over.
3         It you can tell me, how many patients that
4  you've implanted a sling in have come back to you with
5  problems that you treated them for?
6      MR. WALKER:  Object to form.
7      A.   What kind of problems are you describing?
8      Q.   Anything that potentially might be related
9  or that they believe might be related to their sling.
10     A.   Well, I've seen patients after -- can you
11  rephrase your question?
12     Q.   Sure.
13     A.   I guess what I'm having a hard time with
14  is you're implying that it's an issue with the mesh, and I
15  really don't feel like it's the mesh itself that's the
16  issue a lot of times.  But every time you do surgery on a
17  patient, whether it be with a sling or, like I said,
18  Interstim, or any other reason that the patient may have
19  some problems with their surgery, I see them back to help
20  them get through their issues.
21         So as far as the mesh itself, I don't know
22  if I can answer that, but I would say after, you know,
23  pelvic surgery and it's something that they feel like is
24  going on, I mean, I don't know, a handful of times.
25     Q.   What type of complaints have you seen or

Page 24

1  treated with regards to your patients following their
2  implant surgeries?
3      A.   Well, I mean, after -- sometimes some of
4  the incontinence returns.  You know, of course, there's the
5  rate of urge incontinence that occurs in some of these
6  patients.  I've had probably just a handful of patients who
7  have had an extrusion.  I'm trying to think of any others.
8  I've had a few patients with a TVT-O that initially
9  complained of some groin pain and then that eventually
10  resolved.
11     Q.   By "resolved," you're basing that on the
12  fact that they didn't come back in for follow-up treatment?
13     A.   No.  No.  Those patients, if they were
14  having some discomfort initially, I made sure to get them
15  back regularly.  And I can honestly remember only just a
16  handful of patients who had that, and made sure all of them
17  resolved.  So I can't remember only one case where I felt
18  like there was a long-term problem.
19     Q.   How many patients that were originally
20  implanted by another physician have you seen and attempted
21  to treat?
22     MR. WALKER:  Object to form.
23     A.   That's hard for me to -- I don't know.  I
24  would say -- I don't know that I can give you a specific
25  number.  Gosh, I don't know.

Page 25

1      Q.   Is it greater than ten?
2      A.   Yeah, it's probably around 10 to 15,
3  somewhere around there.
4      Q.   What type of complications, if you can
5  recall, have you seen that have been --
6      A.   Usually what I get --
7      MR. WALKER:  You've got to let her finish
8      the question.
9      THE WITNESS:  I'm sorry.
10     MS. BAGGETT:  It's hard for all of us to
11     do because it's like we want to have a
12     conversation.
13  BY MS. BAGGETT:
14     Q.   So my question is how many -- or what
15  types of complications have you seen in patients that were
16  originally implanted by another doctor and treated them
17  for?
18     MR. WALKER:  Object to form.
19     A.   Okay.  So you're asking me how many --
20  what type of problems these patients have had?
21     Q.   Yes, sir.
22     A.   Okay.  Well, like I was saying before, the
23  majority of my practice is incontinence work.  And so if
24  another doctor has implanted them and they've had
25  recurrence of their incontinence, that's usually what I'll

Brian D. Parker, M.D

Page 26

1 see the referral for, and then trying to determine if it's
2 a recurrence of the stress incontinence or if it's an issue
3 with urge incontinence.  So that's a lot of what I do.
4        Q.    Have you ever treated anything more
5 serious than just a recurrence that occurred with a patient
6 that you did not implant?
7              MR. WALKER:  Object to form.
8        A.    Yes.
9        Q.    What type of problems?
10       A.    She had -- one patient, and I don't recall
11 the -- I do not recall the actual device that was
12 implanted, but I do remember one patient having a small
13 extrusion.
14       Q.    And do you keep track of all of the cases
15 you do somewhere in your practice?  The products that you
16 implant, is there some system that you maintain that keeps
17 track of the implant devices you implanted?
18       A.    No, ma'am.
19       Q.    So the same would be true for any
20 conditions that you treat as a result of having had that
21 implant implanted?  You don't keep track of that either.
22 That's what I'm trying to find out.
23       A.    I'm not following your question.  I'm
24 sorry.
25       Q.    Do you also track any of the adverse

Page 27

1 events that you may have treated?
2        A.    Well, I'm not in an academic setting so I
3 really don't have a need -- or it's not the need, but I
4 don't have -- I'm not doing studies on my patients, so I
5 don't have a registry.
6        Q.    That was going to be my next question
7 actually.  Have you been involved with any studies or
8 registries with regards to the sling?
9        A.    No.
10       Q.    Doctor, do you also implant POP devices?
11       A.    No.
12       Q.    Doctor, are you familiar with the
13 difference between mechanically-cut versus laser-cut
14 meshes?
15       A.    I am.
16       Q.    Tell me what your understanding is of the
17 difference between those two devices.
18       A.    Well, one is actually physically cut with
19 some type of shears or some type of device, and the other
20 one is cut on the side with a laser to give you the device
21 shape.  I don't know anything more than that, though, how
22 they do it.
23       Q.    And have you implanted both types of mesh?
24       A.    I assume I have.  I know I have.  I know I
25 have because TVT-Secur is laser cut and the TVT-O is, for

Page 28

1 the most part, mechanically cut.
2        Q.    Do you recognize any differences between
3 the meshes, the two types of meshes, when you look at them
4 or feel them?
5        A.    I don't notice any differences when I feel
6 them.  The only difference you can see is when the laser
7 has come across the edge, there may be more of a
8 heat-sealed type of look on the side of it.  But there's
9 no -- other than that, they feel the same, they look the
10 same, yeah.  It's not something in residency or in training
11 that has been brought up.  But, yeah, I know now.
12       Q.    Are you familiar with the differences in
13 the type of adverse reactions that are associated between
14 the two types of devices?
15             MR. WALKER:  Object to form.
16       A.    No.  Honestly, I haven't seen anything
17 like that in the literature.  It appears to me that the
18 adverse events are about the same.
19       Q.    Have you ever witnessed in your practice
20 with the meshes that you have implanted that were
21 mechanically cut -- have you ever witnessed any particle
22 loss on those products before you implanted them?
23       A.    Not that I'm aware of.
24       Q.    Were you aware that the mechanically-cut
25 meshes could lose particles or fray?

Page 29

1        A.    I'm aware of that.
2              MR. WALKER:  Object to form.
3        Q.    And did that have any bearing on the types
4 of products that you continued to use or chose to use?
5        A.    No.  What I would say to that is, you
6 know, I base my decisions on the literature and outcomes
7 and adverse events, and there's really nothing that would
8 suggest that particle loss is an issue.
9        Q.    Do you know if the particle loss has been
10 studied in any of the literature that you have reviewed?
11       A.    I'm not aware of any literature looking at
12 specifically the particle loss in the patients.
13       Q.    Have you done any research to see if there
14 have been any studies regarding particle loss in the mesh
15 that's used?
16       A.    I haven't done a PubMed research for
17 particle loss for slings, but I've read thousands of
18 articles, and not one has ever discussed particle loss.  So
19 that in itself is a new concept.
20       Q.    Have you also in preparing for your
21 deposition today had the opportunity to review any Ethicon
22 internal documents?
23       A.    I have.
24       Q.    Have you read any documents through that
25 review that discuss particle loss in any way?

Brian D. Parker, M.D

Page 30

1     A.    Yes.
2     Q.    What types of information was contained in
3  the documents that you reviewed with regard to particle
4  loss?
5     A.    The only article -- or the only documents
6  I remember seeing was based on internal documents in
7  Ethicon; communications from one engineer to the next, or I
8  don't know.  I can't keep their titles straight, but I
9  don't know if it was marketing, advertising.  I know there
10 was an engineer involved.
11    Q.    Do you know whether or not there were any
12 discussions in the documents that you read with regard to
13 performing a study on the effect of this particle loss in
14 the patients?
15    A.    I don't recall that.
16    Q.    Do you know if the documents that you read
17 suggested that there may be a need to study this phenomenon
18 in order to protect the safety of the patients that were
19 implanted with the device?
20          MR. WALKER:  Object to form.
21    A.    I'm sorry.  Repeat that.
22          MS. BAGGETT:  Can you read that back?
23          (Thereupon the question was read back by
24    the court reporter.)
25          THE WITNESS:  That question is supposing

Page 31

1     that there's a problem with particle loss causing
2     safety, and I disagree with that.  But to answer
3     the other part of your question is I think there
4     were some general discussions about it, but I
5     don't recall specifically trying to get a study
6     involved, and I don't know that there's really a
7     good need to have a study involved for that.
8      Clinically, there's really no -- you know,
9     clinically, this idea about particle loss is a
10    moot point.  There's no -- prolene mesh is inert,
11    for the most part.  And any little suture bits
12    that have been cut in the past, you know, those
13    happen to have -- those happen all the time.  When
14    you cut the suture, you're going to have some
15    particle loss.  And those particle losses have
16    never been documented or shown in any studies to
17    be of any consequence clinically.
18 BY MS. BAGGETT:
19    Q.    And you had mentioned just in your
20 response something about polypropylene being inert.  What
21 do you base that on?
22    A.    Well, reviewing some of the records, I do
23 recall some conversations back and forth about the
24 properties of the mesh, and one of them -- well, that was
25 tossed back and forth in some of these documents, but more

Page 32

1  specifically, in the guidelines from the different
2  professional societies, there's -- I believe there's
3  discussion about being an inert mesh.
4     Q.    Did you also review internal Ethicon
5  documents that discussed the fact that the prolene mesh
6  does suffer some form of degradation and may not be inert?
7          MR. WALKER:  Object to form.
8     A.    What I saw and what I remember reading --
9  and, again, I don't have the specific name and information,
10 but what I remember is that there was some controversy
11 about that and it was felt to be -- the comment that you
12 just made was then subsequently found to be not accurate.
13    Q.    I'm not going to mark this because I
14 didn't bring copies, but I'm going to show you a document
15 and you can look at it as well.  It's a document labeled
16 ETH.MESH 12831407.  And this is a document that was
17 provided to us by Ethicon in discovery of this case with
18 regards to prolene explant study meeting minutes that took
19 place October 8 of 1987.  If you want to read over that for
20 a second.
21    A.    1987?
22    Q.    Yes.
23          MR. WALKER:  Let me know when you're ready
24    for the question.
25          MS. BAGGETT:  And if you'll let me see it

Page 33

1     when you're done.  I'm not going to ask you to
2     remember anything you read on it, but just in
3     general ask you some questions when you're done.
4          THE WITNESS:  Here you go.
5  BY MS. BAGGETT:
6     Q.    And after reviewing that document, would
7  it appear to you that Ethicon was aware, at least as early
8  as 1987, of the potential for their prolene sutures
9  material to degrade?
10         MR. WALKER:  Object to form.
11    A.    The way I'll answer that is prolene has
12 been around for 50 years, has been used in multiple
13 different settings, transplant surgery, cardiovascular
14 surgery, and it continues to be used.  It's still on the
15 market.  And so whether there's some findings of changes in
16 the mesh or not or on the prolene suture or not, you know,
17 clinically, it really has no -- there's really nothing that
18 I can -- from a clinical standpoint, there's no adverse
19 events that we've been able to determine.
20    Q.    When you were being trained on devices
21 manufactured by Ethicon, you understood that those devices
22 all contained the same type of polypropylene; the TVT, the
23 TVT obturator and TVT-S devices all contained the same type
24 of mesh, which was the prolene mesh, correct?
25    A.    Yes.

Brian D. Parker, M.D

Page 34

1    Q.    And you knew that those were made from the
2   same material that the sutures were made from.  Is that
3   accurate?
4    A.    Yes.
5    Q.    And were you aware back at that time of
6   the potential for the sutures to become degraded?
7        MR. WALKER:  Object to form.
8    A.    I disagree with that.  I would have to
9   think that something that would be used as a suture for
10  vessels would have to be proven to be non-degradable.  And
11  so based on that and the fact that I've seen the mesh after
12  it's been removed and there's no visible change in the
13  mesh, I really can't agree with the initial premise of your
14  question.
15   Q.    I think my question was just simply did
16  you know that the polypropylene had a tendency to degrade
17  after implantation back when you were being trained on the
18  devices.
19       MR. WALKER:  Object to form.
20   A.    Well, are you basing it on that one
21  article?
22   Q.    Well, I'm just asking --
23   A.    Because from a clinical standpoint, we
24  would assume all surgeons are trained to look at prolene
25  suture as a non-degradable suture.  So that is the premise

Page 35

1   that I came into this with and continue to use, not that --
2   well, I'll just stop with that.
3    Q.    When was the first time you had heard of
4   the potential of degradation with regard to polypropylene?
5    A.    Not until late last year.
6    Q.    When you began preparing for your report?
7    A.    Yes, ma'am.
8    Q.    I'm going to show you a document that's
9   marked ETH.MESH.00004755, and I'll represent to you that
10  this was another document that was produced in the
11  discovery of this case.  And this document is also dated in
12  1988, and it just has some notes with regard to some
13  explants, and I just want you to look at it and then I'll
14  briefly ask you a question.
15   A.    Okay.  You can ask me.
16   Q.    Sure.  What does this appear to be to you?
17   A.    These are -- these are explants of
18  something and it describes whether there's cracking or not
19  cracking.  I don't -- these are explanted something or
20  other.  I don't know exactly what these are.
21       Do you know what those are?
22   Q.    Well, I don't want to misrepresent
23  anything on the record, but my understanding was
24  polypropylene material that had been explanted.
25       The next document I'm going to hand you is

Page 36

1   ETH.MESH.05447475, and this is an e-mail discussion with
2   regards to, "Subject Line:  How inert is polypropylene?"
3   And take a second to...
4        MR. WALKER:  You don't want to mark these
5    as exhibits?
6        MS. BAGGETT:  No, only because I didn't
7    bring enough.  I intended to get them copied, but
8    I didn't.  I ran out of time.
9        If I can see that back when you're done.
10   Thank you.
11  BY MS. BAGGETT:
12   Q.    And this document, as I said, was dated in
13  2007, so would you agree that at least as of 2007, Ethicon
14  was still discussing the fact that there were changes in
15  the surface of the mesh fibers and a question of -- that
16  had been raised with regards to the inertness of the
17  polypropylene?
18       MR. WALKER:  Object to form.
19   A.    I don't see anything in there about
20  inertness.  I think they are talking about tensile strength
21  and ways to help prevent suture breakage.
22   Q.    I'm going to hand you one more document on
23  this subject.  It's ETH.MESH.05447481, and it's dated
24  July 6, 2007.  It's also an e-mail chain.
25   A.    Okay.

Page 37

1    Q.    And my question is, continuing into 2007,
2   they were still discussing the degradation of the
3   polypropylene, and at this point they are actually
4   discussing a new polymer that they may consider in future
5   applications that doesn't have that same propensity.  Did
6   you read --
7    A.    Can I see that one more time?
8    Q.    Sure.
9    A.    Thank you.
10       MR. WALKER:  Object to form.
11   Q.    Could you just tell me what the product is
12  they are referencing in this document that you're reading?
13   A.    Which product are you talking about?
14   Q.    Well, I mean --
15   A.    The new product or the older product?
16   Q.    The new product that they are referencing
17  potential --
18   A.    They're describing something called a
19  Pronova suture.
20   Q.    By reading the document, does it sound
21  like it suffers from the same potential to degrade as the
22  original prolene suture?
23       MR. WALKER:  Object to form.
24   A.    Ma'am, I can't say much about it other
25  than this e-mail, the way this e-mail describes it.

Brian D. Parker, M.D

Page 38

1 There's no data on it.  It's just a discussion between two
2 colleagues.
3      Q.     But in the discussion that you read, does
4 it discuss the characteristics of this new product and do
5 they different from the prolene suture?
6           MR. WALKER:  Object to form.
7      A.     Yes.
8      Q.     You also mentioned earlier that some of
9 the information where you learned about the inert qualities
10 of polypropylene were through some of the societies that
11 are involved in treatment of stress urinary incontinence
12 and other urological disorders.
13           Is that what I understood you to say?
14      A.     Well, yeah.  I mean, I guess my point of
15 saying that is that a large group to -- a large group of
16 physicians to get together and discuss things and to come
17 out with a consensus statement would have to include all
18 these factors.  And if they felt that a product wasn't safe
19 or reliable -- and inertness being part of that, I suppose,
20 although from a clinical standpoint, it's really not
21 something we consider and it really has not been shown in
22 any studies to show any value.  But if those large group
23 societies endorse the product, us as physicians would have
24 to use that as our beacon to know that that's a safe and
25 effective product that's endorsed by many physicians at the

Page 39

1 academic level that look at all these things.
2      Q.     So is it fair to say that you as a
3 physician rely heavily on the information provided to you
4 through these societies?
5      A.     I think that it's, you know, part of our
6 decision-making process, and it certainly helps when one of
7 these large groups is either advocating or in some
8 situations they may not advocate a certain way of doing
9 things.  And to listen to that I think is part of our duty
10 as urologists, to listen to the American Urological
11 Association guidelines.
12      Q.     Are you aware of the fact that some of the
13 members of these societies are also employees of the device
14 manufacturers?
15           MR. WALKER:  Object to form.
16      A.     I have no way of knowing that, ma'am.
17      Q.     Would that --
18      A.     Does it surprise -- I'm sorry.  I
19 interrupted you.
20      Q.     No, I didn't let you finish.  Go ahead.
21      A.     I would assume that these physicians are
22 probably consultants of many, many different companies.
23 And so it wouldn't surprise me at all if they were
24 consultants for Johnson & Johnson or Ethicon.
25      Q.     Would that have any bearing on your

Page 40

1 reliance on the materials or the information that you are
2 provided from these societies?
3      A.     No.  No, because for every physician that
4 may be -- you know, there's a counterbalance there and
5 these are not made by -- these guidelines aren't made by
6 one individual.  They're made by a group.  And so it's a
7 consensus statement.  It's not an individual statement.
8      Q.     Would you agree that if a device
9 manufacturer were to try to affect the information that was
10 being presented through these societies in some way that
11 was misleading, that that would be unethical?
12           MR. WALKER:  Object to form.
13      A.     Can you break down that question, because
14 it seems like there's two parts to it?
15      Q.     Sure.  Would you agree that it would be
16 unethical for a company, a device manufacturing company, to
17 use their influence a society to misrepresent
18 information about their product to the medical community
19 and the public at large?
20           MR. WALKER:  Object to form.
21      A.     Ma'am, that seems to me a little bit
22 insulting to physicians to think that we would let a device
23 company make decisions for us.  And I'm not trying to be
24 ugly about it, but to me that would -- you know, as a
25 physician, you know, we're not beholden to any company.

Page 41

1 And so, honestly, that's not part of my thought process.
2 So I can't really answer that question the way you have it
3 stated.
4      Q.     I want to show you what's marked as
5 ETH.MESH.10216874, and this is an e-mail chain dated
6 August 2000, and it's with regards -- the subject line is
7 AUGS Lecture/Content of Discussion, and I want to ask if
8 you would just look at this for a second.
9      A.     Okay.
10      Q.     After reviewing this document, Doctor,
11 does it appear that, at least based on what you read in
12 this memo, that Ethicon has had conversations or meetings
13 that were centered around having doctors represent -- let
14 me start that over.  That's getting too long.
15           What was your impression from reading this
16 memo?
17      A.     I need to look at one more thing before I
18 can answer that question.
19           What's my impression from reading that
20 memo?
21      Q.     Yes, sir.
22      A.     It sounds like a typical marketing person
23 and any company trying to be encouraging of their product.
24      Q.     Do you agreed that in marketing that a
25 company is ethically bound to present truthful and complete

Brian D. Parker, M.D

Page 42

1 information when they are discussing the products that they
2 are selling?
3          MR. WALKER:  Object to form.
4 BY MS. BAGGETT:
5     Q.     Let me put it this way.  Have you ever
6 heard of a term called "fair and balanced"?
7     A.     Yes.
8     Q.     And do you agree that information that is
9 provided by a company with regards to the products that
10 they sell should contain fair and balanced information on
11 both the risks and the benefits of that product?
12          MR. WALKER:  Object to form.
13     A.     To some extent.  I mean, I wouldn't
14 expect -- let me give you an example.  I wouldn't expect a
15 marketing person or a salesman for a company that sells
16 me -- or wants to provide samples for, let's just say an
17 overactive bladder drug, to give me all the benefits of
18 their competitor, right?  So from a physician standpoint, I
19 know where this is coming from, I know everybody's -- but
20 in reality what happens is I take that information and then
21 I compile it with all the other information that's out
22 there to come to our decision.
23          So does it surprise me?  No, not really.
24 That's their job as a marketing person.  But does it
25 influence the physicians?  Not me.  It shouldn't.  I mean,

Page 43

1 we're not relying on their information to make decisions.
2 We're relying on the clinical data that's out there.
3     Q.     And do you -- with every study that you
4 come across in your field, your area of expertise, do you
5 not only read the study, but do you try to look at the
6 underlying data that's involved with that study to
7 determine whether or not you feel it's an adequate study?
8          MR. WALKER:  Object to form.
9     A.     Are you asking me if I always do?
10     Q.     Yes, sir.
11     A.     I try to.  I don't know that I always do.
12 But it's part of the whole -- you know, as a physician,
13 that's part of the whole process.  I mean, we don't live in
14 a vacuum.  So the research that we did in residency, all
15 the studies that we did beforehand, all the books that we
16 read, I mean all that stuff gets assimilated and then this
17 is part of that assimilation, right?
18          MR. WALKER:  Renee, when you hit a
19          stopping point, could we take five minutes?
20          MS. BAGGETT:  Sure.  Let's go ahead and do
21 that now.
22          (Thereupon a break was taken 9:33 a.m. to
23 9:37 a.m.)
24 BY MS. BAGGETT:
25     Q.     Doctor, before we took a break, we were

Page 44

1 talking about societies, such as AUGS.  And what are some
2 other societies that you're familiar with with regards to
3 this field of practice?
4     A.     Well, American Urologic Association,
5 Society for Urodynamics in Female -- I don't remember the
6 acronym.  SUFU or -- let me look through here.  There's one
7 for the American -- what is it -- Urogynecologists Society.
8 I'm not very good with acronyms.  I'm sorry.
9     Q.     Me neither.  That's all right.  That's
10 plenty.
11          SUFU is one you mentioned, and are you
12 familiar with the position statement that was jointly put
13 out between AUGS and SUFU?
14     A.     I remember reading it, but can you give me
15 a second to review it?
16     Q.     Well, if you want to, in a second you can.
17 I want to show you some different documents, and this may
18 remind you what it's about.  But if you need to, you can
19 certainly take time before you answer any questions.
20          I'm going to hand you what's been marked
21 as MIL00282, and this is an AUGS/SUFU MUS task force
22 agenda.  And this, I'll represent to you, was provided to
23 us in the production of documents obtained in this
24 litigation.  You don't have to necessarily focus on the
25 highlighting.  That was for me.

Page 45

1     A.     Okay.
2     Q.     And I'm going to hand you now what was
3 marked as MIL00268.
4          MR. WALKER:  Rebecca, this is a seven-page
5 document?
6          MS. BAGGETT:  Yes, I believe it is.
7 BY MS. BAGGETT:
8     Q.     Did you have a chance to look at it the
9 way --
10     A.     Well, I mean, I can sit here and spend
11 some time reading these things, if you want me to.
12     Q.     That's not my purpose.  I wanted --
13     A.     Was I --
14          MR. WALKER:  Just wait for the question.
15     Q.     Do you have an opinion of -- or do you
16 understand what the documents were that I gave to you?
17     A.     I didn't have time enough to look at the
18 second document.
19     Q.     That's fine.
20     A.     The first document was some meeting agenda
21 notes.
22     Q.     And it was with regards to the position
23 statement?
24     A.     Yes.
25     Q.     And the second document I handed you --

Brian D. Parker, M.D

Page 46

1 and I'll let you look at it again if you want to -- it
2 appears to be a draft of that position statement with some
3 comments in the margin with regards to editing notes.
4 Would you agree with that?
5      MR. WALKER: Object to form.
6      A.    I agree. Did I have this beforehand?
7      Q.    I doubt it. And I'm not going to ask you
8 about the content. But as least as far as the two
9 documents that I just handed you, does it appear that there
10 was some input by Ethicon with regards to the drafting of
11 that position statement?
12      MR. WALKER: Object to form.
13      A.    Ma'am, I can't make heads or tails of this
14 in the short amount of time that you've given this to me,
15 so I really can't comment.
16      Q.    Sure. But as far as what this appears to
17 be on its surface, what does this appear to you to be?
18      A.    I don't know, because I don't know who
19 wrote this. I don't know who's making the comments. I
20 mean, I don't -- I haven't had enough time to really dig my
21 teeth into it.
22      Q.    That's all right. I'm not going to ask
23 you to criticize it. My question then, based on your
24 review of these materials, would it bother you to know that
25 a device manufacturer was having input over the position

Page 47

1 statements or the guidelines that were being circulated to
2 physicians in the community about the devices that they
3 were selling?
4      MR. WALKER: Object to form.
5      A.    No, it would not bother me, and I'll
6 explain why. Because when a physician is doing a procedure
7 with a certain device and that device is getting good
8 results and they feel like it's an adequate treatment, for
9 them to feel like there's an issue with it. A lot of times
10 there just needs to be more information. There needs to be
11 support from the other physicians who you trained with, who
12 your colleagues are. So there needs to be some rallying
13 point.
14           Irregardless, just like I mentioned
15 before, it still comes down to the body of work in the
16 medical literature to come up with those guidelines,
17 though. It doesn't bother me at all.
18      Q.    Would it bother you to learn that any
19 information that was being shared with the medical
20 community through these position statements, that the
21 information being shared was being misrepresented or
22 withheld, or if there was important information being
23 withheld?
24      MR. WALKER: Object to form.
25      A.    I feel like I'm not quite catching your

Page 48

1 drift there. Can you explain that again?
2      Q.    Sure. I'm going to hand you what's been
3 marked as ETH.MESH.06828907, and it's another e-mail chain.
4      A.    Okay.
5      Q.    And in this document that I passed to you,
6 that's an e-mail chain discussion between internal
7 employees at Ethicon with regards to a safety aspect of --
8 I lost where the device is that was being discussed. At
9 least with regards to this information, it's discussing one
10 of the adverse events that Ethicon learned of, and the
11 discussion was to not include that information in this
12 submission and spin the safety aspect rather than talk
13 about the complications. Is that your --
14      A.    Do you mind me looking at it?
15      Q.    Sure.
16      MR. WALKER: Object to form.
17      A.    Well, I don't know if this is related to a
18 sling or which sling or if it's related to pelvic organ
19 prolapse. I don't have an idea. So it's really
20 incomplete. So because of that, I don't really have a
21 whole lot of way to answer it, although I will say that
22 internal communications between Ethicon are just that, and
23 still don't -- you can't hide -- you know, their
24 conversations between each other are their own
25 conversations. That has no bearing on the data that's out

Page 49

1 there that's been reported by thousands and thousands of
2 papers. So I think their getting upset about something is
3 their just own worry. It's not necessarily something
4 that's of any clinical concern.
5      Q.    Are you familiar with the MAUDE database
6 within the FDA and the requirement of device manufacturers
7 and other even pharmaceutical manufacturers to report
8 adverse events that they learn of through their work?
9      MR. WALKER: Object to form.
10      A.    I know something about the MAUDE database.
11 I really don't know all the details about the MAUDE
12 database.
13      Q.    But you're at least familiar with the fact
14 that doctors are required to report adverse events that
15 they experience with the products that they use?
16      A.    I don't know that "required" is the right
17 word. I don't know that for a fact. But is that
18 suggesting that any type of complication that I'm having
19 I'm supposed to report back to the MAUDE database?
20      Q.    Well, I'm asking you, are you familiar
21 with the concept that doctors, when they see an adverse
22 event, have an obligation to either report it to the FDA or
23 back to the manufacturer? Are you familiar with that at
24 all? Is that your understanding?
25      A.    I'm not familiar with that.

Brian D. Parker, M.D

Page 50

1    Q.    Are you aware of any studies that are
2  based off of the adverse events that are reported, either
3  or both to the MAUDE database or to the manufacturers?  Are
4  you aware of any studies that use that data as part of
5  their study?
6    A.    Not specifically.  It wouldn't surprise me
7  if there is, but I don't know off the top of my head.
8    Q.    Are you aware of any requirement of the
9  manufacturer to provide the FDA with adverse event
10  information that they obtained from the doctors in the
11  field that are using their products?
12    A.    I don't know that I am or not.  The reason
13  I'm hesitating a little bit is because, as I stated before,
14  I do proctor Interstim cases, which is an implantable
15  device.  And so if there's a problem with a device, then I
16  get some paperwork that I'm supposed to fill out.  But I
17  don't get anything for anything else.  I don't know of any
18  other database or studies or -- I don't remember your exact
19  question, but I don't know that I'm real familiar with
20  that.
21    Q.    Okay.  If a manufacturer, a device
22  manufacturer, is aware of complications that they are
23  seeing in the medical community, do you feel that they have
24  an ethical responsibility to advise the doctors using their
25  products of the rate of incidence that they are seeing

Page 51

1  these problems?
2        MR. WALKER:  Object to form.
3    A.    Well, I suppose, but let me -- to me, that
4  doesn't quite make sense, because I don't know how the
5  device manufacturers are knowing how the patients are doing
6  when they are not the one seeing the patients.  So I would
7  think that more likely that the physicians themselves who
8  are conducting the studies would actually provide that
9  information in all the 2,000 or 3,000 different studies
10  that have been done.
11        So I don't know that the manufacturer has
12  -- I mean, I think that gets out to the manufacturer
13  secondarily through the physicians, but I don't know that
14  they are the ones that are seeing it.  So I think it's
15  already out there of anything going on with any products
16  because they can see that.
17    Q.    In the cases where the doctors are not
18  involved in studies and not gathering data for a particular
19  purpose, simply doctors who have experienced an adverse
20  event with their patients that they bring to the attention
21  of the manufacturer, do you feel that once the manufacturer
22  learns this from the doctor that's in the trenches, but not
23  doing the study, that they have an obligation to report
24  that information and to investigate it to make sure that
25  it's not a red flag of some sort of problem with the

Page 52

1  device?
2        MR. WALKER:  Object to form.
3    A.    That was a long question.  But the answer
4  is, no, I don't think they have to report every adverse
5  event.
6    Q.    Let's go to your report.  We're doing two
7  separate today, so we're going to be talking about TVT-O
8  and TVT-S.  Do you care if I go with one first or the
9  other, because my outline kind of goes by the report.
10        So are you here today to offer any
11  opinions with regard to the TVT device, the retropubic
12  device?
13    A.    No, ma'am.
14    Q.    Because I noticed in your report that you
15  do have sections with regards to the TVT device.
16    A.    Yes, ma'am, and that's as a baseline
17  because that's where it all started.  So to come up to date
18  with things I needed to be as complete as I could, and that
19  had to be part of my report in order to get to where I
20  wanted to get.
21        MR. WALKER:  Yeah, we're only disclosing
22        him as an expert for TVT-O and TVT-Secur.
23    Q.    Okay.  Well, then I won't drill you too
24  hard with the TVT device today other than just the general
25  that needs to be included to understand the materials we're

Page 53

1  going to be going over.
2        The first section I want to talk to you
3  about is you've got a section entitled "Stress Urinary
4  Incontinence," and it's on page 2 of your report.
5    A.    Yes, ma'am.
6    Q.    And you discuss urinary incontinence and a
7  little bit of the background on it, and I just wanted to
8  focus your attention on the last paragraph where it talks
9  about the economic burden.  The very last sentence, "The
10  economic burden of SUI is in the billions."
11        Do you recall where that number came from?
12    A.    No, actually, I don't, but I do remember
13  that was part of one of the things I read, but I
14  couldn't -- well, after I read it I remember thinking about
15  it, and it's been in my head a long period of time.  It
16  wasn't necessarily associated with coming up with this
17  report specifically, but, you know, because of all the work
18  that I do in incontinence, it's something that I came
19  across in the past and it just stuck with me.
20    Q.    Have you also reviewed anything that
21  discusses the economic burden of treating complications
22  with regards to sling devices?
23        MR. WALKER:  Object to form.
24    A.    Have I reviewed that?
25    Q.    Yes, sir.

Brian D. Parker, M.D

Page 54

1  A.   I tried, but there's a lot overlap between
2  stress incontinence.  Some patients have stress
3  incontinence, some patients have urge incontinence, some
4  have both.  So to really pinpoint it for stress
5  incontinence is very, very difficult.
6  Q.   Are you familiar with the -- or are you
7  aware of whether or not Medicare had to come up with a
8  coding system to treat complications with regards to
9  medical sling devices?
10  MR. WALKER:  Object to form.
11  A.   Was I aware that Medicare came up with a
12  coding system?
13  Q.   For billing for services performed to
14  treat complications with mesh devices.
15  A.   Oh, you mean a different CPT code?
16  Q.   Yes.
17  A.   Yes, I think I was aware of that.
18  Q.   And in your research, you did not come
19  across anything with regards to Medicare or Medicaid that
20  suggested what the economic burden has been with regard to
21  the treatment of the adverse events relating to the mesh
22  device?
23  MR. WALKER:  Object to form.
24  A.   Again, going through all this, I tried to
25  find as much information as possible, good and bad, and I

Page 55

1  couldn't find anything specific for that one particular
2  question that you had.
3  Q.   So you don't know the economic burden with
4  regards to the treatment of complications related to mesh
5  devices sitting here today?
6  MR. WALKER:  Object to form.
7  A.   No, not specifically.
8  Q.   On page 3 you talk about the risk factors
9  for developing SUI, and some of them are -- include age,
10  Caucasian or Hispanic race, obesity, smoking, chronic
11  cough, pregnancy and childbirth, nerve injuries to the
12  lower back and pelvic surgery.  Those were ones that you
13  listed, at least here.
14  Are you aware of whether or not those
15  conditions are also contraindications to having the
16  procedure or a sling device or a transvaginal mesh device
17  implanted?
18  A.   You're asking if any of these things
19  listed are a contraindication to having a sling placed?
20  Q.   Yes, sir.
21  A.   Yes.
22  Q.   Which ones?
23  A.   Pregnancy.
24  Q.   Anything else?
25  A.   Not that I'm aware of.

Page 56

1  Q.   And in your practice, based on your
2  experience, should any of these conditions be
3  contraindications -- other than pregnancy and childbirth,
4  should any of these other conditions be contraindications
5  for having a transvaginal mesh device implanted?
6  A.   Well, each individual that comes in my
7  office has their own set of problems.  They're unique,
8  right?  So you have to take all these things into
9  consideration to determine if that's the best way of going
10  about things.
11  I mean, a little lady who is 90 years old
12  who may leak a little bit here and there and wears a pad is
13  maybe completely fine with that.  And another one who's 90
14  may come in and be completely upset about that.  So, you
15  know, you have to factor all that into consideration, their
16  health.  And so are these general contraindications?  Other
17  than pregnancy, those are all things you have to factor,
18  but they are not contraindications.
19  Q.   But they are things that each doctor
20  should consider when deciding and having a conversation
21  with the patient about whether or not to have the device
22  implanted.  Is that fair?
23  MR. WALKER:  Object to form.
24  A.   Rephrase your question again.
25  Q.   Sure.  But this is a conversation that you

Page 57

1  would have individually with your patients in discussing
2  the risks and benefits of having the device implanted.  Is
3  that fair?
4  A.   Well, what this list is, is why do people
5  develop urinary incontinence in the first place, right?
6  Not necessarily would that prevent them from having the
7  surgery afterwards.  I mean, if they are obese, would you
8  like the patient to lose weight?  Yes.  But in all
9  likelihood, is that patient likely going to lose a lot of
10  the weight?  Probably not significantly in a short period
11  of time.
12  So, again, these are things you discuss
13  with the patient before and you tell them, you know, you're
14  at risk for the incontinence because of this and you're
15  also at risk for this recurring possibly afterwards because
16  of these things if you don't change your habits, quit
17  smoking, et cetera.  So those are conversations you have to
18  have with the patients.
19  Q.   I guess that's what I was getting at.  If
20  these are risk factors for the condition of being
21  incontinent in the first place, these risk factors also
22  increase the risk that a patient may develop a recurrence,
23  and does that in any way factor into your recommendation on
24  whether or not to use the device?
25  A.   So, no, it does not, and I'll tell you

Brian D. Parker, M.D

Page 58

1  why. It's because these patients are coming in because
2  they are upset, they are depressed, they are sad. They are
3  having to spend a fortune on pads and they're upset. And
4  so if you say, well, ma'am, you know, you are slightly
5  obese, so, therefore, no surgery, well, that patient is
6  going to keep -- I mean, is going to be upset about all
7  these other things. So they're obese because they can't
8  work out, right? So maybe if you place a sling, now they
9  are able to work out and lose weight.
10        So I guess the answer is it's more
11  convoluted than that. It's more complicated than just
12  saying those are risk factors for recurrence. I mean, yes,
13  but the alternative is maybe nothing and they would be very
14  unhappy with that, and a hundred percent recurrence rate if
15  you never do surgery in the first place.
16     Q.    But as far as the risks that are
17  associated with the procedure, when you're balancing the
18  risks with benefits, if there's a high likelihood of
19  recurrence, is it, in every situation, worth the risk that
20  they are exposed to these other potential adverse events in
21  order for the product not to work?
22        MR. WALKER: Object to form.
23     A.    Well, in my hands and in the studies I've
24  seen, adverse events are low enough that it's reasonable,
25  and you have that conversation with the patient

Page 59

1  individually so they understand the risks and the benefits
2  and then they can make their own informed consent, just
3  like any surgery, all right? If they feel like the risks
4  are too high, then they may opt not to have surgery.
5     Q.    If you look down at the paragraph right
6  before treatment options for SUI, you discuss some
7  questionnaires that could be helpful, and you include the
8  King's Health Questionnaire, Bristol Female Lower Urinary
9  Tract Symptoms Questionnaire, Stress and Urge Incontinence
10  Quality of Life Questionnaire.
11        Do you know when these questionnaires
12  began being used in your field?
13     A.    I don't know.
14     Q.    Have they been around for a long time?
15     A.    I'd have to go look and see. I'm not
16  exactly sure when they came out.
17     Q.    Have you reviewed each one of these
18  questionnaires before?
19     A.    It's been a while since I've looked at
20  them.
21     Q.    Do you have any idea who drafted those
22  questionnaires?
23     A.    I don't.
24     Q.    Do these questionnaires cover all
25  potential problems that these women may experience with

Page 60

1  regards to the treatment that they are receiving?
2        MR. WALKER: Object to form.
3     A.    No. Those are just part of our -- you
4  know, when they are coming in to talk to us, they're just
5  part of the whole process. It gets us started on our
6  conversation, but there's no way that we use those
7  questionnaires solely to make our decision on. It's part
8  of the conversation that gets us going and going through
9  all the questions that we need to ask to determine if they
10  are a candidate or not.
11     Q.    And you wouldn't rely on these
12  questionnaires, for example, if they are filled out after
13  they've had the sling procedure to give you a complete
14  picture of what the patient may or may not be experiencing
15  with regards to their mesh device. Would you agree with
16  that?
17        MR. WALKER: Object to form.
18     A.    It can be used at any point in time. I
19  don't know that it's all that helpful. I mean, again, it
20  gets the conversation going and so patients feel more
21  comfortable talking about some of the things that maybe
22  they hadn't thought about.
23     Q.    Are these the same type of questionnaires
24  that are used in some of the studies that you've reviewed
25  regarding this litigation?

Page 61

1     A.    These questionnaires are -- no. Well, let
2  me rephrase that. They could be, but it's not something
3  that I hunted down to find. And they may be part of the
4  questions, but when we're looking at the data, it doesn't
5  say the King's Health Questionnaire number was X, Y or Z.
6  You know, you're looking at preoperative stress
7  incontinence with the urodynamic studies look like this
8  type of thing.
9        So could they be? They could be, but they
10  are not specific and, you know, they are not a very
11  important part of what we're -- how we discuss things with
12  the patients.
13     Q.    In these studies that do include some form
14  of questionnaire in determining the data and the opinions
15  that come from those studies, is it important if you're
16  trying to determine safety and efficacy for a questionnaire
17  to be complete on at least the things that are being
18  studied?
19        MR. WALKER: Object to form.
20  BY MS. BAGGETT:
21     Q.    For example, if this study were geared
22  towards determining how many patients had experienced
23  dyspareunia with regard to a product and you would expect
24  that that questionnaire would have a question with regards
25  to dyspareunia. Is that fair?

Brian D. Parker, M.D

1    A.    If there's a study specifically looking
2  for dyspareunia?  Well, first of all, I don't know how you
3  would make a study looking just for dyspareunia, right?
4  But if you're looking just for all patients, they can be
5  helpful, but these don't necessarily mean that that's the
6  only thing the patients -- I don't think your question -- I
7  don't think what you're saying and what I'm thinking is
8  jibing, because I'm thinking of these questionnaires as
9  just basic forms the patients fill out when they come into
10  the office to help with the clinician determining if the
11  patient is a candidate for surgery.
12      I think what you may be referring to is
13  some type of useful tool that's used in studies to help
14  determine quality of life and adverse events.  And,
15  honestly, I don't view them the same way that you're
16  viewing them.
17    Q.    And I think maybe that transition is what
18  I need your help understanding.  It may not be this exact
19  questionnaire, but would you agree that for the studies
20  that include a component where the only information that
21  they obtain from the plaintiff is through the
22  questionnaire, do you believe that that questionnaire
23  should include some questions with regard to the adverse
24  events that you are trying to study with that particular
25  study?  And by that I mean if -- I understand you said that

1  you wouldn't have a study just based on dyspareunia, but if
2  that was one of the things the study was supposed to
3  report, would you expect that the questionnaire should have
4  a question -- series of questions with regards to
5  dyspareunia in order to be able to report in that study
6  whether or not dyspareunia and the frequency and the
7  severity, things like that?  You would expect that question
8  to be asked in the questionnaire, would you not?
9    MR. WALKER:  Object to form.
10    A.    Yeah, that's a good question.  I think
11  that it's interesting.  You know, when I was going through
12  this, I was looking specifically for dyspareunia rates in
13  the early stages of any type of stress incontinence
14  surgery, and they're just not there.  They don't mention
15  them, all right?  There's a few studies that do.  But if
16  you're asking me specifically for adverse events, I think
17  each study individually is set up specifically to figure
18  out what outcomes they want.  And so it could include
19  dyspareunia, it could not.  But it really depends on an
20  individual study, the way it's set up, you know.
21    Q.    And so I guess the purpose of the study
22  somewhat drives the information that will be contained in
23  that study.  Is that what you're trying to say?
24    A.    You said "study" twice.  I'm not quite
25  sure I understand how you --

1    Q.    So the purpose of the study, whatever the
2  purpose is, is what the study will ultimately report on.
3  Is that fair?
4    A.    Not necessarily.  You might find things
5  you weren't expecting to find, or you might find things
6  that you'd have to stop the study for them.  I think in
7  general people try to set studies up initially to be able
8  to predict the future of what they are going to find, but
9  they may find things that they weren't expecting.  I think
10  that's what happened in the early years before they were
11  really looking at this.  They weren't expecting to find any
12  issues.  Before mesh was even on the market, you know, they
13  were looking at these studies, and they were very specific
14  about retention rates and those things.  But they were
15  finding these other things and then that kind of propagated
16  from there.
17      Yes, maybe, but not necessarily every
18  time.
19    Q.    Page 4 of your report, if we could look
20  down.  And I know I'm not going through it line-by-line.
21  I'm trying to hit some of the more significant points to me
22  so that I understand what's been proposed here and what
23  your opinions will actually be.
24      I guess this would be a good point for me
25  to ask you, are all the opinions that you hold in this case

1  contained in your report?
2    MR. WALKER:  In terms of his general
3    opinions?
4    MS. BAGGETT:  Yes.
5    THE WITNESS:  Are all my opinions in this
6    report?  As of now.  Those opinions may change.
7  BY MS. BAGGETT:
8    Q.    And that would be based on what?
9    A.    Data.
10    Q.    Since the date that you finalized this
11  report, has any additional data been reviewed by you that
12  affected your opinions in this report?
13    A.    I've reviewed other data, but nothing
14  that's affected my opinion.  Again, you got to remember, I
15  mean, part of my daily routine is reading, you know.  And
16  so reading about this, reading about other things I do, so
17  I'll continue to monitor it.
18    Q.    I'm trying to understand this section
19  under midurethral slings in that second paragraph.
20    MR. WALKER:  On page 4?
21    MS. BAGGETT:  Yes.
22  BY MS. BAGGETT:
23    Q.    "One constant factor over the years since
24  the first procedure, there has never been one procedure
25  that has high success rates with good durability and with

Brian D. Parker, M.D

Page 66

1 low complication rates until now with the midurethral
2 slings. If there had been, then there would not be a host
3 of operations that have been tried and failed over the last
4 hundred years."
5      Is there any study in particular that you
6 base this paragraph off of?
7     A.   Not one in particular. I think the point
8 of that is there's thousands of studies done, and
9 initially the studies were done to compare midurethral
10 slings with either what was the standard at the time,
11 either Burch or pubovaginal slings, right? So at that
12 point, it was fairly obvious there was a lot less problems
13 with the midurethral slings than there were with the Burch
14 and the pubovaginal slings.
15     So that transitioned into the studies now
16 being all done comparing to each other. It's rare you find
17 studies comparing to the pubovaginal slings or the Burch
18 procedures. And so in the past, that's never been the
19 case. So now you're seeing a transition of all the data to
20 just look at those different corporations that make the
21 different products. And the other things are still
22 available, but rarely used.
23     And so that's what my comment on this is,
24 is that you're seeing a transition from, hey, we need to
25 try this, we need to try doing a bone anchor, we need to

Page 67

1 try using cadaveric fascia, we need to try using autologous
2 fascia, we need to try incorporating some type of mesh in
3 our own way, we need to go make an incision
4 laparoscopically. All these things were done until these
5 mesh slings came around, which changed the complete
6 complexion of everything. If they didn't work, weren't
7 successful, then we would have lost that. We would
8 continue to be searching for something that was better.
9     Q.   That's the point I was trying to get at,
10 is searching for something better, that component of it.
11     Is it not true these device manufacturers
12 continuously try to improve on their products and develop a
13 better mesh?
14     A.   I hope so.
15     Q.   So that's one of the reasons why -- or
16 what do you understand one of the reasons for the single
17 incision sling being?
18     A.   So what I mean by "I hope so," is that if
19 a company stands pat with the product that is has and never
20 tries to improve upon it, then that stalls innovation. We
21 would never get to point we're at, right? So I'm hoping
22 surgeons, physicians, clinicians, engineers, companies, are
23 all trying to improve upon what we already have. So, yes,
24 I would expect that.
25     Did that answer your question adequately?

Page 68

1     Q.   For the most part I think. I think we'll
2 get into it as we get later into it. If not, I'll come
3 back to it.
4     Now, you were discussing some of the
5 earlier procedures, such as the Burch and the autologous
6 slings. Are you aware of any more current studies that
7 compare those procedures with mesh products or not and
8 what the data -- if the data has changed with regards to
9 the cure rates of each device? Or each procedure, sorry.
10     A.   I can't remember if the Shim study looks
11 at all the pubovaginal slings and Burches.
12     How recent are you talking?
13     Q.   I guess, to be more precise, are you aware
14 of any changes in the medical literature with regard to the
15 comparison between the prior procedures without mesh versus
16 the procedures that use mesh?
17     MR. WALKER: Object to form.
18     A.   I can't think of any.
19     Q.   If you look on page 5, section Rationale
20 on Clinical Decision Making Favoring TVT, the
21 second-to-last paragraph it starts, "Making decisions based
22 on the medical literature is what allows us to make
23 informed rational decisions." And I think you alluded to
24 that earlier in some of your responses, that you're the
25 type of doctor that reads the medical literature and learns

Page 69

1 from that.
2     Is that a fair representation of what you
3 said earlier?
4     A.   Yeah, that's adequate.
5     Q.   Then it goes on to say, "How do we make
6 those decisions? Partly on personal experience, but
7 significantly on the experience of others relayed in
8 medical journals. Hopefully and ideally this is unbiased,
9 unflawed information, but deciphering information presented
10 while understanding this bias is also a learned skill."
11     What did you mean by that?
12     A.   So part of what happens is we get
13 bombarded with this study, this study, this study, this
14 study. And after you're reading numerous studies, you
15 start to see this is a good study, the way it was put
16 together, it was well put together, this study is flawed
17 for these reasons, there may be a bias because this surgeon
18 only likes this type of procedure. So those are all built
19 in.
20     Every study is going to have a little bit
21 of a bias. So you have to be able to look at that study in
22 the back of your mind thinking that this physician or this
23 group of physicians is looking at this specifically. What
24 can I see in that study that would unbias it and then be
25 able to look at it more objectively.

Brian D. Parker, M.D

Page 70

1    Q.    Would one bias, in your opinion, be based
2  on whether or not the investigators are involved with or
3  have support from device manufacturers?
4    A.    That's part of it, sure.
5    Q.    And is it important in your role as a
6  treater of women with incontinence using these devices --
7  is it important to you that the information in these
8  studies is as unbiased and unflawed as possible?
9         MR. WALKER: Object to form.
10   A.    That's an ideal situation, right?  Rarely
11 do we come up with that.  That's part of reading the
12 journals, is to say where does this person's background
13 come from and then interpret it based on that.
14   Q.    But as the doctor working in the trenches
15 and using these devices, do you always have time to go back
16 and look at the underlying data and research the
17 investigators to determine the reliability of the study?
18        MR. WALKER: Object to form.
19   A.    So there's those type of studies that are
20 individual studies, you know, whether they're randomized
21 controlled or whether they're just case studies or
22 retrospective studies.  So that's part of it.  But, then,
23 you know, that's a part of the puzzle, right?  That one
24 study is a small part of the puzzle.  And big meta
25 analysis, those are very helpful.

Page 71

1         So, yeah, I don't necessarily look up
2  every individual.  However, it's oftentimes disclosed right
3  there on the front and so -- or the urology community is
4  pretty small.  The same physicians tend to write the same
5  articles and so you kind to know already where a lot of
6  those people are coming from.
7    Q.    But do you agree that it's important that
8  the data that is obtained from the investigators in these
9  studies is presented accurately and truthfully?
10        MR. WALKER: Object to form.
11   A.    Ideally you would, but every study --
12 you're going to be able to find a flaw with every study
13 somehow, whether it be the way they present it, the
14 different types of statistical analysis they are using to
15 try to prove their point.  Those are the things with years
16 and years and years of reading these journals, you are able
17 to see through a little bit.
18   Q.    If the data in any particular study has
19 been manipulated or reported inaccurately, with regards to,
20 say, the adverse events that were seen in that particular
21 study, and it's not obvious to you on the face of the
22 document, then would you agree that you can't relay
23 anything more than what is apparent in that study to the
24 patients that you treat?
25        MR. WALKER: Object to form.

Page 72

1    A.    I'm not exactly sure how to answer that
2  question.  But I think what I'm hearing from you is do I
3  rely on one specific study to relay to my patients.
4    Q.    Well, it's a little more than that.  I'm
5  just saying in all the materials that you reviewed in the
6  course of your experience and your field of study and your
7  treatment of these women, all of the materials that you
8  review influence your understanding of a particular
9  condition or treatment.  Is that fair?
10   A.    I think that's fair.
11   Q.    So if any of that information was wrong in
12 some significant way, the information that you relay to
13 your patients when you're having this discussion with them
14 about whether or not the treatment is appropriate for them,
15 you cannot relay information that you don't have to a
16 patient that would allow them to make the decision based on
17 that information.  Is that fair?
18        MR. WALKER: Object to form.
19   A.    So when I get an individual study, if that
20 individual study is leaving out information and it seems
21 contrary to what's already been published, that's a big red
22 flag, right?  However, that should be ferreted out over
23 time, and that one particular study may not be in a month
24 from now or a year from now reproducible.
25        So any time I get an individual study,

Page 73

1  again, it gets put in the database, processed.  But if I
2  get something that's contrary to what's already been
3  published, then that tells me I need to continue and pay
4  attention to this to see if there's other studies to
5  reproduce that one study.
6         That happened with, you know, testosterone
7  usage back and forth.  So now it's kind of swinging to one
8  side.  So now my antenna is up to think about how -- if
9  there's going to be more studies on testosterone to support
10 what's already out there.
11        The same thing with the slings.  If
12 there's something out there that catches my eye, there
13 better be another study coming down the road that's going
14 to either refute it or confirm it.  And that is a continual
15 process.
16   Q.    But it's not always obvious on first
17 glance whether or not a study has flawed data or has
18 presented data in a flawed way?
19   A.    I assume every study has a little bit of
20 bias.  So I'm always sceptical when I read any study.  I
21 don't think you can look at one study and say, oh, my
22 goodness, this is a panacea of all studies, right?  So is
23 there going to be things that may be left out, either
24 purposely or unpurposely?  Possibly.
25   Q.    Does that bother you in any way with your

Brian D. Parker, M.D

Page 74

1 treatment of these women and recommending the product to
2 them, that there is bias -- do you feel in any way that
3 that affects your practice and your relationship with your
4 clients in recommending a particular treatment?
5     A.    No.
6         MR. WALKER:  Object to form.
7         THE WITNESS:  No.  And, again, because of
8     what I said before, it's just part of the
9     equation.
10 BY MS. BAGGETT:
11     Q.    Do you think it's fair to women receiving
12 these products to receive them based on flawed information
13 when that information was known and could have been
14 provided before they were treated with the product?
15         MR. WALKER:  Object to form.
16     A.    Well, you said -- to answer that question
17 assumes I'm saying it's flawed information.
18     Q.    Okay.  Let's do it as a hypothetical.
19     A.    Okay.
20     Q.    If you have a patient that you're treating
21 with a product and the information that you've obtained in
22 all your research suggests that it is the product that's
23 appropriate for that particular patient, and you find out
24 later that there was something about the data that was not
25 presented to you that made it less appropriate for that

Page 75

1 person, which resulted in them sustaining some
2 complications they could have avoided, would that bother
3 you?
4         MR. WALKER:  Object to the form.
5     A.    That scenario wouldn't happen.
6     Q.    Could you explain that?
7     A.    Well, because if you're basing your
8 decision making on one study of one product, then you
9 shouldn't be performing that procedure.  It's not until
10 you've looked at, you know, thousands and thousands and
11 thousands of these studies can you really come to a
12 conclusion -- not thousands of study -- I should say
13 thousands of patients being treated -- before you could
14 really say -- you know, you may be able to hide one study,
15 but you can't hide 500 studies.  You can't hide a thousand
16 studies.  If there was a new product that was out that I
17 wasn't familiar with and I had a study, I would wait until
18 there was a little bit more data, me personally.
19     Q.    Were you familiar -- we'll get back to
20 that in a minute.
21         Do you agree with the concept that a
22 device manufacturer should provide all information that
23 they know about the adverse events that have been
24 associated with their product before they put it on the
25 market?

Page 76

1         MR. WALKER:  Object to form.
2     A.    No.  There's no way to predict every --
3 I'll just leave it at that.
4     Q.    Okay.  Let's turn to page 6.  In the
5 second-to-last paragraph you say in your opinion, the
6 treatment for stress urinary incontinence should be viewed
7 in different eras before the TVT, which was cleared by the
8 FDA in 1998.  And then the next sentence I wondered if you
9 would explain that to me.  "The number of different types
10 of pubovaginal slings, bone anchor slings, retropubic
11 surgeries are numerous generally because of lack of
12 long-term efficacy combined with the morbidity associated
13 with each treatment."  If you could explain that.
14     A.    Sure.  So I guess my sentencing wasn't
15 very good there, or sentence structure.  It's been awhile
16 since I took English.
17         What I'm trying to get across is that --
18 like we mentioned before, before midurethral slings we
19 would do these other types of surgeries.  Well, there was
20 always -- none of these surgeries were really
21 device-driven.  They were all individual.  Maybe the bone
22 anchor slings were somewhat device-driven.  But by and
23 large these were all just different types of surgeries
24 using different types of material.  They weren't very
25 reproducible because there was no set way of -- you know,

Page 77

1 surgeries that you could look and see this is how you do
2 the surgery.  But each individual physician had their own
3 way of doing that particular sling or bone anchor or
4 retropubic or what have you.  And it's hard to standardize,
5 number one.
6         Number two is, over time you kept seeing
7 that these procedures were -- just people were either
8 having a high number of problem with retention with the
9 pubovaginal slings, or over time these things were just
10 wearing out and their incontinence was returning at a much
11 higher rate than what we would see with the midurethral
12 slings.
13         So efficacy, so lack of ability to fix the
14 problem, and combined with the high rate of problems that
15 they were having with them led to the situation now where
16 we have a more effective, less morbid procedure than
17 before.
18     Q.    Okay.  So if I understand you correctly,
19 you're suggesting in this paragraph that the midurethral
20 slings have better efficacy and less morbidity than things
21 like the pubovaginal sling and other surgeries that do not
22 include mesh.  Is that fair?
23     A.    That's fair.
24     Q.    Okay.  The next paragraph begins right
25 after that and starts, "Also, as a physician and surgeon, I

Brian D. Parker, M.D

Page 78

1 appreciate and utilize the current medical literature to
2 shape and change my practice with the patient's best
3 interest at heart. The literature is culled and reviewed
4 to stay current with trends in medicine. Without that
5 continued dialogue between practicing frontline urologists
6 and academic urologists, there becomes a disconnect between
7 what is theoretically going to possibly happen and what is
8 happening with each individual patient."
9        The section next is what I really want to
10 ask you about. "The device companies listen to the
11 frontline high-volume urologists to let them know what they
12 like and don't like about each of their products. This
13 message is then relayed eventually to the academians who
14 have the time and resources to do large volume, randomized
15 clinical trials." I want you to explain that a little bit
16 for me.
17        A.   So, you know, it's like a pyramid. So the
18 bottom of the pyramid is all the practicing urologists who
19 see patients, do surgery, you know, take care of patients
20 in the hospital, those type of things. A lot of volume,
21 lot of patients, but no time to do any, you know, really
22 data gathering to present articles.
23        So how does that -- all those patients,
24 how do we-- because that's a huge number of patients
25 compared to the number of patients that are in the studies.

Page 79

1 So how does the whole process occur? Well, at the
2 meetings, just talking to your colleagues, you know, those
3 type of things get disseminated through the sales reps.
4 Things that, hey, I'm seeing this with this product, I'm
5 seeing this with this product. We need to, you know, look
6 at this. So that gets disseminated up the corporate chain
7 of issues. And then also it goes up the academic chain
8 with the urologists who are more at the top. They don't
9 see as many patients so their volume is lower, but they do
10 a lot of paper writing, right? And so people read the
11 papers, right? We have no voice as working, practical
12 urologists. So how's does our voice be heard? By making
13 sure that the other urologists know what's going on.
14        Q.   I guess that's what I was alluding to a
15 little earlier in some of our discussions.
16        So based on the practicing doctors in the
17 field, they're relaying information on what they like and
18 what they don't like about the product, including
19 potentially any adverse events that they've had, they're
20 relaying that back to the company?
21        A.   Uh-huh.
22        Q.   And then the company is then relaying that
23 to the academians. Is that what you're trying to say?
24        A.   Not only that, back and forth between the
25 clinicians and the company. There could be a dialogue

Page 80

1 there, depends on how open that is, but then also up to the
2 academic guys, yeah.
3        Q.   Are you suggesting with this section that
4 when a manufacturer learns about something good or bad that
5 they should share that information --
6        MR. WALKER:  Object to form.
7        MS. BAGGETT: -- with the medical
8 community?
9        THE WITNESS:  I think that's something
10 that each individual -- well, I think that's
11 something that each individual company has to
12 decide on their own. And then I think also that
13 it's not necessarily something they have to share
14 with the community, but it's something that needs
15 to be evaluated and looked at and discussed.
16     I mean, look, there's no perfect procedure for
17 anything and so it always can be improved upon.
18 And that's my point, is if we just said, oh, this
19 is perfect, we never have any issues with
20 anything, then there's never this idea about
21 improving upon what we already have.
22 BY MS. BAGGETT:
23        Q.   Do you hold any opinions or are you
24 familiar with the FDA review process for getting devices to
25 the market?

Page 81

1        A.   On the surface, but nothing in detail.
2        Q.   You're not going to hold any opinions here
3 today as to whether or not Ethicon complied with the FDA
4 regulations for marketing their products?
5        A.   I know they went through the proper
6 channels to get the FDA to approve it. From a physician's
7 standpoint, that's really all that I'm concerned about.
8        Q.   What do you base that knowledge on?
9        A.   I'm not sure I understand what you're
10 asking me.
11        Q.   Well, you said the fact that they were
12 approved through the FDA.
13        A.   Well, I guess I'll put it to you simply
14 this way. As a clinician, if I know it's FDA approved,
15 then I feel like that's an adequate way for each individual
16 product to be cleared. And the amount of hurdles it has to
17 go through to pass the FDA is substantial enough that
18 that's their job, that's their role as a regulatory -- you
19 know, I'm not a regulator so I don't know all the rules and
20 regulations. But I do know once it comes to market that,
21 you know, we should feel that the FDA has done their due
22 diligence.
23        Q.   And are you familiar with the difference
24 between having a product cleared versus approved?
25        A.   Yes.

Brian D. Parker, M.D

Page 82

1    Q.    And what is your understanding of that
2  distinction?
3    A.    One has to do with devices and one has to
4  do with medications.
5    Q.    Are you familiar with something called the
6  (510)k process?
7    A.    Through my review of things I have become
8  familiar with it somewhat.
9    Q.    What's your understanding of the
10  difference between the 510(k) process and pre-market
11  approval process?
12    A.    It seems to me the 510(k) process -- and,
13  again, I'm not a regulator so I'm talking off-the-cuff a
14  little bit -- is when another device is already approved,
15  and based on that device they can move the FDA process a
16  little bit quicker in order to -- because there's already
17  been safety and efficacy from the previous product, they
18  can use that as their basis to get another product
19  approved.
20    Q.    So would you agree that that process is a
21  little less intensive for the manufacturer than the
22  full-blown pre-market approval process?
23    A.    Likely, but I have no way of knowing that.
24    Q.    And are you familiar with the process by
25  which the FDA actually scrutinizes the devices before they

Page 83

1  are put on the market?
2    A.    I have no inside information on that,
3  ma'am.
4    Q.    You mentioned earlier that the FDA does
5  its due diligence.  What did you mean by that?
6    A.    Well, I mean, it's hard to get any product
7  on the market in America versus in a lot of other
8  countries.  And so I think that's -- because of that, I
9  mean, the products that come out are generally viewed as
10  being tested of some sort, that they are safe, that they
11  say what they intend to do.
12        So when they actually come on the market,
13  as physicians we don't have to go through that whole
14  process and review each step of the way.  We just have to
15  assume that the FDA has their regulations they meet and
16  once it hits the market that we should feel comfortable
17  with it.  I think if each individual clinician had to go
18  back and review the process that it took for each
19  individual product that comes to market, that would be too
20  onerous.  There's no need for that, so...
21    Q.    And you agree that that's the way it
22  should be, that in order for a product to make it through
23  that process, that the proper studies had been done and
24  that there was some showing that the product was indeed
25  safe and effective?

Page 84

1        MR. WALKER:  Object to form.
2    A.    I think that the FDA has decided, in many
3  years, that there are certain processes to go through, and
4  I can't disagree with FDA's approval process.
5    Q.    Are you here today offering any opinions
6  on whether or not Ethicon complied with all the FDA
7  regulations with regards to the studies and the data in
8  order to get the products brought to market?
9        MR. WALKER:  Object to form.
10    A.    The FDA approves the products.  They're on
11  the market so I have to assume that that was adequate for
12  the FDA.  Again, I'm not a regulator; I'm just a clinician.
13    Q.    And that's what I'm trying to get at.  Are
14  you going to be offering any opinions with regard to that
15  process and whether or not Ethicon complied with that
16  process?
17    A.    I'm not a regulator so I can't comment on
18  the regulations that go along with that.
19    Q.    So, no, you won't be?
20    A.    No.
21    Q.    Thank you.
22        MR. WALKER:  Can we take five minutes?
23        MS. BAGGETT:  Sure.
24        (Thereupon a break was taken from 10:39
25    a.m. to 10:45 a.m.)

Page 85

1  BY MS. BAGGETT:
2    Q.    Doctor, before we went on break, we were
3  talking about your report and we were on page 7.  One of
4  the questions we were talking about was the FDA clearance
5  process and whether or not you held any opinions with
6  regard to whether or not Ethicon complied with the
7  requirements of the FDA in getting the product to the
8  market.  And you said you're not going to be offering any
9  opinions on that; is that correct?
10        MR. WALKER:  Object to form.
11    A.    That's correct.
12    Q.    And that second paragraph, starting with,
13  "Additionally the device companies are trying to respond to
14  the surgeons and improving the devices they already make.
15  The tendency is to compare the most recent prototype to the
16  gold standard, not the previous methodology, as can be seen
17  with some of the single incision slings, especially the
18  TVT-Secur.  There was a steeper learning curve initially,
19  but still with very low side effects and complications."
20        Do you see that section?
21    A.    Yes, ma'am.
22    Q.    Okay.  Are you familiar with what process
23  the TVT device went through with regards to the FDA and
24  being brought to market?
25    A.    Which TVT device?

Brian D. Parker, M.D

Page 86

1    Q.    Of the Secur.  I'm sorry.
2    A.    Yes.
3    Q.    And what process was that?  What route?
4    A.    510(k).
5    Q.    And do you know if there were any studies
6  in human subjects on the TVT-Secur device before it was put
7  on the market?
8    A.    I'm not aware.
9    Q.    You're not aware of whether there was or
10  not, either way?
11    A.    I'm not aware that there were any studies
12  on humans before it came to market.  It was all based on
13  previous -- the fact that the sling had been shown to be
14  effective on the TVT and the TVT retropubic and TVT-O.
15    Q.    Are you familiar with the differences
16  between the TVT-S device and the TVT retropubic and the
17  TVT-O?
18    A.    The differences between the devices?
19    Q.    Yes.
20    A.    Yeah, there's differences between the way
21  of placement.  There's no difference in the mesh.
22    Q.    With regards to the mesh, it's still the
23  same polypropylene, correct?
24    A.    I think, like we discussed earlier, the
25  Secur is laser cut and -- but it's the same polypropylene

Page 87

1  mesh that I'm aware of.
2    Q.    Are there any differences with regards to
3  how the product is implanted between the TVT-S, the Secur
4  device, and the TVT-R and the TVT-O?
5    A.    Yeah, there's a difference in the way it's
6  implanted.
7    Q.    And what is that difference?
8    A.    The TVT-Secur is a single incision sling,
9  whereas the TVT-O and the TVT retropubic had an exit point.
10  The Secur did not.
11    Q.    And are you familiar or did you read
12  any -- have you read anything, whether it be internal
13  documents or studies, that suggests whether or not the
14  TVT-Secur device initially was rejected because of the
15  dissimilarity between the two devices that were used
16  originally for the predicate device to where they had to
17  add another predicate device in order for it to come on the
18  market?
19        MR. WALKER:  Object to form.
20    A.    I can't recall that.
21    Q.    So your understanding of the 510(k)
22  process, the only thing that a manufacturer has to do is to
23  show that it's substantially similar to a device that's
24  already on the market.  Is that your understanding of what
25  that process involves?

Page 88

1    A.    Ma'am, I'm not a regulator.  I really
2  don't know the specifics of how that occurs.  I mean, I
3  really don't.
4    Q.    Would you expect a manufacturer that is
5  using a predicate device to get a product on the market to
6  follow the guidelines and use products that are similar to
7  the product that it's chosen as its predicate?
8        MR. WALKER:  Object to form.
9    A.    Well, they're all slings, so I would
10  suspect that they are very similar.
11    Q.    Would you expect that the data used to get
12  the predicate devices on the market may not apply the same
13  to a product that is not substantially similar to that
14  product?
15    A.    Would you give me an idea about what you
16  mean by "predicate"?  I think I understand what you mean,
17  but if you would just define that for, me what you're
18  getting at I guess.
19    Q.    Sure.  In the process of applying for a
20  product to be approved to market, the FDA has a procedure
21  where you go through this 510(k) process, and what you have
22  to do is show the product is substantially similar to a
23  product that's already on the market.  And I understand
24  you're not a regulator and there's more to it than just
25  that, so I don't want to mislead you.

Page 89

1        My point is, if you're relying on a
2  product you're saying is substantially similar to a product
3  you're putting on the market and you're going to rely on
4  the data that was used in bringing that predicate device to
5  market, shouldn't that data apply equally across the board
6  to the product that you're bringing on?
7    A.    So the predicate device that you're
8  discussing, what exactly are you describing as a predicate
9  device?  The device that's in question?
10    Q.    No, sir.  The predicate device would be
11  the TVT and TVT-O, which were initially the predicate
12  devices.
13    A.    I understand what you're saying now.
14    Q.    So in order for Ethicon to rely on the
15  data from the TVT device, then that product needs to be
16  substantially similar to the TVT device.  Do you agree?
17        MR. WALKER:  Object to form.
18    A.    Needs to have the same use, yes.  If
19  you're trying to say that what was on the market for --
20  well, again, I don't know all the regulations about this,
21  but it would seem to me that that would be a -- there's so
22  many small variations of something, if you had to go
23  through the whole process every time, that would be very
24  cumbersome for the FDA.  So I'm assuming that the FDA had
25  to make some type of provision to allow like devices to be

Brian D. Parker, M.D

Page 90

1  brought to market.
2         Now, you know, we're talking about
3  suburethral and midurethral slings. We're not talking
4  about apples and oranges. We're talking about the same
5  type of device. So I guess in my estimation, yes, it is
6  based on what was on there before, which was, again, the
7  same type of mesh, the same placement of the mesh, the same
8  position of the mesh. But other than that, I don't know
9  what the FDA's regulations are about that.
10      Q.    Maybe this will help just slightly and it
11 may not.
12      A.    All right. Good.
13      Q.    I'll do my best. The TVT-S device was
14 smaller than the other two devices; is that right?
15      A.    Yes, ma'am.
16      Q.    And the TVT-S device was stiffer than the
17 other two devices. Would you agree with that?
18             MR. WALKER: Object to form.
19      A.    No.
20      Q.    The mesh itself was not in any way stiffer
21 than the other two devices?
22      A.    I couldn't tell any difference.
23      Q.    The TVT-S had anchors that were made of a
24 degradable substance where it attached to the body instead
25 of being left open.

Page 91

1      A.    Yes, ma'am, that's correct.
2      Q.    And the insertion tools that were used
3  were different than the procedures that were used to insert
4  the other two devices. Is that fair?
5      A.    That's correct, ma'am.
6      Q.    Do you have any opinion whether or not
7  those differences made it necessary that the device should
8  be studied in a different way to see if those differences
9  had any impact on outcomes before the product was brought
10 to the market?
11      A.    Yeah, I mean, I thought about that. And
12 that's been part of my -- when we were going through all
13 this, I did think about that. But I really don't know
14 enough about the regulations to give an opinion. And from
15 a clinical standpoint, if the device has been shown to be
16 safe -- there may be little differences in effectiveness,
17 but if it's been shown to be safe, then I don't know that
18 you really need other studies other than what's already
19 been out there.
20      Q.    Have you read any literature or any
21 internal documents, any of the reliance materials that you
22 reference, in formulating the opinions in your report? Do
23 you recall reviewing anything that suggested that the
24 TVT-Secur device should have been studied more before it
25 was brought to the market?

Page 92

1      A.    Did I review records of that? There were
2  internal memos having that conversation, or something of
3  that nature.
4      Q.    And those were Ethicon's own internal
5  communications?
6      A.    I don't remember exactly. I'm assuming
7  so. I don't remember.
8      Q.    Do you recall any testimony as to whether
9  or not -- whether it was Ethicon employees or Ethicon
10 experts that suggested that the product should have been
11 studied or should have had more testing done before it was
12 brought to the market?
13             MR. WALKER: Object to form.
14      A.    So I don't recall the specifics. I do
15 remember that there was some internal conversations about
16 that, but I don't know who it was that had the
17 conversations. I don't recall any of the details.
18      Q.    And do you recall any studies that
19 suggested that more data was needed on the TVT-S device
20 before it came to the market?
21      A.    I don't remember that either. I don't
22 know that there was -- I know they did testing before just
23 to determine strength and how much was needed to -- how to
24 put the Secur in, but that wasn't done on humans. But I
25 don't recall there being a study or a conversation or

Page 93

1  mandate or FDA went back and said we need more data. I
2  just assume that once they got to the FDA point and it was
3  approved that that was adequate.
4      Q.    You mentioned in this section the fact
5  that there was a steeper learning curve initially. What
6  did you mean by that?
7      A.    Well, with the TVT retropubic and the
8  TVT-O, the name stands for tension-free vaginal tape. So
9  from the first two that were placed, that was the --
10 standard was to place it tension-free underneath the
11 urethra. With the Secur, because of the way that you could
12 either place it in a hammock or U-shape, there's a little
13 bit of a different technique there implanting that. And
14 then also knowing that you needed to place it more firmly
15 and securely up underneath the bone into the ligament.
16             Yeah, I mean, those are the things that
17 initially when I started doing the Secur that I found were
18 a little bit different, but it took all of about five to
19 figure out how that worked.
20      Q.    Did you read any materials in your review
21 for this report that suggested some doctors, the learning
22 curve required more attempts?
23      A.    I believe so, yes.
24      Q.    And do you have an opinion as to whether
25 or not a company that develops a new procedure with a new

Brian D. Parker, M.D

Page 94

1 product has any obligation to properly train the doctors
2 using that product before their product is made available
3 to them to use in the patients?
4       MR. WALKER: Object to form.
5       A.     So, yes. So in order for a new product to
6 be utilized correctly, you need another little -- you need
7 to know the steps, right? And that's what the proctor was
8 to provide to the new physicians. And the technique needed
9 to be modified based on the product. All the slings are a
10 little bit different. I mean the Altis is different than
11 the TVT versus the retropubic versus obturator versus the
12 Monarc. They are all a little bit different, so those
13 little nuances do need to be relayed to the physician.
14      Q.     And you agree that each of these devices
15 that we're talking about, they are not just the device,
16 they are also the toolkits for implanting the device that's
17 part of the package that you get when you go to use these
18 devices. Is that true?
19      A.     The device and the toolkit are what now?
20      Q.     It's part of the package that you receive.
21 It's not just the sling materials --
22      A.     In the operating room you're saying?
23      Q.     Sure.
24      A.     So in the operating room, on the back
25 table the device is opened. Yeah, so the sling and then

Page 95

1 anything else that goes with it to implant it.
2       Q.     So you don't use your own tools to implant
3 the sling?
4       A.     Sometimes. Yeah, in the Secur because you
5 had to use a needle driver.
6       Q.     And that's something that you weren't
7 supplied with by the company?
8       A.     Huh-uh.
9       Q.     And that was part of the instruction that
10 you received in training for the device?
11      A.     Yes, ma'am.
12      Q.     But for the most part, with regards to the
13 TVT retropubic and the TVT obturator, you didn't utilize
14 your own tools to implant those devices?
15      A.     Well, I had to have a scalpel and pick-ups
16 and sutures, So there's -- I just couldn't use what they
17 brought me. I had to use other things for surgery. I
18 mean, it is a part of the surgery.
19      Q.     But as far as the trocars and --
20      A.     The trocars were included.
21      Q.     -- and the cannulas, those --
22      A.     Those were not -- I'm sorry. I cut you
23 off, ma'am.
24      Q.     That's okay.
25      A.     The trocars were single-time use. So they

Page 96

1 weren't sterilized and reused. So each kit had an
2 individual trocar.
3       Q.     And other than the sling -- and I know you
4 said you don't do POP procedures, but other than those type
5 procedures, is a trocar something you use in your normal
6 practice in any other procedures?
7       A.     Yes.
8       Q.     What type of procedures?
9       A.     Interstim, and there's a trocar that
10 passes the wire or the lead underneath the skin from the
11 sacrum over to the battery site.
12      Q.     Is that something that's supplied with the
13 Interstim device as well?
14      A.     Yes.
15      Q.     Now, do you train others how to implant
16 these devices?
17      A.     I do.
18      Q.     And by that I meant the TVT devices, the
19 TVT-Secur, the TVT retropubic.
20      A.     No, I do not.
21      Q.     Are you holding any opinions here today as
22 to whether or not Ethicon's training materials and
23 professional education were adequate with regard to the
24 TVT-O and the TVT-S devices that we're here today about?
25      A.     Yes.

Page 97

1       Q.     And what are those opinions?
2       A.     They were adequate.
3       Q.     And did you review all of the materials,
4 the professional education materials, within Ethicon in
5 formulating that opinion?
6       A.     That's part of it, yes, ma'am.
7       Q.     Did you also review internal materials
8 with regards to the development of the procedure as it was
9 laid out in the IFU?
10      A.     I'm not sure I'm following on that.
11 Because what I thought you were meaning was as a surgeon
12 operating on a patient, do you rely on the professional
13 handouts. And so for that I agree. But as a clinician and
14 a surgeon, you wouldn't have privy to those other
15 documents. If you're asking as an expert witness if I'm
16 relying on those things, that's different than just me
17 being a surgeon and operating.
18      Q.     I guess that's where I was going with
19 that. Are you holding any opinions today with regards to
20 the materials that were used to train doctors as to whether
21 that information, those materials, were adequate in this
22 case?
23      A.     Yes.
24      Q.     You do have opinions, and that's based off
25 of --

Brian D. Parker, M.D

Page 98

1    A.    That's based off everything I saw.
2    Q.    So that would include the materials, the
3  internal Ethicon documents --
4    A.    Uh-huh.
5    Q.    -- and all the training materials
6  associated with the device?
7    A.    Yes, ma'am.
8    Q.    And you've read all of them?
9    A.    I think so, but I couldn't -- I don't know
10  that I've seen every one of them, but all the ones that I
11  saw I think I looked at and read.
12    Q.    And have you heard of -- have you seen
13  what is referred to as a cookbook with regards to the
14  TVT-S?
15    A.    Cookbook?
16    Q.    In the materials you reviewed, did
17  anything --
18    A.    Well, maybe it's the same thing I'm
19  thinking of. But it was kind of like there are like Tips &
20  Tricks? Yeah, I do remember seeing that.
21    Q.    Do you recall whether or not the Tips &
22  Tricks were similar to the instructions that were included
23  in the original IFU, the instructions for use?
24    A.    I believe the Tips & Tricks came out later
25  to help speed up the learning curve.

Page 99

1    Q.    Do you have any understanding as to
2  whether or not the Tips & Tricks were put through the FDA
3  process for approval for use with the device?
4    A.    I don't know that.
5    Q.    And do you have any understanding or
6  opinion as to whether or not the Tips & Tricks differed
7  substantially from the IFU?
8    A.    Substantially? No. I think there were
9  some nuance things that after performing it a few times
10  that were obvious that were included on that.
11    Q.    For instance, with regards to the
12  dissection, are you familiar with the recommended
13  dissection length included in the IFU versus the dissection
14  that was discussed in the Tips & Tricks?
15    A.    Well, no. I remember 1.5 centimeters.
16  Now, nobody gets a ruler and makes a 1.5 centimeter mark on
17  the urethra. So it's all kind of an eyeball idea anyway.
18  It may be two centimeters. It may be one centimeter. But
19  that part of things, I don't -- I think of all this -- the
20  idea behind it is to make an incision large enough for the
21  Secur to lay down. And I think that was relayed to the
22  physicians.
23    Q.    So if Ethicon were telling physicians
24  early on that a smaller incision was okay and then found
25  out that that was not actually the case and provided a

Page 100

1  different recommendation in the Tips & Tricks, would you
2  expect that to be something that they would make sure that
3  all physicians were aware of by changing the IFU or
4  advising them, or do you think that every physician was
5  given the opportunity to have the benefit of the Tips &
6  Tricks?
7    MR. WALKER:  Object to form.
8    A.    So to answer your question, so if I was to
9  make an incision that wasn't large enough to accommodate
10  the tip of a trocar, I'd have to enlarge that incision
11  anyway. So I think that was a step that was taken from
12  a -- just to complete things. But from a practical
13  standpoint, when you're inserting the sling in place, it
14  wouldn't take very long to realize that you had to make a
15  little bit bigger incision than you would with the TVT
16  retropubic or TVT-O.
17    So whether that was necessary and needed
18  to be transmitted to the surgeons, maybe, but in all
19  reality, that was something that was happening already
20  because it had to happen.
21    Q.    Okay. Right after that section we were
22  just discussing, you start the sentence, "When compared to
23  a retropubic TVT, there were some studies suggesting" --
24    A.    Ma'am, can I stop you for a second?
25    Q.    Sure.

Page 101

1    A.    What page are you on?
2    Q.    I'm still on page 7, and it's below the
3  section we were just -- it's actually continuing of the
4  paragraph we were just starting, and the part I'm focusing
5  on --
6    "When compared to a retropubic TVT"?
7    Q.    Yes. And what I'm trying to understand is
8  you said -- at one point in the sentence you said "but if
9  it had been invented first would have been a revolutionary
10  improvement over the Burch." Can you explain that section
11  for me?
12    A.    Right. So in my estimation, and the way
13  the literature bears out, is that we had this progression
14  of the way things went was Burch, pubovaginal sling, bone
15  anchor for a time period there, which had its -- definitely
16  it worked, but we were seeing some -- a lot of patients who
17  were having problems with those or were developing quickly
18  recurring incontinence.
19    And so when we went from here to the TVT
20  retropubic, which was here, we saw -- in my estimation and
21  based on the literature, there was a significant jump in
22  the efficacy and a decrease in the morbidity. The
23  procedure itself took 15 minutes versus before maybe an
24  hour or two, having multiple incisions for a pubovaginal
25  sling. So these people who were in the hospital, they were

Brian D. Parker, M.D

Page 102

1  going home.  So we saw this change in the Burch and other
2  things to the TVT.
3          If the TVT-Secur had been the first thing
4  invented, we still would have seen an improvement over what
5  we were dealing with, right?  It would have been here.  And
6  that aspect of things would have been looked at as, wow,
7  this is significantly better than what we have been dealing
8  with.  And it still is, in my estimation, and has been
9  shown to be, better than what we were dealing with.  But
10 because these other things were -- already had been on the
11 market, the one thing that Secur had an issue with was
12 initially some efficacy.  And that, I think, over time
13 has -- and experience by the physicians has really changed,
14 or did change, but initially there was this small decrease
15 in efficacy versus the TVT retropubic and the TVT-O.  But
16 if that would have been invented first, it would have been
17 felt like it was a milestone win.
18     Q.     What is your understanding of the reason
19 that the TVT-S device was removed or was no longer
20 available for use?
21     A.     Why?  I think there were a few things that
22 went into it, but I think a lot of it was they just didn't
23 want to continue to -- well, I don't know all the details
24 of it.  I don't know all the details why the company pulled
25 it.  I think that they decided internally to do that versus

Page 103

1  continue to try to do studies to prove it was effective.
2     Q.     And do you know if the company is
3  currently looking to replace any of those products and
4  currently conducting studies to develop any new products?
5          MR. WALKER:  I'm sorry.  Could you repeat
6     the question?
7          (Thereupon the question was read back by
8     the court reporter.)
9          MR. WALKER:  I just wanted to clarify.
10    What did you mean by "those products"?
11 BY MS. BAGGETT:
12    Q.     Well, TVT-Secur, for example.  The fact
13 that it's no longer available on the market, do you have
14 any knowledge or understanding of whether or not Ethicon is
15 currently working on a device to replace that product?
16    A.     I have no idea.
17    Q.     And based on the fact that -- or were you
18 aware that the FDA was making a requirement that they
19 conduct additional studies on TVT-S in order for it to
20 remain on the market?
21    A.     I was aware of that.
22    Q.     And you know that they were issued a 522
23 order, and you know what that is?
24    A.     Vaguely, but I couldn't spit it off for
25 you.  I couldn't name it exactly, but I have an idea that

Page 104

1  there's a different process of having to kind of re-go
2  through all those steps of getting the product to the
3  market.
4     Q.     And these would be the same type of
5  testing that would be required if you were going to bring
6  another product on the market similar to the one that was
7  removed.  Would you agree with that?
8          MR. WALKER:  Object to form.
9     A.     So you're asking me if that's the same
10 process that occurs if a new product is coming to market?
11    Q.     I guess what I'm asking you is the studies
12 that they are being asked to do to prove the safety and
13 efficacy of the TVT-S device in order for it to stay on the
14 market would be similar to the same studies that they would
15 need to do to bring a similar device back to market to
16 replace the TVT-S.
17          MR. WALKER:  The same objection.
18    A.     I don't know.
19    Q.     And that's a fine answer.  I'm not trying
20 to pressure you.  I'm just wondering if you do know, if you
21 knew whether or not that was the case.
22          Okay.  Let's see.  All right.  If you'll
23 look down to that next paragraph.  I'm actually looking
24 towards the latter part of the sentence where you start --
25 where you're talking about studies that were done today,

Page 105

1  and in the past and in the future that may be important to
2  a chemist, biologist, or physicians, and then you go into a
3  discussion with regards to these.  And I think you meant
4  MSDS.
5     A.     Yes.
6     Q.     For polypropylene suture by Dupont, and
7  that discusses the fact that it suggests a sarcoma was seen
8  in a rodent and perceived to be associated with the
9  polypropylene suture.  Can you tell me what they meant by
10 that, that discussion?
11    A.     Well, there was a document that I reviewed
12 that had one case of a sarcoma in a rodent.  The
13 correlation was that that could be associated with a
14 polypropylene suture.  And what my point was, was that that
15 in and of itself, if you were to tell everybody in the
16 world that this happened, you would get a different --
17 there would be a different perspective than if you said
18 millions of people have polypropylene sutures in them and
19 none have been reported in the studies to have a sarcoma
20 associated with it.  That's a different set of information.
21          And in my estimation, and based on the
22 data out there, you can't take individual things that in
23 and of itself seem to be applicable to one situation and
24 apply it to a different situation and compare them and say
25 they are comparative.  You have to know -- take that

Brian D. Parker, M.D

Page 106

1  information as adequate, but in reality has no clinical
2  value. That's what I mean. There's other things that
3  happen like that -- in all of medicine that can't be
4  compared, or apply little clinical value data.
5      Q.    Would you agree that if a concern is
6  raised by the manufacturer of the polypropylene, that you
7  would expect that it would be something that would be
8  studied before it was used in human applications?
9      MR. WALKER:  Object to form.
10      A.    Would you rephrase that?
11      Q.    If a concern was raised by the
12  manufacturer of the actual polypropylene with regards to
13  the use of that material in a medical environment, would
14  you expect Ethicon to at least investigate that concern
15  before using that product in a device that would be
16  permanently implanted in a human body?
17      A.    Would I expect them to?  I think that
18  that's -- in this particular situation, no, because there
19  have been, like I said, thousands and thousands and
20  thousands of polypropylene suture placed without any
21  evidence of causing sarcomas.
22          I do think that if a manufacturer notices
23  there's a problem, they should alert their distributors or
24  people who use their product. Then it's up to the -- you
25  know, based on that, you can interpret it through the scope

Page 107

1  or -- you can view it through the scope of a clinician, but
2  the clinician's viewpoint is going to be different than the
3  engineer's viewpoint. It's going to be different from the
4  manufacturer's viewpoint.
5      Q.    And you mentioned something about the fact
6  that thousands and thousands of sutures have been used in
7  different applications.
8          Are you familiar with the amount of suture
9  material that is required to comprise the mesh used in the
10  devices we're here today about, the TVT, TVT-O, and the
11  TVT-Secur?
12      A.    The amount of the prolene suture?
13      Q.    Material.
14      A.    I know the weight and I know the -- but I
15  don't know the actual volume of suture that is placed in a
16  sling.
17      Q.    Would you expect the amount of exposure to
18  a product can have a direct correlation to a different
19  outcome when compared to a smaller amount?  You take a
20  single suture versus a larger area of the suture, would you
21  expect the reaction in the human body to be the same?
22      A.    There's no way for me to know that. I
23  mean, that's a pretty big jump to be able to say that. I
24  think that it's not necessarily the volume of the suture.
25  It may be where it's placed. It may be how much is placed.

Page 108

1  It may be what it's intended use is for. I mean, a whole
2  host of -- how it's woven together. I mean, to say the
3  volume of a suture would automatically increase the rate of
4  X, Y or Z, unless there's a study on that to let me look at
5  that, I can't say for sure.
6      Q.    And that's kind of where I was heading
7  with it.
8          The more foreign body material that is
9  introduced into the human body, the more the human body is
10  going to respond to it. Would you agree with that?
11      MR. WALKER:  Object to form.
12      A.    No, I don't agree with that.
13      Q.    So if you have a small splinter in your
14  finger and your body responds with an inflammatory
15  response, is that response going to be greater the bigger
16  the splinter is?
17      A.    Well, the whole site is bigger because the
18  splinter is bigger, but the actual amount of reaction may
19  be the same. It may just appear bigger because the
20  splinter is bigger.
21      Q.    I guess my point is, the bigger surface
22  area means more foreign body present to respond to. Would
23  that --
24      A.    I would agree.
25      Q.    So the bigger the piece of material is in

Page 109

1  the body, the more the body is going to have to respond to
2  address that foreign body. Would you agree with that?
3      A.    I agree that the larger surface area,
4  there's more contact with the tissue, but the actual amount
5  of reaction doesn't increase in that specific spot for that
6  particular piece of mesh or prolene or whatever foreign
7  body we're talking about.
8      Q.    And with regards to the -- you were
9  discussing the difference in mesh weaves and the size. Do
10  you have any understanding of how the porosity of a device
11  affects the surface area that comes in contact with the
12  body?
13      A.    Yes.
14      Q.    What is that understanding?
15      A.    That anything bigger than 75 microns is a
16  large enough pore size to allow ingrowth of fibroblast and
17  macrophages and the normal healing that you'd see.
18      Q.    Have you reviewed materials with regards
19  to the pore size in the devices we're talking about today?
20      A.    Yes.
21      Q.    What materials did you review to get your
22  understanding of the pore size in the TVT-R, the TVT-O and
23  the TVT-S devices?
24      A.    I don't remember the name of the document.
25  I don't recall the name, but I know I looked at it multiple

Brian D. Parker, M.D

Page 110

1 times.
2     Q.    What is your understanding of the porosity
3 of the TVT-R, the TVT-O and the TVT-S devices?
4     A.    Those are all 1.37 microns; 1,379 microns.
5 I'm sorry.
6     Q.    Are you familiar with the term "effective
7 porosity"?
8     A.    Not specifically.
9     Q.    Do you -- in your experience with the
10 meshes that you've implanted, you understand that the mesh
11 is flexible, correct?
12     A.    I agree.
13     Q.    And that it stretches.  It's elastic in
14 some aspects.  Is that true?
15     A.    It is.
16     Q.    Do you have an understanding of whether or
17 not stretching the material changes the porosity?
18     A.    If I took the mesh and I pulled it like
19 this, would it change the form, the size of the pores?
20     Q.    Yes, sir.
21     A.    I would expect so.
22     Q.    Do you have an understanding of whether or
23 not the mesh -- once it has been stretched or put under
24 tension, whether or not the mesh regains the original pore
25 size or if it remains collapsed?

Page 111

1         MR. WALKER:  Object to form.
2     A.    I don't know specifically, but I would
3 think if it hits a certain threshold, it would probably not
4 regain its form.
5     Q.    Would that be important with regard to
6 tissue ingrowth once the device is implanted?
7     A.    No.
8     Q.    It would not?
9     A.    The reason being, is there is no
10 physiologic force that can stretch that material in a way
11 that it can't be -- there's no force that can stretch that
12 material it would change the pore size of any
13 significance.
14     Q.    Do you agree that when the mesh is placed
15 initially in the body that the woman is usually in a
16 position where she is laying down to where there's no
17 tension on the mesh with regards to the organs that it's
18 supporting, the lithotomy position?
19     A.    The lithotomy position.  That's the normal
20 position to place it, yeah.
21     Q.    Does the tension that is placed on the
22 mesh change when the woman stands up?
23     A.    Ever so slightly.
24     Q.    And by "ever so slightly," do you have an
25 understanding of how much it changes?

Page 112

1     A.    No, I do not have like a number of newtons
2 of cavity that pulls on there.  I do know that it's nothing
3 that would be significant enough to change the size of the
4 mesh, because the mesh itself when removed has no real
5 changes in its visible properties.
6     Q.    And that's your understanding, that the
7 mesh pores remain constant after insertion?
8         MR. WALKER:  Object to form.
9     A.    I think the pores can change minimally,
10 but nothing of any substance.  And that's due to mainly,
11 probably, from the actual healing process itself.  You
12 know, once the healing process starts, then you see
13 probably a -- you know, it gets to a certain point and it's
14 not going to change at all.
15     Q.    But before the healing process starts, do
16 you have an understanding of whether or not the mere fact
17 that a woman standing up or having a body function and
18 putting tension on the mesh, if that has any effect on the
19 porosity before the tissue has a chance to get incorporated
20 into the mesh?
21         MR. WALKER:  Object to form.
22     A.    It's my understanding that that's not
23 enough physiologic force to change any -- have any
24 long-term change in the mesh.
25     Q.    And you said earlier the prolene mesh --

Page 113

1 do you know what the different categories of porosity are
2 with regard to the mesh devices?  Have you heard of the
3 term "microporous"?
4     A.    Yes.  I've seen studies on type I, II,
5 III, and IV mesh.
6     Q.    And which category do you put the prolene
7 mesh that's used in the devices we're talking about today?
8 Which category does that fall under?
9     A.    I believe that's type I, macroporous mesh.
10     Q.    And do you have an understanding of
11 whether or not the mesh used in the prolene mesh -- do you
12 have an understanding of whether or not the prolene mesh
13 that's used in the devices we're here to talk about today,
14 whether or not that is considered heavyweight or
15 lightweight mesh?
16     A.    Well, describe heavyweight and lightweight
17 to me.  I think the weight is dependent upon how you're
18 placing it, how you're utilizing that within the body.  So
19 I think the definitions I've seen, different definitions, I
20 don't think there's a consensus on that.  I think that's
21 kind of a -- I can't find literature that would say this is
22 a consensus, heavyweight, lightweight.  But in reality, the
23 amount of weight is pretty minimal when you're actually
24 placing it underneath the urethra.  I really can't comment
25 on heavyweight and lightweight.  My suspicion is that it's

Page 114

1 the appropriate weight.
2 Q. Are you aware of any concerns, either
3 through the literature or within the medical community,
4 that the heavier weight meshes, the more complications you
5 see? Are you aware of anything like that, or the
6 difference between a macroporous versus a microporous mesh
7 and the outcomes?
8 MR. WALKER: Object to form.
9 A. I think you're asking me two different
10 things, because a macroporous mesh and a microporous mesh,
11 I think there's studies on there as far as how the patient
12 heals. As far as heavyweight and lightweight mesh, that's
13 more of an arbitrary discussion and, again, one that I
14 think falls short when it talks about midurethral slings.
15 I think that's helpful maybe when you're
16 talking about hernia repairs or big pieces of mesh that are
17 placed, but when we're talking about such a small area --
18 and I've done the math on it. I looked at all the
19 different slings and tried to figure what actual weight
20 you're actually seeing when you place it under the
21 midurethra, and there's very significant little difference.
22 I mean, there's miniscule, you know, micrograms of
23 difference when you actually get that piece of mesh and
24 determine the weight and then the length of all the
25 different ones.

Page 115

1 So I'm not -- it's not the heaviest
2 weight, it's not the lightest weight, but it's the
3 appropriate weight to do what it does.
4 Q. Are you familiar with internal documents
5 within Ethicon that discuss the need for a lighter weight,
6 larger pore mesh?
7 MR. WALKER: Object to form.
8 A. Uh-huh.
9 Q. And are you familiar with the devices that
10 were developed -- or excuse me -- the mesh material that
11 was developed in an attempt to obtain a lighter weight,
12 larger pore mesh for use in the application similar to the
13 devices we're here to talk about today?
14 MR. WALKER: Object to form.
15 A. I've seen documents on different types of
16 meshes used from internal documents from Ethicon.
17 Q. And if there were studies that suggest
18 that a lighter weight, larger pore mesh resulted in safer
19 and better outcomes, would you expect the company to use
20 that mesh if it's available to them?
21 MR. WALKER: Object to form.
22 A. Well, you're asking me a hypothetical
23 question, correct? Because that device doesn't exist, or
24 that mesh, that I'm aware of, doesn't exist. So any
25 studies on that would have to be done in the same exact way

Page 116

1 that the TVT retropubic or TVT-O or TVT-Secur was done in
2 order to get results that are comparable. And I don't know
3 those.
4 Q. Are you familiar with the pelvic organ
5 prolapse devices that were manufactured by Ethicon?
6 A. I know they exist, and that's about the
7 end of my knowledge.
8 Q. So you're not aware of what type of mesh
9 is used in those products versus the stress urinary
10 incontinence device?
11 A. I think along the way somewhere I may have
12 heard there's a different mesh, but I don't know a lot of
13 the details because I never implanted those.
14 Q. So if the mesh that was used in the pelvic
15 organ prolapse devices was lighter weight and larger pore,
16 would you expect the mesh being used in all of their
17 products to be changed in order to obtain the best possible
18 outcomes for their patients?
19 MR. WALKER: Object to form.
20 A. I think that's an assumption that you're
21 saying that that same mesh would provide the same function
22 and efficacy when used for a sling. So I don't know that,
23 again, you can compare the mesh for that product versus the
24 mesh for a sling product unless you had, you know,
25 countless number of patients to compare it. I mean, just

Page 117

1 because it does the job for one particular problem, I don't
2 think you can just assume it's going to be effective in the
3 same -- for a sling.
4 Q. Would that also be true with regards to
5 the use of hernia mesh in the abdomen versus hernia mesh in
6 the pelvis?
7 A. Yeah, that's the same thing. Until you
8 get studies that show it's effective and safe, then I think
9 you should always, you know, make sure you're wary of any
10 type of crossover utilization of products.
11 Q. In the section on page 8 under
12 Tension-Free Vaginal Tape, the second paragraph, mid
13 paragraph, you talk about prolene sutures being composed of
14 polypropylene. They contain antioxidants to prevent the
15 polymer degradation.
16 In that section, are you saying that you
17 have an understanding as to whether or not polypropylene
18 can degrade?
19 A. I don't know all the details of why the
20 antioxidants are put in there. I think that, you know, as
21 we discussed earlier, there's nothing that proves that
22 prolene dissolves. Could there be some things that can
23 help it stay sturdier and stronger? Possibly the
24 antioxidants. Again, I'm not a biochemist so I don't know
25 the details of that. But I'm assuming it would just be

Brian D. Parker, M.D

Page 118

1  something to help continue to keep its strength.
2      Q.    Are you planning to offer any opinions in
3  this case with regards to whether or not polypropylene used
4  in the prolene devices that make up the products we're here
5  to talk about today, whether or not that polypropylene
6  degrades?
7          MR. WALKER: Object to form.
8      A.    My opinion is that the prolene does not
9  degrade. And so if you're asking me if I have an opinion
10  about it, yes, I do. That's my opinion. If you're asking
11  me from a biochemist's standpoint what occurs at the
12  cellular level, molecular level, I can't tell you all that.
13  I can just tell you from a clinician, having used prolene
14  suture for many years, doing transplants and other things,
15  that later, when we go back, the prolene mesh is still
16  there. If it wasn't still there, there would be a lot of
17  problems with the prolene -- I mean, the prolene suture,
18  not the mesh -- but the prolene suture would be off the
19  market. So in my estimation, there's no sign of any
20  degradation or loss of structure of the prolene sutures.
21      Q.    So based on that, is it fair to say that
22  you will be basing your opinions off of your experience
23  with the device rather than your understanding of the
24  science behind the concept; is that correct?
25          MR. WALKER: Object to form.

Page 119

1      A.    Can you be more specific how you ask that
2  question? Are you asking me from a biochemical standpoint
3  am I able to give you the composition of the prolene mesh?
4  If you're asking me that, I can say I'm not here to comment
5  on that. If you're asking me to say when that prolene mesh
6  is outsed in patients, what happens to it, does it degrade
7  or not, I can certainly answer that without any hesitation.
8      Q.    I guess that's what I'm getting at. Have
9  you reviewed anything in your preparation to draft a report
10  in this case that gave you an understanding from a polymer
11  standpoint whether or not the polypropylene used in this
12  device is appropriate in this application?
13      A.    I can't comment from a biochemist's
14  standpoint, so I will not provide any insight as far as how
15  this thing is put together; only from a clinical
16  standpoint.
17      Q.    In the section on page 9 under TVT
18  Complications and Side Effects, you talk again about the
19  literature and reviewing it to determine the risks and
20  complications associated with all mesh procedures, and
21  you've listed a couple of studies in this section.
22  Specifically with regard to your discussion on dyspareunia,
23  you suggest that "It's a well-known complication that can
24  follow any vaginal surgery whether mesh is used or not. It
25  is also prevalent among women, especially those that are

Page 120

1  postmenopausal." Do you see where we are?
2      A.    Yes, ma'am.
3      Q.    Do you know if the studies that you
4  reviewed, do they distinguish between the dyspareunia that
5  is experienced by a woman prior to the surgery, or
6  de novo that occurs after she has the device implanted or
7  the procedure done?
8      A.    Yes, ma'am. The studies that I remember
9  reviewing were from the '60s and '70s, and they were
10  looking at overall complication rates after -- and I can't
11  remember, but it was like a hysterectomy, Burch procedure,
12  colposuspension. It wasn't one specific type of surgery.
13  It was all vaginal surgery. And they didn't mention before
14  and after. All right?
15          So I don't know if it was -- we don't have
16  that. What we do know is what the percentage of patients
17  were after surgery that had a complaint of dyspareunia. We
18  do know from a longitudinal standpoint there's a baseline
19  number of patients who have dyspareunia who don't complain
20  of it, don't share it with other people, but just suffer
21  from it.
22      Q.    So I guess what I'm trying to understand
23  from this section is, are you suggesting that the majority
24  of women that have a procedure are experiencing dyspareunia
25  prior to those procedures?

Page 121

1      A.    I can't comment on that, but I would say
2  that not only in that study but in other studies, they do
3  look at dyspareunia rates. And so there's a high -- not a
4  high percentage, but there's certainly a percentage of
5  patients who have dyspareunia rates just like -- well, I'll
6  leave it at that.
7      Q.    Because I think you go into that more in
8  the next paragraph where you talk about atrophic vaginitis
9  occurs in postmenopausal woman can lead to vaginal dryness,
10  cracking. But I guess what I'm trying to understand is
11  that every woman that enters menopause, you're not
12  suggesting that every woman who hits menopause
13  automatically experiences dyspareunia?
14      A.    No.
15      Q.    And you mention that women don't always
16  talk about dyspareunia and may not have talked about it
17  before their procedure.
18          Is it fair to say the same can be said
19  about women after the procedure, maybe not talking about it
20  at that point either? I mean, is that something that could
21  be possible as well?
22          MR. WALKER: Object to form.
23      A.    There's two possibilities with that. One
24  possibility would be what you just mentioned. The second
25  possibility was that they were having the dyspareunia

Brian D. Parker, M.D

Page 122

1 beforehand. So the studies, even after the years of the
2 midurethral slings, when they started looking at
3 dyspareunia rates, they don't necessarily comment on what
4 baseline of those patients had dyspareunia to begin with.
5          So there's two points of that that are a
6 little bit mysterious, is how many people are complaining
7 of it afterwards and they're saying -- or had the problem
8 and staying silent, and also how many people had it
9 beforehand that weren't discussed in the study before.
10         So it's possible. Yes, it's possible.
11 The rate of dyspareunia afterwards is possible. However,
12 in these studies they ask them specifically those
13 questions, if they're going to report them. They're asking
14 specifically for dyspareunia rates. So if they're trying
15 to get an idea about their adverse events and they have a
16 list of things that could happen, one of the checkboxes is
17 it could be dyspareunia, that's one of the things they're
18 going to report on.
19     Q.    And are you saying that in the studies you
20 reviewed that the question was asked both before and after
21 the study was conducted?
22     A.    I'm not suggesting that, because, like I
23 said, some of these people who had dyspareunia after the
24 surgery could have had dyspareunia before the surgery, both
25 before the use of midurethral slings and after the use of

Page 123

1 midurethral slings.
2     Q.    And I'm just trying to make sure I
3 understand, if you know if the questionnaires with that
4 question were asked prior to and then asked again after or
5 not?
6     A.    Every study is different. There's no way
7 for me to know.
8     Q.    That would make a difference to you, as a
9 clinician, in understanding whether or not you're putting
10 your patients at risk for dyspareunia if you had an
11 understanding of whether or not there was actually a
12 presence of it before versus after. Would that make a
13 difference to you in trying to figure out whether or not
14 that's a complication you want to discuss with your patient
15 before her consenting to have the procedure, especially in
16 a young, fairly young, sexually active woman?
17     A.    Listen, I think the way to answer that is
18 this. If we were to see the dyspareunia rates after
19 surgery to be significantly higher than the baseline, I
20 mean, then you would have to assume that those dyspareunia
21 rates are based on the surgery itself. If you see that
22 it's a moderate number, very close to what baseline numbers
23 would be, you would never know if it's just due to the --
24 there's no way for you to know, and -- unless it is
25 specifically asked before and after, unless there was a big

Page 124

1 discrepancy between what would be expected to be baseline
2 and a high rate. We are not seeing that so we can't assume
3 that in this situation.
4     Q.    So in your review of the literature,
5 you're saying that the rate of the dyspareunia that comes
6 after the surgery is low?
7     A.    Yes.
8     Q.    And do you know, based on your review of
9 the literature, whether or not the dyspareunia remains
10 chronic and indefinite after the procedure or if it
11 improves after time passes?
12         MR. WALKER: Object to form.
13     A.    They have done longitudinal studies on
14 them. I'd have to go back and review the literature to see
15 exactly. But it's in my mind that it tends to get a little
16 bit better, but not substantially better over time, unless
17 treated with other like topical agents, estrogens and
18 things like that.
19     Q.    Let's turn to page 10. We're in the
20 section entitled TVT-O.
21     A.    Yes, ma'am.
22     Q.    And you discuss the development of the
23 TVT-O procedure was sparked by rare but significant
24 complications with valve preparations in the middle of the
25 paragraph, but the second small paragraph.

Page 125

1         So your understanding from the review of
2 the literature is that the TVT-O device was meant as
3 another option to improve upon some of the adverse
4 experiences surgeons were having with the TVT retropubic
5 device?
6         MR. WALKER: Object to form.
7     A.    From my understanding, the obturator route
8 of placement of the sling was sparked not only to decrease
9 the risk of what's listed here, but also to help improve
10 voiding postoperatively and to decrease the rate of
11 transient retention. It also was sparked by -- there's
12 blood vessels behind the pubic bone that can be hit and
13 that low risk of retroperitoneal hematoma. So it was
14 trying to improve upon an already good product.
15     Q.    On page 11, the complications and side
16 effects, you discuss the studies that compare a retropubic
17 route to the transobturator route and the fact that the
18 obturator exhibits more neurologic symptoms, mainly
19 consisting of leg weakness of the upper legs. Do you see
20 where that is?
21     A.    Yes, ma'am.
22     Q.    And then you go on to quote the Richter
23 study with regard to those adverse events. And then in the
24 next section you mention most leg weakness is short-term
25 from placement of the trocar through the obturator internus

Brian D. Parker, M.D

Page 126

1 muscle. And in this section I was wondering what study you
2 were basing this information on, because you also go on to
3 discuss the procedure with regards to the 45 degrees versus
4 90 degrees, and I wanted to see if I could get an
5 understanding of where this information came from.
6      A.     Which part are you wanting to know? So
7 the 45 to 90 degrees part?
8      Q.     Well, the fact that most leg weakness is
9 short-term, what did you base that opinion on?
10      A.     Well, because there's some longitudinal
11 studies that look at leg weakness or pain initially and
12 then that over time is -- the rates of that actually
13 decrease so, you know, that actually is just transient. So
14 that's part of it.
15      Also part of it is from experience placing
16 the TVT-O. And then just the shear volume of data that's
17 out there. I don't know if there's a specific study. I do
18 remember one longitudinal study looking at 12 months, 24
19 months and seeing if there was a decrease in leg weakness
20 and pain.
21      Q.     But you're not aware of any longer-term
22 studies that suggest that the leg weakness continues?
23      A.     I am. I just can't quote it to you. And
24 it tends to decrease over time.
25      Q.     Do you know of instances where it has not

Page 127

1 decreased over time but it has increased based on reports
2 or studies you reviewed?
3      A.     That it's increased over time? I've not
4 seen that.
5      Q.     Going on to the section with regards to
6 the section where the handles had to be dropped from 45
7 degrees to 90 degrees before passing through the foramen,
8 are you basing this on Tips & Tricks that you learned with
9 regards to the TVT-O or was this something that was in the
10 IFU, or do you know?
11      A.     I believe that was in the IFU, but I would
12 have to go back and review specifically. I do know that
13 there's -- they may not say it specifically, but that's the
14 idea behind the placement, was dropping the handle. That's
15 a key technique part.
16      Q.     Now, in the section near the bottom of
17 page 11, you're continuing to talk about some studies that
18 you referenced above, the Cheng study, the Serati study.
19 You start the paragraph, "These findings demonstrate that
20 while nerve injury is a potential and warned about risk of
21 the TVT-O, long lasting pain associated with TVT-O is very
22 rare. While it is possible that misguided trocars could
23 injure the obturator nerve or even in some cases the
24 pudendal nerve, such injuries are almost impossible if the
25 TVT-O instructions for use are properly followed by the

Page 128

1 implanting doctor."
2      My question is, if there is a patient that
3 experiences an injury with regards to the obturator nerve,
4 it's your opinion that it's the implanting doctor, his
5 failure to follow the instructions for use that results in
6 that complication?
7      A.     Yes.
8      Q.     Do you have any opinion with regards to
9 whether or not the fact that it's a blind passage of sorts
10 has anything to do with the ability of the doctor to follow
11 the instructions in the IFU?
12      A.     So you're asking me does it make it more
13 difficult because it's a blind procedure? The answer to
14 that is that if you follow the instructions, that it's been
15 shown in anatomy, cadaveric labs, that you're going to be
16 way away from any nerves. And so the only way to -- you
17 know, you can feel your landmarks. You can feel where
18 you're going with the procedure. So it may be partly
19 blind, but it's also a tactile procedure as well. And so
20 if you're just -- you would have to be extremely way off
21 mark to get anywhere near the nerve or artery or vein.
22      Q.     Are the landmarks you discussed, described
23 just now, do they change from patient to patient as far
24 as -- so if a woman is small stature versus larger in
25 stature, does that affect the landmarks and the path of the

Page 129

1 device?
2      A.     Not substantially.
3      Q.     What do you mean by "not substantially"?
4      A.     Well, externally there may be a little bit
5 more size, but the actual anatomy of the pelvic bone
6 doesn't change substantially. So once you know where your
7 landmarks are, you should be able to follow the path in
8 without any trouble. So even though the patient may be
9 small or big, certain landmarks are consistent. And you
10 don't see, you know, wide variations in pelvises. I mean,
11 from child to adult there is, but from one adult to
12 another, there's not a wide variation. You don't see a
13 change in where a nerve or vein go. I mean, anatomy is
14 anatomy. So there might be some subtle changes, but
15 nothing substantial.
16      Q.     And that would have no affect on the
17 ability of a doctor to follow the instructions provided
18 with the TVT-O device in your opinion?
19      A.     Correct.
20      Q.     So in any of the cases where there were
21 reports of groin pain related to the passage of the trocar
22 through the -- I guess it's the --
23      A.     Obturator internus and obturator membrane.
24      Q.     Correct. So any injury that would be
25 sustained by a patient in those areas following a procedure

Brian D. Parker, M.D

Page 130

1  would all be because of the doctor's error?
2          MR. WALKER: Object to form.
3      A.   So I would expect there to be some pain in
4  that area initially. It doesn't mean it was a defective
5  product. It doesn't mean that the surgeon did anything
6  wrong. Because you're placing a needle through a membrane
7  and then some muscle. So, you know, I would expect there
8  to be some transient groin pain. I mean, that's part of
9  having surgery.
10     Q.   And do you have an opinion whether or not
11 the actual mesh that is fed through the tissues and muscles
12 that you were just describing, whether or not the fact that
13 that foreign body remains behind in that area has anything
14 to do with the continued groin pain or any of the effects
15 we were just discussing?
16         MR. WALKER: Object to form.
17     A.   I have not seen data to support that.
18     Q.   Would you expect for there to be
19 situations where having a foreign body in that area
20 long-term with movement, such as running or being active,
21 could potentially manifest itself as groin pain related to
22 the placement of the mesh?
23     A.   I think any surgery in that area could,
24 but my problem with that premise is that if that was the
25 case, then every woman who ever had that implanted should

Page 131

1  have that problem, and that's obviously not the case. So
2  any woman can have groin pain from that surgery or she
3  could have groin pain from a non-mesh-related surgery.
4  Whether it's related to the mesh internally, you know,
5  again, I haven't seen the data on that.
6      Q.   Do you know if there are any studies that
7  look at specifically the activity levels of a woman
8  receiving an obturator device versus a retropubic device
9  where that was actually analyzed and discussed in the
10 study?
11     A.   I can't recall one being set up to discuss
12 activity levels after a sling. I would -- you know,
13 everybody's activity level is different to begin with, so
14 how can you really compare that? It would be a tough study
15 to compare.
16         I think that more than anything you're
17 looking at are the people in general living their lives and
18 doing the things they want to do without complaining of
19 groin or leg pain. And that would be shown in the studies.
20     Q.   Have you reviewed any documents in
21 preparation for your report in this litigation, internal or
22 otherwise, that suggests that there was a concern for using
23 the TVT-O device in women who were active in sports that
24 would include a lot of running or activity --
25         MR. WALKER: Object to form.

Page 132

1      A.   An internal document?
2      Q.   Yes.
3      A.   I can't -- I don't recall seeing one, no,
4  ma'am.
5      Q.   Okay. If we could turn to page 12.
6          MR. WALKER: Could we take five minutes?
7  It's noon.
8          MS. BAGGETT: Sure. That's fine.
9          MR. WALKER: Just so we're clear, tell me
10 if you have any issues with this.
11         We're doing a five-hour deposition that is
12 covering both TVT-O and TVT-Secur. We're not
13 doing two separate depositions essentially. Is
14 that fair enough?
15         MS. BAGGETT: That's fair.
16         (Thereupon a break was taken from 11:59
17 a.m. to 12:08 p.m.)
18 BY MS. BAGGETT:
19     Q.   Doctor, before the break we were talking
20 about the TVT-O device and some of your -- sections of your
21 report. I think we left off on page 11. And going to
22 page 12 from page 11, you start the discussion about the
23 Cochran Review, and you're discussing the 2015 review by
24 Ford, and then on 12 you move over to discuss the more
25 recent Cochran Review. And I noticed you didn't cite it,

Page 133

1  so I was just wondering which review you were relying on
2  there.
3      A.   Well, let me look at this here. You're
4  talking about which Cochran Review is this last one?
5      Q.   Yes, sir.
6      A.   I assume it was the most recent one, but
7  I'll have to look and see here.
8      Q.   And at least for the purpose of drafting
9  this report, where you have referenced a study, is it fair
10 to say that you read the study at least in its entirety and
11 not just an abstract or --
12     A.   That's correct. If it's in here, then I
13 read more than just the abstract. Let's look and see here.
14     Q.   Actually, if you're saying the most
15 recent, I'm going to accept that as -- I don't want you to
16 have to --
17     A.   Thank you.
18         MR. WALKER: I can tell him which tab to
19 go to, though.
20         MS. BAGGETT: Understood.
21 BY MS. BAGGETT:
22     Q.   I did have trouble finding one in the
23 section under urinary retention, the Johnsson Funk I think.
24 I was looking for that study. Is that the correct spelling
25 and such? Can you just verify that?

Brian D. Parker, M.D

Page 134

1    A.    It might be a hyphen in between there. I
2  may have it in here, too.  Let me look and see.  I'll tell
3  you what.  If I can't verify it now, can I get back and
4  update you?
5    Q.    Certainly.  That's fine.  So if you'll
6  just note that one and the Funk one referenced above of
7  2013, if you could just confirm that both of those, what
8  the actual --
9    A.    Can I write on this?
10        MR. WALKER:  Yeah.  Well, no, actually,
11  that's the one that's been marked.
12        MS. BAGGETT:  You know what I can do is --
13  I have an extra copy he can use.
14        THE WITNESS:  Thank you.
15        MS. BAGGETT:  All right.  So we'll move
16  on.
17        MR. WALKER:  Maybe I can help with that.
18  I think that might be a typo in terms of Jonsson.
19  It's J-o-n-s-s-o-n Funk.
20        MS. BAGGETT:  J-o-n-s-s-o-n.  And is it
21  hyphenated?
22        MR. WALKER:  It's not in the study.
23        MS. BAGGETT:  Is Funk, also by itself, the
24  proper cite for the one above it?
25        MR. WALKER:  I don't know.

Page 135

1        MS. BAGGETT:  That's fine.
2  BY MS. BAGGETT:
3    Q.    Okay.  Now, on page 13 of your report you
4  talk about professional society statements.  And you've
5  read each one of the statements or the guidelines that you
6  reference in your report in full.  Is that fair?
7    A.    At one point in time I have, yes.
8    Q.    And in doing so, did you also look at the
9  studies that were cited in each one of the documents
10  produced by these societies, or had you seen it before on
11  reviewing the society documents?
12    A.    I didn't go through each one specifically
13  individually, but a lot of them I recognized or knew I had
14  read sometime in the past, so I didn't go back through each
15  one to review each study.
16    Q.    And the reason I ask that is because in
17  the third paragraph starting in 2015, you're talking about
18  the American College of Obstetricians and Gynecologists in
19  conjunction with the American Urological Society, and you
20  referenced that they reviewed the literature and issued a
21  statement based on level of data available, Level A
22  recommendation based on good consistent scientific
23  evidence.  And I wanted to make sure that you -- if I
24  understood whether or not you had independently verified
25  that that was actually the type of evidence that was

Page 136

1  used --
2    A.    Oh, okay.
3    Q.    -- or if it was something you relied on
4  the position statement to tell you.
5    A.    So on this one specifically, I went back
6  and I reviewed the -- I didn't read the whole study, but I
7  did go through to see what they recommended as far as Level
8  A and so on to see if I either recognized the study or saw
9  that it was a high-powered study.  And if I wasn't sure,
10  I'd go back and reviewed the abstract quickly to make sure
11  that it was something I could feel comfortable with.  Did I
12  read every bit of every study?  No, I did not.
13    Q.    And by doing the abstract, or reviewing
14  them in the manner you just described, were you able to
15  discern how many of those studies were long-term versus
16  short-term in your review?
17    A.    Sitting here now, I can't give you that.
18  I can't recall.
19    Q.    That's fine.  At the bottom of page 14,
20  you reference five other societies and organizations joined
21  AUGS and SUFU in support of these statements.  Are they
22  listed above or are they an additional five societies that
23  also -- I was wanting to make sure I understood what the
24  five other societies were.
25    A.    No, I would have go back and review.  I

Page 137

1  think there was a mention of other small societies and I
2  didn't have the acronyms for each one of those.  So I can
3  go back and review that and get that.
4    Q.    Sure.  And we can move on.  I don't want
5  to hold up to do that.  We can make a note to reference
6  what the five other studies were here.  And we'll move on
7  to TVT-Secur.
8        Okay.  In this section, under Design, you
9  reference the fact that "Other companies were developing
10  their own type of single incision sling and cumulatively,
11  they were described as 'mini slings.'  I believe that the
12  TVT-Secur was safe in design and base this opinion on my
13  review of Ethicon documents, my discussions with colleagues
14  and my review of the medical literature."
15        So is your opinion with regards to the
16  actual design of the device or on its application in your
17  practice?
18        MR. WALKER:  Object to form.
19  BY MS. BAGGETT:
20    Q.    I guess what I'm trying to say --
21    A.    Is that two separate issues?
22    Q.    Well, let me see if I can make that
23  question a little better.  I may need to break it down.
24        Okay.  So I guess what I want to get an
25  understanding of is the opinions that you hold in your

Brian D. Parker, M.D

Page 138

1  report.  Are you an expert -- are you holding yourself out
2  as an expert on the design of medical devices?
3      A.    Only as they apply to how they are used
4  when the final product is available and used on a patient.
5  But the actual engineering, I wouldn't.
6      Q.    So you've never designed a medical device
7  in your practice?
8      A.    No, but I have been involved with a think
9  tank, help improve designs for the Medtronic Interstim
10  device.  I've helped with that, but I haven't physically
11  engineered any type of sling device.
12      Q.    Are you familiar -- as part of your review
13  in offering these opinions, did you make yourself familiar
14  with the standards a manufacturer must follow in designing
15  a mesh product?
16          MR. WALKER:  Object to form.
17      A.    So you're asking me if there's a certain
18  set of guidelines that manufacturers have to follow?  No,
19  I'm not aware of how that process goes on.
20      Q.    And are you aware of any standards or
21  guidelines that must be followed in order to submit a
22  device, medical device, for approval or clearance through
23  the FDA?
24      A.    You lost me on that.  Say that again.
25      Q.    I'm just trying to understand if you

Page 139

1  are -- in addition to being familiar with how a company
2  manufactures a device, are you familiar with the
3  regulations surrounding designing a device that must be met
4  in order to satisfy the FDA in order to get the product on
5  the market?
6      A.    Is that not similar to what we discussed
7  earlier about the 510(k)?
8      Q.    It's similar to it, but with particular
9  regards to the design.  So there's safety and efficacy
10  things that can be done --
11      A.    Right.
12      Q.    -- but then there may be some --
13      A.    My knowledge of these devices comes from
14  going to meetings and talking to the different doctors who
15  have been involved in the different designs, or going and
16  reading the internal documents.  But in no way, shape or
17  form have I ever been involved in the day-to-day process of
18  designing these things.
19      Q.    So is it fair to say that you're not
20  familiar with the failure modes and effect analysis and its
21  role in the development of the device?  Do you know what
22  those are?
23      A.    I'm not familiar.
24      Q.    So you didn't review any procedures from
25  Ethicon's internal documents with regards to design, the

Page 140

1  designing of this device?
2      A.    I did read those.
3      Q.    You did?
4      A.    Yes.
5      Q.    And what, if anything, did that, in your
6  opinion, make you qualified to opine about with regards to
7  the design?
8      A.    So from the standpoint of all the
9  prototypes, no.  But once it gets to a certain prototype
10  and it starts to become -- when the device is actually to
11  the point where it's going through the different studies,
12  whether it be human or animal, at that point those studies
13  are important to me, and so I would give an opinion based
14  on that.
15      Q.    Do you know what a DDSA is?
16      A.    DDSA.  I'm not familiar.
17      Q.    And FMEA?  Those are not acronyms that you
18  would use routinely in your practice?
19      A.    No.
20      Q.    Do you have an understanding of whether or
21  not when Ethicon was designing the TVT, the prolene mesh
22  that was used in the TVT, the TVT-R and the TVT-S, if the
23  mesh was designed to rope?
24          MR. WALKER:  Object to form.
25      A.    Well, the mesh was not designed to rope.

Page 141

1  You're asking me if it was designed to rope?
2      Q.    Do you know if the mesh was designed to
3  rope?
4      A.    I think the idea behind the mesh was for
5  it to lie flat, but I don't know that there was any studies
6  to look at roping on mesh.
7      Q.    Do you know whether or not the mesh was
8  designed to curl?
9      A.    I can't comment on that, but in reality we
10  all know that it curls.
11      Q.    Do you know if it was designed -- that the
12  mesh in the prolene -- do you know if the mesh -- let me
13  just start over on that one.
14          Do you know if the mesh used in these
15  devices was designed to fray?
16      A.    Was designed to fray?  I'm not privy to
17  that information.
18      Q.    Do you know if it was designed to lose
19  particles?
20      A.    I'm not aware of any documents on that.
21      Q.    Do you know if it was designed to shrink?
22      A.    No.  I'm not aware of any studies that
23  were designed to look at shrinkage of mesh.
24      Q.    Do you know if the mesh was designed to
25  deform easily?

Brian D. Parker, M.D

Page 142

1    A.    I'm not aware of that either.
2    Q.    Would you agree that the things that I
3 just asked you about, each one of these, the roping, the
4 curling, the fraying, the particle loss, and shrinking and
5 deformation, that these would be considered unwanted or
6 unintended consequence of the mesh, whether they have
7 clinical impact or not?
8         MR. WALKER:  Object to form.
9    A.    No.  It depends on what they are using
10 them for.  Some of the things you're saying -- you lumped a
11 bunch of things together.  I don't know that, A, number
12 one, that some of the things you described are of any
13 negative consequence.  B, I think it depends on what you're
14 using the mesh for at the time it was studied.
15   Q.    And today, for the purposes of today's
16 discussions, we're talking about the use in the TVT-R, the
17 TVT-O and the TVT-S devices.  And my question is
18 specifically whether or not you agree if those qualities
19 would be unintended with regards to the design of the
20 devices, whether or not it has a clinical impact or not?
21        MR. WALKER:  Object to form.
22   A.    What you're describing there may -- well,
23 I don't know that it has a clinical impact.  If it were to
24 have a clinical impact, hypothetically, then I don't know
25 of it.  And I don't know of the ramifications of

Page 143

1 determining that and then what the next steps are to
2 rectify it.
3    Q.    But even more succinctly, do you agree
4 that these conditions were not the intended consequence in
5 designing the mesh?
6         MR. WALKER:  Object to form.
7    A.    I can agree with that.
8    Q.    While we're on the subject of your
9 opinions, are you going to be offering opinions with regard
10 to warnings that were provide by Ethicon with regards to
11 the products at issue in this case?
12   A.    Yes.
13   Q.    What risk information are medical device
14 companies required to put in their IFUs?  Are you familiar
15 with the requirements?
16   A.    Their requirements?
17   Q.    Uh-huh.
18   A.    Adverse events that are reported in the
19 literature I suppose.  I don't know if there's a way that
20 the IFU is set that has to be met, but...
21   Q.    Do you know what the industry standards
22 are governing warnings on medical devices?
23   A.    I'm not aware of how those industry
24 standards are set.  I do know that from a -- again, this is
25 all from a clinician standpoint, how we perceive and look

Page 144

1 at those warnings.
2    Q.    And that's kind of what I'm trying to get
3 at.  As far as in your clinical practice, the way that you
4 perceive the warnings versus whether or not those warnings
5 met the expectations of the industry in complying with
6 regulations and standards.
7    A.    So you're taking that question and
8 assuming I know what the standards are.  I think they met
9 the standards, yes.
10   Q.    And you know what those standards are?
11   A.    What I'm saying, I'm speaking from the
12 standpoint of a clinician what those standards would be.
13 I'm not involved in, again, regulation, so I don't know how
14 those things are set.  Do I think the IFU is acceptable in
15 its either current or prior form?  Yes.
16   Q.    Have you, in your review and in drafting
17 your report, read any testimony from Ethicon employees
18 regarding Ethicon's position on what needs to be in the
19 IFU?
20   A.    Yes.
21   Q.    And do you have an opinion as to whether
22 or not there was some conflict between the employees at
23 Ethicon whether or not something should have been in the
24 device that never made it to -- or should have been in the
25 warnings that never made it to the warnings?

Page 145

1         MR. WALKER:  Object to form.
2    A.    I don't know of -- I do know there were
3 conversations among Ethicon representatives about certain
4 items.  Again, from a clinical standpoint, that's kind of
5 a ticky-tack question.  Most of those items they're
6 discussing are already well-known complications, side
7 effects, that we tend to deal with with any pelvic surgery.
8 To me, I glanced through those, but in practice it's not
9 much of an issue.
10   Q.    Do you agree that physicians should be
11 made aware of all the significant safety risks that are
12 associated with the product via the IFU?
13        MR. WALKER:  Object to form.
14   A.    I'll just say this about the IFU.  The
15 IFU, to me, needs to be in there because it has to be in
16 there.  But I don't rely on the IFU.  I don't know other
17 surgeons who rely on the IFU.  I mean, to me, that would be
18 like relying on your builder to look at a printout of how
19 to put each board together.
20        There are certain inherent things that are
21 in the IFU that I think are silly and don't need to be
22 there.  For instance, it says "Don't operate on people who
23 are on anticoagulation," or "Make sure you sew up your
24 incision."  So the IFU, from a clinician's standpoint, is
25 very -- it has to be there, but it's not something that we

Brian D. Parker, M.D

Page 146

1 rely upon.

2    Q.    In our discussions earlier today we were
3 talking about how you were trained on the devices, and you
4 mentioned that the earlier devices you learned in
5 residency, through your residency programs, and that with
6 the TVT-S device you actually took the professional
7 education courses provided by Ethicon.  Do you recall that
8 conversation?

9    A.    Yes, ma'am.

10    Q.    Do you have an understanding of whether or
11 not -- and I know that you just recently testified that you
12 don't rely on the IFU -- do you have an understanding
13 whether or not the people that you learned the procedure
14 from, whether or not at some point they may have read and
15 relied on the IFU in relaying information to you?

16    A.    Well, I don't know that I testified
17 exactly that, said I don't rely on the IFU.  But it's not a
18 critical -- if I said that, really, my point of saying it
19 is it's not a critical part of a clinician's
20 decision-making process.  It can be helpful in certain
21 circumstances, but in reality we don't -- you know,
22 physicians don't look at that every time that we perform a
23 procedure.  Are there other physicians who may look at that
24 before?  I have no way of knowing.  I have no way of
25 knowing the people that I've trained from, whether they

Page 147

1 looked at that or not.

2    Q.    I guess what I'm getting at is who would
3 be in a better position to know all of the fine details of
4 the procedure than the designers of the device and the
5 procedure?

6        MR. WALKER:  Object to form.

7    A.    So who would be better at knowing that
8 than the designers?  Are you talking about the
9 manufacturers?

10    Q.    Uh-huh.

11    A.    Well, isn't it kind of a combination of
12 the manufacturers and the physicians to come up with that?

13    Q.    Well, and, actually, I think the
14 manufacturers employ physicians that assist with this.  But
15 I guess what I'm saying is, you learn what you learn from
16 med school.  At some point someone has to be taught --
17 number one, shown that there is such a device and then
18 shown how to properly use the device, even if that
19 information passes from preceptor to preceptor to
20 preceptor.

21        I guess what I'm trying to understand is,
22 who would be in the best position to know how to properly
23 perform that procedure than the manufacturer?

24    A.    I understand what you're saying now.
25 Okay.  So there's multiple parts on the IFU.  The part

Page 148

1 that's probably the most helpful may be the step-by-step
2 way of putting the device in, the utilization of it.  The
3 things that actually from a standpoint of -- I think it's
4 kind of a little bit -- I don't know if not necessary is
5 the right word, but of really no practical importance; you
6 know, what patient is operated on, how long postoperatively
7 to do things.  I mean, that's a little bit insulting to my
8 intelligence to say that I went through all that training
9 to have somebody tell me that I have to tell the patient
10 they must wait four weeks before intercourse after having
11 the sling procedure.  And there's a lot of stuff like that
12 that's in there, but of any to no practical use.

13        So that thing that is practical useful is
14 the actual, you know, where do my hands go, what do I need
15 do to put this in.  But the other part of it is, I mean,
16 it's already well-known, it's already something that's
17 reported in the literature, and it's not something we
18 gained just from the IFU.

19        So to answer your question is, there's no
20 other person that's better than all the physicians who use
21 it and the company that makes it combined together with all
22 the literature to come up with these IFUs.

23    Q.    I don't mean in any way to insult you and
24 your intelligence with my questions.

25    A.    You're not insulting me.

Page 149

1    Q.    I just want to make sure that you
2 understand that I've got my job to do to ask these
3 questions.

4    A.    No, ma'am, I don't take it from you at
5 all.

6    Q.    And I do understand where you're coming
7 from with the fact that certain things that are understood
8 in your practice may not be as necessary to state in the
9 IFU, but would you expect that the more important the
10 information is that the more -- I have a tendency to get my
11 whole thought process off.  So if that is common
12 information that every doctor should know, and you're not
13 going to pay any attention to it when you go and review it,
14 certainly if there's something that's not common, that
15 would be something that you would expect to learn from the
16 manufacturer of the device and not wait until the studies
17 that could be many years down the road come out that
18 suggest there's a problem, if they knew at the time the
19 device was manufactured.  Do you agree with that?

20        MR. WALKER:  Object to form.

21    A.    That's a pretty convoluted question.

22    Q.    If you want me to restate it I will, or
23 do you think you understand it?

24    A.    I think I understand it.

25    Q.    Because I don't want you to guess.  I

Brian D. Parker, M.D

Page 150

1 don't want to confuse you.
2     A.    Right.  So are there things in there that
3 need to be stated that aren't well-known otherwise?  I
4 mean, by the time that these things are made or put in,
5 there's already data on it, so you have to come up with
6 that information somehow, right?  And that data -- I mean,
7 is there any data that we don't see that's out there?  I
8 wouldn't think there's very often that that occurs.  But
9 anything that I think is important could be put in there,
10 but it could not be put in there.
11         Again, as surgeons we just don't use that.
12 I mean, it's not a practical part of daily operation.  I
13 get an IFU every time that I put in an Interstim.  I've not
14 looked at one in years.  I don't understand why people feel
15 like that's the Holy Grail of what we do as surgeons.  I
16 mean, we learn how to do a procedure.  Once we learn how to
17 do the procedure, we already knew the risks and benefits
18 beforehand, we know what the potential side effects are
19 afterward.  I mean, all these things can happen.  We know
20 anything can happen with surgery.  So, you know, the IFU
21 doesn't really play a big role in this.
22     Q.    I guess what my distinction is, certainly
23 between the things that you know or should know as a
24 surgeon, and more focused on the things that you may not
25 have the ability to know because as far as the literature

Page 151

1 available to you, it hasn't made its way into the common
2 knowledge.
3     A.    Well, I think things like -- for instance,
4 if I put in a sling and they noticed that patients were
5 having blue vision, I'd want to know that.  That's
6 something that doesn't make any sense.  That's completely
7 off the mark.
8         But anything that has to do with vaginal
9 procedures, bleeding, pain, et cetera, et cetera,
10 et cetera, that's not a big surprise.  What would be a big
11 surprise is if they said that your right knee would hurt or
12 maybe your left elbow would hurt.  I mean, those are
13 off-the-wall things.  Yeah, those things I would want to
14 know, but anything other than that, it's all common
15 knowledge.
16     Q.    So for instance, with regards to the TVT-S
17 device, we discussed earlier about the fact that it was
18 laser cut.
19     A.    Okay.
20     Q.    If the manufacturers of the TVT device
21 understood that the laser-cut mesh had a propensity to
22 cause more frequent and more severe erosions or exposures
23 than the other devices, would that be something that you
24 would expect that they would -- whether it be in the IFU or
25 in the form of some other communication -- make you aware

Page 152

1 of as soon as they knew about it?
2         MR. WALKER:  Object to form.
3     A.    So by stating that you're wanting me to
4 assume that's the truth, that there's a significant
5 difference in the two?  Because I'm not going to answer in
6 a way that's going to tell you that I think there's a
7 difference significantly between a TVT-O --
8     Q.    I'm not asking it in the way that you --
9     A.    If you are asking hypothetically --
10     Q.    If there were documents that suggests --
11     A.    If there were documents, okay.
12     Q.    -- that Ethicon was aware of that suggest
13 that the device had a greater risk of erosion than the
14 mechanically-cut devices, and they knew that before they
15 offered that device, do you feel like the company is
16 obligated to make you aware of that before --
17     A.    If there's a huge --
18         MR. WALKER:  Hang on a second.  Did you
19 finish your question?
20         MS. BAGGETT:  -- before you use that device
21 in one of your patients?
22         MR. WALKER:  Object to form.
23         THE WITNESS:  If there's an enormous
24 disparity, then I think there's something that
25 needs to be said.  If it's an inconsistent, small,

Page 153

1 then I think that there would be -- the margin of
2 error or the -- I guess I'm blanking on what I'm
3 trying to think of.  But the potential that
4 happens by chance could accommodate for that.  But
5 if there's a significant change, then that would
6 be something that we would want to look at.
7 BY MS. BAGGETT:
8     Q.    And I understand that as far as this field
9 of practice goes, you're in the upper end in a urologist's
10 understanding of female anatomy and the procedures and the
11 techniques, but as far as someone on that bottom layer --
12 and I think you also mentioned to me earlier that at least
13 unique to Knoxville, the gynecologists don't perform the
14 same stuff that the urologists do, they refer them to the
15 urologists.
16         So in situations where that's not the
17 case, this is not the norm, and you've got a doctor who is
18 not as well adept at the procedures and the anatomy and the
19 understanding of the disease processes, do you feel that
20 there's any obligation on the manufacturer of warning in a
21 way that helps that type of doctor understand the
22 seriousness of some of the adverse events, if only to allow
23 them to have that conversation with their patients when
24 deciding whether or not to use the device?
25         MR. WALKER:  Object to form.

Brian D. Parker, M.D

Page 154

1    A.    Well, that's a thought.  And I guess
2 that's something that the individual physician probably
3 needs to come to terms with, is do they feel comfortable
4 doing that procedure or not.  I mean, there's certain
5 procedures I don't feel comfortable with and I'll send off
6 to others.  But, you know, that's part of the whole --
7 you're asking me is that -- if you didn't know about a
8 certain problem, and you were going to go ahead and perform
9 a procedure, would that be something that you may have not
10 done if you had known there could be a problem to begin
11 with?  Is that what you're asking me?
12    Q.    Yes, sir.
13    A.    I think what you're insinuating there is
14 there's some type of significant discrepancy between what's
15 known and what's true, and that would be hard for me to
16 really comment.
17    Q.    And I'm not asking you to agree with me on
18 any given point whether or not there is such a thing,
19 because we don't have time to go through all the studies
20 and all the internal documents for me to show it to you,
21 and I know you're limited on what you can glean from the
22 few documents I've even shown you today.  Certainly that's
23 one document in millions.
24          But for the sake of argument, as I said,
25 it's only if that were true and there were events that were

Page 155

1 serious enough that a doctor might reconsider using it,
2 especially in a certain population of patients, or at the
3 very least would have had that conversation with the
4 patient and allowed them the opportunity to decide, that
5 would be something important to relay to those doctors?
6          MR. WALKER:  Object to form.
7    A.    You know, I think that -- I'm trying to
8 put myself in the position of those physicians.  And, you
9 know, if it was a new procedure that just came on the
10 market and there was no precedents before it, it was
11 completely new, I can see that.  But when it's just a
12 variation of what's going on before, I think you already
13 have an idea about what to expect and not expect and side
14 effects and complications.
15          So at that point, you have to make the
16 decision.  And I think you have to be honest with the
17 patient and say, look, I haven't done many of these
18 procedures; if you would rather go see somebody else who
19 has, we can do that.  But it's the conversation.  And I
20 think if it's a completely new procedure that's never been
21 on the market, completely different than anything else, I
22 can see that.  I think in other ways, as a physician, you
23 can assimilate all that information fairly rapidly and come
24 to your own conclusion.
25          I do think there's some -- you know,

Page 156

1 obviously, the companies are trying to make it easier on
2 the physicians and, therefore, the patients.  And so they
3 don't want to -- they don't want to hide things from the
4 physicians, because if they start having problems, they're
5 going to have a big backlash against that product and they
6 are going to lose confidence in that product.  So I think
7 there's got to be a very open dialogue.  I would expect the
8 company would want that, because, otherwise, there would be
9 a mutiny.
10    Q.    And you were just describing a situation
11 where a product is new to the market.  With regard to the
12 TVT-S, are you aware of any discussions in any of the
13 documents that you've reviewed or in any of the testimony
14 that you've reviewed in preparing your report today of
15 whether or not one of the problems with the learning curve
16 situation with the TVT-S device was because doctors were
17 trying to rely on the procedure they had been taught with
18 the TVT-R and the TVT-O and that procedure was different
19 enough that it wasn't flowing perfectly with the way that
20 this procedure had to be performed, or do you have an
21 opinion at all?
22          MR. WALKER:  Object to form.
23    A.    Yeah, it would be hard for me to really
24 comment on how that all -- I mean, each individual
25 physician's ability to do that.  I mean, it would be a

Page 157

1 guess on my part.
2    Q.    And if you knew that -- and I think we may
3 have talked about this before, so if I'm repeating, I
4 apologize.  I'm just trying to make sure I've got it clear.
5 But if Ethicon was aware of enough of a difference in a
6 procedure that was subjecting women to additional
7 complications and/or failure of the device because of the
8 lack of proper training or information with regard to the
9 differences in the approach and the technique, do you feel
10 that it's their responsibility to make sure that that is
11 related to the doctors that are going to be using the
12 device?
13          MR. WALKER:  Object to form.
14 BY MS. BAGGETT:
15    Q.    Do you understand what I'm asking you?
16    A.    So you're asking me if the complication
17 occurs or if there's a change in the procedure enough, that
18 that needs to be relayed to the physician?  Possibly.  This
19 is just so -- you know, I think that it is a new procedure,
20 or it was a new way of putting it in, and so there are
21 little nuances there that I think very quickly could be
22 disseminated to the physicians, either through the work of
23 their sales reps or what have you, or the proctors.  And
24 that could be something done very easily, just a phone call
25 or e-mail saying, hey, make sure you put this in this way,

Page 158

1  a little bit tighter than normal with the obturator and the
2  retropubic. I think that could be a very easy way of
3  disseminating that information.
4      Does that answer your question?
5      Q.   It does. Do you know who Dr. Lucente is?
6      A.   Dr. Lucente? I've never met the man.
7      Q.   Have you read about him in the materials
8  that you reviewed in drafting this report?
9      A.   Yes, I do remember him, but I'm going to
10  have to go back and review precisely what his role was.
11     Q.   And I'll save you some trouble. I just
12  want to know if you recall reading anything that suggested
13  that even Dr. Lucente -- who I'll represent to you was one
14  of the KOLs with Ethicon -- whether or not you read
15  anything suggesting he was having trouble with the learning
16  curve as well when he first began using the TVT device?
17     MR. WALKER: Object to form.
18     A.   Yeah, I don't recall exactly.
19     Q.   And that's fine. You reference on page
20  16, in the second paragraph, "Other studies showed inferior
21  cure rates of the TVT-Secur and the TVT-O and
22  TVT-retropubic," and you chalked that up to the learning
23  curve for the placement of the sling because the only
24  variable was the surgeon. Can you tell me exactly what you
25  meant by that?

Page 159

1      A.   Sure. So, I mean, it's the same product
2  and it's the same -- you know, we'll go back to your IFU
3  you discussed. It's the same women. They are not some
4  different type of women. So how can you explain the
5  difference between some products being as effective as
6  other products? Well, I mean, if you're getting good
7  results in one area of the world, but a completely
8  different area of the world doesn't, then that means that
9  there's an issue with the way they are putting it in. I
10  mean, there's no other variable. And I can't explain it.
11  I don't know. But, I mean, who knows what their training
12  is, who knows how they work in Australia and Germany. I
13  have no idea. If they are experienced implanting these
14  things, I have no idea. That's the only variable.
15     Q.   And you go on to suggest that "Ethicon's
16  outreach to surgeons and their communications of surgical
17  insights to the medical community following the release of
18  the TVT-Secur demonstrate the company's responsible efforts
19  to ensure the TVT-Secur was being properly implanted across
20  the board. Their warning in the TVT Secur IFU that
21  under-correction or incorrect placement may result in
22  incomplete or no relief of urinary incontinence was
23  appropriate."
24     And based on what we discussed earlier,
25  can you explain this to me?

Page 160

1      A.   Well, they have to place it in there,
2  right? I mean, that's part of what they have to do. They
3  have to say that. But the other part of it is, again, they
4  want a product that is effective and they want their
5  implanters and their patients to have good results. I
6  mean, if you make a crappy product, it's not going to --
7  you're going to have a hard time with having the physicians
8  trust you, right?
9      So if they noticed they were having some
10  issues, they could have done one of two things. They could
11  have just said, Well, those doctors don't know what they
12  were doing, they just need to read the literature, or we
13  can actually encourage them with some little tips that will
14  improve the efficacy of what we're already doing.
15     Q.   And is that what you meant by their
16  warnings in the TVT-Secur IFU and their outreach? Are you
17  saying that Ethicon undertook efforts to make doctors aware
18  of these?
19     A.   I believe so.
20     Q.   And you base that on the documents that
21  you reviewed in preparation for this report?
22     A.   Yeah. I mean, there's a lot of ways to go
23  about improving things, and so they did take steps to try
24  to improve it.
25     Q.   And what steps do you recall from your

Page 161

1  review, if any -- what do you recall from your review of
2  the steps that they took to reach out to the surgeons?
3      A.   Well, the Tips & Tricks is the main one,
4  and that gets relayed, again, to the guys in the field who
5  are in there operating with the surgeon, just reminding
6  them of the simple facts.
7      Q.   If you'll go with me to page 17, at the
8  top. Although it's the middle of the paragraph, I wanted
9  to focus on the first sentence. It says, "relatively few
10  side effects as thigh pain was virtually eliminated and
11  retention rates that were much lower. It appears that if
12  this technique was developed prior to the TVT or TVT-O,
13  that the enthusiasm would have been much greater."
14     A.   Hold on.
15     Q.   It's back to what you were saying before
16  about the innovation --
17     A.   I'm not sure where -- do you know -- which
18  paragraph are you on?
19     Q.   Top of 17. You can read the whole
20  paragraph. That was what I was trying to understand, is --
21     A.   Okay. I understand now. I see.
22     MR. WALKER: Was your question just for
23  him to explain it?
24     Q.   Well, yeah. I wanted to know that you --
25  let's see. The fact that it appears if this technique was

Brian D. Parker, M.D

1 developed prior to the TVT or the TVT-O that the enthusiasm

2 would have been much greater, and I just wanted to get an

3 idea what you meant by that.

4     A.    Well, it goes back to what I said earlier.

5 The bar was set so high when the TVT Retropubic and TVT-O

6 came on board that people saw cure rates and success rates

7 and less morbidity and return to work and those type of

8 things. They saw that so much faster that you kind of lost

9 perspective of where you were in 1990. And if the

10 TVT-Secur had been the first product on the market, and had

11 the same efficacy that it did when it was launched, people

12 would say, oh, man, what an improvement from what we had

13 before, we can now cure incontinence with a small incision,

14 people can get back to work the next day or a few days

15 later, minimal pain medicine, you know, the voiding

16 dysfunction is really undisturbed, incontinence rates are

17 improved, we would say that's a significant improvement

18 over what we had to begin with. And it's all based on

19 perspective.

20     Q.    And you go on to say that "Lesser surgical

21 techniques for SUI have lasted longer in common place

22 surgical therapy than TVT-Secur. This does not mean that

23 it was flawed in design or concept. It was not brought to

24 market too quickly, it did not have high side effects. In

25 my opinion, the TVT-Secur was a safe and effective therapy

1 for SUI."

2     And my question is, what are you basing

3 your opinion on with this respect? And I think we've

4 touched on some of it, but I want to make sure I haven't

5 misunderstood what was meant in this particular section, so

6 I was going to get you to explain it to me.

7     A.    So let's take, for instance, something --

8 injection therapy for incontinence. That's been around for

9 years. Collagen, Coaptite, other things. It's nowhere

10 near as effective as any of these procedures, but people

11 still use it. It doesn't mean the product is flawed. It

12 means that it does what it's supposed to do.

13     The same thing with TVT-Secur. It's

14 designed for what it's meant to do. It has low side

15 effects. It was brought out in a situation where we

16 already knew what mini-slings can do, that, in my opinion,

17 that it was brought in in a situation that was -- did not

18 raise any eyebrows. People, once they got the hang of it,

19 were doing well. My patients were doing well with it. I

20 was upset when it was taken off the market. So it wasn't a

21 design flaw. It was just the nature of kind of the

22 environment at that time.

23     Q.    And, again, that's based on your

24 experience with the product and from a clinical standpoint

25 and not based on your analysis of the design history files

1 or your understanding of the industry standards and such as

2 that we talked about before. Is that fair? And you can

3 correct me in any of those ways. But what I'm trying to

4 make sure of is you haven't changed your opinion from

5 earlier in our discussions to now with regards to the

6 design of the product.

7     MR. WALKER: Object to form.

8     A.    So, yeah, I see what you're saying now.

9 So, again, when it comes to a product that's on the market,

10 does it do what it's meant to do, is the design that it was

11 made for get the job done. I can comment on that, and I

12 think it was.

13     What I can't comment on is how did it come

14 to being, from that standpoint. You know, where did it

15 come from to become the shape it was in, how did they

16 decide what angle to make the points at, all those type

17 things. I have no idea. But when it came to market and it

18 was used and the study showed what it did, then I can

19 comment that I felt if there was a design flaw, it would

20 have been obvious.

21     Q.    And as far as your opinion that it was not

22 brought to the market too quickly, is that based on -- I

23 guess what I'm -- let me start back over with that.

24     Are you aware of any documents or

25 testimony in the review that you conducted prior to forming

1 your opinions in this case as to whether or not there may

2 have been additional steps or more studies that had to be

3 performed before this product was brought to the market?

4     A.    Yeah. So there was internal documents

5 about should we do more studies or not, and the consensus

6 felt that based on the previous TVT retropubic, TVT-O, the

7 fact that the mesh was proven already and it was the same

8 mesh, that they needed some studies to prove certain

9 things, and that then it was up to the FDA to decide if

10 that was adequate or not. And the FDA approved it, so you

11 can only -- you have to go by that.

12     Q.    And in your opinion it doesn't have high

13 side effects. And that's based on the literature that

14 you've read and your clinical experience with the products

15 or the TVT-S devices that you've implanted. Is that what

16 you're basing that on?

17     A.    Yes, ma'am.

18     Q.    And you're not aware of any studies that

19 suggest that the side effects were any greater than the

20 other devices, the TVT-R and the TVT-O?

21     A.    If you look at the big studies, the

22 randomized controlled trials and the big meta analysis

23 studies, there's really not. You can see that now. You

24 know, even after the Secur came off the market, they did

25 some more studies afterwards, and you can see there's not a

Brian D. Parker, M.D

Page 166

1 significant difference in severe side effects. The caveat
2 would be whether there's a difference in efficacy, and I
3 think there's a small difference in efficacy, but some
4 studies show very similar efficacy.
5         So if you're talking about efficacy being
6 a side effect, let's make sure to clarify that. That's not
7 a side effect, I mean, that I would say is a significant
8 side effect specific to that device. That can happen with
9 any type of incontinence procedure. I think, if you're
10 asking me, you know, erosion, extrusion, those type of
11 things, those type of things are documented to be very
12 similar.
13     Q.     And I apologize. That's what I meant to
14 do, was to distinguish between the safety issues and the
15 efficacy. So you did very well in explaining that and
16 the --
17     A.     That makes me worry.
18     Q.     With regard to the success rates, are you
19 aware of any studies that suggest that there is a decline
20 in its effectiveness the further out from this procedure
21 that you get, or if it remains constant after the
22 procedure?
23     A.     Well, all the slings -- it's not specific
24 for Secur, but all the slings, whether it be mesh or
25 non-mesh, they do show a gradual increase in incontinence

Page 167

1 rates.
2     Q.     And are you aware of anything particular
3 to the TVT-S that suggests that the initial postoperative
4 success was great, but there was a very quick decline in
5 the effectiveness of --
6         MR. WALKER: Object to form.
7     A.     I think I saw a study or two that may have
8 commented on that. But, again, when you look back at the
9 big overall picture, that doesn't really play out as much.
10     Q.     Okay. So now we're to the TVT-O, TVT
11 Secure warning section of your report.
12     A.     And before we get started, can I take a
13 bathroom break real quick?
14     Q.     You sure can.
15         (Thereupon a break was taken from 1:04
16     p.m. to 1:07 p.m.)
17 BY MS. BAGGETT:
18     Q.     So when we went off the record, we were
19 about to start the section of your report on page 17 where
20 you talk about TVT-O and TVT-Secur warnings. And I just
21 want to clarify our discussions earlier with regards to the
22 warnings.
23         Your opinion is based on your clinical
24 practice and what you know as a surgeon and not necessarily
25 on the regulations involved with the warnings and the

Page 168

1 obligations with reporting, such as that, or tell me,
2 correct me, as to what your opinions will be.
3     A.     My opinions are going to be based on
4 clinical work, not bench work.
5     Q.     And the next section on page 18, we talked
6 about degradation. Is it fair to say that anything you
7 read with regards to the topic of degradation would have
8 been included in your reliance materials?
9     A.     Yes.
10     Q.     Okay.
11     A.     Well, yes. I will say, though, that I
12 tried to get a little bit more familiar with that term.
13 And so there were some PubMed searches that I did that I
14 just kind of perused the abstracts of. I didn't break down
15 every bit of it. I just tried to learn a little bit more
16 about what that was all about.
17     Q.     But if it had an impact on or changed your
18 opinions, that would have been something you would have
19 listed in your reliance material?
20     A.     Yes. Yes, ma'am.
21     Q.     Cytotoxicity. We talked briefly about
22 whether or not the mesh was inert. I just want to
23 understand whether or not your opinions on cytotoxicity
24 come, again, from your practice and experience with the
25 mesh or if there's some underlying research or material

Page 169

1 that you reviewed that you're going to testify with regards
2 to the more basic properties and such, like polymer science
3 and things like that.
4     A.     At this point I'm not planning on
5 testifying as an expert in those bench type of issues. I
6 know some about it, but not enough that I would feel that I
7 can be -- I'm not going to be able to tell you how those
8 polymers are put together. I'm not a chemist.
9     Q.     And, let's see, with regards to
10 contraction, your opinion with regard to whether or not
11 mesh contracts once it's in the body, have you read any
12 literature that suggests that the mesh contracts or shrinks
13 over time?
14     A.     The literature that I read suggests
15 there's some initial foreign body reaction, and that can
16 cause a kind of scarring which can cause that a bit. But
17 when you actually look to see if it moves or contracts,
18 there's no data on that at all. There were different
19 studies to look at placement of the mesh. And the biggest
20 thing, from my perspective, that proves it is if there was
21 continued contraction, then we wouldn't see a worsening or
22 a decline in incontinence rates. We'd see an improvement
23 in incontinence rates and we'd see also an increase in
24 retention rates, which we don't see.
25         So looking at different studies on whether

Brian D. Parker, M.D

Page 170

1 the mesh actually moves, you know, could there be some
2 slight contraction from the fibrotic reaction?  Yeah, but
3 not substantially, not clinically a large volume, a large
4 percentage.
5    Q.    Is it your experience that different
6 patients scar differently in response to trauma?
7    A.    I mean, there's very little change.  I
8 mean, it's all within a certain realm, yes.
9    Q.    By that I mean like some people when we
10 get a scar -- I was bitten by a dog and it's recessed.
11 Some people develop these really thick ones.
12    A.    Those are called keloids and some people
13 have a problem with it.  It doesn't occur vaginally that
14 I'm aware of.  From my understanding, it's only on the
15 epidermis.
16    Q.    So the tissue in the vagina is different
17 than the skin in the way that it responds to --
18    A.    Well, again, you're not going to see --
19 I've never seen keloids vaginally.  You know, everybody
20 heals a little bit differently, but not substantially
21 differently.
22    Q.    And based on the foreign body response,
23 even if it's the initial healing process, does that affect
24 the development of adhesions in the area?
25    A.    Adhesions?  There shouldn't be any

Page 171

1 adhesions.
2    Q.    If we go to page 20, Section 4, pores too
3 small, we discussed that earlier as well.  Is your opinion
4 different than what we discussed before as far as the
5 studies that you've reviewed, the materials that you've
6 looked at of the internal documents on pore sizes -- is
7 there something about pore size that you are familiar with
8 enough that you feel comfortable rendering an opinion as to
9 the pore size and its effects on success of the procedure
10 or any of the complications that may result from the
11 procedure?
12    A.    No.  But Moalli is the paper that I
13 remember referencing now as far as the pore size.  But, no,
14 I think I said everything earlier that I wanted to say.
15         I have a little bit of confusion because
16 on one hand there's this concept of the mesh somehow
17 pulling, but then there's also this concept of the mesh
18 contracting.  And so I feel like it's contradictory how --
19 I mean, I don't think either one of them will happen with
20 any significance.  So I think pores pretty well stay the
21 same.  And I can tell that's the case on the few pieces of
22 mesh I've had to remove, there's really no clinical
23 difference whenever -- a visible difference whenever you
24 look at the mesh that you've removed when it's sitting
25 there in the patient, you know, years after surgery verus

Page 172

1 when it was put in.  I mean, it looks pretty well the same.
2    Q.    When you review the mesh that you review,
3 do you do so with the naked eye or do you look at it under
4 a microscope?
5    A.    Me personally, I look at it with the naked
6 eye, but the pathologists look at it under the microscope.
7    Q.    And are you aware of whether or not the
8 pathologist that you send your mesh to does any type of
9 analysis to determine whether or not the mesh has retained
10 its pore size, original pore size?
11    A.    Well, I don't -- no, ma'am, to answer your
12 question.
13    Q.    That's not part of your practice on a
14 daily basis?
15    A.    Yeah, they don't measure the pore size.
16 But from a visible standpoint, you can tell it hasn't
17 deformed.
18    Q.    Section 5 where it says, "Mesh is too
19 heavy, meaning lightweight mesh is preferred," you can go
20 ahead, and if you will, tell me what your opinion is with
21 regards to that.
22    A.    Well, that was an interesting point.  I
23 mean, this whole thing has brought up some points.  And I
24 wanted to mention too that part of my being an expert
25 witness means I have to follow the code of conduct of the

Page 173

1 American Urologic Association, which says follow all --
2 consider all sides of the point, don't just consider one
3 point.
4         So, you know, this is an interesting
5 concept that I've had to really deal with.  But if you
6 actually look at some of the data, I mean, it really is
7 inconsistent, number one, and there's no consensus.  I
8 mean, this heavyweight versus lightweight thing, I don't
9 understand -- I mean, I understand where your perspective
10 is, but my perspective isn't the same.  And a lot of this
11 mesh was based on huge pieces of mesh that were placed in
12 the abdomen, not a very small thin piece that was placed
13 vaginally.  And so I think that's comparing apples to
14 oranges.
15         And, secondly, you can see here that in
16 certain classifications, your describing of heavyweight
17 mesh isn't necessarily what one classification stated that
18 this mesh was.  So I think there's a lot of inconsistency,
19 but the main thing I came away with this is that the mesh
20 is the appropriate mesh for what it does.  The weight is
21 the right weight.
22    Q.    Do you have an opinion as to whether or
23 not a mesh used for a hernia application would be
24 appropriate for use in the female reproductive area based
25 on, like we discussed before, the location of it and the

Page 174

1  dynamics, the difference between the dynamics of those two
2  applications?
3        A.    It could be, and let me tell you why it
4  couldn't be.  They used GORE-TEX for mesh repairs in the
5  past.  And then they tried to use that for female slings
6  and it just didn't work.  There was too many problems.  And
7  so that has been abandoned.  But prolene and polypropylene
8  is a different story.
9        Q.    And if you look to page 21, laser-cut mesh
10 versus mechanically-cut mesh, we talked about that briefly
11 earlier.  As far as your opinions here, you say that the
12 mesh is not defective because of the way that it's cut.
13 Can you tell us a little bit more about how you came to
14 that conclusion?
15       A.    Right.  So if you look at studies from
16 TVT-O, there's some TVT-O that's laser cut and some that's
17 mechanically cut.  Personally, I think if you polled most
18 physicians, they wouldn't know the difference in what they
19 were holding.  But if you were to look at the studies to
20 see if there was a difference, you're not going to find it.
21 And so based on that, you have to then conclude that
22 whether it's laser or mechanical cut, it's of no clinical
23 difference.  There's just no studies.  There's nothing
24 there to support it.
25       Q.    As far as your review in preparing your

Page 175

1  opinions on that matter in this case, do you recall
2  reviewing any documents, internal documents, from Ethicon
3  that suggest that there was a concern --
4        A.    Uh-huh.
5        Q.    -- with regard to these differences and
6  whether or not they actually did make a difference in the
7  success rates or the safety profile of the product?
8        MR. WALKER:  Object to form.
9        A.    Yes, I do remember seeing internal
10 documents and there were conversations.  And I think those
11 conversations had to be had because there was a difference.
12 But, again, I'm looking at it from a perspective of is
13 there any data to suggest there's a problem or a
14 difference.  And if there is, I'm not aware of it.
15       So conversations and those things have to
16 take place within a company.  I'm not worried about that.
17 It doesn't change my viewpoint.  And I actually applaud
18 them for thinking outside the box.  But I don't see that
19 it's been borne out in any literature.
20       Q.    If Ethicon were to become aware of the
21 inferiority of a particular aspect of their product, would
22 you expect them to take the steps necessary to fix whatever
23 was making the product inferior in some aspect?
24       MR. WALKER:  Object to form.
25       A.    You know, in that situation, if you're

Page 176

1  describing a company trying to improve upon it, they
2  already have, yeah, I would expect that.
3        MS. BAGGETT:  I'll reserve the remainder
4  of my questions, if necessary, for rebuttal.
5        (Time 1:20 p.m.)
6        EXAMINATION
7  BY MR. WALKER:
8        Q.    Doctor, do you recall being asked
9  questions about the issue of particle loss with respect to
10 mesh?
11       A.    I do.
12       Q.    In the course of preparing your expert
13 report, did you review the medical literature to determine
14 whether or not there was any clinically significant issue
15 with particle loss with respect to mesh?
16       A.    I never came across that.
17       Q.    Have you, in your experience, seen any
18 clinically significant problems stemming from particle loss
19 in mesh?
20       A.    I have not.
21       Q.    Do you recall being asked about
22 cytotoxicity and degradation?
23       A.    Yes.
24       Q.    And those are issues that you address in
25 your expert report, correct?

Page 177

1        A.    Correct.
2        Q.    Do you plan to offer an opinion about the
3  biocompatibility of mesh?
4        A.    Yes.
5        Q.    And what is that opinion?
6        A.    That it is biocompatible.
7        Q.    And do you have an opinion as to whether
8  or not mesh used in TVT-O and TVT-Secur is cytotoxic?
9        A.    Am I going to give an opinion about that?
10       Q.    Yes.
11       A.    Yes, I am.
12       Q.    And what is that opinion?
13       A.    That it's not cytotoxic.
14       Q.    And what do you base that opinion on?
15       A.    My research, my personal experience,
16 meetings, literature, all the things that come about.  All
17 these things have to be processed from a positive and a
18 negative standpoint, and after reviewing that, that's my
19 opinion.
20       Q.    And you were asked a number of questions
21 about degradation as well.
22       A.    Yes, sir.
23       Q.    Do you recall reviewing any internal
24 company documents that dealt with the issue of degradation
25 of prolene?

Brian D. Parker, M.D

Page 178

1  A.  Yes.
2  Q.  And when you were forming your opinions in
3  this case, did you consult the medical literature to
4  determine whether or not degradation of prolene is a
5  clinically concerning issue?
6  A.  I did.
7  Q.  And what is your opinion with regards to
8  the degradation of mesh?
9  A.  Well, I've never seen it degrade.  I've
10  never seen any studies that say it degrades, that it turns
11  into nothing.  So, I mean, there's really no data at this
12  point.
13  Q.  And have you reviewed medical literature
14  that concludes that prolene does not degrade?
15  A.  Yes.
16  Q.  And did you rely on that literature when
17  you formed your opinions?
18  A.  Yes.
19  Q.  You were asked a number of questions about
20  polypropylene and then questions about prolene.  Just so
21  the record is clear, you understand that polypropylene is a
22  component of prolene, correct?
23  A.  Right.  It's not just the prolene.
24  Q.  And prolene is polypropylene plus the
25  additives the company has put into it, correct?

Page 179

1  A.  Correct.
2  Q.  You were shown a number of internal
3  company documents by plaintiff's counsel during today's
4  deposition.  Do you recall that?
5  A.  Yes.
6  Q.  As a pelvic floor surgeon, when you are
7  looking to form opinions regarding a medical device, where
8  would internal company documents rank on the spectrum of
9  what sources of information you're going to give weight to?
10  A.  Extremely low.  Meta analysis, randomized
11  controlled trials, everything in the case studies would be
12  very high.  Clinical experience is down a little bit lower
13  and then below that would be internal company documents
14  about conversations about the mesh.
15  Q.  And why would you place internal company
16  documents below those other sources of information?
17  A.  Because those are opinions.  There's no
18  facts.  I mean, if there is facts, they haven't been -- if
19  there's any shred of a fact, they have to prove it somehow,
20  and those opinions just don't -- are just case-specific
21  opinions.
22  Q.  So you would agree that internal company
23  documents are not what we would call Level 1 evidence?
24  A.  Yes.
25  MS. BAGGETT:  Object to form.

Page 180

1  Q.  And would you agree that internal company
2  documents lack the benefit of the creative process that
3  you're going to find in medical literature?
4  A.  Correct.
5  Q.  The Tips & Tricks document came up a
6  number of times in the deposition.  Do you recall that?
7  A.  Yes.
8  Q.  And do you recall seeing internal company
9  documents that demonstrated that Ethicon disseminated that
10  information to surgeons regarding the TVT-Secur?
11  A.  Yes.
12  Q.  And is that a document or are those
13  documents that you relied on when you formed your opinion
14  about the adequacy of Ethicon's professional education with
15  respect to TVT-Secur?
16  A.  Yes, that was part of it.  I saw that they
17  were making an effort to improve upon what was already
18  going on.
19  Q.  You were asked some questions about the
20  pore size, specifically affected porosity.  Do you recall
21  that?
22  A.  Yes, sir.
23  Q.  And when you were forming your opinions in
24  this case, you considered the issue of the pore size of the
25  mesh, correct?

Page 181

1  A.  I have to.
2  Q.  And did you review the medical literature
3  with an eye towards forming your opinions regarding the
4  adequacy of the pore size of the mesh?
5  A.  From what I could, yes, sir.
6  Q.  In your review of the medical literature,
7  did you see any evidence that the physiological forces
8  applied to the mesh will deform its shape in such a way
9  that the pore sizes are compromised in a clinically
10  concerning way?
11  A.  Not physiologic forces, no.
12  Q.  Are you aware of any objective medical
13  evidence or medical literature that has found that the pore
14  size of TVT-O or TVT-Secur mesh, once it's been implanted
15  in the body and integrated into the tissues, becomes
16  inadequate or too small?
17  A.  I never came across that.
18  Q.  You were asked some questions about the
19  weight of the mesh and the existence of other
20  lighter-weight mesh materials.  Do you recall that?
21  A.  Yes.
22  Q.  Do you recall reviewing company documents
23  regarding a project TOPA?
24  A.  Yes.
25  Q.  What was this project TOPA?

Brian D. Parker, M.D

Page 182

1    A.    TOPA stood for transobturator.  That was
2  partially what it was.  So they were looking at a
3  lighter-weight mesh for incontinence.
4    Q.    And were the company's efforts with
5  respect to developing a lighter-weight mesh to treat
6  incontinence successful?
7    A.    No.  No, they failed miserably.
8    Q.    In fact, they failed six cadaver labs,
9  correct?
10    MS. BAGGETT:  Object to form.
11    A.    Right.
12    Q.    And does the fact that the company failed
13  in its efforts to develop a lighter-weight mesh to treat
14  incontinence, is that something that you considered when
15  you formed your opinions about the feasibility of a
16  lighter-weight mesh to treat SUI?
17    MS. BAGGETT:  Object to form.
18    A.    Again, we've got to go back to lightweight
19  and heavyweight, and that's a little bit confusing to me.
20  But in response, they did try to come up with a different
21  type of mesh.  But, yeah.  So that definitely made me
22  realize that just because something is "lighter weight"
23  doesn't necessarily mean it's better for that particular
24  situation.
25    Q.    You were asked some questions about the

Page 183

1  complication rates of TVT-Secur relative to other slings.
2  Do you recall that?
3    A.    Yes, sir.
4    Q.    And I believe you testified that the
5  medical literature essentially showed similarity in
6  complication rates between Secur and other slings like
7  TVT-O; is that correct?
8    A.    Right.
9    Q.    Did you see in your review of the
10  literature any findings that the laser cut quality of
11  TVT-Secur was causing any increase in erosions or other
12  complications?
13    A.    That wasn't something that I came across.
14  I never saw that mentioned.
15    Q.    And you looked at a number of studies
16  dealing with TVT-Secur and TVT-O, correct?
17    A.    I looked at hundreds and hundreds of
18  studies.
19    Q.    If I could direct your attention to tab 50
20  of what was marked as Exhibit Number 7.  You were asked
21  about a statement in your report concerning the other
22  professional societies that were endorsing this AUGS/SUFU
23  position statement.  Do you recall those questions?
24    A.    I do.
25    Q.    Do you see -- in tab 50, just so the

Page 184

1  record is clear, that is what?
2    A.    Tab 50 is the American Urologic -- or the
3  American Urogynecologic Society and SUFU Position
4  Statement.
5    Q.    And this is a position statement that you
6  read and relied upon when forming your opinions?
7    A.    Right.
8    Q.    In fact, you referred to it in your expert
9  report.
10    A.    Exactly.  Yes, sir.
11    Q.    And then at the end of this position
12  statement, does it lists these organizations that were
13  endorsing that statement?
14    A.    It does.
15    Q.    Which ones?  Which organizations endorsed
16  the AUGS/SUFU position statement?
17    A.    The American Association of Gynecological
18  Laparoscopists, the American College of Obstetricians and
19  Gynecologists, the National Association for Incontinence,
20  the Society of Gynecologic Surgeons, and Women's Health
21  Foundation.
22    Q.    Doctor, you were asked a number of
23  questions about warnings and the requirements for what
24  belongs in an IFU.
25    Am I correct that you intend to offer

Page 185

1  opinions regarding what is commonly known amongst pelvic
2  floor surgeons in terms of potential risks and
3  complications associated with vaginal surgery?
4    A.    Yes.
5    Q.    And in terms of having an opinion about
6  what risks or complications would be commonly known amongst
7  pelvic floor surgeons, what would you base your opinions
8  on?
9    A.    What is commonly known?  Well, textbooks,
10  journals, personal experience, clinical trials, those type
11  of things.
12    Q.    And that would be true with respect to all
13  of the potential risks and complications that you address
14  in your expert report; is that correct?
15    A.    I do.  Yes, I do.  There are -- a lot of
16  the aspects of what you're describing are things that are
17  general complications that can occur with any pelvic
18  surgery.  Are there some that are specific for mesh?  Yes.
19  We already know those are accepted known side effects.
20  Okay?  But anybody who performs pelvic surgery is aware of
21  all of those to begin with.
22    Q.    Doctor, are all of the general opinions
23  that you intend to offer regarding TVT-O and TVT-Secur
24  contained either in your expert report or in testimony that
25  you've provided today?

Brian D. Parker, M.D

| Page 186 | Page 188 |
|---|---|

**Page 186**

1    A.    As of now, yes.

2    Q.    And are all of those opinions based on

3  your education, training, experience, review of the medical

4  literature?

5    A.    Yes.

6    Q.    Do you offer all of these opinions to a

7  reasonable degree of medical certainty?

8    A.    I do.

9        MR. WALKER:  That's all I have, Doctor.

10  Thank you.

11        MS. BAGGETT:  Very quickly, just a couple

12  of things.

13        (Time 1:34 p.m.)

14            EXAMINATION

15  BY MS. BAGGETT:

16    Q.    Now, in the questioning by defense counsel

17  you were asked about particle loss and whether or not it's

18  had a clinically significant impact on patients that you've

19  treated.  At least that's the way I understood it.  You can

20  correct me if that's wrong.

21        But my question is, have you been trained

22  in pathology or do you perform any activities involving

23  analysis of pathological specimens?

24    A.    We have been trained in pathology as part

25  of our residency training and part of the testing that we

**Page 187**

1  have to do when we get out of residency.  As far as the

2  day-to-day processing of it, no, but it is something that

3  we will oftentimes go to the pathologist and review slides

4  and discuss things with him, go to tumor conferences, other

5  things where we have to discuss pathology and review

6  pathology.

7    Q.    In your normal course of practice, is it

8  your habit to review the pathology that you remove from

9  your patients for any signs of particle loss or the impact

10  that it may or may not have on it?  Is that something that

11  you do routinely in your practice?

12    A.    That's something that nobody does

13  routinely, ma'am.

14    Q.    And you have not undertaken any efforts to

15  study whether or not there is particle loss and whether or

16  not that particle loss has any clinically significant

17  impact on the outcomes of the patients who were implanted

18  with the device, have you?

19    A.    So you're asking me if I've looked at any

20  studies based on particle loss?

21    Q.    No.  No.  It's even simpler than that.

22  Have you conducted any studies or analyses and are you

23  involved in any study that looks at the pathology of

24  removed mesh devices to determine whether or not particle

25  loss is something that happens, that occurs and whether or

**Page 188**

1  not it's clinically significant?

2    A.    I'm not involved in a study of that

3  nature.

4    Q.    You were asked about ranking the

5  importance of information that you relied on in determining

6  your opinions in this case, and with respect to the

7  internal documents, obviously, they are not Level 1

8  evidence like a study would be, but do the internal

9  conversations and recordings of the device manufacturer

10  that place a product on the market have any bearing -- any

11  insight that you can glean from the development of that

12  product and the company's understanding of that product?

13        MR. WALKER:  Object to form.

14    A.    That would be something that -- no, I

15  cannot tell from just those company documents what their

16  next step would be.  What I can tell you is when I see

17  company documents like that, it just tells me that the

18  company is always reviewing what's going on.  And I

19  wouldn't anticipate, even if they were doing -- whether the

20  product they feel is doing perfectly or there's some

21  improvements on it, I would anticipate internal documents

22  to try to comment on things they can continue to improve

23  on.  And whether that has -- you know, those things have no

24  basis as far as what actually happens with the patients and

25  the clinical data, all of that.  So it's something we

**Page 189**

1  consider, but it's to be expected I would imagine.

2    Q.    Does the review of those materials, the

3  company documents, play a role in completing the picture of

4  your understanding of the development of the device and an

5  understanding of the appropriateness of the device for the

6  application that we are here today about with regards to

7  the pelvic anatomy of a women?

8        MR. WALKER:  Object to form.

9    A.    It's part of the equation, yes, ma'am.

10    Q.    And you were asked about the Tips & Tricks

11  and the fact that Ethicon attempted to disseminate that

12  information to the doctors.

13        Do you know if the dissemination of that

14  document was limited in any way to certain groups of

15  doctors or if it was provided across-the-board to anyone

16  who --

17    A.    I can't recall.

18    Q.    And do you know if Ethicon undertook

19  efforts to make sure that everyone implanting the device

20  was provided with that information?

21        MR. WALKER:  Object to form.

22    A.    I do recall that there was an effort,

23  concerted effort.  I don't know.  I can't recall the

24  document, but I do remember there was an effort to say we

25  need to get this out to the physicians out in the field.

Brian D. Parker, M.D

Page 190

1    Q.    But you're not aware of whether or not
2 that information was limited to any particular group of
3 doctors.  You feel that it was disseminated to all doctors
4 equally.
5    A.    I can only say -- and I can't say whether
6 it got to all doctors or not.
7    Q.    Okay.  You were asked questions about
8 TOPA, and we didn't go over that so I'm just going to ask
9 you a couple of questions about that.
10          And I think you stated that you understood
11 that TOPA was an attempt to evaluate a lighter-weight mesh
12 for the applications similar to the devices we're looking
13 at today.  And I think you said that it was unsuccessful
14 because the mesh was too stretchy or too -- you tell me.
15 You said it was unsuccessful because --
16    A.    I said it was unsuccessful.  I didn't say
17 why.
18    Q.    Okay.  And what is your understanding of
19 why it was unsuccessful?
20    A.    It wasn't strong enough.
21    Q.    And have you reviewed the deposition
22 testimony in this litigation regarding that study?
23    A.    I think I reviewed bits and pieces of it,
24 but that's been many months ago, and I couldn't quote any
25 of it right now.

Page 191

1    Q.    And do you know how many, if any,
2 documents that you reviewed related to that study other
3 than the study itself?
4          MR. WALKER:  I'm sorry.  By "study," do
5    you mean just the project TOPA itself?
6          MS. BAGGETT:  Right.  I'm sorry.  Yes,
7    TOPA.
8          THE WITNESS:  I would say that I reviewed
9    five to ten documents, if that.  I don't recall.
10   It wasn't a large volume.
11 BY MS. BAGGETT:
12    Q.    And do you know what project SCIOM was,
13 spelled S-C-I-O-M?
14    A.    That is -- I do remember reading about it,
15 but the details of it escape me right now.
16    Q.    Did you read any deposition testimony
17 regarding that as well?
18    A.    I probably did, but I don't recall.
19    Q.    And do you know what project Matrix is?
20    A.    No, ma'am.
21    Q.    Did Ethicon ever submit a 510(k)
22 submission -- are you aware of whether or not a 510(k)
23 submission was submitted for the SCIOM?
24    A.    I'm not sure.
25    Q.    And the same question with regard to the

Page 192

1 Matrix.
2    A.    I don't know anything about Matrix.
3    Q.    And do you know if a 510(k) was ever
4 submitted on TOPA?
5    A.    I don't know.
6    Q.    If Ethicon's expert testified project
7 SCIOM was killed for business reasons, would you disagree
8 with that?
9          MR. WALKER:  Object to form.
10    A.    I don't remember.
11    Q.    If Ethicon's employees testified that the
12 project Matrix was killed for business reasons, would you
13 disagree with that?
14          MR. WALKER:  Object to form.
15    A.    Again, I don't recollect anything about
16 that.
17    Q.    And the same with regard to TOPA?
18          MR. WALKER:  Object to form.
19    A.    From TOPA's standpoint, that just didn't
20 work, and after a while I think they realized that was
21 something they needed to abandon and maybe revisit for
22 another day.  I don't know the reasons for that, though.
23    Q.    Did you ever review any of the cadaver
24 labs for TOPA?
25    A.    Yes, I do remember vaguely.  I don't

Page 193

1 remember any of the details, ma'am.
2    Q.    Did you talk to any of the engineers or
3 doctors who worked on any of those projects?
4    A.    No.
5    Q.    Do you know what the size of the mesh in
6 TOPA was?
7    A.    I can't recall.
8    Q.    Do you know what the pore size was?
9    A.    I can't recall.
10    Q.    Do you know what the weight was?
11    A.    No, ma'am.
12    Q.    Do you know what type of material was
13 used?
14    A.    That would be a guess.  I shouldn't answer
15 that.  I don't know for sure.
16    Q.    And the same questions with regard to
17 SCIOM and Matrix.  If you want me to go through them all, I
18 will.
19    A.    No, ma'am.  I don't remember.
20    Q.    You were asked about the AUGS position
21 statement and you went to it.  You were asked to go to it
22 in your notebook.  Is that tab 50?
23    A.    I believe that's right.
24    Q.    And I just wanted to bring back the
25 document we looked at earlier today that I had referenced

Brian D. Parker, M.D

Page 194

1  was Bates stamped MIL00268.  And I just want you to take a
2  look at it and see if that refreshes your recollection as
3  to whether or not that is similar to or in any way related
4  to the document that you referenced in your testimony.
5      A.   Okay.
6      Q.   And other than the fact that I've
7  represented to you that that document, with the edits on
8  it, was produced in this litigation through the production
9  requests, did you review anything in preparing for your
10  deposition today or preparing for this report that you
11  drafted as to whether or not Ethicon had anything to do
12  with the editing and/or drafting of this position statement
13  that was produced through AUGS and SUFU?
14          MR. WALKER:  Object to form.
15      A.   Ma'am, I have no idea.  This is just one
16  document.  I have no idea if it was -- it doesn't tell me
17  where it came from, who edited it.  There's just not enough
18  information for me to really comment on that.  I don't
19  know.
20      Q.   And that's kind of what I was asking.
21  Based only on my representation that this was produced by
22  Ethicon, you've not read anything in the materials that
23  suggested that Ethicon had anything to do with the drafting
24  or publishing of this document?
25      A.   I'm not aware of any.

Page 195

1          MS. BAGGETT:  That's all I have.
2          MR. WALKER:  Nothing further.
3          (Signature waived.)
4          (Time 1:47 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 196

1          C E R T I F I C A T E
2  STATE OF TENNESSEE  )
3  COUNTY OF KNOX     )
4          I, Charlene M. Shade, LCR and Notary
5  Public, do hereby certify that I reported in machine
6  shorthand the deposition of BRIAN PARKER, M.D., called as a
7  witness for all purposes applicable; that the said witness
8  was duly sworn by me; that the reading and subscribing of
9  the deposition by the witness was waived; that the
10  foregoing pages were transcribed by me and constitute a
11  true and accurate record of the deposition of said witness.
12          I further certify that I am not an attorney
13  or counsel of any of the parties, nor an employee or
14  relative of any attorney or counsel connected with the
15  action, nor financially interested in the action.
16          Witness my hand and seal this the 3rd day
17  of April, 2017.
18
19
20
21          _____
            Charlene M. Shade, LCR
22          Notary Public
            Tennessee LCR #105
23
            My Commission Expires:  7-6-19
24
25