# EXHIBIT 1

Olga Ramm, M.D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    CHARLESTON DIVISION

 4   IN RE:  ETHICON, INC.,        Master File No.

     PELVIC REPAIR SYSTEM          2:12-MD-02327

 5   PRODUCTS LIABILITY            MDL 2327

     LITIGATION,                   JOSEPH R. GOODWIN

 6                                 U.S. DISTRICT JUDGE

 7   _____

 8   THIS DOCUMENT RELATES TO:

 9   Wave 4 Cases

10   _____

11

12

13

14

15                *GENERAL RE: TVT MATTER*

16             DEPOSITION OF OLGA RAMM, M.D.

17                   Oakland, California

18                 Friday, March 17, 2017

19                        Volume I

20

21

22   REPORTED BY:

23   REBECCA L. ROMANO, RPR, CSR No. 12546

24

25
```

Olga Ramm, M.D

**Page 2**

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3               CHARLESTON DIVISION

4   IN RE: ETHICON, INC.,      Master File No.
        PELVIC REPAIR SYSTEM      2:12-MD-02327

5   PRODUCTS LIABILITY      MDL 2327
        LITIGATION,           JOSEPH R. GOODWIN

6           U.S. DISTRICT JUDGE

7   _____

8   THIS DOCUMENT RELATES TO:

9   Wave 4 Cases

10  _____

11

12

13

14

15       DEPOSITION OF OLGA RAMM, M.D., taken on behalf

16  of the Plaintiff, at Oakland Marriott City Center,

17  1001 Broadway, Conference Room 212, Oakland, California,

18  commencing at 9:34 a.m., Friday, March 17, 2017 before

19  Rebecca L. Romano, Certified Shorthand Reporter

20  No. 12546

21

22

23

24

25

**Page 3**

1           APPEARANCES OF COUNSEL

2

3   For the Plaintiff:

4

5       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC

6       BY:  MARY LIU, ESQUIRE

7       17 East Main Street

8       Suite 200

9       Pensacola, Florida 32502

10      (850) 202-1010

11      mliu@awkolaw.com

12

13

14  For the Defendants:

15      BUTLER SNOW

16      BY:  NILS B. (BURT) SNELL, ESQUIRE

17      500 Office Center Drive

18      Suite 400

19      Fort Washington, PA 19034

20      (267) 513-1884

21      burt.snell@butlersnow.com

22

23

24

25  /////

**Page 4**

1               I N D E X

2   DEPONENT                    EXAMINATION

3   OLGA RAMM, M.D.                   PAGE

4   BY MS. LIU                          5
        BY MR. SNELL                      122

5   BY MS. LIU                        136
        BY MR. SNELL                      144

6

7           E X H I B I T S

8   NUMBER                            PAGE

9           DESCRIPTION

10  Exhibit 1    Expert Report of Olga Ramm,      10
                 M.D.;

11

        Exhibit 2    Notice to Take Deposition of    7

12               Olga Ramm, M.D.;

13  Exhibit 3    Invoice #OR1001;              11

14  Exhibit 4    General Reliance List in      48
                 Addition to Materials

15               Referenced in Report MDL Wave
                 4;

16

        Exhibit 5    Supplemental General Reliance   48

17               List in Addition to Materials
                 Referenced in Report MDL Wave

18               4;

19  Exhibit 6    Curriculum Vitae;           75

20  Exhibit 7    Medical Records;            148

21  Exhibit 8    Medical Records;            148

22  Exhibit 9    Medical Records;            148

23  Exhibit 10    Medical Records;           148

24  Exhibit 11    Medical Records;           148

25  Exhibit 12    Medical Records.           148

**Page 5**

1       Oakland, California, March 17, 2017

2               9:34 a.m.

3               ---o0o---

4           OLGA RAMM, M.D.,

5   having been administered an oath, was examined and

6   testified as follows:

7

8           EXAMINATION

9   BY MS. LIU:

10      Q.  Good morning, Doctor.

11      A.  Good morning.

12      Q.  For the record, could you please state your

13  full name.

14      A.  Olga Ramm.

15      Q.  And how do you spell Ramm?

16      A.  R-A-M-M.

17      Q.  Thank you, Doctor.

18      Doctor, we met off the record, but officially

19  my name is Mary Liu.  I represent the plaintiffs in

20  this case.

21      A.  Nice to meet you.

22      Q.  Doctor, have you ever been deposed before?

23      A.  I have been deposed in -- in residency or

24  after residency about a case pertaining to residency.

25      Q.  And what year was that?

Olga Ramm, M.D

Page 6

1    A.  I think it would have been 2013 or 2014.  I
2  can't exactly recall.
3    Q.  And you have been deposed one time?
4    A.  Yes.
5    Q.  Just to go over the rules a little bit
6  briefly here.
7        If you need to take a break, just let me
8  know.  The only thing that I ask is that if I have a
9  question pending, for you to answer that question prior
10 to taking a break.
11   A.  Sure.
12   Q.  If you don't understand my question, could
13 you please ask me to clarify?
14   A.  Uh-huh.
15   Q.  If you answer, I'm going to assume that you
16 understood my question.
17       Okay?
18   A.  Okay.
19   Q.  The other thing is this is a question/answer
20 session.  So we need to make sure that we don't talk
21 over each other for the court reporter's sake because
22 she's not going to be able to take down what we both
23 say at the same time.
24       And also, I see that you are nodding your
25 head, and you have to answer verbally so that she's

Page 7

1  able to take down your answers.  So a "yes," "no"
2  rather than "huh-huh," "uh-huh" because that's very
3  hard to translate on the record.
4        Okay?
5    A.  Understood.
6    Q.  Thank you, Doctor.
7        If there are some other things that come up,
8  I will let you know as well.
9    A.  Sounds good.
10   Q.  Doctor, I am handing you what I have marked
11 as Exhibit 2.
12       (Exhibit 2 was marked for identification by
13 the court reporter and is attached hereto.)
14   Q.  (By Ms. Liu)  Doctor, have you seen this
15 before?
16   A.  Yes.
17   Q.  Okay.  And, Doctor, if you will look on
18 page 7, you see Schedule A.
19       Did you take a look at Schedule A prior to
20 today?
21   A.  I did.
22   Q.  I know that you have provided an invoice via
23 email this morning and six separate thumb drives,
24 correct?
25   A.  Yes.

Page 8

1    Q.  And these are in response to Schedule A?
2    A.  Correct.
3    Q.  Do you know what's on these thumb drives?
4    A.  So the thumb drives contain a combination of
5  company documents, studies pertaining to my general
6  report, and stress incontinence surgery, in general, as
7  well as pelvic surgery and any relevant studies that
8  were cited or used in preparation of the general
9  report.
10   Q.  Did you put together the thumb drives?
11   A.  I did not put together the thumb drives.
12   Q.  Do you know how they were put together?
13   A.  They were put together by Butler Snell.
14   Q.  Did you send them the information to put on
15 it?  Do you know how the information got on there?
16       MR. SNELL:  Objection to form.  Asked and
17 answered.  Compound.
18       THE DEPONENT:  So some of the information I
19 cited in my general report as a result of my research
20 and -- and in complying it.  Some of the information
21 was background studies that are just widely read on the
22 subject.  And some of it was studies -- you know,
23 company documents that, obviously, I wouldn't have been
24 privy to that were sent to me for review.
25   Q.  (By Ms. Liu)  Doctor, is this the first time

Page 9

1  you have ever been asked to be an expert?
2    A.  It is.
3    Q.  Have you been a consultant for any medical
4  device company in the past?
5    A.  No.
6        MR. SNELL:  Counsel, can I ask a question.
7  Are you done with the materials?
8        MS. LIU:  No.
9        MR. SNELL:  Okay.  Because I just want the
10 record to reflect the doctor has brought numerous
11 hard-copy materials as well.  I didn't want there to be
12 a misrepresentation on the record that all there was
13 was thumb drives.
14       MS. LIU:  That's fine.
15       MR. SNELL:  Okay.
16   Q.  (By Ms. Liu)  Doctor, when did Ethicon first
17 contact you to become an expert witness?
18   A.  In 2016.
19   Q.  What month?
20   A.  Let me think.
21       I -- I don't recall the exact month.  It
22 would have been sometime over the summer, I believe.
23   Q.  And when did you decide to become an expert
24 for Ethicon?
25   A.  Shortly thereafter.

Olga Ramm, M.D

Page 10

1    Q.   Why did you decide to become an expert for
2  Ethicon?
3    A.   Well, as you know, there's been a lot of
4  litigation and just a lot of legal scrutiny around
5  mid-urethral slings, the TVT specifically.  I used the
6  TVT in my practice as the first-line surgical approach
7  to the treatment of stress urinary incontinence in
8  women who have no contraindications to it.  And,
9  whereas, I have seen other slings go off the market, I
10 would hate to see that happen to the TVT.  I think it
11 would be a disservice to women.
12   Q.   Doctor, you mentioned previously that you had
13 been deposed one time.
14        Was that a malpractice case?
15   A.   It was.  I wasn't named in it.  I was one of
16 the witnesses.
17        MS. LIU:  Can we go off the record.
18        (Recess taken.)
19        MS. LIU:  Back on.
20        Just -- just for the record, Exhibit 1 is
21 marked the doctor's TVT general report.
22        (Exhibit 1 was marked for identification by
23 the court reporter and is attached hereto.)
24        MR. SNELL:  Thank you, Counsel.
25   Q.   (By Ms. Liu)  Doctor, I was talking to you

Page 11

1  earlier about the malpractice suit in which you were
2  deposed.
3        You mentioned that you were not named in it,
4  correct?
5    A.   Correct.
6    Q.   Was the case involving any kind of medical
7  device?
8    A.   It was an obstetrical case.
9    Q.   Doctor, your counsel just brought in the
10 invoice -- your invoice, which I have marked as
11 Exhibit 3.
12        (Exhibit 3 was marked for identification by
13 the court reporter and is attached hereto.)
14   Q.   (By Ms. Liu)  Can you take a look at that?
15        MR. SNELL:  I'm just going to object to the
16 predicate.  I'm not Dr. Ramm's counsel.  I represent
17 Ethicon and Johnson & Johnson.
18        MS. LIU:  Thank you.
19        MR. SNELL:  Just so that that is clear.
20   Q.   (By Ms. Liu)  Doctor, do you recognize that
21 as your invoice?
22   A.   I do.
23   Q.   Did you prepare that?
24   A.   I did.
25   Q.   And I believe it states that you have spent

Page 12

1  33-1/2 hours; is that correct?
2    A.   Between November 2016 and January 31st, 2017,
3  yes.
4    Q.   And, Doctor, how did you calculate the
5  33-1/2 hours?
6    A.   So I just kept a daily log of the time that I
7  spent working on the general report, kind of on a
8  day-by-day basis, and then I searched my calendar and
9  added it all up.
10   Q.   Doctor, do you have that daily log still?
11   A.   I could probably find it in my calendar.
12        MS. LIU:  Counsel, I would like to have the
13 daily log produced, please.
14        MR. SNELL:  I will take it under advisement.
15   Q.   (By Ms. Liu)  Doctor, in drafting your
16 report, how much time would you -- would you be able to
17 allocate to doing research or actually doing the
18 drafting out of your 33-1/2 hours?
19        MR. SNELL:  Object to form.  Compound.
20        Go ahead.
21        THE DEPONENT:  You know, it's hard for me to
22 say that because oftentimes I would be reading as I
23 wrote the report.  So it's hard to separate those out.
24   Q.   (By Ms. Liu)  And, Doctor, did you meet with
25 Mr. Snell or any other attorney that represents Ethicon

Page 13

1  in preparation for your deposition today?
2    A.   I did.
3    Q.   When?
4    A.   Yesterday.
5    Q.   And how many -- how long?
6    A.   About 9:30 to 5:00, with a lunch break.
7    Q.   And who was the person who contacted you to
8  become an expert for Ethicon?
9    A.   Mr. Snell.
10   Q.   Have you had any contact with any other
11 attorney besides Mr. Snell?
12   A.   I believe I had a telephone call with -- with
13 another attorney, and I -- I don't recall her last
14 name.  I'm sorry.
15   Q.   Do you know the first name?
16   A.   I believe her first name was Sherry.
17   Q.   And, Doctor, you mentioned that you were
18 reading a lot while drafting your report.
19        Doctor, how did you get the literature that
20 you used in your report?
21   A.   Well, some of the literature was previously
22 known to me, obviously, as a result of my training.  I
23 also performed PubMed searches and MEDLINE searches.
24   Q.   Doctor, did Butler Snell provide you with
25 literature?

Olga Ramm, M.D

Page 14

1    A.   They provided me with literature, some -- you
2    know, you see the binders.
3    Q.   Do you know how they provided you those
4    literature?
5         MR. SNELL:  Object to form.
6         THE DEPONENT:  They FedEx'd it to me.
7    Q.   (By Ms. Liu)  Do you know how they determined
8    which articles or which piece -- which studies to send
9    to you?
10    A.   So doing my own review of the studies that
11    they sent to me, it was -- it was pretty clear that it
12    was a comprehensive list of studies that pertain to the
13    TVT, but also stress incontinence surgery, in general.
14    So there are studies that involve the Burch fascial
15    slings, as well as company documents.
16    Q.   Doctor, I want to turn to just a little bit
17    about your background with TVT.
18    A.   Okay.
19    Q.   How many TVT implants have you performed?
20    A.   So, roughly, 1400.  I think it states that in
21    my general report.
22    Q.   And what years did you perform these TVT
23    implants?
24    A.   I started performing them in my residency.
25    My residency was from 2005 to 2009.  And then,

Page 15

1    obviously, did a much higher volume in fellowship.
2    And, thereafter, I still performed the implants.
3    Q.   Now, in your report you mention both
4    performing the TVT retropubic original as well as the
5    EXACT sling; is that correct?
6    A.   Uh-huh.
7         MR. SNELL:  You have to say "yes" or "no."
8         THE DEPONENT:  Yes.  Sorry.
9         MR. SNELL:  That's okay.
10    Q.   (By Ms. Liu)  Doctor, currently, today, do
11    you use the TVT EXACT?
12    A.   Currently, I'm using the original TVT.
13    Q.   And when did you use the EXACT?
14    A.   I used the EXACT in fellowship and early on
15    in my practice at Kaiser Permanente.
16    Q.   And why did you stop using the EXACT?
17    A.   Well, I worked in the -- I work in the
18    context of a managed-care organization and there are
19    preferred products.  And I didn't see a clinical
20    difference in the performance of the original TVT and
21    the TVT EXACT, but the original TVT is actually
22    substantially cheaper.  And so that is the preferred
23    product for Kaiser Permanente and that's why I used
24    primarily the TVT original.
25    Q.   And, Doctor, do you have a role in making

Page 16

1    that decision with Kaiser?
2    A.   I am not on the contract negotiation team,
3    but I can make recommendations.  So if I felt that one
4    sling was substantially better than the other,
5    certainly I would voice that opinion and that opinion
6    would be taken under heavy consideration by the
7    contract team.
8    Q.   And, Doctor, have you used any other slings
9    in the past?
10    A.   I have used the Boston Scientific Advantage
11    and Advantage Fit in my training.
12    Q.   Any others?
13    A.   In residency, we worked with private
14    physicians who may have used other slings.  So on
15    occasion, I may have participated in a case, but -- but
16    not -- not when I was the independent surgeon.
17    Q.   Doctor, you mentioned that you had implanted
18    1400 TVT slings.  Now, you have mentioned that that
19    started in residency.
20         In residency, were you the doctor who
21    actually implanted the sling or were you assisting a
22    doctor?
23    A.   So in order to log the case, you have to
24    perform as -- when you are the resident and you have to
25    report this to the ACGME, you have to perform at least

Page 17

1    50 percent of the case.  So whereas I was being
2    supervised by an attending physician, I performed more
3    than 50 percent of the procedure.
4    Q.   And when you say you performed more than
5    50 percent of the procedure, does that -- strike that.
6         What portion of the procedure did you perform
7    in the more than 50 percent that you just described?
8    A.   Okay.  So, generally, I would make the
9    incision.  Prior to the incision, I would do all of the
10    requisite injections.  I would do the dissection of the
11    TVT tunnels, and usually I would be the one to pass the
12    dominant side.  So for me, as a right-handed surgeon,
13    that's the patient's right side.
14         And then, generally, you know, depending on
15    the case, especially if it was earlier in residency,
16    the attending surgeon would pass the nondominant side,
17    and then I would perform the cystoscopy.  And earlier
18    on in residency -- and, actually, usually in residency,
19    it was the attending physician who would tension the
20    sling.  And then I would close the incision.
21    Q.   So the tensioning -- during residency, the
22    tensioning was performed by the attending physician,
23    correct?
24    A.   Yeah, with me assisting right there next to
25    them.

Olga Ramm, M.D

Page 18

1    Q.   And when did you start performing TVT
2  implantations on your own without an attending surgeon?
3    A.   In fellowship.
4    Q.   And what year was that?
5    A.   So fellowship was 2009 through 2012.
6    Q.   And how many TVT slings would you say you
7  would have implanted starting from fellowship to
8  present day?
9    A.   So I think in my report I say I did about 750
10 cases in fellowship and approximately 600 since then.
11 So what is that, 13- --
12   Q.   1350?
13   A.   Yeah.
14   Q.   And you mentioned 1400.
15     So you only did 50 cases during residency?
16     MR. SNELL: Object. Misstates.
17     THE DEPONENT: It's an estimate.  But,
18 generally, residency is comprised of, at most, four
19 urogynecology rotations.  So that would make sense.
20   Q.   (By Ms. Liu)  And, Doctor, have you done a
21 registry of your own sling patients?
22   A.   What do you mean by "registry"?
23   Q.   Well, how do you keep track of them?
24   A.   So, generally, postoperatively, I have the
25 patients follow up between two and four weeks

Page 19

1  postoperatively; then at three months and then again at
2  one year.
3       The sling implants are all entered into a
4  Kaiser Permanente database that's part of the
5  electronic medical record.  I keep my own log of
6  surgical cases and, every couple of years, go back
7  to -- through the charts to see whether there are any
8  new developments that are -- that are related to the
9  outcomes of those cases.
10      And we also -- within Kaiser northern
11 California, we have a network of physicians who are
12 pelvic reconstructive surgeons, so they are the ones
13 that are performing these types of cases.  So if --
14 you know, if a patient moves away, or whatever, but
15 they stay with the same insurance provider, I will -- I
16 will have follow-up that way.
17   Q.   And, Doctor, you mentioned that you see your
18 patients at two weeks, four weeks, three months and a
19 year?
20   A.   Between two and four weeks, so that's one
21 time.
22   Q.   Okay.  So between two and four weeks, you
23 have your initial postop, and then you have another
24 postop appointment at three months?
25   A.   Correct.

Page 20

1    Q.   And then a follow-up appointment at the
2  one-year mark, correct?
3    A.   Correct.
4    Q.   And then what happens after the one-year
5  mark?
6    A.   So after the one-year mark, it kind of
7  depends on the patient.  Some patients who are
8  particularly attached come in yearly.  And then there's
9  some patients who prefer not to come in for an
10 in-person visit.  Sometimes I will follow up with those
11 patients via an email.
12   Q.   And, Doctor, do you have patients that don't
13 follow up at the one-year mark?
14     MR. SNELL: Object to form.
15     THE DEPONENT: I am sure there are some
16 patients that don't, but we have a pretty decent system
17 to -- I would say the majority certainly do.
18   Q.   (By Ms. Liu)  And do you do anything
19 proactively to keep track of whether or not patients
20 show up for their follow-up appointments?
21   A.   Yeah.  So, actually, at their three-month
22 postoperative visit, I send a secure message to my care
23 team with a reminder that they should come back --
24 you know, let's say their one-year postop will be in
25 August, so I send a message to my care team to say,

Page 21

1  Please schedule postop visit in August.  And so then
2  they contact the patient.  And if -- if the patient
3  can't be contacted, I hear back that way.
4    Q.   And, Doctor, after the one-year mark, if a
5  patient doesn't come back to see you, you don't know
6  what happens to that patient; is that correct?
7      MR. SNELL: Object to form.
8      THE DEPONENT: So if a patient stays within
9  the Kaiser Permanente system, if they come back for
10 something related to their urogynecologic condition, I
11 would more likely than not know that because it's a
12 small group of colleagues of mine.  And so people would
13 either contact me or would cc me the chart at the end
14 of the encounter.
15   Q.   (By Ms. Liu)  Doctor, if the patient leaves a
16 Kaiser Permanente group, then you would not have a --
17 any notice as to any kind of problems that might arise
18 after that; is that correct?
19     MR. SNELL: Object to form.
20     THE DEPONENT: I suppose that's possible,
21 yes.
22   Q.   (By Ms. Liu)  You mentioned that you have a
23 log of your surgical cases.
24     How often do you go and find patients that
25 had been lost?

Olga Ramm, M.D

Page 22

1  MR. SNELL: Object to form.
2  THE DEPONENT: That have been -- what do you
3  mean by "lost"?
4  Q. (By Ms. Liu) That haven't followed up with
5  you after the year mark.
6  MR. SNELL: Same objection.
7  THE DEPONENT: Okay. I'm sorry. I'm not
8  sure I quite understand the question.
9  Q. (By Ms. Liu) Okay. Let me try to break it
10  up a little.
11  A. Sure.
12  Q. You mentioned that you do have a log of all
13  your surgical cases, correct?
14  A. Yes.
15  Q. So after a year, if a patient doesn't come
16  back to see you and you are not getting updates about
17  that patient, do you ever go and try to look through
18  your log and try to find these patients and see what's
19  going on with them?
20  MR. SNELL: Object to form.
21  THE DEPONENT: So the expected follow-up is
22  at one year postoperatively. Do I go through,
23  you know, at three-, four-, five-year intervals to see
24  where that patient is and try to contact the patient?
25  No, I don't do that.

Page 23

1  Q. (By Ms. Liu) And, Doctor, currently, today,
2  you stated that you use the TVT original.
3  Do you use the one that is mechanically cut
4  or the one that is laser cut?
5  A. Mechanically cut.
6  Q. And why do you use the mechanically cut one?
7  A. So, again, I don't think that there is any
8  difference in the clinical outcomes or ease of implant,
9  but the mechanically cut TVT is significantly cheaper.
10  Q. Than the laser cut?
11  A. Than the laser cut.
12  Q. Doctor, have you taken the mechanically cut
13  TVT sling out of the sheath and felt it?
14  A. Yes. I have patients feel it preoperatively.
15  Q. And, Doctor, have you seen particles come
16  loose from the mechanically cut TVT?
17  MR. SNELL: Object to form.
18  THE DEPONENT: I have seen some particles
19  come off of the TVT sling when I cut the -- when I cut
20  the mesh at the suprapubic skin site.
21  Q. (By Ms. Liu) And these particles would be
22  blue?
23  A. Yeah.
24  Q. And, Doctor, let's talk a little bit about
25  the TVT sling coming out of the kit.

Page 24

1  Does your OR nurse open the package for you?
2  A. Generally. Uh-huh.
3  Q. When you take -- strike that.
4  When the kit is on your --
5  A. Table.
6  Q. -- table, yeah -- what does it look like
7  coming out of the package?
8  A. So it's -- the sling itself is encased in a
9  plastic sheath attached to the two metal trocars.
10  Q. So the sling is actually attached to the
11  metal trocars, correct?
12  A. Uh-huh.
13  Q. And then there is a handle that you screw on
14  to each side to pass the trocars; is that correct?
15  A. Right.
16  Q. Is the handle reusable?
17  A. It is.
18  Q. So do you know how the metal trocars are
19  attached to the sling?
20  A. Yeah, they are bonded to the -- the sling is
21  bonded to the trocar.
22  Q. And, Doctor, have you ever taken the sling
23  off the trocar prior to implantation?
24  A. So for -- for teaching purposes with
25  residents, but I didn't then go on to implant that

Page 25

1  sling, so, no.
2  Q. Okay. So it's not meant to be taken off the
3  trocars for you to implant separately without those
4  trocars; is that correct?
5  A. That's correct.
6  Q. And that would not be within your standard of
7  care to do so; is that correct?
8  A. To implant the TVT without the use of the
9  trocars --
10  Q. Correct.
11  A. -- is that what you are asking me?
12  Q. That is what I'm asking.
13  A. I don't -- I don't generally do that;
14  although, I don't know that there's a standard of care
15  around the use or nonuse of trocars.
16  Q. And, Doctor, you mentioned that this trocar
17  was bonded to the mesh, correct?
18  A. I did.
19  Q. So it's not meant for you to take it apart
20  prior to implanting it in a woman, correct?
21  A. It's not meant to be taken apart, no.
22  Q. Okay. And, Doctor, let's talk a little bit
23  about the trocar.
24  I know in your report you mention that it is
25  a 5-millimeter trocar; is that correct?

Olga Ramm, M.D

Page 26

1    A.  Yes.
2    Q.  I know in your report you also mention that
3  it was a 1-centimeter sling.  But in a different part
4  of your report, you mention that it is an 11-millimeter
5  sling.
6        Were you just doing an estimate for the
7  centimeter?
8        MR. SNELL:  Object to form.
9        THE DEPONENT:  So it's 11 millimeters in
10  width.
11    Q.  (By Ms. Liu)  So let's talk about this
12  implantation, then.
13        Doctor, the trocar is 5 millimeters and it's
14  tubular, correct?
15    A.  Yes.  So in a cross-section it is round.
16    Q.  So it is a 5-millimeter diameter?
17    A.  Right.
18    Q.  Now, you are passing an 11-millimeter flat
19  mesh through that space that you have created with the
20  5-millimeter trocar; is that correct?
21    A.  So you are passing the mesh through tissue,
22  but there's no space, per se, that is created by the
23  trocar itself.  It's not like the trocar is there to
24  create a passageway or a canal or a tunnel.  Rather,
25  it's there to guide the path.

Page 27

1        So you could actually use, you know, a very
2  small needle rather than a 5-millimeter trocar.  You
3  don't need -- yeah, you don't need the trocar to be the
4  same shape or size or width as the mesh itself.
5    Q.  Now, the TVT retropubic is original --
6  sorry -- is supposed to be placed behind the pubic
7  rami; is that correct?
8    A.  Yes.
9    Q.  So it passes through underneath the urethra
10  in the dissection that you've made, correct?
11    A.  So in the midline it sits under the
12  mid-urethra, and then, through the tunnels, it passes
13  through the under-pelvic connective tissue around the
14  urogenital diaphragm and the retropubic space and then
15  exits through the rectus tendon as it inserts on the
16  pubic bone.  And then it makes its way through the
17  fatty tissue under the skin and then through the skin,
18  ultimately.
19    Q.  And, Doctor, that -- that retropubic space
20  that you are talking about, it's not an open space, is
21  it?
22        MR. SNELL:  Object to form.
23        THE DEPONENT:  So it's a potential space.
24    Q.  (By Ms. Liu)  And it is a space that is
25  created by the surgeon to be -- to implant a product;

Page 28

1  is that correct?
2    A.  Actually, the retropubic space is not
3  developed with the implantation of the TVT.  That's
4  what makes it minimally invasive.  That's what also
5  decreases your risk of bleeding, right?  So the
6  retropubic space is a space that you would develop with
7  a Burch procedure, for example, where you actually have
8  to physically go in there and suture in that space.
9        It's also a space that you would have to
10  develop with the passage of a fascial sling, you know,
11  where you -- where you are actually entering
12  abdominally and then making your way from above into
13  the vagina.
14        But with the TVT, you don't have to develop
15  the retropubic space.  It pass -- the trocar and the
16  mesh that follows it passes through this space without
17  having to expand it.
18    Q.  Now, Doctor, the mesh is supposed to lay
19  flat; is that correct?
20    A.  The mesh should be flat under the
21  mid-urethra.
22    Q.  And how do you ensure that the mesh is flat
23  in the retropubic space and in the layers of fat
24  underneath the skin and the fascia?
25        MR. SNELL:  Form objection.

Page 29

1        THE DEPONENT:  Well, I think that's a
2  two-part question.
3        So to answer the question directly, the mesh
4  is encased in the plastic sheath that ensures that the
5  mesh stays flat, right?
6        The second part to that question is
7  actually -- it is -- it's important to have the mesh
8  flat in the areas where it comes into contact with the
9  periurethral tissues.  But you could very easily make
10  the argument that it doesn't need to be completely flat
11  in the subcutaneous tissues, like, for example, in the
12  adipose tissue under the skin.
13    Q.  (By Ms. Liu)  So now, Doctor, do you know
14  what the weight of the mesh is prior to implantation?
15    A.  Do you mean per-centimeter surface area --
16    Q.  Yes.  Per-centimeter squared, what the gram
17  amount is.
18    A.  I would have to look that up.  I don't recall
19  off the top of my head.
20    Q.  I will represent to you that it's 100 grams
21  per centimeter squared.
22    A.  Okay.
23    Q.  Does that sound approximately right to you?
24    A.  Per centimeter squared?
25        MR. SNELL:  I will object.  Hold on.  I have

Olga Ramm, M.D

---

Page 30

1 to object as to the foundation as to that exact number.

2 But go ahead.

3 THE DEPONENT: Per --

4 Q. (By Ms. Liu) Per centimeter.

5 A. -- squared of surface area, 100 grams. No, I

6 would disagree with that.

7 Q. That's fine. You can look that up later.

8 A. Okay.

9 Q. Let me ask you. If -- if the mesh is not

10 flat in the retropubic space when it -- when it passes

11 through, it would fold; is that correct?

12 MR. SNELL: Object. Foundation.

13 THE DEPONENT: Again, I think that we could

14 make all kinds of conjectures about what the mesh would

15 do if it weren't flat when it passes through the

16 retropubic space, but I have no reason to believe that

17 it's not flat when it passes through the retropubic

18 space. The plastic sheath flattens the mesh and keeps

19 it in that orientation when it's passing through the

20 retropubic space.

21 Does that make sense?

22 Q. (By Ms. Liu) And, Doctor, you pull the

23 sheath off after implantation; is that correct?

24 A. Yeah.

25 Q. The sheath doesn't stay in; is that correct?

Page 31

1 A. Right. The sheath does not stay in the

2 patient once the procedure is done.

3 Q. Now, are you claiming that the mesh, after

4 implantation, is so stiff that it wouldn't curl in a

5 5-millimeter space that is being created?

6 MR. SNELL: Object. Form. And totally

7 misstates.

8 Go ahead.

9 THE DEPONENT: So, again, there's -- there's

10 no 5-millimeter space that is created, right?

11 That's -- that's an erroneous premise to this.

12 The mesh is placed inside the plastic sheath.

13 And when the plastic sheath is pulled up, then there's

14 sort of a friction effect that keeps the mesh in place

15 along the edges of the mesh. So the tissue attaches to

16 those. And then, over time, tissue ingrowth into the

17 pores of the mesh keeps it in the orientation at which

18 it was originally placed.

19 Q. (By Ms. Liu) And, Doctor, how long does it

20 take for the tissue ingrowth process to complete?

21 A. Well, to answer that question, we have to

22 look at wound healing and scar tissue remodeling. So

23 that's not a linear process, right?

24 That process is more rapid in the beginning.

25 So within the first four weeks, a large portion of that

Page 32

1 ingrowth has occurred, but scar tissue remodeling goes

2 on over the course of months through the first year

3 after implantation.

4 And that's not unique to the TVT. That's

5 true of a Cesarean delivery incision or -- or, really,

6 any kind of wound.

7 Q. So, Doctor, in the first four weeks where you

8 are describing the -- the more rapid tissue ingrowth,

9 during -- during the time that the patient is healing

10 in those first four weeks, the patient is not laying in

11 the lithotomy position the whole four weeks; is that

12 correct?

13 A. That's correct.

14 Q. So after you finish the procedure, the

15 woman's legs come down, correct?

16 A. Yes.

17 Q. And then the patient is able to move; is that

18 correct?

19 A. Yeah. They are encouraged to ambulate, to

20 perform their usual daily activities, barring any,

21 you know, excessively heavy lifting and exertion.

22 Q. So prior to the tissue -- the full tissue

23 ingrowth, when the patient is moving around like

24 normal, how do you ensure that the mesh that's been

25 placed there has not curled or is not rolling?

Page 33

1 A. Because the mesh has been -- has been secured

2 in place with surface tension, and if the -- if there

3 were more pressure in that area, then the mesh would

4 most likely be more flattened out. It wouldn't curl in

5 response to that.

6 Q. And, Doctor, have you -- have you removed

7 mesh?

8 A. I have removed mesh.

9 Q. So you perform revision procedures, correct?

10 A. That's correct.

11 Q. How many times?

12 MR. SNELL: Object to form. Vague, mesh.

13 Are you talking just TVT, or are you -- any

14 and all mesh?

15 Q. (By Ms. Liu) Let's just start with TVT.

16 A. So are you asking specifically in my practice

17 or ever?

18 Q. Ever.

19 A. Ever. I would say I have probably done

20 somewhere between 20 and 30 revision procedures. And

21 that includes in fellowship, as we were a ordinary-care

22 center.

23 Q. And this is 20 to 30 sling revisions?

24 A. Sling revisions.

25 Q. Have you done revisions dealing with pelvic

Page 34

1  organ prolapse mesh?
2      A.  I have.
3      Q.  How many?
4      A.  You know, maybe a -- a third of that number.
5      Q.  So eight to ten?
6      A.  Eight to ten.
7      Q.  So eight to ten pelvic organ prolapse mesh
8  revisions, correct?
9          So in the sling revisions, in the 20 to 30
10  that you have performed, have you gone into the
11  retropubic space via an abdominal incision?
12      A.  So that's generally not necessary.  I recall
13  having to do that in only one case.  But, generally,
14  that's not the problem area and that's not what is
15  required.
16      Q.  So, Doctor, in those 20 to 30 revisions, you
17  haven't seen what the sling looks like in the
18  retropubic space, have you?
19          MR. SNELL:  Object.  Form.
20          THE DEPONENT:  I haven't had reason to look
21  in the retropubic space and dissect the sling out.
22  That would be more than necessitated by the -- the
23  cause for the sling revision.
24      Q.  (By Ms. Liu)  And, Doctor, have you done any
25  ultrasounds to measure the width of the sling in the

Page 35

1  retropubic space?
2      A.  I have done ultrasounds to measure the width
3  of the sling in the retropubic space.
4      Q.  How many times?
5      A.  So the BK ultrasound has a 3D probe that's a
6  linear probe that -- that can be used for imaging mesh.
7  And so when I was learning to use that ultrasound, I
8  would do intraoperative and then 12-week postoperative
9  ultrasounds to ascertain the location of the mesh and
10  whether it looked the same before versus at the postop
11  visit and it did.
12      Q.  Did you measure the --
13          MR. SNELL:  You said -- what was the spelling
14  of that?  BK ultrasound?
15          THE DEPONENT:  B-K.
16      Q.  (By Ms. Liu)  And did you measure the
17  thickness of the mesh during these ultrasounds?
18      A.  By "thickness," do you mean width?
19      Q.  No.  By "thickness," I mean you have got the
20  width, you have got the length and you have got the
21  thickness of it, so from, you know, one side of where
22  the pores are to the other side.
23          MR. SNELL:  Object.  Form.
24          THE DEPONENT:  So, generally, on ultrasound
25  it is -- it's going to look linear if it's flat, and it

Page 36

1  did.
2      Q.  (By Ms. Liu)  But you did not measure it as
3  far as the thickness goes; is that correct?
4      A.  I don't -- I don't remember whether I
5  actually measured it in calibers.
6      Q.  Did you measure the width, though, which
7  is --
8      A.  (Deponent nods head.)
9      Q.  You did.
10          And what was the width on these ultrasounds
11  that you -- what's the range of the width?
12      A.  You know, I honestly don't recall what the
13  range of the width was, but the findings were not
14  concerning, alarming or something that's unexpected.
15  So I would imagine it was in the range of about a
16  centimeter.
17      Q.  Did you record the width down?
18      A.  No.
19      Q.  So at this point you are not sure exactly
20  what the width was.  You are guessing that it was about
21  a centimeter?
22          MR. SNELL:  Misstates.
23          THE DEPONENT:  No, I am not guessing.  I -- I
24  recall that it was about a centimeter.  Because if it
25  were significantly greater than that, well, that would

Page 37

1  then prompt a line of investigation to figure out why
2  that would be, or if it was significantly less than
3  that, again, we try to investigate why that would be.
4          So there was nothing that was surprising
5  about the width of the mesh on that ultrasound image.
6      Q.  (By Ms. Liu)  And, Doctor, have you used the
7  TVT original in the laser cut mesh?
8      A.  I'm sorry.  I don't quite follow the
9  question.
10      Q.  Okay.  You mentioned that, currently, you are
11  using mechanically cut TVT retropubic original mesh.
12          Have you ever used the laser cut mesh?  Not
13  in the EXACT, but in the retropubic original.
14      A.  I don't remember.
15      Q.  You mentioned in your report that,
16  clinically, you found them to be the same.  So that's
17  why I'm wondering how you came -- you came up with that
18  conclusion?
19      A.  So I came to that conclusion as a result of
20  doing the implantation.  The -- my own personal bladder
21  perforation rate and intraoperative complication rate,
22  as well as intraoperative time, blood lost, all of
23  these parameters that we look at in order to evaluate
24  the flow of surgery, those were comparable.
25          And then, postoperatively, there was -- there

Olga Ramm, M.D

Page 38

1 was no difference in either efficacy or complication
2 rates. And that is not unique to my practice,
3 obviously. I rely on substantial body of literature
4 also that corroborates my experience.
5     Q.  Have you compared the laser cut mesh and the
6 mechanically cut mesh in your own practice, as far as
7 long-term clinical outcomes?
8     A.  So at one year, which is what I can speak
9 about most reliably, because everyone follows up to one
10 year. There's -- there's not been a difference.
11     Q.  Now, you mentioned you are not sure whether
12 or not you have used the laser cut mesh in the TVT
13 retropubic; is that correct?
14     A.  So I have used the laser cut mesh with the --
15 with the TVT exact, which has a smaller trocar for
16 certain. And I don't recall whether I have used the
17 laser cut mesh with the original TVT introducer device.
18     Q.  So as far as comparing the two, you can only
19 compare your EXACT to the TVT original as far as laser
20 cut or mechanically cut, correct?
21     MR. SNELL:  Object. Misstates.
22     THE DEPONENT:  So I think I can compare them
23 based not only on my own experience, but, again, on
24 the -- on the significant amount of literature that's
25 been published on outcomes following the TVT with the

Page 39

1 use of mechanically and laser cut mesh.
2     And, again, I don't -- I don't know that the
3 size of the trocar makes much of a difference, right?
4 So the trocar doesn't stay in the patient afterwards.
5 It's literally there for a few minutes and -- and it's
6 then removed.
7     MS. LIU:  Let's take a quick break.
8     (Recess taken.)
9     MS. LIU:  Back on.
10     Q.  (By Ms. Liu) Doctor, do you believe that
11 mesh extrusion exposure and erosion is a risk of the
12 TVT retropubic sling?
13     A.  It's a known risk.
14     Q.  But it is a risk, correct?
15     A.  Yes.
16     Q.  Infection is a risk; is that correct?
17     A.  Infection is a risk of any surgical
18 procedure. That is not unique to the implant.
19     Q.  But it is a risk; is that correct?
20     A.  It's a risk of surgery.
21     Q.  Is it a risk that the implant would get
22 infected?
23     MR. SNELL:  Form.
24     THE DEPONENT:  I -- I haven't seen that. And
25 I am not sure what you mean by the implant getting

Page 40

1 infected. Like you mean just purulence around the
2 implant? That's rare; although, I'm --
3     Q.  (By Ms. Liu) Is it a risk, though?
4     MR. SNELL:  Object. Form. Asked and
5 answered.
6     THE DEPONENT:  Infection is -- is a risk of
7 surgery.
8     Q.  (By Ms. Liu) Acute pain is a risk of the
9 TVT?
10     A.  Acute pain is a surgical risk. It's a risk
11 of pelvic surgery and stress incontinence surgery,
12 specifically.
13     Q.  Is chronic pain a risk of the TVT?
14     A.  Chronic pain is a risk of any pelvic surgery,
15 including stress incontinence procedures.
16     Q.  Including TVT?
17     A.  TVT is a stress incontinence procedure that
18 involves surgical placement of the TVT. So, yeah,
19 chronic pain is a risk.
20     Q.  Is voiding dysfunction a risk of the TVT?
21     A.  Again, voiding dysfunction is a risk of any
22 stress incontinence procedure.
23     Q.  Including the TVT?
24     A.  Including the TVT.
25     Q.  What about pain with intercourse; is that a

Page 41

1 risk of the TVT?
2     A.  Pain with intercourse is a risk of pelvic
3 surgery and vaginal surgery. I don't think it's -- my
4 opinion is that it's not directly linked to the TVT
5 implant.
6     Q.  What about neuromuscular problems; is that a
7 risk of the TVT?
8     MR. SNELL:  Object. Form.
9     THE DEPONENT:  What do you mean by
10 "neuromuscular problems"?
11     Q.  (By Ms. Liu) Chronic pain in the pelvic or
12 abdominal area because it passes through the
13 musculature.
14     A.  So we talked about chronic pain being a risk
15 of any pelvic, abdominal or vaginal surgery.
16     Q.  Recurrence of incontinence is a risk of the
17 TVT implant; is that correct?
18     A.  Recurrence of incontinence is a risk of any
19 anti-incontinence procedure, including the TVT.
20     Q.  Bleeding, including hemorrhaging or
21 hematomas, are a risk of the TVT, correct?
22     A.  They are a risk of pelvic, abdominal or
23 vaginal surgery.
24     Q.  Including the TVT?
25     A.  Including the TVT, although lower with the

Olga Ramm, M.D

Page 42

1 TVT than other anti-incontinence procedures.
2    Q.   Seroma is a risk of the TVT?
3       MR. SNELL: Object. Form.
4       THE DEPONENT:  Seroma could be a risk in
5 theory, but the risk of seroma formation with a
6 minimally invasive procedure like a TVT would be much
7 lower than with other anti-incontinence procedures that
8 actually require an open abdominal approach.
9    Q.   (By Ms. Liu)  But it is still a risk,
10 correct?
11       MR. SNELL: Object. Form.
12       THE DEPONENT:  A small theoretical risk.
13    Q.   (By Ms. Liu)  Urge incontinence or frequency
14 is a risk of TVT, correct?
15    A.   It's a risk of any anti-incontinence
16 procedure, including the TVT.
17    Q.   Urinary retention, is that a risk of the TVT?
18    A.   It's a risk of any pelvic surgery, not just
19 anti-incontinence surgery.  But, yeah, certainly
20 patients who have anti-incontinence procedure are at
21 risk of transient and longer-term urinary retention,
22 and TVT is no exception.
23    Q.   Adhesion formation, is that a risk of the
24 TVT?
25    A.   What do you mean by "adhesion formation"?

Page 43

1    Q.   Well, what do you, as a doctor, define
2 "adhesion formation" as?
3    A.   Generally, when I'm referring to "adhesions,"
4 I'm talking about the obliteration of a real or
5 potential space.  And so we are not really talking
6 about real or potential spaces except for the
7 retropubic space.  I imagine there may be some adhesion
8 formation in the retropubic space.
9    Q.   So that is a risk?
10    A.   Of the -- of the TVT, as well as any other
11 abdominal, pelvic or vaginal surgery.  I believe lower
12 with the TVT.  Again, as I mentioned, you are not
13 creating a real space within the retropubic space, you
14 leave it as a potential space.
15    Q.   And -- but it is -- adhesion formation in the
16 retropubic space is a risk of TVT, correct?
17       MR. SNELL: Object. Form.
18       THE DEPONENT:  Yes.
19    Q.   (By Ms. Liu)  Atypical vaginal discharge, is
20 that also a risk of the TVT?
21    A.   What do you mean by "atypical"?
22    Q.   Well, discoloration, foul odor.
23    A.   So abnormal vaginal discharge has so many
24 causes that I think it would be -- my opinion is that
25 it would be impossible to say whether the TVT is

Page 44

1 directly related to it.
2    Q.   But is it a risk?
3       MR. SNELL: Objection.  Asked and answered.
4       THE DEPONENT:  In the cases where there is
5 mesh exposure in the vagina, it may be linked to
6 abnormal vaginal discharge; although, there are
7 certainly patients who have exposure who don't have
8 abnormal vaginal discharge.  But overwhelmingly, the
9 cause of abnormal vaginal discharge is not the TVT, and
10 it is certainly not -- a TVT that's not exposed is not
11 the cause of abnormal vaginal discharge.
12    Q.   (By Ms. Liu)  So in cases where there is
13 exposure, the TVT can be the cause of the abnormal
14 vaginal discharge, correct?
15    A.   Correct.
16    Q.   Exposed mesh can cause pain to the patient's
17 partner; is that correct?
18    A.   During intercourse.
19    Q.   Correct.
20       Is that a risk?
21    A.   Yes.
22    Q.   Okay.  Is death a risk?
23    A.   Death is the risk of life.
24    Q.   Doctor, do you believe that all known risks
25 of the TVT should be in the IFU?

Page 45

1    A.   No, I don't believe that.
2    Q.   Doctor, have you reviewed the IFU?
3    A.   I have.
4    Q.   Which ones?
5    A.   I reviewed the 2015, as well as the 2011 IFU.
6    Q.   And did you find the 2015 IFU to be
7 sufficient?
8    A.   The 2015, is that the one you are asking
9 about?
10    Q.   Yes.
11    A.   I actually found both of them to be
12 sufficient.
13    Q.   Now, did you review any IFUs besides the 2015
14 and 2011?
15    A.   About the TVT, specifically?
16    Q.   About the TVT, specifically.
17    A.   I don't think so.
18    Q.   So you didn't review the 2000 IFU; is that
19 correct?
20    A.   I may -- I may have reviewed it.
21       MR. SNELL:  You are allowed to look through
22 your stuff, if it will help you to refresh your
23 recollection.
24       MS. LIU:  And I appreciate if Counsel would
25 not coach the witness.

Olga Ramm, M.D

**Page 46**

1       MR. SNELL:  I am not coaching her.  It is --
2   she is allowed to do that.
3       MS. LIU:  I'm not saying she is not.
4       MR. SNELL:  For the record, the witness has
5   brought boxes and boxes of materials -- of materials
6   that she's reviewed.  All I am stating is if she
7   wishes, she can go and look at that before trying to
8   answer a question about a specific document.  There's
9   nothing improper about that.  And I didn't coach her as
10  to whether she looked at it or not.
11      MS. LIU:  You just said she brought boxes
12  that she reviewed.
13      Q.   (By Ms. Liu)  Doctor --
14      MR. SNELL:  Well, she's already testified to
15  that.
16      Q.   (By Ms. Liu)  -- the boxes that you -- have
17  you reviewed in detail every single document that you
18  brought?
19      A.   It depends on your definition of "in detail."
20  But, yes, I have reviewed the documents that I have
21  brought.
22      Q.   In your 33-1/2 hours that you have billed?
23      A.   Yes.
24      Q.   So you reviewed all the documents that are
25  there in the 33-1/2 hours and drafted your report,

**Page 47**

1   correct?
2       A.   Well, some of these -- a large number of
3   these documents are clinical trials that I have -- I
4   was familiar with before I became an expert witness.
5   It's just a part of the body of knowledge that I am
6   expected to have as a pelvic reconstructive surgeon.
7       Q.   And, Doctor, do you know the number of
8   internal documents you have reviewed in preparing your
9   report?
10      A.   I didn't enumerate them.
11      Q.   Would you say, you know, more than five?
12  More than ten?  Do you have a -- a good guestimate?  A
13  fair estimate?
14      A.   If I had to estimate, I would say more than
15  50.
16      Q.   So when you say "more than 50," are you
17  saying 50 to 75?
18      Do you have a better range for that?  What
19  was the high end of your range?
20      A.   I am not sure I can give you a range.
21      Q.   Doctor, how did you receive these internal
22  documents?
23      A.   Some of them were on the thumb drives and
24  some were with -- with duplication on -- on paper,
25  hard copy.

**Page 48**

1       Q.   Doctor, do you know how many documents have
2   been produced in this litigation?
3       A.   I didn't count off the documents, no.
4       Q.   And, Doctor, do you know how defense counsel
5   determined which documents to send to you?
6       A.   So my understanding was that defense counsel
7   sent the documents that were made available to the --
8   to the plaintiffs; that all of those were made
9   available to me.
10      Q.   Doctor, did you receive billions of pages of
11  internal documents?
12      A.   Billion of pages?
13      Q.   Correct.
14      A.   You know, I didn't count them up.  Certainly
15  there was electronic as well as hard copy, so I
16  didn't -- I didn't count them.
17      MS. LIU:  Doctor, I am going to mark the
18  reliance lists that were provided by Ethicon for your
19  report as Exhibit 4 and 5.
20      (Exhibit 4 was marked for identification by
21  the court reporter and is attached hereto.)
22      (Exhibit 5 was marked for identification by
23  the court reporter and is attached hereto.)
24      Q.   (By Ms. Liu)  Doctor, did you prepare the
25  reliance list?

**Page 49**

1       A.   I didn't prepare the reliance list.
2       Q.   Do you know what -- strike that.
3       Do you know who prepared your reliance list?
4       A.   Butler Snell prepared the reliance list.
5       Q.   And, Doctor, did you know that Butler Snell
6   submitted a supplemental reliance list this week?
7       A.   I see that here.
8       Q.   Did you prepare the supplemental reliance
9   list?
10      A.   I didn't prepare either of these lists.
11      Q.   Do you know what the difference is between
12  the two -- strike that question, actually.
13      Did you give Butler Snell additional
14  documents to add to your reliance list?
15      A.   Than what was previously outlined in my
16  general report, I think there were a couple of articles
17  about the incidence and prevalence of pelvic pain.
18      Q.   And strike that -- move to strike.
19      My question was:  Do you know -- did you --
20  did you give Butler Snell additional documents that
21  were not in your original reliance list to add to your
22  supplemental reliance list?
23      A.   And by "documents," are you referring to
24  citations?
25      Q.   Anything.  Any kind of document -- any

Olga Ramm, M.D

Page 50

1  additions that would be on your supplemental, did you
2  provide them to Butler Snell to add?
3     A.  So we discussed citations, but I didn't --
4  I'm not privy to company documents.  So I certainly
5  wouldn't be supplying them to Butler Snell, if that's
6  what you are asking.
7     Q.  Did you give them any additional articles?
8  Is that --
9     A.  Citation to articles.
10    Q.  And, Doctor, did you review everything that
11 is on your reliance list?
12    A.  I did.
13    Q.  And, Doctor, when did you review your
14 reliance list?
15    A.  So I reviewed my reliance list yesterday, as
16 well as intermittently through the course of working on
17 this.
18    Q.  Doctor, do you know when your reliance list
19 was created?
20    A.  I don't know the exact day, no.
21    Q.  Do you know when you received the reliance
22 list?
23    A.  So the supplemental reliance list, I received
24 a copy of that yesterday morning.  And the general
25 reliance list, I don't recall the exact date of when I

Page 51

1  received it.
2     Q.  Was it before or after you submitted your
3  report?
4     A.  I don't recall.
5     Q.  Do you remember whether or not you reviewed
6  design specifications for the TVT?
7     A.  I did review design specifications for the
8  TVT.
9     Q.  Do you know how many?
10    A.  I have read a number of articles about the
11 design of the TVT.
12    Q.  Articles?
13    A.  And I have reviewed -- reviewed company
14 documents about the design of the TVT as well.
15    Q.  Do you remember whether or not you read
16 specific design specifications?
17       MR. SNELL:  Object.  Asked and answered.
18       THE DEPONENT:  I have read about specific
19 design specifications.
20    Q.  (By Ms. Liu)  Doctor, did you review any
21 corporate deposition testimony?
22    A.  I did.
23    Q.  Do you know who?
24    A.  Oh, let's see here.  I have reviewed the
25 deposition testimony that's -- well, this isn't

Page 52

1  numbered, but under the materials list, you can see
2  that there is Moore, Angelini, Axel Arnaud,
3  Thomas Barbolt, and it just kind of goes on, as well as
4  the expert witnesses.
5     Q.  And, Doctor, you have reviewed every single
6  one of these that is listed on your reliance list?
7     A.  I am aware of them, yes.
8     Q.  You are aware of them.
9        Did you read their deposition testimony?
10    A.  I have read some of it.  Probably not every
11 single page.
12    Q.  And, Doctor, did you review the expert
13 reports of -- the general experts for the plaintiffs?
14    A.  I have.
15    Q.  Which ones?
16    A.  Bruce Rosenzweig and Jerry Blaivas.
17    Q.  Doctor, did you pull up the citations in
18 their reports when you were reviewing them?
19    A.  Do you mean did I read the entirety of every
20 article that was cited in their report?
21    Q.  Correct.
22    A.  I didn't do that, no.
23    Q.  Did you read any of them?
24    A.  Yes.
25    Q.  And why didn't you pull up every single

Page 53

1  citation that the plaintiffs' experts cited to?
2     A.  Some of them I was familiar with.  Some of
3  them I looked at the abstract or just looked at the
4  relevant results tables.
5     Q.  And did you disagree with the plaintiffs'
6  experts that you reviewed?
7     A.  I disagreed with their opinions.
8     Q.  Doctor, how many case-specific reports were
9  you asked to produce in this litigation?
10    A.  So I reviewed a total of four cases and
11 produced case-specific reports for two of those.
12    Q.  So you reviewed four cases.
13       In the two that you did not produce reports
14 from, did you generate an opinion?
15    A.  I did.
16    Q.  And in the two cases that you did produce a
17 report, you wrote up your opinion; is that correct?
18    A.  Yes.
19    Q.  In all four cases, did you conclude that the
20 TVT was not the cause of the plaintiffs' symptoms?
21       MR. SNELL:  Object.  Form.
22       THE DEPONENT:  So I concluded that the TVT
23 implant did not directly cause the -- the symptoms or
24 problems that -- that these patients had.
25    Q.  (By Ms. Liu)  And, Doctor, did you also read

Olga Ramm, M.D

Page 54

1  the depositions of the plaintiff experts?
2      A.  I did.
3      Q.  Which ones?
4      A.  I thought we just did this.  So --
5      Q.  We talked about the expert reports.  I'm now
6  switching to the depositions --
7      A.  Oh, the depositions.  Okay.  Gotcha.
8          So the same people, Bruce Rosenzweig and
9  Jerry Blaivas.
10     Q.  And, Doctor, did you read all of this
11  material, including the deposition transcripts, within
12  the 33-1/2 hours that you have billed for?
13     A.  Well, some of that was also done in the
14  preparation of the case-specific reports, which are not
15  reflected in that.
16     Q.  And, Doctor, since you have produced this
17  invoice, which is from November to January, how much
18  time have you spent on the general TVT, including
19  preparation for today?
20     A.  So I haven't tallied it up because I
21  haven't -- you know, I haven't submitted a bill, or
22  anything like that.
23     Q.  Do you have a best estimate?
24     A.  Probably at least as much.
25     Q.  So another 33-1/2 hours?

Page 55

1      A.  If not more, yeah.  Again, I haven't tallied
2  it up.
3      Q.  And in those 33-1/2 extra hours, what -- what
4  did you do in preparation?
5      A.  So I looked at company documents.  I read the
6  depositions of the plaintiffs' experts.  I have
7  reviewed medical records.  I reviewed the depositions
8  of -- of the plaintiffs themselves.  I reviewed
9  additional studies or re-reviewed the literature that I
10  had relied upon.
11     Q.  And, Doctor, you mentioned medical records
12  and plaintiffs' depositions.
13         So you are talking about the case specifics
14  now, correct?
15     A.  So those, yeah, would be.  Yes.
16     Q.  So that extra 33-1/2 hours encompasses both
17  the TVT general preparation, as well as the
18  case-specific reports that you are relying on; is that
19  correct?
20     MR. SNELL:  Hold on.  Object.  Form.
21  Misstates.  He said "at least."  You keep saying
22  33.  She did not testify it was 33 hours.
23         THE DEPONENT:  Right.  So there's, I think --
24  I'm sorry.  What was your question?
25     Q.  (By Ms. Liu)  Let's just -- you know, strike

Page 56

1  that.  We will move on.
2      A.  Okay.
3      Q.  Doctor, earlier you mentioned the tissue
4  ingrowth process, the four weeks for the initial acute
5  phase; is that correct?
6      A.  Yeah.  I mean, it's not separated into
7  phases, but the rapid incorporation of tissue and
8  fibroblast ingrowth and neovascularization happens
9  rapidly at the beginning.
10     Q.  And then you mentioned that it continues on
11  until approximately a year time; is that correct?
12     A.  Yeah.  And there's scar remodeling that
13  happens even after a year, but at a much lower rate.
14     Q.  Doctor, would you -- do you believe that
15  chronic inflammation is a risk of the TVT?
16     A.  I don't believe that, no.
17     Q.  So this process where you have got continual
18  tissue and growth and remodeling is not considered
19  chronic inflammation to you?
20     A.  No.  So if you break up wound healing,
21  it's -- it's broken up into four commonly recognized
22  stages.  Initially, after you create a wound, there's
23  hemostasis, where the blood vessels contract in order
24  to diminish blood loss.
25         Then there's an acute inflammatory phase

Page 57

1  where -- which is characterized by leaky blood vessels
2  and the release of cytokines in order to call in,
3  first, cells of the immune system to fight any
4  infection that might be associated with a wound.  And
5  that's regardless of whether there's a foreign body or
6  an implant, or whatnot.
7          Following that, you have got fibroblast
8  ingrowth, neovascularization.  And that's actually not
9  the inflammatory part.  That's -- that's the next phase
10  of wound healing.  And then there is scar remodeling
11  where collagen types are switched from one type to
12  another that is better organized.
13     Q.  Doctor, have you examined mesh that's been
14  removed under an electron microscope?
15     A.  I haven't personally examined mesh that's
16  been removed under an electron microscope, but I'm
17  familiar with the studies that have examined mesh under
18  the electron microscope.
19     Q.  Have you -- strike that.
20         Doctor, so since you have not examined
21  removed mesh under an electron microscope and the
22  tissues that are incorporated into this mesh, you would
23  not know whether or not there was chronic inflammation
24  in the explanted mesh, would you?
25     MR. SNELL:  Objection.  Form.  Lacks

Olga Ramm, M.D

Page 58

1  foundation as well.
2      THE DEPONENT:  So when I explant mesh,
3  there's no gross evidence of inflammation around the
4  mesh.  There's good tissue incorporation that's seen.
5  You know, that's why it's sometimes difficult to remove
6  mesh.
7      Q.  (By Ms. Liu)  But you have never actually
8  examined mesh, like an explanted mesh piece, under
9  electron microscope to see whether or not there's
10  evidence of chronic inflammation; is that correct?
11      MR. SNELL:  Objection.  Asked and answered.
12      THE DEPONENT:  I haven't, but I'm not -- I
13  don't believe that an electron microscopy image would
14  even be indicative of inflammation.  I think
15  inflammation is something that is better assessed with
16  plain histology.
17      Q.  (By Ms. Liu)  And, Doctor, you are not a
18  pathologist, are you?
19      A.  I am not a pathologist; although, I've worked
20  closely with pathologists.
21      Q.  But you have never performed the work of a
22  pathologist?
23      A.  I'm not a pathologist.
24      Q.  Doctor, we talked a little bit about the IFU
25  earlier, and you had stated that you specifically

Page 59

1  remember reviewing the 2015 and the 2011 IFUs, correct?
2      A.  Correct.
3      Q.  Doctor, have you ever written an IFU?
4      A.  I have not written an IFU.
5      Q.  Have you ever given input to a medical device
6  company on what needs to be in an IFU?
7      A.  I have not.
8      Q.  Would you consider yourself to be an expert
9  in drafting IFUs?
10      A.  I have used IFUs.  I have been the end user,
11  the intended audience of IFUs.
12      Q.  But you have never drafted one, correct?
13      A.  I have not drafted an IFU, not --
14      Q.  Do you know -- sorry.  Didn't mean to cut you
15  off.
16      Do you know what the regulations are of what
17  needs to be in an IFU?
18      A.  So in preparation for this case, I -- I have
19  reviewed some of the FDA regulations around IFUs.
20      Q.  Do you know which regulations they were?
21      A.  I don't remember the exact number.  There --
22  there are lots of regulations, but they were specific
23  for medical devices whose use would be limited to train
24  physicians --
25      Q.  Now --

Page 60

1      A.  -- or clinicians.
2      Q.  -- in these -- in these regulations that you
3  reviewed, did you use them to draft an IFU?
4      A.  I haven't drafted an IFU.
5      MS. LIU:  I'm sorry.  Can we take a quick
6  break.
7      (Recess taken.)
8      MS. LIU:  Back on.
9      Q.  (By Ms. Liu)  Doctor, in your report, you had
10  some opinions on pore size; is that correct?
11      A.  Yes, I discuss porosity and pore size in my
12  report.
13      Q.  And, Doctor, do you know what the pore size
14  is in the TVT?
15      A.  Yeah.  It's 13- to 1400 microns.
16      Q.  And do you know how that is measured?
17      A.  So the length of the pore is measured, so
18  fiber to fiber.
19      Q.  And, Doctor, do you know what the shape of
20  the pore is?
21      A.  Yes.  It's roughly a diamond-shaped,
22  four-corner structure.
23      Q.  So do you know from which -- which portion of
24  the pore is measured, like what end to what end?
25      A.  I don't know exactly which of the --

Page 61

1  you know, whether it's straight across or a diagonal,
2  but I don't think that's clinically relevant.
3      Q.  And, Doctor, the TVT is weaved, correct?
4      MR. SNELL:  Object.  Foundation.
5      THE DEPONENT:  So the TVT is a monofilament
6  macroporous knitted mesh.
7      Q.  (By Ms. Liu)  So it is knitted?
8      A.  Right.
9      Q.  And so, Doctor, you have got the pores, the
10  one that you said is measured.
11      What about the little pieces or the little
12  ones where you have got the -- the knitting, where
13  there's much smaller; do you know what that size is?
14      MR. SNELL:  Object.  Form.  Foundation as
15  well.
16      THE DEPONENT:  I'm sorry.  The size of the
17  knitting, what are you referring to?
18      Q.  (By Ms. Liu)  So if you look at a TVT, you
19  will see the pore size that you just mentioned, the
20  13- to 1400 microns, correct?
21      A.  Correct.
22      Q.  So now between each pore, there's also
23  knitting; is that correct?
24      A.  No.  The pores are -- are created by the
25  intersection of the fibers, right?  So there's -- there

Olga Ramm, M.D

Page 62

1 are places where the fibers touch and places where the
2 fibers don't touch. The places where the fibers don't
3 touch are the pores. Everything else is the fiber.
4     Q.  Okay. And so where -- the areas where the
5 fiber is touching, there's multiple fibers in -- in
6 those corners; is that correct?
7     A.  So -- I mean, technically, by definition, a
8 corner is the lack of fiber. But, yes, fibers do come
9 together for the knitting of the mesh.
10     Q.  Okay. So where those fibers come together,
11 do you know what the pore size is in between each of
12 those fibers?
13         MR. SNELL: Object. Form. Asked and
14 answered. It lacks foundation.
15         THE DEPONENT: So where the fibers come
16 together, they are actually touching. So there's no
17 space between them. And then the fibers gradually
18 widen to a maximum of, you know, probably roughly 1400
19 microns, if we assume that that was measured on a
20 diagonal. More than that if it was measured straight
21 across.
22     Q.  (By Ms. Liu) And, Doctor, do you know the
23 definition of "effective pore size"?
24         MR. SNELL: Objection.
25         THE DEPONENT: There's not a standard

Page 63

1 definition of "effective pore size." But according to
2 Amid classification, TVT polypropylene mesh is a Type 1
3 monofilament macroporous mesh, as defined by pore size
4 greater than 75 microns. So the TVT pore size is
5 roughly 20 full path.
6     Q.  (By Ms. Liu) And, Doctor, what I mean by
7 "effective pore size" is, you know, after the mesh is
8 implanted, do you know what -- how the pore size change
9 after the measure is implanted?
10         MR. SNELL: Object. Foundation.
11         THE DEPONENT: So I -- I don't have any
12 reason to believe that the pore size changes after the
13 mesh is implanted.
14     Q.  (By Ms. Liu) Do you know what the forces of
15 the pelvic floor or the -- the area under the urethra
16 are after the mesh is implanted -- what the forces are
17 on top of the mesh?
18         MR. SNELL: Object. Form. Compound.
19         THE DEPONENT: So there have been studies
20 that look at the forces on the pelvic floor that are
21 generated as a result of a variety of activities, you
22 know, including carrying laundry or constant --
23 you know, Valsalva with constipation.
24     Q.  (By Ms. Liu) And do you know what that does
25 to the pore size?

Page 64

1         MR. SNELL: Lacks foundation.
2         THE DEPONENT: It doesn't effectively change
3 the pore size within the physiologic range.
4     Q.  (By Ms. Liu) So you don't believe that the
5 movement or the forces on the pelvic floor stretch the
6 mesh after implantation?
7     A.  So the mesh may elongate slightly after
8 implantation. And I think there are -- or I know there
9 are published studies to quantify that. But with
10 physiologic forces, that is an insubstantial
11 elongation, so the effective pore size remains roughly
12 the same.
13     Q.  And that is your belief; is that correct?
14     A.  That's my opinion.
15     Q.  It is your opinion. So it is your opinion
16 that the pore size remains approximately the same?
17     A.  Yes.
18     Q.  Okay. Doctor, do you believe that the mesh
19 shrinks after implantation?
20     A.  I don't believe that the mesh shrinks after
21 implantation, no.
22     Q.  Is there evidence in the literature that the
23 mesh shrinks?
24     A.  There's -- there's suggestion to support mesh
25 surface area remaining the same. There are conjectures

Page 65

1 about mesh shrinkage as well. But I think that based
2 on what I have seen, both in the literature about these
3 explanted samples, as well as in my own clinical
4 practice, is scar tissue remodeling and reaction of the
5 native tissue around the mesh -- there's not been
6 anything to suggest that the mesh itself shrinks.
7     Q.  So in reviewing the documents, the internal
8 documents, did you see anywhere where Ethicon
9 internally stated that the mesh can shrink 30 percent?
10         MR. SNELL: Object. Lacks foundation as to
11 Ethicon.
12         THE DEPONENT: So I have -- I have reviewed
13 company documents, and I have reviewed a variety of
14 tests that were performed in vitro in the lab on the
15 mesh, including tensiometry testing and pull-out
16 strength. But those tests, in my opinion, have less
17 bearing to me than the clinical data in my own clinical
18 experience, and the safety and efficacy profile of the
19 TVT slings suggest that the mesh does not shrink or
20 contract.
21         And that's actually borne out by several
22 studies that look specifically at -- at the mesh, as
23 well as tissue mobility around the mesh; for example,
24 urethral mobility.
25     Q.  (By Ms. Liu) And, Doctor, for the studies

Olga Ramm, M.D

Page 66

1 that you suggest, that the mesh shrinks, did you not
2 consider that?
3    A.  I did consider them.  Yeah, I considered --
4    Q.  And what weight --
5    A.  -- all the relevant evidence.
6    Q.  What weight did you put on each of those
7 types of articles or studies?
8    A.  Are you asking me to quantify something?  I
9 am not sure what you are asking me.
10    Q.  Well, you have said that you considered all
11 of them.  But clearly, you are considering the studies
12 that you believe and that support your opinion.
13       So did you give the -- the studies that state
14 that the mesh does shrink less weight than the ones
15 that support your opinion?
16    A.  Well, I generally don't base weighting
17 studies, as you put it, on the outcomes of the studies.
18 I base it on the methodology, the study design and the
19 level of evidence that the studies fall under, not the
20 result of the studies.
21    Q.  And did you give any weight to the internal
22 documents that suggests that the mesh shrinks?
23       MR. SNELL:  Object.  Lacks foundation.
24       Go ahead.
25       THE DEPONENT:  Again, I considered internal

Page 67

1 documents.  I don't think that the -- my conclusion
2 from the internal documents wasn't that there was
3 definitive evidence of mesh shrinkage.  And, generally,
4 I give more weight to higher-level evidence,
5 peer-reviewed level-1 evidence preferably as compared
6 to internal company documents about the -- the
7 pre-clinical design of the TVT.
8    Q.  (By Ms. Liu)  Now, Doctor, are you aware that
9 some doctors will report to a manufacturer when they
10 have complications?
11    A.  I'm aware of that, yes.
12    Q.  Have you ever done so?
13    A.  Specific to the TVT sling?
14    Q.  Anything.
15    A.  I have given feedback to manufacturing
16 representatives, but I haven't written a formal
17 complaint, no.
18    Q.  Now, you would expect that the manufacturer,
19 when they do receive complaints, would make note of it,
20 correct?
21    A.  Yes.
22    Q.  And you would expect them to analyze the data
23 that they receive, correct?
24    A.  It depends on what you mean by "analyze the
25 data."  Oftentimes, there's not data that they receive,

Page 68

1 right?  I mean, I -- oftentimes, these complaints come
2 in the form of unquantified expressions of a single
3 user's single experience.  So I am not sure that you
4 can make a case for analyzing something like that.
5    Q.  So if a manufacturer receives, you know,
6 hundreds of complaints about the same thing, you would
7 expect them to keep a log of this, correct?
8    A.  Yeah.  I would want them to be aware of the
9 complaints that they are receiving.
10    Q.  And would you agree that the manufacturer
11 would have the best knowledge of what's going on --
12 going on in the field as far as complications or
13 complaints go about their product?
14       MR. SNELL:  Objection.  Form.  Lacks
15 foundation as well.
16       THE DEPONENT:  I don't -- I don't necessarily
17 agree with that, no.  I think that the -- the end users
18 in the academic community performing -- you know, let's
19 go back to the case of the TVT, for example.  Pelvic
20 reconstructive surgeons would probably have the best
21 knowledge of the issues surrounding a specific
22 procedure.
23    Q.  (By Ms. Liu)  So you don't believe that the
24 manufacturers, say, of the TVT Ethicon would be the
25 best source of information dealing with complaints or

Page 69

1 complications about their product; is that correct?
2       MR. SNELL:  Objection.  Asked and answered.
3       THE DEPONENT:  I -- in this specific case, we
4 are so far into the litigation that I imagine Ethicon
5 has a pretty good sense of what the complaints are and
6 has painstakingly reviewed them.  But if we are talking
7 in general about a surgery procedure that involves --
8 you know, whether an implant or a device or whatnot,
9 no.  I would not expect that the manufacturer have
10 their finger on the pulse of all of the complications
11 or latest developments.  I think that is for the
12 practicing community that actually utilizes that.
13    Q.  (By Ms. Liu)  And do you believe that the
14 manufacturer who is selling the product should be
15 keeping up with all the -- all the complications about
16 their product?
17    A.  I don't think -- I think they shouldn't be
18 ignoring those complications, certainly.
19    Q.  Doctor, do you believe that the TVT mesh has
20 a potential to degrade?
21    A.  I don't believe that, no.
22    Q.  Doctor, have -- you stated -- strike that.
23       Doctor, you stated earlier that you have not
24 looked at any explanted mesh under electron microscope;
25 is that correct?

Olga Ramm, M.D

Page 70

1      A.   I haven't personally looked at explanted mesh
2   under an electron microscope.
3      Q.   And so you haven't seen whether or not, with
4   your own eyes, that the TVT mesh can degrade; is that
5   correct?
6          MR. SNELL:  Objection.  Form.  Misstates.
7          THE DEPONENT:  So I have -- I haven't seen
8   degradation with my own eyes, and I don't believe that
9   the mesh degrades.  But I have seen studies that
10  included electron microscopy images of surface
11  irregularities and roughness that the authors concluded
12  may be indicative of mesh degradation.
13     Q.   (By Ms. Liu)  Okay.
14     A.   Those studies were later refuted by other
15  studies that -- that process the mesh in more complete
16  and thorough ways, showing that there was actually no
17  residual roughness or -- or surface cracking and that
18  this was biologic in origin.
19     Q.   Doctor, have you seen an article by
20  Dr. Talley?
21     A.   Show me the article that you are referring
22  to.
23     Q.   I only have the abstracts.  I don't have the
24  actual article with me.  So I can show you the article,
25  but --

Page 71

1      A.   Could I take a look at the abstract that you
2   are referring to?
3      Q.   Sure.
4          Doctor, I just handed you an article.  I have
5   not marked it as an exhibit.  That's my only copy.
6      A.   I'll give it back to you, don't worry.
7      Q.   I just want to see if you have ever seen it
8   before.
9      A.   So I am familiar with some of the authors.
10         I will let you go ahead and ask your
11  question.
12     Q.   Doctor, in your searches you mentioned that
13  you did PubMed searches and the MEDLINE searches?
14     A.   Uh-huh.
15     Q.   Did you review the article by Dr. Talley?
16     A.   I don't remember whether I reviewed that
17  exact article.  I certainly reviewed a number of
18  articles about electron microscopy and processing of
19  the mesh in order to -- to determine whether or not it
20  degrades.
21     Q.   And it is still your opinion that it does not
22  degrade, correct?
23     A.   Yeah, my opinion is that the mesh does not
24  degrade.  And that's based on -- not only on the -- the
25  more translational and -- and benchwork studies, but it

Page 72

1   is also corroborated by all of the clinical data that
2   shows sustained efficacy in the long term in terms of
3   stress incontinence cure for women who have had the TVT
4   implant.
5      Q.   And, Doctor, your experience is clinical
6   experience, correct?
7      A.   Well, my experience is my own clinical
8   experience, but it is also the -- the added experience,
9   so to speak.  We are all privileged to have the added
10  experience of the entire academic community that
11  publishes studies and also that then creates
12  meta-analyses to pool the data.
13     Q.   And, Doctor, have you designed any mesh
14  products before?
15     A.   I haven't designed mesh products, no.
16     Q.   Do you know what goes into the design of a
17  mesh product?
18     A.   Well, it depends on what you mean by
19  "design," but I have a rough understanding of what went
20  into the design of the TVT, for example, based on the
21  articles that I reviewed by Petrus and by Olmsted.
22     Q.   And, Doctor, you mentioned Olmsted.
23         Are you aware that Olmsted was compensated
24  based on positive results?
25         MR. SNELL:  Object.  Lacks foundation.  Also

Page 73

1   misstates the evidence.
2          THE DEPONENT:  So I am aware that Dr. Olmsted
3   was compensated.  I would expect that he would be
4   compensated for his work and invention.
5      Q.   (By Ms. Liu)  And, Doctor, were you aware
6   that Dr. Olmsted was -- was paid based on a contingency
7   that he had positive results?
8          MR. SNELL:  Same objection.  Lacks
9   foundation.  Misstates the evidence.
10         THE DEPONENT:  That he had positive results
11  as a result of the TVT?
12     Q.   (By Ms. Liu)  Correct.
13     A.   Yeah, I was aware of that.
14     Q.   And does that -- your awareness of that, does
15  that influence you as far as whether or not you -- how
16  much weight you give his study?
17     A.   Well, it's not just one single study and I --
18  if his study and his results were an outlier and there
19  was some kind of compensation scheme to reward him for
20  reporting specific results, then that would give me
21  pause in a study that that has results that are not
22  congruent with the rest of the scientific community.
23         But his results are actually pretty much in
24  line with randomized clinical trials and meta-analyses
25  of these in terms of both the safety and the efficacy

Olga Ramm, M.D

Page 74

1 profile of the TVT sling.

2    Q.  And, Doctor, as far as literature goes, do

3 you give weight to -- strike that.

4      Doctor, as far as the literature goes, if you

5 see that there's a disclosure of a conflict of

6 interest, do you take that into account as to how much

7 weight you give the study?

8    A.  So I think conflict of interests must --

9 conflicts of interest must be considered.  But how much

10 weight I give a study ultimately depends on the study

11 methodology, the number of patients, the study design,

12 the measurement tools that were used.

13      So much more goes into evaluating a study

14 than just who wrote it or -- but, yeah, that's why we

15 have conflict of interest disclosures -- right? -- to

16 make more transparent whether there may be some kind of

17 financial motivation.

18    Q.  And you do believe that every study -- if

19 there is a conflict of interest, it should be

20 disclosed, correct?

21      MR. SNELL:  Object.  Form.

22      THE DEPONENT:  I believe that at least in my

23 professional lifetime, medical journals have required

24 conflict of interest disclosure forms from all authors

25 that submit papers for publication.

Page 75

1    Q.  (By Ms. Liu)  Doctor, do you belong to any

2 organizations -- any medical organizations?

3    A.  The American Urogynecologic Society, the

4 Society of Gynecologic Surgeons, ACOG.

5    Q.  Doctor, I am going to hand you what I have

6 marked as Exhibit 6, and that is your CV?

7    A.  My CV.

8      (Exhibit 6 was marked for identification by

9 the court reporter and is attached hereto.)

10    Q.  (By Ms. Liu)  Doctor, is that your current

11 CV?

12    A.  This is the -- the updated copy.

13    Q.  Okay.  And, Doctor, I am sure you are aware

14 that there have been society papers on mid-urethral

15 slings, correct?

16    A.  Are you referring to position statements?

17    Q.  Position statements.

18    A.  Uh-huh.

19    Q.  And in those position statements, do you

20 believe that conflicts of interest should be disclosed?

21    A.  Yes.

22    Q.  And if they aren't disclosed, is that a

23 problem?

24      MR. SNELL:  Object.  Form.

25      THE DEPONENT:  It's not necessarily a

Page 76

1 problem, but it could be basis for a problem.  So

2 that's why, generally, conflicts of interest are -- the

3 conflicts of interest are disclosed.

4    Q.  (By Ms. Liu)  Okay.  And, Doctor, you

5 mentioned earlier that -- I know I'm skipping around,

6 but, you know, when you mention something, I go down

7 that path.  I am not very good at following my own

8 outline, so...

9    A.  No problem.

10    Q.  Doctor, you mentioned, you know, the

11 different types of -- you are using clinical trials,

12 you are using literature a lot to base your -- your

13 opinions.

14    A.  Uh-huh.

15    Q.  Doctor, do you believe that the majority of

16 the literature out there, the primary outcome is on

17 efficacy of the mid-urethral sling?

18      MR. SNELL:  Object.  Form.

19      THE DEPONENT:  So there's a variety of

20 studies, but efficacy and cure of stress incontinence,

21 whether that's by single measure or compound measures,

22 is often the primary outcome.

23    Q.  (By Ms. Liu)  And, Doctor, when certain

24 studies look at complications --

25    A.  Uh-huh.

Page 77

1    Q.  -- if they are looking for a specific

2 complication, like a -- an intraoperative complication,

3 that's what that primary outcome -- not necessarily --

4 strike that.  Let me -- that was a terrible question.

5      Doctor, when a study looks at a complication,

6 it doesn't look at all complications, does it?

7      MR. SNELL:  Object.  Form.  Incomplete

8 hypothetical.

9      THE DEPONENT:  So it depends on study design,

10 but, generally, studies will report on all of the

11 complications encountered within their sample.

12    Q.  (By Ms. Liu)  And, Doctor, are you familiar

13 that many studies have questionnaires that they provide

14 to the patients?

15    A.  The -- validated questionnaires, yes, that

16 are part of the subjective outcome measures.

17    Q.  And if these questionnaires have specific

18 questions like voiding dysfunction or -- let's just

19 start with that.

20      If -- if it is talking about voiding

21 dysfunction, it's not necessarily collecting

22 information, say, on dyspareunia or chronic pain, is

23 it?

24      MR. SNELL:  Object.  Form.

25      THE DEPONENT:  So it depends on the

Olga Ramm, M.D

Page 78

1 questionnaire. And, again, that's something that you
2 would look at when you are evaluating the study based
3 on the methods, right? So there are sexual function
4 questionnaires that are specific to dyspareunia,
5 libido, et cetera.
6       And so if -- if you are evaluating a study
7 based on -- to see, well, what are the results in
8 regard to sexual function, yeah, you are going to go to
9 the methods and make sure that they used a sexual
10 function specific questionnaire.
11   Q.  (By Ms. Liu) And I guess my question is:
12 Each study has a different -- has different
13 data points, correct?
14   A.  Correct.
15   Q.  And so whatever the data points that are
16 collected in those studies is what is being reported,
17 correct?
18   A.  So in those individuals studies, yes. And
19 then with the wealth of studies that are available
20 about mid-urethral slings, in general, and with the TVT
21 specifically, we can then also pool all of these
22 studies and look at combined data points in the scope
23 of meta-analyses.
24   Q.  And I believe you mentioned two such
25 meta-analyses.

Page 79

1       One was the Schimph study and one was the
2 Cochrane review; is that correct?
3       MR. SNELL: Object to form.
4       THE DEPONENT: Those are at least two of the
5 meta-analyses and systematic reviews that I mentioned
6 in my report, yes.
7   Q.  (By Ms. Liu) And in both of those studies,
8 the authors specifically state that the data that they
9 used to collect was only moderate-level evidence; is
10 that correct?
11       MR. SNELL: Objection. Lack of foundation.
12       THE DEPONENT: So the data that was used in
13 those studies was the highest-level evidence that is
14 available at the time about the TVT. And so some of
15 that was case series which is -- which is not level-1
16 evidence, but some of that was randomized clinical and
17 surgical trials which is level-1 evidence.
18   Q.  (By Ms. Liu) But both studies did have the
19 disclosure that it was a moderate level of evidence
20 that they used, correct?
21   A.  Yeah, I think --
22       MR. SNELL: Hold on. Same objection as
23 before.
24       THE DEPONENT: The authors are very
25 transparent about which studies they included and what

Page 80

1 level of evidence those studies fell under.
2   Q.  (By Ms. Liu) So as far as the meta-analyses,
3 if they are meta-analyses of the highest level of
4 evidence, then that particular evidence is also
5 somewhat suspect; is that correct?
6       MR. SNELL: Objection. Lacks foundation.
7       THE DEPONENT: I guess I would disagree with
8 the word "suspect." I don't think it makes them
9 suspect. You have to review the evidence in -- in the
10 context in which it was gathered and analyze it within
11 that context to recognize its limitations, but it
12 doesn't make it suspect.
13       Oftentimes it can be -- you know, what you
14 might be referring to is that it can be incomplete.
15 For example, there's some studies that may not have
16 included a specific validated questionnaire. And
17 that's why we have large multi-centered networks in
18 order to ensure that we produce high-level data. And
19 those networks have done studies on TVT.
20   Q.  (By Ms. Liu) And, Doctor, you don't know
21 how many studies include long-term chronic pain as a
22 data point, do you?
23   A.  Are you asking specifically about the TVT --
24   Q.  Yes.
25   A.  -- how many studies about the TVT report

Page 81

1 long-term chronic pain?
2   Q.  Correct.
3   A.  So there are studies that attest to the
4 long-term chronic pain outcomes that query patients
5 about dyspareunia and chronic pain, but chronic pain
6 is -- is -- assessment of that is also somewhat
7 difficult because there's oftentimes not a linear
8 causality with chronic pain.
9       And chronic pain is such a common preexisting
10 condition that is associated with pelvic floor
11 disorders, in general, of which stress urinary
12 incontinence is one that it's -- you know, there --
13 there are challenges in -- in attributing -- a
14 specific -- pelvic pain to a specific cause.
15   Q.  Now, Doctor, in many of those studies -- in
16 most of these studies, would you agree that the studies
17 track pain just in the postoperative period?
18       MR. SNELL: Object. Foundation.
19       Are we talking about TVT studies?
20       MS. LIU: TVT, yes.
21       THE DEPONENT: So let me just rephrase your
22 question back to you.
23       Are you asking me whether studies report on
24 postoperative pain after TVT?
25   Q.  (By Ms. Liu) No. Sorry.

Olga Ramm, M.D

---

Page 82

1  My -- my question is: Most of these studies
2  that you have cited that -- that track pain, is it
3  mostly in the postoperative period, say, up to the, you
4  know, six-month point?
5  A. Well, so it depends on the study, right?
6  Some studies report their results at a year, some at
7  two years, some at five years.
8  Q. So how many long-term studies, say, that's
9  over five years is chronic pain a primary data point?
10  MR. SNELL: Object. Form.
11  THE DEPONENT: Do you mean a primary endpoint
12  of the study --
13  Q. (By Ms. Liu) Sure.
14  A. -- or a primary objective?
15  It's reported in a number of studies, but I
16  don't think it's the primary objective.
17  Q. What about long-term chronic dyspareunia
18  related to TVT; is that a primary endpoint in the
19  studies that you have cited to?
20  MR. SNELL: Object. Lacks foundation.
21  THE DEPONENT: So it would be difficult to
22  do -- to use that as a primary outcome with TVT because
23  it's not -- dyspareunia is not a result of the TVT. So
24  I don't think there would be investigators to -- to
25  undertake those studies; however, there are studies

---

Page 83

1  that look specifically at dyspareunia after stress
2  incontinence surgery, not the TVT, and after pelvic
3  reconstructive surgery, in general.
4  Q. (By Ms. Liu) And, Doctor, I know that I
5  skipped around a little bit. I want to circle back
6  around to your experience.
7  Your experience, in generating your report,
8  has been clinical experience, correct?
9  MR. SNELL: Object. Misstates.
10  THE DEPONENT: So, again, my experience is a
11  combination of my own clinical experience, the clinical
12  experience of my colleagues, my training, my review of
13  the literature; and specific to the generation of the
14  report, also my review of company documents.
15  Q. (By Ms. Liu) And, Doctor, you stated before
16  that you have not designed a medical device.
17  Have you designed any type of polymer before?
18  A. I have not designed a polymer.
19  Q. You wouldn't purport yourself to be a polymer
20  expert, would you?
21  MR. SNELL: Objection.
22  THE DEPONENT: I believe that I am an expert
23  in the polypropylene polymer based on my clinical use
24  of it, based on my review of the literature surrounding
25  its design and applications.

---

Page 84

1  Q. (By Ms. Liu) Are you a materials engineer?
2  A. I don't have that degree, no.
3  Q. Have you designed any materials before?
4  A. I haven't personally designed materials.
5  Q. Have you provided any input to a medical
6  device company on how to design a sling, for example?
7  A. Informally, I have given feedback about
8  the -- the clinical applications of mesh.
9  Q. And have you given any opinions to a medical
10  device company as to the weight of the mesh -- of what
11  the mesh should be?
12  A. I haven't personally done that, no.
13  Q. Have you given a medical device company what
14  you believe the pore size -- the optimum pore size of
15  the mesh should be?
16  A. So, again, not personally, because those
17  questions were actually answered before I was
18  mid-career, right? I'm fortunate to practice in a time
19  where those questions have been answered.
20  Q. So -- but to answer my question, you have
21  never given, then, any opinion as to how the TVT or any
22  type of sling should be designed, correct?
23  A. Correct.
24  MR. SNELL: Object to form.
25  MS. LIU: Off the record.

---

Page 85

1  (Recess taken.)
2  MS. LIU: Back on.
3  Q. (By Ms. Liu) Do you know what Ethicon's
4  internal standard operating procedures are related to
5  design?
6  MR. SNELL: Object. Form. Overbroad. Lacks
7  foundation as to the device.
8  THE DEPONENT: I -- I -- can you repeat the
9  question. I'm sorry.
10  Q. (By Ms. Liu) Sure.
11  Have you -- first off, have you reviewed any
12  internal documents about Ethicon's standard operating
13  procedures related to the design of the TVT mesh?
14  A. So I have reviewed internal documents from
15  Ethicon related to the TVT mesh, yes.
16  Q. And these are standard operating procedures
17  on how it is supposed to be designed, correct?
18  A. Again, you know, I -- I am not sure whether
19  they are standard operating procedures. They are --
20  they are documents and internal company communications
21  around the design of the TVT sling.
22  Q. Would you agree that Ethicon did not design
23  the TVT mesh to rope?
24  A. I would agree that the sling is not designed
25  to rope, nor does it rope.

---

Olga Ramm, M.D

Page 86

1    Q.   Move to strike the "nor does it rope."  That
2  was not my question.
3         My question was:  Was it designed to rope?
4    A.   It wasn't designed to rope.
5    Q.   Was it designed to curl?
6         MR. SNELL:  I am going to note my objection
7  to the motion to strike.  I think it was responsive.
8  And certainly Judge Eifert, in this litigation, has
9  stated that a witness may give a responsive answer in
10  furtherance or the basis for the answer.  So I think
11  her answer was proper.
12         THE DEPONENT:  Curling, is that what you are
13  asking about now?
14         Yeah, the mesh was not designed to curl and
15  it doesn't curl.
16         MS. LIU:  Move to strike "and it doesn't
17  curl."
18    Q.   (By Ms. Liu)  My question is just:  Is it
19  designed to curl?
20         MR. SNELL:  So same counter.
21         Go ahead.  Asked and answered now.
22         THE DEPONENT:  It's designed to -- to lay
23  flat under the urethra.
24    Q.   (By Ms. Liu)  Is Ethicon -- is the TVT
25  designed to fray?

Page 87

1    A.   I don't -- I don't believe that the TVT is
2  designed to fray, nor is there fraying under
3  physiologic implantation conditions.
4    Q.   And, Doctor, you already testified that you
5  haven't seen the mesh and explanted mesh under electron
6  microscope, correct?
7         MR. SNELL:  Objection.  Asked and answered.
8         THE DEPONENT:  Under electron microscopy, no.
9    Q.   (By Ms. Liu)  Doctor, is the TVT designed to
10  lose particles?
11    A.   So I think we covered this earlier in my
12  testimony.  But there are blue particles that are
13  released from the mechanically cut TVT mesh when that
14  mesh is cut with scissors, for example.
15    Q.   And, Doctor, is the TVT mesh designed to
16  easily deform?
17    A.   So I think that -- to answer that, I would
18  have to say that the TVT mesh is designed to be not so
19  stiff as not to deform under super physiological
20  forces.  But when it is under physiological forces, the
21  TVT does not deform.
22    Q.   You did mention that it does elongate,
23  correct?
24    A.   It can elongate.
25    Q.   And have you measured how much it elongates

Page 88

1  after implantation?
2         MR. SNELL:  Objection.  Foundation.  Assumes
3  facts not in evidence.
4         THE DEPONENT:  It does not elongate after
5  implantation.  The elongation that I was referring to
6  is in vitro elongation with benchwork studies using a
7  tensiometer.  And so those studies were then used to
8  extrapolate an explanation for the excellent clinic
9  performance of the TVT relative to some of the other
10  meshes where -- so I'm referring specifically to
11  Pam Moallis' study.
12         And in the discussion, they make a point
13  about the low incidence of voiding dysfunction, urinary
14  retention or mesh extrusion, or erosion with the TVT
15  possibly because it's less -- it's a less stiff mesh.
16  But their study isn't clinically based.  It actually
17  compared a number of different sling types in -- in the
18  lab.
19    Q.   (By Ms. Liu)  Doctor, has anyone tested
20  whether or not the mesh elongates after implantation?
21    A.   So I believe there's small case theories on
22  ultrasound -- with ultrasound studies to look at the
23  length of TVT that have found no change in the length
24  of the sling.
25    Q.   Now, Doctor, the sling is cut, correct?

Page 89

1         MR. SNELL:  Object to form.
2    Q.   (By Ms. Liu)  At the suprapubic puncture,
3  they are cut, correct?
4    A.   Yeah, the mesh is trimmed just below the skin
5  line.
6    Q.   So in these ultrasounds that you are talking
7  about, how can someone know exactly how much mesh was
8  implanted?
9    A.   Well, so -- if you are asking about study
10  design, we know the entire length of the TVT sling
11  prior to implantation, right?  So if I were trying to
12  figure out the amount of the length of mesh that
13  remains, then it would be a several-touch-point
14  exercise where I would measure the amount of mesh
15  that's given back to the surgical scrub tech and -- and
16  from the total starting length subtract whatever was
17  given back.  And then if I were doing an ultrasound
18  study, I would measure that length and compare it to
19  that number at the time of implantation.
20    Q.   In these small case series that you are
21  talking about, do you know whether or not everything
22  was measured prior to the ultrasound?
23    A.   So I was actually referring not to a
24  published case series, but to a study that
25  Elizabeth Mueller was carrying out when I was a fellow.

Olga Ramm, M.D

Page 90

1 And I don't believe she published that data. That just
2 never met the recruitment -- the number needed to
3 recruit.
4    Q.   So this is just a small number of people and
5 not a peer-reviewed study that you are referring to?
6    A.   Correct.
7    Q.   And, Doctor, we talked a little bit about
8 shrinkage earlier.
9        Do you, in your mind, have a difference
10 between the word "shrinkage" and "contraction"?
11    A.   So these words are used -- they are not
12 actually medical terms.  They are just -- they are used
13 in a variety of settings.  So maybe you could tell me
14 what you mean by them and I will let you know if I
15 agree.
16        Does that sound fair?
17    Q.   Well, Doctor, do you believe that the mesh
18 contracts after implantation?
19        MR. SNELL:  Objection.  Asked and answered.
20        THE DEPONENT:  I don't believe that the mesh
21 contracts, no.
22    Q.   (By Ms. Liu)  Okay.  Doctor, after you
23 implant a TVT, is it supposed to be palpable?
24    A.   Through the vagina?
25    Q.   Through the vagina, yes.

Page 91

1    A.   By whom?
2    Q.   By the physician.  Like when you examine a
3 patient with -- who has a TVT sling, is it supposed to
4 be palpable?
5    A.   And by "palpable," do you mean unextruded
6 mesh that is completely covered by the vaginal skin, is
7 that palpable?
8        That's dependent on a lot of patient
9 characteristics.  So in a well-estrogenized rugae
10 vagina, the sling is very rarely, if ever, palpable.
11 There are cases in which vaginas are atrophic or
12 stenotic, lack the normal rugation, the skin is thin,
13 and then an experienced examiner that's specifically
14 looking for an implant may be able to palpate it
15 through the vaginal mucosa.
16    Q.   And when it's palpated, it's not supposed to
17 feel like a band, is it?
18        MR. SNELL:  Object.  Form.
19        THE DEPONENT:  I don't think there's really
20 any consensus on what it should feel like.
21    Q.   (By Ms. Liu)  Should it feel like it's
22 contracted?
23    A.   I don't -- I don't know what -- what a
24 contracted band would feel like, you know.
25    Q.   Doctor, if you feel the mesh, should it feel

Page 92

1 hard or should it feel incorporated into the tissues?
2        MR. SNELL:  Object.  Form.
3        THE DEPONENT:  So, again, there's not
4 consensus on how the mesh should feel.  Most of the
5 time, you cannot feel the mesh.  There are times when
6 you can feel the mesh, and there's really no clinical
7 significance to it.  The patient is not aware.  Her
8 partner is not aware.  So I don't think anyone really
9 can -- I know that no one can say what a sling should
10 or shouldn't feel like, if it's not extruded.
11    Q.   (By Ms. Liu)  Doctor, have you seen an
12 article by a Dr. Sue Ross?
13    A.   I would have to see the article.  I don't
14 memorize the authors.
15    Q.   It was an article that was -- that talks
16 about banding and palpable mesh.
17        Do you recall reading an article about
18 banding --
19    A.   Banding and palpable mesh?
20    Q.   Yes.
21        MR. SNELL:  Hold on.  Objection as to
22 foundation.
23        Is this a TVT study or just some random
24 study you're talking about?
25        MS. LIU:  It's a TVT versus TVT study.

Page 93

1        MR. SNELL:  I'm going to object, actually, to
2 foundation because that's not what that study is about.
3 That misstates the evidence, then.
4    Q.   (By Ms. Liu)  Doctor, do you recall that
5 study?
6    A.   So I -- I don't -- I may have looked at it,
7 but I -- without having the study in front of me, I
8 can't comment to any of the data in that study.
9    Q.   So if you had read the study, would it have
10 made an impression on you if you read that over
11 22 percent of the patients in that study with a TVT
12 retropubic sling -- their sling is palpable?
13        MR. SNELL:  I'm going to object again.  That
14 misstates the evidence.  Counsel very well knows that
15 was not a TVT study.
16        THE DEPONENT:  So your question is, would I
17 be impressed by this.
18        I think there are a number of other factors I
19 would have to consider, such as the total number of
20 patients who were in the study, as well as whether this
21 was just a random isolated finding noted by the
22 clinician on physical exam or if it was correlated with
23 any clinical outcomes, patient complaints, et cetera.
24    Q.   (By Ms. Liu)  Doctor, have you considered --
25        MR. SNELL:  Are you done with the Ross study?

Page 94

1    MS. LIU: Yes.

2    MR. SNELL: Just note defense counsel's

3    objection. Lacks foundation. Misstates the evidence.

4    That study was a study concerning Boston Scientific

5    Advantage versus the Obtryx. It did not involve the

6    TVT retropubic device. Thank you.

7    Q.   (By Ms. Liu) Doctor, have you considered

8    using other types of mesh besides TVT in stress

9    incontinence?

10   A.   I have considered it, yes.

11   Q.   And have you performed pelvic organ prolapse

12   surgery?

13   A.   Yeah. I do that as a routine part of my

14   practice.

15   Q.   With mesh?

16   A.   The sacrocolpopexy is one of my go-to

17   operations for advanced apical prolapse in healthy

18   younger women.

19   Q.   And what kind of mesh do you use for the

20   sacrocolpopexy?

21   A.   So I have used a variety of meshes, but it is

22   macroporous, polypropylene monofilament mesh.

23   Q.   Do you use the Gynemesh?

24   A.   I have used the Gynemesh.

25   Q.   What do you do use currently?

Page 95

1    A.   Currently, I'm using the Restorelle mesh.

2    Q.   And, Doctor, have you compared the Restorelle

3    mesh with the TVT mesh?

4    And when I say "compare," I mean visually,

5    touch?

6    A.   Yeah, I have handled both of these meshes.

7    Q.   And, Doctor, have you considered whether or

8    not the Restorelle mesh -- sorry, strike that.

9    Doctor, in your comparison of the Restorelle

10   versus the TVT mesh, do you notice that the Restorelle

11   mesh is larger pore?

12   A.   I do notice that.

13   Q.   Do you notice that it's lighter weight?

14   A.   It has less material per surface area.

15   Q.   And, Doctor, do you -- have you ever tested

16   the difference between the Restorelle mesh versus the

17   TVT mesh, as far as sling material goes?

18   MR. SNELL: Object to form.

19   THE DEPONENT: I wouldn't want to test it. I

20   mean, I -- when I perform surgery on a woman, she is

21   taking on the risk, right? It's not me that is taking

22   on the risk. So when I'm counseling her, I prefer very

23   much to have the highest level of evidence available in

24   order to counsel her about the risks and the expected

25   outcomes of a procedure.

Page 96

1    And so that's one of the primary reasons for

2    why I feel so comfortable with the TVT. There is a

3    wide body of literature to support use of the TVT

4    specifically with regard to efficacy, safety,

5    durability. There's no data to rely on with regard to

6    Restorelle mesh in a sling, and I -- I suppose I could

7    just go rogue and fashion my own sling made out of

8    Restorelle mesh, but I don't think that would be fair

9    to my patients.

10   Q.   (By Ms. Liu) Doctor, have you considered

11   whether or not the Restorelle mesh or a lighter-weight

12   mesh would be safer than the TVT?

13   MR. SNELL: Sorry. Go ahead. Object to

14   form.

15   THE DEPONENT: Yeah, I considered it. And I

16   have arrived at the conclusion that the TVT is

17   currently the safest operation for stress urinary

18   incontinence.

19   Q.   (By Ms. Liu) And do you know why the Ethicon

20   would call the TVT Prolene mesh "old construction

21   mesh"?

22   MR. SNELL: Object. Foundation as to

23   Ethicon.

24   THE DEPONENT: So I have seen company

25   documents that refer to it as such, and I think that

Page 97

1    that is a semantic term that reflects the temporality

2    of mesh development.

3    Q.   (By Ms. Liu) Is that your opinion based on

4    asking them the question as to why they call it that?

5    A.   It is my opinion based on review of the

6    documents. So the -- older mesh was the mesh that

7    was developed first.

8    Q.   And do you know whether or not Ethicon took

9    on trying to develop a better mesh?

10   A.   Well, they -- they went on to develop

11   additional meshes for a variety of applications, as I

12   would expect them to do.

13   Q.   Do you know whether or not they tried to

14   develop a better mesh for stress urinary incontinence?

15   MR. SNELL: Objection. Form.

16   THE DEPONENT: So they attempted to develop a

17   lighter-weight mesh with an absorbable component. Then

18   they tested this mesh and it didn't perform well in

19   tests.

20   Q.   (By Ms. Liu) Do you know what it was called?

21   A.   It was called the Ultrapro.

22   Q.   Have you heard of the term "TOPA," T-O-P-A?

23   A.   I may have. I don't remember.

24   Q.   Do you remember whether or not you reviewed

25   any testimony related to TOPA?

Olga Ramm, M.D

Page 98

1    A.  I may have.  I just -- I don't recall.
2    Q.  Have you ever reviewed any documents relating
3  to Scion?
4    A.  Yes.  That -- that definitively rings a bell.
5  I would have to see those documents to know exactly
6  what they were about.  But I believe that was a
7  project, yes.
8    Q.  Do you remember what that project was about?
9    A.  I would have to look at it again to tell you
10  exactly.
11    Q.  Did you read -- did you talk to any of the
12  engineers about this project?
13    A.  I didn't personally talk to the engineers,
14  no.
15    Q.  And do you know what the pore size or weight
16  or material that was used in these projects?
17    A.  So what can I tell you is that Ethicon has
18  tried a variety of meshes, not just in the stress
19  incontinence application, but also in the pelvic organ
20  prolapse application, and Ultrapro was one of these
21  meshes.  And the absorbable component -- the absorbable
22  fibers of this mesh did not perform well in testing.
23  So it wasn't clinically released.
24    Q.  And that was your understanding; is that
25  correct?

Page 99

1    A.  That was my understanding of what I reviewed.
2    Q.  And, Doctor, we talked a little about
3  inflammatory response or foreign body reaction.
4       Do you remember that?
5    A.  We talked about inflammation, yes.
6    Q.  And is that the same to you as "foreign body
7  reaction"?
8    A.  No, not necessarily.  That's why we have the
9  two separate terms.
10    Q.  So can you describe what "foreign body
11  reaction" is?
12    A.  Yeah.  Foreign body reaction is either gross
13  or histologic, microscopic findings that are consistent
14  with an implant of an exogenous product.  So that can
15  be either a synthetic product or a biologic graft.
16    Q.  And would pore size affect how much foreign
17  body reaction occurs?
18    A.  So the -- the foreign body reaction is
19  modulated by pore size, but there's not a scale -- a
20  quantitative scale of foreign body reaction.  So when
21  you ask how much, that's difficult for me to answer.
22    Q.  What about the -- let's just use it as a
23  scale, not necessarily a definitive number.
24       So if the pore size was larger, it would be a
25  less foreign body reaction.

Page 100

1       Would you agree with that?
2       MR. SNELL:  Lacks foundation.
3       THE DEPONENT:  So it's much more than just
4  pore size.  Pore size is one of the factors that we
5  consider in a foreign body reaction.
6    Q.  (By Ms. Liu)  Would you consider density of
7  the mesh?
8    A.  You would consider the -- the origin of the
9  material itself, the density, the pore size, the
10  antigenicity.  You would consider a lot of factors.
11    Q.  You would consider the volume of the mesh?
12    A.  So, yeah, you would consider the shape and
13  the volume of the mesh.
14    Q.  You mentioned origin.
15       Do you know where the polypropylene comes
16  from?
17    A.  It's manufactured.  It's synthetic.
18    Q.  Do you know what -- sorry.  Strike that.
19       Do you know what additives are put in with
20  the polypropylene mesh when they design the TVT?
21    A.  I couldn't give you a complete list of the
22  additives that are put into the TVT.  But I -- I know
23  about the downstream clinical effects as a result of
24  the TVT that have convinced me that it's -- it's safe
25  for use.

Page 101

1    Q.  But you don't know what the additives are; is
2  that correct?
3    A.  I don't know a list of all the additives,
4  yeah.
5    Q.  Do you know why additives are even put into
6  the mesh?
7    A.  Well, I know there is a plastic sheath over
8  the mesh.  If you are referring to the -- the chemicals
9  and solutions that are used in the manufacture of the
10  polypropylene, polymers themselves, no, I don't know
11  that.
12    Q.  And you don't know the reason why they are
13  added into the fibers, correct?
14    A.  So I don't know what they are.  As a result,
15  I wouldn't know why they are added.
16    Q.  And, Doctor, do you believe that the TVT
17  polypropylene mesh is inert?
18    A.  Yes, I do believe that.
19    Q.  Doctor, did you review any documents,
20  internal Ethicon documents, that their internal
21  engineers determined that the polypropylene was not
22  inert?
23       MR. SNELL:  Object.  Lacks foundation.
24       Go ahead.
25       THE DEPONENT:  So I reviewed a variety of

Olga Ramm, M.D

Page 102

1 company documents, and I don't use company documents,
2 generally, to base my opinions. Nor do I base my
3 opinions on them entirely. I certainly consider them.
4      But polypropylene has been around for a long
5 time not only in the form of mesh but also in the form
6 of suture. And I believe that the -- that there is no
7 resorption of the polypropylene and that it's -- it's
8 safe and durable in the human application.
9      Q. (By Ms. Liu) And, Doctor, so are you saying
10 that if you had seen a document of the internal
11 engineers who tested the product and stated that it was
12 not inert, you would not have relied on that document?
13      MR. SNELL: Object. Lacks foundation.
14      Go ahead.
15      THE DEPONENT: So I would have -- if I had
16 seen a document like that, I would have considered it.
17 But the term "inert" and "not inert" is very broad.
18 And so if it was not inert, I would want to know, well,
19 what are the clinical ramifications of this, right?
20      Autologous fascial slings are not inert. And
21 yet, for a selected group of patients, they are a
22 well-accepted form of stress incontinence surgery. So
23 I -- I don't -- I wouldn't place undue weight on that
24 document.
25      Q. (By Ms. Liu) Doctor, have you heard of a

Page 103

1 material called "ProNova"?
2      A. Does it have a different name? Is there a --
3 that sounds like a trade name. Is there is a generic
4 name for it?
5      Q. Doctor, I'm just -- I'm just asking if you
6 have ever heard of the term "ProNova"?
7      A. ProNova?
8      MR. SNELL: Object. Form.
9      Go ahead.
10      THE DEPONENT: I may have, but I don't recall
11 off the top of my head.
12      Q. (By Ms. Liu) Do you remember reviewing any
13 documents where, internally, the engineers were talking
14 about moving the stress urinary incontinence mesh to
15 using ProNova because of TVT's polypropylene not being
16 inert?
17      MR. SNELL: Object. Lacks foundation.
18      THE DEPONENT: So I -- I recall reviewing
19 company documents that talk about using a variety of
20 meshes, in addition to the polypropylene --
21 polypropylene that's currently in use.
22      Again, I don't base my opinion on internal
23 company documents that may be the result of academic
24 dialogue in the design of something that is
25 pre-clinical.

Page 104

1      Q. (By Ms. Liu) So, Doctor, you don't get
2 involved in anything that is pre-clinical, correct?
3      A. Define "involved."
4      Q. You are not involved in anything -- designing
5 any kind of products prior to it being released on the
6 market, correct?
7      A. Correct.
8      Q. Your opinion is based on clinical studies and
9 your own clinical practice, correct?
10      MR. SNELL: Objection. Misstates. And asked
11 and answered about three or four other times.
12      THE DEPONENT: So, yeah, my clinical opinion
13 is based on my own clinical experience, the available
14 literature, as well as review of internal company
15 documents.
16      So, whereas, I am not intimately involved
17 prospectively in the design of something, certainly
18 once I start using that product, I become familiar with
19 salient points in the design.
20      Q. (By Ms. Liu) And, Doctor, you already stated
21 that you don't -- you don't put much weight on the
22 internal documents, right?
23      MR. SNELL: Objection. Probably misstates
24 prior testimony. Also asked and answered.
25      THE DEPONENT: So I consider company

Page 105

1 documents, and I consider them in the context of all
2 other available evidence about the TVT, as well as
3 patient outcomes.
4      Q. (By Ms. Liu) Doctor, you mentioned sutures.
5      How many sutures would equal a TVT sling?
6      A. That depends on the caliber and the length of
7 the suture.
8      Q. Would you agree that the TVT sling has much
9 more mesh fiber than a suture would, polypropylene
10 fiber?
11      A. Than one single suture?
12      Q. Correct.
13      A. I would agree with it.
14      Q. And so if the product -- if a suture were to
15 not be inert, the foreign body response would be much
16 less than the amount that is in a mesh, correct?
17      MR. SNELL: Object. Incomplete hypothetical.
18 Lacks foundation.
19      THE DEPONENT: I'm sorry. Can you repeat the
20 question.
21      Q. (By Ms. Liu) Certainly.
22      So a suture has much less polypropylene fiber
23 than a TVT mesh, correct?
24      A. Uh-huh.
25      Q. So if the polypropylene is determined to not

Olga Ramm, M.D

1 be inert, if there is a foreign body reaction -- a
2 long-term chronic foreign body reaction to the TVT
3 or -- and to the suture, the amount of foreign body
4 reaction would be much less with the suture; is that
5 correct?
6         MR. SNELL: Objection. Lacks foundation.
7 Also now compound.
8         THE DEPONENT: So if there were foreign --
9         MR. SNELL: I'm sorry. Incomplete
10 hypothetical as well.
11        THE DEPONENT: If there were foreign body
12 reaction to -- to any material, right? Since you are
13 asking me a hypothetical, I will just answer it in
14 regard to any material -- then you -- that could be a
15 hypothesis that you could test, whether there's a dose
16 response.
17        Q. (By Ms. Liu) Now, if there is -- let's
18 assume that there is a chronic foreign body reaction,
19 then the complications from a TVT mesh due to that
20 foreign body reaction would be much greater than that
21 of the suture; is that correct?
22        MR. SNELL: Objection. Lacks foundation.
23 Misstates the evidence. Incomplete hypothetical.
24        THE DEPONENT: Right. So that's -- that's
25 something that we do have, is the -- the clinical

1 outcomes and the complications and, you know,
2 pathologic data about the TVT and -- and those bear out
3 that, actually, the -- the Prolene mesh performs very
4 well in terms of clinical outcomes, not only --
5 you know, we are not talking about efficacy now. We
6 are talking about safety, in terms of safety, that
7 these reactions are incredibly rare.
8         Q. (By Ms. Liu) Doctor, could you turn to
9 page 30 of your expert report.
10        Doctor, under the heading "TVT and prior
11 anti-incontinence surgery," I wanted to get a
12 clarification.
13        Are you stating that someone with a prior
14 sling could be implanted with a TVT?
15        A. So this section refers to specific --
16 specifically to patients who have had a prior
17 anti-incontinence procedure that's not specific to the
18 sling.
19        Q. So let me clarify.
20        So this is only -- this -- this paragraph or
21 this section only goes to patients that have had a
22 non-sling anti-incontinence surgery?
23        MR. SNELL: No.
24        THE DEPONENT: No, no.
25        MR. SNELL: I'm sorry. Objection. Misstates

1 her testimony.
2         THE DEPONENT: No.
3         Q. (By Ms. Liu) So that's what I wanted to
4 clarify.
5         A. Yeah, it includes people who have had any
6 anti-incontinence procedure in the past.
7         Q. So if somebody already has a TVT sling, it is
8 your opinion that a second sling can be placed; is that
9 correct?
10        A. Yeah, that's my opinion. Uh-huh.
11        Q. And that's after the first sling has failed,
12 correct?
13        MR. SNELL: Objection.
14        THE DEPONENT: Generally, if someone has had
15 a favorable outcome and has an effective
16 anti-incontinence procedure, you wouldn't do another
17 one, right? So you would have to have an indication
18 for your repeat surgery, which would be recurrent or
19 persistent stress incontinence.
20        Q. (By Ms. Liu) Now, Doctor, do you believe
21 that Ethicon had tested the mesh material prior to
22 marketing the product?
23        MR. SNELL: Objection. Form.
24        TVT, right?
25        MS. LIU: Yes, TVT. I'm just asking

1 whenever -- let's assume that any question that I ask
2 here, unless I specify otherwise, is about the TVT.
3         Okay?
4         MR. SNELL: Okay. So if you say "mesh," she
5 can -- she can read that to be TVT mesh.
6         MS. LIU: Yes, absolutely.
7         MR. SNELL: Okay.
8         MS. LIU: Unless I specifically say pelvic
9 organ prolapse mesh or some other mesh.
10        MR. SNELL: I just -- yes. I only have
11 concern because we have talked about Ultrapro and other
12 meshes already today, so -- but if she can -- I just
13 want to make sure we have a clear record.
14        MS. LIU: Yes.
15        MR. SNELL: Can you repeat the question,
16 then, so I understand -- I don't remember what it was.
17        (Record Read as follows:
18        "QUESTION: Now, Doctor, do you
19        believe that Ethicon had tested the
20        mesh material prior to marketing the
21        product?")
22        MR. SNELL: Okay. Fair question.
23        THE DEPONENT: Yes. Ethicon tested the TVT
24 mesh material before releasing the TVT to market.
25        Q. (By Ms. Liu) And do you know what tests

Olga Ramm, M.D

Page 110

1 those were?
2    A.  There were a variety of tests.  There were
3 biomechanical tests that were done.  There were
4 biochemical tests that were done.
5         Yeah, I reviewed company documents with
6 various tests.
7    Q.  And do you know whether or not Ethicon tested
8 multiple materials to see which one is the safest for
9 patients?
10    A.  So what I do know is that, in the design of
11 the TVT, Petrus and Ulmsten tested a variety of
12 materials, including, first, a removable implant and,
13 later, Mersilene and Gore-Tex, and found that the
14 polypropylene mesh was the best in terms of safety and
15 efficacy.
16    Q.  And would you agree that -- and we talked
17 about this a little bit ago -- that if Ulmsten tested a
18 product and it was a pay-for-performance compensation
19 scheme, that that would put the results, you know, in a
20 biased -- sorry.  Let me repeat the question.  This is
21 a terrible question.
22        We talked a little bit about Ulmsten earlier,
23 correct?
24    A.  We did.
25    Q.  And if Ulmsten had a pay-for-performance

Page 111

1 compensation scheme with Ethicon, would those results
2 be questionable, in your mind?
3        MR. SNELL:  Objection.
4        THE DEPONENT:  So --
5        MR. SNELL:  Asked and answered.  I believe it
6 also misstates the evidence or lacks foundation.
7        Go ahead.
8        THE DEPONENT:  So Ulmsten wasn't paid for his
9 own performance.  My understanding of the arrangement
10 between Ulmsten and Ethicon was that if his results
11 were reproducible by others, that there would be an
12 additional financial incentive.  So his own results
13 really didn't bear into that incentive.
14    Q.  (By Ms. Liu)  And, Doctor, when consultants
15 have studies and papers and if they are highly paid
16 consultants by mesh companies, does that conflict of
17 interest go into your mind when you review those
18 studies?
19    A.  Yeah, I take that into consideration.  I
20 think we talked about that earlier.
21    Q.  And you would give it less weight, correct?
22        MR. SNELL:  Object.  Misstates prior
23 testimony.
24        THE DEPONENT:  I wouldn't necessarily give it
25 less weight.  I would consider it.  Again, we talked

Page 112

1 about all of the different characteristics of a study
2 and its patient population that I -- that I consider
3 when assigning weight to a study.
4    Q.  (By Ms. Liu)  You mentioned earlier that
5 there was a study that refuted the degradation of
6 polypropylene mesh.
7        Do you remember that?
8    A.  I do.
9    Q.  Was it the Thames study?
10    A.  I don't remember the first author on that
11 study.  It was published recently.
12    Q.  I believe you quoted it on page 41 of your
13 report.
14    A.  Oh, Thames.  Okay.  Yes, I was saying that
15 name differently in my head.  Yes.  Thank you.
16    Q.  I don't know how to pronounce it either.
17 That was what I thought.
18    A.  Yeah, like you are going with the river.  I
19 got it.
20    Q.  Doctor, are you aware that Dr. Thames or
21 "Thames," or whatever --
22    A.  Sure.
23    Q.  -- was a highly paid consultant for the mesh
24 companies?
25        MR. SNELL:  Object.  Form.

Page 113

1        Go ahead.
2        THE DEPONENT:  So I'm aware of his
3 affiliation with a biomedical engineering consulting
4 firm.
5    Q.  (By Ms. Liu)  And if the doctor had earned,
6 you know, say, a million dollars from the mesh device
7 companies, would that make his findings suspect to you?
8    A.  So if I were to -- I don't know how much he
9 was paid, obviously.  But I can tell you this, that if
10 his findings were somehow mis- -- either taken just
11 completely in a void or were misaligned with the vast
12 amount of clinical data that's out there about the
13 short-, medium- and long-term outcomes of the TVT, it
14 would certainly give me a very long pause.
15        The fact that his findings are supported
16 completely by my own experience and the pooled
17 experience of pelvic reconstructive surgeons
18 internationally that are reporting their data makes
19 that potential conflict of interest less concerning.
20    Q.  And, Doctor, the other studies that are out
21 there that show that mesh -- that mesh does degrade
22 in vivo, have you discounted them because of
23 Dr. Thames' study?
24        MR. SNELL:  Objection.
25        THE DEPONENT:  I don't think that --

Olga Ramm, M.D

Page 114

1    MR. SNELL:  Lacks foundation as to -- go
2  ahead.
3    Objection.  Lacks foundation.  Misstates the
4  evidence.
5    THE DEPONENT:  So in my opinion, there are no
6  studies that definitively prove that mesh degrades,
7  right?
8    Q.  (By Ms. Liu)  Okay.
9    A.  There are studies that show that there are
10  superficial artifact on electron microscopy.  But as I
11  mentioned in my general report, medical history is rife
12  with these.
13    MS. LIU:  Can we go off the record real
14  quick, please.
15    (Recess taken.)
16    MS. LIU:  Back on.
17    Q.  (By Ms. Liu)  Doctor, have you gone to a
18  training session with Ethicon?
19    A.  When I was a fellow, I attended an
20  Ethicon-sponsored training session on electrosurgical
21  energy and minimally evasive hysterectomy.
22    Q.  Have you attended any TVT --
23    A.  Training sessions?
24    Q.  -- from Ethicon?
25    A.  I have not.

Page 115

1    Q.  Okay.  Doctor, have you reviewed the TVT
2  surgeons monograph?
3    A.  I have.
4    Q.  And, Doctor, have you reviewed professional
5  education materials produced by Ethicon?
6    A.  I have.
7    Q.  And do you remember what they were?
8    A.  So they were surgical videos.  These I
9  reviewed, actually, yeah, earlier, outside of this
10  case, as well as presentations and slide decks.
11    Q.  And do you know how long ago you reviewed
12  them?
13    A.  The -- just recently, except for the surgical
14  video that I watched, you know, intermittently with
15  residents and also in my fellowship.
16    Q.  And it is your opinion that the surgeon's
17  monograph and the presentations are sufficient; is that
18  correct?
19    A.  Yeah, I think they are very well done.
20    Q.  Doctor, have you ever talked to anyone at
21  Ethicon that felt that the laser cut mesh versus the
22  mechanically cut mesh was a problem?
23    MR. SNELL:  Object to form.
24    THE DEPONENT:  I have never talked to anyone
25  at Ethicon.

Page 116

1    Q.  (By Ms. Liu)  So you have never had any kind
2  of communications with anyone at Ethicon?
3    A.  Regarding the TVT legal proceedings, none.
4    Q.  What about just regarding the TVT mesh?
5    A.  You know, I may have had kind of social
6  conversations as -- as a fellow with sales reps that
7  covered the TVT product, but it wasn't about the TVT
8  mesh specifically, no.
9    Q.  Do you remember who your sales reps were?
10    A.  No.
11    Q.  Do you currently have sales reps?
12    A.  No.
13    Q.  So there are no sales reps that visit from
14  Ethicon to your practice, currently?
15    A.  Right.  I can get in touch with them.  There
16  are ones that cover the area.  But the way the contract
17  purchasing works, there's really not a need for them.
18    Q.  Have you ever seen internal documents from
19  Ethicon that shows that physicians do not believe that
20  the laser cut mesh versus the mechanically cut mesh are
21  the same clinically?
22    MR. SNELL:  Object.  Lacks foundation.
23    THE DEPONENT:  You know, I may have come
24  across an email like that, but I don't -- I don't
25  recall reviewing any reports of internal studies that

Page 117

1  concluded that there was a difference in the
2  performance of this mesh at physiologic and -- outside
3  of -- or within physiologic conditions.
4    Q.  (By Ms. Liu)  Do you know whether or not
5  Ethicon has done a study comparing the laser cut mesh
6  versus the mechanically cut mesh?
7    A.  They do have laser cut and mechanically cut
8  mesh, yes.
9    Q.  My question was:  Do you know if they have
10  ever done a study?
11    A.  So --
12    MR. SNELL:  Object.  Asked and answered.
13    Go ahead.
14    THE DEPONENT:  Yes, they have investigated
15  the differences between mechanically cut and laser cut
16  mesh.
17    Q.  (By Ms. Liu)  And do you know what the
18  results are?
19    A.  I do; that there's no difference under
20  physiologic conditions.
21    Q.  And have you seen the documents where it
22  shows that the mechanically cut mesh is frayed upon
23  forces that are placed on it?
24    A.  Forces that greatly exceed anything that
25  would be encountered under physiologic conditions.

Olga Ramm, M.D

Page 118

1    Q.   And I know we talked a little bit about it,
2  but do you know what the force is under a physiologic
3  condition after implantation?
4    A.   Yeah, that's -- that's widely known.  People
5  have studied those -- those forces.  I would have to
6  go -- I didn't memorize the exact number, but I can --
7  I can certainly find that for you, as can anyone who
8  wants to do a PubMed search.
9    Q.   So -- but you, off the top of your head,
10  sitting here today, do not to know what that is; is
11  that correct?
12    A.   That is correct.
13    Q.   Doctor, I want to talk to you a little bit
14  about tensioning.
15       Would you agree that there is not a consensus
16  between surgeons as to what the appropriate amount of
17  tensioning is with the TVT?
18       MR. SNELL:  Lacks foundation.
19       THE DEPONENT:  No, I wouldn't agree with that
20  statement.  I think that there's a pretty uniform way
21  in which tensioning is described both in operative
22  reports and in the way that it is taught to trainees
23  who are going to be performing the TVT.
24    Q.   (By Ms. Liu)  Now, as far as tensioning goes,
25  there are terms such as "tension-free" or "no

Page 119

1  tensioning" or "no tension"; is that correct?
2    A.   Those are terms that are used, yeah.
3    Q.   And "minimal tension"?
4    A.   Generally, "tension-free" is the term that is
5  used.
6    Q.   Okay.  And so in that -- in that description,
7  is there an exact amount of tension or how loose the
8  sling needs to be for physicians to follow?
9       MR. SNELL:  Objection.  Compound.
10       Go ahead.
11       THE DEPONENT:  So there -- there are
12  suggestions for how to ensure a tension-free mesh
13  placement, including placement of Mayo clamp or Mayo
14  scissors or a Hegar dilator, all of which are going to
15  ensure a tension-free placement.
16    Q.   (By Ms. Liu)  And what does "tension-free"
17  mean?
18    A.   "Tension-free" means that the material is not
19  exerting tension or forces on -- on the urethra
20  that's -- that's -- it's not a quantitative term.  It's
21  a qualitative descriptor, as often happens in --
22    Q.   So you can't provide --
23    A.   -- search --
24       MR. SNELL:  Hold on.  Don't interrupt her.
25  Finish your answer.

Page 120

1       THE DEPONENT:  That often happens in surgery,
2  right?
3       So a great example is the Burch procedure.
4  When you are placing your perivesical, periurethral
5  sutures, you are then tensioning them to Cooper's
6  ligament.  And in doing so, the description is the
7  right amount of tension, which is incredibly nebulous,
8  you know.  There is not anything to guide you about
9  what instrument you use to ensure that.  So a lot of it
10  is -- is based on the surgeon's training and clinical
11  experience.
12    Q.   (By Ms. Liu)  And, Doctor, you reviewed many
13  studies.  I want to talk a little bit about erosions or
14  exposures.
15       Have you seen some studies with erosion rates
16  as high as 19 percent?
17    A.   Specific to the TVT?
18    Q.   Correct, the mid-urethral sling.
19       MR. SNELL:  Hold on.  Objection.  Foundation.
20  Are we talking TVT or mid-urethral sling?
21       MS. LIU:  Mid-urethral slings.
22       MR. SNELL:  So she's talking about beyond
23  TVT, so answer whatever you know.
24       THE DEPONENT:  Yeah, I have seen studies, for
25  example, of the ObTape or the IVS Tunneller that have

Page 121

1  very high, relative to the TVT, extrusion rates.
2    Q.   (By Ms. Liu)  Have you seen high rates of
3  erosion specific with the TVT?
4    A.   And by "erosion," are we talking about
5  in viscous, so urethra, bladder, bowel?
6    Q.   Let's go with erosion meaning eroding into
7  the vaginal tissues -- or let's do extrusion, erosion
8  and exposure together.
9    A.   Okay.
10       MR. SNELL:  Object.  Form.  Compound.
11       Go ahead.
12       THE DEPONENT:  So in synthesizing my opinion
13  about mesh erosion specific to the TVT, I have looked
14  at many studies with specific weight that I have placed
15  on the systematic reviews, the Cochrane reviews,
16  because they are the most likely to capture
17  complications and complications rates, because of the
18  pooled end for the study.
19       And -- and those have come back, you know,
20  both in time and regardless of author, with roughly the
21  same conclusions; that those erosion rates are less
22  than 3 percent.
23    Q.   (By Ms. Liu)  And do you disagree that the
24  Ethicon president, Renee Salman, had said that the TVT
25  erosion rate was 5 to 6 percent?

Olga Ramm, M.D

Page 122

1    MR. SNELL: Objection. Misstates the
2 evidence.
3        THE DEPONENT: So if someone said that the
4 TVT erosion rate is 5 to 6 percent, I would disagree
5 with that statement.
6    Q. (By Ms. Liu) Okay. You would or wouldn't?
7        MR. SNELL: She would.
8        THE DEPONENT: I would.
9        MR. SNELL: Asked and answered.
10       THE DEPONENT: I would. That's not
11 corroborated by the data.
12       MS. LIU: I am going to save the rest of my
13 time for rebuttal.
14       Let's go off the record.
15       (Recess taken.)
16              EXAMINATION
17 BY MR. SNELL:
18    Q. Dr. Ramm, this is Burt Snell representing
19 Ethicon and Johnson & Johnson. I have some follow-up
20 questions based on the questions posed by plaintiffs'
21 counsel.
22       Are you ready to proceed?
23    A. I am ready.
24    Q. Okay. And the same instructions plaintiffs'
25 counsel gave you earlier apply. So if you don't

Page 123

1 understand one of my questions, just let me know and I
2 will try to give you questions that you can answer.
3    A. Will do.
4    Q. You were asked earlier about all the
5 different ways you track your outcomes, complications,
6 efficacy with regard to the TVT device.
7        Do you recollect those lines of questioning?
8    A. I do.
9    Q. And you just talked about your practice,
10 residency, things like that.
11       Let me ask you this: Did you track your TVT
12 surgical outcomes in fellowship?
13    A. Yeah, we tracked those very carefully. So I
14 did fellowship at Loyola University Medical Center,
15 which was at the entire duration of my fellowship, a
16 site in the pelvic floor disorders network. So
17 patients were very carefully tracked, and those
18 outcomes were reported in -- in the trials that we
19 participated in.
20    Q. Can you tell us some of those trials where
21 your patients, and the patients who you were involved
22 in implanting or following TVT, what -- this is a
23 terrible question. Rephrase.
24       Can you tell us the names of those studies
25 that you were involved in where you either implanted or

Page 124

1 you followed patients who received a TVT retropubic
2 device --
3    A. Sure.
4    Q. -- for your fellowship.
5    A. For my fellowship.
6    Q. Yes.
7    A. So during my fellowship with the PFD -- and
8 specifically we participated in the OPUS trial, which
9 is the trial of prophylactic anti-incontinence
10 procedures in patients without symptomatic stress
11 urinary incontinence at of time of vagina apical
12 repair, and those outcomes were followed and there were
13 no mesh exposures in -- in that group. Obviously, none
14 in the sham group either.
15    Q. Let me ask you a question --
16       MS. LIU: Well --
17    Q. (By Mr. Snell) -- was that a small study, or
18 how would you characterize the OPUS trial? What
19 type --
20    A. That was a study --
21    Q. -- of study was it?
22       MS. LIU: Objection. Form.
23       MR. SNELL: Sorry. Withdraw.
24    Q. (By Mr. Snell) What type of study was the
25 OPUS trial with regard to its design?

Page 125

1    A. So the OPUS trial was a randomized clinical
2 trial that was multi-centered and involved over nine
3 centers nationally.
4    Q. Is that a -- well, go ahead. I'm sorry.
5       I was going to ask, is that a level-1
6 evidence trial?
7    A. Yeah, it is.
8    Q. Okay.
9    A. The OPTIMAL trial was another randomized
10 surgical, multi-centered study that examined outcomes
11 following uterus, sacral and sacrospinous ligament
12 suspension, but many of those patients had a
13 concomitant TVT, and those results were reported.
14       MS. LIU: Let me -- I'm sorry. I just didn't
15 hear.
16       What was the name of that trial?
17       THE DEPONENT: OPTIMAL, O-P-T-I-M-A-L.
18    Q. (By Mr. Snell) You mentioned mesh exposures
19 in the OPUS trial.
20       Was that tracked in the OPTIMAL trial?
21    A. It was tracked in the OPTIMAL trial and --
22 yeah.
23    Q. Was the rate of mesh exposure in the TVT
24 patients -- let me ask you this: In the OPTIMAL trial,
25 how many patients was that? Was that under 100? More

Olga Ramm, M.D

Page 126

1 than 100?
2       Just a general neighborhood.
3    A.   More than 100 patients.
4    Q.   And the rate of mesh exposure, was it
5 consistent or inconsistent with the rates you mentioned
6 earlier to plaintiffs' counsel, less than 3 percent?
7       MS. LIU:  Objection.  Form.
8       THE DEPONENT:  It was consistent with that
9 rate.
10    Q.   (By Mr. Snell)  Do you have a recollection as
11 to what the exact number was, or the range, if you can
12 give us?
13    A.   Yeah.  I believe it was 1-1/2 to 2-1/2
14 percent.
15    Q.   Okay.
16    A.   And then also, when I was there, we were a
17 center of the urinary incontinence treatment network.
18 So we participated in patient recruitment for the TOMUS
19 trial, the trial of mid-urethral slings, which compared
20 the retropubic to the transobturator approach, and the
21 retropubic approach was represented entirely by the TVT
22 sling.
23       And so I'm sure you are familiar with the
24 complications, papers following that trial.
25    Q.   And for your opinion with regard to the

Page 127

1 safety and efficacy of TVT, do you rely on not just
2 your education, training and clinical experience, but
3 also these study results that you just talked to us
4 about, OPUS, OPTIMAL and TOMUS, with regard to the TVT
5 device?
6       MS. LIU:  Objection.  Form.
7       THE DEPONENT:  Yeah, I -- I rely on -- on
8 these studies and -- and then these results, actually,
9 and these studies reflect our practice as well.
10    Q.   (By Mr. Snell)  Okay.  Did you track your
11 outcomes and surgeries in connection with any of your
12 board examinations or preparation?
13       MS. LIU:  Objection.  Form.
14       THE DEPONENT:  So I had to provide a case
15 list for my general boards, and I had to provide a case
16 list for the written FPMRS boards as well and state the
17 procedure and complications thereafter.
18    Q.   (By Mr. Snell)  Do you -- have you
19 systematically tracked your own complications and
20 outcomes and surgeries with regard to TVT, since the time of your
21 fellowship?
22    A.   I have.  So in my own practice, I -- I track
23 complications and -- and results at a year after --
24 you know, including and up to a year after surgery.
25    Q.   And did you -- do you use your tracking of

Page 128

1 your own complications or efficacy in informing your
2 discussion with patients as to potential risk or
3 benefits with the TVT device?
4    A.   So when I counsel them, the patients, I -- I
5 take the approach of this is -- this is the body of
6 literature, the data that guides my decision, and my
7 own personal experience is corroborated -- is supported
8 by this -- by this data.
9    Q.   Okay.  At page 2 of your report, you note
10 that you were trained on and have used the Ethicon
11 TVT-O device for stress incontinence.
12       Do you see that?
13    A.   I do.
14    Q.   Can you tell us, was that in residency or
15 fellowship, or when did that occur?
16    A.   Both residency and fellowship.
17    Q.   Okay.  Are the rates of exposure that were
18 reported in the OPUS and OPTIMAL trial, for example,
19 consistent or inconsistent with your own personal
20 experience that you have systematically tracked --
21       MS. LIU:  Objection.
22    Q.   (By Mr. Snell)  -- since your fellowship?
23       MS. LIU:  Objection.  Form.  Compound.
24       THE DEPONENT:  So I would say that my own
25 personal rates are a little bit lower than what is

Page 129

1 reported in these trials, and I think that's a function
2 of a couple factors.
3    Q.   (By Mr. Snell)  You were asked questions
4 about the various different IFUs you looked at, and you
5 were also asked questions about whether you reviewed
6 the TVT monogram.
7       Do you recollect that?
8    A.   Yeah.
9    Q.   You brought numerous binders and materials
10 here today; is that correct?
11    A.   Yes.
12    Q.   And you have looked at the materials and the
13 binders and whatnot; is that correct?
14    A.   That's correct.
15    Q.   So there's a binder that has the monograph
16 and it has also got a TVT IFU in it.
17       Is this an IFU that you reviewed?
18    A.   Yes.
19    Q.   And do you recall if this IFU was from around
20 this same time period as the surgeon's monograph in the
21 early 2000s?
22       MS. LIU:  Objection.  Form.
23       THE DEPONENT:  I believe so.  They were filed
24 together.
25    Q.   (By Mr. Snell)  You talked about reviewing

Olga Ramm, M.D

## Page 130

1 numerous different company documents on different
2 topics.
3        Do you recall that?
4    A.  Yes.
5    Q.  Did you also look at company documents that
6 plaintiffs' experts cited to or that were discussed in
7 their depositions that you reviewed?
8    A.  I did.
9        MS. LIU:  Objection.  Form.
10   Q.  (By Mr. Snell)  And did you consider those
11 company documents?
12   A.  I looked at them and considered them, yes.
13   Q.  And is it correct that you have
14 Dr. Rosenzweig's and Dr. Blaivas' depositions with all
15 their exhibits and binders here?
16   A.  That's correct.
17   Q.  Did you read their -- the exhibits to the
18 plaintiffs' experts' depositions?
19   A.  I did.  I read those binders.
20   Q.  Okay.  Did you review studies concerning the
21 pathological analysis of the TVT?
22       MR. SNELL:  Objection.  Form.  Vague.
23       THE DEPONENT:  So I reviewed studies that
24 were based on pathologic findings after mesh
25 implantation.

## Page 131

1        Is that what you are referring to?
2    Q.  (By Mr. Snell)  Yes.
3        You were asked questions about ProNova and
4 Ultrapro.
5        Do you recall those questions?
6    A.  Yes.
7    Q.  Did you investigate whether there was a safer
8 alternative mesh for the TVT device as opposed to the
9 Prolene polypropylene mesh?
10   A.  Yes.  I investigated this.
11   Q.  Did you issue an opinion on that?
12   A.  Yeah, I believe that the -- the TVT
13 polypropylene mesh is the safest mesh for the
14 application of surgical treatment of stress urinary
15 incontinence.
16   Q.  With regard to meshes like Ultrapro, did you
17 also read or see any studies with regard to another
18 prolapse mesh called BiPro?
19   A.  Yes.  It also has absorbable component.
20   Q.  And did you see whether or not those meshes
21 like Ultrapro and BiPro have a risk of mesh exposure
22 with their use?
23   A.  They do.  And that risk is actually higher
24 than the heavier weight relative to the Ultrapro or
25 BiPro polypropylene mesh.

## Page 132

1    Q.  Does that inform your opinion with regard to
2 the TVT device employing the Prolene polypropylene
3 mesh?
4        MS. LIU:  Objection.  Form.
5        THE DEPONENT:  So it supported my opinion
6 that the TVT polypropylene mesh that is currently
7 in use is the safest and the best alternative.
8    Q.  (By Mr. Snell)  Did you review any internal
9 documents that discussed studies done with a
10 lighter-weight, partially absorbable mesh for the sling
11 application and whether that sling was able to be
12 effectively used in cadavers?
13       MS. LIU:  Objection.  Form.
14       THE DEPONENT:  Yes.  So those were studies
15 about the Ultrapro mesh which has an absorbable
16 monocryl component, and those -- those early-phase
17 studies show that the outcomes -- not the clinical
18 outcomes but, rather, the implantation outcomes were
19 not satisfactory in cadavers.
20   Q.  (By Mr. Snell)  Are you an expert in
21 assessing the design of the TVT device?
22       MS. LIU:  Objection.  Asked and answered.
23       THE DEPONENT:  I believe that I'm an expert.
24 I have implanted well over 1,000 TVT devices.
25   Q.  (By Mr. Snell)  Did you investigate the

## Page 133

1 design and the development of TVT in formulating your
2 opinions?
3    A.  I did.  It's outlined in my report.  I looked
4 at the integral theory that Ulmsten and Petrus outlined
5 and read about the different steps that they took in
6 the development of the TVT that ultimately led to their
7 arrival at the product that -- that we are using today.
8    Q.  Did you evaluate whether or not different
9 materials were assessed in the design of the TVT?
10   A.  Yeah.
11       MS. LIU:  Objection.  Form.
12       THE DEPONENT:  We -- I think we discussed
13 this a little bit earlier, but there was an animal
14 model, as -- as well as experiments in humans,
15 that they used a variety of meshes -- Gore-Tex,
16 Mersilene, Marlex -- and polypropylene had the best
17 side effect and safety profile.
18   Q.  (By Mr. Snell)  Are you an expert in the
19 utility, feasibility and effect of the different design
20 elements of the actual TVT device --
21       MS. LIU:  Objection.  Form.
22   Q.  (By Mr. Snell)  -- to include the trocar, the
23 sheath and the mesh?
24       MS. LIU:  Objection.  Form.  Compound.
25       THE DEPONENT:  Yes, I believe that I am.  I

Olga Ramm, M.D

Page 134

1 utilize and evaluate these different components
2 regularly.
3    Q.  (By Mr. Snell)  Did you assess and study the
4 medical literature with regard to those design elements
5 of the TVT device?
6    A.  I did.
7    Q.  Are those different design elements
8 evaluated -- you mentioned Dr. Petrus and Dr. Ulmsten.
9        Are they pelvic floor surgeons as well?
10   A.  Yeah, they are, Swedish and Australian.
11   Q.  You were asked some questions about whether
12 you would disagree with someone at Ethicon who said X,
13 Y or Z.
14       Do you recall those general hypothetical
15 questions?
16   MS. LIU: Objection. Form. Vague.
17   THE DEPONENT:  I think, yeah.
18   Q.  (By Mr. Snell)  Well, let me ask you this:
19 Are you more interested in what data proves as opposed
20 to what a study author or someone may say?
21   MS. LIU: Objection. Form.
22   THE DEPONENT:  So I do my very best to
23 evaluate the data objectively and to draw my own
24 conclusions.  So the results section of a paper and the
25 method sections are probably the most informative.

Page 135

1    Q.  (By Mr. Snell)  Was one of the meshes that
2 you saw assessed in -- with regard to -- strike that.
3 Back up.
4        Was one of the meshes that you saw assessed
5 or discussed in the company documents a mesh called
6 "PVDF"?
7    A.  Yes, I have heard of this mesh.
8    Q.  Are you aware of anybody in the United States
9 who uses PVDF mesh for the stress urinary incontinence
10 application?
11   A.  No, it's not used for that application, and
12 it's not used in the United States.
13   Q.  Plaintiffs' counsel asked you about, if I
14 recall correctly, whether you -- let me find it.
15       Let me ask you this:  You earlier mentioned
16 in your testimony that you didn't need to do a certain
17 activity because that information had already been
18 assessed and was known in your field?
19   A.  Oh, like counsel Ethicon on the pore size?
20   Q.  Right.
21   A.  Yeah.
22   Q.  Do you have an opinion as to what is the
23 optimal pore size for the TVT device?
24   A.  Greater than 75 microns, which would then
25 place it into the category of type 1 monofilament mesh.

Page 136

1    Q.  And for the Prolene polypropylene mesh used
2 in the TVT, is it the optimal mesh based on the
3 reliable clinical evidence that you reviewed?
4    MS. LIU: Objection. Form.
5    THE DEPONENT:  Yes, it is.  I believe that it
6 is.
7    MR. SNELL:  That's all I have.
8    MS. LIU:  Let's go off the record real
9 quickly.
10   (Recess taken.)
11   MS. LIU:  Back on.
12       FURTHER EXAMINATION
13 BY MS. LIU:
14   Q.  Doctor, your -- defense counsel asked you
15 about your tracking the outcomes during your
16 fellowship.  You mentioned the OPUS trial.
17       That was a prophylactic trial of mid-urethral
18 slings; is that correct?
19   A.  Yes.  So the premise of the trial is that
20 when you correct pelvic organ prolapse, you can unmask
21 stress urinary incontinence that was previously
22 undiagnosed, and so the -- the point of the trial was
23 to compare whether a prophylactic mid-urethral sling
24 for the treatment of stress urinary incontinence was
25 warranted.

Page 137

1    Q.  And, Doctor, you mentioned that there were no
2 mesh exposures.
3        Was that the only complication you tracked
4 with regard to the TVT in this trial?
5    A.  No.  No.  That was one of them.  Urinary
6 retention, urinary tract infection rate, re-operation,
7 you know, a number of them.  I -- I we can look at the
8 complications table for -- for that study, if you would
9 like.
10   Q.  Doctor, do you know whether or not it
11 tracked -- strike that.
12       Doctor, how long was this study for?
13   A.  So there's one-year and two-year data
14 available, and those -- those patients are still being
15 followed.  So it's hard to know what the pelvic floor
16 disorders network will decide to publish, but my
17 understanding is that they're still -- the patients are
18 still being tracked.
19   Q.  In this one- and two-year data, does it track
20 chronic pain?
21   A.  I would have to look at the complications
22 table.  I can't remember off the top of my head.
23   Q.  Do you know whether or not it tracks
24 dyspareunia, chronic dyspareunia?
25   MR. SNELL: Object. Form.

Olga Ramm, M.D

Page 138

1    THE DEPONENT: Again, the same answer.
2    Q. (By Ms. Liu) And, Doctor, this OPTIMAL study
3 that you also talked about, you also talked about mesh
4 exposures with your counsel over there.
5    Did you also track chronic pain in this
6 study?
7    MR. SNELL: Objection in reference to me as
8 her counsel.
9    MS. LIU: Sorry.
10    MR. SNELL: That's okay.
11    THE DEPONENT: So the OPTIMAL trial was --
12 had several arms, including one that looked at pelvic
13 floor physical therapy, so pelvic floor muscle
14 performance was tracked. And even if the -- the
15 pain-related validated questionnaires and the sexual
16 function questionnaires aren't included in that paper,
17 I think it was tracked. It's not published. But that
18 there may be a secondary analysis. Oftentimes
19 there's -- there's secondary analyses and smaller
20 papers that come out of these trials.
21    Q. (By Ms. Liu) So when something is not
22 published, like a specific complication is not
23 published and it's included in a meta-analysis, the
24 portions that aren't published can't be included in
25 that meta-analysis; is that correct?

Page 139

1    MR. SNELL: Objection. Foundation.
2 Incomplete hypothetical.
3    THE DEPONENT: So meta-analyses generally
4 include published data, yes.
5    Q. (By Ms. Liu) And so if it's not published,
6 it would not be included, correct?
7    A. So in this case that you're asking
8 specifically, it would change the denominator, the end,
9 right? So if you are not reporting on a number of
10 patients -- if you are not reporting on pain or
11 dyspareunia, in general, then you are not changing the
12 number of patients who did or didn't have pain. You
13 are -- you simply have a lack of information, and that
14 drives down your total number from which you can draw
15 conclusions.
16    Q. And how long was this OPTIMAL study?
17    A. So it -- again, it is still ongoing, but the
18 one-year outcomes have been published and maybe the
19 two-year outcomes. I got to check.
20    Q. And the TOMUS trial, that was a one-year
21 study, correct?
22    A. No. That trial is ongoing as well. And
23 two-year outcomes are actually the ones that are
24 reported in the complications paper, which is one of
25 the secondary papers from that trial.

Page 140

1    Q. Now, were the primary outcomes of all three
2 of these studies cure rate or efficacy?
3    MR. SNELL: Objection. Form.
4    THE DEPONENT: The primary outcome of the
5 TOMUS trial was non-inferiority of the transobturator
6 approach as it relates to the retropubic approach,
7 which was deemed the standard of care.
8    Q. (By Ms. Liu) And that was an equivalent
9 study -- the equivalent study, correct?
10    A. That was a non-inferiority study.
11    Q. Okay.
12    A. And the primary outcome for the -- for the
13 OPUS trial was actually the number needed to treat with
14 regard to placement of a mid-urethral sling into an
15 asymptomatic patient to prevent one case of de novo
16 stress urinary incontinence. The primary outcomes in
17 the OPTIMAL trial were anatomic outcomes for prolapse
18 repair.
19    Q. And, Doctor, do you still place TVTs
20 prophylactically?
21    A. So I present the options to the patients, and
22 I believe in shared decision-making that's based on a
23 patient's individual goals. I -- if someone strongly
24 feels that they want to avoid any risk of stress
25 incontinence or any risk of having to be re-operated

Page 141

1 for stress incontinence, then I don't think it's
2 unreasonable, as long as the patient understands that
3 she's taking on the risks of the mid-urethral sling in
4 the absence of knowing for sure that she would have
5 needed the procedure.
6    Q. In general, do you recommend implanting a TVT
7 sling prophylactically with a patient that you are
8 treating surgically for a pelvic organ prolapse?
9    A. I offer it, but I don't recommend it. Again,
10 it's a process of shared decision-making. And it
11 depends very much on the patient and -- and her goals.
12    Q. And, Doctor, you stated that you do track
13 your complications up to a year of your current
14 patients, but you don't track further down past a year,
15 correct?
16    A. Not -- not systematically, in the sense that
17 the patients don't -- aren't required to follow up with
18 me after a year. But as I previously mentioned, I'm
19 fortunate to practice within a system that's -- that's
20 closed. So if a patient showed up within the Kaiser
21 northern California system later on down the line, I
22 would be privy to that information.
23    Q. And that's -- that's a patient here or a
24 patient there, it's not necessarily all of your
25 patients, correct?

Olga Ramm, M.D

Page 142

1    MR. SNELL: Object. Form.
2    THE DEPONENT: A patient here or there with
3 regards to what? I'm sorry.
4    Q. (By Ms. Liu) Past the one-year mark, if a
5 patient goes to someone else to -- within Kaiser, you
6 might hear about it, but it's not something that you
7 actively track; is that correct?
8    MR. SNELL: Object. Form.
9    THE DEPONENT: So I don't actively pro- --
10 prospectively track outcomes beyond a year.
11    Q. (By Ms. Liu) Doctor, these binders that are
12 on the table currently, did you put them together?
13    A. No, I didn't originally put them together.
14    Q. Do you know who put them together?
15    A. I imagine the associates at Butler Snell.
16    Q. They were put together by the attorneys,
17 correct?
18    A. Correct.
19    Q. So it wasn't that you looked at each document
20 or looked at each article and put them together as
21 something that you have reviewed; is that correct?
22    MR. SNELL: Objection. Misstates and
23 compound.
24    THE DEPONENT: So I have reviewed all of the
25 documents that are -- that are -- that were presented

Page 143

1 here. I didn't print them out. I didn't put them in
2 the binders.
3    Q. (By Ms. Liu) Did you read each and every
4 page of those documents in the binders?
5    MR. SNELL: Objection. Asked and answered.
6    THE DEPONENT: Yes.
7    Q. (By Ms. Liu) In thorough review?
8    MR. SNELL: Objection.
9    THE DEPONENT: I looked -- I looked at all of
10 them. There's -- there are duplicated records in
11 there. There are also studies that I was previously
12 familiar with, so I didn't read every single word.
13    Q. (By Ms. Liu) Now, defense counsel also asked
14 you about the exhibits for the expert reports that you
15 had read, Dr. Blaivas and Dr. Rosenzweig.
16    Do you remember that questioning?
17    A. Yes.
18    Q. Did you specifically look up every footnote
19 or every citation within those reports?
20    A. I looked up the citations that I thought were
21 particularly relevant or that were new to me that I was
22 unfamiliar with.
23    Q. Doctor, did you read any documents from
24 Ethicon that specifically stated that they believed the
25 Amid classification was outdated?

Page 144

1    A. There's been -- so there's been discussion in
2 the pelvic reconstructive surgery community about
3 whether it is outdated; however, it's currently, and in
4 the foreseeable future, still the accepted
5 classification system when describing mesh.
6    MS. LIU: I believe that's all the questions
7 that I have currently.
8    MR. SNELL: Just a couple questions.
9    FURTHER EXAMINATION
10 BY MR. SNELL:
11    Q. So you were asked about the prophylactic
12 placement of TVT.
13    Do you recall that?
14    A. Yes.
15    Q. In your expert report, you cite to the recent
16 updated practice bulletin by ACOG and OGs regarding
17 stress urinary incontinence.
18    Do you recollect that?
19    A. Yes.
20    Q. Is the prophylactic placement of the TVT
21 device supported by or recognized as within the
22 standard of care by ACOG and OGs in the most recent
23 practice bulletin?
24    A. Yes. So I -- the -- the conclusion, based on
25 the available data, is that this is something that

Page 145

1 should be discussed with the patient and offered on an
2 individual basis after a thorough discussion of the
3 potential risks and benefits.
4    Q. Is that an assessment you have independently
5 analyzed and made and offered to your patients?
6    A. Which assessment?
7    Q. Withdrawn.
8    You were asked about the Amid classification.
9    Is the Amid classification based upon
10 biologic plausibility?
11    MS. LIU: Objection. Form.
12    THE DEPONENT: So the Amid classification
13 is -- is, to some extent, based on that. But it is
14 also based on clinical outcomes with the -- with the
15 materials that fall into these different categories.
16    Q. (By Mr. Snell) Are all opinions and bases
17 for opinions that you stated or discussed with counsel
18 here today been given to a reasonable degree of medical
19 certainty?
20    A. Yes, they are.
21    MR. SNELL: No further questions.
22    MS. LIU: I don't have any questions, but I
23 would like, for housekeeping's sake, to state on the
24 record that I am marking the thumb drives as Exhibits 7
25 through 10 -- actually, no, 7 through 12.

Olga Ramm, M.D

Page 146

1       THE DEPONENT: There's six of them.
2       MS. LIU: 7 through 12.
3       MR. SNELL: Okay. And I will just note for
4  housekeeping that there are an additional -- um,
5  two -- three hard-copy binders, a minimum of five or
6  six spiral-bound binders, and stacks of company
7  documents, studies and other materials the doctor has
8  reviewed that are not being marked.
9       MS. LIU: We can mark them, if you would
10 like, but that's just --
11      MR. SNELL: No, no, no. It's your
12 deposition. It's your cost, if you want to mark them;
13 however, I'm making a record because this is the only
14 TVT general deposition this witness -- right? -- is
15 doing. So I don't want there to be some claim that she
16 didn't present and bring her file on TVT to a
17 deposition.
18      MS. LIU: Now --
19      MR. SNELL: It's all there.
20      MS. LIU: -- I just want to --
21      MR. SNELL: As between all the thumb drives
22 and all her hard-copy materials, everything --
23 everything is on there or -- and/or the materials
24 listed.
25      That reminds me, I do have one other

Page 147

1  question.
2              FURTHER EXAMINATION
3  BY MR. SNELL:
4       Q. Doctor -- sorry. I should ask this, but have
5  you reviewed any of the recent studies that have just
6  come out at SUFU with regard to whether there is any
7  type of adverse clinical inflammatory or autoimmune
8  response with the use of mesh?
9       A. Yeah, there are two abstracts that were
10 presented at SUFU that should be available for
11 publication soon that are epidemiologic studies based
12 on the New York State population following the
13 incidence of cancers, as well as autoimmune diseases.
14      Q. Okay.
15      A. And there was actually a lower incidence of
16 bladder cancers in patients who had had prior mesh
17 implantation and no difference in the incidence of
18 autoimmune diseases.
19      Q. So I guess, then, my question would be: Do
20 those new studies -- do they -- supportive of your
21 opinions you have expressed in your report or not?
22      A. Yeah, I think they fall exactly in line with
23 my opinion that the TVT is a safe device that's
24 effective in the treatment of stress urinary
25 incontinence with very minimal short-term, medium-, or

Page 148

1  long-term risk.
2       Q. Do those studies cause you to change any of
3  your opinions?
4       A. They do not.
5       MR. SNELL: Okay. That's all I have.
6       (Exhibit 7 was marked for identification by
7  the court reporter and is attached hereto.)
8       (Exhibit 8 was marked for identification by
9  the court reporter and is attached hereto.)
10      (Exhibit 9 was marked for identification by
11 the court reporter and is attached hereto.)
12      (Exhibit 10 was marked for identification by
13 the court reporter and is attached hereto.)
14      (Exhibit 11 was marked for identification by
15 the court reporter and is attached hereto.)
16      (Exhibit 12 was marked for identification by
17 the court reporter and is attached hereto.)
18      MS. LIU: I just have one -- another
19 housekeeping thing.
20      MR. SNELL: Uh-huh.
21      MS. LIU: I know you had a bag of the -- the
22 thumb drives and some of them were --
23      MR. SNELL: Right there.
24      MS. LIU: Some were case specific and some of
25 were not, more general.

Page 149

1       MR. SNELL: She separated all of them.
2       MS. LIU: Right. I just want to make sure
3  that there were none that were in the -- in the bag
4  that is general that was left as general that --
5       MR. SNELL: You can answer that. I thought
6  you went through --
7       THE DEPONENT: Yeah --
8       MR. SNELL: These are all case specific.
9       THE DEPONENT: -- I can go through them
10 again, if you want me to. They are going to have the
11 case --
12      MS. LIU: Okay. I just want to
13 double-check --
14      MR. SNELL: So Dr. Bales, that's got the --
15 that's in the case, Galarza, Moore.
16      THE DEPONENT: Deposition, Moore.
17      MR. SNELL: Moore is the case, right? Brown?
18 Moore?
19      THE DEPONENT: Yeah, that's the case.
20      MR. SNELL: Katherine Moore?
21      THE DEPONENT: Yeah, Moore deposition.
22      MR. SNELL: It's hard to read.
23      THE DEPONENT: Galarza.
24      MR. SNELL: Galarza. So these are all case
25 specific. You have all the generals.

Olga Ramm, M.D

## Page 150

1      MS. LIU:  Okay.  And I just want to clarify
2  very quickly that all of the materials that are in the
3  binders are in the thumb drives; is that correct?
4      MR. SNELL:  You are asking me or the witness?
5      MS. LIU:  Whoever put them together, at this
6  point.
7      MR. SNELL:  I don't know.
8      THE DEPONENT:  I don't know that they are
9  exact duplicates of each other, actually.
10     MR. SNELL:  I don't either.  I can't say that
11  either.
12     THE DEPONENT:  I don't know the answer to
13  that.
14     MS. LIU:  Just on the record, Doctor, these
15  thumb drives are not put together by you, correct?
16     THE DEPONENT:  Correct.
17     MS. LIU:  Okay.  They were given to you by
18  Butler Snell, correct?
19     THE DEPONENT:  Correct.
20     MS. LIU:  That's it.  No further questions.
21     (Deposition concluded at 1:14 p.m.)
22
23
24        ---o0o---
25

## Page 151

1      I, OLGA RAMM, M.D., do hereby declare under penalty
2  of perjury that I have read the foregoing transcript;
3  that I have made any corrections as appear notes; that
4  my testimony as contained herein, as corrected, is true
5  and correct.
6      Executed this ____ day of _____,
7  2017, at _____, _____.
8
9
10
11        _____
12        OLGA RAMM, M.D.
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 152

1  STATE OF CALIFORNIA      ) ss:
                            )
2  COUNTY OF CONTRA COSTA   )
3
4      I, Rebecca L. Romano, CSR. 12546, do hereby
5  certify:
6      That the foregoing deposition testimony was taken
7  before me at the time and place therein set forth and at
8  which time the witness was administered the oath;
9      That the testimony of the witness and all
10  objections made by counsel at the time of the
11  examination were recorded stenographically by me, and
12  were thereafter transcribed under my direction and
13  supervision, and that the foregoing pages contain a
14  full, true and accurate record of all proceedings and
15  testimony to the best of my skill and ability.
16     I further certify that I am neither counsel for any
17  party to said action, nor am I related to any party to
18  said action, nor am I in any way interested in the
19  outcome thereof.
20     IN WITNESS WHEREOF, I have subscribed my name this
21  22nd day of March, 2017.
22        _____
          Rebecca L. Romano, RPR,
23        CSR. No 12546
24
25

## Page 153

1        DEPOSITION ERRATA SHEET
2  Case Name:  In Re:  Ethicon, Inc. Pelvic Repair System
   Products Liability Litigation
3  Name of Witness:  Olga Ramm, M.D.
   Date of Deposition:  March 17, 2017
4  Job No.:  152305
   Reason Codes:  1.  To clarify the record.
5              2.  To conform to the facts.
              3.  To Correct transcript errors.
6  Page _____ Line _____ Reason _____
7  From _____ to _____
8  Page _____ Line _____ Reason _____
9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24  Page _____ Line _____ Reason _____
25  From _____ to _____

Page 154

```
1          DEPOSITION ERRATA SHEET
2   Page _____ Line _____ Reason _____
3   From _____ to _____
4   Page _____ Line _____ Reason _____
5   From _____ to _____
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  _____ Subject to the above changes, I certify that the
        transcript is true and correct
23  _____ No changes have been made.  I certify that the
        transcript is true and correct.
24
        _____
25          OLGA RAMM, M.D.
```