Exhibit E

1

2                 IN THE UNITED STATES DISTRICT COURT

3            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

4                            AT CHARLESTON

5

6    _____

7    JO HUSKEY AND ALLEN HUSKEY,           :

8            Plaintiffs,                    :   CASE NUMBER

9       v.                                  :   2:12-cv-05201

10   ETHICON, INC., ET AL.,                :

11           Defendants.                    :

12   _____

13

14                  TRANSCRIPT OF TRIAL - DAY TWO

15                       AUGUST 25, 2014

16             BEFORE THE HONORABLE **JOSEPH R. GOODWIN**,

17                 UNITED STATES DISTRICT JUDGE

18

19

20   Court Reporter:          Carol Farrell, CRR, RMR, CCP, RPR
                               (304)347-3188
21                            carol_farrell@wvsd.uscourts.gov

22                            Anthony Rolland, CRR, RMR, RPR
                               (407)760-6023
23                            rolland.crr@gmail.com

24
     Proceedings recorded by machine stenography; transcript
25   produced by computer.

1  A P P E A R A N C E S

2

FOR THE PLAINTIFFS:

3

4  EDWARD A. WALLACE, ESQUIRE
   MARK R. MILLER, ESQUIRE
5  Wexler Wallace
   55 West Monroe Street, Suite 3300
6  Chicago, IL  60603

7  FIDELMA L. FITZPATRICK, ESQUIRE
   Motley Rice
8  321 South Main Street, Suite 200
   Providence, RI  02903

9

   JEFFREY M. KUNTZ, ESQUIRE
10 Wagstaff & Cartmell
   4740 Grand Avenue, Suite 300
11 Kansas City, MO  64112

12

13 FOR THE DEFENDANTS:

14 CHRISTY D. JONES, ESQUIRE
   Butler, Snow, O'Mara, Stevens & Cannada, PLLC
15 1020 Highland Colony Parkway, Suite 1400
   Ridgeland, MS  39157
16

17 DAVID B. THOMAS, ESQUIRE
   PHILIP J. COMBS, ESQUIRE
   SUSAN M. ROBINSON, ESQUIRE
18 Thomas Combs & Spann
   PO Box 3824
19 Charleston, WV  25338-3824

20

21

22

23

24

25

1        MR. THOMAS:  Your Honor, these are just kind of SEM

2  images in the air.  They're not tied to anything.  They're

3  scanning electronic microscopy images that aren't tied to

4  anything, and I don't think there's an adequate foundation for

5  them to be --

6        THE COURT:  This time I have to sustain the

7  objection.

8        MR. WALLACE:  That's fine.  Thank you, Your Honor.

9  BY MR. WALLACE:

10  Q.  You mentioned a dog study.  Can you tell me whether or

11  not you reviewed any Ethicon documents relating to a dog study

12  and whether -- I will just leave it there.

13  A.  Yes, I did.

14  Q.  Okay.  And did you review those documents in connection

15  with reaching your opinions in this case?

16  A.  Yes, I did.

17        MR. WALLACE:  13152 would be the exhibit I'd like to

18  offer, Your Honor, absent an objection.

19        THE COURT:  Is there an objection?

20        MR. THOMAS:  No, Your Honor.

21        THE COURT:  It may be received.

22        MR. WALLACE:  Thank you, Your Honor.

23  (PLAINTIFFS' EXHIBIT P-13152 WAS RECEIVED IN EVIDENCE.)

24        THE COURT:  Make sure there's a paper copy provided

25  to the Courtroom Deputy.

GUELCHER - DIRECT - WALLACE

```
 1            MR. WALLACE:  Can we pull up --
 2            THE COURT:  And provide it to the Courtroom Deputy.
 3   BY MR. WALLACE:
 4   Q.  Can you please -- do you have it in front of you,
 5   Dr. Guelcher?
 6   A.  Yes.
 7   Q.  Can you tell the jury what the document you have in front
 8   of you is and the document that they have on the screen in
 9   front of them?
10   A.  So this is titled "Seven-Year Data for a Ten-Year Prolene
11   Study."
12   Q.  And what is the date of that?
13   A.  October 15th, 1992.
14   Q.  And, in reviewing this document in connection with the
15   work that did you in this case, what conclusions did you draw?
16   A.  Well, this document, again, showed evidence that the
17   polypropylene was changing and cracking on the surface of the
18   suture, that the Prolene suture was changing with time and
19   cracking.
20   Q.  In the interest of time, Dr. Guelcher, I want you to look
21   at the conclusions that are found on the second page in the
22   middle of the document.
23   A.  Yes.
24   Q.  And I'm just going to take those, again, one at a time.
25            Can you -- and you have reviewed the entirety of this
```

GUELCHER - DIRECT - WALLACE

1  document?

2  A.   Yes.  It's very long.  Yes.

3  Q.   Can you tell me what impact that first bullet point

4  that's the conclusion there had on your opinions in this case?

5  A.   The seven-year in vivo results generally substantiated

6  the five-year findings.  They closely correspond to the

7  observations of the explanted sutures of the dog that died

8  prematurely, and these findings were that the Prolene was

9  cracking with time and that was increasing with time.

10  Q.   I'd like just -- just to take a step back and give the

11  jury a little bit of context for this study.  What do you

12  understand the study, this study to be about and how long it

13  went?

14  A.   So, from my reading of the document, this study was

15  designed to be a ten-year study in dogs, to understand the

16  stability of the Prolene suture.  So what happens -- how does

17  the Prolene suture change over time, and it's implanted in a

18  dog because this is -- we can do this in animals.  You can't

19  do these type of experiments in humans, and the dog is a good

20  model, it's a large animal model.  And so we can use these

21  data to tell us something about how Prolene sutures would

22  respond and how stable they are, how they'll react in a human.

23       And, again, it was designed to be a ten-year study.

24  One of the dogs died prematurely, not related to the suture,

25  at six years and ten-and-a-half months, and so they sacrificed

GUELCHER - DIRECT - WALLACE

1  all the dogs at seven years so they could get the data.

2  That's my understanding.

3  Q.  And let's move on to the second bullet point.  Tell me

4  what, if anything, this second conclusion -- what impact, if

5  any, it had on your opinions.

6  A.  So the second conclusion states that degradation in

7  Prolene is still increasing, and PVDF, which is another

8  material that is less susceptible, so it's less reactive with

9  oxygen, PVDF was more stable, in terms of cracking.  So my --

10  what I learned from this was that, with the increased time,

11  the degradation of Prolene is continuing.  This is consistent

12  with the idea that the foreign-body reaction doesn't stop.  It

13  just keeps going until the material is removed.

14  Q.  Can you move on to the third conclusion and tell the

15  jury, what, if any, impact that had on your opinions in this

16  case?

17  A.  Well, this is, again, noting that this reaction starts at

18  the surface, so the eight explanted Ethilon sutures all showed

19  heavy cracking, in many cases abrasion of the dyed surface

20  layer.  A decrease in the suture diameter was apparent in

21  several cases.  So Ethilon is a different type of material.

22  It was also degrading.  And they noticed a decrease in the

23  diameter of the suture which, again, is consistent with this

24  idea that it starts at the surface and works its way in, until

25  you're gradually losing material until it works its way to the

GUELCHER - DIRECT - WALLACE

1  middle of the suture.

2  Q.   Just a point of clarification, Dr. Guelcher.  Are --

3  PVDF, that's not Prolene, is it?

4  A.   No, that's a different material.  That's polyvinylidene

5  fluoride.  That's chemically different from polypropylene.

6  Q.   Thank you.

7       Let's just move right on to the fourth bullet point.

8  And tell the jury what impact, if any, that had on your

9  opinions in this case.

10 A.   Well, in this other type of material, they did not find

11 any cracks.  There were some scratches.  What this tells me,

12 that these four materials that they implanted were all

13 degrading at different rates.  Some of them were more affected

14 by the reactive oxygen than others.

15 Q.   Is Novafil polypropylene?

16 A.   No.

17 Q.   How -- how have the human Prolene suture study and this

18 dog study, how have they impacted your opinions on mesh, if at

19 all?

20 A.   So, both the human explants that were explanted from

21 humans out to eight years and the seven-year dog study both

22 show that the polypropylene, the Prolene polypropylene, reacts

23 with the oxygen that's secreted by these inflammatory cells

24 and it changes the structure over time.  So, as we progress

25 from one to five, seven, eight years, these changes get more

———— GUELCHER - DIRECT - WALLACE ————

1  severe, we see more cracking, more oxidation, more changes in

2  the properties of the polypropylene.

3      This is basically happening because of this

4  foreign-body reaction.  And, in my opinion, these changes,

5  because the mesh is also made from propylene, this reaction

6  with oxygen, these changes in the surface will also occur with

7  the mesh because it's made from the same base material,

8  propylene.

9  Q.  So, I'll try to ask it this way, Dr. Guelcher.  Does the

10 fact that this is a Prolene suture affect at all your opinion

11 on what you referred to as the more-mesh opinion?

12 A.  So, I think it's very important to remember that a suture

13 implanted under the skin or in a blood vessel is very

14 different than mesh implanted in the pelvic floor.  Mesh has a

15 lot more polypropylene, a lot more Prolene, a lot more

16 surface, that can react with this oxygen.

17     So, I think what we can learn from the suture study is

18 that the Prolene is unstable and it reacts in the body.

19 Whether -- in this -- in my view, would lead to more studies

20 with the mesh actually in the anatomic location where I want

21 to use it, in the pelvic floor.

22     How does this oxidation affect the mesh in the pelvic

23 floor?  This is, to me, an important unanswered question.  But

24 what these studies point to is that Prolene does change over

25 time.  That's my conclusion.

GUELCHER - DIRECT - WALLACE

1  Q.  Well, since we're talking about Ethicon documents, beyond

2  the documents that the jury has seen and that have been

3  offered into evidence, did you review any other Ethicon

4  documents?

5  A.  I reviewed a number of other Ethicon documents.  These

6  are the two that struck me as the most -- in forming my

7  opinions.

8  Q.  And in reviewing those Ethicon documents, did you see any

9  other studies like these that were actually done on the TVT-O

10 mesh or mesh of any kind?

11 A.  There are a number of other studies looking at mesh,

12 complications of mesh, and what happens to mesh when it's

13 implanted in the body.

14 Q.  Well, my question is more specific than that,

15 Dr. Guelcher.

16       My question is, specifically, in all of the internal

17 company documents that you reviewed, did you see whether or

18 not Ethicon ever did any sort of explant studies on their

19 mesh?

20 A.  I haven't seen those documents, no.

21 Q.  Is that at all important to you as a biomedical engineer

22 and how it might impact your opinions in this case?

23       MR. THOMAS:  Objection, Your Honor.

24       THE COURT:  Sustained.

25 BY MR. WALLACE:

GUELCHER - DIRECT - WALLACE

1  Q.  Now, when you looked at these Ethicon documents, who

2  provided those to you?

3      MR. THOMAS:  I'm going to object to the generic

4  description of documents.  I really don't know what he's

5  talking about.  I don't think the witness does either.

6      THE COURT:  Sustained.  The documents that have been

7  admitted into evidence, you may inquire about certainly.

8      MR. WALLACE:  Thank you.

9      THE COURT:  I'm not trying to limit you.  I'm just

10  trying to hurry it.

11      MR. WALLACE:  Okay.  Sure.  Then why don't I move on.

12  BY MR. WALLACE:

13  Q.  Did you -- in connection with the work that you've done

14  on polypropylene, have you reviewed any literature?

15  A.  Yes.  There is a number of published papers on these

16  meshes and how they respond.

17  Q.  In connection -- are you familiar with Drs. Costello and

18  Clavé?

19  A.  Yes.

20  Q.  Have you reviewed their work?

21  A.  Yes, I have.

22  Q.  Can you tell the jury -- can we go to the --

23      MR. THOMAS:  Before you publish anything, may I have

24  a copy of whatever you're going to publish?

25      MR. WALLACE:  It's in the PowerPoint.

GUELCHER - DIRECT - WALLACE

1          MR. THOMAS:  Well, it's quotes from the study.  I

2     object to this, isolated quotes from the study, Your Honor, as

3     opposed to the full study.

4          THE COURT:  Do you have a copy of the full study that

5     you can provide counsel?  If that's what you plan to

6     introduce.

7          MR. WALLACE:  It's just the articles.  They're marked

8     as exhibits.  I'll give you the exhibit numbers, David.  I

9     believe you have a copy in front of you.

10          THE COURT:  Why don't you two get together.

11          MR. WALLACE:  Sure.

12          THE COURT:  Maybe over that way a little bit.

13          (Discussion held off the record between Mr. Wallace

14     and Mr. Thomas.)

15          MR. WALLACE:  Your Honor, may I proceed?

16          THE COURT:  You may.

17          MR. WALLACE:  And, Mr. Thomas, you have the article.

18     BY MR. WALLACE:

19     Q.  In connection with your work, did you perform a

20     literature search?

21     A.  Yes, I did.  I searched a number of papers on this.

22     Q.  And in connection with your work, did you come across any

23     articles that dealt with polypropylene degradation in

24     explants?

25     A.  Yes, I did.

GUELCHER - DIRECT - WALLACE

1   Q.   And what articles were those?

2   A.   Well, I've selected three that I believe make the point,

3   by Clavé, et al., and published in 2009; by Costello, et al.,

4   published in 2007; and by Wood, et al., published in 2013.

5   Q.   And, for the record, the Clavé article is Exhibit 21457.

6   A.   Yes, that's right.

7          MR. WALLACE:  And absent an objection, I'd like to be

8   able to publish it to the jury.

9          THE COURT:  21 -- the number is?

10         MR. WALLACE:  21457.

11         THE COURT:  21457 may be admitted when presented to

12  the Courtroom Deputy.

13  (PLAINTIFFS' EXHIBIT P-21457 WAS RECEIVED IN EVIDENCE.)

14         MR. WALLACE:  Thank you.

15         Your Honor, as a learned treatise, we'd -- it's my

16  understanding we would not be ultimately providing that to the

17  jury.

18         THE COURT:  All right.

19         THE DEPUTY CLERK:  It does not go to the jury?

20         THE COURT:  That's correct.

21         MR. WALLACE:  Correct.  But we would like to publish.

22         MR. THOMAS:  Yes.

23         MR. WALLACE:  Thank you.

24  BY MR. WALLACE:

25  Q.   So let's keep moving on, Dr. Guelcher.  The article is in

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                        AT CHARLESTON

4

5    _____

6    JO HUSKEY AND ALLAN HUSKEY,           :

7            Plaintiffs,                   :   CASE NUMBER

8        v.                                :   2:12-cv-05201

9    ETHICON, INC., ET AL.,                :

10           Defendants.                   :

11   _____

12

13               TRANSCRIPT OF TRIAL - DAY SEVEN

14                    SEPTEMBER 02, 2014

15           BEFORE THE HONORABLE JOSEPH R. GOODWIN,

16                UNITED STATES DISTRICT JUDGE

17

18

19   Court Reporter:        Carol Farrell, CRR, RMR, CCP, RPR
                            (304)347-3188
20                          carol_farrell@wvsd.uscourts.gov

21                          Anthony Rolland, CRR, RMR, RPR
                            (407)760-6023
22                          rolland.crr@gmail.com

23
     Proceedings recorded by machine stenography; transcript
24   produced by computer.

25
```

**A P P E A R A N C E S**

**FOR THE PLAINTIFFS:**

**EDWARD A. WALLACE, ESQUIRE**
**MARK R. MILLER, ESQUIRE**
Wexler Wallace
55 West Monroe Street, Suite 3300
Chicago, IL  60603

**FIDELMA L. FITZPATRICK, ESQUIRE**
Motley Rice
321 South Main Street, Suite 200
Providence, RI  02903

**JEFFREY M. KUNTZ, ESQUIRE**
**ANDREW N. FAES, ESQUIRE**
Wagstaff & Cartmell
4740 Grand Avenue, Suite 300
Kansas City, MO  64112


**FOR THE DEFENDANTS:**

**CHRISTY D. JONES, ESQUIRE**
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS  39157

**DAVID B. THOMAS, ESQUIRE**
**PHILIP J. COMBS, ESQUIRE**
Thomas Combs & Spann
PO Box 3824
Charleston, WV  25338-3824

THAMES - DIRECT - THOMAS

1          THE COURT:  Ladies and gentlemen, I think that we've

2    done very well.  We haven't had to take very many unscheduled

3    breaks.  This is a time when we have to take one.

4          Ten-minute break -- make it 15, and we'll look and

5    see how the morning goes.  Do a 15-minute break.

6          I hope you enjoy that healthy stuff that's back in

7    the jury room.  And I'll call you back when we're ready.

8          Court stands in recess.

9          (The jury left the courtroom at 10:03 a.m.)

10          (A recess was taken at 10:03 a.m.)

11          (The jury entered the courtroom at 10:22 a.m.)

12          THE COURT:  Okay.  Mr. Thomas.

13          MR. THOMAS:  May I proceed, Your Honor?

14          THE COURT:  Yes, sir.

15    BY MR. THOMAS:

16    Q.  Dr. Thames, before the break I was asking you about

17    defendants' exhibit 23228 which is titled *Seven Year Dog*

18    *Study*.  Did you review this document in connection with your

19    work in this case?

20    A.  Yes, I did.

21    Q.  And you relied on it for some of the opinions you have in

22    this case?

23    A.  Yes, I did.

24          MR. THOMAS:  Your Honor, I'd offer into evidence

25    defendants' exhibit 23228.

*United States District Court*
*Southern District of West Virginia*

THAMES - DIRECT - THOMAS

1            MR. KUNTZ:  No objection.

2            THE COURT:  It may be received.

3            (Defendants' Exhibit 23228 received in evidence.)

4   BY MR. THOMAS:

5   Q.   Dr. Thames, what is the *Seven Year Dog Study*?

6   A.   A study where a number of dogs were used to implant

7   Prolene into the dogs and they were maintained over a period

8   of a number of years, in this case seven years, and at

9   intervals some of the dogs would be sacrificed.  The sutures,

10  the Prolene sutures that were implanted in the dog would be

11  removed and would be evaluated, evaluated for molecular

12  weight, evaluated for tensile strength, evaluated for

13  elongation, and other features like the infrared spectroscopy

14  would be done and so forth.  And at the end of seven years the

15  last dogs were used.  And this study compiles data that was

16  collected in that manner for over a seven year period.

17  Q.   Dr. Thames, the jury has already heard a little bit about

18  this study in the examination of Dr. Guelcher last week.  I

19  want to direct your attention to page 115, excuse me, 116 of

20  this document.  Jamie, could you pull that up, please?

21       Do you have that in front of you, Dr. Thames?

22  A.   Yes, sir.

23  Q.   Right in the middle of the page there's a heading called

24  optical microscopy and scanning electron microscopy.  Are

25  those analytical chemical techniques?

1  A.   Yes, sir.

2  Q.   Can you tell the jury what optical microscopy and

3  scanning electron microscopy is?

4  A.   Sure.  Optical microscopy is looking through a microscope

5  with no unnecessary additional energy input into it, with good

6  lighting assistance and so forth, typical microscope, but a

7  sophisticated one and fairly expensive.

8       Scanning electron microscopy is a technique in which a

9  sample is placed in an instrument, it's bombarded with an

10  electron beam, and that electron beam then is reflected on to

11  a mirror of sorts and that produces an image, and that image

12  is of a surface that it's looking at.  It can be very high

13  magnification, five, six, seven thousand times, and it's a

14  good way of looking at fine structure of a material.

15  Q.   Under the heading conclusions, the second bullet point

16  reads, "Degradation in Prolene is still increasing and PVDF,

17  even though a few cracks were found, is still by far the most

18  surface resistant in-house made suture in terms of cracking."

19       What does that report mean from a scanning electron

20  microscopy perspective?

21  A.   Well, it suggests and states that the surface of the

22  Prolene explant that they saw cracks and that it would -- they

23  think it will continue to crack.

24  Q.   And as a polymer chemist, if there is degradation in

25  terms of cracking in the polypropylene, what would you expect

THAMES - DIRECT - THOMAS

1  to find?

2  A.   You would expect -- you would not only expect to find,

3  you would find a loss of, and they allege that this is

4  degradation, a loss of molecular weight, and you would change

5  different properties, tensile strength and elongation would be

6  changed from the normal not exposed sample.

7  Q.   Now, let's go back to the page 115 right before and under

8  IR and IR microspectroscopy.  Could you tell the jury what

9  that is, please?

10  A.   IR microscopy is infrared microscopy where an electron

11  beam hits the sample, reflects back to a sensor and it shows

12  the picture of the surface that you're looking at.

13  Microspectroscopy is looking at a very, very fine small point

14  under a microscope.  In other words, if you find an area under

15  a microscope, you can zero in on a very, very small area and

16  run an infrared spectra or see the spectra of that particular

17  compound, whatever that might be at that pinpoint type area.

18  Q.   And this report is October 15, 1992, is that right?

19  A.   Yes, sir, that's correct.

20  Q.   And that's seven years into the test?

21  A.   Yes, sir.

22  Q.   Under the second paragraph, under the IR and IR

23  microspectroscopy, it reads, "IR microspectroscopy was used to

24  examine cracked areas in Ethilon, Novafil and Prolene."  Just

25  for the jury's benefit, what are Ethilon and Novafil?

THAMES - DIRECT - THOMAS

A.   They're not Prolene, they are different structures of materials, sir.

Q.   It says, "IR spectra obtained for cracked Prolene specimens, paren, figure A, showed possible evidence of slight oxidation, paren, a broadened weakened absorbance at about 1650 C M minus one."

What does that mean to you as a polymer chemist?

A.   Well, when I see the term *shows possible evidence*, that means it's not clear and not concise, that it's possible. Most anything is possible.  Then they say a broadened weak absorption at about 1650 reciprocal centimeters.  My mind would jump to the fact that the 1650 reciprocal centimeters is an absorption frequency in the infrared that would be an area where you would expect to see proteins perhaps, and that more likely than you would see proteins then, of course, you would see any degradation from polypropylene or Prolene.  So my feeling is that we are looking at something that's not Prolene, it may even be an acid salt, but not Prolene.

Q.   How would proteins get on to this suture?

A.   Proteins are in flesh.  When they take the explants out, and they didn't clean these in any way, they didn't put them in any sort of chemicals for anything, they're on flesh, you would expect to see proteins from the flesh.

Q.   Down the next paragraph there's a heading for IV and GPC. What is GPC?

1    A.   Gel permeation chromatography.

2    Q.   Tell the jury what GPC does.

3    A.   GPC is a standard method for determining molecular

4    weight.  If I wanted to know the molecular weight of a

5    polymer, I would use the instrument called the gel permeation

6    chomatograph.  What you do in a situation like that is you

7    dissolve the polymer in a solvent, typically halogenated

8    hydrocarbon.  You inject it into a machine that has columns in

9    it that separate chemical species by virtue of their size and

10   molecular weight.  And as they elude from that column, the gel

11   permeation chromatograph measures the numbers of materials,

12   the weight, puts it into the computer, and at the end of the

13   run it provides you information about the molecular weight of

14   the sample that was just analyzed.

15   Q.   And read this with me for the jury, please.  It says,

16   "Gel permeation chromatography, paren, GPC, was run on Prolene

17   sutures explanted from dogs after seven years."  What does

18   that mean?

19   A.   They took the sutures, Prolene sutures from the dogs

20   after seven years.

21   Q.   And it says, "The GPC data was compared to data from a

22   current 4 slash O Prolene suture."  What does that mean?

23   A.   That means that they took the experimental sample from

24   the dog and they ran its molecular weight, and then they

25   compared it to a pristine sample of Prolene that had never

THAMES - DIRECT - THOMAS

1  been introduced to anybody, right out of the box so to speak,

2  brand new.

3  Q.   And why do you do that kind of analysis?

4  A.   Called a control.  In other words, if we want to know if

5  the molecular weight of the Prolene was reduced while it was

6  in the dog, then we need a standard or control, so we use the

7  unused, unimplanted material as a control.  This is what your

8  molecular weight ought to be.  And then you test the sample

9  from the dog and say, well, is it the same or is it within

10  experimental error.  If it is, then nothing has happened to

11  the molecular weight this seven years.  The polymer has not

12  degraded.

13  Q.   So continue reading on with me.  "The results indicate

14  that there was no significant difference in molecular weight

15  between the 4 slash O Prolene control and the seven year

16  explants."

17       What does that mean to a polymer chemist?

18  A.   That means that there was no degradation because of

19  implantation of Prolene in the dog over a seven year period of

20  time.

21  Q.   Had there been degradation, what would you expect to see?

22  A.   You would have seen a reduction in molecular weight would

23  be one thing that you would expect to see.

24  Q.   I want to direct your attention now to page 153 of this,

25  of exhibit 23228.  153 is an interim report dated October 19,

1   1992.  Do you see that?

2   A.   Yes, I do.

3   Q.   Tell the jury what this document is.

4   A.   Well, this is a document that shows the physical

5   properties of explanted materials, in particular we're

6   interested in Prolene.  It measured the physical testing, it

7   took these samples and did tensile strength and elongation

8   studies on them and we talked about that earlier today.  And

9   they have a chart in here which I think we'll get to a little

10  bit later that will show you what happens to the physical

11  properties of Prolene over the seven year period.

12  Q.   And what were the findings -- strike that.

13       What different tests did they run, Dr. Thames?

14  A.   They ran tensile strength test, which is the pull test,

15  to determine how much force you have to put on the sample to

16  break it.  And then they determined elongation, which is how

17  much did it extend before it finally broke.  And finally they

18  looked at modulus, which is a measure of stiffness to see if

19  it was stiffer than when it was implanted or as stiff as when

20  it was implanted just to get a handle on what the

21  characteristics of stiffness was of that explanted material.

22  Q.   Dr. Thames, what did Ethicon find after seven years of

23  implantation happened to the tensile strength of these

24  sutures?

25  A.   They found that the tensile strength was reduced, as far

THAMES - DIRECT - THOMAS

1   as my memory, it's about five PSI, slight reduction in the

2   strength required to break the Prolene sample.

3   Q.   What did the Ethicon scientists find with respect to

4   elongation?

5   A.   The sample elongated twice its original length.  The

6   first length was like 37, 38, something like that, I forget

7   exactly the number, and finally upon explantation after seven

8   years it was twice as elongatable.

9   Q.   And what's the significance of the changed elongation?

10  A.   Well, when you talk about just a very, very small

11  reduction in strength and a very long elongation, the area

12  under that curve of is far greater after seven years of

13  explantation than before.

14  Q.   Tell the jury and me what it means, area under the curve,

15  as it relates to the ability of the suture to perform its

16  intended function.

17  A.   Remember we talked about the fact that the area under the

18  curve was a measure of toughness.  So what that means is that

19  not only, not only did the Prolene explant not undergo

20  degradation, but it improved with implantation.  It became

21  tougher.  It became more elongatable with only a very minor

22  reduction in tensile strength.  So it was a tougher strand of

23  polypropylene after seven years than it was when it was

24  implanted in the dog.

25  Q.   Finally, Dr. Thames, you talked about Young's modulus

THAMES - DIRECT - THOMAS

1  test?

2  A.   Yes, sir.

3  Q.   Tell the jury about that, please.

4  A.   Modulus is a test of toughness and typically slope of the

5  curve, and since I didn't have the exact numbers I couldn't

6  give you a curve that showed the exact shape of the modulus

7  curve, but it's reduced somewhat, and that means the stiffness

8  was reduced a bit during the period of time when it was being

9  implanted.  So we, we reduced stiffness, we improved

10 elongation with very minor changes in tensile strength, and so

11 overall the properties were enhanced during the seven year

12 implantation.

13 Q.   Dr. Thames, I put a slide up there that shows the data

14 and the cover page, page 115, so the jury can see it.

15 A.   Yes, sir.

16 Q.   And the citation there says that "Novafil samples show a

17 decrease in breaking strength while Prolene and PVDF showed no

18 significant change after seven years of implantation."  That

19 refers to the breaking strength?

20 A.   Yes, sir.  Or tensile strength, the same thing.  We're

21 going to call it the same thing, okay.

22 Q.   And is the other data up there, is that the data upon

23 which you relied for your opinions about the Prolene becoming

24 tougher after seven years?

25 A.   Yes, sir.

THAMES - DIRECT - THOMAS

1  Q.   Can you explain to the jury how you read that data just

2  so they understand?

3  A.   If you look at the chart that says, the first segment

4  says zero in the top line, that's at implantation.  That's at

5  the beginning.  And then they measured the breaking strength

6  or the tensile strength was 1.68, that's before it was ever

7  implanted.  And then after implantation, which is over here

8  under the seven column, breaking strength is 1.60.  So the

9  actual strength to break it reduced by point 08 pounds or

10 Newtons.

11       And then in terms of the elongation, which is the

12 second group of numbers, the original elongation was 37

13 percent at zero time of implantation.  After seven years it

14 was 78 percent, 78 percent, which means that it's doubled its

15 elasticity during the period of time that it was implanted.

16       And then the modulus was originally 721 and it went to

17 214 after seven years with a reduction of minus 70 in modulus,

18 meaning it became more flexible, more pliable, less stiff.

19 Q.   Can I have the next slide, please, Jamie?

20       Dr. Thames, I have a slide up called *Seven Year Dog*

21 *Study Break Strength Versus Percent Elongation*.  Can you

22 explain that to the jury, please?

23 A.   Yes, sir.  I've taken the numbers that we just talked

24 about in the table by the Ethicon scientists and I have

25 plotted them in terms of breaking strength is on the vertical

THAMES - DIRECT - THOMAS

1  column or tensile strength, elongation is on the horizontal

2  column.  The red represents the original Prolene before it was

3  inserted into the dog, implanted; the blue represents the data

4  that was collected from the explanted sutures after seven

5  years of implantation in the dogs.

6      You'll notice the blue had a very small decline in

7  breaking strength, as we said, point 08 pounds, but its

8  elongation went out to 78 percent.  So if I measure the area

9  under the red and compare that area to the area under the

10  blue, we can see that the area under the blue is twice or

11  perhaps more than the area under the red.  And when we

12  understand that the definition of toughness is area under this

13  stress strain curve, it's obvious then that the Prolene

14  implant improved its toughness over the period of the seven

15  years it was implanted in the dog.

16  Q.  And from a polymer chemistry perspective, how can it

17  improve?

18  A.  It can improve by being able to be plasticized.  For

19  instance, we talked about the fact that polypropylene was a

20  group of chains and you pull them, and as you pull them they

21  began to stretch out and so forth, like the spaghetti that we

22  talked about.  Well, if you implant this in an animal or in

23  human flesh, the body, there are lipids there, there are fats.

24  Unfortunately there's probably too much on those that would be

25  put in me because I'm a little overweight, but every human

THAMES - DIRECT - THOMAS

1  body has a certain amount of fat in it, and those lipids are

2  fats, they're triglycerides, we go to the doctor and have our

3  triglycerides and our cholesterol looked at, and we know we

4  have them in our body.  Well, they can plasticize and make

5  more pliable a molecule like Prolene.

6        Now, in order to understand that, I think I have to

7  maybe use a human example.  There have been times when, you

8  know, I've worked in my shop and I've gotten grease on my

9  hands and I've wiped it off with an organic solvent, and my

10  hands felt dry and they felt rough.  First thing I do is reach

11  over for some hand lotion and rub it into my hands.  I bet you

12  there's been times when most of you all and I've also washed

13  dishes at times.  And when you get through washing dishes,

14  your hands feel a little dry and a little rough, and the first

15  thing you do is you reach over and put lanolin and lotion on

16  them.  What you're doing is putting a plasticizer on your

17  hands so that the plasticizer can soften, move in between the

18  molecules of your hand, your flesh, and provide elasticity and

19  lubricity, and that's what happened here is the lubricity has

20  been improved for the polypropylene or Prolene implant.

21  Q.  How about a little glass of water?

22  A.  I think I need it.

23        Thank you.

24  Q.  Next slide, please, Jamie.

25        Jamie, next slide, please.