# EXHIBIT F

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 2 of 712 PageID #: 133166
Case 2:12-md-02327   Document 2752-6   Filed 03/09/16   Page 2 of 712 PageID #: 62962

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

```
 1                   IN THE CIRCUIT COURT
                TWENTY-SIXTH JUDICIAL CIRCUIT
 2                 CAMDEN COUNTY, MISSOURI
 3   DONALD BUDKE,                )
                                  )
 4                   Plaintiff,   )
                                  )
 5   v.                           ) No. 10CM-CC00085
                                  )
 6   LAKE AREA WOMEN'S CENTER OF  )
     OBSTETRICS & GYNECOLOGY,     )
 7   a subsidiary of Lake         )
     Regional Medical Management  )
 8   Inc., f/k/a Lake of the      )
     Ozarks Medical Management,   )
 9   Inc.; BECKY SIMPSON, M.D.;   )
     JOHNSON & JOHNSON, a         )
10   New Jersey corporation;      )
     ETHICON, INC., a New Jersey  )
11   corporation; and            )
     GYNECARE WORLDWIDE,          )
12   a division of Ethicon, Inc.  )
     a foreign corporation,       )
13                                )
                     Defendants.  )
14
15              TRANSCRIPT - JURY TRIAL
16                    VOLUME VI
17                 January 12, 2015
18
19       On January 12, 2015, the above cause came on
20   for Jury Trial before the HONORABLE WILLIAM R.
21   HASS, Judge of the Camden County Circuit Court at
22   Camdenton, Missouri, a jury of 12 and three
23   alternate jurors.
24
25
```

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 3 of 712 PageID #: 123167
Case 2:12-md-02327  Document 2592-6  Filed 09/09/16  Page 3 of 712 PageID #: 62963
In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

```
 1                    APPEARANCES
 2    For the Plaintiff:
 3         Ms. Amy Collignon Gunn
           THE SIMON LAW FIRM, PC
 4         800 Market Street, Suite 1700
           St. Louis, MO 63101
 5         314.241.2929
           agunn@simonlawpc.com
 6
           Mr. Erik A. Bergmanis
 7         BERGMANIS LAW FIRM, LLC
           380 West U.S. Highway 54, Suite 201
 8         Camdenton, MO 65020
           573.317.4156
 9         erik@ozarklawcenter.com
10         Mr. Adam M. Slater
           MAZIE SLATER KATZ & FREEMAN, LLC
11         103 Eisenhower Parkway, 2nd Floor
           Roseland, NJ 07068
12         973.228.9898
           aslater@mskf.net
13
           Mr. Benjamin Houston Anderson
14         ANDERSON LAW OFFICES, LLC
           1360 West 9th Street, Suite 215
15         Cleveland, OH 44113
           216.589.0256
16         ben@andersonlawoffices.net
17
18
19
20
21
22
23
24
25
```

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

```
 1         A P P E A R A N C E S  (Continued)
 2   For the Defendants Becky Simpson, M.D. and Becky
     Simpson, M.D., P.C. d/b/a Lake Area Center of
 3   Obstetrics & Gynecology, a subsidiary of Lake
     Regional Medical Management, Inc., f/k/a Lake of
 4   the Ozarks Medical Management, Inc.:
 5        Mr. Kent O. Hyde
          Mr. David E. Overby
 6        HYDE, LOVE & OVERBY, LLP
          1121 South Glenstone
 7        Springfield, MO 65804
          417.831.4046
 8        kohyde@aol.com
          deovrby@cs.com
 9
     For the Defendants Johnson & Johnson, a New Jersey
10   Corporation; and Ethicon, Inc., a New Jersey
     Corporation:
11
          Mr. Dan H. Ball
12        Ms. Bettina J. Strauss
          BRYAN CAVE, LLP
13        One Metropolitan Square
          211 North Broadway, Suite 3600
14        St. Louis, MO 63102-2750
          314.259.2000
15        dhball@bryancave.com
          bjstrauss@bryancave.com
16
          Ms. Christy D. Jones
17        BUTLER SNOW LLP
          Renaissance at Colony Park
18        1020 Highland Colony Parkway, Suite 1400
          Ridgeland, MS 39157
19        601.948.5711
          christy.jones@butlersnow.com
20
21
22
23        Charles W. Motter, CCR No. 617
24     Twenty-Sixth Judicial Circuit at Camdenton,
25                    Missouri
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 5 of 712 PageID #: 132169
Case 2:12-md-02327 Document 2592-6 Filed 08/09/16 Page 5 of 712 PageID #: 62969
In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1462

```
 1                    I N D E X

 2                    VOLUME VI

 3                 January 12, 2015

 4                   JURY TRIAL

 5                                        Page

 6    Certificate of Reporter ...................1844

 7          PLAINTIFF'S WITNESSES

 8   DR. ANNE WEBER

 9        Direct Examination by Mr. Slater  .......1465

          Cross-Examination by Ms. Jones  .........1834

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 6 of 712 PageID #: 133170
Case 2:12-md-02327  Document 2192-6  Filed 05/09/16  Page 6 of 712 PageID #: 62966

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1463

1            (Proceedings began at 9:09 a.m.)

2                    (The following proceedings were

3     held in the courtroom outside the presence of the

4     jury:)

5                    THE COURT:  Are you ready?  Okay.

6     Would you call Tony and tell him to bring the jury

7     up?

8                    THE BAILIFF:  Yes.  Bring them in?

9                    THE COURT:  Yes, we're ready.

10                    (The following proceedings were

11     held in the courtroom in the presence of the

12     jury:)

13                    JUROR:  Good morning.

14                    THE COURT:  Good morning.  Looks

15     like maybe there's -- are there any obstacles over

16     there?  Just want to make sure you can get

17     through.

18                    THE BAILIFF:  All rise.

19            Camden County Circuit Court is now in

20     session, the Honorable William Hass residing.

21                    THE COURT:  You may now be seated.

22     I hope you had a good weekend.

23                    JUROR:  Yes.

24                    THE COURT:  And at least we

25     escaped a big ice storm so far.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 7 of 712 PageID #: 133171
Case 2:12-md-02327 Document 2192-6 Filed 05/09/16 Page 7 of 712 PageID #: 62967

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1464

1          JUROR:  So far, yes.

2          THE COURT:  Knock wood.  Well, I'm

3   hoping it will just be nice to us and hold off and

4   not do anything.  It will make it a lot better.

5          I guess we're ready to start, Mr. Slater,

6   whenever you are.

7          MR. SLATER:  Thank you, Judge.  We

8   call Dr. Anne Weber.

9          THE COURT:  If you'd please raise

10  your right hand to be sworn.

11  (At this time, the oath was administered to the

12  witness by the Court.)

13          THE COURT:  All right.  Be seated.

14          THE WITNESS:  Actually, with your

15  permission, Your Honor, I'd like to stand.

16          THE COURT:  All right.  Well,

17  that's all right too.

18          MR. SLATER:  It's for medical

19  reasons, Your Honor.

20          THE COURT:  I'm sorry?

21          MR. SLATER:  For medical reasons.

22          THE COURT:  That's fine.

23          Should you get tired or need to sit, you

24  will have my permission to sit, but do what you

25  wish.

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1465

1                    THE WITNESS:  Thank you.

2                    DR. ANNE WEBER,

3    called as a witness on behalf of the Plaintiff,

4    being sworn by the Court, testified:

5                    DIRECT EXAMINATION

6    QUESTIONS BY MR. SLATER:

7       Q.   **Good morning, Dr. Weber.**

8       A.   Good morning.

9       Q.   **Dr. Weber, we're going to talk a little**

10   **bit about your background before we talk about**

11   **some of the issues in the case.  Is that all**

12   **right?**

13      A.   Yes.

14      Q.   **Can you tell the jury where you live?**

15      A.   I live in Baltimore, Maryland.

16      Q.   **We've put up on the table just in front**

17   **of you your CV, your curriculum vitae.  It should**

18   **be right -- just below you.  Next level down.**

19   **Nope.  Down below.  Down there.**

20      A.   Oh, I'm sorry.  Yes.

21      Q.   **So if you need to refer to that, it's**

22   **perfectly fine.  Exhibit 2105.**

23           **But in any event, would you tell the jury**

24   **about your educational background, where you went**

25   **to school, and take us through that, please?**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 9 of 712 PageID #: 133173
Case 2:12-md-02327 Document 2592-6 Filed 09/09/16 Page 9 of 712 PageID #: 62963

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1466

1      A.   Yes.

2           I went to college at the University of

3      Maryland, and I also went to medical school at the

4      University of Maryland, and I did my residency in

5      obstetrics and gynecology at Hartford Hospital in

6      Connecticut.

7           And when I finished my residency, I

8      realized I wanted additional experience in

9      gynecologic surgery, so I attended the advanced

10     surgery fellowship at the Cleveland Clinic, which

11     is in Cleveland, and that was a one-year program.

12          And after I completed that, I then joined

13     the staff at the Cleveland Clinic as a

14     gynecologist.

15     Q.   **Would you tell the jury what the**

16     **Cleveland Clinic is, please.**

17     A.   Yes.  So the Cleveland Clinic is a

18     tertiary referral center as well as a primary care

19     center, but the tertiary referral center is -- you

20     may know means people are referred in from the

21     community when they have problems that are

22     particularly difficult to solve or if they've

23     exhausted the resources in their community and

24     they need some additional expertise.

25          So it's a very large institution, some

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 10 of 712 PageID #: 133174
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 10 of 712 PageID #: 62970

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1467

1    10,000 employees.

2        Q.   Can you tell the jury, when you began to

3    work at the Cleveland Clinic and joined the

4    staff --

5            And what year was that, again?

6        A.   That was in 1993.

7        Q.   Can you tell the jury what it was that

8    you were doing professionally at that point in

9    time?

10       A.   Yes.  So I began my practice in general

11   gynecology.  I didn't practice obstetrics, which,

12   you know, is delivering babies.  Even though I was

13   trained in that, I wanted to focus on gynecology.

14           And so that was the beginning of my

15   practice where I was seeing women of all ages,

16   well women care, problem visits, and also what

17   ultimately became my specialty -- and we'll talk

18   about that -- women with prolapse and

19   incontinence.

20       Q.   And I was actually going to ask you:  Can

21   you tell the jury about that?

22           As you worked at the Cleveland Clinic and

23   your career went forward, did you begin to have a

24   specialization and a focus to your medical

25   practice?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 11 of 742 PageID #: 133175
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 11 of 742 PageID #: 62971

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1468

1    A.   Yes.

2         So since I had the advanced training in

3    the fellowship, I had advanced surgical training

4    and I realized that I'd like to focus on that in

5    my clinical practice.

6         So that within a few years of starting my

7    practice at the Cleveland Clinic, I was able to

8    focus on women with pelvic floor disorders, which

9    is the big group of women, big category, and in

10   that group includes women with prolapse,

11   incontinence, other pelvic issues that I was

12   helping to take care of.

13   **Q.   And you've mentioned it, so you want to**

14   **just give the jury a little bit of background?**

15   **They've heard a little bit, but if you**

16   **could just give them a simple overview:**

17   **prolapse, what is that, what were you treating.**

18   A.   Okay.  So prolapse is when there's some

19   relaxation or dropping down of the pelvic organs.

20        The vagina loses its support when some of

21   the muscles lose their tone and some of the

22   connective tissue gets stretched, and the other

23   organs nearby -- the bladder in the front of the

24   vagina, the uterus at the top of the vagina, the

25   rectum behind the vagina -- those depend on the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 12 of 712 PageID #: 133176
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 12 of 712 PageID #: 62972

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1469

1  vagina for their support.  So if the vagina loses

2  its support, then those organs drop down also.

3  And that's essentially what prolapse is.

4      Q.    In your work at the Cleveland Clinic, did

5  you have teaching responsibilities?

6      A.    Yes.

7      Q.    Would you tell the jury about that,

8  please?

9      A.    Yes.  We had medical students, we had

10  residents, and we also had fellows.

11          When I went through the advanced surgery

12  fellowship, that was a one-year program, and then

13  as urogynecology --

14          That's the name for specialists in

15  prolapse and incontinence is urogynecology.

16          As that became a little more formalized

17  as a subspecialty, the fellowship in that training

18  became three years, so we had fellows who were

19  attending a program of three years in length.

20          After they did their four-year residency

21  in obstetrics and gynecology, then they did a

22  three-year fellowship in urogynecology, and I was

23  involved in training them, helping to take care of

24  patients, and also training them in research

25  methods, and assisting them in performing their

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 13 of 712 PageID #: 133177
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 13 of 712 PageID #: 62973

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1470

1    own research.

2       **Q.    Were you board certified at any point?**

3       A.    Yes.

4       **Q.    And when was that?**

5       A.    That was in 1995.

6       **Q.    And who board certified you?**

7       A.    That's the American Board of Obstetrics

8    and Gynecology.

9       **Q.    And just very simply, what does it mean**

10   **to be board certified?**

11      A.    So this involves a written test that you

12   take after your -- after you've completed your

13   residency, and then an oral examination after

14   you've been in practice for a couple of years,

15   where you collect a case list of patients, an

16   example of the kind of patients that you see in

17   your practice and how you're taking care of them,

18   and you submit all that information to the board

19   and then you have the oral examination where they

20   question you on not just your care of these

21   particular patients but all the issues that can

22   come up in obstetrics and gynecology.

23          And then once you've passed that, you're

24   board certified, you're certified by the American

25   Board of Obstetrics and Gynecology, to be an

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1471

1   obstetrician-gynecologist.

2       Q.   In looking at your CV, I saw that between

3   1994 and 2000, you were the director of clinical

4   research, department of obstetrics and gynecology,

5   at the Cleveland Clinic.

6       A.   Yes.

7       Q.   What does that mean, "director of

8   clinical research"?  What was your position and

9   what were your responsibilities?

10      A.   So my role was to assist not only the

11  fellows and also the residents, as I've mentioned,

12  but also the other faculty member in -- faculty

13  members in the department of gynecology and

14  obstetrics at the Cleveland Clinic.

15           And what I realized, when I had such a

16  strong interest in research, that the training I

17  had had to that point really wasn't sufficient if

18  I wanted to really conduct high-quality rigorous

19  research.

20           So I attended a program at the University

21  of Michigan, in the school of public health, and

22  that was a two-year program where I earned a

23  master's in clinical research design and

24  statistical analysis.

25           And when I graduated from that program,

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 15 of 712 PageID #: 133179
Case 2:12-md-02327  Document 2182-6  Filed 05/09/16  Page 15 of 712 PageID #: 62975

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1472

1   the chairman of my department created this role as

2   the director of clinical research, which hadn't

3   existed before, but since I brought this extra

4   level of training, I could then assist, as I said,

5   the other trainees and the faculty in the

6   department so they could benefit from my

7   experience and training and raise the level of

8   their research.

9       Q.   You said that you went to the University

10  of Michigan and obtained a master's of science in

11  clinical research design and statistical analysis?

12      A.   Yes.

13      Q.   What does that mean?

14      A.   Okay.  So I know it's a big title.

15           So clinical research design, so how do

16  you study -- I'm sorry.  How do you set up and

17  perform studies so that you can actually answer

18  the question that you set out to answer.

19           And as you probably know -- I mean,

20  research is, you set up a question, you want to

21  know something, and then you identify how you can

22  learn that answer.

23           So you pick a patient population, if this

24  is a clinical study, what kinds of questions are

25  you going to ask to get the information that you

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 16 of 712 PageID #: 133180
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 16 of 712 PageID #: 62978

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1473

1    need, and then you collect that information over

2    time, analyze the data, and report it that ideally

3    would answer the question that you started out

4    with.

5           And then the second part, the statistical

6    analysis, that's the data part where you have all

7    this information.  How are you going to put it

8    together, learn what it really means.  You have to

9    condense it down, of course, because at the end of

10   a study, you know, you'll have piles and piles of

11   information, so you need to analyze that,

12   summarize that, make some conclusions about it,

13   and then you get along to reporting it.

14       Q.   **How did obtaining this master's degree in**

15   **study design and statistical analysis affect your**

16   **professional practice and the work you were doing**

17   **at the Cleveland Clinic?**

18       A.   Yes.  So as I mentioned, I was able to

19   bring this extra level of training and experience

20   to the residents and fellows who were performing

21   their research as part of their educational

22   program, and then the faculty in the department as

23   well, so I could help enrich their study designs

24   and performance so that could be done as well as

25   can be done.

Case 2:12-md-02327 Document 3756-6 Filed 04/25/17 Page 17 of 712 PageID #: 133181
Case 2:12-md-02327 Document 2182-6 Filed 05/05/16 Page 17 of 712 PageID #: 62977

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1474

1        And as -- we'll get to this in a minute

2   but this was also very important to me when I took

3   a position at the National Institutes of Health a

4   little later on in my career.

5        **Q.   And that's actually where I was going to**

6   **go to next.**

7             **When was it that you became involved with**

8   **the National Institutes of Health?**

9        A.   So that began in 1999.

10       **Q.   And first, would you tell the jury:  What**

11   **is the National Institutes of Health, the NIH?**

12       A.   Right.  So this is part of the federal

13   government that performs its own research.

14   They're based in Bethesda, Maryland, which is

15   right outside Washington.  And they also fund

16   research around the country, and to a limited

17   extent around the world, but primarily supporting

18   American researchers to perform research in all

19   fields.

20            And how I became involved in this

21   position, as I mentioned, the field of

22   urogynecology was really in its infancy as -- in

23   the early parts of my career.  The research that

24   had been done to that point wasn't really

25   rigorous.  It wasn't the kind that allowed us to

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 18 of 712 PageID #: 133182
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 18 of 712 PageID #: 62978

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1475

1    draw strong conclusions about the best way to care

2    for women with these problems.

3          And the NIH recognized this as a public

4    health problem and realized that this had not been

5    a focus of their funding in the past, and so at

6    the -- members of the professional organizations

7    that I belong to proposed to NIH that they create

8    a special program for research in women with

9    pelvic floor disorders, and then in 1999 I was

10   given that job to begin that program at the NIH,

11   to attract investigators.

12         Since this hadn't been a focus before,

13   there weren't a lot of investigators submitting

14   their own proposals for research because it hadn't

15   really been recognized as a high priority, so the

16   funding wasn't readily available.

17         So what we got in the beginning -- you

18   know, the late 1990s into the early 2000s -- was

19   some dedicated funding for pelvic floor disorders

20   in order to stimulate investigators, get some

21   high-quality research done, and really help

22   advance the science as far as the best way to take

23   care of women with these problems.

24   **Q.   Once you became involved with the Pelvic**

25   **Floor Disorders Network of the NIH, what were your**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 19 of 742 PageID #: 133183
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 19 of 742 PageID #: 62973

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1476

1   **responsibilities?  What was your position and what**

2   **was your responsibility?**

3        A.    Okay.  So the Pelvic Floor Disorders

4   Network came out of these initiatives that I was

5   just talking about, and what that network is is a

6   collection of institutions around the country --

7   seven institutions that were clinical and one

8   institution that was doing the data analysis, so

9   that was the data coordinating center, so eight

10  institutions altogether -- who were working

11  together to design and perform studies about women

12  with pelvic floor disorders.

13            And as you can easily imagine, it would

14  be easier when you have seven different

15  institutions collecting patients and entering them

16  into studies rather than just one institution

17  trying to do that by itself.

18            So this was a way to bring the

19  investigators together, really take advantage of

20  all that brainpower, design rigorous studies,

21  perform them, get the information, and then report

22  this high-quality research that will help take

23  care -- better care of women with these problems.

24            So I was the program director of the

25  Pelvic Floor Disorders Network, so this was while

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 20 of 712 PageID #: 133184
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 20 of 712 PageID #: 62980

Page 1477

1    I was working for NIH, and I basically supervised

2    the investigators at the clinical sites and the

3    investigators at the data coordinating center.  We

4    worked together.  I ran the meetings and those

5    kinds of things to keep things going, keep things

6    organized while the group was designing these

7    studies and performing them.

8        **Q.   I note that you have published in what's**

9    **called the peer-reviewed literature.**

10       A.   Yes.

11       **Q.   What does that mean?**

12       A.   Okay.  So the peer-reviewed literature is

13   the standard for reporting research in the

14   scientific community, and peer review means that

15   once an author has submitted a manuscript to the

16   journal with a report of their research results,

17   then the manuscript is sent out to usually two or

18   three other people in the field so they can review

19   it, critically review it, so that they can judge

20   the merits of the research.  Was the research done

21   well, was it rigorous, did it have enough

22   patients, are the results reported clearly, all

23   the kinds of things that you want to see in

24   high-quality research.

25           And then that's returned -- all those

Case 2:12-md-02327  Document 3756-6  Filed 04/25/17  Page 21 of 712 PageID #: 133185
Case 2:12-md-02327  Document 2762-6  Filed 09/09/16  Page 21 of 712 PageID #: 62901

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1478

1   reviews are returned to the editor and then to the

2   author, where the manuscript can then be improved

3   and sent back and ultimately accepted.  Not a

4   hundred percent of the time, of course, because

5   sometimes it's rejected.

6           So that's -- as I mentioned at the very

7   beginning, that's considered the standard of

8   reporting research results in the scientific

9   community.

10      **Q.   In looking at your CV, I note that it**

11  **looks like that you have about a hundred**

12  **publications you've published in the peer-reviewed**

13  **literature.  Does that sound right?**

14      A.   Yes.

15      **Q.   In looking through your CV also, you were**

16  **one of the authors of a textbook, "Office**

17  **Urogynecology," published in 2004.  What was that?**

18      A.   Okay.  So this was a textbook --

19          The publishers approached myself and my

20  coauthors.  They thought -- they saw a gap in the

21  textbooks that most of them focused on surgery and

22  anatomy and atlases and things like that, and they

23  saw a gap in providing information on how to take

24  care of women in the office when they have these

25  kinds of problems.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 22 of 712 PageID #: 133186
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 22 of 712 PageID #: 62962

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1479

1          Because honestly, the vast majority of

2    women can be helped in the office and only some of

3    them need to go to surgery for their problems.

4          So this was a focus on the evaluation and

5    treatment of women with pelvic floor disorders --

6    which, like we talked about, prolapse,

7    incontinence, those kinds of things -- and how to

8    best help them from an office practice.

9    **Q.    In looking at your CV, I want to ask you**

10   **about certain items that are mentioned, if I**

11   **could, and there's a section in here that is**

12   **titled, if I can get to it, "Professional**

13   **Service."  I want to ask you about a few things.**

14          **One of the things you were between 2003**

15   **and 2007, "Examiner, American Board of Obstetrics**

16   **and Gynecology."**

17          **What does that mean?**

18   A.    Okay.  So like I was describing a little

19   bit earlier, the American Board of Obstetrics and

20   Gynecology provides certification to people who

21   have passed the written test and then the oral

22   test.

23          So of course examiners are needed to

24   administer the oral tests, and that's what that

25   role was, is testing the individuals who had

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1480

1   recently completed their training and were coming

2   in as a proposed board certification, and I was

3   one of the examiners giving them this oral exam.

4        **Q.    Another thing I see is you were a member**

5   **of the editorial board of "Obstetrics and**

6   **Gynecology."**

7             **What is that?**

8        A.   So "Obstetrics and Gynecology" is the --

9   one of our scientific publications that is -- the

10  American College of Obstetrics and Gynecology

11  publishes all of its documents in.

12            And I'll just -- so there are these two

13  different things:  The American Board and then the

14  American College.

15            So the board is the certifying

16  organization.  They give the exams.  The American

17  College is the professional organization.  So they

18  hold annual meetings and they have research

19  presentations and they have publications about

20  different issues in women's care and guidelines

21  and so forth.

22       **Q.    I note that it says on here you were a**

23  **member of the board of directors of the American**

24  **Urogynecologic Society.  What does that mean?**

25       A.   Okay.  So that's another professional

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 24 of 742 PageID #: 132188
Case 2:12-md-02327   Document 3782-6   Filed 05/09/16   Page 24 of 742 PageID #: 129084

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1    organization, the American Urogynecologic Society.

2         So people who have -- who are

3    urogynecologists or have a special interest in

4    urogynecology, they hold annual meetings,

5    scientific presentations, advance the education

6    and research in the field.

7         So I served on the board of directors of

8    this organization, so that's participating in the

9    decision-making about what does the future look

10   like for this organization, how can we best serve

11   our members, that kind of thing.

12   **Q.   In looking through the journal, it says**

13   **that you were actually a peer reviewer for -- I**

14   **count about 10 journals, and I think you're doing**

15   **that currently for one of them.**

16        **What does it mean to be a peer reviewer?**

17   **I think you've touched on it, but since you were**

18   **doing this for so many journals, I think you**

19   **should just give the jury a brief explanation.**

20   A.    Right.

21        So remember I was just talking a few

22   minutes ago about how a journal -- an article

23   becomes peer reviewed and then published in a

24   journal.

25        So I mentioned that it gets sent out to

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 25 of 712 PageID #: 133189
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 25 of 712 PageID #: 62908

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1482

1    people in the field, the reviewers.  So of course

2    that means they need people to do that job.

3           So I was one of the people doing that

4    job.  Which means I would receive manuscripts from

5    other authors, I would critically review it,

6    identify any -- any problems that I thought there

7    were, any points of improvement to make this

8    better, and then give that feedback to the editor

9    of the journal, who then went -- those comments

10   then went back to the author.

11      Q.   And it says in this CV that you had

12   trained about 21 fellows at the Cleveland Clinic

13   in the advanced pelvic surgery fellowship.

14           Does that sound about right?

15      A.   I think 21 is the number overall, because

16   I started in the Cleveland Clinic and then I went

17   to Pittsburgh.

18      Q.   Okay.  And I see one of the people that

19   you trained at the Cleveland Clinic was Richard

20   Hill.  He's one of the experts that's been named

21   on behalf of Dr. Simpson in this case.  You were

22   one of the people who trained him?

23      A.   Yes.

24      Q.   I think you touched on it, and I'll ask

25   you to explain a little.

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 26 of 712 PageID #: 133190
Case 2:12-md-02327  Document 2182-6  Filed 05/09/16  Page 26 of 712 PageID #: 62988

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1483

1          Did there come a time when you left the

2  Cleveland Clinic and moved on in your career to

3  another institution?

4      A.   Yes.

5          So in 2000, there was an opportunity at

6  the University of Pittsburgh, Magee-Womens

7  Hospital, which is obviously in Pittsburgh,

8  Pennsylvania.  And remember I mentioned the

9  fellowships, which became a three-year program.

10 And they didn't have a fellowship in urogynecology

11 at that point at that institution, and they wanted

12 to develop one, and the staff there didn't really

13 have the -- the experience or the -- the resources

14 to start a new fellowship from scratch, so at that

15 point I decided to leave the Cleveland Clinic and

16 then go to the University of Pittsburgh to

17 continue my clinical practice and I was also still

18 working at NIH at that time, but also with the

19 goal of starting a fellowship.

20          And that was successful, I'm happy to

21 say, and that's ongoing and they're continuing to

22 train fellows at the University of Pittsburgh.

23     Q.   Now, did there come a point in time --

24 and you don't have to give us any details, but is

25 there a point in time when you stopped practicing

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1484

1    medicine?

2        A.    Yes.

3        Q.    And when was that?

4        A.    2006.

5        Q.    And you can generally tell the jury just

6    what was the reason why that was.

7        A.    Right.  So I had a medical condition that

8    was just making it increasingly difficult for me

9    to participate in surgery.  You know, of course

10   I'm getting a little older, like everyone else,

11   and surgery is really a very physically demanding

12   profession, and there came a point where it just

13   didn't become -- it was not possible for me to

14   really continue.  And that was in 2004.

15           And then I continued to work at the

16   University of Pittsburgh with an office practice,

17   and I continued to work at NIH, but in 2006 I

18   decided that an office practice was really not

19   what I had trained for.  I'd trained to be a

20   surgeon, and since that wasn't possible for me any

21   longer, I decided not to continue with my clinical

22   practice at that point.

23           I continued to work at NIH until the end

24   of 2007, and at that point I decided that my

25   health would really benefit from some time off,

1    that there -- I was doing a lot of traveling, a

2    heavy workload, and at that point I really just

3    needed to take a break.

4        Q.    When you were practicing medicine, where

5    were you licensed as a physician?  What states?

6        A.    So I was licensed in Connecticut first,

7    since that's where I completed my residency

8    training; Ohio; and then Pennsylvania.

9        Q.    And when you stopped practicing medicine

10   and treating patients, did you remain licensed?

11   Was there any reason to do that?

12       A.    No, there's no reason to remain licensed.

13   I wasn't going to be caring for patients.

14   Unfortunately, I didn't have a prospect for that

15   in my future.  So there wasn't a real reason to

16   maintain my medical license.

17       Q.    Doctor, let me hand you what we've marked

18   as PLT0500.  Copies to counsel.

19            And would you briefly tell the jury what

20   this is and whether you're one of the authors of

21   this medical journal article?

22       A.    Yes.

23       Q.    The first question is:  Are you an

24   author?

25       A.    Yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 29 of 712 PageID #: 133193
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 29 of 712 PageID #: 62989

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1486

1      Q.    Is it an article that you are familiar

2   with?

3      A.    Yes.

4      Q.    Is it an article that you believe to be

5   authoritative in the field of urogynecology?

6      A.    Yes.

7              MR. SLATER:  Assuming no

8   objection, we'll place this up on the board.

9              MS. JONES:  Your Honor, may we

10  approach?

11             THE COURT:  Uh-huh.

12             (Counsel approached the bench and

13  the following proceedings were held outside the

14  hearing of the jury:)

15             MS. JONES:  Your Honor, I believe

16  this is the same issue that we had last week.  I

17  object to him putting up -- it up on the board.  I

18  think she's entitled to state her opinions but

19  she's not entitled to put up on direct examination

20  a copy of an article, even one that she wrote, and

21  just read from it.

22             MR. BALL:  The rule in Missouri

23  is -- and I'm quoting from a case -- "a learned

24  treatise is inadmissible hearsay during a direct

25  examination."  Simple as that.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 30 of 712 PageID #: 133194
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 30 of 712 PageID #: 62990

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1487

1          They can say they have such and such an

2    opinion and there's literature to support it, and

3    they can talk -- they can say, "Here's" -- they

4    can cite to literature that supports it, but they

5    can't just read hearsay into the record.

6                MR. SLATER:  My understanding,

7    Your Honor, is that the treatise itself does not

8    go into evidence.  We understand that.  However,

9    if the person is talking about something they

10   actually authored and states that they actually

11   wrote it, that that can be evidential because

12   she's the author.

13          And aside from that, even with articles

14   that they didn't author, they're certainly allowed

15   to show the jury portions, testify about portions,

16   so the jury can hear that.

17                MR. BALL:  No.  You cannot --

18                MR. OVERBY:  No.

19                MR. BALL:  Go ahead.

20                MR. OVERBY:  We deal, of course,

21   with medical literature all the time --

22                THE COURT:  I know.

23                MR. OVERBY:  -- so here's the

24   situation:  I think there is an exception if it's

25   one that they've written.  I think they get more

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 31 of 712 PageID #: 133195
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 31 of 712 PageID #: 62991

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1488

1    leeway in discussing something that they've

2    specifically written.

3                    THE COURT:  Yes.

4                    MR. SLATER:  And she's the author

5    of this.

6                    MR. BALL:  That still doesn't --

7                    MR. OVERBY:  Outside of that --

8    and we may cross this, so we might as well address

9    this now.

10                   THE COURT:  Yeah.

11                   MR. OVERBY:  Outside of that, when

12   it comes into other literature, while she could

13   cite to that as being a basis for her opinions,

14   it's still inadmissible, particularly on direct.

15   It's only usable -- used for impeachment.  So she

16   could -- she could say "It's a" -- "There's

17   literature that supports my opinions," she can

18   generally refer to it, but to put it up here --

19                   THE COURT:  Yeah.

20                   MR. OVERBY:  -- it's still

21   inadmissible hearsay.

22                   THE COURT:  Okay.  I'm going to

23   make a ruling on this because we need to move on.

24   I know plaintiff's got a lot to put on and a short

25   time to do it because, like I say, I've talked

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1489

1    since day one that we're going to split the time

2    up with everybody, so I'm going to say it's not

3    going up, but you can sure talk to her about it

4    and she can explain whatever she did as an author

5    in it.

6                    MR. SLATER:  Okay.

7                    MR. BALL:  Thank you.

8                    (The proceedings returned to open

9    court.)

10        **Q.    (By Mr. Slater)  Okay.  Dr. Weber, will**

11   **you tell the jury what this article is, please,**

12   **that you were one of the coauthors of?**

13        A.    Yes.  So this --

14        **Q.    And if you could, you could read the**

15   **title to the jury.**

16        A.    Okay.  So the title is "Anterior

17   Colporrhaphy" -- and that's a medical term for

18   anterior repair, which you'll hear a lot more

19   about -- "A Randomized Trial."

20                Remember we talked about in my training I

21   learned how to do different types of studies, so a

22   randomized trial, just to give you some

23   background, is when women are assigned by chance

24   to one group or the other.  And in this case,

25   actually we had three groups.  And in that way,

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 33 of 712 PageID #: 133197
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 33 of 712 PageID #: 62997

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1490

1    this is the only type of study design that

2    actually allows you to draw a conclusion of cause

3    and effect.  Because in other study designs, like

4    where you're just watching women over time, there

5    are so many factors involved and so many things

6    that are out of your control, that you can't draw

7    that kind of a conclusion of cause and effect

8    like, "This operation was better for these women."

9    You can't do that, except in a randomized trial.

10        Q.   And what was this study?

11        A.   So this was a trial of three different

12   techniques for anterior repair, to see if one of

13   them was better than the other two.

14        Q.   Tell the jury:  What is anterior repair?

15   Obviously it's very relevant here in this case,

16   please.

17        A.   Right.  So that's a surgical procedure

18   that's designed to address anterior vaginal

19   prolapse.

20             And, you know, I told you a little bit

21   about prolapse earlier, so in the -- when the

22   front wall of the vagina is dropping down, that's

23   called the anterior wall.  Then the bladder drops

24   down behind it.  That's called anterior vaginal

25   prolapse.  And that -- the anterior repair is

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 34 of 712 PageID #: 133198
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 34 of 712 PageID #: 62994

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1491

1    designed to address that.

2        **Q.    Is another name for that a cystocele?**

3        A.    Anterior prolapse can be called a

4    cystocele, yes.

5        **Q.    And just to skip ahead, Joan Budke, did**

6    **she have a cystocele?**

7        A.    Yes.

8        **Q.    Okay.**

9        A.    She had a mild cystocele.

10       **Q.    Okay.  And you could continue.  Tell the**

11   **jury, you know, briefly what was the significance**

12   **of this article.**

13       A.    Okay.  So what we learned is that the

14   three techniques that we were studying actually

15   turned out to be pretty similar in terms of how

16   they corrected the anterior prolapse.

17            And the way that we were measuring

18   prolapse outcomes at this time was by measuring

19   the anatomy.  So how much had the front wall of

20   the vagina and the bladder dropped down.

21            At this point, this was -- we started

22   this study in 1996 and it was published in 2001.

23   We didn't have instruments where we could ask

24   women, "How are you doing, how are you feeling, is

25   this -- has this solved your problem."  And I know

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 35 of 712 PageID #: 132199
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 35 of 712 PageID #: 62998

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1492

1    it might seem kind of simple.  You can just ask

2    women -- right? -- and they'll tell you.

3          But in the context of research, it has to

4    be very carefully designed, so that every time a

5    woman is asked this kind of a question, it's asked

6    in the same way, you gather exactly the same

7    information, and that's the only way you can put

8    it all together at the end of the study and come

9    up with your conclusion.

10         So those things weren't available at this

11   point in time.  And we'll talk about how those

12   things were developed later.

13         So the -- the techniques turned about --

14   turned out to be pretty similar.

15   **Q.    In terms of this study, a randomized**

16   **controlled trial of three surgical techniques to**

17   **treat an anterior prolapse, had that ever been**

18   **done before?**

19   A.    No.

20   **Q.    So this was the first time this was ever**

21   **done?**

22   A.    Yes.

23   **Q.    Okay.  What I'd like to do now -- and**

24   **this is a document that's already been utilized.**

25   **It's Exhibit 750.  So counsel will have it, and**

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1493

1    **I'll ask if we can put it up on the board.**

2                    MS. JONES:  Counsel, do you mind?

3    I'm sorry?

4                    MR. SLATER:  Exhibit 750.

5                    MS. JONES:  Have you got a copy

6    that I can see where --

7                    MR. SLATER:  I'm out of copies.

8    The RCT, February 2, 2006.

9                    MS. JONES:  Your Honor, just give

10   me a second.

11                   THE COURT:  Okay.

12                   MS. JONES:  We've got to find

13   this.

14                   THE COURT:  Sure.  We'll give you

15   a minute to find it.

16                   MS. JONES:  I apologize, Your

17   Honor.  He doesn't have a copy for me and I don't

18   have the copies that have been here --

19                   THE COURT:  That's all right.  The

20   documents are by the bale.  I understand that.

21   I've seen the boxes and boxes of them.  In fact,

22   somebody told me that maybe the -- they'd

23   generated over 2 million documents or exhibits out

24   of all these cases from around.  I don't know.  I

25   thought about that and thought well --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 37 of 712 PageID #: 132201
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 37 of 712 PageID #: 62597

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1494

1          MR. SLATER:  It's up to about

2    10 million now.  10 million pages.

3          THE COURT:  Is it?  Okay.  Well,

4    at the time I heard about it, I sat down and just

5    did some country boy math and figured if I just

6    worked 8 hours a day reading it, I could get it

7    all done in 13 1/2 years, but I'm not sure I got

8    that much time left.  Now they're generating it

9    faster than I can think about it, so we'll give

10   her a minute to get it.

11          MS. JONES:  I have a copy, Your

12   Honor.  I'm sorry.

13          THE COURT:  You do?

14       All right.  You may go ahead, Mr. Slater.

15          MR. SLATER:  Thank you, Your

16   Honor.

17     Q.   (By Mr. Slater)  Dr. Weber, is this a

18   document you've seen?

19     A.   Yes.

20     Q.   And it's titled "Notes from a Meeting

21   with Vincent Lucente and Dr. Miles Murphy,

22   Allentown, Pennsylvania, to Discuss Prolift

23   Randomized Control Trial, 2nd of February, 2006,"

24   and what we'll do now is bring us to the third

25   page and then I'll just ask you to tell us what

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 38 of 712 PageID #: 133202
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 38 of 712 PageID #: 62998

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1495

1    **we're seeing here.**

2            MS. JONES:  Objection, Your Honor.

3    May we approach?

4            THE COURT:  Yes.

5            (Counsel approached the bench and

6    the following proceedings were held outside the

7    hearing of the jury:)

8            MS. JONES:  Your Honor, I just

9    want to bring this to Your Honor's attention that

10   we -- one of the aspects of the trial brief that

11   we put in today is that as an expert witness,

12   she's here to talk about opinions and to express

13   opinions; she's not here to talk about company

14   documents and to be a company witness, historian,

15   or to move that forward.

16        So I'm going to object to this discussion

17   as being improper testimony.  At least -- I'm not

18   sure exactly where he's going but she can't just

19   put up documents and talk about them.  This is

20   not -- Your Honor, this is not the appropriate

21   subject of expert testimony.  Certainly it's the

22   same -- the type of thing that the jury can look

23   at the documents and read and draw conclusions

24   from.

25            MR. BALL:  It's a hearsay doc- --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 39 of 712 PageID #: 133203
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 39 of 712 PageID #: 62999

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1496

1   double -- it's multiple levels of hearsay because

2   it's a company document that's hearsay, and then

3   on top of it, it's a recording of them from what

4   various people said at meetings.

5           So it's double hearsay, and under the

6   Missouri rules -- that's why we sent you this

7   thing -- the only types of things that this doctor

8   can rely upon is the doctors that regularly rely

9   upon in the field.  She's a medical doctor.

10  Company documents.  There's no showing that some

11  kind of company document --

12          And so this is what is intended to be

13  done all day today is use Dr. Weber as a

14  mouthpiece for company document after company

15  document after company document.

16                  THE COURT:  No, we're not going to

17  do that.

18                  MR. BALL:  Thank you.

19                  MR. SLATER:  Well, I -- I

20  certainly think she's allowed to tell the Court

21  what documents she's relying on for her opinions,

22  but this one I'm actually relying on because

23  part --

24                  THE COURT:  Here's the whole

25  thing.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 40 of 712 PageID #: 133204
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 40 of 712 PageID #: 63800

In Re Budke Jury Trial Official Transcript Vol VI 1/12/2015

Page 1497

1                    MR. SLATER:  Depends on why I'm

2       using it.

3                    THE COURT:  Okay.  I mean, I'll

4       give you that, but if it's just to criticize what

5       the company did, hey --

6                    MR. SLATER:  It's actually not.

7       It's to pat them on the back for mentioning her as

8       one of the people that they would think would be a

9       good person to consult with them on their

10      randomized control trial on the Prolift.

11                   THE COURT:  I'll let you ask that

12      or talk about it, but we're not going to play this

13      game all afternoon.  Okay.

14                   (The proceedings returned to open

15      court.)

16                   THE COURT:  You may proceed.

17      Q.    (By Mr. Slater)  Pull that out.

18            At the very top --

19            First of all, what -- just so the jury

20      understands, what was the subject matter of this

21      document, considering that we don't have a context

22      for when we read the top part so we'll understand

23      why you're mentioned in this Ethicon document

24      about a Prolift study?

25      A.    Yes.  So Ethicon was considering

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 41 of 712 PageID #: 133205
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 41 of 712 PageID #: 63001

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1498

1   designing and performing a randomized trial.  We

2   talked about that, what that means.  And this

3   meeting was drawn together to get people to talk

4   about it and see what to do.

5       **Q.   And it says at the top that it was**

6   **discussed that they were considering adding some**

7   **people to help structure the RCT, and they mention**

8   **that you would be a better dissenting voice than**

9   **Linda Brubaker.**

10              **What does that mean?**

11              MS. JONES:  Objection, Your Honor.

12              THE COURT:  That's sustained.

13      **Q.   (By Mr. Slater)  Does the document**

14  **suggest that they were thinking that --**

15              MS. JONES:  Objection.

16              THE COURT:  Well, let's see what

17  he -- let him ask his question and then I'll rule

18  on it.

19              MS. JONES:  Okay.

20              THE COURT:  Here's what I don't

21  want to do.  I don't want to get into what she

22  thinks their state of mind was.  If it's something

23  that she can talk about abstractly that's there,

24  fine, but --

25              MR. SLATER:  Well, if Dr. Weber

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 42 of 712 PageID #: 138206
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 42 of 712 PageID #: 63802

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1499

1    knows what it means, she can't tell the jury what

2    it means?

3            I don't think it's interpretation.  It's

4    a straightforward factual statement.

5                 THE COURT:  Ask your question,

6    then.

7                 MR. SLATER:  Thank you.

8    **Q.    (By Mr. Slater)  What does that mean?**

9                 MS. JONES:  Objection, Your Honor.

10               THE COURT:  Overruled for the

11   time.

12               MR. SLATER:  Thank you.

13   A.   So they were looking for additional

14   opinions in the development of this possible

15   trial, and since they knew I had this --

16               MS. JONES:  Your Honor --

17   A.   -- experience --

18               MS. JONES:  -- I'm going to object

19   to this as being nonresponsive.  I think there's a

20   very simple question that refers to exactly what's

21   up there, as opposed to what the entire document

22   refers to.

23               THE COURT:  Can you limit it a

24   little bit to talk about what this is up here?  It

25   mentions her one time right there, and that's --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 43 of 712 PageID #: 133207
Case 2:12-md-02327 Document 1826-6 Filed 05/09/16 Page 43 of 712 PageID #: 63003

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1500

1    we don't need to get into the whole document to

2    figure that out.

3        A.   All right.  They wanted to ask my help in

4    designing this possible trial.

5                MR. SLATER:  Okay.  Take that

6    down.

7                I'm now going to discuss PLT0011.  It's

8    the ACOG bulletin that we've discussed during the

9    trial which was authored by Dr. Weber.

10               THE COURT:  00- --

11               MR. SLATER:  0011, PLT0011.

12               THE COURT:  Okay.  Gotcha.

13       Q.   (By Mr. Slater)  Dr. Weber, are you one

14   of the authors of this document?

15       A.   Yes.

16       Q.   And what is this document?

17       A.   So this is --

18               MR. BALL:  We had this ruling,

19   Your Honor.

20               MS. JONES:  Your Honor, I

21   apologize.  I think that this is the same ruling

22   we just had.

23               MR. SLATER:  Your Honor, she's the

24   author of the document.  The law says --

25               THE COURT:  Yeah, but remember I

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 44 of 712 PageID #: 133208
Case 2:12-md-02327  Document 2782-6  Filed 05/09/16  Page 44 of 712 PageID #: 63004

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1501

1    told you we weren't going to publish those; that

2    you could talk to her about them.  If she -- if

3    she was an author of them, she knows about them.

4    I don't know as it's necessary to go beyond that.

5              MR. SLATER:  It's already been

6    published to the jury.  It's a factual document,

7    Your Honor, that's in evidence.

8              THE COURT:  When was it published

9    to the jury?

10             MR. SLATER:  In the context of the

11   testimony of --

12             THE COURT:  Of a company official?

13             MR. SLATER:  Yeah.

14             THE COURT:  All right.

15             MR. SLATER:  Yeah.

16             THE COURT:  Well, I don't think

17   she needs it if she was an author of it.

18             MR. BALL:  Right.

19             THE COURT:  Go ahead.

20   Q.   (By Mr. Slater)  Okay.  Dr. Weber, we're

21   talking about PLT0011, the ACOG Practice Bulletin

22   Number 79, February 2007.

23        Did you have involvement with this

24   document?

25   A.   Yes.

Case 2:12-md-02327  Document 3756-6  Filed 04/25/17  Page 45 of 712 PageID #: 132209
Case 2:12-md-02327  Document 2182-6  Filed 05/09/16  Page 45 of 712 PageID #: 63005

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1502

1     Q.   And what was your involvement?

2     A.   I was a coauthor.

3     Q.   And what does this document represent?

4  How did you become involved and what was the

5  purpose of it?

6     A.   So this is a practice bulletin that was

7  published by the American College.

8          Remember I mentioned to you a little

9  earlier they publish guidelines to update

10  clinicians as to the best way of helping take care

11  of women, and since I'm an expert in this field of

12  prolapse, they asked me to coauthor this document

13  to give clinicians an update and a summary of the

14  management -- the evaluation and management of

15  women with prolapse.

16     Q.   And who was it specifically within ACOG,

17  the American College of Obstetricians and

18  Gynecologists -- what group or what people within

19  there asked you to become involved?

20     A.   The committee on gynecologic practice.

21     Q.   What is that committee?

22     A.   So that's a committee of about eight

23  people that functions within the American College.

24  One of their purposes is obviously to develop

25  guidelines like this, update previous guidelines,

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 46 of 712 PageID #: 132310
Case 2:12-md-02327  Document 3782-6  Filed 05/09/16  Page 46 of 712 PageID #: 63000

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1503

 1    see if there's a gap that needs to be filled, to

 2    bring that information to clinicians and help them

 3    stay up-to-date.

 4        Q.   And you authored this and then -- and

 5    then after you had authored it, what was the next

 6    step?  Did you submit it to the committee?

 7        A.   Yes.

 8        Q.   And what did they do with this document?

 9        A.   They reviewed it themselves, the

10    committee members, and they also sent it to other

11    experts in the field who were not members of the

12    committee.

13        Q.   And for what purpose?

14        A.   For review.  For critical review.

15        Q.   And at the end of that process, were

16    there meetings to discuss the review and whether

17    this would be published in the ACOG journal?

18        A.   Yes.

19        Q.   And what was the outcome of that?  What

20    was the discussion?

21        A.   The decision was to -- to publish the

22    guidelines as written.

23        Q.   There's a section later on in the

24    journal, in the article, and I just want to get to

25    it and ask you about something.  The jury's heard

Page 1504

1    about it a little bit.  We're going to come back

2    to this later, but just in the context of the

3    publication --

4        A.   Yes.

5        Q.   -- it mentions certain recommendations

6    that you made?

7        A.   Yes.

8        Q.   And one of them was that the procedures

9    should be considered experimental and patients

10   should consent to surgery with that understanding?

11       A.   Yes.  And this is referring specifically

12   to the mesh kits like Prolift.

13       Q.   And was there discussion among the

14   committee before it was published about the use of

15   the word "experimental"?

16       A.   Yes.

17                 MS. JONES:  Objection, Your Honor.

18   Hearsay.

19                 MR. SLATER:  This is factual

20   evidence that Dr. Weber participated in.

21                 THE COURT:  Overruled.

22       A.   One of the reviewers noticed the word

23   "experimental" and brought this to the committee's

24   attention that this might be a matter of

25   concern --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 48 of 712 PageID #: 133212
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 48 of 712 PageID #: 63008

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1505

1                    MS. JONES:  Your Honor, I'm going

2    to object --

3                    MR. SLATER:  This is discussion

4    that Dr. Weber participated in.  I don't

5    understand the objection, Your Honor.

6                    THE COURT:  Well, come up.  Let's

7    talk about it.

8                    (Counsel approached the bench and

9    the following proceedings were held outside the

10   hearing of the jury:)

11                   MR. SLATER:  I'd just like to say

12   for the record, Your Honor, I was concerned this

13   was going to happen, that the only strategy that

14   the defense would have with Dr. Weber is to

15   obstruct her testimony.  I'm -- it's a little bit

16   frustrating because --

17                   THE COURT:  Well, apparently a lot

18   of judges have been frustrated with her testimony.

19                   MR. SLATER:  She's testified in

20   one court, Your Honor, and Judge Higbee -- you can

21   call him -- in New Jersey thought she was an

22   excellent witness or thought she was --

23                   MS. JONES:  Whoa, whoa, whoa.

24                   THE COURT:  Oh, I don't want to

25   get into a --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 49 of 712 PageID #: 132913
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 49 of 712 PageID #: 63009

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1506

```
1              MR. SLATER:  They've said that

2    she's not liked by judges.  She's only testified

3    once in her life, Your Honor.

4              MR. BALL:  Your Honor, here's the

5    other thing --

6              THE COURT:  Whoa, whoa.

7              MR. BALL:  Here's the deal:

8    Hearsay is an out-of-court statement --

9              THE COURT:  Yes, it is.

10             MR. BALL:  -- so just because she

11   was in the conversation doesn't make it an

12   in-court statement.  It is a hearsay, okay?  What

13   somebody else told her years ago is hearsay.

14         And, you know, Mr. Slater's things about

15   trying to frustrate, all we're trying to do is

16   have the rules of evidence followed, okay?  He can

17   put her on and follow the rules of evidence and

18   you won't hear a peep from us, but that's not what

19   he's trying to do.  He's trying to create a lot of

20   improper testimony about company intent,

21   out-of-court statements, and all this.

22             THE COURT:  Well, that's a fact

23   question for the jury to decide.

24             MR. BALL:  Right.

25             THE COURT:  I'm trying to give you
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 50 of 712 PageID #: 138214
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 50 of 712 PageID #: 63810

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1507

1    some latitude.  I don't -- I just don't want

2    everybody up here every minute on every question.

3            So I know what you want to do.  Just take

4    those internal company documents and spend a

5    couple of days on that, but --

6                    MR. SLATER:  I don't want to do

7    that, Judge.  You know --

8                    THE COURT:  Okay.  Well, then give

9    me -- prove it, then.

10                   MR. SLATER:  I haven't done

11   anything to give you that sense at all with her.

12   I haven't even started yet.

13           Their internal company documents are

14   important to her testimony because they're a

15   foundation for a lot of her opinions because

16   they're the facts on which she relies.  Certainly

17   she can tell the jury the basis for her opinions,

18   the facts she's relying on.  I mean, otherwise,

19   what does she do?

20                   MS. JONES:  Your Honor, we're not

21   there yet.  With all due respect, the objection

22   here --

23                   THE COURT:  Yes.

24                   MS. JONES:  -- is that she is --

25   this is simply a hearsay statement and that she

Page 1508

1  was getting ready to testify about what somebody

2  else told her.

3                  THE COURT:  Okay.

4                  MS. JONES:  And that's hearsay.

5                  THE COURT:  Let's just -- let's

6  stay out of hearsay.

7                  MR. SLATER:  I'll ask the question

8  differently and see if she understood --

9                  THE COURT:  Then I'll sustain that

10  objection as it is, okay?

11                 MR. BALL:  You'll what?

12                 THE COURT:  I will sustain your

13  objection.

14                 MR. BALL:  Thank you.

15                 (The proceedings returned to open

16  court.)

17     Q.   (By Mr. Slater)  Dr. Weber, let me ask

18  you a factual question.

19         When this was published, was the

20  committee aware that there would be people or

21  institutions that would be concerned with the use

22  of the word "experimental"?

23     A.   Yes, that had been discussed.

24     Q.   And did they still go ahead and publish

25  it?

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 52 of 712 PageID #: 133216
Case 2:12-md-02327  Document 3782-6  Filed 05/09/16  Page 52 of 712 PageID #: 63812

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1509

 1      A.   Yes.

 2      Q.   We'll come back to that a little bit

 3  later.  I'd like to ask you a couple more

 4  background questions about this, though.

 5           In authoring this and writing this

 6  practice bulletin giving guidelines to

 7  gynecologists around the United States, did you

 8  perform research?  Did you analyze the use of mesh

 9  kits like the Prolift as part of authoring this

10  article?

11      A.   Yes.

12      Q.   And I'm not going to go through them all,

13  but I counted about 82 references to different

14  articles, and you did a thorough literature

15  search?

16      A.   Yes.

17      Q.   Did you also speak with physicians and

18  surgeons on this topic?

19      A.   Yes.

20      Q.   Was this article published before you

21  ever met me?

22      A.   Yes.

23      Q.   Dr. Weber, do you understand that any

24  opinions you offer in this case must be to a

25  reasonable degree of medical certainty?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 53 of 712 PageID #: 138217
Case 2:12-md-02327 Document 2752-6 Filed 09/09/16 Page 53 of 712 PageID #: 68217

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1510

```
 1      A.   Yes.

 2      Q.   Okay.  So any opinions you give, you're

 3  going to give them to a reasonable degree of

 4  medical certainty unless you tell us otherwise?

 5      A.   Yes.

 6      Q.   Thank you.  I'm just going to put this

 7  aside.

 8           When was it that you first began to work

 9  on my behalf and with me as an expert witness with

10  regard to the Prolift and pelvis mesh?

11      A.   In January of 2010.

12      Q.   And during that time, have you billed for

13  your time?

14      A.   Yes.

15      Q.   And do you do that on an hourly basis?

16      A.   Yes.

17      Q.   Okay.  And have you spent a great deal of

18  time?

19      A.   Yes.

20      Q.   And just in this case alone, can you give

21  the jury as close an estimate as you can of

22  roughly the amount of time you've spent and what

23  you've billed, so that we have some idea so that

24  we have that out there in the open so the jury

25  will know what you've done here in this case for
```

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1511

1    the Budke family?

2        A.   Yes.

3             So about 240 hours, which is about

4    $88,000.

5        Q.   And you bill on an hourly basis for that?

6        A.   Yes.

7        Q.   Outside of this, you've done other work

8    and obviously you've billed for that work as well?

9        A.   Yes.

10       Q.   Okay.  And I'll just show you -- I'm not

11   going to bring it all up there, but in the course

12   of your work, does this binder contain some of the

13   reports you've written in this litigation?

14       A.   Yes, it does.

15       Q.   Including the first one, which is over

16   500 pages long?

17       A.   Yes.

18       Q.   Let's put up the first PowerPoint, the

19   materials reviewed.  Let's talk about this case

20   now.

21            And, Doctor, we've put up here a little

22   list.  Can you just tell the jury what's there and

23   what that represents in terms of what you have

24   been reviewing for -- I guess we're now up to five

25   years --

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1512

1      A.    Uh-huh.

2      Q.    -- plus in this case?

3            **Can you give the jury an idea of the**

4      **types of materials you've reviewed as the basis**

5      **for the opinions you're going to give here before**

6      **this jury?**

7      A.    Yes.

8      Q.    **Please do that.**

9      A.    So the medical literature, like we've

10     been talking about, the articles published in the

11     scientific literature.

12           The clinical and the preclinical studies

13     that Ethicon performed, including the underlying

14     data, which means the case report forms where it's

15     actually written in for each patient the data that

16     had been collected and then the studies -- the

17     reports based on those case report forms.

18           The documents internal to Ethicon and

19     Johnson & Johnson.  Hundreds and thousands of

20     pages.

21           Depositions of the Ethicon employees.

22     Dozens and dozens.

23           Depositions of the Ethicon consultants,

24     editors of the New England Journal of Medicine.

25           Product labeling and marketing documents

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1513

1    from Ethicon.

2            The medical records of Mrs. Budke.

3            And then the depositions of Dr. Simpson,

4    all the treating doctors, the experts.

5            The photograph of the explanted mesh.

6        Q.    And that's a general summary of what

7    you've looked at?

8        A.    Yes.

9        Q.    And I would like to ask you one question.

10            The opinions that you're going to offer

11    to this jury, the Ethicon and Johnson & Johnson

12    internal documents from their files, is that of

13    importance to you in being able to give the

14    opinions you're going to give to the jury?

15        A.    Yes.

16        Q.    Why is that?

17        A.    Yes.  So reviewing all of these documents

18    really gave me the back story.

19            I had an opinion.  I had a grave concern

20    about these mesh kits and I expressed that in the

21    medical literature to my colleagues, and that

22    opinion I had held and still hold.

23            What I learned from all of the work I've

24    done in this case is the information that's not

25    readily available to the public.  Not to

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 57 of 742 PageID #: 138221
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 57 of 742 PageID #: 63022

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1514

1    scientists, not even to Ethicon's preceptors who

2    are the teachers who go out in the community and

3    teach other doctors to do things like the Prolift

4    procedure.

5         Ethicon knows things that no one else

6    knows --

7              MS. JONES:  Objection, Your Honor.

8    I believe we're going into --

9              THE COURT:  Well, I'll sustain

10   that.  Goes to state of mind.

11             MR. SLATER:  It's a factual

12   statement of whether the information's available

13   to others, I think, Your Honor.

14             THE COURT:  I sustained that

15   objection.

16             MR. SLATER:  Okay.  Understood.

17   Okay.

18        Q.   (By Mr. Slater)  Suffice to say that

19   those internal documents and the facts there were

20   important to you in forming your opinions?

21        A.   Yes.

22        Q.   Okay.  You've talked a little about

23   prolapse and I'm going to try to move through

24   this.  The jury's seen illustrations of what it

25   looks like.  I'm not going to put those up again.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 58 of 712 PageID #: 133222
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 58 of 712 PageID #: 63028

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1515

1          **What I'm going to ask you is:  Can you**

2     **tell us how researchers and physicians measure**

3     **prolapse?  Because I think that's going to become**

4     **important in some of the questioning today, so**

5     **just tell the jury very simply:  What are the**

6     **measurement techniques for measuring how much --**

7     **for example, let's talk about what Mrs. Budke had,**

8     **a cystocele, how that drops down.**

9          A.    Right.  So there are two systems that are

10     in wide use, and one that's used mainly by

11     clinicians and one that's used mainly by

12     researchers.

13          Now, the one that's used by clinicians is

14     called the Baden-Walker system.  It's sometimes

15     called the Halfway system.  So what that does is

16     describe how much dropping down there is, and

17     since we're talking about a cystocele or the

18     anterior prolapse, you know, I'll just talk about

19     that and that's the only thing that affected

20     Mrs. Budke.

21          So a first degree or a mild cystocele is

22     where the vagina and the bladder drops down and

23     it's still within the vaginal -- within the vagina

24     itself.  It doesn't come down or past the vaginal

25     opening.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 59 of 712 PageID #: 132323
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 59 of 712 PageID #: 63029

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1516

1           And then second degree is when it does

2    come to the vaginal opening.

3           Third degree is when it comes past the

4    vaginal opening and then that becomes a bulge that

5    the woman can feel and sometimes can see.

6           So that's what clinicians use, typically.

7    That's what Dr. Simpson used in her medical

8    records.

9           Then there's a system that's more

10   commonly used by researchers, and this is

11   standardized, has very detailed measurements --

12   nine of them for each time you do the

13   examination -- and that's just so researchers can

14   communicate with each other, they know exactly

15   what everybody means if they say one number, and

16   they can publish their research results and they

17   can be compared across studies because everybody's

18   using the exact same thing.

19       Q.   **What type of prolapse did Mrs. Budke have**

20   **in April of 2008?**

21       A.   So she had an anterior prolapse, or a

22   cystocele, that had been described by Dr. Simpson

23   in the medical records as a first degree, or mild,

24   up until she went into the hospital to have the

25   Prolift procedure, at which time Dr. Simpson wrote

Page 1517

1    that this was a first to a second degree, so

2    somewhere between mild and moderate.

3              So it's something --

4              As I mentioned, mild is where it stays

5    totally within the vagina and typically is not

6    something the woman is aware of.  Most -- or many

7    women walking around who have had babies, vaginal

8    births, have at least some degree of -- of

9    prolapse and that's not something that they're

10   typically aware of.

11             Moderate, where it comes down to the

12   vaginal opening.

13             So Mrs. Budke was somewhere in between

14   there, as Dr. Simpson described in her medical

15   records.

16                  MR. SLATER:  Let's go to the

17   PowerPoint on treatment options, please.

18        **Q.   (By Mr. Slater)  Doctor, we've put up a**

19   **short list here of treatment options, and tell us**

20   **what this represents.**

21        A.   Okay.  So all kinds of different ways to

22   take care of women with prolapse.  And as I

23   mentioned earlier, lots of these ways can even be

24   done in the office and only a relatively small

25   number of women need to have surgery for this kind

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 61 of 712 PageID #: 138225
Case 2:12-md-02327   Document 2182-6   Filed 05/09/16   Page 61 of 712 PageID #: 63021

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1518

1    of a prolapsed condition.

2           So the first option is to do nothing.

3    This is not a dangerous condition.  If the woman

4    has symptoms and she's uncomfortable, then that's

5    the reason to pursue treatment.  If she doesn't

6    have any symptoms, she doesn't have any discomfort

7    or whatever, there's nothing -- there's no need to

8    do anything.  It's not dangerous.  Nothing changes

9    rapidly.

10          In fact, in Mrs. Budke's records, this

11   mild cystocele had been documented over years in

12   the medical record where Mrs. Budke was going in

13   for her yearly checkups, not something that had

14   changed drastically.  So that's a very legitimate

15   option.

16          A pessary, that's a little device.  There

17   are different shapes.  A ring shape that fits

18   inside the vagina like a little -- like a little

19   donut they can slip inside and hold the vagina up,

20   and in that way hold everything up.  That's an

21   option for some women.

22          The suture repair, the colporrhaphy, we

23   talked a little bit about that, so that's where

24   stitches are used to bring together the layers of

25   the vagina to reduce that dropping down, and that

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1519

1   can be done -- it could have been done in

2   Mrs. Budke's case.

3        A graft can be used, in -- sort of in

4   addition to a suture repair, where some biological

5   tissue, a donor tissue or something like that, or

6   a synthetic like a mesh, could be used in addition

7   to that stitching, just to augment that repair and

8   potentially give it a little more support.

9        Or a mesh kit like the Prolift.

10   **Q.   In Mrs. Budke's case, was -- those first**

11   **three options there, were they reasonable and**

12   **appropriate options for her as well?**

13   A.   Yes, definitely.

14   **Q.   Now, what I'd like to do is talk a little**

15   **bit about:  What was the rationale for the**

16   **Prolift?  What was the reason that it was**

17   **developed?  What was the need that it was stated**

18   **to be meeting?**

19   A.   Yes.

20        So it -- we talked about this a little

21   bit before, about when research was done focusing

22   only on the anatomy and whether the prolapse had

23   been put back to where doctors thought it

24   belonged, there was concern that the results were

25   not as good as they could be or perhaps should be.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 63 of 742 PageID #: 133227
Case 2:12-md-02327 Document 3782-6 Filed 05/09/17 Page 63 of 742 PageID #: 138023

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1520

1          So that the idea was to bring something

2    in like mesh, hopefully to add some support --

3    this was a concept transferred from hernia repair,

4    where mesh had become used commonly -- to try to

5    come up with better anatomic results, better --

6    better -- you know, putting the bladder and the

7    vagina back where they belonged.  The anatomy.

8         Q.   Okay.  We're going to talk in more detail

9    about this, but I want to just get your opinion

10   out there first.

11          Do you have an opinion as to whether

12   there was a need for the Prolift system as an

13   alternative to a suture repair?

14        A.   Yes.

15        Q.   And what is that opinion, for the jury?

16        A.   My opinion is that it was unnecessary.

17        Q.   I'm now going to hand you something we've

18   marked as PLT0707 and ask you about a few

19   different parts of it.

20          It's an article.  Do you find this

21   article to be authoritative in the field?

22        A.   Yes.

23        Q.   And what I'd like to do now is just ask

24   you about a few portions.

25          First, tell the jury what the title is

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 64 of 742 PageID #: 133228
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 64 of 742 PageID #: 63024

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1521

1    and when it was published.

2        A.    So the title is "Incidence and Risk

3    Factors for Reoperation of Surgically Treated

4    Pelvic Organ Prolapse," and this was published in

5    2012.

6        Q.    And what I'd like to do is just take you

7    to Page 39.

8              In the interest of time, there's a

9    discussion in this article?

10       A.    Yes.

11                  THE COURT:  What page did you say?

12                  MR. SLATER:  Page 39, Your Honor.

13                  THE COURT:  Okay.  Thank you.

14       Q.    (By Mr. Slater)  And this was a study of

15    women who had had suture repairs?

16       A.    Yes.

17       Q.    And the first part of the discussion

18    states, "Our study" --

19                  MS. JONES:  Objection, Your Honor.

20    Hearsay.

21       Q.    (By Mr. Slater)  Dr. Weber, is this

22    article one of the bases for your opinions in this

23    case and one of the things you're relying on?

24       A.    Yes.

25                  MS. JONES:  May we approach, Your

Page 1522

1    Honor?  Maybe we can clear this up.

2                    THE COURT:  Yes.

3                    (Counsel approached the bench and

4    the following proceedings were held outside the

5    hearing of the jury:)

6                    THE COURT:  You got me lost here

7    now.  What's the deal?

8                    MS. JONES:  Well, Your Honor, I

9    thought the rule was clear that he cannot -- to

10   read from an article -- she's not an author here.

11   To read from an article is hearsay.

12       If there's an issue and it's part of her

13   opinion and she wants to express an opinion with

14   respect to it, or whatever, that's appropriate,

15   but it's not appropriate for her to simply -- or

16   for counsel to simply go through and read the

17   article to her.

18                    MR. SLATER:  Your Honor --

19                    MR. BALL:  Because the article --

20   she is stating an opinion that Prolift was

21   unnecessary.

22                    THE COURT:  Yes.

23                    MR. BALL:  She can say this

24   article supports that opinion --

25                    THE COURT:  All right.

Page 1523

1          MR. BALL:  -- but she can't sit

2    there and read from it.

3          THE COURT:  And read from it and

4    criticize it?

5          MR. BALL:  She can't do that

6    because the author of that article is not here for

7    us to cross-examine about it, so she can't stand

8    up there and read from it.  These are different

9    rules.

10          MR. SLATER:  My understanding is,

11   you sustained the other objection.  I understand

12   the ruling.  So now the ruling is all I can do is

13   identify an article; I can't let the jury know

14   what it says so that the jury will know what it is

15   the expert is relying on?

16          I've never heard of such a thing.

17          I understand your ruling on the other

18   thing, you don't want me to put it on the board --

19          THE COURT:  Right.

20          MR. SLATER:  -- but how do they

21   judge her opinion if they don't know what it says?

22          MR. BERGMANIS:  It's to identify

23   the article and generally discuss it so that she

24   can intelligently tell the jury why she bases her

25   opinion on it.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 67 of 712 PageID #: 133231
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 67 of 712 PageID #: 63027

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1524

 1                    MR. BALL:  That's -- but she can't

 2     -- he was getting ready to sit there and read from

 3     it.

 4                    THE COURT:  Right.  Okay.  All

 5     right.

 6                    MR. BERGMANIS:  He's going to have

 7     her just testify about what it generally says.

 8                    THE COURT:  That didn't sound that

 9     way --

10                    MR. BERGMANIS:  I'm sorry.

11                    MR. BALL:  But, Your Honor --

12                    THE COURT:  -- but maybe that was

13     it.  If he'll do that, I'm going to bark at it.

14     Okay?

15                    MR. BERGMANIS:  Okay.  Thank you.

16                    (The proceedings returned to open

17     court.)

18                    THE COURT:  All right.  Let's go

19     back and try that tune again.

20          **Q.   (By Mr. Slater)  Okay.  Dr. Weber,**

21     **looking at the "Discussion" section, I'm not going**

22     **to read it to you.**

23          A.   Okay.

24          **Q.   Would you explain to the jury what, if**

25     **anything, is of significance?**

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 68 of 712 PageID #: 133232
Case 2:12-md-02327  Document 2182-6  Filed 05/09/16  Page 68 of 712 PageID #: 68028

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1525

1        **Without reading the article, tell the**

2   **jury why this article is significant to you in**

3   **your opinions.**

4        A.    Okay.  So what the authors of this

5   article found is that the need for reoperating on

6   women who had had an operation already for

7   prolapse was actually quite low.

8            And this is in contrast to some

9   literature that has been published in the past

10  which showed high rates for various reasons like

11  lumping together people with prolapse and

12  incontinence and reasons like that.

13           So looking strictly at a population of

14  women with prolapse who had had one operation, the

15  need for another operation if the prolapse came

16  back was actually quite low.

17       Q.   **Does this article provide you information**

18  **that you rely on in offering an opinion as to**

19  **whether or not surgery with sutures, which was the**

20  **alternative that the Prolift was attempting to be**

21  **an alternative to, as to whether that is effective**

22  **to treat prolapse?**

23       A.    Yes.

24       Q.   **And what of importance is there to you**

25  **from this article?**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 69 of 742 PageID #: 132233
Case 2:12-md-02327 Document 2782-6 Filed 03/09/16 Page 69 of 742 PageID #: 63029

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1526

1       A.   Yes.  So the importance is that if women

2   develop recurrent prolapse in the future, only a

3   very small number of them need surgery to take

4   care of it again.

5            And remember we talked about this a

6   little bit before, that just because a woman has

7   prolapse doesn't automatically mean she needs

8   treatment.  She may not have any symptoms.  She

9   doesn't need treatment at all.  And there are

10  various other forms of treatment before surgery.

11           And so the point is that with the

12  reoperation so low, that can be quite reassuring

13  to women that this is not a problem that they're

14  ultimately going to be forced to face.  A small

15  number will, and that's too bad, but it's nowhere

16  near as high as was thought in the past.

17      Q.   Okay.  What I'd like to do now is

18  transition to Exhibit 1593, the professional

19  education deck that we've already utilized during

20  the trial, and we're going to go in here to about

21  the third page, titled "Prolapse Repair,

22  Unacceptable Failure Rates."

23           And Dr. Weber, is this a document you're

24  familiar with?

25      A.   Yes.

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1527

1    **Q.    And can you tell the jury what this page**

2    **of the professional education teaching deck, what**

3    **this is representing, what it means?**

4    A.    So this is the rationale for -- behind

5    Ethicon's development of the Prolift kit, that --

6    their representation that the traditional forms of

7    prolapse repair failed too often and that the

8    Prolift kit was going to make things better for

9    women, and this is one of the articles that I was

10   just referencing.

11          These articles in the past had reported a

12   high rate of reoperation, but there are very --

13   numerous flaws with that research.  One of them,

14   as I mentioned, the fact that women with prolapse

15   and incontinence were lumped together and reported

16   as a need for reoperation, as opposed to

17   separating out, "Okay, women with prolapse, this

18   is what happened to them, women with incontinence,

19   this is what happened to them."

20          So this is not really a number you can

21   rely on.  Even though it says prolapse repair at

22   the top, that's not what these numbers represent.

23   **Q.    The article -- the citations here are to**

24   **three articles and I'm just going to say the names**

25   **of the first authors.  Olson, Marchionni, and**

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1528

```
 1    Clark.

 2              And with regard to those three articles,

 3    is there testimony from Piet Hinoul, the medical

 4    affairs corporate representative, on the subject

 5    you just talked about?

 6        A.   Yes.

 7        Q.   And do you rely on that, in part, for

 8    your opinion?

 9        A.   Yes.

10        Q.   And what is that testimony that you're

11    relying on?

12                  MS. JONES:  Objection, Your Honor.

13                  THE COURT:  Go ahead.

14                  MS. JONES:  I don't believe it's

15    appropriate for Dr. Weber to talk about another

16    witness' testimony.

17                  MR. SLATER:  She's relying on it

18    as an expert witness, Your Honor.  It's the

19    corporate representative who bound the company in

20    his deposition.  It's the testimony of the

21    company.

22                  MR. BALL:  That doesn't give a

23    witness an opportunity -- the right to stand up

24    here and say, "This is what somebody else said,

25    this is what somebody else said."  He can put on
```

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 72 of 712 PageID #: 133236
Case 2:12-md-02327  Document 3782-6  Filed 05/09/16  Page 72 of 712 PageID #: 63032

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1529

```
 1   that testimony when the time comes.

 2                   THE COURT:  Well --

 3                   MR. SLATER:  Should I put it -- I

 4   mean --

 5                   THE COURT:  Well, I'll just let

 6   you ask her if she was critical of it but let's

 7   not go into it and try to think what the other

 8   person was thinking at the time they wrote it.

 9       Q.   (By Mr. Slater)  In the testimony by Piet

10   Hinoul, was he questioned about these articles?

11       A.   Yes.

12       Q.   And these rates of recurrence?

13       A.   Yes.

14       Q.   And did he agree with what you said?

15   That these rates are not actually accurately

16   stated?

17                   MS. JONES:  Objection.  It's

18   inappropriate comment on another person's

19   testimony.

20                   THE COURT:  Well --

21                   MR. SLATER:  It's the basis of her

22   opinions, Your Honor.  I mean, I don't

23   understand -- I don't understand --

24                   MR. BERGMANIS:  It's an admission

25   of the company.  It's his testimony, not his
```

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 73 of 712 PageID #: 133237
Case 2:12-md-02327  Document 2782-6  Filed 05/09/16  Page 73 of 712 PageID #: 63035

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1530

1   opinion.

2              THE COURT:  Is what you're saying

3   now in the article which she read?

4              MR. SLATER:  In his deposition, he

5   agreed with me in the deposition --

6              MS. JONES:  Objection, Your Honor.

7   May we approach?

8              THE COURT:  Yes, let's do.  Come

9   on.

10             (Counsel approached the bench and

11  the following proceedings were held outside the

12  hearing of the jury:)

13             MS. JONES:  Your Honor --

14             MR. SLATER:  Judge, this is --

15             THE COURT:  One at a time, please.

16  Okay.  Go ahead.

17             MS. JONES:  Object to him

18  commenting on another witness' testimony.  That's

19  what he's asking Dr. Weber to do is to relate

20  Dr. Hinoul's testimony.  He can play Dr. Hinoul's

21  testimony --

22          (Court reporter interruption.)

23             THE COURT:  He can't hear.

24             MS. JONES:  I'm sorry.  It's not

25  appropriate for him to ask Dr. Weber to comment on

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 74 of 712 PageID #: 132238
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 74 of 712 PageID #: 68034

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1531

1   another witness' testimony.  He can ask her about

2   her opinions but she can't comment about what

3   somebody else said.

4                  MR. BALL:  He's trying to do his

5   closing argument through this witness.

6            (Court reporter interruption.)

7                  THE COURT:  He can't hear.

8          Where were we?  All right.  I think the

9   last thing you said was that she can state her

10  opinion but she can't go back and say what he

11  said.  Is that basically what you're saying?

12                 MS. JONES:  Your Honor --

13                 THE COURT:  Wait a minute.

14                 MR. SLATER:  Oh, I'm sorry.  I

15  thought I was up.

16                 THE COURT:  Go ahead.

17                 MS. JONES:  I think the objection

18  was she can state her opinion as to what those

19  articles say or don't say but what she can't do is

20  to relate the testimony or comment on the

21  testimony of Piet Hinoul.

22                 MR. SLATER:  She's relying on the

23  testimony of the corporate- -- of the -- that's in

24  the case by the corporate rep.  She's relying on

25  him also saying it's inaccurate.  Why can't she

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 75 of 712 PageID #: 133239
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 75 of 712 PageID #: 63039

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1532

1   rely on it?  That's what experts do.  They rely.

2   I was stopped before and you told me when the

3   expert comes in, she can do this.

4          I've never -- the rules are that an

5   expert can rely -- she tells the basis for her

6   opinion, she tells the jury what she relied on.

7   In this case the witness happens to have said yes,

8   those are misleading numbers, and she should be

9   able to say that and say, you know, "It's not just

10  my -- it's not just my word for it but the

11  corporate representative gave the admission on

12  it."

13              MR. BALL:  He's going the third

14  step.  She can say "my opinion," she can say "in

15  my view Dr. Hinoul's opinion supports that," but

16  she then can't say "and Dr. Hinoul said" blah,

17  blah, blah, blah.

18              THE COURT:  Right.

19              MR. SLATER:  She can't show her

20  knowledge?

21              MR. BERGMANIS:  Corporations only

22  testify through their witnesses, through their

23  corporate reps.  I mean, it's an admission by the

24  corporation.

25              MR. BALL:  Okay.  So it will come

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 76 of 712 PageID #: 133240
Case 2:12-md-02327   Document 2182-6   Filed 05/09/16   Page 76 of 712 PageID #: 68030

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1533

1    in when it comes in.  Doesn't --

2                   MR. SLATER:  What does that mean?

3    I can bring in stuff --

4                   THE COURT:  We'll be here all day.

5    Just ask her what her thoughts of it were, okay?

6                   MR. SLATER:  Well, I've done that

7    already but I'd also like -- they're now going to

8    cross-examine her, and she can't say, "Well, guess

9    what.  Your company agrees with me"?  I mean, this

10   is --

11                  THE COURT:  Go back and ask your

12   question again and we'll be right back up here.

13                  (The proceedings returned to open

14   court.)

15                  THE COURT:  Okay.  Now, in the

16   context of what I've said, let's start back and

17   see where we are.

18   **Q.   (By Mr. Slater)  Okay.  Dr. Weber, I'll**

19   **try one last time, see if I can get my batting**

20   **average up a little bit.**

21   **With regard to what you've just stated,**

22   **that these rates are not accurate with regard to**

23   **prolapse recurrence, do you have an understanding**

24   **as to whether or not Ethicon's corporate**

25   **representative agrees or disagrees with that**

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 77 of 742 PageID #: 138241
Case 2:12-md-02327  Document 2762-6  Filed 03/09/16  Page 77 of 742 PageID #: 63037

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1534

```
 1   position?

 2       A.   Yes.

 3       Q.   And what is that?

 4       A.   He agrees with the position that these

 5   are not accurate.

 6       Q.   Now what I'd like to do is I've handed

 7   you three articles, and we'll put up Exhibit 2656.

 8                 MS. JONES:  I'm sorry.  What --

 9                 MR. SLATER:  P2656.

10                 MS. JONES:  Counsel, could you

11   tell us what you're putting up, please?

12                 MR. SLATER:  You'll see it.  It's

13   your PowerPoint slide from opening statements.

14   It's your PowerPoint from your opening.

15       Q.   (By Mr. Slater)  Dr. Weber, do you have

16   an understanding this is one of the PowerPoint

17   slides used by defense counsel in opening

18   statement?

19       A.   Yes.

20       Q.   And what I'd like to do very briefly is,

21   there are three studies there representing

22   recurrence rates in surgeries without mesh

23   frequently exceed 30%, and I'd just like to

24   quickly go through these articles and focus on the

25   third one most, but I want to just touch on the
```

Case 2:12-md-02327 Document 3756-6 Filed 04/25/17 Page 78 of 712 PageID #: 133242
Case 2:12-md-02327 Document 2152-6 Filed 05/09/16 Page 78 of 712 PageID #: 63838

Page 1535

1    first two.

2          The 1994 study authored by Miyiazki,

3    you've had a chance to look at that study?

4        A.   Yes.

5        Q.   And does that study study women like

6    Mrs. Budke?

7        A.   No.

8        Q.   What's different about it?

9        A.   These women are women with severe

10   cystocele, which is not what Mrs. Budke had.

11       Q.   Let's look at the second study, the

12   Paraiso study.

13          Does that study study something that's

14   similar to Mrs. Budke?

15       A.   No.

16       Q.   And why not?

17       A.   These are women who were undergoing a

18   procedure called a sacrospinous ligament fixation,

19   which is when the top of the vagina drops down.

20          That's not what Mrs. Budke had.  Like we

21   already talked about, she had an anterior

22   prolapse.  She had a cystocele, a mild cystocele.

23   No other parts of -- in the vagina were affected

24   by prolapse.

25       Q.   The third study, "Risk Factors for

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 79 of 712 PageID #: 132243
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 79 of 712 PageID #: 63039

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1536

1    Prolapse Recurrence after Vaginal Repair," are you

2    familiar with that study?

3        A.    Yes.

4        Q.    Why is that?

5        A.    I was a coauthor.

6        Q.    And what does that study stand for, and

7    briefly what's the message from that, as you

8    authored it?

9        A.    Yes.

10            So the message was, again, we're -- we're

11    learning as we're publishing these things.   The

12    anatomic rates appear high, but they don't

13    represent what the woman is feeling, and --

14        Q.    Let me just stop you there.   When you say

15    "anatomic rates," what do you mean by that?

16        A.    Okay.   So that means did the prolapse

17    come back in a way that bothers the woman.   So

18    that looks -- if that were true of 58%, that would

19    look bad.   But that's the anatomic, which means

20    just where the organs are in position.   That

21    doesn't tell you whether the woman is bothered by

22    this or not.

23            And the fact that these articles were

24    being reported like this without the accompanying

25    information "is the woman bothered or not" --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 80 of 712 PageID #: 133244
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 80 of 712 PageID #: 63040

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1537

1    that's really the key question -- led to the

2    development of the kind of questionnaires that we

3    were talking about before that researchers --

4                MS. JONES:  Objection, Your Honor.

5    I believe this is going far beyond the question

6    that was asked here.

7                THE COURT:  Well, okay.  Can

8    you -- rather than having her give a narrative,

9    could you ask some questions?

10               MR. SLATER:  Sure, Judge.

11               THE COURT:  All right.

12       Q.   (By Mr. Slater)  Doctor, I'll take it one

13    step at a time with you.

14            First of all, with regard to Mrs. Budke,

15    relevant to her, what does this article stand for

16    relative to her?

17       A.   Okay.  So relative to Mrs. Budke, she was

18    at a very low risk of recurrence.  In other words,

19    her prolapse coming back in the future.  Because

20    what we found in this study is that younger women

21    and women with more severe prolapse were at higher

22    risk for recurrence.

23            So Mrs. Budke, obviously being on the

24    other end of those two things -- she was on the

25    older end of the scale and she had very mild

**In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015**

Page 1538

1    prolapse -- she was at very low risk of having

2    recurrent prolapse, having it come back and bother

3    her in the future.

4        **Q.    Of the 58% of women that had an anatomic**

5    **recurrence --**

6            **And that would mean Stage 2?**

7        A.    Yes.

8        **Q.    Of those women, what was the severity?**

9    **How was that measured?**

10       A.    So that was measured by the examination

11   that I mentioned previously.  It's called a POP-Q,

12   which is for pelvic organ prolapse quantification,

13   so we say "POP-Q" for short.

14           And that's the system that's used by

15   researchers, like I mentioned before, that can

16   measure points exactly and researchers know what

17   they're talking about when they talk to each other

18   and when they put things in the literature.

19           So we define things by stages, and what

20   you have to remember about stages is that it's

21   somewhat arbitrary.  It's just goes with the

22   territory.  If you're going to make a line

23   somewhere, it has to be somewhat arbitrary.

24           So women in Stage 2, these were women

25   primarily in very early Stage 2, and typically in

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 82 of 742 PageID #: 133246
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 82 of 742 PageID #: 63042

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1539

1    that -- with findings like that, that's not

2    something they would be aware of or bothered by.

3        **Q.    In terms of whether or not the**

4    **recurrences for the women in your study actually**

5    **caused them to actually need another operation,**

6    **what can you tell us about that?**

7        A.    Right.  There were no women in this

8    report that required a new operation -- another

9    operation, excuse me, for prolapse.

10       **Q.    And the last thing, you had talked about**

11   **the difference between anatomic measures and**

12   **functional measures, whether the woman was**

13   **actually being affected in her day-to-day life,**

14   **and did this article have importance with regard**

15   **to that question?**

16       A.    Well, it was important in that we saw

17   that the anatomic results did not correlate well,

18   didn't match up well, with the functional results.

19   So we might measure someone as if they're in

20   Stage -- well, they are in Stage 2 and technically

21   that puts her in the category of failure, but

22   she's fine.  She feels she's fine, she's not

23   having any symptoms.  That's just one of the

24   weaknesses of this type of examination system, the

25   POP-Q, and that's why it's so important when

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 83 of 712 PageID #: 132347
Case 2:12-md-02327 Document 3782-6 Filed 05/09/17 Page 83 of 712 PageID #: 133047

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1540

1    you're looking at the results of studies to say,

2    "Okay.  That's what the anatomy says.  What's the

3    function?  What do the women themselves say about

4    how they're feeling?"

5        Q.   In terms of --

6            That was 2004 it was published.  Here we

7    are about 10, 11 years later.  In terms of the

8    field of urogynecology, has it moved in that

9    direction?  To recognize the importance of what --

10   what you talked about in that article?

11       A.   Yes.  Yes.  In studies that are done

12   currently, the primary outcome is based, at least

13   in part, on how the woman is feeling, and the

14   anatomic is still important but it's not the most

15   important thing and it is not the most important

16   thing to women.

17       Q.   All right.  What I'd like to do now is

18   I'd like to transition into talking a little about

19   the Prolift procedure.  Is that okay?

20       A.   Yes.

21       Q.   And what I'd like to do is ask you:  Did

22   you have the chance, as part of the materials you

23   reviewed, to look at the videos that were used by

24   Ethicon in training physicians on the Prolift

25   anterior procedure?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 84 of 712 PageID #: 133248
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 84 of 712 PageID #: 63044

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1541

1        A.    Yes.

2        Q.    **And was one of those videos an animation**

3   **that would be helpful to you in demonstrating to**

4   **the jury what the Prolift procedure is?**

5        A.    Yes.

6                   MR. SLATER:  And would it be okay,

7   Your Honor -- Dr. Weber has taken a few short

8   excerpts that she'd like to narrate through to

9   explain the procedure, and they're Ethicon's

10  professional education animation video and then a

11  short excerpt from a real one.  They're short and

12  she would like to explain it and they come from

13  the same procedure.

14                  MS. JONES:  May we approach just a

15  second, Your Honor?

16                  THE COURT:  Oh, yeah.

17                  (Counsel approached the bench and

18  the following proceedings were held outside the

19  hearing of the jury:)

20                  MS. JONES:  I don't know exactly

21  what he's going to show.  We haven't been

22  furnished with copies of exactly what he intends

23  to show and whether they've been cut up or not cut

24  up at all, so I don't know, first of all, whether

25  I have any objection to the actual presentation of

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1542

1   it.

2          I do object, however, to Dr. Weber, who

3   has never ever done or observed a Prolift

4   operation, discussing this surgery and how it is

5   done in this case, number one.

6          And number two, I think that it's

7   generally irrelevant and a waste of the time of

8   the jury in the fact that there's no criticism or

9   concern at all in this case about how the surgery

10  was performed.

11                THE COURT:  Was performed?

12                MS. JONES:  No criticism of

13  Dr. Simpson.

14                THE COURT:  Okay.  Can you keep

15  it --

16                MR. SLATER:  It's very brief but

17  there is relevance.  It will be relevant to our

18  design defect claims in showing how the mesh sits

19  and how the arms sit and that they don't sit flat,

20  that they sit roped and cause tension and pressure

21  on the mesh that causes contraction which

22  Dr. Simpson testified led to the erosion into the

23  vagina of Mrs. Budke --

24                THE COURT:  Well --

25                MR. SLATER:  -- so it is directly

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 86 of 712 PageID #: 138250
Case 2:12-md-02327  Document 2782-6  Filed 05/09/16  Page 86 of 712 PageID #: 63046

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1543

1    relevant.

2            They're short clips.  They are relevant.

3    They're from their own professional education.

4    They're from the same procedure.  There's a couple

5    of short ones.  It's not going to take that long.

6    And I -- I would think she could be able to

7    demonstrate it so the jury should understand what

8    the procedure is.

9                    MR. OVERBY:  You know, we're not

10   doing any -- most of this according to how it's

11   supposed to be done.  I've never seen these clips

12   before.  We've got all kinds of things flying up

13   and being published to the jury that aren't in

14   evidence and --

15                   THE COURT:  I know it.

16                   MR. OVERBY:  -- so I don't know

17   what these are.  I mean, given what I --

18                   MR. BALL:  I think we should take

19   a break and look at them because the other

20   thing --

21                   THE COURT:  All right.  I've got

22   other -- I was going to give a break at 11:00.  I

23   just don't want to shift the whole day, but let's

24   do that.  Let's take a break and that will give

25   them 10 minutes --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 87 of 742 PageID #: 132251
Case 2:12-md-02327 Document 2782-6 Filed 05/09/16 Page 87 of 742 PageID #: 68047

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1544

1              MR. BALL:  Yeah.  We should be
2     able to look at them before he puts them up there.
3              THE COURT:  Right.  Yeah.  Let's
4     do that.  I'll give them a break, okay?
5              (The proceedings returned to open
6     court.)
7              THE COURT:  Justice requires that
8     you not make up your mind about the case until all
9     the evidence has been seen and heard.  You must
10    not discuss this case among yourselves or with
11    anyone else or comment on anything you hear or
12    learn in this trial until the case is concluded
13    and you retire to the jury room for your
14    deliberations.
15         Also, you must not remain in the presence
16    of anyone who is discussing the case when the
17    court is not in session.
18         I have about -- I have about 18 minutes
19    till 11:00.  I'll tell you what, if you'll be back
20    here at five till 11:00, that clock and I may have
21    a tick or two difference, but let's take about
22    a -- right at a 15-minute break so you can do
23    whatever, and then we'll try to get back at it.
24              MR. SLATER:  Your Honor, you want
25    to see that now, right?

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 88 of 712 PageID #: 133252
Case 2:12-md-02327   Document 2182-6   Filed 05/09/16   Page 88 of 712 PageID #: 63048

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1545

1                THE COURT:  Yeah, as soon as the

2      jury is out.

3                (The following proceedings were

4      held in the courtroom outside the presence of the

5      jury:)

6                THE BAILIFF:  We're clear, sir.

7                THE COURT:  Okay.  Now --

8                MR. BALL:  The first thing we

9      would say, Your Honor, is that if we're going to

10     do things like showing video clips and showing

11     slides from opening statement stuff, we -- to

12     avoid delays, show us ahead of time.  Just -- you

13     know, he --

14               MR. BERGMANIS:  Why would we ever

15     do that?  In Missouri, I've never done that.

16               MR. BALL:  I'm not saying -- I'm

17     not saying -- last night -- well, on the video

18     clips because there's a motion in limine about it,

19     okay?  And the judge --

20               (Court reporter interruption.)

21               THE COURT:  Okay.  But let's do

22     this:  Let's get ahead of ourselves here for the

23     rest of today and tomorrow.

24               If you're going to keep showing clips --

25     snippets and clips --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 89 of 742 PageID #: 138253
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 89 of 742 PageID #: 63049

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1546

1              MR. SLATER:  This is it, this is

2    it.

3              THE COURT:  All right.  Good deal.

4    Okay.  So y'all look at it and if you got a

5    criticism, let me know.

6              MR. SLATER:  And I'm not going to

7    have Dr. Weber testify.  They can just see the

8    clips, we'll play them.  I'm not going to have her

9    preview her testimony but they can see what they

10   are.

11             THE COURT:  Okay.

12         (Video was started at 10:43 a.m.)

13             VIDEO NARRATOR:  -- repair system

14   procedure --

15             MR. BALL:  Are you going to play

16   the video?

17             MR. SLATER:  Part of it.

18             MR. BALL:  Okay.  I mean, the

19   audio is what I meant to say.

20             MR. SLATER:  Partially with it and

21   partially not.

22         He's going to replay it because he had

23   the volume off.  The parts that we're going to

24   play the volume [sic], he's going to do it just

25   like we --

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 90 of 712 PageID #: 132254
Case 2:12-md-02327   Document 2182-6   Filed 05/09/16   Page 90 of 712 PageID #: 63050

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1547

1          VIDEO NARRATOR:  During the

2    anterior placement of the Gynecare Gynemesh PS in

3    the Gynecare Prolift pelvic floor repair system

4    procedure, there are two implant straps of mesh

5    that pass through the obturator foramen on each

6    side.  One superficial end, one deep.

7          In its lateral-to-medial passage, the

8    cannula-equipped guide passes through the skin,

9    subcutaneous tissue, fascia lata, gracilis muscle,

10   adductor brevis muscle, adductor magnus muscle,

11   obturator externus muscle, by the edge of the

12   inferior pubic ramus, obturator membrane,

13   obturator internus muscle, and against the finger

14   in the paravaginal space.

15          When the anterior cannulas and retrieval

16   devices are in place bilaterally, the distal end

17   of each implant strap is captured in the

18   corresponding loop of the retrieval device.  The

19   loop is then pulled through the cannula to exit

20   the groin.

21          (Video was stopped at 10:47 a.m.)

22              MR. SLATER:  That's it, Your

23   Honor.

24              MR. BALL:  So our objection, first

25   of all, would be that it's inappropriate for

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1548

1    Dr. Weber to be testifying about this because

2    she's never done a Prolift procedure ever.  She's

3    never personally been there when one was done.

4           So she is -- it's inappropriate and

5    irrelevant, and she's without sufficient

6    qualifications for her to be narrating this.

7    That's number one.

8           Now --

9                  MR. SLATER:  Should I answer that

10   one first or --

11                 MR. BALL:  Well, let me get the

12   other one out there and then you can go ahead.

13                 MR. SLATER:  I'll never remember

14   the first one.

15                 MR. BALL:  Okay.  And then the

16   other is, Your Honor, that the -- with respect to

17   the non-animation part, the real-life part, that

18   that would be, first of all, duplicative and

19   cumulative.  They've already shown -- they're

20   already showing the animation.

21          And number two, that the -- the

22   prejudicial impact, unfair prejudice of showing an

23   actual surgical procedure outweighs any probative

24   value in a situation like here, where there is no

25   dispute about the manner in which the surgery was

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 92 of 742 PageID #: 133256
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 92 of 742 PageID #: 68052

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1549

1    done or that there was any problem with the

2    implantation of the mesh.

3          Anything else?

4                    THE COURT:  All right.  Here's --

5                    MR. BALL:  Anything else?

6                    THE COURT:  Here's my thoughts on

7    it.

8          I'll grant number two.  I think the

9    animation will work fine.  I don't think you need

10   to go --

11                   MR. SLATER:  Well --

12                   THE COURT:  I know you don't like

13   it, but --

14                   MR. SLATER:  No, but I didn't get

15   a chance to argue, Your Honor.  I'm not --

16                   THE COURT:  Okay.  Go ahead.

17   Argue, but --

18          Start from the beginning and go to the

19   end and I'll keep my mouth shut.  Go ahead.

20                   MR. SLATER:  I appreciate it.  I

21   just -- I have a lot of responsibility to the

22   Budke family.

23                   THE COURT:  I know you do.

24                   MR. SLATER:  I don't want to tick

25   you off.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 93 of 742 PageID #: 133257
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 93 of 742 PageID #: 63053

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1550

1                    THE COURT:  And they have a lot of

2      responsibility to their clients.

3                    MR. SLATER:  I'm not trying to do

4      that, Your Honor.

5                    THE COURT:  Go ahead, go ahead, go

6      ahead.

7                    MR. SLATER:  Number one, with

8      regard to qualifications, obviously they can

9      cross-examine her but she's well-qualified.  She's

10     studied it.  She's an author of articles on this

11     subject.  She authored an article for a national

12     organization about these kits.  So the idea that

13     she's not qualified, I think that we can dispense

14     with that based on the standards in Missouri.

15                   Number two, with regard to their concern

16     about the procedure, I don't -- I don't want to

17     give all the testimony to them, but it's directly

18     relevant to our design defect claims because it's

19     going to show, for example, the roping of those

20     arms -- you see how they came out like ropes?

21     That's not what was supposed to happen.  That was

22     never studied or tested.  And when that happens,

23     it turns into fibrotic bridging, it turns into

24     contraction and tightness.

25                   The mesh that was removed had fibrotic

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 94 of 742 PageID #: 133258
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 94 of 742 PageID #: 63054

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1551

1    bridging.  That's a defect.

2            Number two, when you see where the mesh

3    goes, which it never was placed there for any

4    anterior colporrhaphy procedures ever done, now

5    they're putting meshes in un-impacted parts of the

6    musculature, in the obturator section of the body,

7    where people don't operate and where the women had

8    nothing wrong with them and they implant mesh, and

9    then when they got to get it out, they do all

10   sorts of damages and Mrs. Budke suffered that

11   damage and she had her body torn up and the

12   doctors had to go in and try to remove that mesh.

13           One of the major defects is the

14   difficulty in removing it.

15           That video shows the roping in real life.

16   It's a quick short clip of a few seconds.  We

17   are -- we would be very severely prejudiced and be

18   having -- not be able to put our case on.

19           This is -- this is -- this is part of our

20   case and it is specific proof of what happened to

21   this woman, and we should have the right to put

22   this evidence in front of the jury, Your Honor.

23           There's nothing prejudicial about it.

24   It's a prolapse surgery case.  How can they say

25   it's prejudicial to show the jury the procedure

Page 1552

1    that they sold?  They don't want the jury to see

2    what the procedure looks like and it's only a few

3    seconds.

4              MR. BERGMANIS:  And what happens

5    in real life is different than what happens in the

6    animation.  That's part of the point.  That's what

7    the jury has to see.

8         Just because they have an

9    in-house-produced animation doesn't mean that's

10   what really happens.

11             MR. BALL:  Your Honor, our

12   position is still the same.  Your job is to weigh

13   the probative value --

14             THE COURT:  Absolutely.

15             MR. BALL:  -- and the --

16        This case is about infection, and there

17   is no evidence --

18             MR. SLATER:  It's about

19   contraction and erosion.

20             MR. BALL:  There is no evidence in

21   this case that Mrs. Budke was influenced at all by

22   this that they claim that they want to show from

23   the real -- from the real surgery.  There's --

24             THE COURT:  Well, when we get to

25   that and that's asked, then I'll rule on that.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 96 of 712 PageID #: 133260
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 96 of 712 PageID #: 63050

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1553

1          Here's what I'm going to do on this:  If

2     we don't -- and, heavens, we're never going to get

3     anywhere.  I'm going to -- I'm going to let you

4     show your whole animation, the whole shooting

5     match.

6                    MR. SLATER:  Thank you, Your

7     Honor.

8                    THE COURT:  I'm going to give them

9     an opportunity to voir dire her before you start

10    on this as to whether she's ever done one, been

11    present when one was done, or if she's just basing

12    this on her academic knowledge of what she

13    believes.  Okay?

14                   MR. SLATER:  She's qualified with

15    the academic knowledge, I would assume, so --

16                   THE COURT:  Well, I assume she is,

17    but I don't know what she'd know --

18                   MR. SLATER:  So they're going to

19    cross her in the middle of the direct?  Okay.

20                   THE COURT:  Well, it's kind of

21    like, you know --

22                   MR. SLATER:  I mean, I think it

23    will be duplicative --

24                   THE COURT:  -- I write a manual on

25    how to fly a C-47.

Page 1554

1                 MR. BERGMANIS:  He gets to play

2    the whole thing but they get to cross her on

3    whether she's never done one.

4                 THE COURT:  Yeah.  Well, first

5    they're going to get to voir dire her if she's

6    ever done one.  So --

7                 MR. SLATER:  I'll stipulate she

8    never did a Prolift procedure.

9                 THE COURT:  Well, just ask her

10   that.  You can do it.

11                MR. SLATER:  I'll stipulate to it.

12                MR. BALL:  She's not even --

13          Well, it would be more than that.  She's

14   never done a Prolift procedure.  She's never been

15   there when one was done.  She's never done it on a

16   cadaver or real person.

17                MR. SLATER:  Terrific.

18                MR. BALL:  She's never done any

19   kind of mesh vaginal surgery.

20                MR. SLATER:  Terrific.

21                THE COURT:  All right.  Here's

22   what we do, then:  I'll call the jury back in --

23                MR. BALL:  We don't want him

24   asking our questions.

25                MS. JONES:  I'll ask it.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 98 of 742 PageID #: 138262
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 98 of 742 PageID #: 68088

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1555

1          THE COURT:  All right.  All right.

2    If you'd say -- if one of y'all will say "We have

3    stipulated to the following," okay?

4               MR. BALL:  No.  She's going to --

5               MR. SLATER:  And just to say, Your

6    Honor, that's why I put in the RCT document

7    before.  She's so unqualified that their company

8    was talking about using her to help them structure

9    the most high-level study of the Prolift that can

10   be done.  She's so unqualified, she wrote the

11   practice bulletin for ACOG.

12          I mean, they could cross her in due

13   course, but all they're doing is obstructing and

14   dragging my case out.

15               THE COURT:  Well, I'm trying to

16   get around that if I can, so I thought if we

17   could, you know, stipulate, then they wouldn't be

18   objecting to every bit of that.

19               MR. SLATER:  I'll stipulate she

20   never did it, she never saw it during her

21   practice.

22          She stopped practicing before it came on

23   the market, Your Honor.

24               THE COURT:  All right.  One of

25   y'all who is more familiar with this will say "We

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 99 of 712 PageID #: 132263
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 99 of 712 PageID #: 63059

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1556

1    have stipulated to the following," and since

2    you're on the other side, can you do that?

3                MS. JONES:  I will stipulate to

4    the following --

5                THE COURT:  All right.  Just for

6    the record and then -- go ahead.

7                MS. JONES:  Dr. Weber has never

8    seen a Prolift surgery --

9                MR. SLATER:  Well, she's seen it

10   on video.  That's not a true statement.

11               MS. JONES:  -- observed a

12   Prolift --

13               MR. SLATER:  She's watched every

14   Pro- -- it's just not true.  She's watched every

15   video you guys published.

16               THE COURT:  All right.  Then just

17   give me something and I'll do the stipulation.

18               MR. SLATER:  Just tell it like it

19   is.

20               MR. BALL:  She's never seen it in

21   person, she's never been present in person on a --

22               MR. SLATER:  Yep.

23               MR. BALL:  -- real person, she's

24   never --

25               THE COURT:  Just a minute.  Never

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 100 of 742 PageID #: 132264
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 100 of 742 PageID #: 63080

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1    seen one in person.

2                  MS. JONES:  Never done one.

3                  THE COURT:  On a real person.

4                  MS. JONES:  Never observed one.

5                  MR. SLATER:  In person.

6          She watched all your videos.

7                  THE COURT:  Okay.  Never seen one

8    in person on a --

9                  MR. BALL:  Never done one.

10                 THE COURT:  Never seen one in

11   person on a real person -- on a real patient.

12   I'll use that to distinguish person from who's

13   laying there.

14                 MR. BALL:  Yeah.  Never has --

15   never has been present when one was done on a

16   cadaver.

17                 THE COURT:  Okay.

18                 MR. BALL:  Never has done --

19                 MS. JONES:  Never performed one.

20                 MR. BALL:  Yeah.  Never performed

21   a Prolift surgery.

22                 MR. SLATER:  I mean, does that

23   cover it or --

24                 MR. BALL:  No.  One more.  At

25   least one more.

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1558

1              THE COURT:  All right.  Just a

2    minute.  "Performed a Prolift surgery."

3              MR. BALL:  Never done any kind of

4    surgery involving mesh for prolapse.

5              MR. SLATER:  What was the

6    question?  What was the last one?

7              MR. BALL:  Never done any kind of

8    surgery with mesh for prolapse.

9              MR. SLATER:  Not true.

10             MS. JONES:  Transvaginal.

11             MR. BALL:  Trans -- never done any

12   kind --

13             MR. SLATER:  Not true.  Now

14   they're going to split hairs?  I mean now they're

15   going to -- I mean, that's just not a true

16   statement.

17             THE COURT:  All right.

18             MR. SLATER:  She's used mesh for

19   prolapse surgery through the abdomen.

20             MR. BALL:  Never done a

21   transvaginal --

22             THE COURT:  Okay.

23             MR. SLATER:  Your Honor, she's

24   actually placed mesh through the vagina, so that's

25   not a true statement either.  The 2001 RCT --

Page 1559

 1             (Court reporter interruption.)

 2                    THE COURT:  Wait a minute.

 3   Please.

 4                    MR. SLATER:  It's not a true

 5   statement.  She has placed mesh through the

 6   vagina.

 7                    MR. BALL:  Okay.  But let me --

 8   let me -- I think I can state it more simply.

 9          She's never done the type of surgery that

10   was done on Mrs. Budke.

11                    MR. SLATER:  That's too broad and

12   it's -- she has done that type of surgery.  She

13   hasn't done a Prolift.

14                    THE COURT:  I'll just let y'all

15   fight that out with her on it.

16                    MR. BERGMANIS:  On cross?

17                    THE COURT:  I'm going to stipulate

18   on these other ones --

19                    MR. BALL:  Okay.

20                    THE COURT:  -- and then I'll give

21   you a really wide -- give you all a really wide

22   latitude to cross-examine her on what she doesn't

23   know about them.  Okay?

24                    MS. JONES:  Thank you.

25                    MR. BALL:  And then one other

Page 1560

1    thing, Your Honor.

2                    THE COURT:  All right.

3                    MR. BALL:  When you were saying

4    they can show the animation, does that mean both

5    the animation and the real-life surgery or just

6    the animation part?

7                    THE COURT:  How do you -- well --

8                    MR. SLATER:  It's a very

9    significant piece of proof.

10                    THE COURT:  You need both of them?

11                    MR. SLATER:  Absolutely.

12   Absolutely.

13                    THE COURT:  All right.  You got

14   it.

15                    MR. SLATER:  Thank you, Your

16   Honor.

17                    MS. JONES:  Counsel, could you get

18   your tech folks to send a copy of that to your

19   tech folks so we'll know exactly what you're

20   playing?

21                    MR. SLATER:  Yeah.  Sure.  I mean,

22   I don't know that they can do it right now.  I'd

23   really like to -- I just showed it to you.

24                    MR. BERGMANIS:  Send it to you

25   later?

Page 1561

1          MR. SLATER:  Yeah, we'll --

2          MS. JONES:  Well, I've been asking

3    for exhibits for a while, so if I can get it --

4          MR. BERGMANIS:  But you don't get

5    them in Missouri.

6          MS. JONES:  -- before the end of

7    the day, that would be fine.

8          THE COURT:  Okay.  Is that fair?

9       Okay.  I'm going to bring the jury in.

10         MR. SLATER:  Thank you, John.

11         THE COURT:  Go get my smoker and

12   all my other people.

13         MR. SLATER:  Your Honor, do you

14   want Dr. Weber to go back to the stand before the

15   jury comes or after?  I just --

16         THE COURT:  She can wait until

17   after, if she wants to.  It will give her a little

18   extra time there before --

19         MR. SLATER:  Okay.  That's fine.

20         THE COURT:  -- when the saints

21   come marching in.

22           (The following proceedings were

23   held in the courtroom in the presence of the

24   jury:)

25         THE BAILIFF:  Found them all, Your

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 105 of 742 PageID #: 132269
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 105 of 742 PageID #: 63069

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1562

1   Honor.

2              THE COURT:  Got them all.

3         Be seated.  The jury is in.

4         Before we pick up on this again with

5   Mr. Slater, you are going to be watching a -- some

6   material that will be shown on the video screen

7   here.

8         Part of it is an animation that somebody

9   drew up of what went on, and a secondary one is a

10  real surgery on a female.

11        Now, if it -- you know, if it bothers any

12  of you, let me know, or just close your eyes, turn

13  your head down.  I can't keep you from doing that.

14  But that's what they want to show and I'm going to

15  let them do it.

16        However, we have a stipulation as to the

17  doctor, who may take --

18        Where did she go?

19             THE WITNESS:  I'm right here.

20             THE COURT:  There she is.  If

21  you'd come on over and I'll remind you you're

22  still under oath.

23             THE WITNESS:  Yes.

24             THE COURT:  We're going to

25  stipulate that -- that Dr. Anne Weber, who is on

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 106 of 712 PageID #: 133270
Case 2:12-md-02327 Document 2192-6 Filed 05/09/16 Page 106 of 712 PageID #: 63060

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1563

1   the stand now and has been testifying pretty much

2   all morning, has never seen what you're -- what

3   you're going to see, she has never seen one in

4   person.  She's never been in the operating one --

5   room when one was done on a real patient.  She was

6   never present to see one done on a cadaver.  And

7   that she has never performed a Prolift surgery.

8   Okay?  All right.

9                 MR. SLATER:  Thank you.  And

10  proceed, Your Honor?

11                THE COURT:  Yeah.

12       Q.   (By Mr. Slater)  Dr. Weber, before we

13  show this, do you feel comfortable as to whether

14  or not you understand the Prolift procedure well

15  enough to narrate what you're going to explain to

16  the jury here?

17       A.   Yes.

18       Q.   Was there anything about this procedure

19  that was so complicated that you couldn't

20  understand it?

21       A.   No.  I'm an experienced gynecologic

22  surgeon.

23       Q.   Okay.  You can stand where you think you

24  need to, point, and we'll take you through now

25  these short clips.  Please do that.

Page 1564

1    A.   Okay.  I'd like to step forward.

2              THE COURT:  All right.  That's

3    fine.

4              THE WITNESS:  Thank you.

5              THE COURT:  Yeah.

6         (The witness left the stand.)

7    A.   Okay.  Shall I explain what the

8    next step --

9    **Q.   (By Mr. Slater)  Would you -- well, I'll**

10   **ask -- I'm sorry.**

11             MS. JONES:  I'm sorry.  Just the

12   way Dr. Weber is facing, I can't hear Dr. Weber.

13        I apologize, Doctor, but if you could

14   either back up or we can get a --

15             THE COURT:  Oh, I see.  She

16   doesn't have -- she's not wired for sound.

17             MR. SLATER:  I'm afraid to turn

18   one of those on, after the last --

19             THE COURT:  Yeah.  Well, that's

20   why I like witnesses over there (indicating), but

21   I don't -- I never tell you you can't have them,

22   but sometimes we get catastrophes in doing that.

23             MR. SLATER:  I'm still shaking

24   from the last time.

25             THE WITNESS:  Okay.  Great.  Thank

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 108 of 712 PageID #: 132872
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 108 of 712 PageID #: 63068

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1565

1    you.

2                MR. BALL:  There's a screen right

3    there.  I don't know what we're doing here.

4                THE COURT:  I don't either, but --

5                MR. SLATER:  Well, she's going to

6    point to things and narrate it, and this is how

7    Dr. Weber feels comfortable.  I appreciate

8    Mr. Ball's concern for our presentation, but I'm

9    sure his experts will be walking around too.

10               THE COURT:  Yeah.  Whatever.

11   Probably so.  I don't know.  Or standing on their

12   heads or whatever.  But I just want to get it

13   where she can see it and I'd like to get on with

14   it.  Okay?

15               MR. SLATER:  Great.  Yeah.  We

16   would like to too.

17       Q.   (By Mr. Slater)  Dr. Weber, will you tell

18   the jury what they're about to see, please.

19       A.   Okay.  Now I have to remember to lower my

20   voice so I don't blast out your ears.

21               What we're going to be looking at is an

22   animation and then a very short couple of surgical

23   clips of the anterior Prolift procedure, which is

24   what Mrs. Budke had performed.

25               All of this material is part of Ethicon's

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 109 of 742 PageID #: 132373
Case 2:12-md-02327 Document 3158-6 Filed 05/09/16 Page 109 of 742 PageID #: 63069

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1566

1   professional education, so this is what they

2   produced in-house to use with doctors in training

3   them to perform the Prolift procedure.  Okay?

4         So we've already talked about the

5   anterior vaginal prolapse or the cystocele.

6   That's what the anterior Prolift procedure was

7   designed to address.

8         The first thing we're going to see is an

9   image, and I just want to orient you to things so

10  it won't -- this will be clear to you as we go

11  through.

12        (Video was started at 11:02 a.m.)

13        (Video was stopped at 11:02 a.m.)

14   A.   Okay.  So this is a depiction of a woman

15  as if she's in the operating room.  She's lying on

16  her back.  Her legs would be in stirrups like a

17  pelvic exam in the office.  And I just want to

18  orient you to some of the anatomy here.

19        So you can see here in the middle, this

20  (indicating) is the vaginal opening, and then

21  above that the urethra, which is the little tube

22  that drains the urine from the body.

23        Below that is the anus.

24        And this depiction also shows some of the

25  bony landmarks because that's important in

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 110 of 712 PageID #: 133274
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 110 of 712 PageID #: 636070

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1567

1   performing the anterior Prolift procedure, so I

2   just want to draw your attention to a couple of

3   those.

4          Here in the front (indicating), the pubic

5   symphysis, that's the bone that's at the very

6   bottom of the abdomen.

7          And then these bones coming down here

8   (indicating) as if they're part of a triangle,

9   those are the ischiopubic rami.  So "ischio" just

10  means this end of the bone (indicating), "pubic"

11  means this end of the bone (indicating), and

12  "rami" is just the medical term for the bone

13  connecting those two spots.  Okay?

14         So now we're going to show just the

15  beginning part of the animation and then I want to

16  show the Prolift mesh implant when that comes up.

17         (Video was started at 11:03 a.m.)

18            VIDEO NARRATOR:  During the

19  anterior placement of the Gynecare Gynemesh PS in

20  the Gynecare Prolift pelvic floor repair system

21  procedure --

22         (Video was stopped at 11:03 a.m.)

23    A.   Okay.  So this (indicating) is the

24  anterior Prolift mesh implant.  It has this large

25  central body of mesh, and then these long mesh

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 111 of 712 PageID #: 132275
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 111 of 712 PageID #: 638075

Page 1568

1    arms, four mesh arms, that are the arms that come

2    out to the groin.

3            And we'll see -- in a little bit the

4    animation is going to tell us all the layers of

5    tissue that those mesh arms go through as part of

6    the procedure in the permanent mesh implantation.

7    Okay.

8            (Video was started at 11:04 a.m.)

9                 VIDEO NARRATOR:  There are two

10   implant straps of mesh that pass through the

11   obturator foramen on each side.  One superficial

12   end, one deep.

13           After the anterior vaginal dissection has

14   been performed in the true vesicovaginal space --

15           (Video was stopped at 11:04 a.m.)

16   A.    Okay.  Now I want to orient you again,

17   just to make sure this is all clear.

18           So obviously the pelvis has just been

19   rotated, so now this is as if the woman is

20   standing up.  Okay?

21           You've got the pubic bone in front, the

22   tailbone back here (indicating), and then the

23   rectum leading to the anal sphincter and the anus.

24   The bladder in the front and the urethra.  And

25   then the vagina in the middle.

1          And what the narrator was just describing

2    is this incision that's made in the front wall of

3    the vagina and then the dissection that goes out

4    to each side.  And "dissection" is a surgical term

5    that means basically creating a space where a

6    space didn't exist before the surgery.

7          And in that space between the rectum --

8    I'm -- forgive me, the bladder and the vagina is

9    where the Prolift mesh is going to be implanted.

10   Okay?

11          (Video was started at 11:05 a.m.)

12              VIDEO NARRATOR:  In its

13   lateral-to-medial passage, the cannula-equipped

14   guide passes through the skin, subcutaneous

15   tissue, fascia lata, gracilis muscle, adductor

16   brevis muscle, adductor magnus muscle, obturator

17   externus muscle, by the edge of the inferior pubic

18   ramus, obturator membrane, obturator internus

19   muscle, and against the finger in the paravaginal

20   space.

21          (Video was stopped at 11:06 a.m.)

22     A.   Okay.  So the important part here is that

23   this is -- this is two of the mesh arms, one on

24   each side.  The one that goes deeper travels

25   through all the same things except for one muscle

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 113 of 742 PageID #: 132077
Case 2:12-md-02327  Document 3756-6  Filed 05/09/17  Page 113 of 742 PageID #: 130073

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1570

 1   that just isn't in that position.

 2           But what I want to draw your attention to

 3   the fact is, a couple of things.

 4           One, the involvement of the hip and the

 5   groin would never come up in a traditional suture

 6   repair where only the prolapse is addressed.

 7           In the development of the Prolift

 8   procedure, a whole new category of complications

 9   has been added of areas of the body that were

10   never involved in the prolapse in the first place

11   and now have permanent mesh implantation --

12                   MS. JONES:  Your Honor, I'm sorry.

13   I'm sorry to interrupt --

14                   THE COURT:  Okay.

15                   MS. JONES:  -- but if we're not

16   just going to discuss the procedure, then I'm

17   going to ask that we proceed in a

18   question-and-answer form rather than a narrative

19   form.

20                   THE COURT:  Okay.

21                   MS. JONES:  I think that --

22       Q.   (By Mr. Slater)  Dr. Weber, why is that

23   significant that the mesh is being placed through

24   that portion of the pelvis where the obturator and

25   the other muscles are located?

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 114 of 742 PageID #: 132278
Case 2:12-md-02327  Document 3156-6  Filed 05/09/16  Page 114 of 742 PageID #: 130278

Page 1571

1          Why is that significant to you in forming

2     your opinions?

3          A.   So the importance is that these are areas

4     of the body that have nothing to do with the

5     prolapse, yet with the Prolift procedure and the

6     permanent Prolift mesh implantation, these areas

7     are now involved and any complication related to

8     the mesh that occurs is going to extend into those

9     previously healthy areas.

10         Q.   Okay.  Are we ready to proceed with the

11    next piece?

12         A.   Yes.

13              (Video was started at 11:07 a.m.)

14              VIDEO NARRATOR:  When the anterior

15    cannulas and retrieval devices are in place

16    bilaterally, the distal end of each implant strap

17    is captured in the corresponding loop of the

18    retrieval device.  The loop is then pulled through

19    the cannula to exit the groin.

20              (Video was stopped at 11:08 a.m.)

21         A.   Okay.  So I want to draw your attention

22    to a couple of things before we get to the very

23    end of this video.

24         Q.   (By Mr. Slater)  And I'll ask you a

25    question.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 115 of 742 PageID #: 132279
Case 2:12-md-02327 Document 3758-6 Filed 05/09/16 Page 115 of 742 PageID #: 130079

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1572

1      A.    Oh, excuse me.

2      **Q.    What is the significance about this stage**

3   **of the procedure and that image there?  What is**

4   **that telling us that's significant to you?**

5      A.    Okay.  So this is when all four cannulas

6   have been put in place, and those are the tubes

7   through which the mesh arms are going to be pulled

8   in order to get the Prolift mesh implant in the

9   space between the vagina and the bladder.

10          I want to draw your attention to a couple

11   of things.

12          One, you'll notice in the animation how

13   the body of the Prolift mesh, that -- that large

14   central portion, goes into the vagina very

15   smoothly like it's just gliding in.  And we'll see

16   that's different in the real surgical video in

17   just a few minutes.

18          The other thing that I want to draw your

19   attention to is the mesh arms, and as they're

20   pulled through the cannula, they're going to

21   appear as if they retain their shape and are still

22   2 centimeters wide and flat.  And again, as we're

23   going to see in the surgical video, that's not how

24   it turns out either.

25          (Video was started at 11:09 a.m.)

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 116 of 742 PageID #: 132280
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 116 of 742 PageID #: 63070

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1573

1          (Video was stopped at 11:10 a.m.)

2     **Q.   (By Mr. Slater)  And what is there of**

3  **significance in what we've just viewed, Dr. Weber?**

4     A.   So this is as if the procedure has been

5  completed, and I just want to draw your attention

6  to this very large mesh burden that stretches all

7  across the pelvis.

8     **Q.   Why is that significant, a large mesh**

9  **burden?**

10    A.   So this is completely different than what

11 would -- a woman would experience if she had had

12 an anterior repair, which is done with absorbable

13 sutures so there's nothing permanently left in

14 place, and really by the time you put the stitches

15 in place and tie the knots, she'd probably have

16 maybe this much (indicating) suture material

17 absorbable that will go away in a few months.

18          And instead, with the Prolift procedure,

19 she has this very large mesh burden taking up the

20 entire front part of her pelvis.

21    **Q.   And while we have it on the screen, you**

22 **talked about the mesh burden.  Do you have an**

23 **opinion as to whether or not that is a safe or an**

24 **unsafe thing to put into a woman's body in that**

25 **form?**

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 117 of 742 PageID #: 132281
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 117 of 742 PageID #: 63081

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1574

```
 1      A.   It's un- --

 2               MS. JONES:  Objection, Your Honor.

 3  Lack of appropriate foundation.

 4               THE COURT:  Well, can you put some

 5  foundation to it?

 6      Q.   (By Mr. Slater)  Dr. Weber, with regard

 7  to the amount of mesh placed in that portion of

 8  the woman's pelvis, have you reviewed scientific

 9  literature with regard to that subject?

10      A.   Yes.

11      Q.   Have you reviewed internal Ethicon

12  documents with regard to what their medical

13  affairs and scientist employees thought about

14  that?

15      A.   Yes.

16      Q.   Have you studied the literature and those

17  documents in order to form opinions as to whether

18  or not, to a reasonable degree of medical

19  certainty, that is a safe or unsafe thing to do in

20  a woman's body?

21      A.   Yes.

22               MS. JONES:  Objection.

23               THE COURT:  Go ahead.

24      Q.   (By Mr. Slater)  Please offer that

25  opinion.
```

1    A.   My opinion is that this amount of mesh

2    left permanently implanted in a woman and at risk

3    for complications for the rest of her life is

4    unsafe.

5        **Q.   Why?**

6        A.   It's unsafe because it stimulates a

7    chronic foreign body reaction, inflammation that's

8    ongoing and that never settles down and goes away

9    completely, that leads to other consequences or is

10   related to where the mesh contracts and bunches up

11   on itself, where it erodes through the vaginal

12   wall.  These are things that happened to

13   Mrs. Budke.  Where surgery is needed, an infection

14   occurs, the mesh is infected, it has to be removed

15   because the infection can't be cleared when

16   there's a foreign body in place, typically.  The

17   mesh has to be removed.

18        She went through operations to try to

19   remove mesh.  The mesh -- all the mesh was never

20   removed.  She suffered morbidity, not just from

21   the mesh itself but from the attempts to treat the

22   mesh complications.

23       **Q.   And specifically, what happened to her**

24   **that's relevant to your opinion as to the --**

25   **whether or not this is safe or unsafe?  What**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 119 of 712 PageID #: 133283
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 119 of 712 PageID #: 63079

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1576

1    **happened to Mrs. Budke to illustrate that opinion?**

2       A.   Mrs. Budke experienced mesh contraction,

3    which is where the mesh bunches up on itself; mesh

4    erosion, where it wears through the vaginal wall;

5    infection, where the bacteria in the vagina got

6    onto the mesh and formed this very large pelvic

7    abscess that made her critically ill.

8            This mass was so large it blocked off her

9    ureters, which are the tubes that lead from the

10   kidneys to the bladder.  And they were blocked off

11   because they come into the bladder right next to

12   the vagina, and because of where the Prolift mesh

13   is placed, like I told you, right between the

14   vagina and the bladder, that's right where the

15   ureters come in, so a problem in that space is

16   going to affect the ureters.

17           She had acute kidney failure.  Her

18   kidneys shut down because the ureters were blocked

19   because of this abscess.

20      **Q.   And with regard to the -- the ability or**

21   **inability to remove this mesh that's in this**

22   **location in this amount, is there something about**

23   **Mrs. Budke's situation that's also illustrative of**

24   **your opinion?**

25      A.   Yes.  It's -- it's difficult, if not

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 120 of 712 PageID #: 132394
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 120 of 712 PageID #: 63088

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1577

1    impossible, to remove all the mesh, and as I just

2    mentioned, the mesh was never -- all the mesh was

3    never removed from Mrs. Budke.

4           And you saw all the layers of the muscles

5    and the -- and the connective tissue and

6    everything that the mesh has to go through, and

7    remember the design intent was for the mesh to

8    become incorporated into the tissue so it's bound

9    up in the tissue.  That's what was intended.

10   Which makes it difficult, if not impossible, to

11   remove.  That's a design defect.  That's unsafe

12   from the get-go.

13              MS. JONES:  Objection, Your Honor.

14   It --

15              THE COURT:  Sustained.

16              MR. SLATER:  Your Honor, it's her

17   opinion as the expert.

18      Q.   (By Mr. Slater)  Do you have an opinion,

19   to a reasonable degree of medical certainty, as to

20   those -- as to whether those aspects of the

21   Prolift system are a safe or an unsafe design?

22      A.   Yes, I have an opinion.

23      Q.   And what is that opinion?

24      A.   My opinion --

25              MS. JONES:  Objection, Your Honor.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 121 of 712 PageID #: 132295
Case 2:12-md-02327  Document 3150-6  Filed 09/09/16  Page 121 of 712 PageID #: 63085

Page 1578

1  Lack of qualifications and foundation.

2            THE COURT:  What she bases it on

3  and the like, can you give it a little bit more

4  and then --

5       Q.   (By Mr. Slater)  Dr. Weber, you said

6  you've read dozens of depositions of Ethicon

7  witnesses?

8       A.   Yes.

9       Q.   You've read hundreds of thousands of

10 pages of internal Ethicon documents?

11      A.   Yes.

12      Q.   You've read all of the medical literature

13 with regard to the Prolift and similar systems?

14      A.   Yes.

15      Q.   Based on all of that information and your

16 knowledge --

17          Let me ask you this:  Have you reviewed

18 the medical records of many women --

19            MS. JONES:  Objection, Your Honor.

20            THE COURT:  Sustained.  You can

21 ask about her.  About the -- your client.

22      Q.   (By Mr. Slater)  You've reviewed

23 Mrs. Budke's records?  Her medical records?

24      A.   Yes, I have.

25      Q.   And taking that all together and

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 122 of 742 PageID #: 132286
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 122 of 742 PageID #: 63082

Page 1579

1    understanding what goes on with this device, do

2    you have an opinion that you can hold to a

3    reasonable degree of medical certainty as to

4    whether or not this is a defectively designed

5    medical device system?

6        A.   Yes, I do.

7                MS. JONES:  Objection, Your Honor.

8    Lack of qualification.

9                THE COURT:  Overruled.

10       Go ahead and ask.

11       Q.   (By Mr. Slater)  What is your opinion?

12       A.   My opinion is that the Prolift was so

13   defectively designed and so unsafe, it never

14   should have been on the market.

15       Q.   Okay.  Now, there's more here to show,

16   right?

17       A.   Yes.  What I --

18       Q.   Please continue.

19       A.   What I'd like to do is show you the

20   difference between the animation and the real

21   world.

22            And the two things that we talked about

23   I'd like to -- you to focus your attention on is

24   the placement of the Prolift mesh, where we saw in

25   the animation it's gliding in smoothly.  The

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1580

1    intent is to lay flat.  If it doesn't lay flat,

2    it's not safe.

3          And the mesh arms, they're supposed to

4    come out the cannulas flat, because --

5                MS. JONES:  Your Honor --

6       A.   -- if they don't stay flat, it's unsafe.

7                MS. JONES:  I'm sorry, Your

8    Honor --

9                THE COURT:  Yeah.  That's all

10   right.

11               MS. JONES:  -- but I -- we've just

12   got a talk going on up here, and I would much

13   rather --

14               THE COURT:  I agree.  I mean,

15   we're not having a medical school lecture.  She's

16   an expert witness.  You ask her questions, she'll

17   give you responses.

18               MR. SLATER:  I'll do so, Your

19   Honor.

20               THE COURT:  All right.  Because

21   we're not trying to teach a class on this.  We're

22   just trying to inform the jury about what she

23   thinks happened.  Okay.

24               MR. SLATER:  Understood.

25       Q.   **(By Mr. Slater)  Dr. Weber, with regard**

Page 1581

1    to what you're now going to show with regard to

2    the mesh arms, is this of significance to you in

3    forming your opinions in this case?

4        A.   Yes.

5        Q.   And what is of significance specifically

6    about what we're going to see that is significant

7    to you in your opinions about whether or not this

8    is a defectively designed medical device system?

9        A.   What's significant to me is that in the

10   design of the Prolift procedure, built in,

11   unavoidable, is the issue of mesh roping when the

12   cannulas are removed.  And we're going to see

13   that.  They don't stay flat and wide.

14       Q.   And why does that matter?

15       A.   That matters because when they're roped,

16   that leads to an increased inflammatory reaction,

17   fibrotic bridging where the scar tissue joins up

18   with itself and makes a hard, rock hard, scar

19   tissue layer, which is unsafe, and again makes it

20   extremely difficult, if not impossible, to remove.

21       Q.   Would it be helpful to now show these

22   videos?

23       A.   Yes.

24       Q.   Okay.  Let's go ahead.

25            (Video was started at 11:18 a.m.)

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1582

1      A.    Okay.  So what I'd like to do is just

2  orient you here again so we all know what we're

3  looking at.

4           Similar to some of the pictures we saw in

5  the animation -- okay? -- the woman is lying on

6  her back.  She's in the operating room.  Her legs

7  are in the stirrups.  All this blue clothing,

8  cloth (indicating) around her, are the surgical

9  drapes.  Okay?

10          Here in the center (indicating) is the

11  vaginal opening.  That's where the surgeons are

12  working.

13          Here, this yellow tube (indicating) is a

14  Foley catheter, so that's placed in the bladder to

15  drain the bladder during surgery so it stays

16  empty.

17          And then the cannulas, the four cannulas

18  that we saw -- okay? -- have already been placed,

19  and then these purple strings, this is the

20  retrieval device, which is what loops around the

21  end of the mesh arm and then gets brought through

22  the cannulas that drags the Prolift mesh into

23  place.  Okay?

24          So what I'd like to make your -- call

25  your attention to is the contrast between this and

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 126 of 712 PageID #: 133290
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 126 of 712 PageID #: 133290

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1583

1    what we saw in the animation as if it went in so

2    smoothly.

3             (Video was stopped at 11:19 a.m.)

4         Q.   (By Mr. Slater)  Why does that matter to

5    you in forming your opinions?

6         A.   The importance is, the intent was for the

7    mesh to lay flat.  If it doesn't lay flat, it's

8    unsafe because it goes through all those things we

9    just talked about with the mesh roping:  the

10   increased inflammatory reaction, the fibrotic

11   bridging, the scar tissue that binds up with the

12   mesh and becomes impossible -- difficult, if not

13   impossible, to remove.

14        Q.   And in giving this testimony about what

15   happens with the mesh, are you relying on actual

16   documents from inside Ethicon where they document

17   what you've just told the jury?

18        A.   Absolutely.

19        Q.   So they knew this?

20        A.   They knew this.

21        Q.   Let's proceed.

22             (Video was started at 11:20 a.m.)

23        A.   So right now the surgeons are just tying

24   some stitches to the mesh implant itself.

25             (Video was stopped at 11:20 a.m.)

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 127 of 712 PageID #: 132291
Case 2:12-md-02327 Document 3152-5 Filed 05/09/16 Page 127 of 712 PageID #: 63089

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1584

1     A.   That's how the Prolift mesh implant gets

2   into the vagina.

3     Q.   **(By Mr. Slater)  And why is --**

4     A.   It's not --

5     Q.   **-- that significant?**

6     A.   It's not lying flat.

7     Q.   **Sorry.  Why is that significant that it's**

8   **put in in that bunched way?  What does -- what**

9   **impact does that have on the mesh?**

10    A.   Because it's bunched.

11         The next thing the surgeon is going to do

12   is close the vaginal incision.  The mesh is no

13   longer visible to him or her.  He can't tell --

14   she -- he or she can't tell whether the mesh is

15   bunched.  It's underneath the vaginal skin.  So

16   what goes in bunched stays in bunched.

17    Q.   **Let's continue.**

18         **(Video was started at 11:21 a.m.)**

19         **(Video was stopped at 11:21 a.m.)**

20    A.   So this is the end of the operation where

21   he's pulling the cannulas off the mesh arms.

22    Q.   **(By Mr. Slater)  And what is significant**

23   **to you there that's on that image with those arms?**

24    A.   Those arms aren't flat.

25    Q.   **And why does that matter?**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 128 of 742 PageID #: 132292
Case 2:12-md-02327 Document 3150-6 Filed 05/09/16 Page 128 of 742 PageID #: 63088

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1585

1      A.   That matters because this --

2                 MS. JONES:  Objection, Your Honor.

3                 THE COURT:  Just a minute.  Go

4      ahead.  What?

5                 MS. JONES:  We've been through

6      this three or four times now, Your Honor.

7      **Q.   (By Mr. Slater)  Let me ask a specific**

8      **question.**

9           **What impact does the roping of the mesh**

10     **have on the pores and the pore sizes?**

11     A.   Right.  The roping means that the pores

12     have collapsed, right?

13          If you take any kind of a net and you

14     pull on it -- right? -- the pores collapse.  The

15     openings in the net go away.

16          And that's exactly what happens when

17     these mesh arms are dragged through the cannulas

18     and they have this roped -- rope appearance.  You

19     can't say it any other way.  They're not flat.

20     They're roped.  That means that the -- the pores

21     inside that mesh arm have all collapsed.  They've

22     all been dragged flat by coming through the

23     cannula in a space that's not big enough where the

24     mesh arm can't actually lay flat.

25          And so between the pore collapse, the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 129 of 712 PageID #: 133293
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 129 of 712 PageID #: 63089

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1586

1   roping, the inflammation, the foreign body

2   reaction, the mesh contraction, the mesh erosion,

3   infection, all these things happened to

4   Mrs. Budke.

5        **Q.   Why does the roping and the concentration**

6   **of the mesh, as you said, increase the**

7   **inflammatory reaction?**

8        A.   Right.

9             So it's just more concentrated.  In a

10   small space, the mesh is more concentrated.  It's

11   rolled up on itself.

12             In addition to the pore collapse that we

13   were just talking about, it's just the body trying

14   to fight off this foreign material, creating this

15   inflammatory reaction.  The cells produce things

16   that damage other cells.  That's what they do when

17   they're trying to fight something off.  So you

18   have this cascade of cell damage and cell death,

19   tissue damage --

20                  MS. JONES:  Objection, Your Honor.

21                  MR. BALL:  May we approach the

22   bench, Your Honor?

23                  THE COURT:  Sure.

24                  (Counsel approached the bench and

25   the following proceedings were held outside the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 130 of 742 PageID #: 63294
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 130 of 742 PageID #: 63090

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1587

1    hearing of the jury:)

2              MR. BALL:  I've got a few things

3    here.

4         First of all, he asked her a simple

5    question --

6              THE COURT:  Yes.

7              MR. BALL:  -- and then she goes on

8    for three or four minutes.

9              THE COURT:  Yes.

10             MR. BALL:  She should be

11   instructed to keep her answers to the question and

12   brief.  That's number one.

13        Number two, that he -- she has now

14   repeated things like five times.  She's given an

15   opinion about what she finds defective, and why,

16   and she's repeating everything five times.

17        The third thing is that he violated a

18   motion in limine by injecting the issue of other

19   claims in this case when he asked her if she had

20   seen records of other people and -- well, I don't

21   want to say it --

22             THE COURT:  What, now?

23             MR. SLATER:  I'm just having

24   trouble hearing.

25             THE COURT:  All right.

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1588

```
 1              MR. SLATER:  I'll try to lean in

 2    more.

 3              THE COURT:  All right.  Now number

 4    one, I want to keep it this way.  You ask her a

 5    question, I want her to answer that and not range

 6    out onto everything else.  Okay?

 7              MR. SLATER:  Yeah.  I will -- I

 8    will today, Your Honor, and I'm very conscious of

 9    that, but some of these questions involve multiple

10    parts to the answer.  I mean, she's --

11              THE COURT:  Well, like I say, I

12    want the jury -- I want the jury to get the whole

13    bale, but you're not teaching a group of residents

14    on what we're doing here, so --

15              MR. BALL:  We -- we ask that the

16    witness be instructed to keep the answers short

17    and to the point, and we ask the lawyer and the

18    witness not to repeat things over and over, and we

19    ask that there be no more references that in any

20    way refer to the possibility of other lawsuits

21    which --

22              THE COURT:  Yeah.  Now, that --

23    that --

24              MR. BALL:  -- Mr. Slater did.

25         And then I'd also ask that the -- he also
```

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 132 of 712 PageID #: 133296
Case 2:12-md-02327   Document 3756-6   Filed 05/09/16   Page 132 of 712 PageID #: 63092

Page 1589

1   said "and they knew it."  That is a state of mind.

2   That's another violation --

3                    MR. SLATER:  Your Honor, it's

4   not --

5                    MR. BALL:  -- of a motion.  That's

6   a motion in limine violation.

7                    MR. SLATER:  That, I'll address.

8          It's not a state of mind in terms of

9   intent.  It's a state of fact that they had that

10  information, and it's documented in the records,

11  and that goes to our failure to warn claim, our

12  negligence claim, and our defect claim, that they

13  had --

14         If they didn't have this information and

15  they learned it later, they'd be telling the jury

16  "We didn't know that.  We couldn't have known

17  that."

18         That's a big part of this case to be

19  able --

20                   THE COURT:  Well, I've given you

21  pretty good latitude on that --

22                   MR. SLATER:  I appreciate that.  I

23  was just responding to --

24                   THE COURT:  -- but I'm just saying

25  we don't need to reiterate and reiterate and

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 133 of 712 PageID #: 132997
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 133 of 712 PageID #: 63093

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1   reiterate that and she does not need to go on and

2   on and on.

3        If you ask her a specific question, tell

4   her to give you the answer to that, okay?

5              MR. SLATER:  I'll try to do it.

6              THE COURT:  All right.  Try.

7              MS. JONES:  And, Your Honor, I

8   think if Dr. Weber is finished with going through

9   the video, I'd ask that she retake the stand,

10  because --

11             THE COURT:  Yeah.

12             MR. SLATER:  I think there's one

13  more --

14             THE COURT:  Well, let's do it and

15  then get it off of there.

16             (The proceedings returned to open

17  court.)

18             MR. SLATER:  Actually, you know

19  what?  We're fine.  We can skip the last one.  You

20  can go back up here, Dr. Weber.

21             THE WITNESS:  All right.

22          (The witness resumed the stand.)

23             MR. SLATER:  Proceed, Your Honor?

24             THE COURT:  You may.

25             MR. SLATER:  Thank you.  Turn that

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 134 of 712 PageID #: 132298
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 134 of 712 PageID #: 63092

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1591

1  thing off.

2      Q.   (By Mr. Slater)  Dr. Weber, you just

3  explained what you explained to us with the arms

4  and the cannulas and I'm not going to ask you to

5  go through that again.

6      A.   All right.

7      Q.   My question is this:  Did Ethicon ever

8  study whether there was a safety risk with regard

9  to the mesh being pulled through the cannulas as

10  you described it?

11          Simple yes-or-no question.

12      A.   No.

13      Q.   Okay.  Do you have an opinion as to

14  whether or not it was appropriate or inappropriate

15  for Ethicon to sell this device for surgeons to

16  use it without studying that specific issue?

17              MS. JONES:  Objection, Your Honor.

18              THE COURT:  Sustained.

19              MR. SLATER:  I'm not sure --

20              THE COURT:  Well, she's already

21  told what she thinks about it.

22              MR. SLATER:  I'm just talking

23  about failure to -- not studying the issue.  It

24  was a different question, I thought.  I think it's

25  part of our case.

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1592

```
 1                    THE COURT:  Well, I don't know

 2   whether they studied it or not.  You know, I don't

 3   know what they thought or said, and that's asking

 4   her to --

 5                    MR. SLATER:  I'll rely on

 6   Mr. Ciarrocca's testimony where he said they

 7   didn't --

 8                    THE COURT:  Fine.  All right.

 9                    MR. SLATER:  -- but I just wanted

10   to ask her an expert opinion on that if I could.

11   I thought I was supposed to do that.

12                    MR. BALL:  She's not been

13   identified on the standard of care of a company

14   and she's not qualified to talk about the standard

15   of care of a company.

16                    MR. SLATER:  Huh?

17                    THE COURT:  I don't know.  I don't

18   know what you're -- I'm going to let you ask the

19   one question and let's go on.  Okay?

20                    MR. SLATER:  Yeah.  That's fine.

21                    THE COURT:  All right.

22        Q.   (By Mr. Slater)  Do you have an opinion

23   as to whether or not it was appropriate or

24   inappropriate for Ethicon to sell the device

25   without studying what you just described with the
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 136 of 742 PageID #: 133800
Case 2:12-md-02327 Document 3762-6 Filed 05/09/17 Page 136 of 742 PageID #: 135090

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1593

1    **arms and the cannulas?**

2               MS. JONES:  Objection, Your Honor.

3    Form and foundation.

4               MR. BALL:  And relevancy.

5               MS. JONES:  And relevance.

6               MR. SLATER:  And relevancy?  We

7    have a negligence claim.

8               THE COURT:  I'll let her answer

9    one time.  That's it.

10              MR. SLATER:  All right.  Thank

11   you, Your Honor.  I wasn't sure.

12       **Q.   (By Mr. Slater)  Okay.  You can answer.**

13       A.   Okay.  It was inappropriate for Ethicon

14   to put this product and procedure on the market

15   without ever studying how this cannula system

16   would affect the mesh placement and incur safety

17   risks to women.

18       **Q.   Okay.  I'm now going to hand you a**

19   **document, Dr. Weber, marked as P1660.  I'm going**

20   **to give copies to counsel.**

21          **And Dr. Weber, let me first, as a**

22   **foundation, ask you:  Do you know what this**

23   **document is?  Have you reviewed this?**

24       A.   Yes.

25       **Q.   And what --**

Page 1594

1           It's dated what date?

2     A.   It is dated September 6th, 2006.

3     Q.   And it says "Peter Meier" on the front.

4  Do you know who Peter Meier is?

5     A.   Yes.

6     Q.   Who is Peter Meier?

7     A.   Peter Meier was a senior research

8  engineer at Ethicon.

9     Q.   And is this document of significance to

10  you in supporting your opinions?

11     A.   Yes.

12     Q.   Okay.  What I'd like to ask you to do --

13  and I'd like to put up Page 14.

14           Page 14 is up on the screen.  Can you

15  tell the jury:  Is that of significance to you in

16  supporting your opinions?

17     A.   Yes.

18     Q.   Why is that?

19           What is being shown, please?

20     A.   So what is being shown is the Prolift

21  mesh implant, and this is something that was used

22  in a cadaver lab.

23     Q.   Keep your voice up or get closer to the

24  mic, please.

25     A.   I'm sorry.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 138 of 712 PageID #: 123302
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 138 of 712 PageID #: 63098

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1595

1          So this was used in a cadaver lab, where

2    Ethicon was looking for the opinion of surgeons,

3    and in particular, in comparison between two

4    different types of meshes.  One you can see

5    identified here as UltraPro, "UP," and the other

6    one which is the Gynemesh PS mesh which is the one

7    that's in the Prolift procedure.

8          Q.   And what was shown by this cadaver lab?

9    What was learned?  What information is there?

10         A.   So they experienced that the UltraPro

11   handled better with the Prolift instruments.  They

12   thought it might be too weak because the arms were

13   torn, but it felt very soft in place in comparison

14   to the Gynemesh PS in the Prolift procedure.  No

15   crumpling of the arms.

16         Q.   What does that mean?

17         A.   So that means, like we saw in the video,

18   when the arms are pulled through the cannula,

19   they're crunched and roped and crumpled, and it

20   was this surgeon's experience that that was less

21   of an issue with UltraPro but worse of an issue

22   with the Gynemesh PS which is in the Prolift.

23         Q.   And now what I'd like to do is turn to

24   Page 22, and just very quickly, what is this page

25   telling us?  Is this significant to you?

Page 1596

1     A.   Yes.

2     Q.   And what is it telling us, real quick?

3     A.   So this is a comparison in vitro, now --

4  so that means in the lab, not a cadaver kind of

5  testing -- of a comparison, again, between the

6  UltraPro mesh and the Gynemesh PS mesh that was in

7  the Prolift.

8     Q.   And what information is there of

9  significance to you?

10    A.   So on all of these characteristics that

11  they were studying, Gynemesh PS mesh turned out

12  worse than the UltraPro.

13    Q.   Now, with regard to Ethicon's knowledge

14  of the UltraPro, as we've seen here, I want to ask

15  you --

16         We've seen a bunch of documents during

17  trial -- you're aware of that? -- with regard to

18  this subject?

19    A.   Yes.

20    Q.   We're not going to go through those

21  documents again because we know we've seen them,

22  but you've read all those documents and relied on

23  them?

24    A.   Yes, I have.

25    Q.   And with regard to the -- the story of

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 140 of 712 PageID #: 133304
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 140 of 712 PageID #: 133304

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1597

1  **UltraPro, do you have an opinion as to what**

2  **Ethicon should have done based on its knowledge of**

3  **its scientists with regard to the properties that**

4  **they believed UltraPro had, compared to the**

5  **Gynemesh?**

6                      MS. JONES:  Objection, Your Honor.

7  One, no foundation.

8                      THE COURT:  I'll sustain it

9  without some foundation for it.

10                     MR. BALL:  Your Honor, if I could

11  expand on that just a little bit.

12                     THE COURT:  All right.

13                     MR. BALL:  He is asking her to say

14  what a company should have done.  She is a former

15  medical doctor and she's not had -- does not have

16  expertise or qualifications to talk about what a

17  company should have done.

18                     MR. SLATER:  I'll rephrase the

19  question, Your Honor.

20                     THE COURT:  If you would.

21  **Q.   (By Mr. Slater)  The people who made the**

22  **decisions as to whether or not the Prolift would**

23  **go on the market with Gynemesh, were they**

24  **gynecologists?**

25  A.   Yes.

Page 1598

1      Q.   In fact, the doctor who was in charge of

2  the decision-making at the time the Prolift went

3  on the market was -- is Dr. Owens, a gynecologist?

4      A.   Yes.

5      Q.   She had four years of experience outside

6  of her residency at that time?

7      A.   Yes.

8      Q.   As you compare Dr. Owens, four years out

9  of her medical residency, compared to you, would

10 it be fair to say you have a little bit more

11 experience and knowledge in the field than a

12 fourth year doctor would have?

13     A.   Yes.

14     Q.   And that was the person who made the

15 decision to keep it on the market and put it on

16 the market?

17              MS. JONES:  Objection, Your Honor.

18              THE COURT:  Well, only if she

19 knows that's who did it.

20     Q.   (By Mr. Slater)  It was -- who -- was it

21 Dr. Owens who signed off to allow this to be sold?

22              MS. JONES:  Objection, Your Honor.

23 Misrepresents the evidence.

24              MR. BALL:  And no foundation.

25              MS. JONES:  No foundation.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 142 of 742 PageID #: 133306
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 142 of 742 PageID #: 133302

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1599

1        Q.    (By Mr. Slater)  Was it the job of the

2    medical affairs director to sign various documents

3    attesting that the risks were outweighed by the

4    benefits and it could be sold?

5        A.    Yes.

6        Q.    And have you learned that from reading

7    the depositions, for example, of Charlotte Owens?

8        A.    Yes.

9        Q.    And she testified to that?

10             MS. JONES:  Objection, Your Honor.

11   That -- she cannot comment on the testimony of

12   another witness.  Objection.

13             THE COURT:  I'll let it go to that

14   extent, but we won't go into anything else that

15   she said or thought.

16       Q.    (By Mr. Slater)  Let me ask it this way:

17   Have all of the witnesses in the case expressed

18   whether or not medical affairs directors have to

19   sign off before a product like the Prolift can be

20   marketed?

21             MS. JONES:  Objection, Your Honor.

22             THE COURT:  Sustained.  I don't

23   know how they do that internally and that kind of

24   thing.

25       Q.    (By Mr. Slater)  Did you learn from the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 143 of 712 PageID #: 133307
Case 2:12-md-02327 Document 3158-6 Filed 05/09/16 Page 143 of 712 PageID #: 63107

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1600

1    depositions how it works internally at Ethicon?

2                    MS. JONES:  Objection, Your Honor.

3                    THE COURT:  That's right back to

4    the same thing.  Sustained.

5        Q.   (By Mr. Slater)  Do you have an opinion

6    as to whether or not Ethicon should have been

7    selling Gynemesh when they had this knowledge

8    about UltraPro --

9                    THE COURT:  I think that's been

10   asked, hasn't it?

11       Q.   (By Mr. Slater)  -- as a medical affairs

12   director?

13                   THE COURT:  Except for that last

14   two words, I think that's been asked and answered.

15                   MR. SLATER:  That's all I'm

16   asking.

17                   MS. JONES:  And I object, Your

18   Honor, to Dr. Weber offering this opinion --

19                   THE COURT:  Well, I think it's

20   been asked and answered --

21                   MS. JONES:  -- without

22   qualification and foundation.

23                   THE COURT:  -- and so I'm going to

24   say, folks, I think that you heard that once --

25   everybody is nodding yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 144 of 712 PageID #: 133308
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 144 of 712 PageID #: 133308

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1601

1          Okay.  Go on.  Let's move to something

2     else.

3      **Q.   (By Mr. Slater)  I'm going to go into**

4     **some areas talking about risks and complications.**

5     **I want to ask you a foundational question.**

6          **In forming your opinions, are you relying**

7     **on testimony which would establish whether or not**

8     **Ethicon knew the risks and complications of the**

9     **Prolift when they launched it?**

10     A.    Yes.

11     **Q.    And what is that?**

12     A.    That is that they knew the risks --

13               MS. JONES:  Objection, Your Honor.

14     I --

15               MR. BALL:  That's the state of

16     mind.

17               MS. JONES:  That goes directly to

18     the state of mind --

19               THE COURT:  State of mind.

20               MS. JONES:  -- and it's --

21               MR. SLATER:  It's factual, Your

22     Honor.  It's an admission by the corporate rep

23     that's been agreed to to be played.

24          I mean, I could play it to the jury right

25     now.  I'm trying to save time.  I don't know how

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 145 of 742 PageID #: 133309
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 145 of 742 PageID #: 63109

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1602

1    that's not --

2                MR. BALL:  Can we approach again,

3    Your Honor?

4                THE COURT:  Sure.

5                (Counsel approached the bench and

6    the following proceedings were held outside the

7    hearing of the jury:)

8                MR. BALL:  If he's got testimony

9    about what somebody knew or didn't know, then play

10   the testimony.  This is not the province of this

11   witness to come in and say what Ethicon knew or

12   didn't know.

13               THE COURT:  That's true.

14               MR. BALL:  It's not the province

15   of --

16           (Court reporter interruption.)

17               MR. SLATER:  Relax.  Please.  Take

18   it easy.  She's an expert witness.  Your whole

19   objections to the other witness was, "Wait for the

20   expert to come in and talk about the facts."

21           Your Honor, my understanding is that the

22   expert can lay a foundation for opinions they're

23   going to give.  Dr. Hinoul is going to testify to

24   this jury.

25           Look, I could play the testimony -- let

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 146 of 742 PageID #: 133010
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 146 of 742 PageID #: 133010

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1603

1   me please talk.

2              MS. JONES:  I'm just trying to

3   tell you that you're talking so loud that the

4   jury --

5              THE COURT:  Yeah.  I wish you'd

6   keep it down a little.

7              MR. SLATER:  Well, I can't get

8   past that (indicating).

9              THE COURT:  Get over here.  Okay.

10             MR. SLATER:  Your Honor, they are

11  seriously objecting to my expert telling this jury

12  that she knows as a fact, based on testimony

13  that's already been agreed to be played, that the

14  corporate rep said they knew all the risks on day

15  one and they don't want to let her say that and

16  then testify about the risks?

17        I mean -- I mean, they are doing anything

18  they can to obstruct.  I've never -- I've never

19  seen anything like this.

20        I could go play the testimony.  If they

21  want, I'll play the clip.  I'll do it.  If they're

22  challenging the testimony, they know he gave the

23  testimony.  I mean, do they want her not to be

24  able to say what she's relying on?

25             MR. BALL:  I've never seen

Page 1604

1    anything like this either, okay?

2                    MR. SLATER:  Well --

3                    MR. BALL:  And the question is

4    supposed to be "Do you have an opinion?"

5         "Yes."

6         And then she can say, "What's the basis

7    of your opinion?"

8         "Well, in my opinion company witness

9    testimony supports that."  Period.  This is not --

10                   MR. SLATER:  Shouldn't she say

11   what that --

12                   MR. BALL:  Excuse me.

13                   MR. SLATER:  Why are you pointing

14   at me?

15        Shouldn't she say what the testimony is

16   so the jury knows what she relied on?

17                   MR. BALL:  This is not supposed to

18   be -- this examination is not supposed to be the

19   platform for the closing argument.  It's not

20   supposed to be the platform for putting everything

21   together.  It's not the platform for saying what

22   Ethicon knew or didn't know.

23        He puts in the evidence piece by piece.

24   He doesn't use this as a summary witness to put

25   all this together in closing argument form and

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 148 of 742 PageID #: 133312
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 148 of 742 PageID #: 63108

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1605

1   that's what he's trying to do and that's what's

2   improper under the law.

3                   MR. SLATER:  I disagree fully.

4   I'm not trying to do a closing argument.  Man,

5   take it easy.  I'm --

6                   THE COURT:  Well, look, look,

7   look.  Ask a question and ask her if she's got an

8   opinion on it, but don't go into the --

9                   MR. SLATER:  Okay.

10                  THE COURT:  -- deposition

11  transcripts to have her criticize the other

12  people.

13                  MR. SLATER:  I'll ask it that way.

14  That's cool.

15                  THE COURT:  All right.  Mighty

16  fine.

17                  MR. SLATER:  I thought I was

18  taking the first step.  Now I got you.  I'll do

19  more like that.

20                  (The proceedings returned to open

21  court.)

22                  THE COURT:  We're going to give it

23  another shot here.

24      **Q.   (By Mr. Slater)  Dr. Weber, do you have**

25  **an opinion as to whether or not Ethicon was**

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 149 of 742 PageID #: 133313
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 149 of 742 PageID #: 133309

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1606

1   knowledgeable about the risks and complications

2   associated with the Prolift when it was first

3   marketed?

4           Do you have an opinion on that question?

5       A.   Yes, I do.

6       Q.   And what is your opinion?

7       A.   My opinion is that Ethicon knew of all

8   the risks of -- associated with the Prolift

9   product and procedure before launch.

10      Q.   And do you rely on internal documents and

11  deposition testimony for that opinion?

12      A.   Yes, I do.

13              THE COURT:  Mighty fine.

14      Q.   (By Mr. Slater)  Okay.  I'm just going to

15  put this up here.

16      A.   Okay.

17      Q.   We've just given you, Dr. Weber, Exhibit

18  P065.  Is that a document that you are familiar

19  with?

20      A.   Yes.

21      Q.   And what is that document?

22      A.   This is a report on mesh erosions that

23  was commissioned by Ethicon.

24              MS. JONES:  Objection, Your Honor.

25  May we --

Page 1607

1          MR. SLATER:  Let me ask a

2    foundational question.

3          THE COURT:  Okay.

4          MR. SLATER:  We'll get to that

5    right now.

6      Q.   (By Mr. Slater)  Dr. Weber, do you have

7    an opinion as to whether or not Charlotte Owens

8    was familiar with all of the risks and

9    complications stated in this document at the time

10   that she was signing off on the product in 2005?

11         MS. JONES:  Objection, Your Honor.

12         THE COURT:  All right.

13         MR. SLATER:  What's the objection?

14         MS. JONES:  She can't comment --

15   he's asking her about what was known to who.

16         THE COURT:  Do you want to come

17   back up here and state it -- huh?

18         MR. BALL:  It's repeated -- this

19   is improper under Missouri law to say what

20   somebody else knew.  That is not this witness'

21   name.

22         He can ask that witness and he has

23   testimony from that witness, but you're not

24   supposed to ask one witness what another witness

25   knew.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 151 of 742 PageID #: 133315
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 151 of 742 PageID #: 133315

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1608

1       Q.    (By Mr. Slater)  Do you have -- do you

2   have an opinion as to whether or not medical

3   affairs was knowledgeable about the risks and

4   complications described in this report about mesh

5   erosions?

6       A.   Yes, I have an opinion.

7       Q.   And what is your opinion?

8       A.   My opinion is that Ethicon was

9   knowledgeable -- Ethicon medical affairs was

10  knowledgeable about the complications related to

11  mesh erosion.

12      Q.   And were they knowledgeable, in your

13  opinion, about the complications described in this

14  document?

15      A.   Yes.

16      Q.   Is the basis for that deposition

17  testimony and internal documents from the company?

18      A.   Yes.

19      Q.   Okay.  Now, this is authored -- it

20  looks -- Peter Meier, the same person who was on

21  the cover of the last PowerPoint?

22      A.   Yes.

23      Q.   And his title was principal scientist,

24  Johnson & Johnson Medical?

25      A.   Yes.

Page 1609

1       Q.   What I'd like to do, if I could, is turn

2   to --

3            What's the title of the document, first?

4                 MS. JONES:  Objection, Your Honor.

5   May we approach?  I'm sorry --

6                 THE COURT:  Yes.

7                 MS. JONES:  -- but --

8                 (Counsel approached the bench and

9   the following proceedings were held outside the

10  hearing of the jury:)

11                MS. JONES:  This document is dated

12  November 2010.

13                THE COURT:  Okay.  Then it's --

14                MS. JONES:  That's three years

15  after --

16                MR. SLATER:  Every single risk in

17  this document was known to Charlotte Owens.  I

18  have her deposition testimony.  I asked her in the

19  dep, "Do you see this document?"

20           "Yeah."

21           "Did you know all the risks stated when

22  you were the medical affairs director in 2005?"

23           "Yes," she said.  So -- so --

24                THE COURT:  Huh?

25                MR. BALL:  Then show that

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 153 of 712 PageID #: 133317
Case 2:12-md-02327  Document 2152-6  Filed 05/09/16  Page 153 of 712 PageID #: 63117

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1610

1   testimony.

2              THE COURT:  Yeah.  Show it.

3              MR. SLATER:  No, no, no, no.  My

4   expert -- this document goes through chapter and

5   verse what happened to Mrs. Budke.  This is the --

6   this is a --

7              THE COURT:  Keep it down.  Would

8   you --

9              MS. STRAUSS:  I was just going to

10  say, I can hear you clear back at counsel table.

11             THE COURT:  Would you please keep

12  it down?

13             MR. SLATER:  This document goes

14  through, chapter and verse, the complications that

15  happened to this woman, who died, and the medical

16  affairs director who let this go on the market

17  testified that she knew everything here, and now

18  they're saying just because the document was

19  written afterwards it can't come in?

20         She said she knew everything on -- at the

21  time.  She was handling this in '05.  So it's

22  not -- it doesn't matter if this document was

23  written right now.  If she says she knew it, it

24  comes in.  And Piet Hinoul testified they knew all

25  the risks on day one.  It is not fair.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 154 of 742 PageID #: 133318
Case 2:12-md-02327 Document 3756-6 Filed 03/09/16 Page 154 of 742 PageID #: 133318

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1611

1              MR. BALL:  You know, it's all a
2    matter of how this is done, Your Honor.
3              THE COURT:  What?
4              MR. BALL:  It's all a matter of
5    how this is done.
6              THE COURT:  Yes.
7              MR. BALL:  All he has to say is
8    "Was this risk known at the time it went on the
9    market?"
10         "Yes."
11         "Was this risk -- was this risk known in
12   the medical community at the time it went on the
13   market?"
14             MR. SLATER:  Well, I'd like to
15   show this document is written by an Ethicon
16   principal scientist in damaging language against
17   them --
18             THE COURT:  How long -- how long
19   are you going to pursue that?  I mean, how many --
20             MR. SLATER:  This document?
21             THE COURT:  Yeah.
22             MR. SLATER:  When you see what's
23   in here, it's going to astound you.  It tells the
24   life and death of Joan Budke, the mesh
25   complications that she had, the infections.  It

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 155 of 742 PageID #: 133319
Case 2:12-md-02327 Document 3192-6 Filed 09/09/16 Page 155 of 742 PageID #: 63115

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1612

1    lists the same infections she got.

2                 MS. STRAUSS:  This argument is too

3    loud.  I can hear it --

4                 THE COURT:  I understand that it

5    is and that's why I'm trying to get y'all away

6    from here.

7                 MR. SLATER:  Your Honor, I have

8    the right to go through this document as long as I

9    need to to establish my case.

10          This is a critical document and the

11   medical affairs director said she knew all these

12   complications.  So how can they try to keep it

13   out?  They knew it and they ignored it.  That's

14   the heart of this case.

15                MS. JONES:  Your Honor, this

16   document is dated -- this document is dated

17   November of 2010.

18                THE COURT:  Yes.

19                MS. JONES:  It includes a

20   summary --

21                MR. SLATER:  I'm not using any of

22   that.

23                MS. JONES:  Well --

24                MR. SLATER:  I'm not using the

25   medical --

Page 1613

1          THE COURT:  If you use anything

2    after the date of her death that's in that from --

3          MR. SLATER:  She testified -- I

4    put this document in front of her and she

5    testified she knew it all in '05.  The medical

6    affairs director.

7          THE COURT:  Okay.  '05 is fine.  I

8    just said I don't want to get into anything after

9    the date of her death on that.

10          MR. SLATER:  No.  The document was

11    written in 2010 but she testified she knew it all

12    in '05, that there's nothing in here that wasn't

13    known.

14          MR. BALL:  Your Honor, he just

15    said he's got her testifying -- Charlotte Owens'

16    testimony to this, so put on Charlotte Owens --

17          MR. SLATER:  No.  My expert can

18    rely on that.  I don't have to play Charlotte

19    Owens' entire testimony.

20          THE COURT:  Was she here when --

21          MR. SLATER:  Charlotte Owens?

22    Yeah.  Charlotte Owens was the worldwide medical

23    director.

24          THE COURT:  I know who she is.  I

25    said was your witness there when she testified.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 157 of 712 PageID #: 133321
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 157 of 712 PageID #: 133321

Page 1614

1                    MS. JONES:  No.

2                    MR. SLATER:  At the deposition?

3                    THE COURT:  Yeah.

4                    MR. SLATER:  Was she sitting in

5      the room?

6                    THE COURT:  I don't know.  I

7      mean --

8                    MR. SLATER:  But she's seen the

9      deposition.  She's allowed to rely on the

10     deposition testimony.

11                   MR. BERGMANIS:  This is what

12     experts do.

13                   MR. SLATER:  Experts --

14                   THE COURT:  I understand that.

15                   MR. SLATER:  Yeah.  Experts --

16                   THE COURT:  I understand that.

17                   MR. SLATER:  I'm being held to --

18                   THE COURT:  What?

19                   MR. SLATER:  Nothing.

20                   MS. JONES:  My objection, Your

21     Honor, is to the use of this document, which is

22     dated 2010, to which is attached a series of --

23                   MR. SLATER:  I'm not using that, I

24     just told you.

25                   MS. JONES:  That's all right.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 158 of 742 PageID #: 133322
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 158 of 742 PageID #: 133323

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1615

 1   It's part of the document.

 2                 MR. SLATER:  I'm not using that.

 3   I'm using the text.  I'm just --

 4                 THE COURT:  Are you going to try

 5   to put that whole document in?

 6                 MR. SLATER:  I won't put the --

 7                 THE COURT:  All right.

 8                 MR. SLATER:  -- literature

 9   summary.  Just the text.

10                 THE COURT:  All right.  Then let's

11   go back, then, but I'm going to bind you to that.

12   Okay?

13                 MR. SLATER:  I'm with her.  I'm

14   happy.  Talk to her.

15                 (The proceedings returned to open

16   court.)

17                 THE COURT:  Okay, Mr. Slater.

18                 MR. SLATER:  Sorry, Judge.

19      **Q.   (By Mr. Slater)  Okay.  Doctor --**

20   **Dr. Weber, what I'd like to do now is turn to**

21   **Page 8, the section -- or Page 7, actually, the**

22   **section titled "2.2 Mesh-Related Complications."**

23      A.   Yes.

24      **Q.   And this entire document, are you relying**

25   **on this for your opinions in this case?**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 159 of 712 PageID #: 133323
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 159 of 712 PageID #: 133323

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1616

```
 1      A.   Yes.

 2      Q.   Now, we'll look at the first paragraph.

 3  And pull that out, please.

 4           And what I'd like to do is start with the

 5  first sentence and I'll read it for the jury and

 6  then ask you a question.

 7           It says, "While the" --

 8           And this was written by an Ethicon

 9  scientist, correct?

10      A.   Yes.

11      Q.   "While the advantages of synthetic meshes

12  are evident, specific concerns regarding their use

13  which can seriously compromise the patient's

14  health and quality of life have been reported in

15  the literature.  Once the mesh material has been

16  implanted in the body, the host immune system

17  reacts to the introduction of this foreign

18  material and covers the material with a biofilm.

19  This triggers a complex series of host-to-implant

20  material interaction."

21           Can you tell the jury what that means,

22  please?

23      A.   Okay.  So that -- what that means is,

24  when a permanent synthetic mesh is implanted, the

25  body recognizes that as a foreign object, and the
```

Page 1617

1   immune system is trying to do its job of -- of

2   eliminate or, if it can't eliminate, at least

3   protect the body from this foreign body.

4       **Q.   Now, a little further down in the**

5   **paragraph, it refers to an acute inflammatory**

6   **phase and a chronic inflammatory phase resulting**

7   **in foreign body reaction.**

8           **What does that mean, acute versus chronic**

9   **inflammatory phases?**

10      A.   Okay.  So that's just two steps in this

11  inflammatory phase.

12          The first step is called the acute, so

13  the white blood cells are rushing in, they're

14  trying to scoop up any bacteria that have come in

15  with the implant.  And the fact of the matter is,

16  because the mesh is implanted through the vagina

17  and the vagina has lots of normal bacteria that

18  live there, there are bacteria that come in with

19  the mesh.  Completely unavoidable.

20          So in the acute phase, the body's trying

21  to use the immune system to scoop up those

22  bacteria and try to prevent them from causing

23  trouble.

24          And then it moves into a chronic phase

25  where a similar kind of thing is going on.  The

1    white blood cells are working against the implant,

2    the foreign body.  They release products that can

3    be toxic to nearby cells, so there can be another

4    reason for ongoing cell death and tissue damage.

5        Q.   Let's go -- let's go to the next

6    paragraph.

7        A.   Right.

8        Q.   And just -- actually, I just want to make

9    sure, "chronic inflammatory phase," does that

10   "chronic" mean it goes on indefinitely?

11       A.   Yes.

12       Q.   The second paragraph, the second sentence

13   says, "Mesh material related adverse events

14   include infections, erosions, extrusions, mesh

15   shrinkage, vaginal granulation tissue, sinus

16   formation, abscess, fistulas," all those things.

17            Do you see where I just read?

18       A.   Yes.

19       Q.   With regard to infection, erosion,

20   extrusion, mesh shrinkage, abscess, and fistula,

21   do you have an opinion as to whether Ms. Budke --

22   Mrs. Budke experienced those complications?

23       A.   Yes, I have an opinion.

24       Q.   And what's your opinion?

25       A.   My opinion is that she suffered from all

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 162 of 742 PageID #: 133326
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 162 of 742 PageID #: 133326

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1619

1    of those complications and others.

2        Q.   Let's look at the third paragraph.

3            It says, "Various pathogens, including

4    gram-positive and gram-negative aerobic and

5    anaerobic bacteria such as" -- and I'm going to

6    try to pronounce these.

7            Actually, you know what?  I'm going to

8    ask you to pick up there.

9        A.   Okay.  "Morganella morganii, Actinomyces,

10   Bacteroides melanginococcus [sic]."

11       Q.   And the rest of the sentence says those

12   bacteria have also been implicated as causative

13   organisms associated with vaginal mesh infections.

14           Is that of significance to you in this

15   case?

16       A.   Yes.

17       Q.   Why?

18       A.   Because Mrs. Budke had a vaginal mesh

19   infection.  She had a pelvic abscess.  Bacteroides

20   was identified as one of the organisms that was

21   part of the pelvic abscess.

22       Q.   Let's go to the next page, Page 8, at the

23   top.

24           It says at the very top, the paragraph

25   just below those types, "Of all these

Page 1620

1    complications, mesh erosion remains a major cause

2    of concern in the use of meshes in pelvic

3    reconstructive surgery."

4           I just want to stop there.

5           Is that something you'd actually agree

6    with?

7       A.   Yes.  A major cause of concern.

8       Q.   And then it talks about the factors

9    contributing to the wide range of erosion rates,

10   and at the bottom it says, "The specific

11   properties of the mesh material, such as pore

12   size, stiffness, elasticity, and basic tissue

13   compatibility."

14          I'm going to stop there and ask you:

15   Have you studied those aspects of the Prolift in

16   your work in this litigation?

17      A.   Yes.

18      Q.   Have you studied internal documents and

19   deposition testimony with regard to Ethicon's

20   knowledge of those things?

21      A.   Yes.

22      Q.   Have you studied the clinical and

23   peer-reviewed literature on those subjects to

24   understand what those -- the impact of those

25   aspects of the mesh has on the safety of the mesh?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 164 of 712 PageID #: 133328
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 164 of 712 PageID #: 133328

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1621

 1       A.   Yes.

 2       Q.   **And with regard to those things -- pore**

 3  **size, stiffness, elasticity, and basic tissue**

 4  **compatibility -- do you have an opinion as to**

 5  **whether, with the Prolift, those aspects of the**

 6  **mesh are safe or unsafe?**

 7                 MS. JONES:  Objection, Your Honor.

 8  Qualifications.

 9                 THE COURT:  I'm going to overrule

10  that.

11           Go ahead.

12       Q.   **(By Mr. Slater)  You can answer.**

13       A.   Yes.  My --

14       Q.   **And what -- and what is your opinion?**

15       A.   My opinion is that the Prolift mesh is

16  unsafe.

17       Q.   **And those -- and with regard to those**

18  **aspects that I just asked you about, do you have a**

19  **specific opinion as to those?**

20       A.   Yes, I do.

21       Q.   **What?**

22       A.   That based on those characteristics of

23  the Prolift mesh, the Prolift mesh is unsafe.

24       Q.   **Well, let's look at Paragraph 3 now,**

25  **"Etiology of Mesh Erosions."  That means cause of**

Page 1622

1    mesh erosions?

2        A.   Yes.

3        Q.   And it says in the second sentence, "Mesh

4    erosion refers to the breakdown of internal tissue

5    caused by irritation or infection elicit by" --

6    "elicited by the patient's immune system when a

7    foreign material such as synthetic mesh is

8    introduced into the body.  The exposed mesh may

9    erode the vagina, urethra, rectum, bladder, or

10   bowel."

11            Do you see that?

12       A.   Yes, I do.

13       Q.   And is that significant to you with

14   regard to this case?

15       A.   Yes.

16       Q.   Why?

17       A.   Because that's exactly what happened to

18   Mrs. Budke.  She had a mesh erosion that -- that

19   existed for months that, as we've been talking of,

20   is a result of the body's response to the foreign

21   body in its attempts to protect the whole body

22   from this -- the adverse reactions to this

23   implant.

24       Q.   The next paragraph says, "An accurate

25   erosion rate is difficult to determine, because

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 166 of 712 PageID #: 133380
Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 166 of 712 PageID #: 133380

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1623

1    mesh erosions can occur at variable time intervals

2    after placement ranging from 6 weeks to 7 years."

3           Is that significant to you?

4    A.   Yes.

5    Q.   Why?

6    A.   It's significant because it indicates

7    that mesh erosion can occur at a time remote from

8    the indexed surgery, the initial surgery, and

9    although this limits the time frame to seven

10   years, we know that's not true.  It's a lifelong

11   risk that a woman carries as soon as she has this

12   mesh implanted in her body.

13   Q.   Let's turn the page to Page 9 where it

14   discusses the "Surface Area of Mesh."

15          And that Paragraph 9 -- on Page 9, I

16   mean, "Surface Area of Mesh," let's pull that up.

17          It starts out -- and I'm going to ask you

18   a question about this -- "The amount of foreign

19   body reaction increases with the amount of surface

20   of the foreign material being exposed to the

21   host."

22          Is that significant to you?

23   A.   Yes.

24   Q.   Why is that -- does that relate to the

25   Prolift?

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 167 of 742 PageID #: 133384
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 167 of 742 PageID #: 133181

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1624

```
 1      A.   Yes, it does.

 2      Q.   Please explain to the jury why that does.

 3      A.   Like we saw in the animation video, at

 4   the end of the operation you saw how much mesh is

 5   left in the woman.  That large central body that

 6   goes from one side of the pelvis to the other and

 7   those four mesh arms that come out through those

 8   previously uninvolved areas in the hip and the

 9   thigh.  That's an enormous amount of mesh for the

10   body to try to cope with.

11      Q.   At the bottom of that paragraph, it says,

12   "Therefore, a thinner mesh combined with less

13   material per given area reduces the risk of

14   erosion."

15           With regard to that sentence, does

16   UltraPro fit that characteristic, compared to the

17   Prolift mesh?

18      A.   Yes.

19      Q.   Let's go to Page 11.  Towards the middle

20   of the page, it says, "Several commercially

21   available all-inclusive kits."

22           Do you see that?

23      A.   Yes.

24      Q.   I'd like to bring up that paragraph and

25   highlight the last sentence of that paragraph.  It
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 168 of 742 PageID #: 133382
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 168 of 742 PageID #: 133382

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1625

1    says, "Large randomized trials of conventional

2    surgery versus mesh insertion is necessary to

3    determine the long-term anatomical and functional

4    efficacy of these kits."

5            Do you see that?

6    A.   Yes, I do.

7    Q.   Is that significant to you?

8    A.   Yes.

9    Q.   Why?

10   A.   Because like we talked about a little bit

11   earlier, the only way you can draw a conclusion as

12   to cause and effect is with a randomized trial.

13           So for anyone to say that the Prolift is

14   safe and effective compared to traditional

15   surgery, you need a randomized trial.

16           And "long-term" is very important because

17   of what we just talked about.  Once the mesh is

18   implanted, the woman is subject to mesh

19   complications for the rest of her life.  So if you

20   only look at a very short-term follow-up, things

21   might look okay, but when you look longer, it

22   turns out, no, they're not okay at all.

23   Q.   With regard to that statement, do you

24   have an opinion as to whether or not a study of

25   the rigor and the comprehensiveness that you would

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 169 of 712 PageID #: 133383
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 169 of 712 PageID #: 133129

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1626

1  think would be necessary to adequately study the

2  Prolift, was any such study ever performed?

3      A.   No.

4      Q.   Is that significant to you?

5      A.   Yes.

6      Q.   Why?

7      A.   Because in failing to perform a study of

8  that nature, the Prolift was put on the market

9  without the kind of evidence and information that

10  women need to make a decision, balancing the risks

11  and benefits, is this a good choice for me.  So

12  they don't have that information.

13          That's what we call experimental.  That's

14  when you need to do a clinical study.  Because if

15  you don't do a clinical study at that point, the

16  women who are getting the procedure are being

17  experimented on anyway.  They just don't know it

18  and they're not given permission for it.  They

19  have not given permission for it.

20              MS. JONES:  Objection, Your Honor.

21  I think this goes --

22              THE COURT:  Sustained.  I'll

23  sustain that.

24              MR. SLATER:  Just to the last

25  part, Your Honor?

Page 1627

1              THE COURT:  Yeah.

2              MR. SLATER:  I just don't want to

3    reask the first part.

4              THE COURT:  Yeah, yeah, yeah.

5              MR. SLATER:  Thank you.

6      Q.   (By Mr. Slater)  Let's go to Page 14, the

7    section on "Diagnosis of Mesh Erosions," and we'll

8    go to Section 5.2, "Diagnosis."

9      A.   Yes.

10     Q.   Pull that paragraph up, please.

11          And it says, the second half,

12    "Intravaginal visualization" --

13          And what does that mean?

14     A.   That just means you can see it inside the

15    vagina.

16     Q.   -- "of a foreign body at the apex" --

17          And that's the top of the vagina?

18     A.   Correct.

19     Q.   -- "or elsewhere implies intravaginal

20    mesh erosion or/and infection.  Furthermore,

21    eroded meshes through the vagina may indicate a

22    simultaneous infection, based not only on the

23    presence of vaginal discharge or consolidation of

24    inflammatory tissue around the mesh, but also on

25    the type of mesh applied."

Page 1628

1          **Is that important to you in your**

2    **opinions?**

3        A.   Yes, it is.

4        **Q.   Why?**

5        A.   Again, that's because that's exactly what

6    happened to Mrs. Budke.  She developed a mesh

7    erosion and then it became infected from the

8    bacteria that live in the vagina normally.

9             So you have this mesh erosion.  It's a

10   raw, open spot in the vagina, and the bacteria get

11   in there.  That's just what they do.  And then

12   they initiate this infection and the inflammatory

13   mass that's described here.

14            Again, the body's just trying to respond

15   appropriately to the infection, but unfortunately

16   what's happened -- what happens sometimes in the

17   body's efforts is it actually makes matters worse.

18            So you've got this inflammation, all this

19   swelling, it blocked off her ureters, she had

20   kidney failure --

21                 MS. JONES:  Your Honor, I'm --

22                 THE COURT:  It's going far beyond

23   the question that was asked.

24                 MR. SLATER:  All right.  I'll ask

25   the next question.

Page 1629

1       Q.    (By Mr. Slater)  Let's look at

2   Paragraph 6.0, "Management of Mesh Erosions," on

3   Page 15.

4       A.    Yes.

5       Q.    And Doctor -- and Peter Meier, the

6   Ethicon scientist, writes -- let's pull that up --

7   "The management of erosions is dependent on the

8   amount of material exposed, the type of material,

9   and associated infection.  There is limited data

10  on the optimal cost-effective management of mesh

11  erosion and infection."

12            I want to stop there.

13            Is that significant to you?

14      A.    Yes.

15      Q.    Why?

16      A.    Again, this is exactly what Mrs. Budke

17  had, and this is years after the Prolift had been

18  put on the market.

19            Limited data.  Well, whose fault is that?

20  Ethicon is responsible for --

21                THE COURT:  Stop.

22                MS. JONES:  Your Honor, move to

23  strike.

24                THE COURT:  I'll strike all of

25  that.

Page 1630

1              MS. JONES:  And I'd ask that the

2      jury be instructed --

3              THE COURT:  Disregard that last

4      statement and the answer that was given and let's

5      start over, and please, let's stay with the --

6      **Q.   (By Mr. Slater)  Please explain from a**

7      **scientific and a medical standpoint why that's**

8      **significant.**

9      A.   Okay.  So from a medical and a scientific

10     standpoint, it's an -- it's significant because

11     doctors don't have the kind of information they

12     need to know how to best care for women when they

13     show up -- when they come in with these very

14     important complications related to the mesh.

15     **Q.   It says just below that, "surgical**

16     **treatment which involves drainage of abscesses,**

17     **partial or complete removal of the mesh."**

18          **Is that significant here?**

19     A.   Yes.

20     **Q.   Is that what happened to Mrs. Budke?**

21     A.   It was attempted.  The -- the complete

22     removal of the mesh was attempted.  And again, as

23     we've already discussed, that never was possible.

24     She was never -- the doctors were never able to

25     remove all the mesh in Mrs. Budke.

```
 1        Q.    Let's go to Section 6.2, the first

 2   paragraph, the last sentence.

 3            "When the upper" -- "When the upper

 4   portion of the mesh is infected, removal of the

 5   entire mesh is required through a transvaginal or

 6   abdominal approach."

 7            Is that significant?

 8       A.   Yes.

 9       Q.    Why is that significant in this case with

10   Mrs. Budke?

11       A.   That the -- the idea that the removal of

12   the entire mesh can even be accomplished.

13            You know, like we were just saying, it

14   can't be accomplished.  The mesh is infected.

15            The ordinary medical thing to do would be

16   to remove the foreign object that's contributing

17   to this infection and making it resistant to

18   treatment, and that cannot be accomplished.

19       Q.    Let's go to the next paragraph, the very

20   last sentence.

21            It says, "Residual infected mesh after a

22   failed partial excision requires a second excision

23   generally via laparotomy" --

24            That's actually cutting open the tissue?

25       A.   Actually that's through the abdomen,
```

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 175 of 712 PageID #: 133389
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 175 of 712 PageID #: 63138

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1632

1    right.   An abdominal incision.

2        Q.    -- "and usually represents a difficult

3    surgical dilemma, as recurrent erosions are

4    associated with chronic morbidity including

5    chronic infection, sinus tracts, abscess, and

6    fistula formation."

7            Is that description significant to you in

8    this case with Mrs. Budke?

9        A.   Yes, it is.

10       Q.   Why?

11       A.   Because that's exactly what happened.

12   This cascade of complications where she had an

13   initial mesh excision in January, another attempt

14   at excising more mesh in March, and -- to treat

15   the abscess, and -- and later developed a fistula,

16   the vesicovaginal fistula that connected the

17   bladder to the vagina, so that she was unable to

18   control her urine at all.

19           She was constantly leaking urine that

20   contributed to more tissue damage in the area.

21   She had sacral ulcers that were unable to heal, at

22   least in part because of this condition because of

23   the fact that urine was under her all the time and

24   she had no way of controlling that.

25       Q.   When it refers to a chronic infection, is

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 176 of 712 PageID #: 133340
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 176 of 712 PageID #: 63130

1   that significant here?

2       A.   Yes.

3       Q.   Why?

4       A.   Because of the presence of the mesh, it

5   makes it very difficult to treat the infection,

6   and that's why the recommendation is to remove the

7   entire mesh, even though we already know that's

8   not possible, because the body can't resolve an

9   infection -- or at least it makes it very much

10  more difficult -- when a foreign body is in place.

11          So that's what a chronic infection is,

12  where antibiotics alone can't take care of the

13  problem, and the -- you know, the idea that you

14  need to try to remove the mesh, even though that's

15  not possible.

16      Q.   Okay.  We're going to go to the next

17  document.

18          This is Exhibit P1755.  Is this a

19  document you're familiar with, Dr. Weber?

20      A.   Yes.

21      Q.   Is it a document that you rely on, in

22  part, for your opinions in this case?

23      A.   Yes.

24               THE COURT:  Yes?

25               MS. JONES:  Your Honor, once

Page 1634

1   again, this is a 2011 document that postdates the

2   events in this case by two or three years.  I

3   would object.

4               MR. SLATER:  We have -- we have

5   the same foundation as we pointed out up there,

6   that it's been acknowledged they knew all these

7   things.

8               THE COURT:  Prior to.

9               MR. SLATER:  Yes.  Every single

10  risk.

11              MS. JONES:  Well, wait.

12              MR. BALL:  Your Honor, may we

13  approach?

14              THE COURT:  Sure.

15              MR. SLATER:  You know what, Your

16  Honor?  In the interest of time, I just won't use

17  the exhibit.

18              THE COURT:  All right.  Asked and

19  answered.  I think we're getting lots of

20  information maybe.

21         Okay.  If you can move on to something

22  else.

23              MR. SLATER:  Yeah.  No problem.

24       Q.   (By Mr. Slater)  Okay.  Dr. Weber, before

25  we put this up, this is a document that has been

Page 1635

1    prepared with regard to the Gynemesh PS study,

2    correct?

3        A.   Yes.

4        Q.   Would you tell the jury what the Gynemesh

5    PS study was?

6        A.   Okay.  So Ethicon sponsored a study to

7    look at what happens to women who have the

8    Gynemesh PS mesh implanted either through the

9    abdominal approach or transvaginally.

10       Q.   And what was the purpose of this study?

11       A.   To -- well, to report on the outcomes, as

12   I mentioned, of using Gynemesh PS mesh to

13   encourage doctors to become mesh users.

14       Q.   Did you actually read the study

15   reports -- we'll start with those -- the reported

16   results of this study of the mesh?

17       A.   Yes.

18       Q.   Did you do more to get information about

19   this actual study?

20       A.   Yes, I did.

21       Q.   Please tell the jury what you did to

22   evaluate the data in the Gynemesh study, please.

23       A.   So I evaluated the study protocol and all

24   the data collection forms for the women that were

25   enrolled in the study.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 179 of 712 PageID #: 133343
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 179 of 712 PageID #: 133139

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1636

1       Q.    What does that mean, "the data collection

2    forms"?

3       A.    So that's what we call the raw data.  So

4    that's where the information has been transcribed

5    from the woman's medical chart or if it's a

6    questionnaire that she filled out herself.  That

7    becomes part of the package that we call a case

8    report form.

9            And then each visit that the woman has

10   has another set of case report forms with that

11   information, and maybe if the questionnaires were

12   repeated.

13           So for every patient for every visit that

14   was involved in this study, I reviewed the case

15   report forms myself.

16      Q.    Did that take a while?

17      A.    Yes, it did.

18      Q.    Okay.  What I'll do is put up Exhibit

19   P1768 now.  Tell the jury what this document is

20   when it gets up on the screen.

21      A.    Yes.

22      Q.    Please tell the jury what we're looking

23   at here.

24      A.    Okay.  So what I did, after I analyzed

25   all the data myself from the case report forms, is

1    then I set out to summarize the results myself.

2         And what I found was that there was a

3    drastic difference between the results that I

4    found, when I analyzed the data myself, and what

5    Ethicon had reported to the scientific community.

6    **Q.   And take us through that, please, and**

7    **tell us line by line what you found and what these**

8    **different values were, based on your assessment of**

9    **the actual records.**

10   A.   Right.

11        So as you can see, the first column just

12   describes the characteristic.

13        The second column is what Ethicon said

14   happened.

15        The third column is what I found when I

16   went through those case report forms myself.

17        So mesh exposure, as you've -- excuse me,

18   as you've probably heard by now, is another name

19   for mesh erosion.

20        At one year, Ethicon claimed that 9.4% of

21   women had experienced a mesh erosion.  What I

22   found actually was that 15.4% of women had

23   experienced a mesh erosion by one year.

24   **Q.   Was that significant to you?**

25   A.   Yes, it was.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 181 of 712 PageID #: 133345
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 181 of 712 PageID #: 133345

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1638

1      Q.    Why?

2      A.    That's a very high rate.  And like we

3  were talking about before, with short-term

4  followup, you're just getting a little snapshot of

5  what can happen to a woman when she has this

6  permanent mesh implant for the rest of her life.

7            So for 15% in only one year, when some

8  women are going to have this implant for 20, 30,

9  40 years, it becomes a matter of grave concern

10  that even within one year, the mesh complication

11  rates are so high.

12      Q.    **And in the interest of time, I want to**

13  **now go to the prolapse recurrence rates.**

14      A.    Yes.

15      Q.    **Can you tell the jury what you found and**

16  **what's documented here?**

17      A.    Yes.

18            So prolapse recurrence, like we talked

19  about before, is when the prolapse comes back

20  again.

21            And what Ethicon reported was that this

22  happened to 24% of women.  Even that's not so

23  great.  Again, with only one year of follow-up.

24            What actually happened was it was closer

25  to 34%.  33.8% of women had had a recurrent

1    prolapse by the time one year had elapsed.

2         Q.   And that's of the total number of women

3    that are being -- that you counted?

4         A.   That's right.

5         Q.   And then you have a one-year vaginal

6    surgery prolapse recurrence rate.  What does that

7    mean?

8         A.   So as I mentioned, the study set out to

9    evaluate women who had the mesh placed abdominally

10   and then placed vaginally.

11        So Ethicon didn't even report these

12   people as separate groups, even though they're

13   very different operations.  They have a very

14   different set of risks and benefits and outcomes.

15   You know, success as far as treating the prolapse

16   problem.

17        So they didn't report that at all, but

18   what I found was that 27.3% of women who had the

19   vaginal implantation of mesh had recurrent

20   prolapse within one year.  And that's a very high

21   rate.  That's a matter of concern.

22        Q.   Who were the investigators for this

23   study?

24        A.   The investigators for this study were

25   Ethicon consultants and preceptors, the doctors

Page 1640

1   who teach other doctors how to perform these

2   procedures, paid by Ethicon.

3        Q.   Do you remember the names of some of

4   them?

5        A.   Dr. Lucente.  Dr. Murphy.  Dr. Miller.

6             I think that's all I can remember right

7   now.

8        Q.   In terms of the reports by Ethicon of the

9   number of patients studied and what the rates were

10  of these complications, were the reports

11  consistent or inconsistent even with one another?

12       A.   They were inconsistent with one another.

13  This -- the results of this study were reported in

14  different venues at different professional society

15  meetings, and even that information wasn't

16  consistent.  The numbers changed from -- from

17  meeting to meeting, and it certainly came nowhere

18  close to what I found when I analyzed the data

19  myself.

20       Q.   The case report forms, the data

21  collection forms for the patients, do they have

22  sections where certain information is requested so

23  that it will be sure that an investigator will

24  know to look for certain things?

25       A.   Yes.

Page 1641

1      Q.    And is that important?

2      A.    Yes, it is.

3      Q.    Why?

4      A.    Well, remember we talked about this a

5    little bit this morning when I went on to that

6    additional training in research study design?

7          It's like anything else, right?  You only

8    get out what you put in.  So after the study is

9    done and you say, "Gosh, I wish I'd remembered to

10   ask that question," you know what?  It's too late.

11   You can't go back and get that.

12         So the key is to set that up from the

13   start, to know how to properly design a study so

14   that you capture the information that's critical

15   to your understanding of the risks and benefits of

16   what you're trying to study.

17     Q.    Did the case report forms ask the doctors

18   to look and see if there was contraction of the

19   mesh?

20     A.    No, it did not.

21     Q.    Is -- do you have an opinion about

22   whether or not that was a good or a bad thing?

23     A.    That was inappropriate.  That's -- again,

24   if you don't ask the question, you're not going to

25   get the answer.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 185 of 742 PageID #: 133349
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 185 of 742 PageID #: 133349

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1642

1        So from a scientific point of view, when

2    you're trying to understand the risks and benefits

3    of this vaginal mesh use -- or abdominal, for that

4    matter -- you have to include the items of

5    importance, the items that we know carry severe

6    clinical consequences when they occur, like mesh

7    con- -- mesh contraction.

8        **Q.   Okay.  What I'm going to do is we'll take**

9    **that one down and then I'm going to go -- just**

10   **flip back to Exhibit 1593, the professional ed**

11   **deck, and we'll look real quick at Page 16.**

12              THE COURT:  While you're pulling

13   that up, I'd like to give them a break about

14   12:30, if you can kind of work it around that.

15              MR. SLATER:  Anytime you want,

16   Judge.

17              THE COURT:  Okay.

18              MR. SLATER:  Whenever you think.

19   I'll -- well, whenever you give me the high sign.

20              THE COURT:  All right.

21       **Q.   (By Mr. Slater)  All right.  So we're on**

22   **Page 16, and this is the professional ed deck that**

23   **was used, for example, to train Dr. Simpson**

24   **about -- about the data on the mesh in the**

25   **Prolift?**

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 186 of 742 PageID #: 133350
Case 2:12-md-02327 Document 3756-6 Filed 04/09/16 Page 186 of 742 PageID #: 133350

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1643

1      A.   Yes, it was.

2      Q.   And here they're talking about the

3   Prolene -- the Gynemesh Prolene Soft mesh, the

4   mesh material?  The study you just told the jury

5   about?

6      A.   Yes.

7      Q.   And I'd like to look at the last line

8   there.  It says 84% success rate, Stage 0 or 1 at

9   one year.

10         Do you see that?

11     A.   Yes, I do.

12     Q.   And based on your review of the actual

13   patient-level study data, do you have an opinion

14   as to whether that was accurate or inaccurate?

15     A.   Yes.

16     Q.   What's your opinion?

17     A.   My opinion is that that is inaccurate.

18     Q.   And what is the difference?

19         You don't have to quantitate it, but was

20   there more or less?

21     A.   There were -- there was a lower rate of

22   success than what was claimed by Ethicon in their

23   professional education.

24     Q.   Okay.  Let's go to the next one now.

25   This is Exhibit P1754, for the record.  And before

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 187 of 712 PageID #: 133251
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 187 of 712 PageID #: 133151

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1644

1    we put this up, Dr. Weber, this is a document with

2    regard to the French TVM study?

3        A.    Yes.

4        Q.    The jury's heard a little bit about it,

5    but just so that they know that you know what it

6    is, would you please tell the jury what that was?

7        A.    Yes.  So the TVM group, the French --

8    group of French doctors that you may have heard

9    were the ones who were instrumental in developing

10   the procedure that eventually became the Prolift

11   procedure, they were experimenting with different

12   mesh designs, cutout shapes, and different tools

13   and whatnot, to see if they could improve on the

14   prolapse repair procedures that had been done in

15   the past.

16          And so Ethicon sponsored a study of the

17   women who were undergoing this as a -- as a

18   prototype, an earlier version -- not the real

19   Prolift but an earlier version of what would

20   become the Prolift, and the French investigators

21   were involved and there were also investigators

22   involved in the United States.

23       Q.    Okay.  Let's put this up, P1754, please.

24             What are we seeing here, Dr. Weber?

25       A.    Okay.  So this is going to start to look

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 188 of 742 PageID #: 133252
Case 2:12-md-02327 Document 2152-6 Filed 05/09/16 Page 188 of 742 PageID #: 68148

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1645

```
 1   very familiar to you.

 2            I went through all the data on these

 3   patients to arrive at my own analysis and compared

 4   that with what was reported by Ethicon.

 5       Q.   And please show us what you found.

 6       A.   So you can see at all of these times of

 7   follow-up -- six months, one year, three years --

 8   they underreported the number of women who

 9   experienced a mesh erosion.  In other words, they

10   didn't report the right number.  It was lower than

11   what the correct number should have been.

12       Q.   And just let's go through it.

13            Starting at six months, what did you

14   find?

15       A.   17.2%.

16            Again, at such a short duration of

17   follow-up, that is alarmingly high.

18       Q.   And you're saying 17.2% of the 87 women

19   who were there at six months had a mesh erosion?

20       A.   Yes.

21       Q.   At one year, what did you find and what

22   did Ethicon report?

23       A.   So Ethicon reported -- as you can see,

24   they reported it as if the mesh erosion rate went

25   down.  They reported 14.9% at six months and then
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 189 of 712 PageID #: 133253
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 189 of 712 PageID #: 63149

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1646

1    9.2% at one year.

2        Q.    How do you have less erosions at a year

3    than you had at six months?

4        A.    The way you do that is if a woman had an

5    erosion that was treated and went away, they acted

6    like it didn't happen and they didn't count it

7    anymore.  That's the way you get to have a lower

8    number at one year than at six months.

9        Q.    And then you see the three-year rates.

10            They reported 14.4% and you found 23.5%?

11       A.    Yes.

12       Q.    I want to ask you -- I'm not going to

13   pull up the study report.  We've seen it.  We know

14   what it says.

15            With regard to these --

16            Well, we'll get to that, actually.  I'm

17   going to get to that in just a second.

18       A.    Okay.

19       Q.    Let's try to get through this and we'll

20   go to the U.S. study report now, and then we'll

21   wrap it up in a few minutes.  1737.

22            Dr. Weber, what is this exhibit?

23       A.    So this is what happened in the U.S. side

24   of the study.  We just looked at what was

25   happening in the French side of the study, so this

Page 1647

1    is the U.S.

2       **Q.    And we see the figures, and just quickly**

3    **tell us what you found with regard to the reported**

4    **rates versus what you found when you went through**

5    **the actual documents yourself.**

6       A.   Yes.  So as you can see, at each time

7    point -- and at three years it wasn't even

8    reported by Ethicon -- the number Ethicon reported

9    is much lower than what I found when I examined

10   the documents myself.

11          And you can see the same pattern between

12   six months and one year in what Ethicon reported,

13   where they said 9.5% of women were affected by

14   mesh erosion at six months, but only 6% were

15   affected at one year.  Eight women at six months

16   and five women at one year.

17          And like we said before, the only way

18   that can happen is when a woman has had a mesh

19   erosion and it has resolved with treatment, or

20   whatever, and then Ethicon pretended it didn't

21   happen, they didn't have to count that --

22              MS. JONES:  Objection, Your Honor.

23   That's an inappropriate comment.

24              THE COURT:  Sustained.  Would --

25      **Q.   (By Mr. Slater)  Just rephrase it,**

Page 1648

1  **Dr. Weber, please.**

2       A.   Okay.  Ethicon didn't count those mesh

3  exposures as something that had happened to women,

4  and that's how you get a lower number from six

5  months to one year.

6       **Q.   What is good clinical practice in terms**

7  **of reporting adverse events?  What does that mean?**

8       A.   Okay.  "Good clinical practice," even

9  though it doesn't sound like it, is a research

10  term -- oh, excuse me.  Is a research term, okay?

11          And so what that means is that the

12  investigators are following the rules to protect

13  patients, first of all, because in any experiment

14  where women are voluntarily consenting to be

15  involved, patient safety is the most important

16  thing to protect, and rules as far as collecting

17  data appropriately so that you can analyze it, and

18  then rules as far as data analysis, so that in the

19  end people can trust your results.

20          If you follow all of the good clinical

21  practice guidelines in research, then your

22  research results are robust and people will be

23  able to rely on them.

24       **Q.   Did Ethicon, in your opinion, follow good**

25  **clinical practices with regard to how they counted**

Page 1649

1    adverse events?

2        A.    Not at all.

3        Q.    And for the reasons you've already

4    stated?

5        A.    Yes.

6        Q.    Exhibit 1752.

7                    THE COURT:  Can we take the break

8    after this one?

9                    MR. SLATER:  Sure.

10                   THE COURT:  Go ahead.

11       Q.    (By Mr. Slater)  Doctor, what is

12   Exhibit 1752?

13       A.    Okay.  So this reports the findings of

14   the French part of the TVM study again, and this

15   time we're looking at prolapse recurrence.

16           So if prolapse came back in the women who

17   had gone through the TVM procedure, which stands

18   for "transvaginal mesh."

19       Q.    And the jury's heard this, so we've heard

20   what a primary endpoint is.  That's -- that's the

21   point that was set up as either the -- as the

22   cutoff for success or failure?

23       A.    Yes.

24       Q.    We've heard the term "confidence

25   interval."  If you would briefly tell the jury

Page 1650

1    **what that means and why that's significant with**

2    **regard to those numbers on that page.**

3        A.    Yes.  So a confidence interval is another

4    statistical term.

5              When you have a group of women and you

6    measure something, you come up with an average.

7    So it's -- you know, you add everybody all up and

8    you divide them and you have an average number.

9              Now, what the confidence interval does is

10   put some limits around that average to tell you,

11   if you did this same study in another hundred

12   women, and another hundred women and another

13   hundred different women, and maybe you went to

14   Australia or whatever, then you would be 95 or 90%

15   confident that the average would fall within those

16   boundaries.  Okay?

17             Does that make sense?

18             Okay.  Good.

19       Q.    **And with regard to the confidence**

20   **interval and the rates there, what is significant?**

21       A.    Okay.  So the confidence interval, as I

22   said, gives you a -- a lower and an upper bound

23   that you can be confident in, if you'd repeated

24   this study many times with different women, the

25   average would fall within that.

```
 1              So that gives you -- I hate to keep

 2    saying the word "confidence," but that's where it

 3    got its name -- that you can rely on this as being

 4    a number that's going to be true for a lot of

 5    women.  Even if you took many mother -- many other

 6    women, studied them, then this average would be

 7    true, and that they would fall somewhere within

 8    this range.

 9         Q.   And why was 20% of significance here?

10         A.   That was the cutoff that Ethicon chose in

11    their study design to say, "Okay, this -- if the

12    failure rate exceeds 20%, then that's too much of

13    a failure.  That's not good enough and we should

14    stop there."

15         Q.   And what was the outcome here?

16         A.   So the outcome was that the recurrence

17    rate exceeded 20%, and when you look at -- the top

18    one is the 90 and the bottom is the 95.  Both of

19    them exceeded 20% by quite a good deal.

20         Q.   Technically a failure, under the study

21    guidelines?

22         A.   This is a failure by their own study

23    design, set up in advance.  This was a failure.

24         Q.   Did they stop or did they continue

25    forward?
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 195 of 742 PageID #: 133359
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 195 of 742 PageID #: 63359

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1652

1      A.   They continued forward.

2              MR. SLATER:  Your Honor, we're

3   done with that document.

4              THE COURT:  All right.  We're

5   going to take a noon break, then.

6         Justice requires that you not make up

7   your mind about this case till all the evidence

8   has been seen and heard and you must not discuss

9   the case among yourselves or with anyone else or

10  comment on anything you heard or learned in this

11  trial until the case is concluded and you retire

12  to the jury room for your deliberation.

13        Also, you must not remain in the presence

14  of anyone who is discussing the case when the

15  court is not in session.

16        Let's meet back at 1:30.  Court's in

17  recess.

18    (Recess taken from 12:27 p.m. to 1:33 p.m.)

19              (The following proceedings were

20  held in the courtroom outside the presence of the

21  jury:)

22              THE COURT:  Are we ready to start?

23              MR. HYDE:  Yes, sir.

24              THE BAILIFF:  I'll go get the

25  jurors, sir.

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1653

1          THE COURT:  Okay.  If you would,

2  we'll bring the jury up.

3          Are you getting warmed up any?

4          MS. JONES:  I'm not.  I think it's

5  getting cooler.

6          MR. ANDERSON:  I think so.  It's

7  pretty cold out here, Judge.  Can't feel my toes.

8          THE COURT:  Well, we're turning it

9  up some, then.

10          MR. ANDERSON:  Thank you.

11          THE COURT:  Now, if you complain

12  that it's hot --

13          MR. ANDERSON:  Well, there's a

14  happy medium.  We just can't seem to find it.

15          THE COURT:  We'll try to find it.

16  Okay.

17          MS. STRAUSS:  Judge, I don't think

18  we've ever thought it was that hot just yet.

19          THE COURT:  Not yet.

20          MS. STRAUSS:  No.

21          THE COURT:  I had a judge friend,

22  when the arguments would get too hot and heavy,

23  he'd turn to the bailiff and do that (indicating),

24  and I knew what he meant, and they'd run it down

25  to 55, which was the lowest denominator you could

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 197 of 712 PageID #: 133361
Case 2:12-md-02327 Document 3702-6 Filed 05/09/16 Page 197 of 712 PageID #: 63191

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1654

1    have on that courthouse, and he'd just leave it

2    there until they finally froze out and he said,

3    "Well, this will end this."

4             They'd say, "Well, can we go put on a

5    coat?"

6             "No.  No.  You do your trial."

7                  (The following proceedings were

8    held in the courtroom in the presence of the

9    jury:)

10                  THE COURT:  Jury's in.

11             If anybody is freezing or burning up, let

12    me know because we've had quite a discussion of

13    whether it's too cold out there or too warm up

14    here or what, so --

15                  JUROR:  It's really cold.

16                  THE COURT:  Is it pretty cold?

17                  JUROR:  Really cold.

18                  THE COURT:  Well, we turned the

19    heat up, so...

20                  JUROR:  Feels good in here.

21                  THE BAILIFF:  Your Honor, all the

22    jurors are present and accounted for.

23                  THE COURT:  Thank you.  Be seated.

24             Ladies and gentlemen, you may be seated,

25    and Mr. Slater, you may pick up where you left

Page 1655

1    off, I guess.

2                  MR. SLATER:  Thank you very much,

3    Your Honor.

4            We call Dr. Weber back to the stand,

5    Your Honor.

6                  THE COURT:  And of course you

7    remember you're under the same oath you took this

8    morning.

9                  THE WITNESS:  Yes.

10       Q.   (By Mr. Slater)  Okay.  Dr. Weber, in the

11   interest of time, we're going to try to move

12   things a little quicker.  Okay?

13       A.   Yes.

14       Q.   And the first thing I'm going to ask you

15   about is:  What is the Prolift IIS database?

16            Please tell the jury what those words

17   mean.

18       A.   Okay.  "Prolift," self-explanatory.

19            "IIS," investigator initiated study.

20            And then the database is an Excel

21   spreadsheet that has information, data collection.

22   Not the individual case report forms, but putting

23   the information from those forms into a

24   spreadsheet.  So that's the database.

25       Q.   And is that something that you reviewed

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 199 of 742 PageID #: 133363
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 199 of 742 PageID #: 63363

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1656

1    **in this case?**

2       A.   Yes.

3       **Q.   And tell the jury what it is you looked**

4    **at.**

5       A.   So along with the database itself, there

6    were several other documents.

7            Dr. Lucente was the principal

8    investigator of this study, and he proposed to

9    Ethicon --

10           Which is what "investigator initiated"

11   means.  So he's the investigator.  He initiated

12   this study proposal to Ethicon.

13           -- and proposed to them that he report on

14   the outcomes of the patients in his clinical

15   practice.  Women who had had the Prolift procedure

16   performed.

17           So I had that information, and the

18   database itself, which contained the information

19   on 514 women and follow-up -- not all of them

20   completed the follow-up and we'll see that -- more

21   about that in a little bit, but information on --

22   at baseline, before the Prolift procedure had been

23   performed, and then follow-up in different

24   intervals up to one year.

25                   MR. SLATER:  Let's put up the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 200 of 742 PageID #: 133364
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 200 of 742 PageID #: 133160

1    first PowerPoint on this and the number of

2    patients, please.

3                    MS. JONES:  Could I see it,

4    please, before we put it up?  Please?

5                    MR. SLATER:  You want to see it?

6                    MS. JONES:  I'd like to see what

7    you're going to put on the screen, yes.

8                    MR. SLATER:  I'm going to put this

9    up.  She's going to see this (indicating).

10                    MS. JONES:  Okay.

11        **Q.    (By Mr. Slater)  Please tell us what this**

12    **represents.**

13        A.    Okay.  So this is a brief summary.

14            As I mentioned to you, it contained

15    information on 514 patients, and this represented

16    women who had had the Prolift procedure between

17    August 29th, 2005, and July 8th, 2008.

18            Out of those 514 patients, only 378 of

19    them completed follow-up at four months, which

20    means that 136 of them were lost to follow-up.

21    They didn't come back in for their appointment at

22    four months so there's no information that could

23    be collected on them at that point.

24            And then at one year, only 134 patients

25    came back for their one-year follow-up, which

Page 1658

1   means 380 were lost to follow-up.

2       Q.   Now, you said you actually reviewed the

3   actual spreadsheets that had been documented as

4   part of this study?

5       A.   Yes.

6       Q.   And as part of that study, did you

7   calculate the erosion rates as documented in those

8   records?

9       A.   Yes.

10      Q.   Okay.  And I'd like to put up a --

11           And have we prepared a PowerPoint slide

12   that actually shows what you calculated?

13      A.   Yes.

14               MS. JONES:  Your Honor, I --

15               THE COURT:  Yes.

16               MS. JONES:  I'd like to just see

17   what we're putting up before we put it up.

18               THE COURT:  Yeah.  Please don't

19   put anything on there you haven't shown to the

20   other side, before they get a chance to look at

21   it.

22               MS. JONES:  May we approach just

23   briefly, Your Honor?

24               (Counsel approached the bench and

25   the following proceedings were held outside the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 202 of 712 PageID #: 133366
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 202 of 712 PageID #: 63162

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1659

1   hearing of the jury:)

2                   MR. SLATER:  What's your

3   objection?

4                   THE COURT:  Oh, I'm sorry.

5                   MS. JONES:  That's all right.

6                   THE COURT:  Let me get this.

7                   MS. JONES:  Your Honor, this is an

8   analysis of Dr. Lucente's database; it's not an

9   analysis of Ethicon's database.

10                  MR. SLATER:  Ethicon owned the

11  data.  By agreement, they owned the data --

12          (Court reporter interruption.)

13                  THE COURT:  I'm on?  Okay.  Back

14  to the drawing board.

15                  MS. JONES:  My objection, Your

16  Honor, is that Dr. Lucente's database is

17  Dr. Lucente's database that the plaintiff -- that

18  Ms. -- that Dr. Weber reviewed.  These are not

19  Ethicon documents coming out of Ethicon's --

20                  THE COURT:  Business records?

21                  MS. JONES:  I object to that

22  basically as hearsay.

23          Now, the plaintiff is going to say -- and

24  Mr. Slater's going to say -- that under the

25  contract we had a right to look at the data, but

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 203 of 742 PageID #: 133367
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 208 of 742 PageID #: 133367

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

Page 1660

1    the fact is we've never seen it.  It's never been

2    submitted to Ethicon.  I object to it.

3                    THE COURT:  Now.

4                    MR. SLATER:  Ethicon, by

5    agreement, owned the data.  They owned all the

6    rights to the data.  I took his deposition by

7    court order from the New Jersey judge running

8    7,000 mesh cases.  I took his deposition.  He was

9    their chief consultant.  He gave -- he kept the

10   data per payment.  Ethicon paid for this.  They

11   fund- --

12        Please let me finish.

13                    MS. JONES:  Go ahead.

14                    MR. SLATER:  Ethicon funded this.

15   They owned the data.  There's nothing more

16   relevant in the world than this, and they own the

17   data, and it contradicts all of the data that he

18   ever published.

19        This is incredibly important evidence.

20   His recurrence rate is 49%.  Dr. Weber calculated

21   it.  They can't keep this out.  They have no

22   basis.

23                    MS. JONES:  We have a basis to

24   keep it out that it's not Ethicon --

25                    MR. SLATER:  Ethicon owns it.

1    They funded the study.

2              MS. JONES:  By definition, Your

3    Honor, an investigator-initiated study is one that

4    the investigator initiates, the investigator

5    conducts.

6        There is a track -- there is a contract

7    that says that Ethicon has a right to review the

8    data, but Ethicon never had this data in its

9    possession.

10             MR. SLATER:  They funded the

11   study.  It's one of their studies.

12             MS. JONES:  It is --

13             MR. SLATER:  And it's their chief

14   consultant, who was a consultant at the time,

15   Judge.  He was their chief investigator for the

16   TVM study, the Gynemesh study, every single -- he

17   published data all over, he taught everybody, and

18   he told Dr. Simpson what his rates of

19   complications were.  This is going to prove he

20   lied to Dr. Simpson.  This is key evidence in the

21   case.

22             THE COURT:  Hold it.

23             MR. BALL:  Can I ask what the

24   relevance of this is because --

25             MR. SLATER:  It shows that -- it

Page 1662

1    shows that Dr. Simpson was lied to by Ethicon when

2    she was trained on the complication rates.  It

3    shows that the complication rates are far higher

4    than have ever been reported before.

5          We got -- you know what it took us to get

6    this data?  We had to fight and fight.  They

7    pretended it was gone.  They said when an employee

8    of the place died, they couldn't find it.  It took

9    us two years and the judge ordered the deposition

10   and we got it.

11         This is the death testimony in the whole

12   case.

13                 MR. BALL:  Your Honor --

14                 MR. SLATER:  I can't believe

15   they're trying to keep this out.

16                 MR. BALL:  -- as I understand

17   it -- and correct me if I'm wrong, Adam -- but

18   this deal with recurrence rates.  Is that right?

19                 MR. SLATER:  And erosions.  It was

20   funded by Ethicon.  Ethicon --

21                 THE COURT:  Shhh.

22                 MR. SLATER:  I'm sorry.  Ethicon

23   funded the study.  How can they fight it?  Even if

24   it was some schmoe on the street, they could -- I

25   could bring it in and then you could cross-examine

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 206 of 742 PageID #: 133370
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 206 of 742 PageID #: 63160

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1663

1   her on what weight to give.  I don't know how you

2   can keep this out.

3               MS. JONES:  You can keep it out,

4   Your Honor, because --

5               MR. SLATER:  And there was no

6   in-limine motion on this either.  They never filed

7   a motion on this.

8               MS. JONES:  Your Honor --

9               MR. SLATER:  We were supposed to

10  file motions on everything.  Now they're

11  sandbagging us now in the middle of the trial as

12  if it's a new issue?

13              MR. BALL:  There's no rule that we

14  have to file motions in limine on evidence.

15              MR. SLATER:  Judge, I'm trying to

16  move the case along.  I just cut my outline down

17  to 20 percent.  I'm trying to get done by 3:30, a

18  quarter to 4:00, and I've never heard such an

19  objection.  I've never heard such an objection.

20  Ethicon funded the study.  They paid for it.

21              MS. JONES:  Your Honor, with all

22  due respect, this is what is called an

23  investigator initiated study.

24              MR. SLATER:  Which were the

25  studies they're relying on to defend the case.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 207 of 742 PageID #: 133371
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 207 of 742 PageID #: 63167

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1664

1    Every one of them.  The Altman study --

2                    THE COURT:  Go ahead and talk,

3    talk, talk, because I'm going to listen her in a

4    minute.

5                    MR. SLATER:  I'm sorry, Judge, but

6    every study they're relying on is an investigator

7    initiated study.  The Altman study, the Withagen

8    study, they all are.  But they're relying on them.

9    It's unbelievable.

10                   THE COURT:  What do you mean

11   they're relying on them?

12                   MR. SLATER:  They're using them to

13   defend the case.  The same types of studies,

14   they're defending with, and now they're saying I

15   can't use it against them.

16                   MS. JONES:  Your Honor, this data

17   was never in Ethicon's possession.  It's never

18   been published.  It's --

19                   MR. SLATER:  It was supposed to

20   be, by contract.  That's one of the points we're

21   going to make.  By contract, it was supposed to be

22   and it never got published --

23                   MS. JONES:  Well --

24                   MR. SLATER:  -- because they

25   deep-sixed it.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 208 of 742 PageID #: 133372
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 208 of 742 PageID #: 133168

1          MS. JONES:  It's never been

2  published.  The data has never been in Ethicon's

3  possession.  This is hearsay.  Object to it.  It's

4  irrelevant.

5          And the mere fact that Dr. Lucente was a

6  consultant to Ethicon on other matters and is the

7  investigator here who never published the data and

8  let it drop doesn't mean that you can go out and

9  get all of his data and come in here and produce

10  it today.

11          MR. SLATER:  I don't understand

12  that.  We got a court order to get this stuff

13  against Ethicon.  The judge was so angry at

14  Ethicon for hiding this that she ordered them not

15  to use J&J's same lawyers to defend Lucente for

16  this deposition.  They had to get a different law

17  firm.  She forbid them from using the same

18  lawyers, she was so worried, because they had been

19  hiding this from us for two years before we got

20  it.

21          MS. JONES:  That is absolutely

22  false.

23          MR. SLATER:  I'll produce the

24  transcripts to you.

25          MS. JONES:  Well --

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 209 of 712 PageID #: 133373
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 209 of 712 PageID #: 133373

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1666

1                    THE COURT:  No.

2                    MR. SLATER:  I don't need to do

3    it, Judge, but it's paid for.  The study was

4    sponsored by Ethicon.  They own the rights to the

5    data, Judge.  I can't believe --

6                    MR. BALL:  The problem I see is

7    that they are trying to use data from some other

8    doctor that is all hearsay and pin it on Ethicon.

9    Okay?

10                   MR. SLATER:  He's the guy who

11   taught Dr. Simpson.

12                   MS. JONES:  But that's --

13                   MR. BERGMANIS:  He's the guy that

14   Ethicon paid to teach Dr. Simpson.

15                   MR. SLATER:  They paid him to

16   teach Dr. Simpson about the complication rates.

17                   MR. BALL:  The study -- this

18   study, you can tell by the data that it didn't

19   even get -- the last piece wasn't even in until

20   after her surgery, so it doesn't have anything to

21   do with --

22                   MR. SLATER:  Dan, you're using --

23   all your studies post-date the plaintiff's

24   surgery.  They are all from 2011.

25                   MR. BALL:  I was responding to

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 210 of 742 PageID #: 133374
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 210 of 742 PageID #: 133370

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1667

1    your argument that Dr. Lucente taught Dr. Simpson,

2    because he didn't teach her about this study

3    because the surgery was long gone by then.

4                    MR. BERGMANIS:  But he had the

5    data.

6                    MR. SLATER:  He had the data.

7                    MR. BERGMANIS:  He had the data

8    and he didn't tell Dr. Simpson.  He lied to

9    Dr. Simpson.

10                   MR. SLATER:  This is punitive

11   damage evidence.

12                   MS. STRAUSS:  Your Honor --

13                   THE COURT:  Is there evidence of

14   that?

15          (Court reporter interruption.)

16                   THE COURT:  I'm sorry.

17                   MR. SLATER:  Yes.  We're about to

18   give it to you.

19                   MR. BALL:  There's no evidence --

20                   THE COURT:  No.  You're about to

21   put that up, is what you're about to do.

22                   MR. BALL:  There's no evidence in

23   this case about when Dr. Simpson and Dr. Lucente

24   interacted in relation to this data.  There's no

25   evidence in this case to that effect.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 211 of 712 PageID #: 133375
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 211 of 712 PageID #: 133375

Page 1668

1           They put her on for two or three hours

2    and no -- not one iota of evidence --

3           (Court reporter interruption.)

4               THE COURT:  Just a minute.

5               MR. BALL:  You don't have that --

6               MR. SLATER:  I do.

7               THE COURT:  He can't -- you're not

8    making --

9               MR. SLATER:  I do.  I have the

10   internal documents.

11              MR. BERGMANIS:  Just stop for a

12   second.

13              THE COURT:  You're not going to

14   have a record on that if we don't slow down.

15              MR. SLATER:  Mr. Ball doesn't

16   realize we have documentation that if the

17   Prolift --

18              THE COURT:  Well, I'll tell you

19   what, you come back to it later and I'll consider

20   it.  It's out right now.

21              MR. SLATER:  Judge, she's the only

22   witness I have on it.

23              THE COURT:  Step back.

24              (The proceedings returned to open

25   court.)

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1669

```
 1              THE COURT:  Proceed.

 2       Q.    (By Mr. Slater)  Take the PowerPoint

 3  down.

 4              Dr. Weber, I've handed you a document

 5  marked Plaintiff's Trial Exhibit 1557.  Have you

 6  seen this document before?

 7       A.    Yes, I have.

 8       Q.    Is this a document you rely on for your

 9  opinions in this case?

10       A.    Yes.

11       Q.    Please put this document up.

12              In the fourth line, let's highlight where

13  it points out that there are patients post-Prolift

14  who cannot void.

15              What does that mean?

16       A.    So that means they can't empty their

17  bladders.  They have the -- their bladder fills

18  normally.  You know, the kidneys are always

19  putting out urine and the bladder fills, but

20  they're just not able to release that.

21       Q.    And if we go a little further down, to

22  the sentence that starts six lines up with the

23  word "but," can you highlight that, please?

24              And it says, "But if this starts getting

25  reported, it is going to scare the daylights out
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 213 of 712 PageID #: 133377
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 213 of 712 PageID #: 133173

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1670

1  of doctors."

2           And this was in October of 2005, correct?

3     A.   Yes.

4     Q.   Did they -- did Ethicon ever publicize

5  that they had patients who had this complication

6  where they couldn't even urinate and clear urinary

7  retention?

8     A.   No.

9     Q.   Do you have an opinion as to whether or

10  not Ethicon failed to adequately warn with regard

11  to this complication?

12     A.   Yes, I do have an opinion.

13     Q.   What is that?

14     A.   My opinion is that they failed to warn at

15  all as to the -- this kind of a complication:

16  inability to void for a prolonged period of

17  time.

18           MR. SLATER:  Actually, Your Honor,

19  maybe -- can I try to lay a foundation for what we

20  discussed up at sidebar a few moments ago?

21           THE COURT:  No.  Let's go on with

22  something else.

23        Okay.  Go ahead.

24           MR. SLATER:  Thank you.

25           THE COURT:  Lay your foundation

1   and then I'll rule on it again.

2              MR. SLATER:  Thank you.

3       Q.   (By Mr. Slater)  I want to come back --

4   we can take that document down.

5            Dr. Weber, have you read all of the

6   documents that were produced by Dr. Lucente with

7   regard to his IIS database?

8       A.   Yes.

9       Q.   Have you read his sworn deposition and

10  that of his partner, Miles Murphy, regarding that

11  database?

12      A.   Yes, I have.

13      Q.   Have you read the agreement between

14  Ethicon and Dr. Lucente for this database?

15      A.   Yes, I have.

16      Q.   Can you tell the jury the important

17  points of that agreement?

18              MS. JONES:  Objection, Your Honor.

19              THE COURT:  If it's between that

20  doctor and --

21              MS. JONES:  Ethicon.

22              THE COURT:  -- who was the other

23  party?

24              MR. SLATER:  Ethicon.  Ethicon.

25  It's -- Dr. Lucente had a contract with Ethicon.

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1672

1    MR. BERGMANIS:  It's part of the

2    foundation, Your Honor.

3                MR. BALL:  I think the agreement

4    speaks for itself.

5                THE COURT:  Well --

6                MR. BERGMANIS:  It's part of the

7    foundation.

8                MR. SLATER:  Can my expert

9    describe what it said and then she can explain --

10               THE COURT:  Do we have a copy of

11   it?

12               MR. SLATER:  I don't have it in

13   the room.  I can have it printed in the next 10

14   minutes.

15               THE COURT:  All right.  Go ahead

16   and ask questions, but I'd like to see a copy of

17   it.

18   **Q.   (By Mr. Slater)  Tell the jury the**

19   **important points of the agreement, please.**

20   A.   Okay.  So this consulting agreement

21   between Ethicon and Dr. Lucente stipulated that --

22   stipulated requirements in completing the study,

23   and one of the requirements was that Dr. Lucente

24   publish his results.  That makes sense.  If he's

25   going to do the study, then the results should

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 216 of 742 PageID #: 133380
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 216 of 742 PageID #: 133378

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1673

1   become known to the scientific community.

2           And it is standard for an Ethicon

3   contract of this type.  Ethicon owned the data

4   themselves.  Dr. Lucente was required to provide a

5   report to Ethicon.

6               MS. JONES:  Objection, Your Honor.

7   I don't believe Dr. Weber is qualified to testify

8   to the legal ramifications of that contract.

9               MR. SLATER:  She's explaining the

10  terms of the contract.  She's an expert, and

11  certainly an expert with regard to clinical

12  studies.

13              MS. JONES:  Your Honor, the issue

14  is the contract of an independent --

15              THE COURT:  I'd like -- let's just

16  stop that.  I want to see that contract before we

17  go any further.

18              MR. SLATER:  Fair enough.  I'll

19  move on and we'll come back.

20              THE COURT:  All right.  Doctor,

21  we're going to go to another subject.  I'm not

22  taking that up right now.

23              MR. SLATER:  Okay.

24              THE COURT:  Are you an attorney at

25  law?  Are you an attorney at law?

Page 1674

1                    THE WITNESS:  No, I am not.

2                    THE COURT:  Have you gone to law

3   school?

4                    THE WITNESS:  No, I have not.

5                    THE COURT:  All right, all right.

6       Q.   (By Mr. Slater)  Are you --

7                    THE COURT:  We'll take that

8   up later.

9       Q.   (By Mr. Slater)  Are you an expert with

10   regard to clinical study agreements?

11       A.   Yes, I am.

12       Q.   Did you run the program at the NIH

13   whereby $50 million was being used to fund

14   research all over the United States?

15       A.   Yes, I was.

16       Q.   And did you have the supervisory

17   authority over that contracting?

18       A.   Yes, I did.

19                    THE COURT:  Well, one question

20   there.  Did you draw the agreements or did your

21   legal department draw them?

22                    Did you draw the agreements yourselves or

23   did your legal departments at the National

24   Institute of Health --

25                    THE WITNESS:  No.

Page 1675

 1                    THE COURT:  -- take care of those?

 2                    THE WITNESS:  I drew those

 3    agreements myself.

 4                    THE COURT:  You did?

 5                    THE WITNESS:  Yes, I did.

 6                    THE COURT:  Put in all the

 7    ramifications and terminology?

 8                    THE WITNESS:  Yes.

 9                    THE COURT:  All right.

10       Q.   (By Mr. Slater)  I've handed you a

11    document marked as Exhibit 1238.  Have you seen

12    this document before?

13       A.   Yes, I have.

14       Q.   Is this a document on which you rely on,

15    in part, for your opinions in this case?

16       A.   Yes.

17       Q.   Let's put this up, Exhibit 1238.

18                    MS. JONES:  Your Honor, I object.

19                    THE COURT:  Which one is it?  I --

20                    MS. JONES:  I object to this --

21                    THE COURT:  I haven't seen it.

22                    MS. JONES:  -- because this refers

23    to a matter that I think Your Honor said you would

24    take up later on.  I think --

25                    THE COURT:  If that's part of

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 219 of 742 PageID #: 133383
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 219 of 742 PageID #: 68179

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1676

1  that, I thought we --

2                    MS. STRAUSS:  No, no.  It's not.

3                    MS. JONES:  It's not.  I don't

4  mean to mislead the court.  It's not part of that

5  subject.

6                    THE COURT:  Okay.

7                    MS. JONES:  But it does deal with

8  a patient other than Ms. Budke.

9                    MR. SLATER:  It's a report of an

10  adverse event very similar to hers to the

11  company --

12                    MS. JONES:  No.

13                    MR. SLATER:  -- three years

14  before.

15                    THE COURT:  No, no, no.  Come on

16  up here.

17                    MR. SLATER:  Oh, my God.

18                    THE COURT:  We're not getting

19  anywhere here.

20                    (Counsel approached the bench and

21  the following proceedings were held outside the

22  hearing of the jury:)

23                    MR. BALL:  Your Honor, our

24  objection is that this is in reference to an event

25  other than Ms. Budke's.

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 220 of 712 PageID #: 133384
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 220 of 712 PageID #: 133384

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1                    THE COURT:  That's what I was

2    trying to get.

3                    MR. BALL:  It's hearsay --

4                    THE COURT:  Yes, it is.

5                    MR. BALL:  -- it's hearsay and

6    it's without proper foundation and you cannot put

7    in other individual events of other people, other

8    lawsuits, other people.  You can't do it.  You can

9    talk statistically, but you can't put in specific

10   other events without -- because they're all

11   hearsay, and unless somebody comes in with

12   firsthand knowledge of the event and establishes

13   that the event is very similar to Mrs. Budke's

14   event, you can't put it in.  And you can't put it

15   in through a piece of paper; it has to be a person

16   with firsthand knowledge.  That's black letter

17   law.

18                    MR. BERGMANIS:  Black letter law

19   is experts always rely on hearsay.

20                    MR. SLATER:  I'm sorry, but this

21   isn't hearsay.

22                    THE COURT:  I didn't hear you.

23                    MR. BERGMANIS:  Oh.  Black letter

24   law is that --

25                    MR. SLATER:  I'm sorry, Judge.

Page 1678

 1                    MR. BERGMANIS:  -- experts always

 2    rely on hearsay.

 3                    MR. SLATER:  This is a business

 4    record written by Ethicon.

 5                    MS. JONES:  In response --

 6                    MR. BALL:  It doesn't matter --

 7                    MR. SLATER:  Please let me finish.

 8    You guys are crushing me, so just let me talk.

 9    I'm -- you know.

10                    THE COURT:  I'll let you talk.

11    Talk, talk, talk, talk.  I will.  But damn it, you

12    can't -- it's either --

13                    MR. SLATER:  Judge, you've already

14    ruled this in evidence.  You ruled in our favor.

15    You said if it predates it and it's very

16    similar --

17            This is -- this is vaginal erosion.

18                    THE COURT:  "Dear redacted."  I'm

19    telling you that is hearsay.

20                    MR. SLATER:  Judge, it's a letter

21    written by the company.  It's their official

22    business record about an adverse event report.

23            If this goes out, I can't use one piece

24    of paper in this case.

25                    MR. BALL:  Oh.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 222 of 712 PageID #: 133386
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 222 of 712 PageID #: 133185

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1679

1          MS. JONES:  Your Honor --

2          MR. BALL:  You --

3          MR. SLATER:  And now that we -- he

4  just made an argument that all I can put in is

5  statistical analyses?

6          To say that, I have adverse event reports

7  to the company predating her surgery giving them

8  notice of the defect.  I have negligence claims.

9  They ignored this.  I have all sorts of claims.

10  This is implicated by punitive damage claims in

11  this case.  They're ignoring all this.

12          MR. BALL:  Then he should have

13  gotten the right foundation, and the right

14  foundation is not to come up with an out-of-court

15  statement, a piece of paper, and try and show

16  other --

17          MR. SLATER:  It's a business

18  record of the company.

19          MR. BALL:  It is not because it

20  contains hearsay in it about the report of the

21  event.

22          MR. SLATER:  Oh, my gosh, it's --

23          MR. BALL:  I deal with this every

24  time in a product liability case where they try to

25  put into evidence other events that have happened

Page 1680

1   to people besides this.  There's a very specific

2   way that they can try to do this and they haven't

3   done it and they can't do it in this case.

4        We have to have somebody with firsthand

5   knowledge who can establish that the other event

6   is substantially similar to Mrs. Budke's.

7            MS. JONES:  Your Honor, this

8   letter, Exhibit 1238, is a response from the

9   company to a doctor --

10           THE COURT:  Presumably.

11           MS. JONES:  -- in response to an

12  adverse reaction report that's not been

13  demonstrated to be similar to Ms. --

14           MR. SLATER:  We have a failure

15  to --

16           THE COURT:  Go ahead.  What?

17           MS. JONES:  It's dissimilar, it

18  contains hearsay, and therefore is irrelevant to

19  this claim.

20           MR. SLATER:  Judge, I have a

21  failure to warn claim.  Their knowledge of the

22  risks is my basis for what they're supposed to

23  warn of.  This is their knowledge base.  This is

24  their business records.

25           THE COURT:  I thought you were

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 224 of 742 PageID #: 133386
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 224 of 742 PageID #: 63188

Page 1681

1    doing a pretty good job of getting that point

2    across.

3                MR. BALL:  He's already provided

4    all kinds of testimony about --

5                MR. SLATER:  Are you stipulating

6    to liability?

7                MR. BALL:  No.

8                THE COURT:  No --

9                MR. BALL:  I suspect --

10               THE COURT:  -- they're not doing

11   that.

12               MR. SLATER:  Then you know what,

13   Judge?

14               THE COURT:  They don't want to

15   sound that dumb to the Court.

16               MR. BALL:  You've put in -- you've

17   put -- he's put in multiple pieces of testimony

18   about what was supposedly known to Ethicon

19   beforehand.  This is a step farther where he's

20   trying to show, through hearsay evidence, other

21   events other than Mrs. Budke.  He can't do that.

22   I can't help --

23               MR. SLATER:  So I'm limited only

24   to Mrs. Budke's situation to prove my case?  Come

25   on.

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 225 of 742 PageID #: 133389
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 225 of 742 PageID #: 63589

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1682

1           MR. BALL:  You are not allowed --

2           MR. SLATER:  Stop.

3           MR. BALL:  This is standard.  You

4    are not allowed to put in other events and

5    incidents involving people with a product without

6    a sufficient foundation, and that isn't enough

7    foundation.  It's not even --

8           MR. SLATER:  It's their business

9    record.  Let them bring someone in --

10          MR. BALL:  It's hearsay --

11          MR. BERGMANIS:  Hold on, hold on.

12          MR. SLATER:  It didn't really

13   happen --

14          MR. BERGMANIS:  This will take

15   care of it.  Amy's got the hearsay issue.

16          MS. GUNN:  Your Honor, I have

17   tried to listen.  I have a case -- I have a case

18   that's Patterson.  Your Honor, there is no

19   question -- there is no question that experts can

20   rely on hearsay.  Experts can rely on hearsay.

21   They can take anything and rely on it.  Otherwise,

22   they wouldn't be able to have anything other than

23   their firsthand knowledge.

24          It's clear in Missouri that experts can

25   rely on hearsay.  So any objection based on

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 226 of 742 PageID #: 133390
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 226 of 742 PageID #: 63590

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1683

1    hearsay is entirely unfounded.

2              MR. BALL:  That is not -- that is

3    not part of the basis --

4              MR. BERGMANIS:  Black letter law.

5              MR. BALL:  That is not the basis

6    of the objection, Your Honor.

7         Just so we're clear, the objection is not

8    that an expert can't rely on hearsay.  That is not

9    the objection.

10        The objection is that you cannot put in

11   front of the jury another incident involving

12   another person.  You can't put that in whether

13   it's an expert or not an expert.  You can't put

14   another person's event in front of the jury unless

15   you have a firsthand-knowledge foundation that

16   establishes substantial similarity.

17        Taking a case and saying that an expert

18   can rely on a policeman's diagram has nothing to

19   do with this incident.

20              MS. GUNN:  It has --

21              MR. BALL:  Nothing.

22              MS. GUNN:  -- everything.  It's

23   exactly the same.

24              MR. BERGMANIS:  You just -- you

25   just said it was hearsay a minute now.  Now you're

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 227 of 742 PageID #: 133391
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 227 of 742 PageID #: 63191

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1684

1   saying it's not a hearsay objection?

2              MR. BALL:  It is hearsay but it's

3   as -- it's hearsay in another -- another event

4   objection.  I've said that repeatedly.

5              MR. BERGMANIS:  It goes to weight.

6   You get to cross-examine.

7              MS. GUNN:  It goes to the weight,

8   not the admissibility of it.  We're trying to

9   establish the basis of her opinions.

10             MR. BALL:  Your Honor, you

11  already ruled on this.

12             THE COURT:  Yeah.  I think this is

13  trying to be -- independent substantive

14  evidence --

15             MS. JONES:  Your Honor --

16        (Court reporter interruption.)

17             THE COURT:  Okay.  Here's what I'm

18  going to do.

19        I'm good to sustain the objection on the

20  ground that this letter is not offered as

21  independent substantive evidence.

22             MR. BALL:  Right.

23             THE COURT:  It's just a -- another

24  person that wrote the company about something.

25             MR. SLATER:  Judge, it's the

Page 1685

1    company --

2              THE COURT:  Shhh.

3              MR. BERGMANIS:  Can you do it

4    through notice?

5              MR. SLATER:  -- sponsoring and

6    considering it.

7              MR. BALL:  You already ruled on

8    this.

9              MR. SLATER:  They have systems

10   when they --

11             THE COURT:  Take me up on it.

12             (The proceedings returned to open

13   court.)

14      **Q.   (By Mr. Slater)  Dr. Weber, I've handed**

15   **you a medical article with the stamp PLT0108.  Are**

16   **you familiar with this article?**

17      A.   Yes, I am.

18      **Q.   Is this an article that you believe to be**

19   **authoritative with regard to the subject matter it**

20   **addresses in this field?**

21      A.   Yes.

22      **Q.   Who are the authors of this article?**

23      A.   The authors are part of the French TVM

24   group, the transvaginal mesh group that worked on

25   developing the procedure.

Page 1686

1       Q.    And who's the last named author?

2       A.    Michel Cosson.

3       Q.    And what's the significance of who is

4   listed as the last author in the string?

5       A.    That's typically the senior author.

6       Q.    And this is dated as having been received

7   by this journal, the International Urogynecology

8   Journal --

9       A.    Yes.

10      Q.    -- March 22, 2005, and was accepted for

11  publication July 25, 2005, is that correct?

12      A.    Yes.

13      Q.    First, just in the abstract in the

14  beginning, what was -- what was the number of

15  patients studied, what was being studied, first of

16  all?

17      A.    Okay.  So they studied 277 patients who

18  were undergoing surgery with the transvaginal mesh

19  implantation technique, and they wanted to learn

20  how many women developed a mesh erosion.

21      Q.    And what was their stated rate?

22      A.    That was 34 cases within two months of

23  surgery at 12.27%.

24      Q.    And do you have an opinion, to a

25  reasonable degree of medical certainty, as to

Page 1687

1    whether that shows this to be a safe or unsafe

2    device?

3        A.   Yes.

4        Q.   And what's your opinion?

5        A.   My opinion is that this is unsafe.

6        Q.   Now, have you read the conclusion by the

7    authors of this article?

8        A.   Yes, I have.

9        Q.   And what was their conclusion?

10       A.   Their conclusion was that a mesh erosion

11   rate of 12.27% at only two months of follow-up was

12   too high to be acceptable, and they felt like the

13   technique was still experimental unless they were

14   able to -- until they were able to bring the mesh

15   erosion rate below 5%.

16       Q.   And this was in 2005?

17       A.   Yes.

18       Q.   And was the Prolift on the market at this

19   point?

20       A.   It was just, yes.  For a few months.

21       Q.   And when someone says a -- something

22   should be experimental, what does that mean?

23       A.   That means that there's not enough

24   evidence to weigh in the risk balance -- excuse

25   me, risk/benefit equation.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 231 of 712 PageID #: 133395
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 231 of 712 PageID #: 63195

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1688

1          For example, in a doctor talking with a

2    patient in terms of undergoing a procedure like

3    the Prolift procedure, there isn't enough

4    information to say, "In your case, the risks are

5    going to be outweighed by the benefits and

6    therefore I recommend you go ahead."

7          So when it's experimental, there isn't

8    enough information of that sort and the doctor

9    isn't able to say whether the risks outweigh the

10   benefits, and if the woman chooses to undergo that

11   procedure, she understands that this is an

12   experiment and she enters into that voluntarily:

13       **Q.   If something's experimental, would it be**

14   **sold widespread on the market, as the Prolift was?**

15                    MS. JONES:  Objection, Your Honor.

16   I think this --

17                    MR. SLATER:  I'm asking for

18   definition of terminology, Your Honor.

19                    THE COURT:  What are we talking

20   about?

21                    MR. SLATER:  Talking about whether

22   or not something that's experimental should be

23   sold on the market for widespread use.

24          I'm asking Dr. Weber as an expert to

25   answer that question.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 232 of 742 PageID #: 133396
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 232 of 742 PageID #: 133192

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1689

1              MS. JONES:  And I think that's

2    beyond her qualifications.

3        Q.    (By Mr. Slater)  Are you an expert with

4    regard to the implications of something being

5    deemed experimental in the field of medicine?

6        A.    Yes, I am.

7        Q.    Is that something that you actually

8    considered on a day-to-day basis in your academic

9    and research work?

10       A.    Yes.

11       Q.    Would you please tell us:  Would an

12   experimental product be sold for widespread

13   marketing?

14             MS. JONES:  Objection, Your Honor.

15             THE COURT:  Well, you can answer

16   the question.

17             THE WITNESS:  Thank you.

18       A.    No.

19       Q.    (By Mr. Slater)  Why not?

20       A.    By its very definition, experimental

21   means it should be used in a trial setting, in a

22   research setting, where the woman understands and

23   participates voluntarily, consents to participate

24   in an experiment, not something that's in

25   widespread use, in clinical use, where women don't

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 233 of 742 PageID #: 133397
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 233 of 742 PageID #: 133397

Page 1690

1   understand that it's experimental.

2       Q.   Okay.  Doctor, I've handed you what we've

3   marked as PLT0139A.

4                  THE COURT:  What was that number?

5   Zero --

6                  MR. SLATER:  0139A.

7                  THE COURT:  All right.

8       Q.   (By Mr. Slater)  Is this a medical

9   article that you're familiar with?

10      A.   Yes.

11      Q.   And is this something you consider to be

12   authoritative in this field?

13      A.   Yes.

14      Q.   Okay.  Doctor, will you tell the jury

15   what this is.

16      A.   Okay.  So this is a research article

17   that's presenting a summary of the use of

18   synthetic mesh for prolapse repair.

19      Q.   And who are the authors?  Who are the

20   people that are talking about the use of this

21   mesh?

22      A.   These are also members of the French

23   transvaginal mesh group.

24      Q.   Including Dr. Cosson?

25      A.   Yes.

1      Q.   Okay.  What I'd like to do now is I'd

2   like to ask you --

3           First of all, I'm going to read a --

4           Well, let me just ask you this:  Did they

5   comment upon the use of Prolene Soft mesh, the

6   mesh they had been using and at this time was on

7   the market in the Prolift?

8      A.   Yes.

9      Q.   And what is it that they said about that?

10          MS. JONES:  Objection, Your Honor.

11   This --

12          MR. SLATER:  I'll rephrase the

13   question.

14          THE COURT:  All right.

15      Q.   (By Mr. Slater)  Based on this article,

16   what is your understanding as to what the position

17   was as to the authors of this article, including

18   Cosson?

19          MS. JONES:  Same objection.

20   Hearsay.

21          THE COURT:  Well, fair enough.

22   She can answer it.

23      A.   Okay.  The authors concluded that the

24   Gynemesh PS mesh in the Prolift did not fulfill

25   expectations.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 235 of 742 PageID #: 133399
Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 235 of 742 PageID #: 133399

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1692

1      Q.    (By Mr. Slater)  Do you have an

2   understanding from this article about whether or

3   not from their work here they felt that it was

4   appropriate to have the widespread use of

5   synthetic mesh for the treatment of prolapse?

6      A.    No.

7                MS. JONES:  Objection.

8      A.    I mean, I'm sorry, I do have an opinion.

9      Q.    (By Mr. Slater)  And what is that?

10     A.    The opinion is no.

11     Q.    And explain that.

12     A.    They felt like the --

13               MS. JONES:  Objection, Your Honor.

14   I believe that's hearsay.  I don't believe she can

15   testify --

16               THE COURT:  I'm sorry?

17               MS. JONES:  It's hearsay.

18               THE COURT:  Well, I think that the

19   thing speaks for itself.  She can read what they

20   said but I won't let her put her innuendo on it,

21   if you've got it there.

22     Q.    (By Mr. Slater)  And what did they say

23   with regard to that issue?

24     A.    Okay.  They said the Prolift kit -- the

25   follow-up on patients with the Prolift kit was

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 236 of 742 PageID #: 133490
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 236 of 742 PageID #: 63190

Page 1693

1    still too short for proper assessment.

2           This is after the Prolift is on the

3    market in the United States.

4       **Q.   And what did they say starting with**

5    **"proposed to improve these phenomenon," right**

6    **under that black line in the middle?**

7                 MR. BALL:  Your Honor, Your

8    Honor --

9                 THE COURT:  Yes.

10                MR. BALL:  -- they are not

11   entitled to read the -- they are not entitled to

12   read from a document like this.  This is hearsay.

13   She can say she can have an opinion, she can say

14   this expresses the opinion, but they can't read

15   from it or paraphrase it.  It's hearsay.

16                THE COURT:  All right.  Ask her a

17   question, then, and she can give us what her

18   opinion is on it.

19      **Q.   (By Mr. Slater)  What is your opinion as**

20   **to whether or not they had reservations about the**

21   **widespread use of synthetic meshes?**

22                MR. BALL:  That's the same thing.

23   He's asking her hearsay.  He can ask her opinion

24   about whether mesh -- she's already said four

25   times what her opinion is about mesh.  She can say

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 237 of 712 PageID #: 133491
Case 2:12-md-02327  Document 3702-6  Filed 05/09/16  Page 237 of 712 PageID #: 133191

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1694

1   this supports it but she can't read the document.

2   It's a hearsay --

3                 MR. SLATER:  I wasn't asking her

4   to, sir.  I asked her what his understanding was

5   as to a question that I asked her.  I didn't ask

6   her to read the documents.

7                 MR. BALL:  He asked about what was

8   your understanding of what they said.  That is

9   hearsay and he -- he's trying to --

10      **Q.   (By Mr. Slater)  What is your**

11  **understanding as to whether or not they thought**

12  **that the Gynemesh --**

13                THE COURT:  Drop the "they

14  thought."

15                MR. SLATER:  I don't know --

16                THE COURT:  I mean, I assume that

17  when a doctor reads this type stuff, they read it

18  with their understanding of what it is, and so...

19      **Q.   (By Mr. Slater)  Is it -- as a doctor in**

20  **the field, when you read an article like this,**

21  **based on who these people were and their role in**

22  **the development of the Prolift procedure, would it**

23  **be of interest to understand what they thought,**

24  **based on their study?**

25      A.   Yes.

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1695

1      Q.    Would that be standard within the medical

2    community?

3      A.    Yes.

4      Q.    And is that how you've read this and

5    understood it?

6      A.    Yes.

7      Q.    And is it important to you in forming

8    your opinions?

9      A.    Yes.

10     Q.    What is your understanding as to whether

11   or not the inventors of the Prolift were

12   comfortable with the widespread use of synthetic

13   meshes, after all their work with the Prolift?

14              MR. BALL:  Objection as hearsay,

15   Your Honor.  It's -- he's asking the same thing

16   four different ways.  It's all hearsay.

17              THE COURT:  I'm -- I'm going to

18   allow it one time if you just won't beat it to

19   death.  Okay?

20              MR. SLATER:  Thank you.

21     A.    Okay.  The inventors were not comfortable

22   with having the procedure used widespread in

23   clinical practice.

24          As we've mentioned, they felt that the

25   erosion rate was too high, that it needed to be at

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1696

1    least under 5%, and they weren't anywhere close to

2    that.

3        Q.   (By Mr. Slater)  Dr. Weber, we've spoken

4    about the ACOG practice bulletin that you authored

5    earlier in your testimony.  Remember that?

6        A.   Yes.

7        Q.   And what I'm going to do now is ask you:

8    Factually, what happened to that practice bulletin

9    after you authored it and it was published?  What

10   factually occurred?

11       A.   What occurred is that a small number of

12   clinicians contacted the American College of

13   Obstetrics and Gyn- -- Obstetricians and

14   Gynecologists to express their reservations over

15   the term "experimental" because they were worried

16   this meant insurance companies would not pay for

17   the procedure, since they don't typically pay for

18   things that are experimental, and they were also

19   concerned that this would increase their

20   medical-legal risk if a patient of theirs

21   experienced a complication in the setting of a

22   procedure that was deemed experimental.

23       Q.   I'm going to show you a document that has

24   been received -- the jury's seen this document and

25   it's been testified to -- and I want to ask you

Page 1697

1    from your viewpoint as the author of the study:

2    When did you learn about Ethicon's direct

3    involvement in this process?

4                    MS. JONES:  Objection, Your Honor.

5    Assumes facts not in evidence.

6                    MR. SLATER:  I'll ask it

7    differently.

8                    THE COURT:  All right.

9        Q.    (By Mr. Slater)  We've handed you Exhibit

10   P2299.  Is this an email chain you've seen?

11       A.    Yes.

12       Q.    And is this significant to you, as the

13   author of the article?

14       A.    Yes.

15       Q.    Why?

16       A.    Because before I saw this document, I

17   didn't realize that Ethicon and its paid

18   consultants were working --

19                    MS. JONES:  Objection, Your Honor.

20       A.    -- to --

21                    THE COURT:  Just a minute.

22                    MS. JONES:  Excuse me, Your Honor.

23        The document speaks for itself.  It's

24   cumulative, there's been testimony about it, and

25   the doctor -- the jury can decide what it means.

Page 1698

1              THE COURT:  Well, it's been

2     published so it's going to go back to them.

3              MS. JONES:  It's not the subject

4     of appropriate expert testimony or of Dr. Weber --

5              MR. SLATER:  She's also testifying

6     factually, Your Honor.  She's the person who wrote

7     it.  Who could better talk about it than her?

8              THE COURT:  Wrote this right here

9     (indicating)?

10             MR. BALL:  She didn't write this.

11             MR. SLATER:  No.  She wrote the

12     article.

13             THE COURT:  Well, then they can

14     interpret that.  They're the trier of facts.  It's

15     going to go back to them, unless you tell me you

16     don't want it to go back.

17     Q.    (By Mr. Slater)  Without stating --

18             THE COURT:  If nothing else, it

19     invades the province of the jury.

20     Q.    (By Mr. Slater)  I'm sorry.

21             Without stating what was in the email,

22     what was your reaction when you read the emails?

23             MS. JONES:  Objection, Your Honor.

24     That's irrelevant.

25             THE COURT:  Well, that's her state

Page 1699

1    of mind.  I don't...

2                    MR. SLATER:  Okay.

3                    THE COURT:  She can testify to

4    medical opinions, but not state of mind.

5        **Q.   (By Mr. Slater)  We've just handed you,**

6    **Dr. Weber, PLT0506.  What is this?**

7        A.   This is a letter to the editor that I

8    wrote to describe the situation that occurred

9    between the publication of the original practice

10   bulletin and the retraction and publication of a

11   second bulletin.

12       **Q.   And why did you write this letter?**

13       A.   I wrote this letter because I was very

14   concerned that my professional organization, the

15   American College of Obstetricians and

16   Gynecologists, was taking a stand that instead of

17   advocating for women's safety actually endangered

18   their safety.

19           I thought that was an inappropriate

20   response, and it was very concerning to me that

21   other doctors need to know about this to

22   understand what had happened between the initial

23   publication --

24                    THE COURT:  Okay.  Just -- have

25   you got an objection?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 243 of 712 PageID #: 133407
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 243 of 712 PageID #: 133207

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1700

1          MS. JONES:  I do have an objection

2  at this stage, Your Honor.  I think it's

3  irrelevant and beyond the scope of the question.

4          THE COURT:  Let's play Q&A if we

5  can.

6          MR. SLATER:  Your Honor, I'm

7  asking why she wrote the letter that I'm about to

8  ask her to read to the jury so they can know what

9  position she took so they can understand the

10  letter --

11          THE COURT:  Is that in evidence?

12          MS. JONES:  No.

13          MR. SLATER:  Well, it's being used

14  with the witness who wrote it for the first time

15  in the case right now.

16          THE COURT:  It's never been

17  published before?

18          MR. SLATER:  It has not, but the

19  author of it is here now.

20          THE COURT:  All right.  Okay.

21    **Q.   (By Mr. Slater)  So --**

22          MR. BALL:  Your Honor --

23          THE COURT:  Yes.

24          MR. BALL:  -- I would object to

25  the relevance of this.  This is a -- this is a

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 244 of 712 PageID #: 133408
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 244 of 712 PageID #: 133202

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1701

 1   dispute between this witness and the American

 2   College of Obstetricians and Gynecologists that is

 3   not relevant to this case.

 4          This case is about whether the Prolift

 5   benefits outweighed the risks, and that's

 6   what it's-- all it's about, and whether they had

 7   had some kind of dispute going on is collateral

 8   and irrelevant.

 9               MR. SLATER:  Your Honor, it's

10   relevant for many reasons.  I'd rather not -- I

11   thought we were supposed to do it at sidebar but

12   it's relevant for many reasons.

13               THE COURT:  Let's just don't have

14   her read it.  If she was involved in it, she knows

15   what it says.  She's an intelligent woman.

16               MR. SLATER:  Your Honor, the jury

17   needs to hear this.

18               THE COURT:  Are you not going to

19   ask to have it admitted into evidence?

20               MR. SLATER:  Of course I'm going

21   to ask to have it admitted into evidence.

22               THE COURT:  Well, then they're

23   going to have an opportunity to read it.

24               MR. SLATER:  Shouldn't they have

25   the opportunity for us to put it in the record at

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 245 of 712 PageID #: 133409
Case 2:12-md-02327 Document 3162-6 Filed 09/09/16 Page 245 of 712 PageID #: 63209

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1702

1   the trial?

2          This is important evidence in our case,

3   Your Honor.

4              MR. BALL:  Our objection stands,

5   Your Honor.  Our objection stands.

6              MR. SLATER:  She's the author of

7   the letter.

8              MR. BALL:  Doesn't matter.

9              MR. BERGMANIS:  Your Honor, it --

10             MS. JONES:  It's irrelevant to the

11  issues in this case, Your Honor.

12             MR. BERGMANIS:  It's going to go

13  into evidence and they're going to get a whole

14  pile of --

15             THE COURT:  I just got -- did I

16  not say that?

17             MR. BERGMANIS:  I was just going

18  to ask that we put it up on the screen, because

19  otherwise they're going to get this whole pile and

20  we may as well do it in context.

21             MR. BALL:  This is getting --

22             MR. BERGMANIS:  They're going to

23  have stacks of documents back there anyway, and if

24  they're going to see it anyway --

25             THE COURT:  Well, let's -- I'm not

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 246 of 712 PageID #: 133410
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 246 of 712 PageID #: 133200

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1703

1    going to publish it out here and then send it back

2    with them.  If he wants to ask her some questions

3    about it, that's fine, but you can send that back.

4    It becomes part of the record if I admit it.  You

5    know that.

6              MR. SLATER:  I know that, Your

7    Honor, but I think that at a trial we need to let

8    the jury hear the evidence in the flow of the

9    trial as we deem fit.

10              MR. BALL:  I'm not going to repeat

11   my objection, Your Honor.

12              THE COURT:  Well, I'm going to let

13   you ask questions about it.  I'm not going to let

14   you have her read it into evidence, if it's going

15   to be there otherwise.

16        So if you want to ask her some questions

17   about it, let's do it.  If you don't, let's put it

18   down and go to something else.

19              MR. SLATER:  All right, Your

20   Honor.  Then I guess I'll ask her to interpret it

21   as I go.  I don't know any other way to do it.

22              THE COURT:  Mighty fine.

23        **Q.  (By Mr. Slater)  Okay.  Dr. Weber, this**

24   **was written August 8, 2009.  That was when it was**

25   **actually submitted to the International**

Case 2:12-md-02327 Document 3756-6 Filed 04/29/16 Page 247 of 712 PageID #: 132414
Case 2:12-md-02327 Document 3756-6 Filed 04/29/16 Page 247 of 712 PageID #: 132411

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1704

1    Urogynecology Journal?

2        A.   Yes.

3        Q.   Now, when you took the positions that you

4    took in this letter, had you ever spoken with me?

5        A.   No.

6        Q.   So this shows what your opinions and

7    viewpoints were before you ever became involved in

8    this litigation?

9        A.   Yes.

10       Q.   And in the first paragraph --

11            I'll go to the second paragraph, and it

12   says that after you had learned what happened, you

13   said, "The explanation I was given at the time why

14   ACOG decided to change the wording, over my

15   strenuous objection, was that the meaning of the

16   word 'experimental' was ambiguous.  This is

17   disingenuous at best.  In fact, the ACOG staff

18   member at the meeting of the committee on practice

19   bulletins, gynecology, described the real reason

20   for concern, quote, recognition that the current

21   wording would possibly deny payment for some

22   physicians."

23            Now I want to stop there.

24            When you wrote this letter, did you have

25   any concerns about putting this out there for

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1705

1    **every doctor not only in the United States but**

2    **abroad to see your viewpoints, or did you want**

3    **them to see what you had to say?**

4        A.   No, I wanted to -- I wanted to tell the

5    story of what happened.

6        Q.   **You say -- I'm going to ask you what this**

7    **means.**

8                   MR. BALL:  Your Honor, he's

9    continuing to just read from the letter --

10                  THE COURT:  Well, here's what --

11                  MR. BALL:  -- and ask her why she

12   did -- why she had this dispute with the American

13   College.  That is a completely irrelevant matter.

14                  THE COURT:  It's already -- this

15   has already been bordered way on once before.  I

16   recall that.  Where you talked about these very

17   things.  And you would like, of course, to

18   reinforce it with the author of it, or whatever,

19   but I mean --

20                  MR. SLATER:  We're trying to prove

21   that this procedure should have always been

22   experimental and never should have been on the

23   market.  We got the author of the thing telling

24   the jury why that word "experimental" belonged in

25   there, Judge.

Page 1706

```
 1                  THE COURT:  I thought you'd
 2   already -- I thought we did that before, and as to
 3   why they took it out was because of things
 4   unrelated.
 5                  MR. SLATER:  Judge, there's more
 6   to this story and I have a right --
 7                  THE COURT:  Oh, man, I know it.
 8   There's probably six weeks of it, but let's --
 9   okay.  Just go ahead and do it because I want to
10   get -- get done --
11                  MR. SLATER:  I'm trying and I get
12   an objection every time I open my mouth.
13                  THE COURT:  I know you do.  Okay.
14   Can you do something besides just read it to her?
15                  MR. SLATER:  Well, I'd prefer --
16   that was your question, Judge.
17                  THE COURT:  Go right -- go
18   right -- go right ahead.  Be my guest.  We got all
19   kinds of time.
20       Q.   (By Mr. Slater)  You wrote:  "Most of the
21   clinicians who objected to the use of the word
22   'experimental' understood only too well exactly
23   what meaning was intended, that the use of mesh
24   kits as procedures for prolapse lacked sufficient
25   evidence of risk versus benefit to adequately
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 250 of 712 PageID #: 133414
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 250 of 712 PageID #: 133414

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1707

1   counsel patients as to expected outcomes.  Such

2   clinicians were concerned that insurance companies

3   would not cover procedures labeled experimental

4   and they were concerned about the medical-legal

5   risks, should a complication arise in the course

6   of procedures labeled experimental."

7           That's what you've explained to the jury?

8   A.   Yes.

9   Q.   And you took that position back in August

10  of 2009?

11  A.   Yes.

12  Q.   And is that the position you take today

13  as you stand before this jury?

14  A.   Yes.

15  Q.   And you say, "Exactly the kinds of

16  concerns that a professional organization that

17  truly promoted best medical practices would see as

18  a red flag that clinicians' concerns were not

19  focused on what was best for the patient but on

20  what protected their income.  That ACOG chose to

21  align itself with these few fellows at the expense

22  of patients' outcomes and safety is of grave

23  concern."

24          Do you still hold these opinions today?

25              MR. BALL:  Same objection, Your

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 251 of 742 PageID #: 132415
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 251 of 742 PageID #: 132415

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1708

1    Honor, about hearsay and irrelevance.

2              MR. SLATER:  It's hearsay?  She's

3    the author of it, sir.

4              THE COURT:  I -- go ahead.  I'll

5    overrule it.  Go ahead.

6       Q.   (By Mr. Slater)  And you said, "If ACOG

7    had actually decided that the meaning of the word

8    'experimental' was ambiguous, it could have

9    decided to clarify the meaning of the term in the

10   document itself."

11           So they had the ability to define it.

12      A.   Yes.

13      Q.   And you then say -- the last paragraph --

14   "I agree with Drs. Wall and Brown," and they had

15   written a letter taking the same position you were

16   taking, hadn't they?

17      A.   An article, yes.

18      Q.   And that's Dr. Lewis Wall in St. Louis?

19      A.   Yes.

20      Q.   "I agree with Drs. Wall" --

21           And I'll just ask you a question.

22   Dr. Wall is a noted national ethicist, an expert

23   in medical ethics, isn't he?

24      A.   Yes.

25      Q.   And he was in agreement with you, wasn't

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 252 of 742 PageID #: 133416
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 252 of 742 PageID #: 133416

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1709

1    he?

2         A.    Yes.

3         Q.    "I agree with Drs. Wall and Brown that

4    ACOG can and should do better.  The appropriate

5    action on the part of ACOG at this time is to

6    restore the wording of the original practice

7    bulletin, to emphasize the truly experimental

8    nature of these procedures, and to stand behind

9    its promise to women in its own bylaws by serving

10   as a strong advocate for quality healthcare for

11   women and maintaining the highest standards of

12   clinical practice."

13             And --

14                  MR. BALL:  What's happening here,

15   Your Honor?  He's standing here reading, facing

16   the jury.  He's just testifying.  That's not the

17   way trials are supposed to work.

18                  THE COURT:  I'm going to -- I'm

19   going to ask -- I think it's -- the cat's already

20   out of the bag.  I'm going to ask you to strike

21   from your mind, if you can, that last statement he

22   made.  He was just reading from that

23   documentation.  He's not asking her questions

24   about it.

25                  MR. SLATER:  I was about to.  He

Page 1710

1    interrupted me, Your Honor.

2                THE COURT:  Well, don't read the

3    whole thing.  She's got a copy of it up there.

4    Just ask her about it, what her opinion was or

5    whatever.

6        Q.    (By Mr. Slater)  Do you have an opinion

7    as to whether or not the original bulletin that

8    you authored was correct or incorrect in using the

9    word "experimental"?

10       A.    It was correct.

11       Q.    Since that time, you've had the

12   opportunity to read hundreds of thousands of pages

13   of documents from Ethicon and Johnson & Johnson?

14       A.    Yes.

15       Q.    And to see their deposition testimony and

16   learn things you didn't know?

17       A.    Yes.

18       Q.    As a result of that additional

19   information, please tell the Court and the jury

20   whether there's been any change in your opinion

21   and where your opinion is now.

22       A.    The only change in my opinion is that

23   this product and procedure of the Prolift should

24   not even be experimental; it should not be used in

25   women, period.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 254 of 712 PageID #: 133418
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 254 of 712 PageID #: 133418

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1711

1      Q.    Why?

2      A.    Because it's unsafe.

3      Q.    And I want to ask you this:  You've given

4  a lot of information to us today.  Do you have an

5  opinion, to a reasonable degree of medical

6  certainty, as to whether or not the Prolift system

7  was a defective medical device product?

8      A.    Yes, I do have an opinion.

9      Q.    And what's that opinion?

10     A.    That it -- that it was defective in

11 design.

12     Q.    And why is that?  Explain the foundation

13 for that a little more.  You've talked but we want

14 to make sure we have a little bit here too.

15     A.    Because in the design intent, the -- the

16 intent of the procedure was to accomplish things

17 that in literal fact could not be accomplished.

18          To place the Prolift mesh in a way that

19 lay flat to reduce the complications, because if

20 the mesh isn't laying flat, it's not safe.

21          To have the mesh in a condition where the

22 pores allow the ingrowth of tissue, and that's not

23 what happened.  The pores collapsed, and instead

24 you had this intensified inflammatory reaction,

25 the bridging fibrosis that scrunches the mesh

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 255 of 712 PageID #: 132419
In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1712

1   together, mesh erosion, infection of the mesh.

2         When it's necessary to remove the mesh,

3   something that can -- is difficult, if not

4   impossible.

5         These are all things that are part and

6   parcel of the Prolift procedure that could not be

7   improved.  They could not be mitigated.

8         They had insufficient warnings --

9               MR. BALL:  Your Honor, I will

10  object on the basis that this is repetitive to

11  what we heard three hours ago --

12              THE COURT:  Yes, it --

13              MR. BALL:  -- plus another

14  narrative response.  We can't go over and over the

15  same things.

16              THE COURT:  Okay.  I'm going to

17  sustain your objection.

18              MR. BALL:  Thank you.

19              THE COURT:  Now, please go to

20  something else.  She has pontificated on that at

21  least two times today, so let's go to something

22  else.

23         She doesn't like it.  She wouldn't use

24  it.  I understand that.  And she's told the jury

25  that.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 256 of 742 PageID #: 133420
Case 2:12-md-02327  Document 3752-6  Filed 05/09/16  Page 256 of 742 PageID #: 133240

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1713

1        Q.    (By Mr. Slater)  Do you have an opinion,

2    to a reasonable degree of medical certainty, as to

3    whether the Prolift medical device system was

4    unreasonably dangerous?

5                    MR. BALL:  That's the same

6    question.

7                    MR. SLATER:  It's a different

8    question I have to cover for the record.  I have

9    to make sure that I have an adequate record.

10                   THE COURT:  All right.  One time.

11   You do it again and I'm going to --

12          You ask -- ask it now.  Bear in mind

13   you've done it.

14                   MR. SLATER:  That's all I plan to

15   do.

16                   THE COURT:  All right.  Do it.

17                   MR. SLATER:  And I was going to

18   say, for the reasons you've already stated, and I

19   wasn't going to go through it again.

20                   THE COURT:  Yeah.  All right.

21   Appreciate it.

22        Q.    (By Mr. Slater)  Do you have an opinion,

23   to a reasonable degree of medical certainty, as to

24   whether the Prolift system was an unreasonably

25   dangerous medical device system?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 257 of 742 PageID #: 133421
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 257 of 742 PageID #: 68121

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1714

```
 1      A.   Yes, I do.

 2      Q.   And is that for all of the reasons and

 3  all the issues that you've provided to this jury

 4  today?

 5      A.   Yes.

 6           MR. SLATER:  Your Honor, I don't

 7  know what time you wanted to break.  I'm fine to

 8  keep going, but I just want to -- now is a --

 9           THE COURT:  You want a break now?

10           MR. SLATER:  I'm going to go on to

11  a new subject.

12       All right.  We'll keep going.

13           THE COURT:  Huh?

14           JUROR:  No.

15           THE COURT:  No?

16       Okay.  Well, how -- how much -- well,

17  soldier on.  When somebody tells me we want a

18  break, we'll take a break, okay?

19      Q.   (By Mr. Slater)  Dr. Weber, I've handed

20  you Exhibit P1624.  Is that an internal Ethicon

21  PowerPoint you're familiar with?

22      A.   Yes.

23      Q.   And is this document of significance to

24  you?

25      A.   Yes.
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 258 of 742 PageID #: 132422
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 258 of 742 PageID #: 132413

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1715

1      Q.   And what I'd like to do is ask you who

2   authored this document and what's its title.

3      A.   This was authored by Dr. Arnaud.  He is

4   the scien- -- excuse me, scientific director of

5   Gynecare in Europe.

6      Q.   And let's put it up on the screen.

7      A.   And the title is "Graft or No Graft."

8      Q.   And what I'd like to do is we see the

9   cover there, and let's go to the fourth page.

10  That says "Primum Non Nocere" at the top.  What

11  does that mean?

12     A.   That's a Latin phrase that means "First,

13  do no harm."

14     Q.   And in what community is that Latin

15  phrase known?

16     A.   In medicine.  It's part of the

17  Hippocratic Oath.

18               THE COURT:  Correct.

19     Q.   (By Mr. Slater)  And we can see that

20  document and I want to just ask you about the

21  bottom of it.

22          It says "Whatever the treatment, it must

23  not create serious complications."

24          That's what Axel Arnaud wrote in January

25  of '05?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 259 of 742 PageID #: 133423
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 259 of 742 PageID #: 132143

Page 1716

```
 1      A.   Yes.

 2      Q.   In your opinion, did the Prolift meet

 3  that standard?

 4      A.   No.  Not at all.

 5      Q.   And is that one of the bases for your

 6  opinions on design defect as you've given them?

 7      A.   Yes.

 8              MR. SLATER:  Now, I'm going to put

 9  up a PowerPoint.  Would you like to see it before

10  I put it up?

11              MS. JONES:  Do you mind?

12              MR. SLATER:  No, I don't mind.

13              MR. BALL:  Your Honor, can I ask a

14  question of everybody here as soon as they're done

15  with that?

16              THE COURT:  Sure.  You want a

17  sidebar here?

18              MR. BALL:  Please.

19              (Counsel approached the bench and

20  the following proceedings were held outside the

21  hearing of the jury:)

22              MR. BALL:  Your Honor --

23              THE COURT:  Yes.

24              MR. BALL:  -- we're now at 2:30

25  plus --
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 260 of 742 PageID #: 133424
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 260 of 742 PageID #: 63220

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1717

1             THE COURT:  Yes.

2             MR. BALL:  -- and Dr. Weber has

3   expressed her opinion on multiple occasions that

4   the product is defective and unreasonably

5   dangerous, it has a bad design, et cetera, and

6   she's given reasons for that repeatedly.

7             THE COURT:  And I've let almost

8   all of that in.

9             MR. BALL:  I don't know why -- I

10  don't think it's appropriate to continue, after

11  the opinion's been given and after the basis for

12  her opinion -- there's no principle in Missouri

13  law that --

14            MR. SLATER:  I was about to start

15  failure to warn.

16            THE COURT:  What?

17            MR. SLATER:  I was about to start

18  failure to warn.

19            THE COURT:  Failure to warn.

20            MR. SLATER:  Yeah.  I just showed

21  Ms. Jones a list of what the medical affairs

22  director said they were supposed to do in their

23  warnings.

24            MR. BALL:  Okay.

25            THE COURT:  Okey-doke.

1            MR. BALL:  Then I'll withdraw that

2    for right now.

3            THE COURT:  When you get done with

4    that, where else are we going with her?

5            MR. SLATER:  We have to go through

6    Mrs. Budke's suffering and horrible death.  She

7    suffered and died.  I need the jury to understand

8    how that happened.

9            THE COURT:  But this is going to

10   be the last of the general professional --

11           MR. SLATER:  Sorry?

12           THE COURT:  This is the last phase

13   of your general professional questions for her is

14   failure to warn?

15           MR. SLATER:  And then I have

16   obviously the damages which, you know, she's going

17   to need to teach to the jury because it's a

18   catastrophic situation.

19           THE COURT:  Okay.  And then we're

20   going to go on and talk about her and get out of

21   this generalized thing?

22           MR. SLATER:  Then I'm -- you'll

23   probably put me in jail by then, so I'm just going

24   to --

25           MR. HYDE:  That's what I was

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 262 of 742 PageID #: 133426
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 262 of 742 PageID #: 63212

Page 1719

1    thinking.

2                    THE COURT:  Okay.  All right.

3    We'll go back.

4                    (The proceedings returned to open

5    court.)

6                    MR. SLATER:  Okay.  You can put it

7    up.

8        Q.   (By Mr. Slater)  Dr. Weber, we've put up

9    a PowerPoint titled "Ethicon Warning Standards,"

10   and would you please tell the jury why you had us

11   put that up there?

12       A.   Yes.  So in the --

13                   MR. BALL:  Your Honor, Your

14   Honor --

15                   THE COURT:  Yes.

16                   MR. BALL:  -- our objection to

17   that is this:  That you are the one that gives the

18   law on what the warning is supposed to be.

19                   MR. SLATER:  Your Honor, can we

20   have a sidebar?

21                   THE COURT:  Oh, yeah, sure, let's

22   do a sidebar.  I like the noise.

23                   (Counsel approached the bench and

24   the following proceedings were held outside the

25   hearing of the jury:)

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 263 of 742 PageID #: 133427
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 263 of 742 PageID #: 63223

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1720

 1               MR. BALL:  Okay.  Our objection is

 2    that you -- you are the one that -- you establish

 3    the law on what the warning duty is, and what he's

 4    trying to do through a PowerPoint here -- and I

 5    don't care whatever Ethicon said.  They don't

 6    establish the duty in this courtroom.  The duty

 7    for us is to give an adequate warning.  That's it.

 8          And he has principles that -- it's what

 9    we argued back in the motions in limine back in

10    November, and this is where it's all coming to

11    roost now is he can't create a duty that's beyond

12    the law, and that's what he's doing now.

13          Our only legal duty is to give an

14    adequate warning, and he's trying to create a duty

15    beyond that.

16               THE COURT:  Well, he's going to

17    have the same opportunity to do MAI instructions

18    as you all are, and I'm going to give the law on

19    it, which I think that's my duty to do.

20               MR. BALL:  It is, but this is --

21    and this is putting in front of the jury --

22               THE COURT:  Yeah.

23               MR. BALL:  -- something that's

24    beyond the Missouri legal standard.

25          He's trying to have this witness testify

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1721

1  as to what the standard should be or what Ethicon

2  said it should be, and that's not the law.

3             MR. SLATER:  These are industry

4  standards.

5             MR. BALL:  That's not her job.

6             MR. SLATER:  These are Ethicon's

7  own standards, their own industry standards.

8             THE COURT:  That doesn't matter to

9  me whether they are or not because I've got to

10  give the law on it, and they can look at those and

11  tell whether they meet it or not.  They're

12  supposed to follow the law as I read it to them.

13            MR. SLATER:  Judge, so I have a

14  strict liability failure to warn claim, I have a

15  negligent failure to warn claim, and I have

16  punitive damage claims, and I'm not allowed to

17  show the jury that they violated their own

18  standards?

19        He can argue whatever he wants to argue.

20  He's telling you what the facts are.  We have a

21  difference of opinion on that, and the jury will

22  decide, but we're allowed to have evidence of what

23  they were supposed to do based on their own

24  testimony.  This is what we were supposed to do.

25        I can't tell the jury what they thought

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 265 of 712 PageID #: 132429
Case 2:12-md-02327 Document 3156-6 Filed 05/09/16 Page 265 of 712 PageID #: 132429

Page 1722

1    they were supposed to accomplish?

2              MR. BALL:  She -- she can say, "I

3    believe that the warning is inadequate because it

4    didn't have this, it didn't have this, and it

5    didn't have that," but what she can't do is get up

6    here and then say --

7              THE COURT:  And say "This one and

8    this one and this one."

9              MR. BALL:  Right.

10             MR. SLATER:  Why not?

11             MR. BALL:  All she can say is --

12             MR. SLATER:  I don't understand.

13   With all due respect, I don't understand.

14             THE COURT:  She's formed an

15   opinion on what they did wrong --

16             MR. SLATER:  And she's relying, in

17   part, on their own internal standards to show they

18   violated their own standards.  This is a punitive

19   damage issue.  This is outrageous.  They violated

20   all their own standards.

21        Now, if they want -- if they want to get

22   an expert to get up there and say Ethicon's

23   standards are -- were too high, they can put on a

24   witness to say that.  This is Mr. Ball testifying.

25             THE COURT:  No.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 266 of 742 PageID #: 133420
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 266 of 742 PageID #: 133220

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1723

1          MR. SLATER:  And honestly, with

2   all due respect, he hasn't worked on this case.

3   He doesn't know this.  He doesn't know -- he --

4          THE COURT:  I know you've worked

5   on these cases a lot.

6          MR. SLATER:  How can --

7          THE COURT:  I understand that.

8          MR. SLATER:  How can I not tell

9   the jury their own internal standards for

10  warnings, Judge?  They're experts in the field.

11  That's what they do for a living is they make

12  warnings.  They're -- and I'm not going to say it,

13  but this is all under the FDA regulations and

14  they're trained by that and that's what they're

15  supposed to be meeting and this is what they're

16  supposed to do by law.

17       I mean, I don't understand.  These are

18  the standards by law that they have to meet.

19  Mr. Ball is telling you these exceed the law of

20  the state of Missouri.  I don't agree.  The law in

21  Missouri is very easy.  They decide what's

22  adequate or not.

23       And one of the evidential connectors is,

24  the company says "We're supposed to warn of XYZ."

25  The jury can consider that as evidence.  I'm not

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 267 of 712 PageID #: 133431
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 267 of 712 PageID #: 133431

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1724

1   saying it's dispositive, but it's evidence of

2   whether or not they met the standard of care and

3   whether they violated the failure to warn strict

4   liability.

5               MR. BALL:  I've handled a lot more

6   warnings cases in Missouri than Mr. Slater has,

7   and what an expert is supposed to do is come up

8   and say do they believe the warning is inadequate?

9   No.  Why not?  Because it's missing this or it's

10  missing that or --

11              THE COURT:  That's what I'm

12  saying.

13              MR. SLATER:  But I have to lay a

14  foundation for it.

15              MR. BALL:  No, you don't.

16              MR. SLATER:  Oh, of course if I

17  put my foundation in, they would move to strike

18  the opinion.  The problem is they violated their

19  own standards.

20              THE COURT:  No, I'd have to strike

21  it.

22              MR. SLATER:  Judge, you're not

23  going to let me show the jury they violated --

24              MR. BERGMANIS:  No.  He's agreeing

25  with you.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 268 of 742 PageID #: 133482
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 268 of 742 PageID #: 63238

Page 1725

1              MR. SLATER:  Oh, oh, I --

2              MR. BALL:  No, he's not.

3              THE COURT:  No, no, no.  I wasn't

4    agreeing with putting that up and publishing it.

5              MR. SLATER:  Judge, it's a

6    PowerPoint summary of testimony that's coming into

7    evidence.

8              MR. BALL:  There's a correct way

9    to do this and a wrong way to do it, and the

10   correct way is to say "It's inadequate because

11   it's missing this and it's missing that" and

12   "What's your basis for that?"  "Based on my

13   experience, it should include this and that kind

14   of thing."  That's the right way to do it.

15             MR. SLATER:  And the right way to

16   do it is to say, "And let me tell you why I think

17   that.  I'm relying on certain things.  I'm not

18   just pulling these opinions out of thin air."  And

19   she's not.

20             THE COURT:  She can do that.

21             MR. SLATER:  I don't want her to

22   pull everything.  I want her to --

23             THE COURT:  You want her to stand

24   there and go one, two, three, four, five down the

25   line.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 269 of 712 PageID #: 132483
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 269 of 712 PageID #: 132483

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1726

1               MR. SLATER:  I want the jury to

2     hear what the standards are that the company held

3     itself to so she can say, "I don't think they

4     adequately warned and they violated their own

5     standards" --

6               (Court reporter interruption.)

7               MR. SLATER:  And by the way, they

8     never -- whatever.  I'm not even going to go

9     there.  I'm not going to say it.

10          I've never heard an objection that I

11     can't, in any case -- that you can't tell the jury

12     the defendants' own standards, what they were, and

13     whether or not they met them.

14               MR. BALL:  You give --

15               MR. SLATER:  It's evidence.  It's

16     not dispositive --

17               MR. BALL:  You give the law in the

18     case.

19               MR. SLATER:  Of course you give

20     the law, adequate warning in Missouri.

21          It's evidential, Your Honor.  It's

22     something that she can say --

23               THE COURT:  She's got to know what

24     they -- what they say and what they -- she can

25     testify as to what --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 270 of 742 PageID #: 133434
Case 2:12-md-02327 Document 3782-6 Filed 05/09/17 Page 270 of 742 PageID #: 133238

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1727

1              MR. SLATER:  Are they going to

2    cross-examine her and try to impeach her

3    credibility of not knowing what she's talking

4    about?  Darn right.

5              THE COURT:  Okay.

6              MR. SLATER:  And I mean -- and I'm

7    getting cut off at the knees here.  I mean,

8    they're going to come after her.

9         I'll tell you what it is.  They're going

10   to say, "Dr. Weber, that's your opinion and why

11   don't you just hold that opinion," and they're

12   going to -- and she's not going to be able to show

13   the jury all the Ethicon statements they violated?

14        I mean, I can't -- I've got to be able to

15   make my case.  This is evidence that's devastating

16   evidence in the sense that they violated their own

17   standards and they want to keep it out.  They have

18   no basis to.  Show me a case.

19             MR. BALL:  Your Honor, we run into

20   this all of the time because he wants to do --

21        (Court reporter interruption.)

22             MR. BALL:  What if we had a

23   standard that said the warning should be

24   absolutely perfect, okay?

25             THE COURT:  Yes.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 271 of 742 PageID #: 133495
Case 2:12-md-02327  Document 3752-6  Filed 05/09/16  Page 271 of 742 PageID #: 63295

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1728

1          MR. BALL:  That would not be the

2     law.

3               THE COURT:  No.

4          MR. BALL:  And he would be putting

5     in front of them that.

6          And that's what he's doing here.  He's

7     holding -- he should just have her say the way it

8     is done in every other case:  The warning is

9     adequate because it didn't contain this and this

10    and this and that's the way I feel about it, and

11    that's it.

12          (Court reporter interruption.)

13          MR. BERGMANIS:  Can you tell them

14    what their standard was?  What the company's

15    standard was?

16          MR. BALL:  That's irrelevant

17    because you give them the standard.

18          MR. BERGMANIS:  Whoa, whoa, whoa.

19    You give them jury instructions.  You're mixing

20    jury instructions with the standard.  The

21    standards is what they have.  The company

22    standard.

23          MR. BALL:  You can't put in front

24    of the jury some other standard other than what

25    the law is because that's what it is.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 272 of 742 PageID #: 133436
Case 2:12-md-02327 Document 3162-6 Filed 09/09/16 Page 272 of 742 PageID #: 63292

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1729

1              MR. SLATER:  Are you serious?  Are

2    you serious?

3              MR. BERGMANIS:  That's jury

4    instructions versus the company policies.

5              MR. SLATER:  I deal with industry

6    standards all the time.  Industry standards -- I

7    mean, this is their legal obligations, Judge,

8    under the FDA regulations.  I'm not going to say

9    that.

10             THE COURT:  I was trying to give

11   you wide latitude in asking her about them.  I

12   just don't want those things put up there on the

13   board.  You're going to have a copy of them in.

14             MR. BERGMANIS:  Can you put them

15   in front of her and ask her to go through them?  I

16   mean, just say --

17             MR. SLATER:  Oh.  So she can say

18   them?  She just can't put them on the screen?

19             MR. BERGMANIS:  Just -- yeah.  Put

20   them in front of her and have her go down the

21   list.

22             THE COURT:  She can talk about

23   them generally.  I just don't want her to start

24   reading the list.

25             MS. STRAUSS:  Judge, she is not

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 273 of 742 PageID #: 133487
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 273 of 742 PageID #: 63587

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1730

```
1    somebody who can talk about this.

2                    THE COURT:  What?

3                    MS. STRAUSS:  She is not somebody

4    who knows about internal company standards.  She's

5    not a company person.

6                    MR. SLATER:  She's studied this

7    stuff for four years --

8                    THE COURT:  I'm willing to let

9    her --

10                   MR. SLATER:  -- and every one of

11   the medical affairs doctors is also a

12   gynecologist.

13                   MR. BERGMANIS:  Just let her have

14   it and go through the list, but don't put it up.

15                   THE COURT:  Yeah.  Let's do that.

16   Can we do that?

17                   MR. SLATER:  I'll do whatever you

18   tell me.

19                   THE COURT:  All right.  Well,

20   let's do that.  We're burning daylight.

21                   MR. SLATER:  Well --

22                   THE COURT:  Well, I mean, that's

23   all right too.  I don't care.  You can burn it all

24   you want.

25                   (The proceedings returned to open
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 274 of 742 PageID #: 133426
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 274 of 742 PageID #: 133426

1   court.)

2              THE COURT:  Let's do what I

3   suggested.  Yeah.  We're going to take a break at

4   3:00, so wherever you -- whatever you're doing.

5         Okay.  If -- let's give it about a

6   12-minute shot here and then we'll take it up

7   after they have their break.

8              MR. SLATER:  You know what, Judge?

9   Now is probably a good time.  If you're going to

10  do it in 10 minutes, now is a good time to break.

11             THE COURT:  Well, all right.

12  Let's just go -- we'll take -- let me read this.

13  We'll do it till 3:00.

14         Justice requires that you not make up

15  your mind about the case until all the evidence

16  has been seen and heard.  You must not discuss

17  this case among yourselves or with anyone else or

18  comment on anything you hear or learn in this

19  trial until the case is concluded and you retire

20  to the jury room for your deliberations.

21         Also, you must not remain in the presence

22  of anyone who is discussing the case when the

23  court is not in session.

24         And having said that, go ahead and take a

25  break and if you would be back up here at 3:00.

Page 1732

1                    (The following proceedings were

2    held in the courtroom outside the presence of the

3    jury:)

4                    THE COURT:  Hey, before you all

5    leave, I want to talk to the -- to everybody that

6    represents a different client.

7                    THE REPORTER:  Do you want it on

8    the record, Judge?

9                    THE COURT:  You bet I do.

10                   THE REPORTER:  Okay.

11                   THE COURT:  As many as want to

12   from each side, come up.

13        If y'all will come up here because I

14   don't want to holler or get to talking real loud.

15        I'm not the sharpest knife in the drawer,

16   I'm sure.  I'm sure there are better -- much

17   better judges in the state of Missouri than I am,

18   but I will try to follow the law.  I really will

19   do that.  And I will try to give you an equal

20   opportunity, and you an equal opportunity, and I

21   don't have a dog in this fight, but here's the

22   whole thing.

23        We're spending much more time than I've

24   spent in any case up here at this deal.  I thought

25   the boat case that I had last month was something,

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 276 of 742 PageID #: 133440
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 276 of 742 PageID #: 63250

Page 1733

```
 1    but it pales besides this.

 2           I know what you want to do and I know

 3    what your pleadings ask for, but there's a right

 4    way and a wrong way to do it and I don't think

 5    putting that thing up there and having her get up

 6    and say this -- "I think this" and "I think this"

 7    and "I think this is what caused this," because

 8    that is a -- that's a -- that's a factual matter

 9    that the jury's got to determine.  Or maybe it's

10    not that way in New Jersey.  I don't know.

11                MR. SLATER:  Don't I -- don't I

12    have the right to put expert opinion on on the

13    failure to warn?

14                THE COURT:  Yeah.  And that's why

15    I took --

16                MR. SLATER:  That's what I'm

17    trying to do.

18                THE COURT:  Oh, I thought you were

19    just wanting to -- her to go down through there

20    and affirm everything that you asked about.

21                MR. SLATER:  No.  I wanted to use

22    that as the framework in which to analyze their

23    warnings so that I could show that -- the jury

24    that they violated their own warning standards.

25                THE COURT:  Well, you can do that
```

Page 1734

1    without putting that up there.

2                    MR. BALL:  Your Honor, I -- we

3    continue to believe that the appropriate way to do

4    this is for her to state an opinion that the

5    warning was inadequate --

6                    THE COURT:  Was inadequate and

7    then --

8                    MR. BALL:  -- and to give -- and

9    to give reasons for it without reference to --

10        Our internal standards do not set the

11   standard in the state of Missouri for whether a

12   warning is adequate or not.

13                   MR. SLATER:  I'm not saying they

14   set the standard but they're evidence that can be

15   considered by the jury, right?

16                   THE COURT:  Well, that's why I was

17   going to let you give them --

18                   MR. BERGMANIS:  I think we just

19   give her copies and she looks at it, and he'll

20   have a copy, and go through the list --

21                   THE COURT:  Yeah.  And we don't

22   have to go through all this.

23                   MR. BALL:  So -- and the other

24   thing I'll say is that she's supposed to state

25   this based on her professional opinion.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 278 of 742 PageID #: 133442
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 278 of 742 PageID #: 63258

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1735

1              THE COURT:  Yes.  And you're going

2     to have to ask her "Is this based on your

3     professional opinion?"

4              MR. SLATER:  Of course.

5              THE COURT:  I mean, that's part of

6     it.

7              MR. SLATER:  But she's allowed to

8     rely, in part, on the standards in the industry.

9              MR. BALL:  And then so instead, so

10    she's getting up there taking something from a

11    PowerPoint of ours and trying to --

12             MR. SLATER:  It's not your

13    PowerPoint.

14             MR. BALL:  -- say that --

15             MR. SLATER:  It's actually a --

16        I'll tell you what the PowerPoint is.

17    Each one of them is footnoted with the pages and

18    lines of the deposition testimony from the medical

19    affairs director who testified to the standard.

20    These are all admissions.

21             MR. BALL:  See, so this is what

22    he's doing is again he's got a medical expert up

23    here being a mouthpiece for his interpretation of

24    company documents and company testimony.

25             MR. SLATER:  Isn't --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 279 of 712 PageID #: 133443
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 279 of 712 PageID #: 63299

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1736

1              MR. BALL:  That's not what is

2   supposed to be permitted.  It was partially

3   covered in that brief that we gave you this

4   morning.  This is supposed to be a medical expert

5   talking about the product and the warnings on the

6   product, and that is what it's -- all it's

7   supposed to be about, and we've gone on and on and

8   on and repetitive multiple times.

9              MR. SLATER:  I haven't even gotten

10  to go there at all.  I've -- I don't understand

11  how it is that the jury doesn't get to hear that

12  they had standards among the medical affairs

13  people, who are doctors just like her, who are

14  responsible to make sure the warnings were

15  adequate and had sign off on every warning.  She's

16  in the same profession as them.  They were at the

17  top of the pyramid on deciding what was what, in

18  terms of the medical information and making sure

19  that the standards were met.

20       She's perfectly qualified.  She's

21  certainly a heck of a lot more qualified than

22  Charlotte Owens, who was four years out of her

23  residency when she was letting the Prolift go on

24  the market.

25              THE COURT:  Well, I thought you

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1737

1    made a pretty good point on that, and --

2                    MR. BERGMANIS:  He did.  He's --

3                    THE COURT:  Yeah.

4                    MR. SLATER:  I'm just saying I

5    don't understand how they can argue that she can't

6    rely on their standards, in part, to say, "Look,

7    this isn't just my opinion" --

8                    THE COURT:  Here's what I want.  I

9    don't want to get into things like this:

10   "Specific example of an improper and inadmissible

11   opinion would be if Ethicon were truly committed

12   first and foremost to patient safety, Ethicon

13   would not have ignored these compelling findings

14   in the literature and would have appropriately

15   studied and tested this known phenomenon to

16   determine whether the product could be safely

17   manufactured and given the nature of this design

18   characteristic and, if so, corrected all the

19   IFUs for its mesh product that included false

20   claims."

21                   MR. BALL:  Yeah.  He's -- that's

22   what we've been --

23                   MR. SLATER:  I'm not sure where

24   you're reading from.  Is that their brief?

25                   MR. BALL:  Yeah.

Page 1738

```
 1                    THE COURT:  What's that?

 2                    MR. BALL:  No.  That's from your

 3   expert's report.

 4                    MS. STRAUSS:  Her testimony.

 5                    MR. BALL:  From your expert's

 6   report.

 7          We've been going -- that's what's been

 8   happening all day long.

 9                    MR. BERGMANIS:  That's not what's

10   going on --

11                    MR. BALL:  That's what's been

12   happening all day long and what's going to --

13                    MS. GUNN:  I'm just trying to

14   figure out what they're --

15          They're worried about something that

16   might happen in the future, if those --

17                    MS. STRAUSS:  No.

18                    MR. BALL:  No.

19                    MS. STRAUSS:  Parts of that have

20   already happened today.

21                    MR. SLATER:  The only issue before

22   the court --

23                    MS. GUNN:  No.

24                    MS. STRAUSS:  Yeah.

25                    MR. SLATER:  -- is whether or
```

Page 1739

1   not --

2          Your Honor, I'll respect -- I'll do what

3   you said.  I won't publish it.  But certainly she

4   can rely on it, and that's all.

5                  THE COURT:  You're going to get

6   most all of it in the record by the time you talk

7   to her about it.

8                  MR. SLATER:  But I need my --

9   obviously I need my expert to give an opinion.

10         See, they're going to cross her and say,

11  "You don't know anything about warnings."

12                 THE COURT:  I thought you said --

13  I thought that's what we talked about is you've

14  said, "Doctor, do you have an opinion?"

15                 MR. BERGMANIS:  We're good.

16                 THE COURT:  Okay.  You and Erik

17  talk about this.  He's got -- you know, it's

18  better -- it's better for the guy who knows the

19  SOB than the guy who doesn't, but you can come out

20  on this.  Believe it or not, you can.

21         I don't -- I'm not here just -- I didn't

22  come here just to want to fight with you.  As an

23  old senior judge, you know, I'd rather be fishing,

24  but I'm not.  I'm here and I'm in the middle of it

25  and there ain't no backing out now.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 283 of 742 PageID #: 133447
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 288 of 742 PageID #: 63247

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1740

1          So all I'm saying is, you seem to me like

2     a very intelligent lawyer.  Just ask the doctor,

3     "Do you have an opinion about this?"  "Do you have

4     an opinion about that?"  "Do you have an opinion

5     about this?"  "If so -- if they said so-and-so, do

6     you have an opinion as to whether that's" --

7                    MR. SLATER:  I plan to do that.

8                    THE COURT:  -- "medically

9     certain?"

10                    MR. SLATER:  I plan to do that,

11     but obviously they're going to cross her and say,

12     "Well, you don't have any basis for that," and so

13     they need to know the basis.

14                    THE COURT:  Well, I'm not --

15                    MR. BALL:  If we cross-examine and

16     open something up, then -- then he's --

17                    THE COURT:  I'll give you plenty

18     of time.  I'll even let you voir dire or whatever

19     you need to do.

20                    MR. SLATER:  I was going to be

21     done at 3:30, but for all these objections.

22                    THE COURT:  Well, I would -- I'd

23     love to woulda-coulda-shoulda, but we're not going

24     to get there that way, I don't think.

25          Yeah.  Cut her down.

Page 1741

1         (Recess taken from 2:54 p.m. to 3:05 p.m.)

2                    (The following proceedings were

3     held in the courtroom outside the presence of the

4     jury:)

5                    THE COURT:  Okay.  I guess

6     Mr. Ball and Ms. Christy, if y'all would come up,

7     we're going to -- tell them I'll be with them in

8     just a minute.  I just -- I'd rather do this as to

9     have them have to sit here while we play horse.

10                    THE BAILIFF:  You want them out?

11                    THE COURT:  No.  I'll be -- yeah.

12    Okay.

13                    THE BAILIFF:  No.  They're fine.

14                    THE COURT:  Now, you want to come

15    back up here, Mr. Slater, and --

16         Let's see now.  Have we got one of

17    everybody?

18         Okay.  Now, let's start what we -- what

19    you and Ms. Bettina started to talk about and then

20    we decided to wait till we got everybody here and

21    leave the jury out.

22         Okay.  Mr. Slater.

23                    MR. SLATER:  Thank you, Your

24    Honor.

25         I have presented to Your Honor the IIS

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 285 of 742 PageID #: 133449
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 285 of 742 PageID #: 63245

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1742

1   study agreement that was discussed earlier between

2   Ethicon and Vincent Lucente, who is the person who

3   actually gets paid the money.  He's the person on

4   the contract.

5               THE COURT:  It must not have been

6   much of an agreement if it was $12,500.

7               MR. SLATER:  Well --

8               THE COURT:  You got people that

9   charge that much an hour, almost, here.

10              MR. BALL:  Not quite.

11              MR. SLATER:  So what they were

12  doing was they were paying for his support staff

13  and the access to computers and stuff so that they

14  could crunch the data and run the databases --

15              THE COURT:  Okay.

16              MR. SLATER:  -- so that they could

17  study this data, and he went to Ethicon and said,

18  "Will you fund this for me so that I can have this

19  done?"

20          And this agreement was reached whereby

21  Ethicon said okay, and you've seen the agreement.

22  There's several important provisions.

23          One, "The company has unrestricted access

24  to the data and may use it for any purpose it

25  deems fit in compliance with applicable laws."  So

Page 1743

1    they had absolute access to it.

2              His testimony was they never looked at

3    it.  Which is negligent, in and of itself, in

4    our -- in our view.

5                   THE COURT:  In your view.

6                   MR. SLATER:  In our view, and I

7    think it's -- I think, you know, that's what -- to

8    tell you our view, but we think that a jury could

9    believe it would be negligent not to look at the

10   data after they contracted and had the right to

11   look at it.

12             Number two, it provides that he is

13   required -- not "may," but "will seek to publish

14   in the peer-reviewed literature the results of the

15   study."  That did not happen.  It was never

16   published in the peer-reviewed literature.  We

17   have his depo- --

18                  THE COURT:  You know for

19   definite -- oh, go ahead.

20                  MR. SLATER:  Yeah.  We do.  We

21   know it was not published in the peer-reviewed

22   literature.

23             And there are some other provisions about

24   publishing the full data.  This was a set of 514

25   patients.  They never ever published an article on

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 287 of 712 PageID #: 133451
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 287 of 712 PageID #: 133451

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1   it.  It's in the deposition.  Dr. Weber has read

2   it.  I took the deposition.  They never ever

3   published all the patients in one study.

4          They couldn't answer questions to us as

5   to some abstracts they put out as to how many

6   patients came from this group and how many

7   patients came from other databases.

8          It showed very serious issues, and

9   Dr. Lucente's articles are very important evidence

10  that the company has used over the years to

11  support the safety of the products, and in fact,

12  we learned things in this -- from this study that

13  showed that Dr. Lucente didn't follow what's

14  called good clinical practice and didn't do things

15  the right way from a -- from an investigator's

16  standpoint as a scientist, and he was the primary

17  investigator or one of the primary investigators

18  for the two pilot studies.

19          The Gynemesh and TVM studies that allowed

20  this to be marketed, in Ethicon's view, where they

21  were studying the prototypes, he was one of the

22  investigators, which obviously when Dr. Weber

23  tells the jury, you know, he published -- and I

24  don't have the PowerPoints in front of me but I

25  think he disclosed in an abstract of a part of the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 288 of 742 PageID #: 133452
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 288 of 742 PageID #: 63243

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1    patients about a 13% recurrence rate.

2          She went through the data and she

3    analyzed it at the highest level possible and

4    found that 49% of the patients at one year had

5    recurrence of prolapse, which is an astronomical

6    number, and it would be very damaging in many ways

7    to the defense and it's a very strong fact for us

8    in many ways, not just to show that the product

9    didn't work very well but also to show that

10   Dr. Lucente had some serious issues with the

11   veracity of the data he published.

12          And as Your Honor -- I think we told you

13   earlier, we have -- we have testimony from the

14   medical affairs director, who was the corporate

15   representative of the company, that he admitted he

16   did not believe certain data published by Lucente

17   on erosion rates, and that's another problem.

18          Lucente's group published in some studies

19   that they had patients being studied and they had

20   zero erosions, or 1.1% erosions, and Hinoul, the

21   corporate rep, said, "I don't believe those

22   numbers."

23          So this is a guy who also taught

24   Dr. Simpson and she relied on his statements about

25   what the safety was.

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1746

 1                    THE COURT:  Which doctor?

 2                    MR. SLATER:  Dr. Lucente.  The guy

 3    who contracted with the company --

 4                    THE COURT:  Oh, okay, okay.

 5                    MR. SLATER:  -- taught

 6    Dr. Simpson, and she testified at length that she

 7    relied on him to give truthful information about

 8    the data that supported the product and what were

 9    the real complication rates and she was led to

10    believe that day it was a 5% erosion rate.

11             This data shows that he has over a 10%

12    erosion rate on his own patients.  His recurrence

13    rate was far higher than what she was led to

14    belief.

15                    THE COURT:  Dr. Lucente?

16                    MR. SLATER:  Dr. Lucente.

17             So it's a -- he's a central figure in

18    this case for a lot of reasons, and this data

19    shows that his patients had very high complication

20    rates that he never disclosed, didn't disclose to

21    Dr. Simpson, and obviously that's an important

22    issue on the learned intermediary issue, and I

23    think that we should have the right to be able to

24    show the jury the truth of the data, and the

25    defense has the right to come in and challenge

Page 1747

1    Dr. Weber and say she didn't add up the numbers

2    right, or whatever it is.

3          And, you know, if they had a witness they

4    could bring somebody in.  I don't think they have

5    any witnesses who actually did what Dr. Weber did,

6    so there's nobody they can bring in, but that's

7    their choice.

8          And I think it's -- it's an important

9    fact for the jury to hear and then the chips will

10   fall where they may.

11          That's our argument, Your Honor.

12                THE COURT:  Now, in order to get

13   to that information, you're going to ask her

14   questions to a reasonable degree of medical

15   certainty?

16                MR. SLATER:  Of course.

17   Absolutely.

18                THE COURT:  And you're not going

19   to publish that thing?

20                MR. SLATER:  I'll just have her

21   speak it to the jury.

22                MS. JONES:  May I respond, Your

23   Honor?

24                THE COURT:  Yes, ma'am.

25                MS. JONES:  There are several

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 291 of 712 PageID #: 133455
Case 2:12-md-02327 Document 3156-6 Filed 05/09/16 Page 291 of 712 PageID #: 63255

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1748

1    issues about the admissibility of this.

2          Mr. Slater represented to the Court

3    earlier -- and I want to make this clear and I

4    want to say it carefully because Mr. Slater has

5    accused me of making a misstatement, and just so

6    the record is clear.

7          Mr. Slater has suggested repeatedly that

8    Ethicon owned this data.  If you look at

9    Paragraph 7 of this contract --

10                THE COURT:  Agreement?

11                MS. JONES:  -- of the agreement --

12                THE COURT:  Uh-huh.

13                MS. JONES:  -- it provides that

14    the institution, which is defined as the doctor

15    and the clinic, had --

16                THE COURT:  They were the ones who

17    were going to run it.

18                MS. JONES:  -- they were the

19    owners of the data.

20                THE COURT:  I'm sorry.

21                MS. JONES:  That Ethicon does have

22    -- did have access to it, but Ethicon was not the

23    owner of the data.  It was not produced from

24    Ethicon's files.

25          That's number one.

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1749

1              THE COURT:  In other words,

2    whatever the data was came from the other party.

3              MS. JONES:  Came from Dr. Lucente.

4              THE COURT:  Okay.

5              MS. JONES:  The second issue is

6    that our obligation -- that our objection to this

7    is an objection that Dr. Weber's analysis, to the

8    extent that it is, is not reliable, has never been

9    published.  It's her statement, looking at these

10   documents, about what they show.

11       And in fact, what -- it's not clear,

12   under any circumstances, that this data proves

13   that anything that Dr. Lucente specifically did or

14   didn't do or published or didn't publish is wrong.

15       In fact, Your Honor, this agreement

16   didn't even begin until 2007 and didn't

17   conclude -- or wasn't supposed to conclude --

18   until after Ms. Budke's surgery.

19              THE COURT:  Surgery?

20              MS. JONES:  So what we're having

21   here is something that I suggest to Your Honor is

22   irrelevant, to the extent that it has any

23   probative value is outweighed by the prejudicial

24   effect, that it's not been something that's been

25   published or reviewed by anybody other than

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 293 of 742 PageID #: 133457
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 298 of 742 PageID #: 63257

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1750

1   Dr. Weber, and the suggestion and the implication

2   that Ethicon ought to be tarnished because

3   Dr. Lucente didn't publish the data when, in fact,

4   there's an agreement for him to do so is -- is

5   just wrong.  It's irrelevant and it's not -- it's

6   not right under these circumstances.

7                MR. BALL:  If I could just kind of

8   add -- chip in just a little bit there, Your

9   Honor.

10           So what we've heard from Mr. Slater he

11   wants to do is, first of all, he wants to say that

12   she did an analysis that showed it had a high

13   recurrence rate, okay?

14           Well, number one, we've -- Dr. Simpson

15   has already said and all the people in the case

16   have already said that there was no recurrent

17   prolapse with Mrs. Budke.  It's an erosion problem

18   if there's anything, an infection problem, but

19   there was not a recurrence.  So that's number one.

20                THE COURT:  All right.

21                MR. BALL:  Number two, there's no

22   showing that Dr. Lucente ever had occasion before

23   Mrs. Budke's surgery to have any communication

24   with Dr. Simpson about this data because the data

25   wasn't even done yet.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 294 of 712 PageID #: 133458
Case 2:12-md-02327 Document 2192-6 Filed 05/09/16 Page 294 of 712 PageID #: 63252
In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1751

1          And then number three -- and this is, I

2    think -- well, and then number three is -- as

3    Christy has said, is that she wants to state an

4    opinion that the data shows such and such in terms

5    of rates and yet there's no showing of

6    reliability, there's no showing of standard error,

7    there's no showing -- she hasn't had it

8    peer-reviewed by anybody, she hasn't published it

9    herself.

10         And then the final -- final point is --

11   and probably this is the one that is the most

12   telling on this -- is even if they are allowed to

13   state that "I did this evaluation, here's my

14   opinion," they then want to go to the next step.

15   The next step is that they want to say -- that

16   they want to create the impression that Ethicon

17   hid this from everyone when it was the doctors

18   that decided not to publish it.

19         These are not our employees and they're

20   the ones that made the decision not -- and it's

21   unfairly prejudicial for us for them, through

22   these questions and through the argumentative nature

23   of the questions and the answers, are allowed to

24   stand up there and create testimony or create an

25   impression that we somehow hid these results by

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 295 of 742 PageID #: 132459
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 295 of 742 PageID #: 68255

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1752

1    not getting them published when it was the doctor,

2    not us, that didn't do that.

3              MS. JONES:  Which just to make it

4    clear, Your Honor, the contract is signed in the

5    end of October '07, after Dr. Simpson's training,

6    so the implication that Dr. Lucente somehow lied

7    to her based upon this data is absolutely wrong.

8              MR. BALL:  So we have two

9    questions.

10        One is the admissibility of the -- one is

11   the admissibility of the analysis she did, and

12   that; and then the second is, is the line of

13   questions that go anything -- that try to intimate

14   that we hid something or did something improper.

15   Those are the two different questions and the two

16   different objections.

17             MR. SLATER:  At this point, Your

18   Honor, what I would seek to do is to have

19   Dr. Weber explain that she studied the data, tell

20   the rates that she found of complications, and

21   I'll stop.

22             THE COURT:  And stop right there.

23             MR. SLATER:  I'll stop there.

24             THE COURT:  If you do that and you

25   don't try to put an innuendo on it, I'm going to

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 296 of 742 PageID #: 133460
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 296 of 742 PageID #: 63256

Page 1753

1    let you do it.

2                 MR. SLATER:  That's fine.  And I

3    should --

4                 THE COURT:  Okay.  Because here's

5    the whole -- here's the whole thing.  There is

6    some truth in what they say.  She died -- I mean,

7    this took place in 2008, as I recall.  I've got

8    all those dates here when she had her surgery and

9    when she died.  And this -- at best, this contract

10   was for up to 2009.

11                MR. BERGMANIS:  Seems like that

12   would be a perfect subject for them to cross her

13   on.

14                THE COURT:  Well, they can, but

15   I'm not going to let --

16        I mean, I'm going to let him do what he

17   said he would do --

18                MR. BERGMANIS:  Very good.

19                THE COURT:  -- okay?

20                MR. BERGMANIS:  Thank you, Judge.

21                MR. SLATER:  Should I put the

22   agreement into evidence as well, so that at

23   least --

24                MS. STRAUSS:  No.

25                MR. BALL:  No.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 297 of 742 PageID #: 133461
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 297 of 742 PageID #: 133251

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1754

1            THE COURT:  No, I don't think so.

2            MS. JONES:  Well, let me --

3            THE COURT:  Wait.

4            MS. JONES:  But it is -- I think

5  it is important, for the implication and for the

6  accusations that have been made, to show that the

7  agreement is dated in October of 2007 so there's

8  not a question.

9            MR. BERGMANIS:  Well, let's put it

10 in.

11            MR. BALL:  But -- no.  But here --

12 I think what I heard is all he's going to do --

13 all he's going to do is say "I got some data" --

14 "I got some data from this study and I looked at

15 it and here's the recurrence rate," period.

16 That's all he's going to do.

17            MR. SLATER:  The erosion rate.

18            MR. BALL:  He's not going to

19 read -- he's --

20            MR. SLATER:  There's three rates.

21            MR. BALL:  Yeah.

22            MR. SLATER:  The erosion rate, the

23 recurrence rate, and the reoperation rate.

24            MR. BALL:  And we -- just so we're

25 clear, Your Honor, we still object to that but I

Page 1755

1    understand that you're overruling that but you're

2    not --

3                    THE COURT:  But the thing is, if

4    one of those three did not occur with her, they've

5    certainly got wide latitude in arguing that.  I

6    thought this --

7                    MR. BALL:  Yeah.  But --

8                    THE COURT:  What were the -- I

9    can't remember now the three --

10                   MR. BALL:  What we don't want --

11   and I think Adam is agreeing not to do this -- is

12   any innuendo that something was being hidden by

13   Ethicon or something like that.

14        If he just does what he's saying here,

15   our objection to that has been overruled and we'll

16   proceed.

17                   THE COURT:  All right.  Well, we

18   know that they -- whatever the information was in

19   there was not available to Dr. Simpson at that

20   time because they hadn't reprinted that new.

21                   MR. SLATER:  Yeah.  I mean, we

22   could -- we could talk chapter and verse on it but

23   I'm going to stick with your ruling, so...

24                   THE COURT:  Well, you know,

25   because she told you several times -- she told you

Page 1756

1   several times yesterday over there, she said,

2   "I've not -- I can't tell you I've read all those

3   medical articles" any more than I can tell you

4   that I've read everything that's come out of the

5   Supreme Court of Missouri, the court of appeals of

6   every district around here, and the federal court.

7   I haven't.

8           You guys educate me on what I know with

9   stuff like this, you know, but, yeah, if you'll

10  stay in the bounds of what I said, I'm not going

11  to be barking any.  Okay?

12                  MS. JONES:  Okay.

13                  MR. SLATER:  That's it.  I'm going

14  to ask, you know, "You went through the data, you

15  studied it and here's -- tell us the three rates."

16                  THE COURT:  And do we want that

17  document in or not?

18                  MS. JONES:  I hate to ask this

19  question.

20                  THE COURT:  Yeah.

21                  MS. JONES:  I need 30 seconds to

22  run to the restroom, if you don't mind.

23                  THE COURT:  Okay.  30 seconds is

24  granted.  I'll bring the jury in within one

25  minute.  The time starts now.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 300 of 742 PageID #: 133464
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 300 of 742 PageID #: 133464

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1757

```
 1                    MS. JONES:  Okay.

 2        (Recess taken from 3:20 p.m. to 3:22 p.m.)

 3                    (The following proceedings were

 4    held in the courtroom outside the presence of the

 5    jury:)

 6                    MS. JONES:  Thank you, Judge.

 7                    THE COURT:  Okay.  Let's bring the

 8    jury in.

 9                    (The following proceedings were

10    held in the courtroom in the presence of the

11    jury:)

12                    THE COURT:  Okay.  Be seated.  I

13    guess all but Mr. Slater.  I think he's going to

14    remain standing for a while.

15          And the doctor is taking the stand again

16    with the understanding that she remains subject to

17    the oath.

18                    THE WITNESS:  Yes.

19        Q.   (By Mr. Slater)  Okay.  Dr. Weber, before

20    we come back and talk about some warnings issues,

21    I want to ask you a discrete couple of questions

22    about the Vincent Lucente IIS database with

23    Ethicon, okay?

24        A.   Yes.

25        Q.   You had testified to the jury that you
```

Page 1758

1    reviewed that database and you analyzed the data

2    yourself independently?

3        A.    Yes.

4        Q.    And would you please tell the jury:

5    Beginning with the erosion rate, what was the

6    one-year erosion rate for Dr. Lucente?

7        A.    10.6%.

8        Q.    What was Dr. Lucente's recurrence rate,

9    meaning recurrence of prolapse, at one year?

10       A.    49%.

11       Q.    What was Dr. Lucente's reoperation rate,

12    meaning the percentage of patients that were --

13    made it to one year who had a reoperation?

14       A.    29% of the women required another

15    operation after the Prolift.

16       Q.    What I'd like to do now is talk to you

17    about certain of the documents that provided

18    information to physicians, okay?

19       A.    Yes.

20       Q.    We're all familiar with the IFU, the

21    instructions for use.

22            Are you familiar with that document?

23       A.    Yes.

24       Q.    Okay.  Very simply, what was the purpose

25    of that document?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 302 of 742 PageID #: 133466
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 302 of 712 PageID #: 63262

Page 1759

1      A.   The purpose of the document was to set

2   out, from Ethicon to doctors, certain critical

3   information about the Prolift.

4           The indications and the

5   contraindications, which means simply who must not

6   have the Prolift and who may be a good candidate

7   for the Prolift; warnings; adverse events; things

8   like that.

9      **Q.   Have you formed opinions as to whether or**

10   **not the warnings provided by Ethicon in the IFU**

11   **were adequate?**

12      A.   Yes, I have an opinion.

13      **Q.   Okay.  We're going to go through that and**

14   **I want to just touch on a few other documents.**

15           **The patient brochure that we've seen, are**

16   **you familiar with that?**

17      A.   Yes.

18      **Q.   Do you have opinions about whether those**

19   **warnings and the information provided there was**

20   **adequate?**

21      A.   I have opinions, yes.

22      **Q.   And with regard to the GPS sales aid that**

23   **we spoke to Dr. Simpson about, are you familiar**

24   **with that document?**

25      A.   Yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 303 of 712 PageID #: 132467
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 303 of 712 PageID #: 132467

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1      Q.   And do you have opinions about whether or

2  not that document adequately warned physicians?

3      A.   Yes, I have opinions.

4      Q.   And with regard to those three documents,

5  what is your opinion?

6                    MS. JONES:  Your Honor --

7                    MR. SLATER:  And then I was --

8                    THE COURT:  Just hold it.

9                    MR. SLATER:  -- going to explore

10  it.  Once I have the opinion, I'll explore it.

11                    MS. JONES:  Just -- let's go up

12  one second.

13                    MR. SLATER:  Just tell me what you

14  want to do.  I'll do whatever you want.

15                    MS. JONES:  I just want --

16                    (Counsel approached the bench and

17  the following proceedings were held outside the

18  hearing of the jury:)

19                    MR. SLATER:  I'll do whatever you

20  want.

21                    MS. JONES:  No, no, no.  My only

22  objection is that Ethicon's duty to warn goes to

23  the doctor, and I don't want to waive the

24  objection on the patient brochure.  The way it's

25  phrased --

Page 1761

1                    MR. SLATER:  That's the way I

2     phrased it.

3                    MS. JONES:  Well, just as long as

4     it's clear and clear for the jury, the duty goes

5     to the doctor, as opposed to the patient.

6                    MR. SLATER:  Sure.

7                    THE COURT:  Do that.  Thank you.

8                    (The proceedings returned to open

9     court.)

10    **Q.   (By Mr. Slater)  Dr. Weber, what is your**

11    **opinion as to whether or not Ethicon adequately**

12    **warned physicians in the IFU, the patient**

13    **brochure, and the GPS sales aid?**

14    A.   My opinions is that the warnings were not

15    adequate.

16    **Q.   Okay.  And we're going to go through that**

17    **a little.**

18           **And with regard to the professional**

19    **education PowerPoint from 2005 that we've talked**

20    **about, do you have an opinion about whether that**

21    **provided adequate warnings to physicians?**

22    A.   Yes, I have an opinion.

23    **Q.   And what's that opinion?**

24    A.   My opinion is that the warnings were not

25    adequate in the professional education.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 305 of 742 PageID #: 133469
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 305 of 742 PageID #: 133469

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1762

1      Q.    Now, would you please tell the jury:

2    What do you consider in forming those opinions?

3    What's the background and information you're

4    relying on to form those opinions about what you

5    just told us?

6      A.    Okay.  So all of the internal

7    documents -- excuse me -- that I reviewed, and

8    deposition testimony particularly from medical

9    affairs, since that -- their input would fall

10   within my area of expertise in terms of their

11   knowledge and background.

12     Q.    Do you have familiarity with the

13   information that was available to and known by

14   Ethicon at the time that the warnings were

15   initially given and what was available even up to

16   the date of Mrs. Budke's surgery?

17     A.    Yes.

18     Q.    Okay.  Now, starting with the IFU, I want

19   to ask you a couple questions about the IFU.

20          There's a statement regarding

21   bidirectional elasticity allowing adaptation to

22   the body's stresses.

23          Are you familiar with that statement?

24     A.    Yes.

25     Q.    Can you tell the jury your opinion as to

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 306 of 742 PageID #: 133470
Case 2:12-md-02327 Document 3758-6 Filed 05/09/16 Page 306 of 742 PageID #: 133260

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1763

1  whether or not the information provided in that

2  statement is adequate or not?

3      A.   I think if it were true, it would be an

4  important attribute of the mesh; that if it did,

5  in fact, stretch in such a way to allow or adapt

6  to the forces in the pelvis, that would be an

7  important attribute.

8      Q.   Based on your knowledge of the internal

9  documents, is there a factual basis for that

10  statement in the IFU?

11      A.   No.  There is no evidence whatsoever to

12  support that claim.

13      Q.   There's a statement in the IFU that

14  animal studies show that implantation of the

15  Gynemesh mesh elicits a minimum to slight

16  inflammatory reaction which is transient.

17          Do you have an opinion as to whether or

18  not that is an adequate warning to physicians?

19      A.   Yes, I have an opinion.

20      Q.   And please tell the jury your opinion.

21      A.   That is not adequate and not accurate.

22          The inflammatory reaction is not

23  transient.  It is chronic.  It is not slight to

24  minimal.  It can be quite severe in women, in some

25  women, and it's not possible to predict in advance

Page 1764

```
1    who -- or which women are going to be on the end

2    of the spectrum --

3                  MS. JONES:  Objection, Your Honor.

4        A.   -- experiencing severe --

5                  THE COURT:  I'm sorry.

6                  MS. JONES:  I'm sorry.  I think

7    this goes beyond the scope of the question at this

8    stage.

9                  THE COURT:  All right.  Yeah.

10   Stop there and just ask a question because she's

11   back kind of preaching to the choir.

12       Q.   (By Mr. Slater)  Is the inflammatory

13   reaction with the Prolift transient, meaning it's

14   a short time and ends, or is it chronic?

15       A.   It is chronic.

16       Q.   Was that known to Ethicon from the day

17   the Prolift was launched?

18       A.   Yes.

19       Q.   Is the inflammatory reaction with the

20   Prolift minimum to slight?

21       A.   No, it is not.

22       Q.   And in some women, can it be very severe?

23       A.   Yes.

24       Q.   Was that known to medical affairs in

25   Ethicon right from the beginning?
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 308 of 712 PageID #: 132472
Case 2:12-md-02327 Document 3192-6 Filed 05/09/16 Page 308 of 712 PageID #: 68268

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1765

1      A.   Yes.

2      Q.   **It says in the IFU that the mesh remains**

3  **soft and pliable.  Are you familiar with that**

4  **statement?**

5      A.   Yes, I am.

6      Q.   **Do you have an opinion as to whether that**

7  **adequately warned physicians?**

8      A.   No, it does not.

9      Q.   **And why do you say that?**

10     A.   Because in use, the soft -- the mesh does

11  not remain soft and pliable.

12              MS. JONES:  Objection, Your Honor.

13  I don't think there's qualifications for Dr. Weber

14  to talk about that.

15              THE COURT:  Do you want to voir

16  dire on that question?  Or not?

17              MS. JONES:  I'll cross-examine her

18  on it, but I --

19              THE COURT:  All right.

20     Q.   **(By Mr. Slater)  Are you relying, in**

21  **part, for your answer on deposition testimony of**

22  **Ethicon medical affairs as to how the mesh behaves**

23  **in the body?**

24     A.   Yes.

25     Q.   **And based on that testimony, what is your**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 309 of 742 PageID #: 132473
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 309 of 742 PageID #: 132269

1    understanding?

2        A.    My --

3                    MS. JONES:  Objection.  Same

4    objection, Your Honor.

5                    THE COURT:  All right.  Go ahead.

6    I'll overrule it for now.  Go ahead.

7        Q.    (By Mr. Slater)  You can answer.

8        A.    Okay.  My understanding is that the mesh

9    does not remain soft and pliable, it becomes

10   encased in scar tissue, and in some women when the

11   inflammatory reaction becomes very severe, then

12   you have the fibrotic bridging and very stiff,

13   hard, firm tissue.

14       Q.    With regard to Mrs. Budke, is there

15   significance to that issue in her case?

16       A.    Yes.

17       Q.    Can you explain that?

18       A.    Yes.  Based on Dr. Simpson's medical

19   records, she described palpation of the anterior

20   vagina where the Prolift mesh had been placed,

21   where the mesh was palpable, which means she could

22   feel it, and that's not normal under the

23   circumstances.

24             And then later, when she was in surgery

25   in January of 2009, Dr. Simpson described

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 310 of 712 PageID #: 133474
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 310 of 712 PageID #: 133470

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1767

1    concentric stricturing of the vagina, and what

2    that means is that in normal anatomy, the vagina

3    has kind of an "H" shape, so the bar across the

4    middle would be the vaginal walls, and then the

5    "H" -- the arms of the "H" are the supports that

6    ordinarily attach the vagina to the pelvic

7    sidewall.  And I'm just referring anteriorly,

8    because that's what Mrs. Budke had was the

9    anterior Prolift.

10          So instead of that "H" kind of shape, she

11   had this concentric stricturing, which was because

12   of the Prolift mesh contraction.  So instead of

13   having that -- those arms of support in the "H"

14   analogy that I'm giving you, instead, those were

15   obliterated and scarred so that the top of the

16   vagina, the front wall of -- and towards the top

17   of the vagina were strictured.  Scarred down.

18       Q.   And what is your basis for saying that

19   there was this concentric stricturing around the

20   vagina?

21       A.   That was in Dr. Simpson's operative note.

22       Q.   And for -- for the opinions that you're

23   drawing, have you relied on the official medical

24   records prepared by Dr. Simpson and other

25   physicians?

1     A.   Yes, I have.

2     Q.   **Is that customary for -- for an expert in**

3  **your field to do?**

4     A.   Yes.

5     Q.   **There's a -- there's a statement in the**

6  **professional education and GPS sales aids stating**

7  **that this type of mesh does not potentiate**

8  **infections.  Do you have an opinion as to whether**

9  **those statements adequately inform physicians,**

10 **including Dr. Simpson, of the risk of infection**

11 **potentiation?**

12    A.   Yes, I have an opinion.

13    Q.   **What is your opinion?**

14    A.   My opinion is that that's not an adequate

15 characterization of the mesh itself, and in fact

16 was contradicted, the information in the marketing

17 material in the professional education where the

18 mesh did not potentiate infection.  In other

19 words, it did not make it easier for the infection

20 to get settled in and -- and -- or -- and magnify

21 the infection.  That's what "potentiate" in this

22 context means.

23         And that's contradiction -- excuse me,

24 contradicted by the IFU itself, where it says that

25 infection potentiation is one of the risks of the

Page 1769

1    mesh implantation.

2        Q.   In Mrs. Budke's case, was there infection

3    potentiation?

4        A.   Yes.  Definitely.

5        Q.   Now, in the IFU, the word "erosion" and

6    "exposure" appears in the IFU.  You're familiar

7    with that?

8        A.   Yes.

9        Q.   Do you have an opinion as to whether it

10   was adequate to simply mention erosion and

11   exposure in the IFU?

12       A.   Yes, I have an opinion.

13       Q.   And what's your opinion?

14       A.   My opinion is that that was not adequate.

15       Q.   Why do you say that?

16       A.   That didn't describe the kinds of

17   erosions that some women can develop, the

18   complex --

19               MS. JONES:  Objection, Your Honor.

20               THE COURT:  Just a minute.

21               MS. JONES:  I'm going to object,

22   in that I do not believe that Missouri law

23   requires what I think Dr. Weber is going to talk

24   about.

25               MR. BALL:  Missouri law requires a

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 313 of 742 PageID #: 132477
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 313 of 742 PageID #: 68473

Page 1770

1    reference to the risk and it doesn't require

2    details about -- all the details about the risk.

3              THE COURT:  All right.

4              MR. SLATER:  I thought -- we

5    just -- we're just trying to make sure that the

6    basis of the doctor's opinion is understood.

7              THE COURT:  Okay.  Just get it

8    across there and don't dwell on it, then --

9              MR. SLATER:  Okay.

10             THE COURT:  -- because I don't

11   want to step on the case law on it.

12        **Q.   (By Mr. Slater)  Okay.  The risk of**

13   **erosion, can you describe what the risk of erosion**

14   **is based on what you've seen not only in the**

15   **medical literature but also the internal documents**

16   **of Ethicon as to what they knew and have admitted**

17   **they knew from day one?**

18        A.   Yes.  That mesh erosion can be associated

19   with infection, abscess formation, sinus tract

20   formation, fistula formation.  These are all some

21   of the clinical consequences that can occur, once

22   mesh erosion has occurred.

23        **Q.   What is a complex mesh erosion or a**

24   **complex recurrent mesh erosion?**

25        A.   A complex recurrent mesh erosion is one

Page 1771

1   that is very difficult to treat.

2          In that kind of a situation, a woman may

3   require several surgeries where portions of the

4   mesh are excised and the -- and the vaginal skin

5   can be closed again but the erosion comes back.

6          This often occurs in the setting of

7   infection, and that's what Mrs. Budke experienced

8   as well, where she had the mesh erosion leading up

9   to her surgeries in January and then developed

10  more mesh erosions in March that then required

11  another surgery to try to excise.

12      **Q.   Was that, in your opinion, adequately**

13  **warned of?**

14      A.   No, not at all.

15      **Q.   Was that adequately warned of in any of**

16  **the documents we've listed?**

17      A.   No.

18      **Q.   That would be the IFU, the patient**

19  **brochure, the sales aid, the professional**

20  **education deck?**

21      A.   Correct.

22      **Q.   Did Ethicon warn of whether or not there**

23  **would be patients that could not be -- safely and**

24  **effectively have their mesh complications treated?**

25      A.   No.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 315 of 742 PageID #: 132479
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 315 of 742 PageID #: 68279

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1772

1    Q.   Do you have an opinion as to whether that

2  was necessary?

3    A.   Yes, I have an opinion.

4    Q.   What is your opinion?

5    A.   My opinion is that was definitely

6  necessary.  That's one of the most difficult

7  problems to treat.

8    Q.   And was that adequately warned of in any

9  of those documents?

10   A.   No.

11   Q.   It mentions in the IFU implant --

12  scarring that leads to implant contraction.

13        Do you have an opinion as to whether that

14  was an adequate warning of the full scope of the

15  risk of contraction?

16   A.   Yes, I have an opinion.

17   Q.   And what is that?

18   A.   The opinion is that that was completely

19  inadequate, and on -- based on my review of

20  internal Ethicon documents where it stated that

21  the consequences of mesh contraction are vaginal

22  anatomic distortion, scar plating, fibrosis, and

23  that this is a very difficult problem to treat.

24   Q.   We've talked about this document

25  previously.  It's PLT0062.  Are you -- are you

Page 1773

1   familiar with this journal article?

2       A.   Yes.

3       Q.   And who are the authors of this article?

4       A.   The authors are the TVM group -- they

5   label themselves as such -- with nine authors,

6   nine French authors listed.

7       Q.   When was that published?

8       A.   This was published in November 2004.

9       Q.   And from that article, do you have an

10  understanding as to who -- which women were

11  intended for the TVM, the Prolift procedure, in

12  terms of the severity of prolapse?

13      A.   The intention was --

14              MS. JONES:  Objection, Your Honor.

15              THE COURT:  Yes.

16              MS. JONES:  I object to the form

17  of the question, the way it's asked.

18              THE COURT:  Okay.  Can you

19  rephrase it?

20      Q.   (By Mr. Slater)  Do you have an

21  understanding, from reading this literature by the

22  inventors of the Prolift, as to what level of

23  prolapse the Prolift procedure was intended for?

24              MS. JONES:  Objection, Your Honor.

25  That's -- this is the early TVM --

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 317 of 712 PageID #: 132484
Case 2:12-md-02327 Document 3702-6 Filed 03/09/16 Page 317 of 712 PageID #: 132484

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1774

```
 1           Well, I object to the form of the

 2   question, the question as formed, as it relates to

 3   that article.

 4               THE COURT:  Well, I'll let you go

 5   ahead and ask it, with the understanding that this

 6   was written back at the beginning of time.

 7               MR. SLATER:  November 2004, three

 8   months before the -- four months before the

 9   product was on the market, Your Honor.

10               THE COURT:  All right.

11      Q.   (By Mr. Slater)  And what's your

12   understanding?

13      A.   I'm sorry.  Could you repeat the

14   question?

15      Q.   Sure.

16           What is your understanding, based on the

17   article, as to what women were intended for the

18   Prolift procedure, based on what the TVM group

19   published in November 2004 in terms of stage of

20   prolapse?

21               MR. BALL:  Object to the

22   relevance, Your Honor.  The question is what

23   Ethicon intended, not some French doctor group,

24   and it's irrelevant.

25               THE COURT:  What do you say about
```

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1775

1    that?

2              MR. SLATER:  I say they invented

3    it, they were paid consultants for the company,

4    they were the TVM investigators, they invented the

5    procedure, and the testimony from Dr. Arnaud was

6    that the company was in close contact with them

7    and held Cosson up as one of the foremost experts

8    in the world with the use of mesh and was

9    consulting with the company --

10             MR. BALL:  I think that's a little

11   lengthy --

12             MR. SLATER:  -- at all times and

13   was the inventor.

14             MR. BALL:  -- that's a little

15   lengthy speech, Your Honor.

16             THE COURT:  Well, ask one question

17   about it and then let's go on.  Okay?

18        Q.   (By Mr. Slater)  Do you have an

19   understanding as to what stage of prolapse the TVM

20   group intended the Prolift for?

21        A.   Yes.

22        Q.   What?

23        A.   The TVM group intended the Prolift to be

24   used for the most severe stages of prolapse.

25   Stage 3 and 4.

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 319 of 712 PageID #: 132483
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 319 of 712 PageID #: 132483

Page 1776

1      Q.   Did Mrs. Budke fall into that category?

2      A.   No, she did not.

3      Q.   I'm going to give you P1664 and let me

4  just get situated and ask a question.

5           This is a document dated May 15, 2006,

6  about two years before Mrs. Budke's surgery?

7      A.   Yes.

8      Q.   And it's a document you're familiar with?

9      A.   Yes.

10      Q.   And rely on, in part, for your opinions?

11      A.   Yes.

12      Q.   And what I'd like to do, if we could, is

13  turn in this PowerPoint to Page 8.

14      A.   Okay.

15      Q.   And if you look in the upper left corner,

16  does this official Ethicon document state the

17  patient profile in terms of what stage of prolapse

18  the Prolift was intended for?

19      A.   Yes, it does.

20      Q.   What does it say?

21      A.   It says, "Patient Profile, Stage 3 and

22  4."

23      Q.   Did Ethicon ever warn doctors that this

24  device and this system was intended for Stage 3

25  and 4 prolapse?

Page 1777

1      A.    No, never.

2      Q.    Are you familiar with the testimony of

3   Price St. Hilaire and Paul Parisi consistent with

4   what you've just told us?

5      A.    Yes.

6      Q.    I'm done with that document.

7            Let's talk about the Prolift patient

8   brochure a little bit.  You're familiar with that

9   document, correct?

10     A.    Yes.

11     Q.    I want to ask you about a few statements

12  in it, to understand whether they're adequate or

13  not, in your opinion.

14            In the Prolift patient brochure, it says,

15  "Soft synthetic mesh specially designed for

16  placement through the vagina."

17            Do you have an opinion as to whether that

18  is an adequate warning to physicians regarding the

19  characteristics and properties of the Prolift?

20     A.    Yes, I have an opinion.

21     Q.    And what's your opinion?

22     A.    My opinion is that it's not adequate.

23     Q.    And why is that?

24     A.    It's not soft, as we already discussed.

25            It is synthetic.

Page 1778

1           It was not specially designed for use in

2    the vagina.  This is the exact same mesh as

3    Prolene Soft, which is a hernia mesh.

4         **Q.   It says in the patient brochure that**

5    **complications with the Prolift are rare.**

6           **Do you have an opinion as to whether that**

7    **provided adequate warning to physicians as to the**

8    **complication rates they could expect with their**

9    **patients?**

10        A.   Yes, I have an opinion.

11        **Q.   What's your opinion?**

12        A.   My opinion is that the claim that

13   complications are rare is very inaccurate.

14        **Q.   Why do you say that?**

15        A.   Because of my review of all of the

16   Ethicon internal documents, their studies, my

17   independent analysis of their studies, the medical

18   literature that's been published, in no way could

19   complications be considered rare, caused by the

20   Prolift system.

21        **Q.   It says that there's a small risk of mesh**

22   **material becoming exposed into the vaginal canal.**

23          **Do you have an opinion as to whether that**

24   **adequately warned physicians regarding the risk of**

25   **mesh being exposed into the vaginal canal?**

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 322 of 742 PageID #: 132486

Page 1779

1      A.   Yes, I have an opinion.

2      **Q.   What is your opinion?**

3      A.   My opinion is that that is not an

4  adequate characterization of how frequent mesh

5  erosion occurs.

6      **Q.   And what's the basis for that?**

7      A.   The basis for that is, again, as I just

8  mentioned, all of those things I've reviewed, and

9  even Ethicon concedes that the typical mesh

10  erosion rate is 10%.

11          I think 1 in 10 people cannot be

12  characterized fairly as a small chance.

13      **Q.   In medicine, you practiced as a physician**

14  **for many years, ran studies, categorized**

15  **complications.  Is that -- is that part of the**

16  **basis for your opinion?**

17      A.   Yes.

18      **Q.   It says in the patient brochure on**

19  **Page 13, it's appropriate for most patients.**

20          **Do you have an opinion as to whether that**

21  **adequately warned physicians as to what women**

22  **should be operated on with this system?**

23      A.   Yes, I have an opinion.

24      **Q.   And what's that opinion?**

25      A.   The opinion is that that is an inaccurate

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 323 of 742 PageID #: 133487
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 323 of 742 PageID #: 133287

Page 1780

1   characterization of appropriate patient selection

2   for the Prolift procedure.

3       Q.   You testified a few moments ago about

4   Stage 3 and 4.  Is that a factor in that opinion

5   as well?

6       A.   Yes.

7       Q.   Now, before Mrs. Budke's surgery --

8   before it -- had Ethicon made a corporate decision

9   to make changes to the patient brochure warnings?

10      A.   Yes.

11      Q.   Before the surgery?

12      A.   Yes.

13      Q.   Did they inform Dr. Simpson that they

14  were changing the warnings in the patient brochure

15  when that decision was made before the surgery?

16  Did they tell her that in any way?

17              MR. BALL:  Your Honor, we need to

18  approach the bench.

19              THE COURT:  All right.  Yeah.  I

20  knew that was coming.

21              (Counsel approached the bench and

22  the following proceedings were held outside the

23  hearing of the jury:)

24              MR. BALL:  You've already made a

25  ruling, Your Honor --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 324 of 712 PageID #: 133486
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 324 of 712 PageID #: 63268

In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1781

 1              THE COURT:  On that.

 2              MR. BALL:  -- that changes that

 3   occurred afterwards, that the changes in the

 4   warnings are not admissible.

 5              MR. SLATER:  I wasn't asking about

 6   changes made afterwards.

 7              MR. BALL:  He's --

 8              MR. SLATER:  I'm asking about

 9   decisions -- I'm sorry, Dan.  I'm sorry.

10              THE COURT:  The decision may have

11   been made but it wasn't published.  It wasn't out.

12              MR. BALL:  Right.  It's unfairly

13   prejudicial to enter into evidence the fact the

14   warnings were changed afterwards, even if the -- a

15   decision was headed in that direction beforehand.

16              THE COURT:  I'll leave it like it

17   is now, but I'll give you warning:  Don't do any

18   more of that.

19              MR. SLATER:  And I don't want to

20   violate a ruling so just so you know what I'm

21   doing, Your Honor, I'm not going to ask if they

22   eventually changed the warnings, but I think the

23   fact that they had acknowledged internally the

24   warnings --

25              THE COURT:  You just asked her

Page 1782

1    that.

2                    MR. SLATER:  Yeah.  It was

3    objected to so I don't know that she answered the

4    question.

5                    MR. BALL:  I don't think there

6    should be any reference that says anything about

7    changing the warnings because there's not going to

8    be anything like that because that's within the

9    Court's ruling.

10                   MR. SLATER:  I thought Your

11   Honor -- and I respect the rulings -- to say don't

12   bring out that the warnings got changed later and

13   we're not going to bring that out, but the fact

14   that internally the company acknowledged that the

15   warnings, they didn't have support for what they

16   were saying and they needed to change a bunch of

17   things, shouldn't we be able to tell that to --

18   that's a punitive damage issue.  I mean, they knew

19   the warnings were wrong and they had information

20   that was untrue and didn't tell the doctor.

21                   MR. BALL:  He's already -- he's

22   actually done pretty well.  He said what was

23   inadequate about it and the basis for it --

24                   THE COURT:  Yeah.

25                   MR. BALL:  -- and this is now

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 326 of 742 PageID #: 132490
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 326 of 742 PageID #: 63280
In Re Budke Jury Trial Official Transcript Vol VI  1/12/2015

Page 1783

1   getting into subsequent changes that should not be

2   allowed.

3               THE COURT:  Well --

4               MR. BERGMANIS:  Lucente's study

5   was ongoing so it's fair to ask whether or not

6   there were any changes --

7               MR. SLATER:  I'm not asking about

8   Lucente's study.

9               MR. BERGMANIS:  I understand that.

10              THE COURT:  Here's the thing.  My

11  ruling's going to stand on the post-remedial

12  action, so let's just get out of it and talk about

13  something else.

14              MR. BALL:  Thank you.

15              (The proceedings returned to open

16  court.)

17     Q.   (By Mr. Slater)  Let me try to ask the

18  question a little bit differently.

19          Before Mrs. Budke's surgery, did Ethicon

20  internally believe that the warnings and

21  information in the patient brochure were accurate

22  or not?

23              MS. JONES:  Objection, Your Honor.

24              THE COURT:  Sustained.

25              MS. JONES:  State of mind.

Page 1784

1        Q.    (By Mr. Slater)  With regard --

2                 THE COURT:  That goes to state of

3    mind, and that's -- I don't know what their state

4    of mind was.

5        Q.    (By Mr. Slater)  Before Mrs. Budke's

6    surgery, have you seen documents indicating

7    whether or not Ethicon had made decisions as to

8    whether or not the warnings and information in the

9    patient brochure were accurate or not?

10                 MR. BALL:  Your Honor, you have

11   already ruled on this.  He's asking the question

12   three times now in an effort to try and avoid

13   the -- Your Honor's rulings.

14                 THE COURT:  Let's move on.

15       Q.    (By Mr. Slater)  With regard to the IFU,

16   was Ethicon -- based on documents you've seen, is

17   it documented whether or not Ethicon was aware of

18   what you told us about bidirectional elasticity?

19       A.    Yes.

20       Q.    And is that a portion of your -- the

21   basis for your opinion?

22       A.    Yes.

23       Q.    And with regard to all the warnings and

24   information -- rephrase.

25                 With regard to the IFU, patient brochure,

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 328 of 712 PageID #: 133482
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 328 of 712 PageID #: 133488

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1785

1    the GPS sales aid, professional education

2    PowerPoint from 2005, is it your opinion that they

3    failed to adequately warn physicians, including

4    Dr. Simpson?

5        A.    Yes.

6        Q.    What we're going to do now, Doctor, is

7    we're going to turn and we're going to speak about

8    Joan Budke.   Okay?

9        A.    Yes.

10       Q.    And the first thing I want to do is

11   promise you that I'm not going to put a bunch of

12   medical records, all the records in front of you,

13   but I'm going to ask you to do me a favor for the

14   Court and for efficiency's sake.

15            We have a pile of records here in front

16   of you --

17       A.    Yes.

18       Q.    -- and we've been through those and --

19   been through those with you, and I just want to

20   ask you:  Those are the records from -- all the

21   way from April 2008 plus Dr. Simpson's,

22   Dr. Griswald's records, Dr. Adkins, and every

23   hospitalization all the way through August 5,

24   2009.

25            Have you read every single one of those

Case 2:12-md-02327   Document 3756-6   Filed 04/29/17   Page 329 of 712 PageID #: 133493
Case 2:12-md-02327   Document 3756-6   Filed 05/09/16   Page 329 of 712 PageID #: 133493

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1786

1    records?

2        A.   Yes, I have.

3        Q.   Do those records form, at least in part,

4    the basis for the opinions you're going to offer

5    regarding what happened with Mrs. Budke and her

6    health and -- and what happened to her physically?

7        A.   Yes.

8        Q.   And are those records important to you in

9    forming your opinions and something that you

10   relied upon?

11       A.   Yes.

12       Q.   Would you briefly tell the jury about

13   Mrs. Budke and the surgery she had on April 28,

14   2008?

15            In the interest of time, we're going to

16   kind of be in a bit of a summary fashion and then

17   we're going to pick and choose some things to talk

18   about in detail because it deserves to be talked

19   about and I'd like to ask you if you can start

20   that.

21       A.   Yes.

22            So Mrs. Budke, as Dr. Simpson recorded in

23   the hospital chart, had a first- to second-degree

24   cystocele.  We talked about that before.

25            She also had some urinary issues, so

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 330 of 742 PageID #: 133494
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 330 of 742 PageID #: 63290

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

1    Dr. Simpson was planning some other procedures to

2    address those.

3            And on April 28th, Dr. Simpson performed

4    the anterior Prolift procedure with some other

5    procedures designed to address her urinary

6    problems by Dr. Simpson.

7            She was initially well after her surgery.

8            At her first postoperative visit, as I

9    mentioned earlier, Dr. Simpson was able to palpate

10   the mesh.  It was tender.  Dr. Simpson wasn't sure

11   if there was possibly an infection starting, so

12   she treated her with antibiotics by mouth, and

13   then saw Mrs. Simpson back in another month, and

14   at that time a mesh erosion had developed.

15           And then she saw her again a couple of

16   months later.  The mesh erosion was persistent.

17           She was seen again in the beginning of

18   January by Dr. Simpson's nurse practitioner and

19   the mesh erosion was still present.

20       **Q.   Let me stop you there.**

21       A.   Okay.

22       **Q.   Do you have an opinion as to what's**

23   **caused the mesh erosion that you've talked about?**

24       A.   The cause of mesh erosion is not

25   completely understood.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 331 of 712 PageID #: 133495
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 331 of 712 PageID #: 63295

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1788

1          It's understood that the -- the mesh

2     causes the inflammatory reaction that we've talked

3     about, cell damage, cell death, tissue damage, and

4     then with other contributing factors, it is --

5     results in the Prolift mesh eroding through the

6     vaginal wall and becoming visible.

7          **Q.    Now, as Mrs. Budke now went into early**

8     **2009, what was her condition?**

9          A.    Yes.  At the time she saw the nurse

10    practitioner, she was well.

11          In the course of the next couple of

12    weeks, into the middle/end of January, she became

13    critically ill.  This is when the abscess

14    manifested itself, and as we talked about earlier,

15    the inflammation took up so much space to the

16    extent that the ureters, the tubes from the kidney

17    to the bladder, were blocked, and when that

18    happens, the urine has nowhere to go and those

19    things in the urine that your body's trying to get

20    rid of get reabsorbed and go back in your

21    circulation and that makes the kidneys fail.  So

22    she was in acute kidney failure.

23          And at that point, she was brought to the

24    hospital and the first operation was performed.

25          **Q.    Now, this was in January 23, 2009?**

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1789

1      A.   Yes.

2      Q.   What I'd like to do now is:  Have you

3  also viewed the imaging studies?  The CAT scans,

4  the x-rays, and these other studies that were

5  actually performed on Mrs. Budke?

6      A.   Yes, I have.

7      Q.   And do those form a basis for your

8  opinions as well?

9      A.   Yes.

10     Q.   Okay.  What I'd like to do is we have the

11  scout film for the CAT scan of January 22, 2009.

12  I'd like to put that up, please.

13          And while we're doing that, Dr. Weber, we

14  under- -- I just want you to understand

15  Dr. Simpson's testified and Dr. Dixon will be

16  testifying, so that's why we're skipping along a

17  little bit, because no need to repeat everything.

18     A.   Right.

19     Q.   Will you tell the jury what they see

20  here?

21     A.   Yes.  Could I have the laser pointer

22  back, please?  I gave it back.

23          So this is what's called a scout film, so

24  this is something that's taken before an imaging

25  test, like a CAT scan.  And we'll see some of the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 333 of 742 PageID #: 133497
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 333 of 742 PageID #: 133497

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1790

1    images from the CAT scan, but I just wanted to put

2    this up to orient you.

3           So in the CAT scan machine, Mrs. Budke is

4    lying on her back, and this image just shows, as

5    you can see from the bottom part of the lung -- I

6    just want to use my little pointer.

7           Okay.  The bottom parts of the lungs here

8    (indicating).  There's the heart (indicating).

9    The lower ribs, you can see.

10          Coming down into the abdomen, those

11   (indicating) are gas in the large intestine where

12   it belongs.  That's healthy.

13          And then of course the bones of the

14   pelvis, the spinal column, and then the hip here

15   (indicating), the top of the femur, the thighbone,

16   on each side.

17          And for -- what a CAT scan does then is

18   take slices, like as if it were, you know, through

19   your body like through and through, and we're

20   going to look at a couple of those pictures.

21       Q.   **Are you ready for the next image?**

22       A.   Yes.

23       Q.   **And this is from the January 22, 2009 CAT**

24   **scan?**

25       A.   Yes.

Page 1791

1       Q.    Okay.   Go to the next one, please.

2       A.    Okay.  So let me orient you here again.

3             So she's lying on her back.  The front of

4    her is up here (indicating).  The back of her is

5    here (indicating).  And here (indicating) you can

6    see bone highlights very clearly in white.

7             So this (indicating) is just the bottom

8    of the tailbone, okay?

9             Here (indicating) you can see her hip

10   bones on the right and on the left.

11            Back here (indicating) is the rectum.

12   And you can see a -- the dark spaces, at least

13   some of them, are gas pockets, so gas in the

14   rectum is perfectly normal, as we all know.

15            The front of her.  So this (indicating)

16   would be the front of her abdominal wall.

17            And here (indicating), this -- this

18   larger gray circle is the Foley balloon inside the

19   bladder, and then that smaller dark circle inside

20   is the Foley catheter itself.

21            The way the Foley catheter works, just

22   since you're looking at it here, the catheter is

23   inserted through the urethra into the bladder and

24   then the balloon is inflated with fluid, saline,

25   so that that keeps the catheter inside the

Page 1792

1   bladder.  Otherwise, it would just slip out.  But

2   now with the balloon, the balloon is big enough it

3   can't slip down the urethra and fall out, so that

4   keeps the catheter in the bladder.

5        And then you can see this layer of tissue

6   (indicating) around the Foley balloon, and that's

7   the bladder wall.  The front part of the bladder

8   wall.  And you don't see any urine in the bladder,

9   of course, because the catheter is there draining

10  the urine out, so there's no fluid-filled space

11  that would be the bladder.

12       **Q.   And what's the significance of the air**

13  **pocket within that area?  What's that telling you?**

14       A.   This one (indicating)?

15       **Q.   Yes.**

16       A.   Okay.  That's what I'm getting to.  Yes.

17            So this area (indicating), this would be

18  encompassing the front wall of the vagina, and

19  this whole area here (indicating) is the pelvic

20  abscess.

21            Now, mesh is not something that can be

22  seen on CT scan, but we know, just from her

23  history, that somewhere in this red circle

24  (indicating) is the Prolift mesh implant, that --

25  that central body that we saw earlier.

Page 1793

1             And this (indicating), the black stuff,

2     is an air pocket within the abscess, and all this

3     (indicating) is the inflammatory tissue, pus,

4     which is basically white blood cells, bacteria,

5     the body's reaction to trying to respond to this

6     very significant infection.

7             And so the air pocket inside is a

8     characteristic finding of an abscess which,

9     especially in the pelvis, is almost always a

10    combination of different bacteria, which is what

11    we call a polymicrobial infection.  So "poly"

12    means many; "microbial," microbes, bacteria,

13    yeast, any kind of microorganism.  So many

14    different organisms.

15            And there are certain types of organisms

16    that just produce gas as part of their metabolism,

17    and so that's what's seen here in this very large

18    inflammatory mass between the bladder and the

19    rectum.

20    Q.   We've heard a little from Dr. Simpson

21    about the surgery she performed with Dr. Dixon, so

22    I would just ask, so that we have a basis when we

23    go forward and a little bit of foundation and, you

24    know, pretty quick, what was done here.

25            We're going to move ahead -- we have a

Page 1794

1   lot to cover and we're going to move ahead to the

2   parts we haven't heard yet --

3      A.   Okay.

4      Q.   -- but just to situate ourselves, what

5   happened in this surgery on the 23rd?

6      A.   Okay.  So what Dr. Simpson did was put an

7   incision in the front wall of the vagina, similar

8   almost to what is the very beginning step of doing

9   a repair procedure.

10          So putting an incision in the front wall

11  of the vagina, and there she encountered this

12  pelvic abscess -- and she talked to you a little

13  bit about that, I imagine -- pus; necrotic tissue,

14  which is basically dead tissue; damaged tissue;

15  inflammation; and then the mesh itself, which was

16  encased in -- in all of this inflammation and

17  infection.

18     Q.   After that surgery, going forward, can

19  you take us forward a little bit and we'll walk

20  our way up to March, if we could.

21     A.   Okay.  So after this surgery where part

22  of the mesh, of the anterior Prolift mesh implant,

23  was removed, the following week another operation

24  was done where more mesh was not removed but more

25  debridement, which is the surgical term for

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 338 of 742 PageID #: 138502
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 388 of 742 PageID #: 63298

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1795

1    basically cleaning out the infected, necrotic,

2    dead, unhealthy tissue; irrigation, which is just

3    rinsing and rinsing and rinsing to try to flush

4    out as much of the material -- you know, the

5    tissue -- the tissue that wasn't surviving and

6    healthy, just to get that out of the way and give

7    a better chance, hopefully, of having this heal.

8         And then she was released from the

9    hospital --

10        Oh, and -- well, should I mention

11   Dr. Dixon and the ureters?

12   **Q.   Yes.  In both January 23rd and at the end**

13   **of the month -- I think it was the 30th or the**

14   **29th -- was he able to be successful with what he**

15   **wanted to do as a urologist?**

16   A.   No.  No.  The ureters were blocked, and

17   so what was -- what he wanted to do was to be able

18   to pass a stent from the bladder into the opening

19   of the ureter and then up to the kidney, to

20   provide a way for the urine to get out until this

21   inflammation settled down and the ureters could be

22   opened by themselves.

23        But there was so much inflammation, not

24   only could he not pass a stent on either side, he

25   couldn't even find the openings of the ureters

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 339 of 742 PageID #: 63503
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 339 of 742 PageID #: 63299

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1796

1    into the bladder at either operation, one -- you

2    know, the two operations about a week apart.

3         **Q.    And Dr. Dixon then took Mrs. Budke to**

4    **another hospital to have what done?**

5         A.    Right.

6              So he recommended that they go to a

7    hospital that had the facilities to perform a

8    procedure where the stents are placed in not from

9    the bladder but from the -- from the kidneys

10   themselves.  Put the -- put the stent in through

11   the back of the wall into the kidney in that way,

12   and then feed the ureter -- excuse me, feed the

13   ureter -- sheesh -- feed the stent down the ureter

14   to where it could be in the bladder.

15             So that was successfully accomplished at

16   a different hospital.

17             But while Mrs. Budke was there, the

18   doctor noticed that she had a clot in her kidney,

19   a blood clot that he didn't think was really

20   accounted for by the procedure itself.  It seemed

21   to him that there was more of a blood clot there

22   than could be explained just by having the -- the

23   stent being passed at that point, and he decided

24   to bring her into the hospital, because this was

25   otherwise planned as an outpatient procedure where

Page 1797

1    she came in and had it done and then went back

2    home.  He instead decided to keep her and do some

3    more tests to try to find out what was wrong.

4        Q.   And what I'd like to do now is we want to

5    pull up P1873, the February 5, 2009 medical chart.

6    Specifically, it's Bates stamped Page 91, which is

7    the -- looks like the admitting consult note with

8    Dr. Schultz.  Now, I want to just draw your

9    attention to a couple things.

10          First of all, the reason for

11   consultation, let's see what Dr. Schultz wrote.

12          "I was asked to see Mrs. Budke both

13   personally by Dr. Jill Oberle and by order in the

14   chart regarding the possibility of metastatic

15   cancer of the lungs in this 76-year-old woman

16   admitted with pelvic floor infection with

17   bilateral ureteral obstruction."

18          What was happening that led an oncologist

19   to be involved and looking at -- for potentially

20   cancer spreading into the lungs at this point?

21       A.   Yes.

22          So when she was admitted to the hospital

23   in January, she had the CT scan that we looked at

24   that showed just the bottom parts of her lungs,

25   and the radiologists saw a couple of nodules.

1          And so the concern was there was

2     something going on in her lungs, and the thought

3     was, "Okay, let's get her through this first week

4     of addressing the pelvic abscess directly and look

5     into this lung problem a little bit later."

6          So then when she went to Missouri Baptist

7     Hospital and had the stents placed and then had

8     extra work -- you know, extra testing being done,

9     she had a full chest CT and chest x-ray that

10    showed nodules that the doctors were initially

11    suspicious could be related to metastatic disease.

12          And what that means is that if there's

13    cancer somewhere else in the body and it gets into

14    the bloodstream, then it can land in the lungs and

15    continue to grow and be a problem like cancer is.

16     **Q.   Now, throughout the hospitalizations and**

17    **the rest of what went on in 2009, I just want to**

18    **take care of one thing.**

19          **Mrs. Budke never was diagnosed with**

20    **cancer, correct?**

21     A.   That's correct.

22     **Q.   It was -- it was thought that she may**

23    **have it at different times, but she did not have**

24    **cancer.   Correct?**

25     A.   That's correct.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 342 of 712 PageID #: 138506
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 342 of 712 PageID #: 138502

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1799

1      Q.    Okay.  Now, down a little further down,

2   there is a paragraph just above the past medical

3   history -- we'll pull that up and I want to ask

4   you a quick question about that -- where it talks

5   about Mrs. Budke having some -- Joan having some

6   discomfort in her chest, going to the local

7   doctor, and it says that the chest image was

8   performed showing the presence of multiple small

9   nodules, as you said, questionable for metastatic

10   disease, with the differential diagnosis in this

11   patient also including septic emboli.

12          And what does that mean?

13      A.    Okay.  So as doctors, when we have

14   someone come in with a problem, we construct a

15   differential diagnosis, which is really basically

16   a list of what could be wrong with this person and

17   in some order -- not fixed in stone but just in

18   our minds in some kind of order as far as what's

19   likely -- what's more likely, less likely, and

20   have that list of the things that could be wrong

21   with someone.

22          So we've already talked about the

23   possibility of metastatic cancer, which turned out

24   not to be the case but it was certainly a concern,

25   especially in the early part of Mrs. Budke's

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 343 of 742 PageID #: 63507
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 343 of 742 PageID #: 63507

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1800

1   evaluation, and then the septic emboli.

2         So septic emboli are a -- an embolus is

3   just something that travels to the lungs.

4   "Septic" means that the embolus itself is carrying

5   an infection.

6         And so a thrombus, which --

7      Q.   What is that?

8      A.   An embolus.

9         So a thrombus is a blood clot.  An

10  embolus is a little less specific.  It basically

11  means anything that travels to the lung.

12        So a thrombus is a little more specific

13  because it's a blood clot that travels to the

14  lungs, but the -- so the embolus can be a blood

15  clot, it could be purely infectious material, you

16  know, a pack of white blood cells, bacteria, cell

17  products, that kind of a thing, that eventually --

18  because they get into the circulation, they

19  eventually get to the lungs because that's just

20  the way the body's circulation works.

21     Q.   And going forward, I just -- I want to

22  ask you one question.  Then we're going to go

23  forward.

24        Do you have an opinion, to a reasonable

25  degree of medical certainty, ultimately as to what

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 344 of 742 PageID #: 63508
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 344 of 742 PageID #: 63802

Page 1801

1   caused those nodules in the lungs?

2      A.   Yes.

3               MR. BALL:  Your Honor, I will

4   object now to lack of qualifications for a

5   gynecologist to talk about lung issues like this.

6      Q.   (By Mr. Slater)  Is it part of your

7   medical training --

8               MR. BALL:  May we approach the

9   bench, Your Honor?

10              THE COURT:  Yes, you may.

11              (Counsel approached the bench and

12   the following proceedings were held outside the

13   hearing of the jury:)

14              MR. BALL:  Mr. Slater has an

15   infectious disease expert that he has disclosed.

16   He has a lung pathologist expert he has disclosed.

17   He has a radiologist he has disclosed.  And he

18   should not have an unlicensed,

19   no-longer-practicing-medicine gynecologist talking

20   about lung disease and the causes of lung disease

21   and the causes of septic emboli in the lungs.

22   That is beyond her qualifications and it should

23   not be allowed in this court.

24              And there are numerous Missouri cases

25   saying that just because somebody's a doctor and

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 345 of 742 PageID #: 138509
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 345 of 742 PageID #: 68509

1    learned about something in medical school doesn't

2    make them an expert sufficient to -- under the

3    Missouri statute and the Missouri law to state an

4    opinion about everything that's medicine.

5                MR. BERGMANIS:  He was in the

6    process of laying his opinion, the foundation.

7    You objected before he got done.

8                MR. BALL:  That's right because I

9    didn't want --

10               MR. BERGMANIS:  But how will you

11   know if he's going to even get there?

12               MR. BALL:  Because I didn't want

13   to blurt out rules here.  There's been a little

14   bit of blurting out going on here today.

15               MR. BERGMANIS:  He's not finished.

16               MR. BALL:  It doesn't matter.  I

17   don't -- there's no question he can ask that can

18   turn an unlicensed doctor who no longer practices

19   medicine into a lung specialist.

20               THE COURT:  Well, if this is all

21   he had to depend on, if this was the only doctor

22   he had, I'd feel really sympathetic about letting

23   her opine to something, but I don't in this case

24   because a lot of what you stated is true, and then

25   secondly, I went to law school like the rest of

Page 1803

1   you.  I took a course in admiralty but I'm not an

2   admiralty lawyer and I shouldn't opine on what

3   happened to a boat out in the ocean any more than

4   Jack and Jill should have dropped the bucket.

5           But anyway, no, I'm not going to let you

6   have her opine to that.

7                   MR. SLATER:  Could I offer --

8                   MR. BERGMANIS:  Could we try to

9   lay the foundation?

10                  MR. BALL:  That's outside the --

11          (Court reporter interruption.)

12                  THE COURT:  Whoa, whoa, whoa.  I

13  don't know whether he will or not, but I'm going

14  to give him a chance to make a record on this.

15  But it's out.

16          Go on and make a record.

17                  MR. SLATER:  Okay.  Judge, in

18  Missouri, it's well -- in Missouri, under

19  Section 490.065, to be qualified as an expert, a

20  witness must have knowledge, skill, experience,

21  training, or education so that his or her opinion

22  will probably aid the trier of fact.

23          The law to allow someone to be qualified

24  in Missouri is a very open-door type of one and we

25  all know that.  It says that the experience and

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 347 of 712 PageID #: 63504
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 347 of 712 PageID #: 63504

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1804

1    competence of a medical expert goes to the weight,

2    not the admissibility of her -- his or her

3    testimony, and in fact, when an expert from a

4    particular profession is called to testify, it is

5    not normally required that he be a specialist in a

6    particular branch of that profession.

7           I'm reading from the case of MacDonald

8    v. Sheets, and it's basically citing to these

9    general propositions from the Missouri Supreme

10   Court.

11              MR. BALL:  Can I see the case,

12   please?

13              MR. SLATER:  Dr. Weber is a board

14   certified physician who actually functioned at the

15   very highest levels of medicine and academic

16   medicine in the United States of America for a

17   long time.

18          Dr. Weber knows what all of the medical

19   issues in this case are.  Now, if they think she

20   doesn't know enough to be persuasive to the jury,

21   they can cross-examine her on the weight of the

22   evidence.  The defense has a urologist named

23   Dr. Elizabeth Kavaler who offered all the same

24   opinions on all the same areas, and she is just a

25   urologist, and --

Page 1805

1          THE COURT:  I didn't know you used

2   a urologist to talk about her lung problems.

3          MR. BALL:  Who used that?

4          MR. SLATER:  You did.

5   Dr. Kavaler.

6          MR. BALL:  We haven't tendered

7   that at all.  We have not tendered that.

8          THE COURT:  I'll sure give you a

9   chance to jump all over that, but, you know, I

10  don't want -- I don't think I've got a conflict

11  with the Missouri Supreme Court over this but I

12  just -- go ahead.

13          MR. BALL:  It's not, it's not.

14  The was a case -- the case he cited from is a case

15  involving dental problems and they had a -- they

16  had a dentist but not an oral surgeon and they had

17  an ENT -- ear, nose, and throat person -- and the

18  doctor said -- the Court essentially said that's

19  close enough.  We're way off here.

20          MR. SLATER:  The general

21  propositions are well known and the law has been

22  very inviting to allowing people to testify and it

23  goes to the weight.

24          THE COURT:  We're close to

25  testifying as to what the ultimate fact of her

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 349 of 712 PageID #: 63505
Case 2:12-md-02327 Document 3702-6 Filed 05/09/16 Page 349 of 712 PageID #: 63809

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1806

1   death was, and I just don't think she's the one to

2   bring that in on.

3                   MR. SLATER:  She's a physician,

4   Your Honor.

5                   THE COURT:  I know she is.

6                   MR. BALL:  She's not a physician

7   any longer.

8                   MR. SLATER:  Well, she's an M.D.

9           (Court reporter interruption.)

10                  THE COURT:  Here's the thing.  I'm

11  going to sustain the objection, so...

12                  MR. BALL:  Thank you.

13                  (The proceedings returned to open

14  court.)

15      Q.   (By Mr. Slater)  Okay.  Dr. Weber, we're

16  going to skip ahead now to the March 25, 2009

17  hospitalization at University of Missouri --

18  University Hospital.  It's Exhibit 1875.  And

19  right on top is the operative report.  We're going

20  to put that up in front of you and ask you a few

21  questions about that.  Okay?

22      A.   Yes.

23      Q.   If you could, Dr. Weber, are you familiar

24  with this operative report?

25      A.   Yes, I am.

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1807

1    Q.    And would you walk the jury through and

2   explain what was happening with Joan?  Tell us

3   what her condition was that led to this operation,

4   please.

5    A.    Yes.  There we go.

6         So this was a procedure performed by

7   Dr. Neal, and this is just the ordinary format of

8   a dictated operative note pretty standard across

9   all hospitals.

10        She had been in the office with both

11  Dr. Neal and Dr. Hunter.  You can see those --

12             MR. BALL:  Your Honor, for the

13  record, I would -- excuse me.

14        I would like to interpose an objection.

15  Dr. Neal has given testimony about his own record

16  and his own report, and I believe it's cumulative

17  to have somebody else testify about that, but I'm

18  making that --

19             THE COURT:  Well, you know, you --

20  you people have been through this from the get-go,

21  day one.  This is all new to me.  I sat down here

22  like a goose last Monday and started on it and I

23  don't know about who all you've deposed and

24  everything but I don't need cumulative testimony,

25  if that's what it is.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 351 of 742 PageID #: 168515
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 351 of 742 PageID #: 168515

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1808

1        If you've got something in there that's

2   going to be pointed out that Dr. Neal didn't talk

3   about, then fine.

4             MR. SLATER:  I think that we're

5   going to lay a foundation for some opinions, and

6   Dr. Neal's was deposed by both parties and I

7   assume that both parties are playing their

8   portions, but I think I need Dr. Weber to at least

9   explain what was happening.  Otherwise, there's no

10  context for what she's going to tell the jury.

11            MR. BALL:  I'll wait until I hear

12  where we're going before I --

13            THE COURT:  Okay.  That's good.

14  Yeah.  Fair enough.

15       **Q.   (By Mr. Slater)  Okay.  Dr. Weber, please**

16  **tell us what was happening at that point.**

17       A.   Okay.  So Mrs. Budke had been seen by

18  Dr. Neal and Dr. Hunter.  Dr. Neal is a urologist.

19  Dr. Hunter is a gynecologic oncologist, so that's

20  the kind of a doctor who specializes in caring for

21  women with gynecologic cancers and also women who

22  have very difficult surgical problems, because

23  they have an extra amount of surgical experience

24  compared to regular gynecologists.

25            So she had been seen in the office the

**In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015**

Page 1809

1   preceding week by both of these doctors, and they

2   were not able to examine her as fully as they

3   would have liked because she was so uncomfortable.

4   They couldn't really get all the information just

5   from examining her.  And there was still the

6   lingering concern that this might represent a

7   cancerous condition and they wanted to check again

8   that that wasn't the case.

9          Also, she had new mesh erosions where the

10  mesh had again eroded through the vaginal wall on

11  both sides, and Dr. Neal was planning to take care

12  of that.

13      **Q.   When you say there was a mesh erosion on**

14  **both sides, what are we talking about?**

15      A.   So previously, Mrs. Budke's mesh erosion

16  was roughly in the center of the front wall of the

17  vagina and then Dr. Simpson removed a portion of

18  that middle piece, that body of the Prolift mesh

19  implant, and now what Dr. Neal was seeing was mesh

20  erosions out toward the side of the vaginal wall,

21  rather than in the center.

22      **Q.   And did the operation actually go**

23  **forward?**

24      A.   Yes, it did.

25      **Q.   And what occurred during the operation of**

Page 1810

1    significance to you?

2        A.   Dr. Neal dictated in his operative note

3    that he removed mesh from both sides of the

4    vagina, and like we talked about earlier, because

5    the mesh is in such close proximity to the

6    bladder, and also because of all the inflammation

7    and tissue damage that was going on at the time,

8    Dr. Neal inadvertently made a hole in the

9    bladder -- that's called a cystotomy -- in the

10   course of removing the pieces of mesh that he did

11   remove.  And that was repaired.

12       Q.   **What I would like to do is provide you an**

13   **exhibit and it's Exhibit 1925.  I'd like to put**

14   **that up and ask you to explain to the jury what**

15   **they're looking at, please.**

16       A.   Yes.

17       Q.   **What is that?**

18       A.   So this is the pathological specimen of

19   the mesh that was removed from Mrs. Budke by

20   Dr. Neal on March 25th.

21       Q.   **And what is that?  What are we seeing**

22   **there?**

23       A.   So this is a portion of the mesh itself,

24   and then -- and you can see in certain locations a

25   remnant of the pore shape, and you can also see

Page 1811

```
 1   these little -- these little white strands

 2   (indicating).

 3          These are fragments of the mesh where the

 4   mesh has become thinner, as opposed to the regular

 5   thicker strands.

 6          And more up here (indicating) you can see

 7   where it's shredded, really, for lack of a better

 8   term.

 9          And then in these red areas (indicating),

10   you can see the fibrotic tissue, the scar tissue

11   that's grown onto the mesh, and it's red because

12   it's so inflammatory and with inflammation,

13   naturally the body is trying to bring extra blood

14   to the area to help fight off the problem, and so

15   there's extra blood vessels, the inflammatory

16   tissue appears very red, and you can see here that

17   it has that appearance as part of the mesh and the

18   scar tissue that's been removed from Mrs. Budke's

19   body.

20        Q.   You talked about fibrotic tissue.

21             Is that the bridging fibrosis, the scar

22   plating you talked about earlier?

23        A.   Yes.

24        Q.   And you spoke earlier about what happens

25   with the arms and the roping and all those things.
```

Page 1812

1          **Is this a helpful demonstration of the**
2  **results of that?**
3      A.   Yes.  I believe what this represents is
4  the side edge of that large central implant, the
5  body of the mesh, and then where one of those mesh
6  arms goes off, here you can see -- it's not a
7  complete circle, but you can see this looks
8  semicircular, and here it looks either circular or
9  it's a whole cord of tissue and mesh where the
10  tissue has grown into the mesh, the scar plating,
11  the fibrosis pulling the mesh together, which --
12  mesh contraction that we've talked about.
13      Q.   **And this process that you're talking**
14  **about with the mesh, would that have had any**
15  **relationship to the mesh erosions?**
16      A.   Yes.
17      Q.   **Explain that.**
18      A.   So mesh contraction is definitely a
19  predisposing factor for the development of mesh
20  erosion.  So while all this intensified
21  inflammatory and foreign body reaction is going
22  on, there is the -- the cell death, tissue damage,
23  and that's another reason how the mesh erodes
24  through to get to -- through the surface of the
25  vaginal wall.

1      Q.   Now, what I'd like to do is take a step

2   back to Exhibit 1874 and I'll show you the page to

3   save you a little time.

4           1874, and we're looking for this page.

5   04736.  Admission notes.

6               MR. BALL:  What is it there, Adam?

7               MR. SLATER:  It's an admission

8   note with an impression from a transvaginal

9   ultrasound of the pelvis.

10              MR. BALL:  And what is the date?

11              MS. JONES:  I'm sorry.  Would

12  you --

13              MR. SLATER:  It's March 9, 2009, I

14  believe.

15     Q.   (By Mr. Slater)  Okay.  Let's pull up the

16  portion that says "Transvaginal Ultrasound" down

17  through the Paragraph Number 1, and we'll talk

18  about that.

19              MS. JONES:  Adam, what -- is that

20  04736 on the bottom?

21              MR. SLATER:  Yeah.

22              MS. JONES:  Thank you.

23     Q.   (By Mr. Slater)  Okay.  What is this

24  telling us?

25     A.   Okay.  So the doctors wanted to have an

Page 1814

1    ultrasound done of Mrs. Budke, and the report is

2    described as limited because Mrs. Budke couldn't

3    tolerate the endovaginal exam.

4           As you may know, ultrasounds can be done

5    in many different ways:  a surface ultrasound or

6    using a thin probe actually placed in the vagina

7    to look around at the pelvic tissues.

8           Except in this instance, Mrs. Budke was

9    so uncomfortable with having that probe in the

10   vagina, that the ultrasonographer found that the

11   examination was limited.  All the information that

12   could normally be obtained wasn't obtainable

13   because Mrs. Budke was too uncomfortable.

14      **Q.   And what's the significance of that, in**

15   **terms of the mesh?  Is there any connection to**

16   **that?**

17      A.   Yes.

18      **Q.   And what is that?**

19      A.   Well, at this point she's -- she's past

20   the first mesh excision but before the second one,

21   so you still have the same ongoing processes that

22   we've talked about.  The inflammatory mass is

23   there.  The mesh contraction.

24          You can imagine if the probe is -- is in

25   the vagina and putting any pressure on the -- on

Page 1815

1   the mesh that's contracted, then that would be

2   very uncomfortable because that would put even

3   more pressure on the mesh, and causing Mrs. Budke

4   to be -- to have quite a lot of pain.

5       **Q.   And this is the condition she was in as**

6   **she's leading up to this surgery with Dr. Neal?**

7       A.   Yes.

8       **Q.   What was her overall medical health, what**

9   **was her overall condition as she was dealing with**

10  **this infection in her pelvis and what you've been**

11  **telling us about?  How was she doing?**

12      A.   Yeah.

13           Before her surgery, she had been quite

14  well.

15           By this time, in the middle of March,

16  she's already starting to -- to weaken.  Her

17  appetite is poor.  Of course she doesn't feel well

18  so she doesn't feel like eating.  She's not

19  getting around because she's in a lot of pain.  So

20  she's beginning to lose weight, and as most of you

21  probably know, if you're not using your muscles,

22  they very quickly waste away.  So she was

23  beginning to have muscle wasting, deconditioning,

24  which meant basically that her tolerance for any

25  kind of exercise was rapidly diminishing.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 359 of 742 PageID #: 138523
Case 2:12-md-02327 Document 3762-5 Filed 05/09/16 Page 359 of 742 PageID #: 138523

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1816

1      Q.    Now, as we go forward, I'm not going

2   to -- I'm not going to put this up just yet

3   because I want to just move along, but there's a

4   June 5, 2009 hospitalization at DePew [sic]

5   Hospital of St. Louis, and I'd like to ask you a

6   couple questions about some of the language in

7   here.

8            It talks about a vesicovaginal fistula.

9   What is that?

10                 MR. BALL:  Can you tell us what

11   you're reading from?

12                 MR. SLATER:  The history and

13   physical on admission, the June 5, 2009 admission.

14                 MR. BALL:  Thank you.

15                 MS. STRAUSS:  What Bates is it?

16                 MR. SLATER:  691.

17                 MR. BALL:  Thanks.

18      Q.    (By Mr. Slater)  What's a vesicovaginal

19   fistula?

20      A.    So a fistula is an abnormal connection

21   between two different organs.

22            So "vesico" is the medical word for

23   bladder; "vaginal," obviously.  So an abnormal

24   connection between the bladder and the vagina.

25   And we touched on this just briefly earlier this

Page 1817

1    morning where that means the -- the urine is

2    effectively bypassing the urethra.

3            There's no storage of urine which happens

4    normally when the urethra is closed.  The urine is

5    just constantly pouring out the vagina because she

6    has no way of controlling that.

7        **Q.    What was the cause, in your opinion, of**

8    **this fistula?**

9        A.    There were contributing factors that all

10   led back to the Prolift mesh.

11           The surgeries that she required for the

12   Prolift mesh excision.

13           The ongoing cell death and tissue damage

14   related to the mesh that was left behind.

15           The surgeries that re- -- that were

16   required that introduced their own level of tissue

17   damage, which is unavoidable.

18           Her impaired ability to heal because she

19   was becoming so weakened, malnourished.  She

20   wasn't taking in enough calories.  She was losing

21   weight.

22           So those -- all those factors contributed

23   to the development of this -- of this huge

24   fistula.

25       **Q.    And when we talk about a fistula, it's a**

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 361 of 742 PageID #: 133525
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 361 of 742 PageID #: 133525

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1818

1    connection between the bladder and the vagina?

2    They actually become connected by essentially an

3    opening?

4        A.    Yes.

5        Q.    What does that tell us about the

6    condition of her vagina and vaginal tissue at that

7    point?

8        A.    That it's -- it's not healthy enough to

9    heal and maintain the normal separation of -- of

10   those two organs.

11       Q.    In reading these records, it says that

12   she had a G-tube in place.

13             What is a G-tube?

14       A.    So a G-tube is a gastrostomy tube.

15   "Gastro" means stomach.

16             So because she was taking in so few

17   calories on her own, because she had no appetite,

18   losing weight, losing muscle mass, being

19   deconditioned and weakened, her doctors

20   recommended that she have a G-tube placed.

21             And what that is, is a tube that goes

22   from the outside directly into the stomach and

23   pumps liquid food into the stomach.

24             So it -- she was still able to eat, but

25   the -- to try to build her back up and at least to

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1819

1    try to keep her from losing even more weight,

2    the -- the idea was to give her supplemental

3    nutrition through this tube in her stomach.

4        **Q.    There's mention of a sacral decubitus.**

5    **What does that mean?**

6        A.    Yeah.  A sacral decubitus is -- you could

7    make a good analogy with a vaginal mesh erosion,

8    actually, without the mesh part.

9            But because she was essentially

10   bed-bound, she was lying in bed.  She could once

11   in a while get to a chair but she wasn't up and

12   around in any kind of a normal way.  So what

13   happens is, with that unrelenting pressure on the

14   skin, and because she had lost so much weight, she

15   didn't have any protective cushioning of a little

16   fat under the skin right at the bottom of her

17   tailbone.  You know, it's kind of a bony

18   prominence there.  And that eventually wears away

19   the skin and some of the tissue over the bones,

20   and it never did heal in her.  That was present

21   from at least April until the time of her death.

22           And the other problem that undoubtedly

23   contributed to that was the vesicovaginal fistula.

24   Because she had urine pouring out of her all of

25   the time and the wound care people didn't want her

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 363 of 742 PageID #: 138527
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 363 of 742 PageID #: 138527

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1820

1   to wear briefs because that would, you know,

2   contain the moisture, so instead, she's lying on a

3   pad in her bed that's constantly soaked,

4   incredibly uncomfortable, and, you know, despite

5   their best efforts at wound care to try to get

6   these sacral decubiti to heal, they never did

7   heal.

8      **Q.    There's a reference to "thrombocytosis**

9   **likely reactive from infection as well as from**

10  **multiple chronic stimuli."**

11          **What is that?**

12      A.    So "thrombocytosis" is a description of

13  the platelet count.

14          So the platelets are part of the blood

15  cells that circulate in your body, and if you have

16  a scratch, they begin the clotting process to get

17  your cut to stop bleeding and go on to -- to go to

18  the next stages of healing.

19          Now, in Mrs. Budke's case, she had a

20  very, very high platelet count, and that started

21  quite early in her course as far as being

22  abnormally high, and it became even higher, the

23  more sick she became.

24          So why does that happen?  The bone marrow

25  was being stimulated because she was anemic.  She

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 364 of 712 PageID #: 138528
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 364 of 712 PageID #: 138528

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1821

1    a low blood count.  So the body is telling the

2    bone marrow, "Okay, make more blood cells, make

3    more blood cells," but it made too many platelets.

4              And then the multiple other chronic

5    stimuli that was recorded, in the presence of a

6    chronic infection, the body also responds by

7    making more platelets.  The -- the open tissue

8    areas, the sacral decubiti, the mesh erosions, the

9    vesicovaginal fistula, all of those are stimuli

10   that the body responds to by doing things like

11   making more platelets.

12       **Q.    You mentioned chronic infection.  Did**

13   **Joan have chronic infection?**

14       A.    Yes.

15       **Q.    And do you have an opinion as to whether**

16   **the chronic infection, the fistula, the**

17   **thrombocytosis, the anemia, the deconditioning,**

18   **all the things you talked about, whether or not**

19   **they were caused by the -- started the process,**

20   **the mesh erosion and the infection?**

21              MR. BALL:  Object to the form and

22   the foundation.

23              THE COURT:  Can you restate it?

24       **Q.    (By Mr. Slater)  What is the cause, in**

25   **your opinion, of all of the different conditions**

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 365 of 742 PageID #: 638529
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 365 of 742 PageID #: 638529

In Re Budke Jury Trial Official Transcript Vol VI 1/12/2015

Page 1822

1      that we've been talking about:  the need for the

2      gastrostomy tube, the thrombocytosis, the

3      deconditioning, the fistula, the decubitus ulcer,

4      all of these things that Joan was having to deal

5      with now in her life?

6              What was the cause, in your opinion?

7       A.    None of this would have happened without

8      the Prolift mesh implantation.

9       Q.    And why do you say that?

10      A.    Because that initiated the cascade.

11             She started with the mesh erosion that

12     became infected, developed this pelvic abscess

13     that blocked her ureters and put her into acute

14     renal failure.  She required procedure after

15     procedure to try to address this problem.  She had

16     the septic emboli that went to her lungs and she

17     developed a pneumonia --

18                  MR. BALL:  Your Honor,

19     Your Honor --

20                  MS. JONES:  Objection.  That's --

21                  MR. BALL:  We just had a ruling

22     on -- may I approach the bench?

23                  THE COURT:  Yes, you may.

24                  (Counsel approached the bench and

25     the following proceedings were held outside the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 366 of 742 PageID #: 138520
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 366 of 742 PageID #: 138520

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1823

1   hearing of the jury:)

2               MR. BALL:  You know, we just had a

3   ruling about her not talking about the lungs and

4   I'm about ready -- I'm about ready to move for a

5   mistrial on these repeated little jabs at trying

6   to violate the court's orders.  That was

7   inappropriate insertion and it's because she just

8   rambles on without any control from the lawyer.

9               MR. SLATER:  I'm sorry.

10              THE COURT:  Please.  I don't know

11  how long you're going to keep her on and I don't

12  know how much of tomorrow you're going to use on

13  her.  You say we've got two other doctors.  We've

14  got to get his doctor on sometime.  Is it

15  tomorrow?

16              MR. HYDE:  Wednesday.

17              THE COURT:  Wednesday.  Okay.

18  We've got all day tomorrow, then, to do whatever,

19  I guess.

20              MR. BALL:  But my objection is

21  that she should not be talking about the lungs.

22  That was your ruling.  And I think it was

23  inadvertent but I'd just ask you to tell her not

24  to talk about the lungs anymore.

25              MR. SLATER:  I'll be happy to do

1   that.

2                    MR. BALL:  Thank you.

3                    MR. SLATER:  But I will say, Your

4   Honor, it's all over the medical records.  It's a

5   diagnosis of what she was dealing with.

6                    THE COURT:  Well, that's for

7   somebody else to deal with.  It wasn't her.  Just

8   stay out of it.

9                    MR. BALL:  Just tell her to not do

10  that anymore.

11                   THE COURT:  We're going to quit

12  here about 5:00, so you've got about 22 minutes.

13                   MR. SLATER:  I think she'll be

14  done before that.  I've been narrowed so much, I

15  probably won't have much more to do.

16                   THE COURT:  Okay.

17                   MR. SLATER:  I feel bad for the

18  family, but I'll do what I got to do.

19                   THE COURT:  All right.

20                   (The proceedings returned to open

21  court.)

22                   MR. BALL:  I'm just going to walk

23  over and speak to Dr. Weber for a moment.

24                   THE WITNESS:  Yeah.  I wish you

25  would.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 368 of 742 PageID #: 63582
Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 368 of 742 PageID #: 63582

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1825

 1      (There was a discussion off the record.)

 2      Q.   (By Mr. Slater)  The various conditions

 3   that you've talked about, it's your opinion that

 4   they were set in motion by the infection of the

 5   mesh and that that carried forward to these

 6   conditions that you testified to?

 7      A.   Yes.

 8               MR. BALL:  Object to the form and

 9   foundation.

10               THE COURT:  Oh, I'll overrule that

11   this time, but please, please couch it in

12   questions, okay?

13      Q.   (By Mr. Slater)  Doctor, there's

14   reference in these records here in this

15   hospitalization in June of '09 to a 30-pound

16   weight loss and debilitation.

17           What does that mean, "debilitation," and

18   why was this weight loss occurring?

19      A.   Yes.

20           So the debilitation, the fact that she

21   was bed-bound.

22           So, you know that colloquial phrase "use

23   it or lose it."  If you don't use your muscles,

24   they very quickly lose their mass.  They lose

25   muscle mass.  She's not taking in nutrition, and

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 369 of 712 PageID #: 63583
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 369 of 712 PageID #: 63529

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1826

1    so -- enough nutrition, so one of the ways the

2    body tries to compensate for that is actually to

3    start breaking down the muscles because that is a

4    source of protein.

5        So that's why she ended up with the

6    G-tube was to try to supplement her nutrition and

7    to try to improve her chances of -- of being able

8    to come back, which unfortunately was not

9    successful.

10   **Q.   It says that she is very debilitated and**

11   **ambulates short distances in the home but mainly**

12   **gets around in a wheelchair.**

13       **In comparing that to her condition before**

14   **all this started, can you tell the jury about that**

15   **and whether that's significant to you?**

16   A.   Yes.  She -- before the surgery, before

17   the Prolift, she was a very active woman.  She

18   exercised at home.  She exercised at a community

19   gym.  She attended water aerobics classes.  She

20   was active in her community.

21       So that was a completely drastic change

22   from -- from someone at that level of activity to

23   someone who has essentially been bed-bound or

24   wheelchair-bound with very short stretches of

25   getting up on her feet.

Page 1827

1      Q.    And there's a note in here that

2    "Dr. Adkins is planning" -- and this was in June

3    of 2009.    June 26.   "Dr. Adkins is planning to do

4    a cystectomy for removal of her bladder after the

5    patient is medically stable and stronger.    The

6    surgery is scheduled for July 14."

7             What are they talking about there?

8      A.    So because of the extent of her

9    vesicovaginal fistula, it was so large and there

10   was so much tissue damage in the -- in the front

11   wall of the vagina and the bladder, the doctor

12   didn't even think it was feasible to attempt a

13   repair to try to recreate that separation between

14   the vagina and the bladder.

15            So his solution was to remove the bladder

16   altogether, which is called a cystectomy, and then

17   do a urinary diversion, kind of like a colostomy,

18   except for the urinary part, where the urine would

19   actually come out to the surface and be collected

20   in a bag and then get emptied and -- and all that

21   stuff.

22            And that surgery was scheduled and

23   rescheduled, but Mrs. Budke never came to the

24   point where she was strong enough to undergo that

25   kind of really extensive surgery.

Page 1828

1    Q.    So she was told she needed to have her

2    bladder removed from her body and that was how she

3    was going to live going forward, but she never was

4    strong enough to do it?

5    A.    That's correct.

6    Q.    I'd like to put up Exhibit P2106 now, the

7    scout film from August 2, 2009.

8              MS. JONES:  I'm sorry, Counsel.  I

9    didn't understand what you said it was.

10             MR. SLATER:  It's a scout film

11   from a CAT scan of August 2, 2009.

12   Q.    (By Mr. Slater)  So Dr. Weber, what are

13   we looking at here?

14   A.    So this again is a scout film.  So this

15   is a picture taken preliminary to a CAT scan, just

16   kind of an overview of Mrs. Budke's body, and I

17   just want to orient you here briefly.

18             So again, she's lying on her back in the

19   CAT scan machine.  You can see obviously this

20   (indicating) is towards her head.  This

21   (indicating) is towards her feet.  The rib cage.

22   This white area (indicating) is opaque material in

23   her stomach.  This (indicating) is her stomach.

24   So it's just filled with fluid that turns white

25   when it's under an x-ray, okay?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 372 of 712 PageID #: 138536
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 372 of 712 PageID #: 138536

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1829

1          Her spine, her pelvic bones, her hips

2    (indicating).  Okay?

3      **Q.   What I'd like to do now is I'd like to**

4    **put a side by side of 2106 and 2107, please.**

5          **Dr. Weber, these are the scout films.  On**

6    **the left is January 22, 2009.  On the right is**

7    **August 2, 2009.**

8          **Can you tell the jury what's significant**

9    **about that, please?**

10     A.   So you remember we saw this picture

11   earlier of the CAT scan that Mrs. Budke had when

12   she first became acutely ill, and you can see the

13   same bony structures, right?  The spinal column,

14   the hip bones.

15          And what you see here on the outside --

16   the outline of the body are some -- you know, the

17   normal skin folds and a little bit of fat

18   underneath the skin.  Pleasingly plump.

19          Now we see, right before Mrs. Budke died,

20   she has no fat anymore.  All of that has been

21   burned up in her body's fight to stay alive, and

22   she lost that fight.

23     **Q.   Do you have an opinion as to what --**

24   **whether what we're looking at right there in this**

25   **process you just described is related to the mesh**

Page 1830

1    erosion and the process that began with that?

2        A.   Yes, I do.

3        Q.   And what's that opinion?

4                MR. BALL:  Object to the form and

5    the foundation and the qualifications for that.

6                THE COURT:  Can you lay a little

7    better foundation?

8        Q.   (By Mr. Slater)  Doctor, based on your

9    knowledge, skill, and experience, are you able to,

10   from looking at all the medical records, follow

11   the different conditions that Joan suffered from,

12   and is that within your field of expertise to

13   understand how that has impacted -- how that

14   impacted on her physical well-being?

15       A.   Yes.

16       Q.   And explain why.

17            Explain what about your training and

18   experience allows you to talk about that.

19       A.   Well, in my field of urogynecology, this

20   does predominantly affect older women, so I have a

21   large range of experience caring for older women,

22   bringing them through the surgical process,

23   managing complications that arise, going through

24   the steps like we talked about before, the

25   differential diagnosis and calling in consultants,

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 374 of 742 PageID #: 138526
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 374 of 742 PageID #: 63888

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1831

1   when needed, to manage these things.

2        I've -- that's the standard medical

3   practice that I had for more than 15 years.

4   **Q.   The medical conditions that Joan had in**

5   **this process, are these things that you treated in**

6   **your own medical practice?**

7   A.   Yes.

8              MR. SLATER:  Okay, Your Honor?

9   Thank you.

10  **Q.   (By Mr. Slater)  Do you have an opinion,**

11  **to a reasonable degree of medical certainty, as to**

12  **whether the process that you've described that**

13  **began with the mesh erosion and the infection of**

14  **the mesh is related to what we're seeing here and**

15  **this process that you've talked to the jury about**

16  **and that is documented in the medical records and**

17  **you've talked about?**

18  A.   Yes, I have an opinion.

19  **Q.   And what is your opinion?**

20  A.   My opinion is that this entire cascade of

21  events that resulted in Mrs. Budke's death was

22  initiated by the Prolift mesh implantation.

23  **Q.   And does that mean in your opinion that**

24  **there's a causal connection and a causal link?**

25  A.   Yes.

Page 1832

1       Q.    And do you hold that opinion to a

2    reasonable degree of medical certainty?

3                MR. BALL:  Object to the form and

4    the foundation, Your Honor.

5                THE COURT:  Well, I'll let her

6    answer it.  I've gone this far.

7                MR. SLATER:  Thank you.

8       Q.    (By Mr. Slater)  And you hold that

9    opinion to a reasonable degree of medical

10   certainty?

11      A.    Yes, I do.

12                MR. SLATER:  Your Honor, I think

13   we've reached the point where we can stop our

14   direct testimony of Dr. Weber.  I understand your

15   rulings on the other issues so I think we're done

16   for today.

17                THE COURT:  All right.  Ladies and

18   gentlemen, that --

19           Anything else?  Do we have something --

20   did you --

21                MS. JONES:  No.  I was ready to

22   begin cross-examination.

23                THE COURT:  Well, I was going to

24   say, do you want -- you've got 12 minutes.  Do you

25   want to use some of that?

Page 1833

1          MS. JONES:  It's totally up to

2   Your Honor.

3          THE COURT:  Oh, no, it's fine with

4   me.  It's fine with me.  I just want to let them

5   out of here when it's let-out time, so, you know,

6   if you've got something -- a couple, three

7   questions you'd like to ask, well, let's do it.

8          MS. JONES:  Frankly, I'll leave it

9   up to the jury, Your Honor.  I'm happy to go ahead

10  and start or --

11         THE COURT:  Well, yeah.  I don't

12  know that you can finish because my guess is you

13  can't cross-examine her in 12 minutes.

14         MS. JONES:  No, no, no, I can't

15  finish.

16         THE COURT:  No way, Jose.  And I'm

17  not going to keep them here till 6:00, so, you

18  know, if you've got two or three questions you

19  want to ask, and then we'll get rip-roaring in the

20  morning, that's fine.

21         MS. JONES:  All right.  Let me

22  just ask a couple of questions.

23         THE COURT:  All right.  Sure.

24

25

Page 1834

```
 1                    CROSS-EXAMINATION

 2       QUESTIONS BY MS. JONES:

 3       Q.   Dr. Weber, Judge Hass told the jury this

 4   morning and I think it's true.  You never

 5   implanted a Prolift, did you?

 6       A.   No.  That's right.

 7       Q.   And you never treated a woman that had a

 8   Prolift, did you?

 9       A.   No, I don't believe so.

10       Q.   You never examined a woman that had a

11   Prolift, did you?

12       A.   No, I don't think so.

13       Q.   You never treated a woman like Mrs. Budke

14   that had a Prolift, did you?

15       A.   No.  No, I didn't.

16       Q.   You never -- you never examined a woman

17   with what you claim to be mesh contracture, did

18   you?

19       A.   No.  That's right.  I'm relying on the

20   medical records in that case.

21       Q.   And those medical records in this

22   particular case don't mention the word

23   "contracture" anyplace, do they?

24       A.   No, not in so many words.

25       Q.   That word does not appear anywhere in
```

Page 1835

1     Mrs. Budke's medical records, does it?

2        A.   No, I don't believe it does.

3        Q.   Now, it's also true that before you

4     became involved, you never went to any

5     professional education sponsored by Ethicon?

6        A.   No, I did not.

7        Q.   You never -- I'm sorry, I lost my train

8     of thought.  Just bear with me.

9             You never went to any professional

10    education sponsored by Ethicon with respect to

11    Prolift, did you?

12       A.   No, I did not.

13       Q.   And before you were hired by Mr. Slater,

14    you never looked at any of the product materials

15    on Prolift, did you?

16       A.   No, that's not true.

17       Q.   I think you told us -- and if not, we can

18    come back and talk tomorrow.

19            I thought you told us that you'd never

20    seen the instructions for use on Prolift before

21    then.

22       A.   Oh, I thought you said the product

23    labeling.  I was being more inclusive than that.

24       Q.   I said product literature.

25            You've never seen -- you never saw the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 379 of 742 PageID #: 63543
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 379 of 742 PageID #: 63889

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1836

1    instructions for use on Prolift before you started

2    working for Mr. Slater, did you?

3        A.   Okay.  I -- I was interpreting your use

4    of the word more broadly.

5             So you're correct.  I had not seen the

6    IFU.

7        Q.   Never had seen the patient brochure, had

8    you?

9        A.   No, I don't think so.

10       Q.   Never gone through and reviewed internal

11   company documents of any medical device

12   manufacturer, had you?

13       A.   No.  Those are not available to the

14   public.

15       Q.   And it's fair to say, Dr. Weber, that

16   you've done -- have not participated in any of the

17   clinical trials that relate to Prolift, have you?

18       A.   That's correct.

19       Q.   You never participated in any of the

20   clinical trials that were done by the TVM group,

21   did you?

22       A.   That is correct.

23       Q.   And the transvaginal mesh group was a

24   group of doctors in Europe?

25       A.   In France, yes, uh-huh.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 380 of 712 PageID #: 63854

1      Q.    And you know there were also doctors in

2   the United States that were working with Ethicon

3   to develop the tools to work with the mesh that

4   became the kit?

5      A.    Yes.

6      Q.    And you know that the studies done by the

7   transvaginal mesh group were published in the

8   medical literature for all of the doctors to see,

9   correct?

10     A.    Eventually, uh-huh.

11     Q.    And I think you told us -- and correct me

12   if I'm wrong -- that you were not aware of any

13   medical device mesh kit, transvaginal mesh

14   product -- let me start over.  I got a little

15   confused there.

16           I think you've agreed with us that there

17   was not a single transvaginal mesh product to

18   treat prolapse for which there were more clinical

19   studies published in the medical literature than

20   Prolift.  Correct?

21     A.    After its launch, correct.

22     Q.    Well, without regard to its launch or

23   when it's out there, there are more medical

24   studies done to evaluate the safety and efficacy

25   of Prolift than relate to any other medical device

1     used -- transvaginal mesh medical device used to

2     treat prolapse, correct?

3         A.   Yes.

4         Q.   And the same is true of Gynemesh PS?

5     That there's no other product other than Prolift

6     on which there have been more medical studies

7     published in the medical literature?

8         A.   I don't know that for a fact, but I don't

9     have any reason to dispute that.

10        Q.   If you told us in your deposition that

11    you agreed with that and that you did not know of

12    any product in which there had been more medical

13    studies done other than Prolift --

14             Let's go back and see if I can get my --

15             If you told us in your deposition that

16    other than Prolift, Gynemesh PS was the most

17    studied -- in terms of published medical

18    studies -- transvaginal mesh products on the

19    market, you would agree with that, wouldn't you?

20        A.   And you're restricting this to prolapse?

21        Q.   I'm talking about products to treat

22    pelvic organ prolapse.

23        A.   Prolapse, yes.  Yeah.

24        Q.   Which is what we're here about today,

25    correct?

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1839

1      A.   Yes.

2           Again, I don't have any reason to dispute

3   that.

4      Q.   **And in fact, you do know that there were**

5   **other transvaginal mesh products produced by**

6   **competitors of Ethicon on the market used for**

7   **exactly the same product -- purpose, correct?**

8      A.   Yes.

9      Q.   **And what you're telling this jury today**

10  **is that compared to any of those other products,**

11  **Prolift was the best studied in terms of the**

12  **published medical literature?**

13     A.   Yes.

14          MS. JONES:  Your Honor, I think

15  it's five till and I don't want to get in trouble

16  with the jury and I'll just stop there.

17          THE COURT:  All right.  That's a

18  good time to stop.  We'll start in the morning at

19  9:00 promptly, and if you want me to, I'll

20  re-swear her or however you want to do it.  Just

21  let me know.

22          Okay.  Ladies and gentlemen, I'm going to

23  get you out of here at 5:00.

24          Justice requires that you not make up

25  your mind about the case till all the evidence has

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 383 of 742 PageID #: 138547
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 383 of 742 PageID #: 138547

Page 1840

1    been seen and heard.  You must not discuss this

2    case among yourselves or with anyone else or

3    comment on anything you've heard or learned in

4    this trial until the case is concluded and you

5    retire to the jury room for your deliberations.

6            Also, you must not remain in the presence

7    of anyone who is discussing the case when the

8    court is not in session.

9            And having said that, then I will excuse

10   you.  I will see you in the morning.  If you'll be

11   here, hopefully we'll line you up at 9:00 and

12   within a reasonable few minutes get you in here.

13           If you got anything in there or anything,

14   let us know or -- that you need tonight, because

15   I'm not -- I haven't tried to be tough with

16   everybody about this leaving the courtroom -- the

17   jury's no problem, but, you know, these folks work

18   all day, and 5:00 is their quitting time, and I

19   just don't want to fight with the county

20   commission about keeping them here a long time, so

21   we'll get everything together and we'll get out of

22   here as quick as we can.  Although if we've got

23   anything to discuss, stick around and we'll talk

24   about it.

25                  (The following proceedings were

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1841

1   held in the courtroom outside the presence of the

2   jury:)

3                    THE BAILIFF:  They're gone.

4                    THE COURT:  The jury's out.

5   Anything we need to talk about before we go home?

6                    MR. BALL:  Yeah.  I'd just like to

7   confirm what's going to happen tomorrow.

8                    THE COURT:  Okay.

9                    MR. BALL:  So we're going to

10  obviously finish Dr. Weber.  What else will happen

11  tomorrow?

12                   MR. SLATER:  Well, it depends when

13  you finish.  I believe it's a little bit depending

14  on that.

15                   MR. BALL:  We'll finish in the

16  morning for sure.

17                   MR. SLATER:  Well, we'd like to be

18  able to play our videos, which I think we're still

19  waiting for answers on a lot of videos.  We were

20  waiting up late last night and never got some

21  answers, so we're trying to work out those issues.

22                   THE COURT:  Oh, okay.  Well, yeah,

23  that's fine.

24                   MR. SLATER:  And that's holding us

25  up.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 385 of 742 PageID #: 68549
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 385 of 742 PageID #: 68549

Page 1842

1              THE COURT:  Let me know the

2     compromise.

3              MR. BALL:  What about any live

4     witnesses tomorrow besides Dr. Weber?

5              MR. SLATER:  Well, you know,

6     honestly we would like to call perhaps some of the

7     family members and we talked, we'd like to call

8     Dr. Godleski and use the time as well as we can.

9              And then we have Dr. Dixon and Dr. Neal's

10    videos.  I think they're pretty much done.  So we

11    have plenty to do.

12             MR. BALL:  Your Honor, as I stated

13    this morning, I think I'm entitled to finish

14    Dr. Simpson --

15             THE COURT:  Well, that's getting

16    to be the sticking point there.

17             MR. BALL:  Yeah.  If he wants to

18    put on video -- if he wants to do Dr. Weber and

19    then videos the rest of the day to fill it up, or

20    if he wants to put --

21             I just need to know whether Dr. Godleski

22    is coming tomorrow so I can prepare.  I just need

23    to know that.

24             MR. SLATER:  He may.  He's going

25    to be here and if he's ready to go to the witness

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 386 of 742 PageID #: 163550
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 386 of 742 PageID #: 163540

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1843

1   stand, he will.  Otherwise, he'll go Wednesday.

2                 MR. BALL:  You know, I think I'm

3   entitled to know here at 5:00 who is coming the

4   next day and who isn't.

5                 THE COURT:  Well, do you have him

6   scheduled for tomorrow?

7                 MR. BERGMANIS:  How long are you

8   going to cross tomorrow?

9                 MR. SLATER:  He's coming in late

10  tonight.  I don't know when he's getting in,

11  Judge.

12          (Court reporter interruption.)

13                 THE COURT:  Let's go off the

14  record.

15    (Proceedings recessed for the day at 4:59 p.m.)

16

17

18

19

20

21

22

23

24

25

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 387 of 742 PageID #: 138551
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 387 of 742 PageID #: 138551

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

Page 1844

1                    REPORTER'S CERTIFICATE

2           I, CHARLES W. MOTTER, Certified Court

3    Reporter, certify that on January 12, 2015, I was

4    the acting official court reporter for the Camden

5    County Circuit Court at Camdenton, Missouri; that

6    I was present and reported all of the proceedings

7    in Donald Budke, Plaintiff, vs. Lake Area Women's

8    Center of Obstetrics & Gynecology, a subsidiary of

9    Lake Regional Medical Management, Inc., f/k/a Lake

10   of the Ozarks Medical Management, Inc.; Becky

11   Simpson, M.D.; Johnson & Johnson, a New Jersey

12   Corporation; Ethicon, Inc., a New Jersey

13   Corporation; and Gynecare Worldwide, a division of

14   Ethicon, Inc., a foreign corporation, Defendants,

15   Case No. 10CM-CC00085.  I further certify that the

16   foregoing 386 pages contain a true and accurate

17   reproduction of my proceedings transcribed.

18

19

20

21           CHARLES W. MOTTER, CCR No. 617

             Acting Official Court Reporter

22   Camden County Circuit Court at Camdenton, Missouri

23

24

25

| A | | | |
|---|---|---|---|
| **$12,500** 1742:6 | 1826:7 1830:9 | 1711:16 1722:1 | 1822:13 | 1778:7 1779:4 |

**A**

**$12,500** 1742:6
**$50** 1674:13
**$88,000** 1511:4
**a.m** 1463:1
  1546:12
  1547:21
  1566:12,13
  1567:17,22
  1568:8,15
  1569:11,21
  1571:13,20
  1572:25 1573:1
  1581:25 1583:3
  1583:22,25
  1584:18,19
**abdomen**
  1558:19 1567:6
  1631:25
  1790:10
**abdominal**
  1631:6 1632:1
  1635:9 1642:3
  1791:16
**abdominally**
  1639:9
**ability** 1576:20
  1708:11
  1817:18
**able** 1468:7
  1473:18
  1513:13 1532:9
  1543:6 1544:2
  1551:18
  1589:19
  1603:24
  1630:24
  1648:23
  1669:20
  1682:22
  1687:14,14
  1688:9 1727:12
  1727:14
  1746:23
  1782:17 1787:9
  1795:14,17
  1809:2 1818:24

1826:7 1830:9
1841:18
**abnormal**
  1816:20,23
**abnormally**
  1820:22
**abroad** 1705:2
**abscess** 1576:7
  1576:19
  1618:16,20
  1619:19,21
  1632:5,15
  1770:19
  1788:13
  1792:20 1793:2
  1793:8 1794:12
  1798:4 1822:12
**abscesses**
  1630:16
**absolute** 1743:1
**absolutely**
  1552:14
  1560:11,12
  1583:18
  1665:21
  1727:24
  1747:17 1752:7
**absorbable**
  1573:12,17
**abstract** 1686:13
  1744:25
**abstractly**
  1498:23
**abstracts** 1744:5
**academic**
  1553:12,15
  1689:8 1804:15
**acceptable**
  1687:12
**accepted** 1478:3
  1686:10
**access** 1742:13
  1742:23 1743:1
  1748:22
**accompanying**
  1536:24
**accomplish**

1711:16 1722:1
**accomplished**
  1631:12,14,18
  1711:17
  1796:15
**accounted**
  1654:22
  1796:20
**accurate** 1533:22
  1534:5 1622:24
  1643:14
  1763:21
  1783:21 1784:9
  1844:16
**accurately**
  1529:15
**accusations**
  1754:6
**accused** 1748:5
**acknowledged**
  1634:6 1781:23
  1782:14
**ACOG** 1500:8
  1501:21
  1502:16
  1503:17
  1555:11 1696:4
  1704:14,17
  1707:20 1708:6
  1709:4,5
**acted** 1646:5
**acting** 1844:4,21
**Actinomyces**
  1619:9
**action** 1709:5
  1783:12
**active** 1826:17,20
**activity** 1826:22
**actual** 1541:25
  1548:23
  1583:15
  1635:19 1637:9
  1643:12 1647:5
  1658:3
**acute** 1576:17
  1617:5,8,12,20
  1788:22

1822:13
**acutely** 1829:12
**Adam** 1460:10
  1662:17
  1755:11 1813:6
  1813:19
**adapt** 1763:5
**adaptation**
  1762:21
**add** 1520:2
  1650:7 1747:1
  1750:8
**added** 1570:9
**adding** 1498:6
**addition** 1519:4
  1519:6 1586:12
**additional**
  1466:8,24
  1499:13 1641:6
  1710:18
**address** 1488:8
  1490:18 1491:1
  1566:7 1589:7
  1787:2,5
  1822:15
**addressed**
  1570:6
**addresses**
  1685:20
**addressing**
  1798:4
**adductor**
  1547:10,10
  1569:15,16
**adequate** 1713:9
  1720:7,14
  1723:22
  1726:20 1728:9
  1734:12
  1736:15
  1759:11,20
  1761:15,21,25
  1763:2,18,21
  1768:14
  1769:10,14
  1772:14
  1777:12,18,22

1778:7 1779:4
**adequately**
  1626:1 1670:10
  1706:25 1726:4
  1760:2 1761:11
  1765:7 1768:9
  1771:12,15
  1772:8 1778:24
  1779:21 1785:3
**Adkins** 1785:22
  1827:2,3
**administer**
  1479:24
**administered**
  1464:11
**admiralty** 1803:1
  1803:2
**admissibility**
  1684:8 1748:1
  1752:10,11
  1804:2
**admissible**
  1781:4
**admission**
  1529:24
  1532:11,23
  1601:22 1813:5
  1813:7 1816:13
  1816:13
**admissions**
  1735:20
**admit** 1703:4
**admitted**
  1701:19,21
  1745:15
  1770:16
  1797:16,22
**admitting** 1797:7
**advance** 1475:22
  1481:5 1651:23
  1763:25
**advanced** 1466:9
  1468:2,3
  1469:11
  1482:13
**advantage**
  1476:19

advantages
  1616:11
adverse 1618:13
  1622:22 1648:7
  1649:1 1676:10
  1678:22 1679:6
  1680:12 1759:7
advocate
  1709:10
advocating
  1699:17
aerobic 1619:4
aerobics 1826:19
affairs 1528:4
  1574:13 1599:2
  1599:18
  1600:11 1608:3
  1608:9 1609:22
  1610:16
  1612:11 1613:6
  1717:21
  1730:11
  1735:19
  1736:12
  1745:14 1762:9
  1764:24
  1765:22
affect 1473:15
  1576:16
  1593:16
  1830:20
affirm 1733:20
afraid 1564:17
afternoon
  1497:13
ages 1467:15
ago 1481:22
  1506:13
  1670:20
  1712:11 1780:3
agree 1529:14
  1580:14 1620:5
  1708:14,20
  1709:3 1723:20
  1838:19
agreed 1530:5
  1601:23

1603:13
1837:16
1838:11
agreeing 1724:24
  1725:4 1755:11
agreement
  1659:11 1660:5
  1671:13,17
  1672:3,19,20
  1708:25 1742:1
  1742:6,20,21
  1748:10,11
  1749:15 1750:4
  1753:22 1754:7
agreements
  1674:10,20,22
  1675:3
agrees 1533:9,25
  1534:4
agunn@simonl...
  1460:5
ahead 1487:19
  1491:5 1494:14
  1501:19
  1508:24
  1528:13
  1530:16
  1531:16
  1545:12,22
  1548:12
  1549:16,19
  1550:5,5,6
  1556:6 1574:23
  1579:10
  1581:24 1585:4
  1621:11
  1649:10
  1660:13 1664:2
  1670:23
  1672:15
  1680:16 1688:6
  1706:9,18
  1708:4,5
  1731:24
  1743:19 1766:5
  1766:6 1774:5
  1793:25 1794:1

1805:12
  1806:16 1833:9
aid 1759:22
  1761:13
  1771:19 1785:1
  1803:22
aids 1768:6
ain't 1739:25
air 1725:18
  1792:12 1793:2
  1793:7
alarmingly
  1645:17
align 1707:21
alive 1829:21
all-inclusive
  1624:21
Allentown
  1494:22
allow 1598:21
  1695:18
  1711:22 1763:5
  1803:23
allowed 1474:25
  1487:14
  1496:20 1614:9
  1682:1,4
  1721:16,22
  1735:7 1744:19
  1751:12,23
  1783:2 1801:23
allowing 1762:21
  1805:22
allows 1490:2
  1830:18
alternate
  1459:23
alternative
  1520:13
  1525:20,21
Altman 1664:1,7
altogether
  1476:10
  1827:16
ambiguous
  1704:16 1708:8
ambulates

1826:11
America 1804:16
American 1470:7
  1470:24
  1474:18
  1479:15,19
  1480:10,13,14
  1480:16,23
  1481:1 1502:7
  1502:17,23
  1696:12
  1699:15 1701:1
  1705:12
amount 1510:22
  1574:7 1575:1
  1576:22
  1623:18,19
  1624:9 1629:8
  1808:23
Amy 1460:3
Amy's 1682:15
anaerobic 1619:5
anal 1568:23
analogy 1767:14
  1819:7
analyses 1679:5
analysis 1471:24
  1472:11 1473:6
  1473:15 1476:8
  1645:3 1648:18
  1659:8,9
  1749:7 1750:12
  1752:11
  1778:17
analyze 1473:2
  1473:11 1509:8
  1648:17
  1733:22
analyzed
  1636:24 1637:4
  1640:18 1745:3
  1758:1
anatomic 1520:5
  1536:12,15,19
  1538:4 1539:11
  1539:17
  1540:14

1772:22
anatomical
  1625:3
anatomy 1478:22
  1491:19
  1519:22 1520:7
  1540:2 1566:18
  1767:2
Anderson
  1460:13,14
  1653:6,10,13
anemia 1821:17
anemic 1820:25
angry 1665:13
animal 1763:14
animation
  1541:2,10
  1548:20 1549:9
  1552:6,9
  1553:4 1560:4
  1560:5,6
  1562:8 1565:22
  1567:15 1568:4
  1572:12
  1579:20,25
  1582:5 1583:1
  1624:3
Anne 1462:8
  1464:8 1465:2
  1562:25
annual 1480:18
  1481:4
answer 1472:17
  1472:18,22
  1473:3 1548:9
  1588:5,10
  1590:4 1593:8
  1593:12
  1621:12 1630:4
  1641:25
  1688:25
  1689:15
  1691:22 1744:4
  1765:21 1766:7
  1832:6
answered
  1600:14,20

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 390 of 712 PageID #: 63855
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 390 of 712 PageID #: 63855

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1634:19 1782:3
**answers** 1587:11
1588:16
1751:23
1841:19,21
**anterior** 1489:16
1489:18
1490:12,14,18
1490:23,24,25
1491:3,16
1492:17
1515:18
1516:21
1535:21
1540:25 1547:2
1547:15 1551:4
1565:23 1566:5
1566:6 1567:1
1567:19,24
1568:13
1571:14
1573:12
1766:19 1767:9
1787:4 1794:22
**anteriorly**
1767:7
**antibiotics**
1633:12
1787:12
**anus** 1566:23
1568:23
**anybody** 1654:11
1749:25 1751:8
**anymore** 1646:7
1823:24
1824:10
1829:20
**anyplace**
1834:23
**Anytime** 1642:15
**anyway** 1626:17
1702:23,24
1803:5
**apart** 1796:2
**apex** 1627:16
**apologize**
1493:16

1500:21
1564:13
**apparently**
1505:17
**appeals** 1756:5
**appear** 1536:12
1572:21
1834:25
**appearance**
1585:18
1811:17
**APPEARANC...**
1460:1
**appears** 1769:6
1811:16
**appetite** 1815:17
1818:17
**applicable**
1742:25
**applied** 1627:25
**appointment**
1657:21
**appreciate**
1549:20 1565:7
1589:22
1713:21
**approach**
1486:10 1495:3
1521:25 1530:7
1541:14
1586:21 1602:2
1609:5 1631:6
1634:13 1635:9
1658:22
1780:18 1801:8
1822:22
**approached**
1478:19
1486:12 1495:5
1505:8 1522:3
1530:10
1541:17
1586:24 1602:5
1609:8 1658:24
1676:20
1716:19
1719:23

1760:16
1780:21
1801:11
1822:24
**appropriate**
1495:20
1519:12
1522:14,15
1528:15
1530:25 1574:3
1591:14
1592:23 1692:4
1698:4 1709:4
1717:10 1734:3
1779:19 1780:1
**appropriately**
1628:15
1648:17
1737:14
**April** 1516:20
1785:21
1786:13 1787:3
1819:21
**arbitrary**
1538:21,23
**area** 1459:6
1461:2 1623:14
1623:16
1624:13
1632:20
1762:10
1792:13,17,19
1811:14
1828:22 1844:7
**areas** 1570:9
1571:3,6,9
1601:4 1624:8
1804:24 1811:9
1821:8
**argue** 1549:15,17
1721:19,19
1737:5
**argued** 1720:9
**arguing** 1755:5
**argument** 1531:5
1604:19,25
1605:4 1612:2

1667:1 1679:4
1747:11
**argumentive**
1751:22
**arguments**
1653:22
**arm** 1582:21
1585:21,24
**arms** 1542:19
1550:20 1568:1
1568:1,1,5
1569:23 1572:7
1572:19 1580:3
1581:2 1584:21
1584:23,24
1585:17 1591:3
1593:1 1595:12
1595:15,18
1624:7 1767:5
1767:13
1811:25 1812:6
**Arnaud** 1715:3
1715:24 1775:5
**arrive** 1645:3
**article** 1481:22
1485:21 1486:1
1486:4,20
1489:11
1491:12
1503:24
1509:10,20
1520:20,21
1521:9,22
1522:10,11,17
1522:19,24
1523:6,13,23
1525:1,2,5,17
1525:25
1527:23 1530:3
1537:15
1539:14
1540:10
1550:11
1685:15,16,18
1685:22 1687:7
1690:9,16
1691:15,17

1692:2 1694:20
1697:13
1698:12
1708:17
1743:25 1773:1
1773:3,9
1774:3,17
**articles** 1487:13
1509:14
1512:10 1527:9
1527:11,24
1528:2 1529:10
1531:19 1534:7
1534:24
1536:23
1550:10 1744:9
1756:3
**aside** 1487:13
1510:7
**asked** 1492:5,5
1502:12,19
1537:6 1552:25
1587:4,19
1600:10,14,20
1609:18
1621:18
1628:23
1634:18 1694:4
1694:5,7
1733:20
1773:17
1781:25
1797:12
**asking** 1530:19
1554:24 1561:2
1592:3 1597:13
1600:16
1607:15
1688:17,24
1693:23 1694:3
1695:15 1700:7
1709:23
1729:11 1781:5
1781:8 1783:7
1784:11
**aslater@mskf....**
1460:12

**aspects** 1495:10
    1577:20
    1620:15,25
    1621:5,18
**assessment**
    1637:8 1693:1
**assigned** 1489:23
**assist** 1471:10
    1472:4
**assisting** 1469:25
**associated**
    1606:2,8
    1619:13 1629:9
    1632:4 1770:18
**assume** 1553:15
    1553:16
    1694:16 1808:7
**Assumes** 1697:5
**Assuming** 1486:7
**astound** 1611:23
**astronomical**
    1745:5
**atlases** 1478:22
**attach** 1767:6
**attached** 1614:22
**attempt** 1632:13
    1827:12
**attempted**
    1630:21,22
**attempting**
    1525:20
**attempts** 1575:21
    1622:21
**attended** 1466:9
    1471:20
    1826:19
**attending**
    1469:19
**attention** 1495:9
    1504:24 1567:2
    1570:2 1571:21
    1572:10,19
    1573:5 1579:23
    1582:25 1797:9
**attesting** 1599:3
**attorney** 1673:24
    1673:25

**attract** 1475:11
**attribute** 1763:4
    1763:7
**audio** 1546:19
**augment** 1519:7
**August** 1657:17
    1703:24 1707:9
    1785:23 1828:7
    1828:11 1829:7
**Australia**
    1650:14
**author** 1477:15
    1478:2 1482:10
    1485:24
    1487:12,14
    1488:4 1489:4
    1500:24 1501:3
    1501:17
    1522:10 1523:6
    1550:10 1686:1
    1686:4,5
    1697:1,13
    1700:19 1702:6
    1705:18,23
    1708:3
**authored**
    1487:10 1500:9
    1503:4,5
    1535:2 1536:8
    1550:11
    1608:19 1696:4
    1696:9 1710:8
    1715:2,3
**authoring** 1509:5
    1509:9
**authoritative**
    1486:5 1520:21
    1685:19
    1690:12
**authority**
    1674:17
**authors** 1478:16
    1482:5 1485:20
    1500:14 1525:4
    1527:25
    1685:22,23
    1687:7 1690:19

1691:17,23
    1773:3,4,5,6
**automatically**
    1526:7
**available**
    1475:16
    1492:10
    1513:25
    1514:12
    1624:21
    1755:19
    1762:13,15
    1836:13
**average** 1533:20
    1650:6,8,10,15
    1650:25 1651:6
**avoid** 1545:12
    1784:12
**aware** 1508:20
    1517:6,10
    1539:2 1596:17
    1784:17
    1837:12
**Axel** 1715:24

------

### B

**babies** 1467:12
    1517:7
**back** 1478:3
    1482:10 1497:7
    1504:1 1509:2
    1513:18
    1519:23 1520:7
    1524:19
    1525:16
    1531:10
    1533:11,12,16
    1536:17
    1537:19 1538:2
    1544:19,23
    1554:22
    1561:14
    1564:14
    1566:16
    1568:22 1582:6
    1590:20 1600:3
    1607:17

1610:10
    1615:11
    1638:19
    1641:11
    1642:10
    1649:16
    1652:16 1655:4
    1657:21,25
    1659:13
    1668:19,23
    1671:3 1673:19
    1698:2,15,16
    1702:23 1703:1
    1703:3 1707:9
    1719:3 1720:9
    1720:9 1731:25
    1741:15
    1757:20
    1764:11 1771:5
    1774:6 1787:13
    1788:20
    1789:22,22
    1790:4 1791:3
    1791:4,11
    1796:11 1797:1
    1813:2 1817:10
    1818:25 1826:8
    1828:18
    1835:18
    1838:14
**background**
    1465:10,24
    1468:14
    1489:23 1509:4
    1762:3,11
**backing** 1739:25
**bacteria** 1576:5
    1617:14,17,18
    1617:22 1619:5
    1619:12 1628:8
    1628:10 1793:4
    1793:10,12
    1800:16
**Bacteroides**
    1619:10,19
**bad** 1526:15
    1536:19

1641:22 1717:5
    1824:17
**Baden-Walker**
    1515:14
**bag** 1709:20
    1827:20
**bailiff** 1463:8,18
    1545:6 1561:25
    1652:24
    1653:23
    1654:21
    1741:10,13
    1841:3
**balance** 1687:24
**balancing**
    1626:10
**bale** 1493:20
    1588:13
**Ball** 1461:11
    1486:22
    1487:17,19
    1488:6 1489:7
    1495:25
    1496:18
    1500:18
    1501:18 1506:4
    1506:7,10,24
    1508:11,14
    1522:19,23
    1523:1,5
    1524:1,11
    1528:22 1531:4
    1532:13,25
    1543:18 1544:1
    1545:8,16
    1546:15,18
    1547:24
    1548:11,15
    1549:5 1552:11
    1552:15,20
    1554:12,18,23
    1555:4 1556:20
    1556:23 1557:9
    1557:14,18,20
    1557:24 1558:3
    1558:7,11,20
    1559:7,19,25

| | | | | |
|---|---|---|---|---|
| 1560:3 1565:2 | 1719:16 1720:1 | 1842:3,12,17 | 1815:24 | 1549:18 |
| 1586:21 1587:2 | 1720:20,23 | 1843:2 | **basing** 1553:11 | 1567:15 |
| 1587:7,10 | 1721:5 1722:2 | **Ball's** 1565:8 | **basis** 1488:13 | 1686:14 1758:5 |
| 1588:15,24 | 1722:9,11,24 | **balloon** 1791:18 | 1507:17 | 1764:25 1774:6 |
| 1589:5 1592:12 | 1723:19 1724:5 | 1791:24 1792:2 | 1510:15 1511:5 | 1787:17 1794:8 |
| 1593:4 1597:10 | 1724:15 1725:2 | 1792:2,6 | 1512:4 1529:21 | 1815:20,23 |
| 1597:13 | 1725:8 1726:14 | **Baltimore** | 1532:5 1604:6 | **behalf** 1465:3 |
| 1598:24 | 1726:17 | 1465:15 | 1608:16 | 1482:21 1510:9 |
| 1601:15 1602:2 | 1727:19,22 | **Baptist** 1798:6 | 1660:22,23 | **behaves** 1765:22 |
| 1602:8,14 | 1728:1,4,16,23 | **bar** 1767:3 | 1680:22 1683:3 | **belief** 1746:14 |
| 1603:25 1604:3 | 1734:2,8,23 | **bark** 1524:13 | 1683:5 1684:9 | **believe** 1486:4,15 |
| 1604:12,17 | 1735:9,14,21 | **barking** 1756:11 | 1689:8 1712:10 | 1514:8 1528:14 |
| 1607:18 | 1736:1 1737:21 | **base** 1680:23 | 1717:11 | 1537:5 1662:14 |
| 1609:25 1611:1 | 1737:25 1738:2 | **based** 1474:14 | 1725:12 | 1666:5 1673:7 |
| 1611:4,7 | 1738:5,11,18 | 1512:17 | 1727:18 | 1685:18 |
| 1613:14 | 1740:15 1741:6 | 1540:12 | 1740:12,13 | 1692:14,14 |
| 1634:12 | 1742:10 1750:7 | 1550:14 | 1763:9 1767:18 | 1722:3 1724:8 |
| 1661:23 | 1750:21 1752:8 | 1578:15 1597:2 | 1770:6 1779:6 | 1734:3 1739:20 |
| 1662:13,16 | 1753:25 | 1603:12 | 1779:7,16 | 1743:9 1745:16 |
| 1663:13 1666:6 | 1754:11,18,21 | 1621:22 | 1782:23 | 1745:21 |
| 1666:17,25 | 1754:24 1755:7 | 1627:22 1637:8 | 1784:21 1786:4 | 1746:10 |
| 1667:19,22 | 1755:10 | 1643:12 | 1789:7 1793:22 | 1769:22 |
| 1668:5,15 | 1769:25 | 1682:25 | **Bates** 1797:6 | 1783:20 |
| 1672:3 1676:23 | 1774:21 | 1691:15 | 1816:15 | 1807:16 1812:3 |
| 1677:3,5 | 1775:10,14 | 1694:21,24 | **batting** 1533:19 | 1813:14 1834:9 |
| 1678:6,25 | 1780:17,24 | 1721:23 | **bear** 1713:12 | 1835:2 1841:13 |
| 1679:2,12,19 | 1781:2,7,12 | 1725:12 | 1835:8 | **believed** 1597:4 |
| 1679:23 1681:3 | 1782:5,21,25 | 1734:25 1735:2 | **beat** 1695:18 | **believes** 1553:13 |
| 1681:7,9,16 | 1783:14 | 1752:7 1763:8 | **Becky** 1459:9 | **belong** 1475:7 |
| 1682:1,3,10 | 1784:10 1801:3 | 1765:25 | 1461:2,2 | **belonged** |
| 1683:2,5,21 | 1801:8,14 | 1766:18 | 1844:10 | 1519:24 1520:7 |
| 1684:2,10,22 | 1802:8,12,16 | 1770:14 | **becoming** | 1705:24 |
| 1685:7 1693:7 | 1803:10 | 1772:19 | 1778:22 1788:6 | **belongs** 1790:12 |
| 1693:10,22 | 1804:11 1805:3 | 1774:16,18 | 1817:19 | **ben@anderson...** |
| 1694:7 1695:14 | 1805:6,13 | 1784:16 1830:8 | **bed** 1819:10 | 1460:16 |
| 1698:10 | 1806:6,12 | **baseline** 1656:22 | 1820:3 | **bench** 1486:12 |
| 1700:22,24 | 1807:12 | **bases** 1521:22 | **bed-bound** | 1495:5 1505:8 |
| 1702:4,8,21 | 1808:11 1813:6 | 1523:24 1578:2 | 1819:10 | 1522:3 1530:10 |
| 1703:10 1705:8 | 1813:10 | 1716:5 | 1825:21 | 1541:17 |
| 1705:11 | 1816:10,14,17 | **basic** 1620:12 | 1826:23 | 1586:22,24 |
| 1707:25 | 1821:21 | 1621:3 | **began** 1463:1 | 1602:5 1609:8 |
| 1709:14 1712:9 | 1822:18,21 | **basically** 1477:1 | 1467:2,10 | 1658:24 |
| 1712:13,18 | 1823:2,20 | 1531:11 1569:5 | 1474:9 1510:8 | 1676:20 |
| 1713:5 1716:13 | 1824:2,9,22 | 1659:22 1793:4 | 1830:1 1831:13 | 1716:19 |
| 1716:18,22,24 | 1825:8 1830:4 | 1794:14 1795:1 | **beginning** | 1719:23 |
| 1717:2,9,24 | 1832:3 1841:6 | 1799:15 | 1467:14 | 1760:16 |
| 1718:1 1719:13 | 1841:9,15 | 1800:10 1804:8 | 1475:17 1478:7 | 1780:18,21 |

1801:9,11
1822:22,24
**benefit** 1472:6
1484:25
1706:25
**benefits** 1599:4
1626:11
1639:14
1641:15 1642:2
1688:5,10
1701:5
**Benjamin**
1460:13
**Bergmanis**
1460:6,7
1523:22 1524:6
1524:10,15
1529:24
1532:21
1545:14 1552:4
1554:1 1559:16
1560:24 1561:4
1614:11
1666:13 1667:4
1667:7 1668:11
1672:1,6
1677:18,23
1678:1 1682:11
1682:14 1683:4
1683:24 1684:5
1685:3 1702:9
1702:12,17,22
1724:24
1728:13,18
1729:3,14,19
1730:13
1734:18 1737:2
1738:9 1739:15
1753:11,18,20
1754:9 1783:4
1783:9 1802:5
1802:10,15
1803:8 1843:7
**best** 1475:1,22
1479:8 1481:10
1502:10
1630:12

1704:17
1707:17,19
1753:9 1820:5
1839:11
**bet** 1732:9
**Bethesda**
1474:14
**better** 1464:4
1476:23 1482:8
1490:8,13
1498:8 1520:5
1520:5,6
1527:8 1595:11
1698:7 1709:4
1732:16,17
1739:18,18
1795:7 1811:7
1830:7
**Bettina** 1461:12
1741:19
**beyond** 1501:4
1537:5 1628:22
1689:2 1700:3
1720:11,15,24
1764:7 1801:22
**bidirectional**
1762:21
1784:18
**big** 1463:25
1468:9,9
1472:14
1585:23
1589:18 1792:2
**bilateral** 1797:17
**bilaterally**
1547:16
1571:16
**bill** 1511:5
**billed** 1510:12,23
1511:8
**bind** 1615:11
**binder** 1511:12
**binds** 1583:11
**biofilm** 1616:18
**biological** 1519:4
**births** 1517:8
**bit** 1465:10

1468:14,15
1479:19
1490:20
1499:24 1504:1
1505:15 1509:2
1518:23
1519:15,21
1526:6 1533:20
1555:18 1568:3
1578:3 1597:11
1598:10
1625:10 1641:5
1644:4 1656:21
1711:14 1750:8
1777:8 1783:18
1786:16
1789:17
1793:23
1794:13,19
1798:5 1802:14
1829:17
1841:13
**bjstrauss@bry...**
1461:15
**black** 1677:16,18
1677:23 1683:4
1693:6 1793:1
**bladder** 1468:23
1490:23
1491:20
1515:22 1520:6
1568:24 1569:8
1572:9 1576:10
1576:11,14
1582:14,15
1622:9 1632:17
1669:17,19
1788:17
1791:19,23
1792:1,4,7,7,8
1792:11
1793:18
1795:18 1796:1
1796:9,14
1810:6,9
1816:23,24
1818:1 1827:4

1827:11,14,15
1828:2
**bladders** 1669:17
**blah** 1532:16,17
1532:17,17
**blast** 1565:20
**bleeding** 1820:17
**blocked** 1576:8
1576:10,18
1628:19
1788:17
1795:16
1822:13
**blood** 1617:13
1618:1 1793:4
1796:19,21
1800:9,13,14
1800:16
1811:13,15
1820:14 1821:1
1821:2,3
**bloodstream**
1798:14
**blue** 1582:7
**blurt** 1802:13
**blurting** 1802:14
**board** 1470:2,6,7
1470:10,18,24
1470:25
1479:15,19
1480:2,5,13,15
1480:23 1481:7
1486:8,17
1493:1 1523:18
1659:14
1729:13
1804:13
**boat** 1732:25
1803:3
**body** 1551:6,11
1566:22
1567:25 1570:9
1571:4 1572:13
1573:24
1574:20 1575:7
1575:16 1586:1
1586:13

1616:16,25
1617:3,3,7
1618:2 1622:8
1622:21,21
1623:12,19
1624:5,10
1627:16 1633:8
1633:10
1765:23
1790:19
1792:25
1798:13
1809:18
1811:13,19
1812:5,21
1820:15 1821:1
1821:6,10
1826:2 1828:2
1828:16
1829:16
**body's** 1617:20
1622:20
1628:14,17
1762:22
1788:19 1793:5
1800:20
1829:21
**bone** 1567:5,10
1567:11,12
1568:21 1791:6
1820:24 1821:2
**bones** 1567:7
1790:13
1791:10
1819:19 1829:1
1829:14
**bony** 1566:25
1819:17
1829:13
**bordered**
1705:15
**bother** 1538:2
**bothered**
1536:21,25
1539:2
**bothers** 1536:17
1562:11

**bottom** 1567:6
1620:10
1624:11
1651:18
1715:21 1790:5
1790:7 1791:7
1797:24
1813:20
1819:16
**bound** 1528:19
1577:8 1650:22
**boundaries**
1650:16
**bounds** 1756:10
**bowel** 1622:10
**boxes** 1493:21,21
**boy** 1494:5
**brainpower**
1476:20
**branch** 1804:6
**break** 1485:3
1543:19,22,24
1544:4,22
1642:13 1649:7
1652:5 1714:7
1714:9,18,18
1731:3,7,10,25
**breakdown**
1622:4
**breaking** 1826:3
**brevis** 1547:10
1569:16
**bridging** 1550:23
1551:1 1581:17
1583:11
1711:25
1766:12
1811:21
**brief** 1481:19
1495:10
1542:16
1587:12
1657:13 1736:3
1737:24
**briefly** 1485:19
1491:11
1534:20 1536:7

1649:25
1658:23
1786:12
1816:25
1828:17
**briefs** 1820:1
**bring** 1463:6,8
1473:19
1476:18
1494:24 1495:9
1503:2 1511:11
1518:24 1520:1
1533:3 1561:9
1624:24 1653:2
1662:25 1682:9
1687:14 1747:4
1747:6 1756:24
1757:7 1782:12
1782:13
1796:24 1806:2
1811:13
**bringing** 1830:22
**broad** 1559:11
**broadly** 1836:4
**Broadway**
1461:13
**brochure**
1759:15
1760:24
1761:13
1771:19 1777:8
1777:14 1778:4
1779:18 1780:9
1780:14
1783:21 1784:9
1784:25 1836:7
**brought** 1472:3
1504:23
1582:21
1788:23
**Brown** 1708:14
1709:3
**Brubaker** 1498:9
**BRYAN** 1461:12
**bucket** 1803:4
**Budke** 1459:3
1491:5 1511:1

1513:2 1515:7
1515:20
1516:19
1517:13
1518:12 1535:6
1535:10,14,20
1537:14,17,23
1542:23
1549:22
1551:10
1552:21
1559:10
1565:24
1575:13 1576:1
1576:2 1577:3
1586:4 1610:5
1611:24
1618:21,22
1619:18
1622:18 1628:6
1629:16
1630:20,25
1631:10 1632:8
1676:8 1681:21
1750:17
1766:14 1767:8
1771:7 1776:1
1785:8 1786:5
1786:13,22
1788:7 1789:5
1790:3 1796:3
1796:17
1797:12
1798:19 1799:5
1808:17
1810:19 1814:1
1814:2,8,13
1815:3 1827:23
1829:11,19
1834:13 1844:7
**Budke's** 1518:10
1519:2,10
1576:23
1578:23
1676:25
1677:13 1680:6
1681:24 1718:6

1749:18
1750:23
1762:16 1769:2
1776:6 1780:7
1783:19 1784:5
1799:25
1809:15
1811:18
1820:19
1828:16
1831:21 1835:1
**build** 1818:25
**built** 1581:10
**bulge** 1516:4
**bulletin** 1500:8
1501:21 1502:6
1509:6 1555:11
1696:4,8
1699:10,11
1709:7 1710:7
**bulletins** 1704:19
**bunch** 1596:16
1782:16
1785:11
**bunched** 1584:8
1584:10,15,16
1584:16
**bunches** 1575:10
1576:3
**burden** 1573:6,9
1573:19,22
**burn** 1730:23
**burned** 1829:21
**burning** 1654:11
1730:20
**business** 1659:20
1678:3,22
1679:17
1680:24 1682:8
**BUTLER**
1461:17
**bylaws** 1709:9
**bypassing** 1817:2

_____
**C**
_____
C 1461:1
**C-47** 1553:25

**cadaver** 1554:16
1557:16 1563:6
1594:22 1595:1
1595:8 1596:4
**cage** 1828:21
**calculate** 1658:7
**calculated**
1658:12
1660:20
**call** 1463:6
1464:8 1505:21
1554:22
1582:24
1626:13 1636:3
1636:7 1655:4
1793:11 1842:6
1842:7
**called** 1465:3
1477:9 1490:23
1490:24 1491:3
1515:14,15
1535:18
1538:11
1617:12
1663:22
1744:14
1789:23 1804:4
1810:9 1827:16
**calling** 1830:25
**calories** 1817:20
1818:17
**Camden** 1459:2
1459:21
1463:19 1844:4
1844:22
**Camdenton**
1459:22 1460:8
1461:24 1844:5
1844:22
**canal** 1778:22,25
**cancer** 1797:15
1797:20
1798:13,15,20
1798:24
1799:23
**cancerous**
1809:7

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

cancers 1808:21
candidate 1759:6
cannula 1547:19
　1571:19
　1572:20
　1585:23
　1593:15
　1595:18
cannula-equip...
　1547:8 1569:13
cannulas
　1547:15
　1571:15 1572:5
　1580:4 1581:12
　1582:17,17,22
　1584:21
　1585:17 1591:4
　1591:9 1593:1
capture 1641:14
captured
　1547:17
　1571:17
care 1466:18
　1467:16
　1468:12
　1469:23
　1470:17,20
　1475:1,23
　1476:23,23
　1478:24
　1480:20
　1502:10
　1517:22 1526:4
　1592:13,15
　1630:12
　1633:12 1675:1
　1682:15 1720:5
　1724:2 1730:23
　1798:18
　1809:11
　1819:25 1820:5
career 1467:23
　1474:4,23
　1483:2
carefully 1492:4
　1748:4
caring 1485:13

1808:20
1830:21
carried 1825:5
carries 1623:11
carry 1642:5
carrying 1800:4
cascade 1586:18
　1632:12
　1822:10
　1831:20
case 1465:11
　1470:15
　1482:21
　1486:23
　1489:24
　1490:15
　1509:24
　1510:20,25
　1511:19 1512:2
　1512:14,17
　1513:24 1519:2
　1519:10
　1521:23
　1531:24 1532:7
　1542:5,9
　1544:8,10,12
　1544:16
　1551:18,20,24
　1552:16,21
　1555:14 1581:3
　1587:19
　1589:18
　1591:25
　1599:17 1612:9
　1612:14
　1615:25
　1619:15
　1622:14 1631:9
　1632:8 1633:22
　1634:2 1636:7
　1636:10,14,25
　1637:16
　1640:20
　1641:17 1652:7
　1652:9,11,14
　1655:22 1656:1
　1661:21

1662:12
1663:16,25
1664:13
1667:23,25
1669:9 1675:15
1678:24
1679:11,24
1680:3 1681:24
1682:17,17
1683:17 1688:4
1700:15 1701:3
1701:4 1702:2
1702:11 1723:2
1726:11,18
1727:15,18
1728:8 1731:15
1731:17,19,22
1732:24,25
1746:18
1750:15
1766:15 1769:2
1770:11
1799:24
1802:23 1804:7
1804:11,19
1805:14,14,14
1809:8 1820:19
1834:20,22
1839:25 1840:2
1840:4,7
1844:15
cases 1493:24
　1660:8 1686:22
　1723:5 1724:6
　1801:24
CAT 1789:3,11
　1789:25 1790:1
　1790:3,17,23
　1828:11,15,19
　1829:11
cat's 1709:19
catastrophes
　1564:22
catastrophic
　1718:18
categorized
　1779:14

category 1468:9
　1539:21 1570:8
　1776:1
catheter 1582:14
　1791:20,21,22
　1791:25 1792:4
　1792:9
causal 1831:24
　1831:24
causative
　1619:12
cause 1459:19
　1490:2,7
　1542:20 1620:1
　1620:7 1621:25
　1625:12
　1787:24 1817:7
　1821:24 1822:6
caused 1539:5
　1622:5 1733:7
　1778:19
　1787:23 1801:1
　1821:19
causes 1542:21
　1788:2 1801:20
　1801:21
causing 1617:22
　1815:3
CAVE 1461:12
CCR 1461:23
　1844:21
cell 1586:18,18
　1618:4 1788:3
　1788:3 1800:16
　1812:22
　1817:13
cells 1586:15,16
　1617:13 1618:1
　1618:3 1793:4
　1800:16
　1820:15 1821:2
　1821:3
center 1459:6
　1461:2 1466:18
　1466:19,19
　1476:9 1477:3
　1582:10

1809:16,21
1844:8
centimeters
　1572:22
central 1567:25
　1572:14 1624:5
　1746:17
　1792:25 1812:4
certain 1479:10
　1504:5 1640:22
　1640:24
　1725:17 1740:9
　1745:16
　1758:17 1759:2
　1793:15
　1810:24
certainly
　1487:14
　1495:21
　1496:20
　1507:16
　1640:17
　1673:11
　1736:21 1739:3
　1755:5 1799:24
certainty
　1509:25 1510:4
　1574:19
　1577:19 1579:3
　1686:25 1711:6
　1713:2,23
　1747:15
　1800:25
　1831:11 1832:2
　1832:10
Certificate
　1462:6 1844:1
certification
　1479:20 1480:2
certified 1470:2
　1470:6,10,24
　1470:24
　1804:14 1844:2
certify 1844:3,15
certifying
　1480:15
cetera 1717:5

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

chain 1697:10
chair 1819:11
chairman 1472:1
challenge
    1746:25
challenging
    1603:22
chance 1489:23
    1535:3 1540:22
    1549:15
    1658:20
    1779:12 1795:7
    1803:14 1805:9
chances 1826:7
change 1704:14
    1710:20,22
    1782:16
    1826:21
changed 1518:14
    1640:16
    1781:14,22
    1782:12
changes 1518:8
    1780:9 1781:2
    1781:3,6
    1783:1,6
changing
    1780:14 1782:7
chapter 1610:4
    1610:14
    1755:22
characteristic
    1624:16
    1637:12
    1737:18 1793:8
characteristics
    1596:10
    1621:22
    1777:19
characterization
    1768:15 1779:4
    1780:1
characterized
    1779:12
charge 1598:1
    1742:9
Charles 1461:23

1844:2,21
Charlotte 1599:7
    1607:7 1609:17
    1613:15,16,18
    1613:21,22
    1736:22
chart 1636:5
    1786:23 1797:5
    1797:14
check 1809:7
checkups
    1518:13
chest 1798:9,9
    1799:6,7
chief 1660:9
    1661:13,15
chip 1750:8
chips 1747:9
choice 1626:11
    1747:7
choir 1764:11
choose 1786:17
chooses 1688:10
chose 1651:10
    1707:20
Christy 1461:16
    1741:6 1751:3
christy.jones@...
    1461:19
chronic 1575:7
    1617:6,8,24
    1618:9,10
    1632:4,5,25
    1633:11
    1763:23
    1764:14,15
    1820:10 1821:4
    1821:6,12,13
    1821:16
Ciarrocca's
    1592:6
circle 1791:18,19
    1792:23 1812:7
Circuit 1459:1,1
    1459:21
    1461:24
    1463:19 1844:5

1844:22
circular 1812:8
circulate 1820:15
circulation
    1788:21
    1800:18,20
circumstances
    1749:12 1750:6
    1766:23
citations 1527:23
cite 1487:4
    1488:13
cited 1805:14
citing 1804:8
claim 1552:22
    1589:11,12,12
    1593:7 1680:19
    1680:21
    1721:14,15
    1763:12
    1778:12
    1834:17
claimed 1637:20
    1643:22
claims 1542:18
    1550:18
    1587:19 1679:8
    1679:9,10
    1721:16
    1737:20
clarify 1708:9
Clark 1528:1
class 1580:21
classes 1826:19
cleaning 1795:1
clear 1522:1,9
    1545:6 1566:10
    1568:17
    1610:10 1670:6
    1682:24 1683:7
    1748:3,6
    1749:11 1752:4
    1754:25 1761:4
    1761:4
cleared 1575:15
clearly 1477:22
    1791:6

Cleveland
    1460:15
    1466:10,11,13
    1466:16,17
    1467:3,22
    1468:7 1469:4
    1471:5,14
    1473:17
    1482:12,16,19
    1483:2,15
client 1578:21
    1732:6
clients 1550:2
clinic 1466:10,13
    1466:16,17
    1467:3,22
    1468:7 1469:4
    1471:5,14
    1473:17
    1482:12,16,19
    1483:2,15
    1748:15
clinical 1468:5
    1471:3,8,23
    1472:2,11,15
    1472:24 1476:7
    1477:2 1483:17
    1484:21
    1512:12
    1620:22
    1626:14,15
    1642:6 1648:6
    1648:8,20,25
    1656:14
    1673:11
    1674:10
    1689:25
    1695:23
    1709:12
    1744:14
    1770:21
    1836:17,20
    1837:18
clinicians
    1502:10,13
    1503:2 1515:11
    1515:13 1516:6

1696:12
    1706:21 1707:2
    1707:18
clip 1551:16
    1603:21
clips 1543:2,11
    1545:10,18,24
    1545:25 1546:8
    1563:25
    1565:23
clock 1544:20
close 1510:21
    1562:12
    1584:12
    1640:18 1696:1
    1775:6 1805:19
    1805:24 1810:5
closed 1771:5
    1817:4
closer 1594:23
    1638:24
closing 1531:5
    1604:19,25
    1605:4
clot 1796:18,19
    1796:21 1800:9
    1800:13,15
cloth 1582:8
clothing 1582:7
clotting 1820:16
coat 1654:5
coauthor 1502:2
    1502:12 1536:5
coauthors
    1478:20
    1489:12
cold 1653:7
    1654:13,15,16
    1654:17
collapse 1585:14
    1585:25
    1586:12
collapsed
    1585:12,21
    1711:23
collateral 1701:7
colleagues

1513:21
**collect** 1470:15
  1473:1
**collected** 1512:16
  1657:23
  1827:19
**collecting**
  1476:15
  1648:16
**collection** 1476:6
  1635:24 1636:1
  1640:21
  1655:21
**college** 1466:2
  1480:10,14,17
  1502:7,17,23
  1696:12
  1699:15 1701:2
  1705:13
**Collignon** 1460:3
**colloquial**
  1825:22
**Colony** 1461:17
  1461:18
**colostomy**
  1827:17
**colporrhaphy**
  1489:17
  1518:22 1551:4
**column** 1637:11
  1637:13,15
  1790:14
  1829:13
**combination**
  1793:10
**combined**
  1624:12
**come** 1470:22
  1483:1,23
  1492:8 1504:1
  1505:6 1509:2
  1515:24 1516:2
  1520:5 1530:8
  1532:25
  1536:17 1538:2
  1541:12
  1561:21

1562:21 1568:1
1570:5 1576:11
1576:15 1580:4
1602:11,20
1607:16
1610:19
1617:14,18
1624:7 1630:13
1650:6 1657:21
1665:9 1668:19
1671:3 1673:19
1676:15
1679:14
1681:24 1724:7
1727:8 1732:12
1732:13
1739:19,22
1741:6,14
1746:25 1756:4
1757:20
1799:14 1826:8
1827:19
1835:18
**comes** 1488:12
1516:3 1517:11
1529:1 1532:3
1533:1 1561:15
1567:16
1610:24
1638:19
1677:11 1771:5
**comfortable**
1563:13 1565:7
1695:12,21
**coming** 1480:1
1537:19 1567:7
1585:22
1659:19
1720:10 1725:6
1780:20
1790:10
1842:22 1843:3
1843:9
**comment**
1529:18
1530:25 1531:2
1531:20

1544:11
1599:11
1607:14
1647:23
1652:10 1691:5
1731:18 1840:3
**commenting**
1530:18
**comments**
1482:9
**commercially**
1624:20
**commission**
1840:20
**commissioned**
1606:23
**committed**
1737:11
**committee**
1502:20,21,22
1503:6,10,12
1504:14
1508:20
1704:18
**committee's**
1504:23
**commonly**
1516:10 1520:4
**communicate**
1516:14
**communication**
1750:23
**community**
1466:21,23
1477:14 1478:9
1514:2 1611:12
1637:5 1673:1
1695:2 1715:14
1826:18,20
**companies**
1696:16 1707:2
**company**
1495:13,14
1496:2,10,11
1496:14,14,15
1497:5 1501:12
1506:20 1507:4

1507:13
1528:19,21
1529:25 1533:9
1555:7 1592:13
1592:15
1597:14,17
1604:8 1608:17
1676:11
1678:21 1679:7
1679:18 1680:9
1684:24 1685:1
1723:24 1726:2
1728:21 1729:4
1730:4,5
1735:24,24
1742:23
1744:10
1745:15 1746:3
1775:3,6,9
1782:14
1836:11
**company's**
1728:14
**compare** 1598:8
**compared**
1516:17 1597:4
1598:9 1624:16
1625:14 1645:3
1808:24
1839:10
**comparing**
1826:13
**comparison**
1595:3,13
1596:3,5
**compatibility**
1620:13 1621:4
**compelling**
1737:13
**compensate**
1826:2
**competence**
1804:1
**competitors**
1839:6
**complain**
1653:11

**complete**
1630:17,21
1812:7
**completed**
1466:12
1470:12 1480:1
1485:7 1573:5
1656:20
1657:19
**completely**
1573:10 1575:9
1617:19
1705:13
1772:18
1787:25
1826:21
**completing**
1672:22
**complex** 1616:19
1769:18
1770:23,24,25
**compliance**
1742:25
**complicated**
1563:19
**complication**
1571:7 1638:10
1662:2,3
1666:16 1670:5
1670:11,15
1696:21 1707:5
1746:9,19
1778:8
**complications**
1570:8 1575:3
1575:22 1601:4
1601:8 1606:1
1607:9 1608:4
1608:10,13
1610:14
1611:25
1612:12
1615:22
1618:22 1619:1
1620:1 1625:19
1630:14
1632:12

1661:19
1711:19
1715:23
1752:20
1771:24 1778:5
1778:13,19
1779:15
1830:23
comprehensive...
1625:25
compromise
1616:13 1842:2
computers
1742:13
con 1642:7
concedes 1779:9
concentrated
1586:9,10
concentration
1586:5
concentric
1767:1,11,19
concept 1520:3
concern 1504:25
1513:19
1519:24 1542:9
1550:15 1565:8
1620:2,7
1638:9 1639:21
1704:20
1707:23 1798:1
1799:24 1809:6
concerned
1505:12
1508:21
1696:19
1699:14 1707:2
1707:4
concerning
1699:20
concerns
1616:12
1704:25
1707:16,18
conclude
1749:17,17
concluded

1544:12
1652:11
1691:23
1731:19 1840:4
conclusion
1490:2,7
1492:9 1625:11
1687:6,9,10
conclusions
1473:12 1475:1
1495:23
condense 1473:9
condition 1484:7
1518:1,3
1632:22
1711:21 1788:8
1807:3 1809:7
1815:5,9
1818:6 1826:13
conditions
1821:25 1825:2
1825:6 1830:11
1831:4
conduct 1471:18
conducts 1661:5
confidence
1649:24 1650:3
1650:9,19,21
1651:2
confident
1650:15,23
confirm 1841:7
conflict 1805:10
confused
1837:15
connected
1632:16 1818:2
Connecticut
1466:6 1485:6
connecting
1567:13
connection
1814:15
1816:20,24
1818:1 1831:24
connective
1468:22 1577:5

connectors
1723:23
conscious 1588:8
consent 1504:10
consenting
1648:14
consents 1689:23
consequences
1575:9 1642:6
1770:21
1772:21
consider 1668:19
1690:11
1723:25 1762:2
considered
1478:7 1504:9
1689:8 1734:15
1778:19
considering
1497:21,25
1498:6 1685:6
consistent
1640:11,16
1777:3
consolidation
1627:23
constantly
1632:19 1817:5
1820:3
construct
1799:14
consult 1497:9
1797:7
consultant
1660:9 1661:14
1661:14 1665:6
consultants
1512:23
1639:25
1697:18 1775:3
1830:25
consultation
1797:11
consulting
1672:20 1775:9
contact 1775:6
contacted

1696:12
contain 1511:12
1728:9 1820:2
1844:16
contained
1656:18
1657:14
contains 1679:20
1680:18
context 1492:3
1497:21
1501:10 1504:2
1533:16
1702:20
1768:22
1808:10
continue 1483:17
1484:14,21
1491:10
1579:18
1584:17
1651:24
1717:10 1734:3
1798:15
continued 1461:1
1484:15,17,23
1652:1
continuing
1483:21 1705:9
contract 1659:25
1661:6 1664:20
1664:21
1671:25 1673:3
1673:8,10,14
1673:16 1742:4
1748:9 1752:4
1753:9
contracted
1743:10 1746:3
1815:1
contracting
1674:17
contraction
1542:21
1550:24
1552:19 1576:2
1586:2 1641:18

1642:7 1767:12
1772:12,15,21
1812:12,18
1814:23
contracts
1575:10
contracture
1834:17,23
contradicted
1768:16,24
contradiction
1768:23
contradicts
1660:17
contraindicati...
1759:5
contrast 1525:8
1582:25
contributed
1632:20
1817:22
1819:23
contributing
1620:9 1631:16
1788:4 1817:9
control 1490:6
1494:23
1497:10
1632:18 1823:8
controlled
1492:16
controlling
1632:24 1817:6
conventional
1625:1
conversation
1506:11
cool 1605:14
cooler 1653:5
coordinating
1476:9 1477:3
cope 1624:10
copies 1485:18
1493:7,18
1541:22
1593:20
1734:19

copy 1486:20
  1493:5,17
  1494:11
  1560:18
  1672:10,16
  1710:3 1729:13
  1734:20
cord 1812:9
corner 1776:15
corporate 1528:4
  1528:19
  1531:23,24
  1532:11,23
  1533:24
  1601:22
  1603:14
  1745:14,21
  1780:8
corporation
  1459:10,11,12
  1461:10,10
  1532:24
  1844:12,13,14
Corporations
  1532:21
correct 1616:9
  1627:18 1635:2
  1645:11
  1662:17 1670:2
  1686:11 1710:8
  1710:10
  1715:18 1725:8
  1725:10
  1771:21 1777:9
  1798:20,21,24
  1798:25 1828:5
  1836:5,18,22
  1837:9,11,20
  1837:21 1838:2
  1838:25 1839:7
corrected
  1491:16
  1737:18
correlate
  1539:17
corresponding
  1547:18

1571:17
Cosson 1686:2
  1690:24
  1691:18 1775:7
cost-effective
  1629:10
couch 1825:11
counsel 1485:18
  1486:12
  1492:25 1493:2
  1495:5 1505:8
  1522:3,16
  1530:10
  1534:10,17
  1541:17
  1560:17
  1586:24
  1593:20 1602:5
  1609:8 1610:10
  1658:24
  1676:20 1707:1
  1716:19
  1719:23
  1760:16
  1780:21
  1801:11
  1822:24 1828:8
count 1481:14
  1646:6 1647:21
  1648:2 1820:13
  1820:20 1821:1
counted 1509:13
  1639:3 1648:25
country 1474:16
  1476:6 1494:5
county 1459:2,21
  1463:19
  1840:19 1844:5
  1844:22
couple 1470:14
  1507:5 1509:3
  1543:4 1565:22
  1567:2 1570:3
  1571:22
  1572:10
  1757:21
  1762:19

1787:15
  1788:11
  1790:20 1797:9
  1797:25 1816:6
  1833:6,22
course 1473:9
  1478:4 1479:23
  1482:1 1484:9
  1487:20
  1511:11
  1555:13 1655:6
  1701:20
  1705:17 1707:5
  1724:16
  1726:19 1735:4
  1747:16
  1788:11
  1790:13 1792:9
  1803:1 1810:10
  1815:17
  1820:21
court 1459:1,21
  1463:5,9,14,19
  1463:21,24
  1464:2,9,12,13
  1464:16,20,22
  1465:4 1486:11
  1487:22 1488:3
  1488:10,19,22
  1489:9 1493:11
  1493:14,19
  1494:3,13
  1495:4 1496:16
  1496:20,24
  1497:3,11,15
  1497:16
  1498:12,16,20
  1499:5,10,23
  1500:10,12,25
  1501:8,12,14
  1501:16,19
  1504:21 1505:6
  1505:17,20,24
  1506:6,9,22,25
  1507:8,23
  1508:3,5,9,12
  1508:16 1514:9

1514:14
  1521:11,13
  1522:2,6,22,25
  1523:3,19
  1524:4,8,12,17
  1524:18
  1528:13 1529:2
  1529:5,20
  1530:2,8,15,22
  1530:23 1531:6
  1531:7,13,16
  1532:18 1533:4
  1533:11,14,15
  1537:7,11
  1541:16
  1542:11,14,24
  1543:15,21
  1544:3,6,7,17
  1545:1,7,20,21
  1546:3,11
  1549:4,6,12,16
  1549:23 1550:1
  1550:5 1552:14
  1552:24 1553:8
  1553:16,20,24
  1554:4,9,21
  1555:1,15,24
  1556:5,16,25
  1557:3,7,10,17
  1558:1,17,22
  1559:1,2,14,17
  1559:20 1560:2
  1560:7,10,13
  1561:8,11,16
  1561:20 1562:2
  1562:20,24
  1563:11 1564:2
  1564:5,15,19
  1565:4,10
  1570:14,20
  1574:4,23
  1577:15 1578:2
  1578:20 1579:9
  1580:9,14,20
  1585:3 1586:23
  1587:6,9,22,25
  1588:3,11,22

1589:20,24
  1590:6,11,14
  1590:17,24
  1591:18,20
  1592:1,8,17,21
  1593:8 1597:8
  1597:12,20
  1598:18
  1599:13,22
  1600:3,9,13,19
  1600:23
  1601:19 1602:4
  1602:13,16
  1603:5,9
  1605:6,10,15
  1605:21,22
  1606:13 1607:3
  1607:12,16
  1609:6,13,24
  1610:2,7,11
  1611:3,6,18,21
  1612:4,18
  1613:1,7,20,24
  1614:3,6,14,16
  1614:18 1615:4
  1615:7,10,16
  1615:17 1621:9
  1626:22 1627:1
  1627:4 1628:22
  1629:21,24
  1630:3 1633:24
  1634:8,14,18
  1642:12,17,20
  1647:24 1649:7
  1649:10 1652:4
  1652:15,22
  1653:1,8,11,15
  1659:4,6,12,13
  1659:20 1660:3
  1660:7 1661:22
  1662:21 1664:2
  1664:10
  1665:12 1666:1

| | | | | |
|---|---|---|---|---|
| 1667:13,15,16 | 1717:1,7,16,19 | 1769:20 1770:3 | **cover** 1557:23 | 1595:15 |
| 1667:20 1668:3 | 1717:25 1718:3 | 1770:7,10 | 1608:21 1707:3 | **crunch** 1742:14 |
| 1668:4,7,13,18 | 1718:9,12,19 | 1773:15,18 | 1713:8 1715:9 | **crunched** |
| 1668:23,25 | 1719:2,5,15,21 | 1774:4,10,25 | 1794:1 | 1595:19 |
| 1669:1 1670:21 | 1720:16,22 | 1775:16 | **covered** 1736:3 | **crushing** 1678:8 |
| 1670:25 | 1721:8 1722:7 | 1780:19 1781:1 | **covers** 1616:18 | **CT** 1792:22 |
| 1671:19,22 | 1722:14,25 | 1781:10,16,25 | **create** 1475:7 | 1797:23 1798:9 |
| 1672:5,10,15 | 1723:4,7 | 1782:24 1783:3 | 1506:19 | **cumulative** |
| 1673:15,20,24 | 1724:11,20 | 1783:10,16,24 | 1715:23 | 1548:19 |
| 1674:2,5,7,19 | 1725:3,20,23 | 1784:2,14 | 1720:11,14 | 1697:24 |
| 1675:1,4,6,9,19 | 1726:6,23 | 1785:14 | 1751:16,24,24 | 1807:16,24 |
| 1675:21,25 | 1727:5,21,25 | 1801:10,23 | **created** 1472:1 | **current** 1704:20 |
| 1676:4,6,15,18 | 1728:3,12 | 1802:20 | **creating** 1569:5 | **currently** |
| 1677:1,4,22 | 1729:10,22 | 1803:11,12 | 1586:14 | 1481:15 |
| 1678:10,18 | 1730:2,8,15,19 | 1804:10 1805:1 | **credibility** | 1540:12 |
| 1680:10,16,25 | 1730:22 1731:1 | 1805:8,11,18 | 1727:3 | **curriculum** |
| 1681:8,10,14 | 1731:2,11,23 | 1805:24 1806:5 | **critical** 1503:14 | 1465:17 |
| 1681:15 | 1732:4,9,11 | 1806:9,10,14 | 1529:6 1612:10 | **cushioning** |
| 1684:12,16,17 | 1733:14,18,25 | 1807:19 | 1641:14 1759:2 | 1819:15 |
| 1684:23 1685:2 | 1734:6,16,21 | 1808:13 | **critically** | **customary** |
| 1685:11,13 | 1735:1,5 | 1821:23 | 1477:19 1482:5 | 1768:2 |
| 1688:19 | 1736:25 1737:3 | 1822:23 | 1576:7 1788:13 | **cut** 1541:23,23 |
| 1689:15 1690:4 | 1737:8 1738:1 | 1823:10,17 | **criticism** 1542:8 | 1663:16 1727:7 |
| 1690:7 1691:14 | 1738:22 1739:5 | 1824:6,11,16 | 1542:12 1546:5 | 1740:25 |
| 1691:21 | 1739:12,16 | 1824:19,21 | **criticize** 1497:4 | 1820:17 |
| 1692:16,18 | 1740:8,14,17 | 1825:10 1830:6 | 1523:4 1605:11 | **cutoff** 1649:22 |
| 1693:9,16 | 1740:22 1741:5 | 1832:5,17,23 | **cross** 1488:8 | 1651:10 |
| 1694:13,16 | 1741:11,14 | 1833:3,11,16 | 1553:19 1554:2 | **cutout** 1644:12 |
| 1695:17 1697:8 | 1742:5,8,15 | 1833:23 | 1555:12 | **cutting** 1631:24 |
| 1697:21 1698:1 | 1743:5,18 | 1839:17 1840:8 | 1559:16 | **CV** 1465:17 |
| 1698:8,13,18 | 1746:1,4,15 | 1841:4,8,22 | 1739:10 | 1471:2 1478:10 |
| 1698:25 1699:3 | 1747:12,18,24 | 1842:1,15 | 1740:11 | 1478:15 1479:9 |
| 1699:24 1700:4 | 1748:2,10,12 | 1843:5,12,13 | 1753:12 1843:8 | 1482:11 |
| 1700:11,16,20 | 1748:16,20 | 1844:2,4,5,21 | **cross-examinat...** | **cystectomy** |
| 1700:23 | 1749:1,4,19 | 1844:22 | 1462:9 1832:22 | 1827:4,16 |
| 1701:13,18,22 | 1750:20 | **court's** 1652:16 | 1834:1 | **cystocele** 1491:2 |
| 1702:15,25 | 1752:22,24 | 1782:9 1823:6 | **cross-examine** | 1491:4,6,9 |
| 1703:12,22 | 1753:4,14,19 | **courthouse** | 1523:7 1533:8 | 1515:8,17,21 |
| 1705:10,14 | 1754:1,3 | 1654:1 | 1550:9 1559:22 | 1516:22 |
| 1706:1,7,13,17 | 1755:3,8,17,24 | **courtroom** | 1662:25 1684:6 | 1518:11 |
| 1708:4 1709:18 | 1756:5,5,6,16 | 1463:3,11 | 1727:2 1740:15 | 1535:10,22,22 |
| 1710:2,19 | 1756:20,23 | 1545:4 1561:23 | 1765:17 | 1566:5 1786:24 |
| 1712:12,16,19 | 1757:7,12 | 1652:20 1654:8 | 1804:21 | **cystotomy** |
| 1713:10,16,20 | 1760:8 1761:7 | 1720:6 1732:2 | 1833:13 | 1810:9 |
| 1714:9,13,15 | 1761:9 1764:5 | 1741:3 1757:4 | **crumpled** | |
| 1715:18 | 1764:9 1765:15 | 1757:10 | 1595:19 | **D** |
| 1716:16,23 | 1765:19 1766:5 | 1840:16 1841:1 | **crumpling** | **D** 1461:16 1462:1 |

d/b/a 1461:2
damage 1551:11
  1586:16,18,19
  1618:4 1632:20
  1667:11
  1679:10
  1721:16
  1722:19
  1782:18 1788:3
  1788:3 1810:7
  1812:22
  1817:13,17
  1827:10
damaged
  1794:14
damages 1551:10
  1718:16
damaging
  1611:16 1745:6
damn 1678:11
Dan 1461:11
  1666:22 1781:9
dangerous
  1518:3,8
  1713:4,25
  1717:5
dark 1791:12,19
Darn 1727:4
data 1473:2,6
  1476:8,9
  1477:3 1512:14
  1512:15 1629:9
  1629:19
  1635:22,24
  1636:1,3,25
  1637:4 1640:18
  1640:20
  1642:24
  1643:13 1645:2
  1648:17,18
  1655:21
  1659:11,11,25
  1660:5,6,10,15
  1660:17,17
  1661:8,8,17
  1662:6 1664:16
  1665:2,7,9

1666:5,7,18
1667:5,6,7,24
1673:3 1742:14
1742:17,24
1743:10,24
1745:2,11,16
1746:8,11,18
1746:24 1748:8
1748:19,23
1749:2,12
1750:3,24,24
1751:4 1752:7
1752:19
1754:13,14
1756:14 1758:1
database
  1655:15,20,24
  1656:5,18
  1659:8,9,16,17
  1671:7,11,14
  1757:22 1758:1
databases
  1742:14 1744:7
date 1594:1
  1613:2,9
  1762:16
  1813:10
dated 1594:1,2
  1609:11
  1612:16,16
  1614:22 1686:6
  1754:7 1776:5
dates 1753:8
David 1461:5
day 1489:1
  1494:6 1496:13
  1533:4 1543:23
  1561:7 1603:14
  1610:25 1738:8
  1738:12
  1746:10
  1764:16
  1770:17
  1807:21
  1823:18
  1840:18
  1842:19 1843:4

1843:15
day-to-day
  1539:13 1689:8
daylight 1730:20
daylights
  1669:25
days 1507:5
dead 1794:14
  1795:2
deal 1487:20
  1506:7 1510:17
  1522:7 1546:3
  1651:19
  1662:18 1676:7
  1679:23 1729:5
  1732:24 1822:4
  1824:7
dealing 1815:9
  1824:5
Dear 1678:18
death 1586:18
  1611:24 1613:2
  1613:9 1618:4
  1662:11
  1695:19 1718:6
  1788:3 1806:1
  1812:22
  1817:13
  1819:21
  1831:21
debilitated
  1826:10
debilitation
  1825:16,17,20
debridement
  1794:25
decide 1506:23
  1697:25
  1721:22
  1723:21
decided 1483:15
  1484:18,21,24
  1704:14 1708:7
  1708:9 1741:20
  1751:18
  1796:23 1797:2
deciding 1736:17

decision 1503:21
  1598:15
  1626:10
  1751:20 1780:8
  1780:15
  1781:10,15
decision-making
  1481:9 1598:2
decisions
  1597:22 1781:9
  1784:7
deck 1526:19
  1527:2 1642:11
  1642:22
  1771:20
deconditioned
  1818:19
deconditioning
  1815:23
  1821:17 1822:3
decubiti 1820:6
  1821:8
decubitus 1819:4
  1819:6 1822:3
dedicated
  1475:19
deem 1703:9
deemed 1689:5
  1696:22
deems 1742:25
deep 1547:6
  1568:12
deep-sixed
  1664:25
deeper 1569:24
defect 1542:18
  1550:18 1551:1
  1577:11
  1589:12 1679:8
  1716:6
defective
  1587:15 1711:7
  1711:10 1717:4
defectively
  1579:4,13
  1581:8
defects 1551:13

defend 1663:25
  1664:13
  1665:15
defendants
  1459:13 1461:2
  1461:9 1726:12
  1844:14
defending
  1664:14
defense 1505:14
  1534:17 1745:7
  1746:25
  1804:22
define 1538:19
  1708:11
defined 1748:14
definite 1743:19
definitely
  1519:13 1769:4
  1772:5 1812:18
definition 1661:2
  1688:18
  1689:20
degree 1473:14
  1509:25 1510:3
  1515:21 1516:1
  1516:3,23
  1517:1,8
  1574:18
  1577:19 1579:3
  1686:25 1711:5
  1713:2,23
  1747:14
  1800:25
  1831:11 1832:2
  1832:9
delays 1545:12
deliberation
  1652:12
deliberations
  1544:14
  1731:20 1840:5
delivering
  1467:12
demanding
  1484:11
demonstrate

1543:7
**demonstrated**
 1680:13
**demonstrating**
 1541:3
**demonstration**
 1812:1
**denominator**
 1653:25
**dental** 1805:15
**dentist** 1805:16
**deny** 1704:21
**deovrby@cs.co...**
 1461:8
**dep** 1609:19
**department**
 1471:4,13
 1472:1,6
 1473:22
 1674:21
**departments**
 1674:23
**depend** 1468:25
 1802:21
**dependent**
 1629:7
**depending**
 1841:13
**depends** 1497:1
 1841:12
**DePew** 1816:4
**depiction**
 1566:14,24
**depo** 1743:17
**deposed** 1807:23
 1808:6
**deposition**
 1528:20 1530:4
 1530:5 1605:10
 1606:11
 1608:16
 1609:18 1614:2
 1614:9,10
 1620:19 1660:6
 1660:8 1662:9
 1665:16 1671:9
 1710:15

1735:18 1744:1
 1744:2 1762:8
 1765:21
 1838:10,15
**depositions**
 1512:21,23
 1513:3 1578:6
 1599:7 1600:1
**describe** 1515:16
 1672:9 1699:8
 1769:16
 1770:13
**described**
 1516:22
 1517:14
 1591:10
 1592:25 1608:4
 1608:13
 1628:13
 1704:19
 1766:19,25
 1814:2 1829:25
 1831:12
**describes**
 1637:12
**describing**
 1479:18 1569:1
**description**
 1632:7 1820:12
**deserves** 1786:18
**design** 1471:23
 1472:11,15
 1473:15
 1476:11,20
 1490:1 1542:18
 1550:18 1577:7
 1577:11,21
 1581:10 1641:6
 1641:13
 1651:11,23
 1711:11,15
 1716:6 1717:5
 1737:17
**designed** 1490:18
 1491:1 1492:4
 1566:7 1579:4
 1579:13 1581:8

1777:15 1778:1
 1787:5
**designing** 1477:6
 1498:1 1500:4
**designs** 1473:23
 1490:3 1644:12
**despite** 1820:4
**detail** 1520:8
 1786:18
**detailed** 1516:11
**details** 1483:24
 1770:2,2
**determine**
 1622:25 1625:3
 1733:9 1737:16
**devastating**
 1727:15
**develop** 1483:12
 1502:24 1526:2
 1769:17 1837:3
**developed**
 1492:12
 1519:17 1628:6
 1632:15
 1686:20 1771:9
 1787:14
 1822:12,17
**developing**
 1644:9 1685:25
**development**
 1499:14 1527:5
 1537:2 1570:7
 1694:22
 1812:19
 1817:23
**device** 1518:16
 1547:18
 1571:18 1579:1
 1579:5 1581:8
 1582:20
 1591:15
 1592:24 1687:2
 1711:7 1713:3
 1713:25
 1776:24
 1836:11
 1837:13,25

1838:1
**devices** 1547:16
 1571:15
**dhball@bryan...**
 1461:15
**diagnosed**
 1798:19
**diagnosis** 1627:7
 1627:8 1799:10
 1799:15 1824:5
 1830:25
**diagram** 1683:18
**dictated** 1807:8
 1810:2
**died** 1610:15
 1662:8 1718:7
 1753:6,9
 1829:19
**difference**
 1539:11
 1544:21
 1579:20 1637:3
 1643:18
 1721:21
**different** 1476:14
 1480:13,20
 1489:21
 1490:11
 1509:13
 1517:21
 1518:17
 1520:19 1523:8
 1535:8 1552:5
 1572:16
 1573:10
 1591:24 1595:4
 1637:8 1639:13
 1639:14
 1640:14,14
 1644:11,12
 1650:13,24
 1656:23
 1665:16
 1695:16 1713:7
 1732:6 1752:15
 1752:16
 1793:10,14

1796:16
 1798:23 1814:5
 1816:21
 1821:25
 1830:11
**differential**
 1799:10,15
 1830:25
**differently**
 1508:8 1697:7
 1783:18
**difficult** 1466:22
 1484:8 1576:25
 1577:10
 1581:20
 1583:12
 1622:25 1632:2
 1633:5,10
 1712:3 1771:1
 1772:6,23
 1808:22
**difficulty**
 1551:14
**dilemma** 1632:3
**diminishing**
 1815:25
**dire** 1553:9
 1554:5 1740:18
 1765:16
**direct** 1462:9
 1465:5 1486:19
 1486:24
 1488:14
 1553:19 1697:2
 1832:14
**direction** 1540:9
 1781:15
**directly** 1542:25
 1550:17
 1601:17 1798:4
 1818:22
**director** 1471:3,7
 1472:2 1476:24
 1599:2 1600:12
 1609:22
 1610:16
 1612:11 1613:6

| | | | | |
|---|---|---|---|---|
| 1717:22 | 1801:15,20,20 | 1562:17 | **document** | 1709:23 |
| 1735:19 | **disingenuous** | 1564:13 | 1492:24 | **documented** |
| 1745:14 | 1704:17 | 1597:15 1598:1 | 1494:18 1496:2 | 1518:11 |
| **directors** | **disorders** 1468:8 | 1598:12 | 1496:11,14,15 | 1589:10 |
| 1480:23 1481:7 | 1475:9,19,25 | 1615:19 1629:5 | 1496:15 | 1638:16 1658:3 |
| 1599:18 | 1476:3,12,25 | 1649:11 1666:8 | 1497:21,23 | 1658:7 1784:17 |
| **disagree** 1605:3 | 1479:5 | 1671:20 | 1498:13 | 1831:16 |
| **disagrees** | **dispense** 1550:13 | 1673:20 1680:9 | 1499:21 1500:1 | **documents** |
| 1533:25 | **dispositive** | 1688:1,8 | 1500:14,16,24 | 1480:11 |
| **discharge** | 1724:1 1726:16 | 1690:2,14 | 1501:6,24 | 1493:20,23 |
| 1627:23 | **dispute** 1548:25 | 1694:17,19 | 1502:3,12 | 1495:14,19,23 |
| **disclose** 1746:20 | 1701:1,7 | 1697:25 1705:1 | 1503:8 1526:23 | 1496:10,21 |
| **disclosed** | 1705:12 1838:9 | 1739:14 1740:2 | 1555:6 1583:16 | 1507:4,13 |
| 1744:25 | 1839:2 | 1746:1 1748:14 | 1593:19,23 | 1512:18,25 |
| 1746:20 | **Disregard** | 1752:1 1757:15 | 1594:9 1606:18 | 1513:12,17 |
| 1801:15,16,17 | 1630:3 | 1760:23 1761:5 | 1606:21 1607:9 | 1514:19 |
| **discomfort** | **dissection** | 1774:23 | 1608:14 1609:3 | 1574:12,17 |
| 1518:6 1799:6 | 1568:13 1569:3 | 1782:20 1785:6 | 1609:11,17,19 | 1578:10 |
| **discrete** 1757:21 | 1569:4 | 1796:18 1799:7 | 1610:4,13,18 | 1583:16 |
| **discuss** 1494:22 | **dissenting** | 1801:25 | 1610:22 | 1596:16,21,22 |
| 1500:7 1503:16 | 1498:8 | 1802:18,21 | 1611:15,20 | 1599:2 1606:10 |
| 1523:23 | **dissimilar** | 1805:18 | 1612:8,10,16 | 1608:17 |
| 1544:10 | 1680:17 | 1808:20 | 1612:16 1613:4 | 1620:18 1647:5 |
| 1570:16 1652:8 | **distal** 1547:16 | 1823:14 | 1613:10 | 1647:10 1656:6 |
| 1731:16 1840:1 | 1571:16 | 1825:13 | 1614:21 1615:1 | 1659:19 |
| 1840:23 | **distances** | 1827:11 1830:8 | 1615:5,24 | 1668:10 1671:6 |
| **discussed** 1498:6 | 1826:11 | **doctor's** 1770:6 | 1633:17,19,21 | 1694:6 1702:23 |
| 1500:8 1508:23 | **distinguish** | **doctors** 1496:8 | 1634:1,25 | 1710:13 |
| 1630:23 | 1557:12 | 1513:4 1514:3 | 1636:19 1644:1 | 1735:24 |
| 1670:20 1742:1 | **distortion** | 1519:23 | 1652:3 1669:4 | 1749:10 |
| 1777:24 | 1772:22 | 1551:12 1566:2 | 1669:6,8,11 | 1758:17 |
| **discusses** | **district** 1756:6 | 1630:11,24 | 1671:4 1675:11 | 1759:14 1760:4 |
| 1623:14 | **diversion** | 1635:13 | 1675:12,14 | 1762:7 1763:9 |
| **discussing** | 1827:17 | 1639:25 1640:1 | 1693:12 1694:1 | 1770:15 |
| 1488:1 1542:4 | **divide** 1650:8 | 1641:17 1644:8 | 1696:23,24 | 1771:16 1772:9 |
| 1544:16 | **division** 1459:12 | 1670:1 1699:21 | 1697:16,23 | 1772:20 |
| 1652:14 | 1844:13 | 1730:11 | 1708:10 | 1778:16 1784:6 |
| 1731:22 1840:7 | **Dixon** 1789:15 | 1736:13 | 1714:23 1715:2 | 1784:16 |
| **discussion** | 1793:21 | 1751:17 1759:2 | 1715:20 | 1836:11 |
| 1495:16 | 1795:11 1796:3 | 1776:23 | 1756:17 | **dog** 1732:21 |
| 1503:20 | 1842:9 | 1798:10 | 1758:22,25 | **doing** 1467:8 |
| 1504:13 1505:3 | **doc** 1495:25 | 1799:13 1809:1 | 1759:1,24 | 1473:16 1476:8 |
| 1521:9,17 | **doctor** 1485:17 | 1813:25 | 1760:2 1772:24 | 1481:14,18 |
| 1524:21 | 1496:7,9 | 1818:19 | 1776:5,8,16 | 1482:3 1485:1 |
| 1654:12 1825:1 | 1511:21 | 1823:13 | 1777:6,9 | 1491:24 |
| **disease** 1798:11 | 1517:18 | 1836:24 1837:1 | **documentation** | 1543:10 |
| 1799:10 | 1537:12 | 1837:8 | 1668:16 | 1555:13 |

| | | | | |
|---|---|---|---|---|
| 1562:13 | 1563:12 | 1750:1,3,14,22 | 1630:16 | 1720:19 |
| 1564:22 1565:3 | 1564:12,12 | 1750:24 1752:5 | **draining** 1792:9 | 1760:22 1761:4 |
| 1588:14 | 1565:7,17 | 1752:6,19 | **drains** 1566:22 | **dwell** 1770:8 |
| 1603:17 1681:1 | 1570:22 1573:3 | 1755:19 | **drapes** 1582:9 | |
| 1681:10 | 1574:6 1578:5 | 1757:19 1758:6 | **drastic** 1637:3 | **E** |
| 1720:12 1728:6 | 1580:25 1590:8 | 1758:8,11 | 1826:21 | **E** 1461:1,1,5 |
| 1731:4 1735:22 | 1590:20 1591:2 | 1759:23 | **drastically** | 1462:1 |
| 1742:12 | 1593:19,21 | 1761:10 | 1518:14 | **ear** 1805:17 |
| 1781:21 | 1598:3,8,21 | 1765:13 | **draw** 1475:1 | **earlier** 1479:19 |
| 1789:13 1794:8 | 1600:18 | 1766:18,25 | 1490:2,6 | 1490:21 1502:9 |
| 1815:11 | 1602:23 | 1767:21,24 | 1495:23 1567:2 | 1517:23 |
| 1821:10 | 1605:24 | 1768:10 | 1570:2 1571:21 | 1625:11 |
| **Donald** 1459:3 | 1606:17 1607:6 | 1769:23 1775:5 | 1572:10,18 | 1644:18,19 |
| 1844:7 | 1615:20 | 1780:13 1785:4 | 1573:5 1625:11 | 1696:5 1742:1 |
| **donor** 1519:5 | 1633:19 | 1785:21,22,22 | 1674:20,21,22 | 1745:13 1748:3 |
| **donut** 1518:19 | 1634:24 1640:5 | 1786:22 1787:1 | 1797:8 | 1787:9 1788:14 |
| **double** 1496:1,5 | 1640:5,5 | 1787:3,6,9,10 | **drawer** 1732:15 | 1792:25 1810:4 |
| **dozens** 1512:22 | 1642:23 1644:1 | 1787:18 | **drawing** 1659:14 | 1811:22,24 |
| 1512:22 1578:6 | 1644:24 | 1789:13,15,15 | 1767:23 | 1816:25 |
| **Dr** 1462:8 1464:8 | 1646:22 1648:1 | 1793:20,21 | **drawn** 1498:3 | 1829:11 |
| 1465:2,7,9 | 1655:4,10 | 1794:6 1795:11 | **drew** 1562:9 | **early** 1474:23 |
| 1482:21 | 1656:7 1659:8 | 1796:3 1797:8 | 1675:2 | 1475:18 |
| 1489:10 | 1659:16,17,18 | 1797:11,13 | **drop** 1469:2 | 1538:25 |
| 1494:17,21 | 1660:20 | 1804:13,18,23 | 1665:8 1694:13 | 1773:25 1788:7 |
| 1496:13 | 1661:18,20 | 1805:5 1806:15 | **dropped** 1491:20 | 1799:25 |
| 1498:25 1500:9 | 1662:1 1665:5 | 1806:23 1807:7 | 1803:4 | 1820:21 |
| 1500:13 | 1666:11,14,16 | 1807:11,11,15 | **dropping** | **earned** 1471:22 |
| 1501:20 | 1667:1,1,8,9,23 | 1808:2,6,8,15 | 1468:19 | **ears** 1565:20 |
| 1504:20 1505:4 | 1667:23 1669:4 | 1808:18,18,18 | 1490:22 | **easier** 1476:14 |
| 1505:14 | 1671:5,6,14,25 | 1808:19 | 1515:16 | 1768:19 |
| 1508:17 | 1672:21,23 | 1809:11,17,19 | 1518:25 | **easily** 1476:13 |
| 1509:23 1513:3 | 1673:4,7 | 1810:2,8,20 | **drops** 1490:23 | **easy** 1602:18 |
| 1516:7,22,25 | 1685:14 | 1815:6 1824:23 | 1515:8,22 | 1605:5 1723:21 |
| 1517:14 | 1688:24 | 1827:2,3 | 1535:19 | **eat** 1818:24 |
| 1521:21 | 1690:24 1696:3 | 1828:12 1829:5 | **Drs** 1708:14,20 | **eating** 1815:18 |
| 1524:20 | 1698:4 1699:6 | 1832:14 1834:3 | 1709:3 | **ed** 1642:10,22 |
| 1526:23 | 1703:23 | 1836:15 | **due** 1507:21 | **edge** 1547:11 |
| 1528:15 | 1708:18,22 | 1841:10 1842:4 | 1555:12 | 1569:17 1812:4 |
| 1530:19,20,20 | 1714:19 1715:3 | 1842:8,9,9,14 | 1663:22 | **editor** 1478:1 |
| 1530:25 | 1717:2 1719:8 | 1842:18,21 | 1722:13 1723:2 | 1482:8 1699:7 |
| 1532:15,16 | 1727:10 1744:1 | **dragged** 1585:17 | **dumb** 1681:15 | **editorial** 1480:5 |
| 1533:18 | 1744:9,13,22 | 1585:22 | **duplicative** | **editors** 1512:24 |
| 1534:15 1541:7 | 1745:10,24 | **dragging** | 1548:18 | **educate** 1756:8 |
| 1542:2,13,22 | 1746:2,6,15,16 | 1555:14 | 1553:23 | **education** 1481:5 |
| 1546:7 1548:1 | 1746:21 1747:1 | **drags** 1582:22 | **duration** 1645:16 | 1526:19 1527:2 |
| 1556:7 1561:14 | 1747:5 1749:3 | **drain** 1582:15 | **duty** 1720:3,6,6 | 1541:10 1543:3 |
| 1562:25 | 1749:7,13 | **drainage** | 1720:11,13,14 | 1566:1 1643:23 |

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 405 of 712 PageID #: 133569
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 405 of 712 PageID #: 133569

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

1761:19,25
1768:6,17
1771:20 1785:1
1803:21 1835:5
1835:10
**educational**
1465:24
1473:21
**effect** 1490:3,7
1625:12
1667:25
1749:24
**effective** 1525:21
1625:14
**effectively**
1771:24 1817:2
**efficacy** 1625:4
1837:24
**efficiency's**
1785:14
**effort** 1784:12
**efforts** 1628:17
1820:5
**eight** 1476:9
1502:22
1647:15
**Eisenhower**
1460:11
**either** 1558:25
1564:14 1565:4
1572:24 1604:1
1635:8 1649:21
1663:6 1678:12
1795:24 1796:1
1812:8
**elapsed** 1639:1
**elasticity**
1620:12 1621:3
1762:21
1784:18
**elicit** 1622:5
**elicited** 1622:6
**elicits** 1763:15
**eliminate** 1617:2
1617:2
**Elizabeth**
1804:23

**email** 1697:10
1698:21
**emails** 1698:22
**emboli** 1799:11
1800:1,2
1801:21
1822:16
**embolus** 1800:2
1800:4,8,10,14
**emphasize**
1709:7
**employee** 1662:7
**employees**
1467:1 1512:21
1574:13
1751:19
**emptied** 1827:20
**empty** 1582:16
1669:16
**encased** 1766:10
1794:16
**encompassing**
1792:18
**encountered**
1794:11
**encourage**
1635:13
**endangered**
1699:17
**ended** 1826:5
**endovaginal**
1814:3
**endpoint**
1649:20
**ends** 1764:14
**engineer** 1594:8
**England** 1512:24
**enormous** 1624:9
**enrich** 1473:23
**enrolled** 1635:25
**ENT** 1805:17
**enter** 1781:13
**entering** 1476:15
**enters** 1688:12
**entire** 1499:21
1573:20
1613:19

1615:24 1631:5
1631:12 1633:7
1831:20
**entirely** 1683:1
**entitled** 1486:18
1486:19
1693:11,11
1842:13 1843:3
**equal** 1732:19,20
**equation** 1687:25
**Erik** 1460:6
1739:16
**erik@ozarkla...**
1460:9
**erode** 1622:9
**eroded** 1627:21
1809:10
**erodes** 1575:11
1812:23
**eroding** 1788:5
**erosion** 1542:22
1552:19 1576:4
1586:2 1608:11
1618:19 1620:1
1620:9 1622:4
1622:18,25
1623:7 1624:14
1627:20 1628:7
1628:9 1629:11
1637:19,21,23
1645:9,19,24
1646:5 1647:14
1647:19 1658:7
1678:17
1686:20
1687:10,15
1695:25 1712:1
1745:17
1746:10,12
1750:17
1754:17,22
1758:5,6
1769:5,10
1770:13,13,18
1770:22,23,24
1770:25 1771:5
1771:8 1779:5

1779:10
1787:14,16,19
1787:23,24
1809:13,15
1812:20 1819:7
1821:20
1822:11 1830:1
1831:13
**erosions** 1606:22
1608:5 1618:14
1621:25 1622:1
1623:1 1627:7
1629:2,7
1632:3 1646:2
1662:19
1745:20,20
1769:17
1771:10 1809:9
1809:20
1812:15 1821:8
**error** 1751:6
**escaped** 1463:25
**especially** 1793:9
1799:25
**essentially**
1469:3 1805:18
1818:2 1819:9
1826:23
**establish** 1601:7
1612:9 1680:5
1684:9 1720:2
1720:6
**establishes**
1677:12
1683:16
**estimate** 1510:21
**et** 1717:5
**ethicist** 1708:22
**Ethicon** 1459:10
1459:12
1461:10
1497:23,25
1512:13,18,21
1512:23 1513:1
1513:11 1514:5
1540:24
1574:11 1578:6

1578:10
1583:16 1591:7
1591:15
1592:24
1593:13 1594:8
1595:2 1597:2
1600:1,6
1601:8 1602:11
1604:22
1605:25 1606:7
1606:23 1608:8
1608:9 1611:15
1616:8 1629:6
1629:20 1635:6
1637:5,13,20
1638:21
1639:11,25
1640:2,8
1643:22
1644:16 1645:4
1645:22,23
1647:8,8,12,20
1648:2,24
1651:10 1656:9
1656:12
1659:10,19
1660:2,4,10,14
1660:24,25
1661:7,8
1662:1,20,20
1662:22
1663:20 1665:6
1665:13,14
1666:4,8,14
1670:4,10
1671:14,21,24
1671:24,25
1672:21 1673:2
1673:3,5
1678:4 1681:18
1697:17
1710:13
1714:20 1719:9
1720:5 1721:1
1727:13
1737:11,12
1742:2,17,21

1748:8,21,22
1750:2 1751:16
1755:13
1757:23 1759:2
1759:10
1761:11
1762:14
1764:16,25
1765:22
1770:16
1771:22
1772:20
1774:23
1776:16,23
1778:16 1779:9
1780:8 1783:19
1784:7,16,17
1835:5,10
1837:2 1839:6
1844:12,14
**Ethicon's** 1514:1
1527:5 1533:24
1541:9 1565:25
1596:13
1620:19 1659:9
1659:19
1664:17 1665:2
1697:2 1721:6
1722:22
1744:20
1748:24
1760:22
**ethics** 1708:23
**Etiology** 1621:25
**Europe** 1715:5
1836:24
**evaluate** 1635:22
1639:9 1837:24
**evaluated**
1635:23
**evaluation**
1479:4 1502:14
1751:13 1800:1
**event** 1465:23
1676:10,24
1677:12,13,14
1678:22 1679:6

1679:21 1680:5
1683:14 1684:3
**events** 1618:13
1634:2 1648:7
1649:1 1677:7
1677:10
1679:25
1681:21 1682:4
1759:7 1831:21
**eventually**
1644:10
1781:22
1800:17,19
1819:18
1837:10
**everybody**
1489:2 1507:2
1516:15
1600:25 1650:7
1661:17
1716:14 1732:5
1741:17,20
1840:16
**everybody's**
1516:17
**evidence** 1487:8
1501:7 1504:20
1506:16,17
1543:14 1544:9
1551:22
1552:17,20
1598:23
1604:23 1626:9
1652:7 1660:19
1661:20
1663:14
1667:11,13,19
1667:22,25
1668:2 1678:14
1679:25
1681:20
1684:14,21
1687:24 1697:5
1700:11
1701:19,21
1702:2,13
1703:8,14

1706:25
1721:22
1723:25 1724:1
1725:7 1726:15
1727:15,16
1731:15
1734:14 1744:9
1753:22
1763:11
1781:13
1804:22
1839:25
**evident** 1616:12
**evidential**
1487:11
1723:23
1726:21
**exact** 1516:18
1778:2
**exactly** 1492:6
1495:18
1499:20
1516:14
1538:16
1541:20,22
1560:19
1585:16
1622:17 1628:5
1629:16
1632:11
1683:23
1706:22
1707:15 1839:7
**exam** 1480:3
1566:17 1814:3
**examination**
1462:9 1465:5
1470:13,19
1486:19,25
1516:13
1538:10
1539:24
1604:18
1814:11
**examine** 1809:2
**examined** 1647:9
1834:10,16

**Examiner**
1479:15
**examiners**
1479:23 1480:3
**examining**
1809:5
**example** 1470:16
1515:7 1550:19
1599:7 1642:23
1688:1 1737:10
**exams** 1480:16
**exceed** 1534:23
1723:19
**exceeded**
1651:17,19
**exceeds** 1651:12
**Excel** 1655:20
**excellent** 1505:22
**exception**
1487:24
**excerpt** 1541:11
**excerpts** 1541:8
**excise** 1771:11
**excised** 1771:4
**excising** 1632:14
**excision** 1631:22
1631:22
1632:13
1814:20
1817:12
**excuse** 1539:9
1572:1 1604:12
1637:17
1648:10
1687:24
1697:22 1715:4
1762:7 1768:23
1796:12
1807:13 1840:9
**exercise** 1815:25
**exercised**
1826:18,18
**exhausted**
1466:23
**exhibit** 1465:22
1492:25 1493:4
1526:18 1534:7

1606:17
1633:18
1634:17
1636:18
1642:10
1643:25
1646:22 1649:6
1649:12 1669:5
1675:11,17
1680:8 1697:9
1714:20
1806:18
1810:13,13
1813:2 1828:6
**exhibits** 1493:23
1561:3
**exist** 1569:6
**existed** 1472:3
1622:19
**exit** 1547:19
1571:19
**expand** 1597:11
**expect** 1778:8
**expectations**
1691:25
**expected** 1707:1
**expense** 1707:21
**experience**
1466:8 1472:7
1473:19
1483:13
1499:17
1573:11
1595:20 1598:5
1598:11
1725:13
1803:20,25
1808:23 1830:9
1830:18,21
**experienced**
1563:21 1576:2
1595:10
1618:22
1637:21,23
1645:9 1696:21
1771:7
**experiencing**

1764:4
**experiment**
 1648:13
 1688:12
 1689:24
**experimental**
 1504:9,15,23
 1508:22
 1626:13
 1687:13,22
 1688:7,13,22
 1689:5,12,20
 1690:1 1696:15
 1696:18,22
 1704:16
 1705:22,24
 1706:22 1707:3
 1707:6 1708:8
 1709:7 1710:9
 1710:24
**experimented**
 1626:17
**experimenting**
 1644:11
**expert** 1495:11
 1495:21
 1502:11 1510:9
 1523:15
 1528:18 1532:3
 1532:5 1577:17
 1580:16
 1592:10
 1602:18,20,22
 1603:11 1610:4
 1613:17 1672:8
 1673:10,11
 1674:9 1683:8
 1683:13,13,17
 1688:24 1689:3
 1698:4 1708:22
 1722:22 1724:7
 1733:12
 1735:22 1736:4
 1739:9 1768:2
 1801:15,16
 1802:2 1803:19
 1804:1,3

**expert's** 1738:3,5
**expertise**
 1466:24
 1597:16
 1762:10
 1830:12
**experts** 1482:20
 1503:11 1513:4
 1532:1 1565:9
 1614:12,13,15
 1677:19 1678:1
 1682:19,20,24
 1723:10 1775:7
**explain** 1482:25
 1489:4 1524:24
 1541:9,12
 1563:15 1564:7
 1624:2 1630:6
 1672:9 1692:11
 1711:12
 1752:19
 1766:17 1807:2
 1808:9 1810:14
 1812:17
 1830:16,17
**explained** 1591:3
 1591:3 1707:7
 1796:22
**explaining**
 1673:9
**explanation**
 1481:19
 1704:13
**explanted** 1513:5
**explore** 1760:9
 1760:10
**exposed** 1622:8
 1623:20 1629:8
 1778:22,25
**exposure**
 1637:17 1769:6
 1769:11
**exposures** 1648:3
**express** 1495:12
 1522:13
 1696:14
**expressed**

1513:20
 1599:17 1717:3
**expresses**
 1693:14
**extend** 1571:8
**extensive**
 1827:25
**extent** 1474:17
 1599:14 1749:8
 1749:22
 1788:16 1827:8
**externus** 1547:11
 1569:17
**extra** 1472:3
 1473:19
 1561:18 1798:8
 1798:8 1808:23
 1811:13,15
**extremely**
 1581:20
**extrusion**
 1618:20
**extrusions**
 1618:14
**eyes** 1562:12

_____

**F**

**f/k/a** 1459:8
 1461:3 1844:9
**face** 1526:14
**facilities** 1796:7
**facing** 1564:12
 1709:15
**fact** 1493:21
 1506:22
 1518:10
 1527:14
 1536:23 1542:8
 1570:3 1589:9
 1598:1 1603:12
 1617:15
 1632:23 1660:1
 1665:5 1704:17
 1711:17
 1744:11 1745:7
 1747:9 1749:11
 1749:15 1750:3

1763:5 1768:15
 1781:13,23
 1782:13
 1803:22 1804:3
 1805:25
 1825:20 1838:8
 1839:4
**factor** 1780:4
 1812:19
**factors** 1490:5
 1521:3 1535:25
 1620:8 1788:4
 1817:9,22
**facts** 1507:16,18
 1514:19
 1602:20 1697:5
 1698:14
 1721:20
**factual** 1499:4
 1501:6 1504:19
 1508:18
 1514:11
 1601:21 1733:8
 1763:9
**factually** 1696:8
 1696:10 1698:6
**faculty** 1471:12
 1471:12 1472:5
 1473:22
**fail** 1788:21
**failed** 1527:7
 1631:22
 1670:10,14
 1785:3
**failing** 1626:7
**failure** 1526:22
 1539:21
 1576:17
 1589:11
 1591:23
 1628:20
 1649:22
 1651:12,13,20
 1651:22,23
 1680:14,21
 1717:15,18,19
 1718:14

1721:14,15
 1724:3 1733:13
 1788:22
 1822:14
**fair** 1561:8
 1598:10
 1610:25
 1673:18
 1691:21 1783:5
 1808:14
 1836:15
**fairly** 1779:12
**fall** 1650:15,25
 1651:7 1747:10
 1762:9 1776:1
 1792:3
**false** 1665:22
 1737:19
**familiar** 1486:1
 1526:24 1536:2
 1555:25
 1606:18 1607:8
 1633:19 1645:1
 1685:16 1690:9
 1714:21
 1758:20,22
 1759:16,23
 1762:23 1765:3
 1769:6 1773:1
 1776:8 1777:2
 1777:8 1806:23
**familiarity**
 1762:12
**family** 1511:1
 1549:22
 1824:18 1842:7
**far** 1463:25
 1464:1 1475:22
 1537:5 1628:22
 1639:15
 1648:16,18
 1662:3 1746:13
 1799:18
 1820:21 1832:6
**farther** 1681:19
**fascia** 1547:9
 1569:15

| | | | | |
|---|---|---|---|---|
| **faster** 1494:9 | 1692:12 | **fills** 1669:17,19 | 1497:19 1510:8 | 1827:9 |
| **fat** 1819:16 | 1695:24 | **film** 1789:11,23 | 1511:15,18 | **fistulas** 1618:16 |
| 1829:17,20 | **female** 1562:10 | 1828:7,10,14 | 1515:21 | **fit** 1624:16 |
| **fault** 1629:19 | **femur** 1790:15 | **films** 1829:5 | 1516:23 1517:1 | 1703:9 1742:25 |
| **favor** 1678:14 | **fibrosis** 1711:25 | **final** 1751:10,10 | 1518:2 1519:10 | **fits** 1518:17 |
| 1785:13 | 1772:22 | **finally** 1654:2 | 1520:10,25 | **five** 1511:24 |
| **FDA** 1723:13 | 1811:21 | **find** 1493:12,15 | 1521:17 | 1544:20 |
| 1729:8 | 1812:11 | 1520:20 | 1527:25 1535:1 | 1587:14,16 |
| **feasible** 1827:12 | **fibrotic** 1550:23 | 1645:14,21 | 1537:14 | 1647:16 |
| **February** 1493:8 | 1550:25 | 1653:14,15 | 1541:24 1545:8 | 1725:24 |
| 1494:23 | 1581:17 | 1662:8 1795:25 | 1547:24 | 1839:15 |
| 1501:22 1797:5 | 1583:10 | 1797:3 | 1548:10,14,18 | **fixation** 1535:18 |
| **federal** 1474:12 | 1766:12 | **finding** 1793:8 | 1554:4 1566:8 | **fixed** 1799:17 |
| 1756:6 | 1811:10,20 | **findings** 1539:1 | 1570:10 1587:4 | **flag** 1707:18 |
| **feed** 1796:12,12 | **field** 1474:21 | 1649:13 | 1593:21 | **flat** 1542:19 |
| 1796:13 | 1477:18 1481:6 | 1737:13 | 1605:18 1606:2 | 1572:22 1580:1 |
| **feedback** 1482:8 | 1482:1 1486:5 | **finds** 1587:15 | 1609:3 1616:2 | 1580:1,4,6 |
| **feel** 1516:5 | 1496:9 1502:11 | **fine** 1464:22 | 1616:5 1617:12 | 1581:13 1583:7 |
| 1563:13 1653:7 | 1503:11 | 1465:22 | 1627:3 1631:1 | 1583:7 1584:6 |
| 1728:10 | 1520:21 1540:8 | 1498:24 | 1637:11 | 1584:24 |
| 1766:22 | 1598:11 | 1539:22,22 | 1648:13 | 1585:19,22,24 |
| 1802:22 | 1685:20 1689:5 | 1549:9 1561:7 | 1655:14 1657:1 | 1711:19,20 |
| 1815:17,18 | 1690:12 | 1561:19 1564:3 | 1686:13,15 | **flaws** 1527:13 |
| 1824:17 | 1694:20 | 1590:19 1592:8 | 1691:3 1700:14 | **flip** 1642:10 |
| **feeling** 1491:24 | 1723:10 1768:3 | 1592:20 | 1704:10 | **floor** 1460:11 |
| 1536:13 1540:4 | 1830:12,19 | 1605:16 | 1715:12 | 1468:8 1475:9 |
| 1540:13 | **fields** 1474:19 | 1606:13 1613:7 | 1737:12 | 1475:19,25 |
| **feels** 1539:22 | **fight** 1559:15 | 1703:3,22 | 1750:11 | 1476:3,12,25 |
| 1565:7 1654:20 | 1586:14,17 | 1714:7 1741:13 | 1785:10 | 1479:5 1547:3 |
| **feet** 1826:25 | 1662:6,6,23 | 1753:2 1808:3 | 1786:23 1787:8 | 1567:20 |
| 1828:21 | 1732:21 | 1833:3,4,20 | 1788:24 | 1797:16 |
| **fellows** 1469:10 | 1739:22 | 1841:23 | 1797:10 1798:3 | **flow** 1703:8 |
| 1469:18 | 1811:14 | **finger** 1547:13 | 1814:20 | **fluid** 1791:24 |
| 1471:11 | 1829:21,22 | 1569:19 | 1829:12 | 1828:24 |
| 1473:20 | 1840:19 | **finish** 1660:12 | **firsthand** | **fluid-filled** |
| 1482:12 | **figure** 1500:2 | 1678:7 1833:12 | 1677:12,16 | 1792:10 |
| 1483:22 | 1738:14 | 1833:15 | 1680:4 1682:23 | **flush** 1795:3 |
| 1707:21 | 1746:17 | 1841:10,13,15 | **firsthand-kno...** | **fly** 1553:25 |
| **fellowship** | **figured** 1494:5 | 1842:13 | 1683:15 | **flying** 1543:12 |
| 1466:10 1468:3 | **figures** 1647:2 | **finished** 1466:7 | **fishing** 1739:23 | **focus** 1467:13,24 |
| 1469:12,17,22 | **file** 1663:10,14 | 1590:8 1802:15 | **fistula** 1618:20 | 1468:4,8 |
| 1482:13 | **filed** 1663:6 | **firm** 1460:3,7 | 1632:6,15,16 | 1475:5,12 |
| 1483:10,14,19 | **files** 1513:12 | 1665:17 | 1770:20 1816:8 | 1479:4 1534:24 |
| **fellowships** | 1748:24 | 1766:13 | 1816:19,20 | 1579:23 |
| 1483:9 | **fill** 1842:19 | **first** 1474:10 | 1817:8,24,25 | **focused** 1478:21 |
| **felt** 1595:13 | **filled** 1503:1 | 1485:6,23 | 1819:23 1821:9 | 1707:19 |
| 1687:12 1692:3 | 1636:6 1828:24 | 1492:20 | 1821:16 1822:3 | **focusing** 1519:21 |

| | | | | |
|---|---|---|---|---|
| **folds** 1829:17 | 1735:17 | 1786:9 | 1830:5,7 | 1683:11,14 |
| **Foley** 1582:14 | **foramen** 1547:5 | **forms** 1512:14,17 | 1832:4 | 1720:21 1728:5 |
| 1791:18,20,21 | 1568:11 | 1526:10 1527:6 | **foundational** | 1728:23 |
| 1792:6 | **forbid** 1665:17 | 1635:24 1636:2 | 1601:5 1607:2 | 1729:15,20 |
| **folks** 1560:18,19 | **forced** 1526:14 | 1636:10,15,25 | **four** 1568:1 | 1744:24 |
| 1600:24 | **forces** 1763:6 | 1637:16 | 1572:5 1582:17 | 1767:16 |
| 1840:17 | **foregoing** | 1640:20,21 | 1585:6 1587:8 | 1785:12,15 |
| **follow** 1506:17 | 1844:16 | 1641:17 | 1598:5,8 | 1791:3,15,16 |
| 1648:20,24 | **foreign** 1459:12 | 1655:22,23 | 1624:7 1657:19 | 1792:7,18 |
| 1721:12 | 1575:7,16 | **forth** 1480:21 | 1657:22 | 1794:7,10 |
| 1732:18 | 1586:1,14 | **forward** 1467:23 | 1693:24 | 1806:20 |
| 1744:13 | 1616:17,25 | 1495:15 1564:1 | 1695:16 | 1809:16 |
| 1830:10 | 1617:3,7 | 1651:25 1652:1 | 1725:24 1730:7 | 1827:10 |
| **follow-up** | 1618:2 1622:7 | 1793:23 | 1736:22 1774:8 | **froze** 1654:2 |
| 1625:20 | 1622:20 | 1794:18,19 | **four-year** | **frustrate** |
| 1638:23 1645:7 | 1623:18,20 | 1800:21,23 | 1469:20 | 1506:15 |
| 1645:17 | 1627:16 | 1809:23 1816:1 | **fourth** 1598:12 | **frustrated** |
| 1656:19,20,23 | 1631:16 | 1825:5 1828:3 | 1669:12 1715:9 | 1505:18 |
| 1657:19,20,25 | 1633:10 | **found** 1525:5 | **fragments** | **frustrating** |
| 1658:1 1687:11 | 1812:21 | 1537:20 | 1811:3 | 1505:16 |
| 1692:25 | 1844:14 | 1561:25 1637:2 | **frame** 1623:9 | **fulfill** 1691:24 |
| **followed** 1506:16 | **foremost** | 1637:4,7,15,22 | **framework** | **full** 1743:24 |
| **following** 1463:2 | 1737:12 1775:7 | 1638:15 | 1733:22 | 1772:14 1798:9 |
| 1463:10 | **forgive** 1569:8 | 1639:18 | **France** 1836:25 | **fully** 1605:3 |
| 1486:13 1495:6 | **form** 1570:18,19 | 1640:18 1645:5 | **Frankly** 1833:8 | 1809:2 |
| 1505:9 1522:4 | 1573:25 | 1646:10 1647:3 | **FREEMAN** | **function** 1540:3 |
| 1530:11 | 1574:17 1593:3 | 1647:4,9 | 1460:10 | **functional** |
| 1541:18 1545:3 | 1604:25 1636:8 | 1745:4 1752:20 | **freezing** 1654:11 | 1539:12,18 |
| 1555:3 1556:1 | 1762:4 1773:16 | 1814:10 | **French** 1644:2,7 | 1625:3 |
| 1556:4 1561:22 | 1774:1 1786:3 | **foundation** | 1644:8,20 | **functioned** |
| 1586:25 1602:6 | 1789:7 1821:21 | 1507:15 1574:3 | 1646:25 | 1804:14 |
| 1609:9 1648:12 | 1825:8 1830:4 | 1574:5 1578:1 | 1649:14 | **functions** |
| 1652:19 1654:7 | 1832:3 | 1593:3,22 | 1685:23 | 1502:23 |
| 1658:25 | **formalized** | 1597:7,9 | 1690:22 1773:6 | **fund** 1474:15 |
| 1676:21 | 1469:16 | 1598:24,25 | 1774:23 | 1660:11 |
| 1716:20 | **format** 1807:7 | 1600:22 | **frequent** 1779:4 | 1674:13 |
| 1719:24 1732:1 | **formation** | 1602:22 1634:5 | **frequently** | 1742:18 |
| 1741:2 1757:3 | 1618:16 1632:6 | 1670:19,25 | 1534:23 | **funded** 1660:14 |
| 1757:9 1760:17 | 1770:19,20,20 | 1672:2,7 | **friend** 1653:21 | 1661:1,10 |
| 1780:22 | **formed** 1576:6 | 1677:6 1679:13 | **front** 1465:16 | 1662:20,23 |
| 1794:23 | 1722:14 1759:9 | 1679:14 1682:6 | 1468:23 | 1663:20 |
| 1801:12 | 1774:2 | 1682:7 1683:15 | 1490:22 | **funding** 1475:5 |
| 1822:25 | **former** 1597:14 | 1711:12 | 1491:19 | 1475:16,19 |
| 1840:25 | **forming** 1514:20 | 1724:14,17 | 1551:22 1567:4 | **furnished** |
| **followup** 1638:4 | 1571:1 1581:3 | 1793:23 1802:6 | 1568:21,24 | 1541:22 |
| **food** 1818:23 | 1583:5 1601:6 | 1803:9 1808:5 | 1569:2 1573:20 | **further** 1617:4 |
| **footnoted** | 1695:7 1762:2 | 1821:22 1825:9 | 1594:3 1613:4 | 1669:21 |

1673:17 1799:1
1844:15
**Furthermore**
1627:20
**future** 1481:9
1485:15 1526:2
1537:19 1538:3
1738:16

**G**

**G-tube** 1818:12
1818:13,14,20
1826:6
**game** 1497:13
**gap** 1478:20,23
1503:1
**gas** 1790:11
1791:13,13
1793:16
**Gastro** 1818:15
**gastrostomy**
1818:14 1822:2
**gather** 1492:6
**general** 1467:10
1513:6 1718:10
1718:13 1804:9
1805:20
**generalized**
1718:21
**generally** 1484:5
1488:18
1523:23 1524:7
1542:7 1631:23
1729:23
**generated**
1493:23
**generating**
1494:8
**gentlemen**
1654:24
1832:18
1839:22
**get-go** 1577:12
1807:20
**getting** 1484:10
1508:1 1524:2
1626:16

1634:19 1638:4
1653:3,5
1669:24
1676:18 1681:1
1702:21 1727:7
1735:10 1752:1
1783:1 1792:16
1815:19
1826:25
1842:15
1843:10
**give** 1468:14,16
1480:16
1481:19 1482:8
1483:24
1489:22 1493:9
1493:14 1494:9
1497:4 1502:13
1506:25 1507:8
1507:11 1510:2
1510:3,20
1512:3,5
1513:13,14
1519:8 1528:22
1537:8 1543:22
1543:24 1544:4
1550:17 1553:8
1556:17
1559:20,21
1561:17 1578:3
1580:17 1590:4
1593:20
1602:23
1605:22
1642:13,19
1663:1 1667:18
1693:17 1720:7
1720:13,18
1721:10
1726:14,17,19
1728:17,19
1729:10 1731:5
1732:19 1734:8
1734:9,17,19
1739:9 1740:17
1746:7 1776:3
1781:17 1795:6

1803:14 1805:8
1819:2
**given** 1475:10
1543:17
1587:14
1589:20
1606:17
1624:13
1626:18,19
1630:4 1704:13
1711:3 1716:6
1717:6,11
1737:17
1762:15
1807:15
**gives** 1650:22
1651:1 1719:17
**giving** 1480:3
1509:6 1583:14
1679:7 1767:14
**Glenstone**
1461:6
**gliding** 1572:15
1579:25
**go** 1474:6 1479:3
1483:16 1487:8
1487:19
1494:14 1501:4
1501:19
1508:24
1509:12 1514:2
1517:16
1522:16
1524:18
1526:20
1528:13 1529:7
1530:16
1531:10,16
1533:11
1534:24
1548:12
1549:10,16,18
1549:19 1550:5
1550:5,5
1551:12 1556:6
1561:11,14
1562:18

1566:10 1568:5
1573:17
1574:23 1577:6
1579:10
1581:24 1585:3
1585:15 1590:1
1590:20 1591:5
1592:19
1596:20
1597:23
1599:13,14
1601:1,3
1603:20 1605:8
1610:16 1612:8
1615:11 1618:5
1618:5 1619:22
1621:11
1624:19 1627:6
1627:8 1631:1
1631:19
1633:16
1638:13
1641:11 1642:9
1643:24
1645:12
1646:20
1649:10
1652:24 1654:4
1660:13 1664:2
1665:8 1669:21
1670:21,23
1672:15
1673:17,21
1680:16 1688:6
1698:2,15,16
1702:12
1703:18,21
1704:11 1706:9
1706:17,17,18
1708:4,5
1712:14,19,21
1713:19
1714:10 1715:9
1718:5,20
1719:3 1725:24
1726:8 1729:15
1729:20

1730:14
1731:12,24
1733:19
1734:20,22
1736:10,23
1743:19
1751:14
1752:13
1759:13
1760:11
1761:16 1766:5
1766:6 1774:4
1775:17
1788:18,20
1791:1 1793:23
1796:6 1800:22
1803:16
1805:12 1807:5
1809:22 1816:1
1820:17,17
1833:9 1838:14
1841:5 1842:25
1843:1,13
**goal** 1483:19
**God** 1676:17
**Godleski** 1842:8
1842:21
**goes** 1514:10
1538:21 1551:3
1569:3,24
1572:14 1575:8
1579:1 1583:8
1584:16 1587:7
1589:11
1601:17 1610:4
1610:13
1618:10 1624:6
1626:21
1678:23 1684:5
1684:7 1760:22
1761:4 1764:7
1784:2 1804:1
1805:23 1812:6
1818:21
**going** 1465:9
1467:20
1472:25 1473:7

| | | | | |
|---|---|---|---|---|
| 1474:5 1477:5 | 1596:20 | 1727:8,9,12,12 | 1465:8 1497:9 | 1638:23 |
| 1485:13 | 1600:23 1601:3 | 1729:8,13 | 1519:25 1546:3 | **Griswald's** |
| 1488:22 1489:1 | 1602:23,23 | 1731:3,9 | 1589:21 | 1785:22 |
| 1489:2,3 | 1605:22 | 1734:17 1735:1 | 1626:11 | **groin** 1547:20 |
| 1495:16,18 | 1606:14 1610:9 | 1738:7,10,12 | 1641:22 1648:6 | 1568:2 1570:5 |
| 1496:16 | 1611:19,23 | 1739:5,10 | 1648:8,20,24 | 1571:19 |
| 1497:12 | 1615:4,11 | 1740:11,20,23 | 1650:18 | **ground** 1684:20 |
| 1499:18 1500:7 | 1617:25 1619:5 | 1741:7 1747:13 | 1651:13,19 | **group** 1468:9,10 |
| 1501:1 1504:1 | 1619:7 1620:14 | 1747:18 | 1654:20 1681:1 | 1477:6 1489:24 |
| 1505:1,13 | 1621:9 1623:17 | 1748:17 | 1684:19 1731:9 | 1502:18 |
| 1509:12 1510:3 | 1628:22 | 1752:25 | 1731:10 1737:1 | 1588:13 1644:7 |
| 1510:6 1511:11 | 1633:16 1638:8 | 1753:15,16 | 1739:15 | 1644:8 1650:5 |
| 1512:5 1513:10 | 1641:24 1642:8 | 1754:12,13,16 | 1744:14 | 1685:24,24 |
| 1513:14 1514:8 | 1642:9 1644:25 | 1754:18 | 1753:18 1759:6 | 1690:23 1744:6 |
| 1514:23,25 | 1646:12,17 | 1755:23 | 1808:13 1819:7 | 1745:18 1773:4 |
| 1515:1,3 | 1651:4 1652:5 | 1756:10,13 | 1839:18 | 1774:18,23 |
| 1518:12 1520:8 | 1655:11,14 | 1757:13 | **goose** 1807:22 | 1775:20,23 |
| 1520:17 1524:6 | 1657:7,8,9 | 1759:13 1760:9 | **gosh** 1641:9 | 1836:20,23,24 |
| 1524:13,21 | 1659:23,24 | 1761:16 1764:1 | 1679:22 | 1837:7 |
| 1526:14,20 | 1661:19 1664:3 | 1769:21,23 | **Gotcha** 1500:12 | **groups** 1489:25 |
| 1527:8,24 | 1664:21 | 1776:3 1781:21 | **gotten** 1679:13 | 1639:12 |
| 1532:13 1533:7 | 1668:13 | 1782:7,13 | 1736:9 | **grow** 1798:15 |
| 1537:5 1538:22 | 1669:25 | 1783:11 1785:6 | **government** | **grown** 1811:11 |
| 1541:21 1543:5 | 1672:25 | 1785:7,7,11,13 | 1474:13 | 1812:10 |
| 1543:22 1545:9 | 1673:21 | 1786:4,15,17 | **GPS** 1759:22 | **guess** 1464:5 |
| 1545:24 1546:6 | 1684:18 1688:5 | 1790:20 | 1761:13 1768:6 | 1511:24 1533:8 |
| 1546:8,15,22 | 1691:3 1695:17 | 1793:25 1794:1 | 1785:1 | 1655:1 1703:20 |
| 1546:23,24 | 1696:7,23 | 1794:18 1798:2 | **gracilis** 1547:9 | 1741:5 1757:13 |
| 1550:19 1553:1 | 1698:2,15 | 1799:6 1800:21 | 1569:15 | 1823:19 |
| 1553:2,3,3,8,18 | 1701:7,18,20 | 1800:22 | **graduated** | 1833:12 |
| 1554:5 1555:4 | 1701:23 | 1802:11,14 | 1471:25 | **guest** 1706:18 |
| 1558:14,15 | 1702:12,13,17 | 1803:5,13 | **graft** 1519:3 | **guide** 1547:8 |
| 1559:17 1561:9 | 1702:19,22,24 | 1806:11,16,19 | 1715:7,7 | 1569:14 |
| 1562:5,14,24 | 1703:1,10,12 | 1808:2,5,10,12 | **gram-negative** | **guidelines** |
| 1563:3,15 | 1703:13,14 | 1810:7 1812:21 | 1619:4 | 1480:20 1502:9 |
| 1565:5,21 | 1705:6 1709:18 | 1816:1,2 | **gram-positive** | 1502:25,25 |
| 1566:8 1567:14 | 1709:19,20 | 1823:11,12 | 1619:4 | 1503:22 1509:6 |
| 1568:4 1569:9 | 1712:16 | 1824:11,22 | **grant** 1549:8 | 1648:21 |
| 1570:16,17 | 1713:11,17,19 | 1828:3,3 | **granted** 1756:24 | 1651:21 |
| 1571:8 1572:7 | 1714:8,10,12 | 1830:23 | **granulation** | **Gunn** 1460:3 |
| 1572:20,23 | 1716:8 1718:4 | 1832:23 | 1618:15 | 1682:16 |
| 1576:16 | 1718:9,16,20 | 1833:17 | **grave** 1513:19 | 1683:20,22 |
| 1580:12 1581:1 | 1718:23 | 1839:22 1841:7 | 1638:9 1707:22 | 1684:7 1738:13 |
| 1581:6,12 | 1720:16,18 | 1841:9 1842:24 | **gray** 1791:18 | 1738:23 |
| 1584:11 1590:8 | 1723:12 | 1843:8 | **great** 1510:17 | **guy** 1666:10,13 |
| 1591:4 1592:18 | 1724:23 1726:8 | **good** 1463:13,14 | 1564:25 | 1739:18,19 |
| 1593:18,19 | 1726:9 1727:1 | 1463:22 1465:7 | 1565:15 | 1745:23 1746:2 |

| | | | | |
|---|---|---|---|---|
| **guys** 1556:15 | **H** | 1738:20 1786:5 | **healthcare** | 1495:25 1496:1 |
| 1678:8 1756:8 | **H** 1461:11 | 1786:6 1794:5 | 1709:10 | 1496:2,5 |
| **gym** 1826:19 | 1767:3,5,5,10 | 1803:3 1822:7 | **healthy** 1571:9 | 1504:18 1506:8 |
| **Gyn** 1696:13 | 1767:13 | **happening** | 1790:12 1795:6 | 1506:12,13 |
| **Gynecare** | **hairs** 1558:14 | 1646:25 | 1818:8 | 1507:25 1508:4 |
| 1459:11 1547:2 | **half** 1627:11 | 1709:14 1738:8 | **hear** 1487:16 | 1508:6 1521:20 |
| 1547:3 1567:19 | **Halfway** 1515:15 | 1738:12 | 1489:18 | 1522:11 |
| 1567:20 1715:5 | **hand** 1464:10 | 1797:18 1807:2 | 1506:18 | 1659:22 1665:3 |
| 1844:13 | 1485:17 | 1808:9,16 | 1530:23 1531:7 | 1666:8 1677:3 |
| **gynecologic** | 1520:17 | **happens** 1532:7 | 1544:11 | 1677:5,11,19 |
| 1466:9 1502:20 | 1593:18 | 1550:22 1552:4 | 1564:12 | 1677:21 1678:2 |
| 1563:21 | **handed** 1534:6 | 1552:5,10 | 1610:10 1612:3 | 1678:19 |
| 1808:19,21 | 1669:4 1675:10 | 1583:15 | 1677:22 | 1679:20 |
| **gynecologist** | 1685:14 1690:2 | 1585:16 | 1701:17 1703:8 | 1680:18 |
| 1466:14 1598:3 | 1697:9 1699:5 | 1628:16 1635:7 | 1726:2 1731:18 | 1681:20 |
| 1730:12 1801:5 | 1714:19 | 1788:18 | 1736:11 1747:9 | 1682:10,15,20 |
| 1801:19 | **handled** 1595:11 | 1811:24 1817:3 | 1808:11 | 1682:20,25 |
| **gynecologists** | 1724:5 | 1819:13 | **heard** 1468:15 | 1683:1,8,25 |
| 1502:18 1509:7 | **handling** | **happy** 1483:20 | 1494:4 1503:25 | 1684:1,2,3 |
| 1597:24 | 1610:21 | 1615:14 | 1523:16 1544:9 | 1691:20 |
| 1696:14 | **happen** 1505:13 | 1653:14 | 1600:24 | 1692:14,17 |
| 1699:16 1701:2 | 1550:21 1638:5 | 1823:25 1833:9 | 1637:18 1644:4 | 1693:12,15,23 |
| 1808:24 | 1646:6 1647:18 | **hard** 1581:18,18 | 1644:8 1649:19 | 1694:2,9 |
| **gynecology** | 1647:21 | 1766:13 | 1649:19,24 | 1695:14,16 |
| 1459:6 1461:3 | 1682:13 | **harm** 1715:13 | 1652:8,10 | 1708:1,2 |
| 1466:5 1467:11 | 1738:16 | **Hartford** 1466:5 | 1663:18,19 | **heart** 1612:14 |
| 1467:13 | 1743:15 | **Hass** 1459:21 | 1712:11 | 1790:8 |
| 1469:21 1470:8 | 1820:24 1841:7 | 1463:20 1834:3 | 1726:10 | **heat** 1654:19 |
| 1470:22,25 | 1841:10 | **hate** 1651:1 | 1731:16 | **heavens** 1553:2 |
| 1471:4,13 | **happened** | 1756:18 | 1750:10 | **heavy** 1485:2 |
| 1479:16,20 | 1527:18,19 | **he'll** 1524:13 | 1754:12 | 1653:22 |
| 1480:6,8,10 | 1551:20 | 1734:19 1843:1 | 1793:20 1794:2 | **heck** 1736:21 |
| 1704:19 1844:8 | 1575:12,23 | **head** 1562:13 | 1840:1,3 | **held** 1463:3,11 |
| **Gynemesh** | 1576:1 1580:23 | 1828:20 | **hearing** 1486:14 | 1486:13 1495:6 |
| 1547:2 1567:19 | 1586:3 1610:5 | **headed** 1781:15 | 1495:7 1505:10 | 1505:9 1513:22 |
| 1595:6,14,22 | 1610:15 | **heads** 1565:12 | 1522:5 1530:12 | 1522:4 1530:11 |
| 1596:6,11 | 1622:17 1628:6 | **heal** 1632:21 | 1541:19 1587:1 | 1541:18 1545:4 |
| 1597:5,23 | 1628:16 | 1795:7 1817:18 | 1587:24 1602:7 | 1561:23 |
| 1600:7 1635:1 | 1630:20 | 1818:9 1819:20 | 1609:10 1659:1 | 1586:25 1602:6 |
| 1635:4,8,12,22 | 1632:11 | 1820:6,7 | 1676:22 | 1609:9 1614:17 |
| 1643:3 1661:16 | 1637:14 | **healing** 1820:18 | 1716:21 | 1652:20 1654:8 |
| 1691:24 | 1638:22,24 | **health** 1471:21 | 1719:25 | 1658:25 |
| 1694:12 | 1646:23 1648:3 | 1474:3,8,11 | 1760:18 | 1676:21 |
| 1744:19 | 1679:25 1696:8 | 1475:4 1484:25 | 1780:23 | 1716:20 |
| 1763:15 1838:4 | 1699:22 | 1616:14 | 1801:13 1823:1 | 1719:24 1726:2 |
| 1838:16 | 1704:12 1705:5 | 1674:24 1786:6 | **hearsay** 1486:24 | 1732:2 1741:3 |
| | 1711:23 1718:8 | 1815:8 | 1487:5 1488:21 | 1757:4,10 |

| | | | | |
|---|---|---|---|---|
| 1760:17 1775:7 | 1477:24 | **hole** 1810:8 | 1590:7,23 | 1702:3,5,9,11 |
| 1780:22 | **higher** 1537:21 | **holler** 1732:14 | 1591:17 1593:2 | 1703:7,11,20 |
| 1801:12 | 1662:3 1746:13 | **home** 1797:2 | 1593:11 1597:6 | 1705:8 1708:1 |
| 1822:25 1841:1 | 1820:22 | 1826:11,18 | 1597:10,19 | 1709:15 1710:1 |
| **help** 1473:23 | **highest** 1709:11 | 1841:5 | 1598:17,22 | 1712:9 1714:6 |
| 1475:21 | 1745:3 1804:15 | **honestly** 1479:1 | 1599:10,21 | 1716:13,22 |
| 1476:22 1479:8 | **Highland** | 1723:1 1842:6 | 1600:2,18 | 1719:13,14,19 |
| 1498:7 1500:3 | 1461:18 | **Honor** 1464:15 | 1601:13,22 | 1726:21 |
| 1503:2 1555:8 | **highlight** | 1464:19 1486:9 | 1602:3,21 | 1727:19 1734:2 |
| 1681:22 | 1624:25 | 1486:15 1487:7 | 1603:10 | 1739:2 1741:24 |
| 1811:14 | 1669:12,23 | 1493:9,17 | 1606:24 | 1741:25 |
| **helped** 1479:2 | **highlights** 1791:6 | 1494:12,16 | 1607:11 1609:4 | 1745:12 |
| **helpful** 1541:3 | **Highway** 1460:7 | 1495:2,8,20 | 1611:2 1612:7 | 1747:11,23 |
| 1581:21 1812:1 | **Hilaire** 1777:3 | 1498:11 1499:9 | 1612:15 | 1749:15,21 |
| **helping** 1468:12 | **Hill** 1482:20 | 1499:16 | 1613:14 | 1750:9 1752:4 |
| 1469:23 | **Hinoul** 1528:3 | 1500:19,20,23 | 1614:21 1621:7 | 1752:18 |
| 1502:10 | 1529:10 | 1501:7 1504:17 | 1626:20,25 | 1754:25 1760:6 |
| **hernia** 1520:3 | 1531:21 | 1505:1,5,12,20 | 1628:21 | 1764:3 1765:12 |
| 1778:3 | 1532:16 | 1506:3,4 | 1629:22 | 1766:4 1769:19 |
| **hey** 1497:5 | 1602:23 | 1507:20 1514:7 | 1633:25 | 1773:14,24 |
| 1732:4 | 1610:24 | 1514:13 | 1634:12,16 | 1774:9,22 |
| **hid** 1751:17,25 | 1745:20 | 1521:12,19 | 1647:22 1652:2 | 1775:15 |
| 1752:14 | **Hinoul's** 1530:20 | 1522:1,8,18 | 1654:21 1655:3 | 1780:17,25 |
| **hidden** 1755:12 | 1530:20 | 1524:11 | 1655:5 1658:14 | 1781:21 |
| **hiding** 1665:14 | 1532:15 | 1528:12,18 | 1658:23 1659:7 | 1782:11 |
| 1665:19 | **hip** 1570:4 | 1529:22 1530:6 | 1659:16 1661:3 | 1783:23 |
| **Higbee** 1505:20 | 1624:8 1790:14 | 1530:13 | 1662:13 1663:4 | 1784:10 1801:3 |
| **high** 1475:15 | 1791:9 1829:14 | 1531:12 1537:4 | 1663:8,21 | 1801:9 1806:4 |
| 1525:10 | **Hippocratic** | 1541:7,15 | 1664:16 | 1807:12 |
| 1526:16 | 1715:17 | 1544:24 1545:9 | 1667:12 | 1822:18,19 |
| 1527:12 | **hips** 1829:1 | 1547:23 | 1670:18 | 1824:4 1831:8 |
| 1536:12 1638:2 | **hired** 1835:13 | 1548:16 | 1671:18 1672:2 | 1832:4,12 |
| 1638:11 | **historian** | 1549:15 1550:4 | 1673:6,13 | 1833:2,9 |
| 1639:20 | 1495:14 | 1551:22 | 1675:18,23 | 1839:14 |
| 1642:19 | **history** 1792:23 | 1552:11 1553:7 | 1676:23 1679:1 | 1842:12 |
| 1645:17 | 1799:3 1816:12 | 1555:6,23 | 1680:7 1682:16 | **Honor's** 1495:9 |
| 1687:12 | **hold** 1464:3 | 1558:23 1560:1 | 1682:18 1683:6 | 1784:13 |
| 1695:25 | 1480:18 1481:4 | 1560:16 | 1684:10,15 | **Honorable** |
| 1722:23 | 1513:22 | 1561:13 1562:1 | 1688:15,18 | 1459:20 |
| 1746:19 | 1518:19,20 | 1563:10 | 1689:14 | 1463:20 |
| 1750:12 | 1579:2 1661:22 | 1570:12 1574:2 | 1691:10 | **hope** 1463:22 |
| 1820:20,22 | 1682:11,11 | 1577:13,16,25 | 1692:13 1693:7 | **hopefully** 1520:2 |
| **high-level** 1555:9 | 1707:24 | 1578:19 1579:7 | 1693:8 1695:15 | 1795:7 1840:11 |
| **high-quality** | 1727:11 1760:8 | 1580:5,8,19 | 1697:4,19,22 | **hoping** 1464:3 |
| 1471:18 | 1832:1,8 | 1585:2,6 | 1698:6,23 | **horrible** 1718:6 |
| 1475:21 | **holding** 1728:7 | 1586:20,22 | 1700:2,6,22 | **horse** 1741:9 |
| 1476:22 | 1841:24 | 1588:8 1589:3 | 1701:9,16 | **hospital** 1466:5 |

1483:7 1516:24
1786:23
1788:24 1795:9
1796:4,7,16,24
1797:22 1798:7
1806:18 1816:5
**hospitalization**
1785:23
1806:17 1816:4
1825:15
**hospitalizations**
1798:16
**hospitals** 1807:9
**host** 1616:16
1623:21
**host-to-implant**
1616:19
**hot** 1653:12,18
1653:22
**hour** 1742:9
**hourly** 1510:15
1511:5
**hours** 1494:6
1511:3 1668:1
1712:11
**Houston** 1460:13
**huge** 1817:23
**huh** 1592:16
1607:17
1609:24
1714:13
**hundred** 1478:4
1478:11
1650:11,12,13
**hundreds**
1512:19 1578:9
1710:12
**Hunter** 1807:11
1808:18,19
**Hyde** 1461:5,6
1652:23
1718:25
1823:16

――――――――
**I**
――――――――
**ice** 1463:25
**idea** 1510:23

1512:3 1520:1
1550:12
1631:11
1633:13 1819:2
**ideally** 1473:2
**identified**
1592:13 1595:5
1619:20
**identify** 1472:21
1482:6 1523:13
1523:22
**IFU** 1758:20
1759:10
1761:12
1762:18,19
1763:10,13
1765:2 1768:24
1769:5,6,11
1771:18
1772:11
1784:15,25
1836:6
**IFUs** 1737:19
**ignored** 1612:13
1679:9 1737:13
**ignoring** 1679:11
**IIS** 1655:15,19
1671:7 1741:25
1757:22
**ill** 1576:7
1788:13
1829:12
**illustrate** 1576:1
**illustrations**
1514:24
**illustrative**
1576:23
**image** 1566:9
1572:3 1584:23
1790:4,21
1799:7
**images** 1790:1
**imagine** 1476:13
1794:13
1814:24
**imaging** 1789:3
1789:24

**immune** 1616:16
1617:1,21
1622:6
**impact** 1548:22
1584:9 1585:9
1620:24
**impacted**
1830:13,14
**impaired**
1817:18
**impeach** 1727:2
**impeachment**
1488:15
**implant** 1547:4
1547:17 1551:8
1567:16,24
1568:10
1571:16 1572:8
1583:24 1584:1
1594:21
1617:15 1618:1
1622:23 1638:6
1638:8 1772:11
1772:12
1792:24
1794:22
1809:19 1812:4
**implantation**
1549:2 1568:6
1570:11 1571:6
1639:19
1686:19
1763:14 1769:1
1822:8 1831:22
**implanted**
1569:9 1575:2
1616:16,24
1617:16
1623:12
1625:18 1635:8
1834:5
**implicated**
1619:12
1679:10
**implication**
1750:1 1752:6
1754:5

**implications**
1689:4
**implies** 1627:19
**importance**
1513:13
1525:24 1526:1
1539:14 1540:9
1571:3 1583:6
1642:5
**important**
1474:2 1507:14
1514:20 1515:4
1539:16,25
1540:14,15,15
1566:25
1569:22
1625:16 1628:1
1630:14 1641:1
1648:15
1660:19
1671:16
1672:19 1695:7
1702:2 1742:22
1744:9 1746:21
1747:8 1754:5
1763:4,7
1786:8
**impossible**
1577:1,10
1581:20
1583:12,13
1712:4
**impression**
1751:16,25
1813:8
**improper**
1495:17
1506:20 1605:2
1607:19
1737:10
1752:14
**improve** 1644:13
1693:5 1826:7
**improved** 1478:2
1712:7
**improvement**
1482:7

**in-court** 1506:12
**in-house** 1566:2
**in-house-prod...**
1552:9
**in-limine** 1663:6
**inability** 1576:21
1670:16
**inaccurate**
1531:25
1643:14,17
1778:13
1779:25
**inadequate**
1722:3 1724:8
1725:10 1734:5
1734:6 1772:19
1782:23
**inadmissible**
1486:24
1488:14,21
**inadvertent**
1823:23
**inadvertently**
1810:8
**inappropriate**
1529:18
1547:25 1548:4
1591:14
1592:24
1593:13
1641:23
1647:23
1699:19 1823:7
**Incidence** 1521:2
**incident** 1683:11
1683:19
**incidents** 1682:5
**incision** 1569:2
1584:12 1632:1
1794:7,10
**include** 1618:14
1642:4 1725:13
**included** 1737:19
**includes** 1468:10
1612:19
**including**

| | | | | |
|---|---|---|---|---|
| 1511:15 | 1568:22 | 1797:16 1800:5 | 1503:2 1513:24 | **innuendo** |
| 1512:13 1619:3 | 1573:16 1582:8 | 1815:10 1820:9 | 1525:17 | 1692:20 |
| 1632:4 1690:24 | 1582:10,13 | 1821:6,12,13 | 1536:25 | 1752:25 |
| 1691:17 | 1603:8 1653:23 | 1821:16,20 | 1578:15 | 1755:12 |
| 1768:10 1785:3 | 1657:9 1698:9 | 1825:4 1831:13 | 1589:10,14 | **input** 1762:9 |
| 1799:11 | 1784:6 1790:8 | **infections** | 1595:9 1596:8 | **inserted** 1791:23 |
| **inclusive** 1835:23 | 1790:8,11,15 | 1611:25 1612:1 | 1626:9,12 | **insertion** 1625:2 |
| **income** 1707:20 | 1791:4,5,5,7,9 | 1618:14 | 1630:11 | 1823:7 |
| **inconsistent** | 1791:11,15,17 | 1619:13 1768:8 | 1634:20 | **inside** 1518:18 |
| 1640:11,12 | 1792:6,14,17 | **infectious** | 1635:18 1636:4 | 1518:19 |
| **incontinence** | 1792:19,24 | 1800:15 | 1636:11 | 1583:16 |
| 1467:19 | 1793:1,3 | 1801:15 | 1640:15,22 | 1585:21 |
| 1468:11 | 1811:2,6,9 | **inferior** 1547:12 | 1641:14 | 1627:14 |
| 1469:15 1479:7 | 1828:20,21,22 | 1569:17 | 1655:21,23 | 1791:18,19,25 |
| 1525:12 | 1828:23 1829:2 | **inflammation** | 1656:17,18,21 | 1793:7 |
| 1527:15,18 | **indications** | 1575:7 1586:1 | 1657:15,22 | **instance** 1814:8 |
| **incorporated** | 1759:4 | 1628:18 | 1688:4,8 | **Institute** 1674:24 |
| 1577:8 | **individual** | 1788:15 | 1710:19 1711:4 | **Institutes** 1474:3 |
| **incorrect** 1710:8 | 1655:22 1677:7 | 1794:15,16 | 1736:18 1746:7 | 1474:8,11 |
| **increase** 1586:6 | **individuals** | 1795:21,23 | 1747:13 | **institution** |
| 1696:19 | 1479:25 | 1810:6 1811:12 | 1755:18 | 1466:25 1476:8 |
| **increased** | **industry** 1721:3 | **inflammatory** | 1758:18 1759:3 | 1476:16 1483:3 |
| 1581:16 | 1721:7 1729:5 | 1581:16 | 1759:19 1762:3 | 1483:11 |
| 1583:10 | 1729:6 1735:8 | 1583:10 1586:7 | 1762:13 1763:1 | 1748:14 |
| **increases** | **infancy** 1474:22 | 1586:15 1617:5 | 1768:16 | **institutions** |
| 1623:19 | **infected** 1575:14 | 1617:6,9,11 | 1782:19 | 1476:6,7,10,15 |
| **increasingly** | 1628:7 1631:4 | 1618:9 1627:24 | 1783:21 1784:8 | 1508:21 |
| 1484:8 | 1631:14,21 | 1628:12 | 1784:24 1809:4 | **instructed** |
| **incredibly** | 1795:1 1822:12 | 1711:24 | 1814:11 | 1587:11 |
| 1660:19 1820:4 | **infection** 1552:16 | 1763:16,22 | **information's** | 1588:16 1630:2 |
| **incur** 1593:16 | 1575:13,15 | 1764:12,19 | 1514:12 | **instructions** |
| **indefinitely** | 1576:5 1586:3 | 1766:11 1788:2 | **ingrowth** | 1720:17 |
| 1618:10 | 1618:19 | 1793:3,18 | 1711:22 | 1728:19,20 |
| **independent** | 1619:19 1622:5 | 1811:12,15 | **initial** 1623:8 | 1729:4 1758:21 |
| 1673:14 | 1627:20,22 | 1812:21 | 1632:13 | 1835:20 1836:1 |
| 1684:13,21 | 1628:12,15 | 1814:22 | 1699:22 | **instrumental** |
| 1778:17 | 1629:9,11 | **inflated** 1791:24 | **initially** 1762:15 | 1644:9 |
| **independently** | 1631:17 1632:5 | **influenced** | 1787:7 1798:10 | **instruments** |
| 1758:2 | 1632:25 1633:5 | 1552:21 | **initiate** 1628:12 | 1491:23 |
| **indexed** 1623:8 | 1633:9,11 | **inform** 1580:22 | **initiated** 1655:19 | 1595:11 |
| **indicate** 1627:21 | 1712:1 1750:18 | 1768:9 1780:13 | 1656:10,11 | **insufficient** |
| **indicates** 1623:6 | 1768:10,18,19 | **information** | 1663:23 1664:7 | 1712:8 |
| **indicating** | 1768:21,25 | 1470:18 | 1822:10 | **insurance** |
| 1564:20 | 1769:2 1770:19 | 1472:25 1473:1 | 1831:22 | 1696:16 1707:2 |
| 1566:20 1567:4 | 1771:7 1787:11 | 1473:7,11 | **initiates** 1661:4 | **intelligent** |
| 1567:8,10,11 | 1793:6,11 | 1476:21 | **initiatives** 1476:4 | 1701:15 1740:2 |
| 1567:23 | 1794:17 | 1478:23 1492:7 | **injecting** 1587:18 | **intelligently** |

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 416 of 712 PageID #: 63858
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 416 of 712 PageID #: 63858

In Re Budke Jury Trial Official Transcript Vol VI 1/12/2015

| | | | | |
|---|---|---|---|---|
| 1523:24 | 1778:16 | **invades** 1698:19 | **iota** 1668:2 | **J** 1461:12 |
| **intended** 1496:12 | 1836:10 | **invented** 1775:2 | **irrelevance** | **J&J's** 1665:15 |
| 1577:9 1706:23 | **internally** | 1775:4 | 1708:1 | **jabs** 1823:5 |
| 1773:11,23 | 1599:23 1600:1 | **inventor** 1775:13 | **irrelevant** 1542:7 | **Jack** 1803:4 |
| 1774:17,23 | 1781:23 | **inventors** | 1548:5 1665:4 | **jail** 1718:23 |
| 1775:20,23 | 1782:14 | 1695:11,21 | 1680:18 | **January** 1459:17 |
| 1776:18,24 | 1783:20 | 1773:22 | 1698:24 1700:3 | 1459:19 1462:3 |
| **intends** 1541:22 | **International** | **investigator** | 1701:8 1702:10 | 1510:11 |
| **intensified** | 1686:7 1703:25 | 1640:23 | 1705:13 | 1632:13 |
| 1711:24 | **internus** 1547:13 | 1655:19 1656:8 | 1728:16 | 1715:24 |
| 1812:20 | 1569:18 | 1656:10,11 | 1749:22 1750:5 | 1766:25 1771:9 |
| **intent** 1506:20 | **interpose** | 1661:4,4,15 | 1774:24 | 1787:18 |
| 1577:7 1580:1 | 1807:14 | 1663:23 1664:6 | **irrigation** 1795:2 | 1788:12,25 |
| 1583:6 1589:9 | **interpret** | 1665:7 1744:17 | **irritation** 1622:5 | 1789:11 |
| 1711:15,16 | 1698:14 | **investigator's** | **ischio** 1567:9 | 1790:23 |
| **intention** | 1703:20 | 1744:15 | **ischiopubic** | 1795:12 |
| 1773:13 | **interpretation** | **investigator-in...** | 1567:9 | 1797:23 1829:6 |
| **interacted** | 1499:3 1735:23 | 1661:3 | **issue** 1486:16 | 1844:3 |
| 1667:24 | **interpreting** | **investigators** | 1522:12 | **Jersey** 1459:10 |
| **interaction** | 1836:3 | 1475:11,13,20 | 1581:11 | 1459:10 1461:9 |
| 1616:20 | **interrupt** | 1476:19 1477:2 | 1587:18 | 1461:10 |
| **interest** 1471:16 | 1570:13 | 1477:3 1639:22 | 1591:16,23 | 1505:21 1660:7 |
| 1481:3 1521:8 | **interrupted** | 1639:24 | 1595:21,21 | 1733:10 |
| 1634:16 | 1710:1 | 1644:20,21 | 1663:12 | 1844:11,12 |
| 1638:12 | **interruption** | 1648:12 | 1673:13 | **Jill** 1797:13 |
| 1655:11 | 1530:22 1531:6 | 1744:17,22 | 1682:15 | 1803:4 |
| 1694:23 | 1545:20 1559:1 | 1775:4 | 1692:23 | **Joan** 1491:5 |
| 1786:15 | 1602:16 | **inviting** 1805:22 | 1722:19 | 1611:24 1785:8 |
| **intermediary** | 1659:12 | **involve** 1588:9 | 1738:21 | 1799:5 1807:2 |
| 1746:22 | 1667:15 1668:3 | **involved** 1469:23 | 1746:22,22 | 1821:13 1822:4 |
| **internal** 1507:4 | 1684:16 1726:6 | 1474:7,20 | 1749:5 1766:15 | 1830:11 1831:4 |
| 1507:13 | 1727:21 | 1475:24 1490:5 | 1782:18 | **job** 1475:10 |
| 1512:18 | 1728:12 | 1502:4,19 | **issues** 1465:11 | 1482:2,4 |
| 1513:12 | 1803:11 1806:9 | 1570:10 1571:7 | 1468:11 | 1552:12 1599:1 |
| 1514:19 | 1843:12 | 1636:14 | 1470:21 | 1617:1 1681:1 |
| 1574:11 | **interval** 1649:25 | 1644:21,22 | 1480:20 | 1721:5 |
| 1578:10 | 1650:3,9,20,21 | 1648:15 | 1702:11 1714:3 | **John** 1561:10 |
| 1606:10 | **intervals** 1623:1 | 1701:14 1704:7 | 1744:8 1745:10 | **Johnson** 1459:9 |
| 1608:17 | 1656:24 | 1797:19 1835:4 | 1748:1 1757:20 | 1459:9 1461:9 |
| 1620:18 1622:4 | **intestine** 1790:11 | **involvement** | 1786:25 1801:5 | 1461:9 1512:19 |
| 1668:10 | **intimate** 1752:13 | 1501:23 1502:1 | 1804:19 | 1512:19 |
| 1714:20 | **intravaginal** | 1570:4 1697:3 | 1832:15 | 1513:11,11 |
| 1722:17 1723:9 | 1627:12,19 | **involves** 1470:11 | 1841:21 | 1608:24,24 |
| 1730:4 1734:10 | **introduced** | 1630:16 | **items** 1479:10 | 1710:13,13 |
| 1762:6 1763:8 | 1622:8 1817:16 | **involving** 1558:4 | 1642:4,5 | 1844:11,11 |
| 1770:15 | **introduction** | 1682:5 1683:11 | ––––––––––– | **joined** 1466:12 |
| 1772:20 | 1616:17 | 1805:15 | **J** | 1467:3 |

| | | | | |
|---|---|---|---|---|
| **joins** 1581:17 | 1612:15,19,23 | 1769:21 | 1803:17 1834:3 | 1524:24 1525:2 |
| **Jones** 1461:16 | 1614:1,20,25 | 1773:14,16,24 | 1843:11 | 1527:1 1530:12 |
| 1462:9 1486:9 | 1621:7 1626:20 | 1783:23,25 | **judges** 1505:18 | 1532:6 1541:4 |
| 1486:15 1493:2 | 1628:21 | 1813:11,19,22 | 1506:2 1732:17 | 1541:19 1542:8 |
| 1493:5,9,12,16 | 1629:22 1630:1 | 1822:20 1828:8 | **Judicial** 1459:1 | 1543:7,13 |
| 1494:11 1495:2 | 1633:25 | 1832:21 1833:1 | 1461:24 | 1544:13 1545:2 |
| 1495:8 1498:11 | 1634:11 | 1833:8,14,21 | **July** 1657:17 | 1545:5 1551:22 |
| 1498:15,19 | 1647:22 1653:4 | 1834:2 1839:14 | 1686:11 1827:6 | 1551:25 1552:1 |
| 1499:9,16,18 | 1657:3,6,10 | **Jose** 1833:16 | **jump** 1805:9 | 1552:7 1554:22 |
| 1500:20 | 1658:14,16,22 | **journal** 1477:16 | **June** 1816:4,13 | 1561:9,15,24 |
| 1504:17 1505:1 | 1659:5,7,15,21 | 1481:12,22,24 | 1825:15 1827:2 | 1562:3 1563:16 |
| 1505:23 | 1660:13,23 | 1482:9 1485:21 | 1827:3 | 1565:18 |
| 1507:20,24 | 1661:2,12 | 1503:17,24 | **JUROR** 1463:13 | 1580:22 |
| 1508:4 1514:7 | 1663:3,8,21 | 1512:24 1686:7 | 1463:23 1464:1 | 1583:17 1587:1 |
| 1521:19,25 | 1664:16,23 | 1686:8 1704:1 | 1654:15,17,20 | 1588:12,12 |
| 1522:8 1528:12 | 1665:1,21,25 | 1773:1 | 1714:14 | 1589:15 |
| 1528:14 | 1666:12 | **journals** 1481:14 | **jurors** 1459:23 | 1594:15 |
| 1529:17 1530:6 | 1671:18,21 | 1481:18 | 1652:25 | 1601:24 1602:7 |
| 1530:13,17,24 | 1673:6,13 | **judge** 1459:21 | 1654:22 | 1602:24 1603:4 |
| 1531:12,17 | 1675:18,20,22 | 1464:7 1477:19 | **jury** 1459:15,20 | 1603:11 |
| 1534:8,10 | 1676:3,7,12 | 1505:20 1507:7 | 1459:22 1462:4 | 1604:16 |
| 1537:4 1541:14 | 1678:5 1679:1 | 1523:21 | 1463:4,6,12 | 1609:10 1616:5 |
| 1541:20 | 1680:7,11,17 | 1530:14 | 1465:14,23 | 1616:21 1624:2 |
| 1542:12 | 1684:15 | 1537:10 | 1466:15 1467:2 | 1630:2 1635:4 |
| 1554:25 1556:3 | 1688:15 1689:1 | 1545:19 | 1467:7,21 | 1635:21 |
| 1556:7,11 | 1689:14 | 1615:18 | 1468:14 1469:7 | 1636:19,22 |
| 1557:2,4,19 | 1691:10,19 | 1642:16 1653:7 | 1474:10 | 1638:15 1643:4 |
| 1558:10 | 1692:7,13,17 | 1653:17,21 | 1481:19 1484:5 | 1644:6 1649:25 |
| 1559:24 | 1697:4,19,22 | 1660:7 1661:15 | 1485:19 | 1652:12,21 |
| 1560:17 1561:2 | 1698:3,23 | 1662:9 1663:15 | 1486:14 | 1653:2 1654:9 |
| 1561:6 1564:11 | 1700:1,12 | 1664:5 1665:13 | 1487:15,16 | 1655:16 1656:3 |
| 1570:12,15,21 | 1702:10 | 1666:3,5 | 1489:11,15 | 1659:1 1671:16 |
| 1574:2,22 | 1716:11 | 1668:21 | 1490:14 | 1672:18 |
| 1577:13,25 | 1717:21 | 1677:25 | 1491:11 1495:7 | 1676:22 |
| 1578:19 1579:7 | 1747:22,25 | 1678:13,20 | 1495:22 | 1683:11,14 |
| 1580:5,7,11 | 1748:11,13,18 | 1680:20 | 1497:19 1499:1 | 1690:14 |
| 1585:2,5 | 1748:21 1749:3 | 1681:13 | 1501:6,9 | 1697:25 |
| 1586:20 1590:7 | 1749:5,20 | 1684:25 | 1505:10 | 1698:19 1700:8 |
| 1591:17 1593:2 | 1752:3 1754:2 | 1705:25 1706:5 | 1506:23 | 1701:16 1703:8 |
| 1593:5 1597:6 | 1754:4 1756:12 | 1706:16 | 1507:17 | 1705:24 1707:7 |
| 1598:17,22,25 | 1756:18,21 | 1721:13 | 1510:21,24 | 1707:13 |
| 1599:10,21 | 1757:1,6 | 1723:10 | 1511:22 1512:3 | 1709:16 |
| 1600:2,17,21 | 1760:6,11,15 | 1724:22 1725:5 | 1512:6 1513:11 | 1710:19 |
| 1601:13,17,20 | 1760:21 1761:3 | 1729:7,25 | 1513:14 1515:5 | 1712:24 1714:3 |
| 1603:2 1606:24 | 1764:3,6 | 1731:8 1732:8 | 1520:15,25 | 1716:21 1718:7 |
| 1607:11,14 | 1765:12,17 | 1739:23 | 1522:5 1523:13 | 1718:17 |
| 1609:4,7,11,14 | 1766:3 1769:19 | 1753:20 1757:6 | 1523:14,24 | 1719:10,25 |

1720:21
1721:17,21,25
1723:9,25
1724:23 1726:1
1726:11
1727:13
1728:19,20,24
1729:3 1731:20
1732:3 1733:23
1734:15
1736:11 1741:4
1741:21 1743:8
1744:23
1746:24 1747:9
1747:21
1756:24 1757:5
1757:8,11,25
1758:4 1760:18
1761:4 1762:1
1762:25
1763:20
1780:23
1786:12
1789:19
1801:13
1804:20 1807:1
1808:10
1810:14 1823:1
1826:14 1829:8
1831:15 1833:9
1834:3 1839:9
1839:16 1840:5
1841:2
**jury's** 1503:25
1514:24 1644:4
1649:19
1654:10
1696:24 1733:9
1840:17 1841:4
**Justice** 1544:7
1652:6 1731:14
1839:24

---

**K**

**KATZ** 1460:10
**Kavaler** 1804:23
1805:5

**keep** 1477:5,5
1542:14
1545:24
1549:19
1562:13
1587:11 1588:4
1588:16
1594:23
1598:15 1603:6
1610:7,11
1612:12 1651:1
1660:21,24
1662:15 1663:2
1663:3 1714:8
1714:12
1727:17 1797:2
1819:1 1823:11
1833:17
**keeping** 1840:20
**keeps** 1791:25
1792:4
**Kent** 1461:5
**kept** 1660:9
**key** 1537:1
1641:12
1661:20
**kidney** 1576:17
1628:20
1788:16,22
1795:19
1796:11,18
**kidneys** 1576:10
1576:18
1669:18
1788:21 1796:9
**kind** 1470:16
1474:25
1481:11 1490:7
1492:1,5
1496:11
1517:25 1537:2
1553:20
1554:19 1558:3
1558:7,12
1585:13 1596:4
1599:23
1617:25 1626:9

1630:11
1642:14
1670:15 1701:7
1725:13 1761:7
1764:11 1767:3
1767:10 1771:2
1786:16
1793:13
1799:18
1800:17
1808:20
1815:25
1819:12,17
1827:17,25
1828:16
**kinds** 1472:24
1477:5,23
1478:25 1479:7
1517:21
1543:12 1681:4
1706:19
1707:15
1769:16
**kit** 1519:9 1527:5
1527:8 1692:24
1692:25 1837:4
1837:13
**kits** 1504:12
1509:9 1513:20
1550:12
1624:21 1625:4
1706:24
**knees** 1727:7
**knew** 1499:15
1583:19,20
1589:1 1601:8
1601:12 1602:9
1602:11
1603:14
1604:22 1606:7
1607:20,25
1610:17,20,23
1610:24
1612:11,13
1613:5,11
1634:6 1653:24
1770:16,17

1780:20
1782:18
**knife** 1732:15
**Knock** 1464:2
**knots** 1573:15
**know** 1466:20
1467:12
1472:14,19,21
1473:10
1475:18 1484:9
1487:22
1488:24
1490:20
1491:11,25
1493:24 1501:4
1506:14 1507:3
1507:7 1510:25
1515:18
1516:14 1520:6
1523:13,14,21
1532:9 1538:16
1541:20,24
1543:9,15,16
1545:13 1546:5
1549:12,23
1553:17,17,21
1555:17
1559:23
1560:19,22
1562:11,12
1565:3,11
1582:2 1589:16
1590:18 1592:1
1592:2,3,17,18
1593:22 1594:4
1596:21
1599:23
1601:25 1602:9
1602:12
1603:22
1604:22
1609:21 1611:1
1613:24 1614:6
1619:7 1623:10
1626:17
1630:12
1631:13 1633:7

1633:13
1634:15
1639:15
1640:24
1641:10,13
1642:5 1644:5
1644:5 1646:13
1650:7 1654:12
1662:5 1663:1
1669:18 1678:9
1681:12
1694:15
1699:21 1700:8
1703:5,6,21
1706:7,13
1710:16 1714:7
1717:9 1718:16
1723:3,3,4
1726:23 1731:8
1733:2,2,10
1739:11,17,23
1740:13 1743:7
1743:18,21
1744:23 1747:3
1755:18,24
1756:8,9,14
1781:20 1782:3
1784:3 1790:18
1791:14
1792:22
1793:24 1795:4
1796:2 1798:8
1800:16
1802:11
1803:13,25
1804:20 1805:1
1805:9 1806:5
1807:19,23
1814:4 1815:21
1819:17 1820:1
1820:4 1823:2
1823:10,12
1825:22
1829:16 1833:5
1833:12,18
1837:1,6
1838:8,11

1839:4,21
1840:14,17
1842:1,5,21,23
1843:2,3,10
**knowing** 1727:3
**knowledge**
1532:20
1553:12,15
1578:16
1596:13 1597:2
1598:11 1600:7
1620:20
1677:12,16
1680:5,21,23
1682:23
1762:11 1763:8
1803:20 1830:9
**knowledgeable**
1606:1 1608:3
1608:9,10,12
**known** 1589:16
1607:15
1609:17 1611:8
1611:11
1613:13 1673:1
1681:18
1715:15
1737:15
1762:13
1764:16,24
1805:21
**knows** 1499:1
1501:3 1514:5
1514:6 1598:19
1603:12
1604:16
1701:14 1730:4
1739:18
1804:18
**kohyde@aol.c...**
1461:8

**L**

**lab** 1594:22
1595:1,8
1596:4
**label** 1773:5

**labeled** 1707:3,6
**labeling** 1512:25
1835:23
**lack** 1574:3
1578:1 1579:8
1801:4 1811:7
**lacked** 1706:24
**Ladies** 1654:24
1832:17
1839:22
**Lake** 1459:6,7,8
1461:2,3,3
1844:7,9,9
**land** 1798:14
**landmarks**
1566:25
**language**
1611:16 1816:6
**laparotomy**
1631:23
**large** 1466:25
1567:24
1572:13 1573:6
1573:8,19
1576:6,8
1624:5 1625:1
1790:11
1793:17 1812:4
1827:9 1830:21
**larger** 1791:18
**laser** 1789:21
**lata** 1547:9
1569:15
**late** 1475:18
1641:10
1841:20 1843:9
**lateral-to-medial**
1547:7 1569:13
**Latin** 1715:12,14
**latitude** 1507:1
1559:22
1589:21
1729:11 1755:5
**launch** 1606:9
1837:21,22
**launched** 1601:9
1764:17

**law** 1460:3,7,14
1500:24 1605:2
1607:19
1665:16
1673:25,25
1674:2 1677:17
1677:18,24
1683:4 1717:13
1719:18 1720:3
1720:12,18
1721:2,10,12
1723:16,18,19
1723:20
1726:17,20
1728:2,25
1732:18
1769:22,25
1770:11 1802:3
1802:25
1803:23
1805:21
**laws** 1742:25
**lawsuits** 1588:20
1677:8
**lawyer** 1588:17
1740:2 1803:2
1823:8
**lawyers** 1665:15
1665:18
**lay** 1580:1,1
1583:7,7
1585:24
1602:22
1670:19,25
1711:19
1724:13 1803:9
1808:5 1830:6
**layer** 1581:19
1792:5
**layers** 1518:24
1568:4 1577:4
**laying** 1557:13
1711:20 1802:6
**lead** 1576:9
**leading** 1568:23
1771:8 1815:6
**leads** 1575:9

1581:16
1772:12
**leaking** 1632:19
**lean** 1588:1
**learn** 1472:22
1473:8 1544:12
1599:25
1686:19 1697:2
1710:16
1731:18
**learned** 1486:23
1489:21
1491:13
1513:23
1589:15 1595:9
1599:6 1652:10
1704:12
1744:12
1746:22 1802:1
1840:3
**learning** 1536:11
**leave** 1483:15
1654:1 1732:5
1741:21
1781:16 1833:8
**leaving** 1840:16
**lecture** 1580:15
**led** 1537:1
1542:22 1746:9
1746:13
1797:18 1807:3
1817:10
**leeway** 1488:1
**left** 1483:1
1494:8 1564:6
1573:13 1575:2
1624:5 1654:25
1776:15
1791:10
1817:14 1829:6
**legal** 1673:8
1674:21,23
1720:13,24
1729:7
**legitimate**
1518:14
**legs** 1566:16

1582:6
**length** 1469:19
1746:6
**lengthy** 1775:11
1775:15
**let's** 1498:16
1505:6 1508:5
1508:5 1511:18
1511:19 1515:7
1517:16
1524:18 1529:6
1530:8 1533:16
1535:11
1543:23,24
1544:3,21
1545:21,22
1581:24
1583:21
1584:17
1590:14
1592:19 1601:1
1615:10 1618:5
1618:5 1619:2
1619:22
1621:24
1623:13,16
1624:19 1627:6
1629:1,6
1630:4,5
1631:1,19
1643:24
1644:23
1645:12
1646:19
1652:16
1656:25
1669:12
1670:21
1673:15
1675:17 1700:4
1701:13
1702:25
1703:17,17
1706:8 1712:21
1715:6,9
1719:21
1730:15,20

Case 2:12-md-02327  Document 3756-6  Filed 05/29/17  Page 420 of 742 PageID #: 133584
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 420 of 742 PageID #: 133584

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

| | | | | |
|---|---|---|---|---|
| 1731:2,5,12 | 1822:5 | 1512:11 | 1789:17 1790:6 | 1621:24 |
| 1741:16,18 | **lifelong** 1623:10 | 1513:21 1525:9 | 1793:20,23 | 1625:20,21,21 |
| 1754:9 1757:7 | **ligament** 1535:18 | 1538:18 1574:9 | 1794:12,19 | 1629:1 1635:7 |
| 1760:11 | **liked** 1506:2 | 1574:16 | 1798:5 1799:1 | 1640:24 |
| 1775:17 1777:7 | 1809:3 | 1578:12 1615:8 | 1800:10,12 | 1641:18 |
| 1783:12 | **limine** 1545:18 | 1616:15 | 1802:13 1811:1 | 1642:11 1643:7 |
| 1784:14 | 1587:18 1589:6 | 1620:23 | 1811:1 1813:3 | 1644:25 |
| 1797:11 1798:3 | 1663:14 1720:9 | 1737:14 | 1819:15 1823:5 | 1651:17 |
| 1813:15 1833:7 | **limit** 1499:23 | 1743:14,16,22 | 1829:17 1830:6 | 1658:20 |
| 1838:14 | **limited** 1474:16 | 1770:15 | 1837:14 | 1659:25 |
| 1843:13 | 1629:9,19 | 1773:21 | 1841:13 | 1721:10 1737:6 |
| **let-out** 1833:5 | 1681:23 1814:2 | 1778:18 | **live** 1465:14,15 | 1743:9,11 |
| **letter** 1677:16,18 | 1814:11 | 1835:24 1837:8 | 1617:18 1628:8 | 1748:8 1776:15 |
| 1677:23 | **limits** 1623:9 | 1837:19 1838:7 | 1828:3 1842:3 | 1790:20 1798:4 |
| 1678:20 1680:8 | 1650:10 | 1839:12 | **living** 1723:11 | 1814:7 |
| 1683:4 1684:20 | **Linda** 1498:9 | **litigation** | **LLC** 1460:7,10 | **looked** 1513:7 |
| 1699:7,12,13 | **line** 1538:22 | 1511:13 | 1460:14 | 1646:24 1656:3 |
| 1700:7,10 | 1637:7,7 | 1620:16 1704:8 | **LLP** 1461:6,12 | 1743:2 1754:14 |
| 1702:7 1704:4 | 1643:7 1669:12 | **little** 1465:9 | 1461:17 | 1797:23 |
| 1704:24 1705:9 | 1693:6 1725:25 | 1468:14,15 | **local** 1799:6 | 1835:14 |
| 1708:15 | 1752:12 | 1469:16 1474:4 | **located** 1570:25 | **looking** 1471:2 |
| **letting** 1736:23 | 1840:11 | 1479:18 | **location** 1576:22 | 1478:10,15 |
| 1802:22 | **lines** 1669:22 | 1482:25 | **locations** | 1479:9 1481:12 |
| **level** 1465:18 | 1735:18 | 1484:10 | 1810:24 | 1499:13 |
| 1472:4,7 | **lingering** 1809:6 | 1490:20 | **long** 1511:16 | 1524:21 |
| 1473:19 1745:3 | **link** 1831:24 | 1499:24 1502:8 | 1543:5 1567:25 | 1525:13 1540:1 |
| 1773:22 | **liquid** 1818:23 | 1504:1 1505:15 | 1611:18,18 | 1565:21 1582:3 |
| 1817:16 | **list** 1470:15 | 1509:2 1511:21 | 1612:8 1667:3 | 1595:2 1636:22 |
| 1826:22 | 1511:22 | 1514:22 | 1738:8,12 | 1649:15 1749:9 |
| **levels** 1496:1 | 1517:19 | 1518:16,18,18 | 1761:3 1804:17 | 1791:22 |
| 1804:15 | 1717:21 | 1518:23 1519:8 | 1823:11 | 1797:19 |
| **Lewis** 1708:18 | 1729:21,24 | 1519:14,20 | 1840:20 1843:7 | 1810:15 1813:4 |
| **liability** 1679:24 | 1730:14 | 1526:6 1533:20 | **long-term** 1625:3 | 1828:13 |
| 1681:6 1721:14 | 1734:20 | 1540:18 | 1625:16 | 1829:24 |
| 1724:4 | 1799:16,20 | 1561:17 | **longer** 1484:21 | 1830:10 |
| **license** 1485:16 | **listed** 1686:4 | 1566:21 1568:3 | 1584:13 | **looks** 1463:14 |
| **licensed** 1485:5,6 | 1771:16 1773:6 | 1578:3 1597:11 | 1625:21 | 1478:11 |
| 1485:10,12 | **listen** 1664:3 | 1598:10 1603:6 | 1802:18 1806:7 | 1514:25 |
| **lied** 1661:20 | 1682:17 | 1617:4 1625:10 | **look** 1481:9 | 1536:18 1552:2 |
| 1662:1 1667:8 | **lists** 1612:1 | 1638:4 1641:5 | 1495:22 1535:3 | 1608:20 |
| 1752:6 | **literal** 1711:17 | 1644:4 1655:12 | 1535:11 | 1734:19 1797:7 |
| **life** 1506:3 | **literature** 1477:9 | 1656:21 | 1536:19 | 1812:7,8 |
| 1539:13 | 1477:12 | 1669:21 | 1540:23 | **loop** 1547:18,19 |
| 1551:15 1552:5 | 1478:13 1487:2 | 1711:13,14 | 1543:19 1544:2 | 1571:17,18 |
| 1575:3 1611:24 | 1487:4,21 | 1750:8 1761:17 | 1546:4 1602:25 | **loops** 1582:20 |
| 1616:14 | 1488:12,17 | 1775:10,14 | 1605:6,6,7 | **lose** 1468:21 |
| 1625:19 1638:6 | 1509:14 1512:9 | 1777:8 1783:18 | 1616:2 1619:2 | 1815:20 |

| | | | | |
|---|---|---|---|---|
| 1825:23,24,24 | 1640:5 1656:7 | 1828:19 | 1771:10 | **master's** 1471:23 |
| **loses** 1468:20 | 1665:5,15 | **Magee-Womens** | 1794:20 | 1472:10 |
| 1469:1 | 1667:1,23 | 1483:6 | 1806:16 | 1473:14 |
| **losing** 1817:20 | 1671:6,14,25 | **magnify** 1768:20 | 1810:20 | **match** 1539:18 |
| 1818:18,18 | 1672:21,23 | **magnus** 1547:10 | 1813:13 | 1553:5 |
| 1819:1 | 1673:4 1742:2 | 1569:16 | 1815:15 | **material** 1562:6 |
| **loss** 1825:16,18 | 1744:13 | **MAI** 1720:17 | **marching** | 1565:25 |
| **lost** 1522:6 | 1745:10,16 | **maintain** | 1561:21 | 1573:16 |
| 1657:20 1658:1 | 1746:2,15,16 | 1485:16 1818:9 | **Marchionni** | 1586:14 |
| 1819:14 | 1749:3,13 | **maintaining** | 1527:25 | 1616:15,18,18 |
| 1829:22 1835:7 | 1750:3,22 | 1709:11 | **marked** 1485:17 | 1616:20 |
| **lot** 1464:4 | 1752:6 1757:22 | **major** 1551:13 | 1520:18 | 1618:13 |
| 1475:13 1485:1 | 1758:6 | 1620:1,7 | 1593:19 1669:5 | 1620:11 1622:7 |
| 1488:24 | **Lucente's** 1659:8 | **majority** 1479:1 | 1675:11 1690:3 | 1623:20 |
| 1489:18 | 1659:16,17 | **making** 1484:8 | **market** 1460:4 | 1624:13 1629:8 |
| 1505:17 | 1744:9 1745:18 | 1631:17 1668:8 | 1555:23 | 1629:8 1643:4 |
| 1506:19 | 1758:8,11 | 1736:18 1748:5 | 1579:14 | 1768:17 |
| 1507:15 | 1783:4,8 | 1807:18 1821:7 | 1593:14 | 1778:22 1795:4 |
| 1549:21 1550:1 | **lumped** 1527:15 | 1821:11 | 1597:23 1598:3 | 1800:15 |
| 1651:4 1711:4 | **lumping** 1525:11 | **malnourished** | 1598:15,16 | 1828:22 |
| 1723:5 1724:5 | **lung** 1790:5 | 1817:19 | 1610:16 1611:9 | **materials** |
| 1736:21 | 1798:5 1800:11 | **man** 1605:4 | 1611:13 1626:8 | 1511:19 1512:4 |
| 1746:18 1794:1 | 1801:5,16,20 | 1706:7 | 1629:18 | 1540:22 |
| 1802:24 1815:4 | 1801:20 | **manage** 1831:1 | 1687:18 | 1835:14 |
| 1815:19 | 1802:19 1805:2 | **management** | 1688:14,23 | **math** 1494:5 |
| 1841:19 | **lungs** 1790:7 | 1459:7,8 | 1691:7 1693:3 | **matter** 1497:20 |
| **lots** 1517:23 | 1797:15,20,24 | 1461:3,4 | 1705:23 | 1504:24 |
| 1617:17 | 1798:2,14 | 1502:14,14 | 1736:24 1774:9 | 1581:14 1583:4 |
| 1634:19 | 1800:3,14,19 | 1629:2,7,10 | 1838:19 1839:6 | 1584:25 |
| **loud** 1603:3 | 1801:1,21 | 1844:9,10 | **marketed** | 1610:22 1611:2 |
| 1612:3 1732:14 | 1822:16 1823:3 | **managing** | 1599:20 1606:3 | 1611:4 1617:15 |
| **Louis** 1460:4 | 1823:21,24 | 1830:23 | 1744:20 | 1638:9 1639:21 |
| 1461:14 | **lying** 1566:15 | **manifested** | **marketing** | 1642:4 1675:23 |
| 1708:18 1816:5 | 1582:5 1584:6 | 1788:14 | 1512:25 | 1678:6 1685:19 |
| **love** 1461:6 | 1790:4 1791:3 | **manner** 1548:25 | 1689:13 | 1702:8 1705:13 |
| 1740:23 | 1819:10 1820:2 | **manual** 1553:24 | 1768:16 | 1721:8 1733:8 |
| **low** 1525:7,16 | 1828:18 | **manufactured** | **marrow** 1820:24 | 1802:16 |
| 1526:12 | | 1737:17 | 1821:2 | **matters** 1581:15 |
| 1537:18 1538:1 | **M** | **manufacturer** | **Maryland** | 1585:1 1628:17 |
| 1821:1 | **M** 1460:10 | 1836:12 | 1465:15 1466:3 | 1665:6 |
| **lower** 1565:19 | **M.D** 1459:9 | **manuscript** | 1466:4 1474:14 | **MAZIE** 1460:10 |
| 1643:21 | 1461:2,2 | 1477:15,17 | **mass** 1576:8 | **mean** 1470:9 |
| 1645:10 1646:7 | 1806:8 1844:11 | 1478:2 | 1628:13 | 1471:7 1472:13 |
| 1647:9 1648:4 | **ma'am** 1747:24 | **manuscripts** | 1793:18 | 1472:19 |
| 1650:22 1790:9 | **MacDonald** | 1482:4 | 1814:22 | 1477:11 |
| **lowest** 1653:25 | 1804:7 | **March** 1632:14 | 1818:18 | 1479:17 |
| **Lucente** 1494:21 | **machine** 1790:3 | 1686:10 | 1825:24,25 | 1480:24 |

| | | | | |
|---|---|---|---|---|
| 1481:16 1497:3 | 1482:2,4 | 1466:3 1467:24 | 1785:12 1797:5 | 1704:18 |
| 1498:10 1499:8 | 1498:2 1499:1 | 1469:9 1484:7 | 1799:2 1800:25 | **members** |
| 1507:18 1526:7 | 1499:2 1512:14 | 1485:16,21 | 1801:7 1802:1 | 1471:13 1475:6 |
| 1529:4,22 | 1516:15 1527:3 | 1487:21 | 1804:1,18 | 1481:11 |
| 1532:23 1533:2 | 1536:16,19 | 1489:17 1496:9 | 1815:8 1816:22 | 1503:10,11 |
| 1533:9 1536:15 | 1567:10,11 | 1509:25 1510:4 | 1824:4 1830:10 | 1690:22 1842:7 |
| 1538:6 1543:17 | 1569:5 1585:11 | 1512:9 1513:2 | 1831:2,4,6,11 | **membrane** |
| 1546:18 1552:9 | 1585:20 | 1513:21 1516:7 | 1831:16 1832:2 | 1547:12 |
| 1553:22 | 1595:17 1596:4 | 1516:23 | 1832:9 1834:20 | 1569:18 |
| 1555:12 | 1616:21,23 | 1517:14 | 1834:21 1835:1 | **mention** 1498:7 |
| 1557:22 | 1621:25 | 1518:12 1528:3 | 1836:11 1837:8 | 1769:10 |
| 1558:14,15 | 1627:14 | 1567:12 | 1837:13,19,23 | 1795:10 1819:4 |
| 1560:4,21 | 1648:11 1650:1 | 1574:12,18 | 1837:25 1838:1 | 1834:22 |
| 1580:14 | 1656:11 | 1577:19 | 1838:6,7,12,17 | **mentioned** |
| 1588:10 | 1657:20 1658:1 | 1578:12,18,23 | 1839:12 1844:9 | 1468:13 |
| 1595:16 | 1669:16 | 1579:3,5 | 1844:10 | 1471:11 |
| 1601:24 | 1687:23 | 1580:15 1581:8 | **medical-legal** | 1473:18 |
| 1603:17,17,23 | 1689:21 | 1597:15 1598:9 | 1696:20 1707:4 | 1474:21 1478:6 |
| 1611:19 1614:7 | 1697:25 1705:7 | 1599:2,18 | **medically** 1740:8 | 1479:10 |
| 1617:8 1618:10 | 1715:12 1759:5 | 1600:11 1608:2 | 1827:5 | 1481:25 1483:8 |
| 1623:16 | 1766:21 1767:2 | 1608:9,24 | **medicine** 1484:1 | 1497:23 1502:8 |
| 1627:13 1636:1 | 1768:22 | 1609:22 | 1485:4,9 | 1517:4,23 |
| 1639:7 1648:7 | 1793:12 | 1610:15 | 1512:24 1689:5 | 1527:14 |
| 1655:17 | 1798:12 1800:4 | 1611:12 | 1715:16 | 1538:11,15 |
| 1664:10 1665:8 | 1800:11 1817:1 | 1612:11,25 | 1779:13 1802:4 | 1577:2 1635:12 |
| 1669:15 1676:4 | 1818:15 | 1613:5,22 | 1802:19 | 1639:8 1657:14 |
| 1687:22 1692:8 | **meant** 1546:19 | 1630:7,9 | 1804:15,16 | 1695:24 1779:8 |
| 1694:16 | 1653:24 | 1631:15 1636:5 | **medium** 1653:14 | 1787:9 1821:12 |
| 1705:19 | 1696:16 | 1685:15 | **meet** 1652:16 | **mentioning** |
| 1715:11 | 1815:24 | 1686:25 1690:8 | 1716:2 1721:11 | 1497:7 |
| 1723:17 1727:6 | **measure** 1515:2 | 1695:1 1699:4 | 1723:18 | **mentions** |
| 1727:7,14 | 1538:16 | 1707:17 | **meeting** 1494:20 | 1499:25 1504:5 |
| 1729:7,16 | 1539:19 1650:6 | 1708:23 1711:5 | 1498:3 1519:18 | 1772:11 |
| 1730:22 1735:5 | **measured** 1538:9 | 1711:7 1713:2 | 1640:17,17 | **mere** 1665:5 |
| 1753:6,16 | 1538:10 | 1713:3,23,25 | 1704:18 | **merits** 1477:20 |
| 1755:21 | **measurement** | 1717:21 | 1723:15 | **mesh** 1504:12 |
| 1782:18 | 1515:6 | 1730:11 | **meetings** 1477:4 | 1509:8 1510:10 |
| 1799:12 1819:5 | **measurements** | 1735:18,22 | 1480:18 1481:4 | 1513:5,20 |
| 1825:17 | 1516:11 | 1736:4,12,18 | 1496:4 1503:16 | 1519:6,9 |
| 1831:23 | **measures** | 1745:14 | 1640:15 | 1520:2,4 |
| **meaning** 1704:15 | 1539:11,12 | 1747:14 1756:3 | **Meier** 1594:3,4,6 | 1534:22 |
| 1706:23 1708:7 | **measuring** | 1762:8 1764:24 | 1594:7 1608:20 | 1542:18,21 |
| 1708:9 1758:9 | 1491:17,18 | 1765:22 | 1629:5 | 1547:4 1549:2 |
| 1758:12 | 1515:6 | 1766:18 | **melanginococcus** | 1550:25 1551:2 |
| 1764:13 | **medical** 1459:7,8 | 1767:23 | 1619:10 | 1551:8,12 |
| **means** 1466:20 | 1461:3,4 | 1770:15 | **member** 1471:12 | 1554:19 1558:4 |
| 1473:8 1477:14 | 1464:18,21 | 1778:17 | 1480:4,23 | 1558:8,18,24 |

| | | | | |
|---|---|---|---|---|
| 1559:5 1567:16 | 1630:14,17,22 | 1792:21,24 | **Michel** 1686:2 | 1784:4 1839:25 |
| 1567:24,25,25 | 1630:25 1631:4 | 1794:15,22,22 | **Michigan** | **minds** 1799:18 |
| 1568:1,5,6,10 | 1631:5,12,14 | 1794:24 1809:9 | 1471:21 | **minimal** 1763:24 |
| 1569:9,23 | 1631:21 | 1809:10,13,15 | 1472:10 | **minimum** |
| 1570:11,23 | 1632:13,14 | 1809:18,19 | **microbes** | 1763:15 |
| 1571:6,8 | 1633:4,7,14 | 1810:3,5,10,19 | 1793:12 | 1764:20 |
| 1572:7,8,13,19 | 1635:8,12,13 | 1810:23 1811:3 | **microbial** | **minute** 1474:1 |
| 1573:6,8,19,22 | 1635:16 | 1811:4,11,17 | 1793:12 | 1493:15 |
| 1574:7 1575:1 | 1637:17,19,21 | 1812:5,5,9,10 | **microorganism** | 1494:10 1507:2 |
| 1575:10,14,17 | 1637:23 1638:6 | 1812:11,12,14 | 1793:13 | 1531:13 |
| 1575:19,19,19 | 1638:10 1639:9 | 1812:15,18,19 | **middle** 1553:19 | 1556:25 1558:2 |
| 1575:21,22 | 1639:19 | 1812:23 | 1566:19 | 1559:2 1585:3 |
| 1576:2,3,3,6,12 | 1641:19 1642:3 | 1814:15,20,23 | 1568:25 | 1664:4 1668:4 |
| 1576:21 1577:1 | 1642:6,7,24 | 1815:1,3 | 1624:19 | 1683:25 |
| 1577:2,2,6,7 | 1643:3,4 | 1817:10,12,14 | 1663:11 1693:6 | 1697:21 1741:8 |
| 1579:24 1580:3 | 1644:12 1645:9 | 1819:7,8 | 1739:24 1767:4 | 1756:25 |
| 1581:2,11 | 1645:19,24 | 1821:8,20 | 1809:18 | 1769:20 |
| 1582:21,22 | 1647:14,18 | 1822:8,11 | 1815:15 | **minutes** 1481:22 |
| 1583:7,9,12,15 | 1648:2 1649:18 | 1825:5 1829:25 | **middle/end** | 1543:25 |
| 1583:24 1584:1 | 1660:8 1685:24 | 1831:13,14,22 | 1788:12 | 1544:18 |
| 1584:9,12,14 | 1686:18,20 | 1834:17 | **Mighty** 1605:15 | 1572:17 1587:8 |
| 1584:21 1585:9 | 1687:10,14 | 1836:23 1837:3 | 1606:13 | 1646:21 |
| 1585:17,21,24 | 1690:18,21,23 | 1837:7,13,13 | 1703:22 | 1672:14 |
| 1586:2,2,6,10 | 1691:5,6,24 | 1837:17 1838:1 | **mild** 1491:9 | 1731:10 |
| 1591:9 1593:16 | 1692:5 1693:24 | 1838:18 1839:5 | 1515:21 | 1824:12 |
| 1594:21 1595:6 | 1693:25 | **Mesh-Related** | 1516:23 1517:2 | 1832:24 |
| 1596:6,6,11 | 1706:23 | 1615:22 | 1517:4 1518:11 | 1833:13 |
| 1606:22 1608:4 | 1711:18,20,21 | **meshes** 1551:5 | 1535:22 | 1840:12 |
| 1608:11 | 1711:25 1712:1 | 1595:4 1616:11 | 1537:25 | **mislead** 1676:4 |
| 1611:24 | 1712:1,2 | 1620:2 1627:21 | **Miles** 1494:21 | **misleading** |
| 1616:15,24 | 1737:19 1763:4 | 1693:21 | 1671:10 | 1532:8 |
| 1617:16,19 | 1763:15 1765:2 | 1695:13 | **Miller** 1640:5 | **Misrepresents** |
| 1618:13,14,20 | 1765:10,22 | **message** 1536:7 | **million** 1493:23 | 1598:23 |
| 1619:13,18 | 1766:8,20,21 | 1536:10 | 1494:2,2 | **missing** 1724:9 |
| 1620:1,11,25 | 1767:12 1768:7 | **met** 1509:21 | 1674:13 | 1724:10 |
| 1620:25 1621:6 | 1768:15,18 | 1724:2 1726:13 | **mind** 1493:2 | 1725:11,11 |
| 1621:15,23,23 | 1769:1 1770:18 | 1736:19 | 1498:22 | **Missouri** 1459:2 |
| 1621:25 1622:1 | 1770:22,23,24 | **metabolism** | 1514:10 1544:8 | 1459:22 |
| 1622:3,7,8,18 | 1770:25 1771:4 | 1793:16 | 1589:1,8 | 1461:25 |
| 1623:1,7,12,14 | 1771:8,10,24 | **metastatic** | 1601:16,18,19 | 1486:22 1496:6 |
| 1623:16 1624:4 | 1772:21 1775:8 | 1797:14 | 1652:7 1699:1 | 1545:15 |
| 1624:7,9,12,17 | 1777:15 1778:2 | 1798:11 1799:9 | 1699:4 1709:21 | 1550:14 1561:5 |
| 1625:2,17,18 | 1778:3,21,25 | 1799:23 | 1713:12 | 1607:19 |
| 1627:7,20,24 | 1779:4,9 | **methods** 1469:25 | 1716:11,12 | 1682:24 |
| 1627:25 1628:6 | 1787:10,14,16 | **Metropolitan** | 1731:15 | 1717:12 |
| 1628:9 1629:2 | 1787:19,23,24 | 1461:13 | 1756:22 | 1720:24 |
| 1629:10 | 1788:1,5 | **mic** 1594:24 | 1783:25 1784:3 | 1723:20,21 |

Case 2:12-md-02327   Document 3756-6   Filed 04/29/17   Page 424 of 712 PageID #: 163588

1724:6 1726:20
1732:17
1734:11 1756:5
1769:22,25
1798:6 1801:24
1802:3,3
1803:18,18,24
1804:9 1805:11
1806:17 1844:5
1844:22
**misstatement**
1748:5
**mistrial** 1823:5
**mitigated** 1712:7
**mixing** 1728:19
**Miyiazki** 1535:2
**MO** 1460:4,8
1461:7,14
**moderate** 1517:2
1517:11
**moisture** 1820:2
**moment** 1824:23
**moments**
1670:20 1780:3
**Monday** 1807:22
**money** 1742:3
**month** 1732:25
1787:13
1795:13
**months** 1573:17
1622:19 1645:7
1645:13,19,25
1646:3,8
1647:12,14,15
1648:5 1657:19
1657:22
1686:22
1687:11,20
1774:8,8
1787:16
**morbidity**
1575:20 1632:4
**Morganella**
1619:9
**morganii** 1619:9
**morning** 1463:13
1463:14 1465:7

1465:8 1563:2
1641:5 1655:8
1736:4 1817:1
1833:20 1834:4
1839:18
1840:10
1841:16
1842:13
**mother** 1651:5
**motion** 1545:18
1587:18 1589:5
1589:6 1663:6
1663:7 1825:4
**motions** 1663:10
1663:14 1720:9
**Motter** 1461:23
1844:2,21
**mouth** 1549:19
1706:12
1787:12
**mouthpiece**
1496:14
1735:23
**move** 1488:23
1495:15
1514:23 1601:1
1629:22
1634:21
1655:11
1663:16
1673:19
1724:17
1784:14
1793:25 1794:1
1816:3 1823:4
**moved** 1483:2
1540:8
**moves** 1617:24
**multiple** 1496:1
1588:9 1681:17
1717:3 1736:8
1799:8 1820:10
1821:4
**Murphy** 1494:21
1640:5 1671:10
**muscle** 1547:9,10
1547:10,11,13

1569:15,16,16
1569:17,19,25
1815:23
1818:18
1825:25
**muscles** 1468:21
1570:25 1577:4
1815:21
1825:23 1826:3
**musculature**
1551:6

_____

**N**
**N** 1461:1 1462:1
**name** 1469:14
1491:2 1607:21
1637:18 1651:3
**named** 1482:20
1686:1 1804:22
**names** 1527:24
1640:3
**narrate** 1541:8
1563:15 1565:6
**narrating** 1548:6
**narrative** 1537:8
1570:18
1712:14
**narrator** 1546:13
1547:1 1567:18
1568:9 1569:1
1569:12
1571:14
**narrowed**
1824:14
**national** 1474:3
1474:8,11
1550:11
1674:23
1708:22
**naturally**
1811:13
**nature** 1626:8
1709:8 1737:17
1751:22
**Neal** 1807:7,11
1807:15 1808:2
1808:18,18

1809:11,19
1810:2,8,20
1815:6
**Neal's** 1808:6
1842:9
**near** 1526:16
**nearby** 1468:23
1618:3
**necessary** 1501:4
1625:2 1626:1
1712:2 1772:2
1772:6
**necrotic** 1794:13
1795:1
**need** 1464:23
1465:21
1466:24 1473:1
1473:11 1479:3
1482:2 1488:23
1500:1 1517:25
1518:7 1519:17
1520:12 1525:5
1525:15 1526:3
1526:9 1527:16
1539:5 1549:9
1560:10
1563:24
1589:25 1590:1
1612:9 1625:15
1626:10,14
1630:12
1633:14 1666:2
1699:21 1703:7
1718:7,17
1739:8,9
1740:13,19
1756:21
1780:17
1789:17
1807:24 1808:8
1822:1 1840:14
1841:5 1842:21
1842:22
**needed** 1479:23
1485:3 1575:13
1695:25
1782:16 1828:1

1831:1
**needs** 1501:17
1503:1 1526:7
1701:17
**negligence**
1589:12 1593:7
1679:8
**negligent**
1721:15 1743:3
1743:9
**net** 1585:13,15
**network** 1475:25
1476:4,5,25
**never** 1523:16
1532:4 1542:3
1543:11
1545:15 1548:2
1548:3,13
1550:22 1551:3
1553:2 1554:3
1554:8,14,14
1554:15,18
1555:20,20
1556:7,20,21
1556:24,25
1557:2,4,7,9,10
1557:14,15,18
1557:19,20
1558:3,7,11,20
1559:9 1563:2
1563:3,4,6,7
1564:21 1570:5
1570:10 1575:8
1575:19 1577:2
1577:3 1579:13
1603:18,18,25
1630:23,24,24
1660:1,1
1661:8 1663:6
1663:18,19
1664:17,17,22
1665:1,2,7
1700:16
1705:22 1726:8
1726:10 1743:2
1743:15,25
1744:2 1746:20

1749:8 1777:1
1798:19
1819:20 1820:6
1827:23 1828:3
1834:4,7,10,13
1834:16,16
1835:4,7,9,14
1835:19,25,25
1836:7,10,19
1841:20
**new** 1459:10,10
1461:9,10
1483:14
1505:21
1512:24 1539:8
1570:8 1660:7
1663:12
1714:11
1733:10
1755:20
1807:21 1809:9
1844:11,12
**nice** 1464:3
**night** 1545:17
1841:20
**NIH** 1474:11
1475:3,7,10,25
1477:1 1483:18
1484:17,23
1674:12
**nine** 1516:12
1773:5,6
**NJ** 1460:11
**no-longer-prac...**
1801:19
**Nocere** 1715:10
**nodding** 1600:25
**nodules** 1797:25
1798:10 1799:9
1801:1
**noise** 1719:22
**Non** 1715:10
**non-animation**
1548:17
**nonresponsive**
1499:19
**noon** 1652:5

**Nope** 1465:19
**normal** 1617:17
1766:22 1767:2
1791:14 1818:9
1819:12
1829:17
**normally** 1628:8
1669:18 1804:5
1814:12 1817:4
**North** 1461:13
**nose** 1805:17
**note** 1477:8
1478:10
1480:22
1767:21 1797:7
1807:8 1810:2
1813:8 1827:1
**noted** 1708:22
**notes** 1494:20
1813:5
**notice** 1572:12
1679:8 1685:4
**noticed** 1504:22
1796:18
**November**
1609:12
1612:17
1720:10 1773:8
1774:7,19
**number** 1482:15
1501:22
1516:15
1517:25 1526:3
1526:15
1527:20 1542:5
1542:6 1548:7
1548:21 1549:8
1550:7,15
1551:2 1587:12
1587:13 1588:3
1639:2 1640:9
1645:8,10,11
1646:8 1647:8
1648:4 1650:8
1651:4 1657:1
1686:14 1690:4
1696:11

1743:12 1745:6
1748:25
1750:14,19,21
1751:1,2
1813:17
**numbers**
1527:22 1532:8
1640:16 1650:2
1745:22 1747:1
**numerous**
1527:13
1801:24
**nurse** 1787:18
1788:9
**nutrition** 1819:3
1825:25 1826:1
1826:6

---

## O

**O** 1461:5
**oath** 1464:11
1562:22 1655:7
1715:17
1757:17
**Oberle** 1797:13
**object** 1486:17
1495:16
1499:18 1505:2
1530:17 1542:2
1600:17
1616:25
1631:16 1634:3
1659:21 1660:2
1665:3 1675:18
1675:20
1700:24
1712:10
1754:25
1769:21
1773:16 1774:1
1774:21 1801:4
1821:21 1825:8
1830:4 1832:3
**objected** 1706:21
1782:3 1802:7
**objecting**
1555:18

1603:11
**objection** 1486:8
1495:2 1498:11
1498:15 1499:9
1504:17 1505:5
1507:21
1508:10,13
1514:7,15
1521:19
1523:11
1528:12
1529:17 1530:6
1531:17 1537:4
1541:25
1547:24 1574:2
1574:22
1577:13,25
1578:19 1579:7
1585:2 1586:7
1591:17 1593:2
1597:6 1598:17
1598:22
1599:10,12,21
1600:2 1601:13
1606:24
1607:11,13
1609:4 1614:20
1621:7 1626:20
1647:22 1659:3
1659:15
1663:19,19
1671:18 1673:6
1676:24
1682:25 1683:6
1683:7,9,10
1684:1,4,19
1688:15
1689:14
1691:10,19
1692:7,13
1695:14 1697:4
1697:19
1698:23
1699:25 1700:1
1702:4,5
1703:11
1704:15

1706:12
1707:25
1712:17
1719:16 1720:1
1726:10 1749:6
1749:7 1755:15
1760:22,24
1764:3 1765:12
1766:3,4
1769:19
1773:14,24
1783:23
1806:11
1807:14
1822:20
1823:20
**objections**
1602:19
1740:21
1752:16
**obligation**
1749:6
**obligations**
1729:7
**obliterated**
1767:15
**observed** 1542:3
1556:11 1557:4
**obstacles**
1463:15
**obstetrician-gy...**
1471:1
**Obstetricians**
1502:17
1696:13
1699:15 1701:2
**obstetrics** 1459:6
1461:3 1466:5
1467:11
1469:21 1470:7
1470:22,25
1471:4,14
1479:15,19
1480:5,8,10
1696:13 1844:8
**obstruct** 1505:15
1603:18

| | | | | |
|---|---|---|---|---|
| obstructing | 1803:7 | 1482:18 | 1571:10,21 | 1703:23 1706:9 |
| 1555:13 | offered 1684:20 | 1488:22 1489:6 | 1572:5 1579:15 | 1706:13 |
| obstruction | 1804:23 | 1489:10,16 | 1580:23 | 1712:16 |
| 1797:17 | offering 1525:18 | 1491:8,10,13 | 1581:24 1582:1 | 1714:16,18 |
| obtainable | 1600:18 | 1492:23 | 1582:5,9,18,23 | 1717:24 |
| 1814:12 | office 1478:16,24 | 1493:11 1494:3 | 1588:6 1590:4 | 1718:19 1719:2 |
| obtained 1472:10 | 1479:2,8 | 1497:3,13 | 1591:13 | 1719:6 1720:1 |
| 1814:12 | 1484:16,18 | 1498:19 1500:5 | 1592:19 | 1727:5,24 |
| obtaining | 1517:24 | 1500:12 | 1593:12,13,18 | 1731:5 1732:10 |
| 1473:14 | 1566:17 | 1501:20 | 1594:12 1601:1 | 1739:16 1741:5 |
| obturator 1547:5 | 1807:10 | 1506:12,16 | 1603:9 1604:1 | 1741:12,18,22 |
| 1547:11,12,13 | 1808:25 | 1507:8 1508:3 | 1605:9 1606:14 | 1742:15,21 |
| 1551:6 1568:11 | OFFICES | 1508:10 1510:2 | 1606:16 1607:3 | 1746:4,4 |
| 1569:16,18,18 | 1460:14 | 1510:17 | 1608:19 | 1749:4 1750:13 |
| 1570:24 | official 1501:12 | 1511:10 | 1609:13 1613:7 | 1753:4,19 |
| obviously 1483:7 | 1678:21 | 1514:16,17,22 | 1615:12,17,19 | 1756:11,12,23 |
| 1490:15 | 1767:23 | 1517:21 1520:8 | 1616:23 | 1757:1,7,12,19 |
| 1502:24 1511:8 | 1776:16 1844:4 | 1521:13 1524:4 | 1617:10 1619:9 | 1757:23 |
| 1537:23 1550:8 | 1844:21 | 1524:14,15,20 | 1625:21,22 | 1758:18,24 |
| 1568:18 | oh 1460:15 | 1524:23 1525:4 | 1630:9 1633:16 | 1759:13 |
| 1718:16 1739:9 | 1465:20 | 1526:17 | 1634:21,24 | 1761:16 1762:6 |
| 1740:11 | 1505:24 | 1527:17 | 1635:6 1636:18 | 1762:18 1766:8 |
| 1744:22 | 1531:14 | 1530:16 | 1636:24 1642:8 | 1770:7,9,12 |
| 1746:21 | 1541:16 | 1532:25 1533:5 | 1642:17 | 1773:18 |
| 1816:23 | 1564:15 1572:1 | 1533:15,18 | 1643:24 | 1775:17 |
| 1828:19 | 1648:10 1659:4 | 1536:16 1537:7 | 1644:23,25 | 1776:14 1785:8 |
| 1841:10 | 1676:17 | 1537:17 1540:2 | 1646:18 1648:2 | 1787:21 |
| occasion 1750:22 | 1677:23 | 1540:19 1541:6 | 1648:8,10 | 1789:10 1790:7 |
| occasions 1717:3 | 1678:25 | 1542:14 1544:4 | 1649:13 | 1791:1,2,8 |
| occur 1623:1,7 | 1679:22 1706:7 | 1545:7,19,21 | 1650:16,18,21 | 1792:16 1794:3 |
| 1642:6 1755:4 | 1719:21 | 1546:4,11,18 | 1651:11 1653:1 | 1794:6,21 |
| 1770:21 | 1724:16 1725:1 | 1548:15 | 1653:16 | 1798:3 1799:1 |
| occurred | 1725:1 1729:17 | 1549:16 | 1655:10,12,18 | 1799:13 |
| 1696:10,11 | 1733:18 | 1553:13,19 | 1657:10,13 | 1803:17 |
| 1699:8 1770:22 | 1743:19 1746:4 | 1555:3 1557:7 | 1658:10 | 1806:15,21 |
| 1781:3 1809:25 | 1795:10 | 1557:17 | 1659:13 1666:9 | 1808:13,15,17 |
| occurring | 1825:10 1833:3 | 1558:22 1559:7 | 1670:23 | 1813:15,23,25 |
| 1825:18 | 1835:22 | 1559:19,23 | 1672:20 | 1821:2 1823:17 |
| occurs 1571:8 | 1841:22 | 1561:8,9,19 | 1673:23 1676:6 | 1824:16 |
| 1575:14 1771:6 | Ohio 1485:8 | 1563:8,23 | 1684:17 | 1825:12 |
| 1779:5 | okay 1463:5 | 1564:1,7,25 | 1686:17 1690:2 | 1828:25 1829:2 |
| ocean 1803:3 | 1468:18 | 1565:14,19 | 1690:14,16 | 1831:8 1836:3 |
| October 1670:2 | 1472:14 1476:3 | 1566:3,14 | 1691:1,23 | 1839:22 1841:8 |
| 1752:5 1754:7 | 1477:12 | 1567:13,23 | 1692:24 | 1841:22 |
| offer 1509:24 | 1478:18 | 1568:7,16,20 | 1695:19,21 | Okey-doke |
| 1513:10 | 1479:18 | 1569:10,22 | 1699:2,24 | 1717:25 |
| 1574:24 1786:4 | 1480:25 | 1570:14,20 | 1700:20 | old 1739:23 |

**In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015**

older 1484:10
1537:25
1830:20,21
Olson 1527:25
once 1470:23
1475:24
1477:15 1506:3
1600:24
1616:15
1625:17
1633:25
1705:15
1760:10
1770:21
1819:10
oncologist
1797:18
1808:19
one-year 1466:11
1469:12 1639:5
1657:25 1758:6
ones 1543:5
1559:18 1644:9
1748:16
1751:20
ongoing 1483:21
1575:8 1618:4
1783:5 1814:21
1817:13
opaque 1828:22
open 1489:8
1497:14
1508:15
1510:24
1524:16
1533:13 1544:5
1590:16
1605:20
1615:15
1628:10
1631:24
1668:24
1685:12
1706:12 1719:4
1730:25
1740:16 1761:8
1783:15

1806:13 1821:7
1824:20
open-door
1803:24
opened 1795:22
opening 1515:25
1516:2,4
1517:12
1534:13,14,17
1545:11
1566:20
1582:11
1795:18 1818:3
openings
1585:15
1795:25
operate 1551:7
operated
1779:22
operating 1563:4
1566:15 1582:6
operation 1490:8
1525:6,14,15
1539:5,8,9
1542:4 1584:20
1624:4 1758:15
1788:24
1794:23 1796:1
1807:3 1809:22
1809:25
operations
1575:18
1639:13 1796:2
operative
1767:21
1806:19,24
1807:8 1810:2
opine 1802:23
1803:2,6
opinion 1487:2
1513:19,22
1520:9,11,15
1520:16
1522:13,13,20
1522:24
1523:21,25
1525:18 1528:8

1530:1 1531:10
1531:18 1532:6
1532:14,15
1573:23
1574:25 1575:1
1575:24 1576:1
1576:24
1577:17,18,22
1577:23,24
1579:2,11,12
1587:15
1591:13
1592:10,22
1595:2 1597:1
1600:5,18
1604:4,7,8
1605:8,25
1606:4,6,7,11
1607:7 1608:2
1608:6,7,8,13
1618:21,23,24
1618:25 1621:4
1621:14,15,19
1625:24
1641:21
1643:13,16,17
1648:24 1670:9
1670:12,14
1686:24 1687:4
1687:5 1692:8
1692:10
1693:13,14,18
1693:19,23,25
1710:4,6,20,21
1710:22 1711:5
1711:8,9
1713:1,22
1716:2 1717:3
1717:12
1721:21
1722:15
1724:18
1727:10,11
1733:12 1734:4
1734:25 1735:3
1737:7,11
1739:9,14

1740:3,4,4,6
1751:4,14
1759:12 1760:5
1760:10
1761:11,20,22
1761:23,24
1762:25
1763:17,19,20
1765:6 1768:8
1768:12,13,14
1769:9,12,13
1769:14 1770:6
1771:12 1772:1
1772:3,4,5,13
1772:16,18
1777:13,17,20
1777:21,22
1778:6,10,11
1778:12,23
1779:1,2,3,16
1779:20,23,24
1779:25 1780:4
1784:21 1785:2
1787:22
1800:24 1802:4
1802:6 1803:21
1817:7 1821:15
1821:25 1822:6
1825:3 1829:23
1830:3 1831:10
1831:18,19,20
1831:23 1832:1
1832:9
opinion's
1717:11
opinions 1486:18
1488:13,17
1495:12,13
1496:21
1499:14
1507:15,17
1509:24 1510:2
1512:5 1513:10
1513:14
1514:20
1521:22 1525:3
1529:22 1531:2

1571:2 1574:17
1581:3,7
1583:5 1594:10
1594:16 1601:6
1602:22
1615:25 1628:2
1633:22 1669:9
1675:15 1684:9
1695:8 1699:4
1704:6 1707:24
1716:6 1725:18
1759:9,18,21
1760:1,3
1761:14 1762:2
1762:4 1767:22
1776:10 1786:4
1786:9 1789:8
1804:24 1808:5
opportunity
1483:5 1528:23
1553:9 1701:23
1701:25
1710:12
1720:17
1732:20,20
opposed 1499:21
1527:16 1761:5
1811:4
optimal 1629:10
option 1518:2,15
1518:21
options 1517:17
1517:19
1519:11,12
or/and 1627:20
oral 1470:13,19
1479:21,24
1480:3 1805:16
order 1475:20
1572:8 1574:17
1660:7 1665:12
1747:12
1797:13
1799:17,18
ordered 1662:9
1665:14
orders 1823:6

ordinarily
1767:6
ordinary
1631:15 1807:7
organ 1521:4
1538:12
1838:22
organisms
1619:13,20
1793:14,15
organization
1480:16,17
1481:1,8,10
1550:12
1699:14
1707:16
organizations
1475:6
organized 1477:6
organs 1468:19
1468:23 1469:2
1536:20
1816:21
1818:10
orient 1566:9,18
1568:16 1582:2
1790:2 1791:2
1828:17
original 1699:9
1709:6 1710:7
ought 1750:2
out-of-court
1506:8,21
1679:14
outcome 1503:19
1540:12
1651:15,16
outcomes
1491:18
1635:11
1639:14
1656:14 1707:1
1707:22
outline 1663:16
1829:16
outpatient
1796:25

outrageous
1722:19
outside 1463:3
1474:15
1486:13 1488:7
1488:11 1495:6
1505:9 1511:7
1522:4 1530:11
1541:18 1545:4
1586:25 1598:5
1602:6 1609:9
1652:20
1658:25
1676:21
1716:20
1719:24 1732:2
1741:3 1757:4
1760:17
1780:22
1801:12
1803:10
1818:22
1822:25
1829:15 1841:1
outweigh 1688:9
outweighed
1599:3 1688:5
1701:5 1749:23
outweighs
1548:23
overall 1482:15
1815:8,9
Overby 1461:5,6
1487:18,20,23
1488:7,11,20
1543:9,16
overrule 1621:9
1708:5 1766:6
1825:10
overruled
1499:10
1504:21 1579:9
1755:15
overruling
1755:1
overview
1468:16

1828:16
Owens 1598:3,8
1598:21 1599:7
1607:7 1609:17
1613:15,16,19
1613:21,22
1736:22
owned 1659:10
1659:11 1660:5
1660:5,15
1673:3 1748:8
owner 1748:23
owners 1748:19
owns 1660:25
Ozarks 1459:8
1461:4 1844:10

_____

**P**

P 1461:1,1
P.C 1461:2
p.m 1652:18,18
1741:1,1
1757:2,2
1843:15
P065 1606:18
P1624 1714:20
P1660 1593:19
P1664 1776:3
P1754 1643:25
1644:23
P1755 1633:18
P1768 1636:19
P1873 1797:5
P2106 1828:6
P2299 1697:10
P2656 1534:9
pack 1800:16
package 1636:7
pad 1820:3
page 1462:5
1494:25 1521:7
1521:11,12
1526:21 1527:1
1594:13,14
1595:24,24
1615:21,21
1619:22,22

1623:13,13,15
1624:19,20
1627:6 1629:3
1642:11,22
1650:2 1715:9
1776:13
1779:19 1797:6
1813:2,4
pages 1494:2
1511:16
1512:20
1578:10
1710:12
1735:17
1844:16
paid 1640:2
1660:10
1663:20 1666:3
1666:14,15
1697:17 1742:3
1775:3
pain 1815:4,19
pales 1733:1
palpable 1766:21
palpate 1787:9
palpation
1766:19
paper 1677:15
1678:24
1679:15
paragraph
1616:2 1617:5
1618:6,12
1619:2,24
1621:24
1622:24
1623:15
1624:11,24,25
1627:10 1629:2
1631:2,19
1704:10,11
1708:13 1748:9
1799:2 1813:17
Paraiso 1535:12
paraphrase
1693:15
paravaginal

1547:14
1569:19
parcel 1712:6
Parisi 1777:3
Park 1461:17
Parkway
1460:11
1461:18
part 1473:5,6,21
1474:12
1496:23
1497:22 1509:9
1521:17
1522:12 1528:7
1540:13,22
1546:17
1548:17,17
1551:19 1552:6
1560:6 1562:8
1565:25 1567:8
1567:15 1568:5
1569:22
1573:20
1589:18
1591:25 1615:1
1619:21
1626:25 1627:3
1632:22
1633:22 1636:7
1649:14 1658:4
1658:6 1672:1
1672:6 1675:15
1675:25 1676:4
1683:3 1685:23
1703:4 1709:5
1712:5 1715:16
1722:17 1735:5
1735:8 1737:6
1744:25
1765:21
1776:10
1779:15 1786:3
1790:5 1792:7
1793:16
1794:21
1799:25 1801:6
1811:17 1819:8

1820:14
1827:18
**partial** 1630:17
1631:22
**partially** 1546:20
1546:21 1736:2
**participate**
1484:9 1689:23
**participated**
1504:20 1505:4
1836:16,19
**participates**
1689:23
**participating**
1481:8
**particular**
1470:21 1595:3
1804:4,6
1834:22
**particularly**
1466:22
1488:14 1762:8
**parties** 1808:6,7
**partner** 1671:10
**parts** 1474:23
1520:19
1535:23
1546:23 1551:5
1588:10
1738:19 1790:7
1794:2 1797:24
**party** 1671:23
1749:2
**pass** 1547:5
1568:10
1795:18,24
**passage** 1547:7
1569:13
**passed** 1470:23
1479:21
1796:23
**passes** 1547:8
1569:14
**pat** 1497:7
**pathogens**
1619:3
**pathological**

1810:18
**pathologist**
1801:16
**patient** 1472:23
1512:15
1557:11 1563:5
1636:13
1648:15 1676:8
1688:2 1696:20
1707:19
1737:12
1759:15
1760:24 1761:5
1761:12
1771:18
1776:17,21
1777:7,14
1778:4 1779:18
1780:1,9,14
1783:21 1784:9
1784:25
1799:11 1827:5
1836:7
**patient's** 1616:13
1622:6
**patient-level**
1643:13
**patients** 1469:24
1470:15,16,21
1476:15
1477:22
1485:10,13
1504:9 1640:9
1640:21 1645:3
1648:13
1656:14 1657:2
1657:15,18,24
1669:13 1670:5
1686:15,17
1692:25 1707:1
1707:22
1743:25 1744:3
1744:6,7
1745:1,4,19
1746:12,19
1758:12
1771:23 1778:9

1779:19
**pattern** 1647:11
**Patterson**
1682:18
**Paul** 1777:3
**pay** 1696:16,17
**paying** 1742:12
**payment** 1660:10
1704:21
**PC** 1460:3
**peep** 1506:18
**peer** 1477:14
1481:13,16,23
**peer-reviewed**
1477:9,12
1478:12
1620:23
1743:14,16,21
1751:8
**pelvic** 1468:8,11
1468:19 1475:9
1475:19,24
1476:3,12,25
1479:5 1482:13
1521:4 1538:12
1547:3 1566:17
1567:20 1576:6
1619:19,21
1620:2 1767:6
1792:19
1794:12
1797:16 1798:4
1814:7 1822:12
1829:1 1838:22
**pelvis** 1510:10
1568:18
1570:24 1573:7
1573:20 1574:8
1624:6 1763:6
1790:14 1793:9
1813:9 1815:10
**Pennsylvania**
1483:8 1485:8
1494:22
**people** 1466:20
1477:18
1479:20 1481:2

1482:1,2,3,18
1482:22 1496:4
1497:8 1498:3
1498:7 1502:18
1502:23
1508:20
1525:11 1551:7
1561:12
1587:20
1597:21
1605:12
1639:12
1648:19,22
1677:7,8
1680:1 1682:5
1690:20
1694:21
1736:13 1742:8
1750:15
1779:11
1805:22
1807:20
1819:25
**percent** 1478:4
1663:17
**percentage**
1758:12
**perfect** 1727:24
1753:12
**perfectly**
1465:22
1736:20
1791:14
**perform** 1472:17
1474:18
1476:11,21
1509:8 1566:3
1626:7 1640:1
1796:7
**performance**
1473:24
**performed**
1512:13
1542:10,11
1557:19,20
1558:2 1563:7
1565:24

1568:14 1626:2
1656:16,23
1787:3 1788:24
1789:5 1793:21
1799:8 1807:6
**performing**
1469:25
1473:20 1477:7
1498:1 1567:1
**performs**
1474:13
**period** 1604:9
1670:16
1710:25
1754:15
**permanent**
1568:6 1570:11
1571:6 1616:24
1638:6
**permanently**
1573:13 1575:2
**permission**
1464:15,24
1626:18,19
**permitted** 1736:2
**persistent**
1787:16
**person** 1487:9
1497:9 1529:8
1554:16
1556:21,21,23
1557:1,3,5,8,11
1557:11,12
1563:4 1598:14
1608:20
1677:15
1683:12
1684:24 1698:6
1730:5 1742:2
1742:3 1799:16
1805:17
**person's** 1529:18
1683:14
**personally**
1548:3 1797:13
**persuasive**
1804:20

pessary 1518:16
Peter 1594:3,4,6
    1594:7 1608:20
    1629:5
phase 1617:6,6
    1617:11,20,24
    1618:9 1718:12
phases 1617:9
phenomenon
    1693:5 1737:15
photograph
    1513:5
phrase 1715:12
    1715:15
    1825:22
phrased 1760:25
    1761:2
physical 1816:13
    1830:14
physically
    1484:11 1786:6
physician 1485:5
    1779:13
    1804:14 1806:3
    1806:6
physicians
    1509:17 1515:2
    1540:24
    1704:22
    1758:18 1760:2
    1761:12,21
    1763:18 1765:7
    1767:25 1768:9
    1777:18 1778:7
    1778:24
    1779:21 1785:3
pick 1472:23
    1562:4 1619:8
    1654:25
    1786:17
picture 1828:15
    1829:10
pictures 1582:4
    1790:20
piece 1560:9
    1571:11
    1604:23,23

1666:19
1677:15
1678:23
1679:15
1809:18
pieces 1681:17
    1810:10
Piet 1528:3
    1529:9 1531:21
    1610:24
pile 1702:14,19
    1785:15
piles 1473:10,10
pilot 1744:18
pin 1666:8
Pittsburgh
    1482:17 1483:6
    1483:7,16,22
    1484:16
place 1486:8
    1547:16
    1570:10
    1571:15 1572:6
    1573:14,15
    1575:16
    1582:23
    1595:13
    1633:10 1662:8
    1711:18 1753:7
    1818:12
placed 1551:3
    1558:24 1559:5
    1570:23 1574:7
    1576:13
    1582:14,18
    1639:9,10
    1766:20 1796:8
    1798:7 1814:6
    1818:20
placement
    1547:2 1567:19
    1579:24
    1593:16 1623:2
    1777:16
plaintiff 1459:4
    1460:2 1465:3
    1659:17,23

1844:7
plaintiff's 1462:7
    1488:24
    1666:23 1669:5
plan 1713:14
    1740:7,10
planned 1796:25
planning 1787:1
    1809:11 1827:2
    1827:3
platelet 1820:13
    1820:20
platelets 1820:14
    1821:3,7,11
platform
    1604:19,20,21
plating 1772:22
    1811:22
    1812:10
play 1497:12
    1530:20 1546:8
    1546:15,24
    1554:1 1601:24
    1602:9,25
    1603:20,21
    1613:18 1700:4
    1741:9 1841:18
played 1601:23
    1603:13
playing 1560:20
    1808:7
pleadings 1733:3
please 1464:9
    1465:25
    1466:16 1469:8
    1489:11
    1490:16 1512:8
    1517:17
    1530:15
    1534:11 1559:3
    1563:25
    1565:18
    1574:24
    1579:18
    1594:19,24
    1602:17 1603:1
    1610:11 1616:3

1616:22 1624:2
1627:10 1630:5
1630:6 1635:21
1635:22
1636:22 1637:6
1644:6,23
1645:5 1648:1
1655:16 1657:2
1657:4,4,11
1658:18
1660:12
1669:11,23
1672:19 1678:7
1689:11
1710:19
1712:19
1716:18
1719:10 1758:4
1762:1 1763:20
1789:12,22
1791:1 1804:12
1807:4 1808:15
1810:15
1823:10
1825:11,11
1829:4,9
Pleasingly
    1829:18
plenty 1740:17
    1842:11
pliable 1765:3,11
    1766:9
PLT0011 1500:7
    1500:11
    1501:21
PLT0062
    1772:25
PLT0108
    1685:15
PLT0139A
    1690:3
PLT0500
    1485:18
PLT0506 1699:6
PLT0707
    1520:18
plump 1829:18

plus 1512:2
    1712:13
    1716:25
    1785:21
pneumonia
    1822:17
pocket 1792:13
    1793:2,7
pockets 1791:13
point 1467:8
    1470:2 1471:17
    1474:24
    1483:11,15,23
    1483:25
    1484:12,22,24
    1485:2 1491:21
    1492:11
    1526:11 1552:6
    1563:24 1565:6
    1588:17
    1626:15 1642:1
    1647:7 1649:21
    1657:23 1681:1
    1687:19 1737:1
    1751:10
    1752:17
    1788:23
    1796:23
    1797:20
    1808:16
    1814:19 1818:7
    1827:24
    1832:13
    1842:16
pointed 1634:5
    1808:2
pointer 1789:21
    1790:6
pointing 1604:13
points 1482:7
    1538:16
    1664:20
    1669:13
    1671:17
    1672:19
policeman's
    1683:18

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

policies 1729:4
poly 1793:11
polymicrobial
  1793:11
pontificated
  1712:20
poor 1815:17
POP-Q 1538:11
  1538:13
  1539:25
population
  1472:23
  1525:13
pore 1585:10,25
  1586:12
  1620:11 1621:2
  1810:25
pores 1585:10,11
  1585:14,20
  1711:22,23
portion 1570:24
  1572:14 1574:7
  1631:4 1784:20
  1809:17
  1810:23
  1813:16
portions 1487:15
  1487:15
  1520:24 1771:3
  1808:8
position 1471:8
  1474:3,21
  1476:1 1534:1
  1534:4 1536:20
  1552:12 1570:1
  1691:16 1700:9
  1707:9,12
  1708:15
positions 1704:3
possession
  1661:9 1664:17
  1665:3
possibility
  1588:20
  1797:14
  1799:23
possible 1484:13

1484:20
1499:14 1500:4
1630:23 1633:8
1633:15 1745:3
1763:25
possibly 1704:21
  1787:11
post-date
  1666:23
post-Prolift
  1669:13
post-remedial
  1783:11
postdates 1634:1
postoperative
  1787:8
potentially
  1519:8 1797:19
potentiate
  1768:7,18,21
potentiation
  1768:11,25
  1769:3
pouring 1817:5
  1819:24
PowerPoint
  1511:18
  1517:17
  1534:13,14,16
  1608:21 1657:1
  1658:11 1669:2
  1714:21 1716:9
  1719:9 1720:4
  1725:6 1735:11
  1735:13,16
  1761:19
  1776:13 1785:2
PowerPoints
  1744:24
practice 1467:10
  1467:11,15,25
  1468:5,7
  1470:14,17
  1473:16 1479:8
  1483:17
  1484:16,18,22
  1501:21 1502:6

1502:20 1509:6
1555:11,21
1648:6,8,21
1656:15
1695:23 1696:4
1696:8 1699:9
1704:18 1709:6
1709:12
1744:14 1831:3
1831:6
practiced
  1779:13
practices
  1648:25
  1707:17
  1802:18
practicing
  1483:25 1485:4
  1485:9 1555:22
practitioner
  1787:18
  1788:10
preaching
  1764:11
preceding 1809:1
preceptors
  1514:1 1639:25
preclinical
  1512:12
predates 1678:15
predating 1679:7
predict 1763:25
predisposing
  1812:19
predominantly
  1830:20
prefer 1706:15
prejudice
  1548:22
prejudiced
  1551:17
prejudicial
  1548:22
  1551:23,25
  1749:23
  1751:21
  1781:13

preliminary
  1828:15
prepare 1842:22
prepared 1635:1
  1658:11
  1767:24
presence 1463:3
  1463:11
  1544:15 1545:4
  1561:23
  1627:23 1633:4
  1652:13,20
  1654:8 1731:21
  1732:2 1741:3
  1757:4,10
  1799:8 1821:5
  1840:6 1841:1
present 1553:11
  1556:21
  1557:15 1563:6
  1654:22
  1787:19
  1819:20 1844:6
presentation
  1541:25 1565:8
presentations
  1480:19 1481:5
presented
  1741:25
presenting
  1690:17
pressure 1542:20
  1814:25 1815:3
  1819:13
Presumably
  1680:10
pretended
  1647:20 1662:7
pretty 1491:15
  1492:14 1563:1
  1589:21 1653:7
  1654:16 1681:1
  1737:1 1782:22
  1793:24 1807:8
  1842:10
prevent 1617:22
preview 1546:9

previous 1502:25
previously
  1538:11 1571:9
  1624:8 1772:25
  1809:15
Price 1777:3
primarily
  1474:17
  1538:25
primary 1466:18
  1540:12
  1649:20
  1744:16,17
Primum 1715:10
principal
  1608:23
  1611:16 1656:7
principle
  1717:12
principles 1720:8
printed 1672:13
Prior 1634:8
priority 1475:15
Pro 1556:14
probably
  1472:19
  1565:11
  1573:15
  1637:18 1706:8
  1718:23 1731:9
  1751:11
  1803:22
  1815:21
  1824:15
probative
  1548:23
  1552:13
  1749:23
probe 1814:6,9
  1814:24
problem 1467:16
  1475:4 1491:25
  1526:13 1549:1
  1576:15
  1633:13
  1634:23
  1639:16 1666:6

| | | | | |
|---|---|---|---|---|
| 1724:18 | 1688:3,11 | 1719:24 | 1838:18,21 | 1519:22 1521:4 |
| 1745:17 | 1694:22 | 1730:25 1732:1 | 1839:5,10 | 1525:7,11,14 |
| 1750:17,18 | 1695:22 | 1741:2 1757:3 | **profession** | 1525:15,22 |
| 1772:23 1798:5 | 1696:17,22 | 1757:9 1760:17 | 1484:12 | 1526:2,7,21 |
| 1798:15 | 1705:21 | 1761:8 1780:22 | 1736:16 1804:4 | 1527:7,14,17 |
| 1799:14 | 1710:23 | 1783:15 | 1804:6 | 1527:21 |
| 1811:14 | 1711:16 1712:6 | 1801:12 | **professional** | 1533:23 |
| 1819:22 | 1773:11,23 | 1806:13 | 1473:16 1475:6 | 1535:22,24 |
| 1822:15 | 1774:18 1775:5 | 1822:25 | 1479:12 | 1536:1,16 |
| 1840:17 | 1780:2 1787:4 | 1824:20 | 1480:17,25 | 1537:19,21 |
| **problems** | 1794:9 1796:8 | 1840:25 | 1526:18 1527:2 | 1538:1,2,12 |
| 1466:21 1475:2 | 1796:20,25 | 1843:15 1844:6 | 1541:10 1543:3 | 1539:9 1551:24 |
| 1475:23 | 1807:6 1822:14 | 1844:17 | 1566:1 1640:14 | 1558:4,8,19 |
| 1476:23 | 1822:15 | **process** 1503:15 | 1642:10,22 | 1566:5 1570:6 |
| 1478:25 1479:3 | **procedures** | 1697:3 1802:6 | 1643:23 | 1570:10 1571:5 |
| 1482:6 1772:7 | 1504:8 1551:4 | 1812:13 | 1699:14 | 1638:13,18,19 |
| 1787:6 1805:2 | 1640:2 1644:14 | 1820:16 | 1707:16 | 1639:1,6,15,20 |
| 1805:15 | 1706:24 1707:3 | 1821:19 | 1718:10,13 | 1644:14 |
| 1808:22 | 1707:6 1709:8 | 1829:25 1830:1 | 1734:25 1735:3 | 1649:15,16 |
| **procedure** | 1787:1,5 | 1830:22 1831:5 | 1761:18,25 | 1690:18 1692:5 |
| 1490:17 1514:4 | **proceed** 1497:16 | 1831:12,15 | 1768:6,17 | 1706:24 1745:5 |
| 1516:25 | 1563:10 | **processes** | 1771:19 1785:1 | 1750:17 1758:9 |
| 1535:18 | 1570:17 | 1814:21 | 1835:5,9 | 1773:12,23 |
| 1540:19,25 | 1571:10 | **produce** 1586:15 | **professionally** | 1774:20 |
| 1541:4,9,13 | 1583:21 | 1665:9,23 | 1467:8 | 1775:19,24 |
| 1543:4,8 | 1590:23 1669:1 | 1793:16 | **profile** 1776:17 | 1776:17,25 |
| 1546:14 1547:4 | 1755:16 | **produced** 1566:2 | 1776:21 | 1837:18 1838:2 |
| 1548:2,23 | **proceedings** | 1671:6 1748:23 | **program** | 1838:20,22,23 |
| 1550:16 | 1463:1,2,10 | 1839:5 | 1466:11 | **prolapsed** 1518:1 |
| 1551:25 1552:2 | 1486:13 1489:8 | **product** 1512:25 | 1469:12,19 | **Prolene** 1643:3,3 |
| 1554:8,14 | 1495:6 1497:14 | 1593:14 | 1471:20,22,25 | 1691:5 1778:3 |
| 1563:14,18 | 1505:9 1508:15 | 1599:19 1606:9 | 1473:22 1475:8 | **Prolift** 1494:22 |
| 1565:23 1566:3 | 1522:4 1524:16 | 1607:10 | 1475:10 | 1497:10,24 |
| 1566:6 1567:1 | 1530:11 | 1679:24 1682:5 | 1476:24 1483:9 | 1504:12 1509:9 |
| 1567:21 1568:6 | 1533:13 | 1689:12 | 1674:12 | 1510:10 1514:3 |
| 1570:8,16 | 1541:18 1544:5 | 1710:23 1711:7 | **prolapse** 1467:18 | 1516:25 1519:9 |
| 1571:5 1572:3 | 1545:3 1561:22 | 1717:4 1736:5 | 1468:10,17,18 | 1519:16 |
| 1573:4,18 | 1586:25 | 1736:6 1737:16 | 1469:3,15 | 1520:12 |
| 1581:10 | 1590:16 1602:6 | 1737:19 1745:8 | 1479:6 1490:19 | 1522:20 |
| 1593:14 1595:7 | 1605:20 1609:9 | 1746:8 1774:9 | 1490:21,25 | 1525:20 1527:5 |
| 1595:14 1606:9 | 1615:15 | 1835:14,22,24 | 1491:3,16,18 | 1527:8 1540:19 |
| 1626:16 | 1652:19 1654:7 | 1837:14,17 | 1492:17 | 1540:24 1541:4 |
| 1644:10,11 | 1658:25 | 1838:5,12 | 1502:12,15 | 1542:3 1547:3 |
| 1649:17 | 1668:24 | 1839:7 | 1514:23 1515:3 | 1548:2 1554:8 |
| 1656:15,22 | 1676:21 | **products** 1618:2 | 1515:18 | 1554:14 1555:9 |
| 1657:16 | 1685:12 | 1744:11 | 1516:19,21 | 1556:8,12 |
| 1685:25 1688:2 | 1716:20 1719:4 | 1800:17 | 1517:9,22 | 1557:21 1558:2 |

| | | | | |
|---|---|---|---|---|
| 1559:13 1563:7 | 1766:20 1767:9 | propositions | 1838:16 | 1751:8 1752:1 |
| 1563:14 | 1767:12 | 1804:9 1805:21 | pubic 1547:12 | 1773:7,8 |
| 1565:23 1566:3 | 1773:11,22,23 | prospect 1485:14 | 1567:4,10 | 1774:19 |
| 1566:6 1567:1 | 1774:18 | protect 1617:3 | 1568:21 | 1778:18 |
| 1567:16,20,24 | 1775:20,23 | 1622:21 | 1569:17 | 1781:11 1837:7 |
| 1569:9 1570:7 | 1776:18 1777:7 | 1648:12,16 | public 1471:21 | 1837:19 1838:7 |
| 1571:5,6 | 1777:14,19 | protected | 1475:3 1513:25 | 1838:17 |
| 1572:8,13 | 1778:5,20 | 1707:20 | 1836:14 | 1839:12 |
| 1573:18 | 1780:2 1787:4 | protective | publication | publishers |
| 1576:12 | 1788:5 1792:24 | 1819:15 | 1504:3 1686:11 | 1478:19 |
| 1577:21 | 1794:22 | protein 1826:4 | 1699:9,10,23 | publishes |
| 1578:13 | 1809:18 | protocol 1635:23 | publications | 1480:11 |
| 1579:12,24 | 1817:10,12 | prototype | 1478:12 1480:9 | publishing |
| 1581:10 | 1822:8 1826:17 | 1644:18 | 1480:19 | 1536:11 1725:4 |
| 1582:22 1584:1 | 1831:22 1834:5 | prototypes | publicize 1670:4 | 1743:24 |
| 1594:20 1595:7 | 1834:8,11,14 | 1744:21 | publish 1501:1 | pull 1497:17 |
| 1595:11,14,22 | 1835:11,15,20 | prove 1507:9 | 1502:9 1503:21 | 1585:14 1616:3 |
| 1596:7 1597:22 | 1836:1,17 | 1661:19 | 1508:24 | 1623:16 |
| 1598:2 1599:19 | 1837:20,25 | 1681:24 | 1516:16 | 1627:10 1629:6 |
| 1601:9 1606:2 | 1838:5,13,16 | 1705:20 | 1672:24 1703:1 | 1646:13 |
| 1606:8 1620:15 | 1839:11 | proves 1749:12 | 1739:3 1743:13 | 1725:22 1797:5 |
| 1621:5,15,23 | prolonged | provide 1525:17 | 1747:19 | 1799:3 1813:15 |
| 1621:23 | 1670:16 | 1673:4 1795:20 | 1749:14 1750:3 | pulled 1547:19 |
| 1623:25 | prominence | 1810:12 | 1751:18 | 1571:18 1572:7 |
| 1624:17 | 1819:18 | provided 1681:3 | published 1477:8 | 1572:20 1591:9 |
| 1625:13 1626:2 | promise 1709:9 | 1714:3 1758:17 | 1478:12,17 | 1595:18 |
| 1626:8 1629:17 | 1785:11 | 1759:10,19 | 1481:23 | pulling 1584:21 |
| 1642:25 | promoted | 1761:21 1763:1 | 1491:22 1501:6 | 1642:12 |
| 1644:10,19,20 | 1707:17 | 1778:7 | 1501:8 1502:7 | 1725:18 |
| 1655:15,18 | promptly | provides 1479:20 | 1503:17 | 1812:11 |
| 1656:15,22 | 1839:19 | 1743:12 | 1504:14 | pumps 1818:23 |
| 1657:16 | pronounce | 1748:13 | 1508:19 | punitive 1667:10 |
| 1668:17 | 1619:6 | providing | 1509:20 | 1679:10 |
| 1687:18 1688:3 | proof 1551:20 | 1478:23 | 1512:10 1521:1 | 1721:16 |
| 1688:14 1691:7 | 1560:9 | province 1602:10 | 1521:4 1525:9 | 1722:18 |
| 1691:24 | proper 1677:6 | 1602:14 | 1540:6 1543:13 | 1782:18 |
| 1692:24,25 | 1693:1 | 1698:19 | 1556:15 | purely 1800:15 |
| 1693:2 1694:22 | properly 1641:13 | provisions | 1660:18 | purple 1582:19 |
| 1695:11,13 | properties | 1742:22 | 1661:17 | purpose 1502:5 |
| 1701:4 1710:23 | 1597:3 1620:11 | 1743:23 | 1664:18,22 | 1503:13 |
| 1711:6,18 | 1777:19 | proximity 1810:5 | 1665:2,7 | 1635:10 |
| 1712:6 1713:3 | proposal 1656:12 | PS 1547:2 | 1696:9 1698:2 | 1742:24 |
| 1713:24 1716:2 | proposals | 1567:19 1595:6 | 1700:17 | 1758:24 1759:1 |
| 1736:23 | 1475:14 | 1595:14,22 | 1743:16,21,25 | 1839:7 |
| 1758:15 1759:3 | proposed 1475:7 | 1596:6,11 | 1744:3,23 | purposes |
| 1759:6,7 | 1480:2 1656:8 | 1635:1,5,8,12 | 1745:11,16,18 | 1502:24 |
| 1764:13,17,20 | 1656:13 1693:5 | 1691:24 1838:4 | 1749:9,14,25 | pursue 1518:5 |

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 434 of 712 PageID #: 163598
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 434 of 712 PageID #: 163598

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1611:19
**pus** 1793:3
1794:13
**put** 1465:16
1473:7 1486:19
1488:18,24
1492:7 1493:1
1495:11,19
1506:17 1510:6
1511:18,21
1514:25
1517:18
1519:23
1523:18
1528:25 1529:3
1534:7 1538:18
1551:18,21
1555:6 1572:6
1573:14,24
1574:4 1584:8
1593:14
1594:13
1598:15
1604:24
1606:15 1613:4
1613:16 1615:5
1615:6 1626:8
1629:18
1634:25
1636:18 1641:8
1644:1,23
1650:10 1654:4
1656:25 1657:4
1657:7,8
1658:10,17,19
1667:21 1668:1
1669:11 1675:6
1675:17 1677:6
1677:9,14,14
1679:4,25
1681:16,17,17
1682:4 1683:10
1683:12,13
1692:20
1701:25
1702:18
1703:17 1715:6

1716:8,10
1718:23 1719:6
1719:8,11
1722:23
1724:17
1728:23
1729:12,14,18
1729:19
1730:14
1733:12 1744:5
1752:25
1753:21 1754:9
1785:11
1789:12 1790:1
1794:6 1796:10
1796:10
1806:20
1810:13 1815:2
1816:2 1822:13
1828:6 1829:4
1842:18,20
**puts** 1539:21
1544:2 1604:23
**putting** 1486:17
1520:6 1534:11
1551:5 1604:20
1655:22
1658:17
1669:19
1704:25
1720:21 1725:4
1728:4 1733:5
1734:1 1794:10
1814:25
**pyramid** 1736:17

**Q**
**Q&A** 1700:4
**qualification**
1579:8 1600:22
**qualifications**
1548:6 1550:8
1578:1 1597:16
1621:8 1689:2
1765:13 1801:4
1801:22 1830:5
**qualified**

1550:13
1553:14
1592:14 1673:7
1736:20,21
1803:19,23
**quality** 1616:14
1709:10
**quantification**
1538:12
**quantitate**
1643:19
**quarter** 1663:18
**question** 1470:20
1472:18,20
1473:3 1485:23
1492:5 1498:17
1499:5,20
1506:23 1507:2
1508:7,18
1513:9 1533:12
1537:1,5
1539:15 1558:6
1571:25 1585:8
1587:5,11
1588:5 1590:3
1591:7,11,24
1592:19
1597:19 1601:5
1604:3 1605:7
1606:4 1607:2
1616:6 1623:18
1628:23,25
1641:10,24
1674:19
1682:19,19
1688:25
1689:16
1691:13
1693:17 1694:5
1700:3 1706:16
1708:21 1713:6
1713:8 1716:14
1754:8 1756:19
1764:7,10
1765:16
1773:17 1774:2
1774:2,14,22

1775:16 1776:4
1782:4 1783:18
1784:11 1799:4
1800:22
1802:17
**question-and-a...**
1570:18
**questionable**
1799:9
**questioned**
1529:10
**questioning**
1515:4
**questionnaire**
1636:6
**questionnaires**
1537:2 1636:11
**questions** 1465:6
1472:24 1509:4
1537:9 1554:24
1580:16 1588:9
1672:16 1703:2
1703:13,16
1709:23
1718:13 1744:4
1747:14
1751:22,23
1752:9,13,15
1757:21
1762:19
1806:21 1816:6
1825:12 1833:7
1833:18,22
1834:2
**quick** 1551:16
1596:2 1642:11
1793:24 1799:4
1840:22
**quicker** 1655:12
**quickly** 1534:24
1595:24 1647:2
1815:22
1825:24
**quit** 1824:11
**quite** 1525:7,16
1526:12
1651:19

1654:12
1742:10
1763:24 1815:4
1815:13
1820:21
**quitting** 1840:18
**quote** 1704:20
**quoting** 1486:23

**R**
**R** 1459:20 1461:1
**radiologist**
1801:17
**radiologists**
1797:25
**raise** 1464:9
1472:7
**rambles** 1823:8
**rami** 1567:9,12
**ramifications**
1673:8 1675:7
**ramus** 1547:12
1569:18
**ran** 1477:4
1779:14
**randomized**
1489:19,22
1490:9 1492:15
1494:23
1497:10 1498:1
1625:1,12,15
**range** 1588:5
1620:9 1651:8
1830:21
**ranging** 1623:2
**rapidly** 1518:9
1815:25
**rare** 1778:5,13
1778:19
**rate** 1527:12
1622:25 1638:2
1639:6,21
1643:8,21
1645:24
1651:12,17
1660:20
1686:21

1687:11,15
1695:25 1745:1
1746:10,12,13
1750:13
1754:15,17,22
1754:23,23
1758:5,6,8,11
1779:10
**rates** 1525:10
1526:22
1529:12,15
1533:22
1534:22
1536:12,15
1620:9 1638:11
1638:13 1640:9
1646:9 1647:4
1650:20 1658:7
1661:18 1662:2
1662:3,18
1666:16
1745:17 1746:9
1746:20 1751:5
1752:20
1754:20
1756:15 1778:8
**rationale**
1519:15 1527:4
**raw** 1628:10
1636:3
**RCT** 1493:8
1498:7 1555:6
1558:25
**re-swear** 1839:20
**reabsorbed**
1788:20
**reached** 1742:20
1832:13
**reaction** 1575:7
1581:16
1583:10 1586:2
1586:7,15
1617:7 1623:19
1680:12
1698:22
1711:24
1763:16,22

1764:13,19
1766:11 1788:2
1793:5 1812:21
**reactions**
1622:22
**reactive** 1820:9
**reacts** 1616:17
**read** 1486:21
1487:5 1489:14
1495:23
1497:22
1522:10,11,16
1523:2,3,8
1524:2,22
1530:3 1578:6
1578:9,12
1596:22 1616:5
1618:17
1635:14 1671:5
1671:9,13
1687:6 1691:3
1692:19
1693:11,12,14
1694:1,6,17,20
1695:4 1698:22
1700:8 1701:14
1701:23
1703:14 1705:9
1706:14 1710:2
1710:12
1721:12
1731:12 1744:1
1754:19 1756:2
1756:4 1785:25
**readily** 1475:16
1513:25
**reading** 1494:6
1525:1 1599:6
1709:15,22
1729:24
1737:24
1773:21 1804:7
1816:11
1818:11
**reads** 1694:17
**ready** 1463:5,9
1464:5 1508:1

1524:2 1571:10
1652:22
1790:21 1823:4
1823:4 1832:21
1842:25
**real** 1485:15
1541:11
1551:15 1552:5
1552:23,23
1554:16
1556:23 1557:3
1557:11,11
1562:10 1563:5
1572:16
1579:20 1596:2
1642:11
1644:18
1704:19
1732:14 1746:9
**real-life** 1548:17
1560:5
**realize** 1668:16
1697:17
**realized** 1466:8
1468:4 1471:15
1475:4
**really** 1471:17,18
1473:8 1474:22
1474:24
1475:15,21
1476:19
1483:12
1484:11,14,18
1484:25 1485:2
1513:18
1527:20 1537:1
1552:10
1559:21,21
1560:23
1573:14
1654:15,17
1682:12
1732:18
1796:19
1799:15
1802:22 1809:4
1811:7 1827:25

**reask** 1627:3
**reason** 1484:6
1485:11,12,15
1518:5 1519:16
1618:4 1704:19
1797:10
1812:23 1838:9
1839:2
**reasonable**
1509:25 1510:3
1519:11
1574:18
1577:19 1579:3
1686:25 1711:5
1713:2,23
1747:14
1800:24
1831:11 1832:2
1832:9 1840:12
**reasons** 1464:19
1464:21
1525:10,12
1649:3 1701:10
1701:12
1713:18 1714:2
1717:6 1734:9
1746:18
**reassuring**
1526:12
**recall** 1705:16
1753:7
**receive** 1482:4
**received** 1686:6
1696:24
**recess** 1652:17
1652:18 1741:1
1757:2
**recessed** 1843:15
**recognition**
1704:20
**recognize** 1540:9
**recognized**
1475:3,15
**recognizes**
1616:25
**recommend**
1688:6

**recommendation**
1633:6
**recommendati...**
1504:5
**recommended**
1796:6 1818:20
**reconstructive**
1620:3
**record** 1487:5
1505:12
1518:12 1556:6
1643:25
1668:14 1678:4
1678:22
1679:18 1682:9
1701:25 1703:4
1713:8,9
1732:8 1739:6
1748:6 1803:14
1803:16
1807:13,15
1825:1 1843:14
**recorded**
1786:22 1821:5
**recording** 1496:3
**records** 1513:2
1516:8,23
1517:15
1518:10
1578:18,23,23
1587:20
1589:10 1637:9
1658:8 1659:20
1680:24
1766:19
1767:24
1785:12,12,15
1785:20,22
1786:1,3,8
1818:11 1824:4
1825:14
1830:10
1831:16
1834:20,21
1835:1
**recreate** 1827:13
**rectum** 1468:25

Case 2:12-md-02327 Document 3756-6 Filed 05/09/17 Page 486 of 712 PageID #: 133600
Case 2:12-md-02327 Document 3756-6 Filed 05/09/17 Page 486 of 712 PageID #: 133600

In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015

1568:23 1569:7
1622:9 1791:11
1791:14
1793:19
**recurrence**
1529:12
1533:23
1534:22 1536:1
1537:18,22
1538:5 1638:13
1638:18 1639:6
1649:15
1651:16
1660:20
1662:18 1745:1
1745:5 1746:12
1750:13,19
1754:15,23
1758:8,9
**recurrences**
1539:4
**recurrent** 1526:2
1538:2 1632:3
1638:25
1639:19
1750:16
1770:24,25
**red** 1707:18
1792:23 1811:9
1811:11,16
**redacted** 1678:18
**reduce** 1518:25
1711:19
**reduces** 1624:13
**refer** 1465:21
1488:18
1588:20
**reference**
1676:24 1734:9
1770:1 1782:6
1820:8 1825:14
**references**
1509:13
1588:19
**referencing**
1527:10
**referral** 1466:18

1466:19
**referred** 1466:20
**referring**
1504:11 1767:7
**refers** 1499:20,22
1617:5 1622:4
1632:25
1675:22
**regard** 1510:10
1528:2 1533:21
1533:22
1537:14
1539:14 1550:8
1550:15 1574:6
1574:9,12
1576:20
1578:13
1580:25 1581:1
1591:8 1596:13
1596:17,25
1597:3 1618:19
1620:19 1621:2
1621:17
1622:14
1624:15
1625:23 1635:1
1644:2 1646:15
1647:3 1648:25
1650:2,19
1670:10 1671:7
1673:11
1674:10
1685:19 1689:4
1692:23
1759:22 1760:4
1761:18
1766:14 1784:1
1784:15,23,25
1837:22
**regarding**
1616:12
1671:10
1762:20
1777:18
1778:24 1786:5
1797:14
**Regional** 1459:7

1461:3 1844:9
**regular** 1808:24
1811:4
**regularly** 1496:8
**regulations**
1723:13 1729:8
**reinforce**
1705:18
**reiterate** 1589:25
1589:25 1590:1
**rejected** 1478:5
**relate** 1530:19
1531:20
1623:24
1836:17
1837:25
**related** 1571:7
1575:10
1608:10
1618:13
1630:14
1798:11
1817:14
1829:25
1831:14
**relates** 1774:2
**relation** 1667:24
**relationship**
1812:15
**relative** 1537:16
1537:17
**relatively**
1517:24
**Relax** 1602:17
**relaxation**
1468:19
**release** 1618:2
1669:20
**released** 1795:8
**relevance**
1542:17 1593:5
1661:24
1700:25
1774:22
**relevancy** 1593:4
1593:6
**relevant** 1490:15

1537:15
1542:17 1543:1
1543:2 1550:18
1575:24
1660:16 1701:3
1701:10,12
**reliability** 1751:6
**reliable** 1749:8
**relied** 1532:6
1596:22
1604:16
1745:24 1746:7
1767:23
1786:10
**relies** 1507:16
**rely** 1496:8,8
1525:18
1527:21 1528:7
1532:1,1,5
1592:5 1606:10
1613:18 1614:9
1633:21
1648:23 1651:3
1669:8 1675:14
1677:19 1678:2
1682:20,20,21
1682:25 1683:8
1683:18 1735:8
1737:6 1739:4
1776:10
**relying** 1496:21
1496:22
1507:18
1521:23
1523:15
1528:11,17
1531:22,24
1583:15 1601:6
1603:24
1615:24
1663:25 1664:6
1664:8,11
1722:16
1725:17 1762:4
1765:20
1834:19
**remain** 1485:10

1485:12
1544:15
1652:13
1731:21
1757:14
1765:11 1766:9
1840:6
**remains** 1620:1
1757:16 1765:2
**remember**
1481:21 1483:8
1489:20
1500:25 1502:8
1526:5 1538:20
1548:13
1565:19 1577:7
1640:3,6
1641:4 1655:7
1696:5 1755:9
1829:10
**remembered**
1641:9
**remind** 1562:21
**remnant** 1810:25
**remote** 1623:7
**removal** 1630:17
1630:22 1631:4
1631:11 1827:4
**remove** 1551:12
1575:19
1576:21 1577:1
1577:11
1581:20
1583:13
1630:25
1631:16 1633:6
1633:14 1712:2
1810:11
1827:15
**removed** 1550:25
1575:14,17,20
1577:3 1581:12
1794:23,24
1809:17 1810:3
1810:19
1811:18 1828:2
**removing**

1551:14
1810:10
**Renaissance**
1461:17
**renal** 1822:14
**reoperating**
1525:5
**reoperation**
1521:3 1526:12
1527:12,16
1754:23
1758:11,13
**rep** 1531:24
1601:22
1603:14
1745:21
**repair** 1489:18
1490:12,14,25
1518:22 1519:4
1519:7 1520:3
1520:13
1526:21 1527:7
1527:21 1536:1
1546:13 1547:3
1567:20 1570:6
1573:12
1644:14
1690:18 1794:9
1827:13
**repaired** 1810:11
**repairs** 1521:15
**repeat** 1588:18
1703:10
1774:13
1789:17
**repeated** 1587:14
1607:18
1636:12
1650:23 1823:5
**repeatedly**
1684:4 1717:6
1748:7
**repeating**
1587:16
**repetitive**
1712:10 1736:8
**rephrase**

1597:18
1647:25
1691:12
1773:19
1784:24
**replay** 1546:22
**report** 1473:2
1476:21
1477:16
1512:14,17
1539:8 1606:22
1608:4 1635:11
1636:8,10,15
1636:25
1637:16
1639:11,17
1640:20
1641:17
1645:10,22
1646:13,20
1655:22
1656:13 1673:5
1676:9 1678:22
1679:20
1680:12 1738:3
1738:6 1806:19
1806:24
1807:16 1814:1
**reported** 1477:22
1527:11,15
1536:24
1616:14
1635:15 1637:5
1638:21
1640:13 1645:4
1645:23,24,25
1646:10 1647:3
1647:8,8,12
1662:4 1669:25
1844:6
**reporter** 1462:6
1530:22 1531:6
1545:20 1559:1
1602:16
1659:12
1667:15 1668:3
1684:16 1726:6

1727:21
1728:12 1732:7
1732:10
1803:11 1806:9
1843:12 1844:3
1844:4,21
**REPORTER'S**
1844:1
**reporting**
1473:13
1477:13 1478:8
1648:7
**reports** 1511:13
1512:17
1635:15 1640:8
1640:10
1649:13 1679:6
**represent** 1502:3
1527:22
1536:13 1809:6
**representation**
1527:6
**representative**
1528:4,19
1532:11
1533:25
1745:15
**represented**
1657:15 1748:2
**representing**
1527:3 1534:21
**represents**
1511:23
1517:20 1632:2
1657:12 1732:6
1812:3
**reprinted**
1755:20
**reproduction**
1844:17
**reps** 1532:23
**requested**
1640:22
**require** 1770:1
1771:3
**required** 1539:8
1631:5 1673:4

1743:13
1758:14
1771:10 1804:5
1817:11,16
1822:14
**requirements**
1672:22,23
**requires** 1544:7
1631:22 1652:6
1731:14
1769:23,25
1839:24
**rescheduled**
1827:23
**research** 1469:24
1470:1 1471:4
1471:8,16,19
1471:23 1472:2
1472:8,11,15
1472:20
1473:21
1474:13,16,18
1474:23 1475:8
1475:14,21
1476:22
1477:13,16,20
1477:20,24
1478:8 1480:18
1481:6 1492:3
1509:8 1516:16
1519:21
1527:13 1594:7
1641:6 1648:9
1648:10,21,22
1674:14 1689:9
1689:22
1690:16
**researchers**
1474:18 1515:2
1515:12
1516:10,13
1537:3 1538:15
1538:16
**reservations**
1693:20
1696:14
**residency** 1466:4

1466:7 1469:20
1470:13 1485:7
1598:6,9
1736:23
**residents**
1469:10
1471:11
1473:20
1588:13
**residing** 1463:20
**Residual** 1631:21
**resistant** 1631:17
**resolve** 1633:8
**resolved** 1647:19
**resources**
1466:23
1483:13
**respect** 1507:21
1522:14
1548:16
1663:22
1722:13 1723:2
1739:2 1782:11
1835:10
**respond** 1628:14
1747:22 1793:5
**responding**
1589:23
1666:25
**responds** 1821:6
1821:10
**response** 1622:20
1678:5 1680:8
1680:11
1699:20
1712:14
**responses**
1580:17
**responsibilities**
1469:5 1471:9
1476:1
**responsibility**
1476:2 1549:21
1550:2
**responsible**
1629:20
1736:14

1575:3 1619:11
1625:19 1638:6
1798:17
1802:25
1842:19
**restate** 1821:23
**restore** 1709:6
**restricting**
1838:20
**restroom**
1756:22
**result** 1622:20
1710:18
**resulted** 1831:21
**resulting** 1617:6
**results** 1477:16
1477:21 1478:8
1516:16
1519:24 1520:5
1539:17,18
1540:1 1635:16
1637:1,3
1640:13
1648:19,22
1672:24,25
1743:14
1751:25 1788:5
1812:2
**resumed** 1590:22
**retain** 1572:21
**retake** 1590:9
**retention** 1670:7
**retire** 1544:13
1652:11
1731:19 1840:5
**retraction**
1699:10
**retrieval** 1547:15
1547:18
1571:15,18
1582:20
**returned**
1477:25 1478:1
1489:8 1497:14
1508:15
1524:16
1533:13 1544:5

1590:16
1605:20
1615:15
1668:24
1685:12 1719:4
1730:25 1761:8
1783:15
1806:13
1824:20
**review** 1477:14
1477:18,19
1482:5 1503:14
1503:14,16
1643:12 1661:7
1772:19
1778:15
**reviewed**
1481:23 1503:9
1511:19 1512:4
1540:23 1574:8
1574:11
1578:17,22
1593:23
1636:14
1655:25 1658:2
1659:18
1749:25 1758:1
1762:7 1779:8
1836:10
**reviewer** 1481:13
1481:16
**reviewers** 1482:1
1504:22
**reviewing**
1511:24
1513:17
**reviews** 1478:1
**rib** 1828:21
**ribs** 1790:9
**Richard** 1482:19
**rid** 1788:20
**Ridgeland**
1461:18
**right** 1464:10,13
1464:16,17
1465:12,18
1474:12,15

1478:13
1481:20
1482:14 1484:7
1490:17 1492:2
1493:19
1494:14
1499:25 1500:3
1501:14,18
1506:24 1515:9
1522:25
1523:19 1524:4
1524:5,18
1528:23 1531:8
1532:18
1533:12
1537:11 1539:7
1540:17
1543:21 1544:3
1544:22,25
1546:3 1549:4
1551:21
1554:21 1555:1
1555:1,24
1556:5,16
1558:1,17
1560:2,13,22
1562:19 1563:8
1564:2 1565:2
1576:11,13,14
1579:16
1580:10,20
1583:23
1585:11,12,14
1586:8 1587:25
1588:3 1590:6
1590:21 1591:6
1592:8,21
1593:10
1597:12 1600:3
1601:24
1605:15 1607:5
1607:12
1610:23 1612:8
1614:25 1615:7
1615:10 1618:7
1628:24 1632:1
1634:18

1637:10 1639:4
1640:6 1641:7
1642:20,21
1645:10 1652:4
1659:5,25
1661:7 1662:18
1668:20
1672:15
1673:20,22
1674:5,5
1675:9 1679:13
1679:13
1684:22 1690:7
1691:14 1693:5
1693:16 1697:8
1698:8 1700:15
1700:20
1703:19 1706:6
1706:17,18,18
1713:10,16,20
1714:12 1718:2
1719:2 1722:9
1725:14,15
1727:4 1730:19
1730:23
1731:11 1733:3
1733:12
1734:15
1743:10
1744:15
1746:23,25
1747:2 1750:6
1750:20
1752:22
1755:17 1764:9
1764:25
1765:19 1766:5
1770:3 1774:10
1780:19
1781:12
1789:18
1791:10 1796:5
1802:8 1806:19
1819:16
1824:19 1829:6
1829:13,19,24
1832:17

1833:21,23
1834:6,19
1839:17
**rights** 1660:6
1666:4
**rigor** 1625:25
**rigorous** 1471:18
1474:25
1476:20
1477:21
**ring** 1518:17
**rinsing** 1795:3,3
1795:3
**rip-roaring**
1833:19
**rise** 1463:18
**risk** 1521:2
1535:25
1537:18,22
1538:1 1575:2
1591:8 1609:16
1611:8,11,11
1623:11
1624:13
1634:10
1687:24
1696:20
1706:25
1768:10 1770:1
1770:2,12,13
1772:15
1778:21,24
**risk/benefit**
1687:25
**risks** 1593:17
1599:3 1601:4
1601:8,12
1603:14,16
1606:1,8
1607:8 1608:3
1609:21
1610:25
1626:10
1639:14
1641:15 1642:2
1680:22 1688:4
1688:9 1701:5

1707:5 1768:25
**robust** 1648:22
**rock** 1581:18
**role** 1471:10
1472:1 1479:25
1694:21
**rolled** 1586:11
**room** 1544:13
1563:5 1566:15
1582:6 1614:5
1652:12
1672:13
1731:20 1840:5
**roost** 1720:11
**rope** 1585:18
**roped** 1542:20
1581:15
1585:18,20
1595:19
**ropes** 1550:20
**roping** 1550:19
1551:15
1581:11 1583:9
1585:9,11
1586:1,5
1811:25
**Roseland**
1460:11
**rotated** 1568:19
**roughly** 1510:22
1809:16
**rule** 1486:22
1498:17 1522:9
1552:25
1663:13 1671:1
**ruled** 1678:14,14
1684:11 1685:7
1784:11
**rules** 1496:6
1506:16,17
1523:9 1532:4
1648:12,16,18
1802:13
**ruling** 1488:23
1500:18,21
1523:12,12,17
1755:23

1780:25
1781:20 1782:9
1822:21 1823:3
1823:22
**ruling's** 1783:11
**rulings** 1782:11
1784:13
1832:15
**run** 1653:24
1674:12
1727:19
1742:14
1748:17
1756:22
**running** 1660:7
**rushing** 1617:13
_____
**S**
**S** 1461:1
**sacral** 1632:21
1819:4,6
1820:6 1821:8
**sacrospinous**
1535:18
**safe** 1573:23
1574:19
1575:25
1577:21 1580:2
1621:6 1625:14
1687:1 1711:20
**safely** 1737:16
1771:23
**safety** 1591:8
1593:16
1620:25
1648:15
1699:17,18
1707:22
1737:12
1744:11
1745:25
1837:24
**saints** 1561:20
**sake** 1785:14
**sales** 1759:22
1761:13 1768:6
1771:19 1785:1

**saline** 1791:24
**sandbagging**
1663:11
**sat** 1494:4
1807:21
**save** 1601:25
1813:3
**saw** 1471:2
1478:20,23
1539:16
1555:20 1577:4
1579:24 1582:4
1582:18 1583:1
1595:17 1624:3
1624:4 1697:16
1787:13,15
1788:9 1792:25
1797:25
1829:10
1835:25
**saying** 1530:2
1531:11,25
1545:16,17
1560:3 1589:24
1604:21
1610:18
1631:13
1645:18 1651:2
1664:14
1683:17 1684:1
1724:1,12
1734:13 1737:4
1740:1 1755:14
1767:18
1782:16
1801:25
**says** 1480:22
1481:12
1482:11 1498:5
1500:24
1523:14,21
1524:7 1527:21
1540:2 1594:3
1610:23 1616:7
1618:13 1619:3
1619:11,24
1620:10 1622:3

1622:24
1624:11,20
1625:1 1627:11
1630:15
1631:21 1643:8
1646:14 1661:7
1669:24
1687:21
1701:15
1704:12
1715:10,22
1723:24 1765:2
1768:24
1776:21
1777:14 1778:4
1778:21
1779:18 1782:6
1799:7 1803:25
1813:16
1818:11
1826:10
**scale** 1537:25
**scan** 1789:11,25
1790:1,3,17,24
1792:22
1797:23
1828:11,15,19
1829:11
**scans** 1789:3
**scar** 1581:17,18
1583:11
1766:10
1772:22
1811:10,18,21
1812:10
**scare** 1669:25
**scarred** 1767:15
1767:17
**scarring** 1772:12
**scheduled** 1827:6
1827:22 1843:6
**schmoe** 1662:24
**school** 1465:25
1466:3 1471:21
1580:15 1674:3
1802:1,25
**Schultz** 1797:8

1797:11
**scien** 1715:4
**science** 1472:10
1475:22
**scientific**
1477:14 1478:8
1480:9 1481:5
1512:11 1574:8
1630:7,9
1637:5 1642:1
1673:1 1715:4
**scientist** 1574:13
1608:23
1611:16 1616:9
1629:6 1744:16
**scientists** 1514:1
1597:3
**scoop** 1617:14,21
**scope** 1700:3
1764:7 1772:14
**scout** 1789:11,23
1828:7,10,14
1829:5
**scratch** 1483:14
1820:16
**screen** 1562:6
1565:2 1573:21
1594:14
1636:20 1657:7
1702:18 1715:6
1729:18
**scrunches**
1711:25
**search** 1509:15
**seated** 1463:21
1464:13 1562:3
1654:23,24
1757:12
**second** 1473:5
1493:10 1516:1
1517:1 1535:11
1541:15
1618:12,12
1622:3 1627:11
1631:22
1637:13
1646:17

| | | | | |
|---|---|---|---|---|
| 1668:12 | 1641:18 | 1603:19,25 | **separation** | **severely** 1551:17 |
| 1699:11 | 1643:10 | 1614:8 1646:13 | 1818:9 1827:13 | **severity** 1538:8 |
| 1704:11 1749:5 | 1644:13 1645:6 | 1652:8 1660:1 | **September** | 1773:12 |
| 1752:12 | 1645:23 1646:9 | 1669:6 1675:11 | 1594:2 | **shaking** 1564:23 |
| 1760:12 | 1647:2,6,11 | 1675:21 | **septic** 1799:11 | **shape** 1518:17 |
| 1814:20 | 1656:20 1657:3 | 1696:24 | 1800:1,2,4 | 1572:21 1767:3 |
| **second-degree** | 1657:5,6,9 | 1697:10 | 1801:21 | 1767:10 |
| 1786:23 | 1658:16 1666:6 | 1731:16 | 1822:16 | 1810:25 |
| **secondary** | 1672:16 | 1742:21 | **series** 1614:22 | **shapes** 1518:17 |
| 1562:9 | 1673:16 | 1759:15 | 1616:19 | 1644:12 |
| **secondly** 1802:25 | 1702:24 1705:2 | 1770:14 1784:6 | **serious** 1715:23 | **sharpest** 1732:15 |
| **seconds** 1551:16 | 1705:3 1707:17 | 1784:16 | 1729:1,2 | **she'd** 1541:8 |
| 1552:3 1756:21 | 1710:15 1715:8 | 1787:17 | 1744:8 1745:10 | 1553:17 |
| 1756:23 | 1715:19 1716:9 | 1792:22 | **seriously** | 1573:15 |
| **section** 1479:11 | 1735:21 | 1793:17 | 1603:11 | **she'll** 1580:16 |
| 1503:23 | 1739:10 | 1808:17,25 | 1616:13 | 1824:13 |
| 1524:21 1551:6 | 1741:16 | 1835:20,25 | **serve** 1481:10 | **sheesh** 1796:13 |
| 1615:21,22 | 1789:19,25 | 1836:5,7 | **served** 1481:7 | **Sheets** 1804:8 |
| 1627:7,8 | 1790:5,9 | 1840:1 | **Service** 1479:13 | **Shhh** 1662:21 |
| 1631:1 1803:19 | 1791:6,9,12 | **selection** 1780:1 | **serving** 1709:9 | 1685:2 |
| **sections** 1640:22 | 1792:5,8 | **self-explanatory** | **session** 1463:20 | **shift** 1543:23 |
| **see** 1470:16 | 1797:11,12 | 1655:18 | 1544:17 | **shooting** 1553:4 |
| 1477:23 1480:4 | 1804:11 | **sell** 1591:15 | 1652:15 | **short** 1488:24 |
| 1482:18 | 1807:11 | 1592:24 | 1731:23 1840:8 | 1517:19 |
| 1490:12 1493:6 | 1810:24,25 | **selling** 1600:7 | **set** 1472:16,18,20 | 1538:13 1541:7 |
| 1498:4,16 | 1811:6,10,16 | **semicircular** | 1636:10 1637:1 | 1541:11,11 |
| 1503:1 1508:8 | 1812:6,7 | 1812:8 | 1639:8,14 | 1543:2,5 |
| 1516:5 1533:17 | 1828:19 | **send** 1560:18,24 | 1641:12 | 1551:16 |
| 1533:19 | 1829:12,15,19 | 1703:1,3 | 1649:21 | 1563:25 |
| 1534:12 | 1837:8 1838:14 | **senior** 1594:7 | 1651:23 | 1565:22 |
| 1544:25 1546:7 | 1840:10 | 1686:5 1739:23 | 1734:10,14 | 1588:16 |
| 1546:9 1550:20 | **seeing** 1467:15 | **sense** 1507:11 | 1743:24 1759:1 | 1645:16 1693:1 |
| 1551:2 1552:1 | 1495:1 1644:24 | 1650:17 | 1825:4 | 1764:14 |
| 1552:7 1563:3 | 1809:19 | 1672:24 | **setting** 1689:21 | 1826:11,24 |
| 1563:6 1564:15 | 1810:21 | 1727:16 | 1689:22 | **short-term** |
| 1565:13,18 | 1831:14 | **sent** 1477:17 | 1696:21 1771:6 | 1625:20 1638:3 |
| 1566:8,19 | **seek** 1743:13 | 1478:3 1481:25 | **settled** 1768:20 | **shot** 1605:23 |
| 1568:3 1572:15 | 1752:18 | 1496:6 1503:10 | 1795:21 | 1731:6 |
| 1572:23 1581:6 | **seen** 1493:21 | **sentence** 1616:5 | **settles** 1575:8 | **show** 1487:15 |
| 1581:12 1595:4 | 1494:18 | 1618:12 | **seven** 1476:7,14 | 1511:10 |
| 1609:19 | 1514:24 | 1619:11 1622:3 | 1623:9 | 1532:19 |
| 1611:22 | 1543:11 1544:9 | 1624:15,25 | **severe** 1535:9 | 1541:21,23 |
| 1618:17 | 1556:8,9,20 | 1631:2,20 | 1537:21 1642:5 | 1545:12 |
| 1622:11 | 1557:1,7,10 | 1669:22 | 1763:24 1764:4 | 1550:19 |
| 1624:22 1625:5 | 1563:2,3 | **separate** 1639:12 | 1764:22 | 1551:25 |
| 1627:14 | 1587:20 | **separating** | 1766:11 | 1552:22 1553:4 |
| 1637:11 | 1596:14,16,21 | 1527:17 | 1775:24 | 1560:4 1562:14 |

| | | | | |
|---|---|---|---|---|
| 1563:13 | **shut** 1549:19 | 1623:6,22 | 1759:23 | 1648:4 1669:22 |
| 1567:14,16 | 1576:18 | 1625:7 1626:4 | 1766:25 | 1706:8 |
| 1579:15,19 | **sic** 1546:24 | 1629:13 1630:8 | 1767:24 | **size** 1620:12 |
| 1581:1,21 | 1619:10 1816:4 | 1630:10,18 | 1768:10 | 1621:3 |
| 1609:25 1610:2 | **sick** 1820:23 | 1631:7,9 | 1780:13 1785:4 | **sizes** 1585:10 |
| 1611:15 | **side** 1547:6 | 1632:7 1633:1 | 1786:22 1787:1 | **skill** 1803:20 |
| 1630:13 1645:5 | 1556:2 1568:11 | 1637:24 1650:1 | 1787:3,6,9,10 | 1830:9 |
| 1679:15 | 1569:4,24 | 1650:20 | 1787:13 | **skin** 1547:8 |
| 1681:20 | 1624:6 1646:23 | 1697:12 1793:6 | 1793:20 1794:6 | 1569:14 |
| 1696:23 | 1646:25 | 1826:15 1829:8 | 1809:17 | 1584:15 1771:4 |
| 1721:17 | 1658:20 | **signing** 1607:10 | 1842:14 | 1819:14,16,19 |
| 1722:17 | 1732:12 | **similar** 1491:15 | 1844:11 | 1829:17,18 |
| 1724:23 | 1790:16 | 1492:14 | **Simpson's** | **skip** 1491:5 |
| 1727:12,18 | 1795:24 | 1535:14 | 1752:5 1766:18 | 1590:19 |
| 1733:23 1745:8 | 1809:20 1812:4 | 1578:13 1582:4 | 1767:21 | 1806:16 |
| 1745:9 1746:24 | 1829:4,4 | 1617:25 | 1785:21 | **skipping** 1789:16 |
| 1749:10 1754:6 | **sidebar** 1670:20 | 1676:10 | 1787:18 | **Slater** 1460:10 |
| 1763:14 1813:2 | 1701:11 | 1677:13 | 1789:15 | 1460:10 1462:9 |
| **showed** 1525:10 | 1716:17 | 1678:16 1680:6 | **simultaneous** | 1464:5,7,18,21 |
| 1560:23 | 1719:20,22 | 1680:13 1794:7 | 1627:22 | 1465:6 1486:7 |
| 1717:20 1744:8 | **sides** 1809:11,14 | **similarity** | **single** 1609:16 | 1487:6 1488:4 |
| 1744:13 | 1810:3 | 1683:16 | 1634:9 1661:16 | 1489:6,10 |
| 1750:12 | **sidewall** 1767:7 | **SIMON** 1460:3 | 1785:25 | 1493:4,7 |
| 1797:24 | **sign** 1599:2,19 | **simple** 1468:16 | 1837:17 | 1494:1,14,15 |
| 1798:10 | 1642:19 | 1486:25 1492:1 | **sinus** 1618:15 | 1494:17 |
| **showing** 1496:10 | 1736:15 | 1499:20 1587:4 | 1632:5 1770:19 | 1496:19 1497:1 |
| 1542:18 | **signed** 1598:21 | 1591:11 | **sir** 1545:6 | 1497:6,17 |
| 1545:10,10,24 | 1752:4 | **simply** 1470:9 | 1652:23,25 | 1498:13,25 |
| 1548:20,22 | **significance** | 1507:25 1515:5 | 1694:4 1708:3 | 1499:7,8,12 |
| 1750:22 1751:5 | 1491:11 | 1522:15,16 | **sit** 1464:23,24 | 1500:5,11,13 |
| 1751:6,7 | 1524:25 1572:2 | 1559:8 1758:24 | 1523:1 1524:2 | 1500:23 1501:5 |
| 1799:8 | 1573:3 1581:2 | 1759:5 1769:10 | 1542:19,19,20 | 1501:10,13,15 |
| **shown** 1548:19 | 1581:5 1594:9 | **Simpson** 1459:9 | 1741:9 | 1501:20 |
| 1562:6 1594:19 | 1594:15 1596:9 | 1461:2,2 | **sites** 1477:2 | 1504:19 1505:3 |
| 1594:20 1595:8 | 1619:14 1651:9 | 1482:21 1513:3 | **sits** 1542:18 | 1505:11,19 |
| 1658:19 | 1686:3 1714:23 | 1516:7,22,25 | **sitting** 1614:4 | 1506:1 1507:6 |
| **shows** 1551:15 | 1766:15 | 1517:14 | **situate** 1794:4 | 1507:10 1508:7 |
| 1566:24 | 1792:12 1810:1 | 1542:13,22 | **situated** 1776:4 | 1508:17 |
| 1658:12 | 1814:14 | 1642:23 | **situation** 1487:24 | 1514:11,16,18 |
| 1661:25 1662:1 | **significant** | 1661:18,20 | 1548:24 | 1517:16,18 |
| 1662:3 1687:1 | 1525:2 1560:9 | 1662:1 1666:11 | 1576:23 | 1521:12,14,21 |
| 1704:6 1746:11 | 1570:23 1571:1 | 1666:14,16 | 1681:24 1699:8 | 1522:18 |
| 1746:19 1751:4 | 1572:4 1573:8 | 1667:1,8,9,23 | 1718:18 1771:2 | 1523:10,20 |
| 1790:4 | 1581:6,9 | 1745:24 1746:6 | **six** 1645:7,13,19 | 1524:20 |
| **shredded** 1811:7 | 1584:5,7,22 | 1746:21 | 1645:25 1646:3 | 1528:17 1529:3 |
| **shrinkage** | 1595:25 | 1750:14,24 | 1646:8 1647:12 | 1529:9,21 |
| 1618:15,20 | 1622:13 1623:3 | 1755:19 | 1647:14,15 | 1530:4,14 |

| | | | | |
|---|---|---|---|---|
| 1531:14,22 | 1593:10,12 | 1667:10,17 | 1721:3,6,13 | 1805:20 1806:3 |
| 1532:19 1533:2 | 1597:18,21 | 1668:6,9,15,21 | 1722:10,12,16 | 1806:8,15 |
| 1533:6,18 | 1598:20 1599:1 | 1669:2 1670:18 | 1723:1,6,8 | 1808:4,15 |
| 1534:9,12,15 | 1599:16,25 | 1670:24 1671:2 | 1724:6,13,16 | 1813:7,13,15 |
| 1537:10,12 | 1600:5,11,15 | 1671:3,24 | 1724:22 1725:1 | 1813:21,23 |
| 1541:6 1542:16 | 1601:3,21 | 1672:8,12,18 | 1725:5,15,21 | 1816:12,16,18 |
| 1542:25 | 1602:17 1603:7 | 1673:9,18,23 | 1726:1,7,15,19 | 1821:24 1823:9 |
| 1544:24 1546:1 | 1603:10 1604:2 | 1674:6,9 | 1727:1,6 | 1823:25 1824:3 |
| 1546:6,17,20 | 1604:10,13 | 1675:10 1676:9 | 1729:1,5,17 | 1824:13,17 |
| 1547:22 1548:9 | 1605:3,9,13,17 | 1676:13,17 | 1730:6,10,17 | 1825:2,13 |
| 1548:13 | 1605:24 | 1677:20,25 | 1730:21 1731:8 | 1828:10,12 |
| 1549:11,14,20 | 1606:14 1607:1 | 1678:3,7,13,20 | 1733:11,16,21 | 1830:8 1831:8 |
| 1549:24 1550:3 | 1607:4,6,13 | 1679:3,17,22 | 1734:13 1735:4 | 1831:10 1832:7 |
| 1550:7 1552:18 | 1608:1 1609:16 | 1680:14,20 | 1735:7,12,15 | 1832:8,12 |
| 1553:6,14,18 | 1610:3,13 | 1681:5,12,23 | 1735:25 1736:9 | 1835:13 1836:2 |
| 1553:22 1554:7 | 1611:14,20,22 | 1682:2,8,12 | 1737:4,23 | 1841:12,17,24 |
| 1554:11,17,20 | 1612:7,21,24 | 1684:25 1685:5 | 1738:21,25 | 1842:5,24 |
| 1555:5,19 | 1613:3,10,17 | 1685:9,14 | 1739:8 1740:7 | 1843:9 |
| 1556:9,13,18 | 1613:21 1614:2 | 1688:17,21 | 1740:10,20 | **Slater's** 1506:14 |
| 1556:22 1557:5 | 1614:4,8,13,15 | 1689:3,19 | 1741:15,22,23 | 1659:24 |
| 1557:22 1558:5 | 1614:17,19,23 | 1690:6,8 | 1742:7,11,16 | **slices** 1790:18 |
| 1558:9,13,18 | 1615:2,6,8,13 | 1691:12,15 | 1743:6,20 | **slide** 1534:13 |
| 1558:23 1559:4 | 1615:17,18,19 | 1692:1,9,22 | 1746:2,5,16 | 1658:11 |
| 1559:11 1560:8 | 1621:12 | 1693:19 1694:3 | 1747:16,20 | **slides** 1534:17 |
| 1560:11,15,21 | 1626:24 1627:2 | 1694:10,15,19 | 1748:2,4,7 | 1545:11 |
| 1561:1,10,13 | 1627:5,6 | 1695:20 1696:3 | 1750:10 | **slight** 1763:15,23 |
| 1561:19 1562:5 | 1628:24 1629:1 | 1697:6,9 | 1752:17,23 | 1764:20 |
| 1563:9,12 | 1630:6 1634:4 | 1698:5,11,17 | 1753:2,21 | **slip** 1518:19 |
| 1564:9,17,23 | 1634:9,15,23 | 1698:20 1699:2 | 1754:17,20,22 | 1792:1,3 |
| 1565:5,15,17 | 1634:24 | 1699:5 1700:6 | 1755:21 | **slow** 1668:14 |
| 1570:22 | 1642:15,18,21 | 1700:13,18,21 | 1756:13 | **small** 1517:24 |
| 1571:24 1573:2 | 1647:25 1649:9 | 1701:9,16,20 | 1757:13,19 | 1526:3,14 |
| 1574:6,24 | 1649:11 1652:2 | 1701:24 1702:6 | 1760:7,9,13,19 | 1586:10 |
| 1577:16,18 | 1654:25 1655:2 | 1703:6,19,23 | 1761:1,6,10 | 1696:11 |
| 1578:5,22 | 1655:10 | 1705:20 1706:5 | 1764:12 | 1778:21 |
| 1579:11 | 1656:25 1657:5 | 1706:11,15,20 | 1765:20 1766:7 | 1779:12 1799:8 |
| 1580:18,24,25 | 1657:8,11 | 1708:2,6 | 1770:4,9,12 | **smaller** 1791:19 |
| 1583:4 1584:3 | 1659:2,10 | 1709:25 1710:6 | 1773:20 1774:7 | **smoker** 1561:11 |
| 1584:22 1585:7 | 1660:4,14,25 | 1713:1,7,14,17 | 1774:11 1775:2 | **smoothly** |
| 1587:23 1588:1 | 1661:10,13,25 | 1713:22 1714:6 | 1775:12,18 | 1572:15 |
| 1588:7,24 | 1662:14,19,22 | 1714:10,19 | 1781:5,8,19 | 1579:25 1583:2 |
| 1589:3,7,22 | 1663:5,9,15,24 | 1715:19 1716:8 | 1782:2,10 | **snapshot** 1638:4 |
| 1590:5,12,18 | 1664:5,12,19 | 1716:12 | 1783:7,17 | **snippets** 1545:25 |
| 1590:23,25 | 1664:24 | 1717:14,17,20 | 1784:1,5,15 | **SNOW** 1461:17 |
| 1591:2,19,22 | 1665:11,23 | 1718:5,11,15 | 1801:6,14 | **so-and-so** 1740:5 |
| 1592:5,9,16,20 | 1666:2,10,15 | 1718:22 1719:6 | 1803:7,17 | **soaked** 1820:3 |
| 1592:22 1593:6 | 1666:22 1667:6 | 1719:8,19 | 1804:13 1805:4 | **SOB** 1739:19 |

society 1480:24
1481:1 1640:14
soft 1595:13
1643:3 1691:5
1765:3,10,11
1766:9 1777:15
1777:24 1778:3
sold 1552:1
1598:21 1599:4
1688:14,23
1689:12
soldier 1714:17
solution 1827:15
solve 1466:22
solved 1491:25
somebody
1493:22
1506:13 1508:1
1528:24,25
1531:3 1562:8
1602:9 1607:20
1677:11 1680:4
1714:17 1730:1
1730:3 1747:4
1807:17 1824:7
somebody's
1801:25
something's
1688:13
somewhat
1538:21,23
soon 1545:1
1623:11
1716:14
sorry 1464:20
1465:20
1472:16 1493:3
1494:12
1524:10
1530:24
1531:14 1534:8
1564:10,11
1570:12,13
1580:7 1584:7
1594:25 1609:5
1615:18 1659:4
1662:22 1664:5

1667:16
1677:20,25
1692:8,16
1698:20
1718:11
1748:20 1764:5
1764:6 1774:13
1781:9,9
1813:11 1823:9
1828:8 1835:7
sort 1519:3
1688:8
sorts 1551:10
1679:9
sound 1478:13
1482:14 1524:8
1564:16 1648:9
1681:15
source 1826:4
South 1461:6
space 1547:14
1568:14 1569:5
1569:6,7,20
1572:9 1576:15
1585:23
1586:10
1788:15
1792:10
spaces 1791:12
speak 1509:17
1747:21 1785:7
1824:23
speaks 1672:4
1692:19
1697:23
special 1475:8
1481:3
specialist
1802:19 1804:5
specialists
1469:14
specialization
1467:24
specializes
1808:20
specially 1777:15
1778:1

specialty 1467:17
specific 1551:20
1585:7 1590:3
1591:16
1616:12
1620:10
1621:19 1677:9
1680:1 1737:10
1800:10,12
specifically
1488:2 1502:16
1504:11
1575:23 1581:5
1749:13 1797:6
specimen
1810:18
spectrum 1764:2
speech 1775:15
spend 1507:4
spending
1732:23
spent 1510:17,22
1732:24
sphincter
1568:23
spinal 1790:14
1829:13
spine 1829:1
split 1489:1
1558:14
spoke 1759:23
1811:24
spoken 1696:3
1704:4
sponsored
1635:6 1644:16
1666:4 1835:5
1835:10
sponsoring
1685:5
spot 1628:10
spots 1567:13
spreading
1797:20
spreadsheet
1655:21,24
spreadsheets

1658:3
Springfield
1461:7
Square 1461:13
St 1460:4
1461:14
1708:18 1777:3
1816:5
stable 1827:5
stacks 1702:23
staff 1466:13
1467:4 1483:12
1704:17
1742:12
stage 1538:6,24
1538:25
1539:20,20
1572:2 1643:8
1700:2 1764:8
1774:19
1775:19,25
1776:17,21,24
1780:4
stages 1538:19
1538:20
1775:24
1820:18
stamp 1685:15
stamped 1797:6
stand 1464:15
1523:7 1528:23
1536:6 1537:15
1561:14 1563:1
1563:23 1564:6
1590:9,22
1655:4 1699:16
1707:13 1709:8
1725:23
1751:24
1757:15
1783:11 1843:1
standard
1477:13 1478:7
1592:13,14
1673:2 1682:3
1695:1 1716:3
1720:24 1721:1

1724:2 1727:23
1728:14,15,17
1728:20,22,24
1734:11,14
1735:19 1751:6
1807:8 1831:2
standardized
1516:11
standards
1550:14
1709:11 1719:9
1721:4,7,7,18
1722:17,18,20
1722:23 1723:9
1723:18
1724:19 1726:2
1726:5,12
1727:17
1728:21 1729:6
1729:6 1730:4
1733:24
1734:10 1735:8
1736:12,19
1737:6
standing 1565:11
1568:20
1709:15
1757:14
standpoint
1630:7,10
1744:16
stands 1649:17
1702:4,5
start 1464:5
1483:14
1533:16
1549:18 1553:9
1616:4 1630:5
1635:15
1641:13
1644:25
1652:22
1717:14,17
1729:23
1741:18
1786:19 1826:3
1833:10

| | | | | |
|---|---|---|---|---|
| 1837:14 | 1533:21 1607:9 | 1581:13 1630:5 | 1556:17 | **straps** 1547:4 |
| 1839:18 | 1609:21 1649:4 | 1756:10 1824:8 | 1562:16 | 1568:10 |
| **started** 1473:3 | 1686:21 | 1829:21 | **stirrups** 1566:16 | **strategy** 1505:13 |
| 1482:16 | 1713:18 | **stays** 1517:4 | 1582:7 | **Strauss** 1461:12 |
| 1491:21 | 1772:20 | 1582:15 | **stitches** 1518:24 | 1610:9 1612:2 |
| 1507:12 | 1802:24 | 1584:16 | 1573:14 | 1653:17,20 |
| 1546:12 | 1842:12 | **stent** 1795:18,24 | 1583:24 | 1667:12 1676:2 |
| 1566:12 | **statement** 1499:4 | 1796:10,13,23 | **stitching** 1519:7 | 1729:25 1730:3 |
| 1567:17 1568:8 | 1506:8,12 | **stents** 1796:8 | **stomach** 1818:15 | 1738:4,17,19 |
| 1569:11 | 1507:25 | 1798:7 | 1818:22,23 | 1738:24 |
| 1571:13 | 1514:12 | **step** 1503:6 | 1819:3 1828:23 | 1753:24 |
| 1572:25 | 1534:18 | 1532:14 | 1828:23 | 1816:15 |
| 1581:25 | 1545:11 | 1537:13 1564:1 | **stone** 1799:17 | **street** 1460:4,14 |
| 1583:22 | 1556:10 | 1564:8 1605:18 | **stop** 1536:14 | 1662:24 |
| 1584:18 | 1558:16,25 | 1617:12 | 1620:4,14 | **strenuous** |
| 1741:19 | 1559:5 1625:23 | 1668:23 | 1629:12,21 | 1704:15 |
| 1807:22 | 1630:4 1679:15 | 1681:19 | 1651:14,24 | **stresses** 1762:22 |
| 1820:20 | 1709:21 1749:9 | 1751:14,15 | 1668:11 | **stretch** 1763:5 |
| 1821:19 | 1762:20,23 | 1770:11 1794:8 | 1673:16 1682:2 | **stretched** |
| 1822:11 | 1763:2,10,13 | 1813:1 | 1704:23 | 1468:22 |
| 1826:14 1836:1 | 1765:4 1768:5 | **steps** 1617:10 | 1752:21,22,23 | **stretches** 1573:6 |
| **starting** 1468:6 | **statements** | 1830:24 | 1764:10 | 1826:24 |
| 1483:19 | 1506:21 | **stick** 1755:23 | 1787:20 | **strict** 1721:14 |
| 1645:13 1693:4 | 1534:13 | 1840:23 | 1820:17 | 1724:3 |
| 1762:18 | 1727:13 | **sticking** 1842:16 | 1832:13 | **strictly** 1525:13 |
| 1787:11 | 1745:24 1768:9 | **stiff** 1766:12 | 1839:16,18 | **strictured** |
| 1815:16 | 1777:11 | **stiffness** 1620:12 | **stopped** 1483:25 | 1767:17 |
| **starts** 1623:17 | **states** 1485:5 | 1621:3 | 1485:9 1532:2 | **stricturing** |
| 1669:22,24 | 1487:10 1509:7 | **stimulate** | 1547:21 | 1767:1,11,19 |
| 1756:25 | 1521:18 | 1475:20 | 1555:22 | **strike** 1629:23,24 |
| **state** 1486:18 | 1644:22 | **stimulated** | 1566:13 | 1709:20 |
| 1498:22 | 1674:14 1693:3 | 1820:25 | 1567:22 | 1724:17,20 |
| 1514:10 1531:9 | 1705:1 1804:16 | **stimulates** | 1568:15 | **string** 1686:4 |
| 1531:18 1559:8 | 1837:2 | 1575:6 | 1569:21 | **strings** 1582:19 |
| 1589:1,8,9 | **stating** 1522:20 | **stimuli** 1820:10 | 1571:20 1573:1 | **strong** 1471:16 |
| 1601:15,18,19 | 1698:17,21 | 1821:5,9 | 1583:3,25 | 1475:1 1709:10 |
| 1607:17 | 1768:6 | **stipulate** 1554:7 | 1584:19 | 1745:7 1827:24 |
| 1698:25 1699:4 | **statistical** | 1554:11 | **storage** 1817:3 | 1828:4 |
| 1723:20 | 1471:24 | 1555:17,19 | **storm** 1463:25 | **stronger** 1827:5 |
| 1732:17 1734:4 | 1472:11 1473:5 | 1556:3 1559:17 | **story** 1513:18 | **structure** 1498:7 |
| 1734:11,24 | 1473:15 1650:4 | 1562:25 | 1596:25 1705:5 | 1555:8 |
| 1751:3,13 | 1679:5 | **stipulated** 1555:3 | 1706:6 | **structures** |
| 1776:16 | **statistically** | 1556:1 1672:21 | **straightforward** | 1829:13 |
| 1783:25 1784:2 | 1677:9 | 1672:22 | 1499:4 | **students** 1469:9 |
| 1784:3 1802:3 | **statute** 1802:3 | **stipulating** | **strands** 1811:1,5 | **studied** 1550:10 |
| **stated** 1519:17 | **stay** 1503:3 | 1681:5 | **strap** 1547:17 | 1550:22 |
| 1529:16 | 1508:6 1580:6 | **stipulation** | 1571:16 | 1574:16 1592:2 |

1620:15,18,22
1640:9 1651:6
1686:15,15,17
1730:6 1737:15
1745:19
1752:19
1756:15
1838:17
1839:11
**studies** 1472:17
1476:11,16,20
1477:7 1489:21
1512:12,16
1516:17
1534:21 1540:1
1540:11
1661:11
1663:25
1664:13
1666:23
1673:12
1744:18,19
1745:18
1763:14
1778:16,17
1779:14 1789:3
1789:4 1837:6
1837:19,24
1838:6,13,18
**study** 1472:16,24
1473:10,15,23
1490:1,3,10
1491:22 1492:8
1492:15
1497:24
1521:14,18
1535:2,3,5,5,11
1535:12,13,13
1535:25 1536:2
1536:6 1537:20
1539:4 1555:9
1591:8 1625:24
1626:1,2,7,14
1626:15 1635:1
1635:5,6,10,14
1635:16,19,22
1635:23,25

1636:14 1639:8
1639:23,24
1640:13 1641:6
1641:8,13,16
1643:4,13
1644:2,16
1646:13,20,24
1646:25
1649:14
1650:11,24
1651:11,20,22
1655:19 1656:8
1656:12 1658:4
1658:6 1661:1
1661:3,11,16
1661:16
1662:23
1663:20,23
1664:1,6,7,7,8
1666:3,17,18
1667:2 1672:22
1672:25
1674:10
1694:24 1697:1
1742:1,17
1743:15 1744:3
1744:12
1754:14 1783:4
1783:8
**studying** 1491:14
1591:16,23
1592:25
1593:15
1596:11
1744:21
**stuff** 1533:3
1545:11
1665:12
1694:17 1730:7
1742:13 1756:9
1793:1 1827:21
**subcutaneous**
1547:9 1569:14
**subject** 1495:21
1497:20 1528:4
1550:11 1574:9
1596:18

1625:18
1673:21 1676:5
1685:19 1698:3
1714:11
1753:12
1757:16
**subjects** 1620:23
**submit** 1470:18
1503:6
**submitted**
1477:15 1660:2
1703:25
**submitting**
1475:13
**subsequent**
1783:1
**subsidiary**
1459:7 1461:3
1844:8
**subspecialty**
1469:17
**substantial**
1683:16
**substantially**
1680:6
**substantive**
1684:13,21
**success** 1639:15
1643:8,22
1649:22
**successful**
1483:20
1795:14 1826:9
**successfully**
1796:15
**suffered** 1551:10
1575:20
1618:25 1718:7
1830:11
**suffering** 1718:6
**Suffice** 1514:18
**sufficient**
1471:17 1548:5
1682:6 1706:24
1802:2
**suggest** 1498:14
1749:21

**suggested** 1731:3
1748:7
**suggestion**
1750:1
**Suite** 1460:4,7,14
1461:13,18
**summarize**
1473:12 1637:1
**summary**
1502:13 1513:6
1604:24
1612:20 1615:9
1657:13
1690:17 1725:6
1786:16
**superficial**
1547:6 1568:11
**supervised**
1477:1
**supervisory**
1674:16
**supplement**
1826:6
**supplemental**
1819:2
**support** 1468:20
1469:1,2
1487:2 1519:8
1520:2 1742:12
1744:11
1763:12
1767:13
1782:15
**supported**
1746:8
**supporting**
1474:17
1594:10,16
**supports** 1487:4
1488:17
1522:24
1532:15 1604:9
1694:1 1767:5
**supposed**
1543:11
1550:21 1580:3
1592:11 1604:4

1604:17,18,20
1607:24 1663:9
1664:19,21
1680:22
1701:11
1709:17
1717:22
1719:18
1721:12,23,24
1722:1 1723:15
1723:16,24
1724:7 1734:24
1736:2,4,7
1749:17
**supposedly**
1681:18
**Supreme** 1756:5
1804:9 1805:11
**sure** 1463:16
1489:3 1493:14
1494:7 1495:18
1537:10
1560:21 1565:9
1568:17
1586:23
1591:19
1593:11 1602:4
1618:9 1634:14
1640:23 1649:9
1711:14 1713:9
1716:16
1719:21
1732:16,16
1736:14,18
1737:23 1761:6
1770:5 1774:15
1787:10 1805:8
1833:23
1841:16
**surface** 1623:14
1623:16,19
1812:24 1814:5
1827:19
**surgeon** 1484:20
1563:22
1584:11
1805:16

**In Re Budke Jury Trial Official Transcript Vol VI    1/12/2015**

surgeon's
1595:20
surgeons
1509:18
1582:11
1583:23
1591:15 1595:2
surgeries
1534:22 1771:3
1771:9 1817:11
1817:15
surgery 1466:9
1466:10
1469:11
1478:21 1479:3
1482:13 1484:9
1484:11
1504:10
1517:25
1525:19 1526:3
1526:10 1542:4
1542:9 1548:25
1551:24
1552:23
1554:19 1556:8
1557:21 1558:2
1558:4,8,19
1559:9,12
1560:5 1562:10
1563:7 1569:6
1575:13
1582:15 1620:3
1623:8,8
1625:2,15
1639:6 1666:20
1666:24 1667:3
1679:7 1686:18
1686:23
1749:18,19
1750:23 1753:8
1762:16
1766:24
1771:11 1776:6
1780:7,11,15
1783:19 1784:6
1786:13 1787:7
1793:21 1794:5

1794:18,21
1815:6,13
1826:16 1827:6
1827:22,25
surgical 1468:3
1490:17
1492:16
1548:23
1565:22 1569:4
1572:16,23
1582:8 1630:15
1632:3 1794:25
1808:22,23
1830:22
Surgically
1521:3
surviving 1795:5
suspect 1681:9
suspicious
1798:11
sustain 1508:9
1508:12 1514:9
1597:8 1626:23
1684:19
1712:17
1806:11
sustained
1498:12
1514:14
1523:11
1577:15
1578:20
1591:18
1599:22 1600:4
1626:22
1647:24
1783:24
suture 1518:22
1519:4 1520:13
1521:15 1570:5
1573:16
sutures 1525:19
1573:13
swelling 1628:19
sworn 1464:10
1465:4 1671:9
sympathetic

1802:22
symphysis
1567:5
symptoms
1518:4,6
1526:8 1539:23
synthetic 1519:6
1616:11,24
1622:7 1690:18
1692:5 1693:21
1695:12
1777:15,25
system 1515:14
1515:15 1516:9
1520:12
1538:14
1539:24
1546:13 1547:3
1567:20
1577:21 1579:5
1581:8 1593:15
1616:16 1617:1
1617:21 1622:6
1711:6 1713:3
1713:24,25
1776:24
1778:20
1779:22
systems 1515:9
1578:13 1685:9

---

**T**

table 1465:16
1610:10
tailbone 1568:22
1791:8 1819:17
take 1465:25
1468:12
1469:23
1470:12
1475:22
1476:19,22
1478:23 1485:3
1500:5 1502:10
1507:3 1517:22
1521:6 1526:3
1537:12 1543:5

1543:18,24
1544:21
1562:17
1563:24
1585:13
1602:17 1605:5
1633:12
1636:16 1637:6
1642:8 1649:7
1652:5 1669:2
1671:4 1674:7
1675:1,24
1682:14,21
1685:11
1707:12
1714:18 1731:3
1731:6,12,24
1790:18
1794:19
1798:18
1809:11 1813:1
taken 1541:7
1652:18 1741:1
1757:2 1789:24
1828:15
talk 1465:9,10
1467:17 1487:3
1489:3 1492:11
1495:12,13,19
1497:12 1498:3
1498:23
1499:24 1501:2
1505:7 1511:19
1515:7,18
1519:14 1520:8
1528:15
1538:17
1580:12
1592:14
1597:16
1602:20 1603:1
1615:14 1664:2
1664:3,3
1677:9 1678:8
1678:10,11,11
1678:11,11
1698:7 1718:20

1729:22 1730:1
1732:5 1739:6
1739:17
1741:19
1755:22
1757:20
1758:16
1765:14
1769:23 1777:7
1783:12
1786:17 1801:5
1805:2 1808:2
1813:17
1817:25
1823:24
1830:18
1835:18
1840:23 1841:5
talked 1479:6
1488:25
1489:20 1498:2
1514:22
1518:23
1519:20 1526:5
1528:5 1535:21
1539:10
1540:10 1566:4
1573:22
1579:22 1583:9
1625:10,17
1638:18 1641:4
1705:16
1711:13
1739:13
1761:19
1772:24
1786:18,24
1787:23 1788:2
1788:14
1794:12
1799:22 1810:4
1811:20,22
1812:12
1814:22
1821:18 1825:3
1830:24
1831:15,17

| | | | | |
|---|---|---|---|---|
| 1842:7 | 1466:15 1467:2 | 1756:2,3,15 | 1688:2 1736:18 | 1506:20 |
| **talking** 1476:5 | 1467:7,21 | 1758:4 1760:13 | 1751:4 1762:10 | 1507:14 1528:3 |
| 1481:21 1487:9 | 1469:7 1474:10 | 1762:1,25 | 1773:12 | 1528:10,16,20 |
| 1501:21 | 1484:5 1485:19 | 1763:20 | 1774:19 | 1529:1,9,19,25 |
| 1512:10 | 1489:11 | 1780:16 | 1776:17 | 1530:18,20,21 |
| 1515:17 1537:3 | 1490:14 | 1782:17,20 | 1814:15 | 1531:1,20,21 |
| 1538:17 | 1491:10 1492:2 | 1786:12 | 1838:17 | 1531:23 1546:9 |
| 1540:18 1555:8 | 1494:25 | 1789:19 1807:2 | 1839:11 | 1550:17 |
| 1586:13 | 1496:20 1499:1 | 1808:10,16 | **Terrific** 1554:17 | 1583:14 1592:6 |
| 1591:22 1601:4 | 1507:17 1510:4 | 1816:10 1818:5 | 1554:20 | 1599:11 1601:7 |
| 1603:3 1622:19 | 1511:22 1515:2 | 1823:23 1824:9 | **territory** 1538:22 | 1602:8,10,25 |
| 1638:3 1643:2 | 1515:5 1517:19 | 1826:14 1829:8 | **tertiary** 1466:18 | 1603:12,20,22 |
| 1688:1,19,21 | 1520:25 | **telling** 1572:4 | 1466:19 | 1603:23 1604:9 |
| 1690:20 1727:3 | 1523:24 1525:1 | 1589:15 | **test** 1470:11 | 1604:15 |
| 1732:14 1736:5 | 1527:1 1534:11 | 1595:25 1596:2 | 1479:21,22 | 1606:11 |
| 1801:19 | 1536:21 1539:6 | 1603:11 | 1789:25 | 1607:23 |
| 1809:14 | 1544:19 | 1678:19 | **tested** 1550:22 | 1608:17 |
| 1812:13 1822:1 | 1556:18 | 1705:23 | 1737:15 | 1609:18 1610:1 |
| 1823:3,21 | 1564:21 | 1721:20 | **testified** 1465:4 | 1613:16,19 |
| 1827:7 1838:21 | 1565:17 1568:4 | 1723:19 | 1505:19 1506:2 | 1614:10 |
| **talks** 1620:8 | 1584:13,14 | 1751:12 | 1542:22 1599:9 | 1620:19 |
| 1799:4 1816:8 | 1590:3 1594:15 | 1792:13 | 1610:17,24 | 1662:11 1681:4 |
| **tarnished** 1750:2 | 1603:3 1616:21 | 1813:24 | 1613:3,5,11,25 | 1681:17 1696:5 |
| **taught** 1661:17 | 1635:4,21 | 1815:11 1821:1 | 1696:25 | 1697:24 1698:4 |
| 1666:11 1667:1 | 1636:19,22 | 1839:9 | 1735:19 1746:6 | 1710:15 |
| 1745:23 1746:5 | 1637:7 1638:15 | **tells** 1532:5,6 | 1757:25 1780:3 | 1721:24 1725:6 |
| **teach** 1514:3 | 1644:6 1647:3 | 1611:23 | 1789:15 1825:6 | 1735:18,24 |
| 1580:21 1640:1 | 1649:25 | 1714:17 | **testify** 1487:15 | 1738:4 1743:2 |
| 1666:14,16 | 1650:10 | 1744:23 | 1508:1 1524:7 | 1745:13 |
| 1667:2 1718:16 | 1655:16 1656:3 | **tender** 1787:10 | 1532:22 1546:7 | 1751:24 1762:8 |
| **teachers** 1514:2 | 1657:11 | **tendered** 1805:6 | 1602:23 | 1765:21,25 |
| **teaching** 1469:5 | 1666:18 1667:8 | 1805:7 | 1603:16 1673:7 | 1775:5 1777:2 |
| 1527:2 1588:13 | 1668:18 | **tension** 1542:20 | 1692:15 1699:3 | 1804:3 1807:15 |
| **tech** 1560:18,19 | 1671:16 | **term** 1489:17 | 1720:25 | 1807:24 |
| **technically** | 1672:18 | 1567:12 1569:4 | 1726:25 1804:4 | 1832:14 |
| 1539:20 | 1689:11 | 1648:10,10 | 1805:22 | **testing** 1479:25 |
| 1651:20 | 1690:14 | 1649:24 1650:4 | 1807:17 | 1596:5 1798:8 |
| **technique** | 1698:15 1705:4 | 1696:15 1708:9 | **testifying** 1548:1 | **tests** 1479:24 |
| 1686:19 | 1710:19 | 1794:25 1811:8 | 1563:1 1613:15 | 1797:3 |
| 1687:13 | 1719:10 | **terminology** | 1698:5 1709:16 | **text** 1615:3,9 |
| **techniques** | 1721:11,25 | 1675:7 1688:18 | 1722:24 | **textbook** 1478:16 |
| 1490:12 | 1723:8 1725:16 | **terms** 1491:15 | 1789:16 | 1478:18 |
| 1491:14 | 1726:11 1727:9 | 1492:15 | 1805:25 | **textbooks** |
| 1492:13,16 | 1728:13 | 1511:23 1539:3 | **testimony** | 1478:21 |
| 1515:6 | 1730:18 | 1540:5,7 | 1495:17,21 | **Thank** 1464:7 |
| **tell** 1463:6 | 1735:16 1741:7 | 1589:8 1640:8 | 1501:11 | 1465:1 1489:7 |
| 1465:14,23 | 1743:8 1752:19 | 1648:6 1673:10 | 1505:15,18 | 1494:15 |

| | | | | |
|---|---|---|---|---|
| 1496:18 1499:7 | 1573:24 | 1620:20 1621:2 | 1672:3 1675:23 | 1811:4 |
| 1499:12 | 1574:19 | 1625:20 1634:7 | 1675:24 | **third** 1494:24 |
| 1508:14 1510:6 | 1584:11 | 1640:24 | 1684:12 | 1516:3 1526:21 |
| 1521:13 | 1587:17 1591:1 | 1655:12 | 1688:16 1689:1 | 1532:13 |
| 1524:15 1553:6 | 1599:24 1600:4 | 1696:18 | 1692:18 1700:2 | 1534:25 |
| 1559:24 | 1617:25 | 1705:17 1706:3 | 1703:7 1709:19 | 1535:25 |
| 1560:15 | 1631:15 | 1710:16 | 1717:10 | 1587:17 1619:2 |
| 1561:10 1563:9 | 1641:22 | 1711:16 1712:5 | 1720:19 | 1637:15 |
| 1564:4,25 | 1648:16 | 1712:15 | 1725:16 1726:3 | **thorough** |
| 1590:25 | 1655:14 | 1725:17 | 1733:4,6,6,7 | 1509:14 |
| 1593:10 1627:5 | 1692:19 | 1729:12 1737:9 | 1734:18 | **thought** 1478:20 |
| 1653:10 | 1693:22 | 1744:12,14 | 1740:24 1743:7 | 1482:6 1493:25 |
| 1654:23 1655:2 | 1695:15 | 1759:7 1779:8 | 1743:7,8 | 1493:25 |
| 1670:24 1671:2 | 1705:23 1710:3 | 1782:17 | 1744:25 | 1505:21,22 |
| 1689:17 | 1718:21 | 1786:17 | 1745:12 | 1519:23 1522:9 |
| 1695:20 | 1725:14 | 1788:19 1797:9 | 1746:23 1747:4 | 1526:16 |
| 1712:18 | 1732:22 1733:5 | 1799:20 | 1747:8 1751:2 | 1531:15 |
| 1741:23 | 1734:24 | 1811:25 | 1754:1,4,12 | 1555:16 |
| 1753:20 1757:6 | 1747:19 1753:5 | 1821:10,18 | 1755:11 | 1574:13 |
| 1761:7 1783:14 | 1755:3 1783:10 | 1822:4 1831:1 | 1757:13 1763:3 | 1591:24 1592:3 |
| 1806:12 | 1785:10 | 1831:5 | 1764:6 1765:13 | 1592:11 |
| 1813:22 | 1798:18 | **think** 1481:14,17 | 1769:23 | 1595:12 |
| 1816:14 1824:2 | 1800:17 | 1481:18 | 1775:10 | 1599:15 |
| 1831:9 1832:7 | 1806:10 | 1482:15,24 | 1779:11 | 1605:17 |
| **Thanks** 1816:17 | **things** 1477:5,5,5 | 1486:18 | 1781:22 1782:5 | 1653:18 1676:1 |
| **theirs** 1696:20 | 1477:23 | 1487:24,25 | 1795:13 | 1680:25 |
| **they'd** 1493:22 | 1478:22 1479:7 | 1494:9 1496:20 | 1796:19 | 1694:11,14,23 |
| 1589:15 | 1479:13,14 | 1497:8 1499:3 | 1804:19 | 1699:19 |
| 1653:24 1654:4 | 1480:13 1490:5 | 1499:19 | 1805:10 1806:1 | 1701:11 1706:1 |
| **thicker** 1811:5 | 1492:10,12 | 1500:21 | 1808:4,8 | 1706:2 1721:25 |
| **thigh** 1624:9 | 1496:7 1506:14 | 1501:16 | 1823:22 | 1732:24 |
| **thighbone** | 1514:3,5 | 1514:13 1515:3 | 1824:13 | 1733:18 |
| 1790:15 | 1521:23 1527:8 | 1529:7 1531:8 | 1827:12 | 1736:25 |
| **thin** 1725:18 | 1536:11 | 1531:17 1542:6 | 1832:12,15 | 1739:12,13 |
| 1814:6 | 1537:24 | 1543:6,18 | 1834:4,12 | 1755:6 1770:4 |
| **thing** 1480:4 | 1538:18,19 | 1549:8,9 | 1835:17 1836:9 | 1782:10 1798:2 |
| 1481:11 | 1543:12 | 1550:13 | 1837:11,16 | 1798:22 1835:8 |
| 1495:22 1496:7 | 1545:10 1565:6 | 1553:22 1559:8 | 1839:14 | 1835:19,22 |
| 1496:25 1506:5 | 1566:9 1569:25 | 1563:23 | 1841:18 | **thoughts** 1533:5 |
| 1515:19 | 1570:3 1571:22 | 1570:21 1590:8 | 1842:10,13 | 1549:6 |
| 1516:18 | 1572:11 | 1590:12 | 1843:2 | **thousands** |
| 1523:16,18 | 1575:12 | 1591:24 1600:9 | **thinking** 1498:14 | 1512:19 1578:9 |
| 1531:9 1539:10 | 1579:22 1583:8 | 1600:14,19,24 | 1529:8 1719:1 | 1710:12 |
| 1540:15,16 | 1586:3,15 | 1626:1,21 | **thinks** 1498:22 | **three** 1459:22 |
| 1543:20 1545:8 | 1587:2,14 | 1634:19 1640:6 | 1580:23 | 1469:18,19 |
| 1554:2 1560:1 | 1588:18 | 1642:18 1653:4 | 1591:21 | 1477:18 |
| 1566:8 1572:18 | 1618:16 | 1653:6,17 | **thinner** 1624:12 | 1489:25 |

1490:11
1491:14
1492:16
1519:11
1527:24 1528:2
1534:7,21
1585:6 1587:8
1609:14 1634:2
1645:7 1647:7
1668:1 1676:13
1712:11
1725:24 1751:1
1751:2 1754:20
1755:4,9
1756:15 1760:4
1774:7 1784:12
1833:6,18
**three-year**
　1469:22 1483:9
　1646:9
**throat** 1805:17
**thrombocytosis**
　1820:8,12
　1821:17 1822:2
**thrombus** 1800:6
　1800:9,12
**tick** 1544:21
　1549:24
**tie** 1573:15
**tightness**
　1550:24
**till** 1544:19,20
　1652:7 1731:13
　1741:20
　1833:17
　1839:15,25
**time** 1464:11
　1467:9 1473:2
　1478:4 1483:1
　1483:18,23,25
　1484:25
　1487:21
　1488:25 1489:1
　1490:4 1491:18
　1492:4,11,20
　1494:4,8
　1499:11,25

1510:12,13,18
1510:22
1516:12,25
1521:8 1529:1
1529:8 1530:15
1533:19
1537:13 1542:7
1545:12
1561:18
1564:24
1573:14 1593:9
1598:2,6
1601:25 1607:9
1610:21 1611:8
1611:12 1623:1
1623:7,9
1632:23
1634:16
1638:12 1639:1
1647:6 1649:15
1655:11
1661:14
1670:17
1679:24 1691:6
1695:18
1700:14
1704:13
1706:12,19
1709:5 1710:11
1713:10 1714:7
1727:20 1729:6
1731:9,10
1732:23 1739:6
1740:18
1755:20
1756:25
1762:14
1764:14 1774:6
1786:15
1787:14 1788:9
1804:17 1810:7
1813:3 1815:15
1819:21,25
1825:11 1833:5
1839:18
1840:18,20
1842:8

**times** 1585:6
　1587:14,16
　1645:6 1650:24
　1693:25
　1712:21 1736:8
　1755:25 1756:1
　1775:12
　1784:12
　1798:23
**tired** 1464:23
**tissue** 1468:22
　1519:5,5
　1547:9 1568:5
　1569:15 1577:5
　1577:8,9
　1581:17,19
　1583:11
　1586:19 1618:4
　1618:15
　1620:12 1621:3
　1622:4 1627:24
　1631:24
　1632:20
　1711:22
　1766:10,13
　1788:3 1792:5
　1793:3 1794:13
　1794:14,14
　1795:2,5,5
　1810:7 1811:10
　1811:10,16,18
　1811:20 1812:9
　1812:10,22
　1817:13,16
　1818:6 1819:19
　1821:7 1827:10
**tissues** 1814:7
**title** 1472:14
　1489:15,16
　1520:25 1521:2
　1608:23 1609:3
　1715:2,7
**titled** 1479:12
　1494:20
　1526:21
　1615:22 1719:9
**today** 1495:11

1496:13 1515:4
1545:23 1588:8
1665:10
1707:12,24
1711:4 1712:21
1714:4 1738:20
1802:14
1832:16
1838:24 1839:9
**toes** 1653:7
**told** 1490:20
　1493:22 1501:1
　1506:13 1508:2
　1532:2 1576:13
　1583:17
　1591:21
　1614:24 1643:4
　1661:18
　1712:24
　1745:12
　1755:25,25
　1762:5 1777:4
　1784:18 1828:1
　1834:3 1835:17
　1835:19
　1837:11
　1838:10,15
**tolerance**
　1815:24
**tolerate** 1814:3
**tomorrow**
　1545:23
　1823:12,15,18
　1835:18 1841:7
　1841:11 1842:4
　1842:22 1843:6
　1843:8
**tone** 1468:21
**tonight** 1840:14
　1843:10
**Tony** 1463:6
**tools** 1644:12
　1837:3
**top** 1468:24
　1496:3 1497:18
　1497:22 1498:5
　1527:22

1535:19
1619:23,24
1627:17
1651:17
1715:10
1736:17
1767:15,16
1790:15
1806:19
**topic** 1509:18
**torn** 1551:11
　1595:13
**total** 1639:2
**totally** 1517:5
　1833:1
**touch** 1534:25
　1759:14
**touched** 1481:17
　1482:24
　1816:25
**tough** 1840:15
**toxic** 1618:3
**track** 1661:6
**tract** 1770:19
**tracts** 1632:5
**traditional**
　1527:6 1570:5
　1625:14
**train** 1483:22
　1642:23 1835:7
**trained** 1467:13
　1482:12,19,22
　1484:19,19
　1662:2 1723:14
**trainees** 1472:5
**training** 1468:2,3
　1469:17,23,24
　1471:16 1472:4
　1472:7 1473:19
　1480:1 1485:8
　1489:20
　1540:24 1566:2
　1641:6 1752:5
　1801:7 1803:21
　1830:17
**Trans** 1558:11
**transcribed**

1636:4 1844:17
**TRANSCRIPT**
1459:15
**transcripts**
1605:11
1665:24
**transferred**
1520:3
**transient**
1763:16,23
1764:13
**transition**
1526:18
1540:18
**transvaginal**
1558:10,21
1631:5 1649:18
1685:24
1686:18
1690:23 1813:8
1813:16
1836:23 1837:7
1837:13,17
1838:1,18
1839:5
**transvaginally**
1635:9
**traveling** 1485:1
**travels** 1569:24
1800:3,11,13
**treat** 1492:17
1525:22
1575:21
1632:14 1633:5
1771:1 1772:7
1772:23
1837:18 1838:2
1838:21
**treated** 1521:3
1646:5 1771:24
1787:12 1831:5
1834:7,13
**treating** 1468:17
1485:10 1513:4
1639:15
**treatise** 1486:24
1487:7

**treatment** 1479:5
1517:17,19
1518:5 1526:8
1526:9,10
1630:16
1631:18
1647:19 1692:5
1715:22
**trial** 1459:15,20
1462:4 1489:19
1489:22 1490:9
1490:11
1492:16
1494:23
1495:10
1497:10 1498:1
1499:15 1500:4
1500:9 1526:20
1544:12
1596:17
1625:12,15
1652:11 1654:6
1663:11 1669:5
1689:21 1702:1
1703:7,9
1731:19 1840:4
**trials** 1625:1
1709:17
1836:17,20
**triangle** 1567:8
**tried** 1682:17
1840:15
**trier** 1698:14
1803:22
**tries** 1826:2
**triggers** 1616:19
**trouble** 1587:24
1617:23
1839:15
**true** 1536:18
1556:10,14
1558:9,13,15
1558:25 1559:4
1568:14
1602:13
1623:10 1651:4
1651:7 1763:3

1802:24 1834:4
1835:3,16
1838:4 1844:16
**truly** 1707:17
1709:7 1737:11
**trust** 1648:19
**truth** 1746:24
1753:6
**truthful** 1746:7
**try** 1514:23
1520:4 1524:19
1529:7 1533:19
1544:23
1551:12
1575:18 1588:1
1590:5,6
1612:12 1615:4
1617:22 1619:6
1624:10
1633:14
1646:19
1653:15
1655:11
1670:19
1679:15,24
1680:2 1727:2
1732:18,19
1752:13,25
1771:11
1783:17
1784:12 1795:3
1797:3 1803:8
1818:25 1819:1
1820:5 1822:15
1826:6,7
1827:13
**trying** 1476:17
1506:15,15,19
1506:19,25
1531:4 1550:3
1555:15
1580:21,22
1586:13,17
1601:25 1603:2
1605:1,4
1612:5 1617:1
1617:14,20

1628:14
1641:16 1642:2
1662:15
1663:15,17
1666:7 1677:2
1681:20 1684:8
1684:13 1694:9
1705:20
1706:11 1720:4
1720:14,25
1729:10
1733:17
1735:11
1738:13 1770:5
1788:19 1793:5
1811:13 1823:5
1841:21
**tube** 1566:21
1582:13
1818:14,21
1819:3 1822:2
**tubes** 1572:6
1576:9 1788:16
**tune** 1524:19
**turn** 1562:12
1564:17
1590:25
1595:23 1609:1
1615:20
1623:13
1653:23
1776:13 1785:7
1802:18
**turned** 1491:15
1492:13,14
1596:11
1654:18
1799:23
**turning** 1653:8
**turns** 1550:23,23
1572:24
1625:22
1828:24
**TVM** 1644:2,7
1649:14,17
1661:16
1685:23

1744:19 1773:4
1773:11,25
1774:18 1775:4
1775:19,23
1836:20
**Twenty-Sixth**
1459:1 1461:24
**two** 1477:17
1480:12
1490:13 1515:9
1535:1 1537:24
1542:6 1544:21
1547:4 1548:21
1549:8 1550:15
1551:2 1567:13
1568:9 1569:23
1579:22
1587:13 1595:3
1600:14
1617:10 1634:2
1662:9 1665:19
1668:1 1686:22
1687:11
1712:21
1725:24
1743:12
1744:18
1750:21 1752:8
1752:15,15
1776:6 1796:2
1816:21
1818:10
1823:13
1833:18
**two-year**
1471:22
**tying** 1583:23
**type** 1490:1
1495:22
1516:19
1539:24 1559:9
1559:12
1627:25 1629:8
1673:3 1694:17
1768:7 1803:24
**types** 1489:21
1496:7 1512:4

1664:13
1793:15
**typical** 1779:9
**typically** 1516:6
1517:5,10
1538:25
1575:16 1686:5
1696:17

**U**

**U.S** 1460:7
1646:20,23
1647:1
**uh-huh** 1486:11
1512:1 1748:12
1836:25
1837:10
**ulcer** 1822:3
**ulcers** 1632:21
**ultimate** 1805:25
**ultimately**
1467:17 1478:3
1526:14
1800:25
**UltraPro** 1595:5
1595:10,21
1596:6,12,14
1597:1,4
1600:8 1624:16
**ultrasonograp...**
1814:10
**ultrasound**
1813:9,16
1814:1,5
**ultrasounds**
1814:4
**un** 1574:1
**un-impacted**
1551:5
**unable** 1632:17
1632:21
**Unacceptable**
1526:22
**unavoidable**
1581:11
1617:19
1817:17

**unbelievable**
1664:9
**uncomfortable**
1518:4 1809:3
1814:9,13
1815:2 1820:4
**undergo** 1688:10
1827:24
**undergoing**
1535:17
1644:17
1686:18 1688:2
**underlying**
1512:13
**underneath**
1584:15
1829:18
**underreported**
1645:8
**understand**
1487:8 1493:20
1497:22 1505:5
1509:23
1523:11,17
1529:23,23
1543:7 1563:14
1563:20 1612:4
1614:14,16
1620:24 1642:2
1662:16
1665:11 1690:1
1694:23
1699:22 1700:9
1712:24 1718:7
1722:12,13
1723:7,17
1736:10 1737:5
1755:1 1777:12
1783:9 1789:14
1828:9 1830:13
1832:14
**understanding**
1487:6 1504:10
1523:10
1533:23
1534:16 1579:1
1602:21

1641:15
1691:16 1692:2
1694:4,8,11,18
1695:10
1757:16 1766:1
1766:8 1773:10
1773:21 1774:5
1774:12,16
1775:19
**understands**
1497:20
1688:11
1689:22
**understood**
1508:8 1514:16
1580:24 1695:5
1706:22 1770:6
1787:25 1788:1
**undoubtedly**
1819:22
**unfair** 1548:22
**unfairly** 1751:21
1781:12
**unfortunately**
1485:14
1628:15 1826:8
**unfounded**
1683:1
**unhealthy**
1795:2
**uninvolved**
1624:8
**United** 1509:7
1644:22
1674:14 1693:3
1705:1 1804:16
1837:2
**University**
1466:2,4
1471:20 1472:9
1483:6,16,22
1484:16
1806:17,18
**unlicensed**
1801:18
1802:18
**unnecessary**

1520:16
1522:21
**unqualified**
1555:7,10
**unreasonably**
1713:4,24
1717:4
**unrelated** 1706:4
**unrelenting**
1819:13
**unrestricted**
1742:23
**unsafe** 1573:24
1574:19 1575:4
1575:6,25
1577:11,21
1579:13 1580:6
1581:19 1583:8
1621:6,16,23
1687:1,5
1711:2
**untrue** 1782:20
**up-to-date**
1503:3
**update** 1502:9,13
1502:25
**upper** 1631:3,3
1650:22
1776:15
**ureter** 1795:19
1796:12,13,13
**ureteral** 1797:17
**ureters** 1576:9
1576:15,16,18
1628:19
1788:16
1795:11,16,21
1795:25
1822:13
**urethra** 1566:21
1568:24 1622:9
1791:23 1792:3
1817:2,4
**urinary** 1670:6
1786:25 1787:5
1827:17,18
**urinate** 1670:6

**urine** 1566:22
1632:18,19,23
1669:19
1788:18,19
1792:8,10
1795:20 1817:1
1817:3,4
1819:24
1827:18
**Urogynecologic**
1480:24 1481:1
**urogynecologists**
1481:3
**urogynecology**
1469:13,15,22
1474:22
1478:17 1481:4
1483:10 1486:5
1540:8 1686:7
1704:1 1830:19
**urologist**
1795:15
1804:22,25
1805:2 1808:18
**usable** 1488:15
**use** 1496:13
1504:14
1508:21 1509:8
1515:10 1516:6
1557:12 1566:2
1591:16
1604:24 1613:1
1614:21
1616:12
1617:21 1620:2
1634:16 1642:3
1664:15
1665:15 1666:7
1678:23
1688:23
1689:25,25
1690:17,20
1691:5 1692:4
1693:21
1695:12
1706:21,23
1712:23

1733:21
1742:24
1758:21
1765:10 1775:8
1778:1 1790:6
1823:12
1825:22,23
1832:25
1835:20 1836:1
1836:3 1842:8
**users** 1635:13
**usually** 1477:17
1632:2
**uterus** 1468:24
**utilized** 1492:24
1526:19

**V**

**v** 1459:5 1804:8
**vagina** 1468:20
1468:24,24,25
1469:1,1
1490:22
1491:20
1515:22,23
1517:5 1518:18
1518:19,25
1520:7 1535:19
1535:23
1542:23
1558:24 1559:6
1568:25 1569:3
1569:8 1572:9
1572:14 1576:5
1576:12,14
1584:2 1617:16
1617:17 1622:9
1627:15,17,21
1628:8,10
1632:17
1766:20 1767:1
1767:2,6,16,17
1767:20
1777:16 1778:2
1792:18 1794:7
1794:11
1809:17 1810:4

1814:6,10,25
1816:24 1817:5
1818:1,6
1827:11,14
**vaginal** 1490:18
1490:24
1515:23,24
1516:2,4
1517:7,12
1536:1 1554:19
1566:5,20
1568:13
1575:11 1576:4
1582:11
1584:12,15
1618:15
1619:13,18
1627:23 1639:5
1639:19 1642:3
1678:17 1767:4
1771:4 1772:21
1778:22,25
1788:6 1809:10
1809:20
1812:25
1816:23 1818:6
1819:7
**vaginally**
1639:10
**value** 1548:24
1552:13
1749:23
**values** 1637:8
**variable** 1623:1
**various** 1496:4
1525:10
1526:10 1599:2
1619:3 1825:2
**vast** 1479:1
**venues** 1640:14
**veracity** 1745:11
**verse** 1610:5,14
1755:22
**version** 1644:18
1644:19
**versus** 1617:8
1625:2 1647:4

1706:25 1729:4
**vesico** 1816:22
**vesicovaginal**
1568:14
1632:16 1816:8
1816:18
1819:23 1821:9
1827:9
**vessels** 1811:15
**VI** 1459:16
1462:2
**video** 1541:10
1545:10,17
1546:12,13,16
1547:1,21
1551:15
1556:10,15
1562:6 1566:12
1566:13
1567:17,18,22
1568:8,9,15
1569:11,12,21
1571:13,14,20
1571:23
1572:16,23,25
1573:1 1581:25
1583:3,22,25
1584:18,19
1590:9 1595:17
1624:3 1842:18
**videos** 1540:23
1541:2 1557:6
1581:22
1841:18,19
1842:10,19
**view** 1532:15
1642:1 1743:4
1743:5,6,8
1744:20
**viewed** 1573:3
1789:3
**viewpoint** 1697:1
**viewpoints**
1704:7 1705:2
**Vincent** 1494:21
1742:2 1757:22
**violate** 1781:20

1823:6
**violated** 1587:17
1721:17
1722:18,19
1724:3,18,23
1726:4 1727:13
1727:16
1733:24
**violation** 1589:2
1589:6
**visible** 1584:13
1788:6
**visit** 1636:9,13
1787:8
**visits** 1467:16
**visualization**
1627:12
**vitae** 1465:17
**vitro** 1596:3
**voice** 1498:8
1565:20
1594:23
**void** 1669:14
1670:16
**voir** 1553:9
1554:5 1740:18
1765:15
**volume** 1459:16
1462:2 1546:23
1546:24
**voluntarily**
1648:14
1688:12
1689:23
**vs** 1844:7

**W**

**W** 1461:23
1844:2,21
**wait** 1531:13
1559:2 1561:16
1602:19
1634:11
1741:20 1754:3
1808:11
**waiting** 1841:19
1841:20

**waive** 1760:23
**walk** 1794:19
1807:1 1824:22
**walking** 1517:7
1565:9
**wall** 1490:22,23
1491:19 1569:2
1575:12 1576:4
1708:14,18,20
1708:22 1709:3
1767:16 1788:6
1791:16 1792:7
1792:8,18
1794:7,10
1796:11
1809:10,16,20
1812:25
1827:11
**walls** 1767:4
**want** 1463:16
1468:13
1472:20
1477:23 1479:9
1479:13 1495:9
1498:21,21
1503:24
1505:24 1507:1
1507:3,6
1520:9 1523:18
1534:25
1543:23
1544:24
1549:24
1550:16 1552:1
1552:22
1554:23
1561:14
1562:14
1565:12 1566:9
1566:17 1567:2
1567:15
1568:16 1570:2
1571:21
1572:10,18
1573:5 1587:21
1588:4,5,12,12
1596:14 1601:5

| | | | | |
|---|---|---|---|---|
| 1603:15,21,23 | 1819:25 | 1726:20 | **wasting** 1815:23 | 1826:1 |
| 1607:16 1613:8 | 1828:17 | 1727:23 1728:8 | **watched** 1556:13 | **we'll** 1467:17 |
| 1618:8 1620:4 | 1832:24,25 | 1733:24 1734:5 | 1556:14 1557:6 | 1474:1 1486:8 |
| 1627:2 1629:12 | 1833:4,19 | 1734:12 | **watching** 1490:4 | 1492:11 |
| 1638:12 | 1839:15,19,20 | 1736:15 | 1562:5 | 1493:14 1494:9 |
| 1642:15 | 1840:19 | 1763:18 | **water** 1826:19 | 1494:24 |
| 1646:12 1657:5 | **wanted** 1466:8 | 1772:14 | **way** 1475:1,22 | 1497:22 1509:2 |
| 1671:3 1673:16 | 1467:13 | 1777:18 1778:7 | 1476:18 | 1533:4,12 |
| 1681:14 | 1471:18 | 1781:17 | 1489:25 | 1534:7 1544:23 |
| 1696:25 | 1483:11 1500:3 | **warnings** 1712:8 | 1491:17 1492:6 | 1546:8 1560:19 |
| 1698:16 | 1592:9 1686:19 | 1717:23 | 1492:7 1502:10 | 1561:1 1563:24 |
| 1703:16 | 1705:4,4 | 1723:10,12 | 1518:20 1524:9 | 1568:3 1572:15 |
| 1704:23 1705:2 | 1714:7 1733:21 | 1724:6 1733:23 | 1536:17 | 1607:4 1616:2 |
| 1706:9 1711:3 | 1790:1 1795:15 | 1736:5,14 | 1564:12 1584:8 | 1627:7 1635:15 |
| 1711:13 1714:8 | 1795:17 1809:7 | 1739:11 | 1585:19 1588:4 | 1642:8,11 |
| 1714:9,17 | 1813:25 | 1757:20 1759:7 | 1588:20 | 1646:16,19,20 |
| 1715:20 | **wanting** 1733:19 | 1759:10,19 | 1599:16 | 1653:2,15 |
| 1716:16 | **wants** 1522:13 | 1761:14,21,24 | 1605:13 | 1656:20 |
| 1722:21,21 | 1561:17 1703:2 | 1762:14 1780:9 | 1625:11 | 1673:19 1674:7 |
| 1725:21,22,23 | 1721:19 | 1780:14 1781:4 | 1632:24 1646:4 | 1714:12,18 |
| 1726:1 1727:17 | 1727:20 | 1781:14,22,24 | 1646:7 1647:17 | 1719:3 1731:6 |
| 1729:12,23 | 1750:11,11 | 1782:7,12,15 | 1680:2 1703:21 | 1731:12,13 |
| 1730:24 1732:5 | 1751:3 1842:17 | 1782:19 | 1705:15 | 1755:15 |
| 1732:7,11,14 | 1842:18,20 | 1783:20 1784:8 | 1709:17 | 1789:25 |
| 1733:2 1737:8 | **warm** 1654:13 | 1784:23 | 1711:18 1725:8 | 1794:19 1799:3 |
| 1737:9 1739:22 | **warmed** 1653:3 | **Washington** | 1725:9,10,14 | 1813:17 |
| 1741:10,14 | **warn** 1589:11 | 1474:15 | 1725:15 1726:7 | 1833:19 |
| 1748:3,4 | 1670:10,14 | **wasn't** 1471:17 | 1728:7,10 | 1839:18 |
| 1751:14,15,16 | 1680:21,23 | 1474:24,25 | 1733:4,4,10 | 1840:11,21,21 |
| 1755:10 | 1717:15,18,19 | 1475:16 | 1734:3 1740:24 | 1840:23 |
| 1756:16 | 1718:14 | 1484:20 | 1744:15 | 1841:15 |
| 1757:21 | 1721:14,15 | 1485:13,15 | 1760:24 1761:1 | **we're** 1463:9 |
| 1759:14 | 1723:24 1724:3 | 1593:11 | 1763:5 1773:17 | 1464:5 1465:9 |
| 1760:14,14,15 | 1733:13 | 1613:12 | 1778:18 | 1489:1 1495:1 |
| 1760:20,23 | 1760:22 | 1640:15 1647:7 | 1780:16 | 1496:16 |
| 1762:18 | 1771:22 | 1666:19 1694:3 | 1785:21,23 | 1497:12 |
| 1765:15 | 1776:23 1785:3 | 1708:25 | 1791:21 | 1501:20 1504:1 |
| 1770:11 | **warned** 1726:4 | 1713:19 1725:3 | 1794:20 1795:6 | 1506:15 |
| 1777:11 | 1760:2 1761:12 | 1749:17 | 1795:20 | 1507:20 |
| 1781:19 | 1765:7 1771:13 | 1750:25 1781:5 | 1796:11 | 1511:24 1514:8 |
| 1785:10,19 | 1771:15 1772:8 | 1781:11,11 | 1800:20 | 1515:17 1520:8 |
| 1789:14 1790:6 | 1778:24 | 1787:10 1795:5 | 1805:19 1817:6 | 1526:20 |
| 1797:4,8 | 1779:21 | 1809:8 1814:12 | 1819:12 | 1536:10,10,11 |
| 1798:17 1799:3 | **warning** 1719:9 | 1817:20 | 1833:16 | 1543:9 1545:6 |
| 1800:21 1802:9 | 1719:18 1720:3 | 1819:11 1824:7 | **ways** 1517:21,23 | 1545:9 1546:23 |
| 1802:12 | 1720:7,14 | **waste** 1542:7 | 1695:16 1745:6 | 1553:2 1562:24 |
| 1805:10 1816:3 | 1722:3 1724:8 | 1815:22 | 1745:8 1814:5 | 1565:3,21 |

| | | | | |
|---|---|---|---|---|
| 1566:8 1567:14 | 1831:14 | **wear** 1820:1 | 1685:14 | 1550:9 |
| 1570:15 | 1832:15 | **wears** 1576:4 | 1688:24 1696:3 | **went** 1465:24 |
| 1572:22 | 1838:24 1841:9 | 1819:18 | 1698:4 1699:6 | 1466:2,3 |
| 1580:15,21,21 | 1841:18,21 | **Weber** 1462:8 | 1703:23 | 1467:23 |
| 1581:6,12 | **we've** 1465:16 | 1464:8 1465:2 | 1714:19 1717:2 | 1469:11 1472:9 |
| 1582:2 1588:14 | 1485:17 | 1465:7,9 | 1719:8 1727:10 | 1482:9,10,16 |
| 1590:19 | 1493:12 1500:8 | 1489:10 | 1744:1,22 | 1516:24 1562:9 |
| 1596:20 | 1511:21 1512:9 | 1494:17 | 1747:1,5 | 1575:18 1583:1 |
| 1605:22 | 1517:18 | 1496:13 | 1750:1 1752:19 | 1598:2 1611:8 |
| 1633:16 | 1520:17 | 1498:25 1500:9 | 1757:19 | 1611:12 |
| 1634:19 | 1526:19 | 1500:13 | 1761:10 | 1637:16 1641:5 |
| 1636:22 | 1543:12 1566:4 | 1501:20 | 1765:13 | 1645:2,24 |
| 1642:21 | 1573:3 1580:11 | 1504:20 1505:4 | 1769:23 | 1646:5 1647:4 |
| 1649:15 1652:2 | 1585:5 1596:14 | 1505:14 | 1789:13 | 1650:13 |
| 1652:4 1653:8 | 1596:16,21 | 1508:17 | 1804:13,18 | 1742:17 1745:2 |
| 1655:11 | 1606:17 | 1509:23 | 1806:15,23 | 1756:14 1788:7 |
| 1658:17 | 1622:19 | 1521:21 | 1808:8,15 | 1797:1 1798:6 |
| 1664:20 | 1630:23 | 1524:20 | 1824:23 | 1798:17 |
| 1667:17 | 1646:13 | 1526:23 | 1828:12 1829:5 | 1802:25 |
| 1673:21 | 1649:19,24 | 1528:15 | 1832:14 1834:3 | 1822:16 1835:4 |
| 1676:18 1683:7 | 1653:18 | 1530:19,25 | 1836:15 | 1835:9 |
| 1684:8 1705:20 | 1654:12 1660:1 | 1533:18 | 1841:10 1842:4 | **weren't** 1475:13 |
| 1716:24 | 1690:2 1695:24 | 1534:15 1541:7 | 1842:18 | 1492:10 1501:1 |
| 1718:19 | 1696:3 1697:9 | 1542:2 1546:7 | **Weber's** 1749:7 | 1696:1 |
| 1721:22 | 1699:5 1719:8 | 1548:1 1556:7 | **Wednesday** | **West** 1460:7,14 |
| 1723:24 | 1736:7 1737:22 | 1561:14 | 1823:16,17 | **whatnot** 1644:13 |
| 1730:20 1731:3 | 1738:7 1750:10 | 1562:25 | 1843:1 | **whatsoever** |
| 1732:23 | 1750:14 | 1563:12 | **week** 1486:16 | 1763:11 |
| 1739:15 | 1759:15 | 1564:12,12 | 1794:23 1796:2 | **wheelchair** |
| 1740:23 1741:7 | 1761:19 | 1565:7,17 | 1798:3 1809:1 | 1826:12 |
| 1749:20 | 1771:16 | 1570:22 1573:3 | **weekend** 1463:22 | **wheelchair-bo...** |
| 1754:24 | 1772:24 | 1574:6 1578:5 | **weeks** 1623:2 | 1826:24 |
| 1758:20 | 1785:18 1788:2 | 1580:25 1590:8 | 1706:8 1788:12 | **white** 1617:13 |
| 1759:13 | 1793:20 | 1590:20 1591:2 | **weigh** 1552:12 | 1618:1 1791:6 |
| 1761:16 1770:5 | 1799:22 | 1593:19,21 | 1687:24 | 1793:4 1800:16 |
| 1782:13 1785:6 | 1812:12 | 1600:18 | **weight** 1663:1 | 1811:1 1828:22 |
| 1785:7,7 | 1814:22 1822:1 | 1605:24 | 1684:5,7 | 1828:24 |
| 1786:15,17 | 1823:13,13,18 | 1606:17 1607:6 | 1804:1,21 | **whoa** 1505:23,23 |
| 1789:13,16 | 1832:13 | 1615:20 | 1805:23 | 1505:23 1506:6 |
| 1790:19 | 1840:22 | 1633:19 | 1815:20 | 1506:6 1728:18 |
| 1793:25 1794:1 | **weak** 1595:12 | 1634:24 1644:1 | 1817:21 | 1728:18,18 |
| 1800:22 | **weaken** 1815:16 | 1644:24 | 1818:18 1819:1 | 1803:12,12,12 |
| 1805:19,24 | **weakened** | 1646:22 1648:1 | 1819:14 | **wide** 1515:10 |
| 1806:15,19 | 1817:19 | 1655:4,10 | 1825:16,18 | 1559:21,21 |
| 1808:4,12 | 1818:19 | 1659:18 | **well-being** | 1572:22 |
| 1813:4 1824:11 | **weaknesses** | 1660:20 1669:4 | 1830:14 | 1581:13 1620:9 |
| 1829:24 | 1539:24 | 1671:5 1673:7 | **well-qualified** | 1729:11 1755:5 |

| | | | | |
|---|---|---|---|---|
| **widespread** | 1599:17 1747:5 | 1540:3,16 | 1836:4 | **woulda-coulda...** |
| 1688:14,23 | 1842:4 | 1551:7 1578:18 | **wording** 1704:14 | 1740:23 |
| 1689:12,25 | **woman** 1492:5 | 1593:17 | 1704:21 1709:6 | **wouldn't** |
| 1692:4 1693:21 | 1516:5 1517:6 | 1626:10,16 | **words** 1537:18 | 1555:17 |
| 1695:12,22 | 1518:3 1526:6 | 1630:12 1635:7 | 1600:14 1645:9 | 1682:22 |
| **William** 1459:20 | 1536:13,17,21 | 1635:24 | 1655:16 1749:1 | 1712:23 |
| 1463:20 | 1536:25 | 1637:21,22 | 1768:19 | 1838:19 |
| **willing** 1730:8 | 1539:12 | 1638:8,22,25 | 1834:24 | **wound** 1819:25 |
| **wired** 1564:16 | 1540:13 | 1639:2,9,18 | **work** 1467:3 | 1820:5 |
| **wish** 1464:25 | 1551:21 | 1644:17 1645:8 | 1469:4 1473:16 | **wrap** 1646:21 |
| 1603:5 1641:9 | 1566:14 | 1645:18 | 1484:15,17,23 | **write** 1553:24 |
| 1824:24 | 1568:19 | 1647:13,15,16 | 1510:8 1511:7 | 1698:10 |
| **Withagen** 1664:7 | 1573:11 1575:2 | 1648:3,14 | 1511:8,12 | 1699:12 |
| **withdraw** 1718:1 | 1582:5 1610:15 | 1649:16 1650:5 | 1513:23 1549:9 | **writes** 1629:6 |
| **witness** 1464:12 | 1623:11 1624:5 | 1650:12,12,13 | 1620:16 | **writing** 1509:5 |
| 1464:14 1465:1 | 1625:18 1636:9 | 1650:24 1651:5 | 1642:14 1689:9 | **written** 1470:11 |
| 1465:3 1495:11 | 1638:5 1646:4 | 1651:6 1656:15 | 1692:3 1695:13 | 1479:21 |
| 1495:14 | 1647:18 | 1656:19 | 1709:17 1745:9 | 1487:25 1488:2 |
| 1505:22 1510:9 | 1688:10 | 1657:16 | 1798:8 1837:3 | 1503:22 |
| 1528:16,18,23 | 1689:22 | 1686:20 | 1840:17 | 1511:13 |
| 1530:18 1531:1 | 1701:15 1771:2 | 1689:25 1709:9 | 1841:21 | 1512:15 |
| 1531:5 1532:7 | 1797:15 | 1709:11 | **worked** 1467:22 | 1610:19,23 |
| 1562:19,23 | 1826:17 1834:7 | 1710:25 | 1477:4 1494:6 | 1611:15 |
| 1564:4,6,25 | 1834:10,13,16 | 1758:14 | 1685:24 1723:2 | 1613:11 1616:8 |
| 1580:16 | **woman's** | 1763:24,25 | 1723:4 | 1678:4,21 |
| 1588:16,18 | 1573:24 1574:8 | 1764:1,22 | **working** 1476:10 | 1703:24 |
| 1590:21,22 | 1574:20 1636:5 | 1766:10 | 1477:1 1483:18 | 1708:15 1774:6 |
| 1599:12 | **women** 1467:15 | 1769:17 | 1582:12 1618:1 | **wrong** 1551:8 |
| 1602:11,18,19 | 1467:16,18 | 1773:10 | 1697:18 1836:2 | 1662:17 |
| 1604:8,24 | 1468:8,9,10 | 1774:17 | 1837:2 | 1722:15 1725:9 |
| 1607:20,22,23 | 1475:2,8,23 | 1779:21 | **workload** 1485:2 | 1733:4 1749:14 |
| 1607:24,24 | 1476:11,23 | 1808:21,21 | **works** 1600:1 | 1750:5 1752:7 |
| 1613:25 1655:9 | 1478:24 1479:2 | 1830:20,21 | 1791:21 | 1782:19 1797:3 |
| 1668:22 1674:1 | 1479:5 1489:23 | **women's** 1459:6 | 1800:20 | 1799:16,20 |
| 1674:4,25 | 1490:4,8 | 1480:20 | **world** 1474:17 | 1837:12 |
| 1675:2,5,8 | 1491:24 1492:2 | 1699:17 1844:7 | 1579:21 | **wrote** 1486:20 |
| 1689:17 | 1502:11,15 | **wood** 1464:2 | 1660:16 1775:8 | 1487:11 |
| 1700:14 1701:1 | 1517:7,22,25 | **word** 1504:15,22 | **worldwide** | 1516:25 1529:8 |
| 1720:25 | 1518:21 | 1508:22 | 1459:11 | 1555:10 |
| 1722:24 1747:3 | 1521:15 1525:6 | 1532:10 1651:2 | 1613:22 | 1684:24 1698:6 |
| 1757:18 | 1525:14 1526:1 | 1669:23 | 1844:13 | 1698:8,11 |
| 1803:20 | 1526:13 1527:9 | 1704:16 | **worried** 1665:18 | 1699:8,13 |
| 1824:24 | 1527:14,17,18 | 1705:24 | 1696:15 | 1700:7,14 |
| 1842:25 | 1535:5,9,9,17 | 1706:21 1708:7 | 1738:15 | 1704:24 |
| **witnesses** 1462:7 | 1537:20,21 | 1710:9 1769:5 | **worse** 1595:21 | 1706:20 |
| 1532:22 | 1538:4,8,24,24 | 1816:22 | 1596:12 | 1715:24 |
| 1564:20 1578:7 | 1539:4,7 | 1834:22,25 | 1628:17 | 1797:11 |

| | | | | |
|---|---|---|---|---|
| **X** | 1743:20 | **yes-or-no** | **11:00** 1543:22 | 1642:10 |
| **X** 1462:1 | 1754:21 1755:7 | 1591:11 | 1544:19,20 | **16** 1642:11,22 |
| **x-ray** 1798:9 | 1755:21 1756:9 | **yesterday** 1756:1 | **11:02** 1566:12,13 | **17.2** 1645:15,18 |
| 1828:25 | 1756:20 1764:9 | **younger** 1537:20 | **11:03** 1567:17,22 | **1700** 1460:4 |
| **x-rays** 1789:4 | 1780:19 1782:2 | | **11:04** 1568:8,15 | **1737** 1646:21 |
| **XYZ** 1723:24 | 1782:24 | **Z** | **11:05** 1569:11 | **1752** 1649:6,12 |
| | 1808:14 | **zero** 1690:5 | **11:06** 1569:21 | **18** 1544:18 |
| **Y** | 1813:21 | 1745:20 | **11:07** 1571:13 | **1834** 1462:9 |
| **y'all** 1546:4 | 1815:12 1819:6 | | **11:08** 1571:20 | **1844** 1462:6 |
| 1555:2,25 | 1824:24 | **0** | **11:09** 1572:25 | **1874** 1813:2,4 |
| 1559:14 1612:5 | 1833:11 | **0** 1643:8 | **11:10** 1573:1 | **1875** 1806:18 |
| 1732:13 1741:6 | 1838:23 1841:6 | **00** 1500:10 | **11:18** 1581:25 | **1925** 1810:13 |
| **yeah** 1488:10,19 | 1841:22 | **0011** 1500:11 | **11:19** 1583:3 | **1990s** 1475:18 |
| 1500:25 | 1842:17 | **0139A** 1690:6 | **11:20** 1583:22,25 | **1993** 1467:6 |
| 1501:13,15 | **year** 1467:5 | **04736** 1813:5,20 | **11:21** 1584:18,19 | **1994** 1471:3 |
| 1541:16 1544:1 | 1598:12 | **05** 1610:21 | **1121** 1461:6 | 1535:2 |
| 1544:3 1545:1 | 1637:20,23 | 1613:5,7,12 | **12** 1459:17,19,22 | **1995** 1470:5 |
| 1554:4 1557:14 | 1638:7,10,23 | 1715:25 | 1462:3 1832:24 | **1996** 1491:22 |
| 1557:20 | 1639:1,20 | **07** 1752:5 | 1833:13 1844:3 | **1999** 1474:9 |
| 1560:21 1561:1 | 1643:9 1645:7 | **07068** 1460:11 | **12-minute** | 1475:9 |
| 1563:11 1564:5 | 1645:21 1646:1 | **09** 1825:15 | 1731:6 | |
| 1564:19 | 1646:2,8 | | **12.27** 1686:23 | **2** |
| 1565:10,15 | 1647:12,15,16 | **1** | 1687:11 | **2** 1493:8,23 |
| 1580:9 1588:7 | 1648:5 1656:24 | **1** 1643:8 1779:11 | **12:27** 1652:18 | 1538:6,24,25 |
| 1588:22 | 1657:24 1745:4 | 1813:17 | **12:30** 1642:14 | 1539:20 |
| 1590:11 | 1758:9,13 | **1.1** 1745:20 | **1238** 1675:11,17 | 1572:22 1828:7 |
| 1592:20 1603:5 | **yearly** 1518:13 | **1/2** 1494:7 | 1680:8 | 1828:11 1829:7 |
| 1609:20 1610:2 | **years** 1468:6 | **1:30** 1652:16 | **13** 1494:7 | **2.2** 1615:22 |
| 1611:21 | 1469:18,19 | **1:33** 1652:18 | 1779:19 | **2:30** 1716:24 |
| 1613:22 1614:3 | 1470:14 1494:7 | **10** 1481:14 | **13%** 1745:1 | **2:54** 1741:1 |
| 1614:15 1627:1 | 1506:13 | 1494:2,2 | **134** 1657:24 | **20** 1638:8 |
| 1627:4,4,4 | 1511:25 | 1540:7 1543:25 | **136** 1657:20 | 1663:17 |
| 1634:23 | 1518:11 1540:7 | 1672:13 | **1360** 1460:14 | **20%** 1651:9,12 |
| 1658:18 | 1598:5,8 | 1731:10 | **14** 1594:13,14 | 1651:17,19 |
| 1684:12 | 1609:14 1623:2 | 1779:11 | 1627:6 1827:6 | **2000** 1471:3 |
| 1713:20 | 1623:10 | **10%** 1746:11 | **14.4** 1646:10 | 1483:5 |
| 1717:20 | 1629:17 1634:2 | 1779:10 | **14.9** 1645:25 | **2000s** 1475:18 |
| 1719:21 | 1638:9 1645:7 | **10,000** 1467:1 | **1400** 1461:18 | **2001** 1491:22 |
| 1720:22 | 1647:7 1662:9 | **10.6** 1758:7 | **1465** 1462:9 | 1558:25 |
| 1729:19 | 1665:19 | **10:43** 1546:12 | **15** 1629:3 1776:5 | **2003** 1479:14 |
| 1730:15 1731:3 | 1676:13 1730:7 | **10:47** 1547:21 | 1831:3 | **2004** 1478:17 |
| 1733:14 | 1736:22 | **1020** 1461:18 | **15-minute** | 1484:14 1540:6 |
| 1734:21 1737:3 | 1744:10 1776:6 | **103** 1460:11 | 1544:22 | 1773:8 1774:7 |
| 1737:21,25 | 1779:14 1831:3 | **10CM-CC00085** | **15%** 1638:7 | 1774:19 |
| 1738:24 | **yeast** 1793:13 | 1459:5 1844:15 | **15.4** 1637:22 | **2005** 1607:10 |
| 1740:25 | **yellow** 1582:13 | **11** 1540:7 | **1557** 1669:5 | 1609:22 |
| 1741:11 | **Yep** 1556:22 | 1624:19 | **1593** 1526:18 | 1657:17 1670:2 |

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 457 of 712 PageID #: 138621
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 457 of 712 PageID #: 138621

In Re Budke Jury Trial Official Transcript Vol VI   1/12/2015

1686:10,11
1687:16
1761:19 1785:2
**2006** 1484:4,17
1493:8 1494:23
1594:2 1776:5
**2007** 1479:15
1484:24
1501:22
1749:16 1754:7
**2008** 1516:20
1657:17 1753:7
1785:21
1786:14
**2009** 1703:24
1707:10
1753:10
1766:25
1785:24 1788:8
1788:25
1789:11
1790:23 1797:5
1798:17
1806:16
1813:13 1816:4
1816:13 1827:3
1828:7,11
1829:6,7
**201** 1460:7
**2010** 1510:11
1609:12
1612:17
1613:11
1614:22
**2011** 1634:1
1666:24
**2012** 1521:5
**2015** 1459:17,19
1462:3 1844:3
**21** 1482:12,15
**2105** 1465:22
**2106** 1829:4
**2107** 1829:4
**211** 1461:13
**215** 1460:14
**216.589.0256**
1460:15

**22** 1595:24
1686:10
1789:11
1790:23
1824:12 1829:6
**23** 1788:25
**23.5** 1646:10
**23rd** 1794:5
1795:12
**24%** 1638:22
**240** 1511:3
**25** 1686:11
1806:16
**25th** 1810:20
**26** 1827:3
**2656** 1534:7
**27.3** 1639:18
**277** 1686:17
**28** 1786:13
**28th** 1787:3
**29%** 1758:14
**29th** 1657:17
1795:14
**2nd** 1460:11
1494:23

_____

**3**

**3** 1621:24
1775:25
1776:21,24
1780:4
**3:00** 1731:4,13
1731:25
**3:05** 1741:1
**3:20** 1757:2
**3:22** 1757:2
**3:30** 1663:17
1740:21
**30** 1638:8
1756:21,23
**30-pound**
1825:15
**30%** 1534:23
**30th** 1795:13
**314.241.2929**
1460:5
**314.259.2000**

1461:14
**33.8** 1638:25
**34** 1686:22
**34%** 1638:25
**3600** 1461:13
**378** 1657:18
**380** 1460:7
1658:1
**386** 1844:16
**39** 1521:7,12
**39157** 1461:18

_____

**4**

**4** 1775:25
1776:22,25
1780:4
**4:00** 1663:18
**4:59** 1843:15
**40** 1638:9
**417.831.4046**
1461:7
**44113** 1460:15
**49%** 1660:20
1745:4 1758:10
**490.065** 1803:19

_____

**5**

**5** 1785:23 1797:5
1816:4,13
**5%** 1687:15
1696:1 1746:10
**5.2** 1627:8
**5:00** 1824:12
1839:23
1840:18 1843:3
**500** 1511:16
**514** 1656:19
1657:15,18
1743:24
**54** 1460:7
**55** 1653:25
**573.317.4156**
1460:8
**58%** 1536:18
1538:4

_____

**6**

**6** 1623:2
**6%** 1647:14
**6.0** 1629:2
**6.2** 1631:1
**6:00** 1833:17
**601.948.5711**
1461:19
**617** 1461:23
1844:21
**63101** 1460:4
**63102-2750**
1461:14
**65020** 1460:8
**65804** 1461:7
**691** 1816:16
**6th** 1594:2

_____

**7**

**7** 1615:21 1623:2
1748:9
**7,000** 1660:8
**750** 1492:25
1493:4
**76-year-old**
1797:15
**79** 1501:22

_____

**8**

**8** 1494:6 1615:21
1619:22
1703:24
1776:13
**800** 1460:4
**82** 1509:13
**84%** 1643:8
**87** 1645:18
**8th** 1657:17

_____

**9**

```
 1                  IN THE CIRCUIT COURT
              TWENTY-SIXTH JUDICIAL CIRCUIT
 2               CAMDEN COUNTY, MISSOURI
 3    DONALD BUDKE,                )
                                   )
 4                  Plaintiff,  )
                                   )
 5    v.                         ) No. 10CM-CC00085
                                   )
 6    LAKE AREA WOMEN'S CENTER OF )
      OBSTETRICS & GYNECOLOGY,    )
 7    a subsidiary of Lake       )
      Regional Medical Management )
 8    Inc., f/k/a Lake of the    )
      Ozarks Medical Management,  )
 9    Inc.; BECKY SIMPSON, M.D.; )
      JOHNSON & JOHNSON, a        )
10    New Jersey corporation;    )
      ETHICON, INC., a New Jersey )
11    corporation; and           )
      GYNECARE WORLDWIDE,          )
12    a division of Ethicon, Inc. )
      a foreign corporation,      )
13                                 )
                  Defendants. )
14
15            TRANSCRIPT - JURY TRIAL
16                  VOLUME VII
17               January 13, 2015
18
19      On January 13, 2015, the above cause came on
20    for Jury Trial before the HONORABLE WILLIAM R.
21    HASS, Judge of the Camden County Circuit Court at
22    Camdenton, Missouri, a jury of 12 and three
23    alternate jurors.
24
25
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 459 of 712 PageID #: 138628
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 459 of 712 PageID #: 138429

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

```
 1                    APPEARANCES
 2    For the Plaintiff:
 3         Ms. Amy Collignon Gunn
           THE SIMON LAW FIRM, PC
 4         800 Market Street, Suite 1700
           St. Louis, MO 63101
 5         314.241.2929
           agunn@simonlawpc.com
 6
           Mr. Erik A. Bergmanis
 7         BERGMANIS LAW FIRM, LLC
           380 West U.S. Highway 54, Suite 201
 8         Camdenton, MO 65020
           573.317.4156
 9         erik@ozarklawcenter.com
10         Mr. Adam M. Slater
           MAZIE SLATER KATZ & FREEMAN, LLC
11         103 Eisenhower Parkway, 2nd Floor
           Roseland, NJ 07068
12         973.228.9898
           aslater@mskf.net
13
           Mr. Benjamin Houston Anderson
14         ANDERSON LAW OFFICES, LLC
           1360 West 9th Street, Suite 215
15         Cleveland, OH 44113
           216.589.0256
16         ben@andersonlawoffices.net
17
18
19
20
21
22
23
24
25
```

In Re Budke Jury Trial Official Transcript Vol VII    1/13/2015

```
 1        A P P E A R A N C E S  (Continued)
 2   For the Defendants Becky Simpson, M.D. and Becky
     Simpson, M.D., P.C. d/b/a Lake Area Center of
 3   Obstetrics & Gynecology, a subsidiary of Lake
     Regional Medical Management, Inc., f/k/a Lake of
 4   the Ozarks Medical Management, Inc.:
 5        Mr. Kent O. Hyde
          Mr. David E. Overby
 6        HYDE, LOVE & OVERBY, LLP
          1121 South Glenstone
 7        Springfield, MO 65804
          417.831.4046
 8        kohyde@aol.com
          deovrby@cs.com
 9
     For the Defendants Johnson & Johnson, a New Jersey
10   Corporation; and Ethicon, Inc., a New Jersey
     Corporation:
11
          Mr. Dan H. Ball
12        Ms. Bettina J. Strauss
          BRYAN CAVE, LLP
13        One Metropolitan Square
          211 North Broadway, Suite 3600
14        St. Louis, MO 63102-2750
          314.259.2000
15        dhball@bryancave.com
          bjstrauss@bryancave.com
16
          Ms. Christy D. Jones
17        BUTLER SNOW LLP
          Renaissance at Colony Park
18        1020 Highland Colony Parkway, Suite 1400
          Ridgeland, MS 39157
19        601.948.5711
          christy.jones@butlersnow.com
20
21
22
23        Charles W. Motter, CCR No. 617
24     Twenty-Sixth Judicial Circuit at Camdenton,
25                  Missouri
```

Page 1848

1                    I N D E X

2                   VOLUME VII

3               January 13, 2015

4                   JURY TRIAL

5                                        Page

6   Certificate of Reporter ...................2191

7           PLAINTIFF'S WITNESSES

8   DR. ANNE WEBER

9       Cross-Examination (cont'd) by Ms. Jones  1883

        Cross-Examination by Mr. Overby  ........2033

10      Redirect Examination by Mr. Slater  .....2049

11  EUGENE DIXON (by video)

12      Examination ...........................2116

13  DAVID BUDKE

14      Direct Examination by Mr. Slater  .......2141

15  MARTIN WEISBERG (by video)

16      Examination ...........................2160

17  SEAN O'BRYAN (by video)

18      Examination ...........................2175

19

20

21

22

23

24

25

Page 1849

1              (Proceedings began at 8:58 a.m.)

2                    (The following proceedings were

3     held in the courtroom outside the presence of the

4     jury:)

5                    THE COURT:  Okay.

6                    MR. HYDE:  Can I tell you what the

7     issue is, Judge?

8                    THE COURT:  Yeah.  Let's get

9     everybody here where they can hear you.

10                   MR. HYDE:  We thought best address

11    it before the cross-examination of Dr. Weber.

12         It was brought up her charges and fees

13    yesterday, which is appropriate.  The fact is,

14    she's been paid almost a million dollars by

15    plaintiff's firm.  Okay?  And so we intend to ask

16    her about that, but don't want to violate the

17    ruling and the motions in limine on all these

18    other cases that are filed and pending, which, of

19    course, would not be relevant.

20         So my view on this is very simple.

21         The law is very clear that other lawsuits

22    would not be relevant and highly prejudicial in

23    this case, and she will not be asked about those,

24    but certainly the witness connection to the

25    plaintiff's lawyer is very relevant.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 463 of 712 PageID #: 138627
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 463 of 712 PageID #: 138627

In Re Budke Jury Trial Official Transcript Vol VII    1/13/2015

Page 1850

 1          And of course that instruction has

 2     already been given to the jury in -- in

 3     Instruction 201 --

 4                    THE COURT:  In Instruction 201.

 5                    MR. HYDE:  -- where the interest

 6     of the witness in the outcome of the case, the

 7     behavior, the relationship of the witness to any

 8     of the parties, et cetera, is to be considered by

 9     the finder of the fact.  In this case, the jury.

10          So it's simply our view that's obviously

11     relevant.  We intend to do it.  I just thought if

12     there's going to be some kind of problem with it,

13     we'd just bring it up ahead of time.

14                    MR. BALL:  We agree with that same

15     position.  I'd just add in that since January of

16     2010, Ms. Weber -- Dr. Weber has testified that

17     her full-time -- that her only employment, her

18     only employment, is working for Mr. Slater.

19          So -- I'm not sure whether it's since

20     January 2010, but certainly presently and for the

21     past few years, that has been her employment.

22          And the plaintiff injected into the case

23     that she'd done a 500-page report, that she's

24     reviewed thousands of pages of testimony, that

25     she's reviewed hundreds of thousands of pages of

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 464 of 742 PageID #: 133628
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 464 of 742 PageID #: 133628

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1851

1   documents, and he's created an impression that

2   that was all done for $88,000 and that's just not

3   accurate.

4           And so for all of the reasons that Kent

5   said plus what we say, we just want to know that

6   we're going to ask those questions and we are not

7   thereby opening the door to anything else.

8                   MR. SLATER:  Good morning, Judge.

9                   THE COURT:  Good morning, sir.

10                  MR. SLATER:  How are you?

11                  THE COURT:  I'm fine.

12                  MR. SLATER:  Good, thanks.

13          We never said that she was paid $88,000

14  to look at all those documents.  We said, "How

15  much time have you spent in this case," and she

16  said how many hours she spent in this case, and

17  that was a truthful statement.

18          Nobody in the world would pay Dr. Weber

19  the amount of money and have the amount of time

20  spent for one case for this case.

21          Dr. Weber --

22                  THE COURT:  I didn't understand

23  that.

24                  MR. SLATER:  And I just want to

25  let you know the full background and then

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 465 of 742 PageID #: 138629
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 465 of 742 PageID #: 138629

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

1    Mr. Anderson is also going to give you some

2    background because Judge Goodwin has ruled --

3    because all the experts that come in front of him

4    are not just acting as an expert in one case but

5    they're doing what Dr. Weber does.

6                    THE COURT:  Sure.  I mean, I

7    understand that.

8                    MR. SLATER:  And here's the fact.

9    Dr. Weber is working as an expert available to

10   testify in 7,000 cases in New Jersey, okay?

11            We have 7,000 cases in New Jersey, and I

12   retained her to not just be the expert in one case

13   or two cases but to be available -- whenever a

14   case comes to trial in that litigation to be

15   available to be able to testify in those cases.

16            That's what she's retained to do and now

17   here she is in Missouri and she was ready to

18   testify in Joplin earlier this year.

19            She's also working as the expert -- she's

20   already testified in Linda Gross' case, which is a

21   two-month trial in New Jersey.  She's ready to

22   testify in the Wicker case, which we're hoping is

23   going to be scheduled in two months in New Jersey.

24   We have several other cases that we're pushing

25   hopefully towards trial.  She is available to work

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 466 of 712 PageID #: 133620
Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 466 of 712 PageID #: 133620

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1853

1   in those cases.

2          The work she's done is not limited to

3   this case and she hasn't been paid just in this

4   case on the other things.

5          I didn't mislead the jury.  We asked the

6   time she spent just on the Budke case, looking at

7   these records, these depositions, doing what she's

8   done here.  She told the truth.

9          If they want to ask her the total amount

10  she's been paid, we don't want to mislead the jury

11  about anything.  We want them to know the absolute

12  whole truth.  And the whole truth is that time has

13  been spent in a lot of women's cases.  She's

14  looked at the records I think of about 15 other

15  women.  I'm talking in-depth, because we have

16  other cases that are going through the bellwether

17  discovery process in New Jersey and then it gets

18  whittled down.

19          She's constantly looking at cases for me

20  because I represent 300 women.  And lawyers from

21  around the country call me and say, "Hey, I have a

22  question about this, I have a question about

23  that," and I consult with her, because as lead

24  counsel of the New Jersey litigation, I have an

25  obligation to be available to lawyers around the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 467 of 712 PageID #: 138681
Case 2:12-md-02327 Document 3102-6 Filed 05/09/16 Page 467 of 712 PageID #: 63421

In Re Budke Jury Trial Official Transcript Vol VII    1/13/2015

Page 1854

1    country to consult and help them and share my

2    knowledge.

3          So if they want to ask about the total

4    amount, I'm happy for them to do that, but she has

5    to be allowed to tell the truth to the jury --

6                THE COURT:  Well, right.

7                MR. SLATER:  -- about what she's

8    done, and that way the jury won't be misled at

9    all.

10         And as Mr. Anderson can tell you, Judge

11   Goodwin has ruled he doesn't even want them to

12   know the total amount an expert has been paid.  He

13   says, "Tell them the amount they've been paid on

14   that matter alone," because he doesn't want to get

15   into all this, and he's ruled that way, is my

16   understanding.  Mr. Anderson has tried cases in

17   front of Judge Goodwin.

18                MR. ANDERSON:  Your Honor, if I

19   could real quick.

20                THE COURT:  Sure.

21                MR. ANDERSON:  Unlike a lot of the

22   cases that Your Honor may see, this is one piece

23   of a larger puzzle, and --

24                THE COURT:  Yeah.  It's a small

25   piece of the pie.

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 468 of 742 PageID #: 132682
Case 2:12-md-02327  Document 3182-6  Filed 05/09/16  Page 468 of 742 PageID #: 63428

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1855

1              MR. ANDERSON:  Well, it's just --

2              THE COURT:  Well, I mean, yeah,

3    it's --

4              MR. ANDERSON:  There's a lot of

5    cases involved --

6              THE COURT:  Yes.

7              MR. ANDERSON:  -- and so in the

8    MDL context, we have generic experts and we have

9    case-specific experts, and the general liability

10   experts are brought in to testify for all of the

11   women in the particular MDL.

12             THE COURT:  Gotcha.

13             MR. ANDERSON:  Yes, sir.

14        And so what Judge Goodwin has recognized

15   is in his courtroom, he says, "You know, it's not

16   going to be fair to talk about all of the cases.

17   You can ask them about the case that's involved

18   and you can ask them how much money they've made

19   in that case."

20        And in fact, it's interesting that the

21   defendants are on the other side of this argument

22   before Your Honor this morning, because not a

23   month ago we were sitting in Judge Goodwin's

24   chambers and Ms. Jones said, "Your Honor, I want

25   to make sure that it's clear that when we question

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 469 of 712 PageID #: 138633
Case 2:12-md-02327 Document 3102-6 Filed 05/09/16 Page 469 of 712 PageID #: 138429

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1856

1    our experts about how much they've been paid,

2    we're only going to talk about this case, in line

3    with your prior rulings, Judge.  I want to make

4    sure of that."

5           And he said, "Yes, Ms. Jones, that's what

6    we're going to do."

7           Now we find ourselves, when it's

8    convenient, they -- they're on the other side of

9    the issue saying, "Oh, no, we want the expert --

10   we want to be able to ask questions about all the

11   money they've made."

12          And so it makes sense in the context of a

13   case where there's a limited number of experts who

14   have to look at tens of thousands of cases, or be

15   responsible for them as a general expert, that the

16   jury hear what they did, the work that they did in

17   this case.

18          Otherwise, if they -- you know, let's do

19   what's fair.  Let's make sure the playing field is

20   level here.  If they want to get into that, then

21   we got to talk about all the other women in the

22   other lawsuits that she's working on.

23               MS. JONES:  Could I just clear up

24   one thing?

25               THE COURT:  Sure.

Page 1857

1          MS. JONES:  Just so we're clear,

2    the colloquy that Mr. Anderson reported did, in

3    fact, happen.  It happened as a result of an event

4    in another trial where there had been a

5    stipulation and an agreement that we were only

6    going to address payments in that particular file

7    and that agreement was not abided by, and so that

8    was -- it was a matter of trying to confirm that

9    agreement at that point.

10         All I would say in this case is, it is

11   our position that the bias and -- the amount that

12   the plaintiff has been -- excuse me, that the

13   witness has been paid demonstrates her bias,

14   without regard to the amount of work that she's

15   done, and as Mr. Hyde has suggested, the other

16   cases are totally irrelevant.

17         The reason we're having this discussion

18   is, we don't want to get into a situation where

19   there's discussion of all of the other cases.  In

20   fact, when there was a mention of other cases

21   yesterday, we were a little bit concerned but let

22   it go.

23         I will say that Dr. Weber has testified

24   that she's only consulted in six cases.  Now, that

25   was six months ago when she'd only been paid

Page 1858

1   eighty- -- $800,000, but --

2               MR. BALL:  So, Your Honor, we have

3   two principles of law here.

4          We have one principle is you shouldn't be

5   talking about other cases in front of the jury --

6               THE COURT:  I don't want to do

7   that.

8               MR. BALL:  -- and we have another

9   principle that says, according to the -- wherever

10  the book goes -- according to the MAI and

11  long-established law that you're entitled to

12  question about the financial interest of a witness

13  for possible bias.

14         Just because -- so that is an established

15  principle.  The other is an established principle.

16         The plaintiffs are trying to say if we

17  exercise our right on one established principle,

18  that that overrules the other established

19  principle, and that's not the case.  That's not

20  the case.

21         What they're trying to do is to prevent

22  us from showing the financial interest of this

23  witness by holding this threat of other lawsuits

24  which are clearly not admissible, and they're

25  trying to tie the two together and that should not

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 472 of 742 PageID #: 132636
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 472 of 742 PageID #: 132632

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1859

1    be allowed.  They're two different issues.  One is

2    financial interest; the other is other lawsuits.

3              MR. ANDERSON:  Another principle

4    that applies here, Your Honor, whether it's

5    Missouri or Alaska, and that's fundamental

6    fairness and making sure that each party is able

7    to put in something that is balanced.  And you've

8    just heard it.  Judge Goodwin has ruled the other

9    way.  No one disputed that.  And now you've heard

10   from counsel, "Your Honor, we want it both ways.

11   We want to be able to put in the money but we

12   don't want them to talk about the cases."  That's

13   an unlevel playing field --

14              THE COURT:  Well, I think --

15              MR. ANDERSON:  -- and that's not

16   fair.

17              THE COURT:  I think night follows

18   day.  I think if you talk about one, you got to

19   talk about both, to some extent.

20              MR. ANDERSON:  Yes.

21              THE COURT:  Here's the whole

22   thing.  I made a quip and I think it's on the

23   record.  And bless my heart, I'm going to be real

24   truthful with you.  I probably paid more attention

25   to Kent way back early on.  I said, "How do you

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 473 of 712 PageID #: 128687
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 473 of 712 PageID #: 63687

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1860

1    work these documents?"  Because I began to see

2    that everybody was carrying boxes and boxes and

3    boxes.  And he told me something and I don't think

4    that's any secret or has anything particularly to

5    do with this case.  He said, "We're at the point

6    in this type of litigation where you don't

7    exchange paper, you exchange hard drives."

8                 MR. SLATER:  They give us hard

9    drives usually with a hundred to 200,000 documents

10   -- pages of documents at a time.

11                THE COURT:  This is kind of -- I

12   mean, and as far as they went but that's what I

13   kind of gathered.  Then I --

14                MR. SLATER:  And then they put

15   them on computer systems and people search them

16   with -- I don't understand how to do it.

17                THE COURT:  Right.  And I know

18   it's out there -- a lot of is out there in the

19   cloud somewhere.

20        So I made the comment, just kidding -- I

21   think it was while some of y'all were around; it

22   was up here after a pretrial -- I said, "Well, how

23   long am I supposed to take to read this?"  And he

24   made some comment like at that time maybe there

25   were -- I don't remember, what, 10 million page --

Page 1861

1   or maybe 2 million -- 2 million pages, and now you

2   say it's more like 10.

3           And I said, "Well, that would take

4   while."

5           He said, "I -- just calculating it out,

6   if you sat and read 8 hours a day 5 days a week,

7   you'd probably get it done in about 13 years."

8           And that's kind of -- I made that quip on

9   the record, "I don't think I'm going to spend -- I

10   don't think I have 13 years I can spend on reading

11   all this record."  I made that comment.  You

12   know --

13                   MR. SLATER:  You said that in

14   front of the jury yesterday or the day before --

15                   THE COURT:  Yeah.

16                   MR. SLATER:  -- and I think you

17   got a good laugh about it.

18                   THE COURT:  Yeah, and everybody

19   kind of laughed about it.

20           But here's the whole thing.  I understand

21   where both of you are coming from, and I think

22   that if they want to raise the issue that she's

23   made more than that amount of money, then she's

24   got a right to say, "Well, yeah, but I -- this is

25   not the only case I've got."

Page 1862

1          I mean, nobody -- surely nobody that

2    hears this testimony is going to think that she

3    read all that -- that much stuff for that amount

4    of money.  I don't know.  Because -- well, we know

5    that it didn't take 13 1/2 years, and I doubt, if

6    she got on the stand under oath, she'd say "I've

7    read all 10 million pages."

8                  MR. SLATER:  And I doubt I'd be a

9    very good businessman as a lawyer if I hired her

10   and --

11                 THE COURT:  Yeah.

12                 MR. SLATER:  -- paid that much in

13   just one case.

14                 THE COURT:  I was going to say, if

15   you're paying that kind of money, could I just

16   maybe retire and do -- carry your books around or

17   something?  I mean, you know, if people got that

18   kind of money to give away.

19          I don't want to mishandle this, and I've

20   tried to watch what these other judges are doing

21   to the extent that I could, because they've had a

22   lot more experience at it than I have.

23          Somebody made comment a minute ago and I

24   don't know that much about all of this.  I know

25   that I've got this case here and it's -- I'm

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 476 of 742 PageID #: 63640
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 476 of 742 PageID #: 63430

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1863

1    about -- well into it.  Not quite halfway, but I'm

2    well into the swamp.  And somebody mentioned a

3    case in Joplin.  Now, I don't know anything about

4    that.  Don't care anything about it.  But as far

5    as I know, that's about all of this litigation

6    that's going on in the Show-Me state right now.

7    There may be more.

8                     MR. SLATER:  We had three cases in

9    Joplin.  They settled.

10                    THE COURT:  Okay.

11                    MR. SLATER:  They were actually

12   the only three cases that have settled in the

13   United States with J&J.

14                    THE COURT:  Okay.  Well, see, I

15   didn't even know that, so it's not like I've

16   snooped around.

17                    MR. SLATER:  No, no.

18                    THE COURT:  All I'm saying is I

19   don't have much jungle drum around here from my

20   other judge friends or lawyers who say, "Hey, we

21   know a lot about that," because, you know, when

22   I -- when I had mentioned that I had this

23   Ethicon/Johnson & Johnson case, they said, "I

24   didn't know there was any of that going on around

25   here," and I said, "Well, come to Camdenton."

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 477 of 712 PageID #: 133641
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 477 of 712 PageID #: 133454

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1864

1          How, then, do you suggest -- I don't want

2     to build an error in or something here, but how do

3     you suggest we do this?  Because I think -- I

4     think the jury would have a question, maybe, in

5     their mind, has she spent all this many hours on

6     this case that we're hearing.

7               MR. SLATER:  Our suggestion is

8     it's up to them if they want to open the door on

9     this, and, you know, the law being where -- and

10    I'm just reading from, you know, boilerplate law

11    from State v. Shockley.  It's a Missouri Supreme

12    Court case --

13              THE COURT:  All right.

14              MR. SLATER:  -- where the Court

15    says, "Where the defendant has injected an issue

16    into the case, the plaintiff may be allowed to

17    admit otherwise inadmissible evidence in order to

18    explain or counteract a negative inference raised

19    by the issue.  Defendant objects."  Basically

20    open-the-door stuff.

21          So that law is -- you know, that's the

22    black letter law in any state in the country.

23          It's up to them.  I just say if they

24    raise the issue, as Mr. Anderson says, let's tell

25    the jury the truth and not mislead the jury.  So

1   we didn't inject the issue in.  If they want to

2   raise it, she should be allowed to tell the jury

3   the truth.

4                   THE COURT:  Let me ask you this --

5   no.  Go ahead.  Go ahead.

6                   MR. BALL:  Could I?

7                   THE COURT:  I'm sorry.

8                   MR. BALL:  If I could respond to

9   that, Your Honor, before we get too far.

10                  THE COURT:  Yes.

11                  MR. BALL:  They injected this

12  issue by create- -- by saying she did this 5-0-0

13  page report --

14                  THE COURT:  Yes.

15                  MR. BALL:  -- and she read all of

16  the testimony and all of the documents and things.

17  They're -- they didn't say, "You did $88,000 to

18  read Mrs. Budke's records" and that type of thing.

19                  MR. SLATER:  But we did.

20                  MR. BALL:  Excuse me.

21        They went into considerable detail as to

22  what all she had done.  They had a list up there,

23  "Materials Reviewed."  It had like 10 bullet

24  points on it, okay?

25                  So they've created -- they have created

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 479 of 712 PageID #: 136643
Case 2:12-md-02327 Document 2182-6 Filed 05/09/16 Page 479 of 712 PageID #: 63489

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1866

1   that impression.  They're the ones that have

2   injected the issue.  And it seems to us that

3   having done that, having put in that she did a

4   500-page report and having put in how much time

5   she read and she read every one of things, that

6   we're entitled to show her -- the amount of money

7   that she has charged here.

8          Now, if they -- so the -- and then the

9   flip side of that -- this is all a weighing

10  process.

11         The flip side of that, of them turning

12  around and saying, you know, "She's worked --

13  there's thousands of cases pending," that's just

14  unfairly prejudicial and improper.

15         If they want to say something like "You

16  have also worked on some other cases," period --

17  period -- then that's something that could be

18  considered.  But to get into details beyond that

19  is inappropriate.

20              MR. OVERBY:  Your Honor, if I

21  could, just very briefly.

22              THE COURT:  Go ahead.

23              MR. OVERBY:  What I would do in

24  this case is what we do in every case.

25         If, for example, there's an expert

**In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015**

Page 1867

1   witness who testifies frequently for a particular

2   law firm, you might ask them "How much money have

3   you been paid by X?"  By that law firm.

4          That's not getting into -- because I

5   think there's a difference if you say "You've

6   looked at all this stuff and you got paid X

7   dollars to look at all that stuff."  That clearly

8   could, potentially at least, open up the fact that

9   she's looking at all that stuff for multiple

10  cases.

11         The question, "How much money have you

12  been paid by Mr. Slater or his firm," though, goes

13  straight to her credibility.  It's no different

14  than any other case that we have when an expert

15  gets paid a hundred thousand dollars a year.  We

16  all know that's not on one case.  Or has been paid

17  X dollars from a firm.  Of course it's on other

18  cases.

19         It's not really opening up the details of

20  what she did, but it goes straight to her

21  credibility and her incentive to testify the way

22  that she does, which is part of what the jury

23  is --

24             THE COURT:  Well, that's -- it's

25  true that the first instruction I gave in this

1   case and every other civil case states that the

2   jury can consider the weight to give to the

3   testimony based on different things, and one

4   incentive is "What have you been paid to do it."

5            MR. BALL:  Right.

6            THE COURT:  I don't -- here's the

7   whole thing.  I don't want to open a can of worms

8   because we've just got so long to try this and if

9   we get into that and take all the time doing that,

10  then we'll be down there and --

11         I tend to understand what Mr. Overby is

12  telling me.  What do you -- what do you say about

13  that?  Is it --

14            MR. ANDERSON:  It's in a different

15  context, and he knows it.

16         In the context of an MDL litigation,

17  where you have tens of thousands of cases, and you

18  have -- and that's just in the federal case, and

19  then you have state court cases that have

20  consolidated cases, it's a different ball game.

21  This is a different creature we're working with,

22  Your Honor.

23         And I know you'd probably prefer not to

24  have something that had all of this baggage with

25  it, but indeed it does --

1                    THE COURT:  Right.

2                    MR. ANDERSON:  -- and in front of

3    you is a case that is attached to a lot of other

4    cases, and so if they're going to try to create

5    the bias, fundamental fairness, making sure the

6    playing field around here is level, says yes, you

7    give them that instruction, but we should have an

8    opportunity to be able to explain what that goes

9    to, so that the jury gets the full story, Your

10   Honor.

11                   THE COURT:  All right.  I'm not --

12   hey, I'm not fussing about it.  I just was making

13   a comment you may burn a lot of clock.  If you

14   want to burn it, burn it.  That's fine with me.

15   I'm here -- I'm here until the end of the 23rd.

16   If you can make it work, make it work.  But I do

17   think they're entitled to inquire on the --

18                   I mean, this was like a treatise she gave

19   yesterday.  I mean, it's like she -- if it were a

20   law professor you had up here, "How many Hornbooks

21   have you written about this, you know, Professor?"

22                   It's obvious that her knowledge extends

23   far beyond reading the decedent's medical records.

24   I don't think anybody in their right mind thinks

25   that they paid them $88,000 to read those medical

Page 1870

1    records.

2           Her knowledge of this was so expansive

3    that I had to stay on it, and we -- I don't know

4    how many conversations we had up here in sidebar

5    over that, because it's pretty obvious she has

6    some pretty direct opinions, and of course those

7    are based on a number of things, one of which is

8    that she's researched this for beaucoup number of

9    cases.

10          So it's not like she just put all this

11   knowledge into the Budke case and then she's going

12   to go home and clean her computer off and start

13   over again.

14          I think you're entitled to inquire as to

15   whether her -- if she did all -- if she did all

16   that she's done for $88,000.

17                MR. BALL:  Well, Your Honor --

18                THE COURT:  How do you -- okay.

19   Tell me how you want to --

20                MR. BALL:  Well, I mean, we

21   think -- we think that the -- that it should be --

22   just like David Overby said, that it should be a

23   situation where -- and I've encountered this with

24   recurrent experts all the time, and "How much has

25   this law firm paid you" --

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 484 of 742 PageID #: 133648
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 484 of 742 PageID #: 133648

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1871

1              THE COURT:  Yeah.

2              MR. BALL:  -- and then that

3    doesn't allow them to come in and talk about all

4    the other cases, you know, that -- that are out

5    there.

6         And just because there is an MDL doesn't

7    change that.  You're entitled to talk about the

8    bias of a witness as it relates to payments from a

9    lawyer and the fact that that's -- this is her

10   only job is working for this lawyer.

11              MR. SLATER:  That's actually not

12   accurate, though.  She does do other things, Your

13   Honor.  They can ask her that.  We're not trying

14   to stop them from asking the question.

15              MR. BALL:  She testified that this

16   is her only source of income, okay?  So --

17         But if we do that, what we don't want to

18   do is turn around and hear about other cases,

19   because you've ruled that out, so that's why we're

20   having this discussion, and it's obvious it's

21   appropriate we're having this discussion.

22              THE COURT:  Well, what has sen --

23   is there any way she can pare down that amount?

24   Because I mean otherwise, if they say, "Well,

25   she's gotten $5 million" or 1 million or

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 485 of 742 PageID #: 133649
Case 2:12-md-02327 Document 3152-6 Filed 05/09/16 Page 485 of 742 PageID #: 133649

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1872

1   whatever -- 50 cents, whatever the number is,

2   then, you know, it sounds like, "My God, they have

3   spent a million dollars in testimony on this

4   case."

5           MR. SLATER:  We just want to tell

6   the jury the truth.  If they want to ask the

7   question, she should be allowed to tell the truth

8   in response.  That's all we want to do.

9           MR. BALL:  If they can talk about

10  how much money she's spent reviewing all the

11  documents and doing the 500-page report without

12  reference to the other cases -- okay? -- give us

13  that number.

14          MR. SLATER:  Mr. Ball, I don't

15  know what we're going to do.  We can't make up a

16  new reality.

17          MS. GUNN:  Open is open.  If they

18  want to talk about it, we get to talk about it.

19          MR. SLATER:  She's under oath to

20  tell the truth.

21          MS. GUNN:  It's their choice.

22          MR. SLATER:  Yeah.  We're not

23  going to lie to the jury.

24          MS. STRAUSS:  It's a Hobson's

25  choice, Your Honor.  That's not an appropriate

Page 1873

1    choice.

2            We're suggesting one question and one

3    answer that doesn't open up an entire scope and

4    allows us to do what is required under Missouri

5    law on bias.

6            As you can imagine, almost a million

7    dollars, or whatever number they want to come up

8    with --

9                    THE COURT:  Yeah.

10                   MS. STRAUSS:  -- that doesn't

11   reference these six other cases that she reviewed,

12   is a substantially higher number than the 88,000

13   they offered yesterday, and right after that, they

14   went into this long list of the hundreds of

15   thousands of documents of depositions and

16   consultants.

17                   THE COURT:  All right.  Here's

18   what I'm going to do and I may commit an error

19   right here and if I do, well, that's -- you know,

20   me bad and I'll learn something from it.

21           I'll let you ask that question and I'll

22   let you ask three repair questions, but we're not

23   going to get into the MDL litigation --

24                   MR. BALL:  What would the three

25   be, though?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 487 of 742 PageID #: 132651
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 487 of 742 PageID #: 134471

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1874

1                     THE COURT:  What?

2                     MR. BALL:  What would the repair

3    questions be?

4                     MS. GUNN:  Open is open.

5                     THE COURT:  Gosh, I don't know.

6    Huh?

7                     MS. GUNN:  Open is open.  If they

8    want to talk about it, then we get to respond, or

9    we leave it as it is.

10                    MS. STRAUSS:  Your Honor, it

11   requires a --

12                    THE COURT:  But the 88,000 is not

13   a true figure.

14                    MR. SLATER:  Well, but I phrased

15   it as "How much money have you been paid for the

16   work you've done specifically in this case?"  And

17   I -- and we can put the transcript in front of --

18                    MS. STRAUSS:  And right after that

19   you spent all this time talking about the other

20   things --

21                    MR. SLATER:  Well, I did, but the

22   jury was --

23        Look, I told -- nothing was misleading.

24   I said she was paid 88,000 in this case.  That's a

25   truthful statement.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 488 of 742 PageID #: 136652
Case 2:12-md-02327 Document 3756-6 Filed 05/09/46 Page 488 of 742 PageID #: 1684R3

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1875

1          And then I said, "Let's talk about all

2     the things you've done in general," and we went

3     through it.  I didn't ask how much she's been paid

4     for that.

5          I'd welcome them to say, "And for all

6     that other work, you've been paid, about -- you

7     know, close to a million dollars," or whatever the

8     number is.  And I don't even know.  I'm afraid to

9     ask my bookkeeper.  But whatever it is.

10          And then Dr. Weber should be able to say,

11     "Yes, I have, and, you know, this is what I'm

12     doing it for and this is the context," and then

13     the jury hears the truth.

14               MS. STRAUSS:  Judge --

15               MR. SLATER:  I've never had

16     actually, in my career, an argument like this

17     where someone is trying to set up their cross on

18     bias of my expert to say, "Look, we're going to

19     impeach their expert.  We don't want the expert to

20     be able to tell the truth about what he or she

21     did."

22          I don't -- I think we're just burning

23     time here.  I don't think they're going to do it.

24     I think it's going to be two questions or three

25     questions total, anyway, because they don't want

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 489 of 742 PageID #: 138653
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 489 of 742 PageID #: 118449

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1876

1    to go there because they don't want to open the

2    door and Hobson's choices happen all the time and

3    we always have to weigh things.

4                 MS. STRAUSS:  Judge --

5                 MR. SLATER:  That's the hard thing

6    of being a trial lawyer.

7                 MS. STRAUSS:  Judge, there are two

8    different standards that apply here.  It is not

9    error for you to allow us to put her number in to

10   show bias without addressing the standard of other

11   cases which have to be substantially similar and

12   all of the other standards that apply.

13          It's one question and answer.  It's also

14   curative of what they did yesterday and it does

15   not open the door.

16                 MR. ANDERSON:  Your Honor, they

17   want it both ways and it's not fair.  If they want

18   to come in and say that, as Your Honor has pointed

19   out, we have a chance to rebut it.  That's what's

20   fair.

21                 MR. SLATER:  She's under oath --

22                 MR. ANDERSON:  Night does follow

23   day.

24                 THE COURT:  Well, what I fear is,

25   though, we'll go beyond fair and just get -- we'll

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 490 of 712 PageID #: 128654
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 490 of 712 PageID #: 128654

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1877

1   make a case within a case over what all she's

2   doing, and I don't want to get into that.

3                MR. SLATER:  It's up to them.

4                MR. BERGMANIS:  If they open the

5   door --

6                MR. SLATER:  We're not saying they

7   can't ask about bias.  We just want her to tell

8   the truth.  When she's on the stand under oath,

9   she just wants to tell the truth.  That's all.

10               MR. BALL:  It's not error for you

11  to rule that we're entitled to look into bias,

12  which is totally proper under the rules, and it

13  would be error to say that that opens the door to

14  dozens or hundreds or thousands of other lawsuits.

15  That's where we are.

16               MR. ANDERSON:  But that's not --

17  yeah, but that's not what we said that we want to

18  do.

19          They make these broad sweeping arguments

20  and they're not specific.

21               THE COURT:  Let's just do this:

22  Let's just go ahead and play the tune and I'll

23  tell you when I've heard all of it I want.  Okay?

24               MR. BALL:  But are you going to

25  let them ask questions --

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 491 of 712 PageID #: 133655
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 491 of 712 PageID #: 133655

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1878

 1            I mean, we need to know this because --

 2                 MR. SLATER:  We're not conducting

 3   your cross, so --

 4                 MR. BALL:  Excuse me.  Will we be

 5   -- if we say something about the amount of money

 6   she's been paid, will they then be allowed to ask

 7   anything about other lawsuits?

 8            Because if they are --

 9                 MR. SLATER:  Depends what you ask,

10   how you ask it, sir.

11                 MS. STRAUSS:  Right.  The reason

12   for asking for a ruling now, Your Honor, is that

13   that is not going to be appropriate in this case

14   and we don't want to do that, but we think we're

15   entitled to --

16                 THE COURT:  Well, depending on

17   what she says, but I don't want to open the door

18   on this thing, but I think we've got -- we've got

19   to know that there -- something happened to cause

20   her to do all the work that she's done for the

21   amount of money that she's --

22                 MR. BERGMANIS:  She should be

23   allowed to testify truthfully.  She's going to be

24   -- she's a medical doctor.  She's under oath.

25                 THE COURT:  Hey, if she's under

Page 1879

1    oath and she says, "This is what I got," okay,

2    asked and answered.  All right?

3              MR. BERGMANIS:  And if asked,

4    "What did you get paid all this money for," she

5    needs to be able to tell truthfully what work she

6    did.

7              MS. STRAUSS:  We're not going to

8    ask her that question.

9              THE COURT:  Okay.  Let's --

10             MS. STRAUSS:  We're just going to

11   ask her what she's been paid --

12             THE COURT:  Okay.  Let's --

13             MS. STRAUSS:  -- by Mr. Slater's

14   firm.

15             THE COURT:  All right.  All right.

16             MR. SLATER:  Okay.  We're good.

17             THE COURT:  All right.  We're

18   good.  I think.  Anyway, we may be back up here,

19   but --

20             MR. HYDE:  Sorry about the time,

21   Judge.

22             THE COURT:  That's all right.

23             MR. SLATER:  You're the master of

24   your question, and once the question comes out,

25   you don't control it anymore.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 493 of 742 PageID #: 133657
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 493 of 742 PageID #: 133657

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1880

1          THE COURT:  There you go.

2       Let's bring the jury up.

3          MR. BALL:  Your Honor, I still

4  don't understand.  I want to make sure we

5  understand.

6          MR. SLATER:  Oh, come on.

7          MR. BALL:  I still don't

8  understand.  I still don't understand.  Just one

9  question I've got.

10         THE COURT:  Yeah.

11         MR. BALL:  If we ask the

12  question -- if we ask the question "Have you been

13  paid almost a million dollars by Mr. Slater's

14  firm," are they going to be allowed to ask

15  questions about other lawsuits that she's worked

16  on?  That's the question I have.

17      We have to know that before -- because I

18  don't want to ask --

19         THE COURT:  Unless you ask --

20  unless you ask it -- "Have you gotten a million

21  dollars to do what you're doing in this case?"

22         MR. BALL:  No, that's not what

23  we're going to -- what now?

24         THE COURT:  I don't know.  Just

25  ask it and we'll get into it when it comes.  I

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 494 of 742 PageID #: 136658
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 494 of 742 PageID #: 136658

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1881

1   don't know what to tell you.

2               MR. BALL:  Yeah.

3               THE COURT:  I think it's beyond my

4   pay grade, but, you know, I'm going to try to do

5   the right thing.

6               MR. BALL:  I know you are, Judge.

7               THE COURT:  I don't want to spend

8   the rest of the week litigating this thing, but I

9   think it's a fair question, "You didn't do all of

10  this for $88,000, did you?"

11        Now, I don't know how you want to phrase

12  it.

13              MR. BALL:  All right.  Okay.

14              THE COURT:  Maybe that's a country

15  boy way.  But anyway...

16              MR. HYDE:  We thought it would

17  have been a good idea to get here at 8:30 but we

18  messed that up, I guess.

19              THE COURT:  Yeah.

20  Woulda-coulda-shoulda.

21              (The following proceedings were

22  held in the courtroom in the presence of the

23  jury:)

24              THE COURT:  Good morning.

25              JUROR:  Good morning.

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1882

 1                    THE COURT:  Well, we're off a

 2    little but maybe we're getting closer.  Keep

 3    hoping.

 4                    JUROR:  Good morning.

 5                    THE COURT:  Good morning.

 6                    JUROR:  They took our water.

 7                    THE COURT:  Somebody missing

 8    water?

 9                    JUROR:  Yeah.  They took our

10    water.

11                    THE BAILIFF:  All present and

12    accounted for.

13          Court's back in session.

14                    THE COURT:  All right.  Be seated.

15          Let's see.  You had completed your direct

16    testimony of the doctor, correct?

17                    MR. SLATER:  Yes, Your Honor, and

18    I believe Ms. Jones began her cross --

19                    THE COURT:  Yeah, she did.

20                    MR. SLATER:  -- and Dr. Weber is

21    ready to step back up and continue her testimony.

22                    THE COURT:  Is it all right that I

23    just remind her of the oath that she took or do

24    you want me --

25                    MS. JONES:  Absolutely.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 496 of 742 PageID #: 132660
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 496 of 742 PageID #: 63450

Page 1883

1            THE COURT:  -- to re-swear her?

2       Okay.  Come on up.

3            THE WITNESS:  Thank you.

4            THE COURT:  I'm sure you've been

5    in courts enough times to know that that oath

6    follows you around kind of like your shadow.

7            THE WITNESS:  Yes, Your Honor, I

8    do.

9            THE COURT:  All right.  Then you

10   may stand.

11        I started to say "You may be seated," but

12   you may stand.

13            THE WITNESS:  Thank you.

14            THE COURT:  Yes.

15            DR. ANNE WEBER,

16   called as a witness on behalf of the Plaintiff,

17   being previously sworn by the Court, testified:

18            CROSS-EXAMINATION (Cont'd)

19       QUESTIONS BY MS. JONES:

20       **Q.   Good morning, Dr. Weber.**

21       A.   Good morning.

22       **Q.   Dr. Weber, we were talking about**

23   **yesterday, before we stopped, that you had not**

24   **previously implanted -- never implanted a Prolift.**

25   **Correct?**

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1884

1      A.   Yes, that's right.

2      Q.   You've never removed a Prolift?

3      A.   That's right.

4      Q.   Never examined a woman that had a

5  Prolift?

6      A.   That's right.

7      Q.   And I think you told us that you had

8  never attended or seen any of the professional

9  education programs that Ethicon produced for

10  doctors.

11      A.   Yes, that's right.

12      Q.   Now, yesterday you showed us a video --

13  an animation and a video of surgery.  You remember

14  that?

15      A.   Yes.  That's Ethicon's training video.

16      Q.   And there's one thing I want to clear up.

17           That's -- that video and that animation

18  is also something you had never seen before you

19  were hired by Mr. Slater, correct?

20      A.   Yes, that's right.

21      Q.   And you showed the jury two different

22  parts of that video.  One was an animation and one

23  was part of the actual surgery.  You remember

24  that?

25      A.   Yes.

Page 1885

1     Q.    And just to make sure that we all

2    understand, all of that was part of the

3    professional education program that Ethicon

4    produced.   Correct?

5     A.    Those were training videos produced by

6    Ethicon.   They were not used in the professional

7    education courses that Ethicon provided.

8     Q.    Some of those --

9          Well, those videos, including the actual

10   surgery video, were materials provided by Ethicon

11   to doctors.   Correct?

12    A.    Yes, that's correct.

13    Q.    So I just want to make sure that the jury

14   understands that the actual surgery that you

15   showed was also something that Ethicon produced

16   and gave to doctors so they could see how the

17   procedure should be done.   Correct?

18    A.    Yes, that's correct.

19    Q.    Now, you told us yesterday that you had

20   begun working on this case I believe in January of

21   2010?

22    A.    No.   I began working with Mr. Slater in

23   January of 2010.

24    Q.    And --

25    A.    That's five years now.

Page 1886

1    Q.   And since that time, you went through and

2    you looked at a bunch of documents?

3    A.   Yes.   Hundreds and thousands of

4    documents.

5    Q.   And you looked at those hundreds and

6    thousands of documents so that you could educate

7    yourself about the Prolift?

8    A.   I reviewed those documents so that I

9    could learn what Ethicon knew and withheld from

10   the public.

11              MS. JONES:   Objection, Your Honor.

12   I --

13              THE COURT:   Sustained.

14              MS. JONES:   I'd ask the jury to

15   disregard.

16              THE COURT:   Please disregard that

17   statement.   There will be more questions.

18   Q.   (By Ms. Jones)  At the time that you

19   started working with Mr. Slater in 2010, you had

20   not seen any of the professional education

21   programs from Ethicon?

22   A.   I had not attended professional education

23   that Ethicon sponsored, that's correct.

24   Q.   In fact, I believe that you told us that

25   you actually didn't perform surgery after 2004.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 500 of 742 PageID #: 138664
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 500 of 712 PageID #: 63400

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1887

1   Is that correct?

2       A.   Yes, that's correct, because of my

3   medical condition.

4       Q.   And you last saw a patient in 2005, is

5   that correct?

6       A.   No, that's not correct.  That was -- I

7   was forced to discontinue my medical practice in

8   2006.

9       Q.   And you've not seen a patient since 2006?

10      A.   That's right.

11      Q.   You're not licensed to practice medicine

12  in any state in the United States today, are you?

13      A.   That's right.  I'm not --

14      Q.   You haven't --

15      A.   -- caring for patients, so there isn't a

16  need for me to be licensed.

17      Q.   And you haven't attended any type of

18  continuing medical education programs in the last

19  few years, have you?

20      A.   In the two years, yes, that's correct.

21  My health has --

22      Q.   And so --

23      A.   -- prohibited me from traveling

24  extensively.

25      Q.   In the course of reviewing those

Page 1888

1   documents, you have an hourly fee you're charging?

2       A.   Yes, that's correct.

3       Q.   And that's $350 for reviewing documents?

4   $350 per hour?

5       A.   That's the number -- figure that's

6   currently correct, yes.

7       Q.   And you're charging a thousand dollars

8   per hour for testifying here today?

9       A.   Yes, that's correct.

10      Q.   Now, you told us yesterday -- and I think

11  it's self-evident, but you told us yesterday that

12  you'd been board certified in obstetrics and

13  gynecology?

14      A.   Yes, that's right.

15      Q.   You were not ever board certified in the

16  subspecialty of female reconstructive and pelvic

17  surgery, were you?

18      A.   No.  That's right.  That wasn't available

19  at the time when I was in clinical practice.

20      Q.   And when that board became available, you

21  didn't sit for that board, did you?

22      A.   No.  I was not in clinical practice at

23  that time.

24      Q.   It is true that you are no longer board

25  certified in any field, are you?

Page 1889

1      A.    That's correct.  Since I'm not in

2    clinical practice, that's not something that's

3    required of me.

4      **Q.    You told us yesterday that you had been a**

5    **peer reviewer of certain medical articles.  You**

6    **remember that?**

7      A.    Yes, that's correct.

8      **Q.    And I'd like to talk with you a little**

9    **bit about peer review.**

10          **My understanding is that what you told us**

11   **yesterday was that the process of peer review is**

12   **one to assure, if you can, the scientific and**

13   **medical validity of the articles that appear in**

14   **the medical journals.  Correct?**

15     A.    Yes, that's right.

16     **Q.    And what happens is that somebody that's**

17   **conducted a study, for example, submits that study**

18   **to a particular journal for publication.  Correct?**

19     A.    Yes, that's right.

20     **Q.    And the editorial board then looks at**

21   **that study to determine whether or not, on its --**

22   **on its face, it appears to be something that the**

23   **journal would be interested in publishing.**

24   **Correct?**

25     A.    The editor, yes.

Page 1890

1          Q.   The editor does.

2               And then if the editor thinks that it

3     looks like a good piece of information to be

4     published in the scientific literature, the editor

5     will send it out to peer reviewers who haven't had

6     anything to do with the particular study to review

7     the article and the materials submitted.  Correct?

8          A.   To review the manuscript, yes.

9          Q.   And then they may make suggestions about

10    changes or raise questions about the information

11    that's contained in there, correct?

12         A.   Yes, that's right.

13         Q.   And sometimes it is sent back then to the

14    editors with a suggestion that changes be made?

15         A.   The reviewers' comments are sent back to

16    the editor, yes.

17         Q.   And the editor makes a determination as

18    to whether or not the reviewers believe that the

19    data contained in the scientific article is

20    accurate and good for publication?

21         A.   The comments go back to the author, but I

22    think what you're saying is that the editor makes

23    the final decision as to whether the manuscript is

24    accepted.

25         Q.   Well, that, but first, generally the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 504 of 742 PageID #: 63666
Case 2:12-md-02327 Document 3582-6 Filed 05/09/16 Page 504 of 742 PageID #: 63462

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1891

1   comments go back to the editor, who makes a

2   determination about whether or not we're going to

3   reject it right now or whether we're going to send

4   it back to the author to make corrections.

5   Correct?

6        A.   No, that's not my experience.

7             Once it's been sent to peer review to be

8   reviewed by these other people in the field, the

9   editor sends those comments then to the author.

10       Q.   And the author can either accept those

11  changes and make some changes and send it back to

12  the editor or not.  Correct?

13       A.   Yes.

14       Q.   And the editor then makes a determination

15  about whether or not to accept that particular

16  study or article for publication?

17       A.   The manuscript, yes.

18       Q.   And the editor sometimes will send that

19  particular piece of information or particular

20  study back out a second time to peer reviewers to

21  look at, correct?

22       A.   That does happen sometimes, yes.

23       Q.   And then the editor, after he's gotten

24  all of these independent reviews and comments from

25  the author, makes a determination as to whether or

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 505 of 742 PageID #: 132669
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 505 of 742 PageID #: 132669

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1892

1  not it ought to be published.  Correct?

2       A.   Yes, that's correct.

3       Q.   And the intent of doing all of that is to

4  see that the studies as published in the public --

5  in the professional medical and scientific

6  literature are as accurate as possible?

7       A.   Yes.  The process relies on the honesty

8  of the authors who are presenting --

9       Q.   Well --

10      A.   -- this information to --

11                MS. JONES:  Excuse me, Your Honor.

12      A.   -- the journal.

13                THE COURT:  Just a minute.

14      Q.   (By Ms. Jones)  Dr. Weber, my question

15  was very simple.

16           The purpose of the peer review process is

17  to establish and to ensure the scientific and

18  medical accuracy of the literature that's

19  published as best as possible, correct?

20      A.   No, that's not quite true, because what

21  the peer reviewers and the editors receive is only

22  the manuscript.  The editor can request the data

23  behind a study in particular, but that's not

24  typically done.

25           So as I said, the whole process relies on

Page 1893

1   the scientific honesty of the authors.

2       Q.   And, Doctor, let me ask you this

3   question:  You showed the jury some analysis

4   yesterday of the French TVM data.

5           Do you remember that?

6       A.   Yes, I do.

7       Q.   That's analysis that you did that's not

8   been subject to peer review, has it?

9       A.   No.  That's an independent analysis that

10  I carried out.

11      Q.   All right.

12      A.   And in addition, the data were

13  independently reviewed by a biomedical

14  statistician --

15              MS. JONES:  Objection, Your Honor.

16      A.   -- who --

17              THE COURT:  Sustained.  It's not

18  responsive.

19              MS. JONES:  I would ask that the

20  jury be instructed to disregard the comment --

21              THE COURT:  All right.  Disregard

22  that last soliloquy and we'll start over again.

23              MR. SLATER:  Your Honor, can I

24  briefly approach you for one second to ask a quick

25  question?

Page 1894

1                    THE COURT:  Why, sure.

2                    MR. SLATER:  Quick question.  I'm

3    going to jog.

4                    THE COURT:  Well, you don't have

5    to jog, but --

6                    (Counsel approached the bench and

7    the following proceedings were held outside the

8    hearing of the jury:)

9                    MR. SLATER:  Judge, I understand

10   that Ms. Jones wants to ask questions and try to

11   limit the answers, but she's asking some questions

12   and I'd appreciate if she asks a question that

13   makes a suggestion that Dr. Weber wants to

14   truthfully answer it, that she not be cut off,

15   because it was misleading to say no one else has

16   reviewed the data because she knows that a

17   biomedical statistician came to all the same

18   conclusions that is a nationally known biomedical

19   statistician.

20        So if she's going to ask that question,

21   again the jury should know.  I don't want them to

22   be misled.  I'd rather she not cut off answers.

23   She couldn't go there because she knows the

24   answer.  That's all I want to say.

25                    MS. JONES:  May I just simply say,

Page 1895

1    one, the question didn't call for that.  The

2    question simply asked whether or not it had been

3    submitted to peer review.

4                    MR. BALL:  Yeah.

5                    MS. JONES:  Secondly -- secondly,

6    Your Honor, she wants to talk about another expert

7    that Mr. Slater hired to look at this.  Now,

8    that's totally improper.

9                    MR. SLATER:  I'll listen to the

10   questions and I'll wait for redirect.

11                   THE COURT:  Okay.

12                   MR. SLATER:  I just would like her

13   not to cut her off.

14                   MS. JONES:  No.  That's not

15   appropriate, Your Honor.

16                   MR. BERGMANIS:  Don't ask the

17   question.

18                   MS. JONES:  I'm entitled to get an

19   answer to my questions.

20                   THE COURT:  All right.  Let's try

21   that approach.  I'll listen real carefully to your

22   question, and if I think she's going beyond that,

23   I'll cut her off.

24                   MR. SLATER:  Thanks, Judge.

25                   MS. JONES:  Thank you.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 509 of 712 PageID #: 132673
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 509 of 712 PageID #: 132673

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1896

1                (The proceedings returned to open

2     court.)

3        Q.    (By Ms. Jones)  Dr. Weber, we're going to

4     come back and talk about this, but the French

5     doctors that were members of the transvaginal mesh

6     group, the nine doctors that were members of that,

7     you're familiar with that?

8        A.    Yes, I am.

9        Q.    And you're familiar with the fact that

10    they have, in fact, published the results of their

11    study?

12       A.    Yes.

13       Q.    And those documents have been published

14    in well-recognized medical journals and scientific

15    journals?

16       A.    Well, that's exactly what I was referring

17    to as far as the process relying on the

18    scientific --

19                MS. JONES:  Objection, Your Honor.

20       A.    -- honesty because as we saw yesterday,

21    when I reviewed the data independently --

22                MS. JONES:  Excuse me.

23                THE COURT:  Just a minute.

24       Q.    (By Ms. Jones)  Dr. Weber, my question --

25                THE COURT:  Just answer the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 510 of 742 PageID #: 128674
Case 2:12-md-02327 Document 3756-6 Filed 04/09/16 Page 510 of 742 PageID #: 128674

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1897

1   question, if you can.

2        Q.   (By Ms. Jones)  -- was very simple.

3        Did the doctors from the TVM group

4   publish their scientific data in peer-reviewed

5   journals?

6        A.   To answer that question simply with a yes

7   or no would be misleading, and what I'd like to

8   convey to the jury is exactly why that's true.

9              MS. JONES:  Well, Your Honor --

10             THE COURT:  I'll let her answer,

11   and then if it's -- if it's going beyond the

12   bounds of what we're talking about here, and that

13   is, whether it was ever peer-reviewed or not --

14             MS. JONES:  That was the question.

15             THE COURT:  That's the question.

16   I mean, either you know it or you don't know it.

17             THE WITNESS:  I do know that it

18   was peer-reviewed.  And as I said, it relies on

19   the scientific honesty of the authors and that is

20   in question, as -- based on my review of the data.

21             THE COURT:  Well, all right.  Wait

22   a minute.

23        Now, not your opinion of this.  She just

24   asked you a question:  Was it reviewed?

25             I understand you've got a totally

1    different outlook on it, but you'll get an

2    opportunity to talk about that, I'm sure, on

3    redirect.

4        Q.    (By Ms. Jones)  You've already talked

5    about that on direct, have you not?

6        A.    We reviewed some of that yesterday.  We

7    weren't able to review all of it.

8        Q.    There have been many different articles

9    published by the members of the French

10   transvaginal mesh group, correct?

11       A.    Yes, they [sic] have.

12       Q.    Now, I want to switch around and I'm

13   going to skip around just a little bit because I

14   want to make sure that we cover some things

15   yesterday before I want to talk -- that you talked

16   about yesterday.

17            You remember that you talked about your

18   ACOG publication?

19       A.    Yes.

20       Q.    And as I appreciate it, you're concerned

21   because the word "experimental" was deleted from

22   that practice bulletin.  Correct?

23       A.    Yes, that's right.

24       Q.    And you spent time yesterday going over

25   and reading your letter to the editor complaining

Page 1899

1   about that, correct?

2       A.   The letter to the editor was published to

3   convey to the scientific community what happened

4   behind the scenes.

5       Q.   And you published that letter to the

6   editor in 2009, correct?

7       A.   The journal published that letter, yes.

8       Q.   And the change was actually made in 2007,

9   wasn't it?

10      A.   Yes, that's correct.

11      Q.   In fact, that change was made six months

12  after -- six months after the original publication

13  with your word "experimental" in it, correct?

14      A.   Yes.   That's unprecedented in the history

15  of ACOG practice bulletins to have a change made

16  in such short order.

17      Q.   And in fact, in response to your letter

18  in 2009, the ACOG published a response about how

19  that was handled, didn't they?

20      A.   Yes, they did.

21      Q.   And when they did that, they published

22  and they made it clear that that change had gone

23  through the same channels, did they not?

24      A.   The same channels prompted by industry

25  influence.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 513 of 712 PageID #: 63677
Case 2:12-md-02327  Document 3752-6  Filed 05/09/16  Page 513 of 712 PageID #: 63473

Page 1900

1       Q.   Well --

2       A.   Ethicon, specifically.

3       Q.   -- there's nothing in the --

4            ACOG never said it was due to industry

5    influence, did it?

6       A.   ACOG didn't have the full story and --

7       Q.   Whoa.

8                 MR. SLATER:  Excuse me.

9       A.   -- Ethicon withheld that information from

10   the public.

11                MR. SLATER:  Excuse me.  I would

12   ask that the witness, Dr. Weber --

13                THE COURT:  Just a minute.  What?

14                MR. SLATER:  I'm sorry.  I just

15   would ask that if Dr. Weber is speaking, that she

16   be allowed to finish her answer, as opposed to

17   being interrupted.

18                MS. JONES:  I think I'm asking her

19   to answer my question.

20                THE COURT:  As long as she doesn't

21   go far afield from what she's asking, I'll go

22   along with that, but I'm not going to have her

23   pontificate on things she wasn't asked.

24                MR. SLATER:  I understand.  But

25   she was answering that question, I believe, and in

Page 1901

1   fairness, I'd just like her to let her speak.

2                   THE COURT:  All right.

3       Q.   (By Ms. Jones)  The question was:  When

4   ACOG published the letter, ACOG said it was in

5   response specifically to numerous calls and emails

6   by physicians doing the surgery, did it not?

7       A.   It was a small number of physicians.

8       Q.   And when ACOG published the response,

9   ACOG said that when they got a number of the

10  complaints, that they sent the practice bulletin

11  back through the same standard channels to

12  evaluate whether or not it should be changed,

13  didn't it?

14      A.   What I was told was that --

15      Q.   I'm -- I'm asking you --

16      A.   -- the committee --

17      Q.   -- Dr. -- Dr. Weber --

18      A.   I'm explaining what channels you're

19  referring to.

20      Q.   I'm asking you whether or not --

21                  MR. SLATER:  Your Honor, I would

22  ask that she be allowed to answer --

23                  THE COURT:  Just -- all right.

24  Wait a minute.  Whoa.

25                  Reask your question and I'm going to try

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 515 of 742 PageID #: 138679
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 515 of 742 PageID #: 138679

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1902

1    to listen to every word of it, because I think

2    what you were asking her and what she was

3    answering, it was apples and oranges, and I'd like

4    to at least -- let's either talk about apples or

5    oranges.

6        Q.   (By Ms. Jones)   When ACOG published the

7    response --

8            You're familiar with their response,

9    aren't you?

10       A.   Yes, I am.

11       Q.   And when ACOG published their response,

12   ACOG specifically noted that when the practice

13   bulletin that you published with the word

14   "experimental" was published, that the college,

15   the American College of Obstetrics and

16   Gynecology --

17           That's the group you were a member of,

18   correct?

19       A.   The American College of Obstetricians and

20   Gynecologists, yes.

21       Q.   And that's a group of professional

22   doctors that treat women?

23       A.   Yes, it's a professional organization.

24       Q.   -- that when the practice bulletin that

25   you wrote was published, that the college received

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 516 of 712 PageID #: 128680
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 516 of 712 PageID #: 128680

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1903

1    emails, letters, and phone calls from ACOG fellows

2    who objected to the word -- use of the word

3    "experimental" to describe the anterior and

4    posterior vaginal prolapse.  Correct?

5        A.   They were -- this was specifically in

6    reference to the mesh kits, and they were

7    objecting not because of patient safety --

8        Q.   Excuse me, Doctor.

9        A.   -- but because of their concern of

10   insurance companies not paying for procedures that

11   were labeled experimental.

12       Q.   Did the college specifically --

13       A.   They were concerned about their income.

14       Q.   Did the college specifically say that

15   their concern centered on the ambiguity of the

16   word "experimental" and their perception that

17   "experimental" did not accurately reflect the wide

18   acceptance of those surgeries?

19       A.   This is exactly the issue.

20       Q.   Look, I'm just asking you, Doctor:  Is

21   that what the American College of Obstetrics and

22   Gynecology published?

23            Is that what they said?

24       A.   That's what they said.

25       Q.   Now, did they also say that the college

Page 1904

1    followed the routine procedure for handling such

2    correspondence by putting the -- that -- the

3    agenda on -- the matter on the agenda for the next

4    college -- the next meeting of the committee on

5    practice bulletins, gynecology?

6       A.   Yes.  That's what I was trying to explain

7    as far as the --

8       Q.   And then --

9       A.   -- usual channels that you referred to.

10      Q.   And then, Doctor, that as a result of

11   that meeting, that practice bulletin was changed

12   and that practice bulletin was changed by, one,

13   initially, the committee on practice bulletins for

14   gynecology, correct?

15      A.   Yes.

16      Q.   And then it was subsequently presented to

17   certain of the staff of the American College of

18   Obstetrics and Gynecology?

19      A.   I believe the committee approved the

20   document and then it went to the board.

21      Q.   And then it was approved by the executive

22   board for publication.  Correct?

23      A.   Yes.

24      Q.   And the executive board for publication

25   were doctors who practice in the field of

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 518 of 742 PageID #: 128682
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 518 of 742 PageID #: 128683

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1905

1    obstetrics and gynecology from around the

2    United States.   Correct?

3        A.   Yes, that's true.

4        Q.   One other thing and then we're going to

5    get to some different issues.

6             You were asked yesterday about some

7    documents relating to UltraPro.  Do you remember

8    that?

9        A.   Yes.

10       Q.   And so we can remind the jury, UltraPro

11   is a mesh that contains -- this is just my

12   words -- a combination of Gynemesh PS and a

13   partially absorbable mesh.   Correct?

14       A.   Yes.  UltraPro is another hernia mesh

15   that was, as you say, a combination of a permanent

16   component, the polypropylene, and an absorbable

17   component.

18       Q.   And that was a mesh that was evaluated by

19   Ethicon for use in the Prolift kit, and we've seen

20   other discussions about it, correct?

21       A.   Later.  You mean much later, after the

22   Prolift had been marketed?

23       Q.   In the mid-2005, '6, '7.   That area.

24   Mid-2000s.

25            Let me just -- I don't want to confuse

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 519 of 712 PageID #: 128683
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 519 of 712 PageID #: 128683

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1906

1    this.  This is not where I'm going.

2            The fact of the matter is, you know that

3    UltraPro was considered as a potential use in

4    Prolift, correct?

5        A.   It was considered and not fully evaluated

6    when Ethicon put Prolift on the market as just the

7    Gynemesh PS mesh itself.

8        Q.   Now, I want to make sure that we're clear

9    about something.  This is -- I just have one

10   question about this.

11       A.   Uh-huh.

12       Q.   As a practical matter, you don't believe

13   there is a single mesh of any type that can be

14   used appropriately transvaginally, do you?

15       A.   None of the meshes that were available

16   were safe for transvaginal use.  That's right.

17       Q.   And what you have testified to, just so

18   we're clear and everybody knows, is that you

19   cannot tell us of any mesh that you believe -- you

20   believe -- can be appropriately used

21   transvaginally.

22       A.   As I said, of the meshes that were

23   currently available, none of them have proven to

24   be safe for use in transvaginal implantation.

25       Q.   And what you have said and testified to

1    is that you don't believe any mesh product exists,

2    correct?

3        A.    That's right.   Currently, no mesh product

4    exists that is safe for use in the vagina.

5        Q.    And now --

6        A.    Ethicon itself said there is no

7    patient-centric -- pelvic-floor-centric material.

8        Q.    Now, you've testified to that, and that

9    would include, in your judgment, UltraPro?

10       A.    As far -- to --

11            My information, gathered from my review

12   of the internal Ethicon documents and the studies

13   that have been published to date as to use of

14   UltraPro in the Prolift kit, is that is unsafe.

15       Q.    Now, so that when you came in here and we

16   were talking about those documents yesterday, you

17   didn't mean to convey to the jury that you thought

18   that because -- well, let me strike that.

19            Let me go back and let's talk about this

20   case a little bit.

21            We've talked about a number of things

22   about the development of Prolift and a number of

23   things that you had said.   Let's see if we can go

24   back to the history.

25            And you remember yesterday you were asked

Page 1908

1   by Mr. Slater and you showed Mr. Slater a number

2   of -- discussed with Mr. Slater a number of

3   studies regarding recurrence rate of the more

4   traditional native tissue surgeries?

5       A.   Yes.

6       Q.   And there was some discussion, if you

7   remember, that back in the 1990s, for example, and

8   the early 2000s there was significant concern

9   about recurrences of prolapse in women who had

10  prolapse surgery, correct?

11      A.   Yes.  At that time, the availability of

12  questionnaires -- the questionnaires weren't

13  available and the outcomes focused mainly on the

14  anatomic -- the position of the organs, rather

15  than how the women were feeling.

16      Q.   Doctor, I didn't ask you anything at all

17  about questionnaires, did I?

18      A.   Well, you were asking about the --

19      Q.   My question is --

20      A.   -- outcomes that had been reported.

21      Q.   -- did I ask you anything at all about

22  questionnaires?

23      A.   I was doing the best I could to answer

24  your question.

25      Q.   Well, let's -- let's see if we can try

Page 1909

1    again.

2         A.   Okay.

3         Q.   There were a number of publications in

4    the late 1990s and early 2000s where doctors

5    were expressing concerns about the recurrence rate

6    of prolapse in women who had had native tissue or

7    traditional surgeries without mesh, correct?

8         A.   Yes, that's correct.

9         Q.   And among those articles that were

10   published were articles that, for example, you

11   published showing a 30% recurrence rate?

12        A.   Well, again, this is where answering that

13   with a simple yes or no --

14        Q.   I'm asking the question, Doctor --

15        A.   -- would be misleading.

16        Q.   -- very simply:  Did you accomplish a

17   study in 2001 that said there was a 30% recurrence

18   rate in anterior colporrhaphy?

19        A.   Based only on the anatomic position of

20   the organs and not how the -- how the women were

21   feeling, yes, that's right.

22        Q.   All right.  And you similarly published

23   in 2004 another study that suggested that there

24   was a 58% recurrence rate, correct?

25        A.   Yes.  Based on the position --

Page 1910

1       Q.    And --

2       A.    -- of the organs and not how the -- on

3   the women were feeling.

4       Q.    **And when they were looking at the**

5   **position of the organs at that point in time,**

6   **that's what doctors were looking at to determine**

7   **whether or not there was a recurrence rate.**

8   **Correct?**

9       A.    That's what doctors were looking at.

10      Q.    And --

11      A.    That's not the outcome of greatest

12  importance to women.

13      Q.    **And so that we're clear, Doctor, when**

14  **we're talking about a recurrence rate, we're**

15  **talking about a failure of the original surgery to**

16  **cure prolapse.  Correct?**

17      A.    No, I don't agree with that.

18            "Failure" implies -- a failure is when

19  women do develop a recurrence to the extent that

20  they require treatment or become symptomatic.  A

21  recurrence simply means that the anatomic position

22  of the organs is in an arbitrary stage that

23  doctors have decided means that it's not perfect.

24      Q.    **It is fair to say, Doctor, that the**

25  **medical community was concerned about the**

1    recurrence rate of prolapse in the late 1990s

2    and 2000s because they didn't believe that the

3    surgeries were effective long-term to cure

4    prolapse.  Correct?

5        A.   No, I don't agree with that.

6        Q.   All right.  Fine.

7             Do you remember that it was, in fact, the

8    concern about failure rates that led surgeons to

9    use synthetic mesh in prolapse surgery?

10       A.   That concern, propagated by Ethicon, was

11   based on a misinterpretation and a misreporting --

12             MS. JONES:  Object.

13       A.   -- of the medical literature.

14             THE COURT:  That is not responsive

15   to the question.

16             MS. JONES:  And I would ask that

17   the jury be instructed to disregard.

18             THE COURT:  All right.  Disregard

19   that.  It didn't ask about any particular type;

20   just asked about the devices.

21       Q.   (By Ms. Jones)  Now, Doctor, I'm going to

22   ask the question again.

23            In the late 1990s and early 2000s,

24   doctors -- well, let me go back actually before

25   that.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 525 of 742 PageID #: 132689
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 525 of 742 PageID #: 132689

Page 1912

1          You would agree with me that prolapse can

2    be very problematic for some women?

3        A.   It can be when it's in its severe stages.

4        Q.   And --

5        A.   That's not what we're talking about with

6    Mrs. Budke.

7        Q.   And you would agree --

8          You would agree that women are entitled

9    to have effective treatment for pelvic organ

10   prolapse, correct?

11       A.   That's a goal, yes.

12       Q.   And surgeons have been trying to treat

13   that condition for decades.  Years and years and

14   years.  Correct?

15       A.   Yes, that's correct.

16       Q.   And surgeons noticed, over a period of

17   time, that some women's prolapse came back.

18   Correct?

19       A.   Yes, that's true.

20       Q.   And they came back, at least in part,

21   because what was happening was that surgeons were

22   stitching up or using the native tissue, which was

23   already weakened by whatever caused the prolapse,

24   to fix it.  Correct?

25       A.   In part, yes.

Page 1913

1      Q.    Because the thought was that if your --

2    the muscles that hold up the organs, or the

3    ligaments that hold up the organs, those tissues

4    are already weakened by -- whether it's age or

5    childbirth or whatever, that over a period of time

6    that prolapse comes back after it's been stitched

7    up?

8      A.    That can happen.  You're right.

9      Q.    And because of that and because doctors

10   were seeing such high rates of that, they began to

11   use mesh to incorporate into the tissue to hold

12   the organs up.  Correct?

13     A.    Yes, that's a part of the -- how they

14   attempted to address that.

15     Q.    And that started happening as early as

16   the 1960s, didn't it?

17     A.    I'm not familiar with literature that's

18   that old, but it's certainly possible.

19     Q.    Certainly by the 1970s, gynecological

20   surgeons, surgeons like you, urogynecologists, had

21   begun to use mesh to treat pelvic organ prolapse.

22   Correct?

23     A.    Yes.  And they found a high rate of --

24     Q.    And --

25     A.    -- complications.

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1914

1    Q.   And those complications had been reported

2  long before 2000 and the TVM group came along,

3  hadn't they?

4    A.   Yes, that's right.

5    Q.   And in fact, among those complications

6  that were regularly reported in the medical and

7  scientific literature was the potential for

8  erosion.  Correct?

9    A.   Yes, that's correct.

10   Q.   And in fact, there had been erosion rates

11 published by doctors of as high as 10 or 12% long

12 before the TVM group ever started working on what

13 became Prolift.  Correct?

14   A.   You're right.  And those numbers were --

15   Q.   And --

16   A.   -- considered too high.  That

17 complication rate --

18   Q.   Well --

19   A.   -- was considered too high, yet --

20           MS. JONES:  Your Honor --

21           THE COURT:  Okay.

22   A.   -- what the French TVM group found was

23 rates even higher.

24           THE COURT:  Just try to answer the

25 question.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 528 of 742 PageID #: 133692
Case 2:12-md-02327 Document 3152-6 Filed 05/09/16 Page 528 of 742 PageID #: 63488

Page 1915

1              MS. JONES:  I move to strike, Your

2    Honor, and ask the jury to disregard the

3    voluntary --

4              THE COURT:  Well, if -- where it

5    went beyond that into another study that was not

6    even asked about, disregard that.

7         I'd like to get this down to where we

8    can -- I'm not saying a yes/no answer, but answer

9    the question.

10             THE WITNESS:  Yes, Your Honor.

11   I'm doing --

12             THE COURT:  There may be a lot of

13   stuff that you know and I don't know because

14   apparently what I'm gathering here is you've spent

15   years and years in the study of this, and so on --

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  -- so I understand

18   that.  But try to answer the question.

19        These folks will ask you whatever they

20   want, to expand it, and I won't fuss about that

21   because they got a right to do it, but on the

22   other hand, please try to answer her questions.

23             THE WITNESS:  Yes, Your Honor.

24   I --

25        Q.   (By Ms. Jones)  And, Doctor --

Page 1916

```
1                   THE WITNESS:  I am trying the best

2     I can.

3                   THE COURT:  All right.  Good,

4     good.

5         Q.   (By Ms. Jones)  And, Doctor, it's fair to

6     say that you had published that anterior vaginal

7     prolapse --

8              That is what Mrs. Budke had, correct?

9         A.   Yes, in the mildest form.

10        Q.   And you have published that anterior

11    vaginal prolapse may recur after standard anterior

12    colporrhaphy in up to 40% of the patients.

13             You published that in 2001, didn't you?

14        A.   Yes, you're right.  That's the --

15        Q.   And --

16        A.   -- function -- the position of the

17    organs, not related to the function.

18        Q.   And you published that that high rate of

19    recurrence --

20             And you would agree that that's a high

21    rate of recurrence.  40%.  Correct?

22        A.   That's a high rate of the position of the

23    organs.  That doesn't tell us how the women are

24    feeling.

25        Q.   Well, Doctor, the fact of the matter is
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 530 of 742 PageID #: 132694
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 530 of 742 PageID #: 63499

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1917

1   that in 2000, 1999, 2002, that's -- that's how

2   doctors were measuring recurrence.   Correct?

3        A.   Yes, you're right.   That's because the --

4   the questionnaires that we needed, to find out how

5   the women were feeling, weren't available yet.

6        Q.   That's fine.

7             We have to look at the state of medicine

8   at the time that we're writing, correct?

9        A.   Yes, you're right.

10       Q.   And in 1999 and 1998 and 2000 when this

11  was being written, based upon the then-standards

12  applicable, they were talking -- you were talking

13  about a 40% recurrence rate, correct?

14            MR. SLATER:   Objection, Your

15  Honor.   Can I just jog up here again to you real

16  quick?   Thanks.

17            (Counsel approached the bench and

18  the following proceedings were held outside the

19  hearing of the jury:)

20            MR. SLATER:   I'm just a little

21  concerned because Ms. Jones is going down a line

22  suggesting that our claims are going to be decided

23  based on medicine and science at the time it was

24  marketed, and obviously on a design defect claim,

25  we're not limited to that.

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1918

1           Strict liability design defect considers

2    all of the knowledge on the mesh at any time, so I

3    just would ask that that question -- I'm objecting

4    to that question because -- and the prior

5    question, I -- you know, I'll address it on

6    redirect and I'll address it in the charge, but I

7    didn't want to go any further down, and I try not

8    to object too much, as you can see, but -- so I

9    would object to going down that line because it's

10   obviously not consistent with the law.

11           MS. JONES:  Well, Your Honor, that

12   really, frankly, was not my question at all.  My

13   question is simply what she had written back

14   in 2000 --

15           THE COURT:  Yes.

16           MS. JONES:  -- and what the

17   standard was that she was writing about in that,

18   and she's trying to throw in all of this other

19   stuff that she's come up with later on.

20           THE COURT:  That's why I've asked

21   her please just try to answer the question, and he

22   can -- he can go into whatever she's thinking.

23           I mean, it's pretty obvious, you know,

24   she's not a one-horse show on this case.  I mean,

25   I think everybody's figured that out.  I'd be

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 532 of 742 PageID #: 138696
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 532 of 712 PageID #: 638492

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1919

1   surprised if the folks over here haven't.

2        But anyway, let's just try to get

3   along --

4             MR. SLATER:  Absolutely.

5             THE COURT:  -- the best we can.

6             (The proceedings returned to open

7   court.)

8             THE COURT:  Okey-doke.

9   Q.   (By Ms. Jones)  Dr. Weber, just bear with

10  me.  I don't mean to be beating this horse but

11  I've got a follow-up question.

12       You wrote in 2001 that it was the high

13  rate of recurrence that had led to the addition of

14  synthetic materials like mesh to use in these

15  surgeries.  Correct?

16  A.   Yes.  There's always room for

17  improvement.  It's a matter of balancing the

18  improvement versus the complications that get

19  introduced.

20  Q.   And, Doctor, what the -- many of the

21  doctors were doing at that time, in 2000 and 2001,

22  was taking and fashioning their own mesh to use it

23  to treat prolapse, correct?

24  A.   A few doctors were doing that, yes.

25  Q.   And those doctors were publishing those

Page 1920

1    **results in the medical literature?**

2        A.   Yes, that's true.

3        **Q.   When the TVM group was formed, those**

4    **doctors were looking for a better, more permanent**

5    **cure for prolapse, weren't they?**

6        A.   The TVM group had two objectives.

7             One of them was as you stated.  The other

8    was to understand why mesh erosion occurred so

9    commonly with the use of permanent mesh and was a

10   matter of such grave concern.

11       **Q.   And in terms of looking at and treating**

12   **women with prolapse, those doctors you know**

13   **historically watched each other do surgery and**

14   **compared how they were doing surgery to come up**

15   **with an appropriate mesh treatment for prolapse,**

16   **correct?**

17       A.   They were experimenting with the

18   materials and with the procedure, and while they

19   were in the midst of this experimentation, this

20   was obtained by Ethicon and promoted for

21   widespread commercial use.

22       **Q.   Well, that's --**

23       A.   They felt that --

24       **Q.   Could --**

25       A.   -- the mesh was not the appropriate mesh,

1  they were still very unhappy with the high rate of

2  complications that they found with use of this

3  mesh, and they told Ethicon for years that a new

4  mesh was required.

5              MS. JONES:  Your Honor --

6              THE COURT:  Yes.

7              MS. JONES:  -- I move to strike.

8  Nonresponsive.

9              THE COURT:  Well, it's not

10 responsive.  I mean --

11             MR. SLATER:  They're complicated

12 questions, Judge.

13             THE COURT:  Yeah.  Well, and she's

14 giving complicated answers.  She knows a lot about

15 the subject.  I know that.  I've figured that out.

16             MR. SLATER:  Balancing it out.

17             THE COURT:  Yeah, yeah.  We're

18 balancing it out okay.  Now, let's just --

19        Again, I'm going to ask you one more

20 time, try to stick with the question, okay?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Yeah.

23    Q.   (By Ms. Jones)  So let's stick with the

24 question.

25             When the TVM group was formed in 2000,

Page 1922

1   they looked at different types of meshes to use,

2   correct?

3       A.   Yes.

4       Q.   And --

5       A.   You're right.  They experimented with

6   different types of mesh.

7       Q.   And they used --

8            When you say they experimented, these are

9   doctors.  These are well-established

10  urogynecologyist, pelvic floor surgeons doing

11  these surgeries, aren't they?

12      A.   Yes.  They were doing experimental work

13  with different types of meshes.

14      Q.   And they were using those meshes in

15  patients that they were treating, weren't they?

16      A.   Yes.  They were doing experimental work

17  in patients that they were treating.

18      Q.   And they've published the results of

19  those studies that they did, haven't they?

20      A.   Yes, they did --

21      Q.   And --

22      A.   -- and that goes back to the issue about

23  scientific honesty.

24      Q.   Well --

25               THE COURT:  Well, let's don't get

Page 1923

1    into that.

2          Just answer the question, please, Doctor.

3              THE WITNESS:  I am trying, Your

4    Honor.

5              THE COURT:  Yeah.  Okay.

6        Q.   (By Ms. Jones)  Ethicon began working

7    with these doctors to develop the tools for the

8    Prolift kit in 2003, correct?

9        A.   Yes, Ethicon was closely involved --

10       Q.   And --

11       A.   -- with this group.

12       Q.   And, Doctor, just so we're clear, you've

13   never used those tools in the Prolift kit, have

14   you?

15       A.   No, I have not.

16       Q.   Now, those doctors, those French doctors

17   that you say were conducting experimental studies,

18   continued to follow the women and to treat the

19   women that they had done surgery on for years,

20   didn't they?

21       A.   Yes, they did.

22       Q.   And they published their results after

23   years, didn't they?

24       A.   They published their results which in --

25   on my independent analysis raised --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 537 of 712 PageID #: 132704
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 537 of 712 PageID #: 68491

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1924

1      **Q.   Well --**

2      A.   -- grave concerns about what was being

3   reported and what truly happened.

4      **Q.   And, Doctor, you know that when Prolift**

5   **went on the market, despite what you have said**

6   **about their disenchantment with mesh, that those**

7   **doctors used the Prolift, don't you?**

8      A.   They did.  And they were, in the

9   meantime --

10     **Q.   And in fact --**

11     A.   -- objecting to Ethicon --

12              MS. JONES:  Object.

13     A.   -- over and over again --

14              THE COURT:  Hold it.

15     A.   -- that they needed a new mesh.

16              THE COURT:  Just a minute.

17              MR. BALL:  May we approach the

18   bench, Your Honor?

19              THE COURT:  Yes.

20              (Counsel approached the bench and

21   the following proceedings were held outside the

22   hearing of the jury:)

23              THE COURT:  Now, let's go one at a

24   time and you raised the issue.

25              MR. BALL:  Yeah.  I've never seen

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 538 of 742 PageID #: 132792
Case 2:12-md-02327 Document 3156-6 Filed 05/09/16 Page 538 of 742 PageID #: 68498

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1925

1    anything quite like this.  This person is

2    obviously trying to be an advocate for the

3    plaintiff during cross-examination.

4                THE COURT:  Well, I think it's

5    pretty obvious that she's a hired gun.

6                MR. BALL:  I think she should be

7    strongly admonished to answer the question and not

8    go into other advocacy areas and things like that.

9    She should be admonished to do that.

10               THE COURT:  I gave her pretty wide

11   latitude yesterday with her attorney on things,

12   and I've admonished her, but, you know, it's

13   just -- I hate to have to do it on every question.

14   She's not going to just answer the question.

15               MR. BALL:  Well, when are we going

16   to be -- I guess we're not taking a break yet.

17               THE COURT:  I was going to take a

18   break about a quarter of 11:00, if we can make it

19   that far.

20               MS. JONES:  That's fine.

21               MR. BALL:  We'd just ask that you

22   admonish her going forward not to do that.

23               THE COURT:  All right.  You have

24   something?

25               MR. SLATER:  I always throw in

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 539 of 742 PageID #: 132703
Case 2:12-md-02327 Document 3180-6 Filed 05/09/16 Page 539 of 712 PageID #: 68499

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1926

1   something.

2              THE COURT:  Come on.  We've got

3   some people up here.  Go ahead.

4              MR. SLATER:  I was just going to

5   say, I understand what they're saying, to some

6   extent, but the problem is there's a lot -- as you

7   say, there's a lot of baggage behind these

8   questions and when they're asking questions, I

9   mean if Dr. Weber can't answer with a simple yes

10  or no because there's more to it --

11             THE COURT:  Well, I didn't --

12             MR. SLATER:  -- she's trying to

13  say that, but there's -- there's a lot going on

14  between Ms. Jones and Dr. Weber where there's

15  implications to the questions that are not out in

16  front so that someone who really knows this area

17  would say, "Well, you know, that question is

18  really not straightforward."

19       Even though it might sound

20  straightforward to one of us, you or me, people

21  who really know this area, the question really

22  isn't so straightforward, so it's not that simple.

23             MS. JONES:  I'm sorry.

24             MR. SLATER:  And Ms. Jones just

25  probably needs to narrow her questions a little

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 540 of 712 PageID #: 133704
Case 2:12-md-02327 Document 3180-6 Filed 05/09/16 Page 540 of 712 PageID #: 63508

Page 1927

1   and I think she can get what she wants.

2                THE COURT:  Well, I'm sure she's

3   cotton-picking.  You were.

4                MR. BALL:  Here, listen to this.

5                THE COURT:  Yes.

6                MR. BALL:  "Did they publish their

7   results," and then she goes off on honesty and --

8                THE COURT:  Yes or no.

9                MR. BALL:  Don't give me any of

10  that stuff.

11               THE COURT:  And it's just like

12  this, "I don't know how women were feeling."

13  That's not the question.

14         I mean, maybe that's a bad problem, but

15  the thing was it had to do with the medical

16  report.  So I don't know whether they put out

17  questionnaires to them and asked them whether

18  they'd like a free donut if they sent something

19  in, but that's not the question.  You can ask that

20  question.

21               MR. SLATER:  Yeah, and I could say

22  Mr. Ball just gave a great example.  When the

23  question is "Did they publish their results," they

24  didn't publish their results because Dr. Weber has

25  said their results are different than what was

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 541 of 712 PageID #: 133705
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 541 of 712 PageID #: 63505

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1928

1   published.

2           If the question was "Did they publish

3   results of the data and tell people what -- what

4   they -- did they say what results were," that's

5   one thing, but to say "their results," she's

6   saying they didn't publish their results because

7   it's different than the reality.

8           So that's what I'm saying is there's --

9   there's nuance in here.

10              THE COURT:  Well, she's critical

11  of that.  I don't know whether it's worthy of

12  criticism or not.  I don't know.  But to some

13  extent, this is kind of like that old story about

14  the day after Lincoln was assassinated and the

15  reporter come up and said, "Well, outside of that,

16  Mrs. Lincoln, how did you like the play?"

17          You know, I mean, that -- that's not very

18  responsive to the death of the 16th President of

19  the United States.

20          Okay.  Let's try to do this.

21              (The proceedings returned to open

22  court.)

23      Q.   (By Ms. Jones)  Doctor, whether you agree

24  with their results or not, the French doctors and

25  Dr. Jacquetin and Dr. Cosson published what they

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 542 of 742 PageID #: 133706
Case 2:12-md-02327 Document 3156-6 Filed 05/09/16 Page 542 of 742 PageID #: 63502

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1929

1    **considered to be the results of their studies,**

2    **correct?**

3        A.    Yes, they did.  And they were very --

4        **Q.    And --**

5        A.    -- concerned that in the literature they

6    published things like --

7                    MS. JONES:  Your Honor --

8        A.    -- "Fails to fulfill obligation" -- I

9    mean, excuse me, "expectations."

10           "More worrisome for the high rate of

11   organ prolapse recurrence found with such short

12   follow-up of 3.6 months."

13           "Should be considered experimental until

14   the mesh erosion rate under" --

15                   THE COURT:  Okay.  We heard that

16   testimony.

17       A.    This is in the medical literature.

18                   THE COURT:  Doctor, stop.  We

19   heard that testimony yesterday from you.  It's --

20   I mean, it's out there and I understand that.  But

21   we're never going to get through with this if you

22   don't answer one or two questions.

23           I understand that you think it was flawed

24   from the get-go.

25                   THE WITNESS:  I was just

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1930

1    addressing Ms. Jones' question about the medical

2    literature and what the discussion --

3                    THE COURT:  She just asked you if

4    they published their results.

5                    THE WITNESS:  And I was answering

6    that question, Your Honor.

7                    THE COURT:  She asks you what time

8    it is and you start telling her how to build a

9    watch.

10                   THE WITNESS:  I apologize, Your

11   Honor.  I'm doing the best I can.

12                   THE COURT:  All right.  Go ahead.

13       Q.   (By Ms. Jones)  I think the answer to my

14   question, Doctor, was that the French doctors,

15   Dr. Jacquetin and Dr. Cosson, published for the

16   world to see what they, the doctors doing this

17   study, found to be their results.

18          Am I correct?

19       A.   Yes, you are.

20       Q.   Now, when Prolift went on the market,

21   those doctors began to use the actual Prolift kit,

22   didn't they?

23       A.   Yes, they did.  And the tools --

24       Q.   And in fact --

25       A.   -- in the Prolift kit --

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1931

 1       Q.    Excuse me, Doctor.

 2       A.    -- had not previously been tested in

 3   human beings.  That was the first --

 4               THE COURT:  That was not the

 5   question.

 6       A.    -- time --

 7               THE COURT:  That was not the

 8   question.

 9            The question was, did they start using

10   Prolift kits.

11       A.    Yes.

12       Q.    (By Ms. Jones)  And when they did

13   those --

14            And when they started using Prolift, they

15   actually conducted studies on the Prolift and they

16   followed the women that were using Prolift, didn't

17   they?

18       A.    Yes, they did.

19       Q.    And they published those results, didn't

20   they?

21       A.    Yes.  With all the same --

22       Q.    And Dr. Cosson --

23       A.    -- issues we've already discussed.

24       Q.    -- and Dr. Jacquetin used Prolift and

25   published those results, correct?

Page 1932

1     A.   Yes, they did.

2     Q.   Now, I want to show you -- or ask you

3  about an article that you talked about yesterday.

4  It's Plaintiff's Exhibit 108.  It's the Collinet

5  article.  Do you remember that?

6     A.   Yes, I do.  May I --

7     Q.   And your --

8     A.   Have a copy, please?

9     Q.   Oh, surely.  I thought surely you had

10  one, but I'll be glad to give you one.

11     A.   Thank you.

12     Q.   And what you told this jury yesterday was

13  about the exposure rates of 12%.  Do you remember

14  that?

15     A.   Yes, I do.

16     Q.   And you also told this jury that what

17  these doctors had suggested were that experimental

18  studies and clinical trials seemed necessary to

19  reduce the level of exposure to less than 5%.

20  Correct?

21     A.   Yes, that's right.

22     Q.   And just so we're clear, so the jury

23  knows, this article was written, among others, by

24  Dr. Michel Cosson.  Correct?

25     A.   Yes.

1     Q.    One of the principals of the TVM group,

2    correct?

3     A.    Yes.

4     Q.    What -- what I'd like to talk with you

5    about are some of the things about this article

6    that you did not tell the jury about.  Okay?

7     A.    By all means.

8     Q.    So for example, the authors in this study

9    specifically said --

10           These are -- these are the authors that

11    you say are criticizing the mesh, correct?

12     A.    What I said was that they were telling

13    Ethicon for years that --

14     Q.    Excuse me.

15     A.    -- a new mesh was needed.

16     Q.    All right.  There are --

17     A.    I believe that's what I said.

18     Q.    The jury can determine what you said.  I

19    apologize.  I don't mean to be short.  I

20    apologize.

21           What, specifically, they said is that

22    recent years had been marked by research into the

23    mesh material most suited to this type of surgery.

24     A.    I'm sorry.  Could you tell me where

25    you're reading?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 547 of 712 PageID #: 63571
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 547 of 712 PageID #: 63501

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1934

1      Q.   I'm down at the bottom of the right --

2  right-hand column.

3      A.   Okay.

4           Yes, I see.  Thank you.

5      Q.   And then it says, "It seems an

6  established fact that this should be a woven

7  monofilament polypropylene with large pores.

8  Since Prolene Gynecare fulfills these criteria, it

9  was used for all of the patients in this

10 particular study."

11          Correct?

12     A.   That's what they wrote.  That's not what

13 they were telling --

14     Q.   That --

15     A.   -- Ethicon.

16     Q.   That's what they wrote here, is it not?

17     A.   That is what they wrote.

18     Q.   It is certainly not wrong for anybody to

19 try and seek an improvement on any product, is it?

20     A.   It is appropriate when the women who are

21 being experimented on understand --

22     Q.   Well --

23     A.   -- that they're involved in an experiment

24 and give their permission to voluntarily

25 participate in an experiment.  That is

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 548 of 712 PageID #: 133712
Case 2:12-md-02327 Document 3752-6 Filed 04/29/16 Page 548 of 712 PageID #: 133508

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1935

1    appropriate.

2         Q.   That was not my question, Doctor.  My

3    question was very simple.

4              It is not wrong for anybody to try and

5    improve upon a product, is it?

6         A.   It's not wrong as long as the

7    condition --

8         Q.   And --

9         A.   -- the conditions I mentioned are met.

10        Q.   At the time that Dr. Cosson wrote this

11   paper, he specifically noted that there were ways

12   to limit the exposure rates, correct?

13        A.   Again, can you -- could you point me out

14   to where you're referring, please?

15        Q.   I'm just asking you just generally about

16   what Dr. Cosson, when he was talking about in this

17   paper, suggested that they ought to be looking for

18   ways to limit the exposure or erosion rate.

19   Correct?

20        A.   Yes, that was one of their objectives, as

21   they mentioned.

22        Q.   And in fact, what he noted was, under the

23   "Discussion" section --

24              And this paper actually is written in

25   2005, correct?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 549 of 712 PageID #: 635708
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 549 of 712 PageID #: 635709

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1936

1    A.   It was written in 2005, yes.  It was

2    published in 2006.

3    **Q.   It says -- again, it says the same thing**

4    **again here about the ideal prosthetic material as**

5    **being the large mesh monofilament polypropylene**

6    **Prolene, correct?**

7    A.   That's what it says, and that's --

8    Q.   And --

9    A.   -- the kind of material that was --

10   Q.   And --

11   A.   -- resulting in such a high rate of

12   complications.

13   **Q.   And specifically what Dr. Cosson said**

14   **was, according to the authors this material helps**

15   **to limit the rejection rate --**

16       **And when they say rejection rate, they're**

17   **talking about the exposure or erosion rate,**

18   **correct?**

19   A.   Yes.

20   **Q.   -- to between 5 and 15%, correct?**

21   A.   Yes.  And that's too high.

22   Q.   And --

23   A.   That's unacceptable and unsafe.

24   **Q.   Well, Doctor, I understand that's your**

25   **opinion and I think we all know that's your**

Page 1937

1    opinion, but I want to ask you questions about

2    what these doctors said.  Okay?

3         A.   I -- I'm giving my opinion on what these

4    doctors say, yes.

5         Q.   And -- and what these doctors

6    specifically said that you didn't tell this jury

7    yesterday was that in this study, they showed that

8    the level of exposure was less than 1% when the

9    uterus was preserved.  Correct?

10        A.   Yes.  And that rate has never been

11   replicated and in --

12        Q.   Doctor --

13        A.   -- research done subsequently,

14   Dr. Hinoul, for example --

15        Q.   Doctor --

16        A.   -- questioned the veracity --

17             THE COURT:  Just a minute, just a

18   minute, just a minute.

19        She just asked you about this.  You

20   can -- when somebody asks you questions about

21   that, you can -- I'll let you pontificate all you

22   want to, but that's not what she asked you.  She

23   asked you about this thing.

24        I know you know what's going on right up

25   till today, probably, but let's talk about then,

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 551 of 712 PageID #: 138715
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 551 of 712 PageID #: 138715

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1938

1    not now.  Okay?

2                    THE WITNESS:  Yes, sir.  Yes,

3    Your Honor.

4                    THE COURT:  All right.

5        Q.   (By Ms. Jones)  Did these doctors say

6    that in their study, they reduced the erosion rate

7    to 1% when the uterus was preserved?  In other

8    words, when there wasn't a hysterectomy?

9        A.   In this small group of women with very

10   short-term follow-up, yes.

11       Q.   Now, we've talked about -- and you talked

12   about yesterday -- the recurrence rates in the TVM

13   study.  Do you remember that?

14       A.   Yes.

15       Q.   And in fact, you put up on the board or

16   on the screen here what's been marked as

17   Plaintiff's Exhibit 1752.  Do you still have that

18   up there?

19       A.   I can look for it.

20       Q.   I'll show you what I'm looking for.

21       A.   If you have a copy, that might be faster.

22       Q.   Well, I'm sorry, I didn't bring a copy of

23   what you used yesterday.

24       A.   All right.  1752?

25       Q.   1752.

1      A.   Yes.

2      Q.   And if we could put that up, please, I

3  want to look at that first -- you see the --

4  right.

5           Now I want to talk about -- this is the

6  French TVM study that was done by the French

7  doctors that involved, as I recall, 90 patients.

8  Is that right?

9      A.   Yes.

10      Q.   And you show on here the Ethicon rate for

11  prolapse recurrence and one-year recurrence rate.

12  You see those?

13      A.   Yes, I do.

14      Q.   And I've got a couple of questions.

15           First, you show on there the Ethicon

16  six-month prolapse recurrence rate at 20.1%, and

17  then you show a one-year recurrence rate of 26.6%.

18           Do you see that?

19      A.   Yes, I do.

20      Q.   Both of those rates are significantly

21  below the 58% recurrence rate, for example, that

22  you reported in 2004.  Correct?

23      A.   They are.  That's not relevant to this

24  study because it's higher than --

25      Q.   Well --

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 553 of 712 PageID #: 135717
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 553 of 712 PageID #: 135717

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1940

1        A.   -- their own defined endpoint.

2        Q.   I'm going to get to that, so just let me

3    make sure because I want -- because I think it's

4    important for us, when we're talking about those

5    failure rates, to understand that those recurrence

6    rates are substantially below what was being

7    reported in the literature with other types of

8    surgery.

9            Correct?

10       A.   Yes, that's true.

11       Q.   Okay.  Now, the fact of the matter is

12   that those rates that you put up there here are

13   not actually the rates that were reported in the

14   TVM study, are they?

15       A.   I'm not sure I understand the question.

16       Q.   Well, you've seen the final report that's

17   been marked as Plaintiff's Exhibit 49?  The TVM

18   report?

19           Do you have this up here?

20       A.   I don't have a copy, no.

21       Q.   Well, let me hand you one.

22               MS. JONES:  Counsel, I have one.

23   This is the previous -- it doesn't actually have

24   the plaintiff's exhibit on it.  Thank you.

25       A.   Thank you.

Page 1941

1      Q.   (By Ms. Jones)  And if we look at that

2   report, what I'd like to do is to look at the

3   conclusions section of it.  And specifically,

4   Doctor --

5           I'm sorry, I may have handed you the

6   wrong -- the wrong study.  Did I -- may I see the

7   one -- I just want to make sure I've given you the

8   right study.

9           All right.  What I'd like you to do,

10  Doctor, is turn to the results and conclusions

11  that appear on what I have marked as the fourth

12  page there.

13     A.   Okay.

14     Q.   And if we bring up just the results and

15  conclusions, it specifically -- let's start with

16  the second -- let's start with the second

17  paragraph down here, okay?

18          The second paragraph talks about the

19  secondary effectiveness parameters showing a

20  failure rate at six months of 12.6%.

21          Do you see that?

22     A.   Yes, I do.

23     Q.   And then underneath that, it has the 90%

24  confidential interval.  You see that?

25     A.   Yes, I do.

Page 1942

1       Q.    And the 90% confidence interval has two

2    numbers there.  7.3 and 20.1.  Correct?

3       A.    Yes.

4       Q.    And if we look at those numbers --

5             And I think you testified yesterday that

6    the confidence intervals are what you look at to

7    determine the outer ranges of where the results

8    really fall.  Correct?

9       A.    No, that's not quite true.

10      Q.    Well, am I not correct that what you

11   testified to -- and we can look at it and you can

12   explain it -- if you're looking at the confidence

13   interval, you put a confidence interval out there

14   and the confidence interval is a tool of

15   statisticians, correct?

16      A.    Yes.

17      Q.    And it's a tool of statisticians when

18   they show that some -- they show --

19            Actually, what the failure rate is as

20   here -- calculated up here was 12.6%, correct?

21      A.    That is the average, uh-huh.

22      Q.    The secondary effectiveness parameters

23   show a failure rate at six months of 12.6%,

24   correct?

25      A.    Yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 556 of 712 PageID #: 133720
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 556 of 712 PageID #: 133720

In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 1943

1    Q.    And that's what's called the absolute

2    failure rate?

3    A.    It's the average.

4    Q.    And it's -- and it falls within the 7.3

5    and the 20.1, correct?

6    A.    Yes.

7    Q.    So what that's saying is --

8          What you're saying, as I understand it,

9    is that that's an average number that falls

10   between the two outside boundaries, if you will,

11   of the confidence interval.  Correct?

12   A.    That's substantially correct.  It's, you

13   know --

14   Q.    I'm not a statistician.  That's just --

15   A.    That's fine.  I think --

16   Q.    -- my interpretation.

17   A.    -- we talked about it yesterday.  I think

18   the jury understands.

19   Q.    So -- and then if you go to the paragraph

20   above that, we're talking about the one-year data,

21   correct?

22   A.    Yes.

23   Q.    And it says the results show a failure

24   rate at 12 months of 18.4%, correct?

25   A.    Yes.

Page 1944

1    Q.    With a confidence interval there of 11.9

2    to 26.6, correct?

3    A.    Yes.

4    Q.    And again, what you would say is the

5    average failure rate is 18.4%, correct?

6    A.    That's correct.

7    Q.    That's what the authors of the study are

8    reporting, correct?

9    A.    Yes.

10    Q.    And the outside confidence interval,

11    which is the highest it might be under this study,

12    is 26.6%.  Correct?

13    A.    No, that's not quite right.  This is a

14    90% confidence interval, so there -- that means

15    there's still 10% left.

16          But, yes, the upper bound of the 90%

17    confidence interval is 26.6%.

18    Q.    And if we go back to Page 1750 -- or

19    Exhibit 1752, and what we were looking at, what

20    you showed the jury are only the upper limits of

21    the confidence level.  Correct?

22    A.    Right.  That's because that's the primary

23    endpoint defined by the study protocol.

24    Q.    That's what I want to get to, so --

25    A.    Yeah.

Page 1945

1      Q.   Because what you're show- --

2           The reason that that's there is that the

3   study and the protocol said, initially, if, in

4   fact, we look at the six-month deal, the Ethicon

5   rate exceeds 20%, it ought to be considered a

6   failure.  Correct?

7      A.   That if the upper bound of the 90%

8   confidence interval exceeds 20% at one year, then

9   that's a failure.  Right.

10     Q.   All right.  And what this one did was

11  showed it at 20.1%, correct?

12     A.   That's at six months.  Correct.

13     Q.   And if we turn to the second page and the

14  conclusion of what the author said, if we look in

15  "Conclusion" -- and we're looking at Page 49 --

16  it's specifically noted here that the study did

17  not meet the stringent predefined statistical

18  criteria.

19          And that's what we're talking about here,

20  correct?

21     A.   That's correct.

22     Q.   It then goes on to say that "The absolute

23  rate" -- "The absolute rate of 18.4%" --

24          Correct?

25     A.   That's what it says, yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 559 of 742 PageID #: 133723
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 559 of 742 PageID #: 63523

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1946

1    Q.    -- "demonstrates the invaluable role of

2  TVM in treating patients with vaginal prolapse in

3  terms of reasonable success rates and a lower rate

4  of recurrence/reoperation compared to other

5  published studies."

6          Correct?

7    A.    That's what it says.  I disagree --

8    Q.    And when --

9    A.    -- with that conclusion.

10   Q.    And when we're talking about -- just so

11  we're sure we're talking about other published

12  studies, we're talking about studies that had been

13  published, like yours and others, that show a high

14  recurrence rate of as much as 40%.  Correct?

15   A.    That's true.

16   Q.    Now I'm going to switch gears a little

17  bit.

18                 MS. JONES:  Your Honor?

19                 THE COURT:  Yes.

20                 MS. JONES:  I know you said you

21  wanted to quit at 11:00 --

22                 THE COURT:  Yeah.  Can we switch

23  gears here and we'll take a break?

24                 MS. JONES:  And I promise to get

25  organized and wrap it up.

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 560 of 742 PageID #: 63724
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 560 of 742 PageID #: 63724

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1947

1          THE COURT:  That's all right.

2    Okay.  I ran over a little bit here.  I was going

3    to give you a break at 15 till and I just got so

4    mesmerized in statistics that I forgot about it.

5          MS. JONES:  My fault.

6          THE COURT:  Justice requires that

7    you not make up your mind about the case until

8    you've heard all of the evidence that's been seen

9    and heard and you must not discuss this case among

10   yourselves or with anyone else or comment on

11   anything you heard or learned in the trial until

12   the case is concluded and you retire to the jury

13   room for your deliberations.

14          Also, you must not remain in the presence

15   of anyone who is discussing the case when court is

16   not in session.

17          I've got about 12 minutes till.  I'll

18   tell you what, let's be back here at five after.

19   That will give you a little over 15 minutes.

20   Okay?

21          See you at five after 11:00.

22              (The following proceedings were

23   held in the courtroom outside the presence of the

24   jury:)

25          THE COURT:  All right.  The jury's

Page 1948

1   out.

2                 MR. SLATER:  Thank you, Judge.

3                 THE WITNESS:  Thank you.

4      (Recess taken from 10:48 a.m. to 11:07 a.m.)

5                 (The following proceedings were

6   held in the courtroom outside the presence of the

7   jury:)

8                 THE COURT:  Let's see.  Are we

9   ready to bring the jury in?  Okay.  I don't know

10  whether we've still got one or two smokers out

11  or did they --

12                THE BAILIFF:  Yeah.  Let me go

13  make sure the smokers are here.

14                THE COURT:  Yeah.  I was going to

15  say I saw two gals walk this way and I figured

16  they were heading for a coffin nail.

17         He's going out to check on our two

18  smokers and then --

19                THE BAILIFF:  You want me to fetch

20  them in?  Are you ready?

21                THE COURT:  I think he's going to

22  go see if they were there --

23                THE BAILIFF:  Okay.

24                THE COURT:  -- and then we'll get

25  the rest of them and, yeah, we're ready.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 562 of 742 PageID #: 133726
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 562 of 742 PageID #: 63522

Page 1949

1                    THE BAILIFF:  They're both out

2    here, Judge.

3                    THE COURT:  They're both out

4    there?

5          Okay.  So I guess we can bring them and

6    let them join them as we get the lineup here.

7    That usually means that one lady over there has to

8    walk all over everybody to get there because she's

9    out there, but that's okay.

10                   (The following proceedings were

11   held in the courtroom in the presence of the

12   jury:)

13                   THE COURT:  Well, I believe we

14   have the panel in.

15                   THE BAILIFF:  All accounted for.

16                   THE COURT:  All right.  You may be

17   seated, and we'll go back to where we were,

18   Doctor.

19                   THE WITNESS:  Thank you.

20                   THE COURT:  Yes, ma'am.  Whenever

21   you're ready.

22                   MS. JONES:  May I proceed, Your

23   Honor?

24                   THE COURT:  Sure.

25       Q.   (By Ms. Jones)  Dr. Weber, I'm going to

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 563 of 742 PageID #: 133727

Page 1950

1      try my best to move this along.

2            We talked about -- just a minute ago

3      about the fact that the Prolift came on the

4      market, the French doctors began using the

5      Prolift.  Correct?

6         A.   Yes.

7         Q.   And we've published -- they have

8      published the results of their studies in using

9      the Prolift, have they not?

10        A.   Yes, they have.

11        Q.   And in fact, early on in 2006, there was

12     a study published by five of the French doctors,

13     the lead author being Dr. Fatton?

14        A.   Do you have a copy of the article?

15        Q.   I do have a copy of it.  I just thought

16     maybe you would be familiar with it.

17        A.   Oh, I am familiar with it, but I -- I

18     would like a copy, please.

19        Q.   I'll hand you what's been marked as

20     Defense Exhibit 32016 --

21        A.   Thank you.

22        Q.   -- and ask you if that is a copy of a

23     study that was written by five of the French

24     doctors involved in the TVM group.

25        A.   Yes.

1      Q.   And this is the preliminary results from

2   the use of a new tension-free vaginal mesh Prolift

3   technique, of the case series, correct?

4      A.   Yes.

5      Q.   It notes that it's a multi-centric study.

6   That means it was performed by different doctors

7   in different medical centers, correct?

8      A.   Yes, that's right.

9      Q.   And in this particular study, the French

10  doctors were using not the TVM prototype Gynemesh

11  PS that they had used before, but were using the

12  actual Prolift.   Correct?

13     A.   Yes, that's right.

14     Q.   And in this particular study, they found

15  an exposure rate of 4.7%, correct?

16     A.   Yes.  With three months of follow-up,

17  yes.

18     Q.   And 4.7% is under the 5% that you

19  suggested Dr. Cosson suggested he needed earlier,

20  correct?

21     A.   At very short-term follow-up.

22          We do know that the risk of mesh

23  complications is lifelong, so I would expect that

24  number to -- to go higher as time went on.

25     Q.   But at least at this point in time it was

Case 2:12-md-02327 Document 3756-6 Filed 04/29/16 Page 565 of 742 PageID #: 133729
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 565 of 742 PageID #: 133729

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1952

1    **4.7%?**

2         A.    That is correct.

3         **Q.    And at this point in time, if you look at**

4    **the conclusions of the authors, they specifically**

5    **say that their findings suggest that transvaginal**

6    **use of mesh according to the Prolift technique is**

7    **a safe procedure.  Correct?**

8         A.    I'm sorry.  Could you let me know where

9    you're reading from?

10        **Q.    I'm at the conclusion.**

11        A.    Okay.  Thank you.

12        **Q.    Am I right that what they -- they**

13   **concluded was, "Our findings suggest that the**

14   **transvaginal use of mesh according to the Prolift**

15   **technique is a safe procedure"?  Correct?**

16        A.    That -- that is what it says.

17        **Q.    And then it says, "We need a longer**

18   **follow-up to confirm the effectiveness of the**

19   **procedure."  That means whether or not it works.**

20   **Correct?**

21        A.    That's what it says, yes.

22        **Q.    And then it talks about prospective**

23   **evaluation of the functional outcome to support**

24   **widespread use of the technique and to recommend**

25   **it to young women with weakened tissues, correct?**

Page 1953

1        A.    That's what it says.

2        Q.    And Ms. Budke obviously was not a young

3  woman with weakened tissues, was she?

4        A.    She was not a young woman.

5        Q.    So at least at this point in time, the

6  TVM group is actually publishing that they

7  considered this to be a safe procedure.   Correct?

8        A.    In my interpretation, yes, that this

9  refers to the immediate operative and

10 peri-operative results in terms of safety, since

11 this is three months of follow-up only.

12       Q.    But their conclusion, as they published,

13 whether it's based upon that or their --

14             You know, by this time they also had had

15 the previous experience with the Gynemesh PS in

16 the prototype for the Prolift, correct?

17       A.    Yes, that's correct.

18       Q.    Now, I want to switch to a little bit

19 different subject, Doctor.   I want to talk about

20 Stage 2 and Stage 3 prolapse.   Okay?

21       A.    Yes.

22       Q.    And if we go back -- if we go back and we

23 look historically -- historically in the field of

24 urogynecology and gynecology, there were lots and

25 lots of procedures that had been done without

1   randomized controlled trials having been performed

2   on them, correct?

3       A.   Yes, that's true.

4       Q.   In fact, your 2001 study where you

5   reported on anterior colporrhaphy was one of the

6   first randomized studies that was done, correct?

7       A.   Yes, that's true.

8       Q.   And that is one of the first randomized

9   studies despite the fact that surgeons had been

10  doing these types of surgeries for 50 years, at

11  least.  Correct?

12      A.   Yes, that's true.

13      Q.   And there's been some discussion in the

14  course of this case about -- and I think you

15  talked about yesterday the POP-Q measuring system

16  used by doctors?

17      A.   Yes.

18      Q.   And the POP-Q measuring system that kind

19  of measures where organs are --

20           And I think you said it was really

21  developed for research purposes.  Correct?

22      A.   Yes.

23      Q.   And that was first developed for research

24  purposes and actually published, I think, in about

25  1996 or so by the American -- by the International

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 568 of 742 PageID #: 133732
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 568 of 742 PageID #: 133732

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1955

1   Continence Society?

2      A.   Yes, it was published in 1996, and that

3   was in the American Journal of Obstetrics and

4   Gynecology.

5      Q.   And what was published at that point in

6   time was really, "This is the way we can consider

7   measuring them going forward," correct?

8      A.   Yes.

9      Q.   And you published that even as late as

10   2004.  That was really still kind of in its

11   infancy, correct?

12      A.   Yes, I believe that's fair to say.

13      Q.   And it's a fair statement that doctors

14   were not all used to using that, correct?

15      A.   Yes.

16      Q.   Now, in terms of who the appropriate

17   women are for use of the Prolift, I want to talk

18   with you about that a little bit, okay?

19      A.   Yes.

20      Q.   In the protocols and in the TVM studies

21   done by the French, they -- the protocol called

22   for use of Stage 3 or 4 or more prolapse, correct?

23      A.   Yes.

24      Q.   There were, however, some protocol

25   variations and there were women who had only Stage

Page 1956

1   2 prolapse that were actually operated on by some

2   of the French doctors, correct?

3       A.   Yes, that's true.

4       Q.   And in fact, the protocol for the

5   Gynemesh PS study, the U.S. arm of the TVM study,

6   called specifically for Stage 2 and greater

7   prolapse, did it not?

8       A.   Yes, that's correct.

9       Q.   So just so we're clear, some of the

10  French doctors initially used it for Stage 2

11  prolapse.  Correct?

12      A.   Correct.  As a protocol deviation, right.

13      Q.   And as to the U.S. arm of that -- that

14  study, the protocol specifically provided for use

15  of the Gynemesh PS or the Prolift at Stage 2,

16  correct?

17      A.   Symptomatic Stage 2 Prolifts, yes, that's

18  correct.

19      Q.   And since that time, the -- well, let me

20  back up, just so it's clear.

21           And doctors, the U.S. doctors, on that

22  part of the study actually inserted or implanted

23  the Gynemesh PS, and subsequently Prolift, in

24  Stage 2 prolapse patients.  Correct?

25      A.   I'm not clear.  Is that in the context of

**In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015**

Page 1957

 1   the study or in their clinical practices?

 2        Q.   Let's just talk about the context of the

 3   study.

 4        A.   Okay.  So yes, symptomatic Stage 2

 5   prolapse was --

 6        Q.   Stage 2 prolapse was included in that?

 7        A.   That's right.

 8        Q.   And subsequently, there have been

 9   articles published by the French doctors where

10   they relate and show the use of the TVM mesh in

11   women who had Stage 2 prolapse?

12        A.   Yes, I believe that's correct.

13        Q.   And similarly, there have been

14   publications by the French doctors, including

15   Dr. Cosson, about -- that reference use of the

16   Prolift in women who had Stage 2.  Correct?

17        A.   Symptomatic Stage 2 prolapse, yes, that's

18   correct.

19        Q.   In fact, it's not only symptomatic Stage

20   2 prolapse, there have been reports of some

21   patients that were used and published in the

22   medical literature where they had Stage 0 to 1

23   prolapse, correct?

24        A.   Use of prolapse -- use of the Pro- -- I'm

25   sorry, I'm just trying to understand your

1   question.

2        Use of the Prolift procedure in patients

3   with Stage 0 prolapse?  Is -- is that what you're

4   asking?

5       **Q.   I'm asking you if you're aware of reports**

6   **published in the medical journal -- medical**

7   **literature that show that women who had a Stage 0**

8   **to Stage 1 actually received a Prolift.**

9       A.   I'm not familiar.  I -- I'd like you to

10  show me that if that's something that you're

11  holding in your hand.

12      **Q.   Are you familiar with the Landsheere**

13  **article?**

14      A.   Yes, I am.

15      **Q.   The Landsheere study?  That's**

16  **Exhibit 31991.**

17      A.   Thank you.

18      **Q.   What I'd like you to do, Doctor, is**

19  **just -- all I really want to talk about about this**

20  **study at this stage is to talk about the -- the**

21  **table --**

22               **MR. OVERBY:  Christy, do you have**

23  **an extra one?**

24               MS. JONES:  Oh, I'm sorry.

25               MR. OVERBY:  No problem.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 572 of 742 PageID #: 132736
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 572 of 742 PageID #: 68532

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1959

1                     MS. JONES:  You're just not in my

2     line of sight.

3                     MR. OVERBY:  Thank you.

4          Q.   (By Ms. Jones)  If you look at the table

5     on -- Table 1 --

6          A.   Uh-huh.

7          Q.   -- on Page 3199.3 [sic], you see that?

8          A.   Yes, I do.

9          Q.   And that is talking about patient and

10    surgical characteristics that received a Prolift?

11         A.   Yes.

12         Q.   And in there, they talk about 92 patients

13    having received a Prolift who have a POP-Q Stage 0

14    to 1?

15         A.   Yes.

16              What I'd like to do is just see if they

17    included a description of the patients overall,

18    because what I suspect this means is that women

19    had more advanced prolapse in a different area of

20    the vagina.

21              And so as you know, there are three

22    different systems in the Prolift procedure -- an

23    anterior, a posterior, and a total -- so I'm just

24    wondering if those are not patients who had an

25    anterior Prolift procedure with a 0 to 1

1    cystocele.

2         Q.   And it may very well be.

3              And certainly that would be appropriate

4    to use a Prolift in even a Stage 0 to Stage 1 if

5    you had another procedure that you're doing at the

6    same time?

7         A.   No, I don't agree with that.

8         Q.   Okay.  It also shows that there were

9    Stage 2 procedures being treated with Pro- --

10   cystoceles being treated by Prolift?

11        A.   Well, again, that's what you can't tell

12   from this article -- this table as to what -- what

13   type of the three systems were being put into

14   women with stages of this description.

15        Q.   All right.  Certainly if you look at the

16   table, it is clear that women with Stage 2

17   prolapse were receiving Prolift.  Correct?

18        A.   No, I don't agree with that.

19        Q.   Well, Doctor, it says Stage 2 and it

20   identifies 70 patients, correct?

21        A.   That doesn't mean that they were treated

22   with an anterior Prolift procedure, though,

23   because of their Stage 2 anterior vaginal

24   prolapse.

25        Q.   And if you simply look --

Page 1961

1          All right.  I understand what you're

2     saying, Doctor.

3          And what you've said is you just haven't

4     looked at the text of the paper to see if it

5     explains it more carefully?

6     A.    I just don't recall that off the top of

7     my head.  I have looked at the text of this paper.

8     Q.    All right.  There's no question, though,

9     in your mind, that Prolift has been used to treat

10    or to address women with Stage 2 prolapse, is

11    there?

12    A.    Symptomatic Stage 2 prolapse.

13    Q.    And certainly that was what was

14    contemplated and was included in the study, in the

15    French -- I mean, the U.S. study of Gynemesh PS,

16    correct?

17    A.    Yes.

18    Q.    And certainly you know that there's

19    published data that talks about the use of Prolift

20    in women who had Stage 2 prolapse?

21    A.    Symptomatic Stage 2 prolapse, yes.

22    Q.    And in fact, I think I may have asked you

23    this, Doctor, and I'm sorry if I'm repeating

24    myself, but in fact, the French doctors in the

25    Fatton study that we just talked about talked

Page 1962

1   about the use of Prolift in women who had Stage 2

2   prolapse, correct?

3       A.   Symptomatic Stage 2 prolapse, yes.

4       Q.   Now, I want to switch gears a little bit,

5   Doctor, because we've talked about recurrence

6   rates and failure rates, so I'm sure the jury is

7   tired of listening to them, and the fact of the

8   matter is that in this case, Ms. Budke didn't have

9   a recurrence of her prolapse, did she?

10      A.   Mrs. Budke did not have a recurrence of

11  her prolapse.  She was at very low risk of

12  recurrence in the first place, and since she only

13  lived for roughly a year and a quarter after her

14  Prolift procedure, she wouldn't have had time,

15  necessarily, to develop a recurrent prolapse.

16      Q.   But in any event, the answer to my

17  question is:  She did not have a recurrent

18  prolapse that's reported anywhere in the medical

19  literature -- records, is there?

20      A.   No.  You're right.  She did not have a

21  recurrent prolapse.

22      Q.   What Ms. Budke did have was an infection,

23  correct?

24      A.   Yes.

25      Q.   Now, you told us yesterday that

1  randomized controlled trials are important,

2  correct?

3      A.    Yes.

4      Q.    And as I recall your testimony, you told

5  us that they are important because only randomized

6  controlled trials can tell you whether there's a

7  causal relationship between two events.  Correct?

8      A.    In a research setting, yes, that's

9  correct.

10     Q.    In the research setting.

11          And just so we --

12          We really haven't talked about this a

13 whole lot, so let me -- if we're talking about a

14 randomized controlled trial, so that the jury and

15 we all understand, what that means generally is

16 that if we take the case of Prolift, for example,

17 you have a group of women treated by doctors, and

18 half of them receive Prolift and half of them are

19 treated with traditional nonconventional [sic]

20 surgery or another type of product.  Correct?

21     A.    Traditional conventional surgery, I think

22 you may have meant to say, and that is one way to

23 set up a study, yes.

24     Q.    All right.  So -- and the purpose of it

25 is that --

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 577 of 712 PageID #: 133741
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 577 of 712 PageID #: 133741

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

1           You want the women to be as much alike as

2    you can, but the purpose is so that you can follow

3    the women over time and determine if there are any

4    differences between what happens with the group

5    who have Prolift versus what happens to the group

6    that has the more traditional surgery.  Correct?

7        A.   Yes.

8        Q.   And so you look at that for different

9    reasons.  One is to see whether or not it works

10   better, one surgery is more successful than the

11   other.  Correct?

12       A.   Yes, that is -- could be one of the

13   outcomes.

14       Q.   And then you also can look at the

15   different complications that are reported over

16   time and compare those.  Correct?

17       A.   Yes, that's also commonly a very

18   important endpoint.

19       Q.   Now, you told us yesterday, I believe,

20   that you had reviewed the medical and scientific

21   literature that related to Prolift?

22       A.   Yes.

23       Q.   And that would include the randomized

24   controlled trials, for example?

25       A.   Yes.

Page 1965

1       Q.    That would include those studies that

2  were done by others which were not necessarily

3  controlled trials but other types of studies?

4       A.    Yes.

5       Q.    And there are other types of studies that

6  are -- that can be done.  One, just to follow the

7  women through and see what happens.  Or two, to

8  retrospectively go back and look at the medical

9  records to see what's happened.  Correct?

10       A.    Yes.  Those are two different study

11  designs.

12       Q.    And those studies, regardless of what

13  type they are, generally include the complications

14  that are reported during the course of the study,

15  correct?

16       A.    They may, certainly.

17       Q.    That's certainly what you would expect

18  under normal circumstances is for those to include

19  a report of the complications, correct?

20       A.    Yeah.  I mean, of course it depends upon

21  the purpose of the study, but yes.

22       Q.    And one of the things that you would

23  expect to be reported in the context of these

24  studies is the occurrence of infections associated

25  with Prolift.  Correct?

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 579 of 712 PageID #: 133743
Case 2:12-md-02327  Document 2150-6  Filed 05/09/16  Page 579 of 712 PageID #: 63539
In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1966

1    A.   Yes.

2    Q.   And in fact, that medical literature has

3  looked at and evaluated infections associated with

4  Prolift, has it not?

5    A.   Yes.

6    Q.   And you would expect that to be so

7  because long before Prolift ever came on the

8  market, there were concerns about the ability of a

9  foreign material, any foreign material, to

10 potentiate infection that we talked about.

11 Correct?

12   A.   Yes.

13   Q.   And "potentiate infection," as you talked

14 about, means makes it more difficult to treat or

15 to manage?

16   A.   That's one of its characteristics, yes.

17   Q.   In fact, when we look at the medical

18 literature, the reported rates of infection

19 associated with Prolift are very low, aren't they?

20   A.   In the range of 1%, yes.

21   Q.   And in all fairness, some of the studies

22 have much lower rates and some studies have a

23 little bit higher rates, correct?

24   A.   That is correct.

25   Q.   But generally, it's 1% or lower of all

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 580 of 742 PageID #: 163744
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 580 of 742 PageID #: 163740

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1967

1   the people who had Prolift, correct?

2       A.   I -- I think that's a fair assessment,

3   yes.

4       Q.   Now, we've talked a little bit -- and I

5   don't want to go into it much because I'm going to

6   turn to something else, but we've talked about the

7   exposure rates and the erosion rates, correct?

8       A.   Yes.

9       Q.   And those are also rates that are

10  reported in the medical literature, correct?

11      A.   Yes.

12      Q.   And in all fairness, there's a pretty

13  wide range of the erosion rates or the infect- --

14  the exposure rates that have been reported,

15  correct?

16      A.   Yes.

17      Q.   And in fact, I think you've told me

18  beforehand -- and forgive me if I'm

19  misremembering, but I think you told me that

20  before 2000, before we ever got involved with

21  Gynemesh PS or whatever, there were reports of

22  erosion in the medical literature in terms of

23  people that had erosion when they had mesh put in

24  the body?

25      A.   Yes.

Page 1968

1      Q.    Including gynecological mesh --

2      A.    Yes.

3      Q.    -- being placed by gynecologists?

4      A.    Yes.

5      Q.    And that those rates appeared to be as

6   high as about 12% in some reports?

7      A.    And higher, yes.

8      Q.    Now, what I'd like to do now is to talk

9   about just one thing.

10         Am I correct that you testified that you

11   don't distinguish between exposure of mesh and

12   erosion of mesh?

13     A.    I think the term "erosion" is a more

14   accurate representation of what's happened, and I

15   think it's more clear than to describe the

16   location of the erosion.

17         So to say "vaginal mesh erosion" or

18   "rectal mesh erosion" or "bladder mesh erosion"

19   gives anyone you're communicating with a very

20   clear idea of exactly what you're talking about.

21     Q.    And I mean that's what you're describing

22   is in an ideal world, that's the way you'd like to

23   see things documented in the medical records or

24   the medical literature, for example?

25     A.    Ideally, we would communicate with terms

Page 1969

1    that we understand.

2        Q.   But the reality is that there have been a

3    number of different terms that have been used in

4    the medical literature, and even in the medical

5    records over time, correct?

6        A.   Yes, I am sure that's true.

7        Q.   And it's fair to say that sometimes

8    exposures have been reported as erosions, correct?

9        A.   I'm not sure I understand the question.

10       Q.   Okay.  Well, let's -- what I'm really

11   just talking about is there are three different

12   words that have been used sometimes, and sometimes

13   interchangeably, correct?

14       A.   Yes.

15       Q.   And those words are "extrusion" --

16            A word we really haven't talked about

17   very much here, correct?

18       A.   Correct.

19       Q.   -- "erosion" and "exposure."

20       A.   Yes.

21       Q.   And my point is that doctors, even in the

22   medical literature, have used those terms in a --

23   sometimes somewhat of a confusing way.  Correct?

24       A.   Yes, I would agree with that.

25       Q.   And there's not been a really good

Page 1970

1   definition of exactly what they were referring to

2   sometimes, correct?

3       A.   Yes, I think that's true.

4       Q.   And that also happens sometimes in

5   medical records, where doctors may use different

6   terms to describe the same -- the same event or

7   appearance in a body.  Correct?

8       A.   I think it's entirely likely that

9   different doctors use different terms.  I would

10  expect that the same doctor would likely use the

11  same terms.

12      Q.   Fair enough, fair enough.

13           And some doctors specifically use

14  "erosion" to refer to, for example, erosion into

15  another organ like the bladder.  Correct?

16      A.   That's correct.

17      Q.   And some doctors use "exposure" to be

18  just when you can see or feel the mesh in the

19  vagina, for example, where there's no -- where you

20  don't know whether it just hasn't healed or not.

21  Correct?

22      A.   I would agree that some doctors use

23  "exposure" when they're talking about a mesh

24  erosion in the vagina.

25      Q.   Okay.  And it's also fair to say that

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 584 of 742 PageID #: 133748
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 584 of 742 PageID #: 133748

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1971

1    even today, medical science doesn't understand

2    exactly how or what factors necessarily cause an

3    erosion.  Correct?

4        A.   Yes, that's correct.

5        Q.   And there have been a lot of different --

6    there have been a lot of different things that

7    have been postulated about it, but right now what

8    we know is it's something that happens in the body

9    and we're not necessarily sure exactly what causes

10   it.  Correct?

11       A.   Yes, I think that's true.

12       Q.   And there have been a lot of different

13   things --

14           I mean, you mentioned infection, but

15   among other things, they've talked about whether

16   or not -- you know, how it's placed or where it's

17   placed in the body.  Correct?

18       A.   Where the mesh is placed?  Is that your

19   meaning?

20       Q.   Right.

21       A.   Yes, uh-huh.

22       Q.   Or they've talked about whether or not a

23   woman, for example, has some medical problems that

24   keep her from appropriately healing?

25       A.   Yes, that's been mentioned as one of the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 585 of 742 PageID #: 133749
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 585 of 742 PageID #: 133749

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1972

1    possible factors.

2        Q.    So one of the things we know is sometimes

3    if people aren't in good health for whatever

4    reason, their body may not heal as well as people

5    who are in good health.  Correct?

6        A.    Yes, I would agree with that.

7        Q.    And the same thing has been happening --

8    this is not true here, but for example it's the

9    type of thing where people say that smokers, for

10    example, may not heal as well as people that don't

11    smoke.  Correct?

12        A.    Yes, I believe that's been reported.

13        Q.    And that -- all of those things apply to

14    the pelvic area and the vagina, the place where

15    the Prolift is placed in a woman, correct?

16        A.    Yes.

17        Q.    Now, those are all things that were

18    generally discussed in the medical literature

19    before 2008, weren't they?

20        A.    Yes.  I -- I think doctors and scientists

21    have been trying to understand fully the cause of

22    mesh erosions.

23        Q.    And it's fair to say that doctors and

24    surgeons that you expect to be using Prolift are

25    generally experienced pelvic floor surgeons,

```
 1   correct?

 2        A.   I don't have the knowledge, you know,

 3   since, when Prolift was available on the market

 4   for widespread use, there weren't controls in

 5   place to assign or sift out who could use the

 6   Prolift and who couldn't.

 7        Q.   And in all fairness, hospitals decide

 8   that, don't they?

 9        A.   In what way?

10        Q.   Well, we're getting a little bit far

11   afield, but generally doctors are credentialed to

12   perform certain surgeries in their hospitals,

13   correct?

14        A.   That is true.  I -- I'm --

15        Q.   And -- and generally, just generally,

16   doctors have to show to the hospital board, or

17   whoever the appropriate person is, that they're

18   qualified to do or have experience doing certain

19   surgeries, correct?

20        A.   That's true in general.

21        Q.   I don't want to get too far afield on

22   that, but in many hospitals, for example, there

23   are only a limited number of doctors who are

24   approved to do certain types of surgeries.

25   Correct?
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 587 of 712 PageID #: 133751
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 587 of 712 PageID #: 63541

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1974

1    A.   Yes, that's correct.

2    Q.   **All right.  And that may vary by**

3 **hospital.**

4    A.   I'm sorry.  Was that a question?

5    Q.   **I said, and that may vary by hospital.**

6         **Yes.**

7    A.   Yes, it may.

8    Q.   **Now, in terms of the Prolift, what I'd**

9 **like to do is we've talked a little bit about**

10 **what -- what information was out there.**

11         **What I'd like to do is to talk with you a**

12 **little bit because I don't think we've really**

13 **talked with the jury about what specific**

14 **information doctors -- Ethicon gave doctors with**

15 **respect to things like infection and erosion that**

16 **we've talked about, and I'm going to hand you**

17 **what's been premarked as Defense Exhibit two**

18 **thousand- -- 20001, which is the IFU.**

19              MS. JONES:  And I confess,

20 Counsel, I don't know if you introduced that.

21              MR. SLATER:  I believe -- I

22 believe we've used the IFU multiple times.  I

23 think I used it -- in fact, Dr. Simpson, I think I

24 presented it to her.

25              MS. JONES:  I just don't have the

**In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015**

Page 1975

```
 1   right number there, but we'll clear it up, Your
 2   Honor.
 3               MR. SLATER:  It's not a problem.
 4               THE COURT:  All right.  Y'all can
 5   work that out.  You both kind of know what this
 6   is.
 7               MS. JONES:  I know.
 8               MR. SLATER:  That's right.
 9               THE COURT:  All right.  That's
10   good enough.  You can educate the jury and me
11   about it later, okay?
12       Q.   (By Ms. Jones)  We'll clear it up but for
13   our record, we're going to refer to Prolift [sic]
14   2000.1, Doctor, and, Doctor, what I've handed to
15   you is the instructions for use as it relates to
16   Prolift.
17               MR. SLATER:  I think it's 1005.
18               THE COURT:  1005.
19               MS. GUNN:  Yeah.  We don't need
20   suspense.  We have it on the floor here.
21               THE COURT:  So instead of 20001,
22   it's 1005?
23               MR. SLATER:  Yes, Your Honor.
24               THE COURT:  Got it.
25               MR. SLATER:  That will be the
```

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 589 of 742 PageID #: 133753
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 589 of 742 PageID #: 133753

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1976

1    first and last time I can find anything for

2    anyone.

3                   THE COURT:  Well, good enough.

4                   MS. JONES:  At least me, I'm sure.

5                   MR. SLATER:  That's it.

6        Q.   (By Ms. Jones)  All right.  Doctor, what

7    I'd like you to do is to turn, if you would, to

8    the sixth page.

9            And this instructions for use -- so that

10   we can orient the jury, the instruction for use is

11   a lengthy document that has a lot of information

12   in it, including information about how the

13   procedure is performed and so forth.  Correct?

14       A.   Yes.

15       Q.   You were asked some questions about this

16   yesterday, but I want to talk with you just about

17   the contraindications, warnings, and adverse

18   reactions.  Okay?

19       A.   Yes.

20       Q.   And if we look specifically at the

21   warnings, I'd just like to talk about a couple of

22   these.

23           It says, "Number 2.  Acceptable surgical

24   practices should be followed in the presence of

25   infected or contaminated wounds."  Do you see

1   that?

2       A.   Yes, I do.

3       Q.   Now, in fairness, that's not what we're

4   talking about here, are we?  In Mrs. Budke's case?

5       A.   We're certainly talking about an infected

6   wound.  An infected Prolift mesh.

7       Q.   But -- well, but my point is that what

8   this is telling the doctor is that you don't want

9   generally to -- that if you're concerned about

10  there being an infection in place at the time that

11  you perform the surgery, you want to take special

12  care that surgeons normally take.  Correct?

13      A.   I'm not sure I understand the question.

14           Are you asking me how I interpret this

15  sentence or -- or exactly what?

16      Q.   Let me just ask this.

17      A.   Okay.

18      Q.   I think I confused it by going someplace

19  probably not particularly important here, but what

20  this refers to is if, in fact, a surgeon is

21  operating where there is an infection in the area,

22  the surgeon needs to follow acceptable practices.

23  Correct?

24      A.   Okay.  So you're talking about a

25  preexisting infection.

1    Q.    Well, doesn't that -- isn't that what

2    that's referring to?

3    A.    That's one possible type of infection

4    it's referring to, yes.

5    Q.    All right.  As -- when a surgeon -- I

6    think I can clear this up in a second.

7         Just before that, it says, "Users should

8    be familiar with surgical procedures and

9    techniques involving pelvic floor repair and

10   nonabsorbable meshes before employing the

11   Gynemesh" -- "the Gynecare Prolift pelvic floor

12   repair system."

13        You see that?

14   A.    Yes, that's what it says.  Ethicon had no

15   way of actually ensuring that's what took place.

16   Q.    Exactly.

17        Surgeons -- you, as a surgeon, wouldn't

18   do a pelvic floor repair surgery if you didn't

19   think you were familiar with it, would you?

20   A.    I would not.  You're right.

21   Q.    And you would expect that what that's

22   saying is that doctors that used the Prolift ought

23   to be familiar with those procedures.  Correct?

24   A.    That's -- that is what it says, yes.

25   Q.    Now, if we come down to "Adverse

1    Reactions" and we highlight the first bullet point

2    there, it talks about potential adverse reactions,

3    and so we're all on the same wavelength, those can

4    be complications following the surgery or

5    associated with the product, correct?

6        A.    Yes.

7        Q.    "Potential adverse reactions are those

8    typically associated with surgically implantable

9    materials."

10          You see that?

11       A.    Yes, I see that.

12       Q.    And then it goes on to say "including

13   infection potentiation, inflammation, adhesion

14   formation, fistula formation, erosion, extrusion,

15   and scarring that results in implant contraction."

16          You see that?

17       A.    Yes, I do.

18       Q.    Now, that's the information that was

19   provided by Ethicon to doctors in the kit that

20   contains the Prolift, correct?

21       A.    Yes, that's correct.

22       Q.    And that information, when we're talking

23   about surgically implantable materials, those

24   potential complications are complications that are

25   associated with virtually every implantable

Page 1980

1    material.  Correct?

2        A.   Those are some of them.  That's not all

3    of them.

4        Q.   Well, fair enough.

5             Erosion, extrusion, and scarring that

6    results in implant contraction would apply to all

7    meshes.  Correct?

8        A.   Yes.

9        Q.   Now, it also says down here, "Sterility.

10   The Gynecare Prolift pelvic floor repair systems

11   are sterilized by ethylene oxide.  Do not

12   resterilize.  Do not reuse.  Do not use if package

13   is opened or damaged.  Discard all opened unused

14   devices."  Correct?

15       A.   Yes.

16       Q.   And that's a precaution that's taken to

17   ensure that the product is not contaminated at the

18   time it's implanted in the patient.  Correct?

19       A.   That's taken to make sure the product is

20   not contaminated by the time it's turned out on

21   the surgical table.

22            By the time it's implanted in the

23   patient, it's contaminated by virtue of having

24   passed through the vagina, which cannot be

25   sterilized.

1       Q.    Well, but hold on with me one second.

2    We'll get there.

3            As a practical matter, you know from your

4    review of the documents that all Prolifts are

5    sterilized when they leave the manufacturing

6    facility, correct?

7       A.    They are sterilized.  I've seen issue

8    reports of contaminated kits where hair was

9    found -- sterile hair, no doubt, but hair found

10   within the kit.

11      Q.    Certainly no indication that any hair was

12   found in Mrs. Budke's kit, was there?

13      A.    No, not that I know of.

14      Q.    You've seen Ms. Budke's batch records?

15      A.    I'm sorry?

16      Q.    You've seen the batch records on --

17      A.    Oh, the batch records.  Yes, yes.

18      Q.    And the batch records for Mrs. Budke's --

19   the Prolift that she received showed that it went

20   through the appropriate sterilization techniques?

21      A.    Yes.  As I'm sure did the kits that ended

22   up with hair in them.

23      Q.    And -- and -- I'm sorry?

24      A.    As -- I'm sure the kits that ended in

25   hair with them went through the standard

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 595 of 742 PageID #: 133759
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 595 of 742 PageID #: 63559

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1982

1   sterilization process and --

2       Q.   You know, Mrs. -- Dr. Weber, let's --

3   let's talk about Mrs. Budke for a second.

4       A.   Certainly.

5       Q.   Her batch records, the batch records on

6   the Prolift that she did, showed that it was

7   appropriately sterilized when it left the

8   manufacturing facility.  Correct?

9       A.   Yes, that's correct.

10      Q.   And you have no reason to suggest to this

11  jury that Ms. Budke's Prolift was in any way

12  contaminated when it got --

13      A.   No, I didn't mean to imply that.  No, not

14  at all.  Not -- no, no.  That wasn't my meaning at

15  all.

16      Q.   Thank you.

17           And the purpose -- one of the purposes of

18  ensuring that all of the kits are sterilized is to

19  avoid the possibility of infection that comes from

20  simply having bacteria on the device when you

21  implant it into the body?

22      A.   The bacteria are on the device after

23  passing through the vagina.

24           It comes out of the box in a sterile

25  condition, yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 596 of 742 PageID #: 128760
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 596 of 742 PageID #: 63550

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1983

1     Q.   Comes out of the box in a sterile

2   condition, and it's fair to say, Doctor, that

3   gynecologists have been operating on the vagina

4   for years and years and years.  Correct?

5     A.   That is correct.

6     Q.   And the vagina is and has normal

7   bacterial flora in it, correct?

8     A.   Yes, it does.

9     Q.   And one of the things that doctors are

10  taught in their residency, or whatever, as

11  gynecologists is how to safely operate in that

12  field.  Correct?

13    A.   Yes.

14    Q.   And how to avoid contamination by the

15  bacterial flora.  Correct?

16    A.   The contamination cannot be avoided.

17    Q.   Well, I'll tell you what, we'll let some

18  other doctors talk about that.

19         The fact is that if -- if there were

20  significant problems with surgical contamination,

21  you would have expected to see much higher rates

22  of infection in the randomized controlled studies,

23  wouldn't you?

24    A.   No, I don't think that's true.

25    Q.   Okay.  The -- the IFU was not the only

1    information that was given to doctors about

2    Prolift and the complications associated with it,

3    was it?

4        A.   That's correct.

5        Q.   And in fact, Ethicon provided to

6    physicians a document called a surgeon's resource

7    monograph, did it not?

8        A.   Yes.

9        Q.   And that surgeon's resource monograph,

10   I'll hand you what's been marked as Defense

11   Exhibit 24240.

12       A.   Thank you.

13               MR. SLATER:  I'm sorry, Your

14   Honor.  Could we just step up real quick?

15               THE COURT:  Sure.

16               MR. SLATER:  I think, Kent, I've

17   got to ask you and David a question, too.

18               (Counsel approached the bench and

19   the following proceedings were held outside the

20   hearing of the jury:)

21               MR. SLATER:  I just want to

22   clarify one thing because I read Dr. Simpson's

23   deposition and I don't -- I don't think she saw

24   this, or if she did, I'm not sure, but she's going

25   to be talking about a document she never saw and I

Page 1985

1    don't think she ever relied on this or used it, so

2    I just don't want to introduce -- you know, a

3    document as an important warning document that the

4    doctor didn't even see, and I don't think she did.

5                    MR. OVERBY:  She wasn't asked

6    about that at the depo.

7                    MR. HYDE:  She has seen one

8    version of it at some point.

9                    MR. SLATER:  One version.

10                   MR. HYDE:  I don't know if there's

11   different generations or not.

12                   MR. SLATER:  Do we know if this is

13   the right one or --

14                   MR. BALL:  This is the only one

15   that predates the surgery.

16                   MR. SLATER:  Okay.  I just wanted

17   to --

18                   THE COURT:  Okay.  I take it

19   that's a "yes."

20                   MR. SLATER:  I have a lot of

21   redirect on it.  I just wanted to make sure we

22   didn't waste time.  I'll be going for a while on

23   it.

24                   THE COURT:  Okay.

25                   (The proceedings returned to open

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 599 of 742 PageID #: 133763
Case 2:12-md-02327 Document 3756-6 Filed 04/29/16 Page 599 of 742 PageID #: 133763

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1986

1   court.)

2       Q.   (By Ms. Jones)  Doctor, you've seen this

3   surgeon's resource monograph?

4       A.   Yes, I have.

5       Q.   And this is a monograph that was made

6   available to doctors by Ethicon?

7       A.   Yes.

8       Q.   And in addition, it was used in certain

9   professional education courses?  Or do you know

10  that?

11      A.   No, I don't know that.

12      Q.   All right.  What I'd like to do is see if

13  we can walk through this with the jury so that we

14  can look at some of the information that was shown

15  to the jury about -- to the doctors and told to

16  the doctors about infection and exposure.  Okay?

17      A.   Certainly.

18      Q.   And if we look at --

19           What I'd like to do is to turn to the

20  table of contents which is on Page 2.

21      A.   Okay.

22      Q.   And if we look at Page 2 --

23           Actually, let's -- so that we're clear,

24  this document was actually authored by doctors and

25  urogynecologists?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 600 of 712 PageID #: 133764
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 600 of 712 PageID #: 133564

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1987

1      A.   Yes, that's true.

2      Q.   And if we look at then the table of

3   contents, I want to talk specifically with you

4   about what was discussed with doctors about the

5   complications, infection, and then mesh

6   complications:  erosion, exposure, and

7   extrusion.  Okay?

8      A.   Yes.

9      Q.   And let's turn to Page 4, the next page,

10   and at the time this was written, in the

11   "Introduction," at this time there had been over

12   35,000 procedures done with respect to Prolift,

13   correct?

14      A.   Yes, that's what it says.

15      Q.   And it points out that there are seven

16   known case series in progress, correct?

17      A.   Yes.

18      Q.   And a case series is a study underway

19   following the women that have had these surgeries,

20   correct?

21      A.   Yes.

22      Q.   And then it goes on to point out what we

23   just said, that the comments and opinions

24   contained within this document represent the

25   experiences of the 10 authors as well as over 200

Page 1988

1    participating international prolapse surgeons.

2    Correct?

3        A.    Yes.

4        Q.    In fact, it goes on to say that the way

5    they collected this information is that this is a

6    summary of the collective experience of the most

7    experienced Gynecare Prolift system users who were

8    invited to attend one of five user forums

9    throughout the world.  Correct?

10       A.    Yes.  So this is anecdotal experience.

11       Q.    It's anecdotal experience based upon that

12   information, but it's information that was

13   collected from over 200 doctors, correct?

14       A.    Right.  Anecdotally, yes.

15       Q.    And if we look down to the "Preparation"

16   portion down here -- I'm going to skip around a

17   little bit before I get to the -- one of the

18   things that they report under "Preparation" is

19   "Infection rates have been exceptionally low and

20   only typical antibiotic prophylaxis is required."

21            Now, what that's referring to is in many

22   surgeons -- or many surgeries, a doctor will,

23   before they ever start the surgery, or at the

24   time, give a dose of antibiotics just to ward off

25   infections.  Correct?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 602 of 712 PageID #: 132766
Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 602 of 712 PageID #: 132766

1       A.    Yes.

2       Q.    But it does say there that infection

3   rates have been exceptionally low, and that would

4   be consistent with what you've told us that had

5   been reported in the literature.   Correct?

6       A.    Yes.

7       Q.    And then if we turn to Page 8, please,

8   there's a section on infection.

9       A.    Yes.

10      Q.    And when we're talking about the section

11  on infection, it says, "There have been very few

12  known cases of infection related to the Gynecare

13  Prolift system.   In this rare event, the mesh will

14  often need to be extracted, although it is

15  assisted by lack of ingrowth surrounding infected

16  tissue.   There is data to support the conservative

17  management of infections when in the presence of

18  monofilament polypropylene" -- "in the presence of

19  monofilament polypropylene."

20          Then it goes on to talk about a

21  peri-rectal abscess, correct?

22      A.    That's what it says, yes.

23      Q.    So let's talk about this just a little

24  bit because when it says "There have been very few

25  known cases of infection related to Prolift,"

1 that's correct, and that's consistent with what's

2 been reported in the studies, correct?

3     A.   Yes.

4     Q.   It then goes on to say when it is, you

5 may have to extract the mesh.  Correct?

6     A.   That's what it says.

7     Q.   And that's something that's consistent

8 with what medical doctors know may happen when

9 you've got a foreign body present in the body in

10 the presence of infection, correct?

11     A.   Yes.  And the principle is to remove all

12 of the infected material, and we know in the

13 Prolift system that's not possible.

14     Q.   Well, just stick with me a minute.

15 You've been doing pretty well.  Stick with me a

16 second.

17          As a practical matter, that's what that's

18 relating to is you want to extract the mesh

19 because of the possibility that it may potentiate

20 infection, make it difficult to treat.  Correct?

21     A.   That's correct.

22     Q.   And then it goes on to say, "There is

23 literature to support the conservative management

24 of infections when in the presence of monofilament

25 polypropylene."  You see that?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 604 of 742 PageID #: 133768
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 604 of 742 PageID #: 63568

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1991

1      A.   That's what it says.

2      Q.   And that's what it says because, in fact,

3   there are studies out there that suggest that in

4   the presence of a monofilament polypropylene mesh,

5   you may not need to remove the mesh.  You may be

6   able to treat it without removal.  Correct?

7      A.   And there are studies, including by the

8   French doctors, who say that the mesh needs to be

9   extracted completely.

10          So there are different practices

11  recommended in the medical literature.

12     Q.   Fair enough.

13          My question is -- and the one I want to

14  make sure you answer is -- that there are studies

15  out there and there are suggestions out there by

16  people who are expert in treating infectious

17  diseases that suggest that in some cases you can

18  treat infection with polypropylene present without

19  having to remove it.  Correct?

20     A.   Yes, I think that's correct.

21     Q.   Now, in this case, no question but what

22  Dr. Simpson thought that the correct thing to do

23  was to extract the mesh, correct?  In Ms. Budke's

24  case.

25     A.   Yes, she did --

Page 1992

1    Q.   That's what Ms. -- that's what

2  Dr. Simpson elected to do when Ms. Budke presented

3  with an infection.   Correct?

4    A.   Yes.  She removed a portion of the mesh.

5    Q.   Now, in addition to the discussion of

6  infection, there is also a discussion immediately

7  below that on the mesh complications erosion,

8  exposure, and extrusion.   Correct?

9    A.   Yes.

10    Q.   And we've got that word up there again,

11  "extrusion."   What -- what this document says and

12  what Ethicon, when it gave to doctors,

13  specifically noted was that there's no uniformity

14  of terms used for mesh complications.

15        You see that?

16    A.   Yes, I do.

17    Q.   That's the same thing you and I were

18  talking about earlier; that sometimes people use

19  "erosion," "exposure," and "extrusion" in

20  different ways?

21    A.   Yes.

22    Q.   And it goes on to say --

23        I'm going to leave out "extrusion"

24  because that's not -- I don't think "extrusion"

25  appears anywhere in Ms. Budke's medical records,

Page 1993

1   does it?

2      A.   I don't think so.

3      Q.   It says, "'Erosion' and 'extrusion' are

4   the most appropriate terms, and although they are,

5   in fact, similar in definition, it may be wise to

6   reserve the term 'erosion' for the more serious

7   visceral erosion.  This would help avoid

8   confusion."

9           Do you see that?

10     A.   Yes, I do see that.

11     Q.   Now, what that's referring to is a

12  suggestion that, for example, an exposure may

13  simply be a failure to heal or the mesh may simply

14  be seen, for example, through a suture line, as

15  opposed to erosion actually going through and

16  eroding to the bladder, as we discussed.  Correct?

17     A.   Actually, I don't see any of those terms

18  there as far as I don't see "suture line," I don't

19  see "healing."  I -- I don't see what you're

20  discussing there.

21     Q.   I understand it's not there.  I was

22  trying to get it -- explain what we were talking

23  about, the difference between exposure and

24  erosion --

25     A.   Oh, I didn't understand.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 607 of 742 PageID #: 133571
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 607 of 742 PageID #: 133571

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 1994

1    Q.   -- and if you're not familiar with that,

2  that's --

3    A.   Okay.

4    Q.   -- we can move on.

5    A.   Okay.

6    Q.   Visceral erosion occurs when the mesh

7  erodes through an organ like the bladder, correct?

8    A.   Yes, that's -- that's correct.

9    Q.   And it contrasts that, in the second

10  paragraph, with the known occurrence of simple

11  vaginal mesh exposure.  You see that?

12    A.   Yes.

13    Q.   Mesh exposure, which obviously some

14  people would refer to as erosion -- I'm not trying

15  to confuse things -- occurs in 3 to 17% of cases.

16  You see that?

17    A.   That's what it says, but the upper range

18  is actually quite a bit higher.

19    Q.   Well, I think you told us earlier -- and

20  forgive me if I'm wrong, but I thought you told us

21  earlier this morning that there had been a range

22  of reports in the studies of erosion that range

23  from as low as 3% to as high as 20%.

24    A.   Or higher, yes.  "And higher," I should

25  say.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 608 of 742 PageID #: 135772
Case 2:12-md-02327 Document 3750-6 Filed 05/09/16 Page 608 of 742 PageID #: 135568

Page 1995

1      Q.   And it's fair to say, Doctor, that if you

2   look at all of the medical literature that's out

3   there and the studies that are reported, that

4   there are some factors associated with the

5   reporting rate in different studies.   Correct?

6      A.   Yes.

7      Q.   And in some cases, as the surgeons become

8   more familiar with the surgery, the rate of

9   exposure goes down?

10      A.   People have reported that, yes.

11      Q.   And in some cases, there have been

12   reports of the use of different types of mesh and

13   their different exposure rates?

14      A.   Yes, that's correct.

15      Q.   And that when you change from one mesh to

16   another mesh, the exposure rate goes down?

17      A.   It changes.   It may not go down; it may

18   go up.

19      Q.   They change.   Fine.

20           You know you've seen reports of where

21   it's gone down?

22      A.   I'm not -- are you talking about a direct

23   comparison?

24      Q.   I'm talking about reports in the medical

25   literature where a doctor moves from one type of

1    mesh to another type of mesh and sees a dramatic

2    improvement.

3        A.   Do you -- are you referring to a specific

4    article?

5        Q.   Well, let me ask you this:  I think that

6    you mentioned this yesterday.  You know that when

7    the French doctors started studying this, they

8    didn't initially start studying the development of

9    this product with Gynemesh PS, did they?

10       A.   That's correct.

11       Q.   In fact, they started with other meshes,

12   including a Prolene mesh that's different.

13   Correct?

14       A.   Yes.

15       Q.   And you know that the French doctors said

16   their exposure rate went from 17% to about 2.7%,

17   as I recall, when they did that?

18       A.   When they were also experimenting with

19   the procedure itself.

20            So it's not purely the mesh.  There were

21   other factors that were going on during that time

22   of experimentation.

23       Q.   Fair enough.

24            The point is, the exposure rate dropped

25   from 17% to less than 3%, didn't it?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 610 of 712 PageID #: 133774
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 610 of 712 PageID #: 133774

Page 1997

1      A.   I believe those figures --

2      Q.   At one point.

3      A.   -- are relatively accurate, yes.

4      Q.   If we go on and we look at the other

5   information that was furnished to doctors, they go

6   on to say, "Experience and avoiding hysterectomy,

7   when possible, will reduce the rate to 1 to 6%."

8           Do you see that?

9      A.   I do see that.

10     Q.   In fact, that's consistent with what was

11  reported by Dr. Cosson, correct?

12     A.   Yes.

13     Q.   And it also seems -- says that "Exposure

14  may spontaneously resolve if seen in the first six

15  weeks but seems unlikely to resolve if seen after

16  that time," correct?

17     A.   That's what it says, yes.

18     Q.   And you know that to be true as reported

19  in the medical literature?

20     A.   It may occur, yes.

21     Q.   It also says, "They are often

22  asymptomatic and require no treatment, in that

23  case."  You see that?

24     A.   I do see that.

25     Q.   And asymptomatic requiring no treatment

Page 1998

1   means that it's not causing the woman any

2   problems.  Correct?

3        A.   At that moment, it's not.  That's

4   correct.

5        Q.   Well, at any moment if it's asymptomatic,

6   it's not causing her any problems, is it?

7        A.   There's a risk for future, but at that

8   moment, correct.

9        Q.   Well, there's a risk that I may be hurt

10  falling down the stairs, right?  But today, I'm

11  standing here right now and I'm fine, right?

12       A.   I appreciate your analogy --

13       Q.   I apologize, I apologize.

14       A.   -- but the mesh as a lifelong implant --

15       Q.   I'm sorry, doctor.

16       A.   -- carries the permanent risk of

17  complications.

18       Q.   Doctor, I apologize for my analogy.

19            The fact of the matter is that when

20  someone is asymptomatic, what that means is

21  they're not having any problems.  Correct?

22       A.   At that moment, that's correct.

23       Q.   All right.  And at that moment, they

24  don't require any treatment.  Correct?

25       A.   I don't agree with that.

Page 1999

1      Q.   All right.  Fine.

2           It then goes on to say -- and I think

3   this is what you were just trying to say --

4   "Experience has demonstrated that it is not

5   uncommon for the initially asymptomatic exposures

6   to become symptomatic over time."  Correct?

7      A.   That's what it says.

8      Q.   That's exactly the point you're trying to

9   say, correct?

10     A.   That's -- yes, that's true.

11     Q.   So if you just stick me, I'll get there.

12          It goes on to say that, "The symptoms may

13   be mild, ranging from spotting or leukorrhea to

14   dyspareunia and/or vaginal pain," correct?

15     A.   That's what it says, yes.

16     Q.   And it goes on to say, "Intervention is

17   usually quite minimal with local excision under

18   sedation.  It can be performed in the office,

19   especially with small defects and if there is some

20   capability of sedation."  Correct?

21     A.   That's what it says.

22     Q.   Well, the fact of the matter is that it

23   had been -- we've seen in the medical literature

24   that when doctors are reporting on the studies,

25   what doctors have reported in the medical and

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 613 of 712 PageID #: 135777
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 613 of 712 PageID #: 135777

In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 2000

1    scientific literature is consistent with that

2    statement, is it not?

3        A.   No, I don't agree.

4        Q.   You don't agree that there are reports by

5    doctors that specifically say, "We've looked at

6    exposures and a certain percentage of those

7    exposures are asymptomatic"?

8        A.   That's the key point, "a certain

9    percentage" --

10       Q.   All right.

11       A.   -- "that are asymptomatic," and --

12            Go on.

13       Q.   So a certain percentage are asymptomatic

14   and require -- well, doctors have chosen not to

15   treat them, whether you agree with it or not.

16   Correct?

17       A.   That's correct.

18       Q.   And they have reported that they required

19   no treatment, correct?

20       A.   At that moment, that's correct.

21       Q.   And they have also reported that in many

22   of those cases, you can just go in and do a small

23   excision in the office to treat it.  Correct?

24       A.   I don't agree with that.  I don't --

25       Q.   You don't agree that that's what's been

1   reported?

2       A.   I don't agree with "many."  This is the

3   key --

4       Q.   If you --

5       A.   That's a key concept.

6       Q.   If -- well, let's -- just stick with me,

7   Doctor.

8            If we go back and we look at the studies,

9   many of those studies report erosion rates,

10  correct?

11      A.   Yes.

12      Q.   And many of those reports include women

13  who they say have exposure or erosion but no

14  symptoms.  Correct?

15      A.   In some cases.

16      Q.   And many of those doctors have chosen not

17  to treat those women or to give them vaginal cream

18  or vaginal estrogen, correct?

19      A.   Which is a treatment, yes.

20      Q.   Well, it is a treatment and I apologize

21  if I've misstated something.

22           Other doctors have said sometimes if that

23  doesn't do it, you go in and do a little clipping

24  in-the-office procedure, correct?

25      A.   Yes.  I imagine that's intensely

Case 2:12-md-02327   Document 3756-6   Filed 04/29/17   Page 615 of 712 PageID #: 133779
Case 2:12-md-02327   Document 2150-6   Filed 05/09/16   Page 615 of 712 PageID #: 63577

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2002

 1   uncomfortable.

 2       Q.   That's what doctors have reported.  Am I

 3   correct?

 4       A.   Yes.

 5       Q.   Now, if we look at the second -- the next

 6   page of this document, it says, "The true etiology

 7   of mesh exposure is unclear and may vary."

 8            You see that?

 9       A.   Yes, I do.

10       Q.   That's exactly what we were just talking

11   about earlier, that there are many potential

12   theoretical bases for what causes erosion.

13   Correct?

14       A.   Yes.

15       Q.   And medical science simply hasn't

16   determined the cause of that today.  Correct?

17       A.   That's right.

18       Q.   And as we sit here today, you're not

19   aware -- well, strike that.

20            It goes on to say, in the final

21   paragraph, that, "The best prevention is strict

22   adherence to the surgical technique guidelines

23   with full-thickness incision, good tissue

24   handling, no vaginal trimming, tension-free wound

25   closure and keeping the mesh flat and

 1    tension-free.  The largest number of vaginal

 2    exposures is in the anterior incision line and

 3    they are generally less than 2 centimeters in

 4    largest dimension."

 5           You see that?

 6      A.   That's what it says.

 7           That's the problem with anecdotal reports

 8    like this in terms of "the largest number,"

 9    "generally less."

10           As we already know, women who have

11    complications move on to a different doctor, they

12    may move on to a tertiary referral center.  These

13    doctors may not have experience with the women who

14    have the most severe complications because they go

15    away from their practices.

16           So this is what they report, but this is

17    by no means a comprehensive summary of the kinds

18    of complications, mesh complications, that women

19    experience.

20      Q.   Doctor, I want to go back to the

21    beginning.

22           This document was written by experienced

23    pelvic floor surgeons who were using Prolift,

24    correct?

25      A.   Who were all Ethicon consultants.

Page 2004

1      Q.   Well, you would expect Ethicon to have

2   gotten consultants to -- someone to write this,

3   wouldn't you?

4      A.   Every time I've looked more deeply into

5   what Ethicon consultants have written and produced

6   in terms of research, that has raised grave

7   concerns about their scientific honesty.

8      Q.   Doctor, we've just been through three and

9   four and five paragraphs of a lengthy document

10   where Ethicon was furnishing information about

11   infection to doctors, correct?

12      A.   Yes.  And that's the concern that the --

13      Q.   And --

14      A.   -- information is inaccurate and

15   misleading.

16      Q.   That's your opinion, Doctor.

17      A.   It's not just my opinion.

18      Q.   There's nothing I can do to change that

19   today, so let's just talk about the fact that as a

20   practical matter, the information that was

21   presented --

22      A.   Excuse me.

23      Q.   This information was presented to

24   doctors, correct?

25      A.   Yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 618 of 712 PageID #: 132782
Case 2:12-md-02327 Document 2150-6 Filed 05/09/16 Page 618 of 712 PageID #: 63578

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2005

1      Q.    Made available to doctors to help them --

2   or to educate them about what had been reported in

3   the literature, correct?

4      A.    No.   This is based on surgeons'

5   experience, anecdotal experience, and it doesn't

6   help them if the information is misleading and

7   inaccurate.

8      Q.    All right, Doctor.

9             MS. JONES:  With all due respect,

10   Your Honor, I move to strike the comment and ask

11   that it be disregarded.

12             MR. SLATER:  Your Honor, I think

13   that was responsive, with all due respect.

14             THE COURT:  Well, asked and

15   answered.  I'm -- I'll allow that one time.  I

16   don't want to get into that web again, okay?

17         By the way, while we got a lull here, do

18   you know what -- Ms. Jones, what might be a

19   convenient breaking point?  Because we're now on

20   to 12:30, but I'll -- go ahead.  I don't want to

21   break a thought process but I'm just --

22             MS. JONES:  I'm sorry, Your Honor.

23   I --

24             THE COURT:  That's all right.

25             MS. JONES:  I was being coached by

Page 2006

1   my colleagues and I didn't --

2                   THE COURT:  I'm sorry.

3                   MS. JONES:  -- I didn't hear what

4   you said.

5                   THE COURT:  Oh, okay.  Well, what

6   I said was I've been giving them a dinner break

7   around 12:30.  That's not written in stone.  It

8   could be a quarter of 1:00, I guess.  We'll clean

9   the restaurants out more.  But just kind of a

10  preliminary warning that somewhere here we're

11  going to take a noon hour.

12      **Q.   (By Ms. Jones)  Doctor, with the**

13  **admonition of the court, I'm going to ask this one**

14  **question.**

15                  MR. BALL:  Can we talk for just a

16  second?

17                  MS. JONES:  I apologize.  If

18  you'll indulge me one second.

19                  THE COURT:  What's that?  Okay.

20  You may confer.

21      (There was a discussion off the record.)

22      **Q.   (By Ms. Jones)  Doctor, in talking about**

23  **this particular document, if we go back to the**

24  **first page here, the very introduction, in this**

25  **introduction it's talking about 35,000 procedures**

Page 2007

1    in seven known case centers with interim --

2    studies -- series with interim results available,

3    correct?

4        A.    Remind me again where you are.

5        Q.    I'm in the introduction.

6        A.    Oh, I beg your pardon.  I thought you

7    were in the foreword.

8              Okay.  Yes.

9        Q.    And specifically, this refers to the

10   collective experiences of 200 participating

11   international prolapse surgeons, correct?

12       A.    That's what it says.

13       Q.    And what it's referring to is that these

14   are the comments and this is the information that

15   was collected and statements made by over 200

16   doctors worldwide that were actually using the

17   Prolift.  Correct?

18       A.    This is anecdotal information that was

19   not systematically collected.

20       Q.    Doctor -- Doctor, my question is very

21   simple.

22             It's important to have information from

23   doctors that are actually doing the procedure, is

24   it not?

25       A.    It's important to have accurate and fair

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 621 of 712 PageID #: 123795
Case 2:12-md-02327  Document 3752-6  Filed 04/29/16  Page 621 of 712 PageID #: 63585
In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

1   and balanced information.

2       Q.   And -- and, Doctor, the best place to get

3   information, the very best place to get

4   information, about a product is from doctors who

5   actually are treating patients with the product.

6   Correct?

7       A.   If it's accurate and fair and balanced.

8       Q.   Well, Doctor, are you telling me that you

9   think that there are 200 or over 200 people out

10  there that are giving inaccurate information?

11           You're not saying that, are you?

12      A.   They --

13      Q.   You're not saying that, are you?

14      A.   Anecdotal information is --

15      Q.   Doctor, please answer my question.

16      A.   Excuse me.  I'm trying to answer your

17  question.

18      Q.   I'm asking you to answer my question.

19           Very simply, are you saying to this jury

20  that there are 200 -- over 200 recognized pelvic

21  floor surgeons doing this surgery that are all

22  dishonest?  Is that what you're saying?

23      A.   No.  What I'm saying --

24      Q.   Thank you.

25      A.   -- is that anecdotal information is, by

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 622 of 742 PageID #: 133786
In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 2009

1    its nature, incomplete, and what we know has been

2    well-established in the literature is that

3    patients with complications seek care elsewhere

4    and that leaves the original surgeon with a

5    misperception of what happens to patients,

6    especially on the worst-case scenario end of the

7    spectrum.

8        Q.    Doctor --

9        A.    That's what I'm saying.

10       Q.    Doctor, you would also agree with me that

11   one of the best places to get information about

12   women and how they are -- how they are -- how

13   they -- how well -- strike that.

14            You would agree with me that one of the

15   best places to go to determine how women responded

16   and what the actual complications are are the

17   studies that have been done?

18            Do you agree with me on that?

19       A.    No.  The studies that have been done,

20   particularly by Ethicon investigators, have such

21   serious flaws that those results are not reliable.

22       Q.    So, Doctor, what you're saying to this

23   jury -- let's just be perfectly clear --

24       A.    Uh-huh.

25       Q.    -- is that the results --

**In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015**

1          You told this jury yesterday that you

2   were not aware of any transvaginal mesh product

3   that had more published data on the safety and

4   efficacy of the product than Prolift.

5          Do you remember that?

6      A.   More is not better --

7      Q.   Well --

8      A.   -- and every time I've chance to

9   review --

10     Q.   Doctor --

11     A.   -- the raw data of studies paid for by

12  Ethicon --

13     Q.   Doctor --

14     A.   -- the results --

15          MS. JONES:  Your Honor --

16     A.   -- have been vastly --

17          THE COURT:  All right.

18     A.   -- different than --

19          THE COURT:  Okay.

20     A.   -- what's been published.

21          THE COURT:  Enough.  Enough.

22          Let's take a lunch break.  Okay?

23          Justice requires you not make up your

24  mind about the case until all the evidence has

25  been seen and heard.  You must not discuss this

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 624 of 742 PageID #: 133788
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 624 of 742 PageID #: 63588

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2011

1    case among yourselves or with anyone else or

2    comment on anything you hear or learn in this

3    trial until the case is concluded and you retire

4    to the jury room for your deliberations.

5              Also, you must not remain in the presence

6    of anyone who is discussing the case when the

7    court is not in session.

8              That ends the reading.

9              Have a nice noon hour.  It's -- be back

10   here at 12:30, 1:30 -- 25 till 2:00.  When the big

11   hand is on 7 here.

12                   JUROR:  Okay.

13                   (The following proceedings were

14   held in the courtroom outside the presence of the

15   jury:)

16                   THE COURT:  The jury's out.

17         Okay.  Well, we'll take an hour break.

18   Do I need to be back at any special time?  Do we

19   have anything that's --

20                   MS. JONES:  Your Honor, I've

21   got --

22                   THE COURT:  -- pressing before we

23   start again?

24                   MS. JONES:  I have -- I may have a

25   two-minute thing.  No more than two minutes.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 625 of 742 PageID #: 132789
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 625 of 742 PageID #: 63589

Page 2012

```
 1                    THE COURT:  All right.  Okay.

 2                    MS. JONES:  But I may not.

 3                    THE COURT:  You mean --

 4                    MR. BALL:  We may need like five

 5    minutes to make a final record before they come

 6    back in.

 7                    THE COURT:  Yeah.  Okay.

 8            Well, all right.  Let's see.  I'll be

 9    back in when the big hand is on the 5.  That's 10

10    minutes before it goes to the 7.

11                    MR. SLATER:  You said you guys

12    have something to talk about with Your Honor?

13                    MS. JONES:  Huh?

14                    MR. SLATER:  You said you guys

15    have something to talk about before --

16                    MS. JONES:  I may.

17                    MR. SLATER:  Yeah, we may have

18    something to raise too, so it may be good to give

19    us a few minutes.

20                    THE COURT:  All right.  I'll get

21    back here when the hand's on 5 and they're going

22    to go back on here when it gets on 7 and I'd like

23    to have them in here when it gets on 8.  Okay?

24                    MR. SLATER:  Thanks a lot, Judge.

25                    THE COURT:  About as simple as I
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 626 of 712 PageID #: 133790
Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 626 of 712 PageID #: 133580
In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2013

1    can make it.

2                    MR. HYDE:  I like it.

3                    MR. SLATER:  Reminds me of a

4    Fisher-Price clock.

5                    THE COURT:  Thank you.  Huh?

6                    MR. SLATER:  Remember the

7    Fisher-Price clocks --

8                    THE COURT:  Yeah.

9                    MR. SLATER:  -- and they'd have a

10   little song that would play.

11                   THE COURT:  Yeah.  In fact, the

12   one I used to rely on was a Mickey Mouse clock,

13   you know.  When the little gloved hand's on 3 and

14   the big one's is on 5 till, it's about time for

15   school to get out.  All right.

16     (Recess taken from 12:33 p.m. to 1:29 p.m.)

17                    (The following proceedings were

18   held in the courtroom outside the presence of the

19   jury:)

20                   THE COURT:  Hello.  Everybody got

21   here about the time the hand's on the big 5, I

22   guess, or whatever.  The big hand was on the 5.

23   I'll get it right in a minute.

24                    MR. SLATER:  I think, Ms. Jones,

25   you had an issue?  Christy did.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 627 of 712 PageID #: 133791
Case 2:12-md-02327  Document 3762-6  Filed 05/09/16  Page 627 of 712 PageID #: 63591

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2014

1              MS. JONES:  Hold on one second.

2              MR. BALL:  Okay.  So Adam?

3              MR. SLATER:  Yes.

4              MR. BALL:  I'm going to go ahead.

5    We've got a couple things.

6              MR. SLATER:  Okay.

7              MR. BALL:  Following up on our

8    discussion before court started this morning, we

9    would like to ask two questions.

10         First question:  "Dr. Weber, are you

11   primarily employed by Mr. Slater?"

12         We'd like a ruling that that doesn't open

13   the door to other lawsuits.

14              MR. SLATER:  Well, she's not

15   employed by me.

16              MR. BALL:  That's what she said in

17   her deposition.

18              MR. SLATER:  She's not a W-2

19   employee.  She's gets a 1099.  She's a consultant

20   who works with me.

21              MR. BALL:  That's what she said --

22              MR. SLATER:  So I'd have to

23   clarify that.

24              MR. BALL:  Okay.

25              THE COURT:  "Are you a full-time

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 628 of 742 PageID #: 133792
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 628 of 742 PageID #: 63588

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2015

1   consultant?"

2                   MR. BALL:  "Are you a full-time

3   consultant for Mr." --

4                   THE COURT:  Someplace she said she

5   wasn't doctoring anymore and --

6                   MR. SLATER:  Yeah.  I mean, I

7   don't know -- whatever.  He can ask whatever he

8   wants.  We'll clean it up.  I mean --

9                   MR. BALL:  No.  So I want -- so

10  that would be --

11                  THE COURT:  No, I will not treat

12  that as opening the door if you don't go beyond

13  that.

14                  MR. BALL:  Okay.  Second question

15  is -- and this is -- this is directly related to

16  what we talked about before.  We would like a

17  ruling that if we ask the question "How much have

18  you been paid by Mr. Slater," then she -- and

19  she'll give an answer, then that we ask for a

20  ruling that that not open the door to other

21  lawsuits.

22                  MR. SLATER:  I think in the

23  interest of time, Your Honor, I think you've

24  already heard extensive argument.  I think

25  Your Honor gave us a clear ruling.  I really would

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 629 of 742 PageID #: 133793
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 629 of 712 PageID #: 63589

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2016

1   prefer not to reargue an issue that we spent a lot

2   of time on this morning.  I think we all

3   understood what you said.

4                    MR. BALL:  I'm asking for a

5   specific ruling to that question.  I'm not --

6                    THE COURT:  Well, here -- here --

7                    MR. BALL:  I'm not trying to

8   reargue it.

9                    THE COURT:  -- here's the whole

10  thing.  She has said that she charged a thousand

11  dollars an hour to testify, right?  Am I right on

12  that?

13                   MR. SLATER:  For deposition --

14  yeah, for trial testimony.

15                   MR. BALL:  Yeah.

16                   THE COURT:  She charged $350 an

17  hour --

18                   MR. SLATER:  To look at stuff.

19                   THE COURT:  -- to look at stuff.

20  I'll take that job if you got an extra one open.

21  I can -- I'm an avid reader.  But -- yeah, right.

22        But anyway, I know surely that would

23  satisfy the fact that she's done pretty well with

24  you, and -- rather than just setting a figure.

25  Because once you set that figure, then the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 630 of 742 PageID #: 133794
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 630 of 742 PageID #: 63594

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2017

```
 1   question becomes, "Well, what did" --

 2                 MR. ANDERSON:  "What did you do?"

 3                 THE COURT:  -- "what did you do,

 4   because you surely -- if they're paying you that

 5   kind of money for what you're doing here, you'll

 6   have all kinds of applicants."

 7                 MR. SLATER:  That's what I

 8   normally pay people for --

 9                 THE COURT:  You can ask her again,

10   "Now, Doctor, what did you say your rate was?"

11                 MR. BALL:  No.  We've already done

12   that.

13                 THE COURT:  All right.

14                 MR. BALL:  So I just want to make

15   sure that we have a clear ruling on the record.

16          So the ruling would be that if --

17                 THE COURT:  That you can ask --

18                 MR. BALL:  -- that if we ask how

19   much she's been paid by Mr. Slater total, then you

20   would view that as opening the door for them to

21   ask some questions about other lawsuits.

22                 THE COURT:  Well, I think probably

23   so.  I mean, I think that's what they're going to

24   say and then we're going through all of this

25   again.
```

Page 2018

1    I think that if you set out -- if you

2  want to reiterate that -- I mean, I'm not telling

3  you to do it, but if you're going to, stick with

4  what she's said.  That is, "You've been charging a

5  thousand dollars" --

6              MR. ANDERSON:  "At trial."

7              THE COURT:  Yeah.

8        -- "for trial work and 350 for research,

9  and your -- basically your job at this point in

10  your life is consulting for Mr. Slater?"

11              MR. BALL:  Okay.  Then --

12              MR. SLATER:  And she'll answer it

13  however she does and we'll move on.

14              THE COURT:  Yeah.

15              MR. BALL:  And then the -- so then

16  I would make an offer of proof, then --

17              THE COURT:  Yes.  That if you

18  were --

19              MR. BALL:  -- an offer of proof

20  that if we were allowed to ask the question about

21  how much she has been paid by Mr. Slater, that she

22  would say that at the time of the deposition it

23  was 800 and some-odd thousand dollars last summer

24  and it's more since that time and it's approaching

25  a million dollars.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 632 of 742 PageID #: 133726
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 632 of 742 PageID #: 63592

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2019

1                    THE COURT:  Whatever you know.  I

2       have no idea.

3                    MR. BALL:  That would be our offer

4       of proof.  Is that acceptable?

5                    THE COURT:  Yeah.  As an offer of

6       proof, I -- that's fine.

7                    MR. SLATER:  Yeah.  I think the

8       testimony would probably be close to that.  It

9       would probably be it's over $800,000, and I

10      haven't added up the final number but I would

11      agree it's over $800,000 and I think that's

12      what --

13                   THE COURT:  Well, I think that --

14      let me tell you this:  I don't think our juries

15      here are particularly stupid.  They seem to be

16      figuring out things pretty well in cases I've been

17      handling lately.  And I think they're going to

18      figure out somehow that if you're -- if you're the

19      consultant -- if she's your consultant, that she's

20      getting paid for it.  And, you know --

21                   MR. BALL:  So --

22                   THE COURT:  But we'll make the --

23      let's go ahead.

24                   MR. BALL:  -- our offer of proof

25      is denied?

Page 2020

```
 1                    THE COURT:  No.

 2                    MR. BALL:  We can do it with her.

 3                    MR. SLATER:  You don't deny an

 4     offer of proof.  You just make it for the record.

 5                    THE COURT:  No, no.  It's a

 6     record.

 7                    MR. SLATER:  You're just making a

 8     record.

 9                    MR. BALL:  So --

10                    MR. SLATER:  We have -- I'm sorry.

11                    THE COURT:  Here's what my ruling

12     will be, and then you can make your offer of

13     proof.

14          My ruling is that I'm going to let you

15     ask what she does and if she -- if her primary

16     professional thing at this point is a consultant

17     for his -- his firm or for Mr. Slater.  I don't

18     even know -- if I had a test, I don't even know

19     where you live.  I know it's in New Jersey, but,

20     you know, that's a fairly big state.

21          And if you want to start it with that or

22     end it with that, you can ask her, "Now, you've

23     told us in this -- in this trial that you're

24     getting a thousand dollars an hour to testify and

25     $350 an hour to do research and the like."
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 634 of 742 PageID #: 133798
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 634 of 742 PageID #: 63592

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2021

1          MR. BALL:  Okay.  Thank you, Your

2   Honor.

3          THE COURT:  All right.

4          MR. SLATER:  Thanks.  We have an

5   issue we wanted to put in front of Your Honor now

6   because Dr. Weber is here and it's something that

7   I think would be a fair thing to ask her.

8          Before the trial, Your Honor provided a

9   ruling regarding the fact that Ethicon has stopped

10  selling the Prolift as of 2012, and Your Honor

11  said, "Look, I'm not going to have the plaintiffs

12  put it in in the first instance, but if the

13  defendants put the issue in, open the door to it,

14  then it could come in."

15         We believe the door has been opened

16  because of this.  Two things.

17         The reason the Prolift was withdrawn was

18  because -- and we can do this, by the way -- I

19  want to preface it -- without ever mentioning the

20  FDA.

21         THE COURT:  All right.  Yeah, I

22  don't want that.

23         MR. SLATER:  No.  I'm going to

24  tell you what happened but I'm telling you right

25  now it can be done without saying "FDA."

Page 2022

1          THE COURT:  Okay.  That's a

2   compound felony so I don't want to get into that.

3          MR. SLATER:  In early 2012,

4   January 3rd, the FDA said "You've got to do this

5   study," a high-level clinical study, the type

6   Dr. Weber is saying was never done, "and you need

7   to do that so you can prove this is safe and

8   effective.  It needs to be a three-year study and

9   then we're going to make some decisions on, you

10  know, whether or not we're going to let these be

11  sold anymore."

12         The net-net of the story was, the deal

13  that was made was Ethicon went to the FDA and

14  said, "Look, we're pulling the product off the

15  market so we don't want to do the study."

16         And the FDA said, "Fine.  If you -- if

17  you pull it off the market, you don't have to do

18  these studies, but if you ever want to try to come

19  back with it, you're going to have to do the

20  studies to get on."

21         Now, that's number one.

22         They have -- Ms. Jones has stated to the

23  jury in opening and with Dr. Weber that the

24  Prolift is the most studied medical device for

25  vaginal repair of prolapse that has ever existed.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 636 of 742 PageID #: 133800
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 636 of 742 PageID #: 63896

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2023

1          And I'm paraphrasing, but that's the

2    message.

3          She's told the jury about all the

4    studies.  She put up a list of studies in opening

5    and, you know, I think there was about 12 studies

6    on the graph in the PowerPoint.  And she's

7    repeatedly asked Dr. Weber all morning about the

8    fact that Ethicon has heavily studied the product

9    and proven it's safe, and was reading, in fact,

10   from articles.  For example, the 2007 article by

11   the TVM group saying it's safe.

12         And then she referenced the fact that

13   they had published more studies, the three- and

14   five-year results were studied, and they're saying

15   it's safe, and that goes into like 2011, those

16   articles.  2010 and 2011.  I think maybe even

17   2012.  And has made it clear to the jury that

18   their position is, there's plenty of studies

19   proving it's safe and effective.

20         The fact is, when Ethicon was told "You

21   need to do the high-level study and have it

22   watched over and have no slips in it and no

23   openings," Ethicon made the choice to withdraw the

24   product rather than do the study.

25         They have an explanation for it.  They

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 637 of 742 PageID #: 133891
Case 2:12-md-02327 Document 3752-6 Filed 05/09/16 Page 637 of 742 PageID #: 63891

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2024

1   say it was a business decision, they weren't

2   making a lot of money on it.  That's fine.  That's

3   the kind of thing that gets presented.

4           How -- and the other reason why I think

5   the door has been opened is they have talked about

6   the wide acceptance of the Prolift.  They've told

7   the jury it was put in 35,000 women.  And they

8   have repeatedly suggested that doctors love this

9   thing and there's a lot of doctors who use it all

10  the time.  Ms. Jones has spoken in present tense

11  multiple times.

12          So you put those things together and all

13  we want to do is play the --

14          First of all, Dr. Weber should be able to

15  say that because she's in a box and she knows she

16  can't say that they pulled it off the market on

17  that date.  She's not saying that explicitly.  But

18  she should be able to say that on redirect.

19          The second thing is -- and we don't have

20  to argue the details of it now, but we have a

21  short deposition clip of the regulatory affairs

22  guy at Ethicon who handled this who testifies to

23  the story of it, and I think it's about a

24  25-minute video that we have, so we'd want to be

25  able to play that to the jury to show them what

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 638 of 742 PageID #: 133802
Case 2:12-md-02327  Document 3752-6  Filed 05/09/16  Page 638 of 742 PageID #: 63898

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2025

1    happened, or, you know, maybe we don't even have

2    to do that.  Maybe we can just do it where

3    Dr. Weber says it and we stop there.

4            You know what?  That's fine.  I'd be

5    happy to just put it out.

6            And all she would say is when the subject

7    came up that they needed to do this type of study,

8    not saying who brought it up or anything, that

9    they made a decision not to sell the Prolift

10   anymore, rather than do that study, and it's

11   not -- no longer sold, and that's it.

12           And I think that that's a fair way to

13   handle the fact that the jury's been given the

14   type of evidence that clearly needs to now be

15   answered.

16                   THE COURT:  Okay.  Now, let me ask

17   one question here --

18                   MR. BALL:  Can I respond?

19                   THE COURT:  Yeah, I'll let you.

20           Tell me about what is this M+ or +M?

21                   MR. SLATER:  Okay.  As you've

22   seen, there was this hernia mesh that was

23   partially absorbable.

24                   THE COURT:  Uh-huh.

25                   MR. SLATER:  And going back to

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 639 of 742 PageID #: 133803
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 639 of 742 PageID #: 63899

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2026

1    2004, the scientists at Ethicon were looking at

2    that and saying, "You know what?  We think this

3    could be safer because there will be less material

4    left in the body after it absorbs."

5         What it is, it's the same type of mesh

6    here, partially, and then something called

7    Monocryl, which absorbs into the body.  Absorbable

8    sutures.  And it turns out to have about, I think,

9    45% less material when it absorbs like over 80

10   days.  So it's leaving less mesh in the body.  So

11   they figured maybe it would be softer, maybe you'd

12   have less inflammation, maybe it wouldn't cause as

13   many erosions, not as many problems.  And as

14   you've seen, they consistently within the company

15   thought it was going to be a safer product.

16        They did that study on it and then

17   eventually they got clearance and sold the Prolift

18   with the Monocryl, with the UltraPro.  They

19   started selling that in early '09, and that's what

20   Dr. Simpson adopted and stopped using the Prolift

21   and went to the Prolift+M at that time.

22        And the Prolift+M was on the market, and

23   then when they -- when they actually pulled the

24   Prolift off, they pulled the Prolift+M at the same

25   time.  Pulled them both off the market.  And

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 640 of 712 PageID #: 133804
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 640 of 712 PageID #: 63804

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2027

 1   that's what the Prolift+M is, and we've been very

 2   careful in not mentioning it.

 3                THE COURT:  I know that because --

 4   yeah.

 5                MR. SLATER:  You know, we're not

 6   going to go over your -- even though there's been

 7   some questions that got close --

 8                THE COURT:  Yeah.

 9                MR. SLATER:  -- we're not

10   mentioning the Prolift+M and we've been careful

11   about that.

12        So that's also off the market.

13                MR. BALL:  We need to respond.

14                THE COURT:  Yeah.  I'm going to

15   listen.

16        Okay.  Ms. Jones?

17                MS. JONES:  Thank you, Your Honor.

18        First, Your Honor, this is a matter

19   that's been already ruled upon.  Your Honor

20   excluded the evidence of a discontinuance on the

21   ground that it was more prejudicial than

22   probative.

23        I'll remind you that every other court

24   that's ever considered it has done exactly the

25   same thing.  The evidence has never come in.

Case: 2:12-md-02327 Document: 3756-6 Filed: 04/29/17 Page: 641 of 712 PageID #: 63805
Case: 2:12-md-02327 Document: 3756-6 Filed: 05/09/16 Page: 641 of 712 PageID #: 63805

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2028

1          With respect to some claim that we've

2     opened the door, all of the studies that were

3     referred to specifically and that we've pulled up

4     were early studies talking about the TVM study and

5     whatever.

6          We did talk about, and Dr. Weber did

7     acknowledge the existence of, the other studies

8     that had looked at it and what their infection

9     rates were and so forth, but that doesn't in any

10    way, shape, or form mislead the jury.  Those are

11    what those study results were, period.

12          And there's been no suggestion, Your

13    Honor -- I mean, when we talk about 35,000 women

14    that use the Prolift, what we showed up there was

15    a 2007 document shortly after it went on the

16    market.  That has nothing to do with suggesting

17    that it's still on the market today.  That's what

18    was done in 2007 before Ms. Budke ever got --

19               THE COURT:  Well, I think it --

20    yeah.  I mean, and that's --

21               MS. JONES:  -- implanted.

22               MR. BALL:  The simple matter is,

23    Your Honor, we cannot get a fair trial here if

24    they're allowed to come up here and say that we

25    withdrew this from the market.  We are not able to

Page 2029

1   get a fair trial if they're able to say four

2   years --

3                  THE COURT:  I thought I ruled that

4   we wouldn't talk about that.

5                  MR. BALL:  You did.  They're

6   trying to now say -- they're trying to now say --

7                  THE COURT:  That you opened the

8   door and that --

9                  MR. BALL:  -- by discussing the

10  fact that it is un- --

11         We also have to defend the claim that the

12  product is defective.  The way you defend that

13  claim is to -- and, well, they also have a claim

14  of negligence, okay?

15         They also have a claim of punitive

16  damages.

17                 THE COURT:  Yes.  And I've been --

18                 MR. BALL:  The way that you defend

19  those claims is by proving the product has been

20  tested.

21         We -- if they're saying that we -- that

22  by us saying that the product has been extensively

23  tested opens the door to us not being able to sell

24  it anymore, we wouldn't be able to defend any of

25  the claims because their claims are all based on

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 643 of 712 PageID #: 63807
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 643 of 712 PageID #: 63807

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2030

1   testing and things.

2          So this is -- this is just an attempt at

3   an end-run around your ruling.

4                THE COURT:  Okay.  Well, let me --

5   let me rule.

6                MR. BALL:  Thank you.

7                THE COURT:  Well, go ahead.

8                MR. BERGMANIS:  What I was going

9   to say is you don't have to tell them that there's

10  how many thousands of these?  32,000 or --

11               MR. SLATER:  Well, actually their

12  opening slide said 120,000 women, and they're

13  talking in the present tense and how safe it is

14  and the studies prove it's safe, and the language

15  of Your Honor's ruling, just so you know it, it

16  said "unless the defendant chooses to put the

17  subject into evidence."

18         They've put the subject in evidence by

19  saying the studies prove it's safe, but they

20  declined to do a study that would have proven it

21  wasn't and, instead, stopped selling it.

22               MR. BALL:  That's ridiculous.  We

23  have not -- we have not put the withdrawal of this

24  product in the market [sic].  All we have done is

25  defended ourself against their claim that we were

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 644 of 712 PageID #: 63808
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 644 of 712 PageID #: 63808

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2031

1  negligent, and that's it.

2              THE COURT:  Well, I'm going to let

3  them argue all their claims but we're not going to

4  talk about the fact that -- how it got stopped.

5              MR. BALL:  Thank you.

6              THE COURT:  All right.

7              MR. SLATER:  We could tell you if

8  we think they kicked the door too hard, right?

9              THE COURT:  Yeah.  Yeah.  I

10  don't -- I hate to hear crying and gnashing of

11  teeth.

12        So anyway, let's -- I think you're going

13  to get fine here with that, and that stays fairly

14  consistent with what the other judges have done.

15              THE BAILIFF:  Ready for him to

16  round up the jurors?

17              THE COURT:  Yeah.  Yeah.

18        Mr. Bergmanis?

19              MR. BERGMANIS:  Yes, sir.

20              THE COURT:  Let me talk to you

21  just one second.

22              MR. BERGMANIS:  Are we off the

23  record, Judge?

24              THE COURT:  Yeah, I'm off the

25  record on this.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 645 of 742 PageID #: 133809
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 645 of 742 PageID #: 133809

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2032

1          (There was a discussion off the record.)

2                   THE BAILIFF:  All rise.

3                   (The following proceedings were

4     held in the courtroom in the presence of the

5     jury:)

6                   THE COURT:  Good morning.  Or good

7     afternoon.  Yeah, it is afternoon.

8                   JUROR:  It is afternoon.

9                   THE COURT:  It really is.

10                  THE BAILIFF:  Found every one of

11    them.

12                  THE COURT:  Yes, you did, it looks

13    to me like.  If I got enough fingers, you got

14    everybody here.

15                  THE BAILIFF:  If that doesn't

16    bother the Court.

17                  THE COURT:  No, I don't know --

18    huh-uh.  That doesn't bother me a bit.

19                  THE BAILIFF:  The jury panel was

20    complaining about the glare.

21                  THE COURT:  Oh, well, we don't

22    want to put their eyes out.  I'll tell you, the

23    sun's bad enough but I don't have much control

24    over it.  That's kind of like ordering your dog

25    around.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 646 of 742 PageID #: 63810
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 646 of 742 PageID #: 63810

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2033

1          Okay.  We got everybody here.  You may be

2    seated, and with the exception of the doctor,

3    because she stands, and she's going to go to the

4    witness stand.

5          And I'll remind you that you're still

6    under the same oath you were a day ago.

7                    THE WITNESS:  Yes.

8                    MS. JONES:  Dr. Weber, thank you.

9    I have no more questions for you today.

10                   THE WITNESS:  Thank you.

11                   MR. BALL:  I tender the witness,

12   Your Honor.

13                   THE COURT:  Yes.

14                   MR. OVERBY:  Going to be me, Your

15   Honor.

16                   THE COURT:  Well, that's just fine

17   with me, Mr. Overby.

18                   MR. OVERBY:  I figured.

19          I won't be long, Doctor.

20                   THE COURT:  Your partner will keep

21   copious notes.  I can see that because he's got

22   his pen and pencil in hand.  Okay.

23                   CROSS-EXAMINATION

24      QUESTIONS BY MR. OVERBY:

25      Q.   Here's where I want to start on I think

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 647 of 712 PageID #: 138804
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 647 of 712 PageID #: 138804

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2034

1   some things that we'll agree on.  Maybe -- maybe

2   when we're said and done, we'll agree on

3   everything here, you and me here today.

4          But we -- I've met you at least once

5   before in your deposition in this case.  True?

6   A.   Yes.

7   Q.   And you understand that there are -- that

8   there may be more than two claims but there are

9   two parts to this case.  There are claims that are

10  pending relating to the plaintiff's claim against

11  Ethicon or Johnson & Johnson.

12          You're aware of that?

13  A.   Yes.

14  Q.   And that there are -- there is a claim

15  pending with respect to Dr. Simpson, whom I

16  represent.

17          You understand that?

18  A.   Yes.

19  Q.   And that claim has to do with whether or

20  not she met the appropriate standard of care.

21  Right?

22  A.   I understand that, yes.

23  Q.   And we talked about this back at your

24  deposition.  I just want to make sure that

25  everybody else is clear.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 648 of 712 PageID #: 133812
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 648 of 712 PageID #: 133812

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2035

1          Your testimony here is not related to

2     that claim against Dr. Simpson.   True?

3          A.   Yes, that's correct.

4          Q.   Okay.   And you've talked about peer

5     review.   There's been a lot of discussion about

6     peer-reviewed journals.   It sounds to me like --

7          First of all, I think you've made this

8     point several times.   Just because it's peer

9     reviewed doesn't mean it's right.

10          That's a point you've made, right?

11          A.   Yes.

12          Q.   You've had peer-reviewed stuff of your

13     own published.   I assume you probably think it's

14     all correctly done, though.   Right?

15          A.   To the best of my ability, yes.

16          Q.   You sure hope so.

17          The doctors out there like Dr. Simpson

18     don't necessarily know, without digging into the

19     data that may or may not be available, those kinds

20     of details as to, in other words, whether or not

21     the data provided was accurate or not.

22          Fair enough?

23          A.   That's correct.

24          Q.   There has been some discussion about

25     literature that's been published at different

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 649 of 712 PageID #: 63903
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 649 of 712 PageID #: 63809

In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 2036

1    points in time, and some of that literature, at

2    least -- one of them I kept track of simply

3    because I know there's a summary.

4            What was this (indicating)?  Exhibit --

5    it's Plaintiff's Exhibit 139 or 139A.  It's

6    actually not in English, right?

7        A.   The entire article is not in English --

8        Q.   Right.

9        A.   -- you're correct.

10       Q.   There's a summary in English?

11       A.   The abstract is in English, yes.

12       Q.   So things get published in the literature

13   all over the world, correct?

14       A.   Yes.

15       Q.   And doctors like Dr. Simpson can read

16   this.  To the extent that they have opportunity

17   and time and dig deep enough for whatever it is,

18   they can see what the literature says.  That's one

19   thing doctors do do, can -- can do and do do,

20   right?

21       A.   Yes.

22       Q.   And I don't want to get into a discussion

23   with you, if I can avoid it, about staging and the

24   appropriateness or inappropriateness of using

25   products in staging other than this:  You are

Page 2037

1  aware that doctors and patients have chose

2  together, through the years -- forget about

3  mesh -- okay? -- completely -- to address

4  surgically Stage 2 and sometimes Stage 1 prolapse.

5  Fair?

6      A.   Symptomatic.

7      Q.   Right.  I understand.

8           But that's -- that's happened, right?

9      A.   Yes.

10     Q.   In fact, if we look at a couple -- if I

11  come over here, this will make it easier and

12  quicker, I think.

13          These are just a few that I pulled that

14  were discussed with you.

15          514, that's one you're an author on,

16  right?

17     A.   Yes.

18     Q.   Remind me what the gist of this one was.

19  This is an '04 article that talks about the

20  recurrence rate after repair, vaginal repair.

21     A.   Yes.  So the title of the article is

22  "Risk Factors for Prolapse Recurrence After

23  Vaginal Repair," and what we were interested in

24  learning, if we could, is in the women who do

25  experience recurrence of prolapse, what factors

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2038

1    might be contributing to that.

2             In this article, we found that women of

3    younger age and women with more severe prolapse

4    had a higher risk of experiencing a recurrence

5    than older women and women with less severe

6    prolapse.

7        **Q.   Okay.  But all of the women in this study**

8    **had surgery for prolapse repair.   True?**

9        A.    Yes.

10       **Q.   And so we can, for example, see --**

11            **I'm not going to belabor it at this**

12   **point, but just to make this point:   Here, for**

13   **example, preoperatively, Stage 2, 49.4% of all the**

14   **women in the study, so just short of half of them,**

15   **were Stage 2?**

16       A.    Actually, this table represents the women

17   who had a preoperative stage of 2 and then a

18   postoperative stage of 0 or 1.  That's what the

19   49.4% represents --

20       **Q.   Okay.**

21       A.    -- in this table.

22       **Q.   In this category of those who --**

23            And that's a good point.  There's

24   actually more than just the 41 there.  There's

25   also another 42 that were Stage 2, right?

Page 2039

1      A.    After the surgery, that's correct.

2      **Q.    Before the surgery.   Preoperative.**

3  **Right?**

4      A.    Oh, I see what you're saying.   Okay.

5  Right.

6            So preoperative, Stage 2 --

7      **Q.    Here, let me make it -- maybe I can cut**

8  **through some of this and make it easier.**

9      A.    Okay.

10     **Q.    Several of those women in that study who**

11 **were operated on for prolapse were Stage 2 in the**

12 **beginning, right?**

13     A.    Yes.

14     **Q.    One of the things you were look- --**

15           **This didn't have anything to do with mesh**

16 **either.**

17     A.    That's correct.

18     **Q.    One of the things you were looking at,**

19 **though, is who has a recurrence and can we figure**

20 **out what kinds of people, what kinds of**

21 **preexisting conditions, et cetera, are going to be**

22 **most likely to result in recurrence down the road.**

23 **Fair?**

24     A.    Yes.

25     **Q.    You also talked about this article, which**

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 653 of 712 PageID #: 138917
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 653 of 712 PageID #: 138917

1    is Plaintiff's Exhibit 500.  That's -- that's

2    another one of yours.  True?

3         A.   Yes.

4         Q.   And which -- what's the date of this?

5              It's '01.  This is a little older, but

6    the patients studied in this -- this is the one

7    that looks at three different techniques, and are

8    you also looking to see what the recurrence rate

9    is, or something else?

10        A.   Yes.

11        Q.   And so you looked at these three

12   different techniques.  Again, this didn't have

13   anything to do with the kind of mesh we're talking

14   about in this case.  I think it was absorbable

15   mesh of some sort that was used in one of the

16   techniques.

17        A.   Yes.  You're right.

18        Q.   But again, there were patients in these

19   that had -- actually, it says that there were some

20   in Stage 0, but certainly in Stage 1 and Stage 2

21   that were included in this.  True?

22        A.   Yes.

23        Q.   And we could go through probably lots of

24   others, but just the last one here, Exhibit 707.

25   That study also talks about specifically

```
 1    cystoceles.  There were 52 of -- out of the 100

 2    that were being studied that were Stage -- or,

 3    excuse me, Grade 1 and 2?

 4        A.   Right.  And grade and stage are

 5    different, and --

 6        Q.   I knew you were going to tell me that.

 7        A.   Yes.

 8        Q.   You're going to educate me on that.

 9    They're different how?

10             One of them is the POP and one of them is

11    the -- one of them is -- not POP.  POP-Q.

12        A.   Yes.

13        Q.   Okay.  How does that relate?  Is a -- is

14    a Grade 1 the same as a Stage 1, or sometimes, or

15    never?

16        A.   Sometimes.

17        Q.   Okay.  Depends on who's doing it,

18    probably?  The staging?

19        A.   Well, we hope not.  That's -- that's the

20    point of having a standardized examination, that

21    if it's performed correctly, it should not vary

22    between examiners.

23        Q.   That's with the POP-Q.

24        A.   Well --

25        Q.   Or staging too?
```

Page 2042

1        A.    Oh, yes.  With either, yes.

2        **Q.    Okay.  So if they're doing it right, is a**

3   **Grade 1 and a Stage 1 going to be the same?**

4        A.    Not exactly.

5        **Q.    Tell me, without teaching me the whole**

6   **class, how they're going to be different.  And I**

7   **don't mean that in a bad way at all, but just kind**

8   **of short, sweet, and to the point.**

9        A.    Okay.  So in the grading system, which is

10   what's used primarily by clinicians, a Grade 1 is

11   a prolapse that extends roughly halfway down the

12   length of the vagina towards the vaginal opening.

13          Grade 2 is when the prolapse extends to

14   the vaginal opening.

15          Now, in the staging process of POP-Q,

16   Stage 1 actually includes a greater amount of the

17   vaginal length, to within 1 centimeter of the

18   hymen.  So it's just above the hymen, which is not

19   exactly the vaginal opening because the vaginal

20   opening is a couple of centimeters away, but

21   anyway, it just extends it to a degree closer to

22   the vaginal opening than the grading does.

23          Does that answer your question?

24        **Q.    You know, it probably did.  I'm not sure**

25   **I understood it, but --**

Page 2043

```
 1        A.    I did my best.

 2        Q.    -- I bet it probably did.  That's okay.

 3   It's close enough.

 4              You talked about the ACOG bulletin.  Let

 5   me see if I can boil this down.

 6              You were involved in the bulletin

 7   language that said -- and I'm really

 8   summarizing -- using mesh is experimental.

 9        A.    Using the mesh kits in particular.

10   That's right.

11        Q.    They came along -- I say "they."

12              Were you still on that committee when

13   they changed it?

14        A.    No, no.  I was never a member of the

15   committee on gynecologic practice within ACOG.  I

16   was asked by the committee to coauthor this

17   document.

18        Q.    They -- they then, the committee, however

19   they did it -- there was some discussion about

20   that -- came along and decided to make changes to

21   it, and understandably you, having written the

22   first one and feeling the way you feel, didn't

23   like it and you wrote a letter saying, "I don't

24   like this, I think it's wrong, for multiple

25   reasons."  True?
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 657 of 742 PageID #: 138821
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 657 of 712 PageID #: 63821

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2044

```
 1      A.   That's a paraphrasing, but yes.

 2      Q.   I understand.

 3      A.   Yes.

 4      Q.   You also --

 5           You were asked about this.  You also,

 6      though, do understand there are those out there

 7      who did have different opinions and also wrote to

 8      the -- a letter to the editor saying basically,

 9      "We think the process was followed and we think

10      this is the right way to do it."

11           That happened?

12      A.   Any individual to whom you are referring

13 would not have knowledge of the internal processes

14 within ACOG as to how exactly this happened.

15      Q.   What if it was Hal Lawrence III?  Would

16 he have knowledge of it --

17      A.   Well, he's represent- --

18      Q.   -- being he was the vice president of

19 practice activities?

20      A.   Right.  I'm sorry.  I didn't know you

21 were referring specifically to the ACOG

22 representative who was responding.

23      Q.   Yeah.  And here -- my question is just as

24 simple as this, because it seems to me like this

25 is the case, not uncommonly in litigation, that
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 658 of 742 PageID #: 63922
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 658 of 742 PageID #: 63813

```
 1    there could be two sides to the story or two

 2    arguments and they present their side and the

 3    other side presents their position.

 4              There is another position that you don't

 5    agree with on the issue of the word

 6    "experimental."  True?

 7        A.    There is another position, yes.

 8        Q.    And you don't agree with it.  You've made

 9    that clear.  You don't.  Right?

10        A.    That's right.  I don't agree with that.

11        Q.    Then I think I learned this from reading

12    some articles, including a couple that you were

13    the author of.  At least at one point in time

14    about 200,000 surgeries are done a year on -- and

15    you're going to correct me, I'm sure, if I get

16    this wrong.

17              Is it 200,000 in the United States or

18    worldwide --

19        A.    That is --

20        Q.    -- on prolapse and --

21              Which is it?

22        A.    Yes, that's -- in the United States.

23        Q.    Okay.  Which is one of the reasons

24    that -- I assume that there's a lot of literature

25    out there on both sides of the fence discussing
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 659 of 712 PageID #: 138823
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 659 of 712 PageID #: 138823

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2046

1   lots of things about, you know, what should we be

2   doing, when should we be doing it, what should we

3   use, et cetera.  I mean, that's a fair amount of

4   surgeries.

5       A.   Yes.  You're right.

6       Q.   You -- I'm just going to go through these

7   notes here.  We're getting close, I think.

8            This is sort of what I started with, but

9   just again, I want to make sure that I've made

10  this clear, if for no other purpose so that I've

11  done my job.

12      A.   Uh-huh.

13      Q.   These documents, to the extent that

14  you've discussed internal documents of Ethicon --

15           Are you with me?

16      A.   Yes.

17      Q.   So we've talked about some literature,

18  we've talked about a few things that the doctors

19  may have seen, but to the extent you're talking

20  about internal documents that have details in

21  there -- and I suspect you may be asked about some

22  more here in a little bit -- those are the kinds

23  of things that the doctors like Dr. Simpson, they

24  don't see.  True?

25      A.   Correct.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 660 of 742 PageID #: 138824
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 660 of 742 PageID #: 138824

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2047

1       Q.    The one other thing -- well, two more

2    things I think I want to ask you about real quick.

3            Is it still true --

4            Do you remember when your deposition was

5    taken?  It was about -- was it April, May,

6    June-ish?

7       A.    Which one?

8       Q.    In this case.

9       A.    I -- June and then December.

10      Q.    Okay.  In December, you had a

11   supplemental depo and we talked about some other

12   issues that had come up?

13      A.    Yes.

14      Q.    Is it still true that your only source of

15   earned income is working with Mr. Slater and/or

16   his firm?

17      A.    Yes.

18      Q.    Okay.  And then I think I heard you say

19   earlier today -- and maybe I was confused about

20   it -- that -- you talked about transvaginal mesh,

21   and I think we may have got caught up in the

22   moment of saying all of it is for prolapse.

23            There's actually transvaginal mesh used

24   for non-prolapse purposes that you have used.

25   True?

Page 2048

```
 1      A.   Yes.

 2      Q.   Okay.  So the whole idea of taking mesh

 3 and putting it through the vaginal wall, up into

 4 the -- between -- actually, between the vaginal

 5 wall and the -- ureter, isn't it?

 6      A.   Urethra I think you're referring to --

 7      Q.   Urethra.  You're right.

 8      A.   -- yes.

 9      Q.   The whole idea of using that approach,

10 there is at least some time when you think --

11 well, at least there was a point in time when you

12 used it and obviously thought it was appropriate

13 at that time.  True?

14      A.   At that time.

15      Q.   Okay.

16      A.   That's not a position I hold any longer.

17      Q.   I understand.

18                MR. OVERBY:  Doctor, appreciate

19 your time.  Thank you.

20                THE WITNESS:  Thank you.

21                MR. SLATER:  Give me one second to

22 find a paper clip.

23      David, I just needed you to go another

24 minute.

25                MR. OVERBY:  You needed me to do
```

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 662 of 742 PageID #: 133826
Case 2:12-md-02327  Document 3182-6  Filed 05/09/16  Page 662 of 742 PageID #: 63826

Page 2049

```
 1  what?  Go a minute?

 2                MR. SLATER:  I just needed you to

 3  go another minute because I was just trying to

 4  find a paper clip for a couple things.

 5                JUROR:  Here.

 6                MR. SLATER:  Oh, I'm good.

 7                THE COURT:  Well, we could stand

 8  up and stretch.

 9                MR. SLATER:  Excellent.  Thank

10  you.

11                JUROR:  You're welcome.

12                THE COURT:  If you run out of any

13  more, here's a whole box of them.  They belong to

14  the county, so use what you want.

15                MR. SLATER:  I think we're giving

16  the local Staples a lot of business lately.  Let

17  me put my stuff up here.

18                REDIRECT EXAMINATION

19      QUESTIONS BY MR. SLATER:

20      Q.   Okay.  Dr. Weber, you were just asked by

21  Mr. Overby about 200,000 procedures a year to

22  treat prolapse.  That's not all with mesh, is it?

23      A.   No.

24      Q.   Okay.  And in terms of the number of

25  procedures dealing with mesh -- being done with
```

Page 2050

1   mesh today to treat prolapse versus the numbers

2   back in 2008, the numbers are much lower now,

3   aren't they?

4       A.   Yes, they are.

5       Q.   Okay.  We're going to run through these

6   things topically, okay?

7            You talked a lot about anatomic versus

8   functional outcomes, right?

9       A.   Yes.

10      Q.   And in your 2004 article, you actually

11  published that there needed to be more focus on

12  this subject because you thought that science

13  needed to move more towards functioning on how

14  does the woman feel, how does she do day-to-day,

15  as opposed to just a measurement?

16      A.   Yes.  That's correct.

17      Q.   Okay.  And in fact, from 2004 forward,

18  did the scientific community ultimately -- and I'm

19  talking about in the field of urogynecology --

20  ultimately accept that viewpoint?

21      A.   Yes.

22      Q.   And in fact, did you publish an article

23  in 2011, along with Dr. Chmielewski, Dr. Walters,

24  and Dr. Barber, actually reanalyzing your initial

25  study from 2001 and making that point?

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 664 of 742 PageID #: 132828
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 664 of 742 PageID #: 132828

Page 2051

```
 1        A.   Yes.

 2        Q.   And your coauthors, Dr. Barber, he's

 3   actually at the -- for the last few years -- I

 4   guess he's not anymore -- he was the president of

 5   the American Urogynecologic Society and he was

 6   your coauthor?

 7        A.   Yes, that's right.

 8        Q.   And ultimately also that viewpoint was

 9   accepted by ACOG and by AUGS in 2011 in a joint

10   committee opinion, correct?

11        A.   Yes.

12        Q.   I'm going to talk a little bit about the

13   studies.

14             Ms. Jones asked you quite a bit of

15   questions about randomized controlled trials and

16   that there's been all sorts of studies done on the

17   Prolift.  Remember that?

18        A.   I remember those questions.

19        Q.   And you were asked about the

20   de Landsheere article -- I guess that's the

21   gentleman's last name -- and Cosson was one of the

22   authors?

23        A.   Yes.

24        Q.   And that was published -- if I can find

25   it in the small type -- in 2011, correct?
```

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 665 of 742 PageID #: 130329
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 665 of 742 PageID #: 130329

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2052

 1      A.   Yes.

 2      Q.   And ultimately --

 3           I don't know if you have a copy there,

 4   but I can walk up there and save time.

 5           Sometimes when authors publish a study,

 6   they will recognize there may be some weaknesses

 7   or some issues that would say you might not want

 8   to take this all a hundred percent because there

 9   were some issues here?

10      A.   Yes.

11      Q.   Okay.  And as you look at the study that

12   Ms. Jones asked you about, in terms of loss to

13   follow-up, was that something that they referenced

14   as a weakness, potentially, because there were

15   patients that they lost track of, they didn't come

16   back, so they don't know what happened to them?

17      A.   Yes.

18      Q.   Okay.  And did they also say that there

19   may be some complications underestimated because

20   some patients didn't have reoperations and that's

21   what they were really focusing on was

22   reoperations?

23      A.   Yes, that's right.

24      Q.   And ultimately, did the authors at the

25   very end say, "You know, although we think that

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 666 of 742 PageID #: 133820
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 666 of 742 PageID #: 133820

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2053

1    these results are good for -- for these -- this

2    period of time, we need further long-term

3    follow-up to evaluate this technique in order to

4    decide whether or not it's really something that

5    can -- should be used all the time"?

6        A.   Yes.

7        Q.   And there's another study that's an RCT

8    that Ms. Jones was asking you about the RCTs,

9    and I just want to ask you a couple questions

10   about one.

11            And, Doctor, this is an article that

12   we've marked as PLT0516 and it's -- it's titled

13   "Trocar Guided Mesh Compared with Conventional

14   Vaginal Repair in Recurrent Prolapse, a Randomized

15   Control Trial."

16            You see that?

17       A.   Yes, I do.

18       Q.   And with regard to the subject matter in

19   here, is this something that you find has

20   authoritative and reliable information within it?

21       A.   Yes.

22       Q.   Okay.  Now, this was published and this

23   was -- this was a study of the Prolift compared to

24   suture repairs, right?

25       A.   Yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 667 of 742 PageID #: 138831
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 667 of 742 PageID #: 138831

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2054

1      Q.    And in fact, the people who authored it

2   studied women for about a year, right?

3      A.    Yes.

4      Q.    And the people who authored it actually

5   are the -- they have a financial disclosure.  Most

6   of them were actually consultants to Ethicon,

7   correct?

8      A.    Yes.

9      Q.    And this was published in two

10  thousand- -- February 2011, right?

11     A.    Yes.

12     Q.    And here we have -- on the front page,

13  they have a -- the results, and what was the mesh

14  exposure rate they found in that study with the

15  Prolift?

16     A.    Okay.  Mesh exposure was detected in 14

17  of 83 patients.  16.9%.

18     Q.    And in fact, if we now go to the last

19  page -- and it's Page 250 -- at the very top of

20  the left column, with regard to the subject we

21  talked about about comparing functional results of

22  how women actually do, did they, in fact, find

23  that women pretty much did the same, regardless of

24  whether they had a Prolift or a suture?

25     A.    Yes.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 668 of 712 PageID #: 63882
Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 668 of 712 PageID #: 63882

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2055

1      Q.    And --

2      A.    Equal improvements.

3      Q.    And then at the end, they basically say

4    that the -- "Because the long-term effects and

5    safety of mesh reinforced repairs are not yet

6    fully known, surgeons may consider these

7    procedures primarily for recurrent vaginal

8    prolapse after counseling patients on the risks

9    and benefits."

10           Now, recurrent vaginal prolapse means the

11   woman's already had surgery and then it happened

12   again and you need more surgery, right?

13     A.    Yes.

14     Q.    That's not Mrs. Budke, correct?

15     A.    That's correct.

16     Q.    And of course Dr. Simpson couldn't know

17   this.  And she was sitting over there before.

18   This is three years after, correct?

19     A.    Yes.

20                 MS. JONES:  Your Honor --

21                 THE COURT:  Yes, ma'am.  Okay.

22                 MS. JONES:  -- I know we're trying

23   to finish and I don't mean to interrupt but I

24   don't believe that the leading is appropriate so I

25   object to continuing with leading.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 669 of 742 PageID #: 133883
Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 669 of 742 PageID #: 133823

In Re Budke Jury Trial Official Transcript Vol VII    1/13/2015

Page 2056

 1                    THE COURT:  Okay.

 2                    MR. SLATER:  Okay.  I'm sorry.  I

 3   was --

 4                    THE COURT:  Yeah.  I know you were

 5   trying to expedite it, but let's don't lead.

 6                    MR. SLATER:  That's no problem.

 7                    THE COURT:  I don't want to get

 8   back into that.

 9                    MR. SLATER:  That's no problem.

10                    THE COURT:  Okay.

11       Q.   (By Mr. Slater)  So anyway, this

12   conclusion we're talking about, in terms of

13   recurrent prolapse, did, in fact -- did the TVM

14   group, in their 2004 article, actually address

15   that issue too?

16       A.   Yes, they did.

17       Q.   And was it similar?

18       A.   Yes.

19       Q.   Okay.  I'm showing you a article we've

20   marked as PLT0227 titled "Vaginal Mesh for

21   Prolapse, a Randomized Controlled Trial."

22            Is this an article you're familiar with?

23       A.   Yes.

24       Q.   And is this something you find to be

25   authoritative in the field?

 1      A.   Yes.

 2      Q.   And it's authored by Dr. Iglesia and some

 3   others, correct?

 4      A.   Yes.

 5      Q.   And in this study, it was studying the

 6   Prolift compared to suture repairs?

 7      A.   Yes.

 8      Q.   And what was the erosion rate that these

 9   doctors found with the Prolift?

10      A.   15.6%.

11      Q.   And were these doctors connected to

12   Ethicon?

13      A.   No.

14      Q.   And when they got an erosion rate at

15   15.6%, what did they do?

16      A.   The study protocol defined in advance a

17   threshold for safety, and if the mesh erosion rate

18   exceeded 15%, they would stop the study, and in

19   fact, that's what they had to do.

20           And by stopping the study, just to be

21   clear, that means that --

22      Q.   Nothing else.

23               THE COURT:  Whoa, whoa.

24               THE WITNESS:  Oh, I'm sorry.  I

25   just --

Page 2058

```
 1                    THE COURT:  Yeah.  Remember, we're

 2   not teaching now.  We're answering questions.

 3                    THE WITNESS:  I just didn't want

 4   the jury to be --

 5                    THE COURT:  That's all right.

 6                    MR. SLATER:  I'll ask another

 7   question.

 8                    THE WITNESS:  Okay.  I'm sorry.

 9                    MR. SLATER:  I'll ask another

10   question.

11      Q.   (By Mr. Slater)  Did they continue to

12   follow the women who had already been operated on?

13      A.   Yes, they did.

14      Q.   Okay.  They just didn't operate on any

15   more women going forward?

16      A.   Exactly.

17      Q.   Okay.  Meaning they didn't put any more

18   Prolifts in women's bodies?

19      A.   That's right.

20      Q.   Okay.  I've marked as PLT0629 an abstract

21   from -- that says -- Abstract Number 121 from a

22   medical conference.

23           Are you familiar with this?

24      A.   Yes.

25      Q.   And with regard to the information found
```

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 672 of 742 PageID #: 133836
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 672 of 742 PageID #: 133832

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2059

1   in it, do you find it to have authoritative and

2   reliable information that you can rely on?

3       A.   Yes.

4       Q.   Now, this -- this abstract, what is it

5   telling us about?

6       A.   This is a retrospective review from the

7   French TVM group reporting on the use of the

8   Prolift mesh in 687 patients.

9       Q.   And just to be clear, this was from 2005,

10  so it was the mesh used in the Prolift but it

11  wasn't the Prolift kit.  It was the Gynemesh they

12  were using.

13      A.   That's correct.

14      Q.   Okay.  And the follow-up period was how

15  long for these women?

16      A.   3.6 months.

17      Q.   Would that be considered very short-term?

18      A.   Very short-term.

19      Q.   And if we look at the interpretation of

20  the results --

21           And the authors are people from the

22  group?  Cosson, Jacquetin, and the rest?

23      A.   Yes.

24      Q.   Look at the very end, the "Interpretation

25  of Results," and what was the erosion rate that

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 673 of 742 PageID #: 138887
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 673 of 742 PageID #: 63887

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2060

1    they reported at 3.6 months?

2        A.   Okay.

3        Q.   At the very bottom of the page.  Very

4    last sentence.

5        A.   Yes.  6.7%.

6        Q.   And what did they consider that to be, in

7    terms of defining 6.7%?

8        A.   They considered that was high regarding

9    the impairment that granulation formation and

10   vaginal erosion would cause.

11       Q.   In 2005, that's the -- that's when the

12   Prolift was put on the market?

13       A.   Yes.

14       Q.   Okay.  And if you look at the concluding

15   message on the next page, with regard to the

16   erosion rates, based on this, what was the -- what

17   was the definition of how they described those

18   rates?

19       A.   They described those rates as

20   significant.

21       Q.   And the recurrence rates, how did they

22   describe those?

23       A.   The recurrence rates were described as

24   disappointing.

25       Q.   Doctor, you were asked about the TVM

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 674 of 712 PageID #: 133826
Case 2:12-md-02327 Document 3756-6 Filed 04/09/16 Page 674 of 712 PageID #: 133826

In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 2061

1    study, the French TVM study, and I'm not going to

2    bother to put it up on the board.  I think we all

3    know it.  I think we've talked about it.

4              The confidence intervals in that study,

5    were they chosen by Ethicon?

6        A.   Yes.

7        Q.   Okay.  And is that something that's

8    normally done in a study like this where you do a

9    study on a certain number of women but you want to

10   know what the wider impact is so you want to say,

11   "Well, we want to be able to translate these

12   results to more people so we have an idea how this

13   will affect more people"?

14       A.   Yes.

15       Q.   Okay.  And that's what they did here?

16       A.   Yes.

17       Q.   Based on the criteria Ethicon set, did

18   the results of the French TVM study show a success

19   or a failure of the primary thing being studied?

20       A.   A failure.

21       Q.   Now, you were asked about the protocol

22   deviations where there were some women that were

23   operated on with Stage 2s even though they

24   weren't supposed to be?

25       A.   Yes.

Page 2062

1      Q.    The bottom line was they weren't supposed

2    to be operated on by this study, right?

3      A.    That's correct.

4      Q.    And the protocol deviations were because

5    the people examining them didn't know how to do

6    the POP-Q measurements correctly?

7                  MS. JONES:  Objection, Your Honor.

8                  MR. SLATER:  I'll ask it

9    differently.  Apologize.

10                 THE COURT:  I sustain that.

11     Q.    (By Mr. Slater)  What was the reason for

12   the protocol deviation?

13     A.    In many cases, the POP-Q had been done

14   incorrectly, resulting in -- in measurements

15   adding up to stages that were not allowed in the

16   study by protocol.

17     Q.    And in terms of the final data, and when

18   you reviewed the internal documents about the data

19   collection, were there any issues with the POP-Q

20   measurements in accumulating the final data?

21     A.    Yes.

22     Q.    What was that issue?

23     A.    The same issue, where measurements were

24   made that were outside of the definition of the

25   measurement so that it could only range, say, from

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 676 of 742 PageID #: 63884
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 676 of 742 PageID #: 63890

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2063

1    minus 3 to plus 3, but someone would record a plus

2    5, which is outside the definition, so it's

3    impossible.

4              And since this was the outcome they

5    relied on, with having so many problems with the

6    POP-Q measurements, the overall failure rate

7    anatomic recurrence becomes unreliable.  It could

8    be much worse.

9              MR. SLATER:  I have a couple short

10   PowerPoints I want to use.  I want to ask

11   Ms. Jones if I could just show them to you real

12   quick.  We made them up over the lunch hour.  I

13   don't want to put it up without showing her.

14             THE COURT:  Yeah.  I don't want

15   you to.  I don't need to gnaw at that, so just

16   y'all go look at it.

17             MS. JONES:  May we approach, Your

18   Honor?

19             THE COURT:  Sure.

20             (Counsel approached the bench and

21   the following proceedings were held outside the

22   hearing of the jury:)

23             MR. SLATER:  Judge, if you can see

24   what he can put up on the screen, we could show

25   you what it looks like without putting it up on

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 677 of 712 PageID #: 63884
Case 2:12-md-02327 Document 3182-6 Filed 05/09/16 Page 677 of 712 PageID #: 63884

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2064

1   there.  We can put it up --

2                  THE COURT:  He can put it on

3   where?  On this (indicating)?

4                  MR. SLATER:  Yeah.  You get the

5   same thing that the witness gets on the TV screen.

6   Whatever comes up on there comes up on your

7   screen.

8          Okay.  They say no so --

9                  THE COURT:  No?

10          What did you start to say?

11                 MS. JONES:  Well, I object to the

12   use of the PowerPoints that he intends to put up.

13   Let me see if I can describe what he intends to

14   put up.

15                 THE COURT:  All right.

16                 MS. JONES:  He intends to put up a

17   PowerPoint with 35,000 women, and then to take it

18   and take 20% of those would be X and 20% of -- I

19   mean, 20% of those would be a recurrence, and he's

20   got the number there, and then he's got an erosion

21   rate and he shows the number there.

22          That's an inappropriate use of that

23   document and it's simply argument, inappropriate

24   for redirect, and I think beyond the scope of

25   redirect.  The scope of redirect --

Page 2065

1                    THE COURT:  I'll buy it on the

2      scope of redirect.  Not otherwise.  But on the

3      scope, that it does beyond --

4                    MR. BALL:  Thank you.

5                    THE COURT:  -- your examination.

6                    MS. JONES:  Thank you.

7                    MR. SLATER:  Okay.  I'll save it

8      for later.

9                    THE COURT:  Yeah.  All right.

10                   (The proceedings returned to open

11     court.)

12                   THE COURT:  Get rid of that.

13     **Q.   (By Mr. Slater)  Okay.  Dr. Weber,**

14     **remember you were asked by counsel about the fact**

15     **that the TVM group and the doctors who did the TVM**

16     **study -- I guess it was U.S. and France --**

17     **ultimately published their results in the**

18     **peer-reviewed literature and said, you know, "We**

19     **think this proves we -- this should be used"?**

20     A.   Yes.

21     **Q.   Remember those questions?**

22     A.   Yes, I do.

23     **Q.   I'm going to show you one of those**

24     **articles and it's PLT0335, and this is an article**

25     **titled "Prospective Clinical Assessment of the**

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2066

1    **Transvaginal Mesh Technique for Treatment of**

2    **Pelvic Organ Prolapse, Five-Year Results," right?**

3        A.   Yes.

4        **Q.   And who are the authors of that article?**

5        A.   Dr. Miller, Dennis Miller; Dr. Vincent

6    Lucente; Dr. Elizabeth Babin; Patricia Beach;

7    Peter Jones; and David Rob- -- Dr. David Robinson.

8        **Q.   And who would have chosen the authors and**

9    **said, "Okay, these could be the people put on this**

10   **study as the authors"?**

11       A.   Ethicon would do that.

12       **Q.   Okay.  And this was published when?  What**

13   **year?**

14       A.   This was published in 2001.

15       **Q.   2001 or --**

16       A.   Oh, I beg your pardon.  2011.

17       **Q.   Okay.  And as of 2011, in Ethicon medical**

18   **affairs, and with regard to Dr. Lucente publishing**

19   **data, were there any concerns?**

20       A.   Yes.  There were grave concerns about the

21   veracity of Dr. Lucente's data when published.

22               MS. JONES:  Objection, Your Honor.

23   Beyond the scope of redirect.

24               THE COURT:  What?

25               MS. JONES:  Let's approach.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 680 of 742 PageID #: 133844
Case 2:12-md-02327 Document 3762-6 Filed 05/09/16 Page 680 of 712 PageID #: 138840

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2067

1                    THE COURT:  All right.

2                    (Counsel approached the bench and

3    the following proceedings were held outside the

4    hearing of the jury:)

5                    MS. JONES:  This paper was not

6    discussed.

7                    MR. SLATER:  It was referenced

8    generally.  Counsel said that the TVM group and

9    all these studies were put out by Ethicon talking

10   about how safe the Prolift was proven to be by

11   their studies.  This is the paper on the TVM study

12   and they put Lucente on it as an author reporting

13   the data, and we know that the company thought he

14   was publishing false data at that point.

15                   MS. JONES:  Yeah, but you can't --

16                   MR. BALL:  Whoa.  This is like

17   three steps removed from our --

18                   THE COURT:  I'm going to go along

19   with the objection on it.

20                   MR. SLATER:  Okay.

21                   MS. JONES:  I'm sorry, Your Honor.

22   I --

23                   MR. SLATER:  I'm not going to ask

24   any more questions.  No more questions on that.

25                   THE COURT:  All right.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 681 of 742 PageID #: 133845
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 681 of 742 PageID #: 133845

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2068

1          (The proceedings returned to open

2    court.)

3      **Q.   (By Mr. Slater)  Okay.  Moving right**

4    **along, remember you were asked some questions,**

5    **Dr. Weber, about whether something's published,**

6    **and I think you said words to the effect of the**

7    **journals have to rely on the honesty of the**

8    **authors?**

9      A.   Yes.

10     **Q.   And I'm going to just give you something**

11   **and ask you a question about it, and it's Exhibit**

12   **P2672.**

13     A.   Thank you.

14     **Q.   And what is this document?**

15     A.   This is a publication in the American

16   Journal of Obstetrics and Gynecology where the

17   editors are informing their readership that an

18   article has been retracted and the reasons for

19   that retraction.

20             MS. JONES:  Your Honor, I'm going

21   to object to this as totally irrelevant and beyond

22   the scope.  I'm -- this --

23             MR. SLATER:  Dr. Weber was

24   asked --

25             MS. JONES:  This does not --

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 682 of 742 PageID #: 638846
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 682 of 742 PageID #: 638846

In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 2069

1          THE COURT:  Let me look at the

2   thing.  Let me look at that.

3          MR. SLATER:  Yeah.  Sure.

4          (Counsel approached the bench and

5   the following proceedings were held outside the

6   hearing of the jury:)

7          THE COURT:  Wait a minute.  I

8   haven't put on the silence yet.  I just want to

9   read this first.

10      Okay.  What's your problem with this?

11         MS. JONES:  I object to it, one,

12  because it's totally beyond the scope.  Two, it

13  doesn't deal with any of the articles that we're

14  talking about.

15         MR. BALL:  Isn't it hearsay?

16         MS. JONES:  Three, it is hearsay.

17         THE COURT:  Did we ever talk about

18  the original article that --

19         MS. JONES:  No.

20         MR. SLATER:  No, we didn't.  I

21  just want a chance to argue after her.

22         MS. JONES:  The last thing is that

23  we can't extend the scope of redirect because of

24  some voluntary statement that Dr. Weber made when

25  we were on cross-examination.

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 683 of 712 PageID #: 638847
Case 2:12-md-02327  Document 3752-6  Filed 05/09/16  Page 683 of 712 PageID #: 638847

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2070

```
 1                    THE COURT:  Well, yeah.  She's

 2    made a lot of them and so have other people, but

 3    anyway, here's the whole thing.  If the

 4    original -- if the original thing was not put in

 5    evidence, then I'm not going to allow this in as a

 6    criticism of something I don't know about.

 7                    MR. SLATER:  I was just -- okay.

 8    I was going to let you know why, but okay.

 9                    THE COURT:  Oh, I think -- okay.

10    Go ahead.

11                    (The proceedings returned to open

12    court.)

13        Q.   (By Mr. Slater)  Okay.  Dr. Weber, do you

14    have the monograph up there?  The document that

15    you were asked about for a while today?

16        A.   I should.  Let me put my hands on it.

17             Okay.  Yes.

18        Q.   Okay.  Now, you were shown some documents

19    and some information by Ms. Jones during your

20    cross-examination, right?

21        A.   Yes.

22        Q.   And they were documents like the

23    monograph and the IFU, and you were asked

24    questions about the warnings.  Remember that?

25        A.   Yes.
```

Case 2:12-md-02327  Document 3756-6  Filed 04/27/17  Page 684 of 712 PageID #: 63848
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 684 of 712 PageID #: 63848

Page 2071

1       Q.    Having heard everything Ms. Jones asked

2  you, as you stand here now, what is your opinion

3  as to whether or not the Prolift is a defective

4  and unreasonably product and dangerous [sic] due

5  to the inadequate warnings?

6                   MS. JONES:  Your Honor, I object

7  as improper redirect.

8                   MR. SLATER:  I just want to

9  reiterate --

10                  MR. BALL:  The purpose of redirect

11  is not to repeat things that were said on direct

12  examination.

13                  MR. SLATER:  I'm sorry, Your

14  Honor.

15                  THE COURT:  Have you changed your

16  opinion from a few minutes ago where you said

17  it -- or back this morning where you said it was

18  no good?  Have you changed your mind?

19                  THE WITNESS:  No, I haven't, Your

20  Honor.

21                  THE COURT:  All right then.

22  That's good enough.  We don't need to retrack

23  that.

24      Q.   (By Mr. Slater)  Okay.  Now, you were

25  asked about 200 surgeons giving information.  I

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 685 of 742 PageID #: 138849
Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 685 of 742 PageID #: 138849

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2072

1    want to try to -- I think there was a disconnect.

2    I want to try to focus on where we are and move

3    forward.

4        A.   All right.

5        Q.   In this monograph, they talk about

6    surgeons having attended forums.

7        A.   Yes.

8        Q.   To your knowledge -- well, let me -- I'll

9    jump ahead, actually.

10            We don't have documentation of what those

11   surgeons actually told Ethicon, right?

12       A.   That's right.  We don't.

13       Q.   We know what Ethicon says they learned

14   when they spoke to them, and we have Ethicon's

15   version of what they learned, right?

16       A.   Yes.

17       Q.   And the important thing is that Ethicon

18   accurately represent information in its own

19   documents, right?

20       A.   That would be -- that would be important

21   if that were the case.

22       Q.   Now, what I'd first like to do is turn to

23   the first page of it, Page 1, and look at who

24   authored this and you see it right in the

25   foreword, the first paragraph?  There's a series

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 686 of 742 PageID #: 132850
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 686 of 712 PageID #: 138840

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2073

1    of people?

2        A.   Yes.

3        Q.   I don't know the exhibit.  You don't have

4    to.  Don't bother it.  We'll move faster this way.

5             And one of them is Vince Lucente?

6        A.   Yes.

7        Q.   And in the second paragraph, about four

8    lines down, there's a sentence that starts right

9    in the middle of the line, "This document is an

10   open exchange of ideas representing the most

11   up-to-date information possible."

12            That's what Ethicon told people?

13       A.   Yes.

14       Q.   And a little further down, it says -- two

15   lines from the bottom of that paragraph -- that

16   the information is honestly presented, right?

17       A.   Yes.

18       Q.   Let's go just a little further down.

19   Down in the first paragraph -- not the first.

20   One, two, three -- the fifth paragraph.  Sorry

21   about that.

22       A.   Okay.

23       Q.   And it talks about a recent study

24   published in Obstetrics and Gynecology by the

25   Nordic -- what do they call themselves?  The

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 687 of 742 PageID #: 133851
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 687 of 742 PageID #: 133851

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2074

1    Nordic Transvaginal Mesh Group.

2           You see that?

3       A.   Yes, I do.

4       Q.   And it says that they -- their study

5    demonstrated the rate of peri-operative

6    complications with the Gynecare Prolift system is

7    very low.

8           That's what's represented in this

9    document, right?

10      A.   Yes, that's what it says.

11      Q.   Okay.  I'm going to bring you the actual

12   article now.  PLT0030.  Let's see what they said

13   in the article.

14          This is titled "Peri-Operative

15   Morbidity" -- PLT00- -- oh, you can't put it up.

16   Don't worry about it.  "Peri-Operative Morbidity

17   Using Transvaginal Mesh in Pelvic Organ Prolapse

18   Repair."  The authors are Altman, Falconer for the

19   Nordic Transvaginal Mesh Group, right?

20      A.   Yes.

21      Q.   2007, right?

22      A.   Yes.

23      Q.   And there's a financial disclosure down

24   in the left that Dr. Altman and Falconer are

25   consultants to Ethicon?

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 688 of 742 PageID #: 133852
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 688 of 742 PageID #: 133843

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

1      A.    Yes.

2      Q.    Okay.  And what I want to do is just kind

3  of skip along through this.

4            They're studying peri-operative outcomes.

5  That would be from the surgery and the very short

6  time after?

7      A.    Correct.

8      Q.    And let's skip forward all the way to

9  Page 307.

10           And just to orient ourselves again, this

11 is the study that Ethicon represented proved that

12 the peri-operative complications are very low --

13     A.    Yes.

14     Q.    -- right?

15     A.    Correct.

16     Q.    In the top left, the first full

17 paragraph, tell me if I read this right.

18           "Close to 15% of our patients experienced

19 what we characterized as minor complications."

20                MS. JONES:  I'm going to stop --

21                THE COURT:  Okay.  Do you have

22 a --

23                MS. JONES:  -- ask counsel to

24 stop.  I believe it's hearsay and I think he's

25 read what he wants to to the jury, but I think --

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 689 of 742 PageID #: 132853
Case 2:12-md-02327 Document 3152-6 Filed 05/09/16 Page 689 of 742 PageID #: 63843

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2076

1                    THE COURT:  Well, was this -- was

2    this spoken of in direct examination?

3                    MS. JONES:  No.

4                    MR. SLATER:  Can we approach?

5    It's referenced in the document counsel used.

6    It's referred to and they claim it said one thing

7    and I'm showing that it said something else.

8                    MS. JONES:  It did not.

9                    MR. SLATER:  Of course it did.

10   It's in the document you used, Counsel.

11                   THE COURT:  Let's look.  Let's go

12   back on here, if it is, and we'll let him do it.

13   If it's not, that's it.

14                   MR. SLATER:  It's this paragraph

15   right here (indicating), Your Honor.

16                   THE COURT:  Let's --

17                   MR. SLATER:  It refers to a recent

18   study right there (indicating).  I circled it.

19   That's this article.

20                   (Counsel approached the bench and

21   the following proceedings were held outside the

22   hearing of the jury:)

23                   MR. BALL:  Is this as far as

24   you're going to go with it?

25                   MR. SLATER:  No.  I'm going to

Page 2077

1    bring out all the stuff, the detail.

2                    MS. JONES:  My objection, Your

3    Honor --

4                    MR. SLATER:  Can we come over here

5    because this time I'm hoping to get a chance to

6    argue this time.

7                    THE COURT:  All right.

8                    MS. JONES:  My objection, Your

9    Honor, is he's simply sitting up there reading the

10   article.  It's hearsay.

11                   THE COURT:  Yeah.

12                   MS. JONES:  It's back to the same

13   issues that we had the other day about whether or

14   not he could ask her opinion and elicit it.

15        Now, he said 15% of minor complications.

16   You know, that's what he wanted to put up there.

17   He's gotten it in there.

18                   MR. SLATER:  This is what I --

19   I'll tell counsel what I was going to do.

20                   THE COURT:  Okay.

21                   MR. SLATER:  Okay.  First of

22   all -- and I'd like to preface this.  I respected

23   what you said, obviously, and I spoke to my expert

24   and I told her stop doing it --

25                   THE COURT:  Yeah.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 691 of 742 PageID #: 63855
Case 2:12-md-02327 Document 3782-6 Filed 05/09/16 Page 691 of 742 PageID #: 63855

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2078

1          MR. SLATER:  -- because Your Honor

2    told us we'd get plenty of room on redirect.

3          THE COURT:  Well, here's the whole

4    thing.  Look, I'm trying to be fair here.  Every

5    time you turn around, you say "Now those are

6    consultants to Ethicon, aren't they?  Those are

7    consultants to Ethicon, aren't they?"

8       You know, if they want to say it and say,

9    "You're a consultant to Mr. Slater, aren't you?

10   You're a consultant to Mr. Slater, aren't you?" --

11         MR. SLATER:  They've done it.

12   They've done it.

13         THE COURT:  They've done it to

14   some extent, but I thought they were pretty easy

15   on that.

16         MR. BERGMANIS:  She let her

17   testimony weigh in, though, and now she ought to

18   be able to explain it on redirect.

19         MS. JONES:  I'm not -- I'm not --

20         MR. SLATER:  Can I finish, please?

21   Pretty please?  With sugar on top?  I was going to

22   try and be nice.

23         MS. JONES:  I'm objecting on the

24   basis of hearsay and the way it's been presented

25   in terms of -- if you're going to talk about what

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 692 of 742 PageID #: 138856
Case 2:12-md-02327 Document 3162-6 Filed 05/09/16 Page 692 of 742 PageID #: 63852

1    you're going to do --

2                MR. SLATER:  What I was going to

3    do is I was going to present the article.  I read

4    the first sentence to orient her, and then I'm

5    going to have her read the rest to herself and

6    then ask her --

7                THE COURT:  Okay.  You can ask her

8    if she agrees or disagrees with that, but --

9                MR. SLATER:  -- what her opinion

10   is as to whether or not in the monograph they

11   accurately disclosed the information here and let

12   her go that.

13          They actually stood up and said this is

14   how --

15               MR. BALL:  Your Honor --

16               MR. SLATER:  Please, Dan.

17          They used this document and said this is

18   a document where doctors got warnings about the

19   product that were adequate, and I'm proving right

20   now that they cited a study in a misleading way

21   and I have the right to do that, I think, with all

22   due respect, and I think Don Budke has the right

23   to have me show that to the jury when his wife

24   died from this.

25               MS. JONES:  And I think I have the

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 693 of 712 PageID #: 63857
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 693 of 712 PageID #: 63857

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2080

1   right then to come back --

2                   MR. SLATER:  Shouldn't have used

3   the document.

4                   THE COURT:  What's that?  What?

5                   MS. JONES:  If he is misusing the

6   document and misusing this, I think -- I mean,

7   we're just getting into a whole 'nother issue.

8                   MR. SLATER:  I'm not misusing

9   anything.  I'm showing that the article that you

10  cited doesn't say what they said it said.

11                  MR. BALL:  That's going to lead to

12  a lot of recross by us.  Okay?

13                  THE COURT:  I know it is.

14                  MR. SLATER:  No, it's not.

15                  THE COURT:  Well, maybe not okay.

16  Well, try to make it short and sweet.

17                  MR. SLATER:  I was.  I would have

18  been done already.

19                  THE COURT:  Okay.  Okay.  We'll

20  see.

21                  (The proceedings returned to open

22  court.)

23      Q.   (By Mr. Slater)  Dr. Weber --

24      A.   Yes.

25      Q.   -- looking in the top left paragraph

Case 2:12-md-02327   Document 3756-6   Filed 04/27/17   Page 694 of 712 PageID #: 133858
Case 2:12-md-02327   Document 3756-6   Filed 04/09/16   Page 694 of 712 PageID #: 133858
In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2081

1    where I just started off to situate you --

2         A.   Yes.

3         Q.   -- in looking at the information there

4    and looking at what Ethicon said in their honest

5    information about the Prolift where they cited

6    this article, do you have an opinion as to whether

7    or not the information in the -- in the monograph

8    accurately represents the information there in

9    that paragraph?

10        A.   Yes, I have an opinion.

11        Q.   And what's your opinion?

12        A.   My opinion is that the Ethicon monograph

13   in no way accurately represents the level of

14   complications reported in this study.

15        Q.   And what about the severity of the

16   complications?

17        A.   It also doesn't represent the severity of

18   the complications reported in this article.

19        Q.   And do they talk about complications

20   having a considerable impact on quality of life

21   and daily function?

22                  MS. JONES:  Objection.  Hearsay,

23   Your Honor.

24                  THE COURT:  Sustained.

25        Q.   (By Mr. Slater)  Differently, what is of

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 695 of 742 PageID #: 163859
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 695 of 742 PageID #: 163859

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2082

1  significance to you in this article that makes you

2  say what you said and give that opinion?

3      A.   That they reported complications that

4  not -- no -- that were medically significant in

5  terms of being dangerous unless they were

6  adequately treated, and also complications that

7  would interfere with a woman's well-being and

8  quality of life.

9      Q.   Okay.  Let's skip ahead now.   In

10  paragraph -- at Page 4, let's look at Page 4,

11  there's a section "Anesthesia and

12  Hydrodissection."

13      A.   Yes.

14      Q.   And right in the middle of that

15  paragraph, it talks about how to do this procedure

16  on the Prolift system, and it refers to the low

17  rates of mesh exposure seen by experienced

18  Gynecare Prolift system users.

19          Do you see that?

20      A.   Yes, I do.

21      Q.   And do you have an opinion as to whether

22  that is an accurate statement or not as to the --

23  whether or not the mesh exposure rates were low?

24      A.   Yes, I do have an opinion.

25      Q.   And what is that?

Page 2083

1    A.   My opinion is that mesh exposure rates,

2    even in the hands of experienced Prolift users,

3    were not low.

4    Q.   Let's go now to Page 5.

5         Page 5, "Mesh Handling."  And actually,

6    I'm going to skip over that in the interest of

7    time.  Let's go to the next page.

8         Here we go.  Go to Page 8, please.

9    A.   Okay.

10   Q.   This is the section on "Mesh

11   Complications:  Erosion, Exposure, and Extrusion"?

12   A.   Yes.

13   Q.   Okay.  And in there, they make certain

14   representations with regard to the nature of the

15   complications of erosion and they say there,

16   "Intervention is usually quite minimal with local

17   excision under sedation"?

18   A.   Yes.

19   Q.   "Symptoms are generally mild, ranging

20   from spotting" and a few other minor things?

21   A.   Yes.

22   Q.   And what I'd like to do now is show you

23   an article we've marked as PLT0067.  And are you

24   familiar with this article, PL- --

25                MS. JONES:  Your Honor --

Case 2:12-md-02327  Document 3756-6  Filed 04/29/17  Page 697 of 712 PageID #: 63861
Case 2:12-md-02327  Document 3756-6  Filed 05/09/16  Page 697 of 712 PageID #: 63861

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2084

 1                    MR. SLATER:  Counsel doesn't know

 2   what I'm going to ask.

 3                    THE COURT:  Have a chance to look

 4   at it?  I'll give you a chance.

 5                    MS. JONES:  May we approach?

 6                    MR. SLATER:  Can I go till maybe

 7   I --

 8                    THE COURT:  Yeah.

 9                    (Counsel approached the bench and

10   the following proceedings were held outside the

11   hearing of the jury:)

12                    MR. SLATER:  Judge, you want to

13   tell me what I'm going to do?

14                    MS. JONES:  Doesn't matter what

15   you're going to do.  This is a 2008 --

16                    MR. SLATER:  Doesn't matter what

17   I'm going to do?  Got to have something.  Got to

18   tell the judge what I'm planning to do, don't I?

19                    THE COURT:  Okay.  Go ahead.  Tell

20   me.

21                    MR. SLATER:  Can I step in?

22                    THE COURT:  Yeah.

23                    MR. SLATER:  This was an article

24   that was published in early 2009, and it was

25   presented to the medical affairs corporate

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 698 of 742 PageID #: 63862
Case 2:12-md-02327 Document 3756-6 Filed 04/09/16 Page 698 of 712 PageID #: 63858

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2085

1    representative, and the language I'm going to ask

2    Dr. Weber about, he testified they knew those

3    complications would happen when the Prolift was

4    first marketed, and that testimony is established

5    testimony by Dr. Piet Hinoul.

6             So what I'm going to do is I'm going to

7    use the language, and I'm going to use that

8    language because there are very serious mesh

9    erosion complications the company knew about, as

10   opposed to what they're saying here about easily

11   treated and minor.  And I don't -- and, Your

12   Honor, you told me on redirect to go through this

13   and I really would appreciate the chance to be

14   able to show that this monograph that she relied

15   on for most of her cross is a false document.

16            MS. JONES:  Well, with all due

17   respect, it's not a false document, Your Honor.

18   If he wants to ask her about that, that's fine.

19            This article is beyond the scope of

20   redirect.  It's a 2009 article.  You can't use

21   this to go back and ask him about what's in that

22   in 2007, which is when that was done.

23            MR. SLATER:  I have a solution.  I

24   have a solution.

25            THE COURT:  All right.  Give me

Page 2086

 1    the solution.

 2                    MR. SLATER:  Please, just wait.  I

 3    have a solution.

 4                    THE COURT:  We got another -- he'd

 5    like to weigh in.

 6                    MR. SLATER:  Hear my solution

 7    first.

 8            This is what I'm going to do:  I'm going

 9    to make statements of certain levels of

10    complications.  They're the ones described in

11    here.  But I'm not going to read the article.  I'm

12    just going to say "Was Ethicon aware of these

13    types of complications and are they described in

14    the monograph."

15            They've already admitted they knew them.

16    It's not in dispute.  So I'm going to have to be

17    able to show the jury that Ethicon knew of more

18    serious complications and then -- than what is

19    here, and in fact, when they talk about something

20    being hearsay, Your Honor, I'm not offering it for

21    the truth.  I'm offering it to show notice.  Which

22    is -- which means that it's not a hearsay purpose.

23    But I'll do it outside the article but I have to

24    be able to ask her about the more serious

25    descriptions of the complications the company has

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 700 of 742 PageID #: 132864
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 700 of 742 PageID #: 63800

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2087

1    acknowledged knowing.

2          I don't know how else I can do it and

3    they have a right to show this document to the

4    jury and I can't get around to showing -- showing

5    where the truthful information is?

6                MS. JONES:  Your Honor, I'm going

7    to say simply that it is one, cumulative.

8          Two, she's testified that she --

9                MR. SLATER:  What?  I didn't hear.

10   Cumulative?

11               MS. JONES:  Cumulative.

12         She's testified that she doesn't think

13   it's right and they're not entitled to go through

14   this.  She's not entitled to go through Ethicon's

15   knowledge.  It's beyond the scope of redirect.  If

16   he wants to ask her whether or not she thinks that

17   the --

18               MR. BERGMANIS:  It's not beyond

19   the scope.

20               MR. SLATER:  How can it be beyond

21   the scope of redirect?  You used this document to

22   show that doctors were adequately warned.

23         (Court reporter interruption.)

24               MR. SLATER:  They used the

25   monograph and represented to the jury that that's

Page 2088

1    an adequate document providing notice to doctors.

2    I have -- I didn't use it, but on redirect if they

3    bring in the document, I have a right to fully

4    have a wide berth on redirect to show that the

5    document's not providing the accurate information

6    they said.  Of course I didn't use all this on

7    direct because I didn't go on it.  I didn't attack

8    the monograph.  I didn't have time.  But they

9    opened the door.  They put the document in.  I

10   have the right to fully explore it.

11                MS. JONES:  That has nothing to

12   do --

13                MR. OVERBY:  May I --

14                THE COURT:  Yes.

15                MR. OVERBY:  May I speak?

16                THE COURT:  Yes, you may.

17                MR. OVERBY:  You are all tired and

18   been here a long time and are going to be here a

19   long time and here's my suggestion.

20          To the extent that this document

21   specifically talks about complications -- we've

22   been over this in this case several times --

23                THE COURT:  Oh, yeah.

24                MR. OVERBY:  -- beyond those which

25   are at issue in this case, and I think it is

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 702 of 742 PageID #: 133866
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 702 of 742 PageID #: 63862

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2089

1    inappropriate for that reason.

2                    MR. SLATER:  Well --

3                    THE COURT:  What --

4            (Court reporter interruption.)

5                    THE COURT:  Yeah, I understand.

6    All right.  You -- whoa, whoa.  You.

7                    MR. OVERBY:  That's my comment.

8    So he says he's not going to do that, so --

9                    MR. SLATER:  No.  I agree with

10   that a hundred percent.

11                   MR. OVERBY:  I just wanted to make

12   sure that we don't plow through a whole bunch

13   of -- because that just lengthens it.  That's all.

14                   THE COURT:  I know.  Yes, sir.

15                   MR. BALL:  We've spent two days

16   having her talk about complications.  If there's

17   anything that's cumulative, it's complications,

18   and he's just piling on, piling on, piling on.

19   And I don't care if it's a brand-new document.  He

20   can't --

21           It is a brand-new document.  I agree.

22   It's a brand-new document.  It's beyond the scope

23   of doing -- of cross -- it's beyond the scope --

24   we didn't bring up that -- anything about this

25   document and it's just piling on, piling on,

Page 2090

1   piling on with new stuff now on redirect.

2                THE COURT:  All right.  Let's get

3   on down the road.  Huh-uh.  No.  I'm not going to

4   do that.  I think you've got plenty in there

5   already.

6                MR. SLATER:  Okay.

7                THE COURT:  And you're going to

8   have your chance.

9                MR. SLATER:  I'm not, though.

10  This is it.

11               (The proceedings returned to open

12  court.)

13               THE COURT:  All right.  What next?

14  Q.   (By Mr. Slater)  Simple question.

15       Their description of erosion here, in

16  your opinion, knowing what you know, does that

17  match Ethicon's knowledge at the time about the

18  scope and severity of erosion complications?

19  A.   No, not at all.

20  Q.   Thank you.

21               THE COURT:  All right.

22  Q.   (By Mr. Slater)  Let's go to Page 10.

23  There's a chart of clinical data summary.

24       You see that?

25  A.   Yes, I do.

Case 2:12-md-02327 Document 3756-6 Filed 04/29/16 Page 704 of 742 PageID #: 63868
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 704 of 742 PageID #: 63868

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2091

1    Q.    And for what reason would Ethicon be

2  putting a chart of clinical data in this monograph

3  to be shown to doctors?

4              MS. JONES:  Objection, Your Honor.

5  Calls for speculation, state of mind.

6    Q.   (By Mr. Slater)  What's the purpose of

7  putting clinical data summaries in the Prolift

8  monograph?  What is the functional purpose of

9  giving doctors this data?

10             THE COURT:  I'll let you ask that

11  one question but we're not going to just keep

12  going and going and going on it, so go ahead.

13    A.    The purpose is to inform doctors of the

14  range and frequency of the kinds of complications

15  that have occurred.

16    Q.   (By Mr. Slater)  The first one across the

17  top is Cosson, et al., 90 patients.  Right?

18    A.    Yes.

19    Q.    That's the French TVM group study, right?

20    A.    Yes.

21    Q.    The rates of exposure and success stated

22  there, in your opinion are they accurate or

23  inaccurate?

24    A.    They are inaccurate.

25    Q.    Do they tell about less complications or

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 705 of 742 PageID #: 128869
Case 2:12-md-02327 Document 3756-6 Filed 05/09/16 Page 705 of 742 PageID #: 63869

In Re Budke Jury Trial Official Transcript Vol VII  1/13/2015

Page 2092

1    more?

2        A.    Less.

3        Q.    If you go down to the third one, it says

4    "Murphy, et al."

5              You see that?

6        A.    Yes, I do.

7        Q.    And the coauthor with Murphy would be who

8    on that study?

9        A.    Dr. Lucente.

10       Q.    And what's the exposure rate they say

11   there?

12       A.    Zero.

13       Q.    At that time, did --

14             Well, let me ask you this:  Does Ethicon

15   believe that to be an accurate statement of his

16   exposure rate?

17             THE COURT:  I'll sustain your

18   objection before you get it out because that's

19   Ethicon's state of mind and I don't know that

20   and -- no.

21             MR. SLATER:  I could offer you

22   deposition testimony on that specific question,

23   Your Honor.

24             MS. JONES:  Objection, Your Honor.

25   That's inappropriate.

Case 2:12-md-02327 Document 3756-6 Filed 04/27/17 Page 706 of 742 PageID #: 132870
Case 2:12-md-02327 Document 3182-6 Filed 09/09/16 Page 706 of 742 PageID #: 63860

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2093

1              THE COURT:  No.  No.  Go ahead.

2    Go ahead, but just stay out --

3              MR. SLATER:  Can I just approach

4    on this because I think there's just something to

5    fix it with, then.  I just want to make sure

6    because Dr. Weber is going to leave.  I just want

7    to know that I can do something else.  Because we

8    won't have a chance to talk about it after.

9              (Counsel approached the bench and

10   the following proceedings were held outside the

11   hearing of the jury:)

12             THE COURT:  Let's try one at a

13   time and we'll start with you.

14             MR. SLATER:  Thank you, Judge.

15   Dr. Hinoul is an Ethicon witness, a medical

16   affairs corporate representative.  Okay?  He's the

17   witness they put up for the company in all these

18   cases in the country.

19             THE COURT:  She's talked about him

20   and all the rest of it.

21             MR. SLATER:  I understand, and let

22   me tell you what he said.

23         He said in the document -- and in

24   testimony he admitted he meant this -- that when

25   Lucente and his group report that they have no

1    erosions, nobody believes that, okay?  That's

2    testimony.

3            It's testimony that was agreed to in the

4    federal trial in Bellew in front of Judge Goodwin

5    and now they're going to make an objection to you

6    on that testimony.  So I want it -- so if

7    Dr. Weber can't say it, then I need to know that

8    they're going to -- that the testimony is going to

9    come in so the jury can see what Hinoul said

10   because he said nobody believes Lucente's data

11   when he says zero erosions.  I have to have a

12   right to get it in one way or the other.

13                MS. JONES:  Dr. Hinoul has

14   explained exactly what that meant.  He's got the

15   testimony.

16                MR. SLATER:  And we should play

17   it.  I'm fine with that.

18                MS. JONES:  He's got the

19   explanation and he's got the email and that's

20   fine.

21                THE COURT:  We can do it that way.

22                MR. SLATER:  As long as it's

23   coming in, I don't have to ask that question then.

24                THE COURT:  As to that thing, I'll

25   let you play that later on, okay?  And that will

Page 2095

1    take care of that.

2                    MR. SLATER:  Yeah.  Thank you,

3    Judge.  That saved me from doing this.  Okay.

4                    (The proceedings returned to open

5    court.)

6        **Q.   (By Mr. Slater)  Moving right along,**

7    **Dr. Weber, you were asked some questions about**

8    **Gynemesh Prolene Soft and the use of Gynemesh to**

9    **be put through the vagina to do a transvaginal**

10   **mesh repair, right?**

11       A.   Yes.

12       **Q.   And as we sit here now, is Gynemesh**

13   **Prolene Soft indicated by Ethicon to be put in**

14   **through the vagina?**

15       A.   No.  No, they changed the indications to

16   restrict it to abdominal implantation only.

17       **Q.   Now --**

18                   MR. BALL:  We have to approach the

19   bench now.

20                   THE COURT:  Yes.  One question

21   caused a lightning strike.

22                   MR. SLATER:  I'm down to one more

23   question.

24                   (Counsel approached the bench and

25   the following proceedings were held outside the

Case 2:12-md-02327 Document 3756-6 Filed 04/29/17 Page 709 of 742 PageID #: 138873
Case 2:12-md-02327 Document 3192-6 Filed 09/09/16 Page 709 of 742 PageID #: 63869

In Re Budke Jury Trial Official Transcript Vol VII    1/13/2015

Page 2096

1   hearing of the jury:)

2                   MR. BALL:  Your Honor, this is --

3   he just violated the court order that --

4                   MR. SLATER:  I did not.

5                   MR. BALL:  Yes, you did.

6           He just violated the court order you gave

7   before lunch so I think we're going to have a

8   discussion --

9                   MR. SLATER:  That's not true.  How

10  did I violate the court order?

11                  MR. BALL:  I'll tell you but I

12  think we're going to have to do it -- it's going

13  to require something more than a sidebar.  If

14  you've got one more question and you want to take

15  a break and then we do it --

16                  MR. SLATER:  That's fine.

17                  MR. BALL:  -- this is probably --

18                  THE COURT:  All right.  Let's do

19  one more question.

20          See, here's the whole thing.  I told you

21  I would let you play that tape later and --

22                  MR. SLATER:  This has nothing to

23  do with that, Judge.  This is a different subject.

24                  MR. BALL:  That's right.  It's a

25  different subject but it relates to the topic we

**In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015**

1   asked about.

2                     MR. SLATER:  I'm going to ask one

3   question right here (indicating).

4                     MR. BALL:  This relates to a

5   question we talked about right after lunch.

6                     MR. SLATER:  That's not true.

7   It's just not true.

8            I have one more question for Dr. Weber.

9   Then I can sit down.  I assume they're done with

10  her --

11                    THE COURT:  Just promise me one

12  thing.  That you won't ask one question that takes

13  a hundred more before you can sit down, okay?

14                    MR. SLATER:  That takes what?

15                    THE COURT:  A hundred more before

16  you can sit down.

17                    MR. SLATER:  Judge, I think I'm

18  doing pretty good.

19                    THE COURT:  I know a few times I

20  asked one question that I knew I shouldn't have

21  asked and then it takes me a hundred more to get

22  out of the rabbit hole, and that's all I'm asking

23  of you.  You're a good lawyer but I'm just saying

24  let's don't.

25                    MR. SLATER:  I think I'm moving

Case 2:12-md-02327   Document 3756-6   Filed 04/29/17   Page 741 of 742 PageID #: 138875
Case 2:12-md-02327   Document 3756-6   Filed 04/29/16   Page 741 of 742 PageID #: 138875

In Re Budke Jury Trial Official Transcript Vol VII   1/13/2015

Page 2098

```
 1   pretty quick here.

 2              THE COURT:  All right.  Mighty

 3   fine.  One more.

 4              (The proceedings returned to open

 5   court.)

 6      Q.   (By Mr. Slater)  All right.  I want you

 7   to put up Exhibit P1920- -- you know what?  Don't

 8   put it up.  I'm just going to ask you this and

 9   we'll move through it.

10         Dr. Weber, you were shown the IFU by

11   counsel?

12      A.   Yes.

13      Q.   And I'm not going to put it up but you've

14   seen the picture of -- and we talked about it

15   earlier in your testimony -- the explanted mesh

16   from Joan Budke, correct?

17      A.   Yes.

18      Q.   Does the IFU or any of those documents

19   warn doctors that that was going to happen to

20   women?

21              MS. JONES:  Objection.  I --

22      Q.   (By Mr. Slater)  Yes or no.  A simple

23   yes-or-no question.

24              THE COURT:  What?

25              MS. JONES:  Your Honor, I object
```

1    to this being beyond the scope of redirect.  We

2    didn't talk about the picture that he's talking

3    about for Ms. Budke.  It's beyond the scope.

4               THE COURT:  Well, who put --

5    who --

6               MR. SLATER:  I'm just asking if --

7               THE COURT:  I'm sorry.  It seems

8    like this is going on forever.  How -- who first

9    put that video up?

10              MR. SLATER:  You know what, Your

11   Honor?  I'll withdraw it.

12              THE COURT:  All right.  Withdrawn.

13              MR. SLATER:  It's no problem.

14              THE COURT:  All right.

15              MR. SLATER:  And that's my

16   redirect.  Thank you very much.

17              THE COURT:  Okay.  Recross?

18              MS. JONES:  Nothing further.

19              THE COURT:  Nothing further.

20         Nothing further.

21         You may be excused.

22              MR. SLATER:  And Your Honor,

23   obviously we're going to offer the exhibits we

24   used with Dr. Weber and the other ones but I

25   assume we can talk about that at one of the