# EXHIBIT A

Jerry G. Blaivas, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2           SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    AT CHARLESTON

 4       ---------------------------:

         IN RE ETHICON, INC., PELVIC  :

 5       REPAIR SYSTEM PRODUCTS       : MASTER FILE

         LIABILITY LITIGATION         : No. 2:12-MD-02327

 6       _____:

                                      :

 7       THIS DOCUMENT RELATES TO     : MDL 2327

         ALL WAVE 3 CASES             :

 8                                    : JOSEPH R. GOODWIN

                                      : US DISTRICT JUDGE

 9       -----------------------------

10                    -   -   -

11               August 29, 2016

12                    -   -   -

13            DEPOSITION of JERRY G. BLAIVAS,

14   M.D., commencing at 12:00 p.m. on the above

15   date at Urocenter of New York, 445 East 77th

16   Street, New York, New York, before Marie Foley,

17   a Registered Merit Reporter, Certified Realtime

18   Reporter and Notary Public of the State of New

19   York.

20                    -   -   -

21            GOLKOW TECHNOLOGIES, INC.

22       877.370.3377 ph | 917.591.5672 fax

23               Deps@golkow.com

24
```

Jerry G. Blaivas, M.D.

```
1    A P P E A R A N C E S:

2

3    MOTLEY RICE, LLC

4    BY: FIDELMA L. FITZPATRICK, ESQUIRE

5        321 South Main St., 2nd Floor

6        Providence, RI 02903

7        401.457.7700

8        ffitzpatrick@motleyrice.com

9        Representing the Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Jerry G. Blaivas, M.D.

Page 14

1  are not caused by the polypropylene
2  midurethral sling?
3      A.   Yes.
4      Q.   And it's fair to say that in
5  your clinical practice, there are times
6  that you diagnose women's complications as
7  being related to the polypropylene
8  midurethral sling that they have?
9      A.   Yes.
10     Q.   When a woman presents to you
11  with a complication that you then
12  determine after examination is caused by a
13  midurethral sling, what treatment options
14  do you offer to that woman?
15     A.   Well, it depends what the
16  complication is.  Generally, and these are
17  very -- you know, it depends what the
18  complication is.  If it's clearly an
19  obstruction from the sling, and when there
20  is an obstruction that's what it usually
21  is, then my recommendation is that we
22  remove the entire suburethral portion of
23  the sling.
24         If the complication is a

Page 15

1  fistula, then we remove all of the sling,
2  all of the sub -- all of the sling that's
3  in the vicinity of the urethra -- excuse
4  me, of the fistula and then repair the
5  fistula.
6          If it's pain, then it depends
7  where the pain is, and again I don't have
8  to go into the particulars, but sometimes
9  we just remove that portion that appears
10  to be related or causing the pain, but
11  sometimes we remove the entire mesh 'cause
12  I think the entire mesh is causing the
13  pain.
14         If it's overactive bladder
15  symptoms, we -- if it's due to urethral
16  obstruction, we remove the suburethral
17  portion.  If we're not -- if it seems like
18  it's in the wall of the bladder but -- or
19  through the wall of the bladder, then we
20  remove all of the sling on that side and
21  sometimes the entire sling.
22     Q.   Is it fair to say based on what
23  you've just told me that the treatment
24  options that you offer are tailored to a

Page 16

1  woman's specific problems?
2      A.   Of course.
3      Q.   And would you say that you try
4  to treat the problems as conservatively as
5  possible, with the least amount of surgery
6  necessary to correct those problems?
7      A.   No, I would say I try to be
8  appropriate.  I mean, sometimes it's
9  appropriate to be conservative.  Sometimes
10  it's appropriate to be radical, but I
11  discuss it with the patient.
12     Q.   Okay.  Now, in addition to your
13  clinical work and your clinical
14  experience, you also have done academic
15  work and published articles concerning
16  mesh and mesh complications, correct?
17     A.   I have.
18     Q.   And most recently you published
19  an article entitled "Safety Considerations
20  for Synthetic Sling Surgery" that was
21  published in the Nature Reviews of Urology
22  in 2015, correct?
23     A.   Yes.
24     Q.   And you were a co-author on that

Page 17

1  with eight other individuals, correct?
2      A.   Yes.
3      Q.   Can you tell me, first of all,
4  how this article came to be?
5      A.   Well, Nature Reviews in Urology
6  is a highly respected peer review journal,
7  and they, for their reviews they actually
8  solicit authors.  I don't believe you can
9  just submit.  I'm not sure of that.
10         But they asked me to do a review
11  article, and they told me right up front
12  that just because I agreed to do it, it
13  did not mean that it would be automatically
14  accepted.
15     Q.   Now, can you tell us what a
16  review article is?
17     A.   A review article is, there are
18  lots of different types, but basically
19  it's a compilation of many and sometimes
20  all of the articles in the peer review
21  literature about a certain topic.  And
22  then, so the first thing that you do is
23  you -- is you do a literature search and
24  you identify the articles and then you use

Jerry G. Blaivas, M.D.

Page 18

1 search criteria to eliminate certain
2 articles and then you analyze them based
3 on whatever methodology you choose.
4    Q.   So, let me discuss, you were
5 approached by Nature and asked to conduct
6 a review on the literature available
7 concerning synthetic sling surgery,
8 correct?
9    A.   Yes.
10    Q.   And, I see that we mentioned you
11 have a number of other authors here.
12       Are those authors that you asked
13 to help you with this, or are those
14 authors that Nature assigned to this
15 project?
16    A.   No, I got to select my team.
17    Q.   Can you tell me how you went
18 about selecting the team?
19    A.   Sure.  Well, okay, so, two of
20 the co-authors, Robert Bendavid and
21 Vladimir Latovlev, L-A-T-O-V-L-E-V, are
22 recognized authorities in the field, and I
23 asked them if they would be willing to
24 help me with this.

Page 19

1       One of them, Roger Purohit,
2 P-U-R-O-H-I-T, is my partner, so we
3 operate together and he has a considerable
4 amount of clinical experience.  And then
5 Matt Benden and Gabriel Mekel, M-E-K-E-L,
6 and Michael Stern and Mubashir Billah,
7 B-I-L-L-A-H, and I'll have to spell the
8 other ones, K-O-L-A is the first name and
9 it's O-L-U-G-B-A-D-E, were all students
10 that -- well, actually, Dr. Mekel was
11 doing a fellowship with me and the others
12 are either medical students, or are all
13 medical students.
14    Q.   Okay.  When did Nature approach
15 you about authoring a review on synthetic
16 sling surgery?
17    A.   It was some time after May of, I
18 guess, 20 -- I don't know if it was 2013
19 or -- probably -- or 2014.  I can't
20 remember.
21    Q.   Okay.
22    A.   But it was after the American
23 Urologic Association national meeting.
24    Q.   Did anyone from Nature tell you

Page 20

1 why they selected you or asked you to
2 write this article over others?
3    A.   Well, yes, they had heard --
4 one, they heard about me, they knew of me
5 and they asked around and they asked who
6 would be a good person to do it, and I
7 believe someone had seen me participate in
8 a debate at the annual meeting of the
9 American Urologic Association.
10    Q.   Was there any kind of
11 preconceived outcome that anyone had
12 discussed with you of what they expected
13 your research to show or not show?
14    A.   No.
15    Q.   Now, this article that you did,
16 a review article, does not contain all of
17 the articles available in the medical
18 literature that reference or concern
19 midurethral slings, correct?
20    A.   Correct.
21    Q.   How did you and your co-authors
22 determine and choose the articles that you
23 relied on for this particular piece?
24    A.   Well, two ways.  One, and I'm

Page 21

1 sorry, I don't have all the details in my
2 memory, but there was an article
3 published -- there was another review
4 article that I thought was timely that did
5 a review up to a certain date and then
6 we -- I just decided to do it from about
7 that time to the what was then current,
8 which was 2014.  And I can tell you in a
9 minute what the dates were.
10    Q.   Sure.
11       (Pause.)
12    A.   So, it was from 2007 to 2014.
13       Excuse me, that was for the
14 clinical review, okay.  Dr. Latovlev
15 independently reviewed the pathology which
16 went back many years before that.
17    Q.   One of the things that I want to
18 talk to you about today is the conclusions
19 that you reached concerning the
20 complications and the complication rates
21 associated with midurethral slings.
22       Would that be included in the
23 clinical review that you just mentioned?
24    A.   Yes.

Jerry G. Blaivas, M.D.

Page 22

1    Q.   So, you and your co-authors
2 chose articles written from 2007 to 2014,
3 and I think what you mentioned to me
4 before was that there's certain search
5 criteria that you use when conducting your
6 literature search to determine what
7 articles would be included in a review
8 article; is that right?
9    A.   Yes.
10    Q.   And can you tell me what the
11 search criteria that you and your
12 co-authors were?
13    A.   It's a long list.  Shall I read
14 it to you?
15    Q.   Sure.
16    A.   Okay.  So, the search combined
17 the terms, and some of these are just
18 spelling things.  So, there was
19 midurethral slings where "mid" and
20 "urethral" are two words; midurethral
21 slings where "midurethral" is one word;
22 suburethral sling, urethral sling,
23 midurethral slings with a plural, both
24 words again with a plural.  All of the

Page 23

1 words that I just said also in plural.
2 Follow-up study, other than all of those
3 terms and follow-up study.
4         Also, we used free text searches
5 including the terms urinary
6 incontinence -- excuse me, TVT, tension
7 free vaginal tape, tension free vaginal
8 sling, transobturator tape, transobturator
9 sling, TVT-Obturator, TVT-O, TVT Secure,
10 Minarc, that's M-I-N-A-R-C, Abbrevio,
11 A-B-B-R-E-V-I-O, TOT, suprapubic arc
12 sling, Sparc, S-P-A-R-C, sling,
13 intravaginal slingplasty, IVS sling, RAZ,
14 R-A-Z, sling, Uratape, that's
15 U-R-A-T-A-P-E, ObTape, O-B-T-A-P-E,
16 prepubic sling, prepubic TVT, prepubic
17 tape, Pelvilace, P-E-L-V-I-L-A-C-E,
18 ureter, Aris, A-R-I-S, In-Fast,
19 I-N-F-A-S-T, Monarc I-STOP, urethral
20 reconstruction, urethral vaginal fistula,
21 other spelling of ObTape, Gore-Tex sling,
22 silastic sling, Mersilene sling, Marlex
23 sling, vesicovaginal fistula, Bioarc.  And
24 then -- yeah, so that was the search that

Page 24

1 we did on the clinical end.
2    Q.   Okay.  And that sounds like
3 quite a number of search terms; is that
4 right?
5    A.   Yes.
6    Q.   Why did you have so many search
7 terms?
8    A.   'Cause we didn't want to miss
9 any articles, and what we did is we would
10 look up -- we started with less search
11 terms and as we read articles, we would
12 see synonyms or new words and then we
13 would add that to the search term.
14    Q.   Did you limit the types of
15 articles you were looking at?  For
16 example, did you only look at randomized
17 control trials or only look at
18 meta-analyses or only look at case
19 studies?
20    A.   No, we did not limit it.
21    Q.   Is it fair to say that you were
22 trying to get as big a cross-section or as
23 big a representation of all of the
24 articles out there and kind of gather them

Page 25

1 up before you got started with this
2 process?
3    A.   Yes.  I just remembered there
4 was actually, there was one exclusion
5 criteria that we used.  If an article by
6 the same authors seemed to include the
7 same patients in a different study, we
8 would have used the most -- either the
9 most recent one or the most appropriate
10 one.  We tried not to count the same
11 patients twice.
12    Q.   Okay.
13    A.   So if one author had a
14 patient -- had a study that showed the
15 patients at one year, five years, 10
16 years, 15 years and 20 years, and they had
17 complications, we wouldn't count the
18 complications five times.  We'd only count
19 the complications once.
20    Q.   Okay.  Is it fair to say that
21 you were attempting to count each patient
22 one time and not duplicate those patients
23 or those complications in your analysis at
24 all?

Jerry G. Blaivas, M.D.

Page 26

1    A.    Exactly.
2    Q.    And the method that you used to
3  do that by only using one article from a
4  series, is that a standard acceptable way
5  of achieving that goal when doing medical
6  or scientific research?
7    A.    You know, I don't know.
8    Q.    Tell me why you thought that it
9  was an appropriate way to achieve that
10  result.
11    A.    Because I wanted to be sure on
12  the one hand that we captured every
13  complication, but on the other hand we
14  didn't count anybody twice 'cause we were
15  looking to get as precise a number for
16  both -- for complications as we could.  We
17  didn't want to overestimate; we didn't
18  want to underestimate.
19    Q.    Okay.  And that's for the
20  clinical portion, and clinically you
21  looked at both the safety of the product,
22  correct, the complications?
23    A.    Yes.
24    Q.    And you also looked at the

Page 27

1  efficacy of the product, correct?
2    A.    Yes.
3    Q.    Was there different criteria
4  that you looked at for articles relating
5  to efficacy?
6    A.    Yes.  For articles for efficacy
7  we only included those articles that
8  measured efficacy, that had appropriate
9  follow-up, and we did have criteria for
10  that.
11    Q.    Is that different from -- it
12  sounds like you had more exclusion
13  criteria for the efficacy articles than
14  you did the complication/safety articles;
15  is that right?
16    A.    Yes.
17    Q.    Is there anything else that you
18  excluded beyond, from your literature
19  search, beyond the subsequent articles or
20  the multi-reported cases?
21    A.    Yes.  The only other exclusion
22  was non-human subjects.
23    Q.    Did you in any way cherry pick
24  or look only for reports or articles that

Page 28

1  dealt with high rates of complications?
2    A.    No.
3    Q.    Did you only look for articles
4  that reported low rates of complications?
5    A.    No.  We intend -- to the best of
6  our ability, we picked every article in
7  the literature in that time period.
8    Q.    And that are articles that
9  reflected some lower rates of
10  complications, correct?
11    A.    Of course.
12    Q.    And articles that reflected
13  higher rates of complication, correct?
14    A.    Yes.
15    Q.    And fair to say it included case
16  studies?
17    A.    Yes, it did.
18    Q.    It included randomized control
19  trials?
20    A.    Yes.
21    Q.    It included meta-analyses?
22    A.    Yes.
23    Q.    Is there anything at all that
24  you or your co-authors did to limit or

Page 29

1  exclude certain articles or certain
2  findings in articles that would otherwise
3  have been encompassed in your search
4  terms?
5    A.    Only for the efficacy studies.
6    Q.    Okay.  Now --
7    A.    And that -- but those were a
8  search term, so we -- so I guess the
9  answer is no, we did not.  Okay.
10    Q.    Now, could somebody look at what
11  you've reported in Table 1 relating to the
12  efficacy issues and extrapolate in any way
13  what you did there and apply it to the
14  complication tables that you reflected in
15  Table 2, 3, 4 and 5?
16    A.    No, you couldn't because they
17  didn't apply -- none of these -- well,
18  most of these studies did not have any
19  scientifically valid prospective way of
20  looking at complications.  This was just
21  for efficacy.
22    Q.    Is there any way that someone
23  could --
24    MS. FITZPATRICK:  Let me ask it

Jerry G. Blaivas, M.D.

1  a different way.
2     Q.   Is it correct that there are
3  articles that you considered for your
4  safety considerations or complication
5  rates that are not reflected in the table
6  concerning efficacy?
7     A.   Probably not because we would
8  always -- no, because we would -- we
9  would -- if there was even one
10 complication, we would -- we would have
11 included it.
12    Q.   But just because you had it, and
13 I think what you're telling me is all of
14 your efficacy articles were included in
15 your complication analysis, and I'm
16 actually asking the opposite.
17         Were all of the articles that
18 you considered for the complication part
19 all used also to look at efficacy?
20    A.   No.
21    Q.   So you can't say that simply
22 because something isn't on the Table 1
23 that you didn't rely on it, use it,
24 conclude anything about it or consider it

1  as part of your safety considerations and
2  complication considerations; is that
3  right?
4     A.   To the contrary;  we would have
5  used it.
6     Q.   Okay.  Now, this article went
7  through the peer review process, correct?
8     A.   Very much so.
9     Q.   Can you tell me what you mean by
10 that?
11    A.   Well, the peer review process
12 itself is designed to insure that the
13 highest standards of scientific
14 methodology were used in the paper and
15 very specifically that the results and the
16 conclusions follow from the methodology;
17 i.e. that the conclusions follow from the
18 methods.
19    Q.   Is there anything that was
20 different about the Nature peer --
21        MS. FITZPATRICK:  Strike that.
22    Q.   You've worked as a peer reviewer
23 before, correct, for other journals?
24    A.   Yes.

1     Q.   And you've also been editor of a
2  journal that is a peer review journal,
3  correct?
4     A.   Yes.
5     Q.   Can you tell me generally in the
6  medical and scientific community how
7  individuals get selected as peer
8  reviewers?
9     A.   Sure.  They get selected by a
10 process of usually by a committee of
11 experts that picks other experts that they
12 think contribute to the peer review
13 process.  So they have to show -- they
14 have to be held in high regard as experts
15 that can give a fair and unbiased
16 appraisal of submissions.
17    Q.   Do you know of any peer review
18 publication that has considered the
19 opinions of attorneys from medical device
20 manufacturers as part of peer review
21 process?
22    A.   No, I do not.
23    Q.   Why aren't attorneys for medical
24 device manufacturers qualified to serve as

1  peer reviewers for a medical journal?
2     A.   Well, the most obvious reason is
3  that their opinions were likely to be
4  biased or that they have a major conflict
5  of interest and they don't fulfill our
6  criteria for being an expert.  They're
7  lawyers;  they're not experts in
8  scientific research.
9     Q.   Is it fair to say that the peer
10 review process is designed to have
11 neutral, objective, experienced
12 individuals assessing the methodology and
13 the conclusions that are reached in
14 medical and scientific journals?
15    A.   Of course.
16    Q.   That process is designed to
17 insure that the methodology that is used
18 is something that is recognized and
19 acceptable in the medical and scientific
20 community, correct?
21    A.   Yes.
22    Q.   In your experience as both a
23 peer reviewer and as an editor of a peer
24 review journal, what happens in the

Jerry G. Blaivas, M.D.

Page 34

1  process if an article is presented that
2  does not use established accepted
3  methodology in the scientific and medical
4  community?
5      A.    Well, as a general rule, it's
6  rejected.  On rare occasions, someone
7  comes up with such a novel approach that
8  even though that it wasn't known before,
9  it might become -- it might be acceptable.
10     Q.    Do you believe that the peer
11 review -- let me ask you this.
12         Tell me about the peer review
13 process that you went through for your
14 Nature article.
15     A.    This was the most rigorous peer
16 review that I've ever been part of.  I
17 mean, we -- this article took more time
18 and more effort than any article I've ever
19 written, and I, you know, I've done
20 hundreds and hundreds.  So it was a very
21 labor intense project.  We read all of the
22 articles, and then when we wrote the
23 articles, we submitted it and they had a
24 number of questions, concerns, suggested

Page 35

1  revisions and it went back and forth a
2  number of times to be sure that we -- that
3  our -- to be sure, quite honestly, that
4  our, as I mentioned a few minutes ago is
5  that our results and conclusions were
6  clearly supported by the methodology and
7  that they were scientifically sound.
8      Q.    Do you believe, Doctor, that the
9  fact that your article in Nature Review
10 survived the peer review process
11 establishes that the methodology that you
12 and your co-authors used in that, in
13 drafting that article, was scientifically
14 reliable?
15     A.    I do.
16     Q.    Would it be widely considered in
17 your medical community that an article
18 such as yours that has gone through such a
19 rigorous peer review process has
20 demonstrated appropriate medical and
21 scientific methodology?
22     A.    Yes.
23     Q.    Has anybody in the medical
24 community or at Nature questioned your

Page 36

1  methodology in connection with that
2  article at any time prior to its
3  publication?
4      A.    Well, they asked questions about
5  it in the review process, but I don't --
6  but afterwards, no, I don't -- I'm not
7  aware of anybody questioning it.
8      Q.    And are you comfortable that the
9  Nature Review Urology looked closely at
10 the methodology that you and your
11 co-authors used to reach the conclusions
12 that you did in that review paper?
13     A.    I'm quite confident of that.
14     Q.    We're going to talk in a little
15 bit specific about some of the conclusions
16 in that article and I'm going to ask you
17 more specifically how you reached the
18 conclusions that you did.
19         But, in addition to the
20 conclusions that you reached in that
21 article, you also rely on your clinical
22 experience for an independent basis of
23 your TVT-Exact report, correct?
24     A.    Yes.

Page 37

1      Q.    And including those portions
2  that overlap with the other polypropylene
3  midurethral sling products that you've
4  offered reports on, correct?
5      A.    Yes.
6      Q.    In addition to your Nature
7  article, in addition to your clinical
8  experience, did you also rely on
9  peer-reviewed literature which was
10 identified both in the footnotes of your
11 report and then in the reliance list that
12 you provided with that report?
13     A.    I did.
14     Q.    In selecting that peer-reviewed
15 literature for inclusion in your report or
16 your reliance list, were there any
17 articles that you just dismissed out of
18 hand and refused to consider when reaching
19 the opinions that you have in this case?
20     A.    I don't dismiss them out of
21 hand.  I mean, there's some that I don't
22 agree with the methodology.
23         I mean, are you asking in
24 general?

Jerry G. Blaivas, M.D.

Page 38

1  Q.   Would you ever look at an
2  article and say well, there's only a .1
3  complication rate, so I'm not even going
4  to look or consider that article?
5  A.   No, I don't do that.
6  Q.   Tell me what you do when you
7  look at articles to determine that you
8  think, or what weight you should be giving
9  to those particular articles.
10  A.   Generally, first thing I do is
11  look at the results of the -- basically I
12  basically look at the conclusions first
13  and then I look at the methodology and
14  say -- confirm that the conclusions could
15  be justified by the methodology.  If the
16  methodology is such that it can't even
17  answer the questions that the conclusions
18  concluded, I would still look at the
19  paper, but I would -- I would tend to not
20  read that in great depth.  And then if the
21  two go hand in hand, then I look at the
22  results and make sure that the results
23  follow from the methods as well.
24  Q.   In your both clinical and

Page 39

1  academic practice, do you regularly read
2  routinely read articles that appear in the
3  medical and scientific literature about
4  polypropylene slings?
5  A.   I do.
6  Q.   Are those also brought to your
7  attention by colleagues of yours?
8  A.   Yes.
9  Q.   Do you consider all of those
10  articles as part of --
11  MS. FITZPATRICK:  Excuse me.
12  Q.   Do you consider all of those
13  articles prior to reaching the conclusions
14  that you've set forth in your expert
15  report?
16  A.   I consider them, yes.
17  Q.   Okay.  Now, I want to ask you a
18  couple of questions, specifically about
19  what's in your report.
20  In paragraph 17 of your report
21  that you have in front of you, you note
22  that it is common for trocars to puncture
23  the bladder or urethra during trocar
24  passage.

Page 40

1  A.   Yes.
2  Q.   Do you see that?
3  A.   I do.
4  Q.   Looking at your Nature article,
5  you also looked at incidents of bladder
6  and transvaginal trocar perforation, some
7  of the complications that were reported in
8  the medical literature, correct?
9  A.   I do.
10  Q.   Let's start with do you rely on
11  any of your clinical experience for your
12  opinion that it is common for trocars to
13  puncture the bladder or urethra during
14  trocar passage?
15  A.   I do.
16  Q.   And how does your clinical
17  experience specifically support your
18  opinion that it is common for trocars to
19  puncture the bladder or urethra during
20  trocar passage?
21  A.   Well, from my clinical
22  experience, when I -- first of all, I talk
23  to a lot of my peers and colleagues about
24  it and I simply ask them in the hospital.

Page 41

1  I -- in over two thousand cases that I've
2  done without mesh, there's only been one
3  time that I perforated the -- the bladder,
4  and when that happened, I was personally
5  really taken aback and I kind of made a
6  big deal about it.  And the resident said,
7  "What are you doing?  Why are you so
8  upset?"  I said, "Geez, well, we just
9  perforated the bladder."  And the resident
10  said, "Well, yeah, happens all the time
11  with -- it happens all the time with the
12  midurethral slings."  That's one -- that's
13  one point of information.
14  Second is, as I mentioned, I
15  talk to my colleagues and my peers a lot
16  about this stuff and they, virtually all
17  of them, almost all of them say that it
18  does happen periodically that they
19  perforate the bladder.
20  Q.   But --
21  A.   And then --
22  Q.   Sorry.  Go ahead.
23  A.   And then finally, I've seen
24  hundreds of patients that have had

Jerry G. Blaivas, M.D.

Page 42

1  complications from slings, and when I
2  review those operative notes, they not
3  infrequently say that they perforated the
4  bladder.
5      Q.   Okay.
6      A.   And then took it out and passed
7  it again.
8      Q.   But you don't rely just on the
9  anecdotal stories from colleagues or
10 looking at your report to reach your
11 opinion that it's common for trocars to
12 puncture the bladder or urethra during
13 passage, correct?
14     A.   Of course not.
15     Q.   What else do you rely on for
16 that opinion?
17     A.   On the published literature.
18     Q.   Can you identify any
19 peer-reviewed published literature that
20 you have seen that you rely on to support
21 your opinions that it's common for these
22 punctures to happen?
23     A.   Sure.  There's an article by
24 Albo, I think it was -- I think it was

Page 43

1  2012, that was reported in the Journal of
2  Urology that found an incidence of, I
3  forget the exact number, either five or
4  six percent were perforated.  And in the
5  AUA guidelines, Roger Dmochowski published
6  that in, he was the lead author, in 20 --
7  actually, I don't remember the year, but
8  that also had a similar incidence of about
9  five or six percent.
10     Q.   Are those the only articles that
11 you rely on?
12     A.   No, there's many other ones.
13     Q.   And are many of those articles
14 also cited in your reliance list --
15     A.   Yes.
16     Q.   -- that you provided in this
17 case?
18     A.   Yes.
19     Q.   Do you believe that there's
20 sufficient peer-reviewed published
21 literature to support the opinion that
22 it's common for trocars to puncture the
23 bladder or urethra during trocar passage?
24     A.   Well, common is in the eyes of

Page 44

1  the beholder, but I think there's ample
2  literature to show that it happens on the
3  order of magnitude of five percent.  In
4  series it's as high as 20 or 30 percent.
5      Q.   And is that something that you
6  also looked at in connection with your
7  Nature Review article?
8      A.   Yes.
9      Q.   Can you tell me what you did in
10 your Nature Review article to look at this
11 incidence of trocar puncture of the
12 bladder or urethra?
13     A.   Well, that we just compiled all
14 the articles in the literature because
15 there wouldn't be a case report -- all of
16 the -- all of the articles that were
17 reviewed and we just averaged the -- we
18 gave a range and an average and a mean of
19 how often it was perforated.
20     Q.   Okay.  So, let me stop you there
21 because I want to talk a little bit more
22 about the methodology that you used not
23 just for calculating trocars, but for
24 calculating all of the rates of

Page 45

1  complications.
2           Was bladder or urethra puncture
3  during trocar passage one of the
4  complications that you looked at and
5  considered in your Nature Review article?
6      A.   It was.
7      Q.   What I'd like you to do is to
8  walk me through you and your co-authors
9  compile all of the literature that you can
10 find from an extensive literature search
11 that report any complications or any
12 incident of complications from either an
13 individual patient or a patient cohort; is
14 that correct?
15     A.   Yes.
16     Q.   And you looked for everything
17 you could find; is that right?
18     A.   Yes.
19     Q.   And you didn't exclude any
20 articles unless it was a multiple
21 reporting of the same cohort?
22     A.   Or non-humans.
23     Q.   Or non-humans, okay.
24          And your reason for excluding

Jerry G. Blaivas, M.D.

1  multiple reports of the same cohort is you
2  didn't want to double count injuries, so
3  therefore potentially inflating the rates
4  of complications that you were looking at;
5  is that right?
6      A.   Yes.
7      Q.   You were attempting to keep it
8  one patient counted for one time
9  throughout this analysis that you did,
10  correct?
11     A.   Yes.
12     Q.   So you and your colleagues have
13  this massive medical literature in front
14  of you.
15          What did you do with that
16  information to reach the conclusions that
17  you reached in your article concerning the
18  existence of certain complications and
19  then the incidence of those complications?
20     A.   Well, for the incidence we
21  counted every single complication.  So, to
22  make it simple, if there were only two
23  articles, one had a hundred patients and
24  no, in this instance, perforations and one

1  was a case report of one complication with
2  no denominator because it's just a case
3  report, we would use the one as the
4  numerator and the denominator would be the
5  101.
6      Q.   Okay.
7      A.   But of course this was done in
8  hundreds of papers, so it was much more
9  complicated than that.
10     Q.   So let me, as a non-scientist
11  and non-medical person, let me see if I'm
12  right in my understanding.
13          You took and counted every
14  patient who was included in all of those
15  articles and you counted them all up and
16  that became your denominator, the total
17  number of people who have been studied,
18  reported, considered in some way in the
19  medical literature as potentially, or as a
20  subject in a study about mesh
21  complications; is that right?
22     A.   Yes.
23     Q.   And then you took that entire
24  denominator and then what you did is you

1  went through and you added up each, for
2  example in this case, each incident of
3  bladder or urethral trocar perforation
4  that you could find anywhere in that
5  medical literature; is that right?
6      A.   Yes.
7      Q.   What did you do with those two
8  numbers to reach the percentages in the
9  conclusions that you reached?
10     A.   Well, we just added them up.  So
11  the numerator is the number and the -- the
12  numerator divided by the denominator is
13  the percent.
14     Q.   And that's the methodology that
15  was reviewed by the neutral peer reviewers
16  for Nature Journal of Urology, correct?
17     A.   Yes.  I mean, we also did -- we
18  did it another -- the other way we did it
19  is we looked at the range and the averages
20  for each -- for when there's a -- when
21  there were a series.
22          So, if there were two series and
23  one had, you know, a hundred patients with
24  zero perforations, another one had a

1  hundred patients with 20 percent, you
2  know, we would say that the range in the
3  different series was zero to 20 percent
4  and the mean of the series was whatever
5  the numbers comes to.
6      Q.   So you have two different ways
7  that you've gone about this analysis and
8  the two different methodologies.
9          The first is the adding up all
10  of the individual women who are identified
11  and doing the numerator and the
12  denominator, and you did that specifically
13  for each complication individually,
14  correct?
15     A.   Yes.
16     Q.   So you'd calculate the number of
17  women who had a bladder perforation
18  separately from the number of women who
19  had a urethral erosion, separate from the
20  number of women who had a pain
21  complication; is that right?
22     A.   Yeah, we'd count each of them
23  separately, yeah.
24     Q.   And you also broke that down

Jerry G. Blaivas, M.D.

Page 58

1 went about calculating the percentage of
2 patients who have a potential complication
3 based on what's available in the medical
4 literature; is that right?
5    A.   Yes.
6    Q.   Now, the next column is
7 "Incident mean range."
8        That's the second way that you
9 went about also checking on the reports of
10 complications and the incidence of
11 complications, correct?
12    A.   Yes.
13    Q.   Can you explain to me how the
14 methodology for reaching the incidence
15 differs from the methodology used for
16 reaching the complications?
17    A.   Sure.  In the first case, we
18 counted every single patient, every single
19 patient was counted once.  In the
20 incidence, where it says "Incidence mean
21 and range," those -- that we only
22 considered series of patients.  So that
23 doesn't include any of the patients
24 with -- that were case reports.  It

Page 59

1 doesn't include any of the patients, for
2 example, that were just a paper on
3 complications.
4        So the numbers in these two
5 columns, even though they both represent
6 means or averages, the numbers could be
7 very different because they're different
8 populations of papers.
9    Q.   So, this was the way that you
10 and your co-authors went about presenting
11 the full gamut of information based on two
12 statistical analyses, correct?
13    A.   Exactly.
14    Q.   And you reported on both the
15 complications and the incidence without
16 consideration to what was higher or lower?
17 You made sure everything was reported
18 here, correct?
19    A.   Exactly.
20    Q.   In some of these, the numbers
21 are fairly comparable, right?
22    A.   Yes.
23    Q.   And in some of them there's some
24 divergence in the percentage of patients

Page 60

1 that you had and the mean.
2        How do you account for that?
3    A.   Because in the series, they may
4 not have mentioned a certain complication.
5 So for example, if you're looking at that
6 same column, if you look at neurologic
7 symptoms within six weeks, in the middle
8 column we counted every single patient
9 where they mentioned it.  Now, it looks
10 like there were only 42 patients in that
11 particular group where they said these
12 patients had these complications.  Whereas
13 in the other article, they could have had
14 a paper with a thousand patients in it,
15 but they didn't even mention whether or
16 not there was a neurologic complication,
17 so we couldn't count that.
18    Q.   And in any event, let me look at
19 the range.  So, tell me what the range is.
20    A.   Well, the range is -- describes
21 what the minimum complication rate was in
22 one series and the maximum in another --
23 in other series, and the reason that we
24 did that is one of the critiques that you

Page 61

1 might apply to this kind of scientific
2 literature is, well, if you just do an
3 average -- if you just do an average, it
4 doesn't tell you about the difference
5 between perhaps, this is a perhaps, people
6 that are really expert surgeons might get
7 a zero complication rate and novices
8 might, you know, get a 15 percent
9 complication rates.
10        So this gives you the range of
11 what you might expect with the same
12 surgeon or groups of surgeons doing the
13 operation.
14    Q.   In looking at both your
15 percentage of patients, as well as the
16 mean that you have reported in this
17 article, all of those fall within below
18 the highest reported incident rate on the
19 range; is that right?
20    A.   Sure.  That makes sense.
21    Q.   So, does that reflect that your
22 article is not reporting the highest
23 possible rates of complications associated
24 with any of these complications?

Jerry G. Blaivas, M.D.

Page 62

1    A.   To the contrary.  We describe in
2  the paper that we believe this represents
3  the least possible number of complications.
4    Q.   And it's well below --
5      MS. FITZPATRICK:  Well, strike
6  that.  I think I already asked you
7  that.
8    Q.   Now, this methodology that
9  you've just described, the two different
10 types of methodology, you used that same
11 methodology for each of the complications
12 that you reported in this medical article;
13 is that correct?
14   A.   We did.
15   Q.   Is it fair to say that this
16 medical article is -- identifies all of
17 the complications that you were able to
18 see that are reported in the medical
19 literature, correct?
20   A.   From 2007 to 2014, yes.
21   Q.   Now, what I want to ask you is
22 you identify in your Nature Review article
23 specific types of complications.
24      Are those complications that you

Page 63

1  have also seen with mesh synthetic sling
2  patients in your clinical practice or
3  through your academic experience?
4    A.   Yes.
5    Q.   In doing this work in 2014 and
6  2015, did you see any complications that
7  were reported here that you didn't also
8  have some clinical experience with?
9    A.   Give me a moment.
10      (Pause.)
11      I'm amazed to say that no, I've
12 seen every one of these complications.
13   Q.   And do you rely on your clinical
14 experience for your opinions that the
15 TVT-Exact and the Ethicon midurethral
16 slings can cause these types of
17 complications in women?
18   A.   They do.
19   Q.   In addition to your clinical
20 experience and in addition to what you
21 have presented in the Nature Review
22 article, do you also rely on other
23 peer-reviewed literature from other
24 authors to support your opinions that each

Page 64

1  of these complications is associated with
2  the polypropylene midurethral slings?
3    A.   I mean, it's not a question that
4  the answer is "yes."
5    Q.   Sometimes we ask stupid
6  questions.
7    A.   Okay.
8    Q.   It's 'cause we have to.
9      Now, you walked me through the
10 complication rates for retropubic slings,
11 and what I want to talk to you about is
12 your -- you've reached some opinions on
13 the risk of negative outcome after
14 synthetic midurethral sling implantation
15 for surgery is greater than or equal to 15
16 percent.
17      Do you recall that?
18   A.   I do.
19   Q.   Can you tell me the methodology
20 that you and your co-authors used to
21 determine that the overall risk of a
22 negative outcome after synthetic
23 midurethral sling implantation surgery is
24 greater than or equal to 15 percent?

Page 65

1    A.   Sure.  First we looked at the
2  reported incidence that we already
3  described.  Then we took the chances of
4  the failure of the sling, which would be a
5  negative consequence.  So we took the
6  first number was the complications as we
7  reported them.  The second number was the
8  chances of just failure, like any
9  operation can fail.  The third was the
10 failure for stress incontinence after an
11 operation -- after a complication from a
12 sling, okay.  And the fourth -- let me get
13 my numbers right.  I think it's the
14 fourth.  The fourth was the incidence of
15 refractory overactive bladder, and what we
16 did with that was that we made, again, a
17 very conservative estimate, okay.  So we
18 took the number of reported de novo
19 overactive bladder patients and we said
20 that a certain percentage of them are
21 likely to be refractory.  And because the
22 trouble is there is no data on that.
23 There's no data that says, that we could
24 find, that says that if you operate on

Jerry G. Blaivas, M.D.

**Page 66**

1  them and they have de novo overactive
2  bladder and you treat them, X number would
3  get better.  So I don't have the exact
4  number, but we picked the number of de
5  novo overactive bladder patients and then
6  we took a percentage of that, of patients
7  that are likely to be refractory, and when
8  you add all those numbers up -- then we
9  added a couple of -- there were a few
10  things like bowel injuries and fistulas
11  that are very rare, but we added in a
12  number of that and added all of those up,
13  the methodology, it's in the paper
14  someplace.
15      Q.   And that's the same methodology?
16      A.   Yeah.
17      Q.   Just so I understand, if I'm
18  looking at box 1 on page 8 of your
19  article.
20      A.   Okay.
21      Q.   It says: "Complications
22  requiring surgery."
23           Is this the list of
24  complications that you would consider a

**Page 67**

1  serious complication for the purposes of
2  calculating that 15.3 percent number?
3      A.   Yes.
4      Q.   Is it fair to say that, or am I
5  accurate in saying that that list of
6  complications, plus the number of sling
7  failures, the percentage of women whose
8  slings simply don't work for them, you
9  calculated that total --
10      A.   No, no, that's in there.  The
11  recurrent and/or persistent stress
12  incontinence.
13      Q.   Okay.
14      A.   That number is -- that's where
15  the number comes from.
16      Q.   Okay.  Thank you for clarifying
17  that.
18           So, when you say there's a total
19  incidence of serious complications is 15.3
20  percent, is it accurate to say that's the
21  calculation of the overall risk to a woman
22  that one of these things could happen to
23  her if she has a polypropylene midurethral
24  sling implanted?

**Page 68**

1      A.   I would say it another way.
2  That there's a, I believe, at least a 15
3  percent chance of having a negative
4  outcome from the sling, from putting the
5  sling in.
6      Q.   And the negative outcomes would
7  be one of those things that you have
8  identified in Box 1?
9      A.   Yes.
10      Q.   But it's not your testimony, for
11  example, that 15.3 percent of women who
12  have a midurethral sling will have chronic
13  pain?
14      A.   No.
15      Q.   Or that 15.3 percent will have a
16  urethral obstruction, correct?
17      A.   Correct.
18      Q.   It's just the overall chances of
19  having one of these negative outcomes?
20      A.   Yes.
21      Q.   Now, going back in time, you
22  published this article in late 2015; is
23  that right?
24      A.   Yes.

**Page 69**

1      Q.   And it was based on medical
2  records 2007 through 2014; is that right?
3      A.   Yes.
4      Q.   And do you recall that in the
5  summer of 2014, you testified in front of
6  Judge Goodwin in the Southern District of
7  West Virginia in a case involving Mrs. Joe
8  Husky; is that right?
9      A.   I have a remote memory of it,
10  yes.
11      Q.   Well, I put you on the stand,
12  so.
13      A.   No, I did it.
14      Q.   So I know that you did it.
15           And at that time, you had not
16  done the statistical analyses and this
17  analysis that's reflected in your Nature
18  article, correct?
19      A.   I'm sorry, what was the date?
20      Q.   Summer of 2014.
21      A.   Correct.
22      Q.   So, since you testified in Mrs.
23  Husky's case in the summer of 2014, have
24  you done additional work that you rely on

Jerry G. Blaivas, M.D.

Page 70

1  as the basis for your current opinions
2  reflected in this expert report on the
3  incidence of individual complications rate
4  and the overall complication rate?
5      A.   Well, of course.  That's what
6  this paper is.
7      Q.   And this information wasn't
8  available to you and you had not done this
9  analysis at the time of Mrs. Husky's
10 trial, correct?
11     A.   Correct.
12     Q.   Ethicon has made a statement
13 that you may not -- I'm going to quote
14 you: "Dr. Blaivas may not, quote, merely
15 a year later, quote, purport to be certain
16 about TVT complication rates."
17     Can you tell me why you can be
18 certain about complication rates in August
19 of 2015 when you couldn't be certain about
20 complication rates in the summer of 2014?
21     A.   Because we did such an
22 exhaustive search of the literature and
23 this is our best estimate of the minimum
24 complication rate.  I emphasize that.

Page 71

1      Q.   And when you call it an
2  estimate, it's an estimate that is based
3  on two different scientifically reliable
4  means for calculating the rates of
5  complication; is that right?
6      A.   Yes.
7      Q.   And those are the ones that are
8  reflected in Tables 2, 3, 4 and 5 of the
9  report?
10     A.   I'll take your word for it.
11 Yes.
12     Q.   I just want to make sure that
13 I'm right.
14     A.   Okay.
15     Q.   Dr. Blaivas, do you believe that
16 the conclusions that you reached in your
17 report and in your Nature article assume
18 the worst case scenario?
19     A.   No.  As I said, I think it
20 assumes the best case scenario.
21     Q.   And do you believe that it errs
22 on the side of opining as to a higher
23 complication rate to better protect a
24 patient?

Page 72

1      A.   No.  I think if anything, it
2  errs on the lower complication rate.
3      Q.   And is that reflected in the
4  fact that both the complication percentage
5  and the incidence that you report out are
6  lower than the highest rates that you saw
7  in the research that you did?
8      A.   Well, in part, but not --
9          MS. FITZPATRICK:  Take a break.
10         (Discussion held off the record.)
11         MS. FITZPATRICK:  Can you read
12     back the question and answer?
13         (The requested portion of the
14     record was read by the Court Reporter.)
15     A.   Yeah, because we don't expect it
16 to be the highest rate reported, but we
17 know that the studies, that the majority
18 of the studies don't follow the patient
19 long enough to account for all the
20 complications and that there's no registry
21 and there isn't -- and they don't -- there
22 isn't a methodology to specifically look
23 for complications.  So because of those
24 three things alone, it's very likely that

Page 73

1  the complication rate that we reported is
2  an underestimate of the real number of the
3  complications.
4      Q.   Now, Ethicon claims that your
5  Review article cherry-picked data in
6  failing to take into account long-term
7  studies finding TVT complication rates to
8  be much lower.  And they then refer to the
9  articles that are identified in Table 1
10 and states that at Table 1 of the article,
11 the authors collected 11 studies
12 purportedly meeting the criteria for
13 inclusion.
14     Do those articles have to do
15 with efficacy and your conclusions about
16 efficacy, or do they have to do with the
17 overall rates of complications?
18     A.   The methodology was primarily
19 geared towards efficacy.
20     Q.   So, is it accurate to say that
21 simply because something was not included
22 in Table 1, it is incorrect for Ethicon to
23 say that you did not take into account
24 long-term studies that find TVT

Jerry G. Blaivas, M.D.

Page 74

1  complication rates to be lower?
2      A.   I'm sorry, there was a couple of
3  negatives in there.  I'm not sure about
4  that.
5      Q.   Okay.  Ethicon attempts to use
6  the fact that there were certain articles
7  that you did not consider for efficacy as
8  evidence that you did not use those
9  articles for consideration of safety.
10      Is that accurate?
11      A.   It's not accurate.
12      Q.   Why not?
13      A.   Because one thing I already
14  alluded to is that we only counted the
15  patients once.  So if a patient -- I mean,
16  for example, I know one of the articles in
17  there -- when I say "know," let me just
18  double check.
19      (Pause.)
20      For example, the Nielson
21  article -- no, this doesn't answer your
22  question.  Excuse me.
23      The answer is "no" because some
24  of the papers that they cited in that --

Page 75

1  in that deposition or, I think it was a
2  deposition, were papers that were
3  duplicate, so they used the same patients
4  twice, and I already testified that when
5  that happens, we only counted the
6  complication once.
7      And the second thing is that if
8  an article did not mention a complication,
9  that it wasn't included.  They didn't say
10  that they even looked for it.
11      And then thirdly, I do remember,
12  again I don't remember the specifics, but
13  there was one or two articles that didn't
14  come up in our search, and I don't know,
15  you know, we did a very methodical search,
16  but we searched thousands of papers and
17  it's not unexpected that one or two
18  wouldn't come up with a search.
19      Q.   And is that something that
20  routinely happens in peer-reviewed
21  articles?
22      A.   Sure.
23      Q.   Does it call into question the
24  reliability of a peer review article?

Page 76

1      A.   I don't believe so.
2      Q.   Now, defendants claim that your
3  opinion that the TVT has a minimal
4  complication rate takes into account
5  prolapse devices.
6      Did you look at articles or
7  consider statistics on prolapse devices
8  when reaching your complication rate in
9  this paper?
10      A.   We did not look at -- if a paper
11  had -- it's possible that some of the
12  papers had patients with both prolapse and
13  slings, but in the review process, we
14  would have made our best effort to only
15  include those patients that had to do with
16  sling -- that where the complication was
17  from a sling.
18      Q.   Is it fair to say that Ethicon's
19  claim that you included prolapse devices
20  in calculating your complication rate is
21  untrue?
22      A.   To the best of our ability to
23  make the distinction, it's untrue.
24      MS. FITZPATRICK:  Can we go off

Page 77

1  the record for a second?
2      (Discussion held off the record.)
3  BY MS. FITZPATRICK:
4      Q.   Dr. Blaivas, you participated in
5  the committee at the AUA that considered
6  the safety and efficacy of midurethral
7  slings, correct?
8      A.   Yes.
9      Q.   Can you tell me what you did in
10  that respect, what you personally did?
11      A.   Well, we all -- it was a
12  complicated process, similar to what I
13  testified before.  We did a literature
14  search.  We had inclusion criteria.  We
15  selected papers that had to do with the
16  surgical management of urinary
17  incontinence in women.  We selected the
18  papers and we tabulated the data on safety
19  and efficacy, very similar to what we did
20  in the Nature Review article for that
21  column in the right where we looked at the
22  incidence and the range.  And we did that
23  for all of the known treatments to stress
24  incontinence at the time, surgical

Jerry G. Blaivas, M.D.

Page 78

1  treatments.
2      Q.   You didn't author those
3  guidelines, correct?
4      A.   Well, I was one of eleven
5  authors.
6      Q.   Do those guidelines reflect your
7  personal opinions or the position of the
8  AUA?
9      A.   It reflected the opinions of the
10 AUA.
11     Q.   Did you disagree with some of
12 those opinions?
13     A.   Yeah, I disagreed with some of
14 the conclusions.
15     Q.   And did you express that during
16 your meetings and to others?
17     A.   I did.
18     Q.   Is it fair to say that this
19 though ended up being a consensus paper
20 that doesn't fully and accurately reflect
21 your personal views on the safety and
22 efficacy of midurethral slings?
23     A.   That's correct.  I was one
24 eleven -- I had one-eleventh of the vote.

Page 79

1      Q.   Now, did the AUA conclude that
2  mesh products are suitable surgical
3  alternatives?
4      A.   They did.
5      Q.   What is your opinion as to
6  whether mesh products are suitable
7  surgical options?
8      A.   I think they're suitable
9  surgical options in a small percentage of
10 patients who accept the known risks and
11 complications and weigh the risks and
12 benefits.  But as I said, I contend that
13 it's almost impossible to do that because
14 those risks are not well-described and not
15 well-known by either the doctors or the
16 patients.
17     Q.   When you say it's a suitable
18 surgical option in, did you say a limited
19 number of patients?
20     A.   Yes.
21     Q.   Can you tell me what you mean by
22 that?
23     A.   Well, I think in a -- first of
24 all, in patients that are not going to

Page 80

1  be -- that have no intention of being
2  sexually active and whose life expectancy
3  isn't that long, so, you know, older
4  women, particularly those that can't
5  withstand the rigors of an open operation,
6  that are not going to be sexually active,
7  particularly those that are obese will be
8  a much bigger operation to do an
9  autologous sling.  I think those patients
10 are reasonable candidates once -- if they
11 accept and are informed of the risks.
12     Q.   Do you believe though that
13 midurethral polypropylene slings are a
14 safe first line surgical option for all
15 women who suffer from stress urinary
16 incontinence?
17     A.   Well, I don't think it's my job
18 to decide for another patient.  I don't
19 believe -- for the patient.  I think the
20 patient and the -- the patient needs to be
21 informed of the risks and benefits, and if
22 they were informed of the risks and
23 benefits, I think they would realize that
24 it's not safe and it's not worth the risk.

Page 81

1      I might not have answered.  What
2  was the actual question?
3      Q.   You had said that you believed
4  it was an appropriate surgical option for
5  a limited number of patients.  You
6  identified who those patients were.
7      What I was asking was do you
8  believe that the Ethicon midurethral
9  slings are a suitable safe surgical option
10 as a first line treatment for all women
11 who have stress urinary incontinence?
12     A.   I do not.
13     Q.   And is that based on your
14 clinical experience in treating women who
15 have mesh-related complications?
16     A.   Yes.
17     Q.   And is it based --
18     A.   Excuse me.  And my knowledge of
19 how likely they are to occur.
20     Q.   Is it based on your review of
21 the medical literature discussing the
22 potential complications and the incidence
23 of complications that are associated with
24 midurethral slings?

Page 82

1    A.    Yes.
2    Q.    And that includes a review of
3 literature that reports few complications
4 and literature that reports many
5 complications, correct?
6    A.    Yes.
7    Q.    And you take into account for
8 your opinions medical articles that report
9 low rates of complications when reaching
10 your opinions, correct?
11    A.    Yes.
12    Q.    And you took all of those into
13 account, to the best of your ability, when
14 conducting your Nature Review, correct?
15    A.    I did.
16    Q.    And you didn't exclude any such
17 reports simply because they had a low
18 incidence of complication reported in
19 them, correct?
20    A.    Correct.
21    Q.    Do you also base that opinion on
22 your clinical experience in implanting
23 autologous slings or doing non-mesh
24 surgery for SUI patients?

Page 83

1    A.    Yes.
2    Q.    Do you also base your opinion on
3 medical literature concerning the
4 complications associated with the
5 autologous fascial sling and other
6 non-mesh surgeries to correct SUI?
7    A.    I do.
8    Q.    Now let's go back to the AUA.
9        Does the AUA recognize an
10 autologous fascial sling as a suitable
11 surgical option for women who have stress
12 urinary incontinence?
13    A.    It does.
14    Q.    Does it recognize other non-mesh
15 procedures as suitable surgical options
16 for women who have stress urinary
17 incontinence?
18    A.    It does.  Yes, it does.
19    Q.    And what are those?
20    A.    Autologous fascial sling, a
21 Burch, it doesn't really -- also
22 Marshall-Marchetti-Krantz, and other
23 retropubic kind of operations and
24 midurethral -- excuse me, periurethral

Page 84

1 injections, and homologous and xeno --
2 homologs and xenografts.
3    Q.    Does the AUA conclude that the
4 or look at --
5        MS. FITZPATRICK:  Strike that.
6    Q.    Does the AUA conclude that the
7 polypropylene midurethral sling is a safer
8 surgical option to some of the non-mesh
9 surgeries?
10    A.    It does not.
11    Q.    And does the AUA guidelines that
12 you were involved with suggest that
13 physicians such as yourself and others
14 should only consider polypropylene
15 midurethral slings as a suitable surgical
16 option for --
17    A.    It does not.
18    Q.    In that respect, do you agree
19 with the AUA that these non-mesh
20 procedures are suitable surgical options
21 for women who have stress urinary
22 incontinence?
23    A.    Of course.
24    Q.    Separate and apart from what's

Page 85

1 reflected in the AUA, do you believe that
2 the non-mesh surgical options, and
3 particularly the autologous fascial sling,
4 are safer procedures for women who have
5 stress urinary incontinence generally?
6    A.    I do.
7    Q.    Tell me what the basis for that
8 opinion is.
9    A.    Well, because the autologous
10 slings simply don't have any of the
11 devastating kind of complications that we
12 talk about.  For practical purposes, no
13 refractory pain and there's, for practical
14 purposes, no erosion, and for practical
15 purposes, there's no fistulas.  I mean,
16 the really serious complications, the
17 autologous sling does not have.
18    Q.    Now, Ethicon has asserted that
19 you base your opinions on the benefits of
20 autologous slings solely on your own
21 unreliable personal experiences.
22        Is that correct?
23    A.    I wonder why they call my
24 published peer-reviewed articles

Jerry G. Blaivas, M.D.

Page 86

1 unreliable, but no, that's not correct.
2    Q.   What else do you base it on?
3    A.   The peer review literature and
4 speaking with my associates.
5    Q.   Okay.
6    A.   My colleagues.
7    Q.   Is there any specific -- let me
8 ask you this.
9        When reaching your opinions
10 concerning the safety of autologous
11 fascial slings, did you consider all
12 reported medical articles that you had
13 seen concerning the complications rates
14 associated with autologous fascial slings?
15    A.   I did.
16    Q.   And that formed one basis of
17 your opinions, correct?
18    A.   Yes.
19    Q.   And you didn't simply adopt or
20 form your opinion based on reading of a
21 single article, correct?
22    A.   Correct.
23    Q.   Did you look at the totality of
24 the articles out there that supported your

Page 87

1 opinions?
2    A.   I looked at the totality, but I
3 also looked at the severity of the
4 complications and there's no question in
5 my mind that the severity of the
6 complications on average are much worse in
7 synthetic slings than in autologous
8 slings.
9    Q.   Okay.
10    A.   And also the ease with which
11 they can be corrected are much easier and
12 predict -- more predictable in the
13 autologous sling compared to the mesh
14 sling.
15    Q.   Okay.  Now, you offered opinions
16 concerning mesh degradation, shrinkage and
17 other deformation, correct?
18    A.   Yes.
19    Q.   Have you seen deformed mesh that
20 you've explanted from women?
21    A.   Of course.
22    Q.   Have you seen mesh that's shrunk
23 that you've explanted from women?
24    A.   Well, I've seen the mesh scar

Page 88

1 complex.
2    Q.   And mesh degradation, have you
3 seen mesh falling apart when you take it
4 out of women?
5    A.   I have.
6    Q.   Is your clinical experience in
7 observing each of these phenomenon a basis
8 for your opinion that each of those things
9 can happen?
10    A.   Yes.
11    Q.   In addition to your clinical
12 experience, is this an issue that you also
13 studied in your Nature Review article?
14    A.   Yes.
15    Q.   Did you rely on the conclusions
16 that you reached in your Nature Review
17 article as a separate basis for your
18 conclusions about mesh degradation,
19 shrinkage and deformation?
20    A.   I did.
21    Q.   And can you tell me what you and
22 your co-authors did to study mesh
23 degradation, shrinkage, and deformation in
24 your Nature Review article?

Page 89

1    A.   Well, Dr. Latovlev actually that
2 did that.  I mean, he wrote that part of
3 the article, and he himself has done
4 extensive studies both of a explanted mesh
5 looking at the gross specimen for
6 stiffness and deformation, looking at the
7 light microscopic and also the
8 ultramicroscopic characteristics of the
9 mesh, and he concluded based on his own
10 work and that of many others in the
11 literature that mesh degrades in vivo.
12    Q.   Did he also conclude that mesh
13 shrinks in vivo?
14    A.   Yes.
15    Q.   And did he also conclude that
16 mesh can deform in vivo?
17    A.   Yes.
18    Q.   So you talked about what Dr.
19 Latovlev did in your paper.
20        Is there additional literature
21 in the peer review that you are aware of
22 that establishes that mesh can degrade,
23 shrink and deform?
24    A.   Yes, there's a lot of -- there

Jerry G. Blaivas, M.D.

Page 90

1 are a number of studies in the literature.
2     Q.    Have you cited to those as part
3 of your reliance list in this case?
4     A.    I have.
5     Q.    And those are the basis for your
6 opinions?
7     A.    Yes.
8     Q.    I want to go back to just a
9 general question.
10         Ethicon has raised questions
11 about the methodology that you have used
12 to reach your opinions in this case.
13     A.    I'm sorry, I missed the first
14 part of your sentence.
15     Q.    Ethicon has raised issues with
16 the methodology that you have used to
17 reach your opinions in this case.
18         Did you rely on your clinical
19 experience as part of your basis for each
20 of the opinions that you hold?
21     A.    I did.
22     Q.    And did you rely on your own
23 peer-reviewed literature as part of the
24 basis for the opinions?

Page 91

1     A.    I did.
2     Q.    And did you rely on other peer
3 review literature as part of the basis for
4 your opinions in this case?
5     A.    I did.
6     Q.    Is it fair to say that each of
7 your opinions depends on all three of
8 those aspects of your experience as its
9 bases?
10     A.    It did, but when I heard your
11 question, I'm trying to understand.
12 There's no controversy about whether these
13 things exist except for possibly the
14 degradation. Everything's well documented
15 in the literature. I think the only thing
16 they could possibly contest is how often
17 that occurs, but the published literature,
18 exclusive of anything that I said, I mean,
19 we -- you know, we cited the New England
20 Journal of Medicine, the Journal of
21 Urology, the most reputable journals, you
22 know, show, for example, a five to six
23 percent incidence of perforation. Every
24 review article has shown one or two

Page 92

1 percent, at least, urethral obstruction,
2 revision surgery. Those things are
3 indisputable. There's no controversy
4 about that.
5         The only thing -- the only thing
6 they could possibly argue with is the
7 actual incidence.
8     Q.    And you've laid out for us what
9 your methodology in calculating that
10 incidence is, correct?
11     A.    I think in much greater detail
12 than any of the other articles that talk
13 about complications.
14     Q.    Let me just go back.
15         Now, Ethicon is not here at this
16 deposition today, correct?
17     A.    Correct.
18     Q.    Now, this deposition was
19 originally noticed by Ethicon, and you are
20 here in deposition today because Ethicon
21 asked you to be in deposition, correct?
22     A.    Correct.
23     Q.    And if Ethicon had chosen to
24 show up for this deposition, they could

Page 93

1 have asked you any questions that they
2 wanted based on your TVT-Exact report,
3 correct?
4     A.    Yes.
5     Q.    And they chose not to do so
6 today?
7     A.    I believe so.
8         MS. FITZPATRICK:  That's all
9 that I've got.
10         I just would like to mark as
11 Exhibit 2 the original notice of
12 deposition of Dr. Blaivas from Ethicon
13 that was dated August 25th, 2016.
14         (Blaivas Exhibit 2, Notice To
15 Take Deposition of Jerry Blaivas, M.D.
16 dated August 25, 2016, was marked for
17 identification, as of this date.)
18         MS. FITZPATRICK:  And mark as
19 Exhibit 3 the amended notice to take
20 the deposition of Dr. Blaivas that we
21 filed today, August 29th, immediately
22 following Ethicon's withdrawal of its
23 notice.
24         (Blaivas Exhibit 3, Amended