EXHIBIT 2H

Prof. Dr. Med Uwe Klinge

```
 1            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  AT CHARLESTON
 3

    IN RE: ETHICON, INC,      ) MASTER FILE
 4  REPAIR SYSTEM PRODUCTS,   ) NO. 2:12-MD-02327
    LIABILITY LITIGATION      )
 5                            ) MDL NO. 2327
    _____)
 6                            ) JOSEPH R. GOODWIN
    THIS DOCUMENT RELATES TO ) US DISTRICT JUDGE
 7  CAROLYN LEWIS, ET AL. V. )
    ETHICON, INC.             )
 8  CASE NO. 2:12-CV-04301    )
 9
              THURSDAY, NOVEMBER 14, 2013
10
                      - - -
11
12           Deposition of Prof. Dr. Med.
13  Uwe Klinge, Volume I, held at the Quellenhoff
14  Hotel, Monheimsallee 52, 52062 Aachen, Germany,
15  commencing at 9:01 a.m., on the above date,
16  before Carrie A. Campbell, Registered
17  Professional Reporter, Certified Realtime
18  Reporter, Certified Shorthand Reporter,
19  and Certified Court Reporter.
20                      - - -
            GOLKOW TECHNOLOGIES, INC.
21      877.370.3377 ph|917.591.5672 fax
              deps@golkow.com
22
23
24
```

Page 2

INDEX

PAGE

APPEARANCES.................................. 3

EXAMINATIONS
  BY MR. THOMAS............................. 4

EXHIBITS

No.  Description                    Page

1   Kling invoice                  69
2   Draft of a contract between Ethicon    81
    Hamburg and the university, in
    particular the surgical department
3   Announcement of a specific study done   86
    with Ethicon
4   Confidentiality agreement          87
5   Contract between Ethicon and Klinge    90
6   Draft of a possible contract        96
    consulting agreement
7   Draft of a first contract between    120
    Ethicon and the university
8   letter from Klinge and          168
    Dr. Klosterhalfen to Dr. Engel dated
    December 8, 2000
9   Ethicon Surgeon Panel Meeting Mesh,    221
    Suvretta House Hotel, St. Moritz,
    January 18, 2003,
    ETH.MESH.05455878 - ETH.MESH.05455898
10  Klinge curriculum vitae         242
11  Klinge expert report           244

(Exhibits attached to the deposition.)

CERTIFICATE.................................. 337
ACKNOWLEDGMENT OF DEPONENT.................... 338
ERRATA....................................... 339
LAWYER'S NOTES............................... 340

Page 3

A P P E A R A N C E S :

ANDERSON LAW OFFICES, LLC
  BY:  BENJAMIN HOUSTON ANDERSON, ESQUIRE
  ben@andersonlawoffices.net
  1360 West 9th Street, Suite 215
  Cleveland, Ohio 44113
  (216) 592-8384

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
  BY:  DANIEL J. THORNBURGH, ESQUIRE
  dthornburgh@awkolaw.com
  17 East Main Street, Suite 200
  Pensacola, Florida  32502
  (850) 202-1010
  Counsel for Plaintiffs

THOMAS COMBS & SPANN, PLLC
  BY:  DAVID B. THOMAS, ESQUIRE
  dthomas@tcspllc.com
  PHILIP J. COMBS, ESQUIRE
  pcombs@tcspllc.com
  300 Summers Street, Suite 1380
  Charleston, West Virginia  25301
  (304) 414-1807

ALSO PRESENT:
  Julie Filarski, Anderson Law Offices, LLC

          ---

Page 4

PROF. DR. MED. UWE KLINGE, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendants, as follows:

DIRECT EXAMINATION
QUESTIONS BY MR. THOMAS:

Q.   Good morning, Doctor.

A.   Good morning.

Q.   It has been just a little bit more than a year since we saw each other.

A.   Yeah.  Yeah.

Q.   What have you been --

A.   My daughter is much heavier.

Q.   Taller you mean?

A.   Taller and heavy.  Very heavy.

Q.   How old is your daughter now?

A.   How old?  She's going to be one and a half year.

Q.   Oh, wonderful.

     Since we saw each other last, I know that you've testified in the Gross trial, correct, in New Jersey?

Page 5

A.   Yes.

Q.   What else have you done with your professional time in the last year?

A.   Professional time, do you mean what I -- what I'm -- what I was working on?

Q.   Yeah, let me ask you a little more specifically.  That's probably too general.

     You've continued to work at the university?

A.   Yes.

Q.   You've continued in the same position at the university?

A.   Yes.

Q.   Have you taught any classes at the university in the last year?

A.   Yes.

Q.   What classes have you taught in the last year?

A.   I am included in the classes for -- to have lessons for the students in -- that are learning surgery.  That is the third year of the students in their curriculum, and there's another class that all of the

Prof. Dr. Med Uwe Klinge

---

Page 6

1  students learning medicine for dentists.
2  They also have to pass some lessons from
3  surgeons and there I'm included.
4      Q.    Okay.  Any other classes that
5  you've been involved in since October of last
6  year?
7      A.    Not at the university, no.
8      Q.    Have you made any presentations
9  in the last year?
10     A.    Yes.
11     Q.    How many?
12     A.    Maybe ten.  Publications at
13 conferences.
14     Q.    Right.  That's what I'm talking
15 about.
16     A.    Yeah.
17     Q.    And who are the sponsors of
18 these conferences?
19     A.    Usually it has been invitations
20 by the organizers of the Berlin hernia
21 conference, of the European Hernia Society,
22 of the German Hernia Society and some others.
23 Usually there are five, six companies acting
24 as sponsors for these ones, and usually they

---

Page 7

1  have a company that are organizing the
2  invitations, the travel expenses and so.
3          So it is going directly to
4  these companies.  Not to a specific sponsor
5  that is most of these.
6      Q.    When you talk about companies,
7  are you talking about medical device
8  manufacturers?
9      A.    It's usually medical device.
10 It's Covidien, it's Ethicon.  Ethicon is
11 usually the gold sponsor, but it is Covidien,
12 Brown in Germany, DynaMesh® is some sponsor
13 there.
14         So you always find it at the
15 documents of the conferences which -- the
16 list of the main sponsors for the European
17 Hernia Society, I think for this meeting in
18 Duns, the list is longer than for some local
19 meetings.
20     Q.    When you say DynaMesh®, you're
21 referring to the company FEG?
22     A.    Yes, it is.  There is some
23 relation.
24     Q.    I thought FEG made DynaMesh®?

---

Page 8

1      A.    Yes.
2      Q.    Okay.  When you said "there's
3  some relation," are they -- is there
4  something I'm missing?
5      A.    As far as I know and we already
6  discussed it, DynaMesh® is the brand name of
7  the product, and here we have a company and
8  this is the FEG.  When it started it.
9  Whether the DynaMesh® meanwhile has its own
10 company, I don't know.
11     Q.    That's fine.  That's what I
12 understood.
13     A.    So, therefore, this is this
14 mixing up of these terms.
15     Q.    Okay.  I didn't want to mix it
16 up.  I just thought I may have missed
17 something.  I'm just trying to understand.
18         Now, when you've attended these
19 conferences, are you paid to attend?
20     A.    No.  No.  Never.
21     Q.    Are your expenses reimbursed?
22     A.    Usually.  As I'm an invited
23 speaker, they always took the costs of the
24 hotel and the flight or train or car.

---

Page 9

1      Q.    Do you receive an honorarium
2  for presenting?
3      A.    No, never.
4      Q.    Do you receive -- strike that.
5          Have you attended -- strike
6  that again.
7          Have you spoken at any
8  conferences sponsored solely by FEG?
9      A.    Yes.  There is a -- yes.
10     Q.    How many times in the last
11 year?
12     A.    It is -- I remember three
13 times.
14     Q.    And where have you spoken at
15 conferences sponsored by FEG in the last
16 year?
17     A.    There has been a master class
18 that is organized by Professor Berger in
19 Baden-Baden.  He's the head of the German
20 Hernia Society and -- no, excuse me, I have
21 to correct.  Last year it was stopped because
22 they have -- they are under reconstruction.
23 It has been planned, but last year we didn't
24 do it, but we will do it next week.

---

Page 10

1  Q.   Okay.
2  A.   And the year before.
3  Q.   All right.
4  A.   So, therefore, I have to put
5  that out.
6  Q.   And what is that conference
7  that happened two years ago --
8  A.   This master class?
9  Q.   Yes.
10  A.   About 20, 20 to 30
11  international surgeons, about 30
12  international surgeons are coming there
13  together and they are -- they want to see how
14  Professor Berger, who is one of the famous
15  surgeons who is doing laparoscopic incisional
16  hernia repair and parastomal hernia, he's a
17  real expert there and they want to see how he
18  operates it, and this occasion we are
19  discussing problems in this field with the
20  participants, and I'm the moderator and I'm
21  presenting some overviews, some reviews of
22  our past work there.
23  Q.   Okay.  So if that conference
24  doesn't count, then you've done two

Page 11

1  conferences for FEG in the last year,
2  correct?
3  A.   As I remember, yes.
4  Q.   Tell me what the other two are.
5  A.   The other was a meeting at
6  Cologne at the University of Cologne where
7  Professor Jager presented his innovative
8  procedure to treat incontinence.  And I was
9  part as Dr. Klosterhalfen to present some
10  basics, some science there at that
11  conference.
12  Q.   And this was the conference
13  organized by Professor Shaffer?
14  A.   It was Yaeger.  Yaeger.  His
15  name is Professor Yaeger.  You will find it
16  in the internet.  He has an excellent web
17  page where he presented his new procedure,
18  how he addresses -- how he treats it.
19  Q.   And --
20  A.   By laparotomy through the
21  abdomen he placed an implant there.
22  Q.   And that was for the treatment
23  of stress urinary incontinence?
24  A.   Urgent stress.

Page 12

1  Q.   And what kind of implant did he
2  recommend to be used?
3  A.   He has been working or he
4  worked on this for, I think, for the past
5  five to ten years and he originally tried it
6  with ePTFE, but he has some -- several
7  problems and finally he found the FEG, the
8  small medium enterprises, and they
9  constructed during the past two, three years
10  this device.  This device is a combination of
11  a sling-like, it has sling-like parts, and it
12  has flat mesh-like parts for the fixation of
13  the vagina.
14  So it's a combination with
15  different parts in the device which each of
16  them is specifically designed to the local
17  function in this one.  It's complex.
18  Q.   What kind of polymer is used?
19  A.   PVDF.
20  Q.   Did you know of this innovative
21  procedure prior to attending the conference?
22  A.   Yes.  I've seen the internet,
23  I've seen the document which is there about
24  this procedure and I've seen the device.

Page 13

1  Q.   Have you worked with Dr. Yaeger
2  in the development of the device?
3  A.   In some regards.  So I'm not
4  specifically asked whether it should be three
5  or four filaments in a specific area because
6  this is a decision by the surgeon, by
7  Professor Yaeger.  But once upon a time, I'm
8  asked whether this construction fits to what
9  we have learned.  What is our experience for
10  the behavior of textiles in tissues that we
11  have learned during the past 20 years.  So I
12  had to check whether it -- there may be some
13  problems or not and, therefore, I had to look
14  to this.
15  Q.   Had you worked with Dr. Yaeger
16  in the past?
17  A.   Professor Yaeger?
18  Q.   Yes.
19  A.   I only met him there, and later
20  on I met him in Barcelona where we had
21  another meeting together.
22  Q.   How did you happen to work with
23  Professor Yaeger on this innovative
24  procedure?

Page 14

1    MR. ANDERSON:  Other than what
2  he's already mentioned?
3  QUESTIONS BY MR. THOMAS:
4    Q.    How did you two come together
5  is what I want to know.
6    A.    I was -- I was asked by the
7  FEG, they told me that they have a new
8  concept.  They have a new idea that they are
9  going to work on this and if they are -- if
10  I'm able to have a look to this.
11    Q.    Okay.  And who --
12    A.    This is --
13    Q.    I am sorry.
14    MR. ANDERSON:  Are you through?
15  Go ahead.
16    THE WITNESS:  No.  It's --
17  QUESTIONS BY MR. THOMAS:
18    Q.    Who at FEG asked you to speak
19  with Professor Yaeger about this new device
20  that used PVDF?
21    A.    It is either Boris Obolensky or
22  Dr. Andreas Mullen.
23    Q.    And did you meet with Professor
24  Yaeger to discuss this device?

Page 15

1    A.    I met him first time in Cologne
2  at this conference.
3    Q.    Okay.  How did you consult with
4  Professor Yaeger on this new device?
5    A.    I didn't get --
6    Q.    I am sorry, let me ask the
7  question this way.
8        You told me a minute ago, I
9  think, that you were asked by FEG to look at
10  the proposed device and give your opinions
11  about -- based upon the work that you've done
12  for the past 20 years to determine whether
13  this device is consistent with what you've
14  found.
15        Is that correct?
16    A.    Yes.
17    Q.    Is that work that you did at
18  the request of FEG?
19    A.    They gave me the questions to
20  this device and I answered to them.  Because
21  it's usually a matter of textile properties,
22  textile characteristic, pores and so on and,
23  therefore, it was a conversation with the
24  engineers from the FEG.

Page 16

1    Q.    I see.
2        And so the work that you did on
3  this device was not working with Professor
4  Yaeger, is that fair?
5    A.    That is fair.  Yeah, that is.
6    Q.    So all of the work that you did
7  on the device was in consultation with the
8  engineers at FEG?
9    A.    Yes.  Or maybe sometimes there
10  has been a feedback loop.  They're talking to
11  Professor Yaeger and then so there is another
12  question.
13    Q.    How much time --
14    A.    It's not so strict that there
15  is one question, one answer and so --
16    Q.    How much time did you spend
17  consulting with FEG on the development of
18  this new device?
19    A.    It is very difficult to answer
20  this question because when they -- when I got
21  a question to this and I have to answer it, I
22  have to summarize all of my experience and
23  all my knowledge to this one.  Maybe
24  sometimes the answer was in two minutes, but

Page 17

1  it wouldn't be fair to say that I'm working
2  just two minutes for this.
3    Q.    Well, did you --
4    A.    Because all --
5    Q.    Go ahead.
6    A.    Yeah.
7    Q.    Did you keep track of the time
8  that you spent working on this project with
9  FEG?
10    A.    No.
11    Q.    Did you charge FEG for the time
12  that you spent working on this project?
13    A.    Not specifically for this
14  project, but I am consulting for them.  I'm
15  helping them in medical questions.  They are
16  mainly engineers without a medical profession
17  and, therefore, for many medical questions,
18  they like to ask me and for this time effort,
19  I got a compensation.
20    Q.    And how are you compensated by
21  FEG?
22    A.    I got about 25,000 -- no,
23  30,000 Euros a year, once a year.
24    Q.    Do you have a contract with

Page 18

1  FEG?
2      A.    There is as I -- so far I
3  remember, I do not have a contract where I
4  agreed or where I said that I will work for
5  something for several hours for this amount
6  of money.  I don't have such a contract.
7  There is no contract.
8           I know that there has been or
9  I've signed a contract that we work together.
10  It was in relationship to a patent, the FEG
11  claim for it, and they placed my name as well
12  as Klosterhalfen as well as others who
13  contribute to this patent on PVDF meshes, and
14  in this relation, I have signed that I have
15  been or that I'm working with the FEG
16  together.  It's a general contract without
17  any specific agreements how to work, where to
18  work.
19      Q.    Are you paid by the FEG based
20  on the amount of mesh that FEG sells?
21      A.    Definitely not.
22      Q.    How is your compensation
23  calculated?
24      A.    They -- so far I know, they

Page 19

1  calculated if they are -- if they had a good
2  year, they said, okay, I -- they want me to
3  participate at a good year.  So sometimes it
4  was 20,000 Euros a year, meanwhile it is
5  30,000 Euros a year, but it is an overall
6  estimate by them.
7      Q.    So the better the company does,
8  the more money you make, is that fair?
9      A.    I don't know, but overall,
10  yeah, maybe.  But I have no obligation to do
11  anything or I have no expectation that it
12  happens next year.  So it's just an
13  expression of how we have been working
14  together, and it is a cheaper solution for
15  them to ask me as a consultant than to employ
16  a medical doctor and they will never get
17  someone with my expertise on the market.  So
18  I think it's a good agreement for both of us.
19      Q.    And do you have a written
20  agreement with the FEG that you look to to
21  determine your -- the duties and obligations
22  of both parties?  Is there a written
23  contract?
24      A.    No.  No.  As I told you, it's

Page 20

1  just once a year they coming up and said,
2  "Okay, the last year, you did a lot and we're
3  able to give you a compensation for this
4  spare time that you invested and, therefore,
5  we would be happy to give this to you."
6      Q.    Okay.
7      A.    And that is the reason maybe
8  that we continue this work.  Otherwise, we
9  would have to think about it.  But there is
10  no written contract that I have to do it for
11  the next year or that they expect me
12  something.  No, it's free.
13      Q.    Do you have a written contract
14  of any kind with FEG?
15      A.    Apart from this general
16  statement in relation -- in relation to these
17  patent affair, it was six, seven years ago,
18  but I cannot really remember the details for
19  this.  But I usually refused to have this
20  strict contract as I had it with Ethicon.  I
21  never had it with the FEG like this.
22      Q.    To your knowledge and
23  recollection, does the contract that you have
24  that relates to the patents provide that you

Page 21

1  receive compensation for the sale of
2  products?
3      A.    So far I know from the German
4  law, there is an obligation of someone who
5  has a patent to share the royalties with
6  those guys that are -- have been working on
7  the patents.  But so far I'm informed is that
8  the law does not define the amount.  It can
9  be very small.  It depends of the medical
10  device.
11      Q.    Okay.
12      A.    So I do not recollect any
13  figure that it is .5, 2 or 3 percent or so.
14      Q.    Have you received royalties
15  from the FEG for the sale of any of their
16  products?
17      A.    As a consequence of the not
18  existing contract there and I refuse to have
19  this contract, as I told you several times, I
20  never got what you may call royalties.
21      Q.    That's my question.
22      A.    Yes.
23      Q.    Did you receive royalties --
24      A.    Never.

Page 22

1    Q.    Let me finish my question,
2  please.
3    A.    Sorry.
4    Q.    Did you receive royalties in
5  addition to this arrangement that we've
6  already discussed where you've received 20 to
7  30,000 Euros a year?
8    A.    Definitely not.
9    Q.    Okay.  Do you have an agreement
10  with the FEG that the 20 to 30,000 Euros that
11  you've received is in place of any royalties
12  that you might receive under that patent
13  agreement?
14    A.    No.
15    Q.    Okay.
16    A.    It is a compensation for the
17  time I spent the last year.
18    Q.    You talked about the meeting in
19  Cologne.
20         What was the other meeting in
21  the last year where you attended where it was
22  sponsored by FEG?
23    A.    The last meeting has been just
24  recently in Barcelona where we had a meeting

Page 23

1  that has been organized by the -- or that has
2  been sponsored by the FEG in Barcelona at the
3  occasion of the international society --
4  incontinence society of this meeting in
5  Barcelona there, and there was a scientific
6  presentation there that includes the
7  requirements to the function presented by
8  Dr. Liedl from Munich.  It was Professor
9  Yaeger who presented his way to overcome this
10  anatomical dysfunction in these patients, and
11  it was planned to have an overview what can
12  be done by textile engineers by Dr. Mullen,
13  but, unfortunately, as I made a very poor
14  time management, it has to be stopped.  He
15  was not able to make his presentations there.
16         And my function there was to
17  give an overview from our experience of
18  surgical meshes, which is ten years longer
19  than for the gynecologists, and my task was
20  to moderate between the gynecologists and the
21  urologists because they're -- I don't know
22  whether it's in the US as well, but in
23  Europe, there is some competition between
24  these two.  The woman belongs to whom, they

Page 24

1  always complain and, therefore, me as a
2  surgeon, I'm a little bit outside and,
3  therefore, my task was to moderate.
4         Professor Yaeger is a
5  gynecologist, Dr. Liedl is a urologist, so,
6  therefore, I -- yeah.  I helped to organize
7  this meeting and this was this session there.
8    Q.    How many people attended that
9  meeting?
10    A.    40.
11    Q.    40?
12    A.    Yeah.
13    Q.    And it was presented to
14  urologists and urogynecologists?
15    A.    Yes.
16    Q.    Was the purpose of the meeting
17  to introduce Dr. Yaeger's new method for the
18  treatment of stress urinary incontinence?
19    A.    To present his idea and to give
20  some background information about the
21  biomechanics of the pelvis, and so some of
22  the participants, as I noticed afterwards,
23  they already use this device, but they wanted
24  to have some background information there.

Page 25

1    Q.    Did you present on the
2  biomechanics of the pelvis, or did someone
3  else make that presentation?
4    A.    Dr. Liedl did that.
5    Q.    And Dr. Liedl is what?
6    A.    He's a urologist.  He's working
7  in Munich.  He's -- yeah.  He's an expert in
8  this.
9    Q.    Okay.  Doctor, you've made
10  about ten presentations, you've been working
11  on a couple of classes, you testified in the
12  Gross case.
13         Have you been doing any
14  research in the last year in specific areas?
15    A.    That is my main topic.  I am
16  still a surgeon, once a surgeon, ever a
17  surgeon.  So this didn't -- does not change,
18  but my main task is to do surgical research,
19  research in biomaterials, research in hernia
20  treatment research, in biological,
21  morphological, cell reaction to biomaterials.
22  That is my main thing.  And in this context,
23  I did some research projects, I prepared some
24  manuscripts, some studies to be published.

Page 26

1     Q.   What studies in the last year
2 have you published or will be published?
3     A.   Let me start from the last
4 because it's more easy to recollect.
5        Submitted, we have a paper
6 which deals with the inflammatory activity of
7 the cells around surgical meshes and what
8 type of cells are the major part of the
9 foreign body granuloma of this infiltrate.
10 We've worked some time to identify the origin
11 of these cells there. This is one work which
12 is submitted. There is another work I did
13 together with some international colleagues
14 where we had some analysis in -- general
15 analysis of the value of randomized control
16 trials, clinical studies, in relation to the
17 power of registries. Because this is a very
18 important topic in particularly if you want
19 to compare medical devices.
20        There is a limitation of
21 clinical studies and that is maybe not
22 realized fully up to now and, therefore,
23 we -- I define some aspects there. We
24 submitted it and we agreed. We discussed it

Page 27

1 at international, and then we presented it to
2 a journal and we are waiting whether it's
3 accepted or not.
4        I have another project that is
5 working on lang -- non-small cell lung cancer
6 and the value of biomarkers. It is -- the
7 manuscript is in a -- it's still under work
8 so one other colleague just -- we are waiting
9 on his comments on it. I had -- I prepared a
10 manuscript for the German Journal for
11 Surgeons. They asked me to make a manuscript
12 to the question whether you can avoid
13 complications by selection of a mesh that is
14 more adequate. And we made a manuscript on
15 this topic.
16        There has been another request
17 that is incisional hernia repair, whether
18 it's necessary to make a closure of the
19 fascia that is just finished and submitted.
20 We had a research project where we had some
21 knockout mice where we placed meshes, and the
22 advantage of these genetic-transferred mice
23 were that when the inflammatory cells are
24 activated, they are transmitting

Page 28

1 luminescence. So with the camera, you can
2 see whether there is some activation of
3 inflammatory cells by a camera without taking
4 the samples and killing the mice. And we
5 compared several meshes and several coatings
6 there and we controlled or monitored the
7 local inflammatory response.
8        This was a manuscript and they
9 want to have some additional stainings and we
10 were just preparing them and I think we can
11 resubmit this within the next four weeks. So
12 this is another project.
13        Yeah, I'm discussing in the
14 moment with Professor Köckerling, you know,
15 he has a large -- the German register for
16 hernia and in this registry, he has some
17 information about meshes and, of course, we
18 will talk about it in detail later on, but he
19 wants to know the impact of meshes on the
20 clinical results and, therefore, we started
21 to do an analysis in respect to -- to define
22 the impact of mesh materials that can be
23 identified by the data of his registry.
24        We started to think about -- he

Page 29

1 started to make some analysis, and I think
2 within the next weeks we can discuss it in
3 detail and get some more information.
4        Several other -- I cannot say
5 whether this is -- this is, of course, not
6 complete. There are some other -- maybe you
7 have more specific things.
8     Q.   You've been busy.
9        The first one you talked about,
10 the inflammatory activity in the cells that
11 surround meshes; is that correct?
12     A.   Yes.
13     Q.   Who is on that study with you?
14     A.   It is Professor Klosterhalfen,
15 he's there, because, yeah. And it is
16 Dr. Fet, F-e-t, she's the research assistant.
17 She made this, and there is Professor Deetz
18 from Würzburg, D-e-e-t-z. These are all of
19 the coauthors from this.
20     Q.   And what meshes do you analyze
21 in that study?
22     A.   It was -- it was part of a
23 project that is granted by North
24 Rhine-Westphalia and the European community,

Page 30

1 and one of the basic questions was to
2 identify these cells there and we took 50
3 explants that has been collected at our
4 department there.
5     Q.    You say "our department" --
6     A.    Surgical department going
7 directly to our lab and having been stored
8 there during the past five, six years.
9     Q.    Okay.
10     A.    And we collected these because
11 we wanted to have a certain variation of mesh
12 materials, a variation of procedures, a
13 variation of complications because this was
14 the first screening study there. Initially
15 when we started the project, we just thought
16 it was macrophages and nothing else and
17 macrophages were the most important thing,
18 so, therefore, we learned a lot during this
19 process.
20     Q.    So in this first study we've
21 talked about, what you did was studied
22 explants; is that correct?
23     A.    Yes. Human explants.
24     Q.    All right. What conclusions

Page 31

1 did your study reach?
2     A.    The conclusion is that the
3 inflammatory infiltrate, which you see in all
4 these HE stainings and it is more or less
5 thought in the last years that it is
6 macrophages and, therefore, a lot of
7 macrophage staining has been done there.
8     But now we are knowing that
9 there are a lot of lymphocytes there, and
10 there are cells that can be called
11 fibrocytes. Fibrocytes has first been
12 published by Bucala in the US ten years ago.
13 It's a specific cell with an origin of the
14 bone marrow and going to some site of injury
15 and then can switch to an inflammatory
16 macrophage or going to a fibroblast to the
17 connective tissue production.
18     So this is a new cell that is
19 maybe very, very important. The most
20 important finding is that it is not possible
21 to identify a specific cell just by making or
22 by taking one biomarker. So there are a lot
23 of cells that are positive for two, three,
24 four, five different markers. And before

Page 32

1 this study, we thought that when we want to
2 identify a cell, you take a marker, are
3 looking if this is positive for this marker
4 and you believe that that is a specific cell,
5 and we have seen because we made it in
6 parallel with 20 different markers that very
7 many of these cells express several different
8 markers. So it's very complex these, and
9 we're just at the beginning. The restriction
10 to macrophages is shortcoming.
11     Q.    Does this study analyze the
12 extent to which one design of a mesh may be
13 better than another?
14     A.    No. It is not possible because
15 the variation -- by intention, the variation
16 is too big.
17     What we can say is that there
18 are differences. So material has an impact
19 on the tissue response.
20     Q.    Are you able --
21     A.    There's no doubt about it.
22     Q.    Are you able to conclude from
23 the research that you've done whether PVDF or
24 polypropylene are better meshes for the

Page 33

1 issues that you were studying?
2     A.    As I told you, we're not able
3 to make specific conclusions that one is
4 better than the other. There is no doubt
5 that the material has an impact and we now
6 know that the cells are not only macrophages.
7 We get some new ideas how to improve or how
8 to reduce the inflammatory reaction
9 furthermore.
10     So it has to be a coating not
11 only addressing the macrophages, but a little
12 bit other cells, stem cells or so. So we get
13 new ideas for the general principle, but...
14     Q.    Now, in your deposition last
15 time, you talked a little bit about
16 registries and I don't want to redo what
17 we've done before.
18     But this study that you've
19 worked on where you analyze the value of
20 randomized controlled trials and clinical
21 studies versus registries, is that a general
22 discussion of the topic, or is it specific to
23 a certain kind of problem like hernias?
24     A.    I think it is, of course, it is

Page 34

1 an evolution of our thinking. As you surely
2 know, I was asked by the British Journal of
3 Surgery some years ago to make -- to make an
4 editorial comment on the meshes, and already
5 in this article, I mentioned that many of
6 these questions cannot be solved by these
7 clinical studies that we are used to, placing
8 the one mesh in 100 other patients as well.
9 So many of these questions cannot be solved
10 by this.
11         At that time, already I -- I
12 mentioned the problem but did not get to the
13 solution so far, but during the following
14 years, we had more and more discussions. We
15 had the discussions on the occasion of the
16 introduction of the European registries for
17 incisional hernias in this working group as
18 Professor Moysums.
19         So we have a lot of working and
20 so finally I made this general -- this
21 general concept to show the limitations of
22 randomized control trials, but in this
23 publication, there is already as a
24 consequence that we should -- that we need

Page 35

1 registries as it was in others. In the
2 manuscript for the classifications and in
3 many other manuscripts, we already indicated
4 that we need these data pools of registries.
5     Q.    What problems do you think that
6 you can address through registries that the
7 randomized control trials and clinical
8 studies do not adequately address?
9     A.    To make it short, in a
10 registry, you cannot prove the superiority of
11 a -- and that is a sentence I think I used in
12 this manuscript. You cannot prove the
13 superiority of any device because you never
14 have the absolute figures.
15     Q.    In a registry that's true or in
16 a trial?
17     A.    In a registry, you cannot prove
18 the superiority of a specific device.
19     Q.    Okay.
20     A.    It would be -- it would not be
21 correct to use this data to say this device
22 is better than the other. In a registry, it
23 is not acceptable to do so.
24         The thing that you can do with

Page 36

1 a registry is you can detect poor
2 performance. So if you have a device that
3 has significantly more complications in your
4 group than others, then you should get along
5 by this and then you have to be very careful,
6 you have to make further investigations to
7 this.
8         So detect the inferiority phase
9 with a registry, with a follow-up of all of
10 these different patients, different devices,
11 this is the only way to help you to find
12 this. And you have a more powerful
13 instrument to find mesh-related complications
14 than in a clinical study with 100 patients or
15 200 patients. You need at least 2,000, 3,000
16 patients in a clinical study to have
17 sufficient statistical power. This is the --
18     Q.    Does this study speak
19 specifically to mesh-related complications?
20     A.    Not specifically, but it
21 includes as a consequence that to address
22 these questions because you're in the -- the
23 incidence rate of mesh-related complications
24 are in a percentage where you need some big

Page 37

1 databases, some big registries and,
2 therefore, it is included. It is not only
3 addressed limited to this, no.
4     Q.    You also identified non-small
5 cell lung cancer and the value of biomarkers.
6         Did I write that down right?
7     A.    We had a study over -- it has
8 been going over years, and at the beginning,
9 we thought that you take some serological
10 biomarker and you will get a good impression
11 on the outcome of the patient, of the
12 prognosis and then we added some histological
13 markers. So we made in our lab stainings
14 with some specific cell markers and then
15 looked whether this was related to the
16 prognosis. And we took some clinical data.
17 So overall we got 34 -- 35 parameters, which
18 we wanted to correlate to the prognosis.
19     Q.    Do any of these -- strike that.
20         Does this study relate in any
21 way in the study of mesh?
22     A.    Only indirectly because it
23 showed that these only causal relationship,
24 you have one marker, one outcome. In

Page 38

1 biology, it doesn't work. It is a -- you
2 have very much interferences, crosslinks to
3 other things and --
4     Q.    Does the study attempt to make
5 an analysis of the extent to which biomarkers
6 associated with the use of mesh are
7 associated with non-small cell lung cancer?
8     A.    No, definitely not.
9     Q.    Now, the fourth one that I have
10 on my list, the fourth study you have been
11 working on is whether you can avoid
12 complications by the selection of a more
13 adequate mesh.
14         Is that correct?
15     A.    It is not a study. It's -- I
16 was asked to give a review.
17     Q.    Okay. And what are the topics
18 of the discussion in that review?
19     A.    The main fields we addressed in
20 this has been infection, it has been
21 recurrence, it has been pain, maybe it has
22 been adhesion, I think. Yeah, those are the
23 topics.
24     Q.    And -- I'm sorry.

Page 39

1     A.    Yeah.
2     Q.    Is that in the context of
3 hernia repair?
4     A.    Yes. It is the issue of
5 this -- this issue of this journal is hernia,
6 meshes in hernia. So it's a collection of
7 various aspects and one -- so several authors
8 invited to make a review to questions of
9 hernia repair.
10     Q.    Do you recommend a specific
11 mesh for the use of hernia repair in this
12 study?
13     A.    This question is too -- so we
14 wrote 28 pages there to address this
15 question, and the editor just informed us
16 that we have to shorten it by one-third so
17 next week we have to cut it down. If you
18 want -- if you ask me whether I recommended a
19 specific mesh, so the question is, is there
20 one ideal mesh, no, there isn't one ideal
21 mesh. You have to look to the various
22 indications, the various conditions of the
23 patients, various problems there. But there
24 are some -- I presented there some evidence

Page 40

1 that some things shouldn't be done, and if it
2 has been done and the complication occurs,
3 you can correct it by doing it otherwise.
4     Q.    Is the type of material one of
5 the things that you think you can choose in
6 order to reduce complications in hernia
7 surgery?
8     A.    I don't know what you are --
9 what you're thinking of when you said "type
10 of material." Of course, the characteristics
11 of the mesh is important because I was asked
12 what is the impact of the mesh there. It may
13 be the polymer, it may be the textile
14 structure, it may be the porosity, it may be,
15 it may be.
16     Q.    And without being too general
17 or simple, it's the same sort of things we
18 talked about for years and we're going to
19 talk about later today.
20         Is that fair?
21         MR. ANDERSON: Objection.
22         THE WITNESS: A lot of these
23     things we have been talking always and
24     again and again and again, yeah.

Page 41

1 QUESTIONS BY MR. THOMAS:
2     Q.    Is there anything new in this
3 article about hernia surgery and reducing
4 complications from hernia surgery that you
5 haven't written before?
6     A.    This review includes the actual
7 reference, the actual literature, that was
8 the intention by the editors. So you have to
9 check whether these opinions are based on the
10 actual literature that has been published
11 there. And I have to say, when we said that
12 heavy-weight is a high-risk product, it
13 didn't change so there is still the
14 confirmation, but now we added the recently
15 published literature of the past two, three
16 years.
17         But, yeah, they -- it was
18 always a confirmation of what we have been
19 working on for the past 20 years.
20     Q.    So is it fair to say that this
21 review article that you're working on right
22 now is a collection of work that you've
23 already done and others have done and is
24 nothing new for the literature?

Page 42

1    A.    No, that is -- that is not
2    correct.
3         First of all, it is new because
4    when we made such a review in 2005 and in
5    2013, you have other evidence, you have other
6    studies that are included that are discussed
7    there.  There are -- I didn't make a review
8    where I just copy, paste the abstract
9    conclusion there and made it there.  But you
10   have to make a synthesis of all of these
11   thoughts, you have to build up a structure to
12   present it to the reader in a reasonable form
13   and, therefore, a review is not a really
14   study coming from the lab, but it includes a
15   lot of intellectual work.  So it is new.
16        Q.    And you mentioned the article
17   in 2005.  Are you referring to your review
18   article that was talked about at length in
19   your last deposition, the review article you
20   did with Professor Klosterhalfen on the
21   light-weight, large pore concept of mesh
22   construction?  Is that what you're talking
23   about?
24        A.    Just some minutes ago I

Page 43

1    referred to the British Journal of Surgery.
2         Q.    I'm sorry.  Okay.
3         A.    British Journal of Surgery,
4    there I was invited to give a comment on the
5    medical devices and just three, four pages
6    and there -- yeah, therefore, the first time
7    I outlined that we need some further studies,
8    additional studies to understand this problem
9    to get -- we need some other data.
10        Q.    Okay.  Is the study where you
11   study whether -- strike that.
12        Is the study where you analyzed
13   whether it's necessary to make the closure of
14   a fascia in a certain hernia procedure, is
15   that a pure surgical analysis?  Or does that
16   involve mesh issues?
17        A.    I didn't get --
18        Q.    Okay.  Let me start over again.
19   I'm reading from my notes to try to remember
20   what you described one of these studies to
21   be.  And I think one of your studies is
22   whether it was necessary to make a closure of
23   the fascia in a certain hernia surgery.
24        A.    Yes.

Page 44

1         Q.    Is that correct?
2         A.    Yes, that's correct.  And just
3    to explain you, this is the question that is
4    under discussion since one, two years at
5    surgical conferences very intensely, whether
6    to -- it is necessary to make this fascia
7    closure.  This is a question in the field of
8    laparoscopic hernia repair, only in this
9    field.  In open surgery, there is no question
10   about it.  You have to make the closure of
11   the fascia.  But for the laparoscopic
12   incisional hernia repair, it is a -- still a
13   question and laparoscopic incisional hernia
14   repair always means use of mesh.
15        Q.    But does the type of mesh that
16   you use bear on the answer to that question?
17        A.    It is not specifically
18   differentiated what type of mesh you are
19   using.
20        Q.    Okay.  The next study you're
21   working on is the study with knockout mice
22   where you're studying genetics in the
23   activation of a cellular response with a
24   camera?

Page 45

1         A.    Yes.
2         Q.    And as I understood your
3    description, the use of this specific strain
4    of mice allows you to analyze the
5    inflammatory response associated with certain
6    meshes by just solely using a camera; is that
7    correct?
8         A.    Yes.
9         Q.    Okay.  Is this the first time
10   you've used this type of analysis in mice
11   with mesh?
12        A.    I think this is the first time
13   in the world that someone is using these type
14   of mice for the analysis of the local
15   inflammatory foreign body reaction.
16        Q.    Okay.  And how many mice were
17   involved?
18        A.    Overall, I think that we have
19   three different strains of mice.  We have --
20   overall, we have five different materials.
21   You have several time points.  100, 120.
22        Q.    How many different kinds of
23   mesh were used with the mice?
24        A.    We had four different meshes.

Page 46

1    Q.    And what four different meshes
2  did you test?
3    A.    As a control for a material
4  where we know that we have a significant
5  intense inflammatory reaction, we used
6  polypropylene as a --
7    Q.    Any specific polypropylene?
8    A.    It is a polypropylene -- all
9  these meshes have been provided by the FEG
10 here.
11   Q.    Okay.
12   A.    They are partner in this
13 project, official partner in this project.
14   Q.    Okay.
15   A.    So they provided this
16 polypropylene structure for us to see -- or
17 because there it is more likely to see some
18 inflammation.  We know this and, therefore,
19 we wanted to check whether this is -- whether
20 we can see a sufficient signal there, that
21 was the first question.  Is it possible to
22 see a signal there and, therefore, we took a
23 material where we know that we have an
24 intense inflammatory reaction and that was

Page 47

1  polypropylene.
2         For comparison, we immediate --
3  or in the beginning we -- that was the first
4  step in this project was to use
5  polypropylene.  Then we have to look whether
6  a signal occurs after one day, three days,
7  seven days, 11 days because we didn't know
8  when the maximum signal occurs.  That was the
9  first step to look what happens.
10        Next is when we have identified
11 that there is a signal, where is the maximum
12 of the signal that we compared it to PVDF,
13 whether there is a difference of the
14 intensity of the luminescence in all strains,
15 in which strains, at what day and so.  And
16 the subsequent step of this project was that
17 we wanted to reduce the inflammatory reaction
18 by coating and, therefore, we made a coating
19 of the PVDF mesh with a collagen spacer and
20 two drugs, one is a spironolactone and the
21 other was a steroid.
22   Q.    There's three meshes.
23        Is there a fourth mesh that you
24 tested?

Page 48

1    A.    No, it was control collagen, it
2  was coating 1, coating 2, polypropylene and
3  PVDF.
4    Q.    I see.  Thank you.
5    A.    So five, I think.
6    Q.    And did you conduct the study
7  with the knockout mice that you're describing
8  --
9    A.    Not really.  I have to correct.
10 It is not a knock out because not a gene is
11 knocked out.  It is a transgenic mice because
12 they got additionally some genes which makes
13 this luminescence.
14   Q.    Do you have a short name that
15 you give to this study that I can use?  Is it
16 the genetic study?
17   A.    It is luminescence.  What we
18 are measuring is luminescence.
19   Q.    So it's the luminescence study?
20   A.    Study.
21   Q.    For this luminescence study, is
22 this done pursuant to a grant from FEG?
23   A.    No.  It's done by grant, as I
24 told you, from North Rhine-Westphalia and the

Page 49

1  European Union.
2    Q.    But FEG supplied the materials?
3    A.    Yes.  We -- yeah.
4    Q.    Does FEG provide any financial
5  assistance to the study?
6    A.    No.  They -- I have to pay them
7  for providing these materials and for
8  providing this coating.
9    Q.    Okay.
10   A.    And the people from North
11 Rhine-Westphalia which makes the organization
12 of this grant they asked me why this is
13 necessary and whether I ask other
14 manufacturers if they can provide the
15 material cheaper, and I had to tell them
16 there aren't any other manufacturer that are
17 able to make a coating of these materials.
18   Q.    Why did you choose to study
19 PVDF?
20   A.    Since 1998, 1998, we are
21 convinced -- we are working -- we are
22 convinced that PVDF is a superior material,
23 and since 1998, I didn't saw any literature
24 convincing me from a -- or bringing me to

Page 50

1 another opinion to this and, therefore, we
2 still are convinced that PVDF is the best and
3 we want to work with the best material.
4    Q.    And are you compensated in any
5 way for the work that you're doing on the
6 luminescence study in addition to the
7 compensation you receive at the university?
8    A.    No.
9    Q.    The last study I think you
10 mentioned dealt with the German registry of
11 meshes, and you're trying to analyze the
12 impact of mesh materials and their
13 complications by data in the registry; is
14 that correct?
15    A.    Yeah.
16    Q.    Is that study underway,
17 completed?  What stage are you?
18    A.    We're at the beginning.
19    Q.    Okay.
20    A.    Professor Köckerling asked me
21 whether it is possible to do so because he
22 knows the classification and then to go
23 further on to combine this one and,
24 therefore, he asked me and I provided some

Page 51

1 steps how to make this analysis and last week
2 we was in South Africa on a conference, but
3 I'm waiting daily on his phone so that we can
4 sit together and discuss further steps.
5    Q.    And the next steps will be to
6 design the methodology for the appropriate
7 analysis of this data?
8    A.    It is -- the main step is that
9 we have to learn -- I see severe or I see
10 some difficulties to make an adequate
11 analysis of the data of a registry.  It's not
12 so simple.  We have to make some significant
13 input in this.  We have to work on it to find
14 the best way to analyze these data in
15 principle and at the occasion of these
16 specific registry in Germany for hernia.
17    Q.    Doctor, I've read some of your
18 work and the work of others on the idea of a
19 registry and one of the things that I've seen
20 is the need for some sort of identification
21 or data card.
22        Is that something that you
23 advocate for registries?
24    A.    I would prefer if you can

Page 52

1 specify what you're thinking as --
2    Q.    Some template of information
3 that comes with each hernia or mesh implant
4 so that the registry can use the data to
5 analyze the issues that you've described.
6 Did you see a need for that, a uniform
7 identity card or some sort of descriptive
8 information at the time of the implant so
9 that you can make a meaningful analysis of
10 the data at a later point?
11    A.    We had -- we're in the process
12 of discussing all of this.  We had a lot of
13 discussions about it just to give the option
14 to identify the mesh that has been implanted
15 and to place this ID card in the document, in
16 the records of the patient.  It is not -- it
17 will not help a lot.  It will make -- it is
18 already done in Germany you can -- if you
19 take the records of any patient, you can see
20 what implant has been used in this specific
21 patient.
22        This will not help to learn
23 what are the complications.
24    Q.    What do you need to add to the

Page 53

1 registry to help you learn about the
2 complications?
3    A.    First of all, I -- yeah, first
4 of all, you have to be very careful or you
5 have to define very carefully what type of a
6 parameters you're going to use to reflect the
7 specific condition of the surgeon, of the
8 patient and of the material -- of the mesh
9 material there.  So you have to define a
10 certain number of parameters and one of the
11 questions, for example, is whether you
12 include in these parameters the weight of a
13 mesh material, is it a worthful, helpful
14 information, yes or not.  Or do you have to
15 use some coating, say, light-weight below a
16 range of 35 gram or something like this.
17 There are several attempts to do so.
18        So for the organization of the
19 registry, you have to work on the parameters,
20 you have to work on the follow-up, you have
21 to provide the opportunity that when after
22 three, four years an infection occurs that it
23 is -- this information is included into the
24 registry as well.  So all this together has

1 been there and then you need some
2 mathematics, good methods to define the best
3 interpretation of this data.
4     Q.   Is the goal of your work
5 with -- is it Professor Köckerling did I
6 write that down write?
7     A.   Professor Köckerling.
8     Q.   Is the goal of your work with
9 Professor Köckerling to identify the best way
10 to gather the company data so that you can
11 make the necessary analysis to learn about
12 the complications associated with mesh?
13     A.   To go a step further on this
14 process to learn from registries and what we
15 already may learn from our present data that
16 we have.  He has already 100,000 records from
17 patients with hernia and maybe we can learn
18 something from this.  But I'm sure as science
19 usually, we have to work on it.
20     Q.   Okay.
21     A.   And it will take some time.
22     Q.   And is the goal of this study
23 to figure out the best way to make use of the
24 data that you have and to make better use of

1 the data you develop in the future?
2     A.   I think it -- I agree to this.
3 It's a dynamic process.
4     MR. THOMAS:  Let's take a
5 break.
6     MR. ANDERSON:  Okay.
7     (Off the record at 10:10 a.m.)
8 QUESTIONS BY MR. THOMAS:
9     Q.   Doctor, who is working with you
10 on the luminescence study?
11     A.   On the luminescence study, it
12 was a Dr. Fet.  She was the scientist, and it
13 was a technical assistant who made some
14 additional histological stainings because
15 afterwards when the study finished, we took
16 some tissue samples to correlate then to what
17 we have seen with the luminescence signal.
18 We have some help from the animal clinics
19 there to take care of this.  And I have to
20 add, as coauthor, there has been two guys
21 from the Institute for Anatomy, they
22 provided -- they brought these three
23 transgenic mice to Aachen and, therefore,
24 this was their technology to make this

1 measurement of the luminescence there, and in
2 collaboration we were able to use their mice
3 and their technology to make this light
4 analysis there.
5     Q.   Who designed the luminescence
6 study?
7     A.   Mainly it is my -- it has been
8 my idea to do this and to use these mice and
9 then for the -- all of the details, we all
10 together discussed it with all of the
11 participants there.
12     Q.   And the coauthors who supplied
13 the mice, what are their names?
14     A.   Wruck, W-r-u-c-k, is one, and
15 the other one is Pufe, P-u-f-e.
16     Q.   And what are their specialties
17 or disciplines?
18     A.   Professor Pufe is head of an
19 Institute for Anatomy and Dr. Wruck is one of
20 his coworkers in this institute.
21     Q.   Okay.
22     A.   And they are dealing with
23 molecule or changes in cells.
24     Q.   As you probably know, earlier

1 this week, I had the opportunity to talk to
2 Dr. Klosterhalfen for a couple of days.
3     A.   Yes.
4     Q.   Have you spoken to
5 Dr. Klosterhalfen about his deposition?
6     A.   No.
7     Q.   During his deposition,
8 Dr. Klosterhalfen said that the FEG is
9 working on a new mesh for the use in the
10 pelvic floor.
11     Are you familiar with the FEG's
12 project for a new mesh in the pelvic floor?
13     A.   I am familiar with some idea,
14 some projects they are working on and -- but
15 not in the details of these projects.  I am
16 basically informed about the projects we
17 still have together so.
18     Q.   What projects do you still have
19 with FEG today?
20     A.   We have mainly, apart from this
21 project with the luminescence mice where we
22 did not apply for this grant together, but we
23 have two projects that we have been working
24 on that are granted.  The first project is

Page 58

1  dealing with -- to allow the mesh to be
2  detected in the magnetic resonance imaging,
3  the MRI, and, therefore, we included some
4  feral particle into -- during the extrusion
5  of the filament, that it's necessary to do it
6  during the extrusion of the filaments, these
7  particles are added there and then these
8  fibers are used for mesh construction and
9  then these meshes can be visualized in
10  human -- in living -- in living -- not
11  things. In living animals or humans. In
12  vivo so you can see it.
13       This visualization, there are a
14  couple of following projects looking to what
15  happens to the meshes after implantation by
16  use of this one. This is one.
17       Q.    What's the benefit of being
18  able to see the mesh in vivo with these iron
19  particles?
20       A.    It is enormous.
21       So, first of all, if you
22  want -- some of these advantages are if you
23  have a complication, if you have a
24  recurrence, if you have an infection or so,

Page 59

1  up to now you're forced to make a surgical
2  revision because there is no good way to
3  visualize the mesh, what happens to the mesh.
4  So in case of any complications, you can
5  verify whether there's a correct position of
6  the mesh device.
7       Second is if you made an
8  implantation there and you have the feeling
9  that it's okay during the operation, we
10  usually have the feeling that it is okay when
11  we left the OR, and then you make an MRI two
12  days later, sometimes you will be surprised
13  what happens to the device there. Where the
14  configuration changes, we are -- meanwhile we
15  are even able to identify the pores.
16       So it helps a lot to get an
17  impression what happens to the device, to the
18  three-dimensional configuration of the device
19  after use in humans. Even you can objectify
20  shrinkage, degree, extents of shrinkage,
21  extent of migration after some time.
22       So we are convinced that it is
23  a very important step, first of all, for
24  the quality control of our surgery, that it

Page 60

1  helps for the diagnosis of complication and
2  for the development of meshes, it will be
3  very, very, very helpful. This is one.
4       Q.    What's the other project you're
5  working on?
6       A.    The other project is together
7  with the institute for textile technique and
8  with the radiology and with the animal clinic
9  it is the question whether it is possible to
10  use elastic polymers for the use of
11  constructions. Mainly if you have the
12  problem that it is not tension free, there is
13  tension, there are some forces, you need some
14  elasticity, some stretchability. We -- yeah.
15  We can discuss all of these problems in
16  detail, I'm sure we will do so.
17       But the question is whether it
18  is possible to use an elastic polymer for the
19  construction of a mesh and to get first ideas
20  what happens when using them in tissue.
21       Q.    In the projects that you've
22  worked on the last year for FEG, who is the
23  primary contact that you've had there?
24       A.    There is always -- for both of

Page 61

1  these projects, there are mainly three, four
2  people that are working in the FEG mainly on
3  these projects. It is a very small company
4  so it doesn't have the --
5       Q.    Who are they?
6       A.    Dr. Mullen always,
7  Dr. Obolensky, these are the two that are
8  frequently involved, and there is Mr. Glazer,
9  one again, and -- yeah.
10       Q.    In the last year, have you had
11  occasion to meet at FEG along with
12  Dr. Klosterhalfen to discuss FEG projects?
13       A.    In the last year, it was
14  Klosterhalfen at the FEG together. I really
15  cannot remember. The year before we have
16  several meetings there, I know, at the
17  occasion of this video film, but last year it
18  is not -- Klosterhalfen is so busy in his
19  institute and I'm busy with my university, I
20  cannot remember that we met there.
21       Q.    Okay. Did you talk on a
22  conference call with the people at FEG and
23  yourself and Professor Klosterhalfen about
24  issues that you were analyzing for FEG?

Page 62

1    MR. ANDERSON:  In the last
2  year?
3    MR. THOMAS:  In the last year.
4    MR. ANDERSON:  Thanks.
5    THE WITNESS:  Do you mean
6  that -- sorry, maybe I didn't
7  understand.
8    Was it -- did I meet with
9  Klosterhalfen or the FEG or did you
10  think of meetings where we all are
11  together at one place?
12  QUESTIONS BY MR. THOMAS:
13    Q.   Either together in one place or
14  on the telephone together.  Either one.
15    A.    With Klosterhalfen sometimes
16  depending on the data we got from the
17  projects, at least every two weeks, once a
18  month we had some phone calls, some exchange,
19  sometimes I'm driving to Düren.  It is -- no,
20  he never came to the university so I usually
21  go over there to him or at his home place
22  here and there we discussed it or during the
23  meetings.  So he took me to the -- so he
24  brought me to the conference to Professor

Page 63

1  Yaeger so we had two hours time to discuss
2  all of this.
3    With the FEG, I think -- or if
4  I estimate, there are two times a week --
5  yeah, two times a week we have some short
6  communications.  We regularly -- in these
7  projects, we have learned that it is
8  necessary to have regular meetings to make
9  protocol, you have to define some problems
10  and you have to define the question that have
11  to be addressed.  So there are regularly
12  meetings once a month for each of these
13  projects.
14    Q.   Okay.
15    A.   Usually at the university.
16    Q.   And so you have meetings once a
17  month and you talk to them about twice a week
18  about the project on the --
19    A.   Depends.  Sometimes four weeks
20  not, but some -- yeah.
21    Q.   Okay.
22    A.   Usually it's -- there is
23  something that has to be discussed.
24    Q.   Okay.  Now, Professor

Page 64

1  Klosterhalfen told us this weekend about a
2  video that he uses in his presentations.
3    Did you assist in the
4  preparation of that video?
5    A.    Yes.  Yes.  It was -- it is the
6  idea mainly behind -- I was just contacted
7  by, I think, Dr. Obolensky that they wanted
8  to visualize the slides that Bernd created.
9  You know it, it was used by Ethicon as well,
10  where the macrophages are sitting to the
11  cells and what happens during the foreign
12  body reaction.
13    So he made -- he prepared, I
14  think, about 2000 or even maybe before he
15  prepared these slides with PowerPoint to
16  illustrate what happens during the start of
17  the foreign body reaction.  And a lot of
18  people -- it was difficult to explain it to
19  surgeons and, therefore, the idea was to make
20  a short film there, and there was a small
21  company here in Aachen that offered this
22  opportunity and this was the first time to
23  try to realize to make a film showing the
24  foreign body reaction.  And the film people

Page 65

1  doesn't know what is a cell.
2    They looked at Google images,
3  but it was very difficult for them to get the
4  information what happens there.
5  Dr. Obolensky is an engineer.  The question
6  what is a size of the macrophage, what is the
7  size of the morphology of a fiber blast, it's
8  too much for them, and, therefore, he needs
9  to -- that we have to define some
10  measurements and that we have to check
11  whether this was correct what was shown and,
12  therefore, we had some meetings looking to
13  ten seconds of a video sitting there and
14  discussing one hour for ten seconds.  It
15  was -- yeah, but it was -- afterwards we were
16  very satisfied because then we can use some
17  parts just to illustrate what happens there.
18    Q.   Do you use the video in your
19  presentations?
20    A.    Sometimes.  Sometimes -- when I
21  was asked to give a presentation to explain
22  foreign body reaction, it is very helpful to
23  take a sequence of one minute there and to
24  explain it to the people.  It is very helpful

1  for them.
2      Q.    What contribution did you have
3  to the film other than the meetings that
4  you've described?
5      A.    Contributions?  When are you
6  thinking of?
7      Q.    Are you part of the film?
8      A.    I'm -- there are only cells on
9  the film so --
10      Q.    I've not seen it.
11      A.    I'm not part of the film.
12      Q.    Not your cells?
13      A.    No.  It's all -- it's all in
14  animation.  There is no real cell there.
15      Q.    Okay.  Who prepared the
16  animation?
17      A.    It's a company here.  A small
18  two guys here trying to survive in this
19  society here.
20      Q.    So just trying to understand,
21  you provided information to this company,
22  they worked on this animation?
23      A.    Yes.
24      Q.    And then you and Professor

1  Klosterhalfen reviewed what they did and
2  changed it as necessary so it was a fair
3  preparation of what you're trying to show.
4      Is that fair?
5      A.    That -- I think that is
6  correct, yeah.
7      Q.    All right.
8      A.    So we sometimes, just as an
9  example, we have to enhance the size of some
10  cell and put it lower than and to say that
11  the vessels are coming after day seven and
12  not after -- so all of these details are
13  coming from both of us.
14      Q.    And this is an animation, I
15  think you said?
16      A.    If animation is a correct word.
17  It's just computer work.
18      Q.    I've not seen it.  That's why I
19  don't know.  I didn't know if you were in it
20  and holding things up or what.  So that --
21      A.    Yeah, but I think it's free.
22  Everyone can look at it.
23      Q.    I guess we'll see.
24      How much time did you spend

1  working on the film?
2      A.    Maybe it was five sessions.
3      Q.    Okay.  You've had a busy year.
4      Have you done anything else
5  professionally of significance -- I'm just
6  trying to think of big things that you've
7  done in the last year, other than the things
8  that you've described to me in the last
9  little bit of time.
10      A.    I'm in the review board for the
11  university to -- we have an internal grant
12  system where we got a lot of applications,
13  and I'm in the group that has to review these
14  grants.  So this takes some time.  I have to
15  pass exam, so when finishing the medical
16  studies, you have to pass a final exam there,
17  and I have a group or I'm leader of a group
18  for making this exam.  This is two times a
19  year I have to do so.  This takes some time.
20      Q.    Okay.
21      A.    I have to review a lot.  It
22  takes time to review other -- for other
23  journals and so...
24      Q.    How much time did you spend

1  preparing your report in this case?
2      MR. ANDERSON:  Would you want
3  this?
4      MR. THOMAS:  That would be
5  great.
6      (Klinge Exhibit 1 marked for
7  identification.)
8      MR. ANDERSON:  And that's
9  just I'm handing you his invoice
10  that's up through the end of October
11  31.
12  QUESTIONS BY MR. THOMAS:
13      Q.    Okay.  Doctor, I've handed you
14  what's been marked as Deposition Exhibit
15  Number 1, Klinge Deposition Exhibit Number 1.
16  Mr. Anderson just gave this to me.  This is
17  an invoice that you sent to Mr. Anderson for
18  the time that you've spent in this matter; is
19  that correct?
20      A.    Yeah.
21      Q.    Now, does Exhibit Number 1
22  cover the time that you've spent on this
23  matter learning the information that you've
24  been provided and preparing your expert

Page 70

1  report?
2     A.   Yes.
3     Q.   Does it include any time
4  preparing for this deposition?
5        MR. ANDERSON:  It just goes
6     through October.
7        THE WITNESS:  So we met here
8     Tuesday, Wednesday so this is not
9     included in that.
10 QUESTIONS BY MR. THOMAS:
11    Q.   Okay.  And so the time that
12 you've spent in November has been the time
13 that you've spent with counsel preparing for
14 your deposition?
15    A.   Yes.
16    Q.   And you've met on Tuesday and
17 Wednesday to prepare for the deposition?
18    A.   Yes.
19    Q.   How much time did you spend on
20 Tuesday?
21       MR. ANDERSON:  You need to see
22    this over there?
23       MR. THOMAS:  Pardon me?
24       MR. ANDERSON:  Do you need to

Page 71

1     look at this --
2        MR. THOMAS:  I am sorry, I just
3     wanted him to have it.
4        MR. ANDERSON:  No problem.
5        THE WITNESS:  About six hours.
6  QUESTIONS BY MR. THOMAS:
7     Q.   Each day?
8     A.   Each day.
9     Q.   Okay.  And you continue to
10 charge at the rate of $500 an hour?
11    A.   Yes.
12    Q.   Why do you laugh?
13    A.   Yeah, it's an interesting
14 question, yeah.  I have to think about it.
15    Q.   I don't understand.
16       MR. ANDERSON:  Maybe he's going
17    to change his bill after today.  Maybe
18    he'll --
19       THE WITNESS:  It's a good idea.
20    Thank you.
21       MR. ANDERSON:  I think he
22    interpreted it, "Are you going to
23    continue to bill at $500 an hour," and
24    he's like, "Oh, good idea, maybe I

Page 72

1     should charge more."  That was the --
2     just teasing with you.
3  QUESTIONS BY MR. THOMAS:
4     Q.   Is your salary at the
5  university the same as it was last year?
6     A.   We have a small increase.
7  Annually we have a small increase to this,
8  but roughly, it's in this range.
9     Q.   Okay.  Doctor, as a part of the
10 deposition in this case you were asked to
11 collect a bunch of documents.
12       What did you do to collect the
13 documents that you have concerning your
14 relationship with Ethicon?
15       MR. ANDERSON:  And, Counsel, if
16    I could just help address that with
17    you.  So very similar to the way
18    that -- in response to the request
19    that you had served and then with the
20    multiple hearings with Judge Eifert,
21    as we did with Dr. Klosterhalfen, we
22    asked Dr. Klinge to try to go back and
23    recover any documents that he had
24    going back through his relationship

Page 73

1     with Ethicon into the '90s.  And so he
2  made a reasonable, diligent effort to
3  try to get as many of those as he
4  could, and as you know, we produced
5  thousands of pages of documents in
6  that regard.
7        In preparing him in talking
8  about hard copies and things like
9  that, he said there may be old hard
10 copies somewhere at the hospital.  So
11 that was new information, he hadn't
12 thought of it, so Mr. Thornburg went
13 with him to the hospital and, in fact,
14 there are some old paper copies as
15 they dug through his information.  We
16 got those yesterday.  We sent them to
17 a copy center hoping that -- realizing
18 you wouldn't have a chance to look at
19 them, but at least to say in an effort
20 to make sure we unturned every stone
21 just like your team is trying to do
22 over here with all of the hernia
23 productions that have been rolled out,
24 we wanted to make sure that we tried

1  to capture everything for you.
2      Unlike maybe a Kinko's what
3  we're used to, they said it would take
4  until Saturday to get these documents
5  produced for us.  So they're in
6  German.  They go back to, like, VYPRO
7  and things like that.  But certainly
8  we will -- when we get those copies,
9  we're going to send them to you.  If
10  in looking at those -- I mean, I don't
11  think that they're going to provide
12  you with some significant level of new
13  information beyond the -- it's my
14  impression -- that they won't provide
15  you with any significant level of
16  information beyond all of the things
17  that he's produced thus far.
18      However, if in looking at
19  those, you determine that there's,
20  "Boy, those were -- there's a couple
21  of burning issues in there and had I
22  had them before, I certainly would
23  have liked to have asked him some
24  questions on it," then you and I can

1  speak about that once you've had an
2  opportunity to look at them and we'll
3  come up with a fair and reasonable
4  approach to allow you to do what you
5  need to as you see fit, if, in fact,
6  there is any more information.
7      Is that fair?
8      MR. THOMAS:  Sure.
9      MR. ANDERSON:  Okay.
10      MR. THOMAS:  I appreciate it.
11      MR. ANDERSON:  Sure.
12  QUESTIONS BY MR. THOMAS:
13      Q.  What is the volume of
14  additional documents that you found in the
15  last couple of days?
16      A.  The value?
17      Q.  Well, how many?
18      MR. ANDERSON:  I would say
19  hundreds of pages, not thousands.
20  Maybe a few hundred in looking at
21  maybe this.  Maybe that.
22  QUESTIONS BY MR. THOMAS:
23      Q.  What kinds of documents did you
24  retrieve from the hospital in the last couple

1  of days?
2      A.  We started to work in this
3  field in 1994 and this was a time without
4  internet.  I was one of the first who has a
5  computer so I had these big floppies from IBM
6  and so no one is able to read them any
7  longer.
8      But at that time, we had some
9  paperwork.  Then it started with e-mail, I
10  think, in 1998 or so that we started to make
11  these e-mails, sometimes a copy/paste there,
12  and we have to switch all of these e-mail
13  accounts a little bit.
14      So all of these documents are
15  some incomplete printouts of this time period
16  in this field.  Something has to do with the
17  VYPRO -- international VYPRO study where we
18  produced some hard copies.  But all in all,
19  these are documents where I'm sure that we
20  have shared them with the people from
21  Norderstedt, Ethicon Norderstedt.  I'm -- I
22  don't expect that there is any page there
23  that is not known by Dr. Engel, Dr. Holste
24  and these guys.

1      Q.  Okay.  Doctor, when you
2  conducted your search the first time, where
3  did you look for documents?
4      A.  Mainly, I have been looking on
5  my computer.
6      Q.  How old is your computer?  How
7  long have you had it?
8      A.  The last critical crash I had
9  in 2000 where I lost some data and the next
10  disappointing experience was when we had
11  to -- when I had to change from Netscape to
12  Outlook.  So the e-mails until 2005, I lost
13  several of them.  I could recover some of
14  them, and for some times they are doubled or
15  three times on the computer because I never
16  worked on it to make a chronic {sic} of the
17  e-mails at that time.
18      Q.  So do you feel like you
19  captured all of the documents that you had on
20  your computer back to 2005?
21      A.  Even longer.  There are some
22  documents, some manuscripts, some e-mails,
23  some attachments that are from the time
24  period before.

Page 78

1  Q.  I understand that.
2  A.  Some sheets --
3  Q.  I guess I'm trying to break it
4  down.  I thought I understood you to say the
5  last computer problem you had was 2005.
6  So are you pretty confident
7  that what you gathered from 2005 forward is a
8  complete set of the documents that you have?
9  A.  I was asked to send you all
10  documents for the time period when I was
11  consulting or were in direct --
12  Q.  I understand that.  And I think
13  you've told me --
14  A.  You always --
15  Q.  For the period 2000 to 2005,
16  you've done your best, from the period of
17  2000 to 2005, there may be some documents
18  that were lost in the changeover of your
19  computer system, is that fair?
20  A.  I cannot exclude that some of
21  the e-mails, mainly e-mails, are lost.
22  Q.  And prior to 2000, there were
23  other documents that you had a computer
24  problem in 2000, you may have lost some

Page 79

1  documents with your computer problems in
2  2000.
3  Is that fair?
4  A.  Yes.
5  Q.  Okay.  So you made your best
6  efforts to recover whatever computer
7  documents that you have stored on your
8  current computer, correct?
9  A.  Yes.
10  Q.  You've already described or
11  Mr. Anderson has described efforts that you
12  made to find hard copies that exist at the
13  hospital.
14  Do you have any hard copies in
15  your possession either in your home or your
16  office that you haven't produced in this
17  litigation?
18  A.  No.  They remind me to have
19  another look to all of these documents.  They
20  are in my trunk.
21  MR. ANDERSON:  Cabinet.
22  THE WITNESS:  Cabinet.  They're
23  very back with the dust of ten
24  centimeters on top, and so we worked

Page 80

1  on it and to find it and you get it.
2  QUESTIONS BY MR. THOMAS:
3  Q.  Okay.
4  A.  And I'm sure you will be happy
5  with it.
6  Q.  Somebody will.
7  Doctor, I have tried to
8  identify the documents that have been
9  produced to me in German.  I need your help.
10  A.  Was it a sharp decision for the
11  US to talk -- that your language is English?
12  I've learned the history.
13  Q.  You know what, that's one
14  decision I have no responsibility for.  It's
15  not my fault.
16  A.  Yes.  Of course, but looking
17  backwards it may be a disadvantage.
18  Q.  Some people may think so.
19  A.  For you.  For your specific
20  condition in this specific location.
21  Q.  Today.
22  A.  Today.  That's correct.
23  Q.  Wait until next week.
24  A.  Please mark that we are in

Page 81

1  agreement, in full agreement.
2  Q.  Doctor, I agree with you more
3  than you know.
4  (Klinge Exhibit 2 marked for
5  identification.)
6  QUESTIONS BY MR. THOMAS:
7  Q.  Let me show you Deposition
8  Exhibit Number 2.
9  What is Deposition Exhibit
10  Number 2?
11  A.  That is a draft of a contract
12  between Ethicon Hamburg and the university,
13  in particular, the surgical department there.
14  It is not the first one.  It is a -- one of
15  the subsequent proposals, contracts there.
16  This is the official contract between Ethicon
17  and the surgical department, and there is
18  mentioned what has to be done by the surgical
19  department.
20  So on page 2, for example, you
21  have to optimize mesh structures as hernia
22  device on basis of large pore meshes.  So
23  we're asked to do so.  We should do -- use
24  long-term absorbable materials for the use in

Page 82

1  pediatric surgery. We should look at mesh
2  materials for antimicrobial effectivity
3  there, and we should look or develop meshes
4  for temporary closures of the abdominal wall.
5  And there has been to each of these points,
6  there has been some specifically proposals,
7  projects by some of my colleagues. And you
8  see later on at A, at B, there are some more
9  details to these projects, but during the
10  following years, this is -- try to realize
11  all of these working projects.
12       And there are others
13  conditions. The costs. So the money that
14  Ethicon prepared there. It's listed on here.
15  It's 100,021 -- 120,000 Euros per year for
16  three years, and it is arranged a
17  confidence -- a level of confidence and it is
18  fixed what happens to patents and so on.
19       That is standard -- a routine,
20  not a standard, maybe I've learned that there
21  is a difference in the meaning. It's a
22  routine form that has been arranged in
23  agreement with the administration at our
24  university.

Page 83

1       Q.    You told me that Exhibit 2 was
2  a draft contract.
3       When was this draft discussed,
4  if you remember?
5       A.    It should be 2001 to 2002.
6       Q.    Was there ultimately a final
7  contract signed by the parties that people
8  agreed to?
9       A.    Yes.
10       If you look to my reports,
11  somewhere there is listed of the projects
12  with external financiation, and there I have
13  listed in a table the project that have been
14  done with Ethicon. And there you can find
15  when this project started and, therefore,
16  there will be a definitive contract. One --
17  one will be at the administration, one is in
18  the hands of Professor Schumpelick and one
19  will be at Hamburg Norderstedt.
20       Q.    Do you have a final --
21       A.    No.
22       Q.    Let me finish my question.
23       Do you have a final copy of the
24  draft contract which is Exhibit 2? Do you

Page 84

1  have a final signed copy of that agreement?
2       A.    A final of the draft copy?
3       Q.    That's a bad question.
4       A.    Yeah.
5       Q.    Do you have the document that
6  resulted from Exhibit 2 that the parties
7  ultimately signed as a contract?
8       A.    No.
9       Q.    Thank you.
10       During the time that you had a
11  research relationship with Ethicon, was it
12  your understanding that Ethicon and the
13  clinic had a contract that governed their
14  relationship?
15       MR. ANDERSON: Objection.
16       Go ahead.
17       THE WITNESS: I know from the
18  first contract in '94, that there
19  is -- that there has to be and that
20  there is an official contract when
21  industry wants to make research with
22  the university and this has to be
23  officially checked by the
24  administration there and, yeah, and I

Page 85

1  know that this happens and it has to
2  be signed by the head of the
3  university and it has to be signed by
4  the head of the surgical department
5  and it has to be signed by Ethicon.
6  QUESTIONS BY MR. THOMAS:
7       Q.    Okay.
8       A.    Not by me.
9       Q.    But whatever those contracts
10  are, you don't have copies of the signed
11  versions; is that true?
12       A.    I don't have copies of it, but
13  I know -- I have seen at that time the final
14  version that they exist, yes.
15       Q.    Okay.
16       A.    Because I had to send them and
17  to bring them.
18       Q.    You had to bring them?
19       A.    I brought them to the
20  administration and to Schumpelick and had to
21  take care that they are signed and --
22       Q.    If you wanted to get a copy of
23  that signed contract at the hospital, do you
24  know where to go get it?

Page 86

1    A.    I know where to ask for it.  I
2  have some doubts because the head of the
3  surgical department changed so a lot of these
4  older documents will be somewhere at
5  someplace.  Probably I would first ask the
6  people in Hamburg Norderstedt.
7          (Klinge Exhibit 3 marked for
8      identification.)
9  QUESTIONS BY MR. THOMAS:
10    Q.    Let me hand you now what I've
11  marked as Deposition Exhibit Number 3.
12          What is Deposition Exhibit
13  Number 3?
14    A.    If you have a project with
15  industry and you have this research contract,
16  then it is clear that the industry or that
17  the supporter or whatever it is, that they
18  provide some resources, some money for these
19  studies and the administration needs to place
20  the money somewhere and, therefore, it is --
21  they need an announcement of this third-party
22  project and this is the announcement of a
23  specific study we did with Ethicon that is
24  the closure of laparotomy with a panicle

Page 87

1  suture.  It has been a prospective randomized
2  trial that we performed for Ethicon
3  Norderstedt in the time from 1997 to 1999 and
4  so we -- there is, of course, some of this
5  research contract and this additionally is
6  the announcement for the administration.
7    Q.    Okay.  So is the money in
8  Exhibit 3 for this specific project in
9  addition to the money that Ethicon paid to
10  the clinic?
11    A.    Yes.
12    Q.    Thank you.
13          So at this time, Ethicon
14  provided money to the clinic on a yearly
15  basis in a flat sum and then paid additional
16  sums for work that was outside the contract;
17  is that right?  Is that correct?
18    A.    Outside of this contract, but
19  it is always covered by some contract.  But
20  there has been some additional contracts,
21  some overlapping periods of some different
22  projects.
23          (Klinge Exhibit 4 marked for
24      identification.)

Page 88

1  QUESTIONS BY MR. THOMAS:
2    Q.    Doctor, I've handed you now
3  what's been marked as Deposition Exhibit
4  Number 4.
5          What is Exhibit 4?
6    A.    It is an agreement for
7  confidence that we -- yeah.  To be confident
8  about -- yeah.  Confidence agreement, I think
9  that is --
10    Q.    Confidentiality agreement?
11    A.    Yeah.
12    Q.    Okay.  And this obviously was a
13  draft document.
14          Was this document ever
15  finalized and signed?
16    A.    I'm sure it will because the
17  people in Hamburg, they are very careful to
18  have this back in a signed version.
19    Q.    When -- what's the date when
20  this negotiation of this draft document was
21  going on?
22    A.    I think this is just
23  restricted -- I have -- I have got an
24  invitation to go to Hamburg in a working

Page 89

1  group there, and I was asked to present the
2  results of our studies there and discussed
3  with some people from R&D, and I remember
4  there has been someone from the US as well
5  and I -- I remember -- if I look to the last
6  page, it is on the occasion of a meeting for
7  developing of new meshes there.  Just for
8  this meeting.  This is just restricted a
9  confidentiality for this specific meeting
10  there.
11    Q.    Okay.
12    A.    But I don't remember any more
13  details.
14    Q.    Do you know when?
15    A.    Maybe around 2000.
16    Q.    Is that all that you remember
17  about this document?
18    A.    Yes, we -- there are so many
19  documents about confidentiality agreement
20  and --
21    Q.    I understand.  And I'm doing
22  the best I can, too, because I have no idea
23  what I'm looking at.  This is my bad day, you
24  told me.

Page 90

1    A.    No.  No.  No.  Definitely not.
2         (Klinge Exhibit 5 marked for
3    identification.)
4    QUESTIONS BY MR. THOMAS:
5         Q.    Doctor, let me show you what
6    I've marked as Deposition Exhibit Number 5.
7         What is Deposition Exhibit
8    Number 5?
9         A.    That is a contract between
10   Ethicon and me.  There has been in the time
11   period of 2000.  2000, there has been a
12   discussion whether it is possible or
13   necessary that me and, in particularly,
14   Professor Klosterhalfen get some further
15   support to keep on our working.  And then all
16   of the money went directly to the university
17   or to the surgical department or whatever.
18   So in 2000, there was a discussion that we
19   would like to participate a little bit when
20   we are asked to spend so much effort and time
21   in these developments, and we got a draft
22   from Ethicon Norderstedt that they offered to
23   us for the time period of five years
24   royalties of .5 percent.  And they offered

Page 91

1    this with some additional remarks about the
2    patents and some restrictions of what is
3    allowed and what is not allowed and so this
4    was -- this is the draft of it.
5         Q.    Do you know whether this is the
6    document that you finally signed?
7         A.    I have no doubt that this is
8    the one.
9         Q.    It is or it is not?
10        A.    Otherwise there should be draft
11   on it.
12        Q.    I don't have a signed copy of
13   it.
14        A.    It is not a copy where I signed
15   it.
16        Q.    Okay.
17        A.    So --
18        Q.    At some point in time, do you
19   recall signing a document like Exhibit 5?
20        A.    Yes.  Yes.
21        Q.    Did you retain --
22        A.    I have no doubt that this is
23   the one we signed.
24        Q.    Okay.  I don't want you to read

Page 92

1    it word for word for me, but just tell me
2    what each category speaks to, please.
3         A.    First of all, here -- so what
4    may be interesting for you, they refer to
5    a -- to ongoing research activities with the
6    technical university starting in July 1995
7    for them, that is the first sentence.
8         Second sentence is they mention
9    that they already had -- were the owner of
10   all relevant patents in this -- in this
11   field.
12        Q.    And we're referring now
13   specifically to VYPRO?
14        A.    They don't -- they just said
15   they have all rights at the invention related
16   to this topic.
17        Q.    Okay.  That's fine.
18        A.    There's no specifically that
19   there is a VYPRO patent or not.
20        The next is that both partners
21   have worked on it and has introduced some
22   efforts to this.  And the agreement they said
23   that -- the partner agreed that they will
24   contribute some knowledge for the development

Page 93

1    in these -- in these projects.  That the
2    partners -- if Ethicon want to know
3    something, that the partner said, I will give
4    you the answer to this and will help you to
5    answer it.
6         And there is in point 1.3,
7    there is a sentence that the partner, that
8    makes me, that we never will claim afterwards
9    whether my name should have been included in
10   the patent.
11        Q.    I see.
12        A.    This is a very tricky
13   situation.  I'm not expert in German
14   international patent laws, but the fact is
15   that the VYPRO patent for Europe and for the
16   US, they included a lot of these phrases that
17   we produced, but we are not named as an
18   inventor in these.  And this may be
19   disputable, but we agreed in this -- I'm not
20   sure whether the limitation of this contract
21   for five years means that we are not allowed
22   to claim this within the five years or
23   whether we have to accept it lifelong.  So
24   I'm not sure.

Page 94

1    Q.    Okay.
2    A.    But this is the --
3    Q.    Does the next section --
4    A.    Compensation is €120,000 and
5  then for five years, we got royalties. So
6  this is the right of 1.5 percent.
7    Q.    1.5 percent of what?
8    A.    Of the internal -- the internal
9  costs, not without the -- so the value of the
10 meshes they sold in this time period.
11   Q.    Okay. For all meshes?
12   A.    It is not specified here. It
13 is not specified. So later on, I know that
14 it -- that they took the VYPRO, but they took
15 as well VYPRO II and ULTRAPRO™.
16   Q.    Okay. So you --
17   A.    It is not limited to VYPRO.
18   Q.    So you had VYPRO I, VYPRO II
19 and ULTRAPRO™ for which you were paid
20 royalties?
21   A.    Yes.
22   Q.    Okay.
23   A.    So this was what I learned from
24 the letters I got from Ethicon.

Page 95

1    Q.    Okay. Is that pretty much the
2  substance of this contract?
3         Is there anything else of
4  significance to you in the contract?
5    A.    Yeah, I think that is -- and
6  I'm not -- I'm not allowed to talk to anyone
7  else about this agreement. So -- but I was
8  told that Ethicon asked for this agreement
9  and, therefore, I provided it, but otherwise,
10 I would -- I don't hope that I will get in
11 conflict by someone else because I open it to
12 a third --
13   Q.    You won't. We arranged that.
14   A.    Okay. Please --
15   Q.    She takes down every word, and
16 she's very good.
17   A.    That is so fine.
18   Q.    Now, I understand from your
19 last deposition, I don't want to replow this
20 ground, but sometime in 2005, there was a
21 discussion about negotiating a new contract?
22   A.    Yes.
23   Q.    Did you produce any draft
24 contracts to me --

Page 96

1    A.    Yes. There is a draft.
2    Q.    Maybe this is it.
3         (Klinge Exhibit 6 marked for
4  identification.)
5  QUESTIONS BY MR. THOMAS:
6    Q.    Let me show you what I've
7  marked as Deposition Exhibit Number 6.
8         What is Deposition Exhibit
9  Number 6?
10   A.    This is a -- so after the
11 first -- after this contract stopped in 2005,
12 then we had some discussions how to continue
13 our collaboration, our work, and this was
14 provided in 2009. It was a draft of a
15 possible contract consulting agreement, how
16 to make the further collaboration.
17   Q.    Now, last time we were
18 together, you testified that the reason why
19 you weren't interested in the contract was
20 because Ethicon would not allow you to work
21 with other manufacturers, that's what I
22 recall.
23         Is that right?
24   A.    That is -- that is one aspect

Page 97

1  of this.
2    Q.    Okay.
3    A.    There are several arguments and
4  there are always some pros and some cons, but
5  overall, it is just consulting. It is some
6  money for some time period where you were
7  asked and this to the prize that you're not
8  allowed to do any other work there.
9    Q.    Okay.
10   A.    And I'm not interested in being
11 a tester for devices or a consulter, just
12 being consulting. I wanted to work on it.
13        This would mean when I sign
14 this, I may earn some money for some
15 consulting activities, but I'm limited in my
16 scientific work. And there's no option to
17 work scientifically in some projects. That
18 was not included in this and that is my major
19 criticism to this.
20   Q.    Exhibit 6 was a document that
21 you produced to us.
22        Is that the only draft that you
23 were able to find?
24   A.    I'm sure that in the documents

Prof. Dr. Med Uwe Klinge

Page 98

1  I sent you there are several versions of this
2  draft because there are some comments. It
3  has to be checked by the administration, by
4  the legal offices in the administration at
5  the university hospital as well. So there
6  was a little bit attempt to improve it, but
7  finally it was not acceptable by me.
8      Q.   Is it your recollection in the
9  documents that you produced to counsel that
10 were given to us that there should be more
11 versions than just Exhibit 6?
12     A.   Here you see there are some
13 corrections.
14     Q.   Yeah.
15     A.   Some comments.
16     Q.   My question is really a very
17 simple one, and I don't mean to interrupt
18 you.
19         Do you think there's more than
20 one draft of the contract in the documents
21 that you gave Mr. Anderson?
22     A.   I would expect there's some
23 version, at least the original version
24 without these comments there. I would expect

Page 99

1  that.
2      Q.   There very well may be.
3         For Exhibit Number 5, who at
4  Ethicon did you deal with to negotiate this
5  contract?
6      MR. ANDERSON:  Objection.
7  Form.
8      THE WITNESS:  The two people at
9  that time that was Dr. Engel, he was
10 the head of the R&D in Ethicon
11 Norderstedt, and the man finally
12 signed was Dr. Schmitt. He was the
13 head of Ethicon Norderstedt at that
14 time. But the e-mails, communication,
15 they were done with the head of the
16 R&D department. I'm not sure whether
17 it was Dr. Engel or Dr. Hoepffner.
18 Dr. Hoepffner was the predecessor
19 before Dr. Engel. There was
20 Dr. Hoepffner. If this is -- the time
21 already with Dr. Engel, I assume it
22 is. So these are the two.
23     Q.   Who within the Aachen group
24 received a contract like this to share in the

Page 100

1  royalties from the sale of Ethicon meshes?
2      A.   It is -- such a contract was
3  given only to Professor Klosterhalfen and me.
4      Q.   Do you know whether Professor
5  Schumpelick received any kind of contract?
6      A.   I know that he has some
7  contract either or the time before. When it
8  start, I don't know, but I know that he has a
9  specific contract there, and at that time, it
10 was told that it's about two percent.
11     Q.   Did you know that at the time
12 that you were negotiating this contract with
13 Ethicon in 2000 that Professor Schumpelick
14 was receiving two percent of sales?
15     A.   We had the knowledge. We
16 didn't see the contract, but we had the
17 knowledge that he got some royalties for all
18 of the work, yeah.
19     Q.   Did you and Professor
20 Klosterhalfen negotiate these contracts
21 together?
22     A.   Negotiate in the meaning -- so
23 I cannot remember that either Bernd or me
24 changed anything. It was some legal thing as

Page 101

1  to be with a -- with the administration, they
2  have to check the legal things, whether it's
3  allowed to do so as an employee or so. And
4  I'm sure we got similar draft.
5      Q.   Did you and Dr. Klosterhalfen
6  talk about it between yourselves before you
7  agreed to it?
8      A.   Yes, of course.
9      Q.   And you and Dr. Klosterhalfen
10 were satisfied at the time that that was a
11 fair contract for you?
12     A.   It was the best we could and it
13 was the first time to our knowledge that
14 someone has got this privilege.
15     Q.   Okay. Did Ethicon comply with
16 its obligations under this agreement with
17 you, Exhibit 5?
18     A.   Comply means fulfill all these
19 obligations?
20     Q.   Yes.
21     A.   Yes. No complaint about it.
22     Q.   Exhibit Number 6, which is the
23 next agreement, who did you deal with in
24 your -- for your discussions about the

Prof. Dr. Med Uwe Klinge

Page 102

1  contract in 2009?
2       A.    Whom do you deal?  With whom I
3  discussed it?
4       Q.    That's right.  At Ethicon.
5       A.    Ethicon, it was a -- I got this
6  mail with this attachment from Brigitte
7  Hellhammer because when looking to all of the
8  documents, I by chance saw this e-mail from
9  Brigitte Hellhammer, but she forgot it for
10  some time, but then she remind me and she
11  sent me this contract.
12      Q.    Was Dr. Hellhammer the person
13  who approached you about the contract?
14      A.    No.  It was a discussion with
15  Boris Batke.  We had discussions with
16  Dr. Engel, but then later he left some times
17  Ethicon.  Then I had some discussions about
18  Boris -- with Boris Batke how to continue
19  this work, how to -- how to continue the
20  activities of the so-called Aachen group and
21  then we had some discussions with the
22  chairpersons from Ethicon.  At some
23  conferences, we had some meetings and to
24  check whether there are some options to work

Page 103

1  together and what are the expectations, what
2  has been going wrong in the past and why.  So
3  a lot of these discussions, but it started
4  with Boris Batke and I think it was Dr. Engel
5  and then they provided this one.
6       Q.    Okay.  What did you understand
7  from your conversation with Ethicon about
8  what had gone wrong in the past?
9       A.    There are still many aspects we
10  still do not understand why this sometime
11  stopped.  I didn't get a good explanation why
12  this happened.
13      Q.    Why what happened?
14      A.    If you look to the records, we
15  have a collaboration with Ethicon almost
16  daily.  We have some phone calls, some mails,
17  we have an exchange of data, we have
18  questions, we presented a lot of these
19  things, we have a lot of discussions, they
20  have a lot of questions, we have a lot of
21  answers, and with the VYPRO, we had for the
22  first time a medical device with a -- with a
23  reliable scientific story behind it.  It is
24  the first time I know that you have a medical

Page 104

1  device development with this science as
2  background information there.
3            And this was offered to the
4  market with all of the explanations, with all
5  of the scientific support that we was
6  tremendously successful for all the speakers,
7  including Professor Schumpelick who for the
8  first years presented all of these messages.
9  It was successful for Ethicon as well.
10           So until 2002, 2003, we thought
11  that it is possible to continue this way of
12  working to make the scientific support from
13  the university to have a manufacturer
14  transporting, transferring this knowledge to
15  the patient there and work together to the
16  benefit of all.  Until 2002, 2003, we have
17  been -- we hope that it could be realized,
18  but then it stopped.
19      Q.    Why did it stop?
20      A.    I don't know full details, but
21  I can show you that there are a lot of -- or
22  I remember we have several working -- or
23  meetings with this working group in Aachen
24  there and even there it was discussed how we

Page 105

1  can revival -- no, we can revitalize the
2  activity and productivity.  But there's still
3  open questions.  I don't know whether you
4  find someone who can give you a sufficient
5  explanation for this.
6       Q.    Okay.
7       A.    Maybe you can ask -- one point
8  of that point is we made this development
9  with the German part of the R&D at Ethicon,
10  and I cannot remember that there was any
11  serious conflict that they said, no, that's
12  not right.  So we went the way to the
13  ULTRAPRO™.  Finally to the ULTRAPRO™.  And I
14  know that there always has some discussions
15  with the part of Ethicon in the US.  We had a
16  visit from Barbolt here in Germany and he
17  looked to the data of Klosterhalfen and said,
18  "No, I don't believe anything of it.  It's
19  all mild to moderate," and then they
20  disappeared again.
21           So we had the impression that
22  there was some internal conflict in Ethicon
23  between the US and the Germany, but I didn't
24  have any serious information about this.

Page 106

1     But the people in Norderstedt,
2  I'm sure in all of these meetings, they
3  totally agreed to our way of thinking of a
4  development of a medical device.
5      Q.    When did it change?
6      A.    It changed in 2001, 2002.  It
7  start to change in this time period.
8      Q.    And how did it change?
9          MR. ANDERSON:  Other than what
10     he's already told you?
11         MR. THOMAS:  Yes, but he's now
12     given me a time frame of 2001, 2002.
13 QUESTIONS BY MR. THOMAS:
14     Q.    Doctor, given your answer that
15 there was a change in 2001, 2002, I want you
16 to tell me how your day-to-day interactions
17 with Ethicon changed.
18     A.    Basically, I was at the
19 beginning of this VYPRO story, and at that
20 time, we have been sitting together sharing
21 the ideas, discussing these ideas, sending
22 some ideas with Dr. Hyntsch from Hamburg to
23 Germany and then we got some first textiles.
24 We made some measurements here.  We sent the

Page 107

1  results to them back and then we made
2  together decisions how to proceed, what to do
3  and all of these discussions very, very open
4  there.
5          And the first what -- the first
6  experience where it was indicated that it
7  changes was the manufacturing of the VYPRO
8  II.  The VYPRO II was an idea of Professor
9  Schumpelick.  He wanted to have a stiffer
10 material and, therefore, he proposed to
11 double the amount of Vicryl and suddenly --
12 for me, suddenly there appears the VYPRO II
13 mesh material where they just doubled the
14 amount of Vicryl.
15         If you look to the science and
16 to the literature, Vicryl is increasing the
17 inflammatory and fibrotic reaction to the
18 tissue.  So it was not a good idea to enhance
19 the inflammatory and fibrotic reaction by
20 doubling the amount of the Vicryl.
21     Q.    And just so I understand, that
22 was Professor Schumpelick's idea?
23     A.    He had -- we had all several
24 discussions about it, but just to see when

Page 108

1  they -- when the people from Ethicon are
2  coming to Hamburg, eight persons are coming
3  there, finally there was a meeting of
4  Dr. Hoepffner, Dr. Engel with Professor
5  Schumpelick up there out of this -- there was
6  a working group and there is some -- the
7  heads or the leading persons are meeting
8  separately.  And so this is not discussed in
9  the entire group.
10         So then they appeared with
11 these Vicryl II mesh.
12     Q.    VYPRO II?
13     A.    VYPRO II mesh.
14         And immediately there has been
15 some publication from Professor Köckerling at
16 that time in Hanover where he saw that the
17 performance of the VYPRO II is poor.  It's
18 bad.  And at that time Klosterhalfen met me,
19 we wrote a letter to Dr. Engel and said that
20 is -- we have to expect this.  This poor
21 performance of the VYPRO II.
22         But we have not been involved
23 in any step of the decisions of the
24 configuration of this mesh.  And later on the

Page 109

1  ULTRAPRO™ was presented I think at a meeting
2  at Suvretta for the first time.  Again, we
3  haven't been involved in the development.  We
4  switched to get -- to become a tester of some
5  material that has been produced outside and
6  that is -- that is complete different to the
7  starting period.
8      Q.    Did you -- strike that.
9          The letter that you wrote to
10 Dr. Engel explaining to Dr. Engel that the
11 problems with VYPRO II should have been
12 expected, did you save a copy of that letter?
13     A.    It is in the -- in the
14 documents I provided to you.
15     Q.    Great.
16         And did you review that in
17 preparation for your deposition?
18     A.    I saw this -- I know that we
19 wrote this letter, and I found it when
20 looking to all of these e-mails, attachments
21 and documents, there some way was this
22 letter.
23     Q.    And is it from you and
24 Dr. Klosterhalfen to Dr. Engel?

1     A.     Yes.  We signed it, yeah.
2     Q.     And it's in German?
3     A.     It is in German.
4     Q.     Do you remember the month and
5 year when you wrote the letter?
6     A.     2000, 2001.
7     Q.     Okay.
8     A.     It was a -- we thought that it
9 was -- it was somehow difficult for us to
10 make such a statement there.
11     Q.     Is it fair to understand that
12 you wanted Dr. Engel to know that this was
13 not the way you wanted the relationship to
14 continue?
15     A.     We wanted to inform him that
16 there is a risk that the VYPRO I was a
17 specific development with a specific
18 scientific background, that this is not true
19 for the VYPRO II, that there are some
20 additional risks that we wanted to inform
21 him.  And if you look to the literature
22 further on and I have learned by this
23 litigation, there has been the use of VYPRO
24 II in some regions of the body with not very

1 satisfying results.  And when I saw this
2 letter, yeah, it is not very surprising.
3     Q.     Other than the letter that you
4 and Professor Klosterhalfen wrote to
5 Dr. Engel, did you have communications with
6 any other Ethicon people expressing your
7 dissatisfaction about the way the VYPRO II
8 matter was handled?
9     A.     I don't recall.  I recall this
10 specific letter because this was an important
11 decision for ourselves as well to make this
12 letter.  I know we had our discussions -- we
13 had several discussions with these people
14 during our meetings, the various topics, and
15 I'm sure we presented the experimental
16 results of the Vicryl to them as well, so in
17 this regard, we discussed a lot about the
18 disadvantages of Vicryl, and I am sure that
19 this is the reason that the ULTRAPRO™ do not
20 have the Vicryl any longer, but they switched
21 to Monocryl.
22     Q.     Why were you and Professor
23 Klosterhalfen concerned about writing this
24 letter to Dr. Engel?

1     A.     Because it -- no, we have a
2 little bit afraid what are the results of
3 going in opponent position to this.  It is
4 not very -- at least I'm not sure.  I think
5 it is not very well appreciated to get such a
6 letter from two scientists from the
7 university and, therefore, we several times
8 think whether it was justified, whether we
9 should be brave enough to do so and take the
10 consequences.  However, we did it.
11     Q.     Was Professor Schumpelick aware
12 that you and Dr. Klosterhalfen wrote a letter
13 to Dr. Engel about VYPRO II?
14     A.     We did not -- we didn't go to
15 him and ask him whether we can do or we
16 didn't inform him.  We were independent
17 scientists and this was our -- we were
18 convinced of this fact and, therefore, we did
19 it, but I'm sure he will be informed from
20 Dr. Engel.
21     Q.     Did you and Professor
22 Klosterhalfen ever have discussions with
23 Professor Schumpelick about the letter that
24 you and Professor Klosterhalfen wrote to

1 Dieter Engel about VYPRO II?
2     A.     Not about the letter, but about
3 the fact, the fact that we didn't like --
4 that we didn't think that Vicryl is a good
5 material to be added to the meshes.  That
6 is -- that we discussed very, very clearly.
7     Q.     Did he disagree with you?
8     A.     Not on the basis of the facts.
9     Q.     Why did he disagree with you?
10     A.     He want to add a stiffer
11 material.  However --
12     Q.     He's wrong?
13     A.     Of course.
14     Q.     Exactly.
15           Now, Doctor, Professor
16 Schumpelick is trained as what, what's his
17 specialty?
18     A.     Professor Schumpelick, he's
19 retired meanwhile in 2000 --
20     Q.     I'm talking about at this time
21 in 1990 --
22     A.     At the time, he was the head of
23 the surgical department at the university
24 hospital, and he is one of the most famous

Page 114

1 person in hernia surgery, in the field of
2 hernia surgery, and with the help of our
3 work, he's very, very well-known in all of
4 the discussions about mesh materials, and
5 today he is the president of the European
6 Hernia Society for -- elected last year for
7 the next two years. And he's living in
8 Hamburg so very close to the people in
9 Norderstedt.
10     Q.    At the time that you wrote --
11 you and Professor Klosterhalfen wrote this
12 letter to Dr. Engel, was he the person who
13 was the head of the Aachen group?
14     A.    The official -- he was the
15 official head of the surgical department.
16     Q.    And as such --
17     A.    The scientific group was mainly
18 based on my activities there.
19     Q.    Dr. Klinge, your activities
20 with the scientific group at the university
21 ultimately had to report to Professor
22 Schumpelick, is that fair?
23        MR. ANDERSON:  At what point in
24 time?

Page 115

1        MR. THOMAS:  At this time he
2 wrote the letter.
3        MR. ANDERSON:  Okay.
4        THE WITNESS:  No, I didn't have
5 to.  No, I didn't have to make a
6 report to Professor Schumpelick.  He
7 asked me what can be done.  He
8 mentioned some issues, some problems
9 he got from all of the conferences
10 where you're coming from and wanted to
11 have some solutions, and my ability
12 was to make some projects to make some
13 questions, to make some study
14 protocols there and then I collected
15 people that are willing to take over
16 this part of the project and so we --
17 I built up a network research to the
18 topic of the mesh and then we put all
19 of these documents together, make a
20 PowerPoint presentation and then he
21 goes to the conference and presented
22 these -- all these results or he was
23 an organizer of the Suvretta meetings,
24 but we made all of the different

Page 116

1 presentations and put the messages,
2 but he is organizing these meetings.
3 That was his responsibility.  But not
4 that he controlled my science or so,
5 that was not the way.
6 QUESTIONS BY MR. THOMAS:
7     Q.    At the time that you and
8 Professor Klosterhalfen wrote this letter to
9 Dieter Engel at Ethicon suggesting that the
10 VYPRO II mesh had some problems, was
11 Professor Schumpelick your superior at the
12 university?
13     A.    Yes.
14        MR. ANDERSON:  Been going about
15 an hour and a half, a little more,
16 want to take a little break?
17        MR. THOMAS:  Take a break.
18     (Off the record at 11:41 a.m.)
19 QUESTIONS BY MR. THOMAS:
20     Q.    Doctor, we've talked about your
21 search for documents and the large number of
22 documents you've produced.
23        About how tall of a stack of
24 documents did you find?

Page 117

1     A.    The hard copies or the --
2     Q.    Hard copy.
3     A.    -- the electronic things when
4 they're printed out?
5     Q.    Did you produce it
6 electronically, or did you produce them in
7 hard copy or both?
8        MR. ANDERSON:  As I was telling
9 you before, the first batch that I
10 sent you, it was actually in two
11 batches that we were trying to get
12 printed and stuff, those are the ones
13 that I had him search his computer
14 for, and the latter batch that I'm
15 talking about as we were discussing, I
16 realize there may be some hard copies,
17 those are the ones with 10 centimeters
18 of dust on them, those would be the
19 hard copies.  As I showed you before,
20 it may be a four-inch, five-inch
21 stack.  The other ones, as you know,
22 is a box or two full of documents.
23        MR. THOMAS:  The production
24 that I -- that Butler Snow received is

Page 118

1  a box or two of documents.
2      MR. ANDERSON:  Right.
3      MR. THOMAS:  More than three
4  Red Wells for both Klosterhalfen and
5  Klinge.
6      MR. ANDERSON:  Probably, yeah.
7      MR. THOMAS:  Were any of the
8  documents produced on disk?
9      MR. ANDERSON:  To you.
10     MR. THOMAS:  "To you" meaning
11  Butler Snow or to David?
12     MR. ANDERSON:  Oh, yeah.  I
13  don't know because I was here, but I
14  think they were produced in hard copy.
15  That was my understanding they were
16  produced in hard copy.  If there was a
17  disk in there, they may have been.  I
18  don't know that there was.
19     MR. THOMAS:  There was a disk
20  in there that's a conversation or a
21  discussion at a conference.  I have
22  listened enough to that to know.  I
23  didn't want to listen to any more of
24  it.

Page 119

1      But I'm just trying to figure
2  out if I have a complete universe of
3  documents that you've collected, and I
4  don't know the answer to that.
5      MR. ANDERSON:  Except for
6  what's coming on Saturday per my
7  earlier discussion on the record, you
8  should have them.
9      MR. THOMAS:  Again, for my
10  benefit and I'm not doing anything
11  other than trying to understand, did
12  you make the production of all of the
13  documents from Professor Klinge and
14  Professor Klosterhalfen at the same
15  time?
16     MR. ANDERSON:  I don't know
17  because I didn't stand there at the
18  mailbox and ship the documents
19  because, as you know, I was here.  So
20  I assume that they were roughly the
21  same time.
22     MR. THOMAS:  Okay.  I'm
23  becoming concerned I don't have all of
24  the documents is my point.

Page 120

1      MR. ANDERSON:  If so, it
2  wouldn't be from our end.  It would be
3  on your end.  And so all I'm saying is
4  I can't speak to your side.  I can
5  just speak to my best belief from our
6  side.
7      MR. THOMAS:  I understand.
8      MR. ANDERSON:  Okay.
9      MR. THOMAS:  I'm not accusing
10  anybody of anything.
11     MR. ANDERSON:  Like you said, I
12  am just trying to understand.
13     MR. THORNBURGH:  Can I maybe
14  add some clarity?  There were two
15  productions for Klinge.  If you
16  personally only received one box, then
17  another box was sent the following
18  day.  So you may -- I don't know what
19  you received from Butler Snow.  I know
20  that Butler Snow received two
21  productions.
22     (Klinge Exhibit 7 marked for
23  identification.)

Page 121

1  QUESTIONS BY MR. THOMAS:
2      Q.    Doctor, I hand you what's been
3  marked as Deposition Exhibit Number 7.
4      What is Deposition Exhibit
5  Number 7?
6      A.    This --
7      MR. ANDERSON:  Why don't you
8  look through it before you answer.
9      THE WITNESS:  This is a draft
10  of a first contract between Ethicon
11  and the university and partners at the
12  university were the surgical
13  department and the Institute for
14  Pathology.  They had was Professor
15  Mittermayer and for surgery was
16  Professor Schumpelick and the guy
17  responsible from Ethicon was
18  Dr. Hoepffner.
19     Q.    Do you know the date of that
20  agreement?
21     A.    '95, '96, around this.  And
22  there was identified some issues to work
23  about it.
24     Q.    Do you understand that to be at

Page 122

1 least a version, a draft, of the contract
2 that the parties ultimately executed back in
3 around 1995 to provide for the Ethicon
4 support of activities at the university?
5     A.    Please, can you --
6     Q.    Do you have a final version of
7 the contract?
8     A.    I don't recall any detail
9 there, but I have no doubts that I have seen
10 and there is a final version of this
11 contract.  There has been this -- there was
12 this contract between the university and
13 Ethicon in this form.
14     Q.    Did you have anything to do
15 with the negotiation of that contract?  Did
16 you comment on the draft?
17     A.    The -- all what is related to
18 the content here, to the scientific content
19 or the content, what we should work on, that
20 is a commented, corrected, changed by me as
21 well.  So I saw all of these drafts and then
22 give my comments, then they were changed,
23 then finally they got to the legal department
24 and they checked it again and then they were

Page 123

1 signed by the people there.
2     Q.    Okay.  And who did you give
3 your comments to?
4     A.    This, of course, will be a
5 conversation between Dr. Hoepffner and me.
6 We sent it directly.
7     Q.    Okay.  Did you go through
8 Dr. -- Professor Schumpelick?
9     A.    If there's any question, we
10 discussed it at our department or with
11 Professor Klosterhalfen.  At that time,
12 Professor Klosterhalfen, we discussed it
13 before so there was a discussion among all of
14 these peoples at the university and then the
15 partner was Dr. Hoepffner there.
16     Q.    Were you the person on behalf
17 of the university who negotiated the terms of
18 the ultimate agreement, which is Exhibit 7?
19     A.    So negotiate means that I'm the
20 only person who changed something?  No.
21     Q.    No.
22         Were you the person who had the
23 responsibility from the university to discuss
24 with Ethicon changes the university wanted in

Page 124

1 the agreement?
2     A.    If such a draft turns ten times
3 around, the first eight versions are going to
4 me.
5     Q.    Okay.  And my point is there
6 were a number of people at the university
7 that had something to say about what went
8 into the contract.
9         Is that fair?
10     A.    As the legal officers, they
11 have some specific things they have to add
12 there, yeah.
13     Q.    And Professor Mittermayer may
14 have specific things, Professor Schumpelick
15 may have specific things?
16     A.    But I cannot recall any
17 specific changes of these two to this --
18     Q.    That's not my point.
19         My point is whatever comments
20 anybody had from the university were passed
21 to you so you could pass them on to Ethicon?
22     A.    It was my responsibility at
23 that time to make it pass.
24     Q.    Very good.

Page 125

1     A.    To send it and receive it so.
2     Q.    And the person that you dealt
3 with at Ethicon is --
4     A.    Dr. Hoepffner at that time.
5 But it changed, but at that time, it was
6 Dr. Hoepffner.
7     Q.    Okay.  And I believe you said
8 there were several drafts that were traded
9 back and forth?
10     A.    Yeah, usually.
11     Q.    How was it that you happened to
12 be the lucky person to be in charge of the
13 contract?
14         MR. ANDERSON:  Objection to
15 form.
16         Go ahead.
17         THE WITNESS:  First of all,
18 because I'm clever enough to do so and
19 the other people thought that I'm
20 clever enough to do so.  It is a -- to
21 understand it completely, you have to
22 go back in the history when this
23 collaboration and when this idea
24 started and, therefore, I was the man

Page 126

1  responsible for development of meshes,
2  to study, to make surgical research in
3  this field. That was my profession
4  and, therefore, it --
5  Q. Doctor, I believe you testified
6  in your last deposition that Ethicon hired
7  FEG to develop VYPRO I.
8      Is that true? Did I read that
9  correctly?
10  MR. ANDERSON: Objection.
11  Mischaracterizes.
12      Explain it.
13      THE WITNESS: So, again, in
14  1994, when it became clear that we had
15  a development project or we had a
16  project to develop meshes with
17  Ethicon, we mainly discussed it with
18  Dr. Hyntsch. And we come together and
19  it was clear that we need someone who
20  provides us with textile constructions
21  and so we had to decide -- the idea
22  was quite simple. We wanted to reduce
23  the material. We wanted to adopt it
24  to the physiological requirements and,

Page 127

1  therefore, we want to change the
2  textile characteristics.
3      But to include all of the
4  options, we need a textile engineer in
5  doing this. At that time, it was not
6  available at Hamburg Norderstedt.
7  They didn't have a textile engineering
8  facility there. Therefore, we had to
9  look some -- to places there.
10      The idea was born in strong --
11  in collaboration with Boris Obolensky
12  who at that time was at the Institute
13  for Textile Engineering at the
14  university. So he was very
15  well-informed about the -- that there
16  is an option there. At that time, it
17  was in 1994 there -- the FEG was very
18  small. They didn't deal with medical
19  devices and Obolensky was at the
20  Institute for Textile Engineering, and
21  at that time -- so we planned and
22  organized this project to develop the
23  mesh and I had several discussions
24  with Dr. Hyntsch there.

Page 128

1      So, first of all, we tested all
2  current materials, we developed some
3  methods to evaluate what happens to
4  these meshes and then the point came
5  that we have to decide where and how
6  to make these new mesh constructions,
7  this modified mesh constructions. And
8  there has been two options; the first
9  is you have to go -- you can go to the
10  technical university. It is -- it is
11  very famous. It is an official site,
12  maybe a little bit more long-lasting
13  and the other alternative was a
14  factory in Kemnitz in the former GDR
15  and in 1994, it was empty. So it was
16  a factory without having to do a lot
17  of things.
18      So this has been the two
19  options to realize a modified mesh
20  material either in Aachen or either in
21  Kemnitz. And I went with Dr. Hyntsch
22  to Kemnitz and we visited the factory
23  and talked to the people there. In a
24  car, we went there. And afterwards it

Page 129

1  was clear we need a decision. Either
2  Kemnitz or Aachen and then Ethicon and
3  I assume Dr. Hyntsch, he decided, no,
4  we want to have the power of the
5  technical university. We want to have
6  it in Aachen and not in Kemnitz. And,
7  therefore, we tried to realize it.
8      Meanwhile Boris Obolensky left
9  the university and went to the FEG
10  Textiltechnik. And, therefore, there
11  was a contract, I've never seen this
12  contract, but there has been this
13  linkage of Ethicon. They hired the
14  FEG Textiltechnik to make this
15  modification of the mesh materials and
16  the FEG, Boris Obolensky, he found the
17  manufacturer in Goth where later on
18  VYPRO and ULTRAPRO™ is really
19  manufactured.
20      So, yes, they hired the FEG to
21  make the VYPRO.
22  QUESTIONS BY MR. THOMAS:
23  Q. Okay. When Boris Obolensky was
24  at the textile institute at the university,

Page 130

1  did you collaborate with him in the
2  development of VYPRO mesh?
3      A.   First of all, the idea was
4  raised in a discussion with Boris Obolensky
5  in 1993. He was the person who told me that
6  there are several textile options to optimize
7  this mesh and that the current meshes at that
8  time are not very satisfying from his point
9  of textile engineer. So that raises the idea
10  that you can do something with it.
11          Later on, it was a
12  collaboration with him that we got the
13  textile characteristic of meshes at the
14  Institute for Textile Engineering. It was
15  done independently of this institute. Later
16  on, he made the modifications for Ethicon and
17  since then, when we need some modification of
18  textiles, either for -- in the project for
19  VYPRO or later on for the research institute
20  when we have some other grants, we always did
21  it in collaboration with the FEG. So we have
22  this -- yeah, this ivitäten, research
23  activities in parallel and we need a lot of
24  textile modifications. And Ethicon at that

Page 131

1  time was not able to provide this.
2      Q.   What was Professor Obolensky's
3  title with the Textile Institute?
4          What position did he hold?
5      A.   Dr. Obolensky.
6      Q.   I am sorry.
7      A.   In the textile sciences is
8  something special.
9          He has been what is called here
10  overassistant. That is the -- you have the
11  head of the institute and then you have two,
12  three persons on the level below.
13      Q.   So is it fair to understand
14  that he, Dr. Obolensky, is the first person
15  who approached you with the idea of changing
16  mesh design to make a larger pore,
17  lighter-weight mesh?
18      A.   The starting point of all of
19  this mesh trouble has been a -- has been a
20  private session at my house. There has been
21  20 women in Aachen in the beginning of the
22  '90s, '91, '92, they founded the center for
23  mothers to take care of children and so on,
24  and these mothers are coming together and

Page 132

1  some of these founders have been my wife.
2  And in 1993, in December, I had the
3  invitation -- I had the -- I had the order
4  from Professor Schumpelick to prepare a
5  preparation of meshes in the Suvretta
6  conference in 1994 in St. Moritz.
7          In December of 1993, we have a
8  pre-Christmas meeting there of the women of
9  this mother center there. And you can
10  imagine a lot of children, some husbands
11  there, sitting around and all of the wives
12  chattering and chattering, and then you have
13  to talk to the husbands there. You don't
14  know each other and then it was the first
15  time that I managed or that I noticed that
16  there is someone as a textile engineer. I
17  didn't know about it.
18          And in preparation of my
19  presentation for the Suvretta, I always have
20  a piece of mesh in my pocket and, therefore,
21  we have been sitting there and I showed him
22  the Marlex mesh, he said, "Well, I wouldn't
23  made a sock out of it. It is so strong you
24  can wrap in a cup." And then we start to

Page 133

1  talk about it. And then I said okay, I have
2  to make a presentation, and I would like to
3  send him some of these ideas and experiences.
4  And then it comes back what for them is a
5  very simple approach to textile things.
6          But I learned from this hosiery
7  is that there are -- what textile tests can
8  be done and so on. But this was the starting
9  point that he said, "It is too strong. Do
10  you know how strong it has to be?" That was
11  the question at that time point, and then I
12  looked to the literature without Google. You
13  have to go down to the bib and look to all
14  this all stuff and trying to figure out what
15  is the stability you need. That was the
16  starting point, and it was first
17  documentation of this effort was in the first
18  Suvretta book.
19      Q.   When did Dr. Obolensky leave
20  the university?
21      A.   In 1994, sometime.
22      Q.   Was the FEG already in
23  existence at the time he left?
24      A.   Yes.

Page 134

1  Q.   And what was the business of
2  the FEG before he arrived?
3  A.   It was engineering of machines.
4  Mainly a quality control of -- when you
5  manufacture paper, for example, you have some
6  fleece to press the water off, and this
7  fleece is somehow a mesh form and they wanted
8  handful of engineers.  They optimized these
9  machines.  They found some or elaborated some
10 technical solutions for technical problems
11 for airplanes, cars and for these printing or
12 paper manufacturers mainly which are related
13 with textiles.
14 Q.   And at some point,
15 Dr. Obolensky became one of the owners of the
16 company, correct?
17 A.   Yes.  Mainly -- yeah, but I
18 don't know exactly at what time point, but --
19 Q.   And who was --
20 A.   -- he's one of the two or three
21 people that are the owners of this company.
22 Q.   And who are the other owners of
23 the company?
24 A.   Stefan Schneemelcher is the

Page 135

1  name.
2  Q.   And does he have an active
3  responsibility in the management or operation
4  of the company?
5  A.   They both have it, yeah.
6  Q.   What does Stefan do?
7  A.   He's an engineer as well.  Both
8  are coming from the Institute for Textile
9  Engineering so they are both engineers.  I
10 don't know exactly -- I know that both have
11 some projects that both have some devices,
12 but they have different responsibility.  One
13 is for safety regulations more or less
14 focused or for contract, but it's close
15 together.  It changes all the time, and I'm
16 not familiar with the details.
17 Q.   Do you know how FEG was
18 compensated by Ethicon for the work that it
19 did on the VYPRO mesh?
20 A.   I have heard somehow where a
21 figure, but I've never seen a contract.
22 Q.   What have you heard?
23 A.   I've heard it was about
24 100,000, but I even don't know whether it's

Page 136

1  Deutsche mark or Euro.  It has to be Deutsche
2  mark at that time.
3  Q.   Okay.  Do you know whether FEG
4  had any royalty interest in VYPRO?
5  A.   I've heard that it was a fix
6  sum without any subsequent requirements or
7  demands or royalties or obligations.  It was
8  just for this -- at that time, it was not in
9  the interest of the company to be there.
10 Q.   Did FEG have any responsibility
11 for VYPRO II?
12 A.   No.  I don't know any, no.
13 Q.   Are you aware of any
14 responsibility that FEG had for any mesh
15 manufactured by -- strike that.
16      Are you aware of any interest
17 that FEG had in any mesh sold by Ethicon
18 other than VYPRO I?
19 A.   They don't have -- even have an
20 interest in VYPRO I.  So they --
21 Q.   Okay.
22 A.   So they made it, they know how
23 to made it, they know all of the story, they
24 are included in the story, and that's -- and

Page 137

1  then the collaboration stopped.  We tried to
2  put them together and there was a meeting
3  from these guys in Hamburg in May 2000, 2001,
4  where they met with Dr. Engel to see whether
5  this can be continued, but I was not
6  participant of this meeting.
7  Q.   In May 2000 or 2001, when FEG
8  met with Dr. Engel, what was the purpose of
9  that meeting?
10 A.   The purpose of this meeting was
11 that we have been -- that we did show that
12 the VYPRO was a very good, a very successful
13 approach to improve -- to develop new meshes
14 by the use of science of the university,
15 textile engineering and a manufacturer.  And
16 then we have some subsequent research
17 projects funded by the university that we
18 wanted to work on the PVDF at that time.  So
19 one option would be is that it is separated
20 again and we have our research project with
21 the university and the FEG to work on PVDF.
22      A better way would have been to
23 put -- to keep this together and to work
24 together.  But then there has to be an

Page 138

agreement between the two companies.

Q. The two companies being Ethicon and FEG?

A. Yes, obviously.

Otherwise, we -- and everyone knows it -- we have this scientific project with PVDF from the university working with the FEG and they're providing us the material. They know how to manage, it and they're providing us the mesh structures and on the other hand, we have this history and this collaboration with Ethicon. For us, not a very happy situation. So the best would have been if they really keep to work together.

Q. And was the goal of the meeting to have FEG and Ethicon work together to develop a PVDF mesh?

A. This was -- not restricted to PVDF. Our hope was that they come together, work together and that we can continue to talk to Obolensky and Ethicon and all -- making all of this together and, therefore, we told Dr. Engel that they have to consider

Page 139

that Obolensky knows how to do a mesh. So to keep this knowledge to the company for the future, it should be wise to keep him.

Q. And --

A. And that was the reason that we said to both meet, meet and try to continue your collaboration, but the result was not successful.

Q. You said "we" a number of times.

Who tried to put the meeting together, you and who else?

A. Bernd Klosterhalfen.

Q. Was Professor Schumpelick involved at all?

A. No.

Q. Okay. And who did you speak to at Ethicon in an effort to arrange the meeting with Dr. Obolensky?

A. It was a meeting -- I remember at least -- we have several meetings, and we have several times discuss all this continuation, future prospective and so on, it's always a topic, but this was a meeting

Page 140

in Hamburg Norderstedt in the office of Dr. Engel where I remember quite clearly that Bernd Klosterhalfen and me were sitting there with Dr. Engel, and then we told him that it should be necessary to meet for them and to combine their capabilities.

Q. What did Dr. Engel say when you made that proposal?

A. Obviously, he agreed to make this meeting.

Q. Okay. Did you attend the meeting between Dr. Obolensky and Dr. Engel?

A. No.

Q. Did Dr. Obolensky report to you the results of the meeting?

A. He roughly gave me his impression that there has been different expectations. The problem for the FEG -- the main problem for the FEG was that they have been afraid when they have good ideas of good mesh, that there is not obligatory push that this mesh will be manufactured and will provide some royalties for the FEG company, and there was not agreement -- no agreement

Page 141

that Ethicon agreed that they -- they agreed that they always -- will not always, but usually will realize the products that are provided by the FEG. And that means that it can be that you have a inferior product and this is sold and the good idea is keeping down and this would be in agreement with the contract.

So to overcome this problem, it would be necessary to find a participation, even at the products that already are on the market and on the future prospective.

So this is the conflict that was not solved in this.

Q. I think I understood that. Let me see if I can break it down a little bit.

Is it fair to understand that FEG wanted some assurance from Ethicon that Ethicon would market the meshes that FEG brought to Ethicon?

MR. ANDERSON: Did you say would or wouldn't?

MR. THOMAS: Would market.

THE WITNESS: Yes, or at least

1 have some -- they need some -- some --
2 some confident thing where they can
3 rely on for the future, yeah.
4 QUESTIONS BY MR. THOMAS:
5 Q. Okay. Did you ever speak --
6 strike that.
7 Did you understand that to be
8 the big breakdown in the negotiations that
9 Ethicon couldn't provide FEG any assurance
10 that they would market the meshes that FEG
11 brought to Ethicon?
12 A. No. No, definitely not. It is
13 rather an expression of the attitude, how you
14 think to work in future or how to
15 manufacture, how to develop. Obviously, the
16 Ethicon people at that time they believed
17 they have employed young textile engineers.
18 They have bought some machines there. They
19 thought they could do it themselves without
20 any help, and they don't care what happens
21 outside. At the FEG in 2001, 2002, they
22 haven't been on the market at that time, but
23 they -- obviously, they don't have the vision
24 of what happens in the future.

1 Q. Did you ever talk to Dr. Engel
2 about the meeting?
3 A. I don't recall.
4 Q. Is the only person that you've
5 spoken to about the meeting who was present
6 was Dr. Obolensky?
7 A. I -- I assume. He just
8 reported me --
9 Q. Okay.
10 A. -- his impression.
11 Q. Okay.
12 A. So I don't have anything more.
13 Q. Was the meeting with Dr. Engel
14 before or after the letter that you and
15 Professor Klosterhalfen wrote to Dr. Engel
16 about VYPRO II?
17 A. I guess it was after, but --
18 Q. Okay.
19 A. It's 2000, 2001.
20 Q. Your best judgment or your best
21 recollection is that the meeting with the
22 FEG, with Dr. Engel, was after the time that
23 you and Professor Klosterhalfen sent the
24 letter to Dr. Engel about problems with VYPRO

1 II?
2 A. Or maybe same year and May, the
3 meeting was and in June, the letter was. So
4 maybe something.
5 Q. Okay. To your knowledge, after
6 that meeting with Dr. Engel at FEG, were
7 there any further discussions between Ethicon
8 and FEG about a collaboration?
9 A. I know that there has been some
10 discussions on some conferences between Boris
11 Batke and Dr. Obolensky, but I don't know any
12 further details. Only that they have
13 contacted each other, not a collaboration.
14 Q. Do you have any idea whether
15 the relationship between the companies is
16 pleasant and cordial?
17 A. I don't know the -- I didn't
18 get the last word.
19 Q. Cordial, they get along
20 together.
21 Let me start again.
22 Do you know from your
23 experience whether the relationship between
24 FEG and Ethicon is smooth?

1 A. Smooth.
2 Q. Is the relationship between FEG
3 and Ethicon bad?
4 A. So, first of all, they are all
5 professionals. I assume they're all
6 professionals and they have their different
7 standpoints. It is from the market share,
8 you have an elephant and you have a fly. The
9 fly is the FEG. It has good ideas, good
10 products, but it's a very small one and you
11 have the giant there. So this relationship
12 is like it is.
13 Q. Okay.
14 A. And there is only one legal
15 conflict and this is a conflict I don't know
16 any details, but maybe you have in all of
17 these thousands, hundred thousands of
18 documents, the details. There is a legal
19 conflict dealing with the PVDF patent.
20 They're -- you know, the Ethicon -- and I
21 just saw it one year or two years ago.
22 Ethicon has a PVDF patent made in 2002. And
23 this is obviously in conflict to the PVDF
24 patent of the FEG. I don't know which one is

Page 146

first, which one claims all what has been
done, but there has been a legal --
legally -- there has been a conflict between
the two companies and they have been at the
European patent justice or court in Den Haag
and in Munich, and they fought a little bit
or the lawyers fought a little bit. Mainly
the lawyers fought.

Q. Has that dispute been resolved,
do you know?

A. I've heard that it's resolved,
but mainly there are some subsequent redos
and appealings or whatever, yeah.

Q. Did you have any involvement in
the patent dispute?

A. I was -- I got the information
that it was like this, but I never was
present at any of these meetings at the
courts. Yeah. I'm on the patent of the FEG,
but I'm not on the patent from Ethicon so.

Q. Dr. Klinge, we spent some time
talking about the relationship that you had
with Ethicon and the contracts that are in
place.

Page 147

Tell me the kinds of projects
that you worked on in the '90s for Ethicon,
other than VYPRO.

A. Other than VYPRO. Do you mean
VYPRO, specifically the development of this
mesh or our mesh restructure? I got more
than 20 different mesh materials from Ethicon
that we tested it, that we evaluated under
different conditions.

Q. I'm keeping VYPRO separate from
your other research.

A. You're keeping mesh out?

Q. So what I want to know is
exactly what you just described, the 20
different mesh materials that you received
from Ethicon.

A. Yeah.

Q. Did you receive 20 different
mesh materials at one time or over time?

A. I cannot separate it from the
development of VYPRO because the VYPRO was
the aim, the purpose, we did. We started --
we had to learn -- in 1994, we had to learn
everything about meshes. There hasn't been

Page 148

any investigation and any good literature
about it. So we have to start with the
textile characteristic. First time that we
provided these testing of mesh materials at a
Textile Institute. And we wanted to know
what happens to the tissue, what happens to
the function when we need -- when we implant
some meshes. We need some mouse models, rat
models. We have to look what is appropriate,
what is the better thing. And then we
started with the first current meshes to
learn how to correct the rise of this tissue
response. Then the next was first
modification of these meshes. Define a range
of the stability of the mesh materials, the
polymer, we have to define whether it's
polyester or polypropylene. Then we created
in a small period of time the modifications A
and B that later on become the VYPRO mesh.

Again, four modifications that
has been tested. The next question was
impact of Vicryl on it. So we made some
modifications coated with Vicryl. We left
the Vicryl out and compared the reaction.

Page 149

All of this is published in our subsequent
literature.

So the steps has been there
that we have regular meetings, that we
proposed -- we identified some questions,
that I made some proposals how to make this
and then we're sitting together and it was
clear we need -- when we wanted to
investigate the impact of Vicryl, we wanted
to have three, four different mesh materials,
modifications with various parts of Vicryl
and then we proposed this to Ethicon and then
they -- people said, "Okay, yes, what do you
need?" And then we say, "We need 2.5 to
3.5-centimeter meshes with this
characteristics. We need them best in May
that we can start in June." Then they said,
"No, it's not possible." One month later,
"Yeah, okay."

Then we started one month
later. Then we got a box with these mesh
modifications, and we got the suture material
as well and all of this together then was
used for the experiment.

Page 150

When we are all finished with this, the next question was, for example, sometimes a mesh quite similar to the soft Prolene® mesh were coming and they were interested in -- so the impact of various polypropylene amount to compare this or to compare -- then we had a -- wanted to investigate whether nuclear medicine can help us. We made a pet study, and then again, we have to decide which mesh material and what model we want to have and this was done in discussions with Ethicon, and if we need some material, we got it from -- they prepared the material for that.

Q. Okay.

MR. ANDERSON: Did you say pet?

THE WITNESS: Pet, p-e-t, nuclear medicine where you can see the inflammation.

QUESTIONS BY MR. THOMAS:

Q. I'm going to break that down a little bit. That was a very helpful explanation. I want to explore some of the details of it.

Page 151

You said you had regular meetings.

Who was part of your team that was responsible for understanding these 20 different meshes?

A. Who was part of your team responsible for understanding? Me.

Q. So did you have people help you or did you just --

A. A lot of people. So the issue was there that you have to address all these various problems. We really looked to all sides that may be a concern. We go to the microbiology, to all of these. It is impossible to take care yourself of all of these things.

Q. Exactly.

A. Therefore, I'm running around and asking my younger colleagues if you want to make research, I can offer you a project, it is paid, you get the material, you have to do the operations, you have to do the evaluation, and we will publish it. Are you interested in doing so? Yeah, and most of my

Page 152

colleagues are interested in doing so, and if you look to the references of my publications, you see that almost everyone or two-thirds of the department sometimes belong to some of these projects and took part of this.

Q. Was there a core group of people within the Aachen group as it's been described that you worked with through the '90s with Ethicon?

A. There is no structured core group. It is -- I am -- I'm the core group there, and there is a changing amount of people for the time they are doing surgery, they're in the hospital, they made it, then they left it. So the -- the main continuation that is my person.

Q. Is it fair to understand that you use younger people who were spending their time at the university learning to assist you in research projects that you might publish with them?

A. I would object to the term "use" because use is in my -- what I learned

Page 153

from -- when we use the word "use," it has a negative feeling thereby.

Q. Not intended at all.

A. I offered them the opportunity to work with this project, and they agreed to it.

Q. Let me ask you this.

Is it fair to understand that you collaborated with the younger people who were being taught at the university in order to conduct the research and writing necessary to further the research you were doing?

A. If you put all people together working in this scientific field with all of the various aspects, maybe 50 to 100 persons, that at some parts contributed, collaborated with me.

Q. Dr. Klosterhalfen was a constant throughout the whole process, wasn't he?

A. Almost always.

Q. Okay.

A. At some time period. There was some significant research where he was not

Page 154

1 part, but in the first years when he was in
2 the hospital, he was, of course -- we almost
3 always took the chance to have him get a look
4 to what we say.
5     Q.    Okay.
6     A.    But when he left the
7 university, he -- this was less.
8     Q.    Well, he left the university in
9 2003?
10    A.    Three.
11    Q.    And so from '94 to 2003,
12 Dr. Klosterhalfen was a significant part of
13 your efforts?
14    A.    Yes, without any doubt.
15    Q.    Was there anyone else on the
16 scale of Dr. Klosterhalfen who contributed to
17 your efforts in understanding mesh?
18        MR. ANDERSON:  Objection.
19        THE WITNESS:  Nothing that can
20    compare to the contributions of
21    Dr. Klosterhalfen.
22 QUESTIONS BY MR. THOMAS:
23    Q.    Okay.  What role or
24 responsibility did Professor Schumpelick have

Page 155

1 in your research?
2     A.    His responsibility, he brought
3 the focus hernia to the university, which is
4 not very popular.  Most of the universities
5 are focused on cancer research, but he was
6 interested from his story to hernia and,
7 therefore, he encouraged and let and was
8 happy to have research on this hernia issue.
9        As a head, he was the only
10 person who can sign these contracts.  He has
11 to sign every contract.  Every research
12 contract.  So he was responsible for this.
13 He attended hundred thousands of conferences
14 dealing with hernia, dealing with meshes and
15 have countless presentations there.  And for
16 five to ten years, he got most of the slides
17 from me.  So he agreed to this.  We
18 discussed -- when I offered him the slides,
19 we discussed the presentation and, yeah, he
20 agreed with this.  We have a discussion about
21 the -- all these results and he presented it
22 to the international audience, and he has to
23 withstand the discussions about cancer, about
24 all this what has been discussed.

Page 156

1     Q.    It's fair to understand that
2 Dr. Klosterhalfen was the person who was able
3 to give you the opportunity to do the
4 research that you did?  Is that fair?
5        MR. ANDERSON:  Did you say
6    Dr. Klosterhalfen?
7 QUESTIONS BY MR. THOMAS:
8     Q.    Yeah, bad question.
9        Is it fair to understand that
10 Dr. Schumpelick is the person who is
11 responsible for giving you the opportunity to
12 conduct the research that you did?
13    A.    We thought a lot about how to
14 find the best phrase for it.  I would prefer
15 to say he was able to hinder it.  He could
16 have been able to have it stopped.  He could
17 prevent any research in this field.  He
18 didn't stop us.  He was not able to stop us
19 in our activities.
20    Q.    Okay.  But he --
21    A.    But he -- but I would not agree
22 that he really supports our research.  He
23 uses it.  He didn't stop it, but support I --
24 I have some problems with it.

Page 157

1     Q.    Okay.  During the time that you
2 were collaborating with Ethicon through the
3 '90s up until 2000, you mentioned the
4 experiments that you would conduct and that
5 you would request materials from Ethicon.
6        Was Ethicon the sole source of
7 the meshes that you tested?
8     A.    Mostly.  Ethicon provided, of
9 course, the test -- or the projects we did
10 with Ethicon.  We have other projects, as
11 I've told, for example, PVDF development
12 where we need PVDF modifications that we got
13 from the FEG.  And we took some or we made
14 some experiment with the Parietex where we
15 wanted to see what happens to polyester
16 multifilament, and there I asked Sofradim at
17 that time if they wanted to supply us
18 Parietex and, therefore, we got this material
19 from Sofradim.  Some other materials we took
20 from our OR, from the clinics.
21    Q.    Before our break for lunch, I
22 want to ask you something before I forget.
23        Several minutes ago you made a
24 comment about Dr. Barbolt coming to Germany.

Page 158

1  A. Uh-huh.
2  Q. When did that happen?
3  A. Frequently times we figure it
4  out and I usually forget it. 1999 or 2000.
5  We prepared a summary of all
6  activities in English language at that time
7  because it was announced that two American
8  guys and one was Barbolt, that they visit our
9  group in Aachen and we prepared some
10  presentations there and we were quite -- we
11  were somehow exciting to have -- to start in
12  this discussion with the US experts. Because
13  in the time before we have this agreement
14  with the German guys, no problem with it, but
15  this was the first time that they were
16  coming, and I remember that Klosterhalfen
17  presented his results as he did it today and
18  the reaction from Barbolt just was it's not
19  relevant. That was it.
20  Q. Was the meeting in 1999, 2000
21  your first contact with anyone from Ethicon
22  from the United States?
23  A. I'm not sure. There has been
24  one or two other meetings where I was invited

Page 159

1  one of these confidential drafts. Maybe,
2  maybe in this field where I've been in
3  Hamburg Norderstedt, I was invited with Bernd
4  Klosterhalfen to present our findings and
5  there have been two other guys in another
6  room where we discussed it, yeah, but I don't
7  know the name or --
8  Q. Do you know who was traveling
9  with Dr. Barbolt?
10  A. I don't recall.
11  Q. You said there were two.
12  A. I don't recall, and I didn't
13  find the protocol of this meeting.
14  Q. When you say "the protocol,"
15  the description or the minutes of the
16  meeting?
17  A. I know that the Ethicon guys
18  usually made some minutes of this meeting and
19  some of them I got, but I didn't find any
20  further documents showing any details.
21  Q. You said a minute ago that in
22  anticipation of the meeting that your group
23  prepared a summary of all activities.
24  A. Up to then, including the

Page 160

1  animal experiments, including the
2  publications and some proposals for further
3  ongoing activities.
4  Q. Was that in English or German?
5  A. It's in English.
6  Q. Who was responsible for
7  preparing that document?
8  A. I did it. I got the order from
9  Professor Schumpelick to make such a thing,
10  and then I started to write it and collect it
11  and design it.
12  Q. How long was it?
13  A. 20 pages.
14  Q. Do you still have a copy of it?
15  A. You have it already in the pile
16  of paper.
17  Q. Okay. Does the 20-page
18  presentation contain a list of attendees,
19  people who were there?
20  A. No.
21  Q. Who was there from the Aachen
22  group?
23  A. I only remember Schumpelick, of
24  course, it's me, it's Klosterhalfen, but I

Page 161

1  don't recall there has been a -- or the
2  number of participants changes according to
3  whether they left the department at that time
4  or whether they're on duty or in the OR.
5  I even do not recall whether
6  it's Dr. Hoepffner or Dr. Engel, but some of
7  these.
8  Q. How long did the meeting last?
9  A. Two to three hours.
10  Q. And you made a presentation?
11  A. I don't recall precisely what I
12  presented there, but I assume that I made the
13  presentation as Bernd Klosterhalfen and --
14  Q. And did --
15  A. Usually we prepared several
16  presentations there.
17  Q. And Dr. Schumpelick, did he
18  make a presentation?
19  A. Usually not.
20  Q. And what did you understand the
21  purpose of the meeting to be?
22  A. I didn't have any information
23  why at that time, whether there -- what
24  intention is by Ethicon there. We were happy

Page 162

1 that we have got the opportunity to have a
2 discussion with another continent these
3 ideas. It was as our usual meetings that we
4 discussed the current stages, what is going
5 on in the future, what can be done, how we
6 can help support, what has to be done there.
7 Q. What was the context of
8 Dr. Barbolt's comment about Professor
9 Klosterhalfen's work?
10 A. What was?
11 Q. What was the context? How did
12 it come up? How did Dr. -- strike that.
13 How did Dr. Barbolt happen to
14 comment on Professor Klosterhalfen's
15 presentation?
16 A. How he come to this conclusion,
17 I don't --
18 Q. Let me ask it another way.
19 What was the nature of the
20 presentation from Professor Klosterhalfen on
21 which Dr. Barbolt commented?
22 A. The presentation of Bernd is
23 always that the larger the pores the better.
24 The smaller the pores it means intense

Page 163

1 inflammation and fibrosis, and this is
2 relevant and, therefore, we develop the VYPRO
3 mesh and material changes the reaction of the
4 tissue by some markers, expressed by some
5 markers, by some staining and so on. That is
6 what he since then -- always is telling,
7 finding and what we are convinced is
8 confirmed by all of these data. But
9 obviously, he has the opinion that material
10 doesn't matter and meanwhile I know --
11 MR. ANDERSON: "He" being
12 Barbolt?
13 THE WITNESS: Barbolt.
14 MR. ANDERSON: Go ahead, I am
15 sorry.
16 THE WITNESS: And meanwhile I
17 have learned that he think that
18 everything is mild to moderate and
19 didn't see any differences or any
20 impact of the material and
21 disappointing point for us was that
22 we -- we would have accepted very well
23 a discussion to see what are the
24 methods, what can be done better and

Page 164

1 so on, but a summarizing statement is
2 not relevant. That is a killer not
3 only for the future, but for any
4 communication and, therefore, I -- we
5 went out and were a little bit, yeah,
6 disappointed about it.
7 QUESTIONS BY MR. THOMPSON:
8 Q. What exactly did Dr. Barbolt
9 say?
10 A. Precisely, I didn't make any
11 writing there. But in the context, it is not
12 relevant.
13 Q. Okay. And meaning that
14 Dr. Klosterhalfen's work was not relevant?
15 A. Yes. Because he was -- he was
16 announced the pathology of -- from Ethicon
17 from the US, the man who is experienced.
18 Q. Now, you said that you learned
19 later that everything is mild to moderate?
20 A. Yeah.
21 MR. ANDERSON: No --
22 MR. THOMAS: I'll ask him.
23 THE WITNESS: Okay.
24

Page 165

1 QUESTIONS BY MR. THOMAS:
2 Q. Who did you learn that from?
3 A. I didn't learn that this is
4 right. I learned from the documents that in
5 some of the documents of Barbolt from his
6 study, he compared different mesh materials,
7 heavy-weight, light-weight and all thing, and
8 his findings were it is similarly mild to
9 moderate.
10 So if you made a measurement
11 where you don't find any differences, I think
12 your parameters are too rough or your eyes
13 are too closed to find these differences.
14 But if you believe that it is everything
15 similar mild to moderate, it is -- yes, it
16 is -- meanwhile, I know that may be the
17 reason that Barbolt come up to this opinion,
18 but I'm not an expert of Barbolt.
19 Q. So have you reviewed studies
20 conducted by Dr. Barbolt to understand his
21 opinions in that regard?
22 A. I've seen some of these
23 documents, and in some of these, I think a
24 deposition of Barbolt, but yeah, I've seen

Page 166

1   the data of his report and his publication, I
2   think, where he compared different mesh
3   materials and the result was mild to
4   moderate. He very often repeated that his
5   reaction is mild to moderate. So it's a very
6   often used phrase by us.
7       Q.   And, Dr. Klinge, is the
8   information that you've described about what
9   you've learned about Dr. Barbolt only come to
10  you during your work on this litigation?
11      A.   I don't have any other
12  information about the work of him.
13      Q.   Okay.
14      A.   Just this mainly based on this
15  personal impression at that time, which was
16  rather disappointing and it was really no
17  scientific discussion and later on, I've seen
18  his comment, his interpretation of his data.
19      Q.   Okay.
20      A.   These are the two only --
21      Q.   At the time of the meeting in
22  1999 or 2000, you didn't have any idea of the
23  basis of the comment that Dr. Barbolt made at
24  the time of that meeting; is that fair?

Page 167

1       A.   I didn't -- I didn't know -- we
2   just got this reflection by him and then it
3   stopped. There was no opportunity to discuss
4   these data as we did it now.
5       Q.   It was only the last three
6   years during the source of this litigation
7   that you understand how Dr. Barbolt has
8   analyzed certain data from studies he
9   conducted that you draw this conclusion?
10      A.   During my work and I'm looking
11  very carefully to all of the references and
12  literature and science about meshes, there is
13  no need to focus, to think about this study.
14  I never had the -- I never saw the necessity
15  to think about it. Just only because I'm
16  asked in -- at the opportunity of this
17  litigation, I had to look to these data
18  there.
19      Q.   And that's the first time you
20  drew a conclusion of what Barbolt meant when
21  he said it wasn't relevant; is that fair?
22      A.   I didn't get the -- all
23  correction.
24      Q.   And that's the first time when

Page 168

1   you reviewed the depositions and testimony of
2   Dr. Barbolt in this litigation that you drew
3   a conclusion of what Barbolt meant in 1999
4   when he said that Dr. Klosterhalfen's data
5   was not relevant; is that fair?
6       A.   It is my assumption that maybe
7   he had thought at that time that because of
8   this he gave it to us.
9       Q.   Okay.
10          MR. THOMAS: Let's take a break
11  for lunch.
12          THE WITNESS: However, it's a
13  difficult style to do it in this
14  manner.
15      (Off the record at 12:59 p.m.)
16          (Klinge Exhibit 8 marked for
17      identification.)
18  QUESTIONS BY MR. THOMAS:
19      Q.   Doctor, Mr. Anderson has kindly
20  given me a copy of a letter from you and
21  Dr. Klosterhalfen to Dr. Engel that is dated
22  December the 8th, 2000. I've marked it as
23  Exhibit number 8.
24          Is that the letter to which you

Page 169

1   referred to earlier where you and
2   Dr. Klosterhalfen wrote the letter Dr. Engel
3   advising Dr. Engel of issues with the VYPRO
4   II about which you're concerned?
5       A.   That is true.
6       Q.   I don't need you to read word
7   for word, but as you review the letter, what
8   are the nature of the problems that you've
9   identified with VYPRO II?
10      A.   I think it will be best to --
11  every sentence has some --
12      Q.   That's fine. Then you do
13  whatever you need to do to explain to me.
14      A.   So based on the results of
15  the -- the fresh results of our experiments
16  in rats with the implanted VYPRO II meshes,
17  we have to consider that these mesh
18  modification biologically behave similarly as
19  a common heavy-weight mesh as reason for the
20  intensified inflammatory fibrotic reaction
21  has to be discussed the considerable amount
22  of polyglactin, Vicryl, with the considerably
23  fibrogenetic power and the use of
24  multifilaments with the enhanced surface

Page 170

1  quality of the material. These results are
2  in accordance to the studies that are done by
3  you and Dr. Holste in pigs.
4        From our point of view, the
5  VYPRO II, as based on the present data,
6  cannot be considered as improvement of the
7  VYPRO mesh because the amount of the material
8  and the surface is significantly increased
9  and the pore size is reduced. Considering
10 these effects, it is in contradiction to
11 the -- to our published principles that have
12 been the basis for our joint development of
13 the VYPRO mesh. We want to state that we
14 haven't been involved in the development of
15 this specific mesh modification. Even if the
16 name VYPRO II, VYPRO, may indicate that we
17 have been involved. The clinical relevance
18 of these experimental results we cannot -- we
19 cannot evaluate or the significance or
20 relevance of these experimental results;
21 however, we advised a very careful testing.
22        We advised him to test it very
23 carefully and hope this modification rapidly
24 will be replaced by a large pore material and

Page 171

1  surface reduced monofil modification.
2  Respectfully.
3        So that is the entire text.
4        Q.   Did Dr. Engel respond to your
5  letter?
6        A.   I don't remember any response.
7        Q.   Did you discuss your letter to
8  Dr. Engel with anyone at Ethicon?
9        A.   With anyone else?
10       Q.   Yes.
11       A.   I don't recall. He was the
12 head of the R&D department at that time.
13       Q.   Did you take any other action
14 with respect to VYPRO II other than writing
15 the letter to Dr. Engel, which is Exhibit 8?
16       A.   No, we didn't. So far I
17 remember correctly, we didn't intensify our
18 warning to VYPRO II.
19       Q.   Okay. Now, back to our work
20 that you were doing from the period 1994 to
21 2000. You said you had regular meetings with
22 Ethicon personnel.
23        Did those meetings occur both
24 at Norderstedt and in Aachen?

Page 172

1        A.   Yeah. We met in Norderstedt.
2  We met sometimes at the factory where later
3  on the meshes have been produced, we met
4  there. Or we met -- mostly we met in Aachen.
5        Q.   And when you met, were there
6  agenda prepared for the meetings so you knew
7  what you were going to discuss?
8        A.   Usually there had been an
9  agenda that has been spread later on my
10 e-mail to everyone and usually we prepared or
11 I organized that we have some actual
12 presentations of the results of the projects.
13       Q.   So the purpose of the meeting
14 was to keep Ethicon advised of the status of
15 the research that you were doing, correct?
16       A.   The first intention was to give
17 an overview current status of the past
18 projects, of the present projects and of the
19 ongoing projects to say what we need to them.
20 There has been sometimes occasionally some
21 other -- some minutes where they had some
22 devices, 3-D devices where they wanted to
23 present these modifications to the -- that we
24 can feel on it so that we can give some

Page 173

1  comments on this sometimes. Not every time.
2        Q.   Did the same group of people
3  from the Aachen group attend these meetings
4  with Ethicon?
5        A.   There is -- always there's
6  Professor Schumpelick there. Most often I've
7  been there. Professor Klosterhalfen very
8  often and the other people on demand. If
9  this project is presented there, if this was
10 ready to be presented there or if they wanted
11 to start a new project, I tried that these
12 guys or some of this group, I usually wanted
13 to have two guys working in one project. If
14 one is on holiday or sick or so that you have
15 some sort of continuation. But one of these
16 guys is there to discuss this.
17       Q.   Dr. Klinge, you've identified
18 now agenda and presentations and I'm sure
19 there are other documents that came out of
20 those meetings.
21        Did you save the documents from
22 those meetings?
23       A.   I have some of these agenda,
24 e-mails put on your file there are some.

Page 174

1   Q.   Okay.
2   A.   It is very often prepared by
3   Dr. Holste or Dr. Hellhammer. They sent the
4   same or the final draft for the agenda and
5   said how many people, when they come so that
6   we have to arrange the peoples are not in the
7   OR at that time.
8   Q.   Okay. Are they in English or
9   German?
10  A.   In German.
11  Q.   And are there presentations
12  included in the documents you produced as
13  well?
14  A.   We --
15  Q.   Presentations related to the
16  meetings with Ethicon, just so we're clear.
17  A.   There aren't specific
18  presentations that are linked to these
19  working meetings here. Because every one of
20  my colleagues just showed three, four, five
21  slides there. No big presentations. I added
22  to your -- to the files several presentations
23  I made in connection to the Ethicon
24  activities.

Page 175

1   Q.   Is this before the year 2000 or
2   after 2000?
3         MR. ANDERSON: Both.
4   QUESTIONS BY MR. THOMAS:
5   Q.   Okay. You mentioned your
6   review of the Barbolt animal studies a few
7   moments ago that you reviewed in connection
8   with the litigation.
9         In your -- what animal studies
10  did you review of Dr. Barbolt, do you
11  remember?
12  A.   It's mainly in -- I remember
13  there has been a famous dog study and some
14  rat studies 90 days or something around this.
15  Q.   Have you ever tried to
16  replicate the studies conducted by
17  Dr. Barbolt that you reviewed?
18        MR. ANDERSON: Objection.
19        THE WITNESS: In principle, we
20  didn't anything else.
21  QUESTIONS BY MR. THOMAS:
22  Q.   I'm sorry, I don't understand
23  your answer.
24  A.   Dr. Barbolt in his study with

Page 176

1   the rats, he compared the tissue reaction to
2   various mesh materials and look what happens
3   there.
4   Q.   Okay.
5   A.   We did it since 1994. We are
6   looking to the tissue response to various
7   mesh materials. He saw -- he described that
8   there's no significant difference between
9   these materials. We use the similar
10  materials in our experiments and we had a lot
11  of publications, a lot of findings showing
12  that there is some difference and this is the
13  basis of our work, our scientific work, our
14  opinions in the development of the
15  light-weight meshes, the large pore meshes,
16  the conception.
17        So, yeah, we didn't anything
18  else --
19  Q.   Is it fair to say that based
20  upon the studies you had already done, you
21  disagreed with the findings of Dr. Barbolt in
22  his study?
23  A.   They are in conflict. They are
24  directly in conflict. His conclusions are

Page 177

1   directly in conflict to our statements.
2   Q.   Is there anything about the
3   study design of the Barbolt rat studies that
4   you can point to that would be a reason for
5   the conflict?
6         MR. ANDERSON: Well, objection,
7   Counsel. Barbolt rat studies, which
8   ones? Do you have something for him
9   to look at?
10        MR. THOMAS: No, I don't.
11        MR. ANDERSON: Because asking
12  him to do that without looking at a
13  study I think is unfair.
14  QUESTIONS BY MR. THOMAS:
15  Q.   Well, you mentioned a 90-day
16  rat study that you looked at.
17        Is that right?
18  A.   Yes. I mentioned it, yeah.
19  Q.   Okay. And you recall of that
20  study that Dr. Barbolt compared a number of
21  different meshes for tissue reaction,
22  correct?
23  A.   Yes.
24  Q.   And when you reviewed that

1 study by Dr. Barbolt, 90-day rat study
2 comparing different meshes and their tissue
3 reaction, did you look at the study design?
4    A.    Yes, I looked to the study
5 detail.
6    Q.    Is there anything about the
7 study design that you could point to explain
8 the difference in the results that were
9 found?
10        MR. ANDERSON:  Again, same
11    objection, without having -- to put a
12    study -- to ask him about a study
13    without putting it in front of him, I
14    think, is unfair, Counsel.
15        MR. THOMAS:  If he can answer,
16    he can.  If he can't, he can't.
17        THE WITNESS:  I can give you a
18    general comment on this.
19 QUESTIONS BY MR. THOMAS:
20    Q.    Okay.
21    A.    There are his study, but there
22 are several other study or studies as well
23 comparing, for example, heavy-weight more
24 pore meshes and large pore meshes.  And it

1 depends from the readout whether you find a
2 different tissue reaction, yes or not.
3        If you don't find a significant
4 difference and come up to the conclusion that
5 there is no different reaction between the
6 Marlex Prolene® and all of these guys and the
7 other guys, if you come to the conclusion
8 that there is no difference, it can have two
9 reasons; first, there is no impact of the
10 material or the readout is not sensitive
11 enough to see any difference there.  That
12 only can be the reason for this.
13    Q.    Okay.
14    A.    So we have worked a lot and
15 this was mainly done with Bernd Klosterhalfen
16 together to define readouts to identify these
17 differences.  Because from our clinical
18 experiences, we know that there are these
19 differences.  We wanted to understand what
20 are these differences and, therefore, we
21 developed parameters that are able to see the
22 impact of mesh material and the tissue
23 response.
24        So Barbolt when -- or when you

1 are coming to the conclusion that there is no
2 impact, the first explanation is that your
3 readout is not sensitive enough.
4    Q.    Okay.
5    A.    Because if you just looking to
6 the weather outside, you will not find any
7 impact from the material on the tissue
8 reaction because you are looking with a
9 insensitive view to this.
10    Q.    You said that you and
11 Dr. Klosterhalfen developed special
12 parameters to measure the tissue reaction to
13 mesh materials.
14        Is that something that you've
15 published, those parameters?
16    A.    That is -- that is one of
17 the -- this is the first main challenge for
18 us.  When we looked at the literature at the
19 beginning of the '90s, there are only a few
20 studies by Hinoul and some others looking to
21 the tissue reaction to mesh materials.  There
22 has been only a very rough description that
23 there is some scar, nothing else, and they
24 didn't differentiate between the different

1 materials, the different properties.  There
2 even was a sufficient characteristic of these
3 mesh designs.
4        So when we started to think
5 about how to optimize, how to evaluate the
6 impact of a modification on the tissue
7 response, we need to get very precise
8 parameters, reproducible parameters,
9 objective parameters, that helps to find the
10 differences and that helps to understand the
11 differences we know from the OR and we
12 started from a surgical problem and used
13 science to explain the surgical problem, not
14 otherwise around.
15    Q.    So you developed --
16    A.    We developed parameters.
17    Q.    New parameters.
18        Have you published those
19 parameters?
20    A.    Of course, it is published
21 in -- if you look to our publications in the
22 '90s and later on, we usually introduced a
23 textile analysis for characterization of the
24 mesh material and then we added a very

Page 182

precise description of material and methods. We presented the measurement, the quantitative measurement of the partial volume of connective tissue, inflammatory, we counted the cells. So that is all what you have seen in the presentation of Professor Klosterhalfen.

Q. Okay. Other than yourself and Dr. Klosterhalfen, who else studies in this field that you respect?

MR. ANDERSON: Objection as to "this field."

THE WITNESS: I respect very much -- very many persons studying in this field. Most of them have very limited resources to do research in this field; however, they struggle a lot, sometimes they have good ideas so a lot of persons that made presentations at the hernia conferences or they -- all of the people they -- that we could invite at the Suvretta meetings, I have deep respect for their contribution to this

Page 183

field.

QUESTIONS BY MR. THOMAS:

Q. Anyone from the United States?

A. There are a lot of -- Matthews from New York, so just the recent ones that I can remember Filippo, Fitzgibbons.

Q. Heniford?

A. Heniford, Kopf, Ransho. Ransho did an excellent job when he developed his institute and made these analysis. Carla Deacon, she presented a lot of textile data to ease the characterization, their amitus clinician, yeah.

Q. Doctor --

A. Great people.

Q. Good.

In the field today, the people you've just described who were involved in research in materials and mesh, do they use the same objective parameters and reproducible tests that you and Dr. Klosterhalfen use?

MR. ANDERSON: Objection.

THE WITNESS: If you look to

Page 184

the literature there and if you're trying to identify what is the result of our activities to the present publications, in the presentations, in the publications of Heniford, you will find a lot of our ideas. In the presentations of Carla Deacon, you find a lot of ideas and calculations. If you look to the studies of, for example, Luenski from US, from Bellan from Spain, you find a lot of these ideas. They are looking to the macrophages, they're looking to the fibrotic tissue. They're mentioning pore size, they're mentioning light-weight, heavy-weight. So a lot of these ideas are -- meanwhile became an essential. If you want to study meshes, textiles in surgery, yeah, you will do it in this way.

Q. Okay.

A. And this was not known in the days before.

Q. In the time that you and your

Page 185

group were conducting the testing that you did on the 20 meshes from 1994 to 2000 in order to understand the meshes, were you the person who supervised the testing?

A. I don't know what is your meaning of "supervising." I was -- in fact, those -- I was responsible for all these things and I did a lot of these things myself, but there have been some others where my colleagues did it theirselves or themselves without sitting aside and doing it all myself.

Q. So you did --

A. Supervising is maybe the correct term.

Q. Throughout this period, you did animal implantation studies to understand how mesh would interact with an animal?

A. We still are doing it.

Q. I'm focusing right now on the period 1994 to 2000.

A. Yes.

Q. And is it fair to understand that for each of those studies that you would

Page 186

1 have ultimate responsibility for those
2 studies?
3         MR. ANDERSON:  Objection to
4     form.
5         Go ahead.
6         THE WITNESS:  In general, yes.
7 QUESTIONS BY MR. THOMAS:
8     Q.    And I'm not --
9         MR. ANDERSON:  Are you finished
10    with your answer?
11        THE WITNESS:  Just to explain
12    this.
13 QUESTIONS BY MR. THOMAS:
14    Q.    Sure.
15    A.    Because there are several
16 variations later on.
17        So there are some -- I usually
18 have been involved in it, but the degree of
19 my activity for defining every detail to
20 this, this may vary a little bit.
21    Q.    Did your animal test during
22 this period from 1994 to 2000 have a standard
23 methodology that you followed for animal
24 implantation studies?

Page 187

1     A.    There are general rules for
2 animal to take care so -- worldwide-accepted
3 rules for doing animal experiments so these
4 have to be considered, of course.  But if you
5 ask specifically, we have developed different
6 animal models, if you like to talk of models
7 in relationship to animals.  But there are --
8     Q.    Not today.
9     A.    There are some certain models.
10 Because it is different whether you made a
11 full abdominal wall replacement in a rat or
12 whether you made a placement of the mesh only
13 in the subcutaneous space, whether you want
14 to investigate the reaction within the
15 abdominal indicative, sometimes you need some
16 bigger animals for the shrinkage, you need
17 bigger animals in mice, you're very limited
18 to do so, so there is a -- maybe half a dozen
19 or a dozen different animal settings with --
20 where we try to make it in a standardized
21 way.
22    Q.    Did you standardize the sample
23 preparations of the mesh prior to implant?
24    A.    We permanently tried to

Page 188

1 optimize it.  So we had -- in the beginning,
2 we had other time points.  Later on, we
3 changed the time points a little bit.  At the
4 beginning, we made some explantation of the
5 42 days, then we later on learned that it's
6 not necessary to do so.
7         But then we started a project,
8 you have a protocol, and in this protocol,
9 you have before -- you have to define how to
10 handle the tissue that is explanted, when do
11 it and so on.
12    Q.    I think you misunderstood my
13 question.
14        I'm talking about the front end
15 before you put the mesh in the animal, was
16 there a standardized procedure about how you
17 prepared the mesh prior to implant?
18    A.    There is a standardized
19 procedure, yes.
20    Q.    Does that standardized
21 procedure include sterilizing the mesh?
22    A.    I read that this was an issue
23 in your discussions.
24    Q.    I am sorry, where did you read

Page 189

1 that?
2     A.    In the deposition, in the
3 question with Klosterhalfen, you already
4 discussed this issue.
5     Q.    I think you mentioned it in
6 your deposition last year, too.
7     A.    That the sterilization?
8     Q.    You sterilized the mesh before
9 you did the implants.
10    A.    We did it for the meshes that
11 are -- where we got -- for PVDF meshes, for
12 example, that we got from the FEG.  At that
13 time, they didn't have the facility to have
14 sterilized.  All mesh materials from Ethicon
15 we got completely cut in a fashion 2.5 to
16 3.5 centimeters, and they're clear for use.
17 They are sterilized, they are picked, they
18 are cut, so that was part of our working
19 meetings there to say that we need meshes
20 five to five centimeters, and we got them
21 completely for this purpose and there was
22 printed on for experimental use.
23        So all these meshes that are
24 coming from Ethicon, they are completely

Page 190

1 picked and sterilized for use.
2 Q. So just to answer the question,
3 for the Ethicon meshes that you used in your
4 animal studies for the period 1994 to 2000 --
5 A. Yeah.
6 Q. -- did you sterilize those
7 yourselves?
8 A. No.
9 Q. Prior to use?
10 A. No. It was not necessary.
11 Q. For the period 1993 to 2000,
12 did any of your work for Ethicon focus on
13 pelvic floor?
14 A. No.
15 Q. And I distinguish between
16 pelvic floor and stress urinary incontinence,
17 so I ask the question again.
18 Did any of your work from the
19 period 1994 to the year 2000 deal with the
20 treatment of stress urinary incontinence?
21 A. No.
22 Q. Doctor, was there a time in
23 your consulting relationship with Ethicon
24 where you were consulted with respect to the

Page 191

1 use of mesh for stress urinary incontinence?
2 A. I only recall one, two
3 conversations with Dr. Hellhammer when she
4 informed me that there is an upcoming issue
5 to use textiles in the pelvic floor and that
6 I pointed out that when doing so, it would be
7 very advised to use the principles of the
8 VYPRO project for this purpose.
9 Q. Did she --
10 A. And later on this was -- we
11 invited Professor Unsten at one of the
12 Suvretta meetings to cover this -- the use of
13 textiles in the pelvic floor as well, but we
14 didn't do any research or any development
15 with focus on these two.
16 Q. In the conversation you had
17 with Dr. Hellhammer, do you know whether the
18 mesh to which she was referring was in the
19 pelvic floor or for stress urinary
20 incontinence?
21 A. I don't recall that there was
22 this differentiation.
23 Q. Did you understand in your
24 conversation with Dr. Hellhammer that the

Page 192

1 mesh to be used in the pelvic floor was a new
2 mesh?
3 A. I don't recall that I got any
4 more precise information about what was
5 ongoing there. I later on saw that in the
6 area of 2001, Dr. Hellhammer prepared a big
7 report where she outlined that VYPRO would be
8 maybe a good solution for the use in the
9 pelvic floor as well.
10 I assumed that this was a
11 consequence of our conversation.
12 Q. Now, do you use pelvic floor to
13 include stress urinary incontinence?
14 A. Please, can you rephrase it?
15 Q. Sure.
16 Pelvic floor can mean different
17 things in different people and when I refer
18 to pelvic floor, I refer to the treatment of
19 cystoceles, rectoceles, pelvic organ
20 prolapse.
21 I refer to other meshes for the
22 treatment of stress urinary incontinence as a
23 different category.
24 Do you separate the two?

Page 193

1 A. I wouldn't separate it in the
2 way that you're doing. I know that there
3 are -- from the clinical standpoint, there
4 are different diseases. They're treated
5 differently, they're paid differently. In
6 the treatment of these things, if you're
7 looking at Petros theory, you can treat
8 everything with slings and with meshes, flat
9 meshes. They acted differently. They have
10 different task, they have different
11 consequences. So incontinence can be a
12 consequence of a prolapse as well. So there
13 is a huge mixup of therapies and diagnosis
14 and of treatments there.
15 I would prefer for the
16 development of a device, for the treatment in
17 the pelvic floor area that you have to -- I
18 would prefer to differentiate between the
19 flat meshes, tension-free, extended area or
20 the slings that are intended to replace
21 ligaments. So from the functional side, I
22 think it is more helpful to differentiate
23 between these two than to say pelvic floor is
24 prolapse and incontinence is sling. That is

Page 194

1 not reflected by the various options that you
2 have in the treatment and that -- but I know
3 it's an ongoing discussion.
4          If you go to the Congresses for
5 them, there are some preferring meshes.
6 There are some meshes with slings or arms and
7 some others are preferring slings as well
8 so --
9     Q.    At what point did you first
10 study the use of slings for the treatment of
11 stress urinary incontinence?
12    A.    The first time I was invited by
13 Professor Schulser, he made a local meeting
14 there for his colleagues. He's a
15 gynecologist and they -- they were starting
16 the discussion in -- I don't remember the
17 name. The year maybe 2004, so something
18 around -- it was not come an issue whether to
19 use other plastic materials in the pelvic
20 floor, yes or not. And he invited me as a
21 surgeon with the experience of hernia meshes
22 which are the -- in fact, similar or the same
23 as in gynecology to reflect our experiences,
24 our knowledge there. That was the first

Page 195

1 time.
2          Later on, I had the
3 opportunity -- he sent us some of his
4 explanted slings. We made a publication
5 together, then we made a review for the
6 journal together. So that was the starting
7 point to think of it and, yeah, today, if I
8 regularly look to the literature and if you
9 look to mesh, then meanwhile one-third of the
10 publications are referring to pelvic floor
11 mesh.
12    Q.    The first work that you did in
13 connection with slings for the treatment of
14 stress urinary incontinence, you came at the
15 invitation of your friend in Lucern; is that
16 right?
17        MR. ANDERSON: Lucern.
18        THE WITNESS: Lucern.
19 QUESTIONS BY MR. THOMAS:
20    Q.    Sorry.
21          And what was the purpose of
22 your presentation there?
23    A.    To present the experiences with
24 textiles in surgery. The experimental

Page 196

1 results, how -- the characteristics. It's a
2 terminology that is not familiar to surgeons,
3 gynecologists and urologists. We have worked
4 for ten years to introduce it in the surgical
5 community, but the gynecologists and
6 urologists still have a limited knowledge
7 about these terminology and, therefore, I was
8 invited by him, later on by Dr. Tunn in
9 Berlin and later on by Ethicon in 2007 for
10 the same purpose to present our experiences
11 there.
12    Q.    And is it fair to understand
13 that you presented your experiences insofar
14 as they relate to meshes and hernia repair to
15 those people who are knowledgeable and
16 experienced in the treatment of stress
17 urinary incontinence to see the extent to
18 which those two went together?
19    A.    The main topic we present is
20 what happens if you use a textile, what
21 happens in the tissue and what are the main
22 things that you have to consider when using a
23 textile in the tissue and this is based on
24 our experiences in surgery for hernia

Page 197

1 patients, on the preclinical studies, which
2 are quite similarly used for many, many
3 different devices. That has been the focus
4 there.
5    Q.    Have you ever studied the
6 placement of transvaginal tape for the
7 treatment of stress urinary incontinence?
8    A.    No. No. We didn't study it
9 ourselves and surprisingly when looking to
10 the literature, I did not know -- I didn't
11 find preclinical studies using comparison --
12 or studying the tissue reaction to slings.
13    Q.    Is it fair to understand that,
14 as you sit here today, you still have not
15 studied the transvaginal placement of mesh
16 for the treatment of stress urinary
17 incontinence specifically?
18        MR. ANDERSON: Objection.
19        THE WITNESS: It is correct
20 that we didn't study this specific
21 application because there is no good
22 animal model, but what we did
23 extensively was we studied Prolene®.
24 So that was without any doubts.

Page 198

QUESTIONS BY MR. THOMAS:

Q. At what point did you begin consulting with Ethicon on pelvic organ prolapse?

A. I never was asked by Ethicon to think about this issue.

Q. Okay. Doctor, have you ever been involved in any degradation studies for mesh, polypropylene mesh?

A. Involved in this direction that we -- that I advised to make the electron microscopy investigation that is later on published last year, I think, by Klink where he presented the electron microscopy, the comparison of PVDF and polypropylene. Because he wanted a manuscript dealing with the long-term result of a PVDF implant and, therefore, I thought it would be very helpful if they added this -- they tried to make an electron microscopy and add it to the manuscript and, in fact, they did it.

This was to my knowledge the only thing where I initiated a specific study in this work for degradation.

Page 199

Q. When you talk about this study by Dr. Klink, who is Dr. Klink?

A. He's one of our surgical coworkers.

Q. At the university?

A. At the university, yeah.

Q. Did you appear on the study with him?

A. Yes.

Q. Who else is on that study?

A. Some other surgical coworkers. I didn't recall everyone.

Q. And did you have any involvement with the design of the study that Dr. Klink conducted?

A. The placement of this material, the rough general plan, yes, but not specifically the details of this study.

Q. Tell me what involvement you had in the rough general plan of the study.

A. The principle idea, what to do or what to investigate, that is discussed with me so that I can say this is already done, this is insufficient to get published

Page 200

from my experience or what are the readouts, to define the readouts so we get a reliable result of such a study or whether it's insufficient to calculate the number of animals. Usually the discussion of this I'm involved in this.

Q. Was Dr. Klink a student at the university at the time?

A. No, he's a doctor.

Q. So he's a colleague of yours?

A. A colleague.

Q. Okay. Were you present with Professor Klosterhalfen when Professor Klosterhalfen had a debate with Clavé about his presentation on degradation of polypropylene?

MR. ANDERSON: Objection. Go ahead.

THE WITNESS: I have been in Dijon at this meeting and saw the presentation of Clavé there, and I know that there has some dispute, academic dispute, between them. From my impression, it was not very

Page 201

intense, but maybe I'm a surgeon and in surgery it is -- we have another sensation for this. So, yeah, it was a conflicting while surprising result there that he shows not -- yeah, that what he shows there.

QUESTIONS BY MR. THOMAS:

Q. And what was it surprising in what Clavé reported?

A. Both in the extent of the degradation of the polypropylene, we didn't expect it at that time point and that he failed to see a degradation in the polyester. Because we already some years ago had seen it even by light microscopy and there wasn't this degradation. There was good literature from vascular grafts made of polyester that polyester is going to be degraded, and if someone is standing up and saying, "No, polyester is not degrading," that was something we could not understand at that time point.

It was not the fact that he showed the polypropylene was going to show

1  this surface cracking because we are not
2  absolute fan of either polymer, of these both
3  polymer.
4      Q.    After the meeting in Dijon, did
5  you and Dr. Klosterhalfen talk about doing a
6  degradation study on polypropylene?
7      A.    There was a discussion.  It was
8  in the car of Klosterhalfen when we came back
9  to this so we had some hours time to discuss
10  this.  And, yes, there appeared the idea that
11  it would be necessary -- that it would be
12  helpful, in particularly as we favor PVDF.
13  So we are interested, and I think it would be
14  an interesting question as well what happens
15  in comparison to those.  So a new field which
16  you can study, that was the result of this.
17      Q.    And did you work on designing a
18  study to determine the extent to which
19  polypropylene degrades as compares to PVDF?
20      A.    No.  I did not make a complete
21  study.  It was the idea that was raised
22  there.  It was the idea to take some
23  implants, to go over there, to pay for it and
24  to give some -- to get some images and to see

1  what happens because at that time point, we
2  didn't know whether it's sensitive enough or
3  not.  To make a study, to really study
4  degradation process, what is impact, is it
5  controlled, at what time point, what is the
6  consequence, it needs a lot of more power and
7  resources to make a real study of it.
8      Q.    And when you say that, what
9  needs to be done in the area of degradation
10  to understand the nature and extent of
11  degradation of polypropylene?
12      A.    The problem of degradation is
13  that it -- my experience of degradation is we
14  had to do it -- we had some studies for --
15  with absorbable material and absorbable
16  material in a reasonable time period shows
17  some degradation.  But then we have to define
18  what happens there.  There is -- there are
19  chemical questions, the problem is the
20  degradation after two years, how do we find
21  this, animal models are limited.  You can't
22  use rats on it.  There are only certain
23  animals.  You cannot -- you should have
24  looked at various localizations at various

1  tissues for different time points.  You have
2  to look in the presence of infection, in
3  germs and in the absence of this material.
4  You have to look with various very sensitive
5  methods to look what is degraded, what
6  happens there.
7          So a lot of these things, if
8  you look to the literature dealing with
9  degradation, there are a lot of methods,
10  techniques that, of course, can be done, but
11  it takes a lot of time, resources, money, to
12  do so.  It is simple to take some rats and
13  look what happens after two years.
14      Q.    And why is that a problem?  Why
15  didn't you take rats and implant the sutures
16  and look after two years?
17          Why is that?
18      A.    The rat is surviving only two
19  years or three years.  It does have different
20  immunological capabilities than humans.  It
21  does not have the disease.  You cannot
22  implant it in the -- in a functional
23  similarity to what is in humans.  So any
24  animal experiments just give you some small

1  aspects.  Some small aspects you can
2  investigate in animals, some others not, so
3  you have to make a network research
4  degradation of the polymer.
5          So different -- many, many
6  different aspects.  Not one.
7      Q.    Doctor, are you aware of a
8  study in the literature today that you would
9  identify as being reliable to analyze the
10  extent to which polypropylene degrades in
11  vivo in a human?
12      A.    I cannot answer to what extent
13  in vivo because it should be more precise to
14  what conditions.
15          The only thing that I can
16  really good or -- I can answer is the
17  question does it degrade, yes or not, and
18  meanwhile, I think if you look to all of the
19  arguments, to all of the studies, there is
20  to -- I'm certain, I'm convinced that there
21  is degradation to the polypropylene when you
22  implanted it into -- in tissues, yes.
23      Q.    Is that based upon the scanning
24  electron microscopy?

Page 206

1    A.   It is based on all these
2  various publications that meanwhile have
3  shown these -- these surface cracking or
4  these degradation, these morphological
5  changes, included the investigation that are
6  done for this.  All of this is in agreement.
7  It's consistent.  All together it makes clear
8  there is some and it should have been
9  investigated so that you have an
10 understanding by the manufacturer, not by the
11 surgeon, not by the patient.
12    Q.   When you and Dr. Klosterhalfen
13 came back from Dijon and talked about
14 conducting a degradation analysis, did the
15 two of you decide what to do?
16    A.   I recall that we discuss how
17 this can be done and this can be done at
18 human explants to bring them somewhere, yeah.
19 That was the discussion there.
20    Q.   And there came a point in time
21 when FEG paid for certain testing, correct?
22    A.   They initiated this thing.
23    Q.   Did you suggest it to them?
24    A.   To do this?

Page 207

1    Q.   Yes.
2    A.   It was a discussion among
3  Obolensky, Klosterhalfen and me that these
4  are interesting findings.  The FEG has been
5  participating in Dijon as well so they
6  realized that there is maybe a new topic
7  there and they wanted to have own experiences
8  in this field and, therefore, they initiated
9  the study.
10    Q.   Did you consult with FEG about
11 how to conduct the study?
12    A.   I'm not an expert in electron
13 microscopy, that is in the field from
14 Professor Klosterhalfen.  I can just say,
15 yeah, should be done in explanted mesh
16 materials, yes, but I'm not able to give
17 advice on how to do an electron microscopy.
18    Q.   Did you provide any explants
19 from your collection to FEG to test?
20    A.   Not that I recall.
21    Q.   Have you ever provided to FEG
22 any mesh explants for them to analyze that
23 came from your collection at the university?
24    A.   Not that I recall.

Page 208

1    You mean the human?
2    Q.   Yes.
3    A.   Human.
4    Q.   The answer is the same?
5    A.   For the humans, not -- they
6  didn't get any specimen for further
7  investigation.  Of course, in the experiments
8  and project I do together with them, we share
9  the results of these.
10    Q.   The animal studies?
11    A.   The animal studies, yeah.
12    Q.   But you've never shared with
13 them a human --
14    A.   Human explants, no.
15    Q.   Dr. Klosterhalfen testified
16 this weekend that he did give some of the
17 explants that he had from his collection for
18 FEG to study.
19    Did you have any involvement in
20 consulting with how those explants would be
21 prepared for analysis?
22    A.   As I told you, it was not my
23 expertise to say how a section has to be
24 prepared for performing a electron

Page 209

1  microscopy.
2    Q.   Have you ever cleaned a mesh
3  explant?
4    MR. ANDERSON:  Objection to
5  form.
6    Go ahead.
7    THE WITNESS:  We did it.  We
8  did it from cells and from proteins to
9  get the permanent structure, to
10 demonstrate the permanent structure of
11 these materials, we sometimes did it.
12 QUESTIONS BY MR. THOMAS:
13    Q.   And did you do it -- strike
14 that.
15    When did you do that?
16    When did you clean tissue to
17 learn about the permanent structure of the
18 material?
19    A.   Sometimes in between the first
20 ten years of our research.
21    Q.   Okay.  How did you clean
22 materials?
23    With what kind of substance did
24 you clean it with?

Prof. Dr. Med. Uwe Klinge

Page 210

1    A.    We usually use some proteases
2    to do so.
3        Q.    Tell me what a protease is.
4        A.    A protease is a protein that's
5    able to degrade other proteins so they can
6    remove or get soluble in a liquid solution.
7        Q.    Are there different kinds of
8    proteases?
9        A.    Yes.
10       Q.    I figured.
11       A.    Numerous.  I don't know them
12   all by heart.
13       Q.    What type of protease would be
14   appropriate for cleaning human tissue off an
15   explant?
16       A.    I don't recall.  I would have
17   to look to the protocols.
18       Q.    And where would you look to
19   figure that out?  Would it be in the
20   published literature?
21       A.    Yeah, there is -- the first man
22   who did it was maybe Coda.  It was an Italian
23   publication, in Hernia, together with Ben
24   David, a Canadian surgeon, and they published

Page 211

1    for the first time the change of pores after
2    explantation and they removed all tissues
3    from their explants.
4        Q.    And what was the finding of
5    that study?
6        A.    That when you're doing this and
7    you're removing all of this tissue -- all of
8    these tissues and make them a photograph of
9    these meshes, the pores are bigger than in
10   the textile -- in the pristine form, I think
11   is the word.
12       MR. ANDERSON:  Pristine, yeah.
13   QUESTIONS BY MR. THOMAS:
14       Q.    So what kind of mesh was
15   tested, do you know?
16       A.    It was usually large pore,
17   heavy-weight meshes, I don't have any detail.
18   Several.  They have maybe 20 different
19   explants and then they are analyzed.
20       Q.    Did Coda and Ben David give an
21   explanation as to why the pores were larger
22   after cleaning than they were pristine?
23       A.    Of course, they tried to give
24   an explanation.  There always is a huge

Page 212

1    discussion there.
2        Q.    Sure.
3        A.    But I don't recall it.
4        Q.    Okay.  And this is Coda,
5    C-o-d-a?
6        A.    Yes, C-o-d-a, Italian, and it
7    is in Hernia published and coauthor I know is
8    Ben David.  Robert Ben David.
9        Q.    How long ago was this, do you
10   know?
11       A.    '99, 2000.
12       Q.    Did you look to the methods
13   used by Coda in his publication to learn how
14   to remove the tissue from the explants where
15   you've done that?
16       A.    I remember that we have -- that
17   we look in the literature to find some
18   references to see what to -- what to do with
19   these tissues and how to remove the tissues,
20   but I don't recall -- I recall that we only
21   found three, four publications at that time
22   when we did it offering some protocols to do
23   these experiments, but I don't recall why we
24   did and for what purpose.  I cannot imagine.

Page 213

1        Q.    Do you know whether the methods
2    used by Coda and Ben David in their study are
3    accepted today as an appropriate method to
4    remove tissue without damaging the mesh
5    material?
6        A.    I never -- and I extensively
7    looked through the literature.  I never found
8    a statement which is close to what you are
9    questioning.
10       Q.    Okay.  Dr. Klosterhalfen
11   testified this weekend that the explants that
12   he supplied to FEG were cleaned before
13   analysis.
14       Did you have anything to do
15   with deciding a method by which the explants
16   would be cleaned?
17       A.    By what?  By --
18       Q.    Did you have any
19   contribution -- strike that.
20       Did you tell Dr. Klosterhalfen
21   or anybody your ideas about how to clean the
22   explants before they were analyzed by
23   scanning electron microscopy?
24       A.    I don't recall any specific

Page 214

1 device there and, of course, it is in his
2 field how to prepare sections for electron
3 microscopy. I just recalled some discussions
4 whether, yeah, there are some pros and some
5 cons to clean it and not to clean it and so,
6 yeah.
7     Q.   What are the pros and cons?
8     A.   To clean it or not to clean it,
9 if you clean it, you -- you expect that you
10 only have the polymer there without any
11 alteration by some attachments from outside.
12         If you clean it, you may get --
13 as a consequence, you may get some damage by
14 cleaning process. So whatever you're doing.
15     Q.   Did you see the results of the
16 FEG testing of the Klosterhalfen explants?
17     A.   Some of these. Not -- I'm sure
18 I didn't see all of them, but I saw some of
19 these images.
20     Q.   Do you have copies of the
21 images?
22     A.   They're included in my
23 presentations there. And it is --
24     Q.   And the presentations you're

Page 215

1 talking about, the presentations that you
2 make to --
3     A.   And you have and is similar
4 images as Klosterhalfen presented.
5     Q.   Okay. Do you have any study
6 analysis of the people who conducted the
7 scanning electron microscopy that would
8 reflect how they prepared the samples and
9 took the photographs, the images, that you
10 now have in your presentations?
11     A.   I didn't saw the protocols, how
12 they did the analysis.
13     Q.   Do you have any paperwork at
14 all from that study?
15     A.   If you call it this pilot study
16 from the FEG, I didn't have any.
17     Q.   Okay. Do you have any
18 documents other than the images that you've
19 described that deal with the FEG analysis of
20 the Klosterhalfen explants?
21     A.   No, I don't have.
22     Q.   Dr. Klosterhalfen also told us
23 that FEG contracted with a lab in Bulgaria to
24 conduct some animals studies with mesh.

Page 216

1         Are you familiar with that
2 study?
3     A.   I know that there is a -- there
4 has been a project together with -- with an
5 urologist from Neuss, close to Dusseldorf
6 where you're going tomorrow, Dr. Otto, and if
7 you look to the -- and this has already
8 published, Otto and Dr. Klosterhalfen
9 together they have published some article
10 dealing -- because he's working on the -- to
11 find better mesh materials for the pelvic
12 floor area. I know that they performed this
13 study in collaboration with this Hungarian
14 lab and these are mentioned as coauthors. So
15 I don't recall the address, but if you're
16 going to this article, they're mentioned as
17 coauthors.
18     Q.   Okay. So you understand that
19 the study conducted by FEG comparing
20 degradation of PVDF and polypropylene has now
21 been published by Dr. Klosterhalfen and
22 Dr. Otto?
23         MR. ANDERSON: Objection to
24     form.

Page 217

1 QUESTIONS BY MR. THOMAS:
2     Q.   Is that right? Is that what
3 you said?
4     A.   No, that is not right.
5     Q.   I am sorry, I misunderstood
6 you.
7     A.   You asked me whether there was
8 a collaboration. He mentioned a
9 collaboration with a lab in Hungaria. That
10 was the question I tried to answer to this
11 and, therefore, I said, yes, there was this
12 collaboration with this lab in Hungary. It
13 does not -- or it is -- it's not in relation
14 to the electron microscopy study. It's
15 completely different.
16     Q.   And maybe I better start over.
17         Dr. Klosterhalfen testified
18 this weekend, I believe, that at the same
19 time or about the same time as FEG asked the
20 lab here in Aachen -- GFE I think it is?
21     A.   Yeah.
22     Q.   -- to conduct electron
23 microscopy of some of his explants, the FEG
24 also conducted an animal study. I believe he

Page 218

1  said Bulgaria, maybe it was Hungary?
2      A.    Hungary.  I don't know
3  Bulgaria.  It may be.
4      Q.    Where there was a rat study
5  conducted with implants of an FEG mesh, their
6  IPOM mesh that had both PVDF and
7  polypropylene strands side-by-side and the
8  rat study was conducted there and results
9  reported back and he uses some of the images
10 from that study in his presentation.
11     A.    Ah, now I get it.  It was -- I
12 think it was the animals.  It -- it was the
13 animals in the report of Klink.
14     Q.    So do you think the Klink study
15 we've already talked about --
16     A.    They've been done in Russia, in
17 Moscow.  To be precisely, I have to look to
18 all of these various things.
19     Q.    Okay.  Are you aware of a study
20 that FEG conducted in Bulgaria where they
21 implanted mesh from their IPOM mesh into rats
22 to compare the degradation of polypropylene
23 versus PVDF?
24     A.    I am not aware of a study made

Page 219

1  in Bulgaria.  I know that there has been some
2  studies in collaboration with Professor
3  Ettinger in Moscow where they implanted some
4  IPOM meshes there.  I'm not -- I do not
5  recall that this was a study to study
6  degradation of it because this would mean a
7  lot of other things to study degradation.
8  But this -- these explants have been used to
9  demonstrate whether there is a surface
10 cracking, yes or not.
11     Q.    I'm not talking --
12     A.    So this is an additional point
13 and this was as a result of this, we got this
14 image where you have the PVDF filaments and
15 the polypropylene filaments after four months
16 implantation in an animal.
17     Q.    Where did you get those?
18     A.    Where?
19     Q.    From what study?
20     A.    This is the image -- that is an
21 image we got -- yeah, I think that is from
22 the study from Klink where we both have
23 these.
24     Q.    Yeah.

Page 220

1      As I recall Professor
2  Klosterhalfen's testimony, he said that came
3  from the Bulgarian study.
4      Is that the same as Dr. Klink's
5  study?
6      A.    Maybe we both have incorrect or
7  incomplete information about this.
8      Q.    Do you --
9      A.    So we have -- we have to --
10 yeah, we can try to clarify this, so
11 obviously, I have not sufficient information
12 to be -- to say exactly there.
13     Q.    Okay.  So if you get a question
14 at your next presentation where did this come
15 from, you're not sure?
16     A.    Then I will be sure.
17     Q.    Do you know whether FEG adds
18 any chemicals to its polypropylene to
19 stabilize the polypropylene?
20     MR. ANDERSON:  FEG to its
21     polypropylene?
22 QUESTIONS BY MR. THOMAS:
23     Q.    Yes.
24     A.    Yes, they have polypropylene as

Page 221

1  well.
2      Q.    Yes.
3      A.    So I don't know whether they
4  use additives for polypropylene, but all I
5  know is that you have to do it because it is
6  not possible to use polypropylene as a pure
7  polymer for the suture manifictation.  So in
8  its polypropylene, they, of course, should
9  have some additives.  I know that in the PVDF
10 filaments, that is pure.  There is no
11 additive.
12     MR. THOMAS:  Take a break for a
13     second?
14     MR. ANDERSON:  Yeah.
15     (Off the record at 3:10 p.m.)
16     (Klinge Exhibit 9 marked for
17     identification.)
18 QUESTIONS BY MR. THOMAS:
19     Q.    Doctor, I'm going to hand you
20 what I've marked as Deposition Exhibit
21 Number 9.
22     Deposition Exhibit Number 9 is
23 a document titled "Ethicon Surgeon Panel
24 Meeting Mesh, Suvretta House, St. Moritz,

Page 222

1 January 18, 2003."
2      Have you seen this document
3 before?
4      A.    I've seen it just recently,
5 yeah.
6      Q.    In preparation for your
7 deposition?
8      A.    Yes.
9      Q.    Did you attend a meeting at the
10 Suvretta House Hotel in St. Moritz on
11 January 18, 2003?
12      A.    Yes.
13      Q.    How did that meeting come
14 about?
15      A.    It was at the occasion of the
16 third Suvretta meeting that has been
17 organized in St. Moritz.  There was a --
18 yeah, meanwhile, there has been a tradition
19 to make this meeting there and this meeting
20 ends one o'clock p.m. on Saturday and
21 afterwards, Ethicon organized this additional
22 meeting there.
23      MR. ANDERSON:  Counsel, can I
24 just ask why the document has been

Page 223

1 redacted?
2      MR. THOMAS:  I have no answer.
3      MR. ANDERSON:  Okay.
4      MR. THOMAS:  I don't know.
5      MR. ANDERSON:  So we'll send
6 you a note asking whoever on your team
7 to give us an explanation as to why
8 it's been redacted.  Okay?
9      MR. THOMAS:  Yeah.
10      MR. ANDERSON:  Thank you.
11      MR. THOMAS:  And I apologize
12 for having no idea.
13      MR. ANDERSON:  I understand.
14 QUESTIONS BY MR. THOMAS:
15      Q.    Doctor, what is -- who sponsors
16 the annual Suvretta meeting?
17      A.    I have to correct.  I'm not
18 sure whether I saw this document.  The first
19 page, yes, I've seen the first page.  If I'm
20 looking to all these text pages here
21 afterwards, these commence to this, I didn't
22 work through this consciously until now.
23      Q.    Okay.
24      A.    That I'm sure.

Page 224

1      Q.    Who sponsors the Suvretta
2 meeting in St. Moritz?
3      A.    The Suvretta meeting first --
4 the first Suvretta meeting was in January or
5 February 1994 and at that time, it was
6 sponsored by Ethicon, Covidien, Brown, maybe
7 three, four major manufacturers with the idea
8 to collect all important persons that can
9 discuss about hernia.  Because at that time,
10 there was the upcoming new techniques with
11 meshes, the endoscopic, the Lichtenstein and
12 they wanted to have their people discussing
13 this from the entire world and because this
14 is very -- they choose a very nice place, but
15 this was very expensive and, therefore, four
16 companies are putting the money together.
17 This was the first conference.
18      The second conference, the only
19 sponsor was Ethicon, and subsequently all
20 other meetings were sponsored only by Ethicon
21 Hamburg Norderstedt.  I don't know.  I think
22 it is a marketing device, but -- department,
23 but they have different people in charge to
24 provide the money for this conference.

Page 225

1      Q.    And has the focus of the
2 Suvretta conference been on hernia repair?
3      A.    The focus of all of these
4 Suvretta conferences is with focus on hernia
5 repair.  First was inguinal hernia.  Then we
6 have incisional hernia, recurrent hernia,
7 meshes, and last, I don't recall in the
8 moment, but all has been published as books.
9 All books have been -- have been bought by
10 Ethicon Hamburg Norderstedt.  They always got
11 1,000 or 2,000 of these books and you can buy
12 it.  It's free.  All of the presentations are
13 written in this book was a lot of work for
14 this, yeah.
15      Q.    So as I understand it, you
16 don't recall -- you recall seeing the cover
17 page of Exhibit Number 9, but you don't
18 recall the rest of the document.
19      Is that fair?
20      MR. ANDERSON:  Said he just
21 didn't read it in detail.
22      THE WITNESS:  So if you ask me
23 some specific thing here, I need some
24 time to think about it, yeah.

Page 226

QUESTIONS BY MR. THOMAS:

Q.    That's fine and we'll do that in just a second.

Going back to the first page, who is Dr. Zollinger, Robert Zollinger, the moderator?

A.    I do not recall.  Yeah, Robert Zollinger is, of course -- no, I don't recall.

Q.    Now, on the surgeon attendees, there's Professor Schumpelick, Dr. Klosterhalfen, Dr. Conze, Dr. Klinge, Dr. Stumpf and Dr. Junge.

Would you consider those to be part of the Aachen group?

MR. ANDERSON:  Objection to form.

THE WITNESS:  I wouldn't object.

QUESTIONS BY MR. THOMAS:

Q.    And where does Dr. Conze fit in the group, what expertise does he bring to the group?

A.    I guess that this was

Page 227

invitation of the entire Aachen group.  Of all of the Aachen participants that have been at the Suvretta meeting at that time because all of the other participants left already.  So we have to stay there for another day to Sunday and, therefore, I guess that the invitation and the surgeon attendees included all of the Aachen members that were -- had the duty to organize this conference and, therefore, we have been there.

If -- so to my recall, there was not a specific task for Dr. Conze or a presentation or something like that.  If you ask me what is the focus of the work that Conze had done with this, he focused on the laparoscopic placement of these meshes.  So he published some IPOM studies in a rabbit model.  This is his --

Q.    And he is a hernia surgeon?

A.    He has been -- yeah, he is a surgeon and he has been working at the university until summer last year and now he left the department.

Q.    Who is Dr. Stumpf?

Page 228

A.    Dr. Stumpf is a surgeon.  His focus is more wound healing, wound healing for after bowel resection and we made several publications together with him.  Some very experienced surgeon who left two, three years ago who left the university and now is head of the department in southern Germany.

Q.    And Dr. Junge?

A.    Dr. Junge at that time was a young resident, meanwhile he's professor as well.  Very enthusiastic and interested in making research, very active.  So I published about 50, 60 reports together with him because it was a pleasure to work with him.

Q.    And what is his area of practice now?

A.    Visceral general surgery.  The main focus of our department is cancer in the upper GI and liver transportation.  So that is his surgical focus at the moment.

Q.    Now, down below the list of surgeon attendees, there are a list of Ethicon observers.

You've told me that you've had

Page 229

interaction with Brigitte Hellhammer, Boris Batke, Dieter Engel.

Have you had contact over the years with any of these other people of the Ethicon observers?

A.    Though I have a limited memory, but I remember Ohad Lavi and Paul Campbell.  There has been some periods where we have a closer contact.  Ohad Lavi was someone, I think he was responsible for the educational program of Ethicon and, therefore, he was a part of the -- of the meetings we have at our department where Ethicon brought about 20 surgeons to our department so that we can demonstrate how to operate incisional hernia and Lavi was one of the team, I think, that was responsible for this program.  What we call team hospitance.

Q.    Do you remember this presentation that you made at this meeting ten years ago?

A.    Not the -- not the slides in detail.

Q.    Turn the page, please.

Page 230

1     The page -- top of the page
2  says, "Notes of Panel Discussion,
3  Presentation One, Dr. Klinge, Light Mesh
4  Theory and Science."
5     Do you recall giving the first
6  presentation of the Ethicon conference in
7  2003 at the Suvretta conference?
8     A.    Yes.
9     Q.    And it appears that you're
10  talking generally about mesh and then you
11  have a lengthy discussion about VYPRO.
12     Is that fair?
13     A.    Obviously, it seems so, uh-huh.
14     Q.    Well, do you recall if the
15  focus of your presentation was on the benefit
16  of VYPRO mesh?
17     A.    The benefits of our
18  presentation is the light-weight mesh theory.
19  That means that the larger the pores, the
20  lower the risk. So that is -- and VYPRO is
21  our example where we for the first time could
22  realize this principle.
23     Q.    At the time that you're giving
24  this presentation in January of 2003, are

Page 231

1  there other meshes on the market that you
2  would characterize as light-weight, large
3  pore?
4     A.    At that time -- if I remember
5  correctly, that was the meeting where
6  ULTRAPRO™ was demonstrated or shown for the
7  first time.
8     Q.    If you go to page 5.
9     A.    Dr. Klosterhalfen, yeah.
10     Q.    It talks about Edelweiss and
11  the Monocryl. They're talking about
12  ULTRAPRO™, I think.
13     But at the time, were there any
14  other light-weight, large pore meshes on the
15  market, January 2003, about which you were
16  aware?
17     MR. ANDERSON:  Objection.
18  Other than what he just stated?
19     THE WITNESS:  So far I recall,
20  the first successor of VYPRO was
21  ULTRAPRO™ and then all other
22  competitors are coming later with
23  their light-weight variance. The tie
24  mesh is later. So at that moment,

Page 232

1  VYPRO was the prototype of this
2  conception.
3  QUESTIONS BY MR. THOMAS:
4     Q.    That's what I'm trying to get
5  to. Is January 2003, the one that's in the
6  market at that time is VYPRO?
7     A.    Yeah. But our concern,
8  whatever we made the presentation not for
9  VYPRO as a product, but VYPRO as an idea of a
10  conception. That is what is expressed in the
11  title, light-weight mesh theory.
12     Q.    VYPRO ultimately was not
13  successful.
14     Would you agree with that?
15     A.    It was totally -- the VYPRO
16  concept was successful as nothing -- as
17  almost nothing else.
18     Q.    But as a commercial success --
19     MR. ANDERSON:  Let him finish.
20     MR. THOMAS:  I didn't mean to
21  interrupt him.
22     THE WITNESS:  As a commercial
23  thing, it was not -- for several
24  reasons, it was not successful.

Page 233

1  QUESTIONS BY MR. THOMAS:
2     Q.    What are the reasons that you
3  understand that VYPRO was not a commercial
4  success?
5     A.    First of all, the VYPRO, we
6  have been limited -- when doing the VYPRO, we
7  have been limited by the fibers that are
8  available for Hamburg Norderstedt. And that
9  was a reason that we had to use five
10  polypropylene fibers because Dr. Hyntsch was
11  not able to provide any others. Therefore,
12  there was some not multifilament, but
13  polyfilament, increase the surface by the
14  VYPRO. That makes it a little bit more
15  floppy. So we have been limited in the
16  construction of the VYPRO and this always has
17  a disadvantage that some surgeons considered
18  this as a multifilament because of the
19  enhanced risk for infection. This is a
20  structural disadvantage.
21     Then it has been the first on
22  the market in this one. So it means that all
23  surgeons has to change their attitude to
24  think, not to think any longer during the OR,

Page 234

1 it's strong, it must work very well, but to
2 think that a floppier one should be better.
3 And this takes a lot of conferences, a lot of
4 publications, a lot of time. So it is a
5 matter of time as well.
6         But the most important thing
7 that VYPRO was not a success was that it was
8 replaced by ULTRAPRO™. So ULTRAPRO™ was
9 looking nice. It's blue and it's white, it's
10 pure monofilament, it doesn't have the
11 Vicryl, it has a Monocryl, which is less
12 inflammatory and fibrotic reaction and,
13 therefore, the ULTRAPRO™ is -- has been a hit
14 for them. And if you look to the -- I don't
15 know whether you have the says rates in this,
16 but I don't have it either, but I'm sure
17 ULTRAPRO™ meanwhile is the current mesh and
18 it's light-weight, large pores, 3, 4
19 millimeters, so the conception is very, very
20 successful, but in the form of the ULTRAPRO™
21 for hernia surgery.
22 QUESTIONS BY MR. THOMAS:
23     Q.    Did anyone in the Aachen group
24 have any role in the development of

Page 235

1 ULTRAPRO™?
2         MR. ANDERSON: Objection.
3         Go ahead.
4         THE WITNESS: I don't know
5     anyone. Maybe Professor Schumpelick
6     himself, but none of my colleagues
7     or -- I don't know any.
8 QUESTIONS BY MR. THOMAS:
9     Q.    On page 2 of Exhibit Number 9,
10 under "Mesh Complications," under "Fibrosis,"
11 it says that, "There will be fibrosis either
12 through scar net or bridging."
13         What is scar net?
14     A.    At that time point, we tried to
15 figure out a good terminology to describe the
16 different appearance what we -- we are seeing
17 there. Just to say there is fibrosis, yes,
18 not -- that is not sufficient enough, and at
19 that time point, it was an attempt to get a
20 better -- to make it easier to understand the
21 differences and there was on the one hand the
22 scar plate. The scar plate where you have
23 scar all around the mesh and this was -- this
24 was in comparison to the scar net. And the

Page 236

1 scar net means that the fibrosis is limited
2 to the peri-filamentary area where you have
3 pores filled with sket -- with fat tissue.
4 So when you made an imaging of these, then
5 you will have a net of scar tissue just
6 around the fibers and in between is the
7 physiological tissue. This is scar net. And
8 the scar plate would mean everything is
9 integrated into scar.
10         It is a difficult terminology
11 and later on we didn't -- we replaced this
12 one, I think. I cannot remember that we
13 today are talking about this -- it is too
14 difficult for the audience to understand
15 this.
16     Q.    Okay. And bridging, what is
17 bridging in this context today? In
18 January 2003?
19     A.    The bridging is the filling of
20 the pores by scar tissue.
21     Q.    At what point does scar net
22 become scar bridging?
23     A.    Our results at that time point
24 until 2003 indicate that there is a -- yeah,

Page 237

1 that in the area of 3 millimeters, you don't
2 have any bridging, if you have 3 millimeters
3 there. If you have 200 microns, 600 microns,
4 you always have this sort of bridging there.
5     Q.    Okay. Continuing on, it says,
6 "Granuloma forms around the individual
7 filaments, and if pore size small enough,
8 there will also be bridging, paren, or
9 fibrosis, between the pores which forms a
10 scar plate. When the pores are farther
11 apart, there is no bridging effect with the
12 pores being filled with fat tissue. The
13 limit for the pore size would appear to be 6
14 to 800 microns. Below this, scar plate;
15 above this, scar net."
16         What does that mean?
17     A.    If you have small pores,
18 without sticking to the microns, if you have
19 small pores, you have this foreign body
20 reaction around the filaments. They're
21 releasing cytokines, they're attracting
22 fibroblasts and you see if you made a
23 microscope that you only have collagen and
24 inflammatory cells in the pores.

Page 238

1    When you have larger distance
2  between the filaments there, then you see
3  that the pores in the middle, they contain
4  fat tissue which usually is the physiological
5  local tissue there in this area, but it is
6  not any longer filled completely by scar
7  tissue. This is the main difference there.
8    Q.    So the scar net is the desired
9  response of the mesh to the tissue; is that
10  fair?
11    A.    It is an attempt to describe
12  the nonbridging, the good mesh, yeah.
13    Q.    It's the result that you hope
14  to achieve when you implant mesh, you want a
15  scar net, correct?
16    A.    We don't want to have a scar
17  plate. We want to have this what we call at
18  that time scar net, yes.
19    Q.    Okay. And did you tell these
20  surgeons back in January 2003 that below
21  800 microns in pore size you would get scar
22  plate, 6 to 800 microns, correct?
23    A.    As it is written here, appeared
24  to be so with some limitations. The risk is

Page 239

1  high for scar plate below this range, yeah,
2  that is correct.
3    Q.    And did you tell --
4    A.    It depends from the pore size.
5  The risk for getting a scar plate depends on
6  the pore size. That is the message of this
7  slide.
8    Q.    Well, did you tell these
9  surgeons and these people from Ethicon in
10  January 2003 that above 6 to 800 microns you
11  would get a scar net?
12    A.    You have the chance with larger
13  pores. With larger pores, the basic message
14  is that with larger pores, the risk for scar
15  plate is less and the risk for scar net -- to
16  achieve a scar net is better. I know it
17  would be completely wrong to say that there
18  is one figure 600, 800, 900, 1,000. If you
19  have 1,001, it is good, and if you have 999,
20  it is bad. That is not what we tried to
21  bring to the audience. The larger the pores,
22  the lower the risk for a scar plate is there.
23    There seems to be a significant
24  range where it seemed to change or -- yeah,

Page 240

1  where you see these differences and this is
2  in the area of 600, 800, 1 millimeter. It
3  evolves -- it changed a little bit because it
4  depends a little bit from the animal
5  experiments, from the tissue, from the
6  material whether you want to have some safety
7  limits there in this area.
8    Q.    My question is pretty simple
9  and pretty direct.
10    Do you recall telling these
11  people at this meeting in January of 2003
12  that above 6 to 800 microns you would -- of a
13  pore size you would expect to get a scar net?
14    A.    I do not recall as I told you
15  exactly that the moment where I told this. I
16  know that I, in very many presentations, I
17  focused on the fact that pore size is
18  decisive and that there is a limit in the
19  range of 600, 800. So sometimes it is --
20  yeah, we use 1 millimeter because we want to
21  be sure that we have even less risk to get
22  some problems, but the message is that pore
23  size is important and that you have to use
24  large pores. That's it.

Page 241

1    Q.    As written here, as I read it
2  to you, "The limit for the pore size would
3  appear to be 6 to 800 microns. Below this,
4  equals scar plate; above this, equals scar
5  net."
6    Is that a true statement of
7  your research as of January 2003?
8    A.    I read the limit for the pore
9  size would appear to be, so some uncertainty
10  is in the sentence there.
11    Q.    Yes.
12    A.    And I recollect that we have
13  made some examination, we have some
14  measurements where we marked it in this area
15  of 600 to 800 microns, yes.
16    Q.    So that's a true statement of
17  your research as of the time this was given?
18    A.    At that time point, we had some
19  data indicating that there is a limit.
20    Q.    Well, is that the best summary
21  of your research as of January 2003 that
22  you're presenting to these surgeons in
23  Exhibit 9?
24    A.    As I told you, the best summary

| Page 242 |
|---|

1 would be if you stress on the point that
2 large pores are helpful and small pores are
3 dangerous.
4      Q.    Is the information that's
5 stated in Exhibit Number 9, "The limit for
6 the pore size would appear to be 6 to
7 800 microns.  Below this, equal scar plate;
8 above this, equals scar net," is that wrong?
9      A.    It is incomplete.
10      Q.    Okay.
11      A.    If you are -- what does it
12 mean?  Wrong or right.  At that time point,
13 it was our present knowledge there.
14 Meanwhile, we know that pore size is much
15 more difficult to define.
16           (Klinge Exhibit 10 marked for
17      identification.)
18 QUESTIONS BY MR. THOMAS:
19      Q.    Doctor, I've handed you what's
20 been marked as Deposition Exhibit Number 10.
21 This is a copy of your curriculum vitae.  It
22 was produced to us in this case.
23           Is this a current CV?
24      A.    Yes.

| Page 243 |
|---|

1      Q.    And the first page sets out
2 your employment history and the members of
3 societies of which you're a member?  Let me
4 start over again.
5           The first page sets out some
6 general information about your education,
7 employment history, scientific work and the
8 professional societies of which you're a
9 member and the rest of it is your
10 publications, grants and patents.
11           Is that fair?
12      A.    You have a question?
13      Q.    Yeah, I asked you if that is
14 what it was.  Your CV with your -- as I
15 described it.
16      A.    Yes.
17      Q.    Let's talk about your patents
18 on the last page, page 41.
19           The first patent is the one we
20 talked about some today, the PVDF mesh on a
21 patent with FEG; is that correct?
22      A.    Yes.
23      Q.    What are the other patents that
24 you have here?  Just describe them for me

| Page 244 |
|---|

1 generally, please.
2      A.    That are mainly other
3 modifications of -- that are using PVDF mesh,
4 textile meshes, but they're modified.
5      Q.    Okay.  And these are all
6 modified of the original FEG patent; is that
7 right?
8      A.    I don't know whether it's a
9 correct term to say modified.  It's in
10 addition.  Whether it's another patent, I
11 really -- I'm -- whether it's another new or
12 whether it's a modification and attachment, a
13 supplement of an existing, I don't know.
14      Q.    Okay.  Are all of the patents
15 that you have on page 41 through -- strike
16 that.
17           Are all of the patents that you
18 have on page 41 of Exhibit 10 with FEG?
19      A.    Yes.
20           (Klinge Exhibit 11 marked for
21      identification.)
22           QUESTIONS BY MR. THOMAS:
23      Q.    Doctor, I'm going to hand you
24 now what I've marked as Deposition Exhibit

| Page 245 |
|---|

1 Number 11.
2           Deposition Exhibit Number 11 is
3 the expert report that you've prepared for
4 this case, correct?
5      A.    Looks like.
6      Q.    And as part of your work in
7 this case, were you asked to look at the
8 Prolene® mesh that is used for the treatment
9 of stress urinary incontinence?
10      A.    Yes.
11      Q.    And I believe from earlier
12 deposition, I understand that you have used
13 Prolene® mesh approximately three or four
14 times for the treatment of hernia repair?
15      A.    Half a dozen, yeah.  Five times
16 I told last year.
17      Q.    And for what purpose would you
18 use Prolene® mesh for the treatment of hernia
19 repair?
20      A.    Today?
21      Q.    At the time that you did it.
22      A.    At that time, we used Prolene®
23 mesh, Marlex meshes.  At the beginning of the
24 mesh -- of the use of meshes for hernia

Page 246

1 repair so they're -- yeah, when we have been
2 in our learning curves, they have been using
3 this for hernia repair. Today we never would
4 do so, but only with a very limited
5 indication for these materials.
6     Q.    Prolene® mesh and Marlex mesh
7 are two different meshes, aren't they?
8     A.    Two different meshes. Marlex
9 is from BARD and Prolene® is from Ethicon.
10     Q.    And they have different --
11         MR. ANDERSON: Let him finish,
12     please.
13         THE WITNESS: Prolene® is even
14     more heavier than the Marlex, and
15     Marlex has been the predominant mesh
16     in the beginning of the '90s in
17     Germany.
18 QUESTIONS BY MR. THOMAS:
19     Q.    And the pore design is
20 different, too, isn't it?
21     A.    The pore design is different,
22 yeah. But you -- you almost never find
23 some -- or two different devices that matches
24 completely.

Page 247

1     Q.    So in the five or six times
2 that you used Prolene®, you said you used it
3 for certain indications.
4         What indications would you use
5 Prolene® for when you were using it in the
6 '90s?
7     A.    Today?
8     Q.    In the '90s.
9     A.    In the '90s, see, before our
10 work in the '93, '94, we used it as a
11 standard device for reenforcement of large
12 incisional hernia. The only alternative at
13 that time or the other alternative at that
14 time has been Marlex. So to use Marlex or
15 Prolene®, that was the option for.
16     Q.    How many times did you use
17 Marlex in hernia repair?
18     A.    Maybe 20, 25.
19     Q.    Why did you use Marlex more
20 than you used Prolene® in hernia repair?
21     A.    Marlex at that time has been
22 the predominantly used mesh material in
23 surgery and in our hospital. I guess it has
24 about 70 percent of incisional hernias when

Page 248

1 using meshes use Marlex.
2     Q.    Were you trained to use Marlex
3 in the repair of incisional hernias?
4     A.    You can say so, yeah.
5     Q.    Why? Why were you taught to
6 use Marlex for the repair of incisional
7 hernias?
8     A.    The time period in the '90s, at
9 the beginning of the '90s or in the late
10 '80s, I was trained to do only suture repair,
11 and in the beginning of the '90s, there was
12 an upcoming feeling that suture repair is not
13 sufficient and there was experience that
14 meshes -- reenforcement of tissues but the
15 meshes can be beneficial, and the meshes
16 available at that time was mainly the Marlex
17 mesh. So you have to decide in surgery to
18 try to use -- if you want to try or to use a
19 mesh because of recurrences, if you want to
20 have an additional reenforcement of the
21 tissue, you are using the Marlex mesh. That
22 was our option to do so. And then we saw
23 increasing number of seroma or some patients
24 with serious complaints. And that -- and we

Page 249

1 had to make some revisions and saw the
2 appearance of these meshes at that time and
3 that was a reason to start our thinking that
4 it can be improved.
5     Q.    Why did you ever use Prolene®
6 instead of Marlex?
7     A.    I don't recall exactly because
8 it was available. At that time, you ask for
9 a mesh and you get the mesh from the nurses
10 there. It was not popular, and it was not --
11 yeah, most of the surgeons at that time
12 really didn't realize that they have to be
13 very careful in the selection of the mesh
14 material. It was the time period before we
15 started to work on it and there they took the
16 mesh that was available.
17     Q.    Before 1993, did you have any
18 information that caused you to choose between
19 meshes for various indications in the hernia
20 surgery you performed?
21     A.    No. No, I don't recall that
22 there was any -- any direct selection of the
23 mesh materials, no.
24     Q.    So are you telling me that you

Page 250

just used what was put in your hands during
the surgery?

MR. ANDERSON:  Objection.
Form.

Go ahead.

THE WITNESS:  We asked for a
suture and we got a suture that was
bought by the hospital that was
provided and we asked for a mesh and
we were provided by this mesh.  There
wasn't any other alternative.  It was
allowed to use these meshes.  It was a
description to use these meshes in the
patients and, therefore, we used it.

QUESTIONS BY MR. THOMAS:

Q.    Well, when you used sutures,
you could order different size sutures,
couldn't you?

MR. ANDERSON:  Objection to
form.

THE WITNESS:  As a surgeon, you
don't start to -- you have some
specific sutures that are best
suitable for your specific purpose and

Page 251

a good nurse in the interaction with
you knows what you want to have.
There are some certain standards in
every hospital, may be different from
hospital to hospital, but then you get
the suture material.

Whether there is a difference
with an absorbable material, whether
you take it from Ethicon or Covidien
or from Brown or from other
manufacturer, you don't care.

QUESTIONS BY MR. THOMAS:

Q.    Prior to 1993, did you care
what kind of mesh that you put in a patient?

A.    1993?

Q.    Before 1993, when you were
doing hernia surgery, did you care what kind
of mesh you put in a patient?

A.    At that time, we didn't have a
satisfying information about the risks and
what happens there.

Q.    Did you care before 1993 what
kind of mesh you put in a patient when you're
doing hernia surgery?

Page 252

MR. ANDERSON:  Objection to
form.

Go ahead.

THE WITNESS:  No.  The only
thing is we care whether to make mesh,
yes, or to take a mesh, yes, or not.
That was a big issue and a big
discussion at that time, but if you
decide to use a mesh, the selection of
the best mesh, that was not an issue.

QUESTIONS BY MR. THOMAS:

Q.    Was Marlex the leader in the
market for mesh at the time that you were
trained in hernia surgery?

A.    Yes.  To my knowledge, yes.

Q.    So if I understand correctly,
those sometimes that you used Prolene® mesh
for hernia surgery, it wasn't because you
chose it, it was because you were given it?

A.    Uh-huh.

Q.    Is that true?

A.    Yes.

Q.    As a surgeon using Prolene®
mesh, in handling it and in using it with a

Page 253

patient, did you notice any difference
compared to Marlex mesh?

A.    It's a long time ago.  Only --
not really.

Q.    Okay.  Now, you know from your
report that there have been three different
versions of Prolene® mesh, correct?

A.    Yes.

Q.    And there is the first
generation Prolene® mesh, the original
Prolene® mesh.

Are you comfortable if I call
it the first generation mesh?

A.    Sorry, last sentence.

Q.    What do you call the original
Prolene® mesh, how do you describe it?

A.    The old Prolene®.  In fact, we
have realized within the last two years
independent from this litigation that
there -- that we are offered or that we have
images of Prolene® with a lot of variations,
and there has been some -- obviously, there
has been done some modifications of the
Prolene®, but it was not ever communicated to

Page 254

1  me in a clear way until I've seen this Excel
2  sheet where the time course were.  That was
3  the first time that we really realized that
4  there has been different modifications of the
5  Prolene® mesh.
6  So, therefore, this was not a
7  common issue in our discussions to see all of
8  these differences.  We know that there has
9  been a PHS with the specific textile
10  structure.  We know that there has been some
11  changes from the old Prolene® to the new
12  Prolene®, but it was not communicated very
13  well which -- when this was done or whether
14  we have the old one or the new one so.
15  Q.    When did you first appreciate
16  that there had been three versions of
17  Prolene® mesh in the last 20 years?
18  A.    I know it already about ten
19  years ago.  I know it that there has been a
20  modification, but we didn't make any
21  comparison or analysis or so.  And so finally
22  two years ago we started -- I recollected
23  images from textile meshes and there I got
24  increasingly confused about the terminology

Page 255

1  what is done.  And if you are looking to the
2  published literature and some of the authors
3  presented some of these textile images at the
4  beginning of their report, you see that there
5  is an entire mixing up of the terminology of
6  this.
7  So I was really happy when I
8  saw these Excel grid so that you can see this
9  one.
10  Q.    Okay.  Do you have an
11  understanding as you sit here today during
12  what periods of time each Prolene® mesh was
13  used for hernia repair?
14  A.    I've seen in this document that
15  in the '90s -- most of the '90s the old
16  Prolene® was available there.  And that was
17  in accordance to my pictures from my time
18  with the Prolene® with this specific textile
19  structure.  So I assumed that at this time we
20  only have been looking at the old Prolene®.
21  Q.    At what time did the old
22  Prolene® for hernia repair change?
23  A.    According to your documents or
24  the Excel sheet I've seen, it was about '98,

Page 256

1  '99.  So then the second version and then the
2  third version is --
3  Q.    Before you saw the documents
4  from this litigation, did you know when
5  the -- what you call the old Prolene® changed
6  to the next Prolene® in 1998 or 1999, did you
7  know that?
8  A.    Did you ask me why or when --
9  Q.    When, when did you figure that
10  out?  Just in the last two years?
11  A.    It was in the -- as I told you,
12  I know in -- I got the information in 2000 in
13  one of the discussions with the Ethicon guys
14  there that they changed it, but we never made
15  any comparison old Prolene® or new Prolene®.
16  I was just informed about it.  It was not an
17  issue to think about it at that time.  But in
18  the past five years, we made some analysis,
19  more analysis, and now we sought -- we looked
20  to the images that there is a mixing up of
21  these things and then we realized this.
22  Q.    What do you mean by that, "The
23  last five years there had been a mixing up of
24  things"?  I don't understand that.

Page 257

1  A.    The terminology, if you --
2  there are a lot of publications here claiming
3  that they are investigating Prolene® mesh.
4  And if you look to the images in the
5  literature there, you sometimes find the old
6  Prolene®, sometimes you find the new
7  Prolene®, but in the text is always Prolene®.
8  And it was very difficult for me to find out
9  what is it.  What is it -- the major
10  difference.
11  Other example is SURGIPRO.
12  SURGIPRO is awful for me as a researcher
13  because SURGIPRO you have five, six, seven
14  variations, and it is not indicated by the
15  name alone.  So and the same with Prolene®,
16  if you -- if Ethicon had chosen another name,
17  it would be more simple, but for the
18  audience, for the public, it is still
19  Prolene® and that makes it so difficult.
20  Q.    Which Prolene® mesh did you use
21  in your hernia repairs the five or six times
22  you did it, do you know which one you used?
23  A.    1993.  So it has to be the old
24  Prolene®.  I'm sure all these animal

Page 258

1 experiments, what we did with the materials
2 we got from Ethicon that were the old
3 Prolene®. From the figures, from the images
4 that I made at that time, it is consistent
5 that it's an old Prolene®, but it was never
6 an official time point where you can say from
7 this on, the world knows it's another
8 Prolene®. We never had this time point.
9     Q.    Now, when you conduct an animal
10 study and you use Prolene® mesh in your
11 animal study, you describe the mesh that
12 you're using and the specifications of that
13 mesh, don't you?
14     A.    We had been the first in our
15 reports in 1995, 1996 where we introduced
16 these -- the values of the textile
17 characteristic of these meshes that has been
18 done at the Institute for Textile Engineering
19 where we put these meshes and it happens in
20 1995, 1996. So it has to be the old
21 Prolene®, and we started our publication with
22 presentation these materials. Now, we
23 offered the stability, the elasticity, the
24 subsequent adhering force, all parameters not

Page 259

1 very familiar to surgeons, but we have
2 learned it.
3     Q.    You've told me earlier today
4 that when you conducted an animal study for
5 Ethicon, that Ethicon would send to you the
6 mesh that you required.
7         Is that fair?
8     A.    I would just change some words.
9 We made some studies and we were supported by
10 Ethicon. It's only maybe one or two where
11 you can say we did a study for Ethicon
12 because they are interested in.
13     Q.    Fair.
14     A.    So just to correct this.
15     Q.    And I appreciate the
16 correction. And I'll ask it better.
17         When you conducted animal
18 studies supported by Ethicon, Ethicon
19 supplied you with the mesh that you required
20 for that study?
21     A.    Yes.
22     Q.    How are you confident that the
23 mesh that you used in all of the studies
24 where you reference Prolene® mesh is what you

Page 260

1 describe as old Prolene® mesh?
2     A.    First of all, I rely -- first
3 of all, from the time period because we got
4 most of these materials, the Prolene®
5 materials before 1998, and we did some images
6 at that time of the textile and we -- in some
7 of the publications, you see that we give an
8 overview of the textiles so the surgeon can
9 understand. And you have this typical
10 configuration of the Prolene®.
11         Meanwhile, I'm not sure -- it
12 could have been Amos, but I'm not sure -- no,
13 I'm sure that the Ethicon -- that we got
14 Prolene® -- the old Prolene® from Ethicon.
15     Q.    Why are you sure?
16     A.    Because of the images and
17 because of the time frame when we got these
18 materials. We started in 1995 with the first
19 Prolene® mesh implantation.
20     Q.    Dr. Klinge --
21     A.    1994.
22     Q.    -- if you're doing a study
23 comparing the meshes that are used in hernia
24 repair, wouldn't it be appropriate to use a

Page 261

1 mesh that's actually used in hernia repair
2 when you're doing a study?
3     A.    MR. ANDERSON: Objection to
4     form.
5         THE WITNESS: So the question
6     is why we took Prolene® and not the
7     Marlex.
8 QUESTIONS BY MR. THOMAS:
9     Q.    No, not the question.
10     A.    Okay.
11     Q.    At a certain time in the '90s,
12 old Prolene® was not used for hernia surgery
13 anymore, you know that?
14     A.    Uh-huh.
15     Q.    You continued to do studies
16 comparing Prolene® to other meshes used in
17 hernia surgery, correct?
18     A.    The --
19     Q.    And the question is why would
20 you use a mesh no longer used in hernia
21 repair for studies comparing meshes used in
22 hernia repair?
23     A.    The main point I want to stress
24 is that we never have tried to be a tester of

1 a medical device or a mesh that has been used
2 somewhere. Our purpose was to understand
3 what happens there and, therefore, we took as
4 a comparison a mesh, a heavy-weight mesh and
5 Prolene® is the heaviest mesh, the mesh where
6 we know that it is -- yeah, the small pore,
7 heavy-weight meshes that makes these
8 differences and, therefore, for comparison,
9 we took this mesh and it was -- we were very
10 happy that Ethicon provided this heavy-weight
11 mesh for our research and for our
12 comparisons. And if you look to all of these
13 studies, you see that there is always for
14 comparison a heavy-weight mesh.
15      You only have one exception
16 where we took the Marlex mesh, but usually
17 the heavy-weight Prolene® mesh is a high-risk
18 device for inflammation and fibrosis that was
19 the Prolene®.
20      Because for our study, it was
21 an excellent choice.
22      Q.   Well, isn't a PVDF mesh twice
23 as heavy as Prolene®?
24      A.   That is, of course, everyone

1 who knows some chemical textbooks knows that
2 the specific weight of the PVDF is double as
3 high as the polypropylene and that leads me
4 to start or to point out that weight, per se,
5 is not relevant alone. That is not
6 sufficient because you can create with a
7 lighter polypropylene, small pore meshes with
8 an awful behavior. There are some studies
9 clearly showing this, and you can produce
10 some heavy-weight meshes with large pores of
11 PVDF with an excellent behavior.
12      So the discussion about the
13 specific weight and the weight of meshes as
14 an indicator of the biocapability or
15 whatever, it is misleading and --
16      Q.   Well, early in your research,
17 heavy-weight was a real indication of an
18 unsafe mesh, wasn't it?
19      A.   Again, you have to go to the
20 history. The first -- the first publications
21 it was called light-weight, large pore and
22 small pore, heavy-weight. These -- the
23 combination of these words. In the '90s, we
24 haven't been able to have a good measurement

1 of pores. There has been various
2 measurements of pores, but it was -- we
3 didn't have a sufficient understanding of
4 this. And, therefore, because of these
5 difficulties, the terminology was reduced and
6 it was mainly reduced by the marketing from
7 Ethicon because they found it easier to
8 transfer the message light-weight versus
9 heavy-weight and, therefore, the posters are
10 indicating and stressing that VYPRO,
11 ULTRAPRO™ is a light-weight version. Within
12 some limitation that is true, but for the
13 overall estimate of these meshes, that is not
14 sufficient, the weight.
15      Q.   And just to be clear, when your
16 research started, you were very concerned
17 about the weight of a mesh, correct?
18      A.   We were concerned about the
19 overengineering. As you remember, the first
20 question where how strong should a mesh be
21 and that was our concern and then we made the
22 material reduction. And if you compare it to
23 different polypropylene and made a material
24 reduction, you get a lighter weight. You get

1 larger pores, less risk. But this was
2 truncated to this weight.
3      Q.   Is it fair to understand,
4 Doctor, that the state of your research today
5 is that weight of the mesh alone is not an
6 indicator of its safety?
7      A.   If you -- as I said, if you
8 compare same polymers, the weight as an
9 indicator of less material can mean that the
10 pores are enlarged and that you may have a
11 better outcome, but as from the beginning,
12 it's the pore size that is decisive.
13      Q.   Is it fair to understand,
14 Doctor, that the state of your research today
15 is that weight of the mesh alone is not an
16 indicator of its safety?
17      A.   Is not a sufficient -- yeah, is
18 not a sufficient indicator of the safety,
19 yes.
20      Q.   Thank you.
21      Do you know whether you have
22 ever tested the second generation Prolene®
23 mesh?
24      A.   I do not recall to have done

Page 266

1 it.
2 　　Q.　As you sit here today, do you
3 know the differences between the old Prolene®
4 mesh and the next generation 6 mil Prolene®
5 hernia mesh?
6 　　A.　The pore size gets smaller, I
7 guess, and the second generation of the
8 Prolene® mesh is -- I suppose it is done
9 because the old Prolene® mesh has an extreme
10 anisotropic behavior.  So extreme differences
11 in the strengths in the horizontal and
12 vertical direction and, therefore, in the
13 next version of the Prolene®, there is some
14 more complex link -- cross-linking of the
15 filaments.
16 　　Q.　What do you base that on?
17 　　A.　On the images.  I've seen some
18 images, but maybe there are so many
19 modifications I'm mixed up, but --
20 　　Q.　Are you -- I am sorry.
21 　　　　MR. ANDERSON:  Go ahead.
22 　　　　THE WITNESS:  No.
23 QUESTIONS BY MR. THOMAS:
24 　　Q.　Are you concluding from your

Page 267

1 review of the images the reasons for the
2 change or have you read somewhere why Ethicon
3 made the change in the mesh?
4 　　A.　I just concluded it.  I never
5 read -- I never got a document where I can
6 see the reason why they changed it or whether
7 they made some investigations to see what are
8 the consequences.  I never see something
9 about it.
10 　　Q.　Do you know how long the second
11 generation 6-mil Prolene® mesh was used in
12 the treatment of hernia repair?
13 　　A.　No.
14 　　Q.　Do you know whether the 6-mil
15 second generation Prolene® mesh was used at
16 the hospital at your university for the
17 treatment of hernia repair?
18 　　A.　I didn't see a document stating
19 this, but I know with the development of
20 VYPRO and the launch of VYPRO and the ability
21 to use VYPRO we didn't use -- in the surgical
22 department, we didn't use this type of mesh
23 any longer.  Except for some indications,
24 thoracic wall.

Page 268

1 　　Q.　I am sorry, for --
2 　　A.　But not for the treatment of
3 hernia.  We didn't use it for the treatment
4 of hernia.
5 　　Q.　Okay.  Was VYPRO the only mesh
6 you used for the treatment of hernia repair?
7 　　A.　In the time period when it was
8 developed, this was our mesh that we used
9 there.
10 　　Q.　I understand.
11 　　A.　Later on it was replaced by
12 ULTRAPRO™.
13 　　Q.　Okay.  Other than VYPRO I at
14 this time, did the hospital at the university
15 use any other kind of mesh?
16 　　A.　Our surgical department, my
17 colleagues and me, we didn't use others.
18 There is a -- there are others -- there are
19 other departments, plastic surgery, I don't
20 know whether they use different materials.
21 We once tried to get a Mersilene mesh there
22 because Professor Stupper has visited our
23 department and performed an operation there
24 and, therefore, for him we tried or we got a

Page 269

1 Mersilene mesh so we had available some other
2 meshes there.
3 　　　　We had some guys showing to us
4 laparoscopic incisional hernia repair and,
5 therefore, for this purpose ePTFE has been
6 used, for example.
7 　　　　The common mesh was VYPRO and
8 later on ULTRAPRO™, but there has been some
9 exceptional others.
10 　　Q.　Do you know whether Prolene®
11 6-mil second generation mesh was ever used at
12 your hospital for the treatment of hernia
13 repair?
14 　　A.　I don't know it.
15 　　　　The old mesh?
16 　　Q.　No.
17 　　A.　6-mil you're talking of
18 Prolene® and new mesh?
19 　　Q.　There's a second generation
20 6-mil hernia mesh, you know that?
21 　　A.　Sorry, I didn't get --
22 　　Q.　There's a first generation, the
23 original Prolene® mesh which was 6-mil, the
24 second generation was the change in pore

Page 270

1  design and it's a 6-mil mesh also, correct?
2  A.  Uh-huh.
3  Q.  And there's a third Prolene®
4  mesh, correct?
5  A.  Yes.  With a smaller 5-mil.
6  Q.  And when we say 5-mil, that's a
7  smaller fiber, correct?
8  A.  Yes.
9  Q.  And there's a change in pore
10  design as well or do you know?
11  A.  I know that there are
12  differences in the pore design, but I cannot
13  recollect this image now precisely.  You have
14  to show me.
15  Q.  Well, it's in your report as
16  you know -- we'll come back to that.
17  Do you know whether in your
18  testing of meshes whether you ever tested the
19  5-mil Prolene® hernia mesh?
20  A.  To be sure, it would be nice if
21  you can demonstrate an image of the -- or
22  this Excel grid where you see --
23  Q.  It's in your report, Doctor.
24  A.  -- the Prolene® II --

Page 271

1  MR. ANDERSON:  It may be in his
2  report, but he still has a right to
3  look at something so he's just asking
4  if he can see it.
5  MR. THOMAS:  Page 77.
6  MR. ANDERSON:  That's fine.
7  He's just asking to see it.  Is there
8  something wrong with that?
9  MR. THOMAS:  Please, Ben.
10  MR. ANDERSON:  Well, I'm asking
11  you.
12  THE WITNESS:  So this is
13  Prolene® hernia system.  This is the
14  old Prolene®, of course.  Marlex, of
15  course.  The 5-mil -- I don't recall
16  that we tested this in the histologic.
17  QUESTIONS BY MR. THOMAS:
18  Q.  How would you know if you
19  tested it when you did your studies?
20  Did you actually select the
21  mesh and implant it in the rats so you would
22  know what it was or did somebody else do that
23  for you?
24  A.  No, I --

Page 272

1  MR. ANDERSON:  From '94 to
2  2000?
3  MR. THOMAS:  At any time.
4  MR. ANDERSON:  At any time.
5  QUESTIONS BY MR. THOMAS:
6  Q.  You already told me you
7  conducted your own rat studies and made your
8  own implantation in the '90s, but you also
9  told me there are times when the others did
10  the study and implanted the mesh in the rats.
11  A.  Yes.  So in the first years, I
12  did a lot of these operations myself, later
13  on I participated at many operations, but to
14  the protocol of all these implantations, it
15  was clear and I required it that we made some
16  images of the textile.  So because if you
17  made a presentation and if you made a
18  publication, what we have learned is that it
19  is essential at the beginning to show the
20  mesh and to show the specifics of this mesh.
21  Not to get in trouble that you have another
22  modification.  And, therefore, I have seen
23  the images of all these meshes there and I
24  cannot recall that we made experiments with

Page 273

1  this type of Prolene®.
2  Q.  Why not?
3  MR. ANDERSON:  Why can't he
4  recall?
5  QUESTIONS BY MR. THOMAS:
6  Q.  No.
7  Why didn't you do tests on this
8  5-mil hernia mesh?
9  A.  Why didn't we do it?
10  Q.  Yes.
11  A.  Because we were busy and what
12  is the scientific -- can you give me a
13  scientific reason for looking at this?
14  Q.  Do you know whether it's still
15  used today in hernia repair?
16  A.  Maybe, but as I told you, we
17  are not tester of a medical device, whether
18  it works or not.  We want to know how it
19  happens, what is the functional impact.
20  Q.  Wouldn't you want to know the
21  tissue reaction to the 5-mil hernia mesh?
22  A.  In comparison to what?  To
23  6-mil?
24  Q.  Or whatever other standard you

Page 274

1    want to measure it to.  Don't you want to
2    figure out how it performs like you had
3    measured all of the other meshes?
4            MR. ANDERSON:  Objection to the
5    form.
6            Go ahead.
7            THE WITNESS:  I'm not -- the
8    major interest is not to see whether a
9    specific device performs differently
10   to another.  A question can be the
11   change of 6-mil to 5-mil, what is the
12   impact of the tissue reaction.  The
13   reduction of the pore size from -- I
14   don't want to give a figure.  It's
15   impossible to give one specific
16   figure, but the change of the textile
17   structure, what is the impact of the
18   tissue generation.  This is a question
19   I think a manufacturer should answer
20   this.
21           The scientific question would
22   be the dependency of the tissue
23   reaction from the size of the filament
24   and then we have to construct five,

Page 275

1    six different modifications, different
2    filament size and then look to the
3    tissue reaction.  That would be a nice
4    experiment and you can do it if you
5    have the resources and the money, the
6    people and the time.  Yeah, but just
7    to look what happens to a specific,
8    there are more than 200 meshes on the
9    market.  We are not able to do so.
10   Q.    Is it your best recollection
11   that the only Ethicon polypropylene mesh that
12   you've tested for hernia repair is the first
13   generation 6-mil mesh?
14   A.    So far I recall, all of the
15   images from the textiles we have, yes.
16   Q.    When you received mesh from
17   Ethicon for the studies that you conduct,
18   you've told me that it comes in a special
19   package and marked experimental use.
20           Is that fair?
21   A.    They come in a special package,
22   yes.
23   Q.    What size are they?
24   A.    What size?

Page 276

1    Q.    Yes.
2    A.    It is a plastic box like this.
3    It depends.  For the rat studies and we ask
4    for 2.5 to 3.5 centimeters, they're already
5    cut.  They are enclosed in a plastic sheet.
6    They are enclosed in a metallic film there
7    and they're included in another plastic sheet
8    there and then 24 -- I think 24, 20 of these
9    meshes are put together in a plastic box and
10   then this plastic box was wrapped in a
11   plastic sheet and then we got this one.
12   Q.    Okay.
13   A.    And then we got a list with a
14   number CV something like this, some
15   artificial number, and then --
16   Q.    And who provides the mesh to
17   you?  Is it Norderstedt?
18   A.    Norderstedt.  Dr. Walthe, yeah.
19   I think Dr. Walthe, he's preparing all this.
20   Q.    Doctor, whenever you place an
21   artificial implant in the human body, there
22   is a chronic foreign body reaction for the
23   rest of the patient's life with an implant,
24   isn't there?

Page 277

1    A.    That is correct.
2    Q.    And that's whether it's a hip
3    implant or a knee implant or a mesh implant?
4    A.    That is correct.
5    Q.    And you learned that in medical
6    school, didn't you?
7    A.    This general statement, yeah,
8    we learned it in medical school.
9    Q.    And any time that you put mesh
10   in a patient for hernia repair, you told the
11   patient that I'm putting an implant in you,
12   you need to understand that there will be a
13   long-term, chronic foreign body reaction for
14   the rest of your life?
15   A.    No, that is not the issue.
16   Because --
17   Q.    Did you tell patients that?
18           MR. ANDERSON:  Excuse me, let
19   him finish his answer.
20           Finish your answer.
21           THE WITNESS:  It is not the
22   appearance of a chronic body -- a
23   chronic foreign body reaction which
24   can be defined in pathology lifelong.

Page 278

1 This is not relevant. This is not the
2 issue that is to be discussed with a
3 patient. The patient is interested in
4 what are the consequences of the
5 chronic inflammatory foreign body
6 reaction. So what is the risk for --
7 from the implant. In our scientific
8 discussions, we know that it is
9 because of the chronic foreign body
10 reaction, but I think it is not
11 valuable information for the patient
12 that there is some chronic foreign
13 body reaction and there are some
14 macrophages, but he has to know that
15 there is a chronic wound which means a
16 lifelong risk for infection that can
17 occur after some years, for chronic
18 pain and that we -- might be
19 impossible to prevent a occurrence at
20 any case.
21       Those are the things that we
22 have to discuss with a patient.
23 QUESTIONS BY MR. THOMAS:
24    Q.    So you tell a patient when

Page 279

1 you're installing a mesh for hernia repair
2 that there's a lifelong risk for infection?
3    A.    That there is a lifelong --
4 permanent mesh material there and that there
5 is a possible risk lifelong for late
6 infections, late onset on chronic pain.
7 Yeah, we tell it. And that is difficult to
8 remove this. This is the other point.
9    Q.    And there is a risk of chronic
10 pain by the implantation of that mesh?
11    A.    Yes. Of course, it is one of
12 the major issues in hernia surgery there are
13 rates of up to 40 percent of chronic pain in
14 patients after every hernia repair, but 80,
15 90 percent meanwhile are done with meshes.
16    Q.    And you tell them there's a
17 risk of recurrence?
18    A.    Yes, of course.
19    Q.    And you tell your patients all
20 of these things when you were doing surgery
21 so that the patient could make a judgment in
22 consultation with you about whether they
23 wanted to have this procedure?
24    A.    It's an interaction. It's an

Page 280

1 interaction that the wishes of the patient.
2 It is -- he relies a little bit on my
3 experience of the arguments that are behind
4 and then, yeah, you find the best solution
5 for the patient together. I think it is very
6 difficult to separate this one that only the
7 patient decides, no, he's not able to decide.
8    Q.    It's a conversation that the
9 patient and the doctor have together and
10 hopefully the two of you together --
11    A.    Yes.
12    Q.    -- can make that decision.
13    A.    Yeah. I think that is what you
14 expect and me expect that you find together
15 the solution, best solution for you.
16    Q.    That's why you need a doctor to
17 help you counsel through these kinds of
18 issues?
19          Strike that.
20          Ultimately, it's the patient's
21 call, correct?
22    A.    What?
23    Q.    Ultimately, it's the patient's
24 decision whether to go through with the

Page 281

1 surgery, you agree with that?
2    A.    To -- whether he will -- he has
3 to agree that he wants to have this
4 treatment. That is a final decision by the
5 patient, yeah.
6    Q.    And the patient has to
7 determine whether the benefits of the surgery
8 outweigh the risks that you've explained to
9 them?
10    A.    If you define this as the way
11 to make up the decision that he finds this
12 balance of disadvantages and advantages, yes,
13 that is.
14    Q.    When you talked about infection
15 a minute ago, you talked about infections
16 that occur later in life that might be
17 mesh-related.
18          Tell me what you mean by that.
19 How can you have infections from mesh later
20 in life that are mesh-related?
21    A.    The most important experience
22 that we have got while we are looking to the
23 explants from Professor Klosterhalfen, and
24 when we look when this was sent to the -- or

Page 282

1  when this was explanted, this was explanted
2  because of infection two years after the
3  operation.  We -- in the late '90s, we have
4  seen the first report from the UK where
5  someone has described this late onset
6  infection of the operation and he always
7  describe this latency of more than a year.
8  There has been a big review from the US,
9  from, I think, what age -- starting with age,
10  but they, again, said that infection occurs
11  with a long delay of two years.
12         So in contrast to the early
13  infection that occurs immediately in the
14  first weeks after the index operation, there
15  can be some infections manifesting after two
16  years, 50 years, with a foreign body with an
17  implant.  So this is an experience and,
18  therefore, it is not so that every patient
19  has to face this complication, but there is a
20  lifelong risk and if you're 80 years old, the
21  lifelong risk fortunately is small, is
22  shorter, but if you're 20 years old and you
23  expect that this implant has to work there
24  for another 70 years, of course, the risk is

Page 283

1  higher to experience an infection than in an
2  old patient.  And that has to be part of the
3  discussion, the risk evaluation for the
4  patient.
5     Q.    As a doctor, hernia surgeon,
6  you had that discussion with the patient?
7     A.    Yes.
8     Q.    Now, what's the background risk
9  for a surgical site infection for a hernia?
10     A.    The background?
11     Q.    What's the general risk of
12  infection for a hernia surgeon?
13     A.    A hernia surgeon?  You have to
14  differentiate what type of hernia.
15         So incisional hernia is a
16  completely different case as groin hernia.
17  You always have the combination by some skin
18  bacteria that is the early surgical site
19  infection.  You can have an infection due to
20  erosion of some bowels, for example, that is
21  a problem when you place the mesh in the
22  abdominal cavity.  You can have a secondary
23  invasion of bacteria sitting or going to the
24  implant and being for some immunological

Page 284

1  reasons activated there.  Yeah, that may be.
2  And necrosis, if you made an operation where
3  a lot of tissue is going to be ischemic and
4  you have a lot of these damaged tissue around
5  and you have an increased risk if you have a
6  history of a past infection, then you have an
7  increased risk.
8         If you take some drugs,
9  immunosuppression after transplantation, you
10  have an increased risk.  If you have
11  diabetes, you have an increased risk.
12     Q.    What's the risk of a surgical
13  site infection for an incisional hernia?
14     A.    Incisional hernia, it is -- in
15  very many studies, it is about 10 to
16  15 percent.
17     Q.    What's the risk of the surgical
18  site infection from groin surgery?
19     A.    It depends which study you are
20  looking at.  If you are really making a
21  follow-up for three weeks, then you're in the
22  range from 3 to 5 percent.  If you're looking
23  to day surgery leaving the patient in the
24  evening and asking whether he has an

Page 285

1  infection, then you have perfect numbers,
2  very close to zero percent.  So there is
3  always this variation.
4     Q.    Do you distinguish between
5  surgical site infections and these latent
6  infections?
7     A.    Yes, I, personally, I do so.
8  Because it is another time period when it
9  occurs and it is another challenge for the
10  surgeon if a patient is coming two years
11  after an operation with a swelling here or
12  sometimes it is a -- just a finding by chance
13  that there is a tumor or so and then it is a
14  late onset bacterial infection, it is always
15  a challenge.
16     Q.    Surgical site infections are a
17  risk of any surgery, aren't they?
18     A.    There is no surgery with zero
19  surgical site infection risk, that is true.
20     Q.    Do you have a number of a rate
21  of infections, latent infections, that you
22  would attach to incisional hernias?
23     A.    Latent infections in incisional
24  hernias.  There is a very limited number of

Page 286

1 reports of systemic reports, long-term
2 reports and that is the importance of the
3 registries because you cannot imagine a
4 randomized control trial looking for 50 years
5 to 1,000 patients. You only get it from
6 registries.
7          And there from the US, I think,
8 the best data are there where they looked to
9 all patients with incisional hernia and
10 looked to the explants. The reason for
11 explantation is given in about three percent
12 of the patients with incisional hernia in
13 this study.
14     Q.    Okay. And for those explants
15 that are removed because of latent infections
16 in the three percent that you just described,
17 are you able to determine the source of the
18 infection from the explant?
19     A.    There are reports where someone
20 has made microbiological investigation and he
21 was successful to identify the germ there.
22 It is possible to do so.
23     Q.    What I'm talking about, just to
24 make it a little bit clear, you've talked

Page 287

1 about secondary infections. It's true that a
2 person can develop an infection in one part
3 of the body that can migrate to the implant
4 and have an infection at the implant.
5          Is that true?
6     A.    To my knowledge, we believe in
7 this conception. That is the reason that,
8 for example, cardiac valves, you have to make
9 a protection of antibiotics if you have -- if
10 you receive a colonoscopy because we believe
11 that these bacteria are going to the implant
12 and obviously there has been some reports of
13 it.
14     Q.    There's --
15          MR. ANDERSON: Wait, are you
16     through?
17          THE WITNESS: Yes.
18 QUESTIONS BY MR. THOMAS:
19     Q.    There's a risk, for example, of
20 a heart valve if a person has a procedure
21 where a heart valve's implanted, they can
22 develop an infection in another part of their
23 body, it can migrate to the heart valve and
24 can be a real problem, even tragic death,

Page 288

1 correct?
2     A.    So --
3     Q.    Is that yes?
4     A.    There is a current -- yes,
5 there is a current knowledge that there you
6 have a migration of the germs to the implant,
7 the secondary.
8     Q.    And that can happen whether
9 it's a knee implant or a hip implant or a
10 heart valve, correct?
11     A.    In principle, I totally agree,
12 but I don't have any specific data showing
13 what is the risk. It depends from the age of
14 the comorbidities and all of these things.
15 In principle, there is a risk.
16     Q.    You're not trained as an
17 infectious disease doctor, are you?
18     A.    Just by my work and facing the
19 problems with patient with surgical site
20 infection and, as you stated already, my
21 surgery as well, they made -- I suffered from
22 some surgical site infections.
23     Q.    You, yourself, or your
24 patients?

Page 289

1     A.    No, I suffered from my
2 patients, yes.
3     Q.    Well, when you have surgical
4 site infections, do you refer them to an
5 infectious disease doctor?
6     A.    No, in Germany, we didn't do
7 so. It depends from the structure of the
8 hospital whether you need this additional
9 skill or not.
10     Q.    And if you're unable to treat
11 the surgical site infection with your own
12 skills, certainly you have that discipline
13 available to you to consult with.
14          Is that fair?
15          MR. ANDERSON: Objection to
16     form. Discipline was --
17          THE WITNESS: I didn't get --
18 QUESTIONS BY MR. THOMAS:
19     Q.    If you needed an infectious
20 disease doctor for an especially complicated
21 infection, you certainly could find one if
22 you needed one, couldn't you?
23     A.    I never made the experience.
24 We're at the university. We are at the

Page 290

1 maximum. We're at the upper level of this
2 and other people send us patients that we
3 treat them --
4     Q.    Okay.
5     A.    -- and they fail to do so and
6 there was no other hospital where we can
7 send --
8     Q.    I see.
9     A.    -- the patients to. So I
10 didn't have the experience whom to ask. In
11 the field of visceral surgery and
12 complication of meshes, so I --
13     Q.    Does the -- I am sorry.
14     A.    Yeah, I cannot give you any
15 statement of this.
16     Q.    Does -- when you were
17 practicing surgery -- and you haven't done
18 surgery since 2006?
19     A.    Yes.
20     Q.    When you were practicing
21 surgery, did your hospital have an infectious
22 disease doctor on staff?
23     A.    In the hospital, there is an
24 institute for microbiology that when we want

Page 291

1 to have some investigations, they can do it.
2 We have a doctor who is responsible for
3 infection in the hospital. He's doing some
4 statistics there and some training for
5 cleaning the hands, washing the hands and so.
6 He's visiting the intensive care unit,
7 looking to some bacteria there.
8         But it is not -- it has not
9 been part of the daily practice that he
10 advises surgeons what to do.
11     Q.    Let me ask the question this
12 way.
13         Is there -- while you were
14 practicing surgery, was there a doctor at the
15 hospital where you practiced that had a
16 specialty in treating patients with
17 infectious disease?
18     A.    Surgical infectious disease?
19     Q.    Yes.
20     A.    No. We did it.
21         MR. THOMAS:  I need to take a
22 break.
23         MR. ANDERSON:  Okay.
24         (Off the record at 4:50 p.m.)

Page 292

1 QUESTIONS BY MR. THOMAS:
2     Q.    Doctor, I spent a lot of time
3 talking to Dr. Klosterhalfen this weekend
4 about the collection of explants that he has,
5 both hernia explants and pelvic floor
6 explants.
7         What kind of collection does
8 your hospital maintain in terms of explants?
9     A.    The explants I have access to
10 that are explants that has been explanted by
11 my colleagues from the surgical department,
12 only from the surgical department, and they
13 are -- and they made an explantation, they
14 send it to our lab and then I get informed
15 and then we place it on stock for the next
16 time.
17     Q.    What do you mean, place --
18     A.    We store it.
19     Q.    Okay. You place it in
20 formalin?
21     A.    In formalin, yeah.
22         And there may be other explants
23 that may go to the Institute for Pathology,
24 but I have no access to this.

Page 293

1     Q.    So when your surgical
2 colleagues explant a mesh, it doesn't
3 immediately go to pathology for analysis?
4     A.    No. There is -- there is no --
5 the pathology is not really interested in
6 looking to the pathology of these mesh
7 materials, but we are interested in, we made
8 investigations and so this is sent to our
9 lab.
10     Q.    Okay. What are the occasions
11 when an explant goes to the Institute of
12 Pathology for review? Why would that happen?
13     A.    An explant may be from the
14 department for gynecology. They will send it
15 to the pathology or some other department.
16 They may send it to the department for
17 pathology, but my colleagues and myself at
18 that time when I explant mesh materials, we
19 are collecting these materials in our lab and
20 for -- because we are interested in analysis,
21 we are interested in specific questions and,
22 therefore, we make this investigation. We
23 don't want to have a standard evaluation of
24 mesh materials.

Page 294

1    Q.    Okay.  Are all of the explants
2 in the collection that you maintain at the
3 hospital hernia explants?
4    A.    Explants that have been
5 explanted from patients with hernia and I
6 always try to get the documents from the OR,
7 what happens there and the medical records of
8 these patients.
9    Q.    And how many hernia explants do
10 you have?
11    A.    It has been around 600 when
12 we --
13    Q.    And how long have you been
14 collecting hernia explants?
15    A.    We really start to look for
16 this, it was in parallel to the increased use
17 of the mesh materials and this starts in
18 about 2000.  In the years before, it was --
19 meshes were rarely used.  So it was rarely
20 the occasion to get a mesh there, but
21 meanwhile, yeah, 30, 40 percent of the
22 patients that you made an operation for
23 recurrent hernia already has some sort of
24 meshes in the --

Page 295

1    Q.    Is it standard practice in your
2 department when a surgeon explants a hernia
3 mesh that they provide it to you?
4    A.    It is -- it is a very visual
5 thinking of all participants and fortunately
6 most of my colleagues are involved somehow in
7 the scientific work of meshes and, therefore,
8 most of the colleagues have been a big
9 interest to send me their explanted mesh
10 materials.
11    Q.    So it's a voluntary decision on
12 the surgeon as opposed to a procedure of the
13 hospital about whether to send you the mesh?
14    A.    No, it's voluntary by the
15 surgeon whether to throw it away or send it
16 to the lab, yes.
17    Q.    And when you receive the mesh,
18 you collect whatever medical records that you
19 can associated with the mesh?
20    A.    Yes.
21    Q.    Do you have a form that you use
22 to detail the information for each of the
23 explants?
24    A.    The paper for documentation of

Page 296

1 the parameters, it is always defined for a
2 specific question.  I don't build up a
3 registry with some basic data where I put in
4 some maybe or likely irrelevant information
5 in it.  So when I want to make a study, I
6 choose some explants and then I decide if I
7 want to study this and I need this parameter
8 for controlling the conditions.
9    Q.    Who has access to your
10 collection of explants?
11    A.    Every member -- in principle,
12 every employee from the surgical department
13 so.
14    Q.    Do you control who has access
15 to the explants?
16    A.    No.
17    Q.    So anyone can go in and check
18 one out?
19    A.    I know who is doing research.
20 It is -- no one is going there and taking
21 them and so you need some specific question
22 to do so and if someone has a question, then
23 yeah, likely he will communicate this and
24 then he can take ten of these explants to do

Page 297

1 some research or if he wants to look.
2    Q.    When Dr. Klosterhalfen left the
3 university and went to Düren, did he take any
4 explants with him?
5    A.    I don't know.  Maybe he took
6 some ex -- he -- maybe he took the explants
7 that he collected in the Institute for
8 Pathology until 2003 that he took this number
9 of explants to Düren maybe.
10    Q.    Okay.  You know that
11 Dr. Klosterhalfen collected explants while he
12 was at the university, correct?
13    A.    Yes.  On several occasions on
14 the presentations we said to the audience, if
15 you have an explant, feel free, no cost, feel
16 free to submit it to Professor Klosterhalfen
17 in Düren or Aachen.  He will be very happy
18 about it.  So it was a pleasure for me to
19 announce this.
20    Q.    The explants collected by
21 Dr. Klosterhalfen while he was at the
22 Institute of Pathology are no longer at the
23 university, are they?
24    A.    I don't know.

Page 298

1    Q.   Okay.  Okay.  Do you have
2  access to Dr. Klosterhalfen's collection of
3  explants?
4    A.   Access in the meaning that he
5  shares his data, his evaluation, yes.
6    Q.   Do you have access that you
7  could go over and remove some of his explants
8  for your own testing?
9    A.   Remove?  So if I want to see
10  some and make some further investigations, of
11  course, I don't see any problems that we can
12  do so.
13    Q.   You typically don't --
14    A.   I never had the idea to go
15  there and to remove something, no.
16    Q.   Okay.  The research you do is
17  on your own collection of explants, is that
18  fair?
19    MR. ANDERSON:  Objection.
20    THE WITNESS:  We have a very
21  close collaboration still there.  It's
22  depending from the time point, but as
23  I saw at the beginning this research
24  program with the European Union, that

Page 299

1  was done because we need a lot of
2  staining there and I asked him whether
3  it's possible to do this at his
4  department, with his machines because
5  they're better than what we have in
6  our lab and so, therefore, I brought
7  him the box and the staining was done
8  at his facility.  So it's no problem.
9  It's 30 kilometers.
10    Q.   Has the hospital -- strike
11  that.
12    Over the last ten years, has
13  the hospital where you currently work used
14  mesh for the treatment of pelvic organ
15  prolapse?
16    A.   As I know from the discussions
17  with -- we have a center for treatment of
18  incontinent patients and we had several
19  discussions and we have several joint
20  projects and scientific projects with the
21  members of these incontinent center and,
22  therefore, yes, in the discussion, they said
23  they used these, they used meshes.  Not as a
24  first line indication, but in some severe

Page 300

1  recurrent patients where a mesh-free device
2  has failed there, they choose to make a
3  reenforcement of tissues with the help of
4  textiles and since one year, two year they
5  change completely to PVDF.
6    Q.   Okay.  Is that for both -- I
7  asked the question was pelvic organ prolapse.
8    Does your hospital use mesh for
9  the treatment of pelvic organ prolapse?
10    A.   Yes.  In these cases.
11    Q.   What do you mean "these cases"?
12    MR. ANDERSON:  The ones he just
13  told you about.  He was answering your
14  question about pelvic organ prolapse.
15    THE WITNESS:  Not a first-line
16  therapy, only in recurrent and --
17  QUESTIONS BY MR. THOMAS:
18    Q.   I understand.
19    A.   -- in some selected patients.
20    Q.   Now, does your hospital use
21  mesh for the treatment of stress urinary
22  incontinence?
23    A.   Yes.
24    Q.   And you told me a minute ago

Page 301

1  that they -- two years ago they changed
2  completely to PVDF.
3    Is that for both procedures?
4    A.   My impression within the last
5  two years.  It is not two years ago sharp
6  time point, but within the last two years.
7  Actually, they are using PVDF for both
8  indications because I assume -- within the
9  past three years, we have increasing
10  conversation about our experiences.  We have
11  made a lot of discussions and meetings with
12  our scientific projects.  We have been going
13  to the animal facilities, to the anatomy to
14  look for all of this and, meanwhile, they're
15  convinced that PVDF is better.
16    Q.   How long have you had these
17  conversations with the Center for Treatment
18  of Incontinence?
19    A.   The first project started in
20  2007, 2008.
21    Q.   And tell me how that happened.
22    A.   It was a -- it was a project
23  together with the FEG as a small medium
24  enterprise, together with the Center for

Page 302

¹ Incontinence and together with me and
² together with Professor Muhl.
³     Q.    Is that Mullen?
⁴     A.    Muhl.  Muhl from the -- from
⁵ our pore -- you see Professor Muhl from
⁶ Monday.
⁷     Q.    Okay.  It's the engineer --
⁸     A.    The engineer, yeah.
⁹         So there has been a project for
¹⁰ the development of -- yeah, for uses of mesh
¹¹ in the pelvic floor area.  And there has been
¹² another for finding a good or to create an
¹³ anchor system or to study anchor systems for
¹⁴ the use for mini slings and, yeah, that these
¹⁵ has been the major activities.
¹⁶     Q.    What kind of mesh is used for
¹⁷ the treatment of stress urinary incontinence
¹⁸ in your hospital now?
¹⁹         MR. ANDERSON:  Objection.
²⁰ Asked and answered.
²¹         Go ahead.
²²         THE WITNESS:  I don't know
²³     exactly.
²⁴

Page 303

¹ QUESTIONS BY MR. THOMAS:
²     Q.    In your discussions with the
³ Center for Treatment of Incontinence and your
⁴ gynecologic department, have you ever
⁵ requested that they give to you explant or
⁶ tissue samples from their patients who have
⁷ had mesh removed from pelvic organ prolapse?
⁸     A.    Not -- definitely not -- no.
⁹     Q.    Why not?
¹⁰     A.    No.  Because I'm rather busy to
¹¹ do so, so a collection of all of these
¹² materials it takes a lot of time to have a
¹³ systemic analysis and I'm busy enough to
¹⁴ investigate all of these others, to make up
¹⁵ the consequence -- the competition to Bernd
¹⁶ Klosterhalfen with all of his explants, no.
¹⁷ But maybe it's a good idea to tell them they
¹⁸ shall send it to Bernd.
¹⁹     Q.    Do you know whether they send
²⁰ them to anybody?
²¹     A.    I guess they send it to the
²² Institute of Pathology in our university.
²³     Q.    But you're guessing at this
²⁴ point?

Page 304

¹     A.    I'm guessing.
²     Q.    They may be throwing it away?
³     A.    Yeah.
⁴     Q.    You think that's likely they're
⁵ throwing the explants away?
⁶     A.    I wouldn't be very surprised.
⁷     Q.    Okay.  So as far as you know,
⁸ the explants for both pelvic organ prolapse
⁹ and stress urinary incontinence are likely
¹⁰ being thrown away or being sent to the
¹¹ Institute of Pathology?
¹²     A.    I would agree to this
¹³ statement, yeah.
¹⁴     Q.    You don't want access to those
¹⁵ because -- "those" being -- strike that.
¹⁶         You don't want access to the
¹⁷ explants for pelvic organ prolapse or stress
¹⁸ urinary incontinence because your hernia
¹⁹ explant collection is keeping you plenty
²⁰ busy?
²¹     A.    No, that is not correct.  I
²² deeply want to have access to this, but it
²³ has an inferior priority for what I'm doing
²⁴ there.  It would be very -- I would be very

Page 305

¹ happy if we have the facilities to collect
² all of these textile implants and to have a
³ scientific investigation and evaluation of
⁴ this.  Yeah, it would be very helpful for all
⁵ of us.
⁶     Q.    But at least today you haven't
⁷ done that?
⁸     A.    I haven't done what, building
⁹ up this institute?
¹⁰     Q.    Collected explants from pelvic
¹¹ organ prolapse or stress urinary
¹² incontinence?
¹³     A.    That, I didn't done up to now.
¹⁴     Q.    Okay.  Do you know what a Burch
¹⁵ colposuspension is?
¹⁶     A.    I've heard this phrase, yeah.
¹⁷     Q.    What is it?
¹⁸     A.    It's a suture repair.
¹⁹     Q.    Suture repair of what?
²⁰     A.    Of pelvic floor prolapse.
²¹     Q.    Okay.  And where do you get
²² your understanding of the Burch
²³ colposuspension as a suture repair of pelvic
²⁴ floor prolapse?

Page 306

1    A.    I have read from the
2  literature.
3    Q.    Okay.  What literature --
4  strike that.
5        Can you describe for me how a
6  Burch colposuspension works?
7        MR. ANDERSON:  Objection.
8    Counsel, you know we're not having him
9    offer any opinions on the Burch
10   colposuspension.
11       MR. THOMAS:  I'm just asking if
12   he knows.
13       THE WITNESS:  I know that I
14   read it.  I know that I did understand
15   it, but I cannot recollect this phrase
16   of this textbook where it works.
17 QUESTIONS BY MR. THOMAS:
18   Q.    You said you understood it.
19       Other than being a suture
20 repair of a pelvic floor prolapse, what do
21 you understand it to be?
22       Is that the extent of your
23 knowledge?
24   A.    Same thing.  So we can together

Page 307

1  go through the textbook and then I'm able to
2  explain you what is done by this.
3    Q.    Doctor, do you know the primary
4  method of treatment of stress urinary
5  incontinence before the use of mesh?
6        MR. ANDERSON:  Objection.  All
7    of these questions about implantation
8    or SUI.
9        Go ahead, Doctor.
10       THE WITNESS:  There has been --
11   I know there has been some attempts to
12   have some -- to improve the -- to the
13   function by placing some tissue
14   approximated by sutures there.  There
15   has been used some fistular slings in
16   the beginning of the '90s, first
17   attempts to make a sling-like repair
18   and then later on it is replaced by
19   artificial slings.
20 QUESTIONS BY MR. THOMAS:
21   Q.    Are you familiar with
22 randomized control trials comparing the use
23 of mesh to other alternative procedures for
24 the treatment of stress urinary incontinence?

Page 308

1    A.    I noticed the results.  I had
2  to look to some meta-analysis mainly from the
3  UK from the NICE where they made up this
4  evaluation of these comparative studies of
5  the various approaches.  It's a very thick
6  document and there are these comparisons
7  where -- have been there.
8    Q.    Is that the extent of your
9  review of the literature of randomized
10 control trials comparing the use of mesh to
11 other traditional repairs for the treatment
12 of stress urinary incontinence?
13   A.    No, it's not limited to this,
14 but the meta-analysis published in the UK,
15 that gives a very good overview that, of
16 course, every week, every month there is
17 published new studies, new reports and I try
18 to get informed about the recent development
19 in this field.
20   Q.    What is NICE?
21   A.    NICE, it's the British -- it's
22 the British office that is reviewing the --
23 or that has to be -- that has to do something
24 with the -- controlling the efficiency of

Page 309

1  some therapies.  They're giving advices to
2  the patients, to the doctors, and they try to
3  define some standards and guidelines.
4    Q.    And the --
5    A.    I don't know the abbreviation
6  where it's specifically.
7    Q.    That's fine.
8        And what are the standards and
9  guidelines for?
10       MR. ANDERSON:  Objection.  If
11   you know.
12       THE WITNESS:  Standards and
13   guidelines they tried to give a -- to
14   give an advice to patients how to
15   treat a standard patient in a standard
16   way so, therefore, many, many surgical
17   and other societies tried to define
18   some guidelines how to treat a patient
19   in a specific situation with what sort
20   of therapy so the surgeon can ask
21   these guidelines and can confirm
22   whether he treats the patient in the
23   best way that is in the moment advice
24   by the literature and the officials.

Page 310

1  That is maybe the function of the
2  guidelines.
3      It is not able to give a
4  specific advice for the treatment in a
5  specific patient.
6  QUESTIONS BY MR. THOMAS:
7      Q.   In your experience, do doctors
8  consult the NICE guidelines in connection
9  with rendering care and treatment to
10  patients?
11      MR. ANDERSON:  Objection.
12      THE WITNESS:  I know some
13  investigations from guidelines from
14  the Dutch where they changed the
15  guidelines and then later on asked the
16  doctors where they follow the new
17  guidelines, yes or not, the result was
18  rather disappointing.  So I'm not sure
19  whether the guidelines published by
20  NICE or someone else really changed
21  the attitude of the doctors, but, of
22  course, these guidelines reflect the
23  knowledge that most of the doctors
24  will share.

Page 311

1  QUESTIONS BY MR. THOMAS:
2      Q.   Is it your understanding the
3  NICE guidelines attempt to reflect the best
4  judgment of the experts in the field about
5  the standard source of treatment for a
6  patient who is suffering from a certain
7  condition?
8      A.   It's even more.  They don't --
9  attempt -- good guidelines don't attempt to
10  reflect only the meaning of the expert, but
11  they're collecting and providing a
12  meta-analysis of the data and then together
13  with the experts, they together try to define
14  what can be the best treatment for the
15  patient, yes.
16      Q.   You've mentioned this is a UK
17  publication.
18      You obviously have consulted it
19  here in Germany.
20      Do you know if others in the EU
21  consult the NICE guidelines?
22      A.   I don't know.  But we have
23  German guidelines as well for the treatment
24  of incontinence, and interestingly in 2003,

Page 312

1  2004, the first version, the sling repair was
2  advocated as first treatment and meanwhile it
3  is restricted to the elderly patient.
4      So there is some dynamic change
5  in all of these guidelines, but they reflect
6  the actual state of the opinions.
7      Q.   What organization in Germany
8  provides guidelines similar to those that
9  you've described are offered by NICE?
10      A.   It is called the AWMF.  It is
11  placed at the server in Dusseldorf.
12      Q.   What is it?
13      A.   It is a joint -- a community of
14  several medical societies or all medical
15  societies, they agreed to work together in
16  this AWMF and they offered a lot of
17  guidelines for the treatment of cancer, for
18  the treatment of incontinence, for the
19  treatment of cirrhosis, and so forth, for all
20  of these things and this is on the internet
21  and you have various levels of evidence and,
22  yeah, everyone can go to the internet and
23  have a look to it.  This is our German
24  platform.

Page 313

1      Q.   Okay.  So you went and
2  consulted the NICE guidelines for the
3  treatment of stress urinary incontinence; is
4  that correct?
5      MR. ANDERSON:  Objection to
6  form.  Misstates testimony.
7      Go ahead.
8      THE WITNESS:  To get an
9  overview what happened there, I try to
10  look to every guidelines and,
11  therefore, in PubMed, I place there
12  the key words, guidelines and mesh and
13  incontinence and so one of the
14  guidelines I saw there was this one
15  from the UK, and I think I liked it
16  very much because it seems to be very
17  accurate at that time.  It's some
18  years old, again, but there are a lot
19  of other summaries of the knowledges
20  and the randomized controlled trials
21  that you referred to.
22  QUESTIONS BY MR. THOMAS:
23      Q.   Before you did this PubMed
24  search that you've just described, had you

1   ever determined the positions of NICE or the
2   AWMF on the care and treatment of stress
3   urinary incontinence?
4        MR. ANDERSON:  Objection to
5   form.
6        THE WITNESS:  I didn't get the
7   question.
8   QUESTIONS BY MR. THOMAS:
9        Q.    You just described for me two
10  organizations that you consulted in your work
11  in this case.
12       A.    No, not in this case.  Sorry.
13       Q.    Okay.  I am sorry, I
14  misunderstood.
15       A.    So I started to think of this
16  very intensely.  I went to look to the
17  literature when we made our publication for
18  medical device dealing with the slings.
19       Q.    Back in 2007?
20       A.    Huh?
21       Q.    Back in 2007?
22       A.    Yeah.  That was the first time
23  that we looked regularly to the literature in
24  this.  But, again, this is another reason to

1   have a look to it, but meanwhile, I'm invited
2   by many gynecological societies.  So it is a
3   hot topic, mesh in urogynecology and,
4   therefore, I try to get -- to get or to keep
5   informed.
6        Q.    Okay.  And where do you go to
7   keep yourself informed on the hot topic of
8   mesh in urogynecology?
9        A.    Apart from the communication at
10  the conferences or the meetings, for me, the
11  best indicator of that is a hot topic is if
12  you count the publications in MEDLINE®, if
13  you place there the topic mesh, almost a
14  third of it, of the recent publication of the
15  last year are dealing with mesh in the pelvic
16  floor area.  So it is increasingly discussed
17  and if I look to all of the publications that
18  included some references of my work, I get
19  who is interested including a citation of our
20  work, then I see again there is a lot of
21  gynecologic, urologic mesh papers there.  So
22  that is the reason.
23       Q.    Now, in the United States,
24  there are professional societies of hernia

1   surgeons and of gynecologists and
2   urogynecologists and urologists and each of
3   those organizations has journals that they
4   published.
5        You're aware of that?
6        A.    Yes.
7        Q.    In Germany, does the AWMF, is
8   that a similar organization?  Is that a
9   professional society that has a journal?
10       A.    No.  No.  I don't think that
11  they have an own journal.  They provided the
12  internet platform so that everyone can have
13  access to this.
14       Q.    Okay.  And is it
15  government-sponsored?
16       A.    I think so, yeah.
17       Q.    Okay.  So it's an organization
18  of the German government?
19       A.    I think so.
20       Q.    Is it -- is the medical system
21  in Germany, is it national health care?
22       A.    We have a very complex medical
23  system.  The universities belong to the
24  countries.  The health system belongs to, I

1   think, about 100 insurance companies,
2   different insurance companies.
3        Q.    And all I'm asking is whether
4   the AWMF is part of the government that
5   describes what procedures will be paid for
6   and under what circumstances, do you --
7        A.    No, it is not related --
8        Q.    That's fine.
9        A.    -- to any reimbursement.
10       Q.    That's exactly what I'm asking.
11       A.    Nothing about this.  This is
12  completely different.  It's just the medical
13  definition of appropriate therapies or best
14  therapies.
15       Q.    All right.  Is there any other
16  organization in Germany about which you're
17  aware that identifies the appropriate
18  therapies for different conditions such as
19  the AWMF or the NICE?
20       A.    There are several societies
21  from the urologists and from the
22  gynecologists in Germany as well, and they
23  try to do -- to give some statements, but I'm
24  not aware that they have provided guidelines

Page 318

1  in the quality of the UK. That is not
2  available with them.
3      Q.  Okay. So at least in your
4  experience, the guidelines in the UK and the
5  NICE guidelines are of superior quality to
6  what's available from the German professional
7  societies?
8      A.  No, I wouldn't say that, but
9  the -- I don't -- I don't want to focus on
10  what the guidelines are saying. The most
11  important thing for me is when you're looking
12  to the guidelines from the NICE, if you look
13  to the document of 100 pages or 200 pages
14  there, you have a very good collection of the
15  status of the publications and the references
16  and a good structure of it, and they present
17  the data very, very nice. That is what
18  I'm -- what I appreciate very much when I
19  look into these guidelines. That is the
20  point. Not the point whether they are in
21  favor of or -- I have read this as well, but
22  this is influenced by the UK health system
23  and so.
24      Q.  Okay. Are there any

Page 319

1  organizations of the EU that put out
2  guidelines about appropriate therapies for
3  patients with certain conditions?
4      A.  I don't know any -- I'm not
5  aware that the EU, that any organization in
6  the EU gives this. There are these
7  international societies for the treatment of
8  incontinence. There are the American
9  societies for urology, gyne -- international
10  societies and these together, they provided
11  some advices to treat, yes.
12      Q.  Did you consult --
13      A.  But EU, no.
14      Q.  Did you consult the physicians
15  of the American Urogynecological Society on
16  the use of mesh for stress urinary
17  incontinence?
18          MR. ANDERSON: Objection.
19          THE WITNESS: I have read some
20  statements. Whether it's this
21  American society or whether it's
22  another, I cannot recollect. Yeah,
23  but there is a discussion, very
24  intense discussion pro and con and

Page 320

1  very often a mixup of pelvic floor
2  prolapse and incontinence and older
3  and younger patients.
4  QUESTIONS BY MR. THOMAS:
5      Q.  Do you distinguish between
6  pelvic organ prolapse and stress urinary
7  incontinence about the use of mesh to treat
8  those conditions, whether it's visible or
9  not?
10          MR. ANDERSON: Objection to
11  form.
12          THE WITNESS: As I indicated
13  this morning, I think it is not very
14  helpful to make this differentiation,
15  however, I made it because you made
16  it.
17  QUESTIONS BY MR. THOMAS:
18      Q.  Okay. But if I hadn't
19  distinguished the two, you would treat them
20  together; is that fair?
21          MR. ANDERSON: Objection.
22  Form.
23          THE WITNESS: What?
24

Page 321

1  QUESTIONS BY MR. THOMAS:
2      Q.  Do you consider the two
3  conditions to be one?
4          MR. ANDERSON: Objection to
5  form.
6          THE WITNESS: There are many,
7  many, many differences. If you stick
8  to the problem of mesh -- of
9  textiles -- the use of textiles in the
10  pelvic floor area, you have to
11  differentiate the effect of flat
12  meshes in a flat area and from the
13  reaction to a sling-like material.
14  That you have to -- that is from my
15  point of view, there is a different
16  reaction and different discussion
17  about the functionality and tissue
18  response and structural stability,
19  different requirements to these
20  things.
21          So for the evaluation of
22  devices, for the development of
23  devices, it may be not thus helpful to
24  have this differentiation in

Page 322

1  incontinence and prolapse. It is not
2  sufficient.
3  QUESTIONS BY MR. THOMAS:
4     Q.    Okay. Let me understand your
5  answer.
6         You said, "From my point of
7  view, there is a different reaction and
8  different discussion about the functionality
9  and tissue response and structural stability,
10 different requirement to these things."
11        Does that mean that you need to
12 separate the two in order to understand them
13 and the appropriate reaction to mesh?
14        MR. ANDERSON:  By "the two," do
15 you mean POP and SUI?
16        MR. THOMAS:  Yes.
17        THE WITNESS:  Can you please
18 rephrase it?
19 QUESTIONS BY MR. THOMAS:
20    Q.    Your answer to my question
21 before you said, "From my point of view,
22 there is a different reaction and different
23 discussion about the functionality and tissue
24 response and structural stability, different

Page 323

1  requirement to these things."
2         That was the answer you gave
3  just a moment ago.
4     A.    Yes.
5     Q.    And what I'm trying to
6  understand is whether the different reaction,
7  different discussion relates to the
8  differences between mesh used for the
9  treatment of pelvic organ prolapse and mesh
10 used for the treatment of stress urinary
11 incontinence.
12    A.    What I try to explain is if
13 you're looking to prolapse, you can -- there
14 are some -- as Petros who said that -- are
15 you ready?
16    Q.    Yes, I am.
17    A.    So if you follow Petros, he
18 said that prolapse can be treated with
19 sling-like structures, five, six sling-like
20 structures. Others said you need flat meshes
21 in this area. So if you want to discuss the
22 requirements to the textile for the use, it
23 is impossible to say that we define the
24 requirements for the textiles for prolapse,

Page 324

1  it is not sufficient. It depends on whether
2  you want to make this reenforcement with flat
3  meshes or by slings. And, therefore, the
4  summarize, or the grouping, prolapse and
5  mesh, that is not sufficient because you
6  can -- you have to differentiate flat mesh
7  and sling. For incontinence, it is more
8  simple because so far I know there are only
9  slings and no one is until now had to realize
10 the idea to treat it with a mesh. So that is
11 my problem to address this problem. And if
12 you just want to differentiate prolapse and
13 the requirements for prolapse, it is not
14 sufficient from my point of view. You have
15 to specify for what sort of treatment, for
16 what sort of textile.
17    Q.    Are you familiar with the
18 European Association of Urology?
19    A.    I've heard it. They publish,
20 yeah.
21    Q.    Have you looked at the European
22 Association of Urology guidelines on urinary
23 incontinence?
24    A.    I have to look at my computer

Page 325

1  where I've stored --
2         MR. ANDERSON:  You can look --
3         THE WITNESS:  Mesh and pelvic
4  floor is in MEDLINE®, I think it's
5  about a thousand hits. And it's
6  increasing. Every week it's going up.
7  So it is -- for hernia, it's 12,000
8  hits. So it's almost impossible to --
9  you can read a lot, but to have it --
10 to keep it in mind is almost
11 impossible.
12 QUESTIONS BY MR. THOMAS:
13    Q.    Have you made an effort to
14 determine a consensus among surgeons who
15 use -- strike that.
16        Have you made an effort to
17 determine a consensus of surgeons who treat
18 stress urinary incontinence of the
19 appropriate method to treat stress urinary
20 incontinence?
21        MR. ANDERSON:  Objection.
22        Go ahead.
23        THE WITNESS:  That is -- that
24 is a -- the discussion we had during

Page 326

1 the past half a year was Dr. Liedl,
2 with Professor Jager, with Professor
3 Kirschner-Hermanns, the head of the
4 Incontinence Society, yeah, that is
5 the severe discussion to find an
6 agreement and they all admit that
7 there is a complete mixup of the
8 patients, mixup of the diseases, mixup
9 of the therapies so we're still
10 looking for the best structure because
11 many of these procedures work very
12 well in many patients, but every
13 surgeon and everyone knows
14 considerably fatal rates there, and to
15 identify which patient should have
16 another treatment than the one that
17 has been selected, it depends of the
18 definition of its individual
19 condition, and it is difficult to have
20 a satisfying preoperative condition in
21 these patients and, therefore, all of
22 these guidelines are too unspecific.
23 QUESTIONS BY MR. THOMAS:
24    Q.   Okay. Maybe my question wasn't

Page 327

1 very clear. What I was trying to determine
2 from you, Doctor, is the extent to which
3 you've undertaken to determine whether there
4 is a consensus of surgeons who treat women
5 with stress urinary incontinence about the
6 appropriate method to treat stress urinary
7 incontinence.
8         I appreciate the fact that
9 you've had discussions with a number of
10 people, but have you reached any conclusion
11 in your own mind about whether there's a
12 consensus or not on the appropriate method to
13 treat stress urinary incontinence?
14         MR. ANDERSON: Objection.
15 Outside of his expert report, what I'm
16 going to ask him to do in this case.
17 But answer his question.
18         THE WITNESS: What do you mean
19 by "consensus"? There are, of course,
20 some writings in the literature where
21 they say, okay, a consensus is like
22 this and this and this. This society
23 is saying this consensus. If I
24 remember all of the discussions that

Page 328

1 we have in Aachen with the urologists,
2 gynecologists of different towns, no,
3 there is no -- there is no agreement
4 of the best therapy. The one made it
5 transvaginal, transabdominal, with
6 mesh, without mesh, first-line mesh,
7 depends from the patient so, no, there
8 is no consensus that you really can
9 say that is a standard therapy for all
10 patients. I don't know it.
11 QUESTIONS BY MR. THOMAS:
12    Q.   Doctor, have you -- strike
13 that.
14         Are you familiar with the rates
15 of complications associated with the use of
16 mesh for the treatment of stress urinary
17 incontinence?
18    A.   I have read a lot of these
19 articles, but I have to admit meanwhile I'm
20 not very interested in these figures, in
21 these rates.
22    Q.   Why not?
23    A.   Huh?
24    Q.   Why not?

Page 329

1    A.   Because I don't think that it
2 reflects the reality. It is usually done in
3 hundred patients or 50 patients, you have a
4 follow-up time which is maybe six months,
5 maybe sometimes one year. And statistically
6 all of these studies are underpowered. So
7 they are helpful to detect whether there is
8 the risk -- whether there is a risk, to
9 demonstrate that there is a risk, they are
10 helpful because in some patients you can find
11 some risks.
12         To define whether they can
13 really confirm the safety of a procedure,
14 they are underpowered. You need at least
15 2,000 patients. You have to make a follow-up
16 of five years, ten years, and that cannot be
17 done, that is not done. You need to have a
18 longer follow-up. And that is what
19 Klosterhalfen and me, we're -- we know this
20 situation for a long and that is the reason
21 that we ask for building up these registries,
22 and meanwhile, we're convinced that is --
23 that this is the responsibility of
24 manufacturers for the post-market

Page 330

1  surveillance to build up these registries.
2  Otherwise, you cannot get a good conclusion
3  what are the risks for the device.
4      Q.    Does a meta-analysis of studies
5  such as you described in the NICE report give
6  you more information to allow you to evaluate
7  the risk of complications from the use of
8  mesh in the treatment of stress urinary
9  incontinence?
10     A.    I hope you soon can be able to
11  read our manuscript where we mention this.
12  No, the meta-analysis is collecting several
13  randomized controlled trials.  You have an
14  increased variation with this so the
15  statistically analysis is even more nonsense,
16  is meaningless in this, but because they
17  analyze more clinical studies, they are able
18  to detect more possible complications,
19  therefore, they are helpful.  You get a good
20  overview what can happen, but they are not
21  able to prove the safety because the power
22  does not increase if you combine ten poor
23  studies.  That is, of course.
24     Q.    Are you familiar with the

Page 331

1  Cochran review?
2      A.    Yes.  It is quite similar.
3      Q.    Okay.  Have you looked at the
4  Cochran review of the use of mesh for the
5  treatment of stress urinary analysis?
6      A.    Yes, I remember there are two
7  or three Cochran reviews in the past ten
8  years, but they work in a similar way.
9      Q.    So of what benefit to you are
10  the Cochran reviews in understanding of the
11  risks of complications from the use of mesh
12  in the treatment of stress urinary
13  incontinence?
14     A.    They give a helpful analysis of
15  what is represented by studies or what is
16  published.  They very often use similar
17  studies so you find always the same studies
18  in the various meta-analysis.  But, again,
19  even the Cochran review cannot prove the
20  safety because all these single studies, they
21  usually are underpowered.
22     Q.    Doctor, we don't have a
23  registry, you agree with me on that?  We
24  don't have a registry to look to as you would

Page 332

1  like to have to determine the complications
2  that arise from the use of mesh in the
3  treatment of stress urinary incontinence.
4      You agree with that?
5      A.    Not completely.  I know we have
6  some in the incisional -- in the -- in the
7  groin area, Ethicon has built up its own
8  registry.  We have in the field of hernias,
9  we have some registries.  There were some
10  registries in Finland I've read in the
11  internet for meshes in the pelvic floor
12  without having access to the long-term data,
13  only for the short term.  There are some data
14  pools in either Austria or Switzerland.
15     So I agree we don't have the
16  data and the registries in the moment to make
17  a decision which is the safe procedure or
18  not.  We have not access to this data, but
19  there are a lot of data, but it is -- we
20  don't have access to all of these data.
21     Q.    What's the best data we have
22  available to us to understand the risks of
23  complications from the use of mesh in the
24  treatment of stress urinary incontinence?

Page 333

1      What's the best we have?
2      A.    To define the possible risks?
3      Q.    Yes.
4      A.    To define the possible risks, I
5  agree the meta-analysis, the NICE analysis,
6  the European analysis, the American analysis,
7  they all raised -- the FDA analysis, it's a
8  very excellent document, they all raised some
9  concern and, therefore, all of these are
10  reliable sources, yeah.
11     Q.    So what is the best information
12  we have available to us today to determine
13  the rate of complications from the use of
14  mesh to treat stress urinary incontinence?
15     A.    The best -- there is no
16  satisfying.
17     Q.    There's nothing?
18     MR. ANDERSON:  Objection.
19  Form.
20     THE WITNESS:  There is nothing
21  satisfying.  All of these data are
22  incomplete.  They are very, very
23  limited.  So the question which one of
24  these limited studies is not as

Page 334

```
 1   limited as the other, yeah, you can
 2   think about it, but it doesn't help.
 3  QUESTIONS BY MR. THOMAS:
 4   Q.    Okay.  So if you were asked
 5  today to find out the rate of complications
 6  associated with the risk of the use of mesh
 7  for the treatment of stress urinary
 8  incontinence, you don't have anyplace to go,
 9  is that what you're telling me?
10       MR. ANDERSON:  Objection to
11  form.
12       Answer the question.
13       THE WITNESS:  The only
14  situation I would think that is
15  relevant if you have a specific
16  patient and she's asking you what do
17  you think is the risk there.
18  QUESTIONS BY MR. THOMAS:
19   Q.    So --
20   A.    So then it depends whether it's
21  young, whether there's comorbidities and so
22  on.  And then you can say within the first
23  weeks it is a very low risk.  That is
24  probably an estimate that you can give.
```

Page 335

```
 1   Q.    So if a doctor is treating a
 2  woman who has stress urinary incontinence and
 3  they're discussing about whether to use mesh
 4  to treat the stress urinary incontinence,
 5  where does the doctor go to understand the
 6  nature of the risks associated with that
 7  mesh?
 8   A.    He has to go to his own
 9  experience.  So whether -- if he made a
10  follow-up investigation of this patient and
11  that is something that has to be required
12  more and more, you need some backup from the
13  surgical communities, you have to re -- or
14  you have to underline the importance of
15  follow-up investigations so that you have
16  your own experience.  You have to go to the
17  literature, you have to go -- you take the
18  information of the companies and that is what
19  you can provide to the patient.  And you have
20  to think about the long-term -- possible
21  long-term complications and that, yeah -- and
22  you have to address some specific risks of
23  the patient, that is the discussion about the
24  possible disadvantages and advantages in a
```

Page 336

```
 1  specific situation.
 2       MR. THOMAS:  Let's stop for the
 3  day.
 4       MR. ANDERSON:  Okay.
 5       MR. THOMAS:  Thank you, Doctor.
 6  (Off the record at 5:57 p.m.)
 7       _ _ _ _ _ _ _
```

Page 337

```
 1          CERTIFICATE
 2
 3       I, CARRIE A. CAMPBELL, Registered
    Professional Reporter, Certified Realtime
 4  Reporter and Certified Court Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Uwe Klinge was duly sworn
    by me to testify to the truth, the whole
 6  truth and nothing but the truth.
 7       I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
         I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
        _____
17  CARRIE A. CAMPBELL,
    NCRA Registered Professional Reporter
18  Certified Realtime Reporter
    Missouri Certified Court Reporter #859
19  Illinois Certified Shorthand Reporter
    #084-004229
20  Notary Public
21  Dated:  November 26, 2013
22
23
24
```

Page 338

1   ACKNOWLEDGMENT OF DEPONENT
2
3
4        I,_____, do
    hereby certify that I have read the foregoing
5   pages and that the same is a correct
    transcription of the answers given by me to
6   the questions therein propounded, except for
    the corrections or changes in form or
7   substance, if any, noted in the attached
    Errata Sheet.
8
9
10
11
12   _____
    Prof. Dr. Med. Uwe Klinge        DATE
13
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24

Page 339

1        _ _ _ _ _ _ _
        ERRATA
2        _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Page 340

1        _ _ _ _ _ _ _
        LAWYER'S NOTES
2        _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

```
 1            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  AT CHARLESTON
 3

    IN RE: ETHICON, INC,      ) MASTER FILE
 4  REPAIR SYSTEM PRODUCTS,   ) NO. 2:12-MD-02327
    LIABILITY LITIGATION       )
 5                             ) MDL NO. 2327
    _____  )
 6                             ) JOSEPH R. GOODWIN
    THIS DOCUMENT RELATES TO ) US DISTRICT JUDGE
 7  CAROLYN LEWIS, ET AL. V. )
    ETHICON, INC.             )
 8  CASE NO. 2:12-CV-04301    )
 9
              FRIDAY, NOVEMBER 15, 2013
10
                     - - -
11
12          Deposition of Prof. Dr. Med.
13  Uwe Klinge, Volume II, held at the Quellenhoff
14  Hotel, Monheimsallee 52, 52062 Aachen, Germany,
15  commencing at 8:35 a.m., on the above date,
16  before Carrie A. Campbell, Registered
17  Professional Reporter, Certified Realtime
18  Reporter, Certified Shorthand Reporter,
19  and Certified Court Reporter.
20
21                   - - -
           GOLKOW TECHNOLOGIES, INC.
22      877.370.3377 ph|917.591.5672 fax
               deps@golkow.com
23
24
```

| Page 342 | Page 344 |
|---|---|

**Page 342**

INDEX

PAGE

APPEARANCES.................................... 344

EXAMINATIONS

BY MR. THOMAS............................. 345
BY MR. ANDERSON........................... 616
BY MR. THOMAS............................. 664
BY MR. ANDERSON........................... 666

EXHIBITS

No. Description                                    Page

12   Interdisciplinary S2e Guideline for        345
the Diagnosis and Treatment of Stress
Urinary Incontinence in Women
13   AWMF online                                346
14   "EAU Guidelines on the Surgical            349
Treatment of Stress Urinary
Incontinence."
15   Guidelines on Urinary Incontinence         350
16   American Urological Association            353
positions statements
17   "Position Statement on Restriction of      354
Surgical Options for Pelvic Floor
Disorders"
18   "ICS Fact Sheets, A Background to          355
Urinary and Fecal Incontinence"
19   "Urinary Incontinence, the Management      359
of Urinary Incontinence in Women"
20   "The New Objective Measurements to         378
Characterize the Porosity of Textile
Implants"
21   "Tensile Properties of Five Commonly       386
Used Midurethral Slings Relative to
the TVT"
22   "Hernia Repair Sequela"                    496
23   "Comparison of Long-Term                   501
Biocompatibility of PVDF and PP
Meshes"

**Page 343**

24   Pathology report for Carolyn Lewis         565
25   Findings from Klinge review of the         615
slides
26   "Impact of Polymer Pore Size on the        624
Interface Scar Formation in a Rat
Model"
27   "The Argument for Light-Weight             633
Polypropylene Mesh in Hernia Repair"
28   Ethicon documents,                         641
ETH.MESH.01782867
29   E-mail from Joerg Holste to Jonathan       644
Meek dated April 22, 2009,
ETH.MESH.02148431 - ETH.MESH.02148432
30   Clinical expert report from Piet           645
Hinoul,
ETH.MESH.08315779 - ETH.MESH.08315810
31   "Demand the most proven technology         647
when selecting a midurethral sling.
Make data and safety your choice"
32   PowerPoint slides                          653
33   Letter from Christoph Walther to           654
Quentin,
HMESH_ETH_00379723

(Exhibits attached to the deposition.)

CERTIFICATE.................................... 668
ACKNOWLEDGMENT OF DEPONENT.................... 669
ERRATA........................................ 670
LAWYER'S NOTES................................ 671

**Page 344**

A P P E A R A N C E S :

ANDERSON LAW OFFICES, LLC
BY:  BENJAMIN HOUSTON ANDERSON, ESQUIRE
ben@andersonlawoffices.net
1360 West 9th Street, Suite 215
Cleveland, Ohio 44113
(216) 592-8384

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
BY:  DANIEL J. THORNBURGH, ESQUIRE
dthornburgh@awkolaw.com
17 East Main Street, Suite 200
Pensacola, Florida  32502
(850) 202-1010
Counsel for Plaintiffs

THOMAS COMBS & SPANN, PLLC
BY:  DAVID B. THOMAS, ESQUIRE
dthomas@tcspllc.com
PHILIP J. COMBS, ESQUIRE
pcombs@tcspllc.com
300 Summers Street, Suite 1380
Charleston, West Virginia  25301
(304) 414-1807

ALSO PRESENT:
Julie Filarski, Anderson Law Offices, LLC

- - -

**Page 345**

(Klinge Exhibit 12 marked for

identification.)

MR. THOMAS:  Before the

deposition, I told Mr. Anderson during

the inquiry yesterday about the

redacted exhibit concerning the

meeting in Suvretta in 2003.  I've

been advised that the company has

already produced an unredacted copy of

that document in another production.

I've asked for it and hope to have it

when they wake up.  So I'll produce it

to you as soon as I have it.

MR. ANDERSON:  Thank you for

doing that.

DIRECT EXAMINATION (Witness previously sworn)

QUESTIONS BY MR. THOMAS:

Q.    Doctor, when we closed

yesterday, we were talking about who a doctor

could consult with to understand the risks

related to the using of mesh for the

treatment of stress urinary incontinence.

Page 346

1    Do you recall that?
2    A.    Yes.
3    Q.    And I believe you identified
4 for me an organization in Germany that you
5 called the AWMF; is that correct?
6    A.    Yes.
7    Q.    Let me show you what I've
8 marked as Exhibit Number 12.  As I understand
9 it from those people who looked for me,
10 Exhibit Number 12 is an English version and
11 the short version of the AWMF registry for
12 the diagnosis and treatment of stress urinary
13 incontinence in women.
14    Is that fair?
15    MR. ANDERSON:  Objection.
16 QUESTIONS BY MR. THOMAS:
17    Q.    Are you familiar with this
18 document, Doctor?
19    A.    With this English, no, I never
20 read it.
21    (Klinge Exhibit 13 marked for
22    identification.)
23 QUESTIONS BY MR. THOMAS:
24    Q.    Let me hand you what's been

Page 347

1 marked as Exhibit Number 13.  It's the long
2 version, and it's in German.
3    Do you recognize that document?
4    MR. ANDERSON:  Well, objection.
5 This is a 62-page document and if you
6 want to ask him if he has -- if by the
7 cover of this or he can read 62 pages.
8    MR. THOMAS:  All I want to
9 know, Ben, is whether this is the
10 organization that he discussed
11 yesterday consulting online for the
12 guidelines for the treatment of stress
13 urinary incontinence.  I don't want
14 him to read the whole document.  We
15 don't have time to do that.
16    MR. ANDERSON:  Different
17 question.
18    Is this AWMF the organization
19 that you mentioned yesterday as far as
20 you can tell?
21    THE WITNESS:  Yes.  I mentioned
22 this.
23 QUESTIONS BY MR. THOMAS:
24    Q.    And did you consult the

Page 348

1 guidelines that you discussed yesterday
2 online on the computer?
3    A.    Please, I had to look, sorry.
4    Q.    I am sorry.
5    When you referred to the AWMF
6 guidelines --
7    A.    Yeah.
8    Q.    -- did you go to the computer
9 to consult the computer to find those
10 guidelines?
11    A.    When I hadn't looked to this,
12 yes.
13    Q.    Do you have a hard copy of the
14 guidelines from the computer?
15    A.    No.
16    Q.    All right.  Do you know whether
17 Exhibit 13 are the guidelines that you looked
18 at online?
19    A.    I tried to figure out the date
20 of when these guidelines have been finished
21 because I know that there are at least two
22 different versions; an older version and a
23 more actual version there.  And, therefore,
24 yesterday I mentioned this phrase that has

Page 349

1 been changed in the documents I saw than I
2 made my research.  It's somewhere in the
3 text.  If you like, I can try to find it
4 here, but it's the recommendation of surgical
5 therapy.
6    Q.    Okay.  I don't want to do that.
7    A.    So I'm not sure whether this is
8 the last version here.
9    Q.    That's fine.
10    (Klinge Exhibit 14 marked for
11    identification.)
12 QUESTIONS BY MR. THOMAS:
13    Q.    Let me hand you what's been
14 marked now as Deposition Exhibit Number 14.
15 Deposition Exhibit Number 14, Dr. Klinge, is
16 a document titled "EAU Guidelines on the
17 Surgical Treatment of Stress Urinary
18 Incontinence."
19    Simple question, have you seen
20 this document before?
21    A.    No, I've not seen it.
22    Q.    And the date on it is September
23 the 7th, 2012, when it was accepted and
24 published online on September the 17th, 2012;

Page 350

1 is that correct? On the left right in the
2 middle?
3     A.    Yeah. That's correct.
4     Q.    Are you familiar with the
5 European Association of Urology?
6     A.    No.
7         (Klinge Exhibit 15 marked for
8     identification.)
9 QUESTIONS BY MR. THOMAS:
10     Q.    Let me show you what's been
11 marked as Deposition Exhibit Number 15.
12         Exhibit Number 15 is a document
13 titled Guidelines on Urinary Incontinence,
14 Text Update, March 2013. It reads, "This
15 pocket version aims to synthesize the
16 important clinical messages described in the
17 full text and is presented as a series of
18 evidence summaries and graded action-based
19 recommendations which follow the standard for
20 levels of evidence used by the EAU."
21         Have you seen Exhibit Number 15
22 before today?
23     A.    No, I haven't seen it.
24     Q.    Doctor, are you familiar with

Page 351

1 an organization known as the American
2 Urological Association?
3     A.    Familiar, if you mean that I
4 have ever heard of it or noticed it, I think
5 so, yes.
6     Q.    Do you consider the American
7 Urological Association to be authoritative in
8 the field of stress urinary incontinence
9 treatment?
10         MR. ANDERSON: Objection.
11     Dr. Klinge is not a urologist and he's
12     not here being offered as a urologist
13     nor the treatment options of SUI, and
14     as I stated yesterday, and so all of
15     these questions about treatment
16     recommendations for a urologist or a
17     urogynecologist clearly are outside of
18     the scope of his expert report and the
19     reasons that he's being offered as an
20     expert. If counsel wants to continue
21     to ask questions about it, but I'm
22     going to move to strike all of it.
23 QUESTIONS BY MR. THOMAS:
24     Q.    Do you consider the American

Page 352

1 Urological Association to be authoritative in
2 the field of treatment of stress urinary
3 incontinence?
4     A.    I cannot comment on this. I
5 know from my colleagues here that there are
6 various societies taking care of the problem
7 of incontinence and they're competing.
8 They're sometimes with -- conflicting with
9 different assumptions, different advices or
10 less.
11         To my knowledge from all of the
12 discussions with them, there is not one
13 single society that is authoritative, yeah,
14 that is able to give recommendations for the
15 woman either treated by urologist or
16 gynecologist. But, of course, you find a lot
17 of these different societies. Maybe this is
18 an expression that there are different
19 opinions as well.
20     Q.    And you said, "I know from my
21 colleagues here." Is that conversations that
22 you've had with colleagues at the hospital
23 where you work?
24     A.    Yes. We have a close

Page 353

1 collaboration with Professor
2 Kirschner-Hermanns, for example, she has been
3 the leader of the incontinence center.
4     Q.    And that's the incontinence
5 center at the hospital that's part of the
6 university?
7     A.    Yeah.
8         (Klinge Exhibit 16 marked for
9     identification.)
10 QUESTIONS BY MR. THOMAS:
11     Q.    Let me show you what's been
12 marked as Deposition Exhibit Number 16. This
13 is titled "Position Statements of the
14 American Urological Association." It's dated
15 at the bottom November 2011.
16         Is it fair to understand that
17 you've not seen this position statement of
18 the American Urological Association?
19         MR. ANDERSON: Same objections
20     I stated before.
21         THE WITNESS: I don't recall
22     whether this is exactly. I recall
23     that I have seen some recent position
24     statements by some of these societies,

Prof. Dr. Med Uwe Klinge

Page 354

but it's not my focus to list all of
these various societies and various
aspects.
        (Klinge Exhibit 17 marked for
identification.)
QUESTIONS BY MR. THOMAS:
    Q.    Let me show you what I've
marked now Deposition Exhibit Number 17.
        Deposition Exhibit Number 17 is
from the American Urogynecologic Society, and
it's titled "Position Statement on
Restriction of Surgical Options for Pelvic
Floor Disorders."
        Have you seen Exhibit 17
before?
    A.    Maybe.  I'm not sure.
    Q.    Did you consider the position
of the American Urogynecologic Society in the
formation of your opinions in this case?
        MR. ANDERSON: Objection.  Same
objection before.
        THE WITNESS:  Please, can you
say it again?

Page 355

QUESTIONS BY MR. THOMAS:
    Q.    Did you consider the position
of the American Urogynecologic Society in the
formation of your opinions in this case?
        MR. ANDERSON: Objection.  The
        question is not fair.
        Do you want him to read the
        entire document because how could he
        know whether he considered the
        position if he doesn't know what it
        is.  My objection stands.  He's not
        going to be asked any of these
        questions and you know that and it's
        not anywhere in his report nor is it
        in his reliance materials, but if you
        want to keep asking, please, feel free
        to.
        MR. THOMAS:  Thank you, I will.
I have a limited amount of time here.
        MR. ANDERSON:  You do.
        MR. THOMAS:  You can have a
standing objection to that.
        (Klinge Exhibit 18 marked for
identification.)

Page 356

QUESTIONS BY MR. THOMAS:
    Q.    Doctor, are you familiar with
the International Incontinence Society?
    A.    Yes.  I know them.
    Q.    Let me hand you what's been
marked as Deposition Exhibit Number 18.
Deposition Exhibit Number 18 is titled "ICS
Fact Sheets, A Background to Urinary and
Fecal Incontinence," prepared by the
publications and communications committee,
July 2013.
        Have you seen this document
before?
    A.    Not as a printout version, but
I repeatedly am going to the website because
they offered a lot of interesting tools for
making research and how to investigate all
these.  So it's an interesting website from
the society.
    Q.    Do you --
    A.    And among this, there is -- I
made a lot of downloads from the society.
    Q.    Why did you do that?
    A.    Because I'm interested.  I want

Page 357

to be informed of what happens.  There's so
many contradicting information and to get an
overview, yeah, I'm a scientist and,
therefore, it is my duty to go into the
problems.
    Q.    Let's go --
    A.    To try to learn of it.
    Q.    Let's go to page 13 of
Exhibit 18, please.
        On the left side, the second
full half reads, "Definitive therapy for SUI
is surgical and involves restoring urethral
support through use of a sling.  Worldwide
mid-urethral slings comprised of synthetic
mesh have become the treatment of choice for
SUI.  Long-term data are robust and
demonstrate durable efficacy and a very low
complication rate particularly in experienced
hands."
        Do you agree with that
statement of the ICS?
        MR. ANDERSON:  Same objections.
        THE WITNESS:  The -- I don't
        think that I'm -- in the moment that

Page 358

1 I'm able to give an opinion in what
2 woman, at what stage of the disease,
3 what therapy may be the best.
4     When they said here they are a
5 low complication rate, we talked about
6 what does it mean low, can we be sure
7 that it is low, that is a question we
8 can have intense discussions about it.
9     My topic or my -- so far as I
10 understood, my question was whether
11 the use of the Prolene®, when it is
12 coming to complications, whether this
13 is a problem of the material. Whether
14 there are some basic requirements that
15 makes it imperative to use the most
16 heaviest weight mesh from a hernia
17 surgery for the use of this. That was
18 the question that I wanted to address
19 by looking all these things.
20     So even if there is only one
21 patient with a complication that is
22 not necessary because of using the
23 wrong requirements, that was the
24 question that I wanted to address.

Page 359

1 But I'm not able to say their
2 requirements for the societies or so.
3 And I have no doubt that there are
4 some patients taking a big benefit by
5 the use of slings.
6     (Klinge Exhibit 19 marked for
7 identification.)
8 QUESTIONS BY MR. THOMAS:
9     Q.    Let me hand you what I've
10 marked now as Deposition Exhibit Number 19.
11 Deposition Exhibit Number 19 --
12     A.    Yeah, that is the NICE, yeah,
13 the National Institute.
14     Q.    Is NICE -- it's called -- it's
15 titled "Urinary Incontinence, the Management
16 of Urinary Incontinence in Women," issued
17 September 2013. And it's issued by the
18 organization called NICE, the National
19 Institute For Health and Care Excellence.
20     Is this the document to which
21 you referred yesterday in your testimony?
22     A.    I downloaded, if I remember
23 correctly, about 10, 15 documents from the
24 website from NICE. So this is one of it.

Page 360

1     Q.    Why did you go to the NICE
2 website?
3     A.    Same answer as some minutes
4 before; to get informed the search and
5 literature is one of our most important tools
6 and -- there has been -- in February -- last
7 year the question whether we have access to
8 all of these things and I would like to point
9 out that at the university we have an almost
10 unlimited access to all things that are
11 published there to correct this impression
12 that it is restricted to the journals I get
13 personally.
14     Q.    I didn't suggest that.
15     A.    No, it was from the last year
16 or in February there has been the discussion,
17 there has been the question whether do our --
18 getting these specific journal and I just
19 wanted to take this opportunity to clarify
20 that we have huge possibilities to access.
21     Q.    I understand that.
22     The computer is a wonderful
23 thing, isn't it?
24     A.    It has changed completely our

Page 361

1 work.
2     Q.    Doctor, let's go back to your
3 report, please, which is Exhibit Number 11.
4     On page 2 of Exhibit 11 under
5 the summary of your opinions, you say, "The
6 mesh -- excuse me, the Prolene® mesh in TVT®
7 is a heavy-weight mesh --
8     MR. ANDERSON: Can you show us
9 where you are?
10     MR. THOMAS: Right at the top
11 of the page.
12     MR. ANDERSON: Thank you.
13 QUESTIONS BY MR. THOMAS:
14     Q.    Doctor, in page 2 of
15 Exhibit 11, you state in your report under
16 the heading, "The Prolene® mesh in TVT® is a
17 heavy-weight mesh ('over engineered').
18     In that paragraph, you say,
19 "Any pelvic mesh designed with this much
20 excess surface area and weight unreasonably
21 increases the risk of injury to the patient
22 and is a less safe design."
23     Did I read that correctly?
24     A.    Yes.

Page 362

1  Q.   And my question is when you say
2  that this mesh design unreasonably increases
3  the risk of injury, compared to what?
4  A.   To a material -- that is, in
5  fact, the most important thing, you have to
6  do it in comparison.  If you compare the
7  108 grams of the Prolene® mesh with the
8  42 grams of Gynemesh® for the 34 grams of
9  ULTRAPRO™, it has a surplus, it has more
10  material, it has more surface.  So if you
11  compare these two, you have more contact area
12  to the tissue and, therefore, you will have
13  intensified tissue reaction.
14  So if there is no need to have
15  this amount of material, if you can reduce
16  it, if you can produce, if there are some
17  facts that allow you to reduce the amount of
18  material of the Prolene® mesh by half, then
19  you will have an improved tissue reaction
20  and, therefore, you will lessen the scar
21  formation, you will lessen the risks for the
22  patient.  That is it.  Prolene® mesh is at
23  the maximum.  In comparison to all other
24  meshes, it's the maximum of the weight of the

Page 363

1  material that is placed in this area and,
2  therefore, it is, of course, it is
3  heavy-weight.  I think it's the heaviest
4  monofilament mesh that I know, and if you can
5  reduce the amount of material, that has been
6  the sense of our work, then you improve the
7  tissue reaction and reduce the risk.
8  Q.   Didn't we decide yesterday that
9  weight was not the determining factor in the
10  intensity of the foreign body reaction?
11  MR. ANDERSON:  Objection to
12  form.
13  Go ahead.
14  THE WITNESS:  In fact, that
15  is -- yeah.  If you have a Prolene®
16  with these fibers and just reduce the
17  amount of material, using a similar
18  fiber, the same fiber, but just reduce
19  the amount of material, of course, you
20  will increase the pore sizes, you will
21  reduce the material and you will
22  improve the tissue reaction.
23  If you just stick to the weight
24  and change the fiber from 120 microns

Page 364

1  to 2 microns and create a
2  multifilament made of polypropylene,
3  then you are right, completely right.
4  That is -- but this has been a -- an
5  important part of our discussions
6  because we, that is coming from
7  Aachen, that is -- has been our work
8  to stick on the importance of the
9  pores and not of the weight.
10  So but sometimes it is more
11  easy to reduce it to this to make it
12  better understandable for the people.
13  Q.   Doctor, do you have any
14  clinical data to which you can point to
15  support your opinion that the Prolene® mesh
16  increases the risk of injury in the treatment
17  of stress urinary incontinence above other
18  materials for the same application?
19  MR. ANDERSON:  Objection.
20  THE WITNESS:  As I pointed out
21  yesterday, the clinical data
22  unfortunately that are provided, they
23  are too limited to allow this
24  consequence; however, the basic

Page 365

1  principle that heavy-weight, a huge
2  amount of material locally, small pore
3  size, that this is linked to an
4  increased risk, there are several
5  studies showing it and not least
6  because of this in the guidelines, in
7  the meta-analysis for surgical meshes
8  for hernia repair they're usually
9  already is a statement that you have
10  to consider light-weight and large
11  pore.
12  QUESTIONS BY MR. THOMAS:
13  Q.   You referred to a meta-analysis
14  for surgical meshes for hernia repair.
15  Have you considered the
16  meta-analysis for the use of meshes for
17  stress urinary incontinence?
18  A.   We mentioned yesterday I'm
19  deeply aware about the fact that the limited
20  value of meta-analysis.
21  Q.   Okay.
22  A.   It just -- it is helpful to
23  confirm the importance of weight and pore
24  size.  In general, that this is -- that has a

Prof. Dr. Med Uwe Klinge

Page 366

1  strong impact of the clinical results. There
2  is no doubt about it. But as I pointed out
3  yesterday, it is impossible to see or to
4  prove any inferiority or superiority of any
5  specific device.
6  Q.  Also in your answer, you
7  referenced several studies showing this basic
8  principle.
9      Are these all animal studies?
10  A.  No, there is -- if you are --
11  if you're trying to figure out what is the
12  relevance of this mesh material discussion in
13  the field of hernia surgery, and the field of
14  hernia surgery is a little bit older than
15  this for the pelvic floor and a lot of -- and
16  we introduced the meshes, I think, earlier,
17  if you try to figure out what is the
18  relevance there, then you find there are
19  several meta-analysis meanwhile summarizing
20  clinical studies, and there are guidelines
21  for the clinical treatment based on these
22  clinical trials and giving the recommendation
23  to use large pore material, reduce
24  light-weight meshes in the treatment -- for

Page 367

1  the treatment of hernia patients.
2      So that confirms that the
3  principle to think or to consider the mesh
4  material and the weight and the pore size,
5  that is well-accepted in the hernia society,
6  yes.
7  Q.  Is it fair to understand,
8  Doctor, that you're relying upon your
9  training, education and experience in
10  connection with the care and treatment of
11  hernias to support your position that mesh
12  used in the treatment of stress urinary
13  incontinence has the same risks as the mesh
14  that's used in hernia repair?
15      MR. ANDERSON:  Objection.
16      Go ahead.
17      THE WITNESS:  Of course, my
18  knowledge of the Prolene® is based on
19  our preclinical studies that we did in
20  the animal models, from our clinical
21  experience, from the experience we
22  have got from hernia patients.
23      Overall, everything confirmed that the
24  tissue response is quite similar.

Page 368

1  That there are some similarities when
2  you place meshes in living tissue,
3  that you have some similarities.
4  There are -- depending on the specific
5  location, there can be some
6  differences in the tissue reaction,
7  but there are very important aspects
8  that are quite similar that a mesh
9  behaves similarly in the various areas
10  from the point of the histological
11  analysis.
12      There are considerable
13  differences in the biomechanics and
14  there we know that pelvic floor has
15  different biomechanics. We have a
16  similar area in the reenforcement of
17  the diagram where we have some forces
18  as well. So the biomechanical problem
19  makes it as a functional difference to
20  the hernia mesh. That is even more in
21  another respect when you're taking a
22  hernia mesh to use it in another
23  functional condition. It's a concern
24  and problem.

Page 369

1  QUESTIONS BY MR. THOMAS:
2  Q.  Let me try my question again
3  and maybe you didn't understand it.
4      What I'm trying to understand,
5  we were talking about clinical studies used
6  to analyze the extent to which mesh causes
7  problems in the pelvic floor -- strike that.
8      The goal of my question was to
9  try to determine whether there are clinical
10  studies on which you rely to analyze the
11  problems of complications with the use of
12  mesh for the treatment of stress urinary
13  incontinence, and I think you told me that
14  you rely on your clinical experience in
15  hernia for that information.
16      Is that true?
17      MR. ANDERSON:  Objection to the
18  form of the whole question.
19      Go ahead.
20      THE WITNESS:  No, that is, of
21  course, not true because to my
22  opinions, it is -- it is necessary to
23  see whether there are some
24  complications when using it as a

Page 370

1  sling, and as you know from the
2  documents, there are some specific
3  complications which are different from
4  those from hernia surgery.  So you
5  have to look to the specific
6  literature what may be some
7  consequences.
8       However, the general opinion
9  whether it's heavy-weight, whether
10 it's a higher risk than another, you
11 have to take all of this information
12 together.
13 QUESTIONS BY MR. THOMAS:
14     Q.    Okay.  Is it your testimony
15 that you need to go to the specific
16 literature to learn what may be the
17 consequences of the use of mesh for the
18 treatment of stress urinary incontinence?
19     A.    You have to consider this as
20 well.  You have to include it into this.
21     Q.    What literature have you
22 considered to understand the complications
23 which arise from the use of mesh in the
24 treatment of stress urinary incontinence?

Page 371

1      A.    I'm not able to give you a list
2  of all of the documents I've downloaded
3  during the past years.  I regularly are
4  looking to the literature, and I know it's
5  hundreds of documents every week are coming,
6  some new.  So, yeah, several.  I looked at
7  several of them.
8      Q.    Can you tell me one?
9      A.    One of these publications?
10     Q.    Yes, just one.
11     A.    Sling.  As I told you, it's the
12 NICE meta-analysis.
13     Q.    Okay.
14     A.    That their -- it is -- as I
15 told you, the AWMF, it is study for PVDF
16 meshes from Norway that has been published
17 this year.  There has been several studies
18 comparing the textile properties.
19     Q.    Are there any clinical studies
20 about which you're aware that suggest that
21 the design of the Prolene® mesh increases the
22 risk of injury to a patient over a larger
23 pore, lighter-weight mesh?
24          MR. ANDERSON:  Objection again.

Page 372

1          Asked and answered.
2          Go ahead.
3          THE WITNESS:  I did not know
4  that there has been a comparison of
5  different materials as it has been
6  done in the hernia -- in the field of
7  hernia surgery where we make
8  randomized controlled trials comparing
9  light-weight and large pore meshes.  I
10 don't know whether -- I don't know in
11 the moment a study where someone
12 compared two different slings with the
13 outcome.  But as we discussed
14 yesterday, clinical studies are very
15 limited in clarifying whether one
16 material really is better than the
17 other.  It is very likely that if you
18 make such a study that you get
19 nonsignificant results due to the
20 variation in your collectives.
21 QUESTIONS BY MR. THOMAS:
22     Q.    Is it true, simple question,
23 that there are no -- it's true that there are
24 no clinical studies about which you're aware

Page 373

1  that suggest that the design of the Prolene®
2  mesh increases the risk of injury to a
3  patient over -- in the treatment of stress
4  urinary incontinence over a larger pore,
5  lighter-weight mesh; is that true?
6          MR. ANDERSON:  Objection.
7  Asked and answered again.
8          THE WITNESS:  It isn't true
9  because you didn't reduce it to the
10 pelvic floor.  So if you made it in
11 general --
12 QUESTIONS BY MR. THOMAS:
13     Q.    Oh, I think I did.
14     A.    You just asked me if I'm
15 correct.  If there are clinical studies
16 showing that Prolene® has more complications
17 in comparison to heavy-weight or I missed it.
18 So a general, there are clinical studies.
19 For the use as sling, I don't know any.
20     Q.    Okay.  So just to make sure
21 we're clear.  For the use of slings, mesh
22 slings, in the treatment of stress urinary
23 incontinence, you're unaware of any clinical
24 studies that show that the use of Prolene®

1  mesh increases the risk of injury to a
2  patient in the treatment of stress urinary
3  incontinence over a larger pore,
4  lighter-weight mesh; is that true?
5      MR. ANDERSON:  Objection.
6      Asked and answered.
7      THE WITNESS:  That is true.
8  QUESTIONS BY MR. THOMAS:
9      Q.    Okay.  Doctor, on page 2 of
10  your report, you continue and say, "The
11  Prolene® mesh in TVT® is a small pore mesh."
12      How big is the pore in TVT®
13  used for the treatment of stress urinary
14  incontinence?
15      A.    This is -- this is a question
16  that is -- that has to be explained in detail
17  from various aspects.  It is insufficient to
18  just make a measure in one dimension and say
19  this is a pore.
20      In the '90s, we made with the
21  VYPRO mesh with 3, 4, 5 millimeters of pores
22  roughly when you make these measurements.  So
23  these are considered really as large pores.
24  There are others that are from the

1  microscopical view can be regarded as small
2  pores.  So to make a precise measurement of
3  the pore size or the distribution of the
4  pores, it was a problem for a long time.
5      We first started in 2000, I
6  think, for the first time that we tried to
7  figure out that it is a distribution, that
8  every mesh has some smaller pores, some
9  larger pores.  So one specific value -- yeah,
10  figure and value of a pore, this does not
11  reflect the reality of a mesh construction.
12  So you have these different pore sizes in
13  every mesh.
14      And then we got aware that if
15  you look to the histology and not to the
16  foreign body reaction around the filaments
17  but to the pores inside, then you see the
18  differences that in the VYPRO and the
19  ULTRAPRO™, you don't have this bridging and
20  there are, if the filaments are coming closer
21  together, then you have these pores filled by
22  scar tissue.  So there seems to be a
23  difference.
24      In 2003, 2004, we started to

1  get objective analysis of this pore
2  distribution.  To make it easier to
3  understand what was found in histology, to
4  make it easier to understand what are the
5  consequences if you change something of the
6  textile construction, what is the consequence
7  to the pore sizes and the distribution of the
8  pores, therefore, we made this machine or we
9  developed this machine together with
10  Professor Mühl and it was able to get clear
11  images of a mesh construction and if you are
12  using the textile porosity as before, you get
13  this distribution.
14      The next decision has to be how
15  to compare distributions to define which is
16  better than the other.  And it is
17  statistically, scientifically it is not easy
18  to make a reliable comparison of
19  distributions and, therefore, we decided to
20  make a cutoff, to define a cutoff because we
21  have seen at various histological sections
22  that there may be a minimum pore size that is
23  increasing the risk for this bridging.  It
24  has been with the Marlex.  It has been done

1  for the first time with the Marlex, and we
2  have -- somewhere in your documents there is
3  a PowerPoint slide with a distribution and
4  then there is on the left side, there is a
5  distribution for the Marlex and there we
6  marked in between 600 and 800 microns that we
7  saw and we measured the distance of the
8  filaments that we saw that below this border
9  of 600, 800 with the Marlex and you have this
10  bridging.
11      Later on, 2003, 2002, we took
12  as a limit -- as a cutoff to separate the
13  meshes with low risk and high risk by 1
14  millimeter because we then had the values of
15  the experiments that has been published by
16  Conze where we measured it in Aachen.
17      But at the beginning, we
18  noticed that there is an impact of the
19  polymer so we separated for PVDF and PP.  Of
20  course, there are a lot of other impact
21  factors that can do it.
22      So the question what is small
23  or what is the best pore or what is the pore
24  cannot be answered by giving you just a

Page 378

1 figure. If you take the extremes, the
2 ULTRAPRO™, the VYPRO, was a pore of 3 to
3 5-millimeter. If you made a linear
4 measurement there with all of the
5 limitations, all restrictions, please don't
6 stick me to this number 3 to 5-millimeter.
7 It's just a shortening of this. This is low
8 risk for bridging, and whereas, very small
9 pores has a high risk of bridging. That is
10 the message.
11     Q.    Doctor, have you ever attempted
12 to physically measure the pore in the
13 Prolene® mesh used in TVT® for stress urinary
14 incontinence repair?
15     A.    Whether we made a measurement
16 of the Prolene® mesh?
17     Q.    Yes.
18     A.    Dr. Mühl did it.
19         (Klinge Exhibit 20 marked for
20 identification.)
21         QUESTIONS BY MR. THOMAS:
22     Q.    And I'm not -- and just for the
23 record, what you're talking about is Exhibit
24 Number 20, the article that you coauthored

Page 379

1 with Dr. Mühl in 2007, "The New Objective
2 Measurements to Characterize the Porosity of
3 Textile Implants."
4         Is that correct?
5     A.    Yes.
6     Q.    My question is in the 1990s
7 when you're doing your experiments, did you
8 ever measure the pore size of the TVT® mesh
9 used -- strike that.
10         In the 1990s when you were
11 studying first generation Prolene® mesh,
12 which you call old Prolene®, did you ever
13 measure the pore sizes?
14     A.    The pore sizes in the '90s have
15 been done first by just making linear
16 measurements. We know -- we all know that
17 this is not accurate to give a good
18 reflection of the pore size, but at that
19 time, it was the way we did it, and the next
20 thing we tried to do is the textile porosity.
21 So it is impossible. It is still today
22 impossible to measure a pore size.
23     Q.    Okay. Still today impossible
24 to measure a pore size, correct?

Page 380

1     A.    It depends from your definition
2 what you're thinking of as a pore size. What
3 is -- of course, you can make images of the
4 pore area so -- first of all, you have to
5 define what is your meaning of pore size, in
6 what context you want to have this. General
7 finding.
8     Q.    Doctor, are you -- I am sorry,
9 I didn't mean to interrupt you.
10     A.    Yeah.
11     Q.    Doctor, are you aware of any
12 standard that tells you or Ethicon how to
13 measure pore size?
14     A.    I think -- or the -- the best
15 solution to get an idea or to try -- an
16 objective measurement to make a
17 characterization of textile structures by the
18 use of pores, this is done in this
19 publication.
20     Q.    Okay. Other than the Mühl
21 publication, Exhibit Number 20 that we've
22 talked about before, are you aware of any
23 standard promulgated by any regulatory,
24 public health authority or company that tells

Page 381

1 you or Ethicon how to measure its pore size?
2     A.    I know there are some -- there
3 has been some publications related to the
4 textile porosity. How to make the textile
5 porosity in a two-dimensional way. There are
6 some -- there are maybe some experimental
7 other attempts to grasp the problem of pores
8 to describe this. But there is, of course, I
9 don't know any official standard showing you
10 have to do it like this.
11     Q.    In the '90s when you were doing
12 your own studies, you measured them in a
13 linear fashion; is that true?
14     A.    At the beginning, yes.
15     Q.    Okay. And tell me how you did
16 that. What points in the pore did you
17 measure?
18     A.    As I remember, we had a visual
19 impression what may be the mean distance in
20 the pore. Not looking what is the farest
21 distance, what is the shortest, but what may
22 be the mean roughly.
23         But, again, the purpose at that
24 time was to give a hint to the reader, to

| Page 382 |
|---|

1 show the difference between 3 millimeters and
2 .3 millimeters. And, therefore, this gives a
3 good impression that the textile construction
4 was different.
5     Q.    Before VYPRO, was there
6 anything in the literature about
7 light-weight -- strike that.
8         Before VYPRO, was there
9 anything about a comparison of large pore to
10 small pore in the literature?
11    A.    I'm not aware of it, no.
12    Q.    Before VYPRO, was Prolene®
13 known as a large pore mesh?
14    A.    These words were not -- it was
15 not a discussion. At the beginning of the
16 '90s, you already had the Mersilene.
17 Mersilene is a mesh with a very low weight.
18 You had the Prolene® with very high weight,
19 and there hasn't been any discussion about
20 the different textile characteristics. I
21 think that is what we introduced. If you
22 look to the literature what has been
23 published until '99 with the search for
24 meshes, you will hardly find any good data up

| Page 383 |
|---|

1 to there. It's a dozen experimental studies
2 until this and then it's going up.
3     Q.    Was the first generation 6-mil
4 Prolene® mesh used for hernia repair, which
5 you refer to as old Prolene®, ever described
6 in the literature as large pore macroporous
7 mesh?
8     A.    In what -- before 1995, that
9 has not been the wording for -- to describe a
10 experimental setting there. Yeah, later on,
11 I know that there is some of the documents
12 where we took over -- I think ourselves took
13 over some measurements provided by the
14 manufacturer and said -- or took it in and
15 mentioned it as 1.2 millimeter, the pore
16 size.
17         So, but, yeah, as we discussed
18 already, it is not sufficient to give a real
19 impression of pore. It's too difficult.
20     Q.    Doctor, we spent a lot of time
21 yesterday talking about the progress in your
22 understanding about the design of meshes
23 beginning in the party in Christmas in 1993?
24     A.    Uh-huh.

| Page 384 |
|---|

1     Q.    At any time in your research
2 from 1993 to the present, in your experience,
3 was it ever appropriate to describe Prolene®
4 as a large pore macroporous mesh?
5     A.    It is in contrast. If you're
6 looking to our experimental publications,
7 there we took the Prolene® mesh in our
8 experiments as a control for a mesh that is
9 usually bridging, that induces usually an
10 intense inflammatory and fibrotic reaction.
11 That was our control for many of these
12 experiments.
13         And on the other end, we really
14 had some large pores, light-weight mesh
15 materials, but the prototype of a
16 heavy-weight, small pore meshes, that has
17 been Marlex and Prolene®.
18     Q.    My question, Doctor, is a very
19 simple one and I'm trying to understand
20 whether based on your 20 years of experience
21 in this field, at any time during that
22 20 years whether the state of knowledge about
23 mesh design was such that it was appropriate
24 to describe first generation 6-mil Prolene®

| Page 385 |
|---|

1 mesh as large pore and macroporous?
2         MR. ANDERSON: Objection to
3     form.
4         THE WITNESS: No. No. It
5     is --
6 QUESTIONS BY MR. THOMAS:
7     Q.    You're familiar with the Amid
8 classification?
9     A.    Uh-huh.
10    Q.    Is that "yes"?
11    A.    Yes. Yes. Sorry.
12    Q.    And you know under the Amid
13 classification that Prolene® is a Class I
14 mesh? Is that "yes"?
15    A.    Yes, I know it, but I have to
16 explain this is not fair because now we are
17 switching to different definitions of large
18 pore.
19    Q.    Okay.
20    A.    I --
21    Q.    Can I --
22    A.    From our work, it is very clear
23 what large pore is. That is a large pore.
24 The consequence of a large pore that you have

1  a low risk for bridging.  That is the message
2  of all our work, and this shouldn't be put
3  together with the definition of large pore in
4  the Amid classification because he has a
5  different aim and purpose to do so.
6        So it is mixing up two
7  different things and it is increasing the
8  confusion that everywhere happens.
9      Q.    You've talked about the Amid
10 classification at length in other depositions
11 and I'm not going to explore that again, but
12 feel free --
13     A.    Me neither.
14         (Klinge Exhibit 21 marked for
15 identification.)
16 QUESTIONS BY MR. THOMAS:
17     Q.    Doctor, I've handed you what's
18 been marked as Exhibit 21.
19         Exhibit 21 is a --
20         MR. ANDERSON:  Excuse me,
21 Counsel, can you tell me what the F
22 mesh is?  Mine is cut off.
23         MR. THOMAS:  Yeah, mine is too.
24 I was just going to say that for the

1      record, but I can't, but I'll get them
2      for you.
3  QUESTIONS BY MR. THOMAS:
4      Q.    Exhibit 21 a journal article in
5  the International Urogynecology Journal,
6  volume 19, number 5, May 2008, it's titled
7  "Tensile Properties of Five Commonly Used
8  Midurethral Slings Relative to the TVT®."
9          You cited this article in your
10 paper, haven't you?  Do you remember that?
11     A.    Cited in what --
12     Q.    In your report?
13     A.    Yes.  Yes.  It's very nice,
14 very interesting study.
15     Q.    And this study compares the
16 tensile properties of five different slings
17 against the Johnson & Johnson TVT® sling,
18 correct?
19     A.    The textile properties, yeah.
20     Q.    Okay.  I want you to turn to
21 page 657 of Exhibit 21, to Table 1.
22         And Table 1 shows, "The textile
23 properties (including loaded failure)
24 provided by the manufacturers listed at the

1  top (AMS, American Medical Systems)
2  describing the different meshes tested in
3  this study.
4          Have you looked at this table
5  before?
6      A.    Yes.
7      Q.    And there are six different
8  types of meshes that are used for the
9  treatment of stress urinary incontinence; is
10 that correct?
11     A.    That is correct.
12     Q.    And the authors in the Moalli
13 paper have a category for mesh thickness,
14 correct?
15     A.    Yes.
16     Q.    And mesh thickness is exactly
17 what it says, it's just how thick the mesh
18 is?
19     A.    Yes.
20     Q.    Then it has pore size and it
21 shows the pore sizes for each of these meshes
22 used for the treatment of TVT®, and you
23 understand that Gynecare is the TVT® mesh,
24 correct?

1      A.    Yes.
2      Q.    And the Gynecare mesh is shown
3  as having a pore size of 1,379 microns,
4  correct?
5      A.    It is written here, but we
6  pointed out, I think, very extensively that
7  the number of 1,379 microns is a measurement
8  within the textile mesh, but it does not
9  reflect the textile characteristic in regard
10 to pores and porosity because you always have
11 a distribution.
12         But you see still here in the
13 year 2008, it was still used there, but this
14 is not what is the relevant information to
15 predict the tissue reaction there.
16     Q.    Do you view --
17     A.    So it's not relevant.  It's not
18 really relevant.
19     Q.    Okay.  Is it inappropriate from
20 a scientific perspective for the authors in
21 the Moalli study, Exhibit 21, to regard pore
22 size in this fashion?
23     A.    No, it is -- no.  It is -- a
24 lot of people is doing it when they don't --

Page 390

1  when they were not aware of the problems of
2  this. You cannot discuss every parameter in
3  detail in every manuscript, otherwise, you --
4  so every manuscript is a comprise. You can
5  present some data.
6          But in this litigation, we're
7  sitting here and discussing about the pores
8  of the Prolene® and when you cited this
9  document as proof that Prolene® is a mesh
10 with pore size of more than 1,000 microns,
11 that is -- that is not relevant. It is a --
12 it is a paper, it is a manuscript and they
13 did the best to take the information they got
14 there, but it doesn't help me for my opinion
15 whether it's a small pore or large pore.
16 That is the fact that has to be clear, I
17 think.
18     Q.   I understand that. I actually
19 am going to use this for a whole different
20 reason than you think.
21     A.   I'm not sure.
22     Q.   I know that, but that's why I
23 get to ask the questions.
24     A.   And I have to be concerned.

Page 391

1      Q.   No, you don't.
2          So have you looked at the mesh
3  of Boston Scientific used in the treatment of
4  stress urinary incontinence?
5          MR. ANDERSON: It's a specific
6  question. Have you looked at the mesh
7  of Boston Scientific?
8          THE WITNESS: No.
9  QUESTIONS BY MR. THOMAS:
10     Q.   Have you looked at the mesh
11 manufactured by AMS for the treatment of
12 stress urinary incontinence?
13     A.   No.
14     Q.   Have you looked at the mesh
15 manufactured by BARD for the treatment of
16 stress urinary incontinence?
17     A.   No.
18     Q.   Have you looked at the mesh
19 manufactured by Caldera for the treatment of
20 stress urinary incontinence?
21     A.   No.
22     Q.   Have you looked at the mesh
23 manufactured by Mentor for the treatment of
24 stress urinary incontinence?

Page 392

1      A.   No.
2      Q.   Are you aware of any other mesh
3  marketed in the United States for the
4  treatment of stress urinary incontinence
5  other than the ones listed in Exhibit 21?
6      A.   Aware in the meaning that I
7  know that there are several others. I
8  not -- I'm not able to present the total list
9  of all possible sling materials there.
10     Q.   Okay. The PVDF mesh for the
11 treatment of stress urinary incontinence is
12 not available in the United States.
13         You agree with that?
14     A.   To my knowledge, it is correct.
15     Q.   And the PVDF mesh from FEG
16 that's used for the treatment of stress
17 urinary incontinence has not been approved by
18 the United States Food and Drug
19 Administration.
20         Do you agree with that?
21     A.   It is -- yeah, to my knowledge,
22 it is the fact. But I'm not sure whether
23 they really sent it to them to have it
24 checked.

Page 393

1      Q.   I understand.
2      A.   Or whether they didn't do it.
3      Q.   I don't know whether they've
4  asked either, but --
5      A.   But this is -- I think this is
6  a major difference.
7      Q.   Okay. Would you agree with me
8  that the pore size for the Gynecare mesh used
9  for the treatment of stress urinary
10 incontinence, the Ethicon TVT®, has a pore
11 size that's larger than the other five that
12 are listed in the Moalli study?
13     A.   No.
14     Q.   Why?
15     A.   Because the question what is
16 the pore size, whether it's bigger than the
17 other, it cannot be answered. You have this
18 distribution. You have some pores bigger
19 than the others. You have to make the
20 testing or you have to figure out what is the
21 specific distribution of the various pore
22 size and then when you want to make a cutoff,
23 when you include a cutoff, then you have to
24 look to the effective porosity and then you

Page 394

1 can get an opinion whether one is better than
2 the other.
3    Q.   Okay.  Have you ever analyzed
4 the extent to which meshes available in the
5 United States have an area of pore size that
6 are larger than the Ethicon TVT® mesh, any of
7 them?
8    A.   Though even the information
9 about the area has some limitations, but I
10 have to say, no, I never made systemic
11 analysis of the competitor -- of the slings
12 from the competitors to have a systemic
13 analysis of the other devices.
14    Q.   It's your opinion that the
15 Ethicon TVT® mesh used for the treatment of
16 stress urinary incontinence does not have
17 sufficient effective porosity as measured by,
18 I think it's Exhibit Number 20, the Mühl
19 study, to be used safely in a woman for the
20 treatment of stress urinary incontinence; is
21 that true?
22    A.   The idea was or the facts are
23 that when you look to the histology, reaction
24 to this mesh material, you always hardly ever

Page 395

1 or always -- almost always find some bridging
2 when looking to tissue around the Prolene®
3 mesh.  Therefore, it behaves biologically as
4 a small pore meshes.  Then if you -- and this
5 is consistent to the measurements and this is
6 consistent to the missing effective porosity
7 in the Mühl testing.
8        So this is very, very
9 consistent.  If you look to the competitors,
10 it is hardly difficult to find -- just to see
11 the differences from the images between the
12 various devices.  So I think -- I assume that
13 we will get similar results.
14        MR. ANDERSON:  And you were
15 pointing to page 658 of Exhibit 21
16 when you said "images"?
17        THE WITNESS:  Yes.  Figure 2
18 and --
19 QUESTIONS BY MR. THOMAS:
20    Q.   Let me break down your answer a
21 little bit.
22        When you measure pore size,
23 it's your expert opinion that it's
24 appropriate to use the effective porosity

Page 396

1 analysis that you and Dr. Mühl devised in
2 Exhibit Number 20, correct?
3    A.   Please can you rephrase the --
4 I didn't -- I'm not sure whether I got the
5 first relationship in your sentence.
6    Q.   When you measure pore size,
7 it's your expert opinion that it's
8 appropriate to use the effective porosity
9 analysis that you and Dr. Mühl devised in
10 Exhibit Number 20, correct?
11    A.   I can say that the effective
12 porosity that we mirrored from the study from
13 Professor Mühl, they give some relevant,
14 important information about the pores, the
15 distribution of the pores in the Prolene®
16 mesh.  So, therefore, this is consistent with
17 the histological findings and, therefore, my
18 opinion is based or includes this one.
19        But it wouldn't be correct to
20 reduce every statement about pores to the
21 effective porosity.
22    Q.   But isn't it true for purposes
23 of your analysis of the extent to which a
24 mesh is designed inappropriately insofar as

Page 397

1 there's adequate pore size for appropriate
2 tissue integration that you rely on the study
3 that you and Professor Mühl prepared, Exhibit
4 Number 20, to determine the appropriate
5 porosity measurement?
6        MR. ANDERSON:  Objection.
7        Go ahead.
8        THE WITNESS:  It's a very long
9 sentence, but I try to answer it
10 however.
11        You have to understand that the
12 measurement of Professor Mühl helps us
13 to understand and to predict the
14 tissue response.
15        If you assume the textile
16 engineers from Ethicon would change
17 the machine a little bit and the
18 Prolene® really is a challenge for
19 this machine.  If they changed the
20 machine a little bit and made the
21 pores a little bit wider, then
22 probably you get with the testing of
23 the machine an effective porosity of
24 maybe 40 percent, yeah.

Page 398

In this case that the machine would have been changed a little bit, then we would have problems because in the histological analysis we saw the scar formation, we saw this bridging and, therefore, it is one way -- it is one important information, the effective porosity, and it helps to explain why certain devices have some problem.

And we would have serious problems if there is a mesh device, and I don't know whether the competitors have it, which may be 1.1 millimeter. So that you have an effective porosity, then the consequence for us would have to be to rise this limit. But in the moment, we feel consistent and satisfied with this limit.

QUESTIONS BY MR. THOMAS:

Q. Under the Mühl study that you and Professor Mühl did in 2007, Exhibit Number 20, is it fair to understand that

Page 399

meshes with an effective porosity with less than 1,000 microns as measured by Professor Mühl, you believe present an increased risk of injury to patients?

MR. ANDERSON: Objection.

Go ahead.

THE WITNESS: Yes.

QUESTIONS BY MR. THOMAS:

Q. And that meshes with an effective porosity of greater than a thousand microns -- strike that. Let me start over again.

Do you know whether any of the meshes on page 657 of Exhibit 21 have an effective porosity of greater than 1,000 microns as described in Exhibit 20?

A. No, I don't know.

Q. As you look at the relative pore sizes as measured by Moalli and others where you see that the Gynecare mesh has a pore size measured at 1379, all of the other manufacturers mesh sizes as measured by Moalli are lower, correct?

MR. ANDERSON: Objection.

Page 400

Go ahead.

THE WITNESS: Is it possible not to make a comment to this?

MR. ANDERSON: No, you have to answer the question, but you can --

THE WITNESS: I think it is inaccurate to compare textiles, different textile constructions by the use of these values for the pore size. It is inaccurate and insufficient.

QUESTIONS BY MR. THOMAS:

Q. Let me ask you this question, Doctor.

Do you know whether any mesh used for the treatment of stress urinary incontinence available in the United States has an effective porosity of greater than a thousand microns as measured by the Mühl study, Exhibit 20?

A. No, I don't know.

MR. THOMAS: Let's take a break, please.

MR. ANDERSON: Okay.

(Off the record at 9:46 a.m.)

Page 401

QUESTIONS BY MR. THOMAS:

Q. Doctor, did you have any involvement in the development of the 5-mil hernia mesh used by -- marketed by Ethicon for pelvic -- strike that.

Doctor, did you have any involvement in the development of the 5-mil hernia mesh marketed by Ethicon?

A. No, I don't have.

Q. Do you know whether the 5-mil hernia mesh marketed by Ethicon is still used today for the care and treatment of hernias?

A. No, I don't.

Q. Do you know whether the 5-mil hernia mesh made by Ethicon is appropriate for use in the treatment of any hernias?

A. For any hernias in the way that there may be some hernias that should be -- can be treated with this, yes.

Q. And under what circumstances would it be appropriate to use a 5-mil Ethicon hernia mesh?

A. If this is a -- in its textile properties comparable to what we know as the

Page 402

Prolene® mesh. If there aren't any severe
differences because I'm not familiar with
this mesh and its textile characteristics.
It should be considered as a heavy-weight,
small pore, very stable mesh material and the
indication for these mesh materials in
general from my point it's more or less the
replacement of defect and not the use for the
treatment of a hernia.

Q.   When you say it's for the
"replacement of a defect," what do you mean?

A.   There are some cases where you
have a complex defect of all tissues.  There
are various layers of tissues.  In a hernia,
you mainly have a hole and you have some
stable surrounded tissue there and,
therefore, the principle for the treatment of
a hernia is to cover the hole with a wide
overlap.

If you don't have this strong
tissue that can cover the mesh, then it is
necessary to have a more stable mesh with a
restricted stretchability, otherwise you have
a bulging here.  And I think still the best

Page 403

indication for using these meshes are when
you made a resection of the thoracic wall
here in this field and when you want to make
a repair in this area.

If you remove the ribs, then
you need some very strong material without
any significant flexibility.

Q.   So would it be appropriate for
a hernia surgeon in certain indications to
use 5-mil hernia mesh for the repair of a
hernia defect?

MR. ANDERSON:  Objection.
Asked and answered.
Answer it again.
THE WITNESS:  There will be
some specific indications where you
have -- where the surgeon can have
some good arguments to use this
material, yeah.
QUESTIONS BY MR. THOMAS:

Q.   Is Marlex mesh still an
acceptable option for a hernia surgeon to use
in the treatment of hernia patients?

A.   You have to define what is

Page 404

acceptable.  Acceptable in a legal way, yes,
so all of these mesh materials that are
permitted to be used in surgery can be used
without any legal consequences.

If you're thinking of the
possible risks for your patients, then it has
to be seen in relation to the patient and the
specific conditions and the specific hernia
type whether you use a Marlex mesh, yes or
not.  There is no principle answer to this
question.

Q.   Based on your training,
education and experience in mesh research and
your experience as a hernia surgeon, would
you ever use Marlex mesh in any of your
patients?

A.   As I told you, it is -- the
basic question wouldn't be whether to use
specifically Marlex or -- yeah, but the
question would be whether to take a
heavy-weight, stable, small pore, whatever
you want to -- whatever you prefer to name
these type of meshes.  Whether you want to
take these more stable meshes or whether you

Page 405

can reduce the amount of material to come to
a satisfying result for the patient.  That is
the decision you have to do, and I can
imagine that there are some conditions where
Marlex is an appropriate -- Marlex or
Prolene® or something like this is an
appropriate selection.

Q.   You've described one
circumstance where you thought it might be
appropriate to use a 5-mil Prolene® mesh for
a repair.

Are there others that you can
think of?

A.   Maybe replacement in the brain,
but I -- I don't -- or I do not have any
specific condition in the moment where I
think that it is necessary to use a mesh like
Prolene® or Marlex.

Q.   Over this litigation, I've
heard a number of different estimates of the
hernia surgeries conducted around the world
in a year.

What is your current best
judgment about how many hernia surgeries are

Page 406

1  conducted around the world each year? Using
2  mesh, I am sorry.
3      A.   I never counted it, but I've
4  read this publication from Sanders and
5  Kingsnorth. They estimate the use of meshes
6  with about 20 million per year. I know that
7  there are in the US about 1 million hernia
8  operations a year. In Germany, it's about
9  300,000 hernia operations in the year. I
10 guess India and China will contribute
11 significantly, however, I don't know the
12 figures.
13     Q.   Do you have any information
14 that allows you to estimate of the 300,000
15 hernia surgeries in Germany using mesh, how
16 many use Prolene® 5-mil mesh?
17     A.   For the treatment of groin
18 hernia, I don't know any. For the treatment
19 of incisional hernia, there will be some few
20 that are still using heavy-weight meshes.
21     Q.   And of the 300,000 hernias in
22 Germany, do you have a breakdown into groin
23 and incisional hernias?
24     A.   Incisional hernia it's about

Page 407

1  30,000 to 50,000. And there is a -- maybe
2  about 50, 60,000 infant hernias that are
3  treated without any mesh.
4      Q.   Of the 30 to 50,000 incisional
5  hernias, which is I think the only category
6  where you said it would be appropriate to use
7  Prolene® 5-mil hernia mesh, what percentage
8  of those incisional hernias would be treated
9  with 5-mil hernia mesh?
10     MR. ANDERSON: Objection to
11 form. Misstates -- mischaracterizes
12 testimony.
13     Go ahead.
14     THE WITNESS: I do not have
15 the -- I do not know the market
16 shares. I know that the predominantly
17 used mesh in Germany is the ULTRAPRO™.
18 It is a large pore, small pore meshes
19 in the groin and for incisional
20 hernia, and I cannot remember in the
21 past years anyone reporting about his
22 experience with a heavy-weight, small
23 pores, either Marlex or Prolene®.
24

Page 408

1  QUESTIONS BY MR. THOMAS:
2      Q.   Do you include any other mesh,
3  specific mesh brand names that are currently
4  used when you describe the Prolene® 5-mil and
5  the Marlex as a heavy-weight, small pore
6  mesh, any other meshes on the market?
7      A.   There are other manufacturers
8  as Covidien and Brown. In Germany, there
9  are, yeah, other manufacturers as well. So
10 there are lots of -- finally Coda comes up
11 with a list of 200 different mesh materials.
12     MR. ANDERSON: I'm not sure he
13 understood your question. He was
14 asking about how many other
15 manufacturers make heavy-weight, small
16 pore meshes.
17     Did you understand that?
18     THE WITNESS: Well, there are
19 other -- yeah, there are some others
20 from Brown, others from Covidien,
21 others from AraVista.
22 QUESTIONS BY MR. THOMAS:
23     Q.   Within your category that
24 you've described as heavy-weight, small pore

Page 409

1  mesh, including as you describe it Marlex,
2  the Prolene® 5-mil, do you know what
3  percentage of the incisional hernia repairs
4  use the heavy-weight, small pore meshes?
5      A.   I don't have exact data. So
6  far I have heard that market share of
7  ULTRAPRO™ was about 70 percent in Germany.
8      Q.   Does that mean --
9      A.   So that will be the most
10 easiest way to figure out what is the
11 relationship between Prolene® and ULTRAPRO™
12 in Germany.
13     Q.   Is it just as simple to say
14 that the remaining 30 percent is a
15 heavy-weight, small pore mesh?
16     A.   No, all of these other
17 manufacturers have light-weight, there's tie
18 mesh, light-weight, material reduced.
19 There's something midway. Again, we're
20 coming into this confusion about the weight
21 material.
22     Q.   Okay.
23     A.   The conclusion that everything
24 else is heavy-weight is not true.

Page 410

Q.    Okay.  That helps me.

But what I'm trying to figure out, and maybe you don't know the answer to this, do you have any information that leads you to be able to estimate the percentage of heavy-weight, small pore meshes used for the treatment of incisional hernias?

A.    Apart from this estimate, no.

Q.    Okay.  This estimate, I don't think you gave me an estimate.

A.    Estimate is 70 percent market share of the ULTRAPRO™.

Q.    Okay.

A.    So at least it should be 70 percent.

Q.    Okay.  Doctor, on page 43 of your report, which is Exhibit 11, you begin your discussion of fraying/particle loss/MCM/LCM/curling/roping.

Do you have that?

A.    I have it, yes, I see it.

Q.    In 2012 when your deposition was taken, I believe your testimony at that time was that you didn't have any information

Page 411

that fraying, particle loss from mesh insofar as it related to pelvic organ prolapse created any injury of clinical significance.

MR. ANDERSON:  Is that a question?

MR. THOMAS:  Yes.

MR. ANDERSON:  It doesn't seem like one.  I'll object to mischaracterizing testimony.

QUESTIONS BY MR. THOMAS:

Q.    Let me start over again.

As you sit here today, Doctor, are you aware of any literature that supports the contention that any fraying of TVT® mesh leads to clinically significant results in patients who receive the mesh for the treatment of stress urinary incontinence?

A.    There is good evidence that fraying, increase of surface induces an inferior tissue response, but I don't know any clinical study testing the relationship between particle loss and the clinical outcome, and I cannot imagine that it can be done in a clinical study.

Page 412

Q.    Is the same thing true for each of these categories that you have in heading G on page 43 of Exhibit 11, do you have any clinical data to link what you understand to be these conditions being fraying, particle loss, machine-cut mesh, laser-cut mesh, curling and roping, to any clinically significant conditions?

A.    No, unfortunately, I did not find any study dealing with these problems.

Q.    Doctor, the next several pages in the description of the fraying, particle loss section beginning on 43 of Exhibit 11, have you ever read any study that discusses risks associated with particle loss in vivo from Ethicon mesh used for the treatment of stress urinary incontinence?

A.    I don't know any study that is testing the impact of this particle loss in an in vivo system.

Q.    You were a hernia surgeon for how long?

A.    I have been surgeon starting in 1985, and I'm still surgeon.  I have been

Page 413

operating hernias from 1985 to 2006.

Q.    Okay.

A.    I'm not a hernia surgeon because in Germany you don't have hernia surgeons.

Q.    I see.

Have you had any surgery -- have you done any surgeries since December 2006?

A.    No.  Not in humans.

Q.    Do you still have your license to practice surgery if you like?

A.    Yes.

Q.    When you used mesh for the treatment of hernias, did you on occasion have to cut the mesh?

A.    Usually you have to trim it, yes.

Q.    And how do you trim it?

A.    Outside of the OR field with specific other gloves to reduce the risk for contamination there, then you get some sterile scissors and you're cutting out of the OR because when you're trimming a mesh,

Page 414

1 always you have some sort of particle loss,
2 always. There are some structures that
3 create more. It depends on the bindings, it
4 depends on the coarse of the filaments. So
5 we know that there is some particle loss when
6 you trim this mesh and, therefore, we did it
7 outside and then we took the trimmed mesh and
8 took these mesh and placed it in the groin or
9 in the abdominal wall. So we try to avoid to
10 trim it when it's already placed in the
11 tissues.
12     Q.    And is it fair to understand
13 that for the approximately 20 million hernia
14 surgeries conducted a year using mesh that
15 you would expect those hernia surgeries to
16 involve the trimming of the mesh in some way?
17     A.    Yes.
18     Q.    Do you expect based on your
19 training, education and experience to the
20 extent there was a clinical problem
21 associated with particles being shed by mesh
22 in vivo during the surgery that it would be
23 reported in the literature now?
24     A.    No. No. I don't think that

Page 415

1 the -- that it has -- that there has -- would
2 have to -- or that there should be a report
3 about this and I don't think that the absence
4 of such a report indicates that it's not a
5 problem.
6     Q.    In the 20 years of mesh
7 research that you've conducted, have you ever
8 studied the clinical effects of particle loss
9 from mesh?
10     A.    We only studied in these years
11 the impact of surface to bacteria adherence,
12 to tissue response, cellular response. So
13 increased surface means enhancement of this
14 reaction. We never made a specific
15 investigation whether reduction of particle
16 loss by 10 percent leads to a change of this.
17 We never did it.
18     Q.    Did you ever consider analyzing
19 the extent that particles shed by hernia mesh
20 create any risk of injury in patients?
21     A.    As I told you, we are convinced
22 or we know that increase of surface will mean
23 increase of tissue response and that means
24 finally increase of scar and increase of the

Page 416

1 risks. In hernia surgery if you place a mesh
2 20 to 30 centimeters in a flat area and you
3 made this trimming of some corners there in
4 relation to the abdominal, surgical trauma,
5 in relation to the mesh area, it is a
6 considerably small area where there may be
7 some effect.
8         We never selected a mesh
9 material by thinking or asking for the amount
10 of particle loss or, yeah, selected the mesh
11 material with the least amount of particle
12 loss. In hernia surgery, it was not an issue
13 and I don't know anyone who is doing so.
14     Q.    Prior to this litigation, in
15 the 20 years of experience that you had in
16 mesh research, did you ever identify a
17 potential risk of injury to a patient
18 associated with particles that are lost from
19 a mesh during hernia implantation?
20     A.    Only in the sense increased
21 surface generally increases the risks but not
22 specifically that we had some patient with a
23 specific complication that can be related to
24 particle loss, no.

Page 417

1         MR. THOMAS:  I am sorry, I have
2 to take a quick break again.
3         MR. ANDERSON:  Okay.
4     (Off the record at 10:21 a.m.)
5 QUESTIONS BY MR. THOMAS:
6     Q.    Doctor, as a part of your
7 opinions in this case, have you analyzed the
8 extent to which you think that the Ethicon
9 mesh used for the treatment of stress urinary
10 incontinence sheds particles in vivo?
11     A.    Can you please repeat the first
12 word?
13     Q.    As a part of your opinions in
14 this case --
15     A.    Yeah.
16     Q.    -- have you analyzed the extent
17 to which the Ethicon mesh used for the
18 treatment of stress urinary incontinence
19 sheds particles in vivo?
20     A.    Sorry, whether we analyze it or
21 whether --
22     Q.    Yes.
23     A.    We did made a systemic
24 analysis, but I saw in one of the specimen

Page 418

1  that I was sent, that I got of the explants
2  there are at least one area where you can be
3  sure that this is a particle that has been
4  there since the implantation.
5      There are a lot of other
6  particles there, but you cannot be sure
7  whether it's by dissecting for the
8  histological preparation, but at least there
9  is one and I made an image where this one
10  particle can be seen there.
11      Q.   We'll talk about that a lot
12  later.
13      My question is -- I think
14  you've already answered.
15      You've not made any systemic
16  analysis to measure the extent to which the
17  Ethicon mesh used in the treatment of stress
18  urinary incontinence sheds particles in vivo;
19  is that fair?
20      A.   No quantitative analysis.
21      Q.   Have you ever -- strike that.
22      Did you compare the extent to
23  which Ethicon mesh used for the treatment of
24  stress urinary incontinence compares to

Page 419

1  hernia mesh to determine the extent to which
2  one sheds particles in vivo compared to the
3  other?
4      A.   Compared to hernia mesh?
5      Q.   Yes.
6      A.   I didn't get it.
7      Q.   Have you made any kind of
8  analysis to understand whether more particles
9  are shed when you trim hernia mesh and
10  implant it for hernia repair as compared to
11  the placement of Ethicon mesh for the
12  treatment of stress urinary incontinence?
13      A.   First of all, it is similar
14  mesh.  It is mainly similar textile
15  structures so when you cut these mesh
16  structures, I wouldn't expect that there is
17  any difference.  The extent of trimming
18  during the gynecological or urological
19  operation, I don't know.
20      Q.   Okay.  Would you expect any
21  particle loss between the placement of mesh
22  in the treatment of stress urinary
23  incontinence to be similar to the placement
24  of mesh for the treatment of hernias?

Page 420

1      A.   What I expect is that you
2  cannot divide some particle loss when you're
3  cutting a textile due to the way it is
4  manufactured.  Therefore, I expect that you
5  will have some particle loss in both areas.
6  The consequences and quantity -- and quantity
7  may be different.
8      Q.   Do you have an opinion as to in
9  which area the particle loss is greater,
10  whether it be hernia repair or stress urinary
11  incontinence?
12      A.   I think that -- or the particle
13  loss depends on the textile structure of a
14  specific device, whether there are some loose
15  ends that can be released from the material,
16  it depends from the lengths of the cutting,
17  not from the amount of mesh material, but
18  from the lengths of the cutting, the more
19  trimming, the more particle loss you will
20  have.  The biological consequences, they have
21  to be defined in relationship to the surgical
22  trauma around.
23      Q.   And my question is:  Do you
24  have an opinion to a reasonable degree of

Page 421

1  scientific or medical certainty that the
2  hernia procedure has some degree of particle
3  loss different from what you would expect
4  from placement of mesh for the treatment of
5  stress urinary incontinence?
6      A.   My opinion is from what I've
7  seen from all of the documents that the
8  surgical trauma in hernia repair is much
9  bigger than the application of a sling.
10      Q.   And how does that inform your
11  opinions about the amount of particle loss in
12  either procedure?
13      A.   As I told you, the amount of
14  particle loss depends on the -- can vary
15  between the different devices.  It depends
16  from the lengths of the trimming away.
17      Q.   Okay.  Doctor, do you know the
18  extent to which a surgeon who implants
19  Ethicon mesh, the TVT® classic, for the
20  treatment of stress urinary incontinence
21  trims the mesh?
22      A.   I'm not an expert of how to
23  handle this during the OR, but at least he
24  cuts it.

Page 422

1    Q.    And where does he cut it?
2    A.    He cuts it to remove the
3  needles beneath the skin level.
4    Q.    Does he cut it
5  intra-abdominally or outside?
6    A.    He tear it and cutted it and
7  then it slipped back, but you have to
8  consider that you have a cutting of the mesh
9  during the manufacturing process and,
10  therefore, usually you have these particles
11  there.  We all know that there are some
12  during the transport, during the preparation.
13  There are some additional particles that is
14  not necessary that they are released during
15  the trimming process, but particle loss is a
16  concern for textiles in general.
17    Q.    For all meshes?
18    A.    Overall.  The amount will
19  differ independent of the type of linkings
20  and connections between the filaments.
21    Q.    When a surgeon implants Ethicon
22  TVT® mesh for the treatment of stress urinary
23  incontinence, the only cutting of the mesh
24  occurs after the mesh is placed, the needles

Page 423

1  are pulled through the skin and then the mesh
2  is cut on the outside of the body; is that
3  correct?
4    A.    The trimming, yeah, outside.
5    Q.    Okay.  When the mesh is
6  placed -- strike that.
7        When a surgeon places Ethicon
8  mesh for the treatment of stress urinary
9  incontinence, after the mesh is cut as you've
10  just described, is the mesh secured to the
11  tissue with anchors in any way, staples or
12  sutures or anything of that kind?
13    A.    No.  No.
14    Q.    Doctor, when a surgeon places
15  Ethicon TVT® mesh for the treatment of stress
16  urinary incontinence, what holds the mesh in
17  place?
18    A.    The mesh is kept in place
19  because the surrounding tissue is filling or
20  is -- yeah, is filling the pores of the mesh.
21  So if you are using a sheet without any
22  pores, it will be more easy to remove this.
23  If you have a -- and this is a reason that we
24  use textiles for the reenforcement of the

Page 424

1  tissues because we know that one place in the
2  tissue it is -- it is more difficult to
3  remove them again.  Therefore, we had the
4  similar discussions about fixation of meshes
5  in hernia surgery.
6    Q.    So when the surgeon places the
7  mesh underneath the urethra for the treatment
8  of stress urinary incontinence, it's the
9  tissue of the patient filling the pores that
10  keeps the mesh in place?
11    A.    That is my belief, yeah.
12    Q.    Now, do you have any
13  understanding about how the mesh used for the
14  treatment of stress urinary incontinence is
15  placed?
16    A.    I've seen a video.
17    Q.    Okay.  And --
18    A.    Or several videos I would say.
19    Q.    Are these -- were you provided
20  videos or did you access them on YouTube or
21  where did you see these videos?
22    A.    Several times on the
23  conferences, videos have been presented there
24  how to do it and there I had the opportunity

Page 425

1  to see this and I got some for this
2  litigation.
3    Q.    From Mr. Anderson?
4    A.    Yes.
5    Q.    Have you seen videotapes
6  showing how surgeons are instructed to use
7  Ethicon TVT® classic mesh for the treatment
8  of stress urinary incontinence?
9    A.    Yes.
10    Q.    What is your understanding
11  about how a surgeon is to place the Ethicon
12  mesh for the treatment of stress urinary
13  incontinence, where and how?
14        MR. ANDERSON:  Objection.
15    Outside the scope of the opinions
16    being offered in this case.
17        THE WITNESS:  I've not the
18    knowledge to discuss any or to give
19    comments to any details of this
20    procedure.
21  QUESTIONS BY MR. THOMAS:
22    Q.    Do you know how -- strike that.
23        Do you know the mechanism by
24  which the Ethicon mesh treats stress urinary

Page 426

1 incontinence?
2        Do you know how it works?
3    A.   I know a lot of ideas that have
4 been developed to get an understanding why
5 this -- why this works and why this doesn't
6 work sometimes.  So a lot of ideas to
7 understand this, but I don't know one way how
8 it works.
9    Q.   What's your best understanding
10 as you sit here today about how Ethicon mesh
11 used for the treatment of stress urinary
12 incontinence works?
13        MR. ANDERSON:  Same objection.
14        THE WITNESS:  So far I
15        understood that the sling provides a
16        relaxation of this area at certain
17        strain of the patient so that you have
18        this tendency to -- that you have
19        these changes in the function of the
20        bladder and the sphincters and if you
21        can provide a resistance there by this
22        textile and the -- and the scarring
23        process around this textile.
24

Page 427

1 QUESTIONS BY MR. THOMAS:
2    Q.   What role do you understand
3 mesh has on the sphincter?
4        MR. ANDERSON:  Objection.
5        Outside the scope of his opinions.
6        Go ahead.
7        THE WITNESS:  I know that there
8        are several other experts saying that
9        it is not a -- that it shouldn't
10        impact the sphincter at all, but
11        should be in the midurethral area, but
12        it is a huge field and it is not my
13        topic to --
14 QUESTIONS BY MR. THOMAS:
15    Q.   That's fine.
16        Do you have any information
17 about how the mesh relates to the bladder for
18 the control of stress urinary incontinence?
19        MR. ANDERSON:  Same objection.
20        THE WITNESS:  Yeah, in general,
21        I have an impression where the sling
22        is, that it's not directly interfering
23        with the wall of the bladder, but,
24        again, this is not the center of my

Page 428

1 work to identify the anatomy or the
2 structures in the pelvic area.
3        We worked a lot of it, but I'm
4 not prepared to give you a specific
5 analysis of it.
6 QUESTIONS BY MR. THOMAS:
7    Q.   Can you tell me anything about
8 what the mesh does to treat stress urinary
9 incontinence?
10        MR. ANDERSON:  Same objections.
11        THE WITNESS:  Roughly we assume
12        that with the providence of a
13        nonabsorbable permanent textile
14        structure you have a reenforcement of
15        these tissues around the midurethra,
16        and this is a some sort of
17        counterforce when the pelvis is going
18        down.  So, therefore, this is
19        compensating these forces and thereby
20        it improves the situation.
21 QUESTIONS BY MR. THOMAS:
22    Q.   Do you know mechanistically how
23 mesh used for the treatment of stress urinary
24 incontinence improves the situation as you've

Page 429

1 described it?
2    A.   As I told you, there are a lot
3 of discussions how it definitely works and I
4 just reflect that there are controversials
5 about the definite mechanism, and I cannot
6 provide you the one mechanistic solution.
7    Q.   Do you have any understanding
8 about whether mesh used for the treatment of
9 stress urinary incontinence provides support
10 to the urethra?
11        MR. ANDERSON:  Same objections.
12        Go ahead.
13        THE WITNESS:  Of course, it
14        supports the tissue area there.  It
15        shouldn't be close to the urethra,
16        but, of course, it supports this --
17        the urethra and this tissue as well.
18 QUESTIONS BY MR. THOMAS:
19    Q.   You said it shouldn't be close
20 to the urethra.
21        How close should it be at the
22 most?
23        MR. ANDERSON:  Same objections.
24        THE WITNESS:  If it's very

Page 430

1    close, there's a high risk for
2    erosion.
3    QUESTIONS BY MR. THOMAS:
4        Q.    Okay.  So based on your
5    training and education and experience, how
6    far away should a surgeon place the mesh in
7    order to protect against erosion?
8            MR. ANDERSON:  Same objection.
9        His experience -- training, education
10       and experience, as he has told you,
11       has nothing to do with the treatment
12       of SUI.
13           THE WITNESS:  I have no
14       experience to give you some comment on
15       this.  I know it is a problem for the
16       surgeons doing this procedure.
17   QUESTIONS BY MR. THOMAS:
18       Q.    What's a problem?
19           MR. ANDERSON:  Same objections.
20           THE WITNESS:  That in some
21       patients you have a damage of the
22       urethra later on.
23   QUESTIONS BY MR. THOMAS:
24       Q.    Do you know in what percentage

Page 431

1    of patients that happens in the placement of
2    mesh for stress urinary incontinence?
3            MR. ANDERSON:  Same objections.
4            THE WITNESS:  No, not -- I
5        don't recall.  I've read it, of
6        course, but I don't recall in the
7        moment.
8    QUESTIONS BY MR. THOMAS:
9        Q.    Do you know from your research
10   in this case where relative to the urethra
11   the surgeon is instructed to place the mesh?
12           MR. ANDERSON:  Same objections.
13           THE WITNESS:  I know this from
14       the video, what is said there, but
15       I've not the expertise to do this
16       procedure or to give a comment on
17       this.
18   QUESTIONS BY MR. THOMAS:
19       Q.    What do you recall from the
20   video about the placement of the mesh
21   relative to the urethra?
22           MR. ANDERSON:  Same objections.
23           THE WITNESS:  That it should be
24       placed right and left to this and

Page 432

1    there has to be a distance.  So I'm
2    not able to recall and to replay the
3    video and I didn't never tried to do
4    so.
5    QUESTIONS BY MR. THOMAS:
6        Q.    Do you have any understanding
7    about whether the mesh -- strike that.
8            Do you have any understanding
9    about whether the Ethicon TVT® mesh used for
10   the treatment of stress urinary incontinence
11   is designed to provide support for the
12   urethra?
13           MR. ANDERSON:  Same objections.
14       He's not being offered as a
15       urogynecologist or a urologist.
16           Answer his question, if you
17       can.
18           THE WITNESS:  I only have a
19       very limited -- no, I -- if you
20       address that problem whether it's
21       designed for the use as a sling, I
22       cannot remember very good -- no, I
23       cannot remember in the documents that
24       there was a specific design for this

Page 433

1    purpose that is used for the
2    reenforcement of this area.  As I told
3    you, yes, there is a risk of the
4    damage of the urethra, yes, by the
5    surgeon immediately, that is one sort
6    of damage.
7            The other is after two or three
8        years you may have this damage and
9        this is a problem with the material.
10       So these are -- has to be separated in
11       this discussion that the mesh material
12       is specifically designed for this
13       purpose.  I don't get any data that
14       confirms this.
15   QUESTIONS BY MR. THOMAS:
16       Q.    Doctor, let's go to page 28 of
17   Exhibit 11.
18           Page 28 of Exhibit 11 deals
19   with that portion of your opinion that
20   addresses mesh contraction.
21           On page 29, you have a Figure 7
22   which is a photograph of a mesh explant.
23           Is that a hernia mesh explant?
24       A.    It is a mesh that we used in

Page 434

1  hernia.
2      Q.    What kind of mesh is that?
3      A.    I have to recall.  It's either
4  Prolene® or it's Marlex.  I guess it's
5  Marlex.  I know it's written in the document,
6  but I don't recall it.
7      Q.    Okay.  On page 30, Figure 8,
8  again, Figure 8 is a hernia mesh?
9      A.    Yes.
10     Q.    And do you know what kind of
11 hernia mesh that is?
12     A.    It is a composite of
13 polypropylene and the ePTFE.
14     Q.    And who makes that mesh?  Is it
15 called a Kugel mesh?
16     A.    Kugel mesh.
17     Q.    And that's a BARD product?
18     A.    I think so, yeah.
19     Q.    And Figure 9 A, that's an
20 explanted Prolift® mesh that apparently
21 you've taken from the International
22 Urogynecological Journal; is that correct?
23     A.    Yes.
24     Q.    And Prolift® mesh is a

Page 435

1  different kind of mesh than what is used in
2  the treatment of stress urinary incontinence,
3  isn't it?
4      A.    Yes.
5      Q.    It's called Prolene® Soft?
6      A.    Yes.
7      Q.    And page 31, Figure 9 B is a
8  photograph of what's described in footnote
9  121 as the Carolyn Lewis explant photos.
10         Is that correct?
11     A.    Yes.
12     Q.    Did you ever observe other than
13 by photographs the actual explant of Carolyn
14 Lewis?
15     A.    No.
16     Q.    So do you have other
17 photographs of the mesh explant in addition
18 to the one that's in 9 B?
19     A.    I do not recall.
20     Q.    Did you make any effort to use
21 the photograph in paragraph 9 B to analyze
22 the condition of the mesh?
23     A.    No.  And I'm convinced it is
24 not possible to make any further analysis

Page 436

1  from this image.
2      Q.    Okay.  Why?
3      A.    The placement of these mesh
4  particles, it depends from how it -- what
5  happens during the OR, how it's done, how
6  it's taken, how it was handled.  There's no
7  protocol how to handle all of these mesh
8  materials there to remove this so, therefore,
9  every further finding when you try to measure
10 something here, it will be very hard to
11 impossible to get a good interpretation of
12 this.
13     Q.    It's fair to understand that
14 after a mesh is explanted, a person needs to
15 know how the mesh is handled at every step
16 before your analysis so that you can
17 understand the extent to which the explant
18 may have been altered, fair?
19         MR. ANDERSON:  Objection.
20     Go ahead.
21         THE WITNESS:  It depends from
22     the question you further on have.
23         If you just want to know if
24     there are some specific cells at the

Page 437

1  interface, it is not important to know
2  where it's explanted or so.
3         So it very -- it depends from
4  where you're looking at whether this
5  is affected by the handling of the
6  surgeon.
7  QUESTIONS BY MR. THOMAS:
8      Q.    Was it important to you in your
9  work in this case that the mesh that was
10 provided to you for analysis had been cut
11 prior to being sent to you?
12     A.    Cut in sections, in
13 histological sections?
14     Q.    Yes.
15     A.    The fact that I was provided
16 only the histological cut that gives some
17 limitations to the analysis, of course.  So
18 you are restricted to what you see there.
19     Q.    Other than the image that's on
20 page 31 of your report and the histological
21 cuts that you've just described, were you
22 provided any other information related to the
23 explant of Mrs. Lewis?
24     A.    I've seen the report during the

Page 438

1 operation by the surgeon.
2    Q.    Okay.
3    A.    And the pathology statement
4 from the hospital.  So some medical records.
5    Q.    Other than the operating room
6 report and the pathology report from the
7 hospital after the explant, do you recall
8 receiving any other information about Carolyn
9 Lewis?
10    A.    Yeah, I recall 10, 11 files
11 with medical records to various extents and
12 thousands of pages with lab results and
13 post-analysis and --
14    Q.    Okay.  Did you understand that
15 you received, to the extent that it was
16 available, her medical history?
17    A.    Yes.
18    Q.    Okay.  So is it fair to
19 conclude, Doctor, that you didn't analyze the
20 mesh that's on -- in the photograph on
21 Figure 9 B on page 31 of your report to
22 determine the extent to which the mesh
23 contracted?
24       MR. ANDERSON:  Objection.

Page 439

1       Go ahead.
2       THE WITNESS:  I didn't analyze
3    it on the basis of this microscopical
4    image.
5 QUESTIONS BY MR. THOMAS:
6    Q.    Do you have an opinion to a
7 reasonable degree of scientific certainty
8 that Ethicon TVT® mesh used for the treatment
9 of stress urinary incontinence contracts
10 after implantation?
11    A.    To make it clear in advance, I
12 know that polymer itself does not contract
13 and polypropylene does not contract itself.
14 It is contraction of the wound area.  It's a
15 contraction of the collagen.  It is a change
16 of the tissue there.  To be clear in this
17 field, otherwise everyone can say a plastic
18 sheet doesn't contract.
19       So in this regard that the scar
20 shows some contraction and with this scar
21 contracts the mesh, yes, it depends.  In
22 principle, the extent of contraction is
23 related to the extent of scar formation and
24 Prolene® induces a lot of scar formation and,

Page 440

1 therefore, yeah, you have a high risk for
2 shrinkage and contraction.  We know -- to say
3 it already here, we know that there are some
4 patients where it's less and there are other
5 patients where it's more pronounced.
6       But what we have learned in
7 these 20 years is that Prolene®, with its
8 structure, with its weight, with its amount
9 of material, it's a high risk for
10 contraction.
11 QUESTIONS BY MR. THOMAS:
12    Q.    In your 20 years of research,
13 have you specifically studied the extent to
14 which Ethicon Prolene® mesh used in the
15 treatment of stress urinary incontinence
16 contracts in vivo in the stress urinary
17 incontinence application specifically?
18    A.    We did not make our preclinical
19 experimental studies to this topic, but I
20 know that my clinical colleagues made some
21 ultrasound investigation looking into the
22 slings that Dr. Tunn in Berlin has done it,
23 that there is -- there are some references
24 showing that you can -- that you can analyze

Page 441

1 the degree of contraction in patients as well
2 and that you find there some narrowing of the
3 width of the sling.
4    Q.    Have your clinical colleagues
5 published any study describing their
6 experience of contraction?
7    A.    There has been a presentation,
8 I think, at an international Congress and at
9 the -- at a German conference where they
10 presented their results.
11    Q.    Do you know if the results that
12 your clinical colleagues found have been
13 published anywhere outside of this
14 presentation?
15    A.    At least the European or the
16 international abstract has been published in
17 the supplements there.
18    Q.    Who are your colleagues so if I
19 wanted to find that abstract I could find it?
20    A.    Professor Kirschner-Hermanns,
21 was a coauthor, Dr. Najjari, she made the
22 study.
23    Q.    Do you cite that abstract in
24 your report?

Page 442

1    You know, I don't need to know.
2    You mentioned some work by
3  Dr. Tunn in this area.
4    A.   Dr. Tunn, yeah.  We call it --
5  he has published studies using ultrasound
6  looking what happens to meshes there, and I
7  think it was -- it were one of the first
8  articles published showing that there is this
9  change of the mesh structure which was quite
10  common in hernia surgery, we know it ten
11  years longer, but for the urogynecologists,
12  it was a new message at that time, I believe.
13    Q.   Now, was his study published in
14  a journal?
15    A.   It was published in a journal.
16  I don't recall precisely whether he was
17  focused on meshes, the flat meshes, the
18  Prolift® things, or whether he really looked
19  to the slings or whether he combined it.  I
20  don't recall the details any longer, but he
21  showed very clearly that using a textile in
22  the pelvic floor as well you have these
23  changes what we have seen in hernia surgery
24  years ago.

Page 443

1    Q.   Do you recall the extent to
2  which Dr. Tunn found contraction in the study
3  that he conducted?
4    A.   Significantly.  50 percent or
5  more.
6    Q.   And when you say "50 percent or
7  more," does that mean that the tissues
8  surrounding the mesh basically shrinks in
9  half?
10    A.   That is a good point because
11  there is a mixup of all of these things.
12  Whether it's a reduction of the area of
13  50 percent, then you have a smaller reduction
14  in the lengths and in the sides.  So
15  sometimes they -- in the literature, it's --
16  they mention the reduction of the lengths,
17  not of the area.
18    So it is very often not clear
19  about it, but at least in our clinical study,
20  they measured the widths of the sling so it
21  is clear it is in one dimension.
22    Q.   Okay.  Now, on page 33 of your
23  report, in the middle of the page it says,
24  "It also is my opinion to a reasonable degree

Page 444

1  of medical and scientific certainty that the
2  Prolene® mesh in Ethicon's TVT® products
3  contracts or shrinks 30 to 50 percent after
4  implantation.
5    Is that correct?  Did I read
6  that correctly?
7    A.   Yes.
8    Q.   Does that mean that every mesh
9  implanted in a woman for the treatment of
10  stress urinary incontinence is going to
11  shrink at least 30 percent?
12    A.   No, that is -- that is not --
13  that is not correct.  I wouldn't expect this.
14  We know that from all of these preclinical
15  and clinical studies that has been done to
16  address the issue of shrinkage, it, of
17  course, is influenced by the textile
18  structure, but it is influenced by the
19  surgical trauma as well, which leads to scar,
20  which leads to a contraction of this area.
21    So even the best mesh which
22  probably does not induce any inflammation in
23  this field will be in an area of scar that
24  shows a contraction of about 15, 20 percent,

Page 445

1  if you have extended scar tissue.  If you
2  have a laparoscopic procedure where the
3  surgical trauma is minimized, this can be
4  less than 20 percent.  When you have an open
5  surgical trauma there, it should be in around
6  20 percent.  I would expect that this is a
7  range that will be very hard to come below
8  this range.
9    Q.   For any --
10    A.   Everything -- yeah, it is a
11  consequence of the surgery and of scar.  If
12  you create some scar, you have it.  If you
13  produce a lot of scar, this shrinkage rate
14  can go up to 80 or 90 percent.
15    Q.   And when you use figures in
16  your report of 30 to 50 percent or use
17  numbers like you just used a moment ago of 80
18  to 90 percent shrinkage, what does that mean?
19    MR. ANDERSON:  Other than what
20  he's already told you?
21    MR. THOMAS:  Well, he told me
22  there's a confusion in the literature
23  about how it was measured and I want
24  to know what he means.

1       MR. ANDERSON: Well, he told
2 you more than that, but go ahead.
3       THE WITNESS: So we started
4 when we first made revision operations
5 and looked to all of these old meshes.
6 We took a lot of photographs where we
7 took the images of the mesh when it
8 was implanted, we got a size of it and
9 then later on at the revision you see
10 that only a small -- a much smaller
11 mesh because of the contraction. And
12 that was the extent of shrinkage at
13 that time.
14       Amid at the Suvretta meetings,
15 he reported of a shrinkage rate of 80
16 to 90 percent for the plaques which
17 are very big amount of material in a
18 small place so this is the upper limit
19 80 to 90 percent of this. When we
20 made our own experiments where we
21 tried to figure out and we were still
22 busy to work on it to objectify the
23 extent of the shrinkage under various
24 conditions.

1 QUESTIONS BY MR. THOMAS:
2     Q. Are you currently involved in a
3 study analyzing the extent to which the
4 tissue around mesh shrinks or contracts?
5     A. Yeah. We have a study in the
6 groin to look what happens to the mesh
7 material after one year and specifically with
8 the focus on shrinkage.
9     Q. Okay. And we talked about that
10 yesterday?
11     A. Yeah.
12     Q. Have you ever conducted a study
13 to determine the extent to which the tissues
14 surrounding mesh after implantation for the
15 treatment of stress urinary incontinence
16 contracts?
17     A. We did a lot of these studies
18 with Prolene®, with Marlex, which is the mesh
19 that is used for the treatment of.
20     Q. I'm talking -- I am sorry.
21     A. But we didn't make specific
22 analysis which reflects the treatment with a
23 sling in the pelvic.
24     Q. Okay. So is it fair to

1 understand that based on your training,
2 education and experience that the use of mesh
3 in any application will induce a shrinkage or
4 contracture of 20 percent?
5     A. Not in the meaning that the
6 mesh makes a shrinkage of 20 percent. It
7 depends from the type of mesh. There are
8 some meshes which usually lead to shrinkage
9 that is 30 to 50 to 60 to 80 to 90 percent
10 so.
11     Q. I get that.
12     My question is: Is the best
13 that you can do when you use mesh in the
14 human body is to have a shrinkage or
15 contracture rate of 20 percent?
16     MR. ANDERSON: Objection.
17 Asked and answered.
18     Go ahead.
19     THE WITNESS: As I told you, it
20 depends. It's influenced by the
21 surgical trauma as well. If you have
22 a very, very small surgical trauma and
23 very little scar formation, there may
24 be. I can't imagine that you can go

1 below this range.
2 QUESTIONS BY MR. THOMAS:
3     Q. "This range" being what?
4     A. Of 20 percent but, yeah.
5     Q. Okay. In how many patients who
6 receive Ethicon TVT® products do you expect
7 to see a shrinkage rate of 30 percent?
8     A. You cannot answer. It depends
9 from the time period. It depends from the
10 conditions of the OR. It depends whether
11 there is a contamination with bacteria. It
12 depends from the degree of the inflammatory
13 process. So hopefully the number is quite
14 low, but even if it's low, if it's not
15 necessary, it should be avoided.
16     Q. In how many patients who
17 receive Ethicon mesh for the treatment of
18 stress urinary incontinence would you expect
19 to see a shrinkage or contracture of
20 50 percent after implantation?
21     A. I can't give you a figure.
22     Q. Is that a common finding, a
23 rare finding? Do you have any kind of range
24 at all to attach to that number?

Page 450

MR. ANDERSON: Objection as to form.

Go ahead.

THE WITNESS: Again, it depends from the subgroup which you analyze and the time period. If you're looking after two months, then you will not expect a significant shrinkage due to wound contraction and therefore, the function may be very well.

If you're going to -- if you're looking at two years, three years and you have a patient with increased problems in this area due to the scarring process, then the likelihood of finding a shrinkage is -- well considerably higher.

If you look to all of the patients that you are -- you have to think about in the moment. In this subgroup, I expect that the rate of the significant shrinkage is much higher than in those who doesn't have

Page 451

any problems.

QUESTIONS BY MR. THOMAS:

Q. Doctor, is it fair to understand that mesh shrinkage or contracture does not always lead to patient complications?

A. I would expect that there isn't a hundred percent correlation between shrinkage and complaints. However, what we have learned in all our work is shrinkage is another description of reality. It's an explanation of complaints in many patients.

Q. And when you performed hernia surgery, you understood that your mesh would shrink or contract, fair?

A. I expected a shrinkage of this area to some degree in every patient, yes.

Q. And the extent to which that shrinkage or contracture caused any complication in the patient depends on the surgeon's skill and the specific comorbidities of the plaintiff -- excuse me, of the patient; is that fair?

MR. ANDERSON: Objection.

Page 452

THE WITNESS: No, it doesn't depend on it. It is influenced on. So you can create some pain just by surgery. You don't need a mesh to create some pain. But if you have an excellent surgery, excellent patient and then you get a pain, then maybe it can be a problem of the mesh.

QUESTIONS BY MR. THOMAS:

Q. Well, my point is you discuss with the patient who is considering whether to have mesh implanted for hernia the fact that this mesh will contract and it may cause complications?

A. Yes, but we are able to tell them that we are using mesh material where this risks has been minimized.

Q. Okay. And to the extent that you're using a heavy-weight, small pore mesh for those repairs where still appropriate, you would have the same conversation, wouldn't you?

A. Similar conversation, but another list of risks and benefits.

Page 453

Q. What are the complications that you associate with shrinkage?

A. Shrinkage?

It is a considerably stiffening of the implant so that migration, erosion is related to this. It is an expression of that you have an intense scar formation there so the likelihood that you will get a very stiff material that is not any longer very close to the physiological requirement or physiological characteristics, properties of the surrounding tissue, it became a very stiff thing and, therefore, it causes complaints and pain just by restricting the mobility of the tissue. It expresses huge intensity of scar formation in this area so there is a high risk of getting entrapped nerves in this scar formation. It reduces the area of the mesh material. In the field of hernia surgery, you expect that the overlap is decreased and, therefore, the increase for recurrence is higher.

If you have a significant shrinkage for meshes, slings that have to

Page 454

1 withstand some forces, then you have a higher
2 pressure to the cells because the contact
3 area is reduced. Shrinkage means that you
4 have an accumulation of material at a
5 specific area so even the large pore
6 constructions will change and switch to small
7 pore constructions. This may be some.
8      Q.    Do you have any idea of the
9 rate of complications that are reported due
10 to contracture or shrinkage in the placement
11 of mesh for the treatment of stress urinary
12 incontinence?
13      A.    We had some figures where we
14 can -- where we can estimate the increase of
15 risk for pain for these heavy-weight, small
16 pore meshes as Marlex, as Prolene®, which
17 were used for the treatment of incontinence.
18      Q.    Marlex is not used for the
19 treatment of stress urinary incontinence, is
20 it?
21      A.    As these meshes that are used,
22 Marlex, no, it's not used. But these are --
23 these are the group of meshes and Prolene® is
24 one of the meshes that is used.

Page 455

1           I'm not sure whether you are
2 sticking on the specific situation in the
3 pelvic floor or whether you want to focus on
4 Prolene®. Prolene® is a hernia mesh that is
5 used for this purpose and, therefore, I can
6 say for the Prolene® mesh there is a
7 significantly increased risk for pain. There
8 are some data about it.
9      Q.    I'm talking more specifically
10 than pelvic floor. I would like to know for
11 the treatment of stress urinary incontinence
12 whether you have any idea of the rate of
13 complications that are reported due to
14 contracture or shrinkage in the placement of
15 mesh for the treatment of stress urinary
16 incontinence?
17          MR. ANDERSON:  Objection.
18      Asked and answered.
19      Go ahead.
20          THE WITNESS:  Independent from
21      the mesh material, if you wanted to
22      know some figures of the patients
23      treated for incontinence, whether they
24      have some problems, I can't give you

Page 456

1 the figures.
2 QUESTIONS BY MR. THOMAS:
3      Q.    Okay.  Doctor, do you have an
4 opinion about the extent to which mesh
5 contracture or shrinkage in patients who are
6 being treated for stress urinary incontinence
7 impacts the cure for stress urinary
8 incontinence?
9          MR. ANDERSON:  Objection to
10      form.
11          THE WITNESS:  It depends from
12      the subgroup you're analyzing.  If
13      you're analyzing the patients that
14      complains afterwards, you will find a
15      significant ratio of patient that
16      suffered from shrinkage and,
17      therefore, developed these
18      complications.
19 QUESTIONS BY MR. THOMAS:
20      Q.    When you say "complaints," what
21 kind of complaints are you talking about?
22      A.    Pain, dysfunction of the
23 bladder.
24      Q.    Now, just so --

Page 457

1      A.    Erosions.
2      Q.    Just so we're clear, the
3 treatment of stress urinary incontinence is
4 designed to help a woman manage her bladder
5 for lack of a better description, isn't that
6 fair?
7      A.    What?
8      Q.    Strike that.
9          The treatment of stress urinary
10 incontinence is designed to treat the
11 involuntary discharge of urine?
12      A.    Yes.
13      Q.    With that goal of the treatment
14 in mind, does mesh contracture or shrinkage
15 have any impact on the ability of the mesh to
16 treat that condition?
17      A.    Shrinkage, from my opinion,
18 will be one reason or is a fact that reflects
19 the extent of scar formation and this will be
20 one reason for bad results of this procedure.
21      Q.    And when you say "bad results,"
22 in terms of the ultimate goal of treating the
23 stress urinary incontinence, what would you
24 expect?

Page 458

MR. ANDERSON:  Objection to
form.

THE WITNESS:  I didn't -- I
didn't understand what comparison you
want to have.

QUESTIONS BY MR. THOMAS:

Q.    Well, we understand the goal of
using mesh to treat stress urinary
incontinence is to manage the involuntary
discharge of urine, correct?

A.    Yes.

Q.    If you have mesh contracture or
shrinkage, how does that impact what the mesh
does to treat the involuntary discharge of
urine?

A.    If you have a significant
shrinkage, a significant scar formation in
this area, then you can have pain, you can
have a increase -- or migration and erosion
of the urethra.  You can have erosion in the
vagina.

So all of these things can be
the consequence of scar formation and
shrinkage in this field.

Page 459

QUESTIONS BY MR. THOMAS:

Q.    Do you know whether mesh
contracture or shrinkage impacts the ability
of the patient receiving the mesh to control
her urine?

A.    I didn't -- please rephrase it.

Q.    Do you know whether mesh
contracture or shrinkage controls -- strike
that.

Do you know whether mesh
contracture or shrinkage impacts the ability
of the patient receiving the mesh to control
her urine?

A.    I expect that considerable
shrinkage of the mesh can in some patients
lead to the -- or to a recurrence of the
incontinence.

Q.    Okay.  So you would expect the
incontinence to return.  Mechanistically, how
does that happen?

A.    I have the impression that
we're back some two hours ago.  There is a
complex interaction between the ligaments,
the muscles of the pelvic floor.  It's a very

Page 460

complex system, and if you have a very strict
scar there that may be too small, that this
impairs the dynamic of the pelvic floor
significantly and, therefore, the function of
all of the organs that are in the pelvic
floor.

MR. ANDERSON:  It's my turn to
take a break.

MR. THOMAS:  Sure.

(Off the record at 11:23 a.m.)

QUESTIONS BY MR. THOMAS:

Q.    Doctor, during the development
of VYPRO I, did you have any involvement in
the biocapability analysis of VYPRO I?

A.    Yes.

Q.    And were there tests conducted
on VYPRO I for carcinogenicity, for example?

A.    If you think -- if you're
thinking of some in vitro tests for -- I do
not recall whether these tests have been done
in Aachen.

If you're thinking of the
general discussion about whether there is a
risk for cancer when using textiles, we made

Page 461

investigations.

Q.    Okay.  Did you make
investigations -- strike that.

Do you recall conducting any in
vitro testing for VYPRO I?

A.    In vitro testing we did it for
the attachment of bacteria.  We did it for
the -- for the -- we did it in a setting
where we looked what happens to the
fibroblasts when growing together with meshes
in vitro.  That has been our studies, yeah.

Q.    Did you conduct any
cytotoxicity testing for VYPRO I?

A.    Not that I recall.

Q.    Do you recall learning that
VYPRO I tested positive for cytotoxicity in
vitro?

MR. ANDERSON:  Objection.
Based on his prior answer.

Go ahead.

THE WITNESS:  I recall that
somewhere in the documents there has
been some -- there has been done some
in vitro cytotoxicity tests indicating

Page 462

1 that polypropylene has some problems,
2 but I do not recall any specific
3 investigations to the VYPRO that is
4 done in Aachen. I'm sure it will be
5 done or it was done in Hamburg Ethicon
6 because it's required before launching
7 a product to the market.
8 QUESTIONS BY MR. THOMAS:
9 Q. And my question is simply this:
10 Whether you did the testing or not, did you
11 ever learn from any source that VYPRO I
12 tested positive for cytotoxicity in vitro
13 during the biocompatibility analysis?
14 A. Not that I recall.
15 Q. About an hour ago, maybe more,
16 you mentioned a recent study in the last year
17 involving PVDF mesh and I thought I
18 understood you to say it was a comparative
19 study.
20 Do you recall that testimony?
21 A. I mentioned a study with PVDF?
22 Q. And I want to say, my notes are
23 very sketchy on it, I tried to write it down
24 so I could remember, but I thought it was a

Page 463

1 comparative study involving PVDF meshes
2 perhaps out of Berlin.
3 MR. ANDERSON: He's asking you
4 if earlier in your testimony did
5 you -- were you talking about some
6 comparative study involving PVDF
7 meshes out of Berlin.
8 THE WITNESS: In the pelvic
9 floor?
10 QUESTIONS BY MR. THOMAS:
11 Q. Anywhere. Pelvic floor,
12 hernia, I'm not sure.
13 A. Comparative in the meaning that
14 you compared different materials and one of
15 it is PVDF?
16 Q. Yes.
17 A. No, I don't recall any clinical
18 study.
19 Q. Okay. Since your deposition
20 last year, are you aware of any clinical
21 studies that compare the risks and
22 complications associated between PVDF and
23 polypropylene?
24 A. Now I got it. You may refer to

Page 464

1 this study that is done by our gynecologist,
2 Dr. Najjari, who made ultrasound
3 investigation comparing two different slings,
4 one of polypropylene and one of PVDF, and
5 they presented these results in this abstract
6 that has been published in this supplement
7 article.
8 Q. Other than that study that you
9 just described, since your last deposition in
10 October 2012, are you aware of any clinical
11 studies that compare the use of PVDF to the
12 use of polypropylene in any application to
13 determine which is better?
14 A. No, I don't recall any clinical
15 study.
16 Q. Doctor, what have you done to
17 analyze the forces that are placed upon mesh
18 used for the treatment of stress urinary
19 incontinence?
20 A. It started with our efforts to
21 get a first impression about forces to the
22 mesh materials in principle, how to define
23 it, how to measure it, how to get a range, a
24 figure out, and these efforts started in 1993

Page 465

1 with this question. And in 1994, we started
2 to think about how to define the forces, the
3 requirements to the textiles for the
4 reenforcement in tissues.
5 So that was the -- that is the
6 rough experience that we got during all these
7 years that we got an impression of the range
8 and what can be considered as over engineered
9 and whatnot.
10 In 2005, '6, the upcoming
11 question was what are the biomechanical
12 properties to the pelvic floor and we tried
13 to -- or we made -- we looked very careful to
14 the literature, Cosson and all of these
15 expressed what they are considering for the
16 use in the pelvic floor and so we tried to
17 combine all of this knowledge to get an
18 impression.
19 Q. Okay. So what specifically
20 have you done to analyze the forces that are
21 placed upon mesh used for the treatment of
22 stress urinary incontinence?
23 A. As I tried to answer it before,
24 we analyzed a lot of these data that have

Page 466

1 been there. We analyzed very careful the
2 difficulties to find a good equipment, a good
3 setting, to come to a specific data there.
4 And finally we got an impression about the
5 biomechanics, the differences of the
6 biomechanics between the pelvic floor and the
7 abdominal wall. We didn't do any specific
8 measurements as Cosson did, yeah.
9     Q.    When you're talking about
10 forces in the pelvic floor, are you talking
11 about forces that occur in the pelvic floor
12 in the management of pelvic organ prolapse?
13     A.    It is not limited to the
14 pelvic -- it is not limited to the prolapse.
15 It is -- when we have been studying the
16 biomechanics of the pelvic floor, what
17 happens there, the intention of this was to
18 define what may be the requirements of the
19 textile in regard to stability. That was the
20 purpose for this. Not to simulate or to
21 reflect the situation there and, therefore,
22 we focused mainly on some forces per
23 centimeters and, yeah, we know that there
24 are -- or I know that there is a -- that it's

Page 467

1 very difficult to define really the
2 biomechanics in the pelvic floor. It is
3 impossible to get all aspects there.
4         So force is one aspect, but we
5 focused on the force -- what is important for
6 the characterization of mesh material, of
7 the textiles there.
8     Q.    And what forces did you study
9 to determine the requirements for textiles in
10 the pelvic floor, what forces did you study?
11     A.    The forces -- the basis of
12 our -- of my opinion about the -- it is based
13 on the experience that tissue has some
14 limited ability to withstand some forces so
15 any repair has to consider that the
16 surrounding tissue is limited in this field.
17         You have to consider some
18 intraabdominal pressure, that you have to
19 consider some flexibility of the anatomic
20 structures. We have made some measurements
21 tearing out looking at what is the resistance
22 of tissues to extract meshes or sutures or
23 anchors what are the forces there. We made
24 some analysis of textile structures, what are

Page 468

1 forces, what is elasticity that can be done
2 there.
3         So a lot of various things to
4 get a closer idea about the biomechanics of
5 the pelvis.
6     Q.    What specifically have you done
7 to measure the forces that are applied to
8 mesh that are used for the treatment of
9 stress urinary incontinence?
10     A.    We never made direct
11 measurements of the forces.
12     Q.    Have you reached any opinions
13 about the nature and the extent of the force
14 that's applied to the mesh used for the
15 treatment of stress urinary incontinence?
16     A.    So in conclusion of all
17 these -- our experiences and all of the
18 literature there, it is -- it is -- I'm sure
19 it is in a range that is far below the
20 tensile strength that is required for the
21 abdominal wall so it is less about 10 newton
22 per centimeters. Yeah, less than 10 newton
23 per centimeters I would expect.
24     Q.    And when you say 10 newtons per

Page 469

1 centimeter, what does that measure?
2     A.    That means that's the force per
3 centimeter of the textile. I know there's a
4 mixing up, and I recall a very precise
5 summary of this mixing up by Professor
6 Williams. At the last deposition, he made an
7 expert report where he summarized the mixing
8 up of pressures force per centimeters and
9 forces, per se. That cannot be interfered or
10 that cannot be exchanged so this figure is
11 limited to newton per centimeter, that means
12 per centimeter of mesh in the width end or
13 tissue.
14     Q.    And when you speak about force,
15 in what direction is it applied?
16     A.    It's a uniaxial force.
17     Q.    And from what direction is it
18 applied?
19         MR. ANDERSON: Objection to
20 form.
21         THE WITNESS: It is a -- first
22 of all, it is an abstract direction --
23 yeah. No, it's theoretical assumption
24 without having a specific direction.

Page 470

1　When you estimate the tensile
2　strengths that is necessary to
3　reinforce abdominal wall of the pelvic
4　floor, there is no specific direction.
5　If you made a measurement at the
6　textile, indeed you have to make
7　separate analysis in meshing direction
8　and perpendicular to the machine
9　direction then you will get different
10　results.
11　　　But to define the -- an
12　estimate of the maximum of the
13　requirement -- maximum or minimum
14　requirements, then there is no
15　direction.
16　QUESTIONS BY MR. THOMAS:
17　　Q.　Okay.  You said a moment ago
18　that the force was uniaxial.
19　　　What do you mean by that?
20　　A.　Uniaxial is the experimental
21　setting that you fix the mesh or the
22　sample -- tissue sample or mesh sample on one
23　side and your tearing on the other and then
24　you get a force.  And if it's a stripe with

Page 471

1　widths of 1 centimeter, you get some figure.
2　If it's 2 centimeters, you get another
3　figure.
4　　　To easy up the comparison of
5　different structures, later on it is
6　normalized to a width of 1 centimeter,
7　though, in fact, these measurements are all
8　done at various widths of the sample size, 4
9　centimeters, 5 centimeters.  There are
10　different standards.  Usually it's described
11　in the material and methods.
12　　Q.　And the uniaxial testing you're
13　describing now, is that used by yourself and
14　Dr. Mühl in your study, Exhibit 20; is that
15　correct?
16　　A.　This uniaxial testing is part
17　of these measurements of Professor Mühl, but
18　we started in 1994 with our first textile
19　analysis to provide this data.
20　　Q.　Back in 2008, 2007, when
21　Exhibit Number 20 was published, the last
22　sentence of the abstract says, "Further, in
23　vivo studies have to investigate whether the
24　preservation of a high effective porosity

Page 472

1　under stress may help to improve
2　biocompatibility of textile implants."
3　　　Has there been any further in
4　vitro -- have there been any further in vivo
5　studies to investigate whether the
6　preservation of a high effective porosity
7　under stress may help to improve the
8　biocompatibility of textile implants?
9　　A.　Can I have a look?
10　　　As we discussed yesterday,
11　the -- a difficult or an important point is
12　to identify the impact of these effective
13　porosity on the clinical outcome, how to
14　identify this.  And, yes, indeed there -- we
15　meanwhile know that there are various mesh
16　materials.  We try to get precise data of the
17　effective porosity of the various kinds of
18　materials and we want to analyze registries
19　in regard to these properties of the mesh
20　materials.  These are the studies we're
21　working on in the moment.  So, yes, there are
22　attempts to make clinical studies.
23　　Q.　But there haven't been any
24　published yet --

Page 473

1　　A.　No.  No.  No.
2　　Q.　Let me get my question out.
3　　A.　Yes.
4　　Q.　There haven't been any
5　studies -- strike that.
6　　　There haven't been any in vivo
7　studies which investigate whether the
8　preservation of a high effective porosity
9　under stress may help to improve the
10　biocompatibility of textile implants; is that
11　correct?
12　　A.　Yes.
13　　Q.　Now, we talked earlier about
14　how the mesh is placed in the body.
15　　　It's not anchored or secured on
16　either end?
17　　A.　That is correct.
18　　Q.　And the way the mesh holds its
19　position in the body is by the tissue moving
20　through the pores and anchoring the pores,
21　correct?
22　　A.　If you restrict it to the time
23　period directly after the operation, this is
24　for the first seconds or minutes, this is the

Page 474

1  major mechanism, I suppose.  Later on, it
2  will be replaced by others.
3      Q.    When there are forces applied
4  to the mesh after implantation, the mesh can
5  move with the forces, can't it?
6      A.    If you apply some forces to a
7  mesh, then, first of all, you have some
8  sheering stress at the area where the forces
9  is applied.
10      So the assumption that the
11  entire mesh as a block moves accordingly to
12  some forces somewhere, I think this is not a
13  true, realistic image.
14      Q.    Okay.  In hernia repair, you
15  often anchor the mesh, suture it; is that
16  fair?
17      A.    Fixation of meshes for
18  incisional hernia, it is not necessary.  When
19  you place a mesh in the retro muscular
20  position, it is not necessary to do any
21  fixation anymore.  If you make a TP repair
22  and you place a mesh there, there's no need
23  for making any further fixation there.  If
24  you make a TAPP, you increasingly use glue --

Page 475

1  which Fibrin glue from Ethicon, for example,
2  that sticks there or fixed there the mesh for
3  some days or hours.  So short-term fixation
4  there.
5      It depends on the position.  It
6  depends -- IPOM mesh usually have to get a
7  fixation.  It is a -- yeah, it is a difficult
8  question there.
9      Q.    Okay.
10      A.    It depends on the mesh and on
11  the localization on the patient, on the
12  surgeon.
13      Q.    Uniaxial loading means just as
14  you described it.  You have one end of the
15  mesh stable and you pull the other end,
16  correct?
17      A.    It's not necessary that one end
18  is stable even if you have a textile like
19  this and you're tearing from both sides, it's
20  uniaxial.
21      Q.    Okay.  And what are the forces
22  underneath the urethra that cause the
23  uniaxial loading that you've just described?
24      A.    To my knowledge, there isn't

Page 476

1  any precise measurements of this that does
2  not interfere with the -- with the procedure.
3      In general, you have to expect
4  that by the movement of the urethra, by some
5  physiological movements, standing up or
6  pressing or so, or the movements of the
7  pelvic floor, that you have some shifting of
8  the position of these -- of these organs in
9  relation to other -- to the bony structures.
10      And this shifting, this
11  mobility, this movements, they will lead to
12  some locally forces.
13      Q.    And those forces will come from
14  multiple directions, won't they?
15      A.    Always.  Always they will come
16  to -- from all directions, from all three
17  directions, but to get a good estimate to get
18  an idea of the model to evaluate a device or
19  to construct a device, I am sure that for
20  slings it is a reasonable and acceptable
21  compromise to think that the uniaxial is more
22  important.
23      Q.    And on what do you rely for
24  that statement?

Page 477

1      A.    On our experience, the
2  literature.
3      Q.    In hernia repair?
4      A.    Textile.  Not hernia repair.
5  It's a use of textiles for the reenforcement
6  of tissues.
7      Q.    Okay.  Specifically, Doctor,
8  have you analyzed the forces that are present
9  in the area of the body where the mesh is
10  placed for the treatment of stress urinary
11  incontinence?
12      A.    Whether I've analyzed these
13  forces?
14      Q.    Yes.
15      A.    Only in the way that I try to
16  express looking to the literature, looking
17  to -- making some measurements at textiles to
18  see whether it's comparable or not.
19      Q.    Can you point me to any
20  literature or research upon which you rely
21  specifically identifying the forces that are
22  present in the area where the mesh is placed
23  for the treatment of stress urinary
24  incontinence?

Prof. Dr. Med Uwe Klinge

Page 478

1    A.    I recently found a publication
2  from 1995, I guess, where they placed at the
3  time before TVT®, they -- at the time, they
4  placed fascia slings around the urethra and
5  there they measured the force there.
6    Q.    Do you remember the name of
7  that study?
8    A.    Not at the moment.
9    Q.    Did you find that information
10 to be valuable, important to you?
11   A.    It was just recently that I
12 found it, but it was a confirmation of these
13 estimates.
14   Q.    Okay.
15   A.    Because it was less than these
16 10 newtons.
17   Q.    And do you recall what that
18 study that you found looked at and what it
19 found?
20   A.    They measured in patients with
21 a device the force at both sides of these
22 fascia sling that the force that was
23 necessary to make a narrowing of the urethra.
24   Q.    Okay.

Page 479

1    A.    So they got an in vivo force
2  there.
3    Q.    Okay.  So anything other than
4  this 1995 study that you recently reviewed
5  upon which you rely for the forces that are
6  present in the area of the body where mesh is
7  placed for the treatment of stress urinary
8  incontinence?
9    A.    Look to a lot of these
10 references, but from my memory, the Deprest
11 working group with Ozon -- I think Ozon is
12 his name, they presented two, three extended
13 thesis, documents where they presented a lot
14 of data, what they measured and what they
15 calculate, what they estimate.
16   Q.    Okay.
17   A.    For the pelvic floor area.
18   Q.    Okay.  Now, did -- is Cosson,
19 is that what you said or Deprest?
20   A.    Yeah, Cosson made a lot of
21 measurements at the tissue, but it was from
22 Leuven, Deprest, yeah.  This working group
23 there.
24   Q.    The working group that you just

Page 480

1  described, did they provide any measurements
2  of the forces in the body at the place where
3  the mesh is used for the treatment of stress
4  urinary incontinence?
5    A.    They made some -- as I recall,
6  they made some estimates of the tensile
7  forces that should be considered for the
8  reenforcement of pelvic floor area.
9    Q.    Now, I'm not talking about
10 reenforcement of pelvic floor.
11        I'm talking very specifically
12 about mesh placement for the treatment of
13 stress urinary incontinence.
14   A.    I don't recall that they have a
15 specific chapter dealing with slings.
16   Q.    Okay.  So we're back to the
17 1995 study.
18        Is there any other study to
19 which you can point me in support of the --
20 your understanding of the forces in the body
21 at the place where the mesh is used for the
22 treatment of stress urinary incontinence?
23   A.    There maybe -- maybe some
24 others, but I don't recall.  But these --

Page 481

1  this is -- to my knowledge, this is the only
2  one who really measured the forces.
3    Q.    And just so the record is
4  clear, you have not conducted your own
5  analysis of the forces in the body at the
6  place where mesh is used for the treatment of
7  stress urinary incontinence; is that true?
8    A.    That is true, I didn't do it.
9    Q.    Okay.  Now, when you use the
10 term "uniaxial loading," you were referring
11 to forces purely coming from one end to the
12 other of the mesh; is that correct?
13   A.    That is correct.
14   Q.    Seems to me that if mesh is
15 placed across a woman to support the urethra
16 for the treatment of stress urinary
17 incontinence, that there will be forces from
18 the back to the front of the mesh as well; is
19 that true?
20        MR. ANDERSON:  Objection to the
21   form of that question.
22        THE WITNESS:  If you're talking
23   about forces that happens in the
24   pelvic floor area, you're right.

Page 482

1 There are various forces for the
2 various structures.
3 QUESTIONS BY MR. THOMAS:
4 Q. So the basis of your opinion is
5 that the predominant force is uniaxial; is
6 that fair?
7 A. In a sling, the assumption that
8 the uniaxial force is an important issue,
9 yes, that is true.
10 Q. Okay. How does the body apply
11 a uniaxial force to a sling?
12 A. If you place -- in contrast to
13 meshes which are flat meshes with a wide area
14 of tissue integration, when you make small
15 slings, not 20 centimeters, but 1 centimeter,
16 and this is 20-centimeter long there and you
17 made or placed a sling from the lower part of
18 the pelvis to the skin there, that if you
19 have some movement there in this direction --
20 Q. You're moving down?
21 A. Down, yeah.
22 If the pelvic floor is going
23 downwards, I expect that most of the forces,
24 the strain, is going in the similar direction

Page 483

1 where the sling is located. And if you
2 compare the movements going down, they are --
3 or they are in relation to the widths of the
4 textile, they are -- they are higher than the
5 mobility in these two directions.
6 Q. Okay.
7 A. You only have 1 centimeter of
8 width. If you have a tensile force trying to
9 make this wider, it's a very small effect.
10 Q. Okay. So as I understand your
11 answer, please correct me if I am wrong, a
12 downward force perpendicular to the placement
13 of the mesh will cause a uniaxial loading on
14 the mesh; is that correct?
15 MR. ANDERSON: Objection to
16 form. Mischaracterizes his testimony.
17 THE WITNESS: What I wanted to
18 express is that you place a sling,
19 that the uniaxial strain in this sling
20 in the direction of the sling, that is
21 more relevant than the strain from the
22 sides.
23 QUESTIONS BY MR. THOMAS:
24 Q. Okay. Uniaxial loading by

Page 484

1 definition means you're pulling on each end,
2 correct?
3 A. Or you made a fixation at one
4 end. It is uniaxial, it is just in one
5 direction.
6 Q. And the force that you just
7 described, if you have a mesh in a straight
8 line, the force that you're describing comes
9 from above is down on top of the mesh; is
10 that correct?
11 MR. ANDERSON: Objection.
12 Form.
13 THE WITNESS: However -- the
14 result is that the sling, the
15 ligament, is stretched.
16 QUESTIONS BY MR. THOMAS:
17 Q. I understand.
18 A. And that makes an uniaxial
19 strain.
20 Q. But the force you're describing
21 is not at the end, it's from the top down on
22 the mesh, correct?
23 A. Yes.
24 Q. And so when the force comes

Page 485

1 down on top of the mesh, there is a force
2 into the pore structure of the mesh, correct?
3 MR. ANDERSON: Objection.
4 Do you understand his question?
5 THE WITNESS: Yeah. Yeah, but
6 I just -- in principle, yes, there's
7 force, but what is the force, how big
8 is the force. It depends on the
9 surface, it depends from the cells.
10 As a scientist, I usually try to then
11 to measure it. I think it is
12 impossible. There is a force, yes,
13 but I think it is -- I'm sure it is
14 a -- in an area where it's almost
15 impossible to measure because it's so
16 low.
17 QUESTIONS BY MR. THOMAS:
18 Q. Let me ask you this question,
19 Doctor.
20 A. And, therefore, not relevant
21 so --
22 Q. Can you think of a circumstance
23 in the body where a mesh used for the
24 treatment of stress urinary incontinence is

Page 486

1 placed under stress by pulling one end
2 against the other like you do in Exhibit 20?
3     A.    Is placed under stress?
4     Q.    In the same way that you did in
5 the study which is Exhibit 20.
6     A.    So far I understood is that the
7 recommendations when implanting these slings,
8 that this shouldn't be done by applying a
9 huge amount of tension there.  And I don't
10 think that it's a good idea to place a mesh
11 wherever under tension.
12     Q.    So my question is this, Doctor.
13 I'm trying to understand whether you can
14 identify for me any force in the body that is
15 uniaxial in nature that replicates the forces
16 that you and Professor Mühl used in your
17 study, Exhibit 20.
18         MR. ANDERSON:  By that you mean
19     uniaxial forces?
20         MR. THOMAS:  Yes.
21         MR. ANDERSON:  Okay.
22         THE WITNESS:  Whether I can
23     identify these forces?
24

Page 487

1 QUESTIONS BY MR. THOMAS:
2     Q.    Yes.
3         MR. ANDERSON:  He said anywhere
4     in the body where there are forces
5     that are uniaxial, right?
6         MR. THOMAS:  Okay.  Let me ask
7     the question again.
8         MR. ANDERSON:  It's a little
9     confusing.  Yeah.
10 QUESTIONS BY MR. THOMAS:
11     Q.    My question, Doctor, is this, I
12 think: Can you describe for me forces in the
13 area where mesh is placed for the treatment
14 of stress urinary incontinence that replicate
15 the forces that are used by you and Dr. Mühl
16 in your study of effective porosity, which is
17 Exhibit 20?
18     A.    The first issue is whether
19 there are some uniaxial strain there and if
20 you look to the anatomy, you have some
21 ligaments.  Ligaments usually are thought to
22 compensate uniaxial the mechanical strain,
23 the biomechanics there, in contrast to some
24 fascias or muscles there.

Page 488

1     So any procedure using textiles
2 for the replacement of ligaments usually
3 mainly has to address uniaxial forces.  So
4 textiles replacement of ligaments usually I
5 think it is -- very acceptable to reduce this
6 to an uniaxial model.
7     Q.    Ligaments have forces and
8 stresses in other directions, too, don't
9 they?
10     A.    As we told, there are always
11 forces to some degree from every direction,
12 but they are not significant.  They are not
13 relevant in comparison to the others.  That's
14 a reason that you have ligaments and not a
15 muscle at that position.
16     Q.    And my question, Doctor, is can
17 you describe for me specifically those forces
18 in the area where mesh is placed for the
19 treatment of stress urinary incontinence that
20 replicate this uniaxial loading?
21         MR. ANDERSON:  Objection. He
22     just answered it.
23         MR. THOMAS:  He used a ligament
24     as an example.

Page 489

1         MR. ANDERSON:  Yeah.
2         THE WITNESS:  If you look to
3     the book of Petros, yeah, there are
4     some sort of ligaments that are
5     stabilizing the urethra, and if you
6     use a textile as reenforcement of this
7     weak structure to treat this patient,
8     yeah, it should be considered as a
9     replacement of a ligament.  And even
10     from the form, you're dealing now not
11     with a flat mesh area, but with a 1
12     centimeter width.  So that is the
13     difference.  20 to 1 centimeter.
14 QUESTIONS BY MR. THOMAS:
15     Q.    So it's your testimony that the
16 forces that are applied to the mesh by the
17 body are uniaxial in nature all the time?
18         MR. ANDERSON:  Objection.
19     Asked and answered.
20         THE WITNESS:  No, that is not
21     correct, not all time.
22         It is a justified assumption
23     that it gives important information to
24     have this testing in a uniaxial

Page 490

1 direction. It helps us to define --
2 to define the requirements to a
3 textile which is intended to replace a
4 ligament in this setting and then you
5 have to define the range not to get
6 the risk of being over engineered.
7 And the Mühl testing just covers
8 one -- some range within this.
9 QUESTIONS BY MR. THOMAS:
10 Q. For mesh that is implanted for
11 the treatment of stress urinary incontinence,
12 if a force is applied to the mesh, both ends
13 of the mesh have the flexibility to move,
14 don't they, with the tissue?
15 MR. ANDERSON: Objection to
16 form.
17 THE WITNESS: Yes. They have
18 the -- yeah.
19 QUESTIONS BY MR. THOMAS:
20 Q. Okay. In the test method that
21 you and Dr. Mühl devised for the measure of
22 the uniaxial loading, when you test the force
23 to measure the effective porosity, one end of
24 the mesh can't move, correct?

Page 491

1 A. Yes. And this leads to the
2 question what period of implantation of mesh
3 you want to get this information for.
4 If you're looking for the
5 situation where the surgeon applies this
6 material, he has to have it in his hands. So
7 he fixed one immediately and that is a
8 situation that is probably more closer to the
9 testing.
10 Of course, there is another
11 situation after three months, after one year
12 when you have all of this tissue integration
13 there and so.
14 Q. Let's go to page 59 of your
15 report, please.
16 Right in the middle of the page
17 you're talking about, "The danger of
18 heavy-weight, small pore hernia mesh and its
19 impact on tissue reaction when using the
20 hernia mesh Prolene® for your gynecological
21 slings," correct?
22 A. Yes.
23 Q. You say, "It is my opinion to a
24 reasonable degree of medical and scientific

Page 492

1 certainty that there is no rational reason
2 why the TVT® needs the stability and the
3 amount of material of the Prolene® hernia
4 mesh which can only be regarded as over
5 engineered for this purpose."
6 Now, we've talked about that at
7 length, haven't we?
8 A. Yes.
9 Q. You continue in your opinion,
10 you say, "It should be mentioned that in the
11 field of abdominal wall hernia repair, the
12 use of large pore, light-weight meshes has
13 become a standard recommended by guidelines
14 and meta-analysis."
15 Why is it important to you that
16 in the field of abdominal wall hernia repair
17 the use of large pore, light-weight meshes
18 has become a standard recommended by
19 guidelines and meta-analysis?
20 A. Just to confirm that the fact
21 that large pore textile constructions are
22 widely accepted in the field of abdominal
23 wall hernia surgery with all the history, and
24 this is not only a fact that is indicated by

Page 493

1 some preclinical animal experiments, but it
2 is widely accepted in the world of surgery
3 that, yeah.
4 Q. When you talk about a standard
5 recommended by guidelines, to what are you
6 referring there?
7 A. There are the European Hernia
8 Society that has guidelines for the treatment
9 of groin hernia, and they said that it is
10 advantages to use a large pore, light-weight
11 meshes. There is the International
12 Endoscopic Hernia Society that has recently
13 published guidelines for the treatment of
14 endoscopic hernia repair and now for the
15 treatment of laparoscopic incisional hernia
16 repair under the guidance of Bittner,
17 Professor Bittner, and they have a chapter,
18 "Impact and Selection of Mesh Material," and
19 there it is clearly expressed that large pore
20 constructions have advantages and should
21 be -- should be used and in these guidelines,
22 you will find the references to the
23 meta-analysis that has been published some in
24 Hernia.

Page 494

1    I know that there are some
2 meta-analysis coming to the result --
3 nonsignificant result -- difference, but more
4 or less taking these meta-analysis and these
5 guidelines. It is well-accepted in the
6 society or in the field of hernia surgeon to
7 use material reduced large pore meshes. It's
8 no doubt about it. No -- yeah.
9    Q.    No doubt about it based upon
10 the standards you just identified --
11    A.    Not based upon, but this --
12 these guidelines are reflecting the
13 literature, the opinion of experts, there are
14 different levels of recommendations. So it's
15 not because of the guidelines, but the
16 guidelines indicate that this acceptance of
17 the surgeons.
18    Q.    The meta-analysis studies the
19 data, correct, and collects the data and
20 draws conclusions from the existing studies?
21    A.    Yes.
22    Q.    And the guidelines to which you
23 refer are the guidelines of the professional
24 organizations who have experience in hernia

Page 495

1 surgery who are familiar with the literature
2 and they publish as a professional
3 organization their opinion as to the proper
4 mesh to use in the hernia application?
5    A.    I don't know whether I got the
6 point. These are not professional
7 organizations. These are organizations by
8 surgeons. They have according to the
9 protocol of the oxford community how to make
10 guidelines. You have to make a reading of
11 the literature. You have to classify the
12 literature according to the level of
13 evidence. You have to add the expert
14 comments on it. You have to pass it several
15 times around so that everyone can give his
16 comment and finally you have some statements,
17 what are the facts and then you have finally
18 some recommendations.
19    And this is not a commercial
20 thing that is our -- this is the enthusiasts
21 trying to define the best therapy.
22    MR. THOMAS: Let's take a break
23 for lunch.
24    MR. ANDERSON: Sounds good.

Page 496

1    (Off the record at 12:27 p.m.)
2    (Klinge Exhibit 22 marked for
3 identification.)
4 QUESTIONS BY MR. THOMAS:
5    Q.    Doctor, I hand you a document
6 that's been marked as Deposition Exhibit
7 Number 22.
8    Deposition Exhibit Number 22 is
9 a section from a book called "Hernia Repair
10 Sequela," written by Volker Schumpelick and
11 Robert J. Fitzgibbons.
12    Is that Professor Schumpelick
13 the same person that is your superior at your
14 office at the university?
15    A.    That was?
16    Q.    Is that the same Schumpelick
17 that you worked for at the university?
18    A.    Yes. Yes.
19    Q.    And who is Robert Fitzgibbons?
20    A.    He is an American surgeon who
21 is a co-editor for this work and the
22 cochairman for this conference.
23    Both are editors of the Hernia
24 Journal still additionally to Marc Miserez

Page 497

1 from Leuven. These three from it.
2    Q.    And it says it's in
3 collaboration with Joachim Conze; is that
4 right?
5    A.    Yes.
6    Q.    And that's the same Dr. Conze
7 that you worked with at the Aachen group?
8    A.    Yes.
9    Q.    I'm sure you're familiar with
10 this chapter, aren't you?
11    A.    Yes.
12    Q.    If you turn to -- it's 2010.
13    The third page reads,
14 "Alloplastic implants for the treatment of
15 stress urinary incontinence and pelvic organ
16 prolapse," shows you as a coauthor with --
17 and who are those people?
18    A.    This was B. Schuessler, it's
19 Professor Schuessler from Luzern. He's the
20 head of the gynecological department there,
21 and he's giving this presentation at the St.
22 Moritz meeting. And T. Kavvadias is a
23 coworker of this department who prepared the
24 manuscript. It was a summarize -- or it's --

Page 498

1 the manuscript that should be printed and the
2 content of the presentation of Professor
3 Schuessler.
4    Q.    Did you have any responsibility
5 for the presentation of Professor Schuessler?
6    A.    My relationship with Professor
7 Schuessler is that we share a lot of ideas, a
8 lot of knowledge. We prepare together some
9 publications and, therefore, some of his
10 ideas are reflecting our experiences in
11 this -- in this meaning, yeah, I'm
12 responsible for some of the contents he
13 presented there.
14    Q.    Okay. What responsibility did
15 you have for the preparation of this chapter
16 in this book?
17    A.    I was asked when they prepared
18 this manuscript as the basic content of the
19 presentation of Professor Schuessler. They
20 asked me to revise this manuscript because
21 some of these aspects are mainly based on our
22 work and our experience and, therefore, I was
23 asked to give my comments and corrections to
24 this manuscript. So I'm a coworker there.

Page 499

1    Q.    If you turn to page 440 of
2 Exhibit 22, that's a category that says,
3 "Meshes in Stress Urinary Incontinence."
4       Do you see that?
5    A.    Yes.
6    Q.    Second paragraph says, "At
7 present, the gold standard in SUI surgery is
8 the suburethral sling, using tension-free
9 vaginal tape, (TVT®) or the transobturator
10 tape, (TOT) technique."
11       Do you agree with that
12 statement?
13    A.    I wouldn't have chosen it. We
14 had similar discussion in our field of
15 surgery is there any gold standard, what is a
16 gold standard. I made several presentations
17 about this. Today I wouldn't select the word
18 "gold standard," but it is not -- I don't see
19 that it is a serious mistake to use it in
20 this context of this article.
21    Q.    Okay. You see in the last
22 paragraph of that column, right in the middle
23 they're talking about "A prospective
24 randomized control trial by Mechia so that

Page 500

1 vaginal erosion of Amid type III mesh used
2 for intravaginal sling plasty was as high as
3 9 percent in a two-year follow-up, which is
4 significantly higher compared to zero percent
5 using the classical TVT®, type 1 macroporous
6 monofilament polypropylene mesh in the same
7 trial."
8       And that's the Johnson &
9 Johnson mesh, Ethicon?
10    A.    I guess I have seen the
11 original publication to this, but it would be
12 misleading to not to mention the first
13 sentence, "Less erosion rates depend on the
14 selection of the material" and, therefore,
15 this study and this article confirms the
16 finding of this study that there is an impact
17 of the material on the clinical outcome and
18 whether it's 9 or zero percent, 1, the power
19 of this study is not sufficient.
20    Q.    You stand by the language in
21 this exhibit, don't you?
22       MR. ANDERSON: Objection.
23       THE WITNESS: I don't see any
24 big conflicts of interest or big

Page 501

1 mistakes there.
2 QUESTIONS BY MR. THOMAS:
3    Q.    What do you understand "gold
4 standard" to mean?
5    A.    Gold standard is a difficult
6 word. I wouldn't use in the moment to define
7 anything.
8       (Klinge Exhibit 23 marked for
9       identification.)
10 QUESTIONS BY MR. THOMAS:
11    Q.    Let me show you what I've
12 marked as Deposition Exhibit Number 23.
13       Deposition Exhibit Number 23 is
14 another study that you've been associated
15 with.
16       You recognize this as the Klink
17 study we talked about yesterday?
18    A.    Uh-huh.
19       MR. ANDERSON: Yes?
20       THE WITNESS: Yes.
21       MR. ANDERSON: Thank you.
22 QUESTIONS BY MR. THOMAS:
23    Q.    And this is a comparison of
24 long-term biocompatibility of PVDF and

Page 502

1  polypropylene meshes, correct?
2      A.    Yes.
3      Q.    What role did you have in this
4  study?
5      A.    My role in this study was
6  mainly to have a look to the data and to work
7  on the manuscript with the interpretation and
8  the presentation of this data.
9      Q.    And all of the authors on this
10  study are associated with the universities?
11      A.    That's true.
12      Q.    And what specialty or
13  discipline does C.D. Klink have?
14      A.    He's a journal -- he's a
15  surgeon.  He's a general surgeon.
16      Q.    And Dr. Junge, what discipline
17  or expertise does Dr. Junge have?
18      A.    The expertise or the medical
19  profession, he's a surgeon as well.  His
20  expertise is that he has been working since
21  1996, '7, I guess, in our group.  We made a
22  lot of different investigations there so he
23  has a -- he's very familiar with all of these
24  work what we have done.

Page 503

1      Q.    And M. Binnebösel, who is that?
2      A.    He's a surgical resident who
3  later on came and mainly he worked in this
4  field in the past five, six years.
5      Q.    Who is the next person?
6      A.    Dr. Alizai, he's a young
7  resident.  He has not finished his surgical
8  training education and he's just at the
9  beginning of his career.
10      Q.    And how about the next person?
11      A.    Dr. Otto, he is a surgeon.  I
12  think he has been -- he's finished his
13  education as a surgeon.  He's working
14  scientifically for some years meanwhile and
15  in our group, if you want to say, so he
16  mainly is busy to investigate this visible
17  mesh structures.
18      Q.    And Dr. Neumann?
19      A.    Professor Neumann is the head
20  of the department.
21      Q.    The department of surgery?
22      A.    Of surgery.
23      Q.    Took Professor Schumpelick's
24  position?

Page 504

1      A.    Yes.
2      Q.    And what was the goal of the
3  study?
4      A.    The goal of the study was to
5  see long-term differences between PVDF and
6  polypropylene meshes.
7      Q.    And the materials that you used
8  for this study were supplied by FEG, correct?
9      A.    Please let me have a look.
10      Q.    It's on the second page under
11  "Mesh Materials."
12      A.    Yes.
13      Q.    Do you know whether FEG
14  provided those materials or you were required
15  to purchase them?
16      A.    I don't know.
17      Q.    All right.  And the mesh
18  materials used in this study -- strike that.
19          One of the things that you also
20  did in this study was to take scanning
21  electron microscope images of the explant,
22  correct?
23      A.    Yes.
24      Q.    And on page 294 of Exhibit 23,

Page 505

1  down under "Results," it says, "Exemplary
2  electron microscopy of explanted samples
3  revealed the signs of surface cracking of the
4  polypropylene samples which were not
5  detectable on the PVDF samples."  And then on
6  the right, there are images of what was found
7  in the study, correct?
8      A.    Yes.
9      Q.    Dr. Klinge, have you discussed
10  with FEG the fact that the polypropylene that
11  they use in their mesh implants displays
12  surface cracks such as are depicted in
13  photograph 9 or page 294?
14      A.    We discussed these results,
15  yes.
16      Q.    Did you discuss with FEG any
17  risks that you saw to patients who received
18  the mesh due to the surface cracking that
19  appears in paragraph -- or picture A on
20  page 294?
21      A.    Not specifically.
22      Q.    Have you discussed with FEG at
23  any time any risks of danger to their
24  patients because of surface cracking such as

Page 506

that depicted in picture A on page 294 of
Exhibit 23?

A. We -- since we started to think
of PVDF in 1998, we were working to figure
out the advantages of PVDF. And, therefore,
the study just to us was a confirmation of
the findings from others and demonstrates the
advantage of PVDF. I didn't -- yeah, that's
it.

Q. Okay. FEG uses polypropylene
in some of its implants, correct?

A. Yes.

Q. And you've been aware that FEG
uses polypropylene in some of its implants
for some time?

A. Yes.

Q. You've been aware that -- you
understand from conversations with Clavé and
Klosterhalfen and others, that there have
been reports that surface of some
polypropylene meshes show cracks?

A. Yes.

Q. Have you ever discussed with
FEG any risks to their patients because of

Page 507

these observations of surface cracks?

A. It is -- I always make it clear
and Bernd Klosterhalfen made it clear since
20 years that using polypropylene in
comparison to PVDF has an increased risk,
yes.

Q. Did you tell specifically FEG
that the surface cracking in these photos
presented a risk to their patients that
received their mesh?

A. They know this, yes.

Q. My question is: Did you tell
them that?

A. Yes, we -- yeah.

Q. And what did you tell them
about the risk?

A. That there is a potential risk
of this surface cracking that sometime it may
be related to some increased inflammatory
reaction, more infections. So we always told
what is the consequence of a surface
cracking. That is an increase of surface
with all of the consequences and, therefore,
this is an increased risk if you have a

Page 508

material that shows this.

Q. And who did you tell FEG about
this increased risk?

MR. ANDERSON: Who did you
tell -- who did you tell FEG?

QUESTIONS BY MR. THOMAS:

Q. Who did you tell at FEG about
this increased risk from what you observed in
this photograph on paragraph A on page 294?

A. To everyone. I'm sure
everyone. All of the -- all of the people
that are involved in this mesh design, that
was it and I've discussed it with them.

Q. Dr. Obolensky?

A. Yes.

Q. Mr. Mullen?

A. Yes.

Q. Do you know whether FEG has
ever taken any steps to warn the surgeons
that use their products of any risk from
degradation -- strike that.

Do you know whether FEG has
ever taken any steps to warn the doctors who
use their mesh about any risks from the

Page 509

surface cracking that's observed in paragraph
A?

A. I'm not familiar. I'm not
familiar with the legal things, what has to
do something with warning here and informing.

My relationship to the FEG is
that we together we're in favor of the PVDF
and that's it. And they tried together with
me to make more and more devices only of pure
PVDF.

Q. You don't want to be associated
with a product that creates a risk of harm to
patients they don't know about, do you?

MR. ANDERSON: Objection to
form.

THE WITNESS: I didn't
understand this question.

QUESTIONS BY MR. THOMAS:

Q. You don't want to be associated
with a product that creates a risk of harm to
patients they don't know about, do you?

MR. ANDERSON: Objection to
form.

THE WITNESS: You have to -- in

Page 510

1 Germany, you have to inform patients
2 about risks with a rate of 1 to
3 10,000, so in this area.
4 In the moment, we have the
5 information of a surface cracking
6 since some years, five, six, seven
7 years, and before the time we thought
8 it was stable. We believed what they
9 have seen there. So this is a recent
10 finding and still today there are a
11 lot of -- there are some people from
12 the manufacturers and saying that is
13 just an artifact. It's not a real
14 complication. We know there are some
15 potential risks by the increase of
16 surface by this, but I cannot figure
17 out what is an exact ratio. I even
18 don't know what happens after
19 30 years, after 40 years.
20 Our experience up to now is
21 that within the first two years, three
22 years, there is no report about a
23 ruptured degradated mesh material
24 leading to a recurrence or to a

Page 511

1 clinical consequence.
2 We have no doubts that it
3 happens, meanwhile the consequences
4 has to be carefully surveyed during
5 the next time.
6 QUESTIONS BY MR. THOMAS:
7 Q. You used the rate of one in
8 10,000. Do you have enough information
9 available to you to determine whether the
10 risk to a patient who receives a
11 polypropylene mesh from FEG creates a risk
12 greater than one in 10,000 that they will
13 suffer adverse consequences because of that
14 mesh?
15 A. My current opinion to this
16 point is that at the moment we don't have
17 sufficient data to quantify exactly the
18 consequence of this finding to the clinical
19 outcome. We don't have any doubt, there is
20 no doubt that it happens, that you have this
21 degradation and there is no doubt that in
22 principle, surface enhancement leads to some
23 complications. But I will not -- or to my
24 opinion, to my knowledge, it is not like this

Page 512

1 that the risk is so high that you have to
2 stop any use of polypropylene in the moment
3 in all devices for all purposes. And that is
4 what I expressed clearly at my presentations
5 as well. It is a concern and to my opinion,
6 there is no doubt that this happens, but it
7 is not enough to forbid the use of
8 polypropylene in medicine in the moment. But
9 maybe it happen. It changes.
10 Q. What should FEG do about this
11 knowledge and its surgeons and its patients
12 that receive this mesh?
13 A. I don't have any specific
14 information what they are doing as a
15 consequence of this. To my knowledge, the
16 way was to use only PVDF.
17 Q. Okay. But is it fair to
18 understand that based upon your knowledge of
19 the information available to you at this
20 time, you're unable to determine the extent
21 to which there is any clinical significance
22 to any surface cracking that may be on this
23 polypropylene mesh manufactured by FEG; is
24 that fair?

Page 513

1 MR. ANDERSON: Objection to
2 form.
3 THE WITNESS: As I told before,
4 I have no doubts that surface cracking
5 and enhancement of surface leads to a
6 higher risk for complications. That
7 is a clear relationship, causal
8 relationship, that is proven by all
9 our experience and all of this work.
10 I cannot give you a figure what
11 does this mean to have these
12 materials, but this should be a
13 starting point. If you decide -- and
14 that is my consequence, if you decide
15 to sell polypropylene further on in
16 your devices, you should study it
17 very, very carefully because this, of
18 course, is not -- a nonlinear process.
19 It happens -- it may happen that 20,
20 30 years after implantation in young
21 patients that you may experience
22 things you don't want to see there.
23 So it has to be studied there.
24

Page 514

QUESTIONS BY MR. THOMAS:

Q. Do you have any ideas as to what you would expect to see?

A. In the worst case for the patient, it can be a malignant transformation because you have 30 years of chronic inflammation. We know this from medicine in general. Chronic inflammation over 30 years may cause some malignant transformation, and, this was, of course, the severest complications for the patients, yeah.

Q. Polypropylene sutures have been used now for over 50 years, haven't they?

A. Yes.

Q. Are you aware of any reports in the literature about clinical issues associated with alleged surface cracking in polypropylene sutures?

A. When we're looking to the literature, the number of scientific investigations of tissue response to foreign body materials is very, very limited and mainly for the meshes with the huge amount of sutures, it would be a better material to be

Page 515

investigated these effects with meshes. It mainly started in 1994. So you don't have a knowledge of 50 years of extensive research in this field.

When you -- if you would asked me five years before whether do you know some cancer case in relationship with textiles, I would say, no, I don't know any report, but meanwhile it changed. Meanwhile we know some.

I don't want to say that we have to expect it in certain number of patients, but it is a concern, yes.

Q. Are you aware of any reports in the literature about clinical issues associated with alleged surface cracking in polypropylene sutures?

A. Polypropylene suture surface cracking, there has been reports. I guess La Roche was an investigation of polypropylene sutures in the eyes showing this cracking or degradation of this material. So there is some literature showing that indicating that you have this degradation.

Page 516

Q. My question is not whether you show the surface cracking. My question is whether there are clinical manifestations resulting from the alleged surface cracking?

A. I don't know any study that was able to differentiate whether it was a surface cracking, whether it was a surface of the material, whether it was the functional biocompatibility of the device, therefore.

Q. Last year when you testified, you testified that polypropylene mesh appropriately designed could be used in a mesh.

Do you recall that?

A. Yes.

MR. ANDERSON: Objection. Mischaracterizes his testimony.

Go ahead.

QUESTIONS BY MR. THOMAS:

Q. Do you still believe that? Has your opinion changed?

A. No. Can you, please, because it depends on -- can you please repeat?

Q. Is polypropylene fiber still an

Page 517

appropriate material to be used in a mesh?

A. It depends from your meaning of appropriate. Is it a possible solution not being forbidden by laws? Yes.

Q. As --

MR. ANDERSON: Let him finish.

MR. THOMAS: I thought he was, I'm sorry.

MR. ANDERSON: He's still counting on his fingers.

THE WITNESS: When I would prefer the best material, I wouldn't choose polypropylene.

QUESTIONS BY MR. THOMAS:

Q. Is PVDF more expensive than polypropylene?

A. It's definitely more expensive, and it's more difficult to handle.

Q. And how much more expensive is it than polypropylene?

A. I don't know.

Q. When you say it's more difficult to handle, what do you mean?

A. What I was told by the textile

Page 518

1  engineers since over the past 15 years, you
2  need a specific knowledge of how to make PVDF
3  fibers because you need higher temperature to
4  do so, you need specific equipment, you need
5  other -- other spinning equipment to do so.
6  Yeah.  The advantage is that you can use a
7  pure material.
8      Q.    Dr. Klinge when a mesh is
9  implanted, what bodily fluids surround the
10  mesh.
11      A.    Immediately when you place it
12  there, depending on the skill of the surgeon,
13  some blood.  Usually some blood.
14      Q.    Do proteins ultimately surround
15  the mesh?
16      A.    Yes, of course.  There are some
17  body liquids from the extra cellular liquids
18  and they contain thousands, hundred thousands
19  of proteins and due to the trauma, to the
20  stress by the implant, you have a
21  accumulation of liquid in this area.  If you
22  look very carefully to this area, you always
23  find some accumulation of liquid around a
24  textile implant.

Page 519

1      Q.    Is it true that proteins
2  surround the mesh fibers?
3      A.    Our current thought is that the
4  liquid containing the proteins, they are
5  around the mesh fibers.  The proteins
6  themselves are too small.  They just adhere
7  to the surface, but they are not able to coat
8  the entire filament to my --
9      Q.    Okay.  Do you know of any
10  impact or effect that these fluids have on
11  the characteristics of the mesh?
12          MR. ANDERSON:  Are you talking
13      polypropylene?
14          MR. THOMAS:  Yes,
15      polypropylene.  Thank you.
16          THE WITNESS:  It is necessary
17      to think or to specify which
18      characteristic of the mesh.
19  QUESTIONS BY MR. THOMAS:
20      Q.    Have you ever heard of a term
21  "plasticizer"?
22      A.    Yes, but not in the context
23  with meshes and proteins.
24      Q.    That the bodily fluids as it

Page 520

1  gets to the mesh will make the mesh softer
2  and more pliable?
3      A.    I never realized this in the
4  context with the -- with polypropylene or
5  with meshes.
6          We used the pre-coating with
7  vascular grafts.  They were preclotted with
8  some substances to change the appearance, but
9  for textiles meshes made of polypropylene
10  with a fiber of -- in a diameter of
11  120 microns, I cannot believe that any
12  protein can change significantly the
13  properties of this.
14      Q.    Have you ever studied the
15  extent to which bodily fluids soften meshes
16  and make them more pliable?
17      A.    No.
18      Q.    When a mesh is explanted, the
19  bodily fluids and proteins remain on the
20  mesh, correct?
21          MR. ANDERSON:  Objection.
22          THE WITNESS:  When you explant
23      a mesh, you usually have a block and
24      you have a lot of scar tissue and

Page 521

1  somewhere in between there are these
2  fibers.  There is some liquids, some
3  cells there, yeah.
4  QUESTIONS BY MR. THOMAS:
5      Q.    And once you take the explant
6  out, you place it into formalin?
7      A.    Yes.  Either you want to make
8  some specific analysis.  If you want to make
9  an electron microscopy, you need some other
10  solution for fixation, or if you want to make
11  some genetic analysis, you have to freeze it
12  down later on making some other -- so these
13  are the three options you have usually.
14      Q.    Okay.  So you can freeze it,
15  you can use formalin or --
16      A.    Yeah.
17      Q.    -- there's some other
18  preparation you use for electron microscopy?
19      A.    Yes.
20      Q.    Tell me what that is.
21      A.    For example, glutaraldehyde.
22      Q.    I'm sorry?
23      A.    Glutaraldehyde.
24      Q.    I don't have any idea what you

Page 522

1 just said.
2       MR. ANDERSON:  Glutaraldehyde.
3   Or glutaraldehyde.
4 QUESTIONS BY MR. THOMAS:
5   Q.   Okay.  Under what circumstances
6 have you used --
7       MR. ANDERSON:  Glutaraldehyde.
8 QUESTIONS BY MR. THOMAS:
9   Q.   -- glutaraldehyde in the
10 preparation of samples for scanning electron
11 microscopy?
12   A.   There has been some time where
13 we tried in some research projects to do some
14 electron microscopy and, therefore, we had to
15 make this specific fixation where we wanted
16 to look to the collagen fibers.  Collagen 3
17 has very small fibers.  So when we were bound
18 to make this fixation and we were asked to
19 make this fixation with glutaraldehyde.
20   Q.   Why did you use glutaraldehyde
21 as opposed to formalin or formaldehyde, what
22 was the reason?
23   A.   Because we received a protocol
24 from the guys making the electron microscopy

Page 523

1 and that we should use this.  I'm not an
2 expert to say the different possibilities to
3 make a preparation for some investigation.  I
4 just told you what my experience was that we
5 have some different options to make it.
6   Q.   Okay.  And how many occasions
7 have you prepared slides for scanning
8 electron microscopy where you've used
9 glutaraldehyde?
10   A.   How many slides for electron
11 microscopy?
12   Q.   Yes.
13   A.   I don't recall.  Most often I
14 think it was to analyze the collagen, the
15 quality of collagens.  There we had -- over
16 some years, we had projects where we made
17 electron microscopy to look to the protein --
18 to the collagens.
19   Q.   Have you prepared any samples
20 for scanning electron microscopy in the last
21 three years using glutaraldehyde?
22   A.   Not that I recall.
23   Q.   Have you prepared any samples
24 using glutaraldehyde for scanning electron

Page 524

1 microscopy where you analyze the extent to
2 which there were --
3   A.   Degradation?
4   Q.   -- surface cracking found on
5 polypropylene?
6   A.   Not that I recall.
7   Q.   Doctor, on pages 40 to 42 of
8 your report, you have three images that come
9 from the report of Dr. Jordi; is that
10 correct?
11   A.   Yes.
12   Q.   Did you select the images that
13 were to be included in your report?
14       MR. ANDERSON:  Objection as to
15   whether or not there's work product
16   and who selected what images.
17 QUESTIONS BY MR. THOMAS:
18   Q.   Well, then I'll ask it this
19 way.
20       Are Figures 13, 14 and 15 of
21 any particular significance to you in your
22 opinions other than just a representation of
23 what was seen in images from Dr. Jordi?
24   A.   I don't see any significant

Page 525

1 differences to many others so --
2   Q.   Do Figures 13, 14 and 15, to
3 your knowledge, have any relationship to
4 Carolyn Lewis?
5   A.   Yes.  I know --
6   Q.   I didn't see it in your report.
7 That's why I'm asking.
8   A.   I remember I received a lot of
9 images from other devices, but from this
10 device specifically as well.  I guess it is
11 from this case.
12   Q.   How do you know that?  You say
13 I guess.
14   A.   I have to be -- look careful
15 every sentence there whether we have already
16 written in here.  Otherwise, if it's not
17 written here, I have to check the files --
18   Q.   Okay.
19   A.   -- with the images there.
20   Q.   I did not find it in your
21 report where you identified these --
22   A.   Sorry.
23   Q.   -- images as being associated
24 with a particular person.  That's why I asked

Page 526

1  the question.
2       MR. ANDERSON:  No, but he
3  reviewed Jordi's report.
4       MR. THOMAS:  I understand that.
5  And Jordi has 22 mesh explants, too.
6  I don't know which ones he picked.
7       MR. ANDERSON:  Yeah, they're
8  all identified by identifying number
9  in Jordi's report.  So if you want us
10  to go get Jordi's report out and look
11  through and identify which ones are
12  Ms. Lewis, we can certainly take the
13  time to do that.  Or I can tell you
14  which one it is or however you want to
15  do it.
16       MR. THOMAS:  I was going to
17  ask -- I do want to see the report he
18  has because the report he has is dated
19  a different date than the report that
20  you produced.  The report that's
21  identified in his report is dated
22  October the 12th, 2013.
23       So do you have that with you,
24  the one that he reviewed here?

Page 527

1       MR. ANDERSON:  No, but it would
2  be the exact same report as Jordi did.
3       MR. THOMAS:  I don't -- it's
4  19 days before his deposition.  You
5  remember we had two marked there with
6  different dates.  I never did figure
7  out --
8       MR. ANDERSON:  Because we
9  reprinted off the first page, and when
10  we reprinted off the first page for
11  you, we printed it as the same day as
12  the depo.
13  QUESTIONS BY MR. THOMAS:
14       Q.   As you sit here today, Doctor,
15  do you know whether the Figures 13, 14 and 15
16  are from mesh explanted from Carolyn Lewis?
17       A.   I'm not sure whether this is
18  precisely from her, but they all look quite
19  similar.
20       Q.   Okay.  You've told me before
21  that you're not a chemist or an analytical
22  chemist.
23       Have you studied the extent to
24  which -- strike that.

Page 528

1       Have you studied how
2  polypropylene degrades?
3       MR. ANDERSON:  Objection.  It
4  was asked yesterday because you wanted
5  to get into expert opinions yesterday.
6  So we're going back over the same
7  ground.
8       MR. THOMAS:  Not really.  I
9  just didn't remember I asked the
10  question.
11       MR. ANDERSON:  You asked a lot
12  of questions on degradation yesterday.
13       MR. THOMAS:  Okay.
14       MR. ANDERSON:  Because you
15  asked to go ahead and start asking
16  expert questions yesterday.
17       MR. THOMAS:  Can we keep going
18  so we can get out of here?
19  QUESTIONS BY MR. THOMAS:
20       Q.   Can you answer the question?
21       MR. ANDERSON:  Have you studied
22  how polypropylene degrades?  That's
23  his question.
24       THE WITNESS:  We have studying

Page 529

1  in the meaning that looking to the
2  data, yes.  Doing own studies,
3  experimental studies looking to the
4  chemistry, what happens there, no.
5  QUESTIONS BY MR. THOMAS:
6       Q.   Do you defer to Dr. Jordi for
7  that type of analysis?
8       A.   Yes.  Definitely.
9       Q.   Doctor, let's go to page 76 of
10  your report, please.  Page 76 of your report
11  deals with the heading "Alternative Design."
12       Is it your opinion that
13  ULTRAPRO™ is an appropriate alternative
14  design for the treatment of stress urinary
15  incontinence in women?
16       A.   No.
17       Q.   Why?
18       A.   Because the structural
19  stability of ULTRAPRO™ is not sufficient to
20  withstand -- or to preserve the big pores
21  under -- under these conditions of
22  biomechanics as it is required for the use as
23  a sling.
24       Q.   Is there any mesh design

Page 530

1 currently marketed by Ethicon that is an
2 appropriate alternative design for the
3 treatment of stress urinary incontinence?
4     A.    I'm not aware of all products
5 from Ethicon that are available in the
6 moment.  In this context, I cannot say
7 whether there is already some device that I
8 can consider sufficiently to be sufficient.
9 It should have -- it has to be tested all
10 these.
11     Q.    And when you mean it has to be
12 tested, what do you mean?
13     A.    To find the optimum structure,
14 the optimum -- the development -- for the
15 development of the optimum structure, you
16 need some studies to define this.
17     Q.    Tell me what studies you need.
18     A.    More or less you need studies
19 to every point of concern that was mentioned
20 in this report and this -- these studies to
21 every point mentioned in this report
22 should -- has to include a lot of preclinical
23 studies in appropriate animal models, in
24 appropriate functional testing, in

Page 531

1 appropriate textile characteristic and then
2 you may get a good impression which design of
3 this -- of your device you want to have is --
4 has the lowest risk.
5     Q.    So first thing you mentioned
6 preclinical studies.
7        Is that animal testing?
8     A.    It can be in vitro testing.  It
9 can be animal testing.
10     Q.    Do you need both?
11     A.    Yes.
12     Q.    And the in vitro testing is
13 what?
14     A.    In vitro testing is maybe it's
15 the counting of particle loss after
16 manufacturing.  It can be the behavior in
17 liquids, the degradation, the combination of
18 these materials with some cells, what happens
19 there, what is the overgrowth.  A lot of
20 questions can be addressed in this field.
21     Q.    Okay.  And do you need to do
22 the in vitro and animal testing before you do
23 the function testing?
24     A.    Everything has to be in

Page 532

1 parallel.  If you want to have a good
2 schedule for how to do so, a good example
3 of -- a good realization of this principle is
4 what we have done with the VYPRO or the
5 principles that we defined at that time, all
6 of these studies, the 100 publications, all
7 of this together gives a good impression or
8 helps you to understand, to find a good
9 device.
10     Q.    And you began with the design
11 of VYPRO in 1994?
12     A.    1994.
13        As I told you, December
14 of 1993.
15     Q.    And when was VYPRO launched?
16     A.    1998.
17     Q.    Is it your opinion today that
18 PVDF is the only appropriate polymer to be
19 used in mesh for implantation in the
20 treatment of stress urinary incontinence?
21     A.    No, but, to my knowledge, it's
22 the best we have.
23     Q.    What other polymers are
24 appropriate for use in a mesh for

Page 533

1 implantation in the treatment of stress
2 urinary incontinence?
3     A.    I cannot answer.  This is a
4 very general question.  There are a lot of
5 polymers, experimental.  We're working on
6 polymers and other polymers so there are a
7 lot of other -- maybe a lot of other
8 alternatives.  There are some literature
9 providing new materials but in the moment
10 from my -- to my knowledge, PVDF has the best
11 results.
12     Q.    Okay.
13     A.    But I cannot give you a
14 complete list of all alternative -- possible
15 alternatives.
16     Q.    Can you give me a list of three
17 possible alternatives?
18     A.    I cannot give you a list of one
19 alternative that is better than PVDF.
20     Q.    And I know that.
21        What I asked you is there --
22     A.    There are some polyimides,
23 polyulitars.  These are classes where you can
24 try to look to see alternatives.

Page 534

1    Q.   Is it your opinion today that
2  polypropylene is not an appropriate mesh for
3  implantation for the treatment of stress
4  urinary incontinence?
5    A.   I think some minutes ago I
6  already said that the word "appropriate"
7  is -- makes it impossible for me to say yes.
8    Q.   Is it your opinion to a
9  reasonable degree of scientific and medical
10  certainty that the use of polypropylene in
11  meshes for the treatment of stress urinary
12  incontinence is unreasonably dangerous?
13    A.   Unreasonable dangerous?  Has to
14  be seen in regard to the specific situation
15  of the benefits and risks.  If you use this
16  implant of polypropylene in an 80-year-old
17  patient, I will not expect that you will
18  experience any problem just because of
19  degradation within the next one year.  So
20  it --
21    Q.   Do you have a --
22    A.   I cannot give a general
23  statement to this.
24    Q.   Okay.  Do you have an opinion

Page 535

1  to a reasonable degree of scientific and
2  medical certainty whether it's appropriate to
3  use polypropylene mesh in hernia repair?
4    A.   The same objection as before,
5  the term "appropriate."
6    Q.   Do you have an opinion --
7    A.   Makes it difficult or
8  impossible for me.
9    Q.   Do you have an opinion to a
10  reasonable degree of scientific and medical
11  certainty as to whether the use of
12  polypropylene in hernia repair is
13  unreasonably dangerous?
14    A.   The -- my present opinion is
15  that it is not so dangerous that it should be
16  forbidden in today to have -- to use it and,
17  therefore, I'm convinced that it is tolerable
18  or acceptable to use polypropylene in
19  medicine.
20    Q.   Okay.
21    A.   But if I may, it depends on the
22  structure.
23    Q.   Right.
24    A.   So it's not a general free

Page 536

1  comment on polypropylene in general.
2    Q.   I understand that.
3     And, Doctor, you have to start
4  somewhere and choosing the textile is a
5  pretty fundamental issue for any mesh that
6  you might use, you agree with that?
7     MR. ANDERSON:  You mean the
8  polymer?
9     MR. THOMAS:  Yeah, that's what
10  I meant.
11  QUESTIONS BY MR. THOMAS:
12    Q.   Doctor, you have to start
13  somewhere and choosing the appropriate
14  polymer is an important first step in the
15  design of any mesh, would you agree with
16  that?
17    A.   Yeah.  I would agree that this
18  is a first step because then it leads you to
19  further decisions.
20    Q.   And even a PVDF polymer can be
21  designed in a way that's unreasonably
22  dangerous, do you agree?
23    A.   Definitely, yeah.
24    Q.   And so as I understand your

Page 537

1  position for use in medicine today, either
2  PVDF or polypropylene are appropriate -- or
3  excuse me, are not unreasonably dangerous if
4  designed correctly?
5    A.   Again, there is this
6  inappropriate.  It depends on what you're
7  looking.  You can create some acceptable
8  textile structures of both, of polypropylene
9  and PVDF.  You will find some different risks
10  if you compare these two.
11    Q.   Doctor, what is Exhibit A to
12  your report?  That's it right there.  Those
13  images.
14    A.   These images?
15     MR. ANDERSON:  That's
16  Exhibit A?
17     MR. THOMAS:  I think.
18     MR. ANDERSON:  A was his CV.
19     MR. THOMAS:  I am sorry, then
20  Exhibit C.  I apologize.
21  QUESTIONS BY MR. THOMAS:
22    Q.   What is Exhibit C to your --
23  let me start over again so I get a good
24  question and you give me a good answer.

Page 538

1    Doctor, what is Exhibit C to
2  Exhibit 11?
3    A.   Exhibit C is a collection of
4  images I made from histological sections I
5  received, and I received HE stainings and
6  stainings with S100.
7    Q.   Okay.  Now, did you create the
8  images that are in Exhibit C?
9    A.   Yes, myself.
10   Q.   And what did you receive --
11 strike that.
12       I take it you received certain
13 materials from Mr. Anderson that allowed you
14 to make these images, correct?
15   A.   I received complete stainings
16 in a box, each explant were prepared with the
17 three stainings, three sections.
18   Q.   So by the time you received
19 them, the slides had already been stained?
20   A.   Yes.
21   Q.   And what stainings were done?
22   A.   HE, this is this one with the
23 red color, and there is an additional
24 staining with a specific antibody S100 that

Page 539

1  marks nerves or nerval structures.  This is a
2  link to a brown color so in these you have
3  this brown color where the S100 is positive.
4    Q.   Okay.  Is the HE two different
5  stains or just one?
6    A.   No, it's two.
7    Q.   Okay.
8    A.   Two.
9    Q.   So you have one -- two --
10   A.   No, it is two colors that are
11 brought to one section.  So it's a counter
12 staining.
13   Q.   You told me, I thought, that
14 you had three slides?
15       MR. ANDERSON:  Three of each.
16       THE WITNESS:  Three of each.
17   Three HE from patient or from case
18   one, and three S100 from case one.
19 QUESTIONS BY MR. THOMAS:
20   Q.   I see.
21       So you have six slides for each
22 patient?
23   A.   Yes.
24   Q.   So you have 66 -- no, you have

Page 540

1  132 slides?
2    A.   You're right.  I'm not a
3  mathematical expert.  It's a big number.
4    Q.   Do you know who prepared the
5  slides?
6    A.   Professor Kreutzer.  I received
7  a note that he prepared this with some
8  numbers so that I can check whether the
9  number of this data sheet was the same as on
10 the slide, on the --
11   Q.   Did you have any interaction
12 with Dr. Kreutzer about how to prepare these
13 slides?
14   A.   Not directly.
15   Q.   Did you provide information to
16 anybody to give to Dr. Kreutzer about how to
17 prepare these slides?
18       MR. ANDERSON:  Other than
19 conversations with me?
20 QUESTIONS BY MR. THOMAS:
21   Q.   Let me ask it this way.
22       Doctor, do you know how
23 Dr. Kreutzer prepared these slides?
24       MR. ANDERSON:  Objection to

Page 541

1  form.
2        Go ahead.
3        THE WITNESS:  I don't know in
4    detail, but this staining HE is a
5    normal procedure for every
6    pathological department and the doing
7    of S100 staining is a -- it's a
8    standard procedure.  Maybe I can use
9    the word "standard" in this context.
10   It is published in all of the reports
11   where we presented these data.  It is
12   no specific knowledge to do these two.
13 QUESTIONS BY MR. THOMAS:
14   Q.   What's Dr. Kreutzer's training,
15 if you know?  I've forgotten.
16   A.   He's pathologist.
17   Q.   That's what I thought.
18       And he's in Connecticut.
19       Have you ever met him?
20   A.   No.
21   Q.   Spoken to him?
22   A.   No.
23   Q.   Did you have any communication
24 with Dr. Kreutzer at all about the slides

Prof. Dr. Med Uwe Klinge

Page 542

1  that he presented to you?
2      A.    No.
3      Q.    Have you ever seen any written
4  analysis by Dr. Kreutzer of the images that
5  are attached as Exhibit C to your report?
6      A.    No.
7      Q.    Tell me again what an HE slide
8  is.
9      A.    HE slide is a staining of cells
10 and of extra cellular matrix, mainly of
11 collagen.  So you have a blue color for the
12 nucleus of the cells to identify the cells
13 and you have a red staining mainly for the
14 collagen and, yeah.
15     Q.    Let's go to the very first
16 slide that you have, very first image that
17 you have on Exhibit C.
18            And down in the lower right
19 there is a scale of 500 microns, correct?
20     A.    Yes.
21     Q.    And what's the magnification of
22 this, do you know?
23     A.    I don't know in this, but when
24 I made the image there, I was asked -- I

Page 543

1  usually took the 40 magnification, 100, 200,
2  400.  These are the options at the
3  microscope.  And then the analyzing system
4  asked me which magnification was done there
5  and then they put into the slide this scaling
6  there.
7            So to place the scaling there,
8  I had to answer the correct magnification.
9  There are only four or five.  So we have a
10 look through the different things, then, of
11 course, we will see whether it's the 400 or
12 the 40.
13     Q.    Well, there are different -- I
14 see different scales throughout these
15 photographs.
16     A.    It's 40, 100, 200, 400
17 magnification.
18            So as I recall, these are the
19 four different magnifications and there will
20 be correspondingly four different scales
21 here.
22     Q.    Okay.  What does this tell you
23 about this first image in Exhibit C with --
24 lower right-hand corner it says 500 microns.

Page 544

1  In the middle of the first image on
2  Exhibit C, there's a measurement of
3  168.53 microns.
4            Can you tell from looking at
5  this image what the magnification is?
6      A.    The magnification would be 40
7  or 100.
8      Q.    Okay.  Now --
9      A.    When I saved the images, I name
10 it so usually I get it from the name.
11     Q.    I believe that one doesn't have
12 any scale on it at all.
13     A.    Yeah, sometimes I forgot it.
14 Sorry.  So 200 -- no, 500, 50, this is the
15 highest magnification.  This is 400, then
16 this is 40.  40.  40 fold magnification.
17     Q.    And how did you conclude that?
18     A.    Because I've seen there one
19 with the highest magnification and this was
20 400.  And so in this the scale was only 50
21 and here we have 500 so it is one-tenth.
22     Q.    Now, you made these images
23 yourself from a scanning electron microscope?
24     A.    No, from a conventional light

Page 545

1  microscope.
2      Q.    And where did you have that
3  light microscope?
4      A.    In our lab on the third level
5  in room 45 at -- no, ward 45, room 1.  On a
6  desk, we have two of them and on the left,
7  there is a camera on it to make these images.
8      Q.    Thank you, Doctor.
9            The first image to Exhibit C, I
10 believe you said the red area depicts
11 collagen.
12     A.    It's mainly collagen, yeah.
13     Q.    And what does the tan area
14 represent?
15     A.    The tan?
16     Q.    This area over here, I call
17 tan.
18     A.    Here?
19     Q.    Yes.
20            What is that?
21     A.    There is nothing.  No cells
22 there.
23     Q.    Does that mean there's no
24 tissue?

Page 546

1　　　A.　No tissue on this.
2　　　Q.　Does that mean the slide does
3　not contain any tissue as you're looking at
4　it?
5　　　A.　Yes.
6　　　Q.　Okay.  Does that mean that the
7　area marked as 168.53 is at the right extreme
8　of the sample you're analyzing?
9　　　A.　In this picture, yes.
10　　　Q.　And what is the area marked as
11　168.53?
12　　　A.　This is a fragment of the
13　polymer fibers.  When looking to the slides,
14　the first thing I try to do is to measure the
15　diameter of these fragments so I know that
16　there is a -- the cutting of these fragments
17　is not directly horizontal to the course of
18　the fibers.
19　　　　But to have a rough impression
20　what is a diameter of the fiber that it is in
21　the area that I expect to be there.
22　　　Q.　Doctor --
23　　　A.　So that is around 150 microns.
24　　　Q.　Okay.  Now, do you believe that

Page 547

1　this -- is this a mesh fiber, is that what
2　you're saying?
3　　　A.　It is consistent with the --
4　with the fact that the -- that this fiber has
5　the diameter of 160.  If I would have seen a
6　polymer with only 4 microns from this, then I
7　would have some doubts that it's the right
8　material.
9　　　　But this finding is consistent
10　with a polypropylene fiber of a TVT®-O or
11　TVT®.
12　　　Q.　So what does this mean to you?
13　　　　What's the significance of this
14　finding on this slide which is the first
15　slide of Exhibit 3 to your report?
16　　　A.　It's consistent with the
17　assumption that it's a TVT®-O or a TVT®.  If
18　it would have been 250 or 300 microns, then I
19　should to rethink about it.  It's just a
20　confirmation that I really just got what was
21　written in the table.
22　　　Q.　And so you're consulting a
23　table as you review these images; is that
24　correct?

Page 548

1　　　A.　I have the information of this
2　table, yeah, but usually I look to the images
3　and without any knowledge so in a blind
4　fashion.
5　　　Q.　I understand.
6　　　　Did you prepare the table which
7　is prepared as the last page of your report?
8　　　MR. ANDERSON:  I prepared it in
9　accordance with the chain of custody
10　forms.
11　　　MR. THOMAS:  Did you prepare
12　all of it?
13　　　MR. ANDERSON:  Well, I had to
14　get his ID number and the Jordi ID
15　number and the Steelgate specimen
16　number and all of the information that
17　Steelgate had in conjunction with the
18　various other information so that I
19　could assimilate his -- the
20　information that he provided on his ID
21　number, and then everything from N to
22　R he prepared or gave the information.
23　　　　So the reason for doing this
24　was to make it A, easier to keep up

Page 549

1　with the chain of custody so that you
2　could see where it went from explant
3　to his hands.  It would also be
4　consistent with the chain of custody
5　forms that Mr. Snell and I agreed to
6　and so it would make it easier at this
7　deposition for you if you wanted to
8　look at a particular device or
9　whatever and be able to compare them.
10　　　　So that was the effort that I
11　put forth in order to try to put the
12　information of all of the slides in
13　one spot for both you and I.
14　QUESTIONS BY MR. THOMAS:
15　　　Q.　And the identifier for these
16　slides is in the lower left-hand corner; is
17　that correct?
18　　　A.　That is the number or the
19　coating that I found on the slide, on the
20　stainings, yeah.
21　　　Q.　Was this number already on the
22　staining or did you have to add it to this
23　document?
24　　　A.　No.  I used -- I used -- I used

Page 550

1  the number from the stainings from Professor
2  Kreutzer and then I placed them or I named
3  the images according to this number and added
4  the sort of staining and added the
5  magnification in the name of the slides.
6    Q.   Did you receive all -- did you
7  see -- is 22 slides all you received or did
8  you receive any more than that? Excuse me,
9  strike that.
10       Did you receive slides from 22
11 separate patients, or did you receive more
12 than that?
13   A.   No, 21, 22 cases, different
14 cases.
15       MR. THOMAS: Can we take a
16 break a second, please?
17       MR. ANDERSON: Sure.
18    (Off the record at 2:42 p.m.)
19 QUESTIONS BY MR. THOMAS:
20   Q.   Doctor, looking again at the
21 first image of Exhibit C to your report, what
22 of significance do you find in this image
23 related to adverse reaction to mesh?
24   A.   Just to explain I looked

Page 551

1  through all of these stainings there and I
2  define some parameters which I've been
3  looking at and these I put in this table and
4  then I made some exemplary images of every
5  case. It's even at this low magnification,
6  it is just one small part of the section.
7  The section is much bigger, and, therefore, I
8  just want to cover the general impression of
9  any of these findings that are on the table
10 by these images.
11       So what you see here is
12 appearance of a polymer fiber in a size that
13 we expected. You see some fat tissue there
14 at the lower part and you see extensive
15 tissue here very close to this fiber. And
16 this is indicated by the red color. This is
17 the content of this image.
18   Q.   Is fat tissue and collagen the
19 same thing?
20   A.   No. The fat tissue is this
21 lower part by the fixation, by the staining.
22 Essentially the fatty liquids are removed so
23 you have almost empty spaces there and you
24 can identify fat cells that you only have the

Page 552

1  cell wall around, and in these cells, the
2  nucleus is at the bottom and you have an area
3  in the middle where the fatty acids have been
4  and, therefore, it is bright. You don't see
5  significant structures in the fat tissue.
6    Q.   Okay. So you showed me the fat
7  tissue and the collagen and you've also shown
8  me the polymer fiber.
9        What else is of significance in
10 the first slide of Exhibit C?
11       MR. ANDERSON: Objection to the
12 form of the question.
13       THE WITNESS: I wouldn't point
14 out any others.
15 QUESTIONS BY MR. THOMAS:
16   Q.   Okay. When you looked at the
17 22 different patients you said that you
18 developed some parameters.
19       What does that mean?
20   A.   The parameters I want -- in
21 general, this -- looking at these samples I
22 want to get a confirmation that what we have
23 seen in all these animal slides, what we have
24 seen in the human explants from the abdominal

Page 553

1  wall that this is confirmed by explants
2  provided by Professor Kreutzer, as well and,
3  therefore, the first is that I look to the
4  fiber size, I try to measure it, that I
5  really am sure that it's a monofilament -- a
6  monofilament in a size that has to be
7  expected there, that was the first.
8        The second is the bridging,
9  whether I see pores, the room between two
10 filaments that are filled with fat and I made
11 a coating to get or to differentiate whether
12 these pores are frequently seen, rarely seen,
13 always seen or never seen.
14       The next was whether there was
15 some sign of folding on shrinkage. The main
16 structure should be -- if there is no folding
17 and shrinkage, should be in a plain way
18 detectable in these stainings or shouldn't be
19 in a folded or in a wave-like position.
20       If I saw somewhere at the mesh
21 that there is a doubling of the structures or
22 there is a configuration that cannot be
23 explained by a plain positioning, then I
24 marked it with a yes.

Page 554

And then finally I looked at the S100 stainings, whether there are some nerves in the -- within the scar area of surrounding the mesh because in former times, there has been the discussion the big nerves are not in this area, therefore, it is impossible that the mesh interacts with some nerves and for this purpose, I just mentioned whether there are some nerves, yes or not, and in fact, you see nerves in this -- small nerves that cannot be visualized by the surgeon during the operation, but you have there some nerve structures very close to this wound.

These are the four points and every slide I analyzed to get an opinion on these four things, for every case.

Q.   The parameters that you've just described, are those parameters unique to this case?

A.   Yes, unique.

Q.   Okay.  And why did you pick those parameters?

A.   Because the value of this -- of

Page 555

these explants is that they allow me to confirm that -- or to test whether what we have seen in the animal tissues, in the human tissues of the abdominal wall, whether this is true for these.  I had the data from Professor Klosterhalfen from his explants and it already indicated that it is similar or comparable and now I personally have the option to test -- to have it tested at these 22 sections.

Yeah, overall, in fact, you see this extended bridging there, you see that the distance between the fibers is less than these 1,400 microns.  So it is -- it underlines, again, that it is irrelevant to discuss these 1,400 because if you look to the tissues, you see this bridging with these devices.

Q.   Okay.  You said a number of things in your answer I want to talk about.

You mentioned you received some explants from Professor Kreutzer; is that right?

MR. ANDERSON:  Objection.

Page 556

Slides.

THE WITNESS:  Slides.

The data explants from Professor Klosterhalfen.

QUESTIONS BY MR. THOMAS:

Q.   That's better.  I thought he said explants.  That's -- so the only thing you received from Dr. Kreutzer were the slides?

A.   Yes.

Q.   Now, the information that you received from Dr. Klosterhalfen was the data that he generated from his analysis of his explant collection, correct?

A.   No, I got his data and I had the opportunity to have a look at some stainings in Düren as well.

Q.   Okay.

A.   So I've seen it.

Q.   But just so I understand, the stainings that you looked at in Düren were stainings that Dr. Klosterhalfen had already prepared and analyzed; is that true?

A.   Yes.

Page 557

Q.   And reported on his findings for those stainings?

A.   Yes, but in the moment, I didn't know it.  He just placed these tissues to me and so, yeah.

Q.   Okay.

A.   I could not relate it to the databases.  It was -- again, it was one way to test whether this was confirmed in these tissues with these explants what we -- what our points of concern are.

Q.   What form did the information take that Professor Klosterhalfen gave to you, the data you talked about?

Is it a chart or is it information on the -- that contains his information -- strike that.

Did Professor Klosterhalfen give to you a document that detailed his analytical findings from his explant collection?

A.   I had an Excel sheet where he had some of his findings.

Q.   Is this the Excel sheet we

Page 558

1  talked about last year, the same sort of
2  thing that you have on your computer?
3      A.    Similar.  Similar.
4      Q.    Is it the same document, just
5  more explants?
6      A.    No.  No.  We talked last year
7  about only explants, full explants, of the
8  abdominal wall.
9      Q.    Okay.
10     A.    Now it is in other Excel sheet
11 for the explants from the pelvic floor.
12     Q.    Okay.  And did you analyze the
13 data provided to you by Professor
14 Klosterhalfen to understand the complications
15 which occur from mesh implants in a pelvic
16 floor?
17     A.    I made an analysis of this data
18 in regard -- or to see whether these data
19 confirm our opinions and our experience from
20 the abdominal call.
21     Q.    In addition to the Excel
22 spreadsheet that you have of Professor
23 Klosterhalfen's findings, you also went over
24 to Düren and looked at some slides, correct?

Page 559

1      A.    Yes.
2      Q.    Did you look at all of the
3  slides that he had?
4      A.    No.
5      Q.    How many did you look at?
6      A.    About 20 to 30.
7      Q.    Why did you look at 20 to 30
8  slides?
9      A.    To have it seen by my personal
10 eyes.
11     Q.    Okay.  Have you produced to us
12 the Excel spreadsheet with the data that you
13 received from Professor Klosterhalfen?
14     A.    Not that I recall.
15         MR. ANDERSON:  You have it.
16     It was the one that we produced
17     to you right before Klosterhalfen's
18     depo and that was the one that Henry
19     also gave to you at the depo or showed
20     you at the depo.
21         MR. THOMAS:  That's the
22     Klosterhalfen exhibit from the BARD
23     litigation.
24         MR. ANDERSON:  Correct.  That

Page 560

1  correlates to the 473, I forget the
2  number, pelvic floor explants in Düren
3  that he's referencing now.
4  QUESTIONS BY MR. THOMAS:
5      Q.    Okay.  And you were relying on
6  the data generated by Professor Klosterhalfen
7  in part for your opinions that you're giving
8  from your review of these slides; is that
9  fair?
10     A.    There is no -- I don't
11 understand whether you see a relation to
12 this.  We have our experience that bridging
13 is important and so on, and we have tested by
14 our own explants.  I took the opportunity to
15 have it controlled in Düren.  I took the
16 opportunity to have it tested by the data
17 sheet of his and then I took the opportunity
18 to have it tested -- test our opinions, our
19 experience at the 21 cases that I got from
20 Professor Kreutzer and finally eventually I
21 took the opportunity to check this at the
22 last 22nd of this case.
23         So it is subsequently permanent
24 confirm -- or looking for a confirmation or a

Page 561

1  rejection of what we know.
2      Q.    And just so I understand, this
3  is the collection of explants maintained by
4  Professor Klosterhalfen in Düren that I'm not
5  allowed to see; is that true?
6         MR. ANDERSON:  Objection to
7     form.
8         MR. THOMAS:  It's true, isn't
9     it?
10 QUESTIONS BY MR. THOMAS:
11     Q.    This is the collection
12 protected by German privacy laws that limits
13 and prohibits me from looking at it without
14 permission from the patient.
15         Do you know the answer to that?
16     A.    I have read it, but I'm not
17 familiar --
18     Q.    I'm talking about whether I can
19 see it.
20     A.    What?
21         I'm not an expert what are the
22 legal steps to go over there and to do so.  I
23 read it in the depo form.
24     Q.    Now, when you were at the

Page 562

1  university, you were a surgeon and you
2  practiced as a surgeon until 2006, correct?
3      A.    I am a surgeon and practiced
4  until 2006.
5      Q.    You did not work for the
6  Institute of Pathology?
7      A.    No.
8      Q.    And that was Dr. Klosterhalfen
9  who worked in the Institute of Pathology and
10 collaborated with you on your work?
11     A.    Yes.
12     Q.    Are you permitted at the
13 hospital where you work to sign pathology
14 reports?
15     A.    No, I'm not permitted to do.
16     Q.    Did you have a residency in
17 pathology?
18     A.    No.
19     Q.    Did you have a fellowship in
20 pathology?
21     A.    No.
22     Q.    Have you ever been an editor or
23 reviewer of a pathology journal?
24     A.    No.

Page 563

1      Q.    Are you familiar with the
2  staining technique known as neurofilament
3  staining?
4      A.    I've read it and I know that it
5  exists.
6      Q.    Have you ever used
7  neurofilament staining?
8      A.    Not that I recall in the recent
9  time.
10     Q.    What is the purpose of
11 neurofilament staining?
12     A.    It's another option to
13 visualize nerval structures.  More specific.
14     Q.    More specific.
15          It can -- okay.  Did you ask
16 for neurofilament staining of the samples
17 that you looked at?
18     A.    No.
19     Q.    Why not?
20     A.    I didn't ask.
21     Q.    Why not?
22     A.    Because in our experience, we
23 made at -- or we preferred due to the advice
24 of Professor Klosterhalfen the S100 staining

Page 564

1  to get an impression whether there are some
2  nerves or not.  And we're not -- or the main
3  focus of our research was not to specify
4  there whether it's neurofilaments or there
5  are so many different options to use
6  antibodies against nerves so we selected
7  S100.
8      Q.    Okay.  You and
9  Dr. Klosterhalfen decided which staining
10 method to use?
11     A.    Mainly he decided.  I think we
12 started at the -- in the '90s and he proposed
13 to use S100 because this was established in
14 the Institute for Pathology and we got good
15 images and good information from this and,
16 therefore, it is still widely used and we're
17 satisfied with it.
18     Q.    Doctor, isn't it true that
19 normal vaginal tissue contains nerve fibers?
20     A.    Yes.
21     Q.    And so the fact that your
22 staining picks up nerve fibers is not
23 remarkable by itself?
24     A.    As I told you, the intention to

Page 565

1  look for these fibers has been discussions we
2  had that someone is standing up and said,
3  okay, it cannot be that someone -- some
4  patient has some pain because the big nerves
5  we took care during the operation and the big
6  nerves are far away and that just to
7  demonstrate to an audience that there are
8  these tiny nerves that cannot be seen by any
9  surgeon when he's in this field, we just made
10 it for this purpose and, therefore, we didn't
11 make any further analysis.  Just yes, no, and
12 as you said earlier, everyone knows that
13 these nerves are there, but some of my
14 colleagues they don't want to know it maybe.
15     Q.    What do you mean, "They don't
16 want to know it"?  I don't understand.
17     A.    They ignore this fact sometimes
18 in discussions.
19     Q.    They ignore the presence of
20 nerves?
21     A.    Of these small, tiny nerves
22 there, yeah.
23     Q.    I see.
24          (Klinge Exhibit 24 marked for

Page 566

1  identification.)
2  QUESTIONS BY MR. THOMAS:
3      Q.    Doctor, I've handed you what's
4  been marked as Deposition Exhibit Number 24
5  and ask you if that's the pathology report
6  for Carolyn Lewis?
7      A.    Yes.
8      Q.    Thank you.  I'm sorry, I didn't
9  hear your answer, I apologize.
10     A.    I didn't get the question.
11           MR. ANDERSON:  He didn't
12     answer.  He was still looking.
13  QUESTIONS BY MR. THOMAS:
14     Q.    Oh, okay.
15           Did the pathology report inform
16  your opinions at all about the tissue
17  reaction Ms. Lewis had to the mesh implant?
18     A.    I didn't get the -- did the
19  pathology -- no, first of all, I looked
20  afterwards to this pathology report, and as I
21  tried to explain, I'm looking to bridging,
22  folding, nerve contact and this is not
23  included here.  But what they describe is the
24  usual appearance and, unfortunately, it's a

Page 567

1  usual report given by pathology when they get
2  an implant, but they never looked to the
3  pores or the extent of the scar tissue.
4           So I would expect a similar
5  report in Germany.
6      Q.    And just to be clear, there's
7  nothing remarkable in Exhibit 4 which is the
8  pathology report to Ms. Lewis that the
9  pathologist found after the explantation to
10  suggest any remarkable tissue reaction with
11  the mesh; is that true?
12     A.    It is too unspecific.  It just
13  confirms that the routine pathology is not
14  able to give a detailed description of the
15  tissue reaction to a device.
16     Q.    Now, are you able to detect
17  fibroblasts as you look at these images?
18     A.    Yes, yes, you can see them.
19     Q.    Are you able to detect
20  microcapillary cells?
21     A.    Microcapillary, endothelial,
22  yes, you can see it.
23     Q.    What is a microcapillary cell?
24     A.    I assume that you are thinking

Page 568

1  of some endothelial cells forming vessels.
2      Q.    And what are fibroblasts?
3      A.    Fibroblasts are cells that are
4  used to -- mainly their task is make a
5  deposition of collagen there.  They are
6  very -- or if you have an injury or a damage
7  in the tissue, usually the fibroblasts are
8  called to make an unspecific repair by
9  forming scar tissue in this field of damage
10  and defect.  It's -- they are the cells
11  mainly responsible for the scar tissue and
12  has to be differentiated from more
13  specialized cells as fat tissue, for example.
14     Q.    And what is -- what are --
15  what's collagen?
16     A.    Collagen is a protein.  There
17  are 13, 16 different collagens.  Mainly we
18  have to deal with collagen 1.  That is a
19  protein of several helixes and this is
20  responsible for the stability of fascia and
21  of skin.  It has to be separated from
22  collagen type 3.  That is a collagen that
23  appears usually at the early days of wound
24  healing and later on is replaced by this

Page 569

1  stable collagen 1.  An increased amount of
2  collagen 3 is an indicator of an impaired
3  wound healing and indicator for high risk for
4  recurrent hernia.
5      Q.    Is the presence of fibroblasts,
6  microcapillary cells and collagen bundles
7  inconsistent with the formation of scar
8  plate?
9      A.    Complete different things.
10  They are -- they contribute to the extent of
11  a scar.
12     Q.    But the presence of --
13           MR. ANDERSON:  Were you through
14     with your answer?
15           THE WITNESS:  What?
16           MR. ANDERSON:  Were you through
17     with your answer?
18           THE WITNESS:  Yes.
19  QUESTIONS BY MR. THOMAS:
20     Q.    But the presence of
21  fibroblasts, microcapillary vessels and
22  collagen bundles are an indication of proper
23  tissue integration, correct?
24     A.    You can't decide from the

Page 570

1  presence of these cells either whether it's a
2  scar plate or a scar net. If you stick to
3  these words or whether it's proper or whether
4  it's inadequate, it's just described that
5  there is some scar reaction there, but it
6  gives -- it doesn't give you any hint whether
7  it's sufficient, necessary or too much scar.
8      Q.   Have you read the expert report
9  of Dr. Zing?
10     A.   Yes.
11     Q.   Okay. And do you agree with
12  the findings of Dr. Zing?
13         MR. ANDERSON: Well, objection.
14  Which ones? It's a long report.
15         Which ones?
16  QUESTIONS BY MR. THOMAS:
17     Q.   Just generally, do you agree
18  with the findings of Dr. Zing?
19     A.   I need to go to the paper
20  otherwise.
21     Q.   Do you have a recollection of
22  anything in the report that you disagreed
23  with?
24         MR. ANDERSON: Again,

Page 571

1  objection.
2         MR. THOMAS: I understand.
3         MR. ANDERSON: Without letting
4  him see the report.
5         THE WITNESS: My rough
6  recollection was that he described a
7  lot of things that I can agree to, but
8  my impression was that he didn't have
9  a -- or that his experience in
10  comparing tissue reaction to different
11  textile structures, that this -- his
12  experience is limited.
13 QUESTIONS BY MR. THOMAS:
14     Q.   Okay.
15     A.   And that his statements whether
16  it is a -- about the quantity in comparison
17  to others, that there are only very few
18  remarks on it. But otherwise we have to go
19  to --
20     Q.   Okay. Let's go to page 70 of
21  your report.
22         Now, are the images of page 70
23  of your report also contained in appendix C?
24     A.   I'm not sure. I made a lot of

Page 572

1  images, but I have to look whether all of
2  these are here or --
3         MR. THOMAS: Do you know, Ben?
4  I don't want to spend my time looking
5  through the report and I'm just
6  curious. I'll want copies of the -- I
7  will want copies of these if they're
8  not the same.
9         MR. ANDERSON: I don't know if
10  all of them are the same, but
11  certainly have an agreement with Burt
12  that we can -- that we need to swap
13  slides. Zing's come to me, mine go to
14  you.
15         MR. THOMAS: Okay. I didn't
16  know that.
17         MR. ANDERSON: Yeah, you-all
18  need to talk more.
19         Yeah, so you'll have the
20  opportunity to -- or have your guy
21  look at ours and I need your guy -- I
22  need yours, too. We just need to get
23  that worked out.
24         MR. THOMAS: You need the

Page 573

1  slides --
2         MR. ANDERSON: The slides.
3         MR. THOMAS: -- somebody else
4  has. They're not mine.
5         MR. ANDERSON: So they can be
6  observed by someone else that are not
7  yours.
8         So I can't really answer this
9  question.
10         MR. THOMAS: Okay. We'll just
11  make a record of that fact. We're not
12  sure that the images that appear on
13  pages 70, 71, 72 and 73 and 74 also
14  appear in the appendix C.
15  Mr. Anderson advises that there's an
16  arrangement whereby we will exchange
17  slides so that Dr. Zing will have an
18  opportunity to review what
19  Dr. Klinge's reviewed, and Dr. Klinge
20  will have an opportunity to review
21  what Dr. Zing reviewed; is that
22  correct?
23         MR. ANDERSON: That's correct.
24  I know without every one of these

Page 574

1  photos and taking up your time,
2  without comparing all of these, I know
3  that some of them are certainly in the
4  back.
5      MR. THOMAS:  And probably by
6  definition since there are so many of
7  them, some of them aren't.
8      MR. ANDERSON:  I don't know if
9  that's true.
10  QUESTIONS BY MR. THOMAS:
11     Q.   So going to page 70, do you
12  know if the images from page 70 are from
13  Carolyn Lewis?  And the reason why I ask is
14  on the next page, you refer to her by code
15  name on page 71 for the first time.
16     A.   Yes.  And, therefore, the first
17  images are not from this case.  These are
18  from the first 21 cases.  And then later on,
19  one week later, I got the case BAL 13-23 and,
20  therefore, the first images are not from her.
21     MR. ANDERSON:  It's BAL 13-23.
22  QUESTIONS BY MR. THOMAS:
23     Q.   Why didn't you say Carolyn
24  Lewis in your report?

Page 575

1      MR. ANDERSON:  Objection.
2      THE WITNESS:  No specific
3  reason for it.
4  QUESTIONS BY MR. THOMAS:
5     Q.   Okay.
6     A.   When I got all this -- all
7  these numbers, I have no problems to use
8  these numbers.  If I take numbers of -- names
9  here, I'm not allowed -- I'm not
10  well-informed about possible consequences
11  there.  But when I get a slide with a code, I
12  take the code.
13     Q.   Dr. Klinge, so the first images
14  that relate to Carolyn Lewis appear on
15  page 71?
16     A.   Yeah.
17     Q.   Now, what are the three images
18  that appear in the middle of page 71?
19     A.   All these are HE stainings and
20  should give you an impression that it's only
21  a small part of the tissue there.  It's not a
22  big section that has been stained there.  And
23  a lot of red there, a lot of deposition of
24  collagen and I used a polarization filter.

Page 576

1  It has been possible to detect polymer
2  particles better because they start to get
3  bright there in this.
4     Q.   Let's stay with the three
5  images on page 71 for right now.
6      As you look at the three images
7  on page 71 --
8     A.   Yeah.
9     Q.   -- is there anything about
10  those images that suggests to you that there
11  is inadequate tissue integration -- strike
12  that.
13      Looking at the images on
14  page 71, the three right there in a row, is
15  there anything about those three images that
16  suggests to you that there's an inappropriate
17  inflammatory response to the mesh?
18      MR. ANDERSON:  Objection to the
19  form.
20      Go ahead.
21      THE WITNESS:  What you see in
22  this is in the middle part, it's a
23  higher magnification than you see some
24  inflammatory infiltrate close to the

Page 577

1  polymer that is the typical foreign
2  body reaction.
3  QUESTIONS BY MR. THOMAS:
4     Q.   I am sorry, that's a typical
5  foreign body reaction?
6     A.   Yeah.
7     Q.   Okay.  Thank you.
8     A.   Foreign body reaction.
9      On the right side, you see that
10  there are some fibers, and in between, the
11  space is completely filled by scar tissue and
12  on the left side, you see the lowest
13  magnification, then you see, again, that
14  there nowhere is a huge area of fat tissue,
15  but all is a scar tissue there.
16      So overall, this HE staining
17  confirms that this mesh material completely
18  is integrated in a scar field.
19     Q.   Okay.  We talked earlier about
20  a scar net or a scar plate?
21     A.   Yeah.
22     Q.   Is it a scar net or a scar
23  plate?
24     A.   It is obviously a scar plate

Page 578

1 because a scar net would require some fatty
2 tissue in between the filaments. And if
3 you're measuring or looking at the distances
4 between the filaments, the filament is
5 150 microns and the distance is very close
6 together. So you can suspect that this is at
7 the linking part and not in the middle of the
8 pores, but if you look through the entire
9 section, you always find images like here,
10 not the big distances.
11        Q.    Okay. And when you get these
12 slides, has the mesh -- does the mesh
13 typically fall out of the slides before you
14 analyze them?
15        A.    Usually, it is a very thin
16 section there and by the knives, it take the
17 polymer fibers out and usually they are --
18 they are out and you only see the cells
19 around.
20        Q.    Okay. So you actually when you
21 look at the slides, you're looking at a hole
22 as opposed to the polymer?
23        A.    Very often, yeah.
24        Q.    Can you tell on 71 whether

Page 579

1 you're looking at the polymer or the hole?
2        A.    From these images, it is very
3 small, but I think even if you make it
4 bigger, that you don't see directly the
5 polymer in this, but only the holes.
6        Q.    Okay. The middle slide depicts
7 a normal fiber foreign body reaction,
8 correct?
9        A.    A typical.
10        Q.    A typical foreign body
11 reaction.
12              Is there anything else
13 remarkable about the middle slide?
14        A.    No.
15        Q.    Now, the slide on the left, you
16 said the red, does that depict collagen?
17        A.    Yeah. Mainly collagen and this
18 is expressing the scar reaction there.
19        Q.    Okay.
20        A.    It's not the yellow color of
21 the fat tissue, but it's the red color of
22 collagen-rich scar. Fibrotic.
23 Fibroconnective tissue.
24        Q.    So I thought collagen was good.

Page 580

1        MR. ANDERSON: Objection.
2        THE WITNESS: In sweeties, it's
3    perfect. There's some sweets made of
4    collagen. There, it's great.
5 QUESTIONS BY MR. THOMAS:
6        Q.    I thought collagen deposition
7 between pores was a good thing.
8              Is that not true?
9        A.    It depends if you have a wound
10 from a burn, then you get an extensive scar
11 formation, and I don't know whether you have
12 seen these images of contractures for these
13 patients. It is a catastrophe. So scar is
14 defect healing, but scar is part of the
15 physiological wound repair as well. It
16 depends on the quality and quantity of the
17 scar.
18        QUESTIONS BY MR. THOMAS:
19        Q.    Describe for me, please, in as
20 detail as you can, what it is about the
21 picture on the left on page 71 that shows you
22 that this is a scar plate?
23        A.    There is no -- not any or there
24 is no area where I can identify a pore that

Page 581

1 is filled by fat tissue. That is not filled
2 by scar and our definition of bridging was
3 that the pore is completely filled by scar
4 tissue.
5        Q.    When you say "your definition,"
6 that definition accepted generally in the
7 field of pathology?
8        A.    That is the definition that we
9 published since years what I -- what is
10 accepted by the documents from Ethicon I saw,
11 I never realized that there was any objection
12 to this.
13        Q.    My question is: Do you know
14 that the definition that you used is
15 acceptable in the field of pathology?
16        MR. ANDERSON: Objection.
17        THE WITNESS: I don't know what
18    is your feeling, what does it mean
19    acceptance in the field of pathology,
20    by whom, in what specific situation?
21 QUESTIONS BY MR. THOMAS:
22        Q.    Okay. Let's go to the same
23 page on the right side, I would like for you
24 to describe for me, please, what is

Page 582

1 remarkable about the image on the right side
2 of the three section on page 71?
3     A.    This is a section where you see
4 in the middle the two almost circular holes
5 where it is likely that there -- a polymer
6 fiber has been there.  You see on the left
7 side of this image that it's a little bit not
8 circular because you have a diagonal cutting
9 in this area.
10         On the right-hand side, you may
11 have the impression that there may have been
12 some of the polymer fibers, but it's not
13 clear whether it's a destruction of the
14 tissue there by the cutting process, but,
15 however, all of the tissue in between the
16 fibers it is scar.
17     Q.    Next page, page 72 at the top,
18 there are three images there and the heading
19 says, "Some areas of the polymer showed
20 considerable M homogeneity of the crystal
21 structure that can hint to a present change
22 of the crystal structure."
23         What does that mean?
24     A.    As I told you, we have -- we're

Page 583

1 frequently using this polarization filter
2 because this allows us to differentiate
3 between collagen 1 and collagen 3 or to --
4 yeah.  And to identify collagens better.
5         And another option of this
6 polarization filter is the identification of
7 some smaller particles, and I use this to
8 look whether there are some particles.  And
9 if you're looking at the upper row in the
10 right picture, you see that there are very,
11 very small particles there, highlighted
12 there.  And it is usually just doing it
13 without the filter, you will not see them
14 because they are almost the same appearance
15 as some cells.  But when using the filter,
16 you really see in a there is a foreign body.
17         On the left, you see a polymer
18 fiber as I would have expected it,
19 homogenously as a polymer.  In the middle,
20 you see that it is different.  I have no
21 explanation for this.  The only explanation I
22 can imagine is that there is some
23 heterogeneity or change in the crystal
24 structure that leads to this different

Page 584

1 rejection of the light there.
2         It is just a -- what I have
3 seen there, I didn't know any literature
4 making deeper studies to relate degradation
5 to this, but I think it is a finding that may
6 offer the option to make investigations using
7 this filter when you want to look at the
8 degradation of polypropylene.
9     Q.    Do you have an opinion to a
10 reasonable degree of scientific certainty
11 that the image in the middle of the
12 three-image set on page 72 is degradation?
13     A.    As I tried to explain, there is
14 no other information about the -- or
15 confirmation that degradation can be seen by
16 this but for my -- from my point of view, it
17 is consistent with the opinion that there is
18 some structural change, but I need further
19 confirmation by further ongoing studies to
20 prove this, but I just want to mention this.
21     Q.    Okay.  So just so I'm clear and
22 I can stop asking questions about it, is it
23 fair that you do not have an opinion to a
24 reasonable degree of scientific certainty

Page 585

1 that the image in the middle of those three
2 is degradation of the polypropylene mesh?
3     A.    Yes.
4     Q.    Okay.  Is the image in the
5 middle of the page of 72, is that your
6 camera?  What is that?
7     A.    The middle here?
8     Q.    Yes.
9     A.    No, it's another image of this
10 section where you see the different
11 appearance of the polypropylene.
12     Q.    I am sorry.
13     A.    Down there is a polymer which
14 seems to be intact as I would have expected
15 it, and in the middle, you see some light
16 changes of the appearance where I don't have
17 any detailed explanation for the studies.
18 It's a new finding.
19     Q.    These samples came to you fixed
20 in formalin, correct?
21     A.    Yes.
22     Q.    And slides were created.
23         Do you have any idea of the
24 extent to which the creation of the slides

Page 586

1 could create any kinds of particles?
2     A.    No.  It's -- yes, of course, it
3 has to be -- or the type of fixation, the
4 type of handling can -- or can make some
5 particles.
6         So, therefore, in the upper
7 row, where you see on the left side some very
8 small particles there, I cannot be sure
9 whether this is done by the cutting, by the
10 preparation of these sections for these
11 stainings or whether it has been other
12 reasons.
13         But if you're looking to the
14 lower part of this, where you see a big
15 particle, a fragment of the fiber, there you
16 see that you already have some surrounding
17 tissue response there and, therefore, it is
18 clear that this particle has been implanted
19 during the index operation there.
20     Q.    Okay.  Have you finished your
21 comments and remarks about the top four
22 images?
23     A.    Yes.
24     Q.    Moving now to the image that

Page 587

1 you just discussed, the single image at the
2 bottom of page 72, and it says, "Around the
3 separate particle, the usual tissue reaction
4 can be seen is known from the tissue reaction
5 to polymer fibers."
6         Do you have an opinion to a
7 reasonable degree of scientific certainty
8 that this was a particle in Mrs. Lewis that
9 came out with her tissue explant?
10         MR. ANDERSON:  Objection to
11 form.
12         THE WITNESS:  I've seen this in
13     the sections which I got and saw this
14     particle in these slides there.
15 QUESTIONS BY MR. THOMAS:
16     Q.    Okay.  Do you have an opinion
17 as to whether this particle was -- strike
18 that.
19         Do you have an opinion as to
20 whether this image on page 72 is actually a
21 part of the polymer that was cut?
22         MR. ANDERSON:  Objection.
23         THE WITNESS:  The polymer
24     always is cut when you make this

Page 588

1 section, but in contrast to the
2 particles on the -- in the upper row,
3 you see that there is a reaction of
4 cells around, which is very tied
5 together to the surface of this
6 particle and this needs time.  So it
7 is impossible that this particle is
8 the result of the section and it shows
9 clearly that even these particles have
10 the typical foreign body reaction with
11 the foreign body giant cells and the
12 inflammatory infiltrate there.
13 QUESTIONS BY MR. THOMAS:
14     Q.    What is your opinion with
15 respect to the specific particle?
16         MR. ANDERSON:  Other than what
17     he just said?
18         MR. THOMAS:  Right.
19         MR. ANDERSON:  Okay.  In
20     addition to what you just said.
21 QUESTIONS BY MR. THOMAS:
22     Q.    Any further comments that you
23 have about this specific particle?
24     A.    No.

Page 589

1     Q.    Can you tell by looking at
2 the -- what you've described as a particle on
3 page 72 -- strike that.
4         Let's go to the next page.
5 Wait a minute.  Before we do that, the tissue
6 reaction to the polymer on page 72, "Consists
7 of an interzone of polymorphous mononuclear
8 inflammatory cells with some confluent
9 foreign body giant cells as a sign of chronic
10 inflammation, mainly located at the interface
11 the polymer."
12         Does that relate to the image
13 above or the next page?
14     A.    No, to this above.
15     Q.    And that's what you were
16 discussing before about showing the
17 inflammation evidence that that's been going
18 on for some time?  Is that true?
19     A.    This is the chronic foreign
20 body reaction that is ongoing lifelong that
21 happens to the filaments but to the particles
22 as well and this is -- yeah.
23     Q.    Page 73, the top of the page,
24 you have two images, the commentary says,

Page 590

1 "The thickness of this inflammatory
2 infiltrate is around 50 microns, but in some
3 areas with close distance between the
4 filaments, the entire space completely is
5 filled out by this inflammatory infiltrate.
6 In some areas, the accumulation of
7 inflammatory cells indicates a more active,
8 acute inflammatory reaction."
9        Tell me what it is about those
10 slides that demonstrate that the entire space
11 is filled out by this inflammatory
12 infiltrate.
13    A.    The fact that the entire space
14 between the filaments is completely filled
15 out by this infiltrate is not reflected in
16 these two images.
17    Q.    Okay.  What is depicted in
18 these images?
19    A.    You see on the left, you see
20 that I tried to measure the wall, the --
21 yeah, the inflammatory infiltrate, the
22 thickness of the inflammatory infiltrate very
23 close to the fiber and measured a distance of
24 about 50 microns here.

Page 591

1        On the left side close to the
2 polymer, you see some foreign body giant
3 cells in the red -- in the right picture --
4    Q.    Let's stop on the left for a
5 second.
6        How many foreign body giant
7 cells do you see?
8    A.    I didn't count them.
9    Q.    How do you determine what they
10 are?
11    A.    They are cells that -- that has
12 confluent nucleus, more than one nucleus, and
13 you have to go to the microscope and have to
14 go through the depth to identify whether it's
15 a giant cell, yes or not.  Otherwise, it can
16 be single cells laying over another.
17    Q.    You've used the term
18 "inflammatory infiltrate."
19        What is included in
20 inflammatory infiltrate?
21    A.    The inflammatory infiltrate, it
22 can be best seen on the right side where you
23 see a lot of these blue nucleus of these
24 cells.  These cells indicate this

Page 592

1 inflammatory infiltrate, and as we discussed
2 yesterday, it is a wide field to identify
3 which cells are specifically there.  Usually
4 there's about 40 percent that are positive
5 for markers that represent macrophages.
6 There are 30, 40 percent positive for markers
7 that are related to lymphocytes as the main
8 cells, but what's the name is specifically,
9 we're still working on it.
10    Q.    But the presence of the
11 inflammatory infiltrate itself is normal; is
12 that correct?
13    A.    Normal as it is in principle,
14 as it is compulsory of every foreign body
15 reaction.
16    Q.    What is abnormal about --
17        MR. ANDERSON:  Hold on.
18 QUESTIONS BY MR. THOMAS:
19    Q.    Did I interrupt you?  I didn't
20 mean to.
21    A.    In quantity, in quality, that
22 there is it, it is normal.  If you mean is it
23 normal in quantity, yeah.  For heavy-weight,
24 for a polypropylene, it is quantity that we

Page 593

1 can expect.
2        If you have other polymers, you
3 won't expect so much.
4    Q.    Okay.  What is it about the
5 nature of the inflammatory infiltrate that
6 you see at the top of page 73 creates a risk
7 of complications to Ms. Lewis?
8    A.    The inflammatory infiltrate
9 reflects an area of increased tissue
10 remodelling.  So you have an increased number
11 of cell dying there in -- you have an
12 increased turnover, you have an increased
13 proliferation of these cells there because
14 these inflammatory infiltrate has a more
15 rapid turnover than a -- than other tissues.
16    Q.    Is what you see --
17    A.    And, sorry --
18    Q.    I apologize.
19    A.    And, therefore, the presence of
20 an inflammatory infiltrate, that means that
21 there is a chronic wound, means an
22 intensified cell turnover with possible late
23 risks, but -- and an increased risk for
24 migration of the implant.

Page 594

1  QUESTIONS BY MR. THOMAS:
2      Q.   There was no evidence in the
3  Carolyn Lewis case that there was a migration
4  of the implant, was there?
5          MR. ANDERSON:  Objection.
6          THE WITNESS:  I cannot state
7      this from these sections.
8  QUESTIONS BY MR. THOMAS:
9      Q.   Okay.
10     A.   It's impossible.
11     Q.   Can you state that from your
12  review of the medical records in the case?
13         Do you know that?
14     A.   Whether it was a real
15  migration?
16     Q.   Yes.
17     A.   Of this?  No.
18     Q.   Okay.  Are the findings that
19  you've described in response to my questions
20  concerning the images at the top of page 23
21  consistent with the reaction that any
22  polypropylene mesh would have?
23     A.   With any heavy-weight, small
24  pore polypropylene meshes, they're completely

Page 595

1  consistent.
2      Q.   Okay.  Middle of page 73, what
3  do we see?
4      A.   We see, again, the holes where
5  the polymers has been.  You see an
6  inflammatory infiltrate around it and it
7  is -- it is an area where a folding and
8  doubling of the layers can be seen, but not
9  in this image, unfortunately, because we are
10  limited with -- the lowest magnification is
11  40, and, therefore, it is impossible to get a
12  good overview.  To really -- either -- no,
13  except of looking at the slides with a
14  microscope where you can see that the
15  configuration of the meshes are not in a
16  plane area any longer, the alternative would
17  be to make five, six images and to place them
18  together.
19         As we made it, we have seen it
20  already in some of the old documents where we
21  made these long combination of various
22  pictures to see the configuration of the
23  meshes.
24         MR. ANDERSON:  You said plane,

Page 596

1  you mean plane?
2          THE WITNESS:  A plane, yeah.
3  QUESTIONS BY MR. THOMAS:
4      Q.   So is it fair to understand
5  that it's your opinion that your microscopic
6  review of these slides shows you that there
7  was folding demonstrated, but this slide
8  that's in the middle, this image that's in
9  the middle of page 73 does not show that?
10     A.   That is -- that is correct.
11     Q.   And you need to see the entire
12  field in order to understand what you believe
13  to be folding demonstrated by that slide?
14     A.   That is correct.
15     Q.   Is the rest of the action --
16  excuse me.
17         Is the rest of the reaction in
18  the middle of page 73 that you've described
19  consistent with the foreign body reaction to
20  every heavy-weight, small pore mesh?
21     A.   Yes.
22     Q.   It is?
23     A.   Yes.
24     Q.   Thank you.

Page 597

1          MR. ANDERSON:  He was waiting
2      to make sure you distinguish
3      heavy-weight, small pore.  That's why
4      he was smiling.
5  QUESTIONS BY MR. THOMAS:
6      Q.   Page 73, the lower image, what
7  does the lower image depict?
8      A.   This is an image, I believe,
9  that the -- the expression of folding is
10  related to the lower image there.  There you
11  have the magnification of 40 and there you
12  have a wider view of the meshes.  And but in
13  reality when you look to the section, you see
14  further on where the mesh is going to.  Here
15  you have -- you see several places where the
16  polymer has been -- this is hardly to believe
17  that this is the mesh with the -- in plane
18  area without doubling or folding that you get
19  this section here.
20     Q.   And help me, I am sorry, it's
21  either late in the day or I'm not very smart,
22  maybe both.  The white areas in those, are
23  those actual polymers?
24     A.   These are some of the few parts

Page 598

1  where the polymers are still in place. The
2  others you only see the holes, but, of
3  course, there has been some polymers now
4  laying in between or being removed by the
5  knife.
6       Q.   So in order for you to conclude
7  that there's been folding here, you count
8  both the polymers that you see and the holes
9  where you suggest that polymers have been and
10  conclude from that that there had to be
11  folding?
12      A.   Yes.
13      Q.   Anything more than that that
14  supports your contention that there's
15  folding?
16      A.   No.  It is the appearance of
17  the holes where the polymers has been and the
18  geometrical configuration of these in a
19  section.
20      Q.   Is there anything else
21  remarkable about the lower slide on page 73
22  other than your testimony about the folding?
23      A.   No.
24      Q.   Is the foreign body reaction

Page 599

1  depicted in the lower slide on page 73
2  consistent with heavy-weight, small pore
3  meshes?
4       A.   Yes.
5       Q.   On page 73 at the top, what do
6  we see?
7       A.   This is an S100 staining and in
8  the little of the left part of the image,
9  there I expect there has been a polymer.  It
10  was removed by the preparation, and you have
11  some areas with a brown staining there and
12  this is consistent with the presence of a
13  nerve in the area.
14           As we have three sections which
15  are very close to each other, if you're
16  looking to all three sections with S100, you
17  see that it's not an artifact -- an
18  artificial staining in one slide, but it is
19  an ongoing structure going through all of
20  these three slides so that I have no doubts
21  that there's a small nerve.
22      Q.   Okay.  And as we said before,
23  the mere presence of a nerve is not
24  remarkable by itself?

Page 600

1       A.   Not for me, but there are
2  people who are -- for whom this is an
3  important message.
4       Q.   In the slides that you analyzed
5  for Ms. Lewis, did you find any evidence of a
6  neuroma?
7       A.   No.
8       Q.   Did you find any evidence of
9  infection?
10      A.   If I remember correctly, there
11  was an area where you have an enhanced or
12  where you have an intensified inflammatory
13  infiltrate in this field.  I know from
14  Professor Klosterhalfen that the definition
15  of infection sometimes is only the appearance
16  of some more inflammatory cells than usually
17  so, therefore, I cannot state it for sure
18  that there has been one.
19      Q.   Do you have an opinion to a
20  reasonable degree of scientific certainty
21  based on your review of the slides that's
22  been provided to you that Ms. Lewis has an
23  infection because of her mesh?
24      A.   I don't have sure proof that

Page 601

1  there was an infection.
2       Q.   So is it fair to understand you
3  don't have such an opinion?
4       A.   Have an opinion that I did not
5  see it.
6       Q.   Great.
7           MR. THOMAS:  Can we take a
8  break, please?
9        (Off the record at 3:54 p.m.)
10  QUESTIONS BY MR. THOMAS:
11      Q.   Doctor, I want to direct your
12  attention to the chart that appears at the
13  end of your report where you compile your
14  findings from the -- your review of the
15  slides and the spreadsheet has columns O, P,
16  Q, R where you record what you found from
17  your review of the slides.
18          Is that correct?
19      A.   That is correct.
20      Q.   The first column P says
21  bridging, 1, less than 5 percent; 2, 5 to
22  30 percent; 3, 30 to 80 percent; and 4,
23  greater than 80 percent.
24          How did you measure that?

Page 602

1    A.    If you look to the entire
2  section, you have some areas where you can
3  identify something like a pore because you
4  see some filament on the one side and on the
5  other side.  And if you look to the space in
6  between two adjacent filaments, then you can
7  assume this to be a pore.  And if this is
8  filled, if the area between the two
9  neighboring filaments, if this is filled by
10  fat tissue, I notice this in this chart and I
11  only saw one or two times in all these
12  sections that I got the image where I saw two
13  filaments and the space in between was not
14  filled by scar tissue.
15       So if I code this with more
16  than 80 percent, then you got in all these
17  sections four.
18    Q.    Is 80 percent consistent with
19  what you've described as scar plate
20  formation?
21    A.    Scar plate formation has been a
22  term in a specific period of time.  I think
23  it's consistent.
24    Q.    Okay.  Well, do you use a

Page 603

1  different term now to describe what you find
2  when you find bridging at greater than
3  80 percent?
4    A.    You have to be very careful
5  when using the term "scar plate" because some
6  people are thinking of the macroscopically
7  appearance and some are thinking of the
8  microscopically appearance.  So if you made
9  it clear, no problem with this, but you have
10  to be very precise in the definition of what
11  you're thinking of.
12       Overall, this is completely in
13  accordance what we expect that we have
14  predominantly bridged or this -- these pores
15  filled by scar tissue, yeah.
16       MR. ANDERSON:  So the first one
17    was macroscopically and then you said
18    microscopically.
19       THE WITNESS:  Microscopically.
20  QUESTIONS BY MR. THOMAS:
21    Q.    So when you say 80 percent
22  filled with scar, does that mean that there
23  is not room for capillary vessels?
24    A.    No.  You have capillary vessels

Page 604

1  in scar tissue as well.  So it means that you
2  have scar and scar is mainly consistent with
3  collagen leading to wound -- or being
4  major -- majorly important for the wound
5  contraction and some fibroblasts and, of
6  course, vessels.  The only area where you
7  hardly have vessels is very, very close to
8  the polymer fiber.
9       But the appearance of vessels
10  is no indicator of scar plate or scar net
11  or --
12    Q.    Do you know whether this
13  scaling that you've done for the bridging is
14  a method that's generally accepted by
15  pathologists to look at mesh explants?
16    A.    I made this scaling just for
17  these cases to give -- to be able to give an
18  impression of what I've seen there.
19    Q.    What is the significance in
20  your judgment of scaling of less than 5
21  percent?  Excuse me, strike that.
22       What is -- what is the
23  significance in your judgment of bridging
24  less than 5 percent?

Page 605

1    A.    You have to understand what we
2  tried in these 15, 20 years is not only to
3  make a qualitative description of the tissue
4  reaction but to find some quantitative an --
5  or way to make a quantitative analysis there.
6  And this is very difficult because from the
7  methods.  So, therefore, we make -- we
8  introduced -- there has been some time when
9  we use image analyzing.  Now we're coming
10  back to this coding, and the coding less than
11  5 percent means usually that you never see a
12  bridging in this specimen.
13    Q.    Why do you use 5 to 10 percent
14  as your next range?
15    A.    It is for scientific reasons
16  you should have at least four different
17  scoring levels, otherwise, you very likely go
18  to the middle and then you will not see any
19  difference so you need at least four
20  different levels and you have to start from
21  the extremes always and none and then you
22  have to fill in between.  I have no problem
23  to make it different.  And I made this coding
24  before looking to the images, and, therefore,

Page 606

1  I was bound to this.
2      Q.    Have you ever used this type of
3  coding before in analyzing mesh explants?
4      A.    We used such a type of coding
5  very, very often to give a semi-quantitative
6  analysis of our staining, yeah.
7      Q.    When you say "we," who do you
8  mean?
9      A.    I, in my projects where we
10 analyze these tissue samples, that is a major
11 aspect before we starting the analysis to
12 define the parameters and to define the
13 coding, how to make the readout there.
14     Q.    Okay.  Do you always use the
15 same numbers?
16     A.    No.  It varies from the
17 specific question there, but it is about four
18 to five.
19     Q.    Okay.  Under folding or
20 shrinkage, that's "or," so if it's either
21 folding or shrinkage, you capture it,
22 correct?
23     A.    Yes.
24     Q.    Didn't we decide that every

Page 607

1  mesh is going to fold -- excuse me, didn't we
2  decide that every mesh is going to shrink
3  approximately 20 percent?
4      A.    What I have been thinking of
5  when looking for this folding was a
6  double-layer structure which I cannot explain
7  by the video I saw where the sling is
8  implanted in a plane area, but when you have
9  the impression that you have two or three
10 layers of mesh materials on top of each
11 other, I would say that there's a folding.
12        And shrinkage is if you have a
13 configuration as a -- with a folding there in
14 this area.
15     Q.    So this says "folding or
16 shrinkage."
17     A.    Yeah.
18     Q.    If you found shrinkage of
19 20 percent, would that be a positive finding?
20     A.    This is a description of what
21 can be seen there.  What is the appearance
22 of --
23     Q.    I understand that.
24        What I'm trying to understand

Page 608

1  if you identified shrinkage of 20 percent,
2  would that be a positive finding in your
3  chart?
4      A.    I didn't measure the degree of
5  shrinkage.  It was not possible to do so.  It
6  was just a configuration of the mesh.
7      Q.    So if you saw any shrinkage at
8  all, it would be a positive finding?
9      A.    If I had the impression that
10 the configuration of the mesh changes by
11 pushing together, going to waves or by
12 doubling, these are the two different things
13 that indicates either shrinkage, pushing it
14 together, or folding --
15     Q.    The only reason I'm asking,
16 Doctor, is because I thought we decided that
17 all wounds shrink to some extent, generally
18 at least 20 percent.
19        And so as I understood your
20 testimony earlier, that means that every mesh
21 explanted would be a positive finding here.
22     A.    Sorry, it may be my fault that
23 I call it shrinkage.  I should have named it
24 waving form or deformation of the shape due

Page 609

1  to shrinkage.
2      Q.    Okay.  The last category,
3  "Nerve contact within one millimeter of
4  sling."
5        Have we -- do we agree that
6  there's nothing remarkable about nerve
7  contact in itself?  The nerves are going to
8  be --
9      A.    The fact that there are nerves
10 in this place is not remarkable.  The fact
11 that these nerves are laying in this scar
12 tissue gives a good explanation why some
13 patients have chronic pain.
14     Q.    Okay.  And if PVDF mesh is
15 placed for the treatment of stress urinary
16 incontinence and comes in contact with a
17 nerve, you would have the same risk of
18 chronic pain, correct?
19        MR. ANDERSON:  Objection.
20        Go ahead.
21        THE WITNESS:  I would assume
22 that if the nerve is laying in the
23 fields of scar that is close to PVDF
24 slings that there will be the chance

Page 610

1 for chronic pain as well.
2      However, the overall chance to
3 get entrapped into scar tissue, I
4 would expect is much lower and,
5 therefore, the risk for pain is much
6 lower when using large pore PVDF
7 structures.
8 QUESTIONS BY MR. THOMAS:
9    Q.    But we don't know that until we
10 study it, correct?
11    A.    We note from all our
12 experience, from all our work that the risk
13 for chronic pain decreases by using large
14 pore structures and decreasing the amount of
15 inflammatory reaction, yes, we know it
16 already.
17    Q.    From animal studies?
18    A.    No.  From clinical studies as
19 well.  We can go back to the guidelines where
20 it is favored, the advantage of large pore
21 meshes because of less chronic pain.
22    Q.    Have we covered all of your
23 opinions with respect to Carolyn Lewis?
24      MR. ANDERSON:  Objection.

Page 611

1      THE WITNESS:  I have the
2 impression that we covered a lot.
3 There are --
4 QUESTIONS BY MR. THOMAS:
5    Q.    I'm talking about Carolyn Lewis
6 specific to the mesh analysis that you did.
7      Have we covered it all?
8      MR. ANDERSON:  Objection.  With
9 "whether you've covered it all."
10      MR. THOMAS:  Well, I'm trying
11 to go to his report, Ben, and I think
12 I've covered every sentence in the
13 report that deals with the mesh.  If
14 there's something that's in the report
15 that I don't know about --
16      MR. ANDERSON:  The only issue,
17 Dave, is that he said that a lot of
18 the slides that you can't put those
19 types of fields into a one-dimensional
20 report, and I told you that I would
21 provide you mine and you were going to
22 send me your guy's.  So whether or not
23 there are similar but expanded
24 opinions based upon a larger review of

Page 612

1 a slide, that's the only thing I can
2 think of.  If that makes sense.
3      MR. THOMAS:  I just want to
4 make sure I haven't missed something
5 in his report in the information that
6 you provided to me here that I need to
7 explore.
8      MR. ANDERSON:  Anything
9 significant.
10      MR. THOMAS:  Either you or the
11 doctor can tell me, if there's
12 something else I need to explore, I
13 want to do it, otherwise, I'm about to
14 quit.
15      MR. ANDERSON:  I think he's
16 listed in his report in the grid and I
17 think you've covered most all of that
18 for her and I don't know if you
19 covered all of the path slides that
20 are in the back or not.
21      MR. THOMAS:  Well, that's the
22 problem is I don't know which ones are
23 hers.
24      MR. ANDERSON:  Yeah, you do.

Page 613

1 The grid says 13-23 and then the
2 images correspond.  That's one of the
3 reasons I gave that to you to try to
4 make that a little easier.
5      MR. THOMAS:  Thank you.
6      Are they in order?
7      MR. ANDERSON:  They're in
8 order.  Yours is in order of this
9 grid, but hers should be last.
10      MR. THOMAS:  They're not.  No.
11      MR. ANDERSON:  They're grouped
12 together.
13      MR. THOMAS:  Okay.
14      MR. ANDERSON:  There we go.  If
15 you find the dark ones, it makes it
16 easier.
17      MR. THOMAS:  The first one that
18 I have here appears to be -- and
19 they're not numbered so I can't give
20 you a page number, but in Exhibit 11,
21 the first one that I have appears to
22 match the one on page 71.
23      MR. ANDERSON:  And that's why
24 we said we have to go through them and

Page 614

1   see if they're -- all of them are
2   listed.  We just have to count them.
3   There's 13 images in the back that I
4   count of the report and you're in the
5   middle of them right now.
6           MR. THOMAS:  Let's go to the
7   last one.
8           MR. ANDERSON:  Show me which
9   slide.
10  QUESTIONS BY MR. THOMAS:
11      Q.    The last slide that I have in
12  front of me, I'm sorry, it's not numbered,
13  but it's BAL 13-23, which is the patient
14  identifier.  On the right, it has a scale of
15  100 microns, and in the middle of the slide,
16  it shows what appears to be a measurement of
17  43.15 microns.
18          Is that a -- that's the one on
19  page 73?
20      A.    Uh-huh.
21      Q.    Is that right?
22      A.    Seems to.  Yeah, I will agree.
23          MR. THOMAS:  So you counted 13?
24          MR. ANDERSON:  I think that's

Page 615

1   right.
2           MR. THOMAS:  And there are 13
3   in the report.
4           (Klinge Exhibit 25 marked for
5   identification.)
6   QUESTIONS BY MR. THOMAS:
7       Q.    Let me mark as Deposition
8   Exhibit Number 25 the chart that we've been
9   consulting, correct?
10      A.    Yes.
11      Q.    And that's where you recorded
12  your findings from your review of the slides
13  that we've been discussing, correct?
14      A.    Yes, these are my results.
15      Q.    And it also includes the
16  information that Mr. Anderson provided about
17  the chain of custody and the source of
18  documents that you received, fair?
19      A.    Yes.
20      Q.    Dr. Klinge, did you ever tell
21  Ethicon that they should not sell the
22  Prolene® mesh used for the treatment of
23  stress urinary incontinence?
24      A.    No.

Page 616

1           MR. THOMAS:  Those are all of
2   the questions I have.
3           CROSS EXAMINATION
4   QUESTIONS BY MR. ANDERSON:
5       Q.    Dr. Klinge, you were asked a
6   few questions a few minutes ago by counsel
7   regarding whether or not you had a residency
8   or a fellowship in pathology.
9           Do you remember those
10  questions?
11      A.    Yes.
12      Q.    Dr. Klinge, approximately when
13  did you begin reviewing pathology slides of
14  explanted meshes?
15      A.    We -- I started to have a look
16  through the microscope to these explanted
17  meshes in 1994.
18      Q.    And was that as part of the
19  work with the IZKF-BIOMAT cross-functional
20  team at Aachen University?
21      A.    It was in relation to this
22  project with the IZKF in collaboration with
23  Professor Klosterhalfen at that time.
24      Q.    Is it fair to say that

Page 617

1   Dr. Klosterhalfen trained you as a
2   pathologist to review the histopathological
3   slides of foreign body reaction to implanted
4   meshes?
5           MR. THOMAS:  Object to the form
6   of the question.
7           THE WITNESS:  Yes.
8   QUESTIONS BY MR. ANDERSON:
9       Q.    You said "yes"?
10      A.    Yes.
11      Q.    Since that time in 1994 when
12  you first began looking at slides from either
13  animals or human tissue of explanted meshes,
14  approximately how many times have you
15  reviewed such slides and analyzed them?  How
16  many slides?
17      A.    How many slides?  It's
18  difficult to estimate, but I've -- I estimate
19  it's more than 25,000.
20      Q.    And as part of your review of
21  over 25,000 slides of the histopathology of
22  explanted meshes, have you also published on
23  some of those reviews?
24          MR. THOMAS:  Object to the form

Page 618

1    of the question.
2    QUESTIONS BY MR. ANDERSON:
3        Q.    In the peer-reviewed
4    literature?
5        A.    Yes.  Yes.
6        Q.    And have there been times where
7    you have published in the peer-reviewed
8    literature where you were the only
9    pathologist that was reviewing the slides for
10   the work that was contained in the study?
11       A.    Yes.
12           MR. THOMAS:  Object to the form
13       of the question.
14   QUESTIONS BY MR. ANDERSON:
15       Q.    You said "yes"?
16       A.    Yes.
17       Q.    Okay.  And have you presented
18   at Congresses and conferences to your
19   colleagues and others with regard to your
20   analysis of histopathological review of
21   slides from explanted tissue in either humans
22   or animals?
23           MR. THOMAS:  Object to the form
24       of the question.

Page 619

1           THE WITNESS:  Yes.  And it is a
2       common procedure that a scientist made
3       his own personal analysis of the
4       tissues and made the analysis and the
5       presentation of these data by himself.
6    QUESTIONS BY MR. ANDERSON:
7        Q.    A little while ago counsel was
8    asking you some questions about your choice
9    of using the S100 staining with regard to
10   your review of these 22 explants.
11           Do you recall that part?
12       A.    Yes.
13       Q.    He also asked you some
14   questions to which you responded that this
15   was something that you and Bernd
16   Klosterhalfen had discussed many years ago
17   about the choice of S100.
18           Do you remember that part of
19   your question?
20       A.    Yes.
21       Q.    When you were answering these
22   questions, you were talking -- strike that.
23           You never talked to
24   Dr. Klosterhalfen about whether to use S100

Page 620

1    for this case; is that correct?
2        A.    Yes, that's correct, I never
3    talked to him.
4        Q.    Yesterday counsel was asking
5    you some questions about this time period
6    from 1994 to 2000 when you were in this
7    cross-functional team with the IZKF-BIOMAT in
8    Aachen with the group Ethicon Norderstedt.
9           Do you recall that part of your
10   testimony?
11       A.    Yes.
12       Q.    He asked you whether that time
13   period dealt with the treatment of stress
14   urinary incontinence.
15           So my question is this:
16   Dr. Klinge, do you consider that your work
17   that you did in the '90s in developing VYPRO
18   and in working with this BIOMAT team, the
19   publications that you've done over the last
20   20 years, the conferences you've spoken at
21   and all of the work that you've done in this
22   field of biomaterial research and the tissue
23   response to surgical meshes as well as your
24   work as a hernia surgeon relates equally to

Page 621

1    hernia surgery mesh and the body's reaction
2    to it, pelvic organ prolapse mesh and the
3    body's reaction to it and sling mesh and the
4    body's reaction to it?
5           MR. THOMAS:  Object to the form
6       of the question.
7           THE WITNESS:  In regard to the
8       biological response to these meshes,
9       to these hernia meshes, there are a
10      lot of similarities that allows us to
11      make conclusions for both of this.
12      There are, of course, severe
13      differences or significant differences
14      in regard to functional analysis or
15      biomechanics, but the tissue reaction
16      to a polymer is a lot of similarities.
17   QUESTIONS BY MR. ANDERSON:
18       Q.    Is one of the similarities that
19   all of this work that we've been discussing
20   for the last two days and the things that I
21   listed in my former question to you help
22   scientists like yourself try to predict the
23   tissue response to particular surgical
24   meshes?

Page 622

1    MR. THOMAS: Object to the form
2  of the question.
3    THE WITNESS: Yes, in fact, it
4  is this knowledge that we acquired in
5  these years that allow us to make this
6  analysis, to define requirements for
7  textiles in this field and it is
8  usually very appreciated when we
9  present our experiences of these
10  15 years to urogynecologists.
11  QUESTIONS BY MR. ANDERSON:
12    Q.   Thank you, Doctor.
13    Yesterday counsel asked you
14  some questions as well regarding whether or
15  not anyone in Aachen had a direct role in the
16  development of ULTRAPRO™.
17    Do you recall those questions?
18    A.   Yes.
19    Q.   Whether or not anyone had a
20  direct role in the research and development
21  of ULTRAPRO™, do you consider the work that
22  you and your team in conjunction with Ethicon
23  did on VYPRO to be the foundational
24  principles upon which ULTRAPRO™ was designed?

Page 623

1    A.   I think it was quite clear that
2  ULTRAPRO™ was the successor of the VYPRO, and
3  it just replaced an oligofilament mesh
4  materials by monofilament and what we tried
5  with the IZKF funding where we tried to do
6  and realized with the PVDF that was done by
7  Ethicon with polypropylene and Monocryl. And
8  as a consequence, I guess that, therefore, I
9  got royalties for the ULTRAPRO™, not only for
10  the VYPRO because of this close relationship.
11    Q.   So is it fair to say that you
12  were receiving royalties for ULTRAPRO™ sales
13  at the same time that you were telling
14  Ethicon that you believed and that the Aachen
15  group believed that PVDF was a superior
16  material to polypropylene?
17    MR. THOMAS: Object to the form
18  of the question.
19    THE WITNESS: There is an
20  overlapping time period there.
21    So, again, just to make it
22  clear, ULTRAPRO™ took over the
23  principles of the VYPRO, the large
24  pore concept, the material reduced

Page 624

1  concept, therefore, it includes what
2  we have collaborated for the VYPRO,
3  but the specific details of the
4  textile construction, there we haven't
5  been involved.
6  QUESTIONS BY MR. ANDERSON:
7    Q.   Okay. Yesterday counsel asked
8  you some questions about Exhibit 9, which
9  were the meeting minutes from the Suvretta
10  meeting in 2003 in St. Moritz.
11    Do you remember that?
12    A.   Yes.
13    Q.   And he asked you some questions
14  about the part of your presentation where you
15  were discussing whether a scar plate or a
16  scar net might begin to -- that would appear
17  to be between 600 and 800 microns.
18    Do you remember that part of
19  your testimony yesterday?
20    A.   Yes.
21    Q.   I want to show you what we've
22  marked as Klinge Deposition Number 26 to your
23  deposition.
24    (Klinge Exhibit 26 marked for

Page 625

1  identification.)
2  QUESTIONS BY MR. ANDERSON:
3    Q.   Do you recognize this
4  publication?
5    A.   Yes.
6    Q.   And this is a publication in
7  2002 in the Journal of Surgical Research?
8    A.   Yes.
9    Q.   And are you one of the authors
10  along with those from the BIOMAT -- the
11  IZKF-BIOMAT group?
12    A.   Yes, I was the author.
13    Q.   And if you turn to the very
14  last page under the "Acknowledgements"
15  section as well as at the bottom of the page,
16  does this indicate who provided funding?
17    A.   Yes.
18    Q.   And which company provided
19  funding to this research?
20    A.   Most supported by Ethicon and
21  by the IZKF-BIOMAT.
22    Q.   Because this was the time --
23  this is the time that you're working closely
24  with them on developing VYPRO?

Page 626

1    A.    No, this was after this time
2  where we developed the VYPRO, but it was the
3  time where we worked close together and had
4  several ongoing projects together.
5    Q.    And if we turn to page 213 of
6  this article from 2002, if we look to the
7  left-hand column, down where the words begin
8  "As a result," what does that say?
9         Does it say, "As a result, the
10 large pore sized greater than 2-millimeter
11 mesh is integrated in a loose network of
12 perifilimentary granulomas and plenty of fat
13 tissue in between.  Whereas the monofilament
14 mesh with its smaller pores almost
15 exclusively is imbedded into granulomas and
16 scar tissue which bridges the whole pore
17 diameter of less than 1 millimeter"?
18        Did I read that correctly?
19   A.    Yes.
20   Q.    Does that language that you've
21 seen appear in Ethicon documents?
22   A.    Yes.
23        MR. THOMAS:  Object to the form
24   of the question.

Page 627

1         THE WITNESS:  Yes, I've seen it
2    in many documents, and I'm sure I have
3    repeated many of these phrases
4    yesterday and today.  Because it's
5    still our belief.
6  QUESTIONS BY MR. ANDERSON:
7    Q.    And given that -- strike that.
8         So this journal article that
9  was published in -- based upon studies that
10 were funded, at least in part by Ethicon, was
11 in 2002, and your presentation in St. Moritz
12 was in 2003.
13        So my question is you've listed
14 a limit of 1,000 microns in the 2002 article
15 with regard to a limit where fibrotic
16 bridging may be seen, whereas in the panel
17 discussion in Suvretta in 2003, you listed
18 600 to 800 microns.
19        Can you please explain that?
20   A.    At that time, we had -- we made
21 several attempts to make measure the pore and
22 the bridging and we started at that time with
23 the Marlex mesh and before I saw somewhere in
24 the documents that there is a PowerPoint

Page 628

1  presentation in 2000, 2001 showing the
2  distribution of the pores based on the Marlex
3  mesh and there we indicated that there may be
4  a -- that in these specimen that we measured
5  at that time there was a limit in between
6  600, 800 microns.
7         In the other article, we want
8  to express that a -- wanted to say or to be
9  on a -- in a range that -- where you can
10 expect that you get pores without this
11 bridging, there we find this is 1 millimeter
12 and in between, I guess, there has been the
13 experiment that later on has been published
14 by Conze with IPOM where we again measured
15 all of these distances.
16        So, yeah, we learned that it
17 depends from the polymer that is affected by
18 the animal model there, but, however, we
19 wanted to give a range or to give a hint
20 where the border lays and, therefore, we said
21 1 millimeter.
22        If you look to the documents
23 later on, in the presence of tension,
24 Klosterhalfen advised 3 millimeters in some

Page 629

1  meetings there, and so I've no disagreement
2  to this.  So you see that there was a
3  evolution of these advises and you have to be
4  carefully looking to the specific conditions
5  in what condition this was expressed there.
6    Q.    And during that time period in
7  the late '90s and early 2000s, were most of
8  the heavy-weight, small pore meshes somewhere
9  in this 600 to 1,000-micron pore size?
10        MR. THOMAS:  Object to the form
11   of the question.
12 QUESTIONS BY MR. ANDERSON:
13   Q.    In a linear measurement?
14   A.    Yeah.  We didn't realize that
15 the Prolene® is around this 1 millimeter in
16 this.  And maybe that there will be an
17 upcoming question whether this millimeter is
18 enough or it's not enough.  If we have known
19 at that time that this may be a problem, we
20 would have thought a little bit more
21 precisely to find maybe another border, to
22 find another border there.
23   Q.    Whether the limit is at
24 950 microns and 1,050 microns, is it safe to

Prof. Dr. Med Uwe Klinge

Page 630

1  say that in all of the explants of Prolene®
2  old construction 6-mil mesh, whether it was
3  in the explants that you looked at from
4  animal studies back during your time working
5  with Ethicon or in any of the explants that
6  had been done both in the 1,000 hernia
7  explants as well as the greater than 400
8  explants that have been looked at from the
9  pelvic floor, have you consistently had an
10 observation with regard to the way Prolene®
11 old construction 6-mil mesh that's used in
12 the TVT® slings reacts in the tissue in terms
13 of its pore size?
14      MR. THOMAS:  Object to the form
15 of the question.
16 QUESTIONS BY MR. ANDERSON:
17     Q.    Have you noticed any sort of
18 pattern or consistency there?
19     MR. THOMAS:  Same objection.
20     THE WITNESS:  In all of these
21 sample that we had a look to it,
22 Prolene® behaves as a heavy-weight,
23 small pore mesh regardless whatever
24 figures are printed out.  The

Page 631

1  morphology of the tissue examination,
2  with the extent of the geometry of the
3  scar formation makes it clear that the
4  old Prolene® is a -- behaves like a
5  small pore -- heavy-weight, small pore
6  mesh.
7      QUESTIONS BY MR. ANDERSON:
8      Q.    And a few minutes ago when
9  counsel was asking you some questions about
10 the pathology slides and he said -- when
11 you're looking at these slides of TVT®
12 meshes, he asked you is this a normal
13 fibrotic response or a normal tissue
14 response.
15     Do you remember those types of
16 questions?
17     A.    Yes.
18     Q.    And you said -- your testimony
19 was normal or what we usually see with regard
20 to a heavy-weight, small pore mesh.
21     Do you remember that part of
22 your testimony?
23     A.    Yes, I remember that part.
24     Q.    Is that what you're referring

Page 632

1  to now with regard to the fibrotic bridging
2  you've seen with Prolene®?
3      MR. THOMAS:  Object to the form
4  of the question.
5      THE WITNESS:  Again, it is
6  clear that it is normal for a high
7  risk -- with a mesh for high risk for
8  fibrosis.  For a high-risk mesh, this
9  is a normal reaction.
10 QUESTIONS BY MR. ANDERSON:
11     Q.    And do you believe that the
12 Prolene old construction 6-mil mesh used in
13 TVT® is a high-risk mesh with regard to
14 heavy-weight, small pore mesh that leads to
15 fibrotic bridging and complications in
16 patients?
17      MR. THOMAS:  Object to the form
18 of the question.
19     THE WITNESS:  It's a high risk
20 in regard to the extent of
21 inflammation, scarring, shrinkage,
22 dimension or the amount of material.
23 QUESTIONS BY MR. ANDERSON:
24     Q.    And do you hold that opinion to

Page 633

1  a reasonable degree of medical and scientific
2  certainty?
3      A.    Absolutely.  I'm convinced of
4  it and there's huge evidence for this.
5      (Klinge Exhibit 27 marked for
6  identification.)
7  QUESTIONS BY MR. ANDERSON:
8      Q.    I show you what I've marked as
9  Klinge Exhibit Number 27.
10     Have you seen this article
11 before entitled, "The Argument for
12 Light-Weight Polypropylene Mesh in Hernia
13 Repair" from Surgical Innovation in 2005?
14     Have you seen this before?
15     A.    Yes, I've seen it before.
16     Q.    And do you know these authors,
17 William Cobb, Kent Kercher and Todd Heniford?
18     A.    Yes, I know them.
19     Q.    And is Todd Heniford the hernia
20 surgeon that you mentioned with reference to
21 the Suvretta conference in 2003?
22     A.    Yeah, I met him there and at
23 several conferences in Europe as well.
24     Q.    And you understand after

Prof. Dr. Med Uwe Klinge

Page 634

1 reviewing materials that I've sent you, that
2 Dr. Heniford is an expert for Ethicon in this
3 litigation?
4     A.    Even more, he's an expert for
5 the argument of light-weight polypropylene.
6 Of the use of light-weight meshes.
7     Q.    If we turn to Dr. Heniford's
8 publication, on page 2, which on this
9 publication is on page 64 at the top left of
10 Exhibit 27, what is the weight listed for
11 Prolene®?
12     A.    Prolene® here, it's given
13 105-gram per square meters.
14     Q.    And it's lighter or heavier
15 than Marlex?
16     A.    It is heavier.
17     Q.    And if we turn over to page 67
18 of this article by Dr. Heniford and his
19 colleagues, do you see the section "Degree of
20 Shrinkage"?
21     A.    Yes, I see it.
22     Q.    And reading under there, "One
23 concern with the long-term implantation of
24 mesh is the amount of shrinkage or passive

Page 635

1 compression the material undergoes.  All
2 available meshes regardless of their
3 composition, experience a 20 to 50 percent
4 reduction in their initial size."
5     Did I read that correctly?
6     A.    Yes.
7     Q.    Was that the state of knowledge
8 as of 2005 based upon your understanding and
9 your work that meshes could shrink from 20 to
10 50 percent?
11     MR. THOMAS:  Object to the form
12 of the question.
13     THE WITNESS:  Yes, I agree.
14 QUESTIONS BY MR. ANDERSON:
15     Q.    Is that part of what you were
16 testifying to earlier when answering
17 Mr. Thomas's questions regarding amount of
18 shrinkage that you can expect from
19 polypropylene meshes in the human body?
20     A.    It's in accordance to what I
21 said.
22     Q.    If you turn over to page 68, in
23 this Heniford article, if you look down to
24 the second -- the column on the right in the

Page 636

1 sentence in Dr. Heniford's article, it says,
2 "In contrast, the small pore mesh was
3 incorporated entirely in perifilimentary
4 granulomas and scar tissue which bridged the
5 whole pore diameter of less than 1
6 millimeter."
7     Did I read that correctly?
8     A.    Yes.
9     Q.    And we have the diagrams down
10 below showing that, "A 4-millimeter pore size
11 will not show the granulomas touching of a
12 light-weight mesh, whereas a 0.8-millimeter
13 pore size does have the granulomas touching
14 of a heavy-weight mesh."
15     Do you see that?
16     A.    Yes, I see that.
17     Q.    So according to this article,
18 would Dr. Heniford and his colleagues'
19 opinions be consistent with your own with
20 regard to the percentage of shrinkage of
21 meshes in vivo as well as the limit of around
22 1,000 microns to prevent fibrotic bridging?
23     MR. THOMAS:  Object to the form
24 of the question.

Page 637

1     THE WITNESS:  All of these
2 statements by -- published or
3 concluded in this manuscript confirms
4 my opinions in regard to shrinkage and
5 required pore size to prevent
6 bridging.
7 QUESTIONS BY MR. ANDERSON:
8     Q.    And if we look to the left
9 under the paragraph that begins, "In a dog
10 model," does that paragraph indicate that
11 polypropylene meshes shrink 30 to 50 percent
12 of their original size within two to six
13 months after implantation.
14     Do you see that?
15     A.    Yes, I see it.
16     Q.    Is that consistent with the
17 opinions that you've stated to counsel here
18 today?
19     A.    Yeah.  It is -- it confirms
20 that the extent of shrinkage is higher in
21 heavy-weight -- when using heavy-weight
22 materials and can be reduced by using
23 material-reduced meshes.
24     Q.    And these ideas of the amount

Page 638

1 of contraction that could be expected in vivo
2 of polypropylene meshes, was this information
3 that Ethicon was aware of as a result of your
4 work with them going back to the '90s?
5         MR. THOMAS:  Object to the form
6 of the question.
7         THE WITNESS:  Yes.  And yeah.
8         MR. THOMAS:  Can we take a real
9 quick break?
10        MR. ANDERSON:  Yeah.
11        MR. THOMAS:  Just ten seconds.
12    (Off the record at 4:44 p.m.)
13 QUESTIONS BY MR. ANDERSON:
14    Q.    I don't remember the exhibit
15 that we had with Professor Klosterhalfen with
16 this document the other day, but if we have
17 the minutes from 2007.
18        I'm going to show you what we
19 marked the other day as Klosterhalfen
20 Exhibit 11, which are the minutes from the
21 meeting in Norderstedt in 2007.
22        You've seen this document
23 before?
24    A.    Yes, I've seen it.

Page 639

1    Q.    And at that meeting, if you
2 turn to page 2, do you see a heading "Factors
3 Related to Mesh Shrinkage"?
4    A.    Yes.
5    Q.    By a Ms. Spychaj?
6    A.    Yes.
7    Q.    S-p-y-c-h-a-j.
8        MR. THOMAS:  Object to the form
9 of the questions related to that
10 document.  Was he at that meeting?
11 Was he shown being in attendance?
12        MR. ANDERSON:  I don't know.
13 It doesn't show him being there.
14        MR. THOMAS:  That's what I
15 thought.  Just a continued objection
16 to his comments because he wasn't
17 there.
18        MR. ANDERSON:  Sure.  I don't
19 think he has to be present at meetings
20 to be able to look at the PowerPoints
21 that were there.
22 QUESTIONS BY MR. ANDERSON:
23    Q.    And this PowerPoint entitled
24 "Factors Related to Mesh Shrinkage," you've

Page 640

1 seen this document before?
2    A.    Yes, I've seen it.
3    Q.    And if we turn over into the
4 document where it says "pore size" from this
5 presentation in -- at Ethicon February 23,
6 2007, does that page indicate on a slide by
7 Kirsten Spychaj, "Small porous meshes less
8 than 1 millimeter lead to fibrotic bridging
9 and increase shrinkage"?
10    A.    Yeah.
11    Q.    "Large porous meshes allow for
12 a better and faster tissue ingrowth and less
13 shrinkage and contraction"?
14    A.    That is a correct summary.
15    Q.    And down below where it says,
16 "less than 1 millimeter" in the three little
17 circles, these are drawings that you've seen
18 before?
19    A.    Yes, I've seen it.
20    Q.    And these little red dots,
21 would those indicate the peri-filamentous
22 granulomas that you were referring to
23 earlier?
24        MR. THOMAS:  Object to the form

Page 641

1 of the question.
2        THE WITNESS:  Maybe it can be
3 interpreted in this way.
4 QUESTIONS BY MR. ANDERSON:
5    Q.    So this would be a depiction of
6 the size of pores after implanted in the body
7 as a depiction of that, correct?
8        MR. THOMAS:  Object to the form
9 of the question.
10        THE WITNESS:  That is correct.
11 It's quite similar to the images that
12 have been in the publication from
13 Heniford.
14 QUESTIONS BY MR. ANDERSON:
15    Q.    And have you seen this image of
16 pores less than 1 millimeter leading to
17 fibrotic bridging that we see here on -- I'll
18 have to mark this as Plaintiff's Exhibit 28.
19    (Klinge Exhibit 28 marked for
20 identification.)
21 QUESTIONS BY MR. ANDERSON:
22    Q.    Is this an image that you've
23 seen many times throughout the Ethicon
24 documents that you've reviewed over the last

Page 642

1 two years in these litigations?
2    A.    Yes, many times.  Many times.
3 And I've never seen any document showing that
4 this is not a fact.
5    Q.    Have you seen in any of the
6 peer-reviewed literature in the last 20 years
7 anyone who has disputed the fact that you
8 need greater than 1 millimeter pore size to
9 prevent fibrotic bridging in the tissues?
10        MR. THOMAS:  Object to the form
11    of the question.
12        THE WITNESS:  No, I don't know.
13    No, any study, any discussion that
14    claimed to have facts that are in
15    contradiction to this finding, to this
16    estimate, to this interpretation.
17 QUESTIONS BY MR. ANDERSON:
18    Q.    In the worldwide peer-reviewed
19 literature over the last 20 years, have you
20 seen any scientist or surgeon who has
21 published regarding looking at -- has
22 published regarding studies either looking at
23 animal explanted mesh or human explanted mesh
24 who have indicated that light-weight, large

Page 643

1 pore meshes versus heavy-weight, small pore
2 meshes, that the heavy-weight, small pore
3 meshes induce fibrotic bridging and scarring
4 and contraction, whereas larger pore, lighter
5 weight meshes do not?  Has anyone in 20 years
6 refuted those findings based upon the
7 indications that I just gave you?
8        MR. THOMAS:  Object to the form
9    of the question.
10        THE WITNESS:  Do less.  Larger
11    pores do less fibrotic reaction, but I
12    never saw or were confronted with
13    someone disputing this findings.
14 QUESTIONS BY MR. ANDERSON:
15    Q.    Have you ever seen in
16 peer-reviewed worldwide publication in the
17 last 20 years any researchers other than
18 yourself and Dr. Klosterhalfen who have
19 reviewed as many explanted meshes from both
20 animals and human beings for hernia, POP and
21 SUI and reported on those in the worldwide
22 literature, any other scientists other than
23 the two of you?
24        MR. THOMAS:  Object to the form

Page 644

1    of the question.
2        THE WITNESS:  No.
3        (Klinge Exhibit 29 marked for
4    identification.)
5 QUESTIONS BY MR. ANDERSON:
6    Q.    Showing you what we will mark
7 as Klinge Exhibit 29.
8        Showing you what we have marked
9 as Plaintiff's -- I am sorry, as Klinge
10 Exhibit 29, have you seen this -- have you
11 seen this e-mail before during this
12 litigation?
13    A.    No.
14    Q.    Okay.  An e-mail from Joerg
15 Holste to Jonathan Meek dated April 22, 2009.
16        Do you see that?
17    A.    Yes, I see it.
18    Q.    And in the first line,
19 "Jonathan, the border for scar plate
20 formation in small pore standard weight
21 meshes was set around 1,000 microns."
22        Do you see that?
23    A.    Yes, I see it.
24    Q.    And is this Joerg Holste that

Page 645

1 you have worked with since the '90s going
2 back all the way back to your IZKF-BIOMAT
3 work with Ethicon to develop VYPRO?
4    A.    That's true.
5        (Klinge Exhibit 30 marked for
6    identification.)
7 QUESTIONS BY MR. THOMAS:
8    Q.    Showing what we will mark as
9 Klinge Exhibit 30.
10        This is a Klinge -- sorry, this
11 is a clinical expert report from Piet Hinoul,
12 medical director, Ethicon, department of
13 medical affairs.
14        Do you see that?
15    A.    Yes, I see it.
16    Q.    It's dated September 25, 2012?
17    A.    Yes.
18    Q.    If you turn over to the page
19 four pages back, which ends in Bates
20 number 5782, under Prolene®, what does he
21 list as the maximum pore size in millimeters?
22    A.    The pore size of less than 1
23 millimeter.
24    Q.    Thank you.

Page 646

1   Showing you what we will mark
2   as Klinge Exhibit 31 -- wait a minute.
3   Actually you -- strike that.
4   Showing you what was previously
5   marked by counsel as Klinge Exhibit 21.
6   There was this International Urogynecology
7   Journal from Moalli and some of her
8   colleagues entitled "Tensile Properties of
9   Five Commonly Used Midurethral Slings
10  Relative to the TVT® " from May 2008.
11  Do you remember counsel showing
12  you this?
13  A.   Yes, I remember.
14  Q.   And he showed you on the top of
15  what is page 57 of this article, he showed
16  you the pore size of Gynecare being listed as
17  1379.
18  Do you see that?
19  A.   Yes, I see it.
20  Q.   And at the top of that under
21  Table 1, it says, "Textile Properties
22  Provided by the Manufacturers."
23  Do you see that?
24  A.   Yes, I see it.

Page 647

1   Q.   Did you see there -- strike
2   that.
3   There was some questions by
4   counsel about their measurements of the pore
5   size in this article.
6   Do you see anywhere in this
7   article where these authors measured these
8   pore sizes?
9   A.   No.   As it is indicated there,
10  they took it from the manufacturer.
11  (Klinge Exhibit 31 marked for
12  identification.)
13  QUESTIONS BY MR. ANDERSON:
14  Q.   Showing you what we will mark
15  as Klinge Exhibit 31, under "Proprietary
16  Mesh," do you see here where they list there
17  under "Proprietary Mesh," it says, "Largest
18  pore size"?
19  Do you see that?
20  A.   Yes, I see it.
21  Q.   And do you see 1379 --
22  1,379 microns listed here by the
23  manufacturer?
24  A.   Yes, I see it.

Page 648

1   Q.   Other than being listed in
2   this -- I am sorry, let's go to the cover
3   page.
4   It has, "Demand the most proven
5   technology when selecting a midurethral
6   sling.   Make data and safety your choice"
7   with the surgeon on the front.
8   Do you see that?
9   A.   Yes, I see it.
10  Q.   And in this document where they
11  list 1,379 microns --
12  A.   Yes.
13  Q.   -- based upon your review of
14  the depositions and the testing and the
15  porosity and pore size evaluations by
16  numerous Ethicon employees, have you ever
17  seen any indication in any of those that
18  there was a measurement of a pore size of
19  Prolene® of 1,379 microns for the mesh used
20  in TVT® anywhere in your review?
21  MR. THOMAS:   Object to the form
22  of the question.
23  QUESTIONS BY MR. ANDERSON:
24  Q.   Other than on this promotional

Page 649

1   document by Ethicon, based upon your review
2   of the depositions of Dan Burkley and all of
3   the other documents that you've seen, have
4   you ever seen them come up with a number of
5   1,379?
6   A.   No, I didn't see it.
7   Q.   In fact, according to their
8   medical affairs director, Piet Hinoul, in
9   this 2012 expert report, which was Klinge
10  Exhibit 30, he says it's less than 1
11  millimeter, correct?
12  A.   Yes.
13  MR. THOMAS:   Object to the form
14  of the question.
15  QUESTIONS BY MR. ANDERSON:
16  Q.   Going back to this Moalli
17  article -- turning to this page where it says
18  Figure 4, is this uniaxial testing that's
19  being shown?
20  A.   Yes, it's uniaxial testing.
21  It's quite similar to what we did with
22  Professor Mühl's machine.
23  Q.   And these are the photos of A,
24  B and C that you have as images in your

Page 650

1 report, correct?
2    A.    Yes.
3    Q.    Okay.  Doctor, I want to ask
4 you one more thing about this Prolift+M®
5 document.
6         Here it shows a weight of what
7 would be 76 grams per centimeter squared.
8         Do you see that?
9    A.    Yes, I see it.
10    Q.    So this would be a lighter
11 Prolene® mesh than actually the old
12 construction 6-mil mesh, correct?
13    A.    Per the other -- yes.
14    Q.    So would you expect the pore
15 size of the heavier weight Prolene® mesh to
16 be just as small, if not smaller, than the
17 Prolene® 76 grams per meter squared mesh?
18         MR. THOMAS:  Object to the form
19    of the question.
20         THE WITNESS:  It is difficult
21    to -- for me to find this relation
22    between weight and pore size.
23 QUESTIONS BY MR. ANDERSON:
24    Q.    And when you were looking at

Page 651

1 the pore size of Prolene® with
2 Dr. Klosterhalfen back in the late '90s and
3 early 2000s, was it your best estimate as of
4 that time that the old construction 6-mil
5 Prolene® fibers used in all of the TVT®
6 devices had a pore size of 1,000 microns or
7 less?
8         MR. THOMAS:  Object to the form
9    of the question.
10         THE WITNESS:  It is when we
11    made this linear measurements in one
12    dimension, we got figures around 1
13    millimeter.  When we made analysis by
14    defining the area, we got figures
15    around 1 millimeter.  So it is
16    Prolene® has pores in this area.
17 QUESTIONS BY MR. ANDERSON:
18    Q.    Over time I think -- over time
19 I think you were telling counsel that rather
20 than using a linear dimension that the pore
21 diameter dimensions and the distribution of
22 the pore area of 1 millimeter in diameter
23 became more important to you than the linear
24 measurement.

Page 652

1         Do you remember that part of
2 your testimony?
3    A.    Yes.  Yes.
4    Q.    Okay.  Do you consider the Mühl
5 testing to be instructive to your opinions as
6 to whether or not the Prolene® old
7 construction 6-mil mesh used in all of the
8 TVT® devices has pores that are -- any pores
9 that are 1 millimeter in diameter?
10         MR. THOMAS:  Object to the form
11    of the question.
12         THE WITNESS:  There are some
13    pores around 1 millimeter.
14 QUESTIONS BY MR. ANDERSON:
15    Q.    And would a Prolene® mesh that
16 has pores of pore area right around 1
17 millimeter be as safe as a pore size of
18 ULTRAPRO™ or VYPRO with pores that are in the
19 3 to 5 millimeter range in diameter?
20         MR. THOMAS:  Object to the form
21    of the question.
22         THE WITNESS:  No.  It is very
23    clear that large pore meshes with 3, 4
24    millimeters has very, very low risk,

Page 653

1    and it is clear that small pores mesh
2    has higher risk.  And biologically,
3    this is true for Prolene® because it
4    bridges all the time.  If you look to
5    the textile property -- the textile
6    porosity, you see that the pores are
7    around 1 millimeter.  But if you look
8    to the effective porosity, it is quite
9    low.  And, therefore, this is
10    consistent.
11         (Klinge Exhibit 32 marked for
12    identification.)
13 QUESTIONS BY MR. ANDERSON:
14    Q.    Showing you what we will mark
15 as Klinge Exhibit 32.  It's a document that I
16 have previously provided to you.
17         Do you recall that, Dr. Klinge?
18    A.    Yes.
19    Q.    And if you look at the front
20 page of this PowerPoint, are these the same
21 authors that we looked at in this Moalli,
22 Abramowitch, Feola article that counsel
23 showed you earlier today?
24    A.    I agree.

Page 654

1    Q.    And if you turn to the third
2  page of this document, first of all, is the
3  date, May 24, 2013?
4    A.    Yes.
5    Q.    And if you look down into the
6  middle slide on that page under "Material
7  Parameters, Textile and Structural Properties
8  of Implant Materials," what does the sixth
9  point say?
10    A.    The sixth point means that --
11    Q.    What does it say, number 6?
12    A.    Effective porosity.
13    Q.    And under "Biomechanics," does
14  it list the Mühl article that you did with
15  Professor Mühl in 2008?
16    A.    Yes.
17    Q.    From your reading of the Feola,
18  Abramowitch and Moalli article, was this your
19  understanding that this is a group out of
20  Pittsburgh, Pennsylvania?
21    A.    Yes.
22        (Klinge Exhibit 33 marked for
23        identification.)
24

Page 655

1  QUESTIONS BY MR. ANDERSON:
2    Q.    One last document.  I'm going
3  to show you Klinge Exhibit 33.
4        Showing you this document that
5  we've marked as Klinge 33.  Sorry.
6        Are you familiar with Christoph
7  Walther?
8    A.    Yes, I know him.
9    Q.    Is this a name that you had
10  mentioned yesterday as someone you had worked
11  with from R&D in Hamburg at Ethicon
12  facilities there?
13    A.    Yes.
14    Q.    And even going back to your
15  work with Ethicon from the late '90s in the
16  development of VYPRO?
17    A.    Yes.
18    Q.    And this is a letter from
19  Christoph Walther to Quentin.
20        Are you familiar with a Quentin
21  Manley?
22    A.    No, I don't know.
23    Q.    And this second paragraph here
24  is talking about, "This applicant is a German

Page 656

1  company in Aachen, FEG Textiltechnik, and the
2  inventors are U. Klinge and B. Klosterhalfen,
3  RWTH Aachen, and two peoples from FEG."
4        Do you see that?
5    A.    Yes, I see it.
6    Q.    And then, "FEG has some
7  products for hernia repair on the market and
8  also for pelvic floor surgery."
9        Did I read that correctly?
10    A.    That is correct.
11    Q.    "In Germany, these products are
12  distributed through Dahlhausen, a big dealer
13  for medical device."
14        Do you see that?
15    A.    That is correct.
16    Q.    And then it talks about, "The
17  technology is based on a special material,
18  PVDF."
19        Do you see that?
20    A.    Yes.
21    Q.    And it says that, "Our
22  material, Ethicon's material, Pronova is
23  comparable to PVDF."
24        Do you see that?

Page 657

1    A.    Yes, I see it.
2    Q.    Is it your understanding that
3  Ethicon has a patent for a PVDF mesh that
4  they filed years ago?
5        MR. THOMAS:  Object to the form
6        of the question.
7        THE WITNESS:  Yes.
8  QUESTIONS BY MR. ANDERSON:
9    Q.    And you've seen that patent,
10  correct?
11    A.    Yes, I've seen it.
12    Q.    To your knowledge, has Ethicon
13  ever acted upon that patent and tried to
14  produce a surgical mesh with PVDF in it for
15  the pelvic floor or for hernia?
16    A.    I didn't ever get any positive
17  information for this.
18    Q.    And then if we look at the next
19  paragraph down, "In extremely, this patent
20  applications could be a strict restriction
21  for Ethicon to sell implants manufactured
22  from Pronova monofilaments.  In my eyes,
23  Pronova monofilaments are extremely good
24  candidate as implant material, very high

Page 658

1 flexibility, low bending stiffness,
2 Y-sterilization -- gamma -- without loss of
3 tensile strength in contrast to
4 polypropylene, long-term stability in human
5 body."
6 　　　Did I read that correctly?
7 　　A.　Yes.
8 　　Q.　And do you know that Christoph
9 Walther is one of the top polymer scientists
10 at Ethicon Norderstedt?
11 　　A.　Yes.
12 　　MR. THOMAS:  Object to the form
13 of the question.
14 QUESTIONS BY MR. ANDERSON:
15 　　Q.　Did Christoph Walther ever
16 contact you to ask you about working with you
17 on a PVDF mesh for Ethicon's catalog of
18 products for either hernia repair, pelvic
19 organ prolapse repair or stress urinary
20 incontinence repair?
21 　　A.　No, he didn't do.
22 　　Q.　Counsel asked you whether or
23 not you were aware of any clinical studies or
24 randomized controlled trials that would look

Page 659

1 at the effect of particle loss of surgical
2 meshes in the tissue.
3 　　　Do you remember that part of
4 your testimony?
5 　　A.　Yes.
6 　　Q.　Do you need a clinical study
7 result, Dr. Klinge, in order to form your
8 opinion that excess polypropylene particles
9 in a human tissue can elicit a greater
10 inflammatory response?
11 　　MR. THOMAS:  Object to the form
12 of the question.
13 　　THE WITNESS:  No, there is --
14 as I tried to express earlier, there
15 is a huge evidence that increase the
16 material, the increase of surface of
17 polymers leads to an increased and
18 intensifying foreign body reaction and
19 with all of the risks.
20 QUESTIONS BY MR. ANDERSON:
21 　　Q.　Counsel asked you some
22 questions earlier today regarding the in vivo
23 forces that would be realized underneath a
24 woman's urethra.

Page 660

1 　　　Do you remember that?
2 　　A.　Yes.
3 　　Q.　He was asking you for articles
4 that you may have or be aware of that relate
5 to what the estimated forces underneath the
6 bladder may be that the TVT® sling may be
7 subjected to.
8 　　　Do you remember that part of
9 your testimony?
10 　　A.　I remember it.
11 　　Q.　Turning now to Klinge
12 Exhibit 11, which was your expert report.
13 　　A.　Uh-huh.
14 　　Q.　I was going to ask you some
15 things counsel did not.
16 　　　Starting with page 18 of your
17 report and going through page 23 of your
18 report, in those five pages, did you go
19 through an analysis of various literature as
20 well as internal Ethicon documents regarding
21 estimated forces that one could anticipate
22 being on the TVT® sling underneath the
23 bladder neck?
24 　　MR. THOMAS:  Object to the form

Page 661

1 of the question.
2 　　THE WITNESS:  Yes.
3 QUESTIONS BY MR. ANDERSON:
4 　　Q.　Yes?
5 　　A.　Yes.
6 　　Q.　And when you gave counsel a
7 measurement -- strike that.
8 　　　When you listed to counsel that
9 you could anticipate less than 10 newtons per
10 centimeter in terms of a force that could be
11 placed upon the sling under the bladder neck,
12 is that reflected in the forces that you list
13 on page 23 of your report?
14 　　A.　Yes, that is a brief summary of
15 all this knowledge collected on these pages.
16 　　Q.　And after you collected the
17 knowledge that's on these pages, did you then
18 use these figures on page 23 of Klinge
19 Exhibit 11 in order to instruct Professor
20 Mühl as to the forces that you thought he
21 should put on the machine to test the TVT®
22 laser-cut and mechanical-cut meshes?
23 　　A.　In fact, that was the reason to
24 define the range for the measurements that we

Page 662

1  collected all of this data.
2      Q.    Counsel also had a statement to
3  you, "There are no in vivo studies regarding
4  whether high effective porosity under stress
5  will help improve biocompatibility."  Taking
6  that statement out of your 2007 publication
7  with Professor Mühl, "The New Objective
8  Measurements for Porosity."
9          Do you recall that part of your
10  testimony today?
11      A.    Yes.
12      Q.    Is the concept of effective
13  porosity to allow for proper tissue healing
14  in between the pores?
15          MR. THOMAS:  Object to the form
16  of the question.
17          THE WITNESS:  Yes.
18  QUESTIONS BY MR. ANDERSON:
19      Q.    And is effective porosity an
20  area that would allow for good tissue healing
21  in pore sizes that are greater than 1
22  millimeter in all direction?
23      A.    Yes.
24      Q.    Based upon your work in this

Page 663

1  area for the last 20 years, your work in the
2  '90s with BIOMAT and with Ethicon, the
3  development of VYPRO, your publications, your
4  Congresses, all of your work in this field
5  for two decades, do you have an opinion as to
6  a reasonable degree of medical certainty as to
7  whether or not the Mühl testing in looking at
8  the 1 millimeter pore diameter of meshes will
9  impact the biocompatibility of that mesh in
10  the tissue?
11          MR. THOMAS:  Object to the form
12  of the question.
13          THE WITNESS:  Yes.  I have no
14  doubts about that this is the effect.
15  QUESTIONS BY MR. ANDERSON:
16      Q.    And do you believe that putting
17  the machine at a 1,000-millimeter limit is
18  based upon all of the work that you've done
19  for the last 20 years, you, Klosterhalfen and
20  the rest of those involved both in Aachen as
21  well as Ethicon in this area of tissue
22  reaction to surgical meshes?
23          MR. THOMAS:  Object to the form
24  of the question.

Page 664

1          THE WITNESS:  It is based on
2  the current data that are available,
3  which is known to Ethicon as well.
4          MR. ANDERSON:  That's all of
5  the questions I have for right now,
6  Dr. Klinge.
7          THE WITNESS:  Thank you very
8  much.
9          MR. ANDERSON:  He's got a few.
10          REDIRECT EXAMINATION
11  QUESTIONS BY MR. THOMAS:
12      Q.    Dr. Klinge, Exhibit 30, which
13  was the expert report from Piet Hinoul,
14  Mr. Anderson already showed you on page 4 of
15  Exhibit 30 that the weight for the Prolene®
16  mesh is lower than the weight that you
17  typically recorded for the first generation
18  old Prolene®, correct?
19      A.    I tried to calculate there
20  are -- there has been milligram per square
21  centimeters.  Usually, it's gram per square
22  meters.  I assumed that the usual data of
23  108-gram per square meter would be
24  10.8-milligram per square centimeters.

Page 665

1      Q.    Do you know whether this is the
2  old Prolene® mesh used in TVT® --
3      A.    It shouldn't be the old one.
4      Q.    It should be the 5-mil hernia
5  repair mesh or some other one?
6      A.    I don't know.
7      Q.    It's -- this is the -- your
8  best interpretation of Exhibit 30, page 4 for
9  the entry of Prolene® is that this is not the
10  first generation Prolene® mesh that you
11  tested and that's used in the treatment of
12  stress urinary incontinence, correct?
13      A.    I just see the name Prolene®.
14  I see this white, and this is inconsistent to
15  what we have seen with other tables where
16  there was Prolene® and -- so this is -- by
17  the way, this is a report from Ethicon.
18      Q.    I know.
19      A.    And I would expect that they
20  indicate clearly what they shared in their
21  table there because this makes a lot of
22  confusion in all the subsequent -- when
23  someone else took over these data there.
24      Q.    Doctor --

Page 666

1    A.    I just want to say it and have
2  it --
3    Q.    And you did.
4    A.    -- documented.
5    Q.    And you did.
6          But so I can say it and
7  document it, this is not the first generation
8  Prolene® mesh, correct?
9    A.    It looks like, yes.
10   Q.    It looks like it's not?
11   A.    It looks like it's not.
12         MR. THOMAS:  Thank you.  That's
13  all I have.
14         RECROSS EXAMINATION
15  QUESTIONS BY MR. ANDERSON:
16   Q.    And even with a later
17  generation Prolene® mesh, they still can't
18  get their pore sizes or Ethicon still chooses
19  not to get their pore sizes above 1
20  millimeter, correct?
21         MR. THOMAS:  Object to the form
22  of the question.
23         THE WITNESS:  Whatever they
24  presented there as a Prolene® there,

Page 667

1  yes, I agree.
2          MR. ANDERSON:  No further
3  questions.
4          MR. THOMAS:  Thank you, Doctor.
5          MR. ANDERSON:  Thank you.
6  (Deposition concluded at 5:16 p.m.)
7
8          – – – – – – –
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 668

1
2          CERTIFICATE
3      I, CARRIE A. CAMPBELL, Registered
   Professional Reporter, Certified Realtime
4  Reporter and Certified Court Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Uwe Klinge was duly sworn
   by me to testify to the truth, the whole
6  truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
11     I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
12 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
13 employee of such attorney or counsel, and
   that I am not financially interested in the
   action.
14
15
16  _____
17  CARRIE A. CAMPBELL,
   NCRA Registered Professional Reporter
18 Certified Realtime Reporter
   Missouri Certified Court Reporter #859
19 Illinois Certified Shorthand Reporter
   #084-004229
20 Notary Public
21 Dated:  December 3, 2013
22
23
24

Page 669

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12
   _____
   Prof. Dr. Med. Uwe Klinge        DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 Notary Public
20
21
22
23
24

Page 670

```
1          _ _ _ _ _ _ _
                ERRATA
2          _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 671

```
1          _ _ _ _ _ _ _
              LAWYER'S NOTES
2          _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```