EXHIBIT 2J

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

----------------------------------------

IN RE:  ETHICON, INC. PELVIC REPAIR         MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION        2:12-MD-02327

----------------------------------------

THIS DOCUMENT RELATES TO:

----------------------------------------

CAROLYN LEWIS                               CIVIL ACTION NO.
                                            2:12-cv-04301

----------------------------------------

                                            February 13, 2014
                                            Charleston, WV


                    TRANSCRIPT OF TRIAL - DAY 4
              BEFORE THE HONORABLE **JOSEPH R. GOODWIN**,
              UNITED STATES DISTRICT JUDGE, AND A JURY


Court Reporters:          Teresa M. Ruffner, RPR
                          (304) 528-7583
                          terry_ruffner@wvsd.uscourts.gov

                          Harold M. Hagopian, RDR-CRR
                          209 Drake Landing
                          New Bern, NC  28560
                          hhagopian@aol.com

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

**APPEARANCES**


**FOR THE PLAINTIFF:**

**THOMAS P. CARTMELL, ESQ.**
Wagstaff & Cartmell
Suite 300
4740 Grand Avenue
Kansas City, MO 64112

**BENJAMIN H. ANDERSON, ESQ.**
Anderson Law Offices
1360 W. 9th Street
Suite 215
Cleveland, OH 44113

**RICHARD A. FREESE, ESQ.**
Freese & Goss
Regions Harbert Plaza, Suite 3120
1901 6th Avenue North
Birmingham, AL 35203

**CARL N. FRANKOVITCH, ESQ.**
Frankovitch Anetakis Colantonio & Simon
337 Penco Road
Weirton, WV 26062


**FOR THE DEFENDANTS:**

**CHRISTY D. JONES, ESQ.**
Butler Snow
P. O. Box 6010
Ridgeland, MS 39158-6010

**DAVID B. THOMAS, ESQ.**
**PHILIP J. COMBS, ESQ.**
**SUSAN ROBINSON, ESQ.**
Thomas Combs & Spann
P. O. Box 3824
Charleston, WV 23558-3824

1                          I N D E X

2                                                        <u>Page</u>

3    <u>Plaintiff's Witnesses</u>

4          JAMES HART (by video)                          17

5          MENG CHEN (by video)                           26

6          GENE KAMMERER (by video)                       28

7          JOERG HOLSTE (by video)                        42

8          UWE KLINGE

9              Direct Examination                         43

10             Cross Examination                          92

11             Redirect Examination                       109

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         MORNING SESSION

2          (Out of the presence and hearing of the jury:)

3              THE COURT:  Okay.  Let me first put on the record

4    rulings on the spoliation issues.  In her February 4, 2014

5    order, Judge Eifert thoroughly examined the evidence of

6    spoliation in this multi-district litigation bellwether -- in

7    this multi-district litigation.  She determined that the

8    evidence did not warrant default judgment or adverse

9    inferences in all cases.  However, she recommended that I

10   allow the plaintiff the opportunity to introduce evidence

11   regarding Ethicon's loss of relevant documents on a

12   case-by-case basis and, when appropriate, to tender an adverse

13   inference instruction.

14       I have considered the parties' written and oral

15   arguments.  The fact is that Ethicon's duty to preserve

16   documents was not, and I find it was not, triggered until

17   April 30, 2007.  The plaintiff's evidence pre-dates this

18   duty.  Judge Eifert specifically found that, quote, The

19   MedScand materials were lost or discarded in 2006 before

20   Ethicon had a duty to preserve evidence relevant to this MDL.

21   Accordingly, the missing MedScand documents do not support a

22   finding of spoliation.  Unquote.

23       In any event, I have already allowed the plaintiffs to

24   introduce evidence that Miss Angelini's documents were lost or

25   destroyed, but beyond that, I will not permit the plaintiff to

1    introduce any further evidence on the issue of spoliation,

2    including the playing of Mr. Mittenthal's deposition which

3    raised no new issues beyond an attempt by -- an apparent

4    attempt by plaintiffs to plow old ground.

5        Show the plaintiff's objection.

6        Did you have something that you wanted to put on the

7    record?

8            MS. JONES:  Yes, Your Honor.  If I --

9            THE COURT:  We may have a long day to put stuff on

10   the record.  I don't know.

11           MS. JONES:  Well, I'm going to do this really

12   quickly because we have agreed.  The plaintiffs know we have

13   some objections to the depositions that we worked diligently

14   with on, Your Honor, and with a smile, and we have -- we need

15   to make these objections to preserve the record.  Your Honor

16   rules, we've got one cut that puts the stuff in and one cut

17   that takes it out.

18           THE COURT:  All right.

19           MS. JONES:  The first is --

20           THE COURT:  Do I need a transcript?

21           MS. JONES:  I don't think so, Your Honor.  If you

22   do, we have them.  The first is that we object to the

23   introduction of medical device reports and reports of patients

24   that have come in, other than Mrs. Lewis in this case, on the

25   grounds that those medical device reports are hearsay,

1    unreliable, and not substantially similar to Mrs. Lewis's
2    complaints.
3         And the testimony that relates to this is in the
4    testimony of Ms. Chen, and specifically it is that testimony
5    related to Plaintiff's Exhibit 700, the testimony of
6    Mr. Kammerer, and it's the testimony that relates to
7    Plaintiff's Exhibits 536 and 545, which are, in fact, the
8    issue reports that are the subject of the testimony.
9         So that's the first objection with respect --
10              THE COURT:  Can I see it?
11              MS. JONES:  Yes, Your Honor.
12              THE COURT:  May I?  I think I can.
13              MS. JONES:  This is the -- that's the one with
14   respect to Miss Chen.
15              THE COURT:  Mr. Cartmell, do you want to address
16   that?
17              MR. CARTMELL:  Yes.  With respect to the Chen --
18        (Remarks off the record)
19              MR. CARTMELL:  We think, Your Honor, you just looked
20   at the issue report from Dr. Kammerer's deposition, and that
21   is, what happens is there are calls from physicians and
22   patients outside the company.  They go into a database called
23   Remetrex.  They're tracked within the company.  And Kammerer
24   is an engineer.  He testified that the frayed edges of the
25   mesh are not a problem.  He doesn't believe they can cause any

1   clinical issues with women.

2       Those documents are related to the frayed edges and the

3   fact that they can cause clinical issues in women, pain and

4   other issues.  Part of our case is that the frayed edges and

5   the particle loss and the roping and curling and all that

6   stuff do in fact cause harm to women, their -- there is

7   clinical benefit, the defense is, that there is not.  And so

8   those are relevant to our case related to notice for the

9   company, related to the negligence case that the company had

10  knowledge related to the defect with the mechanically cut mesh

11  and did not do anything to change or alter the mesh or do a

12  study, which he will testify to, Mr. Kammerer will testify to,

13  related to that.

14      So we think it's highly probative that they did that,

15  especially given that their defense is that none of this does

16  anything; it's just cosmetic.

17          MS. JONES:  And, Your Honor, with all due respect to

18  what Mr. Cartmell says, it doesn't overcome the hearsay and

19  unreliability issues with respect to the report.  If it is to

20  be offered for the issue of notice only, we would ask for an

21  instruction to that effect.

22          THE COURT:  Is this -- I don't quite understand how

23  this is presented to the witness and how it is in the, I

24  guess, the videotape deposition.

25          MR. CARTMELL:  Okay.

```
 1              THE COURT:  Could you explain that for me?
 2              MR. CARTMELL:  Yes.  There is a -- I'm trying to
 3    remember the order, but I think it's, "Have you ever heard
 4    that the frayed edges can cause pain or tissue problems or
 5    damage or clinical issues in women?"  And I think he says,
 6    "Yes."  I will check that to make sure, but then there is a
 7    production of the issue report and then there is,
 8    "Mr. Kammerer, had you ever heard that the frayed edges of the
 9    mesh while you were the lead engineer, technical engineer
10    could perforate a woman's vagina as is stated in the issue
11    report?"
12              THE COURT:  And he says what?
13              MR. CARTMELL:  I think he says, "That's impossible."
14              THE COURT:  He says what?
15              MR. CARTMELL:  He says, "That's impossible.  It
16    doesn't happen."
17              THE COURT:  Okay.  And then is he confronted with
18    this at that point?
19              MR. CARTMELL:  He's confronted with it before, and
20    then I said, "Were you ever told," and he says -- he says, "I
21    don't" -- I think he says, "I wasn't, but it's impossible that
22    that was the frayed edges."
23              MS. JONES:  I can hand you, Your Honor, the
24    testimony if it would help.  It's at pages 167 through 1 --
25    actually, it goes through the two issue reports, 167 through
```

1    roughly 177 of his testimony, if you'd like to just see that.

2              THE COURT:  These are business records of Ethicon,

3    is that correct --

4              MS. JONES:  Yes, Your Honor.

5              THE COURT:  -- that were furnished, and they're used

6    to confront an Ethicon employee?

7              MR. CARTMELL:  Yes, Your Honor.

8              THE COURT:  And I will allow it and overrule the

9    objection.  I will give a limiting instruction that these

10   documents are only -- well, I don't see that the documents

11   come in, but the questions and answer related to the documents

12   may come in, and I will tell the jury that Exhibit Number 536

13   and 545 were offered for the purpose of showing notice.  Of

14   course, if you want to re-word it, I'll consider some other

15   wording.

16             MR. CARTMELL:  I'm fine with that, Your Honor.

17             THE COURT:  Okay.  Anything else?

18             MS. JONES:  Well, those documents specifically

19   related to Mr. Kammerer -- excuse me -- to Mr. Kammerer,

20   Judge.  You also have another exhibit that was -- I think

21   Robin handed you another exhibit.  It's the same issue.  It's

22   with respect to Miss Chen.  And I apologize, Your Honor.

23   You've got the exhibit, so I can't see what the exhibit number

24   is, but it's an issue report and an analysis of a report by

25   the plaintiff.

```
 1            THE COURT:  Number 700; is that right?

 2            MS. JONES:  Yes.

 3            THE COURT:  I haven't read the testimony, but is it

 4   used in a similar fashion?

 5            MR. CARTMELL:  Yeah, this is a little different,

 6   Your Honor, but this was Dr. Chen's, who was in charge of

 7   monitoring the adverse events, and she went and did a review

 8   of all the adverse events for her superiors.  One thing she

 9   looked at is the long-term complications.  Am I on the wrong

10   one?

11            MS. JONES:  It's just this one over here.

12            MR. CARTMELL:  I apologize.

13            MS. JONES:  It's just the -- we have worked the

14   other part out that Mr. Cartmell was talking about.  We

15   redacted it.  This is only on the issue of the adverse event

16   report, and this is the one where the plaintiff underwent a

17   pelvic floor repair procedure nearly four years ago to treat a

18   cystocele of the bladder, and this is the analysis that Dr.

19   Chen performs with respect to that adverse event that's

20   reported to the company.

21            MR. CARTMELL:  That's right.  Sorry.  That is a

22   different, different adverse event report.  It is a single --

23   same argument, Your Honor, just a different document.

24            THE COURT:  In this event, it is an analysis of a

25   report of an adverse event by an employee at Ethicon reacting
```

```
 1        to that adverse report; is that right?
 2                  MS. JONES:  Essentially, Your Honor, yes.
 3                  THE COURT:  This talks about mesh of unknown origin.
 4        What does that mean?
 5                  MR. CARTMELL:  Well, I don't know what that means,
 6        but it is actually the Prolene mesh in the TVT that is an
 7        adverse event is my understanding from that.
 8                  THE COURT:  I don't see that.
 9                  MR. CARTMELL:  A Gynecare TVT abdominal sling was
10        placed during the procedure.  That's the actual sling that was
11        used and caused the adverse event.  I do see where you are
12        saying a device of unknown origin, but I don't think it's
13        disputed that it was the TVT mesh.
14                  MS. JONES:  Well, I think that goes, frankly, to the
15        unreliability of the report and the hearsay objection that
16        we've made.
17                  THE COURT:  Is this lady here?  Is she testifying?
18                  MR. CARTMELL:  This is her.  This is Dr. Chen.
19                  MS. JONES:  This is Dr. Chen.
20                  THE COURT:  And she is testifying --
21                  MR. CARTMELL:  About this.
22                  THE COURT:  -- about this is in a videotaped
23        deposition.
24                  MR. CARTMELL:  Yes, Your Honor.
25                  THE COURT:  And this is a document -- forgive my
```

```
 1   ignorance.  Is this part of her testimony or is this a record
 2   that she made in reaction to an adverse event about which she
 3   is asked to testify?
 4           MR. CARTMELL:  The latter, what you just said.
 5           THE COURT:  It seems to me that the entirety of this
 6   delves into areas that are not relevant, but I don't know how
 7   it's being used, so I guess I'm going to have to look at the
 8   transcript.
 9           MR. CARTMELL:  Look at the transcript?  I think we
10   can --
11           MS. JONES:  I have the transcript right here.  I'm
12   trying to find exactly where that -- do you have a page on
13   this?
14           THE COURT:  In the very conclusion, she says she
15   can't confirm the origin of the mesh which extruded into the
16   bladder, and previously she says, "Our mesh can't do that
17   unless the bladder has been injured" or something like that.
18   I just need to see the testimony.
19           MS. JONES:  I'm trying to find if we have a --
20           THE COURT:  All of the jurors are here.
21           THE CLERK:  Yes.
22           MS. JONES:  I think it starts where it says Exhibit
23   3324.  It's back toward the back.
24           THE COURT:  This is talking about two pictures and
25   not about this exhibit.
```

```
 1              MS. JONES:  I may have given you the wrong exhibit
 2    number.
 3              THE COURT:  The exhibit number I have is 700 on this
 4    page.  Let me give you both documents back.
 5              MR. CARTMELL:  Your Honor, it starts at page 310,
 6    line 10.
 7              THE COURT:  Does it relate to Exhibit 700?
 8              MR. CARTMELL:  Yeah.  That was a trial exhibit and
 9    we were telling you the deposition exhibit.  Sorry about that.
10              THE COURT:  All right.  Starts at page what?
11              MS. JONES:  310.
12              THE COURT:  All right.
13              MS. JONES:  It's about three-fourths of the way
14    down.
15              THE COURT:  Just so I'm not overruling on the wrong
16    thing, the exhibit which is marked 700 that you showed me is
17    Exhibit 3333?
18              MR. CARTMELL:  Yes, Your Honor.
19              THE COURT:  The -- it seems to me that I will admit
20    the examination.  The exhibit appears to say things
21    completely -- that contradict the characterization of the
22    exhibit and examination, but that's appropriate for cross or
23    examination, but I will allow it.
24              MS. JONES:  Your Honor, may I just quickly make two
25    other points?  We have agreed with respect to the various
```

```
1    transcripts that are ready to go.  A couple of things I want
2    to make clear for the record that we discussed with
3    plaintiff's counsel --
4              THE COURT:  Yes.
5              MS. JONES:  -- we have not insisted upon the
6    exclusion and redaction of every complication that the
7    plaintiff did not suffer from in this case with the
8    understanding that we will in fact ask Your Honor at an
9    appropriate point to instruct the jury that their verdict
10   should be premised upon the injuries that the plaintiff
11   actually had.  And we just don't want to waive anything by
12   bringing it up.
13             THE COURT:  Is that agreeable?
14             MR. CARTMELL:  We understand that they're going to
15   make that request.
16             THE COURT:  Right.
17             MR. CARTMELL:  Our -- that's agreeable.  Our -- for
18   the record, although our position is obviously we think all of
19   the risks need to be weighed against all of the benefits.
20             THE COURT:  I understand.  All right.  That's very
21   good, and I really appreciate the obvious hard work that went
22   into this.
23             MS. JONES:  I need 15 more seconds, Your Honor.
24             THE COURT:  Sure.
25             MS. JONES:  There are also cumulative designations
```

```
 1      in here.  We've advised counsel that we think that they're
 2      cumulative.  We've not insisted that they be taken out, but
 3      they come out of their time.  And if they choose to play the
 4      cumulative stuff, it's at the peril that we will object in the
 5      context of their live witnesses.  That's one.
 6          And, finally, Your Honor, and this has nothing to do with
 7      the plaintiff's counsel.  It does have to do with me.  We have
 8      made these agreements and stipulations with respect to both of
 9      the exhibits and the deposition cuts with respect to this case
10      and this case alone.
11              THE COURT:  Understood.
12              MS. JONES:  I want it on the record that we are not
13      making these agreements or these cuts for the remainder of the
14      MDL or for any other state court litigation.  This is very
15      specifically under the circumstances of this case.
16              THE COURT:  I understand, and I certainly agree that
17      under the trial pressures and at the request of the Court, you
18      have made agreements which are for the purposes of this trial
19      only and do not bind either party to the agreements made in
20      future endeavors.
21          I will be proposing something along the lines of what I
22      suggested yesterday, and the parties may agree to a
23      modification, agree to some other procedure.  I'm not trying
24      to rule with an iron hand.  I just want to avoid the same
25      hassle that we had today -- or not today, this week.
```

```
1              MS. JONES:  What I suggest, Your Honor, is that
2      Mr. Cartmell and I will be happy to sit down with you
3      informally and work something out.
4              THE COURT:  That sounds good.
5              MS. JONES:  I think we have both learned.  We now
6      know what the problems have been, and neither one of us takes
7      responsibility for them, but we all understand that we all
8      bear a part of that.  But I think we know of ways that this
9      can be remedied and we don't fool with it again.
10             THE COURT:  All right.  I'll look forward to that.
11        Let's bring the jury in.
12             MR. CARTMELL:  Thank you.
13             MR. FREESE:  Your Honor --
14             THE COURT:  Yes, sir?
15             MR. FREESE:  -- before we bring the jury in, Robin
16     just gave me the current exhibit list, and it doesn't appear
17     that we offered the Angelini exhibits at the deposition
18     yesterday.  I was wondering if we could take care of that now
19     before we bring the jury in.  I know Your Honor wants to keep
20     everything falling smoothly.
21             THE COURT:  Yes, you may.
22        (Counsel conferred privately off the record)
23             THE COURT:  I'm going to consider you do this at the
24     morning break.  I've told the jury that I would be singing and
25     dancing at 9:00.  Bring the jury in.  It may have appeared to
```

```
 1    you all -- and if it hasn't, please understand I hate
 2    last-minute stuff.
 3         (Jury In)
 4            THE COURT:  Good morning, ladies and gentlemen, to
 5    this lovely sunny morning in Charleston, West Virginia.
 6    Please be seated.  I realize it's ten after and you've missed
 7    my singing and dancing.
 8       We are ready to proceed, and I think things will go very
 9    smoothly today.
10       Mr. Cartmell, do you want to call your next witness?
11            MR. CARTMELL:  Yes, Your Honor.  Dr. James Hart,
12    chief medical officer at Ethicon.
13            THE COURT:  All right.
14            MS. JONES:  Your Honor, we've exchanged -- we just
15    found that there was a mistake in -- this has been uploaded
16    and added.  We're trying to -- we are remedying that.  We're
17    going to go ahead and play it, but it's something the
18    plaintiff's counsel may stop it.  It's just a technological
19    mistake.
20            THE COURT:  If you need to stop it to fix something,
21    go ahead and do that.
22            MR. FREESE:  Thank you, Your Honor.
23         (The video of James Hart was played.)
24            MS. JONES:  I'm sorry, Your Honor.  We've got a
25    glitch here.  We've got something that was not part of this, I
```

 1    think.

 2              MR. FREESE:  I was asking that he --

 3              THE COURT:  I'm sorry.  I can't hear you.

 4              MR. FREESE:  I was merely asking that he expand the

 5    document so we can see.

 6              THE COURT:  Well, work out whatever the problem is

 7    before you show anything else.

 8         (Counsel conferred privately off the record)

 9         (The video of James Hart was resumed)

10              MR. FREESE:  Your Honor, we can end our examination

11    here and go to 810 and play the examination by the defendant.

12              THE COURT:  Is that correct?

13              MS. JONES:  I'm sorry?

14              THE COURT:  Take it down.

15         (Counsel conferred privately off the record)

16              MR. FREESE:  Thank you, Your Honor.

17              MS. JONES:  We just need the cuts.  He's the lead

18    part of his thing.  We just need to start on the direct

19    examination.

20              THE COURT:  All right.  Ladies and gentlemen, back

21    to basics.  When we have a live witness, the plaintiff, having

22    the burden of proof, puts on the witness, asks some questions,

23    stops, defendants cross-examine.  Then plaintiffs can come

24    back and redirect in any areas that were contained in the

25    cross-examination.  Where we are with this witness is they've

```
 1    decided that this is -- the plaintiffs have decided this is

 2    the end of his direct examination.  Now the defendants will

 3    move into playing the part which is the cross-examination of

 4    this witness.

 5         It's a little more confusing than that, but because the

 6    parties -- but there you go.

 7              MS. JONES:  Technologically we're ready to go, Your

 8    Honor.

 9              THE COURT:  All right.  Go ahead.

10         (The video of James Hart was resumed.)

11              MR. CARTMELL:  I'm in agreement the objections will

12    be taken out on both sides.

13              THE COURT:  I've noticed that since you all started

14    playing videotapes.  They should have all been taken out.

15              MS. JONES:  Should have been, and we apologize, Your

16    Honor.

17              THE COURT:  Well, it's happened in the ones they

18    did, too, so I'm not pointing fingers at anybody.  Do your

19    best.  Let's go.

20         (The video of James Hart was resumed.)

21              MR. COMBS:  That concludes the examination.

22              MR. CARTMELL:  That's the end of the videotape, Your

23    Honor.

24              THE COURT:  All right.  Instead of getting into the

25    next videotape, let's take our morning break a little early.
```

1    We'll take 15 minutes.

2         During your break, enjoy a doughnut.  You need it for

3    warmth.  Don't discuss the case among yourselves, permit

4    anyone to discuss it with you or in your presence.  Don't use

5    any social media or electronic means to communicate with

6    anyone in any form about anything in this case.

7         Court will be in recess for 15 minutes.

8         (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1         (In open Court following the recess.  The jury is

 2   not present.)

 3              THE COURT:  I understand we have a matter to

 4   take up?

 5              MR. CARTMELL:  And, Judge, if you wouldn't mind

 6   if we could do it at sidebar, that would be best.

 7              THE COURT:  Sure.

 8   SIDEBAR CONFERENCE:

 9              THE COURT:  All right.

10              MR. CARTMELL:  Your Honor, if you didn't -- you

11   probably did notice in that video there was Dr. Hart's

12   background with the company three separate times, and our

13   video designations would have been one quick cut off that

14   for a matter of a minute or two.

15              THE COURT:  It's too late to talk about the

16   time division on that.  It was played.  It doesn't

17   matter --

18              MR. CARTMELL:  I just wanted to make a record.

19   That was my impression, that that time -- these things are

20   being inserted, we feel, to make us look bad.  The jury is

21   hearing the man being introduced the same way three

22   different times.  Our understanding is that your ruling is

23   that this can be contextual and they can add that into the

24   depositions.  I believe that it is not.

25              THE COURT:  I didn't rule on that at all.  I
```

 1   never did rule on that.  I didn't rule on anything in this

 2   deposition.

 3              MR. CARTMELL:  Well, I guess I understand that.

 4   My understanding has been that the rulings from you all

 5   along have been, I guess, that they're going to be able to

 6   play their portions of the depositions, and that's the way

 7   we've been operating, as we've been meeting and conferring

 8   together.  So we are letting them get back into things

 9   that we would not -- it's duplicative.

10        I know you cannot stand duplicative testimony.  I

11   just wanted to make sure that that is in the record.

12              THE COURT:  Mr. Freese asked the same question

13   eight times, eight separate times, the same question.

14   That wasn't objected to.  I didn't rule on it.

15        I did notice that we went over some of the same

16   positions that the medical director had three times.

17        I'm not excited about any of that.  I don't like it.

18   But whoever played it, it's going to be their time.

19              MR. CARTMELL:  Okay.  Could we get

20   clarification, then, for future videos, potentially?

21              THE COURT:  Uh-huh.

22              MR. CARTMELL:  That if they add in duplicative

23   stuff, we'll get a chance to visit --

24              THE COURT:  Whenever they play their section of

25   the video, that will take up their time.  Whenever you

1    play your section, that's your time.

2            MR. CARTMELL:  And if they add in, like, their

3    multiple minutes of their testimony on our side when we're

4    asking questions, can we get relief and that can be

5    charged to them?

6            THE COURT:  You mean when they're cross-

7    examining the witness?

8            MR. CARTMELL:  When we are cross-examining the

9    witness like that, and my question would have been, with

10   Dr. Hart, tell us your history with the company, and it

11   would have been one time.  But then, when they add in

12   another time and a third time, can they be credited with

13   that, or can they not do that?  Can we get a ruling from

14   the Court that if it's duplicative, that that cannot come

15   into the video?

16           THE COURT:  I didn't notice it -- I did not see

17   anything in this video that was of sufficient length to

18   warrant a redo or a ruling on it.  If, in the future, you

19   have a problem with that, and you can't resolve it before

20   you get here, then let's get out the transcript and go by

21   the transcript.

22           MR. CARTMELL:  Okay.

23           THE COURT:  And I have never said that I

24   wouldn't rule on it.  I am not a video editor, and I'm not

25   going to stop and edit videos.  But I certainly will take

 1   the transcript, let you put a reader on the stand, I will

 2   hear objections to the extent they're made.

 3        Now, if it was taken for the purpose of trial, the

 4   objection should have been made at the time it was done.

 5             MR. CARTMELL:  Right.

 6             THE COURT:  I don't understand this.  I've

 7   never experienced this with experienced counsel.  I'm

 8   surprised.  Every minute of yesterday was a full day and

 9   somebody's credited with it.  Today's a full day and

10   somebody's going to be credited with it.  In the end of

11   nine days, the case is going to be over.  Spend it however

12   you like.

13        I'm not happy with you, but we'll do the best we

14   can.

15        (Court conferring with Law Clerk off the record.)

16        To the extent that the defendants have designated

17   parts of your examination, if that's what you're saying --

18             MR. CARTMELL:  That is.  I didn't make it

19   clear, I guess.  It's our questioning.

20             THE COURT:  Then that goes against their time.

21   If they designated it, it's theirs.  Okay?

22             MR. CARTMELL:  That's what I was asking.

23             MR. COMBS:  We have been operating under that

24   assumption the entire time.

25             THE COURT:  Okay.  Well, inform the highly

1  qualified time-keepers that that's the deal, and my -- I

2  will go up and finish another couple sips of coffee and I

3  will be a lot nicer the next time you talk to me.

4          MR. CARTMELL:  Thank you, Judge.

5  END OF SIDEBAR CONFERENCE.

6          MR. COMBS:  Maybe just before the you bring the

7  jury in --

8          THE COURT:  Sure.

9          MR. COMBS:  -- we could just spend a second on

10 the record about the exhibits.

11         THE COURT:  Sure.  Go ahead.

12         MR. COMBS:  The next witness that's going to be

13 played by video, it's my understanding, is Dr. Chen.  Last

14 night we did meet and confer regarding the exhibits that

15 were going to be used in Dr. Chen's deposition.  The

16 parties have agreed to a redact.

17     On 690 the parties have agreed to a redact.  On 686.

18 On Exhibit 176 there was no objection.  The defendant's

19 obviously objected to 700, and the Court ruled that it was

20 admissible.  So, I think that covers all the exhibits.

21         MR. CARTMELL:  I agree.

22         THE COURT:  All right.  You may proceed.

23     It's time to bring the jury in.

24     (The jury entered.)

25         THE COURT:  Thank you, ladies and gentlemen.

1    Please be seated.

2         Call your next witness, please.

3              MR. CARTMELL:  Your Honor, plaintiff calls

4    Dr. Meng Chen, associate medical director at Ethicon.

5         (The videotaped deposition of Meng Chen was played.)

6              MR. CARTMELL:  Your Honor, that's the end of

7    the plaintiff's presentation of Dr. Chen.

8              THE COURT:  All right.

9              MR. COMBS:  Judge, there's very brief

10   questioning that's being cued up now.

11             MS. JONES:  Judge, there's a very brief

12   questioning on behalf of the defendant.

13             THE COURT:  Okay.

14             (Videotaped deposition of Dr. Chen continues.)

15             MR. COMBS:  Judge, that ends the questioning

16   from both parties regarding this witness.

17             THE COURT:  That concludes this witness?

18             MR. CARTMELL:  Yes, your Honor.

19             THE COURT:  All right.  Thank you, very much.

20        Call your next witness.

21             MR. CARTMELL:  Dr. --excuse me, Gene Kammerer,

22   who is an engineer at Ethicon, by video.

23             THE COURT:  All right.

24             MR. COMBS:  Judge, could we just approach very

25   briefly?

1          THE COURT:  Sure.

2   SIDEBAR CONFERENCE:

3          MR. CARTMELL:  I may have misunderstood you

4   this morning, your Honor.  Phil just came over and said

5   the issue reports that were argued this morning were out

6   as far as being able to be shown.  I guess I had -- I had

7   thought that your ruling was that they could be shown, but

8   that you were going to give an instruction to the jury.

9          MR. COMBS:  Judge --

10          THE COURT:  My ruling was that you could ask

11   her about those documents --

12          MR. CARTMELL:  Okay.

13          THE COURT:  -- in testimony, and I would then

14   instruct the jury that they should consider these

15   documents for the purpose of notice to the company of such

16   an event.

17          MR. CARTMELL:  Right.

18          THE COURT:  Or words to that effect.

19          MR. CARTMELL:  Okay.

20          THE COURT:  But I don't know how it is on the

21   video, so --

22          MR. CARTMELL:  They just show the highlighted

23   portions of what is being talked about up on the screen.

24   There's nothing but that.

25          THE COURT:  I'm going to let you do it.  Let's

1 go.

2          MR. CARTMELL:  Thank you.

3 END OF SIDEBAR CONFERENCE.

4      (Video deposition of Gene Kammerer played.)

5          MR. CARTMELL:  Your Honor, this is a good

6 breaking point if we want to have a lunch break.

7          THE COURT:  All right, ladies and gentlemen,

8 before we take lunch, during an earlier part of this

9 witness' testimony he was shown a couple of issue reports

10 which he said he wasn't familiar with, but you may

11 consider those issue reports and the portions that were

12 pointed out to you as evidence that Ethicon had notice of

13 the substance contained in the reports.  But you may not

14 consider them for any other purpose, that is, you may not

15 consider them to be evidence of the truth of the matters

16 reported.

17      Now, it's time for lunch, slip-sliding away across

18 the street.  I asked the Clerk of Court about buying your

19 lunch, and apparently Uncle Sam is too tight to do that.

20 So, I'm going to -- it's ten after.  We'll try to start at

21 1:15.  If you can't comfortably get across and get back by

22 1:15, I'll understand, but we'll do our best.

23      Don't discuss the case among yourselves, permit

24 anyone to discussion with your or in your presence.  Don't

25 read, watch, or listen to anything about it.  Don't use

1    any electronic media of any kind.

2         I'll see you back here at 1:15.

3         Court stands in recess.

4         I want to ask you, and we can talk it over during

5    lunch -- looks like it's going to snow tomorrow, too, or

6    more.  I can have somebody run and get your lunch

7    tomorrow, if you pay for it.  So, talk among yourselves if

8    you want me to do that.

9         I'll see you back here at 1:15.

10        (Luncheon recess.)

11        (During the luncheon recess Mr. Faes for the

12   plaintiffs, Mr. Combs for the defendant, the Clerk and the

13   Court Reporter participated in the following bench

14   conference outside the presence of the Court and jury.)

15             MR. FAES:  These are all from the Laura

16   Angelini deposition.  The first exhibit is Plaintiffs'

17   1963, which is the March 5th, 1997 Medscand agreement.

18             MR. COMBS:  No objection.

19             MR. FAES:  The second exhibit is Plaintiffs'

20   1965, which is the asset purchase agreement dated November

21   15th, 1999.

22             MR. COMBS:  No objection.

23             MR. FAES:  The next exhibit is Plaintiffs'

24   1966, which is an exhibit titled Payments to Medscand.

25             MR. COMBS:  No objection.

1    MR. FAES:  Next exhibit is Plaintiffs' 1971,

2  titled Payments to Ulmsten as Consultant.

3    MR. COMBS:  No objection.

4    MR. FAES:  The next exhibit is Plaintiffs'

5  1970, which is a spreadsheet of payments to Prof. Nilsson.

6    MR. COMBS:  No objection.

7    MR. FAES:  The next exhibit is Plaintiffs'

8  1971, which is titled Payments to Ulmsten as Consultant.

9    THE CLERK:  You've already got that.

10    MR. COMBS:  We've already got that.

11    MR. FAES:  The next exhibit is Plaintiffs' 858,

12  which is an email, Subject:  ICS Submission.

13    MR. COMBS:  No objection.

14    Plaintiff's Exhibit 1885 is a learned treatise that

15  was displayed on the video with the witness.

16    THE CLERK:  I'll hold on to it and then give it

17  back.

18    MR. COMBS:  Thank you.

19    MR. FAES:  Did I give you 858?

20    THE CLERK:  Yes, you did.

21    MR. FAES:  The next exhibit is Plaintiffs' 93,

22  which is a July 30th, 1998, Summary of Key Points.

23    THE CLERK:  That was 93, correct.

24    MR. COMBS:  No objection.

25    MR. FAES:  The next exhibit is Plaintiffs' 669,

1   which is titled The History of TVT.

2           MR. COMBS:  No objection.

3           MR. FAES:  And that's the end of the Laura

4   Angelini exhibits.

5           THE CLERK:  Okay.

6           MR. FAES:  Okay, the first one for James Hart

7   is Plaintiffs' 1256, which is the curriculum vitae of

8   James C. Hart.

9           MR. COMBS:  No objection.

10          MR. FAES:  Next exhibit is Plaintiffs' 1297,

11  which is the Johnson & Johnson credo.

12          MR. COMBS:  No objection.

13          MR. FAES:  The next exhibit is Plaintiffs' 759,

14  which is an email entitled IIS Policy.

15          MR. COMBS:  No objection.

16          THE CLERK:  Thank you.

17          MR. FAES:  And the last Hart plaintiff's

18  exhibit is Plaintiffs' 153, titled Biocompatibility Risk

19  Assessment.

20          MR. COMBS:  No objection.

21          THE CLERK:  Thank you.

22          MR. COMBS:  The next group of exhibits is going

23  to be the exhibits related to Dr. Chen's video

24  deposition.  And, in regard to this group of the exhibits,

25  I want to just rely on what we placed on the record,

1   because we actually had a sidebar and discussed those.

2   So, Mr. Cartmell was here with me at that time, and we

3   discussed what the agreements of parties were that for the

4   placement of the exhibits.

5         And I'll be glad to look at them for form as he is

6   handing them to me.

7         And we're handing the court reporter Exhibit 690,

8   which is the redacted.

9               MR. FAES:  The next one is going to be 176.

10              MR. COMBS:  I just want to see the redaction on

11  that one.

12              Okay, yeah, that's 686.

13              THE CLERK:  And we need 176.

14              MR. FAES:  Here's 176.

15              MR. COMBS:  Exhibit 700 is a two-page document

16  that's Bates stamped FMESH 04097335, FMESH 04097336, and

17  Mr. Faes can just provide a copy of that at the end of the

18  lunch break in the course of that document.

19              THE CLERK:  Okay.

20              MR. FAES:  And the only other one I had is 969,

21  we said last night, was already in, but I don't see it on

22  the list.

23              MR. COMBS:  I believe it was cut from your part

24  of the --

25              MR. FAES:  I'd like to admit it, if we can.

1        MR. COMBS:  Show me the document, because I

2   think it's -- it's been admitted.

3        MR. FAES:  I don't believe it has.  I know we

4   all said that last night, but I just checked her exhibit

5   list, and it's not on there.  And it's about to be offered

6   *in camera*, as well.

7        MR. COMBS:  Just -- we can go off the record

8   for a second.

9      (Off the record discussion.)

10       MR. COMBS:  Okay, in regard to Exhibit 969,

11  frankly, I'm not sure whether it was admitted through Chen

12  or not, but it will be admitted with other witnesses.  I

13  just don't remember.

14       THE CLERK:  So, no objection to this?

15       MR. COMBS:  We don't object to it.  It's going

16  to be discussed with other witnesses.

17       THE CLERK:  Okay.  All right.

18       MR. FAES:  That's everything for now.

19       THE CLERK:  Okay.  Thank you.

20  BENCH CONFERENCE CONCLUDED.

21     (Luncheon Recess.)

22

23

24

25

```
 1                          AFTERNOON SESSION

 2          (Out of the presence and hearing of the jury:)

 3              THE COURT:  Good afternoon.  The Court will do some

 4      housekeeping.

 5          Plaintiff's Exhibit Number 1963 is marked and admitted.

 6      Plaintiff's Exhibit 1965 is marked and admitted.  1966 is

 7      marked and admitted.  1971 is marked and admitted.  1970 is

 8      marked and admitted.  858 is marked and admitted.  1885 is

 9      simply marked.  93 is marked and admitted.  1669 is marked and

10      admitted.  690 is marked.  686 is marked.  176 is marked.  700

11      is marked.  1256 is marked and admitted.  1297 is marked and

12      admitted.  759 is marked and admitted.  153 is marked and

13      admitted.  969 is marked and admitted.

14          I'm advised that we have a very kind group of lawyers and

15      parties in this case who have agreed to equally chip in and

16      buy lunch for the jury.  I think that's awful nice of you all.

17      I want to thank you.  If it's all right with you, I'm just

18      going to tell them the parties have decided to buy their

19      lunch, you know.

20              MS. JONES:  That would be fine, Your Honor, if you'd

21      tell them that I wanted to buy them a really good lunch.

22              MR. CARTMELL:  With dessert.

23              MS. JONES:  And they have --

24              MR. CARTMELL:  She said McDonald's.

25              THE COURT:  All right.  Would you bring them in,
```

```
 1    please.
 2                MR. ANDERSON:  Your Honor --
 3                THE COURT:  Yes, sir.
 4                MR. ANDERSON:  -- excuse me.  After the next video
 5    is played -- I think it's about 45 minutes -- we may need a
 6    few minutes to get a few things set.
 7                THE COURT:  Okay.
 8                MR. ANDERSON:  So I don't know if that's jury time.
 9                THE COURT:  That will work out just fine.
10                MR. THOMAS:  Your Honor, after the next video and
11    before that witness, I'm going to need a few minutes with you.
12                THE COURT:  That's fine.  Just remind me.
13           (Jury In)
14                THE COURT:  You may be seated.  Thank you.
15         Good afternoon, ladies and gentlemen.  After talking to
16    you about the stinginess of your government with regard to
17    lunch tomorrow, the parties volunteered equally to buy your
18    lunch.  So tomorrow they will equally treat you to lunch, and
19    I'm not chipping in anything.  So it's very nice.
20         Now, we also are going to watch the weather close so that
21    we see if we need to let you out early tomorrow afternoon.
22    Right now, it looks like the temperature is going to get up to
23    40 or thereabouts around noon tomorrow and the roads should be
24    clear going home.  But we'll keep a close eye on it, and if it
25    looks like we've got a problem, we'll quit a little early
```

```
 1   tomorrow.  But don't count on it, okay?
 2        All right.  Are you squared away for tonight?  Everybody?
 3             A JUROR:  Not sure yet.
 4             THE COURT:  Not sure yet?  Okay.  Well, work with
 5   Tracy on it and we'll see how it works out.  My weather
 6   forecasting yesterday wasn't that good, so I hesitate to do it
 7   again, but it's warming up right now.  And if it stops
 8   snowing, it shouldn't take very long to have clear roads.  So
 9   we'll see.
10        We're in the middle of a videotaped deposition.  We'll
11   resume where we left off.  Counsel?
12             MR. CARTMELL:  Thank you, Your Honor.
13             THE COURT:  I should say testimony.
14             MR. CARTMELL:  That's the end of the plaintiff's
15   presentation of Gene Kammerer.
16             THE COURT:  Do the defendants have cross-
17   examination?
18             MR. COMBS:  We do, Judge, and it's being queued up.
19        (The video of Gene Kammerer was resumed.)
20             MR. COMBS:  Your Honor, that's the end of the
21   defense questions.
22             THE COURT:  All right.  Call your next witness.
23             MR. THOMAS:  Your Honor, can we have a few minutes
24   before the next witness, please?
25             THE COURT:  Yes.
```

1    MR. THOMAS:  Thank you, Your Honor.

2   SIDEBAR CONFERENCE

3    MR. THOMAS:  Your Honor, I understand the plaintiffs

4   are about to call Dr. Uwe Klinge to testify in the case.  Dr.

5   Klinge prepared an 80-some page report and was deposed for two

6   days in Aachen, Germany, and I have his report.

7    I also have the testimony of Dr. Klosterhalfen, and Dr.

8   Klosterhalfen in his testimony covered almost the entire scope

9   of Dr. Klinge's report.  I have for the Court the Dr.

10  Klosterhalfen deposition with the tabs in the area where he

11  covered the scope of the questions by Dr. Klinge.  I have a

12  list, an index of those portions where the testimony was

13  covered.

14    The numbered categories, there are the categories which

15  appear in the Klinge report in the initial beginning.  He

16  lists the categories of testimony where he is going to offer

17  testimony.  What we did is we went through the Klosterhalfen

18  deposition and identified those places where Dr. Klosterhalfen

19  gave expert testimony, including ultimate opinion questions in

20  the areas that are identified there, and I noted the page line

21  where it occurred.

22    When I prepared that, I did not have the as-read copy of

23  the Klosterhalfen deposition.  And I've since learned that the

24  deposition ceases at 10615.  So the entries on there that

25  relate to chronic foreign body reaction, which is number one,

1   and the last one, is an alternative design, were not covered

2   in the direct.

3       So it's Ethicon's position that all of those areas have

4   been covered by Dr. Klosterhalfen.  Any further testimony by

5   Dr. Klinge in that regard would be cumulative.

6       I also note rulings by the Court at the top on the

7   *Daubert* issues.  The Court ruled in those three areas of the

8   *Daubert* issues.  I see that Dr. Klosterhalfen has brought a

9   microscope with him.  It appears that Dr. Klosterhalfen is

10  going to read slides and describe the results of the slides to

11  the jury.

12      I understood from the Court's *Daubert* ruling when you

13  ruled that the basis of his opinions for his pathology

14  opinions were unreliable, that there were no pathology

15  opinions to be offered in that regard.  What I want to know is

16  the scope of the testimony of Dr. Klinge so I don't jump up

17  and down the whole time if the Court tells me he is or is not

18  going to be permitted to testify in these areas where he's

19  been precluded or there's been cumulative testimony from Dr.

20  Klosterhalfen.

21          MR. ANDERSON:  First of all, I'm just now getting

22  this stack of documents that I would need more time to respond

23  to.  That's one.

24      Secondly, Dr. Klosterhalfen gave numerous fact witness

25  opinions.  And so at this point we're taking counsel's word

1    for it this is what it shows.  If something would be

2    precluded, we would want an opportunity to counter that.

3         Third, when Your Honor addressed the *Daubert* opinions

4    regarding pathology, Ethicon was relating to the explants that

5    were not from Miss Lewis.  So he brought his microscope today

6    in order to specifically address Miss Lewis's pathology.  I

7    saw nothing in your order regarding that.  It wasn't

8    specified.  And so I would ask that this man who's flown from

9    Germany be allowed to testify today.

10        We certainly don't want to provide cumulative things, but

11   he was there from the beginning and he came here to testify

12   and we're going to try to limit him as much as we can, but he

13   does have a lot for the judge and jury to hear.  He has to lay

14   a foundation for how he could give the pathology opinions

15   today and his 20 years' worth of research.

16             MR. THOMAS:  Your order specifically excluded the 22

17   explants.

18             THE COURT:  I take --

19             MR. THOMAS:  They're on the back of his report.  And

20   Mrs. Lewis is one of the 22 that was excluded.

21             THE COURT:  Go ahead.

22             MR. THOMAS:  The basis for his opinion, because he's

23   not a medical doctor -- he's not a pathologist.  The basis of

24   his opinion where he purports to be a surgeon and a

25   histologist and transfer that knowledge into the

```
 1    qualifications to read human pathology is reliance on the
 2    explants during -- and the other 22 explants that are -- that
 3    he reviewed.  So that's the basis of his opinion where he
 4    would give human pathology opinions.  And I think that's what
 5    you exclude.
 6              THE COURT:  I did not find a reliable basis for him
 7    to testify regarding the explants basically because the manner
 8    in which they were selected didn't seem to me to be a
 9    sufficient foundation such for an expert opinion.  I will
10    certainly let counsel attempt to qualify him to testify about
11    this woman's tissues.  If he qualifies, fine.  If he doesn't,
12    you can object and I'll rule on it.
13         What I would ask counsel to do is let's just let the jury
14    have a few-minute break, and go over it, try to avoid the
15    cumulative stuff.  The areas where Dr. Klosterhalfen was
16    incomplete or was testifying as to facts, I will allow this
17    witness to duplicate to some extent.  But there are areas, if
18    this is correct, where it's absolutely duplicative.  So why
19    don't we take some time and look and see what you can do and
20    then we'll put him on the stand.
21              MR. ANDERSON:  Give me a few minutes and I'll try to
22    do that.
23              THE COURT:  Fifteen?
24              MR. ANDERSON:  Fifteen will be great.
25    END OF SIDEBAR CONFERENCE
```

```
1            THE COURT:  Good news and good news.  First of all,
2     the clerk's office has heard that I've been talking about how
3     stingy the federal government is, and they've approved a hotel
4     for the night for all of you, and meals obviously that go with
5     it.
6          Secondly, we need to take an early break for the
7     afternoon.  So we'll take a 15-minute break at this time.
8          Please do not discuss the case.  Don't do any of those
9     other things I've told you repeatedly not to do.  I'll call
10    you back.  Court is in recess.
11         (Recess)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1     (In open court following the recess.  The jury is

2  present.)

3          THE COURT:  Be seated.  Thank you.

4     All right, counsel.

5          MR. ANDERSON:  Yes, your Honor.  Plaintiffs

6  call by video Ethicon preclinical scientist in research

7  and development, Joerg Holste.

8     (The videotaped deposition of Joerg Holste was

9  played.)

10         MR. COMBS:  Let's stop.

11    (Mr. Combs and Mr. Cartmell conferring off the

12  record.)

13         MR. CARTMELL:  Yes, that's the end of the

14  plaintiffs' version.  We're going to go to the defendants.

15         THE COURT:  All right.

16         MR. COMBS:  Judge, the defense will have a

17  brief redirect, but it's going to take a few seconds to

18  cue it up.

19         THE COURT:  Sure.

20         MR. COMBS:  Thank you.

21         THE COURT:  I like any part that begins with

22  the word "brief."

23         MR. COMBS:  It will be brief.

24    (Videotaped deposition of Dr. Holste continues.)

25         MR. COMBS:  Judge Goodwin, that ends the

```
 1    questions by the defense.
 2              THE COURT:  All right, is that the end of this
 3    videotape?
 4              MR. ANDERSON:  Yes, your Honor.
 5              THE COURT:  All right, call your next witness
 6              MR. ANDERSON:  Yes, your Honor.  The plaintiffs
 7    call Dr. Uwe Klinge.
 8              UWE KLINGE, PLAINTIFFS' WITNESS, SWORN
 9                      DIRECT EXAMINATION
10    BY MR. ANDERSON:
11    Q.  Good afternoon, Dr. Klinge.
12    A.  Good afternoon.
13    Q.  State your name, please, for the jury.
14    A.  My name is Uwe Klinge.
15    Q.  And where are you from, Dr. Klinge?
16    A.  I'm coming from Germany and I'm -- yeah, I'm living in
17    Aachen.
18    Q.  And what is your profession?
19    A.  I'm a medical doctor.  I'm a surgeon, mainly a surgeon
20    of diseases in the abdominal cavity and the abdominal
21    wall.  And I'm a scientist as an employee of the
22    university, and the focus is biomaterials, and
23    particularly biomaterials in soft tissue that are textile
24    implants, and the evaluation of the functional
25    consequences and basic pathology consequences of this.
```

```
 1              MR. ANDERSON:  May I approach, your Honor?

 2              THE COURT:  You may.

 3    BY MR. ANDERSON:

 4    Q.  Dr. Klinge, I'm showing you what has been marked as

 5    Plaintiff's Exhibit 1-A.

 6         Doctor, is exhibit 1-A a copy of your curriculum

 7    vitae?

 8    A.  That's true.

 9    Q.  Briefly, if you would, just tell the jury a little bit

10    about your professional career from medical school to the

11    present?

12    A.  When I finished medical school, which I went to

13    Aachen, to the medical school at Aachen, I started as a

14    surgical resident at the university hospital at the

15    surgical department there, and I was --

16    Q.  Just a second.  Talk just a little bit slower for the

17    court reporter and for the jury, okay?

18    A.  Sorry.  So, in 1985, I started as a surgical resident

19    at the surgical department of the university clinic, and

20    since then I was trained as a surgeon and -- yeah -- so,

21    finally, that I can finish my education as a surgeon at

22    this department and were able to -- to do all of the major

23    operations in the abdominal cavity there.

24    Q.  And did there come a point in time when you

25    transitioned out of hernia surgery on a day in and day out
```

1   basis?

2   A.  I --

3   Q.  I'm sorry.  Did there come a time when you

4   transitioned out of hernia surgery?

5   A.  I don't understand.

6   Q.  I'm sorry.  English is not your first language, and --

7   A.  No, sir.

8   Q.  -- you speak German.  Let me try a little better.  I

9   apologize.

10      What did you -- after practicing as a hernia

11  surgeon, what else have you done in your professional

12  career?

13  A.  So the -- the main work was working as a visceral

14  surgeon.

15  Q.  And what is a visceral surgeon?

16  A.  They work with diseases of the intestine and the

17  abdominal cavity, or the organs in there.  So, I'd treat

18  all these diseases and the diseases of the abdominal

19  wall.  That is, all kinds of hernias belong to this field

20  of surgery.  So this has been the focus of my surgical

21  work there.  And besides, we made a lot of scientific

22  work, as I said, with a focus on surgical meshes.

23  Q.  And in terms of that work on the biomaterial science

24  on of surgical meshes, approximately how long have you

25  been studying that, Doctor?

1   A.   We started to work scientifically on the meshes when

2   they -- in the beginning of the nineties, and we are not

3   finished yet.   We are still working on this topic.

4   Q.   As part of that biomaterials science work, have you

5   reviewed pathology slides or histopathology slides?

6   A.   Yes.   It was quite clear from the beginning that we

7   have to look very careful to the -- to the tissue response

8   to this material, and, therefore, we -- I had to learn to

9   evaluate the tissue response to these textile implants.

10        Myself and -- at the beginning, when we started to

11   do so, there hardly was any good way to analyze the tissue

12   response, and, therefore, together with Klosterhalfen, we

13   had to establish a lot of criteria to define whether it's

14   a good or a bad or a difficult tissue reaction to the

15   material.

16   Q.   By the material, you mean surgical meshes for the

17   body?

18   A.   Surgical meshes in the body, yes.

19   Q.   So, how did you go about getting this training to

20   review pathology slides with Dr. Klosterhalfen beginning

21   20 years ago, 30 years ago?

22   A.   Well, actually, we have been sitting many times

23   together and looking together to the explants that we

24   made, and because we used a lot of modifications where we

25   clearly knew what has been the modification, so then we

1  learned what is -- what is a change of the tissue reaction

2  when you apply or when you use a material with a certain

3  modification.

4      And thereby we learned what is relevant, what's

5  predicts the outcome of the mesh materials.

6  Q.  When you're talking about this prediction of the

7  outcome of materials by looking at slides and

8  histopathology, just explain for the jury what

9  histopathology is?

10  A.  It's the pathology -- mainly is the analysis of the

11  tissue on the microscopical level.  So, it's usually

12  the -- the properties of the tissues that you cannot see

13  with the naked eyes.

14  Q.  When did you first start learning about pathology or

15  training, based upon your education and background?

16  A.  Pathology and histology is an essential part of the

17  medical school, so, therefore, it started it.  Then, later

18  on, there are regular meetings with the pathology at

19  almost all diseases that we treat surgically, and mainly

20  for all types of cancer.  So, we had regular meetings

21  together with the pathologists to discuss these

22  histological findings.

23      And then, yeah, as I said, we learned it by our

24  studies, preclinical studies, and by the analysis of

25  explanted meshes from humans that we started to collect to

1    learn about it.  And so, I looked to many, many of these

2    explanted meshes.

3    Q.  So you trained with Dr. Klosterhalfen and the other

4    pathologists about reviewing histopathology slides?

5    A.  Yes, yes.

6    Q.  Over these last 20 years, approximately how many of

7    these histopathology slides have you, yourself, reviewed,

8    analyzed and interpreted of surgical meshes explanted from

9    the human body?

10   A.  I only can roughly estimate it.  We don't have a

11   counter there.  But it is at least 20,000 or more.

12   Q.  Who has relied on your pathology work over those 20

13   years and in your review of histopathological slides?

14   A.  A lot of our studies include the histological analysis

15   of these results.  So, every -- so everyone who read these

16   articles, he has to -- or he would -- relied on the

17   results of these analyses.

18   Q.  I noticed in your CV -- let me see if I can ask it

19   this way -- it shows that you've written some findings in

20   your CV?

21   A.  Yes.  We published everything.  We want to publish all

22   of our findings at the university.  That is, our -- our

23   main task is to educate and to provide our findings to the

24   public.

25   Q.  How many publications in the scientific literature

1   have you written, Dr. Klinge?

2   A.  It's more than 200.

3   Q.  And how many times has your work been cited by other

4   scientists and surgeons in the scientific literature?

5   A.  It's actually more than 2,000 times.

6   Q.  Approximately how many of those scientific

7   publications of yours relate to mesh for the abdomen or

8   the pelvis?

9   A.  For the purpose of meshes, it's more than a hundred.

10  So, half of them.

11  Q.  And in those publications, how many times were you the

12  scientist that was responsible solely for the

13  histopathology of a tissue reaction in explanted meshes?

14  A.  In about 50.

15  Q.  You talked a little bit about the University of

16  Aachen.  Is that where you're still currently employed,

17  sir?

18  A.  Yes.  Yes.

19  Q.  And in terms of textile research, how does the

20  University of Aachen rank in terms of textile research

21  facilities in the entire world?

22  A.  Their technical university is one of the few technical

23  universities which has a combination of a medical faculty

24  and the textile engineering, and the textile university is

25  one of the top locations in Germany and for the -- or for

1    the engineering of the machines of the textile.  It is

2    maybe one of the top faculties of the world.

3    Q.  Is there anyone that you're aware of, other than you

4    and Dr. Klosterhalfen, who has studied surgical meshes in

5    the world over the last 20 years?

6    A.  No, I don't know any, and I don't know any who has our

7    combination of combining engineers and pathology and

8    surgeons.

9              MR. ANDERSON:  May I approach, your Honor?

10             THE COURT:  You may.

11   BY MR. ANDERSON:

12   Q.  Doctor, at my request, did you prepare an expert --

13   well, three expert reports in this case?

14   A.  I did.

15   Q.  And I would like to identify them as Plaintiff's

16   Exhibit 1, 1-B and 1-C.

17             MR. ANDERSON:  Your Honor, I'd like to offer

18   1-A, 1 -- I'm sorry, 1, 1-A, 1-B and 1-C, please.

19             THE COURT:  Is that four exhibits or just

20   three?

21             MR. ANDERSON:  It's the CV and three reports.

22             MR. THOMAS:  Your Honor, I have no objection to

23   the CV, but I do object to the reports being received into

24   evidence.

25             THE COURT:  All right, I'll admit the CV.  I

```
 1    don't think sufficient foundation has been laid for the

 2    others.

 3              MR. ANDERSON:  Nor did I intend to, your Honor.

 4    Thank you.

 5    BY MR. ANDERSON:

 6    Q.  In writing your report and in coming to the opinions

 7    that we'll address with the jury today, did I ask you to

 8    review internal Ethicon documents?

 9    A.  Yes.

10    Q.  Approximately how many pages of Ethicon documents have

11    you reviewed in the course of your work in this case, sir?

12    A.  More than a thousand.

13    Q.  And have I asked you to review depositions?

14    A.  Yes.

15    Q.  Have you reviewed internal Ethicon depositions at my

16    request?

17    A.  I reviewed about a dozen of depositions.

18    Q.  And have you reviewed scientific literature both

19    before this case and during the pendency of this case that

20    relates to the issues of textile meshes and polypropylene

21    meshes in the human tissue?

22    A.  That is part of my daily work, but, particularly for

23    this case, I intensified some research through some

24    specific issues.

25    Q.  Dr. Klinge, what is Prolene mesh; the Prolene mesh
```

1   that's used in the TVT?

2   A.  Prolene mesh is a textile construction with a double

3   filament.  It is, in comparison to others, very heavy.

4   That means that it has a considerable amount of material

5   in comparison to others.  It is done of -- or it is

6   constructed -- the polymer is the polypropylene.

7   Polypropylene is a plastic material that is used -- widely

8   used in our daily life.  So, all -- most of the plastic

9   bags are made of polypropylene.

10  Q.  And do any of the studies that we've talked about in

11  the publications, the hundreds of publications in your CV,

12  do any of those involve research on Ethicon's Prolene

13  mesh?

14  A.  Most of our preclinical studies include the use of the

15  Prolene mesh as a reference of a -- yeah, so-called heavy-

16  weight small-pore meshes, or mesh material of the most

17  intense tissue reaction.  And, therefore, we used it in

18  most of -- almost all of our preclinical studies.

19  Q.  Going back to what time period did you first start

20  looking at and analyzing the Prolene hernia mesh that is

21  also the Prolene mesh in TVT?

22  A.  The first clinical -- or there is -- the first

23  experiments we did to characterize the response to some

24  currently -- at that time currently available meshes, they

25  started in 1994.  There we took some mesh materials that

1  are available on the market at that time, and we placed it

2  in tissue, and then we tried to identify the parameters

3  that are decisive for characterization of the biological

4  response to these different materials.

5  Q.  The jury has just heard from a Joerg Holste, an

6  Ethicon employee.  Are you familiar with Dr. Holste?

7  A.  Yeah, I know him good.

8  Q.  How long have you been working with Dr. Holste at

9  Ethicon?

10  A.  I've seen him the first time -- or the closer

11  collaboration, it started in 1994.

12  Q.  Explain to the jury just briefly about your

13  collaboration and consulting work with Ethicon dating back

14  to the nineties?

15  A.  Beginning with this focus on the meshes, it started in

16  the beginning of the nineties, because at that time there

17  came up some surgical procedures that used these mesh

18  materials, and there was an intense discussion among the

19  surgeons whether really to use these meshes or still using

20  only suture materials.  And, in this discussion, there

21  are -- was the, or we all felt that it is necessary to

22  understand little bit more about the meshes, in

23  particularly, as we have to make some revision operations

24  of these mesh materials, and we saw that there are some

25  complications, though we implanted them in a correct way.

 1          And, to understand this, we said we have to learn a

 2     lot more about these materials, and, in particularly, we

 3     hoped that we can reduce the amount of the material and,

 4     therefore, make it more safe.

 5          That was the basic idea why we started to think in

 6     this direction, and we had the opportunity at the

 7     university to build up a scientific research group for the

 8     studying of biomaterials and meshes, in particularly.  Now

 9     we got a grant so that we could do it.  But when you want

10     to study meshes, you need specific modifications of these

11     meshes, and you are not able -- in surgery, we weren't

12     able to prepare these modifications.  So, you have to

13     contact the manufacturer.  You have to work with a

14     manufacturer who provides the filaments and who provides

15     the mesh materials, and then together you can create these

16     experimentally implants and then making your studies with

17     this.

18          And the manufacturer working for these projects,

19     that has been Ethicon from the beginning.

20     Q.  So, in this collaboration between your group and the

21     biomaterials research group in Aachen in this

22     collaboration with Ethicon, were you able to actually

23     reduce the material and develop a new product?

24     A.  That -- that was finally the end of the first phase

25     that we -- as Joerg Holste had turned it already; that we

1  could reduce the amount of the material to one-third, and

2  that we can -- could demonstrate in multiple studies, and,

3  later on, even in clinical studies that the reduction in

4  the amount of the material improves the clinical outcome

5  and reduces the risk for the patient.

6  Q.  And what was the name of that product that was

7  developed in collaboration between you and Ethicon in the

8  nineties?

9  A.  This first really large pore meshes has been -- was

10  named as Vypro.  It was a combination of polypropylene and

11  an absorbable product.

12  Q.  And after the development of Vypro, did Ethicon begin

13  to sell that and other light-weight meshes for hernia

14  repair?

15  A.  After the development of the Vypro, the subsequent

16  mesh development by Ethicon was in the direction of -- of

17  these large-pore mesh constructions.  Successor is --

18  successor has been the UltraPro, and even today, with the

19  Physiomesh, they provided --

20  Q.  So, was this an evolution from Prolene to Vypro to

21  UltraPro to Physiomesh in terms of weight and pore size?

22  A.  Yeah.  We -- we could show in -- with our studies that

23  it was an advantage for the patient to reduce the amount

24  of the material, and this principle -- this is a

25  principle.  This principle is still used in many of the

1    products.

2    Q.   You're familiar with the old construction 6 mil

3    Prolene that is used in TVT products; correct?

4    A.   Yes.

5    Q.   After Ethicon went to selling Vypro and then UltraPro

6    as lighter-weight large-pore meshes for hernia repair, did

7    it stop selling the old construction 6 mil hernia repair

8    mesh?

9    A.   So far I know that the selling of the Prolene

10   continued, but the Prolene -- the old Prolene mesh

11   changed -- or got a little bit some changes in the textile

12   construction.   But it's still the prototype of a heavy-

13   weight mesh.

14   Q.   What year did Ethicon stop selling the Prolene 6 mil

15   old construction for hernia patients?

16   A.   Pardon?

17   Q.   What year did Ethicon stop selling -- strike that.

18        Did you review some internal deposition testimony of

19   a -- of Ethicon employees regarding it?

20   A.   So far I remember, in 2001 the old Prolene was

21   replaced by a -- a new version.

22   Q.   And you mentioned UltraPro as a light-weight large-

23   pore mesh by Ethicon.   How much larger were the pores and

24   how much lighter was the weight than the old construction

25   Prolene?

1  A.  It's another world.  It is the -- the pore size of

2  UltraPro is more than 3 millimeters, whereas the pore size

3  of the Prolene is less than 1 millimeter.  So, it's

4  considerably significantly more open.

5  Q.  And what about the weight?  How does the weight

6  compare with their UltraPro mesh to their old construction

7  Prolene?

8  A.  The weight is -- if you're -- it has a part of

9  absorbable material, and this is absorbed.  It is

10  one-third in comparison to the Prolene mesh.

11  Q.  After your review of the materials, did you come to an

12  understanding as to whether Ethicon uses the UltraPro mesh

13  in another part of the body?

14  A.  Yes.

15  Q.  What part of the body is that?

16  A.  UltraPro of a large-pore conception was used in -- in

17  meshes for the repair of prolapse.

18  Q.  Did you say prolapse?

19  A.  Prolapse.

20  Q.  Okay.  So, Ethicon sold a light-weight large-pore mesh

21  for hernia, a light-weight large-pore mesh for prolapse.

22  Does it sell a light-weight large-pore mesh for stress

23  urinary incontinence in women's vaginas?

24  A.  No.

25  Q.  After your review and your study over the last 20

1   years of surgical meshes and surgical implants and

2   explants and your review of all of the literature and your

3   background, training and experience, have you ever been

4   able to come to any understanding as to why Ethicon

5   continues to sell a heavy-weight small-pore --

6          (Mr. Thomas rising.)

7                 THE COURT:  Sustained.

8   BY MR. ANDERSON:

9   Q.  While you were a consultant at Ethicon did you speak

10  at conferences at their request?

11  A.  Yes, several times.

12  Q.  At what point in time did your consulting

13  relationship, if you will, stop with Ethicon?

14  A.  The collaboration or the working together with

15  Ethicon, it definitely or finally stopped in 2012.  We

16  have from 1994 to the beginning of 2004, '5, we have this

17  development of this very intensive joint development of

18  meshes, the discussion of the results.  Later on we had

19  ongoing projects Aachen.  I think they finished in 2009.

20  We had regularly meetings there till 2009.  That's --

21  Q.  Have you been asked by Ethicon to speak at conferences

22  that they sponsored regarding biomaterials science and

23  pathology of surgical meshes used in the pelvic floor?

24  A.  Yes.

25  Q.  And have you been asked by Ethicon to speak at

1    conferences urogynecologists, gynecologists and urologists

2    about pelvic-floor meshes either for prolapse or SUI?

3    A.  Yes.

4    Q.  In the course of your work, where you've looked at --

5    you mentioned that you'd looked at animal explants.  Have

6    you also looked at explants from humans regarding Prolene?

7    A.  Yes.  We know from the beginning that animal

8    experiments have -- or have important limitations, and

9    that for -- that we have to edit or we have to look at

10   what happens in the humans.  And the only occasion that we

11   had --

12            MR. THOMAS:  Your Honor?

13            THE COURT:  I know the limitations I've placed

14   on this.  I assume counsel does, too.  As long as this

15   answer stays as general as I it has so far, we're fine.

16   If it goes much further, we aren't.

17            MR. ANDERSON:  Thank you, your Honor.

18            THE COURT:  Okay.

19   BY MR. ANDERSON:

20   Q.  Have you personally analyzed and done the

21   histopathological analysis of hernia explant meshes with

22   Prolene in them?

23   A.  Yes.

24   Q.  Is that part of your work at the biomaterials research

25   group in Aachen University?

1    A.  Yes.

2    Q.  And have you also reviewed pelvic-floor meshes and the

3    tissue response to pelvic-floor meshes as part of your

4    work at Aachen University?

5    A.  Yes.

6    Q.  Approximately how many tissue samples or explants have

7    you reviewed either for hernia meshes or pelvic-floor

8    meshes as part of your work at Aachen University?

9    A.  We have collected at our university 500 hernia

10   meshes -- hernia meshes, and I've reviewed some of the

11   meshes that are collected in Duren by Prof. Klosterhalfen,

12   as well.

13            MR. THOMAS:  Your Honor?

14            THE COURT:  Sustained.  The jury will disregard

15   the last question and answer.

16            MR. ANDERSON:  May I approach, your Honor?

17            THE COURT:  Sure, but I did rule on this.

18   SIDEBAR CONFERENCE:

19            THE COURT:  All right, sir.

20            MR. ANDERSON:  Your Honor, this is what we

21   sought to clarify with our motion for clarification with

22   your Honor.  As part of Dr. Klinge's work, he has

23   published extensively on the explant database that he has

24   maintained at his university and with Duren.  He's

25   published in the worldwide reviewed literature, and he is

1    one of the persons in charge of the European Hernia

2    Society's explant database.

3         What I'm trying to do here, sir, is to ask your

4    Honor if -- to lay a foundation for the fact that he's

5    reviewed pathology slides, 25,000 of them, over 20 years.

6              THE COURT:  He said that.

7              MR. ANDERSON:  And I want to make sure that

8    I've laid the foundation so he can talk about Ms. Carolyn

9    Lewis' explants.  But I can't do that if he can't talk

10   about at lease that he has reviewed these over the course

11   of his career.

12             MR. THOMAS:  Your Honor?

13             THE COURT:  Yes.

14             MR. THOMAS:  His deposition testimony is very

15   clear that when he has collected hernia explants at the

16   University of Aachen he has not collected and has decided

17   not to collect explants from the pelvic floor.  So, his

18   expertise in this regard is clearly related only to hernia

19   explants and not to pelvic floor meshes that he's

20   collected himself.

21        I would suggest to the Court that selection bias

22   exists for any other mesh collections that we've already

23   talked about.

24             THE COURT:  And on your, I guess -- I forget

25   how you styled the motion for me to think it over again.

1           MR. ANDERSON:  Yes, sir.

2           THE COURT:  I actually ruled on that, as well.

3  There is no question that this guy has looked at meshes of

4  different kinds through microscope.  You brought that out.

5           MR. ANDERSON:  Okay.

6           THE COURT:  He's looked at explants of various

7  kinds, and you've brought that out.  Now, whether he's

8  qualified to render some opinion about Ms. Lewis' explant,

9  I don't know yet.

10           MR. ANDERSON:  That's why I was trying to ask

11  if he had ever done histopathological analyses on the

12  meshes that have been explanted from the pelvic floor.  I

13  can't lay that foundation if your Honor won't let me ask

14  it.

15      And I saw that you didn't like my response, so I was

16  going to -- I wanted to ask for my own sidebar just

17  because I want some clarification.  I don't want your

18  Honor to be upset at me.

19           THE COURT:  No, no, no, I'll never be upset.

20  Mr. Anderson, you can be assured I won't be upset with any

21  of you.

22           MR. ANDERSON:  You can get there, though.  And

23  I want -- I want help.  I don't know how you want me to do

24  that.

25           THE COURT:  Well, he's not a pathologist, but

1    he is a surgeon.  He has testified that he has had

2    extensive experience and published peer-reviewed articles

3    involving conclusions he drew about histology.

4         So, I don't know which of those articles -- he said

5    about 50 of them -- the histological opinions were solely

6    his.

7              MR. ANDERSON:  That's right.

8              THE COURT:  And if he has 50 peer-reviewed

9    articles with histological conclusions, and you can tie

10   that -- I'm not trying to tell you how to try your case --

11   if you can tie that to him looking at Mrs. Lewis' SUI mesh

12   somehow -- I don't know what these articles are -- and

13   maybe you can get there.  That's about the best I can do

14   for you.

15             MR. ANDERSON:  I tried to get there, your

16   Honor, but I -- I will tie it more to the publications

17   than to looking at the explanted pelvic floor meshes in

18   Duren.  Is that --

19             THE COURT:  Well, as I understand it, unless

20   you lay a further foundation, I'm not sure that -- as I

21   pointed out in my ruling, I don't know what -- there was

22   no indication how the meshes that he collected and studied

23   were chosen nor how he formed opinions based upon that

24   particular collection that were reliable.  So, there

25   wasn't enough information from which I could conclude that

1   it wasn't junk science.

2       The Supreme Court hasn't been extraordinarily

3   helpful with <u>Daubert</u>, and, frankly, beyond the fact that

4   the Fourth Circuit is pretty generous to doctors on

5   differential diagnosis, nor have they.

6       So, I just have to do my own best shot at this.  And

7   I've told you all, I'm going to tell you now, take a shot

8   and we'll see how it goes.

9           MR. ANDERSON:  Thank you, your Honor.

10  END OF SIDEBAR CONFERENCE.

11  BY MR. ANDERSON:

12  Q.  Dr. Klinge, as part of these publications that you

13  mentioned in which you were the pathologist or

14  histopathologist reviewing slides, did some of those

15  include your review of explanted meshes from women's

16  pelvic floors?

17  A.  Yes.

18  Q.  Is that something that you have done over the course

19  of the last 15 years, is look at explanted meshes from the

20  pelvic floor and published on them?

21  A.  Yes.

22  Q.  I show you what is marked as Plaintiffs' Exhibit 1993.

23          MR. ANDERSON:  If I may approach, your Honor?

24          THE COURT:  You may.

25  BY MR. ANDERSON:

1   Q.  And I'd also like to show you Exhibit 1998 at the same
2   time.
3                  THE COURT:  What was the first one, I'm sorry?
4                  MR. ANDERSON:  1993, sir.
5                  THE COURT:  All right.
6   BY MR. ANDERSON:
7   Q.  I'm showing you what we've marked as Plaintiffs' 1993
8   and 1998.  Are those documents that you had within your
9   files that you produced in this litigation?
10  A.  That's true.
11  Q.  Okay.
12                 MR. ANDERSON:  Your Honor, if we could show
13  1993 and 1998?
14                 MR. THOMAS:  Your Honor, they're in German.  I
15  don't know what they are.  I don't think the witness has
16  identified them yet, other than being documents from his
17  file.
18                 MR. ANDERSON:  Okay.
19  BY MR. ANDERSON:
20  Q.  In 1993, what's the title of that?
21  A.  The title of this symposium that took part in Hamburg
22  in 2007, the title was Pelvic Floor Mesh Forum.
23  Q.  What does it say to the upper left of this Pelvic
24  Floor Mesh Forum?
25  A.  At the upper left on this page there is written

1   "Ethicon women's health and urology."

2   Q.  Were you an invited lecturer at the Ethicon women's

3   health and urology at Ethicon's facilities?

4   A.  Yes.  I was asked to give an overview of the

5   scientific basis and the clinical evidence.

6   Q.  And were you invited as a speaker at Ethicon to speak

7   urogynecologists, gynecologists and urologists about, in

8   part, the histology of pelvic-floor meshes?

9   A.  Yes, that's correct.

10  Q.  And is this presentation something that you prepared

11  at Ethicon's request to present at Ethicon to urologists,

12  gynecologists and urologists?

13  A.  Yes.

14           MR. ANDERSON:  Your Honor, I would seek to

15  admit 1993 and 1998.

16           MR. THOMAS:  Your Honor, I have no objection

17  based on foundation.  I can't read it.

18           MR. ANDERSON:  And if you would allow me --

19           THE COURT:  Let me see you both at sidebar for

20  a minute, because I have another matter I need to mention.

21  SIDEBAR CONFERENCE:

22           THE COURT:  Okay, this still might be helpful.

23  One of the main things that I said is that Dr. Klinge did

24  not put in his report -- and put it in a footnote on page

25  11 -- although Ethicon asserts that Dr. Klinge's specific

1    causation opinion should be excluded, I said he offers

2    none that I could find.  So, what I'm concerned about now,

3    is he about to offer a conclusion on specific causation

4    which was not a part of his report?  So I'm just -- I

5    don't know where you're going, so --

6              MR. THOMAS:  That's a big part of my concern,

7    too, as well, your Honor.

8              MR. ANDERSON:  The pathology slides in his

9    report reflect Ms. Lewis' pathology.  He asked --

10   Mr. Thomas asked him about that at his deposition, at his

11   two-day deposition.  On the second day he asked him are

12   those Mrs. Lewis' slides.  Yes, they are.  And he went

13   into them extensively, and there were page after page of

14   pathology slides from Mrs. Lewis.

15             THE COURT:  I understand, Mr. Anderson.  Well

16   perhaps I should wait for the objection.  I just want to

17   share with you my concern as to specific causation,

18   because I didn't see that he was listed as offering one.

19   They acted like he did.  I agree with you, because they

20   objected to it.

21             MR. ANDERSON:  Underneath each of the

22   photographs in his report, he says bridging fibrosis or

23   shrinking, and that's why I was trying to lay a

24   foundation.  The fact that --

25             THE CLERK:  One of the jurors needs a break

 1  right now.

 2  END OF SIDEBAR CONFERENCE.

 3          THE COURT:  Okay, we'll take a brief break.

 4  Remember my other admonitions.  Let's come back in about

 5  five minutes.

 6          (The jury withdrew.)

 7      This always happens to me.  I'm trying to speed

 8  things up and I had the effect of just slowing it down.

 9  So I'm going to let you go forward the way you want to,

10  and the objections will come or not come.

11          (Off the record discussion.)

12  SIDEBAR CONFERENCE:

13          MR. ANDERSON:  If your Honor feels at this time

14  that I have not laid an appropriate foundation for him to

15  be able to speak to the pathology slides, I don't know how

16  much further I can go with trying to qualify him.

17          THE COURT:  Well, I can't offer advisory

18  opinions, but you just told me about something under the

19  pictures over there --

20          MR. ANDERSON:  Yes.

21          THE COURT:  -- that I thought was interesting.

22      Let me be blunt, Mr. Anderson.  I wouldn't give up

23  yet.

24          MR. ANDERSON:  All right.  Thank you, your

25  Honor.  I don't want to keep beating my head against the

```
 1   wall.  I don't want to keep beating my head against the
 2   wall, your Honor.
 3             THE COURT:  Sorry, Ms. Jones.
 4             MS. JONES:  Give up.
 5   END OF SIDEBAR CONFERENCE.
 6             THE COURT:  Okay, if they're ready, we'll
 7   start.
 8        Is there a chance we'll get this witness done today?
 9             MR. ANDERSON:  Given some of the rulings that
10   we've had here earlier about nonduplicative testimony, I
11   would think that we will -- given the pathology -- end it
12   today.
13             THE COURT:  All right.
14             MR. THOMAS:  Pardon?
15             THE COURT:  I was just trying to find out if we
16   thought we'd finish the rulings today.  He thought he was
17   going to get the pathology and cross, and we'll finish
18   with him.
19             MR. THOMAS:  So you're going to go solely to
20   pathology?
21             THE COURT:  Makes you happy, doesn't it?
22             MR. THOMAS:  I'm always --
23             THE COURT:  You look happy.
24        Let's go.
25        (The jury entered the courtroom.)
```

1      Thank you, ladies and gentlemen.  You may be seated.

2      Thank you, Doctor.

3      Mr. Anderson?

4           MR. ANDERSON:  Thank you, your Honor.

5  BY MR. ANDERSON:

6  Q.  Referring back to Plaintiffs' Exhibit 1, your expert

7  report, Dr. Klinge, in your expert report do you provide

8  photomicrographs of tissue samples taken from Ms. Lewis?

9  A.  Yes.

10 Q.  And are these the type of tissue samples that you

11 reviewed in the past and published articles on, as you

12 explained to the jury?

13 A.  Yes.

14 Q.  And are these the type of pathology slides of tissue

15 samples that you have presented at conferences around the

16 world?

17 A.  Yes.

18 Q.  And did I ask you to review different types of

19 pathology slides for purposes of offering your opinions

20 here to the jury today?

21 A.  For this case, yes.

22 Q.  Okay.  And what different types of slides did we ask

23 you to have prepared to be able to look at the tissue

24 samples coming from Ms. Lewis?

25 A.  Basically, these are two different stains.  The first

1    is a staining for the cells and for the -- for the tissue

2    in between the cells, what we call the matrix, and mainly

3    this is the collagen to identify whether there is scar

4    tissue or fat tissue or other tissues.  This is one

5    stain.

6          And the other stain is to look whether there are

7    some nerves that are entrapped into -- in this scar

8    tissue.  And this is done because these nerves are very,

9    very small, so that you cannot identify them just by

10   looking.  You need some specific markers that are specific

11   for the -- or that binds specifically to the tissue of

12   nerves.

13         And then you have an additional marker with a brown

14   color.  So then you can made a marking of these nerve-like

15   structures --

16               MR. THOMAS:  Your Honor?

17               THE COURT:  Yes?

18               MR. THOMAS:  I think he's going well past

19   foundation, if that's what we're trying to do.  I object

20   to it.

21               THE COURT:  I'm going to allow it.  Please go

22   on.

23               MR. ANDERSON:  Thank you, your Honor.

24   BY MR. ANDERSON:

25   Q.  Did you bring some of those slides from Ms. Lewis here

1  today to show the jury?

2  A.  Yes.

3            MR. ANDERSON:  Your Honor, may he show the

4  slides from Ms. Lewis?

5            MR. THOMAS:  Your Honor, I object and request

6  sidebar.

7            THE COURT:  Sure, we can have a sidebar.  We

8  haven't had one for awhile.

9  SIDEBAR CONFERENCE:

10            THE COURT:  All right, sir.

11            MR. THOMAS:  Your Honor, I object to Dr. Klinge

12  given any pathology opinions.  I don't believe an adequate

13  foundation has been laid.

14       To the extent the Court is inclined to hear

15  testimony, I'd request that I be able to take the witness

16  on voir dire at this point.

17       The other thing I'd like to remind the Court, and

18  this is true, while there are pathology slides identified

19  in the report, you will find nowhere in the report where

20  Dr. Klinge says it's my opinion to a reasonable degree of

21  certainty in my field of expertise that Carolyn Lewis has

22  such-and-such a condition based upon these findings that I

23  find from the slides.

24       There are comments made about the numbered slide,

25  but nowhere in the report is there a statement by the

1  expert that there is a condition that she has suffered as

2  a result of a defect that he's found in the mesh.

3        MR. ANDERSON:  She has chronic pain and

4  dispareunia, he has identified in the slides, and that's

5  what I was trying to lay the foundation for, the

6  foundation there that the brown stain S, 100 and that's

7  found entrapped in nerves.

8        THE COURT:  What is there in the report about

9  that?

10        MR. ANDERSON:  It shows an entrapment -- can I

11  get the report?

12        THE COURT:  Yes.

13     (Pause.)

14     All right, Mr. Anderson.

15        MR. ANDERSON:  Yes.  So the inflammatory slides

16  begin on page 70 of Dr. Klinge's report, and it says 40X

17  making any folded mesh and intense inflammatory reaction,

18  intense, a pronounced acute inflammation, and then I think

19  I told you confirmed the inflammatory and fibrotic tissue

20  reaction, polymer particles --

21        THE COURT:  Okay.

22        MR. ANDERSON:  -- etc.

23        THE COURT:  I'll let you do voir dire of him if

24  you like.  I'm going to let it in.  But it's up to you.

25        MR. THOMAS:  If that's your ruling, I'll save

1   it for cross then.

2                   THE COURT:  That's what I thought you'd do.

3                   MR. ANDERSON:  Thank you.

4           END OF SIDEBAR CONFERENCE.

5                   THE COURT:  All right, sir.

6                   MR. ANDERSON:  Thank you.

7   BY MR. ANDERSON:

8   Q.  Dr. Klinge, did you bring some pathology slides from

9   Ms. Lewis that you could show to the jury here today?

10  A.  Yes.

11  Q.  Okay.  Do you have a microscope there so that you

12  could show the jury some of the points of her slides that

13  you analyzed for me?

14  A.  Yes.

15                  MR. ANDERSON:  Your Honor, can he put it on the

16  screen now, please?

17                  THE COURT:  Yes.

18                  MR. ANDERSON:  May I approach?

19                  THE COURT:  You may.

20  BY MR. ANDERSON:

21  Q.  All right, will you please just explain to the jury

22  what we're looking at here in terms of Mrs. Lewis' explant

23  slides?

24  A.  So, what we see here.

25                  THE COURT:  Hold the microphone closer, would

1   you?

2           THE WITNESS:  Yes.

3   A.  What you see here is a so-called HE staining of the

4   tissue.  It's a very small sample, and we look through the

5   magnification of 40.

6       All these white areas here that are the areas where

7   the mesh initially has been placed there.  And if you --

8           MR. ANDERSON:  One second.

9       (A juror's monitor is malfunctioning.  The Clerk

10  resolved the problem.)

11          THE COURT:  Thank you, Robin.

12          MR. ANDERSON:  Thanks, Robin.

13          THE COURT:  All right.

14  A.  So, this white area here, this is the area where the

15  mesh fibers has been -- or were.  But these are very, very

16  thin sections, and by cutting these sections, the plastic

17  material is removed, so that you usually cannot see

18  directly, with some exceptions, the plastic material

19  itself.  You just can see the tissue response around it.

20      But if you will look on look to this area or to this

21  part here, there has been the filament, and the filament

22  has a diameter of 117 microns, and this is the same

23  diameter of this hole.  So, you usually see the holes

24  where the polymer fibers were.

25  Q.  So, the circles to the right and to the left of the

1    screen, those would be polypropylene Prolene fibers in the

2    TVT mesh; correct?

3    A.  They have been here, they were there, and here in this

4    area, and here there has been these polymer fibers.

5    Q.  And please explain to the jury what the pink or the

6    red area is in between those fibers.

7    A.  When the tissue -- when the plastic material is placed

8    in the tissue, then the patient or the tissue activates

9    the defense mechanism, and the first defense mechanism is

10   that a lot of cells are accumulated at the surface of

11   these materials.  These are inflammatory cells, and they

12   try to -- to block the surrounding tissue from these

13   foreign-body materials.

14        That is what is said, the foreign-body reaction, the

15   inflammatory part of the foreign-body reaction.  These are

16   here all these blue cells that you can see here, and --

17   Q.  And what is -- I'm sorry, Dr. Klinge.  What is the red

18   part in between the fibers?

19   A.  The red part in between the fibers, that is scar

20   tissue.  And the most prominent part of scar tissue is

21   collagen, and this is stained red.

22   Q.  Based upon your work with Ethicon and your literature

23   and your 20 years of research in this area, is there a

24   greater risk for the red inflammatory reaction in the

25   tissue if the pores are a certain pore size between each

```
 1   other?
 2              MR. THOMAS:  Objection, your Honor.
 3   Foundation.
 4              THE COURT:  Give me a minute.
 5   A.  So --
 6              THE COURT:  Wait just a second.
 7              MR. ANDERSON:  No.
 8              THE COURT:  Wait just one second.
 9         Overruled.  You may answer.
10   BY MR. ANDERSON:
11   Q.  Is there a minimum pore size between the fibers that
12   we're seeing here that will cause fibrotic bridging?
13   A.  You see in this image that the entire space between
14   these filaments is filled by scar tissue.  There is no
15   other -- there is no other tissue.  And if you measure the
16   distance between these fibers here, you will find that
17   it's usually a very small distance.
18         So the pores here in this cross-cutting are very,
19   very small, and all this tissue around these mesh
20   materials, it's only scar tissue.
21   Q.  And what does that mean for the patient when you see
22   only scar tissue in between the fibers of surgical meshes?
23   A.  If the --
24              MR. THOMAS:  Your Honor, I object to this.
25              THE COURT:  Sustained.  You need more
```

1    foundation for that, Mr. Anderson.

2    BY MR. ANDERSON:

3    Q.  As we were talking with the jury about a few minutes

4    ago, have you, as part of your work over the last 20

5    years, treated hernia patients who have had similar

6    histopathology as what we see on the screen?

7    A.  This is a typical reaction for all heavy-weight small-

8    pore meshes.  They almost look similar to this.  And this

9    filling of the space in between the filaments only by scar

10   tissue, that is what we call bridging, and this means, as

11   Joerg Holste said, increased risk for shrinkage and

12   chronic pain.

13   Q.  And as both a surgeon and a biomaterials scientist,

14   have you treated patients that have had pain as a result

15   of fibrotic bridging like we see in this pathology slide?

16   A.  Yes.  We have made several explantations because of

17   pain, and mainly 90% of these were explants from heavy-

18   weight small-pore meshes.

19   Q.  What is it about scarring in an implant like we see in

20   this slide that causes pain in patients?

21           MR. THOMAS:  Your Honor, I object.  Once again,

22   foundation.

23           THE COURT:  Doctor, these explants of heavy

24   mesh WHEN you found pain before, from what area of the

25   body were they removed?

1          THE WITNESS:  The meshes that I removed or we

2     removed in our department for pain, they were removed from

3     the abdominal wall.

4          THE COURT:  All right.  I'm going to allow it.

5          Ladies and gentlemen, I want you to know that his

6     opinion is based upon what he found to be a reaction in

7     the removal of a hernia mesh.

8          Go ahead.

9     BY MR. ANDERSON:

10    Q.  Dr. Klinge, have you studied the tissue responses of

11    surgical meshes for the last 20 years?

12    A.  Yes.

13    Q.  Is there a difference in the tissue response, whether

14    it's an abdominal tissue or another tissue in the body,

15    when it comes to a foreign-body reaction to a foreign body

16    in a human's body?

17          MR. THOMAS:  Objection, your Honor.

18    Foundation.

19          THE COURT:  Overruled.

20    A.  The basic tissue reaction is very, very similar, and

21    the principle of this bridging scar formation, this

22    filling out of the pores by scar, we saw it in the

23    animals, we saw it in hernia meshes, and we see it here in

24    a TVT sample.  So, it is a confirmation of what can be

25    seen in all other parts of the body, as well.

1  Q.  Based upon that, do you have an opinion to a

2  reasonable degree of medical and scientific certainty

3  whether or not what we're seeing in this could actually

4  lead to pain in the tissue?

5           MR. THOMAS:  Objection, your Honor.

6  Foundation.

7           THE COURT:  Overruled.

8  A.  We know that the huge amount of scar tissue is a

9  serious -- or reason for chronic pain.  The more scar --

10          THE COURT:  Is that a yes or a no?

11          THE WITNESS:  Yes.

12  BY MR. ANDERSON:

13  Q.  Are you familiar with the term "mesh shrinkage"?

14  A.  Yes.

15  Q.  Is that something you've studied over the last 20

16  years?

17  A.  Yes.

18  Q.  Is that something that you studied while a consultant

19  with Ethicon?

20  A.  Yes.

21  Q.  Is that something that you studied while a consultant

22  with Ethicon in helping them to develop safer light-weight

23  large-pore meshes?

24  A.  Yes.

25  Q.  Is mesh shrinkage a basis for the development of not

1    only UltraPro, but Vypro, for hernia mesh patients?

2    A.  Yes.

3    Q.  And was mesh shrinkage something that was developed

4    with you and Ethicon that led to the development of a

5    light-weight large-pore mesh, Prolene+M -- Prolift+M for a

6    woman's prolapse?

7              MR. THOMAS:  Your Honor --

8    A.  Yes.

9              MR. THOMAS:  -- I know he's trying to get this

10   done, but he's also leading him everywhere he's going, and

11   I think that's improper.

12             THE COURT:  You know, everybody's led all day

13   long.

14             MR. THOMAS:  I know that.

15             THE COURT:  And it is, indeed, too leading, and

16   I'll sustain the objection, which is unusual for me.

17   BY MR. ANDERSON:

18   Q.  Is this something that, when you were a consultant

19   with Ethicon, that you saw in the tissues of one explant?

20   A.  Yes.

21   Q.  And when you looked at the explants of Prolene, was it

22   both for Prolene mesh as well as --

23             MR. THOMAS:  Your Honor?

24             THE COURT:  Sustained.

25   BY MR. ANDERSON:

```
 1   Q.  Do you have another slide for us, sir?

 2   A.  Yes.  So this slide has shown that --

 3              MR. THOMAS:  Excuse me, there's no question

 4   pending, your Honor.

 5              THE COURT:  I'm sorry?

 6              MR. THOMAS:  There was no question pending.

 7              MR. ANDERSON:  Do you have another slide?

 8              THE COURT:  The question is do you have another

 9   slide for us.

10              MR. THOMAS:  And then he began to --

11              THE WITNESS:  Sorry.  Yes.

12              THE COURT:  The answer is yes, that he's got

13   another slide.

14        Mr. Anderson?

15   BY MR. ANDERSON:

16   Q.  Do you have a slide that was from Carolyn Lewis?

17   A.  Yes.

18   Q.  Okay.  And do you have something that you believe will

19   be helpful in formulating your opinions as to what

20   happened in the tissue of Carolyn Lewis from the TVT?

21   A.  Yes.

22              MR. ANDERSON:  May he show it, your Honor?

23              MR. THOMAS:  Objection.  Foundation, your

24   Honor.

25              THE COURT:  I will allow it.
```

1    BY MR. ANDERSON:

2    Q.   What are we looking at here, Doctor?

3    A.   One test performed is whether their shrinkage results

4    in a folding of the meshes, in a contraction of the mesh

5    material.

6         And what we see in this cross-cutting, that you have

7    several mesh areas or filament areas here which showed

8    that you have this folding there.  It cannot be -- or I

9    cannot imagine any flat mesh area so that you, in a cross-

10   cutting, see the meshes in the orientation as it is seen

11   here.

12        So, this slide clearly shows that you have this

13   folding and this deformation of the mesh structure.

14   Q.   And in your work as a hernia surgeon, has mesh

15   shrinkage like this -- have you seen this in explanted

16   histopathology slides?

17   A.   Yes.

18   Q.   And what does that mean for your hernia patients when

19   you see this in their tissue?  What complications are we

20   referring to, Doctor?

21   A.   The complication of this folding depends on the

22   location where it was -- where the mesh has been

23   implanted.  But you have an increased risk for pain and

24   you have an increased risk for erosion of adjacent organs.

25   Q.   Do you have any slides with you today that would show

1   any of these entrapped nerves that are from Ms. Lewis'

2   explant?

3   A.  Yes.

4   Q.  Would you please show those to us?

5   A.  Yes.  May I please --

6   Q.  Yes.

7   A.  What you see on this image, as well, is here you have

8   this blue marked foreign body.  This is a particle.  You

9   see this blue is the polymer which has not been removed by

10  the cutting procession, and you see that there is already

11  a tissue reaction around.  And these is a typical example

12  of these particles which result from the cutting of the

13  mesh during the manufacturing.

14          THE COURT:  How can you tell it's a particle

15  instead of a cross-section of a fiber?

16          THE WITNESS:  Because of these triple --

17  these -- the form of this one.  When you have a cross-

18  cutting of the fiber, you usually have an ellipsoid or a

19  spherical conformation.

20      But these -- these parts -- the only explanation or

21  the most likely explanation is that this is one of the

22  loose ends that occurs when you cut a mesh out of a large

23  piece of mesh.

24          THE COURT:  I also marked on your slide.  The

25  jury saw my mark.  Pay no attention to it.

1             THE CLERK:  Oh, I'm sorry, I cleared it.

2             THE COURT:  That's all right.  That's okay.  He

3  can put any new marks on it he wants.

4             THE CLERK:  Okay.

5             THE COURT:  Mr. Anderson.

6             MR. ANDERSON:  Yes.

7  BY MR. ANDERSON:

8  Q.  I was asking if you had any slides with you today

9  showing any entrapped nerves that you mentioned or scar

10  tissues surrounding nerves in Mrs. Lewis explant?

11  A.  Yes.

12  Q.  Can you show those to the jury?

13             MR. THOMAS:  Your Honor, may I have a

14  continuing objection to this line of questioning on the

15  basis of foundation?

16             THE COURT:  Yes.

17             MR. THOMAS:  Thank you, your Honor.

18  BY MR. ANDERSON:

19  Q.  Doctor, before we get started, are there particular

20  different types of stains that would help the pathologist

21  or the histopathologist be able to identify nerves on

22  human explants?

23  A.  Yes.

24  Q.  And what types of stains would those be?

25  A.  There are various proteins available that marks

1    different parts of the nerves.  What we used here is the

2    so-called S-100 staining that is -- that shows nerve-like

3    structures there.  But there are others, as well.

4    Q.  Okay.  Can you please tell the jury what we're seeing

5    here on this S-100 staining from Ms. Lewis' explant?

6    A.  As you see here, this one is the area where the mesh

7    fiber has been located.  And this brown area here, these

8    are -- this is tissue that appears to be a small nerve.

9    And this is very, very small.  You have here a

10   magnification of 40.  So, this is about 10 to 20 microns.

11   Very, very small nerves.  And no surgeon is able to see

12   these nerves.

13        And as you remember, all this area is transformed

14   into scar tissue, and these nerves are within the middle

15   of this scar tissue.

16        So, when you have the contraction of the scar

17   tissue, then this can result in irritation of these nerve

18   structures and cause chronic pain.

19   Q.  In your work as a hernia surgeon, did you have

20   occasion to treat patients who had S-100 stainings that

21   appear the way this one does on the screen, sir?

22   A.  Yes.

23   Q.  Okay.  And what did that mean for patient

24   complications in your hernia patients when they had an

25   S-100 that had entrapped nerves like we see here?

1    A.   This is usually seen in patients where we remove the

2    meshes because of pain.   And we have to remove the

3    meshes.   And when we looked afterwards, made these tissue

4    analysis, we usually find this very closed neighborhood of

5    nerves and meshes and where the nerves are entrapped into

6    the scar tissue.

7    Q.   In your training, even going back as early as medical

8    school, do you have any knowledge, sir, as to whether or

9    not these types of S-100 stainings would show entrapped

10   nerves in scar tissue anywhere in the body that there is

11   pain?

12           MR. THOMAS:   Your Honor, he's leading.

13           THE COURT:   Well, I'm not sure what you're

14   objecting to, but I'm simply going to tell the jury the

15   fact that something occurs at the same time as something

16   else doesn't mean it was caused by the something else.

17   And in order for an expert witness to say so, they must

18   hold that opinion based on sufficient expertise or say

19   that it is to a reasonable degree of medical certainty,

20   and be qualified to do so in their field.

21       I've allowed all of this testimony so far because I

22   thought it was helpful to you.

23   BY MR. ANDERSON:

24   Q.   Do you have an opinion as to whether or not these

25   entrapped nerves in this slide indicate -- would indicate

1    chronic pain for Ms. Lewis?

2              MR. THOMAS:  Objection, your Honor.

3    Foundation.

4              THE COURT:  Sustained.  Sustained.

5    BY MR. ANDERSON:

6    Q.  Are entrapped nerves like this often related to pain

7    in your hernia patients?

8    A.  Yes, we often find this relation.

9              MR. THOMAS:  Your Honor, I'd move to strike the

10   last answer.

11             THE COURT:  The motion to strike is granted.

12   The witness' prior testimony was that when the hernia

13   meshes were removed, they often found, upon examination,

14   slides that showed similar artifacts.

15        He did not opine that those artifacts, as found, if

16   I'm using the right word, were causally related to any

17   pain that his hernia patients suffered.

18        So the objection is sustained, and the explanation

19   was much too long.  Sorry.

20   BY MR. ANDERSON:

21   Q.  Are these artifacts that you see on the screen here

22   related to pain in your hernia patients?

23             MR. THOMAS:  Objection, your Honor.  It's not a

24   hernia patient.  And foundation.  He's not qualified to

25   give that opinion.

1          MR. ANDERSON:  I'll withdraw the question, your

2  Honor.

3          THE COURT:  All right.

4  BY MR. ANDERSON:

5  Q.  Do you have any other slides that would show bridging

6  fibroses, mesh shrinkage or entrapped nerves from

7  Ms. Lewis's explant samples?

8  A.  I ever two or three others which show the scar

9  formation --

10          MR. THOMAS:  Your Honor, the answer is yes or

11  no, as opposed to his explanation.

12          THE COURT:  I'll overrule it just in the

13  interests of economy.

14  BY MR. ANDERSON:

15  Q.  Do you have any other slides that would show either

16  bridging fibrosis, scar plate formation or mesh shrinkage

17  from Ms. Lewis?

18  A.  Yes.

19  Q.  Do you think those would be helpful to the jury in

20  formulating your opinions?

21  A.  They look almost similar to the one before, so it's

22  always similar appearing, the way you have these closed

23  distance.

24  Q.  Do you have an opinion to a reasonable degree of

25  medical certainty as to whether or not the images that

1   we've seen on the screen today would relate to any

2   complications of pain in Ms. Lewis?

3              MR. THOMAS:  Objection, your Honor.

4   Foundation.  It's not his area of expertise.

5              THE COURT:  With the caution, ladies and

6   gentlemen, that I previously gave you, I will allow the

7   answer.

8   BY MR. ANDERSON:

9   Q.  Do you have an opinion, first of all, sir?

10  A.  Yes.

11  Q.  And what is that opinion?

12  A.  The opinion is that the excessive scar formation that

13  we have found to be the major cause of many complications,

14  that this is found in these samples in this case, as well.

15       We saw the scar formation, the deformation, the

16  folding, the particle loss.

17       So, all these things that we found were the

18  disadvantages of over-engineered meshes.  In animals' --

19              MR. THOMAS:  Your Honor, going far beyond the

20  question that was asked.

21              THE COURT:  Well, and also --

22              MR. THOMAS:  I move to strike it.

23              THE COURT:  I sustain the objection.

24  BY MR. ANDERSON:

25  Q.  I asked you if you have an opinion in that regard.

1   What is your opinion with regard to the slides which

2   you've seen here with regard to -- strike that.  Let me

3   see if I can ask it again.

4        Do you have an opinion to a reasonable degree of

5   scientific certainty as to whether or not the slides that

6   we've just seen, the S-100 slides, and the H&E slides

7   regarding nerve entrapment, mesh shrinkage and bridging

8   fibrosis, as to whether or not those would lead to chronic

9   pain in Ms. Lewis?

10            MR. THOMAS:  Objection, your Honor.

11            THE COURT:  I overrule the objection.

12  BY MR. ANDERSON:

13  Q.  Do you have an opinion?

14  A.  Yes.

15  Q.  And what is the opinion?

16  A.  The opinion is that these findings can very good

17  explain the manifestation of pain.

18            THE COURT:  I'll sustain the objection and

19  strike the answer.  The jury will disregard.

20            MR. ANDERSON:  No further questions.

21            THE COURT:  Can explain -- can explain is not

22  the --

23  BY MR. ANDERSON:

24  Q.  Do you have an opinion to a reasonable degree of

25  scientific certainty as to whether or not --

1                THE COURT:  I've got your objection.

2                MR. ANDERSON:  No further questions.

3                THE COURT:  Okay, cross-exam.

4                MR. THOMAS:  I'm going to be to be a little

5   while, your Honor.

6                THE COURT:  What?

7                MR. THOMAS:  I'm going to be a little while.

8                THE COURT:  Well, take four minutes of it now.

9                MR. THOMAS:  I'll do that, your Honor.  I'll do

10  that.

11                      CROSS-EXAMINATION

12  BY MR. THOMAS:

13  Q.  Good afternoon, Dr. Klinge.  The slides that you've

14  just been talking to the jury about, you didn't prepare

15  those slides, did you?

16  A.  No.

17  Q.  As a matter of fact, those slides were prepared by

18  another pathologist, weren't they?

19  A.  Yes.

20  Q.  They were prepared by a Dr. Kreitzer from Connecticut;

21  is that correct?

22  A.  Yes.

23  Q.  And Dr. Kreitzer is a board-certified pathologist in

24  Connecticut, isn't he?

25  A.  Yes.

1  Q.  And you've never met Dr. Kreitzer?

2  A.  No.

3  Q.  You've never spoken to him, have you?

4  A.  No.

5  Q.  You have not had any communications at all with

6  Dr. Kreitzer about the slides that you discussed with the

7  jury that he prepared, which you just discussed.  Fair?

8  A.  Sir, will you --

9  Q.  I'm sorry.  I'll try again.  You have not had any

10  communications at all with Dr. Kreitzer about the slides

11  which you just discussed with the jury?

12  A.  No.

13  Q.  Now, You don't have --

14  A.  That is not correct.

15  Q.  Oh, you have spoken with Dr. Kreitzer?

16  A.  No.  But it's a communication.  I got a -- a paper

17  from him where he clearly documentated which slides he

18  prepared with -- with his technique.

19  Q.  Okay.  But it was only identifying the slides you

20  received and the technique he performed; correct?

21  A.  Yes.

22          THE COURT:  Let me ask the jury just a second

23  and interrupt you.  I apologize.

24      Since you're staying in town, would you like to

25  finish this witness today?  It will probably take another

 1  half-hour.  If you wouldn't, I certainly understand.

 2         All right, let's finish the witness.

 3             MR. THOMAS:  Thank you, your Honor.

 4  BY MR. THOMAS:

 5  Q.  You're not a pathologist; correct?

 6  A.  Correct.

 7  Q.  You don't have a residency in pathology; correct?

 8  A.  Correct.

 9  Q.  You don't have a fellowship in pathology; correct?

10  A.  Correct.

11  Q.  You're not board-certified in pathology?

12  A.  Correct.

13  Q.  You've never been a reviewer or an editor of a

14  pathology journal, have you?

15  A.  That is not correct.  I have been a reviewer of a

16  histopathology journal.

17  Q.  Could I have your deposition, please -- of Lewis

18  deposition, page 562, line 24.  Lines 22 to 24.

19         Now, I came to Germany and took your deposition, and

20  I asked you a question:  "Have you ever been an editor or

21  a reviewer of a pathology journal?"

22         You answered no at that time?

23  A.  Yes.

24  Q.  Is that the answer you gave then?

25  A.  I have to correct it.

```
 1   Q.  Go ahead.
 2   A.  There is one journal from a Spanish editor who asked
 3   me to make a review of some manuscripts that are sent to
 4   him.  So.
 5   Q.  So, the answer that you gave to me at your deposition
 6   was incorrect; is that fair?
 7   A.  Yes.
 8   Q.  Okay.  Now, you work at a hospital?
 9   A.  Yes.
10   Q.  And you used to be a surgeon; correct?  Excuse me, you
11   used to operate on patients; correct?
12   A.  I have -- have been operating patients, yeah.
13   Q.  But you haven't performed any surgeries since 2006;
14   correct?
15   A.  That is correct.
16   Q.  And there are pathologists at the hospital where you
17   work, aren't there?
18   A.  There is a few, yes.
19   Q.  And at the hospital where you work, you were not
20   permitted to sign pathology reports; correct?
21   A.  That is correct.
22           MR. THOMAS:  May I approach, your Honor?
23           THE COURT:  You may.
24   BY MR. THOMAS:
25   Q.  Dr. Klinge, I've handed what has been marked as Joint
```

1   Exhibit 10020A.263.

2               THE COURT:  Did you get all that, Robin?

3               THE CLERK:  No.

4               MR. THOMAS:  Joint Exhibit 10020A.263.  And I

5   think this is a stipulated medical record, your Honor.

6               THE COURT:  All right.

7   BY MR. THOMAS:

8   Q.  Do you have that in front of you?

9   A.  Yes.

10  Q.  And this is the pathology report from the hospital

11  where Ms. Lewis had her mesh explanted; correct?

12  A.  Yeah, that is correct.

13  Q.  And a pathologist, a real pathologist, looked at the

14  pathology upon the explant and prepared this report?

15  A.  That is correct.

16  Q.  And it's true that there are none of the findings in

17  this report that you've told this jury about today?

18  A.  That is true.

19              MR. THOMAS:  Judge, give me just a second.  I

20  thought I was going to be hear for four minutes and now

21  I'm going to be here for 30.

22      (Pause.)

23  BY MR. THOMAS:

24  Q.   Now, Dr. Klinge, you've actually used mesh to treat

25  hernia patients, haven't you?

1    A.   Yes.

2    Q.   And the use of mesh to repair hernias is an important

3    option for hernia patients, isn't it?

4    A.   Yes.

5    Q.   And polypropylene mesh is the most widely used

6    material for hernia repairs; isn't that true?

7    A.   That is true.

8    Q.   And mesh implants made of polypropylene monofilament

9    fiber have been used in the human body since 1963?

10   A.   Yes.

11   Q.   And Prolene mesh is a polypropylene monofilament

12   fiber; correct?

13   A.   It's double filament, would be more accurate.

14   Q.   You say it's not a monofilament fiber?

15   A.   Yeah, it's a monofilament, but it's two.  It's always

16   two fibers running close together.  So, in some

17   manuscripts it's called double filaments.

18   Q.   Now, there are two ways to repair hernias in terms of

19   mesh and native tissue repair.  You understand that, don't

20   you?

21   A.   Very well.

22   Q.   And native tissue repair you use sutures to put the

23   hernia back into place?

24   A.   Yes.

25   Q.   And sutures is the same thing as stitches; correct?

1   What we call stitches here in the United States?

2   A.  I have to -- I believe it.

3   Q.  All right.  And you can use Prolene sutures to repair

4   a hernia, just like you can use Prolene mesh to repair a

5   hernia; correct?

6   A.  In some patients.

7   Q.  Yes.  And you've performed about 200 native tissue

8   repairs?

9   A.  Yes.

10  Q.  And you've performed about 300 hernia repairs using

11  mesh; correct?

12  A.  Yes.

13  Q.  And you've placed Prolene mesh for hernia repair about

14  five times?

15  A.  Yes.

16  Q.  And when you were doing hernia surgery, you knew there

17  were risks to that hernia surgery; true?

18  A.  Yes.

19  Q.  And when you used polypropylene mesh for hernia repair

20  for your patients, you believed that the benefits

21  outweighed the risks to those patients; correct?

22          MR. ANDERSON:  Objection, your Honor.  May we

23  approach?

24          THE COURT:  Yes.

25  SIDEBAR CONFERENCE:

```
 1              THE COURT:  All right, sir.

 2              MR. ANDERSON:  Because of your Honor's ruling

 3    at the beginning of this, I changed my entire presentation

 4    and outline because I removed everything that would be

 5    cumulative from Dr. Klosterhalfen's deposition, because

 6    your Honor instructed me that I had to do that.  So, I

 7    significantly altered my entire presentation and just

 8    talked about pathology.

 9         I specifically did not go into his hernia work.  I

10    did not go into light-weight, large-pore.  I did not go

11    into those areas that Mr. Thomas listed on his sheet that

12    would be cumulative.  And now Mr. Thomas is seeking to go

13    into all those areas and bring them in, even though he

14    didn't want me to talk about.  So I think it's patently

15    unfair.  We talked about pathology.

16              THE COURT:  Well, the record will reflect what

17    I ruled with regard to the testimony, but you did explore

18    with him the basis for his opinions, which, to a large

19    extent, were based upon his history performing hernia

20    surgeries.

21         And as to the opinions he offered, he based his

22    opinions, to a large extent, if I'm not mistaken, on his

23    experience in doing hernia surgeries and hernia explants.

24    And that was true even as to his opinions regarding

25    Mrs. Lewis.
```

```
 1        Now, I grant you, I'm not keen on spending a lot of

 2   time talking about hernias.  I wasn't when you were doing

 3   it.  I'm not now.  But it is fair for him to cross-examine

 4   this witness to emphasize to the jury that he believes

 5   that a hernia surgeon, which is what he's trying to do,

 6   doesn't know what he's talking about when he's dealing

 7   with this other kind of mesh.

 8        It's all -- the chess pieces are moving very nicely.

 9   You guys are good.  I overrule your objection.  But -- but

10   don't --

11             MR. THOMAS:  I'm not going to abuse it, your

12   Honor.

13             MR. ANDERSON:  He's getting into patient

14   selection, he's getting into risk-benefit analysis, and I

15   didn't discuss any of those things.

16             THE COURT:  Well, I'm going to allow this --

17   I'm going to allow the pending question.

18   END OF SIDEBAR CONFERENCE.

19             THE COURT:  There's a question pending.  Do you

20   want it read or do you remember it?

21             MR. THOMAS:  I need it read, your Honor.

22             THE COURT:  All right.

23             COURT REPORTER:  And when you used

24   polypropylene mesh for hernia repair for your patients,

25   you believed that the benefits outweighed the risks to
```

1    those patients; correct?

2    A.  Yes, but it changed over time, significantly.

3    Q.  Now -- thank you.  Just so the record is clear, you've

4    never performed surgery for the repair of stress urinary

5    incontinence; true?

6    A.  That is correct.

7    Q.  And you've not studied the rates of complications

8    associated with the use of mesh for the treatment of

9    stress urinary incontinence?

10   A.  That is correct.

11   Q.  And you are unaware of any clinical studies that show

12   the use of Prolene mesh increases the risk of injury to a

13   patient in the treatment of stress urinary incontinence

14   over a larger pore, light-weight mesh; true.

15   A.  This is true, but impossible.

16   Q.  You've talked a little bit about your collection of

17   hernia explants.  You do maintain a collection of hernia

18   explants at the university; correct?

19   A.  Yes.

20   Q.  And you had about 600 when we talked last?

21   A.  Yes.

22   Q.  And you have not attempted to collect any mesh

23   explants from patients with pelvic organ prolapse or

24   stress urinary incontinence; true?

25   A.  That's true.

1    Q.   Now, none of your work for the period -- strike that.

2    I'll withdraw that.

3         Now, when you performed hernia surgery, you

4    understood that mesh could shrink or contract, didn't you?

5    A.   Yes.

6    Q.   And contraction is a risk of any hernia surgery.  Do

7    you agree with that?

8    A.   That is true in principle, but not in quantity.

9    Q.   But -- and you do not know the rate of complications

10   from contracture or shrinkage in the placement of mesh

11   with the treatment of stress urinary incontinence; true?

12   A.   We know that it causes complications.

13   Q.   No, excuse me, I asked you a question, a very specific

14   question, Doctor.

15        You do not know the rate of complications from

16   contracture or shrinkage in the placement of mesh for the

17   treatment of stress urinary incontinence?

18   A.   It's not possible, so, therefore, yes.

19   Q.   Therefore, no, you don't know?

20   A.   Yes, you are right.  No, I don't.

21   Q.   Thank you.  That helps me.

22        You're not aware of any literature testing the

23   impact of particle loss in vivo for an Ethicon mesh used

24   for the treatment of stress urinary incontinence; true?

25   A.   True.

1   Q.  Now, You said you've implanted mesh about 300 times in

2   hernia surgery.  And when you used the mesh for the

3   treatment of hernias, you usually trim the mesh; correct?

4   A.  Yes.

5   Q.  And you use scissors to trim the mesh to size it so

6   that you can place it in the hernia; correct?

7   A.  Yes.

8   Q.  And when you trim the mesh, particles come off of the

9   mesh?

10  A.  But it varies from the mesh.

11  Q.  And there are about 20 million hernia surgeries each

12  year?

13  A.  There are 20 million mesh implantations.  That is the

14  last estimate.  That's not all only hernia.

15  Q.  And for a large number of those you would expect the

16  surgeons to be trimming that mesh before they implant it,

17  wouldn't you?

18  A.  Yes.

19  Q.  And in the 20 years of mesh research that you've done,

20  you've never studied the clinical effects of particle loss

21  from mesh; true?

22  A.  It's possible, yes.

23  Q.  And you've never made a systematic analysis to measure

24  the extent to which Ethicon meshes used in the treatment

25  of stress urinary incontinence shed particles in the human

1   body; true?

2   A.   True.

3              MR. THOMAS:   Your Honor, may I approach the

4   witness?

5              THE COURT:   You may.

6   BY MR. THOMAS:

7   Q.   Dr. Klinge, I've handed you a book.   The book is a

8   2010 book called *Hernia Repair Sequellae*.   Do you

9   recognize that?

10  A.   Yes.

11  Q.   Published in 2010?

12  A.   Yes.

13  Q.   And the first author is Volker Schumpelick?

14  A.   He's the editor.

15  Q.   Editor.   And he was your boss at Aachen, is that

16  right, the head of the department?

17  A.   At that time, yes.

18  Q.   And would you turn to page 439?   I've marked it for

19  you.

20             MR. THOMAS:   And, Jamie, it's Defendant's

21  Exhibits 30719, and the page is .3.

22  Q.   And the book chapter is Alloplastic Implants for the

23  Treatment of Stress Urinary Incontinence and Pelvic Organ

24  Prolapse.   Do you see that?

25  A.   Yes.

1   Q.  And you're one of the authors of that chapter of the

2   book?

3   A.  Yes.

4              MR. THOMAS:  Jamie, if you would go to the next

5   page, which is .4.

6   BY MR. THOMAS:

7   Q.  And if you go to the right column, it says, "Mesh used

8   in the treatment of stress urinary incontinence."  And if

9   you go down to the second full paragraph --

10  A.  Yes.

11  Q.  -- let's read that together.  It says, "At present,

12  the gold standard in SUI surgery is the suburethral sling,

13  using either the tension-free vaginal tape with the

14  tension-free" -- excuse me.  Let me start over again.

15        "At present, the gold standard in SUI surgery is the

16  suburethral sling, using either the tension-free vaginal

17  tape, TVT" -- that's the Ethicon Dynacare product, isn't

18  it?

19  A.  Yes.

20  Q.  -- "or the transobturator tape, TOT technique.  The

21  two procedures do not seem to differ in terms of efficacy,

22  with TOT being advantageous because of the lower rate of

23  bladder injuries."

24        And you wrote that in 2010; correct?

25  A.  Yes.

1   Q.  Now, the jury has heard a little bit about a company

2   known as FEG.  You have done research for FEG since 1994,

3   haven't you?

4                THE COURT:  That's what he said on direct.  Go

5   ahead.

6                MR. THOMAS:  With FEG?  I'm sorry?

7                THE COURT:  Yes.

8                MR. THOMAS:  Thank you, your Honor.

9   BY MR. THOMAS:

10  Q.  And you helped FEG develop PVDF mesh, didn't you?

11  A.  Yes.

12  Q.  And FEG has a patent on the PVDF mesh?

13  A.  Yes.

14  Q.  And you were named on that patent; correct?

15  A.  Yes.

16  Q.  You've been a paid consultant for FEG since 1998 or

17  1999; true?

18  A.  No, that's not true.

19  Q.  You've received 20,000 euros or deutchmarks per year

20  from 2000 to 2005; is that true?

21  A.  That is -- from FEG?  This is not true.  2000 to 2005,

22  that is -- that has been -- that was a contract with

23  Ethicon.

24                MR. THOMAS:  Jamie, could you bring up the

25  gross trial transcripts, 103, 6 to 12, please?

```
 1        (Pause.)
 2    BY MR. THOMAS:
 3    Q.  I'm sorry.  You're right.  I apologize.  That's my
 4    mistake.
 5          Today you're compensated by FEG; is that true?
 6    A.  Yes.
 7    Q.  They pay you about 30,000 euros a year?
 8    A.  Approximately, yes.
 9    Q.  And that's about a little less than half of your
10    annual salary at the university?
11    A.  That's less.
12    Q.  And FEG decides how much money it's going to pay you
13    each year; is that true?
14    A.  Yes.
15    Q.  And the amount FEG pays you each year depends on how
16    well the company does that year; true?
17    A.  Yes.
18    Q.  And you've spoken at conferences sponsored solely by
19    FEG; true?
20    A.  Yes.
21    Q.  And you you've spoken recently at conferences for FEG
22    promoting FEG meshes; true?
23    A.  Promote?  Maybe.
24    Q.  Pardon me?
25    A.  Maybe.
```

1   Q.  Maybe.  Well, you've worked with Prof. Jaeger in

2   developing a new PVDF mesh for the treatment of stress

3   urinary incontinence, didn't you?

4   A.  It was a development of a new procedure using a

5   specifically developed device; but it was the presentation

6   of a procedure.

7   Q.  And you worked on the Jaeger device at the request of

8   FEG, didn't you?

9   A.  Yes.

10  Q.  And you didn't charge FEG for the time you spent

11  working on that, did you?

12  A.  No.

13  Q.  You have had occasion to work with both FEG and

14  Dr. Klosterhalfen on different products; correct?

15  A.  I didn't get the whole sentence.

16  Q.  I'm sorry, you've had occasion to work with FEG and

17  Dr. Klosterhalfen with different projects; is that true?

18  A.  I have occasion?

19  Q.  You've done it on different times?  Have you worked

20  with FEG and Dr. Klosterhalfen on different projects over

21  the years?

22  A.  Yes.

23  Q.  And you also worked with FEG and Prof. Klosterhalfen

24  in the preparation of a video; correct?

25  A.  Yes.

1    Q.  And you used that video presentation in your slide

2    shows sometimes?

3    A.  Yes.

4    Q.  And you've --

5    A.  It's free.  And it's free on the Internet.  Everyone

6    can do it.

7    Q.  And FEG paid for that?

8    A.  They paid for the manufacturing of this video, yes.

9    Q.  And to this day you are and continue to be a

10   consultant to FEG; true?

11   A.  Yes.

12            MR. THOMAS:  Your Honor, may I have a moment?

13            THE COURT:  Yes.

14            MR. THOMAS:  That's all the questions I have.

15   Thank you, Doctor.

16            THE WITNESS:  Thank you.

17            THE COURT:  All right.  Mr. Anderson?

18                    REDIRECT EXAMINATION

19   BY MR. ANDERSON:

20   Q.  Dr. Klinge, in the article that counsel mentioned to

21   you about alloplastic materials with Dr. Schussler, do you

22   recall that part of your testimony?

23   A.  Yes.

24   Q.  What is Dr. Schussler's profession?

25   A.  Dr. Schussler is the head gynecologist in Lucerne, in

1  Switzerland.

2  Q.  And in that article, were you responsible for part of

3  the article and was he responsible for a different part?

4  A.  He's responsible for the evaluation of the surgical

5  technique and I was introduced in this team of authors

6  because of my experience with the materials.

7  Q.  And, in 2010, the mechanically cut mesh was no longer

8  on the market, was it, sir?

9        MR. THOMAS:  Objection, your Honor.  It's not

10  only beyond the scope of anything, it's just not true.

11        THE COURT:  I don't know -- I mean, let me see

12  the book.  I don't -- let me see what the quote said.

13  Could I see the book.

14    Thanks, Doctor.

15    I don't see anything in here about whether it was

16  machine cut or hand cut, or whatever.

17        MR. ANDERSON:  And that's my point.  From that

18  article, we can't tell whether or not the slings that

19  Dr. Schussler's talking about were the mechanical cut

20  meshes or were the laser cut meshes.

21        THE WITNESS:  From my understanding, this -- he

22  described the technique of placing a tape there, but this

23  is not specific for a product.  And on my discussions with

24  Prof. Schussler we used the term TVT as an example for a

25  procedure.

1    MR. THOMAS:  Your Honor --

2    THE COURT:  The jury will disregard the

3  elaboration and ignore the last part of the statement.

4  BY MR. ANDERSON:

5  Q.  Counsel showed you the pathology report from Ms. Lewis

6  on cross-examination.  Do you recall that?

7  A.  Yes.

8  Q.  Is it typical for pathology departments at hospitals

9  to report on things like bridging fibrosis?

10    MR. THOMAS:  Objection, your Honor.

11  Foundation.  He's not a pathologist in a hospital.

12    MR. ANDERSON:  I'll withdraw the question.

13    THE COURT:  All right.

14  BY MR. ANDERSON:

15  Q.  As part of being a hernia surgeon at Aachen University

16  and Aachen University Hospitals in Aachen -- strike that.

17    How large is Aachen University Hospital?

18  A.  It has about 1,500 beds in hospital.

19  Q.  And while you were practicing as a hernia surgeon

20  there, did you receive explant reports back -- I'm sorry,

21  pathology reports back from individuals who had had mesh

22  explanted from them?

23  A.  Yes, we would teach with it.

24  Q.  And did the pathologists in your pathology department

25  typically respond and report on things like tissue

```
 1   response, bridging fibrosis and scar plate formation?
 2              MR. THOMAS:  Objection, your Honor.
 3   Foundation.  Didn't have anything to do with the Carolyn
 4   Lewis case.  Didn't have anything with the pathology
 5   report from Texas.
 6              THE COURT:  I'll allow him to answer the
 7   question, but don't go any further.
 8        You may answer.
 9   BY MR. ANDERSON:
10   Q.  You may answer.
11   A.  This is the general statement of pathologists, who are
12   not interested in the specific details to cause to write
13   the tissue response.
14              MR. THOMAS:  Your Honor?
15   A.  And that is what I've seen.
16              THE COURT:  If I understood his answer, which I
17   think I did, he said the pathologists aren't interested in
18   those specific details?
19              MR. ANDERSON:  That's right.
20              THE COURT:  Yes.
21              MR. ANDERSON:  No further questions.
22              THE COURT:  All right.  Anything else?
23              MR. THOMAS:  Nothing, your Honor.
24              THE COURT:  All right.  Thank you, very much,
25   Doctor, you may step down.  May the witness be excused?
```

```
1              MR. ANDERSON:  Yes, your Honor.

2              THE COURT:  Ladies and gentlemen of the jury,

3    we've come to the end of the day.  I really hope you have

4    a nice meal and a nice time.

5         This is difficult.  It's compounded by difficult

6    weather.  It is a duty of citizenship.  And I hope, at the

7    end, you will say, as most jurors in federal court say,

8    I'm glad I did it, but I don't want to ever do it again.

9              Please have a pleasant evening.  Do not discuss the

10   case.  Watch TV, listen to the radio, read the newspapers.

11   Do not talk to anybody about the case.  Do not read social

12   media that might involve any discussion of the case.

13   Don't communicate with anybody by any electronic or other

14   means concerning the case.

15        I feel like some kind of -- one of those recordings,

16   because I say it over and over again.  But it is so

17   important that it bears repeating.  You only can

18   deliberate on this case when you're back in the jury room

19   at the end of all of it, and all 12 of you can then start

20   at the same time talking about it.

21        And you know that's worked very well for well over

22   200 years, and I think it will work well in this case.

23             Have a pleasant evening.  I'll see you at 9 o'clock.

24             Court is in recess, adjourned for the day, whatever.

25             (Proceedings concluded at 5:30 p.m.)
```

1          CERTIFICATE OF OFFICIAL REPORTERS

2

3          Teresa M. Ruffner and Harold M. Hagopian do hereby

4     certify that the foregoing is a true and correct

5     transcript, to the best of our abilities, from the record

6     of proceedings in the above-entitled matter.

7

8
      s/Teresa M. Ruffner                    February 13, 2014
9          Reporter                          Date

10
      s/Harold M. Hagopian                   February 13, 2014
11         Reporter                          Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25