# EXHIBIT 2P

```
 1                   IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                            AT CHARLESTON
 3      -------------------------------- §
        IN RE:  ETHICON, INC., PELVIC    § Master File No.
 4      REPAIR SYSTEM PRODUCTS LIABILITY § 2:12-MD-02327
        LITIGATION                       §
 5                                       § MDL 2327
                                         §
 6                                       §
                                         §
 7      THIS DOCUMENT RELATES TO         §
        ALL CASES                        §
 8                                       §
        -------------------------------- §
 9
10
11            CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
12
13                            - - -
14                      NOVEMBER 4, 2015
15                            - - -
16
              Deposition of PROF. DR. MED. UWE KLINGE, held at
17      The Quellenhoff Hotel, Monheimsallee 52, 52062 Aachen,
        Germany, commencing at 9:36 a.m., on the above date,
18      before Trina B. Wellslager, Registered Professional
        Reporter and Notary Public.
19
20                            - - -
21                  GOLKOW TECHNOLOGIES, INC.
                877.370.3377 ph|917.591.5672 fax
22                      deps@golkow.com
23
24
25
```

## Page 2

1  APPEARANCES:
2
   ANDERSON LAW OFFICE, LLC
3  BY:  BENJAMIN H. ANDERSON, ESQUIRE
   1360 West 9th Street
4  Cleveland, Ohio  44413
   (216) 589-0256
5  ben@andersonlawoffices.net
   Representing Plaintiffs
6
7
   THOMAS, COMBS & SPANN, PLLC
8  BY:  DAVID B. THOMAS, ESQUIRE
   300 Summers Street
9  Suite 1380 (25301)
   Post Office Box 3824
10 Charleston, West Virginia  25338
   (304) 414-1800
11 dthomas@tcspllc.com
   Representing Defendants
12
13
14 ALSO PRESENT:
15
   Julie Filarski, Paralegal, Anderson Law Office
16 Tom Bodyziak, Technical Support
   Gregory Fields, Videographer
17
18
19
20
21
22
23
24
25

## Page 3

1        - - -
         I N D E X
2        - - -
  Testimony of: PROF. DR. MED. UWE KLINGE
3  DIRECT EXAMINATION BY MR. ANDERSON      8
   CROSS EXAMINATION BY MR. THOMAS       116
4  REDIRECT EXAMINATION BY MR. ANDERSON   239
   RECROSS EXAMINATION BY MR. THOMAS      276
5  REDIRECT EXAMINATION BY MR. ANDERSON   287
   RECROSS EXAMINATION BY MR. THOMAS      291
6  REDIRECT EXAMINATION BY MR. ANDERSON   293
   RECROSS BY MR. THOMAS                  294
7  REDIRECT BY MR. ANDERSON               294
8  CERTIFICATE.................................  296
   LAWYERS' NOTES................................  297
9
         E X H I B I T S
10 DEFENSE                         PAGE
   KLINGE TRIAL
11
   Exhibit 1  Safety Considerations for Synthetic
12        Sling Surgery Article, Nature
          Reviews, Urology                  160
13 Exhibit 2  The Lightweight and Large Porous Mesh
          Concept for Hernia Repair Review
14        Article                           164
   Exhibit 3  Prospective, Long-Term Comparison of
15        Quality of Life in Laparoscopic
          Versus Open Ventral Hernia Repair
16        Article                           165
   Exhibit 4  Open Retromuscular Mesh Repair of
17        Complex Incisional Hernia:
          Predictors of Wound Events and
18        Recurrence Article                172
   Exhibit 5  Seventeen Years' Follow-up of the
19        Tension-Free Vaginal Tape Procedure
          for Female Stress Urinary
20        Incontinence Article              176
   Exhibit 6  Ultrasound Assessment of Mid-Urethra
21        Tape at Three-Year Follow-Up After
          Tension-Free Vaginal Tape Procedure
22        Article, Adult Urology            179
   Exhibit 7  The Effects of the Tension-Free
23        Vaginal Tape on Proximal Urethral
          Position:  A Prospective,
24        Longitudinal Evaluation Article   181
   Exhibit 8  Does the Tension-Free Vaginal Tape
25        Stay Where You Put It Article     182

## Page 4

1        I N D E X (Continued)
2  Exhibit 9  International Journal of Surgery,
          Large Pore Size and Controlled Mesh
3         Elongation are Relevant Predictors
          for Mesh Integration Quality and Low
4         Shrinkage/Static Analysis of Key
          Parameters of Meshes in a Novel
5         Minipig Hernia Model Article      183
   Exhibit 10  Comparing Different Types of
6         Suburethral Slings Using Perineal
          Ultrasound Paper                  185
7  Exhibit 11  In Vivo Tension Sustained by Fascial
          Sling in Pubovaginal Sling Surgery
8         for Female Stress Urinary
          Incontinence Article              191
9  Exhibit 12  New Objective Measurement to
          Characterize the Porosity of Textile
10        Implants Paper                    205
   Exhibit 13  Modified Classification of Surgical
11        Meshes for Hernia Repair Bases on the
          Analyses of 1,000 Explanted Meshes
12        Article                           206
   Exhibit 14  Titanium Coating of a Polypropylene
13        Mesh for Hernia Repair:  Effect on
          Biocompatibility Article          209
14 Exhibit 15  Original Research, Comparison of
          Long-Term Biocompatibility of PVDF
15        and PP Meshes Article             228
   DynaMesh in the Repair of
16 Exhibit 16  Laparoscopic Ventral Hernia:  A
          Prospective Trial Original Article  231
17        (Nos. 17-21 were not marked)
   Exhibit 22  Mesh: TVT Lot 3405405 Zero Force
18        Measurement Detailed Results of Pore
          Analysis                          291
19
          Defense Exhibits Attached but
20        Previously Marked:
21 DX20100   Considerations about Surgical Mesh
          Document, DX20100.1-DX20100.2     152
22 DX20207   American Urological Association
          Position Statements               155
23 DX30719   Hernia Repair Sequelae, Bellew v.
          Ethicon, DX30719.1-DX30719.8      128
24
25

## Page 5

1        I N D E X (Continued)
          PLAINTIFF TRIAL EXHIBITS
2  No. 292   Clinical and Ultrasonographic
          Correlations Following Three Surgical
3         Anti-Incontinence Procedures       50
   No. 0636   E-mail Thread from Gene Kammerer,
4         April 19, 2004,
          ETH.MESH.00584811-ETH.MESH.00584813  240
5  No. 0776   Research Article, High Structural
          Stabilityof Textile Implants Prevents
6         Pore Collapse and Preserves Effective
          Porosity at Strain                 69
7  No. 1085   Original Article, Use of Three Types
          of Synthetic Mesh Material in Sling
8         Surgery: A Prospective Randomized
          Clinical Trial Evaluating
9         Effectiveness and Complications   248
   No. 1133   Issues in Women's Health, An
10        Independent Biomechanical Evaluation
          of Commercially Available Suburethral
11        Slings, ETH.MESH.01221055-ETH.MESH.
          01221058                          242
12 No. 0780   Biomaterial, PVDF as a New Polymer
          for the Construction of Surgical
13        Meshes Article                     97
   No. 1757   Ethicon Particle Release
14        Characteristics of Clear and Blue TVT
          Mesh, ETH.MESH.04384185-
15        ETH.MESH.04384188                  79
   No. 1865   Ethicon Document, Mesh Properties,
16        How Important Are They?
          ETH.MESH.05237872                  22
17 No. 1922   E-mail Thread from Dr. Joerg Holste,
          with Attachment, ETH.MESH.05446127-
18        ETH.MESH.05446132                  46
   No. 1923   E-mail Thread from Dr. Dieter Engel,
19        ETH.MESH.05447475-ETH.MESH.05447476  99
   No. 2924   TOPA Mesh Elongation KT Problem
20        Analysis, ETH.MESH.10644647       246
   No. 3045   E-mail Thread from Martin Weisberg,
21        with Attachment, ETH.MESH.12910023-
          ETH.MESH.12910025                  75
22 No. 3496   Update Report on Proposed Changes,
          ETH.MESH.10182456-ETH.MESH.10182461  87
23 No. 4170   Tensile Properties of Five Commonly
          Used Mid-Urethral Slings Relative to
24        the TVT, Original Article          76
25

Page 6

I N D E X (Continued)

No. 8030   Ethicon June 21, 2001, TVT
           Recommendations from Dr. Wang,
           HMESH_ETH_00958003-HMESH_ETH_00958005   73
No. 8064   E-mail from Jill Schiaparelli, May 4,
           2004, ETH.MESH.05918776   254

No. 8333   Demonstrative Aid, ETH.MESH.PM.000004   36
No. 8338   Research Article, Visualization of
           Polypropylene and Polyvinylidene
           Fluoride Slings in Perineal
           Ultrasound and Correlation with
           Clinical Outcome   50
No. 8340   Patient Injury Due to Mesh
           Inflammation and Contraction   56
No. 8341   Holes Should be Measured in all
           Directions   60
No. 8342   Rule 26 Expert Report of Professor
           Thomas Muhl   70
No. 8343   PROLENE Mesh Improvement Project,
           HMESH_ETH_00782152-HMESH_ETH_00782160   83
No. 8344   Ethicon Design and Development Plan,
           HMESH_ETH_00782161   84
No. 8345   Safer Alternative Design
           Demonstrative Aid   110
No. 8346   Design Defects Prolene TVT Mesh
           Demonstrative Aid   110
No. 8349   Factors Related to Mesh Shrinkage,
           ETH.MESH.03020403   62
No. 8351   E-mail Thread from Petra Koehler,
           November 15, 2004, ETH.MESH.04017496-
           ETH.MESH.04017497   256
No. 8347   PROLENE Mesh Demonstrative Aid,
           ETH.MESH.05479411C   12

Page 7

I N D E X (Continued)

PLAINTIFF'S EXHIBIT

(Retained by Counsel)

No. 1940   ETH.MESH.05479411   18

Page 8

1   THE VIDEOGRAPHER:  We are now on the record.
2   My name is Gregory Fields.  I'm a videographer for
3   Golkow Technologies.  Today's date is 11-4-2015.
4   The time is 9:36 a.m.
5       This video deposition is being held in Aachen,
6   Germany, in the matter of In Re:  Ethicon, Inc.,
7   Pelvic Repair System, for the U.S. District Court,
8   Southern District of West Virginia.
9       The deponent is Uwe Klinge.  Counsel will be
10  noted on the stenographic record.  The court
11  reporter is Trina Wellslager, and will now swear in
12  the witness.
13      PROF. DR. MED. UWE KLINGE, called as a witness
14  by the Plaintiff, having been first duly sworn, testified
15  as follows:
16      THE WITNESS:  I swear.
17      MR. THOMAS:  Before we get started.
18      MR. ANDERSON:  Sure.
19      MR. THOMAS:  Mr. Anderson and I discussed this
20  a little bit before the deposition.  I understand
21  that there have been a number of cross-notices filed
22  for this deposition in different jurisdictions I
23  can't begin to name or count.
24      Just for the record, I'm here for Ethicon in
25  the Mullins' consolidated case in the Southern

Page 9

1   District of West Virginia and the MDL that's noticed
2   by Mr. Anderson.
3       MR. ANDERSON:  Okay.  I obviously did not
4   cross-notice the other -- from the other
5   jurisdictions.  Whatever rules they have that apply
6   to sworn testimony, I guess they will apply in their
7   particular state court cases, or whatever it may be,
8   and so we proceed and we'll see how that all plays
9   out in the various jurisdictions.
10      MR. THOMAS:  It's up to them.
11      MR. ANDERSON:  Up to them, I agree.
12      DIRECT EXAMINATION
13  BY MR. ANDERSON:
14      Q.  Okay.  We ready to go?  You ready, Doctor?
15      A.  Ready.
16      Q.  Okay.  Good morning.
17      A.  Good morning.
18      Q.  Could you please state your name for the
19  record?
20      A.  My name is Dr. Uwe Klinge.
21      Q.  Dr. Klinge, will you please tell the jury what
22  your profession is?
23      A.  I'm an abdominal surgeon and I'm a biomaterial
24  science researcher.
25      Q.  Where do you work?

Page 10

1    A.  I'm working at the University Hospital of
2 Aachen.
3    Q.   And that's where we are here now, Aachen,
4 Germany?
5    A.  Exactly.
6    Q.  Okay.  Please tell the jury a little bit about
7 Aachen University Hospital.
8    A.  It is a large hospital.  It's a teaching
9 hospital.  It includes the medical school.  It includes
10 a huge variety of research facilities so that we can
11 say, what we don't have, we don't need, and it includes
12 all specialties that are necessary to make a treatment
13 for patients on a top level.
14    Q.  When you talk about research centers, what type
15 of research center do you have at Aachen University
16 Hospital?
17    A.  There is a big number of different research
18 centers, institutes.  But the main topic for this
19 research activities is the research of biomaterials and
20 interactions to biology.
21    Q.  Would those biomaterials include surgical mesh
22 that are implanted in patients?
23    A.  Yes.
24    Q.   And would those biomaterials and medical
25 devices that you have researched at Aachen University

Page 11

1 Hospital include the PROLENE mesh that is in Ethicon's
2 TVT line of products that we will be discussing here
3 today?
4    A.  Yes, it includes the Prolift, and we have been
5 working on it for more than 20 years.
6    Q.  Did you mean to say PROLENE?
7    A.  PROLENE.
8    Q.  Okay.  Doctor, all your opinions here today
9 will need to be a reasonable degree of medical and
10 scientific certainty.  Do you understand that?
11    A.  Yes.
12    Q.  Before we get into the issues in this case and
13 your opinions, please tell the jury briefly about your
14 education and training as a surgeon.
15    A.  I started in the medical school in 1977 and
16 finished it in 1983.  In 19 -- then I started as a
17 resident at the surgical department at the University
18 Hospital, and I got my first certificate for general
19 surgery in 1993.  And later on, in 2004, I got the
20 certificate for abdominal surgery.
21    Q.  At some point in time did you stop doing
22 surgeries and focus more full-time on your biomaterials
23 research?
24    A.  Yes.  In 2006 I started to be full-time in
25 research.

Page 12

1    Q.  Tell the jury a little bit about your practice
2 of being an abdominal surgeon when you were practicing
3 in that field.
4    A.  Abdominal surgery includes mainly all diseases
5 within the abdominal cavity.  That means liver,
6 gallbladder, pancreas, all diseases of the thin bowels
7 and thick bowels, as well a lot of other diseases that
8 can be treated by surgery.
9    Q.  Did you treat all types of hernias when you
10 were a practicing abdominal surgeon?
11    A.  The repair of hernias was one of the specific
12 topics in this department, and overall hernia is the
13 most frequent surgical operation in Germany.
14    Q.  Did you use synthetic surgical mesh, plastic or
15 polypropylene mesh, in your surgical practice?
16    A.  Yes, I did.
17    Q.  Did you use hernia meshes in your surgical
18 practice that were manufactured by Ethicon, the
19 defendant in this case?
20    A.  Yes, I did.
21    Q.  Dr. Klinge, by this point in the trial the jury
22 will have already heard the term PROLENE mesh a number
23 of times.  Is PROLENE old construction mesh one of the
24 Ethicon meshes that you surgically implanted in your
25 patients at least for some period of time?

Page 13

1    A.  Yes.
2    Q.  Did there come a point in time where you
3 stopped using old construction PROLENE hernia mesh for
4 your patients?
5    A.  Yes, we stopped using these type of meshes when
6 we got available safer designs, safer meshes.
7    Q.  Okay.  If we could just put slide A up.  It's
8 Plaintiff's Demonstrative Exhibit 8347.
9      (Plaintiff's Exhibit No. 8347 was marked for
10 identification.)
11    Q.  What is the jury seeing on the screen here?  Is
12 this old construction PROLENE mesh that I've been
13 asking you questions about?
14    A.  Yes.  You see here the old construction PROLENE
15 mesh, and this is -- meanwhile this is named or it's a
16 typical mesh of the heavyweight, small-pore mesh.
17    Q.  And when we hear the word pore, well, what does
18 that refer to as the jury's looking at this photograph?
19    A.  The pore are the holes in between the fibers.
20    Q.  When did this PROLENE mesh originally come on
21 the market by Ethicon?
22    A.  It was put to the market in 19 -- around 1974.
23    Q.  So putting together what your answer was for
24 the jury, is it accurate to call this PROLENE mesh the
25 1974 old construction heavyweight PROLENE mesh with

Page 14

1 small holes?

2    A.  Yes.

3    Q.  Okay.  You mentioned to the jury that at some

4 point in time you stopped using this 1974 old

5 construction heavyweight PROLENE mesh with small holes

6 for your patients.  What types of complications were you

7 seeing with this old construction PROLENE mesh?

8    A.  We -- with the increased use of these meshes we

9 saw an increased number of patients suffering from pain,

10 restriction of the mobility of the abdominal wall in the

11 area where we implanted this material.  We saw an

12 increased rate of wound complications.  That means

13 formation of seroma or bacterial infection.  We saw

14 increased number of recurrences at the borders of these

15 meshes.

16    Q.  When you talk about recurrences, just please

17 tell the jury what that means in medical terms.

18    A.  Recurrence means that you have a reappearance

19 of the hernia.

20    Q.  Okay.  So the problem you went to fix comes

21 back?

22    A.  Yes.

23    Q.  Okay.  Well, Doctor, if you could not use or

24 you felt you could no longer use this old construction

25 PROLENE mesh to treat your hernia patients in the 1990s,

Page 15

1 what did you have as an alternative material available

2 to you back at that time?

3    A.  At that time we only have these heavyweight,

4 small-pore meshes available, so all or a lot of other

5 meshes has quite similar features as this one, and

6 therefore you have to be very restricted in the

7 indication.  And that was -- definitely that was the

8 reason to look for safer materials.

9    Q.  Is that when your research into biomaterials

10 began?

11    A.  Exactly.  That was the reason to look for --

12 for this, and to build up a -- a research around this

13 question.

14    Q.  So is part of what you were doing with your

15 research back in the 1990s into the problems with this

16 old construction PROLENE heavyweight, small-hole mesh

17 was you trying to find something about the design of the

18 PROLENE mesh material that we are seeing in this

19 photograph that may have been causing these patient

20 injuries?

21    A.  That was exactly the idea, to avoid these

22 overengineered, dangerous, unsafe materials, and to look

23 for safer alternatives for safer constructions of

24 meshes.

25    Q.  When you said overengineered, what does that

Page 16

1 term mean to you or mean in the world of biomaterials

2 science?

3    A.  Overengineered means that it is too strong,

4 that there is too much material to -- for the purpose it

5 was intended to be.

6    Q.  So as part of this research in looking at the

7 design, what did you learn about the design, the

8 specific design features of this old construction

9 PROLENE material from 1974 that was causing

10 complications in your patients and other patients?

11    A.  We learned that this material is too strong, it

12 has too much material.  And if you can reduce the amount

13 of the material, if you can enlarge the holes in

14 between, that you can improve the tissue reaction and

15 you can avoid many of the complications in the patients.

16    Q.  As part of your research that you began in the

17 1990s, in looking at the biomaterial science of surgical

18 meshes, when you started your biomaterials research, and

19 trying to relate those to patient complications, did you

20 work with any mesh manufacturer to try to develop safer

21 meshes?

22    A.  Yes.

23    Q.  Tell the jury who you worked with.

24    A.  For more than 10 years we worked very closely

25 together with Ethicon as the manufacturer who provides a

Page 17

1 lot of mesh modifications and with -- who together we

2 planned a lot of these project and studies and made the

3 analysis together.

4    Q.  So were you working with Ethicon during these

5 10 years to try to help them develop a mesh design that

6 would be safer than this old construction heavyweight

7 PROLENE?

8    A.  Definitely.  That was the purpose and that was

9 the aim we could realize together.

10    Q.  So you were one of the mesh experts that

11 Ethicon relied on from 1995 to 2005 to help them design

12 and develop safer meshes?

13    A.  That's true.

14       MR. THOMAS:  Objection to form and leading.

15    I'd just ask that you stop leading him so much.

16    Q.  So were you one of the mesh experts that

17 Ethicon relied on from 1995 to 2005 to help them design

18 and develop safer meshes?

19    A.  That is true.

20    Q.  Well, why was it that Ethicon came to you and

21 your group here in Aachen and decided that you were

22 someone who would have expertise to help them address

23 these complications of this old construction heavyweight

24 PROLENE?

25       MR. THOMAS:  Objection; form.

Page 18

1    A.  We had a big experience in Aachen for the
2  treatment of hernia.  We have incredible visibility to
3  make research at the University Hospital, and not least,
4  we had a good idea that we can reduce the amount of the
5  material and then that we can, by this way, we can make
6  it safer.  So the idea, the visibility, and the
7  experience all together leads to our joint work.
8    Q.  After identifying these problems with the old
9  construction heavyweight PROLENE -- well, first of all,
10  let me ask you this question:  This PROLENE mesh that
11  we're seeing -- that the jury's seeing on the screen
12  here, is this the identical mesh that Ethicon used and
13  continues to use in its TVT line of products for
14  incontinence repair?
15    A.  That is the same structure, it is just cut into
16  strips.
17    Q.  Okay.  When you say "strips," explain to the
18  jury what you're talking about in terms of how they make
19  the TVT sling out of this large piece of PROLENE mesh
20  like this.
21    A.  It was cut by knives in strips of one
22  centimeter in width.
23    Q.  Okay.  So after identifying the problems with
24  this old construction heavyweight PROLENE that is used
25  in the TVT line of products, did any new generation mesh

Page 19

1  products come out of that consulting arrangement between
2  you and Ethicon?
3    A.  Yes.
4    Q.  Explain that to the jury, please.  And if we
5  could, let's put up Exhibit 1940, Slide 13.
6      (Plaintiff's Exhibit No. 1940 was marked for
7  identification.)
8    A.  Despite we spend a lot of time in studying this
9  problem and despite we are writing hundreds of pages
10  around it, the principal idea is quite simple.
11    MR. THOMAS:  Excuse me, please.  I don't mean
12  to interrupt the witness.  What I have is not the
13  same one.
14    MR. ANDERSON:  Off the record for a minute.
15    THE VIDEOGRAPHER:  We are off the record.  The
16  time is 9:51 a.m.
17    MR. ANDERSON:  So we will grab an actual copy
18  of the document on a break, but we were going to
19  identify Plaintiff's Exhibit 1940, which is
20  Eth.Mesh.05479411, for the record, and that is a
21  PowerPoint, and the purpose of using it was for
22  demonstrative purposes in showing just the VYPRO
23  mesh next to the PROLENE mesh.
24    MR. THOMAS:  And do you know the date of the
25  PowerPoint?

Page 20

1    MR. ANDERSON:  As I said, Counsel, it will be
2  on the PowerPoint printout.  So I don't know it off
3  the top of my head.
4    MR. THOMAS:  That's fine.  Let's just proceed
5  and we'll do the best we can.
6      And what's the exhibit number, Ben?
7    MR. ANDERSON:  1940.
8    THE VIDEOGRAPHER:  We are back on the video
9  record.  The time is 9:55 a.m.
10  MR. ANDERSON:
11    Q.  So, going back, is this a document that you
12  reviewed and relied upon in forming your opinions here?
13    A.  Yes.
14    Q.  And significant to your opinions in this case?
15    A.  Yes.
16    Q.  So please explain to the jury, we've seen the
17  -- the heavyweight old construction PROLENE mesh on the
18  right from our first image.  Now tell the jury what
19  we're seeing on the left.
20    A.  On the left you see the first prototype of the
21  new generation of lightweight, large-pore meshes.  We
22  identified how strong the mesh should be, we identified
23  and defined how stretchable the mesh has to be, and
24  therefore we have been able to reduce the amount of the
25  material in comparison to the PROLENE mesh to -- of

Page 21

1  about 70 percent, and we have made the holes much larger
2  than the PROLENE mesh, as large as possible.  So you
3  have then the results, a lightweight, large-pore mesh.
4  As you can see, it is more flexible, it is stretchable,
5  and has much larger holes than on the right side.
6    Q.  And you mentioned prototype in your answer.
7  But did Ethicon begin selling this VYPRO mesh, this
8  first lightweight, large-hole mesh?
9    A.  This was sold starting in 1997 in Germany, and
10  two years later in the U.S.  It was not -- it was more
11  than a prototype, it was a -- yeah, it was a real
12  product.
13    Q.  And you said you -- you and Ethicon in
14  developing this lightweight mesh on the left that has
15  larger holes, you were able to expand the holes.  How
16  much larger are these holes on the left than on the
17  right?
18    A.  About ten times larger.  The area is about ten
19  times larger than in the right mesh.
20    Q.  These holes that were ten times larger than the
21  one on the right, are they that important to the -- to
22  the mesh design, Doctor?
23    A.  They are very important.  If you're looking to
24  what happens to the mesh when incorporated into the
25  tissues, you will see that the VYPRO mesh, even after

Page 22

1 incorporation still is flexible. It makes no
2 restriction of the mobility there. You have -- when you
3 are looking with a microscope to it you see a lot of fat
4 cells within the holes. So no stiffness by any scar.
5     Q. And when you say scar, in relationship to these
6 holes, is the size of the holes and the scarring, how
7 does that affect patient safety once this mesh is
8 implanted in the tissues?
9     A. The size of the holes is critical for the
10 safety of the patient. When the size of the holes is
11 too small, then the entire hole will be filled by scar
12 tissue, and the entire area of the mesh is filled by
13 scar tissue, and scar tissue makes it very stiff and
14 rigid and it's not stretchable any longer. It favors
15 shrinkage and stretch and deformation of the mesh.
16     Q. And do you have an opinion, to a reasonable
17 degree of medical and scientific certainty, based upon
18 all the work that you did during those 10 years with
19 Ethicon in the years that you came up with in developing
20 the safer mesh on the left, I'm sorry -- let me strike
21 that and start over.
22     Do you have an opinion, Doctor, to a reasonable
23 degree of medical and scientific certainty, as to
24 whether or not this mesh material on the left that has
25 70 percent less weight and ten times larger holes will

Page 23

1 be safer in the tissues than the old construction
2 heavyweight PROLENE mesh on the right?
3     A. Yes.
4     MR. THOMAS: Object to the form of the
5 question.
6     A. Yes, it's much safer.
7     (Plaintiff's Exhibit No. 1865 was marked for
8 identification.)
9     Q. Showing you what we will mark as Plaintiff's
10 Exhibit 1865, Slide 14, please. Have you reviewed and
11 relied upon this document in coming to your opinions
12 here today?
13     A. Yes.
14     MR. THOMAS: Counsel, do we have a date for
15 this document?
16     MR. ANDERSON: Well, it's your document so we
17 can look at the metadata to come up with the date.
18     MR. THOMAS: Just for our purposes today, you
19 don't know what it is?
20     MR. ANDERSON: I don't know. You don't have it
21 dated. But I'm sure that your metadata, when you
22 produce the document, probably will have the date
23 that it was created.
24     MR. THOMAS: Thank you.
25 BY MR. ANDERSON:

Page 24

1     Q. Have you reviewed this slide from this
2 PowerPoint that's up on the screen entitled, Recommended
3 Mesh Construction?
4     A. Yes.
5     Q. And where does this slide come from?
6     A. It is an internal Ethicon document.
7     Q. Okay. And when we look at these three points
8 from this slide, can you explain -- are these
9 significant to your opinions?
10     A. Yes.
11     Q. Can you explain why, when we look at those
12 three bullet points?
13     A. This slide clearly expressed that even in the
14 -- even in the time period after 2006 obviously the
15 Ethicon scientists still recognized the importance of,
16 first, large pore sizes and, second, minimal amount of
17 foreign body material as recommendations for a mesh
18 construction.
19     And, furthermore, if you are looking to the
20 literature they refer or they put on the leaf, you will
21 see that there are two references coming from our work,
22 but there are two others coming from the U.S. colleagues
23 as well. So obviously they confirm these findings and
24 there is no dispute about the relevance and importance
25 of large pores and minimal amount of foreign body

Page 25

1 materials for an adequate mesh construction.
2     Q. And even in these articles maybe in 2006, and
3 this PowerPoint slide may have been created by Ethicon
4 at some point in time after that, were the three
5 principles under Recommended Mesh Construction known to
6 you and as part of your work with Ethicon by the time
7 VYPRO went on the market in 1998?
8     A. Definitely. These are the results of our joint
9 work for the development of the VYPRO, and you see that
10 it's still true in this time period up to now.
11     Q. I'm sorry. Now let's go to Slide 15, please.
12     Okay. Please tell the jury what we are seeing
13 in this image, Dr. Klinge.
14     A. In the right part of the image you see again
15 the old construction PROLENE mesh, and on the left part
16 you see another lightweight, large-pore mesh. That is
17 called the Ultrapro, which has been a successor of the
18 VYPRO mesh, with pores of or holes which are again much
19 larger than those of a PROLENE mesh.
20     Q. When this new generation of lightweight meshes
21 with large holes hit the market in 1998, did other mesh
22 manufacturers begin using this new design concept of
23 mesh with less material and larger holes?
24     A. It is a well-accepted, well-established,
25 undisputed principle that lightweight, large-pore meshes

Page 26

1 are safer, and meanwhile almost all manufacturers
2 provided and offered devices with this feature of
3 material reduction and larger holes.
4     MR. THOMAS: Objection. Move to strike as
5   being non-responsive as to time.
6   Q.  And, again, my question was, after VYRPO came
7 on the market in 1998, from that time point forward, and
8 you understood my question to say that, correct?
9   A.  Yes.
10   Q.  Great.
11     Was the lighter-weight material with these
12 larger holes just used by other manufacturers beginning
13 in 1998 just for hernia?
14   A.  No, it's used for -- for other parts of tissue
15 repair as well.
16   Q.  Have manufacturers used this lightweight,
17 large-hole concept for prolapse meshes?
18   A.  Yes.
19     MR. THOMAS: Objection; scope.
20   Q.  I have no idea what that means, but let's clean
21 it up so we don't have an objection over your answer
22 this time.
23     Were these other manufacturers using lighter-
24 weight material with larger holes for indications other
25 than hernia, like prolapse and incontinence?

Page 27

1   A.  Yes, they did.
2     MR. THOMAS: Just show my objection to the
3   other products.
4   Q.  Did Ethicon utilize this new generation of
5 lighter-weight mesh with larger holes in their surgical
6 mesh products after 1998?
7     MR. THOMAS: Same objection as to other
8   products and time.
9   A.  Ethicon applied this principle of material
10 reduction and larger holes to all their products except
11 the old construction TVT PROLENE mesh.
12   Q.  And when you say "all their other products,"
13 are you aware, from your review in this case and your
14 work with Ethicon, that they use lighter-weight mesh
15 with larger holes for its prolapse meshes for women that
16 have pelvic organ prolapse?
17   A.  Yes.
18     MR. THOMAS: Same objection.
19   Q.  Answer?
20   A.  Yes.
21   Q.  And are you aware that Ethicon, through your
22 work with them, your work as a hernia surgeon, and your
23 work as a biomaterials science researcher for 20 years,
24 has used the lighter-weight mesh with larger-hole design
25 in its hernia meshes?

Page 28

1     MR. THOMAS: Same objection.
2   A.  Yes.
3     MR. THOMAS: Time and scope.
4   Q.  Did Ethicon begin using this lighter weight,
5 larger-hole concept, beginning with VYRPO in 1998?
6   A.  Yes.  With the development of the VYPRO and
7 when we found these principles they became a fact, and
8 they were applied to all new development of -- of
9 meshes, with the exception of the TVT.
10   Q.  So is it your understanding that despite
11 Ethicon using the lighter weight, larger-pore concept
12 for its prolapse meshes and its hernia meshes, that it
13 continues to use this 1974 old construction heavyweight
14 mesh with small holes to this day?
15   A.  Yes.
16   Q.  In all of its TVT line of products?
17   A.  In all.
18   Q.  And just so we understand what the jury's
19 looking at on the screen here, this Ultrapro mesh on the
20 left, when did it come on the market?
21   A.  It came on in about 2000.
22   Q.  And from your review and your work in this
23 case, do you know whether or not this Ultrapro on the
24 left was used for hernia repair by Ethicon's products?
25   A.  Yes, it is widely used for hernia repair.

Page 29

1   Q.  And did Ethicon also employ the use of the
2 Ultrapro mesh on the left for its prolapse repair when
3 they developed prolapse -- pelvic organ prolapse kits?
4   A.  It's used in the pelvic floor as well, yes.
5   Q.  By Ethicon?
6   A.  By Ethicon.
7   Q.  But they never used this mesh on the left, this
8 lighter weight, larger-hole mesh, or any of its lighter
9 weight, larger-hole meshes, for any of its TVT
10 incontinence in women?
11     MR. THOMAS: Objection; leading.
12   Q.  Is that your answer?
13   A.  Yes.
14     MR. THOMAS: Objection; leading.  Asked and
15 answered.
16   Q.  Okay.  You can take down that slide.
17     Did you do studies comparing the old PROLENE
18 material that is this heavyweight, small-hole material
19 to these newer meshes?  Did you do studies?
20   A.  We did a lot of studies where we looked to the
21 reaction to the PROLENE mesh in comparison to other
22 modifications, probably more than anyone else in the
23 world.
24   Q.  Have you published articles in the peer-
25 reviewed medical literature that relate to the safety of

Confidential - Subject to Protective Order

Page 30

1 surgical meshes either for the abdomen and the pelvic
2 tissues?
3   A.  Yes, we did, more than a hundred about.
4   Q.  And when we use the words today "pelvic floor"
5 or "pelvic tissues" in relation to mesh repair, do you
6 use those terms to include slings for incontinence as
7 well as meshes for pelvic organ prolapse?
8   A.  Yes.
9   Q.  Have you written books and book chapters that
10 relate to the safety of surgical meshes for the abdomen
11 and for the pelvic floor or the pelvic tissues?
12   A.  Yes, we did.
13   Q.  Around how many?
14   A.  About 50.
15   Q.  Have you been asked to speak at conferences
16 around the world on the topic of surgical mesh
17 complications and safer mesh design for both hernia and
18 pelvic floor?
19   A.  Many times, and still I am.
20   Q.  Have you been asked by Ethicon to speak as an
21 invited lecturer at conferences sponsored by Ethicon on
22 the topic of safer mesh designs for both hernia and for
23 pelvic floor repair?
24   A.  Yes.
25   Q.  On approximately how many occasions?

Page 31

1   A.  Dozens.
2   Q.  Have you been invited by Ethicon to speak to
3 urogynecologists and urologists regarding safe design of
4 surgical meshes for incontinence and prolapse?
5   A.  Yes, I was.
6   Q.  Did Ethicon ever ask you to speak about this
7 new generation of lighter-weight meshes with larger
8 holes at any of their conferences or anywhere in the
9 world?
10   A.  Many times.
11   Q.  Where did they ask you to do that and how did
12 they ask you to do that, please?
13   A.  I was asked to give presentations on many
14 conferences.  We had some meetings at our university
15 where Ethicon invited about 20 surgeons to come to the
16 hospital where we can treat hernia patients together,
17 and we had or I prepared some lectures in the afternoon
18 before, and I was asked to give a report of the history
19 of the development of the VYRPO, how it had -- how it
20 was done, what are the findings.  And this was
21 documented in a video and this was shown at many
22 conferences on monitor on the loop.  So, yeah, I was
23 asked to or I was able to present this lightweight
24 concept at many conferences on invitation from Ethicon.
25   Q.  So this DVD that Ethicon made interviewing you

Page 32

1 about the lightweight, large-pore concept you said was
2 played, and I just need to make sure I understood you,
3 on a loop, you mean at conferences?
4   A.  On a loop.  Yeah, it was shown permanently on
5 the monitor during the conferences.
6   Q.  Where Ethicon had a booth or Ethicon sponsored
7 an event?
8   A.  Yes.
9   Q.  Okay.  Have you reviewed and do you rely upon
10 Ethicon internal documents and depositions of Ethicon
11 witnesses for your opinions in this case?
12   A.  Yes.
13   Q.  Just briefly give the jury an idea of the
14 number of pages of Ethicon internal documents and pages
15 of Ethicon deposition testimony of their employees that
16 you've reviewed.
17   A.  I didn't count it, but thousands.  Thousands of
18 pages have been produced to me.
19   Q.  With regard to this TVT line of products that
20 has the old construction heavyweight mesh from 1974 in
21 it for stress urinary incontinence, are you familiar
22 with the weight, the surface area, the weave pattern and
23 the size of those holes?
24   A.  Yes.
25   Q.  Okay.  Is that something that you developed an

Page 33

1 expertise in while being a consultant to Ethicon for
2 those 10 years, as well as researching the biomaterial
3 science of meshes for the last 20 years?
4   A.  Definitely it was an important part of our
5 work.
6   Q.  Now, Doctor, I know your -- your history is in
7 abdominal surgery and biomaterial science research, and
8 I know you're not a urogynecologist or a urologist.  But
9 just generally speaking, for purposes of your testimony
10 today, how are the TVT line of products supposed to
11 function in women?
12   A.  The TVT is supposed to function as a ligament
13 to take over forces, to lay flat and smooth in the
14 tissue.
15   Q.  In what particular condition in women is it
16 supposed to prevent or help treat?
17   A.  It is placed underneath the urethra to avoid
18 any leakage.
19   Q.  Okay.  So, Doctor, at this time I'd like to
20 talk to the jury a little bit about the way the tissue
21 in our bodies reacts to a foreign substance like PROLENE
22 mesh and how the mesh reacts in the tissues in the body.
23 Is that something that you've studied over the last 20
24 years?
25   A.  Extensively, yes.

## Page 34

1    Q.  And at your request did we prepare some slides
2  for the jury today to help express your opinions in that
3  regard?
4    A.  Yes.
5    Q.  Do you feel that those would be helpful to you
6  in explaining your opinions to the jury?
7    A.  I think so.
8    Q.  Okay.  Let's go to Slide 1, PowerPoint slide
9  entitled, Foreign Body Reaction.  First of all, please
10  tell the jury what a foreign body reaction is.
11    A.  A foreign body reaction is the reaction of the
12  body to -- as a defense reaction to -- to someone which
13  is strange to the tissues.
14      For example, if you have a splinter in the
15  tissues then the first reaction will be that white blood
16  cells are forming a wall around this foreign body.
17  Later on they form a scar capsule around this foreign
18  body to seal it from the surrounding tissue.  And, as
19  probably everyone knows, this is related to a lot of
20  pain, this is a lot of inflammation in this area.
21      This is a reaction that is -- that happens in
22  all parts of the body, it is identical in all parts of
23  the body.  You always have this inflammation and scar
24  reaction to a foreign body.
25    Q.  And when you have more foreign body equals more

## Page 35

1  inflammation, what does that mean, doctor?
2    A.  The extent of the foreign body reaction, it is
3  very clear.  It depends from the surface or at the
4  contact area between the tissues and the foreign body.
5  So the more foreign body, the more inflammation, the
6  more scar tissue will have in the tissues.
7    Q.  Doctor, one thing I want to clear up right now
8  before we get going any further in your opinion.
9      Does it matter what part of the body the mesh
10  is implanted in as to whether it will have this foreign
11  body reaction and what that foreign body reaction will
12  be?
13    A.  No.  It is completely independent from the area
14  of the body.  You always have the identical foreign body
15  reaction and you always will see the more foreign body
16  the higher the surface, the more inflammation.  These
17  are two facts that are true for every part of the body.
18    Q.  Does it matter whether the mesh is in the
19  pelvic tissues, the abdominal tissues, or other tissues
20  in a woman's body, or even if it were in a man's body,
21  as to whether or not you will have this similar foreign
22  body reaction?
23    A.  Not in regard to the quality of the foreign
24  body reaction, but there are differences for the
25  consequences to the patients.  In an area as in the

## Page 36

1  pelvic floor with a lot of nerves, the risk for getting
2  nerves entrapped into the scar, the risk for pain for
3  these patients is higher than if you implant the mesh in
4  an area where there are no nerves or only very small
5  number of nerves.
6    Q.  So if someone, an expert or another witness or
7  even a lawyer comes into this courtroom and says the
8  tissue reaction in the abdomen to hernia meshes doesn't
9  apply to meshes in the pelvic tissues, what would you
10  say to that?
11      MR. THOMAS:  Object to the form of the
12      question.
13    A.  That is not true.
14    Q.  And what is that based upon, Doctor?
15    A.  It is based on our extensive work over 20
16  years, the histological analysis of human explants where
17  we all confirmed this identical reaction to foreign
18  bodies and this is a fact.  This is undisputed,
19  well-established, no doubt about it.
20    Q.  Have you seen anywhere in the worldwide
21  scientific literature or attended any scientific or
22  medical conferences anywhere in the world or seen any
23  credible studies that show that the problems that occur
24  in the tissue of a person's body due to a heavyweight
25  mesh with these small holes will only happen in hernia

## Page 37

1  cases but not happen in the pelvic tissues or other
2  tissues of the body?  Have you seen anything like that
3  in the world?
4    A.  No, nothing.
5    Q.  Okay.  At this point in the trial the jury
6  would have already seen the TVT mesh sling that we have
7  there on the slide up on the right.  And I know we've
8  been talking about foreign body reaction and
9  inflammation.
10      Did I ask you to create a slide where a TVT
11  sling rests in the body in relation to where an
12  abdominal hernia mesh is implanted in the body?
13    A.  Yes.
14    Q.  Would that be helpful to explain some of your
15  opinions here to the jury today?
16    A.  Yes.
17      (Plaintiff's Exhibit No. 8333 was marked for
18  identification.)
19    Q.  This is Plaintiff's Exhibit Demonstrative 8333.
20      Doctor, please explain to the jury what they're
21  seeing on the slide in front of them.
22    A.  On the right side, the image on the right side
23  there you see a cross section of the abdominal wall.
24  That is the area where we usually place these large flat
25  meshes to reenforce our hernia repair.

---

**Page 38**

1 And you see that it's quite going down until
2 the bones, and the red line is the area where usually
3 the TVT is placed there, and you see that there is a
4 huge overlapping of the areas. So our hernia meshes are
5 placed in -- in the same area than - than the TVT, just
6 we stop our dissection on top of the urethra, whereas
7 the TVT is placed underneath the urethra.
8 Q. And I know that you don't place TVT slings
9 because you're not a urogynecologist, but in terms of
10 the image on the right, is that what you use to
11 approximate this line in the red on the right side?
12 A. Yes.
13 Q. Okay. Let's go back to Slide 1, if we could.
14 Doctor, did I ask you to calculate how much
15 mesh material there is in a TVT sling?
16 A. Yes.
17 Q. Okay. And please tell the jury how much
18 polypropylene suture is woven in to create a TVT sling
19 device.
20 A. For the total device it's about 25 meters or
21 let me say 80 feet.
22 Q. And how many PROLENE sutures would it take to
23 weave into this product to create the TVT retropubic
24 device if we -- have you placed PROLENE sutures in the
25 body?

---

**Page 39**

1 A. Yes, several times I use it. Usually you cut
2 the sutures and make a knot and you remove every --
3 every part of the suture that is beyond the knot, you
4 cut it away. So definitely only one inch of the suture
5 will stay in the body.
6 If you compare this to the amount of the
7 material that is used to construct the TVT, and even if
8 you consider that half of the implant that they implant
9 during the implantation is cut to just the half, the
10 material in the TVT corresponds to a thousand stitches
11 with PROLENE.
12 Q. Did I ask you to bring a PROLENE suture in to
13 show the jury today?
14 A. Yes.
15 Q. Okay. If you would just -- is this -- now this
16 is something you've placed in patients over time?
17 A. It's gone. We've lost it.
18 Q. Here it is.
19 A. Yeah, yeah, yeah. Here it is.
20 Q. Is this something, when you're an abdominal
21 surgeon, that you've placed in patients?
22 A. Yes.
23 Q. And please explain to the jury after you use a
24 stitch like this or a suture how much is left in the
25 body.

---

**Page 40**

1 A. It's just -- it mainly depends on the size of
2 the tissue and the skills for knotting, but it's --
3 usually it's less than this.
4 Q. And how much is that, approximately?
5 A. One inch.
6 Q. Okay. And by way of comparison, did I ask you
7 to measure out 80 feet of polypropylene PROLENE fiber?
8 A. Yes.
9 Q. Okay. Did you bring that here today?
10 A. It was a pleasure.
11 Q. So, Doctor, what you have in your hand, now
12 that's not what the TVT looks like when it goes in the
13 body, correct?
14 A. Yes, that is correct.
15 Q. Okay. But if you were to take and unweave all
16 of the fiber that's in the TVT, is that the amount that
17 would be left?
18 A. Yes.
19 Q. And you've brought a TVT device with you today?
20 A. Yes.
21 Q. Okay. So explain why you pulled out the 80
22 feet of polypropylene in relation to what you're seeing
23 there.
24 A. So this is the amount of the suture filament
25 that is used to create such a device, and if you -- if

---

**Page 41**

1 you implanted it and cut it away then at least 10 meters
2 will stay there and this corresponds to, as I said, a
3 thousand sutures. That means a considerably larger
4 surface than a single suture. You have a completely
5 different reaction, because these thousand sutures are
6 placed in a very, very small area of the body. So you
7 have a high density of material, and this is not
8 comparable to the reaction to one single suture.
9 Q. Do you have an opinion, to a reasonable degree
10 of medical and scientific certainty, as to whether there
11 will be a different amount of foreign body reaction in a
12 patient's tissues, no matter where those tissues are in
13 the body, to this less than one inch of suture material
14 versus 80 feet of polypropylene material as is in the
15 TVT?
16 A. Yes.
17 Q. And what is that opinion?
18 A. It is a completely different reaction and it is
19 not justified to -- to transfer the results seen at
20 sutures to -- to the reaction to mesh materials.
21 Q. Does that fit within the slide that the more
22 foreign body equals more inflammation, that with more
23 polypropylene from the TVT you'll have more inflammation
24 than just a one-inch stitch?
25 A. Definitely, yeah.

---

Case 2:12-md-02327  Document 3367-18  Filed 04/27/17  Page 12 of 76 PageID #: 136173
Case 2:12-md-02327  Document 3567-18  Filed 04/27/16  Page 12 of 76 PageID #: 136173
Confidential - Subject to Protective Order

Page 42

1    Q.  Okay.  We can move that to the side, Doctor.
2  Get that back from you.
3        And the suture was Plaintiff's Demonstrative
4  8334, and the 80 feet of fiber is Plaintiff's Exhibit
5  8335, and by the end we will get you the exhibit number
6  for the TVT device.
7        Doctor, I want to shift gears a little bit now.
8  But continuing on with this idea of foreign body and
9  inflammation, I want to talk to you about the
10 relationship between this reaction to polypropylene
11 mesh, like the PROLENE, and a concept known as mesh
12 contraction or mesh shrinkage.  Are you familiar with
13 those terms?
14   A.  Yes.
15   Q.  Just briefly tell the jury in your own words
16 what mesh contraction or mesh shrinkage is.
17   A.  As I told you, the -- the reaction to a foreign
18 body is on the one hand the inflammation but on the
19 other hand it is the formation of scar tissue around the
20 foreign body.
21       The consequence or one of the normal things
22 that happens to scar is that you have a contraction of
23 the scar by the maturing process of the proteins in this
24 field.  So you have a reduction, a shrinkage of any scar
25 tissue there.

Page 43

1    Q.  So if this piece of paper is the mesh as it's
2  in the body, can you explain to the jury what we're
3  talking about in terms of what happens to the mesh
4  material when there is this mesh contraction or mesh
5  shrinkage?
6    A.  If this is the mesh area and if this is filled
7  completely by scar tissue, you have to consider a
8  contraction of the scar by about 30 to 50 percent.  And
9  if a mesh is inside the scar, all together it will
10 deform, it will -- it will reduce the area of the mesh
11 scar compound and thereby it will push together the
12 mesh, making these foldings, which again makes it even
13 more stiffer.
14   Q.  And even though that's a larger piece of paper,
15 if that were cut into the same size strip as the TVT
16 mesh, would it still undergo this 30 to 50 percent
17 contraction?
18   A.  Yes, the contraction does not depend from the
19 size of the mesh.  It happens to every -- every mesh.
20   Q.  Have you published in the peer-reviewed
21 literature on the subject of mesh contraction or
22 shrinkage and the resulting complications or injuries to
23 patients?
24   A.  Yes.
25       MR. THOMAS:  Objection to form.

Page 44

1    Q.  Answer the question.
2    A.  Yes, we did.
3    Q.  Thank you.
4        Have you spoken at conferences in the last 20
5  years about mesh contraction of polypropylene mesh
6  implants including the heavyweight old construction
7  PROLENE mesh used in TVT, and spoken on and taught at
8  conferences around the world for the last 20 years about
9  these concepts for both hernia repair and pelvic floor
10 repair?
11   A.  Many, many times.
12   Q.  Does it matter whether the mesh is in the
13 abdomen or the pelvic tissues or anywhere else in the
14 body whether a polypropylene mesh like PROLENE will
15 contract or shrink after its implantation?
16   A.  No, it does not matter where it is placed, it
17 is just -- it is mainly related to the amount of scar
18 that is seen around the implant.
19   Q.  Is the amount of mesh shrinkage or mesh
20 contraction dependent in any way on the size of these
21 holes or the weight or amount of material that you've
22 been explaining to the jury?
23   A.  Yes, both of these features are critical for
24 the shrinkage.  First of all, the amount of the
25 material, the more material the more scar, as I said

Page 45

1  already.  And the next is, if you have very large holes
2  as we could realize with the VYPRO or with the ULTRAPRO,
3  then these pores are filled by fat and not any longer by
4  scar tissue, and therefore these large pores helps to
5  reduce the amount of shrinkage.
6    Q.  Dr. Klinge, I would like to go through your
7  opinions regarding any problems that can occur to women
8  as a result of the inflammation and mesh contraction of
9  the TVT PROLENE mesh device, okay?
10   A.  Yes.
11   Q.  As a hernia surgeon, did you remove contracted
12 old construction heavyweight PROLENE mesh from patients
13 made of the same PROLENE that's in the TVT line of
14 products?
15   A.  Yes, I did.
16   Q.  And have you also removed contracted mesh from
17 the pelvic floor?
18   A.  Yes.
19   Q.  Tell the jury what contracted mesh feels like
20 when you take it out of a person's body.
21   A.  The first impression is that you have a very
22 dense body like concrete, it is very stiff, it is not
23 flexible.  It is deformed.  Very, very hard, not soft
24 any longer.  Maybe one of the most impressive
25 documentations of such a heavyweight shrunken mesh has

Page 46

1  been provided by Todd Heniford.  On many conferences
2  this was shown, and he used the explanted heavyweight
3  mesh as a hammer knocking on our table.
4      So that is the appearance of these heavyweight,
5  small-pore meshes, whereas if you are looking to the
6  tissue reaction to the large-pore meshes, very soft is
7  almost impossible just by feeling to identify where the
8  mesh is located.
9      Q.  Doctor, over the course of the last 20 years,
10  how many explanted polypropylene surgical meshes from
11  humans have you analyzed as part of your research and
12  work with companies to help develop safer mesh design?
13      A.  From human explants maybe around 500 to 600.
14      Q.  What was the purpose of your analysis of these
15  explanted surgical meshes?
16      A.  The scarring is a phenomenon that we could
17  realize in the OR without any -- any additional need for
18  some analysis.  You can feel it, you can see it.  But
19  the reason for this scarring, and in particularly the
20  extent of the inflammation, to get a better
21  understanding what happens there, there -- then you need
22  the help of the microscope and the tissue analysis in
23  particularly in those patients suffering from
24  complications.
25      MR. THOMAS:  Just, Ben, before you go, show my

Page 47

1      objection to this line of questioning.  I think it's
2      already been excluded by Judge Goodwin in his
3      previous orders on the hernia mesh inventories and
4      the pelvic mesh inventories for which he's excluded
5      testimony.  I just want to preserve that objection.
6      MR. ANDERSON:  You can preserve it, but it's
7      absolutely wrong, 100 percent.  Happy to argue it
8      with you whenever you want and however you want.
9  BY MR. ANDERSON:
10      Q.  Has contraction and shrinkage of polypropylene
11  slides been reported by Ethicon in scientific papers?
12      A.  Yes.
13      (Plaintiff's Exhibit No. 1922 was marked for
14  identification.)
15      Q.  Handing you what has been marked as Plaintiff's
16  Exhibit 1922.  Could you put that up, please?  Can you
17  highlight the top portion?  Is this a document that you
18  recognize?
19      A.  Yes.
20      Q.  Is it a document you reviewed and relied upon
21  in coming to your opinions in this case?
22      A.  Yes, I did.
23      Q.  If we look at this E-mail from 2006, I see some
24  names in the from and to line.  Without going through
25  all the names, are those names that you recognize?

Page 48

1      A.  Many of these peoples have been members of the
2  teams that has been working with us.
3      Q.  They're Ethicon employees?
4      A.  Ethicon employees.
5      Q.  You said working with us.  These are the people
6  you worked with over these years of your consulting?
7      A.  Exactly.
8      Q.  Okay.  And the subject line is mesh and tissue
9  contraction in animal, and then this is from Dr. Joerg
10  Holste.  Are you familiar with Dr. Holste?
11      A.  Very, very good.  We worked together for years.
12      Q.  He said, "This was our scientific statement on
13  mesh shrinkage.  Basically small pores, heavyweight
14  meshes induce more fibrotic, bridging tissue reaction
15  causing more mesh shrinkage during maturing of the
16  collagenous tissue.  See my presentation about
17  biocompatibility."
18      Are you in agreement with Dr. Holste from
19  Ethicon's statement here about Ethicon's scientific
20  statement on mesh shrinkage?
21      A.  Totally.  It reflects the result of our joint
22  work.  So it is a fact that is not longer any simple
23  opinion.
24      Q.  And he attaches to this E-mail an article
25  called shrinking meshes, if you could pull that up.

Page 49

1  Have you reviewed and relied upon this during your work
2  in this case?
3      A.  Yes, I did.
4      Q.  And who are the authors of this paper on
5  shrinking meshes?
6      A.  Again, members of -- of the research department
7  from Ethicon, Germany.
8      Q.  Okay.  And if we could go to the next page, the
9  second page of the document, please, and blow up the
10  left side, starting with four.  Stop right there,
11  please, if you would.  Let me just highlight that first
12  paragraph.
13      Reading from Dr. Holste in this Ethicon
14  statement, "For decades, meshes of mainly polypropylene,
15  MARLEX, PROLENE and polyester, MERSILENE, have been used
16  for hernia repair."
17      Blow up the third paragraph, please.
18      "As far as stability and elasticity are
19  concerned, the heavyweight polyester and polypropylene
20  meshes currently on the market are overdimensioned or
21  not flexible enough for their intended use."
22      Is that significant to your opinions, those
23  words?
24      A.  Yes.
25      Q.  How so?

Confidential - Subject to Protective Order

Page 50

1   A.  You see there is no dispute that this is a
2   fact, even within Ethicon.
3   Q.  And overdimensioned.  You mentioned the word
4   overengineered before.  Is that synonymous with this
5   word?
6   A.  Yes.
7   Q.  Okay.  And then let's look at that last
8   paragraph.  "As also described by the team of Professor
9   Schumpelick in Aachen," was that part of your group here
10  in Aachen that was working with Ethicon?
11  A.  Yes.
12  Q.  Okay.  "The amount and structure of the
13  implanted material is critical for the frequency and
14  intensity of local wound complications and the extent of
15  scar formation, which can be as severe as adverse
16  abdominal covering stiffness."
17      Is that important to your opinions?
18  A.  Yes.
19  Q.  How so?
20  A.  Again, it shows that it is meanwhile a well-
21  established fact.
22  Q.  And have you reviewed other scientific
23  literature that discusses -- oh, strike that.
24      If you could please go to the end and tell us,
25  I want to look at the date of this document, down at the

Page 51

1   bottom.  Blow up other Ethicon products.  What was the
2   date that this scientific paper on shrinking meshes was
3   done by Ethicon?
4   A.  It's prepared -- it's produced in 2002 and it
5   is placed on the web page of Ethicon so that everyone
6   can have access to it.
7   Q.  Okay.  And if you look up above in the
8   references and just highlight on the left side one, two,
9   three, Klinge, is Ethicon citing you in -- and on the
10  right side -- what, five times with regard to --
11  A.  Yes.
12  Q.  -- their position?
13      Okay.  Now, if we could -- let me ask you this:
14  Have you reviewed -- strike that.  New question.
15      Have you reviewed other scientific literature
16  that discusses how this heavyweight old construction
17  PROLENE in the TVT contraction shrinks?
18  A.  Yes.
19      (Plaintiff's Exhibit No. 292 was marked for
20  identification.)
21      (Plaintiff's Exhibit No. 8338 was marked for
22  identification.)
23  Q.  Showing you what we will mark as Plaintiff's
24  PLT292.  Can you put that up, please?
25      Okay.  Also it's identified in the exhibit list

Page 52

1   as Plaintiff's 8338.  It's identified twice in the
2   exhibit list.  If you'd highlight the top part.  Do you
3   recognize this as an article that you reviewed in
4   forming your opinions in this case?
5   A.  Yes.
6   Q.  Okay.  Is it significant to your opinions?
7   A.  Yes.
8   Q.  What were the researchers doing in this study?
9   A.  They've been looking to the width of the sling
10  after incorporation into tissues by ultrasound, and they
11  found for both TOT, TVT and TVT-O a reduction of the
12  width of about 30 percent.
13  Q.  And are those findings consistent with your
14  published studies of the PROLENE mesh and other
15  heavyweight meshes that you did with Ethicon concerning
16  the amount of shrinkage that you could expect from that
17  mesh?
18  A.  It is in accordance to -- to the amount of
19  shrinkage that we found.
20  Q.  And have you seen other peer-reviewed
21  literature regarding the contraction or mesh shrinkage
22  of TVT PROLENE mesh?
23  A.  Yes.
24  Q.  Are you familiar with the Najjari article?
25  A.  Yes, I am.

Page 53

1   Q.  That's Plaintiff's Exhibit 8388.
2      MR. THOMAS:  I'm sorry.  I thought that was the
3   one we just had up on the board.
4      MR. ANDERSON:  I did too.  The one that was on
5   the board was Plaintiff's PLT292.
6      MR. THOMAS:  That's the one you gave me.  I
7   don't have 292.
8      MR. ANDERSON:  Off the record, please.
9      THE VIDEOGRAPHER:  We are off the record at
10  10:39 a.m.
11      (Recess from 10:39 until time 10:54 a.m.)
12      THE VIDEOGRAPHER:  This marks the beginning of
13  Video No. 2.  We are back on the record.  The time
14  is 10:55 a.m.
15  BY MR. ANDERSON:
16  Q.  And, Doctor, what were the researchers looking
17  at in this Najjari article, 8388?
18  A.  They also looked by ultrasound what happens to
19  the slings when implanted into the patients, and they
20  look to polypropylene slings on the one hand and they
21  compared the results to PVDF slings that are slings made
22  of another plastic material, and they confirmed that
23  there was a shrinkage of the polypropylene slings.
24  Q.  And was the TVT PROLENE mesh the old
25  construction, what was used in this study?

Page 54

```
 1    A.  Yes.
 2    Q.  And what were the results of that study?
 3    A.  They confirmed that there is in the patient
 4  that you can objectify and you can detect this shrinkage
 5  and contraction, you can see the reduction of the width
 6  of the slings by this scar contraction.
 7    Q.  Doctor, is there any way for a surgeon who is
 8  considering implanting a polypropylene mesh like TVT to
 9  know the extent of scarring and contraction that will
10  occur over the patient's life in and around the mesh or
11  how to control it?
12    A.  You cannot predict the specific scar reaction
13  of a specific patient, but you can reduce the risk.  You
14  know that if you have a huge amount of material you have
15  a higher risk for this scar contraction.
16    Q.  And when you say "huge amount of material," do
17  you mean the weight of the material?
18    A.  The weight, yeah.
19    Q.  Okay.  After you stopped using the old
20  construction heavyweight PROLENE mesh in your patients,
21  did you use Ethicon's new lightweight meshes with larger
22  holes in them, this new generation of meshes that
23  started with the VYPRO in 1998?
24    A.  Yes, we completely changed to the use of these
25  lightweight, large-pore meshes, and even more it was
```

Page 55

```
 1  almost -- it was impossible to make any study which uses
 2  the heavyweight mesh material.
 3    Q.  Which lightweight meshes with large holes did
 4  you use that were made by Ethicon?
 5    A.  At first we started with the VYPRO, then later
 6  on it was VYPRO II, and then mainly we used the
 7  ULTRAPRO.
 8    Q.  And ULTRAPRO, was that the second photograph
 9  that the jury saw, the one on the left with the large
10  holes and the 70 percent less material?  Is that the one
11  that you're referring to?
12    A.  Exactly.
13    Q.  Okay.  When you used these new generation
14  meshes, manufactured by Ethicon, what did you notice, if
15  anything, about your patient complications?
16    A.  The patient complications almost disappeared.
17  We don't have -- we have a markedly reduced number of
18  patients suffering from pain or from local wound
19  complications.
20    Q.  Did you finish your answer?
21    A.  Yes.
22    Q.  Okay.  I know that you were a consultant for
23  over 10 years to Ethicon about safer mesh design.  I
24  want to ask you this:  Did they ever come to you and ask
25  you to help them with a safer mesh design of the TVT or
```

Page 56

```
 1  other pelvic tissue meshes?
 2    A.  We never have been asked to make a formal
 3  project for the development of pelvic floor meshes.  I
 4  just remember that I have discussions with Dr.
 5  Hellhammer from Ethicon.
 6    Q.  Dr. Hellhammer from Ethicon?
 7    A.  Dr. Hellhammer from Ethicon.
 8    Q.  Okay.  Tell us about those discussions, please,
 9  when did they occur and what was said?
10    A.  She told me in about 2000 that the company
11  planned or is in preparation of textiles for the use in
12  the pelvic floor, and she wanted to have my opinion
13  about it.
14        And I told her that when using textiles in the
15  pelvic floor it is necessary and very important to
16  consider what we have learned during the development of
17  the VYPRO.  You have to define how strong it is, how
18  stretchable it is, and you have to reduce the amount of
19  material to the least amount possible and you have to
20  make holes that are as large as -- as large as possible.
21  So these principles have to be considered.
22    Q.  And from your view of the documents have you
23  been able to determine whether or not Ethicon ever
24  utilized these new safer lightweight, large-pore meshes
25  for their TVT devices?
```

Page 57

```
 1    A.  They're recognized in many articles that this
 2  is true, but they didn't adopt it as to configuration of
 3  the old construction PROLENE mesh.
 4    Q.  In the TVT.
 5    A.  In the TVT.
 6    Q.  And did I -- I'm sorry.  Strike that.  New
 7  question.
 8        And did you help me create a slide for the jury
 9  to summarize your opinions that we've just been
10  discussing regarding inflammation, scarring and
11  contraction?
12    A.  Yes.
13    Q.  And would that be helpful in presenting your
14  summary opinions to the jury today?
15    A.  Yes.
16        (Plaintiff's Exhibit No. 8340 was marked for
17  identification.)
18    Q.  If we could go to Slide 6.  That's Plaintiff's
19  Demonstrative Exhibit 8340.  Is this a slide that I
20  helped you create, Doctor?
21    A.  Yes.
22    Q.  Okay.  And if we look at that patient injury
23  due to mesh inflammation and contraction, does this
24  apply to the old construction heavyweight mesh in the
25  TVT products?
```

Confidential - Subject to Protective Order

Page 58

1   A.  Yes.
2   Q.  Okay.  Explain those four points briefly to the
3   jury.
4   A.  So it is a fact that the implantation of the
5   mesh induces an inflammation, and this inflammation, the
6   more material, the more inflammation, and it's a
7   permanent inflammation.  That means that the
8   inflammation doesn't stop after one week, but it's a
9   permanently chronic wound in the patient for decades.
10      In some patients there is an excessive
11  scarring.  So you have various degrees of scar formation
12  in the different patients, and in some of them you have
13  an excessive scar formation, and this scar formation is
14  not only a thing that can be seen in the microscope or
15  that you can feel, but this is strictly related to
16  patient complications.
17      If the nerves are entrapped into the scar
18  tissue, this will increase the risk for chronic pain.
19  If you have a mesh contraction and a shrinkage with the
20  folding of the mesh, that will cause damage to the
21  surrounding tissue, and this will be the reason for
22  erosions; or if you have this entrapment into the scar
23  tissue, making it stiff and not stretchable any longer,
24  and if this is in contact to other organs you will
25  create organ dysfunctions.  The vagina will get stiff,

Page 59

1   the bladder will get stiff.  You will create some
2   obstruction by deforming the urethra.  So a lot of these
3   complications are strictly related to the amount of scar
4   that is created by these implants.
5       So mesh inflammation and contraction are a very
6   big concern, a critical concern for the patient safety.
7   And the purpose of every mesh design is to reduce the
8   inflammation and reduce the scar -- the amount of scar.
9   Q.  Based upon your 20 years of work in the
10  biomaterials field, including 10 years of work helping
11  design safer meshes with Ethicon, all of your
12  publications, your presentations at teaching conferences
13  around the world for the last 20 years, all of the
14  research that you have done, your review of human
15  explants over the last 20 years and all of your work as
16  an expert in this case, do you have an opinion, to a
17  reasonable degree of medical and scientific certainty,
18  as to whether the old construction, 1974 heavyweight
19  PROLENE mesh and TVT with these small holes creates an
20  unnecessary risk of patient injury due to the increased
21  risk of permanent inflammation, severe scarring around
22  the mesh, leading to chronic pain, erosions and organ
23  dysfunction to the bladder and the vagina in some
24  patients?  Do you have an opinion?
25      MR. THOMAS:  Object to the form of the

Page 60

1   question.
2   A.  Yes.
3   Q.  And what is that opinion?
4   A.  The old construction PROLENE mesh induces more
5   inflammation and more scar tissue than is necessary and
6   therefore it causes more complications than necessary.
7   Q.  And do you consider that to be an unnecessary
8   risk of complications to the patients as a result of the
9   design of this TVT mesh?
10  A.  This creates unnecessary risk and makes it
11  unsafe.
12  Q.  Okay, Dr. Klinge.  We've talked a little bit
13  about these holes in the mesh.  I want to talk a little
14  more specifically about them.  Have you conducted
15  research and published studies on how big these holes
16  need to be in order to safely incorporate in the tissue?
17  A.  Yes.
18  Q.  Are these studies, some of them conducted with
19  Ethicon?
20  A.  Yes.
21  Q.  Have you also studied and published in the
22  peer-reviewed literature on the most important way to
23  measure these holes to give you the best information as
24  to whether or not a design with a particular hole size
25  will incorporate safely into a patient's tissues?

Page 61

1   A.  Yes; we could improve the method to measure the
2   size of the holes.
3       (Plaintiff's Exhibit No. 8341 was marked for
4   identification.)
5   Q.  And if we could just put up Slide 7,
6   Plaintiff's Demonstrative 8341.  And with regard to
7   measuring the holes, what are we seeing here on the
8   screen, Doctor?
9   A.  You'll see this is the ULTRAPRO and you see
10  there are several lines in the holes of the ULTRAPRO.
11  And at the beginning of our research it was quite common
12  just to take one of the line as a measurement of the
13  size of the holes, but meanwhile we know that we have to
14  measure it in all directions so that it is necessary to
15  apply many or to measure many of the distances to get an
16  idea whether the hole is big enough or whether it's too
17  small.
18  Q.  And you mentioned early on in your work that
19  you -- you would use one line.  By the time VYPRO and
20  ULTRAPRO came on the market, were you and your
21  colleagues, in conjunction with your work with Ethicon,
22  aware of the need to measure the holes in all directions
23  as we see in Plaintiff's Exhibit 8341?
24  A.  Yes; but it was -- at that time it was not so
25  critical because the VYPRO and the ULTRAPRO, they have

Page 62

1 holes of about three to four millimeters, so a
2 completely different class of holes. And therefore it
3 -- for many aspects it was sufficient to talk from large
4 pores and small pores.
5 Q. So, Doctor, is it okay if a company just
6 measures its mesh right out of the box, or as you have
7 the TVT in front of you today, right out of the box,
8 before it goes into the patient, before the surgeon puts
9 it in use, is it okay for them to say, well, we measured
10 our holes in our mesh and they're larger than one
11 millimeter and so we're good to go, we have a safe mesh?
12 MR. THOMAS: Object to the form of the
13 question.
14 A. If you are sure that there are not any forces
15 that may work on the mesh, then it may be sufficient to
16 take the textile or the size of the hole from the
17 textile form out of the box.
18 Q. Would that be sort of what we're seeing in
19 8341, just looking at the mesh, the textile as it's made
20 before it goes in, is that what you're talking about?
21 A. This is -- this is the size of the textile when
22 taking out the textile out of the box. It may be this
23 is true for situations where you don't have any forces
24 applying to the meshes. But in conditions where you
25 have to consider some forces acting on the meshes, then

Page 63

1 you have to look what happens to the size of the holes
2 when these forces are applied to the device.
3 (Plaintiff's Exhibit No. 8349 was marked for
4 identification.)
5 Q. Doctor, I'm handing you what we have marked as
6 Plaintiff's 8349. Is this a document that you have
7 reviewed and relied upon in this case?
8 A. Yes.
9 Q. Something that's important to your opinions?
10 A. Yes.
11 Q. What is it that we're looking at here in this
12 document? What is this document?
13 A. It is an internal Ethicon document which
14 clearly shows that they have -- they considered the
15 problem of mesh shrinkage.
16 Q. And if we could go to page or Slide 6 of that
17 presentation.
18 MR. THOMAS: Show my objection to the questions
19 about this document dated February 23rd.
20 THE WITNESS: 2007.
21 MR. THOMAS: February 23rd, 2007, as not been
22 applicable to all the plaintiffs in this case.
23 MR. ANDERSON: Your objection is noted.
24 BY MR. ANDERSON:
25 Q. And you've reviewed this slide, Slide 6?

Page 64

1 A. Yes.
2 Q. When we look at Slide 6 where it says "pore
3 size," small porous meshes, is that -- another word for
4 that small hole meshes?
5 A. Yes.
6 Q. And small hole meshes like the TVT?
7 A. Yes.
8 Q. Okay. If the holes are less than one
9 millimeter, and one millimeter, are we talking about
10 less than one millimeter, that measuring where the red
11 arrows were like for instance in the ULTRAPRO?
12 A. Yes.
13 Q. Okay. Lead to fibrotic bridging and increased
14 shrinkage. What is fibrotic bridging again?
15 A. Fibrotic bridging means that the entire hole is
16 filled up by scar tissue.
17 Q. And then large porous meshes or large-hole
18 meshes allow for a better and faster tissue ingrowth
19 with less shrinkage and less contraction. Is that
20 significant to your opinions?
21 A. Yes.
22 Q. And how so?
23 A. This document clearly demonstrates that the
24 relationship between the pore size and the shrinkage is
25 still accepted, that there is no dispute about it, that

Page 65

1 it is acknowledged as a fact by Ethicon.
2 Q. And about this faster tissue ingrowth, what's
3 that refer to, under the large-pore mesh?
4 A. If the holes are large enough then the body is
5 able to fill the holes by the local fat tissue, which is
6 normally there in this area.
7 Q. Now, even though this document is dated in
8 2007, are these -- when were these principles
9 acknowledged and developed as between you and Ethicon?
10 A. The total concept was finished in 1997, with
11 the development of the VYPRO. Then all the facts have
12 been on the table and all the ideas and measurements had
13 -- had started at that time point.
14 Q. So even though this is dated 2007, this could
15 have easily been a PowerPoint presentation in Ethicon in
16 1997; is that correct?
17 MR. THOMAS: Object to the form of the
18 question.
19 A. Yes. The importance of this is that even 10
20 years later they still accepted it. It just
21 demonstrates that there is no discussion about it,
22 whether it's true or not. It is a fact.
23 Q. You indicated earlier that you had looked at
24 over a thousand or over 500 or 600 human explants,
25 including explants that had come from the body that were

Page 66

1 this old construction heavyweight PROLENE mesh. Do you
2 remember that part of your testimony?
3    A. Yes.
4    Q. Okay. As part of your research in analyzing
5 explanted PROLENE mesh from human tissue, did you see
6 whether the holes in those PROLENE explants were greater
7 than one millimeter and had this fat tissue in between
8 them or were less than one millimeter and had this
9 fibrotic bridging as we've seen in this slide?
10    MR. THOMAS: Object to the form of the
11 question.
12    Q. Were you able to determine that, Doctor?
13    A. Yes.
14    Q. Okay. And what did you find?
15    A. Almost all holes from the old construction
16 PROLENE mesh are filled by scar tissue. It is a real
17 exception if you see a hole where there is some -- some
18 fat tissue in between the filament.
19    Q. As part of your work in this case and part of
20 your scientific research of biomaterials, have you
21 analyzed what happens to these mesh holes when the TVT
22 mesh is in use and forces are placed on it either by the
23 surgeon during the operation or after the sling is
24 implanted in the patient and has forces placed on it?
25 Have you analyzed that?

Page 67

1    A. Yes.
2    MR. THOMAS: Objection; foundation.
3    Q. Well, I'm trying to lay the foundation. I'm
4 asking if he's analyzed it. Have you analyzed that?
5    A. Yes.
6    Q. Okay. Please briefly explain for the jury what
7 analysis or testing you were involved in.
8    A. We applied some forces to -- to the sling, put
9 it into machine, and then stretched it by certain
10 forces, and then we looked what happens to the size of
11 the holes.
12    Q. Okay. As part of your review of the thousands
13 of pages of Ethicon documents and their review of
14 depositions, were you able to determine whether or not a
15 surgeon who is implanting a TVT device places forces on
16 it during implantation?
17    MR. THOMAS: Objection to the form of the
18 question.
19    A. Yes.
20    Q. I'm sorry.
21    A. Yes.
22    Q. Okay. And based upon all of your scientific
23 research, as well as your review of the documents in
24 this case, were you able to determine whether or not
25 once a TVT is implanted in a woman whether forces will

Page 68

1 be placed on it in her body or otherwise known as in
2 vivo?
3    A. It has to be considered that there are some --
4 some forces that are applied to the meshes during the
5 implantation and after.
6    Q. Okay. You said that you had done some analysis
7 of the TVT mesh regarding these forces. Briefly explain
8 for the jury what analysis or testing you have been
9 involved in in looking at this specific issue of how the
10 pores in the TVT will react when stresses are placed on
11 it.
12    A. We have performed an experiment where we --
13 where we put some stress to -- to the sling and looked
14 to the size of the holes.
15    Q. Who did you collaborate with on that testing,
16 if anyone?
17    A. This was done in collaboration with Professor
18 Muhl, from The Technical University, with whom together
19 we developed this improved analysis for the style, for
20 the size of the holes.
21    Q. When did you first begin that work with
22 Professor Muhl from The Technical Institute?
23    A. We started in 2005 and could finish the -- the
24 description or the development of this method in 2007,
25 and publish it in 2007, and later on we applied it to

Page 69

1 mesh materials and published it again in some years
2 later.
3    Q. And were you able to publish the results in the
4 peer-reviewed literature of your testing of the TVT
5 holes?
6    A. Yes, we did.
7    Q. Okay. Was one of those publications this year,
8 in 2015?
9    A. Yes.
10    Q. Do those peer-reviewed publications regarding
11 these -- strike that. New question.
12    And do these peer-reviewed publications cover
13 all of the protocols, test methods, set-up and analysis
14 of the testing that you and Professor Muhl performed?
15    A. Yes, I did.
16    Q. Regarding the test methods that you used to
17 look at the holes and how the holes would react under
18 forces of the TVT mesh with Professor Muhl in these
19 peer-reviewed publications, was it scientifically
20 possible for Ethicon or other mesh manufacturers to have
21 done a similar analysis at the time the TVT was launched
22 in 1998?
23    MR. THOMAS: Object to the form of the
24 question.
25    Q. You can answer.

Confidential - Subject to Protective Order

---

Page 70

1    A.   At that time point all the testing equipment
2    was available for -- for everyone.  You had the software
3    for image analyzing, you had the Instron machines
4    putting some -- some forces to the meshes.  So all of
5    this was available and we did it at that time, just it
6    was not so comfortable.  You have to do it with a lot of
7    hand, hand work.
8    Q.   And you said Instron machines?
9    A.   Instron machines.
10   Q.   How long have Instron machines been around?
11   Fifty years?
12   A.   I would guess before World War.
13        (Plaintiff's Exhibit No. 776 was marked for
14   identification.)
15   Q.   Okay.  Now, getting back to the testing that
16   you conducted with Professor Muhl, if we could put up
17   PLT0776.  If you'd blow up the top part.
18        Doctor, do you recognize this as your
19   peer-reviewed publication with Professor Muhl, and
20   others, regarding your testing of the old construction
21   TVT that we're here to talk about today?
22   A.   Yes.
23   Q.   Okay.  You talked about placing forces on the
24   TVT slings in this study.  How did you determine what
25   forces to place on the TVT during your testing?

---

Page 71

1    A.   So first of all we looked to the literature,
2    and secondly to the Ethicon documents to get a good
3    estimate which forces are reasonably to be expected
4    during the implantation.
5    Q.   And as part of your review of the materials in
6    this case, have you reviewed the expert report of
7    Dr. Thomas Muhl regarding his testing of the TVT slings?
8    A.   Yes.
9    Q.   And do you rely on that report to form the
10   basis of some of your opinions in this case?
11   A.   Yes.
12   Q.   Did you have input into the study that went
13   into that report and the study protocol?
14   A.   Yes.
15   Q.   What was your involvement?
16   A.   I helped to define the range of the forces.
17   Q.   And were the results of Dr. Muhl's expert
18   report regarding the data that was used -- strike that.
19   New question.
20        Were the results of this expert report the data
21   that was used for the published article that we're
22   looking at here in Plaintiff's Exhibit PLT0776?
23   A.   Yes.
24        (Plaintiff's Exhibit No. 8342 was marked for
25   identification.)

---

Page 72

1    Q.   Okay.  If we could go to Page 8 of
2    Professor Muhl's report, which is Plaintiff's Exhibit
3    8342.  And if you could just blow up the top part of
4    this.
5        Explain to the jury what you're seeing in these
6    two images.  And you can start with the top image.
7    A.   First of all, these are the slings that are put
8    into these clamps and then you have a destruction of the
9    clamps with a controlled force there.
10   Q.   And are these -- is the TVT mesh being tested
11   in this?
12   A.   This is in all of these images you have a TVT
13   mesh.  The top, the three, they are -- they are images
14   from the Moalli publications, Moalli, a group of
15   scientists from Pittsburgh; and underneath you see the
16   images from Professor Muhl, and you'll see it's quite
17   identical, the results.
18        The forces that are applied, on the left you
19   have no forces, that is the crystalline form, the
20   textile form without any force.  In the middle you have
21   a very, very low force of one newton.  That means about
22   a hundred gram, a tenth of a kilogram, and you already
23   see this narrowing of the sling, this deformation of the
24   sling.  And on the right you see a mechanical force of
25   10 newton, that means approximately one kilogram, and

---

Page 73

1    you see this roping of the material, this fraying of the
2    borders, these sharp edges of the borders.  And if you
3    compare the upper parts of the images and the lower
4    parts, you'll see identical results.
5        So the PROLENE, if applied to some tension, you
6    see -- on the one hand you see this narrowing of the
7    holes, and on the others you see this fraying of the
8    borders.
9    Q.   You mentioned curling, roping and fraying with
10   regard to this mesh design.  Is that something that you
11   have studied in your work over the last 20 years as to
12   what curling, roping and fraying will do in the tissues?
13   A.   Yes.
14   Q.   And based upon that review, what reaction in
15   the tissues does the body have to a mesh that is curled,
16   roped and frayed like we see in these images?
17   A.   In particularly the roping leads to a higher
18   density of materials in the tissues there and --
19   Q.   When you say "higher density of materials,"
20   explain to the jury what you mean in normal words.
21   A.   That means that the fibers are coming together,
22   that the holes are getting smaller and smaller and
23   smaller.  You have a lot of fibers very, very close
24   together, and all of this tissue in between the fibers,
25   it is filled completely by scar.

---

Page 74

1    Q.   And do you have an opinion, to a reasonable
2    degree of medical and scientific certainty, based upon
3    your 20 years of work and your testing on the TVT
4    slings, as to whether or not the appearance of this mesh
5    at the one newton force and 10 newtons of force will be
6    safe or unsafe in a woman's pelvic tissues?
7        MR. THOMAS:  Object to the form of the
8    question.
9    A.   Yes.
10   Q.   And what is that opinion?
11   A.   The application of even slight forces increases
12   the risk for producing a scarry rope that are
13   contracting all the tissues.
14   Q.   As part of your work in this case have you
15   reviewed internal Ethicon documents regarding this
16   curling, roping and fraying effect from the TVT mesh?
17   A.   Yes.
18       (Plaintiff's Exhibit No. 8030 was marked for
19   identification.)
20   Q.   Showing you what we have marked as Plaintiff's
21   Exhibit 8030, if you could put that up on the screen,
22   please.
23       Do you recognize this as a document that you
24   reviewed and rely upon -- and relied upon in coming to
25   your opinions in this case?

Page 75

1    A.   Yes.
2    Q.   And in this Ethicon document, what is the date?
3    A.   It is a document from 2001.
4    Q.   And it says down below, TVT recommendations
5    from Dr. Wang.  From your review of the materials could
6    you determine who Dr. Wang was?
7    A.   Yes.
8    Q.   Who was that?
9    A.   He was a surgeon who used the TVT very, very
10   often in his patients.
11   Q.   Okay.  And if we could go down to the minutes
12   of the meeting regarding these recommendations from
13   Dr. Wang and highlight the second bullet point.
14       "Fraying is inherent in the product based on
15   the mesh construction."
16       And what is fraying again?
17   A.   Fraying is the change in the borders.
18   Q.   Like from the images we just saw?
19   A.   Yes.
20   Q.   Okay.
21   A.   With the sharp edges.
22   Q.   And in this Ethicon document they say when any
23   amount of tension is applied to the mesh, fraying
24   occurs.
25       Is this significant to your opinions, these two

Page 76

1    sentences right here, Doctor?
2    A.   Yes.
3    Q.   Why is that?
4    A.   It demonstrates that this is not only a concern
5    of Moalli or our group, but this is a concern that is
6    raised by surgeons.  They have seen it and they have
7    seen it already in 2001, and they have reported it in
8    2001.
9        (Plaintiff's Exhibit No. 3045 was marked for
10   identification.)
11   Q.   Showing you what we've marked as Plaintiff's
12   Exhibit P3045.  Put that on the screen, please.  If you
13   could highlight the top part of that E-mail stream from
14   2013.
15       Is this a document that you reviewed and relied
16   upon in coming to your opinions in this case?
17   A.   Yes.
18   Q.   I'm going to look at an E-mail from this
19   string, and the subject line, TVT mesh elongation,
20   forward by Dr. Kenny Maslow.  If you could go to the
21   next page, please.
22       MR. THOMAS:  Show my objection to any
23   discussion about this article in terms of time frame
24   and foundation for this witness to talk about it.
25   Q.   Looking at this E-mail string it says, "Hi,

Page 77

1    Sheelu.  Can you suggest any comments on the attached
2    photo?  Dr. Maslow is our highest volume TVT user in
3    Canada and he has apparently had this issue before."
4        Did I read that correctly?
5    A.   Yes.
6    Q.   Okay.  And it asks about comments on the
7    attached photo.  Let's pull up that attached photo which
8    is attached to this E-mail.
9        Have you reviewed this document?
10   A.   Yes.
11   Q.   Is this significant to your opinions regarding
12   the TVT sling?
13   A.   Yes.
14       MR. THOMAS:  Same objection.
15   Q.   How so?
16   A.   It again confirms that it is not only a concern
17   from Moalli and our group, but it's still a concern that
18   is raised by surgeons and it is even raised in this
19   time, so 12 years after the first warning.
20       (Plaintiff's Exhibit No. 4170 was marked for
21   identification.)
22   Q.   And if we could go back to the Moalli article,
23   PLT4170, and go to Page 658, and highlight the -- over
24   on the right, D and J.  Do you recognize those as the
25   two meshes that are --

Page 78

1    MR. THOMAS: I'm sorry, do I have that one?
2    MR. ANDERSON: Yeah, uh-hum.
3    MR. THOMAS: I don't think I do.
4    MR. ANDERSON: Here's another copy, if you
5  don't have one.
6    MR. THOMAS: Plaintiff's 4170. I think this is
7  the first time you've given it to me.
8    MR. ANDERSON: Well, I apologize for that,
9  Dave, deep from my soul.
10   Q.  Are D and J the TVT images from this article?
11   A.  Yes, they are.
12   Q.  And what are we seeing in the bottom image from
13  this Moalli testing?
14   A.  Again you see this fraying, you see these sharp
15  edges, and you see that the end of the fibers, when they
16  are cut, they form these sharp edges sticking in the
17  tissues.
18   Q.  And is this from the same study that they did
19  where you were comparing the Moalli images with yours
20  and Professor Muhl's images?
21   A.  Yes.
22   Q.  Okay.  Now, if we could just go to Page 661 of
23  this Moalli study from the University of Pittsburgh.  If
24  you blow up the last line and then the top three lines
25  on the next side, and put them side-by-side, if you

Page 79

1  could, please.
2    It says, "The permanent elongation after C1,
3  ten cycles between 0.5 and five newtons, or roughly 0.1
4  and 1.1 pounds."
5    And what does that relate to, the .1 and 1.1
6  pounds?
7    A.  Five newtons is about one pound.
8    Q.  Does that relate to the stretching that they
9  were putting on?
10   A.  The forces they put.
11   Q.  Okay.  "So the permanent elongation after C1 of
12  the Gynecare mesh."  And is that the TVT mesh?
13   A.  Yes.
14   Q.  "Was different from that of all the other
15  samples tested.  Gynecare samples permanently elongated
16  by 17.5, plus or minus 4.2 percent, indicating that
17  although very little force applied there is irreversible
18  deformation of the TVT."
19    Did I read that correctly?
20   A.  Yes.
21   Q.  Is that significant to your opinions?
22   A.  Yes.
23   Q.  Briefly state why, please.
24   A.  Because this study clearly shows that this
25  specific device has a problem when even little force is

Page 80

1  applied to it because then you already have a permanent
2  deformation.  That means roping, curling, and the high
3  risk for scarry roping of the device.
4    Q.  During your expert work in this case, have you
5  reviewed internal Ethicon documents that would
6  demonstrate just how much of the polypropylene fibers
7  come off of the TVT mesh when it is stretched under
8  anticipated conditions according to the own internal
9  Ethicon studies?
10   A.  Yes.
11   Q.  And what amount of the TVT mesh is lost, based
12  upon the internal Ethicon studies?
13    MR. THOMAS: Objection; foundation.  Haven't
14  seen the papers yet.  Do you have them?
15   Q.  If you could just show P1757.
16    MR. THOMAS: Do you have a copy for me?
17    MR. ANDERSON: I'm working on it, Dave.
18    Let's go off the record, please.
19    THE VIDEOGRAPHER: We are going off the record.
20  The time is 11:31 a.m.
21    (Recess from time 11:31 until 11:34 a.m.)
22    THE VIDEOGRAPHER: We are back on the record.
23  The time is 11:34 a.m.
24    (Plaintiff's Exhibit No. 1757 was marked for
25  identification.)

Page 81

1  BY MR. ANDERSON:
2    Q.  Doctor, showing you what has been marked as
3  Plaintiff's Exhibit 1757.  Is this a document that you
4  have reviewed and relied upon in coming to your opinions
5  in this case?
6    A.  Yes, it is.
7    Q.  And we were just talking, before we took a
8  little break, as to the amount of particles that Ethicon
9  estimated would be lost from the TVT mesh.  Do you
10  remember this part of your testimony?
11   A.  Yes.
12   Q.  Okay.  If we could go to just the top part of
13  this and highlight it.
14    What year was this test done?
15   A.  2002.
16   Q.  Okay.  Now, if we could go over two more pages
17  in the document, and then just highlight the right-hand
18  side all the way down where it says, "Percent change".
19  Actually, let's do the whole right side just so it's not
20  quite so big.
21    Doctor, explain what we're seeing in the
22  results from this internal Ethicon particle loss
23  testing.
24   A.  When applying forces to the mesh material you
25  see that about 12 percent of the material is lost, that

Page 82

1  small tiny particles are -- get off the -- off the
2  device in these devices after having been cut
3  mechanically.
4      Q.  Okay.  And we'll get to that in a minute.  What
5  do you mean by a mechanical-cut mesh?
6      A.  It has been cut by large knives without any --
7  any further treatment.
8      Q.  And was that the way the TVT old construction
9  mesh was made originally by Ethicon was with this
10  mechanical-cut knives cutting the edges of the mesh?
11     A.  Yes.
12     Q.  Okay.  And so this is Table 1 showing 12.08
13  percent loss of the material of the TVT sling.  Is that
14  what you said?
15     A.  Yes.
16     Q.  Okay.  And then if we turn to the next page,
17  did they run a second test to determine whether or not
18  they -- what the particle loss would be in a second test
19  within Ethicon?
20     A.  It's again a loss of 12 percent of the
21  material, just some small particles getting off the --
22  off the device.
23     Q.  Doctor, do you have an opinion, to a reasonable
24  degree of medical certainty, based upon your 20 years of
25  work in this field, and all of your other publications

Page 83

1  and presentations, as to whether or not if the TVT sling
2  loses 12 percent of the material, whether or not this
3  will cause an unnecessary risk of harm to women in whom
4  it's implanted?
5          MR. THOMAS:  Object to the form of the
6      question.
7      Q.  Do you have an opinion?
8      A.  Yes.
9      Q.  And what's your opinion?
10     A.  Of course it creates an unnecessary risk.  If
11  these particles get into the tissues you have an
12  increased surface, you have an increased inflammation,
13  you have an increased scarring.  If you're losing 12
14  percent of the material you have an unpredictable change
15  of the characteristics and properties of -- of the
16  sling.  So it is not acceptable.
17     Q.  So based upon your 20 years of research in the
18  field of biomaterials and the reaction of polypropylene
19  mesh in the tissues, and specifically old construction
20  PROLENE mesh that's been mechanically cut, your
21  published literature, your teaching at conferences
22  around the world and your review of explants, do you
23  have an opinion, to a reasonable degree of medical and
24  scientific certainty, as to whether this curling,
25  roping, fraying and loss of particles of the TVT slings

Page 84

1  that we've seen in these images and in these documents
2  this morning will create an unnecessary risk of harm to
3  women in whom these are implanted?
4          MR. THOMAS:  Object to the form of the
5      question.
6      A.  Yes.
7      Q.  And what is that opinion?
8      A.  The curling, roping, particle loss, increases
9  the risk for the patients and it is unnecessary.
10     Q.  During your course of your review of the
11  documents in this case, have you seen anywhere that
12  Ethicon was recognizing a need to make design
13  improvements to reduce this curling, roping and fraying?
14     A.  Yes.
15         (Plaintiff's Exhibit No. 8343 was marked for
16  identification.)
17     Q.  Okay.  Showing you what we'll mark as
18  Plaintiff's Exhibit 8343.
19         Is this a document that you recognize?
20     A.  Yes.
21     Q.  And is this something that you have relied upon
22  for your opinions in this case?
23     A.  Yes.
24     Q.  And were you able to determine from the
25  documents the date of this project document?

Page 85

1      A.  It's around 2001.
2      Q.  Let's actually pull up the -- I'm sorry.  Let
3  me --
4          MR. THOMAS:  This says two of ten.  Is there a
5      Page 1?
6          MR. ANDERSON:  We would like to ask you that
7      because it's never been produced, Counsel, so please
8      go back and ask your people.  I'll give you a chance
9      to do that.
10 BY MR. ANDERSON:
11     Q.  Here's Plaintiff's Exhibit -- I'm sorry.  I
12  gave you the wrong one, Dave.
13         (Plaintiff's Exhibit No. 8344 was marked for
14  identification.)
15     Q.  Plaintiff's Exhibit 8344.  Showing you that,
16  Doctor.
17         Does this refresh your recollection as to the
18  approximate time that this mesh improvement project
19  document that we're looking at was created at Ethicon?
20     A.  Yes, sorry, I have to correct.  It's 1998.
21     Q.  Is that the year that TVT was launched?
22     A.  Yes.
23     Q.  Okay.  And if we just look at the product
24  characteristics under this PROLENE mesh improvement
25  project.  And if you could just highlight 1.2, Product

Page 86

1 Characteristics.
2       "The product characteristics for the PROLENE
3 mesh product, as defined by product management, are
4 indicated in the following section."
5       Did I read that correctly?
6   A.  Yes.
7   Q.  Okay.  Now, if we go under subjective
8 characteristics, roll that just a little higher, 1.2.1,
9 if you can highlight that all the way through the
10 parenthetical.  "Resistance to curling, effect of
11 pulling in one direction of the mesh forcing a permanent
12 curl in the structure."
13      Go to 1.2.3.
14      "The quality of the edges must be equivalent to
15 the current PROLENE mesh."
16      Do you see that?
17  A.  Yeah.
18  Q.  And then if we go to No. 6.
19      "Volume of flaking, loose material which
20 releases from the structure when the mesh is cut."
21      Did I read that correctly?
22  A.  Yes.
23  Q.  If we go to No. 7.
24      "The material must demonstrate a resistance to
25 fraying, unraveling along the edges."

Page 87

1       Did I read that correctly?
2   A.  Yes.
3   Q.  And then No. 8.
4       "The material must not unzip, defined as the
5 ability of the structure to fall apart without further
6 rupture or breaking of the fibers."
7       Did I read that correctly?
8   A.  (Witness nodding head.)
9   Q.  And then No. 9.
10      "The material must demonstrate the ability to
11 resume its flat shape after crumpling and folding better
12 than the current PROLENE mesh."
13      Do you see that?
14  A.  Yes.
15  Q.  Do these highlights in this mesh improvement
16 project back in 1998, are they significant to your
17 opinions regarding curling, fraying, roping and particle
18 loss of the TVT mechanical-cut mesh?
19  A.  Yes.
20  Q.  How so?
21      MR. THOMAS:  Object to the form of the
22 question.
23  A.  You find in this list many of the points I just
24 mentioned some minutes ago, and they have been
25 recognized and acknowledged by Ethicon in already 1998

Page 88

1 as a -- as an issue for to be concerned on.
2   Q.  Before the product was even launched on the
3 market?
4   A.  Before.
5   Q.  So that was in 19 -- that document was in 1998.
6 The Dr. Wang E-mail regarding curling, roping, fraying
7 and particle loss was 2001, correct?
8   A.  Yes.
9   Q.  And then the E-mail from Dr. -- about
10 Dr. Maslow, the user in Canada of TVT, that E-mail was
11 in 2013?
12  A.  Yes.
13  Q.  So do you have an opinion as to whether or not
14 between 1998 and 2013 Ethicon had corrected this problem
15 of curling, roping, fraying and loss of particles along
16 the edges of its TVT mechanical-cut mesh?
17  A.  Yes.
18      MR. THOMAS:  Object to the form of the
19 question.
20  Q.  Go ahead.
21  A.  Yes, I have an opinion.
22  Q.  And what's that?
23  A.  There was no improvement in these 15 years.
24      (Plaintiff's Exhibit No. 3496 was marked for
25 identification.)

Page 89

1   Q.  Okay.  Showing you what we've marked as
2 Plaintiff's Exhibit 3496.
3       Is this a document that you have reviewed and
4 relied upon for your opinions in this case?
5   A.  Yes.
6   Q.  Okay.  If we could turn over to Paragraph 6.
7 Highlight that, please.
8       It says, "Laser-cut PROLENE mesh."
9       Have you reviewed documents in this litigation,
10 internal documents, regarding this laser-cut PROLENE
11 mesh idea?
12  A.  Yes.
13  Q.  Okay.  Explain to the jury what that was.
14  A.  Instead of cutting the filaments with knives
15 you can use a laser that cuts the filaments by heat.
16 And this leads to the situation where in the line where
17 the cutting occurs then the fibers are melted together.
18      So you can, by using this laser-cut procedure,
19 you can reduce the particle loss, you can -- you make it
20 a little bit stiffer, but you can seal a little bit the
21 borders so that you have a smaller risk for fraying and
22 roping when one cuts the mesh with a laser-cut
23 procedure.
24  Q.  Now here I see it says, "The market feedback of
25 the laser-cut mesh compared to the guillotine cut mesh,

Confidential - Subject to Protective Order

Page 90

1  or GCM."
2      Have you seen other documents where GCM is also
3  known as mechanical-cut mesh or MCM?
4      A.  Yes.
5      Q.  Okay.  And then down below it says, "There was
6  a marked reduction in the amount of loose ends falling
7  off."
8      Did I read that correctly?
9      A.  Yes.
10     Q.  So from your review of the documents, could you
11  tell whether or not Ethicon decided to start using this
12  laser=cut mesh by, as you said, welding or melting the
13  borders of the TVT mesh material?
14     A.  It is -- yeah.
15     Q.  What year did they start doing that?
16     A.  They started in 2006.
17     Q.  Okay.  And from your review of the Ethicon
18  documents, did you determine whether by laser cutting
19  the TVT mesh at the borders actually resolved or
20  lessened the problems of curling, roping, fraying and
21  particle loss?
22     A.  Yes.
23     Q.  Okay.
24     A.  It really lessens the problems of particle loss
25  and this fraying at the borders.

Page 91

1      Q.  So when Ethicon came up with this solution of
2  laser cutting its TVT mesh in order to reduce or prevent
3  this particle loss, did they stop selling the
4  mechanical-cut mesh?
5      A.  Unfortunately not.
6      Q.  So from your view of the documents they kept
7  selling the laser-cut mesh and the mechanical-cut mesh
8  at the same time?
9      A.  At the same time.
10     Q.  Based on all of your review in this case and
11  20 years of doing biomaterials research, do you have an
12  opinion, to a reasonable degree of medical certainty, as
13  to whether the edges or borders of this mechanical-cut
14  TVT mesh is a safe or unsafe design?
15     MR. THOMAS:  Object to the form of the
16  question.
17     A.  Yes.
18     Q.  And what is that?
19     A.  It is unsafe, unsafer, and obviously it is not
20  necessary, because they already have some sort of
21  alternative.
22     Q.  And did you -- is it your opinion to a
23  reasonable degree of medical certainty that the
24  laser-cut TVT mesh is a safer alternative design than
25  the mechanical-cut mesh?

Page 92

1      MR. THOMAS:  Object to the form of the
2  question.
3      A.  Yes.
4      Q.  And why is that?
5      A.  It is a safer design.  The laser-cut mesh is a
6  safer design than the mechanical cut, because it has a
7  reduced risk for roping and a decrease in the particle
8  loss.
9      Q.  Dr. Klinge, are you aware of other mesh
10  manufacturers that have addressed how to design a mesh
11  sling for stress urinary incontinence in women that will
12  not have open borders that tend to curl, rope, fray and
13  lose particles like the mechanical-cut TVT?
14     A.  Yes.
15     MR. THOMAS:  Objection.  I don't think that's
16  in his expert report, but go ahead.
17     MR. ANDERSON:  Well, I guess we will have to
18  look at that.
19     MR. THOMAS:  Yes, we will.  I just preserve my
20  objection on this line of questioning.
21     MR. ANDERSON:  You can, but I think maybe in a
22  minute you might withdraw it, but maybe you won't.
23     MR. THOMAS:  Maybe I will.
24  BY MR. ANDERSON:
25     (Plaintiff's Exhibit No. 4063 was marked for

Page 93

1  identification.)
2      Q.  Okay.  If we could go back to Plaintiff's
3  Exhibit 4063.  Oh, we've already handed this out.  Is
4  that your publication from 2015?
5      A.  Yes.
6      Q.  Is that something that was publicly available
7  to everyone, including Ethicon and their lawyer sitting
8  here next to you?
9      A.  Yes.
10     Q.  Was this something that was attached to your
11  expert report?
12     A.  Yes.
13     Q.  Okay.  Maybe we dispelled that notion.
14     Now, let's go to Page 5 of this, please.  Pull
15  up the top part.
16     What is the jury seeing in this image,
17  Dr. Klinge?
18     A.  You see the image of another sling with an
19  alternative textile construction.  You see there it's
20  more square.  The hole has forms of a square and you see
21  the sealed borders just by textile construction.
22     Q.  And was there tension applied between the
23  sample in A and the sample in B?
24     A.  Yes.
25     Q.  And under force under B, what happens to the

Page 94

1  pores?
2    A.  You don't -- under force you don't see any
3  significant reduction or change of the size of the
4  holes, and you don't see any roping and curling or
5  fraying at the edge.
6    Q.  Do you have an opinion, Doctor, as to whether
7  in 1998 TVT slings could have been made with a sealed
8  border?
9    A.  Yes.
10    Q.  And what is that opinion?
11    A.  A sealed border is not an invention of the last
12  10 years; but if you look to the socks or to the pants,
13  sealed borders are a well-known technique for textile
14  engineering since decades.  So it's not a new invention
15  of the past years.
16    MR. THOMAS:  Show my objection to the line of
17  questioning dealing with sealed borders on the TVT
18  as being an alternative design.  But go ahead.
19    MR. ANDERSON:  I don't understand the
20  objection, but that's okay.
21    Q.  And when you said on the pants, are you talking
22  about like the seam or the hem at the bottom of your
23  pants?
24    A.  Yes, where you don't want to have any fraying
25  as well.

Page 95

1    Q.  Technology available in 1998?
2    A.  Definitely.
3    Q.  What type of mesh is this that we see here in
4  Plaintiff's Exhibit 4063?
5    A.  It's -- the brand name is DynaMesh.  It's made
6  of PVDF.
7    Q.  And just briefly and slowly explain what PVDF
8  is when you say it's made out of that.  Are you saying
9  the fibers in the mesh are made of PVDF?
10    A.  Yes.
11    Q.  Is that different from polypropylene like is
12  made in the TVT device?
13    A.  Yes.  PVDF is another polymer, it's another
14  plastic material.  It is available since the middle of
15  the '60s.
16    Q.  And does this mesh have a brand name, this
17  sling that's made out of this PVDF with these sealed
18  borders in your published article, does that have a
19  name?
20    A.  The brand name is DynaMesh.
21    Q.  And who is the company that makes it?
22    A.  It's made by FEG, a company from Aachen.
23    Q.  FEG.
24    And does FEG make surgical meshes for stress
25  urinary incontinence as well as prolapse in women?

Page 96

1    A.  Yes.
2    Q.  And is this sling that we see in Plaintiff's
3  Exhibit 4063 made out of PVDF with the sealed borders
4  currently available on the market?
5    MR. THOMAS:  Object to the form of the
6  question.
7    A.  It's available on the market in many countries
8  in the world.
9    Q.  Is it available in the United States yet?
10    A.  I don't think so.
11    Q.  Okay.  How many countries in the world is it
12  available in?
13    MR. THOMAS:  Object to the form of the
14  question.
15    A.  About --
16    Q.  Okay.  How many countries in the world is the
17  PVDF mesh that we see in Plaintiff's PLT4063 available
18  in, Doctor?
19    A.  About 60, 40 to 60.
20    Q.  How long have you known about PVDF as an
21  alternative polymer to polypropylene for surgical
22  meshes?
23    A.  Exactly we started to work with PVDF in 1998.
24  When we finished with the VYPRO development --
25    Q.  "We" meaning you and Ethicon?

Page 97

1    A.  Yes.
2    Q.  Okay.  Go ahead.
3    A.  When we finished our VYPRO development we
4  wanted to make further improvements, and this can be
5  done by reduction of the surface of the foreign body
6  which is still there in the VYPRO.
7    And this could hardly be done with the use of
8  polypropylene because polypropylene tends to be quite
9  stiff, and therefore I asked the experts at The
10  Technical University and at that time they indicated
11  that PVDF is maybe the best polymer that is available at
12  that time point, and therefore in 1998 we started a new
13  project to create a VYPRO made of the PVDF fibers and
14  got some -- some grants to -- to make this development.
15    Q.  Did you have discussion -- well, first of all,
16  was that work done in conjunction with Ethicon?
17    A.  We started to work this together and offered
18  the proposal to them to make a joint development of PVDF
19  meshes.  And we got some PVDF devices from Ethicon to
20  test it, but later on Ethicon decided not to follow --
21  not to use PVDF as a mesh material, and therefore we
22  focused on our work together with the FEG where we
23  started to develop PVDF mesh materials.
24    Q.  You said in an answer that Ethicon actually
25  provided you with PVDF meshes for your research?

Page 98

1    A.  Yes.
2    Q.  What year was that that they provided you with
3  their own PVDF meshes for your research?
4    A.  1999.
5    Q.  Okay.  Have you studied the differences in the
6  tissue response between polypropylene and PVDF?
7    A.  We made our studies where we compared the
8  PROLENE that is used in TVT when we compared this to the
9  PVDF meshes.
10   (Plaintiff's Exhibit No. 0780 was marked for
11  identification.)
12   Q.  Showing you what's been marked as PLT0780.  I'm
13  sorry.  Can I have that one?
14   MR. THOMAS:  What's the number, please?
15   MR. ANDERSON:  It's the one I just said.  218.
16   MR. THOMAS:  Okay.
17   MR. ANDERSON:  Here's what we had to do.  We'll
18  change that to PLT0780.
19   Q.  If you could highlight the top part.
20   We were talking about research that you had
21  done looking at the tissue response between
22  polypropylene and PVDF.  Can you explain what we're
23  looking at here?
24   A.  This is an article we published.  These are the
25  -- these are the results of our studies where we

Page 99

1  compared the PROLENE mesh to two devices made of PVDF,
2  one from the FEG and the other came from Ethicon.
3    Q.  Okay.  And if we could look in the middle of
4  that.  What were the results of this study, Doctor?
5    A.  Briefly, the study confirmed that the tissue
6  response to PVDF is much better than to polypropylene,
7  less inflammation, less scar, less restriction of the
8  mobility there, so in favor of PVDF.
9    Q.  And this study was done in 2002?
10   A.  It was published in 2002.  It was done in the
11  years 2000, 2001.
12   Q.  And the meshes that you received, you had
13  PROLENE, that's the heavyweight old construction mesh
14  that's in TVT.  That was your comparator?
15   A.  Yes.
16   Q.  And then you also received PVDF meshes that you
17  had been receiving from Ethicon since 1998; is that
18  correct?
19   A.  Yes.
20   Q.  Okay.  And if we could look at the last page of
21  that, under acknowledgement.  Under the acknowledgement
22  section of this paper from 2002, who did you receive
23  support from?
24   A.  Amongst Ethicon, Ethicon supported us.
25   Q.  Okay.  To your knowledge did Ethicon have a

Page 100

1  brand name for this PVDF mesh?
2    A.  It was called -- the brand name was PRONOVA.
3  And as meanwhile I've seen many, many internal Ethicon
4  documents that they made their own studies already in
5  the '90s, all confirming that PVDF is a better material
6  than polypropylene.
7    MR. THOMAS:  Objection.  Move to strike as non-
8  responsive after identification of the name.
9    Q.  Doctor, have you seen internal studies by
10  Ethicon as to whether or not they confirm that PVDF is a
11  better or worse material than polypropylene?
12   A.  Yes.
13   MR. THOMAS:  Object to the form of the
14  question.  Do we have the studies to look at?
15   MR. ANDERSON:  We might, but I'm asking him the
16  question for right now, since you keep objecting.
17  I'm trying to clear up that, so let me ask my
18  questions.
19  BY MR. ANDERSON:
20   (Plaintiff's Exhibit No. 1923 was marked for
21  identification.)
22   Q.  Showing you what's been marked as P1923.
23  Highlight that top part, please.
24   This is an E-mail in 2007 from Dr. Dieter Engel
25  to a John Gillespie.  Are you familiar with Dr. Dieter

Page 101

1  Engel?
2    A.  He has been the medical director of the R & D
3  department, research and development department, from
4  Ethicon, Germany.
5    Q.  Have you worked with him over the years?
6    A.  For many years.
7    Q.  Have you had many meetings with him?
8    A.  Many meetings, many.
9    Q.  Was Dr. Dieter Engel one of the Ethicon
10  representatives who was involved with your PVDF research
11  starting back in the late '90s and early 2000s?
12   A.  He has been our main partner in -- at Ethicon,
13  Germany, and he was responsible for the research
14  activities.
15   Q.  And the research activities including PVDF and
16  polypropylene mesh comparisons?
17   A.  Yes.
18   Q.  Okay.  And under the first two sentences there,
19  "Tom," he says, "Thanks for checking back and asking for
20  my scientific perspective.  There have been a number of
21  anecdotal reports that polypropylene mesh shows some
22  changes in the surface with time.  The Aachen group,"
23  that would be you and your group here in Aachen,
24  correct?
25   A.  Yes.

Case 2:12-md-02327  Document 3367-18  Filed 04/27/17  Page 28 of 76 PageID #: 136180
Case 2:12-md-02327  Document 3367-18  Filed 04/27/16  Page 28 of 76 PageID #: 139180
Confidential - Subject to Protective Order

Page 102

1  Q.  "Who so far have collected more than a
2  thousand explanted meshes showed examples many years
3  back."  Did I read that correctly?
4  A.  Yes.
5  Q.  Okay.  Let's go down, if we could, please, to
6  "What is the future?"  And concludes, "Best regards,
7  Dieter."
8  So with regard to this E-mail from Dieter
9  Engel, he says, "What is the future?  We will change the
10  material of our mesh and move to PRONOVA as the future
11  material platform for mesh starting with NG TSM.
12  PRONOVA has a reduced foreign body reaction compared to
13  PROLENE, as shown in several animal studies, and will
14  improve the perceived compatibility of our mesh.
15  Besides, PRONOVA is much less susceptible to mechanical
16  damage as it is less stretched and a different chemical
17  composition.  It is much easier to process in the
18  knitting machines, less quality issues."
19  Did I read that correctly?
20  A.  Yes.
21  Q.  Is this significant to your opinions and how
22  does it relate to your work that you did with Ethicon on
23  this PVDF project?
24  MR. THOMAS:  Object to the form of the
25  question.

Page 103

1  Q.  Is this significant to your opinions, this
2  E-mail?
3  A.  Yes.
4  Q.  And please relate the things that we've read in
5  this E-mail to your experience with Ethicon.
6  MR. THOMAS:  Object to the form of the
7  question.
8  A.  This E-mail clearly states that Dr. Engel
9  recognized PVDF as a safer material in comparison to
10  polypropylene, and this is completely in agreement to
11  all our findings.  PVDF is a safer material than
12  polypropylene.
13  Q.  Okay.  We were talking about the -- strike
14  that.
15  Doctor, based on your background, training and
16  experience, all the studies that you've conducted, your
17  20 years of biomaterials research, your peer-reviewed
18  studies on the comparison of PVDF and polypropylene in
19  living tissue, do you have an opinion, to a reasonable
20  degree of medical and scientific certainty, as to
21  whether PVDF is safer as a permanent implant in human
22  tissues than the old construction heavyweight PROLENE
23  that's in the TVT?
24  MR. THOMAS:  Object to the form of the
25  question.

Page 104

1  Q.  Do you have an opinion?
2  A.  Yes.
3  Q.  And what is that opinion?
4  A.  PVDF is a safer alternative than polypropylene,
5  which is used in the PROLENE.
6  Q.  You told the jury earlier about consulting for
7  Ethicon for 10 years and helping them develop safer mesh
8  designs.  Have you worked with other companies over the
9  years, mesh manufacturers, doing the same thing, in
10  other words, helping them with safer mesh design?
11  A.  When the collaboration with Ethicon stopped in
12  2005, I continued to work with the FEG as a consultant
13  for the development of safer meshes.
14  Q.  Why did you decide to become a consultant to
15  FEG?
16  A.  From -- basically it was the employers from the
17  FEG has been the textile engineers that has been asked
18  by Ethicon to produce the structure of the VYPRO.  So
19  these engineers clearly knows the advantage of material
20  reduction and large holes.
21  And as I told in 1998, we want to create PVDF
22  meshes, and we have been able to work on this issue
23  together with the FEG.  And when Ethicon declined to
24  work on PVDF meshes we still had the granted projects
25  there, and therefore we continued to work with the FEG

Page 105

1  on PVDF meshes.
2  Q.  What percentage of your professional time do
3  you spend consulting with FEG?
4  A.  Less than five percent.
5  Q.  And when you worked for them, do they pay you
6  for your time?
7  A.  Yes.
8  Q.  Approximately how much do they pay you for
9  working with them per year?
10  A.  It's about 40,000 euros a year.
11  Q.  Do you get royalties for every PVDF mesh that's
12  sold by FEG?
13  A.  No.
14  Q.  Doctor, if someone were to come in here and say
15  that the only reason you believe that PVDF is safer than
16  polypropylene is because you're an advisor to FEG or
17  because you get paid some amount of money by them, what
18  would you say to that?
19  A.  That's ignoring the facts.  We started in 1998
20  to focus on the development of PVDF.  At that time the
21  FEG didn't produce any meshes for the market and they --
22  not before 2003 they started to produce meshes for the
23  market.
24  So our knowledge, our -- our knowledge that
25  PVDF is a superior material in comparison to

Case 2:12-md-02327  Document 3367-18  Filed 04/27/16  Page 28 of 76 PageID #: 135181
Confidential - Subject to Protective Order

## Page 106

1  polypropylene is much older than FEG's history of

2  producing meshes for the market.

3     Q.  Do you speak at conferences that FEG sponsors

4  from time to time?

5     A.  Yes, from time to time.

6     Q.  And in terms of the amount of conferences you

7  speak at in a given year, approximately how many

8  conferences are you invited to on average per year by

9  all manufacturers?

10     A.  About 30 invitations to give a lecture there.

11     Q.  And approximately how many of those would you

12  give that are sponsored by FEG or where they invited you

13  to come?

14     A.  That they -- conferences which are sponsored

15  mainly by the FEG, it's only two to three.

16     Q.  And do they pay for your travel expenses to go

17  speak at these conferences?

18     A.  For most of these presentations at the

19  conferences the travel expenses are covered by either

20  the invitation person or by a company.

21     Q.  Has Ethicon paid you for your expenses to speak

22  at conferences that they've sponsored in the past?

23     A.  In a similar way as today.

24     Q.  Is reimbursing speakers that companies invite

25  to speak at their conferences usual and customary in

## Page 107

1  your industry, at least for your travel expenses?

2     A.  Yes, for the travel expenses.  We don't get --

3  usually we don't get any honorary to make a

4  presentation.

5     Q.  Doctor, you've given us some opinions today

6  about the old construction heavyweight PROLENE mesh in

7  the TVT and various alternative designs and things like

8  that.  Before we get into any more of your opinions I

9  want to ask you about this:  Have you reviewed in the

10  literature and in your work over the last 20 years

11  sometimes either manufacturers or doctors refer to a

12  procedure or device or something as a gold standard?

13  Have you seen those words before?

14     A.  I've seen the word "gold standard" in several

15  publications.

16     Q.  Okay.  And, in fact, do you have a book chapter

17  that you co-authored a few years back in which TVT --

18  there was a mention as to whether or not TVT was a gold

19  standard?

20     A.  Yes.

21     Q.  All right.  Who was your co-author in that book

22  chapter?

23     A.  Professor Schuessler from Lucerne, a

24  gynecologist.

25     Q.  And when you write articles -- I know you said

## Page 108

1  you have over 400 publications.  When you write articles

2  are there sometimes co-authors that are from different

3  specialties or have different professions?

4     A.  Very, very often.

5     Q.  Okay.  And in this book chapter regarding TVT

6  in which the words "gold standard:  Are mentioned, who

7  was responsible for writing the part about how the TVT

8  is used and the history of TVT and whether or not it's a

9  gold standard?

10     A.  The words "gold standard" in this meaning from

11  my point of view says that it is widely used, and this

12  is an expression likely introduced by Professor

13  Schuessler.

14       If you ask me for my understanding of the word

15  of "gold standard," it is quite clear and I expressed it

16  clearly in 2007 at a conference where I was asked to

17  talk about the definition and the meaning and the

18  sentence of looking for gold standard.

19     Q.  First of all, is that 2007 presentation

20  available online to anyone that wants to see it?

21     A.  It's still online in the Internet, and even

22  more it is possible to get the sound because the video

23  is placed in the Internet.

24     Q.  Okay.  And what did you say in that 2007

25  presentation?

## Page 109

1     A.  I made it quite clear that the -- looking for

2  gold standard doesn't make any sense, because we don't

3  have the standard patients.  And in particularly if you

4  are thinking gold standard as a criteria for superior

5  quality, that is not applicable to this.

6     Q.  If "gold standard" means superior quality is it

7  applicable to the TVT, in your opinion?

8     A.  Only in the sense that it's widely used, but

9  not as a quality, we shouldn't use it.  I know that I

10  tolerated in several texts the word "gold standard" that

11  are introduced by others, I guess mainly in the meaning

12  widely used, never as a criteria for quality.  My

13  personal opinion is quite clear, "gold standard," we

14  shouldn't talk about it.

15     Q.  Okay, Doctor.  After your review of all the

16  materials in this case regarding Ethicon's meshes for

17  treating stress urinary incontinence, all of your

18  publications in the scientific literature, the teaching

19  conferences around the world at which you've spoken, the

20  conferences at which you've spoken as an invited

21  lecturer by Ethicon, including their invitation for you

22  to speak at conferences for urogynecologists and

23  urologists, your work as a hernia surgeon both

24  implanting and explanting polypropylene meshes,

25  including the PROLENE mesh that's used in TVT, your work

Page 110

1  in reviewing scientific literature and contributing to
2  the scientific literature, all of the studies that
3  you've done both with Ethicon and outside of your work
4  with Ethicon, do you have an opinion, to a reasonable
5  degree of medical and scientific certainty, as to
6  whether the old construction heavyweight PROLENE mesh in
7  the TVT line of products that's been mechanically cut
8  was a safe design or an unsafe design?
9      MR. THOMAS: Object to the form of the
10  question.
11  A.  Yes.
12  Q.  And what is that opinion, Doctor?
13  A.  It is an unsafe design, with unnecessary risks.
14  Q.  Have you ever seen in any of the worldwide
15  literature or any of your review of the internal Ethicon
16  documents or Ethicon depositions, any scientific reason
17  for using heavyweight old construction PROLENE mesh with
18  small holes for sling repair in SUI?
19  A.  No, I have never seen any -- any of these
20  reasons that indicate that there is an alternative need
21  for the construction as it is.
22  Q.  Doctor, did you ask me to prepare some slides
23  for the jury just listing what you considered to be the
24  most critical design defects in the TVT mechanical-cut
25  mesh?

Page 111

1  A.  Yes.
2  Q.  If I can have that, please.
3      (Plaintiff's Exhibit No. 8346 was marked for
4  identification.)
5  Q.  Showing you Plaintiff's Demonstrative Aid 8346.
6  Is this the slide that you asked me to help me create?
7  A.  Yes.
8  Q.  Okay.  Tell you us what you mean by that first
9  bullet point.  Go through those four or five bullet
10  points quickly, please.
11  A.  I just wanted to list up again the main design
12  defects of the PROLENE TVT mesh.  And the first is the
13  fact that it has too much material, and that makes it
14  unsafe to use this material, to use this mesh.  The
15  holes are too small, which makes it unsafe to use this
16  TVT mesh.  You see a collapse of holes under force which
17  makes -- was favoring this roping and curling and the
18  particle loss, which all together makes it unsafe to use
19  this TVT mesh.  And the use of the polypropylene carries
20  again some more risks than some possible alternatives,
21  which makes it unsafe as well to use this TVT mesh.
22      (Plaintiff's Exhibit No. 8345 was marked for
23  identification.)
24  Q.  And if we go to Slide 9, Plaintiff's Exhibit
25  8345.  Did you ask me to prepare a slide about safer

Page 112

1  alternative designs that would address all of the design
2  defects that we just looked at in the last slide?  Did
3  you ask me to help you do that?
4  A.  Yes.
5  Q.  Is this that slide?
6  A.  Yes.
7  Q.  Explain all of these points, please, to the
8  jury.
9  A.  From my point of view the five disadvantages
10  are listed in the previous image, there is no -- there
11  shouldn't be any dispute about it.  It's a fact that is
12  well-established, it is well-accepted all over the time.
13      The next problem is that --
14  Q.  When you say "all the time," over what time
15  period?
16  A.  Today, today.  But since the development in
17  1997 there is no dispute about this.
18  Q.  Okay.  Go ahead.
19  A.  However, it is necessary to think about whether
20  it's necessary to take these risks or whether there are
21  safer alternative designs.  And if you are looking to
22  these five features that I addressed in the previous
23  slide, if you address the problem of material, yeah,
24  it's possible to use less material, which would make it
25  safer.

Page 113

1  Q.  Okay.  Let's stop you right there.  What mesh
2  products were available on the market prior to 2000 that
3  would have less material than the old construction
4  heavyweight TVT?
5      MR. THOMAS: Object to the form of the
6  question.
7  A.  Prior to 2000 there has been -- even within
8  Ethicon -- there has been the VYPRO and it has been the
9  ULTRAPRO.
10  Q.  And --
11  A.  Which reflects mesh materials with considerable
12  less material.
13  Q.  And let's go under larger holes.
14  A.  Larger holes would make it safer for the
15  patient because it has not this bridging effect of the
16  scars in the holes, and therefore any use of a textile
17  with larger holes would make it safer for the patient.
18  Q.  What material -- mesh materials were available
19  within Ethicon prior to 2000 that would have larger
20  holes than the TVT?
21  A.  Before 2000, again, Ethicon has the -- it was
22  available for them to use the VYPRO and the ULTRAPRO.
23  Q.  Okay.
24  A.  As a material with larger pores.
25  Q.  Okay.  And then stable holes.  Explain that to

Page 114

1 the jury.
2 A. Stable holes means that you have holes that do
3 not collapse under forces that are stable even if you
4 apply some forces to it.
5 Q. And was this design principle available to be
6 incorporated into Ethicon's meshes prior to the year
7 2000?
8 A. It was known at that time point that you could
9 create meshes with stable holes there.
10 Q. Okay. Next point.
11 A. The sealed borders, which make it safer. You
12 have a lot or you have textile possibilities to seal the
13 borders, to avoid this curling, roping and this particle
14 loss. Within Ethicon they tried it with the laser-cut
15 meshes.
16 Q. And we talked about textile designs and putting
17 seams or hems like we do on pants and sealed borders on
18 textiles. Was that available prior to the year 2000?
19 A. The knowledge was available before 2000,
20 without any doubt.
21 Q. And what about the next or last point, PVDF is
22 a safer alternative design.
23 A. The use of PVDF offers more options, make it
24 safer, and of course it was available even for Ethicon
25 to use PVDF as a plastic material for the construction

Page 115

1 of meshes.
2 So all these -- for all these features there
3 are safer alternatives, designs possible, and they are
4 available even before 2000.
5 Q. Thank you, Doctor.
6 From your review of all of the internal Ethicon
7 documents and all your work in this case, have you been
8 able to determine what the mesh is used in all of
9 Ethicon's line of TVT products?
10 A. Yes.
11 Q. And what is that?
12 A. That is the PROLENE old construction TVT mesh.
13 Q. Okay. Is that true for the TVT Retropubic
14 Obturator EXACT, ABBREVO and SECUR?
15 A. Yes.
16 Q. Okay. So would all of your opinions stated
17 here today about the PROLENE mesh in the TVT retropubic
18 be the same for all of the TVT line of products with
19 regard to the opinions regarding design defect and safer
20 alternative design?
21 MR. THOMAS: Object to the form of the
22 question.
23 A. Yes, for all constructions using the old
24 construction PROLENE mesh.
25 Q. Okay.

Page 116

1 MR. ANDERSON: That's all the questions I have
2 at this time. Thank you, Doctor.
3 MR. THOMAS: Let's take a break for lunch.
4 THE VIDEOGRAPHER: We are off the record. The
5 time is 12:18 p.m.
6 (Recess from time 12:18 until 1:05 p.m.)
7 THE VIDEOGRAPHER: This marks the beginning of
8 Video No. 3. We are back on the record. The time
9 is 1:06 p.m.
10 CROSS-EXAMINATION
11 BY MR. THOMAS:
12 Q. Hello, Doctor.
13 MR. ANDERSON: All right. Let's go. He's got
14 his on. Let's go.
15 Q. Doctor, you spent a good deal of time on direct
16 examination talking about the design and introduction of
17 the hernia mesh VYPRO, correct?
18 A. Yes.
19 Q. And you worked with Ethicon in order to bring
20 VYPRO to the market for hernia repair, correct?
21 A. We were working together to develop this.
22 Q. Right.
23 And VYPRO was the first lightweight large-pore
24 mesh used in hernia repair, correct?
25 A. That is correct.

Page 117

1 Q. And you agree that VYPRO is not a good option
2 for pelvic floor repair, correct?
3 A. To take a hernia mesh for the repair of the
4 pelvic floor is dangerous.
5 Q. You agree --
6 A. And, therefore, it is not a good idea to take
7 the VYPRO hernia mesh for the use in the pelvic floor.
8 This would be a repetition of the mistake that is done
9 with the PROLENE mesh, which is a hernia mesh that is
10 used in the pelvic floor.
11 Q. But the simple answer to my question, it's your
12 opinion that VYPRO is not a good option for pelvic floor
13 repair, correct?
14 MR. ANDERSON: Objection; asked and answered.
15 He just answered that question.
16 Q. Can you answer the question, sir?
17 MR. ANDERSON: Objection; asked and answered.
18 MR. THOMAS: Are you going to let him answer
19 it?
20 MR. ANDERSON: You can answer it again.
21 A. To use VYPRO for the pelvic floor means a
22 repetition of the primary mistake to use just a hernia
23 mesh for some different purpose as it was done with the
24 PROLENE mesh used for the repair in the pelvic floor.
25 Q. Let me direct your attention to your deposition

Page 118

1  given on October the 22nd, 2012, Page 42.  Page 42,
2  Line 10.  And you remember that you were here and I
3  asked you questions under oath in October of 2012?  Do
4  you remember that, Dr. Klinge?
5      A.  Yes.
6      Q.  And you were asked the question:  Is it your
7  opinion that VYPRO was a good option for pelvic floor
8  repair?  And your answer was no.  Did I read that
9  correctly?
10     MR. ANDERSON:  Objection.  Inappropriate use of
11     attempted cross-examination when he gave you the
12     exact same or similar answer that he gave before.
13     Q.  Did you give that answer in October of 2012?
14     A.  You read this correctly.
15     Q.  Thank you.
16     MR. ANDERSON:  Objection.  Same objection.
17     Exactly what he said.
18     Q.  Now, Doctor, you also talked about the
19 development of ULTRAPRO mesh following VYPRO, correct?
20     A.  Yes.
21     Q.  And ULTRAPRO likewise is a lightweight
22 large-pore mesh used in hernia repair, correct?
23     A.  Yes.
24     Q.  And you agree that ULTRAPRO is not an
25 appropriate alternative design for the treatment of

Page 119

1  stress urinary incontinence, correct?
2      A.  The same answer as before.  It is a hernia mesh
3  that is not specifically designed for the use in the
4  pelvic floor.
5      Q.  Okay.  So is the answer to my question that you
6  agree that ULTRAPRO is not an appropriate design for the
7  treatment of stress urinary incontinence?
8      MR. ANDERSON:  Objection.
9      A.  The answer is it is not appropriate to use a
10 hernia mesh for the use in the pelvic floor without any
11 reunification, adoption of the textile structure.
12     Q.  So modification of the textile structure, is
13 that what you said?
14     A.  Adoption of the structure to the demands that
15 are necessary when using these devices in the pelvic
16 floor area.
17     Q.  And you've not done that, have you?
18     MR. ANDERSON:  Objection to the form.
19     A.  I didn't do -- I didn't implant meshes for
20 pelvic floor disorders, if you ask this one.
21     Q.  Now, Doctor, if you go to your deposition that
22 you gave on November 15th, 2013, on Page 529, Line 12,
23 once again I asked you the question:
24     Is it your opinion that ULTRAPRO is an
25 appropriate alternative design for the treatment of

Page 120

1  stress urinary incontinence in women?
2      Answer:  No.
3      Question:  Why?
4      Because the structural stability is not
5  sufficient to withstand or to preserve the big pores
6  under -- under these conditions of biomechanics as is
7  required for the use as a sling.
8      Did I read that correctly?
9      A.  Yes.
10     MR. ANDERSON:  Objection to an inappropriate
11     use to attempt the cross-examination when he gave
12     you the same answer to the deposition here that he
13     gave you there.
14 BY MR. THOMAS:
15     Q.  Now, Doctor, you advocate PVDF as a material to
16 be used in a mesh design, correct?
17     MR. ANDERSON:  Objection to form.  Go ahead.
18     A.  Yes.
19     Q.  It's your opinion today that PVDF is the best
20 polymer we have for mesh implantation in the treatment
21 of stress urinary incontinence, correct?
22     A.  It is the best polymer we have in the moment,
23 yeah.  I'm convinced of it.
24     Q.  And a PVDF polymer mesh can be designed in a
25 way that is unreasonably dangerous, correct?

Page 121

1      A.  Yes.
2      Q.  Now, you, yourself, have conducted no studies
3  with PVDF mesh in the human body for hernia repair,
4  correct?
5      A.  Please can you -- can you repeat the question?
6      Q.  I'll withdraw the question.
7      You are aware of no studies that demonstrate
8  that PVDF mesh is superior to polypropylene mesh in
9  pelvic floor repair, correct?
10     MR. ANDERSON:  Objection to form.  Go ahead.
11     A.  As recorded there is the study from Najjari
12 indicating that PVDF meshes are superior to
13 polypropylene meshes.  However, it has to be addressed
14 that clinical studies have considerable limitations to
15 demonstrate differences when comparing materials in a
16 clinical setting.
17     Q.  Okay.  And the Najjari study looked at the
18 DynaMesh made by FEG, correct?
19     A.  Yes.
20     Q.  And the DynaMesh made by FEG out of PVDF is not
21 sold in the United States, correct?
22     A.  Yes.
23     Q.  And you suggested on direct examination that
24 Ethicon should make its own PVDF mesh for sale in the
25 United States, correct?

Case 2:12-md-02327 Document 3367-18 Filed 04/27/17 Page 32 of 76 PageID #: 136108
Case 2:12-md-02327 Document 3367-18 Filed 04/27/16 Page 32 of 76 PageID #: 136198
Confidential - Subject to Protective Order

Page 122

1    A. No.
2    Q. You don't.
3       Do you know, in order to -- is it your opinion
4 that there can be a PVDF mesh design for the safe
5 treatment of stress urinary incontinence?
6    A. Yes.
7    Q. Okay. And that's the alternative design that
8 you advocate?
9    A. That is one alternative design. This is one
10 safer option.
11    Q. Okay. And you've not set out to design the
12 specific mesh implant for the treatment of stress
13 urinary incontinence that would use PVDF, have you?
14       MR. ANDERSON: Objection to form.
15    A. Please, again.
16       MR. THOMAS: Can you read back the question,
17 please?
18       (The question was read by the Reporter.)
19    A. I have been working on PVDF on the comparison
20 on the reaction of the tissues to PVDF, I have been
21 working on the safest design for meshes, but I was not
22 involved in the specific configuration of a product.
23    Q. Okay. You've not yourself designed a mesh for
24 the treatment of stress urinary incontinence which
25 includes PVDF as the polymer, correct?

Page 123

1    A. That is correct. I'm not a manufacturer.
2    Q. Okay. And in order to bring a mesh to market
3 you'd have to first design the mesh with the appropriate
4 filament and the appropriate design of the mesh?
5       MR. ANDERSON: Objection to the form. It calls
6    for him to be an expert in any sort of regulatory
7    matter.
8    A. First of all, as we developed with the VYPRO
9 first of all you have to define how stable it has to be,
10 how stretchable it has to be. Then you have to decide
11 which polymer you want to use. Then you have to decide
12 which filament and what size you want to have. Then
13 you're able to define the size of the holes and all
14 together this one then, at the end of this process, you
15 may come up with a design that likely fulfills the
16 requirements you are to have for this specific purpose.
17 That is the process you have to pass.
18    Q. And once you come up with the proposed design
19 of the mesh you have to test that design, correct?
20    A. Yes.
21    Q. And that includes preclinical testing, correct?
22    A. Yes.
23    Q. And preclinical testing includes benchtop
24 testing where you measure its strength and stability,
25 correct?

Page 124

1    A. Yes; but, amongst many, many others. You have
2 to see on various levels how this device behave.
3    Q. And then you have to do animal testing with the
4 mesh to see how it behaves in animals, correct?
5    A. You have to look what happens when tissue is
6 coming, when white cells are coming, when fibroblasts
7 are coming, yes. This can be done only in animal
8 experiments, but you can do studies in cell cultures as
9 well you have to do it. So a lot of various things you
10 should study before getting the idea that it's safe to
11 use this in humans.
12    Q. And then you have to do clinical studies with
13 the mesh as well, correct?
14       MR. ANDERSON: Objection to the form, and it
15    calls for regulatory opinion. So anything that
16    doesn't involve regulatory you can speak to or how
17    you bring something to market. Otherwise, I'm not
18    going to let him answer.
19    A. Of course if you are -- if you are producing a
20 device for clinical use you will be happy then that if
21 this product then really is used in the clinical
22 studies, and you should look for the outcome to the
23 risks for this -- for this device.
24       Clinical -- clinical studies with the focus on
25 safety is how -- impossible. You need many, many

Page 125

1 patients. You need a very long survival follow-up,
2 surveillance of these patients to get a good idea what
3 really are -- what is the outcome of this specific
4 device.
5       Therefore, the task of the clinical trial is to
6 confirm that it works, and then you have to look to the
7 outcome in some sort of registries permanently and you
8 have to analyze the failures and you have to react to
9 these failures.
10    Q. And the importance of all of this testing is to
11 show that the new mesh that you're designing with PVDF
12 has better results than the existing mesh, correct?
13    A. One other part is to show that it's better
14 results. The other is to exclude that it has some side
15 effects you don't want it to have.
16    Q. You have not designed a mesh with PVDF filament
17 that you can show has better results than the existing
18 polypropylene meshes on the market for the treatment of
19 stress urinary incontinence; true?
20       MR. ANDERSON: Objection to form.
21    A. As I said, we made a lot of studies showing
22 that PVDF material has or induce a superior tissue
23 reaction.
24    Q. In animals.
25    A. In animals.

Page 126

1  Q.  Thank you.

2  A.  And in humans when we are looking to explants.

3  And we have -- when we ask our colleagues that are using

4  these PVDF meshes, they are satisfying, they are not

5  reporting serious complications with these materials.

6  Q.  Your colleagues that you work with?

7  A.  With whom we talk, have conferences.

8  Q.  And in the United States in order for a new

9  mesh product to be available for sale for use by

10  physicians who want to implant that device, it has to be

11  reviewed by the Food and Drug Administration, doesn't

12  it?

13      MR. ANDERSON:  Objection.  Do not answer any

14  questions that call for a regulatory opinion.  He is

15  not here, Dave, and you know it, as a regulatory

16  expert and so he's not here to offer any opinions on

17  the FDA and the regulatory process.

18      MR. THOMAS:  Are you instructing him not to

19  answer?

20      MR. ANDERSON:  If you understand the regulatory

21  process and what's required he can, but otherwise he

22  can't.

23      MR. THOMAS:  Ben, don't coach the witness.

24      MR. ANDERSON:  Don't ask inappropriate

25  questions, Dave.

Page 127

1      MR. THOMAS:  Now, wait a minute, Ben.  The only

2  reason I'm doing this, and you know this, is because

3  it's been cross-noticed in a bunch of jurisdictions

4  where the FDA evidence may come in, and I have to.

5  I'm bound to answer it.  And if you're going to

6  instruct him not to answer, you do that.

7      MR. ANDERSON:  You absolutely do not have to

8  ask him that and you know that, because whether or

9  not he's been cross-noticed in another jurisdiction

10  he still has his expert report upon which he basis

11  this.

12      And there's not one shred, not one word in his

13  expert report, nor in any of his expert reports from

14  the last five years that has one word about whether

15  or not he has any knowledge about FDA regulatory

16  process, any idea about what it takes to bring

17  something to market.  He's not a manufacturer and

18  you know that.  So I don't appreciate you trying to

19  use --

20      MR. THOMAS:  State your objection.

21      MR. ANDERSON:  No, I am stating my objection.

22  I don't appreciate you trying to use a cross-notice

23  as a way to then ask this witness, who is an expert,

24  and he told you, in biomaterials and hernia, and to

25  try to ask him regulatory questions and hide behind

Page 128

1  the, well, your friends filed these cross-notice.

2  It's inappropriate and if you ask him another one I

3  will tell him not to answer.

4  BY MR. THOMAS:

5  Q.  Dr. Klinge, it's fair to understand that to the

6  extent that a new mesh made from PVDF was introduced in

7  the United States for the treatment of pelvic -- of

8  stress urinary incontinence it would have to be reviewed

9  and approved by the United States Food and Drug

10  Administration?

11      MR. ANDERSON:  Objection, and it's also

12  objection to form.  Doesn't get approved.  You know

13  that.

14      MR. THOMAS:  It depends if it's 510(k) or if

15  it's a new drug application or PMA.  You know that.

16  A.  I have no opinion.  It's out of my field.

17  Q.  Do you know the answer to the question whether

18  it has to be approved by the FDA before it can be

19  marketed in the United States?

20      MR. ANDERSON:  Objection.

21  A.  I think so, yeah.

22  Q.  And you know that any new mesh using a new

23  material for the treatment of stress urinary

24  incontinence would have to be reviewed and either

25  cleared or approved by the FDA prior to its use in

Page 129

1  patients in the United States, correct?

2      MR. ANDERSON:  Objection.  You're asking him

3  regulatory questions again, and he's not here for

4  that, nor did I have it in his expert report, and

5  you know that.

6  A.  I think so, but I have no --

7      MR. ANDERSON:  Finish your --

8  A.  -- no detailed information about this process.

9  Q.  In your consulting work with FEG, has FEG ever

10  submitted an application to the United States Food and

11  Drug Administration for the clearance to use or sell the

12  FEG DynaMesh products in the United States?

13  A.  So far I know, yes.

14  Q.  You have done that.

15  A.  They have.  They have done it, but I'm not

16  involved in this process.

17  Q.  Is there an application pending, to your

18  knowledge?

19  A.  Yeah.

20  Q.  Okay.  Currently there are no PVDF meshes for

21  the treatment of stress urinary incontinence available

22  for sale in the United States, correct?

23  A.  I don't have the knowledge to answer this.

24  Q.  Now, I want to go to -- let me hand you what's

25  been marked in a prior proceeding as DX30719.  DX30719

Page 130

1 is the book chapter that you referred to on direct
2 examination written in 2010 in the book Hernia Repair
3 Sequelae?
4    A.  That's true.
5    Q.  And if you go to Page 719.3, the title of the
6 chapter is Alloplastic Implants for the Treatment of
7 Stress Urinary Incontinence and Pelvic Organ Prolapse,
8 and you're listed as one of the authors?
9    A.  That's true.
10   Q.  And you go to the next page, and on the right
11 side in the second paragraph it says, "At present the
12 gold standard in SUI surgery is the suburethral sling
13 using either the tension-free vaginal tape, paren, TVT,
14 or the transobturator tape, paren, TOT technique.  Those
15 two procedures do not seem to differ in terms of
16 efficacy with TOT being advantageous because of the
17 lower rate of bladder injuries."
18       That is the language that you used in the
19 chapter that you co-authored in two 2010, correct?
20   A.  It is correct that this is written in this
21 text, but this text is a transcript of the oral
22 presentation of Professor Schuessler, which later on is
23 done by him and his colleague in a written form, and I
24 was introduced there just to -- deal with the textile
25 aspects in this presentation and therefore I'm listed as

Page 131

1 a co-author.
2    Q.  This was not an oral presentation this was a
3 book chapter, isn't it?
4    A.  All of these -- all of these chapters of this
5 book has been oral presentations at the Suretta Factmore
6 (phonetic) Conference sponsored only by Ethicon.
7    Q.  Okay.
8    A.  And there it has been an oral presentation by
9 Professor Schuessler.  And afterwards we asked every --
10 every speaker there to give a written excerpt of their
11 presentation, and this was what you see here.
12   Q.  But, Doctor, you were asked to give your
13 comments and corrections to that book chapter, weren't
14 you?
15   A.  I cannot remember, but I'm sure if I had it was
16 like this.
17   Q.  Looks like what, that you were asked to give
18 your comments and corrections?
19   A.  That we have the opportunity to -- to correct
20 the text.
21   Q.  So you weren't given --
22      MR. ANDERSON:  Hold on.  He's not through.
23      MR. THOMAS:  Are you finished?
24      MR. ANDERSON:  He wasn't.  He was talking.  So
25 I guess not.  What else would you like to say?

Page 132

1    A.  Yeah, usually we were asked as a co-author to
2 look at this and to be able to make some corrections.
3    Q.  But you were asked to give your comments and
4 corrections to this book chapter, correct?
5      MR. ANDERSON:  Asked and answered.  You just
6 asked the exact same thing.  Go ahead, Doctor.
7    A.  I cannot remember exactly, but I'm confident
8 that I have been asked to -- to make some comments to
9 this text.
10   Q.  And this was a manuscript, wasn't it?
11      MR. ANDERSON:  Objection; asked and answered.
12   Q.  This was a manuscript of a book chapter,
13 correct?
14   A.  This is a book chapter.
15   Q.  Right.
16      And you were a co-worker on this manuscript,
17 correct?
18      MR. ANDERSON:  Objection; asked and answered.
19   A.  Yes.
20   Q.  Now, you told the jury that you were a hernia
21 surgeon up until 2006, correct?
22   A.  Yes.
23   Q.  And after 2006 you stopped performing hernia
24 surgery, correct?
25   A.  I was not only a hernia surgeon, I was an

Page 133

1 abdominal surgeon, and I stopped abdominal surgery in
2 2006, that is correct.
3    Q.  Did you stop all surgery in 2006?
4    A.  All surgery.
5    Q.  And you've never implanted a TVT device.
6    A.  No, I never did it.
7    Q.  And you don't -- you've never made any direct
8 measurements of the forces applied to mesh for the
9 treatment of stress urinary incontinence, correct?
10   A.  That is correct.
11   Q.  And you don't know the mechanism by which TVT
12 mesh treats stress urinary incontinence, correct?
13      MR. ANDERSON:  Objection to form.  Go ahead.
14   A.  Yes.
15   Q.  And you've never studied the placement of
16 transvaginal mesh for the treatment of stress urinary
17 incontinence, correct?
18   A.  If you mean that I never had a look to where
19 this mesh has been placed or where this sling was
20 placed, that is not correct.  I did have a look to
21 figure out and to find out where this sling has been
22 placed.
23   Q.  But the technique of how it's done and the
24 procedures of how it's implanted, you've not studied
25 that, correct?

Page 134

1  A.  "Study" in the meaning that I've seen videos, I
2  have seen live surgery, then I've studied it.  But if
3  you believe that a study is a controlled way to analyze
4  a problem, then it's true that we didn't make a specific
5  study.
6  Q.  Now, would you put up Exhibit 8333, please.
7  Now, the jury sees now Exhibit 8333 that you
8  testified on direct.  And the slide there originally
9  depicts a hernia mesh implantation, correct, and you've
10  added the TVT.
11  A.  That is correct.
12  Q.  So, for the jury to understand, the area that
13  is behind the red U is hernia mesh; is that correct?
14  A.  Maybe it's not the best image.  The area is the
15  space behind the pubic bone, and in this area there is
16  both.  There is the TVT and there is hernia mesh.
17  So, as I indicated, it is overlapping.  It is the same
18  area of same tissue where surgeons meet gynecologists.
19  Q.  Doctor, that's not my point.  All I want the
20  jury to understand is that the mesh that is not the red
21  U is hernia mesh, correct?
22  MR. ANDERSON:  Objection; asked and answered.
23  Go ahead.
24  A.  The mesh that you see on the image, this is a
25  mesh as it is used for a hernia repair, yes.

Page 135

1  Q.  Thank you.
2  And the marks along the left and right side of
3  the hernia mesh, are those sutures?
4  A.  These are sutures, yeah.
5  Q.  And the sutures are used to fix the hernia mesh
6  in place, correct?
7  A.  In --
8  Q.  In this slide.
9  A.  In this drawing.  In this drawing.  But usually
10  it is not necessary to make any fixation of a mesh in
11  this position.
12  Q.  And the purpose of the creation of this slide,
13  8333, is to show the location where the TVT device would
14  go, correct?
15  A.  Yes.
16  Q.  And the mesh contained in the TVT device is
17  less than the mesh that's depicted in that hernia mesh
18  in the same image, correct?
19  A.  Just on this image.  But maybe -- maybe you are
20  you are right, but it's not the best image.  Usually you
21  are going with the mesh even five, six centimeters
22  behind the pubic bone.  And, as I indicated, we stop on
23  top of the urethra where the TVT goes behind it.
24  So there is a difference of one to two
25  centimeters, but mainly the area is quite similar, it's

Page 136

1  a preperitoneal space, it's the space of radials as it
2  was called.  But, you're right, it is not completely
3  reflected in this image.  There may be better ones.
4  Q.  You know that the TVT device was invented by
5  Professor Urmston in Sweden in the 1990s?  Do you
6  remember that from your review of documents?
7  A.  Yeah.
8  Q.  And the PROLENE hernia mesh was made from
9  PROLENE polypropylene sutures?
10  MR. ANDERSON:  Objection to form.
11  Q.  Strike that.  Let me back up again.
12  You know that the TVT device that you talked
13  about at length on direct examination was made from
14  PROLENE hernia mesh.
15  A.  Yes.
16  Q.  And that hernia mesh was first made in 1974,
17  correct?
18  A.  Yes.
19  Q.  And the PROLENE hernia mesh was made from
20  PROLENE polypropylene sutures.  You know that?
21  MR. ANDERSON:  Objection to form.
22  A.  It was made from filaments made out of
23  polypropylene.
24  Q.  Okay.
25  A.  It is not made that you take some sutures and

Page 137

1  combine it and make a mesh of it, no.  So the PROLENE
2  sutures are -- you can buy it, you can use it, but it is
3  a completely separate thing than the textile.
4  Q.  But the PROLENE polypropylene sutures are meant
5  to be permanent implants in the body, correct?
6  MR. ANDERSON:  Objection to form.
7  A.  Yes.
8  Q.  And PROLENE hernia mesh is meant to be a
9  permanent implant in the body, correct?
10  A.  Yes.
11  Q.  And PROLENE polypropylene sutures are used in a
12  variety of applications throughout the human body.  Do
13  you agree with that?
14  A.  Yes.
15  Q.  Do you know that in 1969 the United States
16  Department of Health, Education and Welfare approved an
17  application by Ethicon to allow it to sell its
18  polypropylene sutures?
19  MR. ANDERSON:  Again, objection.  Trying to
20  back door in regulatory issues with an expert who
21  has not been designated by that.  Plus, as you well
22  know, the judge has already said that you can't
23  bring in your PMA evidence of a suture to try to
24  show safety of your TVT sling.
25  So he's not going to answer any questions that

| | Page 138 |
|---|---|
| 1 | are outside of his expertise, and asking about FDA |
| 2 | questions, as I said before, Counsel, is |
| 3 | inappropriate and you well know it. |
| 4 | MR. THOMAS: Are you going to instruct him not |
| 5 | to answer any questions -- |
| 6 | MR. ANDERSON: With my qualifications to him |
| 7 | that he's not to answer any questions that relate to |
| 8 | regulatory or FDA because he's not been designated |
| 9 | an expert in that area and it's not in his report, |
| 10 | and I think it's inappropriate for you to keep |
| 11 | asking these questions. |
| 12 | MR. THOMAS: All I want, Ben, if you'd let me |
| 13 | finish my statement we'll perhaps get through this. |
| 14 | If you're going to instruct him not to answer any |
| 15 | questions about the FDA review, approval and |
| 16 | regulation of polypropylene -- PROLENE polypropylene |
| 17 | mesh, PROLENE hernia mesh and PROLENE used in TVT |
| 18 | for the treatment of stress urinary incontinence, |
| 19 | then that's fine. We'll be over it. |
| 20 | MR. ANDERSON: I'm not going to instruct him |
| 21 | not to answer. Do you have any opinions on that? |
| 22 | If he doesn't have any opinions on it then he can |
| 23 | say -- you can ask him questions. |
| 24 | MR. THOMAS: He can tell me if he knows. |
| 25 | MR. ANDERSON: No, he can say I don't have any |

| | Page 139 |
|---|---|
| 1 | opinion on it. |
| 2 | MR. THOMAS: It's a fact, Ben, it's not an |
| 3 | opinion. |
| 4 | MR. ANDERSON: But you're trying to get an |
| 5 | opinion or else why would you ask him the questions? |
| 6 | BY MR. THOMAS: |
| 7 | Q. Can you answer the question, please? |
| 8 | A. I really don't know whether this decision is |
| 9 | made on the basis for one single stitch or whether it |
| 10 | includes a thousand stitches as would be comparable to |
| 11 | the use of a polypropylene mesh, so therefore I cannot |
| 12 | answer it. |
| 13 | Q. Do you know whether the FDA, as a part of this |
| 14 | approval process, specifically approved the use of |
| 15 | PROLENE polypropylene for these sutures? |
| 16 | MR. ANDERSON: Again, same lengthy objection. |
| 17 | If you want to keep asking the questions all day |
| 18 | long he's going to keep telling you it's out of his |
| 19 | expertise and he has no opinion. Doctor? |
| 20 | A. I don't have sufficient information to talk |
| 21 | about this. |
| 22 | Q. There have been over a billion polypropylene -- |
| 23 | excuse me -- strike that. |
| 24 | There have been over a billion PROLENE |
| 25 | polypropylene sutures used in humans since their |

| | Page 140 |
|---|---|
| 1 | introduction. Do you agree with that? |
| 2 | A. Yes, I agree to that. |
| 3 | Q. And there have been millions of hernia repairs |
| 4 | using PROLENE polypropylene mesh. Do you agree with |
| 5 | that? |
| 6 | A. Millions? I'm not sure. I don't have the |
| 7 | data. |
| 8 | Q. Polypropylene is the most widely used mesh |
| 9 | material for hernia repair, correct? |
| 10 | A. That is correct. |
| 11 | Q. And polypropylene is the favorite fiber for |
| 12 | most mesh constructions. Do you agree with that? |
| 13 | A. Yes. |
| 14 | MR. ANDERSON: And an objection to form as to |
| 15 | which application. |
| 16 | Q. And polypropylene is still appropriate for use |
| 17 | in the pelvic floor if you have the right construction |
| 18 | of polypropylene; true? |
| 19 | MR. ANDERSON: Objection; form. |
| 20 | A. The right construction is a -- one prerequisite |
| 21 | that you have. The other is -- and therefore I have to |
| 22 | point this out is if you are talking of polypropylene it |
| 23 | has to be specified which -- which type of |
| 24 | polypropylene. |
| 25 | There are polypropylenes where the manufacturer |

| | Page 141 |
|---|---|
| 1 | says it shouldn't be used in medical applications at |
| 2 | all. So there are a huge variety of different |
| 3 | polypropylenes. So it has to be clarified whether this |
| 4 | polypropylene is suitable for the use in medical |
| 5 | applications. And the second is that of course you have |
| 6 | to have an adequate configuration, an adequate design |
| 7 | leaving off other risks. |
| 8 | Q. It's true, Doctor, that your opinion is that |
| 9 | polypropylene is not so dangerous that it should be |
| 10 | forbidden today to use it and you're convinced it's |
| 11 | tolerable or acceptable to use polypropylene in |
| 12 | medicine. That's your opinion, correct? |
| 13 | MR. ANDERSON: Objection to the cumulative |
| 14 | nature of the question. |
| 15 | A. I remember that this was a statement of one of |
| 16 | the transcripts. May I have a look to it? |
| 17 | Q. Sure. I was reading from your deposition on |
| 18 | November the 15th, 2013, Page 535. |
| 19 | MR. ANDERSON: 535 you say, Counsel? |
| 20 | MR. THOMAS: I do, Line 9 to 19. |
| 21 | Q. Page 9, I asked you the question: |
| 22 | Do you have an opinion, to a reasonable degree |
| 23 | of scientific and medical certainty, as to whether the |
| 24 | use of polypropylene in hernia repair is unreasonably |
| 25 | dangerous? |

Page 142

1    The answer you gave: The -- my present opinion
2    is it is not so dangerous that it should be forbidden
3    today to have to use it, and therefore I'm convinced
4    that it is tolerable or acceptable to use polypropylene
5    in medicine.
6         Did I read that correctly?
7    A.   Yes.
8         MR. ANDERSON: Objection. It's a different
9    question than you asked him.
10   Q.   Is that a true statement today?
11   A.   Yes.
12   Q.   Thank you.
13        Now, you talked about the TVT device on direct
14   examination and you showed it to the jury. Let me hand
15   you a TVT device. And you've obviously handled one
16   before, correct?
17   A.   Yes.
18   Q.   You've never implanted one before, correct?
19   A.   That is correct.
20   Q.   Now, as you're holding the device you have
21   needles on either end. Do you know what those needles
22   are for?
23   A.   Yes.
24   Q.   What are the needles for?
25   A.   To pass the sling through the tissues.

Page 143

1    Q.   And the mesh itself is attached to the needles,
2    correct?
3         MR. ANDERSON: I'm just going to object to
4    anything regarding clinical expertise. He's not
5    here as a urogynecologist or a gynecologist.
6    Q.   The mesh is attached to the needles, correct?
7    A.   Yes.
8    Q.   And also on the device is a plastic wrapping
9    around the mesh, correct?
10   A.   That is correct.
11   Q.   And the plastic wrapping around -- okay, easy.
12        MR. THOMAS: Strike that. Let's go off the
13   record for a minute.
14        THE VIDEOGRAPHER: We are off the record at
15   1:43 p.m.
16        (Recess from time 1:43 until 1:43 p.m.)
17        THE VIDEOGRAPHER: We are back on the record.
18   The time is 1:43 p.m.
19   BY MR. THOMAS:
20   Q.   Dr. Klinge, the TVT mesh device that you have
21   in front of you has a plastic sheath around the mesh,
22   correct?
23   A.   That is correct.
24   Q.   And the plastic sheath covers the mesh from one
25   needle to the other with a break in that sheath in the

Page 144

1    middle, correct?
2    A.   That is a correct description.
3    Q.   And the sheath itself is affixed to the needle,
4    correct?
5    A.   Yes.
6    Q.   And you know that when the TVT device is
7    implanted in a woman that is implanted with the sheath,
8    correct?
9    A.   It's put in with a sheath, yeah.
10   Q.   And the sheath is not removed until the mesh is
11   in place, correct?
12   A.   I'm not sure whether there is some -- some
13   trimming afterwards, after removal of the sheath, if
14   some surgeons are doing it. It is out of my field to --
15   to discuss what happens during this procedure.
16   Q.   Okay. But you do understand that when the mesh
17   is implanted and the needles go through the vagina and
18   out the abdomen that what is being pulled by the needle
19   is the mesh with the sheath on it, correct?
20   A.   I understand from the documents from Ethicon,
21   but they have to consider an elongation by 50 percent,
22   they have to consider some forcing during the
23   implantation period, and therefore that is I have to
24   consider. I don't have own experiences whether it's
25   really possible to do it without any tension.

Page 145

1         MR. THOMAS: Move to strike the answer as
2    non-responsive.
3         MR. ANDERSON: I completely disagree.
4         MR. THOMAS: I understand you disagree, Ben.
5         MR. ANDERSON: You asked him the question, he
6    gave you his answer.
7    BY MR. THOMAS:
8    Q.   You understand that when the mesh is implanted
9    and the needles go through the vagina and out the
10   abdomen that what is being pulled by the needle is the
11   mesh with the sheath on it, correct?
12        MR. ANDERSON: Objection; asked and answered.
13   A.   I really don't understand what you are going
14   for. If you are tearing this one, and I saw you don't
15   like it, but then in the middle of the -- of the mesh
16   area there is no protection of the sheath.
17   Q.   Okay. Do you understand -- do you know how the
18   mesh is implanted?
19   A.   As I told you --
20        MR. ANDERSON: Objection. Go ahead.
21   A.   -- I've seen it during -- on video
22   demonstrations, during live surgery, but it is out of my
23   expertise to discuss technical details of the procedure.
24   Q.   You conducted a number of tests that you
25   described where you measured the extent to which the TVT

Page 146

1 device would change a pore structure under different
2 forces, correct?
3    A.   Yes.
4    Q.   It's true that you never tested the TVT device
5 with the sheath on it, did you?
6    A.   We didn't test it with the sheath on it.
7    Q.   Thank you.
8        There are risks from any surgical procedures.
9 Do you agree with that?
10    A.   Yes.
11    Q.   And these risks are known as complications.
12    A.   Yes.
13    Q.   And pain can be a complication of any surgical
14 procedure in the pelvic floor.  Do you agree with that?
15    A.   Yes.
16    Q.   And you've not studied the rates of
17 complications associated with the use of mesh in the
18 pelvic floor for the treatment of stress urinary
19 incontinence, correct?
20    A.   Please, can you rephrase it?
21    Q.   What is it that you don't understand about my
22 question so I can ask a better one?
23        MR. ANDERSON:  He just asked you to rephrase
24    the question.  Are you going to ask him another
25    question about why he needs to rephrase it?

Page 147

1    A.   You want to -- you want to -- to know whether
2 we studied the correlation between patients' complaint
3 and the use of a mesh there?
4    Q.   Yes.
5    A.   This we studied extensively.  All our work was
6 done to explain the problems of the complications of the
7 patients for pain, to look whether this is related to
8 the textile structure, and we've published it with some
9 explants from Professor Schuessler some years before
10 where we could really demonstrate that it's the roping,
11 the bridging, the shrinkage that happens after
12 implantation of these slings.
13    Q.   Let's go to Page 328 of your deposition on
14 November 14, 2013.
15    A.   What page?
16    Q.   328.  328, Line 14.
17        Are you familiar with the rates of
18 complications associated with the use of mesh for the
19 treatment of stress urinary incontinence?
20        Answer:  I have read a lot of these articles
21 but I have to admit I'm not very interested in these
22 figures in these rates.
23        Did I read this correctly?
24        MR. ANDERSON:  Objection.
25    A.   You read this correctly.

Page 148

1    Q.   Are you not very interested in the rates of
2 complications?
3        MR. ANDERSON:  Explain that.
4    A.   I'm not interested in these data because we all
5 know meanwhile that these studies with a hundred
6 patients looking for a short period are not able to
7 prove the safety or to give really an idea of how big
8 the complication rates are.  And, therefore, all of
9 these data cannot help us to define whether it's really
10 safe or an unsafe product.
11    Q.   As a hernia surgeon you want to know what mesh
12 is widely accepted in the field of abdominal wall hernia
13 surgery, don't you?
14        MR. ANDERSON:  Objection to the form.  Go
15    ahead.
16    A.   Please, again, I have to -- it's a strange
17 question.
18    Q.   As a hernia surgery, you want to know what mesh
19 is widely accepted in the field of abdominal wall
20 surgery, don't you?
21    A.   First of all, I want to use a safe mesh for the
22 patients, and I want to be confident that it is a safe
23 mesh.  And it is a completely different aspect whether
24 it's the most frequently used or whether it's not so
25 often used.  It may be more interesting for the

Page 149

1 manufacturer than -- than for me.
2    Q.   You've stated before that it should be
3 mentioned that the field of abdominal wall hernia
4 repair, the use of large-pore lightweight meshes has
5 been a standard recommended by guidelines in
6 metaanalysis.  Is that true?
7        MR. ANDERSON:  Objection to the form.
8    A.   It is true that the use of material reduced
9 large-pore meshes is widely established, widely accepted
10 and not disputed, and it is reflected in some of the
11 guidelines which may vary depending on the guideline for
12 what.
13    Q.   And it's fair to understand that the use of
14 large-pore lightweight meshes in abdominal hernia repair
15 has become a standard recommended by guidelines and
16 metaanalysis confirms for you that large-pore textile
17 constructions are widely accepted in the field of
18 abdominal wall hernia surgery, correct?
19    A.   It is a -- one other argument that is reflected
20 in some clinical studies and it is reflected in some
21 metaanalysis; but it does not change and does not let or
22 it does not change the limitations of these studies, in
23 general.
24    Q.   And you rely upon the European Hernia Society
25 and the International Endoscopic Hernia Society for

Case 2:12-md-02327 Document 3367-18 Filed 04/27/17 Page 40 of 76 PageID #: 136200
Case 2:12-md-02327 Document 3367-18 Filed 04/27/17 Page 40 of 76 PageID #: 139190
Confidential - Subject to Protective Order

Page 150

1 guidelines for the treatment of endoscopic hernia
2 repair, correct, and groin hernia, correct?
3    A.  It is one example where the material is
4 discussed.
5    Q.  And the guidelines to which you just referred
6 are the guidelines in professional organizations who
7 have experience in hernia surgery, who are familiar with
8 the literature, and they publish as a professional
9 organization their opinion as to the proper mesh to use
10 in hernia application.  That's true?
11    MR. ANDERSON:  Objection; compound question.
12 Go ahead.
13    A.  The problem of the guidelines to state which
14 material should be used is a very difficult one, and it
15 cannot be answered in just one question.  We have since,
16 in the past two years, we have been working very, very
17 hard to get a formulation of the new guidelines and it
18 is -- it very difficult to -- to summarize this, to
19 bring it down to one sentence.
20    Q.  Are you part of the groups within the hernia
21 societies that come up with the recommendations for the
22 proper material to use for hernia repair?
23    A.  I'm working in some of the groups, not in all,
24 but in some of the groups I was asked to work with them.
25    Q.  And you do this according to protocols of the

Page 151

1 Oxford community on how to make guidelines?
2    A.  That is -- these are some criteria we try to
3 follow.
4    Q.  And you make a --
5    A.  It's not sufficient just to follow them.
6    Q.  And you make a reading of the literature,
7 correct?
8    A.  It's a group.  The entire group, it's 60 to 70
9 persons, colleagues, that are working together.
10    Q.  And you all work together, read the literature,
11 and then pass it around and comment on it, correct?
12    A.  All the literature is -- is collected centrally
13 so that everyone has access to all the literature, and
14 then conclusions and statements are identified and then
15 this is all passed and then you have a -- a conference
16 where you can say, okay, it's disagreement or agreement.
17 You can state how important this statement is, and
18 usually it's a compromise.  All of these formulations
19 are a compromise done by many, many very experienced
20 colleagues.
21    Q.  And these are the enthusiasts who are trying to
22 define the best therapy for a specific condition,
23 correct?
24    MR. ANDERSON:  Objection to form.
25    A.  I don't have any opinion whether they are

Page 152

1 enthusiasts or what their driving spirit is behind it.
2    Q.  I'm just using your word, Doctor.  Have you
3 used that word to describe them?
4    MR. ANDERSON:  Objection.
5    A.  I remember, maybe.
6    Q.  Okay.  You know that there are specialties of
7 doctors who perform surgery in the pelvic floor,
8 correct?
9    A.  Yes.
10    Q.  Urogynecologists perform surgery on the pelvic
11 floor, correct?
12    A.  Yes.
13    Q.  Urologists perform surgery on the pelvic floor,
14 correct?
15    A.  Yes.
16    Q.  Gynecologists perform surgery in the pelvic
17 floor, correct?
18    A.  I said that already, yes.
19    Q.  Did I say urogynecologists?  I'm sorry.  I
20 apologize.
21    A.  The first was gynecologists.
22    Q.  And urogynecologists perform surgery on the
23 pelvic floor, correct?
24    A.  I think so.  We don't have this specialty in
25 Germany.

Page 153

1    Q.  I see.
2       And just like you and hernia surgery, these
3 specialists who perform surgery in the pelvic floor meet
4 and discuss treatments of stress urinary incontinence,
5 correct?
6    A.  I think so, but I don't have any specific
7 knowledge how they discuss it.
8    Q.  Have you ever sought to understand what the
9 specialists in the treatment of stress urinary
10 incontinence recommend for the treatment of that
11 condition?
12    MR. ANDERSON:  Objection.  Outside of his
13 expertise and not part of his expert report or
14 opinions.  With that qualification, Doctor.
15    A.  I have read some -- some of these -- these
16 contributions to the topic about the best treatment, but
17 definitely finally I have to say I have no opinion which
18 is the best procedure for treatment of what disease.
19    Q.  Okay.  So let me show you what's been marked in
20 a prior proceeding as DX20100.  And this is a document
21 from the Food and Drug Administration dated March 27th,
22 2013, titled, Medical Devices, subheading,
23 Considerations About Surgical Mesh For SUI.
24       Have you seen that before?
25    MR. ANDERSON:  Objection to the use of FDA

Confidential - Subject to Protective Order

Page 154

1  documents. Objection to asking this expert
2  questions about the FDA. He's not been offered as a
3  regulatory expert. He hasn't offered any FDA
4  opinions in this case, nor is he going to, and it's
5  outside of his expertise.
6  Q. Have you seen this document before?
7  A. I -- this one or a similar one maybe, but I
8  don't have any -- any -- I do not remember precisely.
9  Q. The first paragraph reads: "Mesh sling
10  procedures are currently the most common type of surgery
11  performed to correct SUI. Based on industry estimates
12  there were approximately 250,000 of these procedures
13  performed in 2010. While all surgeries for SUI carry
14  some risks it is important for you to understand the
15  unique risks and benefits for surgical mesh slings used
16  in SUI repair."
17      The next paragraph says that the FDA formed a
18  meeting of scientific experts in September, 2011, and
19  conducted a systematic review of the published
20  literature from 1996 to 2011. Is that true?
21      MR. ANDERSON: Is what true, that the words
22  there are on the page?
23      MR. THOMAS: Yes.
24      MR. ANDERSON: Okay. Again, I have a running
25  objection to the use of this document.

Page 155

1      MR. THOMAS: Yes, you do.
2      MR. ANDERSON: And all of your questions to
3  this expert are on something that's outside of his
4  qualifications, not something we've offered him for.
5  But if you want to waste time, go ahead.
6      He wants to know if that's what those words say
7  on that piece of paper.
8  A. Yeah, I can follow that you read what is on the
9  paper.
10  Q. Thank you.
11      The first bullet point says, "The safety and
12  effectiveness of multi-incision slings is well-
13  established in clinical trials that followed patients
14  for up to one year. Longer follow-up data is available
15  in the literature but there are fewer of these long-term
16  studies compared to studies with one year follow-up."
17  Did I read that correctly?
18  A. You read this correctly.
19  Q. Do you disagree with the finding of the FDA?
20      MR. ANDERSON: Well, objection to the
21  characterization that's the finding of the FDA. Go
22  ahead.
23  A. My point is they are discussing a procedure.
24  That's not -- that's not my field. My field is that the
25  risk -- that the use of the PROLENE mesh, and there is

Page 156

1  nothing where they've wrote that you have to use a
2  heavyweight small-pore mesh to get these results. If
3  you use it 250,000 times a year I think you have to be
4  very, very sure that there is no risk.
5  Q. No risk at all?
6      MR. ANDERSON: Hold on. Let him finish his
7  question.
8  A. That the lowest risk that is feasible, that you
9  can't avoid any risk. Because the risk that some of the
10  patients can get harmful complications is very, very
11  high. And in all this document it is not written that
12  you -- that it's necessary to use a heavyweight small-
13  pore mesh.
14  Q. Let me show you what's been marked in a prior
15  proceeding as DX20207.
16      MR. ANDERSON: Same objection. He's not here
17  as a urogyn. expert.
18  Q. Did you consider the physician statement of the
19  American Urological Association in your opinions in this
20  case?
21      MR. ANDERSON: Objection; asked and answered.
22  A. I'll have to read it.
23  Q. Did you consider Exhibit 20207 in the
24  formulation of your opinions in this case?
25      MR. ANDERSON: Same objection to the document

Page 157

1  and to the questions.
2  A. This document again discusses the value of the
3  sling procedure, and I don't have any opinion to it. It
4  does not discuss whether it is necessary to use a
5  heavyweight small-pore meshes to get these results.
6  Q. I have a bunch of these statements, Doctor.
7  You're aware there are a number of organizations of
8  doctors around the world who have endorsed midurethral
9  slings for the treatment of stress urinary incontinence.
10  Is that fair?
11      MR. ANDERSON: Objection. Same objections.
12  Outside of his expertise and not why he's here to be
13  called as an expert. Hasn't offered that as part of
14  his opinions nor in his report. Go ahead.
15  A. If you state that you have a huge heap of these
16  documents I cannot comment on it.
17  Q. And your point is, at least in the statements
18  that you've seen so far, is there's nothing in there
19  that says that you must use what you've described as a
20  heavyweight small-pore mesh; is that correct?
21  A. I don't know what do you have in your
22  documents. The documents you showed just recently, they
23  didn't give any -- any -- any data or any facts that
24  show that it is necessary to apply a high-risk device
25  for the use as a sling.

Case 2:12-md-02327  Document 3367-18  Filed 04/27/17  Page 42 of 76 PageID #: 136202
Case 2:12-md-02327  Document 3367-18  Filed 04/27/16  Page 43 of 76 PageID #: 136194
Confidential - Subject to Protective Order

Page 158

1    Q.  What are the incremental risks caused by the
2  TVT device over your alternative design?
3       MR. ANDERSON:  Objection to the form.  No idea
4  what that means.  Go ahead, Doctor.  Objection to
5  the form of the question.  If you can answer it.
6    A.  This is written in the report.  This is
7  summarized in the last figure of the direct
8  investigations.  And so these are the five main risk
9  factors, disadvantages making the device unsafe.
10   Q.  Okay.  How do you make it safer?
11   A.  That is the other figure or the safer
12 alternative design.  So if you are looking -- you have
13 to accept that more material means more foreign body
14 reaction.  So you have to reduce the amount of material
15 to the least amount possible.  That is one point.
16      The second point is that you have to keep the
17 distance between the filament as large as possible to
18 allow fat to be placed in the holes.  This will make it
19 safer.
20      The third point is, you have to consider that
21 you have to apply some tension to this, either within
22 the body or during the implantation.  If applying
23 tension to it the risk is that the collapse go down and
24 that the collapse or that the pores and the holes
25 collapse, then you have an increased -- increased risk

Page 159

1  for scar formation.
2       The next is that when you have -- don't have
3  closed borders you have an increased risk for curling,
4  roping, particles.  All of these three increases the
5  risk for the patient, increases the inflammation, and
6  increases the scarring.
7    Q.  How much?
8       MR. ANDERSON:  Let him finish.
9    Q.  I'm sorry.
10      MR. ANDERSON:  Go ahead.
11   A.  And the third point is that with the
12 polypropylene you have a more intense inflammatory
13 reaction, the foreign body granuloma, the reaction of
14 the tissue is more intense than it would be with the
15 PVDF.  So all of these five points contribute to the
16 increased risk.
17   Q.  How much increased risk are we talking about?
18      MR. ANDERSON:  Objecti8on to form.
19   A.  First of all, it is impossible to play one
20 issue against the other to say this is more important or
21 not.  It is a fact that all these five features
22 increases the risks.
23      If you want to know whether this increased risk
24 is responsible for the patient's complication, it
25 depends to the patients where you are looking to.  If

Page 160

1  you just look to patients with chronic pain and you know
2  it was a good experienced surgeon, it was a consultant
3  of Ethicon who knew very well how to do it, it was a
4  good patient, then it is very likely that it is material
5  related and that you can improve the results with a
6  safer material.
7       So in this group of patients the chance is
8  very, very high that you can improve the results with a
9  better material, but you don't have any other chance.
10 You cannot change the patient, whether the doctor really
11 knows how to do it, you cannot improve it furthermore.
12   Q.  What are the chances -- strike that.
13      I have a low battery time.
14      THE VIDEOGRAPHER:  We are off the record.  The
15 time is 2:10 p.m.
16      (Recess from time 2:10 until 2:13 p.m.)
17      THE VIDEOGRAPHER:  We are back on the record.
18 The time is 2:13 p.m.
19      (Klinge Exhibit No. 1 was marked for
20 identification.)
21 BY MR. THOMAS:
22   Q.  Dr. Klinge, I'm going to hand you what's been
23 marked as Klinge Trial Deposition Exhibit No. 1, and
24 represent to you that this is a document prepared by
25 several authors, including two experts who are

Page 161

1  testifying for the plaintiffs in this case.  You've seen
2  this document before, haven't you?
3    A.  Maybe.  I'm not sure.
4    Q.  Turn to Page 5 of that document, please.  Are
5  you on Page 5?
6    A.  Yes.
7    Q.  Page 5, Table 3, it says, "Complications of RP
8  slings."  That's retropubic slings.  Do you see that?
9    A.  Yes.
10   Q.  And you know retropubic slings are the class of
11 which TVT is a part.  You know that, don't you?
12   A.  Yes.
13   Q.  Now, Table 3 is complications of retropubic
14 slings, correct?
15   A.  Yes.
16   Q.  Now, do you have any reason to disagree with
17 the rates of complications that are presented here?
18   A.  I cannot comment on it.
19   Q.  Okay.  That's fine.
20      I want to use one as an example for my
21 question.  Down under longer-term complications it says,
22 "Refractory pain greater than eight weeks."  It says
23 that 1.8 percent of patients experience pain greater
24 than six weeks.  Do you see that?
25      MR. ANDERSON:  Objection to the form.

Confidential - Subject to Protective Order

Page 162

1    A.  I see it.

2    Q.  What would the design defects -- strike that.

3        What would the design changes that you

4   recommend do to the rate of pain that's reported in

5   Klinge Trial Deposition No. 1?

6        MR. ANDERSON:  Objection to form.

7    A.  To explain it to you, when we changed from the

8   heavyweight small-pore meshes to the use of large-pore

9   lightweight meshes, we didn't see this number of

10  patients with chronic pain after mesh implantation.  We

11  never saw patients with a stiff abdomen.

12       So if you have good patients, if you have a

13  proper technique, then hopefully you can avoid all of

14  these patients with chronic pain by improving the

15  device.

16   Q.  So you're --

17   A.  And it is not reflective and it is not grasped

18  by this number which is a sum up of all studies looking

19  to various time points, various definitions.

20       So our experience, and this is confirmed by

21  many, many others, when you are reducing the amount of

22  material, when you are using large-pore mesh

23  materials --

24       MR. ANDERSON:  Losing or using?

25   A.  Using.  You don't see these patients in the

Page 163

1   number as you see it with the other materials.  And even

2   if it's one, it is happy.  The patient is happy and you

3   will be happy there.

4    Q.  Is it your testimony that by making the design

5   changes that you are here that you're going to reduce

6   this number of 1.8 percent in the patient population for

7   chronic pain?

8        MR. ANDERSON:  Objection.  Go ahead.

9    A.  You cannot take this number of 1.3 -- 8 percent

10  as a real for everything for a specific patient.  But

11  you're right.  If you can reduce this 1.8 to zero just

12  by using a safer design, then it will be great.  I would

13  be satisfied then.  But I don't believe that this 1.8 is

14  the true incidence.

15   Q.  I see.  You believe this number's wrong.

16       MR. ANDERSON:  Objection.  That's not what he

17  said.

18   A.  As I said, I don't believe that this is a true

19  incidence.

20   Q.  Okay.  And what I'm trying to understand,

21  Doctor, are you able to quantify the change in the risk

22  of complications from the five items that you listed on

23  Exhibit 8346?  You can't quantify the change, can you?

24       MR. ANDERSON:  Objection; asked and answered,

25       multiple ways.  Answer it again, Doctor.

Page 164

1    A.  As I tried to explain, it of course depends

2   from the group of patients you are looking at.

3        In the best cases you can avoid completely this

4   complication by using a safer design, as we have seen in

5   our patients.

6    Q.  Now, Doctor, when you first published your

7   review paper on the lightweight and large porous mesh

8   concept for hernia repair, that was in 2005?  Do you

9   recall that?

10   A.  Yes.

11       (Klinge Exhibit No. 2 was marked for

12  identification.)

13   Q.  I'm going to mark as Klinge Trial Exhibit No. 2

14  your article, The Lightweight and Large Porous Mesh

15  Concept For Hernia Repair.

16       And the title, as you've talked on direct

17  examination, suggests that you're trying to get mesh

18  that's of lighter weight that you implant in the body,

19  correct?

20       MR. ANDERSON:  Objection to form.

21   A.  The title includes both lightweight and large

22  porous, and it is not so helpful to isolate this or to

23  reduce it into one.

24   Q.  As a matter of fact, the state of your research

25  today is that weight of the mesh alone is not an

Page 165

1   indicator of its safety; true?

2    A.  If you just stick on the weight and nothing

3   else, then this is true.  It is a ridiculous discussion.

4    Q.  And, in fact, newer studies in the area of

5   hernia repair show there is no difference in the quality

6   of life for people using lighter weight mesh for hernia

7   repair as opposed to heavier weight mesh for hernia

8   repair, correct?

9        MR. ANDERSON:  Objection to form.

10   A.  There is no way or I know there are many

11  studies or there are some studies that does not find any

12  significance; but the absence of significance is not

13  similar to the proof of the equality or similarity.  All

14  these studies are underpowered to demonstrate that there

15  are -- is really a similar or equal result.  They all

16  express the underpowered design of the clinical study,

17  so they are not able to detect differences.

18       (Klinge Exhibit No. 3 was marked for

19  identification.)

20   Q.  Let me show you what I've marked as Klinge

21  Trial Exhibit No. 3.  Klinge Trial Exhibit No. 3 is a

22  study from 2012 in the Annals of Surgery.  You recognize

23  that journal as a reputable journal?

24       MR. ANDERSON:  Object to the journal.  Object

25       that it's outside of his expertise.  But go ahead,

Page 166

```
1    Doctor.
2    A.  I know this journal.
3    Q.  And you know the authors of this study, don't
4  you?
5    A.  I know some of them or only -- only Todd
6  Heniford.
7    Q.  Okay.
8    A.  We talked about him already.
9    Q.  Okay.  Oh, by the way, when you talked about
10  Dr. Heniford banging that piece of mesh on the table,
11  that wasn't a PROLENE hernia mesh, was it?
12    A.  It was a heavyweight small-pore mesh.
13    Q.  It was a Kugel mesh by Bard, correct?
14    A.  Yes.
15    Q.  It wasn't a PROLENE hernia mesh, correct?
16    A.  It was a heavyweight small-pore mesh.
17    Q.  But it wasn't PROLENE mesh.
18    A.  It was a heavyweight small-pore mesh.  And we
19  all know that it's --
20    MR. THOMAS:  Strike that.
21    MR. ANDERSON:  Do you want him to answer the
22  question?
23    MR. THOMAS:  He already has answered the
24  question.  I don't want him to go on and on.  We'll
25  be here all day.
```

Page 167

```
1    MR. ANDERSON:  It's your question so if we're
2  here all day it's your fault.
3  BY MR. THOMAS:
4    Q.  You never answered my question, I don't think.
5    It's true that the mesh that Dr. Heniford
6  banged on the table is a Kugel mesh for hernia repair
7  manufactured by Bard.  You know that to be true?
8    A.  With similar characteristics than the PROLENE
9  mesh.
10    Q.  Doctor, can you answer my question yes or no,
11  please?  Let me ask it again.
12    It's true that the mesh that Dr. Heniford
13  banged on the table is a Kugel mesh by Bard used for
14  hernia repair; true?
15    MR. ANDERSON:  Asked and answered.  He answered
16  earlier it was the Kugel mesh.
17    Q.  I couldn't find the answer.  Let me ask it
18  again.
19    A.  Yes.
20    Q.  It's true, Doctor, that the mesh that
21  Dr. Heniford banged on the table that you discussed on
22  direct examination is a Kugel mesh used for hernia
23  repair manufactured by Bard.
24    A.  Yes.
25    Q.  Now, Dr. Heniford's one of the authors in this
```

Page 168

```
1  study, correct?
2    A.  He's one of the authors, yeah.
3    Q.  And in this study the authors are looking at
4  710 hernia repairs, correct?
5    A.  That is correct.
6    Q.  And down in conclusions it describes this as
7  the largest prospective quality of life study comparing
8  these kinds of hernia repairs, correct?
9    A.  That's in the text.
10    Q.  And you're familiar with the International
11  Hernia Mesh Registry, aren't you?
12    A.  I'm not an expert for this -- for the contents
13  of this registry.
14    Q.  But you're familiar with the registry, aren't
15  you?
16    A.  I know that there is a registry, but I'm not
17  familiar with the details of the variables, whether they
18  are -- whether they are suitable to reflect the reality.
19  I don't know how they control the correctness and the
20  completeness of the data sets.  So, therefore, I don't
21  know the details, how the registry is providing the
22  data.
23    Q.  Okay.  If you look on the right side down at
24  the bottom it says that there are more than 30 centers
25  in the United States, Canada, Europe and Australia that
```

Page 169

```
1  contribute to the registry.  Did you know that?
2    A.  I'm reading it as you're --
3    Q.  Okay.  Have you seen this study before?
4    A.  Some years before, but I don't remember the
5  details any longer.
6    Q.  And you recognize the -- the evaluation for
7  quality of life that they're talking about in the -- in
8  the title of the study.  Do you know what it means to
9  evaluate the quality of life for patients?
10    A.  There are several attempts to objectify the
11  quality of life after an operation, usually done by
12  several questioners.
13    Q.  And you're familiar with the Carolinas Comfort
14  Score?
15    A.  It's one of the tools that can be used.
16    Q.  Okay.  Have you ever used that tool to measure
17  the quality of life in hernia repairs?
18    A.  No, we didn't use it.
19    Q.  Okay.  If you go to -- and this study looked at
20  710 repairs over about four years, correct?
21    A.  There is six at 12 months, one month, one
22  month.  One, six and 12 months I read.  I didn't find --
23    Q.  I'm sorry.
24    A.  -- four years.
25    Q.  Yeah, I was looking at the title under methods
```

Page 170

1 that they gathered the database from September, 2007, to
2 July of 2011. That's what I was looking at.
3    A. But it's completely different to a study with a
4 follow-up of four years.
5    Q. I see what you mean. So this is up to a one
6 year follow-up for these patients?
7    A. In some of the patients I don't find the
8 figures how many of them has a complete follow-up.
9    Q. Okay. If you'd turn to Page 721, the next to
10 the last page.
11    A. 721.
12    Q. You see on the left side beginning in
13 multivariant analysis. Do you see that?
14    A. Yeah.
15    Q. These authors looking at 710 repairs conclude
16 that in multivariate analysis mesh weight had no effect
17 on pain, activity limitation, mesh sensation or overall
18 symptoms in the present study. The effect of mesh
19 weight on quality of life had been studied more
20 extensively in the inguinal hernia literature, where
21 lightweight mesh is often associated with improved
22 quality of life. In a recent small, comparative study
23 of OVHR with light and heavyweight mesh, no difference
24 was seen in quality of life, using SF-36, that's another
25 quality of life questionnaire, right?

Page 171

1    A. That's correct.
2    Q. With long-term follow-up. The results of this
3 study confirm these findings.
4       So this study found that the weight of the mesh
5 had no effect on pain, activity limitation, mesh
6 sensation or overall symptoms, correct?
7       MR. ANDERSON: Objection to the form.
8    A. This is a perfect -- this is a perfect example
9 that --
10    Q. Could you answer my question first and then
11 explain? This study found that in multivariate analysis
12 mesh weight had no effect on pain, activity limitation,
13 mesh sensation or overall symptoms in the present study.
14    A. That's how it's written here.
15    Q. Did they find that?
16       MR. ANDERSON: He said that's in fact how it's
17 written there.
18    Q. I'm sorry. I didn't understand him to say
19 that. I'm sorry. I apologize.
20       MR. ANDERSON: Give your full answer.
21    A. It's written that they cannot find it because
22 to find that there are similar results with a
23 heavyweight and the lightweight you need more patients,
24 we need less subgroups. So there is an insufficient
25 setting to detect any differences. And the absence, as

Page 172

1 I tried to explain to you, the absence of a difference
2 does not mean that the equality or similarity is proven,
3 no, and therefore they can state we didn't identify any
4 difference. We couldn't isolate. We couldn't show any
5 difference, but that's it. It is not suitable and it's
6 not justified to conclude mesh weight had no effect on
7 pain. That is scientifically not justified.
8    Q. What that says is they couldn't detect a
9 difference between the light and the heavyweight mesh,
10 correct?
11       MR. ANDERSON: Objection; asked and answered.
12 He gave you his full answer. We stand by his
13 answer.
14    Q. Can you answer it?
15       MR. ANDERSON: He did answer it.
16    A. I don't have further comment on it.
17       (Klinge Exhibit No. 4 was marked for
18 identification.)
19    Q. Let me hand you what's been marked as Klinge
20 Trial Exhibit No. 4.
21       MR. ANDERSON: Thank you.
22    Q. Klinge Trial Exhibit No. 4 is an article by
23 William Cobb and others about mesh repair of complex
24 incisional hernias, correct?
25    A. It is correct.

Page 173

1    Q. And Dr. Cobb was one of the authors, along with
2 Dr. Heniford, in an article similar to yours about
3 lightweight and large-pore mesh repair, correct?
4    A. Yes.
5    Q. And in this study over a seven-year period they
6 looked at 255 retromuscular mesh repairs of midline
7 incisional defects, correct?
8    A. Yes.
9    Q. And in evaluating polypropylene meshes they
10 determined that recurrence was more likely with
11 lightweight mesh, at 22.9 percent, as compared to
12 mid-weight mesh at 10.6 percent; is that correct?
13    A. They find it.
14    Q. Okay. And this study was published in 2015,
15 correct?
16       MR. ANDERSON: Objection to the document.
17    A. That is correct.
18    Q. And as a result of this study, Dr. Cobb, one of
19 the authors of a study similar to yours in 2005, has
20 stopped using lightweight mesh for the repair of these
21 kinds of hernias, correct?
22    A. As a result he favors the use of mid-weight
23 mesh materials. He doesn't want to go to heavyweight
24 small-pore meshes, but he is favoring the use of
25 material reduced mid-weight meshes.

Page 174

1     I totally agree that there are some patients
2 with huge defects where you need some stronger meshes.
3 But even he tells you there is no need for the
4 heavyweight meshes, but he is satisfied with the
5 mid-weight meshes.
6     Q.  The answer to my question is he stopped using
7 lightweight meshes for the repair of this type of
8 hernia, correct?
9     A.  As I told you, in favor of the mid-weight
10 meshes.
11     Q.  The answer is yes?
12     A.  Yes.
13     MR. ANDERSON:  He answered your question.  He
14 answered your question.
15     Q.  Now, you, yourself, have never studied the
16 extent to which TVT mesh contracts after implantation,
17 have you?
18     A.  We have studied extensively the shrinkage of
19 the PROLENE mesh used for TVT.
20     Q.  Doctor, my question was very specific.  You
21 have never studied the extent to which tissue
22 surrounding TVT mesh contracts after implantation.
23     MR. ANDERSON:  A, it's a different question; B,
24 he even answered that.
25     A.  We extensively studied the extent of shrinkage

Page 175

1 and scar formation around the PROLENE mesh.
2     Q.  Would you go to Page 447, please, of your
3 deposition on November the 15th, 2013, Line 12.
4     Have you ever conducted a study to determine
5 the extent to which the tissue surrounding mesh after
6 implantation for the treatment of stress urinary
7 incontinence?
8     Your answer:  We did a lot of these studies
9 with PROLENE, with MARLEX, which is the mesh used for
10 the treatment of -- I'm talking -- I'm sorry, but we
11 didn't make specific analysis which reflects the
12 treatment with a sling and the pelvic.
13     Is that answer correct?  That's the answer you
14 gave at your deposition, correct?
15     A.  You read it correctly.
16     Q.  And you have not done any specific analysis
17 with respect to contraction of mesh after implantation
18 for the treatment of stress urinary incontinence,
19 correct?
20     A.  We did make an analysis to investigate the
21 effect of this material to the tissues.  We did not do a
22 specific study looking to the implanted sling in human
23 -- in women.
24     Q.  And you don't know the rate of complications
25 from contracture or shrinker -- strike that.

Page 176

1     You do not know the rate of complications from
2 contracture or shrinkage in the placement of mesh for
3 the treatment of stress urinary incontinence, correct?
4     A.  I don't know anyone who is knowing the
5 rate of complications with a long follow-up of 20 years
6 or 30 years, so there is no way to give you a detailed
7 data involving that.  Therefore, I don't know it.
8     THE VIDEOGRAPHER:  We are off the record.  The
9 time is 2:37 p.m.
10     (Recess from 2:37 until 2:42 p.m.)
11     THE VIDEOGRAPHER:  We are back on the record.
12 The time is 2:42 p.m.
13     (Klinge Exhibit No. 5 was marked for
14 identification.)
15 BY MR. THOMAS:
16     Q.  Doctor, I've handed you what's been marked as
17 Klinge Trial Exhibit No. 5, and it's a study by Nilsson,
18 et al., Seventeen Years' Follow-up of the Tension-Free
19 vaginal Tape Procedure for Female Stress Urinary
20 Incontinence.  Have you seen this before?
21     A.  I had a look to it.
22     Q.  If you look on the right side it says, talking
23 about the material used, "The tape material used in the
24 TVT operation was from the beginning a Type 1 mesh,
25 characterized by a monofilament, polypropylene, large

Page 177

1 pore size structure."  Do you see that?
2     A.  I see it.
3     Q.  The authors here characterize the TVT device as
4 having a large-pore structure, correct?
5     A.  They named it as a large pore size structure
6 and referred to the classification of Amid, which is
7 just focusing on the risk for infection, and it is not
8 comparable to the modern definition of large pore that
9 was developed with VYPRO in 1997.
10     MR. THOMAS:  Move to strike everything after he
11 said, "They named it as a large-pore structure."
12     Q.  If you turn to the next to the last page --
13 strike that.
14     This is -- this study started as 90 women and
15 they were followed prospectively for 17 years, correct?
16     A.  So it's in the text, yeah.
17     Q.  And 68 percent of the women were available for
18 follow-up.  Do you see that?
19     A.  Sixty-eight.  Sixty-eight.  Where is it?
20     Q.  Under results.  Sixty-eight percent of the
21 potentially assessable women were evaluated either by a
22 clinic visit or by a telephone interview.
23     A.  Seventy-eight.
24     Q.  Seventy-eight, thank you.
25     A.  Here it's 78 percent.

Page 178

1    Q.  Yes, I read that incorrectly.  Thank you.
2        MR. ANDERSON:  78 percent.
3    A.  Yes.
4    Q.  Seventy-eight percent of the potentially
5  assessable women were evaluated either by a clinic visit
6  or by a telephone interview.  It continues.  Over 90
7  percent of the women were objectively continent, 87
8  percent were subjectively cured or significantly
9  improved.  If you turn to the next to the last page of
10  the study on the right side --
11   A.  That's the bottom?
12       MR. ANDERSON:  Next to the last page.
13   Q.  Next to the last page, on the right side, it
14  begins -- keep going.  Keep going.  That one.
15   A.  That one.
16   Q.  See the paragraph beginning, important
17  observation?
18   A.  Yeah.
19   Q.  These authors find after 17 years finds that
20  there is no shrinkage of the TVT mesh over time.  Is
21  that true?
22       MR. ANDERSON:  Is what true, that it says that
23  on the paper?
24       MR. THOMAS:  That's right.
25   A.  You read it.

Page 179

1    Q.  Okay.
2    A.  It's in the paper there.
3    Q.  Given your testimony on direct examination, is
4  that possible, that of this cohort of 78 percent of 90
5  women followed for 17 years that there's no shrinkage?
6    A.  If you have a method that is not sensitive
7  enough to detect shrinkage, then of course you will not
8  find any -- any shrinkage.  If you are looking at it
9  with inappropriate tools, yeah, it's not missed.
10   Q.  Do you -- do you doubt the findings of the
11  authors in this study that there's no shrinkage after 17
12  years?
13   A.  I can't comment on it because I don't know the
14  details.  I know that we have some rare patients which
15  do not have shrinkage, yes.
16       (Klinge Exhibit No. 6 was marked for
17  identification.)
18   Q.  Let me show you what I've now marked as Klinge
19  Trial Exhibit No. 6.  It's a study by Lo, et al., on an
20  Ultrasound Assessment of Mid-urethra Tape at Three
21  Years.
22       MR. ANDERSON:  Do you have a copy?
23       MR. THOMAS:  I do.
24       MR. ANDERSON:  Thank you.
25   Q.  And that evaluated 80 women who underwent a TVT

Page 180

1  procedure, correct?
2    A.  Eighty women with a TVT.
3    Q.  And they were followed for three years?
4    A.  Yes.
5    Q.  And of the 80 women 85 -- 88.5 percent were
6  objectively cured and six had improved, correct?
7    A.  I cannot follow where you're reading it.
8    Q.  Right under results.
9    A.  Yeah.
10   Q.  Of the 70 women available for evaluation at
11  post-operative year three, 62, which is 88.5 percent
12  were objectively cured and six had improved --
13  improvement, correct?
14   A.  Yes.
15   Q.  And these authors examined these women by
16  ultrasound at three years, correct?
17   A.  Yes.
18   Q.  And they concluded that, from the ultrasound,
19  that the observations of the tape position and
20  characteristics suggest that shrinkage and compromise to
21  the TVT sling does not occur, correct?
22   A.  You read it correctly.
23   Q.  And this is an objective measurement through
24  ultrasound, correct?
25   A.  Ultrasound hardly -- it is somehow objective

Page 181

1  but somehow it depends from the specific details of the
2  investigation, from the experience, from the frequency
3  you are applying to the tissues and how you are doing
4  it.  So there are a lot of possible modifications of how
5  ultrasound is done.
6    Q.  But at least these authors, using ultrasound,
7  found no shrinkage at three years for the people they
8  examined, correct?
9    A.  In their setting obviously they described no.
10       (Klinge Exhibit No. 7 was marked for
11  identification.)
12   Q.  Let me show you what I've marked now as Klinge
13  Trial Exhibit No. 7.  Klinge Trial Exhibit No. 7 --
14  excuse me.  I don't mean to throw it at you.
15       MR. ANDERSON:  Okay.
16   Q.  Klinge Trial Exhibit No. 7 is a study done by
17  Emily Lukacz, and others, titled, The Effects of the
18  Tension-Free Vaginal Tape on Proximal Urethral Position:
19  A Prospective, Longitudinal Evaluation.  And they looked
20  at 94 patients for one year, correct?
21   A.  Yes.
22   Q.  And they used a -- what they call a Q-tip test
23  to determine whether there was shrinkage or tightening
24  of the sling over a year, correct?
25   A.  It's written in the text.

Page 182

1    Q.   And in this study, of these 94 patients after a
2  year, these authors concluded that there was no
3  shrinkage or tightening of the sling, correct?
4    A.   That's how it's written in the text.  I don't
5  have any opinion to this technique or this method.
6       (Klinge Exhibit No. 8 was marked for
7  identification.)
8    Q.   Okay.  Let me show you now what I've marked as
9  Klinge Trial Exhibit No. 8.  Klinge Trial Exhibit No. 8
10 is a study by Dietz, and others, from Australia, Denmark
11 and New Zealand, titled, Does the Tension-Free Vaginal
12 Tape Stay Where You Put It?  And this is a study from
13 2003 in the American Journal of Obstetrics and
14 Gynecology, where they looked at 72 women, out of 92
15 eligible, at a median interval of 1.6 years to evaluate
16 whether the TVT device implanted in them had contracted
17 or shortened over that time.  Do you see that?
18    A.   I see what?
19    Q.   That that's what they were doing.  That they
20 looked at 72 women after -- at least twice after TVT
21 placement at a median of 1.6 years to evaluate whether
22 the TVT tape stayed where it was originally implanted.
23    A.   So it's written in the text, yeah.
24    Q.   And this study found, from their review of 72
25 women, at a median of 1.6 years, that the TVT does not

Page 183

1  contract or shorten over that period of time, correct?
2    A.   You read it correctly, but I don't have any
3  comment on the quality of the data and whether it's even
4  enough to see any differences.  So the absence of a
5  difference usually is due to the setting of the study,
6  very, very often.
7    Q.   Are you suggesting in the studies that we've
8  talked about that these folks just missed it?
9       MR. ANDERSON:  Objection to form.
10    A.   I cannot comment on it.  I don't have it.  You
11 have to check it very carefully.  You have to check the
12 number of patients.  You have to check the technique,
13 how to make it.  The problem is that if you don't see
14 any difference you have to be very careful if you missed
15 it just by the setting.
16       (Klinge Exhibit No. 9 was marked for
17 identification.)
18    Q.   Let me show you what I've marked now as Klinge
19 Exhibit, Trial Exhibit No. 9.  Klinge Trial Exhibit
20 No. 9 is a 2015 study in the International Journal of
21 Surgery titled Large Pore Size and Controlled Mesh
22 Elongation Are Relevant Predictors For Mesh Integration
23 Quality and Low Shrinkage.  And this is a study by Dirk
24 Weyhe, W-e-y-h-e, William Cobb, and others, about
25 large-pore meshes.  Do you see that?

Page 184

1    A.   I see this document, yeah.
2    Q.   And this is a study conducted in minipigs, 20
3  female minipigs, correct?
4    A.   That's how it's written in the text.
5    Q.   And in this animal study comparing different
6  pore sizes of mesh, meshes that were devised for this
7  test by Covidien, they found that the larger pore size
8  and lack of stability in lightweight meshes leads to
9  shrinkage.  Isn't that what they conclude?
10    A.   The major message of this article is written in
11 the title.  Large Pore Size Are Relevant Predictors For
12 Mesh Integration Quality and Low Shrinkage.  That's
13 their main message in this article.
14       However, you are right.  They found that if you
15 have a structural instability of the meshes you can have
16 a collapse of these pores, and therefore the stability
17 of a mesh to some forces is a relevant issue as well.
18 But the main message is large pore as I've outlined in
19 the past hours.
20    Q.   But the second bullet point says, "Large pore
21 size and lack of stability in lightweight meshes leads
22 to shrinkage."  That was their conclusion, correct?
23    A.   That is what you -- yeah, you read it
24 correctly.
25    Q.   Do you have 8338 in front of you, the Najjari

Page 185

1  article?  I'll give you another copy of it, just so you
2  have it handy.
3       On direct examination you were asked questions
4  about Plaintiff's 8338 about the implantation of PVDF as
5  opposed to polypropylene slings.  Now that's a follow-up
6  study of some work that you had done with this same
7  group, correct?
8    A.   This is a study by the urogynecologists.
9       (Klinge Exhibit No. 10 was marked for
10 identification.)
11    Q.   Let me show you what's been marked as
12 Klinge 10.  And Klinge 10 is an abstract by Dr. Najjari
13 which compares different types of suburethral slings
14 using ultrasound, correct?
15    A.   Yes.
16    Q.   And you're a co-author on this study, correct?
17    A.   That is correct.
18    Q.   And in Exhibit No. 10 the authors identify
19 differences between PVDF slings and polypropylene
20 slings, correct?
21    A.   Sorry, in which article?
22    Q.   Ten, Exhibit No. 10.
23    A.   This one?
24    Q.   Correct.  Exhibit No. 10 preceded 8338,
25 correct?

Confidential - Subject to Protective Order

Page 186

1   A.  I think so.
2   Q.  Yes.
3       And in Exhibit No. 10 the authors identify what
4   they describe as differences between the placement of
5   the polypropylene slings and the placement of the PVDF
6   slings, correct?  It's a study in which you're an
7   author.
8   A.  In both articles you have significant
9   differences between the two groups.
10  Q.  But certainly on Exhibit No. 10 you appear as
11  an author and they've identified these differences,
12  correct?
13      MR. ANDERSON:  Do you have a copy of that?
14      MR. THOMAS:  I thought I gave you a copy.  I'm
15  pretty sure I did, because I don't have another one.
16  A.  Yeah, I've been co-author and they identified
17  some significant differences here, yeah.
18  Q.  Okay.  But in Exhibit 8338, which is published
19  after Klinge Exhibit 10, they were unable to find any
20  difference between the slings and the improvement of
21  continence, and no significant influence of the
22  parameters was found for the resulting state of
23  continence, correct?
24  A.  You read it correctly.  But, in fact, they
25  described the same significant differences as in the

Page 187

1   other study, they just could not find any relationship
2   to the clinical outcome.  And that is reasonable because
3   it is underpowered.  With this number of patients you
4   will never get it.
5   Q.  So the bottom line is, in 8338, these authors
6   were unable to tie any of the findings that they made in
7   Exhibit No. 10, where you appeared as an author, to any
8   clinically significant conditions in the patient,
9   correct?
10  A.  In the article for the first time they tried to
11  make this linkage to the clinical outcome.  But it is --
12  it is impossible to do so because it is so -- so much
13  underpowered.  And if you are looking to the data you
14  have a huge standard deviation, so there is no way to
15  link this.  So the absence of a difference does not mean
16  that there is no one, it is just a limitation of the
17  setting.
18  Q.  And for Exhibit 8338 you're no longer listed as
19  an author, correct?
20  A.  My contribution is very, very limited because I
21  just made some statistical analysis, and so you need
22  some specific contributions to be listed as a co-author
23  in an article.  And, therefore, I'm not -- I didn't make
24  any significant contributions to this article and
25  therefore I'm not listed as a co-author there.

Page 188

1   Q.  Thank you.
2       You are unaware of any clinical studies that
3   show the use of PROLENE mesh increases the risk of
4   injury to a patient in the treatment of stress urinary
5   incontinence over a larger pore, lighter weight mesh;
6   true?
7   A.  I'm aware of some clinical studies trying to
8   compare or to look to the outcome when using large pore
9   lightweight constructions.
10      MR. ANDERSON:  Wait a minute.
11  A.  But I'm very -- I'm aware of the fact that
12  there is no sufficient clinical study comparing two
13  different materials with sufficient statistically power.
14  Q.  I don't think your answer is very clear.  I'm
15  going to ask the question again.  Forgive me.
16      MR. ANDERSON:  Objection to your
17  characterization.
18  Q.  You're unaware of any clinical studies that
19  show the use of PROLENE mesh increases the risk of
20  injury to a patient in the treatment of stress urinary
21  incontinence over a larger pore, lighter weight mesh;
22  true?
23  A.  We just discussed the findings from Najjari.
24  This is a clinical study.  They found significant
25  differences when comparing these two materials.  There's

Page 189

1   maybe some other studies comparing this material showing
2   that large pore, lightweight meshes are superior.
3   Q.  But --
4   A.  But, however, it is not -- I don't know any
5   clinical study with sufficient power which really
6   addresses the comparison of two materials.  Either it's
7   lightweight or large pore.
8   Q.  You know that there are multiple manufacturers
9   of polypropylene mesh used for the treatment of stress
10  urinary incontinence in the United States?
11  A.  Sorry.  That was a little bit fast for me.
12  Q.  I apologize.
13      You know that there are multiple manufacturers
14  of polypropylene mesh used for the treatment of stress
15  urinary incontinence in the United States.
16  A.  I don't have any -- any opinion on this.  How
17  many manufacturers, I don't know.
18  Q.  Do you know of any device -- strike that.
19      Do you know of any polypropylene TVT device --
20  strike that.
21      Do you know of any polypropylene sling used for
22  the treatment of stress urinary incontinence that has a
23  pore size larger than TVT?
24      MR. ANDERSON:  And I'm going to object to the
25  form.

Confidential – Subject to Protective Order

Page 190

1    A.  A sling with a pore size that is larger, I
2  don't have the data, the exact data.
3    Q.  Okay.  You don't know whether any of the
4  meshes, the polypropylene meshes, marketed in the United
5  States for the treatment of stress urinary incontinence
6  have an effective porosity greater than a thousand
7  microns, do you?
8    A.  Though we haven't tested it, I'm sure that, for
9  example, Restorelle, will be much more resistant to the
10  -- to the collapse of pores under tension.  So maybe
11  you're right for the textile effective porosity; but the
12  porosity and the mechanical load, there are others where
13  I would suppose that they have a higher effective
14  porosity.
15    Q.  Doctor, let me direct your attention to Page
16  400 of your deposition on November the 15th, 2013.
17    Line 14, I asked you the question:
18    Do you know whether any mesh used for the
19  treatment of stress urinary incontinence available in
20  the United States has an effective porosity of greater
21  than a thousand microns as measured by the Muhl study,
22  Exhibit 20?
23    Answer:  No, I don't know.
24    Did I read that correctly?
25    A.  You read this correctly.

Page 191

1    Q.  By the way, you know now that Ethicon markets a
2  hernia mesh that you would describe as a small-pore
3  heavyweight mesh, correct?  You know that, a five mill
4  hernia mesh.  Do you know about the five mill hernia
5  mesh?
6    A.  No, I don't have any information about this.
7    Q.  Okay.  So you don't know whether Ethicon today
8  makes a hernia mesh for the repair of hernias that
9  actually has pore sizes smaller than the TVT device.
10    A.  I don't have any information about this.
11    Q.  Okay.  Let me show you what I've marked as
12  Klinge Trial Exhibit 17.
13    MR. ANDERSON:  17?
14    (Klinge Exhibit No. 11 was marked for
15  identification.)
16    Q.  Klinge Trial Exhibit 11.  We talked before,
17  Dr. Klinge, about the forces that a sling would
18  experience after placement for the treatment of stress
19  urinary incontinence.  Do you recall that?
20    A.  Yes.
21    Q.  And I believe you told me that you never
22  specifically measured the forces that are applied to the
23  mesh for the treatment of stress urinary incontinence;
24  true?
25    A.  We didn't do our own measurements.

Page 192

1    Q.  Did you consider the study by Drs. Lin, et al.,
2  that measured exactly the in vivo tension sustained by
3  fascial sling in pubovaginal sling surgery for female
4  stress urinary incontinence?
5    MR. ANDERSON:  Objection to the form of that
6  question.
7    Q.  Have you ever seen this study before?
8    A.  I'm not sure.  I do not remember at the moment.
9    Q.  Down at the conclusions it says, "The fascial
10  sling only sustains minor" -- strike that.
11    In the conclusions the authors state, "The
12  fascial sling only sustains minor tension, which is far
13  less than the maximal load needed to break the fascial
14  strips."
15    Up above they have the results found by the
16  tensioning, and you see they're all less than .05
17  kilograms.  Do you see that?
18    MR. ANDERSON:  Where are you referring to,
19  Counsel?
20    MR. THOMAS:  Under results, mean tension,
21  during the cough in the horizontal position was
22  .046, plus or minus .004, etcetera.
23    Q.  Do you see that?
24    A.  Where --
25    MR. ANDERSON:  He's pointing to these figures.

Page 193

1    A.  Yeah, I see that, uh-hum.
2    Q.  And the findings here are that the pressure
3  that's exerted at a maximum under the test that they
4  applied was .05, correct, kilograms?
5    A.  You read it correctly, yeah.
6    Q.  Okay.  And what these authors were trying to do
7  were trying to figure out what kind of tension would be
8  placed upon the sling once it had been placed in the
9  woman for the treatment of stress urinary incontinence,
10  correct?
11    A.  So far on the first glance I just can see that
12  they are looking for the forces when filling up the
13  bladder.  This is one strain.  Other strain is standing
14  up, coughing, pressing, all these other things.
15    Q.  Well, look at the first page, the first
16  paragraph.  "The in vivo tension sustained by the sling.
17  We designed this study to obtain this information."
18  That's the purpose of the study, correct?
19    A.  You read this correct, but I -- this is a very
20  complex system to measure forces.  It is largely
21  influenced by the way, how you make it, by the -- by the
22  patients, by the conditions around it.  So to analyze
23  this you need some time to discuss the data.  It is not
24  so -- so simple that you can just put a -- a measurement
25  and then you get some figures.

Page 194

1  Q.  Okay.
2  A.  I would need more time to discuss this in
3  detail with all the limitations of the measurements.
4  Q.  Okay.  When you and Professor Muhl designed
5  your test to pull on the mesh to determine the extent to
6  which the pores deformed, the smallest weight that you
7  used was what?
8  A.  One U, a hundred gram.
9  Q.  And that's .1 kilograms, correct?
10  A.  Point one kilo.
11  Q.  Which is twice as much as the maximum force
12  that Dr. Lin found in her study, correct, as being the
13  force that's applied on the sling.
14  A.  In this setting they found lower values, yeah.
15  Q.  Okay.  So and the values that you and Dr. Muhl
16  tested began at a 102 grams and went up.
17  A.  Yeah, but it's -- it's far less below the
18  values that are considered by the people from Ethicon or
19  by Moalli and others.
20  Q.  Okay.
21  A.  So I'm not -- I doubt that you can adopt this
22  study to this -- to the definition of the forces that
23  are applied to a -- to a sling in all conditions.
24  Q.  Are you concluding that now without having read
25  the study?

Page 195

1  A.  No, of course not.
2  Q.  Of course not.
3  MR. ANDERSON:  He's just answering your
4  questions, Dave.
5  Q.  And but the point of the matter is, the lowest
6  value that you and Dr. Muhl tested was 102 grams,
7  correct?
8  A.  That is true.  But the critical thing is not
9  the lowest value, the critical thing is to be resistant
10  to any deformation that may occur because of higher
11  values.
12  Q.  Okay.  Now, you have no idea how this -- when
13  you and Dr. Muhl conducted your testing the results of
14  the tests had you left the mesh -- strike that.
15  You have no idea what the results of the tests
16  would have been had you left the sheath on the mesh and
17  pulled on either end, correct?
18  A.  As the sheath has a -- is cut in the middle, I
19  cannot imagine whether it will change any of the
20  results.  But, just to add it, when we have to analyze
21  just values below one U, that would mean that the
22  PROLENE mesh, the TVT mesh, is much more overengineered
23  that we have been estimating.
24  MR. ANDERSON:  Objection.
25  Q.  Doctor, you have no idea what the results of

Page 196

1  the tests would have been had you left the sheath on the
2  mesh and pulled on either end, correct?
3  A.  I have no idea, but I don't have any suspicion
4  that it will change the results because the sheath is
5  cut in the middle.
6  Q.  Do you under -- strike that.
7  And that's because you think that when the mesh
8  is placed the middle is pulled by the doctor.
9  MR. ANDERSON:  Objection.
10  A.  May I demonstrate?
11  Q.  Sure.
12  A.  If you pull on both sides.
13  Q.  That's how you think it's placed?
14  MR. ANDERSON:  Objection.
15  A.  No; but this happens when you applied some
16  forces.
17  Q.  Okay.
18  A.  Even with the sheath on it.
19  Q.  Okay.  But you've never -- hold both ends of
20  the sheath, please.  You've never taken --
21  A.  This one?
22  Q.  Yes, like that.
23  You've never taken the mesh in the sheath as
24  you hold it in your hand and tested what happens to the
25  mesh when you pull on that sheath, correct?

Page 197

1  A.  Yes, it is correct.
2  Q.  Thank you.
3  A.  I didn't test it.
4  Q.  Now, we talked about Dr. Muhl's testing and
5  your reliance on Dr. Muhl's testing.  Is the FEG
6  DynaMesh the only mesh, to your knowledge, that passes
7  your effective porosity test?
8  MR. ANDERSON:  Objection to form.
9  A.  I don't have any data to -- to say whether
10  other meshes pass this test.
11  Q.  Let me ask this question:  Is DynaMesh the only
12  mesh that you know passes your effective porosity test?
13  MR. ANDERSON:  Objection to form.
14  A.  It is the only mesh that we measured in this
15  publication in comparison to the TVT.
16  Q.  And just so the jury understands, when you
17  tested the PROLENE mesh you tested it at a thousand
18  microns, correct, in all directions?
19  A.  Yes.
20  Q.  When you tested the DynaMesh PVDF you tested it
21  at 600 microns, correct?
22  A.  To explain for the jury --
23  Q.  But answer yes first and then you can explain.
24  MR. ANDERSON:  Don't tell him how to answer.
25  Q.  Okay.  Let me start over again.  You can

Page 198

1  explain all you want to, Doctor.
2      It's true that when you tested the DynaMesh
3  PVDF mesh you tested it at 600 microns as opposed to a
4  thousand microns; true?
5      A.  That is true.
6      Q.  Okay.  Do you know whether if you tested the
7  PROLENE mesh at 975 microns, whether it would pass your
8  effective porosity test?
9      A.  We didn't make the calculation at another
10  diameter of -- the critical diameter for the holes as it
11  is polypropylene.  It would just answer the question
12  what happens if you made the TVT out of PVDF and you
13  would get an answer.  That we didn't do.
14      Q.  Okay.  And so you don't know whether the
15  PROLENE mesh would pass at 975 microns on your test,
16  correct?
17      A.  Yeah, we don't know.  I don't know.
18      Q.  You don't know if it would pass if you did it
19  at 990 microns, correct?
20      A.  That is correct.
21      Q.  Just for the benefit of the jury, can you see a
22  micron?
23      A.  With the help of a microscope, yeah.
24      Q.  Can you see 10 microns?
25      A.  With the help of a microscope, yes.

Page 199

1      Q.  A human hair's, what, about 60, 70, microns
2  thick; is that right?
3      A.  I don't have an opinion about this.
4      Q.  Okay.  And just so the jury understands, under
5  the Muhl test, when you're measuring the effective
6  pores, if you don't get a thousand microns in any one of
7  the directions then that pore size is judged to have
8  zero effective porosity, correct?
9      A.  That's the way it calculates.  But the aim of
10  the procedure is to predict the risk for fibrotic
11  bridging, and therefore it does not depend on a specific
12  number, whether it's one millimeter or 99 or so.  But it
13  reflects the visual impression that you have a collapse
14  of these pores, and it allows you to quantify this
15  effect and to predict the risk for a specific textile.
16      Q.  And at least in January of 2003, it was your
17  opinion the limit for pore size was six to 800 microns,
18  correct?
19      MR. ANDERSON:  What page are you on?
20      Q.  I'm not impeaching him, I'm just asking him a
21  question.
22      MR. ANDERSON:  Okay.  If you're asking him
23  about a deposition I think it's fair to let us know
24  what you're looking at.
25      Q.  Is it fair to understand that a true statement

Page 200

1  of your research as of January, 2003, the state of your
2  research was the limit for the pore size would appear to
3  be six to 800 microns.
4      A.  Do you have any reference for me so that I can
5  really see the context where we presented it?
6      Q.  Can you remember?  I'll be glad to show you the
7  deposition.  I'm not trying to trick you.
8      MR. ANDERSON:  Okay.
9      Q.  It's on Page 241 of your deposition on
10  November the 14th of 2013.
11      A.  I know that --
12      MR. ANDERSON:  Hold on.  Page 241 you said?
13      MR. THOMAS:  That's right.
14      Q.  Read all the way to 242.  I think you need to
15  read the whole thing to get the context.
16      A.  So, please, what was the question for this?
17      Q.  At least in January of 2003, it was your
18  opinion that the limit in pore size was six to 800
19  microns, correct?
20      A.  Well, you have to see this in the context.  As
21  I outlined here in this, it was the process where we had
22  been looking to the critical limits to -- to the holes,
23  whether there is a critical limit.
24      We just had made large holes of three to four
25  to five millimeters.  These are really large pores and

Page 201

1  we wanted to know whether the small pores -- whether
2  there is a critical limit, and we made some experiments,
3  and they are influenced by the setting.  They are
4  influenced whether it was a thinner polypropylene
5  filament, whether it was used within the abdominal
6  cavity or whether it was used within other tissues.  And
7  therefore, in this time period, we got some different
8  values.  We presented, as a result of these studies, the
9  best information we had.
10      But, however, the large pore was the VYPRO and
11  the ULTRAPRO, with three to four millimeter.  That is
12  far away from whether it's 600 microns or 800 microns.
13  And you are right.  This is a small distance.  It is
14  impossible to see the difference.  But the large pores,
15  you are able to see the difference.
16      Q.  You don't have a study where you analyzed
17  tissue reactions in animals, or humans, that shows you
18  that pore size over 1,000 microns creates scar plates --
19  excuse me -- creates scar net and pore size under a
20  thousand microns creates scar plate.  You don't have
21  that kind of study, do you?
22      A.  This is not the result of an estimate, this is
23  the result of studies.  These are our experimental data
24  we have at that time.  We looked to hundreds of
25  stainings and -- and measured the distance between the

Page 202

1  fibers and are looking where are some distances where we
2  have some filament. And these are the good distances,
3  and these give the information, the estimate that we
4  said, okay, we need a pore size of at least 800 microns
5  to avoid this bridging by scar. These are experimental
6  data, but we made it in several different tissues.
7     Q. Doctor, can you point to me any publication
8  upon which you rely to support your position in the
9  testing that you've done with Dr. Muhl that 1,001
10  microns in all directions is good mesh and 999 microns
11  in all directions is bad mesh?
12     A. If you want to stick on the number, a thousand
13  microns, recently you showed the publication from Weyhe
14  showing that the large pores is the main point that
15  influences the quality of tissue integration. That's
16  the point.
17     Q. I understand.
18     A. Not pores. And the risk for bridging is higher
19  the smaller the pores and it's lower the larger the
20  pores. And it is ridiculous to fix it to 1,000 and
21  believe that 1,001 is completely different and 999 is
22  completely different as well. This would mislead the --
23  the goal for these measurements. We are not able to
24  make this clearcut and say below one millimeter is good
25  and the other is bad.

Page 203

1     Q. Okay. Isn't that exactly what you've done with
2  the opinions that you've given here about saying that
3  Ethicon's PROLENE mesh has zero effective porosity,
4  therefore, it must be a risk to these patients?
5     A. It objectifies that the pores -- that the holes
6  are small, that the holes even become smaller below this
7  limit of one millimeter when applied some tension to it.
8  And these are facts that increases the risks, in
9  comparison to other meshes that have a hole size that is
10  much bigger. This is confirmed by all our histological
11  studies because we could see that there is scar in the
12  holes and no fat.
13     Q. If we go back to the Muhl study on P8342, do
14  you have that? I can give you my copy if it helps you.
15     A. This is the report from Muhl. You mean the
16  report or the publication?
17     Q. No, I want the report.
18        First of all, go to Page 8. Page 8 shows --
19  you went over those images on direct showing the amount
20  of force there. The lowest force you did was 102 grams.
21  You didn't do anything less than 102 grams, correct?
22     A. That's correct.
23     Q. Now, it's true that upon the initial tensioning
24  that the TVT device did have effective porosity because
25  the tensioning expanded the pores, correct, on Page 4?

Page 204

1  You see Page 4, the last bullet point?
2     A. Yes, I see it.
3     Q. And so you don't know what the tensioning would
4  have been at 50 grams as measured by Dr. Lin, do you?
5  You don't know what the effective porosity would have
6  been there.
7     A. We didn't measure it.
8     Q. Okay. And you don't know whether it's more
9  than 13.9 percent effective porosity, correct?
10     A. I didn't get the question.
11     Q. You don't know whether it's more than 13.9
12  effective porosity.
13     A. As I said, we didn't measure it.
14     Q. Okay. And at least --
15     A. But to -- to make it clear, effective porosity
16  of 13, 14 percent indicates that 86 percent of the area
17  is covered by scar. That's what the figure is meaning.
18     Q. That's what it represents, but there's no
19  scientific proof to say that that mesh as configured is
20  going to have 86 percent covered by scar. There's no
21  scientific data to support that because the thousand
22  figure is an approximation that you made not on any
23  scientific data; true?
24        MR. ANDERSON: Objection.
25     A. That's not true. A thousand -- these are the

Page 205

1  results of the experimental data, and up to now I didn't
2  find any other experimental data, and this is the limit
3  that is acknowledged by Ethicon people as well that is
4  not disputed. There is no one in the world saying that
5  the bridging does not occur or that it is suitable or
6  it's safer to have smaller pores, no.
7        (Klinge Exhibit No. 12 was marked for
8  identification.)
9     Q. You have in Klinge 12, which is the New
10  Objective Measurement in your 2007 article when you
11  first reported this new testing technique, one of the
12  meshes you tested was TiMesh, correct?
13     A. Yes.
14     Q. And you found that TiMesh had zero percent
15  effective porosity, didn't it, Doctor? Correct?
16     A. That was found here, yeah.
17     Q. That's the result of your tests, correct?
18     A. Yes.
19     Q. In another publication you analyzed TiMesh and
20  you found that it had good biocompatibility, didn't you,
21  in the 2004 study? Do you remember that?
22     A. Which study do you mean, in which context, in
23  which model, for which parameter? Good biocompatibility
24  means so many things.
25     Q. Okay. I need a Julie.

Page 206

1    I'll withdraw that question.
2    MR. ANDERSON:  He said I'll withdraw the
3  question.
4    MR. THOMAS:  What number are we?
5    MR. ANDERSON:  I think we're at 13 now.
6    (Klinge Exhibit No. 13 was marked for
7  identification.)
8    Q.  Now, Doctor, I'll hand you what's been marked
9  as Klinge 13.  Klinge 13 is a mesh classification that
10  you and Dr. Klosterhalfen proposed in 2011, correct?
11    A.  That is correct.
12    Q.  And Exhibit No. 13, on Page 253, you identify
13  Class I large-pore meshes, correct?
14    A.  You mean this paragraph here?
15    Q.  I'm on Page 253, in the classification.
16    A.  253.
17    Q.  There you go.  You see where it says large-pore
18  meshes is Class I?
19    A.  Yes.
20    Q.  Characterized by a textile porosity of greater
21  than 60 percent.
22    Now, you know from your table on Page 255 that
23  PROLENE has a textile porosity of 56 percent, correct?
24    A.  I assume, yeah.
25    Q.  It's on Page 255.  It says, PROLENE textile

Page 207

1  porosity, 56 percent.  Do you see that?
2    A.  Yeah, 56 percent.
3    Q.  And if you had measured 60 percent it would
4  have passed your test, correct, into a Class I
5  large-pore mesh, correct?
6    A.  Maybe this -- this will be one solution to
7  this.
8    Q.  Okay.  And then it says that if you have an
9  effective porosity of greater than zero percent you also
10  classify -- qualify as a Class I mesh, correct?
11    A.  In this proposal we -- we wrote this, yes.
12    Q.  Okay.  Well, we just decided that when
13  Professor Muhl attaches a hundred grams of tension to
14  the PROLENE mesh it has an effective porosity of greater
15  than zero percent, correct?
16    A.  Please, again.
17    Q.  We just decided that when Professor Muhl
18  attaches a hundred grams of tension to the PROLENE mesh
19  it has an effective porosity of greater than zero
20  percent, correct?
21    A.  Yes.
22    Q.  So under your classification in 2011, PROLENE,
23  if it has an effective porosity of zero, greater than
24  zero percent, qualifies as a Class I mesh, correct?
25    A.  This classification that we proposed is not

Page 208

1  applicable for meshes used in the pelvic floor.
2    Q.  Okay.
3    A.  Because they -- yeah.
4    Q.  Thank you.
5    Is this only for hernia repair?
6    A.  It is for meshes in a tension-free condition.
7    Q.  Okay.
8    A.  It does not consider the application of tensile
9  forces.
10    Q.  All right.  So if the mesh is placed in a
11  tension-free condition, these rules apply.
12    A.  This will -- this is in -- in accordance to the
13  data.
14    Q.  You recognize in that study, by the way, that
15  any definition of large or small-pore meshes is
16  arbitrary and influenced by test conditions.  Do you
17  agree with that?
18    A.  I totally agree that to find the specific value
19  it is depending from the setting.  It does not depend
20  from the setting the -- the major finding that the
21  larger, the safer.
22    Q.  Dr. Klinge, when you conducted your tests with
23  Dr. Muhl in 2007 on the effective porosity and measuring
24  effective porosity, one of the things that you -- one of
25  the meshes that you measured was a TiMesh Light,

Page 209

1  correct?
2    A.  Yes.
3    Q.  And you determined in 2007 that TiMesh Light
4  had zero effective porosity, correct?
5    A.  That's what we measured.
6    (Klinge Exhibit No. 14 was marked for
7  identification.)
8    Q.  Let me show you what I've had marked as Klinge
9  Trial Exhibit 14.  Klinge Trial Exhibit 14 is an article
10  prepared by Dr. Junge, and others, including yourself in
11  2004, analyzing the addition of titanium to a
12  polypropylene mesh for hernia repair, effect on
13  biocompatibility.  This is the same mesh that you
14  analyzed in 2004 that is the subject of the measuring
15  that you did in 2007, correct?
16    A.  There are so many modifications of the TiMesh,
17  I have to verify lightweight -- yeah, it seems to be the
18  same, similar.
19    Q.  The same mesh.
20    And if you go to the last page, when you're
21  analyzing the biocompatibility of adding titanium
22  coating to the polypropylene mesh, you looked at the
23  histology of the animal studies that you did, correct?
24    A.  Yes.
25    Q.  And you conclude, on Page 118, the last

Page 210

1  paragraph, "To summarize, both mesh modifications
2  investigated showed an overall acceptable
3  biocompatibility, as known from previous studies for low
4  weight, large porous, and monofilamentous mesh
5  structures." Was that your conclusion?
6      A.   The conclusion of this is when you made this
7  weight reduction to 35 grams, when you reduce the thread
8  size to 80 microns instead of 160 of the PROLENE, and if
9  you add some titanium coating to the surface, then you
10 get excellent results.  And this obviously is not
11 reflected by the value of the effective porosity.  So it
12 may or it is likely that if you use this mesh instead of
13 the PROLENE mesh you have better results, you have less
14 risks.
15     Q.   But you don't know until you test that,
16 correct?
17     A.   You have to test it in many different settings.
18 In particular, you have to look to the tissues.  But,
19 again, this is a confirmation that material reduction,
20 thinner threads, maybe a coating of the surface, this
21 helps to improve the tissue integration.
22     Q.   So at least for TiMesh, it failed your
23 effective porosity test but passed your biocompatibility
24 test, correct?
25     A.   I cannot say which is a biocompatibility test.

Page 211

1  It is like I wanted to express, that you have a better
2  tissue reaction when reducing the amount of the
3  material, when you reduce the size of the thread and
4  when you add some coating to make it more heterophobic,
5  then you can improve the tissue reaction, yes.  And
6  obviously this is not reflected by the measurement of
7  the effective porosity.
8      Q.   Now, in your career you implanted mesh for
9  hernias about 300 times?  Does that sound about right?
10     A.   That's possible.
11     Q.   And when you use mesh for the treatment of
12 hernias you usually have to trim the mesh, correct?
13     A.   That is correct.
14     Q.   And you trim the mesh with scissors, right?
15     A.   Yes.
16     Q.   And when you trim the mesh there are particles
17 that come off of the mesh, correct?
18     A.   We try to trim the mesh out of the -- of the
19 wound on the OR table so that we can avoid that the
20 particles are coming into the wound.
21     Q.   For the millions of hernia surgeries conducted
22 each year using mesh you would expect those hernia
23 surgeries to involve the trimming of the mesh in some
24 way, correct?
25     A.   I don't understand what do you mean by

Page 212

1  "involve"?
2      Q.   For nearly every hernia surgery that surgeons
3  conduct for the millions every year, there's going to be
4  some trimming of the mesh involved, correct?
5      A.   Some of the meshes will be trimmed by the
6  surgeons, yes.
7      Q.   And in 20 years of mesh research you've never
8  studied the clinical effects of particle loss from mesh,
9  correct?
10     A.   We studied the relevance of surface to the
11 foreign body reaction.  We did it.  There is no clinical
12 study comparing the amount of particles released during
13 a procedure in relation to the outcome in so far I know.
14     Q.   Doctor, in 20 years of mesh research you've
15 never studied the clinical effects of particle loss from
16 mesh; true?
17     A.   I studied the clinical relevance of an
18 increased surface for a foreign body reaction to the
19 scarring, to the inflammation, yes.  But I don't see any
20 way to make a clinical study with sufficient power, with
21 sufficient sensitivity, to come to a result to -- to
22 identify the -- the change in the outcome just by
23 particle in the field of hernia.  Because in the field
24 of hernia the particles that are released by trimming is
25 in relation to the surgical trauma and in relation to

Page 213

1  the mesh area, complete mesh area.  It's very, very, a
2  small share.
3      Q.   You've never made a systemic analysis to mesh
4  the extent to which Ethicon mesh is used in the
5  treatment of SUI shed particles in the human body, have
6  you?
7      A.   I don't know what do you mean by systematic
8  analysis.
9      Q.   No quantitative analysis.  You've never made a
10 quantitative analysis of the extent to which the Ethicon
11 mesh used in the treatment of stress urinary
12 incontinence sheds particles in vivo.
13     A.   I rely on --
14          MR. ANDERSON:  Objection.
15     A.   -- information from the Ethicon guys about the
16 particle loss.
17     Q.   Can you answer my question, please?
18          You've not made a quantitative analysis to
19 measure the extent to which the Ethicon mesh used in the
20 treatment of stress urinary incontinence shed particles
21 in vivo.  Is that fair?
22          MR. ANDERSON:  Objection; asked and answered.
23     A.   That is true, we didn't make such a study.
24     Q.   Okay.  And when you say you relied upon the
25 Ethicon folks about particle loss, you referred to

Page 214

1 Plaintiff's 1757. Do you have that in front of you?
2 Can you bring that up, please?
3      MR. BODYZIAK: What is it?
4      MR. THOMAS: 1757.
5      MR. BODYZIAK: Sure.
6    Q.   And if you'll bring up the summary and blow up
7 the summary for the jury.
8      Doctor, if you'll read along with me, this
9 talks about particle release characteristics of clear
10 and 50 percent blue PROLENE mesh were evaluated.
11 Samples were weighed before and after being subject to
12 -- subjected to 50-percent elongation, paren, most
13 likely well beyond conditions achieved in vivo.
14      And that's where that data comes from, doesn't
15 it, from an artificial elongation of the mesh up to 50
16 percent of its length; true?
17      MR. ANDERSON: Objection to the form of the
18   question.
19    A.   It is coming from this experiment and it
20 assumes the 50-percent elongation that is assumed by
21 other colleagues from Ethicon, yeah.
22    Q.   Okay. This -- the test was to look at
23 50-percent elongation. You don't -- it's not elongated
24 50 percent when it's implanted in the human body, is it?
25    A.   I remember there has been documents, internal

Page 215

1 Ethicon documents, where it was suggested that you have
2 a maximum 50-percent elongation. So that is -- I don't
3 have any own experiences how often this will happen.
4    Q.   Okay. Do you have any idea whether -- strike
5 that.
6    A.   I even don't know whether it's necessary to
7 make this experiment at an elongation or whether even at
8 a lower elongation of 25 percent you have similar
9 experience. I don't know.
10    Q.   You don't know.
11    A.   I don't know.
12    Q.   The only document you have on which you rely on
13 for the amount of particles that come from Ethicon mesh
14 is Plaintiff's 1757 where they measure particle loss
15 characteristic at 50-percent elongation. Is that true?
16    A.   This is one of the documents.
17    Q.   Do you have any others you can tell me about?
18    A.   I don't remember precisely, but there has been
19 studies before where they compare various materials in
20 regard to the particle loss.
21    Q.   Do you know whether the company ever made a
22 presentation on particle loss between machine cut and
23 laser-cut mesh? Did you ever see that as a part of your
24 work in this case?
25      MR. ANDERSON: Objection to the form.

Page 216

1    A.   I don't remember in the moment.
2    Q.   Okay. You'd like to have all the information
3 available to you in order to reach a judgment as to what
4 the particle loss may have been, wouldn't you?
5      MR. ANDERSON: Objection to the form.
6    Q.   Can you answer the question?
7    A.   Sure, I want to have every -- every type of
8 information that is relevant for making an opinion.
9    Q.   Okay. And you talked about minutes of a 2001
10 meeting from -- from Dr. Wang, and I don't have the
11 exhibit number because you didn't give it to me. It's a
12 June 21, 2001, memo. Do you know which number that was,
13 Ben, by any chance?
14      MR. BODYZIAK: 8030.
15      MR. THOMAS: 8030.
16      MR. BODYZIAK: P8030.
17    Q.   Would you bring it up, please?
18      Mr. Anderson showed you the second bullet
19 point, "Fraying is inherent in the product based on mesh
20 construction. When any amount of tension is applied to
21 the mesh, fraying occurs."
22    A.   I remember.
23    Q.   Okay. You've not done your own tests to
24 determine the extent to which the mesh sheds particles
25 at different weights, correct?

Page 217

1    A.   That is correct, I didn't make these studies.
2    Q.   And looking at Plaintiff's 3045, which is the
3 June 21, 2013, exhibit. Can you bring that up, please?
4      MR. BODYZIAK: Yes, sir.
5    Q.   This is the Maslow request who sends a photo
6 that says, "Can you suggest any comments on the attached
7 photo?" And the last page shows the photo. Would you
8 show the photo, please?
9      There's nothing in this letter that gives you
10 any indication about what happened to this mesh before
11 it ended up in this photograph, is there? You don't
12 know how it got there, in that condition.
13    A.   There is no further information than is on the
14 paper.
15    Q.   But the only information about the mesh is the
16 photograph, correct? There's nothing describing what
17 happened to it in the document, is there?
18    A.   I don't have any further information.
19    Q.   Wouldn't you want to know what happened to the
20 mesh before you'd reach any conclusions about what you
21 see in the photograph?
22    A.   The conclusions we had is the unsafe border.
23 It is not only based on this -- on this image, but this
24 image is a confirmation, and it is the confirmation in
25 2013. So it is not relevant to the safety maybe in 2000

Page 218

1 and the roping and the curling seen by Moalli and seen
2 by Muhl in his testing. So it's just another
3 confirmation of it.
4     Q.   Okay.
5     A.   If you have another explanation, maybe I will
6 be happy if you can share this information to me.
7     Q.   The only person that knows is Dr. Maslow,
8 correct?
9     A.   What?
10     Q.   Dr. Maslow is the person who knows because he
11 sent the photograph, correct?
12     A.   Yes.
13     Q.   Okay. Now, you've talked about Dr. Moalli
14 several times using the same kind of testing that you
15 did. Dr. Moalli did not remove the sheath -- excuse me
16 -- Dr. Moalli removed the -- strike that.
17         We've talked today several times about
18 Dr. Moalli and testing they conducted in Pittsburgh on
19 the uniaxial loading of the TVT device. Dr. Moalli
20 removed the sheath before they conducted their testing
21 as well, didn't they?
22     A.   I think so, yes.
23     Q.   You're not aware of any literature showing that
24 fraying of TVT mesh leads to clinically significant
25 results in patients who receive the mesh for the

Page 219

1 treatment of stress urinary incontinence; true?
2     A.   I don't know of any study focusing on fraying
3 or not fraying or closed borders versus non-closed
4 borders, comparing these two materials, in a clinical
5 trial.
6     Q.   Okay.
7     A.   All our preclinical studies, they confirmed
8 that open borders are a danger and a risk.
9         MR. THOMAS:  Move to strike everything after
10 "clinical trial".
11         MR. ANDERSON:  You asked him are you aware of
12 any literature, any clinical results.
13     Q.   Clinical results.
14     Doctor, is it true you're not aware of any
15 clinical studies showing that fraying of TVT mesh leads
16 to clinically significant results in patients who
17 receive the mesh for treatment of stress urinary
18 incontinence; true?
19     A.   I don't know of any clinical studies with
20 sufficient power.
21     Q.   Okay. And you know of no study that discusses
22 the risk of particle loss in vivo from Ethicon mesh for
23 the treatment of stress urinary incontinence; true?
24     A.   I'm aware of many literature all confirming
25 that increased surface means a risk for the patient and

Page 220

1 for the tissue reaction.
2     Q.   But, Doctor, it's fair to say you're aware of
3 no clinical study that specifically discusses the risks
4 associated with particle loss in vivo from Ethicon mesh
5 for the treatment of stress urinary incontinence; true?
6     A.   Clinical studies comparing mesh without
7 particle loss and with particle loss and looking to the
8 outcome, whether there is a difference between them, I
9 don't know any study and I don't believe that it is
10 feasible to make it with a sufficient power, with
11 sufficient patients to find it out, in a clinical
12 setting.
13     Q.   It's true that you don't have any clinical data
14 to link what you understand to be fraying, particle
15 loss, machine-cut mesh, laser-cut mesh, curling and
16 roping, in any clinically significant measure; true?
17     A.   Clinical in the specific way that you mean
18 clinical study comparing two different materials, that
19 is true. If you accept clinical data as for the general
20 principle that increased surface means increased risk,
21 that is not true.
22     Q.   Okay. Let me go to Page 412 of your deposition
23 on November 15th, 2013.
24         Question, on Line 1:  Is the same thing true
25 for each of these categories that you have in Heading G

Page 221

1 of Page 43 of Exhibit 11? Do you have any clinical data
2 to link what you understand to be these conditions,
3 being fraying, particle loss, machine-cut mesh, laser-
4 cut mesh, curling and roping to any clinical --
5 clinically significant condition?
6         Answer:  No, unfortunately I did not find any
7 study dealing with these problems.
8         Did I read that correctly?
9         MR. ANDERSON:  Objection; asked and answered;
10 improper impeachment.
11     Q.   Did I read that correctly?
12     A.   You read that correctly, but it depends on the
13 definition of clinical study.
14     Q.   Doctor, it's true that there's no optimal pore
15 size for mesh in the pelvic floor, correct?
16     A.   There is no specific volume that can be said if
17 you have this volume this is optimum and you don't have
18 -- all the other problems are gone as well. In this --
19 in this meaning, in this context, this is true that you
20 cannot give a guarantee, guaranteeing figure.
21     Q.   Because every textile -- strike that.
22         Because every textile construction is a
23 compromise, correct?
24         MR. ANDERSON:  Objection to the form.
25     A.   Yes. You can -- you can name it as a -- as a

## Page 222

1 compromise, whatever this means.

2     Q.  It has to be a compromise and you have to

3 compare the risks between different constructions or

4 possibilities of constructions when you're designing a

5 mesh, correct?

6     MR. ANDERSON:  Objection to form.

7     A.  Definitely that is correct, you have to

8 identify the risks.

9     Q.  And the kind of studies you need to address the

10 risk include preclinical studies, functional testing and

11 appropriate textile characteristics, correct?

12     A.  These are three types of studies which you

13 need, yeah.

14     Q.  And it's fair to say you can't go through each

15 of the characteristics of a mesh and say this is the

16 precise way, this is the precise pore and this is the

17 precise polymer you need for a mesh for the treatment of

18 stress urinary incontinence; true?

19     A.  You can indicate for each of the features which

20 are the low-risk characteristic, which are the low-risk

21 properties.  But you cannot reduce it to one parameter

22 and ignore all the others.  That is not suitable.

23     Q.  And you can't do it until you test them and

24 know how well the mesh works in vivo, correct?

25     A.  Yes.

## Page 223

1     MR. ANDERSON:  Just a second.  We're ready for

2 a break, Dave.  Are you about --

3     MR. THOMAS:  I'm just trying to get done.  You

4 can go ahead and take a break.  It will help me get

5 organized.  I'm sorry.

6     THE VIDEOGRAPHER:  We are off the record.  The

7 time is 4:05 p.m.

8     (Recess from 4:05 until 4:16 p.m.)

9     THE VIDEOGRAPHER:  This marks the beginning of

10 Video No. 4.  We are back on the record.  The time

11 is 4:16 p.m.

12 BY MR. THOMAS:

13     Q.  Doctor, you have conducted no studies of the

14 PVDF mesh in the human body for hernia repair, correct?

15     A.  We did a lot of studies investigating PVDF that

16 is used for hernia repair in humans, yes.

17     Q.  But you conducted no studies in humans with

18 PVDF mesh for hernia repair, correct?

19     A.  I did not make a clinical study looking to the

20 results after using a PVDF mesh.

21     MR. ANDERSON:  Just to correct the record, you

22 said we did a lot of studies, not a little studies,

23 right?  We did a lot of studies.

24     THE WITNESS:  A lot of studies in the previous

25 sentence.

## Page 224

1     THE COURT REPORTER:  Thank you.

2     MR. ANDERSON:  Thank you.

3     Q.  And, to your knowledge, there's only one mesh

4 manufacturer in the world that makes mesh made of PVDF

5 for the treatment of stress urinary incontinence,

6 correct?

7     A.  So far I know in the moment.  But it is --

8 well, in fact, I don't know if there is -- meanwhile

9 there is another manufacturer of -- I recently heard

10 that from Eastern Europe there is someone coming up with

11 PVDF meshes as well, but I don't have any other

12 information.

13     Q.  To your knowledge there's only one mesh

14 manufacturer in the world that sells mesh made of PVDF

15 for the treatment of stress urinary incontinence.

16     A.  That is my knowledge.

17     Q.  And that's FEG, who's here in Aachen.

18     A.  Yes.

19     Q.  And you've worked with FEG since 1994, correct?

20     A.  I bought?  I worked.

21     Q.  Yes.

22     A.  Since 1993.

23     Q.  Okay.  And FEG still uses polypropylene in some

24 of its products; true?

25     A.  Yes.

## Page 225

1     Q.  And you have not told them to stop using

2 polypropylene in their products.

3     A.  I am telling since 20 years the -- that PVDF is

4 the best material.

5     Q.  You have not told them to stop using

6 polypropylene; true?

7     A.  I'm not in a position to tell them what to do

8 and what not to do.

9     Q.  Have you told them to stop?

10     A.  As I said to you, I told them, as I told

11 Ethicon, as I told all the participants at the

12 conferences, that PVDF is the better material and isn't

13 higher risk.  I didn't advise the FEG to stop selling

14 polypropylene because this is not my responsibility to

15 -- to give this advice to a manufacturer.

16     MR. ANDERSON:  Can I just correct something?

17 Did you say that PVDF is a better material?  Did you

18 say it's a higher risk?

19     THE WITNESS:  No.

20     MR. ANDERSON:  Okay.

21 BY MR. THOMAS:

22     Q.  You helped FEG develop its PVDF mesh, correct?

23     A.  Yes, that is correct.

24     Q.  And FEG has a patent on that mesh, correct?

25     A.  As Ethicon, the FEG as well has a patent on it,

## Page 226

1  and I am named there as a contributor to this invention.
2  Q.  Okay.  DynaMesh PVDF is heavier than
3  polypropylene, isn't it?
4  A.  It is heavier because of the higher density of
5  the PVDF in comparison to polypropylene, and therefore
6  you cannot take the weight as an indicator of the amount
7  of the material.  It's just a specific problem of the
8  chemistry.
9  Q.  But it's two times heavier, isn't it?
10  A.  Yes.
11  Q.  And TVT and DynaMesh PVDF have about the same
12  textile porosity, don't they?
13  A.  Textile porosity, I believe it is in a similar
14  range, but it's not relevant.
15  Q.  Okay.  And PVDF is more difficult to handle
16  than polypropylene mesh, correct?
17  A.  Difficulty of handling depends on the skills of
18  the man working at the machine.
19  Q.  And PVDF is more expensive than PROLENE
20  polypropylene, correct?
21  A.  That is -- obviously is correct.
22  Q.  And you don't know whether there are any
23  studies on whether PVDF sheds particles, do you?
24  A.  I don't know any particles or I don't know of
25  any specific particles for the particle loss, but I

## Page 227

1  would assume that every hosiery or textile that is
2  constructed on a knitting machine, when trimming it you
3  will have some open ends and you will have some sort of
4  particle loss.  It is unavoidable.  But you can reduce
5  it markedly if you have closed borders.
6  Q.  You don't know whether there are any studies on
7  PVF -- strike that.
8      You don't know whether there are any studies on
9  whether PVDF sheds particles; true?
10  A.  I don't know any specific study looking for
11  particle loss of the PVDF structures.
12  Q.  And you don't know the tearing forces in the
13  two directions of the PVDF; true?
14  A.  The tearing forces in two directions is -- is a
15  very difficult issue, because it is hardly -- it largely
16  depends on the setting of the experimental settings to
17  make the measurement of the forces in two direction.
18  Q.  But you don't have any data on the subsequent
19  tearing force in the two directions; true?
20  A.  I don't know them in the moment, yeah.
21  Q.  Okay.  And you don't know the stretching
22  profile at different loads, correct?
23  A.  Stretching profile, if you are looking at the
24  stretchability at certain load, you can take the data
25  from Muhl's testing where he measured the elongation of

## Page 228

1  the mesh, of the DynaMesh sling, at various mechanical
2  forces.  There you will find the data for this.
3  Q.  But today, sitting here, you don't know the
4  stretching profile of this device at various loads;
5  true?
6  A.  I'd have to look to the data.  I believe that
7  the elongation at a certain strain is -- is
8  comparatively low.  But we'd have to look to the data.
9  Q.  As a matter of fact, you didn't make a specific
10  study to evaluate the use of the DynaMesh sling, did
11  you?
12      MR. ANDERSON:  Objection to form.
13  A.  Again, it depends of your definition, what do
14  you mean by study.  Study in patients?  No, I didn't do
15  it.
16      MR. THOMAS:  What number are we, 15?
17      MR. ANDERSON:  Yeah.
18      (Klinge Exhibit No. 15 was marked for
19  identification.)
20  Q.  Dr. Klinge, I want to hand you what's been
21  marked as Klinge 15.  Klinge 15 is the long-term --
22  Comparison of Long-Term Biocompatibility of PVDF and
23  Polypropylene Meshes.  Do you have that?
24  A.  I have it.
25  Q.  And you're one of the authors on this study?

## Page 229

1  A.  Yes.
2  Q.  And this is published in 2011, correct?
3  A.  This is correct.
4  Q.  And in this study you're looking at and
5  analyzing the differences between the biocompatibility
6  between polypropylene and PVDF, correct?
7  A.  That is correct.
8  Q.  Go to Page 297, please.  297, the last
9  paragraph on the right side, says "Although there are
10  many experimental studies dealing with the analysis of
11  tissue reaction for polypropylene and PVDF meshes, so
12  far there are no long-term results of PVDF meshes
13  available and that's important to understand how the
14  mesh performs over time"; is that correct?
15  A.  It is correct that there are no long-term
16  results on PVDF meshes if you're thinking of outcome
17  studies for five years, 10 years.
18  Q.  "Our study shows an excellent biocompatibility
19  of PVDF not only in the short run.  To conclude, PVDF
20  shows low inflammation parameters and mature scar
21  preparation" -- excuse me.
22      "To conclude, PVDF shows low inflammation
23  parameters and mature scar formation after six months.
24  The present data clearly show that PVDF is a possible
25  alternative to polypropylene, despite an increased

Page 230

1 effective surface area of the PVDF samples."
2      So in 2011 you're recognizing PVDF as a
3 possible alternative to polypropylene, correct?
4      A.   That is correct.
5      Q.   And then you're going down and you say, "Rodent
6 model have their natural limitations and results cannot
7 be translated directly to the human situation.  In
8 particular, the animals cannot reflect any underlying
9 human disease or comorbidity.  Therefore, clinical
10 studies have to be performed to confirm the long-term
11 biocompatibility of the PVDF meshes."  That's what you
12 wrote.
13      A.   You read it correctly.
14      Q.   And the purpose of that is so that any
15 manufacturer or doctor has a track record of actual use
16 of the mesh in humans before they make a judgment either
17 to manufacture or prescribe that for their patients;
18 true?
19      A.   I don't understand the question.
20      Q.   The purpose of long-term data is to make sure
21 that it's safe and effective in the patient, correct?
22      A.   Yes.
23      Q.   And you recognize, in 2011, that you do not
24 have any long-term data in order to evaluate whether
25 PVDF meshes are safe and effective in humans, correct?

Page 231

1      A.   Yeah.
2      Q.   Now, Doctor, in recommending PVDF you're
3 recommending a mesh that is not lightweight, correct?
4      A.   It is lightweight.
5      Q.   And it's not large pore either, is it?
6      A.   It is large pore.
7      Q.   It's not -- is it one millimeter in all
8 directions?
9      A.   It is not necessary for PVDF to have this
10 amount.  When we placed it into tissues and looked we
11 saw fat tissue in the pores.  This is the critical point
12 to this.
13      So the foreign body reaction to PVDF is
14 attenuated in comparison to polypropylene.  Therefore,
15 you are able to have more options in the textile
16 constructions.  However, a polypropylene mesh like
17 TiMesh may have almost similar results.
18      Q.   But, Doctor, just to be fair, it's not 1,000
19 millimeters in all directions, correct?
20      A.   Maybe it is not a thousand microns in all
21 directions, but we didn't measure it.
22      Q.   You don't know how large the pore size is, do
23 you?
24      A.   As we measured it.
25      (Klinge Exhibit No. 16 was marked for

Page 232

1 identification.)
2      Q.   Let me show you what I've had marked as Klinge
3 Trial Exhibit 16.  Klinge Trial Exhibit No. 16 is a
4 study published in Hernia, in 2013, that says DynaMesh
5 in the Repair of Laparoscopic Ventral Hernia, a
6 Prospective Trial, where they look over a five-year
7 period, 181 patients who went -- underwent ventral
8 hernia repair using DynaMesh, and that's a PVDF mesh,
9 correct?
10      A.   Yes.
11      Q.   And folks conducting this study conducted
12 telephone interviews estimating post-operative pain and
13 patient satisfaction, correct?
14      A.   Yes, you read it correctly.
15      Q.   And if you go to the second page you see in box
16 one the results that they got on follow-up in the
17 telephone questionnaire.  Do you see that?
18      A.   Yes.
19      Q.   And of the -- of the patients who responded,
20 16 percent reported mild pain, correct?
21      A.   So it is written in the table.
22      Q.   And 16 percent reported moderate pain, correct?
23      A.   That is correct.
24      Q.   And three percent reported severe pain,
25 correct?

Page 233

1      A.   So it's written in the box.
2      Q.   So 19 percent of the people reported severe or
3 moderate pain after receiving a PVDF mesh for the
4 treatment of their hernia, correct?
5      A.   That's how it's written in the study.
6      Q.   And if you include the mild pain it's 35
7 percent of the people who received the PVDF mesh for
8 their hernia repair had some kind of pain that they
9 reported, correct?
10      A.   So it's written in this study.  But you have to
11 consider that it is a completely different setting.  So
12 when using a mesh in a laparoscopic incisional hernia
13 repair, you are forced to make a lot of fixations, and a
14 lot of fixation means a lot of pain to the patient.  So
15 there are a lot of confounders that are influencing the
16 result as well.
17      Q.   And this follow-up, the median follow-up is
18 34 months, with a range of 12 to 63 months, correct?
19 First page down at the bottom left.
20      A.   Yeah.
21      Q.   Okay.  And that's the time frame in which those
22 reports of pain are reported, correct?
23      A.   Yes.
24      Q.   Going back to Deposition Trial Exhibit No. 1,
25 this is the Safety Considerations For Synthetic Sling

Confidential - Subject to Protective Order

| Page 234 | Page 236 |
|---|---|
| 1 Surgery. This is the report by Dr. Blaivas, and others,<br>2 plaintiffs in this litigation, who reported on the<br>3 complications of retropubic slings, correct? Remember<br>4 that?<br>5    A. I remember.<br>6    Q. And these experts collected a series of studies<br>7 and report only 1.8 percent of long-term pain, correct?<br>8    A. That is correct.<br>9    MR. THOMAS: Let's go off the record for a<br>10 second, please.<br>11    THE VIDEOGRAPHER: We are off the record. The<br>12 time is 4:36 p.m.<br>13    (Recess from 4:36 until 4:37 p.m.)<br>14    THE VIDEOGRAPHER: We are back on the record.<br>15 The time is 4:37 p.m.<br>16 BY MR. THOMAS:<br>17    Q. Now, Doctor, you've been a paid consultant for<br>18 FEG since about 1988 or 1989?<br>19    A. No, I'm a paid consultant just from 2006, I<br>20 believe, 2005 maybe.<br>21    Q. So for the last 10 years you've been a paid<br>22 consultant for FEG?<br>23    A. Yeah, after -- after the consulting activities<br>24 with Ethicon stopped.<br>25    Q. Okay. And just so the record's clear, you | 1 year, correct?<br>2    A. Yes.<br>3    Q. You don't have a contract with them.<br>4    A. I don't have a formal contract, yeah.<br>5    Q. And the amount FEG pays you depends on how well<br>6 the company does that year; true?<br>7    A. That's true.<br>8    Q. And you've spoken at conferences sponsored<br>9 solely by FEG, correct?<br>10    A. As I indicated this morning, in some occasions<br>11 I talked on conferences that are on behalf of the FEG.<br>12    Q. And the distributor of PVDF often reimburses<br>13 your expenses to attend events, correct?<br>14    A. No, they don't often make it. I was -- there<br>15 has been two or three occasions where I was invited by<br>16 the distributor, and not by the FEG, where they took<br>17 over the expenses for the traveling. And overall, in<br>18 the last 10 years, two times or three times I got some<br>19 sort of royalty, but most of the time this is not the<br>20 case.<br>21    Q. When did FEG first sell its PVDF mesh?<br>22    A. I don't know exactly. I would estimate 2005<br>23 maybe.<br>24    Q. And about the same time that you retired from<br>25 surgery? |
| **Page 235** | **Page 237** |
| 1 receive royalties from Ethicon for VYPRO I, VYPRO II and<br>2 ULTRAPRO, correct?<br>3    A. That is correct.<br>4    Q. And to this day you're compensated annually by<br>5 FEG, correct?<br>6    A. That is correct.<br>7    Q. And I believe you told Mr. Anderson that they<br>8 pay you about 40,000 euros a year?<br>9    A. Totally, yes.<br>10    Q. Okay. And how many years have they paid you<br>11 40,000 euros a year?<br>12    A. I -- I don't remember.<br>13    Q. The last five years?<br>14    A. No, no, no, no. So even -- even the year<br>15 before it was less. So I cannot remember.<br>16    Q. You told me when we last met that it was<br>17 $35,000 for each of the last three years. Does that<br>18 sound about right?<br>19    MR. ANDERSON: Objection.<br>20    Q. Excuse me. You told me last time we met it was<br>21 about 35,000 euros each of the last three years. Does<br>22 that sound about right?<br>23    A. Yeah, maybe -- maybe this is true for the last<br>24 three years, but before it was significantly less.<br>25    Q. And FEG determines how much it pays you each | 1    A. No, I -- I stopped active surgery in December,<br>2 2006.<br>3    Q. Okay. And since 2006 you are teaching,<br>4 speaking and conducting research; is that correct?<br>5    A. That is widely correct.<br>6    Q. And I believe you testified on direct that the<br>7 time that you spend working for the FEG occupies about<br>8 five percent of your time?<br>9    A. Two or three hours a week, but it varies,<br>10 depending on the -- on the demands on the projects.<br>11    Q. And you're paid by the plaintiffs in this case,<br>12 correct?<br>13    A. Yes.<br>14    Q. And you're paid at the rate of $500 per hour?<br>15    A. That's correct.<br>16    Q. Now, have you submitted a bill to the<br>17 plaintiffs yet for your work in this case?<br>18    A. No, not yet.<br>19    Q. Okay. Last time we talked about this you had<br>20 met with Mr. Anderson for about 15 hours to prepare for<br>21 your deposition, then you had your deposition, correct?<br>22    A. Yes.<br>23    Q. And you'd also charged I think $10,000 to<br>24 prepare a report; is that correct?<br>25    MR. ANDERSON: Objection; misstates facts. |

Page 238

1  Q. Strike that.
2      Well, how much money did you charge to prepare
3  your report in this case?
4  A. I didn't put up any -- any bills up to now, but
5  I would estimate that overall 60 hours for the entire
6  case.
7  Q. Okay.
8  A. Will be -- will be the sum of it.
9  Q. Does that include your preparation for this
10 testimony?
11 A. Everything.
12 Q. Okay. So about $30,000?
13 A. Yes.
14 Q. Is that time all spent in calendar year 2015?
15     MR. ANDERSON: Objection. That's on this case.
16 You're not allowed to ask outside of that and you
17 know it.
18     MR. THOMAS: That's what I meant.
19     MR. ANDERSON: Well --
20 Q. Strike that.
21     Is the 60 hours that you have identified on
22 this case incurred in calendar year 2015?
23 A. Yes, I guess so.
24 Q. Doctor, go back to this document. It's the
25 second one under this stack. I don't know what number

Page 239

1  it is. 15? Strike that. I'll withdraw that.
2      MR. THOMAS: That's all the questions I have,
3  Doctor.
4      THE VIDEOGRAPHER: We are off the record at
5  4:43 p.m.
6      (Recess from 4:43 until 4:45 p.m.)
7      THE VIDEOGRAPHER: We are back on the record.
8  The time is 4:45 p.m.
9          REDIRECT EXAMINATION
10 BY MR. ANDERSON:
11 Q. Hello again, Dr. Klinge. On cross-examination
12 Mr. Thomas said, you've not designed a PVDF for SUI,
13 have you? And you said, well, I'm not a manufacturer.
14     Let me ask you this question: Has a
15 manufacturer designed a PVDF for incontinence repair?
16 A. I don't know any -- any specific design that is
17 created for incontinence repair by any manufacturer.
18 Q. Does FEG have an SUI sling for incontinence
19 repair?
20     MR. THOMAS: Objection; asked and answered.
21 A. In fact this was designed just for this
22 specific purpose. So therefore I have to correct my
23 previous answer.
24 Q. Okay. Let me ask you again. Is there a
25 manufacturer that makes an SUI sling with PVDF?

Page 240

1      MR. THOMAS: Objection; asked and answered.
2  A. Yes.
3  Q. And what manufacturer is that?
4  A. It's the FEG.
5  Q. And is that the sling that's contained within
6  the 2015 report that you did with Professor Muhl in
7  which you compared the TVT to the PVDF sling
8  manufactured by DynaMesh -- by FEG?
9  A. Yes.
10 Q. Mr. Thomas said, asked you some questions. He
11 said, are you aware that a manufacturer has to have FDA
12 clearance before they put a pelvic floor mesh on the
13 market? You remember he asked you that?
14 A. I remember.
15 Q. Are you aware that Ethicon put its pelvic floor
16 mesh, Prolift, on the market without seeking FDA
17 clearance?
18     MR. THOMAS: Objection.
19 Q. Are you aware of that?
20     MR. THOMAS: Objection.
21 A. I read it in the documents from Ethicon.
22 Q. Are you aware that Ethicon sold their pelvic
23 floor mesh, Prolift, for three years without obtaining
24 FDA clearance. Are you aware of that?
25     MR. THOMAS: Objection.

Page 241

1  A. I am aware of it, yes.
2  Q. He said, on cross-examination, you've never
3  made any direct measurements of forces applied to mesh
4  for SUI. And your response was, no, I relied on
5  Ethicon. Do you remember that part of your testimony?
6  A. I remember.
7  Q. Okay. And you said I believe there were some
8  people within Ethicon who looked at the forces that
9  would be applied. Do you remember that part of your
10 testimony?
11 A. Yes.
12     (Plaintiff's Exhibit No. 0636 was marked for
13 identification.)
14 Q. Showing you what we will mark as P0636. Can
15 you put that up? Let's go down to 2A. Well, first, at
16 the top, E-mail from Gene Kammerer to various
17 individuals within Ethicon. Do you recognize Gene
18 Kammerer as one of the Ethicon scientists?
19 A. Yes.
20 Q. Have you seen his name and read his deposition?
21 A. I've seen it, yeah.
22 Q. Have you seen lots of documents by Gene
23 Kammerer?
24 A. Lots of documents.
25 Q. Okay. And the subject is, Ultrasonic Slitting

Page 242

1 of PROLENE mesh for TVT. And if you look under 2A, if
2 you could blow that up, please. Is this a document that
3 you reviewed and relied upon in coming to your opinions
4 in this case?
5    A. Yes.
6    Q. Okay, 2A. According to Gene Kammerer, "The
7 link between the elongation percent, not force, and the
8 integration of the mesh is this: During the operative
9 procedure as the surgeon removes the protective sheath
10 from the mesh, the mesh stretches or elongates. It is
11 my experience, after viewing many surgical procedures
12 and performing numerous procedures on cadavers myself,
13 that the mesh stretches approximately 50 percent of the
14 maximum." Did I read that correctly?
15    A. Yes.
16    Q. Is this part of the information that you relied
17 upon in determining how much force to be placed on the
18 TVT sling when you did your study in 2015?
19    A. Yes.
20    Q. And did you in fact place forces that were less
21 than 50 percent in your -- in your testing?
22    A. We are starting with forces that are -- that
23 are less than the force that is necessary to make this
24 50 percent elongation.
25    Q. And let me -- if you could pull up the MCM LCM

Page 243

1 picture from his report. In your report did you have a
2 diagram of this stretching test that was done by Gene
3 Kammerer at 50 percent?
4    A. Yes.
5    Q. Okay. If you could blow that up, please. This
6 is in Klinge's expert -- Dr. Klinge's expert report.
7 Did you review and rely upon this article in forming
8 your opinions?
9    A. Yes.
10    Q. Okay. And Mr. Thomas asked you on
11 cross-examination, the only thing that you relied upon
12 in coming to the conclusion that there was particle loss
13 and how much particle loss there would be was that 12
14 percent study. Do you remember he asked you that?
15    A. Yes.
16    Q. Is this also one of the internal Ethicon
17 documents that you relied upon?
18    A. It's another internal document where they
19 compared mechanical-cut and laser-cut meshes.
20    Q. And according to this, as well as the E-mail
21 here, which one of these materials shed more particles
22 and had more degradation, the mechanical cut or the
23 laser cut?
24    MR. THOMAS: Object to the form.
25    A. The mechanical cut shows more particle loss and

Page 244

1 shows more roping at the bottom than the laser cut.
2    (Plaintiff's Exhibit No. 1133 was marked for
3 identification.)
4    Q. I also want to show you PLT1133. With regard
5 to Mr. Thomas saying this is the only study, this 12
6 percent that you're relying upon to look at the amount
7 of particles that are shed on a TVT sling when forces
8 are applied to it, if you'll blow that up, the top of
9 that, please. Are you familiar with this Pariente study
10 and is this something you reviewed and relied upon in
11 your opinions in this case?
12    A. Yes.
13    Q. Okay. And if you could turn it over and look
14 at the second page, is the TVT sling one of the slings
15 that he did and compared it to other slings and other
16 mesh material when it came to the amount of particles
17 that would be lost under various forces?
18    A. Yes.
19    Q. Okay. And if you look over at the final page,
20 Page 12 of this document, if you would just blow up from
21 particle shedding all the way down under Uratape, just
22 that whole left side.
23    A. Yes.
24    Q. Which one of the slings that Dr. Pariente
25 studied in this published article from 2006, how much --

Page 245

1 which one of these had the most loss of particles under
2 force?
3    A. TVT has a particle loss of 8.5 percent. That
4 is significantly more than all the others.
5    Q. So, Doctor, whether it's the 50 percent
6 elongation images that we saw with the particle shed
7 from the mechanical cut mesh by Gene Kammerer, or it's
8 the documents that you saw from Dr. Wang, as well as the
9 ones from Dr. Maslow in Canada, or it is from the 12
10 percent particle loss internal test by Ethicon or the
11 8.5 percent particle loss test by Dr. Pariente, do you
12 have an opinion as to whether or not this particle
13 shedding and this amount of particles coming off of the
14 product will be unsafe in patients? Do you have that
15 opinion?
16    MR. THOMAS: Object to the form of the
17    question.
18    A. Yes.
19    Q. And have you taken all of these things together
20 in forming this opinion?
21    A. This particle loss means an increased surface
22 and therefore an increased risk for the patient to have
23 more inflammation and more scarring.
24    Q. And you were asked a lot of questions about did
25 you do a clinical study on this, did you do a clinical

Page 246

1 study on this. Do you need a clinical study, Doctor,
2 after your 20 years of experience and all that you've
3 done in the field of biomaterial science to tell you
4 whether or not a curled, roped, frayed TVT mesh with
5 particles off the side is going to create a greater risk
6 to patients than one that doesn't shed particles and
7 curl and rope? Do you need a clinical study to tell you
8 that?
9     MR. THOMAS: Object to the form of the
10    question.
11    A. No, I don't think that you will find any ethic
12 committee that allows you to do -- to make such a study.
13    Q. You were asked some questions about whether or
14 not you removed the sheath before you tested it, and you
15 had some responses about how the sheath is cut in the
16 middle so you don't believe it would change your -- your
17 data. Do you remember those questions?
18    A. Yes.
19    Q. Okay. And Mr. Thomas said, well, neither you
20 and Professor Muhl in your tests took the sheath off and
21 Dr. Moalli and her group out of University of
22 Pittsburgh, they did it without taking the sheath off.
23 Do you remember that?
24    A. Yes.
25    Q. Have you seen the TVT implantation video in

Page 247

1 this case?
2    A. Yes.
3    Q. And when they're tugging and pulling on the TVT
4 after it's been implanted, does that still have the
5 sheath on it?
6     MR. THOMAS: Objection to form.
7    A. No, the sheath has been removed before.
8    Q. And when they did that 50 percent elongation
9 test with the laser-cut mesh and the mechanical-cut mesh
10 by Dr. Gene Kammerer, did they have the sheath on it?
11    A. It was always done without any sheath.
12    (Plaintiff's Exhibit No. 2924 was marked for
13 identification.)
14    Q. And let me show you Plaintiff's Exhibit 2924 if
15 I could, please, flagging irrelevant page. Is this a
16 document that you reviewed and relied upon in coming to
17 your opinions in this case?
18    A. Yes.
19    Q. I'm showing you what we've marked as
20 Plaintiff's 2924. If we turn over to this slide, slide
21 No. 36, and is this -- what is this document? Is this a
22 -- that I'm showing you here?
23     MR. THOMAS: Objection; foundation.
24    A. It's an internal Ethicon document where they
25 have been looking for a safer or better design of the

Page 248

1 sling.
2    Q. And what -- what mesh material was Ethicon
3 looking at when they were looking at a different design
4 for their sling?
5     MR. THOMAS: Object to the form of the
6    question.
7    A. In the large- pore lightweight meshes, the
8 ULTRAPRO.
9    Q. Okay. And if you blow up that, when they --
10 when they looked at the mesh tensile testing
11 characteristic of the top images, when they did mesh
12 tensile testing characteristics and looked at this in
13 their own internal studies, did they test it with the
14 sheath on it?
15    A. No.
16    Q. Did they do uniaxial testing like you and
17 Professor Muhl did?
18    A. It is identical to the testing we did and
19 Moalli did, so everyone will do it in this way.
20    Q. On cross-examination Mr. Thomas said -- he
21 pointed you back to some of your testimony as to whether
22 or not you would use or advocate using VYPRO or ULTRAPRO
23 for pelvic floor repair. Do you remember those
24 questions?
25    A. Yes.

Page 249

1    Q. Since that time of your deposition, have you
2 seen any randomized control trials where others looked
3 to see whether or not ULTRAPRO would work as a stress
4 urinary incontinence device?
5    A. Yes.
6    (Plaintiff's Exhibit No. 1085 was marked for
7 identification.)
8    Q. Showing you what's been marked as Plaintiff's
9 Exhibit PLT1085. I think he's going to put it up for
10 you. Blow up the top. Is this a study that you
11 reviewed and relied upon in this case?
12    A. Yes, I've seen it.
13    Q. Is this a study that came out after the
14 deposition that Mr. Thomas was referring you to?
15    A. Yes.
16    Q. Okay. And what did the Okulu study do?
17    A. They used the ULTRAPRO mesh for the treatment
18 of urinary incontinence and placed it underneath the
19 urethra.
20    Q. And after three years of using this in a
21 randomized control trial, what were the results? Were
22 they favorable for using ULTRAPRO or unfavorable?
23    A. They concluded that it's favorable results for
24 the use of this material reduced large-pore mesh.
25    Q. Mr. Thomas also made this statement to you.

Page 250

1 Isn't it true, Doctor, that millions of repairs of
2 polypropylene have been used for hernia repair.  Do you
3 remember that?
4    A.  Yes.
5    Q.  Is it also true that there have been thousands
6 and thousands of patient complications and patient
7 injuries as a result of the use of heavyweight small-
8 hole PROLENE mesh for hernia repair?  Is that true?
9    A.  That is true.
10    MR. THOMAS:  Object; move to strike.
11    MR. ANDERSON:  If you're going to ask him how
12 many people have done well, let's ask him how many
13 people haven't.
14    Q.  He also said to you, polypropylene is still
15 appropriate to use -- he said still appropriate to use
16 in the pelvic floor in the appropriate design.  Do you
17 remember that question?
18    A.  Yes.
19    Q.  Are you aware of whether or not Prolift --
20 Ethicon's Prolift, Ethicon's Prolift Plus M, Ethicon's
21 Prosima and Ethicon's TVT SECUR are still on the market
22 or off the market today?
23    MR. THOMAS:  Objection; move to strike.
24    A.  They are off the market today.
25    Q.  So evidently they are not in an appropriate

Page 251

1 design of polypropylene to still be sold on the market
2 today at least according to Ethicon, huh, Doctor?
3    MR. THOMAS:  Objection.
4    A.  That's true.
5    Q.  He also showed you Page 535 of your deposition
6 from November 15, 2013, and he read you some questions
7 and answers but he stopped a little short, so I want to
8 make sure that the jury gets to hear your full
9 testimony.  He said --
10    MR. ANDERSON:  That's yours under there, Dave.
11    MR. THOMAS:  Oh, I'm sorry.
12    Q.  We are at the place that you referred him to,
13 which was November 15, 2013, Page 535.
14    MR. THOMAS:  This is not mine.
15    MR. ANDERSON:  Okay.  You find that one and
16 I'll swap with you.
17    Q.  He read for you Lines 9 through 22, whether
18 you had an opinion, to a reasonable degree of scientific
19 and medical certainty, as to whether the use of
20 polypropylene in hernia repair done are reasonably
21 dangerous.  And he read to the part all the way down to
22 where you said, "But, if I may, it depends on the
23 structure."  What he didn't read is the next lines.
24    Question:  Right?
25    And you said, answer, so it's not a general

Page 252

1 free comment on polypropylene in general.
2    So you said it depends on the structure and
3 it's not a general comment on polypropylene in general.
4    What did you mean by that answer?  And I'll
5 give you the context.  535 at the bottom.  He started
6 here.  He stopped at Line 19.  Tell the jury from 20 to
7 24 and at the top of the next page, when you qualified
8 your answer, what did you mean?
9    A.  A statement that polypropylene is suitable or
10 not suitable, it doesn't make any -- any sense.  You can
11 -- it depends mainly from the way, how it is produced.
12 There are -- you can buy knives made of polypropylene.
13 This of course is an inadequate structure.  So you
14 cannot answer this question whether polypropylene per se
15 in any structure is suitable or not.  It has to be in
16 context with the textile structure.
17    Q.  Mr. Thomas showed you lots of society papers.
18 He even showed you some things on the FDA.  He showed
19 you a number of purported clinical data regarding SUI
20 slings.  Do you remember those questions?
21    A.  Yes.
22    Q.  So just to clean up this question in case FDA
23 doesn't come in.
24    Do you remember on your cross-examination that
25 Mr. Thomas asked you a number of questions and showed

Page 253

1 you a number of documents on society papers or clinical
2 studies on the effectiveness of SUI slings.  Do you
3 remember that?
4    A.  Yes.
5    Q.  In any of those papers that he showed you did
6 they address whether or not a heavyweight small-hole
7 polypropylene mesh that has laser cut -- I'm sorry --
8 that has mechanical-cut edges, that curls, ropes and
9 frays and lose particle, whether or not those are safe
10 and effective?
11    MR. THOMAS:  Object to the form.
12    Q.  Did you see that in any of those documents?
13    MR. THOMAS:  Object to the form of the
14 question.
15    A.  No, I didn't see it in any.  There was no
16 comment about -- about this.
17    Q.  Have you ever seen in any of Ethicon's
18 sponsored studies or any of these studies where they
19 make a differentiation between the TVT sling that's
20 mechanical cut versus the TVT laser cut when it comes to
21 safety or efficacy?
22    A.  I didn't have -- I didn't saw any -- any study
23 like this or any document.
24    Q.  In response to -- strike that.  New question.
25    Mr. Thomas asked you on cross-examination if

Page 254

1 the explanted heavyweight mesh that Dr. Heniford took
2 out of the patient that was on the DVD and that he
3 banged on the table, he said, was that a Bard mesh. Do
4 you remember those questions?
5     A.  Yes.
6     Q.  And you said, yes, but it's the same
7 construction as PROLENE.  Do you remember that?
8     A.  Yes.
9     Q.  What do you mean by that?
10    A.  Both that the Bard mesh as well as the PROLENE,
11 they are considered as heavyweight small-pore meshes.
12 And many, many studies clearly show that the tissue
13 response is almost identically between these two.
14        So it is exchangeable whether you are taking
15 PROLENE or whether you are taking this Bard mesh to
16 create the tissue response that is typical for
17 heavyweight small-pore meshes.
18    Q.  In the Klinge 13 defense exhibit that he showed
19 you on cross-examination, which was the modified
20 classification of surgical meshes, do you remember that
21 document?
22    A.  Yes.
23    Q.  If you look at Table 1 again, which one is the
24 heavier weight mesh, the Marlex or the PROLENE that's
25 used in the TVT?

Page 255

1     A.  The PROLENE is heavier.
2     Q.  What's the weight of the Marlex?
3     A.  It's 95 gram per square meter, whereas PROLENE
4 has 109 gram per square meter.
5     Q.  And when you were just telling the jury -- and
6 when you were just telling the jury that these meshes
7 behave similarly, is part of the reason that these are
8 this class of heavyweight meshes?
9        MR. THOMAS:  Object to the form of the
10 question.
11    A.  Because of the similar reaction of the tissues
12 to these materials, they can put into the same group of
13 the heavyweight small-pore meshes.
14    (Plaintiff's Exhibit No. 8064 was marked for
15 identification.)
16    Q.  Let me show you Plaintiff's Exhibit 8064.  Can
17 you pull that up?  With regard to this discussion over
18 Dr. Heniford's video, just taking you back to your
19 testimony, you said that this was played at many
20 conferences.  Can you explain what you meant by this
21 video was played at many conferences?
22    A.  I attended or was a participant at many hernia
23 conferences on the European level or on the world level,
24 and there either Todd Heniford showed himself this video
25 or some of my colleagues who probably had access to this

Page 256

1 video demonstrated or showed this video because it's so
2 impressive and it's typically for the tissue reaction to
3 this material.
4     Q.  And at the end of that video did you notice
5 when it said, funded by, which mesh manufacturer funded
6 that video?
7     A.  I'm not sure that this was shown during the
8 part -- during many of these conferences very often that
9 it's just an extraction.  But I know that it's funded by
10 Ethicon.
11    Q.  Okay.  So if you'll blow up that first
12 paragraph.  It says, "The following is an excerpt from
13 an E-mail from Todd Heniford," that's the doctor who was
14 in this video sponsored by Ethicon banging the hard mesh
15 on the table, right?
16    A.  Yes.
17    Q.  Okay.  So, "The following is an excerpt from an
18 E-mail from Todd Heniford as an argument that we need to
19 reduce the mass and inflammatory response in current
20 mesh.  It is consistent with the 'potato chip' folding
21 phenomena that has been reported with Kugel.  We need to
22 keep in mind that PROLENE may behave in a fashion
23 similar to Marlex."  Did I read that correctly?
24    A.  Yes.
25    Q.  Have you reviewed and relied upon this document

Page 257

1 in coming to your opinions?
2        MR. THOMAS:  Objection.
3     A.  Yes.
4     Q.  And do you review and rely upon this document
5 in coming to your opinion that the PROLENE heavyweight
6 mesh will react in a similar fashion as the Marlex
7 heavyweight mesh?
8        MR. THOMAS:  Objection.
9     A.  In this statement they acknowledge that they
10 know it.  But we know from many, many experiments that
11 there is no difference in the -- in the response to
12 these materials.
13    (Plaintiff's Exhibit No. 8351 was marked for
14 identification.)
15    Q.  Showing you Plaintiff's Exhibit 8351.  If you
16 could blow up the top of this E-mail.  Is this also a
17 document that you have reviewed and relied upon in this
18 case?
19    A.  Yes.
20    Q.  Okay.  This E-mail from Petra Koehler.  You
21 know Petra Koehler, right?
22    A.  Yes, very well.
23    Q.  Okay.  And who is she?
24    A.  She has been responsible or she has been
25 working in Ethicon, Germany, and was responsible for the

| Page 258 |
|---|

1 clinical studies.
2    Q. And of course you already told the jury you
3 know who Dieter Engel is, right?
4    A. Yes.
5    Q. And you worked with him as well as this guy
6 Boris Batke who's also on this E-mail, correct?
7    A. Yes.
8    Q. And under the subject, ULTRAPRO Mesh Registry,
9 if we look down to the -- pick up with the top of that
10 video where it says Von, Heniford, and take it down
11 through the first paragraph. Is this an E-mail from
12 Todd Heniford in November of 2004 back to these
13 individuals in Ethicon?
14    A. Yes.
15    Q. Okay. And it says, "Jill, I wanted to give you
16 a bit of follow-up from the ULTRAPRO project that you
17 initiated with our group some time ago."
18      And then if we look down, "You had a number of
19 talented development people working on ULTRAPRO, a/k/a
20 Edelweiss," that's the project name for ULTRAPRO,
21 correct?
22    A. Yes.
23    Q. "Ethicon put a great deal of money behind it,
24 and your new platform was somewhat riding on its
25 success."

| Page 259 |
|---|

1      And if you look down further, "I think the data
2 is clear, the mesh is plenty strong. In fact, I believe
3 that you are on the brink of changing how hernias are
4 performed in North America."
5      And then if you look at the next sentence,
6 "There is no use for a heavyweight mesh like Marlex at
7 any time or anywhere in the human body and, yes, you may
8 quote me." Did I read that correctly?
9    A. Yes.
10    MR. THOMAS: Objection to all this line of
11 questioning about Heniford's comments.
12    MR. ANDERSON: Please do. You're the one that
13 raised it on cross.
14    Q. And under here it says -- when it says there's
15 no use for a heavyweight mesh like Marlex any time in
16 the body, do you agree that a small-pore heavyweight
17 mesh has no use in the human body when it comes to a
18 sling repair?
19    MR. THOMAS: Object to the form of the
20 question.
21    A. I don't see any reasonable indication in this
22 area of the body.
23    Q. Oh. Right at the end of your testimony
24 Mr. Thomas showed you a DynaMesh article, Klinge 16, of
25 the repair of laparoscopic ventral hernia. You're

| Page 260 |
|---|

1 familiar with the laparoscopic ventral hernia repair?
2    A. Yes.
3    Q. Is it often associated with pain?
4    A. Very often, yeah.
5    Q. Explain that why to the jury, please.
6    A. It's so when you make a laparoscopic hernia you
7 -- you place a huge piece of mesh to the abdominal wall
8 and it is within the abdominal cavity and you are forced
9 to -- to make it a prominent fixation of the mesh. And
10 this is done usually by the use of tacks, spiral tacks,
11 very sharp and two centimeters in size spiral metal
12 clamps that are placed every one, two centimeters
13 circulating around it, and this causes a lot of pain.
14 We all know that.
15      So the pain is a thing that is related first of
16 all to the -- to the -- to the need for a fixation of
17 the mesh material there. Otherwise you have some -- you
18 have to make a lot of dissection within the abdominal
19 cavity. You have to use specific mesh materials that is
20 integrated there and which may reduce the mobility. So
21 it's a completely -- it's a challenging surgery there.
22    Q. And whether you use PVDF or polypropylene for a
23 laparoscopic ventral hernia repair, do you expect to see
24 amounts of a third of the patients reporting pain after
25 that procedure?

| Page 261 |
|---|

1    A. This is a usually number. In contrast we know
2 that there are other material that are not so elastic,
3 stretchable than the -- the DynaMesh, they cause much
4 more pain for a much longer time.
5    Q. Then what Mr. Thomas did on cross-examination
6 was he took the 30 percent pain from a laparoscopic
7 ventral hernia repair trial and he used Klinge
8 Exhibit 1, which was a systematic review by these
9 authors regarding sling studies where he says they
10 reported 1.8 percent pain, and he showed that to you
11 right after he showed you the laparoscopic ventral
12 hernia repair, correct?
13    A. Yes.
14    Q. And then he said, well, there's 30 percent or
15 more pain with the laparoscopic ventral hernia repair
16 and only 1.8 percent reported in this metaanalysis of
17 all of these studies in Klinge Exhibit 1. Do you
18 remember that?
19    A. Yes.
20    Q. Is it good science to take the results from a
21 six-month laparoscopic ventral hernia repair and the
22 pain those patients report and try to compare that to
23 sling studies that were done with various numbers of
24 patients over various times with various different
25 materials and say that you can relate the less pain in

Page 262

1 the sling studies to more pain in the laparoscopic
2 ventral hernia repair studies? Is that good science?
3    A. It is not -- scientifically it is not justified
4 to compare these studies and to compare the figures.
5 It's completely different.
6    Q. It's not even intellectually honest, is it?
7       MR. THOMAS: Objection.
8    A. I don't have any opinion to this.
9    Q. When he showed you Klinge Exhibit 3, again, he
10 showed you an article on laparoscopic versus open
11 ventral hernia repair. If you could -- and he went into
12 this multivariate analysis on quality of life.
13       In this 12-month laparoscopic open ventral
14 hernia repair study, did they use PROLENE heavyweight
15 small-pore mechanical-cut mesh to say whether or not it
16 would work better after 12 months versus these other
17 meshes?
18    A. No.
19    Q. Is there anything you can draw from Klinge 3,
20 this open ventral hernia repair, compared to whatever
21 the other laparoscopic ventral hernia repair, to
22 determine whether or not the PROLENE mesh in TVT is
23 going to be safe in women?
24    A. No, it doesn't help.
25    Q. Any value at all?

Page 263

1    A. No.
2    Q. When he talked about Klinge 4 to you, that was
3 the Cobb study where they were looking at incisional
4 hernia and predictors of wound events and recurrence.
5 Do you remember the questions on that?
6    A. Yes.
7    Q. And he said to you, emphatically, Dr. Cobb
8 doesn't use lightweight meshes or I guess in this case ultra
9 lightweight meshes, does he?
10    A. Yes.
11    Q. And you gave some answers to the jury about the
12 fact that he went to middleweight.
13    A. Yes.
14    Q. Okay. I'm just taking you back to that part of
15 your question, back to part of his question.
16       Explain to the jury what you meant when you
17 were saying that he went from lightweight to
18 middleweight.
19    A. So there are -- mainly there are three groups
20 of meshes. The one is the heavyweight meshes prototypes
21 are typical of representing meshes of the Marlex and the
22 PROLENE mesh. There are the lightweight meshes, of
23 course. This is VYPRO and ULTRAPRO. And there are --
24 in between there are some materials that are reduced in
25 weight, such as PROLENE soft or GYNEMESH, and these are

Page 264

1 called for many people mid-weight, because they are
2 already material reduced, but they have a little bit
3 more material than the lightweight meshes.
4    Q. Did you see anywhere in that study or of all
5 your review of the scientific literature and your work
6 in the hernia world and speaking at conference anywhere
7 where Cobb, Heniford or any of your colleagues have gone
8 back to heavyweight small-pore meshes as a first line
9 repair for any of their patients?
10    A. So far I remember they always go in some
11 patients back to the -- to the mid-weight meshes but
12 never to the small-pore heavyweight meshes.
13    Q. Mr. Thomas went over Klinge Exhibit 5 with you,
14 which was this Nilsson article on 17 years of follow-up
15 of tension-free vaginal tape. Do you remember that?
16    A. Yes.
17    Q. And he talked to you about these 70 -- 78
18 percent of the potential assessable women. Do you
19 remember that?
20    A. Yes.
21    Q. So that means 22 percent of the original women
22 were not available, correct?
23    A. That's true.
24    Q. So are you familiar with the term, lost to
25 follow-up?

Page 265

1    A. Yes.
2    Q. Is a study that has 22 percent loss to
3 follow-up significant to your opinions as to the
4 reliability of the results of the study?
5       MR. THOMAS: Object to the form of the
6       question.
7    A. If you are looking to the data that results
8 there, no. It is a -- it has an insufficient power to
9 detect or to be used as a safety study.
10       And even in particularly if you lost 20 percent
11 of the patients, there is no -- no value in regard to
12 the safety or long-term outcome, safeness of the
13 material.
14    Q. I heard you mention a few times in your
15 responses to Mr. Thomas's questions today talking about
16 the lack of value of clinical studies where there's not
17 sufficient power. What does that mean, not sufficient
18 power or number of patients?
19    A. You need a -- a big core of patients to be
20 really sure that your findings are reliable and can be
21 transferred to other patients or otherwise round.
22       Looking to ten patients for one week it will be
23 likely result in non-significant differences. But you
24 are not allowed to say that the -- the absent
25 differences in this small cohort can be transferred to

Page 266

1  the population in general, and therefore you need a --
2  or you can calculate the number of patients that are
3  necessary to have a sufficient statistically power.
4        And roughly you need 1,500 patients in a group
5  if you have an effect, let me say a reduction of a
6  complication from ten to five percent.  If you want to
7  prove this difference you need at least 1,500 patients
8  in a group, and you never -- I don't even have any clinical
9  study that can fulfill this.  And it is ridiculous to
10  believe that 80 patients are sufficient to give this
11  certainty of finding.
12     Q.  And after you account for the 22 percent lost
13  to follow-up of 90 women, we're only talking about 60
14  women in this study that he's pointing to, correct?
15     A.  That is correct, yeah.
16     Q.  Is that enough, in your opinion, enough women
17  to be able to look at and transfer whether or not this
18  product will be safe in millions of other women?
19        MR. THOMAS:  Object to the form of the
20     question.
21     A.  This study cannot serve -- should not serve as
22  an argument for safety.
23     Q.  And would it affect your opinions at all
24  regarding the outcome of this study if you knew that the
25  authors were paid $400,000 for every time they reported

Page 267

1  no new complications on each one of the Nilsson studies?
2  Would that affect your opinions at all?
3        MR. THOMAS:  Object to the form of the
4     question.
5     A.  It raises some more concerns.
6     Q.  I'll say.
7        You can strike that last comment.
8        Mr. Thomas also asked you a question about that
9  study, saying they reported no shrinkage in these 60
10  women.  He also showed you Klinge Exhibit 6 and Klinge
11  Exhibit 7.  One of them was where they looked at 70
12  women with some ultrasound on the vaginal tape and the
13  other's where they looked at 94 patients and they put a
14  Q-tip in their urethra to see whether or not those were
15  shrunken.  And do you remember those articles?
16     A.  Yes.
17     Q.  When is the best ability for you to look as to
18  whether or not polypropylene mesh shrinks in the body,
19  once you've removed it or while it's in the body?
20        MR. THOMAS:  Object to the form of the
21     question.
22     A.  You can do it by both, by both ways.  You can
23  -- you can look to the width of the mesh within the
24  body, but you can see as well -- you will recognize the
25  shrinkage when looking at the explants.

Page 268

1     Q.  And for these studies, these meshes were still
2  in the women, correct?
3     A.  Yes.
4     Q.  Okay.  And if a sling has been removed from a
5  woman due to complications as a result of contraction,
6  and you can observe those on histology, correct?
7     A.  Yes.
8     Q.  In other words, looking under pathological
9  slides.
10     A.  Yes.
11     Q.  Is looking at pathological slides of contracted
12  heavyweight small-pore mesh like the PROLENE, and in
13  fact looking at the PROLENE itself, something that you
14  have done over the last 20 years?
15        MR. THOMAS:  Object to the form of the
16     question.
17     A.  Yes, we -- we had the opportunity to look at
18  various explants.
19     Q.  Dozens, hundreds?
20     A.  Dozens.
21     Q.  Okay.  Mr. Thomas also showed you this article
22  by Dirk Wehye.  You know Dirk Wehye.
23     A.  Yes.
24     Q.  Colleague of yours?
25     A.  Colleague of mine.

Page 269

1     Q.  Also William Cobb.  There was this article they
2  did on minipips.  Do you remember him showing you this,
3  Klinge Exhibit 9?
4     A.  Yes.
5     Q.  If you look under the highlights of the first
6  page it says, "Large pore size greater than 1.5
7  millimeter leads to better integration and biomechanical
8  capacity."
9        Do you agree with that?
10     A.  Totally agree.
11     Q.  Is that something that's been expressed in your
12  opinions here today?
13     A.  That is expressed in the opinions, and this is
14  widely acknowledged and accepted in the literature.
15     Q.  And on the second page of that it says, "A
16  typical phenomenon of scar formation may cause the
17  retraction of the mesh and it is proven in clinical
18  studies that small pores, less than one millimeter,
19  induce a connective tissue scar plate which is described
20  as the bridging effect by Klinge and colleagues."
21        Do you agree with that statement?
22     A.  I totally agree.  No objection to it.
23     Q.  And when they looked at these meshes here they
24  were looking at -- were they looking at experimental
25  meshes, in other words, not on the market, or ones that

Page 270

1  were actually on the market?
2      A.  No, they used only experimental meshes.
3      Q.  So these are all protocol meshes that Covidien
4  was looking at, correct?
5      A.  Prototype just to -- to investigate the
6  relationship of the impact factors.
7      Q.  Two-dimensional, three-dimensional I think he
8  pointed out to you, correct?
9      A.  Yes.
10      Q.  Is it true that if you -- if you design a mesh
11  that has such low weight and such large pores that it
12  could actually cause complications?
13      MR. THOMAS:  Object to the form of the
14      question.
15      A.  Of course there is a critical limit.  If you
16  reduce the amount of material to almost zero, and expand
17  the holes to giant dimensions, of course this will not
18  work.  And therefore I -- sometimes I said it is always
19  a compromise.  You have to define the necessary strength
20  and the elasticity and then to try to find to get the
21  safest design for this mechanical need.
22      Q.  So can you take Klinge 9, this minipig study,
23  and -- of experimental meshes that aren't on the market,
24  and say large-pore heavyweight meshes -- I'm sorry --
25  large-pore lightweight meshes induce more shrinkage than

Page 271

1  small-pore heavyweight meshes?  Does it stand for that
2  proposition?
3      A.  No, it doesn't give any -- any safe data to --
4  to make this conclusion.
5      Q.  Mr. Thomas asked you a lot of questions about
6  your testing with Professor Muhl, and asked you whether
7  or not if you changed the machine to 975 microns or 990
8  microns or 1,100 microns, whether or not this would
9  somehow skew the results.  Do you remember those
10  questions?
11      A.  Yes.
12      Q.  Based upon your 20 years of research, your
13  review of explanted meshes, your work with Ethicon as a
14  consultant, your development of the new generation
15  lightweight large-pore meshes, and all of the things you
16  reviewed in this case, all of your publications and your
17  speaking at conferences around the world, does it matter
18  to you whether or not a mesh has 900 or a thousand
19  microns before it goes into a patient as to whether or
20  not that's going to safely integrate in a patient's
21  tissues?
22      MR. THOMAS:  Object to the form of the
23      question.
24      A.  No, it -- there is no -- it doesn't make any --
25  any sense to discuss whether the last figure is decisive

Page 272

1  for the tissue reaction.  The main goal of this is to
2  predict the risk to get this scar bridging within the
3  entire holes.
4      And of course there are, as we have seen, there
5  are other confounders at the surface coating, as the
6  area where it is implanted, they may affect or they may
7  influence this bridging.  However, this is an objective,
8  reliable, reproducible method to get a figure which
9  relates to the risk of a textile -- textile to create
10  this bridging fibrosis, nothing more.
11      Q.  Mr. Thomas asked you some questions and he
12  said, you trimmed your hernia mesh with scissors when
13  you were a surgeon.  Do you remember he asked you that?
14      A.  Yes.
15      Q.  Okay.  And then you said, yes, but we cut it
16  outside the operative field.  Do you remember that?
17      A.  Yes.
18      Q.  Are hernia meshes flat meshes?
19      A.  Yes.
20      Q.  Okay.  And is there stretch on the flat mesh,
21  in other words, forces being placed on it like there is
22  on the sling?
23      MR. THOMAS:  Object to the form of the
24      question.
25      A.  It is supposed that the hernia mesh is placed

Page 273

1  in a tension-free condition, without any -- any -- any
2  forces that are applied to the implant.
3      Q.  And for any of the flat hernia meshes that
4  you've implanted, do they have this curling, roping,
5  fraying and particle loss that we've been looking at
6  today with regard to the TVT sling?
7      MR. THOMAS:  Object to the form of the
8      question.
9      A.  We never saw with a flat mesh this -- this
10  extent of roping there.  We have sometimes a folding
11  when we - we cannot place it in a very flat manner
12  there, but we never saw this -- this roping that we have
13  seen with the PROLENE mesh.
14      Q.  Mr. Thomas went through a series of questions
15  and said, PVDF mesh from DynaMesh is heavier weight than
16  polypropylene mesh, its effective porosity is similar.
17  Do you remember those questions?
18      A.  Yes.
19      Q.  What is the difference between looking at the
20  weight of a PVDF mesh and the porosity or the pore size
21  of a PVDF mesh versus a comparison with a polypropylene
22  mesh weight and a polypropylene mesh hole size?  Can you
23  explain that, please, and make it clear for the jury?
24      A.  If you're just looking to the weight you don't
25  have any information about the surface.  You can -- when

Page 274

1 you have very, very thin fibers of either polymer you
2 have a huge surface, a huge contact surface of the
3 polymer with an awful tissue reaction therefore.
4 Therefore, the weight, per se, is insufficient to
5 predict the tissue response to it.
6     We know from all of our studies that when you
7 are looking to the foreign body reaction to the
8 thickness of the wall by the white blood cells and the
9 scar reaction around the fiber, that the thickness of
10 this reaction is significantly smaller than the size of
11 this reaction in the neighborhood of polypropylene
12 fibers.
13     Q.  And what does that mean to the patient if you
14 have less inflammation around the PVDF mesh and more
15 inflammation around the polypropylene fibers?
16     A.  With smaller holes you have not the high risk
17 to create the bridging fibrosis if you are using the
18 PVDF.  So if using PVDF you are allowed to use smaller
19 pores, then with the polypropylene in particularly if
20 you have these thick fibers that are used in the PROLENE
21 mesh.
22     Q.  Then Mr. Thomas asked you, he said, have you
23 done studies showing that particles shed or don't shed
24 from the DynaMesh, etcetera.  Do you remember those
25 questions?

Page 275

1     A.  Yes.
2     Q.  When you did your published peer-reviewed
3 studies and you compared the TVT PROLENE mesh to the
4 DynaMesh sling and you put them under force, did the
5 edges of the DynaMesh sling fray?
6     A.  No, it is impossible, because the borders are
7 sealed.  So in this area it is -- you will not have any
8 -- any particle loss.
9     Q.  And when you put the force on the -- the
10 various forces on the DynaMesh sling made out of PVDF,
11 did those pores collapse?  Did those holes collapse on
12 themselves like the TVT did?
13     A.  No, they are very, very resistant to the
14 mechanical forces.  They keep their structure and they
15 -- they stay open.
16     Q.  Did they curl like the TVT?
17     A.  No.
18     Q.  Did they rope like the TVT?
19     A.  No.
20     Q.  Mr. Thomas asked you a lot of questions about
21 your relationship with FEG, and he said on
22 cross-examination, Doctor, you got royalties on VYPRO,
23 VYPRO II and ULTRAPRO from your work with Ethicon and
24 your development with them on those meshes over 10
25 years.  Do you remember that?

Page 276

1     A.  Yes.
2     Q.  Okay.  While you were receiving royalties from
3 the sales of -- by Ethicon of VYPRO, VYPRO II and
4 ULTRAPRO, was that at the same time that you were
5 telling Ethicon and FEG that you believed PVDF was a
6 safer alternative to polypropylene?
7         MR. THOMAS:  Object to the form of the
8 question.
9     Q.  Is that time period correct?
10     A.  It is -- it is -- it started in 2000, and I got
11 the royalties between 2000 and 2005, and we told 1998 to
12 the people of Ethicon that we want to develop PVDF.
13     Q.  So is it true that it was not in your financial
14 interest to tell people that PVDF was better because you
15 were actually getting royalties on a polypropylene mesh,
16 correct?
17         MR. THOMAS:  Object to the form of the
18 question.
19     A.  That is correct.
20     Q.  Let's see.
21         MR. ANDERSON:  We've covered minipigs to
22 Q-tips.  I think we're -- I think we're done.  Go
23 ahead.
24         RECROSS-EXAMINATION
25 BY MR. THOMAS:

Page 277

1     Q.  Doctor -- do you have the mesh classification
2 document there?
3         Doctor, if it's okay I'm going to sit next to
4 you.
5     A.  You're welcome.
6     Q.  Thank you.
7         I'm going to show you again Klinge Exhibit
8 No. 13, and you talked about the weight, relative weight
9 of Marlex and PROLENE.  Do you remember your questions
10 about that?
11     A.  Yes.
12     Q.  And this is Table 1 of Exhibit No. 13 where
13 you're comparing the brand names of different meshes,
14 correct?  And you pointed out that the Marlex was 95
15 grams and the PROLENE was 109 grams.  We've already
16 decided that the weight by itself is not important,
17 correct?  You've got to add other factors as well,
18 correct?
19     A.  Only in the situation where you have quite
20 similar filaments made of a similar polymer.  Then of
21 course the difference in weight indicates that there is
22 a difference in the amount of the material and a
23 difference in surface.  So in this, for this comparison,
24 therefore for a long time we have been satisfied to just
25 talk about the weight.

Page 278

1   Q.   But if you look at Marlex, PROLENE has a
2   50-percent higher textile porosity than Marlex, doesn't
3   it?
4   A.   That is how it is written there, yeah.
5   Q.   So you understand that to be true, that the
6   Marlex pore size is typically considered to be about .6
7   millimeters, isn't it?
8   A.   Therefore, I pointed out that you have to look
9   at the size of the filament.  But if you change the size
10  of the filament, you can create the difference.
11  Q.   Is the answer yes, that Marlex -- that PROLENE
12  has a 50-percent higher textile porosity over Marlex?
13  A.   Yes.
14  Q.   Which means that the Marlex pore size is
15  typically reported as being about 6.6 millimeters,
16  correct?
17  A.   Point six millimeters, yeah.
18  Q.   And the PROLENE is very close to one
19  millimeter, correct?
20  A.   It is reported like this.  But you have to
21  admit that these are the information mainly from the
22  manufacturers and they are usually done by some methods
23  with a lot of limitations.  So it is a not so easy to
24  reduce this to one thing.
25  Q.   But Dr. Muhl's report, to be fair, shows that

Page 279

1   the Ethicon PROLENE mesh is approximately one millimeter
2   in all directions, with some minor variations.
3   A.   If you're going to the report of Dr. Muhl it is
4   quite clear how it is measured, what the limitations is.
5   If you're going to these tables, it is very often not so
6   indicated how these data are generated.
7   Q.   But Dr. Muhl appropriately records those
8   values, correct, as far as you know.
9   A.   Yes.
10  Q.   Okay.  The Pariente study, Plaintiff's 1133,
11  you were asked several questions about particle loss in
12  the Pariente study.  You didn't talk about how much load
13  was applied to the meshes as a part of that study.  Can
14  you tell by looking at Plaintiff's Exhibit No. 33 how
15  much load was applied to the TVT at the time they
16  measured the particle loss there?
17  A.   I'd have to look to the document as well.
18  Q.   Please do.
19  A.   I have to look to the -- to somewhere.  A
20  kilonewton is a thousand newton.
21  Q.   Can you tell from the study how much force is
22  being applied to the mesh?
23  A.   You see here that on the left there is a --
24  MR. ANDERSON:  He's trying to answer your
25  question, Dave.  That's what he's doing.

Page 280

1   MR. THOMAS:  I didn't say anything.
2   A.   The YX is where you see the load, and it is .03
3   kilonewton, I guess.
4   Q.   Do you know what the value of that is, what a
5   kilonewton is?
6   A.   It's a thousand, and they applied 30 newton to
7   it.  But I'm not sure.
8   Q.   You're not able to tell from the study what
9   kind of forces were applied to the TVT?
10  A.   You can see in this figure how many force is
11  applied, but I don't have it in my mind what is the
12  dimension of kilonewtons and how to transfer it into
13  simple newton.  I have to look because it -- it's not a
14  usually dimension where I'm working every day with
15  kilonewton.
16  Q.   Okay.  Now, the documents that you were showed
17  about the Kugel mesh and the Marlex refers to issues in
18  hernia repair, don't they?
19  A.   I was still there thinking, so I didn't get --
20  MR. ANDERSON:  He's talking about a kilonewton.
21  Q.   I only have a couple of these documents that
22  Mr. Anderson showed you, 8064 and 8351, talking about a
23  Heniford video clip and Dr. Schiaparelli.  This all
24  deals with the debate about the use of mesh in hernia
25  repair, doesn't it?

Page 281

1   A.   It addresses the general aspect that there are
2   -- that heavyweight and large-pore meshes have a higher
3   risk.  Whether they are thinking just of hernia and
4   reducing it to hernia, I don't believe that they said
5   that in other areas of the body that it's completely
6   different.  I've never heard it from them that they
7   believe that the tissue reaction is different in other
8   parts of the body.
9   Q.   Would you hand me those stack of exhibits,
10  please.
11  In the Colavita study, Trial Exhibit 3
12  Mr. Anderson asked you about, you said that there was
13  nothing specifically in here about PROLENE mesh.
14  What a registry does is collect procedures for
15  a period of time and then they're able to take the data
16  that's developed during those procedures and group them
17  in a manner that allows them to make scientific
18  conclusions from the studies; fair?
19  A.   That -- that is done during the process of
20  analyzing and presenting the data.
21  Q.   And that's -- while they didn't break out
22  PROLENE hernia mesh, they did separate out lightweight
23  mesh versus heavyweight mesh, correct?  That's what we
24  talked about in this study, correct?
25  A.   They presented some data with these two groups

| Page 282 |
|---|

1 of mesh materials. But you have to consider that they
2 form a lot of these groups and now we're coming back
3 again to the statistically power to this study, and it
4 -- it decreases sharply when you're adding a lot of
5 these subgroups there.
6    Q. But just to be clear, out of 710 repairs, when
7 they looked at mesh weight, they concluded that mesh
8 weight had no affect on pain, activity limitation, mesh
9 sensation, overall symptoms, correct?
10    A. You read it correctly.
11    Q. Okay. And you talked about the Okulu study on
12 redirect. I didn't get the number of that, Ben. Do you
13 all have a number of that study?
14      MR. ANDERSON: PLT1085.
15    Q. 1085. And you suggest that these folks in
16 Turkey had conducted a study where they used -- did they
17 use -- they used ULTRAPRO mesh for the treatment of
18 stress urinary incontinence, correct?
19    A. Yeah.
20    Q. Whatever the people in Turkey say, you don't
21 want ULTRAPRO placed in your body, do you?
22    A. I think ULTRAPRO is a -- an excellent mesh in a
23 tension-free condition. For small defects it is still
24 one of the best or it has a very smooth tissue reaction
25 because of these large pores. So I'm not sure whether

| Page 283 |
|---|

1 it would be a bad choice in some indications to use
2 ULTRAPRO.
3    Q. Okay. Let's go to your deposition, please, on
4 October the 5th, 2015, just last month, on Page 90,
5 Line 20. Let's turn to your report then on Page 36.
6 Are you on Page 36 under -- I need a copy for the
7 doctor.
8      MR. ANDERSON: Just read the deposition.
9      MR. THOMAS: Okay.
10    Q. Under -- this one right here, if you don't mind
11 me helping him. You have it highlighted up here. You
12 highlighted in your own copy of the deposition that you
13 don't want the ULTRAPRO in your body, correct?
14      MR. ANDERSON: Excuse me. That's your copy of
15 the deposition that you gave us for --
16      MR. THOMAS: This one is.
17      MR. ANDERSON: All of these are highlighted.
18 These are the ones that you gave us before the
19 deposition. So he didn't highlight it, you did.4.
20      THE WITNESS: In both versions it is
21 highlighted.
22      MR. ANDERSON: I think we can stipulate to
23 that.
24      MR. THOMAS: I apologize, Doctor, and I have
25 some people to talk to.

| Page 284 |
|---|

1 BY MR. THOMAS:
2    Q. Doctor, let's go back to Page 90, Line 16 --
3 Line 20, I'm sorry. Let's turn to your report then on
4 Page 36, this is your Mullins' report. On Page 36 under
5 safer alternative designs, one such safer alternative
6 design would be a mesh product with less material,
7 larger distance between the mesh fibers, and then you
8 reference Ethicon's ULTRAPRO.
9      In prior depositions you've told me that
10 ULTRAPRO was not an appropriate device for the treatment
11 of stress urinary incontinence.
12      Are you suggesting now that it is an
13 appropriate device for the treatment of stress urinary
14 incontinence?
15      Answer: The ULTRAPRO in its present form or
16 with these huge pores with these material reductions
17 has, of course, advantages in comparison to the PROLENE
18 material in regard to the tissue response.
19      And then you identify this Turkey study.
20      Then I say: Alternative for what?
21      For the PROLENE mesh, for stress urinary
22 incontinence, and then you identify the Turkey study.
23      And then you say, however, on Page 92, Line 1,
24 I know that ULTRAPRO has some disadvantages in regard to
25 the structural stability and therefore I wouldn't like

| Page 285 |
|---|

1 to have this in my body.
2      Did I read that correctly?
3    A. You read this correctly.
4    Q. Is that a true statement?
5    A. That the treatment has to be -- you have to
6 differentiate in what form you want to have it. If
7 you're using the ULTRAPRO to -- to serve as a ligament,
8 as the PROLENE is intended to use, then you have the
9 problem of the pore collapse. So the large-pore
10 ULTRAPRO becomes a small-pore mesh device with all the
11 risks.
12      If you use it like the Turkish people, and in
13 fact at that time point I didn't have the idea that
14 someone is using it in a different way. If you are
15 using it to reenforce the tissues, as we did it with the
16 flats meshes, then you don't have the risk for pore
17 collapse, as with the ligaments, and with this procedure
18 maybe it is a good idea to have it. But to use it as a
19 ligament it's not a good idea, and as a ligament I don't
20 want to have it.
21    Q. And you also, in response to questions from
22 Mr. Anderson, referred to conversations you had with
23 Ethicon about PVDF as a safer alternative design back in
24 the time that you were working with the company. That
25 was in the context of hernia repair, wasn't it? You

Page 286

1 didn't work with the company on its SUI devices or its
2 Prolift devices other than the conversation you've had
3 with Dr. Hellhammer, correct?
4      MR. ANDERSON: Objection to the form of the
5   question and the compound nature of it. Go ahead.
6   A.  We never put the limitation to hernia out there
7 ourselves, but it is a fact that we are just asked by
8 Ethicon to work on hernia for them. But there -- to no
9 time point we said that this is only true for hernia.
10 Never.
11   Q.  But the context of the work that you had with
12 Ethicon and PVDF was in the context of hernia repair;
13 true?
14   A.  That is true. The project focused on hernia.
15   Q.  And when you were talking about PVDF as an
16 alternative mesh, it was in the context of hernia
17 repair; true?
18   A.  Not intentionally by ourselves that we said
19 that this advantage is only true for hernia, no, never.
20   Q.  But that's the context in which you had the
21 conversations is in the context of hernia repair; true?
22      MR. ANDERSON: Objection. He's asked and
23   answered your question a number of times. Answer it
24   one more time, Dr. Klinge.
25   A.  The project at that time, from the side of

Page 287

1 Ethicon they were focused on hernia meshes. But the
2 advantage, the discussions about the PVDF is not limited
3 to hernia, and there is no data indicating that this is
4 true only for hernia or for the abdominal wall, no.
5   Q.  Move to strike everything after his first
6 sentence.
7      MR. ANDERSON: Well, you shouldn't have asked
8   him three times.
9      MR. THOMAS: I'm going to quit.
10      MR. ANDERSON: Okay. Just a few questions.
11      REDIRECT EXAMINATION (Continued)
12 BY MR. ANDERSON:
13   Q.  Mr. Thomas was asking you questions about the
14 pore size of Marlex being somewhere around .6
15 millimeters and the pore size of PROLENE at whatever
16 millimeters he stated. Is there a difference between --
17 I want to clear this up for the jury one last time.
18      Is there a difference between talking about the
19 pore size, or some measurement of the holes of the mesh
20 by the manufacturer as it's coming out of the box,
21 versus talking about what the holes do once it's in use
22 by the surgeon and in the body?
23      So my question is, do these one millimeter pore
24 size out of the box or .6 millimeters out of the box
25 have any relationship to patient safety in how that mesh

Page 288

1 and how those holes are going to incorporate in the
2 tissue in the body?
3      MR. THOMAS: Object to the form of the
4   question.
5   A.  No, these data -- these data shouldn't be
6 regarded as being relevant. The -- the relevant thing
7 is whether you can see these fat within the pores and
8 you see it neither with the Marlex nor with the PROLENE
9 mesh, and therefore both -- it is correct to assume that
10 both are heavyweight small-pore meshes with this high
11 risk for fibrotic bridging.
12      And this creates this deformation we have shown
13 by the scar formation, this contraction, this shrinking
14 and this nerve entrapment by the scar. All of these
15 complications are in relation to the extent of scar
16 formation, and there is no significant difference in
17 between what is said by the manufacturer or whether it's
18 .6 or one millimeter. There is no difference in the
19 quality of tissue reaction.
20   Q.  Okay. He also was talking about kilonewtons
21 and things like that from the Pariente study. Let me
22 ask you this: When you and Professor Muhl,
23 independently from Professor Moalli and her group at
24 University of Pittsburgh, independently from Ethicon's
25 own scientists, tested the TVT mechanical-cut mesh at

Page 289

1 loads that Ethicon said could be anticipated in the
2 body, was there significant particle loss that would
3 affect your opinions as to whether or not that would be
4 safe in the body?
5      MR. THOMAS: Object to the form of the
6   question.
7   A.  The mechanical cut leads to more particle loss
8 than the laser cut.
9   Q.  And was that determined after both your group,
10 Moalli's group and Ethicon put forces that could be
11 anticipated in the body?
12   A.  Yes.
13      MR. THOMAS: Object to the form of the
14   question.
15   Q.  He also asked you a question, he showed you one
16 study where there was a conclusion that said overall
17 mesh weight had no effect on patient complications. Do
18 you remember he showed that to you?
19   A.  Yes.
20   Q.  Did Ethicon change its hernia meshes to have
21 much less weight in order to address patient
22 complications starting in 1998?
23      MR. THOMAS: Object to the form of the
24   question.
25   A.  To my knowledge all of the meshes that has been

## Page 290

1　developed since 1997, they were -- they had the design
2　with a material reduction, they had the design with
3　smaller filament size, they had the design with larger
4　holes to reduce the risk operatively.
5　　Q.　And even though this one article had some
6　conclusions that overall mesh weight didn't affect
7　patient complications, did Ethicon utilize having much
8　less material in their prolapse meshes that they put on
9　the market since the middle of the 2000s?
10　　MR. THOMAS:　Object to the form of the
11　question.
12　　A.　It is still used in the advertisements that it
13　is a big advantage to have material reduction, to have
14　larger holes, and this will improve the tissue reaction.
15　This is still used for many of the products.
16　　Q.　And when you say advertisements, advertisements
17　by Ethicon?
18　　A.　Yes.
19　　MR. ANDERSON:　No further questions.
20　　MR. THOMAS:　What's the last exhibit number?
21　　MR. ANDERSON:　Your last exhibit number?　I
22　don't know.
23　　THE VIDEOGRAPHER:　We are off the record at
24　5:57 p.m.
25　　MR. THOMAS:　Let's keep going.　No, I'll do

## Page 291

1　Exhibit 22, because there's no way we're near that,
2　and we'll change it later if we have to.
3　　　RECROSS-EXAMINATION (Continued)
4　BY MR. THOMAS:
5　　(Klinge Exhibit No. 22 was marked for
6　identification.)
7　　Q.　Doctor, I've gone back to Dr. Muhl's report,
8　and I'm attaching Pages 1, 2, 3, 4 and 5 of the image
9　size of the TVT device zero force measurement.　Are
10　those the measurements that Dr. Muhl took of the TVT
11　device at zero force?　Are they?
12　　MR. ANDERSON:　Which figures are you talking
13　about?　There's like two pages full of figures.
14　　A.　It's written here, yes.
15　　Q.　What are they?　Tell me what they are.
16　　A.　These images.
17　　Q.　And the measurements on the next page, next
18　several pages, what do those represent?　No, not the
19　graph, but the numbers themselves.
20　　A.　This is an arbitrary way to get an impression
21　about the distribution of the pores, because every
22　textile construction have some sort of smaller pores and
23　some sort of larger pores.　And beyond the question
24　whether it's sufficiently large or not sufficient large,
25　that is the question for the effective porosity.

## Page 292

1　　We wanted to know what is the distribution,
2　what is the relevance of a specific size of the pores.
3　And you see, as you indicated already, that for the
4　PROLENE mesh used in TVT, the pore size is around one
5　millimeters or a little bit above.　But, this pore size
6　is just the square root of the area.　That is not
7　correct.
8　　Because usually for the effective porosity you
9　need the distance in all directions, and therefore the
10　square root of the area is not very precisely.　But it
11　helps to get an understanding that you are close to the
12　one millimeters in most of the pores.
13　　But it is not -- it does not -- it is not able
14　to -- to replace the definition of the effective
15　porosity, because this considers the geometrical shape
16　of the pores much more.
17　　Q.　And on Page 3 of Klinge 22 is a list of 119
18　detailed pore evaluations.　And this is a measurement of
19　each of the pores?
20　　A.　This is so far, I remember correctly, this is
21　when you made an image analyze in here you get a huge
22　variety of different areas, some bigger, some larger.
23　And there you can take the square root and then you get
24　different classes of -- of pores.　Some are lower, some
25　are a little bit larger.　So then you can see in other

## Page 293

1　textiles then that there is a considerably high number
2　of small pores which may be ignored by just looking to
3　the effective porosity.
4　　Q.　Okay.　But these are Dr. Muhl's calculations of
5　the pores that are present in the TVT PROLENE mesh
6　device with a zero force measurement, correct?
7　　A.　Yes.
8　　MR. THOMAS:　That's all the questions I have.
9　　MR. ANDERSON:　Well, let's clear this up.
10　　　REDIRECT EXAMINATION (Continued)
11　BY MR. ANDERSON:
12　　Q.　It says millimeters squared on there, doesn't
13　it, Doctor?
14　　A.　Yes.
15　　Q.　That is an area, not the distance between the
16　fibers that you've talked about, correct?
17　　A.　Yes.
18　　Q.　So you could have a very, very long pore that
19　is a half of a micron tall and 40 microns long.　Will
20　that be safe for bridging purposes?
21　　A.　No, definitely not.
22　　Q.　Can you use this document, as Mr. Thomas is
23　trying to, to say that all these pores in the -- in the
24　PROLENE mesh have one millimeter in all direction pore
25　sizes?

Confidential - Subject to Protective Order

Page 294

1    A.  These measurements does not allow to predict
2  the risk for bridging, they just help to made a textile
3  configuration.
4    Q.  But, in fact, it doesn't even tell you whether
5  or not they're one millimeter in diameter, does it?
6    A.  No.
7    Q.  It's just the square area, correct?
8    A.  Yes.
9        MR. ANDERSON:  Thank you.
10       RECROSS-EXAMINATION (Continued)
11 BY MR. THOMAS:
12   Q.  The last entry does tell you the length of the
13 main axis of the pore size, correct?
14   A.  This is an arbitrary calculation on this.
15   Q.  What do you mean arbitrary calculations?  The
16 numbers are different.
17   A.  It is taken from the pore area.
18   Q.  Okay.  But it's an actual measurement of the
19 pores that he measured as a part of this --
20   A.  It's a calculation, it's not a measurement.
21   Q.  Okay.
22       MR. THOMAS:  Thank you.  That's all I have.
23       REDIRECT EXAMINATION (Continued)
24 BY MR. ANDERSON:
25   Q.  You can't take that -- we have to make this

Page 295

1  clear.  You can't take that piece of paper, as
2  Mr. Thomas is trying to, and say that all of the pores
3  in the TVT are one millimeter in diameter.  You can't
4  use it for that purpose, can you, Doctor?
5    A.  No, you shouldn't do it, and it is impossible
6  to take this information to explain that you don't have
7  the bridging.  You have the bridging, and this is in
8  accordance to the measurement of the effective porosity,
9  and not to these calculated data.
10   Q.  And that's before any tension at all is placed
11 on the mesh, correct?
12   A.  Exactly.
13       MR. ANDERSON:  Okay.  No further questions.
14       MR. THOMAS:  That's all.  Thank you.
15       THE VIDEOGRAPHER:  This concludes the
16 deposition.  We are off the record.  The time is
17 6:03 p.m.
18       MR. ANDERSON:  We need you as soon as humanly
19 possible to get us the final.
20       MR. THOMAS:  And I'll take the same.
21       (Signature having been waived, the deposition
22 of DR. UWE KLINGE was concluded at 6:05 p.m.)
23
24
25

Page 296

1        C E R T I F I C A T E
2
3    I, TRINA B. WELLSLAGER, Registered Professional
4  Reporter and Notary Public, do hereby certify that,
5  pursuant to notice, the deposition of DR. UWE KLING was
6  duly taken on 11/4/15 at 9:36 a.m. before me.
7        The said DR. UWE KLINGE was duly sworn by me
8  according to law to tell the truth, the whole truth and
9  nothing but the truth and thereupon did testify as set
10 forth in the above transcript of testimony.  The
11 testimony was taken down stenographically by me.  I do
12 further certify that the above deposition is full,
13 complete, and a true record of all the testimony given
14 by the said witness.
15
16 _____
17    TRINA B. WELLSLAGER, RPR
18
19   (The foregoing certification of this transcript
20 does not apply to any reproduction of the same by any
21 means, unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24
25

Page 297

1        LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25