IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327<br>MDL 2327 |
| THIS DOCUMENT RELATES TO:<br><br>WAVE 4 CASES ON MOTION EXHIBIT A | JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE |

**RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF STANLEY ZASLAU, M.D.**

Defendants Ethicon, Inc. and Johnson & Johnson (collectively, "Ethicon") hereby respond in opposition to "Plaintiffs' Motion to Exclude the Opinions and Testimony of Stanley Zaslau, M.D." [ECF No. 3665] and "Memorandum in Support of Plaintiff's Motion to Exclude Certain Opinions of Dr. Stanley Zaslau" [ECF No. 3669] (collectively, the "Motion") as follows:

Dr. Stanley Zaslau is a board-certified urologist with two decades of experience treating women for stress urinary incontinence using TVT and TVT-O. Further, he has over a decade of experience performing surgeries to treat pelvic organ prolapse, including having performed over 100 Prolift procedures. Plaintiffs challenge several of Dr. Zaslau's opinions as being beyond the scope of his qualifications or unreliable. However, all of the opinions that Dr. Zaslau intends to offer at trial are well within the scope of his expertise and based on reliable methodology, including his own extensive experience and his review of peer-reviewed literature. For these reasons, Plaintiffs' Motion should be denied.

**BACKGROUND**

Dr. Stanley Zaslau, MD, is a professor and Chief of the Division of Urology at West Virginia University. Mot. Ex. C, General Expert Report of Stanley Zaslau, MD, MBA, FACS Regarding Gynemesh PS and Prolift [ECF No. 3669-3] ("Prolift/Gynemesh PS Report") at 2. He is a medical doctor with a specialty in urological surgery and is the first physician in the State of West Virginia to receive a subspecialty in Female Pelvic Medicine and Reconstructive Surgery, also known as urogynecology. *Id.* Dr. Zaslau has served two general expert reports in this matter: one concerning the use of Prolift and Gynemesh PS for treatment of pelvic organ prolapse and another concerning the TVT and TVT-O procedures for treatment of stress urinary incontinence. *See generally* Mot. Ex. C, Prolift/Gynemesh PS Report; Mot. Ex. J, General Expert Report of Stanley Zaslau, MD, MBA, FACS Regarding TVT and TVT-O [ECF No. 3669-3] ("TVT/TVT-O Report").

**ARGUMENT**

**I.      Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Zaslau Should Be Denied as Moot.**

Dr. Zaslau was only disclosed to offer general causation opinions in one case—*Sandy Strunk, et al.*, Case No. 2:12-cv-04933—which case was active and pending in Wave 4 as of the date Plaintiffs' Motion was filed. *See* Mot. Ex. A, Zaslau Daubert Motion [ECF NO. 3669-1].

However, the *Strunk* case is no longer active and has been removed from Wave 4. As such, Plaintiffs' Motion should be denied as moot.

**II.     Dr. Zaslau Will Not Offer Opinions Concerning the Adequacy of the Warnings, but His Opinions Concerning the Knowledge of the Medical Community Are Reliable and Admissible.**

Plaintiffs devote several pages attacking Dr. Zaslau's opinions concerning the adequacy of the warnings for Prolift. To the extent that Plaintiffs' motion is directed at legal or regulatory

2

opinions concerning the adequacy of the IFU, Dr. Zaslau will not offer such opinions at trial and the Court should deny Plaintiffs' Motion as moot.

However, Plaintiffs also attack Dr. Zaslau's opinions concerning the knowledge of the medical community concerning the risks of pelvic mesh devices. Pls.' Mem. at 7. This attack is unfounded. Dr. Zaslau has extensive experience in the surgical repair of both pelvic organ prolapse and stress urinary incontinence. Dr. Zaslau has implanted over 100 Prolift devices and performed hundreds of TVT and TVT-O procedures. *See* Mot. Ex. C, Prolift/Gynemesh PS Report at 3; Mot. Ex. J, TVT/TVT-O Report at 3–4. He has extensively reviewed medical literature, including peer-reviewed studies and core medical textbooks, concerning the complications associated with all prolapse and incontinence procedures, including procedures that preceded the release of TVT or Gynemesh PS. *See* Mot. Ex. C, Prolift/Gynemesh PS Report at 12–19 (summarizing medical literature concerning traditional prolapse repair techniques that predated the release of Gynemesh PS and Prolift); Mot. Ex. J, TVT/TVT-O Report at 40–61 (summarizing medical literature on SUI procedures that predated TVT).

Through his education, training, experience, and review of literature, Dr. Zaslau is more than qualified to offer opinions concerning the knowledge of the medical community with respect to the risks of TVT, TVT-O, Prolift, Gynemesh PS, and pelvic floor surgeries in general, and these opinions are reliably supported by the medical literature. Further, this is a proper subject of expert opinion. See, e.g., *Kowalski v. Ethicon, Inc.* (*In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*), No. 2:12-cv-01323, 2017 WL 1128638, at *2 (S.D. W. Va. Mar. 24, 2017) (noting that "[e]xpert witnesses may properly offer opinions on" "the knowledge of the medical community in general").

For these reasons, Plaintiffs' Motion should be denied to the extent it seeks to exclude Dr. Zaslau's opinions concerning the knowledge of the medical community with respect to the risks of TVT, TVT-O, Prolift, Gynemesh PS, and other surgical procedures for the treatment of pelvic organ prolapse or SUI.

### III. Dr. Zaslau Is Solely Offering Opinions on Safety and Efficacy—Which He Is Qualified to Do—and Will Not Offer Any True "Design Opinions."

Plaintiffs move to exclude any opinions from Dr. Zaslau concerning the "design" of TVT, TVT-O, Prolift, or Gynemesh PS. Pls.' Mem. at 9–12. Plaintiffs cite to deposition testimony from Dr. Zaslau where he disclaims being a "design" expect. *Id.* at 9–10. They also criticize Dr. Zaslau for not reviewing certain internal Ethicon documents used in the design of Prolift and Gynemesh PS. *Id.* at 10–12. Plaintiffs claim that this lack of expertise and knowledge preclude Dr. Zaslau from offering any "opinions on the issue of product design," including opinions as to the "reasonableness" of this design. *Id.* at 11–12. However, the actual opinions disclosed in Dr. Zaslau's reports are not "design" opinions; rather, these are reliable opinions on safety and efficacy that are squarely within the scope of Dr. Zaslau's qualifications.

This Court has explained that an expert need not be a "design expert" simply because he uses the word "design." *See, e.g.*, *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2327, 2017 WL 988946, at *3 (S.D. W. Va. Mar. 10, 2017). "[T]he mere utterance of a single word is not some incantation that transforms an opinion about one thing into something else." *Id.* This Court has clarified that a "design opinion" is dealing with the design process, such as "opinions about pre-marketing product testing and product development." *Id.* Dr. Zaslau does not and will not offer any opinions about the process of designing mesh implants, and, as such, Plaintiffs' Motion should be denied as moot.

4

To the extent that Plaintiffs' "design" argument is directed at Dr. Zaslau's opinion that the design of the subject products was safe and effective, Plaintiffs' Motion is without merit. As an experienced board-certified urogynecologist, Dr. Zaslau is more than qualified to offer opinions about the safety and efficacy of pelvic floor and incontinence procedures and implants, including TVT, TVT-O, Prolift, and Gynemesh PS. As noted above, Dr. Zaslau has extensive personal experience with these procedures and has reviewed numerous peer-reviewed publications concerning the safety and efficacy of these and other similar procedures.

Dr. Zaslau's knowledge, training, education, experience, and literature review enable him to compare the mesh procedures to traditional procedures that do not use mesh and form reliable opinions concerning the relative safety and efficacy of Ethicon's mesh products. *See, e.g.*, *In re Ethicon, Inc.*, MDL No. 2327, 2016 WL 4493666, at *3 (S.D. W. Va. Aug. 25, 2016) (finding that urogynecologist's "extensive clinical and research experience qualifies [him] to opine on mesh's reaction to and effect on the human body, and relatedly, the safety and efficacy of mesh products"); *Carlson v. Boston Sci. Corp.*, No. 2:13-cv-05475, 2015 WL 1931311, at *35–36 (S.D. W. Va. Apr. 28, 2015) (finding urogynecologist's opinions on safety and efficacy of mesh product based on literature review and personal experience were reliable).

For these reasons, the Court should deny Plaintiffs' Motion with respect to opinions concerning the safety, efficacy, and reasonableness of the design of TVT, TVT-O, Prolift, and Gynemesh PS.

**IV.     Dr. Zaslau's Opinions on Particle Loss and Fraying Are Reliably Based on His Experience and Review of the Literature.**

Plaintiffs challenge Dr. Zaslau's statement in his TVT/TVT-O Report that he has "not removed degraded particles of mesh or seen grossly altered structure of the knitting in any of" the mesh specimens he has removed during urethrolysis. Pls.' Mem. [ECF No. 3669] at 3

5

(quoting Mot. Ex. J, TVT/TVT-O Report at 72). Plaintiffs say that this "essentially" amounts to saying "'I have not seen it, so it does not happen.'" *Id.* This is, however, untrue. Dr. Zaslau's statement does not suggest that the absence of degraded particles in meshes Dr. Zaslau has seen is evidence that such particles are absent in all cases. Instead, his statement is just part of the basis for his opinion that there is no clinically significant difference between machine-cut mesh and laser-cut mesh. Mot. Ex. J, TVT/TVT-O Report at 72. This opinion was based not just on his personal experience, but also on a review of peer-reviewed medical literature. *Id.*

Further, Dr. Zaslau's opinions on this topic are not contradicted by scientific literature or by internal Ethicon documents. During his deposition, Dr. Zaslau agreed with medical literature that showed that "particles that are of a foreign body cause a foreign-body response." Mot. Ex. K, Zaslau 3/17/16 Dep. Tr. [ECF No. 3669-11] at 104:11–105:9. However, Dr. Zaslau clearly opined, based both on his personal experience and his review of peer-reviewed literature, that this foreign body response was not clinically significant. *Id.* at 104:3–10; Mot. Ex. J, TVT/TVT-O Report at 20. The literature plainly recognizes that some foreign-body responses are *subclinical. See, e.g.,* Resp. Ex. A, Abstract, Xue et al., "Local foreign-body reaction to commercial biodegradable implants: an in vivo animal study," Craniomaxillofac Trauma Reconstr. 2014 Mar;7(1):27-34. doi: 10.1055/s-0033-1364199, Epub 2014 Jan 9 ("All local foreign-body reactions were subclinical with no corresponding tissue swelling requiring drainage."). It may be that others have observed to the contrary, but that would not render Dr. Zaslau's opinions unreliable or irrelevant.[1]

---

[1] The role of so-called "negative evidence" is well-recognized:

> The probative force of negative testimony depends largely upon circumstances. In some circumstances, its probative force may be so slight as to reach the vanishing point; in other circumstances, such testimony may be more persuasive than the positive testimony of some witnesses. It is only when it is so clear that

Further, Dr. Zaslau is *not* denying the observations or the opinions of others. He is, rather, asserting an opinion based on what he has learned through more than 15 years of clinical experience with TVT and TVT-O, professional presentations, and review of medical literature. *See* Mot. Ex. K, Zaslau 3/17/16 Dep. Tr. 138:1–22 (discussing that he has not observed a clinical difference between laser-cut and machine-cut mesh in his 15 years of professional experience or at presentations at professional meetings); Mot. Ex. J, TVT/TVT-O Report 20 ("I have not seen any complications attributed to particle loss or mesh fraying in the hundreds of randomized controlled trials evaluating the safety and efficacy of TVT and TVT-O, nor have I had any problems or complications associated with particle loss from TVT or TVT-O in my practice."). Just because Plaintiffs or their experts may disagree with Dr. Zaslau's conclusions on this topic does not render his opinions unreliable. *See, e.g.*, *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 635 (S.D. W. Va. 2013) ("[E]xperts can disagree on their opinions and conclusions, as long as they are based on reliable principles and methods.").

**V.     Dr. Zaslau's Sheath Opinion Is Based on Reliable Methodology.**

Plaintiffs object to Dr. Zaslau's observation that mechanical-cut mesh does not rope when it is pulled with the plastic sheath over it. Plaintiffs say that this "is nothing more than the same sort of inadmissible 'I have not seen it' testimony that he offers regarding particle loss." Pls.' Mem. at 16. However, Dr. Zaslau bases this opinion on reliable *ex vivo* experiments and *in vivo* observations:

> [W]e do different experiments with the mesh *ex vivo*. So when we pull on the mesh by itself, be it mechanically-cut or laser-cut, it'll rip and tear, and it won't regain its normal form. And the pore size will certainly be distorted. But,

---

such testimony has no probative value whatever that reasonable men would not differ in their conclusions with reference thereto that courts are justified in disregarding it on the ground that it does not rise to the dignity of evidence.

*Union Pac. R. Co. v. Burnham*, 124 F.2d 500, 502 (10th Cir. 1941).

> interestingly, when we do the same thing with the plastic sheath over it, we can't move the mesh despite how hard we pull. We've actually even looked with an operative telescope. We've actually even looked with an operative telescope at patients that we finished doing the TVT on to see if there is any evidence of fiber loss or any change in what I think the mesh should look like, and I've never seen any.

Mot. Ex. K, Zaslau 3/17/16 Dep. Tr. 102:9–21. Such experimentation and personal observations are reliable under *Daubert*. *See, e.g.*, *Bullock v. Daimler Trucks N. Am., LLC*, 819 F. Supp. 2d 1172, 1177 (D. Colo. 2011) ("An out-of-court experiment may be offered by an expert at trial in order to illustrate or demonstrate principles used to form an expert opinion." (citing *Pandit v. Am. Honda Motor Co., Inc.*, 82 F.3d 376, 381–82 (10th Cir. 1996))); *see also Cummins v. Lyle Indus.*, 93 F.3d 362, 370 (7th Cir. 1996) ("Indeed, . . . we acknowledged that 'there may be a situation in which personal experiments or observations meet the requirements of *Daubert.*'").

Contrary to Plaintiffs' assertion that Dr. Zaslau's "observations cannot be confirmed, and his opinions cannot be contradicted or tested," Pls.' Mem. at 16, Dr. Zaslau's experiment can be easily reproduced (and potentially refuted) by any expert with a sample of mesh and plastic sheathing. Further, Dr. Zaslau's experimental setup is reliable, as it simulated what the mesh would undergo during the TVT/TVT-O procedure. *See* Mot. Ex K, TVT/TVT-O Report 20 ("It is well known that when the plastic tape is pulled quickly or is under excessive tension that the mesh can lose a few particles from the ends of tape. Such a reaction does not occur when used as designed. The sheath covering the mesh is easily removed when removed as instructed and the techniques described above are utilized to prevent the mesh from being placed under tension.").

Accordingly, Dr. Zaslau should be able to offer opinions based on his personal testing and observations of mesh placement using a sheath.

## VI. Dr. Zaslau's Opinions About Degradation Are Grounded in Peer-Reviewed Literature, Are Reliable, and Fall Within the Scope of His Qualifications.

Plaintiffs attack Dr. Zaslau's degradation opinions as unreliable based on the argument that these opinions conflict with Ethicon's internal documents. What Plaintiffs ignore is that Dr. Zaslau's opinions are based on peer-reviewed literature that postdate these internal documents and that demonstrate that polypropylene mesh does not undergo *in vivo* degradation.

For instance, Dr. Zaslau cites to testing by Ong and Thames that was recently published in 2016. *See* Mot. Ex. C, Prolift/Gynemesh PS Report at 81–82; Mot. Ex. J, TVT/TVT-O Report at 22–23. This testing, published in peer-reviewed literature, directly refutes Plaintiffs' evidence that polypropylene mesh degrades *in vivo*. *See* Resp. Ex. B, Ong, Thames, et al., *The Myth: In Vivo Degradation of Polypropylene Meshes*, Int Urogynecol J (2016) 27 (Suppl 1): S37-S38; Resp. Ex. C, Thames, S., *The Myth: in vivo degradation of polypropylene-based meshes*, Int Urogynecol J. 2016; DOI 10.1007/s00192-016-3131-4. Dr. Zaslau also relies on and cites to a 2011 peer-reviewed article finding that the apparent "degradation" cracks on polypropylene mesh fibers were actually biofilm and that the fibers themselves were unaffected. *See* Resp. Ex. D, de Tayrac & Letouzey, *Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery*, Int Urogynecol J (2011) 22:775–780.

Dr. Zaslau also conducted an extensive review of literature, from which he concluded that there were not any clinically significant consequences to the alleged degradation of polypropylene or Prolene mesh. *See* Mot. Ex. C, Prolift/Gynemesh PS Report at 81 ("There are no reliable clinical studies demonstrating any clinical significance associated with alleged degradation."); Mot. Ex. J, TVT/TVT-O Report at 20 ("There are no reliable scientific studies evaluating the TVT or TVT-O that have demonstrated any clinical significance to alleged cytotoxicity, degradation, or cancer."). Dr. Zaslau's opinion that Prolene mesh does not degrade

*in vivo* and that any degradation is not clinically significant is therefore supported by sound, reliable methodology. *See, e.g.*, *Huskey v. Edwards*, 29 F. Supp. 3d 691, 734–35 (S.D. W. Va. 2014) (finding that urogynecologist's opinions on degradation reliable).

Plaintiffs' reliability arguments against Dr. Zaslau's degradation opinions are nearly identical to the ones this Court rejected in the *Huskey* case with respect to Dr. Harry Johnson, another expert urogynecologist. *See id.* In that case, plaintiffs attacked Dr. Johnson's opinion that polypropylene does not degrade *in vivo* as speculative and based solely on Dr. Johnson's lack of observation of degradation in his medical practice. *Id.* The Court rejected this argument, noting that Dr. Johnson's degradation opinions were based "on his review of scientific literature as well as his clinical experience." *Id.* The Court found that this was a sufficiently reliable basis for Dr. Johnson's opinions, especially since opinions about lack of evidence of clinically significant degradation are "obviously not subject to testing or peer-review." *Id.* As with Dr. Johnson in *Huskey*, Dr. Zaslau's degradation opinions are based on clinical observations *and* an extensive literature review, both of which are reliable bases for such opinions.

Plaintiffs also attack Dr. Zaslau's qualifications to offer degradation opinions on the grounds that he does not know about the chemical processes of degradation and did not test mesh explants for degradation. However, this Court has already found that Dr. Zaslau "is qualified to testify about degradation from a clinical perspective, such as mesh's reaction and effect on the human body." *In re Ethicon, Inc.*, MDL No. 2327, 2016 WL 4944907, at *3 (S.D. W. Va. Aug. 30, 2016). This Court has also found other urologists or gynecologists qualified to offer similar degradation opinions under similar circumstances. *See, e.g.*, *Huskey*, 29 F. Supp. 3d at 726 (finding urologist "qualified by her medical experience to testify whether she has observed mesh degradation in her clinical practice"); *id.* at 734 (finding Dr. Johnson qualified to

offer degradation opinions based on his personal experience implanting mesh and his research experience).

Plaintiffs have not presented any reason to depart from this Court's prior holdings. Dr. Zaslau is board-certified in female pelvic medicine and reconstructive surgery, also known as urogynecology, and has performed hundreds of TVT, TVT-O, and Prolift implants. Mot. Ex. C, Prolift/Gynemesh PS Report 2–4; Mot. Ex. K, TVT/TVT-O Report 2–4. He and his partner have removed approximately 200 SUI meshes in their medical practice and between 10 and 20 pelvic organ prolapse meshes. Mot. Ex. D, Zaslau 3/8/17 Dep. Tr. 164:1–17; Mot. Ex. K, Zaslau 3/17/16 Dep. Tr., 48:8–23. Further, as noted above, Dr. Zaslau has reviewed peer-reviewed literature, studies, and testing in reaching his degradation opinions. He is qualified to offer his degradation opinions based on his knowledge, training, research, and personal clinical experience.

**VII.  Dr. Zaslau's Long-Term Pain Opinions Are Supported by His Review of Medical Literature.**

Plaintiffs challenge Dr. Zaslau's long-term pain opinions based solely on his failure to identify, at his deposition, a specific study supporting his opinions. However, this contention is wrong, because, after Dr. Zaslau was given an opportunity to review his report, he identified a meta-analysis of medium-term and long-term studies on both retropubic and transobturator midurethral slings:

> Q.   Okay. But I didn't ask about erosions or extrusions. I asked you to name one study that tracked chronic long-term pain associated with the TVT.
>
> A.   I can't name one.
>
> MS. ROBINSON: Just to be fair, you're not asking him to look at his records, reports, or anything he has sitting in front of him, right?
>
> MR. WALLACE: He can look at anything he wants.

11

> MS. ROBINSON: Well, if he can look at anything he wants, you might want to take a few seconds and look at what he's got.
>
> MR. WALLACE: And just for the record, we're letting Dr. Zaslau review his materials in an attempt to answer the question as to whether or not there's one study that tracks long-term chronic pain with the TVT.
>
> . . .
>
> **THE WITNESS: In the Tomaselli paper, just looking at the long-term pain complications of which the risks appear to be very low, but can occur with minimally invasive slings.**

Mot. Ex. K [ECF No. 3669-11], Zaslau 3/17/16 Dep. Tr. 72:22–74:5; *see also* Resp. Ex. E, Tommaselli, et al., *Medium-term and long-term outcomes following placement of midurethral slings for stress urinary incontinence: a systematic review and metaanalysis*, Int Urogynecol J. 2015 Sep;26(9):1253-68.

Tommaselli (2015) was a meta-analysis of long-term (five-plus years) studies of retropubic midurethral slings (including, but not limited to, TVT) and medium-term (three-plus years) outcomes of transobturator midurethral slings (including, but not limited to, TVT-O). *See id.* The authors noted that postoperative and chronic pain was reported in 5.9% of the transobturator patients, but that "chronic pain" and similar terms were not consistently defined across all studies. *Id.* at p. 6. Using a consistent definition of "persistent pain"—i.e., pain reported more than seven days after the procedure—the authors found that the rates of persistent pain for retropubic and transobturator procedures were 2.2% and 1.9%, respectively. *Id.* The authors noted, however, that the actual rate of chronic long-term pain lasting more than a few months was much lower than these figures suggest:

> All reported episodes, i.e. postoperative, persistent and chronic pain, are included in this analysis and *most were postoperative or persistent pain that resolved within weeks or months, with no long-term sequelae. The rate of chronic pain in the groin and/or the thigh is far lower.* It must be underlined that not all studies clearly defined postoperative, persistent and chronic pain, so that it was difficult to correctly identify the cases that remained unresolved.

*Id.* at p. 12 (emphasis added). So, contrary to Plaintiffs' arguments, Dr. Zaslau did cite a long-term study at his deposition that supported his opinions on the low rates of long-term chronic pain.

Further, Dr. Zaslau's inability to recall other studies reporting on long-term pain does not render his opinions unreliable. *See Tyree v. Boston Sci. Corp.*, 54 F. Supp. 3d 501, 559 (S.D. W. Va. 2014) (noting that expert's "failure to recall which articles supported his opinion as to safety is an insufficient reason to find his methodology unreliable" because expert had "extensive experience, . . . had authored peer-reviewed articles on this subject . . . , and considered scientific literature in forming his opinions as evidenced by his relied upon list"). Instead, Dr. Zaslau's opinion is based both on his nearly two decades of clinical experience using TVT and TVT-O and his review of peer-reviewed medical literature, including several long-term studies.

Dr. Zaslau's general TVT and TVT-O report clearly cites to numerous studies for his opinion that "long-term studies on TVT and TVT-O have consistently shown a favorable safety profile for both devices." Mot. Ex. J, Zaslau TVT/TVT-O Report at 25; *see also id.* at 23–37 (discussing literature on long-term complications of TVT and TVT-O). In addition to the Tommaselli (2015) study, Dr. Zaslau's report cites to several studies that reported low rates of pain and dyspareunia five or more years following implantation of TVT or TVT-O:

- Kuuva (2006), a study of TVT with a mean follow-up of six years, reported no serious or unexpected long-term complications among patients. *See* Resp. Ex. F, Kuuva, et al., *Long-term results of the tension-free vaginal tape operation in anunselected group of 129 stress incontinent women*, Acta Obstet Gynecol Scand (2006) 85:482-487.

- Serati (2012), a long-term prospective study on TVT that initially included 63 women, reported no de novo dyspareunia among remaining patients after 10 years. *See* Resp. Ex. G, Serati M, et al., *Tension-free vaginal tape for the treatment of urodynamic stress incontinence: efficacy and adverse effects at 10-year follow-up*, Eur Urol (2012) 61:939-946.

- Nilsson (2013) reported no adverse reactions or symptoms among TVT patients after 17 years. *See* Resp. Ex. H, Nilsson CG, et al., *Seventeen years' follow-up of the tension-free vaginal tape procedure for female stress urinary incontinence*, Int Urogynecol J (2013) 24: 1265-1269, doi 10.1007/s00192-013-2090-2

- Kenton (2015) reported that of 404 women who had received TVT or TVT-O implants, only 40 (10%) reported an adverse event, and fewer than eight of those were "nonserious" adverse events related to pain. *See* Resp. Ex. I, Kenton, et al., *5-Year Longitudinal Followup after Retropubic and Transobturator Mid-urethral slings*, J Urol 2015; 193: 203-210.

- Song (2009), a prospective study of 306 women, reported only one pain-related complication at one-year follow-up and no pain-related complications after seven years. *See* Resp. Ex. J, Song, et al., *The 7-year outcome of the tension-free vaginal tape procedure for treating female stress urinary incontinence*, BJU Int. 2009 Oct;104(8):1113-1117.

- Angioli (2010), a randomized controlled trial studying TVT and TVT-O, reported that of 52 remaining patients, only three reported pain or dyspareunia after five years. *See* Resp. Ex. K, Angioli, et al., *Tension-free vaginal tape versus*

>   *transobturator suburethral tape: five-year follow-up results of a prospective, randomised trial*, Eur Urol 2010;58:671-677.

- Laurikainen (2014), a randomized controlled trial for TVT and TVT-O, reported low overall rates of complications and no late-onset adverse reactions after five years. *See* Resp. Ex. L, Laurikainen, et al., *Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence*, Eur Urol 65 (2014):1109-1114.

These studies, along with Dr. Zaslau's personal training, education, and experience, reliably support his opinion that long-term complications—including chronic pain—associated with TVT and TVT-O are rare. Accordingly, Dr. Zaslau's opinions on long-term pain are reliable under *Daubert*.

## VIII. Dr. Zaslau's Opinions About His Personal Experiences Are Reliable and Admissible.

Plaintiffs seek to preclude Dr. Zaslau "from testifying about his perceived safety, efficacy, and patient satisfaction rates with the subject products from his practice." Pls.' Mem. at 19. Plaintiffs attack such opinions as unreliable on the grounds that Dr. Zaslau has not conducted a patient survey or similar formal analysis and that these personal experiences have not been subjected to peer review. *Id.* Plaintiffs also attack these opinions as misleading and confusing under Federal Rule of Evidence 403. *Id.* at 19–20. However, Dr. Zaslau's opinions and testimony concerning his personal experiences and results with the subject mesh products is reliable and admissible.

In previous cases, this Court has consistently allowed practicing medical doctors to offer opinions and testimony concerning their general personal experiences with mesh products. *See, e.g.*, *Trevino v. Boston Sci. Corp.*, No. 2:13-cv-01617, 2016 WL 2939521, at *33 (allowing

15

expert urogynecologist to offer opinions on safety and experience based on general experience with his patients). Where the Court has drawn the line and excluded testimony is when a physician seeks to offer "precise statistics" based on the doctor's personal practice. *In re Ethicon, Inc.*, MDL No. 2327, 2016 WL 4542054, at *4 (S.D. W. Va. Aug. 30, 2016). This Court has held that "expert testimony about specific rates is unreliable without more than the expert's assurances of reliability." *Id.*

Dr. Zaslau is not offering any opinions concerning exact statistics or complication rates calculated from his medical practice. Instead, he is offering opinions and testimony concerning his general personal experience with mesh products and other pelvic floor procedures. This is precisely the same kind of opinions and testimony this Court has allowed expert physicians to offer in previous cases, and Plaintiffs have not presented any reason to depart from these prior rulings. Accordingly, Plaintiffs' Motion on this point should be denied.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion to Exclude the Opinions and Testimony of Stanley Zaslau, M.D.

Respectfully submitted,

*/s/ David B. Thomas*
David B. Thomas (W. Va. Bar No. 3731)
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
P.O. Box 3824
Charleston, WV 25338-3824
(304) 414-1800
dthomas@tcspllc.com

*/s/ Christy D. Jones*
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS  39158-6010

COUNSEL FOR DEFENDANTS ETHICON,
INC. AND JOHNSON & JOHNSON

17

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2017, I electronically filed the foregoing document with the Clerk of the court using CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ David B. Thomas*
David B. Thomas (W. Va. Bar No. 3731)
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
P.O. Box 3824
Charleston, WV  25338-3824
(304) 414-1800
dthomas@tcspllc.com