# EXHIBIT

# B

Case 2:12-md-02327 Document 3790-3 Filed 04/29/17 Page 2 of 311 PageID #: 127751
Case 2:12-md-02327 Document 3790-3 Filed 04/29/17 Page 2 of 311 PageID #: 64459
Vladimir Iakovlev, M.D.

```
 1           IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    AT CHARLESTON

 4

 5   IN RE: ETHICON, INC.,              Master File No.

 6   PELVIC REPAIR SYSTEM PRODUCTS      2:12-MD-02327

 7   LIABILITY LITIGATION               MDL 2327

 8   --------------------------------

 9   THIS DOCUMENT RELATES TO CASE

10   CONSOLIDATION:

11   Terreski Mullins, et al., v.

12   Ethicon, Inc., et al.

13   Case No. 2:12-CV-02952

14   --------------------------------

15

16

17                  DEPOSITION OF

18            VLADIMIR IAKOVLEV, M.D.

19

20                   *  *  *  *

21         HIGHLY CONFIDENTIAL PORTION

22                   *  *  *  *

23

24             September 14, 2015

25             9:00 a.m. - 5:05 p.m.
```

Vladimir Iakovlev, M.D.

```
 1              Deposition of VLADIMIR IAKOVLEV, M.D.,

 2  a witness herein, called for examination by counsel

 3  for the Defense, in the above-mentioned matter, the

 4  witness having been affirmed, taken at the law

 5  offices of Siskinds LLP, 100 Lombard Street,

 6  Toronto, Ontario, commencing at 9:03 a.m. on

 7  Friday, September 11, 2015, and the proceedings

 8  taken down by Stenotype and transcribed by

 9  JUDITH M. CAPUTO, RPR, CSR, CRR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 4 of 311 PageID #: 127773
Case 2:12-md-02327  Document 3790-3  Filed 04/09/16  Page 4 of 311 PageID #: 64461
Vladimir Iakovlev, M.D.

```
 1              A P P E A R A N C E S:

 2

 3   On Behalf of the Consolidated Plaintiffs:

 4   JONATHAN ORENT, Esquire

 5   Motley Rice, LLC

 6   321 South Main Street, Suite 200

 7   Providence, Rhode Island  02903

 8   410.457.7700

 9   jorent@motleyrice.com

10

11   On Behalf of the Defendants, Ethicon:

12   DAVID B. THOMAS, Esquire

13   Thomas, Combs & Spann, PLLC

14   300 Summers Street, Suite 1380

15   Charleston, West Virginia

16   304.414.1807

17   dthomas@tcspllc.com

18

19   M. ANDREW SNOWDEN, Esquire

20   Butler Snow, LLP

21   The Pinnacle at Symphony Place

22   150 3rd Avenue South, Suite 1600

23   Nashville, Tennessee  37201

24   615.651.6700

25   andy.snowden@butlersnow.com
```

Case 2:12-md-02327  Document 3790-3  Filed 04/28/17  Page 5 of 311 PageID #: 127774
Case 2:12-md-02327  Document 3790-3  Filed 04/28/16  Page 5 of 311 PageID #: 64462
Vladimir Iakovlev, M.D.

```
1                  I N D E X

2

3    WITNESS:    VLADIMIR IAKOVLEV

4                                              PAGE

5    DIRECT EXAMINATION BY MR. THOMAS.................5

6    CROSS-EXAMINATION BY MR. ORENT.................296

7    **Highly Confidential Portion noted on page 40**

8

9

10                  INDEX OF EXHIBITS

11   NUMBER/DESCRIPTION                       PAGE NO.

12   NO. 1:  Expert Report of Dr.  Iakovlev in the    5

13   Mullins consolidated cases.

14   NO. 2:  Supplemental Expert Report of            5

15   Dr. Iakovlev in the Mullins consolidated cases.

16   NO. 3:  Notice of Deposition of Dr. Iakovlev.    5

17   NO. 4:  Thumb drive.                             5

18   NO. 5:  Study Entitled, "Safety Considerations   259

19   for synthetic sling surgery."

20   NO. 6:  Article entitled, "Degradation of        271

21   polypropylene in vivo: A microscopic analysis

22   of meshes explanted from patients."

23   Authored by  Vladimir Iakovlev, et al.

24

25   -- NOTE: Exhibit 4 was retained by Mr. Thomas.
```

Vladimir Iakovlev, M.D.

```
 1                    EXHIBIT NO. 1:  Expert Report of

 2                    Dr. Vladimir Iakovlev in the Mullins

 3                    consolidated cases.

 4                    EXHIBIT NO. 2:  Supplemental Expert

 5                    Report of Dr. Vladimir Iakovlev in the

 6                    Mullins consolidated cases.

 7                    EXHIBIT NO. 3:  Notice of Deposition of

 8                    Dr. Vladimir Iakovlev.

 9                    EXHIBIT NO. 4:  Thumb drive.

10

11     Whereupon,

12                    VLADIMIR IAKOVLEV, M.D.,

13     called for examination by counsel for Defendant

14     and having been affirmed by me, was examined and

15     testified as follows:

16                    DIRECT EXAMINATION BY MR. THOMAS:

17                    Q.   Good morning, Doctor.

18                    We've met before.  My name is David

19     Thomas.  I'm going to ask you a number of questions

20     about your expert witness opinion in the Mullins

21     case pending in the MDL in West Virginia; fair

22     enough?

23                    A.   Yes.

24                    Q.   I'm going to hand you what I've

25     marked as Exhibits 1 and 2 and ask you if Exhibit
```

Case 2:12-md-02327   Document 3799-3   Filed 04/29/17   Page 7 of 311 PageID #: 127776
Case 2:12-md-02327   Document 3799-3   Filed 04/29/16   Page 7 of 311 PageID #: 64464
Vladimir Iakovlev, M.D.

```
 1    Nos. 1 and 2 are the expert reports that you

 2    prepared in the Mullins case.

 3              A.   Yes, that's correct.  This one is

 4    on the left, the thicker one, is a combination of

 5    several patients and this one on the right, Exhibit

 6    No. 2, is a supplemental set of figures

 7    specifically from the specimen of Ms. Mullins.

 8              Q.   And Exhibits No. 1 and 2 represent

 9    the complete opinions you're prepared to give in

10    this case; is that fair?

11              A.   That's correct.

12              Q.   I show you now what's been marked

13    as deposition Exhibit No. 3.  That's a Notice of

14    Deposition in this case.

15              A.   Yes, I do see it.

16              Q.   Have you seen that before today?

17              A.   Yes, I did.

18              Q.   As a part of Exhibit 3, there's a

19    request attached to it that you produce documents

20    in response to that.

21              A.   There are 27 requests.  Yes, I've

22    seen that.

23              Q.   Did you review those requests?

24              A.   Yes, I did.

25              Q.   Did you attempt to collect the
```

Vladimir Iakovlev, M.D.

```
 1    information contained in those requests and produce

 2    it to me today?

 3                A.   Yes, I gathered all what I could

 4    on the thumb drive.

 5                Q.   And counsel has given me today

 6    what I've marked as Exhibit No. 4, which is a thumb

 7    drive.  Is this the thumb drive that you just

 8    described where you attempted to load all of the

 9    documents responsive to the Notice of Deposition

10    that you could find to put on the thumb drive?

11                A.   That is correct.

12                MR. ORENT:  At this point I want to

13    place an objection and notification.  We did file a

14    written objection so subject to those written

15    objections that material has been produced.

16                BY MR. THOMAS:

17                Q.   To save the time of going through

18    the notice or the thumb drive for right now, can

19    you recall any documents responsive to the Notice

20    of Deposition that you did not include on the thumb

21    drive?

22                A.   Well, the communication with

23    lawyers I didn't put.

24                Q.   Okay.

25                A.   The rest, I think I included
```

Case 2:12-md-02327 Document 3799-3 Filed 04/27/17 Page 9 of 311 PageID #: 127778
Case 2:12-md-02327 Document 3799-3 Filed 04/27/17 Page 9 of 311 PageID #: 64466
Vladimir Iakovlev, M.D.

1    everything I had pertinent to this case.

2            MR. ORENT:  Just to clarify though

3    again, the communication, I believe, was outside of

4    the three areas specified on Number 27.

5            MR. THOMAS:  I'm sorry, I did not hear

6    you.

7            MR. ORENT:  Under the federal rules

8    your request Number 27, to make the federal rule

9    recognizing the privilege existing between expert

10   and attorneys.

11           With the exception of the three areas

12   that you requested, I believe there were no

13   responsive communications specifically to those

14   three areas.

15           I believe other communications exist

16   that are not discoverable, and that's what the

17   doctor is referring to.

18           MR. THOMAS:  Okay.

19           MR. ORENT:  I don't believe he withheld

20   anything responsive to the request as written.

21           BY MR. THOMAS:

22       Q.   Doctor, you've given depositions

23   before in the Ethicon MDL, correct?

24       A.   That is correct.

25       Q.   You've testified in connection

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 10 of 311 PageID #: 137479
Case 2:12-md-02327 Document 2190-3 Filed 04/18/16 Page 10 of 311 PageID #: 64467
Vladimir Iakovlev, M.D.

1    with the Bellew case?

2              A.    Yes, I did.

3              Q.    And you've testified in connection

4    with the Huskey and Edwards cases, correct?

5              A.    That is correct.

6              Q.    And in those depositions you

7    testified to a methodology that you used to collect

8    specimens, create histopathological slides where

9    appropriate and review those slides.

10             Did you follow the same process in the

11   Mullins case that you followed in the Bellew and

12   Huskey Edwards cases?

13             A.    The process is standard.  It's not

14   specifically for medical-legal cases or mesh cases.

15   It's a standard histology protocols in a diagnostic

16   pathology lab, so I don't change it.  I follow them

17   for each specimen regardless if it's medical-legal

18   or a regular hospital patient.

19             Q.    Doctor, my question really meant

20   to eliminate re asking all those questions that

21   were asked in Huskey, Edwards and Bellew.

22             And if we can confirm that you followed

23   the same procedures in the Mullins case that you

24   followed in the prior depositions where you were

25   asked about your procedures then I'm not going to

Vladimir Iakovlev, M.D.

```
 1   go over that again.  Can we confirm that you

 2   followed the same steps?

 3              A.   Yes, I can confirm that.

 4              Q.   Doctor, what is a neuropathologist?

 5              A.   Neuropathologist?

 6              Q.   Yes.

 7              A.   Neuropathologist is a surgical

 8   pathologist who is specializing in examining brain

 9   tissue or spinal cord.  Sometimes it's the

10   subspecialty people do just neuropathology;

11   sometimes there is cross-coverage.

12              In our institution we have a

13   neuropathologist but it's only one.  Sometimes he

14   goes away on meetings, so we cover neuropathology.

15              Q.   Are you a neuropathologist?

16              A.   I'm cross-covering neuropathology

17   when he is away but I have not specialized in

18   neuropathology.

19              Q.   Are you board certified in

20   neuropathology?

21              A.   No, and you don't have to be board

22   certified in neuropathology because surgical

23   pathology includes neuropathology.

24              I mean, you can sub specialize further

25   down, but it depends on specific institution.
```

Vladimir Iakovlev, M.D.

```
 1   Because some institutions have a large number of

 2   specialized cases and some institutions they cover

 3   broad range.

 4              Q.   You said you had a

 5   neuropathologist at St. Michael's?

 6              A.   Yes, we do.

 7              Q.   What is the person's name?

 8              A.   Dr. David Munoz.

 9              Q.   Is that the only neuropathologist

10   at St. Michael's?

11              A.   Right now, yes.

12              Q.   Did you consult with Doctor --

13   what's his last name?

14              A.   Munoz.

15              Q.   M-U-N-O-Z?

16              A.   Yes.

17              Q.   Did you consult with Dr. Munoz in

18   connection with any of the opinions that you've

19   given in this case?

20              A.   No.

21              Q.   Did you consult with any

22   neuropathologist in connection with the opinions

23   you've given in this case?

24              A.   We're not talking about brain

25   tumors; we're talking about sub tissue
```

Vladimir Iakovlev, M.D.

```
 1    transvaginal.  I mean, why would I consult a

 2    neuropathologist?

 3              Q.    Just a simple yes or no question?

 4              A.    No, I didn't.  There was no

 5    purpose.

 6              Q.    Did you consult any neuropathology

 7    textbooks in connection with your opinions in this

 8    case?

 9              A.    Specifically just recently?

10              Q.    Any time during your work in this

11    case?

12              A.    Not in this case.  I opened and

13    read several neuropathology books when I was doing

14    research in meshes.  It's not just neuropathology

15    books, I mean, neuropathology is described in

16    general surgical pathology books.  Because I've

17    been in this field for three years.

18              Q.    I understand.  Just specific

19    questions, we'll get done quicker if you answer

20    "yes" or "no", if you can, and I'm not trying to

21    pin you down.

22              Is it your belief that neuropathology

23    has no role in understanding the presence of nerves

24    in the pelvic floor?

25              MR. ORENT:  Objection to form.
```

Vladimir Iakovlev, M.D.

```
 1              THE WITNESS:  Yeah, actually the form

 2    of the question is quite bizarre.

 3              Because neuropathology is part of

 4    surgical pathology.  So I'm a surgical pathologist

 5    I'm examining -- yes, there is a field of

 6    neuropathology when you specialize in that.

 7              If you take a combination of peripheral

 8    nerves as part of neuropathology, then I can say

 9    yes, there is a part of neuropathology.  But as I

10    said, it's still within surgical pathology.

11              This separation is somewhat artificial.

12    You probably don't understand exactly how such

13    specialization works.  Probably that's where it's

14    coming from.

15              BY MR. THOMAS:

16         Q.   Perhaps.  Do you know a Kenneth

17    Aldape, A-L-D-A-P-E?

18         A.   No.

19         Q.   Lorraine Kalia, K-A-L-I-A?

20         A.   No.

21         Q.   Julia Keith?

22         A.   No.

23         Q.   Tim Rasmus Kiehl, K-I-E-H-L?

24         A.   The names might be similar.  I

25    mean, a couple of those names are the same as a
```

Vladimir Iakovlev, M.D.

1    couple of neuropathologists in Toronto, I believe,

2    but I don't know their first names.

3              Q.   My information is these

4    neuropathologists are affiliated with the

5    University of Toronto.

6              A.   Yes, so Dr. Kiehl is practicing at

7    UHN and I think there was another name that also

8    practices at UHN.  It's a different institution.

9    The U of T affiliated hospital is called UHN.

10             Q.   There's special neuropathology

11   journals, aren't there?

12             A.   Yes, there are.

13             Q.   Do you subscribe to any?

14             A.   No.

15             Q.   So fair to say you don't serve on

16   the editorial board of any neuropathology journals,

17   true?

18             A.   No, that's true.

19             Q.   Is there any reason for you to

20   consult with a neuropathologist to understand how

21   nerves function in the pelvic floor?

22             A.   Not really.  The only reason I

23   would go to a neuropathologist when there is

24   something I don't know and I cannot find answers in

25   regular books, something which comes from

Vladimir Iakovlev, M.D.

```
 1   experience.  We are talking about basic function.
 2              Q.   In Canada, is there a board
 3   certification for your position as anatomical
 4   pathologist?
 5              A.   Yes, there is.
 6              Q.   Is there a board certification for
 7   neuropathologists?
 8              A.   I'm not sure, but we are
 9   practicing neuropathology with this anatomical
10   pathology certification.
11              Q.   As far as you recall, you haven't
12   consulted with any neuropathologists in connection
13   with your work in this mesh litigation; fair?
14              MR. ORENT:  Objection.
15              THE WITNESS:  Not for this specific
16   case.  Earlier, when I started research, I ask a
17   few questions which stain sometimes it was better
18   to use when there is pathology of nerves.
19              BY MR. THOMAS:
20              Q.   Who did you ask?
21              A.   Dr. Munoz, but I think it was even
22   before the litigation started.
23              Q.   And what did you ask Dr. Munoz?
24              A.   Which stains he was using, if he
25   was using something different that I was using.
```

Vladimir Iakovlev, M.D.

1          Q.   And what question did you ask him?

2    What stain do you use for what?

3          A.   When we started our research in

4    meshes, the question was, if the nerve's ingrown.

5    So this is kind of basic question.

6          Q.   Sorry, if the nerves what?

7          A.   Grow into the mesh.  So this was a

8    basic question.  But then I was thinking, okay, so

9    I need to make sure that I'm not missing anything

10   and I started thinking of possible scenarios, how

11   nerves can be affected by the mesh.

12              Are they going atrophic, can they

13   disappear completely?  And if they go atrophic, you

14   can see atrophy in the nerve with any stain,

15   because the area becomes empty, sort of ooze, the

16   Schwann cells disappear, their axons, this is a

17   basic knowledge.

18              And I ask him if he's using something

19   else, and he was using exactly what I was using.

20         Q.   So is it fair to understand that

21   you confirmed with Dr. Munoz your choice of the

22   S100 stain for nerves?

23         A.   No, that was not about the S100.

24         Q.   What stain specifically was it

25   about?

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 18 of 311 PageID #: 137787
Case 2:12-md-02327 Document 3183-3 Filed 08/06/16 Page 18 of 311 PageID #: 64778
Vladimir Iakovlev, M.D.

          1                 A.    If anything else he's using to

          2    examine nerve atrophy or degeneration.

          3                 Q.    And what were you using to analyze

          4    that question?

          5                 A.    Just locating H&E.

          6                 Q.    And Dr. Munoz said that was what

          7    he was using to analyze the same question?

          8                 A.    He said that you can see it on

          9    H&E, but there are a number of other stains to

         10    examine for nerve atrophy.

         11                 Q.    And what stains did he tell you

         12    that you could use, other than H&E?

         13                 A.    Well, you can see some of the

         14    atrophy on S100 -- I don't remember exactly what he

         15    said because it was three years ago, because now

         16    what I remember it might be coming from different

         17    sources, so from my own experience.

         18                 Q.    Do you have a specific

         19    recollection of talking to any neuropathologist who

         20    gave you any information about how to conduct your

         21    investigation into these meshes?

         22                 A.    I don't understand your question.

         23                 Q.    You've told me about conversation

         24    you had with Dr. Munoz.  Do you have a specific

         25    recollection, you remember having any conversations

Vladimir Iakovlev, M.D.

```
 1   with any neuropathologists about how to conduct

 2   your work in these cases?

 3              A.   Why would I?

 4              Q.   I'm just asking you if you did or

 5   not?

 6              A.   No, I didn't.

 7              Q.   Thank you.  Now, Exhibit No. 1 and

 8   Exhibit No. 2 are your reports in this case; we

 9   talked about that already.  They contain a number

10   of images?

11              A.   That's correct.

12              Q.   Have you supplied copies of all

13   those images on this thumb drive?

14              A.   No, because they're already

15   included in the report.  I can produce them for you

16   separately.

17              Q.   Do you have digital images of the

18   slides in this report?

19              A.   Of course.

20              Q.   But they're not on the thumb

21   drive?

22              A.   No, because they're already in the

23   report.

24              Q.   Do you have images of the tissue

25   samples that are contained in the report that are
```

Vladimir Iakovlev, M.D.

```
 1    not in the report?

 2                 A.   But we took those images together

 3    with your expert.

 4                 Q.   I'm just asking you if you have

 5    them?

 6                 A.   I should have them, yeah.

 7                 Q.   Okay?

 8                 A.   Because we were taking them -- he

 9    would take picture.  I would take picture of the

10    same field.

11                 Q.   But there are images that you have

12    of the tissue samples that are contained in your

13    report that are not produced on this thumb drive,

14    correct?

15                 MR. ORENT:  Objection.

16                 THE WITNESS:  There should be.  I was

17    not using them.  I was just recording together with

18    your expert when I received the specimens.

19                 BY MR. THOMAS:

20                 Q.   Okay.  And if you go to -- let me

21    just ask this question.

22                 What is the source of the images that

23    are contained in your report?  Where did you get

24    them?

25                 A.   I took them.
```

Case 2:12-md-02327   Document 3790-3   Filed 04/27/16   Page 21 of 311 PageID #: 137790
Case 2:12-md-02327   Document 3790-3   Filed 04/27/16   Page 21 of 311 PageID #: 64778
Vladimir Iakovlev, M.D.

```
 1              Q.    Okay.  And from what tissue

 2    samples did you take them?

 3              A.    From explanted TVT and

 4    TVT-O meshes.

 5              Q.    How many TVT?

 6              A.    Oh, that I would have to check

 7    with my records now.  I don't remember now.

 8              Q.    And TVT-O?

 9              A.    It's there, but I don't remember

10    now.

11              Q.    And the TVT and the TVT-O

12    specimens that are contained in your report are

13    that, are those specimens from the set of specimens

14    that you obtained from Dr. Klinge?

15              A.    No.  It's a combination of earlier

16    medical-legal cases, patients of St. Michael's

17    Hospital, and samples which came within this

18    consolidated trial.

19              The earlier cases came from different

20    law firms.

21              Q.    Do you know what I'm referring to?

22    You talked about the Bellew case, the set of slides

23    that you received from Dr. Klinge, and Dr.

24    Kreutzer, 22 TVT and TVT-O samples?

25              A.    My recollection is I was contacted
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 22 of 311 PageID #: 137791
Case 2:12-md-02327  Document 2183-3  Filed 05/06/16  Page 22 of 311 PageID #: 64479
Vladimir Iakovlev, M.D.

```
 1    by Anderson Law and I'm not sure when -- I don't

 2    remember exactly where the package came from, but

 3    all my communication was with the Anderson Law.

 4            Q.   I understand that, Doctor, but in

 5    the Bellew case you testified at length about a set

 6    of 22 TVT and TVT-O samples that you had received

 7    from Mr. Anderson that had previously been reviewed

 8    by Dr. Kreutzer and by Doctor Klinge?

 9            A.   Kreutzer for sure; I'm not sure

10    about Doctor Klinge.  There were no records, or

11    maybe there was records but I just don't remember

12    them.

13            I didn't contact specifically Doctor

14    Klinge, or he didn't contact me specifically about

15    these samples.

16            Q.   Are the images of the TVT and the

17    TVT-O slides that are in your report in this case

18    from the same set of slides that Dr. Kreutzer

19    reviewed?

20            A.   Some of them could be.  Again, I

21    don't remember now.  It would be difficult to trace

22    them back.

23            Q.   Do you have somewhere a key that

24    shows whose tissue this is in the report?

25            A.   In the report, the way the images
```

Vladimir Iakovlev, M.D.

1    were saved during my work, they would be usually

2    saved in folders for specific expert report.

3                Q.   Let's go to page 19 of your

4    report, please, Exhibit No. 1?

5                A.   So if we open these images, I

6    specify if the image is coming from consolidated

7    trial cases, which I received just recently, or if

8    the images are of additional cases, and additional

9    I meant previous TVT and TVT-O cases which I

10   received during the course of my work on expert of

11   possible Bellew case and others.

12               Q.   How many consolidated cases do you

13   have images for, individual plaintiffs?

14               A.   Like four, three.  Three, four.

15   Some specimens came as bare mesh, had difficulty

16   embedding -- well, we embedded them but there was

17   not much in there.

18               Q.   I understand.  I'm just trying to

19   understand what you're working from.

20               So you have three or four tissue

21   samples from plaintiffs in the consolidated cases,

22   correct?

23               A.   That is correct.

24               Q.   What kind of mesh is that?

25               A.   TVT or TVT-O.

Case 2:12-md-02327   Document 3790-3   Filed 04/27/16   Page 24 of 311 PageID #: 137793
Case 2:12-md-02327   Document 2188-3   Filed 05/07/16   Page 24 of 311 PageID #: 64481
Vladimir Iakovlev, M.D.

1          Q.    Okay.  And so in your report,

2    where you refer to images of consolidated cases, is

3    it fair to say that those images come from the

4    three to four tissue samples that you got from the

5    consolidated cases?

6          A.    That's correct.

7          Q.    If you go to page 21?

8          A.    Yes.

9          Q.    Page 21 identifies in Figure Set

10   1c, images of additional TVT cases; what does that

11   mean?

12         A.    That means this image comes from

13   previous TVT and TVT-O cases, or cases I received

14   previously.

15         Q.    Can you tell by looking at this

16   whether it's a medical-legal or whether it's

17   something that came through St. Michael's?

18         A.    It would have to be sort of

19   picture matching.  I would have to open the folders

20   which contain previous reports.

21               It all depends how the figure was

22   taken.  If it was taken by older camera, it didn't

23   record the case number.

24               Now, for some newer cases the images

25   were scanned and when the scanner works, there is

Vladimir Iakovlev, M.D.

```
 1   embedded surgical number.

 2           Because they're all spread within

 3   almost three years, some of them can be traced;

 4   some of them would be difficult to trace.

 5           Q.   Is it fair to understand that

 6   looking at the report, where you identify images

 7   from additional TVT cases, you're unable to tell me

 8   from what case that image comes from?

 9           MR. ORENT:  Objection.

10           THE WITNESS:  In some cases I can, and

11   some cases I cannot.  I can tell that you all of

12   them came from TVT and TVT-O because I kept strict

13   records for that.

14           But I didn't keep strict records for

15   specific cases, at least at the beginning.

16           BY MR. THOMAS:

17           Q.   Okay.  In those places where you

18   can identify the patient, did you do so in your

19   report?

20           A.   No.

21           Q.   Why not?

22           A.   But they are not in this trial --

23   and they may be confidential.  And why would I?

24           Q.   But there are images in this

25   report that don't have identifying information --
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 26 of 311 PageID #: 137795
Case 2:12-md-02327 Document 2183-3 Filed 05/04/16 Page 26 of 311 PageID #: 64765
Vladimir Iakovlev, M.D.

 1    none of them have identifying information?

 2              A.   They have one single identifying

 3    information which is important:  TVT or TVT-O.

 4    Everything else doesn't matter.

 5              Q.   But I can't take this, go into

 6    your file and figure out where this slide is, can

 7    I?

 8              A.   I'm telling you it's all TVT and

 9    TVT-O.  What else do you need to know?

10              Q.   Am I able to take this thumb drive

11    and figure out which slide is which patient on

12    page 21?

13              MR. ORENT:  Objection.  I think what

14    the doctor is explaining is that these are all from

15    prior reports served on you.

16              THE WITNESS:  Most of them are.  You

17    can go to older reports and find them.

18              BY MR. THOMAS:

19              Q.   Why didn't you say "from the

20    Edwards case" to tell us where it came from?

21              A.   Why would I?  I don't understand

22    the question.  I mean, this is an opinion about TVT

23    and TVT-O.

24              I am not making an opinion about

25    Edwards or any other specific patient.  I am giving

Vladimir Iakoviev, M.D.

1    you opinion about TVT-O as a product.

2               Q.   Do you maintain your sets of these

3    slides by individual plaintiff?

4               A.   In some cases, yes.  If there is a

5    generated report because that is a specific

6    plaintiff, I save them as separate folder.

7               But remember those 23 or 22 cases when

8    they came as a bulk and I did not produce any

9    specific reports for specific patients, individual

10   patients.  They were all saved in one folder.

11              Q.   Okay?

12              A.   Which was just additional --

13   didn't keep record for that.

14              Q.   Are the files on this thumb drive,

15   Exhibit 4, marked by individual plaintiff?

16              A.   No.  As I said, I didn't include

17   figures because they were included in the report

18   already.

19              If you want me to include these

20   specific figures, I can do that.  But it will not

21   be possible to trace specific picture, specific

22   patient.

23              And that was not the purpose because

24   the purpose was to give an opinion about TVT-O or

25   TVT as a product, not to give opinion for specific

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 28 of 311 PageID #: 137797
Case 2:12-md-02327  Document 2186-3  Filed 05/04/16  Page 28 of 311 PageID #: 64785
Vladimir Iakovlev, M.D.

```
 1   plaintiffs.

 2            Q.   Exhibit No. 2 is a supplemental --

 3   micro photographs.  You identify those as from the

 4   specimen of Ms. Elizabeth Mullins?

 5            A.   That is correct.

 6            Q.   Is Elizabeth Mullins -- strike

 7   that.  Did you share this tissue with Ethicon?

 8            A.   Yes, I mailed it a week ago.

 9            Q.   Why did you identify this by

10   patient name and not identify the others in your

11   report by patient name?

12            A.   Because it was a single case

13   specifically supplemented for one specific patient.

14            Q.   So this is one of the three or

15   four TVT, TVT-O cases that you reviewed for

16   consolidated plaintiffs?

17            A.   Might be an additional to the

18   three or four.

19            Q.   Okay?

20            A.   So it could be fifth, or fourth.

21            Q.   Okay.  Do you expect to receive

22   any more tissue samples from the consolidated

23   plaintiffs?

24            A.   No.  As far as I would understand

25   this is all what we have at this point.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 29 of 311 PageID #: 137798
Case 2:12-md-02327 Document 2183-3 Filed 04/27/16 Page 29 of 311 PageID #: 64788
Vladimir Iakovlev, M.D.

 1              Q.    For the original tissue samples

 2   that you received from Dr. Kreutzer, the 22 or 23

 3   TVT or TVT-O, did you know that those samples,

 4   tissue samples, were also analyzed by Dr. Jordi,

 5   using analytical chemistry?

 6              A.    The name sounds familiar but I

 7   don't know details.  I don't remember, sorry.  I

 8   don't remember specific details, what was done in

 9   that time.

10              Q.    Have you ever seen any analytical

11   chemistry testing on the 22 or 23 TVT samples that

12   you received from Dr. Kreutzer?

13              A.    I don't recall specific details.

14   I could have seen something, I could have not, it's

15   been quite a long time ago.

16              Q.    Did you ever request that

17   analytical chemistry testing be conducted on any of

18   the mesh samples that you've analyzed?

19              A.    No.  I have my own methodology in

20   this; I describe what I see.  Why would I ask

21   somebody else to do something else?

22              Q.    So is it fair to understand that

23   for Exhibits Number 1 and 2, which is your report

24   and supplemental report, that all of the images in

25   here are TVT or TVT-O manufactured by Ethicon?

Vladimir Iakovlev, M.D.

```
 1              A.   Yes.  Some images were taken from

 2     publications, so there was one or two panels from

 3     different mesh manufacturer.

 4              But the rest, when the pictures were

 5     individual, they were all of TVT or TVT-O explanted

 6     specimens.

 7              Q.   Are you able to tell me sitting

 8     here today -- strike that.

 9              Let's go to Exhibit 3, please.  Number

10     15?

11              A.   Yes.

12              Q.   Number 15 asks for all materials

13     including but not limited to any protocol

14     specimens, slide raw data interim and final test

15     results, log laboratory books, notes, photographs,

16     photo micrographs and any other documents relating

17     to the pristine polypropylene control you tested by

18     exposure to formalin for up to four months

19     referenced on page 17 of your report in this case.

20              Is there any information on the thumb

21     drive from Exhibit 4 for that?

22              A.   The entire protocol is really

23     simple.  It was included in the paper, so it is on

24     the thumb drive; the paper is on the thumb drive.

25     I didn't have anything in addition to that.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/26/16 Page 31 of 311 PageID #: 137800
Case 2:12-md-02327 Document 2188-3 Filed 05/04/16 Page 31 of 311 PageID #: 64788
Vladimir Iakovlev, M.D.

1    Q.   Is there any lab notebook?

2    A.   No, I mean --

3    Q.   Are there any photographs?

4    A.   All photographs I had, I included

5    there.

6    Q.   So whatever you have related to

7    the formalin exposed polypropylene control is on

8    the thumb drive?

9    A.   In the report.  The pictures are

10   on the report.  The paper with description of the

11   experiment is on the thumb drive.

12   Q.   What kind of polypropylene was

13   tested with formalin?

14   A.   What do you mean, what kind?  I

15   tested meshes of different manufacturers including

16   Ethicon TVT.

17   Q.   So you did use an Ethicon Prolene

18   mesh in the formalin control test?

19   A.   It was TVT.

20   Q.   Okay.

21   A.   It was a piece of TVT, a few

22   pieces of TVT put in formalin.

23   Q.   When you say you put it in

24   formalin, did you do anything other than just put

25   it in a jar?

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 32 of 311 PageID #: 137891
Case 2:12-md-02327  Document 3783-7  Filed 04/26/16  Page 32 of 311 PageID #: 64789
Vladimir Iakovlev, M.D.

```
 1                    A.    They were kept in formalin, in a

 2    jar, and then they were put in the cassette for

 3    tissue processing and then they went through the

 4    whole process of xylene alcohol and everything else

 5    and then I had slides made.

 6                    Q.    And no analytical chemistry done

 7    of that control, correct?

 8                    A.    Why would I?  I'm doing histology.

 9                    Q.    I understand.  No analytical

10    chemistry; is that correct?

11                    A.    That is correct.

12                    Q.    Thank you.  Number 19.

13                    A.    Yes.

14                    Q.    "Request all materials related

15                          to testing of intentionally oxidized

16                          polypropylene that had not been

17                          implanted or exposed to formalin."

18                          Do you see that?

19                    A.    Yes, I do.

20                    Q.    Is there any information on

21    Exhibit No. 4 related to that kind of testing?

22                    A.    No, because the test is still in

23    progress.  I mean, I kept part of mesh in different

24    solutions and I haven't taken them out yet.  I

25    haven't examined them yet.
```

Vladimir Iakovlev, M.D.

```
 1                Q.   Okay.  Tell me what that
 2   experiment does?
 3                A.   I did the same thing as I did for
 4   formalin exposure.  I took pieces of mesh and put
 5   them in solutions of hydrogen peroxide, hydrogen
 6   peroxide with catalysts, few strong acids,
 7   solvents, and just they are stored in these
 8   solutions.
 9                Q.   How many pieces of mesh are you
10   testing?
11                A.   It's hard to say now.  It might be
12   over 20 small pieces.
13                Q.   And how are they stored right now?
14                A.   In a dark room in a cabinet.
15                Q.   In a vial?
16                A.   What do you mean, vial?
17                Q.   Are they in a container with a
18   cover on them?
19                A.   Yes, of course.  Some of them are
20   acids and they're in glass containers.
21                Q.   What temperature are they being
22   stored?
23                A.   Just room temperature.
24                Q.   Do you have a protocol that you
25   wrote up for this test?
```

Vladimir Iakovlev, M.D.

```
 1                    A.   No.  The only protocol I used was

 2     there was a published paper, they introduced this

 3     stimulated body environment -- simulated, not

 4     stimulated.  Simulated body environment.  Hydrogen

 5     peroxide was the catalyst.  Catalyst is a chromium

 6     salt.

 7                    Q.   Cobalt chloride?

 8                    A.   Probably.

 9                    Q.   That's Dr. Guelcher's paper?

10                    A.   I'm not sure if it's his paper,

11     it's another paper.  But anyway, I'm testing his

12     protocol.  I followed exactly the description in

13     the paper and kept it in the solution for almost a

14     year by now, but it's still too early to take it

15     out.

16                    Q.   Why is it still too early to take

17     it out?

18                    A.   Because based on my analysis of

19     the specimens explanted from the body I can barely

20     see the degradation bark after a year in the body.

21     So if I take them now it would be too early.

22                    I may just waste samples, so I have to

23     wait for probably a few extra months or maybe

24     another year.  Because by year two or 1 1/2 years

25     in the body, the bark becomes visible in
```

Case 2:12-md-02327  Document 3790-3  Filed 04/26/17  Page 35 of 311 PageID #: 137804
Case 2:12-md-02327  Document 3783-3  Filed 04/26/17  Page 35 of 311 PageID #: 64792
Vladimir Iakovlev, M.D.

```
  1    100 percent of the cases.

  2              If I take them out by 12 months, I may

  3    or may not see something and then it would -- I'll

  4    just waste samples.

  5              Q.   Did you prepare the solution in

  6    which these samples are stored?

  7              A.   Yes, I did.

  8              Q.   And what is the recipe for the

  9    solution that you used?

 10              A.   It's written in the original paper

 11    I used for the --

 12              Q.   Can you tell me what the original

 13    paper is?

 14              A.   I'd have to check now.

 15              Q.   And how many samples are stored?

 16              A.   As I said, probably over 20.

 17              Q.   And how many different kinds of

 18    mesh are being tested?

 19              A.   There is one from one

 20    manufacturer, and then -- four types of mesh.

 21              Q.   How many Ethicon meshes are being

 22    tested?

 23              A.   At least one.

 24              Q.   What kind?

 25              A.   It's written on the jars.  I may
```

Vladimir Iakovlev, M.D.

```
 1    have to check later.

 2              Q.   Doctor, do you have an inventory

 3    of what's in each vial written down?

 4              A.   It's written on the jar.

 5              Q.   Is it written down on a piece of

 6    paper anywhere?

 7              A.   No.

 8              MR. ORENT:  Objection.

 9              BY MR. THOMAS:

10              Q.   Is it written in a computer

11    somewhere?

12              A.   No, just on jars.  Jars label when

13    the case was put and what type of mesh was put in.

14              Q.   When did you start this

15    experiment?

16              A.   Last September.

17              Q.   So it's been a full year?

18              A.   Yes.

19              Q.   And did you put the mesh in this

20    solution in these 20 or so samples all at the same

21    time?

22              A.   Within two weeks.

23              Q.   All right.  As I understand it,

24    there are at least four different mesh

25    manufacturers that are a part of this experiment?
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 37 of 311 PageID #: 137806
Case 2:12-md-02327 Document 2183-3 Filed 05/04/16 Page 37 of 311 PageID #: 64494
Vladimir Iakovlev, M.D.

1          A.   At least four different type of

2     mesh.  I would have to check with the labels what

3     is written there, what manufacturers, what mesh was

4     put in there.  I don't remember.  It's been a year.

5          Q.   Are you working with anybody else

6     on that experiment?

7          A.   No.

8          Q.   This is solely your work?

9          A.   Yes.

10          Q.   Did you consult with anybody about

11     the kind of solution that you would use for your

12     experiment?

13          A.   No.  Whom I would consult?  Nobody

14     did it before.  The only information I extracted

15     was from that specific simulation body environment

16     simulation from the paper.

17          Q.   You know Dr. Guelcher has tried to

18     insulate oxidized polypropylene, don't you?

19          MR. ORENT:  Objection.

20          THE WITNESS:  I know that he did an

21     experiment, and he asked me what I see.  I said

22     it's too early, I'm not going to take them out yet.

23     I will keep them a little longer.

24          BY MR. THOMAS:

25          Q.   Did Dr. Guelcher tell you he had

Vladimir Iakovlev, M.D.

```
 1   intentionally oxidized polypropylene by exposing it

 2   to some chemical solution?

 3              MR. ORENT:  Objection.

 4              THE WITNESS:  Yes, he did.

 5              BY MR. THOMAS:

 6         Q.   Did you ask him to have that mesh

 7   so that you could determine whether this

 8   intentionally oxidized polypropylene absorbed

 9   stain?

10              MR. ORENT:  Objection.

11              THE WITNESS:  No.

12              BY MR. THOMAS:

13         Q.   Why not?

14              MR. ORENT:  Objection.

15              THE WITNESS:  Because I'm doing my own

16   experiment and I believe I need to keep it for at

17   least a year and a half.

18              BY MR. THOMAS:

19         Q.   Did you discuss with Dr. Guelcher

20   the scope of his experiment?

21              MR. ORENT:  Objection.  At this point,

22   Counsel, I think you're getting into -- I think you

23   need to clarify whether your questions are in the

24   context of litigation or research.

25              To the extent it's in litigation it's
```

Vladimir Iakovlev, M.D.

```
 1    covered by privilege and I would instruct the

 2    witness not to answer under the rules.  But to the

 3    extent that you're discussing research, I think

 4    that's fair game to discuss.

 5            BY MR. THOMAS:

 6            Q.   Okay.  From a research

 7    perspective, did you have any discussions with Dr.

 8    Guelcher about his experiment?

 9            A.   It's work in progress so it's

10    privileged to researchers, I guess, at this point.

11            Q.   Are you going to assert a

12    privilege for your research?

13            A.   For research information, yes.

14            Q.   Okay.  And you asserted a

15    litigation privilege, which I don't think is

16    appropriate -- I'm not arguing with you.  You said

17    there's no research privilege.  Now he's trying to

18    assert a research privilege?

19            MR. ORENT:  No, what I said was in

20    terms of legal -- in terms of legal privileges that

21    I can, that I have, that I have an attorney-client --

22    excuse me, a attorney work product under the Rule

23    26.

24            Rule 26 specifically allows for expert

25    witnesses to consult with one another under the
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 40 of 311 PageID #: 137809
Case 2:12-md-02327 Document 2188-3 Filed 05/04/16 Page 40 of 311 PageID #: 64797
Vladimir Iakovlev, M.D.

1    2010 amendments to the federal rules.

2                    So, what I was clarifying is that it is

3    my privilege to seek and to utilize for my client,

4    and that's what I was exercising with regard to

5    non-research thought processes for litigation.

6                    To the extent Dr. Iakovlev has

7    proprietary interests in research that is ongoing

8    or may be ongoing, that's up to him as to whether

9    or not -- and I know that on both sides in this

10   mesh litigation have previously taken a position

11   that those sort of things are not discoverable.

12                   To the extent the doctor is

13   comfortable, I'd be happy to designate this portion

14   of the transcript highly confidential and allow the

15   witness to answer.

16                   THE WITNESS:  I also need to add that

17   that experiment is not in my opinions.  I was not

18   base my opinions on any part of that experiment.

19   And I'm not really sure why you asking me these

20   questions.

21                   BY MR. THOMAS:

22           Q.   Because I get to ask them.

23                   MR. ORENT:  If I can just have a minute

24   with the witness and explain what the highly

25   confidential designation means, that may clarify

Vladimir Iakovlev, M.D.

```
1    this.

2              MR. THOMAS:  Thank you.

3              -- RECESS AT 9:42 --

4              -- UPON RESUMING AT 9:43 --

5              MR. ORENT:  We can go back on the

6    record.

7              I'll just say for the record over the

8    break I just explained to Dr. Iakovlev what the

9    highly confidential designation is and that all the

10   lawyers in this litigation have all signed on to

11   it.

12             Confidentiality agreement whereby there

13   are limited distribution on each side as to who can

14   receive highly confidential information and that

15   after discussing it I believe the witness is

16   comfortable with the designation and will proceed

17   to answer.

18             BY MR. THOMAS:

19             Q.   Thank you.  Have you have

20   discussed with Dr. Guelcher the results of his

21   test?

22             A.   Yes, I asked him what he saw.

23             Q.   And what did he tell you?

24             A.   He said that there is flaking on

25   the surface early, it's not confluent but there are
```

Vladimir Iakovlev, M.D.

```
 1    some flakes forming.

 2              I said it might be too early, because

 3    he did it I think on six weeks or so, maybe more,

 4    maybe up to three months.

 5              I said, well, I keep my specimens for

 6    at least a year and a half because I believe that

 7    that's much time you need to make it visible by my

 8    techniques.  Maybe by SCM we can see a little bit

 9    earlier, and we stopped at that.

10              Q.   Do you know whether he conducted

11    any analytical chemistry testing on any of the mesh

12    he analyzed?

13              A.   I think he did.

14              MR. ORENT:  Objection.

15              THE WITNESS:  I don't remember at this

16    point.  It's not my specifically methodology, so I

17    didn't do these things.

18              BY MR. THOMAS:

19              Q.   Did you have discussions with Dr.

20    Guelcher about trying to stain the polypropylene

21    that he had intentionally oxidized?

22              A.   He asked me.  I said it's too

23    early.

24              Q.   Okay?

25              A.   So I said maybe by your methods
```

Vladimir Iakovlev, M.D.

```
1    you can detect it.  By my methods, probably I

2    cannot.  And I said I will keep my pieces for

3    longer and then we'll see what happens.

4              Q.   And how did you decide -- strike

5    that.  Did I understand you to say that you have

6    chosen 18 months as the time when you think it will

7    be appropriate to test for oxidation?

8              MR. ORENT:  Objection to form.

9              THE WITNESS:  Yes.

10             BY MR. THOMAS:

11             Q.   And at 18 months is it your

12   intention to remove all of those meshes from the

13   chemical solution and determine whether it's

14   intentionally oxidized?

15             A.   Part of it.  Probably not all of

16   them in one shot.  I will start taking some pieces

17   and examining them see what happens and if I --

18   depends on what I see, I may keep them longer.

19             Q.   And what kind of tests do you

20   propose to run on them after 18 months?

21             A.   Histology, what I've done -- what

22   I showed in the paper.

23             Q.   The same kind of tests that you've

24   run on the meshes that are contained in your

25   reports?
```

Vladimir Iakovlev, M.D.

```
 1              A.   Similar.

 2              Q.   Any differences?

 3              A.   Don't plan on anything different

 4   at this point.  I may, I mean, it's work in

 5   progress research.  Maybe I'll find something else,

 6   I don't know.

 7              Q.   Are you consulting with anybody

 8   else on this particular experiment?

 9              A.   We discussed it only with Scott

10   Guelcher.

11              Q.   And is the mesh that's being

12   tested pristine new mesh?

13              A.   Yes.

14              Q.   Never been exposed to tissue?

15              A.   That is correct.

16              Q.   Never been exposed to formalin?

17              A.   That is correct.

18              Q.   Who is paying for this testing?

19              A.   Nobody.  I just took chemicals

20   from our histo lab.

21              Q.   Did counsel fund this experiment?

22              A.   No, there is no additional

23   funding.  What funding would I need for it?

24   Chemicals are in the lab.

25              Q.   Where did you get the mesh?
```

Vladimir Iakovlev, M.D.

```
 1                    A.   They came from some law firms

 2    during earlier cases.

 3                    Q.   Okay.  And where did you get the

 4    chemicals?

 5                    A.   I said, they are in the lab.

 6                    Q.   Okay.  So you used materials from

 7    the St. Michael's histo lab to put them, and you

 8    combined those chemicals in a recipe that you're

 9    now exposing this polypropylene to?

10                    A.   That is correct.  These are

11    regular chemicals that are used in histo lab.

12                    Q.   And the reason why you're doing

13    this test is to determine whether, first, after

14    18 months this polypropylene will oxidize due to

15    exposure to this chemical mixture, correct?

16                    A.   Could you repeat the question?

17                    MR. THOMAS:  Can you read it back?

18                    -- REPORTER'S NOTE:  Question read back

19    as recorded above.

20                    THE WITNESS:  That's correct.

21                    BY MR. THOMAS:

22                    Q.   And how will you determine whether

23    it's oxidized?

24                    A.   I would see degradation layer on

25    the surface.
```

Vladimir Iakovlev, M.D.

```
 1                    Q.    And that would be by light
 2   microscopy?
 3                    A.    Yes.
 4                    MR. ORENT:   Objection.
 5                    BY MR. THOMAS:
 6                    Q.    Any other analytical technique
 7   that you propose to use?
 8                    A.    As I said, none at this point.
 9                    Q.    And as a part of your experiment
10   do you then intend to see whether -- if you are
11   able to oxidize polypropylene, according to your
12   visual observation by light microscopy, will you
13   then see whether the oxidized polypropylene holds
14   stain?
15                    A.    Yes, that's the way to see it.
16   This just becomes porous and after absorbs stain.
17                    Q.    And the way you will test that is
18   the same way you've processed the slides in Exhibit
19   No. 1 and 2 -- you'll put them through the sample
20   preparation histology analysis that you've done in
21   all your other cases?
22                    A.    Can be tried without putting them
23   through histlogy; you can immerse exposed mesh
24   into the dye solution.
25                    Q.    Just drop it in the jar?
```

Vladimir Iakovlev, M.D.

```
 1                  A.   Pretty much.  If it stains, then

 2       you can see staining on the surface.  That means

 3       there is a layer of porous polypropylene on the

 4       surface.

 5                  It's like, this is not stain, this is

 6       anodized aluminum.  So there's porous layer on

 7       aluminum.  If you drop unprepared aluminum in the

 8       jar with black ink it will not absorb anything

 9       because it's sealed.

10                  If you drop it with anodized layer it

11       will become black because it will absorb it.  It's

12       the same technique; it's pretty basic.

13                  Q.   I understand.  Thank you.

14                  Are you aware of a method where you can

15       take a piece of pristine mesh that's been exposed

16       as you've described, and prepare a histological

17       slide of that exposed material without embedding it

18       in some other medium?

19                  A.   Let me ask you if I got your

20       question right.

21                  Am I aware of a histological technique

22       which will allow me to cut through the mesh without

23       embedding it into anything?

24                  Q.   Correct.

25                  A.   No.  It has to be embedded into
```

Case 2:12-md-02327 Document 3790-3 Filed 04/26/16 Page 48 of 311 PageID #: 137817
Case 2:12-md-02327 Document 2186-3 Filed 04/04/16 Page 48 of 311 PageID #: 64505
Vladimir Iakovlev, M.D.

1    some form of medium to hold it for the knife to cut

2    through.

3              Q.   Have you devised or thought of a

4    method to do that?

5              A.   No.  Why would I?

6              Q.   If you're going to do a histology

7    slide of this mesh that's been exposed to chemicals

8    after a year and a half, you're going to have to

9    put it in some medium before the microtome can cut

10   it, correct?

11             A.   Paraffin.

12             Q.   So you're going to put the mesh by

13   itself in paraffin and cut it from there?

14             A.   Yes.

15             Q.   Okay.

16             A.   That's how it's done.

17             Q.   That's fine.  Doctor, on page 82

18   of your report?

19             A.   Yes.

20             Q.   Are you on page 82?  That's where

21   I want you to be.

22             A.   Oh, yes, okay.

23             Q.   I'm sorry, 83.  I apologize, I was

24   wrong.

25             Page 83 of your report has two images,

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 49 of 311 PageID #: 137818
Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 49 of 311 PageID #: 64506
Vladimir Iakovlev, M.D.

1  A and B, identified as Figure Set 16 A, is

2  identified as "cracking on the surface of TVT mesh

3  fibers immediately after removal from the body".

4         Where did you get this?

5         A.   This was a St. Michael's patient.

6  So when it was excised I immediately placed it

7  under the microscope.

8         Q.   How did you know it was being

9  excised?

10        A.   What do you mean how do I know?

11  We receive specimens.

12        Q.   Just so I understand --  strike

13  that.

14             Typically after a surgical procedure

15  when mesh is excised the surgeon immediately places

16  it in formalin, correct?

17        A.   Not always.

18        Q.   Okay.

19        A.   We receive it fresh, so in this

20  case it was fresh.

21        Q.   And did you discuss with the

22  surgeon any of the circumstances of removal?

23        A.   This was a St. Michael's specimen,

24  so I did ask, but I'm not sure if I can go there

25  because of the confidentiality issues.  It was not

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 50 of 311 PageID #: 137819
Case 2:12-md-02327 Document 2183-3 Filed 04/26/16 Page 50 of 311 PageID #: 64807
Vladimir Iakovlev, M.D.

1   a medical-legal case.

2              Q.   Who was the doctor that you

3   discussed it with?

4              A.   I don't know if I can disclose it.

5              Q.   I'm going to ask you to and if you

6   tell me no, you tell me no?

7              A.   Again, I'm not sure if I can

8   disclose that because it is confidential

9   information.

10             Q.   Are you telling me you're not

11  going to?  That's fine.  Tell me you're not going

12  to and I'll move on.

13             A.   No, I will not.  I will not

14  because I don't want to compromise confidentiality.

15             Q.   Okay.  Can you tell me the nature

16  of the conversation you had with this doctor?

17             A.   Oh, I asked her later on what was

18  -- because then I would ask how long it's been in

19  the body, some information was on the records and

20  just basic information.

21             Q.   Did you get medical records for

22  this mesh?

23             A.   It was in medical -- in the

24  medical records of St. Michael's Hospital.

25             Q.   Did you produce on the thumb

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 51 of 311 PageID #: 127820
Case 2:12-md-02327 Document 3185-3 Filed 09/04/16 Page 5p 5 of 311 PageID #: 64308
Vladimir Iakovlev, M.D.

```
 1    drive, Exhibit No. 4, the medical records for the

 2    patient that's on page 83?

 3             MR. ORENT:  Objection.

 4             THE WITNESS:  No, it's confidential

 5    information, St. Michael's Hospital information.

 6    And the picture is not coming from a case itself;

 7    picture is coming from a publication.

 8             BY MR. THOMAS:

 9         Q.   Well, it's your publication; is

10    that fair?

11         A.   Yes.

12             MR. ORENT:  Objection.

13             BY MR. THOMAS:

14         Q.   Okay?

15         A.   But it's not coming from a set of

16    TVT or TVT-O cases which are received within the

17    litigation process.  It's coming from a publication

18    and for that publication I had REB approval and

19    there are strict rules what can be disclosed, what

20    cannot be disclosed.

21         Q.   How long from the removal of this

22    mesh until the time you looked under the

23    microscope?

24         A.   I would say an hour, maybe

25    40 minutes, maybe less.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   How did you manage to get it so

 2    quickly?

 3              A.   We have a lab in the OR.  OR is

 4    practically -- I mean, our receiving area for

 5    specimens is in OR, it's like there.

 6              Q.   Did you tell the doctor if she

 7    ever got a TVT specimen that you'd like to have it

 8    before it was put in formalin?

 9              A.   No, but I told, I told several

10    physicians and several -- everybody knows that I'm

11    working on meshes, so people know that I'm

12    interested in meshes.

13              Q.   My question was, did you tell a

14    doctor to give one to you before it was exposed to

15    formalin?

16              MR. ORENT:  Objection.  Can I just ask

17    for clarification.  Your prior question was --

18    included the word TVT.  Prior testimony on this was

19    that this was not a TVT, I believe.  Oh, this is a

20    TVT, I apologize.

21              THE WITNESS:  In the earlier, very

22    early when we started working on these meshes, the

23    question was how do I process them for scanning of

24    -- transmission of electron microscopy, and I

25    needed fresh samples.
```

Vladimir Iakovlev, M.D.

```
 1                 Not only specifically for this case, I

 2   asked if you can sometimes help me with what you're

 3   excising, or submit it in saline, so it's not

 4   exposed to formalin because I needed samples to be

 5   put in a glutaraldehyde.  This came in saline.

 6                 BY MR. THOMAS:

 7          Q.    Was this put in glutaraldehyde

 8   before you made this image?

 9          A.    No, it was put in saline.  I

10   received it in saline, I examined it, took pictures

11   and put it in formalin.

12          Q.    Other than putting it in saline,

13   was any effort made to clean the mesh prior to the

14   time that you took these images?

15          A.    No, just washed them in saline,

16   that's it.

17          Q.    Was it washed in saline or just

18   soaked in saline?

19          A.    What's the difference?

20          Q.    Well, there was no effort to wash

21   it, it was merely stored in saline before you took

22   your images; is that fair?

23          A.    You immerse something in fluid;

24   it's being washed.

25          Q.    Okay.  Go to page 5 of your
```

Vladimir Iakovlev, M.D.

```
 1    report, please.

 2              A.   Yes.

 3              Q.   Down at the bottom of the page,

 4    the sentence, it reads:

 5                   "Immediately after placement in

 6              the body, foreign objects become

 7              coated with human proteins before

 8              appearance of the inflammatory

 9              cells."

10              Do you see that?

11              A.   Yes.

12              Q.   What does that mean?

13              A.   It means that anything you put in

14    the body will get coated by serum proteins.

15              Q.   How many different kinds of

16    proteins are there in the body?

17              A.   Very large number, thousands,

18    maybe millions.

19              Q.   Is there a special kind of protein

20    that surrounds the foreign body?

21              A.   It's non-specific.  The area will

22    be filled with blood immediately, so main proteins

23    are in the serum, so it will be albumin, some

24    immuglobins, then the blood clotting cascade sets

25    in.
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 55 of 311 PageID #: 137924
Case 2:12-md-02327  Document 2183-3  Filed 05/05/15  Page 55 of 311 PageID #: 64512
Vladimir Iakovlev, M.D.

 1                    So there will be more of a fibrinogen

 2     and fibrin, all of those proteins which are

 3     involved in blood clotting.  It depends what

 4     timeframe we're talking about, immediate coating,

 5     or minutes or hours or days after.

 6                    Q.   Do you know what protein

 7     adsorption is, A-D-S-O-R-P-T-I-O-N?

 8                    A.   You mean adherence of the protein

 9     to the surface?

10                    Q.   Are you familiar with that?

11                    A.   I mean, that's the term as I

12     understand it.

13                    Q.   Do you know chemically how that

14     works?

15                    A.   For all proteins?

16                    Q.   For protein adsorption to foreign

17     bodies; do you know how it works?

18                    A.   Not the specific chemical details.

19                    Q.   Do you know the extent to which

20     the proteins form a bond with the foreign body?

21                    A.   Not the specific details.

22                    Q.   Do you specifically with

23     polypropylene -- or strike that.  Specifically with

24     Prolene, do you have any information about the

25     extent to which human proteins form a bond with the

Vladimir Iakovlev, M.D.

```
 1   Prolene polypropylene?

 2               MR. ORENT:  Objection.

 3               THE WITNESS:  No.

 4               BY MR. THOMAS:

 5               Q.   Do you have any information about

 6   the extent to which saline is adequate to remove

 7   any proteins that are adsorbed on to the Prolene

 8   mesh?

 9               A.   No, I think it's irrelevant

10   because that mesh which was examined didn't have

11   time to dry and couldn't dry because it was in

12   saline.

13               So if it cracks it means that it had

14   time to crack.  In this case it couldn't dry.

15               Q.   There's no analytical chemistry

16   done on this, correct?

17               A.   No.

18               Q.   There are none; am I correct?

19               A.   You are correct.

20               Q.   Thank you.  So, you're basing your

21   opinion on the cracking, which you claim to be the

22   Prolene, based on your visual observation?

23               A.   That is correct.

24               Q.   Let's go back to page 82, please

25   which is your statistical analysis of TVT meshes
```

Vladimir Iakovlev, M.D.

```
 1   analyzed as groups?

 2               A.   Which page number?

 3               Q.   I'm on 82.

 4               A.   Okay.

 5               Q.   82 is called, "Figure Set 15, TVT

 6   Meshes Analyzed as a Group".

 7               And you're doing a statistical analysis

 8   here of the TVT meshes; is that correct?

 9               A.   That's correct.

10               Q.   Are the TVT meshes described on

11   page 82 the meshes that you got from Dr. Kreutzer?

12               A.   Some of them.

13               Q.   How many of them?

14               A.   I don't remember now.  Probably

15   about 20 or 19.

16               Q.   And how many are in this group?

17               A.   23.

18               Q.   So probably 19 or 20 out of 23

19   were meshes you got from Dr. Kreutzer?

20               A.   Probably, but I'm not sure.  I

21   don't remember now.

22               Q.   Are you a trained statistician?

23               A.   No, but I had my statistics when I

24   did my research training.

25               Q.   Okay.  Who chose the statistical
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 58 of 311 PageID #: 137927
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 58 of 311 PageID #: 64515
Vladimir Iakovlev, M.D.

```
 1   method that's employed here?

 2          A.   I did.

 3          Q.   And why?

 4          A.   What do you mean why?

 5          Q.   Why was this method the method you

 6   chose?

 7          A.   Because it's the method to check

 8   what I was intending to check.

 9          Q.   And tell me why that is an

10   appropriate method for what you have done?

11          A.   What do you mean?

12          Q.   Why is this Pearson coefficient?

13          A.   Pearson coefficient?  It's a

14   standard correlation coefficient method.

15          Q.   Are you aware of other statistical

16   methods to test your results?

17          A.   What do you mean?  For

18   correlation?

19          Q.   Yes.

20          A.   Could be Spearman.

21          Q.   Spearman?

22          A.   Yes.

23          Q.   Any others, R-squared?

24          A.   For correlation?

25          Q.   Yes.
```

Vladimir Iakovlev, M.D.

```
 1                    A.   There might be others, but the

 2     main are Pearson and Spearman; there is not much

 3     difference between them.

 4                    Q.   Is the raw data you used to do

 5     your statistical correlation on Exhibit 4?

 6                    A.   Yes, it is.

 7                    Q.   And how is it marked, so if I

 8     wanted to find it, I could see it?

 9                    A.   It's in a separate file it's

10     called 23 TVT-O and something else for the chart.

11                    Q.   So if I wanted to have a

12     statistician run a different model, all of the data

13     he would need to do it is on Exhibit 4?

14                    A.   Yes.  It's there.

15                    Q.   Okay.  Doctor, since you were last

16     deposed, you've had a couple of studies published

17     in journals?

18                    A.   Probably more than a couple, yes,

19     I did.

20                    Q.   And your deposition notice

21     requested communications with the journals about

22     publications that you produced.  Are those on

23     Exhibit 4?

24                    MR. ORENT:  Objection.

25                    THE WITNESS:  I believe it's
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 60 of 311 PageID #: 127929
Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 60 of 311 PageID #: 64512
Vladimir Iakovlev, M.D.

1    confidential to me as a researcher, privileged.

2    They've been published, they've been accepted, they

3    are publicly available.

4                   BY MR. THOMAS:

5                   Q.   Is the answer to my question no,

6    you didn't produce any of those communications?

7                   A.   No, I didn't.

8                   Q.   Do you have such communications?

9                   A.   Acceptance letters, that's about

10   it.

11                  Q.   Do you have any comments or

12   criticisms from any peer reviewers?

13                  MR. ORENT:  Objection.

14                  THE WITNESS:  There were some.

15                  BY MR. THOMAS:

16                  Q.   Do you still have those?

17                  A.   Yes, I do.

18                  Q.   Were any of these articles

19   rejected by any journals?

20                  A.   Sometimes I submit to one journal

21   they say it's out of scope it's probably best

22   suited for another journal so it bounces back.

23                  I don't remember specific rejection,

24   saying that the data isn't reliable.  The only way

25   -- the only time when the paper was not accepted it

Vladimir Iakovlev, M.D.

```
1    was quick answer, right away, that's not in our
2    scope.
3              Q.   So how many journals did not
4    accept your publication?
5              MR. ORENT:  Objection.
6              THE WITNESS:  I don't remember now.
7              BY MR. THOMAS:
8              Q.   Okay.  Do you have that
9    information?
10             A.   Probably somewhere in the replies
11   I can find it.
12             Q.   Okay.  Did you ever disclose to
13   the journals to which you submitted these
14   publications that some of the work contained in the
15   journal publication had been funded by plaintiff's
16   counsel?
17             MR. ORENT:  Objection.
18             THE WITNESS:  Nothing was funded by
19   plaintiff's counsel.  They were litigation cases
20   but I didn't get any additional funding to conduct
21   the study.
22             BY MR. THOMAS:
23             Q.   Certainly the slides from Dr.
24   Kreutzer were provided to you by plaintiff's
25   counsel?
```

Vladimir Iakovlev, M.D.

```
 1                MR. ORENT:  Objection, argumentative.

 2                THE WITNESS:  I didn't use them.

 3                BY MR. THOMAS:

 4                Q.   In your study?  Isn't that what --

 5                A.   I meant I didn't use the stains he

 6      used.  I re-stained on stain slides.  Maybe even

 7      cut the blocks.

 8                Q.   So is it your testimony that all

 9      of the information that you submitted to the

10      journals was unrelated to your medical-legal work?

11                A.   No.  It's not unrelated because

12      some samples came for medical-legal purposes.

13                Q.   And for which you were paid to

14      analyze by plaintiff's counsel, correct?

15                A.   To provide reports.

16                Q.   And what percentage of the cases

17      that you report in the study were cases for which

18      you were compensated by plaintiff's counsel?

19                MR. ORENT:  Objection.

20                THE WITNESS:  The study was not

21      compensated by anyone.  I did it on my own time,

22      during my own time, and I don't know why you're

23      saying that.

24                The percentage of cases which came

25      through medical-legal litigation process is
```

Vladimir Iakovlev, M.D.

```
1    indicated in the paper.
2              BY MR. THOMAS:
3         Q.   Okay.  We'll get to that in a
4    minute.
5              In the last year you've traveled and
6    made presentations around the world on the research
7    that you've done?
8         A.   Yes, I did.
9         Q.   Who has funded that work?
10        A.   Pretty much I did.
11        Q.   Did anybody subsidize your trips?
12        A.   No, I mean, we have a specific
13   portion of our salary from St. Michael's Hospital
14   which is dedicated for presentations.  But it's
15   within my salary, it's more or less a way of
16   getting it through a different tax bracket because
17   it's money spent for -- it's within my contract.
18        Q.   Did you receive any funds from
19   plaintiff's counsel for your presentations in the
20   last year?
21        A.   Never.
22        Q.   The articles that you had worked
23   on --
24        A.   The full answer would be I paid
25   for all the trips and I never received any money
```

Vladimir Iakovlev, M.D.

1    for making presentations or publishing the papers.

2              Q.    Okay.  Let's go back to page 83.

3    83 again is the mesh fiber that you looked at under

4    light microscopy 40 minutes to an hour after it was

5    removed and before it was stored in formalin,

6    correct?

7              A.    That is correct.

8              Q.    Where is that fiber today?

9              A.    It's embedded in formalin.  The

10   specimen went into formalin -- sorry.  The specimen

11   went to formalin and now it's embedded in paraffin.

12             Q.    Why is it in paraffin?

13             A.    To take histological section.

14             Q.    Have you taken histological

15   sections of it yet?  Have you taken histological

16   sections of this mesh fiber yet?

17             A.    Yes, I did.

18             Q.    Are those reported anywhere?

19             A.    What do you mean?  This was St.

20   Michael's Hospital patient.  I described it, and I

21   reported whatever I saw in the microscope.

22             Q.    Okay.

23             A.    It's not within the litigation

24   process.  It's a patient outside of litigation and

25   the only way this picture made it into this report

Vladimir Iakovlev, M.D.

 1    because it was in a publication.

 2                   Q.   Did you obtain permission from the

 3    patient to do that?

 4                   A.   For using the -- we have a

 5    standard protocol for research.  We use material

 6    for research purpose and I had REB approval.

 7                   Q.   Did you obtain permission from the

 8    patient to use this image?

 9                   A.   As I said, each person who enters

10    the hospital, academic hospital, St. Michael's

11    Hospital, signs agreements or release form and it's

12    covered by blanket research regulations.

13                   Q.   Does the patient know that her

14    mesh fiber was featured in a publication?

15                   A.   No, I didn't tell her specifically

16    to the patient.

17                   Q.   Okay.  So the entirety of the

18    excised mesh was then placed in paraffin?

19                   A.   I believe so.

20                   Q.   Is there any remaining of the mesh

21    explant that was not put in paraffin?

22                   A.   I don't think so.  It depends.  If

23    it's a large piece, which I don't suspect it is,

24    there are some remnants which are stored in

25    formalin.  In this case, probably everything went

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 66 of 311 PageID #: 127825
Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 66 of 311 PageID #: 64528
Vladimir Iakovlev, M.D.

```
 1    to paraffin.

 2              Q.   So there still exists some mesh

 3    material in paraffin that could be available for

 4    analysis; fair?

 5              MR. ORENT:  Objection.

 6              THE WITNESS:  For histology?

 7              BY MR. THOMAS:

 8              Q.   Yes.

 9              A.   Yes.

10              Q.   And have you prepared histological

11    slides of the mesh fibers that are contained on

12    page 83 of your report?

13              A.   Yes.

14              MR. ORENT:  Objection.

15              BY MR. THOMAS:

16              Q.   As I understand it, they are not

17    part of your report in this case, true?

18              A.   No.  As I said, this patient has

19    nothing to do with this report.  The only mechanism

20    that this paper appeared in this report because it

21    was in peer-reviewed publication, that's it.  Why

22    are we talking about this patient?  I don't

23    understand.

24              Q.   And if I wanted you to produce the

25    paraffin with the remaining mesh and the slides
```

Vladimir Iakovlev, M.D.

```
 1    that you have for this mesh, which is depicted on

 2    83, would you do that for me?

 3              MR. ORENT:  Objection.  I think you

 4    need to deal with the hospital and privacy laws of

 5    Canada.  I don't think Dr. Iakovlev owns that

 6    property, nor --

 7              MR. THOMAS:  If he's not going to do

 8    it, that's all I want to know.

 9              THE WITNESS:  No, I will not do that.

10    As I said, the paper is published.  It's public,

11    that is why it made it into this report.

12    Everything which belong to St. Michael's and

13    individual patients outside of litigation has

14    nothing to do with this report.

15              BY MR. THOMAS:

16         Q.   Did you wait until it was

17    published before you used it in the report?

18         A.   Yes, I did.  I mean, it was

19    published by the time I produced the report.

20         Q.   Okay.  Did you use it in any other

21    report prior to the time that it was published in

22    the journal?

23         A.   I don't think so.

24         Q.   That would have been

25    inappropriate?
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 68 of 311 PageID #: 137327
Case 2:12-md-02327  Document 3183-3  Filed 05/04/16  Page 68 of 311 PageID #: 64525
Vladimir Iakovlev, M.D.

```
 1              A.   Before it was published, or

 2   accepted -- it depends.  It's my research project

 3   and I'm covered by REB.

 4              So if it's within my research and

 5   knowledge it would be appropriate because I conduct

 6   research, that's information I extract during my

 7   research.

 8              Q.   So if you used it in a report

 9   against Ethicon prior to the time that it was

10   published in the journal, that's okay, because it's

11   a product of your independent research under the

12   REB; is that correct?

13              A.   Yes.

14              (Reporter sought clarification.)

15              A.   Research Ethics Board.

16              Q.   Is the Research Ethics Board the

17   Canadian equivalent of the American Institutional

18   Review Board; do you know?

19              A.   No, no.

20              Q.   What's the difference?

21              A.   Ethics board is individual for

22   specific institutions.  Each institution has their

23   specific research ethics board.

24              Q.   What does the REB do?

25              A.   They review your application.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 69 of 311 PageID #: 137988
Case 2:12-md-02327 Document 2183-3 Filed 05/06/16 Page 9 of 311 PageID #: 64528
Vladimir Iakovlev, M.D.

```
 1    They see if there can be any harm to the patients,

 2    then they approve your methodology.

 3              Q.    And do you have a written document

 4    from the REB that approves your mesh research work?

 5              A.    Yes.

 6              Q.    Is there more than one that you

 7    have from there?

 8              A.    There was renewal.

 9              Q.    Did you submit an application to

10    them for this REB approval?

11              A.    Yes, of course.

12              Q.    And you have that application

13    still?

14              A.    Yes, I should.

15              Q.    What other documents did you have

16    in your possession related to your request for, or

17    their approval of your research in meshes?

18              A.    Nothing.  Just application and

19    their approval letter.

20              Q.    Did you have to appear before the

21    REB to represent on your research?

22              A.    No, it's a simple, it is a very

23    simple project.  I don't do anything to the

24    patient.  I don't do anything specific.

25              I do exactly what I do every day, so it
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 70 of 311 PageID #: 127889
Case 2:12-md-02327 Document 2188-3 Filed 05/04/16 Page 70 of 311 PageID #: 64527
Vladimir Iakovlev, M.D.

1    was straightforward.  It couldn't be any hard, just

2    examining histologically.

3              Q.   Let's take a break.

4              -- RECESS AT 10:19 --

5              -- UPON RESUMING AT 10:26 --

6              BY MR. THOMAS:

7              Q.   Doctor, going back to the images

8    on page 83 of your report, did you write a

9    pathology report of your findings for your review

10   of the histology?

11             A.   Probably I did.  Maybe I haven't

12   completed it yet.  With the meshes, I'm slow, so I

13   could have completed the report, could have not.  I

14   don't remember now.

15             Q.   What's your practice for doing a

16   pathology report for a patient in the hospital who

17   is not involved in medical-legal?  Do you turn that

18   around pretty quickly?

19             A.   What do you mean is not involved

20   in medical-legal?

21             Q.   I thought you told me this was not

22   a medical-legal case, this mesh that's on page 83

23   of your report?

24             A.   That's correct.

25             Q.   So, have you done a pathology

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 71 of 311 PageID #: 137940
Case 2:12-md-02327 Document 3183-3 Filed 09/04/16 Page 71 of 311 PageID #: 64528
Vladimir Iakovlev, M.D.

1   report for this patient based on your review of the

2   histology of her mesh?

3                   A.   Doesn't matter medical-legal or

4   not medical-legal, when I collect mesh specimens

5   because my work is done so slow, I think and it

6   takes me time.  It has nothing to do with

7   medical-legal or not.  The difference is mesh

8   versus no mesh.

9                   Q.   Have you prepared any -- have you

10  dictated anything related to the histology from the

11  mesh ex-plant that's depicted on page 83 of your

12  report?

13                  MR. ORENT:  Objection.

14                  THE WITNESS:  I don't remember.

15                  BY MR. THOMAS:

16                  Q.   Have you written anything about

17  your review of the histology from the explanted

18  mesh that's based on page 83 of your report?

19                  MR. ORENT:  Objection.

20                  THE WITNESS:  As I said, I don't

21  remember.  I've written something, because there

22  was a gross description at least there at the

23  beginning of the report.  Maybe it's signed out, I

24  don't remember now.  I use exactly the same format

25  for all mesh specimens litigation, non litigation.

Case 2:12-md-02327  Document 3790-3  Filed 04/26/16  Page 72 of 311 PageID #: 137941
Case 2:12-md-02327  Document 3790-3  Filed 04/26/16  Page 72 of 311 PageID #: 64529
Vladimir Iakovlev, M.D.

```
 1                    BY MR. THOMAS:

 2             Q.    I understand that.

 3             A.    And because there are so many

 4  items I'm checking it takes me time and I don't

 5  want to do it in a rush.

 6                   With cancer cases it is a different

 7  story.  I rush, I try to make sure diagnostic

 8  process is not involved.  In this case the mesh is

 9  out already so there is no pressure.

10             Q.    So to your knowledge, you don't

11  know whether the doctor or the patient had the

12  benefit of your pathological review of the

13  histology, correct?

14             A.    I think I described it for the

15  physician.

16             Q.    How did you describe it to her?

17  In writing or voicemail or person to person?

18             A.    I don't remember now.  I'm not

19  sure where we're going with this, this is

20  confidential, and I'm not comfortable getting into

21  confidential information of a St. Michael's

22  Hospital patient.

23                   The paper has been published and the

24  picture made it in the report after the publication

25  was peer reviewed and accepted.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/26/16 Page 73 of 311 PageID #: 137842
Case 2:12-md-02327 Document 2186-3 Filed 05/04/16 Page 73 of 311 PageID #: 64580
Vladimir Iakovlev, M.D.

1           Now we're getting into completely

2   different area and I said I'm not getting

3   comfortable in getting into confidential

4   information of a St. Michael's patient.

5           Q.   I'm trying to figure out whether

6   anything in writing exists to your knowledge that

7   describes the findings you made based upon

8   histological review of this explanted mesh.

9           MR. ORENT:  I think he's answered those

10  questions.  I think he's gone far beyond his

11  comfort level.  Let's move on.

12          MR. THOMAS:  Are you instructing him

13  not to answer?

14          MR. ORENT:  I'm not.  However, if he

15  believes that he's confined by Canada's

16  confidentiality laws it's up to him in terms of his

17  knowledge, and what he can share as a doctor over a

18  patient who is not at issue in this lawsuit and not

19  put their medicals at issue.

20          THE WITNESS:  As I said, I'm not

21  comfortable getting into further details.  I think

22  it's inappropriate.  This picture appeared in the

23  report because it was published.

24          BY MR. THOMAS:

25          Q.   Doctor, on page 8 through 11 of

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 74 of 311 PageID #: 137843
Case 2:12-md-02327  Document 2183-3  Filed 05/04/16  Page 74 of 311 PageID #: 64581

Vladimir Iakovlev, M.D.

1    your report, you have a section titled

2    "Polypropylene Degradation and Review of Ethicon's

3    Internal Documents"?

4              A.   That is correct.

5              Q.   How did you determine what

6    documents to review from Ethicon?

7              A.   I asked to send me anything which

8    was available pertinent to polypropylene

9    degradation, specifically if Ethicon scientists

10   performed testing using similar technology and

11   methodology, histology mainly.

12             Q.   Did you rely on counsel to provide

13   to you the documents that you reviewed?

14             A.   Yes.

15             Q.   Did you produce for us on

16   Exhibit 4 all of the documents that you reviewed?

17             A.   Yes, I did.

18             Q.   Were there other documents that

19   plaintiff's counsel supplied to you that you did

20   not include on Exhibit 4?

21             A.   Not to the best of my knowledge.

22             Q.   All right.  You also refer to

23   deposition testimony of Thomas Barbolt?

24             A.   Yes.

25             Q.   Is Dr. Barbolt's deposition on

Vladimir Iakovlev, M.D.

```
 1    Exhibit 4?
 2                 A.   Yes, it is.
 3                 Q.   Do you remember how many days his
 4    deposition was?
 5                 A.   I think there were two days.
 6                 Q.   Did you read the whole thing?
 7                 A.   I read most of the deposition.
 8    Skimmed, I mean it's really long document.
 9                 Q.   Do you recall what his job was at
10    Ethicon?
11                 A.   I don't recall now.
12                 Q.   Do you know what his training was?
13                 A.   No.
14                 Q.   Do you know what kind of testing
15    Dr. Barbolt conducted while he was at Ethicon?
16                 A.   I don't remember now.
17                 Q.   Do you know whether he conducted
18    any animal testing of mesh?
19                 A.   I saw documents of animal testing,
20    many documents.  If he was part of all of them or
21    some of them, I don't remember.
22                 Q.   Do you know whether he conducted
23    any tissue reaction studies?
24                 A.   I don't remember that, no.
25                 Q.   Do you know whether Dr. Barbolt
```

Vladimir Iakovlev, M.D.

 1   compiled and reviewed testing on Prolene

 2   polypropylene from the 1960s to the present?

 3                 A.   As I said, there were many

 4   documents and it's hard for me to remember now.

 5                 Q.   Do you know -- strike that.  Is it

 6   fair to understand that to the extent Dr. Barbolt

 7   presented any testing in his depositions you have

 8   not reviewed that testing?

 9                 MR. ORENT:  Objection.

10                 THE WITNESS:  As I said, I was asking

11   counsel to provide specific information, specific

12   topics.  So they provided this information and I

13   received a number of documents.

14                 I specifically didn't even check

15   whoever signed this, who were the names.

16                 BY MR. THOMAS:

17                 Q.   Did you review any of the testing

18   Dr. Barbolt reviewed in his deposition?

19                 A.   As I said --

20                 MR. ORENT:  Objection.

21                 THE WITNESS:  I don't remember the

22   names.  The only reason I remember his name because

23   it was the only deposition I had specifically for

24   that specific subject.

25

Vladimir Iakovlev, M.D.

```
 1              BY MR. THOMAS:

 2              Q.   What testing do you recall

 3   reviewing as a part of your review of the Ethicon

 4   documents in the case?

 5              A.   As I said, I was focused mainly on

 6   histological examination but I also skimmed through

 7   the testing which was done using scanning electron

 8   microscopy and just regular light microscopy.

 9              Q.   Did you have see any histological

10   examination of what was described as cracked

11   polypropylene sutures?

12              A.   Yes.

13              Q.   And what did you find in your

14   review of the histological examination?

15              A.   I was really surprised.  They

16   found exactly what I found 30 years before I did.

17   I did it independently; I didn't have those

18   documents before.  So I thought I was Columbus, but

19   I guess I wasn't.

20              Q.   And you say they found exactly

21   what you found?

22              A.   Yes, exactly the same.  Even

23   arrows were so much like mine.

24              Q.   What was it that they found which

25   was exactly what you found?
```

Vladimir Iakovlev, M.D.

1              A.    There is a degradation bark and it

2     retains histological dyes, and it also retains the

3     granules of blue fibers.  And they also used

4     polarized light.

5              I think you asked me earlier in the

6     deposition who was using polarized light before.

7     Your scientists were.

8              Q.    Is it your opinion that Ethicon

9     conclusively found exactly what you found?

10             A.    Yes.

11             Q.    And that's based on the documents

12    that have been provided to you?

13             A.    Yes.

14             Q.    Did you see any histological

15    examination of the sutures that analyze to the

16    extent to which it created any risk of harm to

17    patients?

18             A.    I don't think I understand your

19    question.

20             Q.    What don't you understand about

21    it?

22             MR. ORENT:  Objection.

23             BY MR. THOMAS:

24             Q.    Let me start over again.  During

25    the course of your review of Ethicon documents, did

Vladimir Iakovlev, M.D.

```
1    you review any documents where Ethicon scientists

2    reviewed histological slides of tissue samples

3    containing mesh that was described as having

4    cracks?

5              A.   Yes, I did.

6              Q.   And do you recall what the tissue

7    reaction was that they described in those samples?

8              A.   Yes, I do.

9              Q.   And what is that?

10             A.   It is the same thing which I saw,

11   fibrosis foreign body reaction formation.

12             Q.   Do you know how the description

13   they found in their documents compares to what the

14   tissue reaction as described for Prolene sutures at

15   the time that it was approved by the FDA in 1969?

16             MR. ORENT:  Objection.

17             THE WITNESS:  The documents I reviewed

18   they were dated in '80s.

19             BY MR. THOMAS:

20             Q.   I understand that.

21             A.   They had exactly the same

22   description as earlier papers or papers after that.

23   So I don't think there is any difference in any of

24   the descriptions.

25             Q.   Okay.
```

Vladimir Iakovlev, M.D.

```
 1              A.   Either at time of filing of the
 2   FDA application or after, it's all the same.
 3              Q.   And the findings that they found
 4   in the '80s and the findings that they found
 5   earlier, and the findings that they reported later
 6   are just the same as yours are?
 7              A.   Pretty much.
 8              Q.   Okay.  You say on page 9 of your
 9   report at the end of the first paragraph:
10              "An important conclusion should
11              be made that if chemical and
12              physical properties have material
13              change while it is in the body, it
14              should not be used for permanent
15              applications and for anatomical
16              sites from which the devices cannot
17              be safely removed."
18              Did I read that correctly?
19              A.   Yes, you did.
20              Q.   Does St. Michael's use Prolene
21   sutures?
22              A.   Yes, I understand they do.
23              Q.   Does St. Michael's use Prolene
24   hernia mesh?
25              MR. ORENT:  Objection.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 81 of 311 PageID #: 137850
Case 2:12-md-02327 Document 3180-3 Filed 05/04/16 Page 81 of 311 PageID #: 64580
Vladimir Iakovlev, M.D.

```
 1                THE WITNESS:  I see it removed.

 2    Probably it's used for hernia mesh as well.

 3    Prolene or Marlex, I'm not sure.  There are newer

 4    meshes coming on the market.

 5                BY MR. THOMAS:

 6          Q.   Does St. Michael's use Prolene

 7    polypropylene mesh for the treatment of stress

 8    urinary incontinence in TVT and TVT-O?

 9                MR. ORENT:  Objection.

10                THE WITNESS:  I don't think so.

11                BY MR. THOMAS:

12          Q.   Do you know?

13          A.   Maybe in the past.  Right now I

14    just receive them when they're removed.

15                They've been using them before.  I

16    don't know if they still using it right now.

17          Q.   Have you told St. Michael's to

18    stop using Prolene polypropylene sutures?

19          A.   Not sutures.  I talk to

20    gynecologist.  I show them what my research found,

21    what I found, let them know, what's, what's my

22    opinion about this.

23          Q.   Who did you talk to at St.

24    Michael's about that?

25          A.   Our gynecologist.
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 82 of 311 PageID #: 127851
Case 2:12-md-02327  Document 2188-3  Filed 05/05/16  Page 82 of 311 PageID #: 64589
Vladimir Iakovlev, M.D.

1          Q.    I'm sorry?

2          A.    Our gynecologist.

3          Q.    And who is that?

4          A.    I don't think I can go there.

5    Again, I'm not comfortable getting into specific

6    information which is not relevant to my report.

7          Q.    What did you tell that person?

8          A.    I shared my research, what I

9    shared in my papers.

10         Q.    Did you tell them that St.

11   Michael's should not use Prolene polypropylene?

12         A.    I'm not making any guidelines.

13   I'm not a regulating body.  As a researcher I can

14   share my opinion, my findings, with colleagues.

15   And that's what I do in my publications and that's

16   what I did in my personal conversations and

17   personal contacts with St. Michael's physicians.

18         Q.    When did you have those

19   conversations?

20         A.    Throughout.  I've been involved in

21   these meshes for the last year, maybe over a year,

22   I don't remember now.  First it was hernia

23   surgeons, then gynecologists.

24         Q.    So you've spoken to hernia

25   surgeons at St. Michael's about the use of

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 83 of 311 PageID #: 137852
Case 2:12-md-02327  Document 2183-3  Filed 05/04/16  Page 83 of 311 PageID #: 64540
Vladimir Iakovlev, M.D.

1    polypropylene mesh?

2              A.    That's how it came, it came

3    through hernia surgeons.  The whole research

4    project came through hernia surgeons.

5              Q.    Do you know whether hernia

6    surgeons at St. Michael's are still using

7    polypropylene mesh?

8              A.    Probably they do.  But not all of

9    them.  Some of them do, some of them don't.

10             Q.    Do you know whether St. Michael's

11   continues to use polypropylene mesh for the

12   treatment of stress urinary incontinence?

13             A.    As I said, I know they've used it.

14   I don't know if they're still using it right now as

15   we speak.

16             Q.    Did you ever tell them as a

17   scientist and pathologist that they should stop

18   using Prolene polypropylene mesh because it was

19   harming their patients?

20             MR. ORENT:  Objection.

21             THE WITNESS:  I described pathological

22   findings and I disclosed everything I found in the

23   specimens which were coming to me as part of St.

24   Michael's Hospital and what I found during the

25   course of my research.  Yes, I did disclose all of

Case 2:12-md-02327  Document 3790-3  Filed 04/26/16  Page 84 of 311 PageID #: 137853
Case 2:12-md-02327  Document 3790-3  Filed 04/26/16  Page 84 of 311 PageID #: 64541
Vladimir Iakovlev, M.D.

1  this.

2           They are independent practitioners.

3  They collect information from peer-reviewed

4  studies.  They see the evidence which is published.

5  I'm one piece of the puzzle, one piece of the

6  information.

7           They make their own decision.  They're

8  licensed physicians and there are regulating bodies

9  which give guidelines.

10          Again, they are free to use my

11 guidelines in my research or anything else and

12 advise their patients what is the best course and

13 what can be complications.

14          BY MR. THOMAS:

15          Q.   Who was the person at St.

16 Michael's who makes the decision whether to use

17 polypropylene mesh?

18          A.   Each individual physician makes

19 own decisions after discussion with the patient.

20 That's my understanding.

21          I don't think there is any guiding body

22 in specific hospital which can stop physicians from

23 using specific device.

24          Q.   When you said you went to the

25 gynecologist, there's more than one gynecologist at

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 85 of 311 PageID #: 137854
Case 2:12-md-02327 Document 3185-3 Filed 04/27/16 Page 85 of 311 PageID #: 64542
Vladimir Iakovlev, M.D.

 1    St. Michael's, isn't there?

 2            A.   Yes, but not all of them are

 3    dealing with stress urinary incontinence.  There is

 4    a degree of specialization.  Some of them do it,

 5    sometimes some people specialize more in the field.

 6            Q.   There's more than one hernia

 7    surgeon, isn't there?

 8            A.   Yes, correct.

 9            Q.   Is there someone over both of

10    those specialties that can determine that the

11    hospital should not use polypropylene sutures or

12    mesh?

13            A.   I don't know if it can be done.

14            Q.   Have you ever made an effort to do

15    that?

16            A.   To stop them?

17            Q.   (Nods).

18            A.   As I said, I don't know if it can

19    be done.

20            Q.   Have you ever made an effort to

21    stop St. Michael's Hospital from using Prolene

22    sutures or Prolene mesh other than the

23    conversations you had with a gynecologist and a

24    hernia surgeon?

25            A.   No.

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 86 of 311 PageID #: 137855
Case 2:12-md-02327  Document 1183-3  Filed 04/27/16  Page 1 of 311 PageID #: 64548
Vladimir Iakovlev, M.D.

1       Q.   Thank you.

2            What did Dr. Barbolt say about the

3   clinical significance, if any, of surface cracks on

4   polypropylene implanted in the dog study?

5            A.   I don't remember now.

6            Q.   What did Dr. Barbolt say about the

7   molecular weight of the Prolene sutures implanted

8   in the dog study after seven years?

9            A.   I don't remember now.

10           Q.   What did he say about the --

11   strike that.  What did Dr. Barbolt say about the

12   physical properties of the Prolene sutures

13   implanted in the dogs after seven years?

14           MR. ORENT:  Objection.

15           THE WITNESS:  I don't remember now.

16           BY MR. THOMAS:

17           Q.   Page 11 of your report.  You talk

18   about effect on the tissue, we're talking about

19   pain -- sorry, I'm on the wrong page.

20           It's on page 12, I'm sorry.

21           A.   Okay.

22           Q.   Page 12, it says:

23                "It is important to note that

24                in hernia surgery, chronic pain

25                after mesh repair is a growing

Case 2:12-md-02327 Document 3790-3 Filed 04/26/16 Page 87 of 311 PageID #: 127856
Case 2:12-md-02327 Document 3183-3 Filed 09/04/16 Page 87 of 311 PageID #: 64744
Vladimir Iakovlev, M.D.

```
 1                  problem.  Prophylactic neurectomy is

 2                  offered as a method to reduce

 3                  incidence of pain after mesh

 4                  repair."

 5                  What is a prophylactic neurectomy?

 6          A.   When you cut the nerves before you

 7     put the mesh in anticipating the mesh is going to

 8     cause pain.

 9          Q.   When you say cut the nerve, what

10     kind of nerve are you going to cut in the hernia

11     surgery?

12          A.   There are three main nerves

13     branches:  Genitofemoral, inguinal, um, some names,

14     um...

15          Q.   Any other nerves as a part of the

16     hernia surgery?

17          A.   There are three branches, which

18     can be identified visually.  They are thicker

19     trunks.  There is a variability between people, but

20     they're called triple neurectomy because in most

21     people there will be three branches supplying

22     innervation to the area.

23          Q.   So tell me what is done and why

24     it's done in hernia surgery with prophylactic

25     neuroectomy?
```

Vladimir Iakovlev, M.D.

```
 1                A.   It depends.  There's different

 2     techniques.  Either the branches can be cut in the

 3     area, so there will be three branches identified

 4     and transected, buried in muscle.  The stumps will

 5     be buried in muscle.

 6                It could be also arthroscopic

 7     techniques when they go and try and cut the nerve

 8     trunks closer to the spinal cord.

 9                Then I'm not sure if it will be three

10     branches, because if you go proximally it will be

11     less branches, they will all merge into larger

12     trunks.  So you cannot call it triple neurectomy at

13     that level.

14                But the basic rule, we try to identify

15     supply innervation, either larger trunk or smaller

16     branches, transect them and bury the stump in the

17     muscles, so it doesn't form traumatic neuroma.

18                It's done because you want to denervate

19     the area where you anticipate the mesh is going to

20     cause pain.

21                Q.   Why is it important to note the

22     prophylactic neurectomy in your report?

23                A.   Because when chronic pain due to

24     mesh occurs, going back into the scarred area,

25     obstructed by the mesh, proved to be hard.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 89 of 311 PageID #: 137858
Case 2:12-md-02327 Document 2183-3 Filed 05/07/16 Page 89 of 311 PageID #: 64348
Vladimir Iakovlev, M.D.

```
 1                   So historically, first there were

 2      meshes put in, and then more meshes put in, and

 3      then more patients started coming back as chronic

 4      pain, taking the mesh out was difficult, there was

 5      large defect.

 6                   So somebody came up with the idea,

 7      let's leave the mesh in but try to denervate the

 8      area, either bury the nerves with some chemicals

 9      like alcohol, or put nerve blocks, which was an

10      effective strategy.

11                   You anesthetize the area, so the nerve

12      doesn't work for few weeks, and then the pain would

13      be gone.

14                   And then somebody came up with this

15      idea of more permanent denervation, when the area

16      is anesthetized by cutting the nerve.

17                   And then first surgeons try to do

18      neurectomy or transection of the nerve after mesh

19      repair, and after some experience they figure out

20      it's really hard to do to find the nerves from the

21      old scarred area.

22                   So somebody offered, okay, if we

23      anticipate the pain developing from mesh, let's cut

24      the nerve before, when the area is clean and there

25      are no scarring or mesh in the area.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Is that an accepted surgical

 2   technique to do a nerve neurectomy prior to mesh

 3   implantation?

 4              A.   Yes, it is.  It's offered, it's

 5   published and there are results.

 6              Q.   Is that a common occurrence with

 7   mesh implantation?

 8              MR. ORENT:  Objection.  Vague.

 9              THE WITNESS:  Depends on the surgeons.

10   Some surgeons believe in this and they do it.

11   Depends probably on the group of surgeons' practice

12   habits.

13              BY MR. THOMAS:

14              Q.   Right above that section on the

15   prophylactic neurectomy, you discuss the mesh scar

16   complex and its "interlocking and

17   compartmentalizing nature".  What is the

18   interlocking and compartmentalizing nature of the

19   mesh scar complex?

20              A.   So if we look at the mesh, mesh is

21   a structure, three-dimensional structure made out

22   of mesh fibers or mesh filaments.

23              So filament of fiber, circles around,

24   loops around, and then it forms in pores, and in

25   these tissues.  And each pore has 360 degrees of
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 91 of 311 PageID #: 137860
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 91 of 311 PageID #: 64548
Vladimir Iakovlev, M.D.

 1    surrounding fibers, that's why it is a pore.

 2              So it becomes a compartment.  An area

 3    which is surrounded by something or a physical

 4    structure with volume inside, that is a

 5    compartment.  So the mesh introduces all these

 6    micro compartments.

 7              Q.   There aren't walls around each of

 8    these compartments, are there?

 9              A.   Yes, there are.  Fibers, mesh

10    fibers, they form the walls of this compartment.

11              Q.   But they don't totally encapsulate

12    -- strike that.

13              The compartment though, has an opening

14    on either side much like a screen, correct?

15              A.   Yeah, more like a screen or a

16    tube.  To a degree, because mesh is not completely

17    flat, it's a more of a three-dimensional.  If you

18    go with microscopic level, it's three-dimensional.

19              So I would compare it with each pore as

20    a very complex irregular tube, more or less.

21              Q.   My point is, instead of a

22    compartment it is a tube with openings on either

23    side?

24              A.   A compartment is a tube.  All

25    compartments in human body are tubes.

Vladimir Iakovlev, M.D.

```
 1                Q.   That has an opening on either

 2   side?

 3                A.   Yes, that's how they are in the

 4   body.  If we talk about tunnel syndromes in the

 5   hand or in the chest, all these compartments form a

 6   tube.

 7                And the tube lets nerves and blood

 8   vessels through and if compartment syndrome occurs,

 9   it compromises the nerves in the vessel, in the

10   tube-like structure.

11                Q.   Doctor, in your report you

12   discussed the concept of mesh stiffening?

13                A.   Yes, I did.

14                Q.   Please tell me how mesh stiffens?

15                A.   Immediately after placement, it

16   can fold and curve.  So two layers or three layers

17   of mesh is different than one layer.  So this is

18   initial step, if it folds or curls or wrinkles

19   immediately after placement.

20                Then next step which will increase

21   stiffness of the structure is scar encapsulation.

22   So scar immobilizes the fibers in the structures so

23   they can not move inside the elasticity of the

24   meshes, mainly because of the bending ability of

25   the fibers and movement within the structure.
```

Vladimir Iakovlev, M.D.

```
 1                  When it's used with scar it cannot so
 2      that is lost.  When it's incorporated in scar
 3      tissue, the movement and bendability of fibers is
 4      limited.
 5                  Q.   Let me ask you a question here; I
 6      don't mean to interrupt you.  Is folding or curling
 7      a necessary part of mesh stiffening?
 8                  A.   No.  It's one of the processes
 9      which increases mesh stiffness if you compare it
10      with the flat product.
11                  Q.   So you can have, as far as you're
12      concerned, mesh stiffening if the mesh does not
13      fold or curl?
14                  A.   Then other mechanisms will set in.
15                  Q.   But the first one deals with
16      folding, curling and then the scar that you just
17      described?
18                  A.   Yes.
19                  Q.   I didn't mean to interrupt you.
20      Is there anything else you wanted to say about that
21      mechanism?
22                  A.   And then slowly over the years,
23      the degradation layer will start building up and we
24      know it's brittle.  Like any other plastic, we see
25      over time it starts cracking.  It becomes harder
```

Vladimir Iakovlev, M.D.

1    and less flexible and it breaks.

2              Q.   The degradation layer you

3    described is four to five microns?

4              A.   It depends.  It depends how long

5    it's been in the body.

6              Q.   Is four to five microns about the

7    largest you've seen?

8              A.   No, I've seen up to seven or

9    eight.  Depends on the type of mesh, I guess --

10             Q.   Well, Prolene polypropylene, what

11   is the largest you've seen?

12             A.   It's hard to say because it's for

13   -- currently that mesh is -- 80 percent of the time

14   I don't actually know what the product is.

15             Q.   80 percent of the time you don't

16   know what the product is?

17             A.   Yes.

18             Q.   And the reason why I ask is, in

19   all the reports I've seen, I've never seen you give

20   an opinion that is greater than five microns to a

21   Prolene mesh?

22             A.   That's just happened with any

23   litigation process, but I have over 300 meshes in

24   my office.

25             I'm just telling you the thickest bark

Vladimir Iakovlev, M.D.

```
 1    as far as I remember was up to seven, probably just

 2    over seven microns thick.

 3              And I think it was a hernia mesh and

 4    for hernia meshes, when they've been in the body

 5    for like 12 or 14 years, it's very difficult to

 6    trace what type of mesh was put in.

 7              Q.   Your best recollection insofar as

 8    you're dealing with Prolene mesh for the treatment

 9    of stress urinary incontinence, the largest you've

10    seen is five microns, correct?

11              MR. ORENT:  Objection.

12              THE WITNESS:  Probably six, I don't

13    remember now.

14              BY MR. THOMAS:

15              Q.   This bark, as you've described it,

16    by definition is cracking?

17              A.   Yes.

18              Q.   And when you get past the bark

19    layer the interior of the polypropylene as best as

20    you can tell is unaffected?

21              A.   Yes.

22              Q.   Okay.

23              A.   The core of the fibers remains, at

24    least, the same by my methods.

25              Q.   And by your methods, as far as you
```

Vladimir Iakovlev, M.D.

1    can tell, past the five microns or so, the physical

2    properties of the polypropylene remain the same,

3    true?

4              MR. ORENT:  Objection.

5              THE WITNESS:  By my methods, yes.

6              BY MR. THOMAS:

7         Q.   Have you described -- you've

8    described two ways that you believe that mesh

9    becomes stiff.

10             Are there any other ways that you

11   believe mesh becomes stiff in the body?

12        A.    Three.  So multi layering, scar

13   encapsulation and then degradation.  No, I don't

14   know any other mechanism for stiffening.

15        Q.   And the way that you're able to

16   identify multi layering is when you analyze the

17   mesh after it's been sent to you in formalin from

18   the surgeon, correct?

19        A.   As I said, sometimes I receive

20   meshes fresh in saline or not just -- and I see

21   it's folded already.

22        Q.   The only polypropylene meshes that

23   you've given us, other than the one that you've

24   given us limited information about, come to you in

25   formalin, correct?

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 97 of 311 PageID #: 137866
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 97 of 311 PageID #: 64384
Vladimir Iakovlev, M.D.

1           MR. ORENT:  Objection.

2           THE WITNESS:  For litigation cases?

3    Meshes come in formalin, that is correct.  But in

4    St. Michael's Hospital, when they receive mesh, as

5    I mentioned, everybody knows I'm the mesh guy.

6    They call me when they receive a mesh, sometimes I

7    receive them fresh.

8           BY MR. THOMAS:

9           Q.   Do you have any documents, images

10   or any other information about meshes that you've

11   received fresh, without formalin, that show folding

12   or curling?

13          MR. ORENT:  Objection to form.

14          THE WITNESS:  I describe them when I

15   receive them.  But again, we're going to the St.

16   Michael's Hospital patients and I don't want to go

17   there.  I'm not comfortable discussing this

18   confidential information.

19          BY MR. THOMAS:

20          Q.   Okay.

21          A.   Probably took some pictures at

22   some time.

23          Q.   You have not produced those

24   pictures to us?

25          A.   They're not in the report.

Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 98 of 311 PageID #: 137867
Case 2:12-md-02327  Document 3790-3  Filed 04/27/16  Page 98 of 311 PageID #: 64585
Vladimir Iakovlev, M.D.

1    They're confidential information and I took them

2    because in the course of my work as a pathologist

3    at St. Michael's.

4                Q.   Do you have any information about

5    the incidents of folding or curling in mesh

6    implanted -- in Prolene mesh implanted for the

7    treatment of stress urinary incontinence?

8                A.   For stress urinary incontinence,

9    the degree of curling is visible in most of the

10   cases.

11               Q.   More than half?

12               A.   I would say more than half.

13   Again, it depends.  Sometimes one piece is curled,

14   the other one is completely flat.

15               Q.   And again, these are cases where

16   you've received the mesh in formalin?

17               A.   Yes.  But I mean we're talking

18   about curling, not curling on the whole specimen.

19   We're talking about curling as it sits in scar

20   tissue.

21               So whatever curling I'm assessing as is

22   significant is on that, that which can -- which is

23   immobilized by scar tissue.

24               So I'm not talking about curling which

25   occurs secondary to fixation.  I'm talking about

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 99 of 311 PageID #: 127868
Case 2:12-md-02327  Document 2183-3  Filed 05/04/16  Page 9 of 311 PageID #: 64388
Vladimir Iakovlev, M.D.

1    curling which occurred in the body.  I'm able to

2    distinguish between one and the other.

3              Q.    How?

4              A.    I just said.  If it's curled and

5    it's completely surrounded, integrated in scar

6    tissue in curled shape, it occurred in the body.

7              If the entire specimen is curled

8    together with scar, that could have been an

9    artifact.  So I immediately disregard the shape or

10   the formation which occurred as an artifact.

11             Q.    Let's go to page 19 of your

12   report, please.

13             A.    Um-hum.

14             Q.    I'm going to refer you back to

15   page 14, because I think that that's the commentary

16   that you have on that.  So you've got 19, which is

17   the images, and page 14 is the text.

18             A.    Yes.

19             Q.    Okay.  As you look at page 19,

20   Figure Set 1a is described as:

21                   "A foreign body inflammatory

22                   reaction H&E, 40X images

23                   consolidated cases."

24             What are you showing here?

25             A.    Foreign body type inflammatory

Vladimir Iakovlev, M.D.

```
 1    reaction.

 2                    Q.   Is there anything unusual about

 3    this foreign body reaction?

 4                    A.   What do you mean unusual?

 5                    Q.   Is there anything remarkable about

 6    it?  There's a foreign body reaction anytime you

 7    have an implant, correct?

 8                    A.   Then usually it's not normal

 9    tissue.  Normally there shouldn't be any

10    inflammation in the tissue.

11                    Q.   Okay.  And so would there be

12    inflammation regardless of what kind of foreign

13    body is placed in there?

14                    A.   Yes, because having a foreign body

15    in the body is not normal thing.

16                    Q.   And so is it fair to say that

17    Figure Set 1a describes a typical foreign body

18    reaction to implanted materials?

19                    MR. ORENT:  Objection.

20                    THE WITNESS:  I wouldn't say typical,

21    although you can use that word.  I would say

22    non-specific reaction to a foreign body.  The body

23    is trying to destroy the foreign body because it's

24    a noxious stimulus, a noxious or damaging object.

25
```

Vladimir Iakovlev, M.D.

```
 1              BY MR. THOMAS:

 2              Q.   The images on the left show that

 3    the polypropylene was removed as part of the

 4    microtoming process; correct?

 5              A.   Could you repeat that question.

 6              Q.   I'm looking at the figures on the

 7    left, which show the white images, compared to the

 8    right, which show the yellow.

 9              And on the left it shows that the

10    polypropylene that used to be where the white is

11    has been removed as a part of the microtoming

12    process; correct?

13              A.   No, actually, there might be all

14    of them present there.  They're just clear;

15    polypropylene is clear.  If it is not degraded,

16    it's completely clear.

17              If the fibers were blue fibers, they

18    would be visible.  If it's clear fiber they would

19    not.

20              So technically, looking at these

21    images, we cannot say which hole is the actual MTM,

22    and which sort of appear in holes, still contain

23    polypropylene.  You would need polarized light to

24    see that.

25              Q.   So what can you tell me about the
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 102 of 311 PageID #: 127871
Case 2:12-md-02327 Document 3793-3 Filed 04/27/17 Page 102 of 311 PageID #: 64359
Vladimir Iakovlev, M.D.

1    part of the mesh that we're seeing in Figure 1a?

2              A.    Specifically, I don't -- do you

3    want me to discuss a specific feature?

4              Q.    For example, you don't have a

5    clean cut where you're looking at a perfectly round

6    portion of the mesh, correct?

7              MR. ORENT:  Objection to form, to the

8    use of the term "clean cut".

9              THE WITNESS:  Some of them are closer

10   to perpendicular orientation.  Some of them are

11   angled.

12             BY MR. THOMAS:

13             Q.    Okay.  For example, when you have

14   a microtoming process and you pull the knife across

15   the histological slide, sometimes you will create

16   an artifact by pulling the tissue away from the

17   polypropylene, correct?

18             A.    Yes, because polypropylene is

19   harder than tissue, you can damage tissue during

20   cutting.

21             Q.    And you can't tell if you look at

22   set 1a whether the polypropylene is there or not;

23   true?

24             A.    Yes, that's true.

25             Q.    You can't tell by looking at the

Vladimir Iakovlev, M.D.

```
 1    figures in set 1a whether those are the actual size

 2    of the hole that was occupied by the polypropylene,

 3    and whether that is an artifact from microtoming?

 4              A.   That I can tell you because

 5    artifact from microtoming looks completely

 6    different.  These are holes from fibers.

 7              Q.   Completely?

 8              A.   For these specific holes?

 9              Q.   How can you tell the difference?

10              A.   Well, you have to work as I

11    pathologist for so many years and then you can

12    tell.

13              But generally, how we go for that

14    specific feature, it would be shape, rounded shape,

15    oblique, assuming, if we look at this image here --

16    if you want me to point, circle.

17              Q.   I'll give you a red pen -- let's

18    give you a blue pen.  That will show up better.

19              A.   Assuming if we see this tissue,

20    this specific, this is displaced.  So when the

21    fiber was not cut, it probably had different

22    position, different orientation.  Because it's

23    misplaced, it doesn't completely circle here.

24              Q.   Is that an artifact from the

25    microtoming process?
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 104 of 311 PageID #: 137873
Case 2:12-md-02327 Document 3333 Filed 05/09/16 Page 104 of 311 PageID #: 64567
Vladimir Iakovlev, M.D.

1        A.   To a degree.

2        Q.   Okay.

3        A.   Now, see this empty space here?

4        Q.   Mark that A.  Mark the first one

5   A, and the next one B, so the record is clear what

6   you've just done.

7        A.   (Witness complies).

8        Q.   This one will be A.  That's the

9   one you've discussed first.  The other one you're

10  discussing now is B.

11       A.   So this circle labelled A moved

12  during microtomy.  It was within the fibers and now

13  it moved, it changed position slightly.

14            The area B appears empty, but it was

15  occupied in vivo, and this is an artifact.  Another

16  artifact here is artifact C, which is tissue

17  retraction.  Now, if we --

18       Q.   And those are all caused by the

19  microtoming process?

20       A.   No.  Different combination of

21  factors which cause all of this.

22            Now, if we look at the entire opening

23  marked as D, is perfect round shape, no tissue is

24  displaced.  So this would be as close as it gets to

25  the area which is occupied by a cross-section of

Vladimir Iakovlev, M.D.

```
 1    the mesh fiber.
 2              Q.   Okay.  Let's go now to the next
 3    page, page 20.  Anything else remarkable about that
 4    page, page 19?
 5              A.   It depends what you want me to
 6    describe.
 7              Q.   Well, I've seen you testify
 8    before.  And you put these images up on the screen
 9    and you tell the jury what you think is remarkable
10    about them?
11              A.   Do you want me to go through this
12    description?
13              Q.   Do you have anything other than a
14    foreign body reaction, as depicted in the tissue,
15    is there anything other than that that's remarkable
16    about the images on 19?
17              A.   This picture is actually good in
18    terms of it shows this layering.
19              So the fibers are surrounded by this
20    dense foreign body type inflammation, and then the
21    inflammation is actually encapsulated by dense scar
22    on the outside, so this very dense pink area is a
23    scar.  So it goes on the outside of the
24    inflammation.
25              And then beyond the scar plate, here is
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 106 of 311 PageID #: 167875
Case 2:12-md-02327 Document 3715-3 Filed 04/20/17 Page 106 of 311 PageID #: 64363
Vladimir Iakovlev, M.D.

```
 1    the transition into normal lighter tissue not as

 2    densely scarred or densely collagenized.

 3              So this picture is a good example of

 4    showing this multilayering, sort of onion skin

 5    around the mesh fibers.

 6         Q.    Anything else?

 7         A.    No.

 8         Q.    Let's go to page 20 now.

 9         A.    Now, I have the mark coming

10    through.  Should I use a pen?

11         Q.    We'll do that next time, we'll

12    take that away.

13              Now on page 20, again, this is an image

14    from the consolidated cases?

15         A.    That's correct.

16         Q.    And as you look in the top on 1b,

17    you see blue.  And that is polypropylene mesh.

18         A.    Yeah, that's a cross-section of a

19    blue polypropylene fiber.

20         Q.    And it looks like it's been folded

21    as a part of the microtoming process; is that fair?

22         A.    It's not microtoming process; it

23    folds, curls.  Polypropylene just tends to curl.

24         Q.    But this is a four-micron thick

25    slice of polypropylene, correct?
```

Vladimir Iakovlev, M.D.

```
 1              A.   Then it curls up like this.  Some
 2    of them just stay flat.  Some of them curl up.
 3              Q.   But this is an artifact of the
 4    sample preparation process?
 5              A.   Curling?  Yes.
 6              Q.   So the curling of the blue
 7    polypropylene in set 1b on page 20 is an artifact
 8    of the sample preparation process?
 9              A.   That's correct.
10              Q.   All right?
11              A.   The exact shape of that slice is
12    better to be estimated by the tissue which
13    surrounds it because tissue didn't curl, didn't
14    move much.  There is more movement of the
15    polypropylene slices.
16              Q.   What does that mean?  I don't
17    understand.
18              A.   Well, see, when the tissue is cut
19    it doesn't curl, it doesn't wrinkle most of the
20    time because of the technology of the slides and
21    knives.  Everything was designed to keep it flat.
22              So over the years, over the hundred
23    years we learned how to keep it flat.  With
24    polypropylene, because it is a different material,
25    doesn't stick.  The histological slides don't hold
```

Vladimir Iakovlev, M.D.

```
 1    it as well so it's not firmly attached.

 2              So, when it's cut initially, it may

 3    stay flat.  But then after drying and some chemical

 4    treatment, starts curling up, while tissue stays

 5    flat.

 6              Q.   Okay.

 7              A.   Curling up or moving, I mean curls

 8    up, lifts up, and then starts floating around.

 9              Q.   What are you going to say at trial

10    about Figure Set 1b on page 20?

11              A.   Just an example of foreign body

12    type inflammatory reaction.

13              Q.   Okay.  Let's go to page 21.

14              A.   Yes.

15              Q.   Page 21 is Figure Set 1c:

16                   "Foreign body inflammatory

17                   reaction, H&E 40X, image of

18                   additional TVT cases."

19              Now, I think you told us before that

20    these are previous TVT and TVT-O cases?

21              A.   Yes.

22              Q.   Do you know whether this is a TVT

23    or a TVT-O?

24              A.   No.

25              Q.   Can you tell me today whether this
```

Vladimir Iakovlev, M.D.

```
 1    slide comes from the set of 22 patients that you

 2    received from Dr. Kreutzer?

 3                MR. ORENT:  Objection.

 4                THE WITNESS:  My recollection is it was

 5    later, one of the later cases.

 6                BY MR. THOMAS:

 7         Q.   Do you know which one it is?

 8         A.   I can probably trace it but...

 9         Q.   Is it a medical-legal case?

10         A.   I think so, but again it would be

11    hard for me -- just what I recall, it is a TVT that

12    I kept track quite well, TVT or TVT-O.

13         Q.   If I asked you to, could you tell

14    me where it came from?

15         A.   I can make an effort to figure it

16    out.

17         Q.   Okay.

18         A.   If I can't, I can't.

19         Q.   I'm going to want to know where

20    all these came from.  That's what we asked for in

21    advance and I understand we don't have it today?

22         A.   I never had the purpose to trace

23    individual cases unless it's for a specific -- the

24    report is prepared for a specific patient.

25         Q.   Okay.
```

Vladimir Iakovlev, M.D.

```
 1              A.   Because of it wasn't my purpose.

 2    My purpose was to collect information and

 3    photographs for TVT or TVT-O as device.  That's why

 4    I have difficulty tracing all of them back.  Some

 5    of them can be traced; some of them cannot.

 6              Q.   If you look at Figure Set 1c, top

 7    left, again, you see the blue polypropylene,

 8    correct?

 9              A.   Yes, I do.  And the other hole

10    above it may still contain polypropylene but it's

11    clear because the way it's done two fibers are

12    combined together.

13              One filament is blue, one filament is

14    clear.  And they go through the knitting product

15    together, this pair.

16              Q.   Does the fact that the hole that

17    you just identified above the presence of blue

18    polypropylene has an irregular shape, does that

19    impact your opinion as to whether the polypropylene

20    is present or not?

21              A.   Not irregular.  It's more regular

22    curvilinear shape, and there is inflammation around

23    it, so there are several features which tell me

24    that this is space where polypropylene either still

25    is or used to be.
```

Vladimir Iakovlev, M.D.

```
 1                  If I had polarized light or if I had

 2    microscope right now and it would be in the

 3    microscope, I could flip polarized light and see.

 4                  Q.   Now, is that tissue that is in

 5    that large white area above the polypropylene?

 6                  A.   It is a small fragment of tissue.

 7                  Q.   Is that part of a microtoming

 8    artifact?

 9                  MR. ORENT:  Objection.

10                  THE WITNESS:  Microtomy or processing,

11    it's hard to say, but it's an artifact.  It's

12    displaced.

13                  BY MR. THOMAS:

14                  Q.   As you look down to the piece of

15    polypropylene in set 1c, on the top of that blue

16    portion it appears to be some tissue?

17                  A.   Yes.

18                  Q.   And that tissue looks to fit right

19    into the tissue above it?

20                  A.   That's correct.

21                  Q.   So that's pulled away from the

22    tissue as a part of the microtoming process,

23    correct?

24                  MR. ORENT:  Objection.

25                  THE WITNESS:  You have good eyes.
```

Vladimir Iakovlev, M.D.

```
 1              BY MR. THOMAS:

 2              Q.   Why don't I see any bark on that

 3     polypropylene?

 4              A.   Two reasons.  Not enough

 5     resolution of the picture, and second, not in

 6     focus.

 7              Q.   And do you know how long this mesh

 8     was implanted in the person?

 9              A.   No, I don't remember.

10              Q.   But you have those records?

11              A.   Most likely.  But again, some

12     patient samples came without much records.  Most of

13     the samples I received had implantation dates.

14              Q.   So what is remarkable about the

15     slides in Figure Set 1c which you'll talk to the

16     jury about?

17              A.   It shows a blue fiber.  It shows

18     that some of the fibers are blue, but otherwise it

19     shows exactly the same feature as before.

20              It's kind of onion skin mesh fiber

21     covered by inflammation, and then outside of that

22     everything is encapsulated in scar tissue.

23              Q.   And the scar tissue would be

24     reflected in your notations in the ones on the

25     right?
```

Vladimir Iakovlev, M.D.

```
 1              A.    Yes, sometimes I do that.

 2              Q.    Okay.  Anything else remarkable

 3   about the figures on page 21?

 4              A.    No.

 5              Q.    Let's go to page 22, Figure Set

 6   2a.  Again, this is images of additional TVT cases.

 7   And these would be cases that were not part of the

 8   consolidated group that you've just reviewed,

 9   correct?

10              A.    That is correct.

11              Q.    And can you tell me by looking at

12   this whether it was part of the set of cases that

13   you received from Dr. Kreutzer?

14              A.    No, that was later case.

15              Q.    How can you tell me that?  How do

16   you know that?

17              A.    Quality of the picture.  I see it

18   was not taken with the camera that I had at the

19   time that I received the, those specimens.

20              Q.    Was this taken from an active

21   medical-legal case involving Ethicon?

22              MR. ORENT:  Objection to the form.

23              THE WITNESS:  I don't remember.  Most

24   likely it is.

25
```

Vladimir Iakovlev, M.D.

```
 1                BY MR. THOMAS:

 2                Q.   But you can't tell me today what

 3     it might be?

 4                A.   It's hard to say.

 5                Q.   And what is remarkable about the

 6     image in Figure Set 2a on page 22 for purposes of

 7     the jury?

 8                A.   Can I have a pen?

 9                Q.   I'll give you a blue pen.

10                A.   Remember, earlier you asked me

11     about why you cannot see bark?  Now you can see the

12     bark, so this is the bark.  Right there.

13                Q.   What you've indicated is on the

14     left?

15                A.   This is the bark right there.

16     This is the bark right there.

17                Q.   Now are you assuming for purposes

18     of that statement that polypropylene is still

19     present in that slide?

20                A.   Well, degraded part of the

21     polypropylene is still present for sure, because I

22     can see it stained.  If the core remains unlocked,

23     there's a different question.  In this area, most

24     likely it is.

25                Q.   You say most likely it is?
```

Vladimir Iakovlev, M.D.

```
 1                    A.   Because this bark layer is free in

 2       the space, and doesn't happen that often.  Because

 3       if it was free in this area, it would flow all the

 4       way.  So the way it remains in the tissue it

 5       remains attached to tissue.

 6                    So the bark which is firmly attached to

 7       tissue like in this area is most likely detached.

 8       So there is no fiber core in this area.  But in

 9       this specific area, I suspect the core of the fiber

10       is still there.

11                    Q.   Let me do something so the record

12       is clear.

13                    You've made some arrows on Figure 2 A,

14       on the upper image, and there's two arrows on the

15       upper left-hand portion and you suggest that

16       indicates bark -- you suggest that indicates bark,

17       correct?

18                    A.   I didn't suggest.  I just pointed

19       where it is.

20                    Q.   Okay, fine.  And then down in the

21       lower right-hand corner, you've drawn several

22       diagonal lines in addition to two arrows.

23                    The two arrows indicate bark, as you

24       understand it, and you believe that the diagonal

25       lines represent polypropylene which is present in
```

Vladimir Iakovlev, M.D.

```
 1    the slide, correct?

 2              A.    Most likely.

 3              Q.    Okay.  Now, we requested that all

 4    of the slides that were used in your report be

 5    forwarded to our pathologist for their review.

 6              Was this slide forwarded to them, to

 7    your knowledge?

 8              MR. ORENT:  Objection.

 9              THE WITNESS:  No, it's an additional

10    case.

11              BY MR. THOMAS:

12              Q.    Okay.

13              MR. ORENT:  By the way, just for the

14    record, we have not received any slides from your

15    pathologist either and we have requested that

16    repeatedly.

17              MR. THOMAS:  We don't have any to give

18    you.  We're working from the same set of slides.

19              MR. ORENT:  So you're using the

20    plaintiff's stained slides --

21              MR. THOMAS:  So far we have.  We figure

22    it's better off using one set of slides.  And to

23    the extent we make any, you will have them

24    promptly.

25              THE WITNESS:  If it was a litigation
```

Vladimir Iakovlev, M.D.

1   case, you have the report.

2                  BY MR. THOMAS:

3                  Q.   Are you familiar with whole slide

4   imaging?

5                  A.   Yes, I am.

6                  Q.   Do you do whole slide imaging of

7   these cases?

8                  A.   Yes, I do.

9                  Q.   So you have --

10                 A.   Not for all of them.  For some

11  cases, especially the later ones.

12                 Q.   Okay.  And who maintains your

13  whole slide imaging equipment; who has that?  St.

14  Michael's?

15                 A.   Yes, St. Michael's.  It's standard

16  equipment.

17                 Q.   Do you have to pay St. Michael's

18  for use of the whole slide imaging equipment?

19                 A.   No.

20                 Q.   Okay.

21                 A.   It's free for researchers.

22                 Q.   What kind of machine do they have?

23                 A.   Aperio.

24                 Q.   So, you could supply to us digital

25  images of the slides that you have on whole slide

Vladimir Iakovlev, M.D.

```
 1    imaging, correct?

 2              A.   As long as you're entitled to

 3    receive material or information about the case.

 4              Q.   Okay.  What else is remarkable

 5    about Figure Set 2a on page 22?

 6              A.   Oh, it is a very nice example,

 7    again of this layering, onion skinning.

 8              The mesh fibers are surrounded by halo

 9    of foreign body reaction and everything is encased

10    in solid scar plate.

11              And then normal tissue is beyond the

12    solid scar plate so it is a good example of how it

13    happens.

14              Q.   And in terms of -- you've told me

15    that on the upper left of the area where you had

16    the arrows, there's likely not polypropylene but in

17    the lower right there likely is polypropylene?

18              A.   Yes.

19              Q.   How about in the white area to the

20    right where you've written; can you tell whether

21    polypropylene is present or not?

22              A.   Not without polarized light.

23              MR. ORENT:  Counsel, we've been going

24    about another hour.  Shall we take a short break?

25              MR. THOMAS:  Good time, yes.
```

Vladimir Iakovlev, M.D.

```
 1                -- RECESS AT 11:27 --

 2                -- UPON RESUMING AT 11:44 --

 3                BY MR. THOMAS:

 4                Q.   Doctor, going back to image 2a on

 5       page 22 of your report, you described this scar

 6       area in your testimony, and then showed how the

 7       scar then changed to normal tissue, correct?

 8                A.   That' is correct.

 9                Q.   How thick is the area between what

10       you show to be the polypropylene mesh and the scar

11       to the normal tissue?  How thick is that area

12       between the polypropylene and the normal tissue?

13                A.   You mean in this specific image or

14       in general?

15                Q.   In this image.

16                A.   It depends on which part of the

17       mesh.  The thinnest part is within the hundred

18       microns.  The thickest part can be as thick as

19       couple of millimeters, if we measure the whole

20       thing like this.

21                Q.   And just for the record, when you

22       say within a hundred microns, you're referring to

23       the area on the left side of the lower image in the

24       yellow, through the scar to the normal tissue.  And

25       when you're referring to the couple of millimeters,
```

Vladimir Iakovlev, M.D.

```
 1    you were referring to normal tissue to normal

 2    tissue in between the two mesh fibers; is that

 3    fair?

 4              MR. ORENT:  Objection.

 5              THE WITNESS:  That's correct.

 6              BY MR. THOMAS:

 7              Q.   And similarly, down below on the

 8    lower left, where you show the polypropylene mesh,

 9    you show scar and then you do show normal tissue;

10    how far is it from the polypropylene to the normal

11    tissue; how wide is the scar band?

12              A.   The same, within 100 microns.

13    Sometimes you have normal tissue pushing into the

14    pores, sometimes not.  Sometimes the scar plate is

15    within a hundred microns -- I mean, the scar

16    capsule.  Sometimes it goes to the millimeters,

17    three, four millimeters, it depends.

18              Q.   Okay.  Anything else remarkable

19    about the images on page 22?

20              A.   No, we discussed everything, I

21    think.

22              MR. ORENT:  Objection.

23              BY MR. THOMAS:

24              Q.   Let's go to page 23 please, Figure

25    Set 2b.  Let's talk about this a little bit.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 121 of 311 PageID #: 167890
Case 2:12-md-02327 Document 3233-3 Filed 05/09/16 Page 121 of 311 PageID #: 64390
Vladimir Iakovlev, M.D.

```
 1                 Where does this come from?

 2          A.   It came from, if I remember

 3   correctly, Edwards case.  If I remember correctly.

 4          Q.   What is it about this that makes

 5   you think it's the Edwards case?

 6          A.   It is an old photograph.

 7          Q.   And in the top, on the right-hand

 8   side of the image, it looks like a piece of blue

 9   polypropylene that's displaced in its location; is

10   that fair?

11          A.   Slightly displaced, most of it

12   sits right there, it was in vivo.

13          Q.   The other blue pieces that appear

14   there other than the -- why don't you just mark

15   that with an "X" for me so it's clear what we're

16   talking about.

17          A.   (Witness complies).

18          Q.   There are other blue pieces

19   throughout that image, is that polypropylene or is

20   that stain?

21          A.   You mean the blue areas here?

22          Q.   Yes.

23          A.   Some of it is probably displaced

24   polypropylene, it's hard to say because of the

25   resolution.  It could just be inflammation because
```

Vladimir Iakovlev, M.D.

1    there is a weird color coming into the pictures.

2              Q.   If the blue that appears there is

3    in fact displaced polypropylene, then that's part

4    of the microtoming artifact; is that fair?

5              A.   Yes, that's fair.

6              Q.   All right.

7              A.   Anywhere where cross-section of

8    the fiber overlaps with tissue, is a displacement.

9              Q.   All right.  And you title this,

10   "Fibrous Bridging and Scar Encapsulation".  And

11   it's four times power.  What does this show?

12             A.   All pores in this section of the

13   mesh are filled with scar tissue.  So normal tissue

14   is beyond the scar plate, and all the pores are in

15   the spaces in between, and mesh walls are filled

16   with scar tissue.

17             Q.   Okay.  The magnification of the

18   image on the prior page is five times this

19   magnification, correct?

20             A.   About, yes.

21             Q.   Okay.  And can you tell me by

22   looking at the image on page 23 in the cluster of

23   four circles, how close it is from the

24   polypropylene across the scar tissue to the normal

25   tissue?

Vladimir Iakovlev, M.D.

```
 1                  A.   In this area?

 2                  Q.   Yes.

 3                  A.   It would be within the 100 microns

 4  or so.

 5                  Q.   Mark that -- good.

 6                  A.   (Witness complies).

 7                       In this case, it's thicker, could be as

 8  thick as 200 microns.

 9                  Q.   Okay.

10                  A.   It could be .2 millimeters,

11  roughly.

12                  Q.   If you wanted to measure that on

13  the slides that you have, can that be done?

14                  A.   With a eyepiece micrometer, yes.

15                  Q.   Anything else remarkable about

16  Figure 2b other than showing the scar?

17                  A.   Fiber bridging, and completely

18  encapsulating the entire structure of mesh pores

19  that fill the scar tissue, and normal tissue is

20  outside.  This is the mesh scar complex, or mesh

21  scar plate.

22                  Q.   As you look at this image, is this

23  a complete slide?

24                  A.   No, there is tissue beyond

25  slightly.  And this end, I think is here on the
```

Vladimir Iakovlev, M.D.

```
 1   next page, page 24.

 2              Q.   Okay.  We'll come to that in a

 3   second.

 4              A.   That's my recollection.

 5              Q.   The figure on 2a, page 22, is

 6   obviously a smaller part of a bigger slide, correct?

 7              A.   That's correct.

 8              Q.   And you believe that the image on

 9   page 23 is also a smaller part of a bigger slide?

10              A.   I think most of the mesh is here

11   on the slide --

12              Q.   Um-hum.

13              A.   -- so there's not much mesh

14   beyond.

15              Q.   That's why I'm asking the

16   question.

17              Does the image that's shown on page 23

18   represent the outer boundaries of the mesh in that

19   slide?

20              A.   I think so.

21              Q.   Okay.

22              A.   I think so, there's an edge of

23   tissue here.  Now, this exactly piece of this --

24              Q.   You've now turned the page, you're

25   on page 24.  So you believe this is probably from
```

Vladimir Iakovlev, M.D.

```
 1    the Edwards case, your best recollection?

 2              A.   Yes.

 3              Q.   And it's magnified ten times, and

 4    this is the one that is a magnification of the far

 5    right side of the image on page 23?

 6              A.   Likely at different level.

 7              Q.   What do you mean, a different

 8    slide?

 9              A.   Different slide, yes.

10              Q.   Okay.

11              A.   So it's the same piece, but cut

12    little deeper.

13              Q.   Now if you look on the top page of

14    page 24, top image, on the right side there's a

15    blue, that's again, displaced polypropylene?

16              A.   Yes, this is displaced

17    polypropylene.  And this as well (indicating).

18              Q.   Okay.  And that's an artifact due

19    to the microtoming process?

20              A.   It could've done that, yes.

21              Q.   And the description down below

22    again is "fibrous bridging and scar encapsulation",

23    does this image show anything in addition to what

24    we've talked about in the prior slides?

25              A.   This is a terminal pore.
```

Vladimir Iakovlev, M.D.

1          Q.   Sorry?

2          A.   This is a terminal pore of the

3    mesh.  So this is the edge of the mesh and the

4    terminal pore contains normal non-scar tissue.

5          Q.   When you say "terminal pore"

6    that's the outside pore?

7          A.   Yes, it is.

8          Q.   So what is the significance of the

9    terminal pore having normal tissue?

10         A.   It just shows comparison.  Pores

11   which are not filled with scar tissue, and pores

12   which are filled with scar tissue.  So this

13   specific pore contained normal scar tissue.  So

14   within that specific pore, there's no fibrous

15   bridging.

16         Q.   Is it fair to say every place we

17   see the blue, we see displaced polypropylene?

18         A.   Most of the time.  It can be just

19   a weird color of inflammation.

20         Q.   Okay.  Anything else remarkable

21   about the slide on page 24?

22         A.   No.

23         Q.   Okay.  Let's go to page 25.

24         A.   Yes.

25         Q.   This is cited to an article.  Do

Vladimir Iakovlev, M.D.

1    you know off the top of your head what article that

2    is?

3              A.    On the safety of synthetic sling

4    surgery, I believe.

5              Q.    Are you able to tell me what slide

6    that is, what plaintiff?  Strike that.

7              Is that a medical-legal slide?

8              A.    The picture comes from the same

9    case, as you can see it's exactly the same.

10             Q.    Okay.  Is B part of A?

11             A.    No, I don't believe so.

12             Q.    Let's talk about A.  And what does

13   the "BF" mean?

14             A.    "Bridging fibrosis".

15             Q.    And the "AT"?

16             "Adipose tissue"?

17             A.    Adipose tissue, yes.

18             Q.    What is the significance of the

19   adipose tissue?

20             A.    It's a normal non-scar tissue.

21             Q.    So what is the significance of

22   including this slide in your report if it's the

23   same thing that you had in the prior two slides?

24             A.    It's a little bit different.

25   Because, see, on the bottom, B, it shows scar

Vladimir Iakovlev, M.D.

```
 1    tissue in a different stain.

 2              Scar tissue may have some smooth

 3    muscle, when the scar tissue is being remodeled by

 4    myofibroblast.  Myofibroblast can have smooth

 5    muscle.  But once it's mature scar tissue, there is

 6    no contractile filament in the cells anymore, and

 7    it doesn't stain with smooth muscles stain.

 8              But, normal tissue of vaginal wall

 9    contains smooth muscle.  So here you can see that

10    the fibers bridging, can be separated from normal

11    tissue by using smooth muscle stain.

12              Q.   And so the smooth muscle, or the

13    normal tissue is represented by the brown?

14              A.   Yes.

15              Q.   And this is another representation

16    of the fibrous bridging and scar encapsulations

17    depicted in blue?

18              A.   Yes.

19              Q.   Is that the only significance of

20    that stain?

21              A.   Yes.

22              Q.   Okay.

23              A.   For this specific picture, yes, it

24    is.

25              Q.   All right.  Are you able to tell
```

Vladimir Iakovlev, M.D.

```
 1   me the magnification of that image?

 2              A.   Close to times four maybe --

 3   because there's cropping and then the size was --

 4   now it's hard to -- it's much larger than it

 5   appears in the publication.  So I would say for

 6   this specific, it would be close to times four

 7   objective.

 8              Q.   If you go down here it says:

 9                   "Scar encapsulating mesh in

10                   surrounding pre-existent normal

11                   adipose tissue and muscle tissues, a

12                   2.5 image of histological sections."

13                   That means it's magnified 2.5 times.

14              A.   It means that the objective you

15   would use to produce this appearance in the

16   microscope, this would be times 2.5.

17              Q.   Okay.  But the degree of

18   magnification is different from that?

19              A.   On this page?

20              Q.   Yes.

21              A.   Yes.  Because it's cropped and

22   resized and the publication is much smaller.

23              Q.   I see.

24              A.   So if you trace it, if more

25   correctly to trace it, to trace is the objective,
```

Vladimir Iakovlev, M.D.

```
 1    you would use to see like this in the microscope.

 2              Q.   And you could use the optical

 3    micrometer in order to measure to the extent

 4    necessary?

 5              A.   Yes, I can.

 6              Q.   Anything else about this image?

 7              A.   No.

 8              Q.   Let's go to page 26, image 3a.

 9              A.   Yes.

10              Q.   What's the purpose of this image?

11              A.   This image shows the nerve in H&E

12    stain.

13              Q.   What is the significance of

14    showing the nerve; just the fact that you can show

15    it?  Is there any damage to it or any issues

16    associated with it?

17              A.   It's normal nerve, it's present

18    within this mesh scar plate, it innervates the

19    tissue which is inside and outside of the mesh.  It

20    can become trapped.

21              Q.   Is it trapped in this image?

22              A.   Well, it is in scar tissue.  So

23    it's trapped in scar tissue.

24              Q.   Is there any indication that this

25    nerve is damaged in this image?
```

Vladimir Iakovlev, M.D.

```
 1                    A.    Not from this power, I don't see

 2    any -- "damage", you mean atrophic degenerated or

 3    damaged in terms of physical damage?

 4                    Q.    Any kind of damage.

 5                    A.    It is in scar tissue.  For a nerve

 6    to be in scar tissue, is not a healthy environment.

 7                    Q.    But not all nerves in scar tissue

 8    produce symptoms, correct?

 9                    A.    Not all.

10                    Q.    And you can't tell by looking at

11    this image, whether the nerve in Figure Set 3a is

12    producing any symptoms, correct?

13                    A.    Again, it depends on timing.  It

14    may produce symptoms at one time and not produce at

15    another time.

16                    If this specific nerve was producing

17    pain sensation, it would be difficult to determine.

18                    Q.    But you can't tell, looking at the

19    nerve in Figure Set 3a, whether that nerve is

20    producing symptoms for this patient, correct?

21                    A.    I can tell you that this nerve is

22    in a situation when it can produce symptom.  This

23    is the main thing I can say, it can because it is

24    in an abnormal environment.

25                    Q.    And the abnormal environment is
```

Vladimir Iakovlev, M.D.

1    the presence in the scar tissue?

2              A.    Yes.   In addition to be present

3    inside the mesh.

4              Q.    Okay.  Well, it's adjacent to the

5    mesh, correct?

6              A.    I don't know.  There might be

7    fiber right there.

8              Q.    Okay.

9              A.    So it can be inside or outside, it

10   doesn't matter.  It's in scar tissue, it's abnormal

11   environment, it can produce mesh.  And we know that

12   traumatic neuromas, which is the formation of a

13   mesh in scar tissue, is a painful lesion.  This is

14   an established fact.

15             Q.    But there's no traumatic neuroma

16   in this image, correct?

17             A.    A mesh is deformed, we can see

18   it's getting there.

19             Q.    Can you see a traumatic neuroma in

20   this image, 3a on page 26?

21             A.    The formation is not significant

22   to call it a traumatic neuroma.  So in this

23   specific image, I would not use that term.

24             Q.    Now, can you tell whether the

25   nerve on page 26 that you show is a motor nerve?

Vladimir Iakovlev, M.D.

```
 1                    A.    It's a mixed nerve.

 2                    Q.    What do you mean by "mixed nerve"?

 3                    A.    "Mixed" means they're both

 4   afferent and efferent, or motor and sensory signals

 5   going back and forth.

 6                    Q.    How can you tell it does both?  Do

 7   all nerves do both?

 8                    A.    Peripheral nerves, yes.

 9                    Q.    All of them?

10                    A.    Except for head.

11                    Q.    Okay.  So are all nerves in the

12   body, peripheral nerves, capable of mediating pain?

13                    A.    Except for cranial nerves.

14                    Q.    Okay.  And what's the basis for

15   your understanding in that regard?

16                    A.    It's a basic knowledge, it's in

17   the textbooks.

18                    Q.    Okay.

19                    A.    There is some very small

20   proportion of nerves, peripheral nerves, less than

21   5 percent, which are only sensory.  So some of the

22   nerves will be only sensory.  But there are almost

23   no, only motor nerves outside of the cranial

24   nerves.

25                    Q.    Can you, by light microscopy,
```

Vladimir Iakovlev, M.D.

 1   distinguish among the type of nerves which you see?

 2              A.   What do you mean, what type of

 3   nerves?

 4              Q.   Well, sensory and motor nerves?

 5              A.   We just agreed that they're all

 6   mixed.

 7              Q.   You said that, okay.

 8              Is there any way for you to distinguish

 9   by light microscopy which nerves are capable of

10   mediating pain?

11              A.   They all are.

12              Q.   Okay.  5 percent you said, where

13   are they?

14              A.   5 percent is still sensory.  So

15   all of them can deliver pain.  Some of them,

16   5 percent, may not be able to do any motor

17   function, but they will still be able to transmit

18   pain.  And it also depends on the size, because

19   once you go into the very small branches, they

20   become more specialized.  If you go into the large

21   trunk, then you get all of them mixed together.

22              Q.   When you talk about going into the

23   nerve twigs, that's what you're talking about,

24   right?

25              A.   Fibers, individual fibers, yes.

Vladimir Iakovlev, M.D.

```
 1                  Q.   Then they become more specialized;
 2    what do you mean by that?
 3                  A.   So they may have more function for
 4    sensory or motor function.
 5                  Q.   So as the nerves break into twigs,
 6    will there be some nerves that don't mediate pain,
 7    or they still mediate pain?
 8                  A.   Fibers.  If you go into fibers
 9    which is even smaller than twigs, which is
10    individual axon, those will have individual
11    function.
12                  Q.   And what are we looking at nerves
13    here; are we looking at twigs, fibers, or are we
14    looking at nerves?
15                  A.   It's a nerve.  It's thicker than a
16    twig.
17                  Q.   Okay.  And what is remarkable
18    about what you see in Figure 3a; anything more than
19    you've just described, the presence of a nerve
20    adjacent to mesh?
21                  A.   No, just everything else -- we
22    discussed everything significant.
23                  Q.   Now, the polypropylene in the
24    lower left-hand corner image, that's blue
25    polypropylene, correct?
```

Vladimir Iakovlev, M.D.

```
 1                 A.   That's correct.

 2                 Q.   And it's folded over as a part of

 3   the sample preparation process or microtoming

 4   process, correct?

 5                 A.   That's correct.

 6                 Q.   This is a 4 micron thick slide,

 7   correct?

 8                 A.   About 4 microns, plus or minus.

 9                 Q.   I don't see bark on that

10   polypropylene.  Do you see any bark on the

11   polypropylene?

12                 A.   There is a faint line here, I

13   don't know if it's there or not.

14                 Q.   When you say "there," you're not

15   pointing to the polypropylene.  You're pointing to

16   the circular area to the left of the polypropylene

17   adjacent to the tissue, correct?

18                 A.   Yeah.  Curving linear, yes.

19                 Q.   And you're suggesting that that

20   may be some bark?

21                 A.   Yes.

22                 Q.   And why do you say that?

23                 A.   Because it looks like it.

24                 Q.   Okay.  And this is magnified at 20

25   times?
```

Vladimir Iakovlev, M.D.

```
 1              A.   Yes.  For this specific image,

 2    about 20 times -- 20 times objective magnification.

 3              The magnification itself is higher,

 4    because there's also an eyepiece, but eyepiece is

 5    fixed.

 6              Q.   Look at the right side of that

 7    image with the polypropylene.  It's folded over, on

 8    the right side; you'd agree with me there is no

 9    bark?

10              A.   Not visible bark.

11              Q.   Okay.  If we go to page 27, set

12    3b.

13              So 3a comes from the images from the

14    consolidated cases, correct?

15              A.   That is correct.

16              Q.   So we should have this slide, I

17    think.  So paragraph 3b, so set 3b on page 27 says,

18    "additional TVT cases".

19              Are you able to tell me from which case

20    this slide comes?

21              A.   I can only tell you that the top

22    panel is from a newer case, and the bottom is

23    likely from an older case.

24              Q.   So they're two separate cases?

25              A.   Yes.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Do you have any idea from looking
 2   at this, how long the mesh was implanted in these
 3   people?
 4              A.   No.  Not at this magnification.
 5              Q.   And other than showing the
 6   presence of nerves within the mesh scar plate like
 7   you did on page 26, is there anything significant
 8   about your findings on page 27?
 9              A.   The only difference is that in top
10   panel, you can clearly see that this nerve is
11   within the pore.
12              Q.   Are you suggesting that this nerve
13   is inside of a single pour in the mesh?
14              A.   Somewhere within the mesh.
15              Q.   Okay.  Not within the pore itself?
16              A.   It can be within the pore.
17              Q.   Do you know?
18              A.   It also depends how you define the
19   pore.  Pore is a hole in the mesh structure, yes,
20   it is within the space in the mesh structure.
21              Q.   This is 20 times magnification,
22   how far is it from one yellow to the other yellow?
23              A.   At 1.5 millimeter.  Between 1 and
24   1.5 millimeter.
25              Q.   Is there anything abnormal about
```

Vladimir Iakovlev, M.D.

1  the nerve that's depicted on page 27 in the top

2  frame?

3              A.   It's in the scar and it's in the

4  mesh, that is abnormal.

5              Q.   Other than being in the scar

6  plate, is there anything you can tell by light

7  microscopy about abnormality in that nerve?

8              A.   Otherwise, the nerve looks

9  healthy, it would conduct pretty healthy pain

10  signals.

11             Q.   Okay.  Same thing for the lower

12  frame.  Other than the presence of the nerve within

13  the scar tissue, is there anything that you can

14  tell from light microscopy about the general health

15  of the nerve?

16             A.   Same thing, it's not degenerated,

17  therefore, it can conduct pain signal.

18             Q.   As you look at the image on the

19  lower left on 3b, the white in that image, again,

20  is where polypropylene was?

21             A.   Yes.

22             Q.   And as you come down around from

23  about 6 o'clock to about 9 o'clock, there's no bark

24  there, is there?

25             A.   No.  I don't think so.

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 140 of 311 PageID #: 64909

Vladimir Iakovlev, M.D.

1          Q.   Let's go to page 28.  Page 28 is

2    additional TVT cases.

3               Is this one mesh or two?  One patient

4    or two, I guess I should say.

5          A.   This is hard to say, both are come

6    from earlier cases.  I probably have thousands of

7    images by now, so it will be hard.

8          Q.   But you can't tell me from which

9    patient they come, or which case they're from?

10         A.   I may or may not be able.  It

11   would be checking if it's in a specific folder or

12   just in pooled images.

13         Q.   And your description again, below

14   is, "Innervation within the mesh scar plate, H&E,

15   20 times magnification."

16              Other than showing the presence of

17   these nerves in the mesh scar plate, is there

18   anything that indicates to you by light microscopy

19   that these nerves are unhealthy?

20         A.   Well, it's the location.  You see,

21   it's slightly curved, it's inside the pore.

22         Q.   Which one are you talking about

23   now, please?

24         A.   The upper panel.

25         Q.   Okay, thank you.

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 141 of 311 PageID #: 167910
Case 2:12-md-02327 Document 3783-3 Filed 04/20/17 Page 141 of 311 PageID #: 64590
Vladimir Iakovlev, M.D.

```
 1              A.   There are two nerves, one is here,

 2   one is there (indicating).

 3              Q.   And you indicate that with your

 4   two arrows --

 5              A.   This one is gone.

 6              Q.   Okay.

 7              A.   So it is a location -- it's not

 8   the nerve itself, it's the location is abnormal.

 9              Q.   Is there anything that you can

10   tell me by looking at this image by light

11   microscopy that these nerves were producing

12   symptoms in the patient?

13              A.   The question is, if they can.

14              Q.   Can you tell me by looking at this

15   image in set 3c, that these nerves are causing

16   symptoms in the patient?

17              MR. ORENT:  Objection.

18              THE WITNESS:  Again, as a pathologist,

19   I can only estimate the probability.  If it can, if

20   it's in abnormal location, if it's causing a lot --

21   first of all, it's out of the body now, so it

22   cannot cause anything.  But when it was in the

23   patient, it could.

24              BY MR. THOMAS:

25              Q.   Could?
```

Vladimir Iakovlev, M.D.

```
 1              A.   Could produce symptoms all the

 2   time, or one specific time, or only once in a

 3   specific moment, it's hard to say.

 4              Q.   And it could be a nerve positioned

 5   as it is, that never produced any symptoms, true?

 6              MR. ORENT:  Objection.

 7              THE WITNESS:  Some of them probably not

 8   producing anything.

 9              BY MR. THOMAS:

10              Q.   Okay.  And the same thing about

11   the image below on Figure Set 3c on page 28, other

12   than presence of the nerves in the mesh scar plate,

13   anything remarkable about this image?

14              A.   No.  Nothing beyond what we've

15   discussed.

16              Q.   Let's go to page 29.

17              A.   Yes.

18              Q.   What are we showing on page 29?

19              A.   The same features of innervation

20   of the mesh scar plate.  But now in S100 stain.

21              Q.   Now, is there anything other than

22   presence of these nerves in the mesh scar plate

23   that indicates to you that these nerves were

24   causing pain in the patient?

25              A.   They are in abnormal location.
```

Vladimir Iakovlev, M.D.

```
 1                 Q.    And we've already agreed that
 2    nerves, even in an abnormal location, may not be
 3    producing pain, correct?
 4                 A.    Yes, but more likely they will
 5    produce pain.
 6                 Q.    Are you saying that every nerve
 7    within the mesh scar plate more likely than not is
 8    going to cause pain?
 9                 A.    Through one mechanism or the
10    other, there will be zero mechanism at one point
11    that can produce pain, it may not be chronic pain
12    continuous, but I mean, in a specific movement you
13    have start forming the mesh, so it can cause pain.
14                 Q.    Let's talk about this for a
15    minute.  Doctor, if you look at page 29, and 28,
16    and 27 and 26 --
17                 A.    Yes?
18                 Q.    -- it's fair to understand that
19    for every mesh implantation, there are going to be
20    nerves that are going to be in scar tissue.
21                 A.    Are you talking for all meshes?
22    Regardless of location, or just --
23                 Q.    I'm talking about slings.  Stress
24    urinary incontinence slings, TVT, Prolene.
25                 A.    So for slings, there will be
```

Vladimir Iakovlev, M.D.

```
 1    innervation, at least those samples I examined,

 2    there will be innervation in all of them.

 3              Q.   Okay.  And complaints of pain for

 4    slings, TVT slings, you'll agree is less than 5

 5    percent?

 6              MR. ORENT:  Objection.

 7              THE WITNESS:  For the specimens I

 8    received?

 9              BY MR. THOMAS:

10              Q.   I'm talking about the studies on

11    the topic?

12              MR. ORENT:  Objection.  Outside the

13    scope.

14              THE WITNESS:  Now we're talking about

15    what I received and what is still in the patients.

16    Because studies were clinically done based on

17    clinical -- clinical symptoms for the samples or

18    slings which are still in the body.

19              BY MR. THOMAS:

20              Q.   Very simple question.

21              How do you explain findings in the

22    clinical studies that pain is a complaint of

23    patients in less than 5 percent of the time, when

24    you say in every mesh that you see, that there are

25    nerves within the scar plate?
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 145 of 311 PageID #: 167014
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 145 of 311 PageID #: 64602
Vladimir Iakovlev, M.D.

1          A.   Well, first of all, let's start

2    with 5 percent.

3               That number would have to be specific

4    for our study.  There is a range of reported pain

5    anywhere from 5 to 40 plus percent.  It depend on

6    methodology, if the patients were followed in time

7    correctly, if there was correctly of follow up

8    time.  So the 5 percent is a questionable number.

9          Q.   Can I interrupt you there, if you

10   don't mind.  Let's take your upper bound of

11   40 percent?

12         A.   Yes.

13         Q.   So you have, by your own

14   statement, even in the worse case scenario, you

15   have 60 percent of the sling patients who don't

16   experience pain, correct?

17         A.   Who do not complain to the point

18   when it's recorded.

19              There are multiple reasons why it may

20   not be recorded, they may still experience some

21   pain.  Maybe it's not serious enough to be

22   recorded, maybe it's not serious enough -- there

23   will be some patients which have no pain at all.

24   There will be some patients which have so little

25   pain, only in a specific moment, that it's not

Vladimir Iakovlev, M.D.

1    worth reporting.  Some of them don't report it and

2    so forth.

3              And then there will be patients that

4    there is so severe pain, the mesh needs to come

5    out.  There will be a range of sensations and

6    personal perception.

7              So, from my perspective, when I examine

8    specimens, I report what is abnormal.  To what

9    degree it's causing clinical symptoms, it depends

10   on many factors.  If you want to -- you cannot look

11   at the human body as a machine.  I mean, there is

12   part missing, it's not going to work.  Or if there

13   is wire loose, I mean, it may cause some problems.

14             So, there will be a range of -- or

15   degree of pain sensation and a range of personal

16   attitude so this will effect the recording of

17   clinical symptoms.

18             On the histology side, again, there

19   will be a range of how many nerves are involved,

20   one or two, or a really high density.  To what

21   degree they are involved, some of them will have

22   such a strong deformation, that there is

23   100 percent probability that it will cause pain.

24             Q.   Let me ask this question --

25             A.   So that's the complexity of the

Vladimir Iakovlev, M.D.

1    situation.  I mean you cannot separate it sharply,

2    okay, 5 percent for this, 5 percent for that.  It

3    can cause a pain.  This is abnormal location, this

4    is abnormal situation, this is a pathological

5    finding.

6            Q.   Let's talk about this for a

7    minute.  So the pages we've just been through,

8    we've talked about, on pages 26, 27, 28 and 29, and

9    it goes on to 30 and 31, and on to 33.  But just

10   for those for now.

11           Is it fair to understand that in every

12   mesh that you've analyzed - regardless of

13   manufacturer - in the pelvic floor, for treatment

14   of stress urinary incontinence, you find nerves in

15   scar tissue?

16           A.   Yes.

17           Q.   Okay.

18           A.   The degree of innervation will be

19   different, there will be a degree of also nerve

20   deformation within the mesh, but strictly saying

21   there will be innervation of the scar plate in

22   almost all patients.

23           Q.   Have you made any attempt to

24   differentiate across manufacturers, the extent to

25   which the innervation of the scar plate varies?

Vladimir Iakovlev, M.D.

```
1                A.   No.

2                Q.   Have you made any attempt to

3    differentiate across types of mesh products, the

4    extent to which nerve innervation varies?

5                A.   I may in the future, I haven't

6    done it yet.  But I may in the future.

7                Q.   Okay.  So is it fair for me to

8    understand, and the record to reflect, that for

9    every mesh implanted for the treatment of stress

10   urinary incontinence, it's your opinion that there

11   will be nerve innervation within scar plate, that

12   you think is capable of causing pain?

13               MR. ORENT:  Objection.  I think his

14   testimony is every mesh that he's looked at.

15   Manufactured, that he's looked at.

16               I don't think Dr. Iakovlev has any

17   opinions about mesh he's never looked at, brands

18   he's never looked.

19               THE WITNESS:  Yeah, that's correct.

20               BY MR. THOMAS:

21               Q.   Okay.  Let me ask you this question --

22               A.   Let's repeat the question, then I

23   can answer it in more...

24               MR. THOMAS:  Would you read it back,

25   please?
```

Vladimir Iakovlev, M.D.

```
 1                -- REPORTER'S NOTE:  Question read as
 2     recorded above.
 3                THE WITNESS:  Oh, as I said, I can only
 4     testify or make opinions of what came out of the
 5     specimen.  And I told you earlier, that there is --
 6     I have been dealing with those specimens which
 7     caused complications already.
 8                BY MR. THOMAS:
 9           Q.   For every mesh sample that you've
10     looked at for mesh use for the treatment of stress
11     urinary incontinence, have you found mesh
12     innervation in the scar tissue?
13           A.   Almost all, yes.
14           Q.   Any you haven't?
15           A.   If it was a small sample, maybe
16     one or two, I couldn't find nerves.
17           Q.   Is that because -- do you have an
18     opinion, is that because the sample was too small,
19     because it didn't exist, or do you have an opinion?
20           A.   I cannot say beyond that, I just
21     didn't find it.  It could be sampling issue, it
22     could be not.  Again, I cannot state what I don't
23     know.
24           Q.   And how many have you seen?
25           A.   Individual cases.
```

Vladimir Iakovlev, M.D.

```
 1                Q.   How many have you seen?

 2                A.   Less than five.

 3                Q.   How many total cases have you

 4   seen?

 5                A.   Oh, from slings?

 6                Q.   Yes.

 7                A.   About 100.

 8                Q.   About 100.  And less than five you

 9   have not seen nerve innervation within scar tissue?

10                A.   Yes.

11                Q.   And you don't know whether that's

12   because it is a sampling error or because there

13   wasn't any nerves in the scar plate?

14                A.   That's correct.

15                Q.   Is it fair to say, based on your

16   experience as a pathologist, that you would expect

17   that when mesh is placed for the treatment of

18   stress urinary incontinence, that nerves would be

19   encapsulated by the scar tissue in the healing

20   process?

21                A.   They can.  If they become trapped

22   in the scar tissue, each single implanted mesh, we

23   would have to do autopsy series.  I cannot go

24   beyond what I see in explanted meshes, and all

25   explanted meshes came out for complications.  And
```

Vladimir Iakovlev, M.D.

1   almost all of them, or a large proportion had pain

2   as a symptom.

3           Q.   Again, the cases you've received

4   have been complications?

5           A.   Yes.

6           Q.   And of course you know that people

7   have mesh removed for reasons other than pain,

8   don't you?

9           A.   In hernia surgery, yes.

10          Q.   Do you know whether or not

11  patients have mesh removed for reasons other than

12  pain?

13          MR. ORENT:  Objection.

14          THE WITNESS:  There might be an

15  overwhelming other complaint, like erosion or

16  infection, but in almost -- I don't want to stick a

17  number, but most of these patients complain of some

18  degree of pain.

19          BY MR. THOMAS:

20          Q.   Have you have investigated, as a

21  part of your work in this case, the reasons why

22  patients have mesh removed?

23          A.   There's always a reason.

24          Q.   I understand that.  Do you know

25  what they are, and percentage wise, how they

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 152 of 311 PageID #: 167931
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 152 of 311 PageID #: 164609
Vladimir Iakovlev, M.D.

1    breakout across a patient population?

2                A.   You mean the driving reasons for

3    implantation?

4                Q.   Yes.

5                A.   It's in the paper.  At least in

6    those 164 samples.

7                Q.   And that's the paper you did with

8    Dr. Blaivas?

9                A.   No.  The degradation paper.

10               Q.   Okay.

11               A.   But there's always a driving

12   reason for explantation.  There may be driving

13   reason for explantation is erosion, but then pain

14   is attributed to erosion.  So it's not indicated as

15   a main reason of explantation.

16               Q.   You can have voiding dysfunction?

17               A.   Okay.  In a voiding dysfunction,

18   but again, voiding dysfunction usually what

19   happens, you have a strong compression against

20   urethra, and this produces pain due to compression.

21   So there will be a mixture of mechanisms for pain.

22               Q.   Are you suggesting that voiding

23   dysfunction is subsumed within the pain that's

24   reported in these studies?

25               MR. ORENT:  Objection.

Vladimir Iakovlev, M.D.

```
 1                THE WITNESS:  No, it's combined.  It
 2     can be combined, this pain.
 3                BY MR. THOMAS:
 4          Q.    Okay.
 5          A.    To cause void and dysfunction,
 6     even to compress urethra to a degree that the
 7     outflow is obstructed.
 8          Q.    Are you aware of any studies which
 9     have analyzed meshes removed because of pain,
10     compared to meshes removed for other reasons in
11     comparing the histology of those meshes?
12          A.    We're doing some work in hernia
13     specimens.
14          Q.    But in terms of published
15     peer-reviewed studies today, are you aware of any
16     studies out there, which compare the histology of
17     meshes removed for pain, and meshes removed for
18     non-pain reasons?
19          A.    That's a very good question.  Why,
20     after 50 years and a large proportion of specimens
21     removed for pain, there is no histology study.  Why
22     has this not been done?
23          Q.    So did you do a literature search
24     of that?
25          A.    Of course I did.
```

Vladimir Iakovlev, M.D.

```
 1                 Q.    And you didn't find any studies

 2    that compared the histology of mesh removed from

 3    patients who complained of pain, compared to the

 4    histology of patients who had mesh removed for

 5    non-pain reasons?

 6                 A.    There were descriptions in hernia

 7    publications.  I mean in meshes removed for hernia

 8    repair.

 9                 Q.    Which studies, do you remember?

10                 A.    2005, Klosterhalfen.  He put the

11    picture of deformed nerve, and he states that in

12    his experience, over 60 percent of the meshes

13    removed for pain have some degree of nerve

14    involvement.

15                 Q.    Do you view Dr. Klosterhalfen as

16    authoritative in this area?

17                 A.    Yes.  He's an authority, he's one

18    of the oldest researchers.

19                 Q.    Do you know whether Dr.

20    Klosterhalfen has ever investigated the precise

21    question about whether the histology of mesh

22    removed for indications of pain is different from

23    the histology of mesh for -- from patients removed

24    for non-pain reasons?

25                 A.    That's what he stated.  Over
```

Vladimir Iakovlev, M.D.

 1   60 percent of the specimens removed for pain showed

 2   nerve involvement.

 3            MR. ORENT:  Before we go on to the next

 4   question, you had cut Dr. Iakovlev off from

 5   answering.  He started to say "but there are other

 6   authors", if you want to just continue.

 7            THE WITNESS:  Yes.  There are other

 8   descriptors of meshes removed for pain, and they

 9   would find nerve involvement with traumatic

10   neuroma.  Those are, I think individual cases, not

11   the series.

12            Again, same histology.  They were

13   trying to figure out what was wrong, what was

14   causing pain, and they found nerve involvement.

15   And that was done before I started researching my

16   nerves.

17            BY MR. THOMAS:

18            Q.  Would you expect more or less

19   inflammation to be seen in histology of meshes

20   removed for pain than meshes removed for non-pain

21   reasons?

22            A.  To a degree.  My research in

23   hernia showed that foreign body inflammation is a

24   component of pain mechanism.  So those meshes which

25   were removed for pain only, they continue to have

Vladimir Iakovlev, M.D.

```
 1   relatively steady, pronounced foreign body reaction

 2   many years after implantation.

 3            And those which were removed for

 4   recurrence, they show a trend down.  So at the

 5   beginning, there is inflammation, then it goes

 6   down.

 7            So by the time of explantation, if it

 8   happens eight years or ten years after

 9   explantation, foreign bodies subsided; which is

10   different from those which were removed for pain.

11            Q.   So are you able, from your

12   research, in your work, to form an opinion as to

13   whether mesh removed for purposes of pain, the

14   histology will show higher rates of inflammation

15   than the histology for meshes removed for non-pain

16   reasons?

17            A.   So before we go into the

18   individual findings, you're trying to split it into

19   what is causing the pain, nerve entrapment and

20   inflammation or something else.

21            This is a complex process.  There are

22   multiple factors which are playing, together with

23   patient perception of pain and reporting of pain.

24            So with this type of complexity, we

25   cannot separate one individual feature.  Overall,
```

Vladimir Iakovlev, M.D.

```
 1    there's a pool, if we collect enough, we can see

 2    the difference.  For each individual patient, how

 3    much of this feature, or that feature is playing a

 4    role in each individual symptom, will be very

 5    different from patient to patient.

 6              So overall, the higher degree of

 7    foreign body reaction is associated with higher

 8    rates for chronic pain.

 9              Q.   And that's based on your research

10    or other published research?

11              A.   Foreign body has been worked up

12    quite a bit in published histological studies.  How

13    much of that was specifically determined, comparing

14    two groups or three groups, it's difficult to say,

15    I don't remember right now.

16              So it is a combination of what was

17    published before, and what I find in my samples, so

18    that's -- that would be a basis for my opinion.

19              Q.   Is it your opinion that results in

20    the hernia literature on the issue of association

21    between inflammation and pain, are transferrable to

22    the pelvic floor?

23              A.   Some are, yes.  Not everything,

24    but some are.

25              Q.   Okay.  And why would it not be?
```

Vladimir Iakovlev, M.D.

```
 1              A.   There are different anatomical

 2   locations, different physical factors acting on the

 3   scar plate.  It also crosses many anatomical planes

 4   in the pelvis.  While in the abdominal wall, and

 5   it's parallel to anatomical planes.

 6              Q.   I'm trying to get through this for

 7   a second.  If you'll look at pages 30, 31, 32 and

 8   33.  Are the images on those pages additional

 9   depictions of nerves within the mesh scar plate?

10              A.   That's correct.

11              Q.   Is there anything else significant

12   about those images other than they show innervation

13   within the mesh scar plate?

14              A.   No.

15              Q.   On page 33, Figure Set 3h, in the

16   upper right-hand corner, you've called out what

17   you've described as a "neurovascular bundle"; what

18   is that?

19              A.   Most of the larger nerves in the

20   medium size arteries, become together.  One artery,

21   two veins, and one nerve, that's how it works.  And

22   the nerve just starts bleeding, so the nerve goes

23   its way and artery goes its own way.

24              So in this specific case, an artery and

25   a nerve are still together.
```

Vladimir Iakovlev, M.D.

1              Q.   Okay.  The brown is the nerve,

2    correct?

3              A.   Yes.  I mean, there are some other

4    brown, probably picking up some other stuff, but

5    this is --

6              Q.   Where is the artery?

7              A.   In the blue.  You can see

8    streaming, it's not a really high resolution.

9              Q.   What is the significance of the

10   neurovascular bundle as depicted in that image?

11             A.   Well, see, it is in the tight

12   spot.  So this is really as compartmentalized as it

13   gets, and slightly deformed.

14             So if you move this mesh around, the

15   fibers will start compressing on the neurovascular

16   bundle.  It may cause obliteration of the artery,

17   or can impinge the nerve.

18             Q.   Is there any impingement shown in

19   this image?

20             A.   Well, it's deformed.

21             Q.   Is there any impingement shown?

22             A.   It does, because it's deformed,

23   it's curved.

24             Q.   And you're referring now to the

25   lower right-hand image?

Vladimir Iakovlev, M.D.

```
 1           A.    That's correct.

 2           Q.    Is there anything you can tell by

 3  looking at that image, whether that curved nerve

 4  was causing pain in this patient?

 5           A.    I can say the probability of this

 6  causing pain is much higher than a nerve which is

 7  not deformed.  Like something like this on page 31.

 8           Q.    You can't rule out by looking at

 9  the image on page 33, where you show the curved

10  nerve, you can't rule out that that nerve is not

11  causing pain, correct?

12           A.    I think we're going back to the

13  same issue.  You're taking human body as a machine,

14  it's not.  Medicine doesn't happen like that.  So

15  there are many, many, many factors which cause.

16           If the same image we put in MRI image,

17  and this deformation would be on the root coming

18  from the back, the radiologist would report that

19  there's impingement of a root.  And that's how back

20  pain occurs that's radiating to the leg, and so

21  forth.  So this is a much smaller scale, the same

22  mechanism.

23           Q.    Do you know whether this patient

24  was complaining of pain?

25           A.    Most likely she was.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Do you know?

 2              MR. ORENT:  Objection.

 3              THE WITNESS:  With 100 percent

 4   certainty, no.

 5              BY MR. THOMAS:

 6              Q.   Okay.  And you talked about an

 7   obliteration of the artery.  Does the image on

 8   page 33 in the upper right show an obliteration of

 9   the artery?

10              A.   No, not this image.

11              Q.   Other than the nerve impingement

12   that you've described, and the potential for

13   obliteration of the artery, is there anything

14   unusual about the depiction of the nerves in those

15   images?

16              A.   No.

17              Q.   And I need you to go back, because

18   I didn't ask you that question about the prior two

19   pages, 30 through 32.

20              Other than the depiction of the nerves

21   within the scar plate, is there anything about the

22   nerves that are seen there that cause you any

23   concern about the potential of those nerves to

24   cause injury?

25              MR. ORENT:  Objection.
```

Vladimir Iakovlev, M.D.

```
 1              THE WITNESS:  So going back to

 2  mechanisms of pain.  So there are two mechanisms,

 3  or two major groups of mechanisms to cause pain.

 4  First, you affect the nerve itself.  So you impinge

 5  it, squeeze it, becomes deformed and that can be

 6  felt as pain, the nerve itself, the nerve trunk.

 7              The second group of mechanisms is when

 8  you affect the receptors.  And the receptors can be

 9  affected, it can be again a mechanical trauma,

10  cutting, compressing, burning, chemical trauma,

11  ischemia, then the receptors are signalling pain

12  through the nerve.  So for smaller branches, the

13  significance is that the receptors now can pick up

14  the signal of nerves -- of pain, and then it will

15  be delivered through these branches, so it just

16  shows that this tissue can sense pain.

17              BY MR. THOMAS:

18              Q.   Okay.  This tissue is capable of

19  sensing pain?

20              A.   Yes.

21              Q.   Not that it is in fact sensing

22  pain in the body at the time?

23              A.   If you have other mechanisms to

24  deliver pain, it will be -- it will be causing

25  pain.
```

Vladimir Iakovlev, M.D.

```
 1                Q.    Correct.

 2                A.    Now, if you go to page 33, this

 3    will be an example where it would be directly

 4    effecting the nerve trunk.  Impingement of the

 5    nerve.

 6                Q.    Now, are you able, in these

 7    images, 30 to 33, to show me any nerve receptors?

 8                A.    You mean receptors, nerve endings.

 9    When it goes really small, you can see really

10    fiber, and it is -- most of the ends will have no

11    staining, because they just disappear.  But I mean,

12    you'd have to go in higher magnification.

13                Q.    So with the magnification you have

14    here, you're not able to identify any nerve

15    receptors; is that fair?

16                A.    No, not in these pictures.  It's

17    too small magnification.

18                Q.    I have to ask the question again

19    because you answered "no" to a negative question.

20                It's fair to understand that based on

21    the magnification that you have in these images on

22    pages 30 to 33, you can't identify any nerve

23    receptors, correct?

24                A.    I cannot see nerve receptors at

25    this degree of magnification.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Thank you.

 2              If you go to page 34, what is the

 3    significance of this image?

 4              A.   This shows another severely

 5    deformed nerve.  So this would be a mechanism for

 6    pain through impingement.

 7              Q.   And the severely deformed nerve as

 8    you described it, is the brown portion, stained

 9    brown?

10              A.   The dark brown portion or dark

11    brown structure.

12              Q.   And in the lower left-hand corner,

13    the white area is where the polypropylene is or

14    was, correct?

15              A.   That's correct.

16              Q.   And what's the significance of the

17    dark blue and the border of that area?  Is that the

18    staining mechanism, or does that tell you anything?

19              A.   Can you point it?  So significance

20    of what?

21              Q.   The darker blue.

22              A.   This dark blue?

23              Q.   Yes.

24              A.   That's inflammation.

25              Q.   Okay.  And the upper is 2.5 power,
```

Vladimir Iakovlev, M.D.

```
 1    and the lower one was four times; is that correct?

 2              A.   It's a typo, it should be 40.

 3              Q.   40?

 4              A.   40.  Somewhere between 40 X and 50 X.

 5    Again, the cropping factor there, the magnification

 6    there is not exactly...

 7              Q.   And these are, again, additional

 8    TVT cases, and you have not supplied us the slides

 9    for these cases, correct?

10              MR. ORENT:  Objection.

11              BY MR. THOMAS:

12              Q.   In this case?

13              A.   That's correct.  These are

14    previous TVT cases.

15              Q.   On page 35 --

16              A.   Yes.

17              Q.   -- you suggest degeneration of

18    affected nerves; tell me what you mean by that?

19              A.   So you see the inner portion of

20    the nerve lost myelination.  So there is

21    degeneration of myelin sheath in the nerves.  It

22    means that these nerves cannot deliver, or most

23    likely not deliver irregular signals.

24              So earlier you were asking about the

25    abnormality, this is the abnormality that we're
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 166 of 311 PageID #: 127935
Case 2:12-md-02327 Document 3783-3 Filed 05/09/16 Page 166 of 311 PageID #: 146628
Vladimir Iakovlev, M.D.

1  talking about, this is the nerve degeneration.  In

2  this case, if this part is sensory, inside, it

3  means that the area is numb.

4          This part of the nerve cannot sense

5  pain or innervation of that part of the body, which

6  goes through this nerve, may not experience any

7  pain; it's numb.

8          Q.  And that's the portion you're

9  referring to in the lower right-hand image with the

10 arrow, correct?

11         A.  That's correct.  So the

12 abnormality of the neural section indicates the

13 other process, of loss of sensation, loss of pain

14 sensation.

15         Q.  Do you know what a Renaut body is?

16         A.  Say that again.

17         Q.  Do you know what a Renaut body is?

18 R-E-N-A-U-T.

19         A.  I think I've seen this term, but I

20 don't remember it.

21         Q.  Okay.  Does the S100 stain all

22 components of the nerve?

23         A.  It only stains schwann cells.

24         Q.  When you reached the opinion on

25 page 35 that that shows a degeneration of the

Vladimir Iakovlev, M.D.

```
 1    nerve, did you rule out the presence of nerve

 2    structures other than schwann cells that might be

 3    present?

 4              A.   There might be axons still there,

 5    but that's not the point.  The point is the nerve

 6    is degenerating.

 7              Q.   And what's the clinical impact of

 8    the degenerated nerve?

 9              A.   I just told you.  There are

10    fibers, which are in the area, mainly not function.

11    It means that if they are sensory fibers, they may

12    not deliver signals.  So that area which is

13    innervated through those fibers, will be numb.  You

14    will not feel anything in that area.

15              Q.   So it will not cause pain?

16              A.   In the reverse, it will not feel

17    anything.

18              Q.   But if it doesn't feel anything,

19    does that mean that it does not cause pain?

20              A.   Including pain.  It will not feel

21    touch, it will not feel temperature, it will not

22    feel pain.

23              Q.   Okay.  Anything else remarkable

24    about it then?

25              A.   No.
```

Vladimir Iakovlev, M.D.

1          Q.   If you go to page 36, Figure Set 4.

2          A.   Yes.

3          Q.   You have, "A neural ganglia in

4    additional TVT cases."

5               Again, these are cases that you

6    previously worked up?

7          A.   That is correct.

8          Q.   What is a neural ganglia?

9          A.   Neural ganglion is like a switch

10   box, or connection box for the autonomous

11   neuro system.  The neuro system which is

12   innervating in the organs rather than skin and

13   mucosa.

14         Q.   What is the significance of the

15   presence of this image of the neural ganglion?

16         A.   It tells you that some of the

17   nerves, which we see in the specimens are

18   autonomous.  So some of them go into the bladder.

19   That's one -- well, one important aspect of this.

20              The second important aspect is that the

21   ganglia themselves can be affected by the image.

22              So in first case, the nerves can be

23   affected, which are further away from the ganglia.

24   And second case scenario, the ganglia themselves.

25         Q.   Is there anything about this image

Vladimir Iakovlev, M.D.

1   on page 36 -- strike that.

2              This is one image, the second one

3   you've labeled, so it's just one image?

4              A.   That is correct.

5              Q.   Is there anything about the image

6   on page 36, that you can tell by light microscopy,

7   that there's anything abnormal about the ganglia

8   that's depicted there?

9              A.   To begin with, as we saw the

10  nerves, the location was abnormal.  So it's in the

11  scar tissue and it's inside the mesh.

12             Q.   Is that the only thing about this

13  image and the ganglia that causes you concern?

14             A.   No.

15             Q.   What else?

16             A.   I mean, that's about it.  I don't

17  have any other concerns.

18             Q.   Thank you.  Page 37 you have:

19  "Innervation of mucosa overlying the mesh, H&E and

20  S100 of the same tissue area, four times.

21  Additional TVT cases."

22             Again, these are cases outside of the

23  consolidated group, correct?

24             A.   That is correct.

25             Q.   And are all these images just four

Vladimir Iakovlev, M.D.

```
 1   times?

 2              A.   The degree of magnification on the

 3   top image is slightly lower, and magnification on

 4   the lower is slightly higher.  Again, this is

 5   not -- it's hard to say exactly what's the degree

 6   of magnification.  Because they've been taken

 7   through a camera and sort of objective, and then

 8   cropped, and then resized to be reprinted so...

 9              Q.   What is the significance of the

10   image on the top where you showed mucosa, distorted

11   mucosa, and a measurement of 1 millimeter?

12              A.   Significance is that the mesh is

13   right under the mucosa.  So, if you touch the

14   mucosa, even if it's light pressure, it immediately

15   gets compressed into the mesh.  It can be exposed,

16   I mean, the mucosa can breakdown.

17              Q.   This is from the Edwards case,

18   isn't it?

19              A.   It could be, I don't know.  It's

20   old picture, it could be from the Edwards case.

21              Q.   And this does not show an

22   exposure, correct?

23              A.   It's not exposed, yes.

24              Q.   It's not an erosion either yet?

25              A.   In this specific image, it's not
```

Vladimir Iakovlev, M.D.

```
 1    exposed.

 2                  Q.    Okay.  And what's the significance

 3    of the distorted mucosa?

 4                  A.    Probably, it was getting close to

 5    the exposure site.  I don't remember specifics.

 6                  Q.    Okay.  But is it simply the fact

 7    of the location of this mesh related to the mucosa

 8    that you're pointing out here?

 9                  A.    That is correct.

10                  Q.    Is that a surgical placement issue?

11                  A.    Not exactly.  It can migrate, it

12    can move centimeters within the body.

13                  Q.    Or a surgeon can place it there,

14    correct?

15                  A.    Both.

16                  Q.    Yes.  And you're not able to tell

17    from this image, whether the surgeon placed it

18    there or it moved there from somewhere else,

19    correct?

20                  A.    No.  I know that all of them are

21    covered by mucosa after surgery.  That's what

22    surgeons are trying to do.

23                  Q.    So again, I asked a bad question.

24                  You can't tell from looking at the

25    image, whether the surgeon placed it there, or
```

Vladimir Iakovlev, M.D.

```
 1    whether it migrated there, correct?

 2            A.   That's correct.

 3            Q.   Thank you.  And what's the

 4    significance of the two images below that on

 5    Figure Set 5?

 6            A.   It's the same image, the right

 7    copy is labeled, the left one is not labeled.  It

 8    shows that the tissue in between mucosa and the

 9    mesh is innervated.

10            Q.   I see.

11            A.   So if you compress mucosa, you are

12    hitting the receptors, hence small nerve branches

13    at the same time.

14            Q.   Anything abnormal about the nerve

15    branches and twigs that you depict in those images?

16            A.   Just the location.

17            Q.   Okay.  Page 38, "Additional TVT

18    cases."  What does this show?

19            A.   The same as it says on the

20    previous page, superficial location of the mesh,

21    overlying mucosa, innervation of the tissue and the

22    mucosa.

23            Q.   And other than the presence of the

24    nerves in the mucosa, and the position of those

25    nerves relative to the mesh in the mucosa, is there
```

Vladimir Iakovlev, M.D.

```
 1    anything else remarkable about that image?

 2             A.   No.

 3             Q.   If we go to page 39, what is

 4    vascular dilatation?

 5             A.   When the vessels are being

 6    distended, so the outflow from the vessels is

 7    obstructed for varying reasons.  So there is more

 8    fluid coming in, than fluid coming out.

 9             Q.   And what does mesh have to do with

10    vascular dilatation?

11             A.   It caused it.

12             Q.   How do you know that?

13             A.   Because normally vessels are not

14    distended like this, there is a reason why the

15    outflow is obstructed.

16             Q.   Are there any other causes for

17    vascular dilatation?

18             A.   In normal tissue?

19             Q.   Yes.

20             A.   There are some other, like typical

21    example is hemorrhoids.

22             Q.   I'm sorry?

23             A.   Hemorrhoids.

24             Q.   Hemorrhoids?

25             A.   Hemorrhoids.
```

Vladimir Iakovlev, M.D.

```
 1                Q.   I'm sorry.  That's a southern West

 2    Virginia way of saying it, I apologize.

 3                A.   Okay.  So there is dilatation of

 4    the vascular structure, blood stays in.  If it's

 5    lymphatic vessel, lymph will stay, so it will

 6    distend and it becomes larger.

 7                Q.   Now, what is statis, S-T-A-T-I-S?

 8                A.   Stasis, sorry.

 9                Q.   Stasis.  So stasis and tissue

10    edema; what does that mean?

11                A.   Stasis means that the fluid is

12    stagnant in the vessels.  So it accumulates there,

13    it doesn't outflow.  And then after some time, this

14    fluid starts seeping into the tissue.  So because

15    the blood vessels, or lymphatics are so backed up,

16    fluid starts going into the tissue; that's how

17    edema happens.

18                Q.   Okay.  The blue in the image is

19    polypropylene?

20                A.   Yes.

21                Q.   And that is moved in the image by

22    sample preparation?

23                A.   That's correct.

24                Q.   The artifacts?

25                A.   Yes.
```

Vladimir Iakovlev, M.D.

```
 1                    Q.    And do you see any bark around the

 2      polypropylene in those images?

 3                    A.    Here.

 4                    Q.    You pointed to the white.  I'm

 5      looking at the blue polypropylene itself.  There's

 6      no bark attached to any of the polypropylene, is

 7      there?

 8                    A.    Probably there is, but so low

 9      magnification.  I can see it clearly in this space.

10                    Q.    And you're referring now to the

11      upper right-hand corner and the black mark at the

12      lower right, correct?

13                    A.    Just above it -- no, no, here.

14                    Q.    Are you talking about --

15                    A.    The faint line.  This faint line.

16      (Indicating).

17                    Q.    Oh, I see, okay.

18                    And what's the clinical significance of

19      the vascular dilatation and statis tissue edema?

20                    A.    There's pressure inside.  If fluid

21      accumulates to a degree, and then it starts

22      pressing in tissue, there will be pressure

23      accumulating.

24                    Q.    And to what extent can you

25      determine whether this pressure is present in an
```

Vladimir Iakovlev, M.D.

1    area larger than what is presented in this one

2    slide?

3              A.   What do you mean?

4              Q.   Well, this obviously depicts these

5    findings within this slide.  This slide is

6    4 microns thick, and I don't know how far across.

7              A.   About two and a half, three

8    millimeters.

9              Q.   Okay.  Can you tell whether this

10   finding is present anywhere else in the woman from

11   which this was explanted?

12             A.   Oh, it's patches.  Somewhere it's

13   dilated, some areas are edematous, some are not.

14   Sometime the entire mesh is just sewed, or is shown

15   edema or dilatation.  It depends, variables.

16             Q.   And so you're unable to say,

17   looking at this figure on page 39, Figure Set 6a,

18   whether what you've described here was causing

19   symptoms in this woman, correct?

20             MR. ORENT:  Objection.

21             THE WITNESS:  Oh, I think we talked

22   about this before.  Causing symptoms is a complex

23   process, and perceptions.

24             So this is abnormal mechanism, it is a

25   factor in pain mechanisms in some other areas.

Vladimir Iakovlev, M.D.

```
1    Take hemorrhoids, you ask some patients, have them
2    painful; some patients have them not painful.
3              BY MR. THOMAS:
4              Q.   I understand that.  But it's also
5    fair to understand that this woman may have had
6    this issue in the histology, as you've described
7    it, but not be experiencing any symptoms because of
8    it, correct?
9              A.   That's correct.  The main thing is
10   it's an abnormal finding and it can cause pain.
11             Q.   Okay.  Do you know whether the
12   images that are on page 40 are --
13             A.   Stasis.
14             Q.   It's the same patient, 6a, 6b?
15             A.   Could be, I'm not sure.
16             Q.   You don't know, okay.
17             Again, the blue is polypropylene?
18             A.   Yes.
19             Q.   Are you able to tell in 6b, the
20   long, narrow white space in the lower left hand,
21   whether that is polypropylene that's present or not
22   present?
23             A.   I'm not sure.  The largest part is
24   difficult.  I can see a little bit of the
25   degradation bark can be sitting on the non-degraded
```

Vladimir Iakovlev, M.D.

```
 1   bark and -- oh, I can see some of the mesh fibers

 2   left here in this space.

 3            Q.   Okay.  I'm looking at the area

 4   above that one, though.  This one (indicating).

 5            A.   Yes, it's folded and it trapped

 6   some of the dye.

 7            Q.   Now how do you know that's folded

 8   as opposed to just mesh, part of the interstitialcy

 9   or part of the mesh being right adjacent to it?

10            A.   Do you see this line, or this

11   slice, or cross-section of the fiber, it's folded

12   like this, and then there's a little bit of a dye

13   in this space, you can see it.

14            Q.   So what you're showing here is

15   vascular dilatation stasis again?

16            A.   Yes.

17            Q.   Tissue edema?

18            A.   Yes.

19            Q.   Anything else remarkable about

20   this slide?

21            A.   No.

22            Q.   And the top is four times

23   magnification, and the bottom is ten times

24   magnification?

25            A.   That's the best approximation.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 179 of 311 PageID #: 167948
Case 2:12-md-02327 Document 3358 Filed 03/09/16 Page 179 of 311 PageID #: 64638
Vladimir Iakovlev, M.D.

1        Q.   And my expert should have this

2   slide, correct?

3        A.   Yes.

4        Q.   Since you did 6a, 6b, 6c, does

5   that mean that it's from the same patient?

6        A.   No.  They group by the feature.

7        Q.   Okay.  So you don't look at it?

8        (Reporter sought clarification.)

9        A.   Feature.  So if it's the same

10  feature, it's the same figure number, but if it's

11  different images on different pages, they are

12  labeled A, B, C, D.

13       Q.   What is the significance of the

14  edematous scar; the edema, loose scar?

15       A.   It's edema, the same thing we

16  discussed before.  The fluid stays in it, it builds

17  up pressure and can compress the structures.

18       Q.   The same on page 41, 6c?

19       A.   That's correct.

20       Q.   Anything remarkable about the

21  image on page 41 beyond what you've described?

22       A.   No.

23       MR. ORENT:  Counsel, I'm wondering if

24  it's a good time to take a quick lunch break?

25       THE WITNESS:  It feels like it.

Vladimir Iakovlev, M.D.

```
 1              MR. THOMAS:  Sure, absolutely.

 2              -- OFF THE RECORD DISCUSSION --

 3              -- RECESS AT 1:01 --

 4              -- UPON RESUMING AT 2:11 --

 5         BY MR. THOMAS:

 6         Q.    Let's go to page 42 of your

 7  report, please.  I see you're open to it already.

 8         A.    Um-hum.

 9         Q.    Figure 7a says, "Involvement of

10  striated muscle by the mesh, H&E, 4 times.

11  Additional TVT cases."

12              Again, this is a case that is not

13  contained within the consolidated cases?

14         A.    That is correct.

15         Q.    Can you tell whether this is

16  TVT or TVT-O?

17         A.    No.

18         Q.    Does the fact that it's involved

19  striated muscle help you at all?

20         A.    To a degree.

21         Q.    Why would that influence which

22  kind of mesh it is?

23         A.    It helps, because most frequently

24  if I see striated muscle, it's transobturator tape,

25  but occasionally I see striated muscle in
```

Vladimir Iakovlev, M.D.

```
1    retropubic tapes as well.

2              Q.   And what are you showing in Figure 7a?

3              A.   I'm showing involvement of

4    striated muscle in the mesh.

5              Q.   Tell me what you mean by that.

6              A.   Striated muscle can be

7    incorporated right in the mesh, most likely mesh

8    migrated into the striated muscle.  Or sometimes

9    it's just attached to it, so the fibrous capsule.

10             Q.   On the left side is the actual

11   slide, and on the right side you've filled in with

12   a red, orange and a yellow, correct?

13             A.   Yellow and red.

14             Q.   Okay.  The yellow is the

15   polypropylene?

16             A.   That is correct.

17             Q.   And the red is what?

18             A.   Red is striated muscle.

19             Q.   All right.  And you said

20   "involvement of striated muscle by the mesh."

21             This shows striated muscle adjacent to,

22   but not incorporated in the mesh, correct?

23             A.   Some parts of this incorporated,

24   sometimes it's just been fused, surface scar

25   tissue.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Help me.  Show me where it's

 2    incorporated in it.

 3              A.   Well, in this case --

 4              Q.   You're referring to the lower

 5    right?

 6              A.   In the lower panel, striated

 7    muscle is encircling one of the mesh fibers.

 8              Q.   Okay.  What's the distance, in

 9    four times magnification from the muscle and the

10    mesh?

11              A.   Within 1 to 2 hundred microns,

12    probably 100.

13              Q.   Okay.  And what's the significance

14    of that finding to your opinions in this case?

15              A.   Well, if the mesh is fused with

16    the striated muscle, any contraction of the muscle

17    will tug on the mesh and prevent muscle from free

18    contraction.

19              Q.   And what symptoms does that create?

20              A.   The mesh is tugged, and you can

21    feel the mesh moving, pulling the nerves and other

22    tissues.  So it's related to discomfort, feeling of

23    pressure and pain.

24              Q.   Once again, is it true that you

25    can't say by looking at the images in 7a, that this
```

Vladimir Iakovlev, M.D.

```
 1    patient was experiencing pain or discomfort due to

 2    the presence of the striated muscle next to the

 3    polypropylene mesh?

 4              A.   I cannot say the degree of

 5    sensation, but in this specific location, any

 6    contraction of the muscle will tug on the mesh.  So

 7    there will be a degree of sensation, to what degree

 8    I cannot say.

 9              Q.   All right.  Anything else

10    remarkable about the images on 42?

11              A.   No.  Just striated muscle

12    involvement by the mesh.

13              Q.   So let's go to Figure 7b on

14    page 43.  You're using a different stain here, the

15    desmin stain.

16              A.   That is correct.

17              Q.   What is the significance of Figure

18    Set 7b on page 43 of your report?

19              A.   Clearly, more visible in the

20    picture.

21              Q.   What is more visible?

22              A.   Striated muscle.

23              Q.   And that's yellow in this image?

24              A.   No, brown.  Brown is striated

25    muscle.
```

Vladimir Iakovlev, M.D.

```
 1                 Q.    Brown, I'm sorry.

 2                 A.    Because for a non-pathologist, it

 3      would be hard to see where striated muscle is in

 4      H&E section, but when we use desmin stain, it

 5      demonstrates even the presence of striated muscle.

 6                 Q.    I see.  Are you able to tell me

 7      whether the image in 7b is from the same patient as

 8      the image in 7a?

 9                 A.    No, likely not.

10                 Q.    Why do you say that?

11                 A.    Just my recollection.

12                 Q.    Are you able to tell me from what

13      patient 7b comes from?

14                 A.    I may or may not.

15                 Q.    How about 7a, do you know who that

16      came from?

17                 A.    Same thing, I may or may not.

18                 Q.    Okay.  Tell me, please, the

19      significance of the image in 7b.

20                 A.    Now, we can see clearly that

21      muscle is on both sides of the mesh.  So the mesh

22      is sandwiched between striated muscle, surrounded

23      by it.

24                 Q.    The same answers for 7b as 7a,

25      that when the striated muscles touch the mesh there
```

Vladimir Iakovlev, M.D.

```
1    would be a tugging, discomfort and possible pain?

2              A.   That is correct.

3              Q.   But you don't know the extent to

4    which those may manifest themselves from this

5    figure?

6              A.   The degree of sensation is

7    difficult to predict, it depends on multiple

8    factors.

9              I mean, it's clear that in this

10   location striated muscle contraction will be

11   restricted, and will cause movement of the mesh.

12   But the degree of sensation cannot be determined.

13             Q.   What about page 44?  Sorry, let's

14   go back to 43.

15             Did that cover the remarkable findings

16   in Figure 7b?

17             A.   No, I mean --

18             Q.   Is there anything else remarkable

19   about this?

20             A.   We've covered everything.

21             Q.   Thank you.  Figure 8a, on page 44.

22             A.   Yes.

23             Q.   "Involvement of smooth muscle by

24   the mesh, H&E, 10 times.  Consolidated cases."

25             Are you able to tell me whether this is
```

Vladimir Iakovlev, M.D.

```
1    a TVT or TVT-O?

2              A.   No.

3              Q.   Okay.  And you can't tell me which

4    patient it's from as you sit here?

5              A.   I can determine for this specific

6    figures which patient it came from, because this

7    image has been numbered by this time.

8              Q.   And can you tell right now, or do

9    you have to consult something?

10             A.   No, no. I would have to go back

11   and check the names of the files.

12             Q.   I see, okay.

13             And what's the purpose of depicting the

14   smooth muscle in this image?

15             A.   To show that smooth muscle can

16   also be involved by the mesh.

17             Q.   Is the smooth muscle impacted in

18   the same way as the striated muscle that you

19   described in the last two slides?

20             A.   In a similar way, yes.

21             Q.   Okay.  Is the point here to show

22   that the smooth muscle is in close proximity to the

23   polypropylene mesh?

24             A.   That's correct.

25             Q.   And similar to 7a and 7b, any
```

Vladimir Iakovlev, M.D.

```
 1    contact with polypropylene with the smooth muscle

 2    may cause some discomfort, tugging or possible

 3    pain?

 4             A.   There is a little bit more to

 5    smooth muscle.  Because smooth muscle is present in

 6    both vaginal wall and urethra and bladder.

 7             So urethra and bladder have thicker

 8    bundles of smooth muscle.  Vaginal wall has wisps

 9    of smooth muscle.

10             If mesh is in the vaginal wall, smooth

11    muscle, which is in the vaginal wall, can be either

12    attached to the scar plate.  Or, if the mesh

13    migrates, it incorporates smooth muscle inside the

14    pores.

15             So if the smooth muscle of the vaginal

16    wall contracts, the mesh will interfere.  So this

17    will be more of a sensation in the vagina, more

18    likely during intercourse, whether the vaginal wall

19    contracts.

20             Now, if we compare it with the smooth

21    muscle of the bladder and the urethra, it's a

22    different organ.  So if mesh is interfering with

23    those bundles, they may not contract correctly.  So

24    there may be interference with the function of

25    urethra and voiding, urination.  And also,
```

Vladimir Iakovlev, M.D.

1    sensation in the area.

2              Also, you should obstruct urethra

3    through compression of it.  The mesh is pressing

4    against these thick bundles, and then compresses

5    the urethra.  So it's indication that position of

6    the mesh was such that it was causing urinary

7    symptoms.

8              Q.   Are you able to tell from Figure

9    8a, whether this tissue sample is from the vagina

10   or in the area underneath the urethra?

11             A.   For Figure 8a, it would be

12   difficult because it's an H&E slide.  If I stain it

13   with smooth muscle, then I can see exactly borders

14   and position of the muscle.  Or, I can see it in

15   the microscope.

16             It's likely to be urethra, because the

17   area is more compact and there are bundles of it,

18   but I would have to look at the slide.  But

19   comparing between these two applications, I would

20   favor the urethral muscle in this specific image.

21             Q.   And it's fair to say that the

22   muscle here has not yet been incorporated into the

23   mesh, correct?

24             A.   Not fully, but you can see that

25   the mesh is --

Vladimir Iakovlev, M.D.

1          Q.   Adjacent to?

2          A.   Moving, or pressing against this

3    bundle.  It's partially compressed; you see the

4    indentation made with the mesh here.

5          Q.   Okay.  And again, you don't know

6    the extent to which the situation, circumstances

7    described in this slide, may cause or contribute to

8    discomfort, tugging or pain?

9          A.   If it's urethral muscle, it can

10   cause urinary outflow obstruction, because it's

11   clearly pressing on this part of the muscle.  So

12   it's pressing on the whole urethra.

13         Q.   But you don't know the extent to

14   which it was removed for obstruction, or why the

15   mesh was removed; do you?

16         MR. ORENT:  Objection.

17         THE WITNESS:  Yeah.  Again the degree

18   of the symptoms would depend on many factors.  I

19   can say that this picture shows that there was a

20   degree of compression of the muscle.

21         BY MR. THOMAS:

22         Q.   Can you say from this slide, that

23   there was urinary dysfunction based upon this

24   slide?

25         A.   Complete obstruction of the

Vladimir Iakovlev, M.D.

```
 1    urinary outflow, no, I cannot say that.  I mean

 2    there is interference, but the degree of it is more

 3    complex question.

 4               Q.   Page 45, Figure Set 8b is the same

 5    issue using a smooth muscle actin stain.  And

 6    because this is additional TVT cases, this is going

 7    to be a different patient than 8a, correct?

 8               A.   That's correct.

 9               Q.   Is this a TVT or a TVT-O?

10               A.   I cannot say.

11               Q.   And is this the smooth muscle

12    stain that you referred to a few minutes ago?

13               A.   That's correct.

14               Q.   And what does the stain in Figure

15    Set 8b tell you?

16               A.   So you can see clearly that the

17    smooth muscle is in wisps.  So this is the smooth

18    muscle of vaginal wall, and it became incorporated

19    into the mesh.

20               So the mesh migrated in the tissue, and

21    this part of smooth muscle became incorporated in

22    the mesh pore.

23               Q.   How can you tell from Figure 8b

24    that the mesh migrated or moved?

25               A.   Because it contains normal structure.
```

Vladimir Iakovlev, M.D.

```
 1              Q.    How does this figure -- how are

 2    you able to tell from this figure that the mesh

 3    wasn't placed there in the first place, as opposed

 4    to migrated or moved there?

 5              A.    This space didn't exist before the

 6    mesh was placed (indicating).

 7              Q.    Okay.  And "this space" is what

 8    you just drew as a circle?

 9              A.    Yes.

10              Q.    And what does that space represent?

11              A.    It's the space within the mesh.

12    So it was created in the body, when the mesh was

13    placed.  When the mesh was placed, it's empty space

14    because tissue is disrupted.  The mesh goes in, and

15    everything inside needs to be filled in with brand

16    new tissue.  So this area was filled with tissue

17    after the mesh was placed.

18              But, we know that smooth muscle is a

19    more specialized type of tissue.  It has very

20    limited ability for regeneration, so the scar which

21    can be produced.  So if there is normal tissue

22    within the mesh pore, it means that it had been

23    incorporated later on, either through scar

24    contraction, which pulls normal tissue in, or

25    through mesh migration, which migrates into this
```

Vladimir Iakovlev, M.D.

```
 1    (indicating).

 2              Q.   What types of symptoms are present

 3    from the findings that you have in Figure Set 8b?

 4              A.   I don't remember exact history for

 5    this specific patient, but this position of smooth

 6    muscle inside the mesh, is at risk for pain,

 7    especially during intercourse, dyspareunia.  Again,

 8    the degree of these symptoms is difficult to

 9    predict.  But this is an abnormal position of

10    smooth muscle.

11              Q.   Are you suggesting that every time

12    this patient would have sexual intercourse, that

13    she experienced pain due to this condition?

14              MR. ORENT:  Objection.

15              THE WITNESS:  How much of this will

16    contribute to her symptoms would be difficult to

17    predict.  But as I said, this is an abnormal

18    position, and this abnormality provides a risk

19    factor for pain during intercourse.

20              BY MR. THOMAS:

21              Q.   Okay.

22              A.   Or just simply chronic pain.

23              Q.   So as we've talked about before,

24    this is a risk factor in conjunction with other

25    things that may cause the conditions you're talking
```

Vladimir Iakovlev, M.D.

```
 1   about?

 2              A.   That's correct.

 3              Q.   Anything else remarkable about 45?

 4              A.   No.

 5              Q.   46, Figure Set 8c.

 6              Again, this is more smooth muscle with

 7   smooth muscle actin stain, additional TVT cases.

 8   Is this a third patient, do you know?

 9              A.   This is an older case.

10              Q.   So is this a third patient within

11   this set?

12              A.   Most likely.

13              Q.   And it's an older case given the

14   camera that's used?

15              A.   Yes.

16              Q.   Can you tell whether it's a TVT or

17   TVT-O?

18              A.   No.

19              Q.   What is the significance of Figure 8c?

20              A.   This is a nice picture, this is

21   urethral wall.

22              Q.   You're talking about the muscle on

23   the right side of the image on the left?

24              A.   Yup.

25              Q.   Okay.
```

Vladimir Iakovlev, M.D.

```
 1                    A.   It's a thicker bundles of urethra,

 2    and this part is vaginal wall.  So this is part of

 3    vaginal wall.  And you can see the curve of the

 4    sling was compressing urethra (indicating).

 5                    So this part of the sling was excised

 6    with some of the urethral muscle.

 7                    Q.   What is the significance of this

 8    finding in this figure?

 9                    A.   It shows the difference between

10    smooth muscle in the vaginal wall and smooth muscle

11    in the urethra, and the relationship of the mesh,

12    how it sits right on the muscle of the urethra.

13                    Q.   If you look at this, as it's going

14    to be in-situ, is it going to look like this?

15                    A.   Eventually it will look like this.

16                    Q.   So this is the urethral muscle,

17    and I'm holding Figure 8 sideways.  So this shows

18    how the mesh has either the U-shape or the hammock

19    shape underneath the urethra; correct?

20                    A.   That is correct.

21                    Q.   Okay.  So the positioning of this

22    mesh is really consistent with the way it should be

23    placed; is that correct?

24                    A.   It's the normal position.  It's

25    not normal, intended position.
```

Vladimir Iakovlev, M.D.

```
 1              Q.    Intended position, okay.

 2              So what is significant about Figure 8c,

 3    insofar as it relates to your opinions in this

 4    case?

 5              A.    Well, I'm demonstrating that the

 6    mesh is compressing right against urethra.  And if

 7    it was more pressure, it would start migrating into

 8    urethra and sometimes I see that as well.

 9              Q.    When you say migrating, are you

10    talking about eroding into the urethra?

11              A.    Yes.

12              Q.    Okay.  There's no evidence here,

13    though, of evidence of erosion into the urethra,

14    correct?

15              A.    In this specific case, I don't

16    remember.

17              Q.    Well, you don't see it in the

18    slide.  You can't offer the opinion to a reasonable

19    degree of medical certainty that this mesh has

20    eroded into the urethra here, correct?

21              MR. ORENT:  Objection.

22              THE WITNESS:  Not in this image.  And

23    the purpose of this different.

24              So you can see clearly, I should have

25    probably turned it.  I should have turned it like
```

Vladimir Iakovlev, M.D.

```
 1    this (indicating).  And this would demonstrate that

 2    with more pressure, it would start migrating; in

 3    this specific case, it didn't.

 4              BY MR. THOMAS:

 5         Q.   Isn't this supposed to be right

 6    underneath the urethra in order to control the

 7    urine flow?

 8         A.   Yes, but I mean --

 9         Q.   Is this not placed properly?

10              MR. ORENT:  Objection.

11              THE WITNESS:  I wouldn't go and I

12    cannot testify exactly for placement.

13              To me, as a pathologist, I examine what

14    is abnormal and what can cause symptoms.

15              So if there are specific requirements

16    for placement or positioning, it would be a

17    clinical question.

18              BY MR. THOMAS:

19         Q.   Okay.

20         A.   So to me, this position, right

21    against smooth muscle of urethra, indicates that

22    sling is compressing against urethra directly.

23              So, with extra pressure, you can

24    collapse or compress urethra and cause urinary

25    outflow.  And this is repeated in medical histories
```

Vladimir Iakovlev, M.D.

```
1    that slings can cause urinary outflow and

2    obstruction.

3             And with more pressure, it will start

4    going through the muscle and become eroded.  Also,

5    it will describe the clinical phenomena.

6             Q.   And when you talk about disrupting

7    urinary outflow, is that the same thing as

8    retention?

9             A.   Yes.

10            Q.   And that's a recognized complication

11   from mesh placement?

12            A.   Yes, it is.

13            Q.   Anything else remarkable about

14   this slide?

15            MR. ORENT:  Objection.

16            THE WITNESS:  No.

17            BY MR. THOMAS:

18            Q.   Is it fair to understand that

19   you're not able to diagnose urinary retention based

20   upon this single slide, correct?

21            A.   Retention is a symptom, as we've

22   discussed before, symptoms are caused by multiple

23   factors together, so...

24            Q.   Answer my question.  Based on this

25   slide alone, you can't make that finding?
```

Vladimir Iakovlev, M.D.

```
 1                   A.    You can say that this position

 2    creates a risk for obstruction.

 3                   Q.    Yeah.

 4                   A.    And a degree of compression of the

 5    urethra.

 6                   Q.    But like everything else, that's a

 7    risk factor that you'd have to combine with other

 8    things to determine whether, and to what extent

 9    this could cause any problems in her, right?

10                   MR. ORENT:   Objection.

11                   THE WITNESS:   Not necessarily.  It may

12    not need other factors.  It may cause symptom on

13    its own.  But the degree of the symptom is clinical

14    presentation.

15                   BY MR. THOMAS:

16                   Q.    And you don't know what that

17    clinical presentation is as you sit here today?

18                   A.    That's correct.

19                   Q.    Page 47, Figure 8d.  This is,

20    "Innervation within the mesh and between the mucosa

21    and the mesh.  Also, images of muscle movement

22    involvement by the mesh."  And this is a

23    publication?

24                   A.    That's correct.

25                   Q.    Do you know what kinds of mesh are
```

Vladimir Iakovlev, M.D.

```
 1    involved here?

 2                  A.   I don't remember.  I think two of

 3    these images are from TVT or TVT-O.  And two of

 4    these images are from different mesh.

 5                  Q.   Which ones are from TVT or TVT-O?

 6                  A.   I don't remember now.  I would

 7    have to sort of do matching.

 8                  Q.   Okay.  What other manufacturers

 9    did you look at?

10                  A.   AMS, Boston Scientific, Bard.

11                  Q.   And do you know which of those

12    manufacturers are depicted in this image?

13                  A.   No, I know for sure that there's

14    at least one TVT mesh here.

15                  Q.   At least one?

16                  A.   At least one.  I don't remember --

17                  Q.   Do you know whether it was a TVT

18    or a TVT-O?

19                  A.   No.

20                  Q.   Okay.  And what is the purpose of

21    this image?

22                  A.   It demonstrates same smooth muscle

23    involvement.

24                  Q.   Are you able to tell -- as I

25    understand the smooth muscle is either going to be
```

Vladimir Iakovlev, M.D.

```
 1    in the vagina or around the urethra, correct?

 2              A.    That's correct.

 3              Q.    Are you able to tell in Figure 8

 4    whether this is the vagina or the urethra?

 5              A.    Let me see, because the pictures

 6    are cropped to a degree.

 7              Q.    They're "cropped", did you say?

 8              A.    Cropped, yes.  So I need the

 9    larger pictures to -- let me see.

10              Maybe it's described in the caption.

11    (Witness reviews document.)

12              Just representative image.  From what I

13    see, but it's not 100 percent, it may not be

14    100 percent correct.

15              C, would reflect urethral muscle.  And

16    D would reflect vaginal muscle.  But I'm not sure,

17    because most of the structures are cropped.  It

18    just describes the fact that the mesh can

19    incorporate smooth muscle, from either origin.

20              Q.    And just so we're clear.  You're

21    pretty sure that one of these is a TVT or a TVT-O,

22    but you don't know which of the four figures in

23    Figure Set 8d is a Johnson & Johnson product?

24              MR. ORENT:  Objection.

25              THE WITNESS:  It would be either these
```

Vladimir Iakovlev, M.D.

```
1    two or both (indicating).

2                BY MR. THOMAS:

3                Q.   Okay.  C and D, correct?

4                A.   C and D.  That is my recollection.

5                Q.   What is it about those images that

6    cause you to believe it's an Ethicon TVT or TVT-O?

7                A.   Oh, maybe not.  Wait a second.

8                (Witness reviews document).

9                Sorry.  I have to retry this.  I don't

10   remember which exactly are TVT or TVT-O.  It could

11   be one of these images in one of these.

12               Q.   It could be any one of the four?

13               MR. ORENT:  Objection.

14               THE WITNESS:  Yes, I would have to go

15   back and check.

16               BY MR. THOMAS:

17               Q.   Now this is smooth muscle; is that

18   what you're saying?

19               A.   These are smooth muscle.

20               Q.   In A, B, C and D?

21               A.   No.  Figure A shows neurovascular

22   bundle in the pore, we saw similar images before

23   that.

24               Figure B shows innervation between

25   sling and mucosa.
```

Vladimir Iakovlev, M.D.

```
 1                    Figure C -- (witness reviews document.)

 2             Q.   Are you reading the text now?

 3             A.   Yes.  So Figure C shows striated

 4     muscle.

 5                    And Figure D, shows smooth muscle

 6     unspecified, either from vagina or urethra.

 7             Q.   Okay.  And is the purpose of this

 8     image just to show the innervation of the mesh in

 9     general?

10             A.   Well, the purpose of the image is

11     to show all these pictures together.  And I

12     included it because I knew that at least one

13     contains TVT or TVT-O, it is a supplementary

14     picture.

15             Q.   Anything else significance for the

16     figures on page 47?

17             A.   No.

18             Q.   Page 48, Figure Set 9a.  "Arterial

19     obliteration in the mesh scar plate, H&E 10 times.

20     Consolidated cases."

21                    This obviously is from one of the

22     plaintiffs in the consolidated cases.

23             A.   Yes.

24             Q.   And you've indicated on the image

25     an obliterated artery.  How can you -- what is it
```

Vladimir Iakovlev, M.D.

```
 1    about this image that tells you that this artery is

 2    obliterated?

 3                A.    The lumen is collapsed.

 4                Q.    The lumen is collapsed?

 5                A.    Yes.  The arterial wall is

 6    degenerated, so clearly non-functional.

 7                Q.    And what does it mean to have an

 8    obliterated artery?

 9                A.    It means that there is an area in

10    the body which had insufficient or disrupted blood

11    supply.

12                Q.    Okay.  When you say "insufficient

13    or disrupted", it can be disrupted without being

14    insufficient; can't it?

15                A.    That's correct.  There might be a

16    collateral circulation sufficient to supply.

17                Q.    And you're not able to tell from

18    looking at this image in Figure Set 9a, that if

19    this is an obliterated artery, that it has any

20    clinical impact on the patient, correct?

21                MR. ORENT:  Objection.

22                THE WITNESS:  Again, could have had

23    only short-term impact, could have had longer term

24    impact.  Short term would be necrosis, right after

25    the obliteration, or thrombosis, it's like heart
```

Vladimir Iakovlev, M.D.

1    attack.

2              And then long-term would be scarring

3    and fibrosis.  The same thing as a heart, people

4    who have insufficient cardiac output.  If heart

5    muscle doesn't work as well as before the infarct,

6    so the same thing here, it would be a short term,

7    shortly symptoms or changes in the body.  And then

8    longer term.  Longer term would be caused more

9    fibrosis.

10             BY MR. THOMAS:

11             Q.   And longer term there may or may

12   not be a problem, correct?

13             A.   You mean how they would translate

14   into clinical symptoms?

15             Q.   Yes.

16             A.   The degree of translation into

17   clinical symptoms is more a complex process.

18             Q.   Okay.  Is there necrosis in this

19   image?

20             A.   No.  Because artery has supplied

21   the blood to somewhere else further down, so...

22             Q.   Okay.  So given your finding of an

23   obliterated artery, there are no clinical symptoms

24   manifested in this image, at this time that you can

25   point to, correct?

Vladimir Iakovlev, M.D.

```
 1              MR. ORENT:  Objection.

 2              THE WITNESS:  Not in this area.

 3              BY MR. THOMAS:

 4         Q.   Okay.

 5         A.   But it tells us that somewhere

 6    else beyond this square picture, there was damage

 7    for the tissue.

 8         Q.   There was or may be?

 9         A.   There was.

10         Q.   Okay.

11         A.   The degree of it is difficult to

12    determine.  But there was.

13         Q.   You'd have to see the tissue in

14    order to make that evaluation, correct?

15              MR. ORENT:  Objection.

16              THE WITNESS:  Yes.

17              BY MR. THOMAS:

18         Q.   Where is the mesh in Figure 9a?

19         A.   Somewhere beyond it.

20         Q.   It's not in the slide?

21         A.   Maybe right at the corners, I

22    don't know.

23         Q.   But you didn't capture any mesh in

24    the slide on 9a?

25         A.   I didn't crop it in.
```

Vladimir Iakovlev, M.D.

 1                    Q.   Let's go to page 49, Figure Set 9b.

 2                    A.   Yes.

 3                    Q.   It says, "Examples of capillary

 4    thrombosis in the mesh scar plate."

 5                         What is "capillary thrombosis"?

 6                    A.   When there are small thrombi

 7    formed in the capillaries.

 8                    Q.   What is the significance of

 9    capillary thrombosis in the mesh scar plate?

10                    A.   The same as for arteries, just on

11    a small scale.  So there's interruption of blood

12    supply in the smaller area.  Artery can cover large

13    area, capillaries are covering small.

14                    Q.   Is there anything about what you

15    see in Figure Set 9b, that would tell you that this

16    patient is experiencing any clinical symptoms?

17                    A.   Again, the degree of manifestation

18    of this finding would be difficult to determine.

19                    Q.   It could be nothing?

20                    A.   May not be clinically apparent.

21                    Q.   And is this a single plaintiff or

22    is it two different plaintiffs?  It says,

23    "additional TVT cases."  I can't tell if it's one

24    patient or two.

25                    A.   I think it's from the same patient.

Vladimir Iakovlev, M.D.

```
 1                Q.   Is it a TVT or TVT-O?

 2                A.   I think it was the Edwards case.

 3   That's as far as I can recollect.

 4                Q.   Okay.  Is there any mesh in Figure

 5   Set 9b?

 6                A.   Right there (indicating).

 7                Q.   So that's on the lower left, okay.

 8                Is there any mesh in the image above?

 9                A.   Not in the image.  It was probably

10   right beside it.

11                Q.   Okay.  Let's go to Figure Set 10a

12   on page 50.  It says, "TVT sling curled into a roll

13   cross-section through parallel walls.  H&E stain

14   2.5 power magnification.  Consolidated cases."

15                This shows a piece of curled mesh,

16   doesn't it?

17                A.   That is correct.

18                Q.   And this is the curled mesh that

19   you talked about before when you place it in

20   formalin that it will curl over on itself, correct?

21   When it's placed in formalin?

22                A.   Did I say that it curls in

23   formalin?  I said that mesh, which is curled in

24   scar tissue, curled in the body.

25                Q.   I see.  So you believe that this
```

Vladimir Iakovlev, M.D.

```
1    curled in the body?

2              A.   Yes.

3              Q.   And on what basis do you believe

4    that?

5              A.   Because that curl shape is

6    immobilized within the scar tissue, it's

7    incorporated in the scar tissue, in this shape.

8              Q.   Okay.  Anything other than the

9    curling phenomena that you've just described as the

10   purpose of Figure Set 10a?

11             A.   Curling phenomena, scarring, it's

12   all encased in scar tissue.

13             Q.   Okay.

14             A.   That's about it.

15             Q.   Okay.  And at the top where we see

16   the blue, those are going to be artifacts?

17             A.   No.  The blue ones are

18   cross-sections of the blue filaments.

19             Q.   I should have said, in places

20   where they don't fill the holes?

21             A.   It can't be clear filament.

22   Because remember, half of the fibers in the sling

23   are blue, half of them are clear.

24             Q.   Okay.  Let's look at the top, off

25   of the slide there is a blue fragment.  That
```

Vladimir Iakovlev, M.D.

```
 1    obviously has been pulled away from the slide,

 2    correct?

 3              A.    That's correct.

 4              Q.    That's polypropylene?

 5              A.    That's correct.

 6              Q.    Let's go to set 10b.  Is set 10b

 7    from the same patient or a different patient?

 8              A.    I suspect it is the same patient.

 9              Q.    Do you know?

10              A.    Not with 100 percent certainty.

11    But I think it is.  It's just a different part the

12    of the same curled mesh.

13              Q.    Okay.  And does Figure Set

14    10b show anything new beyond what you've showed in

15    10a, or is it the same?

16              A.    It's the same, just tighter roll.

17              Q.    And if you look at the images at

18    the top, there's a blue line coming out of the top

19    right, and that's a polypropylene artifact?

20              A.    Displaced polypropylene fibers.

21    You can also see dilated vascular channels.

22              (Reporter sought clarification.)

23              A.    So in this area, there is vascular

24    dilation.

25              Q.    Can you tell from these images,
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 210 of 311 PageID #: 167979
Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 210 of 311 PageID #: 64667
Vladimir Iakovlev, M.D.

1  10a and 10b, whether this mesh caused any symptoms

2  in the patient when it was implanted?

3              MR. ORENT:  Objection.

4              THE WITNESS:  My answer is the same.

5  Clinical symptoms is a multifactorial, complex

6  phenomena.

7              BY MR. THOMAS:

8              Q.   This is a risk factor?

9              A.   No, this is not a risk factor,

10  this is a mechanism, how the complications occur.

11              But then there is a patient in between

12  who feels the symptoms, and the body however reacts

13  and so forth.  But in this case, the mesh is

14  rolled, so the pressure is distributed in a small

15  area.

16              The probability that it will compress

17  urethra is higher, because if it was flat, it would

18  have much larger distribution of pressure.

19              Q.   So is the risks from this curl

20  mesh compression against the urethra and urinary

21  retention?

22              A.   Yes, one of those.

23              Q.   Do you know whether this patient

24  had urinary retention?

25              MR. ORENT:  Objection.

Vladimir Iakovlev, M.D.

```
 1              THE WITNESS:  I don't remember now.

 2   Because my purpose for this report was to actually

 3   show these things which can happen, and the

 4   pathological changes which happen after mesh

 5   placement.

 6              And, symptoms which can factor in.

 7              BY MR. THOMAS:

 8              Q.   Okay.

 9              A.   But I wasn't working on specific

10   connection between this pathological change, caused

11   that symptom in this specific patient.

12              Q.   Okay.  Anything else remarkable

13   about the images on 50 and 51?

14              A.   No.

15              Q.   Go to page 52.  And you get

16   "Neurovascular bundle within curled mesh, four

17   times magnification.  Consolidated cases."

18              Is this a different patient than was

19   depicted in 10a and 10b?

20              A.   One of these, because I say that

21   it's curled mesh --

22              (Witness reviews document).

23              So likely it was one of these two.

24              Q.   I think you told me -- well, maybe

25   I didn't hear this right.  I thought you told me
```

Vladimir Iakovlev, M.D.

```
 1     that A and B were from the same person?

 2               A.   Most likely.

 3               Q.   Do you know?

 4               A.   I can tell you, but not right now.

 5     I can just check the name of the files.

 6               Q.   And do you think that 10c, is the

 7     same or different person?

 8               A.   Most likely it is the same person,

 9     or one of the two.  It could all be from one

10     patient, it could be from two patients.

11               Q.   Okay.  In the top part on 10c, on

12     page 52, you have a displaced piece of

13     polypropylene?

14               A.   Yes.

15               Q.   And what's the significance of

16     identifying this neurovascular bundle in the

17     figure?

18               A.   As before, we were talking about

19     entrapment of the neurovascular bundle before.  But

20     in this case, it's not just in pore.  It goes in

21     the pore, and became entrapped in the curls.

22               So it's in between two layers of the

23     mesh right inside the curl.  So it's secondary type

24     of compartment.  Because before we're talking about

25     compartmentalizing nature of the mesh, and then we
```

Vladimir Iakovlev, M.D.

```
 1   talk about flat mesh, it's sort of third dimension.

 2   So compartments are within the thickness of the

 3   mesh.  But when it curls, it creates secondary

 4   compartment.  Compartment which is encircled by the

 5   mesh or between the folds.

 6                Q.   Anything that you can see in

 7   Figure 10c, on page 52 that is abnormal or

 8   symptomatic about that neurovascular bundle, other

 9   than its presence in the scar tissue?

10                A.   It's abnormal location.

11                Q.   It's simply that, the abnormal

12   location?

13                A.   Yes.

14                Q.   Anything else?

15                A.   The surroundings are abnormal.

16                Q.   Okay.  Anything else remarkable

17   about that image?

18                A.   No.

19                Q.   Let's go to page 53, section 10d.

20   This is, "A twisted TVT sling" from additional TVT

21   cases."

22                So this is one of your older cases,

23   correct?

24                A.   Yeah.  Earlier or concurrent.

25                Q.   Is this a TVT or TVT-O?
```

Vladimir Iakovlev, M.D.

```
 1                A.   I don't know.

 2                Q.   What is the significance of what

 3      you've done in Figure 10d?

 4                A.   It shows that the mesh just

 5      curled, and also twisted.  To get the shape like

 6      this out of flat tape, it has to curl and then one

 7      end is twist.

 8                Just think about it, how they put these

 9      sections in this shape.  So one end like this, and

10      the other one is probably like that (indicating).

11      Or maybe like this (indicating).

12                Q.   Okay.  Does that happen by

13      placement, or by migration in the body, or do you

14      know?

15                A.   It's hard to figure out if you can

16      place it like this.

17                Q.   Do you know?

18                A.   I don't know.  One thing I can

19      tell you, this shape was formed in the body and

20      then it became incorporated in scar tissue like

21      this.

22                Q.   But you don't know whether that

23      happened on placement or in some other way?

24                A.   No.

25                Q.   Okay.  Now, in Figure 2 and
```

Vladimir Iakovlev, M.D.

```
 1    Figure 3, you show different images of the yellow.

 2    What's the purpose of doing gradations of the

 3    yellow?

 4                A.   Well, this shows the planes of the

 5    mesh.  Just to help you to understand that we're

 6    talking about the mesh which twisted.

 7                Q.   Okay.  Figure 10e is explanted

 8    mesh.  This has been in formalin, correct?

 9                A.   Yes.  I believe it was in

10    formalin.

11                Q.   Okay.  And no attempt to clean it

12    at all, correct?

13                A.   That is correct.

14                Q.   And the purpose here is to show

15    what you believe to be the curling of the mesh?

16                A.   Well, it's not what I believe.  I

17    observe curling.  It's hard to show in the picture,

18    but when you look at it with just magnifying glass

19    or if you have good eyes, you can see that the mesh

20    is curled up and then it's all filled with scar

21    tissue.

22                Q.   Is the purpose of this just to

23    show the simple curling, or are you trying to show

24    something beyond other than that?

25                A.   No, just curling.  And that the
```

Vladimir Iakovlev, M.D.

1    curled shape is actually filled with scar tissue.

2    It's not formalin, as you'd like to say, causing

3    the curling.  It was removed from the body in that

4    shape.

5              Q.   Can you tell whether, assuming

6    this is curled in the body, whether it was curled

7    upon placement or curled after placement?

8              A.   The only thing I can say, it can

9    happen, and it happened.

10             Q.   Okay.  But you don't know whether

11   it happened during placement or after placement?

12             MR. ORENT:  Objection.

13             THE WITNESS:  I don't know.

14             BY MR. THOMAS:

15             Q.   If you go to page 55, Figures A

16   and B, set 10f.  "A TVT sling with curled edges.

17   Right sling is TVT."

18             Are these two different slings or one;

19   do you know?

20             A.   These are two different slings,

21   this is AMS, this one I remember.

22             Q.   AMS is on the left?

23             A.   Yes.

24             Q.   And TVT is on the right?

25             A.   Yes.

Vladimir Iakovlev, M.D.

| | |
|---|---|
| 1 | Q. Is it TVT or TVT-O? |
| 2 | A. I don't know. |
| 3 | Q. Does the AMS figure have any |

relevance to your discussion in this case?

| 5 | A. Not necessarily, no. |
| 6 | Q. Okay. Tell me what is significant |

to you about the TVT in part B of set 10f?

| 8 | A. See, the images which were taken |

from publications were not cropped, so I don't

remove any panels. So in this image, I think I had

a TVT, I provided the entire --

| 12 | Q. I understand, that's okay. |
| 13 | A. So in this case I can tell exactly |

this is TVT, and this is a different manufacturer.

| 15 | Q. All right. So what is the |

significance of slide B?

| 17 | A. It's curled, it's roped. You can |

see it's not tightly -- it's not flat. It's

tightly curled.

| 20 | Q. Can you tell whether it was placed |

that way or whether that happened after placement?

| 22 | MR. ORENT: Objection. |
| 23 | THE WITNESS: I can't say. The only |

thing I can say is that it happened in the body.

25

Vladimir Iakovlev, M.D.

```
 1              BY MR. THOMAS:

 2              Q.   Okay.  Anything else remarkable

 3    about 10f on page 55?

 4              A.   No, just roping.

 5              Q.   Page 56, you have Figure Set

 6    10f again.  Is that a typo, or is that the same

 7    mesh?  It looks like a different mesh, it looks

 8    like one of yours.

 9              A.   It's a typo.

10              Q.   So this would be 10f --

11              A.   No, it should be 10d.

12              Q.   10d?

13              A.   I think it's the same specimen as

14    10e.

15              Q.   Okay.

16              A.   The same case, I believe.  So this

17    case took two pieces.  One piece was rolled like

18    this, like 10e.

19              Q.   Okay.

20              A.   And the second piece was flat

21    area.  Sometimes one piece, especially if it's

22    heat-treated doesn't curl.  So there is a segment

23    of mesh --

24              Q.   What do you mean heat-treated,

25    during removal?
```

Vladimir Iakovlev, M.D.

1          A.   No, during manufacturing.

2          Q.   Are you talking about heat-treated

3    as in laser cut?

4          A.   No, the entire surface is

5    heat-treated, not just edges.

6          Q.   And so what impact -- I didn't see

7    it anywhere in your report, that heat somehow in

8    the manufacturing process will impact the ability

9    of the mesh to lay flat in the body?

10          A.   It doesn't curl -- oh, doesn't

11    curl as much.

12          Q.   Okay.

13          A.   It's more stable structure because

14    fibers are welded together, or to a degree

15    connected together.

16          Q.   Okay.

17          A.   I know that some of the tapes --

18          Q.   Some other manufacturers?

19          A.   Other manufacturers, middle

20    portion is heat-treated.

21          Q.   Okay.  So did Boston Scientific

22    mention it?

23          A.   I don' know.

24          Q.   It's all right.

25          A.   I don't remember now.  I mean some

Vladimir Iakovlev, M.D.

```
 1    of them were coming out first, with no heat

 2    treatment, and then later on they became

 3    heat-treated.

 4              So some portions don't curl because of

 5    heat treatment, or just don't curl because of other

 6    factors.  So in this specific case, there was a

 7    segment of the sling removed, and it was curled.

 8    And in another segment of the sling removed and it

 9    remained flat in the body.

10              Q.    Okay.  Do you know why?

11              A.    No, I don't know.  One of the

12    reasons can be heat treatment.

13              Q.    It could also be placement?

14              A.    It could also be placement or

15    location.

16              Q.    And what is the purpose of the red

17    and the yellow on the image on 10f on page 56?

18              A.    It just demonstrates how flat

19    section of the mesh looks, and how a curled section

20    of the mesh looks.  Because here, cross-section,

21    this mesh.

22              Q.    Yes?

23              A.    And then it came on histological

24    sections like this.

25              Q.    Is this from a case, additional
```

Vladimir Iakovlev, M.D.

1    TVT cases?

2                A.    Yes.

3                Q.    Has this been produced in a report

4    somewhere?  I've never seen this image in a case

5    anywhere, I'm just curious to know if it's been

6    published in a report someplace.

7                A.    I don't want to disclose that if

8    it has not been produced, so it have been produced.

9                Q.    Let me ask you this.  Here is why

10   I ask:  Generally, as you know, at least with

11   Ethicon, we divide these meshes before any work is

12   done on them.

13               Did you divide this mesh with Ethicon

14   before you did this work on 10f?

15               A.    It could be that was divided with

16   your expert, so we were taking pictures together.

17               Q.    Okay.  Well maybe that's right.

18               A.    I think it was the case.  Now I

19   can vaguely remember the issue because we were

20   discussing how we're going to cut this diagonal or

21   cut it --

22               Q.    I see.

23               A.    And so I remember him standing

24   beside me, and I was taking those pictures.

25               Q.    I see.

Vladimir Iakovlev, M.D.

1          A.   I took this picture, then this

2    picture, then we probably have similar pictures

3    from him.

4          Q.   And I apologize, I've been asking

5    this question a lot, and I don't know if I've asked

6    you about this slide, so if I have, I apologize.

7               You don't know whether the curling

8    depicted in 10f, on page 56 occurred during

9    placement or after placement, do you?

10         A.   No, I don't.

11              MR. ORENT:  Objection.

12              BY MR. THOMAS:

13         Q.   Page 57, Figure Set 10g.  "A TVT

14   sling with curled edges."  Is this a different TVT

15   than the ones we've looked at?

16         A.   I think these are the pictures of

17   the same case.  Again, that is my recollection, I'm

18   not 100 percent sure, but I think.

19         Q.   Do you know if this is a TVT or a

20   TVT-O?

21         A.   No.

22         Q.   Are you trying to show anything by

23   these images on 10g other than a different

24   depiction of what's in 10f?

25         A.   Well, no.  This just shows the

Vladimir Iakovlev, M.D.

```
 1   curling state, this cross-section (indicating).

 2              Q.   Okay.  So it's your best

 3   recollection that the images in 10e, 10f and 10g,

 4   are from the same mesh, same patient?

 5              A.   Yes, likely than not, these are

 6   all from the same patient.

 7              Q.   But you're not sure?

 8              A.   No.  As I said, the purpose of

 9   this report was to analyze the device as a whole,

10   not the individual patients.

11              Q.   10h:  "TVT sling with curled

12   edges.  Additional TVT cases"?

13              A.   Yes.

14              Q.   Do you know where -- is this a new

15   patient; do you know?

16              A.   It's older pictures, taken by old

17   camera.

18              Q.   Do you know whether this is a

19   TVT or TVT-O?

20              A.   No.

21              Q.   What is the purpose of this image?

22              A.   It show the cross-section of the

23   curl.  And you can see it clearly, the whole field

24   is scar tissue.  This indicates that this curl

25   shape was formed in the body and then the scar
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 224 of 311 PageID #: 127993
Case 2:12-md-02327 Document 3790-3 Filed 05/09/16 Page 224 of 311 PageID #: 64601
Vladimir Iakovlev, M.D.

1  tissue growing inside and filled the two-block

2  structure.

3          Q.   And are you able to tell from this

4  image, whether it was curled on placement or curled

5  after placement?

6          MR. ORENT:  Objection.

7          THE WITNESS:  No.

8          BY MR. THOMAS:

9          Q.   Anything else remarkable about

10  Figure Set 10h?

11          A.   No.  Curling, scar encapsulation,

12  scar filling.

13          Q.   Page 59, Figure Set 10i:

14  "Neurovascular bundle with rolled TVT tape, S100

15  stain.  Additional TVT cases."

16          Is this from the same or a different

17  patient as set 10h?

18          A.   I don't remember now.

19          Q.   Do you know if it's a TVT or

20  TVT-O?

21          A.   No.

22          Q.   What are you trying to show in

23  Figure 10h?

24          A.   It's a single picture for single

25  purpose as 10c, on page 52.  A neurovascular bundle

Vladimir Iakovlev, M.D.

```
1    is inside the roll of the curled tape.

2              Q.   And is there anything about the

3    depiction in the neurovascular bundle in set 10i on

4    page 59 that is irregular or abnormal other than

5    its presence in the scar plate?

6              A.   Well, it's bent by the mesh fiber,

7    you can see clearly that it deviates from straight

8    course.

9              Q.   Anything about that that makes you

10   have an opinion that this is causing any symptoms

11   in the person who has this mesh?

12             MR. ORENT:  Objection.  Form.

13             THE WITNESS:  Probably, the nerve is

14   irritated by these fibers higher, because it is a

15   direct compression on the nerve.

16             BY MR. THOMAS:

17             Q.   But there's nothing about this

18   slide, just like the other slides, which tells you

19   that the neurovascular bundle in Figure Set 10i,

20   actually caused symptoms in the person who had this

21   mesh?

22             MR. ORENT:  Objection.

23             THE WITNESS:  We discuss this before.

24   The degree of symptoms, the expression by the

25   patient is a complex process.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 226 of 311 PageID #: 637995
Case 2:12-md-02327 Document 3790-3 Filed 04/27/16 Page 226 of 311 PageID #: 64685
Vladimir Iakovlev, M.D.

```
 1              So I can say that this is abnormal,

 2    this is a mechanism for symptoms, and then that can

 3    happen.

 4              BY MR. THOMAS:

 5              Q.   And the reason why you say it's

 6    abnormal is because the mesh fiber causes this

 7    bundle to alter its path?

 8              A.   Yes.

 9              Q.   Anything else?

10              A.   No.

11              Q.   Page 60.

12              A.   Yes.

13              Q.   Figure Set 10j:  "A rolled TVT

14    sling sectioned parallel and perpendicular to the

15    roll.  Additional TVT cases."

16              Do you know whether this is a TVT or

17    TVT-O?

18              MR. ORENT:  Objection.

19              THE WITNESS:  No.

20              BY MR. THOMAS:

21              Q.   What is the significance of this

22    slide to show what you showed in previous slides.

23    That is, the fact of the curling?

24              A.   Fact of the curling and mechanism

25    for erosion on page 61, I demonstrate how the
```

Vladimir Iakovlev, M.D.

1    erosion occurred.  Because one end of this curled

2    tape became eroded.

3              Q.   Okay.  So this is, the dark end of

4    the tape on page 60 and on 61, it is in fact an

5    erosion?

6              A.   Yes, it's --

7              Q.   Where did it erode?

8              A.   In the mucosa, in vaginal mucosa.

9              Q.   Did it erode into another organ?

10             A.   No, it eroded through the mucosa

11   into the vagina.

12             Q.   Do you distinguish between an

13   erosion and an exposure?

14             A.   Technically, there is a

15   distinction.  The terms are used interchangeably,

16   so there is no agreement which one is --

17             Q.   Let's use the technical terms,

18   just so you and are communicating.  Is this an

19   erosion or an exposure?

20             A.   Both.

21             Q.   Okay.

22             A.   Because the mucosa eroded on top

23   of it and mesh became exposed.

24             Q.   Okay.  But in terms of the mesh

25   going into or eroding into another organ, that

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 228 of 311 PageID #: 167997
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 228 of 311 PageID #: 64685
Vladimir Iakovlev, M.D.

```
 1   didn't happen here?

 2              A.   Well, it eroded into the mucosa.

 3              Q.   Okay.  But just the mucosa, not

 4   the bladder, not the rectum?

 5              A.   Not the organs.  Because it is a

 6   different location.

 7              Q.   All right.  And do you remember

 8   this patient?

 9              A.   No.

10              Q.   Do you know how this patient was

11   treated?

12              A.   By sling excision.

13              Q.   Do you know how it worked out?

14   How she recovered from the excision?

15              A.   Better that she didn't have eroded

16   mesh anymore after surgery.  Maybe it eroded again

17   in a different place.

18              Q.   Do you know whether she

19   experienced pain as a part of this?

20              A.   Most likely she did.

21              Q.   Do you know whether she

22   experienced pain as part of this?

23              A.   The degree of pain, as I said, I

24   don't remember now.  But most likely she did.

25              Q.   You have not consulted her records
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 229 of 311 PageID #: 167998
Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 229 of 311 PageID #: 167998
Vladimir Iakovlev, M.D.

1    to see the extent to which this was a painful

2    experience for her?

3                A.    This is commonsense.  This is a

4    chronic and open wound; would it hurt?  Of course

5    it would.

6                Q.    Go to page 61.  Figure Set 11b.

7    Is this the same mesh?

8                A.    No, it's a different one.

9                Q.    All right.  Is this a TVT or a

10   TVT-O?

11               A.    I don't know.

12               Q.    And what are you trying to show in

13   Figure Set 11b?

14               A.    Similar mechanism for erosion, the

15   mesh somehow rotated, probably through curling of

16   the edges and then became exposed.  The edge

17   pierced through the mucosa.

18               Q.    And this is an erosion, as you've

19   defined it, in the last section, some people may

20   call it an exposure, correct?

21               A.    Yes.  It's called -- if you want

22   to call exposure, we will call it exposure.  So the

23   mesh became exposed.

24               Q.    And what does the mesh in this

25   tissue sample tell you?

Vladimir Iakovlev, M.D.

 1          A.   The position, see the position is

 2   towards the mucosa.  So it's not bilateral to the

 3   mucosa, it's angled.  And the edge, or the end of

 4   the tape became exposed, pierced through the

 5   mucosa.  And the site of exposure became infected

 6   and now there is acute inflammation surrounding.

 7          Q.   How do you know that this mesh was

 8   infected?

 9          A.   Because there is acute

10   inflammation in there.

11          Q.   Do you know how long this woman

12   had this sling before it was removed?

13          A.   I don't remember.

14          Q.   Are you able to tell from this

15   slide whether this mesh was placed this way or

16   whether it changed after it was placed?

17          A.   It's hard to place it like this,

18   because you can see it's clearly perpendicular.  So

19   I just cannot imagine it.

20          Q.   Do you know?

21          MR. ORENT:  Objection.

22          THE WITNESS:  I don't know for sure,

23   but this would be a really difficult position to

24   achieve during placement.

25

Vladimir Iakovlev, M.D.

```
 1              BY MR. THOMAS:

 2              Q.   Anything else remarkable about

 3   your description of set 11b?

 4              A.   No, we discussed most of it.

 5              Q.   Anything else you want to talk

 6   about?  You said "most".

 7              A.   Sorry.

 8              Q.   Page 63, Figure Set 11c:  "Exposed

 9   edge of TVT sling rotated towards the mucosa.

10   Additional TVT cases".

11              Do you know whether this is a TVT or

12   TVT-O?

13              A.   No, I don't.

14              Q.   And what is your purpose of

15   including Figure Set 11c?

16              A.   Just mechanism of exposure,

17   because the edge is pointing towards mucosa.

18              So it's a near exposed position in this

19   case.  Probably exposure occurred somewhere either

20   more superficial, or deeper in the block.

21              Q.   As you're looking at that mesh, is

22   the mesh -- you show the yellow portion of the mesh

23   going from the bottom of the figure to the top of

24   the figure.  Is that the width of the mesh?

25              A.   With the length, it's very hard to
```

Vladimir Iakovlev, M.D.

```
 1    determine in this place.  So the mesh is either in

 2    this shape (indicating), or this shape

 3    (indicating).

 4              In any case, one of the edges is

 5    pointing towards mucosa.

 6         Q.   When you talk about -- strike

 7    that.  This mesh when placed, is going to stretch

 8    from one side of the abdomen to the other, isn't

 9    it?

10         A.   Yes.  But we are talking about

11    mucosa.  So it is a very short stretch of the mesh

12    right where it goes between the urethra and vaginal

13    wall.

14         Q.   I understand that.  But my point

15    is, the only thing that can be exposed there is the

16    midpoint, not the ends, correct?

17         A.   Unless you cut one end, and then

18    it becomes exposed again.

19         Q.   Okay.  And in order to cut the

20    end, you'd have to cut the end at the vaginal

21    mucosa, correct?

22         A.   Inside.  So what happens -- first

23    exposure occurs, it curls up like this.  So this

24    part is exposed, there is a revision surgery, one

25    end is cut, the patient is left and sometimes it
```

Vladimir Iakovlev, M.D.

```
 1    curls up like this.

 2                Q.   Is this a multiple revision?

 3                A.   I don't know.

 4                Q.   You don't know?

 5                A.   (Witness nods.)

 6                Q.   Okay.  For the other mesh

 7    erosions, or exposures that you've discussed on 58,

 8    59, 60, 61, 62 and now 63, do you know whether

 9    those are first revision cases, second revision

10    cases, or multiple revision cases?

11                MR. ORENT:  Objection.

12                THE WITNESS:  I don't remember exactly.

13    Sometimes it's first revision, sometimes five, six

14    revisions.

15                BY MR. THOMAS:

16                Q.   You just don't know?

17                MR. ORENT:  Objection.

18                THE WITNESS:  If I go through records,

19    if it was individual report of a case, I go through

20    records thoroughly, so I know exactly how many

21    revisions it was.

22                BY MR. THOMAS:

23                Q.   Go to page 64.  Figure Set 11b, is

24    that part of Figure Set 11c, or is that different?

25                A.   No, it's different.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   How can you tell?

 2              A.   It's a different slide.

 3              Q.   Okay.  Is it a different patient?

 4              A.   I don't remember.

 5              Q.   Okay.

 6              A.   It may or may not be.

 7              Q.   Okay.  Do you know if it's TVT or

 8  TVT-O?

 9              A.   No.

10              Q.   Page 65, Figure Set 11e; isn't

11  that the same as Figure Set 11c?

12              A.   I just noticed, something

13  happened.

14              Q.   You liked that one?

15              A.   Could have been pasted twice or

16  selected and pasted -- I don't remember.  Something

17  happened here.  So I probably intended to insert

18  different picture, but this one made it.

19              Q.   Okay.  I think we can say that

20  63 and 65 came from the same patient?

21              A.   Yes.  It just shows you that I

22  don't have an army of people helping me, I'm just

23  alone.

24              Q.   I understand.  Let's go to

25  page 66, Figure Set 12.
```

Vladimir Iakovlev, M.D.

```
 1                    A.   Yes.

 2                    Q.   This is additional TVT cases.  Do

 3    you know whether this is a single mesh or multiple

 4    meshes?

 5                    A.   What do you mean a single mesh --

 6                    Q.   There are four frames here.

 7    Excuse me, there are two frames here.

 8                    Do you know if it's the same one

 9    patient or two?

10                    A.   No.

11                    Q.   You don't know whether it's one or

12    two?

13                    A.   No.

14                    Q.   Do you know whether it's TVT or

15    TVT-O?

16                    A.   No.

17                    Q.   What are you trying to show in the

18    top image on page 66, Figure Set 12.

19                    A.   Acute inflammation at the site of

20    exposure.

21                    Q.   When you say acute inflammation,

22    is that different from infection?

23                    A.   No.  Acute inflammation is

24    reaction to infection.  Technically, it's the same

25    pathological process.
```

Vladimir Iakovlev, M.D.

```
 1                   Q.    I was just going to ask you that.

 2    Can you diagnose infection from this slide?

 3                   A.    Yes, I can.

 4                   Q.    And based on what?

 5                   A.    Based on the acute inflammation.

 6                   Q.    Okay.  And what is it about the

 7    slide that shows the acute inflammation?

 8                   A.    The neutrophils.

 9                   Q.    And the slide below that, again,

10    shows acute inflammation, and that may or may not

11    be the same patient?

12                   A.    That's correct.  I have feeling

13    that they are different patients.  I think one

14    of -- the top one is the later case, the bottom one

15    is an earlier case.

16                   Q.    As you sit here, do you know which

17    ones they are?

18                   A.    The quality of the histology and

19    the quality of the picture.

20                   Q.    In the top image, where you show

21    the acute inflammation, is there mesh in that

22    image?

23                   A.    Underneath, if you go a little bit

24    over.

25                   Q.    This doesn't appear in the image,
```

Vladimir Iakovlev, M.D.

```
 1    correct?

 2                A.    You're correct.

 3                Q.    Thank you.  And in the lower image

 4    on Figure Set 12, the yellow represents

 5    polypropylene?

 6                A.    That is correct.

 7                Q.    And the presence of neutrophils

 8    again shows the acute inflammation?

 9                A.    That's correct.

10                Q.    Anything else remarkable about

11    that slide?

12                A.    No.

13                MR. THOMAS:  I need to take a break,

14    please.

15                -- RECESS AT 3:19 --

16                -- UPON RESUMING AT 3:23 --

17                BY MR. THOMAS:

18                Q.    Doctor, I understand from prior

19    depositions that when you analyzed your

20    medical-legal cases that you prepared your own, for

21    lack of a better description, your own pathology

22    report.  I think you called it a synoptic recording

23    for each of the plaintiffs?

24                A.    Not for medical-legal.  I do it

25    for all mesh cases, it's a part of research.
```

Vladimir Iakovlev, M.D.

```
 1                Q.   Do you have those kinds of

 2    recordings for all of the patients that are in your

 3    report?

 4                MR. ORENT:  Objection.

 5                THE WITNESS:  May or may not.  Probably

 6    I don't have for all patients.  Some cases are

 7    probably not even signed out, so the report is not

 8    completed yet.

 9                BY MR. THOMAS:

10                Q.   I guess my point is that we didn't

11    get any of those on your thumb drive.  And I'm

12    curious if there's some of those that we don't

13    have.  We have a lot of them in the Huskey, Edwards

14    case or the Bellew case -- in the Bellew case, you

15    produced those to us for the --

16                A.   Yes.  When I started doing my

17    research, I realized that I needed more or less

18    standardized approach when I examined the meshes.

19                And I started entering them as a

20    synoptic report, which is a specific pre-set number

21    of parameters, so I don't forget and they're all

22    analyzed in the same manner so they can compare

23    them.  It has nothing to do with medical-legal

24    cases, or nothing else.  It's pure documentation

25    for research purposes.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Do you have that for each of the

 2    slides that are in this report?

 3              A.   As I said --

 4              MR. ORENT:  Objection.

 5              THE WITNESS: -- I don't have all of

 6    these patients, some of the reports are not

 7    finalized.

 8              BY MR. THOMAS:

 9              Q.   I'm going to ask you to produce

10    those that you do have.

11              I have a --

12              A.   If it's medical-legal case and

13    you're entitled to see the information.

14              Q.   Okay.  I have a title of a study,

15    we talked before about your chemical oxidation

16    study you were performing, and I asked you about

17    the recipe for the chemicals to which you're

18    exposing the TVTs to.

19              A.   You mean hydrogen peroxide with

20    chromium salt catalyst?

21              Q.   Yes.

22              A.   Okay.  I remember.

23              Q.   And there was a study we found

24    called, "Controlled Peroxide Degradation of

25    Polypropylene - Rheological Properties and
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 240 of 311 PageID #: 128009
Case 2:12-md-02327  Document 3793-3  Filed 04/27/17  Page 240 of 311 PageID #: 64809
Vladimir Iakovlev, M.D.

```
 1    Prediction of MWD From Rheological Data".  Lead

 2    author, Azizi, A-Z-I-Z-I.  Including I. Ghasemi,

 3    G-H-A-S-E-M-I, and M. KARRABI, K-A-R-R-A-B-I; does

 4    that ring a bell?

 5                 MR. ORENT:  Objection.

 6                 THE WITNESS:  You're asking the wrong

 7    person, I'm really bad with names.  I'm a

 8    pathologist, I remember the slides but I don't

 9    remember the names.

10                 BY MR. THOMAS:

11                 Q.   Do you have the study that you

12    used to come up with the recipe?

13                 A.   Yes, I do.  I can find it in my

14    hard drive, and I can find it.

15                 Q.   Okay.  Good.

16                 A.   It's most likely at least in the

17    reference materials as well.

18                 Q.   In the reference materials to your

19    report?

20                 A.   Yes.

21                 Q.   Okay.  How did you determine which

22    of the slides from your total number of TVT-O and

23    TVT cases to include in the report?

24                 A.   I went to features.  So every time

25    I would be describing a specific feature in the
```

Vladimir Iakovlev, M.D.

```
 1    opinions, I would go back in my pool of images, for

 2    TVT and TVT-O cases, and search for best images

 3    representing that specific feature.

 4                Q.   I see.  So when you say "best

 5    images", you went back through about 100 different

 6    TVTs and TVT-Os did you say?

 7                A.   No, I said slings.

 8                Q.   I'm sorry.  How many TVTs and

 9    TVT-Os have you looked at?

10                A.   Ballpark of 30 to 40.

11                Q.   Okay.  And so you went back

12    through your 30 to 40 to identify those that best

13    represented the features that you wanted to show?

14                A.   Images.

15                MR. ORENT:  Objection.

16                BY MR. THOMAS:

17                Q.   Okay.  Images?

18                A.   I didn't take new images of

19    various cases, I just used those images which were

20    taken already.  The only new images that I produced

21    are the cases I received as a consulting trial set.

22                (Reporter sought clarification.)

23                A.   Trial set, as a set to facilitate

24    at trial.

25                Q.   Let's go to Exhibit No. 2.
```

Vladimir Iakovlev, M.D.

```
 1                    Exhibit No. 2 is your supplemental

 2    report served two days ago.

 3            A.   Yes.

 4            Q.   And when you received this, you

 5    received slides from CAMC?

 6            A.   Yes.

 7            Q.   You didn't create your own slides?

 8            A.   No, I did the staining.

 9            (Reporter sought clarification.)

10            A.   My lab did staining.

11            Q.   Do you know whether this is a TVT

12    or a TVT-O?

13            A.   No, I don't remember now.

14            Q.   Okay.

15            A.   I didn't review any medical

16    records for the consolidated trial cases.

17            Q.   And if you look at -- your pages

18    aren't numbered, but the first image, which is

19    identified as supplemental Figure EM1, it says:

20    "Portion of excised mucosa with underlying mesh,

21    H&E magnification equivalent to 1.6X objective".

22                 What is the significance of this image?

23            A.   It's just from my review showing

24    where the mesh is and how it relates to the mucosa.

25            Q.   Is there anything significant
```

Vladimir Iakovlev, M.D.

1   about this image in terms of risk factors or issues

2   related to symptoms, clinical symptoms?

3              A.   Well, it's close.  So it's an

4   overview of the part which didn't get exposed but

5   it shows the proximity.  You know, that's

6   significant.

7              Q.   And again, you don't know whether

8   that was placed there or if it migrated there after

9   placement, correct?

10             MR. ORENT:  Objection.

11             THE WITNESS:  That's correct.

12             BY MR. THOMAS:

13             Q.   Okay.  Anything else remarkable

14   about supplemental Figure EM1?

15             A.   No, there's scar tissue which

16   encapsulates and fills the pore; that's about it.

17             Q.   Okay.  Supplemental Figure EM2.

18   Is this part of the same slide or is this a

19   different slide?

20             A.   Oh, it's the same block.

21             Q.   Got it.

22             A.   Yeah, I think it's the same slide

23   because I had only one H&E slide.

24             Q.   It says in the first page you

25   received unstained histological slides, plural.

Vladimir Iakovlev, M.D.

```
 1   Did you only have one?

 2              A.   For H&E, I stain only one slide.

 3   So one slide was stained by H&E method, one slide

 4   smooth muscle actin, and one slide S100 protein.

 5              Q.   Okay.  So supplemental Figure EM2

 6   is just more of a magnification of Figure EM1,

 7   correct?

 8              A.   Yes, I think you can match it,

 9   it's from here.

10              Q.   And again, what you're trying to

11   show is the foreign body reaction and inflammation?

12              A.   That is correct.

13              Q.   Where is the bark in this image?

14              A.   Which image?  The EM2?

15              Q.   Yes.

16              A.   Maybe out of focus, maybe not

17   there.

18              Q.   Okay.  If you go to supplemental

19   Figure EM3, this is another portion of the same

20   image, correct?

21              A.   I think it's a different fragment,

22   from the same slide but from a different piece of

23   tissue.  There were several pieces of tissue on the

24   slide.

25              Q.   I see.  And what is the purpose of
```

Vladimir Iakovlev, M.D.

```
 1    showing supplemental Figure EM3?

 2                   A.   Again, shows mucosa and proximity

 3    of the mesh to mucosa.  There is less than a half

 4    millimeter between the mesh and mucosa.

 5                   Q.   What is the distance between those

 6    two mesh fibers that are shown there?

 7                   A.   About a millimeter.

 8                   Q.   Okay.  Supplemental Figure EM4,

 9    again, you're showing the foreign body inflammatory

10    reaction?

11                   A.   That's correct.

12                   Q.   If you go to supplemental Figure

13    EM5?

14                   A.   Yes.

15                   Q.   You indicate in the description,

16    "acute inflammation and indication of mesh erosion

17    and bacterial infection".

18                   Do you know whether this patient was

19    diagnosed with an infection?

20                   A.   No, I didn't read the records.  I

21    can see clearly there is bacterial infection

22    triggering acute inflammation.  If they saw it

23    clinically or they didn't, I don't know.  But even

24    if they didn't, I would tell them there was an

25    infection.
```

Vladimir Iakovlev, M.D.

1          Q.    Okay.  Are you able to tell from

2    these images that there was in fact a mesh erosion

3    or mesh exposure?

4          A.    Yes.

5          Q.    And how can you tell that?

6          A.    There was a breakdown of mucosa

7    and entry for infection.  That's why I can see

8    acute inflammation.

9          Q.    Where is the breakdown of the

10   mucosa?

11         A.    I don't know.  It didn't get in

12   the section.

13         Q.    Are you assuming there's a

14   breakdown of mucosa?  You don't show one on the

15   slide, correct?

16         A.    It's not an assumption.  I can

17   tell you with 100 percent certainty that there was

18   a breakdown in the mucosa.  Because if mucosa is

19   not broken down, there is no bacterial insemination

20   and acute inflammation.

21         Q.    Supplemental Figure EM6, you

22   identify an obliterated artery?

23         A.    That is correct.

24         Q.    Anything remarkable about that

25   finding beyond what we've talked about before, the

Vladimir Iakovlev, M.D.

```
 1    other obliterated artery?

 2              A.   No.  Exactly the same finding;

 3    interrupted blood supply.

 4              Q.   Which may or may not have clinical

 5    significance?

 6              MR. ORENT:  Objection.

 7              THE WITNESS:  The degree of the changes

 8    may or may not be clinically apparent.

 9              BY MR. THOMAS:

10              Q.   Okay.  Because if the blood flow

11    is reduced or interrupted, they may receive blood

12    flow from other sources that would vascularize this

13    area?

14              A.   Yes.  And then that was fibrosis,

15    and then you mix up fibrosis which is caused by the

16    mesh, then fibrosis lead to ischemia.

17              It's a complex setting; how much of

18    that would translate from one specific symptom

19    would be difficult to discern.

20              Q.   Obliteration of arteries is a risk

21    in any surgery of the pelvic floor, isn't it?

22              MR. ORENT:  Objection.

23              THE WITNESS:  Yes, there would be a

24    risk for obliterated artery.  But when you say

25    obliterated artery in the tissue, which is not
```

Case 2:12-md-02327  Document 3790-3  Filed 04/27/17  Page 248 of 311 PageID #: 128017
Case 2:12-md-02327  Document 3733  Filed 04/27/16  Page 248 of 311 PageID #: 64705
Vladimir Iakovlev, M.D.

1   changed otherwise, because to obliterate an artery

2   during surgery, you have to transect it.

3            So by the time of mesh placement, this

4   part would be separated.  So this is an intact

5   structure, which was not transected during surgery.

6   It became obliterated later on.

7            BY MR. THOMAS:

8            Q.   If you go to supplemental -- how

9   can you tell that it happened after placement?

10           A.   It's not transected during

11  surgery.

12           Q.   I see.

13           A.   See how are the arteries being

14  damaged --

15           Q.   I understand.

16           A.   -- they get transected.

17           Q.   I understand.  Supplemental Figure

18  EM7a, "innervation of the scar tissue encapsulating

19  the mesh, S100".  What are you showing in EM7a?

20           A.   Nerve branch.  EM7a and 7b is the

21  same image; 7b is labeled copy of 7a.

22           Q.   Okay.  And the arrows are pointing

23  to what?

24           A.   Nerve branches, or nerves.

25           Q.   And for the nerve and nerve branch

Vladimir Iakovlev, M.D.

```
 1    on the upper right-hand corner, how far is that

 2    from the mesh?

 3              A.   This one is --

 4              Q.   I'm talking about this one, upper

 5    right?

 6              A.   Oh, this one.  See, with this one

 7    I don't even know.  Maybe there is fiber right

 8    there, so it's pinching it.

 9              Q.   Do you know whether that's fiber

10    or not?

11              A.   That is hard to determine, I

12    suspect there is, but I wasn't sure therefore I

13    didn't put it.

14              Now, looking at this image, I think

15    there was a fiber.  So that curvilinear shape is

16    actually fiber compressing.

17              Q.   How do you know that without

18    looking at it?

19              A.   Well, there's density, increased

20    density.  Similar to this area, the collagen is

21    compacted right around the fibers.

22              Q.   The tissue itself is pretty

23    irregular, isn't it?

24              A.   Well, see, this is clearly not the

25    place where mesh fiber was.  Because there is no
```

Vladimir Iakovlev, M.D.

1    capsule.  If you look here, there is a capsule

2    around the fiber, and if you look there, there is a

3    capsule around the fiber.  So I suspect there was a

4    fiber here.

5              Q.   Okay.

6              A.   Not here, but there.

7              Q.   Looking at those nerves, is there

8    anything about the appearance of those nerves on

9    light microscopy that suggests to you they were

10   causing pain to the patient while the mesh was in

11   place?

12             A.   Could you repeat the question.

13   I'm getting tired, sorry.

14             MR. THOMAS:  Would you repeat it for

15   me, please?

16             -- REPORTER'S NOTE:  Question read back

17   as recorded above.

18             THE WITNESS:  They're healthy nerves

19   which can conduct pain.  This is one of the main

20   findings.

21             BY MR. THOMAS:

22             Q.   Okay.  But again, there's nothing

23   about those that allow you to state that those

24   nerves were in fact reacting in a way to cause pain

25   in a patient while the mesh was implanted?

Vladimir Iakovlev, M.D.

```
1                    A.   The point of the picture is to

2    show that that tissue is sensitive, so it can sense

3    pain.

4                    Those nerve branches are not directly

5    affected or at least one may, but the others are

6    not directly affected by the mesh.

7                    The point is that tissue around it is

8    innervated, so if you get a formation, if you get

9    distortion, mechanical compression, then it can

10   sense pain.

11                   Q.   Okay.  Page 67 of your first

12   report, Figure Set 13a, you're talking about the

13   Prolene degradation layer.

14                   Do you know if this is TVT or TVT-O?

15                   A.   No.

16                   Q.   Do you know from what case this

17   comes?

18                   MR. ORENT:  Objection.

19                   THE WITNESS:  One of the consolidated

20   cases.

21                   It's so similar to this study, which I

22   think our scientists did in 87.  I mean, even the

23   arrow there is so similar.

24                   BY MR. THOMAS:

25                   Q.   So all of these images are from
```

Vladimir Iakovlev, M.D.

```
 1    the consolidated cases through 72, and our experts

 2    have these images, correct?

 3              A.    Images -- they have slides.

 4              Q.    Slides, that's what I meant.

 5              A.    Yes.

 6              Q.    I've talked to you, you've been

 7    talked to at length about these images in prior

 8    cases.  Is there anything new and different about

 9    what's expressed in these images that you haven't

10    seen before?

11              A.    It is exactly what I described in

12    the published papers and previous reports.  Exactly

13    all, everything is the same.

14              Q.    For the other cases that you begin

15    on 73, you had images from additional TVT cases.

16    Do you know whether those are TVT or TVT-O?

17              A.    No.

18              MR. ORENT:  Objection.

19              BY MR. THOMAS:

20              Q.    If you go to page 72, please?

21              A.    Yes.

22              Q.    On page 72, you show an empty

23    space of detached core on the right image.  And a

24    separated degradation bark.  The empty space means

25    that the polypropylene dropped out of the image?
```

Vladimir Iakovlev, M.D.

```
 1                   A.   Not image, slide.

 2                   Q.   Slide, I'm sorry.  Thank you.

 3                   A.   It came detached and displaced.

 4                   Q.   Okay.  And left what you have

 5    described as the bark behind?

 6                   A.   Yes, that's correct.

 7                   Q.   All right.  Now, if you go to the

 8    next page, page 73, again, additional TVT cases you

 9    show an image where you show the polypropylene

10    still in place, correct?

11                   A.   Yes.  So now there is a

12    separation.  The core separated from the bark, but

13    the core didn't detach completely and floated away.

14    It's still close, but there was a split.

15                   Q.   And this is detached as a part of

16    the sample preparation process, correct?

17                   MR. ORENT:  Objection.

18                   THE WITNESS:  I don't know when it

19    became detached.  During surgery or during

20    sectioning or during processing of the specimen.

21                   BY MR. THOMAS:

22                   Q.   Didn't happen in vivo, didn't

23    happen in the body?

24                   A.   No.  I suspect it doesn't happen

25    that often.  I very rarely see the bark actually in
```

Vladimir Iakovlev, M.D.

```
 1    the tissue, being displaced in the tissue away from

 2    the fibers.

 3              Q.    Have you studied how mechanically

 4    that happens?

 5              A.    It just breaks off.  There is a

 6    shear force, a breaking force.

 7              Q.    When you say a shear force, does

 8    it shear off at the point where -- at about five

 9    microns as the degradation ceases?

10              A.    It shears off in the interface

11    between degraded and non-degraded.

12              Q.    That's my point.  Let's see if we

13    can agree with this.  We're dealing with visual

14    observations here, correct?

15              A.    Yes, that's correct.

16              Q.    And is it fair to understand with

17    respect to the images on page 73, where you show

18    detached core and degradation bark separated, are

19    you telling me that the detached core no longer has

20    a bark on it?

21              A.    They have a really thin layer of

22    degraded material.  Because the bark itself is not

23    uniform.  There is a higher degree of degradation

24    on the outside and then smaller, smaller, smaller,

25    smaller, smaller.
```

Vladimir Iakovlev, M.D.

```
1              Q.   Right.

2              A.   And then the degradation blends

3    into not degraded polypropylene.

4              Q.   Right.

5              A.   So at certain point these micro

6    cracks, and mono cracks, they cannot go into this

7    completely solid material, so it shears off

8    somewhere there.

9                   I don't know if it's right at the end

10   of them, close to them or how far they are.  So

11   there might be a layer of degraded polypropylene on

12   the core.  How thick it is, I wouldn't know.

13             Q.   It's too small to measure by your

14   technique?

15             A.   That's correct.

16             Q.   And your best estimate is that the

17   degradation bark that appears, as you've described

18   it in 73, is much as five microns?

19             A.   This is thinner.  By looking at

20   it, it is around two microns.

21             Q.   Now what you show on page 75,

22   again from additional TVT cases, are the cracks

23   which you believe to be oxidized polypropylene,

24   correct?

25             A.   I don't believe -- I know.
```

Vladimir Iakovlev, M.D.

1          Q.   Okay.  And Figure Set 13i, do you

2    know if this is a TVT or TVT-O?

3          A.   No.

4          Q.   Do you know how long this was in

5    the body?

6          A.   Certainly more than a year.

7          Q.   Why do you say that?

8          A.   It's relatively thick.  So if I

9    check here where it's less tangential, this is the

10   thickness, so it's definitely more than a year.

11         Q.   When you devised your experiment

12   to intentionally oxidize polypropylene, did you

13   look at any methods that would allow you to

14   intentionally oxidize polypropylene in a time of

15   less than a year and a half?

16         A.   No, I didn't take them out.

17         Q.   You misunderstood my question.

18              Did you attempt to identify any kind of

19   chemical recipe that would allow you to

20   intentionally oxidize Prolene more quickly than a

21   year and a half?

22         A.   No.

23         Q.   Why not?

24         A.   I'm busy enough with other things.

25         Q.   Okay.

Vladimir Iakovlev, M.D.

```
 1                A.   And I figure I just leave it long

 2   enough, soon enough it will form and I will see

 3   which would -- in which fluid the bark is thicker.

 4                Q.   We talked before, I believe at

 5   trial, about xylene and that you were conducting a

 6   test to determine the extent to which xylene

 7   impacted Prolene polypropylene; do you remember

 8   that?

 9                A.   Yes, I do.

10                Q.   You told me, I believe, that you

11   were currently testing xylene to determine whether

12   xylene would impact Prolene polypropylene.  Are you

13   still conducting that test?

14                A.   It's in the same set of jars.  One

15   of the jars contains xylene.

16                Q.   Is that the only test that you're

17   doing with xylene?

18                A.   Well, previously I did testing for

19   processing.  So new mesh was put in regular xylene

20   solution for time when it happens during tissue

21   process.

22                Q.   Did you produce that to me in the

23   jump drive Exhibit 4.

24                A.   No, these are the images of new

25   pristine mesh.  So this mesh had been through
```

Vladimir Iakovlev, M.D.

1  xylene.

2         Q.   Okay.  Did you do any other

3  testing of pristine mesh impact on xylene over a

4  period of time?

5         A.   No.  These only two.  I did

6  experiment for our routine processing, routine

7  exposure to xylene, and then I started this

8  experiment.

9         I was testing it within month or two

10 after it became exposed.  I was thinking maybe it

11 would get dissolved; it didn't.  But the long-term

12 effect will be studied later on together with other

13 solutions.

14        Q.   When you put the pristine mesh

15 through the sample preparation process, did you

16 perform any analytical chemistry on the mesh to

17 determine the extent to which xylene may have

18 altered the chemical structure of polypropylene?

19        A.   No.

20        Q.   On page 84?

21        A.   Yes.

22        Q.   Is page 84 another image of what

23 we had talked about at length on page 83?

24        A.   No, this is a different case.

25 This is a case consolidated case.  This is

Vladimir Iakovlev, M.D.

```
 1    appearance of case from -- you can see the name of

 2    the patient.

 3              Q.   Okay.  So this is -- strike that.

 4              Did you do any analysis for bark on the

 5    mesh depicted in Figure 16a?

 6              A.   It's embedded in histology.  It's

 7    there.  I mean --

 8              Q.   Have you ever done it?

 9              A.   I didn't do anything specific.

10    It's embedded in histology.  I can pull the slide

11    and take picture of the bark.

12              But again, this is a St. Michael's

13    patients, I'm not comfortable disclosing or giving

14    pictures specifically for trial or anything else.

15    I can tell you that I saw the bark.

16              Q.   So, Figure 16b on page 84 is

17    cracking on the surface of TVT mesh fibers.  And

18    this is from the consolidated cases for patient

19    Dameron; is that correct?

20              A.   That is correct.

21              Q.   And these are the tissue samples

22    that you show on 84 that you had available to you?

23              A.   Yes.

24              Q.   And they had been stored in

25    formalin?
```

Vladimir Iakovlev, M.D.

```
 1              A.   No.  We received it dry.  Your

 2   expert was there.

 3              Q.   Okay.

 4              A.   It was jar without formalin.

 5              Q.   Do you know whether it was in

 6   formalin?

 7              A.   I don't.  Probably it was at one

 8   time, it leaked out but... that's my assumption.

 9              Q.   You do know how long this was in

10   the body?

11              A.   No.

12              Q.   And obviously you don't know how

13   it was handled before it got to you, correct?

14              A.   No.

15              EXHIBIT NO. 5:  Study Entitled "Safety

16              Considerations for Synthetic Sling

17              Surgery" in which Dr. Vladimir Iakovlev

18              appears as an author.

19              BY MR. THOMAS:

20              Q.   Doctor, I'm going to hand you

21   what's been marked as deposition Exhibit No. 5.

22              A.   Yes.

23              Q.   Deposition Exhibit No. 5 is a

24   review study in which you appear as an author --

25              A.   Yes.
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 261 of 311 PageID #: 128030
Case 2:12-md-02327 Document 3793 Filed 04/24/17 Page 261 of 311 PageID #: 64730
Vladimir Iakovlev, M.D.

1          Q.   -- entitled, "Safety

2  Considerations for Synthetic Sling Surgery".

3          I know Dr. Blaivas.  Who is Dr.

4  Purohit?

5          A.   I don't know.  It's a team of

6  urologists and fellows working with Dr. Blaivas.

7          Q.   Okay.  Did you consult with Dr.

8  Blaivas on the content of this article?

9          A.   Well, we wrote it together.

10         Q.   And that's my point.  Did you work

11  with this whole team in writing the article?

12         A.   Yeah.  We were changing, everybody

13  was contributing.  It was changed several times,

14  redacted and...

15         Q.   Did you work with any individual

16  specifically, or did you write your own piece and

17  just look after your own section of the article?

18         A.   Oh, it's a joint effort.  I mean,

19  the manuscript consult, everybody contributes, puts

20  one piece there, puts one piece there.

21         It's been changed and then editorial

22  office changes and then we change back and then so

23  forth.  By the end of the day each single word may

24  be coming from a different person.

25         Q.   How many drafts did this Exhibit 5

Vladimir Iakovlev, M.D.

```
1    go through?

2             A.    Five, six.

3             Q.    Do you still have those drafts?

4             MR. ORENT:  Objection.

5             THE WITNESS:  Yes, I do.  But I mean

6    this is more of a delicate issue because there are

7    many authors involved and there is research

8    produced information, and it's a work in progress.

9             What became public is what we see right

10   in front of us.  What we decided to be correct to

11   be exposed to the public.

12            BY MR. THOMAS:

13            Q.    Other than the journal itself, was

14   anybody else involved in the preparation of

15   Exhibit 5?

16            A.    What do you mean?

17            Q.    Did you have any contribution from

18   any other source other than the authors that were

19   listed in the preparation of the article?

20            A.    Everybody listed as authors,

21   everybody who contributed is here.  Well, editorial

22   office was working with it also.

23            Q.    And who did you work with at the

24   editorial office?

25            A.    I don't remember now.
```

Vladimir Iakovlev, M.D.

```
 1              Q.    Okay.

 2              A.    I mean, they send their paper,

 3    they said, okay, this revision needs to be

 4    reviewed, please check this, please check that,

 5    they suggest some changes, mainly just style.  Very

 6    strict regarding style.

 7              Q.    You said something earlier today,

 8    I want to make sure I understand.  In this

 9    document, there is reference to work that you have

10    done on different meshes in the medical-legal

11    setting.

12              I thought I understood you to say that

13    you didn't use the slides that were provided to you

14    by Dr. Kreutzer, but that you cut new slides from

15    existing blocks and conducted your analysis on

16    those new slides; is that correct?

17              A.    For some cases, I received only

18    slides, stained and unstained.  For some cases I

19    received blocks.  As far as I remember, it's been

20    long time.

21              So I could either use unstained slides

22    which came together with stained slides, or I could

23    ask my lab to do recuts from the blocks which were

24    made before me.

25              Q.    All right.  So, your best
```

Vladimir Iakovlev, M.D.

```
 1    recollection it was a mixture of previously

 2    existing slides or recuts from this mesh that you

 3    had obtained from Dr. Kreutzer, correct?

 4              A.   Yes.

 5              Q.   Is the same thing true with your

 6    other mesh specimens that were involved in

 7    medical-legal field, that on some occasions you'd

 8    use existing slides and some occasions you'd use

 9    recuts or you'd have recuts made of existing

10    blocks?

11              A.   That's correct.  Depends on

12    situation.

13              Q.   I assume you stand by all the

14    findings in this report, correct?

15              A.   It's not findings; this report is

16    a review.  So it's more based on the other papers.

17              Q.   Okay?

18              A.   The only thing which was produced

19    in this paper from us personally was figures.

20              Q.   Let's go to one of those figures

21    on page 4.

22              A.   You mean the table?

23              Q.   Table two on page 4?

24              A.   Yes.

25              Q.   And this review paper, in
```

Vladimir Iakovlev, M.D.

```
 1   reporting longer-term complications, reports pain
 2   greater than six weeks for either retropubic or
 3   transobturator tape slings at 3.5 percent, correct?
 4              A.   Which line?
 5              Q.   Third from the bottom, longer-term
 6   complications.  Do you see it, for refractory pain
 7   greater than six weeks?
 8              A.   So the incidence range is from 4.1
 9   to 30 percent.
10              Q.   The complications percentage of
11   patients that report refractory pain greater than
12   six weeks is 3.5 percent, correct?
13              A.   What I see is 4.1 to 30 percent.
14              Q.   Well --
15              A.   Third line from the bottom.
16              Q.   I understand that's the mean and
17   the range, correct?
18              A.   Yes.
19              Q.   4.1?
20              A.   Sorry, 4.1 is mean.  Yes, you're
21   correct.  I need my glasses.
22              So this is -- the range is from 0 to
23   30 percent.
24              Q.   But the average -- excuse me --
25   the percentage of patients at 7,084 that report
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 266 of 311 PageID #: 64725
Vladimir Iakovlev, M.D.

1    pain greater than six weeks, is 247 or 3.5 percent,

2    correct?  Is that right?

3                A.    Yes and no.  So this is a review

4    of previously published studies.  So the quality of

5    the studies is different, methodology is different.

6    But when you check them, the pain over six weeks is

7    reporting anywhere from 0 to 30 percent.

8                Q.    Okay.

9                A.    With a mean, or average

10   4.1 percent.

11               Q.    But these numbers are correct,

12   aren't they?

13               A.    Well, from what we extracted at

14   that stage from the papers, that's what we have.

15               Q.    Okay.  You went out and tried to

16   obtain complication rates for retropubic or TOT

17   slings, didn't you?

18               A.    Yes.  The whole paper is just for

19   slings.

20               Q.    And as a part of looking at

21   long-term pain which is greater than six weeks, you

22   looked at 7,084 patients, correct?

23               A.    No, we didn't.  The papers in

24   combination.

25               Q.    I understand.  But you gathered

Vladimir Iakovlev, M.D.

```
 1   papers that looked at over 7,000 patients?

 2                MR. ORENT:  Objection.

 3                THE WITNESS:  That's what it says

 4   there, yes.

 5                BY MR. THOMAS:

 6           Q.    And in gathering the papers, who

 7   was in charge of picking which studies you looked

 8   at?

 9           A.    That part -- it's not a study; it

10   is a review.

11           Q.    I apologize.

12           A.    That part of the review was done

13   mainly by urologist.

14           Q.    Do you know who that was?

15           A.    It's a team working with Dr.

16   Blaivas.

17           Q.    So the urologist, the clinicians,

18   are the people who are responsible for identifying

19   the studies to identify the complication rates?

20           A.    That's correct.

21           Q.    And through their best efforts,

22   they identified a percentage of patients that have

23   pain more than six weeks at 3.5 percent, correct?

24           A.    That was an estimate of a minimal,

25   a minimum number.  So this is the bottom line.  So
```

Vladimir Iakovlev, M.D.

```
 1    it's minimum of 3.5 percent of the patients will

 2    develop chronic pain.

 3              Q.    Okay.

 4              A.    Which is -- probably doesn't say

 5    right away, but that was the minimum.  It wasn't

 6    that we were implying that it's a true number.

 7              Q.    Do you know how many, for how many

 8    of those 3.5 percent that the pain was ultimately

 9    resolved?

10              A.    Again, 3.5 percent was minimum

11    number.

12              Q.    I understand.  But for some of

13    those people they were cured of the chronic pain,

14    weren't they?

15              MR. ORENT:  Objection.

16              THE WITNESS:  After mesh removal?

17              BY MR. THOMAS:

18              Q.    Or for whatever treatment?

19              MR. ORENT:  Objection.

20              BY MR. THOMAS:

21              Q.    Do you know that?

22              A.    No, I don't know.  I don't think

23    it was in the published literature.

24              Q.    That's fine.  Do you know whether

25    the urologist group who were looking at the mesh
```

Vladimir Iakovlev, M.D.

```
 1    complications looked to see how many people had

 2    their pain resolved by surgery or some other

 3    treatment?

 4            A.   Those papers are reviews.  Most of

 5    them didn't provide that information.  They just

 6    provided numbers for complications.

 7            Q.   Did you do a literature search

 8    yourself to determine the extent to which long-term

 9    complications of chronic pain were resolved by

10    surgery or other treatment?

11            A.   Not to answer that specific

12    question.  Again, I mean, I only can read what is

13    published.  Because studies don't concentrate,

14    don't focus on this question; I cannot get an

15    answer.

16            Q.   Well, this was your group's best

17    effort at presenting, in a reviewed paper, the rate

18    of complications for long-term pain, correct?

19            MR. ORENT:  Objection.

20            THE WITNESS:  Yes, you're correct.

21            BY MR. THOMAS:

22            Q.   Thank you.

23            A.   But the question is that if I made

24    an effort to look for something which is barely

25    ever published; that's why I answered that it's
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 270 of 311 PageID #: 128039
Case 2:12-md-02327 Document 3753-3 Filed 04/30/16 Page 270 of 311 PageID #: 64739
Vladimir Iakovlev, M.D.

1  specifically to that question, would be difficult

2  to do.

3              -- RECESS AT 4:08 --

4              -- UPON RESUMING AT 4:15 --

5              BY MR. THOMAS:

6         Q.   Doctor, let's go back to Exhibit

7  No. 5, page 5.  I asked you about the wrong chart.

8  I asked you about the chart on page 4.

9              The chart on page 4 does retropubic and

10  obturator slings.  The one on page 5 is limited to

11  retropubic slings; do you see at the top?

12        A.   Yes.

13        Q.   And retropubic slings are what TVT

14  slings are, correct?

15        A.   Yes.

16        Q.   And the long-term refractory pain

17  greater than six weeks reported by your group is

18  1.8 percent, correct?

19        A.   Yes, but it's not reported by our

20  group.

21        Q.   Collected by your group?

22        A.   Collected from other papers by our

23  group, yes.

24        Q.   And as a part of that, the group

25  looked at studies reporting on about 2,328

Vladimir Iakovlev, M.D.

```
 1   patients, correct?

 2             A.   Yes.

 3             Q.   Okay.  For the slide on page 82,

 4   about the -- 83, I'm sorry.  About the image of the

 5   TVT mesh fibers immediately after surgery removal?

 6             A.   Yes.

 7             Q.   Did you submit any histology to

 8   the journal for publication?

 9             A.   For this case?

10             Q.   For the journal.  For --

11             A.   Which one?

12             Q.   In one of the studies you have the

13   image of that --

14             A.   It's --

15             Q.   Is it the other journal?

16             A.   Yes, this one.

17             Q.   I'll come back to that.

18             A.   You mean histology of that

19   specific case?

20             Q.   Yes.

21             A.   No.

22             Q.   Have you shared the histology of

23   that specific slide with anybody period?

24             MR. ORENT:  Objection.

25             THE WITNESS:  No.
```

Vladimir Iakovlev, M.D.

```
 1                    BY MR. THOMAS:

 2                    Q.   So you're the only one that's ever

 3       looked at it?

 4                    A.   Pardon?

 5                    Q.   You're the only one that's ever

 6       looked at it?

 7                    A.   Yes.  I don't think I have

 8       pictures, I didn't take pictures.

 9                    Q.   Okay.  Why not?

10                    A.   What for?

11                    Q.   Okay.

12                    EXHIBIT NO. 6:  Article entitled,

13                    "Degradation of Polypropylene in Vivo:

14                    A Microscopic Analysis of Mesh

15                    Explanted from Patients."

16                    BY MR. THOMAS:

17                    Q.   Let me show you what's been marked

18       as deposition Exhibit No. 6.

19                    Deposition Exhibit No. 6 is an article

20       entitled, "Degradation of Polypropylene in Vivo:  A

21       Microscopic Analysis of Mesh Explanted from

22       Patients".  That was just recently released,

23       correct?

24                    A.   That is correct.

25                    Q.   And you worked with Dr. Guelcher
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 273 of 311 PageID #: 130042
Case 2:12-md-02327 Document 1253-1 Filed 05/07/16 Page 73 of 311 PageID #: 64730
Vladimir Iakovlev, M.D.

```
1    and Dr. Bendavid on this?

2              A.    Yes.

3              Q.    Did you receive any funding for

4    your work in Exhibit 6?

5              A.    No.

6              Q.    Did Dr. Guelcher or Dr. Bendavid

7    receive any funding for their work on Exhibit 6?

8              A.    No.  The work actually was done

9    mainly by me.  Dr. Guelcher and Dr. Bendavid just

10   contributed to the drafting of the manuscript.

11             Q.    What did Dr. Guelcher contribute

12   to the manuscript?

13             A.    The drafting of the manuscript, we

14   discussed mechanism of degradation, mechanically

15   how it happens, oxidation and other aspects.

16             Q.    Do you view Dr. Guelcher as

17   authoritative on the issue of oxidative

18   degeneration -- excuse me.

19             Do you view Dr. Guelcher as

20   authoritative in the area of oxidative degradation

21   of polypropylene?

22             A.    He's a bio engineer.  He works in

23   the area.

24             Q.    How do you feel about him?  Do you

25   view him as authoritative in the field?
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 274 of 311 PageID #: 128043
Case 2:12-md-02327 Document 3793-3 Filed 05/09/16 Page 274 of 311 PageID #: 64784
Vladimir Iakovlev, M.D.

```
 1              MR. ORENT:  Objection.

 2              THE WITNESS:  I'm not sure if I can

 3    answer that question.

 4              BY MR. THOMAS:

 5         Q.    Okay?

 6         A.    He's a specialist who works in the

 7    area and works in the field.

 8         Q.    At any time, have you relied upon

 9    Dr. Guelcher to tell you, chemically, how

10    polypropylene oxidizes?

11         A.    No.  In fact, it wasn't my purpose

12    to answer the question how it oxidizes.  It only

13    describes that it does oxidize.

14         Q.    So what role did Dr. Guelcher play

15    in the preparation of Exhibit 6?

16         A.    Drafting of the manuscript, mainly

17    the discussion part.  He also suggested at one

18    point when we started working on this, doing a

19    myeloperoxidase stain.  Again, in relation to

20    oxidative degradation.

21         Q.    What role did Dr. Bendavid have in

22    this study?

23         A.    Well, he actually brought me to

24    this mesh field and he supplied, or some samples

25    came from Shouldice Hospital, where he worked.  And
```

Vladimir Iakovlev, M.D.

1    he also helped drafting the manuscript.

2                    Q.   In terms of the data gathering and

3    the conclusions contained herein, is this basically

4    your work?

5                    A.   For the most part.

6                    Q.   And I hate to ask you again, but

7    what data gathering or conclusions did Dr. Guelcher

8    or Dr. Bendavid provide?

9                    A.   Dr. Guelcher didn't gather any

10   data.  As you can read the manuscript or paper,

11   it's all histology.

12                   Q.   Okay?

13                   A.   So I've been collecting data and

14   analyzing the samples.

15                   But Dr. Bendavid contributed with idea

16   of degradation and contributing some samples,

17   hernia samples, and Dr. Guelcher contributed in

18   drafting the manuscript and also suggesting

19   myeloperoxidase stain and suggesting what is the

20   mechanism of degradation.

21                   But the histology itself, data

22   collection and analysis, was done by me.

23                   Q.   As part of the preparation of this

24   paper, did you and your coauthors discuss

25   intentionally oxidizing polypropylene to see if it

Vladimir Iakovlev, M.D.

```
 1    would hold stain?

 2              A.   No.  This paper was started, or

 3    most of the data was collected even before I

 4    learned about this simulation model.  So it wasn't

 5    a part.

 6              Q.   Did you ever discuss with Dr.

 7    Guelcher different ways to intentionally oxidize

 8    polypropylene?

 9              A.   Later on.  I mean, the manuscript

10    was mainly written already and then we started

11    discussing plans for the future.  And then that's

12    how I used the paper he suggested as a recipe for

13    simulation.

14              Q.   Okay.  So Dr. Guelcher suggested

15    to you the paper that you used for the simulation?

16              A.   I think so.

17              Q.   Okay?

18              A.   Maybe I saw it before, but he

19    pointed that, that's the recipe he was using as

20    well.

21              Q.   Got it.  Is Dr. Guelcher involved

22    in your experimental work on the samples that

23    you're now storing?

24              A.   No.  I mean, I had my own samples.

25    His contribution to this work is that I ask him
```

Vladimir Iakovlev, M.D.

```
 1    what he's using, or I don't remember exactly how

 2    the conversation started, and he said that he's

 3    using recipe from that specific paper.

 4            Q.    I see.

 5            A.    And I used it.  We didn't have

 6    exchange of the samples, or testing of each other's

 7    samples.

 8            Q.    So you have never analyzed the

 9    samples that he tested?

10            A.    No, never seen those.

11            Q.    And you know that he's exposed

12    samples to five and six weeks' worth of exposure?

13            A.    I do know that.

14            Q.    Okay.

15            A.    I do know that.

16            Q.    Have you requested to look at

17    those or test those or analyze those in any form?

18            A.    There was a discussion.  I don't

19    know if I said that I don't want to do it because I

20    have my own and I believe it needs to be a year.

21            Or maybe they used all their samples

22    for SEM, and they didn't have anything left.  But

23    at that time the decision was to wait for my

24    samples to become mature.

25            Q.    Okay.  Did you submit this article
```

Vladimir Iakovlev, M.D.

```
 1    to multiple journals?

 2                 A.    There was submission to at least

 3    two journals and the answer was really quick, next

 4    day.  They said no, it's not in our scope.  And I

 5    was aiming at really high impact like Nature, so...

 6                 Q.    Nature turned it down?

 7                 A.    (Witness nods).

 8                 Q.    Okay.

 9                 A.    Are you surprised?

10                 Q.    And so is the Journal of

11    Biomedical Materials the only other journal that

12    reviewed it?

13                 MR. ORENT:  Objection.

14                 THE WITNESS:  Yeah, this is my usual

15    approach.  For all my papers I start really high

16    impact journal, hope for the best, and then go

17    from there.

18                 BY MR. THOMAS:

19                 Q.    Now, was there a peer-review

20    process of this article?

21                 A.    Yes.  They ask for revisions, I

22    did revisions, then we drafted it.

23                 Q.    How many drafts did you have of

24    Exhibit 6?

25                 A.    We had one revision, one large
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 279 of 311 PageID #: 128048
Case 2:12-md-02327 Document 1233-4 Filed 04/27/17 Page 73 of 311 PageID #: 64738
Vladimir Iakovlev, M.D.

```
 1    revision.  Part of the manuscript removed tables.

 2                  MR. ORENT:  I object to this whole line

 3    of questioning.  It's outside of the scope of the

 4    expert testimony, and moreover I think there's a

 5    public policy interest in maintaining the integrity

 6    of the editorial board process of the journals.

 7                  BY MR. THOMAS:

 8                  Q.   Do you still have your first

 9    draft?

10                  MR. ORENT:  Objection.

11                  THE WITNESS:  I can't answer that.

12                  BY MR. THOMAS:

13                  Q.   You can't?

14                  A.   (Nods).

15                  Q.   Why?

16                  A.   It goes to the issues Mr. Orent

17    just mentioned.

18                  Q.   Okay.  So have you maintained a

19    file on the preparation, the data you gathered, the

20    submission process and the peer-review process for

21    Exhibit 6?

22                  A.   Did I?

23                  Q.   Yes.

24                  MR. ORENT:  Objection.

25                  THE WITNESS:  Yes, I did.
```

Vladimir Iakovlev, M.D.

```
 1                BY MR. THOMAS:

 2                Q.   I just ask you to maintain that

 3      file and either I'll get it or I won't.  Just don't

 4      do anything to it; that's all I ask.

 5                Just so I can short cut this.  Is it

 6      fair to say you're not going to answer any more

 7      questions about the generation, drafting, peer

 8      review, submission and publication of the article?

 9                A.   It was a standard process.  There

10      was nothing unusual about it.

11                Q.   But in terms of the details of it

12      you're not going to answer any questions about

13      that?

14                A.   No.  I can tell that you there was

15      nothing unusual.

16                Q.   I understand.  If you'll turn to

17      page 2, Table 1 is the sample and patient data?

18                A.   Yes.

19                Q.   And under "Slings", it says that

20      you have 28 TVT or TVT-Os; do you see that?

21                A.   That is correct.

22                Q.   Do you know the breakdown between

23      TVT and TVT-O?

24                A.   No.

25                Q.   Okay.  Do you know whether any of
```

Vladimir Iakovlev, M.D.

```
 1    them are machine cut or laser cut?

 2              A.   No.

 3              Q.   You have four Prolift products; do

 4    you see that?

 5              A.   Yes, I do.

 6              Q.   And then a number of hernia mesh

 7    cases, correct?

 8              A.   That is correct.

 9              Q.   Of the 69 slings that you

10    analyzed, how many were medical-legal cases?

11              A.   The breakdown was about

12    70 percent.  I cannot tell you exact number.  But

13    roughly, it's for the whole set was 70 percent

14    medical-legal and 30 percent hospital cases.

15              And not necessarily St. Michael's.

16    They were coming from different hospitals.

17              Q.   Okay.  Is it fair to say if

18    they're undetermined that they're not medical-legal

19    cases?

20              A.   At least 70 percent were

21    medical-legal.

22              Q.   I understand that, but I'm trying

23    to break it down further to find out which ones

24    were medical-legal and which ones were not.

25              And you have 45 hernia cases that you
```

Vladimir Iakovlev, M.D.

1    identify as undetermined.  I'm making an assumption

2    that because they're undetermined hernia cases that

3    they're probably not medical-legal cases; is that a

4    fair assumption?

5            A.    Some of them are medical-legal.

6            Q.    What percentage of the

7    undetermined hernia cases were medical-legal; do

8    you know?

9            A.    The undetermined are probably all

10   non-medical-legal.  I don't think medical-legal is

11   undetermined.

12           Q.    That was my point?

13           A.    Yes.

14           Q.    So when we're making the

15   calculation of the 70 percent, is it safe for us to

16   exclude -- or strike that.

17           Is it safe for us to include the 45

18   undetermined hernia cases in the 30 percent of the

19   non-medical-legal cases?

20           A.    Yes, we can do that right away.

21   Those would be non-medical-legal cases.

22           Q.    Okay.

23           A.    There could be some potentially

24   medical-legal cases when I receive a specimen but I

25   have not received a history.  They say, hold on to

Vladimir Iakovlev, M.D.

```
 1    this -- may be medical-legal case later on.

 2              Q.    Okay?

 3              A.    So it's not hard number.

 4              Q.    Right.

 5              A.    But it's a ballpark.

 6              Q.    For the Ethicon TVT, TVT-O of

 7    those 28 how many of them are medical-legal?

 8              A.    At least 80 percent.

 9              Q.    Perhaps more?

10              A.    Possibly more.

11              Q.    And included within the 28 Ethicon

12    TVT and TVT-O are the cases that you received from

13    Dr. Kreutzer, correct?

14              A.    Yes.  Most of St. Michael's cases,

15    when I had a record, were actually TVT.  So I don't

16    know for whatever reason most of those excised at

17    St. Michael's were TVT.

18              Q.    Okay.  And in addition, you had

19    new TVT and TVT-O cases since Dr. Kreutzer, and

20    those would be included in this article as well?

21              A.    Yes.

22              Q.    So, for example, the Edwards case

23    would probably be in this?

24              A.    Yes, it would be in there.  I

25    received the Edwards case before I received
```

Vladimir Iakovlev, M.D.

```
 1   specimen from Dr. Kreutzer.

 2          Q.   Okay.  Interesting.

 3               On page 3 of this study, you talk about

 4   measuring the degradation layer's thickness?

 5          A.   Yes.

 6          Q.   And you say a set of 23

 7   mid-urethral slings was the largest uniform group

 8   that fulfilled your criteria.  Is that the slings

 9   that you got from Dr. Kreutzer?

10          A.   Most of them came in that set of

11   samples.

12          Q.   All right.  Tell me how you

13   physically measure the thickness of the stained

14   layer with the eyepiece micrometer?

15          A.   I would find fibers which are cut

16   as perpendicular as possible and measure bark

17   thickness on at least two occasions.

18               And then measure -- I try to find

19   another fiber, measure again, and then take median

20   number, the most frequent I'm getting.

21          Q.   Do you have the data that you

22   collected on those measurements?

23          A.   Yes, I do.

24          Q.   Okay.

25          A.   I mean, you have it on the --
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Is it on the thumb drive?

 2              A.   It's on the thumb drive.  And you

 3    saw it before at various depositions.

 4              Q.   Thank you.  I don't want to redo

 5    that.

 6              And when you do the eyepiece micrometer

 7    and you measure, to what level can you measure?

 8              A.   Initially, I had one micrometer.

 9    It was graded only to one micrometer.  Now, I have

10    little bit better so I can measure up to half a

11    micrometer.

12              Q.   When you were doing this study,

13    were you measuring at one micrometer?

14              A.   I was rounding to one micrometer;

15    it was an older eyepiece.

16              Q.   So the data in the study, you're

17    rounding your findings to the closest micrometer?

18              A.   Yes.  To the full number.

19              Q.   Did you round up always?

20              MR. ORENT:  Objection.

21              THE WITNESS:  No, it depends.  If it's

22    less than a half of the next gradation, it would go

23    to the lower, but that's the usual rule for --

24              BY MR. THOMAS:

25              Q.   Okay, that's fine.  And then when
```

Vladimir Iakovlev, M.D.

```
 1    you had two together -- so you had a total of four

 2    measurements?

 3              A.   I would aim at four measurements

 4    at least.

 5              Q.   And each one of those would go

 6    through some rounding process?

 7              A.   Yeah, I mean, the accuracy of

 8    measurement was within half a micrometer plus or

 9    minus.

10              Q.   Okay.  Now --

11              A.   But it would be random, up and

12    down, up and down, so they would constantly change.

13              Q.   Now, in some places in images we

14    looked at today, we didn't find any bark, correct?

15              MR. ORENT:  Objection.

16              THE WITNESS:  This is not correct.  We

17    could not see it in the images.  I can tell you

18    that in some specimens I did not see bark.

19              BY MR. THOMAS:

20              Q.   How do you report that?

21              A.   I report that I don't see it.  I

22    have cases when I reported that I don't see a bark.

23              Q.   And you reported here that you had

24    two specimens where the degradation layer was not

25    visible where a hernia mesh and a sling were
```

Vladimir Iakovlev, M.D.

```
1    removed at three and ten months.

2              Are those the only two times you

3    haven't been able to see a bark?

4              A.   At that time, the only two.  Since

5    then I've seen a couple of more cases where I

6    couldn't identify bark.

7              Q.   Any of those medical-legal cases?

8              A.   No, I think it was all hernia

9    meshes, not medical-legal cases.

10             Q.   Do you have those slides

11   available?

12             MR. ORENT:  Objection.

13             THE WITNESS:  Yes, I do, but they are

14   of patients.

15             BY MR. THOMAS:

16             Q.   You can't produce those to me if I

17   asked you for them?

18             A.   I can't produce them.

19             Q.   Did the slides where there was no

20   degradation bark, if you will, present contain

21   inflammation?

22             A.   Yes, they did.

23             Q.   Were they removed because of pain?

24             A.   Yes.  I think one of them was

25   removed for erosion with pain.  The other one, the
```

Vladimir Iakovlev, M.D.

1    hernia mesh, was removed just for pain.

2              Q.    On page 6 of the study, you

3    describe that you use transmission electron

4    microscopy --

5              A.    That's correct.

6              Q.    -- to study the ultra structural

7    organization of the degraded layer in

8    cross-sections?

9              A.    That's correct.

10             Q.    Did you use the TEM to study any

11   TVT device?

12             A.    One.  It was one Ethicon device,

13   TVT or Prolift, I don't remember.  I think it was a

14   TVT.

15             Q.    Have you produced that work to us

16   before?

17             A.    It's a St. Michael's Hospital

18   patient.

19             Q.    Okay.  So, is it fair to

20   understand that the only transmission electron

21   microscopy analysis that you've done on an Ethicon

22   mesh is the St. Michael's patient that you can't

23   produce to us?

24             A.    Well, it was a part of research.

25   So if it was included in images, it was included as

Vladimir Iakovlev, M.D.

```
 1   part of research project.

 2               Q.   Well, have you produced that to us

 3   before?

 4               A.   I don't know.

 5               Q.   Okay.  But just to make sure I got

 6   a clean answer.  In all the work that you've done

 7   on all the Ethicon meshes, the only Ethicon mesh

 8   that you've analyzed by transmission electron

 9   microscopy is a mesh of a St. Michael's patient

10   that's either a TVT or a Prolift, you don't know

11   which?

12               A.   Now I'm not sure if it was St.

13   Michael's or it was a medical-legal case.  I don't

14   remember now.

15               Q.   Okay?

16               A.   I would have to check, but if it

17   was, it was the only case.  I could do only one

18   case of Ethicon mesh by transmission electron

19   microscopy.

20               Q.   And why have you not conducted

21   transmission electron microscopy on other meshes?

22               A.   There was no need.  It is a really

23   cumbersome, difficult and --

24               Q.   Does St. Michael's have that kind

25   of equipment?
```

Vladimir Iakovlev, M.D.

```
 1                 A.   Yes, we do.  Otherwise, I wouldn't

 2      be able to do it.  It's really expensive to do it

 3      somewhere outside.

 4                 Q.   Did you have to pay St. Michael's

 5      to do this?

 6                 A.   No, it's just part of our academic

 7      work.

 8                 Q.   Are you able to do this yourself

 9      or does somebody have to do it for you?

10                 A.   I'm trained to do transmission

11      electron microscopy.  I mean, technicians prepare

12      slides.  It's usual, the same as for histology.

13      But I do examination myself.

14                 Most of the transmission electron

15      microscopy samples are with hernia meshes.

16                 Q.   Page 10 there is a discussion of

17      the clinical significance of polypropylene

18      degradation?

19                 MR. ORENT:  Are we going back to the

20      report or saying on the study?

21                 MR. THOMAS:  I'm on the study, sorry.

22                 THE WITNESS:  Yes.

23                 BY MR. THOMAS:

24                 Q.   Page 10 on Exhibit 6, "Clinical

25      Significance of Polypropylene Degradation".
```

Vladimir Iakovlev, M.D.

```
 1              Who drafted this section?

 2         A.   Mostly me, partially my coauthors.

 3         Q.   Dr. Bendavid?

 4         A.   Yes.  And well, mostly Dr.

 5    Bendavid.  I mean, I drafted most of it, but I was

 6    getting some corrections or changes, and the

 7    changes were coming mostly from Dr. Bendavid.

 8         Q.   Exhibits 5 and 6, you stand by the

 9    findings stated in each of those articles?

10         A.   Yes, I am.

11         Q.   Do you have depositions scheduled

12    in the next month?

13         A.   I'm not sure if I can disclose

14    that.

15         Q.   Do you have trial responsibilities

16    in the next month?

17         A.   Pardon?

18         Q.   Do you have any trial

19    responsibilities in the next month?

20         A.   No, I don't think so.

21         Q.   Your next trial is a December

22    trial with Ethicon?

23         A.   I'm not sure if I can disclose

24    that either.

25         Q.   Are you choosing not to?
```

Vladimir Iakovlev, M.D.

```
 1                    A.   There might be more and earlier, I

 2    don't want to disclose that.  I'm not sure if I

 3    can, if I legally can disclose it.

 4                    I mean, if it's not for Ethicon cases.

 5    For Ethicon I would disclose, but if it's not then

 6    I cannot disclose.

 7                    MR. THOMAS:  Counsel, there's no legal

 8    prohibition for him saying it?

 9                    MR. ORENT:  You can answer.

10                    THE WITNESS:  They said that --

11                    MR. ORENT:  Wait, hold on.  They said

12    is not an answer.  So any communications that

13    you've had are covered by a privilege.  So what

14    he's asking specifically are, if anything is firm

15    in terms of a date that you know of, so --

16                    BY MR. THOMAS:

17                    Q.   For depositions or trial?

18                    MR. ORENT:  For depositions or trial,

19    not any communications about we might do this or

20    might do that.  But anything firm that you know you

21    have a date set for.

22                    THE WITNESS:  Then everything is

23    changing.  I have a set date one deposition.  But

24    the rest is still in the air.

25
```

Vladimir Iakovlev, M.D.

```
 1              BY MR. THOMAS:

 2              Q.   Do you have any set dates for any

 3    trials between now and the Ethicon trial?

 4              A.   No.  Again, nothing set firmly.

 5              Q.   Okay.

 6              MR. ORENT:  Just a sec.  In addition to

 7    that, I think in the Cantrell matter I've been

 8    working with Kelly Crawford to schedule, I would

 9    imagine that would be within the next month.

10    That's an Ethicon case, obviously.

11              MR. THOMAS:  Yes, I know about that.

12              Hang on.  Getting close to the end.

13              -- OFF THE RECORD DISCUSSION --

14              BY MR. THOMAS:

15              Q.   Doctor, I'm told that the

16    information supplied to us concerning the eyepiece

17    micrometer measurements of the bark layers is

18    expressed in a single value as opposed to the four

19    individual measurements?

20              A.   No, it's a median, I told you

21    that, then I pick median value out of four.

22              Q.   Okay.

23              A.   It is described in the paper.  So

24    the volume which goes for analysis is a median one,

25    which is more frequent.
```

Vladimir Iakovlev, M.D.

```
 1                    Q.   Do you have the four measurements

 2      that you made or did you just pick the -- do you

 3      have that as a part of your data set?

 4                    A.   I just measure them and right

 5      there I know how frequent is this measurement or

 6      that.  So I don't have to put in the paper.

 7                    Q.   Did you write down or keep a copy

 8      of the four individual measurements that you made

 9      of the --

10                    A.   No, no.  The methodology is check

11      four spots.  I see three, four, four, four, then

12      four is the winner, so then four goes in the

13      record.

14                    Q.   Did you produce your bills today

15      for the time that you spent in this case?

16                    A.   In this case?

17                    Q.   In this case?

18                    A.   Oh, in this.  I had billing done

19      for the -- for the report, it's in the folder.

20                    Q.   Do you recall how much time and

21      money you've spent on preparing the report in this

22      case, Exhibit 3 and 4?

23                    A.   No, I don't.

24                    Q.   The invoice that you produced to

25      us on a thumb drive suggests that you have a
```

Vladimir Iakovlev, M.D.

```
 1   balance, professional services August 14th,

 2   August 24th for a total of $8,550 --

 3              A.   Sounds right.

 4              Q.   -- is that right?

 5              Doctor, I don't see -- I see general

 6   part text revision; what does that mean?

 7              A.   Revision of the general part.

 8              Q.   General party report?

 9              A.   Yes.

10              Q.   This report is the first time that

11   you reviewed any Ethicon documents or Ethicon

12   depositions, true?

13              A.   No, there was another case.

14              Q.   I didn't see it in any of your

15   reports before where you reviewed Ethicon

16   depositions and Ethicon documents?

17              MR. ORENT:  One moment.

18              BY MR. THOMAS:

19              Q.   The only other case it could be

20   would be the Bellew case?

21              MR. ORENT:  The doctor has not

22   testified previously about these issues.  I don't

23   know whether or not there has been another report

24   on another matter disclosed.

25              It may very well be that there is
```

Vladimir Iakovlev, M.D.

```
 1    something that's still work product and not been

 2    disclosed.  So I don't want to get into the details

 3    of that other potential matter.

 4              BY MR. THOMAS:

 5         Q.   Let me just ask it this way:  The

 6    bills that you've submitted to counsel in this

 7    matter do not reflect any charges for time that

 8    you've spent reviewing Ethicon documents or

 9    depositions, correct?

10         A.   Partially, they do.  I reviewed

11    some of that again; it's been drafted earlier.

12              MR. ORENT:  Counsel, just to speed this

13    area up to the extent that it's not clear on the

14    bills, I think what we can do is we can supplement

15    by letter.

16              MR. THOMAS:  That would be fine.  I'm

17    not interested in getting anybody.  I just want --

18              MR. ORENT:  I think what we'll do is we

19    can figure out the amount of time.

20              MR. THOMAS:  I just want to make sure

21    you get paid for your time.  You have to send your

22    bills and get paid.

23              Okay, that's all the questions I have,

24    Doctor.  Thank you.

25              THE WITNESS:  Thank you.
```

Vladimir Iakovlev, M.D.

```
 1              MR. ORENT:  Why don't we take two

 2   minutes.  I'll going to have probably about ten

 3   minutes worth of questions.

 4              -- RECESS TAKEN AT 4:52 --

 5              -- UPON RESUMING AT 4:55 --

 6              CROSS-EXAMINATION BY MR. ORENT:

 7         Q.   Good afternoon, Doctor.

 8         A.   Good afternoon.

 9         Q.   Earlier today you were asked a

10   number of questions about each of the

11   photomicrographs that we looked at, and one of the

12   predicate questions that you were asked for each

13   one was whether or not it was a TVT or a TVT-O; do

14   you recall being asked that series of questions?

15         A.   Yes, I do.

16         Q.   For purposes of your work does it

17   make any difference whether or not the product is

18   the TVT or TVT-O in terms of your findings as

19   reported here?

20         A.    No, it's the same sling, the same

21   mesh.  The only difference is how it's placed and

22   the other components which come in the kit.

23         Q.    So if I understand your testimony,

24   is it your testimony that the TVT and the TVT-O --

25   the actual mesh device is the exact same?
```

Vladimir Iakovlev, M.D.

```
 1              A.    Exactly the same.

 2              Q.    Okay.  And so in terms of the

 3    pathological findings that you make, as reported in

 4    your report and your supplement, is there a -- is

 5    there any reason for making a distinction between

 6    the two devices?

 7              MR. THOMAS:  Object to the form of the

 8    question.

 9              THE WITNESS:  No.  The only difference

10    is there can be more frequent occurrences of

11    striated muscle in the TVT-O samples than in TVT,

12    but it can be seen in both.

13              BY MR. ORENT:

14              Q.    And is that because of the

15    implantation route?

16              A.    That's correct.

17              Q.    And both devices are made of

18    Prolene mesh; is that correct?

19              A.    That is correct.

20              Q.    Now every one of the

21    photomicrographs that appear in Exhibits 1 and 2 to

22    today's deposition, that is your report and

23    supplemental report, did every one of those

24    photomicrographs appear either from prior expert

25    reports in Ethicon litigation, in the specific
```

Vladimir Iakovlev, M.D.

```
 1    pathology of the consolidated plaintiffs, or in

 2    peer-reviewed medical literature written by you?

 3                A.   That's correct.  These are the

 4    three sources.

 5                Q.   And you've been asked questions

 6    today about identifying various -- what you called

 7    additional TVT cases in your report; do you recall

 8    those questions?

 9                A.   Yes, I do.

10                Q.   Did you produce photomicrographs

11    of the additional TVT cases in the course of other

12    reports you've provided in TVT cases?

13                A.   Yes, I did.

14                Q.   Now, with regard to the opinions

15    that you express in your expert report in this

16    case, and your supplement, do you use the same

17    methodology that you have previously used when you

18    testified in the western district -- excuse me, in

19    the southern district of West Virginia?

20                A.   Yes, exactly the same methodology.

21                Q.   And is your -- the materials and

22    your methodology that you utilized in this report

23    the same methodology that you've used in other

24    courts where you have been allowed to testify at

25    trial?
```

Vladimir Iakovlev, M.D.

```
 1                 A.   That's correct.

 2                 Q.   Did you use any different

 3    techniques in this report?

 4                 A.   No.

 5                 Q.   Okay.  Now, the opinions that you

 6    testified to in this report, and in the supplement,

 7    are they identical to the opinions that you've

 8    previously provided in trial in matters before the

 9    southern district of West Virginia?

10                 A.   Yes.

11                 MR. THOMAS:  Object to form.

12                 THE WITNESS:  That is correct.  The

13    same opinions.

14                 BY MR. ORENT:

15                 Q.   Are they, the opinions that you

16    express in your expert report and in the

17    supplement, are they also identical to opinions

18    that you have provided in other courts during

19    trials throughout the country?

20                 MR. THOMAS:  Object to form.

21                 THE WITNESS:  That is correct.

22                 BY MR. ORENT:

23                 Q.   And throughout the course of your

24    report you provide just a few examples of a variety

25    of failure modes associated with the TVT and TVT-O
```

Vladimir Iakovlev, M.D.

```
 1    device; is that correct?

 2              MR. THOMAS:  Object to form.

 3              THE WITNESS:  That is correct.

 4              BY MR. ORENT:

 5              Q.   And why is it that you don't list

 6    a sample size or rate of error in your report?

 7              A.   It's not the purpose.  I'm not

 8    analyzing statistically frequency or rate of

 9    occurrence.  I showed the changes which can occur.

10    It's binary assessment; either it can occur or

11    cannot occur.  It can occur in one case, it can

12    occur in 100 percent of cases, but it can happen.

13    For a specific patient it either occurs or it

14    doesn't.

15              Q.   In order to show that something

16    can occur, in terms of a failure mode, is there a

17    sample size, a minimum sample size that you have

18    need to show that a failure rate or failure mode

19    can occur?

20              MR. THOMAS:  Object to form.

21              THE WITNESS:  One case is enough.  If

22    it can occur in one case, it can occur again.

23              BY MR. ORENT:

24              Q.   And these concepts of sample size

25    with one being enough to prove capability, is that
```

Vladimir Iakovlev, M.D.

```
 1    something that's generally accepted in the medical

 2    community, in the scientific community?

 3              MR. THOMAS:  Object to form.

 4              THE WITNESS:  Yes.  If you answer the

 5    question if it can occur, one case is enough.

 6              BY MR. ORENT:

 7         Q.   Same thing with a binary

 8    observation; it either occurs or doesn't occur.

 9    There's no rate of error associated with that; is

10    that correct?

11              MR. THOMAS:  Object to the form of the

12    question.

13              THE WITNESS:  It's either there or it's

14    not.  It's either zero occurrence or 100 percent.

15              BY MR. ORENT:

16         Q.   When you talk about using large

17    enough sample sizes and large enough rates of

18    error, is that only used when you actually try and

19    extrapolate from a data set to an individual?

20              MR. THOMAS:  Object to the form of the

21    question.

22              THE WITNESS:  That's used to predict

23    specific rates of specific occurrence, and that's

24    used in relation to a cohort of patients and

25    devices.  And it's a different question.
```

Vladimir Iakovlev, M.D.

```
 1                  BY MR. ORENT:

 2                  Q.   Okay.  And in terms of the

 3   opinions that you provided here in your expert

 4   report, do you hold each of those opinions to a

 5   reasonable degree of medical and professional

 6   certainty?

 7                  A.   Yes, I do.

 8                  Q.   And with regard to the various

 9   staining techniques that you've utilized, are each

10   one of those staining techniques peer-reviewed in

11   their own right?

12                  MR. THOMAS:  Object to the form of the

13   question.

14                  THE WITNESS:  That is correct, yes.

15                  BY MR. ORENT:

16                  Q.   Has H&E been utilized as a stain

17   and been peer-reviewed as a proper way of looking

18   at tissue for a significant period of time?

19                  A.   Over 100 years, or over the course

20   of 100 years.

21                  Q.   How about myeloperoxidase, has

22   that been peer-reviewed as use for staining?

23                  MR. THOMAS:  Object to the form of the

24   question.

25                  THE WITNESS:  We have several decades
```

Vladimir Iakovlev, M.D.

```
 1    of use.

 2                BY MR. ORENT:

 3                Q.   And how about S100?

 4                MR. THOMAS:  Object to the form of the

 5    question.

 6                THE WITNESS:  Same thing.  It's been

 7    used since late '70s, early '80s.

 8                BY MR. ORENT:

 9                Q.   What about the use of polarizing

10    light, is that something that's peer-reviewed and

11    accepted in the identification of crystalline

12    substances?

13                A.   It's been described for histology

14    use from 1920s, and even I saw it's been used in

15    Ethicon studies as well.  Ethicon scientists were

16    using polarized light as well.  Well, let me

17    rephrase that.  Who came to the same conclusions I

18    came.

19                Q.   And with regard to the medical

20    peer-reviewed literature on mesh and mesh

21    complications, in fact, there's a group out of the

22    University of Michigan that published utilizing

23    some of the same techniques that you've described

24    in your report; is that correct?

25                MR. THOMAS:  Object to the form of the
```

Vladimir Iakovlev, M.D.

```
 1    question.

 2                  THE WITNESS:  Yes.

 3                  BY MR. ORENT:

 4            Q.   Now, with regard to the work that

 5    you've done here, none of these opinions are new;

 6    is that right?

 7                  MR. THOMAS:  Object to the form of the

 8    question.

 9                  THE WITNESS:  That is correct.

10                  BY MR. ORENT:

11            Q.   And in terms of the material that

12    you've produced on disk.  Having provided to

13    counsel today, did you produce all non-confidential

14    materials that you could provide?

15            A.   Yes.  I selected that I could

16    safely release.

17            Q.   You were also asked a number of

18    questions about the peer review and peer-review

19    process; do you recall those questions?

20            A.   Yes, I do.

21            Q.   As an academic, do you have

22    concerns about maintaining the integrity of the

23    peer-review process?

24            A.   Could you repeat the question.

25            Q.   Sure.  As an academic, as an
```

Vladimir Iakovlev, M.D.

1    author and a researcher, are there important

2    reasons why the confidentiality of the

3    peer-review process needs to be maintained?

4                    A.    Yes.  I mean, especially when

5    there is an involvement of a manufacturer, because

6    I mean, this is major concern.

7                    Most publications -- journals, they

8    require, the first thing they need to have

9    submitted, has it been funded by industry, by

10   manufacturers.  So it's a major concern to try to

11   be independent from manufacturers.

12                   MR. ORENT:  All right, Doctor, thank

13   you very much.  I have no further questions.

14                   MR. THOMAS:  Thank you, Doctor, for

15   your time.

16

17

18   -- Whereupon the deposition concluded at 5:05 p.m.

19

20

21

22

23

24

25

Vladimir Iakovlev, M.D.

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4           I, JUDITH M. CAPUTO, RPR, CSR, CRR,

 5   Registered Professional Reporter, certify;

 6           That the foregoing proceedings were

 7   taken before me at the time and place therein set

 8   forth, at which time the witness was put under oath

 9   by me;

10           That the testimony of the witness and

11   all objections made at the time of the examination

12   were recorded stenographically by me and were

13   thereafter transcribed;

14           That the foregoing is a true and

15   correct transcript of my shorthand notes so taken.

16

17

18

19           Dated this 14th day of September, 2015.

20

21

22   _____

23

     PER:  JUDITH CAPUTO, RPR, CSR, CRR

24

25
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 308 of 311 PageID #: 128057
Case 2:12-md-02327 Document 3793-3 Filed 05/09/16 Page 308 of 311 PageID #: 64765
Vladimir Iakovlev, M.D.

```
 1              CERTIFICATE OF REPORTER

 2    CANADA                    )

 3    PROVINCE OF ONTARIO    )

 4

 5    I, Judith M. Caputo, the officer before whom the

 6    foregoing deposition was taken, do hereby certify

 7    that the witness whose testimony appears in the

 8    foregoing deposition was duly sworn by me; that the

 9    testimony of said witness was taken by me in

10    shorthand, using Computer Aided Realtime, to the

11    best of my ability and thereafter reduced to

12    written format under my direction; that I am

13    neither counsel for, related to, nor employed by

14    any of the parties to the action in which the

15    deposition was taken, and further that I am not

16    related or any employee of any attorney or counsel

17    employed by the parties thereto, nor financially or

18    otherwise interested in the outcome of the action.

19

20

21    _____

22    Judith M. Caputo, RPR, CSR, CRR

23

24    Commissioner for taking

25    Oaths in the Province of Ontario
```

Vladimir Iakovlev, M.D.

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Read your deposition over carefully.

 4    It is your right to read your deposition and make

 5    changes in form or substance.  You should assign a

 6    reason in the appropriate column on the erratum

 7    sheet for any change made.

 8              After making any changes in form or

 9    substance, and which have been noted on the

10    following erratum sheet, along with the reason for

11    any change, sign your name on the erratum sheet and

12    date it.

13              Then sign your deposition at the end of

14    Your testimony in the space provided.  You are

15    signing it subject to the changes you have made in

16    the erratum sheet, which will be attached to the

17    deposition before filing.  You must sign it in

18    front of a witness.  The witness need not be a

19    notary public.  Any competent adult may witness

20    your signature.

21              Return the original erratum sheet

22    promptly.  Court rules require filing within 30

23    days after you receive the deposition.

24

25
```

Case 2:12-md-02327 Document 3790-3 Filed 04/27/17 Page 310 of 311 PageID #: 128079
Case 2:12-md-02327 Document 3783-3 Filed 05/09/16 Page 310 of 311 PageID #: 64767
Vladimir Iakovlev, M.D.

```
 1              * * ERRATA SHEET * *

 2

 3    NAME OF CASE:  TERRESKI MULLINS, ET AL. V.

 4    ETHICON, INC., ET AL.

 5    DATE OF DEPOSITION:  SEPTEMBER 14th, 2015

 6    NAME OF WITNESS:  VLADIMIR IAKOVLEV

 7

 8

 9    PAGE   LINE        FROM      TO

10    ____|_____|_____|_____

11    ____|_____|_____|_____

12    ____|_____|_____|_____

13    ____|_____|_____|_____

14    ____|_____|_____|_____

15    ____|_____|_____|_____

16    ____|_____|_____|_____

17    ____|_____|_____|_____

18    ____|_____|_____|_____

19    ____|_____|_____|_____

20    ____|_____|_____|_____

21    ____|_____|_____|_____

22

23              _____

24

25                   VLADIMIR IAKOVLEV
```

Vladimir Iakovlev, M.D.

```
 1   PROVINCE OF ONTARIO    )

 2   TORONTO REGION         )

 3

 4

 5              I, the undersigned, declare under

 6   penalty of perjury that I have read the foregoing

 7   transcript, and I have made any corrections,

 8   additions or deletions that I was desirous of

 9   making;

10              That the foregoing is a true and

11   correct transcript of my testimony contained

12   therein.

13

14              _____

15                     VLADIMIR IAKOVLEV, M.D.

16

17

18   Subscribed and sworn to before me this _____

19   Day of _____, 2015 at

20   _____, _____.

21       (City)                  (Province)

22

23   _____

24   (Notary Public)

25   My Commission Expires: _____
```