# EXHIBIT C

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 2 of 29 PageID #: 138082
Case 2:12-md-02327 Document 2184-1 Filed 05/09/16 Page 2 of 29 PageID #: 64070
Vladimir Iakovlev, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           OF THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     CHARLESTON DIVISION

 4   IN RE: ETHICON, INC., PELVIC )

 5   REPAIR SYSTEM PRODUCTS        )  Master File No.

 6   LIABILITY LITIGATION          )  2:12-MD-02327

 7   ----------------------------)  MDL 2327

 8   THIS DOCUMENT RELATES TO THE FOLLOWING

 9   CASES IN WAVE 1 OF MDL 200:

10   MARGARET J. STUBBLEFIELD     )  Civil Action No.

11                    Plaintiff,)  2:12-cv-00842

12   vs.                          )

13   ETHICON, INC., ET AL.        )

14                    Defendant. )

15   ----------------------------

16

17   ---  This is the Deposition of VLADIMIR IAKOVLEV, M.D.,

18   taken at The Westin Harbour Castle, 1 Harbour Square,

19   Toronto, Ontario, on the 21st day of March, 2016.

20            REPORTED BY: TERRY WOOD, RPR, CSR

21

22

23

24
```

Page 2

```
 1  Donna Loustaunau           )
 2  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00666 )
 3  Patricia Ruiz              )
 4  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01021 )
 5  Betty Funderburke          )
 6  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00957 )
 7  Elizabeth Blynn Wolfe      )
 8  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01286 )
 9  Barbara Vignos-Ware, et al. )
10  v. Ethicon, Inc., et al.   )
11  Civil Action No. 2:12-cv-00761 )
12  Donna Massey, et al.       )
13  v. Ethicon, Inc., et al.   )
14  Civil Action No. 2:12-cv-0880 )
15  Patti Ann Phelps, et al.   )
16  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01171 )
17  Dina Sanders Bennett       )
18  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00497 )
19  Charlene Logan Taylor      )
20  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00376 )
21  Cynthia Nix                )
22  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01278 )
23  Barbara Kaiser             )
24  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00887 )
```

Page 4

```
 1  Lois Hoy, et al.           )
 2  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00876 )
 3  Constance Danno, et al.    )
 4  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01145 )
 5  Janet Smith, et al.        )
 6  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00861 )
 7  Harriet Beach              )
 8  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00476 )
 9  Maria C. Stone, et al.     )
10  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00652 )
11  Diane Kropf, et al.        )
12  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01202 )
13  Virginia White, et al.     )
14  v. Ethicon, Inc., et al.   )
    Civil Action No.2:12-cv-00958 )
15  Dee McBrayer, et al.       )
16  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00779 )
17  Julie Wroble, et al.       )
18  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00883 )
19  Sherry Fox, et al.         )
20  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00878 )
21  Joyce Justus               )
22  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00956 )
23  Kathleen Wolfe             )
24  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00337 )
```

Page 3

```
 1  Carol Jean Dimock          )
 2  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00401 )
 3  Ana Ruebel                 )
 4  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00663 )
 5  Jackie Frye                )
 6  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-1004 )
 7  Joan Adams                 )
 8  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01203 )
 9  Sharon Boggs, et al.       )
10  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00368 )
11  Dina Destefano-Raston, et al. )
12  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01299 )
13  Teresa Georgilakis, et al. )
14  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00829 )
15  Donna Hankins, et al.      )
16  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01011 )
17  Nancy Hooper, et al.       )
18  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00493 )
19  Krystal Teasley            )
20  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00500 )
21  Margaret Stubblefield      )
22  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-00842 )
23  Cindy Smith                )
24  v. Ethicon, Inc., et al.   )
    Civil Action No. 2:12-cv-01149 )
```

Page 5

```
 1  A P P E A R A N C E S:
 2  FOR THE PLAINTIFF AND THE WITNESS:
 3  ANDERSON LAW OFFICES, LLC
 4  CHRISTOPHER J. ZIMMERMAN, ESQ.
 5  1360 West 9th Street, Suite 215
 6  Cleveland, Ohio 44113
 7  Tel. 216.589.0256
 8  Email:  christopher@andersonlawoffices.net
 9
10  FOR THE DEFENDANT:
11  BUTLER SNOW LLP LLC
12  M. ANDREW SNOWDEN, ESQ.
13  150 3rd Avenue South, Suite 1600
14  Nashville, TN 37201
15  Tel.  615.651.6760
16  Email:  andy.snowden@butlersnow.com
17
18
19
20
21
22
23
24
```

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 4 of 29 PageID #: 138084
Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 4 of 29 PageID #: 64072
Vladimir Iakovlev, M.D.

| | Page 6 |
|---|---|
| 1 | INDEX OF WITNESSES |
| 2 | WITNESS.                                    PAGE |
| 3 | VLADIMIR IAKOVLEV, MD, affirmed |
| 4 | Examination by Mr. Snowden                    8 |
| 5 | Examination by Mr. Zimmerman                102 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 7 |
|---|---|
| 1 | LIST OF EXHIBITS |
| 2 | EXHIBIT NO./DESCRIPTION                     Page |
| 3 | 1    Expert report                              8 |
| 4 | 2    Flash drive                               9 |
| 5 | 3    Operative note, 02/04/05              11 |
| 6 | 4    Surgical Pathology Final Report, reported    55 |
| 7 |        9/28/2009 |
| 8 | 5    Operative report 2007/01/04          57 |
| 9 | 6    Surgical Pathology Report reported on    82 |
| 10 |        2007/01/10 |
| 11 | 7    Progress Notes, dated 3/18/05 to 7/8/05    88 |
| 12 | 8    Urology Gynecology Operative Report    95 |
| 13 |        2009/09/23 |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 8 |
|---|---|
| 1 | --- Upon commencing at 8:10 p.m. |
| 2 | |
| 3 |     (WHEREUPON, the witness was duly affirmed.) |
| 4 | |
| 5 |        VLADIMIR IAKOVLEV, M.D., |
| 6 |      called as a witness herein, |
| 7 |    having been first duly affirmed, |
| 8 |    was examined and testified as follows: |
| 9 |          EXAMINATION |
| 10 |    BY MR. SNOWDEN: |
| 11 |    Q.  Good evening, Dr. Iakovlev. |
| 12 |    A.  Good evening. |
| 13 |    Q.  We are here to talk about the |
| 14 | Margaret Stubblefield case; is that your understanding? |
| 15 |    A.  I do. |
| 16 |    EXHIBIT NO. 1:  Expert report |
| 17 |    BY MR. SNOWDEN: |
| 18 |    Q.  I'm handing you what has been |
| 19 | marked as Stubblefield one.  Could you take a look and |
| 20 | let me know if this is your complete case-specific |
| 21 | expert report in this case. |
| 22 |    A.  Yes, it appears to be complete. |
| 23 |    Q.  How much time did you spend |
| 24 | preparing your opinions in this case? |

| | Page 9 |
|---|---|
| 1 |    A.  As for other cases, can give you an |
| 2 | estimate only because I have not completed billing for |
| 3 | this case.  Ballpark would be probably just over 20 |
| 4 | hours, not more than 30 hours. |
| 5 |    Q.  Okay.  And I've been handed what I |
| 6 | have now marked as Stubblefield 2.  It's a flash drive. |
| 7 |    EXHIBIT NO. 2:  Flash drive |
| 8 |    BY MR. SNOWDEN: |
| 9 |    Q.  Does this flash drive contain all |
| 10 | of the case-specific materials you reviewed in this |
| 11 | case with the exception, of course, of the specimen |
| 12 | itself? |
| 13 |    A.  It should. |
| 14 |    Q.  And -- sorry, strike that. |
| 15 |    When I look at your report in this case |
| 16 | starting on page 11 and then through 13, it looks like |
| 17 | you've headings in your clinico-pathologic correlation |
| 18 | for erosion, pain and polypropylene degradation; is |
| 19 | that right? |
| 20 |    A.  That's correct. |
| 21 |    Q.  In coming to an opinion regarding |
| 22 | pain symptomatology, is your opinion necessarily |
| 23 | dependent on the patient's complaints of pain? |
| 24 |    MR. ZIMMERMAN:  Objection.  Answer if |

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 5 of 29 PageID #: 138085
Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 5 of 29 PageID #: 64705
Vladimir Iakovlev, M.D.

Page 10

1 you can.
2          THE DEPONENT: Well pain has to be
3 voiced by the patient, either without examination or
4 pain on examination, but patient has to indicate
5 somehow that she is feeling pain.
6          Otherwise there wouldn't be no -- well,
7 I mean, you probably can -- if patient cannot speak,
8 you probably see face reaction and emotions indicating
9 that somebody is in pain. That's another way of -- but
10 still, something is indicated by the patient that she
11 feels pain.
12          BY MR. SNOWDEN:
13          Q. Okay. So implicit in your opinion
14 then would be that the -- an assumption that the
15 plaintiff's complaints are accurate; is that fair?
16          MR. ZIMMERMAN: Objection, form. Go
17 ahead, answer it you can.
18          THE DEPONENT: I can only see what is in
19 the records because I cannot take the history from the
20 patient. I'm not urogynecologist, cannot examine to
21 identify tenderness in some areas.
22          So I can be as accurate as the records
23 are.
24

Page 11

1          BY MR. SNOWDEN:
2          Q. Okay. On page 2 of your expert
3 report under urogynecologist history, you have entry
4 for hysterectomy. Do you see that?
5          A. I do.
6          Q. Do you know what type of
7 hysterectomy Ms. Stubblefield had?
8          A. I don't remember now, but if you
9 show me the record I would be able to tell you.
10          Q. Does it have any bearing on your
11 opinion whether she had a vaginal hysterectomy or
12 abdomen hysterectomy?
13          A. Not really. It would matter for
14 clinicians who is doing clinical differential
15 diagnosis. I am not doing clinical differential
16 diagnosis. I'm reliant on the clinicians who work up
17 the patient and make a decision to excise the mesh.
18          EXHIBIT NO. 3: Operative note, 02/04/05
19          BY MR. SNOWDEN:
20          Q. I'm handing you what's marked as
21 Exhibit Stubblefield 3. Do you recognize this to be a
22 copy of the implant operative note from February 4,
23 2005?
24          A. Yes. February 4th, 2005, procedure

Page 12

1 anterior colporrhaphy with synthetic sling.
2          Q. In this case did Ms. Stubblefield
3 undergo two procedures both on the anterior vaginal
4 wall?
5          A. Yes.
6          Q. Okay. Do you know where, in
7 relation to one another, an anterior colporrhaphy is
8 performed versus the synthetic sling that was implanted
9 on February 4, 2005?
10          A. Well colporrhaphy is along the
11 sagittal plane. The sling is in the frontal plane, so
12 they are, to a degree, perpendicular to each other.
13          Q. Do they overlap?
14          A. And colporrhaphy is more higher up,
15 proximal where the sling is placed more closer to the
16 enterocele.
17          Q. Do any portions of those procedures
18 overlap?
19          A. They may but I would defer this to
20 implanting surgeon.
21          Q. Okay. If we look in the body of
22 the report, beginning -- it says description of
23 operation, and if we go -- the fifth line down, it
24 reads:

Page 13

1          "A transverse incision was made
2          across the body of the cystocele and
3          mucosa was retracted laterally."
4          Do you see that?
5          A. Yes, I do.
6          Q. "Sharp and blunt dissection was
7 used to isolate and develop the underlying cystocele."
8 Do you see that?
9          A. I do.
10          Q. Would that sort of dissection
11 result in scarring on the interior vaginal wall?
12          A. After the -- if the mesh was not
13 placed and if mucosa would be placed back and sutured,
14 there would be some scar. The amount of scarring will
15 be much smaller than what we see around the foreign
16 object. Because if it heals with first intention, if
17 there is no infection or any other complicating
18 factors, there will be minimal scar, really thin, which
19 will remodel and then some part of it will disappear
20 with time.
21          But the difference with the wounds which
22 do not heal with first intention is presence of the
23 foreign objects in the wound, inflammation, or
24 infection-related inflammation. All of this will delay

Case 2:12-md-02327  Document 3790-4  Filed 04/27/17  Page 6 of 29 PageID #: 138086
Case 2:12-md-02327  Document 2745-11  Filed 03/18/16  Page 5 of 29 PageID #: 64976

Vladimir Iakovlev, M.D.

Page 14

1 a healing. That's why we call it secondary intention
2 when the wound is open and then it heals up with
3 granulation tissue and so forth.
4        So in this case, scarring which we see
5 is actually related to the mesh, because there was
6 foreign object in the wound and all that space had to
7 be filled with granulation tissue.
8        Q.   What -- and if we just continue
9 reading it says:
10        "When this was accomplished, the sling
11        was placed at the midurethral area.
12        The sling was composed of a piece of
13        soft Prolene mesh 6 inches by 1/2 inch."
14        Do you see that?
15        A.   I do.
16        Q.   Is it your understanding that the
17 surgeon had to cut a piece of Prolene soft mesh to get
18 that shape?
19        A.   That's my understanding. That's
20 what I can see indirectly.
21        Q.   And do you know how many pores,
22 full pores across the width of that mesh there
23 would be when it's cut into a half inch strip?
24        A.   Let's have a look at the gross

Page 15

1 photograph, page 15 of my report.
2        So if you talk about larger pores, not
3 the small pores which are in the weave pattern in the
4 wool of the larger pores -- was that your question?
5        Q.   Yeah, so if it's a rectangle, which
6 you'd agree six inches by a half inch is a rectangle?
7        A.   No, I understand that completely.
8 So I can show you the larger pores and the smaller
9 pores of the mesh which was used.
10        Q.   Okay. And in the -- I'm talking
11 about the half inch dimension so across the short
12 dimension of the sling, perpendicular to it, how many
13 pores across would that be?
14        A.   So I can tell you exactly how many
15 pores were in the sling. On page 15 there's a gross
16 photograph, and you can see clearly the pores, larger
17 pores and the smaller pores. Because there are smaller
18 pores -- I'll use red marker so we can see.
19        So there are smaller pores which are
20 formed by complex weave pattern, and then there will be
21 larger pores which are formed by this complex weaving
22 pattern. And you can actually follow and see how many
23 large pores fit in the sling.
24        In this case, it was approximately three

Page 16

1 large pores fitting in the width of the sling.
2        Q.   The specimen that you've drawn on
3 the gross photo on page 15 was that the full width of
4 the sling or had portion of it been excised prior to
5 this?
6        A.   My understanding is it's full
7 width.
8        There's a scale underneath it and the
9 scale is in centimeters. So we can see that the width
10 is approximately seven, up to 7 millimeters. So this
11 would indicate that the sling contracted to 7
12 millimeters from half an inch.
13        Q.   And the basis of your opinion is
14 the measurement of the tissue here on page 15?
15        A.   The comparison of what width of the
16 sling is during excision and what is the description,
17 unless half inch description in the operative report is
18 not accurate. But we all know that all meshes contract
19 so there was some degree of contraction.
20        Q.   In this case are you able to
21 quantify the degree of contraction?
22        A.   Well we can estimate it, so if it
23 is half inch, which is approximately 1 or 11
24 millimeters I think over -- and if the width is

Page 17

1 approximately 7 millimeters -- so the contraction is in
2 the ballpark of 35 percent of the width.
3        The width could have been reduced due to
4 the stretching towards lateral directions during the
5 surgery so half inch when it was cut out, but there
6 could be some narrowing during the procedure when it
7 was placed. And then that narrowing was further
8 contracted and the dimension, the width further was
9 reduced due to contraction of scar contraction.
10        Q.   So would you agree that this mesh
11 was placed under the midurethra under tension?
12        A.   I don't know. We have to ask the
13 implanting surgeon.
14        Q.   And if we look at his note, it
15 says, "The suspension sutures on the sling were tied
16 with appropriate tension." Do you see that? Seven
17 lines up from the bottom?
18        A.   Yes, I do.
19        Q.   Okay. So at least from this record
20 we see that the surgeon is noting tension is being
21 placed on this mesh?
22        A.   That's what the record says.
23        Q.   Okay. And you haven't reviewed his
24 deposition transcript or any treater's deposition

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 7 of 29 PageID #: 130087
Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 7 of 29 PageID #: 64978
Vladimir Iakovlev, M.D.

Page 18

1 transcript in this case, correct?

2      A. No, I have not.

3      Q. Okay. Still looking at Exhibit 3

4 here, is it your understanding that the suspension

5 sutures used in this case were passed suprapubically?

6      A. I'm not urogynecologist and I'm not

7 doing this procedures, and this procedure is somewhat

8 different that I have seen before. So I would have to

9 defer all the specifics to the implanting surgeon.

10      Q. You are not going to offer any

11 opinions in this case about the technique of

12 implantation?

13      A. No.

14      Q. Are you going to offer any opinions

15 in this case regarding whether the mesh was flat when

16 implanted?

17      A. Well this portion of the mesh came

18 out flat. It's not folded.

19      Q. Do you any opinions in this case

20 regarding deformation of mesh?

21      A. What curled was the lateral ends,

22 not the mid-portion.

23      So the middle portion was relatively

24 flat, and then the lateral ends were somewhat

Page 19

1 distorted, curled or folded longitudinally along the

2 length.

3      Q. Are you able to say to a reasonable

4 degree of medical certainty whether that folding

5 occurred in vivo or at the time of placement?

6      A. I cannot.

7      Q. And what portion -- if you can

8 quantify for us, what portion of the mesh that was

9 removed had curling?

10      A. Lateral ends.

11      Q. Okay.

12      A. And I described it as lateral ends.

13      Q. So if we are talking about the

14 whole of the mesh, how much of the mesh -- that's what

15 I'm trying to get at -- how much of the mesh was

16 curled?

17      A. I can only estimate. Won't be

18 exact number. Maybe 10 percent, maybe 20, somewhere

19 within that ballpark.

20      Q. Was the curling that you saw in

21 this mesh significant to your opinions in the case?

22      A. See, when the mesh was removed

23 in 2009 for the specimen I received, this was a removal

24 of the remnants of the mesh, because there was previous

Page 20

1 excision in 2007. So what I see is only what was in

2 the remaining mesh or what I can describe.

3      Q. Didn't you know -- if you were

4 done.

5      A. I'm just -- I have to see what was

6 your question.

7      Q. My question is whether the curling

8 that you saw in the mesh was significant to your

9 opinion in the case.

10      A. Okay. I drifted away.

11      MR. ZIMMERMAN: It's a good thing it's

12 here. It just might be a different question.

13      BY MR. SNOWDEN:

14      Q. I don't know whose question you are

15 answering.

16      A. In this case, the formation of the

17 mesh certainly doesn't help, but is not the main

18 driving factor. The formation of the mesh is more of a

19 larger contributing factor when there is a bulky

20 structure or when there are multiple nerves involved in

21 the, in the folded or curled mesh or when curling of

22 the sling occurs under the urethra and when the area of

23 pressure is reduced so it can cut deeper in the tissue.

24 So this, these are examples when curling or deformation

Page 21

1 of folding play greater role in the complications.

2      In this specific case it's not as

3 permanent, and it's not as significant.

4      Q. Okay. You mentioned two answers

5 ago or one answer ago about the fact that there was a

6 prior explant, so what you received in this case was a

7 portion of the mesh that was implanted.

8      Are you able -- based on that, are you

9 able to tell whether the mesh contracted as we just

10 talked about a moment ago? Because I believe -- this a

11 long wind up -- I believe when you previously said that

12 you could look at this mesh and see how much it had

13 contracted because it was the full mesh. Now I think

14 you have seen that you've received a remnant and not

15 the full mesh. So I'd like to revisit that.

16      A. Well, I did know that it is part of

17 the mesh.

18      Q. Okay.

19      A. I was implying actually to the fact

20 that there could be more curling in the segment which

21 was excised previously. So I do see some curling, but

22 it does not mean that that's the only amount of curling

23 in the entire sling, because we don't know what was in

24 the previous excision.

Case 2:12-md-02327   Document 3790-4   Filed 04/27/17   Page 8 of 29 PageID #: 138088
Case 2:12-md-02327   Document 3790-4   Filed 04/27/17   Page 8 of 29 PageID #: 64708
Vladimir Iakovlev, M.D.

Page 22

1    Q.  Are you able to get an accurate
2  measurement of the sling as it would have been sitting
3  in vivo based on the remnant of the sling you received
4  as a gross specimen?
5    A.  Well the sling was excised -- my
6  understanding is the segment -- the sling was excised
7  across its length.  It's not that there was a strip
8  excised along its length to reduce the width of the
9  sling.  So what we have missing is a length of the
10 sling, but the width is preserved.
11   Q.  Okay.  Just so we are all on the
12 same page with length and width here, when you say
13 width, are you talking about the measurement that was
14 initially 6 inches per the operative report?
15   A.  6 inches is length.
16   Q.  And width we are talking about the
17 half inch?
18   A.  Half inch, yes.
19   Q.  Okay.  So which dimension are you
20 able to look at the gross specimen and evaluate?
21   A.  Width.  We can evaluate both so --
22 but we cannot restore the full length because we have
23 missing parts which were removed previously.
24      So if we measure this specific portion

Page 23

1  which is excised, we can estimate that the long section
2  is about 6 and a half centimeters and then the two
3  shorter segments, about a centimeter and then a half so
4  seven and a half, eight, eight centimeters.  So we are
5  missing about four centimeters of six inches.  Am I
6  right?
7      Approximately, roughly because in inches
8  just over two centimeters, 22 millimeters or so.
9      That would be an estimate.  Again, we
10 cannot restore length because we don't know exactly how
11 much of it was removed unless we -- okay.  If we go to
12 pathology description in 2007, "received 4 small pieces
13 of pink-red tissue and mesh with cautery artifact.
14 Piece 1 measures 3," largest dimension is 3, and then
15 largest dimension is 1.3 and then 1.7.  And piece
16 number 4 largest dimension is 4.5.  It's not clearly
17 what's the relationship between these pieces, but it
18 could be as much of, as 7 centimeters of the mesh
19 excised at that time or even more, up to 10
20 centimeters.  So in this case full length could be 18,
21 almost 18, 19 centimeters which is way beyond 6 inches.
22   Q.  So if I understand your testimony,
23 are you saying we are not sure the size of the sling
24 when it was initially implanted?

Page 24

1    A.  No, I'm just saying that we cannot
2  restore the length of the sling in vivo and estimate
3  what's difference of the sling which was in vivo
4  comparing with the initial length when it was cut out
5  from pristine mesh.  But we can do approximately, well
6  relatively good estimation of what was the width in
7  vivo, for the width -- using the photograph on page 15,
8  and the widest portion of the mesh is 7 millimeters.
9    Q.  Okay.  During that implantation
10 procedure when the sling was placed, was there -- is it
11 your understanding that there was additional mesh
12 placed?
13   A.  Yes, there was another patch of
14 mesh placed for the anterior colporrhaphy.
15   Q.  And do you know where that was
16 placed in relation to the sling?
17   A.  Well the anterior colporrhaphy is
18 done along the anterior vaginal wall and, as we
19 discussed earlier, it's an area somewhat perpendicular
20 to the sling placement.  I mean, the piece was larger
21 piece but its longest dimension would be perpendicular
22 to the sling.
23   Q.  And do you know whether any of the
24 portions of mesh removed from Ms. Stubblefield were the

Page 25

1  anterior -- strike that.
2      Do you know whether any of the portions
3  of the mesh removed from Ms. Stubblefield were portions
4  of the Gynemesh PS used for the cystocele repair?
5    A.  Hmm, there were smaller pieces
6  removed.  So the long piece is consistent with the
7  sling and the location where it was described -- what
8  was the excision report?
9      MR. ZIMMERMAN:  That's implant.
10     THE DEPONENT:  Sorry.  Excision report
11 is here or my summary of the excision.
12     So they excised mesh remnants from the
13 retropubic space, and they excised remnants of the
14 vaginal wall mesh.
15     So some portions are actually from the
16 vaginal wall mesh in 2009, and we can see by gross
17 pictures that there on page 14, you can see that there
18 is one long piece, which is more consistent with sling,
19 and then there are smaller portions, two smaller or
20 three smaller portions.  But if you want me to go into
21 the details of that excision, I would ask for the
22 excision operative report.
23     BY MR. SNOWDEN:
24   Q.  We going to get to that, but just

Vladimir Iakovlev, M.D.

Page 26

1  not yet.
2        I ask, in this case you received it
3  looks like several hundreds of pages of medical records
4  for Ms. Stubblefield.  Then those are contained on your
5  flash drive.
6        Did you review all of those records in
7  this case?
8        A.  I review all records in all cases.
9  Screened them through, identifying what is relevant.
10        Q.  Okay.  And when reviewing -- so did
11  you request all of the medical records in this case?
12        A.  I ask for all available records in
13  all cases.  I mean for me, the main -- the key records
14  are implantation, and then reasons for explantation,
15  and explantation.  These are three key records for me.
16  This is the minimum I need.  But in most cases I
17  receive more than that.  And I go through them.
18        I mean, of course, if you have more
19  records you can extract more information, and the
20  especially there are several excisions, you can see the
21  reasons for each excision and you can see how much of
22  that was removed at each excision.
23
24        Q.  So in this case -- okay.  Strike

Page 27

1  that.
2        What's the significance of the summary
3  that you've included in your report for
4  Ms. Stubblefield?  And that runs from page 1 through 9.
5        A.  So as I indicated in other cases, I
6  do not do comprehensive differential diagnosis or
7  comprehensive clinical differential diagnosis.  What I
8  do is provide a background of the specimen I receive.
9  The implementation, the development of symptoms, the
10  work up of the clinicians when they go through their
11  clinical differential diagnosis and the decision to
12  excise the mesh, so it provides a context for the
13  specimen I examine.  And the indication that the
14  differential diagnosis was performed by the clinicians
15  and the decision to excise the mesh was final decision
16  after the clinical workup.
17        Q.  And how did you determine in this
18  case to include the eight or so -- or nine page -- let
19  me get this right -- from page 1 to page 9 in this
20  summary versus other cases where you have included one
21  page of the key records you've just described, implant,
22  reasons for explant, and the explant?
23        A.  As I said, when I go through the
24  records I don't know what I'm going to find further on

Page 28

1  and sometimes they are not in chronological order.
2  Sometimes I end up first going through records in the
3  middle and then jump to the front, then there are
4  duplicate entries.  It's all over the place.
5        I start including from page 1.  I don't
6  want to come back and re-review the records, so I
7  include what I think is relevant, what I see is
8  relevant, and then continue including it.  And I don't
9  know how much of that relevant information I will find
10  in the pages which are ahead of me.
11        So I don't have specific target of how
12  many pages or how many records.  I need to just go
13  through them and see if something is relevant, I
14  include it and then continue on.
15        It also depends on the quality of PDF
16  files.  If I can copy information, I copy it.  If I
17  cannot copy, I have to provide my own summary, reading
18  through it.  Sometimes I cannot read it's so poor
19  quality or handwriting.
20        Q.  In this case you received a gross
21  specimen, a tissue; is that correct?
22        A.  That is correct.
23        Q.  And it was in formalin?
24        A.  That is correct.

Page 29

1        Q.  All right.  It was from the 2009
2  explant procedure, correct?
3        A.  Correct, September 23, 2009.
4        Q.  Did you process this specimen in
5  the standard tissue process, using the standard tissue
6  processing protocol you've used in all the cases?
7        A.  The processing methodology is the
8  same for all laboratories.  All diagnostic laboratories
9  use the same -- I mean, all histological labs use the
10  same protocols, and they use the same machines and the
11  same reagents.  They are bought from suppliers and the
12  machines are programmed and adjusted by the
13  manufacturers.
14        Q.  Okay.  Is it your understanding
15  that during the implant Prolene sutures were used to
16  suspend the sling into place?
17        A.  I don't see -- oh, I see one, at
18  least one.  There was a Prolene suture tied to the
19  sling before placement.
20        Q.  Okay.  And then -- sorry, go ahead.
21        A.  They were pulled.  I don't see then
22  description of how they were trimmed or cut completely,
23  so it's not clear if they were left in body after that.
24        Q.  Okay.  On figure MS1 on page 14 of

Page 30

1 your report -- one back -- the suture you see there, is
2 that consistent with Prolene?
3        A.  Yes, but that suture is for
4 excision, not for placement as far as -- if we --
5 again, if you give me the excision operative report, we
6 can read what was used.
7        Q.  Okay.  Well, before we get there,
8 let's look at -- we are still looking at the implant
9 operative report.  It mentions that the cystocele
10 repair was then covered with a piece of the same mesh
11 and sutured into place laterally using 3-0 Ethibond.
12 Do you see that?
13       A.  I do.
14       Q.  Did you find any Ethibond in your
15 specimen?
16       A.  To my recollection, no.
17       Q.  Okay.
18       A.  Because if I see it, I usually
19 include description and pictures.
20       Q.  And the suture found on page 14 of
21 your report, did you submit any of that suture for
22 processing?
23       A.  The part which is in smaller pieces
24 in -- is in the sections.

Page 31

1        Q.  Okay.  Do you have a figure that
2 shows that suture in the section?
3        A.  Because it is thicker, much thicker
4 than mesh fibers, it may or may not stay on the
5 sections.  Because usually what happens with thicker
6 fibers, they pop out completely.  So they just don't
7 stay in the tissue.  Because that Prolene suture is at
8 least three times thicker than the mesh fibers.  It's
9 really firm when it's so thick and does not stay in the
10 tissue.
11       Q.  All right.  Let's start going
12 through your pictures.  Figure MS3.
13       A.  Which page?
14       Q.  Page 16.
15       A.  Yes.
16       Q.  What significance, if any, do you
17 attribute to this picture?
18       A.  So this specific part of the mesh
19 has folding and the scar tissue grew into the folds and
20 between the folds.  So the mesh became incorporated in
21 this folded configuration.  And we can see that most of
22 the tissue around the mesh is scar tissue.  There's a
23 ring of normal fat tissue outside of the scar plate.
24       Now what is interesting, remember we

Page 32

1 were talking about contraction of the tissue.  So this
2 is the edge of the tissue, or of the specimen.
3        Q.  You have drawn a red line.
4        A.  Yes.  And then if we follow scar,
5 at least in this pore we can see the retraction of the
6 scar plate or scar tissue retraction into the mesh.  So
7 that indentation is due to scar contraction.  And it
8 cannot be due to fixation of the tissue because we see
9 the edge which is a different shape.
10       So that fat was pulled into the mesh
11 pore because scar in this area.
12       Q.  Which you have circled with red?
13       A.  Yes, was contracting.  So the
14 contraction was pulling all tissue in, and that
15 specific pore shows the mechanism how normal fat tissue
16 becomes incorporated into the pores.  It's because of
17 the contraction of the scar within the mesh.
18       Q.  And for the record, you have drawn
19 next to the word "fat", you have drawn an arrow
20 pointing where you say the mesh -- the tissue has
21 contracted pulling the fat into the pore space.
22       A.  So in this case we can see the
23 extent of contraction at least in that specific pore,
24 because we see the interface with normal tissue.

Page 33

1        Q.  Okay.  Can you look at this picture
2 and tell us whether this, the pathology here is causing
3 any symptoms in Ms. Stubblefield?
4        A.  We cannot take one picture or
5 single out one feature and say that that's what is
6 causing all the symptoms.  It's not like that.  You
7 have to consider the entire mesh together with all the
8 tissue changes which are triggered by the mesh as one
9 lesion which is causing the symptoms.
10       Q.  Figure MS4 on page 17, what
11 significance, if any, do you attribute to this photo?
12       A.  And I will answer all questions I'm
13 asked at trial for MS3 and I will expand that summary I
14 just gave, so I would not be limited to a -- the
15 summary which we just discussed regarding that
16 photograph.
17       MS4 on page 17 shows another area of
18 curled mesh.  Now interestingly, this is embedded in a
19 way where we can see more fat within the fold.  So I
20 think it's a cutting through cup-like shape of the
21 mesh.  So when we cut through this cup, the fat tissue,
22 which is inside, became in the middle.  So this would
23 be -- this type of shape of the mesh, that's how we see
24 fat tissue within or inside the mesh fold.

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 11 of 29 PageID #: 128091
Case 2:12-md-02327 Document 3790-4 Filed 04/29/16 Page 11 of 29 PageID #: 64079

Vladimir Iakovlev, M.D.

Page 34

1    Q.  So you have drawn sort of oval
2 shape on page 17.
3    A.  It's somewhat similar to a spoon.
4 That's the likely scenario how this appearance was
5 generated in histological section.
6    Q.  How do you rule out tissue
7 processing as a cause of that?
8    A.  Well, tissue processing cannot
9 cause scarring.  Tissue processing cannot cause fat to
10 appear in this areas.  I mean it's just present there.
11 All of these tissues together, fats, scar and the mesh
12 itself, are subject to all changes during tissue
13 processing.  And you can see that that shape is not
14 flat mesh.  It's either curled one layer, which is not
15 as likely, or cup-shape mesh section at the edges of
16 this cup or it's like a spoon-like shape.
17    Q.  Are there any pores in this picture
18 with fat tissue within them?
19    A.  Yes, there are.
20    Q.  How many?
21    A.  Several, at least three.  So in
22 this specific case, the fat was retracted and slowly
23 pushed its way into the pores.  It's the same mechanism
24 as in the previous picture.  The mesh is placed in the

Page 35

1 body, all the spaces within the mesh are filled with
2 blood and then there is granulation tissue and then
3 when it matures, it contracts.  And when it contracts
4 it starts pulling fat tissue through the pores into the
5 mesh.  And in this case we have a tangential view of
6 this process in page MS4 -- sorry, on page 17, picture
7 MS4.
8    Q.  And that process you just
9 described, does that occur with any mesh?
10    A.  You mean contraction of scar tissue
11 and pulling of normal tissue into the pores?
12    Q.  That the blood is there and then
13 that brings the healing that you just described.
14    A.  Yes.  It's a nonspecific mechanism
15 for healing.  All empty spaces in the body first are
16 filled with body fluids.  Most commonly it's blood clot
17 and then that blood clot is being replaced by
18 granulation tissue or that's what we call organization,
19 organizing blood clot.
20    Q.  MS5 on page 18, what do we see here
21 in this picture?
22    A.  So this is a flat portion of the
23 mesh.  And it's embedded parallel to the plane of
24 sectioning.  You can see several mesh fibers, and I

Page 36

1 will use green marker which has sectioned parallel to
2 their access or parallel to the plane of the mesh.  So
3 all of these fibers are sectioned parallel.
4    So this pattern is only possible when we
5 section parallel to the mesh.
6    Q.  Okay.
7    A.  Then we section the mesh fibers
8 along their long axis or along their length.
9    Q.  And what was your reason for
10 including this picture in your report?
11    A.  Here you can see again the same
12 phenomenon, scar plating, bridging fibrosis and then in
13 some areas fat is being pulled into the pores.
14    Q.  Okay.  So in the areas here where
15 fat is in the pores, is there any -- strike that.
16    The fat that you see in the pore spaces
17 here, is it your testimony that was all pulled into the
18 pore as a result of contraction?
19    A.  I think that's the only viable
20 mechanism to, and you can see it in other images that
21 that's what is happening.
22    Q.  Is there anything else abnormal in
23 figure MS5?
24    A.  Well, I can talk for a long time

Page 37

1 about this image.  I will answer all questions I'm
2 asked at the trial and expand this summary.
3    The main abnormality here is presence of
4 the foreign body scar encapsulation, bridging fibrosis.
5 We can see some of the foreign-body type reaction from
6 this power.  And we can see or I can demonstrate the
7 difference between scar plate and surrounding normal
8 fat tissue.
9    Q.  Are you able to tie any
10 complications to the figure MS5?
11    A.  I'm not tying complications to
12 specific or one single picture in any of these cases.
13 What I'm doing, I'm describing all the changes which
14 are occurring at the same time in relation to the mesh,
15 all tissue changes; they work together. I mean there
16 will be contribution, more contribution of one factor
17 comparing to the other, but they will all be present at
18 the same time.  And we can observe them at the same
19 time in the same specimen.
20    Q.  Did you consult a neuropathologist
21 in this case?
22    A.  For this case, as for all other
23 cases, I neither consulted nor needed to consult a
24 neuropathologist to arrive to my opinions.

Case 2:12-md-02327 Document 3799-4 Filed 04/29/17 Page 12 of 29 PageID #: 130082
Case 2:12-md-02327 Document 3799-4 Filed 04/29/17 Page 12 of 29 PageID #: 64780
Vladimir Iakovlev, M.D.

| Page 38 | Page 40 |
|---|---|

**Page 38**

1     Neuropathologists examine brain and
2 spinal cord lesions and some larger peripheral nerves
3 for neurodegenerative diseases. In this case, it's not
4 a brain tissue. It's vaginal tissue. It's a foreign
5 body implanted for urogynecological reasons. And the
6 nerves I observed did not show degeneration or
7 degenerative disease.
8     The location was abnormal. They were
9 present in the mesh, and they were present in the scar
10 tissue. That was abnormal, but the nerves themselves
11 did not show much pathology.
12     Q. Okay. What pathology did they
13 show, if they didn't show much?
14     A. So the main abnormality here on
15 page 20 is presence of the nerves inside the mesh,
16 embedded in the scar tissue which fills the mesh.
17 That's the main abnormality. From this low power I
18 cannot assess for degeneration, but it is not apparent
19 from this view.
20     Q. Okay. Figure MS6 and MS7, are
21 those similar portions of the tissue? One is in H&E
22 and one is a -- is an s100; is that right?
23     A. It's possible. Likely.
24     Q. And if we look at where the mesh

**Page 39**

1 spaces are, they sort of line up together moving from
2 MS6 to MS7; is that right?
3     A. That is correct.
4     Q. Okay. In this case you have two
5 pictures depicting nerves; is that right?
6     A. Yes, there are two images.
7     Q. And I think we've just established
8 they are from the same area?
9     A. Yes, they are likely from the same
10 area.
11     Q. They are essentially like two
12 slices of baloney on top of each other?
13     A. Yes, if you can put it this way.
14     Q. I was trying to think of a way.
15 Anyway --
16     A. I used salami slices.
17     Q. Salami, baloney, whatever.
18     So if we look at MS6, which portion --
19 and you have arrows pointing in MS6, you have the word
20 on lower panel the word "nerves" and then you have two
21 arrows. Could you circle on the upper picture where --
22 in green pen which portion of that specimen has nerves?
23 Just circle the nerves for me.
24     A. Again, this will be estimate based

**Page 40**

1 on H&E picture. It's not microscopic slide where I can
2 zoom in and zoom out.
3     So my accuracy may be somewhat
4 limited.
5     Q. Okay. So you have drawn green
6 circles on the figure MS6.
7     A. I think that's pretty accurate
8 comparing with s100.
9     Q. Okay.
10     A. I didn't look at this, so I just
11 drew it.
12     Q. So the structures where the arrows
13 hit on figure MS6 are sort of below where you've
14 circled the nerves?
15     A. Well, I'm pointing with the arrows
16 not specific point, but the location of the nerves.
17 And you can see there are four nerves here.
18     Q. Okay.
19     A. And the arrows are just pointing in
20 general direction of the nerves.
21     Q. Okay. Did you do any axonal
22 staining in this case?
23     A. I did not need to do axonal
24 staining, and I did not do it.

**Page 41**

1     Q. Did you analyze the specimen to
2 look for axons under -- using s100 or H&E?
3     A. Sorry, it says --
4     --- DISCUSSION OFF THE RECORD ---
5     BY MR. SNOWDEN:
6     Q. Did you analyze the specimen to
7 look for axons using s100 or H&E?
8     A. I don't need to examine axons.
9     Q. Did you do it?
10     A. That's why I did not do it, because
11 I did not need to.
12     Q. Did you identify any nerve
13 receptors in this case?
14     A. The answer will be the same. I did
15 not need to identify nerve receptors.
16     Q. Did you count the nerve density in
17 Ms. Stubblefield's specimen?
18     A. If you received synoptic report, I
19 did. If you did not, then I wouldn't. I think I saw
20 something about ...
21     Q. No synoptic report received is what
22 you saw.
23     MR. ZIMMERMAN: Well, that's at least a
24 clear answer.

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 13 of 29 PageID #: 130993
Case 2:12-md-02327 Document 3790-4 Filed 04/29/17 Page 12 of 29 PageID #: 64703
Vladimir Iakovlev, M.D.

BY MR. SNOWDEN:

Q. So I will represent to you we did not receive a synoptic report in this case.

Would you agree that you didn't see any traumatic neuromas in this case?

A. I do. I do agree. Or traumatic neuroma-type of lesions within the mesh.

Q. Okay. None of those either?

A. None of those.

Q. The nerves found in MS6, are you able to tell on the H&E whether those are pain mediating nerves?

A. Well, all peripheral nerves or most of them are mixed, so they contain motor fibers and sensory fibers afferent and efferent.

Q. Are you able to look at the s100 or H&E of these nerves and determine that?

A. It's just general neuroanatomy that most of the nerves are mixed.

Q. Do you know where -- strike that. Do you know what these nerves are innervating?

A. Tissue within the anterior vaginal wall and the bladder in that area.

Q. Do you know how far their targets

are away from this section?

A. Well, they will have targets along the course of the nerve, so they will be branching on its way. So there will be targets close by and then nerve continues on and the targets will be further down. So some of the targets are close by. Especially considering these are not large nerves, so they will branch out in relative proximity.

Q. If you look at the s100 and MS7, it looks like in the middle of the picture there are sort of two larger s100 positive staining structures. Do you see what I'm talking about?

A. I do.

Q. Just below that, is that a vessel?

A. Yes, there are vessels there. So it's normal anywhere in the body to form neurovascular bundles. There is usually one nerve and arteries or arterials and veins. It's how they run parallel to each other. Certain point they deviate and they run alone.

Q. Are you able to tell whether these are autonomic nerves?

A. No, they can be either motor or autonomic depending on their location. If we are

getting close to the vaginal mucosa, they will be somatic or likelihood of them being somatic will be higher. If you are getting deeper in the bladder wall, there won't be any somatic nerves. All of them will be autonomic.

Q. Do you know how close this slide is from the bladder wall or the mucosa, vaginal mucosa?

A. Well see, I did not see any portions of the bladder wall in this specimen.

Q. Do you see any mucosa -- vaginal mucosa in this specimen?

A. No.

Q. Is it fair to say you don't have a marker above or below, and above meaning bladder and below meaning vaginal mucosa, to orient where the MS7 came from?

A. No. Also some pieces also came from the retropubic space.

Q. And what would be the significance if the portion was from the retropubic space?

A. See, if it's retropubic space, likelihood of those being somatic is higher than autonomic, because autonomic nerves running from below to the bladder. The innervation pattern is from

lateral and below and going into the bladder. If you are going above the bladder, all autonomic or most of the autonomic innervation is already ended in the bladder.

Q. The nerves or the s100 positive staining structures in the top left of the picture, are there vessels around those as well?

A. Yes. I think it might be the same neurovascular bundle just diving in and diving out. There might be two nerves or it might be -- well, most likely there are two nerves running parallel.

Q. In either of these figures, MS6 or MS7, is there any inflammation infiltrating the nerves?

A. I cannot appreciate it from this power. I don't see it from this power, but it does not mean that it's not there.

Q. Do you recall making that finding one way or the other when you were looking at these under microscope?

A. No. Usually I don't see inflammation in the nerves. As I said, the main abnormality in the nerves is their location, not something within the nerves. Sometimes I see degenerative of the nerves and sometimes I see there

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 14 of 29 PageID #: 130094
Case 2:12-md-02327 Document 3790-4 Filed 04/29/16 Page 14 of 29 PageID #: 64708
Vladimir Iakovlev, M.D.

Page 46

1 is distortion and separation within the scar tissue.
2          Q.   MS8, if you could turn there, what
3 does this show?
4          A.   This is an H&E slide.  It shows
5 several mesh fibers, a cluster of mesh fibers.  And
6 that cluster is on the left and close to the lower
7 border, and then the upper right corner is filled with
8 scar tissue and there is a cluster of chronic
9 lymphocytic inflammation in the area.
10          Q.   What significance, if any, would
11 you attribute to this finding?
12          A.   It shows increased inflammation.
13 This would be abnormal to have in normal vaginal
14 tissue.  Increases burden of inflammation within the
15 mesh.
16          Q.   Overall in Ms. Stubblefield's
17 specimen, how would you rate the chronic inflammatory
18 infiltrate?
19          A.   I cannot grade it using just one
20 spot.  How I do it, I use objective times four and I
21 count number of fossa like this.
22          Q.   Did you do that in this case?
23          A.   If I did synoptic report, I did but
24 we determined ...

Page 47

1          Q.   Okay.
2          A.   That why I did not do it.
3          Q.   Okay.  So in some cases you have
4 done that, but not in this one?
5          A.   Well, I do not require those type
6 of measurements to formulate my opinions.  As I said,
7 any degree of inflammation is abnormal -- well, that
8 degree of inflammation is abnormal, and I'm not basing
9 it on the number of clusters of these chronic
10 inflammatory cells but their amount, their clustering.
11 So this is an abnormal finding already without grading.
12          Q.   If you see one cluster like this in
13 MS8, is that significant to your opinion?
14          A.   Everything is significant to my
15 opinion.  All of this is abnormal.  I'm describing the
16 abnormalities.  So as in any pathological specimen,
17 when we examine, we describe what is abnormal, what is
18 different with the tissue which is expected to be seen
19 there or with our knowledge of normal histology in the
20 area.
21          Q.   What clinical symptoms do you
22 attribute to the presence of chronic inflammation in
23 this specimen?  And I don't mean just this picture.  I
24 mean overall in Ms. Stubblefield's specimen.

Page 48

1          A.   So I will not single out one
2 specimen's pathological feature or histological feature.
3 They all occur in the same specimen together.  Some of
4 them have greater roles; some of them have lesser role.
5 But overall we cannot separate them, because they are
6 all incurring in response to mesh.  And when they all
7 occur together, they cause symptoms.
8          Q.   Figure MS9, what are you showing
9 here?
10          A.   This is a different type of
11 inflammation.  This is, again, an H&E stain slide with
12 cluster of mesh fibers.  And in the middle of this
13 image, there is foreign-body type inflammation reacting
14 to the mesh.  And the corners, upper right corner and
15 the lower left corner is filled with scar tissue.  So
16 that scar tissue is part of the scar plate.
17          Q.   Okay.  And -- sorry, are you
18 finished?
19          A.   And you can also see degradation
20 bark in some of the fibers.
21          Q.   In the upper right portion of the
22 picture, the tissue closest to or abutting the mesh
23 fiber, are there any giant cells there?
24          A.   No.

Page 49

1          Q.   And in the space, the -- well, the
2 fiber is still present there, correct?
3          A.   That is correct.
4          Q.   And there's degradation bark along
5 that area where there are no giant cells; is that
6 correct?
7          A.   That is correct.
8          Q.   Are there giant cells on the lower
9 left portion of the tissue in the lower left corner
10 where it's abutting the tissue -- the tissue abuts the
11 mesh?
12          A.   Do you mean other macrophages as
13 part of foreign body reaction?  Giant cells --
14 macrophages don't always form giant cells.  So foreign
15 bodies formed by macrophages, but they are not always
16 giant cells.
17          I see few cells, few macrophages but
18 they amount is not the same as what is occurring in the
19 middle of the image.
20          Q.   Okay.  Is the presence of these
21 foreign body giant cells in the middle of this figure,
22 significant to your opinion?
23          A.   As I said, everything is
24 significant.  Everything is abnormal.  Presence of

Case 2:12-md-02327 Document 3790-4 Filed 04/25/17 Page 15 of 29 PageID #: 130085
Case 2:12-md-02327 Document 3790-4 Filed 04/25/17 Page 15 of 29 PageID #: 64785
Vladimir Iakovlev, M.D.

## Page 50

1 foreign body reaction of any degree is abnormal in the
2 tissue. Normally there is no foreign body reaction in
3 tissues. And this type of inflammation contributes to
4 all the changes which are triggered by the mesh
5 together with a chronic inflammation we discussed
6 earlier, scar plate formation and other features we
7 discussed earlier. All of that works together.
8     Q. And in Ms. Stubblefield's case,
9 does the presence of foreign body inflammation indicate
10 that the mesh is not biocompatible?
11     A. It depends on how we determine or
12 how we use the term "biocompatible." If we want to use
13 the term "biocompatibility" to describe a device or a
14 material which would be completely inert, then I would
15 say the mesh is not inert. The mesh triggers foreign
16 body reaction.
17     Q. Are you going to be offering an
18 opinion in this case regarding whether
19 Ms. Stubblefield's mesh is biocompatible?
20     A. Hmm, I don't think I used that word
21 in either my general report or in this case-specific
22 report.
23     Q. Okay. So is that a no?
24     A. Just don't describe it. What I can

## Page 51

1 say is that it's not inert.
2     Q. And will you be telling the ladies
3 and gentleman of the jury about the principles of
4 biocompatibility and whether Ms. Stubblefield's mesh
5 was biocompatible?
6     A. Again, I did not provide any
7 opinions regarding biocompatibility in either my
8 general report or case-specific report. If I am asked
9 regarding this type of questioning, I think the best
10 wording would be as inertness, because biocompatible or
11 biocompatibility terminology can be used as long as we
12 agree what it means in -- for different people, it may
13 mean different. When we see inert and not inert, that
14 implies that either there is reaction against it or
15 there is no reaction. And in this case we do know that
16 there is reaction. So it's not inert. It triggers a
17 reaction, foreign-body response, foreign-body type
18 inflammatory reaction, it triggers scar encapsulation.
19 All of that is a response to an object, therefore, it's
20 not inert.
21     Q. Figure MS10, if you can turn your
22 attention there, what does this picture show?
23     A. So now this image shows another
24 area of an H&E stain slide, and this area shows

## Page 52

1 actually formation of giant cells. So when the
2 macrophages cannot destroy an object, they merge
3 together to form these larger cells or giant cells,
4 multinucleated cells in an attempt to phagocytose or
5 swallow the body, the foreign body.
6     The degree of foreign body reaction here
7 is greater than what we saw in the previous image.
8 There is also scaring or bridging fibrosis just outside
9 of the mesh fibers and in between the mesh fibers. So
10 all of the tissue which is in this image is abnormal.
11 There is a presence of foreign body. There's scar
12 bridging. There is scar plate formation. And then
13 there is foreign-body type reaction with a number of
14 larger giant cells.
15     Q. The foreign-body type inflammation
16 that you show in MS9 and MS10 is that representative of
17 a degree of foreign body inflammation throughout the
18 specimen?
19     A. I'm not sure what you mean. I
20 don't understand the question.
21     Q. So --
22     A. It's representative of the area I
23 took photograph. It's exact copy what was in there.
24     Q. Right. Is it representative of the

## Page 53

1 foreign body reaction found throughout the entire
2 specimen?
3     A. I'm not sure if it can be done in
4 one image. How can you represent the entire specimen
5 using one image? One image just represents the area.
6     Q. All right. Well, you have two
7 images here. Are the two images representative, when
8 taken together, of the entirety of the specimen with
9 regard to foreign-body type inflammation?
10     A. No, they cannot represent entire
11 specimen because they are just two images of two
12 specific areas.
13     Q. Are there areas with less foreign
14 body inflammation in the specimen?
15     A. Well, even in the image MS9 on page
16 22 we have one corner which has no foreign body
17 reaction. And then the middle part has quite extensive
18 collection of macrophages. So what happens, foreign
19 body responds, in most cases, does not envelope or does
20 not form a sheath around the mesh fibers. There's some
21 skip areas or patchy clusters of foreign body
22 macrophages or foreign-body type reaction. That's how
23 it is.
24     In some areas, the foreign body response

Case 2:12-md-02327 Document 3790-4 Filed 04/29/17 Page 16 of 29 PageID #: 128096
Case 2:12-md-02327 Document 2827 Filed 09/09/16 Page 16 of 29 PageID #: 64786
Vladimir Iakovlev, M.D.

Page 54

1 is so permanent that it forms this confluent band along
2 the mesh fibers. Actually it becomes almost bridging
3 and in this case it is bridging. I mean, if we look at
4 MS10, the spacing between these fibers -- we can mark
5 them with star --
6      Q. Green star.
7      A. Green star. That space is actually
8 bridged by the foreign body reaction, so here we can
9 call it as bridging inflammation.
10      Q. Okay. Is that present throughout
11 the entirety of the specimen?
12      A. No, it's not. Again, some fossa
13 are like this; some fossa have less.
14      Q. What is the significance, if any,
15 of the bridging of the inflammation?
16      A. Just shows the extent of
17 inflammation that it's, it's so extensive in that
18 specific area that it bridges. The volume of
19 inflammation -- the more inflammation, the more damage
20 from inflammation, the more inflammatory mediators in
21 there, the more negative effects of the inflammation.
22          -- RECESS AT 9:39 --
23          -- RESUMING AT 9:51 --
24

Page 55

1      BY MR. SNOWDEN:
2      Q. All right. I'm going to hand you
3 what has been marked as Stubblefield four.
4      EXHIBIT NO. 4: Surgical Pathology Final
5      Report, reported 9/28/2009
6      MR. ZIMMERMAN: Thank you.
7      BY MR. SNOWDEN:
8      Q. If you look at the right-hand of
9 this surgical pathology report, see the collection date
10 of 9/23/2009?
11      A. I do.
12      Q. Does that correspond with the
13 specimen you received in this case?
14      A. Yes, it does.
15      Q. And if we look down under the
16 diagnosis it says, "Mesh excision synthetic material
17 consistent with surgical mesh (gross diagnosis only)."
18 Do you see that?
19      A. I do.
20      Q. Then there is a gross description
21 toward the bottom of the page that then continues on to
22 page 2. Do you see that?
23      A. I do.
24      Q. Okay. And anywhere in the gross

Page 56

1 description does the pathologist at Vanderbilt
2 University assess deformation in the mesh specimen?
3      A. There's no assessment for
4 deformation in the gross description.
5      Q. Okay. And the gross only here
6 means that the pathology department at Vanderbilt did
7 not submit the specimen for microscopic examination; is
8 that right?
9      A. That is correct.
10      Q. Okay. We can put that aside for
11 now. Is it your understanding in this case that
12 Ms. Stubblefield underwent four revision surgeries?
13      A. At least four from what I can see
14 in the summary.
15      Q. Okay. And you received a specimen
16 from one of these, only one of these surgeries; is that
17 correct?
18      A. That is correct.
19      Q. Have you received any other
20 specimens taken from Ms. Stubblefield other than from
21 the September 23rd, 2009, surgery?
22      A. No.
23      Q. And we talked about this briefly
24 earlier, but you had mentioned that a portion of the

Page 57

1 sling had been removed prior to September 23rd, 2009;
2 is that right?
3      A. That is correct.
4      Q. I want to hand you what I'm marking
5 as Stubblefield 5.
6      EXHIBIT NO. 5: Operative report
7      2007/01/04
8      MR. ZIMMERMAN: Thank you.
9      BY MR. SNOWDEN:
10      Q. And do you recognize this to be the
11 operative note from Ms. Stubblefield's surgery on
12 January 4, 2007?
13      A. Yes.
14      Q. Before we get too far into this,
15 let me ask you. Regarding your clinicopathological
16 correlation, do you have an opinion in this case
17 regarding the cause of Ms. Stubblefield's erosion?
18      A. Well, the erosion was caused by the
19 foreign body. So we -- as we discussed with other
20 specimens or other plaintiffs, because mesh cannot be
21 remodeled and cannot be modified, altered by the body,
22 it can erode. So it damages the tissue when it
23 migrates or prevents it from healing when there is
24 exposure of the mesh through the mucosa. Cannot be

Case 2:12-md-02327  Document 3799-4  Filed 04/29/17  Page 17 of 29 PageID #: 128087
Case 2:12-md-02327  Document 3790-4  Filed 04/29/17  Page 17 of 29 PageID #: 64785
Vladimir Iakovlev, M.D.

Page 58

1 reabsorbed completely to seal off the area. So if
2 there is foreign object in the wound, it will not heal.
3 So this is the main feature, nature of
4 the mesh as foreign body. That's why it erodes.
5 That's why it becomes a chronically eroded wound.
6 There is also whole set of other
7 features in relation to the mesh, but those feature,
8 features are of the tissue reaction. The scarring in
9 the area and inflammation, they all work together with
10 the mesh so they also have -- or they also contribute
11 to all the changes.
12 Q. And are you able to identify which
13 of those factors was the cause of Ms. Stubblefield's
14 erosions in this case?
15 A. As I said, because they all occur
16 at the same time, and they all occur due to the mesh
17 placement, we cannot separate one single feature and
18 then link it to one specific symptom. It's impossible.
19 Everything occurs at the same time. They're all related
20 to the mesh and ...
21 Q. In your erosion section on page 11
22 of your report, you have listed as one of the several
23 factors in the mechanisms of erosion, you list
24 infection. Do you see that? In your report?

Page 59

1 A. This would be --
2 Q. Page 11.
3 A. Page 11.
4 Q. And it's just before the last
5 paragraph on the page.
6 A. Yes, I do.
7 Q. Do you have an opinion in this case
8 regarding whether Ms. Stubblefield had an infected mesh
9 prior to -- strike that.
10 Do you have an opinion in this case
11 regarding whether Ms. Stubblefield had an infected mesh
12 that led to an erosion?
13 A. So regarding infection, an
14 infection may not be present before the erosion or
15 trigger the erosion. However, once the mesh is exposed
16 or there is a breach of mucosal surface, the wound of
17 mesh exposure becomes infected. And then that triggers
18 acute inflammation, and then there is more damage of
19 the tissue. Because it is inflamed and infected, the
20 area cannot heal, so that becomes a contributing factor
21 for continuing erosion. So it -- or expansion of the
22 erosion.
23 Q. Okay. In this case, you didn't
24 have any mucosa in the specimen; is that right?

Page 60

1 A. No, I did not.
2 Q. In this case you didn't see any
3 acute inflammation in the specimen?
4 A. No, I did not.
5 Q. In this case you didn't see any
6 signs of infection in the specimen?
7 A. In my half what I examined, I did
8 not.
9 Q. On page 13 of your report under the
10 polypropylene degradation section, you have there,
11 "The degraded polypropylene formed a continuous
12 brittle sheath around the mesh. Filaments contributing
13 to mesh stiffening." Do you see that?
14 A. I do.
15 Q. Did you do any mechanical testing
16 of the mesh?
17 A. I did not perform any destructive
18 testing, either analytical chemistry or mechanical
19 testing, because this would not give me opportunity to
20 do histology. I used histological methods to observe
21 features under the microscope, and then I can judge by
22 the histological appearance or appearance of the
23 polypropylene in this case under the microscope
24 regarding its properties. And if something shatters or

Page 61

1 cracks, it indicates its brittleness, because the
2 nondegraded core of the fibers does not crack while the
3 degraded bark cracks.
4 Therefore, it indicates that there is a
5 change of physical properties which is due to
6 degradation.
7 Q. The next sentence you have,
8 "Extensive cracking can also provide cavities to
9 harbor bacteria as is well known in microporous
10 meshes." Did you identify any bacteria in the cracking
11 of the degradation layer in this case?
12 A. As specimens, I do not search for
13 individual bacteria. It's difficult to do in
14 histological sections. I can identify bacteria when
15 they are in colonies. Then it is more reliable.
16 Q. In the second to last paragraph you
17 have:
18 "Degradation of a polymer also
19 indicates its breakdown into smaller
20 molecules. In cases of implanted
21 materials, the products of degradation
22 are released into the tissue adding to
23 the complex pathological interactions
24 between the mesh and the human body."

Case 2:12-md-02327 Document 3790-4 Filed 04/29/17 Page 18 of 29 PageID #: 130088
Case 2:12-md-02327 Document 3790-4 Filed 04/29/17 Page 18 of 29 PageID #: 64788
Vladimir Iakovlev, M.D.

Page 62

1 Do you see that?

2 A. I do.

3 Q. Did you identify any of those

4 products of degradation released into the tissue in

5 this case?

6 A. We cannot because that would be

7 destructive testing. And I don't know if there is any

8 test to measure it in the tissue. All of the

9 publications I have seen, they were measuring products

10 of degradation in vitro when there was degradation of

11 the polypropylene outside of the body.

12 Q. Okay. On pages 32 -- strike that.

13 Pages 26 of your report through page 32,

14 is -- looks like it contains opinions regarding

15 degradation layer?

16 A. It does. I mean these pages, they

17 describe the same features I described in the January

18 report and other specimens as well.

19 Q. Okay. And as I understand it,

20 the -- is it your opinion that in MS13(a), for example,

21 that the degradation bark takes up histologic dyes?

22 A. That is correct.

23 Q. To give it its purple color; is

24 that right?

Page 63

1 A. That is correct.

2 Q. And if I understand your -- strike

3 that.

4 As I understand it, your opinion is that

5 the reason that it uptakes the dye is that the outer

6 layer is oxidized?

7 A. Well, it takes up the dye because

8 it is not solid any more. So there is some micro or

9 nanopores and nanocavities which can absorb the dye.

10 That's why it takes up the dye.

11 Q. Okay. You've previously testified

12 that you were -- you undertook an experiment to

13 intentionally oxidize polypropylene and see whether it

14 takes up histologic stain. Do you recall that?

15 A. You mean from the general opinions?

16 Q. Do you recall that?

17 A. The discussion? Or the experiment?

18 Q. The experiment.

19 A. I do recall.

20 Q. Okay. Have you concluded that

21 experiment yet?

22 A. So now at the end of last patient

23 we are switching back to general opinions?

24 MR. ZIMMERMAN: Are you asking general

Page 64

1 opinions?

2 BY MR. SNOWDEN:

3 Q. I'm asking if he has a new opinion

4 regarding testing that has been ongoing in the case,

5 which I think I'm entitled to ask.

6 MR. ZIMMERMAN: Do you have a question

7 about Ms. Stubblefield? Because it's a case-specific

8 deposition that we're taking today.

9 If you are asking for an update on the

10 opinions that were elicited during his general

11 deposition, it's outside of the scope of this

12 deposition.

13 BY MR. SNOWDEN:

14 Q. I don't agree. It's part -- okay.

15 Let me ask it this way.

16 Dr. Iakovlev, for any of the cases in

17 Wave 1 have you performed -- have you concluded your

18 degradation -- strike that.

19 For Ms. Stubblefield or any other cases

20 involving Wave 1 plaintiffs, have you completed your

21 experiment where you were attempting to intentionally

22 oxidize polypropylene to see if it would take up

23 histologic dyes?

24 A. That experiment was not required to

Page 65

1 detect degradation layer for any of these cases. It's

2 done for completely different purpose.

3 Q. Have you completed it?

4 A. No, I have not completed it yet.

5 Q. Do you plan to offer any opinions

6 at trial regarding that experiment?

7 A. For Ms. Stubblefield?

8 Q. Yeah, for Ms. Stubblefield.

9 A. No. For Ms. Stubblefield I will

10 not use it. As I said, it's not required. And it's

11 not needed. I'll do it for different purpose. That

12 experiment is mainly to show that the model of in vitro

13 degradation which can simulate in vivo degradation is

14 usable. It's more of a testing of the model rather

15 than confirming the degradation.

16 Q. Dr. Iakovlev, on page 13 of your

17 report you have, under the polypropylene degradation

18 section, a paragraph that begins, "In

19 Ms. Stubblefield's case, the mesh also fragmented in

20 the body." Do you see that?

21 A. I do.

22 Q. What's your opinion regarding when

23 the mesh fragmented within her body?

24 A. So if we go back to the

Page 66

1 intermediate excision, which was in 2007, one of
2 descriptions which was given in January, 2007, was this
3 material, because of its loose weave, fragmented
4 easily. So there is description of fragmentation
5 during that excision date which predated the excision
6 of the specimen I received.
7         Now, if we go back to the images
8 beginning with MS17(a), there's a series of images
9 which shows fragments of polypropylene. Some of these
10 fragments are irregular, and they contain blue fiber --
11 blue granules within or inside the fragments, and some
12 of the fragments are rectangular. And they correlate
13 with scales of the degradation bark.
14        So what happened during the excision in
15 2007, some of the chips or small fragments of the mesh
16 were cut off. And when the mesh was cut off, some of
17 the bark fragments peeled off and formed this
18 scale-type fragments in the tissue.
19        So we have a combination of portions of
20 the mesh fibers which were cut off from the nondegraded
21 core. For example, in picture MS17(a) on page 33, as
22 circled with green marker, that specific fragment was
23 from the nondegraded core. And it's together with the,
24 in the same sort of cluster of fragments with the

Page 67

1 scales of the bark.
2         So what happened, both the degraded bark
3 was fragmented during the excision and the nondegraded
4 core was also fragmented to a degree, with scissors or
5 with other tools. And we see the combination of this
6 too.
7         And if we flip the page to page 34, we
8 can see the appearance of these fragments in polarized
9 light. For example, the fragment which has distinct
10 rectangular shape -- I'm circling it with blue
11 marker -- also shows transverse cracks. So this is
12 typical for degradation bark, where the particle of
13 nondegraded core does not show -- and I also circled it
14 with blue marker but it's difficult to see because it's
15 dark background. It does not have any cracking. It's
16 solid, because it's not degraded -- at least it's not
17 degraded in the middle.
18        What's interesting if we flip the page
19 to page 35, image MS18(a) shows another two or three
20 particles of the nondegraded core which were cut off
21 the mesh during previous excision. And now we can see
22 actually that these fragments of the nondegraded core
23 were left in the body at that time formed their own
24 degradation bark.

Page 68

1         And it's clear -- I will use green
2 marker and outline the edges of the degradation bark
3 which formed on the surface of these fragments. And
4 the degradation bark is also birefringent on next page
5 36, so it behaves exactly the same way as degradation
6 bark which is formed on intact fibers or nonfragmented
7 fibers.
8         And if we check, the excision in 2007
9 occurred approximately two years after implementation.
10 So by two years, the bark was of sufficient thickness
11 to be visible and to peel off the nondegraded core.
12 Then when the nondegraded core fragments were left in
13 2007 by the excision I received specimen of, which was
14 another two years after the intermediate excision,
15 these fragments which I circled on page 35, they were
16 exposed to the body environment long enough to form
17 their own degradation bark.
18    Q.   The fragments in MS18(a), how large
19 are those?
20    A.   Well, I don't know if it's a whole
21 fragment here or just like a tip of the iceberg. It's
22 hard to say. What I can say is what the cross section
23 or estimate the cross section, longest diameter what we
24 see in this section.

Page 69

1         I would estimate it is approximately
2 50-microns long. Maybe less, maybe 30, somewhere
3 between 30 and 50.
4    Q.   And how wide is it?
5    A.   15 microns. Again, it's rough
6 estimate.
7         So overall when there is a cluster of
8 these fragments, it's a combination of scales of the
9 bark and fragments of nondegraded core, which was
10 nondegraded in 2007. By 2009 there is a degradation
11 bark in each of those fragments.
12    Q.   And what's the significance, if
13 any, of this to your opinion?
14    A.   Well, it's all just consistent with
15 previously-described findings regarding degradation
16 bark. It's fragile. It cracks. Cracks and then forms
17 this scale-like particles which were deposited in the
18 tissue. Also it forms on any polypropylene of any
19 shape, either cylindrical shape of intact fibers or
20 fibers like this depicted in MS18(a).
21    Q.   And what's your basis for the
22 opinion that portions of what we see in these figures
23 are fragments of bark rather than pieces of mesh that
24 are dislodged during cutting at the excision procedure?

Case 2:12-md-02327 Document 3799-4 Filed 04/29/17 Page 20 of 29 PageID #: 128490
Case 2:12-md-02327 Document 3799-4 Filed 04/29/17 Page 20 of 29 PageID #: 64780
Vladimir Iakovlev, M.D.

**Page 70**

1  A. Shape. Shape and absence of -- or
2  relative absence of the blue granules, because when
3  material degrades, blue granules degrade as well. So
4  if we see rectangular shape, which represents cross
5  section of a scale, and relative lack of the blue
6  granule, it means that the material was degraded
7  before, formed degradation bark, and then was
8  fragmented further and was left in the body.
9  Q. How do you rule out the absence,
10 that the absence of blue granules was due to the fact
11 that Prolene soft has both blue and clear filaments?
12 A. Some of it can be because of the
13 clear filaments. Some of it, you -- we can actually
14 see some residual blue granules in some of the
15 fragments. It depends on what fiber they are coming
16 from. If they are coming from clear fibers, there was
17 no blue granules at the beginning.
18 For example, on page 37, there's few
19 scales of the bark forming this curvilinear scales, and
20 we see the blue granules within here. So in that
21 specific area, a blue fiber was crushed, and then the
22 bark peeled off and left these scales in the area.
23 Q. And what's your basis for the
24 opinion that this all occurred in the 2007 surgery?

**Page 71**

1  A. Just analysis of the records. This
2  occurred sometime before the excision in 2009. So
3  there was an event sometime between implantation and
4  excision in 2009 which crushed the fibers to produce
5  first of all scales of bark and, at the same time,
6  fragment the nondegraded core. And the only event I
7  can see in the records is excision in 2007.
8  Q. Did you consider the fact that the
9  mesh is cut during placement?
10 A. But during the placement there is
11 no degradation layer. Wouldn't produce this
12 perfectly rectangular scales or cross sections of
13 the scales.
14 I think we had one case -- I don't know
15 if it was you during the deposition -- where there were
16 some fragments which were triangular and some irregular
17 shape. So when the fragment is triangular shape, it
18 can be coming -- or can be embedded in the tissue
19 during implantation. If it's rectilinear and if it's
20 consistent with the bark, the only way to produce this
21 is to leave the mesh in the body long enough so the
22 bark is formed and then crush the fibers, produce those
23 scales, and leave it in the body again for some time so
24 there will be vital reaction around it.

**Page 72**

1  Q. Have you ever done a controlled
2  experiment where you take a pristine Prolene soft mesh
3  and cut it and see what, if any, particles come off the
4  mesh?
5  A. I'm not sure what would be the
6  purpose of this experiment. That -- does it imply that
7  it is impossible to make smaller fragments? Sometimes
8  I cut the mesh fibers and I can see what fragments are
9  left or the crushed ends of the mesh.
10 I examined the meshes. When the
11 pristine mesh is cut and I see the edges, and I can see
12 clearly, especially in the places where short segment
13 of the fiber is still attached, can see it's kind of
14 loose. If it's outside of the body, if it's very small
15 fragment, it will just snap off and become dislodged.
16 So I've seen larger portions of the mesh
17 fibers still attached to the mesh after the cutting.
18 Q. And my question was whether you
19 have done a controlled experiment where you take a
20 pristine Prolene soft mesh, cut it, and determine what
21 particles, if any, come off the mesh.
22 A. So my answer would be I did examine
23 meshes after cutting them with scissors, and I did see
24 some larger portions of the fibers left on the mesh.

**Page 73**

1  They were loose. They were loosely attached so they
2  fall out easily because they are not -- you need a long
3  fiber which is being held in the weave pattern of the
4  mesh.
5  Q. Did you then take those pieces and
6  process them through tissue processing to analyze their
7  shape and the presence of degradation bark?
8  A. Well, I can see the shape in the
9  microscope because when I examined it, I examine it in
10 the microscope without embedding.
11 Q. And have you ever -- first off, do
12 you know what tool the implanting surgeon used to cut
13 the mesh in this case?
14 A. We can check with the excision
15 record from 2007.
16 MR. ZIMMERMAN: Exhibit 3. I'm sorry.
17 THE DEPONENT: Is it 2007?
18 MR. ZIMMERMAN: Five.
19 THE DEPONENT: So where is 2007? Here.
20 BY MR. SNOWDEN:
21 Q. I'm sorry. My first question is:
22 Do you know what tool the surgeon who implanted the
23 mesh to be Exhibit 3, what tool he used to form the
24 mesh into a six inch by half inch sling?

Case 2:12-md-02327 Document 3790-4 Filed 04/27/17 Page 21 of 29 PageID #: 128401
Case 2:12-md-02327 Document 4209-1 Filed 07/29/17 Page 21 of 29 PageID #: 64789
Vladimir Iakovlev, M.D.

Page 74

1    A.  Scissors.  Does not say exactly
2  which tool, but most likely scissors.
3        Q.  So sitting here today, you won't
4  know whether you have replicated the same type of
5  cutting in your lab as the surgeon implanting the mesh
6  used in forming the sling in this case?
7        A.  But I'm not using this experiment.
8  I do not need this experiment to formulate my opinions.
9  I arrive to my opinions examining the specimen.  The
10  effect of what happened.  I'm not -- I don't need an
11  experiment to actually determine that these are
12  fragments of polypropylene.  Some of it is completely
13  degraded; some of it is partially still containing
14  nondegraded core.  I can see it in the images, and I
15  saw it in the specimen itself.
16        Q.  And that wasn't my question.  My
17  question was:  Sitting here today, you do not know
18  whether you employed the same type of cutting of a mesh
19  in your lab as the implanting physician used when he
20  formed the Prolene soft into a sling in this case?
21        A.  As I said, I did not need this
22  experiment.  I did not perform it.
23        Q.  Okay.
24        A.  Because I'm describing the effect

Page 75

1  of it, not specifically how it was formed.  I can see
2  clearly that these are particles of polypropylene.
3        Q.  And then you would agree that you
4  have not performed an experiment where you use the same
5  cutting method on a pristine Prolene soft mesh to
6  determine the shape or presence of any particles that
7  would come off of that mesh?
8        A.  I don't understand how would that
9  experience -- experiment contribute to the opinions.
10  We already observed that there are particles in the
11  tissue.
12        Q.  And that's not my question, Doctor.
13  Would you agree that you have not performed an
14  experiment where you use the same cutting method on a
15  pristine Prolene soft mesh to determine the shape or
16  presence of any particles that would come off the mesh
17  as a result?
18        A.  I did not need that experiment and
19  I did not perform it.
20        Q.  And regarding the January 4th,
21  2007, procedure where mesh was removed, do you know
22  what tool was used to cut the mesh?
23        A.  All I can say, whatever tool was
24  used, the mesh was fragmented under the use of that

Page 76

1  tool.
2        Q.  And motion to strike that answer as
3  nonresponsive.
4        Regarding the January 4th, 2007,
5  procedure, do you know what tool was used to cut the
6  mesh?
7        A.  The record describes that the
8  material was fragmented easily, but it does not say
9  exactly what tool was used at that time.  Whatever tool
10  was used, it fragmented the mesh.
11        Q.  So regarding the January 4th, 2007,
12  procedure where mesh was removed, you do not know
13  whether you have performed an experiment in your lab
14  where you have cut a pristine mesh using the same tool
15  as that used to cut the mesh in this procedure to
16  determine the shape or presence of any particles; is
17  that correct?
18        MR. ZIMMERMAN:  Objection.
19        THE DEPONENT:  It's not what I do.  I
20  don't do specific experiments as for any other
21  specimens.  What I do, I describe the histological
22  feature, what is abnormal in the tissue.  In this case,
23  I described this particle and it's unequivocal.  There
24  are particles of the polypropylene.  Some of them are

Page 77

1  rectangular, describing -- or consistent with scales,
2  and some of them are irregular, larger particles.
3        So my opinions are based on the
4  examination and analysis of the specimen itself, not on
5  additional experimentation.
6        BY MR. SNOWDEN:
7        Q.  Doctor with -- strike that.
8        Sitting here today, you would not be
9  able to tell the ladies and gentlemen of the jury
10  whether or not you performed a control experiment using
11  the same method of cutting a pristine mesh as that used
12  by the doctor who cut the mesh in the January 4th,
13  2007, procedure, correct?
14        MR. ZIMMERMAN:  Objection.  Answer if
15  you can.
16        THE DEPONENT:  So the answer would be
17  that, as for all diagnostic specimens, we do not
18  require a control.  We assess the specimens for the
19  difference what is expected in the tissue, either
20  normal tissue or altered to a degree.
21        So in this case, what I can use as a
22  description of what is expected would be several
23  hundred of the specimens I examined of explanted
24  measures.  This is the first time I see such an extent

Case 2:12-md-02327 Document 3799-4 Filed 04/25/17 Page 22 of 29 PageID #: 138102
Case 2:12-md-02327 Document 3799-4 Filed 04/25/17 Page 22 of 29 PageID #: 64700
Vladimir Iakovlev, M.D.

Page 78

1  of scales of the bark in the tissue. It's not -- it
2  was not expected. This wasn't -- somewhat unexpected
3  finding, and it's completely different from other
4  specimens. And we saw the particles of the measure in
5  the tissue only in the occasional cases.
6          BY MR. SNOWDEN:
7          Q. And in all due respect, I'm not
8  sure whose question you are answering.
9          Doctor, would you be able to tell the
10  ladies and gentlemen of the jury whether or not you
11  performed a control experiment using the same method of
12  cutting a pristine mesh as used by the doctor who cut
13  the mesh in the January 4th, 2007, procedure?
14          A. I did not need to do an experiment,
15  separate experiment, and that's not what we do as
16  pathologists to do experiment every time we see some
17  features under the microscope. We ...
18          Q. And I'm not asking you whether you
19  needed to do it. I'm asking you whether you did such a
20  controlled experiment.
21          A. That's why I did not do it.
22          Q. Okay. So we agree you didn't do
23  it?
24          A. I did not require and I did not do

Page 79

1  it.
2          Q. You have mentioned several times a
3  statement from the January 4th, 2007, operative note
4  mentioning this material, because of its loose weave,
5  fragmented easily. Do you know what this -- do you
6  know if this doctor was deposed in this case?
7          A. No.
8          Q. If he was deposed, do you have any
9  idea what he said?
10          A. No.
11          Q. How do you -- what's the basis for
12  your belief that what he is describing there are the
13  particles you see in your specimen?
14          A. This is first time, after more than
15  200 specimens, I see such a description by the surgeon
16  that the material fragmented easily. This is also the
17  first time I see a number of particles in such an
18  extent.
19          So to a reasonable degree of medical
20  probabilities, the likelihood of these two facts are
21  not related is very low. So to a reasonable degree of
22  medical probability, I can state that there is very --
23  very high likelihood that the description of the
24  surgeon of fragmented mesh correlates with my

Page 80

1  observation of multiple particles in the tissue,
2  because, as I said, the finding is not common. It's
3  not commonly seen. And the description in the records
4  is not common as well.
5          And it correlates logically and
6  pathophysiologically and it correlates also with my
7  understanding of the behavior of polypropylene in the
8  body and formation of the bark and behavior of the
9  bark.
10          Q. Why do you -- well first off, did
11  the physician here during this surgery mention
12  particles coming off the mesh?
13          A. Fragmented. Fragments.
14          Q. So is that the same as particle?
15          A. Well fragment is a particle.
16          Q. Would a one centimeter portion of
17  the mesh also be a fragment?
18          A. I don't think the surgeon would
19  describe one centimeter as a fragment and fragmented
20  easily.
21          Q. Why did you mention loose weave in
22  relation to fragments? What does that have to --
23  sorry, strike that.
24          If you are correct, why did the doctor

Page 81

1  mention loose weave in regards to particles that you
2  see in your specimen?
3          MR. ZIMMERMAN: Objection, answer if you
4  can.
5          THE DEPONENT: I'm not sure what he
6  meant. We would have to ask him. I can say that he
7  noticed that it was fragmented easily, so he had some
8  difficulty excising it in one piece, and there was
9  extra manipulations in the area.
10          BY MR. SNOWDEN:
11          Q. And how did you rule out, if you
12  did, the -- whether what the surgeon was referring to
13  was the mesh coming out in pieces?
14          A. Well I can only say what is in the
15  records, and the record clearly states "fragmented".
16          Q. Okay. And is fragmented also
17  consistent with mesh coming out in four pieces?
18          A. You would have to ask the
19  explanting surgeon.
20          Q. Okay. You didn't care to read the
21  deposition of that doctor in this case, correct?
22          MR. ZIMMERMAN: Objection.
23          THE DEPONENT: This is not correct that
24  I did not care. I do not read depositions for any of

Case 2:12-md-02327 Document 3799-4 Filed 04/28/17 Page 23 of 29 PageID #: 126403
Case 2:12-md-02327 Document 3799-4 Filed 04/28/17 Page 23 of 29 PageID #: 64791
Vladimir Iakovlev, M.D.

## Page 82

1 the cases at least for Wave 1. I read depositions only
2 in very rare occasions where there is significant
3 discrepancy between the records and I need to clarify
4 which record is correct.
5        BY MR. SNOWDEN:
6        Q. I'm handing you what is marked as
7 Stubblefield 6.
8        EXHIBIT NO. 6: Surgical Pathology
9        Report reported on 2007/01/10
10        BY MR. SNOWDEN:
11        Q. Doctor, if you take a look at this
12 surgical pathology report, is it your understanding
13 this relates to the mesh removal from January 4th,
14 2007?
15        A. That's correct.
16        Q. Okay. And if we go down to the --
17 well first off, do you see any mention of particles in
18 this pathology description?
19        A. There is no microscopy. There is
20 only gross description.
21        Q. Would you need a microscope to see
22 the particles?
23        A. Yes, of those particles I describe,
24 they would not be visible without microscope.

## Page 83

1        Q. Okay. So the doctor saw the
2 fragments or particles during the surgery but the
3 pathologist would need a microscope to see it?
4        A. I did not say that the doctor saw
5 fragments. He said it was fragmented easily meaning
6 that he had to do multiple cuts to remove the mesh or
7 that he had difficulty removing it in one piece.
8 That's what it means.
9        It does not specifically indicate that
10 he could see the fragments which were produced during
11 that procedure because, again, it's microscopic and
12 it's in the tissue.
13        Q. So you would agree with me then
14 that the statement that the mesh, because of its loose
15 weave, fragmented easily is consistent with the
16 pathology report showing the mesh was removed in four
17 pieces?
18        A. Yes, it is.
19        Q. Okay.
20        A. It is. So he could not remove it
21 in one piece. He had to do several smaller excisions
22 because it was fragmented. So there was more
23 manipulations in the area.
24        Q. Okay.

## Page 84

1        A. And wasn't as strong.
2        Q. So what the doctor on January 4th,
3 2007, when he was explanting the mesh and he said this
4 material, because of its loose weave, fragmented
5 easily, it's your testimony and your opinion he wasn't
6 identifying the particles you see under the microscope?
7        A. That is correct, he wouldn't be
8 able to see it. But the fact is that the excision was
9 piecemeal. There were multiple cuts and more
10 manipulations describes higher risk for fragmentation
11 at microscopic level.
12        Q. Okay. And this pathology report,
13 does it mention the mesh being deformed?
14        A. There is no description of the
15 configuration of the mesh either way, if it's deformed
16 or flat.
17        Q. In your opinion regarding pain
18 starting on page 12, you have on the third paragraph in
19 that section:
20        "There was a foreign body type
21        inflammatory reaction to the mesh.
22        Additionally, the mesh fragmented at one
23        point and introduced collections of
24        smaller particles."

## Page 85

1        Do you see that?
2        A. I do.
3        Q. You say, "The latter amplified the
4 burden of foreign body reaction in the tissue." Do you
5 see that?
6        A. I do.
7        Q. What role, if any, did the
8 collection of particles play in the pain that
9 Ms. Stubblefield experienced?
10        A. As with all other features, we
11 shouldn't single out one feature and try to connect it
12 to a specific symptom. This was all happening at the
13 same time in the same mesh. It definitely didn't
14 reduce the amount of changes. The additional particles
15 increased the amount of foreign body reaction, so they
16 amplified already abnormal finding.
17        Q. How large was the field of
18 particles -- strike that. Were the particles all in
19 one area in the specimen?
20        A. No. As far as my recollection,
21 there were several fossa of these particles.
22        Q. And how large was the area where
23 the particles were located?
24        A. I did not measure it. If I had the

Page 86

1 slides, I would point where the areas are.
2       Q.  How significant was the tissue
3 reaction to the particles that you saw?
4       A.  It was quite significant.  There
5 was detectable foreign-body type reaction.  We can see
6 it in the images.  If we go to, for example, page 37,
7 you can see several macrophages in the area.
8       Q.  100X objective, is that equivalent
9 to a thousand times magnification?
10      A.  That's correct.
11      Q.  Every picture you have of the
12 particles in your report is that a thousand times
13 magnification?
14      A.  It is.
15      Q.  Okay.  So you are not able to,
16 sitting here today with your report that you have
17 provided in this case, show us a picture that sort of
18 shows the extent of any one of these particle fields?
19      A.  Not required.  Wouldn't contribute
20 either way.
21      Q.  I'm just trying to figure out how
22 large it is.  It sounds like I'm not going to be able
23 to do today.
24      A.  Well, it wasn't my purpose to

Page 87

1 measure it.  If, when you ship the slides back to me, I
2 would be able to show the areas and measure them, but I
3 mean since it wasn't my purpose, I did not do it when I
4 had the slides.
5       Q.  Off the record.
6       -- OFF THE RECORD AT 10:49 --
7       -- RESUMING AT 10:52 --
8       BY MR. SNOWDEN:
9       Q.  Dr. Iakovlev, are you aware --
10 strike that.  Is it important to your opinion in
11 this -- well, strike that.
12      Do you have any opinions in this case
13 regarding when Ms. Stubblefield's pain, that's
14 attributed to mesh, began?
15      A.  This question is best answered
16 going through the records.  So there is -- if we go
17 into the records and implantation is February 2005, and
18 then in March of 2005, which is a postoperative period,
19 there is a description of pain with some movement
20 "otherwise healed well."  So it's not clear if that
21 pain was related to the surgery or to the mesh but
22 there is an entry there.
23      And then in April, which is almost three
24 months after surgery, there is a description of

Page 88

1 bilateral groin pain.  Again, it's not clear what it is
2 attributed to.  And then in 2000 -- again in 2005 in
3 July, low back pain and suprapubic tenderness, some
4 description of pain, however, there is no firm
5 conclusion yet at the time that the pain is related to
6 the mesh.
7       And then later on in July 2005, it says
8 pain in the mesh area.
9       So about five months after implantation
10 examination showed or connected pain with the mesh.
11      EXHIBIT NO. 7:  Progress Notes, dated
12      3/18/05 to 7/8/05
13      BY MR. SNOWDEN:
14      Q.  All right.  I'm handing you what
15 has been marked as Stubblefield 7.
16      And if you look on the left-hand side,
17 it says 3/18/05.  Does this correlate with your entry
18 on page 2 for March 18th, 2005?
19      A.  Yes.
20      Q.  All right.  And I'm just trying to
21 figure out this record here.  It says, there's a
22 urinalysis section and just below that it says, "Having
23 a little leakage."  Do you see that?
24      A.  Uhm-hmm.

Page 89

1       Q.  What's that -- what is that next --
2 on the next line, what does that say?
3       A.  "P with some movement."
4       Q.  Okay.  What's that P mean?
5       A.  Pain.  I think I've seen it in --
6 in other records.  So I interpreted it as pain.
7       Q.  Okay.  Is that a common medical
8 abbreviation for -- P for pain?
9       A.  Sometimes it's used.
10      Q.  Okay.  And -- okay.  And then the
11 next line says, "Well healed otherwise," right?
12      A.  Yes.
13      Q.  I'm done with that one.  You can
14 put it aside.
15      Do you know -- do you have an opinion in
16 this case regarding whether, if at all,
17 Ms. Stubblefield's pain changed throughout the course
18 of her treatment?
19      MR. ZIMMERMAN:  Objection, form.  Answer
20 if you can.
21      THE DEPONENT:   Well, the pain is
22 changing because of the treatments.  We can see that,
23 for example, October, 2007, on page 5, she does not --
24 some residual pain on anterior side where she had the

Case 2:12-md-02327 Document 3799-4 Filed 04/25/17 Page 25 of 29 PageID #: 130405
Case 2:12-md-02327 Document 3799-4 Filed 04/25/17 Page 25 of 29 PageID #: 64795
Vladimir Iakovlev, M.D.

Page 90

1  mesh implant. So it indicates that at that time there
2  is residual pain or there is some reduction of the pain
3  after nerve blocks.
4       So at least at that time there was a
5  change in the pain.
6       BY MR. SNOWDEN:
7       Q. Okay. Any other changes to the
8  pain?
9       MR. ZIMMERMAN: Same objection. Answer
10 if you can.
11      THE DEPONENT: So again another entry on
12 page 7, March 2011:
13       "She went for three years with
14       constant bilateral groin, suprapubic,
15       and vaginal pain which she describes as
16       'burning' like 'needles,' and 'jabbing
17       pain'. She was treated by Dr. Zimmerman
18       with excision of mesh and states that
19       after the excision, the vaginal and
20       midline pain went away. She is still
21       stuck with the [bilateral lower
22       quadrant] pain."
23       So the location changed after the
24 excision. That's another change in the pattern of pain

Page 91

1  again, following treatment procedure.
2       Again another entry, June, 2011:
3        "67 year old female who presents for
4       evaluation and management of pelvic
5       pain. Patient was last seen by me a few
6       months ago with the following diagnosis
7       and treatment plan: Chronic neuropathic
8       pain due to post-mesh pain syndrome.
9       Partially relieved with nortriptyline,
10      but patient could not tolerate it due to
11      side effects."
12      So, again, there was improvement of pain
13 on medication, but patient could not tolerate the
14 medication.
15      But there is a change in pain, again,
16 after treatment.
17      BY MR. SNOWDEN:
18      Q. What role, if any, did your
19 evaluation of changes and complaints of pain have on
20 your opinion?
21      A. It's not in my opinion, but I can
22 see the pattern in the records that if there is a
23 specific treatment in relation to mesh, there is a
24 change of symptoms. So I can see that the clinicians

Page 92

1  are working up their differential diagnosis. They make
2  decision to excise mesh or to treat with specific
3  interventions like nerve blocks, but especially
4  excision of the mesh. If there is change of the
5  symptoms after mesh excision, it just gives an extra
6  evidence that symptoms pre-excision were caused by the
7  mesh. Because the mesh was excised, symptoms were
8  relieved, therefore, symptoms before the excision were
9  caused by the mesh.
10      Q. Does it matter to your differential
11 diagnosis in this case -- strike that.
12      Would it be important to your
13 differential diagnosis in this case to know that the
14 plaintiff later reported to healthcare providers that
15 the surgeries had not addressed her pain?
16      MR. ZIMMERMAN: Objection. Answer if
17 you can.
18      THE DEPONENT: As I said, I'm not doing
19 clinical differential diagnosis. I just see what is in
20 the records. I'm doing my morphological differential
21 diagnosis.
22      BY MR. SNOWDEN:
23      Q. What's the difference between a
24 clinical differential diagnosis and a morphological

Page 93

1  differential diagnosis?
2       A. Clinical differential diagnosis is
3  being worked up by clinical investigations, by taking
4  history, by examining the patient, doing some tests,
5  radiological or imaging studies. Morphological
6  differential diagnosis is determining what is abnormal
7  in the excised tissue.
8       If clinical differential diagnosis
9  narrows the cause of specific symptoms to specific area
10 and then it's being excised, I can look at the tissue
11 in the microscope and I can say what is abnormal in the
12 tissue. So then I can differentiate, is it natural
13 disease like a tumor? Is it a foreign body? And what
14 are the changes related to the foreign body? And then
15 I can complete the diagnostic process which started
16 with clinical differential diagnosis.
17      Q. On page 12 of your report under the
18 pain section, the first paragraph you end with "There
19 was a relief of symptoms after mesh excision." Do you
20 see that?
21      A. Yes.
22      Q. Is it important to your
23 clinico-pathologic correlation in this case that there
24 was a relief of symptoms after mesh excision?

Case 2:12-md-02327 Document 3799-4 Filed 04/25/17 Page 26 of 29 PageID #: 136406
Case 2:12-md-02327 Document 3799-4 Filed 04/25/16 Page 26 of 29 PageID #: 64790
Vladimir Iakovlev, M.D.

Page 94

1      A.  It's not required.  And this is an
2  extra or additional information in the clinical
3  records.
4      Q.  Are you relying on that fact in
5  your opinion in this case?
6      A.  No.  I'm relying on the fact that
7  clinical differential diagnosis lead to mesh excision,
8  and then my examination of the specimen when, when it
9  was removed or what was abnormal in the tissue at the
10  time of removal.  And what I see in the tissue is
11  presence of the mesh and tissue reaction to the mesh.
12      Q.  Were you provided with records from
13  Therapy Works in Winchester, Tennessee, where
14  Ms. Stubblefield reported that her surgeries have not
15  helped and was told that there was nothing else they
16  could do for her, in October of 2011?
17      A.  What provider?
18      Q.  Therapy Works.
19      A.  I don't remember exact all the
20  records by heart.  If it's on the thumb drive, I was
21  provided.  If it's not there, then I did not have them.
22      Q.  In any event, sounds like that
23  would not have been important to your opinion in this
24  case.

Page 95

1      MR. ZIMMERMAN:  Objection.
2      THE DEPONENT:  Just copy what is in the
3  clinical records.  At the end of the day the decision
4  was to excise the mesh.
5      BY MR. SNOWDEN:
6      Q.  During the procedure on
7  September 23rd, 2009, was the -- and that's the
8  specimen you have that relates to that procedure,
9  correct?
10      A.  Yes.
11      Q.  Was the mesh the only thing removed
12  that day from Ms. Stubblefield?
13      A.  There were several fragments of
14  mesh removed at that time together with the tissue.
15      Q.  Okay.
16      EXHIBIT NO. 8:  Urology Gynecology
17      Operative Report 2009/09/23
18      BY MR. SNOWDEN:
19      Q.  I'm handing you what is marked as
20  Stubblefield 8.  And if you look at the top, you'll see
21  "Urology Gynecology Operative Report" 2000 -- well,
22  September 23rd, 2009.  Do you see that?
23      A.  I do.
24      Q.  Okay.  And do you understand this

Page 96

1  is the operative report from the mesh removal surgery
2  on that date?
3      A.  Yes.
4      Q.  Okay.  And if we go down to the
5  last paragraph in the -- on this first page, it
6  mentions that, "A permanent suture was palpated on the
7  left side of the fascia penetrating the muscle and the
8  fascia."  Do you see that?
9      A.  Yes, I do.
10      Q.  And then it says that "The suture
11  was attached to a remnant of the TVT mesh."  Do you see
12  that?
13      A.  I do.
14      Q.  And we know what they mean there is
15  actually the Prolene soft that turned into a sling?
16      A.  Yes.
17      Q.  Okay.  Then it continues and it
18  says:
19          "A second suture was located on the
20          right side of the fascia and the
21          dissection was carried out similarly."
22          Do you see that?
23      A.  Sorry.  I'm so tired, I barely can
24  see.

Page 97

1      Q.  I skipped a sentence about removing
2  the mesh just so I could focus on the suture.  So it
3  continues, "The mesh was carefully dissected."  Do you
4  see that sentence?
5      A.  Which line from the bottom?
6      Q.  We are -- the line I want to look
7  at is three lines up from the bottom.
8          And it -- there's a line before it that
9  says the mesh was removed intact.  Do you see that?
10      A.  Yes, I do.
11      Q.  The next is, "A second suture was
12  located on the right side of the fascia and the
13  dissection was carried out similarly."
14          Do you see that?
15      A.  I do.
16      Q.  Do you understand these to be the
17  tensioning sutures that -- strike that.
18          Do you understand these to be the
19  sutures found in your gross specimen pictures MS1?
20      A.  I don't know if those were the only
21  sutures and if there was any additional sutures for
22  traction.
23      Q.  Okay.
24      A.  I mean some of it is likely to be

Case 2:12-md-02327 Document 3799-4 Filed 04/29/17 Page 27 of 29 PageID #: 128107
Case 2:12-md-02327 Document 3799-4 Filed 04/29/17 Page 27 of 29 PageID #: 64795

Vladimir Iakovlev, M.D.

Page 98

1  the sutures. If it is the only sutures, if there was
2  an additional suture, I cannot say.
3       Q.  And those sutures penetrated the
4  muscle and the fascia?
5       A.  So second suture was on the right
6  side of the fascia.
7       Q.  Uhm-hmm.
8       A.  Does not say that it penetrated.
9       Q.  And the first suture, which was the
10 first sentence I read when we got on to this, it says,
11 "A permanent suture was palpated on the left side of
12 the fascia penetrating the muscle and the fascia." Do
13 you see that?
14      A.  Yes, I do.
15      Q.  Okay. Did you consider the removal
16 of these sutures and their placement through fascia and
17 muscle when coming to your clinico-pathologic
18 correlation regarding pain in this case?
19      A.  So if we go through the records,
20 July, 2005, pain in the mesh area. Then November 2005
21 pain in the mesh area. Then again, pain is associated
22 with the mesh itself in October 2007, residual pain on
23 the anterior side where she had the mesh implant.
24      Q.  October 2007 you would agree she

Page 99

1  still had the sutures that were removed two years
2  later?
3       A.  Yes, but the description of the
4  clinician is that, in relation to the mesh not to the
5  sutures.
6       Q.  And would the sutures that were
7  implanted as tensioning sutures necessarily be
8  associated with the same area as the mesh?
9       A.  They are somewhat away. Again, I'm
10 not urogynecologist and I'm not explanting surgeon to
11 tell exactly where they were. Volume-wise the suture
12 is much smaller in terms of the mesh. Just give me one
13 second.
14          So after the mesh excision, the midline
15 pain went away. Again that specific pain in the
16 middle where only the mesh was, no sutures went away.
17      Q.  Which record are you reading from?
18      A.  March 2011.
19      Q.  So the tensioning sutures were not
20 in the midline?
21      A.  No.
22      Q.  So in this case, did you rule out
23 the sutures as the -- as a cause of pelvic or vaginal
24 pain for Ms. Stubblefield?

Page 100

1       A.  Well, I can see that, first of all,
2  the clinical descriptions are connecting pain with the
3  mesh itself, the mesh is being taken out, and initial
4  excision of the mesh in the middle portion alleviated
5  the symptoms or changed the pattern of symptoms.
6  Again, at that time sutures were not removed, only the
7  mesh was removed. And there was a change in pain.
8          And when I examined the mesh
9  microscopically, it provides much larger volume of the
10 foreign material. The extent of tissue damage is much
11 larger than what we see with the sutures, creates
12 larger scar plate that attaches to larger area of
13 tissues on its way.
14      Q.  Is it your opinion that
15 Dr. Zimmerman, when he was completing his differential
16 diagnosis, settled on the mesh itself and not the
17 suture?
18      A.  The initial excision wasn't
19 anywhere close to the sutures. The initial excision
20 was in the mid-portion.
21      Q.  When coming to your -- or when
22 undertaking your clinical pathologic correlation in
23 this case, did you consider what role, if any,
24 Ms. Stubblefield's use of pain medications and

Page 101

1  narcotics played on her pain symptoms?
2       A.  No. This would be a clinical
3  question.
4       Q.  So you didn't consider that in
5  September 2011, Ms. Stubblefield had a narcotics
6  overdose resulting in detoxification where she realized
7  she did not need the narcotic medications because she
8  really did not experience any pain at all despite not
9  being on any pain medications at all for four days and
10 she realized she can live without pain medications?
11         MR. ZIMMERMAN: Objections. Already
12 asked and answered. Answer if you can.
13         THE DEPONENT: It's beyond my scope.
14 It's a clinical information.
15         BY MR. SNOWDEN:
16      Q.  Go off the record for just a
17 moment.
18         -- OFF-THE-RECORD DISCUSSION --
19         BY MR. SNOWDEN:
20      Q.  Dr. Iakovlev, would you agree that
21 nerve entrapment can lead to numbness?
22      A.  It can.
23      Q.  Okay. I'll reserve the remainder
24 of my time. Thank you.

Case 2:12-md-02327 Document 3799-4 Filed 04/27/17 Page 28 of 29 PageID #: 128408
Case 2:12-md-02327 Document 3799-4 Filed 04/09/16 Page 28 of 29 PageID #: 64798
Vladimir Iakovlev, M.D.

|  | Page 102 |
| --- | --- |

1 EXAMINATION BY MR. ZIMMERMAN:

2     Q. Good evening, Doctor.

3     A. Good evening.

4     Q. I just have a few questions for

5 you. I am going to introduce myself for the record.

6 My name is Christopher Zimmerman and I'm here on behalf

7 of the plaintiff. And I just have a couple questions.

8     Doctor, it's true that you reached

9 several opinions in this case, correct?

10     A. Yes.

11     Q. And those opinions are in summary

12 form described in the expert report marked as Exhibit

13 1?

14     A. Yes.

15     Q. And did you reach those opinions

16 based on your education, skill, and expertise?

17     A. Yes.

18     Q. And do you hold those opinions to a

19 reasonable degree of medical certainty?

20     A. Yes, I do.

21     Q. And I know you were asked over the

22 last three hours many questions regarding

23 Ms. Stubblefield. Have any of the questions posed to

24 you today or any of the answers you have given changed

|  | Page 103 |
| --- | --- |

1 any of the opinions that you have already expressed in

2 your report?

3     A. No.

4     MR. ZIMMERMAN: Those are all the

5 questions. I have at this point.

6     BY MR. ZIMMERMAN:

7     Q. Dr. Iakovlev, thank you, and I hope

8 this process of 35 depositions wasn't too painful for

9 you.

10   -- Whereupon the deposition concluded at 11:30 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

|  | Page 104 |
| --- | --- |

1     REPORTER'S CERTIFICATE

2     I, TERRY WOOD, RPR, CSR, Certified

3 Shorthand Reporter, certify;

4     That the foregoing proceedings were

5 taken before me at the time and place therein set

6 forth, at which time the witness was put under oath by

7 me;

8     That the testimony of the witness and

9 all objections made at the time of the examination were

10 recorded stenographically by me and were thereafter

11 transcribed;

12     That the foregoing is a true and correct

13 transcript of my shorthand notes so taken.

14

15

16     _____

17     PER: TERRY WOOD, RPR, CSR

18     REAL-TIME REPORTER

19

20

21

22

23

24

|  | Page 105 |
| --- | --- |

1     DEPOSITION ERRATA SHEET

2 Case Caption: IN RE: ETHICON, INC., PELVIC REPAIR

3     SYSTEM PRODUCTS LIABILITY LITIGATION

4

5     DECLARATION UNDER PENALTY OF PERJURY

6   I declare under penalty of perjury that I have read

7     the entire transcript of my deposition taken

8     in the captioned matter or the same has been

9     read to me, and the same is true and

10     accurate, save and except for changes and/or

11     corrections, if any, as indicated by me on

12     the DEPOSITION ERRATA SHEET hereof, with the

13     understanding that I offer these changes as

14     if still under oath.

15

16 Signed on the _____ day of _____, 2016.

17

18     _____.

19

20     VLADIMIR IAKOVLEV, M.D.

21

22

23

24

Case 2:12-md-02327 Document 3790-4 Filed 04/25/17 Page 29 of 29 PageID #: 136109
Case 2:12-md-02327 Document 3790-4 Filed 04/25/17 Page 29 of 29 PageID #: 64799
Vladimir Iakovlev, M.D.

Page 106

1    DEPOSITION ERRATA SHEET

2

3

4    Page No._____Line No._____Change to:_____

5    _____

6    Reason for change:_____

7    Page No._____Line No._____Change to:_____

8    _____

9    Reason for change:_____

10   Page No._____Line No._____Change to:_____

11   _____

12   Reason for change:_____

13   Page No._____Line No._____Change to:_____

14   _____

15   Reason for change:_____

16   Page No._____Line No._____Change to:_____

17   _____

18   Reason for change:_____

19   Page No._____Line No._____Change to:_____

20   _____

21   Reason for change:_____

22   Page No._____Line No._____Change to:_____

23

24   SIGNATURE: _____DATE:_____