# EXHIBIT D

Case 2:12-md-02327 Document 3790-5 Filed 04/27/17 Page 2 of 41 PageID #: 136441
Case 2:12-cv-02952 Document 379053 Filed 04/07/16 Page 2 of 41 PageID #: 18629
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                 CHARLESTON DIVISION
 3     ***************************
       IN RE:  ETHICON, INC.,      Master File No.
 4     PELVIC REPAIR SYSTEM         2:12-MD-02327
       PRODUCTS LIABILITY             MDL 2327
 5     LITIGATION
 6                                 JOSEPH R. GOODWIN
       THIS DOCUMENT RELATES TO:   U.S. DISTRICT JUDGE
 7     THE CASES LISTED BELOW
 8
 9
       Mullins, et al. v.
10     Ethicon, Inc., et al.      2:12-cv-02952
11     Sprout, et al. v.
       Ethicon, Inc., et al.      2:12-cv-07924
12
       Iquinto v. Ethicon, Inc.,
13     et al.                     2:12-cv-09765
14     Daniel, et al. v.
       Ethicon, Inc., et al.      2:12-cv-02565
15
       Dillon, et al. v.
16     Ethicon, Inc., et al.      2:13-cv-02919
17     Webb, et al. v.
       Ethicon, Inc., et al.      2:13-cv-04517
18
       Martinez v. Ethicon,
19     Inc., et al.               2:13-cv-04730
20     McIntyre, et al. v.
       Ethicon, Inc., et al.      2:13-cv-07283
21
22
23            VIDEOTAPED DEPOSITION OF
          ROBYN LYN PRUEITT, Ph.D., D.A.B.T.
24
            Thursday, October 22nd, 2015
25                   9:48 a.m.
```

Robyn Lyn Prueitt, Ph.D., D.A.B.T.

## Page 2

```
 1   ****************************
 2   Oxley v. Ethicon, Inc.,     2:13-cv-10150
     et al.
 3   Atkins, et al. v.           2:13-cv-11022
     Ethicon, et al.
 4
     Garcia v. Ethicon, Inc.,    2:13-cv-14355
 5   et al
 6   Lowe v. Ethicon, Inc.,      2:13-cv-14718
     et al.
 7
     Dameron, et al. v.          2:13-cv-14799
 8   Ethicon, Inc., et al.
 9   Vanbuskir, et al. v.        2:13-cv-16183
     Ethicon, Inc., et al.
10
     Mullens, et al. v.          2:13-cv-16564
11   Ethicon, Inc., et al.
12   Shears, et al. v.           2:13-cv-17012
     Ethicon, Inc., et al.
13
     Javins, et al., v.          2:13-cv-18479
14   Ethicon, Inc., et al.
15   Barr, et al., v.            2:13-cv-22606
     Ethicon, Inc., et al.
16
     Lambert v. Ethicon,         2:13-cv-24393
17   Inc., et al.
18   Cook v. Ethicon, Inc.,      2:13-cv-29260
     et al.
19
     Stevens v. Ethicon,         2:13-cv-29918
20   Inc., et al.
21   Harmon v. Ethicon, Inc.,    2:13-cv-31818
     et al.
22
     Snodgrass v. Ethicon,       2:13-cv-31881
23   Inc., et al.
24   Miller v Ethicon, et al     2:13-cv-32627
25
```

## Page 3

```
 1   Matney, et al. v.           2:14-cv-09195
     Ethicon, Inc., et al.
 2
     Jones, et al. v.            2:14-cv-09517
 3   Ethicon, Inc., et al.
 4   Humbert v. Ethicon,         2:14-cv-10640
     Inc., et al.
 5
     Gillum v. Ethicon,          2:14-cv-12756
 6   Ethicon, Inc., et al.
 7   Whisner, et al. v.          2:14-cv-13023
     Ethicon, Inc., et al.
 8
     Tomblin v. Ethicon,         2:14-cv-14664
 9   Inc., et al.
10   Schepleng v. Ethicon,       2:14-cv-16061
     Inc., et al.
11
     Tyler, et al. v.            2:14-cv-19110
12   Ethicon, Inc., et al.
13   Kelly, et al. v.            2:14-cv-22079
     Ethicon, Inc., et al
14
     Lundell v. Ethicon,         2:14-cv-24911
15   Inc., et al.
16   Cheshire, et al. v.         2:14-cv-24999
     Ethicon, Inc., et al.
17
     Burgoyne, et al. v.         2:14-cv-28620
18   Ethicon, Inc., et al.
19   Bennett, et al. v.          2:14-cv-29624
     Ethicon, Inc., et al.
20
21
22
23
24
25
```

## Page 4

```
 1   DEPOSITION OF ROBYN LYN PRUEITT, Ph.D., D.A.B.T.
 2
 3       Held At:
             Gradient Corporation
             20 University Road
 4           Cambridge, Massachusetts
 5
     REPORTED BY:
 6   Maureen O'Connor Pollard, RMR, CLR, CSR
 7
 8
         APPEARANCES:
 9
     FOR THE PLAINTIFFS:
10       JONATHAN D. ORENT, ESQ.
         DENNIS A. COSTIGAN, ESQ.
11         MOTLEY RICE LLC
           321 South Main Street
12         Providence, Rhode Island 02903
           401-457-7723
13         jorent@motleyrice.com
           dcostigan@motleyrice.com
14
15   FOR THE DEFENDANTS:
         CHAD R. HUTCHINSON, ESQ.
16         BUTLER SNOW, LLP
           1020 Highland Colony Parkway
17         Suite 1400
           Ridgeland, Mississippi 39157
18         601-985-4401
           chad.hutchinson@butlersnow.com
19         -and-
     PATRICIA E. LOWRY, ESQ.
20         SQUIRE PATTON BOGGS LLP
           1900 Phillips Point West
21         777 South Flagler Drive
           West Palm Beach, Florida 33401
22         561-650-7214
           patricia.lowry@squirepb.com
23
     Videographer:  Christopher Coughlin
24
25
```

## Page 5

```
 1                   INDEX
 2   EXAMINATION                           PAGE
 3   ROBYN LYN PRUEITT, Ph.D., D.A.B.T.
 4   BY MR. ORENT                             7
 5   BY MR. HUTCHINSON                      118
 6   BY MR. ORENT                           136
 7
 8
 9       E X H I B I T S
10   NO.     DESCRIPTION                    PAGE
11   1    Dr. Prueitt's October 9, 2015
          expert report........................ 8
12
13   2    Notice of deposition................ 22
14   3    Three index sheets from binders...... 46
15   4    Billing Statement.................... 46
16   5    Document titled DRI, Seminar,
          Toxic Torts and Environmental Law.... 47
17   6    Document titled Comments on US
          EPA's Proposed Reconsideration of
18        the 2008 NAAQS for Ozone dated
          2/2/09............................... 51
19
20   7    Document titled Gradient to
          Participate in DRI Tox Torts and
21        Environmental Law Seminar Feb 9-10
          in Miami Beach, Florida.............. 52
22   8    Document titled Defending the Wire
          and Cable Asbestos Cases............. 53
23
24   9    Robyn Prueitt, Ph.D., D.A.B.T.
          biography............................ 54
25
```

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 4 of 41 PageID #: 133613
Case 2:12-cv-02327 Document 3799-6 Filed 06/24/16 Page 4 of 41 PageID #: 106021
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 6

```
 1      P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER:  We are now on the
 4   record.  My name is Chris Coughlin, and I'm a
 5   videographer for Golkow Technologies.  Today's
 6   date is October 22nd, 2015, and the time is
 7   9:48 a.m..
 8          This video deposition is being held in
 9   Cambridge, Massachusetts, In Re:  Ethicon, Inc.,
10   Pelvic Repair System Products Liability
11   Litigation, in the United States District Court
12   for the Southern District of West Virginia,
13   Charleston Division.
14          The deponent is Robyn Prueitt, Ph.D,
15   D.A.B.T..
16          Will counsel please identify
17   yourselves for the record.
18          MR. ORENT:  Good morning.  Jonathan
19   Orent for the Plaintiffs, I'm here with Dennis
20   Costigan, also for the Plaintiffs.
21          MR. HUTCHINSON:  Chad Hutchinson,
22   counsel for Johnson & Johnson and Ethicon.
23          MS. LOWRY:  Patricia Lowry for
24   Defendant Johnson & Johnson and Ethicon.
25          THE VIDEOGRAPHER:  The court reporter
```

Page 7

```
 1   is Maureen Pollard, and she will now swear in
 2   the witness.
 3
 4          ROBYN LYN PRUEITT, Ph.D., D.A.B.T.,
 5   having been first duly identified and sworn, was
 6   examined and testified as follows:
 7              EXAMINATION
 8   BY MR. ORENT:
 9      Q.  We're getting a little bit late start
10   today, I apologize to everyone.  Traffic was
11   unbearable.  It took us over three hours to get
12   here this morning from Providence, which is at
13   least another hour plus than it should have
14   taken.  So I appreciate your courtesy.
15          Ms. Prueitt, would you state -- excuse
16   me.  Dr. Prueitt, would you please state your
17   full name for the record?
18      A.  Robyn Lyn Prueitt.
19      Q.  And did you ever go by any other
20   names, a maiden name, anything like that?
21      A.  No.
22      Q.  Are you currently married?
23      A.  Yes.
24      Q.  Ms. Prueitt -- excuse me.
25          Dr. Prueitt, I'm going to mark as
```

Page 8

```
 1   Exhibit 1 to today's deposition a copy of your
 2   report in this matter.
 3          (Whereupon, Prueitt Exhibit Number 1,
 4          Dr. Prueitt's October 9, 2015 expert
 5          report, was marked for
 6          identification.)
 7   BY MR. ORENT:
 8      Q.  Do you recognize this Exhibit 1 as
 9   being a report authored by you and dated
10   October 9, 2015?
11      A.  Yes.
12      Q.  And does this contain a full listing
13   of all of the opinions that you intend to
14   express in this matter?
15      A.  Yes, it does.
16      Q.  This report is signed on October 9th.
17   When is it that you were first retained by
18   Ethicon in this matter?
19      A.  October 2nd -- excuse me.
20   October 1st.
21      Q.  Had you ever done any work for Ethicon
22   prior to October 1st?
23      A.  No.
24      Q.  Now, this was signed on October 9th.
25   When did it become final in terms of the draft?
```

Page 9

```
 1      A.  October 9th.
 2      Q.  So you were editing it and working on
 3   it up until the moment you signed it?
 4      A.  Yes.
 5      Q.  And prior to October 1st, what work
 6   had you done on medical devices?
 7      A.  None.
 8      Q.  How about medical implants?
 9      A.  None.
10      Q.  When is the first time you evaluated
11   testing using the ISO-10993 series tests?
12      A.  For this case.
13      Q.  This is the first time that you ever
14   evaluated ISO-10993 type testing, is that right?
15      A.  Yes.
16      Q.  And when is the first time that you
17   ever evaluated preclinical animal studies?
18      A.  Just in general?
19      Q.  In general.
20      A.  I can't say.  I've evaluated many such
21   studies over the course of my time at Gradient
22   in evaluating toxicity of various chemicals.
23      Q.  Okay.  So I used the term preclinical.
24   Have you ever evaluated, prior to this case, an
25   in vivo study of an implant?
```

1    A.  No.
2    Q.  Prior to this, what types of in vivo
3  animal studies did you look at?
4    A.  All sorts of studies, acute studies to
5  determine the acute toxicity, such as lethality
6  studies, subacute studies of less than 30 days
7  in duration of various chemicals by various
8  exposure routes, subchronic studies, that is
9  90 day studies of various chemicals, and chronic
10  studies, particularly carcinogenicity studies.
11    Q.  And how far out -- what's the longest
12  in time that you have seen animal studies go?
13    A.  I've seen a few go past two years,
14  though two years is the sort of standard amount
15  of time.
16    Q.  Standard for the work that you've done
17  in the past?
18    A.  Yes.
19    Q.  And prior to your work -- I used the
20  particular ISO protocol 10993 in my prior
21  questions, had you done in vitro assay work
22  prior to this case?
23    A.  I have, although not under the ISO
24  guidelines.  But yes, in general I have done in
25  vivo -- excuse me, in vitro studies.

1    Q.  Okay.  What types of in vitro studies
2  did you do previously?
3    A.  Quite a few.  In my past work I
4  have -- I've added nicotine to prostate cancer
5  cells to study their growth and potential
6  tumorigenic properties after that exposure.
7  I've used in vitro cells to extract protein, DNA
8  or RNA for various molecular biology
9  applications.
10    Q.  Have you done any cytotoxicity
11  studies, as you've defined the term in your
12  report, previously in the in vitro context?
13    A.  In general terms not, in the way that
14  it's described in my report.
15    Q.  How about in specific terms?
16    A.  No.
17    Q.  Now, you've been here at Gradient
18  since 2008, is that correct?
19    A.  2007.
20    Q.  2007.
21       Before that, you worked at the Fred
22  Hutchinson Cancer Research Center?
23    A.  Yes.
24    Q.  And before that, the National Cancer
25  Institute, is that correct?

1    A.  Yes.
2    Q.  Have you ever -- did you do any
3  private consulting while working at Fred
4  Hutchinson Cancer Research Center?
5    A.  No, I did not.
6    Q.  How about while at the National Cancer
7  Institute?
8    A.  No.
9    Q.  So all of your private consulting
10  began when you came to Gradient?
11    A.  Yes.
12    Q.  Now, I see that you have not testified
13  in the last four years.  Have you ever provided
14  deposition testimony at all?
15    A.  No, I haven't.
16    Q.  So this is your first time?
17    A.  Yes.
18    Q.  Have you ever provided testimony in a
19  trial?
20    A.  No.
21    Q.  Have you ever worked on -- strike
22  that.
23       Have you ever sat in on a deposition?
24    A.  No.
25    Q.  Have you ever, prior to your

1  preparation for this and prior to your retention
2  to this case, ever worked to prepare someone for
3  a deposition?
4    A.  Yes.
5    Q.  On approximately how many occasions?
6    A.  Maybe two or three.
7    Q.  And what context?  What types of
8  litigation was that involved in?
9    A.  Let's see.  I can't discuss
10  specifically because they never -- the cases
11  never went to trial, so I'm concerned about
12  confidentiality.
13    Q.  Okay.
14    A.  But in general, toxic tort cases where
15  there was exposure to a substance in air and
16  claims of health effects.
17    Q.  Okay.  Can you tell me what that
18  substance was?
19    A.  I don't know if I can.
20    Q.  Okay.  You've done consulting on
21  behalf of companies that formerly manufactured
22  asbestos, is that correct?
23    A.  Yes.
24    Q.  And you've also done consulting on
25  behalf of companies that manufactured tobacco

Case 2:12-md-02323 Document 7905-5 Filed 04/27/17 Page 6 of 41 PageID #: 136205
Case 2:12-cv-02372 Document 7905-5 Filed 04/27/17 Page 6 of 41 PageID #: 136205
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 14

1 products, correct?
2    A.  Yes.
3    Q.  And you've also done work for the
4 American Petroleum Institute, is that right?
5    A.  Yes.
6    Q.  And you've also done work for
7 individual manufacturers of petroleum products,
8 gas products, correct?
9    A.  Yes.
10    Q.  And you've also done work for other
11 companies that utilize benzene-based products,
12 is that right?
13    A.  Yes.
14    Q.  And with regard to asbestos, you've
15 worked -- or you've formed opinions as to
16 whether or not chrysotile asbestos is a
17 carcinogen, is that right?  That's one of the
18 questions you looked at?
19    A.  Yes.  I did not form opinions.  I was
20 in a supporting role.  But yes, that is a
21 question that was looked at.
22    Q.  And ultimately, the person who was
23 testifying that you worked for in that context
24 concluded that chrysotile asbestos was not
25 carcinogenic, is that right?

Page 15

1    A.  Yes, I believe so.
2    Q.  And that is contrary to what the World
3 Health Organization has said about chrysotile
4 asbestos, is that right?
5    A.  I don't know.
6    Q.  In assisting in that work, did you go
7 to the World Health Organization's publications,
8 like IARC, or any of the other World Health
9 Organization publications to determine whether
10 or not they believed that chrysotile asbestos
11 was carcinogenic?
12    A.  No, because my portion of the work
13 really didn't involve that aspect.
14    Q.  And did your portion look at the
15 epidemiology related to workers who had been
16 exposed to chrysotile asbestos?
17    A.  No.
18    Q.  Did it involve looking at lung tissue
19 samples of individuals who had been exposed to
20 chrysotile asbestos products?
21    A.  No.
22    Q.  And the context in which you were
23 working on these cases was that your company,
24 Gradient, had been hired by companies to
25 demonstrate that the risk -- excuse me, to

Page 16

1 demonstrate that the individual complainant
2 could not have developed mesothelioma as a
3 result of exposure to chrysotile asbestos, is
4 that right?
5    A.  Yes.
6    Q.  Now similarly, with regard to the work
7 that you've done on benzene, you ultimately were
8 retained by someone, a defendant in litigation,
9 who wanted Gradient to provide testimony that
10 said that benzene was not the cause of an
11 individual complainant's cancer, is that right?
12    A.  I believe so.
13    Q.  And similarly, in the tobacco cases
14 that you've worked on, the tobacco companies
15 retained Gradient, and you assisted in preparing
16 reports where ultimately the opinions of
17 Gradient were that the tobacco was not a
18 contributor to the individual's development of
19 cancer, correct?
20       MR. HUTCHINSON:  Object to form.
21    A.  No.
22 BY MR. ORENT:
23    Q.  No.  Okay.
24       What was your role in the tobacco
25 cases?

Page 17

1    A.  It was very small.  It was shortly
2 after I started at Gradient, so I don't remember
3 a lot of the specifics, but it had to do with
4 comparison of light cigarettes to regular
5 cigarettes.
6    Q.  And ultimately, the conclusion there
7 was that regular cigarettes have a more
8 carcinogenic potential, is that right?
9    A.  I don't know.
10    Q.  And that was -- you were there
11 retained on behalf of the Defendant in that
12 tobacco litigation, correct?
13    A.  I'm actually not clear if there was
14 litigation.  It may have just been consulting to
15 understand the scientific issues better.
16    Q.  Okay.  And I see you also were
17 retained in some lead litigation, is that
18 correct?
19    A.  Yes.
20    Q.  And there you worked to determine that
21 individual exposure to lead was not the cause of
22 the injuries complained of by a group of
23 individual children, is that right?
24    A.  Yes, that's what the testifying expert
25 was claiming.

Page 18

1     Q. Okay. And one of the things that
2 you're aware of is that lead has no known
3 threshold below which there's not been seen to
4 have been found an effect, is that correct?
5     A. That's debatable in the scientific
6 literature.
7     Q. Okay. So you're aware that the CDC
8 has taken the position that there is no
9 threshold below which lead doesn't have an
10 effect?
11     A. I think I've seen that statement.
12     Q. Okay. And you disagree with that
13 statement?
14     A. I think that some of the work done
15 here at Gradient may contradict that statement.
16     Q. Okay. And so what threshold have you
17 worked on here at Gradient that shows that there
18 is a threshold effect for lead?
19     A. I can't remember.
20     Q. Do you know, as you sit here today, do
21 you recall what the threshold was that you all
22 determined?
23     A. No, I don't remember.
24     Q. But certainly you are aware that
25 individuals at Harvard, for example Phil

Page 19

1 Landrigan, has done a lot of research that shows
2 that, for example, at 3 micrograms per deciliter
3 there's conclusive effects on individuals?
4     MR. HUTCHINSON: Object to form.
5     A. I don't know. I don't know that
6 they're conclusive.
7 BY MR. ORENT:
8     Q. So you're also aware that the World
9 Health Organization has formed statements on
10 lead, correct?
11     A. I can't remember. I really didn't
12 prepare to talk about lead today.
13     Q. Okay. But your opinion certainly, as
14 you sit here today, is that you believe that
15 there is a threshold for lead exposure, correct?
16     A. I believe that some of the scientists
17 at Gradient have produced manuscripts in the
18 peer-reviewed literature and other comments that
19 indicate that there's likely a threshold.
20     Q. And who are those individuals that
21 wrote those?
22     A. Barbara Beck, and Theresa Bowers.
23     Q. Now, Barbara Beck was retained by the
24 Lead Industries Association, was she not?
25     A. I don't know who she was retained by.

Page 20

1     Q. But she's done work in litigation,
2 regardless, on lead poisoning?
3     A. Yes.
4     Q. And you as a scientist, do you put
5 more weight and credibility into the work done
6 by Barbara Beck and the individuals here at
7 Gradient, or do you put more weight onto the
8 CDC's statements in 1991 and 2005 and 2014, I
9 think was the latest one?
10     MR. HUTCHINSON: Object to form.
11     A. Well, here we look at all the
12 evidence, and so whatever the evidence that the
13 CDC used as their basis we also examine, but we
14 also examine the work of Barbara Beck as well.
15 So, you know, it just depends on -- it's
16 actually a large body of data. We evaluate a
17 large number of studies and you, know, come to
18 our conclusions based on that large body of
19 data.
20 BY MR. ORENT:
21     Q. Okay. And just for the record, the
22 American Academy of Pediatrics has also come out
23 strongly in multiple iterations in the last
24 15 years suggesting that lead has no known
25 threshold below which there are not -- negative

Page 21

1 effects have been found, is that right?
2     MR. HUTCHINSON: Form.
3     A. I don't know.
4 BY MR. ORENT:
5     Q. Okay. But that would be contrary to
6 the position that Gradient has taken as well,
7 correct?
8     A. Yes.
9     Q. Okay. In your work for Gradient, have
10 you found in the asbestos context a threshold
11 below which you believe that there are no known
12 adverse effects of exposure to asbestos?
13     MR. HUTCHINSON: Object to form.
14     Also, Counsel, that exceeds the scope
15 of her report.
16     MR. ORENT: I understand. I'm getting
17 into background and bias.
18     A. I'm sorry, can you repeat it?
19 BY MR. ORENT:
20     Q. Sure.
21     Do you believe that there's a
22 threshold below which asbestos cannot cause
23 human health problems?
24     MR. HUTCHINSON: Same objections.
25     A. I don't know. Again, I had a very

Case 2:12-md-02327 Document 3790-5 Filed 04/27/17 Page 8 of 41 PageID #: 136917
Case 2:12-cv-02327 Document 3790-5 Filed 04/27/17 Page 8 of 41 PageID #: 136917

Robyn Lyn Prueitt, Ph.D., D.A.B.T.

1 small supporting role in the asbestos work here,
2 so I'm not really prepared to discuss that.
3 BY MR. ORENT:
4     Q.  Okay.  So you started work on this on
5 October 1st.
6         Between October 1st and October 9th,
7 how many hours do you put in?
8     A.  I have an invoice.
9     Q.  I'd love to see that.  That may be a
10 good time for me to mark as Exhibit 2 to today's
11 deposition a copy of the notice of deposition
12 for today.
13         (Whereupon, Prueitt Exhibit Number 2,
14         Notice of deposition, was marked for
15         identification.)
16     A.  Did you ask number of hours?
17 BY MR. ORENT:
18     Q.  The number of hours, correct.
19     A.  Myself through last Friday, this
20 invoice indicates I worked 51 hours.  And then
21 because this invoice only goes through last
22 Friday, also approximately 19 hours this week.
23 However, other individuals have also worked on
24 this with me.
25     Q.  Okay.  Can I take a look at that

1 billing statement?
2     A.  Sure (handing).
3     Q.  So this runs through the 16th of
4 October.  How many hours were spent between the
5 10th and 16th of October?
6         MR. HUTCHINSON:  Counsel, do you have
7 another copy for the witness to look at?
8         MR. ORENT:  I can hand this back.  She
9 just gave this this morning.
10     A.  I am not sure.  I cannot tell from
11 this.
12 BY MR. ORENT:
13     Q.  Between the 10th and the 16th, did you
14 continue to do work reading materials and work
15 on this case?
16     A.  Yes, but very little.  Actually it
17 would have been -- it was probably around eight
18 hours or so.  Not very many.
19     Q.  How about your staff, did they
20 continue doing work on this?
21     A.  Only helping me prepare for this
22 deposition in terms of printing documents for me
23 and organizing documents.
24     Q.  Now, in terms of the report itself,
25 did your staff do any of the work in terms of

1 the substantive work of drafting the report, or
2 did you draft all of it?
3     A.  They did help in doing research to
4 draft the report.
5     Q.  And who -- let's start specifically.
6         What was your role in doing this
7 report?
8     A.  I made an outline as to what the
9 report would contain, and I asked staff to help
10 me go through some of the documentation and to
11 summarize some of the documentation for me, and
12 to help in the initial draft sections, some of
13 them.  And then I myself was responsible for the
14 final report, or editing draft sections, and
15 writing several of the sections.
16     Q.  Were there notes exchanged between you
17 and the members of your team on the various
18 sections, or how was that work accomplished?
19     A.  No.  We met in person.
20     Q.  Now, let me just look at this for a
21 minute.
22         What role did Sara Pacheco Shubin --
23 P-A-C-H-E-C-O, next word S-H-U-B-I-N -- play in
24 the work on this?  Who is she?
25     A.  She was the project manager for this

1 work.
2     Q.  What is a project manager?
3     A.  At Gradient the project manager is
4 responsible for kind of the day-to-day aspects
5 of the project as far as helping find people to
6 work on the project, dealing with getting the
7 project started and in our accounting system,
8 reviewing invoices before they go out.
9     Q.  Are they responsible for any
10 substantive work?
11     A.  They can be.  And in this case, yes,
12 Sara was.  She helped me to review a lot of the
13 documents, a lot of the studies, and she helped
14 in the early drafting of some of the sections.
15     Q.  Now, in this particular case, you
16 spent as of the 16th 51 hours.  And based on
17 your testimony that you spent about eight hours
18 between the 10th and 16th, that leads me to
19 believe that you spent about 43 hours and
20 one-tenth, so 43.1 hours in the actual time
21 period between when you got the assignment and
22 drafted the report.  Is that approximately
23 correct?
24     A.  Yes.
25     Q.  Okay.  Now, looking at your report,

Page 26

1 there's a number of reliance documents beginning
2 on Page 18, and that continues between 18 and
3 23, and then there's a Section 6.2 which is sort
4 of reliance documents in addition to the ones
5 that were referenced in the report, and that
6 goes to Page 24, 25, 26, and 27.
7     My first question to you is, in
8 Section 6.1, References, prior to writing the
9 report, did you yourself read each and every one
10 of these references before you wrote the report?
11     A.  Yes, at least portions of them.
12     Q.  Did you read the entirety of each and
13 every one of these references before writing
14 your report?
15     A.  No, because some of these are book
16 chapters, and I only needed to look at certain
17 sections of the chapter.
18     Q.  Okay.  So before writing your report,
19 did you read the full Adami article?
20     A.  No.
21     Q.  Prior to writing your report, did you
22 read the full Aigmueller article?
23     A.  Yes.
24     Q.  Did you read the AUGS Position
25 Statement prior to drafting your report?

Page 27

1     A.  Yes.
2     Q.  Prior to drafting your report, did you
3 read the AUGS Position Statement on Midurethral
4 Slings?  This is the second reference there.
5     A.  Yes, I did.
6     Q.  Did you read the AUA statement?
7     A.  Yes.
8     Q.  How about Barbolt, did you read that
9 document in its entirety?
10     A.  Yes, I did.
11     Q.  And you read that before beginning
12 work on this?
13     A.  Yes, before drafting the report.
14     Q.  And the second Barbolt, did you read
15 that in its entirety before beginning work on
16 this?
17     A.  Yes, I did.
18     Q.  Beck, did you read that in its
19 entirety before beginning work?
20     A.  No.
21     Q.  What portions did you read -- did you
22 read the entire section on Page 35 to 87?
23     A.  No.
24     Q.  And Eaton, did you read the entire
25 section, Page 13 to 48, prior to beginning work

Page 28

1 on this?
2     A.  No.
3     Q.  Prior to drafting your opinions in
4 this case, did you read the entire Ethicon
5 Research Foundation 1971 document?
6     A.  Yes.
7     Q.  And did you read the entire 1972
8 document before beginning work?
9     A.  Yes.
10     Q.  Before beginning work, did you read
11 the entire Ethicon Research Foundation 1975
12 document?
13     A.  I don't remember.
14     Q.  To date, have you read that entire
15 document?
16     A.  Yes.
17     Q.  How about the Ethicon Research
18 Foundation 1983, Prolene Sutures, did you read
19 that in its entirety before beginning your
20 report?
21     A.  I don't think so.
22     Q.  How about the next one, the 1983b?
23     A.  I don't think so.
24     Q.  How about the 1984, did you read that
25 in its entirety before beginning your draft of

Page 29

1 your report?
2     A.  I don't think so.
3     Q.  How about the 1988 Prolene, did you
4 read that in its entirety before beginning your
5 draft report?
6     A.  No.
7     Q.  How about the 1989 Ethicon Research
8 Foundation document, did you read that in its
9 entirety before beginning your report?
10     A.  Yes.
11     Q.  How about the 1990a, did you read that
12 in its entirety before beginning your report?
13     A.  No.
14     Q.  How about the 1990b?
15     A.  No.
16     Q.  1990c?
17     A.  No.
18     Q.  How about the 1990d?
19     A.  No.
20     Q.  How about the 1991a?
21     A.  No.
22     Q.  1991b?
23     A.  No.
24     Q.  How about the 1997 Biological
25 Reactivity In Vitro Cytotoxicity-Elution Test,

Robyn Lyn Pruett, Ph.D., D.A.B.T.

| Page 30 |
| --- |

1 did you read that in its entirety before
2 beginning work on your report?
3    A.  Yes.
4    Q.  How about the 1997b?
5    A.  Yes.
6    Q.  How about the 1997c?
7    A.  Yes.
8    Q.  How about the 1964a, Study of Tissue
9 Reaction to Colorless and Pigmented,
10 Monofilament, Polypropylene Suture in the rat
11 and the dog?
12    A.  Yes.
13    Q.  How about the 1964b?
14    A.  No, not in its entirety.
15    Q.  How about the 1965a?
16    A.  No.
17    Q.  How about the 1965b?
18    A.  No.
19    Q.  How about the 1973 Biological
20 Evaluation in Rabbits?
21    A.  No.
22    Q.  How about the Ethicon 1991 Prolene
23 Suture?
24    A.  No.
25    Q.  How about the 1996 Corporate Product

| Page 31 |
| --- |

1 Characterization:  Product Safety Profile -
2 Prolene?
3    A.  Yes.
4    Q.  How about the TVT System 510(k)
5 Notification, did you read that in its entirety?
6    A.  Yes.
7    Q.  How about the 28-Day Intramuscular
8 Tissue Reaction Study in Rats?
9    A.  Yes.
10    Q.  And the 182-day Intramuscular Tissue
11 Reaction Study?
12    A.  Yes.
13    Q.  You read that in its entirety?
14    A.  Yes.
15    Q.  And the 2001 study?
16    A.  Yes.
17    Q.  How about the Clinical Evaluation
18 Report, the Ethicon 2013, did you read that in
19 its entirety before starting your report?
20    A.  Not in its entirety.
21    Q.  And how about the European Commission
22 2013 Report?
23    A.  Not in its entirety.
24    Q.  How about Goutcher 1997, did you read
25 that in its entirety?

| Page 32 |
| --- |

1    A.  Yes.
2    Q.  How about Groutz, did you read that in
3 its entirety prior to beginning your report?
4    A.  Yes.
5    Q.  How about Hazleton?
6    A.  Yes.
7    Q.  And Hill, did you reread that?
8    A.  Yes.
9    Q.  And the ISO Standardization, did you
10 read that, the 2009a?
11    A.  Not in its entirety.
12    Q.  How about the 2009b?
13    A.  Also not in its entirety.
14    Q.  How about the IUGA 2014 Statement?
15    A.  Yes.
16    Q.  How about the Linder article?
17    A.  Not in its entirety.
18    Q.  How about Linkov?
19    A.  Not in its entirety.
20    Q.  How about Martini, 1993 internal memo?
21    A.  Yes.
22    Q.  How about the Nilsson article?
23    A.  Yes.
24    Q.  How about the NAMSA article?
25    A.  Yes.

| Page 33 |
| --- |

1    Q.  And how about the 1997b NAMSA?
2    A.  Yes.
3    Q.  And 1997c?
4    A.  Yes.
5    Q.  And 1997d?
6    A.  Yes.
7    Q.  1997e?
8    A.  Yes.
9    Q.  And 1997f?
10    A.  Yes.
11    Q.  And "g"?
12    A.  Yes.
13    Q.  How about "h"?
14    A.  Yes.
15    Q.  And the North American Science
16 Associates 2015, did you read that in its
17 entirety before beginning work on writing this
18 report?
19    A.  Yes.
20    Q.  How about Olsson?
21    A.  Yes.
22    Q.  Rhomberg?
23    A.  No.
24    Q.  How about the Royal Australian and New
25 Zealand College of Obstetricians and

Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 34

1  Gynecologists Position Statement?
2      A.  Yes.
3      Q.  How about Serati?
4      A.  Yes.
5      Q.  Svenningsen?
6      A.  Yes.
7      Q.  How about the EPA Region 3, is that
8  just a reference you had on hand?
9      A.  No, I actually looked at it.
10     Q.  Okay.  How about FDA 2013?
11     A.  Not in its entirety.
12     Q.  How about FDA 1995?
13     A.  Yes.
14     Q.  How about Wang?
15     A.  Yes.
16     Q.  How about Ward?
17     A.  Not in its entirety.
18     Q.  How about Weed?
19     A.  Not in its entirety.
20     Q.  Wickwire?
21     A.  Not in its entirety.
22     Q.  And Yoon?
23     A.  Not in its entirety.
24     Q.  Okay.  Turning to 6.2, did you read
25  all of the material in Section 6.2 of your

Page 35

1  report prior to beginning work on drafting your
2  report in this case?
3      A.  No.
4      Q.  Do you agree with me that there's a
5  significant portion of the documents in
6  Section 6.2 that you did not read prior to
7  completing your report?
8          MR. HUTCHINSON:  Object to form.
9      A.  No.  There's very few that I didn't.
10 Specifically I did not read the IARC -- on
11 Page 27, the IARC Preamble, it's the first
12 document listed on Page 27.  I'm quite familiar
13 with that document; however, I was not asked to
14 evaluate carcinogenicity in this case, so I did
15 not review that document.
16 BY MR. ORENT:
17     Q.  Are there any other documents you did
18 not read in their entirety before completing the
19 draft report on October 9th?
20     A.  I did not read also on the same page
21 the MSDS materials, Sunoco MSDS in its entirety
22 before drafting the report.
23     Q.  Did you read it in partial?
24     A.  Yes.
25     Q.  Is there anything else in this

Page 36

1  Section 6.2 that you did not read in its
2  entirety prior to writing your report?
3      A.  I cannot answer that accurately,
4  because some of the Eth.Mesh documents, I cannot
5  tell what they are from here.  However, I did at
6  least open all of them, and if they looked
7  relevant to what I needed to put in my report,
8  then I would have read them, or at least skimmed
9  them to see how relevant they were.
10     Q.  Now, there's on here on 2014, 30(b)(6)
11 Deposition Summary Exhibit.  Was that a summary
12 of the Barbolt deposition?
13     A.  Sorry, what page?
14     Q.  Page 25 under -- the first one under
15 2014.
16     A.  I believe that's a list of studies.
17     Q.  That's the exhibit that he used in his
18 deposition, that he had brought to that
19 deposition?
20     A.  I believe so.
21     Q.  So that's not a summary of his
22 deposition that you were provided?
23     A.  No.
24     Q.  Were you provided any summaries of the
25 material on either 6.1 or 6.2?

Page 37

1      A.  Any summaries.  No.
2      Q.  Let me ask you, did you do your own
3  research to identify each and every one of the
4  sources cited in your report?
5      A.  No.
6      Q.  Were the references in Section 6.1
7  provided to you by Ethicon?
8      A.  Some of them were.
9      Q.  Which ones were not provided by
10 Ethicon?
11     A.  There are approximately 17 such
12 references, because I thought we provided them,
13 PDFs.  I mean I could go through and try to
14 remember.
15     Q.  If you would.
16     A.  So -- and they would only be in
17 Section 6.1.
18     Q.  Okay.
19     A.  And that would be the Adami article,
20 and then the Beck book chapter, the Eaton book
21 chapter.
22         And then on Page 21, the European
23 Commission 2013, the Hill 1965 article, the ISO
24 2009a and 2009b documents, the Linder article,
25 the Linkov article, the Rhomberg article, US EPA

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 12 of 41 PageID #: 136131
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 12 of 41 PageID #: 136131
Robyn Lyn Fruitt, Ph.D., D.A.B.T.

Page 38

1 Region 3 statement, the US FDA 2013, although I
2 believe I later noticed that this document was
3 in, but the initial -- when I read this
4 initially, I had obtained this article myself.
5 Q. Okay.
6 A. The US FDA 1995 reference, the Ward
7 article, the Weed article, the Wickwire article,
8 and the Yoon article.
9 Q. Okay. In terms of the documents and
10 articles listed in Section 6.2, was all of the
11 material in Section 6.2 provided to you by
12 counsel for Ethicon?
13 A. Yes, it was.
14 Q. Now, what particular searches did you
15 use to identify the 17 articles that you
16 yourself pulled? Why were these 17 articles the
17 ones that you selected?
18 A. Right. They were mainly used to
19 describe the methods that I used for my
20 analysis, and these are very common references
21 for these methods that others at Gradient have
22 used as well.
23 Q. And there you're talking about weight
24 of the evidence approach, is that correct?
25 A. And causation, yes.

Page 39

1 Q. So in terms of the substance of your
2 report, the vast majority of the material that
3 you were provided, if not all of it, serves as
4 the basis of your opinions, is that right?
5 A. Yes, most of it.
6 Q. So there's very little original
7 research that you utilized to form the opinions
8 that have been presented in Sections 1 and 2 of
9 your report?
10 MR. HUTCHINSON: Object to form.
11 BY MR. ORENT:
12 Q. And 3.
13 A. Well, I did perform literature
14 searches to try to identify studies, toxicity of
15 Prolene and polypropylene and TVT in the
16 peer-reviewed literature. However, those
17 searches didn't come up with anything.
18 Q. Approximately how long did you spend
19 doing searches?
20 A. Our library staff helps with that, so
21 that would be the work of Ruth Lyddy. Looks
22 like she spent 12 hours.
23 Q. Do you know, in the 12 hours that Ruth
24 spent, do you know what -- did she do a search
25 of PubMed? Would that have been one of the

Page 40

1 sources?
2 A. Yes. PubMed. Actually I need to
3 restate that.
4 It may not have been 12 hours on
5 literature searches because she also did help
6 catalog documents for us, so that's -- when we
7 receive documents we catalog them so that we can
8 find them easily again in the future, so she
9 also did work on that. So that's likely not 12
10 full hours of literature searching.
11 However, back to your other question,
12 in my report I note that the searches were in
13 PubMed, and I believe Scopus, the Scopus
14 database, but let me double-check that.
15 Yes, PubMed and Scopus database.
16 Q. What section are you on, 2 point --
17 A. 2.1, underneath the bullets.
18 Q. And those were the mesh terms that you
19 used?
20 A. Yes.
21 Q. Okay. Now, if I understand your
22 opinions in this case, your general opinion is
23 that Prolene mesh in the TVT device is not
24 cytotoxic. Does that summarize, adequately
25 state your opinion?

Page 41

1 A. Almost.
2 Q. Okay. Why don't you state it.
3 A. That Prolene mesh in the TVT device is
4 not cytotoxic in vivo, and that the weight of
5 the evidence indicates that it is also not
6 cytotoxic in humans.
7 Q. Would you agree with me that Prolene
8 mesh is cytotoxic in vitro?
9 A. In some studies, but not all, yes.
10 Q. I'm going to shift gears as we start
11 to get into some of the substantive stuff.
12 We've been going about 50 minutes, 45 minutes,
13 which is kind of early for our first break, but
14 if you need it, I'm happy to go now. It's up to
15 you?
16 MR. HUTCHINSON: Why don't we take
17 five minutes.
18 THE VIDEOGRAPHER: Going off the
19 record. The time is 10:34.
20 (Whereupon, a recess was taken.)
21 THE VIDEOGRAPHER: Back on the record.
22 The time is 10:43.
23 BY MR. ORENT:
24 Q. I just want to cover a few more
25 preliminary things before we move forward.

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 13 of 41 PageID #: 136182
Case 2:12-cv-02952 Document 379-5 Filed 04/27/17 Page 13 of 41 PageID #: 136182
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 42

1    First of all, focusing on Exhibit 2,
2  the notice of deposition that I've brought in
3  front of you, did you bring -- I know that you
4  brought with you a copy of your billing
5  statement.  Did you bring any other materials
6  with you responsive to any of the items, Numbers
7  1 through 21 on Exhibit 2, Schedule A?
8    A.  Well, I brought with me my report,
9  this billing, and these binders which are the
10  documents that I referenced in my report, so
11  everything listed in Section 6.1.
12    Q.  Okay.  Now, as far as your binders are
13  concerned, I see that there's some tabs on
14  there.  Are there any handwritten notes or
15  highlights anywhere in your report, in the
16  reliance material that you brought with you?
17    A.  No.  At least not by me.  It is
18  possible that -- actually, no.  These were made
19  from PDFs.  I don't think so.  I certainly
20  didn't make notes.
21    Q.  So that's a clean copy of the material
22  listed on either Section 6.1 or 6.2 to your
23  report, is that correct?
24    A.  I guess it is possible a few of the
25  documents may have had writing on them if they

Page 43

1  were hard copy before they were PDF'd, but
2  again, those notes would not be made by me.
3    Q.  Do you have handwritten notes on
4  copies of articles somewhere?
5    A.  No.
6    Q.  What are the tabs that are --the
7  green stickies on the top there, the page flags?
8    A.  Actually I don't know.  I did not put
9  those there.  Let me see.
10    Q.  I see actually there's a little note.
11    A.  Okay.  I don't know who did this.  I
12  think it's -- but this note looks like it's
13  explaining, for example, this is a study,
14  cytotoxicity study that covers both Elution and
15  Agarose overlay, so I guess to help me identify.
16    Q.  If you would identify just for the
17  record --
18    A.  What these are?
19    Q.  Yes, what the pages are, and actually
20  just read the note into the record.  So
21  identify, for example, tab, whatever the tab
22  number is on your report, read in the note, and
23  identify it's on the cover sheet of that report,
24  so that there's a clear record at the end of
25  this as to what exactly everything is that

Page 44

1  you're looking at.
2    A.  Okay.  And I apologize, I did not know
3  these were here.
4    Q.  That's fine.
5    A.  I hadn't reviewed this, because I had
6  already previously looked at most of these
7  documents.
8    Okay.  So in tab 19, the note says
9  "both Elution and Agarose overlay studies
10  reported."
11    And tab 20 says the same thing, "both
12  Elution and Agarose overlay studies reported."
13    Tab 21, same note word-for-word.
14    Q.  Just for clarification, tab 21, that's
15  the 1990d Ethicon Research Foundation?
16    A.  Tab 21?
17    Q.  Yes.
18    A.  It is the Goutcher 1997.
19    Q.  So then what I'm going to do, those
20  are not in the exact order, I'm going to keep
21  having you do that, and what we'll do is take a
22  copy of the index and put that as part of the
23  record.
24    A.  Okay.  Tab 25, "both Elution and
25  Agarose overlay studies reported."

Page 45

1    Tab 26, same note.
2    And tab 27, same note.
3    Q.  Okay.  And that index that you were
4  referring to earlier, is that an index of all
5  three binders that you brought with you?
6    A.  Each binder has its own index.
7    Q.  Okay.  If you would just take a look
8  at the other binders, and just verify for me
9  that there's nothing else in there, tabbed or --
10    A.  There's one on this second binder.
11  Tab 36, the note says "Agarose overlay only."
12    And the third binder has no notes.
13    Q.  Okay.  So what I'd like to do now is
14  mark the three cover sheets collectively as one
15  exhibit.  We can do that as Exhibit 3.
16    MR. ORENT:  Actually I'm happy to do
17  it that way if I get counsel's assurance that
18  those documents are, in fact, what are on here,
19  and that they're all in the production material,
20  and there's no other notes.
21    MR. HUTCHINSON:  We'll be happy to
22  accommodate you, Counsel.
23    MR. ORENT:  Okay.  I don't think
24  anyone needs additional copies of what we all
25  already have five copies of.

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 14 of 41 PageID #: 126123
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 14 of 41 PageID #: 126123
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 46

1     (Whereupon, Prueitt Exhibit Number 3,
2     Three index sheets from binders, was
3     marked for identification.)
4     MR. ORENT:  I'm going to go ahead and
5  mark this as Exhibit 3.
6     And then as Exhibit 4, I'm going to
7  just mark the billing statement that you
8  provided us earlier this morning and we
9  discussed.
10     (Whereupon, Prueitt Exhibit Number 4,
11     Billing Statement, was marked for
12     identification.)
13  BY MR. ORENT:
14     Q.  Just do me a favor and hand me the
15  notice of deposition.  I'm going to try and keep
16  everything here together for Maureen so we don't
17  lose anything at the end of the day today.  And
18  keep your report in front of you.
19     Have you ever presented at DRI?
20     A.  No.
21     Q.  Do you know what DRI is?
22     A.  Yes.
23     Q.  What is DRI?
24     A.  Defense Research Institute.  I know
25  they have occasional meetings.

Page 47

1     (Whereupon, Prueitt Exhibit Number 5,
2     Document titled DRI, Seminar, Toxic
3     Torts and Environmental Law, was
4     marked for identification.)
5  BY MR. ORENT:
6     Q.  I'm going to mark Exhibit 5 a Seminar
7  on Toxic Efforts and Environmental Law from DRI.
8  And if you look at the list of sponsors on
9  Page 8, you'll see Gradient listed there, is
10  that correct?
11     A.  Yes.
12     Q.  And that's your company, is that
13  correct?
14     A.  Yes, it is.
15     Q.  And if you look at -- if you look at
16  the agenda on February -- excuse me, Page 2,
17  February 28th through March 1st, there's a
18  6:00 p.m. networking reception sponsored by
19  Gradient, correct?
20     A.  Yes.
21     Q.  That's your company, correct?
22     A.  Yes.
23     Q.  And at the 2:45 hour, David Dodge from
24  Gradient presented, is that correct?
25     A.  Yes.

Page 48

1     Q.  And he presented on a whole host of
2  potential carcinogens, correct?
3     A.  No, there are other chemicals besides
4  carcinogens.
5     Q.  And let me ask you this.  If you turn
6  to Page 4, it says "David Dodge is a board
7  certified toxicologist with Gradient Corporation
8  in Bend, Oregon, specializing in applied
9  research, risk-based human health evaluations
10  and risk communication.  Mr. Dodge has
11  characterized health risks from exposure to
12  chemical and biological agents in products,
13  workplaces and the environment.  He has
14  conducted detailed toxicological evaluations of
15  various chemicals."
16     Did I read that correctly?
17     A.  Yes.
18     Q.  Do you know David?
19     A.  Yes, I do.
20     Q.  Have you worked with David?
21     A.  Yes, I have.
22     Q.  On what projects have you worked with
23  David, what chemicals, generally speaking?
24     A.  Generally, I have to think.  I haven't
25  worked with him for a while.

Page 49

1     Q.  Did you work with him on lead?
2     A.  No.
3     Q.  How about benzene?
4     A.  No.
5     Q.  TCE?
6     A.  Yes.
7     Q.  Parkinson's and formaldehyde?
8     A.  No.
9     Q.  Formaldehyde and leukemia?
10     A.  No.
11     Q.  Styrene?
12     A.  No.
13     Q.  Chloro --
14     A.  Chlorpyrifos?
15     Q.  Exactly.
16     A.  No.
17     Q.  And chromium?
18     A.  No.
19     Q.  If we were to read David's bio and
20  substitute in your name, would it be accurate to
21  describe you as a board certified toxicologist
22  with Gradient Corporation, specializing in
23  applied research, risk-based human health
24  evaluations and risk communication?
25     MR. HUTCHINSON:  Form.

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 15 of 41 PageID #: 126124
Case 2:12-md-02327 Document 1953-3 Filed 03/01/16 Page 15 of 41 PageID #: 16882
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 50

1   A.  Yes, except for the word
2   "Corporation."  Our company is now only called
3   Gradient.  But the rest would be correct.
4   BY MR. ORENT:
5   Q.  And would it similarly be accurate to
6   say that Dr. Prueitt has characterized health
7   risks from exposure to chemical and biological
8   agents in products, workplaces and the
9   environment?
10  A.  Yes.
11  Q.  And she has conducted detailed
12  toxicological evaluations of various chemicals?
13  A.  Yes.
14  Q.  And we talked earlier, you did work
15  for API?
16  A.  Yes.
17  Q.  That's the American Petroleum
18  Institute, correct?
19  A.  Yes.
20  Q.  And one of the things that you've done
21  with them is we talked about you looked at
22  benzene, correct?
23  A.  Not -- I don't believe that was for
24  API.
25  Q.  I'm sorry, for petroleum manufacturers

Page 51

1   you've looked at benzene, correct?
2   A.  I've done very little benzene work,
3   and I actually can't remember specifically who
4   it was for.
5   Q.  Regardless, you've done work for API,
6   the American Petroleum Institute, correct?
7   A.  Yes, I have.
8   Q.  And you've written policy papers for
9   them, correct?
10  A.  Policy papers?  I have written
11  comments to regulatory agencies for them, and I
12  have written peer-reviewed manuscripts and
13  letters to the editor for them.
14  Q.  I'm going to hand you what's been
15  marked as Exhibit 6 to today's deposition.
16      (Whereupon, Prueitt Exhibit Number 6,
17      Document titled Comments on US EPA's
18      Proposed Reconsideration of the 2008
19      NAAQS for Ozone dated 2/2/09, was
20      marked for identification.)
21  BY MR. ORENT:
22  Q.  And in this particular piece that I've
23  handed you, Gradient was retained to oppose
24  lowering the standard that EPA utilized for
25  ozone, is that correct?

Page 52

1   A.  Yes.
2   Q.  And what you argued here is
3   essentially that there is no evidence of ozone
4   exposure and adverse human health effects below
5   the .08 parts per million, is that right?
6   A.  Yes.
7   Q.  And what ultimately happened with
8   EPA's rulemaking on this?
9   A.  They just lowered the standard within
10  the last week or two.
11  Q.  Thank you.  You can put that down.
12      And you talked earlier that you'd
13  worked with Barbara Beck with lead, correct?
14  A.  Yes.
15      MR. ORENT:  Mark as Exhibit 7.
16      (Whereupon, Prueitt Exhibit Number 7,
17      Document titled Gradient to
18      Participate in DRI Tox Torts and
19      Environmental Law Seminar Feb 9-10 in
20      Miami Beach, Florida, was marked for
21      identification.)
22  BY MR. ORENT:
23  Q.  Did you assist Barbara Beck in
24  preparing for this DRI presentation in 2007?
25  A.  No.

Page 53

1   Q.  Have you assisted in the preparation
2   of other DRI presentations for Barbara or anyone
3   else?
4   A.  No, I have not.
5   Q.  Did I ask you about Julie Goodman?
6   A.  No.
7   Q.  Do you know Julie Goodman?
8   A.  Yes, I do.
9   Q.  Have you worked with Julie Goodman?
10  A.  Yes.
11  Q.  How frequently?
12  A.  Quite frequently.
13  Q.  And have you worked with her on
14  asbestos?
15  A.  I don't think so.
16  Q.  Do you disagree with her opinions?
17  A.  I don't know her specific opinions.
18  Q.  I'm going to hand you what's been
19  marked as Exhibit 8 in this deposition.
20      (Whereupon, Prueitt Exhibit Number 8,
21      Document titled Defending the Wire and
22      Cable Asbestos Cases, was marked for
23      identification.)
24  BY MR. ORENT:
25  Q.  Have you worked with Julie in

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 16 of 41 PageID #: 136125
Case 2:14-cv-02952 Document 299-5 Filed 04/27/17 Page 16 of 41 PageID #: 134312
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 54

1 litigation before?
2     A.   Yes.
3     Q.   And were you aware that Julie helped
4 prepare this presentation on Defending the Wire
5 and Cable Asbestos Cases?
6     A.   No, I was not aware of this.
7     Q.   All right.  You can put that aside.
8         (Whereupon, Prueitt Exhibit Number 9,
9         Robyn Prueitt, Ph.D, DABT biography,
10        was marked for identification.)
11 BY MR. ORENT:
12    Q.   I'm going to hand you what's been
13 marked as Exhibit 9.  "Representative Projects."
14 First, "Carcinogenic Assessment:  Evaluated
15 whether the weight of epidemiology, animal
16 toxicity, mechanistic, and pharmacokinetic
17 evidence indicates that toluene diisocyanate" --
18    A.   Diisocyanate.
19    Q.   -- "diisocyanate is a human
20 carcinogen.  This analysis used Gradient's
21 hypothesis-based weight of the evidence approach
22 and was published in peer-reviewed journal."
23        What was your conclusion?
24    A.   That toluene diisocyanate is not
25 likely to be a human carcinogen.

Page 55

1     Q.   Okay.  And there's a wide body of
2 literature that supports the notion that toluene
3 is, in fact, a human carcinogen, is that
4 correct?
5         MR. HUTCHINSON:  Object to form.
6     A.   No.
7 BY MR. ORENT:
8     Q.   Are there papers -- are there authors
9 that would disagree with you?
10    A.   I'm not sure.
11    Q.   "Review of Toxicogenomics:  Critically
12 reviewed global gene expression profiling data
13 for a population exposed to benzene and
14 determined whether the expression profile could
15 be used as a biomarker of benzene toxicity in a
16 broader population, particularly without proof
17 of benzene exposure from a specific source."
18        What were your conclusions in that
19 project?
20    A.   That project I was just reviewing a
21 published article on gene expression profiling,
22 and so the conclusions were along the lines of,
23 you know, whether the science is strong enough
24 to say that a gene expression profile can
25 indicate benzene toxicity in people, even if

Page 56

1 there's no proof that they were exposed.  So it
2 was more just critically reviewing a manuscript.
3     Q.   And what were your conclusions?
4     A.   That the state of the science is not
5 such that one can use a gene expression profile
6 to conclusively determine whether benzene has
7 caused toxicity.
8     Q.   In other words, you can't use the
9 gene's expression to determine whether or not
10 someone has had benzene exposure?
11    A.   No, it was you cannot use it to
12 determine whether someone has suffered adverse
13 effects of benzene.
14    Q.   Do you believe that there is a
15 biomarker of benzene exposure, based on your
16 work?
17    A.   I'm not sure.
18    Q.   Do you believe -- next is the lung
19 cancer from exposure to asbestos during vehicle
20 brake repair.
21        Did you reach any conclusions with
22 regard to that project?
23    A.   I don't remember.  I think I had an
24 extremely small role on that project.
25    Q.   You were retained by asbestos brake

Page 57

1 manufacturers in that project, correct?
2     A.   Someone at Gradient was, I assume.
3     Q.   And ultimately, the conclusion there
4 was that the asbestos from brakes was not a
5 source or contributor to the cancer, correct?
6     A.   I don't recall.
7     Q.   The next one, "Weight-of-Evidence
8 Analysis:  Used Gradient's hypothesis-based
9 weight-of-evidence approach to assess whether
10 epidemiology, toxicology, and mechanistic
11 evidence supports chlorpyr" --
12    A.   Chlorpyrifos.
13    Q.   Thank you.
14        -- "being a neurobehavioral toxicant
15 in humans at relatively low exposure levels."
16        And what were the conclusions there?
17    A.   That the evidence indicates that
18 chlorpyrifos is not a neurobehavioral toxicant
19 at the low exposure levels that humans are
20 exposed to.
21    Q.   "Bioavailability Assessment:  Assessed
22 whether animal, mechanistic, and epidemiological
23 data are consistent with the nickel ion
24 bioavailable model, which asserts that the
25 carcinogenicity of nickel-containing substances

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 17 of 41 PageID #: 126126
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 17 of 41 PageID #: 126126
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 58

1 is based on the bioavailability of the nickel
2 ion at nuclear sites of target respiratory
3 epithelial cells."
4      And what conclusions did you reach
5 there?
6      A.   That different forms of nickel have
7 different bioavailability in the body, and so
8 the conclusions were that the data regarding
9 bioavailability do not support that certain
10 forms of nickel are carcinogenic.
11      Q.   So in other words, the conclusion
12 there was certain kinds of nickel can't cause
13 cancer?
14      A.   Did you say can or can't?
15      Q.   Cannot.
16      A.   Yes.
17      Q.   "Toxicity Summary: Classified,
18 summarized, and entered relevant studies of lead
19 and bisphenol A into IUCLID database, a database
20 for the intrinsic and hazard properties of
21 chemical substances that companies can use to
22 submit data under the Registration, Evaluation,
23 Authorization, and Restrictions of Chemical
24 legislation in Europe."
25      What was the project there?

Page 59

1      A.   So those were two completely separate
2 projects with separate clients, one for lead,
3 one for bisphenol A, and that is -- and these
4 projects involved reviewing and writing short
5 summaries of a large number of toxicology
6 studies of either lead or bisphenol A, and then
7 entering those summaries into a database that is
8 part of chemical regulation in Europe.
9      Q.   And did you reach any conclusions with
10 lead?
11      A.   No.  Both of these studies were not to
12 reach conclusions, they were simply to summarize
13 the literature that is out there, but not to
14 synthesize it and come to any conclusions about
15 it.
16      Q.   Okay.  So going back to what your core
17 opinions in this case are, I understand that it
18 is that TVT mesh is not cytotoxic in vivo, and
19 that the weight of the evidence, according to
20 you, is that it is not cytotoxic in humans, is
21 that correct?
22      A.   Yes.
23      Q.   And you said there is evidence of
24 cytotoxicity in vitro, correct?
25      MR. HUTCHINSON:  Object to form.

Page 60

1      A.   There is some evidence of potential
2 cytotoxicity in vitro.
3 BY MR. ORENT:
4      Q.   Now, in terms of your final opinion,
5 which is the weight-of-evidence, is that TVT is
6 not cytotoxic in humans.  Does that rely upon
7 the foundation of human clinical evidence?
8      A.   In part, yes.
9      Q.   Does it rely on your review of in vivo
10 cytotoxicity studies?
11      A.   In part, yes.
12      Q.   And does it rely upon your evaluation
13 of in vitro studies?
14      A.   In part, yes.
15      Q.   Is there anything else that it relies
16 upon?
17      A.   The position statements from different
18 medical societies.
19      Q.   Anything else?
20      A.   Just general toxicology principles.
21      Q.   Okay.  Anything else?
22      A.   I don't think so.
23      Q.   Okay.  Now, Gradient, this is a lab,
24 right?
25      A.   Gradient?

Page 61

1      Q.   Yes.
2      A.   No.
3      Q.   Do they have lab facilities?
4      A.   No, we don't.
5      Q.   Do you have, if a project calls for
6 it, the ability to do your own testing?
7      A.   No.  We would have to find a contract
8 lab to do the testing.
9      Q.   And did you inquire about doing any of
10 your own cytotoxicity testing?
11      A.   No.
12      Q.   How about any of your own in vitro
13 testing?
14      A.   No.
15      Q.   So I want to start with where you
16 began in your report on your evaluation of the
17 in vivo studies.  And I think it may be easier
18 here, we're going to switch between sections,
19 and really to switch and go right back to data
20 Table A.1.
21      If we look at A.1, first of all, did
22 you review each and every one of the
23 cytotoxicity studies cited in Table A.1?
24      A.   Yes.
25      Q.   Did you personally review them all

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 18 of 41 PageID #: 126127
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 18 of 41 PageID #: 145915
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 62

1  before completing this data table?
2      A.  Probably not in their entirety, but
3  yes.
4      Q.  How about Table A.2, In Vitro
5  Cytotoxicity - the Agarose Overlay.  Did you
6  read all of those before creating that data
7  table?
8      A.  Before or during, yes.
9      Q.  Now, would you agree with me that the
10 first study in A.1, Study ID M83-184, that is
11 not a -- that is not a -- strike that.
12      That's a suture study, correct?
13      A.  Yes.
14      Q.  That did not involve the same mesh
15 used in TVT, correct?
16      A.  No, it is the same Prolene mesh that
17 is used in TVT; however, it was not taken from a
18 TVT device.
19      Q.  Well, I guess that's my question.  Was
20 it taken from a sheet of Prolene, or was it a
21 Prolene suture?
22      A.  It was a Prolene suture.
23      Q.  Okay.  So I want to be very specific
24 with the terms.  When I'm going to say mesh, I'm
25 going to refer to the sheet of mesh, or I'll try

Page 63

1  and be clear.
2      But this whole study that concluded
3  that it was not cytotoxic, had no cytotoxicity,
4  that was a suture study, correct?
5      A.  Yes.
6      Q.  The next one dated 8/22/1988, that
7  also is a suture study, correct?
8      A.  Yes.
9      Q.  The next one, 6/12/1997, that is a --
10 actually that's a polypropylene mesh, correct?
11      A.  Yes.
12      Q.  That's not Prolene, correct?
13      A.  I'm not sure.  I would have to
14 double-check the study.
15      Q.  Well, for example, if you look later
16 on --
17      A.  Actually it should be, because it's
18 testing different portions of the device such as
19 the needle, the heat-shrink tubing, the sheath,
20 so actually I do believe the mesh is Prolene, it
21 just states polypropylene in this table.
22      Q.  Okay.  That's different -- and that's
23 a different way of stating it than you typically
24 state it here; normally you deviate between PP
25 and Prolene, correct?

Page 64

1      A.  Yes.
2      Q.  At least that's how I've read your
3  data table.
4      A.  Yes.
5      Q.  And this particular study found marked
6  cytotoxicity with the polypropylene portion of
7  the Prolene mesh, correct?
8          MR. HUTCHINSON:  Object to form.
9      A.  With the mesh, yes, but that is
10 Prolene mesh.
11 BY MR. ORENT:
12      Q.  And found marked cytotoxicity,
13 correct?
14      A.  Yes.
15      Q.  The next one is the Sterile Ulmsten
16 device.  And do you know what the difference
17 between the Ulmsten device is and the TVT?
18      A.  Yes, I believe they are the same
19 thing.
20      Q.  Do you know, do they use the exact
21 same Prolene mesh at the time it was still
22 called the Ulmsten device, as opposed to when it
23 later became the TVT?
24      A.  I'm not sure.
25      Q.  Did you investigate that to determine

Page 65

1  whether or not it was the same mesh that was
2  marketed in the United States?
3      A.  I think I did, but I can't remember.
4      Q.  Now, the next one is the Sterile
5  Ulmsten device, correct?
6      A.  Yes.
7      Q.  And the mesh there was found by
8  Dr. Barbolt to be severity cytotoxic, correct?
9      A.  Yes.
10      Q.  And the next two, the NAMSA studies,
11 1987a and "b", those used raw polypropylene
12 meshes, but those are not -- those are not
13 Prolene, correct?
14          MR. HUTCHINSON:  I'm sorry, Counsel,
15 can you tell me where you are?
16          MR. ORENT:  Sure, 7/29/97, raw
17 polypropylene mesh, noncytotoxic, NAMSA 1997a.
18      A.  No, they are Prolene mesh.
19 BY MR. ORENT:
20      Q.  They are.
21      Okay.  And the next one, sterile
22 polypropylene mesh of TVT device, that found
23 moderate cytotoxicity, correct?
24      A.  Yes.
25      Q.  And then the next one, polypropylene

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 19 of 41 PageID #: 126128
Case 2:12-md-02327 Document 2995 Filed 04/27/17 Page 19 of 41 PageID #: 126128
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 66

1  mesh from TVT device made with low temperature
2  HST, severe cytotoxicity, correct?
3      A.  Yes.
4      Q.  Polypropylene from the finished TVT
5  device, slight cytotoxicity, correct?
6      A.  Yes.
7      Q.  And then it went on to find ELTDP
8  noncytotoxic, Santonox R, severe cytotoxic, and
9  Procol LA-10, severe cytotoxicity, is that
10 correct?
11     MR. HUTCHINSON:  Object to form.
12     A.  Yes, although the severe cytotoxicity
13 for Santonox R was only at the higher
14 concentration of 3 milligrams per milliliter,
15 but not at the lower concentration of
16 0.2 milligrams per milliliter.
17 BY MR. ORENT:
18     Q.  Now, at the bottom there's a "d" and
19 an "e", and those refer back up to the top to
20 the PSE Accession No. 97-0174 and PSE Accession
21 No. 97-0128, and those say that the documents
22 were unavailable.
23     A.  Right.
24     Q.  So does that mean you didn't have
25 these studies available to you when you drafted

Page 67

1  this report?
2      A.  It means I did not have the study
3  reports; however, I had other documentation
4  about the results.
5      Q.  So just to be clear, you didn't have
6  the raw data for "d" and "e", correct?
7      A.  Correct.
8      Q.  And for "c", which would be Accession
9  No. -- I must be missing --
10     A.  It's in the Conclusion column.
11     Q.  Oh, there.  "PE sheath -
12 Noncytotoxic," it says "Discrepancy between
13 references."
14         What does that mean?
15     A.  That means that in one reference it
16 labeled the result as noncytotoxic, but I think
17 somewhere else it may have labeled the result as
18 slight cytotoxicity, which still indicates that
19 it's not cytotoxic.
20     Q.  Now, for each of these studies that
21 you rely on in this table, did you go through
22 and re-review the raw data in forming your
23 conclusions?
24     A.  Yes.
25     Q.  And on any of these, do your

Page 68

1  conclusions differ in any way between what the
2  author found and what you've read here?
3      A.  No.
4      Q.  Did you look at the original
5  photomicrographs of the explanted material --
6  excuse me, any of the photomicrographs of any of
7  the tests, the elution studies, to determine and
8  verify the written findings?
9          MR. HUTCHINSON:  Object to form.
10     A.  No.
11 BY MR. ORENT:
12     Q.  Table A.2.  You'd agree, again, that
13 there are tests here that show that there's
14 marked cytotoxicity with regard to the mesh?
15         MR. HUTCHINSON:  Object to form.
16     A.  Yes, one study does note marked
17 cytotoxicity.
18 BY MR. ORENT:
19     Q.  Okay.  And again, you note with a "c"
20 that at least one of these studies was not
21 available to you, and you're relying upon some
22 other document to form the basis of your
23 opinion, is that right?
24     A.  Yes.
25     Q.  As you sit here today, can you tell me

Page 69

1  what specific document you rely on for that
2  opinion here?
3      A.  It would be the -- so this would be
4  for the study PSE Accession No. 97-0128, and so
5  in the Reference column for that study, because
6  I did not have the raw data, the references
7  listed in that column would be those that I
8  relied on for the results of this study.
9      Q.  Okay.  If we go to the Implantation
10 Studies next, I'm just going to go in order,
11 3/10/64, those are sutures, correct?
12     A.  Yes.
13     Q.  They're not Prolene, correct?
14     A.  Correct.
15     Q.  7/25/64, sutures, polypropylene, but
16 not Prolene, correct?
17     A.  Correct.  Well, the study report does
18 not refer to them as Prolene, it only refers to
19 them as polypropylene.
20     Q.  Is it fair to say that when you say
21 something is Prolene it is actually Prolene?
22 For example, beginning on 5/20/71, it says
23 "Prolene suture," and any reference that just
24 say "PP suture" just mean polypropylene suture?
25     A.  Yes.  For the sutures, yes, that's

Case 2:12-md-02327 Document 3709-5 Filed 04/27/17 Page 20 of 41 PageID #: 126129
Case 2:12-md-02327 Document 3709-5 Filed 04/27/17 Page 20 of 41 PageID #: 126129
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 70

1  correct.
2      Q.  And would you agree with me that all
3  of the studies listed on Page 3 are suture
4  studies?
5      A.  Yes.
6      Q.  Would you agree with me that all of
7  the studies cited on Page 4 are suture studies?
8      A.  Yes.
9      Q.  Okay.  The top one on Page 5, that's a
10  suture study as well?
11     A.  Yes.
12     Q.  Okay.  The next study is a 10/21/1973
13  study of Prolene mesh and Marlex mesh, correct?
14     A.  Yes.
15     Q.  Are all -- in your opinion, are all
16  polypropylenes the same?
17     A.  Polypropylene is polypropylene.  But I
18  would not say all polypropylene meshes are the
19  same.
20     Q.  In terms of the cytotoxicity, are all
21  polypropylenes the same?
22         MR. HUTCHINSON:  Object to form.
23     A.  I don't know.  I didn't look at
24  different -- at a large number of polypropylene
25  products.

Page 71

1  BY MR. ORENT:
2      Q.  Well, this one is a 1973, it looks at
3  Prolene mesh and Marlex mesh, correct?
4      A.  Yes.
5      Q.  And do you believe that the results
6  for Prolene and the results for Marlex can be --
7  that in terms of evaluation of the data you can
8  draw common inferences from the findings?  You
9  treat them as the same for purposes of reviewing
10  this study?
11         MR. HUTCHINSON:  Form.
12     A.  No.
13  BY MR. ORENT:
14     Q.  The next one is 6/16/1999, it's a rat
15  study, and the TVT mesh itself found a minimal
16  to moderate cytotoxic reaction, is that correct?
17     A.  Only at seven days after implantation,
18  yes.
19     Q.  Okay.  And then minimal to mild?
20     A.  At 14 days, yes.
21     Q.  At 14 days.
22         And then a mild cytotoxic reaction at
23  28 days, correct?
24     A.  Yes.
25     Q.  Polypropylene showed minimal to

Page 72

1  moderate at seven days, correct?
2      A.  Yes.
3      Q.  Minimal to mild at 14 days?
4      A.  Yes.
5      Q.  Mild at 28 days?
6      A.  Yes.
7      Q.  And that's a rat, correct?
8      A.  Rat study, yes.
9      Q.  PSE Accession 99-0115 dated 4/6/2000,
10  that's a rat study, correct?
11     A.  Yes, it is.
12     Q.  And polypropylene mesh and
13  polypropylene mesh with triclosan, was a gluteal
14  muscle study, and it found a minimal to moderate
15  reaction, correct?
16     A.  Yes.  Although that should say Prolene
17  mesh.  Both the mesh and the mesh with triclosan
18  were Prolene.
19     Q.  Okay.  And the polypropylene, a
20  subcutaneous rat test found that there was a
21  minimal to mild response in rats on 7/12/2001,
22  is that right?
23     A.  Yes, with Prolene mesh.
24     Q.  Then we look at Prolene mesh in 2002,
25  and there was a mild to moderate response at

Page 73

1  seven days, minimal to moderate at 14 days, mild
2  to moderate at 28 days, and minimal to moderate
3  at 14 and 28 days, is that right?
4      A.  Yes.
5      Q.  And then subcutaneously we see minimal
6  to moderate at seven days, minimal to mild at
7  seven days, minimal to mild at 14 days, minimal
8  to moderate at 28 days, and minimal to mild at
9  28 days, is that right?
10     A.  Yes.
11     Q.  Now, all these studies are rat
12  studies, correct?
13     A.  Which studies?
14     Q.  I'm sorry.  The ones that actually --
15  focusing on Page 5 and 6, actually they either
16  involve rats or rabbits, correct?
17     A.  The studies with mesh, yes.
18     Q.  Okay.  And in making your decision
19  on -- on forming your opinions on cytotoxicity,
20  you actually only looked at five studies
21  involving mesh, correct?
22         MR. HUTCHINSON:  Object to form.
23  Mischaracterizes the testimony.
24     A.  I only looked at, yes, five in vivo
25  studies in animals of the Prolene mesh, yes.

Page 74

1  BY MR. ORENT:
2    Q.  And on those particular studies --
3  well, first of all, did you do anything to
4  verify that Ethicon had given you every single
5  in vivo study that it had in its possession?
6    A.  No, I didn't.
7    Q.  Do you know, for example, whether or
8  not Ethicon had dog studies available to it with
9  the actual Prolene mesh?
10   A.  No, I don't.
11   Q.  Do you know whether it had sheep
12 studies available to it with the actual Prolene
13 mesh?
14   A.  No.
15   Q.  Would you have wanted to see any dog
16 studies related to the Prolene mesh?
17   A.  It would depend on what type of study
18 it was.
19   Q.  If we're talking in vivo studies,
20 implantation studies?
21   A.  In vivo implantation study, if it
22 evaluated endpoints that could inform whether it
23 was cytotoxic, yes.
24   Q.  And would the same be true for sheep
25 studies?

Page 75

1    A.  Yes.
2    Q.  Now, as you sit here today, do you
3  have an opinion as to what type of cytotoxic
4  information can be gleaned in the quality of
5  information between a rat study and a dog study?
6    A.  Can you repeat that?
7    Q.  Sure.
8      As you sit here today, do you have --
9  in your professional knowledge, education and
10 training, are you able to quantify or qualify
11 the differences between a dog study and a rat
12 study in terms of the ingrowth, the types of
13 collagen, and the comparability to humans
14 between the different animal species?
15     MR. HUTCHINSON:  Object to form.
16   A.  No.
17 BY MR. ORENT:
18   Q.  So as you sit here, Doctor, are you
19 able to inform us as to how a rabbit, the tissue
20 ingrowth and the macrophages and the whole
21 process that's being observed in vivo, how the
22 cellular structures compare to those of a human?
23     MR. HUTCHINSON:  Same objection.
24   A.  No.
25 BY MR. ORENT:

Page 76

1    Q.  As you sit here today, are you able to
2  tell the jury exactly how one can compare a
3  rabbit study to what might be anticipated in a
4  human being, based on the various structures
5  that you could see under a microscope?
6      MR. HUTCHINSON:  Same objection.
7    A.  No.
8  BY MR. ORENT:
9    Q.  Same question with a dog, as you sit
10 here today, in terms of the physical features
11 that can be observed in an in vivo study under a
12 microscope after a material is explanted, are
13 you able to tell us how that would be
14 anticipated to correlate with a human being?
15     MR. HUTCHINSON:  Same objection.
16   A.  No.  I'm not a pathologist, so no.
17 BY MR. ORENT:
18   Q.  Okay.  And are you able to describe
19 how the collagen is different between a dog and
20 a human?
21   A.  No.
22   Q.  How about the scarification, are you
23 able to determine how the scarification in a rat
24 is different than the scarification in a human?
25   A.  No.

Page 77

1    Q.  Are you able to determine how the
2  scarification in a dog is different than in a
3  human?
4    A.  No.
5    Q.  Do you know what reactive oxygenated
6  species are, or ROS?
7    A.  In general, yes.
8    Q.  Do you know the difference in the
9  release of ROS in a rat versus that of a human?
10   A.  No.
11   Q.  Okay.  Do you have an understanding as
12 to the difference between the release of ROS
13 from a dog and a human?
14   A.  No.
15   Q.  How about a sheep and a human?
16   A.  No.
17   Q.  Do you have an understanding as to
18 whether or not the quadriped nature of a rabbit
19 makes any difference in evaluating the
20 cytotoxicity at the site-specific locations that
21 were done in these studies and what might be
22 inferred from the human pelvis of a woman?
23   A.  No.
24   Q.  Do you have any understanding, as you
25 sit here today, how the quadriped nature of a

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 22 of 41 PageID #: 136181
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 22 of 41 PageID #: 136181
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 78

1 dog might impact the cytotoxicity in the
2 locations implanted in these studies between
3 that and the human pelvis?
4     A.   No.
5     Q.   As you sit here today, do you have any
6 understanding as to how the quadriped nature of
7 a rat would differ with the production of ROS
8 and that in the human pelvis?
9         MR. HUTCHINSON:  Object to form.
10     A.   No.
11 BY MR. ORENT:
12     Q.   In terms of physical structure and
13 cytotoxicity, do you know how a skin test in a
14 rat compares with results in a human pelvis?
15     A.   No.
16     Q.   Do you know how a skin test or
17 under-skin test of a dog would compare with the
18 human pelvis of a woman?
19     A.   No.
20     Q.   Do you know how the human pelvis of a
21 woman would compare to a skin test on a sheep?
22     A.   No.
23     Q.   Okay.  How about a pelvis-to-pelvis
24 comparison, do you know how a pelvis test, the
25 structural test of reactivity in a rat's pelvis

Page 79

1 would compare to that of a human's pelvis?
2     A.   No.
3     Q.   How about with regard to a dog, do you
4 know how a dog's pelvis and the implantation in
5 a dog's pelvis of a piece of mesh would compare
6 in terms of the reaction to that in the human
7 pelvis?
8         MR. HUTCHINSON:  Form.
9     A.   No.
10 BY MR. ORENT:
11     Q.   And a sheep's pelvis, do you know how
12 that would react between the implantation in a
13 human's pelvis and -- excuse me, between the
14 implantation of mesh in a sheep's pelvis and
15 that in a human's pelvis, do you know how one
16 would be able to correlate that reaction?
17         MR. HUTCHINSON:  Form.
18     A.   No.
19 BY MR. ORENT:
20     Q.   Now, Doctor, in terms of
21 predictability in vivo studies, did you do
22 any research to determine which animals would be
23 the most appropriate to draw inferences from an
24 in vivo specimen to a human subject?
25     A.   No.

Page 80

1     Q.   Are you aware that the -- do you know
2 who IUGA is?
3     A.   Yes.
4     Q.   IUGA is International Urogynecological
5 Association, correct?
6     A.   Yes.
7     Q.   And are you aware that they have had
8 roundtables?
9     A.   No.
10     Q.   Doctor, were you provided any
11 information that suggests that the IUGA
12 roundtable evaluated the data and made
13 determinations as to the suitability of
14 particular animals for in vivo testing?
15         MR. HUTCHINSON:  Object to form.
16     A.   No.
17 BY MR. ORENT:
18     Q.   Were you aware that the IUGA
19 recommended one specific type of animal for
20 in vivo testing?
21     A.   No.
22     Q.   Doctor, would that have been
23 information that you would have wanted to see in
24 forming your opinions in this case?
25     A.   It would have been helpful.

Page 81

1     Q.   Okay.
2     A.   But I don't know that it would have
3 changed my conclusions.
4     Q.   Now, Doctor, what we talked about so
5 far was the in vitro studies.  In your report,
6 if you go to Page 10, you make the statement
7 "Ethicon has extensively investigated the safety
8 of Prolene sutures and mesh, and the relevant
9 cytotoxicity and the implantation studies are
10 evaluated below."
11         Doctor, what basis do you have to
12 support the conclusion that Ethicon has
13 extensively investigated the safety of Prolene
14 sutures and mesh?
15     A.   All of the studies in my tables.
16     Q.   And what have you used as your
17 comparator?  So if that, for example, is
18 extensive, how many other companies have you
19 looked at to -- or what other comparison data
20 did you look at to determine that that was
21 extensive versus the alternative?
22     A.   I didn't do a comparative analysis.
23     Q.   Okay.  So what basis do you have to
24 say, other than saying that there's a number
25 that's on that data table, whatever that is, 19

Case 2:12-md-02327 Document 3709-5 Filed 04/27/17 Page 22 of 41 PageID #: 126492
Case 2:12-md-02327 Document 3709-5 Filed 04/27/17 Page 23 of 41 PageID #: 126493
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 82

1 studies, what basis do you have for saying that
2 that is extensive?
3   A.  Just I would say the number of studies
4 and the -- some of the documents from
5 Dr. Barbolt, he did a risk assessment and
6 cytoxicity evaluations to show that Ethicon
7 was definitely interested in understanding the
8 safety of this material.
9   Q.  But we talked earlier that there were
10 only five studies related to mesh, is that
11 right?
12   A.  Five in vivo studies of Prolene mesh
13 that I evaluated, yes.
14   Q.  Okay.  Would you agree with me that
15 you could not say Ethicon has extensively
16 investigated Prolene mesh in vivo?
17     MR. HUTCHINSON:  Objection.  Asked and
18 answered.
19   A.  I would not -- sorry, can you ask that
20 again?
21 BY MR. ORENT:
22   Q.  Could I take and -- just take that
23 statement that you have and just alter it a
24 little bit to say Ethicon has extensively
25 investigated the safety of Prolene mesh in vivo,

Page 83

1 as you sit here today, could you offer to a
2 reasonable degree of scientific certainty that
3 opinion?
4     MR. HUTCHINSON:  Object to form.
5   A.  That they have extensively
6 investigated it, yes, in vivo.
7 BY MR. ORENT:
8   Q.  So five studies is sufficient for you
9 to call something extensive, is that correct?
10   A.  In the context of all the other data
11 available, yes.
12   Q.  Five studies, correct?
13     MR. HUTCHINSON:  Objection.  Asked and
14 answered, Counsel.  Move on.
15 BY MR. ORENT:
16   Q.  Now, with regard to these studies,
17 again, you have no comparator, correct?
18   A.  Right.
19   Q.  And have you ever worked with a
20 company developing an implant to determine how
21 many studies need to be done in vivo in order to
22 reach a significant endpoint?
23   A.  No.
24   Q.  Do you have any basis to say, as you
25 sit here today, from your experience, to say

Page 84

1 that five in vivo studies involving Prolene mesh
2 meets industry standards?
3     MR. HUTCHINSON:  Object to form.
4   A.  I don't know the industry standards.
5 BY MR. ORENT:
6   Q.  Okay.  So wouldn't it be true that you
7 really can't say, compared to what everybody
8 else in the industry is doing, you cannot say
9 that what Ethicon did here was extensive.  Would
10 you agree with that?
11     MR. HUTCHINSON:  Form.
12   A.  My statement wasn't really comparing
13 to the industry.  It was just indicating that
14 the total of the data, not just the in vivo
15 studies, but the in vitro and the human clinical
16 studies are together extensive.
17 BY MR. ORENT:
18   Q.  Now, if hypothetically another
19 company, let's say AMS, performed 50 in vivo
20 studies prior to putting their product on the
21 market, you would then not be able to say that
22 Ethicon's five would be significant, or
23 extensive, correct?
24     MR. HUTCHINSON:  Form.
25   A.  Not comparative to that, no.

Page 85

1 BY MR. ORENT:
2   Q.  Okay.  Now, you read Dr. Barbolt's
3 deposition, correct?
4   A.  Most of it.
5   Q.  And in your report, on Page 11, you
6 state that the findings, and this is right above
7 the 3.2 -- 3.1.2 area, you discuss Santonox R
8 and Procol LA from Barbolt?
9   A.  Yes.
10   Q.  And you call them surfactants?
11   A.  Surfactants.
12   Q.  Surfactants.  Okay.
13     Now, do you know -- would you agree
14 with me that the longer Procol LA is in the
15 human body in a piece of mesh, the more likely
16 it is to migrate?
17   A.  I don't know.
18     MR. HUTCHINSON:  Form.
19 BY MR. ORENT:
20   Q.  Would you agree that Procol LA blooms
21 to the surface?
22   A.  I have read that.  Upon heating at
23 high tem -- or heating the mesh, yes.
24   Q.  Do you know whether or not Procol LA
25 blooms to the surface in the presence of

Case 2:12-md-02327 Document 3790-5 Filed 04/27/17 Page 24 of 41 PageID #: 136133
Case 2:12-md-02327 Document 3793-5 Filed 04/27/17 Page 24 of 41 PageID #: 136433
Robyn Lyn Pruett, Ph.D., D.A.B.T.

1 reactive oxygenated species?
2    A. I do not know that.
3    Q. Do you know whether or not there are
4 other factors in the in vivo environment or the
5 in vitro environment which can cause Procol LA
6 to bloom to the surface?
7    A. No, I don't know.
8    Q. Would it be fair to say to a
9 reasonable degree of professional certainty you
10 do not know of the other factors beyond heating
11 that affect Procol LA?
12    A. That affect its blooming to the
13 surface?
14    Q. Correct.
15    A. Correct.
16    Q. And likewise, beyond heating, you do
17 not have any information as to what promotes
18 Procol LA's migration away from the mesh into
19 other cells except for heating, correct?
20    MR. HUTCHINSON: Object to form.
21    A. Correct, that's not within my area of
22 expertise.
23 BY MR. ORENT:
24    Q. Okay. And your understanding about
25 Procol LA is entirely taken from Dr. Barbolt's

1 work, is that correct? Let me rephrase that.
2    Your understanding of Procol LA and
3 its reactivity to heat is entirely based upon
4 Dr. Barbolt's deposition, is that correct?
5    A. No. There were other documents where
6 I saw discussion of the potential for Procol
7 LA-10 to bloom to the surface.
8    Q. Okay. Those were internal corporate
9 documents, correct?
10    A. I can't remember if they all were.
11 It's possible.
12    Q. Did you do a thorough comprehensive
13 literature review of Procol LA prior to writing
14 your report?
15    A. One of my staff did some searching of
16 Procol LA-10, and I don't believe he came up
17 with anything in the peer-reviewed literature.
18    Q. Did you develop, or did you -- would
19 you agree that you're not an expert on Procol
20 LA-10?
21    A. Yes.
22    Q. Now, when you say "with evidence
23 indicating that the positive results are likely
24 attributable to the surfactant additive Procol
25 LA which migrates to the surface of the mesh

1 when it is heated at sterilized temperatures,"
2 you don't know, again, what other factors
3 attribute to Procol LA's migration to the
4 surface, correct?
5    A. Correct.
6    Q. You don't know what other factors
7 might lead Procol LA to migrate into other
8 tissue in the human body, correct?
9    A. Correct.
10    Q. Do you know what the LD50 is of Procol
11 LA?
12    A. No, I don't.
13    Q. And just for the record, what's an
14 LD50?
15    A. It's the dose of a chemical at which
16 50 percent of the animals exposed at that dose
17 will die.
18    Q. And do you know whether or not there's
19 a dose-response curve that's been developed for
20 Procol LA?
21    A. I don't know.
22    Q. Those are two areas, LD50 and
23 dose-response, that are typically in the realm
24 of a toxicologist, correct?
25    A. Yes.

1    Q. You say "While this additive was
2 cytotoxic when it was applied directly to
3 cultured cells, this does not replicate the
4 conditions of TVT exposure in vivo; these
5 results must be considered in relation to other
6 data available when evaluating the potential
7 cytotoxicity of the tested materials."
8    Do you know, percentage-wise, on a
9 percentage basis, over a ten-year period what
10 percentage of the Procol LA that's in a piece of
11 mesh originally will actually bloom to the
12 surface and migrate?
13    A. No, I don't.
14    Q. So would you agree with me that you
15 can't actually say that the culture cells won't
16 get the same dose ultimately as the cells next
17 to mesh over a ten-year period --
18    MR. HUTCHINSON: Object to form.
19 BY MR. ORENT:
20    Q. -- from Procol LA?
21    A. It's not likely that they will,
22 because in vitro it's naked cells in a petri
23 dish being exposed directly to this chemical,
24 whereas in the body the mesh is on cells, but
25 there, you know, is a circulatory system,

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 25 of 41 PageID #: 126184
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 25 of 41 PageID #: 126184
Robyn Lyn Pruett, Ph.D., D.A.B.T.

there's many other things going on in vivo that
the in vitro tests cannot replicate. So the
dose of the Procol LA-10 is not comparable
in vitro to in vivo.

Q. Okay. Now, in terms of the actual
amount released, I should talk in terms of
release, as you sit here today, you cannot say
that the amount of Procol LA released from mesh
into the human body over a ten-year period is
not the same quantity as that which was tested
in the in vivo dish -- in vitro dish, correct?

MR. HUTCHINSON: Form.

A. I cannot say that, but I believe
many -- several different concentrations were
tested in vitro, but I do not know how they
compare to the in vivo situation.

BY MR. ORENT:

Q. Okay. Now, we next talked about the
in vivo studies that involved both mesh and
non-mesh. In terms of the endpoints, was
necrosis the only endpoint that you were looking
for in terms of determining whether or not
something was cytotoxic or not?

A. No. It was the primary endpoint for
cytotoxicity, but I also know that wound healing

is -- or delayed wound healing can be an
indication of cytotoxicity. So I was looking at
the general tissue response, specifically
necrosis, fibrosis, myofiber regeneration, and
inflammation, but with necrosis being the most
likely indicator of cytotoxicity.

Q. Did you look for whether or not
foreign body giant cells were present?

A. No.

Q. How about macrophages?

A. No.

Q. How about any cells indicating an
acute foreign body reaction?

A. No, just general inflammation.

Q. How about scarification?

A. Yes, the fibrosis.

Q. Did you look at whether or not
bridging fibrosis existed in each of these
studies?

A. Not specifically.

Q. Do you know what bridging fibrosis is?

A. No.

Q. Okay. Do you know how dense the
collagen was in areas where there was reported
to be little cytotoxicity? In other words, if

we're using scarification as a metric in these
animal studies, focusing on the mesh five, what
layer of scarification, what amount of
scarification would be the difference between
minimal and mild?

MR. HUTCHINSON: Object to form.

A. I don't remember. I would have to
look that up.

BY MR. ORENT:

Q. Okay. Did you do an independent
evaluation of each of the specimens and each of
the findings to determine whether or not in
terms of scarification it was consistent with
what your own definition of, for example,
extensive scarification might be, or minimal
scarification, or something like that?

MR. HUTCHINSON: Form.

A. No. I'm not a pathologist, so I had
to rely on the study authors.

BY MR. ORENT:

Q. Okay. So you relied, for each of
those five studies, you relied upon the findings
of the authors, correct?

A. Yes.

Q. And you yourself would not be

qualified to do an in vivo study, correct?

A. No.

Q. And, in fact, that would go towards
either a pathologist or a combination of
physician and pathologist, correct?

A. At least a pathologist.

Q. Okay. And you can only go on the
pathology reports that are provided to you about
whether or not there's evidence of a particular
finding or not, correct?

A. Correct.

Q. And so if something was not an
endpoint that was specifically evaluated for,
you couldn't say whether or not it was there or
not there, you could only state something like
there's no evidence presented of X, correct?

MR. HUTCHINSON: Object to form.

A. Well, these studies are supposed to
look at several different things. And so, for
example, these studies are supposed to look for
necrosis. So if necrosis is not mentioned, I
mean if the study has been done well, then that
means that necrosis is not present.

BY MR. ORENT:

Q. Okay. Now, chronic inflammation, what

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 26 of 41 PageID #: 136135
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 26 of 41 PageID #: 136135
Robyn Lyn Pruett, Ph.D., D.A.B.T.

**Page 94**

1 is the marker that you use for the definition of
2 chronic inflammation when reviewing these
3 studies? Do you look at it in terms of the
4 presence of foreign body giant cells?
5    A. No.
6    Q. Okay. Do you look at it in terms of
7 the presence of bridging fibrosis?
8    A. No. I look at it as the
9 interpretation of the study authors to whether
10 they saw chronic inflammation.
11    Q. Okay. So this is -- when you write
12 these paragraphs on Page 12 and 13, those are
13 more or less summaries of the information that
14 the study authors themselves presented, correct?
15    A. Correct.
16    Q. Okay. That's not your own independent
17 evaluation of those particular studies, correct?
18       MR. HUTCHINSON: Object to form.
19    A. As far as looking at the pathology,
20 correct.
21 BY MR. ORENT:
22    Q. Okay. And you're not reaching
23 independent conclusions from what the authors
24 reached in their findings, correct?
25    A. No, not from the pathology, no.

**Page 95**

1    Q. You're summarizing the findings of the
2 original authors?
3    A. Yes.
4    Q. Okay. The next thing that you do is a
5 summary of the clinical evidence. You "did not
6 identify any clinical studies in which
7 cytotoxicity of TVT was the primary endpoint.
8 However, multiple clinical studies show no
9 evidence of cytotoxicity in women who have been
10 surgically implanted with TVT."
11       Did you do a comprehensive review of
12 the literature regarding TVT?
13    A. Not myself, no.
14    Q. Did your team do a comprehensive
15 literature review of the peer-reviewed medical
16 literature on TVT?
17    A. We didn't -- well, it depends on what
18 you mean by "comprehensive." But no, I did not
19 do literature searches to identify all of the
20 studies.
21    Q. Okay. For example, when I think of
22 comprehensive literature review, I think of
23 reviewing all of the case studies out there, all
24 of the series, case series, all of the
25 retrospective studies, all of the prospective

**Page 96**

1 studies, and randomized controlled trials.
2       Would you agree that that makes up the
3 comprehensive universe of what literature would
4 look like, could look like?
5       MR. HUTCHINSON: Object to form.
6    A. Yes.
7 BY MR. ORENT:
8    Q. And so in terms of case studies, did
9 you direct anyone on your team to perform a
10 comprehensive search for all of the human case
11 studies on TVT?
12    A. No.
13    Q. In terms of the work that you did, did
14 you direct anyone on your staff to do a
15 comprehensive search for all of the case series
16 studies with TVT?
17    A. No.
18    Q. With regard to the work that you did,
19 did you direct anybody to do a comprehensive
20 search of all of the retrospective studies on
21 TVT?
22    A. No.
23    Q. In terms of the work that you were
24 doing, did you direct anybody to look for all of
25 the prospective studies on TVT?

**Page 97**

1    A. No.
2    Q. And in terms of the studies that you
3 did, did you ask anyone to look at all of the
4 randomized controlled trials available on TVT?
5    A. No.
6    Q. How about multicenter. You know what
7 a multicenter study is, correct?
8    A. Yes.
9    Q. Means there's multiple hospitals doing
10 the same procedure to essentially rule out the
11 contribution of physician error as a -- or
12 physician contribution to the result, correct?
13    A. Yes.
14    Q. It removes that as a confounding
15 factor, true?
16    A. Yes.
17    Q. Did you do any, or ask for a
18 comprehensive review of the randomized
19 controlled multicenter studies to be done on
20 TVT?
21    A. No.
22    Q. And to your knowledge, were any
23 comprehensive reviews conducted on any of those
24 areas that I just asked you about?
25    A. No.

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 27 of 41 PageID #: 126186
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 27 of 41 PageID #: 126186
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 98

1  Q.  And would it be true to say that your
2  opinions under 3.3 do not rely upon a
3  comprehensive review of the literature as we've
4  just described it?
5       MR. HUTCHINSON:  Object to form.
6  Mischaracterizing the testimony, Counsel.
7    A.  The way you describe comprehensive,
8  no.
9  BY MR. ORENT:
10   Q.  Okay.  And would you agree that you
11 are not an expert on the peer-reviewed
12 literature regarding the safety and efficacy of
13 the TVT device?
14      MR. HUTCHINSON:  Object to form.
15   A.  Correct.
16 BY MR. ORENT:
17   Q.  Now, the Nilsson study, that's
18 a study that was provided to you by Ethicon, is
19 that correct?
20   A.  It was, yes.
21   Q.  Okay.  Now, were you aware that the
22 original authors of that study began -- or the
23 study that began 17 years earlier, the original
24 named author had since passed away?  Did you
25 know that?

Page 99

1    A.  No.
2    Q.  Okay.  Well, Nilsson is ultimately the
3  guy who took on the role of that.
4       But were you aware that that series of
5  studies that went over a 17-year period included
6  provisions in the contract for those studies
7  that payment would only be issued if no new
8  complications were determined to be found in
9  each of the interval periods?
10      MR. HUTCHINSON:  Form.
11   A.  No.
12 BY MR. ORENT:
13   Q.  Would you question a study where the
14 authors were paid to not find new adverse
15 clinical outcomes?
16      MR. HUTCHINSON:  Form.
17   A.  Possibly.
18 BY MR. ORENT:
19   Q.  Did Ethicon advise you that this study
20 ultimately culminated in paying the authors more
21 than $2 million?
22   A.  No.
23      MR. HUTCHINSON:  Form.
24 BY MR. ORENT:
25   Q.  Would that be information that you

Page 100

1  would have wanted to know?
2    A.  I don't think it would change my
3  opinions.
4    Q.  Would the fact that this was a --
5  well, let me ask you this.
6       What's the prior study -- before the
7  2013 cohort, when is the time prior, immediately
8  prior to that that they looked at the study?
9  How many years had passed?  If this is 17 years,
10 there was one at how many years?
11   A.  I can't remember.
12   Q.  Does 11 sound right to you?
13   A.  10 or 11.
14   Q.  Okay.  And between year 11 and year
15 17, how many new complications were found?
16   A.  I can't remember.  I'd have to look
17 that up.
18   Q.  You would agree, though, that there
19 were new complications found, weren't there?
20   A.  Actually I don't recall, but I don't
21 believe any of them indicated cytotoxicity.
22   Q.  And would erosion indicate
23 cytotoxicity to you?
24   A.  I don't know.
25   Q.  Do you know what erosion is?

Page 101

1    A.  Is that -- not specifically.
2    Q.  Okay.  Well, were you aware -- I
3  looked at your -- I spent some time going over
4  your material that we looked at, your reliance
5  list, and I didn't see anything by
6  Dr. Klosterhalfen.  Do you know who
7  Dr. Klosterhalfen is?
8    A.  No.
9    Q.  Do you know who Dr. Klinge is?
10   A.  Klinge?
11   Q.  Klinge, K-L-I-N-G-E.
12   A.  No.
13   Q.  Were you aware that Dr. Klosterhalfen
14 and his group had evaluated from the 1990s
15 forward thousands of mesh pieces, mesh explants,
16 and published on their findings?
17   A.  No.
18   Q.  Were you aware that -- would that be a
19 line of evidence that you would want to see in
20 making cytotoxicity determinations in terms of
21 what pathologists were finding inside human
22 explants?
23      MR. HUTCHINSON:  Object to form.
24   A.  If they were reporting clear evidence
25 of cytotoxicity, yes.

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 28 of 41 PageID #: 128137
Case 2:12-cv-02352 Document 399-5 Filed 04/27/17 Page 28 of 41 PageID #: 16525
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

BY MR. ORENT:

Q. Okay. And did you do a comprehensive search of prepared reviewed literature for mesh excisions, and pathology of mesh, those sort of things?

A. No.

Q. Would you agree with me that in assessing the human cytotoxicity of mesh that an understanding of human pathology and the human in vivo response is more important than understanding the animal in vivo response?

MR. HUTCHINSON: Form.

A. It is more relevant to the question. However, you cannot simply insert mesh into a woman to see what happens and to evaluate cytotoxicity, you can only go by the studies that have been conducted on women whose doctors recommend that they have this procedure for the benefits of the procedure. So you can only look at those women once they have had the procedure and look for evidence of adverse effects, such as cytotoxicity.

BY MR. ORENT:

Q. Now, do you know what the universe of, for example -- strike that.

Why might a woman with a TVT device have that device explanted?

A. I'm not a doctor, but I suppose if it was giving her complications.

Q. Specifically what type of complications?

MR. HUTCHINSON: Objection. Counsel, this is outside the bounds of her report.

A. I'm sorry.

BY MR. ORENT:

Q. Are there particular complications that you would expect to see that evidence cytotoxicity?

A. Necrosis, and impaired wound healing.

Q. And do you know what the peer-reviewed medical literature reports in terms of necrosis in individuals implanted with TVT?

A. Among the studies I reviewed, necrosis was not mentioned as an endpoint.

Q. Did you specifically look to the peer-reviewed literature, that vast universe of case studies, case series, retrospective and prospective, as well as RCTs and multi-centered studies, did you specifically look for necrosis in any of those?

A. I believe I did a search of TVT and cytotoxicity, and did not find any in the -- anything in the peer-reviewed literature.

Q. So I'm a lawyer, when I do research, it's a big part of what I do, I take the term that I want and I put a little circle around it and I draw all these crazy lines, almost like a little sun, I think of all the different synonyms for the word that I'm looking for. Did you do that same thing with cytotoxicity and TVT?

MR. HUTCHINSON: Object to form.

A. I believe I did after the literature search.

BY MR. ORENT:

Q. Okay. So what terms did you use?

A. Necrosis, and wound healing.

Q. And how many articles on wound healing problems with mesh did you find?

A. Well, no, I didn't do a literature search with that. Just to come to my opinions, I evaluated whether there was impaired wound healing such as in the in vivo studies, and took note of it in the clinical studies that I reviewed as well.

Q. I see.

So you didn't actually search PubMed, for example, for necrosis, or for delayed wound healing, is that correct?

A. Right.

Q. Okay. If I went on PubMed and did those searches, do you have any idea how many articles I would find?

A. No.

Q. Do you know what the most common complication associated with the TVT device is?

A. No.

Q. Do you know whether or not the most common complication of TVT experienced in women correlates at all with cytotoxicity?

A. No.

Q. One of the documents that you reviewed was an Ethicon summary of literature, correct?

A. What type of literature?

Q. The Ethicon 2013 conducted a clinical review of 152 randomized controlled trials.

A. Yes.

Q. Did you do anything to verify the comprehensivity of that?

A. No, I just based it on what they

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 29 of 41 PageID #: 126128
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 29 of 41 PageID #: 126128
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 106

1 stated in this report.
2    Q.  So Ethicon still sells TVT, right?
3    A.  As far as I know.
4    Q.  They make money by it, right?
5    A.  I'm sure they do.
6    Q.  Okay.  Make a lot of money, probably?
7    A.  I don't know.
8        MR. HUTCHINSON:  Objection.  Outside
9 the scope of her report, Counsel.
10 BY MR. ORENT:
11    Q.  And it's in their vested interest to
12 have a body of literature that supports keep
13 selling this device, right?
14       MR. HUTCHINSON:  Same objections.
15 Foundation.
16    A.  I suppose.
17       MR. HUTCHINSON:  We don't want you to
18 guess or speculate.  I think he'll admit that.
19       THE WITNESS:  Okay.
20 BY MR. ORENT:
21    Q.  Now, you did nothing to verify the
22 accuracy of that literature review, is that
23 correct?
24    A.  Correct.
25    Q.  Now, in your report you talk about

Page 107

1 weight of the evidence approach.
2    A.  Yes.
3    Q.  And you use Bradford Hill as an
4 example, right?
5    A.  Yes.
6    Q.  And really when you think about
7 Bradford Hill, you look at causality; that is,
8 can this substance cause this, right?
9    A.  Right.
10    Q.  And you narrowly defined the issue of
11 is TVT cytotoxic here, right?  That's how you
12 defined the issue?
13    A.  Yes.
14    Q.  Now, it seems to me you -- the lines
15 of evidence that you cite in your report are
16 3-fold, correct?
17    A.  Yes.
18    Q.  They're in vitro studies.  And we've
19 discussed those, correct?
20    A.  Somewhat, yes.
21    Q.  And the in vitro studies are -- do
22 show that there is some cytotoxicity, correct?
23    A.  Yes, in vitro.
24    Q.  Okay.  And we discussed in vivo,
25 correct?

Page 108

1    A.  Yes.
2    Q.  And we discussed that there are only
3 five in vivo studies conducted by Ethicon,
4 correct?
5    A.  That I'm aware of, yes.
6    Q.  That you're aware of.
7       And you don't know how to correlate
8 those with the human experience, correct?
9       MR. HUTCHINSON:  Object to form.
10    A.  Not from a pathology standpoint.
11 BY MR. ORENT:
12    Q.  Okay.  And we discussed the third,
13 which would be the literature, correct?
14    A.  Human literature?
15    Q.  Human literature, correct?
16    A.  Yes.
17    Q.  And that you didn't do a comprehensive
18 literature review, correct?
19       MR. HUTCHINSON:  Object to form.
20    A.  Correct.
21 BY MR. ORENT:
22    Q.  And you didn't look at pathology,
23 correct?
24    A.  Right.  I don't have expertise in
25 that.

Page 109

1    Q.  Now, when you do Bradford Hill, you
2 want to look at all available lines of evidence.
3 So, for example, you would look at everything
4 from large scale epidemiological studies, right?
5    A.  Yes, if they're available.
6    Q.  To human case studies, to human
7 series, correct?
8    A.  We don't always look at those in
9 toxicology.  The weight-of-evidence analyses
10 that I've done, including those on Exhibit 9,
11 the epidemiology studies would be more
12 informative than the case reports.
13    Q.  You do look at various types of cell
14 studies, cultures, and things like that, right?
15    A.  Yes.
16    Q.  You look at some animal studies, where
17 available, correct?
18    A.  Yes.
19    Q.  And then you look at all of the
20 evidence together, and you form an opinion,
21 correct?  Is that essentially how Bradford Hill
22 works?
23    A.  Well, that's how weight-of-evidence
24 works, yes.  And you can use the Bradford Hill
25 considerations within that to tie the evidence

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 29 of 41 PageID #: 126139
Case 2:12-md-02327 Document 3799-5 Filed 04/27/16 Page 29 of 41 PageID #: 16883

Robyn Lyn Pruitt, Ph.D., D.A.B.T.

Page 110

1 together, yes.
2    Q.   Would you agree with me that really in
3 this case your opinions rest solely on your
4 interpretation of the mesh in vivo studies?
5        MR. HUTCHINSON:  Object to form.
6    A.   No.
7 BY MR. ORENT:
8    Q.   Even though we've shown that your
9 literature review was not comprehensive?
10        MR. HUTCHINSON:  Objection.
11 Mischaracterizes testimony.
12        I don't know what literature review
13 you're talking about, Counsel.  I don't think
14 the witness does either.
15 BY MR. ORENT:
16    Q.   And even though we have discussed
17 that, in fact, in vitro this mesh is cytotoxic,
18 correct?
19    A.   Yes.  But in vitro results do not
20 predict, necessarily predict what's going to
21 happen in vivo.
22    Q.   Now, part of being a neutral scientist
23 is evaluating both sides of the argument,
24 correct?
25    A.   Yes.

Page 111

1    Q.   And you saw the reports of Dr. Elliott
2 and Dr. Rosenzweig, correct?
3    A.   Yes, I did.
4    Q.   And do you know how many articles,
5 medical articles, Dr. Elliott reviewed prior to
6 forming his opinions in this case?
7    A.   No, I don't.
8    Q.   Do you know how much pathology and how
9 many pathology reports he reviewed in terms of
10 forming his opinion?
11    A.   No, I don't.
12    Q.   Do you know how many human patients he
13 saw with mesh complications prior to forming his
14 opinions?
15    A.   No, I don't.
16    Q.   Same with Dr. Rosenzweig, do you know
17 how many patients he saw with TVT complications
18 prior to forming his opinion?
19    A.   No.
20    Q.   Do you know how much pathology or
21 pathology reports he looked at prior to forming
22 his opinions?
23    A.   No.
24    Q.   Do you know what body of literature he
25 reviewed prior to forming those opinions?

Page 112

1    A.   No.
2    Q.   Do you know what internal corporate
3 documents Dr. Elliott and Dr. Rosenzweig looked
4 at in terms of forming their opinions?
5    A.   No.
6    Q.   Now, in terms of Dr. Iakovlev, how
7 many of his reports have you reviewed?
8    A.   Just one.
9    Q.   Do you know whether or not
10 Dr. Iakovlev has actually written in other
11 reports about necrosis?
12    A.   No, I don't.
13    Q.   Do you know whether or not
14 Dr. Iakovlev has formed opinions on bridging
15 fibrosis?
16    A.   No.
17    Q.   Do you know whether or not he has
18 formed opinions on other aspects of interactions
19 between mesh and human tissue that might be
20 considered cytotoxic?
21    A.   No, but he didn't report any
22 cytotoxicity in this particular report.
23    Q.   And have you read Dr. Iakovlev's
24 peer-reviewed published articles on mesh?
25    A.   No.

Page 113

1        MR. ORENT:  Why don't we take a short
2 five minute break.
3        THE VIDEOGRAPHER:  Going off the
4 record.  The time is 12:09.
5        (Whereupon, a recess was taken.)
6        THE VIDEOGRAPHER:  Back on the record.
7 The time is 12:31.
8 BY MR. ORENT:
9    Q.   I asked you this question with regard
10 to in vivo, but let me ask it with in vitro.
11        You yourself, do you do in vitro
12 testing?
13    A.   No.
14    Q.   Now, if we look at, in your report,
15 data Table A.2 -- I'm sorry, A.3, I notice that
16 there's no footnotes there, and there's a whole
17 host of footnotes on the shorter A.1 and A.2.
18 Why is it that there's no footnotes?
19    A.   I didn't think there was anything
20 necessary to footnote.  The footnotes in Tables
21 A.1 and A.2 were just clarifying whether they
22 were ISO guideline studies.
23    Q.   Okay.  A few other questions for you.
24        With regard to your work at Gradient,
25 you're not a principal, correct?

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 31 of 41 PageID #: 126140
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 31 of 41 PageID #: 126140
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 114

1    A.   Correct.
2    Q.   Are you in line to be a principal?
3    A.   Yes, I am.
4    Q.   And at what point in your career, how
5 many more years, or when do you come up for
6 evaluation for becoming a principal?
7    A.   Well, to become a principal at
8 Gradient, it's dependent upon how much revenue
9 you bring in.
10   Q.   Okay.  And what is the amount of
11 revenue that is considered enough to become a
12 principal?
13   A.   It might be different for different
14 people, but I believe the general number is
15 100,000.
16   Q.   Okay.  Is that per year, or --
17   A.   Yes.
18   Q.   And do you reasonably believe that
19 you're going to become a principal this year, at
20 the end of the year, or next year?
21   A.   This year, no.
22   Q.   Now, with regard to the structure
23 here, do you have a principal who is your
24 supervisor?
25   A.   No.

Page 115

1    Q.   How does that work?  Who is your boss?
2    A.   Well, in a case like this where I'm
3 hired, I'm the boss.
4    Q.   But in terms of structure within
5 Gradient, who do you report to?
6    A.   Yes, I do have a manager who is a
7 principal here.
8    Q.   And who is that?
9    A.   His name is Kurt Herman.
10   Q.   And does he evaluate your work at the
11 end of every year?
12   A.   Yes.
13   Q.   And in terms of the projects that you
14 take on, do you need to get Kurt's approval?
15   A.   No.
16   Q.   Do you need to get any sort of
17 corporate approval?
18   A.   No.  The only thing we do is we do a
19 confidentiality check before agreeing to do
20 work.
21   Q.   And do you individually -- I know that
22 your billing rate is 265 an hour, is that right?
23   A.   Yes.
24        And the last thing I said, I meant to
25 say a conflict of interest check, not a

Page 116

1 confidentiality check.  Sorry.
2    Q.   I understood that that's what you
3 meant.
4    A.   Yes.
5    Q.   Your rate is 265 an hour, correct?
6    A.   Yes, it is.
7    Q.   Do you directly receive any portion of
8 your billings?
9    A.   Principals at Gradient do receive a
10 percentage of the revenue of projects that they
11 bring in.
12   Q.   Okay.  So in terms of this particular
13 project, since you're not technically a
14 principal yet, do you receive a percentage of
15 the total billings?
16   A.   Yes.
17   Q.   What's that percentage?
18   A.   I actually don't know.
19   Q.   Okay.  And that's a percentage of not
20 just the work that you do, but the work that's
21 assigned out and billed under your project, is
22 that right?
23   A.   I don't know.
24   Q.   Do you know, is it greater or less
25 than 10 percent?

Page 117

1    A.   I don't know.
2    Q.   Okay.  We just took what I thought was
3 going to be a short break, ended up being a
4 little bit longer.  Did you have the opportunity
5 over the course of the break to talk to your
6 counsel?
7    A.   Yes, I did.
8    Q.   Did you talk about the substance of
9 your testimony?
10   A.   Substance?  We did talk about the
11 testimony.
12   Q.   Okay.  Did you review any documents?
13   A.   No.
14   Q.   Did you prepare questions that you
15 were going to be asked going forward?
16   A.   I did not, no.
17   Q.   Were you asked -- basically were you
18 told what questions you would be asked?
19        MR. HUTCHINSON:  Objection.  Counsel,
20 that's work product.  Instruct the witness not
21 to answer.
22 BY MR. ORENT:
23   Q.   Are you going to stand by that advice?
24   A.   Yes.
25   Q.   But you did talk about the substance

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 32 of 41 PageID #: 136141
Case 2:14-cv-02351 Document 399-5 Filed 04/27/17 Page 32 of 41 PageID # 136327
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 118

1 of what we're discussing here today, correct?
2    A.  Some of it.
3        MR. ORENT:  Okay.  All right.  I'm
4 going to maintain an objection to your last
5 instruction on the record and reserve all my
6 rights accordingly.
7        Subject to that, I am done, and
8 obviously also subject to my right to redirect.
9        EXAMINATION
10 BY MR. HUTCHINSON:
11   Q.  Dr. Prueitt, my name is Chad
12 Hutchinson, I have the privilege of representing
13 Ethicon and Johnson & Johnson.
14        Walk us through your education,
15 please.
16   A.  I received a bachelor of science
17 degree in biology from Pacific Lutheran
18 University.  And then I received a Ph.D in
19 molecular biology from the University of Texas
20 Southwestern Medical Center at Dallas.  Then I
21 was a post-doctoral fellow at the National
22 Cancer Institute for five years.  Then a staff
23 scientist at the Fred Hutchinson Cancer Research
24 Center for one year.
25   Q.  And what did you do as a staff

Page 119

1 scientist?
2    A.  I managed and conducted studies
3 investigating prostate cancer biomarkers.
4    Q.  Through the course of your education,
5 experience, have you done toxicology work?
6    A.  Yes, I have.
7    Q.  And would that be reflected in your
8 CV?
9    A.  Yes.
10   Q.  Would you tell the jury about your
11 toxicology work, please?
12   A.  At the National Cancer Institute I
13 studied the effects of smoking and nicotine on
14 prostate cancer.
15   Q.  Anything else?
16   A.  No.
17   Q.  Are you board certified in anything,
18 Dr. Prueitt?
19   A.  Yes, I'm board certified in
20 toxicology.
21   Q.  What does it mean to be board
22 certified in toxicology?
23   A.  So first it requires a certain
24 combination of education and experience.  For
25 example, for someone with a Ph.D, it would

Page 120

1 require an additional three years of working
2 toxicology experience, and then for a master's
3 degree it would require seven years.  And so
4 that combination of education and experience
5 qualifies you to take the exam to be board
6 certified.
7        So then I sat for an exam that is --
8 that covers toxicology, every aspect of
9 toxicology, very comprehensive exam, for a day
10 and a half, and so I passed that exam.  And then
11 to keep my board certification, each year I have
12 to do either -- well, I have to do a certain
13 number of toxicology-related activities, such as
14 attend conferences, publish papers, take
15 courses, things like that.
16   Q.  And, Doctor, you mentioned publishing
17 papers.  Have you published any peer-reviewed
18 journal articles regarding toxicology?
19   A.  Yes, I've published quite a few.
20   Q.  Are those reflected in the CV that the
21 Plaintiffs' lawyer attached as Exhibit 1 to your
22 deposition?
23   A.  Yes, they are all listed there.
24   Q.  And have you spoken about toxicology
25 issues?

Page 121

1    A.  Yes.
2    Q.  And that would be presentations in
3 front of peers?
4    A.  Yes.
5    Q.  Are those references and presentations
6 included in your CV that Plaintiffs' lawyer
7 marked as Exhibit 1 to your deposition?
8    A.  Yes, they are.
9    Q.  I notice on your CV there's a Ph.D
10 behind your name, is that correct?
11   A.  Yes.
12   Q.  What does that mean?  What do you have
13 a Ph.D in?
14   A.  My Ph.D is in molecular biology and
15 human genetics.
16   Q.  And do you use that discipline in your
17 field, in toxicology?
18   A.  Yes.
19   Q.  I also noticed behind your name
20 D.A.B.T..  What does D.A.B.T. stand for?
21   A.  Diplomate of the American Board of
22 Toxicology, so that's indicating my board
23 certification.
24   Q.  Now, Dr. Prueitt, let's look at your
25 expert report that's marked as Exhibit 1 to your

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 32 of 41 PageID #: 126142
Case 2:12-md-02327 Document 3799-5 Filed 04/27/16 Page 33 of 41 PageID #: 136563
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

deposition. Do you have that in front of you?

A. Yes.

Q. And turn with me, please, to Page 18 of your report.

Are you there?

A. Yes.

Q. And Page 18 lists reliance documents, correct?

A. Yes.

Q. What are reliance documents?

A. These are the documents that I reviewed, and some of which -- and some of them I cited in my report, and so I reviewed these and used them to come to my opinions.

Q. And, Dr. Prueitt, I'll represent to you that there are 72 different documents under this heading. Does that sound about right to you?

A. It does. They're not numbered, so I can't check, but that sounds right.

Q. You were asked questions about whether you read all of these documents before beginning your expert report. Do you recall that line of questioning?

A. Yes.

Q. And, Dr. Prueitt, I believe you testified that you didn't read some of these documents before you began your expert report, is that right?

A. Correct.

MR. ORENT: Objection to form.

BY MR. HUTCHINSON:

Q. Let's talk about after you started working on your expert report. Have you had an opportunity to review all of the reliance documents listed in Exhibit 1 to your deposition?

A. Yes.

Q. And when did you do that?

A. After I started the report.

Q. Have you reviewed these documents during the course and scope of your work on this particular project?

MR. ORENT: Objection.

A. Yes.

BY MR. HUTCHINSON:

Q. And is that something that you as a toxicologist would normally do in your practice?

A. Yes.

Q. Let's turn to Page 12 and 13 of your

report, starting on Page 12, and let me know when you're there.

A. I'm there.

Q. Section 3.2.1 is "The results from in vivo implantation studies indicate no cytotoxicity." Did I read that correctly?

A. Yes.

Q. Is this part of your report?

A. Yes.

Q. What does that mean?

A. That means that after I reviewed the results of in vivo implantation studies of Prolene sutures in mesh that I came to the conclusions, based on those studies, that the TVT device does not cause cytotoxicity in in vivo animal studies.

Q. And for the benefit of the jury, what is an in vivo animal study?

A. It's a study conducted in a whole animal.

Q. What is an in vitro study?

A. That's a study conducted outside of a whole animal in a closed system, such as in a petri dish.

Q. Can you -- strike that.

You were asked whether or not on Page 12 and 13 of your report you summarized the findings of original authors.

Do you remember that?

A. Yes.

Q. And is that what you did?

A. Yes.

MR. ORENT: Object.

BY MR. HUTCHINSON:

Q. Is that part of the weighted evidence approach that you as a toxicologist use to reach your opinions?

A. Yes, we commonly do that. We have to rely on the study reports of others, the authors of the studies that we review. We are not a testing lab. This is what we do as toxicologists in consulting.

Q. Is it common for a toxicologist such as yourself to rely on work of other scientists?

A. Yes.

Q. Is that what you were doing here?

A. Yes.

Q. Dr. Prueitt, you were asked whether or not you conducted a comprehensive review of all human case studies, retrospective studies,

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 34 of 41 PageID #: 126143
Case 2:12-md-02327 Document 1799-5 Filed 04/07/15 Page 34 of 41 PageID #: 16553
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 126

1 prospective studies, and randomized control
2 trials. Do you remember that line of
3 questioning?
4    A. Yes, I do.
5    Q. Did you need to do that?
6    A. No.
7    Q. Why not?
8    A. Because I reviewed -- I felt that I
9 reviewed a sufficient number of studies to come
10 to my conclusions. And as a toxicologist it's
11 not something that we normally do to -- is
12 review case studies. It's better to rely on
13 epidemiology studies, because they actually will
14 show whether there's a statistically significant
15 effect of a chemical or treatment, whereas case
16 studies do not show that.
17    Q. Tell the jury what type of studies
18 that you as a toxicologist relied on in reaching
19 your opinions.
20    A. I relied on in vitro cytotoxicity
21 studies of Prolene mesh. I relied on in vivo --
22 or the in vivo implantation studies of the
23 Prolene mesh from TVT. I relied on suture
24 studies of the Prolene sutures. And I relied on
25 long -- or clinical studies with long-term

Page 127

1 follow-up of women who were implanted with TVT.
2    Q. And what do those studies tell you as
3 a toxicologist?
4    MR. ORENT: Objection.
5    A. All together the results of all of
6 those studies indicate that the TVT mesh is not
7 cytotoxic in vivo and is not cytotoxic -- or
8 does not show evidence of cytotoxicity in
9 humans.
10 BY MR. HUTCHINSON:
11    Q. Let's talk about the literature and
12 the documents that you reviewed.
13    Did you bring three notebooks with you
14 here today?
15    A. Yes, I did.
16    Q. And marked as Exhibit -- was it 4 to
17 your deposition?
18    MR. ORENT: It's 3.
19 BY MR. HUTCHINSON:
20    Q. Marked as Exhibit 3 to your deposition
21 is a document. Have you seen that document
22 before?
23    A. Yes.
24    Q. Would you tell the ladies and
25 gentlemen of the jury what Exhibit 3 represents?

Page 128

1    A. This represents all of the documents
2 that I specifically cited in my report.
3    Q. And did you review those documents
4 that you specifically cited in your report?
5    A. Yes, I did.
6    Q. Can you give us an idea of how many
7 documents there are?
8    A. There are -- I cited 76 documents.
9    Q. And did you bring those documents with
10 you here today?
11    A. Yes.
12    Q. Dr. Prueitt, you testified earlier
13 that you did not do a comprehensive literature
14 review. Do you remember that?
15    A. Yes.
16    Q. What did you mean by that?
17    A. I meant by his definition of
18 comprehensive.
19    Q. Who is "his"?
20    A. Counsel.
21    Q. For the Plaintiff?
22    A. For the Plaintiff.
23    Because I answered that question
24 shortly after he described what he meant by
25 comprehensive literature review, which included

Page 129

1 case studies and other types of studies that I
2 did not rely on and do not normally rely on as a
3 toxicologist.
4    Q. And, Dr. Prueitt, I believe you
5 testified earlier that you're not an expert on
6 peer-reviewed literature about the safety and
7 efficacy of TVT. Do you remember that
8 testimony?
9    A. Yes.
10    Q. Do you need to be an expert on the
11 peer-reviewed literature of that?
12    A. Not to form opinions on whether TVT is
13 cytotoxic.
14    Q. And is that what you were asked to do
15 in this case?
16    A. Yes.
17    Q. Is a generally accepted methodology of
18 a toxicologist to review all of the safety and
19 efficacy literature of a device when studying
20 only cytotoxicity?
21    MR. ORENT: Objection.
22    A. No, and particularly not the efficacy.
23 BY MR. HUTCHINSON:
24    Q. Why not?
25    A. Because that has no bearing on the

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 35 of 41 PageID #: 136144
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 35 of 41 PageID #: 136888

Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 130

1 potential cytotoxicity of the device.
2     Q.  Dr. Prueitt, walk us through the
3 methodology that you used as a toxicologist to
4 reach your opinions in this case.
5     A.  Okay.  First I reviewed the documents
6 that were given to me, the in vitro cytotoxicity
7 studies, and the related documentation such as
8 by Dr. Barbolt that discusses these studies.
9 Also, the in vivo cytotoxicity studies that were
10 provided for the sutures and the mesh, because I
11 did not find any studies evaluating potential
12 cytotoxicity of TVT or even Prolene in the
13 peer-reviewed literature.
14     Q.  And then what did you do?
15     A.  And then I also looked at the --
16 looked at clinical studies of TVT for -- with
17 follow-up of ten years or more to look for
18 potential adverse effects of TVT that might be
19 related to cytotoxicity.
20     Q.  And what do those studies show,
21 Dr. Prueitt?
22     A.  Those studies showed that there were
23 no adverse effects specifically related to
24 cytotoxicity in the women implanted with TVT.
25     Q.  Did those studies show any evidence of

Page 131

1 necrosis?
2         MR. ORENT:  Objection.
3     A.  Not that I saw, no.
4 BY MR. HUTCHINSON:
5     Q.  And, Dr. Prueitt, as a toxicologist,
6 what does necrosis tell you about cytotoxicity?
7     A.  It can be an indication of
8 cytotoxicity.  However, the presence of necrosis
9 may not definitively indicate that the
10 cytotoxicity occurred from the exposure, it
11 could have been due to other complications, of
12 the surgery itself, or if there was a -- some
13 other type of adverse effect from the surgery,
14 such as a large amount of inflammation.  It
15 could cause cells to die.  There could be
16 mechanical cell death from encountering the edge
17 of the device, I would think.
18     Q.  Dr. Prueitt, I'll apologize if I
19 interrupted you, but had you finished walking us
20 through your methodology that's used in reaching
21 your toxicology opinions?
22     A.  No.
23     Q.  Okay.  What else did you do?
24     A.  Well, I didn't mention this -- all the
25 types of studies that I reviewed and that I did

Page 132

1 a literature search and didn't find any other
2 in vitro or in vivo studies, or clinical studies
3 specifically related to cytotoxicity of TVT.
4 But -- so then I laid out the in vitro and in
5 vivo studies in the tables that are at the back
6 of my report, and looked at all the evidence
7 together, considered the relevance of in vitro
8 results to the situation in vivo and in humans
9 specifically, and then determined that, you
10 know, the weight of the evidence should lean
11 towards the in vivo studies and the clinical
12 studies because those are the most relevant to
13 humans.  And those -- because those studies did
14 not show evidence of cytotoxicity specifically
15 from exposure to the TVT device, then I formed
16 my conclusions.
17     Q.  And, Dr. Prueitt, is this the
18 methodology that you used -- strike that.
19         Is the methodology you used the
20 generally accepted methodology employed by a
21 toxicologist in reaching the opinions you
22 reached in this case?
23         MR. ORENT:  Objection.
24     A.  Yes, it is.  I've used it before, and
25 my colleagues use it as well.

Page 133

1 BY MR. HUTCHINSON:
2     Q.  And, Dr. Prueitt, you mentioned
3 earlier that you created some tables that are in
4 Exhibit 1 to your deposition, is that correct?
5     A.  Yes.
6     Q.  And what do those tables tell us?
7     A.  The tables lay out the general
8 methodology and the results of the in vitro and
9 in vivo studies that I reviewed.
10     Q.  And, Dr. Prueitt, would that allow
11 another scientist to repeat and verify your
12 work?
13     A.  Yes.  Another scientist could look at
14 these tables, or they could make their own
15 tables of these studies and use them to come to
16 their conclusions.
17     Q.  Dr. Prueitt, did you search PubMed for
18 necrosis and wound healing?
19     A.  No, I did not.
20     Q.  Did you need to do that?
21     A.  No, I did not need to do that to come
22 to my opinions.
23     Q.  Why not?
24     A.  Because I felt that the clinical
25 studies that I reviewed which had follow-up of

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 36 of 41 PageID #: 126145
Case 2:12-cv-02327 Document 3799-5 Filed 04/27/17 Page 36 of 41 PageID #: 126345
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 134

1 ten years or more in women with the TVT device
2 and did not show evidence of cytotoxicity were
3 enough to help me reach my opinions. And also
4 the presence of necrosis and wound healing
5 difficulties may not necessarily be caused
6 specifically by cytotoxicity.
7    Q. Doctor, you testified earlier that
8 some of the studies in vitro were positive. Do
9 you remember that?
10    A. Positive for cytotoxicity, yes.
11    Q. Does the analysis stop there when
12 reaching an opinion about cytotoxicity of a
13 material?
14    A. Absolutely not. You also have to --
15    Q. Why not?
16    A. Because results in vitro cannot be
17 directly extrapolated to what will happen
18 in vivo. You have to also evaluate in vivo
19 studies and human studies if they are available.
20    Q. Why can those results not be
21 extrapolated from a scientific standpoint?
22    A. Because those results were based on
23 putting either an elution from the mesh or the
24 mesh itself directly on a single cell type, and
25 with -- so it's an artificial situation, it's

Page 135

1 not anywhere near the same as what's in the
2 body. And so in vitro tests like this are only
3 used as an initial screening test, they are
4 never used to show a definitive affect.
5    Q. Dr. Prueitt, I want to go back to the
6 methodology that you used to render your
7 opinions. Have you used the methodology that
8 you used here before?
9    A. Yes.
10    Q. Have your colleagues used the same
11 methodology before today?
12    A. Yes.
13    Q. Why did you use this type of
14 methodology?
15    A. Because it is the standard methodology
16 for evaluating potential adverse effects and
17 causation that's used by toxicologists both in,
18 you know, a regulatory -- by regulatory
19 toxicologists, as well as in the peer-reviewed
20 literature.
21    Q. Dr. Prueitt, you were asked by the
22 Plaintiffs' lawyer whether or not you did the
23 in vitro or in vivo testing. Do you remember
24 that line of questioning?
25    A. Yes.

Page 136

1    Q. Dr. Prueitt, do you need to be the one
2 who physically does the in vitro or in vivo
3 testing to reach sound toxicology opinions in
4 this case?
5    A. No.
6    Q. Why not?
7    A. Because I can review the studies and
8 see the results and interpret them based on the
9 study. I don't have to be, you know, the one
10 actually conducting the study to be able to
11 interpret it.
12       MR. HUTCHINSON: I don't have any more
13 questions right now. Thank you for your time,
14 Dr. Prueitt.
15       EXAMINATION
16 CONTINUED BY MR. ORENT:
17    Q. Doctor, I have some follow-up
18 questions for you.
19       First of all, Doctor, in order to
20 evaluate cytotoxicity in humans related to the
21 TVT device, specifically what clinical
22 manifestation would you expect to find in the
23 literature to determine whether or not there was
24 evidence of cytotoxicity? What would the
25 clinical picture be?

Page 137

1    A. Right. There could be necrosis.
2 There could be affects on wound healing.
3    Q. How about -- so delayed wound healing?
4    A. Yes, that could be evidence of
5 cytotoxicity.
6    Q. What about ulceration?
7    A. I don't know.
8    Q. Okay. You previously said you don't
9 know what erosions are, correct?
10    A. Right.
11    Q. So you don't know if an erosion could
12 be a sign of cytotoxicity, correct?
13    A. No, I don't know.
14    Q. Okay. How about extrusion, do you
15 know what an extrusion is?
16    A. Not definitively.
17    Q. Okay. So if you're looking in the
18 clinical literature and you see a report of
19 extrusion, to you do you know whether or not
20 that is a sign of cytotoxicity?
21       MR. HUTCHINSON: Objection.
22       Counsel, she just told you she didn't
23 know what it was.
24 BY MR. ORENT:
25    Q. You can answer.

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 37 of 41 PageID #: 136146
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 37 of 41 PageID #: 136846
Robyn Lyn Fruett, Ph.D., D.A.B.T.

Page 138

1    A. No, I don't know specifically what
2 that is, but I know that necrosis and impaired
3 wound healing would be most likely what you
4 would visualize if there was cytotoxicity.
5      MR. ORENT: Move to strike the last
6 portion.
7 BY MR. ORENT:
8    Q. Now, when an individual patient comes
9 in and complains of -- let me see, scarification
10 is another example of cytotoxicity, correct?
11    A. Not that I'm aware of.
12    Q. Fibrotic reaction?
13    A. Not that I'm aware.
14    Q. Okay. How about banding?
15    A. Not that I'm aware.
16    Q. Okay. Now, with regard again to the
17 mesh in cytotoxicity, do you know -- I
18 understand that you were looking for the words
19 necrosis somewhere, but what would the physical
20 presentation of a patient be who complains of
21 something that ultimately may lead to a
22 diagnosis of necrosis? What would that look
23 like?
24    A. I don't know. I'm not a medical
25 doctor.

Page 139

1    Q. Okay. So if you were looking at the
2 initial -- in any of these studies, for example
3 Nilsson, do you know, the complications that
4 arose between 11 and 13 years in Nilsson, did
5 they send the pathology out for microscopy and
6 further diagnosis to determine whether or not
7 necrosis was present?
8      MR. HUTCHINSON: Object to form.
9    A. They report that there were no serious
10 long-term TVT-induced adverse effects, so I
11 don't think that matters for my opinions.
12 BY MR. ORENT:
13    Q. Okay. Well, you looked at the data
14 tables associated with Nilsson 2013, correct?
15    A. Yes.
16    Q. And you're aware that there were new
17 complications that was reported in that period,
18 correct?
19    A. I don't remember.
20    Q. Okay. Well, would you have -- I mean
21 as part of your standard practice, this is one
22 of the few named studies that you looked at,
23 would you have looked at the data tables in
24 Nilsson?
25    A. Yes.

Page 140

1    Q. Okay. So if erosion were listed as
2 something that was new between years 11 and 17,
3 would you have wanted to investigate what
4 exactly that meant?
5    A. No. I was looking for something that
6 would indicate, clearly indicate cytotoxicity.
7    Q. And so prior to beginning this
8 process, prior to looking at the human clinical
9 evidence that you've cited here, did you talk to
10 a urogynecologist?
11    A. No, I don't think I needed to do that.
12    Q. Did you talk to a pathologist to find
13 out what the clinical manifestation of these
14 sort of things might be?
15    A. No, I didn't need to do that.
16    Q. Okay. Now, in terms of necrosis, have
17 you ever seen in a medical implant study a
18 diagnosis of something like necrosis?
19    A. No, I haven't.
20    Q. Okay. Do you know whether or not
21 necrosis is something that's seen at the
22 microscopic level?
23    A. Yes, it would be.
24    Q. Okay. And so do you know whether or
25 not the clinical presentation, that a clinician

Page 141

1 would ever call it necrosis, or do you think
2 that that would later be made by a pathologist?
3      MR. HUTCHINSON: Objection. Outside
4 the bounds of her report.
5 BY MR. ORENT:
6    Q. Do you know?
7    A. I don't know.
8    Q. But that would be important, wouldn't
9 it, in determining whether or not you're likely
10 to see the term necrosis in a clinical study,
11 wouldn't it?
12    A. I don't know.
13    Q. Who makes the diagnosis of necrosis?
14    A. I don't know for sure.
15    Q. Okay. Now, we talked about the
16 studies. You just mentioned you focus on
17 studies with -- that were present at least ten
18 years out, correct?
19    A. Yes.
20    Q. Okay. And do you know what percentage
21 of complications occur before ten years?
22    A. No, I don't think that matters for my
23 opinions on cytotoxicity.
24    Q. Okay. Now, in order for you to
25 determine that a substance is cytotoxic, does it

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 38 of 41 PageID #: 126147
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 38 of 41 PageID # 126147
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 142

1 need to show cytotoxic properties in every
2 single woman?
3    A.  No, because humans are variable.
4    Q.  Okay.  So if the greatest percentage
5 of complications occur between year one and,
6 let's say, year seven or eight or nine, wouldn't
7 you want to look at the complications that occur
8 in that period of time to determine if there's
9 evidence of cytotoxicity?
10   A.  Well, I mean I also looked at the
11 clinical literature review of 152 randomized
12 controlled trials, you know, that Ethicon did.
13 So, you know, to come to my opinions about
14 cytotoxicity I -- you know, if there were issues
15 with cytotoxicity of the device, those issues
16 should be long-term.  I mean if this is
17 implanted and it's causing cytotoxicity, it
18 should cause cytotoxicity all the time, and you
19 should be able to -- that would -- that should
20 be a clear adverse effect.  And so if this is a
21 cytotoxic material, you would expect to see it
22 in a large number of women.
23   Q.  Are you aware that there's 100,000
24 mesh lawsuits in existence right now?
25       MR. HUTCHINSON:  Form.

Page 143

1    A.  No, I don't know the number.
2 BY MR. ORENT:
3    Q.  Is that a large number?
4    A.  I don't know.
5    Q.  Let me ask you -- you didn't actually
6 answer my question, my last question, so let me
7 just go back and ask it again.
8       In order for you to determine that the
9 cyto -- excuse me.
10      If the greatest percentage of
11 complications occur between year one and, let's
12 say, year seven or eight or nine, wouldn't you
13 want to look at the complications that occur in
14 that period of time to determine if there's
15 evidence of cytotoxicity?  It's a yes or no
16 question.
17   A.  Yes, and I did by looking at the
18 clinical literature review.
19      MR. ORENT:  Move to strike after the
20 word "yes."
21 BY MR. ORENT:
22   Q.  The clinical literature review was not
23 a clinical literature review conducted by you,
24 correct?
25   A.  Correct.

Page 144

1    Q.  And you'd agree with me that the dose
2 makes the poison, right?
3    A.  Generally, yes, that's standard
4 toxicology tenet.
5    Q.  And, in fact, you cite it in your
6 report, don't you?
7    A.  Yes.
8    Q.  So understanding that the dose makes
9 the poison, how do you account for that in the
10 studies that look at suture versus mesh?
11   A.  Well, the mesh is larger than the
12 sutures, so if there were chemicals leaching out
13 of the material, there would be -- it would be
14 in a higher concentration in the mesh versus the
15 sutures.  However, the studies -- the in vivo
16 studies of both the sutures and the mesh show no
17 cytotoxicity.
18   Q.  Well, would you agree with me that all
19 of the in vivo mesh cytotoxicity studies are all
20 short-term, correct?
21   A.  In vivo studies?
22   Q.  Mm-hmm.
23   A.  No.  There was a study of up to
24 182 days, that's considered a chronic study.
25   Q.  Okay.

Page 145

1    A.  So that is not considered short-term.
2    Q.  That's the only one?
3    A.  And then the 91-day study below that,
4 that's actually considered chronic as well.
5    Q.  Okay.
6    A.  And then the others are considered
7 subacute, less than 30 days.
8    Q.  So we're talking 182 days, that's
9 roughly half a year, correct?
10   A.  Yes.
11   Q.  Do you know what percentage of women
12 with mesh complications develop those
13 complications after the first six months?
14   A.  No, but I don't think that matters.
15 And the lifespan of a rat is much shorter, and
16 so I don't know -- that's not directly
17 comparable.
18   Q.  So how do you -- what is the
19 established peer-reviewed methodology for taking
20 a rat study and equating it to a human?
21   A.  Well, generally you look to see if
22 there are known -- what the differences in
23 physiology are.
24   Q.  We already discussed one article today
25 about the appropriate types of animals to be

Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 39 of 41 PageID #: 136148
Case 2:12-md-02327 Document 3799-5 Filed 04/27/17 Page 39 of 41 PageID #: 136148
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

1 used in the pelvic mesh context. Are you aware
2 of an entire body of literature that exists on
3 the very issue of animal selection for
4 extrapolation of information to the pelvis?
5     A. No. But I still don't, you know,
6 think that that would necessarily change my
7 opinions.
8     Q. You didn't research that, right?
9     A. No, it's not something I researched.
10 But I --
11     Q. I'm sorry, I have one other question.
12         MR. HUTCHINSON: I'm sorry,
13 Dr. Prueitt, were you finished with your answer?
14     A. Yeah, I wasn't quite finished.
15         The fact that the literature I
16 reviewed for the human clinical studies doesn't
17 indicate cytotoxicity, you know, based on that,
18 based on what I found from that, you know,
19 showing a lack of cytotoxicity in women, so the
20 potential differences in physiology among the
21 different species, you know, it may not matter.
22 BY MR. ORENT:
23     Q. So when you were talking about your
24 opinion relative to women in the human clinical
25 data earlier, you said something. You said that

1 your opinion is that there's no evidence of
2 cytotoxicity in women. Do you recall saying
3 that?
4     A. Yes.
5     Q. Now, I want to just clarify. Is your
6 opinion the TVT is not cytotoxic in women, or is
7 it that you have seen no evidence of
8 cytotoxicity in women?
9     A. I want to be consistent with my
10 report.
11     Q. I'll let you go to your report in a
12 second.
13         Can you answer that question without
14 looking at your report, Doctor?
15     A. No, I just want to be consistent with
16 it.
17     Q. So you cannot answer that without
18 looking at your report?
19         MR. HUTCHINSON: Counsel, she made
20 reference that she wants to look at the report.
21         MR. ORENT: That's fine.
22 BY MR. ORENT:
23     Q. I just want the record to reflect that
24 I've asked that question to what your opinion is
25 before you review your report. And if you need

1 that to look at it, that's fine, but I want the
2 record to reflect that you need your report to
3 answer that question.
4         MR. HUTCHINSON: Let the record
5 reflect the witness has told you she wants to be
6 consistent.
7     A. The clinical studies show no evidence
8 of cytotoxicity, the clinical studies I
9 reviewed.
10 BY MR. ORENT:
11     Q. Okay. So is your opinion that you
12 have seen no evidence of cytotoxicity, or is it
13 that the TVT is not cytotoxic?
14     A. Well, the fact that I've seen no
15 evidence of cytotoxicity in women combined with
16 the other evidence that I evaluated leads me to
17 conclude that the weight of the evidence
18 indicates that the TVT is not cytotoxic in women
19 to a reasonable degree of scientific certainty.
20         MR. ORENT: Okay.
21         MR. HUTCHINSON: We don't have any
22 further questions.
23         Thank you, Dr. Prueitt, for your time.
24         MR. ORENT: Thank you.
25         THE VIDEOGRAPHER: Going off the

1 record. This concludes the deposition of
2 Dr. Prueitt of October 22nd, 2015. The time is
3 1:15.
4         (Whereupon, the deposition was
5         concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:12-md-02327 Document 3709-5 Filed 04/27/17 Page 40 of 41 PageID #: 126149
Case 2:12-md-02327 Document 3709-5 Filed 04/27/16 Page 40 of 41 PageID #: 16303
Robyn Lyn Prueitt, Ph.D., D.A.B.T.

Page 150

```
 1  COMMONWEALTH OF MASSACHUSETTS )
 2  SUFFOLK, SS.              )
 3       I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
 4  and Notary Public in and for the Commonwealth of
 5  Massachusetts, do certify that on the 22nd day
 6  of October, 2015, at 9:48 o'clock, the person
 7  above-named was duly sworn to testify to the
 8  truth of their knowledge, and examined, and such
 9  examination reduced to typewriting under my
10  direction, and is a true record of the testimony
11  given by the witness.  I further certify that I
12  am neither attorney, related or employed by any
13  of the parties to this action, and that I am not
14  a relative or employee of any attorney employed
15  by the parties hereto, or financially interested
16  in the action.
17       In witness whereof, I have hereunto
18  set my hand this 24th day of October, 2015.
19
20  _____
21       MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22       Realtime Systems Administrator
23       CSR #149108
24
25
```

Page 152

```
 1       - - - - - -
         E R R A T A
 2       - - - - - -
 3  PAGE  LINE  CHANGE
 4  ____ ____ _____
 5      REASON: _____
 6  ____ ____ _____
 7      REASON: _____
 8  ____ ____ _____
 9      REASON: _____
10  ____ ____ _____
11      REASON: _____
12  ____ ____ _____
13      REASON: _____
14  ____ ____ _____
15      REASON: _____
16  ____ ____ _____
17      REASON: _____
18  ____ ____ _____
19      REASON: _____
20  ____ ____ _____
21      REASON: _____
22  ____ ____ _____
23      REASON: _____
24  ____ ____ _____
25
```

Page 151

```
 1     INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition over
 4  carefully and make any necessary corrections.
 5  You should state the reason in the appropriate
 6  space on the errata sheet for any corrections
 7  that are made.
 8       After doing so, please sign the
 9  errata sheet and date it.  It will be attached
10  to your deposition.
11       It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

Page 153

```
 1     ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, _____, do
    Hereby certify that I have read the foregoing
 4  pages, and that the same is a correct
    transcription of the answers given by me to the
 5  questions therein propounded, except for the
    corrections or changes in form or substance, if
 6  any, noted in the attached Errata Sheet.
 7
    _____
 8  ROBYN LYN PRUEITT, Ph.D., D.A.B.T.    DATE
 9
10
11
12
13
14
15  Subscribed and sworn
    To before me this
16  _____ day of _____, 20____.
17  My commission expires: _____
18
    _____
19  Notary Public
20
21
22
23
24
25
```

Case 2:12-md-02327 Document 3790-5 Filed 04/27/17 Page 41 of 41 PageID #: 126150
Case 2:12-cv-02352 Document 199-5 Filed 04/27/17 Page 41 of 41 PageID #: 14883
Robyn Lyn Pruett, Ph.D., D.A.B.T.

Page 154

1          LAWYER'S NOTES
2  PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____