# EXHIBIT

# P

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 2 of 409 PageID #: 139475
Case 2:12-md-02327  Document 2188-17  Filed 05/09/16  Page 2 of 504 PageID #: 68463
Vladimir Iakovlev, M.D.

```
 1              CAUSE NO. 2012-CI-18690

 2

 3   JENNIFER RAMIREZ F/K/A  )  IN THE DISTRICT COURT

 4   JENNIFER GALINDO,       )

 5              Plaintiff,)

 6   v.                      )  438th JUDICIAL DISTRICT

 7   CESAR REYES, M.D.,      )

 8   JOHNSON & JOHNSON,      )

 9   AND ETHICON, INC.,      )

10              Defendant. )  BEXAR COUNTY, TEXAS

11   ------------------------)

12

13

14   ---  This is the Videotaped Deposition of VLADIMIR

15   IAKOVLEV, M.D., taken at the Hilton Hotel,

16   University Room, 145 Richmond Street West,

17   Toronto, Ontario, on the 19th day of April, 2016.

18              ------------

19

20

21          REPORTED BY:  HELEN MARTINEAU

22          CERTIFIED SHORTHAND REPORTER

23

24          VIDEOGRAPHER:  DAVID LANE
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 3 of 409 PageID #: 139476
Case 2:12-md-02327 Document 2180-17 Filed 06/09/16 Page 3 of 504 PageID #: 68464
Vladimir Iakovlev, M.D.

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF AND THE WITNESS:

 3   ANDERSON LAW OFFICE , LLC

 4   BENJAMIN H. ANDERSON, ESQ.

 5   1360 West 9th Street, Suite 215

 6   Cleveland, Ohio 44113

 7   Tel. 216.589.0256

 8   Email:   ben@andersonlawoffices.net

 9

10   FOR THE PLAINTIFF AND THE WITNESS:

11   FREESE AND GOSS

12   RICH FREESE, ESQ.

13   1901 6th Avenue North, Suite 3120

14   Birmingham, AL 35203

15   Tel. 205.871.4144

16   Email:   rich@freeseandgoss.com

17

18   FOR THE DEFENDANT:

19   BUTLER SNOW, LLP

20   CHAD R. HUTCHINSON, ESQ.

21   1020 Highland Colony Parkway, Suite 1400

22   Ridgeland, MS 39157

23   Tel.  601.985.4401

24   Email:   Chad.hutchinson@butlersnow.com
```

Vladimir Iakovlev, M.D.

1    A P P E A R A N C E S: (continued)

2    FOR THE DEFENDANT REYES:

3    SCOTT, CLAWATER & HOUSTON, L.L.P.

4    CAROL Y. VERBEEK, ESQ. (via Skype call)

5    2727 Allen Parkway, Suite 500

6    Houston,TX 77019

7    Tel.  713.650.6600

8    Email:   cverbeek@schlawyers.com

9

10   FOR THE DEFENDANT:

11   THOMAS COMBS & SPANN, PLLC

12   PHILIP J. COMBS, ESQ.

13   300 Summers Street, Suite 1380

14   Charleston, WV 25301

15   Tel.  304.414.1805

16   Email:   pcombs@tcspllc.com

17

18

19

20

21

22

23

24

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 5 of 409 PageID #: 139478
Case 2:12-md-02327  Document 2789-17  Filed 03/20/16  Page 5 of 504 PageID #: 68166
Vladimir Iakovlev, M.D.

1                    INDEX OF WITNESSES

2     WITNESS:                                        PAGE

3     VLADIMIR IAKOVLEV, MD, Affirmed

4     DIRECT EXAMINATION BY MR. ANDERSON...............9

5     CROSS-EXAMINATION BY MR. HUTCHINSON...........153

6     RE-DIRECT EXAMINATION BY MR. ANDERSON.........359

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 6 of 409 PageID #: 139479
Case 2:12-md-02327 Document 2185-17 Filed 05/04/16 Page 6 of 504 PageID #: 68467
Vladimir Iakovlev, M.D.

|    | INDEX OF EXHIBITS | |
|----|-------------------|------|
| 1  |  | |
| 2  | NO./ DESCRIPTION | PAGE |
| 3  | PLAINTIFF'S EXHIBITS | |
| 4  | 1      Curriculum vitae of Vladimir Iakovlev, MD, prepared March 18, 2016. | 13 |
| 5  | 2      Brochure for the Bard Davol Inc. European Hernia Symposium, Berlin, Germany, 2015. | 23 |
| 6  | | |
| 7  | 3      Pathology report from UT Southwestern Medical Center re. Jennifer Ramirez, printed 4/1/2015. | 41 |
| 8  | 4(A) to 4(M)Series of photographs taken by Dr. Iakovlev during the examination of Jennifer Ramirez's specimen. | 50 |
| 9  | | |
|    | 5      Diagram depicting the spinal cord. | 70 |
| 10 | 6      Diagram prepared by Dr. Iakovlev depicting the relationship of the excised pieces to the anatomical structures in Ms. Jennifer Ramirez's body. | 75 |
| 11 | | |
| 12 | | |
| 13 | 7(A) to 7(D)Series of high magnification images depicting the specimen from Mr. Ramirez excised in March 2015. | 80 |
| 14 | 8      Article titled "Comparison of the In Vivo Behavior of Polyvinylidene Fluoride and Polypropylene Sutures Used in Vascular Surgery", found in OSAIO Journal 1998.  Bates labelled ETH.MESH.05845592 to ETH.MESH05845599. | 90 |
| 15 | | |
| 16 | | |
| 17 | 9      Article titled "Structural alterations of prosthetic meshes in humans" found in Hernia Journal, 2003. | 91 |
| 18 | | |
| 19 | 10     Article titled "Materials Characterization of Explanted Polypropylene Hernia Meshes" found in the Journal of Biomedical Materials Research Part B: Applied Biomaterials. | 92 |
| 20 | | |
| 21 | 11     Article titled "Materials characterization of explanted polypropylene, polyethylene terephthalate, and expanded polytetrafluoroethylene composites: Spectral and thermal analysis", found in Journal of Biomedical Materials | 94 |
| 22 | | |
| 23 | | |
| 24 | | |

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 7 of 409 PageID #: 139480
Case 2:12-md-02327  Document 2183-17  Filed 05/04/16  Page 7 of 504 PageID #: 68168

Vladimir Iakovlev, M.D.

| | | | |
|---|---|---|---|
| 1 | | Research Part B: Applied Biomaterials. | |
| 2 | | | |
| 3 | 12 | Article titled "Physical | 95 |
| 4 | | Characteristics of Medical Textile Prostheses Designed for Hernia Repair: A Comprehensive Analysis of Select | |
| 5 | | Commercial Devices", found in MDPI Materials, 2015. | |
| 6 | 13 | Article titled "Degradation of polypropylene in the human eye: A | 97 |
| 7 | | sem-study", found in Documenta Ophthalmologica, 1986. | |
| 8 | 14 | Article titled "Reinforcement Materials in Soft Tissue Repair:  Key | 98 |
| 9 | | Parameters Controlling Tolerance and Performance - Current and Future | |
| 10 | | Trends in Mesh Development", found in the journal New Techniques in Genital | |
| 11 | | Prolapse Surgery, 2011. | |
| 12 | 15 | Article titled "Subcutaneous Implants of Polypropylene Filaments", found in the Journal of Biomedical Material | 100 |
| 13 | | Research, 1976. | |
| 14 | 16 | Article titled "Degradation, infection and heat effects on polypropylene mesh for pelvic implantation: what was | 101 |
| 15 | | known and when it was known", found in the International Urogynecology | |
| 16 | | Journal, 2011. | |
| 17 | 17 | Article titled "Post-Implantation alterations of Polypropylene in the Human", found in The Journal of | 102 |
| 18 | | Urology, 2012. | |
| 19 | 18 | Article titled "Materials characterization and histological analysis of explanted polypropylene, | 104 |
| 20 | | PTFE, and PET hernia meshes from an individual patient", found in the | |
| 21 | | Journal of Material Medicine, 2013. | |
| 22 | 19 | Article titled "Pathology of Explanted Transvaginal Meshes", found in World Academy of Science, Engineering and | 105 |
| 23 | | Technology International Journal of Medical, Health, Pharmaceutical and | |
| 24 | | Biomedical Engineering, 2014. | |

Case 2:12-md-02327  Document 3799-17  Filed 04/27/17  Page 8 of 409 PageID #: 139481
Case 2:12-md-02327  Document 2183-17  Filed 05/04/16  Page 8 of 504 PageID #: 68189
Vladimir Iakovlev, M.D.

```
 1              INDEX OF EXHIBITS
 2   NO./ DESCRIPTION                           PAGE
 3   20   Article titled, "Degradation of       107
          polypropylene in vivo: A microscopic
 4        analysis of meshes explanted from
          patients", found in the Journal of
 5        Biomedical Materials Part B, 2015.
     21   Printout of PowerPoint slides created 110
 6        with the assistance of Dr. Iakovlev
          for presentation to the jury.
 7   22   Article titled "Pathologic Evaluation 124
          of Explanted Vaginal Mesh:
 8        Interdisciplinary Experience From a
          Referral Center", found in the Journal
 9        of Female Pelvic Medicine &
          Reconstructive Surgery, 2013.
10   23   Internal Ethicon Research Foundation  130
          document dated March 23, 1983.  Bates
11        labelled ETH.MESH.15955438 to
          ETH.MESH.15955439.
12   24   Internal document from Ethicon        135
          Research Foundation dated May 2, 1984.
13        Bates labelled ETH.MESH.15955462 to
          ETH.MESH.15955468.
14   25   Two pages depicting high magnification 143
          images for comparison.
15
16   DEFENSE EXHIBITS:
17
18   1    Expert report of Dr. Vladimir Iakovlev 167
          re. Jennifer Ramirez, dated April 24,
19        2015.
     2    Medical report from Baptist Health    172
20        System re. Jennifer Galindo dated
          1/21/2015.  Bates labelled
21        RAMIREZJ_BAHSY_MDR00564.
     3    Patient record from UT Southwestern   184
22        Medical Center re. Jennifer Ramirez,
          printed on 4/6/2015.  Bates labelled
23        RAMIREZJ_UTSMC_MDR00311.
     4    Surgical pathology report from St.    186
24        Michael's Hospital re. Jennifer
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 9 of 409 PageID #: 139482
Case 2:12-md-02327  Document 2385-17  Filed 06/09/16  Page 9 of 504 PageID #: 68170
Vladimir Iakovlev, M.D.

| | | | |
|---|---|---|---|
| 1 | | Ramirez dated 10/5/2015. | |
| 2 | | | |
| 3 | 5 | Diagram depicting the female anatomy after a hysterectomy is done. | 201 |
| 4 | 6 | Diagram depicting the muscles in the female pelvic floor. | 205 |
| 5 | 7 | Article titled "Histopathology of excised midurethral sling mesh", found | 209 |
| 6 | | in the International Urogynecology Journal, 2015. | |
| 7 | 8 | Document titled "TR-19/2007 Chemical Resistance of Thermoplastics Piping | 240 |
| 8 | | Materials" from the Plastics-Pipe Institute, dated September 2007. | |
| 9 | 9 | Rule 26 expert report of Dr. Vladimir Iakovlev re. Jo Husky, et al., and | 310 |
| 10 | | Tonya Edwards, et al. | |
| | 10 | Addendum to the Rule 26 expert report of Dr. Vladimir Iakovlev re. | 313 |
| 11 | | Lisa Marie Fontes, et al. | |
| 12 | 11 | Rule 26 expert report of Vladimir Iakovlev, re. Diane Bellew. | 320 |
| 13 | 12 | Rule 26 expert report of Dr. Vladimir Iakovlev re. Amal Eghnayem. | 324 |
| 14 | 13 | Report by Dr. Iakovlev titled "Clinico-pathological Correlation of | 336 |
| 15 | | Complications Experienced by Ms. Virginia White". | |
| 16 | 14 | Medical report from Mercy Hospital Northwest Arkansas re. Virginia White. | 338 |
| 17 | | Bates labelled WHITEV_SMAMM_MDR00027. | |
| | 15 | Expert report of Dr. Iakovlev In Re. Ethicon, Inc., Pelvic Repair System | 351 |
| 18 | | Products Liability Litigation relating to all Wave 1 Cases. | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Vladimir Iakovlev, M.D.

```
 1              ---  Upon commencing at 9:15 a.m.

 2              THE VIDEOGRAPHER:  My name is David Lane

 3    I'm the videographer for Golkow Technologies.

 4    Today's date is April 19th, 2016.  Our time is

 5    9:15 a.m.  This deposition is taking place in

 6    Toronto, Ontario, in the matter of Jennifer

 7    Ramirez versus Ethicon Inc. et al.  Our deponent

 8    today is Dr. Vladimir Iakovlev, MD.  Our deponent

 9    -- counsel will be noted on the stenographic

10    record.  Our court reporter today is Helen

11    Martineau.  Would the court reporter please swear

12    in the witness.

13    (WHEREUPON, the witness was duly affirmed.)

14              VLADIMIR IAKOVLEV, M.D.,

15               called as a witness herein,

16              having been first duly sworn,

17         was examined and testified as follows:

18              DIRECT EXAMINATION BY MR. ANDERSON:

19              Q.  Good morning.

20              A.  Good morning.

21              Q.  What is your name?

22              A.  Vladimir Iakovlev.

23              Q.  What is your occupation?

24              A.  I'm a doctor and I'm a pathologist.
```

Vladimir Iakovlev, M.D.

1      Q.  What is pathology?

2      A.  Pathology is part of medicine is

3  laboratory medicine.  Pathologists are doctors who

4  work in the lab in the hospital.  We receive

5  samples from the patients the samples are taken by

6  the treating doctors.  Samples would be fluids

7  like blood and urine, or tissue samples like

8  biopsies from tumors or larger organs resected

9  from the body.  We analyze them, we cannot do all

10  possible tests so we do only those tests which are

11  needed to manage the patient immediately.  We

12  report these results to the commissions or to

13  treating doctors and they treat the patients.

14      Q.  Do you have a particular focus

15  within pathology?

16      A.  I am an anatomical pathologist.

17      Q.  And what is an anatomical

18  pathologist?

19      A.  Anatomical pathology is part of

20  pathology where laboratory doctors examine tissue

21  samples not fluids like blood but tissue sample,

22  scrapings of cells like pap smears, or biopsy from

23  tumors like a core biopsy from a breast lump, or

24  larger resections like part of bowel or lump from

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 12 of 409 PageID #: 130485
Case 2:12-md-02327 Document 2284-17 Filed 05/20/16 Page 12 of 504 PageID #: 68173
Vladimir Iakovlev, M.D.

1   the breast, or sometimes we examine the entire

2   body.  We do an autopsy.  You probably have seen

3   autopsies on TV.

4           Q.  You said the word "resection", what

5   is a resection?

6           A.  Resection is when a part of the

7   organ is cut-out.  Resected means cut out.  It can

8   be an organ or it can be a part of device like a

9   mesh.

10          Q.  Are you familiar with a term in

11  medicine known as "differential diagnosis"?

12          A.  Yes, I am.

13          Q.  Is that something that you as an

14  anatomical pathologist use in your daily practice?

15          A.  Yes, I do.

16          Q.  Can you please explain for the jury

17  what a differential diagnosis is?

18          A.  A differential diagnosis is a list

19  of possible diseases which can cause similar

20  symptoms.  When the patient comes in they report

21  specific symptoms so the treating doctor has a

22  list of possible diseases which can cause the

23  symptoms.  They take the history, they examine the

24  patient then they narrow down that list to smaller

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 13 of 409 PageID #: 139486
Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 13 of 504 PageID #: 681436
Vladimir Iakovlev, M.D.

1   number.  But then at certain point they need our

2   help.  So they take samples like blood or the

3   tissue samples and send it to the laboratory.  And

4   then laboratory doctors like me examine these

5   specimens and we work down the pathological part

6   of the differential diagnosis.  We narrow down

7   that list to one disease which caused the

8   symptoms.

9           Q.  So is the differential diagnosis

10   that you perform as a pathologist the same or

11   different as a differential diagnosis by patient's

12   treating doctor or clinician?

13           A.  It's the same and it's different.

14           Q.  Okay.  Please explain?

15           A.  It's a part of the larger

16   differential diagnosis because treating doctors

17   can narrow it down to a certain point but they

18   still need our help otherwise we wouldn't be

19   needed in the hospital, we wouldn't have a job.

20   But at certain point they have to take biopsies

21   and send it to us and then we can do our

22   pathological differential diagnosis or we can rule

23   out diseases which can be ruled out only by using

24   a microscope not by just examining the patient.

Vladimir Iakovlev, M.D.

1        Q.  And is this the process that you've

2   described that you do every day in your daily

3   practice what you did in this case in arriving at

4   your expert conclusions in Ms. -- for Ms. Ramirez?

5        A.  That's correct.  I use exactly the

6   same approach for examining Ms. Ramirez's specimen

7   as I do in my routine, day-to-day practice.

8        Q.  Okay.  Showing you what we have

9   marked for identification as Exhibit 1.

10       ---PLAINTIFF EXHIBIT NO. 1:  Curriculum

11           vitae of Vladimir Iakovlev, MD,

12           prepared March 18, 2016.

13       BY MR. ANDERSON:

14       Q.  First can you please identify this

15   for the record?

16       A.  This is my curriculum vitae.

17       Q.  AND what is a curriculum vitae?

18       A.  It's a document which describes all

19   my career, my education, my licenses, my

20   publications, my teaching.

21       Q.  And you have it there in front of

22   you if you need to refer to it at any time.  I

23   just want to go through with the jury a bit of

24   your background education and employment history,

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 15 of 409 PageID #: 138488
Case 2:12-md-02327 Document 3791-17 Filed 04/20/16 Page 15 of 504 PageID #: 138178
Vladimir Iakovlev, M.D.

```
 1    okay?

 2              A.   Okay.

 3              Q.   Where do you currently work?

 4              A.   I work at St. Michael's Hospital,

 5    Toronto, Canada.

 6              Q.   What is your current position?

 7              A.   I'm a pathologist and I'm also a

 8    director of cytopathology at St. Michael's

 9    Hospital.

10              Q.   Okay, that's a new word.  What is

11    cytopathology?

12              A.   Cytopathology is part of anatomical

13    pathology but I'm focusing more on smaller

14    samples.  When the samples are sucked out through

15    a fine needle or they are scraped.

16              Q.   And how long have you been at St.

17    Michael's?

18              A.   About nine years.

19              Q.   Explain to the jury what you do,

20    Doctor, on a day-to-day basis at St. Michael as an

21    anatomic pathologist?

22              A.   As an anatomic pathologist, or as

23    any pathologist we receive specimens.  These

24    specimens are taken out by treating doctors or by
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 16 of 409 PageID #: 138489
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 16 of 504 PageID #: 138489
Vladimir Iakovlev, M.D.

1  radiologist.  So they take a biopsy or they resect

2  an organ and they send it to the lab.  In the lab

3  we receive the specimen; we make sure that it

4  belongs to correct patient; we make sure that

5  everything is labelled correctly; and then we

6  examine this specimen or part of the body which

7  was resected, or biopsy.  We describe it grossly

8  how it looks, how it feels by fingers.  We cut

9  through it, look inside, how it looks inside and

10  then we decide how to take sections for

11  microscopic examination.

12          Q.  When you say "sections" what do you

13  mean?

14          A.  Sections when we slice it like a

15  bread through or we call it cross-sectioning, it's

16  like slicing bread.  And then when we slice it we

17  can look inside and see what's inside.  And then

18  we can take these slices and put them in the

19  microscope, shine light through and see what is in

20  the tissue.

21          So after we slice it with scalpel then

22  we submit it to make histological slides.  And

23  then the lab makes histological slides, slides

24  like this, and then we use a microscope to examine

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 17 of 409 PageID #: 130490
Case 2:12-md-02327 Document 1724-1 Filed 03/29/16 Page 17 of 504 PageID #: 68178

Vladimir Iakovlev, M.D.

1    them in the microscope and then we describe it.

2    We go through morphological differential or

3    pathological differential diagnosis and we make a

4    diagnosis and report it to the treating doctors.

5             Q.  Are you familiar with the term

6    clinico-pathological correlation?

7             A.  Yes, I am.

8             Q.  Can you explain what that means to

9    you as a pathologist this word

10   clinico-pathological correlation?

11            A.  This is like putting different

12   pieces of information together, like species in

13   jigsaw puzzle.  As I explain or as I described

14   when the patient comes in treating doctors examine

15   the patient, take history, so they collect some

16   pieces of information.

17            Then when I receive it I also see what

18   radiologist were reporting or describing by using

19   X-rays or CT scans and then I examine the

20   specimen.  So I have my pieces of information.

21   When I put everything together then we can arrive

22   to the correct diagnosis.  And this is called

23   "clinico-pathological correlation", when we

24   correlate all of the pieces of information from

Vladimir Iakovlev, M.D.

```
 1    clinical treating physicians, treating doctors to

 2    pathology information.

 3              Q.  So please briefly describe for the

 4    jury your education and training that prepared you

 5    to work as a pathologist.

 6              A.  A pathologist needs to go first

 7    through medical school.  My medical school

 8    training was in Russia.  At that time system in

 9    Russia was similar to United Kingdom.  If people

10    do well, they have good grades in high school they

11    can be accepted in medical school straight out of

12    high school.  I had good grades; I volunteer in

13    the ward; I attended some scientific society when

14    I was in high school; and I was accepted straight

15    from high school.

16              Q.  And you say you volunteered at the

17    ward.  Is that volunteering at the ward of a

18    hospital?

19              A.  Yes.

20              Q.  Go ahead, I'm sorry.

21              A.  But you -- some people do first

22    degree, bachelor degree and then they apply to

23    medical school like here in North America so there

24    are two ways, but if you have good grades and show
```

Vladimir Iakovlev, M.D.

1    your dedication you can be accepted straight from

2    high school.

3            When I completed high school it was a

4    time of great struggle in Russia, it was '90s.

5    The government didn't have enough money and they

6    couldn't invest into medical care.  My wife and I

7    decided to move at that time and we came to

8    Canada.  We took Canadian and American licensing

9    exams and then we continued our training as

10   anatomical pathologists here.

11           After I completed the residency then I

12   applied for research fellowship at Ontario Cancer

13   Institute.  That is here in Toronto.  This is the

14   largest cancer institute in Canada.  And when I

15   completed it I had an offer from St. Michael's

16   Hospital and I was also appointed at the

17   University of Toronto.

18           Q.  Where do you hold medical licenses?

19           A.  I hold medical license in the

20   Province of Ontario, Canada, and the State of

21   Michigan, United States.

22           Q.  Are you Board certified in any

23   fields?

24           A.  I'm Board certified in anatomical

Vladimir Iakovlev, M.D.

 1  pathology by the Royal College of Physicians and

 2  Surgeons of Canada, and by the Canadian --

 3  American Board of Pathology.

 4          Q.  Real briefly how does one obtain

 5  Board certification?

 6          A.  Board certification is obtained by

 7  submitting all your education, training, and

 8  experience.  If it is found to be acceptable they

 9  will allow you to sit the exam.  You sit the exam

10  and if you are successful you obtain Board

11  certification.

12          Q.  And do you have to retake the Board

13  certification exam?

14          A.  Yes.  This was a new approach lately

15  because the field of pathology is changing so fast

16  those pathologists who are not updating their

17  knowledge couldn't deliver the same standard of

18  care.  So now the rule is to retake the certifying

19  exam every ten years.  And I retook it last year,

20  it was a ten-year mark for me.

21          Q.  As a current practicing pathologist

22  are you required to complete continuing medical

23  education courses in your field?

24          A.  Yes, this is another initiative by

Vladimir Iakovlev, M.D.

1    the American Board of Pathology and Royal College

2    of Physicians of Canada.  This stimulates you to

3    study and update your knowledge yearly.

4              Q.  Are you currently a member of any

5    professional societies in your field?

6              A.  Yes.  I am Fellow of the Royal

7    College of Physicians of Canada and College of

8    American Pathologists.

9              Q.  Do you currently have any teaching

10   responsibilities?

11             A.  Yes.  I teach medical students.  I

12   teach residents, pathology residents and residents

13   from other specialties.  I teach

14   cytotechnologists, physiotherapists and

15   pathologists.

16             Q.  What do you teaching duties entail?

17             A.  For residents and fellow I teach

18   them practice of pathology how we do it

19   day-by-day; for cytotechnologists it's a more of a

20   formal sessions; for pathologists I do courses at

21   conferences and teach them the field of

22   cytopathology because I'm more focused on

23   cytopathology.

24             Q.  Are those principles of differential

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 22 of 409 PageID #: 138495
Case 2:12-md-02327 Document 3334-17 Filed 11/30/16 Page 22 of 504 PageID #: 68185
Vladimir Iakovlev, M.D.

1    diagnosis and clinico-pathological correlation

2    that you just described for the jury a few minutes

3    ago, are those things that you teach to your

4    students as well as your fellows and your

5    residents?

6            A.  Yes, because these are basic

7    principles.  That's how we arrive to the correct

8    diagnosis.

9            Q.  And did you apply those principles

10   in forming your expert conclusions that you'll be

11   presenting to the Court and the jury today?

12           A.  Yes, I did.

13           Q.  Have you written articles that have

14   been publish in the scientific literature?

15           A.  Yes.  I published over 20 full-size

16   articles and over 30 abstracts, I also presented

17   at multiple international meetings.

18           Q.  Do any of those articles or

19   abstracts relate to your examination of explanted

20   surgical meshes made out of polypropylene like the

21   TVT-O sling device that is the subject of this

22   trial?

23           A.  Yes.

24           Q.  How many?

```
 1                 A.  I published five papers, five
 2    articles on this subject and over ten abstracts on
 3    this subject of implantable meshes.  Also I
 4    presented -- I was invited to present at multiple
 5    international scientific meetings.
 6                 Q.  Has your research included
 7    publications in the peer-reviewed literature on
 8    the topics of, and I'll make a list, the pathology
 9    of surgical meshes like TVT-O?
10                 A.  That's correct.
11                 Q.  Microscopic analysis of the changes
12    in the tissue when the mesh is implanted in the
13    body?
14                 A.  That's correct.
15                 Q.  Correlation of your microscopic
16    pathological findings to the mesh patients'
17    medical problems that led to surgical removal of
18    the mesh?
19                 A.  That's correct.
20                 Q.  Microscopic analysis of the
21    degradation of polypropylene mesh in the human
22    body including degradation of the TVT-O device?
23                 A.  Yes, I did.
24                 Q.  Have you ever been invited by a
```

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 24 of 409 PageID #: 138497
Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 24 of 504 PageID #: 138497
Vladimir Iakovlev, M.D.

```
 1    medical device company to speak at one of their

 2    conferences about polypropylene mesh products like

 3    the TVT-O?

 4            A.  Yes, I was invited to one of these

 5    conferences.

 6            Q.  And where was that?

 7            A.  There was an annual hernia repair

 8    conference if Berlin.

 9            Q.  When was that?

10            A.  It was in September last year.

11            Q.  Who invited you to speak at that

12    conference?

13            A.  It was a scientific committee of

14    Bard.  Bard is a similar manufacturer like Ethicon

15    or competitor of Ethicon manufacturing implantable

16    meshes.

17            Q.  I'm showing you what we have marked

18    as Exhibit 2.

19            ---PLAINTIFF EXHIBIT NO. 2:  Brochure

20            for the Bard Davol Inc. European Hernia

21            Symposium, Berlin, Germany, 2015.

22            BY MR. ANDERSON:

23            Q.  Can you please identify that for the

24    record?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 25 of 409 PageID #: 138498
Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 25 of 409 PageID #: 68198
Vladimir Iakovlev, M.D.

```
1           A.  Yes, this is the program of the

2   meeting.

3           Q.  And can you please pull that up?  If

4   you could blow up the top.

5           You mentioned the company Bard, is the

6   company that invited you to speak at this

7   international conference?

8           A.  Yes, it is.

9           Q.  Were there mesh scientists from

10  around the world at this conference?

11          A.  Yes, there were.

12          Q.  Including scientists and consultants

13  from Bard?

14          A.  Yes.

15          Q.  Including scientists and consultants

16  from Ethicon?

17          A.  Yes.

18          Q.  Did you interact with many of these

19  scientists and consultants at the conference?

20          A.  Yes, I did.

21          Q.  Have you spoken at other

22  international conferences about your research and

23  the topics you'll be presenting to the jury here

24  today?
```

Vladimir Iakovlev, M.D.

1          A.  Yes, I did.

2          Q.  If we could go to the next page.

3   Highlight the top.  You asked me to highlight some

4   of the names here.  Are you familiar with these

5   names?

6          A.  Um, these are co-authors of some

7   research articles we published together and my

8   name.  You can see my name.

9          Q.  If you can highlight the part of the

10  agenda where he spoke.

11          What topic were you invited to speak on

12  at this international conference?

13          A.  This was a topic of pro's and con's

14  of surgery with mesh versus without mesh.

15          Q.  Okay.  Either at this mesh

16  conference, or at any of the international

17  conferences were you have presented your

18  scientific work on mesh, did any scientist, or

19  employee, or executive of any mesh manufacturer

20  ever stand up at the conference or come up to you

21  at any point and question you regarding your

22  credentials?

23          MR. HUTCHINSON:  Objection, irrelevant.

24

Vladimir Iakovlev, M.D.

1              BY MR. ANDERSON:

2              Q.  We have your objection.  Answer

3       please.

4              A.  No.

5              Q.  Did anyone question your experience?

6              A.  No.

7              Q.  Did anyone question your

8       credibility?

9              A.  No.

10             Q.  Did anyone question your

11      methodology?

12             A.  No.

13             Q.  Anyone question any of your

14      conclusions?

15             A.  No.

16             Q.  Anyone question any of your findings

17      from your peer-reviewed literature at this

18      conference, or any international conference at

19      which you've presented your scientific work on

20      mesh?

21             A.  No.

22             Q.  Shifting gears now, as part of your

23      daily practice at St. Michael's do you routinely

24      receive foreign bodies or foreign materials like

Vladimir Iakovlev, M.D.

```
 1   medical devices that have been removed from
 2   patients for which you have been asked to render
 3   medical diagnoses and opinion?
 4           A.   Yes, we receive them regularly.
 5   Those devices would be cardiac valves, tissue
 6   expanders, breast implants, hip joints, knee
 7   joints and meshes.
 8           Q.   And do those meshes include
 9   transvaginal meshes like the TVT-O sling?
10           A.   Yes, they do.
11           Q.   What are the primary reasons that
12   medical devices, like those you've just listed for
13   the jury, are removed and sent to you in
14   pathology?
15           A.   Well, the first reason is we need to
16   document the receipt of the device and then we
17   need to describe it grossly.  Then during
18   examination we need to rule out natural disease
19   like cancer which could cause these symptoms.  And
20   then we can see what the changes were in the
21   tissue, if the changes were related just to the
22   device or to something else.  And also we can
23   describe if the device was failing on its own due
24   to design defect or some other factors.
```

Vladimir Iakovlev, M.D.

1          Q.  Have you received surgically-removed

2    Ethicon meshes to perform pathological analysis as

3    your role as an anatomic pathologist at St.

4    Michael's Hospital?  Let me see if I can ask a

5    better question.

6               In your role as an anatomic pathologist

7    at St. Michael's --

8          A.  Yes.

9          Q.  -- have you received, from surgeons,

10   Ethicon surgical meshes that have been explanted

11   from patients?

12         A.  Yes, I did.

13         Q.  And have you received those in order

14   to conduct pathological analysis and

15   clinico-pathological analysis?

16         A.  Yes, I did.

17         Q.  Approximately how many mesh

18   specimens have you examined in your career as a

19   pathologist?

20         A.  Over 300 by now.

21         Q.  How many of these would be vaginal

22   meshes versus hernia meshes made out of

23   polypropylene?

24         A.  Approximately 100 would be hernia

Vladimir Iakovlev, M.D.

```
 1    meshes and over 200 would be transvaginal meshes.
 2              Q.   Those would include meshes made by
 3    Ethicon?
 4              A.   Yes.
 5              Q.   And those would include
 6    polypropylene meshes?
 7              A.   Most of them are polypropylene
 8    meshes.
 9              Q.   At this time we tender Dr. Vladimir
10    Iakovlev as an expert in the following areas,
11    pathology, anatomic pathology, the pathology of
12    surgical meshes like the TVT-O, microscopic
13    analysis of the changes in the tissue when mesh is
14    implanted in the body, correlation of microscopic
15    pathological findings to mesh patients' medical
16    problems that led to surgical removal of the mesh,
17    and microscopic analysis of the degradation of
18    polypropylene mesh in the human body, including
19    degradation of the TVT-O device.
20              MR. HUTCHINSON:   Counsel, we're
21    reserving our objections.
22              BY MR. ANDERSON:
23              Q.   Based on your clinical experience as
24    a practicing pathologist, as well as your research
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 31 of 409  PageID #: 68504
Case 2:12-md-02327  Document 3384-17  Filed 04/29/16  Page 31 of 504 PageID #: 68192
Vladimir Iakovlev, M.D.

1    in analyzing over 300 polypropylene mesh explants,

2    do you have an opinion, to a reasonable degree of

3    medical certainty, as to whether there are

4    anatomic differences between the abdominal wall

5    and the vaginal?

6         A.  Yes, there are.

7         Q.  What is that opinion, Doctor?

8         A.  The anterior abdominal wall is

9    composed of layers of tissue for skin, and some

10   fat, and then muscle, and then fascia, and then

11   all nerves and vessels are run parallel.  When the

12   hernia is repaired the mesh is laid flat against

13   all the structures and then the abdominal wall

14   expands slightly and then goes up and down with

15   breathing, but there is not much more action

16   beyond that.  So the role of the mesh is just to

17   hold the pressure.

18         Now, if we go to the female pelvis or

19   any pelvis there are no planes.  The structures

20   are rounded and they are confined in a conical

21   shape in a confined space so there are no planes

22   in between the organs.  The organs gradually

23   transition into each other and there are no planes

24   because the bladder is rounded, and then the

Vladimir Iakovlev, M.D.

1   vagina is rounded as well and then the rectum also

2   is rounded.

3          And then the innervation comes from the

4   sides and then sprays like this to innervate the

5   bladder, the vagina and the rectum and then the

6   skin around the vagina from outside.  So when the

7   mesh is placed it's crossing all this place -- all

8   this path of innervation inside the tissue.

9          Also when the mesh is placed it's not

10  placed parallel to one plane because there are no

11  planes.  So it's placed in the tissues somewhere

12  between gradual transition.  Also all the meshes

13  in the vagina are placed on the sensitive vaginal

14  mucosa.  Mucosa is like skin just inside and it's

15  very close do the surface.  Hernia meshes are not

16  put just under the skin.  Hernia meshes are put

17  very deep down.

18         Also in the pelvic area there are lots

19  of action.  The bladder needs to expand and

20  contract; the vagina needs to change shape during

21  intercourse; the rectum needs to function as well.

22  So it's not like in anterior abdominal where there

23  is not much action.

24         Q.  Is the nerve density of the pelvic

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 33 of 409 PageID #: 68506
Case 2:12-md-02327 Document 3391-7 Filed 04/29/16 Page 33 of 504 PageID #: 68192
Vladimir Iakovlev, M.D.

1  area versus the nerve density for a woman's

2  abdominal area something you have published in the

3  peer-reviewed scientific literature?

4          A.  Yes.  I compared it -- on average if

5  we compare the entire abdominal wall and all areas

6  in the vagina, specifically around slings, the

7  difference is 11 times, over 11 times.  The area

8  around slings in the vagina has 11 times more

9  innervation and then the anterior abdominal wall.

10         Q.  And what does "innervation" mean?

11         A.  Innervation means there are nerves

12  which are supplying the skin to feel it, to feel

13  the surface.  Because the genital area needs to be

14  very sensitive, and we know why.  And it's --

15  sensation is supplied by the nerves.  You have

16  more nerves you have more sensation.

17         Q.  Doctor, did we ask you to review

18  materials in this case and to give your expert

19  conclusions with regard to Ms. Jennifer Ramirez?

20         A.  Yes.

21         Q.  And, Dr. Iakovlev, you understand

22  you'll be expressing some expert conclusions and

23  opinions here today, correct?

24         A.  Yes, I do.

Vladimir Iakovlev, M.D.

1           Q.   And can we agree that every opinion

2    you express here today will be to a reasonable

3    degree of medical certainty whether or not I ask

4    that before each question, is that agreed?

5           A.   We agree.

6           Q.   Doctor, are you here today to offer

7    any expert conclusions other than as an expert

8    pathologist?

9           A.   No.  I'm a pathologist.  I offer any

10   opinions as a pathologist, as a doctor and as a

11   pathologist.

12          Q.   And did you use the same approach in

13   this case, in Ms. Ramirez's case, that you do on a

14   day-to-day routine basis as an anatomic

15   pathologist at St. Michael's when you receive

16   explanted medical devices from surgeons there?

17          A.   Yes, exactly the same approach.

18          Q.   What did you receive in this case in

19   order to arrive at your expert conclusions for the

20   jury here today?

21          A.   I received medical records and I

22   received the specimen in formalin.

23          Q.   What do you mean by the specimen in

24   formalin?  Please be specific for the jury.

1      A.   Specimen in formalin was the part of

2   the sling or two piece of the sling which were

3   excised in March 2015.

4      Q.   From Ms. Ramirez?

5      A.   From Ms. Ramirez.  They were

6   preserved in March 2015 in formalin.

7      Q.   Okay.  So for the record just

8   briefly summarize your understanding of

9   Ms. Ramirez's clinical course for the jury as it

10  relates to this case and as it relates to the work

11  that you've done in this case.

12      A.   Ms. Ramirez had hysterectomy and

13  implantation of Ethicon TVT-O sling,

14  transobturator sling, in September 2010 for mild

15  stress urinary incontinence.  Later on, sometime

16  around November, she started experiencing pain on

17  the left side.  During examination the left side

18  of the string was found to be --

19      Q.   The left side of the sling did you

20  say?

21      A.   The left side of Ms. Ramirez or left

22  side of the sling was found to be bow stringing or

23  tight.  It was tight and it was producing pain.

24  Therefore the decision was to release the tension

Vladimir Iakovlev, M.D.

1    and to excise a part of it.  And in December 2010

2    one centimeter of the sling was excised.

3              Then Ms. Ramirez continued to have some

4    symptoms and it continued on up to 2014 and 2015.

5    She continued to have pain on the left side and

6    also she had some urinary obstructive symptoms.

7              She was examined, the treating doctor

8    examined her, did investigations and the final

9    decision was to excise the residual part of the

10   sling.  So in March 2015 the residual part which

11   could be excised was excised.  Two pieces of two

12   centimeters were excised.

13             Q.  Is that the part that you received

14   in order to analyze?

15             A.  Yes, I did.

16             Q.  Okay.  Go ahead.

17             A.  I received two parts.

18             Q.  Okay.

19             A.  But those side parts or lateral,

20   lateral means further sideways.  Lateral parts are

21   still remaining in the body.  They could not be

22   removed.  They are too deep inside the muscle in

23   the obturator space.  Both the left and the right

24   sides are deep inside and they are still here

Vladimir Iakovlev, M.D.

1    today in Ms. Ramirez's body.

2              Q.  You mentioned that the explant

3    samples of the TVT-O mesh that was removed from

4    Ms. Ramirez in March of 2015 was preserved by the

5    surgeon in formalin.  Is that what you said?

6              A.  That's correct.

7              Q.  Can you please explain to the jury

8    what formalin is?

9              A.  Formalin is preservative.  It's been

10   used for over a hundred years.  It's a standard

11   preservative for tissue.  We preserve all

12   specimens, all biopsies in formalin to do our

13   microscopic examination.  It preserves tissue and

14   it can stay in formalin pretty much forever, it

15   will not degrade.

16             Q.  And did you analyze everything that

17   was made available to you?

18             A.  Yes.

19             Q.  Did you use the same procedures in

20   that analysis that you would with any similar

21   specimen in your daily practice?

22             A.  Yes.  They were analyzed exactly the

23   same way.  They were loaded into the same machine

24   and the machine was in the same protocol as any

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 38 of 409 PageID #: 138511
Case 2:12-md-02327  Document 3790-17  Filed 04/29/16  Page 38 of 504 PageID #: 138511
Vladimir Iakovlev, M.D.

 1    other diagnostic specimen.

 2            Q.   Do you know how the specimen was

 3    handled before it came to you?

 4            A.   It was preserved in formalin.  I did

 5    not see any indication that it was outside of

 6    regular range of handling as I see every day.

 7            Q.   And how do you determine that as a

 8    pathologist to see if there was anything that was

 9    done irregular in terms of the handling before it

10    came to you?

11            A.   Well I can see what's the end

12    result.  If the end result is unacceptable

13    something was done not correctly.

14            Q.   Okay.  And what did you do when you

15    received that tissue?

16            A.   When I received the tissue we

17    divided it with the defense consultant.  Each

18    piece, and I mentioned I received two pieces of

19    the excised sling.  Each piece was divided in

20    half.  One half was retained by the defense

21    consultant and the other halves were analyzed at

22    St. Michael's laboratory.  I prepared microscopic

23    slides out of these two pieces.

24            Q.   Explain to the jury how you prepared

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 39 of 409 PageID #: 63861
Case 2:12-md-02327 Document 3790-16 Filed 04/09/16 Page 39 of 504 PageID #: 63862
Vladimir Iakovlev, M.D.

1    the microscopic slides from Ms. Ramirez's surgery

2    in March of 2015 that you're going to show to them

3    today.

4            A.   When we receive a specimen --

5            Q.   Specifically talk about what you did

6    with Ms. Ramirez's sample.  I know you said you do

7    it the same way every day but let's talk about her

8    sample if we could, Doctor.

9            A.   When I received her specimen I

10   examined it grossly.  I felt it with my hands, and

11   we will describe it later with pictures how it

12   looked grossly.

13           Q.   Okay.

14           A.   And then to look inside we need to

15   cut very thin slices.  It's like I explain earlier

16   it's like slicing bread.  And when we slice it

17   really thinly then we can put the slices of the

18   excised tissue on the glass slide like this.

19           Q.   Is that one of the slides that has

20   some of Ms. Ramirez's tissue on it?

21           A.   Yes.  This is a slide and it's

22   labelled correctly with Ms. Ramirez's name.  It

23   contains slices of the tissue I received and which

24   were removed in March 2015 from Ms. Ramirez's

Vladimir Iakovlev, M.D.

1    body.

2              Q.  How many of the slides did you stain

3    for her?

4              A.  Seven.

5              Q.  And what types of staining did you

6    use for those seven slides?

7              A.  Because we cut them so thin they

8    become transparent, so in order to see what

9    structured -- what is what in this -- in the

10   tissue we need to stain it.  Staining is like

11   dyeing a fabric.  We use some dyes or some stains

12   and then we apply it and then some parts become

13   pink, some parts become blue and then I can see

14   them in the microscope.

15             There is one basic stain, the first

16   stain we usually do, it's called hematoxylin eosin

17   or in short we call it H&E.  "H" means

18   hematoxylin, "E" means eosin.  Eosin stains

19   proteins pink, hematoxylin stains nuclei blue.

20   All inflammatory cells stain blue, all scar tissue

21   stains pink.

22             Q.  How long has H&E staining been

23   around and used by pathologists?

24             A.  Around a hundred years.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 41 of 409 PageID #: 68504
Case 2:12-md-02327 Document 3780-17 Filed 04/29/16 Page 41 of 504 PageID #: 68202
Vladimir Iakovlev, M.D.

1          Q.   And did you use any other type of

2     staining other than H&E on any of Ms. Ramirez's

3     slides?

4          A.   I also used newer techniques which

5     were developed relatively recently, like 50 years

6     ago, these are called "immunostains".  These are

7     specific stains against specific proteins.  And

8     when the protein is present the color is brown,

9     when the protein is not present or where in the

10    areas where there is no protein it's blue.

11         Q.   What types of features in the tissue

12    can the blue versus brown staining help you as a

13    pathologist to identify?

14         A.   For example, if I want to see nerves

15    better I can use S100 protein and then the nerves

16    will turn brown.

17         Q.   On the slide?

18         A.   On the slide and I can see them

19    easily.

20         Q.   Did you use any other standard

21    pathological methods in your industry to analyze

22    Ms. Ramirez's explanted tissue to arrive at your

23    opinions that you will be offering to the jury

24    today?

Vladimir Iakovlev, M.D.

```
 1              A.   Yes, I did.

 2              Q.   What was that?

 3              A.   Well first I use regular light on

 4    the microscope and then I use polarizing light.

 5              Q.   And we will get into those finding

 6    about your polarizing light a little bit later

 7    okay?

 8              A.   Okay.

 9              Q.   Did you have the actual piece of

10    mesh or the pieces of mesh that were removed from

11    Ms. Ramirez's body in March of 2015?

12              A.   Yes, I had them.

13              Q.   Okay.  Did you have the pathology

14    report issued by the hospital's pathologist who

15    received the tissue right after it was removed

16    from her body on March 10, 2015?

17              A.   Yes, I had.

18              Q.   And is that something that you

19    reviewed and relied upon in forming your opinions

20    in this case?

21              A.   Yes.

22              Q.   I'll hand you what has been marked

23    as plaintiff's Exhibit 3.

24              ---PLAINTIFF EXHIBIT NO. 3:  Pathology
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 43 of 409 PageID #: 68516
Case 2:12-md-02327 Document 2121-1 Filed 04/29/16 Page 43 of 504 PageID #: 68204
Vladimir Iakovlev, M.D.

```
 1              report from UT Southwestern Medical

 2              Center re. Jennifer Ramirez, printed

 3              4/1/2015.

 4              BY MR. ANDERSON:

 5              Q.  Can you first identify that for the

 6    record?  And can you publish that please?

 7              A.  This is a pathology from UT

 8    Southwestern Medical Center.  It has name of

 9    Ramirez Jennifer with date of birth March 10,

10    1982.

11              Q.  What's the date of this record?

12              A.  The specimen collection date is

13    March 10, 2015.

14              Q.  What did the pathologist describe in

15    his pathology report of March 10, 2015?

16              A.  So the final pathology diagnosis

17    was, "Vaginal mesh removal, synthetic mesh

18    material with embedded fibrous tissue with chronic

19    inflammation.  No evidence of malignancy."

20              Q.  Okay.  Let's get that whole final

21    diagnosis up there.  Thank you.

22              A.  There was also clinical --

23              Q.  Can you expand down to bottom

24    please?
```

Vladimir Iakovlev, M.D.

 1          A.  There was also clinical information

 2   provided with the specimen.

 3          Q.  What clinical information was

 4   provided?

 5          A.  "Urinary dysfunction", and then,

 6   "Questioned vaginal removal of suburethral tape."

 7          Q.  Do the findings that you are going

 8   to show us here today differ from those made by

 9   the pathologist at the hospital where Ms. Ramirez

10   had her mesh removed?

11          A.  No.

12          Q.  Please explain.

13          A.  So we had exactly the same findings

14   that the material I received and the material

15   which was examined at UofT Southwestern Medical

16   Center contained the only pathological abnormality

17   of a mesh and tissue reaction to the mesh.  There

18   was no natural disease like malignancy.  And

19   correctly the pathologist answered the question of

20   the treating doctor that it is indeed suburethral

21   tape.  See there is a question mark and he

22   answered, yes, it is suburethral tape or TVT-O

23   tape remove and there is no malignancy in the

24   specimen.

Vladimir Iakovlev, M.D.

```
 1              Q.  What is the primary reason that

 2    tissue is sent to pathology departments around

 3    North America every day?

 4              A.  Well the most important reason any

 5    pathology is sent to rule out malignancy because

 6    we know malignancies kill.

 7              Q.  And malignancy meaning?

 8              A.  Cancers.

 9              Q.  Is this what this initial

10    pathologist did?

11              A.  Yes.

12              Q.  And was that the end of his

13    analysis.

14              A.  Well, it was not exactly the end.

15              Q.  Okay.

16              A.  He described more what is abnormal

17    in the tissue.  First he sees no cancer and he

18    reports it, and then he describes what is

19    abnormal.  And the abnormality in the tissue is

20    synthetic mesh with fibrous tissue and chronic

21    inflammation.  These are all pathological.  We

22    normally don't have foreign bodies when we are

23    born, we don't have scarring when we are born and

24    we don't have inflammation.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 46 of 409 PageID #: 138519
Case 2:12-md-02327 Document 3134-11 Filed 09/29/16 Page 46 of 504 PageID #: 68207
Vladimir Iakovlev, M.D.

1      Q.  As part of your work in this case,

2  and after your review of the various stained

3  slides that you prepared at St. Michael's, did you

4  have additional findings to those of the hospital

5  pathologist?

6      A.  Yes, I did.

7      Q.  Can you explain that?

8      A.  Well, because I was asked more

9  questions.  I was asked to show or to report to

10  the Court and to the jury if pathological findings

11  correlate with the clinical presentation or with

12  the complications.  So my first answer was the

13  same as for the pathologist, but since I was asked

14  to review this specimen in view of the litigation

15  I went one step further.  I correlated those

16  pathological findings, which are the same, with

17  the symptoms.

18      Q.  Did you endeavor to determine

19  whether or not from your analysis of the slides

20  and your review of the records as to what your own

21  pathological differential diagnosis was?

22      A.  Yes, I did.

23      Q.  And did you see if you could

24  determine whether those could be correlated to the

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 47 of 409 PageID #: 68520
Case 2:12-md-02327 Document 1325-17 Filed 04/29/16 Page 47 of 504 PageID #: 68208
Vladimir Iakovlev, M.D.

1    clinico-differential diagnosis by Ms. Ramirez's

2    treating doctors?

3              A.  Yes, I did.

4              Q.  And were you able to do that?

5              A.  Yes, I was able to do that.

6              Q.  And are those the expert conclusions

7    you're going to offer to the jury here today?

8              A.  Yes.

9              Q.  After you did the staining of

10   Ms. Ramirez's slides what did you do next?

11             A.  Then I examined the slides in the

12   microscope.  First I needed to see what's abnormal

13   in the tissue and then further examine in details

14   the abnormalities in the tissue.

15             Q.  Did you also review her medical

16   records?

17             A.  Yes, I did.

18             Q.  Okay.

19             A.  I needed to know the background,

20   what were the initial reasons why the sling was

21   implanted, and then what type of sling was

22   implanted, and when it was implanted and the

23   reason why it was implanted.  First of all to

24   understand what device I'm looking at, second to

Vladimir Iakovlev, M.D.

1    correlate the pathological changes with the

2    reasons for explantation.  Because when the

3    physicians were going through the differential

4    diagnosis they ruled out several entities but then

5    the decision was to excise due to specific

6    reasons.

7            MR. HUTCHINSON:  Move to strike as

8    nonresponsive.

9            BY MR. ANDERSON:

10           Q.  I asked you whether or not you

11   reviewed medical records, correct?

12           A.  That's correct.

13           Q.  What was your purpose for reviewing

14   those medical records?

15           A.  My purpose was to see what type of

16   device was; if there was foreign body indeed

17   implanted; what symptoms were developing and what

18   symptoms triggered excision of the mesh.

19           Q.  Was it significant to your analysis

20   and ultimately your opinions as to what mesh was

21   implanted, why it was implanted, and when it was

22   explanted and why it was explanted?

23           A.  Yes, it was significant.

24           Q.  And did you review all of that and

Vladimir Iakovlev, M.D.

1  take all of that into consideration before forming

2  your expert conclusion?

3          A.  Yeah, I was basing -- I was reliant

4  on this clinical information, on the work-up of

5  treating doctors which was done for Ms. Ramirez.

6          Q.  And are you here today to offer any

7  opinions as to whether or not her treating doctors

8  complied with the standard of care?

9          A.  No.

10          Q.  Did you take photographs of the

11  slides that were under the microscope?

12          A.  Yes, I did.

13          Q.  And what did you take those

14  photographs with?

15          A.  With a camera, something similar

16  like this.

17          Q.  Like the one that's sitting on top

18  of the microscope next to you here today?

19          A.  Yes, something like this.

20          Q.  What's the purpose of taking

21  photographs of the slides while they're on the

22  microscope?

23          A.  To document my findings and to show

24  them to the jury and to the Court.

Vladimir Iakovlev, M.D.

1          Q.  Did you bring photomicrographs of

2    Ms. Ramirez's slides that you prepared here with

3    you today?

4          A.  Yes, I did.

5          Q.  Are they significant to your

6    opinions in this case?

7          A.  Yes, they are.

8          Q.  Did you also bring the slides

9    themselves?  I see those are in front of you here

10   today?

11         A.  Yes.  These are the slides.

12         Q.  Would it be helpful to show them to

13   the jury?

14         A.  So I'm showing this to the jury.

15         Q.  And are those the different stains

16   of these --

17         A.  These are different stains and these

18   three are H&E stains, the one I just explained

19   hematoxylin and eosin.  And these three are

20   immunostains, those blue and brown stains as I

21   explained.  And they are done by slicing the

22   tissue like bread.

23         Q.  Okay.

24         A.  And then the slices are put on the

Vladimir Iakovlev, M.D.

1    glass slide, and then to see what is what in the

2    tissue we stain them.

3           Q.   Okay.

4           A.   And here are different stains.

5           Q.   Okay.   We talked about

6    photomicrographs.   You can put that down.   We

7    talked about photomicrographs.   Did you bring some

8    here today to show the jury?

9           A.   Yes.

10          Q.   Are these the same ones that would

11   have been provided previously to Ethicon's

12   lawyers?

13          A.   Yes, they were.

14          Q.   I'm showing you what we will mark as

15   a document set which will be 4(A) through 4(M)

16          ---PLAINTIFF EXHIBIT NO. 4(A) to 4(M):

17          Series of photographs taken by Dr.

18          Iakovlev during the examination of

19          Jennifer Ramirez's specimen.

20          BY MR. ANDERSON:

21          Q.   Please identify this document set

22   4(A) through 4(M), Doctor.

23          A.   These are photographs I took during

24   the examination of the specimen of Ms. Ramirez

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 52 of 409 PageID #: 68525
Case 2:12-md-02327 Document 3790-17 Filed 04/29/16 Page 52 of 504 PageID #: 68525
Vladimir Iakovlev, M.D.

1  which was removed from her body in March 2015.

2  Some of these are gross photographs and some of

3  them are microscopic photographs.

4          Q.   You mentioned gross photographs.

5  Can we please put Exhibit 4(A) up?

6          A.   So the gross photograph is something

7  which we see with naked eye, without the

8  microscope.  And these are the two pieces that I

9  received.  And this is the identifier for the

10 surgical case for St. Michael's Hospital.  And we

11 can see here that these two pieces correspond to

12 what was correctly described as two pieces,

13 approximately 2 centimeter each.  One appears to

14 be wider here, one is narrow here.  And I will

15 show on the next photograph why one is wider and

16 one is a little bit narrower.

17         Q.   Okay.  Let's publish plaintiff's

18 4(B) please.  What's the jury seeing in this

19 picture?

20         A.   These are the same two pieces of

21 Ms. Ramirez's specimen which was removed in March

22 2015.  Now it's a close-up and it's slightly

23 different angle.  And now I can show that one

24 piece is -- this piece is flat and the other one

Vladimir Iakovlev, M.D.

1    is curled, which will show better on the next

2    photograph.

3              Q.  Let's go to plaintiff's Exhibit

4    4(C).  Can you identify this for the record?

5              A.  So this is a combined image of

6    previous gross photograph and two microscopic

7    images.

8              Q.  Explain what we're seeing on the

9    left please, Dr. Iakovlev?

10             A.  On the left there is a diagram

11   showing how we take slices.  As I explained we

12   slice the tissue to make microscopic slides.  It's

13   like taking slice of bread.  So this would be a

14   slice, like this.  And from this piece the slice

15   was taken parallel to the piece or flat to the

16   surface.  It's like if we take a loaf of bread and

17   for the top piece the loaf of bread would be cut

18   perpendicular and for the bottom piece the loaf of

19   bread would be cut longitudinal.

20             Q.  And are those two of the slides that

21   you showed the jury on this slide board here just

22   a few minutes ago?

23             A.  Yes, they are exactly the same two

24   slides.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 54 of 409 PageID #: 138527
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 54 of 409 PageID #: 138527
Vladimir Iakovlev, M.D.

1          Q.  Okay.  In your opinion, Doctor, what

2    degree of scarring -- well, go ahead.

3          A.  These are H&E stained slides.  The

4    scar tissue, as I explained, stains pink.  And you

5    can see pink color in between those clear spaces

6    and pink color here in between those clear spaces.

7          Now, why they are clear?  Because

8    polypropylene is clear, it's like fishing line.

9    If there is no color in it it's clear.  But some

10   fibers of the mesh are colored blue, and you can

11   see some of them blue here.  Now, all these spaces

12   in between fibers are filled with scar tissue.  To

13   help the jury to understand where the mesh fibers

14   are and where the tissue is I colored mesh fibers

15   with yellow color on the next image.

16         Q.  Okay.  Can we see 4(D)?  Please

17   identify this for the jury.

18         A.  These are exactly the same images as

19   you saw before.  I just put yellow color in the

20   spaces where the mesh fibers are or were while in

21   the body of Ms. Ramirez.  And --

22         Q.  In your opinion, Dr. Iakovlev, what

23   degree of scarring is shown in Ms. Ramirez's

24   specimen?

Vladimir Iakovlev, M.D.

1          A.   There is one hundred percent

2    scarring.  All the tissue we see here, all pink

3    tissue is scar tissue.

4          Q.   Is there any healthy tissue in and

5    around the fibers of the explant as demonstrated

6    in Exhibit 4(D)?

7          A.   No, there is none.  What happens

8    when we damage the tissue or there is an empty

9    space in the body it becomes filled with scar

10   tissue.  Our body heals through producing a scar

11   tissue.  And in this case this space in between

12   mesh fibers did not exist before the mesh was

13   placed.  It became filled with scar tissue during

14   healing.

15         Q.   Are you familiar with the term

16   "bridging fibrosis"?

17         A.   Yes, I am.

18         Q.   Can you please explain?

19         A.   So as you can see scar tissue fills

20   the spaces between mesh fibers or bridges from one

21   fiber to another, from one fiber to another.  So

22   this is bridging fibrosis.  Fibrosis and scarring

23   are the same.

24         Q.   Okay.  Are you familiar with the

Vladimir Iakovlev, M.D.

1    term "scar plating" and "scar encapsulation"?

2          A.  Yes.

3          Q.  Can you please explain those and

4    whether or not we see those in Exhibit 4(D)?

5          A.  Scar encapsulation happens with all

6    foreign bodies.  All foreign bodies become

7    isolated from the body.  The body tries to isolate

8    them and encase them in scar tissue.  So this

9    would be scar encapsulation.  Together with the

10   scar inside, the scar from outside, this would be

11   capsule and scar inside is bridging fibrosis, and

12   they all together they form one solid structure.

13   It's like concrete filling the spaces in between

14   the rebar.  Rebar would be the mesh fibers and the

15   concrete would be scar tissue.  It solidifies the

16   area and holds all mesh fibers within the scar

17   tissue.

18         Q.  Are you familiar with the term "mesh

19   contraction" sometimes known as "mesh shrinkage"?

20         A.  Yes, I am.

21         Q.  What is that and how does it occur?

22         A.  We know that all scar tissue in the

23   body contracts.  You've probably seen some burn

24   victim when there is a large area and scar tissue

Vladimir Iakovlev, M.D.

 1   when it matures, when it heals, it contracts.  The

 2   body tries to minimize, to shrink the area of

 3   damage.  But when it contracts it's not as

 4   flexible and it also pulls the tissue together so

 5   people cannot move some arms if it's a large area.

 6   The same happens with the scar tissue which is

 7   inside the mesh.  It pulls all the mesh fibers

 8   together, it shrinks.  And in terms of TVT or

 9   TVT-O sling it tightens the sling because it

10   contracts within, it pulls everything together.

11           Q.  Does it -- does contraction cause

12   the mesh implant to be stiffer or more flexible?

13           A.  It becomes stiffer.  Because you can

14   see scar tissue here is very dense.  It's like a

15   tendon.  It's as dense as tendon.

16           Q.  Based on those images, and your

17   overall analysis of Ms. Ramirez's explant, do you

18   have an opinion to a reasonable degree of medical

19   certainty as to whether the TVT-O sling contracted

20   while in Ms. Ramirez's body?

21           A.  Yes, I do.

22           Q.  And what is that opinion?

23           A.  My opinion is that TVT-O contracted

24   while it was in Ms. Ramirez's body.

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 58 of 409 PageID #: 168531
Case 2:12-md-02327 Document 3831-1 Filed 05/20/17 Page 58 of 504 PageID #: 168531
Vladimir Iakovlev, M.D.

1          Q.   Is there anything else descriptive

2    in these images that you'd like to explain to the

3    jury?

4          A.   That's interesting because, as I

5    explained, one piece is flat the other -- one

6    piece is curled.  And the next image will show the

7    plain of curling in the top image.

8          Q.   Can we see 4(E) please?  Please

9    identify this for the jury and explain how it

10   relates to your opinions in this case?

11         A.   These are the same images we just --

12   we saw before but the difference is I put this

13   thick yellow band to show how the sling curled.

14   So the sling, or TVT-O tape, curled in this piece,

15   or what sometimes treating doctors call "roped" or

16   there is a roping, or in this for Ms. Ramirez it

17   was called "bow stringing".  It was like a tight

18   bow string.

19         And it happened because it curled up and

20   the space within the curl or within the roll was

21   filled with scar tissue.  It's like concrete.  It

22   filled the space within that's why it shows that

23   that curling occurred inside the body, which

24   correlates with the clinical description of bow

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 59 of 409 PageID #: 138532
Case 2:12-md-02327 Document 1234-17 Filed 09/29/16 Page 59 of 504 PageID #: 58226
Vladimir Iakovlev, M.D.

1    stringing.  Because it was curled up like a rope,

2    it was filled with dense scar tissue and it

3    occurred in the body.

4              Q.  Doctor, hypothetically if there is

5    testimony in this case that these slides that the

6    jury has been looking at show normal tissue around

7    and in between these mesh fibers, do you have an

8    opinion to a reasonable degree of medical

9    certainty about that?

10             A.  I do.

11             Q.  And what is that opinion?

12             A.  My opinion is there is one hundred

13   percent scar tissue.  There is no normal tissue

14   anywhere in this specimen.  All of the tissue in

15   between mesh fibers is scar tissue, dense scar

16   tissue as dense as a tendon.

17             Q.  Thank you, Doctor.  If we could show

18   Exhibit 4(F) and 4(G).  Can you please identify

19   those for the record?

20             A.  These are microscopic images of the

21   specimen which was taken out of Ms. Ramirez's body

22   in March 2015.  This is a higher power

23   magnification.  These are two images.  One image

24   is original image on the top, and the second image

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 60 of 409 PageID #: 138593
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 60 of 504 PageID #: 138593
Vladimir Iakovlev, M.D.

1   is the same image but I just filled the spaces

2   where the mesh fibers are with yellow color just

3   to help the jury to orient where the mesh fibers

4   are.

5           Now, we can see pink color, which you

6   saw before.  This is scar tissue, the same scar

7   tissue, but there is something in between like a

8   halo around the mesh fibers, in between mesh

9   fibers and the scar tissue.  And this halo is

10  purple and then it has these dark blue dots.

11  These dark blue dots are nuclei of macrophages.

12          Q.  Are nuclei of macrophages.  Okay,

13  we're not all pathologists so can you just explain

14  to the jury what nuclei of macrophages are and why

15  that's important, in your view, regarding these

16  images?

17          A.  Nuclei are center or the cell, it's

18  like a brain of the cell.  It controls everything.

19  Macrophages are the fighter cells.  The body sends

20  macrophages to fight with something which is

21  damaging the body, either bacteria or foreign

22  bodies.  When the bacteria comes to macrophages

23  come and then they try to either destroy, dissolve

24  them or swallow them up and then destroy within

Vladimir Iakovlev, M.D.

1    the macrophages.

2            In terms of foreign bodies the same

3    thing happens with the foreign bodies.  The body

4    sends these fighter cells to degrade or destroy

5    the foreign body and they will be surrounding this

6    foreign body as long as the foreign body stays in

7    the body.

8            So what they do when they come they

9    start producing all this reactive chemicals which

10   can destroy, and which are designed to destroy and

11   degrade the foreign body and bacteria, and they

12   will stay there and they will produce these

13   reactive chemicals.

14           Q.  Is the inflammation that we see in

15   Exhibits 4(F) and 4G transient or temporary

16   inflammation?

17           A.  Absolutely not.

18           Q.  Please explain.

19           A.  This inflammation, this foreign body

20   type inflammation will stay as long as the foreign

21   body stays in the body.

22           Q.  You're familiar with the term

23   "chronic" on "permanent inflammation"?

24           A.  Yes, I am.

Vladimir Iakovlev, M.D.

1          Q.   What does that mean?

2          A.   "Chronic" means long-term.

3    "Permanent" means forever.

4          Q.   Is this chronic or permanent

5    inflammation from Ms. Ramirez's slides?

6          A.   This is chronic and permanent as

7    long as foreign body stays in the body.  This part

8    was removed but the lateral parts, the side parts,

9    deeper parts, are still in the body of

10   Ms. Ramirez.

11         Q.   Do you have an opinion to a

12   reasonable degree of medical certainty as to

13   whether or not the pieces of the TVT-O sling that

14   are still in Ms. Ramirez continue to have chronic,

15   permanent inflammation in and around the mesh

16   fibers?

17         A.   Yes, they will.

18         Q.   Do you have an opinion, to a

19   reasonable degree of medical certainty, as to

20   whether or not Ms. Ramirez's TVT-O mesh caused the

21   chronic foreign body type inflammation, fibrotic

22   bridging, scar plating, scar encapsulation,

23   curling, roping and mesh contraction that you have

24   identified in these images?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 63 of 409 PageID #: 138526
Case 2:12-md-02327 Document 3790-17 Filed 04/29/16 Page 63 of 504 PageID #: 138526
Vladimir Iakovlev, M.D.

1          A.  Yes, I am.

2          MR. HUTCHINSON:  Objection, foundation.

3          THE DEPONENT:  Yes.  I do have this --

4          BY MR. ANDERSON:

5          Q.  What is that opinion?

6          A.  My opinion is that mesh which was

7    implanted into Ms. Ramirez's body caused bridging

8    fibrosis, scar encapsulation, scar plating, nerve

9    entrapment, chronic foreign body reaction, scar

10   contraction and sling tightening while it was in

11   Ms. Ramirez's body.

12         Q.  Doctor, you just mentioned bridging

13   fibrosis, scar encapsulation, scar plating, nerve

14   contraction and sling tightening while the mesh

15   was in Ms. Ramirez's body.  Do you remember that?

16         A.  I do.

17         Q.  In your review of over 300 explanted

18   meshes, in the publications that you have put in

19   the peer-reviewed literature, at the conferences

20   at which you have spoken, international

21   conferences around the world, have you been able

22   to determine that there were similar findings in

23   those or some of those mesh explants?

24         MR. HUTCHINSON:  Objection, foundation.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 64 of 409 PageID #: 138537
Case 2:12-md-02327 Document 3321-17 Filed 06/09/16 Page 64 of 504 PageID #: 68287
Vladimir Iakovlev, M.D.

 1          THE DEPONENT:  Yes, I was able to.

 2   These findings occur in almost all mesh specimens

 3   to a degree, to different degrees, but all this is

 4   happening in all mesh specimens.

 5          BY MR. ANDERSON:

 6          Q.  And that's been reported in your

 7   peer-reviewed literature?

 8          MR. HUTCHINSON:  Objection, leading.

 9          BY MR. ANDERSON:

10          Q.  Has that been reported in your

11   peer-reviewed literature?

12          A.  It has been reported in

13   peer-reviewed literature before I started research

14   and then I continued the work and I published the

15   same findings.

16          Q.  Showing you what's been marked as

17   plaintiff's Exhibits 4(H) and 4(I).  Please

18   identify these images.  First identify them for

19   the jury and then we'll talk about what they show.

20          A.  These are -- this is one image.  One

21   is unlabelled the other one is labelled.  It's a

22   microphotograph of the area of the specimen which

23   was removed in March 2015 from Ms. Ramirez's body.

24   The same type of staining as you saw before called

Vladimir Iakovlev, M.D.

1    hematoxylin eosin or H&E.

2              Q.  Now let's go to images 4(J) and --

3    oh wait.  Go ahead.

4              A.  I wanted to show one area here.

5              Q.  Okay.  So can you please describe in

6    the upper and lower image where these nerve

7    branches are and what is surrounding the nerve

8    branches?

9              A.  So these are the nerve branches and

10   this is part of the mesh, or mesh fibers.  And the

11   nerve branches are entrapped in scar tissue.  So

12   this would be the same magnification but in a

13   labelled image.  So these are nerve branches but

14   it's somewhat difficult to see them in H&E section

15   so I use a different stain to show them better.

16             Q.  You mentioned before an S100

17   staining to the jury?

18             A.  That's correct.

19             Q.  Did you do S100 staining of these

20   same slides?

21             A.  Yes, I did.

22             Q.  And did you bring those here with

23   you today to show the jury?

24             A.  Yes.

Vladimir Iakovlev, M.D.

```
 1              Q.  Can you publish 4(J) and 4(K).

 2    Doctor, are 4(J) and 4(K) the same tissue sample

 3    as 4(H) and 4(I) that the jury just saw?

 4              A.  Yeah.  It's exactly the same area

 5    it's just a different stain.  These mesh fibers

 6    are the same you saw before.

 7              Q.  What is the blue area that the jury

 8    is seeing?

 9              A.  Blue here is a different dye

10    staining scar tissue.  So scar tissue can be

11    stained pink in H&E and in this stain it's blue.

12    Now, if we zoom in now we can see that the nerve

13    branches or nerves are staining brown.  This is

14    the mesh fiber, this is scar tissue and these are

15    nerves which are sitting in the scar tissue.

16              Q.  Are those nerves -- strike that.

17              Are there different types of nerves in

18    the human body?  First answer that question.  Are

19    there different types of nerves in the human body?

20              A.  There are.

21              Q.  Are you familiar with the terms

22    "sensory nerves" and "motor nerves"?  Are you

23    familiar with the term?

24              A.  I'm familiar with the term but it's
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 67 of 409 PageID #: 138540
Case 2:12-md-02327 Document 3834-1 Filed 04/29/16 Page 67 of 504 PageID #: 68240

Vladimir Iakovlev, M.D.

1    slightly incorrect term, sensory nerves of motor

2    nerves.

3              Q.   Can you please explain that?

4              A.   Most of the nerves in our body are

5    mixed.  What is separate, sensory versus motor,

6    are fibers.  So a nerve is like a bundle, like a

7    thick capable containing multiple wires and the

8    wires inside are nerve fibers, but the nerve

9    itself contains multiple nerve fibers.  So one

10   fiber can be motor, one fiber can be sensory but

11   they are all together in one nerve.

12             Q.   So are these nerves that we see here

13   mixed nerves, like you just described, or are they

14   separated?

15             A.   To a reasonable degree of medical

16   certainty these nerves are mixed.  Another

17   additional piece of information is where are we in

18   the body specifically for this specimen?

19             Q.   Okay.

20             A.   This was excised right underneath

21   vaginal mucosa.

22             Q.   Why is that significant to your

23   opinion?

24             MR. HUTCHINSON:  Move to strike as

Vladimir Iakovlev, M.D.

 1    nonresponsive.

 2              THE DEPONENT:  It is significant --

 3              BY MR. ANDERSON:

 4         Q.  Hold on.  So you explain that the --

 5    to a reasonable degree of medical certainty these

 6    nerves are mixed nerves, correct?

 7         A.  That's correct.

 8         Q.  What area of the body are these

 9    nerves coming from and is that significant to your

10    opinions?

11         A.  They come from underneath of vaginal

12    mucosa and it is significant to my opinions.

13         Q.  Why?

14         A.  Because in that area most of the

15    function of the nerves is to supply sensation from

16    vaginal mucosa.  There is not much motor function

17    in the area.  There are no more large organs.  The

18    bladder is all the way back.  There are no more

19    muscles here.  They are right next to mucosa.

20    There is not much else to do for the nerves other

21    than just provide sensation from the mucosa.

22         Q.  Okay.  Let's look at the next

23    photograph, 4(L) and 4(M).  Please identify these

24    images for the jury and then explain what they

Vladimir Iakovlev, M.D.

1    show.

2              A.  This is another image of the nerves,

3    brown staining, however, this one shows that the

4    nerves are within the mesh.  They are between the

5    fibers.  So these nerves, and I will zoom in,

6    these nerves they grew into the mesh spaces after

7    the mesh was placed.

8              Q.  Why is that significant to your

9    opinion?

10             A.  Because these nerves are not just

11   trapped in the scar tissue.  They are also trapped

12   in the mesh.  So when the mesh was placed the

13   nerves grew through the pores of the mesh and

14   became trapped in the mesh.  So, first of all they

15   are in scar tissue firmly fixed, immobilized in

16   scar tissue.  Second, they are within the pores.

17   So if the sling is moved or contracted they will

18   pull on the nerves.

19             Q.  What's the effect of pulling on the

20   nerves in this fashion to the body?

21             A.  It will produce pain.  It's like

22   pinched pain or pulled nerve.  Pinched nerve or

23   pulled nerve.

24             Q.  Okay.

Vladimir Iakovlev, M.D.

```
1              A.  Also because they are in this tight

2    space and within dense scar tissue they can become

3    distorted further.

4              MR. HUTCHINSON:  Move to strike as

5    nonresponsive.

6              BY MR. ANDERSON:

7              Q.  And what happens when a nerve is

8    distorted?

9              A.  It produces pain.

10             Q.  Do you have an opinion to a

11   reasonable degree of medical certainty as to the

12   condition of the nerves that we see here in

13   plaintiff's 4(I), (J), (K), (L) and (M)?

14             A.  The nerves themselves are normal so

15   they are healthy nerves which can conduct healthy

16   pain symptoms -- sensation.  So they can conduct

17   pain but the position of them is abnormal.

18             Q.  Why do you say that?

19             A.  They are in scar tissue inside the

20   mesh or outside of the mesh.  It's not normal to

21   have nerves in the scar tissue.  Scar tissue is

22   not normal tissue, it is abnormal tissue and it is

23   abnormal to have nerves trapped in the scar

24   tissue.
```

Vladimir Iakovlev, M.D.

1          Q.  Doctor, hypothetically if there is

2     testimony during this trial that nerve fibers that

3     deliver pain signals to the brain cannot be

4     stained with this S100 staining that you've been

5     showing to the jury would you have an opinion

6     about that?

7          A.  I would.

8          Q.  And what is that opinion, and have

9     you brought anything to help demonstrate that to

10    the jury?

11         A.  My opinion is that it doesn't matter

12    for the purpose of my opinions, and generally for

13    the analysis of the specimen, and I explain you

14    why.

15         Q.  Have you brought something to

16    demonstrate to the jury?

17         A.  I brought a demonstrative image.

18         Q.  And do you believe it would be

19    helpful to the jury in order to explain your

20    conclusions in this regard?

21         A.  Yes, I do.

22         Q.  I'm handing you what has been marked

23    as Exhibit 5.

24              ---PLAINTIFF EXHIBIT NO. 5:  Diagram

Vladimir Iakovlev, M.D.

1           depicting the spinal cord.

2                THE DEPONENT:  Thank you.

3           BY MR. ANDERSON:

4                Q.  Doctor, please identify that for the

5      record.

6                A.  This is a diagram showing spinal

7      cord, so this would be person lying down, facing

8      down and this would be the back of the person and

9      this is spinal cord.  And these are nerves which

10     are coming out of spinal cord.  And as I explain

11     you earlier, the nerves combine multiple wires or

12     multiple nerve fibers.  Some of the fibers are

13     insulated so some are myelinated.  And S100 stain

14     stains this insulation, it doesn't stain the fiber

15     itself or the wire itself but it stains

16     insulation.  Some of the nerve fibers are not

17     insulated but they run in the same bundle.  And

18     all of them run together insulated, or myelinated,

19     S100 positive or S100 negative, all of them run

20     together.  And I can show you how it's similar to

21     what I saw in Ms. Ramirez's body.

22               MR. HUTCHINSON:  Excuse me.  Note my

23     objection for the record.  This document is not in

24     Ms. Ramirez's report, it's not in his reliance

1    list.  Note my objection for the record.

2            MR. ANDERSON:  And it is a demonstrative

3    aid used for purposes of the record, like we

4    normally do for trials in using demonstrative

5    aids.

6            BY MR. ANDERSON:

7            Q.  So go right ahead.  And would you

8    like to compare this to the S100 stain?

9            A.  Yes.

10           Q.  Please put up that S100.  If you

11   could put that up next to the nerve.

12           A.  I'll do it myself.

13           Q.  Please explain to the jury why you

14   have put the S100 stain from Ms. Ramirez next to

15   demonstrative aid on the left?

16           A.  So you can see that there is

17   staining in some of the fibers but there's no

18   staining in other fibers, but they are all

19   together.  So all those dark blue nuclei or dots,

20   and some of them are staining brown some of them

21   are not staining brown.  But it doesn't matter,

22   they are all together.  Motor fibers, sensory

23   fibers they are all together in one nerve.

24           Q.  What is that significant to your

Vladimir Iakovlev, M.D.

```
1   opinions, if at all, with regard to whether or not

2   S100 can stain sensory nerves?

3           A.  It doesn't matter, as I said.  They

4   are all together in one fiber.  If S100 stains

5   other nerve fibers not those which conduct pain

6   they're still there in one bundle.

7           MR. ANDERSON:  Okay.  We need to take a

8   break.

9           THE VIDEOGRAPHER:  Going off the record

10  at 10:27 a.m.

11          ---  Break taken.

12          THE VIDEOGRAPHER:  We're back on the

13  record at 10:37 a.m.

14          BY MR. ANDERSON:

15          Q.  Okay.  Doctor, going back to this

16  overlaid image that we were showing the jury a

17  minute ago where we had the blue staining over the

18  top of Exhibit 5?

19          A.  Yes.

20          Q.  Do you remember this?  So just to be

21  clear, I may have misspoken.  What type of

22  staining is the image on the right?

23          A.  So right now this is S100 stain.

24  Previously we saw neurofilament stain, this is
```

Vladimir Iakovlev, M.D.

1   S100 stain.  And if I can have my mouse back.  So
2   now we have some staining here and some fibers are
3   not staining.
4           Q.   Okay.
5           A.   Exactly what happens in the diagram.
6   Some fibers are myelinated, or insulated, they
7   stain with S100 some fibers are not.  Pain can be
8   delivered by either myelinated or nonmyelinated.
9   There are two main type of fibers which deliver
10  pain, but again it doesn't matter.  All of them
11  are bundled together in one nerve.  Its' a mixed
12  nerve, sensory and motor.  If we see a nerve there
13  will be sensory fibers, there will be fibers which
14  deliver pain signals to the brain.
15          Q.   Thank you.
16          MR. HUTCHINSON:  Move to strike as
17  nonresponsive.
18          BY MR. ANDERSON:
19          Q.   All of the things that you just
20  mentioned to the jury do you hold those to a
21  reasonable degree of medical certainty?
22          A.   Yes, I do.
23          Q.   Doctor, I'd like to discuss your
24  findings regarding your pathological analysis of

Vladimir Iakovlev, M.D.

1  Ms. Ramirez's urinary symptoms, okay?

2      A.  Okay.

3      Q.  From you review of Ms. Ramirez's

4  medical records could you determine which parts of

5  the TVT-O sling were explanted and sent to

6  pathology from her 2010 and 2015 explant

7  surgeries?

8      A.  Yes.  I could correlate operative

9  reports, pathological descriptions and my

10  examination of the specimen.

11      Q.  Did you, with my help, prepare a

12  demonstrative slide in order to demonstrate these

13  explants from these two surgeries?

14      A.  Yes, I did.

15      Q.  Do you believe they would be helpful

16  to the jury in expressing your opinions?

17      A.  Yes, I do.

18      Q.  Would you please show Exhibit 6?

19      ---PLAINTIFF EXHIBIT NO. 6:  Diagram

20          prepared by Dr. Iakovlev depicting the

21          relationship of the excised pieces to

22          the anatomical structures in Ms.

23          Jennifer Ramirez's body.

24

Vladimir Iakovlev, M.D.

1        BY MR. ANDERSON:

2            Q.  Exhibit 6 identified and used for

3     demonstrative purposes only.  Can you please

4     identify this for the jury?

5            A.  This is a diagram I prepared in my

6     expert report to show the relationship of the

7     excised pieces to the anatomical structures in

8     Ms. Ramirez's body.  So she had --

9            Q.  Explain what we're seeing in the

10    upper photo please?

11           A.   She had implantation of TVT-O sling

12    in September 2010 and it's colored yellow.  These

13    red triangles on the left, this would be

14    Ms. Ramirez's left, our right.  And this would be

15    Ms. Ramirez's right.  These triangles are muscle

16    behind the bone, or spaces within the

17    transobturator space.  And this separate of the

18    sling is the part which is exposed or can be found

19    if we do dissection.  And this is relationship of

20    the sling to the urethra.  So it was under the

21    urethra.  We know what happened.  By November of

22    2010 the left side became painful.  It was

23    described as bow stringing.

24           Q.  Is that where you have your cursor

Vladimir Iakovlev, M.D.

1    pointed right now?

2            A.  Yes.  So this is Ms. Ramirez's left.

3    The decision at that time was to excise that part

4    of sling and release the pressure.  And we know

5    why that pressure occurred or the tensioning

6    occurred.

7            Q.  And why was that, Doctor?

8            A.  I explained to you the sling roped

9    up; it became filled with dense scar tissue; scar

10   tissue contracted, pulled it together, tightened

11   it so that bow stringing was at the roped mesh

12   contracted because of scar contraction.

13           Q.  Is that in the area where you're

14   showing in the second slide, is that what you're

15   talking about?

16           A.  Yes.  And this area was excised,

17   partially excised, only 1 centimeter was excised

18   in 2010.

19           Q.  Were you able to look at the piece

20   that was excised in 2010 from Ms. Ramirez's body?

21           A.  No.  As far as I understand it was

22   not preserved.

23           Q.  And what are we seeing now in the

24   lower image?

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 79 of 409 PageID #: 68552
Case 2:12-md-02327 Document 7184-17 Filed 11/20/16 Page 79 of 504 PageID #: 68542
Vladimir Iakovlev, M.D.

1          A.  So Ms. Ramirez continued to have

2   symptoms and in 2015, in March of 2015 two

3   portions were excised.  And you can see here that

4   one portion was still a portion of the left side.

5          Q.  And what is that little orange dash

6   that's going down underneath the urethra, there?

7          A.  This is the middle portion and it

8   identifies which side is left and which side is

9   right.  So this side was still from the area which

10  was described as bow stringing or cording.  And we

11  can see that one piece during gross examination

12  was roped up.  So this correlates with the left

13  side which was found clinically roped.

14          Q.  Now, Doctor, are you in this picture

15  trying to suggest what Jennifer's urethra actually

16  looked like?

17          A.  No, I just show where the position

18  is.

19          Q.  Okay.

20          A.  So we agreed that pain was here

21  because of tightening of the sling contraction.

22  And when it was tightening it was compressing into

23  the urethra.

24          Q.  So on the bottom image where it

Vladimir Iakovlev, M.D.

1   says, "Excised in two portions", please explain

2   that diagram.

3           A.  So when the remaining part was

4   excised in 2015, which was still held by scar

5   tissue on the left, the urethra was opened up so

6   the pressure on urethra was released.  The

7   pressure which was caused by the contracted mesh

8   was released.

9           Q.  And are those two excised portions

10  the ones that you showed the jury just a few

11  moments ago?

12          A.  Yes.

13          Q.  And were you able to analyze those

14  and those are the slides that you have here today?

15          A.  Yes, you saw all the images which

16  were coming out from these two pieces.

17          Q.  Okay.  You can take that down.

18          A.  Yes.

19          Q.  And let's shift gears now, Doctor,

20  and discuss something -- a scientific principle

21  known as "degradation".  Are you familiar with

22  that term?

23          A.  Yes, I am.

24          Q.  In the context of polypropylene

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 81 of 409 PageID #: 138554
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 81 of 504 PageID #: 138554
Vladimir Iakovlev, M.D.

 1   meshes implanted in the human body, like the TVT-O

 2   device that was implanted in Ms. Ramirez, what

 3   does the term degradation mean to you as a

 4   scientist and pathologist?

 5           A.  The term of degradation, in

 6   relationship to implanted transvaginal meshes,

 7   means that the material of the mesh changes,

 8   changes because the body is attacking it.  It's

 9   trying to destroy or degrade it.  So it's intended

10   purpose of the inflammatory response to degrade it

11   and that's what happens to polypropylene.  It

12   changes, it degrades.

13           Q.  Did you make any microphotographs

14   from the slides in order to demonstrate this

15   principle of degradation from Ms. Ramirez's

16   explant that you brought here to show the jury

17   today?

18           A.  Yes, I did.

19           Q.  Can we see Exhibit 7(A) and (B)

20   please.

21           ---PLAINTIFF EXHIBIT NO. 7(A) to 7(D):

22           Series of high magnification images

23           depicting the specimen from Mr. Ramirez

24           excised in March 2015.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 82 of 409 PageID #: 138555
Case 2:12-md-02327 Document 3790-17 Filed 04/29/17 Page 82 of 504 PageID #: 138545
Vladimir Iakovlev, M.D.

 1          BY MR. ANDERSON:

 2          Q.  And I've marked these as a document

 3   set which are 7(A) through 7(D).

 4          Please identify just broadly what we

 5   have in 7(A) through (D) and then we'll go to the

 6   two images, 7(A) and (B).

 7          A.  These are high-magnification images

 8   of the same specimens as we saw before.

 9          Q.  Did you make these?

10          A.  Yes.  I made them using high-power

11   objectives.

12          Q.  Okay.

13          A.  And this is the same specimen of

14   Ms. Ramirez's TVT-O which was excised in March

15   2015.

16          Q.  Please explain to the jury what

17   we're seeing in images 7(A) and 7(B)?

18          A.  The images are focusing on one mesh

19   fiber.  And as you saw earlier some mesh fibers

20   are clear, some mesh fibers are blue.

21          Q.  What's that blue area there?

22          A.  This one is blue because, as I said,

23   if polypropylene is not colored it's clear, it's

24   like fishing line.  It's hard to see.  So Ethicon

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 83 of 409 PageID #: 68556
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 83 of 504 PageID #: 68556
Vladimir Iakovlev, M.D.

 1   introduced blue granules into it so it's easier to

 2   see in the tissue.  It's like colored fishing

 3   line.  And the dye, which colors it blue, is in

 4   granules.  And all those granules are introduced

 5   into polypropylene by Ethicon when the meshes are

 6   manufactured.

 7            Q.  So just to orient the jury, is this

 8   like taking a slice of the fiber?

 9            A.  I brought something to demonstrate

10   how we slice the fibers in a histology section.

11            Q.  Do you think it would be helpful to

12   the jury?

13            A.  It will.

14            Q.  And is it significant to your

15   opinions?

16            A.  Yes, it is.

17            Q.  Okay.  Tell us what you have,

18   Doctor?

19            A.  If we imagine that a mesh fiber is a

20   tree trunk.  And we cut mesh fibers the same way

21   as we would cut a tree with a chain saw.  But if

22   we take a slice, like a slice of bread but we take

23   slice it with chain saw we would produce something

24   like, a slice of tree trunk.  That's exactly what

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 84 of 409 PageID #: 138557
Case 2:12-md-02327 Document 3781-17 Filed 04/25/17 Page 84 of 504 PageID #: 132247
Vladimir Iakovlev, M.D.

 1    happens in the images.

 2              Q.  So explain how that relates to the

 3    images please?

 4              A.  Now, when the tree grows there is

 5    central core of the tree trunk, but then the

 6    exposed surface changes because it is exposed to

 7    environment.  The trees grow bark, so this is the

 8    bark of the tree.  It's the same wood but it's

 9    changing, it's adapting to whatever is outside.

10    There are some cracks and crevices and some

11    cavities in the bark, the same wood but looks

12    slightly different.  It can peel off as well.  The

13    same happens in the body with polypropylene

14    fibers.

15              Q.  And what is that cracked -- that

16    outer layer that we're looking at there?  In the

17    bottom end it says "degradation layer".  Explain

18    that and these arrows at the bottom please.

19              A.  So the central core, like core of

20    the tree trunk is not degraded, it's not bark yet.

21    But the outer layer of polypropylene degrades,

22    it's like bark on the tree.  And because it has

23    all these cavities it can be stained.

24              Q.  Why is it purple there were the

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 85 of 409 PageID #: 128558
Case 2:12-md-02327 Document 3128-1 Filed 09/09/16 Page 85 of 504 PageID #: 68248

Vladimir Iakovlev, M.D.

1    arrow is?

2            A.  Because histological dyes can stay

3    inside all these cracks.  They can attach inside

4    those cavities and cracks and they can stain

5    purple.  But the central part, the central core is

6    solid so histological dyes cannot attach to it

7    that's why it stays clear.

8            Q.  Okay.  If you can put that down.

9    Did you do anything else to rule out that this

10   outer layer of bark is or is not polypropylene?

11           A.  Well, first of all I looked at the

12   granules.  You can see the blue granules are in

13   polypropylene.  And that was intention of Ethicon,

14   put blue granules to see where polypropylene is.

15   The same thing happens in the microscope.  You see

16   blue granules it's polypropylene.  And you see

17   blue granules in the purple area and it's also in

18   the bark which is separated.  So you cannot

19   explain those blue granules by overlap of this

20   layer with the central core.  It's separated but

21   still has the blue granules.

22           Q.  Did you use any other type of

23   pathological technique in order to rule out

24   whether there is polypropylene?

Vladimir Iakovlev, M.D.

1          A.  I used polarized light, as I

2    mentioned earlier.

3          Q.  Explain to the jury briefly what

4    polarized light is.

5          A.  Polarized light is a neat technique

6    which was developed a hundred years ago to see

7    foreign bodies in the tissue.  Polarizing filters

8    are like polarized sun glasses, there are fine

9    slits in them so they limit the amount of light to

10   specific orientation.

11         Q.  Did you take pictures in polarized

12   light of the same mesh fiber that you showed us

13   earlier?

14         A.  Yes, I did.

15         Q.  Showing you Exhibits 7(C) and (D).

16   What are we seeing in these images?

17         A.  These are exactly the same areas in

18   the microscopic slides of Ms. Ramirez's specimen.

19   I just turned the polarizing filters in the

20   microscope and took photograph.  And you can see

21   in polarized light both the nondegraded part and

22   the degraded bark are bright compared with the

23   collagen in all other proteins of the body which

24   are much darker in the body.

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 87 of 409 PageID #: 138560
Case 2:12-md-02327 Document 3724-17 Filed 04/20/16 Page 87 of 504 PageID #: 132340
Vladimir Iakovlev, M.D.

1      Q.  Is there a name for that?  You said
"brightness", is there a scientific name for that?

3      A.  The scientific name for that is
"birefringence".

5      Q.  Let's just stick with brightness
then.

7      A.  Brightness, okay.

8      Q.  Go ahead.

9      A.  And you can see that the bark, you
can even easier the cracks in the bark.  It's
peeling off and it's cracking.  And it's the same
polypropylene because it's bright, birefringent.
It has the same blue granules as the core and it's
very different from all proteins which are
surrounding the mesh fibers.

16     MR. HUTCHINSON:  Move to strike as
nonresponsive.

18     BY MR. ANDERSON:

19     Q.  Doctor, before we were talking about
the birefringence or the brightness of the outer
layer.

22     A.  Yes.

23     Q.  Can you explain what the
significance is of this brightness and this outer

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 88 of 409 PageID #: 138561
Case 2:12-md-02327 Document 3790-17 Filed 04/29/16 Page 88 of 504 PageID #: 138561
Vladimir Iakovlev, M.D.

1    layer displayed in 7(D) where the arrows are?

2            A.   The significance is that the bright

3    parts in the image indicate polypropylene.  Both

4    the nondegraded core of the fiber is bright and

5    the bark is bright and both are made of

6    polypropylene.  The only difference is the bark is

7    degraded polypropylene and the central part is

8    nondegraded.

9            Q.   Doctor, have you reviewed the

10   scientific literature regarding the degradation of

11   polypropylene in human beings?

12           A.   Yes, I did.

13           Q.   And have you published in the

14   literature, scientific literature amongst your

15   peers about the degradation of polypropylene in

16   the human body?

17           A.   Yes.

18           Q.   Is -- have you used the microscope

19   in order to come up with these images that we just

20   saw?

21           A.   Yes.

22           Q.   Can you just take one of the -- one

23   of the images and put it on there and let's take a

24   look and see what's that's like for the jury?

Vladimir Iakovlev, M.D.

1      A.  Yes, I can do it.

2      Q.  Okay, let's do that.

3      A.  This is how it looks from the

4  microscope.  I will focus.  This is H&E stained

5  slide of Ms. Ramirez's specimen which was taken in

6  March 2015.  This pink color is scar tissue, and

7  this blue part, partially folded and displaced,

8  the central core of the mesh fiber.  Because when

9  the knife of microtome slices it to make the

10  slices it pushes them away, pushes the central

11  part of the fibers away so they get displaced.

12      Q.  Okay.  Now let's see what it looks

13  like using the polarizing filters if you would

14  please?

15      A.  Now I will take the polarizing

16  filter and I will turn it inside the microscope.

17  And when I turn it you can see that the bright

18  parts are polypropylene.  And the central core,

19  which is displaced, is bright here, and the bark,

20  because it has all these cracks, is attached to

21  the tissue.  Collagen anchors to it and holds it

22  in the tissue and it stays close to the tissue,

23  and you can see the cracks of the degradation

24  bark.  But you can see how dark are the proteins.

Vladimir Iakovlev, M.D.

 1    All proteins of the human body are dark.  The only

 2    bright part or birefringent parts are

 3    polypropylene.

 4              Q.  Okay.  You can take that down.

 5              Is there a body of scientific literature

 6    that's been published about polypropylene

 7    degradation, including polypropylene sutures?

 8              A.  Yes.

 9              Q.  Have you reviewed medical literature

10    from other doctors, pathologists, scientists and

11    biomaterials experts who have published

12    peer-reviewed literature on the subject of

13    polypropylene degradation in the human body?

14              A.  Yes, I have.

15              Q.  Have you reviewed as much of this

16    published literature about degradation of

17    polypropylene mesh as possible?

18              A.  I try to review everything I could

19    find in publically available sources.

20              Q.  Rather than go through them all have

21    you helped me prepare some slides of the studies

22    that you find particularly relevant to your

23    opinions regarding degradation of transvaginal

24    meshes?

Vladimir Iakovlev, M.D.

```
 1          A.  Yes, I did.

 2          Q.  Before we get into those slides,

 3   Doctor, I'm handing you what has been marked as

 4   plaintiff's Exhibit 8.

 5          ---PLAINTIFF EXHIBIT NO. 8:  Article

 6              titled "Comparison of the In Vivo

 7              Behavior of Polyvinylidene Fluoride and

 8              Polypropylene Sutures Used in Vascular

 9              Surgery", found in OSAIO Journal 1998.

10              Bates labelled ETH.MESH.05845592 to

11              ETH.MESH05845599.

12          BY MR. ANDERSON:

13          Q.  Can you tell us what this is?

14          A.  This is an article.

15          Q.  From what journal?

16          A.  Published from ASAIO Journal.

17          Q.  Okay.  And what year was it

18   published?

19          A.  It was published in 1998.

20          Q.  Who is the lead author?

21          A.  The lead author is Celine Mary.

22          Q.  And was this article peer reviewed?

23          A.  Yes, it is peer reviewed.

24          Q.  Did you read and review this article
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 92 of 409 PageID #: 168565
Case 2:12-md-02327 Document 3784-17 Filed 04/29/16 Page 92 of 504 PageID #: 68265
Vladimir Iakovlev, M.D.

```
1    in forming the opinions that you're giving here

2    today?

3              A.  Yes, I did.

4              Q.  Is this a recognized and reliable

5    publications for doctors in your field?

6              A.  Yes, it is.

7              Q.  Do experts in your field customarily

8    rely on this type of journal in forming medical

9    and scientific opinions?

10             A.  Yes, they do.

11             Q.  And did you rely on it in forming

12   the opinions that you're giving here today?

13             A.  Yes, I did.

14             Q.  Showing you what we'll mark as

15   plaintiff's Exhibit 9.

16             ---PLAINTIFF EXHIBIT NO. 9:  Article

17             titled "Structural alterations of

18             prosthetic meshes in humans" found in

19             Hernia Journal, 2003.

20             BY MR. ANDERSON:

21             Q.  Can you please identify the journal

22   from which plaintiff's Exhibit 9 comes?

23             A.  This is Hernia Journal.

24             Q.  Okay.  And was it published?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 93 of 409 PageID #: 68566
Case 2:12-md-02327 Document 3794-17 Filed 04/27/17 Page 93 of 504 PageID #: 68566
Vladimir Iakovlev, M.D.

```
 1              A.   It was published in 2003.

 2              Q.   Who is the lead author?

 3              A.   The lead author is Coda.

 4              Q.   And is this article peer reviewed?

 5              A.   Yes, it is.

 6              Q.   Did you review and read this article

 7    in forming the opinions you're giving here today?

 8              A.   Yes, I did.

 9              Q.   Is this a recognized and reliable

10    publication for doctors in your field?

11              A.   Yes, it is.

12              Q.   Do experts in your field customarily

13    rely on this type of journal in forming medical

14    and scientific opinions?

15              A.   Yes, they do.

16              Q.   Did they rely on it in forming your

17    opinions that you're giving here today?

18              A.   Yes, I did.

19              Q.   And now I'll hand you plaintiff's

20    Exhibit 10.

21              ---PLAINTIFF EXHIBIT NO. 10:  Article

22              titled "Materials Characterization of

23              Explanted Polypropylene Hernia Meshes"

24              found in the Journal of Biomedical
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 94 of 409 PageID #: 68567
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 94 of 504 PageID #: 68567
Vladimir Iakovlev, M.D.

```
 1              Materials Research Part B: Applied

 2              Biomaterials.

 3              BY MR. ANDERSON:

 4              Q.  Was this published?

 5              A.  It was published in --

 6              Q.  Was it published?

 7              A.  It was published.

 8              Q.  In what journal?

 9              A.  Journal of Biomedical Materials

10    Research Part B:  Applied Biomaterials.

11              Q.  What year?

12              A.  It was published in 2007.

13              Q.  Was this article peer reviewed?

14              A.  Yes, it is.

15              Q.  Who's the lead author?

16              A.  Lead author is Costello.

17              Q.  Did you read and review this article

18    in forming the opinions that you're giving here

19    today?

20              A.  Yes, I did.

21              Q.  Is this a recognized and reliable

22    publication for doctors in your field?

23              A.  Yes, it is.

24              Q.  Do experts in your field customarily
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 95 of 409 PageID #: 138568
Case 2:12-md-02327 Document 3512-17 Filed 04/20/16 Page 95 of 504 PageID #: 68258
Vladimir Iakovlev, M.D.

1    rely on this type of journal in forming medical

2    and scientific opinions?

3             A.  Yes, they do.

4             Q.  Did you rely on it in forming the

5    opinions you're giving here today?

6             A.  Yes I did.

7             Q.  Showing you what's been marked as

8    plaintiff's Exhibit 11.

9             ---PLAINTIFF EXHIBIT NO. 11:  Article

10            titled "Materials characterization of

11            explanted polypropylene, polyethylene

12            terephthalate, and expanded

13            polytetrafluoroethylene composites:

14            Spectral and thermal analysis", found

15            in Journal of Biomedical Materials

16            Research Part B: Applied Biomaterials.

17            BY MR. ANDERSON:

18            Q.  Was this article published?

19            A.  Yes, it was.

20            Q.  And what journal was it published

21    in?

22            A.  Journal of Biomedical Materials and

23    Research B:  Applied Biomaterials.

24            Q.  What year was it published?

Vladimir Iakovlev, M.D.

```
 1              A.  It was published in 2010.

 2              Q.  Who is the lead author?

 3              A.  Lead author is Cozad.

 4              Q.  Is this article peer reviewed?

 5              A.  Yes, it is.

 6              Q.  Did you read and review this article

 7    in forming the opinions that you are giving here

 8    today?

 9              A.  Yes, I did.

10              Q.  Is this a recognized and reliable

11    publication for doctors in your field?

12              A.  Yes, it is.

13              Q.  Do experts in your field customarily

14    rely on this type of journal in forming medical

15    and scientific opinions?

16              A.  Yes, they do.

17              Q.  Did you rely on it in forming the

18    opinions you are giving here today?

19              A.  Yes, I do.

20              Q.  Marking plaintiff's Exhibit 12 for

21    identification.

22              ---PLAINTIFF EXHIBIT NO. 12:  Article

23              titled "Physical Characteristics of

24              Medical Textile Prostheses Designed for
```

Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 97 of 409 PageID #: 138570
Case 2:12-md-02327 Document 3790-17 Filed 04/25/17 Page 97 of 504 PageID #: 138250
Vladimir Iakovlev, M.D.

1              Hernia Repair: A Comprehensive Analysis

2              of Select Commercial Devices", found in

3              MDPI Materials, 2015.

4              BY MR. ANDERSON:

5              Q.  Was Exhibit 12 published?

6              A.  Yes, it was.

7              Q.  In what journal?

8              A.  MDPI Materials.

9              Q.  And what year was it published?

10             A.  It was published in 2015.

11             Q.  What is the lead author?

12             A.  Lead author is Miao.

13             Q.  And was this article peer reviewed?

14             A.  It was.

15             Q.  Did you review and read this article

16     in forming the opinions that you're giving here

17     today?

18             A.  Yes, I did.

19             Q.  Is this a recognized and reliable

20     publication for doctors in your field?

21             A.  Yes, it is.

22             Q.  Do experts in your field customarily

23     rely on this type of journal in forming medical

24     and scientific opinions?

Vladimir Iakovlev, M.D.

1          A.   Yes, they do.

2          Q.   Did you rely on it in forming the

3   opinions you are giving here today?

4          A.   Yes, I did.

5          Q.   Showing you what's been marked as

6   plaintiff's Exhibit 13.

7               ---PLAINTIFF EXHIBIT NO. 13:   Article

8               titled "Degradation of polypropylene in

9               the human eye: A sem-study", found in

10              Documenta Ophthalmologica, 1986.

11          BY MR. ANDERSON:

12          Q.   Can you please identify whether this

13   article was published?

14          A.   It was published.

15          Q.   In what journal?

16          A.   Documenta Ophthalmologica.

17          Q.   And who is the lead author?

18          A.   Lead author is Jogenbloed.

19          Q.   And what year was it published?

20          A.   1986.

21          Q.   And is this article peer reviewed?

22          A.   Yes, it is.

23          Q.   Did you read and review this article

24   in forming the opinions that you are giving here

Vladimir Iakovlev, M.D.

1    today?

2                A.  Yes, I did.

3                Q.  Is this a recognized and reliable

4    publication for doctors in your field?

5                A.  Yes, it is.

6                Q.  Do experts in your field customarily

7    rely on this type of journal in forming medical

8    and scientific opinions?

9                A.  Yes, they do.

10               Q.  Did you rely on it in forming the

11   opinions you are giving here today?

12               A.  Yes, I did.

13               Q.  Showing you what has been marked as

14   Exhibit 14.

15               ---PLAINTIFF EXHIBIT NO. 14:  Article

16               titled "Reinforcement Materials in Soft

17               Tissue Repair:  Key Parameters

18               Controlling Tolerance and Performance -

19               Current and Future Trends in Mesh

20               Development", found in the journal New

21               Techniques in Genital Prolapse Surgery,

22               2011.

23               BY MR. ANDERSON:

24               Q.  Was this article published?

Vladimir Iakovlev, M.D.

```
 1            A.  It was.

 2            Q.  And in what journal was it

 3   published?  Bottom of the page.

 4            A.  New Techniques in Genital Prolapse

 5   Surgery.

 6            Q.  What year was it published?

 7            A.  It was published in 2011.

 8            Q.  And who is the lead author of this

 9   publication in Exhibit 14?

10            A.  Lefranc.

11            Q.  And is this article peer reviewed?

12            A.  Yes, it is.

13            Q.  Is this a recognized and reliable

14   publication for doctors in the field?

15            A.  Yes, it is.

16            Q.  Did you read and review this article

17   in forming the opinions that you're giving here

18   today?

19            A.  Yes, I did.

20            Q.  Do experts in your field customarily

21   rely on this type of journal in forming medical

22   and scientific opinions?

23            A.  Yes, they do.

24            Q.  Did you rely on it in forming the
```

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 101 of 409 PageID #: 138574
Case 2:12-md-02827 Document 4453-17 Filed 04/27/16 Page 101 of 504 PageID #: 68262
Vladimir Iakovlev, M.D.

1   opinions that you are giving here today?

2         A.  Yes, I did.

3         Q.  Showing you what has been marked as

4   plaintiff's Exhibit 15.

5         ---PLAINTIFF EXHIBIT NO. 15:  Article

6         titled "Subcutaneous Implants of

7         Polypropylene Filaments", found in the

8         Journal of Biomedical Material

9         Research, 1976.

10        BY MR. ANDERSON:

11        Q.  Was this article published?

12        A.  Yes, it was.

13        Q.  And what article -- I'm sorry, what

14  journal was it published in?

15        A.  Journal of Biomedical Material

16  Research.

17        Q.  What year was it published?

18        A.  1976.

19        Q.  And who is the lead author in this

20  publication?

21        A.  Leibert.

22        Q.  Is this article peer reviewed?

23        A.  Yes, it is.

24        Q.  Did you read and review this article

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 102 of 409 PageID #: 138575
Case 2:12-md-02327 Document 3755-17 Filed 05/04/16 Page 102 of 504 PageID #: 68265
Vladimir Iakovlev, M.D.

1    in forming the opinions that you're giving here

2    today?

3              A.  Yes, I did.

4              Q.  Is this a recognized and reliable

5    publication for doctors in your field?

6              A.  Yes, it is.

7              Q.  Do experts in your field customarily

8    rely on this type of journal in forming medical

9    and scientific opinions?

10             A.  Yes, they do.

11             Q.  Did you rely on it in forming the

12   opinions you're giving here today?

13             A.  Yes, I did.

14             Q.  Showing you what's been marked as

15   plaintiff's Exhibit 16.

16             ---PLAINTIFF EXHIBIT NO. 16:  Article

17             titled "Degradation, infection and heat

18             effects on polypropylene mesh for

19             pelvic implantation: what was known and

20             when it was known", found in the

21             International Urogynecology Journal,

22             2011.

23             BY MR. ANDERSON:

24             Q.  Was this article published?

Vladimir Iakovlev, M.D.

```
1           A.  Yes, It was.

2           Q.  In what journal?

3           A.  International Urogynecology Journal.

4           Q.  And who is the lead author?

5           A.  Ostergard.

6           Q.  Was this peer reviewed?

7           A.  It was.

8           Q.  Have you read and reviewed this

9   article in forming the opinions that you're giving

10  here today?

11          A.  Yes, I did.

12          Q.  Is this a recognized and reliable

13  publication for doctors in your field?

14          A.  Yes, it is.

15          Q.  Do experts in your field customarily

16  rely on this type of journal in forming medical

17  and scientific opinions?

18          A.  Yes, they do.

19          Q.  Did you rely on it in forming the

20  opinions that you are giving here today?

21          A.  Yes, I did.

22          Q.  Just a few more here, Doctor.  I'm

23  showing you what has been marked as Exhibit 17.

24          ---PLAINTIFF EXHIBIT NO. 17:  Article
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 104 of 409 PageID #: 138577
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 104 of 504 PageID #: 63265
Vladimir Iakovlev, M.D.

1          titled "Post-Implantation alterations

2          of Polypropylene in the Human", found

3          in The Journal of Urology, 2012.

4          BY MR. ANDERSON:

5          Q.  Was this article published?

6          A.  Yes, it was.

7          Q.  And what journal was this article

8    published in?

9          A.  The Journal of Urology.

10         Q.  And what year was it published?

11         A.  It was published in 2012.

12         Q.  Who is the lead author on this

13   publication?

14         A.  Sternschuss.

15         Q.  Was this published in a

16   peer-reviewed journal?

17         A.  Yes, it was.

18         Q.  Was this article peer reviewed?

19         A.  Yes, it was.

20         Q.  Did you read and review this article

21   in forming the opinions that you are giving here

22   today?

23         A.  Yes, I did.

24         Q.  Is this a recognized and reliable

Vladimir Iakovlev, M.D.

1   publication for doctors in your field?

2           A.  Yes, it is.

3           Q.  Do expert in your field customarily

4   rely on this type of journal in forming medical

5   and scientific opinions?

6           A.  Yes, they do.

7           Q.  Did you rely on it in forming the

8   opinions you are giving here today?

9           A.  Yes, I did.

10          Q.  I'm showing you what's been marked

11  as plaintiff's Exhibit 18.

12          ---PLAINTIFF EXHIBIT NO. 18:  Article

13          titled "Materials characterization and

14          histological analysis of explanted

15          polypropylene, PTFE, and PET hernia

16          meshes from an individual patient",

17          found in the Journal of Material

18          Medicine, 2013.

19          BY MR. ANDERSON:

20          Q.  Was this article published?

21          A.  Yes, it was.

22          Q.  What journal was it published in?

23          A.  Journal of Material Science,

24  Material Medicine.

Vladimir Iakovlev, M.D.

```
 1                 Q.  Was it published -- what year was it

 2     published?

 3                 A.  2013.

 4                 Q.  Who is the lead author?

 5                 A.  Wood.

 6                 Q.  Is this article peer reviewed?

 7                 A.  Yes, it is.

 8                 Q.  Did you read and review this article

 9     in forming the opinions that you are giving here

10     today?

11                 A.  Yes, I did.

12                 Q.  Is this a recognized and reliable

13     publication for doctors in your field?

14                 A.  Yes, it is.

15                 Q.  Do experts in your field customarily

16     rely on this type of journal in forming medical

17     and scientific opinions?

18                 A.  Yes, they do.

19                 Q.  Did you rely on it in forming the

20     opinions you are giving here today?

21                 A.  Yes, I did.

22                 Q.  I'm showing you what has been marked

23     as Exhibit 19.

24                 ---PLAINTIFF EXHIBIT NO. 19:  Article
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 107 of 409 PageID #: 138580
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 107 of 409 PageID #: 68289
Vladimir Iakovlev, M.D.

       1          titled "Pathology of Explanted

       2          Transvaginal Meshes", found in World

       3          Academy of Science, Engineering and

       4          Technology International Journal of

       5          Medical, Health, Pharmaceutical and

       6          Biomedical Engineering, 2014.

       7          BY MR. ANDERSON:

       8          Q.  Do you recognize this article?

       9          A.  Yes, I do.

      10          Q.  And was it published?

      11          A.  It was.

      12          Q.  And in what journal was it

      13   published?

      14          A.  World Academy of Science,

      15   Engineering and Technology International Journal

      16   of Medical, Health, Pharmaceutical and Biomedical

      17   Engineering.

      18          Q.  And who is the lead author?

      19          A.  Me.

      20          Q.  And was this peer reviewed?

      21          A.  Yes, it was.

      22          Q.  And did you read and review -- well,

      23   are you using this article to form the opinions

      24   that you are giving here today?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 108 of 409 PageID #: 138581
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 108 of 504 PageID #: 65289
Vladimir Iakovlev, M.D.

1          A.  Yes, I am.

2          Q.  Is this a recognized and reliable

3    publication for doctors in your field?

4          A.  Yes, it is.

5          Q.  Do experts in your field customarily

6    rely on this type of journal in forming medical

7    and scientific opinions?

8          A.  Yes, they do.

9          Q.  Did you rely on it in forming the

10   opinions you're giving here today?

11         A.  Yes, I did.

12         Q.  Last but not least, I'm showing you

13   plaintiff's Exhibit 20.

14         ---PLAINTIFF EXHIBIT NO. 20:  Article

15              titled, "Degradation of polypropylene

16              in vivo: A microscopic analysis of

17              meshes explanted from patients", found

18              in the Journal of Biomedical Materials

19              Part B, 2015.

20         BY MR. ANDERSON:

21         Q.  Was this article published?

22         A.  It was.

23         Q.  And what journal was it published

24   in?

Vladimir Iakovlev, M.D.

```
1              A.   It's Biomedical Materials Part B.

2              Q.   Journal of Biomaterials Part B?

3              A.   Yes.  Journal of Biomaterials Part

4    B.

5              Q.   Who's the lead author on this?

6              A.   Me.

7              Q.   And when was it published?

8              A.   It was published in 2015.

9              Q.   Okay.  Was it peer reviewed?

10             A.   It was.

11             Q.   Did you rely upon this in forming

12   the opinions that you're giving here today?

13             A.   Yes, I did.

14             Q.   Is it a recognized and reliable

15   publication for doctors in your field?

16             A.   Yes, it is.

17             Q.   Do experts in your field customarily

18   rely on this type of journal in forming medical

19   and scientific opinions?

20             A.   Yes, they do.

21             Q.   Did you rely on it in forming the

22   opinions that you're giving here today?

23             A.   Yes, I did.

24             Q.   Doctor, after looking at all of
```

Vladimir Iakovlev, M.D.

1  these and identifying the record, please tell us

2  what was significant about all of these articles

3  taken as a whole to the opinions you're expressing

4  here today?

5          MR. HUTCHINSON:  Objection.

6          THE DEPONENT:  All these articles they

7  show that for decades researchers continue to

8  study polypropylene degradation in the body using

9  different methods starting from 1970's.  And their

10  conclusion was always the same, polypropylene

11  degrades in the body.

12          BY MR. ANDERSON:

13          Q.  Doctor, have you assisted me in

14  making some slides to demonstrate some of the

15  findings in this literature regarding

16  polypropylene degradation?

17          A.  Yes, I did.

18          Q.  Okay.  And do you think that would

19  be helpful to the jury in this case?

20          A.  It would.

21          Q.  Is it significant to your opinions?

22          A.  It is.

23          Q.  If you could pull up Exhibit 21

24  please.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 111 of 409 PageID #: 132584
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 111 of 504 PageID #: 632521
Vladimir Iakovlev, M.D.

```
 1              ---PLAINTIFF EXHIBIT NO. 21:  Printout

 2              of PowerPoint slides created with the

 3              assistance of Dr. Iakovlev for

 4              presentation to the jury.

 5              BY MR. ANDERSON:

 6              Q.  Exhibit 21 is a PowerPoint slide.

 7      Is this is the presentation that you helped me

 8      create for the jury?

 9              A.  Yes, it is.

10              Q.  And if we could pull up the first

11      slide.  What is this -- please identify this first

12      slide and tell us whether or not it's significant

13      to your opinions?

14              A.  Well, these are headings of some of

15      the articles we just went through.  It shows the

16      range of the techniques and repeated conclusions

17      over the last 50 years.

18              Q.  Okay.

19              A.  Next slide please.

20              Q.  Why is this slide significant to

21      your opinions?

22              A.  This slide shows one of the first

23      publications showing that polypropylene degrades

24      while implanted in the body.  It dates to 1976.
```

Vladimir Iakovlev, M.D.

1    And the conclusion was:

2                 "Analysis shows that degradation

3                 begins to occur after only a few days.

4                 Although the reaction sequence is not

5                 known several factors suggest that the

6                 in vivo degradation process is similar

7                 to auto-oxidation which occurs in air

8                 or oxygen."

9    And that was in 1976.

10           Q.   Okay.  Next slide.  Let's go back

11   just one second.  We've heard this word "in vivo"

12   a couple of times, and the jury has probably heard

13   it by this time, but what does "in vivo" mean,

14   Doctor?

15           A.   In vivo means in the body.  It can

16   be any body, human body, animal body.  In a live

17   body.

18           Q.   Okay, next slide please.  What is

19   this slide please, Doctor?

20           A.   This slide shows a list of the

21   articles we just went through.  It shows that

22   there is a range of different journals, people

23   from different countries and continents, different

24   dates, 1986, 2011, 2014, 2003, '98.  And all of

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 113 of 409 PageID #: 138586
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 113 of 504 PageID #: 682576
Vladimir Iakovlev, M.D.

1  them showed the same conclusion that polypropylene

2  degrades in the body.

3          Q.  From your review of them can you

4  tell whether or not these are different scientists

5  from different specialties?

6          A.  Yes.  I can see their affiliations,

7  what they are.  Surgeons, bioengineers.  I'm a

8  pathologists.  Other pathologists were involved.

9          Q.  Okay.  Next slide.

10         A.  And doesn't matter where

11 polypropylene is implanted.  In the eye, we saw

12 that some ophthalmological journals were published

13 in.  In animals or in humans it still degrades

14 while it's in the body.  Doesn't matter what part

15 of the body, it degrades.

16         Q.  Okay.  Next slide.

17         A.  Next slide.  And this is the list of

18 authors, I mean, this is part of the people who

19 made the conclusion that polypropylene degrades in

20 the body.  And some of them are Ph.D. scientists,

21 some of them are medical doctors, some of them are

22 surgeons, some of them are pathologists like me

23 and some of them are gynecologists.

24         Q.  Did you try and compile the entire

Vladimir Iakovlev, M.D.

```
 1   list of all the scientist and doctors over the

 2   last 40 or 50 years who have published on this?

 3          A.  No, this is just one group.

 4          Q.  Okay.  Next slide.  Why do we have

 5   this slide, Doctor?

 6          A.  This is one of the papers, and this

 7   is example of the conclusions we see in these

 8   papers.  In this specific study the authors

 9   compared three different mesh materials which were

10   explanted from the same patient and they did

11   side-by-side comparison.  "Polypropylene mesh

12   demonstrated chemical degradation via oxidation,

13   permanent distortion of the mesh and changes in

14   thermal properties."

15          Q.  Why is that important, Doctor?

16          A.  It supports all other papers, all

17   other articles, all other studies and my

18   publications as well.  All of those studies they

19   make the same conclusion.

20          Q.  Next slide please.  Why is this

21   slide significant to your opinions, Doctor?

22          A.  This is another example of the

23   conclusion.  Another paper, another group of

24   scientists.  "Overall the results support our
```

Vladimir Iakovlev, M.D.

```
 1    hypothesis that oxidation is involved with the

 2    degradation of polypropylene hernia mesh

 3    materials."

 4              Q.  You mentioned your publications.

 5    Next slide please.  One question, Doctor, you

 6    mention in the last article that that was a hernia

 7    mesh?

 8              A.  Yes, it was.

 9              Q.  From your review of the records,

10    your publications, your review of all of the

11    scientific journals, your presentation at

12    conferences with other scientists and doctors, as

13    well as your examination of over 300 explanted

14    meshes, have you noticed any difference or

15    similarities between explanted hernia

16    polypropylene meshes versus explanted transvaginal

17    meshes?

18              A.  In terms of degradation?

19              Q.  Yes.

20              A.  All of them degrade.

21              Q.  Thank you.  Now this slide.

22              A.  These are my publications where I

23    describe polypropylene degradation which occurs in

24    vivo, and that's what happened in Ms. Ramirez's
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 116 of 409 PageID #: 188589
Case 2:12-md-02327 Document 3795-17 Filed 04/27/17 Page 116 of 504 PageID #: 632779
Vladimir Iakovlev, M.D.

1    body.

2              Q.   Okay, you can take that down.

3              Doctor, based upon your background,

4    training, experience, based upon your work as a

5    pathologist over these many years, based upon your

6    review of over 300 explanted, polypropylene meshes

7    and over -- over 200 transvaginal meshes,

8    including Ethicon meshes, based upon your

9    publications in the literature, your review of all

10   the publications in the literature, as well as all

11   of the work that you've done in this case, do you

12   have an opinion to a reasonable degree of medical

13   certainty as to whether or not the TVT-O mesh that

14   was implanted in Ms. Ramirez degraded?

15             A.   Yes, I do.

16             Q.   And what is that opinion?

17             A.   My opinion is that TVT-O mesh made

18   out of polypropylene degraded while in the body of

19   Ms. Ramirez and is still degrading.  The remaining

20   parts which remain in her body are still

21   degrading.

22             MR. HUTCHINSON:  Objection.  Move to

23   strike as nonresponsive.

24

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 117 of 409 PageID #: 138590
Case 2:12-md-02327 Document 3705-17 Filed 04/27/16 Page 117 of 504 PageID #: 63279
Vladimir Iakovlev, M.D.

```
 1              BY MR. ANDERSON:

 2         Q.  Doctor, do you have an opinion as to

 3    whether or not the mesh that is still in her body

 4    is still degrading?

 5         A.  Yes, I do.

 6         Q.  And what is that opinion?

 7         A.  My opinion is that those parts which

 8    are left in the body of Ms. Ramirez are still

 9    degrading.

10         Q.  Doctor, based upon all of the work

11    that you've done and your publications, and your

12    review of all the explanted meshes, do you have an

13    opinion, to a reasonable degree of medical

14    certainty, as to what complications degraded mesh

15    causes in vaginal tissue?

16         A.  So the degradation occurs on all

17    surfaces of the mesh fibers.  The entire mesh has

18    surface which is covered with degraded

19    polypropylene.  All interactions between the body

20    and mesh occur through this degraded layer.  From

21    day one after implantation the interactions

22    between the body and the mesh is not through

23    pristine polypropylene, it's always going through

24    this degraded layer.
```

Vladimir Iakovlev, M.D.

```
 1              Q.  What's the significance of that?

 2              MR. HUTCHINSON:  Objection.  Move to

 3   strike as nonresponsive.

 4              BY MR. ANDERSON:

 5              Q.  Go ahead.

 6              A.  So all what we see, what happens

 7   after, is mediated through this degraded layer.

 8              Q.  What do you mean by "mediated"

 9   through the degraded layer?

10              A.  Because all interactions, the

11   sensing of the foreign body, the chemical

12   interactions, the physical interactions are all

13   through this degraded surface.  The surface

14   becomes brittle, we saw cracking.  So the entire

15   surface, the entire mesh is covered with this

16   crust of brittle, hardened material.

17              Q.  And what physical changes have you

18   noted in the brittle, explanted transvaginal

19   meshes?

20              A.  It leads to hardening, stiffening,

21   embrittlement of the mesh.

22              Q.  In your opinion what does that mean

23   to the patient if there's a hardened and brittle,

24   stiffened mesh in the transvaginal tissues?
```

Vladimir Iakovlev, M.D.

1          A.  So it doesn't stay soft and flexible

2   it becomes harder, it becomes stiffer.

3          Q.  And what does the stiffness mean to

4   the patient?

5          A.  It damages the tissue around it.  It

6   can damage it easier because it's much stiffer

7   than the tissue around it.

8          Q.  And back to my earlier question.  Do

9   you have an opinion as to whether or not this

10  stiffness, and this rigidity, and this degradation

11  in Ms. Ramirez's TVT-O sling caused any of her

12  injuries in this case?

13         MR. HUTCHINSON:  Objection, foundation.

14         THE DEPONENT:  Yes, I do.

15         BY MR. ANDERSON:

16         Q.  And what injuries do you believe, to

17  a reasonable degree of medical certainty the

18  degradation caused for Ms. Ramirez?

19         A.  Well, as I said, all interactions

20  between the body and the mesh are going through

21  this degraded layer.

22         Q.  What specific complications as it

23  went through that layer did the degraded mesh

24  cause or contribute to for Ms. Ramirez?

Vladimir Iakovlev, M.D.

```
1              MR. HUTCHINSON:  Same objection,

2       foundation.

3              THE DEPONENT:  Pain, pain on sexual

4       intercourse, urinary symptoms.

5              BY MR. ANDERSON:

6              Q.  Do you have an opinion as to whether

7       or not what you have depicted in some of these

8       images as degraded polypropylene, this cracked

9       outer layer or this bark that you described for

10      the jury, whether that is biologic material or

11      something like protein from the body that changed

12      the polypropylene?  Do you have an opinion on

13      that?

14             A.  I do.

15             Q.  And what's that opinion?

16             A.  My opinion is it is not biological

17      material.  After conducting several tests and

18      observations.

19             Q.  What tests did you do and what

20      observations did you make to rule out whether or

21      not the formalin, and other chemicals which are

22      used to make the slides in this case, had anything

23      to do with the degradation bark in the cracked

24      outer layer?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 121 of 409 PageID #: 138594
Case 2:12-md-02827 Document 3790-17 Filed 04/27/17 Page 121 of 504 PageID #: 65282
Vladimir Iakovlev, M.D.

 1          A.  Well, first of all I showed you the

 2   features I saw in the microscope.

 3          Q.  Okay.

 4          A.  The blue granules, the behavior of

 5   the material in polarized light.  This was all

 6   consistent with the earlier published body of the

 7   literature that polypropylene degrades in vivo.

 8   Then I also observed several other features in my

 9   research.

10          Q.  What was that?

11          A.  The first feature I observed that

12   the outer layer can be stained with different

13   histological dyes.

14          Q.  What do you mean by that?

15          A.  Any dye I would use or any stain

16   would stain it.  It can be red, it can be blue, it

17   can be green.  There is no difference.  If it's

18   positively charged dye, negatively charged dye,

19   larger molecule size, small, it all stains.  It

20   stages nonspecifically.

21          Q.  What do you mean by these stains

22   stain the bark layer nonspecifically?

23          A.  It means that the staining is not

24   due to specific electrostatic forces or some other

Vladimir Iakovlev, M.D.

```
 1    specific forces.  There is a nonspecific staining

 2    because of the porosity, because of the cavities

 3    in the bark layer.  However, several stains do not

 4    stain it.

 5            Q.  What do you mean by that?

 6            A.  And those stains are specifically

 7    designed to stain proteins.  And those stains

 8    which you saw brown stains they did not stain it.

 9    There is no protein inside.  It does not stain

10    with protein stains.

11            Q.  Did you do anything else to rule out

12    whether or not formalin, or any other chemicals

13    that are used to prepare the pathological sample

14    for the slides, or anything else had anything to

15    do with this degraded bark in the cracked outer

16    layer?

17            A.  Yes, I did.

18            Q.  What did you do?

19            A.  I took several pieces of pristine

20    mesh, put it in formalin for four months, and then

21    took it out of formalin and loaded it with other

22    specimens through the same processing protocol or

23    processing sequence as all other specimens.  They

24    all went through the same chemicals.
```

Vladimir Iakovlev, M.D.

1          Q.   And what were your findings?

2          A.   And the findings were that there is

3     no degraded layer after four months in formalin

4     and exposure to all chemicals to make the slides.

5          Q.   In your research did you ever have

6     an occasion to see any explanted mesh before it

7     was put into formalin or before histological

8     slides were created?

9          A.   Yes, I had the chance.

10         Q.   Please explain that to the jury and

11    explain what your findings were.

12         A.   I was called from OR when the

13    excision was done.

14         Q.   At St. Michael's?

15         A.   At St. Michael's.

16         Q.   When you say "OR" do you mean the

17    operating room?

18         A.   Operating room.

19         Q.   Now explain it slowly so that the

20    jury can understand.

21         A.   The patient had symptoms of pain,

22    the sling had to be excised.  And when I examined

23    it, while it was fresh, while it was not dried

24    yet, while it was -- even before it was put in

Vladimir Iakovlev, M.D.

1   formalin, some fibers were sticking out.  I

2   examined it in the microscope and I saw extensive

3   cracking.

4            Q.  And is that -- are the photographs

5   of that in your peer-reviewed publications?

6            A.  Yes, they are.

7            Q.  Thank you.  Did you use standards --

8   sorry, strike that.

9            Did you use procedures and protocols

10  that are standard in your industry to conduct the

11  formalin testing on the pristine mesh that had

12  never been implanted in the body?

13           A.  Yes, I did.

14           Q.  Doctor, with regard to the usage of

15  polarized light to assess the mesh explants you

16  were showing the jury the thing like you use

17  fishing glass lenses a few minutes ago.  Do you

18  remember that?

19           A.  Yes, I do.

20           Q.  Are there other scientist that have

21  used this polarization technique in order to

22  examine whether or not there's polypropylene mesh

23  in tissue samples on microscopic slides like you

24  did?

Vladimir Iakovlev, M.D.

```
 1              A.  Yes.  The technique was introduced

 2   in 1920's to identify sutures, even at that time.

 3              MR. HUTCHINSON:  Objection.  Move to

 4   strike as nonresponsive.

 5              BY MR. ANDERSON:

 6              Q.  Has it been around since the 1920s,

 7   Doctor?

 8              A.  Yes, it has.

 9              Q.  Great.  Have you seen any

10   peer-reviewed publications where they used

11   polarized light in these same techniques?

12              A.  Yes, I did.

13              Q.  I'm showing you what's been marked

14   as plaintiff's Exhibit 22.

15              ---PLAINTIFF EXHIBIT NO. 22:  Article

16              titled "Pathologic Evaluation of

17              Explanted Vaginal Mesh:

18              Interdisciplinary Experience From a

19              Referral Center", found in the Journal

20              of Female Pelvic Medicine &

21              Reconstructive Surgery, 2013.

22              BY MR. ANDERSON:

23              Q.  You asked me to highlight this

24   article for purposes of presentation to the jury?
```

Vladimir Iakovlev, M.D.

```
 1            A.   Yes, I did.

 2            Q.   Is this -- was this article

 3   published?

 4            A.   Yes, it was.

 5            Q.   What journal was it published in?

 6            A.   Female Pelvic Medicine and

 7   Reconstructive Surgery.

 8            Q.   In what year?

 9            A.   2013.

10            Q.   Who's the lead author?

11            A.   Smith.

12            Q.   Was this a peer-reviewed article?

13            A.   Yes, it was.

14            Q.   Is this something that doctors like

15   yourself rely on in forming medical and scientific

16   opinions?

17            A.   Yes, it is.

18            Q.   Did you read and review this in

19   forming the opinions that you're giving here

20   today?

21            A.   Yes, I did.

22            Q.   Is this a recognized and reliable

23   publication for doctors in your field?

24            A.   Yes, it is.
```

Vladimir Iakovlev, M.D.

1          Q.   What is -- can you publish that?

2     What is the significance to you of Exhibit 22?

3          A.   So this is the authors, this is the

4     journal.  And if we can go to top part of the

5     paper?

6          Q.   It says there "objectives".  What

7     does that objective word mean when it comes to a

8     scientific journal like this?

9          A.   Objectives are the aims of the study

10    or the goal.  What they're trying to achieve or

11    what they're trying to study.

12         Q.   Okay.  What was the goal of what

13    they were trying to achieve in this study?

14         A.   "In light of vaginal mesh safety

15              concerns we reviewed our institutional

16              experience with analytical process and

17              pathologic findings of explanted

18              vaginal meshes to identify problems and

19              opportunities to facilitate improved

20              documentation and research."

21         Q.   How many cases did they review?

22         A.   They reviewed 102 cases.

23         Q.   If you scroll down please to the

24    conclusion section.  Just briefly describe what

Vladimir Iakovlev, M.D.

```
1    they concluded in this paper, Doctor?

2              A.  Their experience suggested that:

3                  "Gross and histologic examination

4              is appropriate for mesh explants.

5              Documentation of clinical history, mesh

6              product and material was frequently

7              incomplete and associated with

8              increased submission of tissue for

9              histologic examination and inaccurate

10             gross impression of material type.  We

11             recommend..."

12   That was their recommendation, "improved

13   documentation to aid pathologic examination and

14   enable future of pathophysiologic study of mesh

15   complications."

16             Q.  Do you agree with that conclusion?

17             A.  I do.  I frequently see --

18             Q.  And why do you agree with it?  Why

19   is it significant to you, Doctor?

20             A.  Because when I review the medical

21   records I frequently see incomplete and partially

22   inaccurate pathological diagnosis.

23             Q.  Please explain what you mean?

24             A.  Sometimes it's only gross
```

1   examination, sometimes it describes only one part

2   of the findings, it does not list all pathological

3   findings.  And the information which is delivered

4   cannot be related back to the clinical symptoms

5   because it's incomplete.

6           Q.  And if we turn over to page 240 of

7   this.  And if you highlight the top part of the

8   page.  Why did you want to point this out to the

9   jury, these highlights, Doctor?

10          A.  So these are images similar to what

11  we saw.  The images are of mesh.  And you see

12  those spaces you saw before in Ms. Ramirez's

13  specimen.  Those are clear spaces.

14          Q.  Okay.

15          A.  The same stain, H&E stain.  And they

16  use the same technique.  They use polarized light

17  to identify where polypropylene is.  And you can

18  see these are polypropylene fibers here in the

19  tissue.

20          Q.  And under -- the text underneath

21  the -- under the figure for figure B it says,

22  "Polarized micrograph showing brightly colored

23  birefringent."  Is that the word you used before

24  in terms of what brightly means?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 130 of 409 PageID #: 132603
Case 2:12-md-02327 Document 3795-17 Filed 04/28/17 Page 130 of 504 PageID #: 132603
Vladimir Iakovlev, M.D.

1        A.  Yes.  Bright means birefringent or

2    birefringent means bright in polarized light.

3        Q.  You can take that down.

4        Doctor, do you know if anyone else in

5    your field of practice or in science has used the

6    same methods to test if polypropylene degrades in

7    the body?

8        MR. HUTCHINSON:  Objection.

9        THE DEPONENT:  Yes, I do.

10        BY MR. ANDERSON:

11        Q.  And if we could see Exhibit 23?

12        MR. HUTCHINSON:  Ben, just for the

13    record that was a foundation objection.

14        BY MR. ANDERSON:

15        Q.  From your review of all of the

16    records in this case, the internal documents that

17    you reviewed in this case, any depositions that

18    you reviewed, all of your work in the scientific

19    area of explanted transvaginal meshes and hernia

20    meshes, your analysis of over 300 explanted meshes

21    and speaking at conferences and mingling with

22    scientists around the world, are you aware of

23    anyone that has used some of those similar methods

24    to test if polypropylene degrades in the body,

Vladimir Iakovlev, M.D.

 1    including polarized light in high magnification?

 2              MR. HUTCHINSON:  Objection, compound

 3    question.

 4              THE DEPONENT:  Yes, I am.  I saw Ethicon

 5    scientists did the same -- used the same

 6    methodology.

 7              BY MR. ANDERSON:

 8              Q.  Okay.  So let's go to Exhibit 23.

 9              ---PLAINTIFF EXHIBIT NO. 23:  Internal

10              Ethicon Research Foundation document

11              dated March 23, 1983.  Bates labelled

12              ETH.MESH.15955438 to ETH.MESH.15955439.

13              BY MR. ANDERSON:

14              Q.  Is this something that you reviewed

15    in your work in this case?

16              A.  Yes, I did.

17              Q.  Is IT something you relied on in

18    forming your opinions in this case?

19              A.  Yes, I did.

20              Q.  Do you find it significant to your

21    opinions in this case?

22              A.  Yes, I did.

23              Q.  If we could highlight the top.  Can

24    you just identify what this document is for the

Vladimir Iakovlev, M.D.

```
 1    record?

 2              A.  So this is internal document from

 3    Ethicon Research Foundation dated March 23, 1983.

 4              Q.  And if you look at the top paragraph

 5    what was the purpose of this study, Doctor?  I'm

 6    sorry, you need -- the top part needs to go down

 7    all the way.  Did you ask me to help you

 8    prehighlight some of this, Doctor?

 9              A.  Yes, I did.

10              Q.  And what's the subject line of this

11    study?

12              A.  Prolene, in brackets

13    "polypropylene", Prolene is a brand name of

14    Ethicon for polypropylene.

15              Q.  Is Prolene the type of polypropylene

16    that is in the TVT-O?

17              A.  Yes, it is.

18              Q.  And the TVT-O that's in Ms. Ramirez?

19              A.  Body, yes it is.

20              Q.  Now let's go to that top paragraph.

21    What were they doing in this internal Ethicon

22    study regarding Prolene microcracks?

23              A.  They were studying specimens of

24    Prolene sutures which were explanted or retrieved
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 133 of 409  PageID #: 138606
Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 133 of 504  PageID #: 68294
Vladimir Iakovlev, M.D.

1    from humans.

2              Q.  And what type of pathological

3    technique were they using, Doctor?

4              A.  As you can see here they used light

5    microscopy, exactly the same what I did, and

6    polarized light to help identify the cracking.

7              Q.  And if you can just scroll to where

8    we can see the center of this portion.  Now, what

9    were -- what preservation method did the

10   pathologist use to preserve these Prolene

11   specimens?

12             A.  The specimens were as normally

13   preserved in formalin.

14             Q.  And then if we can just scroll down.

15   Why did you want to highlight this last paragraph?

16             A.  They took photographs and they

17   showed their findings in the photographs.

18             Q.  Okay.

19             A.  And apparently at that time the

20   knowledge of Prolene or polypropylene cracking was

21   so prevalent that Ethicon formed a committee, the

22   committee was called "Prolene Microcrack

23   Committee" to study the degradation of

24   polypropylene.

Vladimir Iakovlev, M.D.

1          Q.   Okay.  Let's go to next page of

2    Exhibit 23.  Let's highlight first the left side,

3    top left side.  Thank you.

4               Why is this significant to your

5    opinions, Doctor?

6          A.   So these are the images in

7    transmitted light.  You have to excuse me, this is

8    a black and white copy.

9          Q.   I know they're not as pretty as the

10   ones we saw before but just explain what you can

11   see at least from the black and white copy?

12         A.   They show exactly the same slices of

13   the mesh fibers, so they are cut like this.

14   Exactly the same way as I did for Ms. Ramirez's

15   specimen.  And there is exactly the same bark.

16         Q.   Okay.

17         A.   Showing with the arrows.

18         Q.   Okay.

19         A.   And we can go to upper area here.

20         Q.   Okay.

21         A.   And it shows the bark around the

22   fibers in regular transmitted light.

23         Q.   Now, on the right what do we have?

24   Is that the same images?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 135 of 409 PageID #: 133608
Case 2:12-md-02827 Document 3799-17 Filed 04/27/16 Page 135 of 504 PageID #: 68298
Vladimir Iakovlev, M.D.

1          A.   Then they use polarized light.  The

2    same polarized light as I use and they used it 30

3    years ago.  I was not aware of this document for a

4    long time.  I started my study, research of

5    polypropylene degradation before I saw this

6    document.  And I was pleased to see that it was

7    used 30 years ago.  And these are the same fibers

8    in polarized light.  You can see how they are

9    bright or birefringent.

10          And then if we go to enlarge the area

11   you can see some folding and some parts of the

12   bark with cracks.  This is the same bark.

13          MR. HUTCHINSON:  Move to strike as

14   nonresponsive.

15          BY MR. ANDERSON:

16          Q.   And, Doctor, did you review any

17   other internal Ethicon documents where they

18   studied these microcracks through this Prolene

19   microcrack committee?

20          A.   Yes, I did.

21          Q.   Is this document significant to your

22   opinions in this case?

23          A.   Yes, it is.

24          Q.   And did you review and rely upon

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 136 of 409 PageID #: 138609
Case 2:12-md-02327 Document 3715-17 Filed 04/26/17 Page 136 of 504 PageID #: 68290
Vladimir Iakovlev, M.D.

1    them in informing your opinions?

2          A.  Yes, I did.

3          Q.  Can we please go to Exhibit 24?  I'm

4    showing you what has been marked as Exhibit 24.

5          ---PLAINTIFF EXHIBIT NO. 24:  Internal

6          document from Ethicon Research

7          Foundation dated May 2, 1984.  Bates

8          labelled ETH.MESH.15955462 to

9          ETH.MESH.15955468.

10         BY MR. ANDERSON:

11         Q.  And can you please identify that for

12   the record?

13         A.  This is internal document from

14   Ethicon Research Foundation.

15         Q.  Can you publish it and highlight the

16   top part, including the top third of the document?

17   Thank you.

18         A.  The document dates May 2nd, 1984.

19         Q.  So a year after the last document?

20         A.  Yes, it's about a year.

21         Q.  What's the subject here?

22         A.  Examination of Prolene polypropylene

23   sutures from human cardiovascular explants.

24         Q.  Okay.

Vladimir Iakovlev, M.D.

```
 1              A.  So again the same materials,

 2    polypropylene is explanted from human subjects.

 3              Q.  And under the summary of that what

 4    were these explants preserved in before they were

 5    examined?

 6              A.  So they were received to examine

 7    surface cracking and tensile strength.

 8              Q.  What were they preserved in?

 9              A.  They were preserved in formalin.

10              Q.  If we could go down do the next

11    paragraph that you've asked to be highlighted.

12    What's the significance of these highlighted

13    sentences?

14              A.  So again they use the same methods,

15    histological methods examining histological slides

16    as I did for Ms. Ramirez, to examine them in

17    regular light, or cross-sections of the specimens

18    in regular light.  And they used phloxine.

19              Q.  What's phloxine, Doctor?

20              A.  Phloxine is another histological

21    dye.

22              Q.  Like the H&E or the S100?

23              A.  Similar.

24              Q.  Okay.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 138 of 409 PageID #: 138641
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 138 of 504 PageID #: 68299
Vladimir Iakovlev, M.D.

1          A.   And they examined the specimens and

2    they saw severe surface cracking.  And the bark

3    layer or the cracked layer was 3 to 4.5 microns.

4          Q.   Let me ask you about that level of 3

5    to 4.5 microns.  In your scientific research, and

6    all of the explanted meshes that you've analyzed,

7    is that the same or different in terms of 3 to 4.5

8    micron depth of the bark cracking?

9          A.   It's the same.  Well, they examine

10   small number.  I examine over 300 so my numbers

11   are anywhere from 1 micron to 7 micron.

12         Q.   So hypothetically, I want you to

13   assume with me there may be testimony in this case

14   where someone might say that the depths of these

15   cracks is so small it doesn't make any difference

16   to the patient.  Do you have an opinion about

17   that?

18         A.   I do.

19         Q.   What's that opinion?

20         A.   Well, first of all it -- entire

21   surface of the mesh is involved.

22         Q.   What do you mean by "involved"?

23         A.   Entire surface of the mesh is

24   degraded, is brittle and it's cracked.  And second

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 139 of 409 PageID #: 138612
Case 2:12-md-02327 Document 3795-17 Filed 04/27/16 Page 139 of 504 PageID #: 63300
Vladimir Iakovlev, M.D.

1    point is that the size in pathology and in

2    medicine doesn't matter.  For example, if we take

3    small structures like viruses they can be deadly,

4    like HIV virus or like Ebola virus.  It's very

5    small but it can kill.

6              Q.  Okay.  Let's turn over if we could

7    now to page 3 of this document.  If we can

8    highlight from number 6 -- yes, please.

9              Doctor, on page 3 of this document it

10   describes sample 6.  And in the third -- in the

11   paragraph there in histological sections can you

12   please explain why this is significant to your

13   opinions?

14             A.  So again they describe a cracked

15   surface layer measuring 3 to 4.5 microns thick.

16   The layer was birefringent or bright, as we

17   discussed earlier.  When examined under polarized

18   light microscopy, exactly the same phenomenon as

19   we saw before, it is bright in polarized light.

20   Phloxine stain had completely penetrated the

21   cracked layer.  Again, a different dye stains it

22   purple again.  Different molecules of the dye,

23   different electrostatic charge.  It still dyes it,

24   it still stains it.

Vladimir Iakovlev, M.D.

1          Q.  Okay.  And the next part of that?

2          A.  And particles of blue dye, those

3   blue granules were evident within the cracked

4   layer.  So they saw exactly the same 30 years ago.

5   Those blue granules were in the bark in 1984.

6          Q.  And just to be clear, in both the

7   1983 internal Ethicon Prolene crack study, and the

8   1984 Ethicon internal Prolene crack study not all

9   of those fibers were cracked, correct?

10         MR. HUTCHINSON:  Objection, leading.

11         BY MR. ANDERSON:

12         Q.  Were all of those fibers cracked?

13         A.  No, not all of them were cracked.

14         Q.  Just to be clear, Doctor, in both

15  the Ethicon 1983 Microcrack Committee study, and

16  the Ethicon 1984 Ethicon Microcrack Committee

17  study were all of those fibers cracked or

18  degraded?

19         A.  Well, the report was that some of

20  them were not cracked or at least they did not see

21  cracking.

22         Q.  Okay.  And did these reports did

23  they determine whether or not the cracking was

24  time dependent?  In other words, did they report

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 141 of 409 PageID #: 138614
Case 2:12-md-02327 Document 3517 Filed 03/04/16 Page 141 of 504 PageID #: 63302
Vladimir Iakovlev, M.D.

1  whether or not the longer the material was in the

2  body the more susceptible it was to cracking?

3          A.  There was some information about

4  cracks, they are more prevalent in older or longer

5  in vivo period.

6          Q.  Is that consistent with your

7  scientific research that you've done with regard

8  to degradation and the length of time that the

9  mesh was in the body?

10          A.  Yes, it is.

11          Q.  How so?

12          A.  The bark layer starts really thin.

13  Well, it starts with zero from day one and then it

14  grows slowly.  Over the years it becomes thicker

15  and thicker and thicker, and thicker.

16          Q.  If we go down to the top page -- top

17  of the next page.  At the top of page 4 of this

18  1984 study, plaintiff's Exhibit 24, why is that

19  significant to your opinions here, Doctor?

20          A.  So this is their conclusion.

21              "The cracked layer appeared blue in

22              gross specimens and blue dye particles

23              were evident in histological sections

24              of the layer.  This would indicate that

Vladimir Iakovlev, M.D.

```
 1                the layer is dyed Prolene polymer and

 2                not an isolated protein coating on the

 3                strands."

 4         Q.  Why is that significant to you,

 5    Doctor?

 6         A.  These were exactly the same

 7    conclusions as I independently arrived 30 years

 8    after.  Thirty years ago Ethicon scientists used

 9    the same methods and they concluded that the

10    cracked layer is degraded polypropylene and not a

11    protein layer, not a biofilm.

12         Q.  If we could go to page 6 of this

13    report?  I want to highlight that top part.

14         Is this significant to your report here,

15    Doctor, the description of certain wet and dry

16    conditions?

17         A.  Yes, it is.

18         Q.  Can you please explain?

19         A.  So when the surface of the cracked

20    fibers is dry it's much easier to see the cracks.

21    They are more dramatic in dry sample.  When the

22    surface was wet it's not as easy to see the

23    cracks.  So sometimes --

24         Q.  Why is that?
```

Vladimir Iakovlev, M.D.

1          A.  Water just fills the cracks and you

2    don't see them.

3          Q.  And if we turn to page 7 please.

4    What are we seeing in that upper image, Doctor?

5          A.  This is a similar image we saw

6    before the polypropylene fiber is sectioned in

7    histological section and examined in polarized

8    light.  And this part is the nondegraded core of

9    the fiber.  And this layer, as you can see a

10   scaling layer, is degraded bark.

11         Q.  And it says "birefringent", is that

12   that word that means brightly again?

13         A.  Brightly, bright again.  It's

14   phloxine staining, bright in polarized light,

15   degraded layer of polypropylene or Prolene.

16         Q.  What are we seeing in the image just

17   below that if we could, Doctor?

18         A.  And this is again a cross-section of

19   a fiber like this tree slab.

20         Q.  Okay.

21         A.  Cross-section.  And we just see

22   quarter of it.  And we see bark layer or

23   degradation layer on the outer surface.  So in

24   this image it's in regular light, this part is the

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 144 of 409 PageID #: 138617
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 1 of 504 PageID #: 68305
Vladimir Iakovlev, M.D.

1  core and this is degraded layer.  And they use the

2  same arrows.  I used the same arrows or similar

3  arrows 30 years after that.

4          Q.  With my help did you prepare a slide

5  comparing the findings from these Ethicon

6  scientist and your findings from Ms. Ramirez's

7  explanted mesh?

8          A.  Yes, I did.

9          Q.  Do you think it would be helpful in

10  informing the jury or your opinions?

11          A.  Yes, it will.

12          Q.  Is it significant to your opinions

13  here?

14          A.  Yes, it is.

15          Q.  Okay.  Let's pull up Exhibit 25

16  please.  I'm showing you what's been premarked as

17  plaintiff's Exhibit 25 for demonstrative purposes

18  only.

19          ---PLAINTIFF EXHIBIT NO. 25:  Two pages

20          depicting high magnification images for

21          comparison.

22          BY MR. ANDERSON:

23          Q.  Please explain what we're seeing

24  here, Doctor?

Vladimir Iakovlev, M.D.

```
 1                A.  This is a comparison of the Ethicon

 2    study and the images I took from Ms. Ramirez's

 3    specimen.  The first combination of images shows

 4    microphotographs taken 30 years ago by Ethicon

 5    scientists studying Prolene sutures explanted from

 6    people.  And this image, or the image on lower

 7    right shows Ms. Ramirez's specimen in polarized

 8    light.  And you can see the similarity.  Bright

 9    core, bright bark and then dark surrounding

10    tissue, dark surrounding tissue here.

11                Q.  What do we see in the lower right

12    image, if you can blow that up please for me.

13                A.  This is comparison of mesh fibers

14    examined in regular light.  And you can see the

15    similarity.  Mesh fiber with cracked outer bark or

16    cracked outer layer here in Ms. Ramirez's specimen

17    examined in 2015.  And this is a mesh or Prolene

18    suture examined in 1984.  And we can see the

19    similarity.

20                So this was drawn by Ethicon scientist

21    in 1984.  This is the bark layer with the cracks.

22    And this is 2015, 30 years after that.  These are

23    blue granules in the bark layer.  This is Prolene,

24    it's not protein.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 146 of 409 PageID #: 138619
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 146 of 501 PageID #: 63807
Vladimir Iakovlev, M.D.

1        Q.  Demonstrating what to you,

2   Dr. Iakovlev?

3        A.  It demonstrates that Ethicon

4   scientists knew that Prolene degrades in the body

5   in 1984, and they determined that using exactly

6   the same methodology that I used to examine

7   Ms. Ramirez's specimen and determine that TVT-O

8   degraded while in the body of Ms. Ramirez.

9        Q.  Thank you, you can take that down.

10       Doctor, as part of your evaluation in

11  this case did you rule out any other causes of the

12  scarring the foreign body type inflammation and

13  the nerve involvement in Ms. Ramirez's slide?

14       A.  Yes, I did.

15       Q.  What did you do to rule out all

16  other causes for these tissue changes as it

17  related to the TVT-O mesh in Ms. Ramirez?

18       A.  I examined the specimen grossly, I

19  examined it microscopically and I saw no natural

20  disease like cancer.  All pathological cases were

21  related to the mesh.  My findings were exactly the

22  same in this respect as the findings of initial

23  pathologist.

24       Q.  Doctor, based upon your background,

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 147 of 409 PageID #: 138680
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 147 of 504 PageID #: 68360
Vladimir Iakovlev, M.D.

1    training and experience, your review of over 300

2    explanted meshes, your review of the medical

3    records of hundreds of explanted mesh patients,

4    your scientific publications, your review of the

5    literature and your review of Ms. Ramirez's

6    medical records, do you have an opinion, to a

7    reasonable degree of medical certainty, as to the

8    cause of Ms. Ramirez's pelvic pain?

9            A.   Yes I do.

10           Q.   And what is that opinion?

11           A.   My opinion is --

12           MR. HUTCHINSON:   Objection, foundation.

13           BY MR. ANDERSON:

14           Q.   Go ahead?

15           A.   As I said, there was no natural

16   disease, there was no other foreign body.  All

17   pathology in the excised specimens, and the

18   specimens which were excised to treat the

19   complications was related to the mesh.  And those

20   were bridging fibrosis, scar encapsulation, scar

21   plating, foreign body type inflammation, nerve

22   entrapment, and all of these changes caused

23   complications in Ms. Ramirez.

24           Q.   And was that complication including

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 148 of 409 PageID #: 133631
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 148 of 504 PageID #: 68309
Vladimir Iakovlev, M.D.

```
 1   pelvic pain?

 2           MR. HUTCHINSON:  Objection, foundation.

 3           THE DEPONENT:  Yes.

 4           BY MR. ANDERSON:

 5           Q.  And based upon all of your

 6   background, training, experience, your scientific

 7   work, your review of the medical records in this

 8   case, do you have an opinion -- and you review of

 9   thousands of other pages of medical records for

10   the hundreds of explants that you say you examined

11   as part of your work and your research, do you

12   have an opinion as to whether or not the TVT-O

13   mesh caused pain with sexual intercourse for

14   Ms. Ramirez?

15           MR. HUTCHINSON:  Objection, foundation.

16           THE DEPONENT:  Yes, I do.

17           BY MR. ANDERSON:

18           Q.  What is that opinion?

19           A.  My opinion is that the mesh and in

20   the mesh related changes in the tissue caused pain

21   with sexual intercourse for Ms. Ramirez.

22           Q.  And do you have an opinion as to how

23   it caused pain for sexual intercourse?

24           A.  Yes, I do.
```

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 149 of 409 PageID #: 138622
Case 2:12-md-02327   Document 2955-17   Filed 04/04/16   Page 149 of 501 PageID #: 63842
Vladimir Iakovlev, M.D.

```
 1              MR. HUTCHINSON:  Same objection,

 2     foundation.

 3              BY MR. ANDERSON:

 4              Q.  Go ahead

 5              A.  The mesh triggered tissue reaction.

 6     The mesh degraded itself, it triggered bridging

 7     fibrosis, scar encapsulation, scar plating,

 8     foreign body type inflammation, nerve entrapment,

 9     and all of these changes caused this complication.

10              Q.  Do you have an opinion, to a

11     reasonable degree of medical certainty, based upon

12     your background, training, experience, your review

13     of over 300 explanted polypropylene meshes, your

14     publications in the field, your presentations at

15     conferences around the world, including invited

16     presentations to mesh manufacturers, your review

17     of the records in this case, and your review of

18     the explants, and all of your microscopic

19     analysis, do you have an opinion as to whether or

20     not the pathological analysis you've done has

21     shown that Ms. Ramirez's urinary symptoms were due

22     to TVT-O?

23              MR. HUTCHINSON:  Objection, foundation.

24              THE DEPONENT:  Yes, I do.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 150 of 409 PageID #: 138623
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 1 of 301 PageID #: 68821
Vladimir Iakovlev, M.D.

```
  1              BY MR. ANDERSON:

  2         Q.  What is that opinion?

  3         A.  My opinion is that the sling and

  4   sling-related tissue changes caused scarring, scar

  5   contraction, tightening of the mesh and urinary

  6   symptoms.  As to how this tightening of the mesh

  7   manifested in terms of urinary symptoms I would

  8   defer this to urogynecologist.

  9         Q.  Doctor, with your help did you help

 10   me prepare a slide for your clinico-pathological

 11   findings as they relate to your opinion in

 12   Ms. Ramirez's case?

 13         A.  I did.

 14         Q.  And for demonstrative purposes only

 15   can you please pull up the slide?  Doctor, can you

 16   please explain the slide that you prepared here

 17   for the jury regarding your summary of

 18   pathological findings and your

 19   clinico-pathological correlation?

 20         A.  So the main pathological abnormality

 21   in the excised tissue, in the tissue which was

 22   excised to treat the complications, was presence

 23   of foreign body and that foreign body was the

 24   mesh.  There was no other foreign body.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 151 of 409 PageID #: 138624
Case 2:12-md-02327 Document 3795-17 Filed 04/27/16 Page 151 of 504 PageID #: 138622
Vladimir Iakovlev, M.D.

1        Now, examining further the sling was

2  found curled or roped, which was correlating with

3  the clinical description of bow stringing.  Making

4  a tight rope like a bow string.  This was caused

5  by scarring and contraction within the curled

6  mesh.

7        Q.  Okay.  Next bullet point.

8        A.  There was entrapment of nerves in

9  the scar and in the mesh which was correlated with

10  the pain.

11        Q.  And the next bullet point?

12        A.  There was also foreign body type

13  inflammation which was correlating with further

14  scarring and pain.  The mesh itself was found to

15  be degraded.  It was failing on its own.

16        Q.  And your last bullet point, why is

17  that significant?

18        A.  As important in pathology for all

19  specimens we examine, there was no natural

20  disease.  There is no malignancy or nonmalignant

21  disease in the tissue.  All changes were triggered

22  by the mesh.

23        Q.  Doctor, do you have an opinion, to a

24  reasonable degree of medical certainty, based upon

 1   your knowledge, training, experience, work as a

 2   pathologist for over 15 years, your work on this

 3   case reviewing the medical records of Ms. Ramirez,

 4   all of the work that you've done in the field that

 5   we've previously described, as to whether or not

 6   these pathological changes in the tissue of

 7   Ms. Ramirez, that you've just described, are

 8   related to her clinical symptoms of chronic

 9   vaginal pelvic pain, pain with intercourse and

10   urinary symptoms?

11           MR. HUTCHINSON:  Objection, foundation.

12           THE DEPONENT:  I do.

13           BY MR. ANDERSON:

14           Q.  What is that opinion?

15           A.  My opinion is that the mesh and

16   mesh-related changes in the tissue caused chronic

17   pelvic vaginal pain, pain with intercourse and

18   urinary symptoms for Mr. Ramirez.

19           Q.  And do you have an opinion, based

20   upon your background, training, experience, and

21   all of your work in this case, as to whether or

22   not the pieces of mesh that are still in

23   Ms. Ramirez's body will continue to present a risk

24   for other complications and changes in her tissue?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 153 of 409 PageID #: 138626
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 153 of 504 PageID #: 63024
Vladimir Iakovlev, M.D.

1          A.   I do.

2          Q.   And what is that opinion?

3          MR. HUTCHINSON:   Same objection,

4    foundation.

5          BY MR. ANDERSON:

6          Q.   What is that opinion?

7          A.   My opinion is that the remaining

8    parts of the TVT-O sling which still remain in

9    Ms. Ramirez's body will continue to cause all of

10   those changes, pathological changes I described

11   before, and will pose risk for pain for

12   Ms. Ramirez.

13         Q.   For how long?

14         A.   As long as mesh stays there.  And

15   because there is still damaged tissue, scarring

16   left after the mesh in the area where it was

17   excised, and scarring left after the mesh

18   surgeries, that scar tissue also poses risk for

19   clinical complications.

20         MR. HUTCHINSON:   Move to strike as

21   nonresponsive.

22         BY MR. ANDERSON:

23         Q.   Thank you, Doctor, no further

24   questions.

Vladimir Iakovlev, M.D.

```
1              A.  Thank you.

2              THE VIDEOGRAPHER:  Going off the record.

3    The time is 11:58 a.m.

4              ---   Lunch break taken

5              THE VIDEOGRAPHER:  Back on the record at

6    1:09 p.m.

7              CROSS-EXAMINATION BY MR. HUTCHINSON:

8              Q.  Good afternoon, Dr. Iakovlev.

9              A.  Good afternoon.

10             Q.  My name is Chad Hutchinson and I

11   represent Ethicon and Johnson & Johnson in this

12   case and I'm going to need to ask you some

13   questions, okay?

14             A.  Okay.

15             Q.  You're a pathologist who works in

16   Canada, is that right?

17             A.  That's correct.

18             Q.  And I believe you told us earlier

19   this morning that you grew up in Russia?

20             A.  That's correct.

21             Q.  And you served in the Russian

22   military?

23             MR. ANDERSON:  Objection.

24             THE DEPONENT:  Yes, I did.
```

Vladimir Iakovlev, M.D.

```
 1               BY MR. HUTCHINSON:

 2               Q.  And we're in Canada right now, is

 3     that right?

 4               A.  That's correct.

 5               Q.  Now, Dr. Iakovlev, the jury who is

 6     watching this video is from Texas.  You've never

 7     practiced medicine in Texas have you?

 8               A.  No.

 9               Q.  You've never been to Texas?

10               A.  Just in the airport.

11               Q.  And, Doctor, you've been licensed to

12     practiced medicine in the State of Texas have you?

13               A.  Not in the state of Texas.

14               Q.  In fact, Doctor, let's be more

15     specific, you've never practiced medicine anywhere

16     in the United States have you?

17               A.  That's correct.

18               Q.  And you applied for a residency

19     program in the USA didn't you?

20               A.  I applied to both, to Canada and

21     residency at the same time.

22               Q.  That's correct.  And you didn't get

23     in the USA did you?

24               A.  That's not correct.  I got into
```

Vladimir Iakovlev, M.D.

1   pathology residency in Canada, because when the

2   match happens you can get only one spot.

3           Q.  But you applied for a residency

4   program in the United States, is that correct?

5           A.  That's correct.

6           MR. ANDERSON:  Just show my objection to

7   this entire line of questions.

8           BY MR. HUTCHINSON:

9           Q.  And you never participated in the

10  residency program in the United States, correct?

11          MR. ANDERSON:  Objection.

12          THE DEPONENT:  That's correct.

13          BY MR. HUTCHINSON:

14          Q.  And, Dr. Iakovlev, I want to talk

15  about your history as an expert witness in the

16  mesh litigation.  You've testified for the

17  plaintiffs against American Medical Systems, AMS,

18  is that right?

19          A.  That's correct.

20          Q.  And that's one company that makes

21  mesh?

22          A.  That's correct.

23          Q.  And you've testified for the

24  plaintiffs against Bard, is that correct?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 157 of 409 PageID #: 138630
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 157 of 504 PageID #: 68519
Vladimir Iakovlev, M.D.

1          A.  That's correct.

2          Q.  And that's another company that

3    makes mesh?

4          A.  That's correct.

5          Q.  And you've testified against Boston

6    Scientific haven't you?

7          A.  I did.

8          Q.  Another company that makes mesh?

9          A.  That's correct.

10         Q.  And now you're giving testimony

11   against Ethicon, is that right?

12         A.  That's correct.

13         Q.  In fact you've always testified for

14   the plaintiffs against any manufacturer of mesh

15   products, is that correct, sir.

16         A.  I always testified for the patients.

17   I think it's natural for a doctor.

18         Q.  And, Doctor, you charge $475 an hour

19   for your time, is that correct?

20         A.  That's correct.

21         Q.  How many years have you been doing

22   this, Dr. Iakovlev?

23         MR. ANDERSON:  Objection to form.

24         THE DEPONENT:  Um, I became involved --

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 158 of 409 PageID #: 138631
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 158 of 504 PageID #: 63819
Vladimir Iakovlev, M.D.

1    first I became involved in the mesh research in

2    2012.  And then I became in mesh litigation,

3    without knowing this there is litigation.  I was

4    just called to examine something for litigation in

5    2013.

6            BY MR. HUTCHINSON:

7            Q.  So, Dr. Iakovlev, let me ask you

8    this.  Since 2013 why don't you tell the jury how

9    much money in U.S. currency that you've made in

10   total from all the mesh work that you've done?

11           A.  Um, I don't know for the 2015.  Last

12   time --

13           Q.  I'm sorry, move to strike as

14   nonresponsive.  Dr. Iakovlev --

15           MR. ANDERSON:  He's trying to give you a

16   summary and break it down.

17           MR. HUTCHINSON:  I understand that.

18           BY MR. HUTCHINSON:

19           Q.  But I need you to give me in total

20   how much money that you've made in U.S. currency

21   giving testimony against mesh manufacturers since

22   2013?

23           MR. ANDERSON:  Objection.

24           MR. FREESE:  Hold on a sec.  Dr.

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 159 of 409 PageID #: 138682
Case 2:12-md-02327  Document 2195-17  Filed 05/04/16  Page 3 of 504 PageID #: 63820
Vladimir Iakovlev, M.D.

1    Iakovlev, you can answer the question.  We're not

2    going to have the interruptions.  You ask the

3    question, if you don't think it's responsive you

4    move to strike but we're not going to do this,

5    Chad.

6            MR. HUTCHINSON:  That's exactly what I

7    did and he didn't answer the question.

8            MR. FREESE:  No, you interrupted him.

9            MR. HUTCHINSON:  No, I didn't.

10           MR. FREESE:  Yes, you did.  You

11   interrupted him.  So you're going to ask the

12   question, the doctor is going to answer and then

13   you're either going to move on to another question

14   or you're going to move to strike as

15   nonresponsive.  But you're not going to interrupt

16   the witness and he's not going to interrupt you.

17           MR. HUTCHINSON:  I didn't interrupt the

18   witness.

19           MR. FREESE:  Yes, you did.  You

20   absolutely did.

21           BY MR. HUTCHINSON:

22           Q.  Dr. Iakovlev, you can answer the

23   question.

24           A.  I can only tell you up to 2014

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 160 of 409 PageID #: 138693
Case 2:12-md-02327 Document 2754-17 Filed 08/18/16 Page 1 of 501 PageID #: 63823
Vladimir Iakovlev, M.D.

1   because I've done taxes only for 2014.  I haven't

2   done taxes for 2015 yet.

3           Q.  Move to strike as nonresponsive.

4           Dr. Iakovlev, my question is since 2013

5   tell the jury how much money that you've made in

6   U.S. currency in total in all the mesh litigation

7   that you've been involved in.

8           MR. ANDERSON:  Objection.  Go ahead.

9           THE DEPONENT:  That was my answer.  I

10  can give you number only up to 2014.

11          BY MR. HUTCHINSON:

12          Q.  You can't give us a number before

13  2014?  Is that what you said?

14          A.  I just became involved at the end of

15  2013.  I didn't make -- I don't think I made much

16  or anything in 2013.

17          Q.  But my question, Doctor -- move to

18  strike as nonresponsive.  My question is, I want

19  to know in total how much money that you've

20  received in U.S. currency from being an expert in

21  the mesh litigation since 2013?

22          MR. ANDERSON:  Objection.  That's what

23  he's trying to tell you.  He said he can tell you

24  only up to 2014 and you keep saying "in total".

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 161 of 409 PageID #: 138684
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 161 of 504 PageID #: 63832
Vladimir Iakovlev, M.D.

1   And he says he doesn't know for '15.  What part of

2   that didn't you understand?

3            BY MR. HUTCHINSON:

4            Q.  Dr. Iakovlev, you can answer the

5   question?

6            MR. ANDERSON:  Answer the question.

7            THE DEPONENT:  I will just repeat it

8   again.  I cannot give you total number.  I can

9   give you total number up to the year I completed

10  my taxes.

11           BY MR. HUTCHINSON:

12           Q.  And what year did you complete your

13  taxes?

14           A.  2014.

15           Q.  And what is that amount up until

16  2014?

17           A.  170,000.

18           Q.  Doctor, from 2014 until now, April

19  2016, you've made over a million dollars in U.S.

20  currency haven't you?

21           A.  I don't think so.  I don't know.

22           Q.  You can't answer that question?

23           A.  I can't answer that question.

24           Q.  For the Ramirez case, Dr. Iakovlev,

Vladimir Iakovlev, M.D.

1    how much time have you spent on the Ramirez case?

2             A.  Um, you have my billing.  It

3    describes everything.

4             Q.  Move to strike as nonresponsive.

5             Dr. Iakovlev, how much time have you

6    spent on the Ramirez case?

7             A.  I don't remember exact number of

8    hours.  I mean, usually it takes about 20 hours

9    for me to make one expert report.

10            Q.  Dr. Iakovlev, this morning you told

11   us that you were an anatomical pathologist, is

12   that correct?

13            A.  That's correct.

14            Q.  You're not a clinical pathologist

15   are you?

16            A.  I'm not.

17            Q.  You're not a biochemical pathologist

18   are you?

19            A.  Well, clinical pathologist and

20   biochemical pathologist are the same thing.  Usual

21   term for United States and Canada is clinical

22   pathologist or general pathologist.

23            Q.  But you're not a biochemical

24   pathologist are you, Doctor?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 163 of 409 PageID #: 138686
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 163 of 504 PageID #: 68820
Vladimir Iakovlev, M.D.

1          A.  As I said, we don't use that term,

2    biochemical pathologist.

3          Q.  Doctor --

4          A.  The correct term the clinical

5    pathologist and I'm not clinical pathologist.

6          Q.  Who doesn't use the term

7    "biochemical pathologist"?

8          A.  Pathologists.

9          Q.  Okay.  Doctor, I want to hand you

10   your deposition from the Jennifer Ramirez case.

11   You testified under oath, didn't you, in the

12   Jennifer Ramirez case, the case that we're here

13   about today?

14         A.  That's correct.

15         Q.  And, Doctor, if you'll turn to page

16   102, line 17.  Page 102, line 17.  Are you there

17   with me?

18         A.  Yes, I am.

19         Q.  It says, "I don't know.  I'm not a

20   treating physician and I'm not a biochemical

21   pathologist."  Did I read that correctly, sir?

22         A.  You do.

23         Q.  Those are your own words aren't

24   they?

Vladimir Iakovlev, M.D.

```
 1              A.  I don't know.  That's what
 2    transcript said.  I don't know if I said that
 3    because it's not our usual term.  It says clinical
 4    pathologist.
 5              Q.  Dr. Iakovlev, are you telling the
 6    jury that the transcript for the Jennifer Ramirez
 7    case is wrong?
 8              A.  Could be because it's not our usual
 9    term.
10              Q.  Do you have any evidence,
11    Dr. Iakovlev, that Ms. Ramirez's transcript is
12    wrong?
13              MR. ANDERSON:  Objection.  Go ahead.
14              THE DEPONENT:  No, I'm just that this is
15    not an accepted term.  The subspecialties in
16    pathology are anatomical pathology and clinical
17    pathology.
18              BY MR. HUTCHINSON:
19              Q.  And Dr. Iakovlev, did you sign the
20    errata sheet for your deposition?
21              A.  For this transcript?
22              Q.  Yes, sir.
23              A.  I don't know.
24              Q.  You had the opportunity to review
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 165 of 409 PageID #: 138628
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 165 of 504 PageID #: 68628
Vladimir Iakovlev, M.D.

1  the accuracy of that deposition didn't you, sir?

2         MR. ANDERSON:  Objection.

3         THE DEPONENT:  Sometimes I do, sometimes

4  I don't.  Sometimes I don't review the

5  transcripts.

6         BY MR. HUTCHINSON:

7         Q.  Doctor, you're not a microbiologist

8  either are you?

9         A.  That's correct.

10        Q.  And you're not a urologist?

11        A.  I'm not.

12        Q.  And you're not a urogynecologist?

13        A.  I'm not.

14        Q.  Those are specialties outside of

15  your field.  Is that correct, sir?

16        A.  That's correct.

17        Q.  And you don't treat or counsel

18  patients who have urinary symptoms like

19  Ms. Ramirez do you?

20        A.  I don't.

21        Q.  And you don't counsel or treat

22  patients who have dyspareunia do you?

23        A.  I don't.

24        Q.  And you don't prescribe medicine for

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 166 of 409 PageID #: 138639
Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 166 of 504 PageID #: 63829
Vladimir Iakovlev, M.D.

```
 1    pelvic pain do you, Dr. Iakovlev?

 2            A.  I don't.

 3            Q.  And you don't implant mesh do you,

 4    sir?

 5            A.  I don't.

 6            Q.  And you don't explant mesh do you,

 7    sir?

 8            A.  I don't.

 9            Q.  I want to talk specifically about

10    Ms. Ramirez for a minute.  Okay?

11            A.  Okay.

12            Q.  Now, you know she received a TVT-O

13    product in September of 2010, is that right?

14            A.  That's correct.

15            Q.  And you don't know whether her

16    incontinence was cured or fixed by the TVT-O do

17    you?

18            A.  Well, that's not what purpose of my

19    expert opinion.  I'm not here to testify on the

20    efficacy of the device.

21            Q.  Move to strike as nonresponsive.

22            Doctor, my question is you don't know

23    whether Ms. Ramirez's incontinence was corrected

24    by the TVT-O do you, sir?
```

Vladimir Iakovlev, M.D.

```
1              A.  I don't.

2              Q.  And you haven't examined Ms. Ramirez

3    have you?

4              A.  No, I have not.

5              Q.  You haven't read her deposition have

6    you?

7              A.  I have not.

8              Q.  You haven't talked with her have

9    you?

10             A.  I have not.

11             Q.  And you haven't talked with any of

12   Ms. Ramirez's treating doctors have you?

13             A.  That's correct.

14             Q.  So as I understand it you're basing

15   your opinions on the medical records and your

16   examination of the explant, is that right?

17             A.  That's correct.

18             Q.  Let's talk about the medical records

19   for just a minute.  You asked for all of her

20   medical records didn't you?

21             A.  Yes, I did.

22             Q.  And then you wrote a report?

23             A.  Well, I examined the specimen as

24   well after I went through the records.
```

Vladimir Iakovlev, M.D.

1          Q.  Doctor, I want to hand you the

2   report that you've done for Jennifer Ramirez and

3   we'll mark it as defendant's Exhibit 1.

4              ---DEFENSE EXHIBIT NO. 1:  Expert

5              report of Dr. Vladimir Iakovlev re.

6              Jennifer Ramirez, dated April 24, 2015.

7              BY MR. HUTCHINSON:

8          Q.  That's a copy of your report that

9   you did for Jennifer Ramirez isn't it, sir?

10         A.  Yes, it is.

11         Q.  And your report includes a summary

12  of clinical records, is that right?

13         A.  Yes.

14         Q.  And your summary doesn't say

15  anything about Ramirez -- Ms. Ramirez having

16  dyspareunia before September of 2010, does it?

17         A.  Just give me a second and I'll go to

18  the summary.

19         Q.  Doctor, I'm going to help you out,

20  it's on the first page of your case-specific

21  report.

22         A.  I found it.  This is my summary.

23         Q.  That's correct.  And your summary

24  doesn't say anything about Ms. Ramirez having

Vladimir Iakovlev, M.D.

1    dyspareunia before September of 2010 does it, sir?

2              A.  No, it doesn't.

3              Q.  And you can't tell us what you did

4    to rule out any pre-existing dyspareunia can you,

5    sir?

6              A.  Yes, I can.

7              Q.  Dr. Iakovlev, I want you to look at

8    your deposition again.

9              A.  Yes.

10             Q.  Page 96, line 5.

11             A.  I do.

12             Q.  And it says, "As we sit here right

13   now", and by the way, Dr. Iakovlev, you understand

14   you're under oath right now don't you?

15             A.  I do.

16             Q.  And you understand you were under

17   oath at the time you gave testimony in

18   Ms. Ramirez's case didn't you?

19             A.  I do.

20             Q.  And it says, "As we sit here now you

21   can't tell me what you do to rule out her

22   pre-existing dyspareunia?"  And your answer is,

23   "That's not my job."  Did I read that correctly?

24             MR. ANDERSON:  No.  Objection.  You have

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 170 of 409 PageID #: 138643
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 170 of 504 PageID #: 63851
Vladimir Iakovlev, M.D.

 1    to read the entire answer.

 2              MR. HUTCHINSON:  I'm not finished yet

 3              MR. ANDERSON:  You said, "Did I read

 4    that correctly?"

 5              BY MR. HUTCHINSON:

 6              Q.  Are you following me, Dr. Iakovlev?

 7              A.  I'm following you but I have to read

 8    the whole sequence of questions before I answer

 9    you.

10              Q.  Fine.  Dr. Iakovlev, are you

11    finished?

12              A.  Not yet.

13              Q.  Are you finished Dr. Iakovlev?

14              A.  Yes, I'm finished.

15              Q.  Dr. Iakovlev, that wasn't your job

16    to rule out pre-existing dyspareunia was it?

17              A.  Okay.  Let me read the entire

18    paragraph.  I would have to look --

19              Q.  Excuse me, I'm going to move to

20    strike as nonresponsive.

21              MR. FREESE:  You're doing what I just

22    asked you not to do.

23              MR. ANDERSON:  You cannot interrupt him.

24              MR. HUTCHINSON:  No, I'm not.

Vladimir Iakovlev, M.D.

```
 1              MR. FREESE:  He's speaking.

 2              BY MR. HUTCHINSON:

 3              Q.  My question is very simple.

 4              MR. FREESE:  We're going to --

 5              MR. HUTCHINSON:  My question is if he

 6    was finished or not.

 7              MR. FREESE:  Chad, we're going to be

 8    civil with each other and we're going to go by the

 9    rules.  He was speaking and you interrupted him.

10    He is going to answer the question the best way he

11    can.  You then can move to strike or not.  Go

12    ahead, Doctor.  If you want to withdraw the

13    question and ask it again and let him answer

14    that's fine.

15              BY MR. HUTCHINSON:

16              Q.  My question is, Dr. Iakovlev, are

17    you finished reading your deposition testimony?

18              A.  Those two pages?

19              Q.  Yes.  Are you finished reading them?

20              A.  Yes, I finished.

21              Q.  Dr. Iakovlev, it wasn't your job to

22    rule out pre-existing dyspareunia was it?

23              A.  So I will read you my answer that I

24    gave at the deposition.
```

Vladimir Iakovlev, M.D.

```
 1                    "That is not my job.  My job is to
 2            examine the pathology so the clinician
 3            who worked up the patient, their
 4            decision was to remove the source of
 5            pain.  And they identified source of
 6            pain in the mesh area.  When I received
 7            the specimen there was nothing wrong.
 8            The only abnormality was mesh and
 9            tissue reaction to foreign body.  The
10            mesh itself was a disease in that
11            specimen."
12            Q.  Move to strike everything after
13   "that's not my job".
14            Dr. Iakovlev, you don't know whether
15   Ms. Ramirez had vaginal infections before 2010 do
16   you?
17            A.  I don't remember now.  If it was in
18   the record I probably saw it but as I said, my
19   focus and excised specimen.
20            Q.  And, Doctor, you don't know whether
21   Ms. Ramirez had urinary tract infections before
22   2010 do you?
23            A.  I don't remember now.  Probably she
24   had.  People have them.
```

Vladimir Iakovlev, M.D.

1          Q.   And you don't know whether

2   Ms. Ramirez had any type of pelvic pain before

3   2010 do you?

4          A.   I do.  She had some pelvic pain

5   related to her benign tumors in the uterus, and

6   she had pain from menstrual periods.

7          Q.   And -- I'm sorry.  Were you

8   finished?

9          A.   That's why the uterus was removed.

10         Q.   Doctor, I want to hand you what

11  we'll mark as defense Exhibit 2 to your

12  deposition.

13         ---DEFENSE EXHIBIT NO. 2:  Medical

14             report from Baptist Health System re.

15             Jennifer Galindo dated 1/21/2015.

16             Bates labelled RAMIREZJ_BAHSY_MDR00564.

17         BY MR. HUTCHINSON:

18         Q.   You've seen this record before

19  haven't you, sir?

20         A.   Yes, I have.

21         Q.   And if we look at the middle where

22  it says, "Chief complaint, very heavy menstrual

23  periods.  Pelvic pain."  Did I read that

24  correctly, sir?

Vladimir Iakovlev, M.D.

```
 1                A.   That's correct.  That's what I just
 2      said.
 3                Q.   And this medical record shows that
 4      Ms. Ramirez had pelvic pain before she received
 5      the TVT-O.  Is that correct, sir?
 6                A.   That's correct.
 7                Q.   And, Doctor, you don't know if
 8      Ms. Ramirez had multiple exams after she received
 9      the TVT-O where she didn't complain of pain, do
10      you?
11                A.   Yeah, she had some periods when
12      there was no pain.
13                Q.   And, Doctor, before Ms. Ramirez
14      received the TVT-O she also had another device
15      called an Essure device implanted, is that
16      correct?
17                A.   That's correct.
18                Q.   That's just basically another type
19      of implant that she received in her pelvic area,
20      is that right?
21                MR. ANDERSON:  Objection.
22                THE DEPONENT:  Yes, it was coils
23      implanted in the uterus.
24
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 175 of 409 PageID #: 138648
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 175 of 504 PageID #: 68838
Vladimir Iakovlev, M.D.

1          BY MR. HUTCHINSON:

2          Q.  And you don't know what the Essure

3   device was made of do you?

4          A.  It's metal.

5          Q.  You don't know the type of metal do

6   you?

7          A.  I don't know the specific type of

8   metal.

9          Q.  And you don't know the rate of

10  pelvic pain associated with this metal device in

11  her pelvic area do you?

12         A.  No, I don't know the exact

13  percentage.

14         Q.  And, Doctor, there will always be a

15  foreign body response to any implant in the body,

16  is that correct?

17         A.  Yes, it will be variable but there

18  will be always a foreign body response.

19         Q.  That would include a medical -- a

20  metal, M-E-T-A-L, I'm sorry, metal object wouldn't

21  it?

22         A.  Yes, it will.

23         Q.  And it would include a TVT-O product

24  wouldn't it, sir?

Vladimir Iakovlev, M.D.

1          A.  It would.

2          Q.  Now, let's talk about Ms. Ramirez's

3    treating doctors for a minute.  Dr. Reyes, he was

4    the doctor who implanted the TVT-O, is that right?

5          A.  The document is not complete.

6          Q.  I'm not asking you a question about

7    that document.  I'm asking you whether or not you

8    know the name of the doctor who implanted the TVT

9    device in Ms. Ramirez?

10          A.  I don't remember all names.  I mean,

11    I review so many records I just don't want to

12    guess.  I want to read it from the record.

13          Q.  Did you ever make an effort to find

14    out the name of the doctor who implanted the TVT

15    device in Ms. Ramirez?

16          MR. ANDERSON:  Objection.

17          THE DEPONENT:  Of course.  I review the

18    record I see what's the name of the physician but

19    I don't want to guess.  I want to have records in

20    front of me and read it from the record.

21          BY MR. HUTCHINSON:

22          Q.  And with you can't tell us that

23    specific name now can you?

24          MR. ANDERSON:  Same objection.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 177 of 409 PageID #: 138650
Case 2:12-md-02327 Document 3795-17 Filed 04/25/17 Page 177 of 504 PageID #: 63889
Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  Same answer.

 2              BY MR. HUTCHINSON:

 3         Q.  Is it a yes or no?  Can you tell us

 4    the name of the doctor who implanted the TVT-O

 5    device in Ms. Ramirez?

 6         A.  I don't want to guess.  I want to

 7    have record in front of me.

 8         Q.  Is that a no?

 9         A.  That was my answer.

10         Q.  Doctor, you didn't read any of the

11    doctor depositions from Ms. Ramirez, did you?

12         A.  That's correct.

13         Q.  And you don't know what the

14    implanting doctor said about how the sling was

15    placed, do you?

16         A.  Well, I can see what was in the

17    record at the time of implantation.

18         Q.  But my question is you don't know

19    what the implanting doctor said in his deposition

20    about where the sling was placed, do you?

21         A.  Not in deposition.  Deposition

22    happened years after implantation.

23         Q.  And you don't know what

24    Ms. Ramirez's doctors said in their deposition
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 178 of 409 PageID #: 138651
Case 2:12-md-02327 Document 3795-17 Filed 04/27/17 Page 178 of 504 PageID #: 63889
Vladimir Iakovlev, M.D.

1   about whether or not the mesh curled, do you?

2           A.  I don't know what was said.

3           MS. VERBEEK:  Objection to form.

4           MR. ANDERSON:  She objected.

5           BY MR. HUTCHINSON:

6           Q.  And let's talk about Dr. Graham.  He

7   was the doctor that did the revision surgery, is

8   that correct?

9           A.  Again, I don't want do guess.  I

10  want to have excision operative report.

11          Q.  Can you tell us the name,

12  Dr. Iakovlev, of the doctor who did Ms. Ramirez's

13  revision surgery?

14          MR. ANDERSON:  Counsel, objection.  As a

15  matter of fairness if you want him to talk about

16  the records put the records in front of him and

17  stop the guessing game.  We want to get to what he

18  knows.  Just put the records in front of him.

19          MR. HUTCHINSON:  Your objection is

20  noted.

21          MR. ANDERSON:  Well, objection.  It's

22  not -- it's fundamental fairness.  If you don't

23  know and you don't have a memory game of

24  everything in the records you can tell him that.

Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  I don't want to play

 2   memory game or I don't want to guess.  If we

 3   discuss the record I want to have record in front

 4   of me.

 5              BY MR. HUTCHINSON:

 6              Q.  And, Doctor, do you know when the

 7   doctor who did the revision surgery took out a 1

 8   centimeter piece of mesh?

 9              A.  Again, I would like to see the

10   explanting operative report.  If we want to

11   discuss specific details of the surgery I need to

12   see the record.

13              Q.  And Doctor, if the record shows that

14   on December 22nd, 2010, that some mesh was

15   explanted would you have any reason to dispute

16   that?

17              MR. ANDERSON:  Same objection.

18              THE DEPONENT:  Same objection.  If you

19   want to have specific numbers, specific dates,

20   specific names I want to see the original record.

21              BY MR. HUTCHINSON:

22              Q.  Doctor, you didn't review the

23   pathology from December of 2010, did you?

24              A.  You mean specimen?
```

Vladimir Iakovlev, M.D.

1          Q.  Yes.

2          A.  I believe there was no specimen, no

3    pathological examination.

4          Q.  And you didn't read what Dr. Graham

5    said about where or how the sling was placed in

6    Ms. Ramirez, did you?

7          A.  You mean I did not read it in

8    medical records or I did not --

9          Q.  No, the deposition.

10         MR. ANDERSON:  Objection.  Go ahead.

11   Asked and answered.

12         THE DEPONENT:  I told you I don't review

13   depositions.

14         BY MR. HUTCHINSON:

15         Q.  And you don't know what Dr. Graham

16   said about whether or not the mesh curled do you,

17   sir?

18         MR. ANDERSON:  Objection.

19         THE DEPONENT:  I gave you an answer.  I

20   review what is in the records.  I don't review

21   depositions.

22         BY MR. HUTCHINSON:

23         Q.  Dr. Zimmern, he was another doctor

24   that did a surgery wasn't he?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 181 of 409 PageID #: 138654
Case 2:12-md-02327 Document 3795-17 Filed 04/27/17 Page 181 of 504 PageID #: 68842
Vladimir Iakovlev, M.D.

1      A.  Yes, he was.

2            Q.  And you remember his name but you

3    don't remember the other doctor's names.  Is that

4    fair to say?

5            MR. ANDERSON:  Same objection.

6            THE DEPONENT:  Again, if we want to go

7    to specific surgeries, to specific date, specific

8    names I would like to see the record in front of

9    me.

10           BY MR. HUTCHINSON:

11           Q.  And, Doctor, you know that Dr.

12   Zimmern took out mesh in March of 2015, is that

13   right?

14           MR. ANDERSON:  Objection.

15           THE DEPONENT:  I want to see the record.

16   If we're discussing specific procedure I need to

17   see the medical record.

18           BY MR. HUTCHINSON:

19           Q.  Okay.  And, Doctor, you looked at an

20   explant that was taken out of Ms. Ramirez didn't

21   you?

22           A.  Yes, I did.

23           Q.  And do you know the date that the

24   explant was taken out of Ms. Ramirez?

Vladimir Iakovlev, M.D.

```
 1              A.  It was March 2015.  Exact day, again
 2    I would have to check with my -- so it was March
 3    10th, 2015.
 4              Q.  And you never saw the mesh when it
 5    was in Ms. Ramirez's body did you, sir?
 6              A.  No.
 7              Q.  And if Dr. Zimmern testified under
 8    oath that the mesh was flat when he took it out
 9    you'd disagree with him wouldn't you?
10              MR. ANDERSON:  Objection.
11              THE DEPONENT:  One part was definitely
12    not flat.  That's how it works in medicine,
13    treating physicians they have their opinions but
14    pathologists can find something else.  I mean,
15    otherwise we wouldn't be employed in the hospital.
16    We wouldn't be needed.
17              BY MR. HUTCHINSON:
18              Q.  Move to strike as nonresponsive.
19              My question, Doctor, if Dr. Zimmern
20    testified under oath that the mesh was flat when
21    he took it out you'd disagree with him wouldn't
22    you?
23              MR. ANDERSON:  Objection to form.  Asked
24    and answered.  Go ahead.
```

Vladimir Iakovlev, M.D.

```
1              THE DEPONENT:  I would and it's a pretty

2   common situation when pathologists disagree on

3   some points with the clinicians.

4              BY MR. HUTCHINSON:

5         Q.  And if Dr. Zimmern testified there

6   was no evidence of fraying or curling you'd

7   disagree with him wouldn't you, sir?

8              MR. ANDERSON:  Same objection.

9              THE DEPONENT:  I would.

10             BY MR. HUTCHINSON:

11        Q.  Is that a yes?

12        A.  Yes, I would disagree with him.

13        Q.  And you don't know if photographs

14  that were taken of the mesh out of Ms. Ramirez's

15  surgery -- strike that.

16             Dr. Iakovlev, you don't know if

17  photographs were taken of the mesh after her

18  surgery do you?

19        A.  No, I don't remember seeing them.

20  Maybe they were in the records, maybe not.  I

21  don't remember them.

22        Q.  But you never looked at the

23  photographs did you?

24        A.  I could have.  But I had my
```

Vladimir Iakovlev, M.D.

1   specimen, my own specimen and I examined it

2   grossly, I examined it microscopically.

3           Q.  And you don't know if there was an

4   ultrasound take of the mesh when it was in her

5   body do you, sir?

6           A.  I think it was taken at one point.

7           Q.  And you never looked at the

8   ultrasound did you, sir?

9           A.  Ultrasound pictures or ultrasound

10  report?

11          Q.  No, the ultrasound pictures.  That's

12  something that you never reviewed, is that

13  correct?

14          A.  Again, if they were in the records I

15  probably saw them.  Well, I definitely saw

16  everything which was in the records but I'm not a

17  radiologist and I don't normally look at them in

18  my day-to-day practice.

19          Q.  But if there were an ultrasound that

20  you remember you couldn't interpret it could you?

21          A.  I can interpret it to a degree, not

22  as well as a radiologist but I can interpret some.

23          Q.  Doctor, I want to hand you what

24  we'll mark as Exhibit 3 to your deposition.

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 185 of 409 PageID #: 138658
Case 2:12-md-02327  Document 3795-17  Filed 04/27/17  Page 185 of 501 PageID #: 63846
Vladimir Iakovlev, M.D.

1              ---DEFENSE EXHIBIT NO. 3:  Patient

2              record from UT Southwestern Medical

3              Center re. Jennifer Ramirez, printed on

4              4/6/2015.  Bates labelled

5              RAMIREZJ_UTSMC_MDR00311.

6              BY MR. HUTCHINSON:

7              Q.  But before we go there your

8    specialty is not reviewing ultrasounds, is that

9    correct?

10             A.  No, that's correct.  I am not

11   reviewing ultrasounds.

12             Q.  Are you on Exhibit 3 with me?

13             A.  Yes, I am.

14             Q.  And this is the biopsy, surgical

15   specimen report that we have in front of you, is

16   that right?

17             A.  That's correct.

18             Q.  This was part of the documents you

19   reviewed in forming your opinions, is that right?

20             A.  That it is.

21             Q.  And this was a document prepared by

22   the doctors who saw Ms. Ramirez over in Texas, is

23   that right?

24             MR. ANDERSON:  Objection.

Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  Well it is a pathology

 2    report.

 3              BY MR. HUTCHINSON:

 4              Q.  Pathologists are doctors aren't

 5    they, sir?

 6              A.  Yes, but they don't see patients.

 7    At least most of the patients are not seen by

 8    pathologists when they examine the specimens.

 9    Sometimes we do see patients but most of the time,

10    and I believe for that specific case the

11    pathologist did not see Ms. Ramirez.

12              Q.  And, Doctor, let's look under "Final

13    Pathologic Diagnosis"?

14              A.  Yes.

15              Q.  Of what the doctors from the UT

16    Southwestern Medical Center found.  Are you there

17    with me?

18              A.  Yes, I am.

19              Q.  They didn't find any degradation did

20    they?

21              A.  No, they didn't examine it.

22              Q.  And they didn't find any particle

23    loss did they?

24              A.  They didn't examine for degradation
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 187 of 409 PageID #: 138660
Case 2:12-md-02327 Document 3605-17 Filed 04/25/17 Page 187 of 504 PageID #: 68840
Vladimir Iakovlev, M.D.

      1     or particle loss.

      2            Q.   In fact these doctors from Texas

      3     didn't find any mesh deformation did they, sir?

      4            A.   There is no description of

      5     deformation or nondeformation.

      6            Q.   And, Doctor, I want to hand you what

      7     we'll mark as Exhibit 4 to your deposition.

      8            ---DEFENSE EXHIBIT NO. 4:  Surgical

      9            pathology report from St. Michael's

     10            Hospital re. Jennifer Ramirez dated

     11            10/5/2015.

     12            BY MR. HUTCHINSON:

     13            Q.   You did your own surgical

     14     pathological report here in Canada for Ms.

     15     Ramirez, didn't you, sir?

     16            A.   That's correct.

     17            Q.   And this is a copy of it?

     18            A.   Yes, it is.

     19            Q.   And under "Final Diagnosis" there in

     20     the middle, are you there with me?

     21            A.   Yes.

     22            Q.   You didn't find any degradation

     23     under your final diagnosis for Ms. Ramirez did

     24     you, sir?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 188 of 409 PageID #: 138661
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 188 of 504 PageID #: 63849
Vladimir Iakovlev, M.D.

1          A.  I think that's incorrect.

2          Q.  Doctor, will you show the jury --

3     hold this up and publish it to the jury please?

4          MR. ANDERSON:  Objection.

5          BY MR. HUTCHINSON:

6          Q.  I'm sorry, I'm still working on my

7     question.  Dr. Iakovlev, you didn't find that

8     there was any degradation from Ms. Ramirez's mesh

9     in your final diagnosis did you, sir?

10         A.  Yes, I did.  That's what it says.

11    "Surgical knitted monofilament mesh with

12    associated tissue changes.  Please see synoptic

13    data for details."  Then details expand and the

14    degradation layer is described there and it's

15    measured on the second page.

16         Q.  Doctor, you didn't find any particle

17    loss for Ms. Ramirez did you?

18         A.  Not visible large particles, that's

19    correct.  I could not examine for smaller

20    particles which I could not see, but I could not

21    rule them out.

22         Q.  And in fact, Doctor, you took 19

23    photographs of Ms. Ramirez's mesh, is that

24    correct?

Vladimir Iakovlev, M.D.

```
 1          A.  Possible.

 2          Q.  Or specimen?

 3          A.  I don't remember how many pictures I

 4    took.

 5          Q.  Well, why don't you look at your

 6    report.  Your report includes 19 pictures labelled

 7    JR(1) through JR(19).  Is that correct, sir?

 8          A.  Yeah, except some of them combine

 9    too so it's over 19.

10          Q.  Over 19, is that right?

11          A.  At least 19, yes.

12          Q.  And none of these 19 pictures show

13    any particle loss from the mesh.  Is that correct,

14    sir?

15          A.  That's correct.  No visible particle

16    loss.  I mean, it has to be visible in order for

17    me to see in the microscope.  If it's smaller than

18    what can be seen then I cannot detect them.

19          Q.  Move to strike everything after

20    other than, yes, "that's correct".

21          MR. ANDERSON:  He answered your

22    question.

23          BY MR. HUTCHINSON:

24          Q.  And, Dr. Iakovlev, you're not
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 190 of 409 PageID #: 133663
Case 2:12-md-02327 Document 3795-17 Filed 04/27/17 Page 190 of 504 PageID #: 63351
Vladimir Iakovlev, M.D.

1    telling the jury that there are any loose

2    particles from the mesh in Ms. Ramirez's tissue,

3    are you?

4              MR. ANDERSON:  Objection, asked and

5    answered.

6              THE DEPONENT:  I did not show it in the

7    specimen.

8              BY MR. HUTCHINSON:

9              Q.  And in fact, Doctor, you don't know

10   if Ms. Ramirez's mesh was mechanically cut or

11   laser cut, do you?

12             A.  No, I don't.

13             Q.  And, Doctor, let's look at Exhibit

14   4(B)?

15             A.  You mean 4(B) from my --

16             Q.  From your direct examination.  I'm

17   going to ask that you show it up on the screen

18   please.  Exhibit 4(B).

19             A.  Yes.

20             Q.  This is some of the light microscopy

21   work that you did for Ms. Ramirez's mesh, is that

22   right?

23             A.  No, this is not right.

24             Q.  This is Ms. Ramirez's mesh explant

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 191 of 409 PageID #: 138664
Case 2:12-md-02327 Document 3751-1 Filed 04/26/16 Page 191 of 504 PageID #: 63852
Vladimir Iakovlev, M.D.

 1   isn't it, sir?

 2              A.   That's correct.

 3              Q.   And in fact you can't tell us which

 4   piece of mesh would have come out of her left side

 5   or right side, can you?

 6              A.   Yes, I can.

 7              Q.   Doctor, I want to hand you your

 8   deposition transcript and direct your attention to

 9   page 53, line 7.  Are you there with me

10   Dr. Iakovlev?

11              A.   Yes.  Let me read the page and then

12   we will come back to it.

13              Q.   Have you finished reading it,

14   Dr. Iakovlev?

15              A.   Yes, I did.

16              Q.   And, Dr. Iakovlev, you raised your

17   right-hand and promised to tell the truth on this

18   time didn't you?

19              MR. ANDERSON:  Objection.  You've

20   already asked and answered if he knew he was under

21   oath.  He said he was under oath did.  Stop

22   beating him up.  Don't answer the question.

23              BY MR. HUTCHINSON:

24              Q.   Dr. Iakovlev, are you refusing to

Vladimir Iakovlev, M.D.

```
 1   answer that question.

 2           MR. FREESE:  Yes, he's being instructed

 3   not to answer it.  It's argumentative and he

 4   understands he's under oath.

 5           BY MR. HUTCHINSON:

 6           Q.  Dr. Iakovlev, page 53, line 7 it

 7   says:

 8               "As we sit here today you cannot tell

 9               us which piece of the explant would go

10               in the left-hand side or in the middle

11               side?

12               "ANSWER:  Not from what I have in the

13               specimen.  I mean, if clinically there

14               was some other studies it could explain

15               that.  It would be hard.  Also I don't

16               know if it was divided before."

17   Did I read that correctly, sir?

18           MR. ANDERSON:  Objection.  Inappropriate

19   impeachment.  That is a different question than

20   you just asked him before so it's an unfair

21   re-reading.

22           MR. HUTCHINSON:  No it's not.

23           MR. ANDERSON:  Yeah, it is.  It's an

24   inappropriate way to impeach him.
```

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2         Q.  Dr. Iakovlev --

 3              MR. ANDERSON:  If you want to ask him a

 4    question that's just like that question then

 5    that's fine.  That's a different question and you

 6    know it.

 7              BY MR. HUTCHINSON:

 8         Q.  Dr. Iakovlev, did I read that

 9    question and answer correctly, sir?

10         A.  You did not read the complete

11    answers but you read that part.  Because there is

12    an answer I just gave before that, you repeated

13    the question during deposition.  And my -- can I

14    answer that?

15              MR. ANDERSON:  Yes.

16              THE DEPONENT:  So my answer was it would

17    be difficult to determine with certainty.  So I

18    would need -- and then there is explanation.

19    Clinically there were some other studies it could

20    explain that.  So combining clinical information

21    and my pathological I can tell you which one is

22    left and which 1 is right, but if I don't have

23    clinical information just pathology it would be

24    difficult for me.
```

Vladimir Iakovlev, M.D.

```
  1                    BY MR. HUTCHINSON:

  2            Q.   Move to strike as nonresponsive.

  3            Doctor, let's look at the photographs

  4    that you took labelled J(1) through J(5).

  5            MR. ANDERSON:   What are you referring

  6    to?

  7            MR. HUTCHINSON:   In your expert report.

  8            MR. ANDERSON:   You mean in defendant's

  9    Exhibit 1.

 10            MR. HUTCHINSON:   Correct.

 11            BY MR. HUTCHINSON:

 12            Q.   Are you there, Dr. Iakovlev?

 13            A.   Yes, I am.

 14            Q.   You can't tell us whether the mesh

 15    was curling at the time it was taken out can you,

 16    sir?

 17            A.   I can.

 18            Q.   I'm sorry?

 19            A.   I can.  It was curled inside the

 20    body.

 21            Q.   Dr. Iakovlev, let's look back at

 22    your deposition.  And by the way, before we do

 23    that, you can't tell the jury whether the mesh was

 24    curling at the time it was implanted can you?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 195 of 409 PageID #: 138668
Case 2:12-md-02327 Document 3795-17 Filed 04/28/16 Page 195 of 504 PageID #: 63856
Vladimir Iakovlev, M.D.

         1          A.  No, I cannot tell that.  It curled

         2   sometime in the body.

         3          Q.  But you can't tell us whether or not

         4   it curled at the time it was taken out can you?

         5          MR. ANDERSON:  Objection, asked and

         6   answered.

         7          THE DEPONENT:  What do you mean?  It was

         8   curled only during excision not while it was in

         9   the body?  I can tell you it was curled up before

        10   the scar tissue could grow into the curl.  This is

        11   very obvious in the images.  It curled up in the

        12   body and the lumen inside the curl was filled with

        13   the scar tissue.  This can happen only in the

        14   body.  This cannot happen during the excision.

        15   You cannot make scar grow inside the mesh during

        16   the excision.

        17          BY MR. HUTCHINSON:

        18          Q.  Move to strike as nonresponsive.

        19          Dr. Iakovlev, you cannot say whether the

        20   curling occurred at the time of implantation or

        21   post implantation, can you?

        22          MR. ANDERSON:  Objection to form.

        23   Compound, asked and answered and form.

        24          MS. VERBEEK:  Same objection.

Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  As I told you I cannot.

 2              MR. HUTCHINSON:  Why don't we take a

 3     quick break.

 4              THE VIDEOGRAPHER:  Going off the record

 5     at 1:48 p.m.

 6              ---  Break taken.

 7              THE VIDEOGRAPHER:  We're back on the

 8     record at 1:55 p.m.

 9              BY MR. HUTCHINSON:

10              Q.  Dr. Iakovlev, let's talk about

11     nerves for a minute okay?

12              A.  Okay.

13              Q.  And the TVT-O would have gone

14     through Ms. Ramirez's transobturator space, is

15     that correct?

16              A.  That's correct.

17              Q.  And nerves come in different shapes

18     and they come in different sizes?

19              A.  I'm not sure about shape but, yes,

20     they have different caliber.  The trunk starts

21     thicker and the branches branch off.  They are

22     thinner and thinner and everything gets thinner

23     and thinner.

24              Q.  Doctor, you didn't count the nerve
```

Vladimir Iakovlev, M.D.

1    density for Ms. Ramirez did you?

2            A.   It's not needed for my opinions.

3            Q.   Move to strike as nonresponsive.  My

4    question is asking for a yes or no please.

5            Dr. Iakovlev, you didn't count the nerve

6    density for Ms. Ramirez did you, sir?

7            A.   Because it was not required for my

8    opinions I did not count it.

9            Q.   Move to strike everything after "I

10   did not" -- I mean, before "I did not count it".

11           Dr. Iakovlev, in fact you didn't consult

12   with a neuropathologist regarding Ms. Ramirez's

13   case, did you?

14           A.   I didn't need to.

15           Q.   And, Doctor, if we look at Exhibit

16   4, which is the report that you created in Canada,

17   are we on the same page?

18           MR. ANDERSON:  Objection to form.

19           THE DEPONENT:  Yes, we are.

20           BY MR. HUTCHINSON:

21           Q.   Doctor, look at the bottom for me

22   please.  It says "synoptic diagnosis".  Did I read

23   that correctly?

24           A.   Yes, you did.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 198 of 409 PageID #: 133671
Case 2:12-md-02827 Document 3790-17 Filed 04/27/17 Page 198 of 504 PageID #: 63959
Vladimir Iakovlev, M.D.

 1          Q.  And in fact under synoptic diagnosis

 2   it says, "Acute inflammation:  No."  Did I read

 3   that correctly?

 4          A.  Yes, you read it correctly.

 5          Q.  And it says, "Nerve branch

 6   count/tissue area."

 7          A.  That's correct.

 8          Q.  And then under that it says, "All

 9   tissue".  Do you see that?

10          A.  Yes, I do.

11          Q.  And, Doctor, you write, "Cannot do

12   formal count in a limited specimen."

13          A.  That's correct.

14          Q.  Did I read that correctly?

15          A.  Yes, you did read it correctly.

16          Q.  In fact, Doctor, you have not

17   identified any nerve receptors in Ms. Ramirez's

18   slides have you?

19          A.  Are we now switching from nerves to

20   nerve receptors?

21          Q.  That's correct.

22          A.  Because I was not looking for

23   receptors I was looking for nerves.  There are no

24   nerves without receptors, or most of them will

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 199 of 409   PageID #: 138672
Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 199 of 504 PageID #: 63360
Vladimir Iakovlev, M.D.

1    have receptors.  The only time they don't have

2    receptors is when they end up with traumatic

3    neuroma.

4              Q.  And Doctor, you'll agree that pain

5    receptors are usually just bare endings of nerves,

6    is that correct?

7              A.  Most of them are.

8              Q.  And those are called nociceptors, is

9    that correct?

10             A.  That's another term for pain

11   receptors.

12             Q.  Am I correct, Doctor?

13             A.  You're correct.

14             Q.  You need a stain to detect a

15   nociceptor don't you, sir?

16             A.  You need to stain for anything in

17   histology.  So you need to stain specifically for

18   anything.

19             Q.  And in fact the specific chemical

20   that you need to use to stain for a nociceptor is

21   something called PGP9.5.  Is that correct, sir?

22             A.  One of it.  It can be used for a

23   nerve -- for axons.

24             Q.  And you showed the jury a lot of

Vladimir Iakovlev, M.D.

```
1   slides from Ms. Ramirez this morning, didn't you,

2   sir?

3              A.  Yes, I did.

4              Q.  And you didn't stain one of those

5   with PGP9.5 stain did you, sir?

6              A.  Well, I use neurofilament it's

7   almost the same stain.  It stains the same

8   structures.

9              Q.  Move to strike as nonresponsive.

10             MR. ANDERSON:  Well.  He answered your

11  question.

12             BY MR. HUTCHINSON:

13             Q.  My question, sir, is that you didn't

14  stain any of Ms. Ramirez's slides with the stain

15  PGP9.5.  Yes or no?

16             A.  Well, sounds like you're teaching me

17  pathology what I should and what I should not have

18  used.  I used neurofilament which is similar stain

19  to PGP, this will answer.  But I did not use

20  PGP9.5.

21             Q.  Move to strike everything before "I

22  did not use PGP9.5".

23             In fact, Doctor, you can't look at a

24  nerve on a slide and tell whether or not it's
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 201 of 409 PageID #: 133674
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 201 of 504 PageID #: 63862
Vladimir Iakovlev, M.D.

```
 1   causing pain can you?
 2              A.  As I said, most of the nerves are
 3   mixed therefore most of the nerves deliver or
 4   conduct pain signals.  So when I look at a nerve,
 5   any nerve in the body, to a reasonable degree of
 6   medical certainty, it does conduct pain signals.
 7              Q.  You can only estimate the
 8   probabilities can't you, sir?
 9              A.  Yes.
10              Q.  And, Doctor, when we talk about
11   neuromas that's a painful condition also known as
12   a pinched nerve, is that right?
13              A.  No, it is not.  It is different
14   lesion.  Both can cause pain, traumatic neuroma or
15   pinched nerve but they are different lesions.
16              Q.  And, Dr. Iakovlev, you're not
17   telling this jury that Ms. Ramirez had any
18   neuromas are you, sir?
19              A.  I did not see them in the slides but
20   I cannot rule them out.  I see them all the time
21   in mesh specimens.  They could have not been just
22   sampled.
23              Q.  And, Doctor -- move to strike as
24   nonresponsive.
```

Vladimir Iakovlev, M.D.

```
 1              Tissue necrosis that's the same thing as
 2    dead tissue isn't it?
 3              A.  That's correct.
 4              Q.  And not one of the slides that you
 5    showed the jury showed any tissue necrosis did
 6    they?
 7              A.  No, they did not.
 8              Q.  In fact let's be crystal clear.  You
 9    saw no dead tissue from Ms. Ramirez in your work
10    in this case, is that correct?
11              A.  No, I didn't.
12              Q.  Doctor, I'm going to hand you what
13    we'll mark as Exhibit 5 to your deposition.
14              ---DEFENSE EXHIBIT NO. 5:  Diagram
15                  depicting the female anatomy after a
16                  hysterectomy is done.
17              BY MR. HUTCHINSON:
18              Q.  We know that Ms. Ramirez had a
19    hysterectomy don't we?
20              A.  Yes, we do.
21              Q.  And Dr. Iakovlev, would you show
22    that picture to the jury?  This diagram shows the
23    female anatomy after a hysterectomy is done, is
24    that correct?
```

Case 2:12-md-02327  Document 3790-17  Filed 04/26/16  Page 203 of 409 PageID #: 138676
Case 2:12-md-02327  Document 3790-17  Filed 04/26/16  Page 2 of 504 PageID #: 63864
Vladimir Iakovlev, M.D.

1            A.   That's correct.

2            Q.   And you can't tell the jury where on

3    that diagram that Ms. Ramirez experienced pain can

4    you?

5            MR. ANDERSON:  Objection to form.

6            THE DEPONENT:  Well, this diagram

7    describes a hypothetical patient it does not

8    represent Ms. Ramirez.  I don't see ovaries here,

9    because she still has ovaries in her body and this

10   diagram doesn't depict them.  She has TVT mesh

11   sling and it doesn't depict them so this diagram

12   doesn't represent Ms. Ramirez.

13           BY MR. HUTCHINSON:

14           Q.   Move to strike as nonresponsive.

15           Dr. Iakovlev, show the jury that picture

16   and you can't tell the jury where Ms. Ramirez

17   experienced pain in her anatomy can you, sir?

18           MR. ANDERSON:  Objection.  Asked and

19   answered.  Go ahead, answer it again.

20           THE DEPONENT:  So my answer is that this

21   diagram does not represent Ms. Ramirez.  And I

22   just listed you all the reasons why it does not

23   represent Ms. Ramirez therefore we cannot use this

24   exhibit to demonstrate any anatomical features.

Vladimir Iakovlev, M.D.

1          BY MR. HUTCHINSON:

2          Q.  Dr. Iakovlev, I want to hand you a

3    black marker and why don't you draw the ovaries on

4    that diagram for us please, sir?

5          MR. ANDERSON:  Objection.

6          THE DEPONENT:  I don't want to use this

7    diagram because it does not represent Ms. Ramirez.

8          BY MR. HUTCHINSON:

9          Q.  Are you refusing to draw the ovaries

10   on that diagram?

11         A.  Well, it implies that I will try to

12   make it fit Ms. Ramirez's anatomy but I cannot do

13   that.

14         Q.  Move to strike as nonresponsive.

15         Are you refusing to draw ovaries on that

16   diagram, Dr. Iakovlev?

17         MR. ANDERSON:  Same objection.

18         THE DEPONENT:  I will not use a diagram

19   which does to the represent the patient whose

20   specimen I examined.

21         BY MR. HUTCHINSON:

22         Q.  Doctor, you can't show the jury on

23   that diagram where Ms. Ramirez experienced pain

24   can you?

Vladimir Iakovlev, M.D.

```
1            MR. ANDERSON:  Objection, asked and

2    answered.  I think we're at three times now.  I

3    can probably read it back, but answer it one more

4    time and that's it.

5            THE DEPONENT:  This diagram does not

6    represent Ms. Ramirez's anatomy therefore I will

7    not use this diagram for any demonstrations.

8            BY MR. HUTCHINSON:

9            Q.  Move to strike as nonresponsive.

10           Doctor, yes or no, can you show the jury

11   on that diagram where Ms. Ramirez experienced

12   pain.

13           MR. ANDERSON:  Same objection.  And if

14   you keep being rude to him and trying to beat him

15   up we're going to stop it.

16           MR. HUTCHINSON:  I'm not being rude.

17           MR. ANDERSON:  Yeah, you are.  Asking

18   the same question over and over is rude and

19   disrespectful.

20           BY MR. HUTCHINSON:

21           Q.  Dr. Iakovlev, you can answer the

22   question.

23           MR. ANDERSON:  Asked and answered.  Same

24   answer.
```

Vladimir Iakovlev, M.D.

 1              MR. HUTCHINSON:  Your objection is

 2     noted, counsel.

 3              MR. ANDERSON:  I know it is.  Go ahead.

 4              THE DEPONENT:  I cannot demonstrate

 5     Ms. Ramirez's anatomy on this diagram because it

 6     does not represent Ms. Ramirez.

 7              BY MR. HUTCHINSON:

 8              Q.  Dr. Iakovlev, I want to hand you

 9     what we've mark as Exhibit 6 to your deposition.

10              ---DEFENSE EXHIBIT NO. 6:  Diagram

11                 depicting the muscles in the female

12                 pelvic floor.

13              BY MR. HUTCHINSON:

14              Q.  This diagram shows the muscles in

15     the female pelvic floor doesn't it, sir?

16              A.  That's correct.

17              Q.  Would you show it to the jury

18     please?  You can't show the jury where Ms. Ramirez

19     experienced pain on this diagram can you?

20              MR. ANDERSON:  Objection.

21              THE DEPONENT:  The answer would be

22     similar.  This diagram actually shows depth of the

23     body around the vagina when the nerves are

24     completely removed.  When all the tissue where

Vladimir Iakovlev, M.D.

1    Ms. Ramirez was experiencing pain, or partially,

2    is removed from this tissue.  You can see stumps

3    of the nerves sticking out from behind the bone so

4    it does not represent again the situation

5    Ms. Ramirez was in.

6              BY MR. HUTCHINSON:

7         Q.  Move to strike as nonresponsive.

8              Dr. Iakovlev, show the jury that

9    photograph please.  And tell the jury where on

10   that photograph that Ms. Ramirez experienced pain?

11             MR. ANDERSON:  Objection, asked and

12   answered.

13             THE DEPONENT:  So my answer will be that

14   this diagram shows partially dissected human body

15   when the nerves, which are supplying innervation

16   in the area of vagina, are partially removed in

17   the tissue.  So that tissue which was experiencing

18   pain, or Ms. Ramirez's tissue, was removed in the

19   graphics.  And you can see stumps of the nerves

20   and the vessels sticking from behind the bone.  So

21   this does not represent Ms. Ramirez's anatomy

22   either at the time of explantation or now.

23             BY MR. HUTCHINSON:

24        Q.   Move to strike as nonresponsive.

Vladimir Iakovlev, M.D.

```
1              Dr. Iakovlev, you can't show the jury
2    where Ms. Ramirez experienced pain on that diagram
3    can you?
4              MR. ANDERSON:  Objection.  Asked and
5    answered.  I think --
6              BY MR. HUTCHINSON:
7              Q.  I'm asking for a yes or no.
8              MR. ANDERSON:  Don't interrupt me
9    please.  That's like three times you've asked the
10   same question and you can get the same answer if
11   you want.
12             BY MR. HUTCHINSON:
13             Q.  Yes or no, Dr. Iakovlev?
14             A.  This diagram does not represent
15   Ms. Ramirez's anatomy.
16             Q.  Can you answer that question yes or
17   no?
18             MR. ANDERSON:  Objection, asked and
19   answered.
20             THE DEPONENT:  I'm giving you the best
21   answer I have.
22             BY MR. HUTCHINSON:
23             Q.  Doctor, we know that pain is a
24   subjective complaint don't we?
```

Vladimir Iakovlev, M.D.

```
 1              A.  To a degree.

 2              Q.  And in order to find pain the

 3    patient has to tell you there's pain doesn't she?

 4              A.  Yes.

 5              Q.  And you've never talked with

 6    Ms. Ramirez in this case have you, sir?

 7              A.  That's correct.

 8              Q.  So, Doctor, I want to talk about

 9    foreign body reaction and inflammation as it

10    relates to pain.  Okay?

11              A.  Okay.

12              Q.  Changing gears a bit.  It's my

13    understanding you think there is a higher degree

14    of inflammation associated with high rates of

15    pain.  Am I right?

16              A.  My answer would be that inflammation

17    is one of the factors in the mechanisms of pain.

18    It changes threshold of sensitivity of the

19    tissues.  And we all know that inflamed tissue is

20    painful.  So that known fact.

21              Q.  Doctor, you know that there's some

22    literature that disagrees with you on that don't

23    you?

24              MR. ANDERSON:  Objection, form.
```

Vladimir Iakovlev, M.D.

```
 1            BY MR. HUTCHINSON:

 2            Q.  Dr. Iakovlev you know there's some

 3   literature --

 4            THE VIDEOGRAPHER:  Going off the record

 5   at 2:09 p.m.

 6            ---  Break taken.

 7            THE VIDEOGRAPHER:  We're back on the

 8   record at 2:10 p.m.

 9            BY MR. HUTCHINSON:

10            Q.  Doctor, before we went off the

11   record my question was, you know there's some

12   literature that disagrees with you don't you, sir?

13            A.  Specifically what part of my

14   statement would be described in the literature as

15   in opposite -- with opposite conclusions?

16            Q.  We're going to talk about your

17   conclusion that inflammation is associated with

18   high rates of pain.

19            MR. ANDERSON:  Is that a question.

20            BY MR. HUTCHINSON:

21            Q.  I'm going to finish my question.  I

22   want to hand you Exhibit 7.

23            ---DEFENSE EXHIBIT NO. 7:  Article

24            titled "Histopathology of excised
```

Vladimir Iakovlev, M.D.

```
 1              midurethral sling mesh", found in the

 2              International Urogynecology Journal,

 3              2015.

 4              BY MR. HUTCHINSON:

 5              Q.  This is the Hill paper, is that

 6     correct?

 7              A.  Yes, okay.  Sorry.  You're correct.

 8              Q.  And you don't think the Hill paper

 9     is funny do you?

10              MR. ANDERSON:  Something happened off

11     the record.  Don't do that, counsel.

12              MR. HUTCHINSON:  I'm sorry, I'll

13     withdraw the question.  I thought you were

14     laughing about the Hill paper.

15              MR. ANDERSON:  Well I could but I wasn't

16     there.

17              BY MR. HUTCHINSON:

18              Q.  Dr. Iakovlev, you have in front high

19     of you the Hill paper entitled "Histopathology of

20     excised midurethral sling mesh".  Is that correct?

21              A.  That's correct.

22              Q.  And you're familiar with this

23     article, aren't you?

24              A.  Yes, I am.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   And it was published by the
 2    International Urogynecological Journal, is that
 3    right?
 4              A.   That's correct.
 5              Q.   And that's the official journal of
 6    the International Urogynecological Association, is
 7    that right?
 8              A.   I don't know if it's one -- the
 9    official one but it's a journal in
10    urogynecological field of medicine.
11              Q.   And you're familiar with that
12    association aren't you, sir.
13              A.   Yes, I am.
14              Q.   And that's an organization made up
15    of urogynecologists all over the world, isn't it?
16              A.   Yes, it is.
17              Q.   And the focus of their practice is
18    treating gynecological issues, is that right?
19              A.   That's correct.
20              Q.   And that's much different than
21    yours.  Is that correct, sir?  You're not a
22    urologist or a urogynecologist, is that correct?
23              MR. ANDERSON:  Objection.  That's been
24    asked two or three times.  He's a pathologist.
```

Vladimir Iakovlev, M.D.

```
 1    He's not a urogynecologist or a gynecologist, so

 2    stipulated.  Let's not keep asking the same

 3    question.

 4                MR. HUTCHINSON:

 5         Q.  Dr. Iakovlev?

 6         A.  Yeah, the answer is I'm not a

 7    urogynecologist I'm a pathologist.

 8         Q.  And you would consider this a

 9    reputable organization wouldn't you?

10         A.  Yes, I would.

11         Q.  And you read and rely on articles

12    from this same journal don't you?

13         A.  Yes.

14         Q.  And in fact you consider it

15    authoritative in its field don't you, sir?

16         A.  Yes.

17         Q.  And the authors of this Hill paper

18    are from the Cleveland Clinic here in the United

19    States.  You understand that don't you, sir?

20         A.  Yes, they are.

21         Q.  And the people who wrote this

22    article were pathologists just like yourself, is

23    that right?

24                MR. ANDERSON:  Objection.
```

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 214 of 409 PageID #: 138687
Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 214 of 504 PageID #: 68875
Vladimir Iakovlev, M.D.

```
 1                THE DEPONENT:  One of them.

 2                BY MR. HUTCHINSON:

 3                Q.  And that's the one from the

 4      Cleveland Clinic.  Is that right, sir?

 5                A.  Well, I think they're all from

 6      Cleveland Clinic or from Cleveland.  He's from

 7      Cleveland Clinic.

 8                Q.  Thank you.  And, Dr. Iakovlev --

 9                A.  Actually not he, she is from

10      Cleveland Clinic, sorry.

11                Q.  Dr. Iakovlev, the conclusion of this

12      Hill study was that mesh taken out for non-pain

13      reasons has more inflammation than mesh taken out

14      because of pain.  That's the conclusion of this

15      study.  Is that right, sir?

16                MR. ANDERSON:  Objection.

17                THE DEPONENT:  Well, if you want me to

18      read conclusions I would have to read the

19      conclusions.

20                BY MR. HUTCHINSON:

21                Q.  Well, my question to you, sir, in a

22      nutshell, when we talk about the conclusion of the

23      Hill study that's what these authors concluded, is

24      that correct?
```

Vladimir Iakovlev, M.D.

```
 1              MR. ANDERSON:  Objection to form.

 2              THE DEPONENT:  So their conclusion was

 3     that levels of inflammation -- the way they graded

 4     it, because they used their own grading system and

 5     they graded only one part of the inflammation, was

 6     higher in those meshes which were excised for

 7     voiding dysfunction rather than for pain and or

 8     exposure.  So they would combine meshes which were

 9     excised either for pain or for exposure.  They did

10     not select specifically a group for pain.  It was

11     a combined group.

12              BY MR. HUTCHINSON:

13         Q.  Move to strike as nonresponsive.

14              Dr. Iakovlev, the conclusion of the Hill

15     study was that mesh taken out for non-pain reasons

16     has more inflammation than mesh taken out because

17     of pain.  That's what the authors found, right?

18              MR. ANDERSON:  Objection.  Asked and

19     answered and you're putting words in the paper's

20     mouth.  Go ahead.

21              BY MR. HUTCHINSON:

22         Q.  Yes or no, Dr. Iakovlev.

23              MR. ANDERSON:  Same objection.

24
```

Vladimir Iakovlev, M.D.

```
 1            BY MR. HUTCHINSON:

 2            Q.  Can you answer that question yes or

 3    no?

 4            MR. ANDERSON:  Same objection.

 5            BY MR. HUTCHINSON:

 6            Q.  Can you answer that question yes or

 7    no?

 8            MR. ANDERSON:  Same objection.

 9            THE DEPONENT:  I cannot agree with your

10    wording of the conclusions because the conclusions

11    in the paper are somewhat different.

12            BY MR. HUTCHINSON:

13            Q.  Doctor, let's look at the

14    conclusions in the paper.  Turn with me to page

15    595.  Are you there?

16            A.  Well, I'm also looking at

17    conclusions in the abstract because it says --

18            Q.  Move to strike as nonresponsive.

19            MR. ANDERSON:  You said look at the

20    conclusions.  There is no conclusions on the page

21    you are looking at.

22            MR. HUTCHINSON:  No, my question was

23    turn to page 595.  Are you there?

24            MR. ANDERSON:  There is no conclusion
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 217 of 409 PageID #: 138690
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 217 of 504 PageID #: 63870
Vladimir Iakovlev, M.D.

1    there.

2              BY MR. HUTCHINSON:

3              Q.  Dr. Iakovlev, are you on page 595?

4              A.  Yes, I am.

5              Q.  The author write at the bottom:

6                  "Vaginally placed, mid-urethral

7              sling mesh that is excised for voiding

8              dysfunction demonstrates elevated

9              levels of inflammation compared to mesh

10             that is excised for pain and/or

11             exposure."

12   Did I read that correctly, sir?

13             A.  Yes, you did.

14             Q.  And that's the exact opposite of

15   what you found isn't it, sir?

16             MR. ANDERSON:  Objection.

17             THE DEPONENT:  No, it is not.

18             BY MR. HUTCHINSON:

19             Q.  Doctor, do you disagree with the

20   doctors from the Cleveland Clinic?

21             MR. ANDERSON:  Objection, form.

22             THE DEPONENT:  You mean with their

23   conclusions?  With their results.

24

Vladimir Iakovlev, M.D.

1          BY MR. HUTCHINSON:

2               Q.  Yes, sir, you disagree with the

3     Cleveland Clinic doctors' conclusions don't you,

4     sir?

5               A.  Well, I mean, the way they did the

6     study that's what numbers they got.  But if you

7     want me to discuss exactly how it was done and how

8     they reached to those conclusions I can go ahead

9     and discuss it.

10              Q.  Move to strike as nonresponsive.

11              Doctor, my question is do you disagree

12    with the conclusions that the Cleveland Clinic

13    doctors found in the Hill paper?  Yes or no?

14              MR. ANDERSON:  Objection, asked and

15    answered.

16              BY MR. HUTCHINSON:

17              Q.  I'm asking for a yes or no answer.

18    Can you answer that question yes or no,

19    Dr. Iakovlev?

20              MR. ANDERSON:  Same objection.

21              BY MR. HUTCHINSON:

22              Q.  Not without looking to at your

23    transcript.  I'm going to object to the extent the

24    witness is reviewing an iPad that has in

Vladimir Iakovlev, M.D.

```
 1    real-time his transcript.

 2              MR. ANDERSON:  You can ask every time

 3    that you would like to know -- you can ask the

 4    court reporter to repeat it and then she can

 5    repeat his question for you if you want, or you

 6    can ask him to repeat it.  And when the time is up

 7    today the time will be up.  So if you want to chew

 8    up your time go right ahead, pal.  So go ahead.

 9    If you need to ask her to re-read something as

10    many times as you want then you feel free to do

11    it.  Alright?  Good.

12              THE DEPONENT:  Okay.

13              BY MR. HUTCHINSON:

14         Q.  Dr. Iakovlev, can you answer that

15    question yes or no?

16         A.  You have to repeat the question now.

17         Q.  Do you agree with the conclusions

18    that the authors from the Cleveland Clinic found

19    in the Hill paper?

20              MR. ANDERSON:  Same objection.  Go

21    ahead.

22              BY MR. HUTCHINSON:

23         Q.  Yes or no?

24              MR. ANDERSON:  Objection to form as
```

Vladimir Iakovlev, M.D.

```
 1    well.

 2              BY MR. HUTCHINSON:

 3              Q.  My question is asking for a yes or

 4    no, Dr. Iakovlev, and then I'll give you an

 5    opportunity to give a brief explanation.  But my

 6    question is asking for a yes or no.  Do you --

 7              A.  I would have no specific opinion

 8    regarding their conclusions.  That's what their

 9    conclusions in the study.  I wasn't doing the

10    study.  I can explain you what they did, how they

11    came to these conclusions but the conclusions are

12    there.  I mean, I don't agree or disagree.  I

13    didn't do the study.

14              Q.  Can you answer that question yes or

15    no?

16              A.  I cannot answer it yes or no because

17    I did not do the study.

18              Q.  Doctor, let's switch gears for a

19    minute and I want to talk about Prolene.  Okay?

20              A.  Yes.

21              Q.  Now, you were asked by the

22    plaintiff's lawyer to look at Ms. Ramirez's

23    explanted mesh, is that right?

24              A.  That's correct.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   And her mesh is made of a material

 2      known as Prolene?

 3              A.   That's a brand name.  Ethicon's

 4      brand name of polypropylene.

 5              Q.   And you know that Ethicon's Prolene

 6      material has been used in the body for almost 50

 7      years?

 8              A.   That's correct.

 9              Q.   And St. Michael's, that's the

10      hospital where you work in Canada, is that

11      correct?

12              A.   That's correct.

13              Q.   And St. Michael's uses Prolene

14      sutures don't they, sir?

15              A.   Yes, they do.

16              Q.   And the hospital where you work in

17      Canada uses Prolene mesh for hernia repair.  Isn't

18      that correct, sir?

19              A.   Yes, they do.

20              Q.   And, Dr. Iakovlev, you have never

21      told anybody at the hospital where you work to

22      stop using Prolene sutures have you?

23              MR. ANDERSON:  Objection.  Go ahead.

24              THE DEPONENT:  Not sutures.
```

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2              Q.  Doctor, let's talk about

 3    Ms. Ramirez's explant.

 4              A.  Okay.

 5              Q.  It was taken out in September of

 6    2010, and I'll represent to you that was the date.

 7    Does that sound about right?

 8              A.  No, it was taken in March 2015.

 9              Q.  I'm sorry, strike that.  It was

10    implanted -- strike that.

11              Ms. Ramirez's TVT-O was implanted in

12    September of 2010?

13              A.  That's correct.

14              Q.  And part of it was taken out in

15    March of 2015?

16              A.  That's correct.

17              Q.  And the mesh that you examined was

18    in her body for four and a half, five years, is

19    that correct?

20              A.  Yes.

21              Q.  And at some point after it was

22    removed the mesh samples were divided between the

23    plaintiffs and defendants, is that correct?

24              A.  We divided it with the defendant's
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 223 of 409 PageID #: 138696
Case 2:12-md-02327 Document 3705-17 Filed 04/26/17 Page 223 of 504 PageID #: 63884
Vladimir Iakovlev, M.D.

1    consultant.

2              Q.  And you received half and the

3    defendants received half, is that right?

4              A.  That's correct.

5              Q.  So after it was removed from her

6    body it was placed in formalin?

7              A.  That's correct.

8              Q.  And that's how you received it?

9              A.  That's correct.

10             Q.  And you didn't alter the specimen

11   did you, sir?

12             A.  What do you mean?

13             Q.  Did you alter the specimen?  Did you

14   try and take any proteins of the specimen?

15             MR. ANDERSON:  Different question.

16   Object to form anyway.

17             THE DEPONENT:  I don't exactly

18   understand what you're asking.

19             BY MR. HUTCHINSON:

20             Q.  Well let's be precise, Dr. Iakovlev.

21   You received the excised mesh with tissue on it in

22   a jar of formalin, is that correct?

23             A.  That's correct.

24             Q.  And you never saw the mesh before it

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 224 of 409 PageID #: 138697
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 224 of 504 PageID #: 68887
Vladimir Iakoviev, M.D.

1  was placed in this formalin, is that right?

2          A.  That's correct.

3          Q.  Now, we've used the word "formalin"

4  a lot but I want us to understand that's a

5  solution that contains chemicals such as

6  formaldehyde, isn't that right?

7          A.  That's right.  I explained it

8  earlier what it is and how we use it.

9          Q.  And formaldehyde that's a chemical

10 that's used to embalm people who've died, is that

11 right?

12         A.  Part of it.  I mean, embalming fluid

13 is a complex fluid.  There are many other

14 substances in it.

15         Q.  But the bottom line is formalin

16 preserves the tissue so it won't rot or decay?

17         A.  That's correct.  It's been used like

18 this for pathology for hundred years.

19         Q.  And this preservation allows a

20 pathologist like yourself to study tissue?

21         A.  That's correct.

22         Q.  And you'll agree that after tissue

23 has been in formalin it will contract?

24         A.  To a degree.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 225 of 409 PageID #: 138698
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 225 of 504 PageID #: 63888
Vladimir Iakovlev, M.D.

```
1              Q.  Thank you.  Now let's talk about

2    tissue, Dr. Iakovlev.  You know that human tissue

3    contains proteins?

4              A.  Yes.

5              Q.  In fact human tissue is mostly

6    proteins isn't it, sir?

7              A.  Human tissue is mostly water and

8    then what is not water is mostly proteins.

9              Q.  Proteins is a close second, will you

10   give me that?

11             A.  Yes.

12             Q.  And proteins adsorb to the mesh

13   explants don't they, sir?

14             MR. ANDERSON:  Objection to form.

15             BY MR. HUTCHINSON:

16             Q.  They stick to it?

17             A.  I'm not sure if we can call it like

18   this.  Proteins surround the --

19             Q.  The explant.

20             MR. ANDERSON:  Let him finish his

21   answer.

22             THE DEPONENT:  The implant.  Anything

23   goes in the body the fluid with proteins fills all

24   the spaces and surrounds all the parts.  If it
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 226 of 409  PageID #: 138699
Case 2:12-md-02327  Document 3795-17  Filed 04/27/16  Page 226 of 504  PageID #: 63889

Vladimir Iakovlev, M.D.

1    sticks or doesn't stick that's a different

2    question but it surrounds.

3              BY MR. HUTCHINSON:

4         Q.  And human protein coat a medical

5    device once it's put in the body.  Is that

6    correct, sir?

7         A.  Again, I wouldn't call it "coating"

8    or "not coating" they surround it.  If they coat

9    or not that's -- that depends on the materials.

10

11             THE COURT REPORTER:  Counsel in the call

12   has been disconnected.  Just to let you know.

13             THE VIDEOGRAPHER:  Going off the record

14   at 2:24 p.m.

15             ---  Break taken.

16             THE VIDEOGRAPHER:  Back on the record at

17   2:27 p.m.

18             BY MR. HUTCHINSON:

19        Q.  Dr. Iakovlev, you'll agree that

20   foreign objects such as a mesh implant become

21   coated with human proteins?

22        A.  As I said, coating, not coating,

23   permanent coating, I mean, it depends on the

24   material, it depends on the timing.  At one point

Case 2:12-md-02327 Document 3790-17 Filed 04/26/16 Page 227 of 409 PageID #: 138700
Case 2:12-md-02827 Document 3795-17 Filed 04/26/16 Page 227 of 504 PageID #: 68988

Vladimir Iakovlev, M.D.

1    they can be and then that coating is being

2    resorbed.

3              Q.  Move to strike as nonresponsive.

4              Dr. Iakovlev, my question is for a yes

5    or no, do you agree that foreign objects become

6    coated with human proteins?

7              MR. ANDERSON:  Same objection.  And --

8    well object to form, and asked and answered, and

9    you can give him the same answer.

10             THE DEPONENT:  Foreign objects are

11   surrounded.  Some of them can be coated, depends

12   on the object, depends on the surface properties.

13             BY MR. HUTCHINSON:

14             Q.  Well in fact, Doctor, you've written

15   "Foreign objects become coated with human proteins

16   before the appearance of the inflammatory cells."

17   That's something you've written.

18             A.  Yes, I did.  And I'm saying that

19   some of them become firmly coated, some of them

20   just surround it.  It all depends on an object.

21             Q.  And, Dr. Iakovlev, you've made no

22   efforts to clean off the proteins from

23   Ms. Ramirez's explant, is that correct?

24             MR. ANDERSON:  Objection to form.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 228 of 409 PageID #: 188701
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 228 of 504 PageID #: 68589
Vladimir Iakovlev, M.D.

1          THE DEPONENT:  That would destroy my

2    histology completely.  That's not what

3    pathologists do.  Pathologists try to preserve the

4    specimen the way it is and then examine it in

5    cross-sections.  I mean, why would I do that?

6          BY MR. HUTCHINSON:

7          Q.  Move to strike as nonresponsive.

8          My question, Doctor, you didn't make any

9    efforts to clean the formalin -- strike that.

10          My question, Doctor, you didn't make any

11   efforts to clean off the proteins from the explant

12   from Ms. Ramirez, correct?

13          MR. ANDERSON:  Objection, asked and

14   answered.  Go ahead.

15          THE DEPONENT:  I mean, in opposite.  I

16   try to preserve as much as possible of the

17   specimen.

18          BY MR. HUTCHINSON:

19          Q.  Now, we know that the mesh was put

20   in formalin?

21          A.  That's correct, for preservation.

22          Q.  For preservation.  And we know the

23   mesh was coated with proteins, correct?

24          A.  At the time of explantation or at

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 229 of 409 PageID #: 138702
Case 2:12-md-02327 Document 3785-17 Filed 04/26/16 Page 229 of 504 PageID #: 63590
Vladimir Iakovlev, M.D.

1    any time?

2              Q.  At the time it was taken out of her

3    body.

4              A.  Whatever was outside of the mesh was

5    containing proteins.  I mean, that's the nature of

6    human tissues.  If it surrounds foreign body there

7    are proteins.

8              Q.  Thank you.  And, Doctor, you

9    understand that formalin crosslinks with proteins

10   that are in the tissue.  That's something you

11   understand, is that right?

12             A.  That's how it preserves it.

13             Q.  And that's pathology 101 isn't it?

14             A.  101 I don't know but how it

15   preserves proteins.

16             Q.  That's part of the basic

17   pathological training that you've participated in.

18   Is that right, sir?

19             A.  Yes.

20             Q.  And you'll agree that the formalin

21   and protein crosslinking will stiffen the tissue?

22             A.  Yes, it is.  It does.

23             Q.  And it stiffens the tissue so that a

24   pathologist like yourself can make slices of the

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 230 of 409 PageID #: 133703
Case 2:12-md-02327 Document 1395-17 Filed 04/30/16 Page 230 of 504 PageID #: 68393
Vladimir Iakovlev, M.D.

1  bread that you discussed this morning in your

2  direct exam, correct?

3          A.  No, that's not correct.  That's not

4  why we do it.  If you want me to give full answer

5  or yes or no answer, I mean, but your statement

6  was not correct.

7          Q.  Doctor, you don't know the specific

8  details of the chemical reaction that occurs when

9  formalin crosslinks with tissue, you?

10         A.  Well you just said it, it

11 crosslinks.

12         Q.  My question, Doctor, is you don't

13 know the specific details of the chemical reaction

14 that occurs when formalin crosslinks with tissues,

15 yes or no?

16         A.  You just named it.  Molecules of

17 formalin crosslink with proteins.  That's what the

18 chemical process is.

19         Q.  That's something that you know?

20         A.  Yes.

21         Q.  Okay.  Doctor, I want to hand you

22 the trial transcript in the Bellew case.  Now you

23 testified under oath in front of a judge and a

24 jury in the Bellew case in West Virginia didn't

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 231 of 409 PageID #: 138704
Case 2:12-md-02327 Document 2357-17 Filed 04/27/16 Page 231 of 504 PageID #: 68892
Vladimir Iakovlev, M.D.

```
 1    you, sir?

 2            A.  Yes.

 3            Q.  And did you promise to tell the

 4    truth when you took the witness stand?

 5            MR. ANDERSON:  He testified under oath.

 6    Why do you keep trying to beat him up like that?

 7            BY MR. HUTCHINSON:

 8            Q.  Dr. Iakovlev --

 9            MR. ANDERSON:  He testified under oath.

10    So stipulated.

11            BY MR. HUTCHINSON:

12            Q.  Dr. Iakovlev, did you promise to

13    tell the truth when you were in West Virginia

14    talking to the judge and jury?

15            MR. ANDERSON:  Same objection.

16            BY MR. HUTCHINSON:

17            Q.  Dr. Iakovlev, did you promise to

18    tell the truth when you were talking to the judge

19    and jury in West Virginia?

20            MR. ANDERSON:  Same objection.

21            BY MR. HUTCHINSON:

22            Q.  I need an answer.  Yes or no?

23            A.  I've answered the question many

24    times.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 232 of 409 PageID #: 133705
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 232 of 504 PageID #: 133705
Vladimir Iakovlev, M.D.

1        Q.  My question is, Doctor, did you

2    promise to tell the truth when you were talking to

3    the judge and jury in West Virginia?

4            MR. ANDERSON:  Same objection.

5            BY MR. HUTCHINSON:

6        Q.  Yes or no.

7            MR. ANDERSON:  Same objection.

8            THE DEPONENT:  Yes, I did.

9            BY MR. HUTCHINSON:

10       Q.  Doctor, let's look at page 676, line

11   24.  Question, are you there with me?

12   Dr. Iakovlev?

13       A.  Just let me read the whole page.

14       Q.  I'm on page 676, line 24.  Are you

15   there with me now, Dr. Iakovlev?

16       A.  Yes, I am.

17       Q.  "QUESTION:  Can you tell the jury

18           the chemical reaction that occurs when

19           formalin crosslinks with the tissues.

20           "ANSWER:  Specific details?

21           "QUESTION:  Yes.

22           "ANSWER:  I don't know specific

23           details.  It crosslinks, binds proteins

24           together so they cannot be degraded by

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 233 of 409 PageID #: 138706
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 233 of 504 PageID #: 68994
Vladimir Iakovlev, M.D.

```
 1              bacteria."
 2    Did I read that correctly, sir?
 3              MR. ANDERSON:  Exactly.  Objection to
 4    improper impeachment.  That's exactly what he
 5    said.  Did he read it right?
 6              THE DEPONENT:  Yes, he read it right.
 7              BY MR. HUTCHINSON:
 8              Q.  And, Doctor, specifically for
 9    Prolene you don't know the extent to which protein
10    forms a bond with Prolene do you?
11              A.  Um, can you repeat that question?
12              Q.  You don't know the extent to which
13    proteins form a bond with Prolene do you?
14              A.  Which protein?  You have to -- I
15    mean, there are hundreds of proteins in the human
16    body.  Some of them don't bind to anything and
17    some of them bind -- I mean their function is to
18    bind to surfaces.  So which exactly protein are
19    you asking?
20              Q.  Doctor, I'm talking about any of the
21    proteins that you've ever studied as a
22    pathologist.  You don't know the extent to which
23    proteins form a bond with Prolene do you, sir?
24              A.  Like chemical bond?
```

Vladimir Iakovlev, M.D.

```
 1              MR. ANDERSON:  He asked you a question.
 2              THE DEPONENT:  Are you asking about
 3    chemical bond?
 4              BY MR. HUTCHINSON:
 5              Q.  Yes, sir.
 6              A.  Hydrostatic bond, electrostatic
 7    bond.
 8              Q.  Chemical bond.
 9              A.  I don't think there is any chemical
10    bond between proteins and Prolene.
11              Q.  And, Doctor, you don't know the
12    extent to which proteins form a bond with Prolene
13    from an adhesion standpoint do you, sir?
14              A.  What do you mean again adhesion?  Is
15    it covalent bond?  Is it electrostatic,
16    hydrostatic bond?  I mean, you have to ask
17    specific question.
18              Q.  Can you answer the question as I've
19    asked it?
20              A.  Not the way you asked.
21              Q.  And, Doctor, let's talk about how
22    you prepared the samples from Ms. Ramirez.  Okay?
23              A.  Sure.
24              Q.  I want to talk about how you made
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 235 of 409 PageID #: 138708
Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 235 of 504 PageID #: 68998
Vladimir Iakovlev, M.D.

```
 1    the slices of the bread, so to speak.  Alright?

 2             A.  If you want to use that analogy,

 3    yes, we can.

 4             Q.  And the Ramirez slides were

 5    processed the same way that you've processed

 6    slides for other litigation, is that correct?

 7             A.  For all specimens processed in the

 8    lab, all labs in North America use exactly the

 9    same process.

10             Q.  Okay.

11             A.  And we use the same machinery.  We

12    use the same chemicals.  Everything is processed

13    the same way.

14             Q.  Let's talk about how it was done

15    here in Canada, okay?

16             A.  It's not just in Canada.  It's done

17    the same way anywhere in the world.

18             Q.  I understand.  It was done pursuant

19    to the St. Michael's protocol, is that right?

20             A.  I'm telling you this is not our

21    protocol.  It's a machine which is made maybe in

22    United States, maybe in Europe and chemicals are

23    likely made in the United States.  They are bought

24    in large supplying companies.  Everything is
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 236 of 409 PageID #: 133709
Case 2:12-md-02327 Document 3755-17 Filed 04/27/17 Page 236 of 504 PageID #: 63899
Vladimir Iakovlev, M.D.

```
 1    shared.

 2              Q.  Move to strike as nonresponsive.

 3              MR. ANDERSON:  You said let's talk about

 4    how it's not in Canada and he's answering your

 5    question.

 6              BY MR. HUTCHINSON:

 7              Q.  My question is very specific.  It

 8    was done pursuant to the St. Michael's protocol,

 9    correct?

10              MR. ANDERSON:  Objection to the form.

11              THE DEPONENT:  Our protocols don't

12    differ from any other protocol.  Again, I don't

13    think we can modify much machinery.

14              BY MR. HUTCHINSON:

15              Q.  Move to strike as nonresponsive.

16              Dr. Iakovlev, Ms. Ramirez's slides were

17    processed pursuant to the St. Michael's protocol,

18    correct?

19              A.  We do exactly the same way as any

20    other lab in North America.  I mean, our protocols

21    are exactly the same as in any other lab.

22              Q.  Move to strike as nonresponsive.

23              Dr. Iakovlev, Ms. Ramirez's slides were

24    processed pursuant to the St. Michael's protocol,
```

Vladimir Iakovlev, M.D.

1    correct?  It's a yes or no.

2              MR. ANDERSON:  Do you understand the

3    question.

4              THE DEPONENT:  I do.

5              MR. ANDERSON:  Okay.  Objection to form.

6    Go ahead.

7              BY MR. HUTCHINSON:

8              Q.  I'm asking for a yes or no,

9    Dr. Iakovlev.

10             A.  Yes, they were done exactly the same

11   way as all other diagnostic specimens.

12             Q.  Thank you.  Now, as part of the St.

13   Michael's protocol the sample was first exposed to

14   alcohol or ethanol, correct?

15             A.  No.  The samples came in formalin so

16   first stage is formalin.

17             Q.  And then after formalin, according

18   to the St. Michael's protocol, the samples are

19   exposed to ethanol or a form of alcohol, correct?

20             A.  According to all protocols in North

21   American laboratories after formalin there are

22   several solutions of alcohol.

23             Q.  Is that a yes, Dr. Iakovlev?

24             A.  Yes to what?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 238 of 409 PageID #: 138711
Case 2:12-md-02327 Document 3755-17 Filed 04/28/17 Page 238 of 504 PageID #: 68599
Vladimir Iakovlev, M.D.

1          Q.  My question of whether or not the

2     sample was exposed to alcohol?

3          A.  They were exposed to alcohol --

4          Q.  Thank you.

5          A.  -- like in any other lab.

6          Q.  Thank you.  And alcohol causes

7     tissue to shrink doesn't it, sir?

8          MR. ANDERSON:  Objection to form.

9          THE DEPONENT:  To a degree.

10         BY MR. HUTCHINSON:

11         Q.  Thank you.  And as part of the St.

12    Michael's protocol the sample of Ms. Ramirez was

13    treated with a chemical known as xylene.  Is that

14    correct, sir?

15         A.  In all labs the next step after

16    alcohol will be xylene.

17         Q.  And xylene is a solvent isn't it,

18    sir?

19         A.  It is.

20         Q.  Xylene is used to dissolve the

21    paraffin wax used in the embedding process.  Isn't

22    that correct, sir?

23         A.  That's correct.

24         Q.  And xylene is a chemical that's not

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 239 of 409 PageID #: 138712
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 239 of 504 PageID #: 68400
Vladimir Iakovlev, M.D.

1    found naturally in the body is it?

2              A.  No.

3              Q.  And in fact you've never analyzed

4    the chemical effect that xylene has on Prolene

5    have you, sir?

6              A.  I have.  I did.

7              Q.  Doctor, let's look at the Bellew

8    transcript.  You have it in front of you.

9              A.  Yes, I do.

10             Q.  This is when you testified in front

11   of the judge and the jury in West Virginia, is

12   that correct?

13             A.  Yes.

14             Q.  And if you turn with me to page 679.

15             A.  Yes.

16             Q.  Line 15.

17             A.  Yes.

18             Q.  You say -- or, I'm sorry:

19             "QUESTION:  You've never analyzed the

20             extent that xylene can act as a solvent

21             on polypropylene, correct?

22             "ANSWER:  I did.

23             "QUESTION:  You -- you --

24             "ANSWER:  I did place new mesh in

Vladimir Iakovlev, M.D.

1              xylene.  It's been sitting for eight

2              months.  The mesh didn't change.

3              "QUESTION:  Have you analyzed that mesh

4              chemically?

5              "ANSWER:  No, not chemically."

6    Correct?

7              A.  That's correct.

8              Q.  So let's be clear, you have never

9    analyzed the chemical effect that xylene has on

10   Prolene have you, sir?

11             A.  There is a big difference chemical

12   effect versus chemical testing.  Because chemical

13   effect is changing of chemical structure it can

14   manifest itself in different shapes and forms.

15   Chemical testing is a specific type of testing and

16   it may or may not be specifically related to

17   chemical changes.

18             Q.  Dr. Iakovlev --

19             MR. ANDERSON:  No, no, hold on.  He's

20   not --

21             MR. HUTCHINSON:  Yeah, he is finished.

22             MR. ANDERSON:  No, his hands are in the

23   air and he's not through talking.

24             THE DEPONENT:  So the word "chemical"

Vladimir Iakovlev, M.D.

1  for these two concepts is used in completely

2  different terms.  One is chemical testing the

3  other one is chemical changes.

4          BY MR. HUTCHINSON:

5          Q.  Dr. Iakovlev, you've never done any

6  chemical testing on the effect that xylene has on

7  Prolene have you, sir?

8          A.  Um, well I used chemicals to stain

9  the mesh which had been exposed to xylene, that's

10  a part of chemicals.  If we talk about some

11  chemical reactions, some material scientists type

12  of protocols I did not use those.

13          Q.  Thank you.

14          Doctor, I want to hand you what we'll

15  mark as Exhibit 8 to your deposition.

16          ---DEFENSE EXHIBIT NO. 8:  Document

17          titled "TR-19/2007 Chemical Resistance

18          of Thermoplastics Piping Materials"

19          from the Plastics-Pipe Institute, dated

20          September 2007.

21          BY MR. HUTCHINSON:

22          Q.  This is a Chemical Resistance of

23  Thermoplastics Piping Materials document.  Do you

24  see that?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 242 of 409 PageID #: 132715
Case 2:12-md-02327 Document 3725-17 Filed 04/27/17 Page 242 of 504 PageID #: 68403
Vladimir Iakovlev, M.D.

1          A.  Doesn't specifically say medical

2     devices -- Chemical Resistance of Thermoplastics

3     Piping Materials.

4          Q.  And, Doctor, you've seen this

5     document before haven't you?  You cite it in your

6     reports, your Wave 1 reports don't you, sir?

7          A.  I reviewed a number of testing --

8     tables and testing.  Could be one of them.

9          Q.  Thank you.  And, Doctor, let's go to

10    the tables, the very last page.  Are you there

11    with me?

12         A.  No, just give me one second.

13         Q.  The last page.

14         A.  No, just give me one second.

15         Q.  Oh, I'm sorry.

16         A.  So which page number?

17         Q.  The last page, Doctor, of the

18    document that you have.

19         A.  Yes.

20         Q.  And at the top in the top left it

21    says "xylene", under chemical.  Is that right?

22         A.  Yes.

23         Q.  And along the top line it says,

24    "PP".  Now that stands for polypropylene, is that

Case 2:12-md-02827  Document 3790-17  Filed 04/27/16  Page 243 of 409 PageID #: 138716
Case 2:12-md-02827  Document 3795-17  Filed 04/27/16  Page 243 of 504 PageID #: 68404
Vladimir Iakovlev, M.D.

1   correct?

2            A.  Most likely, yes.

3            Q.  And under PP we have an "N", is that

4   correct?

5            A.  Yes.

6            Q.  And, Doctor, you know that "N"

7   stands for plastic type is not resistant?  You

8   know that, Doctor, don't you?

9            A.  It's used in different tables

10  differently.

11           Q.  Well, if you turn to page --

12           MR. ANDERSON:  Hold on, let him finish.

13           THE DEPONENT:  I would have to see

14  exactly what it means, what temperatures.

15           BY MR. HUTCHINSON:

16           Q.  Doctor, let's look at page 7.  My

17  question is are you on page 7?

18           A.  Yes, I am on page 7.  So I'm trying

19  to read what "N" means.

20           Q.  And "N" on page 7 means plastic type

21  is not resistant, correct?

22           A.  Not resistant, swelling over 8

23  percent, weight loss over 5 percent and elongation

24  of break decreased by 50 percent.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 244 of 409 PageID #: 138717
Case 2:12-md-02827 Document 3795-17 Filed 04/25/16 Page 244 of 504 PageID #: 68405
Vladimir Iakovlev, M.D.

1    Q.  And, Doctor, on that same page "PP"

2    means polypropylene, correct?

3    A.  That's correct.

4    Q.  And if we look on the very last

5    page, polypropylene has an "N" by it doesn't it?

6    A.  Plastics at maximum operating

7    temperature.

8    Q.  No, sir, my question is -- show the

9    jury the last page.

10    A.  Wait a second, I need to see all the

11    data in the table before I answer this question.

12    Q.  Well, my question is polypropylene

13    has the letter "N" by it doesn't it, sir?

14    A.  These tables are designed for

15    maximum --

16    Q.  Move to strike as nonresponsive.

17    Dr. Iakovlev, focus on my question.

18    MR. ANDERSON:  Well, don't tell him what

19    to do.

20    THE DEPONENT:  I cannot interpret the

21    table unless I read everything which is in this

22    table and I have to know exactly what it means.

23    BY MR. HUTCHINSON:

24    Q.  My question, sir, is yes or no, by

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 245 of 409 PageID #: 132718
Case 2:12-md-02327 Document 3795-17 Filed 04/27/17 Page 245 of 504 PageID #: 68406
Vladimir Iakovlev, M.D.

1    xylene in a document that you cite in some of your

2    reports, it has the letter "N" by polypropylene,

3    correct?  Can you answer that question, yes or no?

4             A.  I have to read and what it says and

5    what it means plastics and maximum operating

6    temperature before I answer that question.

7    Because the whole table is designed for maximum

8    operating temperature.

9             Q.  Doctor, my question is on the last

10   page of this document polypropylene has the letter

11   "N" by it doesn't it, sir?

12            A.  So the whole table is subject to

13   knowing what is maximum operating temperature.  I

14   don't know what maximum operating temperature here

15   is therefore that "N" applies to specific

16   condition of maximum operating temperature.

17            Q.  Move to strike as nonresponsive.

18            Dr. Iakovlev, would you show the jury

19   the chart on the last page?  And hold on just a

20   minute, I'm going to ask the videographer to zoom

21   in on the word "PP" at the top and the letter "N"

22   under the word "PP".

23            Now my question to you, Dr. Iakovlev, is

24   does the word PP or polypropylene have the letter

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 246 of 409 PageID #: 138719
Case 2:12-md-02327 Document 2955-17 Filed 04/04/16 Page 26 of 504 PageID #: 68407
Vladimir Iakovlev, M.D.

1    "N" by it, yes or no.

2              MR. ANDERSON:  Keep your voice down,

3    counsel.

4              THE DEPONENT:  So the whole table --

5              BY MR. HUTCHINSON:

6         Q.  Move to strike as nonresponsive.  I

7    need a yes or no.

8              MR. ANDERSON:  He didn't even answer

9    before you moved to strike as nonresponsive at the

10   end of your own question.  What do you want him to

11   answer?

12             BY MR. HUTCHINSON:

13        Q.  Yes or no?  Can you answer the

14   question yes or no, Dr. Iakovlev?

15        A.  I cannot answer you yes or no.  I

16   can only answer you with full answer.

17        Q.  Dr. Iakovlev, PP has the letter "N"

18   by it, yes or no?

19        A.  Yes.

20        Q.  And, Dr. Iakovlev, "N" stands for

21   plastic type is not resistant, is that correct?

22        A.  Not resistant at maximum operating

23   temperature.

24        Q.  And, Dr. Iakovlev, this document

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 247 of 409 PageID #: 132720
Case 2:12-md-02327 Document 1953-17 Filed 04/27/16 Page 247 of 504 PageID #: 63468
Vladimir Iakovlev, M.D.

1    shows that xylene, the chemical that was used with

2    Ms. Ramirez's explanted mesh is not resistant to

3    xylene doesn't it, sir?

4            A.  I do not know what maximum operating

5    temperature was used for this table, therefore we

6    cannot compare two conditions which may be

7    completely different.  Something may be so hot

8    that it starts dissolving.

9            Q.  You can't answer the question can

10   you?

11           A.  I cannot answer because I don't have

12   all information.

13           MR. ANDERSON:  Objection asked and

14   answered.

15           BY MR. HUTCHINSON:

16           Q.  And, Dr. Iakovlev, did you ever

17   study the effect that xylene had on Ms. Ramirez's

18   explanted mesh?

19           A.  Well, I saw the specimen which was

20   exposed to xylene.  I did not see it dissolving.

21   Polypropylene was still there, it did not

22   dissolve.

23           Q.  Dr. Iakovlev, the sample was also

24   treated with permount wasn't it?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 248 of 409 PageID #: 133731
Case 2:12-md-02827 Document 1256-17 Filed 04/26/16 Page 248 of 504 PageID #: 68409
Vladimir Iakovlev, M.D.

1          A.  Yes.

2          Q.  And permount has toluene in it

3    doesn't it, sir?

4          A.  Yes, it's a similar solvent.

5          Q.  And you've never analyzed the

6    chemical effect that toluene has on Prolene have

7    you, sir?

8          A.  Well, you saw it in the pictures.

9    The polypropylene was still there, it did not

10   dissolve so that is my analysis.

11         Q.  Move to strike as nonresponsive.

12         A.  I answered you.  I did study the

13   slides in permount.  These slides they still have

14   permount and I showed it in microscope.

15   Polypropylene is still there, it did not dissolve.

16         Q.  Dr. Iakovlev, turn with me to page

17   683.

18         A.  Of?

19         Q.  Of your transcript for the Bellew

20   case.  Again that's the same case where you

21   testified in front of the judge and jury in West

22   Virginia, is that correct?

23         A.  Yes, it is correct.  Which page

24   number?

Vladimir Iakovlev, M.D.

```
 1              Q.  Page 683, line 2.  Are you there?

 2              MR. ANDERSON:  Objection, inappropriate

 3     impeachment.  It's the exact same question you

 4     gave and the exact same answer he gave.

 5              BY MR. HUTCHINSON:

 6              Q.  Dr. Iakovlev, are you there with me?

 7              A.  Yes, I am.

 8              MR. FREESE:  Same objection.

 9              BY MR. HUTCHINSON:

10              Q.  "QUESTION:  And toluene is -- does

11                  Not behave well with polypropylene.  Do

12                  you know that?

13                  "ANSWER:  I don't know.  As I said, I

14                  put one mesh in xylene and it stays

15                  intact for several months.

16                  "QUESTION:  But you have not analyzed

17                  that chemically have you?

18                  "ANSWER:  No, I didn't."

19     Did I read that correctly?

20              MR. ANDERSON:  Different question and

21     answer than counsel posed before.  It's an

22     inappropriate way to impeach someone with their

23     testimony, reading different questions and

24     different answers.  Go ahead.
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 250 of 409  PageID #: 133723
Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 250 of 504  PageID #: 63423
Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  There is toluene and then
 2     xylene.  I'm not sure exactly what we were talking
 3     about.
 4              BY MR. HUTCHINSON:
 5              Q.  Did I read that correctly, sir?
 6              A.  Oh, you read it correctly.
 7              Q.  Thank you.  And, Doctor, when we
 8     talk about these slides from Ms. Ramirez, they
 9     were prepared here in your lab, is that right?
10              A.  That's correct.
11              Q.  At St. Michael's in Canada, is that
12     correct?
13              A.  Yes.
14              Q.  And by technicians who work for you,
15     is that right?
16              A.  Not for me for the hospital, for the
17     lab.
18              Q.  And, Doctor, you can't tell us the
19     names of any specific technicians who prepared
20     those slides for Ms. Ramirez can you?
21              MR. ANDERSON:  Objection.
22              THE DEPONENT:  Well, I mean, I know
23     their names.  I don't exactly who was working on
24     that day.
```

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2              Q.  Be you can't tell us the specific

 3   technicians who prepared the slides for

 4   Ms. Ramirez can you, sir?

 5              A.  No, there were several.

 6              Q.  Doctor, if you will turn with me to

 7   the exhibit that was used with you this morning,

 8   Exhibit 7(C).  And I'm going to ask the IT folks

 9   to put it up on to the screen please.

10              A.  So which?

11              Q.  Exhibit 7(C).

12              A.  I don't have the numbers so you have

13   to show it to me.

14              Q.  Do you have that in front of you,

15   Doctor?

16              A.  Yes, I'm just checking where --

17              Q.  And, Dr. Iakovlev I believe you told

18   us this morning that you use this photograph to

19   illustrate some degradation, alleged degradation

20   of Ms. Ramirez's mesh, is that correct?

21              A.  That's correct.

22              Q.  And the pathologists at UT

23   Southwestern, that's where Ms. Ramirez went isn't

24   it?  Strike that.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 252 of 409 PageID #: 138725
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 252 of 504 PageID #: 68725
Vladimir Iakovlev, M.D.

1          The pathologists where Ms. Ramirez went

2     to the hospital they didn't do these same type of

3     tests that you did did they?

4          A.  No, they didn't examine for

5     degradation at all.

6          Q.  In fact not one of the doctors in

7     Texas who looked at Ms. Ramirez examined the mesh

8     for degradation did they?

9          A.  Well, I mean the only person who

10    could it was a pathologist.

11         Q.  And, Dr. Iakovlev, that's the same

12    pathologist who found no degradation in his final

13    pathology report, correct?

14         MR. ANDERSON:  Objection.

15         THE DEPONENT:  That's not correct.  Who

16    did not look for degradation either it's there or

17    not.

18         BY MR. HUTCHINSON:

19         Q.  And, Doctor, let's be clear, but we

20    look at this exhibit that's shown the jury now,

21    not one of the doctors in Texas did this type of

22    work did they?

23         MR. ANDERSON:  Same -- asked and

24    answered.  Go ahead.

Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  The only person who could

 2    was the pathologist.  He did not examine

 3    polypropylene for degradation.

 4              BY MR. HUTCHINSON:

 5         Q.  Thank you.  And, Doctor, would you

 6    look at us, please?

 7         A.  Yes.

 8         Q.  You can't tell the jury what

 9    triggers the degradation process to occur can you?

10    Dr. Iakovlev?

11         A.  Give me one second.  I'm thinking

12    how to answer.

13         Q.  I'm asking for a yes or no.

14              MR. ANDERSON:  Hey, he's trying to

15    answer your question.  Quit stop jumping in.

16    That's rude.

17              BY MR. HUTCHINSON:

18         Q.  I'll withdraw the question.

19              MR. ANDERSON:  Alright.

20              BY MR. HUTCHINSON:

21         Q.  Dr. Iakovlev, yes or no, you can't

22    tell us what triggers the degradation process to

23    occur can you?

24         A.  It sounds like you're chasing me.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 254 of 409 PageID #: 138727
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 254 of 504 PageID #: 684715
Vladimir Iakovlev, M.D.

```
1              Q.  Move to strike as non-responsive.

2              A.  So my answer will be that body

3    reaction against polypropylene triggers

4    degradation.

5              Q.  Doctor, you can tell us what

6    triggers the degradation process to occur?  Is

7    that what you're telling us?

8              MR. ANDERSON:  Objection, different

9    question.  Go ahead.

10             THE DEPONENT:  I don't understand the

11   question.  What specific chemicals?  What in

12   general process triggers degradation?  In general

13   the process is triggered by the body reaction

14   against polypropylene.  Specific chemical

15   reactions would be area of expertise of material

16   scientists.

17             BY MR. HUTCHINSON:

18             Q.  And, Doctor, you can't tell us what

19   triggers the degradation process to occur can you?

20   Yes or no?

21             MR. ANDERSON:  Wait, how many times are

22   you going to ask him the same question?

23             MR. HUTCHINSON:  I haven't gotten an

24   answer yet.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 255 of 409 PageID #: 138728
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 255 of 504 PageID #: 684718
Vladimir Iakovlev, M.D.

1          MR. ANDERSON:  Yeah, you did.  He said,

2    I don't understand the question.  What specific

3    chemicals?  In general the process is triggered by

4    the body -- body's reaction against polypropylene.

5    Specific chemical reactions would be an area for

6    the material scientists.  That is your answer.

7          BY MR. HUTCHINSON:

8          Q.  Dr. Iakovlev, my question is asking

9    for a yes or no.  You can't tell us what triggers

10   the degradation process to occur.  Yes or no?

11         MR. ANDERSON:  Objection, asked and

12   answered.  You can't make him say yes or no.

13         THE DEPONENT:  I cannot answer yes or no

14   when the question is so broad.  I have to specify

15   at least to a degree.

16         BY MR. HUTCHINSON:

17         Q.  Dr. Iakovlev, I want to hand you

18   your testimony in the Serrano case versus American

19   Medical Systems.  Do you have that in front of

20   you?

21         A.  Yes, I do.

22         Q.  And, Dr. Iakovlev, if you'll turn

23   with me please to page 310.

24         A.  So this is different manufacturer,

Vladimir Iakovlev, M.D.

```
1    this a different product.

2           Q.  Move to strike as nonresponsive.

3           My question was can you turn with us to

4    page 310?

5           A.  And it's March 6, 2014.

6           Q.  Move to strike as nonresponsive.

7           Dr. Iakovlev --

8           MR. ANDERSON:  Hey, he's turning into

9    the deposition to find the page that you're asking

10   him to.  Can you quit hammering him with questions

11   while he can look.

12          MR. HUTCHINSON:  He's there.

13          MR. ANDERSON:  Yes or no, can you answer

14   the question?

15          THE DEPONENT:  Which page number.

16          BY MR. HUTCHINSON:

17          Q.  Page 310.

18          MR. ANDERSON:  I guess he's not, huh?

19          BY MR. HUTCHINSON:

20          Q.  Page 310.  Are you on page 310?

21   Page 310, line 3.  Are you there with me,

22   Dr. Iakovlev?

23          MR. ANDERSON:  Again, objection.  It's

24   the exact same answer he gave.  It's an
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 257 of 409  PageID #: 138730
Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 257 of 504  PageID #: 68430
Vladimir Iakovlev, M.D.

1  inappropriate method to try to impeach a witness

2  when they give you the exact same answer.  Go

3  ahead, Doctor.

4         BY MR. HUTCHINSON:

5         Q.  Dr. Iakovlev --

6         A.  Just give me a second.  I need to

7  read.  You're chasing me again.  Okay.

8         Q.  Are you with me on page 310, line 3,

9  of your Serrano deposition?

10        A.  That's correct.

11        Q.  "QUESTION:  What is the trigger for

12        That degradation process?

13        "ANSWER:  It's very complex.  I don't

14        think it's been studied.  I could not

15        tell you.  I mean, the working now

16        evidence is oxidated environment, but

17        I'm not the expert in that specific

18        biochemistry.  I cannot testify to

19        that."

20        MR. ANDERSON:  Exactly same.  Objection.

21        BY MR. HUTCHINSON:

22        Q.  Did I read that correctly,

23  Dr. Iakovlev?

24        A.  Yes, you did.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 258 of 409 PageID #: 138731
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 258 of 504 PageID #: 68719
Vladimir Iakovlev, M.D.

1    Q.  And, Doctor, you can't tell us the

2    rate at which degradation occurs, can you?

3    A.  How would we measure rate?

4    MR. ANDERSON:  Object to form.  Go

5    ahead.

6    THE DEPONENT:  You mean thickening of

7    the bark over period of time?  Change of molecular

8    weight or tensile -- I mean, exactly how do we

9    measure the objective parameter for that question?

10   BY MR. HUTCHINSON:

11   Q.  Move to strike as nonresponsive?

12   A.  But you ask a question which is

13   impossible to answer.

14   Q.  Doctor, turn with me please to page

15   311, line 4 of your pre-trial deposition.  Are you

16   there?

17   A.  Which one?

18   Q.  Serrano, same case.

19   A.  But that's 2014, way before I did my

20   degradation study.

21   Q.  Move to strike as nonresponsive.

22   A.  Okay.

23   Q.  Doctor, turn with me please to page

24   311, line 4.  Are you there?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 259 of 409 PageID #: 138732
Case 2:12-md-02327 Document 3796-5 Filed 04/27/16 Page 39 of 504 PageID #: 684720
Vladimir Iakovlev, M.D.

1      A.   Yes.

2      Q.   "QUESTION:   So you can't tell me

3           the rate by which or at which it

4           degrades?

5           "ANSWER:   No."

6   Did I read that correctly, Dr. Iakovlev?

7      A.   "Which line?   You didn't say the

8   line, at least I didn't hear it.

9      Q.   Page 311, line 4 of your pre-trial

10  deposition.   Do you see that?

11     A.   I do.

12     Q.   "QUESTION:   So you can't tell me

13          the rate by which or at which it

14          degrades?

15          "ANSWER:   No."

16  Did I read that correctly, Dr. Iakovlev?

17     A.   Yes, you read it correctly.

18     Q.   Thank you.   And, Doctor, you can't

19  tell the jury how long it would take the mesh to

20  completely degrade in the body can you?

21     A.   Well now 2016, since that deposition

22  I conducted several studies for degradation and

23  published literature.

24     Q.   So my --

Vladimir Iakovlev, M.D.

```
 1              MR. ANDERSON:  Do not interrupt him.

 2              MR. HUTCHINSON:  Absolutely.  Move to

 3     strike as nonresponsive.  I'm not asking him about

 4     the deposition any more.  I have a different

 5     question and you know it, Rich.

 6              MR. FREESE:  Counselor, he's going to

 7     finish what he started and then you can move to

 8     strike.  Until then he's not going to answer any

 9     more questions until you let him finish.  You

10     either withdraw or let him finish.  It's you.

11              MR. HUTCHINSON:  My question --

12              MR. FREESE:  No, no, you either withdraw

13     the question or you let him complete, those are

14     your two choices.

15              MR. HUTCHINSON:  I'm not withdrawing the

16     question.

17              MR. FREESE:  Well then he's going to

18     answer it.

19              MR. HUTCHINSON:  But he's talking about

20     a deposition in 2016, a test in 2016.  That's not

21     the question.

22              MR. FREESE:  Vladimir, finish answering

23     the question.

24              THE DEPONENT:  So that deposition took
```

Vladimir Iakovlev, M.D.

```
 1   place in 2014.  Since that time I conducted

 2   studies researching polypropylene degradation and

 3   I published peer-reviewed articles describing my

 4   findings.  And since then I acquired way more

 5   knowledge therefore we cannot compare what I know

 6   now and what I knew at that time.

 7             BY MR. HUTCHINSON:

 8        Q.  Move to strike as nonresponsive.

 9             Dr. Iakovlev, you can't tell us how long

10   it would take for the mesh to completely degrade

11   in the body can you, sir?

12        A.  I cannot.

13        Q.  Thank you.  Dr. Iakovlev, let's look

14   back at the photograph that's up there on the

15   screen, and that's Exhibit 7(C).

16        A.  Yes.

17        Q.  And it's my understanding that you

18   believe stain is trapped in the little nano

19   cavities.  Am I correct on that?

20        A.  Yes.

21        Q.  And there are no nano cavities shown

22   in any of the photographs that you took, correct?

23        A.  That's why they're nano because you

24   cannot see them.  They are the nano scale size.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 262 of 409 PageID #: 132785
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 262 of 504 PageID #: 684735
Vladimir Iakovlev, M.D.

1   That resolution is not enough.

2           Q.  And you can take down that

3   photograph.

4           The only way you can see -- let me be

5   clear.  There are no nano cavities shown in the

6   photographs that you took for Jennifer Ramirez,

7   correct?

8           A.  I just gave you an answer.  They are

9   nano.  There's -- the resolution of these images

10  of this study does not allow.  The way we see it

11  is because it stains.

12          Q.  And, Doctor, another way you can see

13  nano cavities is by doing transmission electron

14  microscopy, correct?

15          A.  I don't think you can go all the way

16  to that resolution.  It will definitely give you a

17  higher resolution but not all the way to those

18  pores where the dye is trapped.

19          Q.  Dr. Iakovlev, if you'd turn with me

20  please to your deposition in the Ramirez case.

21  Are you with me?

22          A.  Yes, I am.

23          Q.  Page 79, line 23.  Are you there

24  with me?

Vladimir Iakovlev, M.D.

1          A.   Yes.

2          Q.   "QUESTION:  And they are not any

3               nano cavities depicted in any of the

4               photographs that you've taken?

5               "ANSWER:  No.  The only way I could see

6               them, these little cracks, very fine

7               cracks, using transmission electron

8               microscopy."

9     Did I read that correctly, sir?

10         A.   Yes, you did.

11         Q.   And, Doctor, you have not done any

12    transmission electron microscopy in this case for

13    Jennifer Ramirez's have you?

14         A.   I don't do it for any of the cases.

15    Transmission electron microscopy was done for

16    research.

17         Q.   Doctor, when we look at Exhibit C?

18         A.   Yes.

19         Q.   And let's bring it back up, Exhibit

20    7(C).  Doctor, you'll agree that some proteins can

21    polarize light won't you, sir?

22         A.   To a degree.

23         Q.   Thank you.  And, Doctor when we look

24    at the bark that's shown in Exhibit 7(C) you've

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 264 of 409 PageID #: 138737
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 264 of 504 PageID #: 68425
Vladimir Iakovlev, M.D.

1  never tried to isolate that bark for a chemical

2  analysis have you?

3          A.  No.

4          Q.  In fact you haven't had an

5  analytical chemist confirm that Ms. Ramirez's

6  Prolene in fact degraded have you, sir?

7          A.  I didn't need to.  I do my own

8  testing.

9          Q.  And, Doctor, when we talk about

10 staining a stain is a soluble dye isn't it?

11         A.  Most of them are.

12         Q.  Thank you.  And soluble means

13 something that dissolves in water like sugar

14 dissolves in water, correct?

15         A.  Not all of them are soluble in water

16 some of them need to be dissolved in alcohol.  It

17 depends on the dye.  There are different dyes.

18 Some dyes are just exacts from plants.

19         Q.  Doctor, soluble materials are washed

20 away with water aren't they?

21         MR. ANDERSON:  Objection, asked and

22 answered.

23         THE DEPONENT:  Yes and no.  Unless they

24 have stronger bond to whatever surface they are

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 265 of 409 PageID #: 138728
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 265 of 504 PageID #: 684728
Vladimir Iakovlev, M.D.

```
 1    attached to they will not be washed by water.

 2    Washing by water would be hydrostatic forces so

 3    not all of them will be washed off.

 4            BY MR. HUTCHINSON:

 5            Q.  And, Doctor, hematoxylin it's a

 6    soluble dye isn't it?

 7            A.  Yes, it is.

 8            Q.  And eosin it's a soluble dye isn't

 9    it?

10            A.  Yes, but not in water it's in

11    alcohol.

12            Q.  And, Doctor, H&E you talked about

13    this in your direct examination that stands for

14    hematoxylin and eosin, is that correct?

15            A.  That's correct.

16            Q.  And those are the chemicals that

17    were used in the staining process on the slides

18    that you showed the jury, is that right?

19            A.  That's correct.

20            Q.  And if you could pull up for us on

21    Exhibit 4(C), I'm sorry yeah, 4(C).  Doctor, are

22    you there with me?

23            A.  Which picture?  Can you show it to

24    me?
```

Vladimir Iakovlev, M.D.

```
1              Q.  Yes, it's the third picture on

2    Exhibit 4.  Right there.

3              A.  Okay.

4              Q.  I just want to make sure that you

5    and I are looking at the same thing.  Are we?

6              A.  Yes.

7              Q.  Doctor, the chemical hematoxylin

8    stains blue or purple, right?

9              A.  Yes.

10             Q.  And eosin stains pink?

11             A.  That's correct.

12             Q.  And, Doctor, you understand that the

13   staining process used by a pathologist is an ionic

14   chemical reaction don't you, sir?

15             A.  No, not all stains and in some cases

16   most of the dyes actually have very complex

17   staining mechanisms.  They require additional

18   molecules, mordants.  It's not just ionic.

19             Q.  Well, hematoxylin is a positively

20   charged ion isn't it?

21             A.  Hematoxylin is being transformed

22   during staining and there are different mordants.

23   I'm not sure if it always stays the same charge

24   and if charge has no -- has any effect during
```

Case 2:12-md-02827 Document 3790-17 Filed 04/27/17 Page 267 of 409 PageID #: 138740
Case 2:12-md-02827 Document 3795-17 Filed 05/04/17 Page 267 of 504 PageID #: 68420
Vladimir Iakovlev, M.D.

1    staining, because there are different mordants

2    like iron and alum mordant so the answer is quite

3    complex.

4            Q.  Doctor, you understand that

5    hematoxylin binds with negatively charged

6    substances in the body don't you, sir?

7            A.  I gave you an answer.  Most of the

8    dyes have very complex binding mechanisms.  It's

9    not just electrostatic charge.

10           Q.  And, Doctor, that's how hematoxylin

11   produces color isn't it?

12           A.  That's how all of the dyes produce

13   color, through very complex binding mechanisms

14   which require not just dye but also other

15   molecules, mostly metals.

16           Q.  Doctor, eosin, we've talked about

17   hematoxylin but I want to talk about eosin, the

18   other half, alright?

19           A.  Okay.

20           Q.  Eosin, it's a negatively charged ion

21   isn't it?

22           A.  Possible.

23           Q.  And eosin binds with charged

24   substances, positively charged substances in the

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 268 of 409 PageID #: 138741
Case 2:12-md-02327 Document 3795-17 Filed 04/27/16 Page 268 of 504 PageID #: 68429
Vladimir Iakovlev, M.D.

1  body, doesn't it?

2          A.  Again, the process is not as simple

3  as something positively charged with being

4  attracted to negatively charged.  The process is

5  complex and there are other forces involved in

6  staining.

7          Q.  Move to strike as nonresponsive.

8          Doctor, my question is, eosin is

9  negatively charged and binds with positively

10  charged materials in the body, correct?

11          A.  I gave you an answer several times

12  the same answer.  You're trying to make it very

13  simple but it's not.

14          Q.  Okay.  Well, Doctor, let's turn to

15  the Bellew transcript where you testified in West

16  Virginia in front of the judge and jury?  Do you

17  have that in front of you?

18          A.  Yes.

19          Q.  And turn with me to page 687.  And

20  tell me when you're there, Dr. Iakovlev.

21          A.  Yes, 687.

22          Q.  And let's look at line 15.

23          A.  Let me read the whole page.

24          Q.  "QUESTION:  And eosin is negatively

Vladimir Iakovlev, M.D.

```
 1                  charged and binds with positively

 2                  charged materials in the body, correct?

 3                  "ANSWER:  As far as I remember that's

 4                  the mechanism."

 5     Did I read that correctly, Dr. Iakovlev?

 6                  A.  Yes, you did.

 7                  Q.  That was a pretty simple answer that

 8     you gave to that question, right?

 9                  MR. FREESE:  Objection to the form of

10     the question.

11                  MR. ANDERSON:  Object to the form and

12     you didn't read the remaining part of it.  And if

13     we were sitting in front of a judge he or she

14     would make you read the remaining part of it for

15     completeness.  And you didn't do that did you,

16     counsel?

17                  BY MR. HUTCHINSON:

18                  Q.  Doctor, you can answer the question.

19     That was a pretty simple answer that you gave to

20     that question wasn't it?

21                  MR. FREESE:  Objection.  Argumentative.

22     Don't answer it.

23                  BY MR. HUTCHINSON:

24                  Q.  Are you refusing to answer that
```

Vladimir Iakovlev, M.D.

```
 1    question?

 2              MR. FREESE:  I'm instructing him not to

 3    answer it.  You're just arguing with him.

 4              BY MR. HUTCHINSON:

 5              Q.  And, Doctor, let's look at page 687

 6    line 18.

 7              "QUESTION:  Do you know the mechanism?

 8              "ANSWER:  I don't remember exactly what

 9              happens with eosin but I think you're

10              right."

11    Did I read that correctly, sir?

12              A.  You read it correctly.

13              Q.  And, Doctor, when we talk about

14    whether or not hematoxylin has a positive or

15    negative charge, or eosin has a positive or

16    negative charge, all this means is that a material

17    will only stain if it chemically bonds with a

18    material of an opposite bond, correct?

19              A.  This is absolutely wrong because I

20    explain you several times, the staining mechanisms

21    are very complex.  You make it sound like plus,

22    minus, connect and nothing else.  It does not work

23    like that.  The mechanisms are very complex.

24    Polypropylene bark stains with multiple dyes,
```

Vladimir Iakovlev, M.D.

1    blue, pink, green, purple and electrostatic charge

2    has nothing to do in the staining of polypropylene

3    bark.

4              Q.  Move to strike as nonresponsive.

5              MR. ANDERSON:  Just because you don't

6    like the answer --

7              BY MR. HUTCHINSON:

8              Q.  I'm asking for a yes or no.

9              MR. ANDERSON:  And he gave his answer.

10             BY MR. HUTCHINSON:

11             Q.  Am I right or wrong, Doctor?

12             MR. ANDERSON:  Asked and answered.

13             THE DEPONENT:  You were wrong in your

14   question and your statement.

15             BY MR. HUTCHINSON:

16             Q.  Doctor, let's talk about Prolene.

17   Prolene is hydrophobic isn't it?

18             A.  That's correct.

19             Q.  And that means it's not soluble in

20   water, correct?

21             A.  That's correct.

22             Q.  And Prolene does not dissolve in

23   water.  We can agree on that can't we?

24             A.  Yes.

Vladimir Iakovlev, M.D.

```
 1              Q.  And Prolene is nonionic isn't it,

 2   sir?

 3              A.  In any state?  Degraded?  I'm asking

 4   you.

 5              Q.  Fair enough.  Doctor, Prolene before

 6   it's put in the body is nonionic isn't it, sir?

 7              A.  In that state, yes, it is not.

 8              Q.  And nonionic means it does not have

 9   a charge, correct?

10              A.  That's correct.

11              Q.  Okay.  And, Doctor, you don't know

12   the positive or negative components of oxidized

13   Prolene do you, sir?

14              A.  But it doesn't matter because it

15   stains with multiple dyes.  It's clear, it's one

16   hundred percent clear that electrostatic charge

17   has nothing to do with the staining mechanism

18   because it stains with multiple different dyes.

19   Any dye you apply to histological tissue will

20   stain the bark.  I've stained it with different --

21   Ethicon scientists used phloxine, I used

22   trichrome, I use green stains, red stains, I used

23   at least six, seven different dyes.  They all

24   stain it.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 273 of 409 PageID #: 138746
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 273 of 504 PageID #: 68436
Vladimir Iakovlev, M.D.

```
 1              Q.  Move to strike as nonresponsive.

 2              My question, Doctor, is you don't know

 3    the positive or negative components of oxidized

 4    Prolene do you, sir?

 5              A.  Because it doesn't matter.

 6              Q.  Move to strike as nonresponsive.

 7              I need a yes or no, Doctor.  You don't

 8    know the positive or negative components of

 9    oxidized Prolene do you, sir?

10              MR. ANDERSON:  Asked and answered.  Go

11    ahead.

12              THE DEPONENT:  As I said, it doesn't

13    matter that's why I don't know.

14              BY MR. HUTCHINSON:

15              Q.  Move to strike everything before "I

16    don't know".

17              MR. ANDERSON:  Well, I object to your

18    attempt to carve out what you like of his answer

19    and what you don't.

20              BY MR. HUTCHINSON:

21              Q.  Doctor, let's talk about whether or

22    not degraded Prolene stains okay?

23              A.  I thought we were talking about it

24    for the last 15 minutes or so.
```

Vladimir Iakovlev, M.D.

```
 1              Q.  Well, we're going to talk about it a

 2      little more specifically as far as the tests

 3      you've done.  Do you understand that?

 4              A.  I thought we were talking about

 5      that.  Okay.

 6              Q.  And, Doctor, you know what a control

 7      for an experiment is don't you?

 8              A.  Yes.

 9              Q.  And just so I'm clear, but doctors

10      and scientists in Canada use controls when they do

11      experiments.  Is that right, sir?

12              A.  When you do experiment yes, when you

13      do --

14              MR. ANDERSON:  Object to the form.  Go

15      ahead.

16              THE DEPONENT:  When you do experiments

17      in research, yes, you need a control.  When you do

18      diagnostic work you don't need a control.  You

19      don't have a control for each specimen you examine

20      and make a diagnosis.

21              BY MR. HUTCHINSON:

22              Q.  And a control it's part of the

23      scientific process, agree?

24              A.  Scientific, yes.
```

Vladimir Iakovlev, M.D.

1        Q.  Okay.

2        A.  Diagnostic, no.  There is no such a

3   thing as control for each specimen.  It depends on

4   what you do.

5        Q.  Doctor, you'll agree that using a

6   control is the hallmark of good science wouldn't

7   you?

8        MR. ANDERSON:  Objection.  Go ahead.

9        THE DEPONENT:  I think we're talking

10  about different things.

11       BY MR. HUTCHINSON:

12       Q.  Okay.

13       A.  Science and research is one part,

14  one process, diagnostic work, examination of

15  routine, every-day specimens is completely

16  different process.  One part needs controls, the

17  other part for the most part does not.  It depends

18  on what you do.

19       Q.  Dr. Iakovlev, a control increases

20  the reliability of the results, correct?

21       MR. ANDERSON:  Objection to form.

22       THE DEPONENT:  In what process?  In the

23  research or diagnostic work?

24

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2              Q.   In any scientific method, correct,

 3    sir?

 4              A.   But we don't use controls in

 5    diagnostic work.

 6              Q.   And, Doctor, in this case a control

 7    would have been oxidized Prolene that stains

 8    wouldn't it?

 9              A.   But this case was diagnostic work

10    where we don't have controls.  We rely on our

11    knowledge and experience what is normal what is

12    not.  Where have you seen a pathologist, even in

13    their pathology reports, where it says the control

14    was such-and-such tissue from a different patient?

15    It's not there.  We don't function like this.

16              Q.   Doctor, you haven't conducted a

17    controlled experiment to determine whether or not

18    oxidized Prolene stains have you, sir?

19              A.   For Ms. Ramirez?  For all other

20    diagnostic specimens?  Or for research?

21              Q.   Doctor, my question is as broad as

22    it gets.  I'm asking for a yes or no.  You haven't

23    conducted a control experiment to determine

24    whether or not oxidized Prolene stains have you,
```

Vladimir Iakovlev, M.D.

```
1    sir?

2              A.  Yes, I did.  I see it every time,

3    every time I examine mesh specimen oxidized

4    Prolene is staining.  I see it as oxidized.

5              Q.  And, Doctor, you would need to

6    intentionally stain that Prolene when you're doing

7    this control wouldn't you, sir?

8              A.  Can you repeat?

9              MR. ANDERSON:  Objection to the form.

10             BY MR. HUTCHINSON:

11             Q.  You would need to intentionally

12   stain the Prolene -- or I'm sorry.  You would need

13   to intentionally oxidize the Prolene, correct?

14             MR. ANDERSON:  Objection to form, and

15   objection as unintelligible.

16             THE DEPONENT:  I don't exactly

17   understand.  For what?  What purpose exactly?

18             BY MR. HUTCHINSON:

19             Q.  Doctor, the only way to prove that

20   oxidized Prolene stains is by purposefully

21   oxidizing Prolene and seeing how it reacts to H&E

22   stain, right?

23             A.  No, this is wrong.  This is not

24   correct.
```

Vladimir Iakovlev, M.D.

1          Q.   And, Doctor, you were doing an

2    experiment to determine if oxidized Prolene stains

3    weren't you?

4          A.   No.   I was doing an experiment

5    testing if there can be a model which can model

6    oxidation in vivo.

7          Q.   And, Doctor, you haven't finished

8    those tests have you?

9          A.   Yes, but we are talk about something

10   completely different for a different purpose.

11         Q.   Well, Doctor, my question is do you

12   have a control for Ms. Ramirez's case that shows

13   oxidized Prolene stains, yes or no?

14         A.   But we are talking about this for 15

15   minutes.   We do not have controls for each

16   diagnostic specimen.   It's not how the diagnostic

17   work is done.   I mean you're asking for something

18   which is never done.

19         Q.   And I'm just asking is the answer

20   no?

21         A.   You're asking about something which

22   is never done.   There are no controls for

23   diagnostic specimens.

24         Q.   And you were doing a diagnostic

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 279 of 409 PageID #: 133752
Case 2:12-md-02327 Document 3795-17 Filed 04/27/16 Page 279 of 504 PageID #: 68460
Vladimir Iakovlev, M.D.

 1    specimen for Ms. Ramirez, correct?

 2            A.  That's correct.

 3            MR. FREESE:  When you get to a good spot

 4    let's take a break.

 5            MR. HUTCHINSON:  Rich, probably five

 6    minutes or do you need earlier?

 7            MR. FREESE:  Five minutes is fine.  I'm

 8    actually worried about our court reporter than

 9    anyone else.

10            MR. HUTCHINSON:  Then let's take a

11    break.

12            THE VIDEOGRAPHER:  Going off the record

13    at 3:26 p.m.

14            ---  Break taken.

15            THE VIDEOGRAPHER:  We're back on the

16    record at 3:43 p.m.

17            BY MR. HUTCHINSON:

18            Q.  Dr. Iakovlev, I believe it's your

19    testimony that degradation caused Prolene to

20    become brittle, is that right?

21            A.  That's correct.

22            Q.  And you're not a material scientist?

23            A.  I'm not.

24            Q.  You're not a polymer scientist?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 280 of 409 PageID #: 138753
Case 2:12-md-02327 Document 3795-17 Filed 04/28/16 Page 281 of 504 PageID #: 68443
Vladimir Iakovlev, M.D.

1          A.  I'm not.

2          Q.  You're not an analytical chemist?

3          A.  I'm not.

4          Q.  You haven't consulted with anyone in

5     those fields about Ms. Ramirez's explant have you,

6     sir?

7          A.  I have not.

8          Q.  And you would agree that if the

9     Prolene was brittle then that would affect the

10    physical properties of the mesh?

11         A.  That's correct.

12         Q.  And, Doctor, analytical chemists

13    they have equipment to analyze materials, don't

14    they?

15         A.  Yes, they do.  That's what they do.

16         Q.  Like FTIR, is that right?

17         A.  That's correct.

18         Q.  And FTIR is just a way to determine

19    the fingerprint of a chemical.  Is that fair to

20    say?

21         A.  It can be used as an analogy.

22         Q.  And gel permeation chromatography,

23    that's a way to determine loss of molecular

24    weight, is that correct?

Vladimir Yakovlev, M.D.

```
 1              A.  One ways.

 2              Q.  And, Doctor, you've never done an

 3   FTIR or any other type of forensic spectroscopy on

 4   Ms. Ramirez's mesh have you?

 5              A.  No.

 6              Q.  And you've never done any molecular

 7   weight testing on Ms. Ramirez's mesh have you?

 8              A.  No.

 9              Q.  You didn't measure the tensile

10   strength?

11              A.  No.

12              Q.  You didn't measure the elongation?

13              A.  No.

14              Q.  You didn't measure the toughness?

15              A.  No.

16              Q.  In fact you didn't do any type of

17   bench-top testing to determine whether or not the

18   physical properties decreased did you, sir?

19              A.  What do you mean "bench top"?  You

20   mean like wet lab experimental testing?  I have

21   not.

22              Q.  And, Doctor, in fact you haven't

23   done any type of analytical chemistry testing on

24   Ms. Ramirez's explant, have you?
```

Vladimir Iakovlev, M.D.

1          A.  No.

2          Q.  Doctor, I assume that your opinion

3    is that oxidation is what is causing the

4    degradation that you spoke about this morning, is

5    that correct?

6          A.  Well, that's the current knowledge

7    and current understanding that oxidation triggers

8    degradation.

9          Q.  And is that your understanding?

10         A.  That's my understanding.

11         Q.  Okay.  But now doctor, you can't

12   testify to a reasonable degree of scientific

13   certainty that oxidation is what's causing the

14   degradation, can you?

15         MR. ANDERSON:  Objection to form.

16         THE DEPONENT:  Well, I can testify that

17   the body of the literature indicates that

18   oxidation is the most probable mechanism of

19   degradation.

20         BY MR. HUTCHINSON:

21         Q.  Move to strike as nonresponsive.

22         My question, Doctor, is whether or not

23   you can testify to a reasonable degree of

24   scientific certainty that the oxidation is what is

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 283 of 409 PageID #: 138756
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 283 of 501 PageID #: 68446
Vladimir Iakovlev, M.D.

1    causing degradation?

2             A.  Yes, that's what I said, to

3    reasonable degree of scientific certainty.  All

4    body of literature indicates that this is most

5    probable mechanism of degradation.

6             Q.  Doctor, when we talk about oxidation

7    that's the addition of an oxygen atom through the

8    chemical structure, isn't it?

9             A.  Yes, in part.  It may not stay there

10   forever but it involves oxygen.

11            Q.  And you understand that if oxidation

12   occurs you must have a loss of molecular weight?

13            MR. ANDERSON:  Objection.

14            THE DEPONENT:  I think now we're going

15   into an area that is beyond my expertise, into

16   chemical analysis.

17            BY MR. HUTCHINSON:

18            Q.  You can't answer that question, is

19   that correct?

20            A.  No, it's not my area of expertise.

21            Q.  And just so I'm clear, from a

22   chemistry standpoint you cannot answer that

23   question, is that right?

24            MR. ANDERSON:  Objection, asked and

Vladimir Iakovlev, M.D.

1    answer.  He just said he can't do, it's outside of

2    his field and we're not offering him for chemical

3    analysis, or any of those other issues that you're

4    going through.  You know that's for polymer

5    scientists.  So he gave you the answer.  It's the

6    same answer again.  We're not offering him for

7    that.

8              BY MR. HUTCHINSON:

9              Q.  You can answer, Doctor.

10             A.  My answer is that I am not a

11   chemical scientist.  I did not do chemical

12   testing.

13             Q.  Well, Doctor, let's look at your

14   expert report on page 1 for Mr. Ramirez.  You're

15   there, yes, sir?

16             A.  Yes.

17             Q.  The last line, "I am knowledgeable

18   in the areas of chemistry."  Did I read that

19   correctly, sir?

20             A.  Well let's read the full sentence.

21                 "I am knowledgeable in the areas of

22                 chemistry, hematology, microbiology,

23                 serology, immunology and other special

24                 laboratory studies as they relate to my

Vladimir Iakovlev, M.D.

```
1              practice of pathology."

2              Q.  Thank you.  And, Doctor, you're not

3    an expert in chemistry as it relates to oxidation

4    are you?  Dr. Iakovlev?

5              A.  Well, you ask a very broad question

6    and --

7              Q.  My question is simple.  You're not

8    on expert in chemistry as it relates to oxidation

9    are you, sir?

10             A.  Oxidation happens all the time.

11   Burning a fire is oxidation.  I mean, you ask a

12   question so broad.  Yes, I am an expert in some

13   parts of oxidation.  I mean, if you ask me what

14   happens when something burns, oxidizes fast I can

15   tell you.  In terms of polymer science, how this

16   happens I'm not an expert in that field.

17             Q.  Doctor, you'll agree that if

18   oxidation occurs strong carbonyls -- strike that.

19             If oxidation occurs FTIR must show

20   strong carbonyl bands, you'll agree with that

21   wouldn't you?

22             A.  I have no opinion regarding that

23   because as I told you I'm not a chemical

24   scientist.
```

Vladimir Iakovlev, M.D.

```
 1              Q.  And, Doctor, if oxidation occurs

 2    there will be a loss of toughness and tensile

 3    strength and elongation, correct?

 4              MR. ANDERSON:  Objection.  He just said

 5    that this is outside of his area of specialty.

 6    Are you just going to keep asking him questions

 7    and he can just say it every time?

 8              BY MR. HUTCHINSON:

 9              Q.  Is that outside of your area of

10    expertise, Doctor?

11              A.  That's correct.

12              Q.  And, Doctor, you're unaware of any

13    peer-reviewed literature that shows Prolene has

14    loss molecular weight in body, correct?

15              A.  The same answer.  I'm not a chemical

16    scientist.  I do not focus on that aspect.  There

17    might be some literature, because it's outside of

18    my area of expertise I am not focus on this

19    question when I review articles.

20              Q.  And, Doctor, you're unaware of any

21    studies that show Prolene has lost molecular

22    weight in the body, correct?

23              MR. ANDERSON:  Objection, asked and

24    answered.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 287 of 409 PageID #: 128760
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 288 of 504 PageID #: 68449
Vladimir Iakovlev, M.D.

```
1              THE DEPONENT:  I just answered the

2    question.  Since I am not a chemical scientists

3    when I review this literature I am not focusing on

4    that specific topic.  There may or may not be

5    literature out there answering your question.

6              BY MR. HUTCHINSON:

7         Q.  Dr. Iakovlev, you can't tell the

8    jury the chemical structure of oxidized Prolene

9    can you?

10             A.  The same answer.  Do you want me to

11   repeat?

12             MR. ANDERSON:  He said same answer.

13   It's outside of his expertise.

14             BY MR. HUTCHINSON:

15             Q.  Is that outside of your area of

16   expertise?

17             A.  Yes, that's correct.

18             Q.  And, Doctor, you're not an expert in

19   the direct oxidation of polypropylene are you?

20             A.  No.  Well, I can show what happens

21   in the histological sections with degraded

22   polypropylene, but what happens in terms of

23   chemical reactions would be area of expertise for

24   material scientists.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 288 of 409 PageID #: 138761
Case 2:12-md-02327 Document 3705-17 Filed 04/25/17 Page 288 of 504 PageID #: 68449

Vladimir Iakovlev, M.D.

1          Q.  So my question is you're not an

2    expert in the direct oxidation of polypropylene.

3    Yes or no?

4          MR. ANDERSON:  He just answered it.  He

5    doesn't have to give you a yes or no.  And in fact

6    he --

7          MR. HUTCHINSON:  I just want to know if

8    he's an expert.

9          MR. ANDERSON:  Well, he gave you the

10   answer.

11         BY MR. HUTCHINSON:

12         Q.  You can answer, Doctor.

13         A.  I'm an expert in terms of how the

14   process of degradation changes properties of

15   polypropylene in histological sections.  I am not

16   an expert in chemical reactions behind.

17         Q.  Doctor, let's look at what you told

18   the jury in Bellew on page 689.  Page 689, line 6.

19   Tell me when you're there.

20         A.  Yes.

21         Q.  Question, it's the same question I

22   just asked you.

23         "Doctor, you're not an expert in the

24         direct oxidation of polypropylene?

Case 2:12-md-02827  Document 3790-17  Filed 04/27/16  Page 289 of 409  PageID #: 138762
Case 2:12-md-02827  Document 2751-11  Filed 05/04/14  Page 289 of 504 PageID #: 68450
Vladimir Iakovlev, M.D.

1          "ANSWER:  That's correct."

2    Did I read that correctly?

3          A.  You have to give me a second to see

4    exactly what questions are asked.

5          MR. ANDERSON:  And, again, improper use

6    of impeachment.  He said in his answer, "I am not

7    an expert in chemical reactions behind

8    degradation."  I don't know what you're trying to

9    get at, counsel.

10          MS. VERBEEK:  Can we agree on the

11    record, because I'm cutting in and out, that one

12    objection is good for all?

13          MR. HUTCHINSON:  Sure.  Absolutely.

14          MS. VERBEEK:  Thank you.

15          MR. HUTCHINSON:  You're

16          BY MR. HUTCHINSON:

17          Q.  Dr. Iakovlev, did I read that

18    correctly?

19          A.  Okay.  Let's go back to the same --

20    which page and which line did you read?

21          Q.  Doctor, page 689, line 6.

22          "It's fair to say, isn't it, Doctor,

23          that you're not an expert in the direct

24          oxidation of polypropylene?

Vladimir Iakovlev, M.D.

```
 1              "Answer:  That's correct."

 2    Did I read that correctly, Dr. Iakovlev?

 3            A.  Yes, you read it correctly.

 4            Q.  Thank you.  And, Doctor, we talked

 5    about this earlier but you know that Prolene is

 6    the brand name for Ethicon's mesh, right?

 7            A.  Yes.

 8            Q.  And you know that Prolene is made

 9    out of polypropylene plus special additives, is

10    that correct?

11            A.  That's correct.

12            Q.  And in fact that's what makes

13    Prolene different than other meshes on the market.

14    Is that correct, sir?

15            MR. FREESE:  Object to the form and the

16    question.

17            THE DEPONENT:  I don't think I can

18    answer that question.  I don't know if it is

19    different and if that's the only thing which makes

20    it different.

21            BY MR. HUTCHINSON:

22            Q.  That's outside of your area of

23    expertise?

24            A.  Yes.
```

Vladimir Iakovlev, M.D.

```
 1              Q.  And so you can't tell us the names
 2    of antioxidants that Ethicon adds to polypropylene
 3    to make Prolene can you, sir?
 4              A.  No, I cannot.
 5              Q.  And you can't tell the jury how
 6    those antioxidants prevent oxidation can you, sir?
 7              A.  No, I cannot.  I know that they need
 8    to be used because it degrades, that's why it's
 9    being used.
10              Q.  In fact you can't tell the jury the
11    names of the antioxidants that are used can you,
12    sir?
13              MR. ANDERSON:  Objection.  Asked and
14    answered.  Go ahead.
15              THE DEPONENT:  I cannot.
16              BY MR. HUTCHINSON:
17              Q.  I'm sorry?
18              A.  I cannot.
19              Q.  Thank you.
20              A.  I can tell you that Ethicon needs
21    antioxidants in polypropylene to delay
22    degradation.
23              Q.  And, Doctor, you've never done an
24    analysis to determine or quantify the rate at
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 292 of 409 PageID #: 138765
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 292 of 504 PageID #: 68455
Vladimir Iakovlev, M.D.

1   which these antioxidants are depleted have you,

2   sir?

3            MR. ANDERSON:  Well he just said he

4   didn't know what they are so how in the world is

5   he going to know if they're depleted?  But

6   objection.

7            BY MR. HUTCHINSON:

8            Q.  Is that correct, Doctor?  Is that

9   correct, sir?

10           A.  That's correct.

11           Q.  Thank you.  And, Doctor, you showed

12   the jury the slice of wood earlier.  Do you

13   remember that?

14           A.  Yes, I do.

15           Q.  And do you still have it with you?

16           A.  Yes, I do.

17           Q.  And why don't you put it up there on

18   the table?

19           A.  Sure.

20           Q.  And by the way where did you get it?

21   Where did you get that wood?  From the plaintiff's

22   lawyer?

23           MR. ANDERSON:  Objection.

24           THE DEPONENT:  Um ...

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 293 of 409 PageID #: 138766
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 293 of 504 PageID #: 68456
Vladimir Iakovlev, M.D.

```
1                BY MR. ANDERSON:

2                Q.  Doctor?

3                MR. ANDERSON:  The same objection.

4                BY MR. HUTCHINSON:

5                Q.  Did you get that wood from the

6     plaintiff's lawyer?

7                A.  This one?  This specific?

8                Q.  Yes, sir.

9                A.  Yes, it was brought by plaintiff's

10    lawyer.

11               Q.  And if you'll hold it up right

12    there.  Now, you use this piece of wood to

13    demonstrate that there's nothing wrong with the

14    core, is that right?

15               A.  Yes.

16               Q.  Okay.  Now, Dr. Iakovlev, I want to

17    hand you another piece of wood.

18               A.  Yes.

19               MR. ANDERSON:  Plaintiff's lawyer give

20    you that one.

21               MR. FREESE:  We looked at that one

22    yesterday too.

23               BY MR. ANDERSON:

24               Q.  Move to strike.
```

Vladimir Iakovlev, M.D.

```
 1              Dr. Iakovlev, you have never seen a
 2    fiber from a mesh explant have a crack like that
 3    have you, sir?
 4              A.  Which one?  Like this?
 5              Q.  Yes, sir.
 6              A.  When there is chattering in specific
 7    conditions they're in artifact which cracks the
 8    fibers.
 9              Q.  And my question, sir -- why don't
10    you hold the smaller piece up?
11              A.  Yes.
12              Q.  Just the smaller one, I know the
13    bigger one's heavy.  You've never seen a fiber
14    under the microscope that looks like that have
15    you, sir?
16              A.  Not artifact.
17              MR. HUTCHINSON:  Object to the form of
18    the question.
19              THE DEPONENT:  No, I have never seen it.
20              BY MR. HUTCHINSON:
21              Q.  Thank you.  And, Doctor, by the way
22    that wood, let's look at the exhibit that you used
23    in your direct exam.
24              A.  Okay.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 295 of 409 PageID #: 138768
Case 2:12-md-02327 Document 3790-17 Filed 04/26/16 Page 25 of 504 PageID #: 68458
Vladimir Iakovlev, M.D.

1      Q.   That wood's never been in the body
2   has it?

3      A.   No.

4      Q.   And if it had been in the body it
5   would be covered with proteins wouldn't it, sir?

6         MR. ANDERSON:   Objection.

7         THE DEPONENT:   Yes.

8         BY MR. ANDERSON:

9      Q.   And in fact it would be coated,
10  using your own words, with proteins wouldn't it,
11  sir?

12     A.   I wouldn't say coated, it would
13  probably be soaked into the pores of the bark
14  here.

15     Q.   And, Doctor, you testified this
16  morning that eosin stains proteins pink, correct?

17     A.   Yes.

18     Q.   And, Doctor, let's look at your
19  Exhibit 1, which is Ms. Ramirez's report?

20     A.   Yes.

21     Q.   And if you'll turn with me please to
22  page 25?  And let's look at Exhibit 17(A).

23     A.   Page 25.  Of which report?

24         MR. ANDERSON:   Of the case-specific

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 296 of 409 PageID #: 138759
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 296 of 504 PageID #: 68459
Vladimir Iakovlev, M.D.

1    report or the general report?

2              BY MR. ANDERSON:

3              Q.  Yes, case specific.  Page 25, figure

4    JR(17)(A).

5              A.  Yes.

6              Q.  And, Doctor, why don't you hold that

7    up for the jury so they can see it please?  And

8    Doctor, you testified earlier that eosin stains

9    proteins pink.  Do you remember that?

10             A.  Yes.

11             Q.  And, Doctor, you'll agree that the

12   outer layer that in the picture that you've

13   labelled JR(17) is pink, correct?

14             A.  More purple.

15             Q.  Would you show it to the jury?

16             A.  The outer part.

17             Q.  My question, Doctor, is really

18   simple.

19             MR. ANDERSON:  He's trying to answer

20   your question.

21             MR. HUTCHINSON:  No, he's not.  My

22   question is very simple.

23             MR. ANDERSON:  Yes he is.  Just because

24   you say he's not doesn't mean he's not.

Vladimir Iakovlev, M.D.

```
 1              MR. HUTCHINSON:  Absolutely.  Just

 2   because you say he is doesn't mean he is.

 3              MR. ANDERSON:  Oh God.  He's going to

 4   answer your question the way he's going to answer

 5   it.  You want to move to strike it?  Move to

 6   strike it.

 7              MR. HUTCHINSON:  I'll be happy to.

 8              MR. ANDERSON:  I'm sure you would.

 9

10         BY MR. HUTCHINSON:

11         Q.  Dr. Iakovlev?

12         A.  Yes.

13         Q.  You'll agree that the outer layer

14   that you're showing the jury is pink.  Yes or no?

15   Can you answer that question yes or no?

16         A.  I cannot answer that question yes or

17   no.  I have to give you a full answer.  And the

18   full answer will be that the outer portions of the

19   bark, the very edge of this is more pink.  There

20   are more proteins on the surface but when we go

21   deeper down the intensity of color drops and it

22   becomes more purple.

23         Q.  Move to strike everything after "I

24   cannot answer yes or no".
```

Vladimir Iakovlev, M.D.

1          Dr. Iakovlev, you discussed in your

2   direct examination some literature this morning.

3   Do you remember that?

4          A.  Yes, I do.

5          Q.  And in fact let's look at some of

6   that literature.  Let's look at Exhibit 20.  I'm

7   sorry, Exhibit 19.

8          A.  Just give me a second.

9          Q.  Pathology of Explanted Transvaginal

10  Meshes.

11         A.  This is Exhibit 20.

12         Q.  Exhibit 19.

13         A.  Oh 19.  Okay.

14         Q.  Pathology of Explanted Transvaginal

15  Meshes.  Do you see that, Doctor?

16         A.  Yes, I do.

17         Q.  And this is a publication that you

18  authored, correct?

19         A.  That's correct.

20         Q.  And it was published in 2014, is

21  that right?

22         A.  That's correct.

23         Q.  And, Doctor, you were a paid expert

24  witness for the plaintiffs at the time of this

Vladimir Iakovlev, M.D.

1    study weren't you?  In 2014?

2            A.  Yes.

3            Q.  And if we look at that very top

4    paragraph in the abstract do you see that?

5            A.  Yes, I do.

6            Q.  And if you can pull that up?  And I

7    want you to read the very first sentence of the

8    paper you authored.

9                "The use of polypropylene mesh

10               devices for pelvic organ prolapse

11               spread rapidly during the last decade

12               yet our knowledge of the mesh tissue

13               interaction is far from complete."

14           A.  That's correct.

15           Q.  Did I read that correctly, sir?

16           A.  You read it correctly.

17           Q.  Thank you.  And let's look at the

18   other paper that you authored, it's Exhibit 20.

19           A.  Yes.

20           Q.  And it's titled "Degradation of

21   polypropylene In Vivo Microscopic Analysis".  Do

22   you have that paper in front of you, Doctor?

23           A.  Yes, I do.

24           Q.  In fact you were a paid expert

Vladimir Iakovlev, M.D.

```
1    witness for the plaintiffs at the time of this

2    study weren't you?

3              A.  Yes, I was.

4              Q.  And, Doctor, this paper was

5    published by you in July of 2015, is that correct?

6              A.  That's correct.

7              Q.  And in fact that's less than a year

8    ago isn't it, sir?

9              A.  That's correct.

10             Q.  And let's look at the abstract.  And

11   on the left-hand side paragraph in the middle it

12   says, "The fundamental question", do you see that?

13             A.  I do.

14             Q.  And Doctor, you write, "The

15   fundamental question as to whether polypropylene

16   degrades in the body is still debated."  Did I

17   read that correctly?

18             A.  That's correct.  That's what we're

19   doing right now.

20             Q.  And in fact, Doctor, let's look at

21   the first page.  You can pull that down.  And the

22   last sentence under the paragraph "Introduction".

23   Doctor, you write, just less than a year ago, "The

24   causes and mechanisms of complications associated
```

Vladimir Iakovlev, M.D.

```
 1    with the mesh remain incompletely understood."

 2    Did I read that correctly, sir?

 3              A.  That's correct.

 4              Q.  And in fact you go on to write, for

 5    example, "The fundamental question as to whether

 6    or not polypropylene degrades in the body is still

 7    unresolved."  Did I read that correctly?

 8              A.  That's correct.

 9              Q.  And, Doctor, let's look at some more

10    literature that you cite.

11              A.  Sure.

12              Q.  I would like to turn your attention

13    to Exhibit 8 this is the Celine Mary article,

14    correct?

15              A.  Well let me first pull the exhibit.

16    Yes.

17              Q.  And this is one of the documents

18    that you relied on in reaching your opinions, is

19    that correct, sir?

20              A.  That's correct.

21              Q.  And if we look at the first

22    paragraph on the first page it says,

23    "Polypropylene", and I'll give the --

24    "Polypropylene was introduced as a suture material
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 302 of 409 PageID #: 138775
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 302 of 504 PageID #: 68463
Vladimir Iakovlev, M.D.

1    in the late 1950s."  Did I read that correctly?

2            A.  Yes.

3            Q.  "And it has a high flexibility and

4    tensile strength and exhibits low thrombogenicity

5    and tissue reaction."  Did I read that correctly?

6            A.  Well with little mistake but for the

7    most part, yes.

8            Q.  But I did read the fact that it

9    exhibits low tissue reaction correctly didn't I,

10   sir?  If you can highlight it please.

11   "Polypropylene exhibits low thrombogenicity and

12   tissue reaction."  Did I read that correctly, sir?

13           A.  Yes, now you've read it correctly.

14           Q.  Thank you.  And let's look at the

15   Jogenbloed article, Doctor.

16           A.  Exhibit number?

17           Q.  Exhibit 13.

18           A.  Yes.

19           Q.  And if we look at the title, that's

20   the only thing I want to look at on this document.

21           A.  Yes.

22           Q.  It says "Degradation of

23   Polypropylene in the Human Eye".  Did I read that

24   correctly?

Vladimir Iakovlev, M.D.

```
 1              A.  Yes.  It degrades in the eye, in

 2    degrades in other tissues.

 3              Q.  And, Doctor, you understand that UV

 4    light degrades polypropylene don't you?

 5              A.  Yes.

 6              Q.  And, Doctor, vaginal mesh isn't

 7    exposed to UV light in the pelvic region is it,

 8    sir?

 9              A.  Not in normal conditions.

10              Q.  Thank you.  Let's look at Exhibit

11    15, Doctor, that's the Leibert study.

12              A.  Yes.

13              Q.  In fact this is another document

14    that you relied on in support of your opinions,

15    correct?

16              A.  Yes.

17              Q.  And let's look at the very last line

18    in the summary on the first page.  It says,

19    "Long-term effects of polymer implantation upon

20    tissue were not studied in this work."  Did I read

21    that correctly, sir?

22              A.  That's correct.

23              Q.  And in fact, Doctor, you understand

24    from reading the Leibert article that the
```

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 304 of 409 PageID #: 138777
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 304 of 501 PageID #: 68465
Vladimir Iakovlev, M.D.

```
1   scientists studied one filament with antioxidants

2   and one filament without antioxidants, correct?

3          A.   I don't remember if it was just one

4   filament but they compare polymer with

5   antioxidants and without oxidants.

6          Q.   Thank you.  And in fact they

7   compared those after putting it in hamsters, is

8   that correct?

9          A.   That's correct.

10         Q.   And, Doctor, if you look with me on

11  the last page of the Leibert article

12         A.   Yes.

13         Q.   Page 950 please.  It's --

14         A.   The second last.

15         Q.   Yes, the second-to-last, top

16  paragraph.  The paragraph that charts with, "No

17  changes".

18         A.   Yes.

19         Q.   "No changes in mechanical

20              properties or infrared spectra were

21              observed for any of the filaments

22              containing antioxidants which were

23              implanted."

24  Did I read that correctly, sir?
```

Vladimir Iakovlev, M.D.

```
 1              A.  Yes, at the time when they analyzed

 2    that.

 3              Q.  Thank you.  And if we look at the

 4    "Conclusions" section?

 5              A.  I do.

 6              Q.  If we leave -- if we read the very

 7    last line in number 5 it says:

 8                  "These results support the view

 9                  that the changes observed for pure

10                  implanted filaments are due to

11                  oxidation rather than diffusional or

12                  other unknown effects since the

13                  antioxidant specifically inhibits

14                  and/or retards oxidation."

15    Did I read that correctly, sir?

16              A.  Yes, you read it correctly.

17              Q.  Thank you.  And let's look at

18    Exhibit 18, which was the Wood article.

19              A.  Yes.

20              Q.  Dr. Iakovlev, you relied on this for

21    your opinions didn't you, sir?

22              A.  Yes, I did.

23              Q.  And Dr. Iakovlev, you'll agree that

24    the Wood article doesn't even discuss a product
```

Case 2:12-md-02327 Document 3709-17 Filed 04/27/17 Page 306 of 409 PageID #: 138779
Case 2:12-md-02327 Document 3783-4 Filed 04/28/17 Page 306 of 504 PageID #: 68467
Vladimir Iakovlev, M.D.

1    made of Prolene does it, sir?

2              MR. ANDERSON:  Objection.

3              THE DEPONENT:  I can't agree with you.

4    It says "polypropylene".

5              BY MR. ANDERSON:

6              Q.  Move to strike as nonresponsive.

7              I'm talking about Prolene, sir, not

8    polypropylene but Prolene.

9              A.  But Prolene and polypropylene are

10   the same things.

11             Q.  Dr. Iakovlev, you've already told me

12   you're not on analytical chemist, correct?

13             A.  Correct.

14             MR. ANDERSON:  Objection.

15             BY MR. HUTCHINSON:

16             Q.  Alright.  So you'll agree that the

17   Wood article says nothing about Prolene in it,

18   correct?

19             A.  They don't use word "Prolene"

20             Q.  Thank you.

21             A.  That would be a correct statement.

22             Q.  Thank you.

23             A.  But it doesn't mean that they didn't

24   use polypropylene.

Vladimir Iakovlev, M.D.

1              Q.  Thank you.  And, Doctor, if you look

2      at page 117 of the Wood article, 1117 to be exact.

3              A.  Yes.

4              Q.  You'll see that the authors have an

5      FTIR spectra there?

6              A.  Yes.

7              Q.  I'm waiting for the IT folks to

8      catch up.  There it is.  Thank you.

9              And, Doctor, you'll see that there's a

10     carbonyl peak at 1740.  Do you see that?

11             A.  I am not a material scientist.  I

12     cannot interpret this graph.

13             Q.  So you can't interpret whether or

14     not this oxidized -- the polypropylene oxidized in

15     this study can you, sir?

16             A.  I'm not using -- I'm not familiar

17     with this technique.

18             Q.  I'm sorry?

19             A.  I'm not using it.  I'm not familiar

20     with the technique.  I cannot interpret this

21     graph.

22             Q.  Thank you.  In fact you can't

23     interpret any spectra in the Wood article you,

24     sir?

Vladimir Iakovlev, M.D.

```
 1              A.  No.

 2              Q.  In fact, Doctor, you've never seen

 3    an FTIR spectra for oxidized Prolene from the body

 4    have you, sir?

 5              A.  Well, I've seen articles publishing

 6    it.  That's the extent of my knowledge.

 7              MR. HUTCHINSON:  We're going to take a

 8    break, counsel.

 9              THE VIDEOGRAPHER:  Going off the record

10    at 4:13 p.m.

11              ---   Break taken.

12              THE VIDEOGRAPHER:  We're back on the

13    record at 4:22 p.m.

14              BY MR. HUTCHINSON:

15              Q.  Dr. Iakovlev, we just took a break,

16    are you ready to go?

17              A.  Yes.

18              Q.  I want to talk about what you do at

19    the hospital in Canada where you work, okay?

20              A.  Okay.

21              Q.  As a pathologist you study tissue

22    that's been removed from patients, is that right?

23              A.  That's correct.

24              Q.  And then you make slides kind of
```

Vladimir Iakovlev, M.D.

 1  like the ones that you showed the jury earlier, is

 2  that right?

 3          A.  Well my lab makes the slides.

 4          Q.  Okay.  But more or less what you do

 5  as a pathologist is that you review slides and

 6  reach conclusions about a patient's illness or

 7  disease, is that right?

 8          A.  Well I analyze them in view of the

 9  history, connect clinical information with

10  pathological information and then arrive to

11  diagnosis.

12          Q.  Doctor, you'll agree that it's

13  important to never mix up a patient's tissue

14  samples, correct?

15          A.  Yes.

16          Q.  So if we're looking for cancer

17  cells, for example, that would be a bad thing to

18  mix up a patient's tissue samples, is that

19  correct?

20          A.  That's correct.

21          Q.  In fact, Doctor, you would never

22  trust a pathologist who repeatedly mixed up tissue

23  samples would you?

24          MR. ANDERSON:  Objection.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 310 of 409 PageID #: 132783
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 310 of 504 PageID #: 684793
Vladimir Iakovlev, M.D.

1          THE DEPONENT:  Yes.  I mean, this is

2   basic principles that we have to keep track of

3   what is coming from which patient.

4          BY MR. HUTCHINSON:

5          Q.  It's a basic principle that tissue

6   samples should always be accounted for, is that

7   right?

8          A.  Yes.

9          Q.  Okay.  And a pathologist should

10  never mix up tissue samples should they, sir?

11          A.  No.  I mean, they shouldn't mix up

12  -- I mean there are some situations when it does

13  not matter and some situation where it matters.

14  In most cases it matters.

15          Q.  But if it did happen you'd be

16  skeptical of that pathologist's work wouldn't you,

17  sir?

18          A.  Well it may happen at different

19  stages.  It doesn't have to be pathologist's

20  fault.  There are several reasons why it can

21  happen.  I mean, when there are large volumes

22  things happen.  We try to keep them low, as low as

23  possible.

24          Q.  Doctor, have you ever mixed up

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 311 of 409 PageID #: 133784
Case 2:12-md-02827 Document 2790-17 Filed 04/27/17 Page 311 of 504 PageID #: 684732
Vladimir Iakovlev, M.D.

```
 1    tissue samples?

 2              A.  We had some mix-ups.  I mean, this

 3    happens all the time.  Some of the samples I

 4    signed out we had these problems.  We caught them

 5    and corrected the errors.

 6              Q.  Was that at St. Michael's Hospital

 7    in Canada?

 8              A.  Yes.

 9              Q.  Were you reprimanded for that,

10    Doctor?

11              A.  What do you mean?

12              Q.  Were you reprimanded by any type of

13    medical authority for that happening, sir?

14              A.  No, I mean it wasn't my fault.

15              Q.  Doctor, you have given opinions

16    against Ethicon in the Husky Edwards case, is that

17    correct?

18              A.  Yes.

19              Q.  And I want to hand you what's been

20    marked as Exhibit 9 to your deposition.

21              ---DEFENSE EXHIBIT NO. 9:  Rule 26

22              expert report of Dr. Vladimir Iakovlev

23              re. Jo Husky, et al., and Tonya

24              Edwards, et al.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 312 of 409 PageID #: 128785
Case 2:12-md-02327 Document 3690-17 Filed 04/22/16 Page 312 of 504 PageID #: 68475
Vladimir Iakovlev, M.D.

```
1              BY MR. HUTCHINSON:

2              Q.  This is a copy of the report that

3    you prepared against Ethicon.  Is that right, sir?

4              A.  Yes.

5              Q.  And you signed and dated this

6    report, is that correct?

7              A.  Yes.  I don't see a date of this

8    report.

9              Q.  Well, I want to make sure I have the

10   right copy so let's look at page 74.  That's your

11   signature on page 74, is that correct, sir?

12             A.  Yes, it is.

13             Q.  And Doctor, certainly you proofread

14   this before you signed it, correct?

15             A.  Yes, I do read reports when I sign

16   them.

17             Q.  And, Doctor, let's look at page 22

18   of the report that you did for Ms. Edwards.  Are

19   you there?

20             A.  Yes.

21             Q.  And, Doctor, you identify two

22   pictures as Ms. Edward's mesh explant, correct?

23             A.  That's correct.

24             Q.  And there's a picture on the top and
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 313 of 409 PageID #: 132786
Case 2:12-md-02327 Document 3785-17 Filed 04/27/16 Page 313 of 504 PageID #: 682786
Vladimir Iakovlev, M.D.

```
 1    a picture on the bottom?

 2            A.  Yes.

 3            Q.  And both of these pictures were

 4    important to your opinion in the Edward's case,

 5    weren't they?

 6            A.  To a degree.

 7            Q.  And Ms. Edwards received an Ethicon

 8    mesh didn't she, sir?

 9            A.  Yes.

10            Q.  And, Doctor, I've handed you a black

11    Sharpie pen.  Would you circle the top picture for

12    us, please?

13            MR. ANDERSON:  I'm going to object to

14    the relevance of all this line of questioning

15    about Husky Edwards.

16            BY MR. HUTCHINSON:

17            Q.  Circle the top picture for us

18    please, sir.

19            A.  Okay.

20            Q.  And I want you to write down at the

21    bottom "Edwards Ethicon" so that the jury can

22    understand it and review it.  And, Dr. Iakovlev,

23    you've also given testimony against American

24    Medical Systems, is that correct?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 314 of 409 PageID #: 138787
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 314 of 504 PageID #: 68475
Vladimir Iakovlev, M.D.

```
1              A.  That's correct.

2              Q.  I want to hand you what's been

3     marked as Exhibit 10 to your deposition.

4              A.  Yes.

5              ---DEFENSE EXHIBIT NO. 10:  Addendum to

6                  the Rule 26 expert report of

7                  Dr. Vladmir Iakovlev re. Lisa Marie

8                  Fontes, et al.

9              BY MR. HUTCHINSON:

10             Q.  And this is the document or the

11    report that you signed for Lisa Marie Fontes, is

12    that correct?  Doctor?

13             A.  Um, on page 10 I see John Serrano

14    specimen.

15             Q.  No, we're talks about Exhibit 10.

16    That's Exhibit 10.

17             A.  Yes.

18             Q.  My question is, this is the report

19    that you prepared against American Medical Systems

20    for Lisa Marie Fontes, is that correct?

21             A.  That's correct.

22             Q.  And Ms. Fontes received an American

23    Medical Systems mesh didn't she, sir?

24             A.  Yes.
```

Vladimir Iakovlev, M.D.

1          Q.  And that's a company that's

2     completely different from Ethicon isn't it?

3          A.  Yes.

4          Q.  And, Doctor, if you look on page 18

5     of that report, figure 6.  Do you see that figure,

6     Doctor?  Dr. Iakovlev, do you see figure 6 on page

7     18?

8          A.  Well there are two figures in figure

9     6, there is top row figures and bottom row.

10         Q.  And, Doctor, if you'll get your pen

11    and circle the bottom left photograph for the jury

12    please.  Bottom left.

13         A.  Yes, but the entire figure contains

14    two panels, upper panel and lower panel.

15         Q.  I understand.  And, Doctor, your

16    lawyer is going to get to ask you some question.

17         A.  Okay.

18         Q.  But I'm just asking you just the

19    bottom left picture.  You circled two pictures.

20    Just the bottom left picture.

21         A.  It's the same picture.  One is

22    labeled one is not.

23         Q.  And, Doctor, will you please write

24    "AMS" by that photograph?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 316 of 409 PageID #: 132789
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 316 of 504 PageID #: 68479
Vladimir Iakovlev, M.D.

1          A.  Um, I did not say that that specific

2    is AMS.  Why are you making me to do something

3    which I did not do?

4          MR. ANDERSON:  Don't do it.

5          BY MR. HUTCHINSON:

6          Q.  Dr. Iakovlev, would you look at the

7    bottom of that paragraph please and you write "AMS

8    mesh explants."  Don't you, sir?

9          A.  Yes, but there are two panels, one

10   is panel on the top and then one panel on the

11   bottom.

12         Q.  Move to strike as nonresponsive.

13   You write "AMS mesh explants", correct?

14         A.  That's correct.

15         Q.  And in fact, Doctor, I want you to

16   hold these up for the jury, please.  And in your

17   right hand you have an AMS explant mesh, correct?

18         A.  Yes, with two panels.

19         Q.  And in your left hand you have an

20   Ethicon mesh don't you, sir?

21         A.  Yes, I do.

22         Q.  And, Doctor, those pictures that

23   you've circled are identical aren't they?

24         A.  The bottom one here and the top one

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 317 of 409 PageID #: 132790
Case 2:12-md-02327 Document 2377-16 Filed 04/29/16 Page 317 of 504 PageID #: 68480
Vladimir Iakovlev, M.D.

 1    here, yes, they are.  Not the top one here.

 2              Q.  And that tissue couldn't have

 3    belonged to Ms. Edwards who had an Ethicon mesh

 4    and somebody else who had an AMS mesh could it?

 5              A.  No.

 6              Q.  In fact --

 7              A.  Wait a second.  This is not specific

 8    to a specific patient because it does not identify

 9    any patient under these figures.  What it does it

10    combines representative images of thrombosed

11    vessels.  One of them is Ethicon, one of them is

12    AMS.  This one is for specific patient and, yes,

13    one of the images in this specific report was from

14    Ethicon the other one from AMS.

15              Q.  Right.  In fact, Doctor, you

16    included an AMS picture in your Ethicon report

17    didn't you, sir?

18              A.  Did I say that it was just limited

19    to AMS samples?

20              Q.  Doctor, I need you is to stick with

21    me please on page 18.

22              A.  Yes, it was --

23              Q.  And I need you to show the jury --

24              A.  So --

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 318 of 409 PageID #: 133791
Case 2:12-md-02327 Document 2785-17 Filed 03/04/16 Page 318 of 504 PageID #: 68479
Vladimir Iakovlev, M.D.

1          Q.  Excuse me, sir, I'm going to get to

2     ask the questions, okay?

3          MR. ANDERSON:  Well, he's trying to

4     answer your questions.

5          BY MR. HUTCHINSON:

6          Q.  And, Doctor, I need you to show that

7     picture right beside your Ethicon report.

8          MR. ANDERSON:  He just did that.

9          THE DEPONENT:  I just did it.

10         BY MR. HUTCHINSON:

11         Q.  And, Doctor, write "AMS".

12         MR. FREESE:  No, we're not going to be

13    modifying exhibits.  They say what they say.

14         BY MR. HUTCHINSON:

15         Q.  Absolutely.

16         MR. ANDERSON:  If you want to write it

17    on there you write it on there.  If you want to

18    show it to the jury you show it to the jury but

19    you're not going to make him do it.

20         BY MR. HUTCHINSON:

21         Q.  And, Doctor, I've written "AMS" to

22    at the bottom.  Would you publish that to the jury

23    please?

24         A.  Yes, but that's not what I'm saying.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 319 of 409 PageID #: 138792
Case 2:12-md-02327 Document 2551-17 Filed 08/08/16 Page 3 of 504 PageID #: 68480
Vladimir Iakovlev, M.D.

1    Q.  And in fact, Doctor, on the bottom

2    of figure 6, and if the camera would zoom in

3    please, you write "AMS mesh explants."  Don't you,

4    sir?  That's what you write, correct?

5    A.  Yes, one of them is AMS.

6    Q.  And they can't be the same mesh from

7    one from AM and one from Ethicon can it, sir?

8    A.  Well they are.

9    Q.  Is that a mistake, Doctor?

10   A.  Which mistake?  There might be "s"

11   as a plural tense -- sorry, as a plural form is an

12   error, a typo.

13   Q.  Which is a typo?

14   A.  The "explants".

15   Q.  But, Doctor, you'll agree that the

16   AMS mesh picture that you circled is identical to

17   your AM -- to your report in the Edward's case,

18   correct?

19   A.  Well, we clearly see that it's not

20   AMS it's Ethicon case.  It's Ethicon case, yes.

21   Q.  But you labelled it as an AMS

22   explant, correct?

23   A.  Well, I included two pictures here

24   and it was probably a typo that "explants", one of

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 320 of 409 PageID #: 138793
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 320 of 504 PageID #: 68483
Vladimir Iakovlev, M.D.

```
1    them is clearly Ethicon.  And that does not

2    identify which patient.  These are representative

3    images to show thrombosis rather than to attribute

4    specific findings to specific patient so there is

5    a big difference.  Demonstrative purpose or

6    specific diagnostic purpose.

7              Q.  And, Doctor -- but, Doctor, let's

8    look on page 18.  And I want you to show the jury

9    the two samples that you're looking at.  Show the

10   jury.

11             MR. ANDERSON:  How many times do you

12   want him to show the jury?

13             MR. HUTCHINSON:  I know you're upset.

14             MR. ANDERSON:  Nobody's upset.  You

15   think you've got your big gotcha moment.  It

16   doesn't mean nothing to me.

17             BY MR. HUTCHINSON:

18             Q.  Dr. Iakovlev, that's the same tissue

19   sample isn't it, sir?

20             MR. FREESE:  Move to strike your sidebar

21   comment.  Nobody is upset.  You have three people

22   laughing over on this side of the table.

23             MR. HUTCHINSON:  Are you finished?

24             THE DEPONENT:  What do you mean?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 321 of 409 PageID #: 138794
Case 2:12-md-02327 Document 2793-17 Filed 08/24/16 Page 321 of 501 PageID #: 68482
Vladimir Iakovlev, M.D.

1              MR. FREESE:  I might be.  I don't know

2    yet.

3              BY MR. HUTCHINSON:

4         Q.  Dr. Iakovlev, page 18.

5         A.  Yes.

6         Q.  The picture on the top left and the

7    picture on the bottom left, that's the same tissue

8    sample isn't it, sir?

9         A.  I don't know.

10        Q.  It has the same smudge on it in the

11   middle doesn't it, sir?

12        A.  You cannot go by smudge.  You have

13   to go by labels and I would have to see original

14   slides to determine that.

15        Q.  Doctor, you also gave opinions

16   against Ethicon in the Bellew case didn't you,

17   sir?

18        A.  Yes, I did.

19        Q.  I want to hand you what we'll mark

20   as Exhibit 11 in the Bellew case.

21              ---DEFENSE EXHIBIT NO. 11:  Rule 26

22              expert report of Vladimir Iakovlev, re.

23              Diane Bellew.

24

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2              Q.  In fact, Doctor, if you look at page

 3    15 you say at the top "All images are of explanted

 4    Ethicon mesh unless indicated otherwise."  Do you

 5    see that?

 6              A.  Yes, I do.

 7              Q.  And, Doctor, if we turn to page 33

 8    of your report against Ethicon in the Bellew case,

 9    show the jury the picture in the top.

10              A.  Yes.  So we know it's from Edward's

11    case.

12              Q.  And, Doctor, that's the exact same

13    picture that you used in your report against AMS,

14    isn't it?

15              A.  Yes, to demonstrate thrombosis.

16              Q.  And in fact in your AMS report

17    that's the exact same picture that you labelled as

18    an AMS mesh explant, correct?

19              A.  Well, I don't know if --

20              MR. ANDERSON:  Object to the form of the

21    question.

22              THE DEPONENT:  I don't know if it was

23    labelled for both or just for the top.  I cannot

24    remember now what happened in 2014.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 323 of 409 PageID #: 133796
Case 2:12-md-02327 Document 2855-17 Filed 03/04/16 Page 323 of 504 PageID #: 68486
Vladimir Iakovlev, M.D.

```
 1            BY MR. HUTCHINSON:

 2            Q.  Doctor, let's look at Ms. Ramirez's

 3    report.  It's maybe Exhibit 1.

 4            A.  Okay.  Here it is.

 5            Q.  Doctor, you signed and dated

 6    Ms. Ramirez's report, didn't you?

 7            A.  Yes, I did.

 8            Q.  And let's look at page 20.

 9            A.  Page 20 of case specific or page 20

10    --

11            Q.  Of case specific, yes, sir.  Or I'm

12    sorry, general.

13            A.  Yes.

14            Q.  And you write, "All photographs are

15    of explanted Ethicon mesh."

16            MR. FREESE:  Wait.

17            MR. ANDERSON:  Your numbers on this

18    exhibit that you gave me are different.  The page

19    numbers are different.

20            THE DEPONENT:  It's the general.

21            MR. ANDERSON:  Oh it's the general.

22    Okay.

23            BY MR. HUTCHINSON:

24            Q.  Dr. Iakovlev, on page 20 of your
```

Case 2:12-md-02327 Document 3700-17 Filed 04/27/17 Page 324 of 409 PageID #: 132797
Case 2:12-md-02827 Document 1755-17 Filed 04/25/16 Page 3 of 304 PageID #: 68485
Vladimir Iakovlev, M.D.

1    Ramirez report for Jennifer Ramirez you write,

2    "All photographs are of explanted Ethicon

3    devices."  Correct?

4              A.  That's correct.

5              Q.  And, Doctor, if you look at page 32

6    of your report, turn there with me please.

7              A.  Yes.

8              Q.  Show that to the jury.

9              A.  Yes, it's the same pictures we saw

10   before.

11             Q.  That's the exact same picture that

12   you included in your report against AMS, is that

13   correct?

14             A.  One of them.

15             Q.  And, Doctor, that's the exact

16   picture that you included in your AMS report that

17   you labelled an AMS mesh, correct?

18             A.  Well, we agreed that there are two

19   images and one is labelled as AMS, at least one,

20   and the other one, as we agreed, is Ethicon from

21   Ms. Edward's case.

22             Q.  That was just a mistake wasn't it,

23   Doctor?

24             MR. ANDERSON:  Objection.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 325 of 409 PageID #: 132798
Case 2:12-md-02327 Document 3785-17 Filed 04/26/16 Page 325 of 504 PageID #: 68488
Vladimir Iakovlev, M.D.

```
 1              THE DEPONENT:  Again, could be typo.

 2              BY MR. HUTCHINSON:

 3              Q.  Doctor, you also have given

 4    testimony for the plaintiffs against Boston

 5    Scientific haven't you?

 6              MR. ANDERSON:  Objection, asked and

 7    answered.

 8              THE DEPONENT:  Yes, I did.

 9              BY MR. HUTCHINSON:

10              Q.  I want to hand you what we'll mark

11    as the next exhibit.  Defense Exhibit 12.

12              ---DEFENSE EXHIBIT NO. 12:  Rule 26

13              expert report of Dr. Vladimir Iakovlev

14              re. Amal Eghnayem.

15              BY MR. HUTCHINSON:

16              Q.  Are you there with me?

17              A.  Yes.

18              Q.  And, Doctor, this is the report that

19    you did for the Eghnayem case, is that right?

20              A.  That's correct.

21              Q.  And you signed and dated this report

22    didn't you, sir?

23              A.  Yes, I did.

24              Q.  And, Doctor, if you look at page 16
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 326 of 409 PageID #: 138799
Case 2:12-md-02327 Document 3395-17 Filed 05/26/16 Page 326 of 504 PageID #: 68487
Vladimir Iakovlev, M.D.

1    of the report.

2              A.   Yes.

3              Q.   Your write, "All images are of

4    explanted Boston Scientific mesh unless indicated

5    others."   Did I read that correctly, sir?

6              A.   Yes, you did.

7              Q.   And if you go to page 36 of your

8    Boston Scientific report.

9              A.   36?

10             Q.   Yes, sir.

11             A.   Yes.

12             Q.   And using that black pen would you

13   circle the bottom image for us please?

14             A.   This one?

15             Q.   And, Doctor, why don't you write

16   "Boston Scientific" at the bottom?

17             MR. FREESE:   No, we're not going to

18   write anything.

19             THE DEPONENT:   I'm not writing anything.

20   I circled it but I'm not writing.

21             BY MR. HUTCHINSON:

22             Q.   Doctor, would you hand me the

23   document please?  You're refusing to write "Boston

24   Scientific" at the bottom, is that correct?

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 327 of 409 PageID #: 132800
Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 327 of 504 PageID #: 68480
Vladimir Iakovlev, M.D.

```
 1              MR. ANDERSON:  You can't ask him to

 2    alter the exhibits.  If you want to do it you can.

 3              BY MR. HUTCHINSON:

 4              Q.  Doctor, are you refusing to write

 5    Boston Scientific --

 6              MR. ANDERSON:  Don't answer the

 7    question.  Don't answer the question.

 8              MR. FREESE:  He's refusing to do it.

 9              BY MR. ANDERSON:

10              Q.  Doctor, you refuse to write "Boston

11    Scientific" at the bottom didn't you, sir?

12              MR. FREESE:  No, he was instructed not

13    to do it.

14              MR. HUTCHINSON:  Well I'm going to get a

15    yes or no from him on that question.

16              MR. FREESE:  I'm telling you he was

17    instructed not to do it.  You're asking him to

18    modify irrelevant exhibits and we're not going to

19    go down that path.

20              BY MR. HUTCHINSON:

21              Q.  Dr. Iakovlev, are you refusing to

22    answer the question based on counsel's advice?

23              MR. FREESE:  There's no question

24    pending.  You asked him to write something or
```

Vladimir Iakovlev, M.D.

1    modify or alter an exhibit and we're refusing to

2    do that.

3              BY MR. HUTCHINSON:

4              Q.  And, Dr. Iakovlev, are you following

5    the lawyers' instructions?

6              MR. ANDERSON:  Oh my gosh.

7              THE DEPONENT:  Yes.

8              BY MR. HUTCHINSON:

9              Q.  Thank you.  And, Doctor, I want you

10   to compare the picture in your Boston Scientific

11   report to the picture in Ms. Bellew's report,

12   which is Exhibit number 11 on page 40.

13             A.  Yes.

14             Q.  And why don't you show it to the

15   jury alongside the one that you did for Boston

16   Scientific?

17             A.  Yes.

18             Q.  Alongside the one that you did for

19   Boston Scientific.

20             A.  Yeah, they're the same images.

21             Q.  Yeah.  And, Doctor, in your right

22   hand you have a report that you prepared for

23   Boston Scientific, correct?

24             A.  Yes, but I use images from different

Vladimir Iakovlev, M.D.

1   manufacturers.

2            Q.  And, Doctor, in your right hand your

3   report you tell whoever is going to read it that

4   all images are of explanted Boston Scientific mesh

5   don't you, sir?

6            A.  Well --

7            MR. ANDERSON:  Objection to form and

8   relevance.

9            THE DEPONENT:  -- apparently there was

10  missed information -- missed labelling here that

11  it's from Boston Scientific.

12           BY MR. HUTCHINSON:

13           Q.  Thank you.  And in fact, Doctor, if

14  you look in the documents in your right hand, I'm

15  sorry, your left hand, those are Ethicon meshes

16  aren't they, sir?

17           A.  Well I'm not stating that this is

18  Boston Scientific or this is Ethicon.  The only

19  thing that is missing one of the labels misses

20  that it's a different manufacturer, that's it.

21           Q.  Doctor, let's look at what you write

22  on page 16 of the report in your left hand.

23           A.  Well, I told you that --

24           MR. ANDERSON:  Objection, asked and

Vladimir Iakovlev, M.D.

```
 1    answered.

 2              THE DEPONENT:  -- one of the reports is

 3    missing that extra information.  And it doesn't

 4    matter because it does not state that this is

 5    specific manufacturer, it just demonstrates

 6    histological feature.  Manufacturer doesn't

 7    matter.

 8              BY MR. HUTCHINSON:

 9         Q.  Dr. Iakovlev, in your report that

10    you have in your hand now, page 15, you write,

11    "All images are of explanted Ethicon mesh."

12    Correct?

13         A.  That's correct.  I tried to do as

14    precise as possible, but since the focus is not on

15    specific manufacturer but on the histological

16    feature maybe some labels were not expanded

17    appropriately.

18         Q.  And, Doctor, let's look at some more

19    of those labels.  Let's look in the Eghnayem

20    figure 23(B).

21         A.  Now I'm lost which --

22         Q.  Eghnayem, Exhibit number 12.

23         A.  Yes.

24         Q.  Figure 23(B).  And I want you to
```

Vladimir Iakovlev, M.D.

1    compare it to what you did in the Bellew case on

2    page 67.

3               MR. ANDERSON:  Objection.  Relevance and

4    form.

5               THE DEPONENT:  23(B).  And you want me

6    to compare which one?

7               BY MR. HUTCHINSON:

8               Q.  Figure 23(B) on page 51 of your

9    Eghnayem report --

10              A.  With?

11              Q.  -- with figure 25(C) on page 67 of

12   your Bellew report.

13              A.  Figure -- sorry, page?

14              Q.  That's okay, Doctor, let me do it

15   again.  I want you to compare figure 23(B) of your

16   Boston Scientific report to figure 25(C) of your

17   Ethicon report on page 67.

18              A.  Yes.

19              Q.  Doctor, will you show the jury those

20   two images please?

21              A.  So they're exactly the same images.

22              Q.  And, Doctor, in fact the one on the

23   top is from Boston Scientific and the one you have

24   on the bottom is from Ethicon.  Is that correct,

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 332 of 409 PageID #: 133805
Case 2:12-md-02327   Document 3755-17   Filed 04/21/16   Page 32 of 504 PageID #: 68495
Vladimir Iakovlev, M.D.

1    sir?

2              A.  Well, I did not say that the sample

3    is from one and from the other.

4              Q.  In fact, Doctor, you did write that

5    all images are of Ethicon -- are of Boston

6    Scientific unless otherwise indicated, correct?

7              MR. ANDERSON:  Objection.

8              THE DEPONENT:  That was my intent.

9              BY MR. HUTCHINSON:

10             Q.  Thank you

11             A.  But for some labels this information

12   didn't enter it was not entered.

13             Q.  It was not what?

14             A.  Entered.

15             Q.  Entered?

16             A.  Yes.

17             Q.  Entered by whom?

18             A.  By me.

19             Q.  Alright.  Doctor, let's look at the

20   next page.  Page 52 of your Boston Scientific

21   report and compare it to page 68 of your Ethicon

22   report.

23             A.  Yeah, it's the test same image.

24   Again, I'm not demonstrating a feature of a

Vladimir Iakovlev, M.D.

1    specific manufacturer I'm demonstrating a

2    histological feature which is common for all

3    polypropylene meshes, doesn't matter which

4    manufacturer.  Can be coming from AMS, from Boston

5    Scientific, from Ethicon.  All of the meshes

6    degrade.  They will all show the same features.

7            Q.  Move to strike as nonresponsive.

8            Doctor, let's look at 28(A) in your

9    Boston Scientific report and compare it to 30(A)

10   in your Ethicon report.  Those images are

11   identical aren't they?

12           A.  Which ones again?

13           MR. ANDERSON:  Objection.

14           BY MR. HUTCHINSON:

15           Q.  28(A) in your Boston Scientific

16   report and 30(A) in your Ethicon report.

17           MR. FREESE:  Would you identify them

18   by --

19           MR. HUTCHINSON:  Page number?

20           MR. FREESE:  And the party name too

21   please.

22           BY MR. HUTCHINSON:

23           Q.  Those images are identical aren't

24   they, sir?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 334 of 409 PageID #: 132807
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 334 of 504 PageID #: 68495
Vladimir Iakovlev, M.D.

1          MR. FREESE:  Object.  Until you identify

2     what reports in which cases and then we object to

3     the relevance.

4          BY MR. HUTCHINSON:

5          Q.  And, Dr. Iakovlev, I'm referring to

6     your Boston Scientific report, page 58, and your

7     Ethicon report, page 74.

8          A.  Yes.

9          Q.  Those images are identical aren't

10    they, sir?

11         A.  That's correct.

12         Q.  And, Doctor, if we look at the

13    images on page 59 of your Boston Scientific report

14    to page 75 of your Ethicon report, those images

15    are identical aren't they, sir?

16         A.  Yeah.  I'm showing the same feature.

17    I'm using different manufacturers because it

18    doesn't matter, I'm showing features not

19    manufacturers.

20         Q.  And, Doctor, if we look at page 60

21    of your Boston Scientific report and compare that

22    to page 76 of your Ethicon report, those images

23    are identical aren't they, sir?

24         A.  Yes, they are.

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 335 of 409 PageID #: 133808
Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 335 of 504 PageID #: 68498
Vladimir Iakovlev, M.D.

1          Q.  And, Doctor, if we look at page 61

2   of your Boston Scientific report and compare it to

3   page 77 of your Ethicon report those images are

4   identical aren't they, sir?

5          A.  All transmission electron images are

6   identical because I examined only five or six

7   specimens only.  Only I think one or two were

8   Ethicon and others were from other manufacturers.

9          Q.  Move to strike as nonresponsive.

10          My question, sir, is that those images

11   are identical aren't they?

12          A.  Yes.  They show -- as I said, I did

13   very little transmission electron microscopy work.

14   There were just few specimens.  They are the same.

15          Q.  And, Doctor, let's look at page 62

16   of your Boston Scientific report and compare it to

17   page 78 of your Ethicon report.

18          A.  Yes.

19          Q.  62 of the Boston Scientific report

20   and compare that to page 78 of your Ethicon

21   report?

22          A.  Yes.

23          Q.  Those images are identical aren't

24   they, sir?

Vladimir Iakovlev, M.D.

1          MR. ANDERSON:  Objection.

2          THE DEPONENT:  As I said, all

3   transmission electron microscopy images are

4   identical.  I had very limited amount of

5   photographs for transmission electron microscopy.

6   They are all copied from all the same reports.

7          BY MR. HUTCHINSON:

8          Q.  In fact, Doctor, if we look at page

9   63 of your Boston Scientific report and compare

10  that to page 79 of your Ethicon report those

11  images are identical aren't they, sir?

12         A.  Well I just told you, all

13  transmission electron microscopy images are

14  identical for either manufacturer.  Because,

15  again, it doesn't matter what manufacturer I'm

16  showing the features of degradation.

17         Q.  Doctor, those pictures that you're

18  showing us they can't be of both a Boston

19  Scientific and an Ethicon mesh at the same time

20  can they?

21         MR. ANDERSON:  Objection.

22         THE DEPONENT:  No, of course not.

23         BY MR. HUTCHINSON:

24         Q.  Thank you.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 337 of 409 PageID #: 132910
Case 2:12-md-02327 Document 2242-17 Filed 05/04/16 Page 38 of 50 PageID #: 68490
Vladimir Iakovlev, M.D.

1          A.  But the feature is the same.

2          Q.  And, Doctor, you've given testimony

3     in the White case haven't you, sir?

4          A.  Yes.

5          Q.  And I want to hand you what we'll

6     mark as Exhibit 13 to your deposition.

7          ---DEFENSE EXHIBIT NO. 13:  Report by

8          Dr. Iakovlev titled

9          "Clinico-pathological Correlation of

10          Complications Experienced by Ms.

11          Virginia White".

12          BY MR. HUTCHINSON:

13          Q.  This is your expert report that was

14     signed and dated by you, is that correct?

15          A.  That's correct.

16          Q.  And, Doctor, on page 2 at the top

17     you write in your report, "Ethicon TVT sling was

18     placed for incontinence."  Did I read that

19     correctly?

20          MR. ANDERSON:  Objection.

21          MR. FREESE:  Hold on.  Let's identify --

22     you said the White case.  White versus who?

23          MR. HUTCHINSON:  White versus Ethicon.

24

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 338 of 409 PageID #: 138911
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 338 of 504 PageID #: 68499
Vladimir Iakovlev, M.D.

1          BY MR. HUTCHINSON:

2          Q.  Dr. Iakovlev, you write on page 2,

3   "Ethicon TVT sling was placed for incontinence."

4   Correct?

5          MR. ANDERSON:  Objection to the entire

6   line of questions.  It has nothing to do with

7   Ramirez but object to that specific question as

8   well.

9          BY MR. HUTCHINSON:

10         Q.  Dr. Iakovlev?

11         A.  Yes, I do see it.

12         Q.  And that's what you wrote, correct?

13         A.  That's correct.

14         Q.  And you're telling everybody --

15         A.  Well it's not just wrote, this is a

16   clinical summary.  I was copying it from medical

17   records.

18         Q.  Okay.  And, Doctor, Ethicon is the

19   only company that makes a TVT sling aren't they?

20         A.  People use that term flexibly.  So

21   clinician just frequently say "TVT" for any sling.

22         Q.  Move to strike as nonresponsive.

23         MR. ANDERSON:  May not like the answer

24   but --

Vladimir Iakovlev, M.D.

```
1              BY MR. HUTCHINSON:

2              Q.  Dr. Iakovlev, Ethicon is the only

3    company that makes a brand name TVT sling,

4    correct?

5              A.  Brand name TVT sling, yes, but the

6    term is uses loosely by clinicians.

7              Q.  Okay.  And, Doctor, you gave

8    testimony under oath that Ms. White received a TVT

9    sling didn't you, sir?

10             A.  Well I copied it from the records.

11             Q.  And, Doctor, did you ever look at

12   the medical records to make sure that they were

13   accurate?

14             A.  What do you mean?  I'm copying it

15   from the records.

16             Q.  Doctor, I want to hand you what

17   we'll mark as Exhibit 14 to your deposition.

18             ---DEFENSE EXHIBIT NO. 14:  Medical

19             report from Mercy Hospital Northwest

20             Arkansas re. Virginia White.  Bates

21             labelled WHITEV_SMAMM_MDR00027.

22             BY MR. HUTCHINSON:

23             Q.  This is the medical record for

24   Ms. White.  And if you show the jury please in the
```

Vladimir Iakovlev, M.D.

```
 1   middle of the document where we're looking at

 2   under the word "Implants".  Would you show the

 3   jury that for us please?

 4          A.  I have to see where it is.

 5          Q.  Right in the middle.

 6          A.  Yes, I see it.

 7          Q.  Okay.  And, Doctor, the medical

 8   record for Ms. White says, "Inventory:  Sling

 9   transvaginal advent fit.  Implant name:

10   Advantage.  Manufacturer:  Boston Scientific

11   Corporation."  Did I read that correctly?

12          A.  Just let me examine the entire

13   document.

14          MR. FREESE:  Object to the question.

15   You don't have the medical records so you selected

16   one.

17          BY MR. HUTCHINSON:

18          Q.  Your objection is noted.

19          MR. ANDERSON:  Of course it's noted,

20   she's typing it down.  I would hope so.

21          MR. HUTCHINSON:  Your comment is noted

22   too.

23          MR. ANDERSON:  I would hope so.  She's

24   typing it.
```

Vladimir Iakovlev, M.D.

1          BY MR. HUTCHINSON:

2              Q.  Dr. Iakovlev, my question to you is,

3     this medical record for the White case that you

4     gave opinions against Ethicon it says,

5     "Manufacturer:  Boston Scientific".  Correct?

6              A.  Yes, I copied it from the records.

7              Q.  And, Doctor, would you show that to

8     the jury please?  And right in the middle is where

9     it says, "Manufacturer:  Boston Scientific."  Is

10    that right?

11             A.  Yeah, this specific document says

12    Boston Scientific.

13             Q.  And, Doctor, you gave testimony

14    under oath that Ms. White received a product other

15    than Boston Scientific didn't you, sir?

16             MR. FREESE:  Well she did according to

17    the medical record.  Why are you ignoring the top

18    of the exhibit?

19             BY MR. HUTCHINSON:

20             Q.  Dr. Iakovlev, you testified under

21    oath that Ms. White received a TVT sling didn't

22    you, sir?

23             A.  Yes, I did.

24             Q.  And, Doctor, according to the

Vladimir Iakovlev, M.D.

1    medical record for Ms. White she received a

2    product manufactured by Boston Scientific didn't

3    she, sir?

4              MR. FREESE:  Object to the question,

5    misstates the record.  Are you just going to

6    ignore what's right above it?

7              THE DEPONENT:  No, I can see one is a

8    Boston Scientific product, the other is an Ethicon

9    product.

10             BY MR. HUTCHINSON:

11             Q.  In fact, Doctor, the Gynemesh that's

12   not a sling used to treat incontinence is it, sir?

13             MR. ANDERSON:  Objection.

14             THE DEPONENT:  Well let me just read the

15   whole thing again.

16             MR. FREESE:  Can we have a standing

17   objection on anything that is White -- all the

18   stuff that's non-Ramirez specific we don't have

19   complete records.  We don't --

20             MR. HUTCHINSON:  You have a standing

21   objection, counsel.

22             MR. FREESE:  Thank you.

23             MR. HUTCHINSON:  You're welcome.

24

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2              Q.  Dr. Iakovlev, are you still

 3      reviewing that one page medical record?

 4              MR. FREESE:  Objection, argumentative.

 5              THE DEPONENT:  Well, I review

 6      everything.

 7              BY MR. HUTCHINSON:

 8              Q.  Dr. Iakovlev, are you still

 9      reviewing that one page medical record?

10              MR. ANDERSON:  Objection.  Ask your

11      question.

12              BY MR. HUTCHINSON:

13              Q.  That's my question, are you still

14      reviewing that one-page medical record?

15              MR. ANDERSON:  He said he's ready.

16              THE DEPONENT:  I'm ready.

17              BY MR. HUTCHINSON:

18              Q.  Dr. Iakovlev, you testified under

19      oath about the wrong product that Ms. White

20      received didn't you, sir.

21              MR. ANDERSON:  Objection.  Where's the

22      testimony?

23              BY MR. HUTCHINSON:

24              Q.  You can answer.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 344 of 409 PageID #: 133917
Case 2:12-md-02327 Document 3352-4 Filed 04/25/16 Page 344 of 504 PageID #: 63805
Vladimir Iakovlev, M.D.

1          A.  Well, I'm copying here from the

2    records in the summary.  It's not my testimony,

3    it's not my opinion.  That's something I copied

4    from the records.

5          Q.  Doctor, you gave opinions in the

6    White case about a TVT sling, correct?

7          A.  That's -- well, I have to read the

8    whole.  I don't remember the whole case.  Trying

9    -- you're plucking one specific fact.  I have to

10   review the whole report.

11         MR. FREESE:  Well more importantly

12   you're referring to testimony, Chad, and you're

13   refusing to show the witness the testimony you say

14   he gave.

15         BY MR. HUTCHINSON:

16         Q.  Well, let's look at page --

17         MR. FREESE:  And you hand him one page

18   of Ms. White's medical records.

19         BY MR. HUTCHINSON:

20         Q.  I'll tell you what, Doctor, I'll

21   make it easy for you.  Let's look at the first

22   sentence --

23         MR. ANDERSON:  Object to the form of the

24   question.

Vladimir Iakovlev, M.D.

```
 1              BY MR. HUTCHINSON:

 2              Q.  Doctor, let's look at page -- it's

 3      actually page 6.  We're under the

 4      clinico-pathological correlation.  Are you there

 5      with me, Dr. Iakovlev?

 6              A.  You would have to give me time so I

 7      review the document and then I can answer your

 8      questions.

 9              Alright.  So --

10              Q.  Dr. Iakovlev, I'm sorry I don't have

11      a question pending.  I'm not interrupting him but

12      I don't have a question pending.

13              MR. FREESE:  That's fine.

14              MR. HUTCHINSON:  Well, you're looking at

15      me that way and I was going to say --

16              MR. FREESE:  No, I wasn't saying

17      anything.  I was looking because I didn't think

18      there was a question pending.

19              BY MR. HUTCHINSON:

20              Q.  Dr. Iakovlev, turn with me to page 6

21      under "Clinico-pathological correlation".  Are you

22      there?  Dr. Iakovlev, are you there?

23              A.  Yes, I am.

24              Q.  And you write, first sentence:
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 346 of 409 PageID #: 138919
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 346 of 504 PageID #: 63807
Vladimir Iakovlev, M.D.

1          "As described in the clinical

2          records Ms. White had rectocele repair

3          with Gynemesh and TVT retropubic

4          suburethral sling placement for mixed

5          incontinence."

6    Did I read that correctly?

7          A.  That's correct.

8          Q.  And, Doctor, this report that you

9    have in front of you for the White case is a

10   report that contains opinions about Ethicon,

11   correct?

12         A.  That's correct.

13         Q.  And, Doctor, if you look at the

14   medical record that we've marked as Exhibit 13 --

15   14 to your deposition?

16         A.  Yes.

17         Q.  You will agree that in the middle it

18   says, "Manufacturer, Boston Scientific" when it

19   discusses the sling?

20         A.  This is not correct.  It says

21   "Gynecare Gynemesh".  What I received from

22   Ms. White is posterior mesh which was Gynemesh.

23   And I gave opinions regarding Gynemesh

24   manufactured by Ethicon because I received only

Vladimir Iakovlev, M.D.

```
 1   Ethicon product.

 2          Q.  And, Doctor, if you would -- for the

 3   benefit of the jury I'm going to ask that you show

 4   the jury that --

 5          MR. ANDERSON:  No, if you want to show

 6   the jury for something you need to bring your

 7   trial consultant or you bring your own thing.

 8   You're going to stop making him walk around and

 9   parade this thing like a sandwich boy.  Now, if

10   you want to show him something you show it to him.

11   He's not showing you anything else.

12          MR. HUTCHINSON:  He's got Exhibit 14 in

13   front of him, counsel.

14          MR. ANDERSON:  Well, he'll hand it back

15   to you.  Here you go.  Show whatever you want.

16          MR. HUTCHINSON:  No.

17          BY MR. HUTCHINSON:

18          Q.  Dr. Iakovlev, here is Exhibit 14.

19          MR. ANDERSON:  He's not going to be a

20   poster boy no more.  Don't do it.

21          BY MR. HUTCHINSON:

22          Q.  Dr. Iakovlev, would you take Exhibit

23   14 and show the jury where it says the sling that

24   Ms. White received was a TVT sling?
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 348 of 409 PageID #: 133321
Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 348 of 504 PageID #: 63809
Vladimir Iakovlev, M.D.

1          A.  I'm not stating that I received a

2   TVT sling in my White report.  I received a

3   posterior Gynemesh and I gave my opinions

4   regarding Gynemesh.

5          Q.  And you also gave opinions regarding

6   the TVT sling for Ms. White didn't you, sir?  In

7   fact on page 9 under "Urinary Symptoms" you write:

8               "Clinical records indicated

9               worsening of urge incontinence and

10              appearance of urinary obstruction

11              approximately six weeks after the

12              placement of TVT sling."

13  Did I read that correctly?

14          MR. FREESE:  That's now the second

15  question.  You asked a question, then he didn't

16  answer it and you've asked a second question now.

17  Which one do you want him to answer?

18          BY MR. HUTCHINSON:

19          Q.  Dr. Iakovlev, you also gave opinions

20  regarding the TVT sling for Ms. White didn't you,

21  sir?

22          A.  Yes.  Regarding urinary symptoms I

23  gave opinions.  Again --

24          Q.  And in fact, Doctor, you gave

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 349 of 409 PageID #: 138922
Case 2:12-md-02327 Document 3795-17 Filed 04/28/16 Page 349 of 504 PageID #: 63810
Vladimir Iakovlev, M.D.

1   opinions in the White case that TVT was defective,

2   correct?

3           MR. ANDERSON:  Objection.

4           THE DEPONENT:  Well, I didn't use

5   defective, the word "defective" but it caused

6   symptoms.

7           BY MR. HUTCHINSON:

8           Q.  And, Doctor, it was your opinion in

9   the White case that the TVT product degrade, is

10  that correct?

11          A.  I don't see any mentioning of TVT

12  regarding degradation.  Let me read the whole

13  paragraph.

14          Q.  Doctor, it's on the last page.  "It

15  is my opinion that polypropylene of the mesh

16  device degraded while in the body of Ms. White."

17  Did I read that correctly?

18          A.  Well it doesn't say "TVT" anywhere.

19          Q.  Dr. Iakovlev, did I read that

20  correctly?

21          A.  Yes, you did.

22          Q.  Thank you.

23          A.  You didn't read TVT anywhere.

24          Q.  And in fact, Doctor, you write on

Vladimir Iakovlev, M.D.

```
 1    page 9 of your report for Ms. White that she did

 2    receive a TVT sling didn't you, sir?

 3              A.  Well, that's what I copied from the

 4    records.

 5              Q.  And, Doctor, according to the

 6    implant record Ms. White didn't receive a TVT

 7    sling did she, sir?

 8              MR. FREESE:  Object to the form of the

 9    question.  Unless you're going to state on the

10    record and stipulate that there's no other medical

11    record in Ms. White's file that describes a TVT

12    sling -- you've taken one page out of someone's

13    file and are attempting to, I suppose, represent

14    that that is the only record of the description of

15    the sling.  I mean, it's totally improper.  I know

16    you've given me a standing objection on it.  I

17    think we're wasting time.  I don't know how you

18    can ever lay a foundation on this.

19              MR. HUTCHINSON:  Counsel, this has a

20    serial number for the implant.  Your objection is

21    noted.  Just make your objection, we'll move on.

22              BY MR. HUTCHINSON:

23              Q.  Dr. Iakovlev, on Exhibit 14 this

24    lists the two implants that Ms. White received by
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 351 of 409 PageID #: 133924
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 351 of 504 PageID #: 63812
Vladimir Iakovlev, M.D.

```
1    serial number, correct?

2              A.   That's correct.

3              Q.   And, Dr. Iakovlev, did Ms. White

4    received a TVT product with a specific serial

5    number, yes or no?

6              A.   Well all of them have specific

7    numbers.

8              Q.   Move to strike as nonresponsive.

9              MR. ANDERSON:   He answered your

10   question.

11             BY MR. HUTCHINSON:

12             Q.   My question, sir, did Ms. White

13   receive a TVT product with an Ethicon serial

14   number, yes or no?

15             A.   I cannot tell you.   I wasn't

16   handling the product.   I was not inserting them.

17             Q.   Doctor, if you look at page 14?

18             A.   But it's one page and --

19             Q.   I understand that, but my question

20   is if you look at Exhibit 14 can you tell us, do

21   you have Exhibit 14 in front of you, sir?

22             A.   Yes, it's in front of me.

23             Q.   Is it far enough away where you can

24   read it?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 352 of 409 PageID #: 138925
Case 2:12-md-02327 Document 2245-17 Filed 05/04/16 Page 352 of 504 PageID #: 63813
Vladimir Iakovlev, M.D.

1          A.  Well I know what it says.

2          Q.  Doctor, according to Exhibit 14 did

3     Ms. White receive a TVT product with an Ethicon

4     serial number, yes or no?

5          A.  On that page there is no mentioning

6     of TV -- Ethicon TVT brand name.

7          Q.  Thank you.  Doctor, I want to hand

8     you what's been marked as Exhibit 15 to you

9     deposition.

10          ---DEFENSE EXHIBIT NO. 15:  Expert

11              report of Dr. Iakovlev In Re. Ethicon,

12              Inc., Pelvic Repair System Products

13              Liability Litigation relating to all

14              Wave 1 Cases.

15          BY MR. HUTCHINSON:

16          Q.  In fact this is a report that you

17     prepared against Ethicon as early as January of

18     this year, is that correct?

19          A.  That's correct.

20          Q.  And this is a report that's signed

21     and dated by you.  Is that correct, sir?

22          A.  That's correct.

23          Q.  And if we look at page 60 of your

24     report.

Vladimir Iakovlev, M.D.

1          A.  Yes.

2          Q.  You have a figure set 8(E) at the

3    bottom, do you see that?

4          A.  I do.

5          Q.  And I'm going to ask, Doctor, if

6    you'll you use your black pen to circle that

7    photograph, or those two photographs at the bottom

8    please on page 60 of your Wave 1 report.

9          A.  So which ones?

10          Q.  The two photographs at the bottom on

11    page 60 of your Wave 1 report.  And, Doctor, you

12    labelled those photographs as "bladder muscles",

13    correct?

14          A.  Well, let's --

15          Q.  Well --

16          A.  You're stopping me.  The photographs

17    relate to specific portion of the report which is

18    on a different page.

19          Q.  And, Doctor, my question to you is,

20    for the photographs that you've circled on page 60

21    you write at the bottom, "Involvement of the

22    detrusor (bladder) muscle by the mesh, smooth

23    muscle."  Did I read that correctly, sir?

24          A.  Yes.  You read it correctly but you

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 354 of 409 PageID #: 138927
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 354 of 504 PageID #: 63815
Vladimir Iakovlev, M.D.

1    omitted that these all photographs they belong to

2    a specific section of the report, and that section

3    is in front and I can guide you to that.

4             Q.   Well one of my questions, Doctor, is

5    that is of the bladder muscle isn't it?

6             A.   The top photograph?  Yes, it is

7    bladder muscle.

8             Q.   What about the bottom photograph?

9             A.   All these photographs they combine

10   both bladder and the rectum.  And the section in

11   the front clearly describes either bladder or

12   rectum.

13            Q.   And, Doctor, on the photographs on

14   the bottom of page 60 you don't describe these as

15   rectum muscles do you?

16            A.   I describe them on a different page

17   of this report.

18            Q.   Move to strike as nonresponsive.

19            MR. ANDERSON:  You may not like his

20   answer but it's a responsive answer.

21            BY MR. HUTCHINSON:

22            Q.   My question, Doctor, is that on page

23   60 you don't describe these muscles as rectal

24   muscles do you, sir?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 355 of 409 PageID #: 138928
Case 2:12-md-02327 Document 1450-17 Filed 04/27/16 Page 355 of 504 PageID #: 68518
Vladimir Iakovlev, M.D.

1          A.  I describe them on a different page

2     of this report.

3          Q.  In fact, Doctor, if we look at page

4     61 of that report, the very next page, you talk

5     about -- or you show two pictures and label those

6     bladder muscles too, don't you?

7          A.  Again, all these pictures they

8     represent either bladder or the rectum.  And it

9     clearly -- it is clearly described in the report

10    in appropriate section of this report.

11         Q.  Where does it say "rectum" on these

12    pictures that you have in front of you on page 60

13    and 61?

14         A.  I keep telling you it's in a

15    different page of the report.

16         Q.  Doctor, this photograph on -- strike

17    that.

18         Doctor, looking on page 60 of the

19    photograph you've circled?

20         A.  Yes.

21         Q.  Would you show those to the jury

22    please?

23         MR. ANDERSON:  No.  You can show them to

24    the jury if you want to.  Here you go.

Vladimir Iakovlev, M.D.

```
1              MR. HUTCHINSON:  Counsel, we're going to

2    be here all day long but I'm not going to stand in

3    front of the jury and show them the pictures.

4              MR. ANDERSON:  You're not going to make

5    him do it.  You bring them to trial and do it

6    yourself then.

7              BY MR. HUTCHINSON:

8         Q.  Dr. Iakovlev, I've handed you what

9    is Exhibit 15.  Would you take it please?

10        A.  Yes.

11        Q.  Dr. Iakovlev, my question is this,

12   will you agree to show the jury the photographs on

13   page 16?

14             MR. ANDERSON:  No, you can put your

15   camera on it.  He's not going to do this any more.

16             MR. FREESE:  Why are we arguing about

17   this?  Chad, just hold it up yourself.  The

18   camera's right next to you.  Nobody's objecting if

19   you want to hold it up.

20             MR. HUTCHINSON:  I'm entitled to an

21   answer from the witness.

22             MR. ANDERSON:  No, you're not.  You

23   cannot bypass the lawyers to get to the witness.

24   If we tell him he's not doing it he's not doing
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 357 of 409 PageID #: 138930
Case 2:12-md-02327 Document 3795-17 Filed 04/27/16 Page 357 of 504 PageID #: 138930
Vladimir Iakovlev, M.D.

1    it.

2            MR. HUTCHINSON:  I am going to get an

3    answer to the question and the witness may not

4    want to do it and that's fine.

5            MR. FREESE:  Hold on a sec.  You're not

6    asking a question he's refusing to answer, you're

7    asking him to do physical -- become a

8    demonstrative aid for you.  That's not his

9    function here.  He's here to answer questions

10   about his opinions.  If you want the jury to see

11   something you are perfectly welcome to hold it up

12   in front of the camera and show it to them.

13           MR. ANDERSON:  You're not going to

14   disrespect this expert by having him sit there

15   holding up your stuff and then yelling at him.

16   Not going to have it.  We're done with it.

17           BY MR. HUTCHINSON:

18           Q.  Doctor, you've held up a lot of

19   exhibits for the plaintiff lawyers haven't you,

20   sir?

21           MR. ANDERSON:  We've done that.  We're

22   not doing it any more.

23           MR. HUTCHINSON:  No, I'm asking him --

24           MR. ANDERSON:  No, no --

Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 358 of 409 PageID #: 138931
Case 2:12-md-02827 Document 3790-17 Filed 04/27/16 Page 358 of 504 PageID #: 68819
Vladimir Iakovlev, M.D.

1          MR. HUTCHINSON:  I'm getting an answer

2    to the question.

3          BY MR. HUTCHINSON:

4          Q.  Dr. Iakovlev, you've held up

5    exhibits for the plaintiff lawyers haven't you.

6          MR. FREESE:  A piece of wood, the same

7    piece of wood you asked him to hold.

8          THE DEPONENT:  I think I was holding

9    only piece of wood, nothing else.

10         BY MR. HUTCHINSON:

11         Q.  And, Doctor --

12         MR. ANDERSON:  Why don't you just ask

13   him a question and move on with the deposition.

14         BY MR. HUTCHINSON:

15         Q.  -- would you agree to show the jury

16   the photographs on page 60?

17         MR. FREESE:  No, he won't.  You can show

18   the jury the photographs if you like.

19         BY MR. HUTCHINSON:

20         Q.  Would you agree to do that?

21         MR. FREESE:  No.  I'm instructing him

22   not to do it.  This is not even about the Ramirez

23   case.  If you think it's relevant to something you

24   want to prove in Ramirez then you hold it up.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 359 of 409 PageID #: 133932
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 359 of 504 PageID #: 63820
Vladimir Iakovlev, M.D.

```
 1   He's here to answer questions about his opinion in

 2   Ramirez.  We don't need to go through these

 3   gymnastics, Chad.  If you want the jury to see the

 4   picture hold it up.  Hire an IT guy to put it up

 5   on the screen.

 6           MR. ANDERSON:  I think J&J can probably

 7   afford it, huh?  We let you use our guy.  Why

 8   didn't you bring something to show through there?

 9   We're not going to do your work for you.  Are you

10   going to ask the question or not?

11           MR. FREESE:  Really, we're just wasting

12   time.  Let's not argue about it.  If you want to

13   hold something up hold it up but he's not your

14   demonstrative aid.

15           MR. HUTCHINSON:  My question is which

16   one of you all are defending this deposition?

17           MR. FREESE:  Both of us are.

18           MR. ANDERSON:  Are you going to ask your

19   questions or not?  This is ridiculous.

20           BY MR. HUTCHINSON:

21           Q.  Dr. Iakovlev, on page 60 of your

22   report, are any of the photographs you show on

23   page 60 of your report labelled as rectal muscles?

24   Yes or no?
```

Vladimir Iakovlev, M.D.

1          A.  As I said, the description of these

2    pictures is on a different page of this report.

3          Q.  We'll take a quick break.

4          THE VIDEOGRAPHER:  Going off the record

5    at 5:17 p.m.

6          ---  Break taken.

7          THE VIDEOGRAPHER:  Back on the record at

8    5:29 p.m.

9          BY MR. HUTCHINSON:

10         Q.  Dr. Iakovlev, no further questions.

11         A.  Thank you.

12         RE-DIRECT EXAMINATION BY MR. ANDERSON:

13         Q.  Good afternoon, Dr. Iakovlev.  The

14    attorney for the defendants asked you if you have

15    been retained as an expert consultant in cases

16    against the mesh manufacturers AMS, Bard, Boston

17    Scientific and Ethicon.  Do you remember that?

18         A.  Yes, I do.

19         Q.  And for those cases that you've

20    reviewed estimate how many pages of medical

21    records of the patients that you have reviewed in

22    all those cases?

23         A.  Thousands.

24         Q.  Okay.  And are -- is your review and

Vladimir Iakovlev, M.D.

1    your expert consulting work of those related to

2    women who have been injured by mesh?

3             MR. HUTCHINSON:  Objection to form,

4    foundation.

5             THE DEPONENT:  Yes.

6             BY MR. ANDERSON:

7             Q.  And are you asked to relate your

8    pathological findings to complications that women

9    who've been injured by AMS products, Bard

10   products, Boston Scientific, Ethicon products, is

11   that correct?

12            MR. HUTCHINSON:  Objection, foundation.

13            THE DEPONENT:  That's correct.

14            BY MR. ANDERSON:

15            Q.  And are these related to cases that

16   are pending all across the United States?

17            A.  Yes, that's correct.

18            Q.  And is this all involving

19   transvaginal polypropylene meshes?

20            A.  Yes.

21            Q.  Like the TVT-O?

22            A.  Like the TVT-O.

23            Q.  And are all the meshes that you've

24   looked at still on the market?

Vladimir Iakovlev, M.D.

```
 1              A.  No, some of them were so bad that --

 2              MR. HUTCHINSON:  Objection, irrelevant.

 3              THE DEPONENT:  -- they discontinued

 4      their production.

 5              MR. HUTCHINSON:  Objection, relevancy.

 6              BY MR. ANDERSON:

 7              Q.  Is your work in those cases

 8      something that has formed, in addition to your

 9      background, training, and experience, formed the

10      basis for you to be able to do your work in the

11      scientific literature?

12              A.  Yes.

13              Q.  And with regard to your publications

14      in the scientific literature regarding

15      transvaginal meshes, do you include images from

16      all different manufacturers in those scientific

17      studies?

18              A.  Yes, I do.  When I show a

19      histological feature I include all manufacturers.

20      I mean, the features are the same across these

21      manufacturers.

22              Q.  From a pathological standpoint?

23              A.  From a pathological standpoint.

24              Q.  And in your review of all the
```

Vladimir Iakovlev, M.D.

```
1   literature in this case that we discussed quite a

2   bit in your direct examination, have you seen

3   where other scientists, including pathologists,

4   have included features of mesh from different

5   manufactures in their scientific work?

6           A.   That's correct.  Sometimes they

7   don't even know who the manufacturer is.  And

8   polypropylene mesh they describe the mesh but

9   manufacturer isn't known.

10          Q.   Do you find that uncommon or

11  inappropriate to include features of different

12  mesh manufacturers in a body of mesh research in

13  order to try to relate pathological findings to

14  clinical complications?

15          MR. HUTCHINSON:  Objection foundation.

16  Counsel, you're talking about mesh from other

17  manufacturers that he used?

18          MR. FREESE:  Yeah, something like you

19  did in the last hour.

20          MR. ANDERSON:  Yeah, something like

21  that.

22          BY MR. ANDERSON:

23          Q.   Go ahead and answer it please.

24          A.   Yes.  I think it is appropriate just
```

Vladimir Iakovlev, M.D.

1   to see the range of changes and see if there is

2   any change, any difference.  In fact most of the

3   time I cannot even tell what is manufacturer.

4   Looking at the histological slides they all look

5   the same.  The only difference is some of them

6   have blue fibres and some of them have only clear

7   fibers.

8           Q.  Counsel was asking you questions

9   about the testimony against these mesh

10  manufacturers, approximately how many women does

11  that represent that you have -- that have made

12  claims for injuries regarding mesh that you have

13  performed expert consulting work for?

14          MR. HUTCHINSON:  Objection, foundation.

15          BY MR. ANDERSON:

16          Q.  How many are we talking about,

17  doctor?

18          A.  Thousands.

19          MR. HUTCHINSON:  Same objection,

20  foundation.

21          THE DEPONENT:  Tens of thousands of

22  women were injured.  And as I said, some of the

23  devices have been taken off the market because of

24  high complication rate.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 365 of 409 PageID #: 133938
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 365 of 504 PageID #: 63828
Vladimir Iakovlev, M.D.

1          MR. HUTCHINSON:  Move to strike as

2     nonresponsive.

3          BY MR. ANDERSON:

4          Q.  When you have prepared reports in

5     these cases where women have been injured by

6     various mesh manufacturers have you prepared

7     general reports as well as case-specific reports?

8          MR. HUTCHINSON:  Objection, relevance.

9          THE DEPONENT:  Yes, I did.

10         BY MR. ANDERSON:

11         Q.  And in the general portion of those

12    reports are those the one that counsel went to

13    great lengths to show you one after another after

14    another at the end of your cross-examination?

15         A.  Yes.

16         Q.  And in those general reports, like

17    your scientific literature, do you include futures

18    from all different mesh manufacturers that you see

19    in pathological findings?

20         A.  Yes, always.

21         Q.  And do you find anything

22    inappropriate or uncommon about showing

23    pathological changes across all different types of

24    mesh manufacturers in your general reports that

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 366 of 409 PageID #: 138939
Case 2:12-md-02327 Document 3735-9 Filed 04/27/16 Page 366 of 504 PageID #: 63829
Vladimir Iakovlev, M.D.

1   you prepared in this litigation?

2              MR. HUTCHINSON:  Objection, foundation.

3              THE DEPONENT:  No, it's not

4   inappropriate.  Sometimes it's even my purpose

5   just to show the similarities, how similar they

6   are under the microscope.

7              BY MR. ANDERSON:

8        Q.  So for all those reports he kept

9   showing you one after another and showing this

10  image versus that image, was it your intent to

11  present pathological findings across the mesh

12  manufacturers?

13             MR. HUTCHINSON:  Objection, foundation.

14             THE DEPONENT:  Yes, it was.  My intent

15  was to show features and they were similar between

16  manufacturers because the designs are similar.

17             BY MR. ANDERSON:

18       Q.  Of the polypropylene meshes?

19       A.  The polypropylene meshes and

20  transvaginal devices made out of polypropylene

21  meshes.

22             Q.  One of the things counsel showed you

23  was -- I don't know, Exhibit 12 or something.  But

24  he was showing you this bark implying that there

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 367 of 409 PageID #: 138940
Case 2:12-md-02327 Document 3795-17 Filed 04/28/16 Page 38 of 501 PageID #: 63820
Vladimir Iakovlev, M.D.

```
 1    was something inappropriate about putting in

 2    broken bark from one manufacturer to another.  Do

 3    you see that page?

 4              MR. HUTCHINSON:  Objection.

 5              THE DEPONENT:  Yes, I do.

 6              MR. HUTCHINSON:  Objection, form.

 7              BY MR. ANDERSON:

 8         Q.  What's it say in the description of

 9    that?

10         A.  "Blue granules in a bark separated

11    from the core.  Transvaginal mesh of another

12    manufacturer."

13         Q.  Thank you.  When you were shown the

14    information on the Virginia White case, do you

15    remember that?

16         A.  Yes.

17         Q.  Does Virginia White's case have

18    anything to do with Ms. Ramirez?

19              MR. HUTCHINSON:  Counsel, I'm just going

20    to object to the extent that we've admitted that

21    exhibit for the limited purpose of attacking his

22    credibility, and that does not make the entire

23    Virginia White case relevant.

24              MR. FREESE:  Well we'll see about that.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 368 of 409 PageID #: 138941
Case 2:12-md-02327 Document 1435-17 Filed 03/04/16 Page 3 of 504 PageID #: 63829
Vladimir Iakovlev, M.D.

```
 1    I mean my response to that, Chad, is, you know,

 2    there's a reason the rules of evidence don't allow

 3    for impeachment on collateral matters, because

 4    then you get off into a mini-trial on something

 5    else.  You deliberately brought one page of a

 6    medical record of a file that I'm certain has

 7    hundreds of pages of medical records and then

 8    tried to imply -- or not imply, basically said

 9    that he mistranscribed that medical record into

10    his report.  So you have put that into evidence.

11            MR. HUTCHINSON:  Fair enough.  But,

12    counsel, we're simply showing his sloppy

13    methodology.  You know it's sloppy and we put it

14    in for the limited purpose of attacking his

15    credibility.

16            MR. ANDERSON:  I take great exception --

17            MR. HUTCHINSON:  So note my objection.

18            MR. ANDERSON:  No, no, no.  No.  You

19    keep your personal attacks to yourself.

20            MR. HUTCHINSON:  Hey --

21            MR. ANDERSON:  You want to talk about

22    sloppy?

23            MR. HUTCHINSON:  Don't raise your voice

24    at me.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 369 of 409 PageID #: 133942
Case 2:12-md-02327 Document 2785-17 Filed 08/30/16 Page 3p of 504 PageID #: 63880
Vladimir Iakovlev, M.D.

1          MR. ANDERSON:  I already have and I will

2    again.

3          MR. HUTCHINSON:  Don't raise --

4          MR. ANDERSON:  You do not talk about

5    sloppy about this gentleman, you understand?

6          MR. HUTCHINSON:  Don't raise your voice

7    at me.

8          MR. ANDERSON:  You will treat him with

9    respect.

10          MR. HUTCHINSON:  I'm treating him with

11    respect.

12          MR. ANDERSON:  You talk about sloppy,

13    talk about your client who's sloppy.

14          MR. HUTCHINSON:  You treat everybody

15    else here with respect, counsel.  Don't you raise

16    your voice at me.

17          MR. ANDERSON:  I already have and I will

18    again if you keep talking about my witness like

19    that.

20          MR. HUTCHINSON:  I'm not talking about

21    your witness.

22          MR. ANDERSON:  How about your sloppy

23    manufacturer?

24          MR. HUTCHINSON:  I'm not talking about

Case 2:12-md-02327  Document 3390-17  Filed 04/27/16  Page 370 of 409 PageID #: 118843
Case 2:12-md-02327  Document 3395-17  Filed 04/28/16  Page 370 of 504 PageID #: 63884
Vladimir Iakovlev, M.D.

1    your witness.

2              MR. FREESE:  Just object to the form and

3    let us ask -- you introduced this, Chad.  We're

4    going to do a redirect on what you introduced and

5    you can object to the form of the question.

6              MR. HUTCHINSON:  I've already lodged my

7    objection, counsel.  Thank you.

8              BY MR. ANDERSON:

9         Q.  Doctor, is Ms. White a different

10   plaintiff than Ms. Ramirez?

11        A.  Yes, she is.

12        Q.   Is her case pending in a different

13   court?

14        A.  Yes, it is.

15        Q.  How many page of Ms. White's --

16             MR. HUTCHINSON:  Can we have a standing

17   objection to relevance.

18             MR. ANDERSON:  You can have a standing

19   objection to everything you want.

20             MR. FREESE:  Absolutely.  You can have a

21   standing objection on relevancy.

22             MR. HUTCHINSON:  Well, what I mean

23   standing objection on relevancy I'm talking about

24   admitting the exhibit for the limited purpose of

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 371 of 409 PageID #: 138844
Case 2:12-md-02327 Document 3725-17 Filed 04/27/16 Page 371 of 504 PageID #: 63832
Vladimir Iakovlev, M.D.

1      attacking his credibility.

2                    MR. ANDERSON:  Or trying to attack it.

3                    MR. FREESE:  You can have it.

4                    BY MR. ANDERSON:

5             Q.  How many pages of Ms. White's

6      medical record did the defense lawyer show you?

7             A.  Nothing, just one page.

8             Q.  How many medical records were in

9      Ms. White's --

10            A.  Sometimes there are thousands of

11     pages.

12            Q.  Did counsel in fairness provide you

13     with those medical records to take a look at?

14            A.  No, he didn't.

15            Q.  Did he -- he kept saying that you

16     gave opinion in this case, did he offer up your

17     testimony for you to take a look at?

18            A.  No, he didn't.

19            Q.  Doctor, he was -- during this part

20     of your questioning he was asked (sic) whether or

21     not TVT is made by Ethicon, do you recall that?

22            A.  Yes, I do.

23            Q.  In your review of the thousands of

24     pages of medical records across all mesh

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 372 of 409 PageID #: 138845
Case 2:12-md-02327 Document 3295-17 Filed 05/04/16 Page 372 of 504 PageID #: 63885
Vladimir Iakovlev, M.D.

1    manufacturers, have you noted that TVT can be used

2    interchangeably from one mesh manufacturer to

3    another.

4              MR. HUTCHINSON:  Objection, leading.

5              THE DEPONENT:  That's what I told him.

6    When I was answering his questions my first answer

7    was that TVT is a loose term used by clinicians.

8    It means just a sling.

9              BY MR. ANDERSON:

10        Q.   What does "TVT" stand for?

11        A.   Transvaginal tape.

12        Q.   And was Ms. White implanted with a

13   Boston Scientific transvaginal tape?

14        A.   Well, she was implanted with some

15   type of transvaginal tape.

16        Q.   And was it retropubic?

17        A.   Apparently it was retropubic, but I

18   would have to go through the records again to tell

19   you exactly.

20        Q.   And did counsel allow you an

21   opportunity to look through and see where the list

22   -- the "Ethicon TVT retropubic" was in her

23   records?

24        A.   No, he didn't.

Vladimir Iakovlev, M.D.

1          Q.  From all those reports that counsel

2     kept showing you one after another were there any

3     mixed up samples in any of that?

4          A.  No.

5          Q.  When you prepare a medical

6     chronology in your case-specific reports are you

7     simply transferring the patient's medical records

8     and what her doctors have said into your own

9     chronology?

10         A.  Yes.

11         Q.  When you're doing your research or

12    you're preparing the general portion of your

13    reports do you even care which mesh manufacturer

14    it is when you're trying to show the pathological

15    findings and the tissue changes that can relate in

16    a woman's tissue to mesh?

17         A.  No.

18         Q.  Why is that?

19         A.  Because, as I said, they all behave

20    the same way.  TVT slings and tapes are identical.

21    The only difference is AMS was making them out of

22    all clear fiber, Boston Scientific and Ethicon

23    slings are indistinguishable under microscope.  I

24    wouldn't be able to tell you which one is which.

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 374 of 409 PageID #: 138947
Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 374 of 504 PageID #: 63885
Vladimir Iakovlev, M.D.

1          Q.  The defendant for J&J -- the defense

2     counsel for J&J pointed out in this report,

3     Exhibit 15, rectal muscle and bladder muscle.  Do

4     you have that in front of you?

5          A.  Yes, I do.

6          Q.  And do you see on page 58 where you

7     have listed there "rectal muscle"?

8          A.  Yes.

9          Q.  And 59, "bladder muscle" et cetera?

10         A.  Yes, I do.

11         Q.  If you turn back to your report on

12    page 17?

13         A.  Yes.

14         Q.  Do you recall during your testimony

15    you kept saying that there was a part of your

16    report that that all related to?

17         A.  Yes.

18         Q.  Did counsel give you an opportunity

19    to point that out to the jury?

20         A.  No.  After my repeated requests he

21    didn't give me that opportunity.

22         Q.  I'll give you that opportunity now.

23    If you can look at page 17 please explain to the

24    jury what was going on with those images and how

Vladimir Iakovlev, M.D.

1    you referred to it in your report?

2              A.  All those images were provided to

3    support one paragraph on page 17 which has heading

4    "Involvement of Smooth Muscle of the Vaginal Wall,

5    Urinary Bladder, Urethra and Rectum".  And then

6    the description is:

7                    "In explanting transvaginal mesh

8              devices the smooth muscle of the pelvic

9              organs can become affected by the mesh.

10             Microphotographs in figure set 8 are

11             representative of the presence of

12             smooth muscle in explanted mesh

13             devices."

14             And then all of those images they all

15   show the same feature, presence of smooth muscle

16   within the mesh.  Doesn't matter which organ.

17             Q.  Okay.  Let's shift gears for a

18   minute.  During cross-exam counsel emphatically

19   asked you things that you don't do.  You don't

20   implant mesh, right?

21             A.  Yes.

22             Q.  You don't explant mesh?

23             A.  Yes.

24             Q.  You're not an astronaut are you?

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 376 of 409 PageID #: 133049
Case 2:12-md-02327 Document 2325-12 Filed 05/08/16 Page 376 of 501 PageID #: 63887
Vladimir Iakovlev, M.D.

1    A.  No.

2    MR. HUTCHINSON:  Objection,

3  argumentative.

4    Counsel, counsel, withdraw that

5  question, please.  Counsel, Ben, would you

6  withdraw the question please?  It's argumentative.

7  Will you withdraw it?

8    MR. ANDERSON:  No.

9    BY MR. ANDERSON:

10    Q.  Let me ask you this, Dr. Iakovlev,

11  do urogynecologist typically look at pathology?

12    A.  No.

13    Q.  Do polymer scientists typically look

14  at pathology?

15    A.  I hope not.

16    Q.  So within different fields are there

17  different tools for each specialty to be able to

18  examine patients and to be able to examine samples

19  that come from patients?

20    A.  That's correct.

21    Q.  So despite the fact that you don't

22  do this long list, FTIR, SEM, tensile strength,

23  elongation and toughness, or bench-top testing, do

24  you need to do any of that in order to arrive at

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 377 of 409 PageID #: 133850
Case 2:12-md-02327 Document 2753-11 Filed 04/14/16 Page 377 of 504 PageID #: 63830
Vladimir Iakovlev, M.D.

1   pathological findings and to be able to express

2   your opinions that you've given here today?

3           MR. HUTCHINSON:  Objection leading, also

4   form.

5           THE DEPONENT:  No.  None of that is

6   taught in pathology residency, and we're using

7   completely different tools and I'm trained in

8   completely different methods.  None of the

9   pathologists have expertise in any of those

10  techniques.

11          MR. HUTCHINSON:  Objection.  Move to

12  strike as nonresponsive.

13          BY MR. ANDERSON:

14          Q.  Do pathologists typically have an

15  expertise or experience in molecular weight, FTIR,

16  tensile strength, bench-top testing, elongation or

17  toughness testing?

18          A.  I think none of the pathologists

19  anywhere in the world have knowledge of all those

20  techniques.

21          Q.  And do pathologists around the

22  world, when they are looking at explanted meshes,

23  need FTIR, or tensile strength, or molecular

24  weight testing in order to arrive at

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 378 of 409 PageID #: 138851
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 378 of 504 PageID #: 63889
Vladimir Iakovlev, M.D.

1    clinico-pathological correlations?

2            A.  No, they don't.

3            Q.  Counsel asked you questions as to

4    whether or not you ruled out vaginal infections,

5    pre-existing pelvic pain, pre-existing

6    dyspareunia, some metal in the Essure device, and

7    other exams that Ms. Ramirez had.  Do you recall

8    that part of your questioning?

9            MR. HUTCHINSON:  Objection, compound.

10   Also object to form and foundation.

11           BY MR. ANDERSON:

12           Q.  Whatever.  Go ahead, Doctor.

13           A.  I do.

14           Q.  Did any of the doctors for

15   Ms. Ramirez list as the reason for her 2010 or

16   2015 explants vaginal infections?

17           A.  No.

18           Q.  Did any of the doctors who explanted

19   her TVF Ethicon mesh in 2010 or 2015 list

20   pre-existing dyspareunia as the reason for it?

21           A.  No.

22           Q.  Did any of them list the Essure

23   device or some sort of metallic foreign body

24   reaction as the reason that they explanted her TVT

Vladimir Iakovlev, M.D.

1  sling in 2010 or 2015?

2          A.  No, they explanted TVT sling.

3          Q.  Do you need to know the name of the

4  doctor who explanted the TVT-O device, or who

5  implanted the TVT-O device, in order to arrive at

6  pathological conclusions and to give the jury

7  opinions on what you see on the microscopic

8  slides?

9          A.  No, I don't need it.

10          Q.  Do you need to know the name of your

11  technician in your path lab who may have processed

12  the slides in order to offer opinions as an expert

13  in the field of pathology for the jury here today?

14          A.  No, I don't need it.

15          Q.  Can you put up Exhibit 4(C)?

16  Doctor, showing you the -- Doctor, redirecting you

17  back to the part of your testimony where you were

18  talking about Ms. Ramirez's slides here, and the

19  S100 staining on the left showing the nerve

20  entrapment and the scarring on the right.  Do you

21  recall that part of your testimony?

22          A.  I do.

23          Q.  Do you need to count the nerve

24  density in order to make the opinions that you do

Vladimir Iakovlev, M.D.

```
 1    regarding entrapped nerves causing pain and scar

 2    tissue leading to pain?

 3            MR. HUTCHINSON:  Objection, foundation.

 4            THE DEPONENT:  No, I don't need and I

 5    told it to the defense counsel.

 6            MR. HUTCHINSON:  Move to strike as

 7    unresponsive.

 8            BY MR. ANDERSON:

 9            Q.  Do you need to consult with a

10    neuropathologist or any of her treating -- Ms.

11    Ramirez's treating doctors in order to make a

12    determination and have an opinions regarding those

13    slides?

14            A.  No.  I don't need to consult

15    neuropathologist -- and I don't think that

16    neuropathologist would argue that they're not

17    nerves.  They are nerves.

18            MR. HUTCHINSON:  Move to strike as

19    nonresponsive.

20            BY MR. ANDERSON:

21            Q.  Do you need, what did defense

22    counsel say?  Nociceptors and PGP9.5 in order to

23    be able to make the opinions you do about the

24    images that the jury is seeing there with regard
```

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 381 of 409 PageID #: 138854
Case 2:12-md-02827  Document 3790-17  Filed 04/27/16  Page 381 of 504 PageID #: 63842
Vladimir Iakovlev, M.D.

1    to the explants from Ms. Ramirez's body?

2          A.  No.  I could see these nerves even

3    on H&E.  I didn't even need to do S100.

4          MR. HUTCHINSON:  Move to strike as

5    nonresponsive.

6          BY MR. ANDERSON:

7          Q.  Did you need to see this -- explain

8    what you mean by the last statement.

9          MR. HUTCHINSON:  Also object to the

10   form.

11         THE DEPONENT:  I can see the nerves in

12   H&E stain.  And S100 was done more for

13   demonstration, for other people to be able to see

14   them easier, for those who are not pathologists.

15         BY MR. ANDERSON:

16         Q.  Is the lack of dead tissue or

17   necrosis significant to your opinions at all in

18   this case?

19         A.  No, I don't think I barely ever

20   describe necrosis in mesh specimens.

21         Q.  Do you need a neuroma in a pathology

22   slide in order to diagnose whether an entrapped

23   nerve can cause pain?

24         A.  No.  I mean, I know that it can

Vladimir Iakovlev, M.D.

1    happen.  And we can see nerves here right there on

2    the screen.

3              Q.  Counsel went to great lengths to

4    talk about formalin, alcohol, xylene, he said

5    toluene, it's toluene.  Do you remember the

6    questions about that?

7              A.  Yes, I do.

8              MR. HUTCHINSON:  Objection,

9    argumentative.  Counsel, did you hear my

10   objection?

11             MR. ANDERSON:  What did you say?

12             MR. HUTCHINSON:  I said objection,

13   argumentative.

14             BY MR. ANDERSON:

15             Q.  That's fine.

16             In terms of counsel's questions

17   regarding the process of slides, he listed

18   formalin, alcohol, xylene and toluene as things

19   that are treated -- as chemicals that are used to

20   treat specimens in order to put them on the

21   slides.  Do you recall that?

22             A.  I do.

23             Q.  Is that process of using formalin,

24   alcohol, xylene and toluene used every day

Vladimir Iakovlev, M.D.

1   around the world to process pathological slides?

2           A.   Yes.   And it is the same process and

3   it's been used for decades, for a hundred years.

4           Q.   And over those hundred years, or

5   actually let's just take the last 30, has any

6   scientific literature, or have you noticed from

7   your own examination of explants that alcohol,

8   xylene, toluene, or any other treatment of the

9   sample before it's put on the slide, has any

10  effect in causing you to be able to -- whether you

11  can render opinions as to whether or not the mesh

12  has certain tissue reaction in the woman's tissue?

13          MR. HUTCHINSON:   Objection, foundation.

14          THE DEPONENT:   It was a long question.

15  Can you repeat it?

16          MR. HUTCHINSON:   Ben, can you rephrase

17  that question for us please.

18          MR. ANDERSON:   I'm going to.

19          BY MR. ANDERSON:

20          Q.   In the hundreds of slides -- strike

21  that.

22          In the hundreds of explants that you've

23  examined for purposes of your scientific work, and

24  in the context of litigation, has the use of the

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 384 of 409 PageID #: 138857
Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 384 of 504 PageID #: 63845
Vladimir Iakovlev, M.D.

1   standards of formalin, alcohol, xylene or

2   toluene ever impacted your ability to offer

3   opinions and to do a pathological analysis

4   regarding what you see in the slides?

5          MR. HUTCHINSON:  Objection, foundation.

6          THE DEPONENT:  No.  As I said, it's a

7   standard technique used in all labs around the

8   world in North America.  That's how we do it.

9          BY MR. ANDERSON:

10         Q.  Have you ever seen any of the

11   scientific literature regarding the analysis of

12   explanted meshes that formalin, alcohol, xylene or

13   toluene have impacted a pathologist's ability to

14   analyze explanted pathological tissue?

15         A.  No.

16         Q.  I mean, that's the only way to do it

17   to use all those chemicals.

18         MR. HUTCHINSON:  Move to strike as

19   nonresponsive.

20         BY MR. ANDERSON:

21         Q.  You were shown the pathology report

22   from University of Texas Southwestern from March

23   10, 2015, by counsel.  Do you recall that?

24         A.  I do.

Case 2:12-md-02327   Document 3790-17   Filed 04/27/17   Page 385 of 409   PageID #: 138853
Case 2:12-md-02327   Document 3795-17   Filed 04/28/17   Page 385 of 504 PageID #: 63846
Vladimir Iakovlev, M.D.

1          Q.  And he said they don't list

2   degradation do they?  Do you remember that?

3          A.  Yes, I do.

4          Q.  Do you know if the pathologist was

5   asked to determine whether or not there was

6   degradation?

7          MR. HUTCHINSON:  Objection, foundation,

8   also calls for speculation.

9          THE DEPONENT:  What I see -- what I saw

10  in the report the only question he was asked to

11  confirm if there is mesh or not.

12          BY MR. ANDERSON:

13          Q.  Did counsel provide you with any

14  evidence that there was any question by the

15  surgeon asking the pathologist there to tell him

16  whether or not there was degradation of the mesh?

17  Did he provide you any evidence of that?

18          A.  No.

19          Q.  Did he provide you any evidence that

20  the surgeon asked the pathologist to tell him

21  whether or not there was bridging fibrosis or scar

22  plating?

23          A.  No.

24          MR. HUTCHINSON:  I'm sorry, our iPad has

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 386 of 409 PageID #: 138859
Case 2:12-md-02327 Document 3795-17 Filed 05/20/16 Page 386 of 504 PageID #: 63884

Vladimir Iakovlev, M.D.

1    stopped.

2              THE VIDEOGRAPHER:  Going off the record

3    at 5:52 p.m.

4              ---  Break taken.

5              THE VIDEOGRAPHER:  Back on the record at

6    5:53 p.m.

7              BY MR. ANDERSON:

8         Q.  Did counsel provide you any evidence

9    that the surgeon at University of Texas Southwest

10   Hospital asked for any information other than that

11   which was given in his pathology report?

12        A.  No.

13        Q.  Did counsel provide you with any

14   evidence as to whether or not the pathologist at

15   UT Southwestern is even aware of the pathological

16   change in the tissue related to mesh that can lead

17   to degradation, fibrotic bridging or scar plating?

18   Did he provide you any evidence of that?

19        A.  No.

20        Q.  Do we have any idea what the level

21   of knowledge or the scientific background is of

22   the pathologist who looked at Ms. Ramirez's

23   explant?

24        A.  We don't.

Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 387 of 409 PageID #: 138860
Case 2:12-md-02327  Document 3790-17  Filed 04/27/16  Page 387 of 504 PageID #: 63840
Vladimir Iakovlev, M.D.

1          MR. HUTCHINSON:  Ben, I'm going to

2    object to your last question as pure speculation.

3          MR. ANDERSON:  I wish you would.

4          MR. HUTCHINSON:  Thank you.

5          MR. ANDERSON:  Sure.

6          BY MR. ANDERSON:

7          Q.  Counsel asked you a long series of

8    questions about negatively charged ions,

9    positively charged ions, hydrostatic, soluble and

10   all things like that.  Do you remember that part

11   of your question?

12         A.  I do.

13         Q.  Are any of those features important

14   or significant to you as a pathologist in being

15   able to stain mesh explants, and to offer opinions

16   regarding what those tissue changes are on the

17   microscopic slide?

18         MR. HUTCHINSON:  Objection, compound

19   question.

20         THE DEPONENT:  No, doesn't matter how it

21   stains.  The fact that it stains it allows me to

22   see it under microscope that's what's important.

23   Exact mechanism doesn't matter.  And for many dyes

24   we don't even know exact mechanism.

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 388 of 409 PageID #: 138861
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 388 of 504 PageID #: 63849
Vladimir Iakovlev, M.D.

```
 1          BY MR. ANDERSON:

 2          Q.  How many different types of dyes or

 3   staining have been used between you, other

 4   pathological researchers, as well as Ethicon's own

 5   internal pathologists in order to look at bark --

 6   or in order to determine whether or not -- let me

 7   ask a better question.

 8          How many different types of staining

 9   have been used between yourself and the

10   researchers at Ethicon, based upon the internal

11   studies that you saw with regard to being able to

12   stain explanted mesh in order to see if there was

13   in vivo degradation?

14          A.  At least six.

15          Q.  What are those different six stains?

16          A.  Hematoxylin eosin stains it, red

17   counterstain for von Kossa stains it, trichromes,

18   both masson trichrome and other trichromes stain

19   it, counterstain for immunostains stain it,

20   phloxine stains it and stained it when they used

21   in Ethicon, and I'm sure that any other stain will

22   stain in.

23          Q.  Have you been shown by counsel any

24   internal Ethicon documents by their scientists,
```

Vladimir Iakovlev, M.D.

1    not their experts in litigation but by their

2    scientists, indicating they had trouble

3    determining whether or not there was in vivo

4    degradation of their Prolene sutures because they

5    couldn't dye it properly or stain it properly?

6              MR. HUTCHINSON:  Objection,

7    argumentative.

8              BY MR. ANDERSON:

9         Q.  Seen any reports by them?

10             MR. HUTCHINSON:  Same objection.

11             THE DEPONENT:  No.  They used phloxine

12   and it readily stained the degraded layer.

13             BY MR. ANDERSON:

14        Q.  I'm going to direct your attention

15   back to Exhibit 20, which was your publication,

16   Degradation of Polypropylene In Vivo.  Do you

17   remember counsel asked you some questions about

18   that?

19        A.  Yes, I do.

20        Q.  Do you remember out of these 1, 2,

21   3, 4, oh, 12 or 15 page report remember him

22   pulling out two sentence for you to look at?

23        A.  I do.

24        Q.  And let's look at the two sentences.

Vladimir Iakovlev, M.D.

1  Under the abstract, "The fundamental question as

2  to whether polypropylene degrades in vivo is still

3  debated."  Do you remember that?

4        A.  I do.

5        Q.  And then, "The causes and mechanisms

6  of complications associated with the mesh remain

7  incompletely understood."  Do you see that?

8        A.  Yes, I do.

9        Q.  What did that mean in the context of

10 your study?

11       A.  It means that although there were

12 studies showing it there were attempts to

13 discredit those studies.

14       Q.  Okay.

15       A.  And I used different method to show

16 again the same feature, but using histological

17 methods, which shows some other features of

18 degradation which were not shown before, but they

19 show exactly is the same mechanism in the hope

20 that finally, after this, maybe everybody will

21 agree that it does degrade.  I mean there will be

22 no further attempts to dispute those findings.

23       Q.  And if in fact there is a debate do

24 you recall the slides that we put up with all of

Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 391 of 409 PageID #: 138864
Case 2:12-md-02327  Document 3790-17  Filed 04/27/17  Page 391 of 504 PageID #: 63882
Vladimir Iakovlev, M.D.

1    the various authors, and I showed you all of the

2    various scientific literature regarding

3    polypropylene degradation.  Do you recall that?

4              A.  I do.

5              MR. HUTCHINSON:  Objection.  Foundation.

6              BY MR. ANDERSON:

7              Q.  Any question in your mind that there

8    was any debate by those scientists as to whether

9    or not polypropylene degrades in the body?

10             A.  No.

11             MR. HUTCHINSON:  Objection, also

12   speculation.

13             BY MR. ANDERSON:

14             Q.  Go ahead.

15             A.  It was mostly from a small group of

16   people who were questioning the findings, but I

17   did not see actually studies by them showing that

18   it is not degraded polypropylene.  The only thing

19   they did they questioned the results of those

20   studies but they never proved that it's not

21   polypropylene.

22             Q.  And was this Exhibit 20 actually a

23   study rather than just a criticism of other

24   people's studies?

Vladimir Iakovlev, M.D.

1          A.  Yes, it is study.

2          Q.  And what were the results of this

3  study regarding in vivo degradation of meshes

4  explanted from patients?

5          A.  This study was based on 183

6  specimens, as I remember.  And it showed that in

7  all except one or two I believe the degradation

8  bark was detectable by histology.  The only time,

9  or in one or two sample it was not detectable

10  because the explants were taken out of the body

11  too early.  The bark was too thin to be visible.

12          Q.  Counsel also showed you Exhibit 8,

13  that's the Celine Mary article.

14          A.  Yes.

15          Q.  And he pulled one sentence out of

16  this study regarding the degradation of Prolene

17  sutures.  Do you recall that?

18          MR. HUTCHINSON:  Objection,

19  argumentative.

20          THE DEPONENT:  I do.

21          BY MR. ANDERSON:

22          Q.  And that one sentence on that first

23  page it says, "It has high flexibility and tensile

24  strength and exhibits low thrombogenicity and

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 393 of 409 PageID #: 138866
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 393 of 504 PageID #: 63884
Vladimir Iakovlev, M.D.

```
 1    tissue reaction."  Do you recall that?

 2             A.  I do.

 3             Q.  This article was written in 1998?

 4             A.  Yes.

 5             Q.  Had transvaginal meshes even gone on

 6    the market by 1998?

 7             A.  No, I don't think so.

 8             Q.  And has the marketing and sales of

 9    transvaginal meshes been from 1998 to the present?

10             A.  Yes.

11             Q.  Okay.

12             A.  Within that timeframe.

13             Q.  And have -- based upon your review

14    of the literature have you noted whether or not

15    complications have been reported or not reported

16    over those last 18 years?

17             A.  They have been reported over those

18    years.

19             Q.  And what was the conclusion on page

20    205 from the study?  Let me take you down under

21    the last part of that paragraph.  Beginning with

22    the word "visual evidence" what does that say?

23             A.  "Visual evidence of surface

24                 degradation was observed after one and
```

Vladimir Iakovlev, M.D.

```
 1              two years for the polypropylene but not
 2              the PVDF sutures.  This stress cracking
 3              phenomenon is believed to be associated
 4              with distinct, two-phase structure of
 5              oriented polypropylene monofilaments."
 6         Q.  So what does that collusion mean
 7    to -- in laypeople's terms?
 8         A.  It means that polypropylene degrade,
 9    PVDF didn't degrade.
10         Q.  Counsel also pointed out the Leibert
11    article from 1976 and asked you some questions
12    about that.  Do you recall that?
13         MR. HUTCHINSON:  Excuse me,
14    mischaracterized the testimony.  Counsel, I didn't
15    point that article out you did.
16         BY MR. ANDERSON:
17         Q.  In your questioning you did.
18         A.  Yes, I remember that.
19         Q.  Just turn back to page 950 where
20    counsel was pointing out some of the conclusions.
21    You see that?
22         A.  Yes, I do.
23         Q.  Do you see photograph 4.
24         A.  Number 4?
```

Vladimir Iakovlev, M.D.

```
 1                    Q.  Do you see that?

 2                    A.  Yes, I do.

 3                    Q.  Where it says that the filaments

 4    were analyzed 30 days after implant and up to 150

 5    days?  Do you see that?

 6                    A.  I do.

 7                    Q.  So between a month and five months.

 8    Do you see that?

 9                    MR. HUTCHINSON:  Objection, leading.

10                    MR. ANDERSON:  I'm directing him to a

11    part of the literature.  Cheese and crow.

12                    BY MR. ANDERSON:

13                    Q.  Do you see that?

14                    A.  Yes, I do.

15                    Q.  What was degradation -- strike that.

16                    Based upon the research that you've done

17    in your analysis of over 300 explanted meshes,

18    when does degradation become visible after it's

19    been explanted -- implanted the human body?

20                    MR. HUTCHINSON:  Objection, foundation.

21                    THE DEPONENT:  About a year.

22                    BY MR. ANDERSON:

23                    Q.  And this study didn't go out to a

24    year did it?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 396 of 409 PageID #: 138860
Case 2:12-md-02327 Document 3795-17 Filed 04/27/16 Page 396 of 504 PageID #: 63887
Vladimir Iakovlev, M.D.

```
 1              A.  No, it didn't.

 2              Q.  It didn't go beyond five months did

 3    it?

 4              MR. HUTCHINSON:  Objection, leading.

 5              BY MR. ANDERSON:

 6              Q.  Did it go beyond five months?

 7              A.  No, it didn't.

 8              Q.  Doctor, you were asked a number of

 9    questions by defense counsel as to whether or not

10    you've ever met Ms. Ramirez.  Do you remember

11    that?

12              A.  I do.

13              Q.  How often do pathologists ever meet

14    the patients for the pathological specimens that

15    they're looking at?

16              A.  Practically never, I mean unless

17    it's an autopsy case.

18              Q.  How many pathological specimens do

19    you analyze on an annual basis?

20              A.  Sometimes up to 5,000.

21              Q.  Five thousand.  Would you be able to

22    review five thousand of those if you had to meet

23    all the patients?

24              A.  No.
```

Vladimir Iakovlev, M.D.

```
 1              Q.  How often do pathologists examine

 2   patients in a clinical setting when they are

 3   looking at their pathology in order to determine

 4   what the tissue reactions may be in her body?

 5              A.  Very rarely.  Almost never.

 6              Q.  Counsel showed you some comics or

 7   animations, graphics of a pelvis and wanted you

 8   point out for the jury where Ms. Ramirez had pain.

 9   Do you remember that?

10              MR. HUTCHINSON:  Objection,

11   argumentative.

12              THE DEPONENT:  I do.

13              BY MR. ANDERSON:

14              Q.  In forming your opinions as to

15   whether or not the pathological changes in

16   Ms. Ramirez's tissue correlated to the symptoms of

17   pain in her records, did you rely on animations or

18   did you rely on something else?

19              A.  Well, I relied on real clinical

20   history, real records and real specimen.

21              Q.  Did you feel the need to go to

22   Google and look up any animations of the human

23   pelvis?

24              A.  No.
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 398 of 409 PageID #: 138971
Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 398 of 504 PageID #: 63859
Vladimir Iakovlev, M.D.

```
 1              MR. HUTCHINSON:  Objection,

 2    argumentative.

 3              BY MR. ANDERSON:

 4         Q.  Did you need to know where the pain

 5    was in her vagina in order to come to the opinions

 6    and conclusions that you've offered in this case?

 7         A.  No, not exactly because it was

 8    clinical part, clinical differential diagnosis.

 9    They found where the pain is, they excised the

10    sling.  That was their decision after examination

11    of the patient.

12         Q.  Okay.  And I'm glad you brought that

13    up.  We showed the jury earlier your diagram where

14    you had the -- the urethra and the sling was

15    underneath it, do you recall that?

16         A.  I do.

17         Q.  And what was the purpose of showing

18    that to the jury?

19         A.  Just to show the relationship where

20    the sling is and where the urethra is.

21         Q.  Okay.  In the 1983 and 1984 internal

22    Ethicon Microcrack Prolene Committee studies that

23    you looked at are the cracks that were exhibited

24    in those images caused by the drying?
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 399 of 409 PageID #: 138972
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 3 of 504 PageID #: 63860
Vladimir Iakovlev, M.D.

1           A.  It's distracting.

2           Q.  Did you hear my question?

3           A.  Can you repeat it, because it's

4    distracting when you flip the page

5           Q.  Can you read it back please?

6           THE COURT REPORTER:  In the 1983 and

7    1984 internal Ethicon Microcrack polypropylene

8    committee studies that you looked at, are the

9    cracks that were exhibited in those images caused

10   by the drying?

11          THE DEPONENT:  No.

12          BY MR. ANDERSON:

13          Q.  Okay, explain.

14          A.  It was easier to see in the dry

15   fiber because when it was wet water would be

16   filling the cracks and it would be harder to see

17   it.  But their final conclusion was that it's not

18   the drying which is causing the cracks.

19          Q.  Can you pull out Exhibit 1 please.

20   That would be your general and case-specific

21   report for the case that we're actually here for

22   today, Ms. Ramirez.

23          A.  Yes.

24          Q.  Did counsel for Ethicon show you a

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 400 of 409 PageID #: 138973
Case 2:12-md-02327   Document 3390-17   Filed 05/04/16   Page 400 of 501 PageID #: 63861
Vladimir Iakovlev, M.D.

```
 1   single slide in the Ramirez report that changes

 2   your opinions in any way?

 3            A.  No.

 4            Q.  Was every slide that was labelled

 5   JR(1) through (19) in the Ramirez report actual

 6   tissue and mesh samples explanted from

 7   Ms. Ramirez?

 8            A.  Yes.

 9            Q.  Did counsel show you a single slide

10   in Ms. Ramirez's report that was explanted from a

11   woman other than Ms. Ramirez?

12            A.  No.

13            Q.  Did counsel show you a single slide

14   in the Ramirez report that was mislabelled?

15            A.  No.

16            Q.  In the general report did you state

17   that any of those slides were Ms. Ramirez's?

18            A.  No.

19            Q.  Let's go to page 20 in the general

20   report.  On page 20?

21            A.  Yes.

22            Q.  Did you state on this that this

23   slide was related to Ms. Ramirez?

24            A.  No.
```

Case 2:12-md-02327   Document 3790-17   Filed 04/27/17   Page 401 of 409 PageID #: 133974
Case 2:12-md-02327   Document 3790-17   Filed 04/27/17   Page 401 of 504 PageID #: 63862
Vladimir Iakovlev, M.D.

1          Q.  And on figure 21 what does that say

2     under the figure there?

3          A.  Examples of foreign body

4     inflammatory reaction.

5          Q.  Did you state in this report that

6     that was Ms. Ramirez?

7          A.  No.

8          Q.  Look at page 22.  Did you state

9     anywhere on here that this was from Ms. Ramirez's

10    body?

11         A.  No, I didn't.

12         Q.  And why not?

13         A.  Because it's a general part.  I

14    compile it from different patients from different

15    manufacturers to show histological features.  This

16    is not the case specific part.

17         Q.  Okay.  And in the general report on

18    page 23 did you indicate that any of those images

19    were from Ms. Ramirez?

20         A.  No.

21         Q.  And page 24, what does it say under

22    the figure there?

23         A.  "Example of scar encapsulation".

24         Q.  Did you state that that was

Vladimir Iakovlev, M.D.

```
1    Ms. Ramirez's sample?

2              A.  No.

3              Q.  Is it accurate that these are

4    examples of scar encapsulation?

5              A.  Yes, it is accurate.

6              Q.  And on 25 is it accurate this is an

7    example of scar ingrowth?

8              A.  Yes, it is.

9              Q.  And did you state on here that this

10   was Ms. Ramirez's in any way?

11             A.  No.

12             Q.  On page 26 where it's showing nerve

13   branches, did you state that any of these were

14   Ms. Ramirez's?

15             A.  No, I did not state.

16             Q.  And is this an accurate depiction of

17   nerves embedded in scar tissue?

18             A.  It is.

19             Q.  And on page 27 did you state

20   anywhere here that this was Ms. Ramirez's?

21             A.  No.

22             Q.  And what do you state underneath the

23   figures?

24             A.  "Examples of nerve ingrowth."
```

Case 2:12-md-02327 Document 3790-17 Filed 04/27/17 Page 403 of 409 PageID #: 138976
Case 2:12-md-02327 Document 3790-17 Filed 04/27/16 Page 403 of 504 PageID #: 63864
Vladimir Iakovlev, M.D.

1    Q.  And are those accurate that those

2  are examples of never ingrowth?

3    A.  It is accurate.

4    Q.  And on page 29?

5    A.  Yes.

6    Q.  What does it say underneath where it

7  says figure 4(B)?

8    A.  "Examples of nerve ingrowth."

9    Q.  Does it say that that's

10 Ms. Ramirez's?

11    A.  No.

12    Q.  Is that an accurate depiction of

13 nerve ingrowth seen by S100 stain?

14    A.  It is.

15    Q.  On page 31 what does it say under

16 the diagrams?

17    A.  "Examples of vascular dilatation and

18 edema within mesh compartments."

19    Q.  Is that an accurate example of

20 vascular dilatation and edema within mesh

21 compartments?

22    A.  It is.

23    Q.  And did you state anywhere that that

24 is Ms. Ramirez's?

Vladimir Iakovlev, M.D.

1          A.  No.

2          Q.  Page 32, do you see that?

3          A.  Yes.

4          Q.  Did you state anywhere that that was

5     Ms. Ramirez's?

6          A.  No.

7          Q.  What does it say underneath the

8     image?

9          A.  "Examples of vascular thrombosis

10    within mesh compartments."

11         Q.  And does it accurately depict

12    examples of vascular thrombosis within mesh

13    compartments?

14         A.  It is.

15         Q.  And did counsel for the defense

16    point out any of these images to you on your

17    cross-examination shows where you said that these

18    are just examples of these type of features?

19         MR. HUTCHINSON:  Object to the form.

20    I'm also going to object to the extent that it

21    mischaracterizes the testimony.  I asked him about

22    page 20 where he says all photographs are

23    explanted Ethicon --

24         MR. FREESE:  That was your cross,

Vladimir Iakovlev, M.D.

 1    counsel.

 2            MR. ANDERSON:  That's your cross.  Cross

 3    part 2.  This is my part.

 4            THE DEPONENT:  He did not.

 5            BY MR. ANDERSON:

 6            Q.  Thank you.  Again on page 35 and 36

 7    what do you list under those images?

 8            A.  "An example of blue granules

 9    retained in the degradation layer."

10            Q.  Counsel didn't point those out for

11    the jury, did he, on your cross-examination that

12    you just said these were examples?

13            MR. HUTCHINSON:  Objection, leading.

14            BY MR. ANDERSON:

15            Q.  Did counsel for the defense on the

16    cross-examination allow you to tell the jury that?

17            A.  No, he didn't.

18            Q.  On cross-examination did counsel

19    show you anything in your images or in the text of

20    your report that was inaccurate in any way?

21            A.  No.

22            Q.  Do you stand by all of your opinions

23    that you've given here today and all the opinions

24    that you've expressed in this report?

Vladimir Iakovlev, M.D.

1          A.  I do.

2               MR. ANDERSON:  We will offer all of our

3     exhibits into evidence and fight about the

4     admissibility later on at this time.  Otherwise

5     I'm done for right now.

6               MR. HUTCHINSON:  We may have a re-cross.

7     Give us just a minute.

8               THE VIDEOGRAPHER:  Going off the record

9     at 6:15 p.m.

10               ---  Whereupon the examination was

11     completed at 6:15 p.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:12-md-02327   Document 3790-17   Filed 04/27/16   Page 407 of 409 PageID #: 138880
Case 2:12-md-02327   Document 3705-17   Filed 04/26/16   Page 407 of 504 PageID #: 63889
Vladimir Iakovlev, M.D.

1          REPORTER'S CERTIFICATE

2

3          I, HELEN MARTINEAU, CSR, Certified

4     Shorthand Reporter, certify;

5          That the foregoing proceedings were

6     taken before me at the time and place therein set

7     forth at which time the witness was put under oath

8     by me;

9          That the testimony of the witness and

10    all objections made at the time of the examination

11    were recorded stenographically by me and were

12    thereafter transcribed;

13         That the foregoing is a true and

14    accurate transcript of my shorthand notes so

15    taken.

16

17

18         _____

19         PER:  HELEN MARTINEAU

20         CERTIFIED SHORTHAND REPORTER

21

22

23

24

Vladimir Iakovlev, M.D.

```
 1              -  -   -   -   -  -

              E R R A T A

 2              -  -   -   -   -  -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6       REASON:   _____

 7    _____  _____  _____

 8       REASON:   _____

 9    _____  _____  _____

10       REASON:   _____

11    _____  _____  _____

12       REASON:   _____

13    _____  _____  _____

14       REASON:   _____

15    _____  _____  _____

16       REASON:   _____

17    _____  _____  _____

18       REASON:   _____

19    _____  _____  _____

20       REASON:   _____

21    _____  _____  _____

22       REASON:   _____

23    _____  _____  _____

24       REASON:   _____
```

Vladimir Iakovlev, M.D.

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4          I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     VLADIMIR IAKOVLEV, MD              DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20_____.

20    My commission expires:_____

21

      _____
22    Notary Public

23

24
```