# EXHIBIT

# Q

Case 2:12-md-02327 Document 3799-13 Filed 04/27/17 Page 2 of 28 PageID #: 138904
Case 2:12-md-02327 Document 3799-13 Filed 05/04/16 Page 2 of 28 PageID #: 68810
Vladimir Iakovlev, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         OF THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   CHARLESTON DIVISION

 4

 5   IN RE: ETHICON, INC., PELVIC )  Master File No.

     REPAIR SYSTEM PRODUCTS        )  2:12-MD-02327

 6   LIABILITY LITIGATION          )  MDL 2327

                                   )

 7   THIS DOCUMENT RELATES TO THE )  JOSEPH R. GOODWIN

     FOLLOWING CASES IN WAVE 1 OF )  U.S. DISTRICT JUDGE

 8   MDL 200:                      )

     -----------------------------)

 9

10   DONNA HANKINS, ET AL.,        )  Civil Action No.

11                  Plaintiffs,)  2:12-cv-01011

12   vs.                           )

13   ETHICON, INC., ET AL.         )

14                  Defendants.)

15   -----------------------------

16

17

18   This is the Deposition of VLADIMIR IAKOVLEV, M.D.,

19   taken at the Hilton Hotel, 145 Richmond Street

20   West, Toronto, Ontario, Canada, on Wednesday, the

21   9th day of March, 2016, commencing at 5:30 p.m.

22                  ------------

23

24      REPORTED BY:  JUDITH M. CAPUTO, RPR, CSR, CRR
```

Case 2:12-md-02327 Document 3790-13 Filed 04/27/17 Page 3 of 28 PageID #: 138805
Case 2:12-md-02327 Document 3799-13 Filed 05/09/16 Page 3 of 28 PageID #: 68815
Vladimir Iakovlev, M.D.

Page 2

```
 1   Donna Loustaunau                )
 2   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00666 )
 3   Patricia Ruiz                   )
 4   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01021 )
 5   Betty Funderburke               )
 6   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00957 )
 7   Elizabeth Blynn Wolfe           )
 8   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01286 )
 9   Barbara Vignos-Ware, et al.     )
10   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00761 )
11   Donna Massey, et al.            )
12   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-0880  )
13   Patti Ann Phelps, et al.        )
14   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01171 )
15   Dina Sanders Bennett            )
16   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00497 )
17   Charlene Logan Taylor           )
18   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00376 )
19   Cynthia Nix                     )
20   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01278 )
21   Barbara Kaiser                  )
22   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00887 )
23   Carol Jean Dimock              )
24   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00401 )
```

Page 3

```
 1   Ana Ruebel                      )
 2   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00663 )
 3   Jackie Frye                     )
 4   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-1004  )
 5   Joan Adams                      )
 6   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01203 )
 7   Sharon Boggs, et al.            )
 8   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00368 )
 9   Dina Destefano-Raston, et al. )
10   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01299 )
11   Teresa Georgilakis, et al.      )
12   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00829 )
13   Donna Hankins, et al.           )
14   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01011 )
15   Nancy Hooper, et al.            )
16   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00493 )
17   Krystal Teasley                 )
18   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00500 )
19   Margaret Stubblefield           )
20   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00842 )
21   Cindy Smith                     )
22   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01149 )
23   Lois Hoy, et al.                )
24   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00876 )
```

Page 4

```
 1   Constance Daino, et al.         )
 2   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01145 )
 3   Janet Smith, et al.             )
 4   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00861 )
 5   Harriet Beach                   )
 6   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00476 )
 7   Maria C. Stone, et al.          )
 8   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00652 )
 9   Diane Kropf, et al.             )
10   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-01202 )
11   Virginia White, et al.          )
12   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00958 )
13   Dee McBrayer, et al.            )
14   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00779 )
15   Julie Wroble, et al.            )
16   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00883 )
17   Sherry Fox, et al.              )
18   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00878 )
19   Joyce Justus                    )
20   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00956 )
21   Kathleen Wolfe                  )
22   v. Ethicon, Inc., et al.        )
     Civil Action No. 2:12-cv-00337 )
23   ------------------------------
24
```

Page 5

```
 1   A P P E A R A N C E S :

 2

 3       FOR THE PLAINTIFFS AND THE WITNESS:

 4       ANDERSON LAW OFFICE, LLC

 5       BY: BENJAMIN H. ANDERSON, ESQ.

 6       1360 West 9th Street, Suite 215

 7       Cleveland, OH 44113

 8       Tel. 216.589.0256

 9       Email: ben@andersonlawoffices.net

10

11       FOR THE DEFENDANTS:

12       THOMAS COMBS & SPANN, PLLC

13       BY: PHILIP J. COMBS, ESQ.

14       P.O. Box. 3824

15       300 Summer Street, Suite 1380

16       Charleston, WV 25301

17       Tel. 304.414.1805

18       Email: pcombs@tcspllc.com

19

20

21

22

23

24
```

Page 6

1    I N D E X

2

3  WITNESS:   VLADIMIR IAKOVLEV, M.D.

4                    PAGE

5  DIRECT EXAMINATION BY MR. COMBS............8

6  CROSS-EXAMINATION BY MR. ANDERSON..........83

7  REDIRECT EXAMINATION BY MR. COMBS..........98

8

9

10

11

12

13

14            INDEX OF EXHIBITS

15

16  NUMBER/DESCRIPTION                PAGE NO.

17  NO. 1: Clinico-Pathological Report of      8

18  Dr. Vladimir Iakovlev Re: Donna Hankins

19  dated January 24, 2016.

20  NO. 2: Porter Adventist Hospital Surgical      8

21  Pathology Consult Report dated November 16, 2011.

22  NO. 3: Flash Drive Containing Files      8

23  Reviewed by Dr. Iakovlev in Compiling his

24  Clinico-Pathological Report Re: Donna Hankins.

Page 7

1        INDEX OF EXHIBITS

2            (CONTINUED)

3  NUMBER/DESCRIPTION                PAGE NO.

4

5  NO. 4: Compilation of Clinical Examination      63

6  Notes (five).

7  NO. 5: Urogynecologic Follow-Up Report      74

8  dated August 18, 2011.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 8

1  -- Upon commencing at 5:30 p.m.

2

3

4        EXHIBIT NO. 1:  Clinico-Pathological

5  Report of Dr. Vladimir Iakovlev Re:

6  Donna Hankins dated January 24, 2016.

7  EXHIBIT NO. 2:  Porter Adventist

8  Hospital Surgical Pathology Consult

9  Report Re: Donna Hankins dated November

10  16, 2011.

11  EXHIBIT NO. 3:  Flash Drive Containing

12  Files Reviewed by Dr. Iakovlev in

13  Compiling his Clinico-Pathological

14  Report Re: Donna Hankins.

15

16        VLADIMIR IAKOVLEV, M.D.,

17  called as a witness herein, having been first duly

18  affirmed, testified on his oath as follows:

19        DIRECT EXAMINATION BY MR. COMBS:

20        Q.  Dr. Iakovlev, I want to ask you

21  some questions about Ms. Hankins' case.

22            In Ms. Hankins' case, she obviously has

23  bladder cancer.  You're not going to testify at

24  the trial that her bladder was caused by her TVT

Page 9

1  implant, are you?

2        A.  No.

3        MR. ANDERSON:  Objection as to what he

4  will testify to at trial, as I have done in the

5  past.  However, with that objection, what opinions

6  are you going to offer with regard to whether or

7  not the TVT caused her bladder cancer?

8        BY MR. COMBS:

9        Q.  And when I look at page 11 of your

10  report, you say that the two complications were

11  independent clinically and morphologically.

12            Obviously, I'm not a physician, but

13  what does that mean?

14        A.  It means they're disconcurrent

15  (ph).  In fact, the cancer was caught really early

16  and it was incidental discovery during the workup

17  on the complications of the sling.

18        Q.  So, I just wanted to make sure

19  that I didn't have to ask you any questions as to

20  whether you had an opinion that the TVT was in any

21  way causal of the cancer, and it sounds like the

22  answer is no?

23        A.  Not to the degree I can connect.

24        Q.  Thank you.  Dr. Iakovlev, you did

Case 2:12-md-02327 Document 3799-13 Filed 04/27/17 Page 5 of 28 PageID #: 138887
Case 2:12-md-02327 Document 3799-13 Filed 04/27/17 Page 5 of 28 PageID #: 68818
Vladimir Iakovlev, M.D.

Page 10

1 not prepare a synoptic report in this case. Did
2 you count the nerves in this case?
3     A. Yes, we discussed it. I didn't
4 because it doesn't change my opinions one way or
5 the other.
6     Q. Did you grade the foreign body
7 reaction in this case?
8     A. See with these findings, foreign
9 body reaction is already abnormal. There is no
10 point of grading it because it is more or less
11 abnormal, but it's already abnormal. It doesn't
12 really matter, abnormal here or abnormal there,
13 it's abnormal.
14     Q. And is the answer you did not
15 grade the foreign body reaction?
16     A. That is correct.
17     Q. And you did not find any damaged
18 vessels or arteries in this case, did you?
19     MR. ANDERSON: Can he have his report,
20 please?
21     THE WITNESS: Yes, that's what I was
22 looking for.
23     MR. COMBS: Sorry.
24     MR. ANDERSON: That's all right.

Page 11

1     We have that as Exhibit 1?
2     THE WITNESS: Yes.
3     BY MR. COMBS:
4     Q. Okay.
5     A. Usually we have USB as Exhibit 1.
6 Andy does as Exhibit 1. Anyway it doesn't matter.
7     MR. COMBS: I, in all these depositions
8 have marked report 1, usually pathology 2, USB 3.
9 I think you're right. From now on let's do the USB
10 as 1. I think that is a better thing to do.
11     BY MR. COMBS:
12     Q. Okay. Let me have a look. First
13 make sure that it's her report.
14     A. (Witness reviews document).
15     All right. So, as I recall, the
16 question was regarding vascular damage.
17     Q. Yes, sir.
18     A. No.
19     Q. Dr. Iakovlev, you did not identify
20 any traumatic neuromas in this case, did you?
21     A. No.
22     Q. And you made no findings that
23 neural ganglia were involved with any of the
24 slides, did you?

Page 12

1     A. (Witness reviews document).
2 No.
3     Q. No findings that any striated
4 muscle was in the tissue sample that you inspected?
5     A. Yes, there was.
6     Q. And what slide was that?
7     A. Figure DH3.
8     Q. I just turned to it, okay.
9     Any other slides in which you found
10 what you believe is striated muscle, other than
11 DH3?
12     A. DH4.
13     Q. Any others?
14     A. No.
15     Q. Did you do a smooth muscle actin
16 stain in this, on this specimen?
17     A. Most likely I did. Again, you
18 have full list of stains and slides. Not here, not
19 attached to the report, in the chain of custody
20 form.
21     Q. Do any of the photographs that
22 you've included in your report depict what you
23 believe is smooth muscle?
24     A. Only if the finding is

Page 13

1 significant. So the significant finding for me for
2 smooth muscle is I'm looking for parts of hollow
3 organs being excised. Smooth muscle has to be in
4 thick bundles, so it's corresponded to urethra, the
5 bladder or the rectum, depending on the device.
6     Q. You did not find any "organs" in
7 Ms. Hankins' tissue specimen, did you?
8     A. That is correct.
9     Q. Dr. Iakovlev, did you use any
10 myeloperoxidase stains on Ms. Hankins' case?
11     A. No.
12     Q. Did you use any stains for PGP9.5
13 or for neurofilament?
14     A. No. I didn't use many other
15 stains.
16     Q. I apologize, what?
17     A. I mean, there are more stains I
18 did not use rather than I used.
19     Q. Okay. Any other stains that have
20 been significant to your opinions in other cases
21 that you did not use?
22     A. My standard set is H&E; sometimes
23 the only stain is H&E. S100 and smooth muscle;
24 again, smooth muscle and S100 are auxiliary stains.

Case 2:12-md-02327 Document 3799-13 Filed 04/27/17 Page 6 of 28 PageID #: 138888
Case 2:12-md-02327 Document 3799-13 Filed 05/09/16 Page 6 of 28 PageID #: 66814
Vladimir Iakovlev, M.D.

Page 14

1 They are not primary stains, and they usually don't
2 do anything else. Very rarely I do Von Kossa stain
3 if I have some calcifications in the area. That's
4 about it.
5      Q. Dr. Iakovlev, right before the
6 deposition started, Mr. Anderson handed me a flash
7 drive that we marked as Hankins Exhibit 3. It
8 contains the medical records and a chain of custody
9 form.
10      In addition to the specimen that you've
11 reviewed in this case, would those materials
12 constitute all of your case-specific materials for
13 the Hankins case?
14      A. That is correct.
15      Dr. Iakovlev, earlier in the case we
16 discussed reaching a stipulation on things like the
17 next question so I think we'll be able to forego
18 those. No depositions nor expert reports in the
19 case?
20      MR. ANDERSON: Right. We'll stipulate
21 that he -- I'm sorry.
22      MR. COMBS: That's okay.
23      MR. ANDERSON: We'll stipulate that in
24 none of the Wave One cases did Dr. Iakovlev review

Page 15

1 any deposition transcripts, review any other expert
2 reports from plaintiffs' experts, did not review --
3 did not speak with any of plaintiffs' treating
4 doctors, was not present in the OR when the mesh
5 was excised, was not part of the processing of the
6 mesh at the hospital when the mesh was excised.
7 Did not speak with or treat or examine the
8 Plaintiff. That's all I can think of for now.
9      MR. COMBS: Okay, good. Thank you,
10 Ben.
11      BY MR. COMBS:
12      Q. In regard to the specimen that you
13 received from Porter Memorial Hospital, would that
14 specimen have been handled with forceps prior to
15 you receiving it?
16      A. Didn't we have a stipulation on
17 that?
18      MR. COMBS: Let's go off the record for
19 a second.
20      -- OFF THE RECORD DISCUSSION --
21      BY MR. COMBS:
22      Q. Prior to you receiving it, would
23 the specimen have been handled by forceps?
24      A. Likely.

Page 16

1      Q. And dehydrated?
2      A. First fixed in formalin and then
3 processed -- well, no.
4      Q. Do you want the pathology report?
5      A. Well, part of it. I received part
6 of the specimen which was only preserved in
7 formalin. And then they generated their own
8 slides; that's when dehydration happened. But my
9 specimen was dehydrated already at St. Michael's
10 Hospital.
11      Q. I understand. So for the slide
12 that they had prepared, they would have followed
13 the normal -- to the best of your knowledge, would
14 have followed the normal processing protocol?
15      A. That's correct.
16      Q. For the slide that St. Michael's
17 prepared, they would have followed the protocol
18 that you've told us about in other depositions?
19      A. Yeah, it's a similar process. In
20 both labs, they processed their own tissue, and I
21 processed what I received.
22      Q. All of the slides prepared for
23 Ms. Hankins' case would involve a specimen that
24 would have been treated with formalin and would

Page 17

1 have been treated with xylene, wouldn't it?
2      MR. ANDERSON: Objection to the form.
3 Go ahead.
4      A. That's correct.
5      Q. And as a result of the process,
6 the Plaintiff's sample would have hardened, shrunk
7 and changed shape to some degree?
8      MR. ANDERSON: Objection to the form.
9      THE WITNESS: That is correct.
10      BY MR. COMBS:
11      Q. Maybe another area that we will
12 have some agreement on, I'm going to ask now about
13 analytical chemistry.
14      I believe in the earlier deposition
15 that we reached agreement that no analytical
16 chemistry was performed on Ms. Hankins' sample?
17      A. That is correct.
18      Q. And the testing that you would
19 have performed in this case would have been using
20 your light microscope, a polarizing filter, and
21 then the stains that were used; is that correct?
22      A. That's correct.
23      Q. No other testing?
24      A. That's correct.

Case 2:12-md-02327 Document 3799-12 Filed 04/27/17 Page 7 of 28 PageID #: 138989
Case 2:12-md-02327 Document 3718-12 Filed 04/29/16 Page 7 of 28 PageID #: 68815
Vladimir Iakovlev, M.D.

Page 18

1    Q.  Dr. Iakovlev, will you be
2 rendering any opinion in this case that Ms.
3 Hankins' mesh was cytotoxic?
4    A.  I cannot rule it out.  So if you
5 ask my opinion, can it be cytotoxic?  I can tell
6 you, it can.
7    Q.  And my question is, would you be
8 issuing an opinion in this case that Ms. Hankins'
9 mesh was in fact cytotoxic to her?
10    MR. ANDERSON:  I think what he's saying
11 is that if you were to ask him that, he's going to
12 give you his opinion.
13    So that it kind of goes back to my
14 earlier objection, the way we handled it the last
15 deposition.
16    MR. COMBS:  I interrupted you.
17    MR. ANDERSON:  The way we handled it
18 the last deposition was, he went through and said,
19 if I asked, I would say that I can rule it out.
20    So that's kind of the -- as you can
21 tell, it doesn't say in his report.  He doesn't
22 talk about cytotoxicity.
23    BY MR. COMBS:
24    Q.  In any of the photographs that are

Page 19

1 attached in your report, is there an area in which
2 you believe cell death occurred as a result of
3 cytotoxic properties in the mesh?
4    A.  The action is around the fibers,
5 so if we look at the high-power figures where
6 the --
7    MR. ANDERSON:  Tell him which figure
8 you're looking at.
9    THE WITNESS:  For example, DH5 on
10 page 21.
11    BY MR. COMBS:
12    Q.  Yes.
13    A.  So there is action around the mesh
14 fibers.  There is foreign body reaction around it
15 and we know through publications there is constant
16 remodeling of tissue around the fibers.
17    So, some cells are dying, some cells
18 are coming back and recruited again.  There is cell
19 turnover here.
20    If it occurs due to mesh, the cell
21 turnover, to a degree, yes, it happens right in
22 there, in that area.  If it's a direct effect of
23 the mesh on the cells, I cannot show it; I cannot
24 determine.

Page 20

1    Q.  Dr. Iakovlev, will you be issuing
2 an opinion in this case that Ms. Hankins' mesh
3 migrated?
4    MR. ANDERSON:  Objection to the form.
5 Go ahead.
6    THE WITNESS:  Yes.
7    BY MR. COMBS:
8    Q.  And what would your -- I
9 interrupted you before you finished?
10    A.  I just wanted to expand.
11    Q.  Okay.  That's what I was going to
12 do next.  So what would your opinion be in that
13 regard?
14    A.  As I stated before, all meshes
15 migrate.  I cannot determine the degree of
16 migration unless I have landmarks.  But all of them
17 migrate -- microns, millimeters, centimeters; it's
18 all different.
19    Q.  Are there any landmarks in Ms.
20 Hankins' case?
21    A.  (Witness reviews document).
22    I don't have landmarks in the pictures.
23 There was an erosion, so there was enough migration
24 of the mesh through the mucosa to become eroded.

Page 21

1    Q.  Are you able to rule out that Ms.
2 Hankins' tissue was thinning as opposed to the mesh
3 moving?
4    MR. ANDERSON:  Objection.  Form.
5    THE WITNESS:  This is a question like
6 theory of relativity.  What is moving towards what?
7    Is it the thinning because mesh is
8 pressing against it, or it's not thinning, just
9 mesh goes right through it?  I don't think anybody
10 can answer that question.
11    But the fact is pretty simple.  It
12 becomes exposed through a structure which it was
13 not previously.  So relatively to each other, it
14 changed the position.
15    BY MR. COMBS:
16    Q.  At the time of her mesh erosion,
17 Ms. Hankins' vaginal tissue was suffering atrophy,
18 wasn't it?
19    MR. ANDERSON:  Objection to form.  Go
20 ahead.
21    THE WITNESS:  It's a given; every woman
22 experiences some atrophy.  It's a natural process.
23 So for all of these women, everybody who is getting
24 implant sooner or later will have atrophy.

Case 2:12-md-02327 Document 3799-13 Filed 04/27/17 Page 8 of 28 PageID #: 138890
Case 2:12-md-02327 Document 3119-13 Filed 05/09/16 Page 8 of 28 PageID #: 68816
Vladimir Iakovlev, M.D.

Page 22

1    BY MR. COMBS:
2        Q.  Ms. Hankins was postmenopausal,
3    wasn't she?
4        A.  If she wasn't, she will be.  There
5    is no --
6        MR. ANDERSON:  Why don't you look --
7        THE WITNESS:  I can see she was 50 at
8    the time of -- I don't know if she was
9    postmenopausal but that's perimenopausal age.
10       BY MR. COMBS:
11       Q.  Do you know whether Ms. Hankins
12   was receiving estrogen replacement therapy at the
13   time of her explant?
14       A.  Most of women have some form of
15   replacement therapy or estrogen treatment, either
16   topical or systemic.
17       Q.  As a result of the
18   de-estrogenization of her vaginal tissues, were
19   Ms. Hankins' vaginal tissues thinning at the time
20   of her explant?
21       A.  As I said, all women will sooner
22   or later have it.  We can talk about any of these
23   ladies who experienced these complications; they
24   will all have some atrophy.

Page 23

1        Some will be treated for some period of
2    time.  And then some of them will not be treated
3    for some period of time.
4        Q.  Dr. Iakovlev, you will not be
5    offering any opinion in this case that Ms. Hankins'
6    sling was properly placed or improperly placed,
7    will you?
8        A.  No.
9        Q.  Dr. Iakovlev, will you be offering
10   any opinion in this case that Ms. Hankins suffered
11   from a mesh-related infection?
12       A.  The records indicated that --
13   records indicated there was mesh erosion, so any
14   erosion, any exposure of foreign body through
15   mucosa will become infected.
16       Q.  Were any cultures ever taken of
17   the erosion spot?
18       A.  No.  As far as I remember, no.
19   Usually it's not required.  So I don't expect it to
20   be taken.
21       Q.  Did any of Ms. Hankins' treating
22   physicians ever make a finding that Ms. Hankins had
23   suffered from a wound infection?
24       A.  I don't remember now was it in the

Page 24

1    records or not.  I'm not looking specifically
2    because it's a given.
3        Q.  As we sit here today, you cannot
4    point us to any spot in the medical records where
5    one of Ms. Hankins' treating physicians diagnosed
6    her as suffering from a mesh-related infection, can
7    you?
8        A.  (Witness reviews document).
9        I don't see it in this summary, but I'm
10   not focusing on that because all this follows the
11   exposure site.
12       Q.  Dr. Iakovlev, you will not be
13   offering an opinion at this trial that you found
14   loose particles from the TVT mesh in the specimen
15   that you received from Ms. Hankins, will you?
16       MR. ANDERSON:  Objection to the form of
17   the question as to what he will testify to at
18   trial.
19       You can testify as to whether or not
20   you have any opinions as to whether or not there
21   were any loose particles of TVT in this specimen
22   that you received from Ms. Hankins.
23       THE WITNESS:  No, I did not see it.  I
24   did not see the particles.

Page 25

1    BY MR. COMBS:
2        Q.  Dr. Iakovlev, I want to ask you
3    some questions now about the photographs in your
4    report.  So let's start at DH1; what is that
5    photograph?
6        A.  This is the gross photograph of
7    the specimen I received before the division.
8        Q.  Is that the mesh that was removed
9    from Ms. Hankins in 2011?
10       A.  Yes, as far as I remember,
11   November.
12       Q.  Yes.  The pathology report
13   indicates November 14, 2011?
14       A.  Yes, November 14th.
15       Q.  Dr. Iakovlev, do you believe
16   cautery was used to remove Ms. Hankins' mesh?
17       A.  From just looking at these pieces,
18   if it was used it was really gentle.  I don't see
19   much of cautery artifact except for maybe a couple
20   of spots.  Again, it may not be -- it's easier to
21   appreciate microscopically.  I think there was some
22   cautery used.
23       Q.  What photograph are you pointing
24   to, please?

Case 2:12-md-02327 Document 3799-12 Filed 04/27/17 Page 9 of 28 PageID #: 133891
Case 2:12-md-02327 Document 3799-12 Filed 04/27/17 Page 9 of 28 PageID #: 6881
Vladimir Iakovlev, M.D.

Page 26

1    A.  DH2.  It's hard to say exactly --
2  is it drying on the surface or cautery?  It could
3  be cautery.
4    Q.  And where were you pointing to
5  when --
6    A.  This dark discoloration of the
7  very tip of the tissue.
8    Q.  Can you circle that for me?
9    MR. ANDERSON:  He did.
10    BY MR. COMBS:
11    Q.  And just put an "A" to the side
12  of that.  Thank you very much.
13    A.  (Witness complies).
14    Q.  Anywhere else in the photographs
15  that you think represents a cautery artifact?
16    MR. ANDERSON:  Just to clarify the
17  record, he said it may.
18    MR. COMBS:  Yeah.  I apologize.  I'm
19  not trying to put words in your mouth.  Anyplace
20  else in the photographs that you think may
21  represent a cautery artifact?
22    THE WITNESS:  Actually, the more I look
23  at it, the more I believe it is not cautery but
24  more drying.

Page 27

1    BY MR. COMBS:
2    Q.  Okay.
3    A.  But usually that is, it is -- the
4  extent of cautery changes in the tissue.
5  Temperature drops really fast within 150 to
6  100 microns, goes to body temperature.
7    Q.  Dr. Iakovlev, I'm going to ask you
8  now about DH2; what is your opinion regarding the
9  photograph at DH2?
10    A.  So this would be a lower power
11  view of the excised mesh.  And you can see clearly
12  that some of the fibers or cross-sections of the
13  fibers still remain, and you can see them blue,
14  which would correlate with the blue fibers on the
15  previous image, DH1.  And also correlates with the
16  Gynecare type of products.
17    Other empty spaces are representing
18  mesh fibers as well.  Some of them are clear;
19  that's why we don't see them.  Some of them are
20  floated away.  But overall we can appreciate the
21  mesh with some pores.
22    So these larger spaces in between
23  pores, in between mesh fibers, are pores and they
24  are filled with scar tissue.  So this is the

Page 28

1  phenomenon which we call bridging fibrosis.
2    And then if we look around the clusters
3  of the mesh fibers where there is like a knot or
4  crossing of the mesh fibers in the knitting
5  pattern, scar tissue extends beyond it.
6    So this would be scar encapsulation,
7  together with bridging fibrosis or scarring within
8  the pores, the encapsulating scar, or scar which is
9  outside, this all together forms a scar plate, or
10  sort of composite structure, where the scar
11  reinforces mesh, and mesh reinforces scar within,
12  and they both reinforce each other and they become
13  stiff; much stiffer than scar would be on its own
14  and much stiffer than mesh would be on its own.
15    Also, in this photograph we can
16  appreciate darker blue purple areas around the mesh
17  fibers.  This is the foreign body type
18  inflammation, and this is all happening within the
19  scar plate.  And as you can see here, there's no
20  normal tissue.  All of this tissue around it is
21  scarring.  And there is no neoplastic process.
22    So just looking at this photograph and
23  thinking of what is abnormal here, comparing with
24  normal vaginal tissue or any other normal tissue,

Page 29

1  first abnormality is presence of the foreign body
2  of the mesh, and second abnormality is pathological
3  changes in reaction to the mesh.
4    So there is scar encapsulation, scar
5  plate formation, fibrous bridging, foreign body
6  reaction -- all of these changes are related to the
7  mesh.  And there is no other natural condition.
8    Q.  Is there any tissue in the
9  photograph at DH2 that you believe is normal
10  non-scar tissue?
11    A.  Not that I can appreciate from
12  this power.  Maybe if I go on high power somewhere
13  on the periphery because at some point there is a
14  transition into normal tissue which is outside of
15  the scar plate.  I mean, if I had the slide I would
16  be able to examine it further.
17    Q.  Okay.  I guess that actually was
18  my question.  Is there a place here where you can
19  show us the junction between what you claim is scar
20  plate and normal tissue?
21    A.  I would need slide itself.  I
22  mean, is it more towards normal tissue here?  I'm
23  not sure.  I cannot tell you.
24    MR. ANDERSON:  You're pointing to the

Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 10 of 28 PageID #: 138992
Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 10 of 28 PageID #: 66818
Vladimir Iakovlev, M.D.

Page 30

1  edge of it?
2        THE WITNESS:  Edge, upper left corner.
3        BY MR. COMBS:
4        Q.  Okay.  Right in the center there's
5  the empty space.  Do you see what I'm referring to?
6        A.  Yes.
7        Q.  Exactly.  Is that a pore?
8        A.  No.
9        Q.  What is that?
10       A.  It's not a pore.  It's a mesh
11  fiber curling around in a knot or in a knitting
12  pattern.
13       Q.  And is that what you have drawn in
14  yellow below that?
15       A.  Yes.
16       Q.  And how many microns is that space
17  across?
18       A.  Which space?
19       Q.  The one we're talking about right
20  now, the one that you have drawn the curling fiber
21  in?
22       A.  You would have to give me two
23  points.  If you point from which point to which
24  point, then I can...

Page 31

1        Q.  Yeah.
2        A.  But just for the record, this
3  space you just marked does not represent the pore,
4  does not represent the single fiber.
5        What you just pointed to is an oval
6  shape which is produced by a curved fiber,
7  polypropylene fiber, which is being knitted around
8  where the fibers are being knitted around each
9  other.  So it's a loop of mesh fiber.
10       Q.  Okay.
11       A.  It is not a pore; it is not a
12  single fiber.  It is a loop.
13       Q.  And what would the measurements
14  be of that pore on the A and the B axis?
15       MR. ANDERSON:  It's not a pore.
16       BY MR. COMBS:
17       Q.  Whatever you want to describe that
18  as.
19       MR. ANDERSON:  He's already described
20  it.  We have to make sure the record is clear here.
21  That is not a pore, as he said, it is a knitted
22  bundle of fibers.
23       BY MR. COMBS:
24       Q.  Whatever you want to describe it

Page 32

1  as.  All I want to know is, what are the
2  measurements.
3        A.  That's an estimate, around
4  600 microns, .6 millimeter from, I guess -- can I
5  draw it here?
6        Q.  Yes, sir.
7        A.  So this distance is estimated,
8  .6-millimeter.
9        Q.  And the other distance?
10       A.  The other distance will be
11  somewhat larger, more or less 1 millimeter.
12       MR. ANDERSON:  If it's more or less,
13  put that on there.  Or if it's approximations you
14  need to let them know.
15       BY MR. COMBS:
16       Q.  Dr. Iakovlev, I want to ask you
17  now about the photograph at DH3.
18       A.  Yes.
19       Q.  And the legend for that photograph
20  says:
21           "Partially scarred striated
22           muscle, H&E, magnification
23           equivalent to 2.5x objective.  Scar
24           is highlighted by orange color in

Page 33

1  the lower image copy."
2        Let me start by asking you -- the
3  orange at the bottom, how was that added to the
4  photograph?
5        A.  I did it in the computer program.
6        Q.  I don't understand what that
7  means.  Did you add it in manually in the computer
8  program?
9        A.  Yes, with my hand, just selected
10  the areas and changed the color.
11       Q.  Okay.
12       A.  Instead of putting scar, scar,
13  scar all over the image, how I did in other areas,
14  I selected the scar tissue and changed the color
15  for demonstration purposes.
16       Q.  And would you agree that Ms.
17  Hankins' tissue was not normal by virtue of the
18  fact that she had stress urinary incontinence and
19  pelvic organ prolapse?
20       MR. ANDERSON:  Objection to form.  Go
21  ahead.
22       THE WITNESS:  I don't understand.  Are
23  you implying that she had some genetic disorder
24  that caused her to -- or something else?

Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 11 of 28 PageID #: 138993
Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 11 of 28 PageID #: 66839
Vladimir Iakovlev, M.D.

Page 34

1 BY MR. COMBS:
2     Q.  Let's start with that.  Do you
3 know what it was about her tissue that caused Ms.
4 Hankins to have stress urinary incontinence and to
5 have pelvic organ prolapse?
6     A.  In many cases there is no
7 abnormality to the tissue.  It's age-related, a
8 large baby during the birth, multiple birth,
9 multiple factors.  I mean, it's pretty common
10 within women.
11     In some cases, there is some connective
12 tissue disorder, but, I mean, from what I could see
13 in the history, there was no description of a
14 connective -- or collagen diseases.
15     Q.  And so my original question was,
16 by virtue of the fact that Ms. Hankins has had
17 stress urinary incontinence and has had pelvic
18 organ prolapse, do you define her tissue as being
19 quote "normal" close quote?
20     MR. ANDERSON:  Objection to form.  Go
21 ahead.
22     THE WITNESS:  As I said, I mean, it's a
23 very common condition.  There are multiple factors;
24 some of them are just large babies.  Trauma during

Page 35

1 birth.
2     Histologically, I did not see anything
3 abnormal.  I would suspect there was exactly the
4 same reaction to the mesh and pretty strong scar
5 formation in the histological images.  In
6 histological sections, sorry.
7 BY MR. COMBS:
8     Q.  Let's turn to DH4 now.  Does DH4
9 represent any of the same area that you were
10 testifying about in DH3, or is it a different area?
11     A.  No, it is a different area.  I
12 think it's a different portion.
13     Q.  Is anything substantially
14 different about DH3 or DH4?  Can we take the
15 testimony that you gave us about DH3 as also being
16 representative of DH4, or do we need to ask about
17 it specifically as well?
18     A.  Well, I don't think we talked too
19 much about DH3.  You asked me how I added the color
20 but that was, I think, the extent of it.
21     Q.  All right.  What is it that you
22 believe is significant about DH3?
23     A.  This is the transition zone
24 between scar tissue and partially scarred striated

Page 36

1 muscle.  So that's how the striated muscle becomes
2 attached.
3     Q.  Where is the transition zone?
4     A.  That's why I --
5     Q.  Is it the border between the
6 orange and the red?
7     A.  So the -- it's like checkerboard.
8 There's little bit of muscle here, little bit of
9 scarring there, little bit of muscle; there is all
10 this change.  So anywhere beyond this line where I
11 draw now, is just pure scar tissue, A.
12     And anywhere beyond this area which I'm
13 marking now, is scar.  And you can see that the
14 scar -- striated muscle, B.  So these areas are all
15 interlaced, or there is integration of the atrophic
16 muscle within the scar in all remaining zones.
17     Q.  Anything else that would reflect
18 your opinion about DH3?
19     A.  Now, we know where the scar is
20 coming from.  And the scar is coming from the mesh,
21 as we saw here in DH2.
22     So this mesh, which triggered bridging
23 fibrosis and scar encapsulation and formed scar
24 plate together with the scar, continues on and then

Page 37

1 continues on up to this point.
2     So entire mesh and scar plate within
3 the mesh is being connected to the striated muscle
4 here through these anchoring points.  So now we are
5 talking about muscle connected to the scar plate
6 and scar plate connecting to the muscle.
7     So if muscle contracts it will produce
8 pulling force on the entire scar plate.  At the
9 same time, since it is scarred, it cannot contract
10 properly.
11     And, we know that scar contracts during
12 maturation.  So the striated muscle will be
13 distorted and will be pulled, and will not be able
14 to contract properly in the direction that it would
15 contract physiologically.
16     Q.  DH4?
17     A.  DH4 is a similar example; however,
18 it's much less organized.  So the scarred muscle in
19 this case is not as organized.  This is just
20 individual fibers within the scar tissue.
21     They will be contracting if there is
22 stimulus for them if there was innervation
23 preserved for them.  And this is more of a
24 transition zone between solid scar and partially

Case 2:12-md-02327   Document 3790-10   Filed 04/27/17   Page 12 of 28 PageID #: 138894
Case 2:12-md-02327   Document 2138-10   Filed 05/04/16   Page 12 of 28 PageID #: 66820
Vladimir Iakovlev, M.D.

Page 38

1   viable muscle.
2        Q.   And on the bottom, the part that
3   you have marked in orange on the bottom picture on
4   DH4, are any of the changes to that tissue caused
5   by the fact that Ms. Hankins had tissue changes
6   which caused her pelvic floor laxity?  Or is it
7   your testimony that all of those changes are
8   related to the fact that there was a mesh implant?
9        A.   I think we agreed that we did not
10  agree that her tissue was the reason for pelvic
11  organ prolapse.
12       But to answer your question, all these
13  changes in this photograph are related to scarring,
14  which is the result of mesh and mesh-associated
15  tissue changes.
16       Q.   Dr. Iakovlev, let me ask you now
17  about DH5.  And what is your opinion regarding that
18  photograph?
19       A.   So I can give you a summary, but
20  it will not limit my opinions at trial if I'm asked
21  questions.
22       DH5 is a higher magnification showing
23  mesh fibers or cluster of mesh fibers surrounded by
24  foreign body type inflammatory reaction.

Page 39

1        And outside of that halo of
2   inflammatory reaction, there is scarring, or more
3   permanent scar because tissue immediately around
4   the mesh fibers is being remodeled.
5        There is action here.  There are, as we
6   talked about earlier, macrophages there.  They are
7   recruited to destroy the mesh fibers, try to
8   degrade them.  And at the same time, the damaged
9   tissue.  In this case, the tissue needs to be
10  remodeled continuously.
11       But some distance away from it, the
12  scar is more or less stable.  So it's dense scar
13  tissue outside of it.
14       Q.   Is there normal tissue depicted on
15  DH5?
16       A.   No.
17       Q.   So it will be your testimony that
18  there is no normal tissue on DH5?
19       A.   No.  This is all abnormal.  The
20  presence of the foreign body, presence of foreign
21  body reaction to it, and scarring is abnormal by
22  definition.
23       All these components -- they are not
24  present in normal vaginal tissue.  And there is no

Page 40

1   neoplastic process, so there is no natural
2   condition which could have occurred without the
3   foreign body.
4        Q.   Dr. Iakovlev, do you see the
5   section in the upper left-hand corner of DH5 that
6   is lighter?
7        A.   Lighter?  Yes, I do.
8        Q.   Is it your opinion that that is
9   scar tissue as well?
10       A.   I cannot tell you from this
11  cropping.  I don't know what's beyond, because
12  sometimes lightness is caused by tissue separation
13  during processing.  Like if we see here, there is
14  some lightening, but just beyond it there is scar
15  again.
16       So this lightening can be just a zone
17  of rarefaction of the tissue, due to artifacts.
18  And then there is continuation of scar plate
19  further down.  I don't know; I would have to see it
20  from a lower power.
21       Q.   I'm going to come around just for
22  a second because it's difficult to describe these
23  things on the record.
24       -- OFF THE RECORD DISCUSSION --

Page 41

1        BY MR. COMBS:
2        Q.   Dr. Iakovlev, I came around and
3   marked an A and a B on the top of the photograph?
4        A.   There are other areas also
5   representing B type of changes, artifact.
6        Q.   Okay.  So here was my question.
7   Are the areas that are denoted as A and B now on
8   DH5, do those represent normal tissue?
9        MR. ANDERSON:  Objection.  Asked and
10  answered; go ahead.
11       THE WITNESS:  So because I can see
12  the B areas, which are definite artifact; I cannot
13  give you an answer regarding A at this
14  magnification.
15       BY MR. COMBS:
16       Q.   All right.  Dr. Iakovlev, is it
17  your opinion that the photographs that are
18  designated DH2 through 5 represent scar plate?
19       MR. ANDERSON:  Objection. Go ahead.
20       THE WITNESS:  Okay.  So there's a
21  combination, DH2 through DH5.  And DH6 and DH7,
22  DH8, all of these photographs capture at least part
23  of this scar plate.
24       MR. ANDERSON:  All the way through DH9?

Case 2:12-md-02327  Document 3790-18  Filed 04/27/17  Page 13 of 28 PageID #: 138895
Case 2:12-md-02327  Document 3790-18  Filed 04/27/17  Page 13 of 28 PageID #: 668825

Vladimir Iakovlev, M.D.

Page 42

1      THE WITNESS: Yes. Including DH9.
2      BY MR. COMBS:
3      Q. And Dr. Iakovlev, we earlier
4  marked as Exhibit 2 the pathologist's report
5  prepared by the treating pathologist in this case,
6  didn't we?
7      A. Yes.
8      Q. And Dr. Small, the treating
9  pathologist in this case, performed an examination
10  with a light microscope just like you did, didn't
11  he?
12      A. Yes, he did.
13      Q. And Dr. Small did not note that
14  there was scar plate in any portion of this tissue
15  sample, did he?
16      A. He didn't use the word of scar
17  plate.
18      Q. In fact, he described it as benign
19  connective tissue and skeletal muscle, didn't he?
20      A. That is correct. Fibrous tissue,
21  scar tissue are all benign tissue. And connective
22  tissue includes scar, bone and many other, so it's
23  more of a very broad description.
24      Q. And so Dr. Small's description was

Page 43

1  benign connective tissue and skeletal muscle, and
2  not scar plate, wasn't it?
3      MR. ANDERSON: Objection to the form.
4  Go ahead.
5      THE WITNESS: Again, I don't know
6  exactly what he meant describing connective tissue
7  there. Different types of connective tissue.
8      BY MR. COMBS:
9      Q. The word "scar plate" does not
10  appear at any point in Exhibit 2, does it?
11      A. It does not appear there.
12      Q. Dr. Iakovlev, I want to ask you
13  now some questions about the photographs where you
14  label and define nerves?
15      A. Yes.
16      Q. Let's go to DH6. And you have
17  several nerves pointed out on the bottom of that
18  picture.
19      So here is the first thing I want to
20  ask you: Do those nerves that you've identified
21  show any signs of degeneration?
22      A. No.
23      Q. Distortion?
24      A. It's hard to say. They are

Page 44

1  somewhat tortuous. Is it normal? Sometimes
2  nerves can do that.
3      I would -- I wouldn't rule out if we
4  cut really deep, like millimeter or half a
5  millimeter deep, that this nerve would hit the
6  fiber here and become distorted.
7      Q. You cannot testify to a reasonable
8  degree of medical certainty that that nerve is
9  distorted, can you?
10      A. Not at this level, but if I cut
11  deeper sections, I may.
12      Q. Based upon the slides that you've
13  prepared that are included within your report, you
14  have not made that finding, have you?
15      A. No, but I reserve the right to
16  supplement it if I find new features.
17      Q. Dr. Iakovlev, there are no
18  features that you would say diagnose a traumatic
19  neuroma, are there?
20      A. Again, at this level, I cannot
21  demonstrate that. But I don't know what's deeper
22  in the block.
23      Q. Dr. Iakovlev, I want to ask you
24  now about DH7.

Page 45

1      A. Yes.
2      Q. Now what is your opinion regarding
3  DH7?
4      MR. ANDERSON: Objection to form. Go
5  ahead.
6      THE WITNESS: There are quite sizeable
7  nerves there. They are in the scar plate right
8  beside the mesh fibers. This is not normal
9  situation. Normal nerves are in normal tissue.
10  Having a large nerve in the scar plate indicates
11  it's entrapment in the scar tissue.
12      So if we think about it, we just went
13  through the images of scar plate being connected to
14  the striated muscle. So every time this striated
15  muscle would contract, it would move the entire
16  scar plate or apply traction, at least, and then
17  the traction would transfer to these nerves, which
18  are coming from normal tissue.
19      So essentially the nerves are attached,
20  firmly immobilized in the scar plate, and then the
21  scar plate is being tugged. This can provide
22  direct irritation to the nerves. So that's one
23  component of this finding.
24      Second component is that as we see that

Page 46

1 there are some branches, we know that the tissue
2 within the scar plate and around it is innervated
3 so it can sense pain.
4      Although it is expected finding that it
5 would sense pain, the image just reminds us one
6 more time that it is a live tissue; it's not dead
7 tissue. And if we have any distortion, any degree
8 of distortion, it will hurt.
9      It's like pinching the skin. If you
10 pinch skin, it hurts, and the same thing happens
11 deep under the mucosa. If there is any distortion,
12 any pulling, it will hurt.
13      BY MR. COMBS:
14      Q. Are there any nerve receptors
15 identified in DH7?
16      A. No, I did not try to identify
17 them.
18      Q. Dr. Iakovlev, are the nerves that
19 you point to on DH7, would those be nerves that
20 grew into the mesh or that would have been in place
21 prior to the mesh's insertion?
22      A. I would -- my estimate is that
23 these nerves were secondarily involved because
24 these are quite sizeable nerves and --

Page 47

1      But again, it may be some larger nerves
2 can grow through the -- depends on what is damaged
3 during the surgery. If larger nerves are damaged
4 during the surgery, they will attempt to
5 reinnervate their targets.
6      Q. Dr. Iakovlev, do any of the nerves
7 in DH7 show signs of degeneration?
8      A. No, I cannot appreciate that.
9      Q. Distortion?
10      A. No.
11      Q. Any evidence that you would point
12 to to say that they exhibited the features of a
13 traumatic neuroma?
14      A. No.
15      Q. Dr. Iakovlev, how far are those
16 nerves away from the mesh in the left-hand picture
17 of DH7?
18      A. You mean mesh fibers?
19      Q. Yes, sir.
20      A. Because the mesh is a large
21 structure, it has large pores and folds, so these
22 nerves can still be in the, within the mesh.
23      Q. How far are they away from the
24 mesh fiber that's identified at DH7?

Page 48

1      A. So the closest mesh fiber is
2 around 400, 450 microns, just around half a
3 millimeter.
4      Q. Are there any vessels associated
5 with the nerve in DH7?
6      A. There are small capillaries, not
7 directly -- well, there's something here. Small
8 capillaries, much smaller than the nerve itself.
9      Q. Dr. Iakovlev, there's a blue line
10 in between the fiber and the mesh; do you see that?
11 This line right here?
12      A. Yes, I do.
13      Q. What is that?
14      A. That's an artifact.
15      Q. And just for the jury's benefit;
16 what do you mean when you say it's an artifact?
17      A. There's a little fold in the
18 tissue. When it was cut, that little, the thin
19 slice of the tissue wrinkled slightly so it is a
20 wrinkle in the slice of the tissue.
21      Q. Dr. Iakovlev, I want to ask you
22 about DH8 now. What is your opinion regarding DH8?
23      A. This is a similar feature, and I
24 used the same S100 stain, which highlights

Page 49

1 myelinated nerve fibers and myelinated nerves.
2      There's a scar plate, as we discussed
3 earlier, around the mesh fibers, and within the
4 scar plate there is some inflammation. And the
5 scar plate is formed by the scar tissue which is
6 bridging within the mesh pores and encapsulating
7 the mesh.
8      And then there are two nerves, at least
9 two nerves, maybe more -- at least I can see it
10 from this power.
11      Q. Can you circle the two nerves?
12      A. So this is one nerve and I think
13 there are three -- again, from this power it's hard
14 to see. Maybe there are three. If these are
15 cross-sections these will be three. I cannot say
16 exactly what's going on in lower --
17      Q. Just so the record will be clear,
18 when you're saying you can't say exactly what's
19 going on, you're talking about the bottom one that
20 you circled?
21      A. B, and the more clear appearance
22 is in A.
23      Q. Okay.
24      A. Because A is the longitudinally

Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 15 of 28 PageID #: 138897
Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 15 of 28 PageID #: 68823
Vladimir Iakovlev, M.D.

Page 50

1 section nerve. And B appears to be cross-section
2 of nerves. But I cannot say for sure from this
3 power.
4      Now, this nerve has some clearing, but
5 I think it's not nerve degeneration; it may or may
6 not be.
7      However, overall, it seems to be
8 healthy nerve, or at least functional nerve, and
9 what is abnormal is its location in the scar plate.
10 And as I described before, by location in the scar,
11 it is entrapped in the scar.
12      And it can be deformed within the scar
13 plate. It can be pulled and distorted within the
14 scar plate within contraction due to contraction of
15 the scar plate, due to contraction of the attached
16 muscles.
17      And, as previously, the nerve indicates
18 innervation in the scar plate and around it
19 providing several mechanisms for pain development
20 in these ladies.
21      Q. Dr. Iakovlev, for any of the
22 nerves that you see in DH8, can you say that there
23 are features that show degeneration?
24      A. As I said, the one which is

Page 51

1 circled A, I see some clearing, but I would need
2 the slide just to have a look. Because
3 degeneration of the nerves, especially when they
4 get trapped, it's a focal, it's a so-called Renaut
5 body.
6      Focal area of degeneration, they are
7 reported to be associated with a nerve entrapment
8 or chronic trauma of nerves.
9      Q. Can you say to a reasonable degree
10 of medical certainty that there is any degeneration
11 depicted in the photograph on DH8?
12      A. That wasn't my purpose. If I was
13 expecting your question, I would examine it, and
14 prepare that answer. But now I would need a slide
15 and examine it in the microscope to give you an
16 answer.
17      Q. Any of the nerves in DH8
18 distorted?
19      A. This nerve appears to have some
20 curve to it.
21      Q. Is that A or B?
22      A. A.
23      Q. Thank you.
24      A. I cannot tell you if it's a real

Page 52

1 distortion by the mesh or just the shape of it
2 again. Again, I would need a slide and maybe
3 correlate it with H&E to tell you definitively.
4      Q. Are there any features in DH8 that
5 you will point to say are indicative that there
6 is a traumatic neuroma?
7      A. No.
8      Q. DH9. Does that depict a nerve?
9      A. Three nerves.
10      Q. And can you circle the three
11 nerves?
12      A. (Witness complies).
13      Q. And Dr. Iakovlev, are there
14 vessels in that picture?
15      A. Yes, there are.
16      Q. And can you take maybe this green
17 highlighter and highlight any vessels that you see?
18      A. (Witness complies).
19      Q. Any others?
20      A. Other small capillaries here and
21 there.
22      Q. Thank you. Do those nerves show
23 any indication that they have degenerated?
24      A. I don't think so. There's some

Page 53

1 clearing, but I think it's some capillary running
2 across it.
3      Q. Are those nerves distorted?
4      A. Not that I can appreciate.
5      Q. Do those nerves show any evidence
6 that they are a traumatic neuroma?
7      A. No.
8      Q. Dr. Iakovlev, I want to ask you
9 collectively for the --
10      A. Just thinking, one more time. I
11 would need really a slide to tell you exactly if
12 there is any degeneration or not. There is some
13 clearing. Again, I would -- cannot give you
14 definitive answer just by picture.
15      Q. When you say there is some
16 clearing; which nerve are you pointing to?
17      A. This large oblong.
18      Q. The long one on the right-hand
19 side?
20      A. Yes. If it was my purpose to
21 identify if there is degeneration or no
22 degeneration, I would cut deeper and investigate
23 it, but it has no bearing on my opinions, because we
24 know it's already in scar tissue.

Case 2:12-md-02327 Document 3790-16 Filed 04/25/17 Page 16 of 28 PageID #: 138898
Case 2:12-md-02327 Document 3790-16 Filed 04/25/17 Page 16 of 28 PageID #: 66824
Vladimir Iakovlev, M.D.

Page 54

1  So if it is degeneration or not, it
2  just shows the effect of it. But, I mean, we know
3  it's already an abnormal location.
4  Q. Collectively I want to ask you
5  about the photographs that are from DH6 to DH9.
6  Did you consult with a neuropathologist
7  for any aspect of your opinions related to the
8  nerves that are depicted in DH6 to DH9?
9  MR. ANDERSON: We will stipulate for
10 this and all other Wave One claimants that Dr.
11 Iakovlev did not see the need to, nor did he,
12 consult with a neuropathologist.
13 BY MR. COMBS:
14 Q. In the photographs at DH6 through
15 DH9, you do not appreciate any nerve ganglia, do
16 you?
17 A. No.
18 Q. And I believe I asked you this,
19 but just in case I didn't. None of the slides
20 related to the specimen, did you stain them with
21 PGP9.5 or neurofilament stain?
22 A. That is correct.
23 Q. As a result of that, are you
24 unable to appreciate whether there are any nerve

Page 55

1  receptors in any of the slides?
2  A. Wasn't my intention, so I was not
3  looking for them. Not that I was not able, but
4  just didn't do it.
5  Q. Dr. Iakovlev, do you hold the
6  opinion that any aspect of Ms. Hankins' mesh roped
7  or curled?
8  A. (Witness reviews document).
9  The tissue came in pieces so I don't
10 think I can assess it for curling or deformation.
11 Q. Dr. Iakovlev, I'm going to ask you
12 just, I think, a very short series of questions
13 regarding the photographs that you have labeled
14 DH10a through 12c.
15 Are those the ones that you're going to
16 use to present your testimony related to what you
17 claim was degradation of the mesh?
18 A. That's correct.
19 Q. And would your opinions be the
20 same as they have been in -- when you've been
21 deposed in your general depositions regarding
22 degradation issues?
23 A. That's correct.
24 Q. I do have one question. Let's go

Page 56

1  to, for example, DH10; do you see where you have
2  the degradation layer identified on the right-hand
3  photograph?
4  A. This one?
5  Q. Yes, sir. And I just wanted to
6  ask you how thick you believe that degradation
7  layer is?
8  A. Again, this is a really rough
9  estimate without a micrometer or without any
10 reference points. Just by looking at it, it's at
11 least 4 microns, maybe 5. Maybe even thicker.
12 Maybe 6.
13 Q. Okay. Somewhere between 4 to
14 6 microns?
15 A. Probably around 4 microns.
16 Q. All right. Thank you?
17 MR. COMBS: Let's take a break for a
18 minute.
19 -- RECESS AT 6:39 --
20 -- UPON RESUMING AT 6:47 --
21 BY MR. COMBS:
22 Q. Dr. Iakovlev, I want to ask you
23 questions now about your clinico-pathological
24 correlation, and let's start with the urinary

Page 57

1  symptoms. What are the urinary symptoms that you
2  believe are related to Ms. Hankins' mesh implant?
3  A. So after the mesh placement in
4  August 2007, she presented with urinary problems in
5  March of 2010, which were described:
6  "She presents today secondary
7  to difficulty urinating which has
8  been going on since her hysterectomy
9  in 2007 or 2008, at which time she
10 also underwent sling placement."
11 And then it continues on, and then it
12 says:
13 "She does not have any stress
14 incontinence. She has a severe
15 sense of urgency."
16 So her incontinence type changed.
17 Before procedure she had stress incontinence. And
18 after the procedure, she has urinary obstruction
19 and urge.
20 Q. And what is the mechanism by which
21 you think that Ms. Hankins developed urinary
22 obstruction?
23 A. Urinary obstruction is caused in
24 case of implantable meshes.

Case 2:12-md-02327 Document 3790-18 Filed 04/29/17 Page 17 of 28 PageID #: 138899
Case 2:12-md-02327 Document 2789-11 Filed 04/29/17 Page 17 of 28 PageID #: 66823

Vladimir Iakovlev, M.D.

Page 58

1     MR. ANDERSON: We're talking about in
2  the case of her.
3     THE WITNESS: Yes, in the case of Ms.
4  Hankins, was caused by the scar contraction within
5  the sling, which was placed in the body of
6  Ms. Hankins.
7     And, as we know, scar contracts during
8  maturation, as we all see in some burn victims,
9  those who have some larger scars, and it contracts
10 and it tightens the sling.
11     And the sling obstructs the urethra,
12 overtightens over time. Usually it takes several
13 months or up to a year. In this case, presentation
14 was a year and a half, or no, more than that. Or
15 two and a half years.
16     BY MR. COMBS:
17     Q.  I'm sorry, I did not mean to
18 interrupt you.
19     A.  So it's more than two years.
20     Then there's investigation further on
21 after that visit in 2010. Dyspareunia and
22 obstructive pattern. Again, obstructive pattern,
23 that's where the cystoscopy was done and she has an
24 incidental finding of superficial carcinoma.

Page 59

1     MR. ANDERSON: Are you finished?
2     THE WITNESS: Yes.
3     BY MR. COMBS:
4     Q.  You believe that Ms. Hankins'
5  urinary obstruction was caused by scar contraction
6  related to her sling; is that correct?
7     A.  That is correct.
8     Q.  And you stated that her stress
9  urinary incontinence after she had an implant
10 shifted from stress urinary incontinence to urge
11 incontinence?
12     A.  That is correct.
13     Q.  And it is your belief that Ms.
14 Hankins' obstructive voiding started approximately
15 a year after her mesh was implanted; is that
16 correct?
17     A.  No, I don't know exact timing in
18 between these two entries. Sometime by 2010 she
19 already had developed obstructive pattern.
20     Q.  For the mechanism to be scar
21 contraction it would have to be sometime from
22 several months after the implant to a year after
23 the implant; wouldn't it?
24     MR. ANDERSON: Objection to the form.

Page 60

1  Go ahead.
2     THE WITNESS: It can be several weeks
3  after implantation. Because scar starts
4  contracting pretty much after first month, after
5  surgery.
6     And then it can continue on and then
7  can become tighter and tighter and tighter with
8  time. But the beginning of it can start as early
9  as one month after the placement surgery.
10     BY MR. COMBS:
11     Q.  Did you review any records that
12 indicated Ms. Hankins had urinary obstruction in
13 less than a month after her surgery?
14     A.  I don't recall these records.
15     Q.  If there are records that Ms.
16 Hankins had urinary obstruction in less than a
17 month after her surgery, would you agree with me
18 that that would point to an issue of the sling
19 being placed too tight rather than scar
20 contraction?
21     A.  That would be one scenario.
22 However, it would have to be a specific situation
23 which would have to be worked up, clinically
24 investigated.

Page 61

1     Q.  That would be in somebody else's
2  domain, not yours?
3     A.  That's correct. I mean,
4  correctness of placement, the timing of urinary
5  obstruction. Some obstruction can happen right
6  after surgery, but not to the -- not due to the
7  mesh. Due to medications, due to swelling from
8  surgery or something else. We cannot disregard
9  those factors as well.
10     Q.  If Ms. Hankins' obstructive
11 voiding started prior to one month, that could not
12 have been due to the mechanism of scar contraction,
13 could it?
14     MR. ANDERSON: Objection. Asked and
15 answered. Go ahead, one more time.
16     THE WITNESS: There would be minimal
17 contribution of scar contraction. It will slowly
18 get more and more and more, and once we get to a
19 month there will be more contribution, and then it
20 continues on.
21     But the immediate postoperative period
22 may have other causes for urinary obstruction.
23     BY MR. COMBS:
24     Q.  Those other causes would be

Case 2:12-md-02327 Document 3790-16 Filed 04/27/17 Page 18 of 28 PageID #: 138900
Case 2:12-md-02327 Document 3790-16 Filed 04/27/17 Page 18 of 28 PageID #: 66820

Vladimir Iakovlev, M.D.

Page 62

1  outside of your area of expertise, wouldn't they?
2      A.  Unless I have a specimen and I see
3  a tumor or something else, then I can tell you
4  that.
5      Q.  But you do not have any specimens
6  from the period of August 29, 2007, to
7  September 29, 2007, do you?
8      A.  That's correct.
9      Q.  Dr. Iakovlev, you said that you
10  believe Ms. Hankins' urinary incontinence changed
11  from being stress urinary incontinence to urge
12  incontinence after her surgery.
13      As part of your differential diagnosis
14  to draw that conclusion, did you review to see
15  whether Ms. Hankins had urge incontinence prior to
16  her implant?
17      MR. ANDERSON:  Objection to the form of
18  that question.
19      THE WITNESS:  As with previous cases,
20  I remind you that I do not conduct clinical
21  differential diagnosis.  I take conclusions which
22  are already done by the treating physicians.
23      And it's clear to me in the records
24  that the obstructive pattern and the urge

Page 63

1  incontinence were attributed to the sling, and
2  that's why she had sling excision.
3      BY MR. COMBS:
4      Q.  Dr. Iakovlev, I realize that
5  you're not a urologist, but do you know whether the
6  sling is intended to treat urge incontinence?
7      A.  Not urge.  Sling is intended to
8  treat stress incontinence.
9      Q.  I've got a group of records I'm
10  going to collectively mark as Hankins 4.
11      MR. COMBS:  Ben, can you share these
12  with Dr. Iakovlev.  I might have a second set, but
13  let me look and see.
14      MR. ANDERSON:  Sure, that's okay, I can
15  do it.
16      EXHIBIT NO. 4:  Compilation of Clinical
17      Examination Notes (five).
18      MR. COMBS:  I do have a second set.
19      BY MR. COMBS:
20      Q.  Dr. Iakovlev, you can review these
21  or I can just start asking -- I'm only going to ask
22  you about certain pages of them.
23      A.  (Witness reviews document.)
24  Um-hmm.

Page 64

1      Q.  So let's start, the second page
2  which is dated July 19, 2004, and I'm going to ask
3  you about this line starting right here.  Second
4  page, the Bates number on it is 246.
5      A.  Okay.
6      Q.  Do you see the line where it says:
7      "USI with cough, sneeze.  Also
8      urgency/urge incontinence.  Daily
9      loss of urine.  Wears panty shield."
10  Do you see that?
11      A.  I do.
12      Q.  Do you see down at the bottom:
13      "Diagnosis:  USI, urge/urge
14      incontinence/cystocele."
15      A.  I do.
16      Q.  Is the fact that Ms. Hankins was
17  diagnosed with urge incontinence in 2004 a fact
18  that you factored into your differential diagnosis
19  that her incontinence changed from stress urinary
20  incontinence to urge incontinence?
21      A.  I considered all records, as I
22  said.  But I'll leave this detail, specific of
23  development of this to clinical colleagues.  It's
24  not area of my expertise.

Page 65

1      Q.  But is the fact that Ms. Hankins
2  had urge incontinence in 2004 a fact that you
3  considered in your determination that her
4  incontinence changed from stress incontinence to
5  urge incontinence after the device was implanted?
6      MR. ANDERSON:  Objection.  Asked and
7  answered.  It's the exact same question you asked
8  except you put the word "but" in front of it.
9      MR. COMBS:  Yes, I was trying, because
10  I didn't get an answer to the first one.
11      MR. ANDERSON:  Yes, you did.  He said
12  he considered all records.
13      BY MR. COMBS:
14      Q.  Okay.  So you did consider this
15  record?
16      A.  I did consider.  It's 2004, and I
17  don't know exactly why there is urge.  Maybe
18  there's a UTI, and then there's a gap.  I mean,
19  there's so many variables, I have to leave it to
20  clinical expert.
21      Q.  Let me ask you now about the page
22  that's Bates numbered at the bottom 95.  I think
23  it's the fourth page.
24      MR. ANDERSON:  Which one?

Case 2:12-md-02327 Document 3790-16 Filed 04/27/17 Page 19 of 28 PageID #: 138901
Case 2:12-md-02327 Document 3790-16 Filed 04/27/17 Page 19 of 28 PageID #: 66627
Vladimir Iakovlev, M.D.

Page 66

BY MR. COMBS:

Q. The Bates number on it is 95. I believe it's the fourth page.

A. Yes.

Q. Now, Dr. Iakovlev, do you see about the seventh or eighth line down where it says:

"Also complains of urge incontinence - did well on Oxytrol in past."

A. The handwriting, oh, it's difficult. Yeah, I can see at least one word, "urge."

Q. Well, "CO" in medical records stands for "complains of" doesn't it?

A. Chief complaint --

Q. Okay, chief complaint --

A. No, yes. "Complains of," sorry, okay.

Q. All right. And does this record indicate that Ms. Hankins was complaining of urge incontinence on -- in April of 2007 as well?

A. Yes, it does.

Q. Does it reflect that she, that the

Page 67

record says, "did well on Oxytrol in past," close quote?

A. Yeah, I mean if it's Oxytrol. I mean, I cannot read that writing.

Q. All right. Did you consider in your differential diagnosis that Ms. Hankins' incontinence changed from stress urinary incontinence to urge incontinence after the implant, did you consider the fact that she had urge incontinence in April of 2007?

A. As I said, I considered all the records, but I'm not a urogynecologist. I will leave these symptoms to urogynecologist. I can see clearly that it states that there is urge after TVT-O. How much of it is -- sorry, TVT or TVT-O?

Q. TVT in this case.

A. How much of it is due to TVT or preexisting condition would have to be clinical expert. What I can tell you is that there was a reason for urge incontinence as a part of mesh-related complications.

If there were two types of urge incontinence, or two causes at the same time, that's not my area of expertise.

Page 68

was, in fact, the cause of her urge incontinence, can you?

MR. ANDERSON: Objection. Asked and answered.

THE WITNESS: Not all of the urge symptoms.

BY MR. COMBS:

Q. Well, you can't testify that they were the cause of any of the urge symptoms, can you? There were two possible causes you've said, preexisting and the mesh?

MR. ANDERSON: Objection. Mischaracterizes his testimony and asked and answered. You can answer one more time because we're not going to mischaracterize what he said.

THE WITNESS: Because those two causes could coexist together after the implantation.

BY MR. COMBS:

Q. You have never looked at any voiding diaries for Ms. Hankins, have you?

A. I didn't.

Q. You do not know whether her urge symptoms were better or worse after the implant, do

Page 69

you?

A. I don't.

Q. You do not know whether she currently exhibits urge incontinence, do you?

A. I don't.

Q. You would not be able to tell us the extent of her urge incontinence at any time during her treatment of 2004 to the present, would you?

A. I wouldn't.

Q. Let's talk some more about pain and dyspareunia.

Dr. Iakovlev, is it your opinion in this case that Ms. Hankins' pain and dyspareunia was caused by the TVT sling?

A. (Witness reviews document).

MR. COMBS: Let's go off the record.

-- OFF THE RECORD DISCUSSION --

THE WITNESS: The record after the mesh placement in March of 2010 says: "Sex is uncomfortable." That's the first entry.

Then, next entry, April 2010:

"History given of dyspareunia and an obstructive pattern."

Case 2:12-md-02327 Document 3790-16 Filed 04/27/17 Page 20 of 28 PageID #: 138902
Case 2:12-md-02327 Document 3790-16 Filed 04/27/17 Page 20 of 28 PageID #: 66828
Vladimir Iakovlev, M.D.

| Page 70 |
| --- |

1    And:
2        "No evidence of interstitial
3    cystitis."
4        But at that point the attention is
5 completely focused on the carcinomas, or there's a
6 gap of attention to the -- and then we go to
7 June 2010.
8        After the superficial carcinoma is
9 treated, the attention is again refocused to the
10 mesh problems. Dyspareunia is listed together with
11 obstructive voiding here.
12        Now, continuing on. August 2011,
13 she does have obstructive voiding, dyspareunia and
14 symptomatic rectocele and cystocele.
15        So it seems like after the cancer
16 was treated, and when the attention was refocused,
17 Ms. Hankins was ready for removal of the sling.
18        So her symptoms which were attributed
19 to the sling were high enough to trigger the
20 excision, or at least she was convinced that she
21 needs sling excision.
22        BY MR. COMBS:
23        Q.  And do you believe that this sling
24 was excised?

| Page 71 |
| --- |

1        A.  Sorry, I didn't finish.
2        Now, when this problem started being
3 worked up, the examination was, the mesh was
4 palpable, so it was tight enough to be palpable,
5 which corresponds with pain, dyspareunia and
6 obstructive pattern.
7        When it is tightened it compresses the
8 urethra and produced obstructive pattern.  And then
9 further down, she's found to have an erosion
10 through the vaginal mucosa.  So on top of the tight
11 band, tight mesh, she has mucosal erosion.
12        Now, when the mesh was being dissected,
13 not just erosion into the vagina was found, but the
14 sling was so tight that it was almost eroding into
15 the urethra, and the urethra had to be freed
16 completely from scar tissue.
17        Q.  Are you finished with that answer?
18        MR. ANDERSON:  He's still looking.
19        THE WITNESS:  I'm still looking, give
20 me one second.
21        (Witness reviews document).
22        MR. COMBS:  Let's go off the record
23 again.
24        THE WITNESS:  Then the attention then

| Page 72 |
| --- |

1 again refocused here.  So just putting all these
2 records together, I can see there was dyspareunia
3 reported after mesh placement together with
4 obstructive pattern.
5        There was evidence that the sling was
6 overtightened so it was compressing on the tissue.
7 And then mucosal erosion was discovered further --
8 later on.
9        And during the surgery, it was found
10 that there was a tight sling which was almost
11 eroding into the urethra.
12        BY MR. COMBS:
13        Q.  Dr. Iakovlev, you haven't read Dr.
14 Dunn, the explantor's deposition, have you?
15        A.  No.
16        Q.  You do not know whether Dr. Dunn
17 concluded that the sling was a cause of
18 Ms. Hankins' dyspareunia in 2010, do you?
19        MR. ANDERSON:  Again, he has not
20 reviewed any depositions, as we stated earlier in
21 this deposition.  So if he hadn't read it, he
22 wouldn't know what he said.
23        BY MR. COMBS:
24        Q.  You do not know whether Dr. Dunn

| Page 73 |
| --- |

1 concluded the sling was a cause of Ms. Hankins'
2 dyspareunia in 2010; do you?
3        A.  What do you mean?  Which doctor?
4        Q.  Dr. Dunn, the explantor?
5        A.  Well, I mean, he had a reason to
6 explant it.
7        Q.  Yeah.  Do you know what Dr. Dunn's
8 reason was for explanting the sling?
9        A.  He describes tight mesh, which is
10 eroded and almost eroded in the urethra.
11        Q.  Do you know when Dr. Dunn made the
12 decision to explant the mesh rather than lyse the
13 mesh?
14        A.  What do you mean "lyse"?
15        Q.  Cut the mesh.
16        A.  Transect?
17        Q.  Yes.
18        MR. ANDERSON:  The question is when he
19 decided?
20        MR. COMBS:  Do you know?
21        BY MR. COMBS:
22        Q.  Do you know when he decided.  It's
23 actually a "she."  Do you know when she decided?
24        A.  No, I don't.

Case 2:12-md-02327 Document 3790-13 Filed 04/29/17 Page 21 of 28 PageID #: 138903
Case 2:12-md-02327 Document 3790-13 Filed 04/29/17 Page 21 of 28 PageID #: 68529
Vladimir Iakovlev, M.D.

Page 74

1    EXHIBIT NO. 5:  Urogynecologic
2    Follow-Up Report dated August 18, 2011.
3    BY MR. COMBS:
4    Q.  Dr. Iakovlev, let me hand you
5  what's been marked as Exhibit 5, and let's talk
6  about that some.
7       On August 18, 2011, Ms. Hankins had
8  multiple factors that contributed to her
9  dyspareunia, didn't she?
10   A.  Yes.  Could contribute to her
11 dyspareunia.
12   Q.  That did contribute to her
13 dyspareunia, didn't they?
14   MR. ANDERSON:  Well, objection.  Asked
15 and answered.
16   BY MR. COMBS:
17   Q.  Okay.  Well, let's go through.
18      Do you know whether Ms. Hankins'
19 symptomatic rectocele and cystocele contributed to
20 her dyspareunia?
21   A.  This would be more for clinical
22 experts.  Cystocele, rectocele, atrophic vaginitis
23 -- I mean, my understanding is atrophic vaginitis
24 would be a more significant factor rather than

Page 75

1  cystocele and rectocele, but I would have to defer
2  you to clinical experts.
3    Q.  And you see that in Ms. Hankins'
4  examination she was found to have cystocele to the
5  introitus, as well as a rectocele; what does that
6  mean?
7    MR. ANDERSON:  Objection.  He stated
8  that this would have to be deferred to a urogyn.
9    BY MR. COMBS:
10   Q.  Are you able to tell the jury what
11 it means to have cystocele to the introitus?
12   A.  It's not my area of expertise.
13 It's -- cystocele and rectocele it describes a
14 degree of cystocele and rectocele.
15   Q.  "To the introitus" -- would that
16 mean the cystocele had fallen to the vaginal
17 opening?
18   A.  Fallen or is visible, again, it's
19 not my area of expertise.  I'm afraid I cannot give
20 a correct and detailed answer.
21   Q.  Now, Dr. Dunn found that
22 Ms. Hankins had decreased vaginal tone, didn't she?
23   A.  Where exactly?
24   Q.  It's on the pelvic exam between

Page 76

1  "Physical Examination" and "Impression," right
2  there.
3    A.  Yeah, I can see "decreased tone."
4    Q.  Do you know whether the decreased
5  tone contributed to Ms. Hankins' dyspareunia?
6    MR. ANDERSON:  Again, he has said he
7  has to defer to a urogynecologist 12 times.  Do you
8  want him to say it for 13?
9    THE WITNESS:  Yes, that's exactly what
10 I would do.  I would say that.
11   MR. ANDERSON:  Thirteen, good.
12   BY MR. COMBS:
13   Q.  Do you know whether Ms. Hankins'
14 atrophic vaginitis contributed to her dyspareunia?
15   MR. ANDERSON:  Objection.  Go for 14.
16   THE WITNESS:  It could contribute, but
17 it's easily treatable condition.  As I said, all
18 women have it.  It doesn't mean that all women
19 cannot be treated.
20   BY MR. COMBS:
21   Q.  And do you know whether Ms.
22 Hankins was, in fact, treated for atrophic
23 vaginitis through a prescription for estrogen?
24   A.  Again, I would have to defer this.

Page 77

1  When I see a sling and foreign body tight enough
2  to almost invading into the urethra and then
3  invading into the vaginal mucosa and being
4  palpable as tight, I think this is a factor which
5  is much stronger than just atrophic vaginitis.
6       But, again, I see that it was clearly
7  abnormal to have a ridge of tight, scarred mesh
8  pressing against the urethra, distorting the
9  tissues around and eroding through the vaginal
10 mucosa, and I can relate it with histological
11 findings.
12   Q.  Okay.  I believe my question was,
13 was Ms. Hankins' atrophic vaginitis treated through
14 a prescription for estrogen?
15   A.  It could be.  As I said, I mean, I
16 would have to defer you to clinical colleagues.
17 I mean, I see it all the time.  It's being treated
18 and...
19   Q.  Do you know whether Ms. Hankins'
20 cystocele and rectocele were treated by performing
21 a pelvic organ prolapse repair using a porcine
22 graft?
23   A.  Not at the time of TVT-O
24 placement.

Case 2:12-md-02327   Document 3790-10   Filed 04/27/17   Page 22 of 28 PageID #: 138904
Case 2:12-md-02327   Document 3790-10   Filed 04/27/17   Page 22 of 28 PageID #: 68830
Vladimir Iakovlev, M.D.

Page 78

1      Q.   No, that's correct. I'm talking
2  about during the 2011 surgery.
3          I'm talking about the November 14,
4  2011, surgery.
5      A.   Yes, I see there was anterior and
6  posterior repair at the same time.
7      Q.   You do not hold any opinion that
8  that posterior and anterior repair were as a result
9  of the sling in this case, do you?
10     A.   We are talking about symptoms
11 which predate the anterior and posterior repair,
12 are we?
13     Q.   My question is, do you hold any
14 opinion in this case that Ms. Hankins' vaginal
15 sling played any role in her prolapse that was
16 surgically treated in November of 2011?
17         MR. ANDERSON:  Objection.  Again, he's
18 not a urogyn.  Don't answer urogyn questions.
19         THE WITNESS:  I frankly don't
20 understand the question.
21         BY MR. COMBS:
22     Q.   Okay.  You don't understand that
23 question?
24     A.   I mean sling is -- are you asking

Page 79

1  that if I have opinion that sling caused the
2  cystocele and rectocele?
3      Q.   Yes.
4      A.   No, I don't think so.  At least,
5  not to my understanding.  But you're better off
6  asking a urogyn.
7          MR. ANDERSON:  Thank you.
8          BY MR. COMBS:
9      Q.   Dr. Iakovlev, do you know whether
10 Ms. Hankins currently has dyspareunia?
11     A.   I don't.
12     Q.   Do you know whether she had
13 dyspareunia at any point after the November 2011
14 procedure?
15     A.   Could you repeat the question.
16 Sorry.
17     Q.   Do you know whether Ms. Hankins
18 had dyspareunia at any point after the 2011
19 surgical procedure?
20         MR. ANDERSON:  Where are you looking
21 now?  What page of your report?
22         THE WITNESS:  Yes, there were some
23 symptoms of dyspareunia after that procedure.
24

Page 80

1          BY MR. COMBS:
2      Q.   When were those symptoms?
3      A.   There was vaginal pain with
4  initial and deep penetration.
5          MR. ANDERSON:  He said when.
6          THE WITNESS:  Sorry, February 2012.
7          BY MR. COMBS:
8      Q.   And any other reports of
9  dyspareunia after 2012?
10     A.   (Witness reviews document).
11         So she gets this burning pain one month
12 after the surgery, so it's pretty much immediate
13 postoperative period.  (Witness reviews document).
14         Then, let me focus.  I don't see it
15 anymore.  There was some pain in the immediate
16 postoperative period, but then...
17     Q.   Dr. Iakovlev, as part of your
18 differential diagnosis regarding whether Ms.
19 Hankins' pain and urge incontinence were caused by
20 the mesh implant, did you consider the fact that
21 she had had multiple cystoscopies?
22         MR. ANDERSON:  Objection to his
23 differential.  Go ahead.
24         THE WITNESS:  Let me understand the

Page 81

1  question.
2          So if her pain and dyspareunia and
3  urinary --
4          BY MR. COMBS:
5      Q.   -- or urge incontinence?
6      A.   -- urge incontinence were caused
7  by --
8      Q.   Could be caused by cystoscopy?
9      A.   -- cystoscopies?
10         MR. ANDERSON:  Objection to the form.
11 Go ahead.
12         THE WITNESS:  Yeah, this is question
13 definitely for urogynecologist or urologist.
14         BY MR. COMBS:
15     Q.   Do you know whether a cystoscopy
16 can cause urge incontinence?
17         MR. ANDERSON:  Objection.  Goes beyond
18 his expertise; he's not a urogynecologist.  Go
19 ahead.
20         BY MR. COMBS:
21     Q.   Do you know whether a cystoscopy
22 can cause pain?
23         MR. ANDERSON:  Same objection, same
24 instruction.

Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 23 of 28 PageID #: 138905
Case 2:12-md-02327 Document 3780-10 Filed 04/27/17 Page 23 of 28 PageID #: 66891
Vladimir Iakovlev, M.D.

Page 82

1    THE WITNESS: That's definitely beyond
2 my expertise.
3    BY MR. COMBS:
4    Q.  Dr. Iakovlev, do you know whether
5 Ms. Hankins had at least a dozen cystoscopies
6 between April 16, 2010, and June 29, 2015?
7    MR. ANDERSON:  Do you want him just to
8 assume that that's in the record, so he doesn't
9 have to spend time counting them?
10    BY MR. COMBS:
11    Q.  I'll represent to you that she had
12 a dozen cystoscopies, approximately a dozen
13 cystoscopies during that time period.
14    Did you factor that into your
15 differential diagnosis regarding the cause of her
16 pain and urge incontinence?
17    MR. ANDERSON:  Same objection regarding
18 his differential diagnosis.  Same objection
19 regarding outside the scope.
20    If you feel comfortable answering that,
21 given my instructions.
22    THE WITNESS:  Yeah, this is the same
23 answer.  It's not question for me.
24

Page 83

1    BY MR. COMBS:
2    Q.  Dr. Iakovlev, do you know whether
3 Ms. Hankins was treated for her bladder cancer?
4    A.  Yes, she was.
5    Q.  And was one of the treatments that
6 she received for her bladder cancer BCG therapy?
7    A.  Later on, at the very end, yes.
8    Q.  Do you know whether urge
9 incontinence is a risk of BCG?
10    A.  When it is administered, yes.
11 It's a significant factor.  But it happened only in
12 2015.
13    MR. COMBS:  Dr. Iakovlev, I don't have
14 any more questions at this time.
15    CROSS-EXAMINATION BY MR. ANDERSON:
16    Q.  Dr. Iakovlev, you were asked
17 whether or not half the specimen that you were able
18 to look at went to Defense; do you recall that?
19    A.  I do.
20    Q.  Have you ever had an opportunity
21 to look at the slides that were taken from that, if
22 any were created by the Defense.  Have you had an
23 opportunity to look at those?
24    MR. COMBS:  Objection, because I didn't

Page 84

1 ask that question.
2    BY MR. ANDERSON:
3    Q.  Okay.  In your report it says half
4 the specimen was sent to the Defense.  Do you
5 recall that in your report?
6    A.  I do.
7    Q.  Have you ever had an opportunity
8 to look at any slides that may have been created by
9 the Defense from those half, that half of the
10 specimen?
11    A.  No.
12    Q.  Would you like an opportunity to
13 be able to look at those in order to determine
14 whether or not you have any supplemental opinions
15 based upon being able to resume a full 50 percent
16 of the slides that would be with the Defense right
17 now?
18    A.  I do.
19    MR. ANDERSON:  We will reserve our
20 right to supplement his opinions based upon counsel
21 sending this back to us, and we have a stipulation
22 that was on the record as of the last deposition
23 that as soon as these reports are handed in, which
24 should be March 16th, that we will have -- that Dr.

Page 85

1 Iakovlev will have returned to him, his half of the
2 specimens, plus whatever slides the Defense experts
3 create.
4    MR. COMBS:  And I can't speak to that
5 since I wasn't here for the last deposition, but
6 whatever the record reflects, it reflects.
7    MR. ANDERSON:  You wouldn't have any
8 objection providing those per PTO-190, would you?
9    MR. COMBS:  I'm not sure that's what
10 PTO-190 says.  But in any event, I'm not the person
11 to ask that question of.  And if that's what the
12 stipulation placed on the record was, that's fine.
13    MR. ANDERSON:  Okay, great.
14    BY MR. ANDERSON:
15    Q.  So you were asked a number of
16 questions about whether or not you counted nerves,
17 found any traumatic neuromas and found any neural
18 ganglia involvement in any of your slides; do you
19 recall that?
20    A.  I do.
21    Q.  Do you remember the part of your
22 testimony and the part of your report where you
23 showed numerous slides where nerves were entrapped
24 in scar plate?

Case 2:12-md-02327 Document 3790-10 Filed 04/27/17 Page 24 of 28 PageID #: 138906
Case 2:12-md-02327 Document 3789-10 Filed 04/27/17 Page 4 of 28 PageID #: 68532
Vladimir Iakovlev, M.D.

**Page 86**

1  A. I do.
2      Q. Do you need to be able to either
3  count the nerves, look for -- find traumatic
4  neuromas or find neural ganglia involvement in
5  order to express your opinions as to whether or not
6  Ms. Hankins experienced mesh-related nerve pain due
7  to nerve entrapment and scar?
8      A. I don't have to see those.
9      Q. Okay. And why is that?
10     A. Finding nerve in scar tissue is
11  already abnormal. Even a single nerve in scar
12  tissue is already abnormal. How many nerves do you
13  need to feel pain? I mean, like a needle prick. I
14  mean, how big is that needle prick?
15     Q. You were asked a question as to
16  whether or not there was some degree of hardening,
17  shrinking, or change in shape of specimens as a
18  result of formalin; do you recall that?
19     A. I do.
20     Q. Was there any significant degree
21  of hardening, shrinking, or changing shape of the
22  sample for Ms. Hankins that prevented you from
23  being able to offer the opinions that you did,
24  based upon your review of the clinical records and

**Page 87**

1  your correlation of those with your pathological
2  findings on all of the slides that we've looked at
3  with counsel and that are in your report?
4      A. No, I mean, just consider this.
5  Entire world functions through the same procedures.
6  All cancers, all diseases are diagnosed using
7  exactly the same procedures, which shrink to a
8  degree -- tissue. I mean, medicine functions based
9  on the same procedures.
10     Q. The same procedures being?
11     A. Being used every day for millions
12  of patients, formalin fixation, dehydration,
13  slicing tissue by microtome. That's how people are
14  treated, and that's how people are diagnosed.
15     Q. So in your opinion, that's not
16  something that's unique to the mesh litigation;
17  that's something that's used millions of times
18  around the world every day?
19     A. Yes, and it's being validated. We
20  know that our medicine is functioning, and
21  functioning better and better every year.
22     Q. You were asked whether you used
23  myeloperoxidase, something called PGP9.5 or
24  neurofilament, all the types of staining on your

**Page 88**

1  slides. Do you remember those questions?
2      A. Yes.
3      Q. Do you need myeloperoxidase,
4  PGP9.5 or neurofilament staining in order to
5  express the opinions you did based upon the slides
6  in your report indicating your opinions with the
7  correlation between the clinical findings and your
8  findings on the slides?
9      A. No, I don't.
10     Q. Were you able to use the H&E and
11  the S100 to be able to come to your opinions
12  without needing any of these additional stainings
13  on all of these slides?
14     A. Yes.
15     Q. You were asked some questions
16  about erosion, and whether that was due to
17  migration or any of the tissues. Do you remember
18  all that?
19     A. I do.
20     Q. Do you remember your testimony
21  about all women as they age will have some sort of
22  age-related atrophy of their tissue?
23     A. Yes.
24     Q. Do all human beings have some form

**Page 89**

1  of age-related atrophy of their tissue as they get
2  older?
3      A. Yes.
4      Q. Despite this, whether or not it
5  was the thinning or the migration, do you have an
6  opinion to a reasonable degree of medical
7  certainty, based upon your background, training,
8  experience, your review of over 200 explanted
9  meshes, your publications in this area, your review
10  of the medical records, and your review of the
11  slides in this case as to whether or not the
12  erosions that were suffered by Ms. Hankins were due
13  to the mesh?
14         Do you have any question as to whether
15  or not -- do you have an opinion, first of all,
16  whether it was related to the mesh?
17     A. I have an opinion.
18     Q. What is that opinion?
19     A. My opinion is these changes were
20  related to mesh.
21     Q. As set forth in your report and
22  your testimony here today?
23     A. Yes.
24     Q. Okay. You were asked questions as

Case 2:12-md-02327  Document 3790-13  Filed 04/27/17  Page 25 of 28 PageID #: 138907
Case 2:12-md-02327  Document 2128-13  Filed 04/27/17  Page 25 of 28 PageID #: 66893
Vladimir Iakovlev, M.D.

Page 90

1 to whether or not the treating physicians found
2 mesh-related infection and whether any cultures
3 were taken; do you remember that?
4         A.  I do.
5         Q.  Do you know if any of the treating
6 physicians ever did histology or looked at her mesh
7 under a microscope?
8         A.  They didn't.
9         Q.  Okay.  And you said erosion, when
10 there's erosion the infection -- and your words
11 were, "it's a given."  Can you explain to the jury
12 what you mean by that?
13         A.  If there is a breakdown of either
14 skin or mucosa it's exposed to environment.  And
15 environment always has bacteria, so there will be
16 infection.  That's why we put Band-Aids on cuts, so
17 they don't get infected, so they heal faster.
18         Q.  Are you familiar with the terms a
19 "systemic infection" versus a "localized
20 mesh-related infection"?
21         A.  -- yes.
22         Q.  Please explain to the jury the
23 difference between if someone has a systemic
24 infection versus a localized infection?

Page 91

1         A.  Localized infection is where the
2 infection is just in the wound.  I mean, if we have
3 cut on skin and then there is redness around it,
4 then it heals over.  So that is self-limited
5 infection right there, or localized infection.
6         There's a foreign body, that will
7 persist.  So there is continuous chronic infection
8 in the area.
9         But if we're talking about systemic
10 infection, it is infection which travels through
11 bloodstream and can affect the entire body.  That
12 infection would need antibiotics for treatment;
13 where the localized infection needs to be treated
14 locally.  In the case of foreign bodies, it means
15 treatment is excision of the foreign body.
16         Q.  Is that what happened in this
17 case?
18         A.  That's exactly what happened.
19         Q.  You were asked some questions
20 about your figures in DH3 and DH4 where you were
21 discussing the significance of the scar plate
22 anchoring and the scar and striated muscle in Ms.
23 Hankins' slides; do you recall that?
24         A.  I do.

Page 92

1         Q.  Explain to the jury what the
2 significance to Ms. Hankins was of these findings
3 of scar plate anchoring to the adjacent striated
4 muscle and scarred striated muscle?
5         A.  So when that scar --
6         MR. ANDERSON:  For her, for Ms.
7 Hankins.
8         THE WITNESS:  When scar became so
9 extensive that it involved striated muscle, in Ms.
10 Hankins' body, first of all, it damaged the muscle.
11 The muscle couldn't function the way it was
12 functioning when it was in healthy state.
13         And then the second important factor is
14 that the scar plate, which was encasing the entire
15 mesh, became connected to the striated muscle.
16         So with the muscle contraction, you can
17 get tugging and movement of the entire scar plate,
18 or tensioning of it.
19         BY MR. ANDERSON:
20         Q.  And you were asked some questions
21 about Exhibit 2.  That was the path report of the
22 explanted mesh by this Dr. Small.  Do you remember
23 that part of your testimony?
24         A.  I do.

Page 93

1         Q.  And did Dr. Small do the same
2 thing that you did when you looked at the medical
3 records and looked at the -- and examined the
4 histology in this case?
5         A.  Yes.
6         Q.  Did he also do the same thing that
7 you or other pathologists do every time they get a
8 specimen?
9         A.  Yes.  He receives a specimen which
10 is labeled as "eroded mesh."
11         Q.  Is that a clinical finding?
12         A.  That's a clinical finding,
13 clinical description.  And then the pathology
14 describes the mesh.  Blue mesh is described
15 grossly, and then --
16         Q.  "Described grossly" means?  Looked
17 at it?
18         A.  Looked at it without microscope,
19 but just with naked eye.  Then he further describes
20 tissue and the tissue is benign connective tissue
21 and skeletal muscle.
22         Q.  What counsel didn't ask you, why
23 did he put the word "benign" there.  What is the
24 significance of that in a pathology report?

Case 2:12-md-02327  Document 3790-10  Filed 04/27/17  Page 26 of 28 PageID #: 138908
Case 2:12-md-02327  Document 2183-10  Filed 05/05/16  Page 26 of 28 PageID #: 66594
Vladimir Iakovlev, M.D.

**Page 94**

1      A.   Because the most important thing
2  we are looking for is it benign or malignant?
3      Q.   Benign or malignant?
4      A.   Yes.
5      Q.   In terms of cancer?
6      A.   Cancer.  If it is malignancy, it
7  will need completely different treatment.  If it is
8  benign, it means that surgeon excised tissue which
9  was causing the symptoms, and at that point there
10  is no further treatment, or at least no
11  cancer-related treatment.
12      Q.   And counsel asked you the
13  question, he said, well, I don't see the word "scar
14  plate" on there.  Would you expect Dr. Small to be
15  describing a scar plate when he was looking at this
16  mesh?
17      A.   When you try to decide it's benign
18  or malignant you ignore things like scar plate and
19  other things, because your main concern is
20  malignancy.  So the focus here was benign.
21      See, when the excision occurred in this
22  specific case, the pathologist most likely was
23  informed or could see in the records that there was
24  malignancy.  So for us as pathologists, we always

**Page 95**

1  alert -- we are alerted in each case when there is
2  previous malignancy.
3      So any tissue comes out of a patient
4  where there is history of malignancy, first thing
5  we look for is it malignant or it's benign.
6      Q.   So his focus was more on looking
7  at cancer versus looking at specific details of the
8  mesh and the tissue?
9      A.   That would be secondary.  I mean,
10  he wouldn't be paying much attention.  His main
11  concern is cancer or not cancer.
12      Q.   Do you know if Dr. Small has ever
13  seen explanted mesh in tissue samples?
14      A.   I don't know.
15      Q.   You were asked a lot more
16  questions about nerves, and we've looked at some of
17  your images on DH6 and DH7.  What is the impact to
18  Ms. Hankins of these nerves that are entrapped in
19  the scar plate?
20      A.   So as we talked about it earlier,
21  there are two important factors.  When the nerves
22  are seen in the scar tissue, first of all, it's an
23  abnormal location.  So nerve can be normal, but
24  being in scar tissue -- it's an abnormal location;

**Page 96**

1  it's an abnormal environment.
2      It's not normal for nerves to be in the
3  scar tissue; that's how traumatic neuromas are
4  formed.  That's how phantom pain is developing.
5  Every time the nerves gets in scar tissue, there is
6  risk for symptoms, other symptoms.
7      So that would be direct link between
8  this nerve entrapment in the scar tissue and these
9  symptoms in this case, and symptoms of pain.
10      The second important factor is that
11  indicates that although it's scar tissue, it still
12  has innervation.  So it would be subject or can
13  experience all just regular pain through pinching
14  and pulling and tightening.  Like we pinch our
15  skin, we feel pain.  The same thing with that
16  tissue.
17      Now, if we go through the records, it
18  was clearly tight.  The sling was tight.  The
19  tissue was tightened.  The tissue was compressed.
20  There was a lot of distortion in the area, and all
21  of that could be felt.
22      Q.   Do you need to see nerve
23  degeneration, nerve distortion, traumatic neuromas
24  or nerve ganglia in order to come to the opinions

**Page 97**

1  that a healthy nerve entrapped in scar tissue can
2  lead to pain in patients and, in particular, led to
3  pain in Ms. Hankins?
4      A.   I don't need to see nerve
5  distortion or neuroma.  If I see neuroma, it just
6  exacerbates the issue.  But otherwise, I don't have
7  to see it.
8      Q.   You were asked a lot of questions
9  about urge incontinence, whether she had it before
10  or after the mesh, when she had it, what degree she
11  had it.
12      You were asked a lot of questions about
13  biologic grafts for rectocele and cystocele.  Are
14  you a urogynecologist?
15      A.   No.
16      Q.   Are those the types of questions
17  that you have to come up with a clinical
18  differential diagnosis in your field of pathology?
19      A.   Yes.  I mean, somebody would have
20  to work that part.
21      Q.   Somebody other than you?
22      A.   Somebody other than me, work the
23  differential diagnosis, decide that something needs
24  to be excised because there is a lesion which needs

Case 2:12-md-02327 Document 3790-10 Filed 04/29/17 Page 27 of 28 PageID #: 138909
Case 2:12-md-02327 Document 3188-19 Filed 11/11/16 Page 27 of 28 PageID #: 66595
Vladimir Iakovlev, M.D.

Page 98

1 to come out, and then send it to me.
2         And from that point, then I can tell
3 the clinicians what is abnormal in that tissue.
4         Q.  Is that what you do every day in
5 your practice?
6         A.  That is what I do every day in my
7 practice.  And that's what happened in Ms. Hankins.
8 The clinical decision at the end of the day was to
9 excise the mesh.
10         I'm explaining what was abnormal in the
11 mesh, and I'm connecting it was the reasons why it
12 was excised.
13         MR. ANDERSON:  Thanks.  No more
14 questions right now.
15         REDIRECT EXAMINATION BY MR. COMBS:
16         Q.  Dr. Iakovlev, you said in response
17 to Mr. Anderson's question quote, "how many nerves
18 do you need to feel pain"?
19         In order to feel pain, you got to have
20 nerve receptors involved, don't you?
21         A.  No.  You don't have to.
22         Q.  Let's break this down.  Can a
23 nerve twig feel pain without a nerve receptor?
24         A.  Yes.  It would be phantom pain.  I

Page 99

1 mean, those patients will feel pain in the leg
2 which doesn't exist anymore which was amputated.
3 There are no nerve receptors.  All traumatic
4 neuromas are actually dead ends of the nerves
5 dangled in scar tissue.
6         Q.  And you did not find any traumatic
7 neuromas in this tissue, did you?
8         MR. ANDERSON:  Objection.
9         THE WITNESS:  I did not see it in
10 dissections; that is correct.
11         BY MR. COMBS:
12         Q.  And you did not stain this tissue
13 with any stains that would allow you to see nerve
14 receptors, did you?
15         A.  No, I didn't.
16         Q.  How many nerve twigs would need to
17 be involved in order for you to feel pain?
18         A.  Maybe one.
19         Q.  Is that your opinion?
20         A.  That's my opinion.  Because how
21 big is the needle prick?  How large is it?
22         Q.  Dr. Iakovlev, Ms. Hankins had
23 several ultrasounds.
24         Did you review any of those ultrasounds

Page 100

1 to determine the degree of contraction of her mesh?
2         A.  I believe you cannot measure by
3 ultrasound.
4         Q.  Did you review any of her
5 ultrasounds?
6         A.  No, how can you?  You have to know
7 the preexisting length and then measure it with
8 ultrasound.  So it has to be measurement at the
9 time of placement, within first month and then
10 maybe later.  I mean, nobody does it.
11         Q.  Dr. Iakovlev, you were asked some
12 questions about Dr. Small.  You don't have any idea
13 of his background, do you?
14         A.  No.
15         Q.  You don't know whether he has
16 viewed other pelvic meshes, do you?
17         A.  No.
18         Q.  And Dr. Small made no finding of
19 infection in his report that's marked as Exhibit 2,
20 did he?
21         A.  No.
22         Q.  Made no findings of any nerve
23 involvement in any portion of Ms. Hankins' tissue,
24 did he?

Page 101

1         A.  Could you repeat this question?
2         Q.  Dr. Small made no findings of any
3 nerve involvement in any aspect of Ms. Hankins'
4 specimen, did he?
5         A.  I don't know if he looked at
6 nerves at all.  There's no comment on nerves
7 anywhere.
8         Q.  And you said that Dr. Small and
9 you did the same thing, didn't you?
10         A.  Yes.
11         Q.  Dr. Iakovlev, prior to Ms.
12 Hankins' mesh erosion, she suffered at least a
13 grade-two prolapse; didn't she?
14         A.  Again, this is clinical question,
15 I don't remember exactly what grade it was.  I mean
16 -- I'm not the person to answer that question.
17         Q.  Okay.
18         MR. COMBS:  Thank you.  No additional
19 questions.
20         MR. ANDERSON:  Okay.
21
22 -- Whereupon the deposition adjourned at 7:52 p.m.
23
24

Case 2:12-md-02327  Document 3790-10  Filed 04/27/17  Page 28 of 28 PageID #: 138910
Case 2:12-md-02327  Document 2138-11  Filed 05/05/16  Page 28 of 28 PageID #: 66836

Vladimir Iakovlev, M.D.

Page 102

1   CERTIFICATE OF REPORTER
2   CANADA           )
3   PROVINCE OF ONTARIO  )
4
5   I, Judith M. Caputo, the officer before whom the
6   foregoing deposition was taken, do hereby certify
7   that the witness whose testimony appears in the
8   foregoing deposition was duly sworn by me; that the
9   testimony of said witness was taken by me in
10  shorthand, using Computer Aided Realtime, to the
11  best of my ability and thereafter reduced to
12  written format under my direction; that I am
13  neither counsel for, related to, nor employed by
14  any of the parties to the action in which the
15  deposition was taken, and further that I am not
16  related or any employee of any attorney or counsel
17  employed by the parties thereto, nor financially or
18  otherwise interested in the outcome of the action.
19
20  _____
21  Judith M. Caputo, RPR, CSR, CRR
22
23  Commissioner for taking
24  Oaths in the Province of Ontario

Page 104

1   - - - - - -
    E R R A T A
2   - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6   REASON: _____
7   ____  ____  _____
8   REASON: _____
9   ____  ____  _____
10  REASON: _____
11  ____  ____  _____
12  REASON: _____
13  ____  ____  _____
14  REASON: _____
15  ____  ____  _____
16  REASON: _____
17  ____  ____  _____
18  REASON: _____
19  ____  ____  _____
20  REASON: _____
21  ____  ____  _____
22  REASON: _____
23  ____  ____  _____
24  REASON: _____

Page 103

1   INSTRUCTIONS TO WITNESS
2
3        Read your deposition over carefully.
4   It is your right to read your deposition and make
5   changes in form or substance.  You should assign a
6   reason in the appropriate column on the erratum
7   sheet for any change made.
8        After making any changes in form or
9   substance, and which have been noted on the
10  following erratum sheet, along with the reason for
11  any change, sign your name on the erratum sheet and
12  date it.
13       Then sign your deposition at the end of
14  Your testimony in the space provided.  You are
15  signing it subject to the changes you have made in
16  the erratum sheet, which will be attached to the
17  deposition before filing.  You must sign it in
18  front of a witness.  The witness need not be a
19  notary public.  Any competent adult may witness
20  your signature.
21       Return the original erratum sheet
22  promptly.  Court rules require filing within 30
23  days after you receive the deposition.
24

Page 105

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, and that the same is
7   a correct transcription of the answers
8   given by me to the questions therein
9   propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  VLADIMIR IAKOVLEV, M.D.          DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
    _____
22  Notary Public
23
24