# EXHIBIT C

Paul J. Michaels, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | | |
|---|---|---|
| _____ ) | | |
| IN RE: ETHICON, INC., PELVIC ) | Master File No. | |
| REPAIR SYSTEM PRODUCTS ) | | |
| PRODUCTS LIABILITY LITIGATION ) | 2:12-MD-02327 | |
| ) | | |
| THIS DOCUMENT RELATES TO THE ) | MDL 2327 | |
| FOLLOWING CASES IN WAVE 2 ) | | |
| OF MDL 200: ) | | |
| ) | JOSEPH R. GOODWIN | |
| Tamara Carter, et al. v. ) | | |
| Ethicon, Inc., et al. ) | U.S. DISTRICT JUDGE | |
| Civil Action No. 2:12-cv-01661 ) | | |
| ) | | |
| Sandra Childress, et al. v. ) | | |
| Ethicon, Inc., et al. ) | PAUL J. MICHAELS, M.D. | |
| Civil Action No. 2:12-cv-01564 ) | | |
| ) | JUNE 18, 2016 | |
| Marion Chrysler v. ) | | |
| Ethicon, Inc., et al. ) | | |
| Civil Action No. 2:12-cv-02060 ) | | |
| ) | | |
| Melissa Sanders, et al. v. ) | | |
| Ethicon, Inc., et al. ) | | |
| Civil Action No. 2:12-cv-01562 ) | | |
| ) | | |
| Ana Sierra, et al. v. ) | | |
| Ethicon, Inc., et al. ) | | |
| Civil Action No. 2:12-cv-01819 ) | | |
| ) | | |
| Toni Hernandez v. ) | | |
| Ethicon, Inc., et al. ) | | |
| Civil Action No. 2:12-cv-02073 ) | | |
| _____) | | |

Reported by:

Rebecca J. Callow, CSR, RPR, CRR

Paul J. Michaels, M.D.

Page 2

```
1
2            DEPOSITION OF PAUL J. MICHAELS, M.D.
3         THIS DOCUMENT RELATES TO GENERAL TESTIMONY
4                    Austin, Texas
5               Saturday, June 18th, 2016
6                     8:04 a.m.
7
8
9      Deposition of PAUL J. MICHAELS, M.D, pursuant to
10     Notice held at the offices of Hissey Kientz,
11     9442 N. Capital of Texas Highway Building 1,
12     First Floor Conference Room, Austin, Texas, before
13     Rebecca J. Callow, Registered Merit Reporter,
14     Certified Realtime Reporter, Registered
15     Professional Reporter, and Notary Public in and
16     for the State of Texas.
17
18
19
20
21
22
23
24
```

Page 3

```
1      A P P E A R A N C E S:
2
3      FOR PLAINTIFFS:
4          Aylstock, Witkin, Kreis & Overholtz, PLLC
5          17 East Main Street
6          Suite 200
7          Pensacola, Florida 32502
8          (850) 202-1010
9          BY:    Bryan F. Aylstock, Esquire
10             baylstock@awkolaw.com
11
12     FOR PLAINTIFFS:
13         Danny L. Curtis, P.C.
14         9229 Ward Parkway
15         Suite 370
16         Kansas City, Missouri 64114
17         (816) 523-4667
18         BY:    Danny L. Curtis, Esquire
19             dcurtis@dannylcurtispc.com
20
21
22
23
24
```

Page 4

```
1      A P P E A R A N C E S:
2
3      FOR JOHNSON & JOHNSON AND ETHICON, INC.:
4          Thomas Combs & Spann PLLC
5          300 Summers Street
6          Suite 1380
7          Charleston, West Virginia 25301
8          (304) 414-1807
9          BY:    David B. Thomas, Esquire
10             dthomas@tcspllc.com
11
12     FOR JOHNSON & JOHNSON AND ETHICON, INC.:
13         Butler Snow, LLP
14         150 3rd Avenue South
15         Suite 1600
16         Nashville Tennessee 37201
17         (615) 651-6700
18         BY:    M. Andrew Snowden, Esquire
19             andy.snowden@butlersnow.com
20
21
22
23
24
```

Page 5

```
1                    INDEX
2                                PAGE
3      PAUL J. MICHAELS, M.D.
4      Examination by Mr. Thomas .......................6
5      Changes and corrections  ......................127
6      Signature Page  ...............................129
7      Court Reporter's Certificate ..................130
8
9
10
11                  EXHIBITS
12     NO.        DESCRIPTION              PAGE
13     Exhibit 1    Notice of Deposition of Paul      7
14           Michaels, M.D.
15     Exhibit 2    Flash drive containing reliance   8
16           materials of Paul Michaels,
17           M.D.
18     Exhibit 3    Expert Report of Paul T.         16
19           Michaels, M.D. (Re: Sandra
20           Childress)
21     Exhibit 4    Exhibit D:  Reliance List for    17
22           Paul Michaels, M.D.
23
24
```

2 (Pages 2 to 5)

Paul J. Michaels, M.D.

Page 6

1          (Witness sworn.)
2          MR. AYLSTOCK:  Before we get started,
3  Dave, I guess, I know there were some e-mails flying
4  back and forth.  To the extent that Dr. Michaels was
5  withdrawn as a general expert, he's -- by my e-mails
6  for cases where he's designated, our understanding
7  is that he will be designated both as case-specific
8  and generic in those and we're permitting you to
9  take a generic general deposition of Dr. Michaels
10  pursuant to the notices that you provided.
11          MR. THOMAS:  Thank you.
12          PAUL J. MICHAELS, M.D.,
13    Called as a witness herein, having been
14  previously duly sworn by a Notary Public, was
15  examined and testified as follows:
16          EXAMINATION
17  BY MR. THOMAS:
18  Q.  Good morning, Doctor.
19  A.  Good morning.
20  Q.  I introduced myself to you before the
21  deposition.  My name is David Thomas and I represent
22  Ethicon.
23          You've given depositions before?
24  A.  Yes.

Page 7

1          (Exhibit 1 marked.)
2  BY MR. THOMAS:
3  Q.  Let me show you what I've marked as
4  Deposition Exhibit No. 1.  It's a notice of
5  deposition for you in six cases in the pelvic mesh
6  MDL.
7          Have you seen that notice of deposition
8  before?
9  A.  Yes.
10  Q.  Did you bring anything with you in response
11  to Schedule A attached to the notice?
12          MR. CURTIS:  Doctor, before you
13  answer, for the record, we filed written
14  objections -- e-filed written objections to the
15  documents listed in the attachment to the notice for
16  his deposition in all of these cases.  I didn't
17  bring written objections to be made an exhibit,
18  Mr. Thomas, but I wanted the record to include that.
19          And also, we provided, by electronic
20  link, the documents that were on the reliance list
21  for each of the cases to include the medical
22  records, the deposition transcripts, and other
23  materials provided the doctor.  So you have those in
24  that form.

Page 8

1          MR. THOMAS:  Okay.  And is that all
2  the information that you produced pursuant to the
3  notice of deposition?
4          MR. CURTIS:  It's all that I produced.
5  I think that there are other materials that have
6  also been produced, but that's an explanation of why
7  Dr. Michaels did not bring materials in paper copy
8  this morning.
9          MR. THOMAS:  Thank you.
10  A.  I have a flash drive that has my CV and all
11  the representative information that was included in
12  Schedule A of this notice of deposition.
13  BY MR. THOMAS:
14  Q.  Can I have that flash drive?
15  A.  Yes.
16          (Exhibit 2 marked.)
17          MR. THOMAS:  I've marked as
18  Exhibit No. 2 the flash drive that Dr. Michaels just
19  gave me.
20  BY MR. THOMAS:
21  Q.  Without going into great detail, unless you
22  can, is there anything on the Schedule A that you
23  did not produce?
24          MR. AYLSTOCK:  Just again to

Page 9

1  reiterate, we objected to form to a large portion of
2  it --
3          MR. THOMAS:  I understand.  I don't
4  want to spend my time going through each one of them
5  to figure it out.
6          MR. AYLSTOCK:  That's fine.
7  BY MR. THOMAS:
8  Q.  And if there's something that you know of
9  that you didn't produce, tell me.  Otherwise, we'll
10  get to it later.
11  A.  Not that I'm exactly aware of.
12  Q.  Okay.  And that's fine.  We'll figure that
13  out, perhaps, as we go along.
14          Would you state your full name for the
15  record, please?
16  A.  Paul Joseph Michaels.
17  Q.  And, Dr. Michaels, you are a medical
18  doctor?
19  A.  Yes.
20  Q.  And what is your area of specialty?
21  A.  Pathology.  Specifically atomic and
22  clinical pathology with a subspecialty in
23  cytopathology.
24  Q.  Have you been identified as an expert

3  (Pages 6 to 9)

Paul J. Michaels, M.D.

Page 10

1    witness in the Ethicon Pelvic Repair System Products
2    Liability Litigation?
3        A.  Yes.
4        Q.  And you're here to testify on behalf of the
5    plaintiffs?
6        A.  Yes.
7        Q.  In six cases.
8            Who contacted you about this
9    litigation?
10       A.  I don't remember exactly the order of how I
11   was contacted, but I believe it was Mr. Aylstock's
12   firm.
13       Q.  Okay.  And what were you asked to do?
14       A.  I was asked to serve as an expert with
15   regards to the pathologic evaluation of the mesh
16   specimens in these clients that had brought this
17   lawsuit.
18       Q.  The notice of deposition lists six cases in
19   which you're prepared to give opinions in this MDL.
20   Did you review other cases?
21       A.  Yes.
22       Q.  How many other cases did you review?
23       A.  One or two.
24       Q.  Okay.  And did you decline to give opinions

Page 11

1    in those cases?
2        A.  No.
3            One of them I did give an opinion.  I
4    just -- it's not on here.  I think it's for later.
5            And then the other one I was told kind
6    of halfway through that that I shouldn't work on the
7    case anymore.  I don't know what was happening to
8    it, if they were withdrawing or settling.  I didn't
9    ask.  I was just told on this case -- and I don't
10   even remember the name -- don't work anymore on it.
11       Q.  Do you know the names of the plaintiffs in
12   those two cases?
13           MR. AYLSTOCK:  And with regard to
14   that, I'm going to object to the extent that he may
15   have been a consulting expert on those cases, you're
16   not entitled to know the names of those cases until
17   the time -- such time as he's been disclosed as an
18   expert in those.
19           MR. THOMAS:  I can't know that, Bryan.
20   Are you instructing him not to answer or what?  I
21   don't know.
22           MR. AYLSTOCK:  With regard -- one of
23   those cases is not mine, so for that, without his
24   lawyer here, who -- and I can probably shed some

Page 12

1    more light to you off the record, yes, I would tell
2    him not to answer that question.
3            MR. THOMAS:  Okay.  Again, I don't
4    want to spend time discussing stuff.  That's going
5    to waste my time or we're not going to get any
6    answers.
7            BY MR. THOMAS:
8        Q.  Prior to your retention in this case, can
9    you tell me something about your familiarity with
10   pelvic mesh implants?
11       A.  Well, as a pathologist, I've been exposed
12   to these specimens over the last several years.  So
13   I've grossly examined them, microscopically examined
14   them, prior to being involved in this litigation,
15   and that was basically it.
16       Q.  Has that been in your capacity as a
17   pathologist associated with the hospital?
18       A.  That's correct.
19       Q.  And how many pelvic mesh explants have you
20   as a pathologist analyzed prior to your retention in
21   this litigation?
22       A.  I would probably say somewhere around two
23   dozen, maybe.
24       Q.  Over what period of time?

Page 13

1        A.  Seven, eight years, maybe.
2        Q.  Do you recall any time where you as a
3    pathologist have been asked to analyze pelvic mesh
4    implants to determine the extent to which the mesh
5    contributed to the pathology in the tissue that you
6    analyzed?
7        A.  Could you repeat that?
8            MR. THOMAS:  Could you?
9            (The record was read as requested:
10               "Do you recall any time where you as a
11               pathologist have been asked to analyze
12               pelvic mesh implants to determine the
13               extent to which the mesh contributed
14               to the pathology in the tissue that
15               you analyzed?")
16       A.  Well, I would say that as a pathologist,
17   that's what you do on a day-to-day basis.  Whether
18   you're specifically asked by the submitting surgeon,
19   a particular clinical question, that's what we do is
20   analyze specimens and report their pathological
21   significance.
22           So I would say that -- yes, that's
23   part of my purview as a pathologist just with
24   general specimens would be to answer those clinical

4 (Pages 10 to 13)

Paul J. Michaels, M.D.

Page 14

1  questions, whether they're specifically asked or
2  not.
3      BY MR. THOMAS:
4      Q.  Prior to your retention in this litigation,
5  have you written pathology reports which expressed
6  opinions about the impact that the presence of
7  polypropylene mesh may have played in the pathology
8  of the tissue that you reviewed?
9      A.  Well, with regards to impact, I would say
10  if you were talking about a foreign body response,
11  that is in relationship to the mesh, then yes.
12      Q.  Anything other than commenting on the
13  foreign body response due to the presence of the
14  mesh?
15      A.  Fibrosis, fat necrosis.  Those are the main
16  things that we address in pathology reports with
17  regards to either mesh or any foreign-type material.
18      Q.  Have you had any training prior to your
19  work in this litigation concerning the impact of
20  polypropylene mesh in tissue?
21      A.  I wouldn't say I've had any specific
22  training with regards to the polypropylene mesh in
23  tissue and its reaction.  But just as a general
24  pathologist, within our training we are, I guess,

Page 15

1  taught and schooled with respect to foreign bodies
2  in general.
3      Q.  Have you ever authored any papers related
4  to the impact of polypropylene mesh on tissue in the
5  pelvic floor?
6      A.  No, I have not.
7      Q.  Have you ever conducted any research
8  concerning the impact of polypropylene mesh on
9  tissue in the pelvic floor?
10      A.  No.
11      Q.  Have you ever spoken or taught on the topic
12  of the issue of the impact of polypropylene mesh on
13  tissue in the pelvic floor?
14      A.  No.
15      Q.  When you were asked to assist the
16  plaintiffs in this litigation, what did you do to
17  prepare yourself for the work that you were going to
18  do?
19      A.  Well, I re-reviewed a lot of the general
20  pathology of inflammation and foreign body
21  granulomas reactions from several different
22  textbooks and, I guess, online pathology sources.
23      I reviewed a lot of the literature
24  that I came into contact with, either that was

Page 16

1  provided to me or when I did my own PubMed search
2  with regards to mesh, polypropylene, transvaginal
3  surgeries, et cetera, I came across a lot of
4  articles that way.  I read a lot of articles in that
5  respect.
6      I was -- I asked for and was given
7  some of the internal Ethicon documents with respect
8  to the litigation and their research on mesh.
9      And I reviewed some depositions from
10  different physicians that had been involved in the
11  litigation prior to me being asked to be in the
12  litigation, as well as some of their prior expert
13  reports to get a general overview of some of the
14  issues in the litigation.  I would say those would
15  be the main things.
16      Q.  What prior expert reports did you review?
17      A.  Reports I think by physicians
18  Klausterhoften, Clinge, I believe, Iakovlev as well.
19      Q.  Any other expert reports you recall
20  reviewing?
21      A.  Well, not in the beginning, no.
22      (Exhibit 3 marked.)
23      BY MR. THOMAS:
24      Q.  Let me show you what's Deposition Exhibit

Page 17

1  No. 3, which is your expert report in the Childress
2  case.  The expert report in the Childress case has a
3  heading, "Background," "Summary of Opinions," and
4  "Comment."
5      I'm interested now in the Comment
6  section of Exhibit No. 3.
7      Does the Comment section in
8  Exhibit No. 3, which goes from pages 2 through 5,
9  does that generally represent your general report in
10  this case?
11      A.  I would say that that generally represents
12  my general opinions with regards to the case, yes.
13      Q.  Okay.  And without showing you the other
14  five reports, does -- can I use the Childress report
15  as a template for your general opinions across all
16  six cases?
17      A.  I don't know about that, because I -- they
18  change -- I can't remember specifically, as I sit
19  here, but -- and without comparing all of the
20  reports to one another, there may be some
21  differences from one report to another to this
22  comment section.
23      Q.  Okay.
24      (Exhibit 4 marked.)

5 (Pages 14 to 17)

Paul J. Michaels, M.D.

Page 18

1    BY MR. THOMAS:
2        Q.  Let me show you what's been marked as
3    Deposition Exhibit No. 4.
4            Deposition Exhibit No. 4 is Exhibit D
5    that I was provided Thursday afternoon and
6    represented to be your reliance list in connection
7    with your opinions in this case.
8        A.  I don't think so, because this one says
9    "Chrysler deposition" on page 5, and we're talking
10   about Childress.
11       Q.  Well, the reason why I say that -- well,
12   this was given to me by plaintiffs on Thursday
13   afternoon.
14           Other than the page 5, which are
15   individual medical records I think you said for the
16   Chrysler case, do the first four pages of that
17   Exhibit No. 4 represent your reliance materials for
18   your general opinions in the case?
19       A.  I believe so, yes.
20       Q.  And you said a minute ago that you obtained
21   these materials from a variety of sources.
22           Do you know which of these literature
23   references you obtained on your own?
24       A.  I couldn't go through them and pick them

Page 19

1    out.
2        Q.  Counsel supplied you selected literature?
3        A.  Initially, yes.
4        Q.  Are you able to identify from materials
5    that you have in your files those materials that
6    counsel provided to you?
7        A.  No.  Because I put them all in one general
8    folder.
9        Q.  And likewise, are you able to identify
10   those materials that you found on your own through
11   your own PubMed search?
12       A.  No.
13       Q.  I believe you said you did some Internet
14   research.
15       A.  Well, with regards to general -- I mean,
16   PubMed is an Internet research, so yes, I did.
17       Q.  Did you do any -- what did you search for
18   under PubMed?
19       A.  Transvaginal mesh, you know, mesh pain,
20   mesh complications, a variety of different -- I
21   mean ...
22       Q.  Other than your PubMed search on the
23   Internet, did you conduct any other Internet
24   research?

Page 20

1        A.  Well, for general pathology, background
2    information with regards to maybe some of the later
3    advancements with regards to inflammatory cytokines
4    and mechanisms that maybe were even more recent than
5    the most recent textbooks I have on the subject, but
6    not much in addition to that.
7        Q.  And what did you search for specifically in
8    your Internet research?
9        A.  Inflammation mechanisms, foreign body
10   response, pathology foreign body response,
11   histology, biology, et cetera.
12       Q.  You mentioned that you studied papers
13   related to the complications associated with mesh in
14   the pelvic floor.
15           Why was that important to you?
16       A.  Because as part of my role as an expert, I
17   am correlating the findings based on the literature
18   with respect to histopathologic features that I'm
19   finding in the mesh explants.
20           So if there are studies done with
21   respect to correlating these findings, it was
22   important to me, as a pathologist reviewing the
23   mesh, to be able to identify those and correlate
24   them with the individual case-specific opinions, I

Page 21

1    guess.
2        Q.  In analyzing the complications associated
3    with the use of mesh in the pelvic floor, did you
4    determine the rate of those complications in
5    surgeries?
6        A.  From what I read, the rates seemed quite
7    variable from study to study.
8            And it would depend on what you were
9    specifically looking at and what was really
10   considered a complication, because that seems to
11   also have changed with respect to how, for example,
12   recurrence is classified.
13       Q.  To the extent that you studied the rates of
14   complications occurring from mesh in the pelvic
15   floor, did you include those papers in your reliance
16   list, which is Exhibit 4?
17       A.  I included everything in my reliance list
18   that I thought was pertinent to my opinions and that
19   I felt like seemed to be a pertinent study.
20       Q.  Are the rates of complications from the use
21   of mesh in the pelvic floor pertinent to your
22   opinions in the case?
23           MR. AYLSTOCK:  Object to the form of
24   the question to the extent that you're talking about

6 (Pages 18 to 21)

Paul J. Michaels, M.D.

Page 22

1   mesh generally.
2          THE WITNESS: Can you repeat that
3   question?
4          (The record was read as requested:
5          "Are the rates of complications from
6          the use of mesh in the pelvic floor
7          pertinent to your opinions in the
8          case?")
9   A.  I don't think necessarily.
10  BY MR. THOMAS:
11  Q.  Why do you say you don't think necessarily?
12  A.  Well, I'm just -- because these are all --
13  I'm being involved in cases where the complication
14  has occurred.  So whether that occurs in 1 in 10,000
15  or 1 in 5, it doesn't matter.  It occurred in this
16  case.
17          So, although it's something that is a
18  background information with respect to how common
19  something is, I don't think in a particular case it
20  changes any opinion that I would render.
21  Q.  As a part of your work in this case, did
22  you undertake to determine how complications which
23  result from the use of mesh in the pelvic floor
24  occur?

Page 23

1          THE WITNESS: Could you repeat that?
2   Sorry.
3          THE REPORTER: No problem.
4          (The record was read as requested:
5          "As a part of your work in this case,
6          did you undertake to determine how
7          complications which result from the
8          use of mesh in the pelvic floor
9          occur?")
10  A.  Yes.
11  BY MR. THOMAS:
12  Q.  And how did you do that?
13  A.  By trying to read some of the literature
14  regarding the complications.
15  Q.  And did you seek to understand the risk of
16  complications in the pelvic floor from non-mesh
17  procedures?
18  A.  I don't know what non-mesh procedures
19  you're talking about.
20  Q.  Do you know what a Burch colposuspension
21  is?
22  A.  So you mean -- so you mean general
23  treatment for prolapse, et cetera, that's not mesh?
24  Q.  Correct.

Page 24

1   A.  Oh, okay.  Yes.
2   Q.  So you did seek to understand the
3   complications that occur for the treatment of
4   conditions in the pelvic floor that don't involve
5   mesh?
6   A.  Well, in many of the reports that I had,
7   there were discussions regarding comparing the
8   complications with mesh from complications of
9   surgeries that were similar prior to or without the
10  use of synthetic mesh.
11  Q.  As a part of your work in this case, did
12  you make a determination of whether complications
13  were greater or fewer in surgeries using mesh for
14  the treatment of stress urinary incontinence as
15  opposed to procedures involving the
16  Burch colposuspension?
17  A.  Well, with respect to mesh versus non-mesh,
18  yes.
19  Q.  And what did you learn from your work?
20  A.  That the complications from surgeries with
21  respect to using synthetic mesh were greater.
22  Q.  Is that for the treatment of stress urinary
23  incontinence?
24  A.  Well, I would say, in general, with respect

Page 25

1   to organ prolapse and stress urinary incontinence,
2   my understanding from reviewing the literature is
3   that the use of synthetic mesh resulted in an
4   increased number of complications with respect to
5   those types of surgical procedures compared to
6   procedures where non-synthetic mesh was used.
7   Q.  Okay.  Specifically, did your review of the
8   literature lead you to conclude that the risk of
9   complications in the use of mesh for the treatment
10  of stress urinary incontinence is greater than the
11  risk of complications from non-mesh procedures used
12  to treat stress urinary incontinence?
13  A.  I would say my general opinion, as I sit
14  here now, from what I recall would be yes.  But I
15  don't have a lot of those studies in front of me to
16  look at their reported complication rates.
17  Q.  Do you remember which studies you used in
18  that regard?
19  A.  With respect to the authors' names?
20  Q.  Yes.  Anything you can do to identify the
21  study so I can find it.
22  A.  I can go through my reliance list one by
23  one.
24  Q.  I don't want to do that.  I'm just asking

7 (Pages 22 to 25)

Paul J. Michaels, M.D.

Page 26

1    if you recall anything off the top of your head.
2        A. Well, for me to identify these number of
3    studies, I would have to go through them because I
4    reviewed so much literature in preparation for --
5        Q. I understand.
6        A. Okay.
7        Q. Do you agree that acute or chronic
8    dyspareunia is a risk of non-mesh surgery of the
9    pelvic floor?
10           MR. AYLSTOCK: Objection to form.
11           THE WITNESS: Could you repeat that?
12        (The record was read as requested:
13           "Do you agree that acute or chronic
14           dyspareunia is a risk of non-mesh
15           surgery of the pelvic floor?")
16       A. I would say it can be, yes.
17    BY MR. THOMAS:
18       Q. Do you agree that acute or chronic pain is
19    a risk of non-mesh surgery in the pelvic floor?
20           MR. AYLSTOCK: Objection to form.
21       A. Acute or chronic pain, in general, or ...
22    BY MR. THOMAS:
23       Q. Yes.
24       A. Like in your head? Pain can be anywhere,

Page 27

1    so I don't -- that seems like a nonspecific
2    question. I don't understand it.
3        Q. What I'm trying to understand is when a
4    person has surgery in the pelvic floor for the
5    treatment of stress urinary incontinence or pelvic
6    organ prolapse whether acute or chronic pain is a
7    potential risk from that surgery.
8        A. You can repeat the question all you want.
9    But what I'm saying is, pain where?
10           Pain can occur anywhere in your body,
11    so if you're going to ask me if pain is a
12    complication of something, I need to know if you're
13    talking about pain in a particular location.
14       Q. I'm sorry. I'll ask a better question.
15           Do you agree that acute or chronic pain
16    in the pelvic -- strike that.
17           Do you agree that acute or chronic pain
18    in the pelvic floor is a risk of non-mesh surgery for
19    the treatment of pelvic organ prolapse and stress
20    urinary incontinence in the pelvic floor?
21       A. Yes. I would say pain in the pelvic floor
22    can be a risk.
23       Q. Do you agree that vaginal scarring is a
24    potential risk of non-mesh surgery in the pelvic

Page 28

1    floor?
2        A. I would say that vaginal scarring is a
3    potential risk.
4        Q. And do you agree that infection is a
5    potential risk of non-mesh surgery in the pelvic
6    floor?
7        A. Yes. I would say that infection is a risk
8    of basically any surgery regardless of where it's
9    at.
10       Q. And do you agree that urinary problems, be
11    it urinary frequency, urgency, dysuria, retention,
12    obstruction or incontinence, is a risk of non-mesh
13    surgery in the pelvic floor?
14           THE WITNESS: I'm sorry. Could you
15    repeat that?
16           MR. AYLSTOCK: Objection. Form.
17        (The record was read as requested:
18           "And do you agree that urinary
19           problems, be it urinary frequency,
20           urgency, dysuria, retention,
21           obstruction or incontinence, a risk of
22           non-mesh surgery in the pelvic
23           floor?")
24           MR. AYLSTOCK: Objection. Form.

Page 29

1        A. I would agree that urinary problems can be
2    a potential risk of surgery in the pelvic floor.
3    BY MR. THOMAS:
4        Q. Do you agree that organ or nerve damage are
5    potential risks of surgery in the pelvic floor?
6           MR. AYLSTOCK: Objection to form.
7        A. I would want to know what organs you're
8    talking about that would be dysfunctional.
9    BY MR. THOMAS:
10       Q. Are there risks of injury to any organs in
11    pelvic floor surgery?
12       A. I would say organs that are in that
13    anatomic location.
14       Q. And the same with respect to nerves that
15    are in that anatomic location.
16       A. Correct. Nerves that are in that anatomic
17    location can potentially be injured during the
18    surgery.
19       Q. Bleeding is a potential risk of non-mesh
20    surgery in the pelvic floor?
21           MR. AYLSTOCK: Objection to form.
22       A. Bleeding is a risk for any surgery
23    regardless of location.
24    ///

8 (Pages 26 to 29)

Paul J. Michaels, M.D.

Page 30

1    BY MR. THOMAS:
2       Q.  Inflammation is a risk of non-mesh surgery
3    in the pelvic floor?
4           MR. AYLSTOCK:  Objection to form.
5       A.  Inflammation is a general process, it's not
6    really a risk.
7    BY MR. THOMAS:
8       Q.  Inflammation happens in connection with
9    non-mesh surgery in the pelvic floor.  Do you agree
10   with that?
11      A.  Inflammation is a very broad subject.  So
12   whether you're talking about transient inflammation
13   or acute inflammation or granulomatous inflammation,
14   it's a very general term.
15      Q.  All three of those that you just used are
16   risks of surgery -- risks of surgery for non-mesh
17   surgery in the pelvic floor, aren't they?
18          MR. AYLSTOCK:  Objection.  Form.
19      A.  I do not think so.  You don't have a
20   foreign body granulomatous inflammatory response if
21   you're not using a foreign body.
22   BY MR. THOMAS:
23      Q.  To the extent there's sutures involved in
24   this surgery, it's a foreign body.

Page 31

1       A.  Well, sutures can be absorbable or
2    nonabsorbable.
3           So if they're nonabsorbable, yes.  If
4    they're absorbable, once they're gone, no.
5       Q.  Okay.  Is fistula formation a risk of
6    non-mesh surgery in the pelvic floor?
7       A.  I would think that fistula formation could
8    be a potential risk for non-mesh surgery in the
9    pelvic floor.
10      Q.  Are neuromuscular problems a risk of
11   surgery -- non-mesh surgery in the pelvic floor?
12          MR. AYLSTOCK:  Objection to form.
13      A.  I don't know what kind of neuromuscular
14   problems you're referring to.
15   BY MR. THOMAS:
16      Q.  Are neuromuscular problems in the pelvic
17   floor muscles a risk of non-mesh surgery in the
18   pelvic floor?
19          MR. AYLSTOCK:  Same objection.
20      A.  I would say they can be a potential risk.
21   BY MR. THOMAS:
22      Q.  Are neuromuscular problems in the lower
23   extremities a potential risk for non-mesh surgery of
24   the pelvic floor?

Page 32

1           MR. AYLSTOCK:  Objection to form.
2       A.  I would say they can be.
3    BY MR. THOMAS:
4       Q.  And are neuromuscular problems in the
5    abdominal area a potential risk of non-mesh surgery
6    in the pelvic floor?
7           MR. AYLSTOCK:  Objection to form.
8       A.  I would say maybe the lower abdominal area
9    it would be a potential risk.
10   BY MR. THOMAS:
11      Q.  And is there a risk of one or more
12   surgeries to treat an adverse event in non-mesh
13   surgery in the pelvic floor?
14          MR. AYLSTOCK:  Objection to form.
15      A.  I would say that's a general risk of any
16   surgery.
17   BY MR. THOMAS:
18      Q.  And is there a risk of recurrence or
19   failure in non-mesh surgery in the pelvic floor?
20          MR. AYLSTOCK:  Objection to form.
21          THE WITNESS:  Could you repeat that?
22          (The record was read as requested:
23          "And is there a risk of recurrence or
24          failure in non-mesh surgery in the

Page 33

1           pelvic floor?")
2       A.  Recurrence or failure of what?
3    BY MR. THOMAS:
4       Q.  Whatever condition is being treated.
5       A.  I would say that's a potential risk.
6       Q.  And in non-mesh surgery in the pelvic floor
7    using sutures or grafts.  There's a potential risk
8    of a foreign body response.  Would you agree with
9    that?
10          MR. AYLSTOCK:  Objection to form.
11      A.  What kind of grafts?
12   BY MR. THOMAS:
13      Q.  Any foreign body that you're putting in --
14   into the body.
15      A.  Is it biological or synthetic?
16      Q.  Well, let's start with synthetic.
17      A.  Well, synthetic, yes.
18      Q.  What about biological?  Is there a risk of
19   a foreign body response to a biological graft?
20      A.  I guess it would depend on the type of
21   graft.
22      Q.  And for the use of sutures and grafts in
23   non-mesh surgery in the pelvic floor, is there a
24   risk of erosion of those sutures or grafts?

9 (Pages 30 to 33)

Paul J. Michaels, M.D.

Page 34

1          MR. AYLSTOCK:  Objection to form.
2    Completely vague.
3          A.  It would depend on the exact type of
4    surgery and where those grafts or sutures are.
5          BY MR. THOMAS:
6          Q.  Is there a risk of contraction of or
7    shrinkage of tissues in non-mesh surgery involving
8    the pelvic floor?
9          MR. AYLSTOCK:  Objection to form.
10         A.  Well, with respect to scars, you can have a
11   contracture of a scar.  I guess it just is different
12   with respect to quality and quantity of the
13   contracture.
14         BY MR. THOMAS:
15         Q.  Let's go to Exhibit 3, please.  In
16   Exhibit No. 3 you discuss the issue related to pore
17   size in mesh.  Fair?
18         A.  I would say in very vague terms, yes.
19         Q.  What did you know about issues related to
20   pore size before your work in this case?
21         A.  Very little general information.
22         Q.  What did you know before your work in this
23   case?
24         A.  That pore size varied based on the mesh.

Page 35

1          Q.  Is that all you knew before your work in
2    this case?
3          MR. AYLSTOCK:  Objection to form.
4          A.  And that there were differences then.
5    But I didn't know specific differences until I
6    started reading the literature with respect to this
7    litigation.
8          BY MR. THOMAS:
9          Q.  Okay.  After you began your work on this
10   litigation and you reviewed the litigation --
11   reviewed the literature, what is the problem with
12   pore size?  What is the issue?
13         A.  Well, I would say the main issue, from my
14   point of view as a pathologist, is that the smaller
15   the pore size, the less likely you can have adipose
16   tissue infiltrate into those pores between the
17   filaments, and so there's much more likely to have
18   bridging fibrosis between the filaments which will
19   make the mesh less pliable, firmer, and also create
20   a microenvironment where it's basically a
21   constricting compartment-type syndrome with respect
22   to the tissue that's able to infiltrate and
23   incorporate within the pores.
24         Q.  Do you have an opinion about how large the

Page 36

1    pores should be?
2          A.  I didn't specifically pay attention to
3    numbers with respect to pore sizes.
4          Q.  But, do you, as you sit here today, have an
5    opinion about how large the pore needs to be so that
6    these issues that you just identified with the pore
7    size don't occur?
8          A.  I just said that I don't have any specifics
9    with regards to the numbers, the sizes of the pores.
10         Q.  No matter what the size of the pore, in
11   your opinion, is there still a risk of the issues
12   you just described from the use of any mesh for the
13   treatment of conditions in the pelvic floor?
14         MR. AYLSTOCK:  Objection to form.
15         A.  Well, I would say with regards to that
16   question the keyword would be "any."  So there could
17   be any risk, it's just depending on the amount.
18         BY MR. THOMAS:
19         Q.  What do you look for in pathology for
20   evidence that pores in the mesh are causing a
21   complication?
22         A.  Well, under the microscope I would look at
23   the tissue between the filaments which represents
24   the pores, or the filament spaces which would

Page 37

1    represent the pores, and see what kind of tissue is
2    between those and associated with those.
3          Q.  What kind of tissue do you want to see to
4    show that there are no complications?
5          MR. AYLSTOCK:  Objection to form.
6          THE WITNESS:  Could you repeat that?
7          THE REPORTER:  Yes.
8          (The record was read as requested:
9          "What kind of tissue do you want to
10         see to show that there are no
11         complications?")
12         A.  I don't think there would be any tissue
13   that would confirm that there are zero
14   complications.
15         BY MR. THOMAS:
16         Q.  Okay.  Let me ask this question.  I
17   probably asked a bad question.
18         What tissue are you looking for to
19   identify any risk of complications from pore size?
20         MR. AYLSTOCK:  Objection to form.
21         A.  Well, again, I would say if I'm looking at
22   the tissue and the mesh, that there's a problem with
23   the mesh.  There was a problem that was identified
24   by the clinician with that mesh, depending on the

10  (Pages 34 to 37)

Paul J. Michaels, M.D.

Page 38

1    clinical scenario, of course, and this isn't an
2    autopsy and I'm looking at mesh.
3         So I would say features that would be
4    most commonly associated with better incorporation
5    of mesh would be seeing abundant adipose tissue in
6    between the filaments which would indicate that
7    there would maybe be possibly less constriction
8    within those pores.
9              THE WITNESS:  Can we get some more
10   water?
11             MR. AYLSTOCK:  Sure.
12             MR. THOMAS:  There's a refrigerator
13   full of it.
14             MR. AYLSTOCK:  And any time you want
15   to take a break.
16             THE WITNESS:  I'm fine.
17             (Pause in proceedings.)
18             THE WITNESS:  All right.  Thank you.
19   BY MR. THOMAS:
20        Q.  In your general report, Exhibit No. 3, you
21   also discussed issues of the weight of the mesh.
22             What is your criticism about the weight
23   of mesh?
24             MR. AYLSTOCK:  You mean page number 3?

Page 39

1              MR. THOMAS:  Page 3, Exhibit 3.
2         A.  Well, as I stated, mesh that has a lighter
3    weight has better tissue integration with less
4    inflammation and scar formation, and is more likely
5    to remain more pliable over time than a
6    heavier-weight mesh.
7    BY MR. THOMAS:
8         Q.  Are those statements in your report that
9    you just referred to, are those based on your review
10   of the literature or based upon your own experience?
11        A.  Based on my review of the literature.
12        Q.  You've not done a comparative study of
13   different weight meshes to see how they perform in
14   the pelvic floor.  Is that fair?
15        A.  That's correct.  I have not done my own
16   study.
17        Q.  And you've not done any kind of study on
18   your own to determine how different pore sizes
19   perform in the pelvic floor.  Is that correct?
20        A.  That's correct.
21        Q.  You also discuss in your report the risk of
22   a condition known as contracture.  What is
23   contracture?
24        A.  I don't know if I would call it a

Page 40

1    condition.  It's more of a consequence or a finding
2    where based on typically scar formation, you have a
3    contracture or compression or shrinking, so to
4    speak, of tissue where it comes together, is firm
5    and, I guess, less mobile.
6         Q.  Again, is this an issue that you learned
7    from the literature or an issue that you learned
8    about from your own experience?
9         A.  About contracture in mesh?  Or contracture
10   in general?
11        Q.  Contracture in mesh.
12        A.  Well, I would say both.  I would say my
13   experience as a pathologist when I've examined mesh
14   as a day-to-day workload issue, you can see that
15   it's not normal mesh and that it's crinkled and
16   contracted, irregular, deformed.  I would say all of
17   those would correspond to that finding or
18   consequence of contracture.
19        Q.  Every time that you've looked at mesh in
20   your work as a pathologist, has it been in a
21   histopathological slide?
22        A.  No.
23             MR. AYLSTOCK:  Objection to form.
24   ///

Page 41

1    BY MR. THOMAS:
2         Q.  Have you looked at any mesh other than mesh
3    that had already been affixed in formalin?
4         A.  Yes.
5         Q.  Have you looked at pelvic floor explants --
6    analyzed pelvic floor explants before they've been
7    fixed in formalin?
8              MR. AYLSTOCK:  Objection to form.
9         A.  Grossly, yes.
10   BY MR. THOMAS:
11        Q.  Okay.  And under what circumstances would
12   you, as a pathologist, look at pelvic floor explants
13   before they've been fixed in formalin?
14        A.  When it comes from the surgeon and we
15   examine it grossly before formalin's been added.
16        Q.  You told me before that you think about
17   over the last seven or eight years you've maybe
18   looked at about two dozen pelvic floor mesh
19   explants.  How many times have those mesh explants
20   been delivered to you without being placed in
21   formalin?
22             MR. AYLSTOCK:  Objection to form.
23        A.  I don't know.  I would say maybe half of
24   the times that I initially examined them and then

11 (Pages 38 to 41)

Paul J. Michaels, M.D.

Page 42

1    added the formalin to the container.
2        BY MR. THOMAS:
3        Q.  Do you agree that when mesh that's been
4    implanted in the pelvic floor is removed from the
5    body that the tissues surrounding the mesh contract?
6        MR. AYLSTOCK:  Objection to form.
7        A.  I don't understand that question.
8        BY MR. THOMAS:
9        Q.  Okay.  You understand that when mesh is
10   implanted in the pelvic floor that the tissue grows
11   in through the pores of the mesh and -- grows
12   through the pores of the mesh?
13       A.  Yes.
14       Q.  And then when mesh is removed, when the
15   tissue and the elastins in the tissue are released
16   from the body, that the mesh itself with the tissue
17   then contracts before it's placed in formalin.  Do
18   you agree with that?
19       MR. AYLSTOCK:  Objection to form.
20       A.  I don't know that I would use the word
21   "contract" in that -- I guess --
22           I guess I could say that it changes
23   shape or maybe is deformed.  But when I am thinking
24   of -- when we're discussing contracture, I'm

Page 43

1    thinking more of the pathophysiologic fibrosis that
2    draws the tissue together.  But does it change shape
3    after its out of the body artifactually based on the
4    circumstances that it was in both in vivo and then
5    outside?  Yes.
6        BY MR. THOMAS:
7        Q.  Okay.  And why does that happen?
8        A.  Well, that happens with almost any type of
9    specimen, that when you remove it, there is a change
10   in the way the tissue is laying, in the way the
11   tissue is shaped.  And it's because in the body
12   when -- before a particular type of tissue, whatever
13   it is, is removed, it's within a structural
14   framework.  And once you remove that structural
15   framework, there are natural consequences to taking
16   that out and it no longer looks the same as when it
17   was in the body.
18       Q.  And when you then take the explant and
19   place it in formalin, you understand that formalin
20   reacts with the proteins on the mesh to fix the
21   specimen.
22       A.  The proteins that are in the tissue, the
23   tissue changes predominantly, and that's with any
24   tissue in formalin, yes.

Page 44

1        Q.  And you understand that formalin fixation
2    will cause excised tissue to contract due to the
3    cross-linking of the proteins and the collagen?
4        MR. AYLSTOCK:  Objection to form.
5        A.  I haven't specifically read those details
6    about mesh and formalin fixation and, quote/unquote,
7    "contracting."
8        BY MR. THOMAS:
9        Q.  Do you have reason to disagree with that
10   statement?
11       A.  Well, I would have to see the data and the
12   studies that have -- the biochemical studies.  I'm
13   not, you know, a polymer scientist, so I don't have
14   all those studies off the top of my head.
15       Q.  As a part of your work in this case, have
16   you analyzed how various meshes are implanted in the
17   body?
18       A.  I would say generally speaking.
19       Q.  And how did you familiarize yourself with
20   the mesh implantation process?
21       A.  I watched some videos.  I know from my own
22   experience as a physician, both in medical school
23   and doing internships, I've witnessed some of these
24   types of procedures during urology.

Page 45

1            I would say kind of over the years I
2    have had different experiences that have
3    familiarized myself with those types of surgical
4    procedures.
5        Q.  Do you remember the videos you watched?
6        A.  I don't remember the specific videos.
7        Q.  I didn't see them on your reliance list.
8        A.  Well, I didn't also put my urology rotation
9    in medical school on my reliance list, but that's --
10       Q.  But you've reviewed these videos in
11   connection with your work in this case, didn't you?
12       MR. CURTIS:  Objection.  Let him
13   answer.
14       A.  Yeah.
15           So no.  In the past -- I would say in
16   the past and in connection with this case, there are
17   several different types of experiences that I've had
18   that have formed my, I guess, familiarity with the
19   procedures.
20       BY MR. THOMAS:
21       Q.  Have you familiarized yourself with the
22   mesh removal process?
23       A.  I would say that mesh is removed in
24   different ways, so I don't know if there is an exact

12 (Pages 42 to 45)

Paul J. Michaels, M.D.

Page 46

1  process of how a mesh, from one patient to another,
2  is removed.
3      Q.  Fair enough.
4          Have you made any attempt to study the
5  different ways that mesh may be explanted from the
6  pelvic floor?
7      A.  I don't really understand that question.
8  That's like -- I don't understand that question.
9      Q.  What don't you understand?
10     A.  Well, it's like asking me have I studied
11 the ways that I can walk from point A to point B.
12         It depends on how mesh is removed; it
13 depends on where it is in the body, and what vital
14 structures it's next to.  And if it's eroded into
15 the rectum, has it eroded into the vagina?  Has it
16 eroded into the urethra?  Has it eroded into the
17 bladder?  Has it ruptured a vessel?
18         I mean, how it will be removed
19 surgically, even though I'm not a surgeon, it's
20 clear that it would be completely based on the
21 anatomic location that mesh had eroded into.
22     Q.  In connection with your work on the six
23 cases for which you've given opinions in this
24 litigation, have you studied the methodology used by

Page 47

1  the surgeon to remove the mesh?
2      A.  Well, I read the operative reports.
3      Q.  Anything else?
4      A.  Not that I can recall, other than reading
5  the operative reports that were associated with the
6  procedures.
7      Q.  Doctor, do you consider yourself
8  knowledgeable about the pathology slide preparation
9  process?
10     A.  I would say I have a general knowledge, but
11 I don't participate in that as a pathologist.
12     Q.  Have you ever, yourself, processed
13 histology slides from pathology?
14     A.  Processed in what respect?
15     Q.  Put the tissue in a paraffin block.
16     A.  I've put the tissue in the block and then I
17 have loaded the cassettes in the past into the
18 processor and taken them out, but I've never
19 actually inserted the paraffin into the block once
20 the tissue has been finally processed.
21     Q.  Do you do the microtoming?
22     A.  I have in the past.
23     Q.  Is that something you typically allow
24 others to do now?

Page 48

1      A.  Well, we want others to do them; not that I
2  allow them.
3      Q.  Why do you want others to do them?
4      A.  Because that's what they do for a living
5  and my focus is diagnostics.
6      Q.  Have you studied the effect of the slide
7  preparation process on the polypropylene mesh in the
8  slides that you looked at in this litigation?
9      A.  I reviewed some studies that addressed both
10 polypropylene material being -- maybe changes that
11 occurred, or that were thought to have occurred
12 because of the processing, and then other studies
13 that looked at the polypropylene without any sort of
14 processing.  I've looked at, I think, both of those
15 types of studies.
16     Q.  Are those peer-reviewed studies or are
17 those expert opinion reports?
18     A.  I thought they were peer-reviewed studies.
19     Q.  Would those studies be in your reliance
20 list, Exhibit No. 4?
21     A.  I don't know.  I think so, maybe.
22     Q.  Okay.  And do you recall what you concluded
23 from your review of the studies about any impact
24 that the slide preparation process may have on the

Page 49

1  polypropylene that you analyzed in connection with
2  these cases?
3      A.  Well, my conclusion was that, based on what
4  I was seeing and what you see in general under light
5  microscopy, with regards to the characteristics of
6  the polypropylene that it was not significantly
7  influenced based on the processing.
8      Q.  I believe you just told me it was based on
9  your review of the slides.  What I'm interested --
10     A.  And the literature.
11     Q.  And what I'm interested in is what did the
12 literature tell you about the impact of the slide
13 preparation process on the polypropylene that you
14 were looking at in connection with these cases?
15         MR. AYLSTOCK:  Objection to form.  I
16 think he's already answered that.
17     A.  When I form an opinion it's based on
18 everything, it's not based on just one thing.  So I
19 don't remember what I was specifically thinking when
20 I was just looking at one or a couple of studies.
21 But my general opinion with regards to that subject
22 is what I just said.
23     BY MR. THOMAS:
24     Q.  Okay.  And when you say it's not

13 (Pages 46 to 49)

Paul J. Michaels, M.D.

Page 50

1 significantly affected, do you have any opinions it
2 affected at all?
3        MR. AYLSTOCK:  Objection to form.
4     A.  Well, I think the slide processing in
5 pathology in general is, you know, a process that
6 has gone on for years, and we know that it changes
7 everything.  It changes DNA, RNA, proteins; it
8 changes antigen retrieval.  But what is important is
9 if there's any substantive changes to the tissues.
10        So, for example, if I'm looking at a
11 breast cancer and it's been in formalin for a day,
12 does that change the proteins of that cancer that it
13 expresses?  Yes.  Does it change it to the respect
14 that it would impact anything negatively or change
15 anything in a clinically significant way?  No.
16        And I would say the same thing with
17 any type of tissue or synthetic material, that, you
18 know, does the processing maybe change something at
19 a molecular or biochemical level.  I would imagine
20 that it would.  There's different chemicals that are
21 being exposed to it, but does it make it look one
22 way versus another?  No.  I would say, no.
23 BY MR. THOMAS:
24     Q.  Does the microtoming process make the

Page 51

1 appearance of the tissue change from the way it was
2 in vivo to the way it is under the slide?
3        MR. AYLSTOCK:  Objection to form.
4     A.  I would say the microtoming process can.
5 But usually, as a pathologist, you can identify when
6 there are folds in the tissue as opposed to
7 something that is occurring biologically or
8 pathologically.
9 BY MR. THOMAS:
10     Q.  There are artifacts that can occur in the
11 microtoming process that pathologists can detect.
12     A.  That was a statement; are you asking a
13 question?
14     Q.  Yes.
15        Is that true?
16     A.  So yes.  In any type of specimen, there are
17 artifacts that we can see and are comfortable
18 usually identifying that are artifacts of the
19 microtoming process and of the fixation process and
20 of the staining process.
21     Q.  Each one of those three is capable of
22 producing artifacts, and it's the job of the
23 pathologist to identify those artifacts and take
24 those into consideration with your analysis.  Is

Page 52

1 that fair?
2     A.  Yes.  I would say that's fair.  We take all
3 of that into consideration.
4     Q.  Prior to your work in this case, had you
5 read anywhere that as polypropylene mesh degraded
6 in vivo?
7     A.  You said "mesh"?
8     Q.  Yes.
9     A.  I don't recall seeing anything or having
10 remembered reading anything about mesh, in general,
11 that's derived from polypropylene, but suture
12 material, yes.
13     Q.  And when you talk about suture material,
14 are you talking about polypropylene suture material?
15     A.  Well, in general, yes.
16        I would say I've read about different
17 types of both absorbable and nonabsorbable suture
18 material and other types of material that can be
19 implanted and how it degrades.
20     Q.  Prior to your work in this case, what was
21 your knowledge about Prolene mesh or sutures
22 degrading in the body?
23        MR. AYLSTOCK:  Objection to form.
24     A.  Prolene, you mean like with a capital "P,"

Page 53

1 Prolene, from polypropylene or ...
2 BY MR. THOMAS:
3     Q.  Correct.  Prolene --
4        Did you know that "Prolene" is the
5 brand name for Ethicon's polypropylene?
6     A.  Yes.  That's why I was clarifying.
7        I don't specifically remember seeing
8 the brand name.
9     Q.  What about polypropylene, generally?  What
10 is your recollection before this litigation about
11 your knowledge of polypropylene mesh or sutures
12 degrading in the body?
13     A.  That the sutures can.  That was before this
14 litigation that they can degrade.
15     Q.  In what context?
16     A.  In what context "what"?
17        How does it happen?
18     Q.  What do you remember that you read that the
19 polypropylene sutures degraded?
20     A.  I didn't read about -- I don't remember
21 reading about the biochemical consequences or
22 mechanisms, just that it can.
23        From a pathologist's point of view
24 with respect to recognizing changes in the tissue,

14 (Pages 50 to 53)

Paul J. Michaels, M.D.

Page 54

1  because we not infrequently will see suture material
2  in all types of excisions.
3      Q.  Prior to your work in this case, have you
4  ever analyzed polypropylene mesh to determine the
5  extent to which it may have degraded in the body?
6      A.  No.  I don't recall having done that
7  before.
8      Q.  Prior to your work in this case, have you
9  ever analyzed polypropylene sutures to determine the
10  extent to which they may have degraded in the body?
11      A.  I would say I haven't analyzed them with
12  respect to extent, just known that it occurs -- can
13  occur after a period of time and will have seen
14  suture material microscopically, but not more than
15  that.
16      Q.  And those times that you've just described,
17  is that in connection with your work as a
18  pathologist?
19      A.  Yes.
20      Q.  And do you remember the specifics of those
21  circumstances where you recall seeing polypropylene
22  sutures degrade?
23      A.  They were in the setting of a prior
24  abdominal surgery, from my recollection, and it was

Page 55

1  a re-excision of a tumor that had recurred.  And
2  there was a discussion in the past about -- this is
3  more of an academic discussion about focusing on the
4  suture material and the types of foreign body
5  responses and what to look for as a pathologist, and
6  what can be associated with them, et cetera.
7      Q.  What conclusions did you reach about the
8  use of polypropylene sutures in the body following
9  that experience as a pathologist?
10      A.  I wouldn't say there were any dramatic
11  conclusions, just that it could degrade over time.
12      Q.  And other than your work in this case, have
13  you studied what are alleged to be the mechanisms of
14  this degradation over time?
15          MR. AYLSTOCK:  Objection to form.
16      A.  With this case?  Or litigation?
17  BY MR. THOMAS:
18      Q.  Litigation.
19      A.  Oh.
20          THE WITNESS:  Can you repeat that?
21          THE REPORTER:  Yes.
22          (The record was read as requested:
23          "And other than your work in this case
24          have you studied what are alleged to

Page 56

1          be the mechanisms of this degradation
2          over time?")
3          MR. AYLSTOCK:  Same objection.
4      A.  I don't know if I've specifically studied
5  that.  I mean, there have been probably basic
6  general discussions about biologic mechanisms that
7  contribute to degradation of foreign material in
8  general, but I wouldn't say that I specifically
9  analyzed those.
10  BY MR. THOMAS:
11      Q.  If you go to page 5 of Exhibit No. 3.
12      A.  Okay.
13      Q.  And the paragraph beginning "Finally," you
14  talk about degradation.
15          These are all -- strike that.
16          The papers and the documents that are
17  listed in that paragraph, are those things that you
18  reviewed in connection with your work in this
19  litigation specifically.  Is that fair?
20      A.  They're some of them, yes.
21      Q.  Okay.  But there's nothing in paragraph --
22  in that paragraph that you had reviewed and read
23  prior to the time of your work in this litigation.
24  Is that fair?

Page 57

1          MR. AYLSTOCK:  Objection to form.
2      A.  Let me read the paragraph.
3      BY MR. THOMAS:
4      Q.  I'm referring to the studies in the Ethicon
5  documents themselves.
6      A.  You're referring to what?
7      Q.  Let me ask the question again, Doctor.  I'm
8  trying to make it simple.
9          In this paragraph on page 5 you list a
10  number of papers.  Correct?
11      A.  Yes.
12      Q.  Those papers were supplied to you by
13  counsel as a part of your work in this litigation.
14      A.  I don't know if all the papers were.
15      Q.  Do you recall seeing any of those papers
16  prior to your work in this litigation?
17          MR. CURTIS:  I apologize.  I'm
18  confused.  Are you talking about the Ethicon-only
19  documents?
20          MR. THOMAS:  I'm talking about the
21  papers now.  I haven't talked about the Ethicon
22  documents yet.
23          MR. CURTIS:  All right.
24      A.  I don't recall.

15  (Pages 54 to 57)

Paul J. Michaels, M.D.

Page 58

1    BY MR. THOMAS:
2    Q.  Okay.  What is the clinical significance of
3    the degradation that you describe in paragraph -- in
4    that paragraph on page 5 of the report?
5        MR. AYLSTOCK:  Are you talking about
6    the "Finally" paragraph?
7        MR. THOMAS:  I'm talking about
8    degradations.
9    BY MR. THOMAS:
10   Q.  But let me ask it this way:
11       What is the clinical significance of
12   what you describe as degradation in your report?
13   A.  I would say the clinical significance with
14   respect to degradation is that once you're degrading
15   a foreign body and it breaks apart, there's a
16   greater surface area now to that foreign body that's
17   in connection and in affiliation with the tissue.
18   So that would increase the inflammatory response,
19   because now you have new foreign antigens that are
20   in, I guess, direct contact with the tissue.
21       That would then increase the
22   inflammatory response, and that increased
23   inflammatory response would potentially or likely,
24   given the severity of it, lead to additional damage

Page 59

1    to the remaining polypropylene or foreign material.
2    And then that would then lead to more breakdown and
3    more degradation, which would then turn into this,
4    you know, basically cyclical phenomenon where you
5    have a feedback loop that's just constantly going,
6    contributing, to greater amounts of inflammation and
7    scarring.
8    Q.  Have you finished?
9    A.  Yes.
10   Q.  Okay.  Can I limit the clinical
11   significance that you identify from the degradation
12   process that you describe to be an increased
13   inflammatory response and increased scarring?
14       MR. AYLSTOCK:  Objection to form.
15   BY MR. THOMAS:
16   Q.  Those are the two things you just told me,
17   I think.
18   A.  Well, I said a whole paragraph, so ...
19   Q.  I know.  I was listening carefully.  I
20   thought you described each time those things:
21   Increased inflammatory response, due to the cyclical
22   nature of it, and then increased scarring because of
23   the increased inflammatory response.
24       Is there anything else?

Page 60

1    A.  Well, that would be, I guess, the
2    pathological features which would correlate with
3    other clinical symptoms.
4    Q.  Okay.  Let me ask it this way, then:
5        Is it fair to understand from your
6    perspective as a pathologist that the significance of
7    the degradation to you would be an increased
8    inflammatory response and increased scarring?
9    A.  I would say those would be the main things,
10   yes.
11   Q.  And however those manifested themselves in
12   patients would be another issue?
13   A.  Correct.
14   Q.  All right.  Are you aware of any scientific
15   study published anywhere that describes the clinical
16   significance that you've just related to
17   degradation?
18   A.  I've seen it described.  It's not like I
19   just made that up.  So yeah.  I have.  I just -- I
20   don't know -- I wouldn't know who's the author.
21   Q.  Okay.  Did you know this information or
22   have this opinion prior to your work in this case?
23   A.  Well, I would have that general opinion,
24   but I hadn't specifically studied it prior to this

Page 61

1    case in the depth that I have, no.
2    Q.  What is your knowledge of the extent to
3    which -- strike that.
4        What is your opinion about the extent
5    to which mesh implanted in the pelvic floor degrades?
6    Is there a limit to it?
7        MR. AYLSTOCK:  Objection to form.
8        THE WITNESS:  Could you repeat that?
9    I'm sorry.
10       THE REPORTER:  Yes.
11       (The record was read as requested:
12       "What is your opinion about the extent
13       to which mesh implanted in the pelvic
14       floor degrades?  Is there a limit to
15       it?")
16       MR. AYLSTOCK:  Same objection.
17       MR. CURTIS:  Yeah.  I'm sorry.  I just
18   don't understand the question.  Go ahead.
19   A.  Me neither.  Yeah.
20       I would have to -- I don't understand
21   what you mean by "a limit," so I don't understand
22   the question.
23   BY MR. THOMAS:
24   Q.  Okay.  You've read Dr. Iakovlev's report.

16  (Pages 58 to 61)

Paul J. Michaels, M.D.

Page 62

1  Correct?
2      A.  Some of them.
3      Q.  You know Dr. Iakovlev said that the outer
4  core of polypropylene mesh degrades and then it
5  stops.  Do you know that?
6          MR. AYLSTOCK:  Objection to form.
7      A.  I don't specifically recall those words.
8  BY MR. THOMAS:
9      Q.  Do you have any opinions suggesting that
10  the degradation that you've studied and describe in
11  your report on page 5 stops after a certain period
12  of time?
13          MR. CURTIS:  I don't know if it makes
14  a difference.  You repeatedly refer to that
15  section -- "Comment" section in Exhibit 3 as his
16  general report.  I think his testimony was those
17  pages contained his general opinions, not that it's
18  his general report.  That's a distinction he made.
19          MR. THOMAS:  I'm not worried about
20  that.  If you want to make that distinction, that's
21  up to you.
22          MR. CURTIS:  No, no.  I just want to
23  make sure that when we're finished with the process,
24  we all understand what you were after.

Page 63

1  BY MR. THOMAS:
2      Q.  Is it your opinion that degraded mesh
3  becomes embrittled?
4      A.  Yes.
5      Q.  Is it your opinion that degraded mesh forms
6  cracks on the surface?
7      A.  Yes.
8      Q.  And is it your opinion that degraded mesh
9  loses mechanical properties?
10      A.  Yes.  I would say all those are both my
11  opinions and the opinions of the general medical
12  literature.
13      Q.  Have you ever studied the extent to which
14  Prolene polypropylene embrittled over time?
15          MR. AYLSTOCK:  Objection to form.
16  Suture?
17      A.  I don't ...
18          THE WITNESS:  Could you repeat that?
19          THE REPORTER:  Yes.
20          (The record was read as requested:
21          "Have you ever studied the extent to
22          which Prolene polypropylene becomes
23          embrittled over time?")
24      A.  Well, I would say with regards to study

Page 64

1  the -- I've studied it in the sense that I have
2  examined it myself.  So I would say, by definition,
3  I'm studying it.
4          But with respect to the extent, I
5  haven't done a comparison study with regards to
6  other types of synthetic material and their
7  embrittlement.
8  BY MR. THOMAS:
9      Q.  Is it fair to say that the opinions that
10  you have with respect to embrittlement and crack
11  formation, based on work that you've done yourself,
12  is your work in these cases?
13      A.  No.
14      Q.  What other work have you done to study the
15  embrittlement and crack formation on
16  Prolene polypropylene?
17      A.  Well, the embrittlement is by my own
18  examination of the gross specimens in the past.  I
19  didn't examine any of these specimens grossly.
20          So when I've -- you know, my
21  experience, I guess, as a pathologist and a
22  physician outside of the context of this litigation
23  is -- is we've already discussed there are a couple
24  of dozen cases where I've seen the mesh and

Page 65

1  examined it, both in the context of prior to
2  formalin fixation and after formalin fixation.  And
3  when I've examined those, those have been very stiff
4  and rigid and sharp, and I would say that that
5  contributes to my knowledge of that process.
6          Now, whether I've actually looked at
7  them, you know, biochemically, no, I haven't.  But,
8  you know, studying them, I would say that my
9  experience in the past would be characteristic of
10  studying the material.
11      Q.  Do you have available for us to analyze the
12  pathology samples that you looked at over the past
13  seven or eight years where you've reached these
14  conclusions?
15      A.  No.
16      Q.  Do you have pathology reports for those two
17  dozen or so times where you had the opportunity to
18  analyze explants from the pelvic floor?
19      A.  I don't have them myself, no.
20      Q.  The last thing you say is the
21  polypropylene -- excuse me -- that polypropylene
22  loses mechanical properties.  What mechanical
23  properties are you referring to there?
24          MR. AYLSTOCK:  Where are you at?

17 (Pages 62 to 65)

Paul J. Michaels, M.D.

Page 66

1          MR. THOMAS:  Right in the middle of
2    the paragraph.  "... embrittlement, crack formation,
3    and loss of mechanical properties."
4        A.  I would have to re-review that Clave
5    article.
6    BY MR. THOMAS:
7        Q.  Okay.  As you sit here today, you don't
8    know what mechanical properties?
9        A.  Well, no.  I'm using that as a general
10   term, but not the specific mechanical properties
11   other than their ability to perhaps be functional.
12       Q.  Are you relying on the work of others to
13   support your opinion that polypropylene that goes
14   through a degradation process loses mechanical
15   properties.
16       A.  Not entirely, no.
17       Q.  And what is your own experience that allows
18   you to offer that opinion?
19       A.  Well, because I have felt and know what the
20   mesh feels like and functions like before it's
21   implanted.  I have felt it before and I've also felt
22   it as a pathologist when it's come out of the
23   patient.  And it's in some of these cases that I
24   have been aware of -- obviously, I don't examine all

Page 67

1    of these patients that don't have the mesh removed,
2    and maybe some of them it stays relatively pliable.
3    I don't know the extent.
4          But in the ones that I have examined,
5    they are hard and don't move very much, and I would
6    say that that is reflective of the fact that their
7    physical and mechanical properties have been
8    altered.
9        Q.  Do you know which of the meshes that you've
10   held in your hands following explant before fixation
11   in formalin were Prolene meshes?
12       A.  I would say, from my understanding, most of
13   them were.  But I don't know the percentage.
14       Q.  And why do you say most of them were?
15       A.  Because when I have these gross specimens
16   with synthetic material or any type of foreign
17   material, I make a habit of reviewing the operative
18   reports to correlate what I'm seeing and what I'm
19   not seeing, what I'm not submitting for
20   histopathologic evaluation.
21          So in these operative reports they
22   will discuss, this is this type, this is this type.
23   You know, this is, whatever, Boston Scientific.  You
24   know, whether it's an implant for breast implant, et

Page 68

1    cetera?
2          So over time, I've become somewhat
3    familiar with the different types even before this
4    litigation.  So that's why I said I would say most
5    of them, but I didn't do a particular count.
6        Q.  So to the extent that degradation
7    associated with a mesh implant is causing clinical
8    significance you would expect to find increased
9    inflammation around that degradation.  Is that fair?
10         MR. AYLSTOCK:  Objection to form.
11       A.  I would expect to see inflammation.
12   Correct.
13         MR. AYLSTOCK:  Dave, whenever you're
14   at a good point, I could use a bathroom break.
15         MR. THOMAS:  Let's take a break.
16         (Recess from 9:31 a.m. to 9:40 a.m.)
17   BY MR. THOMAS:
18       Q.  Doctor, you told me earlier that you
19   reviewed some information from Dr. Iakovlev.
20       A.  Yes.
21       Q.  Did you review expert reports from
22   Dr. Iakovlev?
23       A.  Yes.
24       Q.  How many?

Page 69

1        A.  One or two maybe.
2        Q.  Did you review any depositions of
3    Dr. Iakovlev?
4        A.  Yes.
5        Q.  How many?
6        A.  I think two.
7        Q.  Did you review any other documents from
8    Dr. Iakovlev?
9        A.  Just articles that he's published in the
10   peer-reviewed literature.
11       Q.  Do you still have the depositions that you
12   reviewed of Dr. Iakovlev?
13       A.  I would imagine they're on that flash
14   drive.
15       Q.  Okay.  And do you still have the studies
16   that you reviewed of Dr. Iakovlev?
17       A.  Yes.  Same thing.  They're on the flash
18   drive.
19       Q.  They're not on your exhibit list or your
20   reliance list.  That's why I asked the question.
21       A.  Oh, well, some of it I've gotten since I
22   submitted my reports.
23       Q.  We got an updated one Thursday.
24       A.  An updated what?

18 (Pages 66 to 69)

Paul J. Michaels, M.D.

Page 70

1    Q.  Reliance list, Thursday.
2    A.  I don't know.
3    Q.  What have you gotten since you've submitted
4  your reports that you've reviewed in connection with
5  your work in this case?
6    A.  Some of the client deposition transcripts.
7    Q.  "Client" as in plaintiff deposition
8  transcripts?
9    A.  Yeah.  Sorry.  The plaintiff.
10   Q.  We each have different clients.
11   A.  Right.  Sorry.
12       The -- some of the plaintiff
13  deposition transcripts.
14       I've reviewed some of the defense
15  expert reports.
16       I've reviewed probably some additional
17  medical literature, just in general.
18   Q.  Is Exhibit No. 2 a complete electronic file
19  of the information that you've been provided and
20  reviewed in connection with your opinions in the
21  case?
22   A.  It's as complete as I am aware.
23   Q.  Okay.  Was there any attempt by you to
24  segregate out things from the electronic file,

Page 71

1  Exhibit No. 2, that you didn't produce to us?
2       MR. AYLSTOCK:  Well, again, we've
3  lodged our objections to a lot of the materials in
4  there and you have those objections.
5       And you can ask the question.
6    A.  I didn't catch the end of that question.
7       THE REPORTER:  Do you need me to
8  repeat it?
9       THE WITNESS:  Yes, please.
10       (The record was read as requested:
11       "Was there any attempt by you to
12       segregate out things from electronic
13       file, Exhibit No. 2, that you didn't
14       produce to us?")
15       MR. CURTIS:  I don't even know what
16  that means.  Do you mean --
17       MR. THOMAS:  He might be able to
18  answer that question.  If he can, he can answer it.
19       MR. AYLSTOCK:  If you understand it,
20  Doctor.
21       MR. CURTIS:  I don't get "to
22  segregate" from what?  You know, are you asking --
23       MR. THOMAS:  I'll start over again.
24  ///

Page 72

1  BY MR. THOMAS:
2    Q.  Did you give me everything you have, to the
3  best of your ability?
4    A.  Everything that my understanding was that I
5  was supposed to provide you --
6    Q.  Okay.
7    A.  -- is on that disc -- or that USB, from my
8  understanding.
9    Q.  Are there any materials that you gathered
10  yourself or you received from others in connection
11  with your work in this case that you did not produce
12  to us?
13    A.  I don't know what types of materials those
14  would be.
15    Q.  As far as you know, you gave us everything
16  that you either found yourself or that others gave
17  you in connection with your work in this case?
18    A.  That's my understanding.
19    Q.  And for what purpose did you review the
20  depositions of Dr. Iakovlev?
21    A.  Well, they sent them to me.
22       And I said that I wanted to review
23  them, because -- since he's a pathologist expert in
24  this litigation as well, I wanted to see the types

Page 73

1  of questions that he was being asked.
2       And, you know, if there was something
3  that surprised me about what they were asking, or
4  something that I didn't think about that I should
5  have evaluated or -- you know, I mean, I'm -- I'm a
6  human being just like everybody else, so I can make
7  mistakes, like anybody else.
8       And I thought, well, let me see if
9  maybe he has a different understanding if he's asked
10  a question, and I think, well, okay, this is how I
11  would answer the question.
12       But then he answers it a different
13  way.  And then I have to think to myself, well, this
14  is just in general.  Well, am I thinking about it
15  differently or is he thinking about it differently?
16       Let me go back to the literature on
17  this point and see what the literature says.
18       So that was my intention when I -- any
19  time I've reviewed deposition transcripts from any
20  of the experts.
21    Q.  And I believe you said you reviewed one or
22  two reports of Dr. Iakovlev.  Correct?
23    A.  Correct.
24    Q.  Do you know what cases they were?

19 (Pages 70 to 73)

Paul J. Michaels, M.D.

Page 74

1    A.  I'm not 100 percent sure, but I believe one
2  of them maybe is Bellew or ...
3    Q.  Good.  Do you recall disagreeing with
4  anything that Dr. Iakovlev said in his reports?
5    A.  Not that I can recall.
6    Q.  Do you recall disagreeing with anything
7  that Dr. Iakovlev wrote in his papers that you have?
8    A.  Again, not that I can recall.
9    Q.  Okay.  Have you ever met Dr. Iakovlev?
10    A.  No.
11    Q.  Have you ever spoken to him on the phone?
12    A.  No.
13    Q.  Have you spoken with any other pathologists
14  who are looking at these types of issues in this
15  litigation?
16    A.  Not to my knowledge.
17    Q.  Are you a neuropathologist?
18    A.  I'm not board certified in neuropathology.
19    Q.  What is a neuropathologist?
20    A.  So the focus of a neuropathologist would
21  be, I would say, central nervous system issues,
22  generally, brain and spinal cord, and dealing with
23  both the non-neoplastic and neoplastic entities that
24  occur in that region.

Page 75

1    Some of them also do muscle biopsies
2  and evaluate those, or large nerve biopsies and
3  evaluate those for pathology.  I mean, that's very
4  neuropathologist-dependent because not all of them
5  do that.  I would say that's basically what they do.
6    Q.  Did you consult with any neuropathologists
7  in connection with your opinions in this case?
8    A.  I didn't consult with any neuropathologists
9  with regards to this case, no.
10    Q.  Have you read any expert reports of
11  neuropathologists submitted by Ethicon?
12    A.  I believe so.
13    Q.  Which ones have you read?
14    A.  I don't recall the name.  I think it was
15  Hannes Vogel.
16    Q.  The Stanford pathologist?
17    A.  I think so.
18    Q.  Is he a neuropathologist?
19    Q.  Yes, he is.
20    A.  Yes.  Then that's one of the ones that I
21  can remember.
22    Q.  Dr. McClendon?
23    A.  I recall the name.
24    I've read so many of the defense

Page 76

1  expert reports, I can't remember who was who.
2    Q.  Okay.  Would those reports be on the thumb
3  drive or the jump drive that you've given us?
4    A.  I believe so.  I don't know.
5    Q.  Did you find yourself disagreeing with what
6  Dr. Vogel said?
7    A.  Well, I don't remember what -- exactly what
8  he said, but -- and I don't remember which case it
9  was in reference to.
10    Q.  Okay.
11    A.  But there were things that I remember
12  thinking that it was -- I guess, the best word would
13  be "petty."
14    Q.  What did you think was petty about
15  Dr. Vogel's report?
16    A.  I can't remember if it was his report or
17  not, but I believe it was his report that he talked
18  about a figure of mine and said something like
19  "Well, clearly his lack of experience is obvious
20  because he didn't comment on nerve in this picture."
21  Which I found to be so absurd and so petty and so
22  ridiculous that I actually laughed out loud when I
23  read it.
24    Because any time any pathologist puts

Page 77

1  any picture in any report, or whatever, in any
2  figure in a peer-reviewed article or a figure in a
3  text, we don't describe every single element of a
4  picture and what's in there.
5    It's not a children's coloring book
6  that I'm, you know, have a line and say, this is the
7  hand; this is the arm.
8    Color the hand blue; color the arm
9  white.
10    So I found that that was -- for him to
11  point that out as evidence of my lack of experience
12  with regards to nerves, I just -- I found that
13  amusing.
14    Q.  Anything substantive about his report that
15  you disagreed with, that you recall?
16    MR. AYLSTOCK:  Objection to form.
17    We can pull out the report if that's
18  really what you're going to do, but this isn't --
19    MR. THOMAS:  I don't want to go to
20  that.  I'm asking what he recalls.
21    MR. AYLSTOCK:  And, as you know, his
22  reports are case specific, so I'll remind you we
23  have limited time for this general deposition.
24    MR. THOMAS:  And you're using it right

Paul J. Michaels, M.D.

Page 78

1    now.
2        MR. AYLSTOCK:  And you're using it,
3    and I'm pointing that out to you --
4        MR. THOMAS:  Thank you.
5        MR. AYLSTOCK:  -- as a courtesy.
6        MR. THOMAS:  Thank you.
7    A.  So I read his whole report.  And, again, I
8    don't remember -- I read so many of them, I don't
9    remember the details of all of them without them in
10   front of me.  And I don't --
11       I think because that one comment about
12   the nerve struck me as so funny that I don't
13   remember other specifics about --
14       MR. AYLSTOCK:  And if you'd like, we
15   can get a printout of it and give it to you.
16       MR. THOMAS:  I don't want that, Bryan.
17   I'm just asking what he recalls.
18   A.  I would say that's what I recall, as I sit
19   here without it.
20   BY MR. THOMAS:
21   Q.  Are you able to determine from the
22   histology section under "Light Microscopy" whether
23   nerve twigs that you see are sensory, motor, or
24   autonomic?

Page 79

1    A.  Well, most of them have sensory and motor
2    functions, by definition.
3    Q.  But are you able to discern from your
4    review of the slide the extent to which there's
5    sensory, motor, or autonomic?
6    A.  So, from reviewing just a regular H&E
7    slide, there's no way to tell with regards to
8    sensory and motor.
9    Q.  Or autonomic?
10   A.  Right.  Autonomic.
11   Q.  Is there any stain that's capable of
12   differentiating among nerves?
13   A.  I don't use those stains on a day-to-day
14   basis, so that's not something that I did in this
15   litigation or have reviewed, because I don't -- I
16   don't do that.
17   Q.  Do you agree that the type of sensation
18   that a nerve carries cannot be determined without
19   identification of the sensory receptor that creates
20   the signal?
21       THE WITNESS:  Can you repeat that?
22       THE REPORTER:  Yes.
23       (The record was read as requested:
24       "Do you agree that the type of

Page 80

1        sensation that a nerve carries cannot
2        be determined without identification
3        of the sensory receptor that creates
4        the signal?")
5    A.  I would say that sounds biologically
6    correct.
7    BY MR. THOMAS:
8    Q.  I'm not sure of the qualification.  Why do
9    you say "biologically correct"?
10   A.  Because you're talking about a mechanism.
11   So that's a biologic mechanism, and so I would say
12   that sounds biologically correct.
13   Q.  And is it fair to say that you need to
14   identify the receptors to conclude that a given
15   nerve fiber will transmit pain signals?
16   A.  I don't know if that's true.
17   Q.  Do you disagree with it or don't know if
18   it's true?
19   A.  I would say that I would say that more
20   likely than not that that's not necessarily the
21   case.
22   Q.  Why?
23   A.  Because these nerve bundles carry, as I
24   said, both sensory and motor signals.  So I don't

Page 81

1    think that you have to say -- I don't think you have
2    to know the receptor to know for sure what kind of
3    signal it's carrying.
4    Q.  Do you agree that not all sensory nerve
5    fibers transmit pain signals?
6    A.  I would say that's correct.
7    Q.  Are you suggesting by the reports that
8    you've offered in these cases that you're able to
9    diagnose disease by examining nerve twigs that you
10   see in these slides?
11       MR. AYLSTOCK:  Objection to form.
12       THE WITNESS:  Could you repeat that?
13       THE REPORTER:  Yes.
14       (The record was read as requested:
15       "Are you suggesting by the reports
16       that you've offered in these cases
17       that you're able to diagnose disease
18       by examining nerve twigs that you see
19       in these slides?")
20   A.  I don't understand that question.
21   BY MR. THOMAS:
22   Q.  Okay.  Let me ask this question, and ask it
23   the other way.
24       When you look at these slides, and you

21 (Pages 78 to 81)

Paul J. Michaels, M.D.

Page 82

1    identify what you do, what is your purpose for these
2    cases?  What are you trying to do with what you
3    reviewed from these slides?
4              MR. AYLSTOCK:  Objection to form.
5        A.  I would say my main purpose in reviewing
6    these slides is to correlate my microscopic findings
7    with the clinical indication for the surgical
8    removal of the mesh.  And to generate a pathologic
9    differential diagnosis with regards to what the
10   clinical indication was for the surgery and with
11   what I'm seeing histologically and to rule out other
12   causes that could have influenced the patient's
13   infections or pain or dyspareunia, or whatever --
14   erosion, whatever else could have influenced that.
15             As a pathologist, that would be my
16   main goal as to both correlate the findings that I'm
17   seeing with what's described in the medical
18   literature, as well as rule out other pathologic
19   causes for those clinical symptoms and signs.
20   BY MR. THOMAS:
21       Q.  What does the term "correlate" mean to you?
22       A.  "Correlate" would be to take one set of
23   findings with another set of findings and relate
24   them to one another, I would say, would be a general

Page 83

1    definition that I would use.
2        Q.  And in your work in this case, one set of
3    findings is your findings from your review of the
4    histologic slides.  Correct?
5        A.  That's correct.
6        Q.  And what is the other set of findings that
7    you're correlating with in order to give your
8    opinion in this case?
9        A.  Either the surgeon's findings operatively
10   or the patient's symptoms or signs that have been
11   described.
12       Q.  And as a result of that, you then make a
13   differential diagnosis as a pathologist as to the
14   likely cause of the symptomology.  Did I understand
15   that correctly?
16       A.  Yes.  I would say that's fair.
17       Q.  So you have control over the information
18   that you review.  You have a limited number of
19   slides and you can look at it, and that's your set
20   of findings.  Correct?
21       A.  Yes.
22             MR. AYLSTOCK:  Objection to form.
23   BY MR. THOMAS:
24       Q.  What do you do to make sure that you have

Page 84

1    all of the information from the rest of the findings
2    in order to make the appropriate differential
3    diagnosis?
4        A.  Well, I mean, in addition to my slides, I
5    would -- I'm not just reviewing them in a vacuum.
6        Q.  I understand that.
7        A.  So I review -- I ask for a full set of the
8    medical records, and in some cases have asked if a
9    deposition transcript for the plaintiff has been --
10   is available if I feel like there is any sort of
11   inconsistency in the medical record, or something
12   that isn't correlating with what the surgeon is
13   reporting.  Then I will ask for additional material.
14             But in these cases at least, I had
15   extensive medical records that were just thousands
16   and thousands of pages, so --
17             And it seemed to me from my review to
18   be pretty complete, so as I went through them, for
19   the most part, I think there may have been a couple
20   cases where I specifically said, "Do you have this
21   report?"
22             Or, "I don't have this operative
23   report.  Did you not send that?"
24             And, "Oh, well, actually, no.  It's in

Page 85

1    this file folder, or maybe I missed it or
2    something."
3              So there were times when I would call
4    and say, "You know, I can't find this.  Did you
5    include this?"
6              Or, "You know, does this plaintiff
7    have a deposition already?  I'd like to review the
8    deposition in this case."
9        Q.  And all the information that you received
10   for each of these six cases is on that flash drive
11   that you supplied to us.  Correct?
12       A.  Yes.
13             MR. AYLSTOCK:  Just so -- I think --
14             MR. THOMAS:  Subject to the objections
15   that you made.
16             MR. AYLSTOCK:  Well, that, and I think
17   you also have some Dropboxes that might be
18   completely coextensive or not, but some links were
19   provided last evening.
20             MR. THOMAS:  Thank you for the timely
21   production of the documents.
22             MR. AYLSTOCK:  Same goes for you in
23   every other deposition that I've been in.  But I
24   appreciate the compliment.

22  (Pages 82 to 85)

Paul J. Michaels, M.D.

Page 86

1    BY MR. THOMAS:
2        Q.  So what do you do to satisfy yourself that
3    you have a complete set of information with which to
4    do your differential diagnosis?
5            MR. AYLSTOCK:  Objection to form.
6        A.  Well, I'm a little uncomfortable by the
7    verbiage of that question.
8            But -- I don't know what I do to
9    satisfy myself that I'm okay with the information,
10   but I basically review all of the -- once I have
11   reviewed all of the data, all of the medical
12   records, if I feel like I have a complete picture of
13   what was going on clinically, then that's what I'm
14   looking for.
15   BY MR. THOMAS:
16       Q.  First of all, I don't mean to insinuate
17   anything by my question.  All I'm trying to
18   understand is, at some point you become satisfied
19   that you have what information you need to make a
20   differential diagnosis.
21           And all I want to understand is how you
22   go through that process to make sure you understand
23   that you have what you need in order to make an
24   appropriate differential diagnosis.

Page 87

1        A.  Okay.
2        Q.  That's all I intend with the question.
3        A.  Okay.
4            MR. AYLSTOCK:  And I think he's
5    answered that extensively in what he's already said,
6    so ...
7            MR. THOMAS:  All I want to do is make
8    sure he didn't think I was disparaging him in any
9    way.
10       A.  Oh, no.
11   BY MR. THOMAS:
12       Q.  Do you rely on counsel to supply you with
13   the information that you need?
14           MR. AYLSTOCK:  With regard to the
15   medical --
16   BY MR. THOMAS:
17       Q.  With respect to the individual plaintiffs.
18       A.  Well, yes.  I don't contact the -- their --
19   it's not like I ask for a list of their physicians
20   and contact the offices directly.
21       Q.  Okay.
22       A.  I rely on them to be responsive when I ask
23   for medical records and further information.
24       Q.  Did you have any help in reviewing the

Page 88

1    medical records, depositions or other information,
2    related to these individual plaintiffs for the
3    formation of your report.
4        A.  I don't know what kind of help you're
5    referring to.
6        Q.  Well, you just described to me quite a
7    volume of information.  Did you do it all yourself?
8        A.  I did it all myself.
9        Q.  Okay.  And for these six cases, about how
10   many hours have you spent working on these cases?
11       A.  Many, many, many hours.  I don't have a
12   number off the top of my head.
13       Q.  Are your billing records included in what
14   you've produced to us?
15       A.  I'm not aware if they are or not.
16       Q.  I know --
17           MR. AYLSTOCK:  If they're not, I'll
18   get them to you, Dave.
19           MR. THOMAS:  Okay.
20   BY MR. THOMAS:
21       Q.  How do you keep your time?
22       A.  I have on my computer Word documents for
23   each of the cases.  And when I'm reviewing
24   something, I have it on my drive -- my Google Drive,

Page 89

1    so if I'm in a library or wherever, at home, I look
2    at what time I start and then when I'm done, I add
3    that time.
4        Q.  Okay.  So real time as you're doing work,
5    you update your individual time sheet for each case.
6    Is that fair?
7        A.  Constantly, yes.
8        Q.  All right.  And you have on your computer
9    right now your up-to-date time that you spent on
10   each of these six cases?
11       A.  Yes.
12       Q.  Do you maintain any other separate bill in
13   addition to the six cases for which you're appearing
14   here today for any general work you're doing on the
15   file?
16       A.  I think I have in the past, yes.
17       Q.  Okay.  So if I wanted to review the time
18   that you spent on this matter, this litigation, it
19   would be these six individual times, and then a
20   general file or a general bill that would provide
21   time that you spent there.  Fair?
22       A.  Yes.  But having said that, I would also
23   say that within the specific cases, there are times
24   when I'm reviewing general information that relates

23 (Pages 86 to 89)

Paul J. Michaels, M.D.

Page 90

1  to that particular case.
2      Q.  Absolutely understand that.
3      A.  Okay.
4      Q.  Is there any other category of time for
5  which you submit bills to the plaintiffs?
6      A.  I don't think there's any other category of
7  time that I submitted a bill.
8      Q.  So if I get the bills for the six cases and
9  the general file, I'll have a complete set of the
10  bills and time that you've submitted to the
11  plaintiffs in the case?
12      A.  Yes.
13      Q.  When you record your time as you do it, you
14  record it by the amount of time you spent.  Correct?
15      A.  Correct.
16      Q.  Do you describe what you were doing?
17      A.  Yes.
18      Q.  And what is your purpose when you describe
19  what you're doing?  What are you trying to say?
20      A.  For my own recollection, mainly.  It hasn't
21  come up yet, maybe because it's not case specific.
22          But a lot of times I will be asked in
23  depositions in the past, "When were you first
24  contacted by the attorneys?"

Page 91

1          And I'll go to my invoice and say,
2  this -- on such-and-such day, I had a ten-minute
3  conversation with so-and-so.
4          And then "Well, when did you receive
5  the slides?"
6          "Well, on such-and-such a day I
7  received the slides and did an inventory."
8          So I do it for completeness' sake and
9  to be able to give a good timeline if I'm asked.
10      Q.  Okay.  So the purpose of your time charges
11  is not only to count your time but also to give you
12  chronology so that you can recall what work you did
13  at what time?
14      A.  I'd say that's correct.
15      Q.  In Exhibit No. 3, you discuss generally the
16  concept or the idea of absorbable mesh on the first
17  couple pages --
18      A.  Okay.
19      Q.  -- do you remember that?  Under "Comment"
20  on page 2.
21      A.  Yes.
22      Q.  Do you have any opinions that absorbable
23  mesh should be used for the treatment of stress
24  urinary incontinence?

Page 92

1          MR. AYLSTOCK:  Objection to form.
2      A.  I think I would leave as far as the actual
3  material that needs to be used for these surgical
4  procedures more to a surgeon.
5          I would say as a pathologist with
6  regards to what type of material they should use --
7  whether it's synthetic, absorbable, nonabsorbable,
8  biologic -- I would say I don't really have a
9  general opinion about what is best surgically to use
10  on these patients.
11  BY MR. THOMAS:
12      Q.  Does that apply to both stress urinary
13  incontinence and pelvic organ prolapse?
14      A.  I would say yes, in general.
15      Q.  Just so I can shut this down:
16          Is it fair to understand that you will
17  not give any opinions at the trial in this case about
18  the appropriate mesh material for the treatment of
19  stress urinary incontinence or pelvic organ prolapse?
20          MR. CURTIS:  Object to the form of the
21  question.  That's not what you asked him before.
22          MR. THOMAS:  Sure, it is.
23          MR. CURTIS:  You're talking about
24  absorbable mesh and then you generalized and

Page 93

1  expanded the scope of it.
2          MR. THOMAS:  He just -- I don't have
3  real time.  I'm sorry.
4          THE REPORTER:  Do you want his last
5  answer?
6          MR. THOMAS:  I do.
7          "I think I would leave as far as the
8  actual material that needs to be used for these
9  surgical procedures more to a surgeon.
10          "I would say as a pathologist with
11  regards to what type of material they should use,
12  whether it's synthetic, absorbable, nonabsorbable,
13  biologic, I would say I don't really have a general
14  opinion about what is best surgically to use on these
15  patients."
16  BY MR. THOMAS:
17      Q.  And my question is, is it fair to
18  understand that you're not going to give an opinion
19  at trial in these cases about what material
20  manufacturers should use in mesh for the treatment
21  of stress urinary incontinence or pelvic organ
22  prolapse in women?
23          MR. AYLSTOCK:  Do you mean as opposed
24  to the materials implanted in these women in the

24 (Pages 90 to 93)

Paul J. Michaels, M.D.

Page 94

1   Ethicon mesh?
2            MR. THOMAS:  That's what I'm trying to
3   understand, Bryan.  He told me no.
4            MR. AYLSTOCK:  I'm trying to
5   understand too.  I'm not telling him not to answer,
6   I'm just trying to understand what you're getting
7   at.
8        A.  So, I guess, to clarify, my opinion would
9   be, as a pathologist, I'm not going to tell a
10  surgeon, for this particular patient you need to use
11  this material; for that patient you should use that
12  material.
13           Oh, you need to make sure and go
14  suburethrally with this type of material; go through
15  the obturator foramen with this type of material.
16           That's not my goal or purview, I
17  guess, as a pathologist.  Mine would be to evaluate
18  the types of material that I see pathologically and
19  to correlate whatever histopathologic responses I'm
20  seeing to whatever material with what's going on
21  clinically.
22       BY MR. THOMAS:
23       Q.  Do you have an opinion to offer in this
24  case that the manufacturers should have used

Page 95

1   different material in any of the meshes you've
2   analyzed?
3        A.  I don't know about the specific types of
4   material that was available to them.  I didn't have
5   those internal documents that I recall that
6   specifically mention the different types of material
7   that they could have used or how they advertised
8   those materials.  I don't have any of that
9   information.
10       Q.  I understand that.
11           Is it fair to understand that you're
12  not prepared at trial to offer an opinion that
13  Ethicon should have used a particular material in
14  the -- in its meshes used for the treatment of stress
15  urinary incontinence or pelvic organ prolapse?
16           MR. AYLSTOCK:  Objection to form.
17           MR. CURTIS:  Yes.
18       A.  Well, you know, as a pathologist, the way I
19  deal with -- or I guess, as any physician, the way I
20  deal with questions that are medically related would
21  be to answer the question that is posed to me.
22           So, I guess, with respect to your
23  question, if I was asked at trial as a pathologist
24  and in my opinion with the types of responses I've

Page 96

1   seen pathologically in this specimen, if there was
2   another specimen type or another mesh type that was
3   known to have these -- these characteristics that
4   would not have given you the same -- that would
5   likely not have given you the same pathologic
6   response, would I feel, as a pathologist, that this
7   type of material was better than another type of
8   material?  I would just answer any question as it's
9   posed to me.
10           I don't know -- you know, when I'm
11  asked, am I going to give this type of opinion in a
12  court, I don't -- all I can say is I'm going to
13  answer whatever questions I'm allowed to answer in a
14  court, based on -- if I feel, based on my
15  information that I have in the medical literature
16  and what I've reviewed, that I can answer the
17  question.
18       BY MR. THOMAS:
19       Q.  For any of the six cases that you've
20  reviewed and that we're here for the next two days,
21  is there a different material that you would
22  advocate for use of the treatment of stress urinary
23  incontinence that would not produce the symptoms
24  that these women experienced?

Page 97

1        A.  Again, I don't -- I didn't discuss any use
2   of a material that should have been used in contrast
3   to what was used.
4        Q.  Okay.  And, as you sit here today, you
5   don't have any opinions in that regard?
6        A.  I haven't been asked any specific questions
7   regarding that, and I haven't reviewed material with
8   respect to that subject.
9        Q.  Okay.  Do you agree that it's a normal
10  histological finding to see nerve branches in all
11  types of surgically removed tissues?
12           MR. AYLSTOCK:  Objection to form.
13       A.  Could you repeat that, please?
14       BY MR. THOMAS:
15       Q.  Do you agree that it is a normal
16  histological finding to see nerve branches in all
17  types of surgically removed tissues?
18       A.  No.
19       Q.  Why don't you agree with that?
20       A.  Because it's not correct; that's why.
21       Q.  Okay.  Do you agree that surgical
22  interruption of the microscopic nerve supply to all
23  types of soft tissues in the human anatomy, whether
24  in the presence of artificial materials or not, is

25 (Pages 94 to 97)

Paul J. Michaels, M.D.

Page 98

1  always accompanied by fibrosis and the repair of
2  blood vessels, nerve fibers, and other vital
3  connective tissues?
4          MR. AYLSTOCK:  Objection to form.
5      A.  I would not say always with respect to any
6  physiologic property in the body.  But I would say
7  that, more likely than not, different degrees of
8  stromal reaction occur following those types of
9  surgical procedures.
10  BY MR. THOMAS:
11     Q.  Okay.  What is the mechanism between, you
12  know, inflammation that you describe in your reports
13  and pain?
14     A.  I would say the mechanism with regards to
15  inflammation and pain is something that is extremely
16  complex and not something that I, as a pathologist
17  generally would report or describe.
18          Simply correlating the fact that
19  inflammation is known to be associated with pain and
20  reporting whether that inflammation is present or
21  not, but not with regards to the receptors and the
22  cytokines that are produced and the feedback loops
23  and the cycles.  That's not something that I have
24  specifically reviewed in preparation for this.

Page 99

1      Q.  Is it fair to understand that you can't
2  tell me today the mechanism between inflammation and
3  pain?
4          MR. AYLSTOCK:  Objection to form.
5      A.  No.  I'm not saying -- what I said is that
6  that mechanism is complex.  And that --
7  BY MR. THOMAS:
8      Q.  Can you explain it to me?
9          MR. AYLSTOCK:  In how many hours?
10     A.  Well, it's not -- it's that there --
11         Inflammation, depending on the
12  inflammatory cell, whether it's a macrophage or a
13  neutrophil, secretes different kinds of interlukens
14  and cytokines, and those can cause other cells to
15  migrate to the area.  Those can induce fibroblasts
16  proliferation, which in a more end stage, may entrap
17  a nerve and cause pain that way.
18         Alternatively, if you have an
19  eosinophil, which is another type of inflammatory
20  cell, that secretes, say, Interleukin-5 or
21  Interleukin-6 that can cause vasodilation of the
22  vessels and cause edema to rush out into the tissue
23  which gives you a pressure sensation which is
24  painful.

Page 100

1          Neutrophils have different cytokines
2  that can be secreted, and those can actually
3  interact with the sensory receptors on the nerve
4  itself which can give you a different quality of
5  pain.
6          So when I say it's complex, it's
7  because there's different types of pain and there's
8  different types of inflammatory reactions that can
9  produce those different types of pain.
10  BY MR. THOMAS:
11     Q.  Finished?
12     A.  Um-hmm.
13     Q.  Thank you.
14         MR. THOMAS:  Let's go back to his
15  prior answer, please.
16         (Pause in proceedings.)
17  BY MR. THOMAS:
18     Q.  I understood your prior answer to be that
19  generally, you -- as a pathologist, you would not
20  generally describe the mechanism of pain --
21  mechanism between inflammation and pain.  Is that
22  fair?
23     A.  In a report.
24     Q.  Okay.  Is there a discipline within -- in

Page 101

1  medicine that is the appropriate discipline to
2  discuss the specifics of the mechanism of
3  inflammation and pain.
4          MR. AYLSTOCK:  Objection to form.
5      A.  I don't think that there's a specific
6  discipline or specialty where that's their focus.
7  BY MR. THOMAS:
8      Q.  Is there a discipline within medicine that
9  has its focus that is more specialized than your own
10  in this area?
11         MR. AYLSTOCK:  In what area?
12  BY MR. THOMAS:
13     Q.  In the mechanism between inflammation and
14  pain.
15         THE WITNESS:  Can you repeat that?
16         MR. THOMAS:  I'll just ask it again.
17         THE WITNESS:  Okay.
18  BY MR. THOMAS:
19     Q.  Is there an area of medicine that is more
20  specialized than your areas of expertise to explain
21  the mechanism between inflammation and pain?
22     A.  Well, I don't know if it would be in
23  medicine or in biology.  Because everything that I
24  described is, you know, biological processes, which

26 (Pages 98 to 101)

Paul J. Michaels, M.D.

Page 102

1    can occur in humans and animals.
2           So I would say that it's not
3    necessarily in human medicine where any specialties
4    focus on specifically inflammation and pain and
5    those mechanisms that are causing them.
6       Q.  Is it your testimony that you're as
7    qualified in your discipline as any other discipline
8    to offer opinions of the mechanism of inflammation
9    and pain?
10          MR. AYLSTOCK:  Objection to form.
11      A.  I don't know.
12      BY MR. THOMAS:
13      Q.  Okay.  In your research in this case, did
14   you make any effort to determine the existence of
15   any studies that looked at the role of inflammation
16   in mesh explants for patients who had mesh removed
17   because of pain, as opposed to mesh removed for
18   reasons other than pain?
19          THE WITNESS:  Can you repeat that?
20          THE REPORTER:  Yes.
21          (The record was read as requested:
22          "In your research in this case, did
23          you make any effort to determine the
24          existence of any studies that looked

Page 103

1          at the role of inflammation in mesh
2          explants for patients who had mesh
3          removed because of pain as opposed to
4          mesh removed for reasons other than
5          pain?")
6          MR. CURTIS:  Object to the form of the
7    of the question.
8       A.  Yes.  I did.
9       BY MR. THOMAS:
10      Q.  Okay.  Did you find any studies?
11      A.  Yeah.  There was a study that -- there was
12   one study in particular that I reviewed.  I can't
13   remember the author's last name.  I think it might
14   have been Hill, or ...
15      Q.  Yep.
16          That's not on your reliance list.  Is
17   there a reason why?
18      A.  I tried to include everything on my
19   reliance list that I had reviewed.
20          You know, again, not everything that's
21   on there -- or not everything that is -- forms my
22   opinions is on there, it just is the nature of my
23   profession.  But on this particular study, I thought
24   that it was a really bad study.

Page 104

1       Q.  So you chose not to deal with it.
2       A.  No.  I dealt with in the sense of I read it
3    and I evaluated it.  But from my recollection, there
4    were a lot of problems with it.
5       Q.  Okay.  Do you remember generally what the
6    problems were?
7       A.  I think that it was -- I think it was a
8    retrospective study, and I didn't feel like they --
9    it didn't seem like they could confidentially rule
10   out that the patients that they were saying didn't
11   have pain didn't actually have pain, because they
12   were reviewing the records -- the medical records
13   only, and there was no attempt to actually discuss
14   these patients' reported pain or not, or had --
15          I should say had pain and just weren't
16   reporting it because maybe they were so focused on
17   their -- I think, it was urinary symptoms, which was
18   the other group that had, like, urinary symptoms and
19   supposedly not pain.
20          But I mean, I know patients in general
21   will go to a physician and have several problems and
22   report really one of them, and they may have another
23   problem.  But unless they are specifically asked may
24   not report it.  So that was one issue with the

Page 105

1    study.
2          Another one is they didn't really
3    characterize the type of fibrosis or inflammation.
4    They talked about grading it, like 0 to 3 or 0 to 2,
5    I don't -- I know there were several different
6    categories.
7          But they didn't really describe that
8    in detail, like -- and the association with the
9    mesh, whether that was inflammation around the mesh
10   or it was away from the mesh.
11          And the reason that's important is
12   because the specimens that would have been reviewed
13   that were from around the bladder or around the
14   urethra, that tissue, in general, can have some
15   degree of inflammation that maybe would just be
16   normal for that region, or could be normal for that
17   region.
18          So if someone's not having pain, and
19   they're saying, Oh, well, look, the patients that
20   had no pain had just as much inflammation as the
21   patients that had pain.
22          Well, you're not taking into account
23   the fact that the patients that didn't have pain,
24   their specimens were from areas that normally would

27 (Pages 102 to 105)

Paul J. Michaels, M.D.

Page 106

1  have had more inflammatory cells, which is skewing
2  the data.  That was another problem that I had with
3  that.
4          Just off the top of my head, those are
5  the ones that I can remember.
6      Q.  Sure.  Any other studies that you looked at
7  analyzing the role of inflammation in meshes
8  explanted for reasons of pain and meshes explanted
9  for non-pain reasons that you've looked at but
10  haven't included in your report or your reliance
11  list?
12     A.  There may have been others.  I just can't
13  remember the specifics of the authors or the actual
14  names.
15     Q.  You agree that less than 5 percent of
16  patients undergoing explantation of SUI slings do so
17  for long-term pain, don't you?
18          MR. AYLSTOCK:  Objection to form.
19     A.  Would you repeat that?
20          BY MR. THOMAS:
21     Q.  Do you agree of the patients who are
22  undergoing -- well, strike that.
23          (Pause in proceedings.)
24  ///

Page 107

1      BY MR. THOMAS:
2      Q.  For patients who receive mesh implants for
3  treatment of SUI, do you know what percentage
4  experience complications of pain more than six
5  months?
6          MR. AYLSTOCK:  Objection to form.
7      A.  I guess I don't understand if you're asking
8  pain greater than six months in duration or --
9          BY MR. THOMAS:
10     Q.  Yes.
11     A.  -- after six months.
12     Q.  Six months greater in duration.
13          MR. AYLSTOCK:  From the time of the
14  original implant?
15          MR. THOMAS:  Yes.
16     A.  I don't understand.
17          So starting at six months and then
18  have it for six months?
19          BY MR. THOMAS:
20     Q.  No.
21          At the time of implant, pain persists
22  from date of implant to longer than six months.
23     A.  So --
24     Q.  Are you aware of the number -- the

Page 108

1  percentage of complications -- the percentage of
2  patients who receive mesh for stress urinary
3  incontinence that experience mesh for -- pain for
4  longer than six months?
5          MR. AYLSTOCK:  Objection to form.
6      A.  Again, I think that that's a very confusing
7  question for me.
8          I don't really understand if you're
9  asking from post-op day number one until post-op day
10  number 180, or if they have six months of pain that
11  may be on and off over the course of several years?
12  I guess I just don't understand.
13          BY MR. THOMAS:
14     Q.  That's fine.
15          You do agree that for more than
16  90 percent of the patients who receive mesh for the
17  treatment of stress urinary incontinence they have no
18  complaints of pain after six months?
19          MR. AYLSTOCK:  Objection to form.
20  What kind of pain?
21     A.  I -- I don't know.  I don't understand.
22          BY MR. THOMAS:
23     Q.  Have you studied the issue of pain as a
24  complication in the use of mesh for the treatment of

Page 109

1  stress urinary incontinence?
2          MR. AYLSTOCK:  Objection.  Asked and
3  answered.  He's already --
4          MR. THOMAS:  Please let me ask the
5  questions completely, Bryan.
6          MR. AYLSTOCK:  I objected to it.
7      A.  Could you repeat that?
8          BY MR. THOMAS:
9      Q.  Have you studied the extent to which pain
10  is a complication in patients who receive mesh for
11  the treatment of stress urinary incontinence?
12     A.  Yes.  I've reviewed the different
13  complications from mesh.
14     Q.  What are the rates of complications for
15  pain over six months in women who've received mesh
16  for the treatment of stress urinary incontinence?
17          MR. AYLSTOCK:  Objection to form.
18     A.  I don't know if you're talking about -- I
19  don't specifically remember reading about studies
20  that have looked at patients that have had six
21  months of continual pain from the time of their
22  surgery until six months post-op.  I don't recall
23  reading that data.
24  ///

28 (Pages 106 to 109)

Paul J. Michaels, M.D.

Page 110

1    BY MR. THOMAS:
2      Q.  Okay.  And to the extent that you looked at
3    studies in that regard, they'd be on Exhibit 2?
4      A.  They should be.
5      Q.  Okay.  Do all women who receive mesh for
6    the treatment of stress urinary incontinence have an
7    inflammatory response to that mesh?
8          MR. AYLSTOCK:  Objection to form.
9      A.  I would say all women that have synthetic
10   mesh implanted would have an inflammatory response
11   to mesh.
12   BY MR. THOMAS:
13     Q.  Why do some women experience pain and
14   others do not?
15     A.  I would say every human is different and
16   there's a reason why complication rates aren't
17   0 percent verses 100 percent.  It's because every
18   body is different, every body has different
19   responses, different genetics.
20          Maybe some people have a higher
21   genetic predisposition to having a particular type
22   of cytokine that's released.
23          Maybe some patients have other medical
24   issues that would influence pain versus not pain.

Page 111

1    That doesn't take away from the fact that they're
2    experiencing pain from a mesh.
3          So all of these factors influence
4    whether someone has a particular type of
5    symptomatology following any type of surgery.
6      Q.  Did you review any studies analyzing the
7    question why some women who receive mesh for the
8    treatment of SUI, and who have inflammation, have
9    pain and others do not?
10     A.  Could you repeat that?
11     Q.  Did you review any studies or papers of any
12   kind which analyzed the question of why some women
13   who receive mesh for the treatment of SUI experience
14   pain and others do not?
15     A.  Well, the first time you said
16   "inflammation".
17     Q.  What did I say the second time?
18     A.  You didn't say "inflammation" the second
19   time.
20     Q.  Well, let me start over again.
21          What I'm trying to understand, Doctor,
22   very simply:  You gave me a descriptive answer about
23   why some people experience pain and others don't.
24          Are you aware of any papers that

Page 112

1    discuss that issue specifically insofar as relates to
2    the replacement of mesh for the treatment of stress
3    urinary incontinence?
4          MR. AYLSTOCK:  Objection to form.
5      A.  I would have to go through my articles.  I
6    don't remember the specifics of your question in
7    relationship to one particular article, but I would
8    have to look at my different articles that I've
9    reviewed.
10   BY MR. THOMAS:
11     Q.  Okay.  Fair to understand you don't recall
12   one now?
13     A.  I can't recall any of the specifics now,
14   no.
15     Q.  Is it true that chronic inflammation is a
16   finding seen in the vaginal tissues of women
17   suffering from stress urinary incontinence, pelvic
18   organ prolapse, and other pelvic floor dysfunction
19   even before mesh is implanted?
20          MR. AYLSTOCK:  Objection to form.
21     A.  I don't think that that's necessarily true,
22   no.
23   BY MR. THOMAS:
24     Q.  Okay.  So --

Page 113

1      A.  And it depends on the anatomic location.
2      Q.  So if a woman has SUI, stress urinary
3    incontinence, you would not necessarily expect to
4    see inflammation if you did histology in the area of
5    the SUI?
6      A.  In what area of the SUI?
7          In the urethra? in the bladder? in the
8    vagina?
9          There's a whole -- it's a completely
10   different histology for all these locations.
11     Q.  Are you saying there won't be any
12   inflammation in some of these people who have these
13   pelvic floor disorders?
14     A.  Yeah.  I would say if you took a vaginal
15   biopsy in someone with SUI, I don't see why you
16   would have inflammation.
17     Q.  Okay.
18     A.  If it wasn't otherwise inflamed by some
19   other reason.
20     Q.  Do you agree with this statement:
21          "At present, general human tissue
22   interactions with the mesh are known, but we have an
23   incomplete understanding of interactions specific to
24   a mesh material and design as well as the

29  (Pages 110 to 113)

Paul J. Michaels, M.D.

Page 114

1  pathophysiology of any complications"?
2      A.  I don't understand that question.
3          MR. AYLSTOCK:  Objection to form.
4      A.  Or that statement.  That seems very
5  convoluted to me.
6      BY MR. THOMAS:
7      Q.  Okay.
8      A.  I'm not sure who wrote it for you but could
9  you reread it.
10     Q.  I didn't write it for me.  But nobody wrote
11  it for me.
12         "At present, general human tissue
13  interactions with the mesh are known, but we have an
14  incomplete understanding of interactions specific to
15  a mesh material and design, as well as the
16  pathophysiology of any complications."
17     A.  I would say none of these processes are
18  completely known 100 percent.  There's always things
19  that are discovered about the specific mechanisms of
20  all these interactions.  But that doesn't take away
21  from the fact that we know a significant amount --
22  at least enough to know how certain material, like
23  mesh, would interact in a patient's body:
24     Q.  Do you agree with this statement:

Page 115

1          "That the question of whether
2  polypropylene degrades in vivo has not been fully
3  resolved despite decades of use"?
4          MR. AYLSTOCK:  Objection to form.
5      A.  Repeat that.
6      BY MR. THOMAS:
7      Q.  The question of whether polypropylene
8  degrades in vivo has not been fully resolved despite
9  decades of use.
10         MR. AYLSTOCK:  Same objection.
11     A.  The polypropylene doesn't completely
12  dissolve?
13     BY MR. THOMAS:
14     Q.  Do you agree with the statement as I've
15  read it?
16     A.  Read it again.
17     Q.  The question of whether polypropylene
18  degrades in vivo has not been fully resolved despite
19  decades of use.
20         MR. AYLSTOCK:  Same objection.
21     A.  I guess I don't know, because I would say
22  it depends on the time.  Because if it's -- maybe
23  not fully with respect to maybe everyone, but I
24  would say more likely than not after a significant

Page 116

1  amount of time, it would degrade.  But I -- it would
2  be something that you would have to evaluate
3  microscopically.
4          MR. THOMAS:  Let's go off the record
5  for a second.
6          (Recess from 10:42 a.m. to 10:51 a.m.)
7      BY MR. THOMAS:
8      Q.  Can you approximate how much time you've
9  spent working on this litigation from the time you
10  were retained till now?
11     A.  Maybe -- I would say approximately 200
12  hours.  Probably not -- maybe not that much.  I
13  don't know.  160 hours.
14     Q.  And that would be for the six cases, as
15  well as the general file for which you've billed
16  time?
17     A.  Correct.
18     Q.  All right.  And you charge $500 for your
19  time?
20     A.  Yes.
21     Q.  And have you submitted bills yet?
22     A.  Some.
23     Q.  Have you been paid?
24     A.  Some.

Page 117

1          MR. THOMAS:  Pay his bills, Bryan.
2          MR. AYLSTOCK:  You know, you keep me
3  busy.
4      BY MR. THOMAS:
5      Q.  And when -- what's your best recollection
6  of when you were hired in this case?
7      A.  I think there were some initial contact in
8  January of this year, but I didn't receive slides or
9  anything until well after that.
10         Because I know my reports were due in
11  early May, and maybe I had slides for over a month
12  before that or something.
13     Q.  When did you begin your general literature
14  review?
15     A.  Probably in February, I would imagine.
16  January, February.
17     Q.  That would be reflected in your time
18  charges?
19     A.  It should be.
20     Q.  Do you have privileges at hospitals now?
21     A.  Yes.
22     Q.  And which hospitals do you have privileges
23  now?
24     A.  Let's see.  St. Davids Medical Center.

30 (Pages 114 to 117)

Paul J. Michaels, M.D.

Page 118

1    Q.  St. Davids?
2    A.  Yes.
3         Seton Medical Center.
4    Q.  Seton?
5    A.  S-e-t-o-n.
6         It's all in the second paragraph of
7    my ...
8    Q.  It sure is.
9         Dell Children's Medical Center?
10   A.  Um-hmm.
11   Q.  Arise Austin Medical Center?
12   A.  Arise (pronouncing), yeah.
13   Q.  Westlake Medical Center?
14   A.  Yes.
15   Q.  Resolute Health Hospital?
16   A.  Right.  Seton Northwest.
17   Q.  As a result of your work in this case, have
18   you developed any concerns medically about the safe
19   use of Prolene polypropylene in patients?
20        MR. AYLSTOCK:  Objection to form.
21   A.  I would say not from a pathologist's
22   standpoint in my -- in my perspective, I guess, or
23   from my perspective.
24   ///

Page 119

1         BY MR. THOMAS:
2    Q.  As a doctor who has medical privileges at
3    the doctors -- at the hospitals that you've
4    identified on your report, have you developed any
5    concern about the safe use of Prolene polypropylene
6    in patients of those hospitals?
7    A.  Well, I would say that's not really --
8    there is nothing that I have identified that I find
9    to be influencing mortality or something that would
10   be a significant alarm that I would raise with the
11   medical staff.
12   Q.  If you had identified any concern from your
13   work in this case that you believe that
14   PROLENE Polypropylene could not safely be used in
15   patients at these hospitals, you could tell the
16   medical staff, wouldn't you?
17        MR. AYLSTOCK:  Let me object to the
18   form.
19        As you know, Dave, a lot of this is
20   off the market, so your question is entirely too
21   broad.
22   A.  Again, I -- from what I have experienced in
23   my practice, there is nothing that I am seeing in my
24   practice that I guess would relate to the current

Page 120

1    work that I'm doing as an expert witness that I have
2    felt the need to go to the medical staff and say
3    this has to never be used again.
4         BY MR. THOMAS:
5    Q.  I need to ask the question a little more
6    specifically.
7    A.  Okay.
8    Q.  Is it fair to understand that nothing in
9    the work that you've done has caused you to believe
10   that the use of Prolene sutures at the hospitals
11   where you have privileges creates a danger in the
12   people that receive those Prolene sutures?
13        MR. AYLSTOCK:  Objection to form.
14   A.  I would say from my standpoint, that's
15   correct.
16        BY MR. THOMAS:
17   Q.  Is it fair to understand that nothing that
18   you've done in the work you've done in this case
19   caused you to believe that the use of
20   Prolene polypropylene in the mesh used in the
21   treatment of stress urinary incontinence creates a
22   danger to any of the women that received those
23   meshes at the hospitals where you have privileges?
24        MR. AYLSTOCK:  Let me object to the

Page 121

1    word "danger."  I don't know what you mean by that.
2    A.  Well, again, as I said, there's nothing
3    that I would say is life threatening that would
4    necessitate me as a pathologist, in my role at the
5    hospitals, going to the medical staff to ensure that
6    something is not used.
7         BY MR. THOMAS:
8    Q.  Do you find from your work in this case
9    that Prolene polypropylene and the meshes used for
10   the treatment of stress urinary incontinence
11   manufactured by Ethicon create an unreasonable risk
12   of danger to women that receive them in the
13   hospitals where you have privileges?
14        MR. AYLSTOCK:  Objection to form.
15        THE WITNESS:  Could you repeat that?
16        (The record was read as requested:
17        "Do you find from your work in this
18        case that Prolene polypropylene and
19        the meshes used for the treatment of
20        stress urinary incontinence
21        manufactured by Ethicon create an
22        unreasonable risk of danger to women
23        that receive them in the hospitals
24        where you have privileges?")

31 (Pages 118 to 121)

Paul J. Michaels, M.D.

Page 122

1      MR. AYLSTOCK: Same objection.
2      At what point in time? With what
3  labels affixed? It's entirely too vague.
4      A. I guess I don't really -- I don't really
5  understand the question.
6      BY MR. THOMAS:
7      Q. Is it true that you've not told anybody at
8  the hospitals where you work that they should stop
9  implanting Ethicon TVT meshes for the treatment of
10  stress urinary incontinence? True?
11      A. That's correct.
12      Q. And the reason why you haven't done that is
13  because you don't see that any of the Ethicon meshes
14  used for the treatment of stress urinary
15  incontinence present an unreasonable risk of harm to
16  the women that receive them. Correct?
17      MR. AYLSTOCK: Objection to form.
18      A. No. I would say that's kind of an
19  oversimplification of my role as a pathologist in
20  the hospital.
21      My role would not be to alert the
22  medical staff to stop using a particular type of
23  medical device without knowing if there are risks
24  that are now discussed with these patients may be

Page 123

1  what I consider to be dangerous, maybe a woman now
2  after discussing those known risks with her
3  physician wouldn't consider dangerous.
4      I would say my role as a pathologist
5  would be that if I found that these were associated
6  with a high risk of developing leukemia, and it's
7  not something that's reported in the medical
8  literature, and it's a product that's still being
9  used.
10      Something like that at that point, I
11  would go and sound the alarm to the medical staff
12  that, Hey, this is something that is not described
13  in their handouts. It's not something that's being
14  discussed by the company. You haven't had the
15  opportunity to discuss this risk with the patient.
16  But my experience as a pathologist from reviewing X
17  number of patients is that this is causing leukemia
18  so you need to be aware of that.
19      There's no scenario like that that has
20  occurred that I have felt the need to alert the
21  medical staff, because the risk/benefit ratio of any
22  procedure, whether I deem it dangerous or not, is
23  not my responsibility given that that's what the
24  surgeon discusses with the patients in their

Page 124

1  preoperative visits.
2      BY MR. THOMAS:
3      Q. Fair to conclude, though, that you have not
4  had conversations with anybody on the medical staffs
5  of any of the hospitals where you have privileges
6  about any risks associated with the TVT devices for
7  the treatment of stress urinary incontinence.
8  Correct?
9      MR. AYLSTOCK: Objection to form.
10      A. I have not had any discussions with the
11  medical staff about TVT or any sort of
12  polypropylene-containing mesh.
13      MR. THOMAS: Okay. I think we're
14  ready to go to individual cases.
15      MR. AYLSTOCK: Okay.
16      MR. THOMAS: Do you want to take a
17  break first?
18      MR. AYLSTOCK: Yeah. Let's conclude
19  the general deposition.
20      MR. THOMAS: And just for the record,
21  we have an agreement that background questions and
22  questions that we've asked in this general
23  deposition will be applied to the individual cases
24  so that we don't have to reask or redo certain

Page 125

1  things.
2      MR. AYLSTOCK: Yeah. In fact, we'll
3  insist that it not be reasked or redone.
4      MR. THOMAS: Right.
5      MR. AYLSTOCK: Anything that was
6  covered in the general portions of this report.
7      MR. THOMAS: But there will be times
8  obviously where we will have to ask predicate
9  questions in order to form an appropriate question,
10  and we'll deal with those as they arise.
11      MR. AYLSTOCK: Mr. Curtis will deal
12  with them.
13      MR. CURTIS: Well, the understanding
14  is, the time we've just spent is on the general
15  issues, and will not be repeated in the six
16  individual cases.
17      MR. THOMAS: Well, as best we can, we
18  unless we have to relate it to a question in order
19  to make the question clear. And we'll figure that
20  out. I don't think we'll have any problem with
21  that.
22      MR. CURTIS: I don't think we will
23  either.
24      What's the time?

32 (Pages 122 to 125)

Paul J. Michaels, M.D.

---

Page 126

```
 1        THE REPORTER:  The total time is
 2   2 hours, 36 minutes.
 3        MR. CURTIS:  Thank you.
 4        (Proceedings concluded at 11:03 a.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 127

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6     REASON:  _____
 7   ____  ____  _____
 8     REASON:  _____
 9   ____  ____  _____
10     REASON:  _____
11   ____  ____  _____
12     REASON:  _____
13   ____  ____  _____
14     REASON:  _____
15   ____  ____  _____
16     REASON:  _____
17   ____  ____  _____
18     REASON:  _____
19   ____  ____  _____
20     REASON:  _____
21   ____  ____  _____
22     REASON:  _____
23   ____  ____  _____
24     REASON:  _____
```

---

Page 128

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, and that the same is
 7   a correct transcription of the answers
 8   given by me to the questions therein
 9   propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   PAUL J. MICHAELS, M.D.        DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.
20   My commission expires:_____
21
22   _____
     Notary Public
23
24
```

---

Page 129

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3             CHARLESTON DIVISION
 4   _____
                              )
 5   IN RE: ETHICON, INC., PELVIC  )  Master File No.
     REPAIR SYSTEM PRODUCTS        )
 6   PRODUCTS LIABILITY LITIGATION )   2:12-MD-02327
                                   )
 7   THIS DOCUMENT RELATES TO THE  )   MDL 2327
     FOLLOWING CASES IN WAVE 2     )
 8   OF MDL 200:                   )
                                   )  JOSEPH R. GOODWIN
 9   Tamara Carter, et al. v.      )
     Ethicon, Inc., et al.         )  U.S. DISTRICT JUDGE
10   Civil Action No. 2:12-cv-01661 )
                                   )
11   Sandra Childress, et al. v.   )
     Ethicon, Inc., et al.         )
12   Civil Action No. 2:12-cv-01564 )
                                   )
13   Marion Chrysler v.            )
     Ethicon, Inc., et al.         )
14   Civil Action No. 2:12-cv-02060 )
                                   )
15   Melissa Sanders, et al. v.    )
     Ethicon, Inc., et al.         )
16   Civil Action No. 2:12-cv-01562 )
                                   )
17   Ana Sierra, et al. v.         )
     Ethicon, Inc., et al.         )
18   Civil Action No. 2:12-cv-01819 )
                                   )
19   Toni Hernandez v.             )
     Ethicon, Inc., et al.         )
20   Civil Action No. 2:12-cv-02073 )
     _____)
21
22        REPORTER'S CERTIFICATE
23   ORAL DEPOSITION OF PAUL J. MICHAELS, M.D.
24             June 18, 2016
```

33 (Pages 126 to 129)

Paul J. Michaels, M.D.

Page 130

```
 1
 2          I, Rebecca J. Callow, Registered Merit
 3   Reporter and Notary Public in and for the State of
 4   Texas, hereby certify to the following:
 5          That the witness, PAUL J. MICHAELS, M.D.,
 6   was duly sworn by the officer and that the
 7   transcript of the oral deposition is a true record
 8   of the testimony given by the witness;
 9          That the original deposition was delivered
10   to _____.
11          That a copy of this certificate was served
12   on all parties and/or the witness shown herein on
13   _____.
14       That pursuant to information given to the
15   deposition officer at the time said testimony was
16   taken, the following amount of time used by
17   each party at the time of the deposition:
18       David B. Thomas (2h36m)
            Attorney for Johnson & Johnson and
19          Ethicon, Inc.
20       Bryan F. Aylstock (0h0m)
            Attorney for Plaintiffs
21
22
23
24
```

Page 131

```
 1          I further certify that pursuant to FRCP
 2   Rule 30(f)(1) that the signature of the deponent:
 3          [  ] was requested by the deponent or a
 4   party before the completion of the deposition and is
 5   to be returned within 30 days from date of receipt
 6   of the transcript.  If returned, the attached
 7   Changes and Signature Page contains any changes and
 8   the reasons therefor;
 9          [  ] was not requested by the deponent or
10   a party before the completion of the deposition.
11
12          I further certify that I am neither
13   counsel for, related to, nor employed by any of the
14   parties or attorneys to the action in which this
15   proceeding was taken.  Further, I am not a relative
16   or employee of any attorney of record in this cause,
17   nor am I financially or otherwise interested in the
18   outcome of the action.
19
20
21
22
23
24
```

Page 132

```
 1
 2
 3          SUBSCRIBED AND SWORN TO under my hand and
 4   seal of office on this the _____ day of
 5   _____, _____.
 6
 7            _____
 8            Rebecca J. Callow, RMR, CRR, RPR
 9            Notary Public, Travis County, Texas
10            My Commission No. 12955701-3
11            Expires:  09/12/2017
12
13
14
15
16
17
18
19
20
21
22
23
24
```

34 (Pages 130 to 132)