# EXHIBIT D

Teri A. Longacre, M.D.

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF KERN

--oOo--

COLLEEN M. PERRY,                    )
                                     )
            Plaintiff,               )
                                     )  No. 1500-cv-27912 LHB
        vs.                          )
                                     )
HUNG T. LUU, M.D.; JOHNSON           )
& JOHNSON, a New Jersey              )
corporation; ETHICON, INC.,          )
a New Jersey corporation;            )
and DOES 1-60,                       )
                                     )
            Defendants.              )
                                     )
_____      )

DEPOSITION OF TERI A. LONGACRE, M.D.

DATE:               December 19, 2014

TIME:               9:00 a.m.

LOCATION:           THE STANFORD TERRACE INN
                    531 Stanford Avenue
                    Palo Alto, CA 94306

REPORTED BY:        LISA R. KEELING
                    Certified Shorthand Reporter
                    License No. 10518

Teri A. Longacre, M.D.

## Page 2

A P P E A R A N C E S
For the Plaintiff:    WAGSTAFF & CARTMELL
                   BY:  NATE JONES, ESQ.
                   4740 Grand Avenue
                   Suite 300
                   Kansas City, MO 64112
                   (816) 701-1100
                   njones@wcllp.com
For the Defendant:    TUCKER ELLIS, LLP,
ETHICON, INC.,    BY:  JOSHUA J. WES, ESQ.
                   515 South Flower Street
                   42nd Floor
                   Los Angeles, CA 90071-2223
                   (213) 430-3400
                   joshua.wes@tuckerellis.com
                   BUTLER SNOW, LLP
                   BY:  M. ANDREW SNOWDEN, ESQ.
                   150 3rd Avenue South
                   Suite 1600
                   Nashville, TN 37201
                   (615) 651-6700
                   Andy.Snowden@butlersnow.com
For the Defendant:    BOYCE SCHAEFFER MAINIERI, LLP
HUNG T. LUU, M.D.    BY:  LAURA L. COTA, ESQ.
                   500 Esplanade Drive
                   Suite 900
                   Oxnard, CA 93036
                   (805) 988-9200
                   lcota@boyceschaefferlaw.com

## Page 3

I N D E X   O F   E X A M I N A T I O N
Examination by:                          Page
Mr. Jones                                  5
Ms. Cota                                 112
Mr. Jones                                139
Ms. Cota                                 143
Mr. Wes                                  145

I N D E X   O F   E X H I B I T S
Exhibit      Description               Page
Exhibit L-1  Opinions of Teri Longacre, M.D.    14
Exhibit L-2  Bakersfield Pathology Report,
             Dated 3-23-11             33
Exhibit L-3  Dignity Health/Bakersfield
             Memorial Hospital Pathology
             Report, Dated 1-17-12     33
Exhibit L-4  USB Flash Drive of Documents
             Produced (Retained by Attorney
             Jones)                    55
Exhibit L-5  Plaintiff's Notice of Oral
             Deposition of Expert Teri A.
             Longacre, M.D.            67
Exhibit L-6  Defendant's Objections to
             Plaintiff's Notice of Deposition
             of Teri A. Longacre and Request
             for Production            67

## Page 4

I N D E X   O F   E X H I B I T S
Exhibit      Description               Page
Exhibit L-7  Teri A. Longacre, M.D. Invoice,
             Dated 10-13-14           68
Exhibit L-8  Curriculum Vitae of Teri A.
             Longacre, M.D.           75
Exhibit L-9  Operation/Procedure Report by
             Hung T. Luu, M.D., Dated 3-23-11    139
Exhibit L-10  Operation Report by Charles
             Allen, M.D., 1-17-12      139

## Page 5

P R O C E E D I N G S:

TERI A. LONGACRE, M.D.,
the Witness herein, having been duly and regularly sworn
by the Certified Shorthand Reporter, deposed and testified
as follows:

EXAMINATION BY MR. JONES

MR. JONES:  Q.  Good morning, Doctor.

A.  Good morning.

Q.  You've been retained by Ethicon's law firm to
give opinions in this case, correct?

A.  Correct.

Q.  And are you here today to discuss those opinions?

A.  Yes, I am.

Q.  Are you here today to discuss the bases for those
opinions?

A.  Yes, I am.

Q.  And you understand this is the plaintiff's
opportunity to ask you questions about your opinions and
the bases of those opinions?

A.  Yes, I do.

Q.  Are you prepared to give all of your opinions and
the bases for those opinions today?

A.  Yes, I am.

Q.  I take it you spent some time preparing for your
deposition?

Teri A. Longacre, M.D.

Page 6

1    A.  Yes, I did.
2    Q.  What did that preparation entail?
3    A.  Review of slides, hospital records, pathology
4  reports, associated literature and discussions with
5  Mr. Snowden predominantly.
6    Q.  Okay.  So we have -- I want to break that down.
7  We have slides, right?
8    A.  Correct.
9    Q.  Path reports?
10    A.  Correct.
11    Q.  Relevant medical literature?
12    A.  Yes.
13    Q.  Talked with Mr. Snowden?
14    A.  Correct.
15    Q.  Anything I'm missing?
16    A.  Operative reports, other medical records --
17    Q.  Okay.
18    A.  -- of course, and then there were discussions
19  with some other attorneys, whose names escape me.
20    Q.  Sure.  Did you review any deposition testimony?
21    A.  Yes, I did.
22    Q.  Whose deposition testimony did you review?
23    A.  Mrs. Perry's, Mr. Perry's, the -- I'm not sure I
24  know how to pronounce their names, the surgeons.
25    Q.  You reviewed some of the treating physicians' --

Page 7

1    A.  Yes, exactly.
2    Q.  -- depositions in this case?
3    A.  Correct.  Yes.
4    Q.  Did you review any internal corporate Ethicon
5  documents?
6    A.  I may have reviewed some, yes.
7    Q.  Fair to say that wasn't the focus of your
8  preparation in rendering your opinions in this case?
9    A.  Correct.
10    Q.  The focus was on the pathology records, the
11  pathology slides, relevant medical literature and the
12  treating physicians' depositions.
13    MR. WES:  Object to form.
14    You can answer.
15    THE WITNESS:  Yes, that's -- that's the focus and
16  then supporting background literature.  That's it.
17    MR. JONES:  Q.  Okay.
18    A.  That was my --
19    Q.  Did you review any depositions of Ethicon
20  employees?
21    A.  No, I don't think so.
22    Q.  Okay.  Did you meet with attorneys prior to today
23  to prepare for your deposition?
24    A.  Yes.
25    Q.  When did you meet with them?

Page 8

1    A.  I met with -- yesterday, the day before.  I think
2  the last three days.
3    Q.  So you've met with attorneys for three days?
4    A.  Yes.
5    Q.  Who did you meet with?
6    A.  Mr. Snowden.
7    Q.  Okay.
8    A.  And most recently with Mr. --
9    MR. WES:  Mr. Wes.
10    THE WITNESS:  I know his first name, but I didn't
11  know his last name.
12    MR. JONES:  Q.  Yeah, sure.  When were you first
13  contacted by Ethicon attorneys to work on this particular
14  case?
15    A.  I think it was mid summer of this year.
16    Q.  Mid summer 2014?
17    A.  Yes.
18    Q.  Who contacted you?
19    A.  Mr. Snowden.
20    Q.  Prior to mid summer 2014, did you have any
21  contact with attorneys representing Ethicon?
22    A.  Yes.
23    Q.  When was that?
24    A.  The first part of the year, I believe.
25    Q.  Early 2014?

Page 9

1    A.  Yes.
2    Q.  Who contacted you then?
3    A.  Mr. Snowden.
4    Q.  Was that related to this particular case?
5    A.  No.
6    Q.  I take it it was related to another Ethicon case?
7    MR. WES:  Object to form.
8    THE WITNESS:  No.
9    MR. JONES:  Q.  What was it related to?
10    A.  It was -- the initial contact was to see if I
11  would be interested in examining or being an expert
12  witness in some of these cases, but there was no specific
13  case at that time.
14    Q.  Okay.  So early 2014 Ethicon attorneys contact
15  you to gauge your availability and interest to work on
16  cases involving transvaginal mesh?
17    A.  Correct.
18    Q.  And then in mid summer 2014, Ethicon attorneys
19  contact you, and you agree to work on this particular
20  case?
21    A.  Correct.
22    Q.  Prior to early 2014 had you been contacted by any
23  other attorneys representing Ethicon?
24    A.  No.
25    Q.  Any other attorneys representing any mesh

3 (Pages 6 to 9)

Page 10

```
 1    manufacturers other than Ethicon?
 2       A.  No.
 3       Q.  I take it you started your work in this case mid
 4    summer 2014 or shortly thereafter?
 5       A.  Probably shortly thereafter, yes.  Correct.
 6       Q.  Maybe late summer 2014 you started to work on
 7    this case?
 8       A.  That would be correct.
 9       Q.  Okay.  When did you first start to review the
10    medical records in this case?
11       A.  I believe it was August.
12       Q.  When did you first start to review deposition
13    testimony in this case?
14       A.  It may have been August or September.
15       Q.  Same for relevant medical literature?
16       A.  I had started reviewing some of the medical
17    literature after the January -- or the early -- the first
18    meeting that we had in January or February of the year but
19    nothing that was specifically associated with this case.
20       Q.  Just to get generally familiar with the topics
21    that you would be touching base on?
22       A.  Correct.
23       Q.  Yeah.  Are you aware that the device in question
24    in this case is the TVT Abbrevo?
25       A.  Yes.
```

Page 11

```
 1       Q.  Have you seen a TVT Abbrevo device?
 2       A.  I've seen mesh that's been removed from the TVT.
 3       Q.  Have you seen the TVT Abbrevo device in its
 4    package form as it's delivered to surgeons?
 5       A.  No.
 6       Q.  Have you held the mesh that makes up the TVT
 7    Abbrevo device in your own hands?
 8       A.  Preplacement?  No.
 9       Q.  Preplacement?
10       A.  No.
11       Q.  How about postplacement?
12       A.  I think I probably have in the gross room, yes,
13    but just portions of the mesh, not the entire.
14       Q.  What type of mesh is used in the TVT Abbrevo?
15       A.  I'm not sure the question you're asking me.
16       Q.  What is the material that makes up the mesh in
17    the TVT device?
18       A.  Polypropylene.
19       Q.  Do you know how much polypropylene makes up the
20    TVT Abbrevo mesh?
21       A.  No, not at the -- not off the top of my head.
22       Q.  You don't know how long the mesh is in the TVT
23    Abbrevo device prior to implementation?
24       MR. WES:  Object to form.
25       THE WITNESS:  Not off the top of my head.
```

Page 12

```
 1       MR. JONES:  Q.  Okay.
 2       A.  I read it, but I'm not all that good with
 3    numbers.
 4       Q.  Sure.  You're focused more on the pathology --
 5       A.  Correct.
 6       Q.  -- aspects?
 7       A.  Correct.
 8       Q.  Not so much the design features of the TVT
 9    Abbrevo device?
10       A.  That's correct, yes.
11       Q.  Do you know -- do you know how the mesh and the
12    TVT Abbrevo device is cut?
13       MR. WES:  Object to form.
14       THE WITNESS:  I'm not sure what you're asking.
15       MR. JONES:  Q.  I'll ask a better question.
16       A.  Okay.
17       Q.  Do you know whether the mesh in the TVT Abbrevo
18    device is mechanical cut mesh or laser cut mesh?
19       A.  I believe it's laser.
20       Q.  Okay.  Are you familiar with any of the aspects
21    of a laser cut mesh?
22       MR. WES:  Object to form.  It's outside the
23    scope.
24       MR. JONES:  Q.  Fair to say you're not going to
25    be offering opinions as to the aspects of the laser cut
```

Page 13

```
 1    mesh device?
 2       A.  That would be fair to say, yes.
 3       Q.  Okay.  Are you familiar with the lightweight
 4    large pore concept in mesh surgery?
 5       A.  Yes, I --
 6       MR. WES:  Object to form, outside the scope.
 7       THE WITNESS:  I am familiar with that concept,
 8    but that's not -- again, this is not an area that I'm
 9    offering an opinion on.
10       MR. JONES:  Q.  Perfect.  Thank you.
11       How does tissue inside the vagina react to
12    polypropylene?
13       MR. WES:  Object to form.
14       THE WITNESS:  The tissue response to
15    polypropylene in the vagina is probably not dissimilar to
16    tissue response to polypropylene anywhere in the body.  I
17    mean, it made some variations, but generally it's a
18    foreign body reaction.
19       Q.  Okay.  There's nothing unique as far as the
20    tissue or inside the vagina that would alter the body's
21    reaction to polypropylene as compared to, say, the
22    stomach?
23       MR. WES:  Object to form.
24       THE WITNESS:  Well, there may be -- vaginal
25    tissue is different than stomach tissue, and so the --
```

Teri A. Longacre, M.D.

Page 14

1   although the overall foreign body reaction would be the
2   same. The adjacent tissue that it's sort of associated
3   with will be different. I don't know that I'm answering
4   your question.
5       MR. JONES: Q. Okay.
6       A. But that's the best I can do.
7       Q. Sure. I appreciate it. That's probably a bad
8   question.
9           In the interest of being as efficient as possible
10  with everyone's time here today, did you bring a sheet
11  with the opinions you intend to offer in this case with
12  you today?
13      A. Yes, I did.
14      Q. Are you willing to share that sheet --
15      A. Yes.
16      Q. -- with me?
17      A. Yes, I am.
18      MR. JONES: I'm going to mark the Summary of
19  Opinion of Dr. Teri Longacre as Exhibit L-1.
20          (Whereupon, Exhibit L-1 was marked for
21          identification.)
22      MR. JONES: Q. You have a copy of this in front
23  of you, Doctor?
24      A. Yes. Yes, I do.
25      Q. Let's go through this Summary of Opinion of

Page 15

1   Dr. Teri Longacre.
2           What is the first opinion you intend to offer in
3   this case?
4       A. I don't know that there's necessarily an order of
5   the opinions. As you see I've set forth at the Roman
6   Numeral I just an itemized, I guess, list of what
7   constitutes the inflammatory response and a foreign body
8   response that's associated with implant material, and this
9   really is just by way of making sure that we're all using
10  the same terminology.
11          So the typical reaction is there may be an acute
12  inflammatory infiltrate, but generally it roughly -- or
13  fairly soon shifts to a more chronic inflammatory
14  infiltrate.
15          By acute, I mean neutrophils. By chronic, I'm
16  referring to other inflammatory cells. They're usually
17  monocytes which can differentiate into macrophages,
18  lymphocytes, mast cells, et cetera.
19          Chronic inflammation, the term itself really
20  denotes a description of the cells, not necessarily
21  longstanding. It may be longstanding, but you know, we --
22  generally we think about chronic being a long-term
23  process.
24          When you're talking about inflammatory cells,
25  it's a specific type of cell. So I just wanted to make

Page 16

1   that distinction.
2       Q. Can I stop you right there, Doctor. Do you mind
3   if we switch copies so that you have the copy with the
4   deposition exhibit sticker on it?
5       A. Sure.
6       MR. JONES: Is that fine with you, Counsel?
7           (Counsel did not verbally respond.)
8       THE WITNESS: Sure. That's fine.
9       MR. JONES: Thank you. That allows me to mark up
10  this copy without it showing up in the records.
11      THE WITNESS: Good.
12      MR. JONES: Q. All right. So before I
13  interrupted you were discussing the acute versus chronic
14  inflammatory reaction.
15      A. Correct. And the types of cells that you see in
16  acute inflammation versus chronic inflammation.
17      Q. And is it fair to say then that the first portion
18  under the heading "Inflammatory Response and Foreign Body
19  Response with Implant" is a discussion of the acute versus
20  chronic inflammatory reaction in the cells and some of the
21  terminology that would be applicable in that area?
22      A. Correct.
23      Q. And then under letter B you have "Factors
24  impacting wound healing."
25          What do you intend to talk about related to

Page 17

1   factors impacting wound healing?
2       A. Well, again, just in general things that can
3   affect how well a wound heals include obviously genetic
4   predisposition, but factors that can prevent wound healing
5   or impair it are lack of nutrition. You need amino acids
6   to heal, protein. Smoking has been shown to impact
7   collagen formation. Diabetes. All of these may have
8   played a role in wound healing in Mrs. Perry.
9           There are other things that can impact wound
10  healing that I haven't listed. Steroid therapy, et
11  cetera. I don't think that that played a role.
12      Q. How about genetics? You mentioned genetics. Do
13  you think that played a role in this case?
14      A. It may or may not.
15      Q. Okay.
16      A. Some people heal faster than others. It's
17  variable, so one doesn't really know.
18      Q. Okay. How about diabetes?
19      A. Yes, diabetics can have impaired wound healing,
20  and it's all about -- well, it's pretty complex, but it's
21  in part due to vascular insufficiency. You need vascular
22  supplying oxygen to the tissue for adequate wound healing.
23          And that's, again, sort of why smoking is a risk
24  factor for poor wound healing because smoking releases
25  carbon monoxide and impairs oxygenation of tissue.

5 (Pages 14 to 17)

Teri A. Longacre, M.D.

Page 18

1    So anything that impairs oxygenation of tissue
2 and delivery of nutrients will impair wound healing.
3    Q.  Okay.  Are you familiar with whether or not
4 Ms. Perry smokes?
5    A.  I don't know if she currently smokes, but there
6 was a record of it historically.
7    Q.  So you don't know one way or the other whether
8 she currently smokes cigarettes?
9    A.  As of today, no, I don't know.  But during her
10 surgery she was a smoker, and after her surgery for her
11 mesh she was.
12    Q.  How often did she smoke cigarettes?
13    A.  I don't recall.  It varied depending on the
14 medical record.  It didn't sound like it was a pack a day.
15    Q.  She's a very light smoker, right?
16    MR. WES:  Object to form.
17    THE WITNESS:  I think -- as a physician I don't
18 know that I'm going to answer that to a yes.  I'm sorry.
19    MR. JONES:  Q.  That's fine.
20    A.  Any smoking is bad.  So yes, she was not a pack a
21 day.
22    Q.  Okay.  And that was a relative term that I used.
23    A.  Correct.
24    Q.  It probably wasn't the best way to ask the
25 question, but you understand what I'm getting at, is that

Page 19

1 the amount that you smoke has an impact on what we're
2 talking about here, wound healing, correct?
3    MR. WES:  Object to form.
4    THE WITNESS:  It may or may not.  Again, it's
5 individual.  Individual response.  So what may impact one
6 patient may not -- you know, may not impact another
7 patient at all.  So a pack a day may be a huge impact on
8 one patient whereas another patient two or three
9 cigarettes.
10    She has some history of asthma and some history
11 of allergies, so she may actually be more impacted by her
12 cigarette smoking than someone who doesn't have allergies
13 or a history of episodic asthma.
14    So again, it's all genetic, so I can't really
15 fairly give an answer to that.
16    MR. JONES:  Q.  Okay.  You said asthma and
17 allergies may impact.  Is that going to be an opinion
18 you're going to be offering in this case?
19    A.  To the extent that I just did, yes.
20    Q.  It doesn't make a difference if a person smokes
21 two cigarettes a day versus a pack a day for wound
22 healing?
23    MR. WES:  Object to form.
24    THE WITNESS:  I suspect -- yes.  Yes.  We're not
25 comparing one person to another, but in an individual

Page 20

1 person, the more you smoke, one would assume the worst of
2 side effects, correct.
3    MR. JONES:  Q.  So if I understand this
4 correctly, there are patient-specific factors that would
5 alter the wound healing process on top of diabetes,
6 smoking, asthma, allergies, and nutrition?
7    MR. WES:  Object to form.
8    THE WITNESS:  Yeah, I'm not sure what -- there
9 are other factors meaning?
10    MR. JONES:  Q.  Meaning -- here's what I'm
11 getting at.  The -- we talked earlier about Ms. Perry not
12 being -- smoking a pack of cigarettes a day.
13    A.  Correct.
14    Q.  And there's reference in the medical records that
15 she may have smoked less than a pack a day, correct?
16    A.  Correct.
17    Q.  And when I asked you whether the amount of
18 cigarettes she smoked would have an impact on the wound
19 healing, meaning the more cigarettes you smoke, it would
20 have a greater impact on the wound healing versus the less
21 cigarettes you smoke having a smaller impact on the wound
22 healing, and your answer was, well, it's -- there's
23 patient-dependent factors involved, too, correct?
24    A.  Correct.
25    Q.  So without knowing -- I guess what I'm getting at

Page 21

1 what are those patient-dependent factors that you
2 discussed?
3    MR. WES:  Object to form.
4    THE WITNESS:  Yeah.  So I guess I'm still not --
5 I don't know that we're communicating very well right now.
6    MR. JONES:  Q.  Okay.
7    A.  I was -- one individual that has vascular
8 insufficiency for whatever reason and smokes could have --
9 even if it's a couple of cigarettes, it may have a much
10 larger impact than someone who does not have an underlying
11 vascular insufficiency.  That's all -- that's the only
12 point I was trying to make.  Nothing more than that.
13    Q.  Okay.  Are you going to be giving an opinion in
14 this case that Ms. Perry's smoking behavior impacted her
15 wound healing?
16    A.  It may have.
17    Q.  It may have?
18    A.  Sure.  Yeah.
19    Q.  Are you reasonably certain that her smoking
20 impacted her wound healing?
21    MR. WES:  Object to form.
22    THE WITNESS:  I'm reasonably certain that it may
23 well have.
24    MR. JONES:  Q.  It may well have.
25    A.  Yes.

6 (Pages 18 to 21)

Teri A. Longacre, M.D.

Page 22

1    Q.  Will you be giving an opinion that Ms. Perry's
2   diet affected her wound healing?
3    A.  It may well have, yes.
4    Q.  It may have.
5    Well, let's move on to C.  "Inflammation occurs
6   with any surgery - even absent mesh."  That's pretty
7   straightforward.
8    A.  Yes, I think so.
9    Q.  Okay.  And your point there is that there's an
10  inflammatory reaction to the mesh that's used with a TVT
11  Abbrevo device, correct?
12   A.  Correct.
13   Q.  But that doesn't distinguish it from other
14  surgeries that may treat stress urinary incontinence?
15   MR. WES:  Object to form.
16   MR. JONES:  Q.  Flush that out -- flush that out
17  for me.
18   A.  So that's actually not the point.
19   Q.  Yeah.
20   A.  So the point is just because you have
21  inflammation doesn't necessarily mean it's associated with
22  the mesh.  There is -- in fact, there is some inflammation
23  associated with the mesh in the slides that -- of the mesh
24  that was removed from Mrs. Perry, but you can have other
25  kinds of inflammation that aren't related to the mesh, and

Page 23

1   that was the point.
2    Q.  Okay.  There's inflammation in the medical
3   records, but it doesn't necessarily mean it's from the
4   mesh?
5    A.  Correct.
6    Q.  Okay.
7    A.  Yes.
8    Q.  We'll skip D and move on to E, "Chronic
9   Inflammation."  Can you flush that out for us?
10   A.  Definitely.  So the first point is, is that if it
11  is, in fact, part of the normal healing response, you
12  would expect it to occur.  It would be abnormal if there
13  wasn't some chronic inflammation in a healing wound.
14   In fact -- well, that's all -- immunosuppressed
15  individuals, part of the problem with their wound healing
16  is they don't have the inflammatory cells to mount that
17  response.
18   And you can see chronic inflammation after
19  surgery, but you obviously can see it without surgery for
20  a variety of other causes.  I just wanted to be sure that
21  that was clear.
22   Q.  Okay.
23   A.  It is considered a normal and expected reaction
24  to any implanted foreign material anywhere on the body.
25   And the other point I really wanted to emphasize,

Page 24

1   you can see, quote, chronic inflammation, closed quote, in
2   normal tissue, and it doesn't necessarily imply anything
3   pathologic at all.  And this is particularly true in areas
4   of mucosa.
5    So in this particular example, vaginal mucosae,
6   you would expect to see in normal vaginal mucosa a small
7   complement of what we refer to as chronic inflammatory
8   cells.
9    Q.  Fair to say chronic inflammation isn't
10  necessarily indicative of any unintended consequences of
11  the TVT Abbrevo implant?
12   MR. WES:  Object to form.
13   THE WITNESS:  I think that's what I'm trying to
14  say.  I think that summarizes it, yes.
15   MR. JONES:  Q.  Okay.  Would it be incorrect to
16  say the inflammatory reaction to the mesh and the TVT
17  Abbrevo device is minimal?
18   A.  In this case, yes.
19   Q.  Would it be incorrect to say the inflammatory
20  response to the mesh used in the TVT Abbrevo device is
21  transitory?
22   MR. WES:  Object to form.
23   THE WITNESS:  It's partially correct and
24  partially incorrect.  So when you put the device in --
25  these implants, any foreign material in, there is an

Page 25

1   initial, quote, transitory, closed quote, inflammatory
2   response that often includes mast cells and probably some
3   neutrophils as well as the lymphocytes and the
4   macrophages.
5    Over time that acute process dissipates and what
6   remains is a layer, if you will, a thin layer of chronic
7   inflammatory cells, typically lymphocytes and macrophages
8   that sort of make a nice little layer around the foreign
9   material, walling it off from the normal tissue.
10   So that does persist, but that acute sort of
11  initial response to the body, that is transitory.
12   MR. JONES:  Q.  You mentioned walling it off.  Is
13  that, I guess, a plate, a scar plate, or is this
14  different?  Are we talking about two different things?
15   A.  We're talking about two different things.  It's
16  not a scar plate.  It's a layer of cells that's -- and
17  there is often a very thin -- well, I won't say often.  In
18  this case because -- you know, there may be instances
19  where you don't see what I'm describing, but in this
20  particular case and what you'd like to see is a very thin
21  layer -- a very thin layer of fibrosis -- fibrous tissue
22  associated with that chronic inflammation, and that's it.
23  Not a thick layer.
24   Q.  Is there always a chronic inflammatory reaction
25  when the TVT Abbrevo mesh is implanted inside the body?

7 (Pages 22 to 25)

Teri A. Longacre, M.D.

Page 26

1    A.  There should -- I would -- I expect as a
2   pathologist anytime I see foreign material removed from
3   the body that has been there for more than a few hours to
4   have an inflammatory response.  Absolutely.  Every single
5   time.
6    Q.  Same for chronic foreign body response?
7    A.  That's exactly what I'm talking about, yes.
8    Q.  Same thing --
9    A.  I would expect to see some kind of chronic
10  response.  It would be -- in fact, if I don't see it, it
11  tells me that that foreign material has been very, very
12  recently placed.
13   Q.  Did you happen to review any of the advertising
14  Ethicon uses for the TVT devices in this case?
15   MR. WES:  Object to form, outside the scope.
16   THE WITNESS:  I -- I don't specifically recall
17  reviewing advertising, but I may have read some inserts.
18   MR. JONES:  Q.  So you don't have any recall of
19  Ethicon in their marketing materials for the TVT devices
20  stating there would be no chronic foreign body response to
21  the mesh?
22   MR. WES:  Object to form, outside the scope.
23   THE WITNESS:  I don't --
24   MR. WES:  Misstates --
25   THE WITNESS:  Yeah, I don't recall reading that

Page 27

1   there would not be one, no.
2    MR. JONES:  Q.  Let's move on to F, "Foreign body
3   reaction expected with the implant."
4    Can you flush that one out?
5    A.  That's just, again, emphasizing basically what we
6   just discussed, that I would expect to see some sort of
7   reaction always to any foreign material.  And in fact,
8   sometimes normal tissue gets in the wrong spot in the
9   body, and you would expect to see a foreign body reaction
10  to that as well.  An ingrown hair follicle, you know, if
11  the hair shaft or keratin gets embedded in the connective
12  tissue of the dermis will incite a foreign body reaction.
13  And that's all self tissue, but it's in the wrong spot.
14   So anything that's occurring in the wrong spot
15  should elicit some reaction.
16   Q.  You talk about foreign body reaction remaining
17  after an absorbable suture has been absorbed.
18   A.  Yes.  I've even seen that, yes.
19   Q.  Okay.  So if someone were to make the argument
20  that using a partially absorbable implant in a TVT Abbrevo
21  device would not cause a chronic foreign body response --
22   A.  No.
23   Q.  -- that would be incorrect?
24   A.  That would be incorrect, yeah.
25   Q.  There's a chronic foreign body response to an

Page 28

1   absorbable mesh just as there would be to a permanent
2   polypropylene mesh?
3    MR. WES:  Object to form.
4    THE WITNESS:  Well, there is a -- so there is a
5   foreign body reaction to absorbable material as well as
6   nonabsorbable material.  Whether that response lasts
7   decades after that suture's been completely absorbed, I
8   can't -- I really don't know that.
9    But in my practice I have seen where, you know,
10  there's -- there's a persistence of that foreign body
11  reaction.  I don't see any suture anymore.  Now, maybe if
12  you do sophisticated studies, you could find little
13  particles, I don't know, but you can see the residual sort
14  of response even though the suture's gone.
15   Q.  Will you be offering an opinion in this case that
16  there is a difference in the foreign body response between
17  an absorbable mesh and a nonabsorbable mesh?
18   A.  No, I will not.
19   Q.  Okay.
20   A.  The only point is that anytime any foreign
21  material gets introduced in the body, there will be a
22  response.
23   Q.  Okay.
24   A.  And it may even last after the material's been
25  removed.

Page 29

1    Q.  Topic G.  Have we covered that topic in some of
2   our discussions already, or is there anything additional
3   that you'd like to share about topic G?
4    A.  The only other point, again, is about
5   terminology.
6    Q.  Okay.
7    A.  Pathologists try to be very specific in the terms
8   that they use, and I just wanted to emphasize that
9   fibrosis is different from dense scarring, and it's
10  different from fibroconnective tissue.  They really mean
11  somewhat different things.
12   Q.  Scarring, scarification, scar plate is different
13  than fibrosis?
14   MR. WES:  Object to form.
15   THE WITNESS:  Generally, yes.  It really -- I
16  mean, obviously part of that dense -- fibrosis is part of
17  that dense scarring, but there are degrees of fibrosis
18  quite honestly.
19   MR. JONES:  Q.  Okay.
20   A.  And fibroconnective tissue is normal tissue.
21   Q.  Okay.  There's nothing abnormal about fibrosis
22  occurring after a transvaginal mesh surgery?
23   A.  There is nothing -- you would expect fibrosis
24  after a wound.  So if there's been surgery, yes.  That's
25  not abnormal.  That's part of the healing process,

8 (Pages 26 to 29)

Teri A. Longacre, M.D.

Page 30

1    correct.
2    Q.  Topic H, "Risk of infection following surgery is
3    well known."
4    A.  Correct.
5    Q.  That is what it is?
6    A.  Yes.
7    Q.  We don't need to flush it out?
8    A.  Yeah, nothing else.
9    Q.  Okay.  Moving to heading Roman Numeral II,
10   "Tissue of the Vaginal Wall."  You talk about the four
11   layers of tissue in the vaginal wall, correct?
12   A.  Correct.
13   Q.  Can you explain those terms and why it's
14   important that you have included the four layers of the
15   tissue of vaginal wall in your summary of opinions?
16   A.  Well, I think it's important to realize that as
17   we -- as you suggested earlier in one of your earlier
18   questions that perhaps vaginal tissue is different from
19   stomach tissue.  This was just to emphasize that vaginal
20   tissue is a mucosal tissue, so there's a mucosal layer
21   that's different from skin.  It's certainly different from
22   stomach, different from hernia repairs, that kind of
23   thing.
24          And then just to emphasize that there's the
25   mucosal layer, and then beneath that what's referred to as

Page 31

1    submucosa, and there's a muscle layer and then the outer
2    adventitia.  There's really no adipose tissue present in
3    the vaginal tissues.
4    Q.  Why is that important to note?
5    A.  Well, I think sometimes people extrapolate
6    findings from mesh in one organ site to another organ
7    site.  Again, that was one of the questions you asked.
8    And although in many respects, I think that it's a similar
9    response.  You would not expect it to be completely
10   identical if you're putting it in a different kind of
11   tissue.
12          So if you see adipose tissue associated with mesh
13   material in a ventral hernia, that would be expected, but
14   you would not expect to see adipose tissue in a vaginal
15   tissue that contained a mesh material.
16          Does that make sense?
17   Q.  Yes.
18   A.  And that would not be -- I mean, it would be
19   abnormal to suddenly start seeing adipose tissue.
20   Q.  It sounds like you're saying there's a
21   distinction between hernia repair, mesh and transvaginal
22   mesh?
23   A.  No.  I don't know necessarily about the mesh, but
24   the surrounding tissue.
25   Q.  Okay.

Page 32

1    A.  So if you see adipose tissue in the hernia repair
2    and you don't see it in the vaginal mesh, that doesn't
3    mean there's anything wrong.  It means there's no adipose
4    tissue there to begin with.  Just to make that clear.
5    That's all I meant.
6    Q.  Sure.  I appreciate that.  We'll move on to topic
7    III.  "No gross findings because nothing but slides to
8    review."
9          What do you mean by that?
10   A.  Well, when we talk about gross findings in
11   pathology, we're talking about the tissue that comes in
12   through the OR.  So in this case it would have been that
13   mesh material that was removed during the mesh removal or
14   the mucosal tissue that was removed at the tying of the
15   mesh placement, and that I don't -- that was already done
16   by a different pathologist.  So my gross finding is really
17   just the slides.  That's all that means.
18   Q.  You talk about the slides you reviewed.
19   A.  Yes.
20   Q.  What slides did you review?
21   A.  They were recut slides from blocks that were made
22   from the initial procedure when the mesh was placed and
23   when the tissue -- the mesh was removed.  So two different
24   surgical procedures.
25   Q.  Were there any conclusions or findings noted on

Page 33

1    those pathology records?
2    A.  Do you mean the pathology reports?
3    Q.  (Nods head.)
4    A.  Yes.  There were pathology diagnoses on both of
5    them, yes.
6    Q.  Do you recall what those diagnoses were?
7    A.  Yes, I have them in front of me.
8          MR. JONES:  Okay.  Why don't we go ahead and mark
9    those very quickly.  We'll mark as exhibit L-2 Bakersfield
10   Pathology Medical Group Pathology Report dated 3-25-2011.
11          (Whereupon, Exhibit L-2 was marked for
12          identification.)
13          MR. JONES:  We'll mark as Exhibit L-3 Bakersfield
14   Memorial Hospital Pathology Report with the date of
15   January 18th, 2012.
16          (Whereupon, Exhibit L-3 was marked for
17          identification.)
18          MR. JONES:  Q.  What was the diagnosis in Exhibit
19   L-2?
20   A.  The pathology report diagnosis reads:
21   "Vaginal wall, comma, posterior, comma, excision.
22   "Hyperplastic squamous mucosa with patchy
23   submucosal mild chronic inflammation and prominent
24   vascular congestion.
25   "There is no evidence of viral cellular changes,

9 (Pages 30 to 33)

Teri A. Longacre, M.D.

Page 34

1    comma, dysplasia or malignancy, period.
2        "All margins of excision are free of lesions and
3    are viable."
4        Q.  Do you have an opinion as to that diagnosis?
5        A.  Yes, I do.
6        Q.  What is that opinion?
7        A.  Well, I agree that there is, in fact, squamous
8    mucosa tissue and that it does, in fact, show patchy
9    submucosal chronic inflammation.  There's also some
10   vascular congestion, which I interpret as likely
11   procedural during the -- i.e., it was introduced during
12   the surgical procedure.
13       There is some edema, and there was also some
14   focal parakeratosis, which you often see in prolapsed
15   squamous tissue.
16       Q.  Okay.
17       A.  There were also fragments of hair bearing skin
18   from the perineum in addition to the fragments of vaginal
19   mucosa.  And, in fact, I think the predominant tissue was
20   actually perineal tissue, it wasn't vaginal tissue.
21       I think we counted, I don't know, 18 or 19
22   fragments of tissue total, and I believe 13 of them were
23   the perineum, and it was -- the minor component was
24   actually squamous mucosal tissue.
25       Q.  What does that indicate to you as a pathologist?

Page 35

1        A.  It indicates there was a significant amount of
2    that perineal tissue that was removed during that
3    procedure.
4        Q.  Do you disagree with the diagnosis in this
5    pathology report?
6        A.  I agree with the diagnosis.  I just think it's
7    incomplete because they didn't note that there was a fair
8    amount of skin there as well, but other than that, there's
9    no substantive disagreement at all.
10       Q.  Okay.  And if someone sitting on the jury asks
11   for the most plain English way to communicate the findings
12   of this pathology report, what would your testimony be?
13       A.  That there was a -- let's stop.  Ask the question
14   again.
15       Q.  Here's what I'm getting at.  These are some
16   complicated concepts, terms that people aren't commonly
17   familiar with, right?
18       A.  Correct.
19       Q.  Very specific to the pathology field?
20       A.  Correct.
21       Q.  So if someone's sitting in the juror box and a
22   juror says, "I don't understand anything that you just
23   said," could you break it down in language that someone
24   who is not a pathologist could understand?  That's what
25   I'm getting at.

Page 36

1        MR. WES:  Object to form.
2        THE WITNESS:  Yes, I can try to do that.  So
3    looking at the slides, there were -- first of all, all the
4    tissue that was submitted to the pathologist was actually
5    submitted for a histological examination.  Sometimes we
6    just do representative submission, but all of it -- all
7    was submitted.  I just wanted to be sure that I was
8    correct.
9        Of that tissue -- of those tissue fragments, I
10   actually have the numbers here now I noticed.  Eight were
11   from the vagina, and those vaginal fragments show changes
12   that are consistent with prolapse, which is bulging of the
13   vagina usually distally, which is part of the reason
14   why -- indirectly part of the reason she was having
15   urinary incontinence.
16       In addition, there were multiple fragments of
17   skin that was removed along the region of the opening of
18   the vagina.  And in fact, there were more fragments of
19   that than the vaginal tissue.  There were 13 fragments of
20   those.
21       MR. JONES:  Q.  And other than your comment about
22   it being incomplete, you don't have any substantive
23   disagreements?
24       A.  That's correct.
25       Q.  Okay.  Let's move on to Exhibit L-3, which is the

Page 37

1    path report related to the explant surgery, right?
2        A.  Correct.
3        Q.  What were the find -- final diagnosis in this
4    pathology report related to the explant surgery?
5        A.  "One irregularly shaped portion of mesh-like
6    material with surrounding portions of fibroconnective and
7    focally non-keratinized squamous epithelial, back slash,
8    mucosal tissue with mild chronic inflammation, back slash,
9    fibrosis with no dysplasia or malignancy identified."
10       Q.  Do you have any substantive disagreement with
11   that diagnosis?
12       A.  No, I don't.  I would add, if that's all right,
13   that the specimen -- the tissue's really fragmented and
14   the mesh material is really fragmented from the
15   processing.  And so it's -- this particular pathologist
16   didn't make a lot of comments about the mesh, and that's
17   largely because it's -- it's a distorted specimen from
18   processing.
19       Q.  What processing are you speaking about?
20       A.  The -- I think the removal and then the
21   sectioning, the tissue sectioning.  I think the way it was
22   embedded and then the knife cut.  It likely -- a
23   combination of those factors.  There is -- in addition,
24   there was an area of mucosal disruption if -- I think
25   that's the best term to use.

10  (Pages 34 to 37)

Teri A. Longacre, M.D.

Page 38

1     And in association with that area of mucosal
2  disruption, there was more inflammation than was evidenced
3  around that actual mesh material.  And there was some
4  organizing fibrosis, which I interpret as a non-healing
5  wound.  And this was associated, of course, with the
6  mucosal aspect, not the underlying mesh material, which
7  was in the submucosal tissue.
8     Q.  Okay.  So there's some healing issues involved
9  here?
10    A.  Yes.  In this mucosal wound, yes.
11    Q.  Okay.  And you talked earlier about smoking and
12  diet and diabetes being related to healing, correct?
13    A.  Correct.
14    Q.  Will you be offering an opinion in this case that
15  there was impaired wound healing from Ms. Perry and the
16  cause of that impaired wound healing was her diet and her
17  smoking behavior?
18    MR. WES:  Object to form.
19    THE WITNESS:  My opinion is that there is a
20  non-healing wound, and it appears chronic.  And there are
21  a variety of factors that may contribute to non-healing
22  wounds, and some of these factors are smoking, you know,
23  diabetes.  I mean, alcohol intake, I don't know that she's
24  a big drinker, but I mean there's a whole lot of factors
25  that could play into non healing, impaired vascular

Page 39

1  supply, et cetera.
2     MR. JONES:  Q.  Okay.  Have we covered all of the
3  aspects of both pathology reports related to the opinions
4  that you intend to offer in this case?
5     A.  Well, there's a -- essentially we have, yes.
6  Other than this non-healing wound and the thin layer of
7  lymphocytes and macrophages around the mesh material,
8  which you would expect to see, there really were very few
9  giant cells.
10    There really wasn't a significant multinucleated
11  sort of -- multinucleated giant cell reaction, foreign
12  body giant cell reaction.  There's nothing concerning
13  about the response of the tissue to the mesh material.
14    Q.  Okay.
15    A.  There is normal vascularization of the tissue.
16  There's no significant acute inflammation, and by that I
17  imply there's no evidence of infection because infection
18  would be one reason to have a non-healing wound, of
19  course.
20    There were also no large nerve fibers.  I
21  received several unstained slides.  And I did an S-100
22  stain on one of the unstained slides, and there were small
23  little nerve twigs, none of which were abnormal in
24  configuration.  They were in the appropriate distribution
25  of the submucosal tissue.

Page 40

1     There was no evidence of a traumatic neuroma.
2  There was certainly no large nerve fiber.
3     Q.  What does that mean?
4     A.  So part of the reason she was having the mesh
5  removal is pain.  Certainly part of it was the husband,
6  but she also had some pain.  And although we often don't
7  see an obvious cause of pain when we examine histologic
8  tissue removed from patients with pain, sometimes we do
9  see the cause of it, and one of them would be a large
10  nerve sitting right next to a foreign body.  You would
11  assume -- or you would presume that that was probably
12  impinging on that nerve.
13    Q.  Okay.  Impinging or entrapped or --
14    A.  Or just anything.  Just pushing on it will cause
15  pain, but there were no large nerves there.
16    Q.  Okay.
17    A.  And then the only other thing is there was no
18  real necrosis.  Again, necrotic tissue will not heal, but
19  I didn't see any necrosis.
20    Q.  Okay.  You said that one of the reasons why
21  Ms. Perry had the mesh removed was because of pain,
22  correct?
23    A.  Correct.
24    Q.  And you said often you won't see factors that
25  would indicate pain in the histology, correct?

Page 41

1     MR. WES:  Object to form.
2     THE WITNESS:  I think what I was trying to convey
3  is that -- let's see.  Clinical and histologic correlation
4  or clinical pathologic correlation is not always perfect
5  in cases of pain, first of all.  We may not see any good
6  cause of pain, and the patient has pain.
7     We may also see what we interpret as a cause of
8  pain, i.e., a large nerve, and maybe the patient never had
9  pain.  You call up and you say, well, oh, that's
10  interesting, the patient never complained about it.
11    So that correlation is not perfect.  That doesn't
12  mean we still don't try.  That's the only point I was
13  making
14    MR. JONES:  Q.  Sure.  What does cause pain?
15    MR. WES:  Object to form.
16    THE WITNESS:  That's a very complicated question.
17    MR. JONES:  Q.  Do we know what causes pain?
18    MR. WES:  Object to form.
19    THE WITNESS:  Well, at some level we know that
20  there are sensory nerves that if they are injured or sense
21  obnoxious stimuli, we perceive pain.  That's a simple way
22  of talking about it, and I don't know that we want to go
23  in much more depth.
24    MR. JONES:  Q.  No.
25    A.  And that's really not in my area of what I want

Teri A. Longacre, M.D.

Page 42

1    to be doing with my opinion.
2        Q.  Okay.
3        A.  If that's okay with you.
4        Q.  It is okay.  Here Ms. Perry is complaining of
5    pain, correct?
6        A.  Correct.
7        Q.  And is there anything in the pathology records
8    that would indicate what the cause of her pain is?
9        A.  Okay.  So I'm not so certain about the actual
10   pathology reports, but I do think the abundant material of
11   that perineal, the skin around the vaginal introitus,
12   suggests that perhaps the result -- resulted in too much
13   narrowing of that opening, vaginal opening, and that will
14   certainly cause pain.
15       Q.  Will you be giving an opinion in this case that
16   Ms. Perry's pain is caused by vaginal narrowing?
17       A.  I think to a certain extent it is, yes.
18       Q.  Is the mesh causing Ms. Perry any pain?
19       A.  I see no histologic evidence for that, no.
20       Q.  It doesn't mean that the mesh isn't causing her
21   pain, it just means you don't see anything in the
22   histology that would --
23       MR. WES:  Object to form.
24       MR. JONES:  Q.  -- be indicative of mesh causing
25   the pain?

Page 43

1        A.  I think that's -- I think it's okay to say that,
2    yes.
3        Q.  Okay.
4        A.  There's nothing on the basis of what I see that I
5    would expect that that -- or attribute any of that pain to
6    the mesh.
7        Q.  And as we discussed before, there's not a perfect
8    correlation there between what you see in the histological
9    records and how it relates to pain?
10       MR. WES:  Object to form.
11       THE WITNESS:  I think that's correct, yes.
12       MR. JONES:  Q.  Sometimes you look at the
13   pathology and there's something there and you say, yep,
14   this is causing the pain, correct?
15       A.  Oh, I see what you're asking.  Yeah, on occasion
16   we do.  I guess the point I was trying to make about the
17   mesh not -- there's no evidence for the mesh being the
18   etiologic -- the cause, if you will, of her pain is that
19   number one, I don't see anything in the slides.  That's
20   the first observation.
21       And the second observation is that based on all
22   my experience looking at lots and lots of foreign
23   material, this looks -- the response, the normal tissue
24   response, to this mesh material looks similar if not -- or
25   if anything much milder than I have seen with other

Page 44

1    foreign material that has not been associated with pain at
2    all.
3        So I would not expect that to be associated with
4    pain, either.  Not only do I not see anything, I would not
5    expect pain to be associated with this mesh --
6        Q.  Okay.
7        A.  -- based on all my experience and in this
8    particular case as well.
9        Q.  What experience are you referencing?
10       A.  Looking at all kinds of foreign materials that
11   have been removed from all different organs.
12       Q.  What foreign materials?
13       A.  Mesh as well as all kinds of medical devices.
14       Q.  What type of mesh?
15       A.  Some of them would be propylene.  I don't know
16   all the meshes.
17       Q.  So you've --
18       A.  Any foreign material basically.
19       Q.  So you've examined explanted polypropylene mesh
20   from the vagina before?
21       A.  Yes.
22       Q.  And you've seen -- what have you seen when you've
23   examined explanted transvaginal mesh?
24       A.  Often findings very similar to this.  In some
25   cases I've seen more inflammation.  A couple of cases have

Page 45

1    been removed for actually acute infection, and so you see
2    it more in the way of acute inflammatory cells.
3        Q.  How many times have you examined explanted
4    transvaginal mesh?
5        A.  I would -- I'm estimating.  I would say grossly
6    it would -- minimal would be probably a couple dozen and
7    then microscopically half a dozen.  We don't do
8    microscopic examinations on all explanted mesh material.
9        Q.  When did -- these 24 times, roughly, that you've
10   examined explanted transvaginal mesh, when did that occur?
11   What time frame?
12       A.  Oh, in the last -- as far as I can remember, I
13   don't really know.
14       Q.  Last 20 years?
15       A.  I've been practicing -- well, maybe not 20.  Last
16   ten.
17       Q.  Okay.
18       A.  I mean, I don't remember that far.  But it's just
19   in my regular practice, not any kind of -- not in the
20   context of a legal case by any --
21       Q.  That was going to be my next question.  So in the
22   course of your normal pathology practice, you've examined
23   roughly two dozen explanted transvaginal mesh?
24       A.  I would say minimum.
25       Q.  Minimum.

12  (Pages 42 to 45)

Teri A. Longacre, M.D.

Page 46

1    A.  Yes.
2    Q.  But --
3    A.  Likely more.
4    Q.  Likely more?
5    A.  But minimum, yes.
6    Q.  Can you give a range?
7    A.  Oh, no.
8    Q.  Ceiling floor?
9    A.  Oh, I don't think more than -- I would say
10   probably not more than three dozen.
11   Q.  Okay.
12   A.  But I mean, I could be wrong.
13   Q.  When you've examined these explanted transvaginal
14   mesh implants, why were you doing that?
15   A.  Because they were submitted to pathology.
16   Q.  Okay.  Do you know why the mesh was removed?
17   A.  Sometimes we do, and sometimes we don't.
18   Q.  Okay.  It's fair to say women don't have mesh
19   removed unless there's some sort of complication that
20   presents itself that makes it appropriate to remove that
21   mesh, correct?
22       MR. WES:  Object to form, assumes facts not in
23   evidence.
24       THE WITNESS:  It -- typically you would expect
25   that, but I don't know that that was always the case in

Page 47

1    some of the cases that I reviewed.
2        MR. JONES:  Q.  But it's fair to say women have
3    mesh removed because of complications, right?
4        MR. WES:  Same objection.
5        THE WITNESS:  I -- I'm not sure I feel
6    comfortable saying yes to that because, as I say, there
7    was a fair number that we get the mesh in, and there's no
8    clinical history.  So I don't -- when I get a clinical
9    history of a complication, yes, absolutely, that's why
10   they're removing it.
11       MR. JONES:  Q.  Okay.
12   A.  Otherwise, I don't necessarily know why.
13   Q.  When Ethicon sells the TVT Abbrevo mesh, it
14   doesn't intend for that mesh to be removed, correct?
15       MR. WES:  Object to form, outside the scope of
16   her opinions.
17       THE WITNESS:  It really is outside my scope.
18       MR. JONES:  Q.  You don't know one way or the
19   other whether --
20   A.  It's not --
21   Q.  -- mesh is removed?
22   A.  -- implanted as a temporary.  My understanding it
23   is not considered -- you know, this is -- you know, like
24   birth control implants they take out after three years.
25   That's not what the intended life span of these mesh is.

Page 48

1    That I can say, yes.
2    Q.  Let me ask a better question.  When Ethicon sells
3    the TVT Abbrevo mesh, it's intended to be a permanent
4    implant?
5    A.  I believe so, yes.
6        MR. WES:  Same objection.
7        MR. JONES:  Q.  Let's get back to your opinion
8    summary.  And we already talked about your overall
9    conclusions related to the pathology reports, correct?
10   A.  Yes, I think so.
11   Q.  We've covered that.  Are there any additional
12   opinions related to the pathology slides that you reviewed
13   beyond the pathology report?
14   A.  I don't think so.  I'm not sure I'm understanding
15   your question.
16   Q.  Yeah, let me ask a better question.  What
17   opinions will you be giving related to the pathology
18   slides in this case?
19   A.  My opinion is that there is mesh material
20   present, that it is lined by a very thin layer of
21   lymphocytes and macrophages with associated fibrous
22   tissue, which is normal and expected.
23       There is no other abnormality or concerning
24   finding associated with the mesh itself.  However, there
25   is a mucosal non-healing wound that is not attributed to

Page 49

1    the device itself but I think is likely a complication
2    from the surgery on the prior incision.
3    Q.  In jumping ahead to page 3, number III, "Overall,
4    chronic inflammation is mild with focal area of more
5    moderate inflammation at the site..."
6        What do you mean by that?
7    A.  Again, there's a very minimal chronic
8    inflammation in the submucosal tissue, and it's comparable
9    in amount to the presence of the chronic inflammation that
10   was present in her vaginal tissue at the time of the mesh
11   insertion.
12       However, at that area of the mucosal disruption,
13   there's more significant, more moderate -- it's a more
14   striking and chronic inflammatory process, which is in
15   keeping with this chronic non-healing wound.
16   Q.  Let's move to 14.  "No evidence of shrinkage of
17   the mesh in vivo."
18       What do you mean by that?
19   A.  I was asked was there evidence of shrinking, and
20   first of all, I mean, I don't know how you'd know that
21   other than obviously a huge retraction, which there's not.
22   But there's no dense scarring or fibrosis that would lead
23   you to think that it's been compressed.
24       And then I just wanted to emphasize that if
25   people were going to try and extrapolate the measurements

13 (Pages 46 to 49)

Teri A. Longacre, M.D.

Page 50

1  of the tissue that was removed and make a comparison to
2  what normal mesh should be measuring, that that's a bit
3  inaccurate would be the polite way to say that.
4       As soon as you remove anything from the body, it
5  retracts.  Any kind of tissue retracts.  And then once
6  it's in formalin, it retracts even more.  Formalin
7  fixate -- fixation.  And measurements in a gross are
8  rough.  They're using quick millimeters.  They're not
9  doing exact measurements.  So that's the only point I
10  wanted to make.  Surgeons are well aware of that.
11      Q.  Have you reviewed any testing by Ethicon related
12  to shrinking mesh?
13      A.  No.
14      Q.  Okay.
15      A.  Not that I recall.
16      Q.  So you don't know one way or the other if the
17  testing that you just described is inaccurate, whether
18  Ethicon's run that actual testing or not?
19      MR. WES:  Object to form, outside the scope.
20      MR. JONES:  Q.  Meaning the gross measurements
21  of look at the size pre-implant, look at the size
22  post-implant, there's a difference, ah-ha, there must be
23  shrinkage?  That's what you're referring to as
24  inadequate or inaccurate, right?
25      A.  Correct.

Page 51

1       MR. WES:  Same objection.
2       THE WITNESS:  Yes.  I'm not sure about -- no, I
3  don't know that an Ethicon study has done that.
4       MR. JONES:  Q.  Okay.
5       A.  That I'm aware of, no.
6       Q.  Are you aware of any testimony from Ethicon
7  doctors, medical directors or engineers or internal
8  Ethicon documents that state the mesh used in the TVT
9  shrinks up to 50 percent?
10      MR. WES:  Object to form, outside the scope.
11      THE WITNESS:  It really is not part of my
12  opinion.
13      MR. JONES:  Q.  So that doesn't matter to you
14  either way whether Ethicon itself says mesh shrinks?
15      MR. WES:  Same objections.  Also, argumentative.
16      MR. JONES:  Q.  Let me restate the question.
17  Does it matter to you in forming your opinions in this
18  case that Ethicon employees, including medical directors
19  and engineers, have stated that the mesh used in the TVT
20  Abbrevo device shrinks up to 50 percent?
21      MR. WES:  Same objections.
22      THE WITNESS:  In the formation of my opinion,
23  looking at the slides, it has no relevance, yes.  Those
24  things may all be true, but that's not part of my opinion
25  and --

Page 52

1       MR. JONES:  Q.  Will you be giving an opinion in
2  this case that the mesh does not shrink?
3       A.  No.
4       MR. WES:  Object to form.
5       MR. JONES:  Q.  Okay.  Your opinion is I've
6  looked at the pathology records, I don't see anything
7  indicative of mesh shrinkage?
8       A.  Yes.  If you mean the slides and the pathology in
9  the pathology reports, absolutely, yes.
10      Q.  Okay.  Have you reviewed any medical literature
11  related to shrinkage of mesh in vivo?
12      A.  Yes, I believe I have.
13      Q.  What literature would that be?
14      A.  I don't recall it off the top of my head, but I'm
15  sure it's on that device that they -- the USB device that
16  would involve all the materials they provided me.
17      Q.  So we can take that thumb drive that you and
18  counsel have provided, look at the medical literature
19  there and find articles related to mesh shrinkage that you
20  have read and reviewed?
21      A.  That I have reviewed.
22      Q.  Okay.
23      A.  There's levels of review, yes.
24      Q.  Okay.  What levels of review?
25      A.  Well, again, this is not exactly in my area of

Page 53

1  expertise -- or at least it's not in the area of where I'm
2  forming my opinions.  So I didn't focus my attention
3  chiefly on that.  I focused my attention on the pathology.
4       Q.  Okay.  And then the final entry on the summary of
5  opinion under number 16.  Can you explain what you mean
6  there?
7       A.  Certainly I think I may have mentioned this
8  already.  Number 16 basically reads:  Other than a
9  non-healing wound, which is present in the region of the
10  vaginal mucosa and not attributable to the device or to
11  the mesh itself, there is really no significant tissue
12  reaction to that mesh other than the thin layer of
13  lymphocytes and macrophages that's expected.  There's no
14  dense fibrosis.
15      All those things that I said were not there are
16  not there, and I think that that wound is likely a
17  complication from the surgical procedure.  The incision
18  may have healed initially but must have broke down.
19  'Cause it really does look like it's a chronic non-healing
20  wound to me.
21      Q.  Any additional opinions you intend to offer in
22  this case that we haven't discussed and are not included
23  on this summary of opinion sheet?
24      A.  No.
25      Q.  We've covered it all?

14 (Pages 50 to 53)

Teri A. Longacre, M.D.

Page 54

1    A.  I believe we have.
2    Q.  Okay.
3    A.  Either we have in this deposition or it's on this
4  sheet, yes.
5    Q.  Okay.  And -- excuse me.  Just in an attempt to
6  try to break it down, there's some healing issues involved
7  in this case, correct, in your opinion?
8    A.  Yes.
9    Q.  Impaired healing, correct?
10    A.  Correct.
11    Q.  And it's your opinion the mesh is not the cause
12  of Ms. Perry's pain, correct?
13        MR. WES:  Object to form.  It assumes facts.
14        THE WITNESS:  It's my opinion that it's highly
15  unlikely that the mesh is what's causing her pain.  I
16  think that's true based on what I've seen and reviewed.  I
17  think it's for more likely attributed to the colporrhaphy
18  procedure.
19        MR. JONES:  Q.  Why do you say that?
20    A.  For the reasons that I mentioned earlier.  In
21  other words, the removal of all that skin tissue around
22  the vaginal opening causing that opening to be narrower
23  and tighter.
24    Q.  Okay.  Let's move on to what you're relying on
25  for the opinions that you've discussed.

Page 55

1        Counsel, did you bring with you some materials
2  today that include her reliance materials --
3        MR. WES:  Yes.
4        MR. JONES:  -- that we can mark for the record?
5        MR. WES:  They are on this flash drive.
6        MR. JONES:  Okay.  I'm going to go ahead and mark
7  this flash drive as L-4.  I'll take it with me, but we'll
8  mark it for the record as Exhibit L-4.
9        (Whereupon, Exhibit L-4 was marked for
10        identification.)
11        MR. JONES:  Q.  On this thumb drive -- first off,
12  Doctor, did you create this thumb drive?
13    A.  No.
14    Q.  Counsel created this for you?
15    A.  Yes.
16    Q.  Have you looked at what's on this thumb drive?
17    A.  No.
18    Q.  Okay.  You've relied on counsel to adequately put
19  all your reliance materials on this thumb drive?
20    A.  Yes.
21    Q.  Okay.  So if there's a mistake, it's their fault,
22  right?
23    A.  Their mis --
24    Q.  That's tough.
25    A.  -- take -- their mistake.

Page 56

1    Q.  Did you review every single item on this thumb
2  drive?  First off -- let me backtrack.
3        Do you know what's on this thumb drive?
4    A.  My understanding is it's everything that's been
5  sent to me.
6    Q.  Did you review everything that was sent to you?
7    A.  No, I have not reviewed everything.  There's been
8  a number of things that have been sent in the last few
9  days that I've not reviewed.
10    Q.  What's been sent in the last few days?
11    A.  I'm not even sure what they are.  There was
12  something that came last night.  I have not opened it
13  so...
14    Q.  Okay.
15    A.  Some of it may be depositions --
16    Q.  Hot off the press deposition --
17    A.  -- that I'm really not aware.
18    Q.  -- transcripts perhaps.
19    A.  Well, no, it's not always that.  There's
20  something --
21    Q.  Go ahead.
22    A.  -- the other day that wasn't --
23        THE REPORTER:  Okay.  I couldn't get you both
24  talking at the same time.
25        Go ahead.

Page 57

1        MR. JONES:  Q.  How can I make a determination of
2  what on this thumb drive you reviewed and what you haven't
3  reviewed?
4    A.  I don't know.
5    Q.  Okay.  I mean, you understand --
6    A.  I know.
7    Q.  -- I've got to know what you're relying on, what
8  you reviewed, right?
9    A.  Well, to a certain extent, yes.  But most of my
10  opinions that I've expressed particularly about this case
11  are really based on pathology, my review of the slides.
12  I'm really not opining on many of those things that were
13  submitted to me.
14        Yes, I'm relying on Ms. Perry's medical record
15  and all those issues that have been associated
16  with her initiating her mesh placement at the beginning
17  and then the subsequent removal of that and some of that
18  follow-up.  Those things certainly I'm using.
19    Q.  That's an easy one.
20    A.  Right.
21    Q.  Pathology slides --
22    A.  Exactly.
23    Q.  -- the pathology reports?
24    A.  And the medical records.
25    Q.  The medical records --

15  (Pages 54 to 57)

Teri A. Longacre, M.D.

Page 58

1    A. Of course, yes.
2    Q. -- Ms. Perry's deposition and Mr. Perry's
3  deposition?
4    A. Yes.
5    Q. Earlier I asked you did you review medical
6  literature related to mesh shrinkage, and you answered
7  yes, right?
8    A. I think I have, yes.
9    Q. And then I asked you what literature that was,
10  and you couldn't recall.
11    A. Correct.
12    Q. And then I said I'll be able to go to this thumb
13  drive and look at the literature related to mesh shrinkage
14  that you reviewed?
15    A. Correct.
16    Q. But you didn't review everything on this thumb
17  drive, right?
18    MR. WES: And Counsel, I can just stipulate that
19  we'll let you know what materials were added that I guess
20  she just got in the last couple of days that you haven't
21  got a chance to review. And we can narrow down for you
22  anything that -- that she hasn't reviewed as of today's
23  date in preparation of her opinions.
24    MR. JONES: I'm not so much worried about what's
25  been submitted to her the last couple of days. I more

Page 59

1  want to get the universe of what she reviewed --
2    MR. WES: Sure.
3    MR. JONES: -- versus, you know, all the stuff
4  that you sent out to her.
5    MR. WES: Yes.
6    MR. JONES: Can you endeavor to produce a list or
7  a thumb drive with materials that she actually looked at
8  so I can know what she's relying on for her opinions?
9    MR. WES: Yeah. We can narrow down -- you know,
10  if there's anything that goes --
11    MR. SNOWDEN: Those are two different questions.
12    MR. JONES: Yeah, you can answer them both if you
13  want.
14    MR. WES: Right. And so we'll -- I mean, we will
15  give you the entire universe of what she's reviewed and
16  what are -- how are the questions -- what's your second
17  question?
18    MR. JONES: It's almost an either/or question.
19    MR. WES: Okay.
20    MR. JONES: I either need a list of what she
21  actually did look at --
22    MR. WES: Right.
23    MR. JONES: -- or a thumb drive of what she
24  actually looked at.
25    MR. WES: Right. And so everything that she

Page 60

1  looked at is on this drive. We just need to tell you
2  basically what --
3    MR. JONES: Yeah.
4    MR. WES: -- is on this drive that -- that she --
5    MR. JONES: There's the road.
6    MR. WES: -- didn't necessarily look at.
7    MR. JONES: There's the road. At the moment I
8  have no way --
9    MR. WES: So we will narrow that down for you.
10  Whether it makes more sense to produce another one of
11  these -- probably it makes more sense for us to just tell
12  you, you know, here's the items on the drive.
13    MR. JONES: Okay. And you'll endeavor to do
14  that?
15    MR. WES: We will do that.
16    MR. JONES: Okay. I appreciate that.
17    Q. So it sounds like once we get a list of materials
18  that are on this thumb drive that you actually reviewed
19  then we can look at that list and decipher here's medical
20  literature that you actually reviewed, correct?
21    A. Yes.
22    Q. Okay. But at the moment everything on this thumb
23  drive you didn't review?
24    A. I don't know that I have.
25    Q. Okay.

Page 61

1    A. I may have. I don't know.
2    Q. There's just no way to tell?
3    A. I just know that they've seen things that I have
4  not reviewed, and I assume they're on that drive.
5    Q. Okay. We touched on this earlier, but I need to
6  go back to it.
7    Internal Ethicon documents, did you review any?
8    A. I may have, and if I did, they will be on that
9  disc.
10    Q. Okay. But at the moment there may be Ethicon
11  documents on this thumb drive that you didn't review?
12    A. I don't think so. I just don't recall.
13    Q. Okay.
14    A. I don't think so.
15    Q. Okay.
16    A. If I have them. If I -- I think I've seen some.
17  Again, I'm not sure what -- I don't want to sound
18  ignorant, but I'm not really sure what you're asking me
19  when you say "internal documents," quite honestly.
20    Q. Testing that Ethicon ran.
21    A. I think I've seen some of that, yes.
22    Q. You think you have?
23    A. I think so, yeah.
24    Q. Okay. Ethicon e-mails?
25    A. No. I've not seen any e-mails that I'm aware of.

16 (Pages 58 to 61)

Teri A. Longacre, M.D.

Page 62

1    Q.  Have not reviewed a single e-mail?
2    A.  I don't think so, no.
3    Q.  Do you have any recall of what type of testing
4  documents from Ethicon you reviewed?
5    A.  Not at this point.  No, not at this time.
6    Q.  Okay.  And no recall of the specific medical
7  literature that you reviewed?
8    A.  Not specific.  I read a lot of long-term
9  follow-up studies of mesh material.  I've reviewed medical
10  literature related to colporrhapy procedures, medical
11  literature concerning indications for performing these
12  surgeries, some of the urologic society's statements about
13  recommendations for these procedures.  Those are the kinds
14  of things that I reviewed.
15    Q.  Okay.  Do you recall reviewing any literature
16  that would be contrary to the opinions you're giving in
17  this case?
18    MR. WES:  Object to form.
19    THE WITNESS:  No, I don't know of any literature
20  that would be -- that would be contrary to what I'm -- to
21  my pathology findings.  None, no.
22    MR. JONES:  Q.  What about to your any findings
23  beyond your pathology findings?
24    MR. WES:  Object to form.
25    THE WITNESS:  Yeah, I don't know what you're

Page 63

1  asking.
2    MR. JONES:  Q.  Well --
3    A.  I'm sure there's something you're asking me, but
4  I don't know what it is.
5    Q.  You limited it to your pathology findings, which
6  makes me wonder are there other findings that you're
7  speaking about?
8    A.  Oh, no.  No, I think that -- well, I mean, let's
9  just cut to the chase.  You are talking about some studies
10  that have shown shrinkage of the mesh, and I see no
11  evidence of shrinkage.  So in vivo I don't see -- once
12  it's in the body, the issue of shrinkage appears to me
13  based on my readings and what I've seen on the slides a
14  moot issue.  Not significant.
15    There may well be, and I have seen at least some
16  of these studies that talk about shrinkage.  Whether that
17  has any relevance clinically in this case and in this
18  particular patient or in general at this site, I'm not --
19  I don't necessarily see that it transfers over.  So that
20  is my opinion.
21    Q.  Okay.
22    A.  But that's it.
23    Q.  So you have reviewed literature that concludes
24  that the mesh shrinks?
25    MR. WES:  Object to form.

Page 64

1    THE WITNESS:  I've reviewed literature addressing
2  shrinkage of mesh ex vivo, invitro, not in the body.  I
3  don't know that I've read about any shrinkage in the body.
4  That's why I brought it back to pathology.
5    Q.  Okay.
6    A.  But other than that I don't remember or recall
7  any specific literature, but I know that there's
8  discussion about --
9    Q.  Are you familiar with any pathology articles by
10  Vladimir Iakolov (phonetic)?
11    A.  How do you spell that?
12    Q.  I don't know.  Does it ring a bell, though, at
13  all?
14    A.  I don't -- well, I don't know.  I don't think so.
15    Q.  Okay.
16    A.  But I might.  If you spelled it, maybe I would
17  know who it was.  Is it with a Y?
18    Q.  It's with an I.  I'll take a guess and say it's
19  I-A-K-O-L --
20    A.  I don't know.
21    Q.  -- O-V.
22    A.  It's possible.  It will be on there.
23    Q.  Did you review plaintiff's independent medical
24  examination?
25    A.  Who was that?

Page 65

1    Q.  I think Dr. Margolis.
2    A.  I reviewed his -- not his deposition, no.  I read
3  parts of it, but I don't think I've received that yet.
4    Q.  Okay.
5    A.  Or maybe that's what I received.  I've not read
6  it.  If I have received it, I have not read it.
7    MR. WES:  And listen carefully to what he asked.
8  He asked if you reviewed her -- his independent medical
9  examination, not his deposition specifically.
10    THE WITNESS:  Oh.  What's his independent medical
11  examination?  Oh.  Oh, I don't know that I've -- I may
12  have.  He took some photographs.  I did see those.
13    MR. JONES:  Q.  Okay.
14    A.  Yes.
15    Q.  Okay.  So it sounds like you have reviewed
16  plaintiff's independent medical examination --
17    A.  I may have.
18    Q.  -- by Dr. Margolis?
19    A.  I may have.  I've seen the pictures anyway.
20    Q.  And you reviewed statements from professional
21  societies like AUGS?
22    A.  Is this A-U-G-S that you're talking about?  Yes.
23    Q.  Yes.
24    Counsel provided those statements to you?
25    A.  Yes.

17 (Pages 62 to 65)

Teri A. Longacre, M.D.

Page 66

1    Q. Did you do an independent literature search?
2    A. No.
3    Q. All the literature counsel provided to you that
4    you've reviewed?
5    A. What is the question?
6    Q. Did you review any literature beyond what counsel
7    provided to you?
8    A. No.
9    Q. So it's fair to say all of the literature that
10   you've reviewed in forming your opinions in this case has
11   been provided by Ethicon's counsel?
12       MR. WES: Objection to form, misstates.
13       THE WITNESS: Well, my opinion's also based on
14   sort of, you know, my general pathology and GYN pathology
15   background and training as well, but I didn't go out and
16   actively look for an article on transvaginal mesh.
17       MR. JONES: Q. Okay.
18   A. I may have requested articles from Mr. Snowden.
19   Q. Do you have any recall of what those articles
20   were?
21   A. No. It would have been general -- not a specific
22   article, but just general topics, but no, I have not
23   pulled -- there's not anything that I've reviewed that's
24   not on that disc.
25   Q. Okay. Will you be testifying about any TVT

Page 67

1    products other than Abbrevo?
2        MR. WES: Object to form, outside the scope.
3        THE WITNESS: I'm not sure I'm really necessarily
4    testifying about Abbrevo except in this particular
5    example.
6        MR. JONES: Okay.
7        MR. WES: Are we doing okay? We've gone about an
8    hour and a half. Do you want to take a break?
9        THE WITNESS: Well, if not now, soon.
10       MR. JONES: Let's take a break.
11       (Short break taken.)
12       MR. JONES: All right. We're back on the record
13   from a quick break.
14       I want to mark for the record Exhibit L-5, which
15   is the deposition notice, Exhibit L-6, which are the
16   response and objections filed to the deposition notice.
17       (Whereupon, Exhibits L-5 and L-6 were marked
18       for identification.)
19       MR. JONES: Q. If you look real quickly at
20   Exhibit L-6, on the top left there's some law firms
21   mentioned. Do you recognize the law firm of Tucker Ellis,
22   Doctor?
23   A. Yes.
24   Q. Have you worked for Tucker Ellis in the past?
25   A. Not that I'm aware of.

Page 68

1    Q. Okay. Are you familiar with the law firm Butler
2    Snow?
3    A. Yes.
4    Q. Okay. Have you worked with the law firm Butler
5    Snow in the past beyond this particular case?
6    A. I don't believe so, no.
7    Q. Do you know William Gage?
8    A. No.
9    Q. Do you know Burt Snell?
10   A. S-N-E-L-L. I'm aware of the name. I don't know
11   if I have, actually.
12   Q. Okay.
13   A. I don't think I've met him, but whether I've
14   talked to him or not, I don't know.
15   Q. And then the third law firm listed Bowman and
16   Brooke, LLP. Are you familiar with that law firm?
17   A. Actually, I don't think I am.
18   Q. Okay. So you haven't worked for them in the
19   past?
20   A. No.
21       MR. JONES: Okay. I'll put those away. We'll
22   mark as Exhibit L-7 an invoice related to this case.
23       Go ahead and hand this to you.
24       (Whereupon, Exhibit L-7 was marked for
25       identification.)

Page 69

1        MR. JONES: Q. What does Exhibit L-7 represent?
2    A. It's an invoice that my administrative assistant
3    submitted to -- I'm not really sure where she submitted
4    it, but she -- I think -- Johnson & Johnson ultimately, I
5    think, foot the bill -- the invoice went to, but it says
6    Butler/Snowden and Ethicon Gynecare Pelvic Mesh, but I
7    think it actually ended up going to Johnson & Johnson.
8    Q. And is that what you've billed for your time in
9    this case so far?
10   A. Yes, it is.
11   Q. And is that the totality of your time thus far
12   that you've spent on this case?
13   A. No.
14   Q. No?
15   A. This is what I've billed.
16   Q. This is what you've billed?
17   A. Yes.
18   Q. Can you estimate beyond what's represented in
19   Exhibit L-7 how many hours you've spent on this case?
20   A. Yes, I can estimate.
21   Q. And what is that estimate?
22   A. Would you like that?
23   Q. Yes, please.
24   A. I think I would estimate about 24 hours in
25   discussions with attorneys and then maybe another 50,

18 (Pages 66 to 69)

Teri A. Longacre, M.D.

Page 70

1    60 hours review of literature.
2         Q.  You say 50 to 60?
3         A.  That's an estimate.  I could be off a little bit.
4    My AA is keeping recent hours, but she didn't keep the
5    early hours.  And so I'm having to go find my notes on
6    those, and I haven't found them yet.
7         Q.  And what are you charging per hour?
8         A.  $500 an hour.
9         Q.  So 24 hours with attorneys, an estimate?
10        A.  Yes.
11        Q.  Fifty to 60 hours looking at medical literature,
12   correct?
13        A.  Correct, minimum.  Perhaps a little bit more,
14   correct.
15        Q.  How about review of medical records?
16        A.  That's included.
17        Q.  Okay.  So 80ish -- around 80 hours thus far
18   you've spent working on this case?
19        A.  Yes, minimum.
20        Q.  A minimum of 80 hours so far you've spent working
21   on this case?
22        A.  Yes.
23        Q.  At $500 an hour?
24        A.  Correct.
25        Q.  So we can take your per hour fee, times it times

Page 71

1    the estimated hours you've spent on this case and get an
2    estimate of the total fees you will collect in this case?
3         A.  Well, that I will bill for them.
4         Q.  Okay.
5         A.  Yes.
6         Q.  Will you be charging $500 an hour for your
7    deposition testimony?
8         A.  Yes.
9         Q.  Do you have a different fee for trial testimony?
10        A.  I believe I do, and I do not recall that right
11   now.
12        Q.  Okay.
13        A.  My AA has that.
14        Q.  That's something you'd be willing to provide,
15   though?
16        A.  Absolutely, yes.  And I really should have
17   brought it, but I forgot.  I knew you would ask that.
18        Q.  Sometime prior to trial --
19        A.  Definitely.
20        Q.  -- we'll get a copy of that, though.
21            Is it more or less than $500 an hour?
22        A.  Well, I think it includes travel time.  I really
23   don't recall.
24        Q.  You don't have any recall of whether it's more or
25   less than your $500 an hour fee?

Page 72

1         A.  It might be by day.  I just don't -- I honestly
2    do not remember.
3         Q.  Okay.  That's common.  In addition to the $500 an
4    hour that you charge to work on this case, you're also
5    reimbursed for travel and other costs associated with this
6    case?
7         A.  Only for testimony.
8         Q.  Okay.
9         A.  There's no other -- yeah, only for testimony.
10        Q.  So $500 an hour to review records and medical
11   literature, correct?
12        A.  Yes.
13        Q.  $500 an hour to meet with attorneys and discuss
14   the case?
15        A.  Yes.
16        Q.  And then a separate fee for trial testimony,
17   correct?
18        A.  Yes.
19        Q.  And then reimbursement of travel expenses, for
20   example, to trial and if you are called to testify?
21        A.  Correct.
22        Q.  Okay.  Does that represent the total universe of
23   the fees that you'll be charging in this case?
24        A.  Yes.
25        Q.  Doctor, do you have a field of specialty inside

Page 73

1    of the field of pathology?
2         A.  Yes.
3         Q.  What is that area of specialty?
4         A.  Broadly speaking it's surgical pathology, but
5    within the realm of surgical pathology, I'm a gynecologic
6    pathology and GI pathology subspecialist.
7         Q.  Do you have a major emphasis in a particular area
8    related to cancer?
9         A.  Most of my research is centered around GYN or GI
10   cancer, yes.
11        Q.  Okay.  Do you hold yourself out on a Stanford
12   website to have a major emphasis in ovarian cancer and
13   ovarian tumors?
14        A.  Yes.
15        Q.  Okay.  Most of your research -- in fact, close to
16   all of your research is related to cancer, correct?
17            MR. WES:  Object to form.
18            THE WITNESS:  Not all -- not all of it.
19            MR. JONES:  Q.  The majority of your research is
20   related to cancer, correct?
21            MR. WES:  Same objection.
22            THE WITNESS:  A substantial amount of my research
23   is related to cancer.
24            MR. JONES:  Q.  Have you ever published an
25   article relating to polypropylene?

19  (Pages 70 to 73)

Teri A. Longacre, M.D.

Page 74

1    A.  No.
2    Q.  Have you ever published an article related to
3  stress urinary incontinence?
4    A.  No.
5    Q.  Have you ever published an article related to
6  pelvic mesh?
7    A.  No.
8    Q.  So your area of specialty is not pelvic mesh,
9  correct?
10        MR. WES:  Object to form.
11        THE WITNESS:  That's correct.  I am not a pelvic
12  mesh product expert --
13        MR. JONES:  Q.  Okay.
14    A.  -- or focused on that in research.
15    Q.  Have you published any articles on mesh
16  complications?
17    A.  No.
18    Q.  Have you taught any courses related to
19  polypropylene?
20    A.  No.
21    Q.  Made any presentations related to polypropylene?
22    A.  No.
23    Q.  Taught any courses related to pelvic mesh?
24    A.  No.
25    Q.  Made any presentations related to pelvic mesh?

Page 75

1    A.  No.
2    Q.  Have you reviewed any material safety data sheets
3  in this case?
4    A.  What are -- I may have.  I'm not sure what a
5  material safety data sheet is.
6    Q.  Okay.
7        MR. JONES:  I'm going to mark as Exhibit L-8 a
8  copy of your CV, which I will give you.
9        (Whereupon, Exhibit L-8 was marked for
10        identification.)
11        MR. JONES:  Q.  I just have a few questions about
12  your CV.  Under professional memberships, page 2, you've
13  been a member of the International Society of
14  Gynecological Pathologists since 1996, correct?
15    A.  Correct.
16    Q.  Since you've been a member of that organization
17  since 1996, has there ever been a discussion of
18  polypropylene mesh used in mid -- I'll rephrase the
19  question.
20        Since you've been a member of the International
21  Society of Gynecological Pathologists, has there ever been
22  a discussion of complications resulting from transvaginal
23  mesh?
24        MR. WES:  Object to form, overbroad.
25        THE WITNESS:  When you ask this question, are you

Page 76

1  asking me was there a formal seminar or meeting to discuss
2  these?
3        MR. JONES:  Q.  I'll break it down.  First I'll
4  ask you related to formal seminars or meetings.
5    A.  No.
6    Q.  Informal discussions?
7    A.  None that I'm aware of.
8    Q.  Okay.  So since 1996 as a member of the
9  International Society of Gynecological Pathologists, you
10  have no recall whether in formal meetings or informal
11  conversations of complications resulting from transvaginal
12  mesh?
13        MR. WES:  Object to form.
14        THE WITNESS:  That's correct.
15        MR. JONES:  Q.  Would that hold true for these
16  other societies that you're a member of?
17        MR. WES:  Object to form.
18        THE WITNESS:  Again, there's no -- I'm not aware
19  of any discussions.  I don't go to all these meetings.
20  There may have been one that occurred, but nothing that
21  I'm aware of or attended or even recall being posted that
22  one would be -- there would be one.
23        MR. JONES:  Q.  If you turn to page 4 under
24  "Editorial Board," you've listed several journals that you
25  serve on the Editorial Board for; is that correct?

Page 77

1    A.  Yes.
2    Q.  Since 1996 you've served on the Editorial Board
3  of the International Journal of Gynecological Pathology?
4    A.  Yes.
5    Q.  Do you have any recall of ever seeing a single
6  article related to mesh complications in your role as an
7  editor on the International Journal of Gynecological
8  Pathology?
9        MR. WES:  Object to form.
10        THE WITNESS:  No, I've never reviewed an article
11  on that.
12        MR. JONES:  Q.  Have you ever reviewed an article
13  on mesh complications?
14    A.  For publication?
15    Q.  (Nods head.)
16    A.  No.
17    Q.  In your role as an editor on these journals, have
18  you ever reviewed an article related to polypropylene?
19    A.  No, or at least not that I remember.
20    Q.  Okay.  Then you have Journal Ad Hoc Reviewers,
21  and you have listed the American Journal of Obstetrics and
22  Gynecology, correct?
23    A.  Correct.
24    Q.  And so you've reviewed articles that are being
25  submitted for publications in that journal?

Golkow Technologies, Inc. - 1.877.370.DEPS

Teri A. Longacre, M.D.

Page 78

1    A.  Correct.
2    Q.  Have you ever reviewed any articles related to
3  polypropylene?
4    A.  Not that I'm aware of.
5    Q.  Have you ever reviewed any articles related to
6  transvaginal mesh?
7    A.  Not that I'm aware of, no.
8    Q.  Have you ever reviewed any articles related to
9  mesh complications?
10    A.  No.
11    Q.  If you go to page 8.  You've listed courses that
12  you've taught, correct?
13    A.  Correct.
14    Q.  And at the very bottom there's a course with the
15  date 2013 called "Human Health and Disease," correct?
16    A.  Correct.
17    Q.  And that's within the gynecologic pathology
18  field, correct?
19    A.  Yes.  I'm not seeing where you're referring to,
20  but yes.
21    Q.  Okay.  Page 8.
22       MR. WES:  Is this the version of the CV that we
23  just gave you, or is this a different version?
24       MR. JONES:  Could be a different version.
25       THE WITNESS:  Must be.

Page 79

1       MR. WES:  Because I think what we gave you was
2  the most up-to-date CV.
3       MR. JONES:  Q.  Okay.  Well, do you see on the CV
4  you have a copy of where you've listed courses that you've
5  taught?
6    A.  Yes.
7    Q.  And you've listed a course for 2013 called "Human
8  Health and Disease," correct?
9    A.  Yes.
10    Q.  Within the gynecologic pathology --
11    A.  Yes.
12    Q.  -- correct?
13    A.  Yes.
14    Q.  What did that course entail?
15    A.  Oh, this is a medical student course, so it's
16  about basic endometrial -- basic uterine service and
17  vulvar and vaginal pathology.
18    Q.  Okay.
19    A.  That's what it's about.
20    Q.  Any discussion of polypropylene in that course?
21    A.  No.
22    Q.  Mesh complications?
23    A.  No.
24    Q.  Transvaginal mesh?
25    A.  No.

Page 80

1    Q.  Have you taught any courses related to
2  polypropylene ever?
3    A.  No.
4    Q.  Have you ever taught any courses related to
5  transvaginal mesh?
6    A.  No.
7    Q.  Okay.  On a copy of your CV that I have, it's
8  page 26, you've listed quite a few articles where you have
9  been an author, correct?
10    A.  Correct.
11    Q.  And I have it as number 71.  The title of the
12  article is "Ovarian Carcinosarcomas Associated with
13  Prolonged use of Tamoxifen."
14    A.  Correct.
15    Q.  Do you have -- and that was published in 2009?
16    A.  Correct.
17    Q.  Do you have a recall of the subject matter of
18  that article?
19    A.  I think it was a report of some ovarian
20  carcinosarcomas that occurred in patients who had been
21  using Tamoxifen basically.
22    Q.  And what is Tamoxifen?
23    A.  It's a -- it's a hormonal -- really more agonist,
24  slash, antagonist for estrogen that's being treated --
25  women with breast cancer are treated with.

Page 81

1    Q.  Is it a drug that's been cleared by the FDA?
2    A.  Yes.
3    Q.  It's been on the market for 40 years,
4  thereabout?
5       MR. WES:  Object to form, foundation.
6       THE WITNESS:  It's been on the market for a
7  while.
8       MR. JONES:  Q.  Okay.  And in what article did
9  you find an association between Tamoxifen and ovarian
10  sarcomas?
11    A.  There was possible association between ovarian
12  carcinosarcomas and Tamoxifen.  And that was what he was
13  reporting, the first author, Oscar Lavie.
14    Q.  Okay.  Did you also -- was there also a finding
15  that in that article that it was a delayed response to the
16  Tamoxifen?
17    A.  I don't know that it's a -- delayed occurrence.
18  And actually probably not even delayed.  I mean, it's
19  basically prolonged use.
20    Q.  Then you have listed some books and book chapters
21  in preparation in your CV, correct?
22    A.  Yes.
23    Q.  And number one, you list yourself as chief editor
24  of Gynecologic Pathology, eMedicine from WebMD, correct?
25    A.  Yes.

21 (Pages 78 to 81)

Teri A. Longacre, M.D.

Page 82

1    Q.  Has that -- is that still in preparation, or has
2  that been published yet?
3    A.  It's still in preparation.
4    Q.  Okay.  Is there any discussion within that book
5  of polypropylene?
6    A.  No.
7    Q.  Transvaginal mesh?
8    A.  No.
9    Q.  Mesh complications?
10    A.  No.
11    Q.  That's all the questions I have about your CV.
12  You can put that away.
13        Do you specialize in how the body reacts to
14  polypropylene?
15        MR. WES:  Object to form.
16        THE WITNESS:  As a pathologist I have expertise
17  in interpreting tissue response to foreign material in
18  general, and that would include polypropylene.
19        MR. JONES:  Q.  In your experience as a
20  pathologist, are mesh explants stored in any type of
21  material to preserve them?
22    A.  They're often submitted -- because there's
23  associated tissue at some level with them, they're often
24  submitted in formalin fixative.
25    Q.  Okay.  Is that the customary practice that you

Page 83

1  see as a pathologist?
2    A.  Yes.
3    Q.  Do you have any opinions about that subject
4  matter that you'll be giving in this case, specifically
5  related to the formalin that it's preserved in?
6        MR. WES:  Object to form, vague.
7        THE WITNESS:  I think we touched a little bit on
8  it earlier in that formalin shrinks tissue.
9        MR. JONES:  Q.  What about mesh?  How does the
10  formalin affect mesh?
11        MR. WES:  Same objection.
12        THE WITNESS:  I don't know how formalin
13  necessarily affects mesh.
14        MR. JONES:  Q.  Okay.
15    A.  To the extent that there's tissue attached, there
16  would be shrinkage as well, but actual mesh material in
17  interaction with formalin, I don't know.
18    Q.  Will you be giving any opinions related to
19  degradation of mesh in this case?
20    A.  No, I will not.
21        MR. WES:  Object to form, outside the scope.
22        MR. JONES:  Q.  I want to ask you a series of
23  questions about your experience as a litigation consultant
24  or expert.
25        Can you give an estimate of how many depositions

Page 84

1  you've given in your role as an expert witness?
2    A.  I think less than 50, but it may be somewhere in
3  that range.
4    Q.  How many times have you testified at trial?
5    A.  Maybe half a dozen.  Not that often.
6    Q.  Do your fees for your litigation consulting and
7  expert work make up a significant amount of your salary
8  and revenue?
9    A.  No.
10    Q.  Have you ever acted as an expert prior to this
11  case on transvaginal mesh?
12    A.  No.
13    Q.  Hernia mesh?
14    A.  No.
15    Q.  Have you ever worked for Johnson & Johnson prior
16  to this case?
17    A.  I don't think so, but it's a big company with a
18  bunch of subsidiaries so...
19    Q.  It is.
20    A.  But not that I know.
21    Q.  How about Ethicon?
22    A.  No.
23    Q.  In this case did you conduct any testing
24  yourself?
25    A.  Other than that S-100 immunohistochemical stain,

Page 85

1  no.
2    Q.  Are there peroxides that are naturally present
3  inside the vagina?
4    A.  I'm not sure what that -- what you're asking.
5    Q.  Okay.  Is the vagina a highly acidic area?
6        MR. WES:  Object to form.
7        THE WITNESS:  It has a low ph.  I don't know if
8  it's highly acidic.  And the ph can change depending upon
9  the flora that's there and whether patients taking
10  antibiotic use, et cetera.
11        MR. JONES:  Q.  Do you have expertise in the
12  flora or peroxides or ph balance of the vagina?
13    A.  That's not --
14        MR. WES:  Object to form.
15        THE WITNESS:  -- within the realm of my opinion
16  in this case.
17        MR. JONES:  Q.  Perfect.  Does the inflammatory
18  response of transvaginal mesh ever stop?
19    A.  Well, so with any foreign body there will
20  always -- to the best of my knowledge in all my
21  experience, there's always a sort of persistent thin
22  layer, and in some instances it may be even thicker of
23  lymphocytes and macrophages associated with that foreign
24  material.  And that would include mesh, yes.
25        How active that is in terms of causing

22 (Pages 82 to 85)

Teri A. Longacre, M.D.

Page 86

1    symptomatology is not so certain.  The cells are obviously
2    alive and viable, but how much they're really doing other
3    than just standing guard, if you will.
4        Q.  Okay.  I'm going to name a few articles related
5    to the inflammatory response to transvaginal mesh or
6    hernia mesh and ask you if they ring a bell.  Are you
7    familiar with a Cobb article?
8        MR. WES:  Object to form, foundation.
9        THE WITNESS:  It would be so much easier if we
10   had the articles.
11       MR. JONES:  Q.  If -- I'll tell you what.  If --
12   once we get a list of the articles that you actually
13   looked at, then I'd gladly be -- would ask you about
14   those.  But I'm just trying to get --
15       A.  I know.
16       Q.  Okay.  Does the name Kosterhalfen ring any bells?
17       A.  Yes, that does.
18       Q.  Okay.
19       MR. WES:  Same objection.
20       MR. JONES:  Q.  What's your recall of Bernard
21   Kosterhalfen?
22       A.  I'm not sure right now.  I don't remember.
23       Q.  It's a pretty unique name, and it rings a bell --
24       A.  Yes.
25       Q.  -- and you know you've reviewed something related

Page 87

1    to Klosterhalfen?
2        A.  I think I have, yes.
3        Q.  We talked about Iakolov, I-A-K-O-L-O-V, perhaps
4    on the spelling.  He's a pathologist who has written some
5    articles related to transvaginal mesh.  Does that ring a
6    bell at all?
7        MR. WES:  Object to form.
8        THE WITNESS:  It's not ringing any bell right
9    now, but it doesn't mean I didn't review it.  But I
10   don't -- I don't recollect it right now.
11       MR. JONES:  Q.  What about Todd Heniford?
12       MR. WES:  Object to form, foundation.
13       THE WITNESS:  Again, I'm not sure about the name.
14       MR. JONES:  Q.  What about Uwe Klinge?
15       MR. WES:  Same objections.
16       THE WITNESS:  That name is familiar.
17       MR. JONES:  Q.  Okay.
18       A.  This is Klinge?
19       Q.  Yes.
20       A.  Yes.
21       Q.  Are you aware that polypropylene is used in
22   products besides transvaginal mesh?
23       A.  Yes.
24       Q.  Do you know what products -- can you name a few
25   products in which polypropylene is used besides

Page 88

1    transvaginal mesh?
2        MR. WES:  Object to form, outside the scope.
3        THE WITNESS:  Well, polypropylene is used in
4    suture material and other mesh materials and maybe other
5    things, but those are the only two that come to mind right
6    now.
7        MR. JONES:  Q.  Okay.  Do you know if it's used
8    in fishing line?
9        MR. WES:  Same objection.
10       THE WITNESS:  My son would know.
11       MR. JONES:  I'll move on.
12       Q.  Will you be giving any opinions related to
13   cytotoxicity in this case?
14       MR. WES:  Object to form.
15       THE WITNESS:  Not -- no, not -- other than what
16   I've already talked about in terms of the inflammatory
17   response, no, not specifically.
18       MR. JONES:  Did you review any Ethicon
19   testing related to the cytotoxicity of the mesh used in
20   the TVT Abbrevo device?
21       A.  No.
22       MR. WES:  Object to form, outside the scope.
23       THE WITNESS:  And no, I don't recall specifically
24   reviewing any cytotoxicity.
25       MR. JONES:  Q.  Would cytotoxicity testing of the

Page 89

1    mesh used in the TVT Abbrevo device be something that you
2    would want to look at in helping you form your opinions in
3    this case?
4        MR. WES:  Object to form, outside the scope.
5        THE WITNESS:  No, it wouldn't -- I don't think
6    that would have any influence on my opinions on the slides
7    and the tissue, no.
8        MR. JONES:  Q.  Did you keep any notes when you
9    worked on this case?
10       A.  No.
11       Q.  Any e-mail folders that you created specifically
12   in response to this case?
13       A.  No.
14       Q.  Any file folders?
15       A.  No.  I have boxes with these but no file folders.
16       Q.  Are you a paper person or an electronic person
17   when you reviewed these deposition testimony, medical
18   records?
19       MR. WES:  Object to form.
20       THE WITNESS:  Mostly I've read the paper.
21       MR. JONES:  Q.  Did anybody help you work on this
22   case?
23       A.  No.
24       Q.  No assistants?
25       A.  No.

23  (Pages 86 to 89)

Teri A. Longacre, M.D.

Page 90

1   Q.   Or fellow doctors?
2   A.   No.
3   Q.   Have you set up a corporation to accept payments
4   for your litigation consulting work?
5   A.   No.
6   Q.   Before rendering your opinions in this case, did
7   you speak with any pelvic floor surgeons at Stanford
8   University?
9   A.   No.
10  Q.   Do you know of any of the pelvic floor surgeons
11  at Stanford University?
12  A.   Yes.
13  Q.   I mean, you're aware that Stanford has a highly
14  respected pelvic floor surgery clinic, correct?
15  A.   I would suspect they do.
16  Q.   With well respected surgeons who make up that
17  clinic, right?
18       MR. WES:  Object to form.
19       MR. JONES:  Q.  Do you know Lisa Rogo-Gupta?
20  A.   No, I don't know her.
21  Q.   Okay.  Didn't talk to her at all --
22  A.   No.
23  Q.   -- before you gave your opinions in this case?
24  A.   Don't even know her.
25  Q.   How about Eric Sokol?

Page 91

1   A.   I know of him, yes.
2   Q.   Did you talk to him before you rendered your
3   opinions in this case?
4   A.   No.
5   Q.   Do you have any knowledge of his work on
6   transvaginal mesh?
7   A.   No.
8   Q.   You didn't review any articles he wrote about
9   transvaginal mesh?
10  A.   No.
11  Q.   We talked about Dr. Margolis earlier.  You're
12  familiar with Dr. Margolis in that you've read his
13  deposition, correct?
14       MR. WES:  Object to form, misstates the
15  testimony.
16       MR. JONES:  I'll rephrase the question.
17  Q.   You're familiar with Dr. Margolis in that you've
18  reviewed pictures Dr. Margolis took of Ms. Perry?
19  A.   Yes.
20  Q.   Did you know Dr. Margolis used to work at
21  Stanford University?
22  A.   Yes, I did.
23  Q.   Do you know Dr. Margolis?
24  A.   I've interacted with him.
25  Q.   What do those interactions entail?

Page 92

1   A.   Oh, he operated on occasion at Stanford.
2   Q.   Okay.
3   A.   And I'm a GYN pathologist.
4   Q.   So you worked with him?
5   A.   I don't know about with him, but I -- you know, I
6   received pathology materials that he removed.
7   Q.   What pathology materials were those?
8   A.   Oh, I don't remember.  They were GYN path, but
9   that was so long ago, I don't remember.  And there were
10  discussions that I had, but I have no recollection of the
11  contents of them.  But I definitely remembered him as
12  being a surgeon that was at Stanford.
13  Q.   Do you have any criticisms of his expertise in
14  the field of urogynecology?
15       MR. WES:  Object to form, foundation.
16       THE WITNESS:  He's not an expert in GYN
17  pathology.
18       MR. JONES:  Q.  Any other criticisms?
19       MR. WES:  Same objection.
20       THE WITNESS:  Nothing that I want to say right
21  now.
22       MR. JONES:  Q.  Right now.  Are these criticisms
23  that you might share at trial?
24  A.   No.
25  Q.   You just want to keep those personal, to

Page 93

1   yourself?
2   A.   I think so.
3   Q.   You realize he set up the urogynecological --
4   urogynecology and pelvic reconstructive surgery clinic at
5   Stanford, correct?
6   A.   No, I didn't realize that.
7   Q.   You didn't know that?
8   A.   No.
9        MR. WES:  Can I get an objection, form,
10  foundation on the last one?
11       MR. JONES:  Q.  And you know that Dr. Margolis is
12  an expert witness for the plaintiff in this case?
13  A.   Yes, I do know that.
14  Q.   Okay.  Are you aware of whether or not the
15  Stanford urogynecology clinic specializes in treating mesh
16  complications?
17       MR. WES:  Same objection.
18       THE WITNESS:  No, I'm not aware of that.
19       MR. JONES:  Q.  Have you reviewed any videos
20  posted by the Stanford urogynecology clinic that have been
21  posted online?
22  A.   I don't think so.
23  Q.   Okay.  Did you notify the pathology department at
24  Stanford that you would be acting as an expert in this
25  case?

Teri A. Longacre, M.D.

Page 94

1    A.  No.
2    Q.  Do any other doctors at Stanford know that you're
3    acting as an expert in this case?
4    A.  No, I don't think they do.
5    Q.  I want to go back to real quickly -- we talked
6    about smoking and diet and diabetes earlier and how it
7    relates to wound healing, and I want to focus on the diet.
8        Have you reviewed records in this case related to
9    Ms. Perry that discuss certain diets she was on?
10   A.  Yes.
11   Q.  And what did those records say?
12       MR. WES:  Object to form.  The records will speak
13   for themselves.
14       MR. JONES:  Q.  Do you have any recollection of
15   it?
16   A.  I do recall it, yes.  It was -- sounded like an
17   odd diet to me.
18   Q.  An odd diet?
19   A.  And it sounded -- yeah, but most diets sound a
20   little odd to me, to be quite honest, so -- but yeah, she
21   was on a -- some special diet that she was trying to
22   reduce her weight, correct.
23   Q.  Okay.
24   A.  And it looked to me like it was really quite low
25   on the calories.

Page 95

1    Q.  Oh, very low calorie intake diet?
2    A.  Yes.
3    Q.  How you about protein?  Was there a focus on the
4    amount of protein in her diet?
5        MR. WES:  Object to form, foundation, calls for
6    speculation.
7        THE WITNESS:  Yeah, I don't really specifically
8    recall what all the components of the diet were.
9        MR. JONES:  Q.  But you do specifically recall it
10   was a low calorie intake diet?
11   A.  Yes.
12   Q.  She was trying to reduce her weight?
13   A.  Yes.
14   Q.  And it was what you phrased as an odd diet?
15   A.  Yes.
16   Q.  And it's your opinion that that diet affected her
17   ability to heal the wound from the TVT Abbrevo device?
18       MR. WES:  Object to form.
19       THE WITNESS:  It's my opinion that that
20   significant reduction in calorie intake when she was
21   having post surgery and wound repair may well have
22   affected the healing, yes.
23       MR. JONES:  Q.  It may well have not have
24   affected the healing, though, too, right?
25       MR. WES:  Object to form, argumentative.

Page 96

1        THE WITNESS:  I think in all likelihood that it
2    did contribute.
3        MR. JONES:  Q.  It's possible that it didn't
4    contribute, though, right?
5    A.  Of course.
6    Q.  It's possible that her smoking, you know, two
7    cigarettes a week did not affect her healing capacity,
8    correct?
9        MR. WES:  Object to form.
10       THE WITNESS:  It's -- yes, it is possible.
11       MR. JONES:  Q.  It's also possible that diabetes
12   didn't impact the wound healing at all, correct?
13       MR. WES:  Object to form.
14       THE WITNESS:  Yes.  All of these things are
15   possible, but are we talking about possible or likely?
16   And I think that these are all factors that have been
17   established to impair wound healing, and if they're active
18   in a particular patient who is having problems with wound
19   healing, one would suspect that in all likelihood they
20   were contributory factors.
21       And that's sort of how medicine works.  It's not
22   an all or none absolute science.  It's not like the
23   non-medical sciences.
24       MR. JONES:  Q.  Not two plus two equals four?
25   A.  Exactly.  It's not mathematical.

Page 97

1    Q.  Did you focus at all -- when you looked at her
2    diet in the association to wound healing, did you focus at
3    all on the amount of protein in her diet?
4    A.  Not specifically.
5    Q.  Okay.  Protein -- the amount of protein in your
6    diet is related to wound healing as well, right?
7    A.  Oh, of course.  Lots of things.  But protein's
8    important as well, yes.
9    Q.  Do you have any recall of her not getting proper
10   amount of protein in her diet?
11       MR. WES:  Object to form, foundation.
12       THE WITNESS:  No, I can't address whether or not
13   she had sufficient protein in her diet.
14       MR. JONES:  Q.  When she was on this diet, was
15   she malnutritioned?
16       MR. WES:  Same objection.
17       THE WITNESS:  I'm not sure what you mean by
18   "malnutritioned."  She may not have been given all the
19   necessary nutrients.
20       MR. JONES:  Q.  Do you know one way or another
21   whether she was getting the necessary amount of --
22   A.  No.
23   Q.  -- nutrients?
24       MR. WES:  Same objection.
25       MR. JONES:  Q.  You're not a nutritionist, right?

25  (Pages 94 to 97)

Teri A. Longacre, M.D.

Page 98

1  A.  Exactly.
2  Q.  So that's outside of the field of your expertise?
3  A.  Correct.  Well --
4  Q.  Whether she was --
5  A.  -- specific nutritional questions are not part of
6  my opinion.
7  Q.  Whether she was getting an adequate amount of
8  nutrients in her diet is outside the field of your
9  expertise?
10  MR. WES:  Object to form.
11  THE WITNESS:  So my opinion is that she's got
12  inadequate wound healing.  Let's just reiterate that -- or
13  insufficient.  That wound is not healing.  And what were
14  the possible causes?
15  One of them might be this drastic diet she went
16  on.  It's a pretty significant cut in calories, I suspect,
17  for her, and that may have been a contributing factor.
18  And I stand by that.
19  Now, if you bring a nutritionist in and they say,
20  well, that should be enough, it may be enough for somebody
21  who is not trying to heal a wound, who is not diabetic,
22  who is not with all these other factors.  I think it gets
23  to be a complicated issue, but that is an added insult in
24  somebody who is already trying to heal postsurgical.
25  In fact, they tell you to increase your nutrition

Page 99

1  because surgery -- any kind of -- this isn't that major of
2  a surgery, I admit, but any kind of procedure actually
3  increases catabolism so...
4  MR. JONES:  Q.  Whether or not Ms. Perry was
5  getting an adequate amount of nutrients in her diet is
6  outside the field of your expertise?  Yes or no?
7  MR. WES:  Object to form.
8  THE WITNESS:  To the extent that I'm a physician,
9  it's still within my area of expertise, but it's not my
10  subspecialty, and I think that's what you're asking.  So
11  no, that's not something that I am a subspecialist in.
12  It's not nutrition.  That would be correct.
13  MR. JONES:  Q.  Okay.  And you won't be giving an
14  opinion that the diet Ms. Perry was on was not supplying
15  her an adequate amount of nutrients, correct?
16  MR. WES:  Object to form.
17  THE WITNESS:  Adequate for what?  See, that's the
18  problem I'm having.  Adequate for what?
19  MR. JONES:  Q.  Adequate for wound healing.
20  A.  It may not have been.
21  MR. WES:  Objection.
22  THE WITNESS:  It may not have been.
23  MR. JONES:  Q.  Do you know the level of
24  nutrients that she was getting in her diet?
25  MR. WES:  Object to form, foundation.

Page 100

1  THE WITNESS:  It's a matter of significant
2  decrease as well as just the level.  You know,
3  physiologic, you know, you're sort of used to a certain
4  level of intake.  And when you do a drastic cut, that has
5  a bigger effect than long term.
6  I mean, a certain amount of nutrients may be
7  healthy at some level, but when you do these sudden cuts,
8  the body doesn't adapt that quickly.  That's my point.
9  MR. JONES:  Q.  Okay.  It's not so much --
10  A.  It's not --
11  Q.  -- the amount of nutrients that she was getting,
12  it's more the decrease in level of the nutrients perhaps
13  due to the low calorie intake diet she was on?
14  A.  Yes.
15  Q.  Okay.
16  A.  So that diet may be totally, although it seems
17  odd, healthy, but I still say these sudden cuts are, you
18  know -- those are the things -- a body doesn't react that
19  fast to those.  It takes awhile to get back to steady
20  state, and that sudden drop could -- could impair wound
21  healing, could impair -- you know, resistant to infection,
22  all sorts of things, colds.
23  Q.  Could it cause an erosion of the mesh?
24  MR. WES:  Object to form.
25  THE WITNESS:  Yeah, because I'm not sure what you

Page 101

1  mean by "erosion of the mesh."
2  MR. JONES:  Q.  So in this case Ms. Perry was
3  implanted with mesh?
4  A.  Correct.
5  Q.  And that mesh eroded through her vaginal tissue,
6  correct?
7  MR. WES:  Object to form.
8  THE WITNESS:  Well, see, that's -- yeah, that's
9  kind of -- I think that's sort of the crux of the issue is
10  that really -- I mean, what is mesh erosion and what
11  causes that?  And I'm not a hundred percent clear that I
12  even understand that reading all the literature about
13  that.
14  Does mesh eventually come up against the
15  vaginal tissues and erode or present itself?  Yes, that
16  is.  But what's causing that?  And in this particular
17  case, the tissue that was removed, as I mentioned, shows a
18  non-healing wound in the vaginal area of the mucosa, but
19  beneath that is an area of submucosal, the normal
20  submucosal in vaginal tissue that looks fine.  And then
21  the next layer down is where you see the mesh.
22  So it's not clear that that mesh eroding up is
23  what caused or was even causally related.  In fact, I
24  would argue it's not to that mucosal disruption.  I think
25  that's postsurgical wound healing that didn't

26 (Pages 98 to 101)

Teri A. Longacre, M.D.

Page 102

1    heal.
2         MR. JONES:  Q.  Okay.
3         A.  Now, that may have eventually, you know --
4    because when you have a non-healing wound, you end up
5    getting a little bit of a depression, and that may have
6    caused that mesh to become closer approximated to that --
7    to the -- you know, the vaginal lumen.
8         But you know, the mesh moving up and eroding the
9    mucosa, I don't think that's what happened in this case.
10   I think it's more that there's a non-healing wound, and
11   eventually that mesh, you know, because of the non-healing
12   wound became more approximated to the surface of the
13   vagina.
14        Q.  You say you reviewed literature related to mesh
15   erosions, right?
16        A.  Yes.
17        Q.  Okay.  Fair to say that mesh has eroded in women
18   who don't smoke?
19        MR. WES:  Object to form, outside the scope.
20        THE WITNESS:  So yeah, it's not -- he's telling
21   us he's trying to say it's not part of my opinion.  I
22   think that's fair to say, but yeah, I'm not sure I've seen
23   a very nice well-designed study for erosion and, you know,
24   pathologic examination and risk factors.  I don't think
25   that that exists in the literature.

Page 103

1         MR. JONES:  Q.  Okay.  You talked earlier about
2    why Ms. Perry had the mesh explanted, and you said
3    Ms. Perry wanted it explanted and Mr. Perry wanted it
4    explanted.  You didn't say Mr. Perry wanted it explanted,
5    but you made a reference to Mr. Perry, right?
6         A.  Correct.
7         MR. WES:  Object to form.
8         MR. JONES:  Q.  Okay.  And flush that out.
9    Explain what you meant when you brought up Mr. Perry
10   related to the explant surgery.
11        A.  Well, when Mrs. Perry presented back to her
12   physicians with her complaints of pain, there were two
13   issues, one, that her husband was complaining of pain
14   during intercourse of it shafted his penis, feeling
15   something in the -- her anterior vaginal wall.  That was
16   his pain.
17        Her pain was pain on entry predominantly,
18   dyspareunia.
19        Q.  In your literature review of mesh erosions, did
20   you see references that -- to mesh causing pain?
21        A.  I'm sorry, would you repeat that question?
22        Q.  Yeah.  You reviewed literature related to mesh
23   erosions, right?
24        A.  Yes.
25        Q.  Within your literature review, did you see

Page 104

1    findings in the literature that transvaginal mesh caused
2    pain in women?
3         MR. WES:  Object to form, outside the scope,
4    foundation.
5         THE WITNESS:  There are a lot of papers
6    discussing pain in association with the transvaginal mesh.
7         MR. JONES:  Q.  Okay.
8         A.  And possible hypotheses about what might be
9    causing that pain, yes.
10        Q.  Same for dyspareunia?
11        A.  Yes.
12        Q.  And you're aware that there's mesh still inside
13   of Ms. Perry, correct?
14        A.  Yes.
15        Q.  And you're aware that that mesh could erode
16   again, correct?
17        MR. WES:  Object to form, foundation, calls for
18   speculation, outside the scope.
19        MR. JONES:  Q.  Will you be giving any opinions
20   about recurring erosions in this case?
21        MR. WES:  Same objections.
22        THE WITNESS:  I don't think so.  I'm not sure.
23   Again, I'm not really sure what the question is.
24        MR. JONES:  Q.  Well, you've made -- you've given
25   opinions related to the wound healing following her mesh

Page 105

1    procedure, correct?
2         A.  Correct.
3         Q.  And you understand the mesh is still inside of
4    her, correct?
5         A.  Correct.
6         Q.  So your opinions related to the wound healing
7    following the mesh procedure are not going to be
8    applicable to any future mesh complications, correct?
9         MR. WES:  Object to form, foundation, calls for
10   speculation.
11        THE WITNESS:  Assuming there's no further
12   problems with wound healing, then I would expect -- I
13   guess I'm not still sure what you're asking me.
14        MR. JONES:  Q.  Could there be wound healing
15   impairment in the future for Ms. Perry?
16        A.  There might be, yes.  I mean, she's already
17   demonstrated impaired wound healing once, so it's possible
18   that it could happen again.  She did have a second
19   surgical procedure presumably that is now well healed and
20   won't break down again, but I don't -- you know, I can't
21   say for certain that it wouldn't.
22        It appears to me that based on at least the
23   preliminary review of records that it was healing.
24        Q.  Have you ever had your opinions excluded by any
25   jurisdiction?

27 (Pages 102 to 105)

Teri A. Longacre, M.D.

Page 106

1    A. No, I don't think so.
2    Q. Okay.
3    A. What does that mean when you're asking me that?
4    Q. Have you ever offered opinions in a case and the
5    judge has come back and excluded your opinions because
6    they weren't relevant to the case?
7    A. No. No.
8    Q. Has a judge ever excluded your opinions on the
9    bases of your lack of expertise?
10   A. No.
11   Q. Has the -- has a judge ever excluded your
12   opinions on the bases that you've given opinions outside
13   of the field of your expertise?
14   A. No.
15   Q. Okay. Will you be giving any opinions in this
16   case as to industry bias in the medical device
17   marketplace?
18   A. No.
19   MR. WES: Object to form, outside the scope.
20   MR. JONES: Q. Will you be giving any opinions
21   as to industry bias in the medical literature?
22   MR. WES: Same objection.
23   THE WITNESS: No.
24   MR. JONES: Q. And when you reviewed the medical
25   literature in this case, did you look and examine the bias

Page 107

1    of the authors?
2    MR. WES: Same objection. Also, foundation,
3    calls for speculation.
4    THE WITNESS: I wouldn't use the word "bias," but
5    generally when I review any scientific paper, I try to
6    take note of who the authors are even though I actually I
7    can't always recall their names but the centers that
8    they're associated with.
9    I also pay attention to the journal that it's
10   published in, whether peer reviewed, and if I can discern
11   whether it's a respected journal. They have different
12   levels of peer review journals.
13   So yes, I do that. And that's probably a better
14   way than just call it bias because we want to be sure that
15   people are presenting good data.
16   Q. The reason why you examine all those factors that
17   you discussed because it helps you form a judgment as to
18   the reliability of the findings in the article, correct?
19   A. Correct.
20   MR. WES: Object to form.
21   MR. JONES: Q. And -- and do you examine --
22   strike that.
23   A. Wait --
24   Q. It's something that you would -- go ahead.
25   A. So wait a second. Why don't you -- repeat that

Page 108

1    question again that he just asked and I responded to about
2    the reliability of what?
3    Yeah, can you read that back?
4    (Record read.)
5    THE WITNESS: Okay. So I want to correct --
6    answer that. The findings may be -- it's more -- it could
7    be the findings, but it also would be the -- sort of the
8    scientific evidence supporting their conclusions.
9    MR. JONES: Q. Okay.
10   A. Right. So some of the opinions stated kind of --
11   that's based on their findings in part but --
12   Q. One of the things you look at is --
13   A. So it's all of that. It's the entire package.
14   It's not just the -- you know, the result section. It
15   would be all of that. Okay.
16   Q. You want as much information as reasonably
17   possible to assess the data in the article that you're
18   reviewing?
19   A. Yes.
20   Q. And one of the pieces of information you would
21   want is whether the authors were being paid by the company
22   marketing the device that they're studying?
23   MR. WES: Object to form.
24   MR. JONES: Q. Correct?
25   MR. WES: Foundation.

Page 109

1    THE WITNESS: I pay -- I pay attention to those
2    issues as well, yes. That doesn't necessarily imply that
3    their findings are unreliable, but no, I definitely pay
4    attention to those things.
5    MR. JONES: Q. But it's something you would want
6    to know absolutely?
7    A. Yes. Yes.
8    Q. And when you reviewed literature, you talked
9    about long-term studies earlier, correct?
10   A. Correct.
11   Q. Did you notice anything in those long-term
12   studies where the authors were paid by companies that were
13   marketing the very products that were discussed in the
14   study?
15   MR. WES: Object to form, foundation, outside the
16   scope.
17   THE WITNESS: Yes. So no, there are -- there
18   were -- I don't recall specific -- which specifics, but
19   there certainly are some of those, and that happens in all
20   the literature of course.
21   MR. JONES: Q. And did you examine whether the
22   authors in some of those long-term studies were the
23   inventors of the products that they were reporting on?
24   MR. WES: Same objections.
25   MR. JONES: Why would it be important when you're

28 (Pages 106 to 109)

Teri A. Longacre, M.D.

Page 110

1  reviewing medical literature to help form your opinions in
2  this case to examine if the authors were, in fact, the
3  inventors of the product they were reporting on?
4          MR. WES:  Object to form, foundation, calls for
5  speculation.
6          THE WITNESS:  Well, it always places things in
7  context, but you know, other than that -- yeah, you know,
8  it's good to know these things, but they don't necessarily
9  impact -- they may, but they don't necessarily impact the
10  validity or dis-validity, if you will, of their findings.
11          MR. JONES:  Q.  When you've served on editorial
12  boards for medical journals, have you required that the
13  author submit disclosures related to how much money
14  they've been paid by companies that they're reporting on?
15          A.  Yes.
16          MR. WES:  Object to form.
17          THE WITNESS:  All the journals that I review
18  require disclosures.  I don't know that if it's the exact
19  dollar amount, but you know, full disclosure is required
20  before publication.
21          MR. JONES:  Q.  Have you made comments online
22  related to industry bias in the medical device
23  marketplace?
24          MR. WES:  Object to form, foundation, outside the
25  scope.

Page 111

1          THE WITNESS:  No.
2          MR. JONES:  Q.  You haven't?
3          A.  No.
4          Q.  Okay.  Do you have social media accounts?
5          A.  No.
6          Q.  You don't?
7          A.  No.  Well, what do you mean?  Which kind?
8          Q.  Are you on Twitter?
9          A.  No.  No.
10          Q.  Okay.  Facebook?
11          A.  No.
12          Q.  LinkedIn?
13          A.  Yes.
14          Q.  Okay.  Have you made any comments online related
15  to concerns about marketing in the medical device
16  marketplace?
17          MR. WES:  Object to form, foundation, outside the
18  scope.
19          THE WITNESS:  No.
20          MR. JONES:  Okay.  I think that may be all the
21  questions I have.  I want to go off record, take a
22  ten-minute break and then sounds like there may be some
23  more questions.  We'll go figure that out.  Does that
24  sound like a good plan?
25          MR. WES:  Sounds good.

Page 112

1          (Short break taken.)
2          MR. JONES:  We're back on the record.  That's all
3  the questioning I have for you, Doctor.  I'll now pass the
4  witness.
5          EXAMINATION BY MS. COTA
6          MS. COTA:  Q.  Good afternoon, Doctor Longacre.
7  My name is Laura Cota.  I don't think I introduced myself
8  earlier.  I apologize for that.  Our firm represents
9  Dr. Luu in this matter, and I have just a few questions
10  for you.  I'm going to try not to repeat any of the
11  questions that counsel has already asked, but I may.  And
12  if I do, I'm going to apologize for that in advance.
13          We spoke in the beginning of counsel's
14  questioning about the documents you have reviewed in your
15  work on this case, and I just want to clarify, you
16  mentioned that you've reviewed some of plaintiff's medical
17  records.  Did you review the plaintiff's record -- or I'm
18  sorry, Ms. Perry -- Ms. Perry's records from Dr. Luu?
19          A.  Yes, I did.
20          Q.  And did you review Dr. Luu's complete chart for
21  Ms. Perry or just portions of it?
22          A.  I think I reviewed most, if not all, of the
23  chart.  I think I was given most of it, and I think I
24  reviewed most of it.
25          Q.  Okay.  And how about -- are you familiar with

Page 113

1  Dr. Allen and his involvement with Ms. Perry?
2          A.  Yes.
3          Q.  And did you review Dr. Allen's chart of
4  Ms. Perry?
5          A.  Yes.
6          Q.  And how about Dr. Singh?  Are you aware of
7  Dr. Singh's involvement with Ms. Perry?
8          A.  Yes.
9          Q.  And did you review Dr. Singh's chart --
10          A.  Yes.
11          Q.  -- of Ms. Perry?
12          A.  Yes, I did.
13          Q.  And you're aware that Ms. Perry had the procedure
14  performed by Dr. Luu at San Joaquin Community Hospital?
15          A.  I don't specifically remember the name of the
16  hospital.
17          Q.  Do you recall if you reviewed the hospital
18  records pertaining to Ms. Perry's procedures performed
19  Dr. Luu?
20          A.  I may have briefly reviewed them.
21          Q.  Okay.  And we talked a little bit about
22  deposition transcripts, and I know you said you reviewed
23  Ms. Perry's and her husband's deposition transcripts.
24          Did you review Dr. Luu's deposition transcript?
25          A.  Yes, I did sometime ago.

29 (Pages 110 to 113)

Teri A. Longacre, M.D.

Page 114

1      Q.  Do you recall how long ago that might have been?
2      A.  A month or so ago.
3      Q.  Okay.  And how about Dr. Allen?  Did you review
4  his deposition transcript?
5      A.  Yes.
6      Q.  And was that the same amount of time ago, about a
7  month and a half ago?
8      A.  I think that was a little more recent.  I think
9  that came in after Dr. Luu's.
10     Q.  Okay.  And Dr. Singh, did you review his
11 deposition transcript?
12     A.  Yes.
13     Q.  And how long ago did you review Dr. Singh's
14 deposition transcript?
15     A.  A month or so ago.
16     Q.  Okay.  And I believe you testified you have not
17 reviewed Dr. Margolis's deposition transcript?
18     A.  Correct.  I've had portions of it relayed to me,
19 but I have not reviewed it.  I'm not even sure I received
20 it.
21     Q.  Okay.  Do you know what portions of his
22 transcript have been forwarded to you?
23     A.  None were forwarded.  I was just read a few --
24     Q.  And what portions of Dr. Margolis's deposition
25 testimony were read to you?  If you can give me sort of a

Page 115

1  summary.
2      A.  I think that he was discussing shrinkage of the
3  mesh and he discussed the pathology report at some point
4  and it was that discussion.
5      Q.  Okay.  And the pathology report he discussed, was
6  it the -- the pathology report that you've referred to as
7  the -- from the -- I'm sorry, give me one second -- the
8  posterior repair procedure?  Was it that pathology report?
9      A.  No.  I think he was mostly just -- at least the
10 parts that were relayed to me was discussing the
11 explant --
12     Q.  Explant?
13     A.  -- tissue, yes.
14     Q.  Okay.  And I'm sorry, I know counsel asked you
15 this, but I'm not sure what the response was.
16 Dr. Margolis, he prepared a report of his independent
17 medical exam of Ms. Perry.  Have you reviewed that report?
18     A.  I may have reviewed that, but I don't -- I don't
19 have a clear memory of that.
20     Q.  Okay.  Do you recall if any of the deposition
21 transcript portions that were read to you from
22 Dr. Margolis's deposition referred to his report?
23     A.  No, I don't recall that.
24     Q.  And Dr. Longacre, I'm going to refer to -- I
25 believe it's Exhibit L-2.  It's the pathology report that

Page 116

1  you had described as -- from the posterior repair
2  procedure.  It's the --
3      A.  Yes.
4      Q.  Okay.  You got that?
5      Okay.  What I'm looking at it says, "Tissue ID is
6  vaginal wall posterior excision."
7      Can you tell me what -- in layman's terms what
8  does that mean?  What are we talking about?
9      A.  Posterior vaginal wall.  So mucosa and some of
10 the submucosa.
11     Q.  And that would have been taken from where?
12     A.  The vagina.
13     Q.  Can you be any more specific about the location
14 that this sample would have been taken from?
15     A.  Distal posterior vagina from my understanding of
16 the surgical procedure.
17     Q.  And do you know why the sample would have been
18 taken?
19     MR. WES:  Object to form.
20     THE WITNESS:  This -- based on other medical
21 records, he performed an anterior and posterior
22 colporrhaphy procedure, and it was because there was a
23 cystocele and rectocele.
24     MS. COTA:  And so the purpose was to
25 determine the pathology of the cystocele and -- or --

Page 117

1      A.  No.  No, this is part of --
2      MR. WES:  Object to form.
3      THE WITNESS:  Again, my -- I'm not a surgeon.
4  This is not -- but in terms of my receiving these
5  specimens, my understanding of these procedures is that
6  when -- they're basically removing excess tissues to sort
7  of tighten it up because the rectocele is basically the
8  rectum is protruding into the vaginal lumen causing
9  prolapse.
10     And so by removing that redundant tissue, it's
11 thought to help prevent that rectocele.  Same thing for
12 the cystocele, but that would be the anterior vaginal
13 mucosa.
14     MS. COTA:  Q.  Okay.  And so is this just a
15 standard procedure to your knowledge?
16     A.  What --
17     MR. WES:  Object to form.
18     MS. COTA:  Q.  To, I guess, get a sample to
19 pathology to review in this instance?
20     A.  Most -- most hospitals require their surgeons to
21 submit all tissue that's removed from patients to
22 pathology.
23     Q.  Okay.
24     A.  Yes.  That part is standard.
25     Q.  Okay.

Teri A. Longacre, M.D.

Page 118

1        A.  Some hospitals don't have the explicit
2    requirement as others do.
3        Q.  Okay.  Very good.  Thank you for clarifying that.
4            And as part of Dr. Luu's chart, did you review
5    Dr. Luu's operative report of Ms. Perry's procedures?  I
6    believe they're on March 23rd of 2011.
7        A.  I'm sorry, did I review the operative procedure?
8    Yes.
9        Q.  Okay.  So you read Dr. Luu's operative report?
10       A.  Yes.
11       Q.  And do we know when during this procedure the
12   sample that we're talking about in this pathology report
13   would have been obtained?
14       A.  I have the report here.  I guess I'm not sure.
15   What do you mean when was it obtained?
16       Q.  Do you know when during Dr. Luu's procedures this
17   sample would have been obtained?
18           MR. WES:  Object to form, foundation, calls for
19   speculation.
20           THE WITNESS:  Short of reading this report, I
21   wouldn't know.
22           MS. COTA:  Q.  Okay.  Well, that's fine.  We'll
23   move on.
24           I believe, Dr. Longacre, you testified earlier
25   that -- or actually, it says here in your report that

Page 119

1    there are no gross findings because nothing but slides
2    were reviewed by you.
3        A.  Correct.
4        Q.  And is it true that based on the pathology
5    report -- and I apologize I cannot read this physician's
6    name -- this physician would have actually viewed the
7    actual sample?
8            MR. WES:  Object, form, calls for speculation.
9            THE WITNESS:  Well, no, there is a gross
10   description in the pathology report from the pathologist.
11           MS. COTA:  Q.  And so that means that this
12   physician actually viewed the sample?
13           MR. WES:  Same objection.  Also, foundational.
14           THE WITNESS:  Well, actually that's not the case.
15   The gross description was dictated by one physician,
16   whereas the diagnosis was signed out -- is rendered by a
17   different physician.
18           MS. COTA:  Q.  Okay.  But based on this pathology
19   report somebody -- some physician --
20       A.  Yes.
21       Q.  -- viewed the actual sample?
22       A.  Correct.
23       Q.  Okay.  Thank you.  And moving on to your list of
24   opinions on page 2 -- and thank you for providing this for
25   us.  It made it a lot easier and probably more expedient

Page 120

1    for us.
2        A.  Okay.  I don't have mine.  I don't know why.  Do
3    I?  Oh, nope.  Here it is.  Go ahead.
4        Q.  Okay.  Page 2.  And if we look at -- let's see --
5    subsection C, number two, where it says, "Fragments of
6    hair bearing skin from perineum."
7            Can you explain how do you know that that's what
8    you were looking at?  How do you identify skin from the
9    perineum?
10       A.  So that's a fair question.  Basically I was
11   trying to distinguish vaginal mucosa from cutaneous
12   tissue, and that's how I knew.  I mean, it wasn't just
13   vaginal mucosa that was in the specimen, because that
14   looks different from skin.
15           Now, because this is a posterior colporrhaphy
16   procedure, the skin would be the perineum.  It should be.
17   If I knew -- how do I distinguish -- if somebody gave me a
18   slide from perineum and a slide from maybe the buttock,
19   would I be able to tell the difference?  No.  It's skin.
20           But there was no reason he would be taking skin
21   from someplace else.  If he's taking it -- if the
22   surgeon's removing skin, it would have been in the
23   perineal region.
24       Q.  And further, what is the perineum?
25       A.  It's the skin -- in this particular case it would

Page 121

1    be the skin immediately posterior to the vaginal -- to the
2    introitus, the vaginal opening.
3        Q.  And so your description here of it being from the
4    perineum is because of -- is based on the procedure that
5    Dr. Luu performed?
6        A.  Yes.  It's contextual.  I can tell that it's
7    perineum as opposed to vaginal mucosa because there's hair
8    and sebaceous glands, and you don't see that in vaginal
9    tissue.
10       Q.  Okay.  But like you said, you wouldn't be able to
11   differentiate -- if you didn't know what it was, you
12   wouldn't be able to differentiate skin from the perineum
13   with skin from -- I think your example was the buttock?
14       A.  Correct.
15       Q.  Okay.  In your looking at the samples, was it
16   obvious to you that there was something other than mucosal
17   tissue on the slide, in the sample?
18           MR. WES:  Object to form.
19           THE WITNESS:  Yes.
20           MS. COTA:  Q.  Okay.  And then moving down to
21   subsection D.  And let's see.  On -- I guess this is
22   little -- little i, 1, where it says, "Hair bearing skin,"
23   et cetera.
24           Can you, as Counsel would say, flush that out for
25   me and just explain what that means and why it's

31 (Pages 118 to 121)

Teri A. Longacre, M.D.

Page 122

1   important?
2      A.  Again, it's just indicating that during -- that
3   it wasn't just vaginal mucosal tissue that was removed, it
4   was skin.  It was cutaneous tissue.  And again, by context
5   it was -- it was the posterior perineal tissue.
6         And the reason I know that is because there were
7   hair and there were sebaceous glands, and it was a little
8   more edematous than -- both -- actually, both the vaginal
9   tissue and the perineal tissue was a little more edematous
10  than usual, but that's -- yeah, that's a soft finding, if
11  you will.  It's not surprising if she has prolapse, but
12  it's not -- it's not an overly significant finding.
13     Q.  Okay.  And what does edematous mean?
14     A.  Filled with fluid.  It's not exactly it, but
15  that -- you know, for a lay person, that's sort of what it
16  means.  If you have tissue protruding, it can be a little
17  more edematous.
18     Q.  Gotcha.  Thank you.  And you testified earlier --
19  and I'm looking at your points here.  It the says 13
20  pieces were perineal -- I hate that word.  I can't say
21  it -- and the remainder eight pieces were of the mucosa.
22         So did you look at 21 slides altogether?
23     A.  No.  That was just the number of pieces of tissue
24  that were on the slide -- on the slides in total.
25     Q.  I see.

Page 123

1      A.  So there were four blocks and in putting --
2   adding up all the pieces in each of those four slides that
3   were made from the four blocks, there were that many
4   fragments of tissue.
5      Q.  Do you know if the entire sample was -- I don't
6   know what the right word is -- prepared and placed on
7   slides?
8         MR. WES:  Object to form, foundation, calls for
9   speculation.
10        THE WITNESS:  So do I know for -- personally
11  because, no, I didn't do the gross.  But based on the path
12  report, it says, "Sections all, four cassettes."  That
13  generally means all the tissue was submitted.  That's what
14  that should mean.
15        If they meant something else, then it's not --
16  it's a miscommunication.  Generally when we say all, all
17  the tissue's been submitted.
18        MR. COTA:  Q.  Okay.  Do you know if you have
19  viewed all of the tissue from the sample that was
20  submitted?
21     A.  Four cassettes were made, and so there were four
22  sets of slides, so that should be all of the slides of the
23  tissue.
24        Now, you could cut additional -- there's still
25  tissue in the blocks, in the paraffin blocks, and you

Page 124

1   could theoretically cut more sections.
2      Q.  Okay.
3      A.  So it's not like every --
4         MR. WES:  Previous objections.
5         MS. COTA:  Q.  So you haven't looked at the
6   entire sample?  Is that fair to say?
7         MR. WES:  Same objections.
8         THE WITNESS:  I'm not sure.  No, I don't think
9   that's fair to say because I'm not even sure what you're
10  asking.
11        MS. COTA:  Q.  Well, I think you talked about the
12  sample they take and cut and make -- prepare slides out of
13  the blocks.
14     A.  Yes.
15     Q.  Do you know if you've viewed -- like if all the
16  material has been prepared as slides?
17     A.  No.  I don't know that.
18     Q.  Okay.  So it could be that there's portions of
19  the sample that you haven't looked at?
20        MR. WES:  Same objections.
21        THE WITNESS:  There will be -- no.  You know,
22  what's going to be left is additional level sections of
23  that tissue, but there's not going to be suddenly another
24  piece of tissue that I didn't see.  That's highly
25  unlikely.  That would be not good pathology practice.

Page 125

1   You're supposed to cut into your block enough that you've
2   seen all the -- that the pathologist has viewed all the
3   tissue on those slides.  So --
4         MS. COTA:  Q.  Okay.
5      A.  So there may be additional levels, but there
6   won't be -- there should not be more tissue that I didn't
7   see.
8      Q.  I see.  And so would each slide have the four
9   levels that you described, the mucosa, the
10  submucosa, the muscularis and the adventitia?
11     A.  Not necessarily.  Most of them just have mucosa
12  and submucosa.
13     Q.  Okay.  And the skin from the perineum, where
14  would -- so that was along with the mucosa or the
15  submucosa level that you saw?
16     A.  No.  No.  It's another piece of tissue.  And then
17  we'll have skin.  Then you don't call it -- it's not
18  mucosae.  You call it epidermis and then dermis --
19     Q.  Okay.
20     A.  -- which is the cutaneous correlate for mucosa
21  and submucosa.
22     Q.  Gotcha.  Okay.  Thanks.
23     A.  There was -- most of the fragments were really
24  distinct.  They were either skin or vaginal mucosa.  As I
25  recall, there was one fragment where most of the tissue

32 (Pages 122 to 125)

Teri A. Longacre, M.D.

Page 126

1    was vaginal mucosa, and then it transitioned into the
2    skin.
3        So obviously he had taken tissue right at the
4    junction of the vaginal mucosa and the skin, again --
5    arguing, again, that it is, in fact, perineum because
6    they're actually connected.
7        Q.  Okay.  And I believe you testified that the -- I
8    could be misstating this, but that the slides you were
9    looking at there was some degradation from the process or
10   something along those lines?
11       A.  No, not degradation.
12       MR. WES:  Objection, form, misstates the
13   testimony.
14       THE WITNESS:  Yes.  So there's no degradation.
15   There's no disruption.  There's no interpretive issues
16   with the initial tissue that was removed during the
17   insertion of the mesh.  It was the mesh -- the second
18   procedure when the mesh was removed, that tissue was
19   fairly disrupted.
20       MS. COTA:  Q.  Okay.  Okay.  I was confusing two
21   words and two different pathology reports.
22       And I know you're familiar with Ms. Perry's
23   statements in her deposition and her medical records.
24   Have you reviewed any of her responses to any discovery
25   requests that have been made in this case?

Page 127

1        A.  I'm -- I don't know 'cause I'm not sure what
2    you're asking.  I don't know what discovery means.
3        Q.  Right.  Typically we lawyers, you know,
4    have to ask lots of questions, and one thing we do in
5    preparing for trial is send written questions to the
6    different parties in the case.  And then it's -- you know,
7    the party has to respond to them.
8        I'm just wondering if your counsel had provided
9    any of Ms. Perry's responses to any of those requests to
10   you to review?
11       A.  They may have.  I've seen other material.
12       Q.  Okay.  But as far as knowing whether or not
13   they're discovery responses, you wouldn't be able to tell
14   me?
15       A.  No.
16       Q.  Okay.  Do you know, as we sit here today, if
17   Ms. Perry continues to complain of pain?
18       A.  My understanding is that she is.
19       Q.  Okay.  And you reviewed Dr. Allen's records, so I
20   know that you are aware that she had a portion of the mesh
21   excised, I believe, in January of 2012; is that right?
22       A.  Correct.  I believe that's when it was.
23       Q.  Okay.  And are you aware that during the excision
24   procedure that Dr. Allen also performed a procedure to
25   basically widen the entrance or the circumference of the

Page 128

1    introitus?
2        A.  Yes.
3        Q.  But Ms. Perry continues to complain of pain; is
4    that right?
5        MR. WES:  Object to form, calls for speculation,
6    foundation, outside the scope.
7        MS. COTA:  Q.  You can answer.
8        A.  My understanding is because I recently saw a
9    document that she was, yes.
10       Q.  Okay.  And were you aware that in addition to the
11   complaints of dyspareunia, she also has complained of
12   vaginal pain?
13       MR. WES:  Same objections.
14       THE WITNESS:  Yes.  I'm not sure what vaginal
15   pain is, but yes.
16       MS. COTA:  Q.  Okay.
17       A.  I understand that she has that.  She says she has
18   that.
19       Q.  Okay.  And is it your understanding that she
20   continues to complain of vaginal pain, as we sit here
21   today?
22       MR. WES:  Same objections.
23       THE WITNESS:  I don't know what she -- what's
24   happening today, but I realize that there was -- so
25   basically, yeah, I was actually pretty surprised because I

Page 129

1    thought post the mesh excision things were a lot better,
2    and I saw documents that all her pain was gone.  And then
3    it was very recently that I was supplied with a document
4    that she has pain again.
5        MS. COTA:  Q.  Okay.
6        A.  It sounded -- I thought it had resolved on my
7    first review of the postsurgical records.
8        Q.  Okay.  And were you aware that she also
9    complains -- or complained -- yeah, we'll leave it as
10   complain of pelvic pain.
11       MR. WES:  Same objection.
12       THE WITNESS:  Yeah, I'm not sure about the pelvic
13   pain.  I'm not so aware of that.  I know there's other
14   pain issues related to a motor vehicle accident and some
15   back pain, but I don't -- other than that I don't know a
16   lot about that.
17       MS. COTA:  Q.  Okay.  But even since Dr. Allen's
18   procedures to excise a portion of the mesh and also widen
19   the introitus, Ms. Perry continues to complain of pain?
20       MR. WES:  Objection, form, foundation,
21   speculation, outside the scope.
22       MS. COTA:  Q.  You can answer.
23       A.  Yeah, she's still complaining of some kind of
24   pain -- or has started complaining again, I guess is what
25   I would say, because I thought at some point she was

Teri A. Longacre, M.D.

Page 130

1    reporting it was all resolved, and now it seems to have
2    come back.
3        Q.  And is that based on your review of her medical
4    records?
5        A.  Yes.  The records that have been supplied by me,
6    yeah.
7        Q.  Okay.  And I know you're aware of Dr. Margolis's
8    reports, although you haven't had a chance to review it,
9    the report of the IME.  So --
10       A.  The IME?
11       Q.  Yes, the independent medical exam.  I'm sorry.
12       A.  Okay.
13       Q.  Okay.  So are you aware that in Dr. Margolis's
14   report he writes that he is able to replicate or reproduce
15   the plaintiff's pain complaints by palpating her vagina
16   where the mesh is?
17       MR. WES:  Objection, form, foundation, calls for
18   speculation.  This is outside the scope.
19       THE WITNESS:  And I don't recall that.  I'm
20   not --
21       MS. COTA:  Q.  Okay.  So you're not aware that
22   Dr. Margolis wrote that in his independent medical exam
23   report?
24       A.  No, not specifically I'm not.
25       Q.  Okay.  And I know you mentioned earlier you read

Page 131

1    Patrick Perry's deposition transcript and talked about his
2    complaints of pain, and I think you said that his
3    complaints had to do with feeling something, I think you
4    said, in the posterior or anterior portion of the vagina
5    of material that he could feel on his penis; is that
6    right?
7        MR. WES:  Object to form, foundation, misstates
8    the testimony.
9        THE WITNESS:  I think it was something was
10   irritating the shaft of his penis during intercourse.
11       MS. COTA:  Q.  Do you recall if he testified that
12   it was -- felt like a Brillo pad?
13       A.  That part I don't --
14       MR. WES:  Same objection.
15       THE WITNESS:  I don't really recall what --
16   his --
17       MS. COTA:  Q.  Okay.
18       A.  -- analogy.  I don't remember that.
19       Q.  Okay.  Do you recall if he testified that the
20   narrow opening -- narrow introitus was causing him any
21   pain?
22       MR. WES:  Object to form.
23       THE WITNESS:  I don't recall that.
24       MR. WES:  Speculation.
25       THE WITNESS:  No.

Page 132

1        MS. COTA:  Q.  And I believe you stated that in
2    your opinion the plaintiff's complaints of pain were due
3    to the colporrhaphy procedure; is that right?
4        A.  I think that her dyspareunia is likely due to the
5    colporrhaphy and that narrowing.
6        Q.  And what is that opinion based on?
7        A.  It's a known complication of colporrhaphy,
8    number one; and number two, there was a substantial amount
9    of that perineal tissue that was removed.  And the more of
10   the perineal tissue, the more likely that there's going to
11   be pain associated with that -- with a posterior
12   colporrhaphy procedure.  And that's -- I think that's
13   pretty well established that there's a significant risk
14   for that.
15       Q.  And is that something you know from your practice
16   as a pathologist?
17       A.  Yes.  Just -- well, practice as a GYN
18   pathologist, yes.
19       Q.  Okay.  And is that based in any way on any of the
20   material that you reviewed that was provided to you by
21   counsel?
22       A.  There were some -- there was some literature that
23   was provided recently on complications of colporrhaphy,
24   and they were actually provided after I made the
25   observation there was an awful lot of perineal tissue.

Page 133

1    And I wondered if that was -- my first thought was maybe
2    this is what's really causing her dyspareunia, and it was
3    shortly thereafter they provided me with this literature.
4        Q.  Okay.  Hang on one second here.
5        A.  And it also corroborates -- I believe Dr. Allen
6    seemed to think that was part of it.  I think he was
7    attributing her pain to that as well.
8        Q.  And that's from reading his deposition transcript
9    or his medical records?
10       A.  One or the other.
11       Q.  And you spent some time telling us about the --
12   and I'm going to say this wrong -- is it a mucosal
13   non-healing wound or a non-healing wound in the mucosa
14   or --
15       A.  Either way.
16       Q.  Okay.  Great.
17       A.  Yeah.
18       Q.  You talked about that.  Could that have been
19   causing Ms. Perry's pain?
20       MR. WES:  Object to form.
21       THE WITNESS:  It didn't sound like it.  The kind
22   of pain she was describing, the dyspareunia, did not sound
23   like that that was -- because she was really just talking
24   about pain on entry initially, and that didn't sound like
25   it was anything to do with any kind of non-healing wound.

34 (Pages 130 to 133)

Teri A. Longacre, M.D.

Page 134

1          MS. COTA:  Q.  In general, in a non-healing wound
2     of the type you're describing, would that potentially
3     cause someone to suffer some pain?
4          A.  It may or may not.  Again, you know, if you're --
5     yeah, it may not.  If there's some level of vascular
6     insufficiency that -- particularly in diabetics.  Now,
7     she's not the classic type I, but she has been diagnosed
8     with type II.  They can have wound healing problems, and
9     they may not have the same -- they may not notice they
10    have injury.  Their sensation may not be there.  So it's
11    possible that, you know --
12         Q.  And I'm sorry, you told us this earlier, and I
13    said I wasn't going to do this, but when did you first
14    start reviewing materials for this case?
15         A.  It was mid or late summer --
16         Q.  Okay.
17         A.  -- of this year obviously.
18         Q.  And when did you first look at any of the slides?
19         A.  I think it was late summer.
20         Q.  Summer.  You mean August or September?
21         A.  I think August.
22         Q.  And did you look at all of the slides you
23    reviewed all at once, or did that happen in stages?
24         A.  There was stages, but I think -- no, I think I
25    did -- I reviewed all the slides the first time, I

Page 135

1     believe.  And then there was another set of recuts that I
2     saw again, but they were recuts of the slides I had
3     already seen, as far as I recall.
4          Q.  Okay.  So you were actually -- you saw all the
5     slides for purposes of what they revealed to you in August
6     of this year; is that right?  That probably wasn't a good
7     question.
8          MR. WES:  Objection, form.
9          THE WITNESS:  I think it was August.
10         MS. COTA:  Q.  Okay.  And so was it at that time
11    upon your review in August that you came to -- or formed
12    your opinion that there were these fragments of the
13    perineum?
14         MR. WES:  Object to form.
15         MS. COTA:  Q.  I'm sorry, was that a yes?
16         A.  Yes.  At the time of my first review of the
17    colporrhaphy tissue that was removed, yes, that was my
18    opinion then.
19         Q.  Okay.  And prior to your review of the samples,
20    had you received any literature regarding the potential
21    risks or side effects of colporrhaphy procedures?
22         A.  No.  No.  As I mentioned, those came after I made
23    the observation that there was a significant amount of
24    that perineal tissue that was removed.
25         Q.  Okay.  And Ms. Perry, she's complaining of pain

Page 136

1     other than the complaints of dyspareunia; is that right?
2          MR. WES:  Objection, form, calls for speculation,
3     foundation, outside the scope.
4          THE WITNESS:  My understanding it's more recently
5     she's complaining of different kinds of pain now, yes.
6          MS. COTA:  Q.  Okay.  And do you have any opinion
7     of what could be causing those complaints of pain?
8          MR. WES:  Objection, outside the scope, calls for
9     speculation.
10         THE WITNESS:  Well, okay.  So I -- my response is
11    yes and no as to whether I have an opinion.  I do think
12    that post colporrhaphy, even when you try to, you know,
13    fix the pain, that it's continuing and ongoing.
14         So even though Dr. Allen tried to dilate the --
15    you know, the expand the circumference and dilate the
16    introitus, there's always a chance that it will -- the
17    pain, the dyspareunia, will recur for lots of reasons, but
18    one of them would just be that it just sort of narrows
19    down again.
20         So I would suspect that if, in fact, she's
21    redeveloped pain, that's probably still a component of
22    that colporrhaphy procedure.  But there are other
23    components of that pain that I have no opinion, 'cause
24    they don't really make sense to me.  I don't understand
25    why she has them.

Page 137

1          Q.  Okay.  And what --
2          A.  So I can't address those.
3          Q.  And what -- I'm sorry, were you finished?
4          A.  Well, I think she said something about burning
5     vaginal pain without -- just de novo.  I don't understand
6     that.
7          Q.  Okay.  Any other components of her pain that
8     don't make sense to you?
9          A.  Well, those are the only one that I recall.  When
10    I read it, it didn't make any -- I don't know what that
11    means --
12         Q.  Okay.
13         A.  -- or how to explain that or even --
14         Q.  And her -- what about her complaints of vaginal
15    pain?  Does that make any sense to you?
16         MR. WES:  Same objections.
17         THE WITNESS:  No, not really.
18         MS. COTA:  Q.  And pelvic pain?
19         A.  Well, again --
20         MR. WES:  Same objections.
21         THE WITNESS:  Again, I don't recall reading about
22    the pelvic.  I don't know what she means by pelvic pain.
23    So that I don't know.
24         MS. COTA:  Q.  Okay.  If --
25         A.  Pelvis is a big area, so I don't know where she's

Golkow Technologies, Inc. - 1.877.370.DEPS

Teri A. Longacre, M.D.

Page 138

1    talking about or what that's referring to.
2        Q.  Okay.  So if you were aware that she -- or if
3    she -- if you were aware that she was complaining of
4    pelvic pain, you wouldn't know the cause of that; is that
5    right?
6        A.  I wouldn't --
7            MR. WES:  Object to form, calls for speculation,
8    outside the scope.
9            Go ahead.
10           MS. COTA:  Q.  You can answer.
11       A.  No, I wouldn't know.
12       Q.  Okay.  And Dr. Longacre, I know you've testified
13   and told us that, you know, these opinions, you know,
14   constitute the opinions you'll be giving at trial.
15           Are you going to be expressing any opinion of
16   Dr. Luu's procedures that he performed on Ms. Perry?
17       A.  No.
18       Q.  Are you going to be making any criticisms of the
19   procedures that Dr. Luu performed on Ms. Perry?
20       A.  No.
21       Q.  Are you going to be making any criticisms about
22   Dr. Luu?
23       A.  No.
24           MS. COTA:  Okay.  Thank you very much.  I don't
25   have any more questions.

Page 139

1            EXAMINATION BY MR. JONES
2            MR. JONES:  Q.  A few issues.  Doctor, you
3    brought with you some materials today that you could refer
4    to, correct?
5        A.  Correct.
6            MR. JONES:  I'd like to go ahead and mark those
7    materials that we haven't already previously marked as
8    Exhibit L-8 (sic).
9            MR. WES:  Sure.  I think those are going to be
10   the two operative reports.
11           THE WITNESS:  Yes.  That's what they were.
12           MR. JONES:  Okay.  We'll mark those as Exhibit
13   L --
14           MS. COTA:  The last one I have is L-8, the CV.
15           MR. JONES:  Mark L-9.
16           (Whereupon, Exhibits L-9 and L-10 were marked
17           for identification.)
18           THE WITNESS:  What happened to L-4?
19           MR. JONES:  A couple of follow-up questions based
20   on information that came about through Laura's
21   questioning.
22           Well, first off, Josh, you're going to provide a
23   narrow universe of materials that she has actually looked
24   at and reviewed, correct?
25           MR. WES:  Yes, we will provide you of the list to

Page 140

1    make clear exactly what is on that flash drive that has
2    actually been reviewed.
3            MR. JONES:  Versus what hadn't been reviewed?
4            MR. WES:  Correct.
5            MR. JONES:  Okay.  Thank you.
6        Q.  Doctor, you understand this trial is set to begin
7    January 12th, 2015, correct?
8        A.  Correct.
9        Q.  And I assume you've cleared your schedule and you
10   would be able to come and testify the month of January?
11       A.  After the 12th, yes.
12       Q.  You'll be able to testify?
13       A.  Yes.
14       Q.  Final question.  Will you be giving an opinion
15   that the AC procedure, anterior colporrhaphy procedure,
16   the AC procedure, caused dyspareunia in Ms. Perry?
17           MR. WES:  Object to form.
18           THE WITNESS:  I think -- well, it was an anterior
19   and posterior colporrhaphy, and it's generally the
20   posterior colporrhaphy part that is thought to be
21   associated with the dyspareunia, not necessarily the
22   anterior colporrhaphy.
23           MR. JONES:  Q.  Will you be giving an opinion the
24   PC procedure caused dyspareunia in Ms. Perry?
25           MR. WES:  Object to form.

Page 141

1            THE WITNESS:  In all likelihood I think that it
2    did, yes.
3            MR. JONES:  Q.  Will you be giving that opinion
4    at trial?
5        A.  Yes, I will.
6        Q.  Is that an opinion that's included in this
7    summary of opinions list?
8        A.  I don't know why I keep -- it may not be.
9            Did you find it?  This is why we have this 'cause
10   I can't even remember what I say let alone what I write
11   down.
12           Oh, consistent with findings of the explanter of
13   a tight band at the introitus.  So that's consistent with
14   Dr. Allen's findings, and I guess by extrapolation I
15   was -- his interpretation that was probably what was
16   causing the dyspareunia.  The literature suggests that,
17   and that's how I'm interpreting it.  So that's what that
18   is.
19       Q.  So consistent with findings of the explanter of a
20   tight band at the introitus?
21       A.  Yes.
22       Q.  What you mean by that is you'll be giving an
23   opinion at trial that the posterior repair caused
24   dyspareunia in Ms. Perry?
25           MR. WES:  Object to form.

36 (Pages 138 to 141)

Teri A. Longacre, M.D.

Page 142

1    THE WITNESS: Yeah, I think -- the opinion is
2 that there was a -- there wasn't just vaginal tissue
3 removed, there was a fair amount -- significant amount of
4 perineal tissue. That perineal tissue -- in all
5 likelihood that -- the removal of that material in all
6 likelihood caused the narrowing, and narrowing of the
7 introitus is associated with dyspareunia.
8    So in all likelihood, I think that that is what's
9 caused her dyspareunia, and that was her report of pain on
10 entry. So I think that's corroborated by Dr. Allen's
11 findings, and that's my opinion.
12    MR. JONES: Q. Okay. Are there any other
13 conclusions that you'll be giving that aren't included in
14 this summary of opinions?
15    A. No.
16    Q. Okay. And you said that counsel provided you
17 literature related to dyspareunia being associated with
18 colporrhaphy procedures, correct?
19    A. Yes.
20    MR. WES: Object to form.
21    MR. JONES: Q. Did counsel provide you any
22 literature related to transvaginal mesh causing
23 dyspareunia?
24    MR. WES: Object to form.
25    THE WITNESS: Counsel provided me a lot of

Page 143

1 literature about -- concerning dyspareunia associated
2 with -- or with -- you know, associated with mesh, yes.
3    MR. JONES: Q. Okay. And once we get the list
4 of materials that you actually are relying on in this
5 case, we'll be able to look at that list and locate
6 articles where transvaginal mesh has been associated with
7 dyspareunia, correct?
8    MR. WES: Object to form.
9    THE WITNESS: Transvaginal mesh material that's
10 been -- I reviewed articles that talked about pain
11 associated with transvaginal mesh.
12    MR. JONES: Okay.
13    THE WITNESS: Yes.
14    MR. JONES: That's all the questions I have.
15    FURTHER EXAMINATION BY MS. COTA
16    MS. COTA: And I'm sorry, I have like two
17 follow-up questions.
18    Q. Dr. Longacre, you testified that it's your
19 opinion that the dyspareunia that Ms. Perry complains of
20 is because of a narrow introitus caused by the PC
21 procedure. Is that --
22    A. Yes.
23    Q. -- accurate?
24    MR. WES: Object to form.
25    MS. COTA: Thank you.

Page 144

1    Q. Do you know how -- how wide the introitus was
2 following the PC procedure?
3    MR. WES: Object to form, foundation,
4 speculation.
5    THE WITNESS: Dr. Allen makes a comment about how
6 it's, you know, narrowed and how many fingers he could
7 insert versus after he dilated it, yes.
8    MS. COTA: Q. Okay. Do you know how wide the
9 introitus was prior to the PC procedure?
10    MR. WES: Same objection.
11    THE WITNESS: I don't know that it was reported
12 in that operative report.
13    MS. COTA: Q Okay. So is that a no?
14    A. Well, I think as -- I think even Doctor -- I'm
15 blocking on his name -- Luu?
16    Q. That's my client.
17    A. Is that how you pronounce his name?
18    Q. My client, yes.
19    A. I think as he mentioned it, if he had seen -- if
20 there was an abnormality, he would have reported it. He
21 mentioned that in his deposition. So if there had been an
22 abnormally narrow introitus, that would have been in his
23 op report.
24    He didn't say that specifically, but I know that
25 during his deposition he was asked something, and he

Page 145

1 basically said it would be in there. If there was
2 anything abnormal, it would have been in there.
3    So I would extrapolate that it wasn't abnormally
4 narrow at the time he did his mesh procedure and probably
5 wasn't, not with all that -- usually with lax tissue, it's
6 usually not narrowed. The enterocele and the recto --
7 cystocele.
8    (Reporter clarification.)
9    THE WITNESS: Yes. That's another term for
10 rectocele.
11    MS. COTA: Q. But it's true we don't have any
12 documentation similar to Dr. Allen's report where he talks
13 about the number of fingers that he can insert?
14    A. That's correct.
15    MR. WES: Same objection.
16    MS. COTA: And is the -- whether or not -- well,
17 strike that. I'm done.
18    THE WITNESS: Okay. That's all.
19    MR. WES: Do you have anything else? Go off the
20 record for just a second.
21    (Discussion held off the record.)
22    MR. WES: We can go back on.
23    EXAMINATION BY MR. WES
24    MR. WES: Q. So just one very brief point of
25 clarification. I think plaintiff's counsel asked you

37 (Pages 142 to 145)

Teri A. Longacre, M.D.

Page 146

1  earlier if you were being compensated for your deposition
2  testimony today.  Is it true that you're being compensated
3  for your time today?
4      A.  Yes.
5      Q.  Okay.  And the opinions you're giving in this
6  case are your opinions; is that right?
7      A.  Absolutely.
8          MR. WES:  Those are all the questions I have.
9          MR. JONES:  Thanks, Doctor.
10         MR. WES:  Standing order, rough and expedite.
11         MR. JONES:  Rough for me and expedite.
12         MS. COTA:  Same for me.
13         (Whereupon the deposition of
14         TERI A. LONGACRE, M.D.,
15         was concluded at 12:55 p.m.)
16
17              --oOo--
18
19
20
21
22
23
24
25

Page 148

1      STATE OF CALIFORNIA,   )
2                              )  ss.
2      COUNTY OF SANTA CLARA   )
3
4          I, LISA R. KEELING, a Certified Shorthand
5  Reporter in and for the State of California, hereby
6  certify that the witness in the foregoing deposition,
7              TERI A. LONGACRE, M.D.,
8  was by me duly sworn to tell the truth, the whole truth
9  and nothing but the truth in the within-entitled cause,
10 and that the foregoing is a full, true and correct
11 transcript of the proceedings had at the taking of said
12 deposition, reported to the best of my ability and
13 transcribed under my direction.
14
15
16
17 Date _____, 2014  _____
18                              LISA KEELING, CSR NO. 10518
18
19
20
21
22
23
24
25

Page 147

1              - - - - - -
2          E R R A T A
3              - - - - - -
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6      REASON: _____
7  ____  ____  _____
8      REASON: _____
9  ____  ____  _____
10     REASON: _____
11 ____  ____  _____
12     REASON: _____
13 ____  ____  _____
14     REASON: _____
15 ____  ____  _____
16     REASON: _____
17 ____  ____  _____
18     REASON: _____
19 ____  ____  _____
20     REASON: _____
21 ____  ____  _____
22     REASON: _____
23 ____  ____  _____
24     REASON: _____
25

Page 148

1          ACKNOWLEDGMENT OF DEPONENT
2
3          I,_____, do hereby
4  certify that I have read the foregoing pages, and that
5  the same is a correct transcription of the answers
6  given by me to the questions therein propounded, except
7  for the corrections or changes in form or substance, if
8  any, noted in the attached Errata Sheet.
9
10
11 _____
12 TERI A. LONGACRE, M.D.            DATE
13
14
15 Subscribed and sworn to
16 before me on this _____day
17 of_____,20____, by _____
18 _____,
19 proved to me on the basis of satisfactory
20 evidence to be the person(s) who appeared before me.
21     Signature _____
22
23
24
25