# EXHIBIT HH

Stephanie Benight, Ph.D.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE: ETHICON, INC., | ) | |
| PELVIC REPAIR SYSTEM | ) | |
| PRODUCTS LIABILITY | ) | Master File No. |
| LITIGATION | ) | 2:12-MD-02327 |
| | ) |    MDL 2327 |
| | ) | |
| | ) | |
| | ) | JOSEPH R. GOODWIN |
| | ) | U.S. DISTRICT JUDGE |
| THIS DOCUMENT RELATES TO: | ) | |
| THE CASES LISTED BELOW | ) | |
| | ) | |
| | ) | |
| Mullins, et al. v. | ) | 2:12-cv-02952 |
| Ethicon, Inc., et al. | ) | |
| | ) | |
| Sprout, et al. v. | ) | 2:12-cv-07924 |
| Ethicon, Inc., et al. | ) | |
| | ) | |
| Iquinto v. Ethicon, Inc., | ) | 2:12-cv-09765 |
| et al. | ) | |
| | ) | |
| Daniel, et al. v. | ) | 2:13-cv-02565 |
| Ethicon, Inc., et al. | ) | |
| | ) | |
| Dillon, et al. v. | ) | 2:13-cv-02919 |
| Ethicon, Inc., et al. | ) | |
| | ) | |
| Webb, et al. v. Ethicon, | ) | 2:13-cv-04517 |
| Inc., et al. | ) | |
| | ) | |
| Martinez v. Ethicon, | ) | 2:13-cv-04730 |
| Inc., et al. | ) | |
| | ) | |
| McIntyre, et al. v. | ) | 2:13-cv-07283 |
| Ethicon, Inc., et al. | ) | |

VIDEOTAPED DEPOSITION OF STEPHANIE BENIGHT, Ph.D.

Tuesday, October 13, 2015, 11:45 a.m.

Stephanie Benight, Ph.D.

## Page 2

```
 1    Oxley v. Ethicon, Inc.,   ) 2:13-cv-10150
      et al.                    )
 2                             )
      Atkins, et al. v.        ) 2:13-cv-11022
 3    Ethicon, Inc., et al.     )
                               )
 4    Garcia v. Ethicon, Inc.,  ) 2:13-cv-14355
      et al.                    )
 5                             )
      Lowe v. Ethicon, Inc., et ) 2:13-cv-14718
 6    al.                       )
                               )
 7    Dameron, et al. v.        ) 2:13-cv-14799
      Ethicon, Inc., et al.     )
 8                             )
      Vanbuskir, et al., v.     ) 2:13-cv-16183
 9    Ethicon, Inc., et al.     )
                               )
10    Mullens, et al. v.        ) 2:13-cv-16564
      Ethicon, Inc., et al.     )
11                             )
      Shears, et al. v.         ) 2:13-cv-17012
12    Ethicon, Inc., et al.     )
                               )
13    Javins, et al., v.        ) 2:13-cv-18479
      Ethicon, Inc., et al.     )
14                             )
      Barr, et al. v. Ethicon,  ) 2:13-cv-22606
15    Inc., et al.              )
                               )
16    Lambert v. Ethicon, Inc., ) 2:13-cv-24393
      et al.                    )
17                             )
      Cook v. Ethicon, Inc., et ) 2:13-cv-29260
18    al.                       )
                               )
19    Stevens v. Ethicon, Inc., ) 2:13-cv-29918
      et al.                    )
20                             )
      Harmon v. Ethicon, Inc.,  ) 2:13-cv-31818
21    et al.                    )
                               )
22    Snodgrass v. Ethicon,     ) 2:13-cv-31881
      Inc., et al.              )
23                             )
      Miller v. Ethicon, et al. ) 2:13-cv-32627
24
25
```

## Page 3

```
 1    Matney, et al. v.         ) 2:14-cv-09195
      Ethicon, Inc., et al.     )
 2                             )
      Jones, et al. v. Ethicon, ) 2:14-cv-09517
 3    Inc., et al.              )
                               )
 4    Humbert v. Ethicon, Inc., ) 2:14-cv-10640
      et al.                    )
 5                             )
      Gillum, et al. v.         ) 2:14-cv-12756
 6    Ethicon, Inc., et al.     )
                               )
 7    Whisner, et al. v.        ) 2:14-cv-13023
      Ethicon, Inc., et al.     )
 8                             )
      Tomblin v. Ethicon, Inc., ) 2:14-cv-14664
 9    et al.                    )
                               )
10    Schepleng v. Ethicon,     ) 2:14-cv-16061
      Inc., et al.              )
11                             )
      Tyler, et al. v. Ethicon, ) 2:14-cv-19110
12    Inc., et al.              )
                               )
13    Kelly, et al. v. Ethicon, ) 2:14-cv-22079
      Inc., et al.              )
14                             )
      Lundell v. Ethicon, Inc., ) 2:14-cv-24911
15    et al.                    )
                               )
16    Cheshire, et al. v.       ) 2:14-cv-24999
      Ethicon, Inc., et al.     )
17                             )
      Burgoyne, et al. v.       ) 2:14-cv-28620
18    Ethicon, Inc., et al.     )
                               )
19    Bennett, et al. v.        ) 2:14-cv-29624
      Ethicon, Inc., et al.     )
20                             )
21
22
23
24
25
```

## Page 4

```
 1
 2
 3
 4
 5                  - - - -
 6        DEPOSITION OF STEPHANIE BENIGHT, Ph.D.
 7
 8        Held at the Offices of Regus Palo Alto
 9            530 Lytton Avenue, California
10        Tuesday, October 13, 2015, 11:45 a.m.
11                  - - - -
12
13
14
15
16      REPORTED BY:  ELAINA BULDA-JONES, CSR #11720
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                   APPEARANCES
 2
 3      For the Plaintiffs:
 4          Aylstock, Witkin, Kreis & Overholtz
            17 East Main Street, Suite 200
 5          Pensacola, Florida 32502
            BY: DANIEL THORNBURGH, ESQ.
 6          BY: SAMANTHA KATEN
            850.202.1010
 7          Dthornburgh@awkolaw.com
            (PRESENT TELEPHONICALLY)
 8
 9      For the Defendants:
10          Butler Snow, LLP
            1020 Highland Colony Parkway, Suite 1400
11          Ridgeland, Mississippi 39157
            BY: CHAD R. HUTCHINSON, ESQ.
12          601.985.4401
            Chad.hutchinson@butlersnow.com
13
14
15      Also present:
16
            Steve Patapoff, videographer
17
18
19
20
21
22
23
24
25
```

Stephanie Benight, Ph.D.

Page 6

INDEX OF EXAMINATIONS

EXAMINATIONS                    PAGE
MR. THORNBURGH                   9
MR. HUTCHINSON                  221
MR. THORNBURGH                  252


INDEX OF EXHIBITS
NO.        DESCRIPTION          PAGE
Exhibit 1    Microscopy Image Index     32
Exhibit 2    Filename: Microscopy Image    32
             Index.docx, Author: Stephanie
             Benight, Creation date:
             9/28/2015

Exhibit 3    Notice of Videotaped        47
             Deposition Pursuant to Rule 30
             and Document Requests Pursuant
             to Rule 34 of Stephanie
             Benight, Ph.D.

Exhibit 4    Histion, Histopathology     47
             Project Plan, Amendment 1,
             Histion Study Number H150118

Exhibit 5    Histion Chain of Custody    48

Exhibit 6    Flash Drive                 48

Exhibit 7    Flash Drive                 51

Exhibit 8    Flash Drive                 51

Exhibit 9    SEM                         56

Page 7

Exhibit 10    SEM                        58
Exhibit 11    SEM                        58
Exhibit 12    SEM                        59
Exhibit 13    SEM                        60
Exhibit 14    SEM                        61
Exhibit 15    FTIR Data                  67
Exhibit 16    PowerPoint Presentation,   70
              Properties

Exhibit 17    Histion Chain of Custody   112
              Staining Log
Exhibit 18    Lab notebook previously marked  119
              in the Kevin Ong deposition

Exhibit 19    SEM                        155

Exhibit 20    FTIR Data 8/25/2015        159

Exhibit 21    Background, QUV oxidized mesh,  167
              Sample #6
Exhibit 22    Photomicrograph            194
Exhibit 23    Photomicrograph            196
Exhibit 24    Photomicrograph            197
Exhibit 25    Expert Report of Dr. Steven  217
              MacLean

Page 8

THE VIDEOGRAPHER:  Good morning.  We are now on the video record.  My name is Steve Patapoff.  I'm the videographer for Golkow Technologies.  Today's date is October 13th, 2015.  Time is 11:45 a.m.

Deposition is being held in Palo Alto, California, in the matter of In Re: Ethicon, Inc., Pelvic Repair Products Liability Litigation for the U.S. District Court, Southern District of West Virginia, Charleston Division.

The deponent is Dr. Stephanie Benight.

Will counsel please voice-identify yourselves for the record.

MR. THORNBURGH:  This is Daniel Thornburgh for the plaintiff.

MR. HUTCHINSON:  And Chad Hutchinson, counsel for Ethicon and Johnson & Johnson.

THE VIDEOGRAPHER:  The court reporter is Elaina Bulda-Jones and will now swear in the witness.

STEPHANIE BENIGHT, Ph.D., called as a witness by the Plaintiffs herein, being first duly sworn by the Certified Shorthand Reporter was thereupon examined and testified as is hereinafter set forth.

Page 9

EXAMINATION
BY MR. THORNBURGH:
   Q.  Good morning, Dr. Benight.  How are you doing today?
   A.  Good.
   Q.  Good.  My name is Daniel Thornburgh.
      I represent thousands of women who have alleged that they have suffered harms and losses as a result of Ethicon's products, including the TVT sling device that was manufactured by Ethicon for use for stress urinary incontinence.
      Do you understand that?
   A.  Yes.
   Q.  Okay.  And this deposition relates to 37 of those women whose cases have been consolidated for trial in West Virginia.
      Do you understand that?
   A.  Yes.
   Q.  And to start off, the technical difficulties, I tried to make this very easy for everybody by doing it by videoconference and by having all my exhibits printed beforehand and indexed and everything else, but that didn't happen the way I wanted it to.
      But I apologize for the delay.

3 (Pages 6 to 9)

Stephanie Benight, Ph.D.

Page 10

1     A.  Okay.
2     Q.  And you are here today to provide
3  deposition testimony related to some experiments
4  that you worked on as an employee of Exponent in
5  collaboration with Dr. MacLean, who was named by
6  Ethicon and Johnson & Johnson as an expert in this
7  case; is that -- is my understanding correct?
8     A.  That's my understanding.
9        MR. HUTCHINSON:  Dan, stop for just one
10 second.
11       (Whereupon, a brief discussion off the
12 record.)
13       MR. HUTCHINSON:  My computer was not doing
14 realtime, but we have it fixed now.  Sorry about
15 that.
16       MR. THORNBURGH:  Okay.  Okay.  All right.
17 You can see the technical problems are everywhere
18 today.
19       MR. HUTCHINSON:  Not just on your end,
20 huh?
21       MR. THORNBURGH:  You know what, it's not
22 on my end, actually, it's on the other end, because
23 you guys can see us and hear us, but we can't see or
24 hear you.  So the -- it's got to be on that end.
25       MR. HUTCHINSON:  Actually, no -- actually,

Page 11

1  no, we cannot see -- we cannot see you guys either.
2  We can only hear you on the speakerphone.
3        MR. THORNBURGH:  Okay.  Well -- okay.
4  Okay.  Well, whatever the case may be, there is
5  technical problems.  We'll figure that out later on.
6  But let's get going.
7     Q.  Dr. Benight, have you given a deposition
8  prior to today?
9     A.  No.
10    Q.  Okay.  I imagine you are a little bit
11 nervous?
12       MR. HUTCHINSON:  Object to form.
13 BY MR. THORNBURGH:
14    Q.  I think it's natural to be a little
15 anxious and nervous about a deposition.
16       Are you a little bit nervous and anxious
17 about your deposition today?
18       MR. HUTCHINSON:  The same objection.
19       You can answer.
20       THE WITNESS:  No, sir.
21 BY MR. THORNBURGH:
22    Q.  Okay.  Well, let me give you -- let me
23 just explain some of the deposition rules so that we
24 can try to get a clean record and make the court
25 reporter's job a little bit easier, okay.

Page 12

1     A.  Okay.
2     Q.  Okay.  So let's try not to speak over each
3  other, all right?
4     A.  Okay.
5     Q.  So when I'm talking, I'll try to refrain
6  from asking another question, and I ask that if I'm
7  asking you a question, that you refrain from
8  answering the question until I'm finished with my
9  question, okay?
10    A.  Okay.
11    Q.  And you are doing a good job so far.
12       Speak audibly, with a -- you know, a "yes"
13 or a "no."  Don't shake your head yes or no because
14 the court reporter can't document that accurately or
15 completely, okay?
16    A.  I understand.
17    Q.  If you answer a question, I'm going to
18 assume that you understand the question, okay?
19    A.  Okay.
20    Q.  If you don't understand a question, make
21 sure that you ask me -- or ask me to rephrase it.
22 Otherwise, if you answer it, I'm going to just
23 assume that you understood and we're going to move
24 forward to the next question --
25    A.  Okay.

Page 13

1     Q.  -- okay?
2        If you need a break at any time, just let
3  me know, okay?
4     A.  Okay.
5     Q.  We'll -- it's not a marathon, so we'll
6  take a break any time you need a break.
7        The only caveat to that instruction is if
8  I have a question pending, I ask that you answer the
9  question that is pending before you ask for a break,
10 okay?
11    A.  Okay.
12    Q.  Now, I don't want to spend too much time
13 going over your background, training and experience,
14 but let's talk just briefly about your educational
15 background.
16       I understand that you went to the
17 University of Washington for school; is that
18 correct?
19    A.  I have a Ph.D. degree in chemistry from
20 the University of Washington.
21    Q.  Okay.  And I think you also have an
22 undergraduate chemistry degree, too; is that
23 correct?
24    A.  I have a bachelor's of science degree in
25 chemistry from Stanford University.

4 (Pages 10 to 13)

Stephanie Benight, Ph.D.

Page 14

1    Q.  Okay.  And then you went back to Stanford
2  University after you received your Ph.D. from
3  Washington University and got another degree; is
4  that correct?
5    A.  I completed two years of postdoctoral
6  training.  There is no degree associated with that
7  training, but yes, that was at Stanford.
8    Q.  Okay.  And just talk a little bit about
9  your work experience.
10     I -- my understanding from looking, I
11  think, at your resumé on the Exponent website is
12  that you -- or maybe just some research on the
13  internet, but you worked for Dalton Research Group
14  at the University of Washington; is that accurate?
15    A.  Yes.
16    Q.  Okay.  And after you finished your
17  postdoctorate degree -- or postdoctorate work at
18  Stanford, what did you do in terms of work and
19  employment?
20    A.  I started working at Exponent.
21    Q.  Okay.  And how long have you been at
22  Exponent?
23    A.  A little over a year and a half.
24    Q.  Now, let me ask you some questions, just
25  some general questions before I get into the

Page 15

1  specifics of your involvement in the experiments
2  that you performed at Exponent in this case.
3     Is it fair to say -- I did some research
4  of you on the internet, and I noticed that you
5  worked at Dalton labs and -- during -- well, let
6  me -- strike that.
7     Isn't it -- is it accurate to say that at
8  Dalton labs you were required to maintain a lab
9  notebook to document all research and experiments
10  that were being performed at Dalton Research Group?
11    A.  While I worked in Larry Dalton's group, I
12  kept a record of all the experiments performed in a
13  lab notebook.
14    Q.  Okay.  And that was something you learned,
15  going back to your undergraduate and graduate
16  studies, is recording your own results or your
17  experiments and the data from those experiments and
18  the steps and processes taken during those
19  experience -- experiments in a lab notebook,
20  correct?
21    A.  That was the process for the Dalton
22  Research Group at the time.
23    Q.  All right.  And that's the process that
24  you actually learned to undertake in your
25  undergraduate and graduate studies as well, correct?

Page 16

1    A.  I learned to record experiments in my
2  undergraduate and graduate work.
3    Q.  In a laboratory notebook or a research
4  notebook, right?
5    A.  I --
6     MR. HUTCHINSON:  Object to form.
7     THE WITNESS:  I learned to keep a record
8  of the experiments performed during those studies.
9  BY MR. THORNBURGH:
10    Q.  Do you agree with me that a lab notebook
11  is intended to ensure the quality and integrity of
12  data generated during the scientific experiment?
13     MR. HUTCHINSON:  Object to form.
14     THE WITNESS:  A lab notebook is a record
15  of the experiments performed for that particular
16  project.
17  BY MR. THORNBURGH:
18    Q.  And the -- and the -- and the intended
19  purpose is to ensure that the -- is to ensure the
20  quality and integrity of the data generated during
21  that scientific experiment, correct?
22    A.  It's meant to be a recording of the
23  experiments performed so that someone else can
24  repeat the work.
25    Q.  And a lab notebook documents the research

Page 17

1  that has been conducted during the experiment,
2  correct?
3    A.  Yes.
4    Q.  And do you agree with me that a lab
5  notebook ensures that the work that is done is done
6  in accordance with agreed-upon procedures,
7  protocols, and controls of the experiment?
8    A.  Work recorded as part of the experiments
9  performed in the lab notebook is that, it's a record
10  of the experiments performed as part of a project.
11    Q.  Right.  And before that project or
12  experiment starts, certain protocols, procedures,
13  and controls are put into place, correct?
14    A.  It depends on the work being performed.
15    Q.  Okay.  Well, when would -- prior to an
16  experiment being done, what type of work would a --
17  would you receive a -- strike that.
18     Let me -- I'll withdraw that question.
19     You said it -- it depends on the type of
20  work being performed.
21     What do you mean by that?
22    A.  If you are doing an experiment, you record
23  the process for that experiment in a record of the
24  experiment.  You keep a record of it.
25    Q.  Right.  And -- right.  And by "process,"

Stephanie Benight, Ph.D.

Page 18

1    that's the protocols that are established before the
2    experiment is started, correct?
3         A.   It depends on the experiment.
4         Q.   Okay.  What do you mean by that?
5         A.   For example, in graduate school, I
6    synthesized a compound.  I would write the reaction
7    down in a laboratory notebook prior to starting the
8    reaction.
9         Q.   Yeah, but -- but I'm not talking about the
10   lab notebook anymore.  So I apologize if my question
11   wasn't clear.
12        My question is, before the experiment gets
13   started --
14        A.   Well, you are breaking up a little bit.
15        Q.   Yeah.  So let me -- let me try this again.
16        Can you hear me better now?
17        A.   Yes.
18        Q.   Okay.  So I am -- I am trying to make sure
19   that you understand my question.
20        Generally speaking, when you intend to
21   conduct some sort of experiment, is it true that
22   there are written protocols that are followed
23   throughout the -- throughout the experiment that is
24   being conducted?
25        MR. HUTCHINSON:  Object to form.

Page 19

1         THE WITNESS:  When you conduct an
2    experiment, you want to keep a record of the
3    experiment that is performed.
4    BY MR. THORNBURGH:
5         Q.   But my question is, before the -- before
6    the record -- or before the experiment is started
7    and before you are keeping a record, in your lab
8    notebook or elsewhere, isn't it true that you begin
9    a study with a study protocol?
10        A.   It depends on the experiment being
11   performed.
12        Q.   Let me -- let me -- let me ask you this
13   question.
14        Before you began the experiment in this
15   case, were you provided with a written protocol?
16        A.   We followed the protocols of the
17   plaintiffs' experts, Dr. Guelcher and Dr. Iakovlev,
18   in the performance of these experiments.
19        Q.   Well, but neither one of those experts
20   performed UV photooxidation, correct?
21        A.   We performed a simple set of control
22   experiments that the plaintiffs' experts did not in
23   this study.
24        Q.   Right.  And so was there a written
25   protocol on -- prior to beginning the experiment

Page 20

1    regarding a protocol that should be followed in the
2    UV photooxidation phase of your experiment?
3         A.   A QUV is a common way to induce changes in
4    polymers, including oxidation.  There are hundreds
5    of papers on the subject, and so in a fundamental
6    perspective, we followed that.
7         Q.   Okay.  So listen to my question, because
8    I'm trying to make it really simple and clear.
9         Before you started the QUV experiment that
10   we're going to talk to in more detail in a moment,
11   were you provided with a written protocol that you
12   were to follow?
13        MR. HUTCHINSON:  Object to form and asked
14   and answered.
15        Dan, just so you'll know, the -- there is
16   something coming up on the screen.  Are you guys
17   trying to call in again?
18        MR. THORNBURGH:  I don't see that from my
19   end, but somebody might on that end.  I don't know.
20   My screen is blank.  It's not even on.
21        MR. HUTCHINSON:  Okay.  So you all aren't
22   trying to call in anymore; is that right?
23        MR. THORNBURGH:  That's right.
24        MR. HUTCHINSON:  Okay.
25

Page 21

1    BY MR. THORNBURGH:
2         Q.   So, Doctor, sorry for the interruption.
3    I'm going to try to make this very simple.
4         My question to you is, before the QUV
5    procedure was conducted, were you provided with a
6    written protocol that you were supposed to follow?
7         A.   A QUV a common way to induce changes in
8    polymers, including oxidation, and we followed the
9    hundreds of literature articles that covered that.
10        Q.   Okay.  So you were not provided with a
11   written protocol, correct?
12        MR. HUTCHINSON:  Objection.  Been asked
13   and answered, Counsel.  Move on.
14        MR. THORNBURGH:  It's a simple question.
15        MR. HUTCHINSON:  Well, she's answered it.
16        MR. THORNBURGH:  Excuse me.  Excuse me.
17        Q.   Dr. Benight, did Dr. MacLean or anybody
18   else from Exponent provide you with a written
19   protocol regarding the QUV procedure?
20        MR. HUTCHINSON:  Same objection.
21        You can answer, Dr. -- Dr. Benight, if you
22   can.
23        THE WITNESS:  We followed a protocol that
24   is in hundreds of literature papers on QUV, which is
25   a common way to induce changes in polymers,

Stephanie Benight, Ph.D.

Page 22

1    including oxidation.
2    BY MR. THORNBURGH:
3        Q.  Okay.  So you weren't provided with a
4    written protocol that synthesized those hundreds of
5    peer-reviewed publications regarding protocols to
6    follow for QUV photooxidation, correct?
7            MR. HUTCHINSON:  Same objection.
8            THE WITNESS:  Can you repeat the question?
9            MR. THORNBURGH:  Madam Court Reporter, can
10   you read back the question, please?
11           (Whereupon, the reporter read the record
12   as follows:
13           "Question:  Okay.  So you weren't provided
14   with a written protocol that synthesized those
15   hundreds of peer-reviewed publications regarding
16   protocols to follow for QUV photooxidation,
17   correct?")
18           THE WITNESS:  For a specific protocol, we
19   followed the protocol of Dr. Reitman, et al., given
20   in a conference presentation.
21   BY MR. THORNBURGH:
22       Q.  Okay.  And Dr. Reitman is another
23   scientist at Exponent who has been retained by
24   Butler Snow and other law firms to represent -- or
25   to serve as an expert in mesh litigation; is that

Page 23

1    your understanding?
2            MR. HUTCHINSON:  Object to form.  Dan,
3    that mischaracterizes the evidence.
4            THE WITNESS:  Dr. Reitman is also an
5    employee at Exponent.
6    BY MR. THORNBURGH:
7        Q.  Correct.  And you understand that
8    Dr. Reitman has been named as an expert in the mesh
9    litigation on behalf of defendants, correct?
10       A.  I don't know about that information.
11       Q.  Okay.  So let's go back to your answer a
12   few moments ago.
13           You testified that Dr. -- that you
14   followed the protocol that was discussed by
15   Dr. Reitman at a -- some sort of conference; is that
16   correct?
17           MR. HUTCHINSON:  Same objection.  Counsel,
18   this has been asked and answered.  She's testified
19   already what she has followed.
20           MR. THORNBURGH:  Excuse me, Chad, I -- if
21   you want to object, just object.
22           MR. HUTCHINSON:  Okay.  Please note my
23   objection for the record.  She's already
24   testified --
25           MR. THORNBURGH:  All right.

Page 24

1            MR. HUTCHINSON:  -- what she followed.
2            MR. HUTCHINSON:  Chad, Chad, your
3    objection is noted.  I would prefer that you don't
4    speak, and that's part of the rules here.
5        Q.  Doctor, is it -- I'm just trying to
6    understand your testimony.
7            Is it your testimony that you followed the
8    protocol regarding QUV photooxidation of synthetic
9    polypropylene meshes that was prepared and presented
10   by Dr. Reitman at a conference?
11       A.  Well, we followed hundreds of literature
12   articles that recount QUV exposure as a way to
13   induce changes in polymers, including oxidation.
14           As for a specific -- what you are
15   referring to as protocol, I -- we used that of
16   Dr. Reitman, et al., in a conference presentation.
17       Q.  Okay.  Was Dr. Reitman's protocol provided
18   to you as the written protocol that should be
19   followed in your experiment using QUV radiation in
20   this case?
21       A.  That is the specific conditions that we
22   used.
23       Q.  Okay.  And when was that protocol provided
24   to you?
25       A.  I don't recall.

Page 25

1        Q.  Did you receive it via e-mail from
2    Dr. MacLean, or how did that -- how did you receive
3    that?
4        A.  I believe that it was a conference
5    presentation given by Dr. Reitman.
6        Q.  Okay.  So you went to the lab and you were
7    recalling the procedures and the protocol that was
8    established by Dr. Reitman during a prior
9    conference --
10       A.  Yes.
11       Q.  -- is that correct?
12           And so you didn't have in front of you
13   Dr. Reitman's written procedures regarding QUV, it
14   was based on your recollection of the protocol that
15   ought to be followed while using QUV to -- to
16   intentionally oxidize synthetic polypropylene mesh?
17           MR. HUTCHINSON:  Objection.  Counsel, you
18   have asked the same question in a roundabout way
19   literally ten times now.  The witness has already
20   told you what they followed.
21           MR. THORNBURGH:  Okay.
22       Q.  So when was that conference given,
23   approximately?
24       A.  I believe in -- I don't know the exact
25   year.  Probably in 2013.

7 (Pages 22 to 25)

Stephanie Benight, Ph.D.

Page 26

1    Q.  So approximately two years before your
2    experiment in this case?
3        A.  That's correct.
4        Q.  Okay.  And you don't have a copy of the
5    protocol that was discussed by Dr. Reitman in your
6    possession today, correct?
7        A.  The protocol is given in Dr. MacLean's
8    expert report.
9        Q.  Well, but my question is, what -- so let
10   me back up a little bit.  We'll get to it -- we'll
11   get to -- we'll come back to this question later on,
12   I think -- actually, this topic later on.  Let's
13   move on and talk about some other issues.
14       Doctor, when you -- let me ask you this
15   question.
16       Do you agree that maintaining a lab
17   notebook documenting the experiments performed helps
18   in the event that your data may have to be explained
19   or defended or reconstructed or repeated without
20   your assistance by some other person?
21       A.  Keeping a record of the experiments
22   performed is important so that another reasonable
23   scientist can repeat the work.
24       Q.  So a lab notebook allows others -- if I
25   understand your testimony correctly, others to

Page 27

1    understand what you did in your experiment and -- so
2    that they can repeat or -- or attempt to reproduce
3    your results in their own study; is that accurate?
4        A.  A record of experiments performed serves
5    that purpose.
6        Q.  Okay.  So you seem to be distinguishing
7    from a lab notebook and a record of the experiment
8    performed.
9        Did you not keep a lab notebook in this
10   case?
11       A.  I kept a record of all of the experiments
12   performed, and that's been provided to you
13   electronically.
14       Q.  Okay.  But you didn't have -- you didn't
15   use the Exponent lab notebook to record your data
16   and the steps that you took during your experiment
17   in a notebook that is designated for research,
18   correct?
19       MR. HUTCHINSON:  Object to form.
20       MR. THORNBURGH:  Let me ask -- let me ask
21   that question better.
22       Q.  Doctor, I have taken other Exponent
23   scientists' depositions before today, so you are not
24   my first Exponent witness.
25       And I have taken, you know, several

Page 28

1    doctors who have -- who have provided testimony or
2    have done experiments on behalf of Exponent in this
3    litigation who have -- who have maintained a lab
4    notebook that was provided to that scientist from
5    Exponent to record their experience -- their
6    experiment.
7        Were you provided with an
8    Exponent-specific lab notebook to use in this case?
9        MR. HUTCHINSON:  Object to form.
10       THE WITNESS:  It sounds like you are
11   referring to your own process.  I kept a record of
12   all the experiments performed on Exponent's servers.
13   BY MR. THORNBURGH:
14       Q.  Okay.  So you didn't use -- strike that.
15       When you were in your undergraduate --
16   strike that.
17       When you were at -- working at Dalton --
18   when you were working at Dalton Research Group at
19   the University of Washington, do you agree that a
20   lab notebook should be written as a diary, where all
21   the information about the work is recorded as it is
22   done, contemporaneous with the experiment that you
23   are performing?
24       MR. HUTCHINSON:  Object to form.
25       THE WITNESS:  That was part of the process

Page 29

1    for that lab, keeping a record of the experiments
2    performed.
3    BY MR. THORNBURGH:
4        Q.  You used a different process in this
5    experiment than the process of recordkeeping and lab
6    notebook recording that you used when you worked for
7    Dalton Research Group, correct?
8        A.  For these set of experiments that are the
9    basis for Dr. MacLean's report, I kept a record of
10   the experiments performed electronically.  It's an
11   electronic lab notebook.
12       Q.  Okay.  So where is your electronic lab
13   notebook?
14       A.  That's been provided to you
15   electronically.
16       Q.  Well, how would I identify what your -- or
17   where your electronic lab notebook is within the
18   production of documents that were provided to me?
19       A.  I can point those out to you, sir, if you
20   would like.
21       Q.  Okay.  So let me -- let me try to
22   understand.
23       So what are you representing to this Court
24   was the lab -- electronic lab notebook that you kept
25   contemporaneous with the study that you performed in

8 (Pages 26 to 29)

Stephanie Benight, Ph.D.

Page 30

1  this case?
2      A.  I can point out those documents to you
3  within the production.
4          MR. THORNBURGH:  Madam Court Reporter, can
5  you find the document that was in the index as
6  Number 4?  It's the -- it's the grid.
7          (Whereupon, a brief discussion off the
8  record.)
9          MR. THORNBURGH:  Well, we're going to
10  finish -- we'll finish this line of questioning,
11  Chad, and then I'll -- I'll do it as quick as I can,
12  but I probably have a few questions just to finish
13  this line of questioning, and then I'll let you --
14  we'll take a break.
15          THE WITNESS:  Is there a question?
16  BY MR. THORNBURGH:
17      Q.  Yeah, my -- you had indicated that you
18  kept an electronic lab notebook within the Exponent
19  databases, or at least some sort of electronic
20  notebook, and I asked you to point out where those
21  notebooks are.
22          And rather than go through the entire
23  production, I'm going to direct you to a couple
24  documents and ask you if certain documents are the
25  documents that you are alleging are your electronic

Page 31

1  lab notebooks, okay?
2      A.  Okay.
3      Q.  So I think the court reporter was going to
4  pull out Document No. 4.
5          MR. THORNBURGH:  Have you done that
6  already, Madam Court Reporter?
7          THE REPORTER:  Yes, sir.
8  BY MR. THORNBURGH:
9      Q.  Okay.  And Document No. 4, let's go ahead
10  and mark that as Exhibit No. 1.
11      A.  It's currently marked as Exhibit No. 4.
12      Q.  Well, let -- we're going to -- I didn't
13  want these premarked, but -- so -- that was just
14  Document No. 4 on the index, so let's go ahead and
15  just mark it as Exhibit Number 1, please.
16          MR. HUTCHINSON:  All right.  And, Dan,
17  just so that we have a clear record, the witness has
18  a document in front of her that is -- somebody
19  marked already as Exhibit 4.  So do you want us
20  to --
21          MR. THORNBURGH:  And that --
22          MR. HUTCHINSON:  Hold on just a minute.
23  I'm talking.
24          Do you want us just to strike out the
25  number four and put one; is that what you want?

Page 32

1          MR. THORNBURGH:  Well, I assume that the
2  court reporter has some exhibit stickers.  And so we
3  keep this in -- sort of do this in organized
4  fashion, I'm going to ask that she re-mark that
5  document as Exhibit No. 1 with a new sticker.
6          (Whereupon, a brief discussion off the
7  record.)
8          (Whereupon, Exhibit 1 was marked for
9  identification.)
10          (Whereupon, Exhibit 2 was marked for
11  identification.)
12  BY MR. THORNBURGH:
13      Q.  Dr. Benight, you have Exhibit No. 1 in
14  front of you, and I just want to make sure we're all
15  on the same page.
16          What is -- what -- what document do you
17  have in front of you currently as Exhibit No. 1?
18      A.  It is a table that contains file names of
19  the microscopy images, embedding material, type of
20  light, whether treated to induce oxidation, question
21  mark, underwent staining protocol, question mark,
22  and miscellaneous notes.
23      Q.  Okay.
24      A.  This document is printed on double-sided
25  paper and is --

Page 33

1      Q.  I think you have --
2      A.  I'm not finished, sir.
3          -- seven pages.
4      Q.  Okay.  It's -- you have sufficiently
5  identified it in terms of what it looks like, but do
6  you recognize this document as a document that you
7  have seen before today?
8      A.  Yes.
9      Q.  Okay.  And is this a document that you
10  created?
11      A.  Yes.
12      Q.  Okay.  And is this a document that you are
13  alleging is your -- I'll represent your electronic
14  lab notebook?
15          MR. HUTCHINSON:  Object to form.
16          THE WITNESS:  This document is part of a
17  record of the experiments performed.
18  BY MR. THORNBURGH:
19      Q.  Would this be a document that you
20  represent and are representing to the Court to be
21  your electronic lab notebook?
22          MR. HUTCHINSON:  Object to form.  Counsel,
23  you have asked and answered that question a plethora
24  of times.
25          MR. THORNBURGH:  Actually, she hasn't.

Stephanie Benight, Ph.D.

Page 34

1      Q.  Please answer my question.
2      A.  This is part of the record of experiments
3   performed and one of the documents provided to you
4   electronically.
5      Q.  Are you representing to the Court that
6   this document is part of your electronic lab
7   notebook?
8      A.  This document is part of the experiments
9   performed.  It is a record of those experiments
10  performed.
11     Q.  Okay.  And let's go ahead and mark
12  Document No. 5 as Exhibit No. 2.
13         MR. HUTCHINSON:  All right.  Hey, Dan,
14  we're going to take a quick break.  I'll be right
15  back.
16         MR. THORNBURGH:  I'm almost finished with
17  this line of questioning.
18         MR. HUTCHINSON:  I understand that, but I
19  need to take a quick break.
20         THE WITNESS:  I would like to take a
21  break.
22         MR. HUTCHINSON:  And we'll be right -- and
23  I'll be right back.
24         MR. THORNBURGH:  No, actually, we're going
25  to keep on going.  I'm going to ask this next

Page 35

1   question, and then we can take a break.  Okay?
2   Hello.
3         THE REPORTER:  They have left the room.
4         THE VIDEOGRAPHER:  Going off the record at
5   12:16.
6         (Whereupon, a brief recess was taken.)
7         THE VIDEOGRAPHER:  Back on the record at
8   12:20.
9         MR. HUTCHINSON:  Okay, Dan.  We're back.
10  BY MR. THORNBURGH:
11     Q.  Dr. Benight -- Doctor --
12         MR. THORNBURGH:  I know.
13     Q.  Dr. Benight, before we went off the
14  record, we looked at and marked a -- an exhibit as
15  Exhibit No. 1, which was a grid containing some
16  information about some of the samples that were
17  looked at during your experiment.
18  I'll represent to the Court and for the
19  record that this was sent to me, and it was named
20  "Microscopy Image Index" and was produced by
21  Dr. MacLean during his deposition on September 29th,
22  2015.
23         And before we went off -- we went off the
24  record, I believe you testified that this represents
25  some notes that you put together related to the

Page 36

1   experiments that were performed by you at Exponent;
2   is that correct?
3      A.  Yes.
4      Q.  Okay.  Now, when did you create this grid
5   of information?
6      A.  This document was created the day before
7   Dr. MacLean's deposition.
8      Q.  Okay.  So this wasn't kept contemporaneous
9   with the experiments that you performed in this
10  case, correct?
11     A.  This specific document was created after
12  the experiments were performed.
13     Q.  Let's back up -- let's back up a little
14  bit.
15         And I want to know, when did you first get
16  involved in this case?
17     A.  I don't know the exact date.  Maybe a
18  couple months ago.
19     Q.  Do you recall providing some time as part
20  of an invoice that was submitted to -- to Butler
21  Snow for the work performed in this case?
22     A.  Is there a particular invoice that you are
23  referring to?
24     Q.  My question was, do you recall providing
25  some information about time spent in this case so

Page 37

1   that your work could be invoiced to Butler Snow?
2      A.  Yes, I believe I have recorded time
3   pertaining to this case.
4      Q.  And I'll represent to you that the first
5   invoice was submitted in July of 2015 and a second
6   invoice was submitted in August of 2015.
7         Does it -- does that sound about accurate,
8   that sometime prior to -- or in July or prior to --
9   just prior to July, you became involved in this
10  litigation?
11     A.  Yes.
12     Q.  And at some point, did you receive a TVT
13  exemplar to use in your experiments?
14     A.  Yes.
15     Q.  When did you receive the TVT exemplar?
16     A.  I don't recall.
17     Q.  Did you document that in a lab notebook
18  somewhere?
19     A.  It's recorded in Exponent's internal
20  quality assurance system.
21     Q.  Okay.  Have you produced Exponent's
22  internal quality assurance program as part of the
23  documents that we requested in this litigation?
24     A.  It's my understanding that the internal
25  Exponent quality assurance system is confidential.

10  (Pages 34 to 37)

Stephanie Benight, Ph.D.

| Page 38 | Page 40 |
|---|---|

**Page 38**

1    Q.  Okay.  So I'm -- is there any document
2  that has been produced in this case to me that
3  identifies for me when you would have received the
4  TVT exemplar product?
5    A.  I don't know.  I can look through the
6  production documents.
7    Q.  Well, we're going to look through a couple
8  of them throughout today, and if you see any
9  anyplace -- well, actually, strike that.
10    Let me -- I'll represent to you that there
11  is no document that has been produced that
12  identifies when you would have received the TVT
13  exemplar, okay?  Do you understand that
14  representation?
15    MR. HUTCHINSON:  Object to form.
16    THE WITNESS:  Can you repeat the question?
17  BY MR. THORNBURGH:
18    Q.  I'll represent to you that I have looked
19  at all the documents that have been produced by
20  Exponent in this litigation, and nothing identifies
21  when the TVT exemplar was received by you, okay?
22    MR. HUTCHINSON:  I'm sorry, Dan.  Is that
23  a -- I'm having trouble understanding if that's a
24  question or not.
25    MR. THORNBURGH:  No, I'm just -- I'm

**Page 39**

1  just -- I'm just making that representation.
2    Q.  If you think -- if you believe that there
3  is some document that you would have recorded the
4  date that you received the TVT exemplar that has
5  been produced to me, let me know.
6    Otherwise, I'm going to represent to you
7  that there is no document that recorded -- that
8  provides me with a date that identifies when you
9  would have received the TVT exemplar, okay?
10    So, Doctor, do you know approximately when
11  you would have received the TVT exemplar?
12    A.  I don't recall exactly.
13    Q.  I'm just looking for a fair estimation.
14  I'm entitled to a fair estimation.
15    A.  I don't recall when I exactly received the
16  TVT exemplar you are referring to.
17    Q.  And you didn't record in a sort of -- what
18  I'll call a traditional lab notebook the date that
19  you would have received the TVT exemplar, correct?
20    MR. HUTCHINSON:  Object to form.  Dan,
21  what do you mean by "traditional lab notebook"?  If
22  you tell me, I'll remove my objection to the
23  question.
24  BY MR. THORNBURGH:
25    Q.  Well, Dr. Benight, you have seen the lab

**Page 40**

1  notebooks that Exponent has available to its
2  scientists, haven't you?
3    A.  I don't know what you are referring to.  I
4  have not been issued a specific Exponent lab
5  notebook.  I kept a record of the experiments
6  performed for this project electronically.
7    MR. THORNBURGH:  Madam Court Reporter, can
8  you read back that response, please?
9    (Whereupon, the reporter read the record
10  as follows:
11    "Answer:  I don't know what you are
12  referring to.  I have not been issued a specific
13  Exponent lab notebook.  I kept a record of the
14  experiments performed for this project
15  electronically.")
16  BY MR. THORNBURGH:
17    Q.  Doctor, when you received the TVT exemplar
18  device, what did you do with it?  What was the next
19  step in your process once you -- go ahead.
20    A.  The TVT exemplar was used for the
21  experiments covered in Dr. MacLean's expert report.
22    Q.  Okay.  Was the TVT exemplar device divided
23  into multiple samples?
24    A.  For the purposes of the experiments that
25  are summarized in Dr. MacLean's expert report, the

**Page 41**

1  TVT was cut into smaller samples.
2    Q.  All right.  Did you perform that work for
3  Exponent?
4    A.  What work are you referring to?  I'm not
5  sure.
6    Q.  Dividing the exemplar TVT device into --
7  into separate samples?
8    A.  I did.  Also, others that were working on
9  the project did as well.
10    Q.  Okay.  When did you divide the TVT
11  exemplar device?
12    A.  For these experiments, we cut the samples
13  before we did the UV and chemically oxidized
14  protocol exposure.
15    Q.  Okay.  My question was, do you know
16  precisely when that would have been -- that division
17  or separation or cutting of the TVT exemplar would
18  have taken place?
19    A.  That was done prior to the chemically
20  oxidized protocol on the samples and the QUV
21  oxidized protocol was conducted on the samples.
22    Q.  How many -- so you don't know the -- the
23  exact date, correct?
24    A.  It was done prior to when those
25  experiments were carried out.

11 (Pages 38 to 41)

Stephanie Benight, Ph.D.

Page 42

1    Q.  Okay.  So you don't know the exact date
2  that you divided the TVT exemplar, correct?
3    A.  It was done before the experiments were
4  carried out, sir.
5    MR. THORNBURGH:  Chad, can you tell your
6  witness to answer my questions?
7    MR. HUTCHINSON:  Well, I think she's
8  trying to, Dan.  What was your last question?
9    MR. THORNBURGH:  The exact date, when
10  exactly did that occur?
11    MR. HUTCHINSON:  Okay.  Well, I thought
12  she was asked -- yeah, maybe I didn't hear your
13  question.
14    MR. THORNBURGH:  I'm looking for a date,
15  Chad.
16    MR. HUTCHINSON:  Huh?
17    MR. THORNBURGH:  So -- I'm looking for the
18  precise date.
19    MR. HUTCHINSON:  Okay.
20    MR. THORNBURGH:  What date --
21    MR. HUTCHINSON:  Well, I don't -- I don't
22  know the precise date.  Are you asking me or --
23    MR. THORNBURGH:  No, I'm not.  I'm not
24  asking you, I'm asking your witness.  If she doesn't
25  know the precise date, all she has to say is, "I

Page 43

1  don't know."
2    MR. HUTCHINSON:  Okay.  Well, why don't
3  you ask her -- why don't you ask your question
4  again.
5    MR. THORNBURGH:  All right.  Well, sir --
6    MR. HUTCHINSON:  And maybe we can go from
7  there.
8    MR. THORNBURGH:  -- can you -- but before
9  we move forward, will you please take five minutes,
10  we'll go off the record, and please talk with your
11  witness and ask her to start answering my questions.
12    MR. HUTCHINSON:  Well --
13    MR. THORNBURGH:  Otherwise, we're going to
14  have to call the Court.
15    MR. HUTCHINSON:  Well, Dan, while we're
16  making records here, the witness is answering your
17  questions.  I'm not sure you fully understand the
18  answers that she is giving you, but the witness is
19  answering your questions.  So let's -- we just --
20    MR. THORNBURGH:  Chad, are you --
21    MR. HUTCHINSON:  Hold on a minute.  I'm
22  still talking.
23    So we -- we just took a break.  We're
24  ready to go, so why don't you -- I don't even think
25  we need a five-minute break.

Page 44

1    MR. THORNBURGH:  Okay.
2    MR. HUTCHINSON:  Dr. Benight, do you think
3  we need a five-minute break?
4    THE WITNESS:  No, I don't need a break.
5    MR. HUTCHINSON:  Okay.  Well, why don't
6  you ask your question again, Dan, and let's move on.
7    MR. THORNBURGH:  For the record, Chad, you
8  are not going to take a break to instruct your
9  witness to answer my questions, correct?
10    MR. HUTCHINSON:  The witness has already
11  answered your questions, Dan.  What I'm telling you
12  is, why don't you ask her again your question about
13  the specific date, and she'll answer it if she can.
14  BY MR. THORNBURGH:
15    Q.  Dr. Benight, on what date did you cut the
16  TVT exemplar into separate pieces for your
17  experiment?
18    A.  It was cut prior to when the experiments
19  were performed, and I don't recall the specific
20  date.
21    Q.  How many pieces -- strike that.
22    How many -- how many samples or pieces of
23  the mesh were cut?
24    A.  I don't know the exact number.
25    Q.  Is that number documented anywhere in a

Page 45

1  lab notebook?
2    A.  It is documented in the documents that
3  were provided to you electronically.  The samples
4  were given different sample numbers.
5    Q.  What size were -- was each sample?
6    A.  Which samples are you referring to?  I'm
7  not sure.
8    Q.  Okay.  So -- well, it's hard for me to
9  have this conversation without having a lab notebook
10  to reference, but let's try to do the best we can.
11    MR. HUTCHINSON:  All right.  Hey, Dan.
12    THE WITNESS:  Is that a question?
13    MR. HUTCHINSON:  Hold on just a minute.
14  Wait a minute.
15    Hey, Dan, look, the witness has already
16  told you that she has provided you the -- her
17  electronic lab notebook.
18    MR. THORNBURGH:  But --
19    MR. HUTCHINSON:  So whatever you want to
20  reference in her lab notebook that she's already
21  given to you, feel free to ask a question about it.
22  BY MR. THORNBURGH:
23    Q.  So you don't know -- you can't tell me
24  right now specifically how many separate pieces of
25  mesh were created from the pristine mesh that you

12 (Pages 42 to 45)

Stephanie Benight, Ph.D.

1  received sometime prior to the experiments that you
2  conducted, correct?
3        MR. HUTCHINSON:  Object to form.  Been
4  asked and answered.
5        THE WITNESS:  I can look in the documents
6  of the electronic lab notebook provided to you.
7  BY MR. THORNBURGH:
8      Q.  Did you bring any documents with you
9  today?
10     A.  I did.
11     Q.  And what did you bring with you today?
12     A.  I brought a copy of the duces tecum notice
13  for deposition.
14        I also brought a Histion project plan,
15  Amendment 1, which you have been provided.  I also
16  brought a Histion chain of custody cover page and
17  chain of custody document which I received
18  yesterday.
19        I brought four flash drives, three of
20  which are the production documents, one of which was
21  provided to you prior to Dr. MacLean's deposition, a
22  second flash drive that contains documents that you
23  were given over the last couple of days, and a third
24  flash drive -- there is two copies.
25        A third flash drive with yesterday's date

1  that contains additional documents as part of the
2  production related to the duces tecum, and I have
3  also brought microscope slides as part of this
4  study.
5     Q.  Okay.  So let's do this.  Let's go ahead
6  and mark as Exhibit No. 2 the deposition notice that
7  you brought with you today.
8        MR. HUTCHINSON:  Hey, Dan, I think we're
9  on Exhibit No. 3; is that correct?
10       THE WITNESS:  I have two exhibits in front
11  of me.
12       MR. THORNBURGH:  Okay.  Well, Exhibit
13  No. --
14       MR. HUTCHINSON:  As far as numbering is
15  concerned.
16       MR. THORNBURGH:  Yeah, I hear you.  So
17  let's mark as Exhibit No. 3 the deposition notice.
18       (Whereupon, Exhibit 3 was marked for
19  identification.)
20       MR. THORNBURGH:  Okay.  Let's mark as
21  Exhibit 4 the Histion project plan.
22       (Whereupon, Exhibit 4 was marked for
23  identification.)
24       MR. THORNBURGH:  Let's mark as Exhibit No.
25  3 the Histion chain of custody --

1       MR. HUTCHINSON:  You mean --
2       MR. THORNBURGH:  -- or Exhibit 5 the
3  Histion chain of custody.
4       (Whereupon, Exhibit 5 was marked for
5  identification.)
6       MR. THORNBURGH:  We'll mark as Exhibit
7  No. 6 the flash drive that, according to your
8  testimony, was provided prior to Dr. MacLean's
9  deposition.
10       (Whereupon, Exhibit 6 was marked for
11  identification.)
12       MR. THORNBURGH:  Let's mark as Exhibit
13  No. 7 the flash drive that, according to your
14  testimony, are documents that were given to me over
15  the last couple days.
16       I assume, and correct me if I'm wrong,
17  that Exhibit No. 7 would include the FTIR on the
18  UV-treated specimens and some additional -- is it
19  XP -- what -- strike that.
20     Q.  Let me just ask this, what documents are
21  contained on Number -- on Exhibit No. 7?  I believe
22  it's probably the FTIR; is that correct?
23     A.  We haven't marked Exhibit 7 yet, sir.
24     Q.  Well, let's mark -- we're going to mark as
25  Exhibit No. 7 the documents that were -- that you

1  testified were given to me over the last couple
2  days.
3     A.  Oh, okay.  And what is --
4     Q.  I --
5     A.  I'm sorry, what is your question?  I don't
6  understand.
7     Q.  Okay.  I -- I just want to make sure I
8  understand what if -- what you believe was given to
9  me over the last couple days.
10       Is that the FTIR data?
11     A.  FTIR data of the oxidized -- intentionally
12  oxidized samples.
13     Q.  Okay.  Is there any other data on that
14  flash drive?
15     A.  I believe -- I don't have it loaded on the
16  computer in front of, me but I believe there is also
17  x-ray photoelectron spectroscopy data as part of
18  this study.  And there is also a microscopy image
19  index.
20     Q.  Okay.  And then you testified that you
21  brought a third flash drive that contains documents
22  that were responsive to the deposition notice duces
23  tecum; is that correct?
24     A.  Yes.
25     Q.  And were -- have these documents been

Stephanie Benight, Ph.D.

Page 50

1    produced in any form prior to today?
2         A.  We are providing them to you today.
3         MR. THORNBURGH:  Now, Chad --
4         MR. HUTCHINSON:  Yeah.
5         MR. THORNBURGH:  -- I asked -- I asked you
6    several days ago very politely to provide all
7    documents responsive to the deposition notice prior
8    to the -- you know, by -- you were supposed to
9    produce it by Friday, which you represented to me
10   you did produce on Friday.
11        And now for the first time I'm learning
12   that you did not produce all of the documents
13   responsive to the request, and as you know, doing
14   this by videoconference, that's specifically why I
15   asked you to produce those documents before today.
16        MR. HUTCHINSON:  Hey, Dan, why don't you
17   ask the witness about these documents.  But for the
18   record, I received them yesterday.  That was the
19   first time I had received them.
20   BY MR. THORNBURGH:
21        Q.  Dr. Benight, what documents are contained
22   on Flash Drive No. 3, on Exhibit 7?
23        MR. HUTCHINSON:  Exhibit 8, I believe.
24        THE WITNESS:  Exhibit 7 hasn't been marked
25   yet.

Page 51

1         MR. THORNBURGH:  There we go.  All right.
2    So let's give the court reporter some time.
3         Can you mark Exhibit No. 7, which should
4    be the documents -- the FTIR and the x-ray
5    photoelectron spectroscopy and -- documents?
6         (Whereupon, Exhibit 7 was marked for
7    identification.)
8         MR. THORNBURGH:  And we'll mark the third
9    flash drive as Exhibit No. 8.
10        (Whereupon, Exhibit 8 was marked for
11   identification.)
12   BY MR. THORNBURGH:
13        Q.  Dr. Benight, what documents are contained
14   on Exhibit No. 8?
15        A.  I don't have it loaded in front of me, but
16   there are additional microscopy and scanning
17   electron microscopy images as part of the study that
18   was summarized in Dr. MacLean's expert report.
19        Q.  And these microscopy images and scanning
20   electron microscopy images have never been produced
21   prior to today?
22        A.  I believe that we are producing them to
23   you today.
24        Q.  For the first time, is that your
25   understanding?

Page 52

1         A.  Yes.  I received the notice of deposition
2    yesterday, and these are in response to those.
3         Q.  Okay.  But you understand that I took
4    Dr. MacLean's deposition on September 29th, correct?
5         A.  Yes.
6         Q.  Okay.  And during that -- I'll represent
7    to you that during that -- prior to that deposition,
8    I also provided him with a request for production of
9    documents.
10        So my question to you is, before
11   Dr. MacLean's deposition, did he or anybody reach
12   out to you and ask you to gather all documentation
13   responsive to his request for production of
14   documents?
15        A.  I'm sure Dr. MacLean provided all of the
16   documents in his file related to his expert report.
17        Q.  That's not my question.  My question to
18   you is very specific.
19        Did anybody reach out to you prior to his
20   deposition and ask you to produce documents that
21   related to this case or the experiments that you
22   performed in this case?
23        MR. HUTCHINSON:  Object to form.
24        THE WITNESS:  Yes.
25

Page 53

1    BY MR. THORNBURGH:
2         Q.  Okay.  When did that occur?
3         A.  I -- before his deposition.
4         Q.  Okay.  And why did you not produce the
5    documents on Exhibit 8 prior to his deposition?
6         A.  We provided all of the documents that were
7    referenced in the microscopy report.
8         Q.  That wasn't my question.  My question --
9         MR. HUTCHINSON:  Hey, Dan -- Dan, that was
10   responsive to your question.  Why don't you just ask
11   her what is on Exhibit 8, and I think that would
12   help you.
13        MR. THORNBURGH:  She told me that there
14   was additional microscopy images and scanning
15   electron microscopy images that have never been
16   produced before today.
17        Q.  So my question is, why haven't they been
18   produced before today?
19        A.  In the original production, we provided
20   images that were summarized in the report as part of
21   the study.
22        Q.  Is it your testimony that Exhibit No. 8
23   contains the identical or same microscopy or
24   scanning electron microscopy images as those that
25   are contained within his report?

Stephanie Benight, Ph.D.

Page 54

1      A.  These are additional images that were
2  taken as part of the study.
3      Q.  Okay.  So why weren't they produced prior
4  to today?
5      A.  I don't know.
6          MR. THORNBURGH:  Chad, why weren't they
7  produced prior to today?
8          MR. HUTCHINSON:  Well, I just -- I just
9  got them yesterday, Dan.  And that's why we produced
10  them to you.  I will tell you that --
11         MR. THORNBURGH:  Here is what I want you
12  to do, Chad.  I want you -- we're going to take a
13  break.
14         This deposition is going to go longer than
15  I had hoped, unfortunately, but, Chad, we're going
16  to take a break and you are going to send me those
17  documents electronically so I can review those.
18         MR. HUTCHINSON:  Okay.  I don't know --
19  maybe we'll see if the court reporter can do that.
20         Can you send Mr. Thornburgh the documents
21  on Exhibit 8 via -- electronically?
22         (Whereupon, a brief discussion off the
23  record.)
24         THE VIDEOGRAPHER:  Going off the record at
25  12:44.

Page 55

1          (Whereupon, a brief recess was taken.)
2          MR. HUTCHINSON:  No, he's going -- okay.
3  He's going.  We're on the record.  We have been on
4  the record all day.
5          MR. THORNBURGH:  Okay.
6      Q.  So before we went off the record,
7  Dr. Benight, you had indicated that there were some
8  additional microscopy and scanning electron
9  microscopy images on Exhibit No. 8 that have not
10  been produced prior to today; is that accurate?
11     A.  Yes.
12     Q.  Okay.  Are there any other documents or
13  images or data contained within Exhibit No. 8, other
14  than the microscopy or scanning electron microscopy?
15     A.  I want to look at the contents of the jump
16  drive I brought before I answer.
17     Q.  I'll give you time during our next break
18  to do that, okay?
19     A.  Okay.
20     Q.  I want to -- I want to move forward, okay?
21     Doctor, talking about the pristine TVT
22  exemplar that you received and was divided into
23  different samples, do you recall when we were
24  talking about that or had that discussion?
25     A.  Yes.

Page 56

1      Q.  And, you know, I don't have a -- and I'm
2  going to just tell you, I don't have a traditional
3  lab notebook, so I have been trying to piece
4  together sort of all of the documents that you have
5  provided to me to try to understand what was done in
6  this case.
7          So let's walk through those documents, and
8  let me know if I have a misunderstanding in any way,
9  okay?
10         MR. HUTCHINSON:  I'm going to object to
11  the narrative.
12         THE WITNESS:  Okay.
13  BY MR. THORNBURGH:
14     Q.  Okay.  So --
15     A.  I don't have any -- I don't have all of
16  the production documents in front of me, sir.
17     Q.  Yeah, well, the -- Madam Court Reporter
18  has the documents, so let's go ahead and look at 7A.
19  So we'll go ahead and mark that as Exhibit No. 9.
20         (Whereupon, Exhibit 9 was marked for
21  identification.)
22  BY MR. THORNBURGH:
23     Q.  Okay.  And, Dr. Benight, I'll -- well,
24  strike that.
25         Do you see on 7A at the very bottom it

Page 57

1  says, 200 KV or -- K -- I think it's KV.
2      Do you see that?
3      A.  It says 20 KV.
4      Q.  I'm sorry.  That's what I meant.
5      20 KV X35, 500 microns is the scale.
6      Do you see that?
7      A.  Yes.
8      Q.  Okay.  I just want to make sure we're
9  looking at the same document.  And I'll represent to
10  you that when this was sent to me or produced to me,
11  it was saved as a document called Sample 4_01.
12      Would this -- would that naming -- the way
13  it was named indicate to you that this was a sample
14  that was -- that was numbered as Number 4?
15     A.  If it says Sample No. 4, then it must be
16  Sample No. 4.
17     Q.  Okay.  And there were a couple images,
18  scanning electron microscopy images of Sample No. 4.
19      Do you recall that?
20     A.  Yes.
21     Q.  Okay.  And then there were -- there was
22  another document that was called Sample 5_01.  Would
23  that indicate to you that that was Sample No. 5?
24     A.  I don't have that document in front of me.
25     Q.  Okay.  So, well, we're going to have to do

Stephanie Benight, Ph.D.

Page 58

1  it this way, then.
2      MR. THORNBURGH:  Madam Court Reporter,
3  let's mark as Exhibit No. 10 7B.
4      (Whereupon, Exhibit 10 was marked for
5  identification.)
6  BY MR. THORNBURGH:
7      Q.  Okay.  And I'll represent to you that this
8  was sent to me as a document that was titled:
9  "Sample 4_02," and the -- just so that we're on the
10  same page, is your Exhibit No. 10 --
11     A.  Yes, okay.  I'm holding now Exhibit
12  No. 10.
13     Q.  Okay.  And does that -- the bottom of that
14  page say, "20 KV X200," and then have a scale of
15  100 microns on it?
16     A.  Yes.
17     Q.  Okay.  And is it your understanding that
18  that is another scanning electron microscopy or SEM
19  of Sample No. 4 which was intentionally oxidized
20  using UV -- the QUV process?
21     A.  Yes.
22     Q.  Okay.  The next document is 7C, for the
23  court reporter's reference, and we'll mark that as
24  Exhibit No. 11.
25      (Whereupon, Exhibit 11 was marked for

Page 59

1  identification.)
2  BY MR. THORNBURGH:
3      Q.  Okay.  And at the bottom of that, do you
4  see it says, "20 KV X35, 500 micron scale"?
5      A.  Yes.
6      Q.  Okay.  And this was sent to me as a
7  document titled:  "Sample 4_03."
8       Does it -- does that indicate to you that
9  this was a image of the QUV-treated Sample No. 4?
10     A.  If it is with the same set of images, yes.
11     Q.  Okay.  So I'm going to try to speed this
12  up a little bit.  Let's take the next three images,
13  sorry, next --
14      MR. HUTCHINSON:  Are you talking about
15  what has already been marked, Dan?
16      MR. THORNBURGH:  Yes -- no, no -- no,
17  withdraw that.
18      MR. HUTCHINSON:  Okay.
19      MR. THORNBURGH:  I'm going to withdraw
20  that.
21       The next document we'll mark as Exhibit
22  No. 12, which was 7D for your reference, Madam Court
23  Reporter.
24      (Whereupon, Exhibit 12 was marked for
25  identification.)

Page 60

1  BY MR. THORNBURGH:
2      Q.  Okay.  And I'll represent to you -- well,
3  do you see at the bottom, it says -- it says, "times
4  200, 100-micron scale"?
5      A.  Yes.
6      Q.  Okay.  And I'll represent to you that that
7  was Image 4 of -- of Sample No. 4 again, okay?
8      A.  Okay.
9      Q.  All right.  So let's go ahead and try to
10  speed this process up a little bit.  I'm going to
11  have the court reporter take Exhibit -- a document
12  numbered 7E, 7F, 7G, and we'll just make that one
13  exhibit and we'll call that Exhibit No. 13.
14      (Whereupon, Exhibit 13 was marked for
15  identification.)
16      (Whereupon, a brief discussion off the
17  record.)
18  BY MR. THORNBURGH:
19     Q.  Okay.  I'll represent to you that these --
20  are you ready?  I'm sorry.
21     A.  I have Exhibit 13 in front of me.
22     Q.  Okay.  And I'll represent to you that
23  these images were sent to us as -- titled Sample 5.
24      So would that indicate to you that a
25  Sample 5 was treated with QUV and -- and then looked

Page 61

1  at under the scanning electron microscopy images?
2      A.  Yes.
3      Q.  Okay.  And then let's go ahead and mark
4  the next two images, which are 7H and 7I, as Exhibit
5  No. 14.
6      (Whereupon, a brief discussion off the
7  record.)
8      (Whereupon, Exhibit 14 was marked for
9  identification.)
10  BY MR. THORNBURGH:
11     Q.  Okay.  And, Dr. Benight, this document was
12  sent to us as -- it was titled:  "Sample 6."
13      So would that indicate to you that Sample
14  6 was treated with QUV radiation and then -- and
15  looked at using scanning electron microscopy?
16     A.  Yes, if -- with the same other set of
17  images, then yes.
18     Q.  Okay.  So we were talking about how the
19  pristine TVT was divided, and we just looked at some
20  scanning electron microscopy of a sample No. 4, a
21  Sample No. 5, and a Sample No. 6, correct?
22     A.  That's what you have indicated, yes.
23     Q.  Okay.  Well, does that indicate to you
24  that -- whatever you have divided, there were three
25  samples that were treated using QUV to intentionally

16 (Pages 58 to 61)

Stephanie Benight, Ph.D.

Page 62

1  photooxidize those -- those samples and then were
2  looked at using scanning electron microscopy?
3       MR. HUTCHINSON: Object to form.
4       THE WITNESS: Can you repeat the question,
5  please?
6       MR. THORNBURGH: Yes.
7       Q. So I think I can tell from sort of piecing
8  this information together that a Sample No. 4, a
9  Sample No. 5, and a Sample No. 6 were subjected to
10 QUV radiation for intentional oxidation --
11 photooxidation, correct?
12      A. That's correct.
13      Q. Were there any other samples that were
14 treated using QUV?
15      A. There may have been, yes.
16      Q. Okay. What other samples were treated
17 using the QUV process?
18      A. Well, there was only one batch of samples
19 treated in that process, including Samples 4, 5, and
20 6.
21      Q. Okay. So what do you mean by "one batch
22 of samples treated using that process"?
23      A. They were all included in the QUV chamber
24 at the same time.
25      Q. Okay. So you -- is it -- is it -- is it

Page 63

1  fair for me to try to sort of restate -- strike
2  that.
3       Let me see if I understand.
4       So you took Samples 4, 5, and 6, and you
5  put those in the QUV and treated those to
6  intentionally oxidize those using photooxidation?
7       A. Yes.
8       Q. All right. Were there any other samples
9  that were treated using -- the QUV process?
10      MR. HUTCHINSON: Object to form. Been
11 asked and answered.
12      THE WITNESS: Yes, I believe there were
13 other samples.
14 BY MR. THORNBURGH:
15      Q. Okay. What samples -- what other samples
16 are there?
17      A. Most likely Numbers 1, 2, and 3.
18      Q. And where would Numbers -- the process of
19 QUV of Samples No. 1, 2, and 3 be recorded?
20      A. I would have to look at the production
21 documents, but we may have not imaged all six
22 samples.
23      Q. Okay. Well, let's try to -- so we'll
24 figure this out. We know that 4, 5, and 6 and
25 potentially additional samples, and we'll try to

Page 64

1  figure that out as we go.
2       But after the photooxidation process using
3  your QUV machine, what was the next step in your
4  experiment?
5       A. They were imaged with scanning electron
6  microscopy.
7       Q. Okay. And those are the documents that we
8  just marked, correct?
9       A. These are some SEM images of the samples,
10 yes. I believe it's Samples 4, 5, and 6.
11      Q. Okay. And what was the next process in
12 your experiment after the QUV and after the scanning
13 electron microscopy?
14      A. I believe we did FTIR, or Fourier
15 transform infrared spectroscopy.
16      Q. Okay. Before we get there, what's -- what
17 was the purpose of doing FTIR?
18      A. Dr. Guelcher did FTIR in his protocol for
19 the chemically oxidized mesh given in the IUGA
20 proceedings paper.
21      Q. Okay. So let's just -- let's separate
22 sort of the experiments that you did -- for now
23 let's just talk about the QUV experiment, okay,
24 where you photooxidized the mesh using radiation in
25 your QUV machine, okay?

Page 65

1       A. Okay.
2       Q. Okay. So after the scanning electron
3  microscopy was conducted on those samples that were
4  treated with UV radiation on the -- in the QUV
5  machine, what was the next process?
6       A. We performed FTIR.
7       Q. When was the FTIR performed?
8       A. After the samples had been exposed in the
9  QUV chamber.
10      Q. Do you have a date?
11      A. I don't recall a specific date. They --
12 FTIR was performed after the samples had been
13 exposed in the QUV chamber.
14      Q. Why did you do FTIR analysis of the
15 UV-treated specimens?
16      A. We did FTIR because it was part of
17 Dr. Guelcher's protocol in the chemically oxidized
18 mesh.
19      Q. Did you do FTIR because you were
20 attempting to demonstrate that the oxidized TVT
21 device doesn't stain?
22      A. The purposes of these experiments were
23 that they were a simple set of control experiments
24 performed to investigate whether intentionally
25 oxidized Prolene stains with H&E.

17 (Pages 62 to 65)

Stephanie Benight, Ph.D.

Page 66

1       Q. Was it important for you to demonstrate
2  that the specimens that were treated with UV were
3  actually oxidized before they were submitted to
4  Histion?
5       A. We performed FTIR on the samples that were
6  processed because, as part of Dr. Guelcher's
7  protocol, he also did FTIR.
8       Q. Right, but what -- was it important for
9  you to demonstrate that -- because part of the
10  QUV -- part of your experiment was to -- was also to
11  demonstrate that oxidized mesh doesn't stain using
12  H&E.
13          Is that -- is that a fair understanding of
14  part of your purpose of those experiments?
15       A. Intentionally oxidized mesh, yes.
16       Q. Okay. And so in order for your tests to
17  be valid, is it fair to say that you had to conduct
18  the FTIR to demonstrate that the specimens were
19  actually oxidized before they were sent to Histion
20  to be stained?
21          MR. HUTCHINSON: Object to form.
22          THE WITNESS: We did carry out FTIR to
23  look for hallmarks of oxidation in the QUV-exposed
24  samples.
25

Page 67

1  BY MR. THORNBURGH:
2       Q. Okay. And that's because you wanted to --
3  you wanted to make sure that the specimens that were
4  treated with UV were actually oxidized, right?
5       A. Well, we wanted to do that because
6  Dr. Guelcher did that in his protocol.
7       Q. Okay. So if we can look at Exhibit No. --
8  or Document No. 6A.
9          THE REPORTER: 6A is before the witness.
10          MR. THORNBURGH: Okay. Can you also give
11  the witness 6B?
12          THE REPORTER: 6B.
13          MR. THORNBURGH: 6C. And then we'll mark
14  those as Composite Exhibit No. -- I think we're on
15  14, is that right?
16          THE REPORTER: 15.
17          MR. THORNBURGH: 15.
18          (Whereupon, a brief discussion off the
19  record.)
20          (Whereupon, Exhibit 15 was marked for
21  identification.)
22  BY MR. THORNBURGH:
23       Q. Okay. Dr. Benight, if you look at the
24  first page on Exhibit 15, what -- what are we
25  looking at here? Is this an FTIR image of -- well,

Page 68

1  strike that.
2          Let me just tell you sort of what this
3  document was named when it was sent to me. It was
4  named "QUV 6."
5          Do you know why -- well, what "QUV 6"
6  would mean?
7          MR. HUTCHINSON: I am going to object to
8  form.
9          THE WITNESS: "QUV" would indicate that
10  the sample was exposed to QUV irradiation.
11  BY MR. THORNBURGH:
12       Q. Okay. And it was identified also as 6.
13          Would that indicate to you that this FTIR
14  was done on Sample No. 6?
15       A. I believe so, yes.
16       Q. Okay. And then if you look at the next
17  page of Exhibit No. 15, you will see that's just
18  a -- looks like a -- zoomed-in on the same FTIR
19  spectra that we just looked at as Exhibit -- on the
20  first page of Exhibit 15, right?
21       A. Yes.
22       Q. Okay. And then the third page is --
23  it's -- on the top left-hand corner, it says, "QUV
24  Oxidized No. 4."
25          Do you see that?

Page 69

1       A. Yes.
2       Q. And regarding the QUV-treated specimens or
3  the UV-treated specimens, the only FTIR that was
4  produced to me were for Specimen 6 and Specimen 4.
5          Was there any additional FTIR done on any
6  other samples that were treated with QUV?
7       A. Not that I'm aware of.
8       Q. Okay. And this document -- this FTIR
9  spectra would have been created at the time that the
10  FTIR was conducted; is that correct?
11       A. We acquired some of these spectra prior to
12  sending the samples to Histion for processing,
13  embedding, and staining.
14       Q. Okay. My question was, to you, these FTIR
15  spectra would have been created at the time that the
16  FTIR was performed on those samples, correct?
17       A. Oh, yes. The spectrum is an output of the
18  FTIR experiment.
19       Q. Okay.
20          MR. HUTCHINSON: Hey, Dan, could you back
21  away from your microphone, please? We're getting a
22  tremendous amount of static over here.
23          MR. THORNBURGH: I'll do my best, but I
24  can't really control it.
25          So let's go --

18 (Pages 66 to 69)

Stephanie Benight, Ph.D.

Page 70

1      THE VIDEOGRAPHER: It's the sound of your
2  paper that you are handling.
3      MR. THORNBURGH: Okay.
4      Let's look at -- mark as Exhibit No. 16
5  the document that was sent to you as 6D, Madam Court
6  Reporter.
7      (Whereupon, a brief discussion off the
8  record.)
9      (Whereupon, Exhibit 16 was marked for
10  identification.)
11  BY MR. THORNBURGH:
12      Q. Okay. Doctor, do you understand what
13  metadata is?
14      A. Yes.
15      Q. Okay. Certain documents contain data
16  regarding when the document was created and who
17  created the document, right?
18      A. Yes.
19      Q. Okay. This -- this document is -- Exhibit
20  No. 16 are the properties from the QUV Specimen 4
21  FTIR, which was marked as Exhibit No. 15.
22      And you will see if -- you see if you look
23  at this document, you see where it says, "Created"?
24      A. Yes.
25      Q. What date do you see there?

Page 71

1      A. October the 5th, 2015.
2      Q. Okay. So I'm correct, aren't I, that the
3  FTIR that was done on -- on Sample No. 4 was
4  actually conducted on October 5th of 2015, correct?
5      A. This particular spectrum was created on
6  October 5th, 2015, and the reason is because the
7  previous --
8      Q. I --
9      A. I'm not finished with my answer. Let me
10  finish.
11      Q. Excuse me.
12      MR. HUTCHINSON: Dan, I'm sorry, but the
13  witness is --
14      MR. THORNBURGH: This is my deposition.
15      Q. My question was --
16      MR. HUTCHINSON: Hey, Dan, the witness
17  is -- no, Dan, the witness is going to finish her
18  answer.
19      (Overlapping speakers.)
20      MR. HUTCHINSON: Dr. Benight, you can
21  finish your answer. Go on. Dan wants to hear it.
22      THE WITNESS: So the -- oh, I thought --
23      MR. THORNBURGH: Well, I -- move to
24  strike.
25      MR. HUTCHINSON: Okay.

Page 72

1      Dr. Benight, please go ahead and finish
2  your answer.
3      THE WITNESS: This spectrum that you are
4  discussing, created on October the 5th, was created
5  because the previous FTIR spectrum of Sample No. 4,
6  we did not save a background spectrum.
7      And so this spectrum was created recently,
8  and the background spectrum associated with it was
9  saved to show that the FTIR spectrum of each is the
10  same.
11  BY MR. THORNBURGH:
12      Q. Well, where is the FTIR spectra of Sample
13  No. 4 that was done any time prior to October 5th?
14      A. If I recall, that was in one of the
15  exhibits that we just marked. I'm looking at
16  Exhibit No. 6C.
17      Q. Yeah. And this is the properties from
18  Exhibit No. 16 -- from Sample No. 4.
19      So my question is, where is the FTIR
20  spectrum or spectra done on Sample No. 4 prior to
21  October 5th?
22      MR. HUTCHINSON: Object to form.
23      THE WITNESS: If it is not included, then
24  an FTIR spectrum of Number 6 or Number 5 or another
25  sample that was processed and treated by QUV in the

Page 73

1  same batch was already provided.
2  BY MR. THORNBURGH:
3      Q. Well, I have the -- I'm going to -- I'll
4  represent to you that the property for the metadata
5  for the FTIR of Sample 6 also indicates that it was
6  created on October 5th.
7      A. What exhibit are you referring to, sir?
8      Q. Exhibit No. -- the metadata for the FTIR
9  spectra that were contained in -- in Exhibit No. 15
10  shows that the FTIR for Sample No. 4 and Sample No.
11  6 were both done on October 5th.
12      A. The spectra that were acquired on
13  October 5th were a repeat acquisition so that we
14  could save the background spectrum related to that
15  sample.
16      The data -- the FTIR data from these
17  spectra were similar to those collected after QUV
18  processing.
19      Q. Okay. So listen to my question, okay.
20      Where are the FTIR spectra of any sample
21  of UV-treated specimens that were conducted prior to
22  October 5th of 2015?
23      A. FTIR spectra of the QUV process sample
24  were acquired after QUV processing, and those
25  documents have been included in the production.

Stephanie Benight, Ph.D.

Page 74

1      Q.  I'm telling you, they haven't.  I haven't
2  received any other --
3          MR. HUTCHINSON:  And, Dan, I'm sorry.
4  Please do not argue with the witness.  I know you
5  are frustrated because you may not have had the
6  opportunity to be here today, but please do not
7  argue with the witness.
8  BY MR. THORNBURGH:
9      Q.  Tell me where I can locate the FTIR
10  spectra for Sample No. 5?
11      A.  I would have to look in the production.  I
12  don't have all of the spectra in front of me at the
13  moment.
14      Q.  Look at -- look at the production, take
15  your time.
16      A.  Okay.
17      Q.  I want -- I need an answer to this.
18          THE WITNESS:  Do we have --
19          MR. HUTCHINSON:  Oh, look at -- what do
20  you want her to look at, Dan?
21          MR. THORNBURGH:  I want her to look at
22  Exhibit -- Exhibit No. 7 -- sorry, Exhibit No. 6, 7,
23  and 8 and tell me where the FTIR spectra for any
24  QUV-treated samples are located that -- that would
25  have been conducted prior to October 5th.

Page 75

1          MR. HUTCHINSON:  All right.  That's on a
2  flash drive.
3          MR. THORNBURGH:  Do you have a computer
4  with you?
5          MR. HUTCHINSON:  No, I don't have a
6  computer with me.
7          MR. THORNBURGH:  Madam Court Reporter, I
8  understand from, I think, discussion that we had
9  earlier that Dr. Benight has her computer with her.
10          THE WITNESS:  I don't have a computer with
11  me.
12          MR. THORNBURGH:  Okay.  Madam -- the --
13  Madam -- the court reporter has her computer.
14      So let's put in the flash drive and
15  identify for me where the FTIR spectra are for any
16  UV-treated specimens that were conducted prior to
17  October 5th of 2015.
18          (Whereupon, a brief discussion off the
19  record.)
20          MR. HUTCHINSON:  Dan, why don't we go off
21  the record while we are getting everything set up.
22          MR. THORNBURGH:  That's fine.
23          THE VIDEOGRAPHER:  This is the end of Tape
24  No. 1.  Going off the record at 1:18.
25          (Whereupon, a discussion off the record.)

Page 76

1          THE VIDEOGRAPHER:  Back on the record.
2  Time is 1:28.
3          MR. HUTCHINSON:  Hey, Dan, while we were
4  on the break, Dr. Benight borrowed the witness' --
5  I'm sorry, the court reporter's laptop.
6      And it's my understanding that it may not
7  have the software on there indicated to -- or
8  needed, rather, to open up the flash drives.  But
9  you can -- you can ask the follow-up questions.
10  BY MR. THORNBURGH:
11      Q.  Dr. Benight, so I understand from Chad's
12  representations that you are unable to open up the
13  flash drive; is that correct?
14      A.  I can see the documents, but I can't open
15  up the PowerPoint files.
16      Q.  Did you have a document, was there a
17  document name or a document that had a name or was
18  titled some -- by some way that refreshed your
19  recollection on where the FTIR data on the
20  UV-treated samples conducted prior to October 5th
21  would be located?
22      A.  Well, I can't read the document or open
23  it, but I believe it's QUV Oxidized_Mesh No. 4.
24      Q.  Okay.  Well, Doctor, we just looked at
25  QUV -- we just looked at Exhibit No. 15.  We looked

Page 77

1  at the FTIR for Number 4, Sample No. 4.
2      Do you recall looking at that?
3      A.  Were we looking at that document or were
4  we looking at the PowerPoint in the
5  2015-10-05_Repeat FTIR document?
6          MR. HUTCHINSON:  Yeah, this has gotten
7  confusing.  You guys, I don't know how we need to
8  get on the same page, but we need to do that.
9  BY MR. THORNBURGH:
10      Q.  Well, so if we look at Exhibit No. 15?
11      A.  Okay.
12      Q.  Okay.  There was FTIR data on Sample No. 6
13  and FTIR data on Sample No. 4.
14      A.  Well, the only labels are Number 4 within
15  Exhibit No. 15.
16      Q.  Right.  Exactly.
17      A.  Okay.
18      Q.  Okay.  And then we looked at Exhibit No.
19  16, which was the -- the metadata for Exhibit No.
20  15, Sample No. 4, which demonstrated that that FTIR
21  spectra was created on October 5th, 2015.
22      A.  The FTIR spectra that were created on
23  October 5th are in the 2015-10-05_Repeat FTIR folder
24  in a document that is 2015-10-05_Summary.
25      Q.  So, I'm sorry, somehow I was on mute.

20  (Pages 74 to 77)

Stephanie Benight, Ph.D.

Page 78

1      Are you guys still there?
2      A.  I can hear you now, yes.
3      Q.  Okay.  So you weren't --
4      MR. THORNBURGH:  What was the last line of
5  questioning?
6      MR. HUTCHINSON:  And, Dan, I'm sorry.  We
7  can hear you guys on the phone, so back up --
8      (Overlapping speakers.)
9      MR. THORNBURGH:  Yeah, what -- yeah, what
10  was the -- what was the last line of -- what was
11  the -- I'm asking the court reporter what the last
12  question was, because I was on mute and I'm not sure
13  how long I was on mute for.
14      (Whereupon, the reporter read the record
15  as follows:
16      "Question:  Okay.  And then we looked at
17  Exhibit No. 16, which was the -- the metadata for
18  Exhibit No. 15, Sample No. 4, which demonstrated
19  that that FTIR spectra was created on October 5th,
20  2015.")
21      MR. HUTCHINSON:  Object to form.
22      MR. THORNBURGH:  Was there a question to
23  that -- was there an answer to that, I mean?
24      (Whereupon, the reporter read the record
25  as follows:

Page 79

1      "Answer:  The FTIR spectra that were
2  created on October 5th are in the 2015-10-05_Repeat
3  FTIR folder in a document that is
4  2015-10-05_Summary.")
5  BY MR. THORNBURGH:
6      Q.  So, doctor, just tell me, what UV-treated
7  specimens or samples were submitted for FTIR
8  analysis prior to October 5th of 2015?
9      A.  Well, the samples that were -- the FTIR
10  spectra that were acquired on October 5th, 2015, are
11  in the 2015-10-05_Repeat FTIR folder in the
12  2015-10-05_Summary document.
13      I'm unable to open the document in the
14  previous folder that is labeled QUV Oxidized_Mesh
15  No. 4.
16      Q.  You must not understand me, okay, so I'm
17  going to try to simplify this.  We looked at Sample
18  No. 4 in Exhibit No. 15.  We looked at the metadata
19  for Sample No. 4, which demonstrated that the FTIR
20  of Sample No. 4 was done on October 5th, 2015.
21      A.  Sir, I can't tell what spectra are
22  included in the metadata printout, Exhibit 16, but I
23  can tell you that the spectra acquired on
24  October 5th, 2015, are contained in the document
25  2015-10-05_Repeat FTIR folder in the document

Page 80

1  entitled:  "2015-10-05_Summary."
2      Q.  Listen to my question very carefully.
3      What UV-treated samples were analyzed
4  using FTIR prior to October 5th, 2015?
5      MR. HUTCHINSON:  Dan, the witness has
6  already answered your question, sir.
7  BY MR. THORNBURGH:
8      Q.  No, just tell me the sample number?
9      A.  Sir, I can't open the PowerPoint document
10  to confirm which samples you are referring to.
11      MR. HUTCHINSON:  Dan, maybe if you had --
12  since you are not here, maybe if you had a document
13  you could show the witness, that may be helpful.
14      MR. THORNBURGH:  I just showed the witness
15  Exhibit No. 15.  Exhibit No. 15 was the FTIR of QUV
16  6 and the FTIR of QUV -- the FTIR of QUV-treated
17  Sample No. 4.
18      MR. HUTCHINSON:  Yes, and, Dan, what I'm
19  telling you is that you are asking her a very
20  specific question, you are not here, she's referring
21  to a documents on a flash drive.
22      We cannot open up the documents on a flash
23  drive because we didn't bring a computer nor did you
24  bring a computer, and the court reporter has
25  graciously allowed us to borrow her computer, and

Page 81

1  for whatever reason it does not have the software on
2  it where Dr. Benight can open all of the files on
3  the flash drives marked as Exhibits 6, 7, or 8.
4      So that's not our problem.  That's your
5  problem.
6      MR. THORNBURGH:  My question is very
7  simple.
8      Q.  Doctor -- so let's just back up a little
9  bit, because I'm not trying to trick you.  I'm not
10  trying to, you know, ask you difficult questions.
11  I'm not trying to ask you questions that you
12  shouldn't be able to answer.
13      So let's just back up a little bit.
14      I understand that we -- you received the
15  pristine exemplar TVT and that exemplar was cut into
16  pieces and there were certain samples that were
17  treated using the QUV machine to photooxidize it,
18  and then after -- and that's correct, right?
19      A.  Yes.
20      Q.  Okay.  And then -- and then you testified
21  that after you put those samples in the QUV machine
22  to photooxidize them, you then looked at Samples 4,
23  5, and 6, at least, and did scanning electron
24  microscopy.
25      And then you testified and you represented

21 (Pages 78 to 81)

Stephanie Benight, Ph.D.

Page 82

1   to the Court and to me that the next process in
2   your -- in your study, was to do FTIR analysis.
3   Okay.  So we have a -- a disagreement, I think, on
4   when that FTIR analysis was done.
5           You are representing to the Court that the
6   FTIR analysis was conducted prior to October 5th of
7   2015 and prior to -- I believe, prior to the next
8   process in your experiment, which would have been
9   embedding some samples in either resin or paraffin.
10          Is that accurate?
11          MR. HUTCHINSON:  Dan, I'm going to object
12  to the form of the question.  It's entirely too
13  long.  Can you please rephrase?
14  BY MR. THORNBURGH:
15          Q.  Are you representing to the Court that you
16  did FTIR analysis of UV-treated specimens or samples
17  prior to October 5th, 2015?
18          A.  Yes.
19          Q.  Okay.  You just can't tell me right now
20  which samples were analyzed prior to October 5th,
21  2015 --
22          MR. HUTCHINSON:  And just -- and just
23  let --
24  BY MR. THORNBURGH:
25          Q.  -- is that correct?

Page 83

1           MR. HUTCHINSON:  And just let the record
2   reflect that are you asking her to look at documents
3   on flash drives and you have provided no computer
4   for the witness to review the flash drives, sir.
5           MR. THORNBURGH:  Excuse me.  Excuse me.
6   Chad --
7           MR. HUTCHINSON:  Do you understand?
8           MR. THORNBURGH:  Chad, Chad, Chad, stop
9   this, okay.
10          MR. HUTCHINSON:  No.  You are asking her
11  about documents on the flash drive --
12          (Overlapping speakers.)
13          MR. THORNBURGH:  It's my choice.  You are
14  wasting my time.
15          MR. HUTCHINSON:  You are wasting this
16  witness' time, more importantly.
17          MR. THORNBURGH:  So -- I'm just trying to
18  understand where we are.
19          Q.  So you -- all I said was you are
20  representing to the Court -- and let me withdraw
21  that question.
22          You still understand, even though we have
23  had breaks, that you are under oath, right,
24  Dr. Benight?
25          A.  Yes, I understand.

Page 84

1           Q.  Okay.  And you are representing under oath
2   to the Court that prior to October 5th, 2015,
3   certain UV-treated specimens, or samples, were
4   analyzed using FTIR, correct?
5           A.  Yes, we did that.
6           Q.  Okay.  And you just can't -- and I
7   understand that right now you can't identify which
8   samples?
9           A.  I can't open a document to confirm which
10  samples were measured with FTIR.
11          Q.  Okay.  So -- but you -- but I think we --
12  I understand from your testimony, that Sample No. 6
13  and Sample No. 4 were done -- there was a repeat
14  FTIR done on October 5th, 2015; is that a fair
15  understanding?
16          A.  The FTIR that was done on October 5th,
17  2015, is contained in the folder labeled
18  2015-10-05_Repeat FTIR in the document entitled:
19  "2015-10-05_Summary."
20          Q.  Okay.
21          A.  Included in that folder is a background
22  file, a background image file, a file named
23  "QUV_6_.csv," an image file entitled:  "QUV_6_," and
24  another QUV file labeled "QUV_6_zoom."
25          MR. THORNBURGH:  Madam Court Reporter,

Page 85

1   were you able to -- did you -- were you able to
2   print out Exhibit No -- or Document No. 13A and 13B?
3           (Whereupon, a brief discussion off the
4   record.)
5           MR. THORNBURGH:  Actually, strike that.
6           Q.  So I think I -- I think I understand your
7   testimony.
8           Your testimony is the only -- the only
9   samples that were rerun on October 5th of 2015 are
10  the documents -- are the -- are the FTIR spectra
11  that are contained within the file folder that you
12  just identified?
13          MR. HUTCHINSON:  Object to form.
14  BY MR. THORNBURGH:
15          Q.  That -- is that your testimony?
16          A.  Yes.  We did repeat FTIR spectra on -- to
17  repeat the spectra that were already acquired after
18  the QUV samples were processed so that we could save
19  a background spectrum and show that the spectrum
20  were the same as the previously acquired spectra.
21          Q.  Okay.  Now, Exhibit -- I'm going to
22  represent to you as an officer of the Court that
23  Exhibit No. 16 is the metadata for the FTIR spectra
24  of Sample No. 4, okay?
25          And Exhibit No. 16 indicates that the FTIR

Stephanie Benight, Ph.D.

Page 86

1  spectra performed on Sample No. 4 was also done on
2  October 5th, 2015, okay?  That's what the metadata
3  shows.  So what I don't have is FTIR -- well, let me
4  ask you this question.
5       Let's assume with me that -- that Sample
6  No. 4 and Sample No. 6 of the UV-treated samples
7  were analyzed using FTIR microscopy on October 5th
8  of 2015.
9       Does that mean that Sample No. 4 and
10  Sample No. 6 were not submitted or processed using
11  paraffin or resin and submitted for histology
12  analysis?
13       MR. HUTCHINSON:  Object to form.
14       THE WITNESS:  Can you repeat the question,
15  please?
16  BY MR. THORNBURGH:
17       Q.  Yes.  I'm -- here's what I'm trying to
18  figure out, and I'm, you know, doing it the best I
19  can by piecing together data from things that were
20  produced.
21       I'm trying to understand what samples,
22  what UV-treated samples were processed for histology
23  purposes?
24       A.  UV samples that were processed in the same
25  batch as the spectra of these samples were sent to

Page 87

1  be processed, embedded, and stained.  I cannot open
2  a document on the flash drive, it's part of the
3  production, entitled: "QUV Oxidized_Mesh No. 4."
4       It's likely that it was saved under a
5  different file name, hence why you have metadata
6  with that date.  We conducted FTIR spectra --
7       Q.  Okay.  That's not my --
8       A.  -- of the QUV oxidized mesh after the QUV
9  process had completed.
10       And we repeated FTIR spectra on
11  October 5th, 2015, in order to save a background
12  scan spectrum and also show that the resultant
13  spectrum from October 5th, 2015, is the same and
14  similar to the spectra acquired after the QUV
15  process had been completed.
16       Q.  Okay.  So let's -- so I don't think you
17  answered my question, but let's try to move on.
18       MR. HUTCHINSON:  Hey, Dan.  I'm going to
19  ask that you --
20       MR. THORNBURGH:  So hold on.  Hold on.
21       MR. HUTCHINSON:  No, I'm going to ask that
22  you stop the commentary of, "So you I don't think
23  you have answered my question.  I'm just trying to
24  piece together stuff."
25       If you just succinctly state your

Page 88

1  question, I think we'll be out of here in short
2  order.
3       MR. THORNBURGH:  Chad -- Chad, I would
4  appreciate -- we would be out of here a lot quicker
5  if your witness would answer my questions and you
6  would stop speaking.
7       MR. HUTCHINSON:  The witness is answering
8  your questions.  You just don't like to hear what
9  she is saying.
10       MR. THORNBURGH:  Stop.  So -- no, that's
11  not true.
12       Q.  Dr. Benight, whatever sample was analyzed
13  on October 5th, 2015, okay, at some point, that --
14  after the QUV treatment and after the scanning
15  electron microscopy images were done, that sample,
16  whatever sample that was that was analyzed using
17  FTIR on October 5th, 2015, would have been stored
18  somewhere, I assume.
19       Where was that sample stored?
20       A.  In my office.
21       Q.  Okay.  And what do you mean by "in your
22  office"?
23       A.  At Exponent in Menlo Park, California,
24  at --
25       Q.  Okay.  Was it --

Page 89

1       A.  Oh, I'm not finished.
2       Q.  Sorry.  Go ahead.
3       A.  At 149 Commonwealth Drive, Menlo Park,
4  California --
5       Q.  Okay.
6       A.  -- 94025.
7       Q.  Dr. Benight, what type of container was
8  that sample stored in?
9       A.  It was stored in an aluminum pan with
10  another aluminum pan cover on it.
11       Q.  What was the room temperature?
12       A.  I don't have a thermometer in my office,
13  but the conditions are at ambient conditions.
14       Q.  How long after the scanning electron
15  microscopy was performed -- how long was it stored
16  between the -- strike that.
17       Let me withdraw that question.
18       How long was it stored in your office at
19  unknown room temperatures from the date that the
20  scanning electron microscopy was done until
21  October 5th of 2015?
22       A.  We performed FTIR spectra on QUV process
23  samples after the QUV process had completed and we
24  analyzed them with SEM.  I believe that that was in
25  August or September.

23  (Pages 86 to 89)

Stephanie Benight, Ph.D.

Page 90

1    Q.  Do you know precisely what date -- strike
2    that.
3         So there -- so the sample that was
4    analyzed using FTIR was sitting in an aluminum
5    container in your office for several weeks?
6    A.  The sample that was recorded with FTIR on
7    October 5th, 2015, was a repeat experiment from the
8    same batch that was performed after the QUV process
9    had finished, and the spectra are similar, sir.
10   Q.  Did you produce to me the similar FTIR
11   spectra that would have been conducted of Sample No.
12   4 that was done prior to October 5th of 2015 to
13   demonstrate to me that they are similar?
14   A.  I believe that I did.  I cannot open the
15   document on the flash drive.
16   Q.  Okay.  So let me ask you this question.
17        After the scanning electron microscopy
18   work was performed on the QUV-treated samples, what
19   samples were sent to be embedded in either paraffin
20   or resin?
21   A.  Samples that had been exposed by QUV and
22   samples that had been -- undergone the chemically
23   oxidizing protocol given in the IUGA proceedings
24   paper authored by Dr. Guelcher, plaintiffs' expert.
25   Q.  Okay.  So let's talk about the QUV-treated

Page 91

1    samples first, okay?
2    A.  Okay.
3    Q.  The -- obviously the specimen -- well, so
4    you say -- I think your testimony is all specimens
5    that were treated -- all -- strike that.
6         I think your testimony is all samples that
7    were treated with QUV and intentionally
8    photooxidized were sent to be processed either using
9    paraffin or resin; is that correct?
10   A.  Samples from the same batch of QUV
11   treatment were sent to Histion for processing,
12   embedding, and staining.
13   Q.  Obviously the sample that was -- that you
14   did a repeat FTIR on October 5th, 2015, wasn't a
15   sample that was submitted for the paraffin or resin
16   processing, correct?
17   A.  That was a sample exposed in the same QUV
18   chamber as the other samples sent to Histion for
19   processing, embedding, and staining.
20   Q.  Okay.  How many samples from the QUV
21   process were submitted for paraffin and resin
22   processing?
23   A.  I believe that one sample was submitted,
24   indicated as Number 2 in the microscopy images.
25   Q.  And was that sample divided in half so

Page 92

1    that half of that sample could be processed using
2    the resin protocol and the other half of that sample
3    through paraffin protocol?
4    A.  I believe so, yes.
5    Q.  Would that be Sample No. 5, because I
6    didn't see any FTIR on Sample No. 5.
7         So is it safe to assume that Sample No. 5
8    is the sample that was divided in half and treated
9    with the paraffin and the resin?
10        MR. HUTCHINSON:  Object to form.  Dan, you
11   have asked two questions there.
12   BY MR. THORNBURGH:
13   Q.  Is -- did you understand the question,
14   Doctor?
15   A.  The QUV sample sent to the lab is
16   indicated in their paperwork as Sample No. 2.
17   Q.  Well, this is what I'm trying to
18   understand, okay.
19        When you received the pristine sample and
20   then started to divide the samples up, would you
21   have identified each one of those pieces at -- with
22   a specific catalog number or identification number?
23   A.  From the original pristine TVT mesh,
24   samples were cut so that they can be exposed to QUV
25   oxidation.

Page 93

1         And additional samples were cut so that
2    they could undergo -- plaintiffs' expert's protocol,
3    Dr. Scott Guelcher, as indicated in his IUGA
4    conference proceedings paper.
5         In addition, separate pieces were cut to
6    represent controls of pristine, out-of-the-box
7    Prolene mesh.
8    Q.  Would -- move to strike.  Nonresponsive.
9         Would you agree with me that the sample
10   size that you -- this is just generally speaking,
11   the sample size that you use affects the ultimate
12   reliability of your scientific studies and results?
13        MR. HUTCHINSON:  Object to form.
14        THE WITNESS:  Can you please repeat the
15   question?
16   BY MR. THORNBURGH:
17   Q.  Would you agree with me that the sample
18   size that you as a scientist may use will ultimately
19   affect the reliability of your results?
20   A.  This was a simple set of control
21   experiments done to show that intentionally oxidized
22   Prolene mesh and investigate whether that stains
23   with H&E.
24   Q.  Well, just tell me generally, as a
25   scientist, what they -- what does confidence mean to

Stephanie Benight, Ph.D.

Page 94

1  you?
2      A.  I'm not prepared to offer any opinions
3  today on that.
4      Q.  Well, Doctor, just -- I mean, you have a
5  Ph.D., right?
6      A.  I have a Ph.D. in chemistry.
7      Q.  Okay.  And you have worked in a lab for
8  several years, right, one and a half years at
9  Exponent and several years at Dalton Research Group,
10  right?
11     A.  Exponent is an engineering consulting
12  firm.  It's true, we do have laboratories.
13         I have also worked in an academic research
14  lab during my tenure at the University of
15  Washington.
16     Q.  Well, you --
17     A.  And I also worked in a laboratory while I
18  was a postdoc at Stanford University.  In addition,
19  I worked in a laboratory as an undergraduate
20  researcher at Stanford for about two years.
21     Q.  Okay.  So with all that background in mind
22  and that experience that you have working at a lab
23  as a scientist, in the scientific community, is
24  setting out a confidence level part of the
25  scientific process when you develop a study?

Page 95

1         MR. HUTCHINSON:  Object to form.  Been
2  asked and answered, Counsel.
3         THE WITNESS:  We followed the scientific
4  method in the -- in conducting the experiments
5  summarized in Dr. MacLean's microscopy report.
6  BY MR. THORNBURGH:
7      Q.  You didn't answer my question, Doctor.
8         My question is, when you develop a
9  study -- have you ever developed a study, Doctor?
10     A.  Yes, I have conducted experiments as part
11  of a project and/or study.
12     Q.  And when -- and when you have done that in
13  the past, as part of developing the study, did you
14  set out a confidence level that you wanted to meet
15  in order to establish the reliability of your
16  results?
17     A.  Can you please repeat the question?
18     Q.  In your experience, your past experience
19  in doing studies or experiments -- developing
20  experiments or studies, as part of that process,
21  isn't it true that you would have set out a
22  confidence level as part of the scientific process
23  that you undertook?
24        MR. HUTCHINSON:  Objection.  Asked and
25  answered.

Page 96

1         THE WITNESS:  In completing studies and
2  conducting experiments, I set out to follow the
3  scientific method, in that I have a hypothesis and I
4  test it.
5  BY MR. THORNBURGH:
6      Q.  Okay.  But as part of that study
7  development, isn't it important that you identify
8  the power part of the scientific process when you
9  develop a study?  In other words, you want a study
10  to be powered, right?
11        MR. HUTCHINSON:  Object to form.
12  Compound.
13  BY MR. THORNBURGH:
14     Q.  Do you understand what I mean, Doctor?
15        I mean, you are a scientist.  You have
16  worked at labs.  You have conducted studies.  You
17  have a Ph.D.
18        Do you understand what I mean by
19  developing a study that is sufficiently powered?
20        MR. HUTCHINSON:  Same objection.
21        THE WITNESS:  I don't understand what you
22  mean by "powered."
23  BY MR. THORNBURGH:
24     Q.  Well, do you understand that the greater
25  number of samples --

Page 97

1      A.  Greater than what number of samples?
2      Q.  Greater than N equals one.
3      A.  I don't understand the question.
4      Q.  Would you agree with --
5      A.  I would like to take a break.
6      Q.  Hold on.  Let me just ask you a question.
7      A.  Oh, I would like to take a break now.
8         MR. HUTCHINSON:  Yeah, that's fine,
9  Dr. Benight.  You can take a break.
10        I am going to stand up, too.
11        (Whereupon, a brief discussion off the
12  record.)
13        MR. THORNBURGH:  Yeah, we'll go off the
14  record.  If they are taking a break, we're going to
15  go off the record.
16        MR. HUTCHINSON:  Okay.
17        MR. THORNBURGH:  We're not counting record
18  time when you guys are taking a break.
19        MR. HUTCHINSON:  Okay, that's fine.
20        MR. THORNBURGH:  Come on, Chad.
21        THE VIDEOGRAPHER:  Going off the record at
22  2:01.
23        (Whereupon, a brief recess was taken.)
24        THE VIDEOGRAPHER:  Back on the record at
25  2:09.

25 (Pages 94 to 97)

Stephanie Benight, Ph.D.

Page 98

BY MR. THORNBURGH:
1    BY MR. THORNBURGH:
2    Q. Doctor, before we went off the record, I
3    was asking you some general questions about
4    statistical analysis and statistical results and
5    confidence intervals and -- and things of that
6    nature, including sample size.
7        And, Doctor, you know, this deposition is
8    going to be public information.
9        And so if you were to assume with me that
10   a colleague of yours was going to read your
11   deposition transcript, are you representing to
12   people like your colleagues, who may read your
13   deposition transcript, that you do not understand
14   what a confidence interval is?
15       MR. HUTCHINSON: Object to form. And
16   also, Dan, you are telling this witness that this is
17   public information. If you handed all the exhibits
18   that you have handed, is that -- are -- is that what
19   you consider to be public documents?
20       MR. THORNBURGH: Well, it may become
21   public. I don't know that anybody has moved to --
22   to keep this deposition confidential. I don't see
23   any proprietary information. But that's besides the
24   point.
25       MR. HUTCHINSON: Okay. Well, that's my

Page 99

1    objection to the -- to the question. So why don't
2    you remove that, and I'll withdraw my objection.
3    BY MR. THORNBURGH:
4    Q. Well, if a colleague were to read your --
5    let me -- let me ask you this question.
6        If Larry Dalton -- you know who Larry
7    Dalton is, right?
8    A. Larry Dalton was my advisor in graduate
9    school.
10   Q. Right. And if Larry Dalton was to read
11   this deposition transcript, and he read your
12   testimony that you don't know what a confidence --
13   what confidence level means, would he be -- how do
14   you think he would feel about -- well, strike that.
15       Would you want -- do you want your
16   colleagues or would you want your colleagues to
17   believe that you, a scientist who studied both at
18   Stanford and at Washington University and at the
19   Dalton Research Group, didn't understand what a
20   confidence level is?
21       MR. HUTCHINSON: Object to form.
22   Mischaracterizes her testimony.
23       THE WITNESS: I can't speak for the
24   opinions of my colleagues, sir, and Larry Dalton has
25   always been very proud of me.

Page 100

1    BY MR. THORNBURGH:
2    Q. Right. And you understand -- you actually
3    do understand what "confidence level" means, right?
4    A. Sir, I can't speak to what my colleagues
5    would think.
6    Q. That wasn't my question.
7        My question was, you actually do
8    understand what "confidence level" means, don't you?
9    A. It's my understanding that confidence
10   level has to do with statistics.
11   Q. Uh-huh. And you understand that there --
12   that -- for example, you understand what 90 -- the
13   confidence level of 95 would be or .95, an alpha
14   .95? Do you understand what I mean by those terms?
15       MR. HUTCHINSON: Object to form. Counsel,
16   in what context are you referring to?
17       MR. THORNBURGH: Confidence level. The
18   confidence level with an alpha of .95.
19   Q. Do you understand what that is?
20   A. I know that alpha is a Greek letter, and
21   if we're talking about confidence intervals, that's
22   part of statistics.
23   Q. Okay. Well, what is the confidence level
24   when the N equals one?
25       MR. HUTCHINSON: Object to form.

Page 101

1        THE WITNESS: Sir, confidence level has to
2    do with statistics. I have --
3    BY MR. THORNBURGH:
4    Q. In fact, it's actually --
5        MR. HUTCHINSON: I'm sorry. Dr. Benight
6    was continuing to -- you may not have heard her,
7    Dan. That's fine.
8        MR. THORNBURGH: I didn't. I didn't.
9        MR. HUTCHINSON: She was continuing to
10   answer your question.
11       So, Dr. Benight, go ahead.
12       MR. THORNBURGH: And I'm sorry. And part
13   of the problem of doing it by phone is I don't get
14   to see your mouth or your movement, so it's
15   difficult.
16       MR. HUTCHINSON: That's fine.
17   BY MR. THORNBURGH:
18   Q. I don't mean to speak over you, Doctor.
19       MR. HUTCHINSON: I tell you, that's fine.
20   No big deal. No big deal. I'm just letting the
21   doctor finish her answer.
22       THE WITNESS: 95 percent -- what you are
23   referring to as confidence is part of statistics.
24   BY MR. THORNBURGH:
25   Q. Yeah, and you can't actually do a

Stephanie Benight, Ph.D.

Page 102

1    statistical analysis comparative or statistical
2    analysis with an N of one, correct?
3         MR. HUTCHINSON:  Object to form.
4         THE WITNESS:  We didn't perform any
5    statistical analysis as part of this investigation
6    that was summarized in Dr. MacLean's report.
7    BY MR. THORNBURGH:
8         Q.  Right.  And the reason that you didn't, --
9    in fact -- strike that.
10        It would be impossible to do a statistical
11   analysis with only one sample, correct?
12        MR. HUTCHINSON:  Object to form.
13        THE WITNESS:  The experiments that we
14   carried out were a simple set of control experiments
15   to investigate whether intentionally oxidized
16   Prolene mesh stains with H&E.
17        MR. THORNBURGH:  Madam Court Reporter, can
18   you read back my question?
19        Q.  And then, Dr. Benight, listen to the
20   question that she reads back and try to answer that
21   question only, okay?
22        (Whereupon, the reporter read the record
23   as follows:
24        "Question:  It would be impossible to do a
25   statistical analysis with only one sample,

Page 103

1    correct?")
2         THE WITNESS:  We didn't carry out any
3    statistical analysis as part of our investigation to
4    see whether intentionally oxidized Prolene mesh
5    stains.
6    BY MR. THORNBURGH:
7         Q.  I understand.  If I would have wanted to
8    know that answer, I would have asked my question a
9    little bit differently.  But my question was very
10   specific.
11        My question is, you can't perform a
12   statistical analysis when you only have one sample?
13        MR. HUTCHINSON:  Object to form.
14        THE WITNESS:  We submitted several
15   different samples for processing at Histion.
16   BY MR. THORNBURGH:
17        Q.  You -- well, you only submitted -- you
18   testified earlier that you only submitted one
19   UV-treated sample, right?
20        A.  Oh, if you are talking about specifically
21   UV-treated sample, we submitted one UV-treated
22   sample to Histion for processing, embedding, and
23   staining.
24        Q.  Right.  And so my question to you, as it
25   relates to the UV-treated single specimen that was

Page 104

1    sent to Histion, you cannot perform a statistical
2    analysis when the N equals 1, one sample, right?
3         MR. HUTCHINSON:  Object to form.
4         THE WITNESS:  Sir, we didn't perform any
5    statistical analysis as part of this investigation.
6    BY MR. THORNBURGH:
7         Q.  Well, can you tell me what your confidence
8    level, had you performed a statistical analysis,
9    would have been for the single UV-treated sample
10   that was sent to Histion?
11        A.  Sir, we didn't perform any statistical
12   analysis as part of this investigation.  This
13   investigation was a simple set of control
14   experiments done to investigate whether
15   intentionally oxidized Prolene stains with H&E.
16        These experiments were done because
17   plaintiffs' experts, Dr. Iakovlev and Dr. Guelcher,
18   did not perform these control experiments as part of
19   their reports.
20        Q.  There is no way to calculate power
21   regarding the UV-treated single sample that was sent
22   for -- to Histion for processing, correct?
23        A.  If by "power," you mean part of a
24   statistical analysis, we didn't conduct any
25   statistical analysis as part of this investigation.

Page 105

1         Q.  Prior to the study, did anybody define for
2    you the power that they wanted prior to performing
3    any testing of the QUV-treated experiment?
4         A.  I don't understand what you mean by
5    "power," sir.
6         Q.  Okay.  So let's look at the single
7    sample -- well, let's strike that.
8         Let's look at the Histion workbook -- or
9    the Histion exhibit -- document.  I think it was --
10   I think it was marked Exhibit No. 1.
11        A.  In front of me I have two Histion
12   documents, Exhibit No. 4, Histion histopathology
13   project plan, Amendment 1, pertaining to Histion
14   Study No. H15-118, page 1 of 5.
15        And as Exhibit 5, I also have a Histion
16   chain of custody form pertaining to Study No.
17   H15-118.
18        Q.  Hold on one second.  Let me just try to
19   find my document.
20        Okay.  So I think you said that you have
21   two Histion documents in front of you; is that
22   right?
23        A.  Currently, yes.
24        Q.  Okay.  Are there -- are there any other
25   additional Histion documents that you are aware of,

Stephanie Benight, Ph.D.

Page 106

1    other than the two that are in front of you?
2         A.  I believe that there is another QC record
3    that I currently don't have in front of me.
4         Q.  By "QC," do you mean quality -- what does
5    "QC" mean?
6         A.  Quality control is my understanding.
7         MR. HUTCHINSON:  And just so the record
8    reflects, you don't have a hardcopy of that in front
9    of you, correct?
10        THE WITNESS:  Oh, no, but it is included
11   on the production.
12        MR. HUTCHINSON:  Okay.  Since Dan --
13        MR. THORNBURGH:  Well --
14        MR. HUTCHINSON:  Since Dan is not here, he
15   couldn't tell whether the flash drives were in front
16   of you or not, and I was just trying to make the
17   record clear.
18   BY MR. THORNBURGH:
19        Q.  Okay.  So what I have in front of me is
20   a -- I only have two -- strike that.
21        I have two documents that were produced to
22   me that appear to be documents that came from
23   Histion.
24        A.  Okay.
25        Q.  I only have two?

Page 107

1         A.  Okay.
2         Q.  I don't know what the QC document is, and
3    I haven't seen it before.
4         A.  That was included on the production given
5    to you prior to Dr. MacLean's testimony.
6         Q.  Okay.  So -- well, that's what your --
7    that's what you believe was given to me prior to
8    Dr. MacLean's deposition, right?
9         MR. HUTCHINSON:  Hey, Dan, please do not
10   argue with the witness.
11        MR. THORNBURGH:  I'm not.  I'm just -- for
12   the record, I mean, how does she know what was given
13   to me?
14        MR. HUTCHINSON:  Well, because she --
15        THE WITNESS:  It's an exhibit, sir.
16        MR. HUTCHINSON:  Hold --
17        MR. THORNBURGH:  All right.  So that's not
18   my --
19        MR. HUTCHINSON:  Hey, Dan, listen to me.
20   Just -- I know it's difficult, but you are going to
21   get through it.
22        The flash drives that are in front of you
23   contain -- that are in front of the witness, rather,
24   contain documents.
25        And I think it would be helpful if maybe

Page 108

1    you would want to ask her whether or not that is on
2    the flash drive that is in front of her right now.
3         MR. THORNBURGH:  Well I don't know what
4    flash drive is in front of her.
5         MR. HUTCHINSON:  Okay.  The flash drive is
6    Exhibits No. 6, 7, and 8.
7         MR. THORNBURGH:  Okay.
8         Q.  Which -- which document has the quality
9    control, the QC Histion document, which exhibit
10   number?
11        A.  I believe it's Exhibit No. 6, and I am
12   putting that into the court reporter's computer now.
13        Q.  Let's do this, okay.  I don't want to
14   waste too much time.
15        Let's look at the two Histion documents
16   that you have in front of you first, okay?
17        A.  Okay.
18        Q.  All right.  So the first one, does it say
19   "Staining Log" at the very top?
20        A.  No.  Exhibit No. 4 that I have says
21   "Histion Histopathology Project Plan," and Exhibit
22   No. 5 has chain of custody cover page pertaining to
23   Study No. H15-118.
24        I am opening the thumb drive that is, I
25   believe, Exhibit No. 6, where I believe the document

Page 109

1    you were referring to is.
2         Q.  Okay.  I -- so I think I hear what you are
3    saying.
4         The project plan, is that a document that
5    is being produced to me, to -- to the best of your
6    knowledge, for the first time today?
7         A.  No, I believe that's been produced to you
8    before today.
9         Q.  Okay.  What does -- what does the project
10   plan look like?
11        A.  It has five pages.  On the first page it
12   says, "Histion Histopathology Project Plan,
13   Amendment 1."  And it says, "Histion Study No.
14   H15-118."
15        On the second page, there are two
16   signatures, one of Peggy Lalor, Ph.D., of Histion
17   LLC, and another of Mariana Garcia, Ph.D. of
18   Exponent.
19        And it has different sections.  Section
20   2.0 says, "Introduction and Scope."
21        And it says, "Mesh implants will be
22   provided for slide preparation to determine if H&E
23   stain will stain the materials.  Samples will be
24   shipped to Histion for processing."  And then there
25   is a Table 1 of the samples received.

Stephanie Benight, Ph.D.

Page 110

1       There is a next section of 3.0,
2   "Compliance Statement." There's a Section --
3       Q.  Okay.
4       A.  -- No. 4.0 of tissue processing and
5   evaluation methods.
6       And there is a couple subsections under
7   Section 4 that includes the paraffin processing
8   protocol and the Technovit processing protocol, as
9   well as the staining protocols.
10      And then there is Section No. 5,
11  "Archiving and Disposition of Study-Related
12  Materials," and Section 6, which is an amendment
13  justification saying that "added a control tissue to
14  verify staining by H&E."
15      Q.  Okay.
16      A.  And that's page 5 of the document. That's
17  the end of the document.
18      Q.  Okay. So I'm going to represent to you
19  that that document has never been produced to me
20  prior to today.
21      MR. HUTCHINSON:  Dan, I'm --
22      MR. THORNBURGH:  Chad, if you believe
23  otherwise, that's fine.  I don't have --
24      MR. HUTCHINSON:  Okay.  I'm sorry.  I'm
25  just going to object to the form.  I think it

Page 111

1   mischaracterizes the evidence.
2       MR. THORNBURGH:  So --
3       MR. HUTCHINSON:  And the witness, as we
4   sit here now, is trying to look on the flash drive
5   right now.
6       MR. THORNBURGH:  I'm going to go look at
7   Exhibit No. -- Exhibit No. 5to Dr. MacLean's
8   deposition, which is Exhibit -- should be Exhibit
9   No. --
10      MR. HUTCHINSON:  Oh, I know what you are
11  talking about.  We're talking about the Histion
12  project plan?
13      MR. THORNBURGH:  Yes.
14      MR. HUTCHINSON:  Okay.  Yeah.  That's what
15  I sent to you in my e-mail, remember?  I attached
16  that to my e-mail to you when I responded to your
17  seven document requests.  That's when I produced
18  that document to you.
19      MR. THORNBURGH:  Okay.  Okay.
20      MR. HUTCHINSON:  I'm sorry.  Are we on the
21  same page now?
22      MR. THORNBURGH:  I think we are.
23      MR. HUTCHINSON:  Okay.  Completely my bad.
24      So just so we're clear, Exhibit 4, which
25  is a histo -- I'm sorry, a Histion histopathology

Page 112

1   project plan, was produced to you on whatever e-mail
2   that I sent you responding to your document
3   requests.
4       MR. THORNBURGH:  I have it.  Okay.
5       So let's go ahead and mark also the
6   Document No. 3 that I gave to the court reporter,
7   which is the staining log as Exhibit -- the next
8   exhibit, which I believe is Exhibit No. 17.
9       (Whereupon, a brief discussion off the
10  record.)
11      (Whereupon, Exhibit 17 was marked for
12  identification.)
13  BY MR. THORNBURGH:
14      Q.  Okay.  So Exhibit No. 4, 5, and 17 would
15  be the documents -- all the documents that you
16  have -- strike that.
17      Yeah, Exhibit No. 4, 5, and 17 would be
18  all documents that you have in your possession from
19  Histion; is that correct?
20      A.  Yes, those documents are from Histion.
21      Q.  Okay.  So if we look at Exhibit No. 4,
22  which is the Histion project plan, Amendment 1?
23      A.  Okay.
24      Q.  Was there a prior amendment?  Was there a
25  prior document?

Page 113

1       A.  Yes.  All amendments are in red in this
2   Amendment 1 document.
3       Q.  Okay.  Great.  And if you -- on Exhibit 4,
4   if you turn with me to page 3?
5       A.  Okay.
6       Q.  It says, "Sample Description."
7       A.  Oh, okay.
8       Q.  Okay.  So -- so this indicates that
9   Histion received an exemplar mesh on August 20th,
10  2015, a QV-oxidized mesh on August 20th of 2015, a
11  chemical-treated mesh or chemically oxidized mesh
12  that says, "To be determined," and then a control
13  tissue that says "NA."
14      Do you see that?
15      A.  Yes.
16      Q.  And there are -- on the right column on
17  page -- of this page, under Section 2.0, is the
18  processing instructions, right?
19      A.  Yes.
20      Q.  Okay.  So I have a couple questions
21  regarding this.
22      So there was one sample for -- as you
23  testified earlier, there is one QUV oxidized mesh
24  sample.  Half of that was -- that was divided in
25  half; half of it was the paraffin process half and

29 (Pages 110 to 113)

Stephanie Benight, Ph.D.

Page 114

1   the other half was the Technovit resin process.
2         Is that correct?
3         A.  Yes.
4         Q.  And you -- is it -- am I -- is it fair to
5   say that you are not -- well, strike that.
6         Let me ask -- let me try to understand a
7   little bit.
8         And I know we talked about this a little
9   bit earlier.  We talked about how the exemplar was
10  divided up into different pieces of mesh.
11        Some of that mesh was treated using QUV
12  photooxidation, some of that was treated with
13  chemicals to try to oxidize it, and then some of it
14  was untreated, right?
15        MR. HUTCHINSON:  Object to form.
16        THE WITNESS:  If you are referring to the
17  untreated mesh as out-of-the-box Prolene mesh, then
18  yes.
19  BY MR. THORNBURGH:
20        Q.  Now, I'm just trying to figure out from
21  the exemplar that you got and you -- you cut it into
22  pieces, trying to figure out how many pieces you cut
23  that into and then how many of those pieces were
24  sent to Histion.
25        It seems to me, based on what we have seen

Page 115

1   today so far, is that at least -- I think probably
2   at most there were three QUV-treated samples, and
3   one of those samples was sent to Histion?
4         MR. HUTCHINSON:  Object to form.
5         THE WITNESS:  A QUV oxidized mesh sample
6   was sent to Histion.
7   BY MR. THORNBURGH:
8         Q.  Okay.  Do you know how -- I mean, can
9   you -- sitting right here, can you tell me how many
10  samples were treated with QUV?  Do you know the
11  answer to that?
12        MR. HUTCHINSON:  Dan, I'm going to object
13  to the extent you have already asked and answered
14  that -- you have already question a plethora of
15  times already.
16        MR. THORNBURGH:  I understand that, but I
17  never really had -- got an answer for that question.
18  So I'm just trying to figure it out.
19        MR. HUTCHINSON:  I understand that.
20        And let the record reflect that are you
21  asking a witness specific question about documents
22  that may be on the three flash drives that we have
23  produced to you before this deposition.
24        And the witness cannot open up any of the
25  flash drives because, number one, you didn't provide

Page 116

1   the witness a computer and, number two, the court
2   reporter's computer does not have, as we discussed
3   earlier, the appropriate software to open up one of
4   the documents.
5   BY MR. THORNBURGH:
6         Q.  But, Dr. Benight, you were part of that
7   process of cutting that exemplar into pieces, right?
8         A.  Yes.
9         Q.  Okay.  And do you recall how many pieces
10  you cut off of the exemplar to create or use as
11  samples in your various experiments?
12        MR. HUTCHINSON:  Same objections.
13        THE WITNESS:  We cut the TVT mesh into
14  different sets of samples, one for -- to be a
15  control exemplar mesh sample, others to be exposed
16  to QUV irradiation prior to processing, embedding,
17  and staining.
18        And another set was cut and subjected to
19  Dr. Guelcher's protocol, which involves a Cobalt(II)
20  chloride solution for -- said to be chemically
21  oxidizing.
22  BY MR. THORNBURGH:
23        Q.  Did each one of those samples that were
24  cut get a identification number assigned to it by
25  you or by Exponent?

Page 117

1         A.  A sample from -- those that were cut from
2   the TVT mesh, samples were then treated in the
3   oxidation protocols previously outlined before they
4   were sent to Histion lab for processing.
5         Q.  Okay.  Listen, I'm -- maybe you are tired
6   or maybe you are hungry.
7         My question was, did you or Exponent
8   assign to each one of those pieces of mesh an
9   identification number so that you could follow that
10  sample from the different steps in the experiment
11  that were conducted?
12        MR. HUTCHINSON:  Object to form.  Dan,
13  please do not argue with the witness.  I have asked
14  you that before.  If we do it again, this deposition
15  is over.  Do you understand me?
16        MR. THORNBURGH:  Chad, I'm -- Chad, I'm
17  not.  Chad, I'm not.  I'm really not.
18        MR. HUTCHINSON:  Hey, do you understand
19  me?
20        MR. THORNBURGH:  My tone is level.  I'm
21  not arguing with the witness.  I just -- I just want
22  her to listen to my question and answer my question.
23        MR. HUTCHINSON:  I understand that, but
24  I'm asking if you understand me.
25        MR. THORNBURGH:  I understand your

30 (Pages 114 to 117)

Stephanie Benight, Ph.D.

Page 118

1    unreasonable request, yes.
2        MR. HUTCHINSON:  No, my question is not
3    unreasonable.  Do not argue with the witness again.
4    I'm asking, do you understand me?
5    BY MR. THORNBURGH:
6        Q.  Dr. Benight, when those samples were cut
7    into individual pieces -- strike that.
8            When the mesh exemplar was divided into
9    individual samples, did you record that process of
10   cutting that mesh and dividing it into pieces
11   somewhere that I can go to, to look at what was done
12   during that process?
13       A.  Each of the samples cut was either exposed
14   to the chemical oxidation protocol as stipulated by
15   Dr. Guelcher or it was used as an exemplar mesh for
16   a control sample or it was exposed to QUV
17   irradiation.
18       Q.  Okay.
19       A.  And then samples from each of those
20   batches were then processed, sent to Histion for
21   processing, embedding, and staining.
22       Q.  Okay.
23       MR. THORNBURGH:  Madam Court Reporter, I
24   sent some exhibits -- or documents over today.  I
25   think you said that you had those and printed them

Page 119

1    out.
2        (Whereupon, a discussion off the record.)
3        MR. THORNBURGH:  Let's go ahead and mark
4    the Ong 14 as Exhibit No. 18.
5        (Whereupon, a brief discussion off the
6    record.)
7        (Whereupon, Exhibit 18 was marked for
8    identification.)
9        MR. HUTCHINSON:  Dan, did you send another
10   copy for me?
11       MR. THORNBURGH:  Well, I asked for two
12   copies of each of these to be -- well, I asked for
13   two copies of Exhibit 18 to be printed.  I don't
14   know that the court reporter printed two copies.
15       MR. HUTCHINSON:  Okay.
16       (Whereupon, a brief discussion off the
17   record.)
18       MR. THORNBURGH:  I'm just going to ask
19   some general sort of questions about this document.
20       MR. HUTCHINSON:  Okay.  Well, I may --
21   here I may just -- in an effort to speed this along,
22   I may just get a copy of it later if I need to.
23       MR. THORNBURGH:  Okay.  Okay.
24       THE REPORTER:  Sorry.
25       MR. THORNBURGH:  It's okay.

Page 120

1        Are we ready to go?
2        THE WITNESS:  I have Exhibit 18 in front
3    of me.
4    BY MR. THORNBURGH:
5        Q.  Okay.  Great.  Now, Dr. Benight, I'll
6    represent to you that this is a lab notebook that
7    was produced by Dr. Ong in the Lewis versus Ethicon
8    litigation, okay.
9        Do you know who Dr. Ong is?
10       A.  Dr. Kevin Ong, I believe he is an Exponent
11   employee based out of our Philadelphia office.
12       Q.  Okay.  And this was represented by Dr. Ong
13   to be the Exponent lab notebooks that were -- that
14   are used by Exponent scientists, okay?  And do you
15   see how it says "Exponent" on the top left-hand
16   corner?
17       A.  I see "Exponent" at the top left-hand
18   corner.
19       MR. HUTCHINSON:  Object to form of the
20   last question.
21   BY MR. THORNBURGH:
22       Q.  Okay.  Okay.  And do you see there is a
23   project name, there is a project number, and then
24   there is an author of the document and a date of the
25   document identified?

Page 121

1        A.  Yes.
2        Q.  Okay.  Have you ever been provided with a
3    lab notebook like the one marked as Exhibit No. 18
4    from Exponent or by Exponent?
5        A.  I have seen this stationery before.
6        Q.  Okay.  Is it -- are you -- are you
7    testifying -- are you representing that this is not
8    a lab notebook?
9        MR. HUTCHINSON:  Object to form.
10   BY MR. THORNBURGH:
11       Q.  Because I'm going to tell you Dr. Ong,
12   Kevin Ong, another Exponent employee and expert for
13   Ethicon, has represented that this is the Exponent
14   lab notebook that scientists are provided to record
15   their research and experiments, okay?
16       MR. HUTCHINSON:  I'm sorry, Dan, is that a
17   question?
18       MR. THORNBURGH:  So -- yeah.
19       Q.  So are you -- are you testifying different
20   than what Dr. Ong has testified to, that this is
21   really not a lab notebook, that it's just stationery?
22       MR. HUTCHINSON:  Same objection.
23   Argumentative.  Also object to the extent you are
24   asking the witness to interpret the testimony of
25   Dr. Ong without handing her the documents.

Stephanie Benight, Ph.D.

Page 122

1       You can answer.
2           MR. THORNBURGH:  She has the -- she has
3   the document in front of her.
4           MR. HUTCHINSON:  I'm talking about the --
5   I'm talking about the testimony, Counsel.
6           MR. THORNBURGH:  All right.  So --
7           MR. HUTCHINSON:  You can answer.
8           THE WITNESS:  This looks to be a record of
9   experiments performed written down in handwriting.
10  BY MR. THORNBURGH:
11      Q.  Okay.  And you were not provided with a
12  similar document, right, to use as a lab notebook
13  for your experiment that you conducted in this case,
14  correct?
15      A.  I provided a record of all of the
16  experimentation performed in electronic format to
17  you, sir.
18      Q.  Okay.  So let's look at the first page of
19  Exhibit No. 18.
20          Do you see that?
21      A.  Yes.  I'm on the first page.
22      Q.  Okay.  Do you see that this Exponent
23  scientist writes on the day of this experiment that
24  he "will be performing optical microscopy on the
25  exemplar mesh that we received, Exponent Evidence ID

Page 123

1   number."
2           You see there is an ID number for the
3   evidence, you see that?
4       A.  Yes.
5       Q.  Okay.  It says, "The exemplar consists of
6   a blue propylene mesh that is attached to two curved
7   metal ends.  See picture.  The mesh has a protective
8   sheath surrounding it with a split down."
9           Do you see that?
10      A.  Yes.
11      Q.  It says, "High-resolution photographs were
12  taken of each numbered circle with a sheath still on
13  it."  Then it says, "Picture" -- "Pictures labeled."
14          See that?
15      A.  Yes.
16      Q.  Okay.  So when -- I have a number of
17  different questions related to this document.
18          When you received the exemplar, did you
19  understand that that exemplar would be evidence in
20  this case?
21      A.  Yes.
22      Q.  Okay.  And did you or somebody at Exponent
23  assign to the exemplar an evidence ID number, as was
24  done on September 21st, 2013, in the Lewis versus
25  Ethicon experiment?

Page 124

1       A.  It's likely that we did, yes.
2       Q.  Okay.  And where is that evidence ID
3   number identified?  Where would that have been
4   recorded?
5       A.  As part of our internal QA system.
6       Q.  Okay.  And do you see how they did
7   scanning electron microscopy of certain areas on
8   their exemplar?
9       A.  I don't see a reference to SEM.  I see a
10  reference to high-resolution photography --
11      Q.  Sorry, the optical --
12      A.  -- and then numbered circles on the
13  drawing.
14      Q.  You see where they identified the areas of
15  the exemplar that would be looked at using
16  high-resolution photography?
17      A.  I see some labels to that extent, yes.
18      Q.  Okay.  Did you label the pieces of mesh
19  that you divided from the exemplar and give it a
20  specific labeling identification number?
21      A.  Each of the samples that we cut were then
22  either exposed to QUV, chemically oxidized protocol,
23  or used as an exemplar for the experiments that are
24  summarized in Dr. MacLean's report.
25      Q.  Well, how do I know what sample the QUV --

Page 125

1   what -- strike that.
2           How do I know which QUV sample was sent to
3   Histion to be processed?
4       A.  Well, all of the samples that were
5   processed by QUV were in the same QUV chamber and
6   exposed similarly, and the SEM images of the samples
7   that were exposed looked similar.
8           So one of those samples that represents
9   the batch was sent to Histion.
10      Q.  I'm just trying to understand which sample
11  was sent, and I think I understand.
12      A.  And I'm --
13      Q.  If the -- if the answer is no, they
14  weren't given identification numbers, and I don't
15  know which sample was sent, but I know that the
16  sample's from the QUV treatment batch, then
17  that's -- then I understand that, but I need to
18  know --
19          MR. HUTCHINSON:  I'm sorry, Dan, is that a
20  question?  Can you rephrase your question, please?
21          MR. THORNBURGH:  Yeah, I --
22          MR. HUTCHINSON:  Just rephrase your
23  question.  I think that would be helpful for the
24  witness.
25

32 (Pages 122 to 125)

Stephanie Benight, Ph.D.

Page 126

1    BY MR. THORNBURGH:
2        Q.  My question is, I had -- I think I had a
3    couple questions that just haven't been answered.
4    One is, did you provide each sample with an
5    identification number?
6            Do you -- let me ask this question.  Let
7    me withdraw the last one.
8            What is the importance of identifying
9    samples with identification numbers?
10       A.  An identification number is used to
11   identify samples.  Also, naming of the samples is a
12   way to identify samples.
13       Q.  Okay.  So is it -- is it fair to say that
14   neither you nor Exponent gave each sample that was
15   treated in QUV a sample identification number?
16       A.  We numbered them 1 through 6, as I believe
17   we discussed earlier.
18       Q.  Okay.  So which sample, from 1 to 6, was
19   sent to Histion for the pathology -- histopathology
20   experiment?
21           You do understand that there is a question
22   pending, right?
23       A.  Yes, sir.
24       Q.  Okay.  Just -- I assume you were just
25   looking, trying to -- trying to answer the question?

Page 127

1        A.  Oh, yes, sir.
2        Q.  Okay.  Great.
3        A.  From the samples that were sent back, it
4    appears that QUV oxidized Sample No. 2 was sent to
5    Histion.
6        Q.  Okay.  So your testimony is Sample No. 2
7    was sent to Histion, right?
8        A.  Yes.
9        Q.  Okay.  And if you look at the scanning
10   electron microscopy that was performed on the QUV --
11   the samples -- and you recall that, right?  We did
12   that -- went through that process of looking at
13   those SEM images?
14           MR. HUTCHINSON:  Object to form.
15           THE WITNESS:  Yes, yes.
16   BY MR. THORNBURGH:
17       Q.  Okay.  And we were able to tell from that
18   process that we did, that line of questioning, that
19   the samples that were looked at using SEM images
20   from the batch that was treated in the QUV or
21   UV-treated specimens was Sample No. 4, 5, and 6,
22   right?
23           Let me -- let me ask -- let me --
24       A.  A sample that was from the representative
25   batch of samples all exposed in the same QUV chamber

Page 128

1    under the same conditions was sent to Histion for
2    processing, embedding, and staining.
3        Q.  Well, how -- but how do I know that?  How
4    do I know that you sent a sample from the QUV batch
5    to Histion?  Where is the documentation that
6    supports that?
7            MR. HUTCHINSON:  Object to form.  Compound
8    question.  Counsel, will you withdraw that question,
9    please?
10           MR. THORNBURGH:  No.
11           MR. HUTCHINSON:  Okay.
12           THE WITNESS:  It's in the chain of custody
13   record at Histion.
14   BY MR. THORNBURGH:
15       Q.  Yeah.  But how do I know from looking at
16   Exponent's records that a sample that was treated
17   from QUV was actually a sample that was provided to
18   Histion?
19           MR. HUTCHINSON:  Objection.  Speculation.
20   Counsel, if you will rephrase the question and stop
21   from asking, "How do -- how would I know," that
22   would be very helpful.
23           MR. THORNBURGH:  No.  No, I think it is a
24   very important question, and I think the Court would
25   think it's an important question.  I need to be able

Page 129

1    to track which QUV sample was provided to Histion
2    for the experiment.
3            MR. HUTCHINSON:  And --
4    BY MR. THORNBURGH:
5        Q.  And so my question is to you, what
6    internal Exponent record identifies which of the QUV
7    samples was provided to Histion?
8        A.  A sample from the batch of samples that
9    were exposed in the same QUV chamber.  One sample
10   from that batch was sent to Histion for processing.
11       Q.  But how do I know that?
12       A.  I have testified to that, sir.
13       Q.  So the only way for me to know that a
14   sample from the QUV batch was sent to Histion for
15   processing is from your testimony today?
16           MR. HUTCHINSON:  Dan, I am going to object
17   to the extent, Dan, the witness has already answered
18   your question.  She testified that Sample No. 2 --
19           MR. THORNBURGH:  Chad.
20           MR. HUTCHINSON:  -- was sent to Histion.
21           MR. THORNBURGH:  Chad.
22           MR. HUTCHINSON:  Yes.
23           MR. THORNBURGH:  My question is which --
24   Chad, quit coaching the witness.
25           MR. HUTCHINSON:  I'm not coaching the

Golkow Technologies, Inc. - 1.877.370.DEPS

Stephanie Benight, Ph.D.

Page 130

1  witness.
2         MR. THORNBURGH:  My -- but that's a
3  document that is on a Histion document.
4       Q.  My question is, what Exponent document
5  tells me and ensures to me that a QUV-treated sample
6  is a sample that was actually provided to Histion?
7       A.  As I have said, a sample from the samples
8  that were exposed to QUV processing, a sample from
9  that batch was sent to Histion.  FTIR and SEM was
10  also done on more than one of those samples in that
11  batch.
12         That sample was documented in the Histion
13  chain of custody as being received by them under
14  Study No. H15-118.
15       Q.  Yeah, but -- yeah, but --
16       A.  And I actually would like to take a break
17  and eat some lunch.
18       Q.  Okay.  We can take a break, but, you know,
19  I have a question I think that is pending but hasn't
20  been answered yet.
21         MR. HUTCHINSON:  Oh.
22  BY MR. THORNBURGH:
23       Q.  And that is -- so I would like to have
24  just this one question be answered before we take
25  the break.

Page 131

1       A.  Well, I would like to take a break now.  I
2  requested a break.  You said at the beginning if I
3  wanted a break, then I could take a break.
4       Q.  Well, but I -- but I had -- I had a
5  caveat, and that is if there is a question that is
6  outstanding --
7       A.  You haven't asked a question.
8         THE WITNESS:  Madam Court Reporter, can
9  you please read back the record where the question
10  is.
11         MR. HUTCHINSON:  Dan, I think she may have
12  asked your -- answered your question, but --
13         MR. THORNBURGH:  She didn't.  I asked her
14  to identify -- I asked her to identify what internal
15  Exponent document proves to me or establishes that a
16  QUV-treated sample was a -- was actually a sample
17  that was given to Histion.
18         THE WITNESS:  The Histion chain of custody
19  document was included in the Exponent production
20  prior to Dr. MacLean's testimony.
21         MR. HUTCHINSON:  Okay.
22  BY MR. THORNBURGH:
23       Q.  But how did Histion --
24         MR. HUTCHINSON:  Hey, Dan, that's all.
25  We're taking a break.

Page 132

1         MR. THORNBURGH:  Okay.  We'll take a
2  break.
3         THE VIDEOGRAPHER:  This is the end of Tape
4  No. 2.  Going off the record at 2:55.
5         (Whereupon, a brief recess was taken.)
6         THE VIDEOGRAPHER:  This is the beginning
7  of Tape No. 3 in the deposition of Dr. Stephanie
8  Benight.  The time is 3:42.  We're on the record.
9  BY MR. THORNBURGH:
10       Q.  Hi, Dr. Benight.
11       A.  Hello.
12       Q.  I hope you had a good lunch.
13       A.  Yes.
14       Q.  Good.  Before we went off the record, we
15  were talking about the sample that was sent from
16  Exponent -- strike that.
17         Before we went off the record, we were
18  talking about the QUV sample, treated sample of the
19  TVT device that was sent to Histion.
20         Do you recall that?
21       A.  Yes.
22       Q.  And you testified that you had divided or
23  cut six pieces of the pristine mesh off of the
24  exemplar to conduct the QUV testing; is that
25  correct?

Page 133

1       A.  I believe so, yes.
2       Q.  Okay.  And I -- and I apologize if I asked
3  this question before.  I don't remember the answer.
4  I'm not sure that I -- or I'm not sure that I got an
5  answer, so I'm going to try to ask it again.
6         Can you point me to any internal Exponent
7  document that will confirm for me or verify to me
8  that Sample No. 2 was a sample that was actually
9  treated using the QUV photooxidation process?
10       A.  Sir, I have the items that were part of
11  this study that were sent to Histion and sent back
12  to me yesterday, and included in that is QUV Sample
13  No. 2.  If you were here, you could see that.
14       Q.  Okay.  Are you referring to the Histion
15  document?
16       A.  No, sir.  These are the actual samples.  I
17  have a slide that is labeled, "QUV Sample No. 2"
18  that has been returned to me from the lab,
19  establishing traceability of these samples.
20       Q.  Okay.  But when did that -- when did -- so
21  you are looking at a slide, right?
22       A.  I have a blue box full of the slides that
23  are left from the study conducted at Histion, and in
24  those slides is a slide labeled, "QUV Sample No. 2."
25  These were returned to me from the lab yesterday,

Stephanie Benight, Ph.D.

Page 134

1    and if you were here, you would see that slide, sir.
2        Q.  Okay.  So who put -- who identified that
3    slide as QUV No. 2?
4        A.  Well, these were the sides that were sent
5    back to me, and they had to get to the lab somehow,
6    so I sent them to the lab.
7        Q.  Yeah, but who wrote -- who put -- who
8    wrote on that sample, "QUV No. 2"?
9        A.  The microscope slide sample?
10       Q.  Yes.
11       A.  I don't know whose handwriting it is, but
12   it's labeled, "QUV Sample No. 2."
13       Q.  Okay.  So -- but that would -- it would
14   have been done by somebody at Histion, correct?
15       A.  No, I believe this is a slide that was
16   originally sent to Histion from Exponent.
17       Q.  Okay.  Well, let me -- let me ask you this
18   question.
19            Did you do any scanning electron
20   microscopy of Sample No. 2?
21       A.  I would have to look in the production,
22   sir.  We did scanning electron microscopy on samples
23   that were treated in the same QUV chamber at the
24   same time as Sample No. 2.
25       Q.  That wasn't -- obviously that wasn't my

Page 135

1    question.
2            My question was, did you perform scanning
3    electron microscopy on Sample No. 2?
4            MR. HUTCHINSON:  Object to form.  Also,
5    asked and answered.  Counsel, she just told you
6    that --
7            MR. THORNBURGH:  Well --
8            MR. HUTCHINSON:  -- she would have to look
9    at the production.
10           BY MR. THORNBURGH:
11       Q.  And which production are you referring to?
12   Earlier today we marked three flash drives as
13   different exhibits.  And so we marked -- Flash Drive
14   No. 6 was documents that were produced by
15   Dr. MacLean.
16           Flash Drive No. 7 were documents -- was
17   the FTIR and the -- and the photoelectron
18   spectroscopy documents that were produced by Chad.
19           And then -- and then Exhibit No. 8 was the
20   flash drive that you produced that had microscopy
21   and scanning -- additional microscopy and scanning
22   electron microscopy images that were not previously
23   produced.
24           Which production would you have to look at
25   to answer that question?

Page 136

1        A.  I am looking at the -- on the electronic
2    production, Exhibit No. 6, produced prior to
3    Dr. MacLean's testimony.
4            And in that microscopy report folder, in
5    the SEM folder, and the 2015-08-07_QUV folder, there
6    are SEM images of Samples 4, Samples 5, and Sample
7    6, which were treated in the same QUV chamber, in
8    the same batch as Sample No. 2, sent to Histion.
9        Q.  Okay.  How do I know that Sample No. 2 was
10   treated in the same batch as Samples No. 4, 5, and
11   6?
12           MR. HUTCHINSON:  Object to form.
13           THE WITNESS:  I have the remnants from
14   Sample No. 2 that were sent back to me from the lab
15   and documented in the chain of custody form that I
16   received yesterday from the lab, establishing
17   traceability.
18           And, you know, the samples had to get
19   there somehow, so they -- since they were returned
20   to me.
21           BY MR. THORNBURGH:
22       Q.  Okay.  So let me go back to the question
23   before that, that I don't think you have answered.
24           I believe your testimony is that you have
25   scanning electron microscopy of Samples No. 4, 5,

Page 137

1    and 6, right?
2        A.  Yes, that's correct.
3        Q.  Okay.  But you do not have scanning
4    electron microscopy images of Samples No. 2,
5    correct?
6        A.  We acquired scanning electron microscopy
7    images on Samples 4, 5, and 6, which were processed
8    in the same QUV chamber as Sample No. 2.
9        Q.  Okay.  So the answer is no, you don't have
10   scanning electron microscopy images of Sample No.
11   4 -- I'm sorry, Sample No. 2, correct?
12       A.  We have scanning electron microscopy
13   images of Samples No. 4, 5, and 6, which were
14   treated in the same batch as Sample No. 2 that you
15   are referring to.
16       Q.  I understand that.  I'm -- look, I'm not
17   trying to be difficult here.  I just want a yes or
18   no to this question.
19           You do not have scanning electron
20   microscopy images of Sample No. 2, correct?
21       A.  Sir, we have scanning electron microscopy
22   images of Samples 4, 5, and 6, which were shown to
23   have cracking similar to each other and are in the
24   same batch as that process of Sample No. 2.
25       Q.  Okay.  So the answer is no, you do not

35 (Pages 134 to 137)

Golkow Technologies, Inc. - 1.877.370.DEPS

Stephanie Benight, Ph.D.

Page 138

1    have scanning electron microscopy of Sample No. 2?
2        MR. HUTCHINSON: Objection. Asked and
3    answered.
4        THE WITNESS: We have SEM images of
5    Samples 4, 5, and 6, sir.
6    BY MR. THORNBURGH:
7        Q. Okay. We looked at some FTIR spectra
8    earlier. We looked and saw that you had FTIR of
9    Sample No. 4 and Sample No. 6.
10       Do you recall that?
11       A. I'm looking in the exhibits that I have.
12       Q. It was Exhibit 16 -- or 15, Exhibit 15.
13       A. Exhibit 15, is that what you are referring
14   to?
15       Q. Yes.
16       A. Yes, I have that in front of me.
17       Q. Okay. Did you do FTIR of Sample No. 2?
18       A. We did FTIR on -- from what you are
19   saying, the exhibits that you have pointed out, on
20   Sample No. 4. And then there is not a label on the
21   first two pages, but you had indicated, I think,
22   earlier that that was Sample No. 6.
23       Q. Okay. So you do not have -- strike that.
24       Am I correct that you do not have FTIR
25   spectra for Sample No. 2?

Page 139

1        A. Similar to the SEM images, we acquired
2    FTIR on a representative sample from the batch that
3    was processed in the same conditions, in the same
4    QUV chamber at the same time.
5        Q. So you do not have SEM images -- strike
6    that. Withdrawn.
7        You do not have -- strike that.
8        You did not perform FTIR analysis
9    specifically on Sample No. 2, correct?
10       MR. HUTCHINSON: Objection. Asked and
11   answered.
12       THE WITNESS: We performed FTIR analysis
13   on, in Exhibit 15, Samples 6 and Samples 4, which
14   were processed in the same QUV chamber as Sample No.
15   2, sent to Histion.
16   BY MR. THORNBURGH:
17       Q. Are there -- do you have any other FTIR
18   analysis, other than the analysis performed on
19   Sample No. 4 and 6 contained in Exhibit No. 15?
20       A. I believe that we also have additional
21   FTIR. And, again, you know, I can't open these
22   files on the production.
23       But we had discussed FTIR acquired on
24   October 5th that also includes a saved background
25   spectrum and shows similar spectra to the FTIR

Page 140

1    spectra in Exhibit 15.
2        And there is also another FTIR document in
3    the production given to you prior to Dr. MacLean's
4    testimony, but I can't open it on the flash drive.
5        Q. Yeah, and I'll -- I'm going to represent
6    to you I have looked at those documents, all of
7    them, very carefully, and the FTIR documentation
8    that you provided prior to Dr. MacLean's deposition
9    was that of the chemical-treated samples, not of the
10   UV-treated samples, okay.
11       So my question is -- my question is very
12   simple, I think.
13       Do you know sitting here today whether or
14   not FTIR microscopy was performed on Sample No. 2?
15       MR. HUTCHINSON: Object to form.
16       THE WITNESS: We performed FTIR on samples
17   that were treated in the same batch as Number 2, and
18   that's been provided to you.
19       MR. THORNBURGH: Chad, can you please have
20   her answer the question? It's a yes or no. It's
21   not a trick question.
22       Q. Did you or did you not perform FTIR on
23   Sample No. 2?
24       MR. HUTCHINSON: Counsel --
25       MR. THORNBURGH: That's all I want her to

Page 141

1    answer, Chad, yes or no.
2        MR. HUTCHINSON: I understand. And,
3    Counsel, she has -- she had answered your question.
4        MR. THORNBURGH: She's not.
5        MR. HUTCHINSON: If you have a document --
6    do you have a document maybe that you could show her
7    to help her maybe understand where you are going?
8        MR. THORNBURGH: Chad --
9        MR. HUTCHINSON: She's answered your
10   question.
11       MR. THORNBURGH: It's a very simple
12   question.
13       Q. Yes or no, did you perform FTIR on Sample
14   No. 2?
15       A. I am not able to open the other FTIR
16   documents on the flash drive, sir. If you have
17   spectra you would like me to look at, I can.
18       I have already answered that we performed
19   FTIR on the samples that were treated in the same
20   QUV chamber that are given in the spectra provided
21   to you.
22       Q. If you would have performed FTIR analysis
23   on Sample No. 2, would they have been produced as
24   part of either Exhibit No. 6, 7, or 8?
25       A. I believe so, yes.

Stephanie Benight, Ph.D.

Page 142

1    Q.  Okay.  And if there -- if there is no FTIR
2  analysis within that production of Sample No. 2, is
3  it safe for me to assume that there was no FTIR
4  analysis performed on Sample No. 2?
5    A.  All of the FTIR that we performed was
6  provided in the production to you.
7    Q.  Okay.  So we have talked about how the
8  pristine TVT exemplar was cut and there were pieces
9  that were -- that had become samples for certain
10  testing.
11        And you identified that there were at
12  least six pieces that were cut from the pristine TVT
13  exemplar, right, that were used, according to you,
14  for UV treatment?
15    A.  Yes, I believe that's correct.
16    Q.  Okay.  Were there any other pieces that
17  were cut from the pristine TVT exemplar that you
18  received?
19    A.  There were additional pieces cut for the
20  control pristine, out-of-the-box Prolene sample that
21  was used as part of the microscopy report and sent
22  to Histion.
23        And there were also pieces cut that were
24  exposed to plaintiffs' expert, Dr. Guelcher's
25  chemical oxidation protocol.

Page 143

1    Q.  Okay.  So we're going to talk about that
2  process in a moment.
3        So what I understand, though, is of the
4  six UV-treated samples that you had, you only
5  submitted one of those samples for histology, right?
6    A.  We actually I have the box in front of me
7  that was returned, and we sent two QUV process
8  samples to Histion, one of which went through the
9  processing, embedding, and staining protocol
10  outlined in Dr. MacLean's microscopy report.
11    Q.  So one was -- I think what you are saying
12  is -- and I think that when we looked at the -- the
13  Histion project plan, it indicated that they
14  received one QUV specimen that was divided in half,
15  half of it was treated with resin and half of it --
16  the -- half of the other -- the other half was
17  treated with paraffin, right?
18    A.  That's what the project plan says, yes.
19    Q.  Okay.  And so is that your understanding,
20  that there wasn't additional QUV other than what the
21  project plan shows; is that correct?
22    A.  Well, there were two samples that were
23  returned to me, one of which looks to have been
24  processed in paraffin and resin.
25    Q.  What about the other half or the other

Page 144

1  one?
2    A.  It's in the box where, if you were here,
3  you could see there was another QUV sample, but I
4  don't believe that it was under -- that it underwent
5  the protocol outlined in the project plan.
6    Q.  Okay.  So there is another QUV sample.
7        Which sample number is that?
8    A.  It says Number 6 on it.
9    Q.  Okay.  So Number 6 did not undergo the
10  project plan outlined in the Histion report, which I
11  think was Exhibit No. 17; is that correct?
12    A.  The sample that I have returned to me from
13  the samples I received yesterday as part of the
14  study from the lab, Sample No. 2 looks to have been
15  processed by the lab, and a sample labeled Number 6,
16  it appears to be intact.
17    Q.  Okay.  Intact and not processed by
18  Histion?
19    A.  It's not in a resin or paraffin block --
20    Q.  What, if anything, was performed -- what,
21  if any, testing was performed on Exhibit No. 6 by
22  Histion?
23    A.  Exhibit No. 6?
24    Q.  I'm sorry.  Sample No. 6.
25    A.  According to the project plan and the

Page 145

1  samples that I have received that you would be able
2  to see if you were here, they are not in a resin or
3  a paraffin block.  It's just in -- on a slide
4  wrapped in some aluminum foil.
5    Q.  Okay.  And was that a deviation from the
6  protocol that was set out or the plan that was
7  developed?
8    A.  No, not at all.  The plan was to process a
9  QUV process sample, and that's what we did.
10    Q.  Why did you send Sample No. 6 to Histion
11  if they weren't going to perform any analysis on --
12  on that sample?
13    A.  Probably as a backup for them at their
14  convenience.
15    Q.  Do you know why?
16        MR. HUTCHINSON:  Objection.  Asked and
17  answered.
18        THE WITNESS:  Probably as a backup for
19  their convenience.
20  BY MR. THORNBURGH:
21    Q.  But in any event, only one of those
22  samples was actually processed by Histion for the
23  microphotography that was done later on, correct?
24    A.  Well, we processed a QUV oxidized sample,
25  a pristine Prolene mesh sample, and a chemically

Stephanie Benight, Ph.D.

Page 146

1  oxidized sample according to plaintiffs' expert,
2  Dr. Scott Guelcher's IUGA proceedings paper
3  protocol.
4      Q.  So let me ask you --
5      A.  We also processed a control tissue sample
6  that was rabbit skin as part of the study.
7      Q.  Okay.  So let me ask you this question.
8          Of the six or alleged six QUV-treated
9  samples, why did you only ask Histion to process one
10  sample of the six?
11      A.  From the SEM and the FTIR, the samples
12  were shown to have similar morphology and similar
13  FTIR spectra.  And in processing one sample, Histion
14  can create hundreds and hundreds of sections from
15  microtoming.
16      Q.  But you could have sent -- you could have
17  asked Histion to perform histopathology on all six
18  specimens, but only -- or samples, but only one
19  sample was actually processed, right?
20          MR. HUTCHINSON:  Object to form.  Compound
21  question.
22          THE WITNESS:  We found that, from the FTIR
23  and the SEM, the samples that were imaged and
24  measured were similar.
25          And so one sample from that batch that was

Page 147

1  processed in the same QUV chamber was sent to
2  Histion, where they had the capability to create
3  hundreds and hundreds of sections from one embedded
4  sample.
5          MR. HUTCHINSON:  Hey, Dan, could you back
6  up from the microphone for a little bit, please?  We
7  are getting a lot of static.
8  BY MR. THORNBURGH:
9      Q.  Now, we -- I think earlier today we marked
10  as Exhibit No. 1 the microscopy image index.
11          Do you recall that?
12      A.  Yes, I have that in front of me.
13      Q.  And this index was -- was, I think,
14  identical -- well, I compared this index with the
15  microphotographs that were produced by Dr. MacLean,
16  and it would appear that this would be an index of
17  those photomicrographs or microphotographs; is
18  that -- is that a correct understanding?
19      A.  That's correct, sir.
20      Q.  And the additional microphotographs that
21  were produced by you today on Exhibit No. 8 would
22  not be identified on this grid, correct?
23      A.  The microscopy --
24      Q.  Or the -- on Exhibit No. 1, sorry.
25      A.  The microscopy image index includes the

Page 148

1  micrographs that were taken of processed sections,
2  embedded and staining protocol slides from Histion.
3          The files that are on Exhibit No. 8
4  include SEM images of chemically oxidized processed
5  mesh and optical microscopy images as well as SEM
6  images of QUV processed mesh.
7      Q.  Okay.  I think I understand.
8      A.  Great.
9      Q.  Okay.  So regarding the chemical -- or
10  chemical -- yeah, chemical treated samples, let's
11  just turn our attention just briefly -- I think
12  hopefully briefly to that experiment.
13          So how many pieces were cut from the TVT
14  exemplar for purpose of -- or purposes of the
15  chemical treatment oxidation experiment that you
16  performed?
17      A.  A few.
18      Q.  And does that mean two?
19      A.  Well, I said, "A few."
20      Q.  Well, how many precisely?
21      A.  On the -- on the same order as the number
22  that were processed for the QUV process step.
23      Q.  So is that an additional six?
24      A.  It's on the order of that number.
25      Q.  What internal Exponent document would I

Page 149

1  look at to confirm how many samples from the
2  exemplar were used for the chemical oxidation
3  experiment?
4      A.  We processed the chemically oxidizing
5  protocol samples and imaged them with SEM.
6      Q.  Were all -- were all samples imaged using
7  SEM?
8      A.  It's likely that, similar to the QUV, we
9  imaged a representative sample from the batch that
10  was processed with the chemical oxidation protocol
11  according to Scott Guelcher.
12      Q.  Okay.  So when you cut the pieces from the
13  exemplar, did you identify which pieces would be
14  treated chemically to try to oxidize them with some
15  sort of identification number?
16      A.  A few -- set of samples were cut and all
17  processed from the same oxidation solution.
18          (Whereupon, a brief discussion off the
19  record.)
20  BY MR. THORNBURGH:
21      Q.  You had testified earlier that for the
22  UV-treated samples you had labeled those samples as
23  Sample 1 through 6.
24          Do you recall that testimony?
25      A.  Yes.

38 (Pages 146 to 149)

Stephanie Benight, Ph.D.

Page 150

1       Q.  Okay.  So what samples were labeled --
2   strike that.
3           How did you -- how did you label each
4   chemically treated sample under your experiment --
5   or -- for the chemical treatment?
6           So in other words -- let me just ask a
7   better question.
8           So for the UV treatment, we -- you are
9   testifying that Samples 1 through 6 underwent UV --
10  the UV process.
11          What sample numbers were submitted for
12  chemical analysis or chemical treatment?
13      A.  We processed a similar number of samples
14  for -- under the chemical oxidizing protocol.
15      Q.  Okay.  So did you label the seventh sample
16  as a sample that was treated chemically?
17      A.  The samples that were sent to the
18  laboratory were labeled with the number four.
19      Q.  Well, so -- okay.  So was Sample No. 4
20  treated with chemical oxidation or chemicals to try
21  to intentionally oxidize it?
22      A.  The Sample No. 4 in the Histion documents
23  was treated with the chemical oxidation protocol, as
24  outlined by Dr. Scott Guelcher.
25      Q.  Okay.  But I thought you testified earlier

Page 151

1   that Samples 1 through 6 were treated with QUV.
2       A.  There were Samples No. 1 through 6 that
3   were treated with QUV.  I'm talking about the sample
4   that was sent to Histion and labeled as Sample No.
5   4.
6       Q.  Well, how do I know that you didn't
7   mistakenly send a different sample to Histion to --
8   to be analyzed as a chemical-treated specimen?
9           MR. HUTCHINSON:  Object to form.
10          THE WITNESS:  There is a record of the
11  samples sent and then also received and returned to
12  me yesterday.  And if you were here, you could see
13  them in person.
14  BY MR. THORNBURGH:
15      Q.  Okay.  But I'm just trying to understand,
16  because you testified that Samples 1 through 6 were
17  treated with QUV and Samples 7 and above were
18  treated with chemicals to try to intentionally
19  oxidize them.
20          So why does the Histion report identify
21  Exhibit No. 4 as -- Sample No. 4 as a sample that
22  was treated chemically?
23      A.  I believe you said that it was Samples
24  No. 7 and above that were chemically oxidized.
25          I said that we chemically oxidized on the

Page 152

1   order of the same -- a similar number of samples
2   using the chemically oxidized protocol compared to
3   the QUV oxidized protocol.
4       Q.  Okay.  That's fair.  So for each
5   experiment, the samples were labeled the same?
6       A.  For each experiment, the QUV samples were
7   labeled 1 through 6, and a similar set of samples on
8   the order of the number of samples processed for QUV
9   were processed using Dr. Scott Guelcher's protocol.
10          One of those samples that was
11  representative of the batch, oxidized from the same
12  chemical oxidizing solution, was sent to Histion,
13  where it was given the label number four.
14      Q.  Okay.  So --
15      A.  In the Histion study, Labels No. 1 pertain
16  to an exemplar, out-of-the-box, pristine Prolene
17  mesh, and Number 2 pertains to the QUV oxidized
18  mesh.
19          Number 4 pertains to a mesh sample that
20  was exposed to the chemically oxidized protocol, as
21  outlined by Dr. Scott Guelcher.  And Sample No. 5 is
22  the control tissue.
23          This is all in the QC record provided by
24  the lab and outlined very clearly.  Specifically, I
25  am looking at Exhibit No. 5 and also the staining

Page 153

1   log document, which I'm not sure that -- oh, yes,
2   Exhibit No. 17.
3       Q.  Okay.  So Exhibit Number -- oh, hold on
4   one second.
5           Okay.  So let's look at the Histion
6   staining log.
7           Do you have that in front of you?
8       A.  Oh, also, before I finish my answer -- for
9   the previous question, the lab does sort of blindly
10  receive the samples so that no bias is put on them
11  when they are processed, embedded, and stained.
12          They label them with the numbers and then
13  keep a record of the labels, from our labels that we
14  sent to their labels on the slides, to ensure
15  traceability.
16      Q.  Okay.  So your testimony is that when
17  Histion receives -- the Histion lab, which is the
18  third-party laboratory who did the histopathology,
19  right?
20      A.  They processed the samples we sent,
21  embedded them, and then stained them according to
22  Dr. Iakovlev's protocol.
23      Q.  Okay.  But then you said that the lab
24  blindly receives the samples.
25          Which lab are you talking about?

Stephanie Benight, Ph.D.

Page 154

1    A.  Histion, sir.
2    Q.  Okay.  So Histion blindly receives the
3  samples.
4       How do you --
5    A.  That's -- oh, go ahead, sorry.
6    Q.  No, that -- I just want to make sure I
7  understand your testimony.
8       Your testimony was that Histion blindly
9  receives the samples, right?
10    A.  No, that's in correct.  Histion receives
11  the sample that we sent and then they assign them
12  numbers so that they do not assign any bias while
13  processing the samples.
14       But in their log, the samples are recorded
15  to the label that was on them when we sent them to
16  Histion.
17    Q.  Okay.  So for the chemical-oxidized
18  experiment, you sent to Histion one sample, correct?
19    A.  Well, we actually sent two, but they
20  processed one.
21    Q.  Do you know why they only processed one
22  sample rather than two?
23    A.  As part of the project plan, they
24  processed one of the chemically oxidized samples.
25       I need to take a break.

Page 155

1       MR. THORNBURGH:  Okay.  That's fine.
2       THE VIDEOGRAPHER:  Your microphone.
3       Going off the record at 4:18.
4       (Whereupon, a brief recess was taken.)
5       MR. HUTCHINSON:  Yes, Dan, we're all here.
6       THE VIDEOGRAPHER:  Back on the record at
7  4:22.
8       MR. THORNBURGH:  Are we on the record?
9       MR. HUTCHINSON:  Yes.
10       MR. THORNBURGH:  Oh, I'm sorry.  I didn't
11  hear that.
12       Okay.  So I -- I provided the court
13  reporter with some documents that are numbered 11A
14  through I.
15       THE REPORTER:  Yes, sir.
16       MR. THORNBURGH:  Okay.  If we can just go
17  ahead and mark all those as the next exhibit.
18       (Whereupon, a brief discussion off the
19  record.)
20       (Whereupon, Exhibit 19 was marked for
21  identification.)
22  BY MR. THORNBURGH:
23    Q.  Okay.  Dr. Benight, do you recognize
24  Exhibit No. 19 as the scanning electron microscopy
25  images of the chemically treated batch?

Page 156

1    A.  It appears to be, yes.
2    Q.  Okay.  And do you know what sample was --
3  from the chemically treated samples was analyzed
4  using scanning electron microscopy?
5    A.  We analyzed a few different samples from
6  those that were exposed with the same solution made
7  from Dr. Scott Guelcher's protocol.
8    Q.  Okay.  My question is, do you know which
9  samples were analyzed?
10    A.  Sir, these images don't have a file name
11  associated with them in front of me.
12    Q.  Well, the file names that they came in --
13  came with say "Flip" -- it says, "8/25/15 Oxidized
14  Mesh Flip-01" through "Flip-05," and then the
15  same -- and then images Oxidized Mesh 01 through 03.
16       Do you know what that naming -- what those
17  names mean?  Because that's how they were produced
18  to us.
19    A.  These are images of several different
20  areas of the same sample, oxidized mesh, and then
21  the numbered samples after that are different areas
22  of the sample.  And then "flip" indicates the
23  opposite side of the sample was imaged.
24    Q.  Okay.  So just -- just one sample was
25  evaluated with scanning electron microscopy of the

Page 157

1  chemical-treated samples?
2    A.  Well, from the exhibit you have handed me,
3  and correlating that with the online production
4  folder, and I am in 2015-08-25_COCL2 Oxidized Mesh,
5  that appears to be a collection of images from one
6  sample.
7    Q.  Okay.  Were there any other scanning
8  electron microscopy images taken from any other
9  chemically treated sample?
10    A.  I believe there are additional images
11  within the microscopy report and SEM folder in
12  Exhibit No. 6, which contains the production from
13  prior to Dr. MacLean's deposition.  I'm looking at
14  file folder named 2015-08-26.
15       And there is also additional SEM images of
16  Cobalt(II) chloride oxidized processed samples.
17    Q.  Within that folder that you just
18  identified?
19    A.  Yes, sir.
20    Q.  Okay.  And are those of a different sample
21  than those that were looked at in Exhibit No. 19?
22    A.  They are all from the same batch of
23  samples, sir.
24    Q.  I know, but my question is, is that a
25  different sample than we see in Exhibit No. 19?

Stephanie Benight, Ph.D.

Page 158

1    A. They are all processed similarly.
2    Q. Is it -- is it a different sample that was
3  looked at under scanning electron microscopy than
4  the sample that we just looked at in Exhibit No. 19?
5    A. It might be.
6    Q. Do you know?
7    A. The samples were all processed the same,
8  sir.
9    Q. Okay. So for Exhibit No. --
10    A. And this was taken on a different day.
11    Q. For Number -- for Exhibit No. 19 --
12    A. Uh-huh.
13    Q. -- what sample is that? What is the
14  sample identification number for -- for the SEM
15  images in Exhibit No. 19?
16    A. Well, as I stated, they were all -- all
17  the images are of the same sample. It's one sample.
18    Q. Yeah, but what is the sample number?
19    A. Well, on these images there doesn't appear
20  to be a sample number.
21    Q. Okay. Because we know that you sent a
22  sample to Histion that you called Sample No. 4 from
23  the chemical-treated samples, right?
24    A. Well, that's the designation that is in
25  the Histion paperwork.

Page 159

1    Q. I thought that was a designation that
2  correlated with your samples.
3    A. We sent a representative sample of the
4  chemically oxidized samples to Histion.
5    Q. Okay. So what sample -- what Exponent
6  chemically treated sample were we looking at in
7  Exhibit No. 19, if you know? If you don't know,
8  that's fine.
9    A. I mean, we're looking at a representative
10  sample. The SEM images are a representative sample
11  of that batch.
12    MR. THORNBURGH: Okay. Let's -- if we
13  could mark as Exhibit No. 20 the document that I
14  provided to the court reporter as Number 12.
15    (Whereupon, a brief discussion off the
16  record.)
17    (Whereupon, Exhibit 20 was marked for
18  identification.)
19    THE WITNESS: I have Exhibit 20 in front
20  of me.
21  BY MR. THORNBURGH:
22    Q. Okay. 20 was sent to us, a document
23  titled: "2015-08-26 FTIR-4.5 weeks," okay?
24    A. Okay.
25    Q. And I assume that the reason why it was

Page 160

1  titled 8-26 -- sorry, 2015-8-26 is because the FTIR
2  spectra was ran on 8/26/2015; is that correct?
3    A. To my knowledge, yes.
4    Q. Actually, it looks like it was ran on
5  8/25/2015.
6    If you turn -- if you turn to page 2 of
7  Exhibit 20, it says, "FTIR data 8/25/15"?
8    A. It's quite possible that the PowerPoint
9  file you are referring to in the production that
10  includes the label four and a half weeks was
11  prepared from spectra that were acquired a day
12  before.
13    Q. Okay. So if you turn to page -- or the
14  third page in Exhibit No. 20.
15    A. Okay.
16    Q. Okay. You will see that there is -- it
17  says, "Exemplar," at the top, and there is a FTIR
18  spectra.
19    Do you see that?
20    A. Yes.
21    Q. Okay. And then underneath those -- the
22  exemplar is another spectra that is labeled
23  "Oxidized."
24    Do you see that?
25    A. Yes.

Page 161

1    Q. Okay. And this is what was treated
2  chemically in an attempt to oxidize it?
3    A. Yes, according to Dr. Scott Guelcher's
4  protocol.
5    Q. Okay. What sample number was analyzed
6  from the chemically treated samples using FTIR?
7    A. All of the samples that were chemically
8  oxidized according to Dr. Guelcher's protocol were
9  oxidized with the same solution separated into
10  different vials. This is one of those samples
11  representative from that batch, sir.
12    Q. Okay. So which sample number is it?
13    A. In the spectrum it doesn't have a sample
14  number, sir.
15    Q. Okay. Which -- what internal Exponent
16  document do I look to, to confirm what sample number
17  I'm looking at from the batch of chemically treated
18  samples?
19    A. Well, it's a representative sample from
20  that batch.
21    Q. So there's -- is it fair to say that there
22  is no document that I can look at to determine what
23  sample number we are looking at here?
24    MR. HUTCHINSON: Object to form. Asked
25  and answered.

41 (Pages 158 to 161)

Stephanie Benight, Ph.D.

Page 162

1    BY MR. THORNBURGH:
2        Q.  Right?
3        A.  The spectrum in front of me that you had
4    indicated is from -- sample from -- that's
5    processed in the same batch of chemically oxidized
6    samples, sir.
7        Q.  So I take it to understand -- I think I
8    understand your testimony, no, there isn't an
9    internal Exponent document that I can look to, to
10   understand which sample I'm looking at here?
11       A.  This is a sample that has been chemically
12   oxidized in that protocol according to Dr. Scott
13   Guelcher.
14       Q.  Is it Sample No. 4 that was sent to
15   Histion?
16       A.  It's a sample from -- representative
17   sample from the same batch --
18       Q.  Do you know if it --
19       A.  -- that was sent to Histion.
20       Q.  Sorry.  Do you know if it is Sample No. 4?
21       A.  It's a representative sample, sir.
22       Q.  If you look at -- on -- still on the third
23   page of Exhibit 20, there is a peak -- it looks like
24   a different peak from that of the exemplar, which
25   runs from, you know, about 3,000 reciprocal

Page 163

1    centimeters to 3,600 reciprocal centimeters.
2        Do you see that?
3        A.  Yeah, I see a peak.
4        Q.  Okay.  What is -- what is your
5    understanding of that peak?
6        MR. HUTCHINSON:  Object to form.
7        THE WITNESS:  I'm not prepared to offer
8    any opinions on the spectra today, sir.
9    BY MR. THORNBURGH:
10       Q.  You don't know one way or the other what
11   that chemical or molecule is that we're looking at,
12   correct?
13       MR. HUTCHINSON:  Object to form.  Counsel,
14   that's been asked and answered.  She just told you
15   she's not prepared to offer any opinions on the
16   spectra today.
17   BY MR. THORNBURGH:
18       Q.  Did you run these -- let me just -- let
19   me -- let me try to understand.
20       Did you run these FTIR, or was that done
21   by somebody else?
22       A.  It's likely that it was done by somebody
23   else, possibly a technician in our lab, at my
24   instruction.
25       Q.  Did you do -- I'm sorry.

Page 164

1        Did you do -- at your instruction at your
2    lab at Exponent in California?
3        A.  Yes, this was done in our -- on our FTIR
4    instrument in California.
5        Q.  And are you familiar with FTIR analysis?
6        A.  I am.
7        Q.  And did you help in preparing
8    Dr. MacLean's report concerning the FTIR analysis?
9        A.  I'm not aware of any FTIR analysis that
10   was included in Dr. MacLean's microscopy report.
11       Q.  Well, in the experiments -- let me ask
12   this question.
13       How much communication did you have with
14   Dr. MacLean concerning the chemical oxidation
15   experiment and the UV oxidation experiment?
16       A.  We discussed those experiments.
17       Q.  Okay.  Did you discuss the findings in the
18   FTIR?
19       A.  I don't recall.  We might have.
20       Q.  Okay.  What might have you discussed with
21   Dr. MacLean regarding the FTIR?
22       A.  Well, in general, I discussed the
23   experiments that we performed as part of this study
24   that was done to investigate whether intentionally
25   oxidized Prolene mesh stains with H&E.

Page 165

1        Q.  Okay.  And did you provide -- strike that.
2        Did you talk to Dr. MacLean about the
3    peaks -- the broad -- very broad peak that we see
4    from 3,000 to 6 -- 3,600 reciprocal centimeters?
5        A.  These spectra were provided to
6    Dr. MacLean.
7        Q.  Okay.  And if you look further down to the
8    right of -- of the oxidized spectra on -- still on
9    the third page?
10       A.  Okay.
11       Q.  Okay.  And do you see 1,600 reciprocal
12   centimeters, do you see that do you see that area on
13   the spectra?
14       A.  I see that area, sir, yes.
15       Q.  Okay.  And do you see that there is a peak
16   just to the left of the 1,600 spectra, at about
17   1,650, on the oxidized -- chemically oxidized sample
18   that does not appear on the exemplar?
19       A.  Yes.
20       Q.  And you do understand, don't you, that a
21   peak at 1,750 reciprocal centimeters would indicate
22   a -- an -- a carbonyl consistent with oxidation?
23       MR. HUTCHINSON:  Object to form.
24       THE WITNESS:  It's my understanding that a
25   peak around 1,750, as you have indicated, can be

Stephanie Benight, Ph.D.

Page 166

1    indicative of oxidation.
2    BY MR. THORNBURGH:
3        Q.  1,650?
4        A.  You said 1,750.
5        Q.  Yeah, no, I said 1,650.  But you
6    understand that 1,650 --
7            MR. HUTCHINSON:  Actually, no, Dan, I'm
8    sorry.  The court reporter wrote down 1,750, so --
9            MR. THORNBURGH:  Okay.  I might have.  I
10   might have.
11           MR. HUTCHINSON:  But I'm going to object
12   to the extent that it's outside the witness's area
13   of testimony.
14           MR. THORNBURGH:  Right.
15       Q.  Okay.  So -- but you understand that
16   carbonyls on oxidized propylene appear anywhere from
17   about 1,650 up to 1,800 reciprocal centimeters?
18           MR. HUTCHINSON:  Same objection.
19           THE WITNESS:  I understand.
20   BY MR. THORNBURGH:
21       Q.  Did you talk to Dr. MacLean about the
22   results or the data that was found on -- or in these
23   FTIR spectra of the chemically oxidized mesh?
24       A.  These spectra were provided for
25   Dr. MacLean's review once they were acquired.

Page 167

1        Q.  Did you talk to him about the data
2    contained herein, in Exhibit No. 20?
3        A.  I mean, I had several discussions with him
4    about the experiments that we were conducting.
5        Q.  Did you talk to him about the peak that
6    was observed on the chemically oxidized specimen at
7    1,650?
8        A.  I don't recall if we discussed that
9    specific peak.  These spectra were made available to
10   him after they were completed.
11           MR. THORNBURGH:  Okay.  Okay.  A document
12   that's titled: "13A."
13           (Whereupon, a brief discussion off the
14   record.)
15           (Whereupon, Exhibit 21 was marked for
16   identification.)
17   BY MR. THORNBURGH:
18       Q.  Okay.  Exhibit No. 21 is the document that
19   was sent to us titled:  "2015-10-2005_Summary."
20           And I believe you said that this is the
21   sample that was tested using FTIR on October 5th,
22   2005 -- 2015, correct?
23       A.  That's correct.
24       Q.  Okay.  And so it looks like the first page
25   of Exhibit 21 is the background spectra?

Page 168

1        A.  Yes.
2        Q.  Okay.  And the -- why did you -- why --
3    what was your reason, again, for running this
4    specimen again?
5        A.  We carried out FTIR on this sample because
6    we wanted to save a background spectrum associated
7    with it.
8            This sample was a QUV-processed sample
9    that was processed in the same chamber at the same
10   time under the same conditions as the previously
11   examined QUV-processed samples by FTIR.
12       Q.  Okay.  So -- so the background information
13   gives us what?  In layman's terms, why are we
14   running background?
15       A.  Essentially there is, in the air and such,
16   peaks that can show up in the FTIR, and the
17   background is used as sort of a zero so that when
18   you are analyzing your sample, you are only
19   collecting peaks pertaining to that sample.
20       Q.  Right.  So you are excluding -- you are
21   excluding the background information?
22       A.  That's inaccurate, sir.  You take a zero
23   spectrum in the form of a background, and that is
24   recorded on the instrument so that when you analyze
25   your sample of interest, you are only collecting

Page 169

1    peaks indicative of that sample.
2        Q.  Yeah, that's what -- I think that's what I
3    was trying to say.  Maybe I still don't understand
4    it.  As I said, I'm a layperson.
5            But you don't -- you want to make sure you
6    understand the background information so that you
7    are interpreting the FTIR on the specimen
8    appropriately, right?
9            MR. HUTCHINSON:  Object to form.  Also
10   object to the extent counsel is providing
11   commentary.
12   BY MR. THORNBURGH:
13       Q.  You still have to answer the question.
14       A.  Can you repeat the question?
15       Q.  Yeah, I'm just trying to -- I'm not --
16   it's not -- it's really not a trick question.  I'm
17   just trying to understand --
18       A.  Sir, I just don't understand the question.
19           Can you please repeat it?
20       Q.  Sure.  Sure.
21           So the purpose of running the background,
22   if I understand your testimony correctly, is because
23   there -- you want to make sure that you have -- are
24   looking at the correct information when you run an
25   FTIR spectra on the actual specimen, right?

43 (Pages 166 to 169)

Stephanie Benight, Ph.D.

Page 170

1     A.  Yes, you want to look at the sample itself
2  and ensure that you are only collecting peaks that
3  are indicative of your sample of interest.
4     Q.  Right, because the background could have
5  oxygen or other things like that, so you don't want
6  that to show up on the FTIR spectra of the sample.
7        So you are -- you are trying to eliminate
8  the background information from the actual spectra
9  of the sample being tested?
10       MR. HUTCHINSON:  Object to form.  Compound
11  question.
12       Counsel, could you rephrase that?
13  BY MR. THORNBURGH:
14    Q.  Yeah.  I -- you know what, I'll withdraw
15  it because I decided it's not important.
16       Let's look at the second page in Exhibit
17  No. 21.
18    A.  Okay.
19    Q.  Okay.  So you ran Specimen No. 6 through
20  the FTIR process on October -- on October 5th, 2015,
21  correct?
22    A.  Yes.  I believe one of my colleagues
23  operated the instrument.
24    Q.  Okay.  Now, you testified a moment ago
25  that there were two samples that were sent to

Page 171

1  Histion, Sample No. 2 and Sample No. 6, correct?
2     A.  From the samples that I have received
3  back, there are two samples, one labeled Sample No.
4  2 and one labeled Sample No. 6.
5     Q.  Okay.  So if I understand the evidence and
6  testimony correctly, on October 5th, 2015, an FTIR
7  was performed on the sample that you have in front
8  of you as Exhibit -- as Sample No. 6, correct?
9     A.  It --
10       MR. HUTCHINSON:  Object to form.
11       THE WITNESS:  It's labeled Number 6.
12  BY MR. THORNBURGH:
13    Q.  So it would appear that that would be the
14  same sample that underwent the FTIR analysis on
15  October 5th, 2015, correct?
16    A.  Yes.  So it might help if I explain the
17  sample to you.  This part of the mesh that was sent
18  to Histion was secured during -- a glass slide
19  during the QUV exposure.
20       And so in analyzing Sample No. 6, the
21  portion of the mesh that was analyzed was from the
22  same sample.  Just a remnant was left behind in my
23  office, but it's part of the same sample that was
24  sent to Histion.
25       So I think you are trying to establish

Page 172

1  that there are two different samples or that there
2  is -- they are different, but really, it's quite
3  possible that they are indeed the same sample.
4  BY MR. THORNBURGH:
5     Q.  How -- well, how -- what document do I
6  look to, to verify that the sample that was tested
7  at Histion is a -- is a -- is the same sample or a
8  remnant of the sample that was testified with FTIR
9  on October 5th, 2015?
10    A.  The Sample No. 6 that is in the
11  October 5th, 2015, spectrum is from the same batch
12  of samples that were processed with QUV, sir.
13    Q.  Okay.  When did you receive Sample No. 6
14  that you have in front of you from Histion?
15    A.  We received the sample labeled -- well,
16  it's labeled 15-118-6.  We received that yesterday.
17    Q.  And has that sample been at Histion ever
18  since?
19    A.  Ever since when, sir?
20    Q.  Since it was initially sent to them
21  according to your -- the -- their chain of custody
22  document on October 26th, 2015?
23    A.  Yes.
24    Q.  I'm sorry.  August 26th, 2015?
25    A.  Yes.

Page 173

1     Q.  Okay.  So how can the same sample be in
2  the same place -- how can the same sample be in two
3  different places at the same time?
4     A.  There are parts of the same sample, sir.
5        Parts of the sample that were remaining in
6  my office, Sample No. 6, were acquired with -- or
7  measured with FTIR, and the majority of that sample
8  was sent to Histion in the date in August that you
9  specified.
10    Q.  Okay.  Which internal document at Exponent
11  do I look to, to see -- or to determine that Sample
12  No. 6 was divided before it was even sent to Histion
13  by you and maintained at your office until
14  October 5th, when whatever sample or piece of Sample
15  No. 6 you retained was tested by FTIR?
16    A.  Each of these samples was all processed
17  the same, with QUV exposure.  And in the FTIR that
18  we acquired, they showed similar spectra, indicating
19  that the samples had been exposed similarly.
20       So as I have stated previously, a sample
21  that is representative from the batch that was
22  processed with QUV was sent to the lab and
23  processed, embedded, and stained according to
24  Dr. Iakovlev's procedure and protocol.
25    Q.  What -- what internal document -- so you

44 (Pages 170 to 173)

Stephanie Benight, Ph.D.

Page 174

1    are testifying that Sample No. 6 was processed
2    through the paraffin protocol or the resin protocol;
3    is that correct?
4        A.  Sir, the Sample No. 6 in the slides that I
5    received was one of the ones that was not processed.
6    I believe the sample that we had referred to as
7    Sample No. 2, QUV oxidized, was processed in both
8    paraffin and resin.
9        Q.  Okay.  But Sample No. 6 was provided to
10   Histion, according to the chain of custody documents
11   from Histion?
12       A.  What document are you referring to?
13       Q.  Yeah, let's do that.  So --
14       A.  There is a lot of background noise.
15           MR. HUTCHINSON:  And, Dan, could you back
16   away from the phone just a minute, please?  We're
17   getting a lot of background noise.  Thank you.
18   That's better.
19   BY MR. THORNBURGH:
20       Q.  So if you look at Exhibit No. 5?
21       A.  Okay.
22       Q.  Okay.  So you testified -- you testified
23   earlier that you recently received from Histion
24   remnants of Sample No. 6 that were not processed by
25   Histion; is that correct?

Page 175

1        A.  No, sir.  We received an unused mesh
2    sample with the label 15-118-6 as part of the
3    samples received yesterday from Histion.  We
4    processed QUV process sample labeled Number 2.
5        Q.  Okay.
6        A.  And that's also present on Exhibit No. 5,
7    the second page, or page 1 of 1, since the first
8    page is a chain of custody cover page, where it
9    says, you know, 15-118-2 are part of the H&E stained
10   slides.
11       Q.  Okay.  But I'm just trying to figure out,
12   because you testified earlier that you received a
13   specimen from Histion that was identified by an -- a
14   Histion accession number of 15-118-6, correct?
15       A.  Yes, that's correct.
16       Q.  Okay.  And you also testified earlier that
17   you know that Sample No. 2 from the UV-treated
18   experiment was sent to Histion because Histion
19   identified the UV-treated sample as 15-118-2.
20           Do you recall that?
21       A.  Well, the sample labeled Number 2 has "2
22   QUV oxidized," a Number 2 label on the glass slide
23   that was sent to Histion, and Histion in its records
24   annotated that as Sample No. 2.
25       Q.  Yeah, but so you testified earlier when we

Page 176

1    went through the six specimens that were treated as
2    a batch with UV radiation as Samples 1, 2, 3, 4, 5,
3    and 6, and when I asked you what samples from that
4    batch was sent to Histion, you testified that there
5    was Sample No. 2.
6            And I said, "Well, how do I know it was
7    Sample No. 2?  How can you verify that for me?"
8            You said, "Let's look at the Histion chain
9    of custody.  They labeled it Number 2 because we
10   sent them Sample No. 2 from that batch."
11           Are you withdrawing that testimony now?
12           MR. HUTCHINSON:  Object to form.
13   Mischaracterizes the testimony.
14           THE WITNESS:  Sir, if you were here, you
15   would see that there was a sample labeled Number 2
16   that was sent back to me and originally sent to the
17   lab, and there is also a sample labeled "QUV mesh
18   No. 15-118-6."
19           The -- one of these samples was processed,
20   and from looking at the samples, the one where the
21   sample is no longer on the glass slide, it's likely
22   in paraffin and resin, and that sample, along with
23   the other one that was -- unused mesh sample, as
24   indicated in the chain of custody record, received
25   to me -- or that I received yesterday, these samples

Page 177

1    were sent back.
2    BY MR. THORNBURGH:
3        Q.  Yeah, I understand that.
4            And you received Sample No. 2 back and
5    Sample -- or, I'm sorry, Sample No. 2 was processed
6    into a -- into a pathology slide, correct?
7        A.  Sample No. 15-118-2 was processed, half in
8    paraffin, half in resin, as indicated in the project
9    plan.
10       Q.  Okay.  So based on what you have in front
11   of you and from what you understand as the person
12   who was involved in these experiments, is it your
13   understanding that a -- that Sample No. 6 was also
14   sent to Histion, which wasn't processed, but was
15   returned back to you yesterday?
16       A.  In the samples that I received, I have a
17   sample labeled 15-118-6, which also is indicated on
18   the chain of custody form received with the samples
19   yesterday as an unused mesh sample.
20       Q.  Okay.  Is that -- is that a -- was that
21   a -- strike that.
22           Is that the same Sample No. 6 that --
23   strike that.
24           Is that Exponent number -- withdrawn.
25           Let me -- let me try this again.

45 (Pages 174 to 177)

Golkow Technologies, Inc. - 1.877.370.DEPS

Stephanie Benight, Ph.D.

Page 178

1    Did Exponent also send to Histion Sample
2  No. 6, and is that the sample that you received
3  returned from Histion yesterday?
4    MR. HUTCHINSON: Object to form. Compound
5  question.
6    THE WITNESS: Yesterday I received a
7  sample labeled QUV 15-118-6 that appeared to not be
8  processed and is consistent with the chain of
9  custody cover page and form document.
10    And I also received a QUV oxidized sample
11  labeled H15-118-2 which was indicated to be
12  processed in the protocol followed by Histion,
13  including processing, embedding, and staining with
14  H&E and followed to be consistent with
15  Dr. Iakovlev's protocol.
16  BY MR. THORNBURGH:
17    Q. I'm going to try to make this simple,
18  Doctor.
19    Did you send Exponent -- a QUV sample
20  labeled by Exponent as Sample No. 2?
21    MR. HUTCHINSON: Object to form.
22    Counsel, can you rephrase your question?
23  BY MR. THORNBURGH:
24    Q. Dr. Benight -- Dr. Benight, did you or
25  someone at Exponent send to Histion a QUV-treated

Page 179

1  sample that was identified internally by Exponent as
2  Sample No. 2?
3    A. Yes.
4    Q. Okay. Did you or Exponent also send to
5  Histion a QUV sample that would have been identified
6  internally as Exhibit -- as Sample No. 6?
7    A. The label on the sample is 15-118-6.
8    Q. Is that -- does that mean that -- that
9  Exponent sent to Histion Sample No. 6 from the
10  QUV-treated samples?
11    A. Sir, all of the samples were processed in
12  the same batch. The label on the sample that was
13  not processed in the staining protocol has label
14  15-118-6.
15    Q. Does that mean that Exponent provided
16  Sample No. 6 to Histion?
17    A. Exponent provided two samples, as I have
18  stated. One is labeled --
19    Q. Numbered --
20    A. -- 2, and one is labeled Number 6.
21    Q. Okay. So now --
22    A. 15-118-6.
23    Q. Okay. So now I'm trying to understand how
24  one sample can be at two places at the same time.
25    So how is it that up until yesterday,

Page 180

1  Histion had possession and custody of Sample No. 6,
2  yet on October 5th, Exponent performed FTIR analysis
3  on the same Sample No. 6?
4    MR. HUTCHINSON: Object to form.
5  Argumentative.
6    THE WITNESS: Sir, it's likely that since
7  the majority of the sample was sent, what you are
8  referring to as Sample 15-118-6 was sent to Histion.
9    The way these samples were processed in
10  the QUV chamber, and if you were here, you could see
11  that, is that a mesh sample is taped to a glass
12  slide.
13    In order to not disturb the sample, the
14  sample was cut away from that tape, and so it's
15  likely that you are still looking at Sample No. 6 in
16  Exhibit No. 21.
17    And the majority of that same Sample No. 6
18  was sent to the lab for analysis, except they did
19  not process that sample. They processed Sample No.
20  2.
21  BY MR. THORNBURGH:
22    Q. Okay. So let me try to understand your
23  testimony. Well, let me -- let me ask you this
24  question.
25    What internal document at Exponent do I

Page 181

1  look to, to verify what you are telling me actually
2  occurred?
3    MR. HUTCHINSON: Object to form. Counsel,
4  the witness has already told you that if you were
5  here, you could see the document that she's talking
6  about and the -- and the -- and the slides.
7  BY MR. THORNBURGH:
8    Q. What internal Exponent document --
9  Exponent document, internal Exponent document do I
10  look to, to verify that what you are telling me is
11  true?
12    A. Well, several documents state that a QUV
13  process sample and a chemically oxidized process
14  sample were sent to -- to Histion for processing,
15  embedding, and staining.
16    That's in Dr. MacLean's microscopy report.
17  It's in the QC records from the laboratory. It's in
18  the Histion project plan. All of these documents
19  were produced to you and provided and give that
20  information.
21    Q. But how do I verify from the internal --
22  and this -- that's the whole point of lab notebooks,
23  right, you want to be able to verify the process,
24  the steps that were taken, okay.
25    And so I'm asking you, what internal

46 (Pages 178 to 181)

Stephanie Benight, Ph.D.

Page 182

1   document do I look to, what electronic lab notebook
2   do I go to at Exponent that tells me that Sample 6
3   was sent to Exponent, but -- but it was taped to a
4   glass slide and a sample was cut away from that
5   slide -- from that tape and also sent back to
6   Exponent to be tested using FTIR analysis?
7           MR. HUTCHINSON:  Object to form.  Counsel,
8   it's argumentative.
9           MR. THORNBURGH:  It's not.
10          MR. HUTCHINSON:  Yes, it is.
11  BY MR. THORNBURGH:
12      Q.  Please answer the question.
13          MR. HUTCHINSON:  I think you are getting
14  frustrated.  Also, it's been asked and answered.
15          THE WITNESS:  Sir, we have provided a
16  record of the experiments performed to you in the
17  form of an electronic laboratory notebook.  It's in
18  the records and the documents produced.  It's in
19  several of the documents produced.
20          It also -- we have, as traceability of the
21  sample sent, not only in the QC custody record -- or
22  the chain of custody record, excuse me, from
23  Histion, but also, if you were here to observe, in
24  the actual samples that have been sent back from the
25  lab, all of them are documented in Exhibit No. 5.

Page 183

1           And I have also stated that to you today,
2   sir.  I have been very polite in answering your
3   questions.
4   BY MR. THORNBURGH:
5       Q.  Okay.  So let's assume what you are
6   telling me is correct, for the sake of argument.
7       A.  I'm under oath, sir.
8       Q.  Okay.  So let's assume it's true.
9           Who would have cut a piece of -- so you
10  testified earlier that the samples that you received
11  back from Histion are taped to a glass slide and the
12  sample may have been cut away from that tape and
13  then produced or returned back to Exponent to be
14  analyzed using FTIR?
15          MR. HUTCHINSON:  Object to form.  Compound
16  question.
17          THE WITNESS:  No, that's incorrect, sir.
18  I said that the way the samples were
19  processed in the QUV chamber is they were taped
20  against a glass slide.
21          And the glass slide that was returned to
22  me yesterday does not have mesh remnants on it, and
23  it's also labeled as QUV oxidized No. 2 or
24  H15-118-2, which is now in paraffin and resin and
25  underwent the staining protocol.

Page 184

1   BY MR. THORNBURGH:
2       Q.  I really am trying to understand your
3   testimony.  I really am.  I'm doing my best.
4           MR. HUTCHINSON:  All right.
5           MR. THORNBURGH:  So --
6           MR. HUTCHINSON:  Hey, well, Dan, we have
7   asked the same question several times.  Let's --
8   we -- you need to move on.
9           MR. THORNBURGH:  No.
10          MR. HUTCHINSON:  Do you understand?
11          MR. THORNBURGH:  No, no, not until I
12  understand how I can verify this.  So --
13          MR. HUTCHINSON:  Well, the witness has
14  answered your question.
15          MR. THORNBURGH:  Yes.
16          MR. HUTCHINSON:  You asked that specific
17  question.  She gave you a paragraph answer.  And
18  it's not my problem that you can't understand it.
19          MR. THORNBURGH:  Hold on.  Hold on, Chad.
20  Quit being rude.
21      Q.  Dr. Benight, you just testified that the
22  QUV-treated samples would have been taped against a
23  glass slide and that the slide that was returned to
24  you doesn't have mesh remnants on it, right?
25      A.  The slide you are referring to is labeled

Page 185

1   "2 QUV oxidized."  And that sample was processed
2   according to Dr. Iakovlev's protocol by Histion.
3       Q.  Okay.  But where did Exponent get its
4   Sample 6 from on October 5th to test it using FTIR?
5       A.  Well, we measured several samples with
6   FTIR.  And the spectrum in Exhibit No. 21, labeled
7   Sample No. 6, is likely part of the same sample,
8   labeled 15-118-6, sent back to me yesterday from the
9   lab.
10      Q.  Okay.  So you say it's likely, but I
11  interpret that as meaning that you don't know and
12  you are speculating?
13          MR. HUTCHINSON:  Counsel, is that a
14  question?
15          MR. THORNBURGH:  Yeah.
16      Q.  Am I -- is that -- is that an incorrect
17  interpretation?
18          MR. HUTCHINSON:  I'm going to object to
19  form.
20          THE WITNESS:  I don't understand the
21  question.
22  BY MR. THORNBURGH:
23      Q.  Well, you said that --
24          MR. HUTCHINSON:  Court Reporter, can you
25  read back her answer to me, please, where she said,

Stephanie Benight, Ph.D.

Page 186

1   "It's likely"?
2        (Whereupon, a brief discussion off the
3   record.)
4        (Whereupon, the reporter read the record
5   as follows:
6        "Answer:  Well, we measured several
7   samples with FTIR.  And the spectrum in Exhibit
8   No. 21, labeled Sample No. 6, is likely part of the
9   same sample, labeled 15-118-6, sent back to me
10  yesterday from the lab.")
11       MR. HUTCHINSON:  And, Dan, if you -- if
12  you have a document or something that you want to
13  show the witness, that would be helpful.  Again, we
14  have three flash drives here, so that would be
15  helpful, if you could show her a document.
16       MR. THORNBURGH:  I'm just trying to
17  understand what she means when she says, "likely."
18       Q.  Does that mean that it is the same sample
19  or that you think it might be the same sample?
20       MR. HUTCHINSON:  Object to form.
21       THE WITNESS:  Sir, as I have already
22  mentioned, Sample 15-118-6 and a sample labeled
23  H15-118-2 were returned to me yesterday from the
24  lab.
25       Both of these samples were processed in

Page 187

1   the same QUV chamber under the same conditions at
2   the same time for the same amount of time, and they
3   were both returned to me yesterday.
4   BY MR. THORNBURGH:
5       Q.  So I understand that.
6       But we have a document that indicates that
7   on October 5th, 2015, when the sample that you
8   received in your possession, Number 15-118-6 was at
9   Histion, but during that same time, that Sample 6
10  was tested by FTIR analysis.
11      And so I think I understand what you are
12  saying.
13      You are saying it's very likely that
14  Sample 15-118-6 is the same sample that was tested
15  on October 5th, 2015, right?
16      MR. HUTCHINSON:  Object to form.
17      THE WITNESS:  Well, it's -- it's from the
18  same mesh sample.  You can think of it as if they
19  were divided and part of it remained at Exponent and
20  the rest of it was sent to Histion.
21  BY MR. THORNBURGH:
22      Q.  When was Sample 6 divided, with a portion
23  of Sample 6 being sent to Histion and the remaining
24  portion being stored and preserved at Exponent?
25      A.  That would have occurred when the samples

Page 188

1   were originally sent to Histion, which is in the
2   chain of custody document and also the project plan.
3   And I believe the project plan said August 20th.
4       Q.  Okay.  Who at Exponent divided Sample No.
5   6?
6       A.  It would have been me or another one of my
7   associates.
8       Q.  And do you recall having done that?
9       A.  I don't recall who specifically cut the
10  sample, sir.
11      Q.  You don't personally recall doing that
12  yourself, correct?
13      A.  I may have.  It also could have easily
14  been someone else doing it at my direction.
15      Q.  Do you have any internal documentation
16  that would verify for me when Sample 6 was divided
17  and who divided it?
18      A.  Sir, this sample that we're discussing was
19  sent to Histion, according to the documents, on
20  August 20th.
21      Q.  That's not an answer to my question, with
22  all due respect.
23      Please point me to an internal document
24  that would allow me to verify when Sample No. 6
25  would have been divided and by whom Sample No. 6 was

Page 189

1   divided?
2       A.  Sample No. 6 -- or the QUV oxidized
3   samples, rather, were sent to Histion on
4   August 20th.
5       Q.  Okay.  Please point me to an internal
6   Exponent document that would verify on what date
7   Sample No. 6 was divided and by whom?
8       MR. HUTCHINSON:  Objection.  Been asked
9   and answered, Counsel.  She just told you
10  August 20th.
11      MR. THORNBURGH:  That doesn't tell me by
12  whom.  It doesn't tell me who would have divided it.
13  It doesn't verify the testimony that she is giving.
14      MR. HUTCHINSON:  All right.  Calm down,
15  Dan.  I'm going to make my objection.  It's been
16  asked and answered.
17      You can answer, Dr. Benight.
18      THE WITNESS:  The QUV process sample that
19  was sent to the lab and used as the set of
20  experiments that we conducted as the basis for
21  Dr. MacLean's microscopy report were sent to the lab
22  on August 20th.  It says that in the project plan.
23      MR. THORNBURGH:  Chad, you want to take a
24  minute and talk to your witness?
25      MR. HUTCHINSON:  For -- about what?  You

48 (Pages 186 to 189)

Stephanie Benight, Ph.D.

Page 190

1    talking about redirect?
2            MR. THORNBURGH:  Ask -- no, to ask her to
3    answer my question.
4            MR. HUTCHINSON:  Counsel, I'm not going to
5    argue with you, so let that be clear.  She just told
6    you it says that in the project plan and it was on
7    August the 20th, so I'm going to object --
8            MR. THORNBURGH:  It says --
9            MR. HUTCHINSON:  -- and instruct the
10   witness not to answer any more questions about that
11   because --
12           MR. THORNBURGH:  You are -- you are
13   instructing her not to answer any more -- that's
14   fine.  If you instruct her not to answer any more
15   questions, that's okay.  We're taking this entire
16   deposition up with the Court.
17           MR. HUTCHINSON:  All right.  Well, Dan, my
18   point to you is, you have asked this question.  I'm
19   trying to work this out with you.
20           MR. THORNBURGH:  But she hasn't answered.
21           MR. HUTCHINSON:  Why don't we take a quick
22   break, and that will give you time to calm down.  I
23   know you are frustrated, okay?
24           MR. THORNBURGH:  I just want some answers
25   to simple questions.  That's all I'm looking for.

Page 191

1    They're very simple questions.
2            MR. HUTCHINSON:  We'll take a quick break.
3            THE VIDEOGRAPHER:  Going off the record at
4    5:16.
5            (Whereupon, a brief recess was taken.)
6            THE VIDEOGRAPHER:  This is the beginning
7    of Tape No. 4.  We're back on the record at 5:26.
8    BY MR. THORNBURGH:
9        Q.  Doctor, before we went off the record, I
10   asked you to identify for me an internal Exponent
11   document which would confirm or verify for me that
12   Sample No. 6 was divided and it was -- and who
13   divided the Sample No. 6.
14           Do you have an internal Exponent document
15   that you can refer me to, to verify your testimony?
16       A.  I don't know that I can refer you to an
17   internal Exponent document that states exactly what
18   you have said.
19       Q.  That was an answer to my question, it
20   feels good, doesn't it.
21           MR. HUTCHINSON:  Hey -- hey, Dan, please
22   do not argue.  I don't know if that was meant to be
23   argumentative or not.
24           MR. THORNBURGH:  It was not.
25           MR. HUTCHINSON:  Good.

Page 192

1    BY MR. THORNBURGH:
2        Q.  Dr. Benight, are you also the person who
3    took the photomicrographs that were produced in this
4    case?
5        A.  Which photomicrographs are you referring
6    to, sir?
7        Q.  Well, so let me ask you -- get some
8    more -- a broader question.
9            Did you take any photomicrographs?
10       A.  Yes.
11       Q.  Okay.  And you took -- did other -- did
12   other employees at Exponent take photomicrographs?
13       A.  Yes.
14       Q.  Okay.  What specimens did you take
15   photomicrographs of?
16       A.  I acquired photomicrographs of the samples
17   that were processed by Histion.
18       Q.  Which samples; do you know?
19       A.  The -- all of the photomicrographs that
20   are in the production in Exhibit 6 that are
21   photomicrographs of processed sections that have
22   gone through the staining protocol, those are the
23   images that I acquired.
24       Q.  Okay.  And did you have any input into
25   which photomicrographs became part of the final

Page 193

1    report issued by Dr. MacLean?
2        A.  Yes.
3        Q.  And what input did you provide?
4        A.  Well, I helped prepare the report in a
5    general sense.
6        Q.  Okay.  Did you -- was it your opinion that
7    the specimen that was processed by -- strike that.
8            Was it your opinion that the specimen that
9    was -- or the sample, Sample No. 2, that was treated
10   with QUV photooxidation did not become -- that the
11   TVT fiber itself did not stain?
12       A.  I am not prepared to offer any opinions
13   today on that.
14       Q.  Did -- but did you provide any opinions
15   or -- did you provide any opinions to Dr. MacLean
16   regarding your work in this case?
17       A.  I acquired images and made them available
18   to Dr. MacLean.
19       Q.  And you chose what images would become
20   part of the report?
21       A.  I helped with the report in general and I
22   selected some images to show Dr. MacLean, but I also
23   showed him all of the images.  They were made
24   available to him.
25           MR. THORNBURGH:  Okay.  Let's look at 8 --

Stephanie Benight, Ph.D.

Page 194

1    the document marked as Exhibit No. 20 -- I think
2    we're at 23, the document that I provided to the
3    court reporter as 8A.
4            (Whereupon, a brief discussion off the
5    record.)
6            (Whereupon, Exhibit 22 was marked for
7    identification.)
8    BY MR. THORNBURGH:
9        Q.  Dr. Benight, is this one of the images
10   that you took?
11       A.  It looks like it.
12       Q.  Okay.  And this would have been of Sample
13   No. 2?
14       A.  It doesn't have a label on it, sir.
15       Q.  Well, couldn't you provide only Sample
16   No. -- didn't Histion only process Sample No. 2 from
17   the QUV-treated samples?
18       A.  Histion processed an exemplar pristine
19   control mesh sample, a QUV process sample, and a
20   chemically oxidized process sample as well as a
21   control piece of tissue.
22       Q.  Right.  And so this was sent to us,
23   identified as 2A 100X xpole 0028.
24           Okay?
25       A.  Okay.

Page 195

1        Q.  Does that indicate to you that this is a
2    photomicrograph of a fiber from Sample No. 2?
3        A.  Yes.  Sample 2 in the image files
4    indicates that it was QUV-oxidized processed.
5        Q.  And you took this image, correct?
6        A.  No, this image was taken by personnel at
7    Histion at my instruction.
8        Q.  Okay.  I thought that you had testified
9    that you had performed the -- the microphotographs
10   or the photomicrographs?
11       A.  I took several images of photomicrographs
12   of samples, but there were some additional
13   photomicrographs that were taken by Histion
14   personnel.
15       Q.  Okay.  So it's your testimony that this is
16   one that was taken by Histion personnel?
17       A.  Yeah, with the file name that you gave me,
18   yes, that's correct.
19       Q.  And was that a technician at Histion?
20       A.  I don't know his role, but it was an
21   employee of Histion.
22       Q.  And do you know why the photomicrograph
23   that was taken was taken with -- is very blurry?  Do
24   you see how the core of the fiber is blurred out?
25   Do you see that?

Page 196

1            MR. HUTCHINSON:  Object to form.
2            THE WITNESS:  Yes, I'm looking at the
3    photo.
4    BY MR. THORNBURGH:
5        Q.  All right.  Do you know why the photo was
6    taken in a way that blurred out the core in the
7    picture?
8            MR. HUTCHINSON:  Object to form.
9            THE WITNESS:  In my experience in
10   analyzing these samples, it's difficult to focus
11   within the entire plane of the sample to be in
12   focus.
13           So it makes sense to me that part of the
14   sample would appear in focus and part of it would
15   not.  That's not unusual.
16           MR. THORNBURGH:  We can go ahead -- let's
17   go ahead and mark the document I have provided the
18   court reporter as 8B as Exhibit 23.
19           (Whereupon, a brief discussion off the
20   record.)
21           (Whereupon, Exhibit 23 was marked for
22   identification.)
23   BY MR. THORNBURGH:
24       Q.  Okay.  Doctor, this was provided to us
25   with a title of 2A 100X BF.

Page 197

1            Is -- would this have been a
2    photomicrograph that was taken by the same personnel
3    at Histion?
4        A.  Yes.
5        Q.  And Exhibit No. 22 and 23 are exhibits --
6    or photomicrographs that actually made it into the
7    report, correct?
8        A.  I don't have a copy of the report in front
9    of me, sir.
10           MR. THORNBURGH:  Well, let's just do this
11   real quick.  The document titled:  "H" -- or "8C"
12   we'll mark it as Exhibit 24.
13           (Whereupon, Exhibit 24 was marked for
14   identification.)
15   BY MR. THORNBURGH:
16       Q.  Doctor, this was sent to us with the title
17   2A_0074.
18           Would this have been an image or
19   photomicrograph that would have been taken by you or
20   somebody else?
21       A.  By me, sir.
22       Q.  Okay.  And do you -- on this image, do you
23   see a -- on the outer -- very outer edge or outer
24   shell of the Prolene fiber from the TVT, that it's
25   stained pink?

Stephanie Benight, Ph.D.

Page 198

1      A.  The whole slide, including the background,
2  looks pink.
3      Q.  But the -- do you see the edge of the
4  fiber, do you see how there is a thin pink line that
5  runs all the way around that fiber?
6          MR. HUTCHINSON:  Object to form.
7          THE WITNESS:  Sir, the whole image looks
8  pink.
9  BY MR. THORNBURGH:
10     Q.  Do you all have a pink image?
11     A.  Well, there is some blue in the image.
12     Q.  Okay.  Do you see the pink outer layer
13  surrounding the mesh fiber?
14         MR. HUTCHINSON:  Same objection.
15         THE WITNESS:  It's the same color as the
16  background and also within the specimen itself.
17  BY MR. THORNBURGH:
18     Q.  It's actually -- well, I think what
19  happened is it printed out weird.
20         So do you have the thumb drive that was
21  marked as Exhibit No. 6 in front of you?
22     A.  I can -- I can put it into the court
23  reporter's computer.
24     Q.  Okay.  Let's put it in and let's look at
25  2A_0074.

Page 199

1      A.  Okay.  One moment.  2A_0074; is that
2  correct?
3      Q.  Yes.
4      A.  Okay.
5      Q.  You have that image in front of you?
6      A.  Yes.
7      Q.  Okay.  And do you see the mesh fiber?
8      A.  Yes.
9      Q.  Okay.  And do you see the outer layer that
10  is stained pink?
11         MR. HUTCHINSON:  Object to form.
12         THE WITNESS:  Also on the electronic form,
13  the -- it's pink on either side of the outside of
14  the fiber.
15  BY MR. THORNBURGH:
16     Q.  Do you see a darker -- what I'm looking at
17  on mine is a very clear image of a fiber that has an
18  outer pink layer.
19         Are you seeing something different on what
20  you have in front of you?
21         MR. HUTCHINSON:  I'm sorry, Dan.  I'm
22  going to have to object to that -- the question.
23  She doesn't know what -- or can't see what you are
24  looking at.
25         You say yours is very clear and a clear

Page 200

1  image, and you are asking her if she is looking at
2  something different than what you are looking at.
3          MR. THORNBURGH:  Well --
4          MR. HUTCHINSON:  And since you are in
5  Pensacola and we're in California, that is going to
6  be difficult.  So can you rephrase your question?
7  BY MR. THORNBURGH:
8      Q.  Well, you would agree with me that the
9  photomicrograph of 2A_0075 would appear to have an
10  outer layer that is colored pink, wouldn't you agree
11  with that?
12         MR. HUTCHINSON:  Object to form.
13         THE WITNESS:  In 0075, the background, as
14  well as the sample, with the exception of the blue
15  granules, is pink.
16  BY MR. THORNBURGH:
17     Q.  Oh, you said 75.  I was referring to 0074.
18     A.  Oh, I'm sorry.  I think you had said 75.
19  The court reporter is nodding her head.
20         74, sir, also, the background and the
21  sample itself that contains blue granules looks
22  pink.
23     Q.  Do you see the outer layer of that -- of
24  the fiber is a darker pink; would you agree with
25  that?

Page 201

1          MR. HUTCHINSON:  Same objection.  Counsel,
2  can you -- this not going to be a clear transcript
3  because, again, you are asking --
4          MR. THORNBURGH:  But let me -- let me just
5  ask you this -- let me -- let me just -- I'll
6  withdraw the question.
7          MR. HUTCHINSON:  Okay.  Thank you.
8  BY MR. THORNBURGH:
9      Q.  Dr. Benight, I'll represent to you that
10  2A-0074 did not make it into the expert report by
11  Dr. MacLean.
12         Do you know why?
13     A.  No, I don't.
14     Q.  Did you have any input on whether or not
15  that image should be put into the report?
16     A.  I don't recall if we discussed this
17  specific image.  There's over a hundred images.
18     Q.  But that image didn't make it, right?
19         MR. HUTCHINSON:  Objection.  Been asked
20  and answered.  Counsel, she just told you she didn't
21  recall.
22         MR. THORNBURGH:  I'll withdraw.  I'll
23  withdraw.  I'll withdraw.
24         MR. HUTCHINSON:  Thank you.
25

Stephanie Benight, Ph.D.

Page 202

1    BY MR. THORNBURGH:
2       Q.  Dr. Benight, did you conduct any
3    additional studies that we haven't discussed today?
4       A.  Related to this work?
5       Q.  Yes.
6       A.  We have produced all of the records of the
7    experiments performed related to the study that was
8    performed to investigate whether intentionally
9    oxidized Prolene stains with H&E.
10      Q.  But my question was, have we discussed
11   today all of the studies or steps of studies that
12   you or Exponent performed -- strike that.
13          That you performed in this case?
14      A.  Yes.
15      Q.  In other words, there is no other studies
16   that were conducted that I am unaware of; is that
17   correct?
18      A.  All of the records of the experiments
19   performed for this case have been produced to my
20   knowledge.
21      Q.  I just have a couple of questions.  Then
22   I -- then I'm done.
23          You have performed the QUV intentional
24   oxidation process, right?
25      A.  We performed that at Exponent.

Page 203

1       Q.  And were -- were you part of that process?
2       A.  Yes.
3       Q.  Okay.  And the QUV machine, what is that
4    machine called?
5       A.  I believe it is a Q-Lab Accelerated
6    Weathering Chamber.
7       Q.  Okay.  And was the Q-Lab Accelerated
8    Weathering Chamber calibrated before you undertook
9    the QUV treatment process?
10      A.  It's Exponent's practice to calibrate the
11   laboratory equipment on a regular basis.  It's
12   either biannually or annually, I believe.
13      Q.  Okay.  Do you run any -- the process of
14   setting up the QUV machine, how does that process
15   occur?
16      A.  Well, it's plugged in to an outlet, and
17   there is a series of buttons where you program in
18   the amount of time and the temperature and the
19   magnitude of irradiance that you want to have run.
20      Q.  Okay.  So you took some samples, you put
21   it into the QUV machine, you set it on some -- on
22   certain settings; is that right?
23      A.  Yes.
24      Q.  Okay.  And then the samples would have
25   remained in the QUV machine for five days; is that

Page 204

1    correct?
2       A.  I believe that we exposed them for
3    24 hours --
4       Q.  All right.
5       A.  -- and then inspected them and then
6    exposed them for an additional 48 hours and then
7    inspected them and then exposed them for another
8    48 hours, to total five days.
9       Q.  Okay.  So did -- are you the person that
10   what would have been part of that entire process?
11      A.  Yes, I was -- I was part of that process.
12      Q.  Were there other individuals that -- also
13   part of that process?
14      A.  I don't recall.  I do recall setting
15   the -- the experiment up, sir.
16      Q.  Okay.  So you set the experiment up.  You
17   put the machine in -- you put the samples into the
18   machine.  You turned it on.  You set the settings.
19          And in 24 hours you or somebody would have
20   gone back to the machine, checked the settings, I
21   assume, turned off the machine, opened up the
22   machine, took out the samples, and then looked at
23   the samples using scanning electron microscopy.
24          Is that correct?
25      A.  Yes, except the machine turns off

Page 205

1    automatically if you set the time for it to run, but
2    everything else you stated was correct.
3       Q.  Okay.  So at that first 24-hour mark, who
4    went in, checked the settings, opened up the
5    machine, took the samples out, and looked at the
6    samples using scanning electron microscopy?
7       A.  I don't recall which specific personnel
8    did, but the program that I had set up to run for
9    24 hours would have completed by the time that
10   someone, either myself or someone else, looked at
11   the samples.
12      Q.  Okay.  What internal document can you
13   point me to that would confirm or verify for me who
14   at Exponent, after the 24-hour period, went to the
15   QUV machine, opened it up, took those samples out
16   and looked at the samples under scanning electron
17   microscopy?
18      A.  Well, in Production Exhibit No. 8 provided
19   today, I believe we have SEM images of that 24-hour
20   time period, but we're not required to say which
21   specific staff person would have performed that
22   exercise.
23      Q.  Okay.  There is -- so there no internal
24   document that would identify which staff member at
25   Exponent would have performed that part of the step,

52 (Pages 202 to 205)

Stephanie Benight, Ph.D.

Page 206

1  right?
2      A.  We're not required to write that down.
3      Q.  The protocol didn't require you to write
4  that down, correct?
5      A.  Well, we're not required to indicate which
6  specific staff member would have performed that
7  action.  And, really, it doesn't matter.
8      Q.  But the protocol that we talked about
9  earlier didn't require, as part of the protocol, for
10 that person to record somewhere in -- internally in
11 Ethicon the who, what, when, where, and the date
12 that that 24-hour process would have been conducted,
13 right?
14     MR. HUTCHINSON:  Object to form.  It's
15 compound.  Also been asked and answered.
16     THE WITNESS:  What is important is that --
17 excuse me, sir.  Let me finish.
18     What is important is that the program was
19 set up and SEM was performed after the program that
20 was set for 24 hours stopped automatically and
21 either myself or someone else imaged those with SEM.
22     As I have stated, we're not required to
23 write down which specific Exponent personnel does
24 it.
25

Page 207

1  BY MR. THORNBURGH:
2      Q.  And sitting here today, you can't tell me
3  who it was, right?
4      A.  I don't recall after -- at that point, as
5  I mentioned, there were three time points.  I can't
6  recall at the 24-hour time point who did that.
7      Q.  Okay.  So after those samples were -- one
8  or more of those samples were looked at under SEM
9  after the first 24-hour period, who started up the
10 machine back up?
11     A.  It was either myself or someone else at my
12 direction.
13     Q.  Okay.  What internal Exponent document can
14 I look to, to verify who would have started the
15 machine back up?
16     A.  As I mentioned, we're not required to
17 state which specific person performed that action,
18 sir.
19     Q.  Well, what internal document can I look
20 to, to see at this -- you know, after the first
21 24-hour period that the settings were set the way
22 they were supposed to be set under the terms of the
23 protocol?
24     MR. HUTCHINSON:  Object.  Form.
25     THE WITNESS:  It was described in

Page 208

1  Dr. MacLean's report that the QUV process samples
2  were exposed for a total of five days.
3      I have told you and there is also SEM
4  imaging as a traceability record to show that there
5  is SEM images after 24 hours, there is SEM images
6  after an additional 48 hours, and then there is SEM
7  images after the total of five days prior to when
8  the samples were analyzed with FTIR and then sent to
9  Histion.
10 BY MR. THORNBURGH:
11     Q.  Okay.  That doesn't answer my question.
12     My question was, what internal Exponent
13 document do I look to, to confirm, number one, who
14 would have started up the second phase of the QUV
15 process and whether or not they confirmed that the
16 settings were set consistent with the protocol?
17     MR. HUTCHINSON:  Objection.  Compound
18 question.  Argumentative.
19     THE WITNESS:  As I mentioned, you know,
20 we're not required to say which person or staff set
21 the settings.  There might be security footage.  I
22 don't know if it is present in that lab.
23     But, you know, in the report authored by
24 Dr. MacLean, we exposed the samples for a total of
25 five days.

Page 209

1  BY MR. THORNBURGH:
2      Q.  I understand that -- you know, it says
3  that the -- the expert report, which was created
4  after the experiment, states that it was radiated
5  with .98 and it's got this little algorithm for, I
6  guess, the level of radiation, then it says "UVB at
7  60 degrees Celsius for five days."
8      I'm trying to figure out who would have
9  confirmed during the second phase of the QUV process
10 that those settings were reentered for the second
11 period of time of the QUV experiment?
12     MR. HUTCHINSON:  Object to form.
13     THE WITNESS:  Well, as far as the
14 instrument itself, the same program that was
15 programmed before, when you reload it, is on the
16 instrument, and so it would have been a matter of
17 changing the time period from 24 hours to 48 hours.
18 BY MR. THORNBURGH:
19     Q.  Okay.  But what it --
20     A.  So that leaves very little room for error
21 there.  And --
22     Q.  Okay.  But --
23     MR. HUTCHINSON:  I'm sorry.
24     Dr. Benight, finish your answer.
25     MR. THORNBURGH:  I thought -- I thought

53 (Pages 206 to 209)

Stephanie Benight, Ph.D.

Page 210

1    she was done, sorry.
2        THE WITNESS: That's it.
3    BY MR. THORNBURGH:
4        Q. So the answer is no, there is no internal
5    document that I can look to, to confirm that the
6    settings would have been the same settings that were
7    required under the protocol?
8        A. Sir, it says in our microscopy report, the
9    report authored by Dr. MacLean, that the samples
10   were exposed at .98 watts per meters squared
11   irradiance for five days at 60 degrees C. That's
12   what we did.
13       And there are SEM images at intermittent
14   time points, which I have already explained to you,
15   of those samples.
16       Q. I understand that's your testimony.
17       But you understand that the report by
18   Dr. MacLean was signed by him at some period after
19   those experiments were already conducted, right?
20       A. Well, we can't write the report before the
21   experiments are conducted, sir. So, yes --
22       Q. I --
23       A. -- the report was created after all the
24   experiments were performed.
25       Q. But -- let me try to answer -- maybe ask

Page 211

1    it an easier way.
2        Remember when we looked at Exhibit No. 18,
3    which was Dr. Ong's lab notebook from the Lewis
4    versus Ethicon litigation?
5        A. I have Document -- Exhibit No. 18 in front
6    of me.
7        Q. Okay. So whoever would have come in and
8    would have put the mesh specimens back into the QUV
9    machine didn't document that process or the steps
10   that they performed or the settings that were set at
11   that time in a document similar to Exhibit No. 18,
12   correct?
13       A. Well, sir, I don't see any QUV experiments
14   in Exhibit No. 18.
15       Q. That wasn't my question.
16       A. And I also -- I also don't see any
17   settings of that instrument in here.
18       Q. That wasn't my question.
19       A. Oh, okay.
20       Q. My question was -- my question was simply,
21   whoever would have come in after the first 24-hour
22   period and put the mesh samples back into the
23   machine and then set the machine at the settings
24   required under the protocol didn't document those
25   steps that were taken in a document similar to

Page 212

1    Exhibit No. 18, correct?
2        MR. HUTCHINSON: Object to form.
3    Argumentative. Also, Dan -- all right. Just strike
4    that.
5        Just object to form.
6        THE WITNESS: Sir, I have already
7    testified that we have provided a record of the
8    experiments performed as part of the production
9    provided to you electronically.
10       And in that production, you know, there
11   are not handwritten notes, which appears to be what
12   is on Exhibit No. 18. They are all provided
13   electronically.
14   BY MR. THORNBURGH:
15       Q. Okay. So after somebody at Exponent would
16   have taken the mesh samples from the SEM and put
17   them back into the machine, they would have set the
18   machine for a period of what time?
19       A. Well, there were three different time
20   points. The first experiment or time point that was
21   set up was for 24 hours.
22       And then after the -- for the second time
23   point, it was for an additional 48 hours. And then
24   that is documented in the SEM images acquired. And
25   then an additional 48 hours after that, to total

Page 213

1    five days, there were SEM images acquired.
2        Q. Okay. And how did you come to understand
3    that there would be this process that would be
4    followed, that the mesh would be exposed to the
5    QUV -- in the QUV machine for 24 hours, then looked
6    at under scanning electron microscopy, and then put
7    into the machine again for another 48 hours, and
8    then looked at under scanning electron microscopy,
9    and then put back into the machine for a final
10   48 hours?
11       MR. HUTCHINSON: Objection.
12   BY MR. THORNBURGH:
13       Q. How did that -- how did it come about that
14   that process was followed or determined?
15       MR. HUTCHINSON: Object to form.
16       THE WITNESS: Well, we wanted to
17   investigate what the samples looked like after
18   incremental exposure to QUV.
19   BY MR. THORNBURGH:
20       Q. Okay. So was there a written protocol
21   that said, "Exponent will perform the QUV steps in
22   the following ways: You will expose the manner for
23   24 hours, after that 24-hour period you will look at
24   it using scanning electron microscopy, and then you
25   will do the same thing for two additional intervals

Stephanie Benight, Ph.D.

Page 214

1    of 48 hours"?
2        Was there some written protocol that you
3    received that told you that was the process you were
4    to follow?
5        MR. HUTCHINSON:  Object to form.
6        THE WITNESS:  Well, from a fundamental
7    perspective, we did QUV treatment of the polymer
8    samples because that's covered in over hundreds of
9    literature articles and -- including intentionally
10   oxidizing polymer samples.
11       And for a specific protocol, we talked
12   about earlier we followed that of Dr. Reitman, et
13   al., given in a conference presentation.
14   BY MR. THORNBURGH:
15       Q.  The -- but did Dr. Reitman, et al.,
16   conference presentation instruct -- provide you
17   instruction to photooxidize these samples for
18   24 hours, to look at them using scanning electron
19   microscopy, then photooxidize them for another
20   48 hours, look at those samples using scanning
21   electron microscopy, and then continue the process
22   for another 48 hours?
23       MR. HUTCHINSON:  Dan, in all candor,
24   that's about six questions in one.  Can you rephrase
25   your question, please?

Page 215

1        MR. THORNBURGH:  Yeah, the -- I'm just
2    trying to understand, she said she -- she said there
3    was --
4        MR. HUTCHINSON:  I understand that, but
5    what we need is we need a clean record.  And we need
6    better questions that I can understand, at least.
7        MR. THORNBURGH:  I think -- I think the --
8    I think I understand the testimony.  I think it's
9    pretty simple.
10       Q.  There was no written protocol that
11   explicitly told you to photooxidize those specimens
12   in the QUV machine for -- during those three
13   intervals and to -- and in between those intervals,
14   to look at the specimen for -- using scanning
15   electron microscopy, right?
16       MR. HUTCHINSON:  Okay.  I'm going to
17   object to form.  Also object to the extent it's been
18   asked and answered.  Dan, you covered this earlier
19   in the deposition, if you may remember.
20       MR. THORNBURGH:  Well, this -- no, this
21   was the first -- this was the first time that --
22   that she testified that there was these three
23   intervals.
24       Q.  And I'm just trying to understand, before
25   the -- before the experiment began, was there a

Page 216

1    written protocol that explained or spelled out how
2    these -- this process would take place?
3        MR. HUTCHINSON:  I understand.  I am going
4    to object to form to the extent it's been asked and
5    answered.  You asked this same series of questions
6    at the very beginning of the deposition.
7        THE WITNESS:  We intentionally treated the
8    samples with QUV for a total of five days.
9        And as part of the experiments we carried
10   out, we chose to expose them first for 24 hours and
11   then monitor via SEM what the morphology of the
12   samples looked like before proceeding for an
13   additional 48 hours and another additional 48 hours.
14   BY MR. THORNBURGH:
15       Q.  You would agree with me that the hundreds
16   of articles that you keep referring to all have
17   different protocols in place, right?
18       A.  I'm sure that they all vary to some
19   extent, but when I referred to the hundreds of
20   articles, I was referring to QUV as a method to
21   induce changes in polymers, including oxidation.
22       Q.  Were any of those articles from which you
23   testify you -- you derived the protocol produced to
24   us -- or to me in Exhibits No. 6, 7, or 8?
25       A.  My knowledge and experience tells me from

Page 217

1    those hundreds of articles, sir, that is
2    well-understood in the literature.
3        Q.  That wasn't my question.  With all due
4    respect, my question was very simple.
5        Were any of those published articles from
6    which you derived this protocol produced to me in
7    Exhibits No. 6, 7, or 8?
8        A.  No.  The protocol that we followed was
9    documented in the microscopy report authored by
10   Dr. MacLean which was given to you.  That's a record
11   of our experiments performed, sir.
12       MR. THORNBURGH:  Well, just real quick,
13   let's mark as Exhibit No. 25 -- I think it's 24 --
14   we have Exhibit 25, Dr. MacLean's expert report real
15   quick.
16       (Whereupon, Exhibit 25 was marked for
17   identification.)
18       THE WITNESS:  I have Exhibit No. 25 in
19   front of me.
20   BY MR. THORNBURGH:
21       Q.  Okay.  If you turn to -- to page No. 8 of
22   Exhibit 25.
23       A.  Okay.
24       Q.  Okay.  You see where it says, "Sections of
25   Prolene mesh were placed inside the Q-Lab QUV

Stephanie Benight, Ph.D.

Page 218

1    Accelerated Weathering Tester and irradiated with
2    .98 W over M squared UV dash -- UV minus A and UV
3    minus B at 60 degrees Celsius for five days"?
4         Do you see that?
5         A.  Yes.
6         Q.  Is there a --
7         MR. HUTCHINSON:  All right, Dan, could you
8    slow -- excuse me, Dan.  Could you slow down just a
9    minute for the court reporter, please?
10        MR. THORNBURGH:  Yep, yep.
11        Q.  And do you see at the end of that sentence
12   where that protocol is discussed, there is no
13   reference to any article or to Dr. Reitman's
14   presentation, right?
15        A.  I don't see a reference in this section.
16   There is also not a reference after the
17   aforementioned sentence of, "A clean razor blade was
18   used to cut sections for laboratory analysis."
19        Q.  Move to strike.  Nonresponsive.
20        For the -- who -- did you perform all the
21   chemical oxidation steps?
22        A.  Myself and also other associates did.
23        Q.  Okay.  And did those samples remain in the
24   chemicals for 4.5 weeks; is that correct?
25        A.  Yes.  Samples were incubated at 37 degrees

Page 219

1    for up to five weeks in oxidative media composed of
2    .1 M CoCl2 in 20 weight percent H2O2.
3         Q.  Okay.  You say "incubated."
4         What do you mean by that?
5         A.  They were -- they were heated to
6    37 degrees C once in the oxidative media and stored
7    at that temperature.
8         Q.  Okay.  Somebody periodically checked to
9    make sure the -- the incubator settings were --
10   remained set at 37 degrees C for the -- for the --
11   during the entire process, the -- four-and-a-half
12   week process?
13        A.  Yes.  I mean, the -- once the instrument
14   is set at that temperature, it doesn't change.  And
15   so -- but to answer your question, yes, people did
16   periodically check to -- to double-check.
17        Q.  Okay.  And was that -- would that have
18   been documented anywhere?
19        A.  What is documented already which I have
20   read to you from the report were that the samples
21   were incubated at 37 degrees C for up to five weeks
22   in oxidative media composed of 0.1 M CoCl2 and 20
23   weight percent H2O2.
24        Q.  There wasn't -- it's really a simple
25   question.  I think the answer is no, but there isn't

Page 220

1    some sort of contemporaneous record that documented
2    who would have periodically confirmed that the
3    settings remained at 37 degrees C, right?
4         MR. HUTCHINSON:  Objection.
5    Argumentative.
6         THE WITNESS:  We're not required to say
7    who checks on things, sir, and record that
8    information.
9         MR. THORNBURGH:  I have no further
10   questions, but will obviously -- maybe -- probably
11   will have some questions after Mr. Hutchinson asks
12   you some questions on direct.
13        MR. HUTCHINSON:  All right.  We'll take a
14   quick break.
15        MR. THORNBURGH:  All right.  How long you
16   want?
17        MR. HUTCHINSON:  We'll see.  I'll do the
18   best I can to make it as quickly --
19        MR. THORNBURGH:  I said how long do you
20   want on the break?
21        MR. HUTCHINSON:  I'll get back to you.
22        THE VIDEOGRAPHER:  Going off the record at
23   6:07.
24        (Whereupon, a brief recess was taken.)
25        THE VIDEOGRAPHER:  Back on the record at

Page 221

1    6:27.
2         MR. HUTCHINSON:  Okay.  Dan, are you
3    there?
4         MR. THORNBURGH:  I'm here.
5         MR. HUTCHINSON:  Good.
6         EXAMINATION
7    BY MR. HUTCHINSON:
8         Q.  Dr. Benight, my name is Chad Hutchinson
9    and I have the privilege of representing Ethicon and
10   Johnson & Johnson and I want to ask you a couple
11   questions, okay?
12        A.  Okay.
13        Q.  Okay.  Where do you work?
14        A.  I work at Exponent.
15        Q.  And how long have you worked at Exponent?
16        A.  A little over a year and a half.
17        Q.  What do you do at Exponent?
18        A.  I am a senior scientist there.
19        Q.  Are you also a chemist?
20        A.  Yes.
21        Q.  Would you describe your education for the
22   jury, please?
23        A.  I have a bachelor's of science in
24   chemistry from Stanford University.  I also have a
25   Ph.D. in chemistry and a dual Ph.D. in

56 (Pages 218 to 221)

Stephanie Benight, Ph.D.

Page 222

1    nanotechnology from the University of Washington.
2        Q.  What is nanotechnology?
3        A.  It's a study of various small things,
4    essentially.
5        Q.  Were you involved in the experiment or
6    testing that is the subject of Dr. MacLean's expert
7    report?
8        A.  Yes.
9        Q.  Would you tell the jury what work that you
10   did on that project?
11       A.  I helped to do experiments.  I also helped
12   to coordinate other staff, and I helped in
13   preparation of the report.  I also helped in
14   reviewing documentation.
15       Q.  And were you working at the direction of
16   Dr. MacLean?
17       A.  Yes.
18       Q.  Okay.  Are you proud of the work that you
19   have done?
20       A.  Yes.
21         MR. THORNBURGH:  Objection.
22   Argumentative.
23   BY MR. HUTCHINSON:
24       Q.  Let's talk about lab documentation for a
25   minute, okay?

Page 223

1        A.  Okay.
2        Q.  As a scientist, what does lab
3    documentation mean to you?
4        A.  It is a record of experiments performed in
5    a laboratory.
6        Q.  Why is -- is laboratory documentation
7    important?
8        A.  Yes.
9        Q.  Why?
10       A.  It ensures that the experiments that are
11   performed are recorded so that another reasonable
12   scientist can repeat the work if needed.
13       Q.  Is it the primary record of research?
14       A.  Yes.
15       Q.  Okay.  And does it explain how experiments
16   were performed?
17       A.  Yes.
18       Q.  Okay.  Dr. Benight, did you keep lab
19   documentation for the experiment that we have been
20   here discussing today?
21       A.  Yes.
22       Q.  Has that lab documentation been given to
23   the plaintiffs' lawyer?
24       A.  Yes.  All of the laboratory documentation
25   and records of experiments performed have been

Page 224

1    provided in the production.
2        Q.  And were all of them given to the
3    plaintiffs' lawyer before this deposition started?
4        A.  Yes.
5         MR. THORNBURGH:  Objection.
6         THE WITNESS:  To my knowledge, yes.
7    BY MR. HUTCHINSON:
8        Q.  Could lab documentation be considered a
9    lab notebook, if you will?
10       A.  Yes.
11         MR. THORNBURGH:  Objection.
12         THE WITNESS:  Yes.
13   BY MR. HUTCHINSON:
14       Q.  Can lab documentation or lab notebooks be
15   kept in different types of format?
16       A.  Yes.
17       Q.  Would it be acceptable for lab
18   documentation to be in a bound or stitched --
19   spirally bound notebook?
20       A.  Yes.
21       Q.  Alternatively, would it be acceptable for
22   lab documentation to be in a loose-leaf, three-ring
23   binder?
24       A.  Yes.
25         MR. THORNBURGH:  Object.

Page 225

1    BY MR. HUTCHINSON:
2        Q.  Alternatively, would it be acceptable for
3    lab documentation to be in electronic format?
4        A.  Yes.
5         MR. THORNBURGH:  Objection.
6    BY MR. HUTCHINSON:
7        Q.  And did you provide or give the
8    plaintiffs' lawyers the lab documentation in an
9    electronic format before today's deposition?
10       A.  Yes.
11       Q.  Dr. Benight, are there benefits to keeping
12   lab documentation in an electronic format?
13       A.  Yes.
14       Q.  Like what?
15       A.  Oh, it is easily shared among people.  You
16   are able to store large amounts of data, and you
17   reduce the amount of transcription errors in
18   hand-writing notes.
19       Q.  And when we talk about storing large
20   amounts of data, do SEMs or scanning electronic
21   microscopy images, do they take up a large amount of
22   electronic data?
23       A.  Generally, yes.
24       Q.  Okay.  I want to talk about the lab
25   documentation that you did for just a minute, okay?

57 (Pages 222 to 225)

Stephanie Benight, Ph.D.

Page 226

1    A.  Okay.
2    Q.  Did you document the microscopy work that
3  you did by way of taking micrographs?
4    A.  Yes.
5    Q.  And did you save all of those micrographs
6  electronically?
7    A.  Yes.
8    Q.  Have those micrographs been given to the
9  plaintiffs' lawyer?
10    A.  Yes.
11    Q.  Does the lab documentation that has been
12  given to the plaintiffs' lawyers before this
13  deposition explain how this experiment was
14  performed?
15    A.  Yes.
16    Q.  Does it --
17        MR. THORNBURGH:  Objection.
18  BY MR. HUTCHINSON:
19    Q.  Does it include documentation of all steps
20  taken during this experiment?
21        MR. THORNBURGH:  Objection.
22        THE WITNESS:  Yes.  All of the steps in
23  this -- these experiments were provided in the
24  production given to you electronically.
25

Page 227

1  BY MR. HUTCHINSON:
2    Q.  Does -- or given to the plaintiffs?
3    A.  Given to the plaintiffs electronically.
4    Q.  Thank you.  And does it include all
5  information another scientist would need to repeat
6  your work or Dr. MacLean's work?
7    A.  Yes.
8    Q.  Does it include all the information needed
9  for another scientist to verify this work done by
10  Exponent?
11    A.  Yes.
12        MR. THORNBURGH:  Objection.
13  BY MR. HUTCHINSON:
14    Q.  Does the lab documentation that has been
15  given to the plaintiffs' lawyer include traceable
16  records?
17    A.  Yes.
18    Q.  And what do you mean by "traceable
19  records"?
20        MR. THORNBURGH:  Objection.
21        THE WITNESS:  Records that show what
22  samples were sent to Histion, where the processing,
23  embedding, and staining of the samples happened.
24  And record of chain of custody showing that all the
25  samples as a result of this work was returned to me.

Page 228

1  BY MR. HUTCHINSON:
2    Q.  Is traceability important?
3    A.  Yes.
4    Q.  Why?
5    A.  It ensures that the experiments that are
6  outlined in the record of the experiments performed,
7  were performed.
8    Q.  Okay.  Does the lab documentation show
9  traceability between the original mesh, the samples
10  that were prepared and stained, and the results of
11  this experiment?
12        MR. THORNBURGH:  Objection.  Which sample
13  are you talking about?
14  BY MR. HUTCHINSON:
15    Q.  You can answer.
16    A.  All of the samples as part of this
17  investigation were documented, and the samples that
18  were created as a result of the work done at Histion
19  were returned to me.
20    Q.  Dr. Benight, have you maintained and
21  preserved all the samples from this testing?
22    A.  Yes.
23    Q.  Dr. Benight, did you follow the same
24  procedure and use the same rigor in conducting this
25  experiment that you would have if you would have

Page 229

1  submitted it for publication in a peer-reviewed
2  journal?
3        MR. THORNBURGH:  Objection.
4        THE WITNESS:  Yes.
5  BY MR. HUTCHINSON:
6    Q.  Let's talk about the protocol for the
7  actual experiment for a minute, okay?
8    A.  Okay.
9    Q.  Who is Dr. Iakovlev?
10    A.  He is one of the plaintiffs' experts.
11    Q.  And is that -- is Dr. Guelcher a plaintiff
12  expert as well?
13    A.  Yes.
14    Q.  Were you trying to recreate and reproduce
15  the testing that Drs. Iakovlev and Guelcher have
16  done?
17    A.  We followed their protocols that they have
18  used.  For Dr. Iakovlev, the staining, and for
19  Dr. Guelcher, the chemically oxidized protocol.
20    Q.  And when you mean you followed the
21  protocols that they used, what do you mean by that?
22    A.  The information from their expert reports
23  and the IUGA proceedings paper.
24    Q.  Dr. Benight, let's talk about the control
25  experiments for a minute, okay?

58 (Pages 226 to 229)

Stephanie Benight, Ph.D.

Page 230

1      A.  Okay.
2      Q.  Did you perform the control experiments
3   that neither Dr. Iakovlev nor Dr. Guelcher performed
4   in their mesh-staining work?
5           MR. THORNBURGH:  Objection.
6           THE WITNESS:  Yes.
7   BY MR. HUTCHINSON:
8      Q.  And what does it show?
9      A.  The results of our work showed that
10  intentionally oxidized Prolene mesh does not stain
11  with H&E.
12     Q.  Dr. Benight, let's talk about Histion for
13  a minute, okay?
14     A.  Okay.
15     Q.  What is Histion Labs?
16     A.  It is a histopathology lab in Everett,
17  Washington.
18     Q.  And what does "histopathology" mean?
19     A.  It's the -- includes the study of staining
20  tissue with different stains.
21     Q.  And does Histion Labs have a specialty or
22  area of expertise?
23     A.  They have an impeccable reputation for
24  staining and processing slides and tissue.
25     Q.  And Dr. Benight, when you say they have

Page 231

1   "an impeccable reputation," how do you know that?
2           MR. THORNBURGH:  Objection.
3           THE WITNESS:  Colleagues of mine at
4   Exponent have told me and Exponent has used them for
5   years.
6   BY MR. HUTCHINSON:
7      Q.  Did Histion --
8           MR. THORNBURGH:  Objection.
9   BY MR. HUTCHINSON:
10     Q.  -- Labs follow its internal quality
11  control procedures when it performed the sample
12  preparation?
13     A.  Yes.
14     Q.  Would that include embedding the samples
15  in either paraffin or resin?
16          MR. THORNBURGH:  Objection.
17          THE WITNESS:  Yes.
18  BY MR. HUTCHINSON:
19     Q.  Would that include either microtoming or
20  cutting the samples?
21     A.  Yes.
22     Q.  Would that include staining or attempting
23  to stain the samples?
24     A.  Yes.
25     Q.  Dr. Benight, you were asked questions

Page 232

1   about whether or not you followed a written protocol
2   for the QUV oxidation.
3           Do you remember that line of questioning?
4      A.  Yes.
5      Q.  Did you need to have a written protocol?
6      A.  No, it's not necessary.
7      Q.  Why not?
8      A.  It's important that you record the
9   experiments that you perform.
10     Q.  And why would you not need a written
11  protocol?
12     A.  Well, we followed a protocol given in
13  hundreds of literature papers where it's
14  demonstrated that QUV is a way to induce changes in
15  polymer samples including oxidation, and we followed
16  a specific irradiance in temperature given in
17  Dr. Reitman, et al., a conference presentation.
18     Q.  Dr. Benight, to your knowledge, would
19  Dr. Iakovlev or Dr. Guelcher have access to the
20  written protocol for QUV oxidation?
21     A.  Yes.
22     Q.  How so?
23     A.  Well, the hundreds of literature papers
24  are -- I'm sure some of them are publicly available
25  to them, and -- but mainly, the procedures that were

Page 233

1   followed are documented in Dr. MacLean's expert
2   report.
3      Q.  Would you consider it a simple procedure?
4      A.  Yes.
5           MR. THORNBURGH:  Objection.
6   BY MR. HUTCHINSON:
7      Q.  And why is that?
8      A.  It requires a few steps and it's easy to
9   follow.
10     Q.  Do you have Exhibit 1 in front of you?
11     A.  Yes.
12     Q.  Would you tell the jury what Exhibit 1 is,
13  please?
14     A.  Exhibit 1 is a microscopy image index.
15     Q.  And was this document created
16  contemporaneously or at the same time with these
17  experiments?
18     A.  This document was created after the
19  experiments were performed.
20     Q.  All right.  And why was it not created
21  contemporaneously with the experiments?
22     A.  This document was created at the request
23  of Dr. MacLean for his ease of reference during his
24  deposition.
25     Q.  And would that microscopy image index need

59 (Pages 230 to 233)

Stephanie Benight, Ph.D.

Page 234

1  to be created contemporaneously with the
2  experiments?
3      A.  No.
4      Q.  Why not?
5      A.  It's an index which is usually created
6  after all of the items to be included in the index
7  are completed.
8      Q.  Dr. MacLean -- I'm sorry -- strike that.
9         Dr. Benight, do you have Exhibit No. 8 in
10 front of you, it's one of the flash drives.
11     A.  Oh, yes.
12     Q.  And would you identify that exhibit for
13 us, please?
14     A.  Exhibit 8 is a flash drive provided --
15 brought with me here to the deposition, and the
16 contents on Exhibit 8 include the TVM consolidated
17 case doc, my Duces Tecum or notice of deposition, a
18 document entitled "H15-118 Sample Chain of Custody
19 Form," which I believe is also produced as a paper
20 exhibit already.
21        And a folder labeled "QUV," which includes
22 optical microscopy and SEM images, a folder labeled
23 2015-08-14_COCL2mesh_twoweeks, which contains SEM
24 images labeled "oxidized mesh," and it also contains
25 a protocol document which is a calculation based on

Page 235

1  the information given in the IUGA proceedings paper
2  authored by Dr. Scott Guelcher.
3      Q.  And the chain of custody documents that
4  you just mentioned, when did you receive it?
5      A.  Yesterday.
6      Q.  And is that what is on Exhibit 8?
7      A.  Yes.  This is electronically given on
8  Exhibit 8.
9      Q.  And yesterday, would that be October 12th?
10     A.  Yes.
11     Q.  Is that -- would that be after Dr. Steve
12 MacLean's deposition?
13     A.  Yes.
14     Q.  Dr. Benight, why wasn't the information on
15 Exhibit 8, the flash drive, provided with
16 Dr. MacLean's production?
17     A.  It wasn't included in his report and it --
18 I believe it wasn't in his file.
19     Q.  Dr. Benight, let's talk about FTIRs for a
20 minute, okay?
21     A.  Okay.
22     Q.  What does "FTIR" stand for?
23     A.  Fourier Transform Infrared Spectroscopy.
24     Q.  And to a layperson, what does FTIR do?
25     A.  It is a way to identify what a material is

Page 236

1  based on the chemical bonds that are present in that
2  material.
3      Q.  And Dr. Benight, you testified earlier
4  about a repeat FTIR.  Do you remember that
5  testimony?
6      A.  Yes.
7      Q.  Would you tell the jury what a repeat FTIR
8  is and why it was done?
9      A.  It's just a second time of doing an FTIR
10 experiment.  It was done in this case so that a
11 background spectrum could be saved along with the
12 spectrum of the sample that was analyzed, and we
13 found in the repeat FTIR that we did that the
14 spectrum of the sample analyzed was quite similar to
15 samples that were analyzed previously as part of the
16 first FTIR.
17     Q.  Why would a background spectrum need to be
18 saved?
19     A.  Elements such as the air can show up in
20 FTIR and you want to ensure that you are only
21 detecting chemical bonds that are present in your
22 sample being analyzed.
23     Q.  Dr. Benight, you were asked questions
24 earlier by the plaintiffs' lawyer about the
25 scientific method.

Page 237

1         Do you remember that line of questioning?
2  Maybe?
3      A.  Maybe, yeah.
4      Q.  It's been a long day?
5      A.  Yes.
6      Q.  Okay.  How many hours have you been
7  deposed?
8      A.  We started at around 11:40.
9      Q.  And what time is it now?
10     A.  6:45.
11     Q.  All right.
12        Dr. Benight, did you follow the scientific
13 method when doing this experiment?
14        MR. THORNBURGH:  Objection.
15        THE WITNESS:  Yes, we --
16 BY MR. HUTCHINSON:
17     Q.  How so?
18     A.  -- we had a hypothesis and then we tested
19 it by performing experiments.
20     Q.  What is a "hypothesis"?
21     A.  It is a theory or I guess a theory of what
22 you believe will -- will be the outcome of the
23 experiments.
24     Q.  Dr. Benight, you were asked questions
25 about doing a statistical analysis as part of your

Stephanie Benight, Ph.D.

Page 238

1    investigation.
2        Do you remember those lines -- that line
3    of questioning?
4        A.  Yes.
5        Q.  Did you do a statistical analysis for this
6    experiment?
7        A.  No.
8        Q.  Why not?
9        A.  The sets of experiments were control
10   experiments done to investigate whether
11   intentionally oxidized Prolene mesh stains with H&E.
12   It wasn't a statistical analysis.
13       Q.  And tell the jury what a control
14   experiment is, please?
15       A.  It is a -- it's an experiment done to
16   essentially show what you expect to happen from that
17   experiment, is what you find.
18       Q.  And while we are talking about statistical
19   analyses, do you know if Dr. Iakovlev conducted a
20   statistical analysis?
21       A.  I haven't seen a record of any statistical
22   analysis that Dr. Iakovlev would have performed.
23       Q.  Have you seen --
24           MR. THORNBURGH:  Objection.
25

Page 239

1    BY MR. HUTCHINSON:
2        Q.  Have you seen a record or do you know if
3    Dr. Guelcher conducted a statistical analysis?
4            MR. THORNBURGH:  Objection.
5            THE WITNESS:  I haven't seen a record of
6    any statistical analysis that Dr. Guelcher may have
7    performed.
8    BY MR. HUTCHINSON:
9        Q.  Do you know -- strike that.
10           Dr. Benight, you were asked questions
11   about whether you had scanning electron microscopy
12   on various samples.
13           Do you remember that line of questioning?
14       A.  Yes.
15       Q.  Do you need to have scanning electron
16   microscopy of all samples?
17       A.  No.
18       Q.  Why not?
19       A.  We acquired scanning electron microscopy
20   on a few of the samples processed in a similar
21   manner, and we chose a representative sample from
22   that batch for the experiments outlined in
23   Dr. MacLean's report.
24       Q.  What does a "representative sample" mean?
25       A.  It is a sample that shows similar features

Page 240

1    and characteristics to the samples of the batch that
2    were all processed in a similar manner.
3        Q.  Dr. Benight, do you need to have scanning
4    electron microscopy of Sample No. 2?
5        A.  It's not needed, no.
6        Q.  Okay.  Why not?  Why is it not needed?
7        A.  Because scanning electron microscopy
8    images of samples that were processed in the same
9    way, in the same amount of time, with the same
10   process were already recorded.
11       Q.  Along those lines Dr. Benight, would you
12   need to do an FTIR analysis on Sample No. 2?
13       A.  No --
14           MR. THORNBURGH:  Objection.
15   BY MR. HUTCHINSON:
16       Q.  Why not?
17       A.  We performed FTIR on samples that were
18   processed in the similar manner, at the same time,
19   under the same conditions.  And so it's -- it wasn't
20   necessary to do an FTIR on every individual sample.
21       Q.  Dr. Benight, you were asked questions
22   about Sample Nos. 1 through 6 and what was sent to
23   Histion.
24           Do you remember that line of questioning
25   by the plaintiffs' lawyer?

Page 241

1        A.  Yes.
2        Q.  What would you tell a jury about the
3    traceability of those samples?
4        A.  I received a chain of custody form from
5    Histion of all of the samples that are part of this
6    investigation, including those that were processed
7    and embedded and stained according to Dr. Iakovlev's
8    protocol.  And also, those that were sent but not
9    processed as part of this study.
10       Q.  Anything else?
11           MR. THORNBURGH:  Objection.  Doesn't
12   answer the question, and mischaracterizes the
13   evidence.
14   BY MR. HUTCHINSON:
15       Q.  Dr. Benight, let me ask you this.  What is
16   a chain of custody form?
17       A.  It is a record of possession of samples.
18       Q.  And have you produced all chain of custody
19   forms to the plaintiffs' lawyer?
20       A.  Yes.
21       Q.  Okay.  Dr. Benight --
22           MR. HUTCHINSON:  We're having technical
23   problems here.
24           (Whereupon, a brief discussion off the
25   record.)

61 (Pages 238 to 241)

Stephanie Benight, Ph.D.

Page 242

BY MR. HUTCHINSON:
 Q.  Dr. Benight, what did you bring with you
to today's deposition?
 A.  I brought my notice of deposition, the
chain of custody form that I received yesterday from
the lab, three jump drives or -- or flash drives
labeled Exhibits 6, 7, and 8, and two blue boxes
that include slides and samples from the study
performed.
 Q.  Let's talk about -- let's talk about the
blue -- would you hold it up and show the jury,
please?
 A.  Yes.
 Q.  And maybe turn it?
 A.  This is the -- one of the blue boxes and
in --
 Q.  If you could open it without everything
falling out --
 A.  I'll try.
 Q.  Very carefully.
 A.  Inside -- I'll tilt it, and inside there
are resin and paraffin blocks.  So the samples that
were sent that we processed at Exponent were sent to
the lab and they embedded them in either a resin or
paraffin.

Page 243

 And as an example, this is a paraffin
block, so you can see wax inside of it.  And if we
look at a resin block, that looks more like this,
where it is a different type of polymer that the --
the mesh sample is embedded in.
 And if you look very closely, it's --
there, you can see blue fibers in this particular
one that I'm -- that I'm holding up, which is sample
1B, and -- which is pristine Prolene mesh.
 And so once the samples are processed and
embedded in those polymer blocks, then they are cut
into very thin slices.
 Q.  And Dr. Benight, do you have any of those
thin slices with you today?
 A.  Yes.  These are the slides in the boxes
that are above what I'm pointing out here, and there
is also --
 Q.  Excuse me.
 A.  -- additional slides in the second box.
 Q.  And Dr. Benight, in the box that you are
holding up, would you show the jury one of the
slides that you are talking about?
 A.  Sure.  So --
 Q.  And if you could identify it for the jury,
please?

Page 244

 A.  Yes.  So here is slide number 15-118-4A,
and you can see that there are four individual
sections of slices of paraffin, and if you look very
closely, there is sections of mesh sort of in the
center of each of those very thin slices and
sections.
 Q.  And Dr. Benight, is there a number on that
particular slide?
 A.  Yes, this is 15-118-4A, which indicates to
me that this was -- underwent the chemically
oxidizing protocol, and is embedded in a paraffin
wax.
 Q.  And Dr. Benight, on the -- your left side
of the box, I see various things in bags; is that
correct?
 A.  Yes.
 Q.  Okay.  Would you identify for the jury
what are in the bags, please?
 A.  Yes.  These are part of the original
packaging that was sent to the lab --
 Q.  And what do you mean by "packaging"?
 A.  These samples are in a -- wrapped in foil
and then in a plastic bag which has a label on it.
 So for example, this one says that it's
"UV oxidized" and you can see that it's -- there was

Page 245

a slide with some yellow tape where the mesh that
was processed by Histion was when it was shipped
from Exponent to Histion.
 Q.  And Dr. Benight, while you have that
showing it to the jury, is there a number on the
backside or the front side, rather?
 A.  Yeah, it's --
 Q.  And what does that number mean?
 A.  Well, the number H15-118-2, is --
indicates that it's Sample No. 2.
 Q.  Okay.  And what does that tell us about
traceability?
 A.  That it's been documented.
 MR. THORNBURGH:  Objection.
 THE WITNESS:  And since the samples were
returned to me, then in the -- they are documented
in the chain of custody record and they were
originally sent from Exponent to Histion and then
sent back to me.
BY MR. HUTCHINSON:
 Q.  Dr. Benight --
 MR. THORNBURGH:  Objection.
BY MR. HUTCHINSON:
 Q.  Are there other bags in the what I would
call the big blue box that you brought with you

Stephanie Benight, Ph.D.

Page 246

1    today?
2        A.  Yes.  There are --
3        Q.  What do they show?
4        A.  There are additional samples that were
5    sent.  We have samples in aluminum foil -- where
6    there is a tiny mesh sample contained in there and I
7    can open it for you if you would like, but it's
8    contained inside this aluminum foil.  And then this
9    is inside a plastic bag which has a label on it for
10   oxidized mesh.
11        So this is chemically oxidized mesh and it
12   says "backup only."  We wanted to sort of cover our
13   basis, if you will, so we sent more than one sample
14   in case the lab needed it for their work.
15        Q.  And do you have any other bags on that
16   side of the box?
17        A.  There's two.  The one I was holding up,
18   there are two that are similar, is labeled
19   H15-115-3A, and then also H15-115-3B, and there are
20   a few other bags including "COCl2 oxidized mesh,"
21   labeled, one for paraffin and one for resin.
22        And the one for paraffin is labeled
23   H15-118-4A, and the second one for resin is labeled
24   H15-118-4B.  And currently, if we look closer, there
25   is no mesh in the bag.

Page 247

1        Q.  Excuse me.  Why would there not be any
2    mesh in the bag?
3        A.  The mesh that was in here when we sent it
4    was processed as part of the work that we have been
5    discussing and is the basis for Dr. MacLean's
6    report.
7        So there is no mesh because all of it was
8    embedded, and since this says 4A, it was embedded in
9    paraffin.
10        Q.  Okay.  Have we discussed all the bags?
11        A.  There is -- there is an additional bag
12   that is labeled "Exemplar."
13        Q.  And what is -- what does "exemplar" mean
14   here?
15        A.  It's out of the box pristine Prolene.
16        Q.  Does that mean it's never been before used
17   in the body?
18        A.  Yes.
19        Q.  Okay.
20        A.  Or intentionally oxidized.  So this --
21        Q.  What does that bag show us right there?
22        A.  It's labeled "Exemplar" and labeled
23   H15-118-1, and if we look closely there is also no
24   mesh in this bag because.
25        Q.  And why not?

Page 248

1        A.  It was processed as part of the work that
2    is covered in Dr. MacLean's report.
3        Q.  Okay.  Is that all of the bags that are in
4    that box?
5        A.  There is one more.
6        Q.  And what does it show?
7        A.  It has a slide with mesh.
8        Q.  And does it have some writing on the
9    outside?
10        A.  Yes, it says.
11        Q.  What does the writing say?
12        A.  15-118-6.
13        Q.  And what does that mean?
14        A.  That means that it's part of the study and
15   it also says "QUV mesh" on it.
16        Q.  Okay.  And what does "QUV mesh" mean?
17        A.  That means that the mesh was exposed to a
18   QUV irradiation for five days at 60 degrees at an
19   irradiance of .98 watts per meter squared.
20        Q.  What is in that bag?
21        A.  Inside here we have a slide wrapped in
22   aluminum foil, and if I'm unwrapping the aluminum
23   foil, we see that there is a glass slide and then
24   also a mesh sample -- I'll try not to drop it --
25   there is a mesh sample that has not been embedded in

Page 249

1    paraffin or resin-embedding media.
2        Q.  And Dr. Benight, are these the type of
3    procedures that you as a scientist use to document
4    your work?
5        A.  The procedures -- this -- all of this is
6    covered in the chain of custody documents, sir.
7        Q.  Is this the type of work that you normally
8    do?
9        A.  We do keep track of samples that are sent,
10   yes.
11        Q.  Okay.  And there is a second box that you
12   have brought with you today; is that correct?
13        A.  Yes.
14        Q.  And would you show the jury what is in the
15   second box?
16        A.  Sure.  So the second box is smaller and
17   it's also a blue box, and inside this box -- see if
18   I can open it -- there is additional microscope
19   slides that were -- that were created as part of
20   this study.  And we have them -- like here is an
21   example --
22        Q.  What does it -- and what does it say?
23        A.  This slide is labeled H15-118-1B, and
24   it -- it's exemplar mesh stained with H&E or gone
25   through the staining protocol.

Golkow Technologies, Inc. - 1.877.370.DEPS

Stephanie Benight, Ph.D.

Page 250

1     Q.  Okay.  Dr. Benight, were these two blue
2   boxes of slides available for Dr. Thornburgh -- I'm
3   sorry, for Mr. Thornburgh's review today?
4     A.  Yes, they are available here at the
5   deposition.
6     Q.  Okay.  Dr. Benight, I want to ask you --
7         MR. THORNBURGH:  Objection.
8   BY MR. HUTCHINSON:
9     Q.  -- another question.
10    A.  Okay.
11    Q.  Or another line of questioning, rather.
12        You were asked some questions earlier
13  about who at Exponent divided Sample No. 6 and the
14  documentation for that.
15        Do you remember that line of questioning?
16    A.  Yes.
17    Q.  Dr. Benight, is it an internal Exponent
18  policy and procedure to document who cuts a sample
19  with the razor blade?
20    A.  No.
21    Q.  Why not?
22    A.  It really doesn't matter.
23        MR. THORNBURGH:  Objection.
24  BY MR. HUTCHINSON:
25    Q.  Was the mesh indeed cut with a razor

Page 251

1   blade?
2     A.  To my knowledge, yes.
3     Q.  And is the name of the person who cuts the
4   sample with the razor blade information that would
5   be necessary for a scientist to repeat the
6   experiment?
7     A.  No.
8     Q.  Okay.  Dr. Benight, you were asked
9   questions about internal documents for the operating
10  of the QUV chamber.
11        Do you remember that line of questioning?
12    A.  Yes.
13    Q.  Is Exponent required to document the name
14  of the person who makes the settings on the QUV
15  machine?
16    A.  No.
17    Q.  Why not?
18    A.  It's -- it's not important who does it.
19    Q.  Is the name of that person important for
20  another scientist to replicate this experiment?
21    A.  No.  The conditions that the experiment
22  were performed at are relevant for another scientist
23  to repeat the experiment.
24    Q.  Dr. Benight -- excuse me.
25        Dr. Benight, I don't have any further

Page 252

1   questions.  Thank you for your time.
2     A.  You are welcome.
3         MR. HUTCHINSON:  Dan, do you have any
4   further questions or are we done?  Do you need to
5   take a break?
6         MR. THORNBURGH:  I have very few
7   additional questions.
8         MR. HUTCHINSON:  Okay.
9         THE WITNESS:  I would like to take a
10  break.
11        MR. HUTCHINSON:  Okay.  That's fine.
12  That's fine.  We'll take a quick break.
13        THE VIDEOGRAPHER:  Going off the record at
14  7:05.
15        (Whereupon, a brief recess was taken.)
16        THE VIDEOGRAPHER:  Back on the record at
17  7:08.
18        EXAMINATION
19  BY MR. THORNBURGH:
20    Q.  Dr. Benight, do you recall questions that
21  defense counsel asked you regarding the scientific
22  method that you performed and/or followed in this
23  case?
24    A.  Yes.
25    Q.  And do you recall that you were asked some

Page 253

1   questions about the control experiment?
2     A.  Yes.
3     Q.  And you were asked some questions about
4   the lack of statistical analysis that was conducted
5   in this case?
6     A.  I was asked about statistical analysis
7   related to this project or investigative work that
8   we performed, and also, whether any statistical
9   analysis was performed by plaintiffs' experts
10  Dr. Guelcher and Dr. Iakovlev.
11    Q.  Okay.  So my question really quick is, and
12  I'm just going to summarize really quick to try to
13  expedite this process, but only one sample was
14  submitted to -- was processed by Histion for their
15  histopathology slides, correct?
16    A.  Well, we --
17    Q.  I'm sorry --
18    A.  I'm sorry, I didn't finish my question.
19    Q.  I'll withdraw the question.  Let me
20  withdraw the question and ask it a better way.
21    A.  Okay.
22    Q.  Regarding the QUV-treated samples, only
23  one sample was processed into histopathology slides
24  by Histion, correct?
25    A.  We sent a few QUV samples, but one was

64 (Pages 250 to 253)

Stephanie Benight, Ph.D.

Page 254

1    sent and processed to create several different
2    slides.
3        Q.  Okay.
4        A.  And there is also a residual resin and
5    paraffin block from which tens or possibly hundreds
6    of additional sections could be processed.
7        Q.  Okay.  But only one sample was actually
8    processed into histopathology slides from the
9    QUV-treated samples, right?
10       A.  Yes.  One sample was, yes.
11       Q.  Okay.  And -- and how do you know that the
12   outcome or the observations that you made didn't
13   occur as a result of chance?
14       A.  We processed several samples within a
15   batch and multiple samples within that batch that
16   were processed under the same condition, the same
17   time, the same temperature, or in the case of the
18   chemically oxidized protocol the same solution, more
19   than one sample was either characterized with SEM
20   and/or FTIR to show that each of the samples had
21   been processed similarly.  And so we chose to send
22   one representative sample from those batches for
23   processing at Histion.
24       Q.  And only one representative sample from
25   the QUV-treated experiment was processed by Histion,

Page 255

1    right?
2        A.  Well, we sent a few but one of those
3    samples that was processed was sent to Histion to
4    create several different sections or slides.
5        Q.  Would you agree with me that if you would
6    have sent three or four or five samples to Histion
7    for the Histion staining, that that would have
8    increased the reliability of your study?
9            In other words, it would have helped you
10   demonstrate that the results you got from the one
11   sample didn't occur as a result of chance?
12       A.  Sir, we produced several different
13   sections that were run through the staining
14   protocol, and they showed similar results.
15       Q.  From the same sample, right?
16       A.  Well, from a section of the sample that
17   was cut and processed as the other cut samples from
18   the same TVT mesh product, yes.
19       Q.  You also testified earlier, I think, that
20   you followed the protocol performed by Dr. Iakovlev
21   in his peer-reviewed publications for the staining
22   of the -- that single QUV sample, correct?
23       A.  No.  That's incorrect, sir.
24           We performed the protocol outlined in the
25   IUGA proceedings authored by Dr. Guelcher.  We

Page 256

1    performed the chemically oxidized protocol outlined
2    in that paper for those samples.  And for the QUV
3    samples, you know, QUV irradiation is a common way
4    to induce changes in polymers including oxidation,
5    and is present in hundreds of literature papers.
6            So in a fundamental sense, we followed
7    that protocol.  Furthermore, we followed a protocol
8    outlined by Reitman, et al., in a conference
9    presentation for specific conditions followed.
10       Q.  Okay.  But for the staining of the mesh,
11   the way the mesh was stained, did you follow
12   Dr. Iakovlev's staining protocol or the protocol
13   that was discussed in his peer-reviewed publication?
14       A.  I believe the protocol was given as an
15   exhibit in one of his trial testimonies and that is
16   the protocol that we instructed the lab to follow as
17   closely as possible.
18       Q.  And it would have been important for you
19   to follow Dr. Iakovlev's protocol, correct?
20       A.  The staining protocol, correct.
21       Q.  You didn't actually follow or instruct
22   Histion to follow the staining protocol that is
23   published by Dr. Iakovlev --
24           (Whereupon, technical difficulties.)
25           THE WITNESS:  We just lost him.  There is

Page 257

1    nothing on the phone screen.
2            MR. HUTCHINSON:  There is nothing on the
3    what?
4            THE WITNESS:  The phone screen.
5            THE VIDEOGRAPHER:  It's dead?
6            THE WITNESS:  Yeah, just completely died.
7            MR. HUTCHINSON:  Well, that's fine.  We'll
8    wait a little bit to see if Mr. Thornburgh calls
9    back and give me an opportunity to see if he wants
10   to continue questioning Dr. Benight.
11           So I will call him on my cell phone and
12   send him an e-mail in an attempt to get in touch
13   with him at 7:15 p.m.
14           So why don't we go off the record until we
15   get Mr. Thornburgh on the line.
16           THE VIDEOGRAPHER:  Off the record at 7:16.
17           (Whereupon, a brief recess was taken.)
18           THE VIDEOGRAPHER:  Okay.  We are back on
19   the record at 7:22.
20           MR. HUTCHINSON:  Dan, we're back on the
21   record and ready to go.
22   BY MR. THORNBURGH:
23       Q.  Dr. Benight, did you read Dr. Iakovlev's
24   papers concerning the degradation of the
25   polypropylene mesh explant?

65 (Pages 254 to 257)

Stephanie Benight, Ph.D.

Page 258

1    A.  I may have read it previously but not
2  recently.
3    Q.  Okay.  In -- on page 21 of Exhibit
4  Number 25?
5    A.  Okay.
6    Q.  You see where it says the,
7  "Paraffin-embedded samples were stained using an
8  automated stainer programmed with the following
9  protocol."
10    Do you see that?
11    A.  Yes.
12    Q.  Okay.  Do you know what type of stainer
13  Dr. Iakovlev used in his studies?
14    A.  We followed the protocol, stain protocol,
15  that Dr. Iakovlev used.  I believe the exhibits were
16  from some of his trial testimony and had the
17  heading, "St. Michael's histology protocol" on them.
18    Q.  And you did that because it would have
19  been important to follow the protocol that
20  Dr. Iakovlev followed, correct?
21    A.  As part of our experiments we wanted to
22  follow Dr. Iakovlev's protocol as closely as
23  possible.
24    Q.  And did you use a vertical or a horizontal
25  tray?

Page 259

1    A.  I'm sorry, can you repeat the question,
2  please?
3    MR. HUTCHINSON:  Dan, you are actually
4  breaking up a little bit.  Maybe if you could move
5  closer to the phone that would help.
6  BY MR. THORNBURGH:
7    Q.  Did you use a vertical or a horizontal
8  tray when the staining process occurred?
9    A.  The samples were mounted in a tray and
10  then immersed in each of the reservoirs that
11  contained these different solutions.
12    Q.  Horizontal or vertical tray?
13    A.  I believe that the slides were mounted on
14  there horizontally.  So that they were -- they were
15  sort of in -- I guess you could call it like a
16  holder where the thin part of the slide was mounted
17  and then submerged in the solution.
18    Q.  Dr. MacLean testified that it was on a
19  vertical tray.
20    A.  Okay.
21    Q.  Do you know if it was vertical or
22  horizontal, and if you don't know, what document
23  would verify or confirm for us whether it was
24  horizontal or vertical?
25    A.  Well, from what I described, I don't know

Page 260

1  how Dr. MacLean described horizontal or vertical.  I
2  have not seen his deposition testimony.  But from
3  what I saw, when I was at the lab, and Dr. MacLean
4  was also present via videoconference, but what I saw
5  was that the slides were mounted so that the
6  thickness of the slide was inserted in a holder and
7  then those slides were immersed in each of those
8  solutions and taken through the protocol outlined on
9  page 21 of Exhibit 25 as specified for the different
10  incubation times and steps which is in line and
11  followed from Dr. Iakovlev's protocol from his
12  previous trial testimony.
13    (Reporter clarification.)
14    MR. HUTCHINSON:  Dan, I'm sorry, but the
15  court reporter is saying that she cannot hear you.
16  So you are still breaking up on us.  Could you move
17  closer to the phone or maybe move your cell phone
18  away from it, please.
19    MR. THORNBURGH:  I'm on the phone.  I'm
20  here.  I'm speaking loud and clear.  Hopefully you
21  can hear me loud and clear.
22    THE WITNESS:  That's better.
23  BY MR. THORNBURGH:
24    Q.  I just have a few more questions.
25    You testified that as it related to the

Page 261

1  QUV Sample No. 2 that was processed by Histion, that
2  scanning electron microscopy and FTIR was not
3  performed on that sample, correct?
4    A.  Excuse me.
5    SEM and FTIR were performed on QUV-exposed
6  samples that were treated in the same way during the
7  same amount of time and the same temperature and
8  irradiance as the Sample No. 2 that you are
9  referring to.
10    Q.  Okay.  Now, you could have analyzed Sample
11  No. 2 using SEM and FTIR before sending it to
12  Histion, correct?
13    A.  That is one option, sir.
14    Q.  And that's an option that wasn't chosen,
15  correct?
16    A.  As I previously stated, we looked at
17  samples that were treated and processed in the same
18  batch as the sample that was sent to Histion with
19  SEM and FTIR.
20    Q.  But not done for Sample No. 2?
21    A.  Sample No. 2 was part of the batch that
22  was processed equally, sir.  From the SEM and FTIR
23  that we did, the spectra and the images showed
24  similar features.  It indicated that all of the
25  samples that were processed in that batch were

Stephanie Benight, Ph.D.

Page 262

1  similar.
2      Q.  The decision was made not to look at
3  Sample No. 2 using FTIR or scanning electron
4  microscopy, correct?
5      A.  Sample 2 was sent to Histion for
6  processing, embedding, and staining.
7      Q.  Who made the decision not to do SEM
8  analysis and FTIR analysis on Sample No. 2?
9      A.  I don't recall, sir.
10     Q.  You testified a couple moments ago that
11  the Exhibit No. 8 and the other materials that you
12  brought with you today were not provided to
13  Dr. MacLean prior to issuing his expert report,
14  correct?
15     A.  It's my understanding that those materials
16  were not in his file.  They were in my file.
17         MR. HUTCHINSON:  And Dan, I'm going to
18  object to the extent that it's mischaracterization
19  of the testimony.  I think it was before
20  Dr. MacLean's deposition that you are talking about.
21         MR. THORNBURGH:  That's not the way -- the
22  transcript will speak for itself.
23         MR. HUTCHINSON:  Okay.  Good.  Thank you.
24         MR. THORNBURGH:  I have no further
25  questions.

Page 263

1          MR. HUTCHINSON:  All right.  We're going
2  to take a quick break and we'll be back on the
3  record in just a second.
4          THE VIDEOGRAPHER:  Off the record at 7:30.
5          (Whereupon, the deposition was concluded
6  at 7:30 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 264

1      STATE OF CALIFORNIA  )
2      COUNTY OF YOLO      )
3          I, ELAINA BULDA-JONES, a Certified Shorthand
4  Reporter of the State of California, duly authorized
5  to administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby
7  certify that
8          STEPHANIE BENIGHT, Ph.D.,
9  the witness in the foregoing deposition, was by me
10  duly sworn to testify the truth, the whole truth and
11  nothing but the truth in the within-entitled cause;
12  that said testimony of said witness was reported by
13  me, a disinterested person, and was thereafter
14  transcribed under my direction into typewriting and
15  is a true and correct transcription of said
16  proceedings.
17          I further certify that I am not of counsel or
18  attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said deposition dated the _____ day of
22  _____, 2015.
23
24
25  ELAINA BULDA-JONES, CSR 11720

Page 265

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.  It will be
10  attached to your deposition.
11          It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
25

67 (Pages 262 to 265)