# EXHIBIT F

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

```
-------------------------------------------------x
                                          :
                                          :        MDL NO. 1657
                                          :
IN RE: VIOXX PRODUCTS LIABILITY           :
LITIGATION                                :        SECTION L
                                          :
THIS DOCUMENT RELATES TO                  :        JUDGE FALLON
ALL ACTIONS                               :        MAG. JUDGE KNOWLES
                                          :
FILER:  Kline & Specter, P.C.             :        February 4, 2011
                                          :
                                          :
-------------------------------------------------x
```

## OBJECTION OF KLINE & SPECTER, P.C. TO THE VIOXX FEE ALLOCATION COMMITTEE'S COMMON BENEFIT FEE RECOMMENDATION

Pursuant to this Court's Order dated Jan. 20, 2011, Kline & Specter, P.C. ("Kline & Specter") hereby objects to the recommendation of the Fee Allocation Committee ("FAC") that Kline & Specter receive a common benefit fee award of $4,000,000.

Kline & Specter performed 25,391.25 hours of common benefit work in Vioxx litigation.  It performed many critical tasks that helped create the settlement fund. These contributions were no less significant than the contributions provided by the other top firms in the litigation, notably the FAC's own members.  However, the FAC recommends that Kline & Specter receive .36 of its lodestar, resulting in an hourly rate of $157.53.  At the same time, the FAC recommends that its nine member firms receive awards averaging 2.46 times their estimated lodestars, resulting in an estimated average

hourly rate of $1,090.46.  This multiple is nearly *seven times* the multiple applied to Kline & Specter.  This treatment is unsupportable under the applicable facts and law.

Kline & Specter's actual lodestar was $12,080,690.[1]  As Kline & Specter's contributions to the litigation were no less valuable than the average contribution of the FAC's members to the litigation, it should receive a common benefit fee equaling its lodestar times the average multiplier applied to FAC members for their similar contributions (i.e., contributions excluding post-settlement administrative work, of which Kline & Specter performed none).  If the FAC's average multiplier for such work is 2.46, then Kline & Specter's award should be $29,718,497.40.  If the multiplier is different, the firm's award should differ as well.

---

[1] In this Objection, Kline & Specter frequently refers to "estimated" lodestars and multipliers based on the Court's average billing rate of $443.29.  Kline & Specter's estimated lodestar is $11,255,687 under this approach.  It does so for comparison purposes – so that it may compare the FAC's suggested allocations for different firms. The FAC has not released each applicant's billing rates for individual lawyers or supporting staff, average billing rates, or overall lodestars.  Kline & Specter intends to ask for these details at the appropriate time.

Kline & Specter does not request that it be awarded only its actual lodestar of $12,080,690.  As set forth herein, Kline & Specter seeks its actual lodestar ($12,080,690) multiplied by the average multiplier recommended for work performed by FAC members, excluding their post-settlement administrative work.  The FAC incorrectly identified Kline & Specter's requested amount as only $12,080.690 in its recommendation dated Jan. 20, 2011.  Kline & Specter has consistently stated that it should receive the same multiplier as the other top-tier firms – in its initial fee request to the FAC, in its objection to the FAC's "recommended award," and here as well.

As a final matter, this Court lacks jurisdiction to allocate common benefit fees for state-court cases that never fell within this Court's jurisdiction. Such allocation should be performed by the state court judge who presided over those cases prior to their resolution. This argument also will be set forth below.

## FACTUAL BACKGROUND

### A.      A summary of Vioxx litigation

This Court extensively reviewed the history of Vioxx litigation in its Order entered October 19, 2010 and in *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp.2d 565 (E.D. La. 2005). By way of brief summary, this multidistrict and state-court products liability litigation involves the prescription drug Vioxx, generically known as Rofecoxib, designed by Merck to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. The Food and Drug Administration approved Vioxx for sale in the United States in May 1999. Merck withdrew Vioxx from the market in September 2004 after data from a clinical trial showed that Vioxx use increased the risk of cardiovascular thrombotic events such as myocardial infarction and ischemic stroke. Thereafter, thousands of individual suits and class actions were filed against Merck in state and federal courts alleging a variety of claims.

California, New Jersey and Texas instituted consolidated proceedings at various dates between 2002 and 2005. In February 2005, the Judicial Panel on Multidistrict

Litigation conferred "MDL" status on federal Vioxx cases, and transferred all such cases to this Court for coordinated discovery and pretrial proceedings under 28 U.S.C. § 1407.

In March 2005, this Court held a status conference in the Vioxx MDL and thereafter appointed twelve lawyers, including Thomas R. Kline of Kline & Specter, to serve on the Plaintiffs' Steering Committee ("PSC"). *See* Pretrial Order No. 7, entered April 8, 2005.    In turn, the PSC created numerous subcommittees to organize representation of the Vioxx plaintiffs and to help manage the MDL.

Extensive litigation followed.  Plaintiffs' attorneys engaged in all aspects of pre-trial litigation, including document discovery, identification and preparation of experts, development of legal and factual theories, the taking of depositions, motion practice, the coordination of state and federal proceedings, and preparation of a trial package capable of being used by all plaintiffs' counsel across the country.  Kline & Specter attorneys were actively involved in all of these critical tasks.

This Court conducted bellwether trials in five cases.  One case resulted in a plaintiff's verdict.  The remaining four cases four defense verdicts, one of which was preceded by a hung jury.  Thirteen additional Vioxx-related cases were tried before juries in state courts in Texas, New Jersey, California, Alabama, Illinois and Florida. The state-court results included a verdict for plaintiff John McDarby in New Jersey state court, where the jury awarded $4.5 million in compensatory damages and $9 million in punitive damages.   The state-court results also included three additional plaintiffs'

verdicts (though two were reversed in the appellate courts), seven defense verdicts on common-law tort issues, and two hung juries.

Counting together federal and state verdicts, the plaintiffs' overall record a trial was 5-12-3 – that is, five plaintiffs' verdicts, twelve defense verdicts, and three hung juries. Taking into account the overturning of two plaintiffs' verdicts on appeal, the final tally is 3 victories, 14 losses, and 3 hung juries.

At some point, this Court caused the appointment of a Plaintiffs' Negotiating Committee ("PNC"). This occurred without disclosure to the PSC. In November 2007, Merck and the PNC announced that they had reached a settlement for an overall sum of $4.85 billion. The agreement was a voluntary "opt-in" agreement, and contemplated that this Court would oversee aspects of the administrative process, including reimbursing of costs and awarding of common benefit fees.

In July 2008, Merck announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program had been met. Eventually 99.9% of all eligible claimants entered the program. By June 2010, the parties had distributed over $4.35 billion to 32,886 claimants.

In January 2009, the PSC moved this Court to award a common benefit fee of 8% of the $4.85 billion settlement. In October 2010, the Court entered its decision allocating 6.5% of the settlement fund for a total common benefit fee of $315,250,000. *See* Order, entered Oct. 19, 2010.

From an early stage of the litigation, the Court indicated that any plaintiffs' attorney wishing to perform common benefit work would have that opportunity. Such attorneys were required, however, to work under the PSC's direction and to report their time and expenses to a Court-appointed CPA. Over 100 firms reported that they performed common benefit work and filed fee applications.

In November 2008, the Court appointed a Fee Allocation Committee ("FAC") to receive applications for common benefit fees. *See* Pre-Trial Order 32, dated Nov. 20, 2007. The Court later established guidelines for assessing each applicant's contribution. *See* Pre-Trial Order 6D, dated Sept. 15, 2008. In particular, the Court directed the FAC to "look to general fee jurisprudence to identify the factors that should be applied in making appropriate allocations. The *Johnson* factors are applicable to this litigation and should be considered in addition to other matters considered by courts to evaluate fee allocations." *Id.*, citing *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir. 1974).

Pursuant to Pre-Trial Order 6D, Kline & Specter submitted an affidavit detailing the common benefit work its attorneys performed during Vioxx litigation, and sought a multiplier equal to those received by the other top firms in the litigation. *See* Affidavit of Thomas R. Kline, dated Oct. 30, 2008, attached as Exhibit "A". Joined by his colleagues at the firm, Mr. Kline made a presentation to the FAC in support of Kline & Specter's application. *See* Transcript of Kline & Specter's Vioxx Fee Presentation, dated

Dec. 1, 2008, attached as Exhibit "B". During this presentation, Mr. Kline showed the FAC a powerpoint highlighting various aspects of Kline & Specter's contributions. *See* Powerpoint, attached as Exhibit "C". Over 100 other firms submitted affidavits and/or made a presentations to the FAC in support of their common benefit claim.

In December 2010, the FAC provided applicants with a document showing their "recommended award." This document stated that the FAC's recommended award for Kline & Specter was $4,514,057.15. It instructed Kline & Specter to indicate acceptance or objection of this amount by December 16, 2010. Kline & Specter objected, stating that it "requests a fee award equal to Kline & Specter's lodestar ($12,080,690) multiplied by the highest multiplier utilized for all others in top leadership in the litigation." *See* FAC's Common Benefit Fees Award Form and Kline & Specter's Objection, dated Dec. 15, 2010, attached as Exhibit "D".

On January 19, 2011, the FAC delivered its overall fee recommendation to the Court. *See* Recommendation of the Fee Allocation Committee, filed Jan. 20, 2011, p. 2, attached as Exhibit "E".[2] The FAC's recommendation contained an alphabetical listing of law firms and their suggested allocations from the common benefit fund. However, the FAC did *not* include any identification of the attorneys or staff who worked on Vioxx matters, or their billing rates, or any other pertinent information that might help assess the reasonableness of the recommend fees. *Id.* The FAC professed to have used

---

[2] The FAC's report to his Court states that many firms did not keep time records. This is a matter for discovery and further analysis and comment. *See* Exhibit E.

the *Johnson* factors with a lodestar cross-check when assessing each firm's suggested allocation. *See id.* However, it was apparent from the FAC's "Point System Guide" that the FAC actually relied on an unprecedented "point system" to guide, or at least justify, its decision-making process. *Id.*; Point System Guide, attached as Exhibit "F". The points system will be discussed more fully herein.

Through its point system, the FAC recommended no allocation to 23 applicants. To the remaining 82 firms, the FAC recommended allocations ranging from zero to $40,900,000. Using the average billing rate of $443.29, the suggested allocations ranged from reducing a firm's estimated lodestar to .04 of its original number to multiplying the estimated lodestar by 4.97. Thus, the largest estimated multiplier (4.97) was over 124 times larger than the smallest estimated multiplier (.04).

The FAC has not explained the basis for its point system, the number of points it allocated to different firms, or the details of each firm's point total. Neither has it disclosed the number of points it assigned to different applications, or the basis for those determinations. Kline & Specter will seek discovery on these issues at the appropriate time.

As for Kline & Specter, the FAC recommended that Kline & Specter be awarded $4,000,000, only .36 of Kline & Specter's estimated lodestar of $11,255,687, resulting in an hourly rate of $157.53. *See* Exhibit E. Significantly, this final recommendation reduced Kline & Specter's suggested award by $514,057.15. *See id.* The FAC provided

has no explanation for this diminished sum or how it was reflected under lodestar analysis or even under the FAC's point system. *See id.*

Although the FAC would award Kline & Specter a fraction of its lodestar, it suggests that its own members be handsomely rewarded. The FAC recommended that its members receive awards with an estimated average multiplier of 2.46 and an estimated average hourly rate of $1,090.49, nearly *seven times* the multiplier applied to Kline & Specter. The FAC made this recommendation even as (1) Kline & Specter's contributions were no less valuable than the average contribution of other FAC members with respect to litigating the case, (2) Kline & Specter was in the top echelon in number of hours expended in the litigation, and worked on many difficult and crucial tasks, and (3) the FAC's firms performed thousands of hours of post-settlement administrative work, which this Court has said does not equate to work that creates a settlement fund. *See Turner v. Murphy Oil USA, Inc.,* 582 F. Supp.2d 797, 811 (E.D. La. 2008). Kline & Specter performed no post-settlement administrative work and devoted all of its energies toward producing the settlement and common benefit fund.

## B.    Kline & Specter's significant contributions to Vioxx litigation

Kline & Specter is among the preeminent law firms in the country focusing on personal injury litigation, with extensive experience in complex medico-legal and scientific matters and a track record that includes dozens of seven and eight figure verdicts (some in pharmaceutical litigation). Its attorneys include several who are

recognized as among the best in the United States.  Other attorneys include physicians who possessed a detailed understanding of medical and scientific issues presented by Vioxx litigation.  *See* Kline & Specter Attorney biographies, attached as Exhibit "G".[3]

The Kline & Specter lawyers primarily involved in Vioxx litigation were Thomas R. Kline, Shanin Specter, Lisa S. Dagostino, Mark A. Hoffman, Lee B. Balefsky, Michelle L Tiger, and David Caputo.  By way of summary, Tom Kline and Shanin Specter are among the most accomplished plaintiffs' trial lawyers in the United States, and have been recognized as such by the National Law Journal, the Inner Circle of Advocates, the American College of Trial Lawyers, the International Academy of Trial Lawyers, "Best Lawyers in America," and many other such organizations.  *See id.*  Lisa Dagostino, M.D., J.D., M.Be, and Mark Hoffman, M.D., J.D., M.S., M.Be, LL.M., are physician-lawyers with distinguished academic, medical, and legal careers who developed and shared a critical understanding of the medical and scientific issues central to Vioxx litigation.  *Id.*  Lee Balefsky and Michelle Tiger have decades of experience litigating mass-tort matters and brought substantial expertise to the litigation.  *Id.*  Finally, David

---

[3] At this time, Kline & Specter chooses not to criticize anyone.  While the suggested fee award to Kline & Specter is shockingly low, it is unnecessary to an assessment of Kline & Specter's entitlement to an appropriate fee for Kline & Specter to "go negative" against anyone or for anyone to "go negative" against Kline & Specter.  In the event someone chooses to comment on Kline & Specter's work or on anything bearing on Kline & Specter's fee, whether on or off the record, Kline & Specter requests that due process be followed, including that Kline & Specter be permitted to learn all details relating to what was said and that Kline & Specter be given a full opportunity to respond.

Caputo is a graduate of Harvard Law School and an experienced trial lawyer who has handled a broad diversity of litigation matters, many involving significant legal issues, including preemption. *Id.*

Kline & Specter became involved in Vioxx litigation in 2003, before Merck removed the drug from the market in September 2004. Its lawyers served on the PSC and numerous of its subcommittees. They served on important steering committees in Vioxx state court proceedings, namely the New Jersey Consolidated Litigation ("NJCL") and the Philadelphia Coordinated Litigation ("PCL"). In these leadership roles, Kline & Specter provided extensive, critical, and highly competent services for the common benefit of all Vioxx litigants. As detailed below, the firm provided litigation funding. It developed substantial portions of the liability and causation cases, taking numerous depositions of key figures in the litigation, including depositions that would be played at trial. The firm performed expert development. It helped put together the trial package. The firm provided significant assistance in the management and oversight of the litigation. It participated in all aspects of discovery, briefing, trial case selection, and trial strategy. Its assignments -- among the most difficult in the litigation – occurred during the heat of battle, without any certainty of recovery, before settlement. In the end, the firm would devote 25,391.25 hours to common benefit work, reflecting the efforts of eighteen lawyers, one law clerk, six paralegals, and thirteen additional office

personnel.  *See* Garrett & Company Time Total Report, dated Oct. 26, 2010, attached as Exhibit "H".

Kline & Specter's contributions have been widely recognized by its peer firms in Vioxx litigation.  Russ Herman, Esq., the MDL liaison counsel, has characterized Kline & Specter's contributions as "integral to ALL efforts."  *See* Email from Russ Herman to Thomas Kline, dated November 8, 2007, attached as Exhibit "I" (emphasis in original). Andrew Birchfield, Esq., a member of the Plaintiffs' Executive Committee, described Kline & Specter's work as "really phenomenal" during the firm's fee presentation.  *See* Exhibit B at 39.

As it would be impractical to detail fully Kline & Specter's common benefit work across 25,391.25 hours, the highlights are described below.

### 1.    Leadership Positions and Committee Service

Kline & Specter's attorneys held leadership positions and served on multiple committees in three of the coordinated litigations:[4]

| Kline & Specter attorney | Position | Litigation |
|---|---|---|
| Tom Kline, Esq. | Member, Plaintiffs Steering Committee | MDL |
| | Co-chair, Trial Committee | MDL |
| Lee Balefsky, Esq. | Member, Discovery Committee | MDL |
| | Liaison Counsel | PCL |
| | Chair, Stroke Committee | NJCL |

---

[4] Kline & Specter was to serve on the PNC and the FAC based on representations made when Kline & Specter joined the PSC.  That delict is not at issue here.

| Lisa Dagostino, M.D., J.D. | Member, Science Committee | MDL |
| | Member, Discovery Committee | MDL |
| | Member, Trial Package Committee | MDL |
| | Member, Stroke Committee | NJCL |
| Mark Hoffman, M.D., J.D. | Member, Science Committee | MDL |
| Michelle Tiger, Esq. | Liaison Counsel | PCL |

## 2.    Development of the case through depositions

Because of Kline & Specter's experience with discovery and trial of complex medical and pharmaceutical cases, its lawyers were assigned a substantial role in the development of the liability and causation cases.   This included deposing many of key Merck scientists and executives, including Merck trial witnesses (some of whom had two or more questioners, of which Kline & Specter was one):

| Merck Executive/Scientist | Dates | Kline & Specter Deposition Taker | Kline & Specter Deposition Preparer |
| --- | --- | --- | --- |
| Raymond Gilmartin (CEO) | 4/11/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD, Michelle Tiger, Esq. |
| Edward Scolnick, M.D. (Former President, Merck Research Laboratories) | 5/17/05 6/1/05 8/16/05 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |
| Peter Kim, Ph.D (President, Merck Research Laboratories) | 3/15/05 3/16/05 4/8/05 6/8/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD |
| Alise Reicin, M.D. (Senior Director, Merck Research Laboratories) | 3/2/05 3/23/05 8/19/05 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |
| Deborah Shapiro, Ph.D (Director of Clinical Biostatistics) | 1/25/05 2/14/05 6/29/05 6/30/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD |
| Peter DiBattise, M.D. (Merck Research Laboratories cardiologist) | 4/7/06 6/9/06 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD, Michelle Tiger, Esq. |

| Alan Nies, M.D., Ph.D (Senior VP, Clinical Sciences, Merck Research Laboratories) | 4/1/05 8/23/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD, Michelle Tiger, Esq. |
| David Anstice (President US Human Health) | 3/18/05 | Lee Balefsky, Esq. | Michelle Tiger, Esq. |
| Barry Gertz, M.D., Ph.D (Executive Vice President) | 9/28/05 | Mark Hoffman, M.D., J.D. | Lisa Dagostino, MD, JD |
| Thomas Simon, M.D. (Senior Director, Clinical Research) | 1/5/05 1/19/05 | Mark Hoffman, M.D., J.D. | Mark Hoffman, MD, JD |
| Kathleen Metters, Ph.D (Head of Basic Research, Merck Frosst) | 7/28/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD |
| Joseph Lynch, Ph.D (Senior Director, Pharmacology) | 3/21/06 | Shanin Specter, Esq. Lisa Dagostino, M.D., J.D. | Lisa Dagostino, MD, JD |

Kline & Specter's attorneys also prepared to take the cancelled depositions of Merck executives Gregory Geba, M.D. (Senior Director of Clinical Development) and Robert Silverman, M.D. (Senior Director, Regulatory Affairs). Mr. Kline was preparing to take the *de bene esse* deposition of Alise Reicin, M.D. when the litigation settled.

In addition, Kline & Specter took the depositions of key third parties in the Vioxx litigation and/or helped prepare the lawyers who took such depositions:

| Third Party | Dates | Kline & Specter Deposition taker | Kline & Specter Deposition Preparer |
| --- | --- | --- | --- |
| Eric Topal, M.D. (Cleveland Clinic Chair of Cardiology) | 11/22/05 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |
| David Graham, M.D., M.P.H. (FDA Medical Officer) | 5/9/06 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD Robert Englert |
| Steve Nissen, M.D. (Chairman Cleveland Clinic Department of CV Medicine) | 12/12/06 | -- | Thomas Kline, Esq. Lisa Dagostino, MD, JD |
| Gregory Curfman, M.D. (Editor of the NEW ENGLAND JOURNAL OF MEDICINE). | 1/17/07 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |

| Jerry Avorn, M.D. (Chair of the Division of Pharmaco-epidemiology at Brigham and Women's Hospital) | 6/29/06 6/30/06 | -- | Thomas Kline, Esq. Lisa Dagostino, MD, JD |
|---|---|---|---|
| Mal Mixon (Chairman of Board of Trustees Cleveland Clinic) | 1/25/06 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |

Deposition testimony elicited by Kline & Specter lawyers had a powerful impact on the litigation. Mr. Kline deposed Eric Topol, M.D., Chair of Cardiology at the Cleveland Clinic and an independent third-party witness. Dr. Topol was among the first to raise the warning flags on cardiovascular risks associated with Vioxx back in 2001. Mr. Kline's deposition chronicled Dr. Topol's attempts to warn Merck and the public about the risks of Vioxx and to conduct a cardiovascular safety study. *See* Deposition of Eric Topal, M.D., attached as Exhibit "J". This deposition would be played at every trial in the MDL and NJCL, placing Mr. Kline in the courtroom on the plaintiffs' behalf.

Mr. Specter's examination of Deborah Shapiro, Merck's Director of Clinical Biostatistics, had a profound impact on the plaintiffs' punitive damages case. On the fourth day of her deposition, Mr. Specter questioned Dr. Shapiro about a draft of a Merck meta-analysis evaluating the number of cardiac events sustained by patients on Vioxx in all Merck studies to date from 2001. The draft contained a sub-analysis done with the "MI endpoint" that demonstrated a statistically significant increase in the rate of heart attacks in patients on Vioxx. On questioning from Mr. Specter, Dr. Shapiro admitted that this sub-analysis was removed from the final version of the document

and never submitted to the FDA.   Significantly, Dr. Dagostino of Kline & Specter discovered the differences between the draft and final versions of this document, enabling the right questions to be asked by Mr. Specter.  *See* Excerpts from Deposition of Deborah Shapiro, attached as Exhibit "K".   During the Cona/McDarby trial, this evidence was found by New Jersey Superior Court Judge Carol Higbee to provide the only evidence sufficient to support a punitive damages verdict against Merck.   The deposition also would be played to the jury during the punitive liability phase, which resulted in a $9 million award of punitive damages.   This deposition also exposed Merck to an unlimited number of punitive damages verdicts and doubtless played a role in the settlement of the cases.

Also significant was Tom Kline's deposition of David Graham, M.D., M.P.H., an FDA Safety Officer and epidemiologist who is an expert in post-marketing drug safety. Dr. Graham, characterized by many as a "whistleblower," had been a strong critic of both the FDA and Merck for their handling of Vioxx.   Mr. Kline elicited testimony from Dr. Graham that Vioxx should not have been approved at the time it was approved, that there were significant concerns around cardiovascular safety that should have been explored more fully, and that Vioxx was the greatest drug safety catastrophe in American history.  *See* Deposition of David Graham, attached as Exhibit "L".

Especially significant was Shanin Specter's deposition of Dr. Peter Kim, the President of Merck Research Laboratories and the person at Merck primarily

responsible for patient safety during critical time-periods when Merck knew and was learning about the risks associated with Vioxx.  Mr. Specter elicited admissions from Dr. Kim that he had failed to pass on to Merck's adverse event department a report that he had received of stroke in two teenage girls taking Vioxx, and also that he did not cause Merck to timely pass on that report to the FDA.  This conduct was admitted by Dr. Kim to be improper and raised issues about Merck's compliance with federal reporting requirements.  Mr. Specter also elicited Dr. Kim's admission that he personally took Vioxx after Merck had withdrawn the drug from the market, and would not fault another who took Vioxx post-withdrawal and suffered a cardio-vascular event.  Mr. Specter's deposition of Dr. Kim hindered Merck from developing a "blame the victim" defense to claims arising from injuries caused to persons who took Vioxx post-withdrawal.  In addition, likely as a result of these admissions, Merck never called Dr. Kim to testify at any Vioxx trials, even though Dr. Kim would have been an obvious person to testify on Merck's behalf.  In sum, Mr. Specter's deposition caused Merck to lose both a key witness and a defense.  *See* Deposition of Dr. Peter Kim, attached as Exhibit "M".

Fellow plaintiffs' counsel in Vioxx litigation described the work done by Kline & Specter lawyers during these depositions as "fantastic," "spectacular," and "incredible," and credited this work as "essential" during the bellwether trials.  Mark Lanier of the

Lanier Law Firm wrote the following email to Tom Kline regarding his deposition of

Dr. Topol:

> Put down your computer/blackberry… Go outside… Listen… Can you
> hear that???  Can you hear the applause?  It is coming from England…
> The applause is so loud, it is traveling the Atlantic!
>
> *I just read the Topol dep.  If that is not your best work, I would love to
> see what is! Fantastic!!! Absolutely fantastic!!!*
>
> My compliments and praise… Happy Thanksgiving…

*See* Email from Mark Lanier to Tom Kline, dated Nov. 24, 2005, attached as Exhibit "N"

(emphasis added).

As noted above, Mr. Specter's videotape deposition of Dr. Shapiro was played to

the jury during the punitive damages aspect of the *Cona/McDarby* case.  Mark Lanier

informed Mr. Specter of this during the trial:  "You were played in closing puni

argument…Great find and delivery form [sic] you and Lisa both!"  *See* Email from Mark

Lanier to Shanin Specter, dated April 12, 2006, attached as Exhibit "O".  This case

resulted in a $4.5 million compensatory award for one plaintiff.  After hearing Mr.

Specter's deposition of Dr. Shapiro, the jury imposed $9 million in punitive damages

against Merck.  Regarding the punitive award, Mark Lanier wrote the following to Ms.

Specter:

> Shanin…
> Thanks again for the great job you did on Shapiro…*Made all the
> difference in the world…*

*See* Email from Mark Lanier to Shanin Specter, dated April 14, 2006, attached as Exhibit "P" (emphasis added).   This email speaks volumes about Kline & Specter's contributions to the successful result in *McDarby*, and the ramifications of this on all other cases.

If any question remains about the productive impact of Kline & Specter's depositions, it was answered by Michael Ferraro during his observation of Shanin Specter's deposition of Dr. Kim:

> I am sitting here at Dr. Kim's deposition. Based on my observations after 33 years of practice, the job that Shanin Specter is doing is nothing short of spectacular. He's forcing Kim to answer questions, he's following up when tries to hide, and he's forcing him to respond to the tough questions. It's ashame [sic] you can't see the body language of Merck's lawyers. They know they are dead. Reading this transcript and viewing this video tape will make all of your [sic] very very happy. *As good as this case was before today, it now has improved 100 fold.* Thanks to Shanin and his partners for being so well prepared and doing such a wonderful job.

*See* Email from Michael Ferrara, dated April 8, 2005, attached as Exhibit "Q" (emphasis added).

Another Vioxx plaintiff's lawyer, Steve Knowlton of the Locks Law Firm, wrote this to Dr. Dagostino during the *Doherty* trial in New Jersey:

> Lisa:  Thank you.  Please tell Tom Thanks for me.  *Your work, as a firm, has been an essential part of our case.*  Win or Lose, if there is anything I can do for you guys, all you have to do is ask.

*See* Email from Steve Knowlton to Lisa Dagostino, dated June 27, 2006, attached as Exhibit "R" (emphasis added).

MDL Liaison Counsel, Russ Herman, acknowledged the significance of this work. Following Kline & Specter's presentation to the FAC, Mr. Herman commented that "when you take 17 key depositions in the case, and they are taken by partners, and you've got two physician lawyers doing the background work, it's significant. That's my view of this." *See* Exhibit B at 35.

### 3. Participation in trials

Kline & Specter's depositions also performed important roles at Vioxx trials. For example, Mr. Kline developed the "defender of the Vioxx franchise" theme with Dr. Alise Reicin, Senior Director of Merck's Research Laboratories, while deposing her with information gained from her personnel file. Dr. Reicin appeared for Merck in many of Vioxx trials, and the admissions Mr. Kline elicited in deposition were used to cross-examine Dr. Reicin.

As noted above, videotape deposition testimony elicited by Kline & Specter's lawyers also was played during trials. Tom's Kline's deposition of Dr. Topol was played during every trial in the MDL and NJCL. Mr. Kline's deposition of Dr. Graham was also played during several trials. These depositions placed Kline & Specter in the courtroom, literally. As noted above, Mr. Specter's deposition of Dr. Shapiro was played to the jury during the punitive damages phase of the Cone/McDarby trial and was credited by Mr. Lanier with "making all the difference" in producing a $9 million punitive damages verdict. *See* Exhibits O, P.

20

### 4.   Kline and Specter's physician-attorneys developed the causation theory through extensive document and literature review and by working with experts.

Kline & Specter's signature contributions to common benefit were not limited to deposing key witnesses.   The firm also played a critical role in developing the fundamental causation theory for Vioxx litigation, in particular refining the strategy to embrace the unique pathophysiology of Vioxx usage in patients with underlying atherosclerotic and/or hypertensive disease (the so-called "eggshell plaintiffs").   This work was performed by two of Kline and Specter's physician-attorneys, Mark Hoffman and Lisa Dagostino, who applied their medical, scientific, and bioethics training and committed extensive time to this project.   In addition to their own critical analysis, they performed extensive document review and worked with experts as necessary to support the causation theory.

Further, as discussed in the previous section, Dr. Hoffman took depositions of some of the key figures in Vioxx litigation.   Dr. Dagostino devoted herself full-time to Vioxx litigation for a period of over two years so that she could perform common benefit work. During this period, Dr. Dagostino performed extensive research and document review necessary to produce significant contributions to the Plaintiffs' causation theories.   In particular, she prepared lead counsel for all of the above named depositions.   She helped non-Kline & Specter counsel prepare for the depositions of Ned Braunstein, M.D. (Merck Senior Director-Regulatory) and Steven Nissen, M.D.

(cardiologist at the Cleveland Clinic and noted Merck critic). She provided significant assistance during the *Irvin, Cona/McDarby,* and *Humeston* trials.

Dr. Dagostino, Dr. Hoffman and Mr. Lee Balefsky also undertook significant work in the area of expert development and preparation. They developed and prepared expert Steven Levine, M.D. (Mt. Sinai—stroke neurology). Along with other lawyers, Drs. Dagostino and Hoffman prepared expert Cecil Pace-Asiak, Ph.D (Pharmacology, University of Toronto). Dr. Dagostino also worked with non-Kline & Specter co-counsel to develop experts Jerry Avorn, M.D. (Harvard, pharmacoepidemiologist), Suzanne Parisian, M.D. (FDA medical officer), Wayne Ray, M.D. (Vanderbilt, pharmacoepidemiology), Edward Feldmann, M.D. (Brown—stroke neurology) and Stephen Schondelmeyer, Pharm.D, Ph.D (University of Minnesota—Health Systems).

In addition to the above, Dr. Dagostino undertook a systematic review of the underlying medical records of all of the cardiovascular adverse events and adjudication packets in the Merck clinical trials; this extensive project was underway at the time the settlement was announced and was therefore halted prior to completion.

5. **Contributions to the Trial Package**

The Trial Package represents a comprehensive body of common benefit work prepared during Vioxx Litigation. It organized and summarized the materials necessary for Plaintiffs' counsel to try a Vioxx case anywhere in the country. It laid out

the liability theories and underlying science. It included relevant transcripts and deposition cuts. It demonstrated how to present a plaintiff's case and organized the critical evidence by themes that might be developed at trial. It provided videotaped examinations of dozens of key witnesses. It included sample motions in limine and sample responses to Merck's motions in limine. It provided numerous additional materials as well. *See* Vioxx MDL Trial Package index, attached as Exhibit "S". This Trial Package was of exceptional quality and represented a substantial piece of common benefit work. As this Court observed,

> The trial package in this case has been very helpful. One of the things that an MDL can do, and we've tried to do in this particular case, is not only to try the case but also to try to prepare a package, so to speak, for lawyers who are interested in trying their cases in another jurisdiction or even in this jurisdiction but not have to pull in all of the witnesses.

> As I mentioned, we tried six cases here, they were bellwether cases but they were very expensive cases to try. Each case the plaintiffs spent between a million and $2 million. The defendants spent between two and $3 million in each case. Not lawyer fees, just court costs. Now, obviously if somebody wants to try a case, they don't want to try a case and put it on for $1 million; particularly if the case is worth 400,000 or 500,000, it doesn't make sense. And so what we've tried to do is to have a package prepared so that that lawyer would be able to put the package, which is a video presentation of a lot of the general witnesses, instead of calling these high powered witnesses on their own ticket, so to speak.

> So they have a large portion of the case already prepared, already in the can, and they put that on and then garnish it with some of the witnesses that are germane and significant for their particular case. Hopefully in that way they can try a case for less amount and get the same benefit that was achieved.

Transcript of Monthly Status Conference Proceedings, dated Jan. 6, 2011, pp. 11-12, attached as Exhibit "T".

Kline & Specter lawyers made significant contributions to the Trial Package.  In particular, Dr. Dagostino researched, digested and indexed the "List of Articles," a compendium of over 3,000 relevant articles from the medical literature.  She developed the "Cast of Characters," a comprehensive guide to the over 700 Merck employees, third parties, and experts involved in Vioxx litigation.  She also developed the "Vioxx Dictionary," a comprehensive guide to 500 scientific terms and Merck's complex corporate structure.  These were massive and brilliantly projects, as can be readily seen by observation of the work product.  *See* List of Articles, attached as Exhibit "U"; Cast of Characters, attached as Exhibit "V"; Vioxx Dictionary, attached as Exhibit "W".

In addition, Dr. Dagostino assisted with the development of the stroke package with Michael Weinkowitz, Esq.  She helped refine the Vioxx "theme grid" with Jeff Grand, Esq.   She helped craft appropriate deposition designations.  She also assisted the development of trial modules that organized plaintiffs' response to Merck's various defenses under various topics with Chris Tisi, Esq., Leigh O'Dell, Esq., and Mr. Grand.

Dr. Dagostino's contributions to the Trial Package were invaluable.   Pete Kaufman, Esq. of the Levin Papantonio firm characterized them in this way:

> Lisa,
> What an incredible resource.
> *Your contributions to the trial package have been astonishing.  If I knew a word better than "astonishing," I would use it.*

> And Kathy [Dr. Dagostino's paralegal], thank you very much. It's almost painful to think of how much work went into this.

Email from Pete Kaufman, dated Aug. 15, 2007, attached as Exhibit "X" (emphasis added). Another member of the Trial Package Committee described Dr. Dagostino's contributions to the trial package as "fantastic" and added, "You guys are the best," while Mr. Herman characterized them as "excellent work as usual," "top-notch," and at "alevel [sic] of excellence." *See* Email from Chris Tisi, dated August 15, 2007, attached as Exhibit "Y"; Emails from Russ Herman, dated July 28, 2007 and Aug. 2, 2007, attached as Exhibit "Z".

Mr. Herman again thanked Dr. Dagostino after Kline & Specter's presentation to the FAC, when he emphasized the Trial Package's importance in justifying the common benefit fee:

> I want to thank Lisa particularly. ***The trial package to me is one of the most important single things that we can do, because it justifies a common benefit fee.*** Individual trials, those that won, some that didn't, depositions, document review, we all know what that is as lawyers. But the ability to resolve the case and at the same time produce a trial package that no one can deny cures a lot of issues in any view, and it's why I pushed so hard for it. I think we had our best people on that committee in terms of knowing the case...the work to me on the trial package is a fundamental situation absolutely necessary in this case. It is the only trial package I have ever seen come out of an MDL that's worth a damn. Nobody else had a trial package where you could go try a case. This one you could.

*See* Exhibit B at 32-33 (emphasis added).

### 6.   Kline & Specter provided legal briefing

At the direction of lead and liaison counsel, Kline & Specter also played a major role in the preparation of the MDL response to Merck's preemption challenge. This issue was a threatened death-knell for this litigation, so its importance cannot be overstated. Partners Shanin Specter and David Caputo prepared legal briefing on this issue, and Dr. Dagostino prepared a detailed factual response and presented factual background at oral argument.

### 7.   Funding of the MDL litigation

Finally, Kline & Specter helped to fund Vioxx litigation by paying $355,000 in MDL assessments and approximately $217,000 in MDL common benefit costs (as well as $30,000 in assessments to the NJCL). These voluntary payments, for which the firm received reimbursement, underscore the firm's deep commitment both to Vioxx litigation and the importance of common benefit work.

## C.   Despite Kline & Specter's contributions, the FAC recommended that Kline & Specter receive a small fraction of its lodestar.

In total, Kline & Specter performed 25,391.25 hours of common benefit work in Vioxx litigation, and its lodestar was $12,080,690. *See* Exhibit H. This was the fifth largest amount of work contributed by any Plaintiffs' firm, and occurred during the heat of litigation, without certainty of recovery, before settlement. *Id.* None of Kline & Specter's time was spent on post-settlement administration.

The FAC's members have acknowledged that this work produced significant common benefit in Vioxx litigation.  Co-lead counsel Chris Seeger stated that "your presentation really speaks for itself, and it is a real reminder about how many pieces of the litigation you were involved with.  Clearly, from the day we got involved together in Vioxx . . . you have been one of the go-to people."  *See* Exhibit B at 37-38.  Mr. Herman agreed that Kline & Specter "made a significant contribution . . . you are real lawyers."  *Id.* at 44.

Despite Kline & Specter's contributions on critical assignments, the FAC recommends that Kline & Specter receive an estimated .36 multiplier and a $4,000,000 award.  This is down from the FAC's initial recommendation of $4,514,057.15.  It represents an estimated hourly rate equaling *one-seventh* of the rate the FAC gave to itself ($157.53 versus $1,090.49).  Ranking the FAC's recommendations by multiplier, this was the 52nd out of 82 recommended allocations.  It is the lowest multiplier recommended for any PSC member.  *Id.*  It is the biggest shortfall between lodestar and recommended allocation of any of the 82 firms recommended to receive a common benefit fee – over $8 million.

Given the fixed nature of the common benefit fund, one person's loss is another person's gain.  The FAC recommended that its nine member firm receive $230,000,000 in common benefit fees based on an average estimated multiplier of 2.46.  *See* Excel Spreadsheet Prepared by Kline & Specter, attached as Exhibit "AA".  *Id.*  This represents

27

nearly 73% of the common benefit fund, even though the FAC billed only 42.6% of the total common benefit hours. *See* Exhibits H and AA. This inequality provides the backdrop against which Kline & Specter objects to the FAC's recommended allocation.

## ARGUMENT

The Court has directed objectors to (a) state their reasons for their objection to the FAC's proposed distribution and (b) state the amount they believe they are entitled to and why. *See* Order, entered Jan. 20, 2011. By way of summary, Kline & Specter objects to the $4 million recommended fee because it is manifestly too low given the quantity, quality, and significance of the firm's common benefit work. It objects further because the method employed by the FAC violates well-established law. This Court instructed the FAC to "look to general fee jurisprudence to identify the factors that should be applied in making appropriate allocations." Pretrial Order No. 6D, entered Sept. 8, 2008, p. 2. But the FAC plainly disregarded *Johnson* and *High Sulfur*. In substance and process, the result cannot be squared with any controlling jurisprudence.

Kline & Specter's contributions to Vioxx litigation were no less significant than the average contribution of the FAC's members toward litigating the matter and generating the settlement fund. Some of the FAC's firms also did considerable work in post-settlement administration, which this Court has correctly observed is not to be accorded the same level of remuneration as work that creates the settlement fund. *See Turner*, 582 F. Supp.2d 811. But Kline & Specter performed no post-settlement

administration; it focused entirely on litigating the matter and generating the settlement fund. Accordingly, Kline & Specter's multiplier should equal to the average multiplier applied to FAC members for their work *excluding* post-settlement administration. If the FAC's members receive an estimated average multiplier of 2.46 for such work, Kline & Specter's multiplier should be 2.46 as well, and its common benefit award should be $29,718,497.40. If the multiplier is higher or lower, Kline & Specter's award should adjust correspondingly.

As a final matter, this Court lacks jurisdiction to award common benefit fees for state-court cases that were never within this Court's jurisdiction. Such allocation must be performed by the New Jersey state court judge who presided over those cases prior to their resolution – Judge Carol Higbee.

**A.** **The FAC's recommended award for Kline & Specter is improperly low. The firm should receive an award equivalent to that received by the FAC's members for their work excluding post-settlement administration.**

    **1.** **Legal framework**

        **a.** **Key circuit court cases**

The law governing allocation of common benefit fees to individual law firms is well developed. A seminal case, especially on procedural matters, is the Fifth Circuit's decision in *In re High Sulfur Content Gasoline Products Litig.*, 517 F.3d 220 (5th Cir. 2008). There, a plaintiffs' steering committee made a recommendation regarding allocation of common benefit funds to a district court in an *ex parte* proceeding. The district court

adopted the recommendation with basically no analysis, and then sealed all records describing the recommendation and its bases. The Fifth Circuit vacated and remanded. *See id.* at 224-26. The Court explained that while a district court may appoint a committee to recommend allocation of an aggregate fee award, "the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *Id.* at 227. Such close scrutiny "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class" and "deflect[ing] the potential public misunderstanding that they may cultivate in regard to the interests of class counsel." *Id.* (citations and internal quotation marks omitted).

The Fifth Circuit explained further that for a district court to fulfill its duty, it "must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties." *Id.* Rather, exacting review is "necessary to discharge the court's obligation to award fees that are reasonable and consistent with the governing law." *Id.* (citation and internal quotation marks omitted). The Fifth Circuit added that district courts are *required* to use the "lodestar" method to assess common benefit fees. *Id.* Under this framework, the district court must first determine the reasonable number of hours expended on the litigation, and the reasonable hourly rate for the participating attorney. The lodestar is computed by multiplying the number of

hours reasonably expended by the reasonable hourly rate.  The district court may adjust

the lodestar upward or downward after a review of the twelve facts set forth in *Johnson*

*v. Georgia Highway, Inc.*, 488 F.2d 714 (5th Cir. 1974):

> (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) amount involved and resulted obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* at n.6, citing *Johnson*, 488 F.2d at 717-19.

In *High Sulfur*, the Fifth Circuit forecast the issues presented here.  It criticized

the district court for sealing record entries that made it impossible for attorneys to

understand the basis upon which fee recommendations had been made.  Here, this

Court has sealed no documents.  But as of this writing, the FAC has refused to disclose

the number of "points" it assessed to different law firms, the completed "grid" it used

to determine point values, or any information on how it developed the point system or

determined how points were distributed.  It also has not explained how the FAC's

initial recommendation that Kline & Specter receive $4,514,057.15 was reduced, after

Kline & Specter objected to that sum, to a final recommendation of $4,000,000.  These

refusals highlight the Fifth Circuit's observation that "[t]he lack of transparency about

the individual fee awards supports a perception that many of these attorneys were

more interested in accommodating themselves than the people they represent."  *Id.* at

229.   As the Court also concluded, without full transparency about a fee committee's process, attorneys cannot "compare their awards to those of other attorneys . . . . One cannot compare apples to oranges without knowing what the oranges are." *Id.* at 232.

Another circuit court case with implications here is *In re Agent Orange Product Liability Litig.*, 818 F.2d 216 (2d Cir. 1987).   There, the Second Circuit invalidated a plaintiffs' steering committee's decision to divide a common benefit fee based on a private fee allocation.   The Court explained that while some authority supported the committee's authority to divide money pursuant to private agreement, the committee could not divide the award in any manner it deemed satisfactory.   "Such a division overlooks the district court's role as protector of class interests under Fed. R. Civ. P. 23(e) and its role of assuring ***reasonableness*** in the awarding of fees in equitable fund cases."   *Id.* at 223 (emphasis added).   Under *Agent Orange*, a court's duty to assure reasonableness extends to the allocation of common benefit money, and does not end with creation of the aggregate fund.   *Id.*   Reasonableness is the touchstone for allocation of a common benefit fund.   *Id.*

Another instructive circuit court case is *In re FPI Agretech Securities Litig.*, 105 F.3d 469 (9th Cir. 1997), in which the Ninth Circuit affirmed a district court's decision not to allocate attorneys' fees to a lawyer who was uninvolved in the litigation in which the fees were recovered.   The rejected lawyer had argued for enforcement of a prior fee agreement.   The Ninth Circuit found that that district court properly could reject that

agreement if it rewarded an attorney "in disproportion to the benefits that attorney conferred upon the class – even if the allocation in fact has no impact on the class." *Id.* at 473. The Ninth Circuit added that district courts should "reject a fee allocation that does not accurately reflect the amount of work performed by the various attorneys." *Id.* Indeed, "we hold that the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal." *Id.* at 474. *FPI* and *Agent Orange* reach basically the same conclusion: courts must assure "reasonableness" and avoid "disproportion" when allocating common benefit fees.

### b. Key district court cases

Federal district courts have issued helpful opinions in this area. Especially significant is the district court's decision in *In re Vitamins Antitrust Litig.*, 398 F. Supp.2d 209 (D.D.C. 2005). There, a district court made an award of an aggregate common benefit fee following antitrust litigation, and the co-lead counsel made allocations among the contributing law firms. One firm objected to its award, saying the multiplier was too low. The district court agreed, and found that the lead counsel had failed to consider whether the fee it awarded itself was justified in comparison to the fees it awarded to others.

Stressing the need for fair allocation across the board, the district court explained: "The commitment to lead counsel of the responsibility of apportioning the fee among itself and other firms is a fundamental exercise of trust by the court. Implicit

in that delegation is the requirement that lead counsel apply a universally fair standard of allocation to all participants." *Id.* at 234.  The court continued:  "*Allocation means proportion*; how does the share lead counsel is taking compare to the shares others are getting?"  *Id.* (emphasis added).  The court concluded that all allocations must be "rationally related to each other." *Id.*  Accordingly, lead counsel must make a "fair allocation among its group even if that allocation diminished the share lead counsel received." *Id.*

*Vitamins Antitrust* stands for a powerful proposition.  Harkening to *FPI* and *Agent Orange*, it holds that **allocation means proportion**.  All fees must be rationally related to one another.  In addition, the decision states explicitly what people know instinctively:  fee allocation is an exercise of trust.

Of course, in the realm of district court decisions, no decision has more relevance than this Court's decision in *Turner v. Murphy Oil USA, Inc.,* 582 F. Supp.2d 797 (E.D. La. 2008).  In *Turner*, homeowners and business owners sued the operator of an oil refinery for damages from an oil spill that resulted when an above-ground tank ruptured during the flooding that followed Hurricane Katrina.  The case was certified as a class action and settled for approximately $330.1 million.  This Court approved an award for attorneys' fees and costs of approximately $33.7 million, and appointed a special master

to recommend allocation of the award to the various plaintiffs' attorneys. *See id.*[5] The special master made a preliminary recommendation. Attorneys had the opportunity to object to the preliminary recommendation, and numerous attorneys did so. Discovery followed. The master then held a hearing at which attorneys could argue and call witnesses. Following that hearing, the special master filed a final recommendation with the Court that differed from the preliminary assessment in many instances. Some attorneys got more, others got less. The Court then entered an Order awarding fees to individual attorneys. *Id.* This Order agreed with the special master's recommendation

---

[5] The $330.1 million recovery was excellent under the circumstances and was recognized in the attorneys' fee award. The Court's overall award of $33.7 million reflected a multiplier equaling 5.08 based on the estimated low end of the lodestar range, and 3.49 based on the estimated high end of the lodestar range. *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp.2d 830, 868-69 (E.D. La. 2007). In contrast, the Court's $315,250,000 award in Vioxx litigation reflects a 1.2633 multiplier over the aggregate lodestar of all firms. This smaller multiplier reflects the lesser degree of success achieved in this litigation as compared to *Turner*, at least as a function of common benefit hours compared to common benefit fee.

A 1.2633 multiplier for contingent work is mediocre (and is mediocre compared with the multiplier achieved in *Turner*). It is largely reflective of the difficulty in proving individual causation. The lopsided trial results for Merck reflect the difficulty in proving individual causation. Where the overall results are mediocre, as here, the argument that any one firm or set of firms is entitled to a windfall is especially weak

In *Turner*, this Court used a blended approach that applied a lodestar cross-check to assess an award of the percentage of the settlement fund. *See Turner*, 472 F. Supp.2d at 867. While Turner suggests that multiple approaches may be combined when awarding an aggregate attorney fee, no case suggests that anything other than a lodestar approach modified by the *Johnson* factors is valid for allocating an aggregate common benefit fund. Moreover, the Garrett firm has completed its audit of the hours and work submitted by the claimants against the common benefit fund at issue here. As such, applying a *Johnson* methodology is relatively straightforward.

in many instances, and modified it in several others. *Id.* The Court gave a detailed explanation of its decision in each instance. *Id.*

In its lengthy Opinion, this Court emphasized the importance of a "fair and transparent process" for allocating common benefit fees, and affirmed its serious commitment to "closely scrutinize the attorneys' fee allocation." *Id.* at 805. The Court also detailed its approach to assessing the contributions of different law firms, focusing on three facts: "financial resources, number of cases, and legal work." *Id.* at 809. (Here, as plaintiffs' counsel have been reimbursed for their MDL contributions, and as Vioxx litigation was never organized into a class action, the most pertinent factor is "legal work.")

Addressing attorney labor, this Court emphasized that an attorney's work "is generally the principal factor *by far* in determining the attorneys' portion of the common benefit fee." *Id.* at 810 (emphasis added). The first component of this factor is the time spent by the attorney. The second component is "the nature of the work." *Id.* On this later point, the Court emphasized that "not all types of work are created equal." *Id.* It continued:

> Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition. This, of course, is not the only

> type of work that such a case requires.  Documents must be reviewed, categorized, and analyzed emails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored.  This work, while necessary and often time consuming, does not deserve equal treatment when allotting fees."

*Id.* at 810-11.   Underscoring the value of work necessary to produce a successful settlement, the Court stated that post-settlement administration could not be treated on a par with the pre-settlement efforts.

> [T]he hours spent by counsel after the approval of the settlement agreement ***did not aid in the creation of the settlement fund***, and, as a result, the Court concludes that it cannot treat the hours spent by counsel in administering the settlement program on a par with the hours spent by counsel who helped create the settlement and Common Benefit Fund.

*Id.* at 811 (emphasis added).

Against this backdrop, the Court undertook to evaluate the special master's final recommendation and apportion the common benefit fee.   Distilling the cases and principles described above, the Court stated that "this apportionment is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel."  *Id.* at 812.

In the end, the Court's allocations differed from the special master's preliminary recommendations in several instances.  Notably, Darleen Jacobs, Esq. was initially recommended $375,000.  That number rose to $1,000,000 in the special master's final recommendation, and was adjusted further by the Court to $1.1 million – a 293% increase from her initial allotment.  Because the Court was distributing a fixed sum, as

some awards rose, other awards fell. Thus, the award for liaison counsel, Sidney Torres, III, Esq., fell from $4,730,000 to $4,257,000, a 10% reduction. The award for Jerald Andry, Jr. fell from $1,920,000 to $1,200,000, a 37.5% reduction. Of course, the Court gave a detailed discussion of its basis for each award, in accordance with *In re High Sulfur*'s concern for basic fairness and transparency in the allocation process.

### 2. The amount recommended for Kline & Specter is manifestly too small given the quantity and significance of its common benefit work.

The above cases frame the legal analysis and require a dramatic rise in Kline & Specter's common benefit fee; the recommended $4 million is grossly insufficient. Initially, as described above, Kline & Specter performed a massive amount of common benefit work during Vioxx litigation – its 25,391 hours were the fifth most submitted by any law firm. Its lawyers served on the PSC and on numerous subcommittees, and expended substantial time and resources in fulfilling the responsibilities of these appointments. They prepared for and took numerous depositions, including some of the key depositions in the entire litigation. They played a leading role in developing and refining the plaintiffs' theory of causation. They made substantial contributions to the trial package. They provided significant briefing support on key legal issues. They worked hard on tough projects and did an excellent job. They also helped fund the Vioxx MDL through over $500,000 in contributions. All of this work occurred in the heat of litigation, without any certainty of recovery, and before settlement.

This body of work made a significant impact on the litigation. Indeed, numerous plaintiffs' counsel described the firm's deposition work as "fantastic," "essential," and "spectacular." The work "made all the difference in the world" and improved by "100 fold" the plaintiffs' case. The firm's work on the trial package was not just "fantastic" and "top notch," but "astonishing." Pete Kaufman added, "[i]f I knew a word better than 'astonishing,' I would use it." *See* Exhibits I, J, L, M, P, Q.

As the Court noted when it created the common benefit fund, $315,250,000 represents a 1.2633 multiplier over the lodestar for common benefit worked performed in Vioxx litigation. *See* Order, entered Oct. 19, 2010, pp. 36. Despite the significance of Kline & Specter's common benefit work, the FAC recommended that Kline & Specter's fee equal a .36 multiplier on its estimated lodestar and estimated hourly rate of $157.53, as against the FAC's average estimated multiplier of 2.46 and estimated hourly rate of $1,090.49. Thus, the FAC valued Kline & Specter's work product as ***one-seventh*** as important as its own. The FAC also valued Kline & Specter's work as worth only 28% of the average for ***all*** common benefit work. It did this notwithstanding the choruses of praise for Kline & Specter's work: "***fantastic***," "***astonishing***," and so good that it improved by "***100 fold***" the plaintiffs' case.

Review of the *Johnson* factors confirms that the estimated multiplier violates applicable law:

(1)   Kline & Specter's expert professionals worked 25,391.25 hours toward the common benefit in Vioxx litigation, the fifth most of all firms seeking a common benefit fee, none of it involving post-settlement administration.   Indeed, if post-settlement administrative work is excluded, Kline & Specter likely performed the third-largest amount of common benefit work of all firms.

(2) Vioxx litigation brought forward many novel and difficult issues, especially around causation where Kline & Specter's physician-lawyers played a key role in developing and refining the plaintiffs' causation theories.   The scientific analysis performed by Kline & Specter's lawyers was crucial to the plaintiffs' ability to succeed against Merck to the extent they did.   Moreover, performing this medico-legal scientific work required considerable experience and skill, as it meant going toe-to-toe with Merck's top scientists – the cream of the American pharmaceutical industry.   This was a struggle of the best lawyers against the best scientists.

(3)   Significant skill and experience was required to understand the legal, medical, and scientific issues in the case, prepare and take the depositions, develop the causation theories, work on the trial package, and do all the other work that Kline & Specter's lawyers undertook.   As noted above, developing and litigating the medical and scientific issues in this case required tremendous experience and skill.

(4) The firm's involvement in Vioxx litigation certainly precluded other employment, as those lawyers were working on Vioxx matters rather than other matters

the firm might have undertook.  The result in Vioxx litigation was contingent on the deployment of two kinds of resources:  money and time.  Kline & Specter's financial commitments are described above.  As for time, the firm worked 25,391.25 hours for the common benefit, all of which was contingent on a successful outcome.  This massive commitment of time, which the FAC says was worth $157.33 per hour, could have been profitably deployed elsewhere, as the firm has an outstanding practice in handling challenging and highly lucrative plaintiffs' litigation.

(5) As a contingent fee practice, Kline & Specter customarily does not work on an hourly basis.  If an hourly rate were determined, however, it would be a large multiple of $157.33 per hour.

(6) There was no certainty that any recovery would flow from Vioxx litigation, especially given how strongly Merck contested all aspects of the case.  Yet all of Kline & Specter's efforts in Vioxx litigation were deployed during the heat of litigation, when no recovery was certain, before settlement.  In contrast, it should be noted that the FAC's members spent thousands of hours on post-settlement administration, which, while necessary, occurred after the battle had ended.

(9) Kline & Specter's lawyers are among the preeminent personal injury lawyers in the country, with significant experience in medico-legal and scientific issues such as presented in Vioxx.  Kline & Specter is the largest personal injury firm in Pennsylvania and one of the largest in the United States.  Its lawyers were recruited to serve on the

PSC and helped develop the causation case precisely because of their skill, depth, experience, resources, and track record. *See Johnson*, 488 F.2d at 717-19.

These factors support increasing the award so that it correlates to the average multiplier applied for the FAC's members with respect to their work *other* than post-settlement administrative work.

The *Agent Orange* and *FPI* decisions further support this conclusion. There is nothing "reasonable" about cutting Kline & Specter's fee to .36 of its lodestar and to *one-seventh* of the rate received by the FAC, while the FAC awards itself $230,000,000. *See Agent Orange*, 818 F.2d at 223. This result does not "accurately reflect" the amount of work, the quantity and quality of work, or the significance of the work performed by Kline & Specter's lawyers. *FPI*, 105 F.3d at 473. Moreover, this result clearly is not "proportionate" given the impact of Kline & Specter's work and its placement in the top tier of the litigation both in hours work and substantive impact. *Id.*

This Court's *Turner* analysis further supports this conclusion. In *Turner*, this Court explained that an attorney's work "is generally the principal factor *by far* in determining the attorneys' portion of the common benefit fee," and that the value of an attorney's work is determined by its quantity and quality. See *Turner*, 582 F. Supp.2d. at 810 (emphasis added).

Here, Kline & Specter worked 25,391.25 hours for the common benefit, the fifth-largest amount of any firm.

As for quality, while "not all types of work are created equal," the character of Kline & Specter's work in Vioxx litigation was complex, wide-ranging in scope, and a significant factor in creating the settlement fund. *Id.* As described above, this work included preparing for and taking depositions, preparing expert witnesses, developing plaintiffs' causation case, developing the trial package, briefing legal issues, and managing and organizing the litigation. In addition, depositions taken by Kline & Specter lawyers – notably, the Topol deposition – were routinely played at trial, placing Kline & Specter in the courtroom, literally. This collective effort falls into the category of work that "deserves the most recognition," according to *Turner*. *Id.* It does not deserve diminishment to **one-seventh** of the FAC's estimated hourly rate.

In sum, Kline & Specter objects because the FAC's $4,000,000 recommendation is unjustified and unjustifiable under the facts and prevailing fee jurisprudence. The award instead must correlate to the average multiplier applied to the FAC's members with respect to their non-settlement administration work product.

### 3. The FAC's recommendations have no basis in case law and violate principles of transparency and fairness.

Kline & Specter objects for a second reason. The FAC's recommendations rely on a "point" system with no precedent in *High Sulfur*, *Turner*, or other relevant case law. The FAC also has provided no justification for its conclusions, which remain secret to everyone except the FAC's members. As the awards cannot be compared to one

another, the FAC's recommendations not only violate substantive law, but basic principles of transparency and fairness.

As noted above, this Court directed the FAC to "look to general fee jurisprudence to identify the facts that should be applied in making appropriate allocations." Order, entered Sept. 15, 2008, p. 2. It noted specifically that the *Johnson* factors are applicable to this litigation and should be considered in addition to other matters considered by the courts to evaluate fee allocations. *Id.*

However, the FAC obviously disregarded the fee jurisprudence in forming its recommendations. Initially, the recommendations themselves contain inequities that defy explanation. The FAC recommended that firms receive amounts ranging from .04 of their lodestar to 4.97 times their lodestar. Thus, the largest multiplier (4.97) was over 124 times larger than the smallest multiplier (.04). No known fee allocation jurisprudence supports such a disparity. No known case even considers allocations involving disparities so great as here. These results are also inconsistent with the Fifth Circuit's approach of (1) using the lodestar as a starting point, and (2) modifying the lodestar up or down by *Johnson* factors. *See In re High Sulfur*, 517 F.3d at 224-27. Neither can they be squared with *FPI*, which held that individual fee allocations must be based on the "relative" efforts of the various contributing counsel. *See FPI*, 105 F.3d at 474. Nor can they be squared with *Vitamins Antitrust*, which held that "[a]llocation means

proportion," and that a "universally fair standard" must be used when making fee allocations. *See Vitamins Antitrust*, 398 F. Supp.2d at 234.

Even more startling is that the FAC awarded itself $230,000,000 to its nine members, nearly 73% of the common benefit fund, even though the FAC's members only billed 42.6% of the total common benefit hours. *See* Exhibits E and Z. In doing so, it awarded itself neat round numbers such as $40,900,000 and a $20,000,000. See Exhibit AA. One might expect round numbers to avoid loose change. But how did the FAC generate these exact numbers though a lodestar analysis? What application of the *Johnson* factors produced such neat outcomes? The point is not that lodestar analysis must always produce messy numbers, but that the fat and round numbers here suggest a fundamentally subjective approach to fee allocation, contrary to *High Sulfur* and established fee jurisprudence.

As this Court stated in *Turner*, not all types of work are created equal. Still, these valuation spreads can not be justified on that statement alone. At a minimum, the FAC should have used an hourly cross-check to validate its recommendations. That approach was used in *Turner*, 472 F. Supp.2d 830, when this Court used a lodestar cross-check to validate the overall common benefit award. Here, the FAC states that "hours were used to cross-check the amount of the recommended fee." *See* Exhibit D. This statement is wholly belied by the facts. The FAC's Point System Guide demonstrates

conclusively that the FAC relied on its point system rather than hours in determining a recommended fee.

The FAC's treatment of Kline & Specter further demonstrates its legally defective approach to fee allocation.  The fee allocation jurisprudence required the FAC to begin with Kline & Specter's $12,080,690 lodestar and adjust up or down based on the *Johnson* factors – inevitably up, given the quality and impact of Kline & Specter's contributions, all of which occurred in the heat of litigation.  Yet the FAC recommended that Kline & Specter receive a startling reduction from its lodestar – a conclusion that cannot reasonably be supported through the *Johnson* factors.[6]  At the same time, the FAC gave its own members multipliers almost seven times that granted to Kline & Specter for substantially equivalent work (excluding the FAC's thousands of hours spend on post-settlement claims administration, of which Kline & Specter performed none).  Thus, the proposed award to Kline & Specter was (a) objectively unreasonable and (b) grossly disproportionate relative to the FAC's recommended payment to its own members of $230,000,000 applying an estimated average multiple of 2.46.  No rational relationship can possibly exist between estimated .36 and 2.46 multipliers where *100%* of Kline & Specter's work contributed to producing the settlement, while the FAC's members performed many thousands of hours on less valuable post-settlement administration.

---

[6] Instead of receiving  multiplier in line with rest of the plaintiffs' leadership, Kline & Specter received *two* reductions.  The FAC initially recommended $4,514,057.15, a massive reduction from Kline & Specter's lodestar.  That number was reduced further to $4,000,000 after Kline & Specter objected.  *See* Exhibits D, E.

Certainly no such relationship has been demonstrated by the FAC.  *See Vitamins Antitrust Litig.*, 398 F. Supp.2d at 234 (explaining that "allocation means proportion" and that different allocations must be "rationally related" to each other).

In addition to the foregoing, no known decision addressing the allocation of common benefit fees interprets a "point system" such as presented here.  No known case suggests that a point system may be a permissible option.  The known cases call for "reasonable relationship" and "proportion" as the touchstones for allocation.  In *High Sulfur,* the Fifth Circuit held that allocation should be based on a firm's lodestar as modified by the *Johnson* factors.  *See High Sulfur,* 517 F.3d at 234.  No case discusses a point system.  The universal yardstick is lodestar modified by the *Johnson* factors.

Rather than working within the established jurisprudence, the FAC replaced it with an unvetted, unvalidated and untested point system.  *See* Exhibit E.  This is apparent from the point-system grid, which shows that the FAC facial methodology for achieving a recommended award.  *Id.* As reflected by the grid, the FAC first assigned points for various categories of work.  It then added individual point assignments, modified the "net" total based on "[f]actors for *Johnson* and PTO 6D criteria," and thereby achieved a "total points" number.  *Id.*

Significantly, the grid contains a final line titled "Allocation based on Points Calculation."  *Id.*  This line is most revealing.  It shows the FAC's core methodological approach:  the FAC based allocation on points, <u>not</u> lodestar.  *Id.*

Yet *High Sulfur* says that lodestar is the touchstone of fee allocation. So did this Court in *Turner*. So has every other court to consider this issue. The FAC's point system violates all fee jurisprudence on this subject, including the Fifth Circuit decision in *High Sulfur*. This conclusion is underscored by the FAC's arbitrary and unexplained reduction in Kline & Specter's recommended award from $4,514,057.15 to $4 million. *See* Exhibit D.

The Point System Guide reflects additional defects in the FAC's approach. It demonstrates that the FAC viewed post-settlement administration as ***more*** valuable than such categories as "discovery, science and experts" and "funding." *See* Exhibit E. This approach exalts post-settlement administration above work that made the settlement fund possible. But as this Court stated in *Turner*, "the hours spent by counsel after the approval of the settlement agreement did not aid in the creation of the settlement fund, and, as a result, this Court concludes it cannot treat the hours spent by counsel in administering the settlement program on a par with the hours spent by counsel who helped created the settlement and the Common Benefit Fund." *Turner*, 582 F. Supp.2d at 811. Thus, the Point System Guide violates both *Turner* and *High Sulfur*.

It might be said, of course, that the FAC considered each firm's lodestar in its assignment of points. But the law does not allow a lodestar to be subsumed into a point system. *See High Sulfur*, 517 F.3d at 234. Further, as the FAC has refused to provide its completed grid, there is no basis upon which firms can determine what net points were

assigned to whom, the basis for those allocations, and the degree of modification under the "*Johnson* and PTO 6D criteria."

Although Kline & Specter has not viewed the intermediate steps taken by the FAC, it can see the final result. The FAC's fee recommendations are the ultimate test of whether its point system produces proportionate results. Manifestly, it does not. It has produced wildly disproportionate results that award 73% of all fees to the FAC's nine firms, even though those firms billed only 42.6% of common benefit hours. And it has done so in a fundamentally nontransparent way.

The FAC purportedly created the point system to achieve "objective evaluation" of each law firm's contributions to Vioxx litigation. However, the point system evidences no objective criteria. If anything, its terms appear reverse-engineered so its authors could benefit most from them. For example, an administrative "leader" could earn a maximum of 125 points for his or her role, and persons active in settlement negotiations and post-settlement administration could earn as much as 100 points for each role. But outstanding work in "discovery, science, and experts" could yield a comparatively paltry 50 points, even though scientific analysis was the heart of the plaintiffs' case – without it, no effective questions could be asked at trial and no settlement achieved. Indeed, no work was more critical to Vioxx litigation than scientific analysis. The PSC acknowledged as much in its application for common benefit fees:

> As Merck strenuously defended the safety profile of Vioxx based upon published medical literature in highly regarded medical journals, the common benefit attorneys were confronted with a strong adversary that was well entrenched with powerful defenses. Undaunted by their adversary, ***common benefit counsel carefully dissected the clinical trial data and developed the complex scientific arguments necessary to controvert Merck's medical arguments. These arguments were highly technical and difficult,*** yet due to the perseverance of common benefit counsel corrections to the public's knowledge of the flawed science created by Merck was accomplished. *See Correction*, N Engl J Med 2006; 355(2): 221.

Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses, Doc. 17642, p. 55 (emphasis added).

Discovery can not "objectively" be relegated to a minor position in the context of Vioxx litigation.[7] Indeed, the unsung and difficult work of discovery made possible the successful prosecution of the plaintiffs' case. No glory can be achieved at trial,[8] and certainly no settlement, without hard labor in the trenches of discovery. Moreover, while settlement negotiations were doubtless labored, the likelihood of settlement was

---

[7] This Court acknowledged the critical role played by discovery efforts in *Turner*, wherein it awarded the second highest fee allocation to the lawyer who "was in charge of the discovery efforts and guided the deposition process" because such work was "key to attacking the Murphy defenses and pushing the defendant to settlement." *Turner*, 582 F. Supp.2d at 813. Vital as such work was in *Turner*, it was even more so in this complex pharmaceutical litigation.

[8] Glory at trial was fleeting for Vioxx plaintiffs. Of the 20 trials, only 3 ultimately returned a plaintiffs' victory. As such, it is bewildering that the FAC should award so much value to trials. Losing multiple trials hardly added value to the plaintiffs' case, and if anything discouraged further investment in the litigation. At a minimum, trial work should not be accorded a multiple several times higher than the value assigned to other necessary work.

obvious by the time they began.   Neither the work of settling the case, nor administering the settlement, remotely compares in importance to the work of building the case through depositions and scientific analysis.   The FAC has turned fair valuation upside down by lionizing settlement while casting discovery to the wolves.

As noted above, this Court caused the appointment of a PNC that undertook to negotiate a settlement with Merck.   The PSC was not notified of this appointment.   Nor was it involved in the settlement of the litigation, in violation of the Order appointing the PSC's members.   *See* Pretrial Order No. 7, entered April 8, 2005.   This improper denuding of the PSC underscores how both the manner of the settlement and its administration are extra-legal and unprecedented.

In the end, little credit can be given the FAC for its stated concern for objectivity where the byproduct of its framework is that the FAC receives 73% of all fees for 42.6% of the hourly work.   As the Third Circuit observed in *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring), "[t]hey make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?"

4.   **Kline & Specter should receive a multiplier commensurate with the average multiplier of its peer firms, excluding their post-settlement administrative work.**

For all the reasons described above, Kline & Specter's contributions toward the common benefit were significant and crucial, and all occurred during the heat of

litigation, when no recovery was certain, before settlement. These contributions equaled those of other top firms. At a minimum, they were no less significant than the average contribution of the FAC's members toward creating the settlement fund. The FAC recommended that its members receive an average estimated multiplier of 2.46 for all of their work, including the thousands of hours spent on post-settlement administration. *Id.* Using that as a benchmark, Kline & Specter's multiplier reasonably should be *higher* than 2.46: it should equate to the average multiplier for FAC members only for their work devoted to creating the settlement fund, excluding post-settlement administration. This outcome is mandated by the extent and nature of Kline & Specter's work on Vioxx litigation, and the controlling jurisprudence.

If the FAC's members receive an estimated average multiplier of 2.46 for their work creating the settlement and excluding post-settlement administration, then (1) Kline & Specter's multiplier should be 2.46 as well, and (2) based on its actual lodestar of $12,080,690, Kline & Specter's award should be $29,718,497.40. If the average multiplier is different, Kline & Specter's award should adjust accordingly.

**B.**      **This Court lacks jurisdiction to award a common benefit fee for state-court cases not under the Court's jurisdiction.[9]**

      **1.**      **The Court's authority does not extend to cases pending in state court.**

"[F]ederal courts are courts of limited jurisdiction, having 'only the authority endowed by the Constitution and that conferred by Congress.'" *Epps v. Bexar-Medina-Atascosa Counties Water Improvement Dist. No. 1,* 665 F.2d 594, 595 (5th Cir. 1982), quoting *Save The Bay, Inc. v. United States Army,* 639 F.2d 1100, 1102 (5th Cir. 1981). Absent jurisdiction conferred by statute, district courts lack power to consider claims. *Veldhoen v. U.S. Coast Guard,* 35 F.3d 222, 225 (5th Cir. 1994).

This Court's status as an MDL transferee court gives it no jurisdiction or authority over state court cases. "One of the most significant limitations on the effectiveness of transfer by the Judicial Panel on Multidistrict Litigation is the inability, on jurisdictional grounds, to transfer state and federal cases for coordinated proceedings. " *Man. Complex Lit.* § 20.3. *See also The Mechanics of Motion Practice Before the Judicial Panel on Multidistrict Litigation,* 175 F.R.D. 589, 603 (Feb. 1998) ("The Panel has no power over state court actions."). *See e.g., In re Celotex Corp "Technifoam" Products Liability Litigation,* 68 F.R.D. 502, 504 n.2 (J.P.M.L. 1975) ("The Panel, of course, does not have the power under Section 1407 to consider the propriety of coordinated or

---

[9] Kline & Specter, with permission, herein adopts and sets forth many of the arguments made by Robert E. Arceneaux and Pascal Calogero, Jr. on behalf of Eric Weinberg, Chris Placitella and Cohen, Placitella and Roth in their Objection to the FAC's Jan. 20, 2010 Recommendation, and also sets forth some of its own.

consolidated pretrial proceedings in state court actions...."); *Coy Chiropractic Health Center, Inc. v. Travelers Cas. & Surety Co.*, 2007 WL 2219102, *2 (S.D. Ill. Jul 27, 2007) (JPML cannot transfer actions that are pending in state court).

The Multidistrict Litigation Manual also addresses the issue, and concludes that there is no federal jurisdiction over parallel state court cases. Section 3:13 is entitled "Limitations on Panel's power—No power over state court cases," and states:

> The Panel has no authority over actions pending in state courts. This limitation on the Panel's authority is part of the inherently limited jurisdiction of federal courts and is therefore fundamentally inflexible.

*Multidistrict Lit Man.* § 3:13 (2009).

The lack of jurisdiction extends to assessment of attorneys fees to compensate for "common benefit work." The most recent case on this issue is the decision of Judge Perry in *In re Genetically Modified Rice Litigation*, which this Court cited with approval on other points in its October 19, 2010 Order and Reasons:

> Plaintiffs' leadership group asks me to include the state court cases in this order, so that defendants would be required to hold back and contribute a portion of any settlements or judgments from those cases as well as from the MDL cases. As stated above, I do not have jurisdiction to do this.

> The leading case on this question is *In re Showa Denko K.K. L-Tryptophan Products Liability Litigation-I*, 953 F.2d 162 (4th Cir. 1992). In that case the Fourth Circuit Court of Appeals reviewed an MDL district court's order of a set-aside that applied not only to the cases transferred to the MDL court, but also to state cases, non-transferred federal cases, and unfiled claims that might be settled and not litigated. The Fourth Circuit found that the trial court did not have jurisdiction to order the contributions from parties who were not before it. The court stated that

the authority to consolidate cases before one MDL judge "is merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred." *Id.* at 166-67. Most cases considering this issue have reached the same conclusion.

In *Hartland v. Alaska Airlines*, 544 F.2d 992, 1001 (9th Cir. 1976), the Ninth Circuit reversed a similar district court order, holding that the court "had not even a semblance of jurisdiction" to order non-parties to contribute to a common benefit fund. Accord *In re Zyprexa Products Liability Litigation*, 467 F. Supp.2d 256 (E.D.N.Y.2006); *In re Baycol Products Litigation*, 2004 WL 190272 (D. Minn. Jan. 29, 2004); *In re Linerboard Antitrust Litigation*, 292 F. Supp.2d 644, 663-64 (E.D. Pa. 2003). * * * I have no jurisdiction over the state cases and I cannot order the defendants to withhold amounts they may end up owing the state plaintiffs.

*In re Genetically Modified Rice Litigation*, 2010 WL 716190, at *4-5 (E.D. Mo. Feb 24, 2010).

*See also In re Baycol Products*, 2004 WL 1058105 (D. Minn. May 03, 2004) (agreeing that a transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred).

This is not to say that the assessments Kline & Specter have paid are unlawful, or should be returned. It agreed to pay the assessment in the Master Settlement Agreement ("MSA"), and it was contractually obligated to pay those amounts. As this Court stated in its October 19th Order:

In addition to equity, quantum meruit, and inherent managerial authority, the Court derives express authority in this case from the terms of the Settlement Agreement entered into by the parties and consented to by their primary attorneys. Section 9.2 of the Settlement Agreement governs common benefit fees and expressly authorizes the Court to determine common benefit attorneys' fees. Settlement Agreement § 9.2.5 In fact the PLC asks the Court to exercise the aforementioned authority and award common benefit fees under the terms of the Settlement Agreement.

Order and Reasons, Oct 19, 2011, at 6.

However, this statement is only partially correct. The imposition of an assessment against all those participating in the settlement is a matter of contract law, and accordingly the assessments were properly collected. But the statement errs in its conclusion that, simply because the parties could agree to pay the assessment, they could also grant this Court jurisdiction over how those assessments would be disbursed. For assessments emanating from cases pending in this MDL, this Court undoubtedly has authority over those funds. But for assessments emanating from cases that were pending in state court, this Court has no jurisdiction to allocate or disburse those funds.

### 2. The Court has no inherent authority to allocate fees arising from state-court cases.

This Court has concluded previously that in addition to the powers granted under the MSA, it has jurisdiction over the state court cases under a reservoir of "inherent" authority. In its order capping attorneys fees, this Court found that it had "equitable authority over the settlement" and "inherent authority to exercise ethical supervision over the parties," as well as "express authority under the terms of the Settlement Agreement" to review all fee contracts for reasonableness "regardless of whether the claimants filed their cases in state or federal courts." Order and Reasons, dated Aug. 27, 2008, p. 14. The Court expanded that power to supervise and administer the contractually paid assessments, regardless of their source, pursuant to "its inherent

authority over the MDL proceedings," as well as the powers granted under the MSA,

citing *the Manual for Complex Litigation* (Fourth) §§ 10.224, 14.215-16, 14.231-.216 (2004).

Order and Reasons, dated Oct. 19, 1010, p. 7 and n.11.

Yet there is no reservoir of "inherent" authority to exercise jurisdiction over state

court litigation that otherwise does not meet the jurisdictional requirements of 28 U.S.C.

§§ 1331 or 1332. Undoubtedly, federal courts do possess "inherent" powers necessary to

preside over the cases otherwise before them, such as the power to sanction for

vexatious or abusive conduct. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123,

115 L.Ed.2d 27 (1991). But these powers are limited, and do not extend to cases that are

not before the Court. *See Crowe v. Smith*, 151 F.3d 217 (5th Cir. 1998), quoting *Chambers,*

*supra*, 501 U.S. at 42 ("The inherent power 'is not a broad reservoir of power, ready at an

imperial hand, but a limited source; an implied power squeezed from the need to make

the court function.'"). They do not serve as an independent basis of jurisdiction.  As the

Second Circuit observed in discussing the scope of inherent power:

> "[t]he lower federal courts are creatures of statute." *Armstrong*, 470 F.3d at
> 102. As such, their "jurisdiction is defined by written law, [and] cannot
> transcend that jurisdiction." *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93, 2
> L.Ed. 554 (1807).

*Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 266 (2nd Cir. 2007). Indeed, even the expressly

granted power to issue writs "in aid of jurisdiction" under the All Writs Act, 28 U.S.C.

§ 1651(a), does not grant jurisdiction to federal courts over cases not otherwise before

them. *See. U.S. v. Denedo*, 29 S.Ct. 2213, 2222 (2009) (The All Writs Act and the

extraordinary relief the statute authorizes are not a source of subject-matter jurisdiction); *Texas v. Real Parties in Interest*, 259 F.3d 387, 392 (5th Cir.2001) ("[A]lmost 200 years of Supreme Court precedent establishes that the Act, originally enacted as part of the Judiciary Act of 1789, cannot serve as an independent basis of jurisdiction.").

*In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, 2008 WL 682174 (D. Minn. Mar 07, 2008), also does not support the existence of inherent jurisdiction here. In that case, Judge Donovan had entered a pre-trial order, applicable to federal and state cases, that any attorney who signed an agreement to pay an assessment into a common fee fund would have access to the MDL work product. In discussing his power to do so, he relied upon the following Supreme Court cases for his "unjust enrichment" conclusion:

> *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("[P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.... *Jurisdiction over the fund involved in the litigation* allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit."); *Hall v. Cole*, 412 U.S. 1, 5-6, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (stating that one exception to the American rule "involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where *the court's jurisdiction over the subject matter of the suit* makes possible an award that will operate to spread the costs proportionately among them' ") (quoting *Mills v. Elec. Auto-Lite*, 396 U.S. 375, 393-94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)).

*In re Guidant, supra,* at *4 (emphasis added). Clearly Judge Donovan did not suggest, or hold, that the need to prevent "unjust enrichment" gave rise to jurisdiction he did not

otherwise enjoy. He had jurisdiction because a fund was created as a result of the order he issued in cases in which he had jurisdiction, offering to share the benefit of those cases with state court lawyers *who signed on to share work.*

In contrast to *In re Guidant,* the fund that the Court proposes to divide was not created as a result of any order entered by it in cases before it. PTO 19's "early bird special" Participation Agreement arrangement was recommended by the PSC precisely to induce attorneys with state court cases beyond this Court's jurisdiction to agree to pay an assessment. *See* C. Darby, *supra,* at 46. But that assessment scheme was superseded by a higher assessment of 8% in the MSA, which assessment was purely a matter of private agreement between the parties to the settlement. For cases that were not pending before this Court, it cannot be said that moneys assessed from those cases arose out of litigation over which this Court had jurisdiction. Thus, unlike in *Guidant,* disposition of those funds is not within the Court's authority.

Instead of relying on *Guidant,* the Court should be guided by Judge Weinstein's decision in the *Zyprexa* MDL. There, the plaintiffs steering committee that was created after a global settlement had been announced (PSC II) sought to have an assessment order entered that would allow compensation for work done by them post-settlement on remaining or new cases. Judge Weinstein granted their request, but refused to include cases pending in state court:

> PSC II seeks to hold back for use in the common benefit fund a percentage of attorneys' fee recoveries in state cases where the state plaintiff's

attorney also represents federal plaintiffs. The question of a federal court's power to impose a compensation scheme on state plaintiffs has apparently not been decided by the Court of Appeals for the Second Circuit. The only Court of Appeals to have squarely addressed the issue held that "a transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred, and any attempt without service of process to reach others who are unrelated is beyond the court's power." *In re Showa Denko K.K.L-Tryptophan Prods. Liab. Litig.*, 953 F.2d 162, 165-66 (4th Cir. 1992).

* * * * *

***The issue of assessing state cases with the costs of a discovery process that benefits all cases, state and federal, should, in the first instance, be left to state court judges***. This court has suggested that the parties voluntarily resolve the issue of payment for PSC II's work by agreeing that attorneys in state cases will assume an equitable proportionate share of the costs of discovery in this litigation.

*In re Zyprexa Products Liability Litigation*, 467 F.Supp.2d 256, 268-69 (D.C. N.Y., 2006) (emphasis added).

The *Manual for Complex Litigation* also does not suggest the existence of inherent jurisdiction over fees generated from state court cases. Section 10.224 discusses a court's obligation to individually screen those appointed for committee positions, and the criteria that should be used to guide that determination. Sections 14.215 and 14.216 state that, early on in litigation, a court should set forth the means and guidelines for compensating those appointed to committee positions, and that this should cover expenses and fees. Section 14.231 discusses options available to the Court for reviewing fee requests, such as sampling of billing records, auditing, or use of special masters. However, none of these sections suggests that there exists an inherent reservoir of

unspecified federal jurisdiction over state court cases that transcend Article III of the Constitution.

Neither is jurisdiction conferred by the notion that because this MDL may have characteristics of a "quasi class action," the Court possesses all the powers of a court managing a properly certified class. *See* Order and Reasons, dated Aug. 27, 2008, p. 9 ("[T]he Court finds that the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness."). Were this a class action, persons who opted into the class by partaking in the settlement would subject their claims and cases to this Court's jurisdiction.  But this is not a class action.  In order for it to be one, it would have had to have been eligible to be certified as a litigation class, which this Court held was not the case. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997); Order and Reasons, dated Nov. 22, 2006 (denying class certification). Further, had it been certified as a class, the MSA could not have been implemented absent notice, an opportunity to opt out, and a fairness hearing, none of which occurred.

While it is laudable for this Court to attempt to craft a method by which federal and state claims could be settled globally subject to the jurisdiction of only one Court, it cannot create a solution not sanctioned by the Constitution or Congress. As the Supreme Court made clear when limiting the use of "settlement only" classes:

> The Rules Enabling Act underscores the need for caution. As we said in *Amchem,* no reading of the Rule can ignore the Act's mandate that "rules

> of procedure 'shall not abridge, enlarge or modify any substantive right,'"
> *Amchem*, 521 U.S. at 613, 117 S. Ct. 2231 (quoting 28 U.S.C. § 2072(b)).

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).

Federal jurisdiction also can not rest on the existence of a "fund" over which it has authority. While this Court may have possession of a fund, that fact is distinct from the question of whether it has jurisdiction to adjudicate its allocation or distribution. Such jurisdiction over funds exists only if it they arise from cases in which this Court otherwise had subject matter jurisdiction – *i.e.*, the MDL cases. This is because *in rem* jurisdiction is a species of personal, not subject matter, jurisdiction. *See Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp.2d 656, 656 n.1. (E.D. Mich. 2001), noting the confusion over, but distinguishing, subject matter and *in rem* jurisdiction. "It is well-settled that subject matter jurisdiction and *in rem* jurisdiction are distinct." *Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd.*, 304 F. Supp.2d 584, 589 (D.C.N.Y. 2004), citing *Mattel, Inc v. Barbie-Club.com*, 310 F.3d 293, 296-97, 298 (2d Cir. 2002). Accordingly, neither the existence of a "fund" nor this Court's possession of it can bootstrap the fund into this Court's jurisdiction.

### 3.  The Master Settlement Agreement does confer jurisdiction where none otherwise exists.

The terms of the MSA appear to assume this Court's exercise of jurisdiction over state court cases not pending before it. As the Court noted in PTO 51, "Section 9.2.2 of the Settlement Agreement provides that "Common Benefit Attorneys shall [also] be

entitled to reimbursement of their reasonable common benefit expenses" and that "Reimbursement of these expenses shall be deducted from the client's net recovery."

However, parties may not confer federal subject matter jurisdiction by private agreement, and lack of such jurisdiction is defense which cannot be waived. *See Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996). As such, there is no federal jurisdiction in a suit that, "[s]tripped to its essentials, [sought] enforcement of state-created contract rights, even though those right were recognized in a federal judgment, under either federal question jurisdiction or All Writs Act. *See Epps*, 665 F.2d at 594-95.

Likewise, no federal jurisdiction arises from the continued "administration" of the purely private settlement – no matter how much it looks like a class action or how many lawsuits it resolved.   The settlement creates contractual rights under state law. To the extent that there is any lingering jurisdiction, it exists only in the courts in which cases resolved by the settlement were pending. Even if all the cases resolved by the MSA were federal cases, this Court would not have automatic ancillary jurisdiction. *See In Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 378-382 (1994) (holding that federal courts lack ancillary jurisdiction to enforce an agreement settling federal litigation). *A fortiori*, it does not have jurisdiction over assessments emanating out of cases over which it never had jurisdiction to begin with.

### 4. Common benefit compensation for state-court litigation must be fixed by state-court judges, who have exclusive jurisdiction over the fees generated in those cases.

There is no dispute that the assessment agreed to in the MSA is due as a matter of contract law, and to the extent that no one has challenged this Court's finding that 6.5% is a more reasonable sum than the 8% specified, the MSA has been modified by the agreement of the parties. However, parties still cannot confer federal jurisdiction by agreement. To the extent that the common benefit fund was generated through state court litigation, state court judges have exclusive jurisdiction to determine how the fees generated from their cases should be disbursed. *Cf. Miener By and Through Miener v. Missouri Dept. of Mental Health*, 62 F.3d 1126, 1127 (8th Cir. 1995), citing *Kokkonen, supra* ("enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction.").

### 5. This Court also lacks jurisdiction to administer the settlement agreement.

The MSA memorializes a private settlement between private parties in a non-class action matter. As it says, "[t]his is a private agreement." *See* MSA, attached as Exhibit BB, at § 6.1.1. Although the agreement lies between private parties, the MSA appoints the Court as "Chief Administrator" at the "request of the parties." *See* Exhibit BB at § 6.1.1. However, private parties cannot confer federal jurisdiction where it does not exist. *See Coury*, 85 F.3d at 248 and requires the parties to submit to the Court's

authority on all relevant matters. *Id.* at § 8.1. The Court lacks jurisdiction to serve in this capacity.

Federal jurisdiction is constrained by Article III of the Constitution and by Title 28 of the United States Code. Neither the Constitution nor any statute empowers the Court to act as a private special master for the benefit of private parties with respect to a settled piece of litigation. In fact, the Constitution specifically bans such involvement, because settlement eliminates the existence of a case or controversy upon which Article III standing can be predicated. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (discussing principles of standing, and noting that federal courts cannot exercise supplemental jurisdiction over a claim that lacks Article III standing). In addition, federal statutory jurisdiction is precise and limited. *See, e.g.,* 28 U.S.C. §§ 1331, 1332. These statutes do not authorize federal judges to act as a private settlement administrators. Moreover, it is fundamental that private parties cannot confer federal jurisdiction where it does not exist. *See Coury*, 85 F.3d at 248. This jurisdictional infirmity underscores the Court's inability to allocate common benefit fees arising from state-court cases over which the federal courts exercised no jurisdiction.

## CONCLUSION

Kline & Specter objects to the FAC's recommended allocation.  The firm should

be awarded a fee equaling its lodestar times the average estimated multiplier received

by the FAC's members for their contributions excluding post-settlement administration.

Thus, if the FAC's average multiplier for such work is 2.46, then Kline & Specter's

award should be $29,718,497.40 based on its lodestar of $12,080,690.  In any event, this

Court lacks jurisdiction to allocate common benefit fees for state-court cases that never

fell within this Court's jurisdiction.  Such allocation should be performed by the state

court judges who presided over those cases prior to their resolution.

Respectfully submitted,

Thomas R. Kline, Esq.
Shanin Specter, Esq.
Lee B. Balefsky, Esq.
Michelle L. Tiger, Esq.
Mark H. Hoffman, Esq.
Lisa S. Dagostino, Esq.
David J. Caputo, Esq.
Charles L. Becker, Esq.
**Kline & Specter,**
**A Professional Corporation**
1525 Locust St., 19th Floor
Philadelphia, PA 19102
(215) 772-1000

Date:  Feb. **4**, 2011

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that on this date he caused a copy of the foregoing **Objection of Kline & Specter, P.C. to the Vioxx Fee Allocation Committee's Common Benefit Fee Recommendation** to be served on Liaison Counsel, Russ Herman and Phillips Wittman, by U.S. Mail and e-mail, and on all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No. 8.

Charles L. Becker, Esq.

Dated: Feb. 4, 2011