# EXHIBIT G

DREXEL UNIVERSITY THOMAS R. KLINE SCHOOL OF LAW



Drexel Law Review

**HOW *NOT* TO MANAGE A COMMON BENEFIT FUND:
ALLOCATING ATTORNEYS' FEES IN *VIOXX* LITIGATION**

*Charles L. Becker, Shanin Specter, Thomas R. Kline*

| Volume 9 | Fall 2016 | Number 1 |
| --- | --- | --- |

5 PageID #: 142486

# HOW *NOT* TO MANAGE A COMMON BENEFIT FUND: ALLOCATING ATTORNEYS' FEES IN *VIOXX* LITIGATION

*Charles L. Becker,* * *Shanin Specter,*† *& Thomas R. Kline*‡

## ABSTRACT

*Kline & Specter, P.C. was significantly involved in the multidistrict Vioxx litigation and the resulting disputes concerning the allocation of common benefit fees among the plaintiffs' counsel. Based on this experience, the authors discuss how the allocation of fees in Vioxx provides lessons in how not to manage a common benefit fund. This Article first reviews the Vioxx litigation and the basic principles of common benefit fee allocation, including the lodestar approach. This Article then discusses how the Vioxx Fee Allocation Committee abandoned the lodestar approach in favor of a "point" system through which insiders sought to award themselves a lion's share of the common benefit fund. This Article reviews a deal between insiders and certain law firms that resulted in an unauthorized distribution from the settlement fund to resolve objections over the size of the Vioxx common benefit fund. The Article argues that common benefit fees should be distributed according to the well-accepted lodestar approach, rather than an ad hoc "point" system created by self-interested parties, and that common benefit money should not be distributed through unauthorized deals. It concludes that Multidistrict Litigation judges should closely supervise the actions of court-appointed counsel to make sure that decisions around the size and distribution of common-benefit funds are transparent, jurisprudentially sound, and fundamentally fair.*

---

* Partner, Kline & Specter, P.C.; Law Clerk to the Honorable Sandra L. Lynch, United States Court of Appeals for the First Circuit, 1997-1998; J.D., Yale University, 1997; B.A., Williams College, 1992.

† Founding Partner, Kline & Specter, P.C; Adjunct Professor of Law, University of Pennsylvania Law School; Lecturer in Law, Stanford Law School; Lecturer in Law, UC Berkeley School of Law; Lecturer in Law, UC Hastings College of Law; J.D., University of Pennsylvania, 1984; LL.M., Cambridge University, 1984; B.A., Haverford College, 1980.

‡ Founding Partner, Kline & Specter, P.C.; Board of Advisors Chairman, Drexel University Thomas R. Kline School of Law; Law Clerk to the Honorable Thomas W. Pomeroy, Jr., Justice of the Supreme Court of Pennsylvania, 1978; J.D., Duquesne University, 1978; M.A., Lehigh University 1971; B.A., Albright College, 1969.

TABLE OF CONTENTS

INTRODUCTION .............................................................................2
I. A BRIEF SUMMARY OF VIOXX LITIGATION
   THROUGH SETTLEMENT ............................................4
II. THE BASIC LAW OF COMMON BENEFIT FEE
    ALLOCATION ................................................................8
    A. *Key Circuit Court Cases*......................................8
    B. *Key District Court Cases* ..................................11
III. THE "POINT SYSTEM" FOR ALLOCATING COMMON
     BENEFIT FEES TO INDIVIDUAL FIRMS....................15
     A. *Emergence of the Point System* ......................15
     B. *Problems with the Point System* ......................19
IV. THE DEAL FOR UNAUTHORIZED DISTRIBUTION OF
    COMMON BENEFIT FUNDS......................................25
    A. *The "Full Participation Option" Contracts and
       Their Nullification*...........................................25
    B. *The Deal to Resolve Objections to the Common
       Benefit Fund* .......................................................30
    C. *Discovery Regarding the 4 Percent Deal and the
       Shortcoming in the Common Benefit Fund*.........37
    D. *Comments on the 4 Percent Deal* ...................39
CONCLUSION.................................................................................41

## INTRODUCTION

Mass tort litigation begins as a contest between plaintiffs and defendants around complex factual and legal issues. When settlement between those parties is reached, that initial contest can give way to another: allocation of common benefit fees among the plaintiffs' counsel. There is a well-developed body of law to guide fee allocation in these common-fund settings. Generally, (1) each law firm calculates its lodestar based on the hours worked and reasonable billable rates for that time; (2) each firm's lodestar may be adjusted upward (or downward) based upon its contributions to the litigation and the amount of money set aside for common benefit attorneys' fees; and (3) the trial court overseeing the litigation evaluates and approves the fee allocations.

*Vioxx* personal injury litigation resulted in a $4.85 billion settlement, of which over $315 million was allocated to pay attorneys for their common benefit work. Significant problems plagued the management and distribution of this common benefit fund. Those problems arose because plaintiffs' lawyers proposed fee allocations through a free-wheeling approach that favored those insiders and

sought to purchase peace through secret negotiation. Because of these problems, *Vioxx* contains object lessons in how *not* to manage common benefit fee allocation.

Kline & Specter, P.C. had a significant involvement in the *Vioxx* litigation and the resulting fee allocation disputes.[1] Based on that experience, the authors review the missteps in *Vioxx* fee allocation that created such uproar. This Article first reviews the history of *Vioxx* litigation followed by a review of the basic principles of fee allocation from a common benefit fund. This Article then discusses (1) the Fee Allocation Committee's abandonment of the lodestar approach in favor of a novel "point" system through which the insiders sought to award themselves the lion's share of the common benefit fund at the expense of others who performed valuable services for the litigation; and (2) the deal between insiders and certain law firms that resulted in an unauthorized distribution of approximately $18.5 million from the settlement fund to resolve objections over the size of the common benefit fund.

The authors suggest that these events provide an object lesson in how *not* to manage a common benefit fund. In particular, common benefit fees should be distributed according to the well-accepted lodestar approach rather than an ad hoc point system created by self-interested parties. Common benefit money should not be distributed through unauthorized deals. As an overarching matter, Multidistrict Litigation ("MDL") judges must closely supervise the actions of court-appointed counsel to make sure that decisions around the size and distribution of common-benefit funds are transparent, jurisprudentially sound, and fundamentally fair. The extensive litigation that

---

1. *See generally* Objection of Kline & Specter, P.C. to the Vioxx Fee Allocation Committee's Common Benefit Fee Recommendation, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Feb. 7, 2011) [hereinafter Objection of Kline & Specter, P.C.]. Kline & Specter had a major role in *Vioxx* litigation that included taking significant depositions and a lead role in developing the causation claim. Author Tom Kline also served on the Plaintiffs' Steering Committee but not the Fee Allocation Committee. Kline & Specter's significant role in *Vioxx* litigation resulted in a $12 million lodestar—the fourth largest of all firms involved. *See id.* at 2. However, the Fee Allocation Committee initially recommended that Kline & Specter receive only $4.4 million in common benefit fees, roughly 37 percent of firm's lodestar. *Id.* at 1. Furthermore, the Fee Allocation Committee recommended that its own members' lodestar be multiplied by an average of 2.5; Kline & Specter's recommended fee would have been $30 million using that average. *Id.* at 2. When Kline & Specter objected to the Committee's initial recommendation of $4.4 million, the Committee reduced its recommendation for Kline & Specter further to $4 million. *Id.* at 7–8. Kline & Specter objected to the further reduced recommendation through an extensive court filing. The Fee Allocation Committee agreed to recommend $15 million the day before Kline & Specter was to make its presentation to a court-appointed special master.

*DREXEL LAW REVIEW* [Vol. 9:1]

occurred in relation to the *Vioxx* common benefit fund need not have occurred and need not occur in future MDLs either.

## I. A BRIEF SUMMARY OF *VIOXX* LITIGATION THROUGH SETTLEMENT

The history of *Vioxx* litigation has been extensively reviewed in judicial decisions.[2] By way of brief summary, this multidistrict and state-court products liability litigation involved the prescription drug Vioxx, generically known as Rofecoxib, which was designed by Merck to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.[3] The Food and Drug Administration approved Vioxx for sale in the United States in May of 1999.[4] Merck withdrew Vioxx from the market in September 2004 after data from a clinical trial showed that Vioxx use increased the risk of cardiovascular thrombotic events, such as myocardial infarction and ischemic stroke.[5] Thereafter, thousands of individual suits and class actions were filed against Merck in state and federal courts alleging a variety of claims.[6]

California, New Jersey, and Texas instituted consolidated proceedings at various dates between 2002 and 2005.[7] In February 2005, the Judicial Panel on Multidistrict Litigation conferred "MDL" status on federal *Vioxx* cases and transferred all such cases to Judge Eldon Fallon of the United States District Court for the Eastern District of Louisiana for coordinated discovery and pretrial proceedings under 28 U.S.C. §1407.[8]

In February 2005, Judge Fallon directed the plaintiffs' counsel involved in the *Vioxx* MDL to offer recommendations for the appointment of plaintiffs' liaison counsel.[9] The plaintiffs' counsel submitted several recommendations, and Judge Fallon entered an order appointing Mr. Russ Herman to perform the liaison role.[10]

---

2. *See In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640 (E.D. La. 2010); *In re* Vioxx Prods. Liab. Litig., 401 F. Supp. 2d 565 (E.D. La. 2005).

3. *In re Vioxx*, 760 F. Supp. 2d at 642.

4. *Id.*

5. *Id.*

6. *Id.* (including "products liability, tort, fraud, and warranty claims").

7. *See id.*

8. *Id.*

9. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 756742, at *10–11 (E.D. La. Feb. 18, 2005) (Pretrial Order No. 1).

10. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *1 (E.D. La. Feb. 28, 2005) (Pretrial Order No. 2).

In April of 2005, after reviewing applications from various counsel, Judge Fallon appointed twelve lawyers (including author Thomas Kline) to serve on the Plaintiffs' Steering Committee ("PSC").[11] He appointed attorneys Andy Birchfield and Christopher Seeger as the PSC's co-lead counsel.[12] He charged the PSC with the management of plaintiffs' litigation efforts, including the negotiation of settlement.[13] In turn, the PSC created numerous subcommittees to organize and coordinate *Vioxx* litigation on the plaintiffs' side.[14] This format is typical in modern mass tort practice.

Extensive litigation followed the appointment of this committee. Plaintiffs' attorneys engaged in all aspects of pre-trial litigation including: document discovery, identification and preparation of experts, development of legal and factual theories, the taking of depositions, motion practice, the coordination of state and federal proceedings, and preparation of a trial package capable of being used by all plaintiffs' counsel across the country.

The court conducted six *Vioxx* bellwether trials.[15] Four trials ended in defense verdicts, one of which was preceded by a trial resulting in a hung jury, while only one case resulted in a plaintiff's verdict.[16] Thirteen additional *Vioxx*-related cases were tried before juries in state courts in Texas, New Jersey, California, Alabama, Illinois, and Florida.[17] The state court results included four additional plaintiffs' verdicts (though two were reversed in the appellate courts), seven

---

11.  *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *1 (E.D. La. Apr. 8, 2005) (Pretrial Order No. 6). The PSC's twelve members were attorneys Andy D. Birchfield (co-lead counsel), Christopher A. Seeger (co-lead counsel), Richard J. Arsenault, Elizabeth J. Cabraser, Thomas R. Kline, Arnold Levin, Carlene Rhodes Lewis, Gerald E. Meunier, Troy A. Rafferty, Drew Ranier, Mark P. Robinson, Jr., and Christopher V. Tisi. *Id.*

12.  *Id.*

13.  *Id.* at *1–2.

14.  *In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 643 (E.D. La. 2010).

15.  *Id.* at 644 (noting that the "first of the bellwether trials took place in Houston, Texas, while [the Louisiana court] was displaced following Hurricane Katrina"). As outlined in *In re Vioxx*, 760 F. Supp. 2d at 644 n.7, the bellwether trials included: Plunkett v. Merck & Co., No. 05-4046 (E.D. La. filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); Barnett v. Merck & Co., No. 06-485 (E.D. La. filed Jan. 31, 2006) (third bellwether trial); Smith v. Merck & Co., No. 05-4379 (E.D. La. filed Sept. 29, 2005) (fourth bellwether trial); Mason v. Merck & Co., No. 06-0810 (E.D. La. filed Feb. 16, 2006) (fifth bellwether trial); Dedrick v. Merck & Co., No. 05-2524 (E.D. La. filed June 21, 2005) (sixth bellwether trial).

16.  *In re Vioxx*, 760 F. Supp. 2d at 644.

17.  *Id.*

*DREXEL LAW REVIEW* [Vol. 9:1]

defense verdicts, and two hung juries.[18] Taking into account the overturning of two plaintiffs' verdicts on appeal, the final tally was three plaintiffs' victories, fourteen plaintiffs' losses, and three hung juries.[19]

At some point (it is not publicly known when), Judge Fallon appointed a Negotiating Plaintiffs' Committee ("NPC"),[20] comprised of plaintiffs' liaison counsel, both co-lead counsels of the PSC, two additional PSC members, and two additional attorneys.[21] The NPC's purpose was to negotiate a settlement with Merck.[22] Judge Fallon did not notify the litigants involved in *Vioxx* litigation that he was contemplating the creation of this additional committee. He did not accept applications for appointment. Neither he nor anyone else informed the PSC as a corporate body that the NPC had been created and was conducting settlement negotiations—a role allocated to the PSC by court order.[23] Individual members of the PSC were kept in the dark.

This marked the end of the PSC as an active force in *Vioxx* litigation. After the NPC's formation, the PSC never met again as a corporate body nor had any substantive role in the litigation. The NPC negotiated with Merck to reach a settlement, conducting those discussions in secret and beyond the authority, knowledge, or oversight of the PSC. The NPC participated in the "4 percent deal" with objectors to the initial proposed allocation for common benefit fees.[24] The NPC essentially became the PSC's successor-in-interest, displacing the PSC and taking over the PSC's responsibility to negotiate a settlement for *Vioxx* litigation and conducting other aspects of the litigation.[25]

---

18. *See* Objection of Kline & Specter, P.C., *supra* note 1, at 4–5.

19. *See id.*

20. *See id.* at 5; *In re Vioxx*, 760 F. Supp. 2d at 644.

21. *See generally* SETTLEMENT AGREEMENT BETWEEN MERCK & CO., INC. AND THE COUNSEL LISTED ON THE SIGNATURE PAGE (dated as of Nov. 9, 2007), http://www.officialvioxxsettlement.com/documents/Master%20Settle

ment%20Agreement%20-%20new.pdf (last visited Oct. 2, 2016) [hereinafter MERCK SETTLEMENT AGREEMENT]. The NPC's seven members were attorneys Russ Herman (plaintiffs' liaison counsel), Andy D. Birchfield (PSC co-lead counsel), Christopher A. Seeger (PSC co-lead counsel), Arnold Levin (PSC member), Edward F. Blizzard, and Thomas R. Girardi. *Id.*

22. *In re Vioxx*, 760 F. Supp. 2d at 644.

23. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *1–2 (E.D. La. Apr. 8, 2005) (Pretrial Order No. 6) ("The PSC will have the following responsibilities: . . . . (2) Negotiate and enter into stipulations with Defendants regarding this litigation . . . . (3) Explore, develop, and pursue all settlement options . . . in this litigation.").

24. *See* infra Part V.

25. This approach raises significant questions. The PSC was created by court order to organize the plaintiffs' counsel, litigate the cases, and negotiate settlement with Merck. *Id.* The PSC having been created and endowed with specific court-ordered duties, it would have been more efficient and transparent to allow the PSC to pursue those duties rather than appoint a second

In November 2007, Merck and the NPC announced that they had reached a settlement for an overall sum of $4.85 billion.[26] The agreement was a voluntary "opt-in" agreement.[27] It provided that Judge Fallon would oversee aspects of the administrative process, including reimbursing of costs and awarding of common benefit fees.[28] During this period, Judge Fallon also appointed a nine-person Fee Allocation Committee ("FAC"), comprised of the same seven lawyers he earlier appointed to the NPC plus two additional lawyers who were not PSC members.[29] Thus, Judge Fallon appointed three different committees to govern the litigation, each with different compositions and numbers, even though the PSC was created from the outset and was empowered to perform all of the functions that the NPC and FAC would later serve.

In July 2008, Merck announced that it was satisfied that sign-up thresholds necessary to trigger funding of the *Vioxx* Settlement Program had been met.[30] Eventually 99.9 percent of all eligible claimants entered the program, and by June 2010, the parties had distributed over $4.35 billion to 32,886 claimants.[31]

Several months later, in October 2010, Judge Fallon entered an Order allocating 6.5 percent of the settlement fund—a total of $315,250,000—to compensate attorneys whose work inured to the common benefit of all plaintiffs and helped produce the settlement fund.[32] When issues regarding the allocation of common benefit attorneys' fees ripened, the second round of litigation began.

---

committee with overlapping function and membership without notice, clear allocation of responsibility, or oversight by the PSC. The abandonment of the PSC and serial creation of new committees may undermine confidence in plaintiffs' steering committees generally and deter lawyers from serving on future committees in other litigation. It also complicates the administration of mass tort cases.

26.  *See* MERCK SETTLEMENT AGREEMENT, *supra* note 21, at 2.

27.  *In re Vioxx*, 760 F. Supp. 2d at 645.

28.  *See id.*; *see also* MERCK SETTLEMENT AGREEMENT, *supra* note 21, at 36. There is a further question about whether a sitting federal district court judge properly can serve as the administrator of a private settlement agreement. That topic is not the subject of this article but is worth further consideration.

29.  *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *1–2 (E.D. La. Nov. 20, 2007) (Pretrial Order No. 32). The FAC's nine members were Russ M. Herman (Plaintiffs' liaison counsel and NPC member), Andy D. Birchfield (PSC co-lead counsel and NPC member), Christopher A. Seeger (PSC co-lead counsel and NPC member), Arnold Levin (PSC and NPC member), Troy Rafferty (PSC and NPC member), Edward F. Blizzard (NPC member), Thomas R. Girardi (NPC member), W. Mark Lanier, and Perry Weitz. *Id.*

30.  *In re Vioxx*, 760 F. Supp. 2d at 645.

31.  *Id.* at 646.

32.  *Id.* at 658. Significant questions exist about whether Judge Fallon had jurisdiction to order fee allocation across the entirety of *Vioxx* litigation, where he only had jurisdiction over

*DREXEL LAW REVIEW* [Vol. 9:1

## II. THE BASIC LAW OF COMMON BENEFIT FEE ALLOCATION

### A. Key Circuit Court Cases

The law governing the allocation of common benefit fees to individual law firms is well developed. A key case is the Fifth Circuit's decision in *In re High Sulfur Content Gasoline Products Liability Litigation* ("*High Sulfur*"),[33] where a plaintiffs' steering committee made a recommendation regarding the allocation of common benefit funds to a district court in an *ex parte* proceeding.[34] The district court adopted the recommendation with no analysis and then sealed all records describing the recommendation.[35]

The Fifth Circuit vacated the district court's recommendation and remanded with instructions.[36] The court explained that while a district court may appoint a committee to recommend allocation of an aggregate fee award, "the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards."[37] Such close scrutiny "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class" and "deflect[s] the potential public misunderstandings that they may cultivate in regard to the interests of class counsel."[38] The Fifth Circuit explained further that for a district court to fulfill its duty, it "must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties."[39] Rather, exacting review is "necessary to discharge the [court's] obligation to award fees that are reasonable and consistent with governing law."[40]

---

those cases submitted to the MDL and where numerous cases were being litigated in state court. Even a district court's "inherent powers" do not extend to cases not subject to that court's jurisdiction. *See* Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991) (explaining that a court's inherent power to assess attorney's fees in common fund scenarios "derives not from a court's power to control litigants, but from its historic equity jurisdiction . . . and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others.") (internal citations omitted). This issue was raised in *Vioxx* litigation but never pursued to an appellate resolution.

33. 517 F.3d 220 (5th Cir. 2008).

34. *Id.* at 223–24.

35. *Id.* at 226.

36. *See id.* at 224.

37. *Id.* at 227.

38. *Id.* at 228 (citations and internal quotation marks omitted).

39. *Id.*

40. *Id.* (quoting FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIGATION § 14.231 (Judge Stanley Marcus et al. eds., 4th ed. 2004)).

The Fifth Circuit added that district courts are *required* to use the "lodestar method" to assess common benefit fees.[41] Under this framework, "[t]he district court must first determine the reasonable number of hours expended on the litigation, and the reasonable hourly rate for the participating attorney."[42] "The lodestar is computed by multiplying the number of hours reasonably expended by the reasonable hourly rate."[43] The district court may then adjust the lodestar upward or downward after a review of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*:[44]

> (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) awards in similar cases.[45]

In *High Sulfur*, the Fifth Circuit addressed similar issues to those that ensued in the *Vioxx* fee dispute. For example, the Fifth Circuit criticized the district court for sealing record entries that prevented attorneys from understanding the basis upon which fee recommendations had been made.[46] In *Vioxx* litigation, there was no sealing of documents related to fee allocation, but the FAC refused to disclose the number of "points" it assessed to different law firms, the completed "grid" it used to determine point values, or any information on how it developed the point system or determined how points were distributed. These are the type of refusals that troubled the Fifth Circuit in *High Sulfur* because "[a] lack of transparency about the individual fee awards supports a perception that many of [the] attorneys [are] more interested in accommodating themselves than the people they represent."[47] As the Fifth Circuit added, without full transparency about a fee committee's process, attorneys cannot "compare

---

41. *Id.*

42. *Id.* (emphasis added).

43. *Id.*

44. 488 F.2d 714, 717–19 (5th Cir. 1974) *abrogated by* Blanchard v. Bergeron, 489 U.S. 87, 96–97 (1989).

45. *In re High Sulfur*, 517 F.3d at 226, n.6 (citing *Johnson*, 488 F.2d at 717–19).

46. *Id.* at 229–30.

47. *Id.* at 229.

their awards to those of other attorneys . . . . One cannot even compare apples to oranges without knowing what the oranges are."[48]

The lessons from *High Sulfur* are reinforced by the Second Circuit's decision in *In re Agent Orange Product Liability Litigation* ("*Agent Orange*").[49] There, the Second Circuit invalidated a plaintiffs' steering committee's decision to divide a common benefit fee that was based on a private fee allocation.[50] The Court explained that while some authority supported the committee's power to divide money pursuant to a private agreement, the committee could not divide the award in any manner it deemed satisfactory: "Such a division overlooks the district court's role as protector of class interests under Fed. R. Civ. P. 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases."[51] Under *Agent Orange*, a court's duty to assure reasonableness extends to the allocation of common benefit money and does not end with creation of the aggregate fund.[52] Thus, reasonableness is the touchstone for allocating money from a common benefit fund.[53]

Another instructive case is the Ninth Circuit's decision in *In re FPI/Agretech Securities Litigation* ("*FPI*"),[54] in which the court affirmed a district court's decision not to allocate attorneys' fees to a lawyer who was uninvolved in the litigation from which the fees were recovered.[55] The attorney in question argued for the enforcement of a prior fee agreement.[56] The Ninth Circuit found that the district court was entitled to reject that agreement if it rewarded an attorney "in disproportion to the benefits that attorney conferred upon the class—even if the allocation in fact has no impact on the class."[57] The Ninth Circuit added that district courts should "reject a fee allocation that does not accurately reflect the amount of work performed by the various attorneys."[58] Indeed, it held that "the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing

---

48. *See id.* at 232.
49. 818 F.2d 216, 217–21 (2d Cir. 1987).
50. *See id.* at 218.
51. *Id.* at 223 (emphasis added).
52. *See id.*
53. *See id.*
54. 105 F.3d 469 (9th Cir. 1997).
55. *Id.* at 470.
56. *Id.* at 472–73.
57. *Id.*
58. *Id.*

to approve a fee allocation proposal."[59] Therefore, *FPI* and *Agent Orange* work in tandem to conclude that courts must assure "reasonableness" and avoid "disproportion" when allocating common benefit fees.

## B. *Key District Court Cases*

Federal district courts have issued important decisions on fee allocation as well. Especially significant is the district court's decision in *In re Vitamins Antitrust Litigation* ("*Vitamins Antitrust*").[60] There, a district court awarded an aggregate common benefit fee following antitrust litigation, and the co-lead counsel allocated fees among the contributing law firms.[61] One firm objected to its award, saying the multiplier was too low.[62] The district court agreed, and found that the lead counsel failed to consider whether the fee it awarded itself was justified in comparison to the fees it awarded to others.[63]

Stressing the need for fair allocation across the board, the district court explained:

> The commitment to lead counsel of the responsibility of apportioning the fee among itself and other firms is a fundamental exercise of trust by the court. Implicit in that delegation is the requirement that lead counsel apply a universally fair standard of allocation to all participants . . . . *Allocation means proportion*; how does the share lead counsel is taking compare to the shares others are getting?[64]

The court concluded that all allocations must be "rationally related to each other."[65] Accordingly, lead counsel must make a "fair allocation among its group even if that allocation diminished the share lead counsel received."[66]

Harkening to *FPI* and *Agent Orange, Vitamins Antitrust* holds that allocation means proportion, which stands for an important proposition: all fees must be rationally related to one another.[67] Additionally,

---

59. *Id.* at 474.

60. 398 F. Supp. 2d 209 (D.D.C. 2005).

61. *See id.* at 217.

62. *Id.* at 218.

63. *Id.* at 234.

64. *Id.* (emphasis added).

65. *Id.*

66. *Id.*

67. *Id.*

its decision states explicitly what people know instinctively: fee allocation is an exercise of trust.[68]

In the realm of district court decisions, no decision had more relevance to *Vioxx* litigation than Judge Fallon's decision in *Turner v. Murphy Oil USA, Inc.*[69] In *Turner*, homeowners and business owners sued an oil refinery operator for damages from an oil spill that resulted when an above-ground tank ruptured during the flooding following Hurricane Katrina.[70] The case was certified as a class action and settled for approximately $330.1 million.[71] Judge Fallon approved an award for attorneys' fees and costs of approximately $33.7 million and appointed a special master to recommend allocation of the award to the various plaintiffs' attorneys.[72] After the special master made a preliminary recommendation, attorneys had the opportunity to object, which numerous attorneys did.[73] Discovery followed, after which the master held a hearing where attorneys could argue and call witnesses.[74] Following that hearing, the special master filed a final recommendation with Judge Fallon that differed from the preliminary assessment in many instances: some attorneys got more,

---

68. *See id.*

69. 582 F. Supp. 2d 797 (E.D. La. 2008).

70. *Id.* at 799–800.

71. *Id.* at 801–02.

72. *See id.* The $330.1 million recovery was excellent under the circumstances. This was recognized in the attorneys' fee award. The Court's $33.7 million overall reward reflected a multiplier equaling 5.08, the estimated high end of the lodestar range, and 3.49, the estimated low end. *See* Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 868–69 (E.D. La. 2007). In contrast, the Court's $315,250,000 award in *Vioxx* litigation reflected a 1.2633 multiplier over the aggregate lodestar of all firms. This smaller multiplier reflects the lesser degree of success achieved in the *Vioxx* litigation when compared to *Turner*, at least as a function of common benefit hours compared to common benefit fee.

The 1.2633 multiplier is small in the context of contingent fee litigation (and certainly when compared with the multiplier achieved in *Turner*). It reflects the lopsided trial results for Merck and an overall settlement amount that was modest considering the quantity of claimants and early projections of how much money Merck would pay. Where results are relatively meager, as here, the argument that any one firm or set of firms is entitled to a large multiplier is especially weak.

In *Turner*, Judge Fallon would use a blended approach that applied a lodestar cross-check to assess an award of the percentage of the settlement fund. *See Turner*, 472 F. Supp. 2d at 867. While *Turner* suggests that multiple approaches may be combined when awarding an aggregate attorney fee, no case suggests that anything other than a lodestar approach modified by the *Johnson* factors is valid for allocating an aggregate common benefit fund. Moreover, in the *Vioxx* litigation, the Garrett accounting firm would present an audit of the hours and work submitted by the claimants against the common benefit fund at issue. As such, applying a *Johnson* methodology would be relatively straightforward.

73. *Turner*, 582 F. Supp. 2d. at 804–05.

74. *Id.* at 806.

PageID #: 142498

others got less.[75] Judge Fallon then entered an Order awarding fees to individual attorneys, which agreed with the special master's recommendation in many instances, but modified it in several others.[76] Judge Fallon gave a detailed explanation of his decision in each instance.[77]

In his opinion, Judge Fallon emphasized the importance of a "fair and transparent process" for allocating common benefit fees, and he affirmed his commitment to "[scrutinize closely] the attorneys' fee allocation."[78] Judge Fallon also detailed his approach to assessing the contributions of different law firms, and focused on three factors: "financial resources, numbers of cases, and legal work."[79] (In *Vioxx*, plaintiffs' lawyers were separately reimbursed for their MDL contributions, and the litigation was never organized into a class action; hence, the most pertinent factor would be "legal work.")

Addressing attorney labor, Judge Fallon emphasized that an attorney's work "is generally the principal factor by far in determining the attorneys' portion of the common benefit fee."[80] The first component of this factor is the time spent by the attorney; the second component is "the nature of the work."[81] Regarding the latter component, Judge Fallon emphasized that "not all types of work are created equal."[82] He continued:

> Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition. This, of course, is not the only type of work that such a case requires. Documents must be reviewed, categorized, and analyzed; emails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the

---

75. *Id.* at 807.
76. *Id.* at 812.
77. *Id.* at 812–27.
78. *Id.* at 805, 808.
79. *Id.* at 809.
80. *Id.* at 810.
81. *Id.*
82. *Id.*

litigation must be monitored. This work, while necessary and often time consuming, does not deserve equal treatment when allotting fees.[83]

Underscoring the value of work necessary to produce a successful settlement, Judge Fallon stated that post-settlement administration could not be treated on a par with the pre-settlement efforts:

[T]he hours spent by counsel after the approval of the settlement agreement did not aid in the creation of the settlement fund, and, as a result, the Court concludes that it cannot treat the hours spent by counsel in administering the settlement program on a par with the hours spent by counsel who helped create the settlement and Common Benefit Fund.[84]

Against this backdrop, Judge Fallon evaluated the special master's final recommendation and apportioned the common benefit fee.[85] Distilling the cases and principles described above, he reasoned that "[t]his apportionment is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel."[86]

In the end, Judge Fallon's allocations differed from the special master's recommendations in several instances. Notably, the special master initially recommended a $375,000 allocation to Darleen Jacobs, Esq., which rose to $1,000,000 in the special master's final recommendation, and the Court adjusted it further to $1.1 million—a 293 percent increase overall.[87] Because Judge Fallon distributed a fixed sum, some awards rose while others fell. Accordingly, the award for liaison counsel, Sidney Torres, III, Esq., fell from $4,730,000 to $4,257,000—a 10 percent reduction—and the award for Jerald Andry, Jr. fell from $1,920,000 to $1,200,000—a 37.5 percent reduction.[88] Of course, Judge Fallon discusses in detail his basis for each award, in accordance with *High Sulfur*'s concern for basic fairness and transparency in the allocation process.[89]

These circuit and district court opinions describe a disciplined doctrine for the allocation of common benefit fees to those attorneys who

83. *Id.* at 810–11.

84. *Id.* at 811.

85. *Id.* at 812.

86. *Id.* at 811.

87. *See id.* at 804 n.4, 817.

88. *See id.* at 812–13 (describing Torres' award); *id.* at 816 (describing Andry's award).

89. *See In re* High Sulfur Content Gasoline Prods. Liab. Litig., 517 F.3d 220, 227 (5th Cir. 2008).

performed work for the common benefit. As set forth below, the *Vioxx* FAC ignored the doctrine, producing needless upheaval and litigation.

## III. THE "POINT SYSTEM" FOR ALLOCATING COMMON BENEFIT FEES TO INDIVIDUAL FIRMS

Given the law's consistent reliance on lodestar, common benefit fee allocation in *Vioxx* would have been expected to use lodestar (modified by the *Johnson* factors) as the primary method for developing recommendations, or at least for cross-checking them. The FAC did not use the lodestar approach; instead, it crafted a novel "point system" as the basis for fee allocation.[90] Under the "point system," the FAC purported to value each law firm's common benefit contribution based on the number of points the committee assigned the firm.[91] Using the point system, the FAC's nine members proposed allocating their own firms nearly 73 percent of the common benefit fund (\$230 million) although those firms billed only 42.6 percent of the common benefit hours.[92] They likewise recommended that other firms that performed significant common benefit work receive relatively little compared to their effort and contributions. The inequities and self-dealing generated by the point system, and the objections that followed, underscore how the lodestar approach remains a sound and time-tested tool for allocating common benefit fees.

### A. Emergence of the Point System

As noted above, following the announcement of the settlement between plaintiffs and Merck, Judge Fallon appointed the nine-person FAC to collect applications for common benefit fees.[93] This appointment allowed a small group of lawyers and law firms, which included the NPC's seven members plus two additional members (but not the PSC as a corporate body), to control the settlement terms and the common benefit distribution recommendation.

---

90. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2011 WL 572394, at \*3 (E.D. La. Jan. 20, 2011).

91. *Id.*

92. Objection of Kline & Specter, P.C., *supra* note 1, at 45; *see In re Vioxx*, 2011 WL 572394, at \*4–5.

93. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Nov. 20, 2007) (Pretrial Order No. 32). See text accompanying *supra* note 29 for the names of those in the *Vioxx* FAC.

Judge Fallon later established guidelines for assessing each applicant's contribution.[94] In particular, he directed the FAC to "look to general fee jurisprudence to identify the factors that should be applied in making appropriate allocations."[95] These factors, known as the *Johnson* factors, are applicable to the *Vioxx* litigation and "should be considered in addition to other matters considered by courts to evaluate fee allocations."[96]

Pursuant to Pre-Trial Order 6D, law firms submitted affidavits and made oral presentations detailing the common benefit work their attorneys performed during *Vioxx* litigation. Over one hundred firms went through this process to develop their claim to common benefit fees.[97]

In December of 2010, the FAC provided applicants with a document showing their "recommended award."[98] This document did not explain how the recommendation was generated. It invited the subject firm to accept or object to the recommended sum by December 16, 2010.[99] Twenty-seven law firms objected to their recommended awards—over 25 percent of the 105 firms that made application for common benefit fees.[100]

On January 19, 2011, the FAC delivered its overall fee recommendation to the Court.[101] The recommendation listed each law firm that applied for common benefit fees and each firm's suggested allocation; however, it did not identify the attorneys or staff who worked on *Vioxx* matters for individual firms, their billing rates, or any other pertinent information that might demonstrate the reasonableness or proportionality of the recommended fees.[102] While the FAC professed to having used the *Johnson* factors with a lodestar cross-check when assessing each firm's suggested allocation, the recommendation did not explain its purported analysis on a firm-by-firm basis.[103] Rather, the

94. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Sept. 15, 2008) (Pretrial Order No. 6D).

95. *Id.* at 2 (citing Johnson v. Ga. Highway Express, 488 F.2d 714, 717–19 (5th Cir. 1974)).

96. *Id.*

97. *See In re Vioxx*, 2011 WL 572394, at *1.

98. Objection of Kline & Specter, P.C., *supra* note 1, at 7 (referencing the "Common Benefit Fees Award Form" and the "Vioxx Allocation Process" found in Exhibit E to Kline & Specter's Objection).

99. *Id.*

100. *In re Vioxx*, 2011 WL 572394, at *5 (labeled as "Exhibit C").

101. *Id.* at *2.

102. *See id.*

103. *See id.*

FAC relied on a "point system" that it created and described in the FAC's "Point System Guide."[104]

The FAC's Point System Guide made no reference to the quantity of common benefit hours that a given firm worked.[105] It did not use lodestar as a foundation for or cross-check on the point system's outcomes.[106] It did not refer to the *Johnson* factors.[107] Instead, the Point System Guide listed the following categories as the only bases for compensation:

- Key Leadership — 125 maximum points
- Trials — 150 maximum points
- Settlement negotiation — 100 maximum points
- Law and Briefing — 100 maximum points
- Settlement implementation and post-settlement issues — 100 maximum points
- Discovery, science and experts — 50 maximum points
- Committee leadership and participation — 50 maximum points
- Funding — 75 maximum points (PSC assessment and case contributions)
- Case management — 25 points.[108]

Within each category, the FAC identified subcategories of responsibility or participation to which different point totals were allocated, culminating in whatever maximum total had been assigned to the category overall.[109]

The results were telling: the FAC assigned the highest point values to the categories of work that the FAC's member firms performed. For example, the exercise of "leadership" could produce an assignment of 125 points to a firm.[110] Another 100 points were available to those who performed post-settlement administration — that is, risk-free administrative work performed *after* Merck had agreed to settle the litigation.[111] At the same time, the FAC assigned lower point values to other categories of work in which other firms predominated,

---

104. Point System Guide ("Exhibit F") at 16, *attached with* Objection of Kline & Specter, P.C., *supra* note 1.

105. *See id.*

106. *See id.*

107. *See* Johnson v. Ga. Highway Express, 488 F.2d 714, 717–19 (5th Cir. 1974).

108. Point System Guide ("Exhibit F") at 16–17, *attached with* Objection of Kline & Specter, P.C., *supra* note 1.

109. *See id.* at 16–17.

110. *See id.* at 16.

111. *Id.* at 17.

including work that was important to achieving settlement. Thus, only 50 points were available to those who built the factual foundation for the plaintiffs' case—reviewing the documents, taking the depositions, working with experts, and developing the causation theory that made settlement possible.[112] The effort to research and brief the difficult legal issues inherent in complex pharmaceutical litigation also could produce only 100 points.[113] The elevation of "leadership" and post-settlement administration over the hard work of litigation was both unfair and inaccurate in terms of allocating responsibility for the settlement. At a minimum, the approach bore no relationship to a traditional lodestar or *Johnson* factor analysis.[114]

Unsurprisingly, the point system's distorted priorities produced poor recommendations. The FAC recommended a "zero" dollar allocation to 23 applicants.[115] To the remaining 82 firms, the FAC recommended allocations ranging from zero to the astonishing sum of \$40,900,000.[116] Using the average billing rate of \$443.29, the suggested allocations ranged from reducing a firm's compensation to .04 of its estimated lodestar to multiplying the estimated lodestar by 4.97.[117] Thus, the largest estimated multiplier (4.97) was 124 times larger than the smallest estimated multiplier (.04).[118] This was in sharp contrast to *Turner*, where the highest multiplier was only 1.3 times larger than the smallest multiplier.[119]

In sum, the FAC recommended that its nine members receive \$230,000,000, nearly 73 percent of the court-ordered common benefit fund, even though the FAC's members billed only 42.6 percent of the total common benefit hours billed by the various plaintiffs' counsel.[120]

The point system's outcome also failed in convincing firms to accept the FAC's proposed fee allocations. Even after the FAC agreed to recommend a higher fee for several objectors, thirteen firms still

112. *See id.*

113. *See id.* at 16.

114. Perhaps not coincidentally, some of the FAC firms concentrated their work on administrative matters and not the hard slog of contentious litigation.

115. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2011 WL 572394, at *2–5 (E.D. La. Jan. 20, 2011) (explaining the recommendation of the Fee Allocation Committee).

116. *See id.* at *4.

117. Objection of Kline & Specter, P.C., *supra* note 1, at 8; *see In re Vioxx*, 2011 WL 572394, at *2–5.

118. Objection of Kline & Specter, P.C., *supra* note 1, at 8.

119. For a discussion of *Turner*, see text accompanying *supra* note 72.

120. *See* Recommended Fee Allocation Table ("Exhibit AA") at 2–7, *attached with* Objection of Kline & Specter, P.C., *supra* note 1, at 45 (referencing the Recommended Fee Allocation Table found in Exhibit AA).

filed formal objections in the district court in February of 2011.[121] For example, the law firm of Weinberg, Placitella & Roth, which the FAC recommended receive a common benefit fee equaling a meager rate of $21.23 per hour even though the firm did significant work in the *Vioxx* litigation.[122] The law firm of Roda Nast LLC also objected after the FAC suggested the firm receive a common benefit fee equaling $35.50 per hour, even though this nationally recognized firm performed extensive briefing work at the PSC's request.[123] Many others had similar stories.[124]

These objections were eventually resolved when many firms agreed to accept larger sums of common benefit money and the FAC firms agreed to accept less. In the end, the FAC declined to permit its allocations to receive judicial scrutiny by settling all the objections.[125] The critical observations that followed the objections and allocations include how the point system was undisciplined and jurisprudentially unmoored, how it operated to favor the interests of those who designed it, and how it promoted objection and litigation, the very opposite of what a fee-allocation system should do. These arguments are discussed in detail below.

## B. Problems with the Point System

The point system suffered from significant substantive and procedural defects. First, it had no precedent or foundation in *High Sulfur*,[126] *Turner*,[127] or other relevant case law. No known decision addressing the allocation of common benefit fees had interpreted, or even described, a "point system" such as presented here. No known judicial decision suggested that a point system could be a permissible approach to fee allocation. The cases instead call for a "reasonable relationship" and "proportion" as the touchstones for allocation. In

---

121. As noted above, Kline & Specter was among the objectors. *See* Recommendation of the Fee Allocation Committee ("Exhibit E") at 3–10, *attached with* Objection of Kline & Specter, P.C., *supra* note 1, at 7, 28 (referencing Kline & Specter's objections to the fee allocation found in Exhibit E); *In re* Vioxx, 2011 WL 572394, at 2–5.

122. *See* Recommended Fee Allocation Table ("Exhibit AA") at 2–7, *attached with* Objection of Kline & Specter, P.C., *supra* note 1, at 45 (referencing the Recommended Fee Allocation Table found in Exhibit AA).

123. *Id.* at 3.

124. *See* Objection of Kline & Specter, P.C., *supra* note 1 (the objections were filed in the district court at various dates between February 2 and February 9, 2011).

125. *See In re* Vioxx Prods. Liab. Litig., 802 F. Supp. 3d 740, 768 (E.D. La. 2011).

126. 517 F.3d 220 (5th Cir. 2008).

127. 582 F. Supp. 2d 797 (E.D. La. 2008).

*High Sulfur,* the Fifth Circuit held that allocation should be based on a firm's lodestar as modified by the *Johnson* factors.[128] No case discusses a point system, let alone one created by a FAC, without apparent judicial oversight or approval. The universal yardstick is lodestar modified by the *Johnson* factors. If there is a scenario where a point system meaningfully assists fee allocation, *High Sulfur* still requires that the approach be cross-checked by a rigorous lodestar analysis.[129]

As noted above, Judge Fallon had directed the FAC to "look to general fee jurisprudence to identify the factors that should be applied in making appropriate allocations."[130] He noted specifically that "[t]he *Johnson* factors are applicable to this litigation and should be considered, in addition to other matters considered by the courts to evaluate fee allocations."[131] However, the FAC abandoned the rich jurisprudence in this area in forming its recommendations and fashioning the point system. Using the point system, the FAC recommended that firms receive amounts ranging from .04 of their lodestar to 4.97 times their lodestar—the largest multiplier (4.97) was over 124 times larger than the smallest multiplier (.04).[132] No fee allocation jurisprudence supports such a disparity. No case even considers allocations involving disparities so great as those recommended by the FAC. Such results cannot be squared with the Fifth Circuit's approach of (1) using the lodestar as a starting point, and (2) modifying the lodestar up or down by the *Johnson* factors.[133] It could not be squared with *FPI,* which held that individual fee allocations must be based on the "relative" efforts of the various contributing counsel.[134] Nor could it be squared with *Vitamins Antitrust,* which held that "[a]llocation means proportion," and that a "universally fair standard" must be used when making fee allocations.[135]

Second, the recommendations generated by the point system were overly generous to the FAC members and unfair to non-FAC members. The FAC recommended that its nine member firms receive $230,000,000, nearly 73 percent of the common benefit fund, even though the nine firms only billed 42.6 percent of the total common

---

128.   517 F.3d at 234.

129.   *Id.* at 228.

130.   *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *2 (E.D. La. Sept. 15, 2008) (Pretrial Order No. 6D).

131.   *Id.*

132.   Objection of Kline & Specter, P.C., *supra* note 1, at 8.

133.   *See In re High Sulfur,* 517 F.3d at 228.

134.   *See In re* FPI/Agretech Sec. Litig., 105 F.3d 469, 474 (9th Cir. 1997).

135.   *See In re* Vitamins Antitrust Litig., 398 F. Supp. 2d 209, 234 (D.D.C. 2005).

benefit hours.[136] Further, in making this recommendation, the FAC used neat round numbers such as $40,900,000 and $20,000,000.[137] How did the FAC generate these exact numbers through a lodestar analysis? What application of the *Johnson* factors produced such neat outcomes? The point is not that lodestar analysis must always produce precise numbers, but that the round numbers may suggest a subjective (and self-interested) approach to fee allocation, contrary to *High Sulfur* and established fee jurisprudence.

Third, the FAC should have used an hourly cross-check to validate (or invalidate) its recommendations. In *Turner*, Judge Fallon used a lodestar cross-check to validate the overall common benefit award.[138] Here, the FAC stated that "hours were used to cross-check the amount of the recommended allocation."[139] That statement was obviously belied by the facts. The FAC's Point System Guide conclusively demonstrated that the FAC relied on its point system alone rather than hours, in determining a recommended fee.[140] If a point system could ever provide a legitimate basis for recommending fee allocation in the mass tort setting (which would seem unlikely based on *Vioxx*), the legitimacy is provided by a rigorous lodestar cross-check. Since the lodestar approach, not a self-serving point system, supplies the public confidence and legal justification for the common benefit fund allocations, it would seem more straightforward to use lodestar from the outset.

Fourth, the FAC provided no explanation of how point totals were generated on a firm-by-firm basis. As a result, recommendations could not be compared to one another. This lack of transparency further undermined confidence in the point system's results.

Fifth, the point system improperly elevated post-settlement administrative work (mainly performed by FAC firms) to a high echelon of value. The FAC viewed post-settlement administration as *more* valuable than categories such as, discovery, science, experts, and funding,

---

136. *See* Recommended Fee Allocation Table ("Exhibit AA") at 2–7, *attached with* Objection of Kline & Specter, P.C., *supra* note 1, at 45 (referencing the Recommended Fee Allocation Table found in Exhibit AA).

137. *See id.*

138. *See* Turner v. Murphy Oil USA, Inc., 582 F. Supp. 2d 797, 801 (E.D. La. 2008)

139. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2011 WL 572394, at *3 (E.D. La. Jan. 20, 2011).

140. *See* Point System Guide ("Exhibit F"), *attached with* Objection of Kline & Specter, P.C., *supra* note 1.

which describe contributions that traditionally generate value in litigation.[141] The FAC's approach exalted risk-free post-settlement administration over the risky effort that made settlement possible. This was wrong. As Judge Fallon stated in *Turner*:

> [T]he hours spent by counsel after the approval of the settlement agreement did not aid in the creation of the settlement fund, and, as a result, [this] Court concludes [that] it cannot treat the hours spent by counsel in administering the settlement program on a par with the hours spent by counsel who helped create the settlement and Common Benefit Fund.[142]

The FAC's decision to assign significant value to post-settlement work is especially suspect where the FAC performed the lions' share of that work. For example, the Levin Fishbein firm billed 27,282.75 hours on *Vioxx* litigation.[143] Approximately 31 percent, 8,467.75 hours total, were post-settlement administrative work.[144] This post-settlement administrative work helped Levin Fishbein generate a total proposed distribution of $21.4 million, at an average rate of $784.38 per hour—a handsome proposed payday especially given that much of its efforts followed the settlement and, hence, were risk-free.[145] A similar dynamic occurred with Blizzard McCarthy, which spent 3,835.50 of its total 9,173.25 hours in *Vioxx* litigation (approximately 42 percent) on post-settlement administration, supporting an $11.6 million proposed recovery at an average billable rate of $1,264.55 per hour.[146] Six of the nine FAC members said they spent a total of 28,744.25 hours on post-settlement work, all compensated by the FAC at very high levels, and all non-contingent and risk-free.[147]

Sixth, the point system's handling of discovery versus administrative work inaccurately assessed the role of each function in achieving the result. An administrative "leader" could earn a maximum of 125 points for his or her role;[148] persons active in settlement negotiations

---

141. *Id.* The NPC and FAC's members did not offer the post-settlement work to other firms, even other PSC firms. They handled all such work themselves.

142. *Turner*, 582 F. Supp. 2d at 811.

143. Garrett and Company Case Cost Management System: Time Totals by Firm—Sortable Report from January 2000 to July 2010 ("Exhibit H") at 21, *attached with* Objection of Kline & Specter, P.C., *supra* note 1.

144. *Id.*

145. *Id.*

146. *Id.* at 19.

147. *Id.* at 19–22.

148. Point System Guide ("Exhibit F") at 17, *attached with* Objection of Kline & Specter, P.C., *supra* note 1.

and post-settlement administration could earn as much as 100 points for each role.[149] Outstanding work in "discovery, science, and experts" could yield a comparatively paltry 50 points,[150] even though scientific analysis was the heart of the plaintiffs' case — without it, no effective questions could be asked at trial and no settlement could be achieved. Indeed, no work was more critical to *Vioxx* litigation than scientific analysis. The PSC acknowledged this in its application for common benefit fees:

> As Merck strenuously defended the safety profile of Vioxx based upon published medical literature in highly regarded medical journals, the common benefit attorneys were confronted with a strong adversary that was well entrenched with powerful defenses. Undaunted by their adversary, common benefit counsel carefully dissected the clinical trial data and developed the complex scientific arguments necessary to controvert Merck's medical arguments. These arguments were highly technical and difficult, yet due to the perseverance of common benefit counsel corrections to the public's knowledge of the flawed science created by Merck was accomplished.[151]

Objectively, discovery cannot be relegated to a minor position in the context of *Vioxx* litigation (or likely any mass tort litigation).[152] The unsung and difficult work of discovery made the successful prosecution of the plaintiffs' case possible. Without hard labor in the trenches of discovery, no glory can be achieved at trial,[153] and certainly, no settlement. Moreover, while settlement negotiations were

---

149. *Id.*

150. *Id.*

151. *See* Plaintiffs' Liaison Counsel's Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses at 55, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Jan. 20, 2009).

152. Judge Fallon acknowledged the critical role played by discovery efforts in *Turner*, when he awarded the second highest fee allocation to the lawyer who "was in charge of the discovery efforts and guided the deposition process" because such work was "key to attacking the Murphy defenses and pushing the defendant to a settlement." Turner v. Murphy Oil USA, Inc., 582 F. Supp. 2d 797, 813 (E.D. La. 2008). Vital as such work was in *Turner*, it was even more so in this complex pharmaceutical litigation.

153. Glory at trial was infrequent and fleeting for *Vioxx* plaintiffs. Of the 20 trials, only 3 ultimately returned a plaintiffs' victory. *See* Objection of Kline & Specter, P.C., *supra* note 1, at 4–5. As such, it was bewildering that the FAC should award so much value to trials. Losing multiple trials hardly added value to the plaintiffs' case, and if anything discouraged further investment in the litigation. Without minimizing the importance of trial, losing trial work should not have been accorded a multiple several times higher than the value assigned to other work necessary to building the case against Merck.