doubtlessly labored, the likelihood of settlement in *Vioxx* litigation was obvious by the time those discussions began. Neither the work of settling the case nor administering the settlement remotely compares in importance to the work of building the case through technical depositions and scientific analysis. The FAC turned fair valuation upside down by lionizing post-settlement work while discounting the work that made settlement possible.

In the end, the point system in *Vioxx* was a substantive, procedural, and practical failure. The approach produced a justifiable storm of objections that required considerable time and effort to resolve. Little credit could be given to the FAC's purported objectivity after the FAC recommended that its members receive 73 percent of all fees for 42.6 percent of the hourly work.[154] As Judge Ambro observed in *In re Diet Drugs Products Liability Litigation*, "[t]hey make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?"[155]

Although the *Vioxx* point system was destructive to the fee allocation process, the point system has one silver lining. Its failure underscores the need for trial courts to (a) retain significant control over the work of common benefit fee allocation and (b) require fee allocation committees and/or court-appointed special masters to use lodestar methodology when determining or cross-checking fee allocation. Lodestar has stood the test of time.[156] It provides an objective measure for fee allocation that is verifiable, accepted, and therefore protective of the entire litigation system.[157] After *Vioxx*, trial judges should consider requiring rigorous application of lodestar principles and case law, confirmed by lodestar cross-checking, to assure legitimate common benefit fee allocation.[158] Explicit reliance on the lodestar approach is especially important when the court has appointed a fee-

---

154. Objection of Kline & Specter, P.C., *supra* note 1, at 45; *see In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2011 WL 572394, at *4–5 (E.D. La. Jan. 20, 2011).

155. *In re* Diet Drugs Prods. Liab. Litig., 401 F.3d 143, 172 (3d Cir. 2005) (Ambro, J., concurring).

156. *See, e.g.*, Landsman & Funk, P.C. v. Skinder-Strauss Assocs., 639 F. App'x 880, 884–85 (3d Cir. 2016) (demonstrating that the lodestar calculation is still used today).

157. Matthew D. Klaiber, *A Uniform Fee-Setting System for Calculating Court-Awarded Attorney's Fees: Combining Ex Ante Rates with a Multifactor Lodestar Method and a Performance Based Mathematical Model*, 66 MD. L. REV. 228, 238–39 (2006) (discussing the United States Supreme Court's early adoption of the lodestar model).

158. *Id.* at 249.

allocation committee comprised of self-interested actors.[159] Trial judges should also endeavor to put fee allocation in the hands of counsel who cannot or will not indulge in self-dealing.[160]

## IV. THE DEAL FOR UNAUTHORIZED DISTRIBUTION OF COMMON BENEFIT FUNDS

A second major failure regarding the *Vioxx* common benefit fund occurred before the fund was formally created. As described below, insiders who controlled the settlement fund were confronted with objections by other attorneys about the percentage of the settlement fund that would be allocated to common benefit attorneys' fees.[161] To resolve those objections, they agreed to distribute $18.5 million of the settlement fund without judicial knowledge or approval.[162] This should never have happened, and represents a secondary cautionary tale about the need for MDL judges to carefully control mass-tort settlement funds.

### A. The "Full Participation Option" Contracts and Their Nullification

As noted above, Judge Fallon appointed a twelve-lawyer Plaintiffs' Steering Committee ("PSC") in April 2005.[163] The PSC's job was to coordinate the litigation from the plaintiffs' side, including the duty to "[e]xplore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation."[164]

After its creation, the PSC sought to encourage lawyers representing *Vioxx* plaintiffs to participate in the MDL process.[165] The PSC wanted to increase the *Vioxx* MDL's size and significance as compared to the various state courts in which *Vioxx* litigation was unfolding, in order to control the litigation and its resolution. The PSC chose to reduce the "price" that counsel for individual *Vioxx* plaintiffs

---

159. *See* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VAND. L. REV. 107, 118, 151 (2010).
160. *See id.* at 141–43.
161. *See* Affidavit of Thomas R. Kline, Esq. ("Exhibit E"), ¶ 6, *attached with* Motion of Kline & Specter, P.C. to Enforce the Full Participation Option, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Apr. 7, 2011) [hereinafter 2011 Thomas Kline Affidavit].
162. *Id.* at 1–2.
163. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *1–2 (E.D. La. Apr. 8, 2005) (Pretrial Order No. 6).
164. *Id.* at *3.
165. *See id.*

would have to pay the firms performing common benefit work.[166] By way of example, suppose that (a) a mass tort settles for a total amount of $9 million, and (b) the counsel for individual plaintiffs have one-third contingent fee agreements with their clients. Those counsel mathematically would be entitled to a $3 million attorneys' fee paid from their clients' awards. Now suppose further that a different group of lawyers performed the common benefit work that made the settlement possible; these counsel did not represent individual clients but took the prime role in litigating the cases. Under common-fund principles, that second group of lawyers is entitled to a portion of the settlement fund;[167] their common-fund fee is paid by the attorneys who represented individual clients.[168] If the court ordered ten percent of the settlement fund to be paid to the common benefit counsel ($900,000), then the result is that (a) the attorneys for individual plaintiffs net $2.1 million, and (b) the common benefit attorneys net $900,000 to be distributed among them, preferably under lodestar principles.

The scenario described above is common in mass tort cases,[169] though there is often overlap in the counsel who represent individual plaintiffs and the counsel who perform common benefit work.[170] The key point is that a low percentage common benefit fund assessment may entice counsel for individual plaintiffs to submit their cases to litigation in the forum in which the common benefit attorneys are organized.[171]

In June 2005, the PSC petitioned Judge Fallon to authorize counsel for individual *Vioxx* plaintiffs to choose from three options based on

---

166. *See id.*
167. *See* Ed Konieczny, *Multidistrict Litigation, Trust the Leaders*, Spring 2008, at 4, 7, http://www.sgrlaw.com/site/assets/files/2149/ttl21.pdf.
168. *Id.*
169. *See* Karen Woodward & Matthew A. Reed, *The Evolution of the Common Benefit Order*, A.B.A. (Apr. 30, 2015), http://apps.americanbar.org/litigation/committees/masstorts/articles/spring2015-0415-evolution-common-benefit-order.html.
170. *See generally* Duke Law Sch. Ctr. for Judicial Studies, *MDL Standards and Best Practices*, 1, 50 (2014), http://law.duke.edu/sites/default/files/centers/judicialstudies/MDL_Standards_and_Best_Practices_2014-REVISED.pdf, ("During the litigation, some attorneys will devote themselves nearly entirely to the case from the outset, particularly those who are appointed to the steering committee or as liaison counsel, while others . . . will benefit from this work done by other counsel.").
171. *See id.* (discussing the benefits and incentives that common benefit orders produce).

the plaintiffs' speed of decision.[172] Among the options was a Full Participation Option ("FPO"), which provided for a common benefit assessment at a relatively low price: 3 percent total (2 percent fees and 1 percent costs) of the gross amount awarded to plaintiffs whose counsel accepted the FPO within ninety days of the Court's Order.[173] To encourage early participation, early submissions would be subject to a lower common benefit fund assessment than later submissions.[174] The PSC attached a sample of the "FPO Contract" to its petition.[175]

At a July 2005 status conference, the PSC reiterated the importance of generating cases within the MDL and encouraged participation through the proposed contracts.[176] As one of the PSC's co-lead counsel stated at the hearing:

> The proposal that we have filed with the Court includes three options. The first option we call the full participation option, and it calls for a two percent assessment for attorney's fees plus one percent for costs. This option is designed to foster cooperation and coordination between the lawyers that are litigating cases in the MDL in federal courts and those in state court litigation.[177]

The PSC was specifically aware that the Full Participation Option represented a low price for the work of common benefit counsel to encourage filings in the MDL.[178] As the co-lead counsel also stated, "I'm not aware of any pharmaceutical MDLs with an assessment that low, but that's designed to foster that cooperation."[179]

On August 4, 2005, Judge Fallon entered an Order that implemented the PSC's suggestions.[180] In this order, Judge Fallon directed the creation of an interest-bearing escrow account into which assessments for the common benefit fund would be paid.[181] He also directed

---

172. PSC's Petition for an Order Securing an Equitable Allocation of Counsel Fees and Costs for MDL Administration and Common Benefit Work at 14–15, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. June 29, 2005).
173. *Id.*
174. *Id.* at 13.
175. *Id.* at 19–23.
176. Transcript of Status Conference at 21–22, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. July 19, 2005) [hereinafter July 2005 Transcript].
177. *Id.* at 21.
178. *Id.*
179. *Id.*
180. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *1 (E.D. La. Aug. 4, 2005) (Pretrial Order No. 19).
181. *Id.* at *1.

that plaintiffs' counsel who agreed to participate in the MDL pay an assessment based on their speed of decision:

- The "*full participation*" option. If plaintiffs' counsel agreed to participate in the MDL within ninety days of the August 4 Order, counsel would pay 3 percent of any gross monetary recovery (2 percent for common benefit fees, 1 percent for common benefit costs), to be subtracted from the attorneys' fees portion of individual fee contracts, for all cases included in the MDL.[182]
- The "*traditional assessment*" opinion. If plaintiffs' counsel agreed to participate in the MDL after the ninety-day period permitted for the full participation option, counsel would pay 4 percent of any gross monetary recovery for cases filed in state court, and 6 percent of such recovery for cases included in the MDL.[183]
- The "*limited waiver*" option. If plaintiffs' counsel agreed to participate in the MDL after the ninety-day period permitted for the full participation option, counsel would pay 6 percent of any gross monetary recovery for cases included in the MDL and would use any common benefit materials only in MDL cases.[184]

The Order attached the sample contracts as exhibits for these three options.[185]

The August 4 Order required all PSC members to exercise the Full Participation Option:[186] "This option shall be required by all members of the PSC, MDL committee members and the Court approved State Liaison Committee."[187]

The FPO contract also contained the following clause, explaining that signatories would be obliged to pay from their contingent fees no more than 2 percent of the client's gross recovery for costs, and 1 percent for fees:

> It is the intention of the parties that such assessment shall be in full and final satisfaction of any present or future obligation on the part of each Plaintiff and/or Participating Attor-

---

182. *Id.* at *3.
183. *Id.* at *4.
184. *Id.* at *4–5.
185. *Id.* at *7.
186. *Id.* at *3–4.
187. *Id.*

ney to contribute to any fund for the payment or reimbursement of any legal fees, services or expenses incurred by, or due to, the MDL and/or any Common Benefit Attorneys.[188]

The FPO contract also made clear that the amounts deposited in the escrow account were for the exclusive purpose of compensating attorneys who performed common benefit work, and that such money would be distributed only pursuant to Court Order:

> The amounts deposited in the MDL Fee and Cost Account shall be available for distribution to attorneys who have performed professional services or incurred expenses for the benefit of the plaintiffs in MDL 1657 and the coordinated state court litigation pursuant to written authorization from the Liaison counsel of the PSC. Such sums shall be distributed only upon an Order of the Court in MDL 1657 which will be issued in accordance with applicable law governing the award of fees and costs in cases involving the creation of a common benefit. Appropriate consideration will be given to the experience, talent and contribution made by all of those authorized to perform activities for the common benefit, including the Participating Attorneys.[189]

The settlement agreement reached in November 2007 between Merck and the NPC purported to negate the participation contracts that plaintiffs' counsel entered into when agreeing to submit their cases to the MDL proceeding.[190] In particular, the agreement purported to authorize Judge Fallon to supersede his August 2005 Order and demand common benefit payments greater than the amount authorized in the FPO contracts.[191]

> To ensure that [the common benefit attorneys] are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8 percent of the gross amount recovered for every client that registers under the terms of the Settlement Agreement.[192]

---

188. *Id.* at \*9.
189. *Id.* at \*15.
190. MERCK SETTLEMENT AGREEMENT, *supra* note 21, § 16.7 ("This Agreement . . . *supersedes and cancels* all previous agreements, negotiations, and commitments in writings between [Merck and the NPC] with respect to the subject matter hereof.") (emphasis added).
191. *Id.* § 9.2.1.
192. *Id.*

The maximum 8 percent attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.[193]

Significantly, Merck had no "dog in the fight" of how its settlement funds were distributed. As set forth in section 9.2.6 of the Settlement Agreement, Merck took "no position regarding . . . the award of common benefit attorneys' fees . . . and waives the right to contest these matters."[194]

## B. *The Deal to Resolve Objections to the Common Benefit Fund*

In January 2009, notwithstanding that many counsel for individual plaintiffs had signed FPO contracts, the plaintiffs' liaison counsel moved Judge Fallon to award a common benefit fee of 8 percent of the $4.85 billion settlement.[195] As described above, this amount was to come out of the plaintiffs' counsel attorneys' fees retained by individual clients, and was to be paid to the firms that performed common benefit work.

On April 16, 2009, Judge Fallon invited any interested party to file a Notice of Objection to an 8 percent assessment on or before May 8, 2009.[196] Several objections were filed. Among the objectors was the law firm Stratton Faxon, which signed a FPO contract and asked Judge Fallon to enforce the FPO contract, which capped its contribution to the common benefit fund at an aggregate of 3 percent.[197] Because of the number of objectors, Judge Fallon decided to appoint Michael Stratton as the objectors' liaison counsel.

Thereafter, numerous status conferences were held, discovery was taken, briefing was submitted, and arguments were heard. While the matter was pending before Judge Fallon, plaintiffs' liaison counsel reduced the recommendation to 7.5 percent.[198] Michael Stratton wrote

---

193. *Id.*
194. *Id.* § 9.2.6.
195. Plaintiffs' Liaison Counsel's Motion for Award of Common Benefit Counsel Fees and Reimbursement of Expenses at 3–4, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Jan. 20, 2009).
196. Joint Report No. 46 of Plaintiffs' and Defendants' Liasison Counsel at 11, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Apr. 27, 2009).
197. *See* Stratton Faxon's Notice of Objection to the PSC Fee Request at 13, *In re* Vioxx Prod. Liab. Litig., MDL No. 1657 (E.D. La. May 5, 2009).
198. Co-Lead Counsel's Memorandum in Support of Motion for Additional Discovery Pursuing Side Deals Related to the Fund Awarded by this Court's Order of October 19, 2010 at 3–4, *In re* Vioxx Prod. Liab. Litig., MDL No. 1657 (E.D. La. Feb. 28, 2011) [hereinafter 2011 Co-Lead Counsel Memorandum].

a letter agreeing that 7.5 percent was appropriate.[199] In October 2010, relying in part on plaintiffs' liaison counsel's reduction in the recommended assessment, Judge Fallon entered a decision allocating 6.5 percent of the settlement fund to compensate for common benefit work, mathematically producing a common benefit fund of $315,250,000.[200]

Issues arise when judicial authority abrogates an agreement entered pursuant to and in specific reliance on a prior judicial order. In Judge Fallon's October 2010 decision, he relied primarily on cases describing "inherent managerial authority" as the basis for abandoning the FPO Contract.[201] None of those cases involved a court order that expressly limited common benefit assessments or involved abrogation of such an order. Rather, the trial courts in those cases had made no prior commitments and assessed common benefit fees against a blank slate based on common fund principles.[202]

This case was very different. Judge Fallon exercised inherent authority by creating the FPO and inviting participation in the MDL on that basis.[203] He entered an Order on which counsel relied in choosing the MDL over other options. The Court-approved FPO Contracts also provided only *one* exception under which its terms would not apply—if *Vioxx* litigation were certified and settled as a class action under Fed. R. Civ. P. 23.[204] Of course, that did not happen.

It might be argued that the Settlement Agreement provided a basis for overriding the Court-approved FPO Contracts. Indeed, Sections 9.2.1 and 9.2.5 of the Settlement Agreement stated that common benefit fees would be assessed and fixed by the Court,[205] and that the common benefit fee, while no greater than 8 percent, could exceed the assessments provided in the Court's Order entered August 4, 2005,

---

199. *Id.* at 4; Correspondence from Michael A. Stratton to Judge Fallon, dated July 28, 2010 ("Exhibit D") at 2, *attached with* Motion of Kline & Specter, P.C. to Enforce the Full Participation Option, In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Apr. 4, 2011) [hereinafter Michael Stratton Letter].

200. *See In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 658 (E.D. La. 2010).

201. *Id.* at 648–49. Citing *inter alia* In re Genetically Modified Rice Litig., MDL No. 06-1811, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010); In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., MLD No. 05-1708, 2008 WL 682174 (D. Minn. Mar. 7, 2008); In re Zyprexa Prods. Liab. Litig., 467 F. Supp. 2d 256 (E.D.N.Y. 2006); In re Linerboard Antitrust Litig., 292 F. Supp. 2d 644 (E.D. Pa. 2003); In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972, 549 F.2d 1006 (5th Cir. 1977).

202. *See* cases cited *supra* note 201.

203. In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Aug. 4, 2005) (Pretrial Order No. 19).

204. *Id.* at *4.

205. MERCK SETTLEMENT AGREEMENT, *supra* note 21, §§ 9.2.1, 9.2.5.

such as the assessment described in the FPO Agreement.[206] However, the agreement was a private agreement not subject to judicial approval and therefore incapable of abrogating a prior judicial order. In addition, common benefit fees were not a material term of settlement, with Merck having no interest in the amount that plaintiffs' attorneys would be paid for their efforts.[207]

The abrogation of the FPO Contracts in *Vioxx* may make future plaintiffs' counsel shy about participating in MDL proceedings based on a promise that the common benefit assessment will be a certain amount. Whether "permissible" as a matter of law, the judge's about-face on the assessment amount may risk the vitality of Federal MDL litigation. Counsel may be deterred by the prospect of being baited into an MDL and then switched to a higher fee once the litigation settles.

Whatever the appropriateness of Judge Fallon's abandoning of the FPO Contracts, the judge failed to consider a significant fact: the existence of a deal between (1) plaintiffs' liaison counsel, purportedly on behalf of the NPC, (2) both of the PSC's co-lead counsel, purportedly on behalf of the PSC, and (3) the objector's liaison counsel purportedly representing the objectors to the 8 percent assessment. The deal was confirmed on July 27, 2010, in Judge Fallon's chambers, but outside of the judge's presence.[208] Plaintiffs' liaison counsel and the PSC's co-lead counsel had agreed that the objectors would pay a net assessment of only 4 percent toward the common benefit fund.[209] In exchange, the objectors' liaison counsel agreed to withdraw his objections and recommend to the court that a 7.5 percent assessment was appropriate.[210]

This deal was memorialized in a court reporter's transcript containing the following critical passage. Initially, one co-lead counsel stated:

> Here in the conference room we have [the objectors' liaison counsel]; [the plaintiffs' liaison counsel]; and [both of the PSC's co-lead counsel]. This is in MDL Docket 1657.
>
> We have entered into a private agreement where [the objectors' liaison counsel] is speaking on behalf of all of the objectors to the plaintiff liaison counsel's petition for assessment

---

206. *See id.* § 9.2.1.
207. *See id.* § 9.2.6.
208. Transcript of Private Proceedings Between Counsel, at 3, *In re* Vioxx Prod. Liab. Litig., MDL No. 1657 (E.D. La. July 27, 2010, 1:00PM) [hereinafter July 2010 Private Transcript].
209. *Id.*
210. *Id.* at 5.

and [the plaintiffs' liaison counsel] is speaking on behalf of the NPC.

The parties have agreed that each side will recommend to the Court that there be a global assessment in the amount of 7.5 percent. For each of the objectors who timely filed an objection to the plaintiff liaison counsel's petition, they will pay a total of a 4 percent assessment, and the difference will be disbursed from the account that's held in escrow now by BrownGreer.

The aggregate amount for that list of objectors is $18,539,236.85. That amount will be transferred to the trust account at Stratton Faxon to be disbursed to the objectors by [the objectors' liaison counsel]. Any common benefit fees or costs will be a matter of agreement between [the objectors' liaison counsel] and the individual objectors.

The parties will prepare a list of objectors that will be submitted to BrownGreer for the amount of the funds to be released for each of those individual accounts. Again, the aggregate, that total sum, will be wired to the trust account of Stratton Faxon.[211]

The other co-leader counsel added: "I would just like, for the record, for [the objectors' liaison counsel] to acknowledge the reasonableness of the 7.5 percent."[212]

The objectors' liaison counsel further added:

Yes. As the liaison counsel for the objectors, we have gotten well through discovery. We have spoken to experts. We have taken depositions, had depositions taken of us, and done the research. At the end of the day, on behalf of all the objectors, I can say that we all feel 7.5 percent is a reasonable fee for the common benefit attorneys in this case.

I would also add that any future cases that result in some sort of recovery brought by anybody who was a timely objector to this fee petition will be treated at the 4 percent level.

Further, it's our understanding that BrownGreer will be instructed as soon as possible to make this disbursement to the objectors via the Stratton Faxon trustee account.

---

211. *Id.* at 3–4.
212. *Id.* at 4.

. . . .

> Liaison counsel for the objectors, being me, on behalf of all of the objectors in this case to the fee petition, withdraw all of those objections. We no longer have any objection to the fee petition filed by the NPC to the extent that our recommendation is that it ought to be reduced to 7.5 percent. We'll be putting that on the record.[213]

The following day, on July 28, 2010, the objectors' liaison counsel sent his letter to the court recommending a global assessment of 7.5 percent, but not disclosing that plaintiffs' liaison counsel and both co-lead counsel agreed to pay the objectors from the common benefit fund an amount such that the objectors' net assessment would be 4 percent.[214] In the end, BrownGreer distributed $18,539,236.85 to the objectors' liaison counsel, who then distributed it to others.[215]

This deal was remarkable for reasons beyond its secrecy. First, the objectors purported to agree to advise the Court that 7.5 percent was a reasonable amount for other law firms to pay for common benefit fees, when they agreed to be assessed 4 percent. Second, plaintiffs' liaison counsel purported to speak for the NPC, when the Court created the NPC only to negotiate with Merck and the NPC had no court-appointment to agree to distribute settlement funds.[216] Third, the PSC never conducted a meeting (telephonic or in-person) where the deal was discussed or put to a vote.[217] The PSC's co-lead counsel consummated the deal without authorization by the PSC as a whole.[218]

Fourth, plaintiffs' liaison counsel and the co-lead counsel directed that the $18,539,236.85 be distributed from the settlement fund—nearly 6 percent of the fund—before the fund for common benefit fees even was created.[219] At that time, Judge Fallon was still considering plaintiffs' liaison counsel's Motion for an Award of Plaintiffs' Common Benefit Fees and Reimbursement of Expenses. Judge Fallon did not issue the opinion until October 19, 2010, nearly three months after the deal had been made.[220] The common benefit fund, therefore, did not even exist.

---

213. *Id.* at 4–5.
214. *See* Michael Stratton Letter, *supra* note 199.
215. *See* July 2010 Private Transcript, *supra* note 208, at 3–4.
216. *See In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 644 (E.D. La. 2010).
217. 2011 Thomas Kline Affidavit, *supra* note 161, ¶ 9.
218. *See id.* ¶ 10.
219. *See id.* ¶ 8.
220. *See In re Vioxx*, 760 F. Supp. 2d at 640.

Fifth, plaintiffs' liaison counsel and the co-lead counsel committed settlement funds without a Court Order, apparently without Judge Fallon's knowledge, and before Judge Fallon had determined the size of the common benefit fund. Judge Fallon would say during a later hearing on February 17, 2011:

> BY THE COURT: The only thing I know of it is that there was an objection to the total sum of the common benefit fund, that Mr. Stratton represented the objectors, and I presided—or I gave them the opportunity to do some discovery early on. They did some discovery. They had some issues. I resolved the discovery issues, the evidentiary issues. They proceeded on with the case. I was advised that the objectors withdrew the objection. That's all that I know of it. I wasn't involved in any discussions or agreements. That's why I didn't issue any orders.[221]

Sixth, plaintiffs' liaison counsel and the co-lead counsel entered into an agreement with the objectors' liaison counsel purportedly speaking for all objectors. Some objectors had no idea that negotiations were ongoing and never gave authority to the objectors' liaison counsel to settle or withdraw their objections. The objectors' liaison counsel had been appointed only to a liaison counsel role, not lead counsel.

For example, in the hearing on February 17, 2011, attorney Kathy Snapka, who was among the objectors, advised Judge Fallon that she had received no notice that the objectors' liaison counsel was negotiating a settlement on her behalf; Snapka merely received a copy of Michael Stratton's July 28, 2010 letter recommending a 7.5 percent assessment.[222] Furthermore, she received a transmittal letter dated September 2, 2010, from the objectors' liaison counsel, enclosing a check, drawn on his trust account, in the amount of over $336,000.[223] Snapka expressed her confusion about the provenance of this check to the objectors' liaison counsel, who then tendered her another check for over $33,000, that she searched in vain for any Order authorizing this distribution from BrownGreer to the objectors' liaison counsel, or from him to her.[224] Snapka did not see in Judge Fallon's subsequent Orders any reference to a depletion of the common benefit fund, therefore

---

221. Transcript of Proceedings at 12, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Feb. 17, 2011, 3:30AM).
222. *Id.* at 11–12.
223. *Id.* at 12.
224. *Id.* at 11–12.

she did not deposit either of the checks tendered by the objectors' liaison counsel and wished to bring this troubling matter to Judge Fallon's attention.[225]

In a related vein, attorney Daniel Becnel signed an FPO contract and also objected to plaintiffs' liaison counsel's recommendation of an 8 percent assessment for common benefit fees.[226] On July 23, 2010, the objectors' liaison counsel attempted to contact Mr. Becnel but never reached him.[227] On September 2, 2010, the objectors' liaison counsel sent Mr. Becnel a letter describing the deal but not stating with whom the deal had been reached or whether it had been court-approved.[228] He enclosed a $440,694.43 check.[229] But according to Mr. Becnel, he never gave the objectors' liaison counsel authority to settle his objection:

> This [was] the first notice I had that Mr. Stratton was acting as my attorney or had authorization to settle a case below the original signed contract made reference to in Document 786. He never had permission to negotiate the fee on my behalf.[230]

In addition, "I had no idea that he was agreeing to a 7.5 percent common benefit fee since that was never discussed or disclosed prior to discovery."[231]

Seventh, plaintiffs' liaison counsel and the co-lead counsel instructed BrownGreer to pay the money (and BrownGreer did so) without a Court Order and without Judge Fallon's knowledge that this commitment had been made. Because of this distribution, the common benefit fund never attained its full ordered and expected value of $315,250,000.[232] When the Fee Allocation Committee made its initial recommendations for fee allocation, the common benefit fund reportedly contained only $311,984,930, notwithstanding the fund's presence in an interest-bearing account.[233]

---

225. Id. at 10–12.
226. Notice to the Court of Daniel Becnel ¶ 2, In re Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Mar. 9, 2011).
227. Id. ¶ 6.
228. Id.
229. Id.
230. Id.
231. Id. ¶ 9.
232. In re Vioxx Prods. Liab. Litig., MDL No. 1657, at *1 (E.D. La. Sept. 9, 2011) (Order).
233. 2011 Co-Lead Counsel Memorandum, supra note 198, ("Exhibit C") at 34.

### C. Discovery Regarding the 4 Percent Deal and the Shortcoming in the Common Benefit Fund

In November of 2008, the Court appointed the FAC to receive applications for common benefit fees.[234] On January 19, 2011, the FAC delivered its recommendations to the court after over 100 law firms submitted affidavits and/or made presentations in support of their common benefit claim.[235] As discussed above, the FAC's recommendation was wholly unsuitable as a basis for the court's ultimate determination of fees, and numerous objections were filed.

The objections served as a platform for learning more about the 4 percent deal. Initially, Judge Fallon appointed a liaison counsel for the objectors, Mr. Pascal Calogero, and co-lead counsel, Mr. Robert Arceneaux, and Ms. Margaret Woodward.[236] They conducted discovery against those who made the deal and BrownGreer, which distributed the money.[237] On February 24, 2011, Mr. Arceneaux participated in a meeting among lead and liaison counsel for the FAC and Objectors.[238] At that meeting, plaintiffs' liaison counsel explained that he and the co-lead counsel had pursued settlement talks with the objectors' liaison counsel, with Judge Fallon's encouragement, to resolve an apparently serious challenge to the common benefit fund.[239] Plaintiffs' liaison counsel explained his view that, at that time, "the fund belonged to nobody."[240] He said that the settlement "inured to the benefit of every claimant to the common benefit fund."[241] Judge Fallon was not informed of the terms of the deal, plaintiffs' liaison counsel said, because "he [the judge] didn't want to know."[242]

In March 2011, various objectors filed a motion for discovery regarding the unauthorized withdrawal from the fund because of the lack of transparency and the realization that the common benefit fund contained less than the court-ordered amount.[243] These motions suggested a variety of remedies ranging from stripping individuals of

---

234. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Nov. 20, 2007) (Pretrial Order No. 32).

235. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2011 WL 572394, at *3 (E.D. La. Jan. 20, 2011).

236. *See generally* 2011 Co-Lead Counsel Memorandum, *supra* note 198.

237. *See id.* at 6–8.

238. *Id.* at 7.

239. *Id.*

240. *Id.*

241. *Id.*

242. *Id.*

243. *See* 2011 Co-Lead Counsel Memorandum, *supra* note 198.

their leadership positions to requiring the disgorgement of the secretly-transferred money.[244] On August 29, 2011, the court directed the Claims Administrator to provide a report of the amount it held as common benefit fees.[245] The resulting report, which the court entered into the record on September 9, 2011, disclosed that only $302,406,562.50 remained in the escrow fund, and that over $12 million had been disbursed to the objector firms.[246]

This revelation prompted the court to order additional briefing and a hearing to determine who should bear the shortfall. The hearing occurred on September 21, 2011.[247] At the hearing, plaintiffs' liaison counsel stated that the FAC would bear the shortfall on a pro-rata basis in order that the FAC not contradict its agreements with the objectors.[248] The court did not probe into the underlying question of why the unauthorized transfers were made, but stated in a resulting order that it was "unaware of the details of the arrangement between Plaintiffs' Counsel and the Percentage-Fee Objectors and did not order any disbursements," and that it was "satisfied that all shortfalls in the fund have been adequately explained."[249] The court denied discovery into the issue and ordered that any shortfall be borne *pro rata* by the FAC's members.[250]

It is unclear how the FAC members fulfilled their obligation to make the common benefit fund whole. On August 9, 2011, the court entered its order allocating the common benefit fund among the counsel that performed common benefit work.[251] The court ordered the disbursement of $315,250,000, even though the court, and all those concerned, knew that the fund was short that amount by at least $12 million.[252] The money was distributed, and nothing suggested that the non-FAC members received less than the amounts awarded.[253] However, there is no documentation in the court record as to FAC's

---

244. *Id.* at 14.
245. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *1 (E.D. La. Aug. 25, 2011) (Order & Reasons).
246. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Sept. 9, 2011) (Order & Reasons).
247. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *4 (E.D. La. Sept. 26, 2011) (Order & Reasons).
248. *See id.*
249. *Id.* at *3–4.
250. *Id.* at *4.
251. *See In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *31–32 (E.D. La. Aug. 9, 2011) (Order & Reasons).
252. *See id.*
253. *See id.*

handling of their *pro rata* reduction to compensate for the shortfall.[254] The scandal ended quietly.

### D.   Comments on the 4 Percent Deal

It is surprising that a federal district judge would not be informed by counsel about an agreement to distribute over $18.5 million of settlement money that was under the judge's direct supervision and that the judge had at that point awarded to nobody, let alone a group of lawyers. This should *never* happen in a mass tort setting (or any setting). In effect, plaintiffs' liaison counsel had it right: the common benefit fund "belonged to nobody." Certainly the lawyers had no claim to it, as they possessed neither the right to determine its allocation nor the power to order the distribution of funds.

The 4 percent deal had major ramifications in the fee allocation process. For starters, the deal undermined basic predicates of Judge Fallon's October 2010 Order regarding common benefit fund assessments.[255] In reaching that decision, Judge Fallon relied on representations that the objectors had withdrawn their opposition and agreed that 7.5 percent was an acceptable resolution.[256] However, Judge Fallon was not informed that plaintiffs' liaison counsel and the co-lead counsel had reached a deal in which some plaintiffs' counsel would pay only 4 percent.[257] Judge Fallon still may have decided that 6.5 percent was appropriate. But he may have considered the 4 percent deal, and rejected it, making clear that the objectors' liaison counsel and his fellow objectors had to pay a court-ordered assessment regardless of their prior understanding. Alternately, Judge Fallon might have reasoned that if the NPC thought 4 percent was satisfactory for the objectors then it was also satisfactory for all plaintiffs' counsel. This would have resulted in lowering the common benefit fund by roughly $121 million down to $194 million. Since 73 percent was recommended to be distributed to the nine FAC firms,[258] such a reduction would have cost each FAC firm nearly $10 million on average.

---

254. *See id.*
255. *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at *31–32 (E.D. La. Oct. 19, 2010) (Order & Reasons).
256. *See id.* at 10.
257. 2011 Co-Lead Counsel Memorandum, *supra* note 198, at 4–5.
258. Objection of Kline & Specter, P.C., *supra* note 1, at 45; *see In re Vioxx*, 2011 WL 572394, at *4–5.

Moreover, if it had been known that a 4 percent deal was available, more than 62 firms may have joined the objectors' liaison counsel objection. As a result, the deal may have collapsed, and the objections may never have been withdrawn. Judge Fallon may have been forced to address the enforceability of the Full Participation Option and its August 2005 Pretrial Order.[259] With dozens more firms objecting and deal-making, the rationale for an 8 percent, or 7.5 percent, or 6.5 percent common benefit fee would have been undermined; the whole effort to undo the Full Participation Option may have collapsed. The process may have gone to the 4 percent agreed upon by the objectors' liaison counsel, or reverted back to the original deal for 2 percent, which would have reduced the common benefit fund by over $218 million to roughly $97 million, costing the FAC firms almost $18 million on average.

Interwoven with these considerations is the lack of transparency concerning the fate of millions of dollars in settlement funds—money that, if it belonged to "nobody," could not permissibly be distributed by lawyers acting without judicial knowledge or authorization. Surely due process considerations are implicated when unallocated settlement funds are distributed to a select group laden with self-serving considerations without providing anybody, not even the court, with notice or opportunity to respond. At the time this was discovered, some suggested that the distribution constituted a fraud on the court, and that the Fee Allocation Committee should be disbanded and its members forced to forfeit a portion of their fees to make the fund whole.[260] Judge Fallon never entered such rulings, and the matter was resolved by negotiation between the FAC and objectors, which was ultimately approved of by the court.

There is little comfort to be found in the FAC's agreement to absorb the shortfall in the common benefit fund. In particular, it is deeply unfair that certain firms only paid 4 percent to place their individual cases in the MDL, while other firms were required to pay the greater sum of 6.5 percent. This wrong was not righted simply by ordering the full amount of $315,250,000 to be distributed amongst the firms that performed common benefit fund activities. This inequity should never have existed, and should not be deemed acceptable in future litigation. At a minimum, it is inadequate that those who distributed settlement funds without judicial approval or knowledge can replace them without accompanying punishment.

---

259. *See In re* Vioxx Prods. Liab. Litig., MDL 1657 (E.D. La. Oct. 19, 2009) (Order & Reasons).
260. 2011 Co-Lead Counsel Memorandum, *supra* note 198, at 14.

It is unlikely any of this would have occurred had the PSC not been dismembered in favor of ad hoc committees run by political insiders to the litigation. Considering that the PSC was created at the outset, the court should have allowed the PSC to continue its supervisory role. The lesson here for future MDL proceedings is quite apparent.

In sum, deals like this should not be made nor should they be permitted. Future plaintiffs and judges in mass tort proceedings should have confidence that plaintiffs' counsel will be forthcoming in all matters relating to fund allocation. At stake are fundamental principles of justice, transparency, and due process, all foundations upon which the American courts, and public confidence are built.

## Conclusion

Mass tort litigation has an important place in the American litigation system. It is therefore vital that MDL judges enforce an orderly framework for resolving disputes between plaintiffs and defendants. It is equally crucial that MDL judges ensure that post-settlement issues are resolved in a manner that is transparent, jurisprudentially-sound, and fundamentally fair. The problems that complicated the creation and allocation of the *Vioxx* common benefit fund should never have occurred. The authors hope such problems will not be present in future MDL proceedings.