# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF KERN

BEFORE THE HONORABLE LORNA H. BRUMFIELD, JUDGE

DEPARTMENT 17

| | |
|---|---|
| COLEEN M. PERRY AND PATRICK PERRY, <br>         Plaintiff, <br>   vs. <br> HUNG T. LUU, M.D.; JOHNSON & JOHNSON, a New Jersey corporation; ETHICON, INC., a New Jersey corporation; and DOES 1-60, <br>         Defendants. | ) <br> ) <br> ) <br> ) Case No. <br> ) S-1500-CV-279123 LHB <br> ) <br> )     VOLUME XIV <br> ) <br> ) Pages 2429 - 2649 <br> ) <br> ) <br> ) <br> ) <br> ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY FOURTEEN

February 3, 2015

Reported By:                                      B. Suzanne Hull

                                                   CSR No. 13495

                                                   Official Reporter

Page 2602

1  in the conclusion paragraph.
2     A.  So this study is questioning the prevailing
3  notion that polypropylene is inert; that it doesn't
4  change.  This study observed changes in mesh that had
5  been explanted from humans; and, therefore, is
6  challenging that idea that it does not degrade.
7     Q.  And does it say anything at all about
8  whether or not the presence of an infection or
9  chronic inflammation has any bearing on degradation?
10        MR. SNELL:  Objection, Your Honor.  Calls
11  for hearsay and expert opinion.  Also duplicative.
12        THE COURT:  Sustained.
13        Please rephrase.
14  BY MR. FREESE:
15     Q.  Okay.  Dr. Guelcher, what I am simply trying
16  to find out is whether or not the human condition in
17  which the mesh is found, does that impact or not
18  impact the degradation or the rate of degradation?
19        MR. SNELL:  Same objections, Your Honor.  He
20  is not a medical doctor.
21        THE COURT:  Sustained.
22  BY MR. FREESE:
23     Q.  Did the doctors who wrote this article have
24  an opinion about whether or not degradation was
25  affected about -- by the condition in the human body?
26     A.  No.  They noted there were no strong
27  correlations.
28     Q.  Last article.

Page 2603

1     Dr. Guelcher, did you -- have you looked at
2  one more article?
3     A.  Yes.
4     Q.  All right.
5        MR. FREESE:  And may I approach, Your Honor?
6        THE COURT:  Yes, you may.
7  BY MR. FREESE:
8     Q.  I'm handing you what has been marked as
9  plaintiff's 3328.
10     A.  Yes.
11        MR. FREESE:  Your Honor, I do have an extra
12  one of these.
13        THE COURT:  I have it.  I am finding them in
14  the binder now.
15        MR. FREESE:  Thank you, Your Honor.
16  BY MR. FREESE:
17     Q.  Dr. Guelcher, do you recognize this
18  document?
19     A.  Yes, I do.
20     Q.  And what is the title of this article?
21     A.  "Pathological findings of transvaginal
22  polypropylene slings explanted for late
23  complications.  Mesh is not inert."
24     Q.  All right.  And who are the authors of this
25  article?
26     A.  Dr. Vladimir Iakovlev is the lead author.
27  Also Dr. Mekel and Blaivas.
28     Q.  And what is the date of this article?

Page 2604

1     A.  It is not on this document, but I think it
2  was this last year, 2014.
3     Q.  All right.  And just so we are clear because
4  we don't have unlimited amount of time, did you look
5  at more articles than the ones I have just shown you
6  today?
7     A.  Yes.  I have looked at a number of articles.
8     Q.  Are the three articles that I have shown you
9  the ones that are representative in your mind to
10  demonstrate your opinions?
11     A.  Yes.  I think so.
12     Q.  All right.  And do they best demonstrate
13  your opinions?
14     A.  Yes.
15     Q.  All right.  Would you tell us what the
16  authors were looking for in Exhibit 3328,
17  "Pathological findings of transvaginal polypropylene
18  slings explanted for late complications.  Mesh is not
19  inert"?
20     A.  So this is another valuable study because
21  these are meshes that are explanted from humans; so
22  it gives us insight as to how they behave in humans.
23  And Dr. Iakovlev tested these meshes, and in
24  100 percent of the cases he found evidence of
25  inflammation and foreign body reaction.  Again, the
26  foreign body reaction is what provides the cells that
27  secrete the oxidative species of oxidized
28  polypropylene; so the foreign body reaction, again,

Page 2605

1  is a source of chemical changes, the oxidation of the
2  polypropylene.
3        He found 100 percent of the time by
4  histology evidence of a foreign body reaction; so
5  that means that the polypropylene is exposed and is
6  reactive to oxygen secreted by those cells.
7        He also found that 100 percent of the -- of
8  the -- of the cases showed polypropylene degradation,
9  which he assessed by this layer of degraded oxidized
10  polypropylene on the surface of the fiber; so he saw
11  100 percent of the cases formed by the reaction;
12  100 percent of the cases, evidence of degradation.
13     Q.  So was there a single explanted mesh that
14  did not show evidence of degradation?
15        MR. SNELL:  Objection, Your Honor.  Lacks
16  foundation, and it is repetitive.  He doesn't know
17  what all Dr. Iakovlev looked at besides what he just
18  happened to disclose in this document.
19        THE COURT:  Well, I guess he can testify
20  about what he believes this document reflects as he
21  relied on it.
22        So you can answer the question.
23  BY MR. FREESE:
24     Q.  Go ahead, Doctor.
25     A.  So --
26     Q.  Let me re-ask the question.
27     A.  Well --
28     Q.  Okay.

Page 2606

1  A.  -- I'm involved in this study; so this is --
2  these data are part of a publication that we are
3  submitting as a manuscript; so I have knowledge of
4  this study.
5  Q.  Okay.
6  A.  Yeah.
7  Q.  So the question is --
8  A.  What was the question?
9  Q.  -- based on the conclusions reached by the
10 authors of this study, did they find any evidence of
11 a single explanted mesh that was not showing evidence
12 of degradation?
13     MR. SNELL:  Objection, Your Honor.
14 Repetitive.  The witness has said it was 100 percent.
15 Now he is asking it the opposite way.
16     THE COURT:  Overruled.
17     THE WITNESS:  Dr. Iakovlev did not find any
18 explants that did not show evidence of foreign body
19 reaction and degradation.
20 BY MR. FREESE:
21 Q.  Thank you, sir.
22    Dr. Guelcher, is there any published
23 literature in any journal that you are aware of that
24 has said polypropylene mesh that is implanted in
25 women -- a woman's pelvic region does not degrade?
26 A.  I am not aware of any such study.
27 Q.  Dr. Guelcher, based on your research and
28 study of the degradation of the polypropylene mesh,

Page 2607

1  do you have an opinion of whether or not the
2  antioxidants added to the Prolene® mesh prevents
3  degradation of the mesh?
4  A.  In my opinion, antioxidants can delay
5  degradation, but they don't prevent it.  It is
6  a permanent implant.  It is impossible to stabilize
7  it over its entire lifetime.  The antioxidants are
8  depleted by the same reactive species that degrade
9  the polypropylene.  Instead of degrading the polymer,
10 they are degrading the antioxidant.  It then goes
11 away, and it is not protected.  And it is subject to
12 degradation; so to me the literature is pointing out
13 that this is not a permanent effect.  It goes away
14 every time.
15 Q.  And what is not permanent is the antioxidant
16 effect?
17 A.  The antioxidant stabilization is not
18 permanent.  It is temporary.  It is depleted over
19 time, and the material is no longer protected.
20 Q.  Dr. Guelcher, do you have an opinion
21 regarding whether or not degradation of the Prolene®
22 mesh in the TVTTM Abbrevo is progressive over time?
23 A.  Yes.  It progresses over time.  The
24 literature is very clear in teaching that the foreign
25 body reaction is ongoing as long as the material is
26 there; so unless you take the material out, this
27 reaction continues to happen.  Ethicon's own studies
28 point to this continued degradation, and the mesh is

Page 2608

1  subjected to this continuing foreign body reaction,
2  it oxidizes and becomes brittle and degrades.
3  Q.  Now, Dr. Guelcher, did Ethicon ever do
4  a study to determine the effects of a degradation of
5  Prolene® mesh in a woman's vagina?
6  A.  Not -- not to my knowledge.
7  Q.  Do you have an opinion, to a reasonable
8  degree of scientific certainty, whether the
9  TVTTM Abbrevo is reasonably designed with the
10 laser-cut Prolene® mesh?
11     MR. SNELL:  Objection, Your Honor.  Beyond
12 the designation.
13     THE COURT:  Overruled.
14     THE WITNESS:  In my opinion, it is not
15 a reasonable design because internal Ethicon studies,
16 the testimony of Ethicon employees, and studies
17 published by people -- scientists outside of Ethicon
18 all clearly point to oxidation and degradation of the
19 polypropylene.  In my opinion, this should have been
20 tested more carefully under very controlled benchtop
21 conditions to understand the rate at which it occurs,
22 how effective are antioxidants.  Those questions were
23 never answered.
24     More preclinical testing was done in large
25 animals modeling the pelvic floor in a human to ask
26 whether these changes are important.  Do they affect
27 long-term performance of the mesh?  Those studies
28 were never done, and I think they would be required

Page 2609

1  for a reasonable design.
2     MR. FREESE:  May I have a moment,
3  Your Honor?
4     THE COURT:  Yes.
5     (Sotto voce discussion between Mr. Freese,
6     Mr. Cartmell, and Mr. Goss.)
7     MR. FREESE:  Thank you, Your Honor.
8  I have no further questions.
9     THE COURT:  All right.  You guys ready for
10 some cross-examination or do you need a break?
11    They are ready, Mr. Snell.
12     MR. SNELL:  Let's get it done.
13     THE JUROR:  You need to speak up there.
14     MR. FREESE:  Two seconds, Burt.  Let me get
15 my stuff.
16         CROSS-EXAMINATION
17 BY MR. SNELL:
18 Q.  Ready, Dr. Guelcher?
19 A.  I'm ready.
20 Q.  All right.  Let's start off at the
21 beginning, a little bit about your qualifications.
22    You talked about a pathologic study by
23 Dr. Iakovlev; correct?
24 A.  Yes.
25 Q.  You know him.
26    He is a pathologist; correct?
27 A.  That's right.
28 Q.  You are not a pathologist; right?

Page 2610

1  A. I am not a pathologist, but I do a lot of
2  work with pathologists.
3  Q. There is pathology in Ms. Perry's case;
4  right, sir?
5  A. Yes.
6  Q. You didn't look at it under a microscope,
7  did you?
8  A. It was --
9  Q. I'm sorry. Yes or no.
10      You didn't look at the pathology slides
11 under a microscope?
12 A. No. I did not look at them under
13 a microscope.
14 Q. And if you go to Dr. Iakovlev -- that's
15 whose article you showed to the jury -- he is an
16 expert for the plaintiffs; right?
17 A. Yes. That is my understanding.
18 Q. Do you know how many tens of hundreds of
19 thousands of dollars he has been paid to be an
20 expert.
21 A. I don't discuss that with Dr. Iakovlev.
22 Q. You saw that Dr. Blaivas was another listed
23 author on that?
24 A. Yes. I have never met Dr. Blaivas.
25 Q. And you know Dr. Blaivas is an expert for
26 the plaintiffs; right, sir?
27 A. That is my understanding. I have never met
28 him, though.

Page 2611

1  Q. Fair enough.
2      You are not a toxicologist.
3      Can we agree to that?
4  A. I am not a toxicologist.
5  Q. And I believe you told Mr. Freese you
6  started looking into this case and the degradation
7  issues in early 2014.
8      Does that sound about right?
9  A. In this particular case I have been looking
10 at the question of polypropylene degradation since
11 2013, when I first got involved with the litigation.
12 Q. Let me see if I can get this right.
13 A. All right.
14 Q. Prior to getting involved, you had not seen
15 in any of your research that there was a problem with
16 polypropylene mesh; is that correct?
17 A. I wasn't aware of it.
18 Q. And prior to getting involved, you had never
19 published any articles on the use of polypropylene in
20 mesh; is that correct?
21 A. I'm not published on polypropylene mesh.
22 Q. And you mentioned inert and what that means
23 to you as a polymer scientist; right, sir?
24 A. Yes.
25 Q. And you know as a polymer scientist -- well,
26 let me see.
27      You do not know of any material that can be
28 used for medical implants that is completely inert;

Page 2612

1  correct?
2  A. Completely, truly inert, all materials
3  respond to the body. The question is how much.
4  Q. You talked to Mr. Freese about your work on
5  this case.
6      And as I understand it, you are charging
7  $385 per hour for your testimony?
8  A. That sounds right, yeah.
9  Q. That's what you told me in your deposition.
10     Have you changed it, brought it down?
11 A. We have made some changes to the bill. We
12 do bill differently now, yeah.
13 Q. What are you billing now?
14 A. So I think it is $2,000 for a half day of
15 trial testimony.
16 Q. When did you come here to Bakersfield?
17 A. Much to the consternation of my family, on
18 Saturday.
19 Q. So you have been here since Saturday;
20 correct, sir?
21 A. Yes. Saturday night.
22 Q. Starting Sunday, how much have you been
23 billing? Have you been billing a half day rate?
24 a whole day rate? an hourly rate?
25 A. We bill it differently now because I am
26 actually doing research on polypropylene; so I am
27 billing it by the trial. Trial preparation is a flat
28 rate.

Page 2613

1      MR. SNELL: Your Honor, I am going to move
2  to strike we are doing research on polypropylene.
3  Again, this is violating Your Honor's ruling on that
4  issue.
5      THE COURT: Well, not necessarily. I don't
6  know what he is referring to.
7      THE WITNESS: I can explain, Your Honor.
8      THE COURT: Why don't we not explain right
9  now.
10     THE WITNESS: Okay.
11     THE COURT: Maybe we'll have to talk about
12 it later, but why don't you answer the question of
13 how much you are getting paid.
14     THE WITNESS: I'm trying to answer as best
15 as I can, Your Honor.
16     THE COURT: Okay.
17     THE WITNESS: There have been changes is
18 what I'm trying to say.
19     THE COURT: Tell him how much you are being
20 paid now.
21 BY MR. SNELL:
22 Q. So yeah.
23     How much are you being paid now? Can you
24 tell me a dollar amount per day?
25 A. So for trial preparation it is $7500, and
26 for a half day of testimony it is 2,000; so it is
27 a flat -- it is not -- it is not hourly. It is just
28 a flat rate.

Page 2614

1  Q. $7500 for trial preparation?
2  A. Yes.
3  Q. Is that per day that you are here?
4  A. No. That is just all the time I spent
5  preparing for trial, $7500.
6  Q. Okay.
7  A. It is just a flat.
8  Q. Okay.
9  A. It's -- well.
10 Q. Polypropylene, that is a polymer invented in
11 the 1950s; right, sir?
12 A. I believe so, yeah.
13 Q. Okay. And I think you said this, but I just
14 want to make sure we are clear.
15    The Prolene® polypropylene, which is
16 Ethicon's Prolene® --
17 A. Right.
18 Q. -- polypropylene, that is specific because
19 of certain antioxidants and additives; correct, sir?
20 A. So all polypropylene that is commercially
21 used is stabilized by antioxidants, and the
22 antioxidants used to stabilize Prolene® are a specific
23 blend; so yes.
24 Q. So I guess it would be fair to say --
25    Thank you.
26    -- the specific blend of antioxidants and
27 additives that are added to the Prolene® polypropylene
28 is what makes it that unique Prolene® polypropylene

Page 2615

1  product; correct, sir?
2  A. Yeah. But similar antioxidants are added to
3  other ones as well. But the specific formulation
4  is -- I will concede that. The specific formulation
5  is particular to Prolene®.
6  Q. And the Ethicon Prolene® polypropylene
7  sutures, the TVT™ mesh is made of the same chemical
8  composition as that; correct?
9  A. It is made of the same Prolene®
10 polypropylene; that's right.
11 Q. It means I asked a poor question.
12    The Ethicon TVT™ mesh --
13 A. Yes.
14 Q. -- used for the treatment of stress urinary
15 incontinence --
16 A. Yes.
17 Q. -- has the exact same chemical composition
18 as the Prolene® sutures; correct?
19 A. It is my understanding.
20 Q. Okay. And we'll talk about degradation and
21 oxidation.
22    As I understood your testimony, sir, and the
23 process, when you have oxidation impacting
24 polypropylene, you have -- you can have a change in
25 molecular structure; correct?
26 A. Yes. It changes the molecular structure;
27 that is right.
28 Q. You can have a change in molecular weight;

Page 2616

1  right?
2  A. Yes.
3  Q. And one of the ways you measure the extent
4  to which a substance degrades is -- or oxidizes is by
5  looking at whether there was a change in molecular
6  weight.
7     True?
8  A. I would -- I would say degrades. You could
9  use molecular weight to assess that.
10    MR. SNELL: I'd like to lodge Dr. Guelcher's
11 prior sworn testimony, Your Honor.
12    THE COURT: Yes.
13    MR. SNELL: And the date of that sworn
14 testimony is August 25th, 2014. Page 174, Lines 4 to
15 7. Page 174, Lines 4 to 7.
16    THE COURT: Any objection?
17    MR. FREESE: No objection, Your Honor.
18    THE COURT: Please proceed.
19    MR. SNELL:
20       "QUESTION: One of the ways that you
21    measure the extent to which a substance
22    degrades or oxidizes is by a change in
23    molecular weight. True?
24       "ANSWER: That is one way of measuring
25    it, yes."
26    THE WITNESS: Okay. Your Honor, can
27 I explain it?
28    You are not done. Okay.

Page 2617

1     THE COURT: I think he is done, but --
2     THE WITNESS: I'm not -- are you asking me
3  a question?
4     THE COURT: -- Mr. Freese gets to ask you
5  questions too.
6     THE WITNESS: Can I explain it?
7  BY MR. SNELL:
8  Q. I have a question.
9  A. Okay. I'll wait for your question.
10 Q. And loss of molecular weight leads to
11 embrittlement; correct?
12 A. Yes.
13 Q. And the progression of the chemical reaction
14 is that you ultimately have a change in the physical
15 properties of the substance; correct?
16 A. That is correct.
17 Q. Like tensile strength; correct?
18 A. Yes.
19 Q. Like toughness; correct?
20 A. Yes.
21 Q. And so you can actually measure by
22 analytical chemistry and benchtop testing the extent
23 to which a substance has undergone degradation;
24 correct, sir?
25 A. Yes.
26    I'd like to clarify; so by oxidation --
27    MR. SNELL: I'm going to move to strike. It
28 is a yes or no question.

48 (Pages 2614 to 2617)

Page 2618

1    THE WITNESS: I'm not sure what you're --
2    I guess I am not sure what you are asking me. If you
3    could repeat it.
4    BY MR. SNELL:
5    Q.   You can measure by analytical chemistry and
6    benchtop testing the extent to which a substance has
7    undergone degradation; correct?
8    A.   Yeah. Yeah.
9    Q.   Thank you.
10       Let's move on.
11       Do you have plaintiff's Exhibit 1531 there,
12   sir? That was the Guidoin paper you discussed.
13   A.   Yes. Yes. Yeah.
14   Q.   It is 1531. It is September 30th, 1997,
15   just so we are on the same page.
16   A.   Yes.
17       THE COURT: I believe it is '87, if I am not
18   mistaken.
19       MR. SNELL: Oh, I'm sorry.
20       THE COURT: Okay. At least the one I am
21   looking at.
22       MR. SNELL: Thank you for that correction,
23   Your Honor.
24   BY MR. SNELL:
25   Q.   September 30th, 1987, plaintiff's
26   Exhibit 1531.
27       Are you there, sir?
28   A.   Yes.

Page 2619

1    Q.   And I just had a question.
2        You mentioned that there was severe cracking
3    at eight years in this study.
4    A.   Yes.
5    Q.   My question to you was was there any
6    cracking at two years?
7    A.   I don't remember at two years. At three
8    years and later there was.
9    Q.   Okay. Let's talk just a moment about the
10   dog study --
11   A.   Okay.
12   Q.   -- plaintiff's Exhibit 2000.
13   A.   Yes.
14   Q.   Do you have it?
15   A.   Yeah.
16   Q.   Okay. There was no evidence of mechanical
17   breakage in the seven-year dog study; correct?
18   A.   What do you mean by mechanical breakage?
19   You mean the sutures failed while they were
20   implanted? Or I'm not sure what you mean.
21       MR. SNELL: Your Honor, I would like to
22   read --
23       THE WITNESS: Is there a --
24       MR. SNELL: -- Page 180, Lines 13 to 16.
25       THE COURT: Any objections?
26       MR. FREESE: No objection, Your Honor.
27       THE COURT: Please proceed.
28       MR. SNELL:

Page 2620

1        "QUESTION: There is no evidence of
2        mechanical breakage in the seven-year dog
3        study?
4        "ANSWER: I do agree that there is no
5        evidence of mechanical breakage."
6    BY MR. SNELL:
7    Q.   The last three pages of that study has the
8    mechanical properties testing that was done after
9    seven years; right, sir?
10   A.   I believe so.
11   Q.   And for those physical properties that they
12   tested and looked for, they didn't lose any of the
13   physical properties; right, sir?
14   A.   Okay. Now I understand your question; so
15   the mechanical testing that they did did not show
16   changes in the suture.
17   Q.   And they did GPC testing, which is gel
18   permeation chromatography?
19   A.   I pronounce it either way. They did GPC.
20   Q.   What it does is it measures molecular weight
21   that we have been talking about; right, sir?
22   A.   That's right.
23   Q.   And there was no significant molecular
24   weight loss -- correct? -- according to the GPC?
25   A.   Well, mechanically being the entire fiber;
26   so the molecular weight loss would be near the
27   surface of the fiber. If you sample the entire
28   fiber, you are not just testing this on the surface,

Page 2621

1    like they did in the Guidoin study; so that is why
2    they didn't observe changes in molecular weight.
3    Q.   Let me see if I can get a simple answer to
4    a simple question.
5        In the GPC testing, looking at molecular
6    weight, they didn't see a significant difference in
7    molecular weight?
8    A.   True. But it is not just a simple question.
9    Q.   Well --
10   A.   They did not see a difference in molecular
11   weight, but there is more nuance than that.
12   Q.   Let's talk for just a minute about the Clavè
13   paper, sir.
14   A.   Yes.
15   Q.   Plaintiff's Exhibit 2687.
16       And what they did in this study is --
17       Are you there, sir?
18   A.   Yes. I have the paper.
19       Did you ask me to go to a page? Or I'm
20   not --
21   Q.   I just want to make sure you --
22   A.   I have it.
23   Q.   I just wanted to make sure you have it
24   there.
25   A.   I have it.
26   Q.   So they started out with 1200 explants;
27   right?
28   A.   Yes.