# EXHIBIT C

Scott A. Guelcher, Ph.D.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF KERN
CASE NO. S-1500-CV 279123 LHB


COLEEN M. PERRY,                          PLAINTIFF


vs.


HUNG T. LUU, M.D.,                        DEFENDANTS
JOHNSON & JOHNSON, a New Jersey
Corporation; ETHICON, INC., a
New Jersey Corporation; and
DOES 1-60,


    The deposition of SCOTT A. GUELCHER, Ph.D.,

called by the Defendants for examination, taken

before Michelle E. Kerr, RPR, a Notary Public in and

for the Commonwealth of Kentucky, Daviess County, at

1719 West End Avenue, Nashville, Tennessee, on

December 18, 2014, commencing at 9:40 a.m.

Scott A. Guelcher, Ph.D.

Page 34

1    disclose consulting relationships.  When I
2    submit a grant application, I'm required to
3    disclose whether I have a significant
4    financial interest.  The NIH changed the
5    rules in 2012.  I disclose whether there is a
6    significant financial interest, and then the
7    dean's office works with me to figure out if
8    there is a conflict, and if there is, how do
9    we manage it.
10       So there is no fixed set procedure.  It's
11   very much handled on a case-by-case basis.
12   And disclosures are continuously updated as
13   new information becomes available.
14   Q  How is significant financial interest
15      defined?
16   A  The NIH defines a significant financial
17      interest as $5,000 a year.  That's one way to
18      define it.  Another is equity.  Strike that.
19      The NIH defines it as $5,000 or greater.
20      Financial interest, that could be cash.  That
21      could be equity.  That could be any form of
22      compensation, but the threshold is $5,000.
23   Q  Have all monies you receive in your role as
24      an expert in the transvaginal mesh litigation
25      for the calendar year 2014 been paid to you

Page 35

1    through Dr. Dunn's company?
2    A  The money I have received has all been
3       received through Dr. Dunn's company, that's
4       right, yes.  The money I received, yes.
5    Q  Does anyone at Vanderbilt know the scope of
6       Dr. Dunn's company?
7    A  I can't speak to Dr. Dunn's company.  I don't
8       know the details of his arrangement with the
9       university.  I just don't.  He has a
10      different type of appointment than I have.
11      He doesn't do federally-funded research.
12      That's what I know.  I don't know the details
13      of his arrangement with Vanderbilt.
14   Q  Is Dr. Dunn in a position of authority over
15      you at Vanderbilt?
16   A  No.
17   Q  If Dr. Dunn wanted to do federally-funded
18      research, would he be able to in light of his
19      activities and the amount of money his
20      company bills for expert work in the
21      transvaginal mesh litigation?
22   A  I can't speak to that.  I don't know how much
23      his company bills or makes.  I don't know
24      that information.
25   Q  Have you investigated what affect your

Page 36

1    independent role now as an expert and
2    billing as an expert will have on your
3    ability to work or run a lab that has
4    federally-funded research?
5    A  Yes, I have.
6    Q  And what affect, if any, have you learned
7       about that?
8    A  I'm contemplating updating my disclosure.
9       And -- well, I will leave it at that.
10   Q  Have you had any discussions with anyone at
11      Vanderbilt about ways you could work around
12      the ramifications that the receipt of federal
13      funding has on your role as an expert?
14          MR. KUNTZ:  Objection.
15   A  I don't like this word work around.  That's
16      not what we do.  We identify conflicts.  We
17      disclose information to the dean's office.
18      We work with the dean's office to identify
19      conflicts.  If conflicts are identified, we
20      work with the dean's office and the general
21      counsel's office to identify and manage a
22      plan, which is then approved -- approved by
23      the conflict of interest committee.
24          I've been through this process multiple
25      times.  I've had management plans.  I've been

Page 37

1    disclosing conflicts to Vanderbilt since I
2    started there.  There is a very standard and
3    routine process.  Faculty are allowed and
4    encouraged to participate in activities
5    outside of Vanderbilt.  I do this in the
6    course of my research with licensing,
7    start-up companies.  This is routine.
8       There is a process and a procedure.  And
9    we're not working around anything.  We're
10   trying to find a way to work within the
11   framework of the federal regulations and
12   university policy.  It's very standard for
13   universities.
14   BY MR. SNELL:
15   Q  Have you told Vanderbilt how much money you
16      have earned as an expert in the transvaginal
17      mesh litigation?
18   A  You have asked me this before.  And I said we
19      are not required in the course of our work to
20      disclose that.  If I believe that I see a
21      conflict between my research and the
22      consulting, then I will disclose that and the
23      university will -- we will have those
24      discussions, but we are not required to
25      disclose this information for consulting

10  (Pages 34 to 37)

Scott A. Guelcher, Ph.D.

Page 38

1    work.
2  Q  So the answer to my question is, no, you have
3     not disclosed that to Vanderbilt, correct?
4  A  I'm not required -- strike that.
5  Q  My question is simple.  Have you disclosed to
6     Vanderbilt --
7  A  And I believe I have answered your question.
8  Q  I think you are telling me about what you're
9     required to do.
10     I'm asking you, have you, Dr. Guelcher,
11     disclosed to Vanderbilt the monies, the
12     amount of monies you have earned as a
13     plaintiff's expert in transvaginal mesh
14     litigation?
15        MR. KUNTZ:  Object.  Answer it.
16  BY MR. SNELL:
17  Q  It's a yes or no answer.
18  A  No, I've not disclosed, but I'm not --
19  Q  Have you informed your dean of your current
20     intention to bill as an independent
21     consultant to attorneys in the transvaginal
22     mesh litigation?
23  A  Why would I inform the dean of this?  I've
24     not informed the dean.  I have to inform the
25     dean when I believe there is a conflict.  And

Page 39

1     if and when I make that assessment, I will
2     update my disclosure.  But according to
3     Vanderbilt policy, we're not required to do
4     those things.
5  Q  Well, if you spent approximately 20 hours at
6     $285 an hour thus far, that is over $5,000.
7     Are you telling me that if you have a greater
8     than $5,000 interest in your role as an
9     independent billing consultant to
10     transvaginal mesh litigation, you do not need
11     to tell that to the dean?
12        MR. KUNTZ:  Objection.
13  A  No, you are misinterpreting and
14     misunderstanding what I have said.  The
15     question is, whether the proposed research,
16     when I submit a grant application, I submit
17     an application to the NIH for federal
18     funding.  I have to answer the question, do
19     you have a significant financial interest in
20     the outcome of this federally-funded project.
21     Significant financial interest is defined
22     as more than $5,000.  But at this point in
23     time and in the past there -- at this time,
24     there is no overlap between the consulting
25     work and the federally-funded research.  So

Page 40

1     if and when I submit a grant application,
2     that would create the conflict, but that's
3     tied to INH funding.  That's not -- why I'm
4     not required to disclose it unless there is a
5     conflict of the federally-funded research
6     project.
7  Q  Have you performed any testing on Ms. Perry's
8     mesh?
9  A  I have not.
10  Q  Have you looked at Ms. Perry's mesh under a
11     scanning electron microscope?
12  A  I have not.
13  Q  What are all of the different tests, methods
14     that one can do to try to determine whether
15     there is degradation of polypropylene?
16  A  So degradation of polypropylene could be
17     assessed by SEM imaging.  That's typically
18     how we assess it.
19  Q  FTIR --
20  A  FTIR -- I'm sorry.
21  Q  FTIR is a way that one can go about trying to
22     assess whether there is degradation of
23     polypropylene, correct?
24  A  No, that's not why we use FTIR.  We use FTIR
25     to assess for oxidation, chemical changes in

Page 41

1     the polypropylene.  That can be assessed by
2     the FTIR.
3  Q  And when you look for oxidation via FTIR,
4     what you are looking for is to see if there
5     is a potential that would lead to
6     degradation; is that correct?
7  A  No.  We are looking at oxidation to answer
8     the specific question of is the surface
9     oxidizing, is it chemically changing.  And we
10     can see that by peaks in the FTIR spectra
11     that are not there in the normal
12     polypropylene, but do appear for oxidized
13     polypropylene.
14  Q  Now, as I understand it, Dr. Dunn, in prior
15     work did FTIR in connection with assessing
16     the question of is there degradation of
17     polypropylene?
18  A  And why is that -- I don't know what you're
19     referring to.
20  Q  I recall in your Huskey testimony, in your
21     deposition, you testified that all of the
22     testing done was done by Dr. Dunn.  And I
23     believe you identified FTIR, XPS, and I don't
24     know if there were others.
25  A  I don't remember the testing that Dr. Dunn

11 (Pages 38 to 41)

Scott A. Guelcher, Ph.D.

Page 42

1    did for the Huskey trial.  I do believe we
2    did FTIR.  I don't remember the others, but
3    oxidation and degradation are related, but
4    they're -- in terms of -- and there may be
5    times that people use the word degradation to
6    consider all of these effects, but I'm
7    speaking specifically about oxidation as a
8    chemical process, and degradation as a
9    physical one, and they're assessed by
10   different techniques.
11        And I remember all of the testing
12   that Dr. Dunn did for the Huskey trial.  I
13   don't remember that.
14   Q   So if one does FTIR testing and sees that the
15   surface is oxidized, that does not
16   necessarily mean that the material is
17   degraded, correct?
18   A   There are different tests to assess -- they
19   could be degraded, but we would assess
20   degradation using a different technique than
21   FTIR.  FTIR, as I said, is for chemical
22   oxidation, which is a chemical change.  There
23   may be degradation, but we would confirm that
24   with a technique such as SEM.
25   Q   So if a scientist has a positive FTIR finding

Page 43

1    for oxidation on the surface, he would then
2    need to confirm that with SEM in order to
3    reasonably say with scientific certainty that
4    there was degradation?
5         MR. KUNTZ:  Objection.
6    A   I would say that the literature teaches us
7    that these processes are related, oxidation.
8    Chemical oxidation leads to physical
9    degradation.  And so if I see evidence of
10   oxidation, I would expect to see physical
11   degradation in time.  To visibly see that
12   physical degradation, I would do the
13   technique such as SEM.
14        But if I see oxidation, I would certainly
15   expect based on published literature findings
16   that there would be degradation in time to
17   some extent.
18   BY MR. SNELL:
19   Q   Well, if you see chemical oxidation, it is
20   not a guarantee that physical degradation has
21   taken place, correct?
22        MR. KUNTZ:  Objection.
23   A   I think I just answered that.  It's a strong
24   indicator that there is also physical
25   degradation.

Page 44

1    BY MR. SNELL:
2    Q   The fact that it's a strong indicator,
3    though, that in and of itself means that
4    there is some possibility that you will not
5    see physical degradation, and there is a
6    possibility as well that you will see it,
7    physical degradation, if you look at SEM,
8    correct?
9         MR. KUNTZ:  Objection.
10   A   Again, the literature tells us that you would
11   expect degradation.  Is it -- unless you
12   actually see it, you can't prove -- you can't
13   guarantee that it's there, but you would
14   certainly expect it.  It's within a
15   reasonable degree of scientific certainty to
16   expect that you would have degradation in
17   time if that surface is being oxidized.
18        There are numerous papers that teach
19   about this, about polymers in general,
20   polymers that are susceptible to oxidative
21   attack showed signs of physical degradation.
22   This was all worked out a number of years
23   ago.
24        MR. SNELL:  Move to strike.
25   BY MR. SNELL:

Page 45

1    Q   My question is this.  It's straight forward.
2    The fact that you see chemical oxidation,
3    that does not mean that you would also see
4    under SEM analysis physical degradation if
5    you were to look at that particular time; is
6    that correct?
7         MR. KUNTZ:  Objection.  Asked
8    and answered.  Calls for speculation, and is
9    an incomplete hypothetical.  But go ahead.
10   A   This is a speculative question.  What I'm
11   saying is, if there is oxidative changes, the
12   body of literature teaches within a
13   reasonable degree of scientific certainty
14   that there will be at some time physical
15   degradation.  That's what the literature is
16   teaching us.
17   BY MR. SNELL:
18   Q   You keep saying at some time there will be
19   physical degradation.  At what time will
20   there be physical degradation?
21   A   As I've said in my previous testimony, it's
22   unpredictable.  And that's a problem for the
23   design of the device, because it's subject to
24   changes that can happen that you can't
25   predict the timing of these changes and what

12 (Pages 42 to 45)

Scott A. Guelcher, Ph.D.

Page 46

1    the implications will be.
2   Q  Do you have an opinion as to what is the
3    earliest point in time where there can be
4    physical degradation of Ethicon's Prolene
5    polypropylene used in TVT Abbrevo?
6   A  Again, that's a speculative question. I
7    believe that upon implantation, the device
8    will be colonized by adherent inflammatory
9    cells. This is well-known in the literature,
10    the foreign body reaction. Those cells will
11    secrete species that oxidize it. The timing
12    of all these events can depend on a number of
13    factors, the nature of the inflammatory
14    response where it's implanted, the mechanical
15    stresses in the environment, whether there is
16    a bacterial infection.
17        The timing can be highly variable. It
18    can happen early or it can happen late. The
19    point is that it's unpredictable. That's
20    what I've been saying.
21   Q  Well, I would like to know what does the
22    literature teach you about the earliest point
23    in time when you can say there is physical
24    degradation of the Prolene polypropylene
25    mesh?

Page 47

1        I don't want to rehash everything you
2    talked about in Huskey. I know you talked
3    about what was seen in two years and I
4    believe five or seven years in a dog study
5    and things like that. So with all of those
6    principles that you've already testified
7    about, let me just back up and re-ask it.
8   A  Okay.
9        MR. KUNTZ: Objection.
10   BY MR. SNELL:
11   Q  What is the earliest point in time that you
12    can say that there is physical degradation of
13    the Prolene polypropylene mesh?
14   A  I just can't answer that question. There are
15    too many factors that can influence it. To
16    say -- again, it's too speculative. It
17    depends on many factors in addition to the
18    chemical oxidation.
19   Q  Based on all of the literature that you saw,
20    what was the earliest time reported that
21    there was physical degradation of the Prolene
22    polypropylene mesh?
23   A  For Prolene polypropylene, I can say from the
24    Clave paper and the explants that were
25    studied in Clave, he recorded degradation in

Page 48

1    time periods of three months and later.
2    That's what Clave reported.
3   Q  And you have a list of materials here today.
4    Where in Clave does it say that --
5   A  I would have to see the paper. I know that
6    in Clave, it says that -- he notes that
7    explants -- I would have to see it to give a
8    precise answer. The number I remember is
9    three months.
10        (Deposition Exhibit No. 1 was
11    marked for identification.)
12   BY MR. SNELL:
13   Q  Doctor, I've handed you Exhibit No. 1. Is
14    that the Clave paper you were referring to,
15    sir?
16   A  That is correct.
17   Q  So can you show me where in Clave it states
18    that physical degradation occurred in the
19    Prolene polypropylene mesh at a certain time
20    period?
21   A  I'm looking for that. So on Page 264 of
22    Clave, it states degradation was observed
23    only in samples implanted for at least three
24    months.
25   Q  That is a general statement about the overall

Page 49

1    cohort of explants, correct?
2   A  That's my understanding.
3   Q  That statement is not necessarily particular
4    to a Prolene polypropylene mesh implant,
5    correct?
6   A  There could have been Prolene implants in
7    this study. That statement doesn't specify
8    whether that applies to Prolene or not.
9   Q  So my question is, can you point to any
10    literature which informs you of the earliest
11    time which the Prolene polypropylene mesh
12    physically degrades?
13        MR. KUNTZ: Objection.
14   A  I don't know of this -- you mean in vivo of
15    patients?
16   BY MR. SNELL:
17   Q  Yes, sir.
18   A  I don't know of a study that has specifically
19    reported that.
20   Q  In the dog study -- and you're still relying
21    on the dog study as well with the Prolene
22    sutures?
23   A  The dog study, it's in my reliance materials,
24    so it's part of the documents I have
25    reviewed.

13 (Pages 46 to 49)

Scott A. Guelcher, Ph.D.

Page 50

1    Q   At what point in time was physical
2        degradation observed in that study?
3    A   I can't remember. I would have to look at
4        the document.
5    Q   Okay. At a break, I would like for you to
6        look at that document. And I will have the
7        same question for the vascular graft Prolene
8        suture study, what is the earliest point in
9        that study if at any point in time it showed
10       physical degradation?
11   A   Again, I would have to look at it. I don't
12       remember that level of detail.
13   Q   Am I correct that although Clave reports
14       there were 100 explanted samples, a smaller
15       number were actually analyzed?
16   A   What do you mean analyzed? I'm not sure what
17       you mean.
18   Q   Let me ask you, how many explants were
19       analyzed in the Clave study?
20   A   I would have to look at it. There were 100
21       explants. I'm still not sure what you're
22       asking, though. I mean, there were 100
23       explants.
24   Q   How many of those 100 explants were actually
25       analyzed?

Page 51

1    A   Well, I think it depends on the method, so --
2        they did a chemical analysis on 32 explants.
3        It doesn't necessarily say in the methods.
4    Q   Why did Clave do less than one-third of the
5        overall sample size for chemical analysis?
6    A   I don't know. I would have to look at this
7        to --
8    Q   By only analyzing 32 out of 100 explants for
9        a chemical analysis, what limitations does
10       that place upon the interpretation one can
11       draw from the Clave paper?
12   A   Well, what I believe Clave is saying is
13       consistent with my opinions, that these
14       events can happen and can lead to problems
15       and complications. He's not saying it
16       happens all the time in every mesh at this
17       particular time.
18           He is saying that these meshes change,
19       which is consistent, which is my opinion in
20       this case, that the meshes change, and that
21       introduces an extra level of risk because
22       these changes make the meshes -- make their
23       behavior unpredictable. That is what he is
24       saying.
25           MR. SNELL: Move to strike.

Page 52

1    BY MR. SNELL:
2    Q   My question was not what is he saying. My
3        question was to you, what limitations does
4        that place upon what one can draw from Clave
5        due to the fact that only 32 out of 100
6        explants were submitted for chemical testing?
7    A   I don't see how it limits the finding that he
8        sees changes. That's what he is reporting,
9        whether he sees it in 32 or 50, whether he
10       looked at 32 or 100. I mean, you may be
11       implying that he was cherry-picking data, but
12       I have no reason to believe that. This is a
13       peer-reviewed journal.
14           I mean, he studied what he could study,
15       but it doesn't limit the finding that these
16       changes happened. Whether he did 32 or 100,
17       he still saw changes. So I don't understand
18       how that limits that finding.
19   Q   Well, he had 100 explants, and he only
20       subjected 32 to chemical analysis. We can
21       agree to that, right?
22   A   That's what he states. But beyond that, I
23       don't --
24   Q   And you don't know the methodology by which
25       he selected the particular 32 for chemical

Page 53

1        analysis, correct?
2    A   Well, let me read it. I need to read this,
3        because I'm not quite following where you are
4        going with this.
5            Okay. So he says -- I mean, he explains
6        himself. The samples were divided into four
7        groups. Because of the small sample size and
8        physical condition of the explanted
9        materials, extensive and complete chemical
10       analysis was difficult, which I think most
11       would agree is true. And he has several
12       groups listed here, four groups.
13           One of the fourth group is a control with
14       pristine implants, which he has a number of
15       pristine implants listed. So he grouped one
16       as degraded polypropylene that he analyzed by
17       SEM.
18           Group two is a group of nondegraded
19       explants, which again looks like
20       polypropylene mesh. And then the fourth
21       group of PET explants. That's what he says
22       he did. And he says it was difficult. He
23       probably didn't have much material to work
24       with, but these are explants. This isn't a
25       clinical trial. These are explants, so that

14 (Pages 50 to 53)

Scott A. Guelcher, Ph.D.

## Page 266

1    studies or documents or data that you can
2    review independently of Dr. Dunn, correct?
3    A  Yes, that's correct.
4            MR. SNELL:  Objection.  You've
5    got to give me a chance to object.  Leading,
6    compound.  Go ahead.
7    BY MR. KUNTZ:
8    Q  You repeatedly in your practice are going to
9    have expertise reviewing those types of
10    studies, SEM, FTIR, and XPS?
11            MR. SNELL:  Objection.  Leading
12    compound.  Go ahead.
13    A  Yes, I do.
14    Q  And if Ethicon did those studies or had those
15    types of documents, you could review those
16    independently, correct?
17            MR. SNELL:  Same objections.
18    A  Yes, I could.
19    Q  The last question I have.  Is there any
20    peer-reviewed article that you're aware of
21    that shows or supports the notion that
22    macrophages in foreign body giant cells can
23    be deactivated?
24    A  I'm not aware of such an article.
25            MR. KUNTZ:  Okay.  No more

## Page 267

1    questions.
2            REDIRECT EXAMINATION
3    BY MR. SNELL:
4    Q  Are you aware of any book chapters, any
5    articles in the peer-reviewed literature that
6    says that macrophages can indeed be
7    deactivated?
8    A  I'm not aware of those articles.  That's what
9    I said earlier.
10    Q  But you have seen it in the literature or in
11    books that macrophages can be quiescent?
12    A  That's not what I said.  I'm familiar with
13    this idea of reprogramming macrophages, but I
14    am not familiar with any studies that have
15    shown that this has been done or under what
16    conditions it happens.  I mean, I'm familiar
17    with the idea.  I'm just not familiar with
18    such a study is what I'm saying.
19    Q  You're not familiar with such a study that
20    shows that macrophages are activated
21    longitudinally every day for years and years?
22    A  No one has proven that, but Anderson teaches
23    they're activated when they adhere.  That's
24    what it says.
25            MR. SNELL:  Move to strike part

## Page 268

1    of the response, part of the answer.
2            I'm done.  Thank you.
3            (Deposition was adjourned at 5:50
4    p.m.)
5                    * * *

## Page 269

1    STATE OF KENTUCKY    )
2                         )
3    COUNTY OF DAVIESS    )
4
5        I, MICHELLE E. KERR, A NOTARY PUBLIC AT LARGE IN
6    AND FOR THE COMMONWEALTH OF KENTUCKY, DO HEREBY
7    CERTIFY:
8        THAT SAID DEPOSITION WAS TAKEN STENOGRAPHICALLY
9    AND ELECTRONICALLY BY ME AND THAT THE TYPEWRITTEN
10    TRANSCRIPT ABOVE IS A TRUE RECORD OF THE
11    TESTIMONY GIVEN; THAT I ALSO RECORDED AND
12    TRANSCRIBED ANY AND ALL OBJECTIONS MADE BY COUNSEL
13    AND THE REASONS THEREFORE; AND THAT I AM NOT A
14    RELATIVE OR EMPLOYEE OR ATTORNEY OR COUNSEL OF ANY
15    OF THE PARTIES, NOR A RELATIVE OR EMPLOYEE OF SUCH
16    ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED
17    IN THIS ACTION.
18
19
20        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND
21    AND AFFIXED MY NOTARIAL SEAL ON THIS _____ DAY OF
22    DECEMBER, 2014.
23
                    _____
            MICHELLE E. KERR, NOTARY PUBLIC
24
25    My Commission Expires:
        March 21, 2017
        March 21, 2017