# EXHIBIT F

In The Matter Of:
*~In Re: Avaulta~*

---

## *Bobbie Shull, M.D.*
### *02/06/2013*

---

Tiffany Alley Reporting & Video
3348 Peachtree Road
Tower Place 200, Suite 700
Atlanta, GA 30326

770.343.9696
www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE:  C.R. BARD, INC.
PELVIC REPAIR SYSTEM PRODUCTS          MDL NO. 2187
LIABILITY LITIGATION:

THIS DOCUMENTS RELATES TO:

LINDA RIZZO and RONALD RIZZO,
        Plaintiffs,                    Case No.
        vs.                            2:10-cv-01224
C.R. BARD, INC.,
        Defendant.

WANDA QUEEN and GREG QUEEN,
        Plaintiffs,                    Case No.
        vs.                            2:11-cv-00012
C.R. BARD, INC.,
        Defendant.



VIDEO DEPOSITION OF BOBBIE LEWIS SHULL, M.D.

February 6, 2013 - 9:14 a.m.

Mueller Law Offices

404 W. 7th Street

Austin, Texas  78701

Judith L. Leitz Moran - RPR, CCR-B-2312

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    CAROLYN JONES,

 2          Plaintiff,                          Case No.

 3          vs.                                 2:11-cv-00114

 4    C.R. BARD, INC.,

 5          Defendant.

 6    _____

 7    DONNA CISSON and DAN CISSON,

 8          Plaintiffs,                         Case No.

 9          vs.                                 2:11-cv-00195

10    C.R. BARD, INC.,

11          Defendant.

12    _____

13    NANCY SMITH and JOHN SMITH,

14          Plaintiffs,                         Case No.

15          vs.                                 2:11-cv-01355

16    C.R. BARD, INC. and SOFRADIM

17    PRODUCTION SAS,

18          Defendants.

19    _____

20

21

22

23

24

25
```

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

```
1                    INDEX OF EXHIBITS

2       For the Defendants

3       EXHIBIT     DESCRIPTION                    PAGE

4       1           Amended Notice of Videotaped    17

5                   Deposition of Robert Shull, MD

6       2           Rule 26 Expert Report of Dr.    22

7                   Bob Shull

8       3           Exhibit A - Curriculum Vitae    25

9       4           Exhibit B - Index of Documents  54

10                  considered

11      5           Ovid: Surgical Management of    82

12                  Prolapse of the Anterior

13                  Vaginal Segment: An Analysis

14                  of... Page 1 of 12

15      6           Article - Pelvic organ prolapse: 85

16                  Anterior, superior, and

17                  posterior vaginal segment

18                  defects

19      7           Editorial - Concerns regarding  90

20                  pelvic reconstructive surgery

21      8           Debate: Transvaginal Mes for   105

22                  POP - The Recent FDA Update -

23                  A perfect storm

24

25
```

~In Re: Avaulta~                       Bobbie Shull, M.D.                       2/6/2013

```
 1              INDEX OF EXHIBITS (CONT.)

 2    For the Defendants

 3    EXHIBIT    DESCRIPTION                        PAGE

 4    9          Case Report - A serious            112

 5               complication following

 6               placement of posterior Prolift

 7    10         Invoice Nos. 1 - 6                  122

 8    11         Flash Drive                        122

 9

10

11


12              INDEX OF EXAMINATION

13                                                 PAGE

14    By Mr. North                                    9

15

16

17

18

19

20

21

22

23

24

25
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    APPEARANCES OF COUNSEL:
 2    On behalf of Plaintiffs:
 3         HENRY G. GARRARD III, ESQUIRE
 4         Blasingame, Burch, Garrard & Ashley
 5         440 College Avenue, Suite 320
 6         Athens, Georgia 30601
 7         (706) 354-4000
 8                   and
 9         MARGARET M. THOMPSON, M.D., ESQUIRE
10         Mueller Law
11         404 W. 7th Street
12         Austin, Texas  78701
13         (512) 478-1236
14
15    On behalf of Defendant C.R. Bard, Inc.:
16         RICHARD B. NORTH, JR., ESQUIRE
17         Nelson Mullins Riley & Scarborough LLP
18         Atlantic Station
19         201 17th Street NW
20         Suite 1700
21         Atlanta, Georgia  30363
22         (404) 322-6000
23
24
25
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   APPEARANCES OF COUNSEL (CONT.):
 2   On behalf of Defendant Sofradim Production SAS:
 3        MICHAEL D. MOELLER, ESQ.
 4        Shook, Hardy & Bacon, LLP
 5        2555 Grand Boulevard
 6        Kansas City, Missouri  64108
 7        (816) 474-6550
 8
 9
10   Also Present:
11        Terry Wetz, Legal Video Specialist
12
13
14
15
16
17
18
19
20
21        (Pursuant to OCGA 15-14-37 (a) and (b) a
22   written disclosure statement was submitted by
23   the court reporter to all counsel present at
24   the deposition and is attached hereto.)
25
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1              VIDEO TECHNICIAN:  And we are on the
 2     record.  The time is approximately 9:14 a.m.
 3              This is the beginning of Tape 1 of
 4     the videotape deposition of Dr. Robert Shull.
 5     In Re: Avaulta Pelvic Mesh Support Systems.
 6              Today's date is February 6th, 2013.
 7              My name is Terry Wetz, Legal Video
 8     Specialist.
 9              Would counsel present please identify
10     themselves and who they represent for the
11     record.
12              MR. GARRARD:  Henry Garrard on behalf
13     of Plaintiffs.
14              MS. THOMPSON:  Margaret --
15              MR. NORTH:  Richard -- oh, I'm sorry.
16     Go ahead.
17              MS. THOMPSON:  Margaret Thompson on
18     behalf of the Plaintiffs.
19              MR. NORTH:  Richard North on behalf
20     of C.R. Bard.
21              MR. MOELLER:  Mike Moeller on behalf
22     of the Sofradim Defendants.
23              VIDEO TECHNICIAN:  Thank you,
24     counsel.
25              Would the court reporter please swear
```

1   in the witness.

2          BOBBY LEWIS SHULL, M.D.,

3   being first duly sworn, was examined as

4   follows:

5          THE WITNESS:  I do.

6          MR. NORTH:  This will be the

7   deposition of Dr. Bob -- how do you pronounce

8   your last name?

9          THE WITNESS:  Shull.

10         MR. NORTH:  -- Shull, taken for

11  purposes of discovery and all other purposes

12  permitted under the federal rules.

13         Mr. Garrard, as usual, I propose that

14  we reserve all objections except as to the form

15  of the question or the responsiveness of the

16  answer until such time as this deposition is

17  used.

18         MR. GARRARD:  That's fine.

19         Although, I would state that the

20  court has encouraged us simply to reserve all

21  objections and I will be agreeable to that, but

22  I can also do form and responsiveness, too.

23         MR. NORTH:  Because I often stumble

24  on form, I would be most appreciative if you

25  would make form objections.  I'm not willing to

1    stipulate as to the reservation of all of

2    those.

3             And what is the witness's preference

4    as to read and sign?

5             MR. GARRARD:  He will read and sign.

6             MR. NORTH:  And we'll stipulate that

7    he may do so before any notary public.

8                      EXAMINATION

9    BY MR. NORTH:

10        Q    Doctor, would you state your full

11   name for the record.

12        A    **Bobby Lewis Shull.**

13        Q    And what is your business address?

14        A    **I work at Scott & White Clinic in**

15   **Temple, Texas.  The address is 2401 South 31st**

16   **Street.**

17        Q    Dr. Shull, as I introduced myself to

18   you before the deposition, my name is Richard

19   North and I'm an attorney representing C.R.

20   Bard in this litigation where you have been

21   named an expert witness.

22             Have you ever given a deposition

23   before?

24        A    **One time.**

25        Q    In what kind of case was that?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          **A      It involved medical care and it's**

2     **been a number of years ago and I don't remember**

3     **the details, but it was a question about the**

4     **adequacy of care for a surgical patient.**

5          Q      But some sort of medical malpractice

6     case?

7          **A      Yes.**

8          Q      And were you testifying on behalf of

9     the physician who was being sued or the

10    patient?

11         **A      The physician.**

12         Q      Did that involve pelvic floor surgery

13    or do you recall?

14         **A      You know, I don't remember the**

15    **details, but I'm sure it did.**

16         Q      Okay.  Well, since it's been a while

17    since you've given a deposition, let me ask you

18    to please let me finish my question before you

19    answer it so the court reporter can take it

20    down.  And that you please answer out loud and

21    avoid the nod of the head or uh-huh or uh-uh.

22              And then, also, if at any time you

23    want to take a break today, please feel free to

24    do so.  Just let us know and we'll be happy to

25    do so.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1              And what is your profession,
 2   Dr. Shull?
 3       A     I practice obstetrics and gynecology,
 4   although, for the last 20 years or so my
 5   practice has been limited to outpatient
 6   gynecology and gynecologic surgery.
 7       Q     And just rough calculations, it
 8   seemed to me you're probably in your late 60s
 9   or early 70s?
10       A     69.
11       Q     Okay.  Are you still practicing
12   medicine full time?
13       A     Yes, I do.
14       Q     Before we get any further, I'd just
15   like to ask you a little bit about your
16   gynecological surgery career.
17              Have you ever implanted a
18   polypropylene mesh product?
19       A     In the case of suburethral slings for
20   the treatment of urinary incontinence, the
21   answer is yes.
22       Q     Do you still to this date implant
23   polypropylene slings?
24       A     For the treatment of urinary
25   incontinence, yes.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1       Q    How frequently do you perform that
2   sort of surgery today?
3       A    It's variable, but in the course of a
4   year, I would estimate maybe 30 times or...
5       Q    What slings do you presently use?
6   What manufacturer's products do you use in
7   those?
8       A    Primarily, we use Johnson & Johnson's
9   tension-free vaginal tape for retropubic
10  slings.  In the occasional case where we do
11  transobturator slings, we'll use the Boston
12  Scientific product.
13      Q    Have you ever used any Bard products
14  for the treatment of stress urinary
15  incontinence?
16      A    To the best of my knowledge, no.
17      Q    So I gather by the way you answered
18  that question, that you have never implanted a
19  transvaginal mesh product for the treatment of
20  pelvic organ prolapse?
21      A    I have not used any mesh products for
22  the treatment of pelvic organ prolapse being
23  placed transvaginally.
24      Q    Have you used mesh for the treatment
25  of pelvic organ prolapse where the mesh was

~In Re: Avaulta~                         Bobbie Shull, M.D.                         2/6/2013

1    placed in the body through some other technique

2    or route?

3         A    Occasionally, we'll do abdominal

4    sacral colpopexy.  That involves placing a

5    synthetic material transabdominally.

6         Q    How often do you do that procedure?

7         A    We look at our statistics

8    periodically, and in the cases of women who

9    have pelvic organ prolapse, probably 90 or

10   95 percent of those women are treated with

11   vaginal surgery, about 5 percent are treated

12   abdominally.

13             I have two associates who are

14   technically more proficient at doing abdominal

15   surgery than I am.  Most of the patients who

16   have abdominal surgery are treated by one of my

17   two colleagues.

18        Q    Did you just say that 90 to 95

19   percent of the patients at your clinic that

20   have this sort of surgery have it through a

21   vaginal route?

22        A    Yes, I did.

23        Q    But you don't perform that surgery?

24        A    The vaginal surgery, yes.

25        Q    You do?

1      **A      Yeah, I do.**

2      Q      Okay.

3             MR. GARRARD:  Richard, he doesn't

4      mean by that he's putting mesh in there

5      transvaginally.  It means he's doing surgery

6      vaginally.

7      BY MR. NORTH:

8      Q      You're doing -- would you call that

9      native tissue surgery?

10     **A      Yes.**

11     Q      Okay.  So you are estimating that in

12     your -- well, are you part of a practice group

13     at the clinic?

14     **A      Yes.**

15     Q      And how many gynecological surgeons

16     are in that group?

17     **A      In our department of obstetrics and**

18     **gynecology, we have a variety of locations**

19     **where we provide care.**

20            **In the main campus at Temple, there**

21     **are approximately 20 people on the faculty,**

22     **there are 16 residents in training in**

23     **obstetrics and gynecology, there are three**

24     **fellows who are doing post residency training**

25     **in the subspecialty of female pelvic medicine**

~In Re: Avaulta~                     Bobbie Shull, M.D.                        2/6/2013

```
 1    and reconstructive surgery.
 2            We have other satellites.  All
 3    together we have about 40 physicians who
 4    practice obstetrics and gynecology.
 5        Q    At the present time, do any of those
 6    surgeons utilize transvaginal mesh products for
 7    procedures?
 8        A    To the best of my knowledge, no one
 9    does.
10        Q    Over the last -- well, let's say
11    since 2005, have any of the surgeons affiliated
12    with your group used transvaginal mesh
13    products?
14        A    For the treatment of prolapse or for
15    the --
16        Q    For the treatment of prolapse.
17        A    For the treatment of prolapse, I'm
18    not aware of that.
19        Q    Did your practice group make a
20    decision at some point that you were not going
21    to use the transvaginal mesh products?
22        A    The group who works with me at Temple
23    has discussed this issue extensively.  We have
24    historically treated women with prolapse
25    through a transvaginal native tissue repair.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          We have a long history of doing the

2    surgery, recording our outcomes, and reporting

3    on them in the scientific literature.

4          The introduction of mesh for the

5    treatment of prolapse 10 or 11 years ago was

6    discussed by those of us who worked together,

7    and we have chosen not to use that.  We feel

8    that we get nice results with native tissue

9    surgery.  We've documented that and recorded it

10   and we're pleased with that.

11         Q    To your knowledge, have you ever used

12   a product manufactured by Bard for the

13   treatment of pelvic organ prolapse or stress

14   urinary incontinence?

15         A    I'm not aware that I have.

16         Q    Are you -- to your knowledge, have

17   you ever used a product manufactured by the

18   French company Sofradim for the treatment of

19   either stress urinary incontinence or pelvic

20   organ prolapse?

21         A    I'm not aware that I have.

22         Q    Same question as to a British company

23   by the name of Tissue Sciences Laboratories?

24         A    I don't know what products they make.

25   Unless they make something for Johnson &

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   Johnson, for example, I don't believe I would

2   have used it.

3       Q    Over the years, has Johnson & Johnson

4   been your principal product that you've used

5   for the treatment of stress urinary

6   incontinence?

7       A    Yes.

8       Q    Do any of the slings or other mesh

9   products that you've used for the treatment of

10  stress urinary incontinence -- well, are they

11  made of polypropylene to your knowledge?

12      A    The tension-free vaginal tape is made

13  of polypropylene.

14      Q    What about the other products that

15  you use?

16      A    That Boston Scientific has?  I can't

17  answer that for sure.  I believe it's

18  polypropylene, but I don't know that for a

19  fact.

20      Q    Do either of those products have any

21  porcine or collagen component?

22      A    No.

23           (Defendant's Exhibit 1 marked.)

24  BY MR. NORTH:

25      Q    Doctor, let me hand you what's been

1    marked as Exhibit 1, which was the notice of

2    deposition filed in this case.  Do you

3    recognize that?

4        A    Yes, I do.

5        Q    And that requested that you bring a

6    number of documents with you.

7             What have brought with you today?

8        A    Well, I believe that I have all the

9    patient records.  I have the records that were

10   provided me by Mr. Garrard and Dr. Thompson

11   regarding the documents they acquired from Bard

12   and Sofradim.  I have some scientific articles

13   which I previously reviewed.  I have my report.

14            I don't know if there's something

15   else I should have.  I don't remember anything

16   else.  Is there something else I should have?

17            MR. GARRARD:  Richard, let me -- let

18   me add that we have downloaded to a thumb drive

19   all of the materials he has reviewed, medical

20   records inclusive, documents, et cetera, which

21   we're furnishing to you.

22            MR. NORTH:  Are those duplicative of

23   the hard copy materials that are sitting in

24   front of him now?

25            MS. THOMPSON:  Everything that he has

~In Re: Avaulta~                     Bobbie Shull, M.D.                      2/6/2013

1    sitting in front of him is on the flash drive,

2    but there are also additional documents on the

3    flash drive that he does not have in front of

4    him.

5           MR. MOELLER:  I just was going to see

6    if I could --

7           MR. NORTH:  Yeah, if Mike can look at

8    that for a while.

9           MR. GARRARD:  You can mark it as an

10   exhibit, whatever you want to do, but...

11          MS. THOMPSON:  So that has all the

12   documents that were listed on his report as --

13          MR. MOELLER:  Thank you, sir.

14          MS. THOMPSON:  -- provided or relied

15   upon.

16          MR. NORTH:  Are there additional

17   documents that he's relied upon that are not

18   listed on his report?

19          MR. GARRARD:  Yeah, he has looked at

20   some updated medical records that are on that

21   flash drive and I've got copies of them here

22   also if --

23          MR. NORTH:  Okay.

24          MR. GARRARD:  -- if you want them.

25          MR. NORTH:  Yeah.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1          MR. GARRARD:  He's also reviewed some

 2   depositions, treating doctor depositions and

 3   what have you that have been taken in the

 4   interim.  Some of them may have been taken

 5   before, I don't know.  There may be something

 6   else.

 7          MS. THOMPSON:  And that's on the

 8   flash drive.

 9          MR. GARRARD:  And they're -- they're

10   all on the flash drive.  Everything's there.

11          MR. MOELLER:  Can I just ask real

12   quick, Richard.  Are these updated records on

13   specific or are they on all of the bellwethers?

14          MR. GARRARD:  I think it's on three

15   of them, Mike.

16          MR. MOELLER:  Okay.  I've got --

17          MR. GARRARD:  I think there are

18   updated records on Queen and Smith and --

19          MS. THOMPSON:  Rizzo.

20          MR. MOELLER:  Rizzo?

21          MR. GARRARD:  -- Rizzo.

22          MR. NORTH:  Has the doctor been

23   furnished any additional Bard documents or

24   Sofradim documents for his review besides what

25   was on the list?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          MR. GARRARD:  You know, I don't want

2    to say, no, he hasn't.  If he has, it's not

3    much, but -- but I'm not going to -- I'm not

4    going to say absolutely, no, without looking

5    through the flash drive.

6          MR. NORTH:  So am I correct that we

7    do not have a current list anywhere of the

8    documents he's been provided, we just have them

9    all on this flash drive?

10         MR. GARRARD:  You have them on the

11   flash drive.

12         MR. NORTH:  And there's no listing or

13   index of them on the flash drive?

14         MR. GARRARD:  Is there, Margaret?

15         MS. THOMPSON:  The -- I'm not -- I

16   don't believe that the depositions and the

17   updated medical records were added to the

18   index.  But the index is on the flash drive of

19   all the documents he reviewed.

20         But the additional ones are, as far

21   as I know, the -- the updated medical records

22   and the depositions.

23         MR. NORTH:  If he were furnished

24   additional corporate documents, would those be

25   on the index on that flash drive?

```
 1                    MS. THOMPSON:  Yes.

 2                    (Defendant's Exhibit 2 marked.)

 3   BY MR. NORTH:

 4        Q    Doctor, let me hand you what's been

 5   marked as Exhibit 2.  Can you identify for the

 6   record what Exhibit 2 is?

 7        A    Exhibit 2 is Rule 26 Expert Report

 8   of -- of Dr. Bob Shull.

 9        Q    And that's your report in this case;

10   is that correct?

11        A    Yes, it is.  Yes, it is.

12        Q    Now, I notice that on the hard copy

13   stacks of documents that you have in front of

14   you that you brought in response to the notice

15   you have handwritten notes on a number of

16   those; is that correct?

17        A    That's correct.

18        Q    Then I see notes on the top of these

19   binders.  Are there notes scattered throughout

20   the binders or just on the top?

21        A    There may be some things underlined

22   as I reviewed the records.  I don't have them

23   marked anyplace, but when I reviewed the

24   records, I may have underlined or highlighted

25   something.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          What you see on the top is basically

2    an outline of some of the information to help

3    me recall what happened in the event you ask

4    about particular items.

5          Q    And when were those notes prepared?

6          A    They've been prepared over a period

7    of the last few months.  I believe the first

8    time I was contacted by Margaret was in May of

9    2012, and sometime after that I began reviewing

10   some of the records.

11         Q    Had you had any previous contact with

12   Margaret before?

13         A    Professionally do you mean?

14         Q    Well, let's start with

15   professionally.

16         A    Well, Margaret practiced obstetrics

17   and gynecology in Austin and I practiced about

18   an hour away.  So in that sense I had contact

19   because sometimes we'd share patients or we go

20   to meetings together or I would see her at

21   professional societies.

22         Q    Okay.  Did you -- the way you

23   distinguished between professionally, did you

24   know her personally, too, beyond those

25   professional contacts?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        A      We didn't have any social
 2   interactions.
 3        Q      Right.
 4               So these handwritten notes had been
 5   prepared over a number of months?
 6        A      That's correct.
 7        Q      But beyond any underlining or
 8   highlighting or something, are all your
 9   handwritten notes regarding these documents at
10   the front of each of these?
11               No.   Just answered it.
12        A      There's one right there on Volume
13   III --
14        Q      Okay.
15        A      -- of Mrs. Rizzo.   I think the rest
16   are on the front.
17        Q      Okay.
18               MR. NORTH:   At the next break or
19   first break I would like to get copies of his
20   notes --
21               THE WITNESS:   Sure.
22               MR. NORTH:   -- so we could have those
23   and mark those as an exhibit.
24               MR. MOELLER:   Just while we're on
25   short dialogue, we probably should get some
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   extra copies of these medical reports, too.  It
 2   can be on a break or if you want me to hand
 3   them to you now.
 4            MS. THOMPSON:  These two are yours.
 5   You want more than that?
 6            MR. MOELLER:  Oh, we'd probably want
 7   to mark some, too, at some point.
 8            MR. NORTH:  Right.
 9            MS. THOMPSON:  Okay.
10            MR. MOELLER:  So I figure you'd guys
11   want some --
12            MS. THOMPSON:  Okay.  I'll just --
13            MR. MOELLER:  Thank you.
14            (Defendant's Exhibit 3 marked.)
15   BY MR. NORTH:
16       Q    Doctor, let me hand you what's been
17   marked as Exhibit 3.
18            Can you identify Exhibit 3 for the
19   record, Doctor?
20       A    This exhibit is my curriculum vitae.
21       Q    And I would represent to you that
22   this was the version of it that was attached to
23   your report when it was served in October.  Has
24   your curriculum vitae been updated since then?
25       A    To the best of my knowledge, nothing
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    of any consequence has changed since this was

2    done.  There have been -- possibly there's one

3    publication that isn't on it, but I don't know

4    that.

5        Q    Doctor, do you know Dr. Donald

6    Ostergard?

7        A    Yes, I do.

8        Q    In what capacity?

9        A    He and I have similar professional

10   interests.  We have a similar practice of

11   medicine.  We belong to some of the same

12   organizations.  We've met at different

13   professional meetings.  He and I have not

14   actually worked together in any patient care

15   issues.

16       Q    Have you ever discussed transvaginal

17   mesh products with Dr. Ostergard?

18       A    I have heard him give presentations

19   and I've read some of his publications about

20   mesh products.  I've not had a personal

21   discussion with him particularly about it.

22       Q    And you have not had any discussions

23   with him then about your work on this

24   particular litigation?

25       A    No, I haven't.

~In Re: Avaulta~                          Bobbie Shull, M.D.                          2/6/2013

1        Q     Okay.  Is the Scott & White Clinic

2    affiliated with Texas A&M?

3        A     Scott & White Clinic is an

4    organization of physicians and support

5    personnel to provide medical care.  The clinic,

6    our hospital, and our health plan are a single

7    organization.

8              We provide medical education for

9    Texas A&M University College of Medicine.  It's

10   done on a contract basis.  We're not actually a

11   part of the Texas A&M system or university.

12       Q     And is Texas A&M located in Temple?

13       A     Texas A&M is located in a variety of

14   places.  The primary campus is in College

15   Station, but there are campuses all over the

16   state.

17             Our particular medical school has a

18   campus in Temple, but there are also campuses

19   in other locations.

20       Q     What would be considered the

21   principal campus for the Texas A&M medical

22   school?

23       A     College Station.

24       Q     Okay.  Are you presently board

25   certified?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        A     I'm presently board certified in
 2   obstetrics and gynecology.
 3        Q     Is there any specific board
 4   certification available for gynecological
 5   surgery as opposed to just obstetrics and
 6   gynecology?
 7        A     In the general specialty of
 8   obstetrics and gynecology, there currently are
 9   three subspecialties for which you can take an
10   examination and be certified by the American
11   Board of Obstetrics and Gynecology.  Maternal
12   and fetal medicine, oncology, reproductive
13   endocrinology.
14            As of June of 2013, there will be an
15   examination for the subspecialty of female
16   pelvic medicine and reconstructive surgery.
17            There currently is no examination for
18   that specialty so no one is subspecialized or
19   certified in that particular area at the
20   present time.
21        Q     Now, my understanding is you
22   graduated from Duke University?
23        A     I attended Duke University from 1961
24   to '64.  I enrolled in medical school before I
25   graduated.
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1          Q     What was your major at Duke?
 2          A     German.
 3          Q     And so you went straight from Duke to
 4   Tulane Medical School?
 5          A     Yes, I did.
 6          Q     And that was without actually
 7   graduating from Duke?
 8          A     That's correct.
 9          Q     And then you did your internship and
10   residency at the University of Virginia?
11          A     That's correct.
12          Q     And I believe you completed your
13   residency in 1973?
14          A     Yes.
15          Q     And where did you go after that?
16          A     I had been enrolled in a program
17   called the Berry Program which allowed me to be
18   deferred from going into active duty military
19   during my residency program.
20                I had agreed that when I finished my
21   residency program, I would serve on active
22   duty.  At the completion of my residency, I was
23   assigned to Sheppard Air Force Base in Wichita
24   Falls where I worked for two years doing
25   general obstetrics and gynecology.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        Q    And after your two-year stint at the
 2   air force base, what did you do?
 3        A    I came to Scott & White and I've
 4   worked there ever since.
 5        Q    And what year did you begin with
 6   Scott & White?
 7        A    1975.
 8        Q    In what states are you licensed to
 9   practice medicine in?
10        A    Texas.
11        Q    Has your license ever been suspended?
12        A    No.
13        Q    Dr. Shull, do you have any previous
14   training -- or any training at all in
15   biomaterials?
16        A    No.
17        Q    Biocompatibility?
18        A    No.
19        Q    Manufacturing processes?
20        A    No.
21        Q    What about pathology?
22        A    In pathology?
23        Q    Yes.
24        A    As a student, we were required to
25   take pathology.  As a resident, we had
```

~In Re: Avaulta~                          Bobbie Shull, M.D.                          2/6/2013

1    pathology as a part of our rotation during our

2    residency program.   So if that's what you're

3    asking about, the answer is yes.

4              Do I practice pathology now?   The

5    answer to that is no.

6         Q    So you have not really had any

7    experience with pathology since you completed

8    your residency?

9         A    Not in interpreting the specimen

10   itself.   We receive reports from pathology.   We

11   integrate that into medical care, but I don't

12   actually do the evaluation of the tissues.

13        Q    You have not ever done any pathology

14   analysis of an explanted mesh material, have

15   you?

16        A    Not microscopically.   The extent of

17   my involvement in that has been looking at the

18   gross specimen, not the microscopic.

19        Q    Do you have any experience or

20   expertise in toxicology?

21        A    No.

22        Q    Have you ever worked for a medical

23   device manufacturer?

24        A    No.

25        Q    Have you ever consulted with a

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   medical device manufacturer in the development

2   of a product?

3       A    I have been asked to sit in groups

4   who are brainstorming about products, including

5   the treatment of urinary incontinence or the

6   pelvic organ -- or pelvic organ prolapse.

7           So if your question is have I been

8   involved in something along those lines, the

9   answer is yes.  Have I actually participated in

10  the development of a product, the answer is no.

11      Q    For what company did you do this

12  brainstorming work?

13      A    Johnson & Johnson.

14      Q    And when was that?

15      A    I can't tell you the specific dates

16  for that.  I am presuming it would have been in

17  the neighborhood of 2000, but I don't have a

18  specific time for it.

19      Q    On how many occasions did you do

20  that?

21      A    I can't tell you for sure, but it may

22  have been two times or so.

23      Q    But it's probably been around a

24  decade or so since you did that?

25      A    Well, the TVT was introduced, I

~In Re: Avaulta~                          Bobbie Shull, M.D.                          2/6/2013

1    believe, in 1970 -- in 1996.  I didn't begin

2    using the tension-free tape probably until

3    about 2001.  So I'm thinking these inquiries

4    occurred sometime around 2000 or 2001.

5         Q    Have you ever conducted a clinical

6    study of a new product that was sponsored by a

7    manufacturer?

8         A    No.

9         Q    Have you conducted any or headed up

10   any clinical studies over the course of your

11   career at Scott & White?

12        A    Well, we've reported a number of

13   surgical procedures which we have performed on

14   the preoperative assessment of the patients, on

15   the morbidity associated with the procedure

16   itself, and on the subsequent follow-up of the

17   patient.  So the answer to that is yes.

18        Q    What's the largest cohort that you've

19   studied?

20        A    I believe it is 302 patients we

21   reported on who had pelvic organ prolapse

22   treated with a native tissue repair and then

23   followed up and an assessment of the

24   preoperative findings, the intraoperative

25   morbidity.  We were particularly interested in

~In Re: Avaulta~                        Bobbie Shull, M.D.                        2/6/2013

```
 1    the durability of the operation.

 2              We looked at those patients in

 3    several other ways, including how did the

 4    preoperative examination compare to the

 5    intraoperative examination.  How did the

 6    participation of residents in the care of the

 7    patients affect the outcome.

 8       Q    When was that study published?

 9       A    2000, I believe.  I can look in my

10    curriculum vitae, but I believe it was 2000.

11       Q    Please do.

12       A    It was published in the American

13    Journal of Obstetrics and Gynecology in 2000.

14       Q    And that was focused on native tissue

15    repair?

16       A    That's correct.

17       Q    Any other clinical studies that you

18    have spearheaded?

19       A    I had previously reported on my

20    experience with treating what are called

21    paravaginal defect repairs.  That was, I

22    believe, in 1996.

23       Q    And how large was the cohort of

24    patients for that study?

25       A    I believe there were approximately
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1    200.

2         I've reported on the evaluation of

3    women who underwent sacrospinous ligament

4    suspension.  That was reported in 1992 and

5    there were 81 women in that.

6         I reported on the use of native

7    tissue iliococcygeus fascia in the treatment of

8    prolapse that was published in 1993.  There

9    were approximately 50 patients in that.

10        Now that I look at my curriculum

11   vitae, the one on paravaginal defect repair was

12   published in 1989.

13    Q    Let me ask you this, Doctor.  Have

14   you conducted any clinical studies since 2000?

15    A    We have reported in 2012 on the

16   follow-up of certain women who were treated

17   with native tissue repair for apical prolapse.

18        We reported in 2008 on the transverse

19   cystocele repair in uterine preservation.

20        We reported on women who have fail

21   sacral colpopexy and who subsequent were

22   treated surgically.

23        When I look at my curriculum vitae,

24   that particular reference is given as a

25   presentation, but it in fact has been

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   published.

2        Q    Obviously, since you've never --

3   neither you nor your group has ever implanted

4   transvaginal mesh for the treatment of pelvic

5   organ prolapse, you have not performed any

6   clinical studies regarding that procedure or

7   those products, have you?

8        A    **We have not done any clinical studies**

9   **using transvaginal mesh for the treatment of**

10  **prolapse.**

11       Q    Now, you are a member of a large

12  number of professional societies, I gather?

13       A    Yes.

14       Q    Including the American College of

15  Obstetricians and Gynecologists?

16       A    Yes.

17       Q    Have you ever held a leadership

18  position in that group?

19       A    **Yes, I have.**

20       Q    And what is that?

21       A    **I was chairman of the Texas section**

22  **of the American College.  The American College**

23  **of Obstetricians and Gynecologists is set up in**

24  **a way that's similar to our states are set up**

25  **in the -- in the United States.  We have state**

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
1   representatives.  In the case of Texas, we
2   would have a chairman, a vice chairman, a
3   secretary and a treasurer.
4          At the time I worked in the American
5   College, we then were divided into districts.
6   Our district was 7 including a number of states
7   that are geographically adjacent to us.
8          As of the last several years,
9   however, Texas has been its own district in the
10  American College.
11     Q    Have you ever held any national
12  leadership positions with the American College?
13     A    No.
14     Q    What about with the American
15  Urogynecologic Society?
16     A    I've been a member of the society.
17  I've served on the board.  I have been
18  president of the American Urogynecological
19  Society.
20     Q    You were the president of the
21  society?
22     A    Yes.
23     Q    In what year?
24     A    1996 through '97.
25     Q    Have you been -- have you remained
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   active with that society since then?
 2       A    Yes.
 3       Q    Have you been -- well, let me start
 4   over.
 5            The American College that we
 6   referenced a moment ago is often called under
 7   the acronym ACOG, correct?
 8       A    Yes.
 9       Q    And the American Urogynecologist
10   Society is often called AUGS, A-U-G-S?
11       A    Yes.
12       Q    And are you aware that both ACOG and
13   AUGS had submitted sort of position statements
14   in the last couple of years regarding the use
15   of transvaginal mesh for the treatment of
16   pelvic organ prolapse?
17       A    Yes.
18       Q    Have you personally been involved at
19   all in the development of those position
20   statements?
21       A    No.
22       Q    There was a practice bulletin issued
23   by ACOG regarding these procedures in about the
24   2004-2005 time frame that's actually cited in
25   your report.  Do you recall what I'm speaking
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1    of?
 2         A      There was one in February of 2007
 3    which is cited in the report.  And then a
 4    revised edition of that in September of 2007.
 5         Q      Okay.  Did you have any involvement
 6    in the development of that practice bulletin?
 7         A      No.
 8         Q      Over the course of the years, have
 9    you had any involvement with either AUGS or
10    ACOG in the development of positions, practice
11    bulletins, or policies with regard to the use
12    of transvaginal mesh for the treatment of
13    pelvic organ prolapse?
14         A      No.
15         Q      What about the same question but with
16    regard to any sling or mesh products for the
17    treatment of stress urinary incontinence?
18         A      No.
19         Q      I see from your curriculum vitae that
20    you've been involved with the credentials
21    committee at Scott & White?
22         A      I have and I'm not presently, but,
23    yes, I have been.  I served on our board of
24    trustees for approximately eight years.
25         Q      And what was your -- what were your
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   duties as a part of the credentials committee?

 2       A     The medical faculty is required to

 3   submit their credentials to be approved to have

 4   hospital privileges.  We have a group of

 5   individuals then who review all of those

 6   credentials.  The credentials come to the board

 7   of trustees for approval.

 8           In addition, I served as chairman of

 9   our department for several years and as

10   director of the division of gynecology.  When

11   it was time for each of us individually to

12   submit our request for credentials, I, as the

13   director of division of gynecology would review

14   those requests from individual faculty members.

15           And then at the time I was chairman

16   of the department would look at them for

17   everyone for all privileges to decide whether

18   or not to approve them.

19       Q     If a gynecological surgeon at Scott &

20   White wants to use a Johnson & Johnson TVT

21   product to perform the surgery for the

22   treatment of stress urinary incontinence, do

23   they need to go through the committee to get

24   credentialed for that procedure?

25       A     They would request permission for
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    treatment of urinary incontinence, and one of

2    the requests may be mid-urethral slings, there

3    wouldn't be a request for a specific

4    manufacturer's product to be used.

5        Q    If when you were on that committee

6    reviewing requests for credentials such as

7    that, would you ever consult with the

8    manufacturer of a device that was going to be

9    implanted as to that manufacturer's view as to

10   whether the doctor was capable of performing

11   that procedure?

12       A    At the time I served in that capacity

13   in obstetrics and gynecology, the only time

14   that question would be applicable, I believe,

15   would have been in the case of mid-urethral

16   slings.

17       Q    Uh-huh.

18       A    And the answer is, we did not consult

19   a manufacturer about that.

20       Q    Was there any reason why you didn't

21   consult the manufacturer?

22       A    I'm not sure we discussed that.

23       Q    Did you feel it was your role and

24   your committee's role to be the arbiter of

25   whether the doctors were competent to use those

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    slings?

2        A      In our particular practice, in our

3    group practice, we have all chosen certain

4    things which we feel that we can provide the

5    best care.

6            Not everyone in our department treats

7    women with pelvic organ prolapse.  Not everyone

8    treats urinary incontinence.  Not everyone does

9    maternal fetal medicine.  Not everyone does

10   oncology.

11           As a consequence, when people request

12   permission to be credentialed in particular

13   areas, they're normally a very specific.  As

14   opposed to requesting privileges for

15   everything, they request privileges for the

16   things in which they are most likely to provide

17   care.  Could be general outpatient gynecology,

18   general obstetrics.

19           But in the case of reconstructive

20   surgery, the treatment of fistulas, for

21   example, not everyone would request that.

22   Reimplantation of ureters in the bladder, not

23   everyone would request that.  Mid-urethral

24   slings, not everyone would request that.

25           So for the people who did request it,

1    you asked do I think that I should know that

2    they're qualified to do the operation?  Yes, I

3    would know whether or not they're qualified to

4    do the operation.

5         Q    And you would consider with regard to

6    those physicians who were seeking credentials

7    to use these slings, that it was your

8    committee's role to make the determination

9    whether they should have those credentials?

10        A    As the division director of

11   gynecology, it was my position to approve it or

12   disapprove it.  As department chairman, it was

13   my position to approve what had been approved

14   by someone else who was the director of the

15   division of gynecology, so yes.

16        Q    And you made those determinations

17   always without any consultation with the

18   manufacturer, correct?

19        A    That's correct.

20        Q    Do you own any patents?

21        A    No.

22        Q    Have you ever been sued for

23   malpractice?

24        A    You know, prob -- and I can't tell

25   you the number of years ago there was a suit,

1   and it could have been 25 or 30 years ago,

2   which never -- there was a complaint.

3          There was nothing that went to court.

4   There was a patient complaint.  We have our own

5   in-house legal counsel.  We have our own risk

6   management.

7          And there was an issue of a woman who

8   brought a complaint about having a

9   hysterectomy.  I believe that her complaint was

10  that she felt there was an alternate therapy

11  available for her.

12         It went through our risk management,

13  our internal legal department, it never went to

14  court.  I never appeared in court.  I don't

15  believe I was ever deposed about it.  That was

16  all handled through our internal risk

17  management system.

18     Q    Is that the only malpractice claim or

19  potential claim against you that you recall in

20  your career?

21     A    To the best of my knowledge.

22     Q    Doctor, you would agree that pelvic

23  organ prolapse is a medical condition that can

24  affect a women's quality of life, correct?

25     A    Pelvic organ prolapse is a complaint

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    which may affect a women's quality of life.

2    There are some women whom we see for

3    examination who have an abnormal physical exam

4    that would by the strict definition qualify for

5    prolapse, and, in fact, the women have no

6    complaints.

7         Q    But in some cases the symptoms can be

8    fairly severe, correct?

9         A    The symptoms of pelvic organ prolapse

10   vary from individual to individual.  Some women

11   have minimal complaints, some women have their

12   quality of life affected to varying degrees

13   including significant effect on their quality

14   of life.

15        Q    In cases where the pelvic organ

16   prolapse has a significance impact on the

17   quality of a women's life, how does it affect

18   the woman?

19        A    When I see someone who has pelvic

20   organ prolapse, the complaints generally fall

21   in several categories.  They have some

22   complaint with support, they see or feel

23   something that they know isn't normal for them

24   and they're concerned do they have some serious

25   underlying disorder.  Do they have a tumor?  Do

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1    they have something that will jeopardize their
 2    health?  So it could be seeing or feeling
 3    something.
 4              It could be function.  Could be
 5    function of the urethra, the bladder, could be
 6    function of the bowel, it could be sexual
 7    function.
 8              It could be that it affects her
 9    ability to have a good image of themselves.
10    That their body image is adversely affected
11    because they know their pelvic exam is
12    abnormal.
13              It could be because it affects their
14    ability to do physical activities they enjoy
15    doing, working, exercising.  So the spectrum of
16    complaints is variable.
17       Q    And there is a grading system that
18    physicians use to assess the severity of pelvic
19    organ prolapse; is that correct?
20       A    There are several ways to assess
21    prolapse.  One is through a history.  So you
22    ask someone about their symptoms.
23              Another is to fill out some quality
24    of life instruments or documents that inquire
25    specifically about bowel function, bladder
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    function, sexual function.

 2              Another is the physical examination.

 3    On physical examination, until approximately

 4    the mid-1990s, there was no recognized

 5    objective system for quantifying the amount of

 6    prolapse that someone has.  Up until the

 7    mid-1990s, people use very nondescript terms to

 8    describe these physical findings.

 9              I happen to be a member of a

10    committee which published the report on pelvic

11    organ prolapse quantification system in 1996

12    that was soon adopted by most organizations

13    around the world as being an objective way to

14    quantify the amount of the prolapse.

15              So history is one way to document

16    someone's concerns, a physical exam can be

17    objectively described, and then there are

18    certain tests of function, bowel function,

19    bladder function.  There are no reproducible,

20    quantifiable tests for other complaints.

21         Q    What about the POP-Q test?

22         A    The POP-Q test is a pelvic organ

23    quantification system.  And as I indicated

24    earlier, I was a part of the committee which

25    published that.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1          And since my name begins with S, it
 2    always comes under the et al. in the
 3    publication.  But if you look in 1996 in my
 4    curriculum vitae it is No. 17, The
 5    standardization of terminology of female pelvic
 6    organ prolapse and pelvic floor dysfunction.
 7          Q    What is the Baden-Walker method?
 8          A    The Baden-Walker method is a way to
 9    describe pelvic organ prolapse which was
10    originated by Dr. Wayne Baden and Dr. Walker,
11    both of whom worked in the department where I
12    work in Temple.
13          And the Baden-Walker system is a
14    slightly different way to describe the extent
15    of prolapse.  I believe Wayne published about
16    that in the 1970s.
17          It frankly is a method I prefer
18    because it's more simple.  It's easy to
19    describe.  And even though I helped with the
20    description of the POP-Q, the truth is I prefer
21    the Baden-Walker system for the general nurse
22    or doctor who is going to see a patient because
23    it's very understandable.
24          Q    And so is the Baden-Walker system
25    what you use generally in your practice?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        A     Yes, it is.

 2        Q     What age range of women does pelvic

 3   organ prolapse affect?

 4        A     Pelvic organ prolapse normally is a

 5   function of age.  If you look at all women who

 6   have prolapse, there are a miniscule number of

 7   females who have a congenital predisposition to

 8   prolapse.

 9             So a tiny number of women are born

10   with certain congenital abnormalities that we

11   know will result in pelvic organ prolapse.

12   Exstrophy of the bladder is one of those.

13             So prolapse may occur at a relatively

14   young age.  Young girls with meningomyelocele

15   may have a congenital predisposition to

16   prolapse.

17             When you exclude those, the vast

18   majority of women then who have pelvic organ

19   prolapse have previously had a delivery, a

20   pregnancy and a delivery.  Usually the delivery

21   has occurred vaginally.

22             So in my practice I will occasionally

23   see someone who with their first delivery at a

24   young age has terrible pelvic floor damage.  A

25   women in her 20s.  That's the exception.
```

~In Re: Avaulta~                   Bobbie Shull, M.D.                      2/6/2013

1          **The majority of women have completed**

2    **child bearing and are in their 40s, 50s, 60s,**

3    **70s or 80s by the time they present for**

4    **evaluation and care.**

5          Q     Would you agree that it is therefore

6    infrequent that you see a patient presenting

7    with prolapse who is in her 30s?

8          A     **If you look at all the patients that**

9    **we see for prolapse, the women in their 30s are**

10   **a smaller percentage of our patient population**

11   **than women who are in their 50s, 60s, 70s and**

12   **80s.**

13         Q     What is your recollection of when

14   transvaginal mesh products for the treatment of

15   pelvic organ prolapse first went into general

16   use in your profession?

17             MR. GARRARD:  Wait a minute.  Would

18   you just repeat that question, please.

19             MR. NORTH:  Let me rephrase it.

20   BY MR. NORTH:

21         Q     Doctor, what is your recollection as

22   to when products, transvaginal mesh products,

23   for the treatment of pelvic organ prolapse were

24   first introduced in the market and used widely

25   by physicians?

1        MR. GARRARD:  Object to the form in

2    terms of your terminology used widely.

3        A    Whenever I look at the history of

4    using something to supplement native tissue

5    repair in vaginal reconstructive surgery, there

6    are several stages.

7            Sometimes women can be treated by

8    using their own body's tissues.  That's called

9    autologous tissue because it comes from a

10   person who is using it.

11           So there's been a history of using

12   autologous tissue for certain things in

13   reconstructive surgery that goes back decades.

14           When you look at the use of a

15   xenograft or an animal product, some people

16   were using xenografts probably 20 or 25 years

17   ago.  Used as a -- basically an applique, a

18   standard repair was done, something then was

19   used to reinforce whatever you had done using

20   suture materials and perhaps the patient's own

21   tissue or perhaps even a xenograft.

22           The next phase of that and

23   this particular instance of using a synthetic

24   material such as polypropylene, individual

25   physicians probably have used that off and on,

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1    I would estimate, for 20 or 30 years.

2         A report about it in 1996 from Tom

3    Julian, who is from the University of

4    Wisconsin, has been cited by a number of

5    authors because Tom treated about 25 women by

6    placing polypropylene and suturing it into

7    place.  The change in the concept of using

8    products then happened sometime after 1996.

9         In 2000 or 2001, Peter Sand presented

10   a report at an organization that he and I both

11   belonged to, the Central Association of

12   Obstetricians and Gynecologists, on using

13   polyglactin an absorbable mesh for cystocele.

14        And when you look at his article,

15   actually, I happen to be one of the reviewers

16   in the comments on his presentation.

17        After the 2000 -- late 1990s, 2000

18   interval, there was more interest in trying to

19   use products.

20        The current system of using

21   trocar-based application of products is a

22   departure from the use of a specific applique

23   sutured in place.

24        The trocar-based products were, I

25   believe, first cleared by the FDA in 2002.  So

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    they've had a relatively short history.

2         The other interest in doing something

3    to reinforce vaginal repair to surgery has gone

4    on for a longer time period.

5    BY MR. NORTH:

6         Q    Did you ever use xenografts in your

7    practice?

8         **A    I have not used a xenograft.  I've**

9    **used autologous material, patient's own fascia.**

10        Q    And I may have asked it this way

11   earlier but I may have limited it, too.  I just

12   want to be sure I'm clear.

13        Have you used any mesh ever for the

14   treatment of pelvic organ prolapse?

15        **A    Through the vagina?**

16        Q    Through the vagina.

17        **A    No.**

18        Q    Okay.  Do you know whose product,

19   trocar-based product, was first cleared by the

20   FDA in 2002?

21        **A    For the treatment of prolapse, let me**

22   **look at that and see.**

23        **Actually, I don't know whose -- I**

24   **don't know whose it was actually.  I don't know**

25   **if it was AMS or J&J.  I can't answer that.**

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        Q    Well, you would agree that Bard is
 2   not the first company to introduce a
 3   trocar-based transvaginal mesh product to the
 4   market, would you?
 5        A    For the treatment of pelvic organ
 6   prolapse?
 7        Q    Yes.
 8        A    To the best of my knowledge, Bard was
 9   not the first company to do that.
10        Q    Are you familiar with the
11   manufacturing processes for polypropylene mesh?
12        A    No.
13        Q    Do you know how the product is
14   sterilized?
15        A    No, I don't.
16             (Defendant's Exhibit 4 marked.)
17   BY MR. NORTH:
18        Q    Let me show you what's been marked as
19   Exhibit 4.
20             MR. GARRARD:   Thank you, sir.
21   BY MR. NORTH:
22        Q    Dr. Shull, Exhibit 4 is actually what
23   was Exhibit B to your expert report in this
24   litigation, correct?
25        A    I don't know the answer to that.
```

~In Re: Avaulta~                         Bobbie Shull, M.D.                         2/6/2013

1   These are references I used, but you asked me

2   if it's Exhibit B and I don't know the answer

3   to that.  I'll have to look and see where

4   Exhibit B is.

5       Q    Well, let's look back at your report

6   then.

7       A    I see, it's on Page 2.  A list of

8   these materials contain Exhibit B.

9       Q    Right.

10      A    I want to look that up.  I don't see

11  it in that form, so, I don't know how to answer

12  that question.

13            THE WITNESS:  Do you?

14  BY MR. NORTH:

15      Q    I'm sorry, what's that?

16      A    I don't see -- in these documents I

17  don't see something that is itemized the exact

18  way you have it.  And you asked me if that's

19  Exhibit B and I can't answer that for sure

20  because I don't --

21            MR. GARRARD:  Richard, to save you

22  some time, I will agree that Exhibit B was

23  attached to his report.

24  BY MR. NORTH:

25      Q    Well, with that stipulation by your

~In Re: Avaulta~ Bobbie Shull, M.D. 2/6/2013

```
 1    -- or agreement by Mr. Garrard, Exhibit B that

 2    was attached to your report was supposed to be

 3    a list of all the materials you reviewed.

 4         A    Yes.

 5         Q    And you have no reason to dispute

 6    Mr. Garrard's representation that this is in

 7    fact that list of materials, do you?

 8         A    I do not.

 9         Q    Now, these materials contained a

10    large number of documents that came either from

11    Bard itself or in a few instances from

12    Sofradim; is that correct?

13         A    Yes.

14         Q    And did you pick out the documents

15    you were going to review in that regard or were

16    those furnished to you by the Plaintiff's

17    counsel?

18         A    I was given a set of documents which

19    I reviewed and highlighted the ones I thought

20    raised questions or concerns in my mind.

21         Q    But my question is, who chose the

22    documents that were sent to you?  They selected

23    which documents would be sent to you

24    originally, correct?

25         A    Are you asking did I request
```

770-343-9696 Tiffany Alley Global Page 56

~In Re: Avaulta~         Bobbie Shull, M.D.         2/6/2013

1    **documents from Bard or Sofradim?**

2        Q     No.

3        **A     I did not request them.**

4        Q     That's not my question, Doctor.

5        My question is, did the Plaintiff's

6    attorneys determine or select which documents

7    from Bard and Sofradim would be sent to you?

8        **A     They provided me the documents.**

9        Q     Well, and they selected which

10   documents to send to you, correct?

11       **A     I'm presuming they chose them.**

12       Q     I mean, they didn't give you -- well,

13   are you aware of the fact that approximately

14   11.5 million pages of documents have been

15   produced in the litigation so far?

16       **A     I didn't know that.**

17       Q     Well, they did not give you an index

18   of all the documents that were produced in the

19   litigation and ask you to identify from that

20   index which ones you wanted, right?

21       **A     That's accurate.**

22       Q     Instead, they chose which ones you

23   would -- they would send to you and sent them

24   to you as a package?

25       **A     That's correct.**

~In Re: Avaulta~                Bobbie Shull, M.D.                2/6/2013

```
1        Q    And you would agree that you weren't

2   sent 11.5 million pages, I would assume?

3        A    I don't believe.  If they were sent,

4   they were never received.

5        Q    Once you reviewed the documents they

6   sent you, did you make a request to see any

7   other documents from the company?

8        A    No.

9        Q    If we could look at Exhibit 3.  And

10  the pages aren't numbered, but let's see.

11  Let's just go through it sort of page by page.

12        On the first page are documents with

13  a Bates number SMITHN, and I'm assuming those

14  are --

15        A    Did you say Exhibit 3?

16        MR. GARRARD:   4.

17        A    Exhibit 4.

18  BY MR. NORTH:

19        Q    I'm sorry, Exhibit 4, which is also

20  Exhibit B.

21        These appear to be medical records

22  from certain Plaintiffs in the action,

23  including Nancy Smith, Cisson, Queen, and

24  Rizzo.

25        A    That's correct.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          Q     And then once you finished the

2     listing of the Rizzo documents, there are a

3     number of medical articles listed; is that

4     correct?

5          A     Yes.

6          Q     And in fact, there are a number of --

7     number of medical articles sort of scattered

8     through this listing as you go through it page

9     by page, correct?

10          A     Yes.

11          Q     And those medical articles were

12     selected and sent to you by the Plaintiffs'

13     attorneys; is that correct?

14          A     No.  Some of these I requested

15     myself.  Some I was familiar with already.

16               Some I knew the general idea of the

17     content, but I didn't have the specific

18     publication in my hand.

19               An example of that would be the

20     American College Bulletin from 19 -- from 2007.

21     And then the subsequent revision of that

22     document later in 2007.

23          Q     Well, let me ask you this, Doctor.

24     Did you request specifically all of these

25     medical articles or were there a subset of the

~In Re: Avaulta~          Bobbie Shull, M.D.          2/6/2013

1  medical articles that the Plaintiffs sent to

2  you saying you need to have this as a part of

3  your file?

4       **A**    **I was provided part of the articles**

5  **without my requesting them.**

6       Q    Okay.  Can you estimate what

7  percentage of the articles you were provided

8  without a specific request?

9       **A**    **Perhaps 50 percent.**

10      Q    Doctor, did you participate at all in

11 the FDA's hearings in September of 2011 --

12      **A**    **No.**

13      Q    -- with regard to mesh products?

14      **A**    **No, I did not.**

15      Q    Have you ever consulted with the FDA

16 in any capacity?

17      **A**    **No, I have not.**

18      Q    So you've never served on an FDA

19 advisory committee of any sort, have you?

20      **A**    **No.**

21      Q    Have you ever prepared a 510(k)

22 submission to the FDA for the approval of a

23 medical device -- or clearance of a medical

24 device?

25      **A**    **I have not.**

~In Re: Avaulta~                        Bobbie Shull, M.D.                        2/6/2013

```
 1        Q    Have you ever prepared a premarket
 2   application or amendment, a PMA, to the FDA for
 3   the approval of a medical device?
 4        A    No.
 5        Q    Have you ever drafted any warnings
 6   with regard to a medical device?
 7        A    No.
 8        Q    Have you ever drafted or prepared any
 9   instructions for use for a medical device?
10        A    No.
11        Q    Have you ever read an instructions
12   for use for a medical device?
13        A    Yes.
14        Q    With how many devices would you
15   estimate over the years?
16        A    I have read the instructions for use
17   for the devices that I use, the suburethral
18   slings.
19             I have reviewed the instructions for
20   use on some of the transvaginally-placed mesh
21   products, even though I've not used the
22   products.  In some cases I have looked at the
23   DVDs provided by the manufacturers.  In
24   addition to have reading -- having read the
25   product information forms.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1          Q     Well, your review of instructions for

 2    use with regard to transvaginal mesh products

 3    for the treatment of pelvic organ prolapse has

 4    all been in the context of your work in this

 5    litigation, hasn't it?

 6                MR. GARRARD:   Object to the form --

 7          A     No.

 8                MR. GARRARD:   -- of your question.

 9    That's not accurate.

10    BY MR. NORTH:

11          Q     Have you looked at those instructions

12    for use of products for the treatment of --

13    transvaginal mesh products for the treatment of

14    pelvic organ prolapse in some other context?

15          A     From another manufacturer or in

16    another context?

17          Q     Either one.

18          A     Well, I have looked at other

19    manufacturer's instructions for use before I

20    was ever knowledgeable about the case against

21    Bard.

22          Q     Are you familiar with the fact that

23    there's similar litigation pending against

24    Johnson & Johnson?

25          A     Yes.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    Q    And that there's similar litigation

2  pending against Boston Scientific?

3    **A    Actually, I didn't know that, but it**

4  **doesn't surprise me, but I didn't know that.**

5    Q    Do you use catheters in your

6  practice, urinary catheters?

7    **A    Yes, we do.**

8    Q    What brand do you use for catheters

9  generally?

10    **A    I believe it's Bard, but I can't tell**

11  **you that for a fact.**

12    Q    So you have used, to your knowledge,

13  some Bard devices over the years, correct?

14    **A    Yes.**

15    Q    And to your knowledge, are you still

16  using Bard devices?

17    **A    Yes.**

18    Q    Do you know whether you've used over

19  the years any devices manufactured by Covidien?

20    **A    When you say devices, could you be**

21  **more specific about that and maybe I could**

22  **answer that accurately.**

23    Q    I'm going to let my colleague be more

24  specific about that.  Do you recall just

25  generally right now?

770-343-9696                  **Tiffany Alley Global**                  Page 63

~In Re: Avaulta~                     Bobbie Shull, M.D.                        2/6/2013

1      A      I don't know who produces some of the

2    things we use at work, frankly.  So it's quite

3    possible because I believe our organization

4    maybe has a contract with Covidien for certain

5    items, but I don't know what they are.

6      Q      Are you familiar with the federal

7    regulations promulgated by the FDA concerning

8    the content of instructions for use with regard

9    to medical devices?

10     A      I don't think I understand the

11   question.

12     Q      Are you familiar with the federal

13   regulations that govern what goes into -- what

14   types of information goes into instructions for

15   use with regard to medical devices?

16     A      No, I'm not.

17     Q      Have you ever developed a training

18   program for the use of medical devices?

19     A      In our department we have taught

20   courses on surgery.  We began probably in the

21   19 -- early 1980s doing a postgraduate course

22   on the evaluation and management of women with

23   pelvic organ prolapse that was entirely

24   didactic.  There were no hands-on experiences

25   of any kind.

~In Re: Avaulta~                  Bobbie Shull, M.D.                  2/6/2013

```
 1          For approximately the last 15 years
 2    once or twice a year we teach a course that is
 3    didactic classroom enhanced by videos.
 4          And at the end of a
 5    one-and-a-half-day session, normally I would be
 6    the one doing live surgery, the registrants
 7    then sit in a classroom and watch me perform
 8    the surgery that we have been discussing for
 9    the previous day and a half.
10          We modified that about maybe seven or
11    six years ago to include a session with cadaver
12    demonstration of the anatomy we're discussing.
13          In the case of mid-urethral slings,
14    we have used the cadavers to demonstrate the
15    placement of a trocar for a mid-urethral sling.
16          In the case of dissection for other
17    types of prolapse, we have not used products to
18    demonstrate with the exception of mid-urethral
19    slings.
20      Q    Well, these training programs that
21    you've just described, those are all, as I
22    understand it, developed by the doctors at your
23    clinic?
24      A    That's correct.
25      Q    You have not worked with a
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    manufacturer of a medical device to develop a

 2    training program for that specific

 3    manufacturer's devices, have you?

 4         A     I have not.

 5         Q     Have you ever attended a training

 6    program sponsored by a device manufacturer?

 7         A     Before I began using the tension-free

 8    vaginal tape, it had been on the market for

 9    about five years.  Actually, I knew a lot about

10    them from reading and conversation with people

11    who are users of the product.

12              Before I used the product myself, I

13    had seen other surgeons around the world use

14    the product.

15              Specifically to your question,

16    however, I went to Pennsylvania to spend a day

17    with Vince Lucente for him to demonstrate in

18    his own patients the placement of a

19    tension-free vaginal tape before I returned and

20    used the product myself.

21         Q     And was your trip to see Dr. Lucente

22    sponsored by Johnson & Johnson?

23         A     Yes, it was.

24         Q     Other than that one day spent with

25    Dr. Lucente, have you ever attended a training
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1    program sponsored by a device manufacturer for

2    the use of a specific device?

3         A    You know, I don't think I have.  I've

4    gone to other anatomy programs and sometimes

5    people will be demonstrating a product.  But I

6    don't believe I've gone to one to be educated

7    about the use of someone's product.

8         Q    Okay.  And you've never attended a

9    cadaver lab, for example, for -- sponsored by a

10   manufacturer for training on one of these

11   devices, have you?

12        A    I don't believe I have.  I've taught

13   at courses where cadavers are used.

14        Q    And this one day you spent with

15   Dr. Lucente being trained or shown a procedure

16   with the Johnson & Johnson TVT, that would have

17   been about a decade ago roughly?

18        A    Approximately.  About 2001 or 2002,

19   someplace in there.  I have it in my records

20   some place.

21        Q    And you know Dr. Lucente?

22        A    I do.

23        Q    Have you kept in touch with him over

24   the years?

25        A    I see him at many professional

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

1    organizations.  I actually gave his oral board

2    exam when he was certified by the American

3    Board of Obstetrics and Gynecology.

4            MS. THOMPSON:  And you passed him?

5            THE WITNESS:  I did.

6    BY MR. NORTH:

7        Q     You've told us that you've never

8    implanted a transvaginal mesh product for the

9    treatment of pelvic organ prolapse, and to the

10   best of your knowledge, neither has anybody in

11   your group, correct?

12       A     That's accurate.

13       Q     Have you ever witnessed another

14   surgeon implanting a transvaginal mesh product

15   for the treatment of pelvic organ prolapse?

16       A     I have.  I operate around the world

17   with some frequency.  I've gone to Italy a

18   number of times to operate, to other countries,

19   to India, to Central America.

20            But in the case of going to Italy,

21   for example, there normally would be five

22   surgeons who are there invited to operate, five

23   or more.  And we may watch other people operate

24   and they may watch us do our surgery.

25            I happened to be there a few years

~In Re: Avaulta~                 Bobbie Shull, M.D.                 2/6/2013

1    ago when Dr. Jacquetin was working on one of

2    the mesh products that he's helped developed.

3    So I saw him early in the development of the

4    transvaginal mesh for the treatment of prolapse

5    employ that technique.

6              I was in the op -- I didn't scrub

7    with him, but I was in the operating room and

8    watched him actually do the procedure.  And

9    after these sessions where multiple surgeons

10   come, then we normally will discuss what

11   people's various interests and skills are.

12       Q    Could you spell his name for me?

13       A    J-A-C-Q-U-E-T-I-N.

14       Q    Is he from Italy?

15       A    France.  Bernard Jacquetin.

16       Q    Do you know what product he was

17   implanting?

18       A    At the time I didn't.  And actually,

19   I still don't know that today.  I know he was

20   doing a synthetic product, but I did not know

21   the manufacturer or the name of the product.

22       Q    Is that the only time that you have

23   seen an implant procedure or witnessed one or

24   observed one with a transvaginal mesh product

25   for the treatment of pelvic organ prolapse?

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1        A     No.   I've seen it on many occasions.
2   I've gone to India five times to volunteer to
3   operate.   Usually there are surgeons from
4   around the world who come to the same hospital.
5   People use various techniques.
6            I normally go specifically to teach
7   using native tissue surgical procedures for a
8   variety of reasons.   One of them, I'm
9   comfortable with it.   Another is in a
10  developing world it's helpful to know how to
11  use things and have very little cost associated
12  with them.
13           When I am there, other surgeons will
14  be using various products.
15       Q     To your knowledge, have you ever seen
16  another surgeon implant an Avaulta
17  Biosynthetic, Avaulta Plus or a Avaulta Solo
18  mesh product?
19       A     No.
20       Q     As a part of your practice, do you
21  treat some patients who have -- come to you
22  with complications from mesh implanted by other
23  surgeons?
24       A     Yes.
25       Q     Have you ever performed any surgeries

~In Re: Avaulta~       Bobbie Shull, M.D.       2/6/2013

```
 1    to remove mesh from a patient?
 2        A    Yes.
 3        Q    On how many occasions would you
 4    estimate?
 5        A    I can't tell you the total number,
 6    but over the past five to six years the
 7    percentage of our surgical practice that has
 8    evolved into the management of various
 9    complications of mesh is probably 15 to
10    20 percent of our total number of surgeries.
11             The three of us together do
12    approximately 400 operations a year.
13        Q    400 mesh removal operations?
14        A    We do 400 total surgeries per year
15    and probably 10 to 20 percent are related to
16    some complication of mesh.
17        Q    To your knowledge, have you ever
18    removed an Avaulta Biosynthetic, Avaulta Plus
19    or Avaulta Solo mesh product?
20        A    Yes.
21        Q    On how many occasions do you believe?
22        A    I can't answer that.  I don't know
23    the answer to that.
24        Q    Do you think it's more than 10?
25        A    I don't think it is.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        Q    How -- on those occasions, how did
 2    you know that it was an Avaulta product?
 3        A    When we see patients in referral --
 4    my practice is primarily a referral practice --
 5    we may receive the physician's records when the
 6    patient presents for the first visit.  We may
 7    request the records and be sent them later.
 8    Sometimes we never receive the records.
 9             The way to know specifically if a
10    particular product has been used generally is
11    because the operative note would state it.
12             However, there are some surgeons who
13    use products for surgery but do not include the
14    trade name of the product in the operative
15    report.  They'll simply indicate they used a
16    mesh product and you could not identify the
17    trade name from the operative note.
18        Q    Well, with the mesh removal surgeries
19    that you've performed over the last five years
20    that -- and your group has performed, have the
21    number of surgeries that -- where you could
22    determine that it was an Avaulta product been a
23    small percentage of those mesh removal
24    surgeries?
25             MR. GARRARD:  Doctor, if you know,
```

1    answer the question, but I ask you not to guess

2    or speculate.

3         A     See, I don't know the answer to that

4    because there are three of us together and I

5    can't answer that question specifically.

6    BY MR. NORTH:

7         Q     What about with you personally?

8         A     **I know that I've removed Avaulta.   I**

9    **have not kept a list of the different products**

10   **to be able to answer that question for you with**

11   **any degree of accuracy.**

12        Q     Well, you have also performed mesh

13   removal surgeries with Johnson & Johnson

14   products, correct?

15        A     **I've removed mesh made by different**

16   **manufacturers, that's accurate.**

17        Q     And you've removed mesh manufactured

18   by Boston Scientific?

19        A     **I probably have.  The truth is I**

20   **don't know the trade names and the connection**

21   **to the manufacturer for everything.**

22        Q     But -- okay.  Well, let me ask it

23   this way.  You have removed a number of meshes

24   over the years that were not Avaulta mesh,

25   correct?

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1        A    Not all the meshes we've removed have

 2   been Avaulta.

 3        Q    Right.

 4        A    That's certainly true.

 5             MR. GARRARD:  When you get to a

 6   reasonable stopping point, I --

 7             MR. NORTH:  Yeah, I think it's a good

 8   point now.

 9             VIDEO TECHNICIAN:  Stand by, please.

10             We are off the record.  The time is

11   10:33.  This is the end of Tape 1.

12             (Recess taken.)

13             VIDEO TECHNICIAN:  And we are back on

14   the record.  The time is approximately 10:48.

15   This is the beginning of Tape 2 of the

16   videotape deposition of Dr. Robert Shull.

17             You may continue, sir.

18   BY MR. NORTH:

19        Q    Dr. Shull, do you speak any foreign

20   languages?

21        A    Not fluently.  I can speak some

22   Spanish, some German.  At one time a little bit

23   of Italian.  But I'm not fluent in anything

24   other than English.

25        Q    Any French?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1      **A      No.**

2      Q      We were talking about your mesh

3    removal surgeries when we -- right before we

4    took the break and what you had witnessed with

5    regard to implant.

6            While you have not to your knowledge

7    observed an Avaulta implant surgery live, you

8    have seen some DVDs or videos of the implant

9    procedure, correct?

10     **A      Yes.**

11     Q      And those videos were on a cadaver,

12   weren't they?

13     **A      To the best of my knowledge, that's**

14   **correct.**

15     Q      Now, in any mesh removal surgeries

16   you performed over the years that involved an

17   Avaulta product, do recall making an

18   examination of the explant, the Avaulta mesh at

19   the time you did the surgery?

20     **A      By gross visualization, we made an**

21   **observation.  We normally record the**

22   **dimensions.  Something about the**

23   **characteristics of the mesh may be included in**

24   **the operative note itself.**

25     Q      Have you performed any testing on any

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1   Avaulta mesh that you have explanted from that

2   patient?

3        A    Beyond looking at it, recording the

4   dimensions, we would send it to the

5   pathologist.  The pathology report usually is

6   very similar to what I just told you, they

7   record the dimensions and there normally is not

8   a microscopic examination.

9        Q    Have you taken over the years

10  pictures of any Avaulta mesh implant or

11  explants that you've removed?

12       A    I don't know the answer to that.

13       Q    Do you recall as you sit here?

14       A    No.

15            MR. NORTH:  Sorry about that.

16  BY MR. NORTH:

17       Q    As you sit here today, can you recall

18  anything different or unusual about the Avaulta

19  mesh explants you may have seen over the years

20  as compared to other manufacturer's mesh

21  explants you've looked at?

22       A    No.

23       Q    Do you know the name of Johnson &

24  Johnson's transvaginal mesh product for the

25  treatment of pelvic organ prolapse?

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1        **A     I believe it's Prolift.**

2        Q     Have you ever removed any Prolift in

3    a mesh removal surgery before?

4        **A     Yes.**

5        Q     Can you estimate on how many

6    occasions?

7        **A     No.**

8        Q     I noticed that a number of your

9    publications involved squirrel monkeys?

10       **A     Right.**

11       Q     Can you explain to me what the

12   significance of squirrel monkeys are in your

13   practice?

14            MR. GARRARD:  You want to buy one to

15   take home?

16       A     Squirrel monkeys weigh about 800

17   grams.  There are 454 grams in a pound.

18   Squirrel monkeys are little.  They have a life

19   expectancy of about 20 or 22 years.  They

20   develop prolapse.

21            There are no good animal models to

22   evaluate prolapse in the mammal family.  We

23   learned by serendipity through one of our PhDs

24   who has an animal colony with squirrel monkeys

25   that they develop prolapse.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

| | |
|---|---|
| 1 | About 20 years ago, we began to look |
| 2 | at these animal colonies.  We realized we could |
| 3 | do some things with animals that you can't do |
| 4 | with humans. |
| 5 | Their life expectancy is shorter. |
| 6 | They do develop prolapse.  It's possible to |
| 7 | create an experimental model trying to learn |
| 8 | about factors that predispose to prolapse or |
| 9 | interventions that may prevent prolapse. |
| 10 | The reason we were curious about that |
| 11 | is because in the history of medicine in |
| 12 | general, if you're able to prevent a disease |
| 13 | rather than treat the disease, there's a public |
| 14 | health benefit to that. |
| 15 | And that's how all of our health has |
| 16 | improved over a period of hundreds of years. |
| 17 | A good example of that in OB-GYN, for |
| 18 | example, is perhaps when your parents were |
| 19 | born, if your mother's mother had been |
| 20 | Rh-negative and your mother were Rh-positive, |
| 21 | your mother may have sustained intrauterine |
| 22 | disease destroying her own blood cells, for |
| 23 | example. |
| 24 | That could have occurred in the '40s, |
| 25 | '50s, and even in the 1960s.  Now that almost |

~In Re: Avaulta~                       Bobbie Shull, M.D.                        2/6/2013

1   never occurs in a developed country because

2   that disease can be prevented.

3          In the case of pelvic organ prolapse,

4   our curiosity is can you do something to

5   prevent the development of pelvic organ

6   prolapse; and if so, how can you evaluate it.

7   The animal model provides you an opportunity to

8   do that.

9          So over the past 20 years we've had a

10  number of publications on this particular

11  animal model describing the anatomy, the gross

12  anatomy, the neurological anatomy.

13         We followed their obstetrical

14  histories and we've done some interventions,

15  asking the question, if you do certain things,

16  does that predispose the animal to develop

17  prolapse more quickly, for example.

18         So this specific animal model has

19  been used in an effort to try to learn more

20  about the causes of prolapse and what could we

21  do to prevent it because in this area we're

22  discussing now about the surgical management of

23  prolapse, we're at a point in time where

24  particular strategies are being used, but those

25  strategies are going to go away because

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    medicine is changing.
 2            In the case of using any materials,
 3    for example, what is likely to happen is the
 4    whole issue of reinforcing a repair may evolve
 5    into we would take some of your blood cells,
 6    some of your fat cells, some of your muscle
 7    cells, and we may create something that your
 8    body recognizes to enhance the surgical
 9    management of whatever it is.
10            If that's the situation, many of
11    these issues about complications associated
12    with whatever we're doing now may not be
13    important.
14            So we're looking at things about
15    etiology and about interventions.  It's
16    unrelated to the surgical strategy of treating
17    prolapse.
18            When we write about surgical
19    strategies, we're writing about our experience
20    with patients that we see, what we do, are
21    there complications.  And if there are, how we
22    manage them, how do we reduce the
23    complications, and how do we increase the
24    durability.  In this case the durability of
25    surgery for prolapse.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   BY MR. NORTH:

 2        Q    Well, that leads me to my next

 3   question then.  I gather that you have never

 4   actually performed surgical tests with squirrel

 5   monkeys?

 6        A    I haven't personally, our lab has.

 7   So, yes, we have PhDs in the lab and physicians

 8   in the lab who do that.  I have not personally

 9   done the surgeries.

10        Q    Have you ever designed any sort of

11   animal test for the implantation of some sort

12   of product or device?

13        A    Our group has.  I didn't personally.

14        Q    I'm asking about you personally.

15        A    No, I haven't.

16        Q    You've never developed a protocol for

17   an animal test?

18        A    No.

19        Q    You've never performed an animal test

20   personally?

21        A    No.

22        Q    Have you ever witnessed animal

23   testing taking place?

24        A    How do you mean witnessing?  The

25   implantation of a product or the explantation
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    of a product?

 2        Q     Right.

 3        A     No.

 4        Q     And to the extent that's done in your

 5    group, that's done in the laboratory with other

 6    physicians and PhDs?

 7        A     That's correct.

 8              MR. NORTH:   If we could mark this as

 9    the next exhibit.   Is that No. 5?

10              THE COURT REPORTER:   Uh-huh.

11              (Defendant's Exhibit 5 marked.)

12              MR. GARRARD:   Do you got one that my

13    old eyes can read?

14              MR. NORTH:   We are all in the same

15    boat, Mr. Garrard.

16    BY MR. NORTH:

17        Q     Doctor, is this an article that you

18    had prepared in the past?

19        A     Yes.

20        Q     And when was this published?

21        A     December 1994.

22        Q     This did not have to do with the

23    implant of any mesh product, did it?

24        A     In this series of 62 women, we used

25    native tissue and suture material.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

| | |
|---|---|
| 1 | Q    And in fact, in this particular |
| 2 | study, 21 of the 62 patients developed some |
| 3 | sort of defect or combination of defects after |
| 4 | the surgery; is that correct? |
| 5 | **A    When we analyze these patients and** |
| 6 | **describe their physical findings as grade, this** |
| 7 | **is using the Baden-Walker system, Grades 1, 2,** |
| 8 | **3 or 4, certain women had poor support in some** |
| 9 | **segments greater than normal would be Grade 0.** |
| 10 | **So some had more than Grade 0.** |
| 11 | Q    Look at Table V, if you will, on Page |
| 12 | 6 of 12. |
| 13 | **A    Okay.** |
| 14 | Q    Does that give a recurrence rate |
| 15 | after the native tissue surgery? |
| 16 | MR. GARRARD:  Which table, Richard? |
| 17 | MR. MOELLER:  Table V. |
| 18 | MR. NORTH:  Table V, Page 6 of 12. |
| 19 | MR. GARRARD:  I've got Table IV I |
| 20 | believe is what you're referring to.  Perhaps |
| 21 | I'm -- |
| 22 | BY MR. NORTH: |
| 23 | Q    I'm looking at the very bottom of the |
| 24 | page.  Is that -- that may not be Table V.  It |
| 25 | says Table V under it. |

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1          A     Yeah, I see it.  I'm just reading it
 2    a minute.
 3          Q     Maybe that's Table IV.
 4          A     (Witness reviews document.)
 5          Q     My question is pretty simple from
 6    that, Dr. Shull.  Doesn't that indicate that
 7    after the native tissue surgery performed --
 8    that was done for these 62 patients that at the
 9    first postoperative visit 34 percent of those
10    patients still had support defects of some
11    sort?
12          A     I'm going to answer that just as soon
13    as I read that.
14                If you read the table you're
15    referring to, it says Groups of Patients and
16    the Number.  Patients undergoing vaginal repair
17    performed transvaginally, there were 62.
18    Patients with no defects at 6 weeks, there were
19    58 patients with no defects at 6 weeks, and
20    that would give a 94 percent.  Patients with
21    support defects at any site, and if you look at
22    the asterisk, it says, Patients with loss of
23    support any site at any time after surgery,
24    there were 21.
25                If we go farther down the
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    explanation, the support defects, halfway to

2    the hymen, those were 16 of the 21.  If we have

3    support defect to the hymen, there were three.

4          So of the 62 women at any time in the

5    follow-up who had something prolapsing outside

6    the hymen, 2 of the 62 patients had something

7    outside the hymen.

8      Q    Okay.  But my question is, 34 percent

9    of the patients following the tissue repair

10   surgery showed some support defect following

11   the surgery, correct?

12     A    At a visit, 21 of these 62 patients

13   had one or more areas that had some degree of

14   pelvic support loss.

15     Q    Okay.

16          MR. NORTH:  Let me have this marked

17   as Exhibit 6.

18          (Defendant's Exhibit 6 marked.)

19   BY MR. NORTH:

20     Q    What is No. 6, Dr. Shull?

21     A    Exhibit No. 6 is an article which I

22   published in the American Journal of Obstetrics

23   and Gynecology in 1999 entitled Pelvic organ

24   prolapse:  Anterior, superior, and posterior

25   vaginal segment defects.

~In Re: Avaulta~                           Bobbie Shull, M.D.                              2/6/2013

```
 1          Q     And here you're talking generally
 2   about native tissue surgeries to correct pelvic
 3   organ prolapse?
 4          A     Yes.
 5          Q     And at that time you were compare --
 6   you made some comparison to the treatment of
 7   pelvic organ prolapse to the treatment of
 8   hernias, correct?
 9          A     Yes.
10          Q     And what were the similarities there
11   in your mind?
12          A     Pelvic organ prolapse is similar to a
13   hernia in the sense that hernias are related to
14   poor support in connective tissue.
15                You or I could have a hernia in your
16   diaphragm, your abdomen, your groin.
17                In the case of women, they could have
18   hernias in the pelvis.  They're associated with
19   some abnormality of the normal continuity of
20   connective tissue in the area where the
21   connective tissue should be supporting either a
22   part of your bowel or in the case of women the
23   bladder, the top of the vaginal canal.
24          Q     Now, looking at Page 7 here.  In
25   discussing --
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                      2/6/2013

```
 1              MR. GARRARD:  Wait a second.  Were
 2    you adding something?
 3              THE WITNESS:  No.
 4              MR. GARRARD:  Okay.
 5    BY MR. NORTH:
 6         Q    In looking at Page 7 here, you
 7    actually are reporting on studies that show
 8    that with a native tissue surgery, there's a
 9    29 percent reoperation rate; is that correct?
10              At the bottom of 6 going over to 7.
11         A    I'm going to find the reference.
12              I use Reference 7 which is a report
13    by Drs. Olson and associates published in 1997
14    in Obstetrics and Gynecology.  And I use that
15    reoperation rate.
16         Q    And that indicated a 29 percent
17    reoperation rate after native tissue surgery;
18    is that correct?
19         A    That is what it indicated.
20    Subsequently, that article has been reviewed
21    more significantly.
22              Of these women who were reoperated,
23    several were reoperated for recurrent prolapse.
24    Others were reoperated for the acquisition of
25    other complaints such as urinary incontinence.
```

Case 2:12-md-02327   Document 4355-6   Filed 08/15/17   Page 90 of 204 PageID #: 145580
Case 2:11-cv-00195   Document 98-3   Filed 03/21/13   Page 89 of 246 PageID #: 2021

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

1     So they may have been reoperated, but

2     not for correcting the previous concern, but

3     because of the acquisition of another

4     complaint.

5     Q     Well, regardless of any

6     reinterpretation of that source, it was your

7     view at this time that even the most effective

8     treatments had significant failure rates; is

9     that correct?

10     A     In these author's hands, yes, it did.

11     There's a difference between a

12     reoperation rate, which they indicated was

13     29 percent, and someone's returning with a

14     physical exam which isn't perfectly normal.

15     And the way we've come to know about

16     that -- there are a lot of ways we'd know about

17     it.  One of the ways we've come to learn about

18     that is there are now reports in our literature

19     which describe the physical findings of women

20     over the course of decades of life.

21     So there are groups of women who have

22     been seen at -- in their 30s, 40s, 50s, 60s,

23     70s and 80s.  Someone then has given a profile

24     of what are these examinations, how are they

25     described in women in each of these different

~In Re: Avaulta~                         Bobbie Shull, M.D.                         2/6/2013

```
 1    decades.
 2              We know, for example, that women who
 3    had children who are in their 50s and 60s do
 4    not normally have perfect support in the
 5    pelvis.  It doesn't mean they're going to be
 6    symptomatic or have surgery.
 7              The analogy I would use for that,
 8    which I think a patient would understand, is a
 9    woman who is 60 or a man who is my age doesn't
10    look the same as an 18-year-old.  Their pelvic
11    exam isn't the same as an 18-year-old.  So
12    pelvic exams change as people change in age.
13              What we understand now, for example,
14    I'll use these patients we described with a
15    Grade 1 loss of support.  That's something
16    halfway to the hymen.
17              It would be exceptional now for
18    someone to recommend any intervention for a
19    woman who has physical findings like that.
20              And in fact, most reports in the
21    literature currently that use the POP-Q, for
22    example, or the Baden-Walker, either one,
23    presume that women who have Stage 0 are things
24    that are at normal levels in the pelvis or
25    halfway to the hymen would be considered to
```

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

1   have a normal pelvic exam.

2           MR. NORTH:  If you would mark this as

3   the next exhibit.

4           (Defendant's Exhibit 7 marked.)

5   BY MR. NORTH:

6       Q   Regardless of what you believe the

7   recurrence rate was or is today with native

8   tissue surgeries, would you agree that in the

9   late 1990s and early part of the 2000s that the

10  belief was there was a significant recurrence

11  rate with native tissue surgery?

12      A    There's a distinction that we made

13  between a physical exam and a reoperation rate.

14  So I believe that there are women who do not

15  have perfect outcomes following surgery, but

16  they're not reoperated.

17          And the number of women who have an

18  exam that wouldn't be called perfect is

19  certainly different than the number of women

20  who have an exam, have symptoms, and have

21  physical findings, all of which would suggest

22  that she's a candidate for repeat surgery.

23      Q    Well, regardless whether you define

24  recurrence as symptoms or the need for

25  reoperation or anything in between, would you

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   agree that the consensus view was that there
 2   was a significant recurrence rate after native
 3   tissue surgery back during that time frame, the
 4   late '90s, early 2000s?
 5          MR. GARRARD:   Object to the form of
 6   your question insofar as the use of the term
 7   "consensus view."
 8      A    What we reported, and we were one of
 9   the early ones to identify this, describe it,
10   and give our personal experiences.
11          What we evaluated is various sites in
12   the pelvis.  You'll see that in the chart of
13   the article you referred to about the editorial
14   on support defects.
15          We looked at specific sites in the
16   pelvis, the support for the urethra, the
17   bladder, the top of the vaginal canal, the
18   cul-de-sac and the rectum in an effort to
19   determine is there some specific part of a
20   reconstructive operation that is more or less
21   effective than another part of surgery.
22          When we looked at our 81 women who
23   had sacrospinous ligament suspension, for
24   example.  Sacrospinous ligament suspension was
25   accepted, and still is, as a very effective
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    method for treatment of the top of the vaginal

2    canal or apical loss of support.

3            What we learned in reviewing our

4    patients is, in fact, it is very effective for

5    treatment of the top of the vaginal canal.

6            The anterior compartment, the support

7    for the bladder, is the area that is most

8    difficult to manage effectively from a surgical

9    standpoint.

10           What we know now is that other

11   physicians have identified the same thing.

12   When they critically look at their own outcome

13   from surgery and look at specific parts of the

14   pelvis, most skilled surgeons have very good

15   success with apical support, support in the

16   posterior compartment.  The dilemma is in the

17   management of the anterior compartment in the

18   anatomy.

19           What we know now also is from looking

20   at large groups of women who have not had

21   surgery that, in fact, if you take all women,

22   examine them and describe the sites of the

23   pelvis where they're most likely to have poor

24   support, it's the anterior compartment of the

25   bladder.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          So women who had no surgery, that's

2     most likely to be the area that will have poor

3     support.  Women who have had surgery, if they

4     have an area in the pelvis where the support is

5     sub-optimal, it is more likely to be the area

6     by the bladder than any of the other parts of

7     the pelvis.

8          We have shown that in sacrospinous

9     ligament suspension.  What difference does that

10    make?  It makes a difference because if you

11    identify something that doesn't work as well as

12    you would like it to work, you can then employ

13    a strategy to try to correct that, such as

14    modify your surgical technique.

15         In this case, what we chose to do is

16    use a different approach to the treatment of

17    prolapse with specific attention to the

18    anterior compartment.

19         The people that are advocates of

20    sacrospinous ligament suspension have modified

21    part of the way they manage the surgery in an

22    effort to reduce the persistence or recurrence

23    of tissue in the anterior compartment.

24         When you look at women who have been

25    evaluated after surgery, that's in one of the

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    charts also in that editorial, you can review

2    several things.  The anatomic outcome, the

3    functional outcome, the sexual outcome, the

4    quality of life.

5          But let's talk specifically about

6    surgery, for example.  If you have an operation

7    for poor support, in your case it can be an

8    inguinal hernia, in a woman's case it may be

9    pelvic, poor support.  For a doctor to provide

10   an effective operation, they have to know what

11   you have and employ a technique that is going

12   to be effective.

13         So in the outcome of hernia surgery,

14   the things that we look for are the cure and

15   the durability.  Is it cured and how long does

16   it last.

17         At the six-weeks visit after surgery,

18   if a patient returns and their examination is

19   normal, you can infer that the person caring

20   for that patient saw what was the matter and

21   executed the procedure effectively to take care

22   of the issue.

23         If someone returns at six weeks and

24   their examination isn't normal, we'll use these

25   patients that you referred to in that chart of

1    mine.

2             At six weeks when the patients came

3    back, 94 percent of the women had a normal

4    exam.  The inference is that we saw and

5    corrected what was the matter.

6             At a subsequent visit, more of these

7    women had poor support than they did at six

8    weeks.  The implication for that is the

9    procedure wasn't durable.  It wasn't that

10   something failed to be repaired, it either

11   wasn't durable, or in the case of sacrospinous

12   ligament suspension, the operation predisposed

13   the woman to some other loss of support.

14            We have several examples in GYN

15   surgery where one operation may dispose you --

16   predispose you to the acquisition of another

17   loss of support.

18            The six-week visit's helpful because

19   at the six-weeks visit you can make an estimate

20   did the doctor see and do what was appropriate.

21            If the six-week exam is abnormal, one

22   of several possibilities.  The person did not

23   see properly and identify what should have been

24   corrected.  They saw it and corrected it, but

25   it wasn't durable enough even to last six

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   weeks.  They saw it and corrected it and there
 2   was some perioperative event that predisposed
 3   the operation not to work.  Collection of blood
 4   in the incision, suture materials that broke.
 5   There are a variety of things that could
 6   happen.
 7           But the six-weeks visit is helpful to
 8   sort out the technical aspects of was the
 9   surgery performed correctly for the right
10   indication.
11           The longer term follow-up gives you a
12   much better clue about was this operation
13   durable.  And if it isn't durable, why isn't it
14   and what can you do to try to make it more
15   durable.
16           Plastic surgery is a perfect example
17   because everyone can see it.  If you know
18   someone who's had plastic surgery, for example,
19   in their face, which is the most obvious place
20   to see it, there's a recovery phase where
21   someone who's had plastic surgery doesn't want
22   to be seen in public because there's bruising,
23   swelling, tenderness, all of those things which
24   would go along with any surgical therapy.
25           Once they recover, ideally they're
```

1    going to look differently than they did before.

2    If you see a woman or a man or a child who has

3    had plastic surgery at six months after

4    surgery, they may have a wonderful outcome.

5    When you see them five years later or some

6    other time in the future, the outcome isn't as

7    likely to be the same as it was in that early

8    perioperative period.

9            All surgery that is reconstructive in

10   nature has durability as an issue.

11           MR. NORTH:  With all due respect,

12   Doctor, I'm going to object to the answer as

13   nonresponsive to the question.

14   BY MR. NORTH:

15       Q    The question was very simple.

16           MR. GARRARD:  And I think he answered

17   your question.

18   BY MR. NORTH:

19       Q    In the early -- late 1990s, early

20   2000s, let me put it this way, did -- was the

21   belief or what was being shown in the medical

22   literature that the recurrence rates for native

23   tissue surgery were high?

24       A    At the time you're asking me about,

25   the article referenced by Ambrose and Amanda

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    Clark in 1997, stimulated this concern about

2    reoperation rate for surgery.

3         Q    Okay.

4         A    As I've told you, the reoperation

5    rate was for more than prolapse.

6         Q    Now, if you would look at Exhibit 7.

7    This is an article you wrote in 2005; is that

8    correct?

9         A    Yes.

10        Q    And what was this published in?

11        A    The International Urogynecologic

12   Journal.

13        Q    And your coauthor was Mickey Karram?

14        A    That's correct.

15        Q    And who is he or she?

16        A    Mickey Karram is a physician in

17   Cincinnati who is specialized in treating --

18   evaluating and treating women who have

19   disorders of the pelvic floor.

20             Mickey has been editor of this

21   journal.  He is not currently.  He has been

22   editor of the journal.  He has been president

23   of our major societies, and he is the director

24   for a fellowship program in female public

25   medicine and reconstructive surgery.  And is

~In Re: Avaulta~      Bobbie Shull, M.D.      2/6/2013

1   the coauthor of what's considered to be one of

2   our standard texts in this field.

3      Q    And this article sort of generally

4   discusses the fact that there are new

5   technologies being introduced to the market

6   during this time frame in 2005 for the

7   treatment of pelvic organ prolapse, correct?

8      A    Yes.

9      Q    And some of those new technologies

10   would be the transvaginal mesh products for the

11   treatment of prolapse?

12      A    Yes.

13      Q    And in fact, towards the end or at

14   the very end of the article, you and Dr. Karram

15   state that: As a patient advocate, however, we

16   all must decide whether to embrace new

17   technologies or products early in their

18   development phase or to wait on appropriately

19   performed trials to understand the risks and

20   benefits of each procedure. These are the

21   decisions that we, as pelvic surgeons, will

22   have to make.

23      Correct?

24      A    That's exactly what it says.

25      Q    And the truth of the matter is that a

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    number of pelvic surgeons at that time frame

2    made the choice to use some of these new

3    technologies, correct?

4         **A    Yes.**

5         Q    And in fact, they have -- were used

6    in the 2005 to 2008 time frame, let's say,

7    fairly widely in the gynecological surgery

8    community, weren't they?

9         MR. GARRARD:  Object to the form of

10   the question so far as you use the term "fairly

11   widely."

12        A    They were used.  I don't know the

13   percentage of patients who had reconstructive

14   surgery had a mesh product used or not.

15   BY MR. NORTH:

16        Q    Fair enough, Doctor.

17        You would agree with me that a number

18   of surgeons that you respect in the

19   gynecological community throughout the country

20   have used these products, correct?

21        **A    I have a lot of associates and/or**

22   **friends who do the same thing that I do because**

23   **this is a relatively small number of physicians**

24   **in general.**

25        **There are multiple ways to do**

~In Re: Avaulta~                     Bobbie Shull, M.D.                       2/6/2013

 1    everything.   On one end of the spectrum, I and

 2    a certain number of people primarily would use

 3    native tissue surgery.   On the other end of the

 4    spectrum, there's someone who would be more

 5    likely to use a product.   And then there's

 6    everything in between.

 7         Q     And there are people on the other end

 8    of that spectrum in your rather narrow field

 9    that you respect, correct?

10         A     There are many.

11         Q     Dr. Lucente, for example, he uses

12    these products, doesn't he?

13         A     I can't tell you which ones.   He's

14    been a spokesman for J&J and I don't know for

15    whom else, but --

16         Q     Okay.

17         A     -- yes.

18         Q     And a number of your colleagues at

19    ACOG or AUGS, A-U-G-S, have used these products

20    over the years, correct?

21         A     I'm sure they have.

22         Q     Have you read the article A Time To

23    Rethink?

24         A     I have.

25         Q     And --

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1        A     By a group who are advocating for

2    more -- a slower approach to the FDA

3    recommendations on being concerned about mesh

4    products.

5        Q     And in fact, the authors or signed --

6    people that have signed on to the Time To

7    Rethink article, see surgical benefits in the

8    use of these transvaginal mesh products, don't

9    they, in certain patients?

10       A     I'm sure they do.  I don't recall the

11   details of the article.  But I'm sure they feel

12   that there are benefits to use of products in

13   particular cases.

14       Q     And a number of the physicians that

15   have signed on or endorsed the Time To Rethink

16   are people that you respect in the field,

17   correct?

18       A     I can't tell you who all signed on.

19   There are some of them I know I respect them.

20   There's some I don't know.

21       Q     Other than the article we just

22   discussed, Exhibit 7, do any of your other

23   publications refer or discuss in any detail

24   transvaginal mesh products for the treatment of

25   prolapse?

~In Re: Avaulta~       Bobbie Shull, M.D.       2/6/2013

```
 1        A    Yes.   There is one that may not be in
 2   my CV, although, I thought it was, relating to
 3   The Perfect Storm.
 4        Q    The Perfect Storm?
 5        A    Yes.
 6        Q    Not the movie, I assume?
 7        A    Not the book.  It's not about deep
 8   sea fishing.  Although, it could be.
 9        Q    Let's see, where did your CV go.
10             MR. GARRARD:   There's a copy of it.
11   BY MR. NORTH:
12        Q    Here, it is.
13             Could you point that out to me?
14        A    I will if it's here.  It isn't on
15   here.  It was published in the last year or two
16   in the International Journal.  Margaret
17   probably can find that if you would like to get
18   it.  We'll have somebody get it and give it to
19   you.  It's indexed.
20        Q    It's called A Perfect Storm?
21        A    I believe that's correct.
22        Q    And published in the International
23   Journal of what?
24        A    International Urogynecologic.
25             THE WITNESS:   And I believe,
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1    Margaret, it was in 2012.
 2              MS. THOMPSON:  Yeah, I have it.
 3              THE WITNESS:  If I'm not mistaken.
 4    BY MR. NORTH:
 5         Q    Did you have any coauthors on that
 6    article?
 7         A    Dr. Brubaker, I believe.
 8         Q    Brubeck?
 9         A    Brubaker, B-R-U-B-A-K-E --
10         Q    Linda Brubaker?
11         A    Yes.
12         Q    Have you consulted with Dr. Brubaker
13    over the years?
14         A    About what?
15         Q    Anything in the practice of your
16    field.
17         A    Well, Dr. Brubaker and I, one, are
18    good friends.  Two, we work together in many
19    organizations.  We have lectured together,
20    taught together, traveled together, discussed
21    patients together.  I think the answer to that
22    would be yes.  We've written articles together.
23         Q    Dr. Brubaker is an advocate against
24    the use of transvaginal mesh for the treatment
25    of prolapse, correct?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          A     I don't know.  Did she classify

2     herself as that?  I haven't given her that

3     title.

4          Q     She does not believe in the use of

5     transvaginal mesh for the treatment of

6     prolapse, does she?

7          A     I don't know how her practice is with

8     that, frankly.  I know that she probably

9     wouldn't use it commonly.  I don't know if she

10    uses it at all.  She has several associates.

11              MR. GARRARD:  Here's the article if

12    you want it.  We can get other copies made.

13              Do you want to take a second and get

14    other copies, Richard?

15              MR. NORTH:  Yeah.

16              VIDEO TECHNICIAN:  Want to go off the

17    record, sir?

18              MR. NORTH:  Yes.

19              VIDEO TECHNICIAN:  Stand by, please.

20              We're off the record.  The time is

21    11:28.

22              (Recess taken.)

23              (Defendant's Exhibit 8 marked.)

24              VIDEO TECHNICIAN:  We are back on the

25    record.  The time is 11:30.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1              You may continue.

2     BY MR. NORTH:

3         Q      Dr. Shull, while we took that brief

4     break, we came up with the -- found a copy

5     through Margaret of the other article you

6     published regarding transvaginal mesh products?

7         A      **Yes.**

8         Q      And it's called A Perfect Storm?

9         A      **Yes.**

10        Q      And it was -- you were a co-author

11    with Linda Brubaker?

12        A      **Yes.**

13        Q      And this was published in 2012?

14        A      **Published online November 16th, 2011.**

15    **The hard copy was in 2012.**

16        Q      When were you first retained to be an

17    expert witness in this litigation?

18        A      **I think the first time Margaret and I**

19    **talked was April or May of 2012.  Because I**

20    **have one letter that came sometime in May.**

21             THE WITNESS:  So I think I must have

22    talked to you in April, maybe.

23             MR. NORTH:  Is -- she can't answer

24    the questions on the record.

25

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    BY MR. NORTH:
 2         Q    Prior to that, did you have any
 3    conversations with Margaret or with Mr. Garrard
 4    or anybody from his firm about possibly getting
 5    involved in the litigation?
 6         A    No.  In truth, I wasn't even familiar
 7    that litigation --
 8         Q    Now --
 9         A    -- was going forward.
10         Q    Okay, fair enough.
11              Is it correct that the article we
12    discussed a few moments ago, Exhibit 7, and
13    then this article, Exhibit 8, are the only two
14    publications you have regarding transvaginal
15    mesh products, correct?
16         A    Yes.
17         Q    Now, in looking through Article 8, it
18    appears that the position taken by you and Ms.
19    -- or Dr. Brubaker was that the use of
20    transvaginal mesh products can be effective in
21    the hands of very highly skilled surgeons, but
22    may not be effective or may be prone to
23    complications in the larger surgical population
24    or surgical troops?
25         A    Are you asking me is that in this
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

| | | |
|---|---|---|
| 1 | | article? |
| 2 | Q | Yeah. |
| 3 | A | May I read it just a moment -- |
| 4 | Q | Sure? |
| 5 | A | -- and then I'll answer that for you. |

6          (Witness reviews document.)

7          I believe what Linda and I stated is,

8    we could assume that there are a group of

9    people who maybe are able to use mesh-based

10   procedures effectively, understand the

11   complications of how to manage them, and would

12   know which population of women would be

13   suitable candidates.  I think that's what you

14   asked me.

15        Q    Yes.

16             Are you familiar with Dr. Patrick

17   Culligan?

18        A    Yes.

19        Q    Do you respect him as a gynecological

20   surgeon?

21        A    Yes.

22        Q    What about Dr. Neeraj Kohli?

23        A    Yes, I know him.

24        Q    Do you respect him as a

25   urogynecological surgeon?

1     **A     Yes.**

2            MR. GARRARD:   You asked him a

3     question if he had any other articles on mesh,

4     there is another article on mesh.

5     A     Oh, I beg your pardon, I was thinking

6     about the editorial.   I beg your pardon.

7     BY MR. NORTH:

8     Q     Mr. Garrard just indicated to us that

9     you had a third article on mesh, and this is

10    entitled A serious complication following

11    placement of posterior Prolift, correct?

12    **A     That's accurate.**

13    Q     And this is a case report regarding a

14    single patient?

15    **A     That's accurate.**

16    Q     And it involves Prolift, which is the

17    Johnson & Johnson mesh implant?

18    **A     Yes.**

19    Q     It was published in 2009?

20    **A     Yes.**

21    Q     What was the complication there?

22    **A     In this particular patient, she is a,**

23    **I believe, 32- or 34-year-old woman.   I haven't**

24    **read that recently.   She's a young woman who**

25    **was referred to our practice with rectal**

```
 1    bleeding.
 2              On examination, she was found to have
 3    a fistula between the rectum and the vagina.
 4    It was noted to have a mesh product that had
 5    eroded into the rectum.
 6              In this particular circumstance, I
 7    personally called the office of the surgeon who
 8    had performed the primary surgery, I did not
 9    speak to that surgeon because he was out, but I
10    spoke to one of his colleagues and was told
11    that Prolift was used and that this particular
12    physician had used Prolift as a product of
13    choice for prolapse.
14              I believe the surgery had been done
15    -- I believe in the same calendar year, but I
16    would have to read the article again to see.  I
17    don't know that for a fact.
18              So the woman had a
19    laparoscopically-assisted hysterectomy.  She
20    had a mesh kit procedure for prolapse and then
21    developed a rectovaginal fistula requiring
22    removal of the mesh, and ultimately several
23    operative procedures.
24        Q    Okay.  With the addition of this
25    third article to the mix, is that now all of
```

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

```
 1    the articles you've ever published with regard
 2    to transvaginal mesh products?
 3         A    I believe it is, and I apologize for
 4    not remembering that.  There is an article
 5    which we have published that doesn't involve
 6    our placing mesh transvaginally.  It will come
 7    when my new CV comes.
 8              There's an article involving 25
 9    patients in my practice who had prolapse of the
10    vagina following an abdominal sacral colpopexy.
11              We operated on those women
12    transvaginally.  In approximately half of them
13    we could identify the mesh from the sacral
14    colpopexy, it was still attached to the sacrum,
15    was not attached to the vagina.  And we left
16    that mesh in place, placed sutures in it and
17    used it as a part of the suspensory mechanism
18    for the corrective surgery which I did.
19              The concept behind that case series
20    was to describe our experience with women who
21    had failed an operation which is felt to be
22    reliable, and all surgeries have a failure
23    rate.  That the failure frequently occurs where
24    the mesh is detached from the vagina, not the
25    sacrum.  And if you can identify the mesh and
```

1    it's in place, not infected, it could become --

2    it could become a part of the suspensory

3    mechanism.

4            THE WITNESS:  If that's my updated

5    CV, that should be...

6            MR. NORTH:  No, it's not.

7            MS. THOMPSON:  No.

8            MR. NORTH:  Could you mark this as

9    Exhibit 8 -- or, I guess, we're at 9?

10            THE COURT REPORTER:  Uh-huh.

11            MR. NORTH:  Yeah, 9, please.

12            (Defendant's Exhibit 9 marked.)

13    A     There's an article you've asked me

14    about before regarding the Prolift.

15            MR. NORTH:  This is the one he's

16    talking about Prolift.

17    A     The Prolift.

18            Is a single patient.  And the reason

19    we reported that is because we felt that the

20    complication was significant enough that it

21    warranted general knowledge about it.

22    BY MR. NORTH:

23    Q     And we have now marked as Exhibit 9

24    there the Prolift article you were discussing,

25    correct?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    **A      Yes.**

2         Q      And then you mentioned a fourth

3    article that concerns mesh that you've seen

4    when you're going in for a surgery on certain

5    patients.

6         **A      Yes.   And it's not related to a**

7    **complication of mesh, it's related to patients**

8    **referred to me who had had a sacral colpopexy,**

9    **they had a recurrence of their prolapse, they**

10   **wanted to have further surgical therapy.   I**

11   **chose to operate on vaginally.   In about half**

12   **of those women, I could use the existing mesh**

13   **as a part of the reconstructive surgery.**

14        Q      None of these four articles that

15   refer to mesh specifically deal with Avaulta

16   mesh, correct?

17        **A      That's accurate.**

18        Q      And none of these articles deal with

19   any product manufactured by Bard to your

20   knowledge?

21        **A      There are no ar -- there are no**

22   **products named in the two editorials.   Prolift**

23   **is identified in the case report.   And in the**

24   **series of sacral colpopexy failures, no**

25   **products were mentioned by name on that because**

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    I don't -- I didn't know the names of the
 2    products.
 3         Q    Now, to your knowledge, have we now
 4    discussed all of your publications with regard
 5    to mesh products for the treatment of pelvic
 6    organ prolapse?
 7         A    I hope so.
 8         Q    Okay.
 9              MR. GARRARD:  Do you need to look at
10    the new CV?
11              MR. NORTH:  Well, he can always --
12              MR. GARRARD:  Well, I'm just -- we
13    may --
14              MR. NORTH:  -- add something.  I'm
15    just asking to his knowledge now.
16    BY MR. NORTH:
17         Q    Let's talk a little bit about your
18    retention in this case as an expert witness.
19              Now, I certainly understand -- you
20    know, appreciate your expertise as an OB-GYN
21    and in the gynecological surgery area.  But I
22    want to see if we can be clear about areas
23    where you're not an expert.  And I asked you
24    about your training and expertise in some of
25    these areas earlier.
```

~In Re: Avaulta~          Bobbie Shull, M.D.          2/6/2013

1           But would you agree that you are not

2    an expert in developing warnings and labels for

3    medical devices?

4       **A     I have never developed a warning or a**

5    **label.   I don't intend to do that.   And I don't**

6    **know the process for doing it, so I would not**

7    **claim to be an expert in that area.**

8       Q     And you are not an expert in the

9    design of medical devices, are you?

10       **A     No, I've never designed a device.**

11       Q     And you are not an expert in

12    biomaterials?

13       **A     No.**

14       Q     And are you an expert in

15    biocompatibility?

16       **A     No.**

17       Q     And are you an expert in materials

18    manufacturing?

19       **A     No.**

20       Q     Are you an expert in the

21    manufacturing processes for medical devices?

22       **A     No.**

23       Q     And we talked about your training in

24    pathology.   Would you consider yourself an

25    expert in pathology?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1        A      No.

2        Q      Would you consider yourself an expert

3   in toxicology?

4        A      No.

5        Q      Would you consider yourself an expert

6   in the marketing of products?

7        A      No.

8        Q      Would you consider yourself an expert

9   in the marketing of medical devices?

10       A      No.

11       Q      Do you deal with sales

12   representatives from various medical device

13   manufacturers as a part of your practice?

14       A      **Sometimes.**

15       Q      Do you deal with any medical device

16   or any sales representative from Bard?

17       A      **Can you tell me what dealing with**

18   **means?**

19       Q      With any type of product.

20       A      **Do I sit down and discuss the**

21   **products with them?**

22       Q      Uh-huh.

23       A      **Perhaps I have.   I certainly wouldn't**

24   **do it with any frequency.**

25       Q      Do you know the name of any Bard

1    sales representative assigned to your facility?

2        A     No.  If you gave me someone's name, I

3    may recognize it.  I would not be able to tell

4    you someone's name.

5        Q     Okay.  Well, as you sit here today,

6    do you have a specific recollection of having

7    sat down and talked with a Bard sales

8    representative in the past?

9        A     Regarding?

10       Q     Any Bard products.

11       A     I don't know the answer to that.  I

12   may have, but I cannot tell you when or what

13   the product was.

14       Q     Do you consider yourself an ethicist?

15       A     Can you tell me what that means?

16       Q     An expert in ethics.

17       A     Well, I don't lecture in it.  I feel

18   that I know the concepts of what it is to be

19   ethical and use them in my practice.

20       Q     But you have no particular training

21   in that, do you?

22       A     I have not had a specific education

23   in ethics.  We are required in Texas to have so

24   many continuing medical education hours per

25   year that relate to the ethics of medicine to

~In Re: Avaulta~                   Bobbie Shull, M.D.                   2/6/2013

1    maintain our license.  And I believe it is one

2    or two hours per year of continuing medical

3    education that is related to the ethics of

4    medicine.

5         Q    Do you consider yourself an expert in

6    regulatory affairs?

7         A    No.

8         Q    Do you consider yourself an expert in

9    FDA procedures and processes?

10        A    No.

11        Q    Are you an engineer?

12        A    No.

13        Q    Have you ever conducted any testing,

14   other than the visual observation of explanted

15   material on any transvaginal mesh implant for

16   the treatment of prolapse?

17        A    No.

18        Q    Have you ever done any comparative

19   study with -- between the various

20   manufacturers' transvaginal mesh implants?

21        A    No.

22        Q    Have you ever seen a product that you

23   knew to be Avaulta Plus?

24        A    Yes.

25        Q    And what was the context of that?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        A    I saw the prepackaged product, opened
 2   the package, felt the product, looked at it,
 3   handled it, but I haven't implanted it in
 4   anyone.
 5        Q    And have you done the same with the
 6   Avaulta Biosynthetic and the Avaulta Solo
 7   products?
 8        A    I've looked at all of -- yes, I've
 9   looked at all of those.
10        Q    Were those products furnished to you
11   by the Plaintiffs' attorneys in this
12   litigation?
13        A    Yes.
14        Q    Prior to your involvement in this
15   litigation, and having seen those products as
16   furnished to you by the attorneys, had you ever
17   seen the Avaulta products that you know of?
18        A    That's a very good question.  I can't
19   tell you the answer to that for sure, because I
20   probably have.
21             And the reason I would say that is
22   that at the majority of the professional
23   meetings I go to, vendors are present and
24   demonstrating what they have.
25             So I frequently go by the vendor
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    stands to look at what they have to sell, to

2    read their information or to talk to someone

3    who is there to describe it.

4            So, even though I can't tell you the

5    circumstances of which I did see it, I believe

6    that that would be true because I normally make

7    an effort at the meetings to go by and see what

8    each company has.

9        Q    So you believe you may have seen the

10   product before because it is your general

11   practice to stop by manufacturers' booths at

12   trade organizations -- or at organizational

13   meetings and for you to just see what they have

14   to offer right now?

15       A    Yes.

16       Q    But as you sit here today, do you

17   have a specific recollection of having done

18   that with the Avaulta products?

19       A    No.

20       Q    After being furnished the products by

21   the Plaintiffs' attorneys in this litigation to

22   look at, have you had any other occasions

23   subsequently to look at those products?

24       A    No.

25       Q    Now, when you looked at those

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
1    products, you didn't do any testing of any sort
2    on them, did you?
3        A    No.
4        Q    Did you read the instructions for use
5    that came with the product?
6        A    Yes.
7        Q    Remind me what your fee is for your
8    services.
9        A    The fee that I'm being paid now is
10   $500 an hour.
11       Q    Did you bring your billing records
12   with you?
13           MR. GARRARD:  We have.
14       A    No.
15           MR. GARRARD:  We have them.
16           MR. NORTH:  Can I see them?
17       A    No, they have them, I don't have
18   them.
19           MR. NORTH:  My colleague, Ms. Cohen,
20   thinks you are purposefully hiding all of these
21   billing records.
22           MR. GARRARD:  She sees worms under
23   every rock.
24           MR. MOELLER:  Please strike that from
25   the record.  I don't want to be any part of
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    that.
 2              (Off-the-record discussions.)
 3              MR. NORTH:  Can you mark this as the
 4    next exhibit?
 5              (Defendant's Exhibit 10 marked.)
 6              MR. GARRARD:  Do you want to mark the
 7    flash drive that we gave y'all?
 8              MR. NORTH:  We will.
 9              MR. MOELLER:  Yeah, I don't want to
10    be the custodian of that.
11              MR. GARRARD:  I don't want you to
12    either.
13              MR. NORTH:  Why don't you mark this
14    as No. 11.
15              (Defendant's Exhibit 11 marked.)
16              (Off-the-record discussions.)
17    BY MR. NORTH:
18         Q    Let me show you what's been marked as
19    Exhibit 10 to your deposition, Dr. Shull.  Is
20    that a complete copy of your billing records
21    thus far --
22         A    Yes.
23         Q    -- in this litigation?
24         A    Yes, it is.
25         Q    Let's go through those a moment.  And
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
1    you said your rate was $500 an hour, correct?

2         A     That's accurate.

3         Q     Your initial bill was for -- on June

4    4 for $3750, correct?

5         A     That's accurate.

6         Q     So what was that approximately, seven

7    hours?

8         A     It would be seven and one half hours.

9         Q     And then your next bill was on

10   July 27th and that was for 1,460, correct?

11        A     That's accurate.

12        Q     And how many hours was that for?

13        A     2.92.

14        Q     2.92 hours, okay.

15              MR. GARRARD:  Richard only bills in

16   half hour increments, Doctor.

17              MR. MOELLER:  Thought it was full.

18              MR. GARRARD:  Huh?

19              MR. MOELLER:  Full hours only.

20   BY MR. NORTH:

21        Q     On August 23, you submitted an

22   invoice for $11,875; is that correct?

23        A     Yes.

24        Q     And how many hours was that for,

25   Doctor?
```

```
 1        A      23.75.

 2        Q      And then on October 15 you submitted

 3   an invoice for 8,250; is that correct?

 4        A      That's accurate.

 5        Q      And how many hours did that reflect?

 6        A      16.5.

 7        Q      So if I am computing this correctly,

 8   by October 15 you had billed for 50.77 hours,

 9   does that sound correct?

10        A      I didn't do the arithmetic, but I

11   trust you did.

12        Q      That's dangerous to trust me with

13   math.

14               But I believe that is correct.  Does

15   that sound about right?

16        A      It's about right.  I'll be glad to

17   add it if you would like me to.

18        Q      And your report was submitted on

19   October 15 of 2012, correct?

20        A      I cannot give you the exact day.

21   Yes, in mid-October.  I don't remember the

22   exact day.

23        Q      So is it fair to say, Doctor, that

24   prior to the submission of your report in this

25   case, you had spent roughly 50 hours reviewing
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   the documents provided to you by the
 2   Plaintiffs' attorneys, reviewing the medical
 3   records of the various Plaintiffs that you have
 4   received, meeting with the Plaintiffs'
 5   attorneys on several occasions, and finalizing
 6   your report in this case?
 7        A    That's accurate.
 8        Q    How many times did you meet with the
 9   Plaintiffs' attorneys prior to October 15 of
10   2012?
11        A    At least six times according to this
12   -- these invoices.
13        Q    And when you --
14        A    I don't know if there's another, but
15   I see six times.
16        Q    And when you would meet with the
17   Plaintiffs' attorneys, you would charge for the
18   time that you spent meeting with them, correct?
19        A    That's accurate.
20        Q    And at the times you met with them,
21   you didn't actually review these documents
22   while you were meeting with them, did you?  Or
23   did you?
24        A    We may have referred to them.
25        Q    But --
```

1        A      Are you asking did we simply talk

2   with one another without the -- looking at any

3   records?

4        Q      No.   I guess what I'm saying is, you

5   didn't go through these documents one by one

6   during those meetings, did you?

7        A      No, that wasn't the purpose of

8   meeting with them.   I did that preparation in

9   advance.

10       Q      Okay.   And then to complete your

11  billing records, I believe that on December 10

12  you billed $4,000, which I assume would be

13  eight more hours, correct?

14       A      That's accurate.

15       Q      And then on January 21 you billed

16  9,875?

17       A      That's accurate.

18       Q      And how many hours would that

19  reflect?

20       A      19.75.

21       Q      And how much time have you spent on

22  this matter since January 21?

23       A      That's a good question.   I was on

24  holiday in Hawaii for one week.   I spent part

25  of my time there reviewing records.   I spent

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   yesterday here and today.  And a few hours on

2   Monday at my house.  So I don't -- I haven't

3   added all of that up.

4        Q    Are you -- have you been designated

5   as an expert witness in any other litigation

6   regarding mesh?

7        A    No.

8        Q    Other than the attorneys representing

9   the Plaintiffs in this case -- well, and first,

10  tell me which attorneys have you spoken to

11  about this litigation.

12       A    This specific litigation?

13       Q    Yes.

14       A    I've spoken to Mr. Garrard.

15       Q    Right.

16       A    Dr. Thompson.  Mr. Mueller and

17  Mr. Matthews.

18       Q    Okay.

19       A    I don't think there's anyone else.

20       Q    Have you spoken with any of the other

21  experts retained by the Plaintiffs in these

22  cases?

23       A    No.

24       Q    Have you reviewed any of the other

25  experts' reports in this case?

```
 1        A      The depositions, not the reports.
 2        Q      Which depositions of experts did you
 3   review?
 4        A      Dr. Raybon, Dr. Miklos, Dr. Kaminski,
 5   Dr. Margolis, Dr. Nutt, Dr. Barber, Dr. Barbee,
 6   Dr. Visco.  I'm trying to remember if there was
 7   someone else.
 8        Q      Well, let me just ask this.  Have you
 9   reviewed the deposition of Dr. Altenhofen?
10        A      I don't recognize that name.
11        Q      Dr. Carroll?
12        A      No.
13        Q      Dr. Loving?
14        A      No.
15        Q      Dr. Hoyte?
16        A      No.
17             MR. NORTH:  H-O-Y-T-E.
18   BY MR. NORTH:
19        Q      Dr. Brennan?
20        A      No.
21        Q      Dr. Zolnoun, Z-O-L-N-O-U-N?
22        A      No.
23             MR. GARRARD:  Richard, to save you
24   time, he hasn't been furnished the depositions
25   of any experts that we have engaged.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                        2/6/2013

```
 1                MR. NORTH:  Okay.
 2                MR. GARRARD:  He has reviewed the
 3      treating and implanting doctors' depositions
 4      that he told you about, and there may be
 5      another one or two that he didn't list.
 6      BY MR. NORTH:
 7          Q    Have you spoken with any of those
 8      doctors that treated the Plaintiffs?
 9          A    No.
10          Q    Have you spoken with any of the
11      Plaintiffs in this litigation?
12          A    No, I've never met one.
13          Q    Have you ever spoken besides -- other
14      than a possible conversation with the Bard
15      sales representative assigned to the Temple
16      territory, have you ever spoken with a Bard
17      employee before?
18          A    Unless it would be at one of these
19      meetings where someone who is representing the
20      company at a national meeting and I wouldn't
21      have remembered who or where, so I could have
22      then.
23          Q    But you don't have a specific
24      recollection of having done so?
25          A    No.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1        Q    What about with regard to Sofradim?

2        A    No.

3        Q    What about with regard to Tissue

4    Sciences Laboratories?

5        A    No.

6        Q    Did you read any depositions of Bard

7    employees taken in this litigation?

8        A    I read excerpts -- I must have read

9    excerpts from something because they're in the

10   report.  I don't know if that's -- if one of

11   those was from a deposition or if that was all

12   e-mail.

13            I don't remember seeing a deposition

14   from a Bard employee.  And I don't believe that

15   any of these references came from a deposition.

16   I guess you would know that better than I.

17            MR. GARRARD:  He has looked at some

18   employee depositions and they're reflected in

19   his report.

20   BY MR. NORTH:

21       Q    Were you furnished entire copies of

22   the depositions or only excerpts of them?

23       A    That's a good question.  I don't know

24   the answer to that.  I don't remember having an

25   entire deposition from anybody from Bard.

~In Re: Avaulta~                    Bobbie Shull, M.D.                         2/6/2013

| | |
|---|---|
| 1 | MR. GARRARD:  He did have whole |
| 2 | copies. |
| 3 | THE WITNESS:  Whose was that?  I |
| 4 | don't remember that. |
| 5 | MR. GARRARD:  Well, you had -- I can |
| 6 | think of right now Orr and -- |
| 7 | BY MR. NORTH: |
| 8 | Q    Oh, the depositions you were |
| 9 | provided, are they here in front of you? |
| 10 | MR. GARRARD:  I'm sorry, what |
| 11 | was your question? |
| 12 | A    Are you asking me about the physician |
| 13 | treaters and whatnot? |
| 14 | BY MR. NORTH: |
| 15 | Q    No, I'm asking about Bard employees. |
| 16 | Where would those depositions be? |
| 17 | **A    I don't know the answer to that.** |
| 18 | MR. GARRARD:  They're on the flash |
| 19 | drive, aren't they?  They're on the flash |
| 20 | drive. |
| 21 | MR. NORTH:  I'm going to remove the |
| 22 | sticker for just a minute. |
| 23 | THE COURT REPORTER:  I'll remember |
| 24 | it. |
| 25 | MR. GARRARD:  Keep your eye on him. |

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1           MR. NORTH:  Just one second, Doctor.

2           If I could ask, counsel, Doctor, in

3      particular, would the depositions have been

4      produced as pdfs on here?

5           MS. THOMPSON:  Probably.

6           MR. GARRARD:  I've got them right

7      here.  Would it assist you if I told you which

8      one's, Richard?

9           MR. NORTH:  Yeah.  I mean, under what

10     file are they?  I'm seeing the Plaintiffs.

11          MR. GARRARD:  Under -- they were the

12     ones that was furnished to him, David

13     Ciavarella, Jennifer Gordon Mercuri, Jim Ross,

14     John Knorpp and Robert Orr.

15          MR. NORTH:  I'm just trying to figure

16     out where they are.

17          MS. THOMPSON:  They're under -- I

18     think they're under Bard depos if you see that.

19          MR. GARRARD:  This is how they're

20     listed on mine.  Is that how it would be?

21          MR. NORTH:  On this flash drive there

22     is nothing called Bard depos.  There are files

23     called Bard Plaintiff depos, Bard treater

24     depos.  I've looked at both of those, the

25     employees are not there.  There's another file

1    called photos, and then there are a list of

2    pdfs.

3              MS. THOMPSON:  Let me check that out

4    for you.  I'll be right back.

5              MR. NORTH:  Mr. Garrard, could you

6    read on the record again the depositions of

7    Bard employees that you gave to Dr. Shull.

8              MR. GARRARD:  I sure will.  Do you

9    see a category titled Full Cited Depositions on

10   there?

11             MR. NORTH:  Uh-uh.

12             MR. GARRARD:  No.  Well, then we've

13   got a transfer problem on that thing, I guess.

14             It's Ciavarella, Jennifer Gordon

15   Mercuri, Jim Ross, John Knorpp, and Robert Orr.

16             MR. NORTH:  Ciavarella, Mercuri, Orr,

17   Knorpp.

18             MR. GARRARD:  Ross.

19             MR. NORTH:  And Ross.

20             MR. GARRARD:  Uh-huh.

21     A    Actually, I remember reading Dr. Ross

22   when you asked me about Bard employees, I

23   believe.  I guess I didn't associate Dr. Ross

24   with a Bard employee.

25   BY MR. NORTH:

1      Q     Right, and that's -- fair enough.

2            Did you review these depositions

3      electronically or did you have hard copies of

4      them?

5      A     I had -- everything that I had in

6      this report, 26, came in hard copy.  With the

7      -- when I told you I looked at the deposition

8      for the treating doctors, I started off on hard

9      copy.  But then I sat down and looked at them

10     on -- electronically instead because the books

11     were too big.

12     Q     Well, you were furnished a hard copy

13     of the employee depositions at some point, the

14     ones that Mr. Garrard just listed or do you

15     recall?

16     A     Well, did I have the whole thing?  I

17     don't -- I don't remember the answer to that,

18     if I have their whole deposition or not.

19     Q     Do you recall anything specific from

20     Dr. Ciavarella's deposition?

21     A     If I look back at what I read, I

22     will.  Without looking at the record.  Do you

23     have something specific you would like me to --

24     Q     No, I'm just -- as you sit here,

25     without looking at anything, is there anything

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   that comes to mind specifically about
 2   Dr. Ciavarella?
 3            MR. GARRARD:  Object to your -- I
 4   object to your question in form.  He's got a
 5   lengthy expert report where he has mentioned a
 6   number of things, including Ciavarella.
 7            I don't think that's a fair question
 8   to say, as you sit here, do you remember
 9   something.
10            MR. NORTH:  Well, you can ask that
11   with the courts.
12            MR. GARRARD:  If you need to look at
13   your report, Doctor, look at your report.
14       A    I'm happy to look at that and then
15   see if there's something --
16   BY MR. NORTH:
17       Q    Well, I don't need to look at that.
18   I just need you to answer the question.
19            MR. GARRARD:  Well, he can look at
20   his report if it assists him in answering the
21   question.
22   BY MR. NORTH:
23       Q    Well, he can answer the question
24   correctly, if the question is, without looking
25   at your report, do you recall anything
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    significant from Dr. Ciavarella's deposition?

2          MR. NORTH:   You can object to it as

3    unfair and take it up with the court, but it's

4    a fair question in my view.

5          MR. GARRARD:   I do object to it as an

6    unfair question without him having the

7    opportunity to look at his report.

8      A    I believe that I remember something

9    about him, but I cannot tell you all of the

10   details.  I believe that Dr. Ciavarella would

11   be one who had questions about the safety and

12   efficacy of the products, and one of the

13   discussions about the development of a product.

14   BY MR. NORTH:

15     Q    But you've never spoken with him?

16     **A    I wouldn't know him if he came in.**

17     Q    You were not shown the deposition of

18   Dr. Scott -- I mean, of Mr. Scott Britton, were

19   you?

20     **A    I don't believe I was.**

21     Q    And you weren't shown the deposition

22   of Laura Bigby?

23     **A    I don't think so.**

24     Q    And you weren't shown the deposition

25   of Adam Silver?

~In Re: Avaulta~       Bobbie Shull, M.D.       2/6/2013

1      **A**    **I don't believe so.**

2      Q    And you weren't shown the deposition

3   of Tad Nations?

4      **A**    **I don't believe so.**

5      Q    You weren't shown the deposition of

6   Melissa Johnson?

7      **A**    **I recognize that name. I don't know**

8   **that I saw her deposition.**

9      Q    The only depositions you've seen are

10   the ones that Mr. Garrard and Dr. Johnson

11   showed you, correct?

12      **A**    **You mean Dr. Thompson?**

13      Q    I'm sorry, Dr. Thompson.

14      **A**    **I believe that would be true.**

15      Q    And they selected the depositions to

16   show you, correct?

17      **A**    **I presume they did.**

18      Q    I mean, you didn't come up with a

19   list of the employees yourself that you wanted

20   to see their depositions, did you?

21      **A**    **No.**

22      Q    Okay. As a part of your work in this

23   case, have you gone back and looked at any

24   regulations put out by the FDA that might

25   govern these products?

~In Re: Avaulta~                  Bobbie Shull, M.D.                  2/6/2013

| | |
|---|---|
| 1 | **A     The 510(k) -- I've looked at the form** |
| 2 | **for 510(k) submission.** |
| 3 | Q     And that was given to you by the |
| 4 | Plaintiffs' attorneys, correct? |
| 5 | **A     Yes.** |
| 6 | Q     Have you looked at any regulations |
| 7 | from the FDA, though? |
| 8 | **A     I have not gone to an FDA website or** |
| 9 | **obtained any information from the FDA regarding** |
| 10 | **how to submit a proposal or what's included or** |
| 11 | **the process for it.** |
| 12 | Q     Well, the FDA regulations go beyond |
| 13 | how to submit a proposal.  So have you looked, |
| 14 | as a part of your work at this case, at any |
| 15 | regulations put out by the FDA that might be |
| 16 | applicable to this product? |
| 17 | **A     No.** |
| 18 | Q     Have you reviewed the 2008 and 2011 |
| 19 | public health notifications put out by the FDA? |
| 20 | **A     Regarding?** |
| 21 | Q     Pelvic mesh products. |
| 22 | **A     The warnings about pelvic mesh** |
| 23 | **products?** |
| 24 | Q     The public health notification. |
| 25 | **A     Yes, I have.** |

~In Re: Avaulta~       Bobbie Shull, M.D.       2/6/2013

1     Q    Had you read those before you became

2 involved in this litigation?

3     A    Yes.

4     Q    Have you -- you did not attend the

5 advisory panels' meetings and hearings

6 regarding these products in September of 2011,

7 did you?

8     A    I did not.

9     Q    And have you read any transcript from

10 those hearings?

11     A    No.

12     Q    Are you familiar with the difference

13 under the FDA's processes between a 510(k) and

14 a PMA?

15     A    I don't think I could describe the

16 differences to you for that.

17     Q    Do you know what Bard was required by

18 the FDA to show in order to get clearance to

19 market the Avaulta products?

20     A    I believe in general for 510(k)s any

21 company has to show that the requested product

22 or device is substantially similar to a

23 predicate device.

24       So Bard had to find one or more

25 predicate devices that were substantially

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   similar to the product they hoped to market and

2   agree that their proposed product was

3   substantially similar to these predicate

4   devices.

5        Q    What is your understanding of when

6   the initial Avaulta product, Avaulta

7   biosynthetic product was first introduced to

8   the market?

9        A    You're asking me what time?

10       Q    Yes.

11       A    I think about 2005 or '6.

12       Q    In 2005, there were already

13  transvaginal mesh products for the treatment of

14  pelvic organ prolapse on the market from other

15  companies, correct?

16       A    Yes.

17       Q    And there were actual kits, correct?

18       A    Yes.

19       Q    And were there trocar-based kits on

20  the market at that time from other companies?

21       A    Yes.

22       Q    Were there kits or mesh implants with

23  arms on the market at that time?

24       A    I believe that every kit with a

25  trocar has an arm or there wouldn't be a

1    trocar.

2        Q    So by the time the Avaulta

3    Biosynthetic was introduced to the market there

4    were predicate devices already being sold,

5    correct?

6        **A    There were products with trocars**

7    **being sold, that's correct.**

8        Q    We talked about the -- your

9    observation of Avaulta mesh in the past.

10            Have you ever looked at Avaulta under

11   a microscope?

12       **A    No.**

13       Q    Have you ever measured its pore

14   sizes?

15       **A    No.**

16       Q    And I believe you told us you'd done

17   no testing with mesh before, so you've never

18   done any degradation testing, have you?

19       **A    No.**

20       Q    Elasticity studies?

21       **A    No.**

22       Q    Shrinkage studies?

23       **A    No.**

24       Q    Do you -- or what is your

25   understanding of the FDA's requirements with

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
1    regard to clinical studies before a product is
2    introduced to the market?
3            MR. GARRARD:  Object to the form of
4    your question unless you delineate what type of
5    products you're talking about.
6            What kind of product you talking
7    about, Richard, because there's a difference?
8            MR. NORTH:  I just want his general
9    understanding.
10           MR. GARRARD:  Well, no, you need to
11   tell him what kind of product you're talking
12   about.  Are you talking about drugs, are you
13   talking about mesh?
14           MR. NORTH:  You can make an objection
15   to the record.
16           MR. GARRARD:  Well, I am making the
17   objection, but, Richard, you need to tell him
18   what type product you're talking about because
19   there's a difference.
20   BY MR. NORTH:
21       Q    What's your understanding of what the
22   FDA requires with regard to clinical studies
23   prior to the introduction of a product to the
24   market?
25           MR. GARRARD:  Objection to the form
```

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

| | |
|---|---|
| 1 | of your question unless you define what you're |
| 2 | talking about in terms of a product because |
| 3 | that makes a difference. |
| 4 | MR. NORTH: Your objection's noted. |
| 5 | A Or if they're pharmaceutical items, |
| 6 | they are, to the best of my knowledge, rigid |
| 7 | requirements for testing pharmaceutical agents |
| 8 | that go through a variety of efficacy and |
| 9 | safety studies, including human information |
| 10 | before they're approved to be sold. |
| 11 | In the case of products such as a |
| 12 | surgical product, there are different classes |
| 13 | of products. Some require very little |
| 14 | information. A trocar, for example, may be in |
| 15 | a class that requires very little information |
| 16 | about it except, perhaps, the technical |
| 17 | description of it and, perhaps, something about |
| 18 | its composition. |
| 19 | Then as the classification of |
| 20 | products increases, I believe this is true from |
| 21 | one, two, or three, there are progressively |
| 22 | more requirements for collecting and reporting |
| 23 | information on indications, complications, |
| 24 | management, safety, efficacy, and whatnot. |
| 25 | BY MR. NORTH: |

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

| | |
|---|---|
| 1 | Q    With regard to medical devices, do |
| 2 | you know what percentage of medical devices go |
| 3 | through clinical studies before they're |
| 4 | introduced to the market? |
| 5 | A    No. |
| 6 | Q    Do you know with regard to medical |
| 7 | devices whether more products go through |
| 8 | clinical studies or don't go through clinical |
| 9 | studies before they're introduced to the |
| 10 | market? |
| 11 | A    I do not know that. |
| 12 | Q    Do you know whether Bard was required |
| 13 | to conduct clinical studies on Avaulta before |
| 14 | introducing it to the market? |
| 15 | MR. GARRARD:   Required?   In terms of |
| 16 | the form of your question, required by what |
| 17 | or whom? |
| 18 | BY MR. NORTH: |
| 19 | Q    By FDA rules and regulations. |
| 20 | A    Do you mind repeating the question |
| 21 | for me? |
| 22 | Q    Do you know whether Bard was required |
| 23 | under FDA regulations to perform clinical |
| 24 | studies on Avaulta before it was introduced to |
| 25 | the market? |

1      A     I do not know that.   My presumption

2   is if they're using the predicate device as the

3   mechanism for getting the clearance, that there

4   may have been no requirements.

5      Q     How long do you believe it would have

6   taken to conduct a clinical study of Avaulta,

7   or do you know?

8      A     I can answer that in general.   It

9   depends on what you would like to know about

10  it.  So depending on the knowledge you hope to

11  acquire, there would be varying time intervals.

12           If it's a question about indications

13  and patient selection, that may take a shorter

14  time period.

15           If there are questions about the

16  morbidity associated with the operation itself

17  or the morbidity in the first six weeks

18  following surgery, that would take a relatively

19  defined time period depending on the number of

20  patients required for you to draw conclusions

21  from.

22           If you're talking about the long-term

23  consequences of a product, in this case we have

24  previous information from reports on sacral

25  colpopexy, for example, which teaches us that

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1    some of the adverse outcomes or adverse events

2    are a function of time.  And some of the

3    adverse events never go away.  And it's a

4    question of how frequently they occur as the

5    duration of time increases.

6              So let's use sacral colpopexy as an

7    example.  There are some cases where you can

8    tell immediately on a perioperative morbidity

9    or mortality, but the long-term information on

10   exposure, erosion, bleeding, and whatnot, it

11   takes years to acquire.

12             So to answer your question about

13   Avaulta.  Depending on the information that

14   someone thinks is appropriate to know, it could

15   take a long time and a lot of patients to learn

16   that.

17        Q    Do you know whether clinical studies

18   were performed on the Johnson & Johnson TVT

19   sling or the Boston Scientific stress urinary

20   incontinence implant you used before the time

21   you began using them?

22        A    Before the time I began using

23   tension-free vaginal tapes by Johnson &

24   Johnson, the product had been cleared for sale

25   in the U.S. for about five years.

~In Re: Avaulta~      Bobbie Shull, M.D.      2/6/2013

```
1        I do not know what was required prior
2   to the clearance of the product, but I know
3   that the reason I waited to use the product is
4   that in a 5-year interval there were reports
5   about its safety and efficacy which had been
6   published.
7        Plus, I had the opportunity to talk
8   to a number of people around the world who had
9   experience using the product.
10       And my entire reason for waiting as
11  long as we did was to learn more about that
12  because in the history of gynecology
13  specifically there have been a number of
14  products introduced during my practice lifetime
15  which have unintended consequences and the
16  products have been met with a great deal of
17  enthusiasm.  And after a certain time period
18  that enthusiasm diminishes.
19       And in fact, some of the products are
20  no longer available.  In the case of urinary
21  incontinence, for example, we already had
22  examples of that with Protogen.  So we knew
23  that there could be unintended consequences of
24  products.  And before that, Gortex used for a
25  sling.
```

1      So we already had examples of

2  procedures being advocated, enthusiasm being

3  generated, and then reality setting in where

4  the enthusiasm died off significantly.

5      IUDs, for example, were taken off the

6  market entirely because one particular product

7  had unintended consequences.

8      So based on all of those things, I

9  was interested in waiting until more

10 information was available.

11     Q    But do you specifically recall

12 whether or not there was -- had been clinical

13 studies performed by the time you began using

14 the J&J stress urinary incontinence product or

15 by the time you started using the Boston

16 Scientific product?

17     MR. GARRARD:  Objection, asked and

18 answered.

19     A    I know that there were case series,

20 surgeon experience, there were cohorts of

21 patients that were followed.

22     I don't remember the year the article

23 was published by Paul Hilton and his associate

24 comparing the Burch colposuspension to the

25 tension-free vaginal tape looking at morbidity

1 and efficacy. That occurred sometime in early

2 2000s. So it would have been about the time

3 that we began using the product.

4 BY MR. NORTH:

5 Q Do you know if -- can you identify

6 any randomized controlled trials that were

7 performed on the Johnson & Johnson or Boston

8 Scientific products before the time you started

9 implanting them?

10 **A No, I do not know that.**

11 Q When did you first start performing

12 native tissue surgery?

13 **A I did my residency from 1968 to 1973.**

14 **I began getting opportunities to operate during**

15 **the residency program during my second and**

16 **third and fourth years. So that would have**

17 **been in 1971, '2 and '3.**

18 Q At the time you first began

19 performing native tissue surgeries, were there

20 randomized controlled trials published

21 concerning that surgical technique?

22 **A I'm trying to think if there's even**

23 **another situation where that could have**

24 **occurred, because there were various types of**

25 **native tissue repairs, but there weren't**

~In Re: Avaulta~       Bobbie Shull, M.D.       2/6/2013

1  **repairs people were routinely doing with any**

2  **supplemental tissue.  So the answer to that is**

3  **no.**

4        MR. GARRARD:  We've been going for

5  about an hour and 45 minutes.

6        MR. NORTH:  Yeah, I'm ready to go.  I

7  was just waiting for lunch.

8        VIDEO TECHNICIAN:  Stand by, please.

9        And we are off the record.  The time

10  is 12:25.  This is the end of Tape 2.

11        (Lunch recess.)

12        VIDEO TECHNICIAN:  And we are back on

13  the record.  The time is 1:09.  This is the

14  beginning of Tape 3 of the videotape deposition

15  of Dr. Robert Shull.

16        You may continue, sir.

17  BY MR. NORTH:

18        Q    Dr. Shull, we were talking about

19  testing before we took our lunch break.

20        In reading your report, I gather that

21  you are critical of Bard's animal testing on

22  its products?

23        **A    Yes.**

24        Q    Are you aware of what testing was

25  done on the Sofradim Avaulta product?

~In Re: Avaulta~                     Bobbie Shull, M.D.                        2/6/2013

1      **A      Do you have something specifically in**

2   **mind that I should -- you're asking about?**

3      Q     No, I'm just asking, did you read

4   anything about the testing done on the Sofradim

5   Avaulta product?

6      **A      Not animal testing, no.**

7      Q     And you did not read the deposition

8   of Dr. Michel Therin from Sofradim?

9      **A      No, I didn't.**

10     Q     What is your understanding of what

11  types of animal tests were performed on the

12  Avaulta Plus and Solo products?

13     **A      That in rats and rabbits, pieces of**

14  **the material were implanted into the abdominal**

15  **wall of the rat.  And the rabbit, there could**

16  **have been something in the vaginal canal.  I**

17  **can't remember about the rabbit.**

18         **And then in the sheep, there were**

19  **four sheep that were studied.  And each of**

20  **those -- well, and the ones in the abdominal**

21  **wall, for example, they clearly would have been**

22  **placed without trocars.**

23         **I don't believe that any animal study**

24  **tested the kit as a unit.**

25     Q     Is that your principal criticism of

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    animal studies, is that they did not study the

2    entire kit in your view?

3         A     There are several reasons to be

4    concerned.  That would be one.

5              Another is there's a limited amount

6    of information that can be gathered on an

7    animal study.  Mainly, the information the

8    investigators collect relate to the body's

9    reaction to the implantation of a foreign

10   material.

11             The material is implanted and then at

12   some point in time it's explanted and the

13   animal may or may not be sacrificed.

14             They're looking at qualities of wound

15   healing, inflammatory changes, scar formation,

16   other issues about which we'd be interested in

17   clinical practice, for example, regarding

18   effects on valve function, bladder function,

19   sexual function, pain, quality of life.

20             Obviously, those can't be obtained in

21   any animal model.

22             But a part of the concern is also

23   testing the product without the entire system

24   is a major concern.

25        Q     Doctor, is it fair to say that your

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   criticisms of the animal studies is that they

2   did not provide sufficient information in your

3   view as opposed to any inherent flaw in the

4   protocol or design of the study?

5        **A    Are the study designs flawed?  It**

6   **depends on what you want to know.  So I'm not**

7   **judging the study based on the study itself**

8   **being performed improperly.**

9              **Can the study provide information**

10  **that's clinically helpful is a whole different**

11  **issue.**

12       Q    Did you review any animal studies of

13  the Johnson & Johnson TVT sling or the Boston

14  Scientific incontinence product you used before

15  you began using those products?

16       A    I did not.

17       Q    Did you read the protocols for the

18  Bard animal studies?

19       **A    I'm trying to remember if I read any**

20  **of the protocols.  I don't believe I did.**

21       Q    Did you read the published reports of

22  the studies?

23       A    I read -- I'll have to look in my

24  files and see specifically what I read.  And

25  I'm not sure I have all of those with me.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1           MR. MOELLER:  Do you want to concede
 2   or stipulate he did not review those?
 3           MR. GARRARD:  I'm sorry?
 4           MR. MOELLER:  Do you want to concede
 5   or stipulate he did not review the --
 6           MR. GARRARD:  No, I think he did
 7   review them.
 8           MR. MOELLER:  Oh, you think he did.
 9   I'm sorry.
10       A    I'm looking for the reference here.
11           MR. MOELLER:  Sorry about that.  I
12   was trying to expedite things.
13           MR. GARRARD:  I know what you were
14   trying to do.
15       A    I'm looking for the reference harder
16   so I can try to answer your question
17   specifically.
18           MR. GARRARD:  May I hand it to him,
19   Richard?
20           MR. NORTH:  What?
21           MR. GARRARD:  I've got the one he
22   reviewed if I may hand it to him without you
23   getting upset.
24           MR. NORTH:  Okay, this one time I'll
25   let you testify for him.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1              MR. MOELLER:  Did we figure out if
 2     our USB drive is complete or not?
 3              MR. NORTH:  It is.
 4              MR. MOELLER:  Oh, it is complete.
 5              MR. NORTH:  Uh-huh.  I found -- well,
 6     I found those depos on there.
 7              MR. MOELLER:  Oh, you found it.
 8     Okay.
 9              MR. NORTH:  He gave me -- they're
10     pdfs and he gave me the key numbers on them.
11              MR. MOELLER:  I gotcha.
12     BY MR. NORTH:
13         Q    Mr. Garrard just handed you a
14     document, Dr. Shull; is that correct?
15         A    Yes, he did.
16         Q    Do you know what a Bates number is,
17     the stamp at the bottom left-hand side on the
18     first page?
19         A    I believe that the Bates number is --
20         Q    Right.  Could you read that --
21         A    -- on the lower right-hand --
22         Q    -- for the record.
23         A    On the lower right-hand, capital
24     AVA2E0066011.
25         Q    Can you tell us what that document
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                      2/6/2013

```
 1   Mr. Garrard handed you is?
 2       A    The title is A Novel Mesh/Tissue
 3   Combination for vaginal prolapse in a sheep
 4   model, a pilot study.
 5       Q    Before Mr. Garrard handed that to
 6   you, do you recall seeing that document?
 7       A    Yes.  I was simply trying to find it
 8   so I could answer your question specifically.
 9       Q    Did you read that document prior to
10   submitting your report in this case?
11       A    Yes.
12       Q    Do you recall seeing any other test
13   reports?
14       A    Regarding?  Did I -- did I see test
15   results regarding what?
16       Q    That performed by Bard on the Avaulta
17   products.
18       A    I did not read the reports on the rat
19   studies.
20       Q    Did you read the report on the rabbit
21   studies?
22       A    I did not.
23       Q    So you read the sheep study but not
24   the rabbit and rat studies performed by Bard in
25   the development of the Avaulta products?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1      A      That's correct.

2      Q      And based on your previous testimony,

3   it's my understanding that you have never

4   yourself created a protocol for an animal study

5   for a device; is that correct?

6      A      That's accurate.   That's correct.

7      Q      In your report you state that there

8   was no scientific basis for Avaulta, the

9   concept, and that the mesh with arms and use of

10  trocars represented a radical departure from

11  previously described grafts.

12          Do you recall that?

13          MR. GARRARD:   Could you tell me which

14  page you're referring to, please.

15          MR. NORTH:   Pages 7 and 8 and 9.

16          MR. GARRARD:   Thank you.

17      A      At the bottom of Page 7, what I said:

18  At the time the Bard Avaulta Biosynthetic

19  product was introduced, there was no credible

20  scientific evidence that supported utilization

21  of an armed, transvaginally placed

22  polypropylene mesh.   In fact, questions

23  regarding the safety and efficacy were already

24  apparent prior to the introduction of the

25  Avaulta Biosynthetic and the Avaulta Plus and

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    Solo products.

2    BY MR. NORTH:

3       Q    And then look over on Page 9.  There

4    you describe the concept as a radical

5    departure, correct?

6           MR. GARRARD:  Doctor, you certainly

7    can look at Page 9, but read whatever you need

8    to.

9       A    I'm looking for that on 9, those

10   words.

11          Yes, I see it.

12          These products and the procedures

13   required for their use represented a radical

14   departure from previously described grafts used

15   in the pelvis, which had been used only in very

16   select cases.

17   BY MR. NORTH:

18      Q    But I think you previously admitted

19   or told me that Bard's Avaulta was not the

20   first product introduced to the market for

21   transvaginal use that involved mesh with arms

22   in the use of trocars, correct?

23      A    I did.  I also -- you didn't ask me

24   if they were a radical departure either, you

25   just asked me if someone else had used them.

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1        Q    So you believe all of these kits were
 2   a radical departure?
 3        A    Yes.
 4        Q    But you agree that Bard's was not the
 5   first kit like that on the market?
 6        A    Bard is not the first one.
 7        Q    In your report you also state in that
 8   section that questions regarding safety and
 9   efficacy with regard to Avaulta were already
10   apparent by the time the product was
11   introduced.
12             What is your basis for that?
13        A    If I could read the context of that.
14             At the time the Bard Avaulta
15   Biosynthetic product was introduced, there was
16   no credible evidence -- scientific evidence to
17   support utilization of an armed, transvaginally
18   placed polypropylene mesh.
19             In fact, questions regarding the
20   safety and efficacy of the referenced item,
21   polypropylene and armed mesh products, was
22   apparent prior to the introduction of the
23   Avaulta Biosynthetic and the Avaulta Plus and
24   Solo.
25             The basis for that is what you asked
```

~In Re: Avaulta~                 Bobbie Shull, M.D.                    2/6/2013

1    me.

2         Q    Yes.

3         A    The basis was on conversations with

4    other physicians who were seeing patients with

5    complications, on case reports, on discussions

6    at scientific meetings, and on observation of

7    patients who had had surgery with mesh

8    products.

9         Q    Were you aware of things like that as

10   of 2005?

11        A    Yes.

12        Q    So by the year 2005, you had already

13   determined that the safety and efficacy of

14   transvaginal kits for the treatment of pelvic

15   organ prolapse, that there was questions about

16   their safety and efficacy?

17        A    Yes.

18        Q    When did you first make that

19   determination?

20        A    I think I told you earlier that on

21   several occasions I was invited to sit in on

22   roundtable discussions as J&J and perhaps

23   someone else was interested in developing

24   products to use mesh for prolapse repair.

25             And at the time those groups met, I

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1    raised these very issues, placing a synthetic
 2    material in a clean contaminated field, of
 3    using trocars through spaces where we normally
 4    would not operate, of the possibility of
 5    injuries to structures we can't see, of how you
 6    could identify to manage an intraoperative
 7    complication, and what the long-term outcomes
 8    would be based on our knowledge specifically of
 9    sacral colpopexy.
10         Q    Can --
11         A    So...
12         Q    Oh.
13              MR. GARRARD:   Finish your answer.
14              THE WITNESS:   That's it.
15    BY MR. NORTH:
16         Q    Can you cite me any article, medical
17    article in the literature prior to 2005 that
18    raised safety or efficacy concerns about these
19    transvaginal mesh kits?
20         A    Can I give you one now with a title
21    and reference, no.  Can I find one?  I'll be
22    happy to look for one and tell you about it.
23         Q    But just so I'm clear, as you sit
24    here right now, you cannot name an article that
25    predates 2005 and questions the safety and
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    efficacy of these kits?

2         A    I do not have the author or the

3    reference for that, that's correct.

4         Q    Have you seen anything that indicated

5    to you that Bard had questions about the safety

6    or efficacy of the Avaulta kits prior to 2005

7    when they were introduced to the market?

8         A    Have I seen a document where these

9    questions were raised by employees of Bard?

10        Q    Yeah, prior to 2005.

11        A    I see on Page 13 in my report,

12   beginning at the bottom of Page 12, Known

13   problems with polypropylene should have alerted

14   Sofradim and Bard to potential problems with

15   its use in the vagina.

16        Q    I'm sorry, read that again or tell me

17   where you are.

18        A    I'm at the bottom of Page 12,

19   beginning of Page 13.  Known problems with

20   polypropylene should have alerted Sofradim and

21   Bard to potential problems with its use in the

22   vagina.

23             It appears that, as early as 2003,

24   Sofradim knew there were problems with

25   polypropylene mesh.  In a document from

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1     May 2003, polypropylene -- then the various

2     trade names, Prolene, Marlex, SURGIPRO, Atrium

3     -- when compared to polyester, was described as

4     "more rigid and more aggressive with the

5     tissues (a barbed wire), undoing when being

6     stretched..."

7            And you can read the remainder of

8     that.

9            And it's referenced in Item No. 27

10    using the Bates code.

11           A Sofradim document from 2004,

12    touting a new polyester mesh product, stated,

13    "Surgeons have used polypropylene mesh as a

14    reinforcement device, but the material is known

15    to shrink, contract, and stiffen.  Because --"

16    Q     I don't mean to interrupt you,

17    Doctor, but I see where you're talking --

18    reading -- you're just reading the report on

19    Page 13, correct?

20    A     Yes, that's correct.

21    Q     Other than from documents given to

22    you by the Plaintiffs' attorneys, do you have

23    any other evidence that Bard and/or Sofradim

24    had reason to question the efficacy or safety

25    of the Avaulta products prior to their launch

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    on the market?

2         A    So you mean, in addition to the ones

3    I've cited already, are there other

4    documents --

5         Q    No.

6         A    -- to suggest there are questions of

7    safety and efficacy?

8         Q    That wasn't my question.

9              Do you have any evidence that Bard

10   and -- or Sofradim employees were questioning

11   the safety and efficacy of these products prior

12   to their introduction other than from the

13   documents that the Plaintiffs sent you to

14   review?

15        A    Prior to the Plaintiffs sending me

16   the documents, I had access to none of the Bard

17   or Sofradim documents.

18        Q    So the sole basis -- I guess this is

19   my question.  The sole basis for your opinion

20   in that regard is the documents provided to you

21   by the Plaintiffs' attorneys?

22        A    No, it isn't.  It's using judgment

23   acquired over a lifetime of treating patients

24   who have various disorders and being somewhat

25   objective about being concerned about the

1    introduction of any type of care into patient
2    practice.
3              A procedure that involves placing a
4    synthetic permanent material into a
5    contaminated field raises legitimate concerns
6    on the question of -- in this case should raise
7    questions with the manufacturer, the marketer,
8    and ultimately to the physician.
9              So, I don't have a document that says
10   that.
11        Q    Now, this section of your report
12   cites the French HAS study from November of
13   2006, correct?
14        A    Yes, it does.
15        Q    Had you ever seen that study before
16   it was provided to you by the Plaintiffs'
17   attorneys?
18        A    No, I had not.
19        Q    Had you ever seen any reference to
20   that prior to the Plaintiffs' attorneys
21   providing that to you?
22        A    No, I had not.
23        Q    Do you have any evidence, Dr. Shull,
24   that Bard was aware of that study or that
25   publication?

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1      A     No, I don't.

2      Q     Do you know what the purpose of that

3  study or that publication was?

4      A     I was not involved in its production

5  or publication.  In reading it, I would presume

6  the purpose was to highlight concerns about the

7  use of mesh so that the people who were

8  producing, marketing, selling and using mesh

9  would be aware there had been questions that

10  had been raised.

11      Q     Now, is that just an assumption on

12  your part?

13           MR. GARRARD:  Object to the form of

14  the question.  Is what just an assumption?

15  BY MR. NORTH:

16      Q     The purpose of that -- I mean --

17      A     No one who wrote the article -- no

18  one who published the article has corresponded

19  with me about the -- the intention.

20      Q     Do you know what the French HAS, what

21  its purpose is?

22      A     No, I do not.

23      Q     Do you know whether it's a government

24  entity or a private entity?

25      A     I do not.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        Q     Do you know whether its task or sort
 2   of purpose is to assess whether new
 3   technologies or devices utilized in patients in
 4   France would be -- will be reimbursable under
 5   the French National Healthcare Plan?
 6        A     I don't know the answer to that.  And
 7   I don't know about the French National
 8   Healthcare Plan in general.
 9        Q     So while you cite the French study,
10   you do not know the exact context of why that
11   publication was published or whether Bard knew
12   about it; is that correct?
13        A     I cite that publication because it
14   raises -- it provides information and raises
15   legitimate questions be answered, not just by
16   the French, but by anyone who's interested in
17   safety and efficacy of a product.
18              So the questions that they have posed
19   are not geographically limited to France.
20        Q     But you weren't aware of that until
21   given to you by the Plaintiffs' attorneys,
22   correct?
23        A     That's accurate.  I was not aware of
24   this publication.  I was aware that the issues
25   which are raised are in one sense common sense
```

~In Re: Avaulta~                Bobbie Shull, M.D.                2/6/2013

```
 1    issues.
 2              MR. MOELLER:  What page do you cite
 3    that, sir?
 4              MR. NORTH:  It's 8, Page 8.
 5              THE WITNESS:  Page 8.
 6              MR. MOELLER:  Page 8, okay, thank
 7    you.
 8              THE WITNESS:  Yes.  It is numbered --
 9    would you like me to give you the number?
10              MR. NORTH:  No, we've got that.
11              MR. MOELLER:  Thank you.
12    BY MR. NORTH:
13        Q    Are you aware of studies in the
14    literature in the 2004-2005 time frame that
15    found good results with the use of transvaginal
16    mesh kits?
17        A    I am not aware of any studies in
18    2005.  If you mean a scientific study, I'm
19    aware of no scientific study of use of mesh
20    kits in 2005 that provided information about
21    their safety or efficacy.
22        Q    What's an H-shaped mesh product?
23        A    Do you mind telling me what you're
24    referencing here?  Is there some reference in
25    my report?
```

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

1    Q    I've just seen that phrase before,

2    H-shaped mesh products.  Does that have any

3    significance to you?

4    A    My assumption would be that it is a

5    product that if you looked at it in certain

6    directions, it would appear to be similar to

7    the letter H.  Which would mean that there's

8    something in the center and there are two

9    perpendicular sides to it.  And the something

10   in the center could be equal to or unequal to

11   the two things on the side.

12        That's not a term I've used, I don't

13   believe.

14   Q    Based on your report, it appears that

15   you intend to give testimony of opinions

16   regarding certain properties of the mesh

17   material used in the Avaulta product; is that

18   correct?

19   A    Can you tell me where I'm referencing

20   that?

21   Q    Well, do you intend to give opinions

22   regarding the propensity, if any, of the

23   Avaulta mesh to shrink, shrinkage of the mesh?

24   A    If I'm asked and I believe what I've

25   indicated here, if I'm asked, I will say that I

1    believe it's the responsibility of the

2    manufacturer to know these qualities not only

3    in the laboratory, but in the patient herself.

4         Do I intend to say that I know about

5    the properties in the laboratory?  I do not.

6    Q    So you are unable to say from your

7    own personal knowledge or experience whether

8    the mesh used in any of the Avaulta products

9    shrinks or does not shrink; is that correct?

10        MR. GARRARD:  Object to the form of

11   your question.  That's not what he said.

12   BY MR. NORTH:

13   Q    Well, regardless is my question.

14   Answer -- you can answer that question.

15   A    There are several ways to evaluate

16   systems that are used in the body.  One is

17   called an in vitro test, one is an in vivo

18   test.

19        In vitro implies in a lab setting.

20   Some of the qualities of a product can be

21   tested through certain textile parameters, for

22   example, mechanical stress and strain, size,

23   weave, microscopic appearance.

24        That product then is exposed to

25   something else, the deployment of the product,

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   its reaction in the body, the body's healing
 2   process around it, that becomes an in vivo
 3   evaluation.
 4              The in vitro qualities can be used to
 5   predict what may happen in vivo.  However, the
 6   actual knowledge of what's going to happen
 7   can't be acquired until the proposed product
 8   that's been testing in a lab has in fact been
 9   implanted in someone, in someone is alive and
10   able to report information which is valuable to
11   be known and physical examination can be done
12   to detect what particular qualities you hope to
13   learn.
14              So the lab testing and the final
15   performance in a patient would not be the same
16   thing.
17        Q    My question --
18        A    So I'm telling you I am not
19   purporting to be an expert in the lab.  I am
20   purporting to be an expert physician who has
21   seen women who have had surgery and have had
22   various outcomes from surgery.
23        Q    But I'm focused right now on one
24   aspect of the mesh.
25        A    Right.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1      Q     Can you give an opinion one way or

2  the other as to whether Avaulta mesh, the mesh

3  in any of the Avaulta products shrinks?

4      **A     Based on the records we received, it**

5  **could shrink anywhere from 10 to 50 percent.**

6      Q     You're basing that on a document you

7  read that was furnished to you by the

8  Plaintiffs' attorneys, correct?

9      **A     That's accurate.**

10     Q     You've done no independent assessment

11 of that?

12     **A     I have not tested any Avaulta**

13 **product.**

14     Q     And you're not qualified to test

15 Avaulta products to determine their rate of

16 shrinkage, if any, are you?

17     **A     I would say my only qualification and**

18 **testing of products in general, not**

19 **specifically Avaulta, would be seeing women who**

20 **have had mesh products implanted and examining**

21 **them and learning about the characteristics of**

22 **their exam after they've had a product**

23 **implanted.**

24     Q     But you've never seen an Avaulta

25 explant that you were able to specifically

1    identify shrinkage in, correct?

2         A    **I have not seen an Avaulta explant**

3    **that I saw before it was implanted and observed**

4    **it, made any measurements, and then measured it**

5    **again after it had been explanted.**

6         Q    Now, as far as contracture of mesh

7    goes, any opinions you offer on the contracture

8    of mesh are not things you've personally

9    observed, correct?

10             MR. GARRARD:  Object to the form of

11   your question.

12        A    The things that I have said about the

13   change in the configuration of the mesh is

14   based on my observation of mesh products which

15   have been removed, and my observation of

16   products that I have seen either at scientific

17   meetings where someone's marketed it or I've

18   seen it in the package or I myself have used a

19   mid-urethral sling, for example, and seen a

20   product before it's implanted.

21             So I have knowledge of seeing what

22   products look like before they're put in the

23   body and I have knowledge of seeing products

24   when they've been explanted.

25   BY MR. NORTH:

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1      Q    But you've never seen that

2   specifically with regard to the mesh in an

3   Avaulta product, have you?

4      **A    I have not specifically quantified an**

5   **Avaulta product which has not been implanted**

6   **and followed that particular patient or any**

7   **other patient and taken an Avaulta product and**

8   **made an assessment of it specifically.**

9      Q    And because you haven't done that,

10  you can't say that you've ever seen a piece of

11  mesh from an Avaulta product that has shrunk or

12  contracted, correct?

13         MR. GARRARD:   Object to the form of

14  the question.

15     A    I can say that I've seen a piece of

16  Avaulta mesh or other mesh products that does

17  not look the same as a product that is in the

18  package or has been removed from the package

19  but not implanted into anyone.

20  BY MR. NORTH:

21     Q    And you would expect a product to

22  look different once it had been implanted in

23  the human body and removed, wouldn't you?

24     **A    There are lots of differences that**

25  **could occur.   There are some that are very**

~In Re: Avaulta~                   Bobbie Shull, M.D.                   2/6/2013

1  obvious about being blood stained, for example.

2  Others are more concerning about the change in

3  the configuration, the gross configuration, the

4  softness, the ability to move it, hold it.

5       Q    Well, here's what I'm trying to

6  understand.  You keep referring to Avaulta and

7  other mesh products.  I want to ask you this

8  question specific to Avaulta.

9       A    Uh-huh.

10      Q    As you sit here today, can you

11 identify any past time when you saw a change in

12 Avaulta mesh after if had been explanted, a

13 change from after the explant compared to

14 pre-implant?

15      A    Every explant that I have seen, every

16 explant that I have removed, does not appear

17 similar to any product I have seen prior to its

18 implantation.  None of them look the same.

19      Q    But with regard to Avaulta products

20 and only Avaulta products, do you have a

21 recollection of how the Avaulta explants looked

22 different from the pristine version of the

23 mesh?

24      A    Rigid, irregular surfaces with scar

25 tissue around it.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        Q     What patient was that removed from,
 2   do you know?
 3              MR. GARRARD:  Doctor --
 4        A     If I knew that, I couldn't tell you.
 5              MR. GARRARD:  I was fixing to say
 6   don't violate HIPAA.
 7   BY MR. NORTH:
 8        Q     On how many occasions did you see an
 9   Avaulta explant in that condition?
10        A     I think when you asked me before
11   about the number of patients I have operated to
12   remove Avaulta, you asked if it would be 10 or
13   less, and I said I think that would probably be
14   right.
15        Q     Have you ever done any studies
16   regarding pore size in mesh and how it
17   contributes to the scar formation or any other
18   phenomena?
19        A     I personally have not done any test.
20   I have read about it, but I haven't done any of
21   the tests myself.
22        Q     Other than what you may have read in
23   the documents provided by the Plaintiffs'
24   attorneys in this case, have you read any other
25   things in the past about pore sizes in
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

1    polypropylene mesh?

2        A    Yes, frequently.  Because the number

3    of scientific meetings I attend, the subject

4    matter of using materials in reconstructive

5    surgery is addressed.

6             And in fact, I've given talks about

7    it myself using the various classifications,

8    the Amid, A-M-I-D, classification, the

9    macroporous, microporous.  I'm familiar with

10   all of that.

11            However, I haven't personally done

12   any of that testing.

13       Q    Do you know how the pore size of the

14   Avaulta mesh products differs, if it does, from

15   the pore size of the transvaginal mesh kits

16   that were on the market by the time Avaulta was

17   introduced?

18       A    I do not.

19       Q    Have you done any comparative studies

20   of the pore size on Avaulta products with the

21   pore size on other products?

22       A    I have not.

23       Q    Do you know whether the pore size in

24   the Avaulta mesh is larger or smaller than the

25   pore size on the TVT sling you used by Johnson

~In Re: Avaulta~                Bobbie Shull, M.D.                  2/6/2013

1    & Johnson?

2         A    I do not know that.

3         Q    Have you ever measured the pore size

4    on the Johnson & Johnson?

5         A    I have not.

6         Q    You offer some opinions critical of

7    the pore size in the Bard mesh, the Avaulta

8    mesh in your report?

9         A    Could you give me the reference and

10   then I'll be happy to read that.

11             If I look at Page 14, the beginning

12   paragraph:  Bard knew that re size is critical

13   to the proper function of surgical mesh.

14   Adequately sized pores allow ingrowth of

15   tissue, fight bacteria, and prevent

16   scarification.  Bard documents show the company

17   recognized the need to have large pores to

18   avoid contraction and what is described as

19   "scar plate formation."

20        Q    But --

21        A    I have that referenced.

22        Q    Yes.

23             All of your information regarding the

24   size of Bard's -- the pore size of Bard's

25   Avaulta mesh comes from the documents provided

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   to you by the Plaintiffs' attorneys in this

 2   case; is that correct?

 3       A    That's accurate.

 4       Q    And, again, you've done no

 5   independent assessment of that?

 6       A    I did not document that, in fact,

 7   these documents came from Bard to Mr. Garrard

 8   and his associates.  So I guess it's possible

 9   that someone else's documents were sent to him

10   and labeled as Bard, but I'm presuming these

11   were Bard documents in his possession which he

12   gave to me.

13       Q    What do you understand to be

14   degradation in a polypropylene mesh product?

15       A    Degradation means the product itself

16   would begin to lose some of its integrity and

17   doesn't have the same characteristics that it

18   had initially.

19       Q    Have you ever personally observed

20   degradation in an Avaulta mesh product?

21       A    This is a microscopic appearance, and

22   the answer is I have not looked at the products

23   microscopically.

24       Q    So you can't say whether you've seen

25   degradation in an Avaulta mesh product or not?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          A     I haven't seen it microscopically.

2          Q     And therefore, because you haven't

3     seen it microscopically, you can't say whether

4     you've seen it at all, correct?

5          A     I can say that I have not seen it

6     microscopically.  That is not the same as

7     saying it doesn't happen.  I'm telling you I

8     have not seen it microscopically and it's a

9     microscopic observation, not a gross

10    observation.

11         Q     Right.

12               And you can't see it unless you do

13    look at it microscopically, correct?

14         A     It would depend on the phase of

15    degradation.  So if -- if you waited a long

16    enough time until the product itself changed

17    gross physical characteristics, you would be

18    able to see it.  But not -- at an early stage

19    you would not be able to see that with the

20    naked eye.

21         Q     Do you know why shrinkage occurs in

22    polypropylene mesh?

23         A     The most commonly accepted reason for

24    that is when mesh is put in place, first of

25    all, it may be deformed when it's deployed,

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    when the mesh arms are deployed.

2           So, if I give you an example of

3    something being as wide as my little finger,

4    for example, and it has a woven pattern,

5    depending on the direction of pull, I may be

6    able to change the physical characteristics of

7    that product simply by pulling on it.

8           So some of the changes can occur when

9    in this particular case the product is deployed

10   into a patient.

11          I've observed that, for example, in

12   using mid-urethral slings, that the

13   configuration of the product may change once

14   you have passed a trocar and removed the

15   protective sleeve.

16          In the case of the remainder of

17   changes with contraction or shrinkage, if the

18   deployment doesn't cause any change in the

19   surface area or the configuration, when the

20   fibroblast grow into the interstices of the

21   product and scar formation occurs, scars

22   generally contract.

23          And when they contract, they will

24   possibly pull on the fibers of the mesh and

25   change the configuration to make the mesh

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    shorter, more rigid, and ostensibly change the

2    pore size.

3         The pore size that is done before the

4    product is deployed is a very static

5    measurement.  Once wound healing has occurred,

6    that product has changed its configuration and

7    possibly the pore size will change.  It would

8    be unlikely it will get larger.  If it changes,

9    it would normally be smaller.

10        Q    Dr. Shull, you told us earlier you've

11   never worked for a medical device company.

12   Have you ever run your own company of any sort?

13        A    I have a business with my daughter

14   and son-in-law which is unrelated to medicine.

15   And I haven't run that, but I have been the

16   signator on the mortgage for the business.

17        Q    The financier?

18        A    That's not to be confused with

19   running it.

20        Q    What sort of business is that?

21        A    I'm actually president of CIA, LLC.

22   Culinary Institutes of America.  Not the

23   Central Intelligence Agency.

24        Q    And what kind of business is that in?

25        A    Restaurant.

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1        Q    How many -- well, do you have any
 2   active managerial role in that company?
 3        A    If they don't pay the mortgage, I do.
 4        Q    Other than financing, do you have any
 5   role there?
 6        A    No.
 7        Q    How many employees does that company
 8   have?
 9        A    That varies.  Full-time employees,
10   I'm guessing they have 10 to 15.
11        Q    Is that company subject to FDA
12   regulations?
13        A    I don't think so.
14        Q    Have you ever been involved in
15   running any other company?
16        A    No.
17        Q    Have you ever had to make decisions
18   on how to run a company in compliance with
19   federal regulations?
20        A    I've sat on the board of trustees of
21   our hospital, so the truth is many of our
22   responsibilities relate to compliance issues,
23   for example, compliance with various agencies.
24             I don't remember specifically the
25   Food & Drug Administration, but governmental
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    agencies, yes.  All medical facilities are

 2    responsible to a variety of governmental

 3    agencies.

 4         Q    Have you ever served on the board of

 5    directors of a medical device company?

 6         A    No, I have not.

 7         Q    Have you ever served on the board of

 8    directors of any publicly held company?

 9         A    No, I have not.

10         Q    Other than the board of trustees for

11    your clinic, have you ever served on any board?

12         A    No.  I've served on the board for our

13    clinic physician organization and for our

14    hospital, so those two, but no other.

15         Q    And you've never spoken to anyone at

16    Bard as to why they decided -- or as to why

17    they made the decisions they did with regard to

18    clinical studies, correct?

19         A    I haven't spoken to anyone about

20    that.

21         Q    And your sole basis for any knowledge

22    regarding decisions made with regard to

23    clinical studies comes from the documents

24    provided to you by the Plaintiffs' attorneys?

25              MR. GARRARD:  Wait a second.
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1              Do you mean as to Bard?
 2    BY MR. NORTH:
 3         Q    As to Bard.
 4         A    Do you mind asking me the question
 5    again?
 6         Q    The sole basis of your knowledge
 7    regarding Bard's decisions with regard to
 8    clinical studies and the Avaulta products comes
 9    from the documents provided to you by the
10    Plaintiffs' attorneys and that limited number
11    of Bard employee depositions provided to you;
12    is that correct?
13         A    That's correct.
14         Q    And the same thing would be true as
15    to the decision making that went into the
16    drafting of the instructions for use with
17    regard to the product; is that correct?
18              MR. GARRARD:  I'm sorry.  I wasn't --
19         A    I don't believe I received any
20    information --
21              MR. GARRARD:  Wait, wait, wait, wait.
22              Would you just ask that again because
23    I didn't understand your question.
24    BY MR. NORTH:
25         Q    The sole basis of your knowledge with
```

~In Re: Avaulta~                     Bobbie Shull, M.D.                     2/6/2013

```
 1   regard to Bard's decision making as to the
 2   instructions for use for the Avaulta products
 3   comes from the documents provided to you by the
 4   Plaintiffs' attorneys and the number of
 5   employee depositions they provided you?
 6        A    I do not believe there's anything in
 7   the documents I have received that goes into
 8   the decision making by Bard to create an
 9   information for use document.
10             I have read the document.  I have not
11   read the process which Bard used to produce the
12   document.
13        Q    A number of your opinions in your
14   report seem to suggest the motivation or the
15   intent of Bard employees in doing certain
16   things.  Would you agree with that?
17             MR. GARRARD:  Object to the form of
18   your question.
19        A    My report suggests what I have read
20   about Bard's interest in working with Sofradim,
21   the predicate product which Sofradim had helped
22   to develop, about the subsequent discussions
23   about safety and efficacy of the products.
24             I read information from territorial
25   managers, salespeople, and physicians who have
```

```
 1    used the products.
 2            Is that what you're asking me about?
 3    BY MR. NORTH:
 4        Q    And a number of those opinions or
 5    statements you make in your report attributes
 6    certain intentions or motivations to Bard
 7    and/or its individual employees, would you
 8    agree with me that?
 9        A    Could you give me an example of that?
10    I'd be happy to address the specific one if you
11    could tell me what it is.
12        Q    I'll tell you what, since we'll be
13    coming back a second day, and so I don't bog
14    this down, I will have that ready for the
15    second day.
16        A    Okay.
17            MR. GARRARD:  Can I have a personal
18    privilege for just one second?
19            MR. NORTH:  What's that?
20            MR. GARRARD:  Can I have a personal
21    privilege for just one second?
22            MR. NORTH:  Absolutely.
23            VIDEO TECHNICIAN:  We're off the
24    record.  The time is 2:00.
25            (Recess taken.)
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1              VIDEO TECHNICIAN:  We are back on the
 2   record.  The time is 2:02.
 3              You may continue, sir.
 4   BY MR. NORTH:
 5       Q    On Page 17 of your report, Doctor,
 6   you state that you have observed banding of the
 7   arms and bunching of the central mesh piece
 8   with these devices.
 9       A    I'm looking for that specific --
10       Q    Yeah, I'm having a hard time finding
11   it, too.  I may have the wrong page here.
12              I'm sorry, there you say, I saw it,
13   it was taut and rigid.  Towards the bottom of
14   the page, and let me quote this, you say:  When
15   the mesh deforms and becomes cord-like, rigid,
16   and taut, it produces an instrument that can
17   saw into the issue and become the source of the
18   pain that I see frequently in these patients.
19       A    Yes.
20       Q    Have you ever seen a piece of Avaulta
21   mesh that had become cord-like, rigid, and
22   taut?
23              MR. GARRARD:  He prefaced that with
24   watching the video, Richard.
25       A    Whenever I operate on someone and do
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    an explant surgery, the indications would

2    usually be bleeding, exposed mesh, pain for the

3    sexual -- the male sexual partner or a pain on

4    the part of the woman who is having surgery.

5            In the case of the woman herself

6    having pain and she's had a mesh kit

7    application to the anterior or a posterior

8    compartment, invariably one or more of the arms

9    is tightly stretched across the anterior or

10   posterior compartment, and the central portion

11   may also be tightly stretched, and/or crumpled

12   up as opposed to lying flat as it was

13   originally deployed into the patient.

14           So that would be an expected finding

15   to have one or more of those issues.

16           On the physical exam of a patient

17   prior to surgery, one of the characteristics,

18   which I believe was mentioned by the consulting

19   physicians in these four women, and is seen in

20   the patients I personally care for, and as

21   described in the literature, that you can feel

22   a band-like substance which is not normally

23   felt in women who have not had these particular

24   procedures performed.

25   BY MR. NORTH:

~In Re: Avaulta~                        Bobbie Shull, M.D.                          2/6/2013

1        Q     Have you ever personally seen that

2   with an Avaulta product?

3        A     **On the Avaulta products that were**

4   **removed, I would have seen one or more of these**

5   **things.  So the answer to that is yes.  Do I**

6   **know was it Avaulta -- Avaulta Solo or Avaulta**

7   **Plus, I do not know that.**

8        Q     Doctor, you have not examined any

9   explanted material from any of the Plaintiffs

10  whose medical records you reviewed, have you?

11       A     **I have not seen any material, I have**

12  **not examined any patient that is in the list,**

13  **and I have not spoken to any of the patients,**

14  **nor have I spoken to their consulting or**

15  **primary care doctors.**

16       Q     And because of that, you do not know

17  whether there was shrinkage in the Avaulta mesh

18  in any of those Plaintiffs, do you?

19             MR. GARRARD:  Object to the form of

20  your question.  He's already referenced that in

21  terms of his review of the records.

22             MR. NORTH:  Objection to the speaking

23  objection.

24       A     The records from the primary treating

25  doctors and/or the consulting doctors suggest

770-343-9696                    Tiffany Alley Global                        Page 190

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   they can see or feel the mesh products in these

 2   patients.

 3   BY MR. NORTH:

 4        Q    That's not my question.  My question

 5   has to do with shrinkage.

 6             Are you able to say whether there was

 7   any shrinkage in the mesh implanted in the

 8   Plaintiffs whose records you reviewed?

 9             MR. GARRARD:  Same objection.

10        A    Tell me how you would like me to

11   define that I know it shrank.  What parameters

12   are you wanting me to use for that?  Do you

13   mean did I know that it was measured and it was

14   shorter than it was before it was implanted?

15   BY MR. NORTH:

16        Q    Well, Doctor, it's a given that you

17   believe these people had complications related

18   to the mesh.

19        A    Right.

20        Q    But I'm talking specifically about

21   shrinkage.  Do you have any knowledge -- can

22   you point to -- do you have any personal

23   knowledge that the mesh in any of those

24   Plaintiffs whose records you reviewed actually

25   experienced shrinkage?
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1          MR. GARRARD:  Do you mean independent

2     of what he reviewed in the medical records?

3     BY MR. NORTH:

4          Q     Do any of the medical records say the

5     mesh shrunk?

6          A     I'll have to go back and look at that

7     to get that specific wording.

8               When I read the operative notes, when

9     the primary procedure was performed, the

10    doctors who performed them indicated that the

11    products were left with the ability to pass an

12    instrument between the product and the

13    surrounding viscera, the bowel, the bladder,

14    for example.

15              So the doctor specifically indicated

16    they left a space and that the arms were

17    deployed.

18              When the patients return for

19    subsequent surgery and the preoperative

20    evaluation, I believe every record indicated

21    that the examining doctor could feel a tight

22    band, a tender spot, something that reproduced

23    the pain.  And in one or more of the operative

24    notes, it was documented that the mesh had

25    itself had folded on itself.

1          Did someone use the term "shrinkage"?

2    I would have to go back in the records and see

3    if that specific word was used.

4          My assessment of the situation is

5    that the product was left tension free and

6    there now is tight banding tenderness.  That

7    something happened to change the configuration.

8    Whether the product itself shrank or whether

9    the product was contracted because of scar

10   tissue is in one sense a question of

11   definition.

12         The product itself was not the same

13   configuration as it was when it was deployed.

14   Q    Doctor, I'm -- with all due respect,

15   I still don't think you've answered the

16   question.  I understand that these patients'

17   records show complications that you associate

18   with the implantation of the mesh; is that

19   correct?

20   A    That's accurate.

21   Q    And you believe that in some of these

22   instances the configuration of the mesh would

23   have changed, correct?

24   A    Based on my review of the records, I

25   believe that is true.

~In Re: Avaulta~                         Bobbie Shull, M.D.                         2/6/2013

| | |
|---|---|
| 1 | Q    But you can't specifically say that |
| 2 | any configuration change was shrinkage in any |
| 3 | of those mesh products, can you? |
| 4 | MR. GARRARD:  Object to the form of |
| 5 | the question.  He's already answered that. |
| 6 | A    If the term "shrinkage" means the |
| 7 | product had different dimensions than it had |
| 8 | before it was implanted, I do not have the |
| 9 | pre-implantation measurements and I do not have |
| 10 | the post implantation measurements. |
| 11 | BY MR. NORTH: |
| 12 | Q    And so the same thing would be true |
| 13 | about contracture; is that correct? |
| 14 | MR. GARRARD:  Object to the form of |
| 15 | your question.  He's already answer you. |
| 16 | A    The other part, there is no way to |
| 17 | tell when a product has been implanted how much |
| 18 | is removed. |
| 19 | So let's presume that I measured a |
| 20 | product before its implantation and I knew its |
| 21 | exact area based on a geometric formula.  I now |
| 22 | explant the product and calculate the area |
| 23 | again based on a geometric formula. |
| 24 | If I knew the original area and the |
| 25 | area at explantation, I could presume one of |

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1   two things, that I took a defined percentage of
 2   the product out.  The fallacy of that thinking
 3   is it is practically impossible to remove the
 4   entire product.
 5           So measuring what was removed doesn't
 6   tell you how much of the product was removed.
 7   In order to know that, you would have to know
 8   how much is remaining in the body.  And there's
 9   not a good way to know that.
10           So whether you ask me if it's
11   shrinking or contracting, that's almost -- it's
12   a semantic differentiation.  I think what I'm
13   saying to you is the area of the product that
14   is laid out in a flat surface has changed.
15   BY MR. NORTH:
16       Q    Degradation.  You can't say one way
17   or the other whether any of the mesh implanted
18   in the women whose records you reviewed
19   underwent a degradation process, can you?
20       A    I cannot.
21       Q    Are you able to say whether any of
22   the women whose records you reviewed had scar
23   plate formation?
24       A    I can only go by the records of the
25   examining physicians to indicate there's
```

~In Re: Avaulta~        Bobbie Shull, M.D.        2/6/2013

```
 1    scarring in the area of the vaginal canal where
 2    they're operating.
 3            In at least of the few operative
 4    notes, if not all, the term "scarring" is used.
 5    I don't know that the term "scar plate" is
 6    specifically used by either physician.
 7       Q    But the fact of the matter is, that
 8    whatever opinions you may have regarding the
 9    condition of the mesh or what happened to the
10    mesh in those individual Plaintiffs is based on
11    the medical records and doctors' depositions
12    that you've reviewed; is that correct?
13       A    Would you ask me that again, please?
14    I missed the first part.
15       Q    Your opinions as to what may have
16    occurred with the mesh implanted in these
17    women, whose records you reviewed, those
18    opinions are based only on the medical records
19    and the depositions, perhaps, of the treating
20    physicians, correct?
21       A    No, that isn't correct.
22       Q    What else is it --
23       A    My -- my conclusions are based on my
24    professional experience, my professional
25    education, my examination of women who have had
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1    complications of surgery, my interviews with

2    them, with their spouses, my examination of

3    them, my operating on them, in addition to the

4    information provided in these records.

5          So, otherwise, you would be presuming

6    I'm making -- drawing a conclusion

7    disassociated with anything else in my

8    background of knowledge and experience, and

9    that isn't true.

10        Q    I guess my question is more this,

11   Dr. Shull.  You don't have, and I think you've

12   conceded this, any personal knowledge about

13   what happened to the mesh in these women

14   because you never examined any pathology from

15   them, and you've never examined them, and

16   you've never taken -- or never talked to their

17   treating physicians, would you agree with that?

18        A    I have not seen them, examined them,

19   talked to them, spoken to or consulted with

20   their treating physicians.

21        The information I have about these

22   women and their care comes from their medical

23   records by the physicians who treated them in

24   their communities.

25        Q    Okay.

```
1              MR. NORTH:  You know, it's close to

2      2:30 and I'm getting ready to start a whole new

3      area.  It may be a good point to stop.

4              Are you comfortable with that?

5              MR. MOELLER:  Sure.

6              VIDEO TECHNICIAN:  You want to go off

7      the record?

8              MR. NORTH:  Thank you so much.

9              MR. GARRARD:  Can we agree that --

10             VIDEO TECHNICIAN:  Do you want to go

11     off the record?

12             MR. NORTH:  Yeah.

13             VIDEO TECHNICIAN:  Stand by, please.

14             MR. GARRARD:  This doesn't have to be

15     on the video, but I do want the court reporter.

16             Can we agree that we don't need to do

17     any errata sheet until we conclude the next

18     version?

19             MR. NORTH:  Any what?

20             MR. GARRARD:  Errata sheet until --

21             MR. NORTH:  Oh, yes, absolutely.

22             And can we also agree on the record,

23     I think, what Margaret and I agreed to off the

24     record, that between now and the continuation

25     of this deposition she will make and scan and
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

```
 1    send to me copies of all your handwritten

 2    notes.

 3              THE WITNESS:  Uh-huh.

 4              MR. NORTH:  Send those to us.

 5              And if there's anything else original

 6    here besides, you know, Bard documents or

 7    depositions or medical literature, that you'll

 8    send that to us.  And then we'll have those

 9    ready to use at the next continuation.

10              MR. GARRARD:  When you say original,

11    I don't know what you mean.

12              MR. NORTH:  I mean, handwritten

13    notes.  Something besides the documents you all

14    have sent him or medical articles --

15              MR. GARRARD:  Okay.

16              MR. NORTH:  -- that he's collected.

17              MR. GARRARD:  Sure.

18              MR. NORTH:  In other words, something

19    that's not on this jump drive or Exhibit B.

20              MS. THOMPSON:  Uh-huh, yeah, for

21    sure.

22              MR. NORTH:  Okay.

23              MS. THOMPSON:  And I believe that

24    will be only these -- these handwritten notes.

25              MR. NORTH:  Yeah, that's what I
```

~In Re: Avaulta~                    Bobbie Shull, M.D.                    2/6/2013

1   think, and the billing reference we already

2   have.

3           MS. THOMPSON:  We'll confirm there is

4   nothing else.

5           MR. NORTH:  Sure.

6           MR. GARRARD:  Okay.

7           (Signature reserved.)

8           (Deposition concluded at 2:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    FULTON COUNTY:

5

6           I hereby certify that the foregoing

7    transcript was taken down, as stated in the

8    caption, and the colloquies, questions, and

9    answers were reduced to typewriting under my

10   direction; that the transcript is a true and

11   correct record of the evidence given.

12          I further certify that I am not a

13   relative or employee or attorney of any party,

14   nor am I financially interested in the outcome

15   of the action.

16              This 18th day of February, 2013.

17

18

19

20

21

22

23          _____

24              Judith L. Leitz Moran, CCR-B-2312

25
```

In Re: Avaulta                          Bobbie Shull, M.D.                          2/6/2013

VIA EMAIL


Date: 2/18/2013

To: Henry Garrard

Re: Signature of Deponent Bobbie Shull, M.D.



Greetings:

The deponent has reserved the right to read and sign. Please
have the deponent review the attached .pdf transcript,
noting any changes or corrections on the attached .pdf
Errata.  The deponent may fill out the Errata electronically
or print and fill out manually.

Once the Errata is signed by the deponent and notarized,
please mail it to the offices of Tiffany Alley (below).

When the signed Errata is returned to us, we will seal and
forward to the taking attorney to file with the original
transcript.  We will also send copies of the Errata to all
ordering parties.

If the signed Errata is not returned within the time below,
the original transcript may be filed with the court without
the signature of the deponent.



Date Errata due back at our offices: 3/21/2013



Please send completed Errata to:
Tiffany Alley Reporting & Video
3348 Peachtree Rd NE, Tower 200, Ste 700
Atlanta, Georgia 30326
(770) 343-9696