# EXHIBIT G

Daniel Steven Elliott, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN RE: ETHICON, INC.,      :Master File No.
PELVIC REPAIR SYSTEM       :2:12-MD-0237
PRODUCTS LIABILITY         :
LITIGATION                 :MDL No. 2327
-------------------------------------------
THIS DOCUMENT RELATES TO :JOSEPH R. GOODWIN
THE CASES LISTED BELOW   :U.S. DISTRICT JUDGE
-------------------------------------------

| | |
|---|---|
| Mullins, et al. V. Ethicon, Inc., et al. | 2:12-cv-02952 |
| Sprout, et al. V. Ethicon, Inc., et al. | 2:12-cv-07924 |
| Iquinto v. Ethicon, Inc., et al. | 2:12-cv-09765 |
| Daniel, et al. V. Ethicon, Inc., et al. | 2:13-cv-02565 |
| Dillon, et al. V. Ethicon, Inc., et al. | 2:13-cv-02919 |
| Webb, et al. V. Ethicon, Inc., et al. | 2:13-cv-04517 |
| Martinez v. Ethicon, Inc., et al. | 2:13-cv-04730 |
| McIntyre, et al. V. Ethicon, Inc., et al. | 2:13-cv-07283 |
| Oxley v. Ethicon, Inc., et al. | 2:13-cv-10150 |
| Atkins, et al. V. Ethicon, Inc., et al. | 2:13-cv-11022 |
| Garcia v. Ethicon, Inc., et al. | 2:13-cv-14355 |
| Lowe v. Ethicon, Inc., et al. | 2:13-cv-14718 |
| Dameron, et al. V. Ethicon, Inc., et al. | 2:13-cv-14799 |
| Vanbuskirk, et al. V. Ethicon, Inc., et al. | 2:13-cv-16183 |

SEPTEMBER 26, 2015
DANIEL STEVEN ELLIOTT, M.D.

Daniel Steven Elliott, M.D.

## Page 2

1   CAPTION CONTINUED:
2   Mullens, et al. V.          2:13-cv-16564
3   Ethicon, Inc., et al.
    Shears, et al. V.          2:13-cv-17012
4   Ethicon, Inc. et al.
    Javins, et al. V.          2:13-cv-18479
5   Ethicon, Inc., et al.
    Barr, et al. V.            2:13-cv-22606
6   Ethicon, Inc., et al.
    Lambert v. Ethicon,        2:13-cv-24393
7   Inc., et al.
    Cook v. Ethicon, Inc.      2:13-cv-29260
8   Stevens v. Ethicon,        2:13-cv-29918
    Ethicon, Inc., et al.
9   Harmon v. Ethicon, Inc.    2:13-cv-31818
    Snodgrass v. Ethicon,      2:13-cv-31881
10  Inc., et al.
    Miller v. Ethicon, Inc.    2:13-cv-32627
11  Matney, et al. V.          2:14-cv-09195
    Ethicon, Inc., et al.
12  Jones, et al. V.           2:14-cv-09517
    Ethicon, Inc., et al.
13  Humbert v. Ethicon,        2:14-cv-10640
    Inc., et al.
14  Gillum, et al. V.          2:14-cv-12756
    Ethicon, Inc., et al.
15  Whisner, et al. V.         2:14-cv-13023
    Ethicon, Inc., et al.
16  Tomblin v. Ethicon,        2:14-cv-14664
    Inc., et al.
17  Schepleng v. Ethicon,      2:14-cv-16061
    Inc., et al.
18  Tyler, et al. V.           2:14-cv-19110
    Ethicon, Inc., et al.
19  Kelly, et al. V.           2:14-cv-22079
    Ethicon, Inc., et al.
20  Lundell v. Ethicon,        2:14-cv-24911
    Inc., et al.
21  Cheshire, et al. V.        2:14-cv-24999
    Ethicon, Inc., et al.
22  Burgoyne, et al., V.       2:14-cv-28620
    Ethicon, Inc., et al.
23  Bennett, et al., V.        2:14-cv-29624
24  Ethicon, Inc., et al.
25

## Page 3

1           DEPOSITION OF DANIEL STEVEN ELLIOTT, M.D.,
2   produced, sworn and examined on behalf of the
3   Defendants, pursuant to Notice and Agreement, on
4   Saturday, the 26th day of September, 2015, between the
5   hours of 9:41 a.m. and 5:54 p.m. of that day, at the
6   law offices of Wagstaff & Cartmell, LLP, 4740 Grand
7   Avenue, in the City of Kansas City, in the County of
8   Jackson, and the State of Missouri, before me,
9   NAOLA C. VAUGHN, CCR No. 1052, CRR, RPR, a Certified
10  Court Reporter, within and for the States of Missouri
11  and Kansas.

## Page 4

1           A P P E A R A N C E S
2   For the Plaintiffs:
3      WAGSTAFF & CARTMELL, LLP
       4740 Grand Avenue
4      Suite 300
       Kansas City, Missouri  64112
5      816.701.1100
       tcartmell@wcllp.com
6      BY:  THOMAS P. CARTMELL
7
    For the Defendants:
8
       BUTLER SNOW, LLP
9      500 Office Center Drive
       Suite 400
10     Fort Washington, Pennsylvania 19034
       267.513.1885
11     Burt.Snell@butlersnow.com
       BY:  NILS B. (BURT) SNELL
12         and
       BUTLER SNOW, LLP
13     1020 Highland Colony Parkway
       Suite 1400
14     Ridgeland, Mississippi 39157
       601.948.5711
15     paul.rosenblatt@butlersnow.com
       BY:  PAUL S. ROSENBLATT
16
17
18
19
20
21
22
23
24
25

## Page 5

1           I N D E X
2   WITNESS:  DANIEL STEVEN ELLIOTT, M.D.
3   Examination by Mr. Snell ...................... 9, 326
4   Examination by Mr. Cartmell .................... 323
5
6           EXHIBITS
7   NUMBER   DESCRIPTION                         PAGE
8   Exhibit 1  - Amended notice of Deposition of      9
9       Daniel Elliott, M.D.
10  Exhibit 2  - Updated publication list          11
11  Exhibit 3  - International Journal of Urology    11
12      Long-term quality of life outcomes
13      and retreatment rates after robotic
14      sacrocolpopexy
15  Exhibit 4  - The Cochrane Collaboration         54
16      Mid-urethral sling operations for
17      stress urinary incontinence in women
18  Exhibit 5  - Oxford Level of Evidence Pyramid   60
19  Exhibit 6  - International Urogynecology Journal 66
20      Long-Term (10-15 years) Follow-up
21      after Burch Colposuspension for
22      Urinary Stress Incontinence
23  Exhibit 7  - Cochrane Database Syst Rev 2015    89
24      (Dr. Elliott's copy)
25

2 (Pages 2 to 5)

Daniel Steven Elliott, M.D.

Page 6

1           EXHIBITS (Continued)
2    NUMBER   DESCRIPTION                    PAGE
3    Exhibit 8 - American Urological Association    116
4           AUA Position Statement on the Use
5           of Vaginal Mesh for The Surgical
6           Treatment of Stress Urinary
7           Incontinence
8    Exhibit 9 - IUGA Position Statement on    134
9           Mid-Urethral Slings for Stress
10          Urinary Incontinence
11   Exhibit 10 - AUGS/SUFU Position Statement on    139
12          Mesh Midurethral Slings for Stress
13          Urinary Incontinence
14   Exhibit 11 - AUGS Position Statement on    146
15          Restriction of Surgical Options
16          for Pelvic Floor Disorders
17   Exhibit 12 - EAU Guidelines on Surgical    151
18          Treatment of Urinary Incontinence
19   Exhibit 13 - EAU Guidelines on Urinary    154
20          Incontinence
21   Exhibit 14 - ICS Fact Sheets            155
22   Exhibit 15 - NICE Urinary Incontinence: The    160
23          management of urinary incontinence
24          in women
25   Exhibit 16 - Mayo Clinic web site information    171

Page 7

1           EXHIBITS (Continued)
2    NUMBER   DESCRIPTION                    PAGE
3    Exhibit 17 - International Urogynecology Journal    178
4           Long-term Results of the Tension-Free
5           Vaginal Tape (TVT) Procedure for
6           Surgical Treatment of Female Stress
7           Urinary Incontinence
8    Exhibit 18 - Neurourology and Urodynamics    185
9           Minimally Invasive Synthetic
10          Suburethral Sling Operations for
11          Stress Urinary Incontinence in Women
12          A Short Version Cochrane Review
13   Exhibit 19 - American Journal of Obstetrics and    204
14          Gynecology, A histologic and
15          immunohistochemical analysis of
16          defective vaginal healing after
17          continence taping procedures:
18          A prospective case-controlled pilot
19          study
20   Exhibit 20 - Hernia Repair Sequelae    213
21   Exhibit 21 - International Urogynecologic    242
22          Journal, polypropylene as a
23          reinforcement in pelvic surgery
24          is not inert:  Comparative
25          analysis of 100 explants

Page 8

1           EXHIBITS (Continued)
2    NUMBER   DESCRIPTION                    PAGE
3    Exhibit 22 - In-Depth Nano-Investigation of    250
4           Vaginal Mesh and Tape Fiber
5           Explants in Women
6    Exhibit 23 - FDA article on Medical Devices,    264
7           Considerations about Surgical Mesh
8           for SUI
9    Exhibit 24 - Journal of Urology, Time Dependent    289
10          Variations in Biomechanical Properties
11          of Cadaveric Fascia, Porcine Dermis,
12          Porcine Small Intestine submucosa,
13          polypropylene mesh and autologous
14          fascia in the rabbit model:
15          implications for sling surgery
16   Exhibit 25 - Urology, Time-Dependent Variations    293
17          in inflammation and scar formation
18          of six different pubovaginal sling
19          materials in the rabbit model

Page 9

1           (Exhibit 1 marked.)
2           DANIEL STEVEN ELLIOTT, M.D.,
3    a witness, being first duly sworn, testified as
4    follows:
5              EXAMINATION
6    BY MR. SNELL:
7        Q.   Good morning, Dr. Elliott?
8        A.   Good morning.
9        Q.   Can you state your full name for the
10   record, please.
11       A.   Daniel Steven Elliott, S-t-e-v-e-n.
12       Q.   You and I know each other.  I'll just
13   forewarn you.  I'm developing a cold and my voice
14   is a little deep and cracky.  And I have some
15   water and I'll try to drink so it my speech is not
16   impeded, but if you don't understand something I
17   say today, please tell me and I'll try to pose a
18   question that makes coherent sense to you.
19           Is that okay?
20       A.   That is perfectly fine.  Thank you.
21       Q.   All right.  I've given you Exhibit 1,
22   which is the notice for your deposition.
23           Have you seen that document before?
24       A.   Yes.
25       Q.   All right.  And what, if anything, did

3 (Pages 6 to 9)

Daniel Steven Elliott, M.D.

Page 10

1  you do to comply with the request that you bring
2  documents and materials that is attached to that
3  request?
4      A.   I provided up-to-date -- well, you
5  have already a copy of my CV. I have -- which I
6  can provide to you. There are five new things.
7  Just as far as what has been published, which I
8  can provide to you there. That's a -- and then
9  that is a copy of the manuscript, that number 5,
10  because that just came out yesterday. So I didn't
11  have that typed up.
12      Q.   Did you bring your file here today?
13      A.   The file? I'm sorry.
14      Q.   I guess, did you bring your expert
15  file here today that would contain the documents
16  and materials that you reviewed and are relying
17  on?
18          MR. CARTMELL: We can just -- for the
19  record, we can get a thumb drive of everything
20  that's on his reliance list, including that
21  update. I just need to talk to Kuntz about that.
22  I don't have the thumb drive with me today.
23      Q.   BY MR. SNELL: Do you have the thumb
24  drive, Doctor?
25      A.   No. I don't have that, no. I have my

Page 11

1  report. I do not have a copy of my reliance list.
2      Q.   Okay. So we'll mark as Exhibit 2 the
3  five new studies that would go on your CV; is that
4  correct?
5      A.   Correct. Those are my published
6  studies, yes.
7          (Exhibit 2 marked.)
8      Q.   BY MR. SNELL: We'll mark as Exhibit 3
9  article number 5, which the lead author is Linder,
10  L-i-n-d-e-r, then Chow, then Elliott. Long-term
11  quality of life outcomes and retreatment rates
12  after robotic sacrocolpopexy.
13          (Exhibit 3 marked.)
14      Q.   BY MR. SNELL: To what professional
15  societies do you currently belong to?
16      A.   That would be in my CV. Let me see if
17  I have a copy of my CV. I might not. Oh, I do
18  have one.
19          Professional societies are going to be
20  listed in the professional membership society on
21  page 3 of 25. AMA, American Medical Association.
22  American Association of Clinical Urologists.
23  American Urologic Association. International
24  Incontinent Society. Society of Urodynamics and
25  Female Urology, which I am a member and on the

Page 12

1  education committee. Minnesota Medical Society.
2  Zumbro Valley Medical Society. Olmsted Community
3  Medical Society. International Urogynecologic
4  Society. Society of Urologic Prosthetic Surgeons.
5  Society of Laparoendoscopic Surgeons. Minimally
6  Invasive Robotic Association. Minnesota Urologic
7  Society. European Association of Urology, which I
8  am a member of, an international member, and then
9  I'm also a member of the subsection of
10  Genitourinary Reconstructive Surgeons, and also a
11  member of the section of the Female Urology and
12  Functional Urology. And again that's underneath
13  the umbrella of the European Urology Association.
14  International Urogynecologic Association.
15  International Pelvic Pain Society.
16      Q.   In your role on the education
17  committee for SUFU -- and that's the society of
18  what?
19      A.   Good question. They changed the name.
20          Society of Urodynamics and Female
21  Urology is an acceptable -- but, again, they've
22  actually moved around the words a bit there, but
23  that's what it means.
24      Q.   Can I just call it SUFU?
25      A.   SUFU.

Page 13

1      Q.   Make it easier on the court reporter,
2  too.
3      A.   SUFU is much better. I prefer that.
4      Q.   SUFU in all caps. Okay. What is your
5  role -- strike that.
6          What do you do in your role as being
7  on the education committee for SUFU?
8      A.   It is a -- focusing on the education
9  not only of the current residents of what we feel
10  would be appropriate for training in female
11  urology, urinary incontinence and prolapse, but
12  also determining goals, objectives of education at
13  meetings and lecture topics, things like that.
14      Q.   You've given testimony in the past;
15  correct?
16      A.   Correct.
17      Q.   I've deposed you in the past; correct?
18      A.   Twice, I believe, yes.
19      Q.   So we can rely on your prior
20  testimony. We don't have to ask you those
21  questions again; correct?
22      A.   Well, with the understanding that
23  sometimes things have changed, but, yeah, as far
24  as data being out, those types of things.
25      Q.   Okay.

4 (Pages 10 to 13)

Daniel Steven Elliott, M.D.

Page 14

1      A.   That's a broad question, because those
2   are depositions over two or three days -- or two
3   days, excuse me.  So I'd have to see each specific
4   question what you're talking about.
5      Q.   Okay.  As you sit here today, is there
6   any testimony that you gave in the Bellew or Gross
7   cases that was inaccurate or untruthful?
8      A.   No.  They would all been truthful and
9   accurate, but as the -- as data becomes available,
10  more research being done, as I read more internal
11  documents, certain positions may change.  But
12  there's nothing dishonest or deceitful.
13     Q.   In connection with the education
14  committee for SUFU, you testified that one of the
15  things that you were involved in was looking at
16  the training that residents would need in urology,
17  female urology?
18     A.   Looking at the goals or where we want
19  residents to be, what criteria or surgeries,
20  volumes, types of surgeries, testing,
21  credentialing.
22     Q.   Okay.
23     A.   All those issues.
24     Q.   And for the EAU, can I call that the
25  European Association of Urology?

Page 15

1      A.   EAU's easy, yeah.
2      Q.   Okay.  And you said you were a member
3   of the genitourinary section?
4      A.   Yeah.  The genitourinary
5   reconstructive.  So it's reconstructive surgeons,
6   because my training is in female pelvic medicine
7   and reconstructive surgery, which are separate and
8   overlapping training.
9      Q.   That would include the surgical
10  treatment of stress urinary incontinence?
11     A.   That would be the other committee.
12  That would be the female urology and functional
13  urology.  Reconstructive would be complications,
14  radiation damage, those types of things.  Anytime
15  you hear of reconstructive, think of fixing
16  mistakes or problems.
17     Q.   Are you a member of the section that
18  assesses surgical treatment options for stress
19  urinary incontinence for the EAU?
20     A.   Well, the members of the female
21  functional -- we're not necessarily -- unlike the
22  SUFU, which is an education section, this is more
23  like the research that's being done.  It's not
24  setting goals or guidelines by any means.  I don't
25  know if that answers your questions or not.

Page 16

1      Q.   Not really.
2          So just remind me, what section of the
3   EAU is focused on assessing the surgical options
4   for stress urinary incontinence?
5      A.   That would be a function of the female
6   and functional urology.
7      Q.   Are you a member of that section?
8      A.   Correct.  And I'm on the board of
9   that, yes.
10     Q.   How long have you been on the board of
11  that section that assesses the surgical treatment
12  of stress incontinence?
13     A.   Since April of 2013.
14     Q.   Okay.  What are your fees for your
15  work as an expert in this matter?
16     A.   $700 an hour.
17     Q.   And what is your fees for testimony?
18     A.   Same.  $700 an hour for everything.
19     Q.   Plus travel expenses and costs?
20     A.   Correct.
21     Q.   How many hours have you worked on the
22  Mullins case.
23          And when I say Mullins, this is the
24  MDL design defect case.
25     A.   As far as specifically on patient

Page 17

1   Mullins, I have not reviewed her records.  As far
2   as TVT and design, I guess I don't know
3   specifically -- specifically on the TVT and
4   design, it's going to be somewhat difficult to
5   ascertain exact time, because obviously the study
6   of Prolift factors in.
7          But as far as I can determine, roughly
8   60 hours have been spent as of August 31st, 2015.
9   60 hours.
10     Q.   How many hours have you spent since
11  September 1st on this matter?
12     A.   It's going to be difficult, because
13  there's also travel involved in there.  So I don't
14  know if you want the total hours, because that's
15  not also study on things.  But that'd be about
16  110 hours.
17     Q.   Do you bill $700 an hour when you
18  travel?
19     A.   Correct.
20     Q.   Do you issue invoices for your time
21  spent on this matter?
22     A.   Correct.
23     Q.   Do you send those to Ben Anderson?
24     A.   Correct.
25     Q.   And would those invoices be specific

5 (Pages 14 to 17)

Daniel Steven Elliott, M.D.

Page 18

1  to and reference your work in the Mullins' TVT
2  design defect case?
3      A.   It will be specific to Ethicon.
4      Q.   Okay.
5      A.   So that's why it's difficult to
6  determine exact number of hours, and that data
7  reviewed two years ago is pertinent to now.  So
8  that's why it's difficult to know the total
9  number.
10     Q.   You're serving as an expert against
11  other mesh manufacturers?
12     A.   Yes.  Mentor ObTape.
13     Q.   Any others?
14     A.   There was start in the Cook Surgisis
15  mesh, but last I've heard there's no action going
16  on with that.
17          I have been deposed with Avaulta.
18  But, again, nothing has happened with that in six
19  months, and I don't know where the status of those
20  are.
21     Q.   Avaulta, is that a Bard product?
22     A.   Correct.
23     Q.   That's a prolapse product?
24     A.   Prolapse product; correct.
25     Q.   Okay.  Does the Mayo Clinic know that

Page 19

1  you're serving as an expert for plaintiffs in the
2  mesh litigation?
3      A.   No.  This is all done by private time.
4      Q.   I know I deposed you in two prolapse
5  cases in the past.  So today I'm really focused on
6  stress urinary incontinence; all right?
7      A.   Correct.
8      Q.   With that said, though, let me just
9  ask you this question.
10          In the Bellew deposition you testified
11  about treatment options you used for prolapse.
12          Do you recall that, in general?
13     A.   Correct.
14     Q.   Have those changed as we sit here
15  today?
16     A.   No.
17     Q.   For Exhibit 3, the robotic
18  sacrocolpopexy cohort that you published on --
19     A.   Yes.
20     Q.   -- am I correct that you're not the
21  one who runs and operates the robot?
22     A.   No.  Dr. Chow does that.
23     Q.   Okay.  Are you credentialed at Mayo
24  Clinic to run the robot for sacrocolpopexy
25  procedures?

Page 20

1      A.   The answer to that probably would be
2  no.  I could be involved in the cases, but I am
3  not the one sitting behind the robot.  I am the
4  one involved directing traffic as far as the
5  dissection goes.
6      Q.   Okay.  What surgical options do you
7  currently use for the treatment of stress urinary
8  incontinence in your patients, if any?
9      A.   Autologous pubovaginal sling,
10  cadaveric pubovaginal sling, autologous obturator
11  vagina sling, and then in the past since August of
12  2013, there's been one mesh sling.  So that is a
13  change from previous testimony.
14     Q.   How many autologous transobturator
15  slings do you use on average each year?
16     A.   Probably it's around 80 or so.  That's
17  a rough -- that's a rough number.  It varies from
18  time to time.  But in the past two years or --
19  yeah, two years now, I'd say 80 a year's probably
20  accurate.
21     Q.   And that's the autologous
22  transobturator sling?
23     A.   Correct.
24     Q.   I know you published a feasibility
25  cohort study on very small sample size for the

Page 21

1  autologous transobturator pubovaginal sling;
2  correct?
3      A.   Correct.
4      Q.   That was ten patients; correct?
5      A.   I believe so.  It was ten patients,
6  yes.
7      Q.   There's a 20 percent failure rate at a
8  mean average of four months' follow-up; correct?
9      A.   Yeah.  That data is now -- we're
10  looking at 60 patients with one year.
11     Q.   Has that data been published?
12     A.   That's in the process of being
13  gathered right now.  All patients are being
14  contacted.
15     Q.   How many patients are going to be in
16  that cohort, you said?
17     A.   60.  It's a continuation of
18  feasibility study.  Looking at safety, efficacy,
19  complications, et cetera.
20     Q.   Has that data been presented anywhere
21  in abstract form or oral presentation?
22     A.   Yes.  I'd have to go back to the CV.
23  It was presented in February of 2015 at SUFU.
24  Again, that was the initial feasibility study.
25     Q.   I think my question maybe wasn't

6 (Pages 18 to 21)

Daniel Steven Elliott, M.D.

Page 22

1 clear.
2        So on this updated cohort of 60
3 patients --
4     A.   Oh, I see.
5     Q.   -- have you presented on those data
6 anywhere?
7     A.   No.  Not in the updated, no.
8     Q.   And then the small feasibility study
9 that you did publish on, you recall the mean
10 follow-up time was to four months?
11     A.   It was short-term, yes.
12     Q.   What's a feasibility study?
13     A.   Feasibility is a small cohort of
14 patients that understand that they're involved in
15 a study to determine whether or not this is a good
16 treatment option, where we're doing quality of
17 life assessments prior to and afterwards and
18 following very closely, looking at complications
19 and efficacy with 24-hour PAD tests.
20     Q.   How many cadaver slings do you use on
21 average each year?  And if that's changed year to
22 year, you can tell me that.
23     A.   Yeah.  The numbers are so -- quite
24 variable.  So it's difficult to give you a number
25 I would say autologous slings are probably going

Page 23

1 to be around, let's say, 30 or so.  And then
2 cadaverics are probably going to be probably less
3 than that.  Probably 10 or so a year.
4     Q.   You do about 30 or so autologous
5 pubovaginal slings; correct?
6     A.   About 30 a year, yes.  And that will
7 vary dramatically, yes.
8     Q.   And that's the traditional pubovaginal
9 sling procedure that's been referenced in the
10 literature for decades?
11     A.   Yes.  With the understanding that the
12 term "pubovaginal" is not necessarily a specific
13 way of doing it, but in general, you are correct.
14     Q.   And that's the sling that's -- where
15 the tissue is harvested from the patient herself;
16 correct?
17     A.   Correct.
18     Q.   Okay.  And the autologous pubovaginal
19 sling is not a medical device; is it?
20     A.   Correct.  It is not.
21     Q.   Why do you only use 10 or so cadaveric
22 slings a year?
23     A.   It's going to be dependent upon the
24 patients, the specific patient, the criteria they
25 have, multiple different surgeries, the quality of

Page 24

1 their tissue.  Because mostly what I'm seeing in
2 my practice is somebody that's been operated on
3 multiple times.  I'm not seeing usually the
4 first-time patient.  So, again, there's multiple
5 patient variables.
6     Q.   Do you have patients for whom you
7 offer the autologous pubovaginal sling and who
8 decline that operation?
9     A.   I suppose that could occur, but
10 usually those individuals are declining surgery
11 period, not declining the autologous sling.  So we
12 have to be very careful how it's the primary phrasing that.
13 They are not a surgical candidate or they're
14 choosing not to undergo surgery for their
15 treatment.  They're not saying, I do not want a
16 autologous sling.
17     Q.   Are there patients for whom you've
18 treated that do not want a cadaveric sling?
19     A.   I have not encountered that, no.
20     Q.   Is the autologous transobturator sling
21 the primary -- sounds like it's the primary stress
22 urinary incontinence surgery you're doing?
23     A.   Primary being the most common?
24     Q.   Yes, sir.
25     A.   That would be correct, sir, at this

Page 25

1 point.  But, again, we're going to analyze the
2 data.
3     Q.   And the autologous transobturator
4 sling is not a medical device; is that correct?
5     A.   That's correct.
6     Q.   The cadaveric sling is not a medical
7 device; correct?
8     A.   Well, it's -- it's a device -- it's a
9 product that is purchased from the company
10 Coloplast.  So I don't think it qualifies.  It's
11 not a man-made device.
12     Q.   It's harvested from a dead person;
13 correct?
14     A.   Correct.
15     Q.   And the one mesh sling you used, I
16 think you said in August of 2013?
17     A.   Correct.
18     Q.   What type of mesh sling was that?
19     A.   That was a Coloplast product, the
20 Supris.
21     Q.   Why did you only use that Coloplast
22 Supris on one occasion?
23     A.   That was -- I can't recall the exact
24 patient issues with that one.  There was some
25 reason why we did not -- and that's one -- it

Daniel Steven Elliott, M.D.

---

**Page 26**

1  wasn't in August of 2013. It's since August of
2  2013 there's only been one. So it's a major shift
3  in my practice. And I don't recall the reasons
4  why we chose it, but there was a medically
5  necessary reason, in my opinion, to do it.
6      Q.   What type of material is the Coloplast
7  material made of?
8      A.   It is a polypropylene mesh.
9      Q.   And what route is the Coloplast Supris
10 sling placed?
11     A.   It's a suprapubic approach.
12 Transvaginal suprapubic.
13     Q.   Can you explain that to me? I'm
14 familiar with retropubic and transobturator.
15     A.   Well, retropubic, all that means is
16 behind the pubic bone. So it doesn't describe to
17 a surgeon -- it doesn't describe -- it just
18 describes an anatomical location. The TVT is
19 bottom up. Supris or Sparc is top-down. That's
20 probably -- that's the easier way to --
21     Q.   So the Colopress -- strike that.
22          The Coloplast Supris polypropylene
23 mesh sling uses a top-to-bottom approach?
24     A.   Correct.
25     Q.   And just so I'm clear, you've used

---

**Page 27**

1  that sling on one occasion only?
2      A.   No. No. I've used that once since
3  August of 2013. Prior to that, I probably placed
4  1200 or so. For a while there I was doing 100 to
5  150 slings a year. Those were synthetic slings.
6  Those were the Coloplast, and that started in 2004
7  or so. So whatever the math is on that. So prior
8  to that I used another product. So what I'm
9  saying is I've stopped using polypropylene as a
10 first line treatment.
11     Q.   So from 2004 up to around the midpoint
12 of 2013, August 2013 --
13     A.   Correct.
14     Q.   -- you used Coloplast polypropylene
15 mesh slings as your primary surgical option for
16 the treatment of stress urinary incontinence?
17     A.   That's correct. At some point in
18 time -- I cannot recall the exact dates -- I
19 changed from using the AMS product, because of the
20 problems I was having with it, to the Coloplast
21 product. Again, we have to take with a grain of
22 salt, it was 2004, 2005, in that time frame. And
23 then it was exclusively the Coloplast product. No
24 other product. No other polypropylene mesh was
25 used.

---

**Page 28**

1      Q.   In the past 10 years, have you used
2  the Birch colposuspension?
3      A.   No, I have not.
4      Q.   In the past 10 years, have you used
5  the Marshall-Marchetti-Krantz colposuspension
6  procedure?
7      A.   No, I have not. I have not
8  personally. I've been involved in cases -- I
9  should take that back or strike it whatever your
10 legal terminology is.
11          I have been involved with GYN cases
12 who have done the Burch. I was not the surgeon
13 doing the Burch. I was doing something else. But
14 I have not personally done the Burch or the MMK
15 since fellowship, which was in '99 to 2000.
16     Q.   How many Burch procedures have you
17 personally done in your career?
18     A.   Probably two.
19     Q.   How many MMK procedures have you
20 personally done in your career?
21     A.   Zero.
22     Q.   The Burch colposuspension is not a
23 medical device; correct?
24     A.   Correct.
25     Q.   Besides the Supris Coloplast sling,

---

**Page 29**

1  what other Coloplast slings did you use?
2      A.   The Aris. A-i -- excuse me, A-r-i-s.
3  That is the transobturator. Same mesh, just a
4  different route.
5      Q.   So I take it you would have began
6  using the Coloplast Supris before the Coloplast
7  Aris sling?
8      A.   I don't recall the sequence of how
9  they were introduced. So it would have been about
10 the same time, because in that time frame,
11 transobturator route was available and suprapubic
12 route, or top-down was available. I would think I
13 probably started using both at the same time, if
14 they were available. I don't recall exactly.
15     Q.   Okay. You mentioned you had some
16 problems with AMS slings.
17     A.   Correct.
18     Q.   Were those AMS polypropylene slings?
19     A.   Correct. The Sparc, S-p-a-r-c, and
20 the Monarc, M-o-n-a-r-c. Because of those
21 problems, I stopped using the product.
22     Q.   Sparc is a retropubic sling?
23     A.   Correct. Top-down.
24     Q.   Top-down. And Monarc, as I understand
25 it, is an outside and transobturator sling?

---

8 (Pages 26 to 29)

Daniel Steven Elliott, M.D.

Page 30

1      A.   Correct.
2      Q.   How many AMS slings do you think you
3   placed in your career made of polypropylene?
4      A.   Yeah.  I initially started -- I'll
5   answer your question.  This is complicated.  I
6   initially started using the ObTape, which was a
7   transobturator Mentor product.  Had a horrible
8   amount of complications.
9         So around in 2004 -- excuse me,
10  2003 -- again, I don't recall the exact dates -- I
11  changed over to the AMS product.  And so I
12  probably placed in a period of a year or two until
13  the Coloplast product became available -- so you
14  have to understand this is a guesstimate -- 100 to
15  150 a year.  So we can say 2 to 300, maybe.
16     Q.   Okay.  So am I correct that the ObTape
17  was the first synthetic sling you placed for the
18  surgical treatment of stress urinary
19  incontinence?
20     A.   Okay.  We're going back 13, 14,
21  15 years now.  That was a transobturator route.
22  So I was doing suprapubic prior to that.  I was
23  the first in the state of Minnesota and possibly
24  the first in the United States to use the ObTape.
25  At least that's what the company told me.  So I
was actually using the Sparc prior to that.  And,

Page 31

1   again, I know it's going to be difficult.  I'm not
2   trying to be difficult.  I just can't recall the
3   exact -- so I was definitively using suprapubic
4   prior to that time.  And then transobturator came
5   out.  The Mentor at the time had the patent, two
6   transobturators.  They were the first ones to do
7   it.  So I would have used a suprapubic route
8   first.  Then transobturator with Mentor.  Had
9   problems.  Then swapped over to the AMS Monarc
10  would probably be the sequence of things.
11     Q.   What kind of problems did you have
12  with the ObTape sling?
13     A.   You name it.  It was a terrible
14  device.  It was problems of buttock abscess.
15  Extrusion rate.  Pussing out.  Pain.  I did it in
16  110 patients, and we had 9 come back within a year
17  or so with obturator fossa abscess, buttock
18  abscess, extrusion.  And then I had one patient
19  come back in 2013.  So what's that?  Eight years
20  after I implanted it with another extrusion.
21     Q.   So you had a total of 10 patients who
22  came back with some type of complication out of
23  110 for the ObTape?
24     A.   Correct.  That I know of.
25     Q.   What type of problems did you have

Page 32

1   with the AMS Sparc and Monarc problems?  Strike
2   that.  That was a bad question.  I need water.
3         When do you recall first using the
4   ObTape?
5      A.   I'd be able to search my records and
6   give you a pretty close to accurate date, but it
7   would have been about in 2003, about in October or
8   so.
9      Q.   You did a fellowship; right?
10     A.   Correct.
11     Q.   What surgeries did you learn to do to
12  treat stress urinary incontinence during your
13  fellowship?
14     A.   Well, that's where we did a Burch.  So
15  I'd never done Burch in residency.  We only did
16  one or two.
17     Q.   Okay.
18     A.   Where I was the surgeon or under the
19  leadership of a staff.
20        I had already done autologous slings.
21  So I improved my skills.  I wouldn't say I was
22  learning something new.
23        And then the cadaveric sling I learned
24  there.
25     Q.   Okay.

Page 33

1      A.   Or first did there.  I knew about it,
2   but had first performed the procedure.
3      Q.   In your residency, what stress urinary
4   incontinence surgeries did you learn about?
5      A.   Only pubovaginal, autologous
6   pubovaginal sling.
7      Q.   Is it correct that in your fellowship
8   you did not learn -- strike that.
9         Is it correct in your fellowship you
10  did not perform any synthetic slings to treat
11  stress urinary incontinence?
12     A.   That is correct.  At that point in
13  time, only the TVT was available.  My staff and
14  residency and then my fellowship staff both did
15  not feel it was safe; so did not do it.  So my
16  first synthetic came afterwards when the Sparc
17  came out.
18     Q.   Is the retropubic mid-urethral sling
19  taught in Mayo Clinic in residencies?
20     A.   It is not taught in the urology
21  department.  I cannot speak for the urogynecology
22  department.
23     Q.   Is the retropubic mid-urethral
24  polypropylene sling taught in fellowship at Mayo
25  Clinic?

9 (Pages 30 to 33)

Daniel Steven Elliott, M.D.

---

Page 34

1    A.   Well, that would just be in the
2  urogynecology department.  We do not have a
3  fellowship.  So I don't know what they learn
4  there.
5    Q.   So circling back around to the AMS
6  sling problems that you had, what were those with
7  the Sparc and the Monarc?
8    A.   We'd have to divide it up into each
9  one, if you want.  Kind of a -- because suprapubic
10 approach, the Sparc, had different complications
11 than the transobturator route.
12   Q.   Okay.  Let's go with Sparc first, and
13 thanks for that clarification.
14   A.   Sparc --
15   Q.   Let me just get a good question.  That
16 was a bad question on the record.
17        Can you tell me the problems you saw
18 with the AMS Sparc device?
19   A.   Yeah.  With the Sparc, it was the
20 top-down route.  We had the problem with about a
21 10 percent bladder perforation rate.  And then
22 also we had the problem the connector of the
23 trochar to the mesh was bulky.
24        So per our routine, after we would
25 place our trochar we would perform a cystoscopic

---

Page 35

1  exam, and we were discovering, after we had
2  attached the mesh and pull it through, we're
3  tearing the bladder.  So we developed these bad
4  tears in the bladder, when we would unequivocally
5  confirmed there was no bladder hole there to start
6  off with.  So that was an unacceptable
7  complication right there.
8        And then we were having a problem as
9  far as mesh extrusion and pain.  Now, that's the
10 Sparc complications.
11   Q.   What rate of mesh extrusion did you
12 have with the Sparc device?
13   A.   It was around -- that's going to be
14 very difficult to say, because it's looking back
15 so far now.
16   Q.   Let me withdraw and ask you a question
17 that I think is easier to answer, a least it may
18 lead me to where I may want to go.
19        Did you or anyone else ever publish on
20 these problems with the AMS Sparc device?
21   A.   We never published.  We spoke about --
22 I spoke about it.  But I never had any
23 publications on it.
24   Q.   When you say you spoke about it, what
25 do you mean by that?

---

Page 36

1    A.   I'm going to have to clarify that
2  statement.  Actually, that's incorrect, because on
3  my CV that I turned in, we have written up the
4  largest series of bladder outlet obstruction
5  requiring urethrolysis.  So in that series would
6  be some of those Sparcs that were obstructed.  So
7  I don't -- I can't give you an exact number.  So
8  that has been published on, yes.
9    Q.   Okay.  What was the rate of bladder
10 outlet obstruction with the Sparc device in your
11 hands?
12   A.   I don't recall me personally having
13 one.  The other -- my colleague had a few, about a
14 1 to 5 percent rate of obstruction.
15   Q.   Who is your colleague?
16   A.   Dr. Deborah Lightner.
17   Q.   And what was your rate of mesh
18 extrusion with the Sparc?
19   A.   I can just, off the top of my head,
20 remember a few.  I did not keep accurate records
21 of the exact number of those.
22   Q.   What was the rate of pain with the
23 Sparc?
24   A.   When we closely -- you know, when we
25 asked patients to see them back, there was

---

Page 37

1  probably about a 5 percent risk, roughly, of
2  suprapubic pain or vaginal discomfort with it.
3    Q.   It would be routine to have the
4  patients come back following stress incontinence
5  surgery with a mid-urethral sling?
6    A.   Yes or no.  It depends if we're doing
7  a study looking at something specifically.  So we
8  do not have a standard protocol to follow-up with
9  them.
10   Q.   So when you put in a trans -- strike
11 that.
12        When you put in a Sparc sling in a
13 patient, am I correct you did not have a specific
14 follow-up plan for the patient?
15   A.   We had a -- based upon efficacy only
16 at that point in time.  I remember, this is back
17 in 2002 or 2003.  We were -- and if the patients
18 were happy, they were continent, then we did not
19 have a scheduled follow-up for them.
20   Q.   For the autologous pubovaginal sling
21 that you would perform around that time, did you
22 have scheduled follow-ups for your patients?
23   A.   During that time frame I performed
24 very few, almost down to zero a year.  There may
25 be an occasional one for a complicated

---

10 (Pages 34 to 37)

Daniel Steven Elliott, M.D.

Page 38

1  reconstruction.  So for a period of, what, seven,
2  eight years my numbers of autologous slings was
3  negligible.
4       Q.   The Aris sling is the one made by
5  Coloplast, which is a transobturator approach;
6  correct?
7       A.   Correct.
8       Q.   When you began using the Coloplast
9  Supris sling, how many randomized control trials,
10 if any, were there on that device?
11      A.   I don't recall.
12      Q.   As you sit here today, do you know if
13 there are any randomized control trials on the
14 Coloplast Supris device?
15      A.   I don't recall.
16      Q.   Do you know or do you -- you say you
17 don't recall.  Do you know?
18      A.   I don't know.  I have not searched the
19 literature if there is or isn't.
20      Q.   When you began using the Coloplast
21 Aris transobturator sling, were there any
22 randomized control trials that existed at that
23 time?
24      A.   Again, I don't recall back then, no.
25      Q.   As you sit here the today, do you know

Page 39

1  if there are any randomized control trials on the
2  Aris Coloplast sling?
3       A.   I don't know.  I don't recall if there
4  are or are not.
5       Q.   When you began using the AMS Sparc
6  polypropylene sling, were there any randomized
7  control trials that existed on that device at that
8  time?
9       A.   I would have to theorize there were
10 not because it was a brand-new product on the
11 market.
12      Q.   When you began using the AMS Monarc
13 device, were there any randomized control trials
14 on that device?
15      A.   Same answer as before.  I don't recall
16 if there were or were not.
17      Q.   Did you began doing the AMS Monarc
18 transobturator sling when it was introduced to the
19 market or did you wait some time?
20      A.   No.  As I recall, I used the Mentor
21 ObTape first for transobturator route.  Again, as
22 I was told by the company, I was the first in the
23 state of Minnesota and possibly first in the
24 United States to do transobturator because it was
25 brand-new.  So that answers a lot of questions.

Page 40

1  There was no data.  I recall trusting the company
2  that there had been data, but there apparently was
3  not.
4            Same answer for the Sparc that I
5  believe that was already on the market when I
6  began using it.
7       Q.   But my question was for the Monarc.
8  When you began using the AMS Monarc transobturator
9  device, did you begin using it when it was
10 introduced to the market or sometime later?
11      A.   It most likely would have been
12 sometime later.  Again, I don't recall the exact
13 dates.
14      Q.   When you began using the AMS Sparc
15 device, did you sit down and do a literature
16 search to ascertain what literature, if any,
17 existed on that device before using it?
18      A.   The product was brand-new to the
19 market.  So there was no independent research on
20 it and definitely no long-term studies on it.
21      Q.   When you began using either the
22 Coloplast sling products, the Supris or the Aris
23 devices, did you sit down and do a literature
24 search to assess what information and data were
25 available on those products, if any, before using

Page 41

1  those products?
2       A.   I don't recall what I did at that
3  point in time, but there definitely were no
4  long-term studies because it was new to the
5  market.
6       Q.   Now, when you began doing the AMS
7  Monarc procedure, did you do a literature search
8  to see if there was any data on that particular
9  device before using it in women?
10      A.   Again, same answer as -- there was no
11 long-term studies.  I don't recall if I did any
12 literature searches on it or not.  I was provided
13 literature by the company, but, again, there was
14 no long-term studies.
15      Q.   What literature were you provided by
16 the company on the AMS Monarc sling?
17      A.   Their IFU and then their product
18 publicity statement, so to speak, that has the
19 blurbs on the product and how it's to be used and
20 things like that, with, you know, criteria, those
21 type things.
22      Q.   Did AMS give you any published
23 clinical studies or abstracts of clinical studies
24 at the time they gave you the IFU or the publicity
25 statement for the Monarc device?

11 (Pages 38 to 41)

Daniel Steven Elliott, M.D.

Page 42

1     A.   I cannot recall exactly what happened.
2  The -- it is part of the routine of most of these
3  reps to provide you with papers.  And I don't
4  recall that specifically with this one, no.
5     Q.   What was your mesh exposure rate, if
6  anything, with the Coloplast Supris device?
7     A.   That I am aware of, I've had two.
8     Q.   How many mesh exposures did you have
9  with the Coloplast Aris device?
10    A.   Oh, I'm sorry.  I misspoke.  Of all
11 the -- of all the Coloplast products combined, I
12 know of two that I've had so far.  I don't know
13 which one was which, though.
14    Q.   Okay.  So it would be fair to say for
15 the Coloplast stress incontinence polypropylene
16 mid-urethral slings you used, those being the
17 Supris and the Aris, you're aware of two mesh
18 exposures?
19    A.   Correct.
20    Q.   Okay.  When was the last time you used
21 a polypropylene mid-urethral sling to treat stress
22 urinary incontinence that utilized a top-down
23 approach?
24    A.   That would have been the one that I
25 did between August of 2013 to the present, and it

Page 43

1  would have been -- I can't recall exactly.  It may
2  have been in 2013 or early 2014.
3     Q.   Have you ever placed a mid-urethral
4  sling utilizing a retropubic approach from the
5  bottom to the top like is employed with the TVT
6  retropubic device?
7     A.   Never.  I've seen it.  But I have not
8  performed it myself.
9     Q.   Okay.  As between the -- so just so
10 I'm clear.  You've done transobturator
11 mid-urethral polypropylene slings, and you've used
12 suprapubic top to bottom polypropylene slings to
13 treat stress urinary incontinence in your career?
14    A.   Correct.
15    Q.   What problems did you have with the
16 AMS Monarc device, the transobturator device?
17    A.   Similar problems as with the
18 suprapubic, the Sparc, in that the adaptor was
19 very large.  So as you pulled it through the
20 obturator foramen, you had to pull very hard, tug
21 on it, stretching the mesh, and then it'd come
22 through forcefully.  So obturator pain, patient
23 discomfort with it.  We had dyspareunia.  And then
24 you had some vaginal extrusions.  I do not
25 recall -- not that it didn't happen, I do not

Page 44

1  recall ever seeing one of my patients who was
2  obstructed afterwards.
3     Q.   Okay.  What was your rate of obturator
4  pain you saw with the Monarc device?
5     A.   Initially was essentially 100 percent.
6  Markedly more than the ObTape.  The ObTape when
7  you placed it, the patient initially did not
8  complain of any obturator foramen pain.  The
9  Monarc, they complained of it significantly
10 immediately postop.  We had to give a lot more
11 analgesic, keep patients in the hospital, those
12 types of things.  So it was unacceptable problem
13 with the device from my perspective.
14    Q.   What was the rate of obturator pain in
15 your Monarc patients at six months or greater?
16    A.   I don't recall.  And I don't know if
17 we ever looked at that.
18    Q.   What was the rate of dyspareunia in
19 your Monarc patients?
20    A.   Same answer as before.  I don't
21 recall.  We never did a formal study on that.  So
22 I don't know.
23    Q.   Why did you have -- strike that.
24         Did you find that the rate of the
25 abscesses in your use of ObTape was unacceptable?

Page 45

1     A.   Absolutely unacceptable.
2     Q.   Why did you have an unacceptable rate
3  of abscesses in the ObTape?
4     A.   That was with the design of the
5  product.  It was a heavy weight, essentially zero
6  pore mesh, polypropylene mesh that transmitted
7  infection through the obturator foramen to the
8  buttock region.
9     Q.   For your Coloplast polypropylene
10 slings, what type of efficacy did you see?
11    A.   Well, there's -- again, there's the
12 suprapubic and the obturator route.  We did
13 never -- we never looked at our rate.  So I can't
14 tell you that.  Though efficacy overall was
15 acceptable.
16    Q.   With the AMS Sparc and Monarc devices,
17 was your efficacy with those devices acceptable?
18    A.   Yes.
19    Q.   With the Coloplast polypropylene
20 slings, did tissue integration occur with those
21 devices?
22         MR. SNELL:  Object to form.
23    A.   The only way to know if there was
24 tissue integration is to do a revision surgery on
25 them.  So we never did that.

12 (Pages 42 to 45)

Daniel Steven Elliott, M.D.

1    Q.   BY MR. SNELL: Did any of your
2  patients with the Coloplast slings made of
3  polypropylene placed at the mid-urethral come back
4  to you with their slings falling out?
5    A.   Well, yeah, we had two that I
6  mentioned that I know of came out.  So you could
7  say those two had poor integration, but I cannot
8  speak to the others, because we did not have a
9  routine follow-up scheduled for them.
10   Q.   For the two patients I thought you
11  told me they had mesh exposures.
12   A.   They did.  So that's poor tissue
13  integration.
14   Q.   What size were those exposures?
15   A.   I don't recall.  They're probably
16  around the range of a centimeter or so.  It was
17  not just a mild exposure.  These required
18  treatment.
19   Q.   And was the tissue integrated in the
20  area beyond the mesh exposure in those two cases?
21   A.   Again, I can't recall going back that
22  far.  I know it was not at the location of the
23  extrusion, though.
24   Q.   What was the pore size of the
25  Coloplast polypropylene mesh?

1    A.   I don't know.
2    Q.   Was the Coloplast polypropylene
3  mid-urethral sling mesh that you used mechanical
4  cut or laser cut?
5    A.   It's actually different.  It's hemmed.
6  So the border of it looks completely different
7  than the TVT or the Sparc.  So you don't have the
8  roping, the fraying particle loss with it or
9  elongation.  That's why I liked it over the Sparc
10  procedure.
11   Q.   Did the Coloplast IFU for their sling
12  products you used provide the frequency, severity,
13  and duration of complications?
14   A.   I don't recall what the IFU said.
15   Q.   Did you read it?
16   A.   Yes, I read it.
17   Q.   As you sit here today, do you know
18  whether those IFUs on the Coloplast mid-urethral
19  slings ever reported frequency, severity, or
20  duration of complications?
21      MR. CARTMELL:  Objection.  Asked and
22  answered.  He just said he didn't recall.
23   A.   I don't recall, sir.  It's been a long
24  time.  I know I'm required to review it, but I
25  don't recall what they stated.

1    Q.   BY MR. SNELL:  What was the weight of
2  the Coloplast slings you used for stress urinary
3  incontinence treatment?
4    A.   70 grams per meter squared.
5    Q.   For the AMS Sparc and Monarc slings,
6  what was the pore size of those products?
7    A.   Well, it depends if it's coming out of
8  the box or once you've implanted it.  And so the
9  answer is, I don't know because it was quite
10  variable.  When you placed it in the patient and
11  then pulled on the trochars, pulled the sheath
12  around it, it would elongate and pull and roll up.
13  And so you'd get this rope look appearance to it,
14  which the pore size was zero, essentially --
15  excuse me, not zero.  It was negligible.
16   Q.   How many Sparc and Monarc slings did
17  you place in your career?
18   A.   And that's in a period of probably
19  two, maybe three years, a rate of 100 to 150 a
20  year.
21   Q.   And when did you first see this roping
22  and elongation of the Sparc and Monarc slings?
23   A.   As soon as we started putting it in.
24   Q.   So you began -- just so I understand,
25  as soon as you began seeing -- strike that.

1       As soon as you began using the AMS
2  polypropylene mid-urethral sling, you began seeing
3  the roping and elongation?
4    A.   Correct.
5    Q.   Yet you continued to place 100 to 150
6  of those a year?
7    A.   That is correct, because I didn't know
8  the significance of it at the time.
9    Q.   Is the Sparc polypropylene sling
10  mechanical cut or laser cut?
11   A.   I believe it is mechanical cut.  In
12  appearance it is identical to the TVT.
13   Q.   Does it have blue striping as well?
14   A.   Has a blue thread through it.
15  Prolene -- or I believe it's Prolene suture.  I'm
16  not sure.  And that was placed there not
17  initially.  That was placed afterwards to prevent
18  the problem of it rolling, because when you'd
19  tension it, it'd roll up.
20   Q.   And for the Monarc sling, is that
21  mechanically cut or laser cut?
22   A.   Same answer as the Sparc.  It appears
23  to be mechanical cut.  I can't speak for the cut.
24  I've not reviewed those documents, but it appears
25  to be mechanical cut.

Daniel Steven Elliott, M.D.

Page 50

1    Q.   Did you ever see particles falling off
2  of that mesh?
3    A.   When you would pull on it, either the
4  Monarc or the Sparc, they're the same mesh, you
5  would pull and then you would get these little
6  tiny fibers, like just little things that you
7  could actually see on your glove.  And so the
8  answer to that question is yes.
9    Q.   And that did not deter you from using
10  those products?
11    A.   I was unaware of the significance at
12  the time.
13    Q.   Well, you knew you were implanting
14  polypropylene into the body; right?
15    A.   Correct.
16    Q.   And those little particles you would
17  see on your glove were made of what?
18    A.   Polypropylene.
19    Q.   Does the Monarc have the blue striping
20  as well?
21    A.   Yeah.  It has a blue Prolene -- well,
22  I assume Prolene -- suture going through end to
23  end.  That's for tensioning purposes.  That was
24  added later.
25    Q.   Have you ever looked at the MSDS

Page 51

1  sheets that pertain to the Sparc or Monarc
2  products?
3    A.   No, I have not.
4    Q.   Have you ever looked at the MSDS
5  sheets that pertain to the Coloplast sling
6  products?
7    A.   I have not.
8    Q.   Why not?
9    A.   Because I don't know how to find them.
10    Q.   Am I correct; you never used the TVT
11  retropubic device?
12    A.   Correct.  Correct.  You're right.
13    Q.   And when I say TVT retropubic, I mean
14  the original, still-on-the-market-today Ethicon
15  manufactured TVT retropubic device.
16    A.   Correct.  The bottom up.  They also
17  have a top-down.  But bottom line, I have not used
18  any Ethicon product for stress urinary
19  incontinence.
20    Q.   Okay.  So that makes it fast.  Great.
21       Before writing your report in this
22  case, did you review the order issued by the judge
23  regarding the design defect claim in Mullins, and
24  what the judge expected the parties to focus on in
25  this matter?

Page 52

1    A.   I don't --
2       MR. CARTMELL:  Let me object to the
3  form.
4       MR. SNELL:  Okay.
5       MR. CARTMELL:  I'm not sure what
6  you're talking about, frankly, and I'm not sure he
7  will either.  So it may call for speculation.
8    A.   I've reviewed a lot of documents, some
9  coming from Judge Goodwin.  I don't recall the
10  nomenclature you're using.
11    Q.   BY MR. SNELL:  Okay.  Have you seen
12  any orders by Judge Goodwin in the Mullins case?
13    A.   Again, same answer as before.  I
14  don't -- I've seen a lot of stuff coming from
15  Judge Goodwin with his signature or whatever on
16  it.  I just don't recall the nomenclature you're
17  talking about.
18    Q.   I looked through your report, and your
19  footnotes begin on page 11; correct?
20    A.   That is correct.
21    Q.   Actually, if you turn to page 9, you
22  have a footnote at the top, but there's no
23  citation to it.
24    A.   Yeah.  That is correct.  That's a
25  typographical error, it looks, appears.

Page 53

1    Q.   Okay.
2    A.   That's my comment.  Yeah, there's no
3  reason to reference that.
4    Q.   Okay.
5    A.   That's my comment.
6    Q.   Okay.  So looking at your report,
7  beginning on page 11 where you have Footnotes, the
8  majority of what you cite -- that way we can just
9  see if we can agree to this.
10       In your expert report -- strike that.
11       The majority of things that you cite
12  in your expert report in footnotes are either
13  Ethicon company documents, testimony by company
14  witnesses, or papers concerning hernia mesh or
15  prolapse.
16       Is that a fair statement?
17       MR. CARTMELL:  Object to the form.
18    A.   Well, the majority -- you're correct.
19  There's internal documentation.  Many depositions.
20  There's the significant amount of medical
21  literature in the canine model, rabbit model,
22  human, and then there's TVT references in there,
23  too.  So I can't say that -- there's a lot of
24  different references from a lot of different
25  sources.

14  (Pages 50 to 53)

Daniel Steven Elliott, M.D.

Page 54

1      Q.   BY MR. SNELL: Well, for the medical
2  literature, it's correct, isn't it, that you cited
3  to a lot more hernia literature than you did TVT
4  literature?
5      A.   That is --
6          MR. SNELL:  Object to the form.
7      A.   That is correct, because TVT is a
8  hernia mesh.
9      Q.   BY MR. SNELL:  And if we go to the
10  back of your report, on page 32, you cite to the
11  recent Cochrane Review by Ford, et al.?
12     A.   Page 32?  I'm sorry.
13     Q.   Yes.  Footnote 97, I see.
14     A.   That is correct.
15     Q.   What is a Cochrane Review?
16     A.   Cochrane Review -- well, I actually
17  have a copy of it here.  A Cochrane Review -- I
18  can give you the exact nomenclature that they use.
19  Yes.  The Cochrane database, which is a -- I
20  believe it's government sponsored, that is in
21  charge of analyzing studies and a combination of
22  studies to hopefully be able to come up with
23  analysts -- analysis of papers and their efficacy,
24  their quality, et cetera.
25          (Exhibit 4 marked.)

Page 55

1      Q.   BY MR. SNELL:  I've handed you
2  Exhibit 4.  This is the intervention review of
3  mid-urethral sling operations for stress urinary
4  incontinence in women by Dr. Ford and others;
5  correct?
6      A.   Well, this is the abbreviated form of
7  it, the summary.
8      Q.   Right.
9      A.   The real document is -- I don't know
10  how many pages, but is a very big document.
11     Q.   Right.
12     A.   But, yes, this is the summary, as you
13  have stated.
14     Q.   And this is the same Cochrane Review
15  you cited; correct?
16     A.   Correct.  One by Ford, et al., in
17  2015.
18     Q.   And it looks like -- the publication
19  status and date, this actually -- Cochrane Review
20  was published this summer; correct?
21     A.   July.  Correct.
22     Q.   And if you look in the abstract -- let
23  me ask you this:  Why did you cite to the Cochrane
24  Review?
25     A.   Multiple different reasons.  It's a

Page 56

1  large study.  It's one of the bits of evidence.  I
2  try to look at all evidence out there, whether it
3  be pro or con for mesh so I can get a balanced
4  opinion on this.  And this is one of the
5  documents.  And it's an updated one.  2015.
6      Q.   Okay.  Under the background, they
7  state that the mid-urethral sling operations are a
8  recognized minimally invasive surgical treatment
9  for stress urinary incontinence.
10          You see that?
11     A.   That's what they state, yes.
12     Q.   You would agree that the mid-urethral
13  sling is minimally invasive compared to the
14  autologous pubovaginal sling which requires
15  harvesting of tissue from the woman?
16          MR. CARTMELL:  Object to the form.
17     A.   I would agree, minimally invasive is
18  always a statement, has to be with qualifiers or a
19  comparison to.  And I think it would be ligament
20  to say the mid-urethral sling is less invasive
21  than the autologous sling.
22     Q.   BY MR. SNELL:  Would you agree that
23  the mid-urethral sling, particularly the TVT
24  retropubic is less invasive than the Burch
25  colposuspension?

Page 57

1          MR. CARTMELL:  Same objection.
2      A.   You know, possibly.  But, again,
3  depends how you do it.  Some people can do it with
4  a very small incision, and it's -- but it depends
5  upon -- again, it's very difficult because you
6  have to pass those trochars blind.  So that's an
7  invasive thing.  It's a stab wound to a patient.
8  What's the difference in making an incision and
9  putting your stitches in.  But you could say, yes,
10  it is going to be less -- the TVT is going to be
11  less invasive somewhat than the Burch.
12     Q.   BY MR. SNELL:  Would you agree that
13  the TVT retropubic device is less invasive than
14  doing an MMK?
15     A.   I think, again, same as the Burch
16  answer.  The MMK requires more lateral dissection.
17  So I think that's a fair statement.
18     Q.   The MMK, as I understand it, has about
19  a 2.4 percent risk of the osteopubitis.  Am I
20  saying that correctly?
21     A.   Correct.  It should not be that high
22  of a percentage, but that is a risk of it,
23  correct.
24     Q.   But you've read literature summarizing
25  that risk is 2.4 percent by authors Drews and

15 (Pages 54 to 57)

Daniel Steven Elliott, M.D.

Page 58

1  others?
2      A.   I've read literature from other people
3  saying it is less than 1 percent.  But I'm not
4  going to deny it.  Yes, there is a risk of that,
5  and that's probably one of the reasons it's not
6  done very much.
7      Q.   And how did patients in the MMK --
8  strike that.
9           The MMK is a open procedure?
10     A.   Correct.  I don't recall anybody doing
11 it laparoscopically, but it's a procedure not done
12 very often anymore.
13     Q.   How does osteopubis occur in open
14 procedure like the MMK?
15     A.   They're thinking it's irritation to
16 the bone with the sutures.
17     Q.   The main results of this Cochrane
18 Review -- I want to go down a little bit.
19          First of all, they included 81 trials;
20 correct?  I'm on this page here, Doc.
21     A.   Oh, I'm sorry.  Yes.
22     Q.   That evaluated 12,113 women; correct?
23     A.   Correct.
24     Q.   The quality of most outcomes was
25 moderate; correct?

Page 59

1      A.   Yes.  It reads, "moderate, mainly due
2  to bias or risk of imprecision."
3      Q.   And the vast majority of these studies
4  that were included in the Ford Cochrane Review
5  that you cited are what are called randomized
6  control trials; correct?
7      A.   I'm sorry.  I don't understand your
8  question.  Can you -- there's misspellings on
9  that.  So can you -- I'm sorry.
10     Q.   Do you know what a randomized control
11 trial is?
12     A.   Yes, I do.
13     Q.   Of course you do.  What is a
14 randomized control trial?
15     A.   Randomized control trial would be a
16 level 1 trial on the Oxford education levels,
17 where there are two different groups that are
18 equally randomized to two separate treatment arms.
19 And then you do the same evaluations and the same
20 pre and postop description of patients and
21 outcomes.
22     Q.   Okay.  You mentioned the Oxford.  I've
23 heard of the Oxford Levels of Evidence.
24          Is that what you're referring to?
25     A.   Yes.  That's fine.

Page 60

1      Q.   And what is the importance, if any, of
2  Oxford Levels of Evidence?
3      A.   It is trying to quantify or
4  demonstrate or show individuals the data that is
5  gathered from various different studies.  It does
6  not mean that other studies are invaluable, such
7  as case reports.  But when you're trying to
8  compare apples to oranges or different types of
9  apples to each other, you need to compare them
10 directly to each other.  And you get arguably the
11 better data from that type of a study.
12     Q.   Level 1 you said was an RCT?
13     A.   Correct.
14     Q.   What is level 2?
15     A.   Level 2 is a case controlled trial.
16 Comparisons are made, but they're not randomized.
17     Q.   You pulled out a document.  Could we
18 mark that as Exhibit 5?  Thank you.  Oh, okay.
19          (Exhibit 5 marked.)
20     Q.   BY MR. SNELL:  I just want to look at
21 it real quick, and then I'll give it right back to
22 you.
23          So where would the Cochrane Review
24 that you cited in your expert report rate on that
25 level of evidence pyramid?

Page 61

1      A.   Cochrane Review is really not on it.
2  Cochrane Review is an analysis of all the data out
3  there.  It's like a meta-analysis.  Meta-analysis
4  which are used extensively don't fall into these
5  categories.  These are smaller studies.  Cochrane
6  or meta-analysis are a combination.  Like they
7  mentioned, 81 trials that evaluated 1200 patients.
8  Hence the reason why there'll be weaknesses or
9  errors within those studies because they're
10 analyzing potentially bad studies.
11     Q.   I've seen a similar evidence pyramid
12 that has on top, above an individual randomized
13 control trial, something called systematic reviews
14 in meta-analyses.
15     A.   Yeah.  That's why I mentioned
16 meta-analysis.  I'm not familiar with that.
17     Q.   Okay.
18     A.   But, again, as I mentioned,
19 meta-analysis, if you take bunches of poor quality
20 studies, you're not going to get out of that
21 magically a good quality study.  If you take dog
22 doo and make a lot of dog doo, you still have dog
23 doo.  So you have to be careful on those types of
24 analyses.  And that's why they mention here in
25 this Cochrane one, the quality, at most, was

16  (Pages 58 to 61)

Daniel Steven Elliott, M.D.

Page 62

1    moderate, and they indicate the reason why.
2       Q.   Do you rely on meta-analyses?
3       A.   I look -- I'm a reviewer for
4    15 different journals, and twice been awarded the
5    best reviewer in Journal of Urology.  I look at
6    them with skepticism, because it's just -- again,
7    as I mentioned, you have to know what goes on on
8    each and every study to know if it's a good
9    quality study.  If you take a lot of good quality
10   studies and put them together, that's quality.
11   And that's why there's going to be selection, and
12   that's why certain studies won't meet criteria.
13   But if you just take everything and analyze it,
14   again, it's the -- a lot of dog doo.  You got a
15   big dog doo at the end.
16      Q.   So you are aware there's a Cochrane
17   Review for the pubovaginal sling published by
18   Remmen.
19      A.   I don't recall that title.  I'd like
20   to see that one.  I don't recall that one.
21      Q.   Let me ask you this:  Do you know if
22   there's a Cochrane Review that analyzes the
23   pubovaginal sling?
24      A.   Yes.  By Remmen.
25      Q.   So if I mispronounce a name, you can

Page 63

1    answer yes and correct me.  I'm okay with that.
2           And the quality of evidence on the
3    pubovaginal slings by Remmen was noted to be poor;
4    correct?
5       A.   I don't recall.  I'd have to see that.
6    I have no reason to think -- I have no reason to
7    think that you would be wrong with that, though.
8    I'm going to see if I have that study.  Yeah.
9    I don't -- without knowing how to spell it, I
10   don't know how to find it.  Okay.
11      Q.   You would agree that overall the
12   quality of studies on pubovaginal slings is poor?
13      A.   I would say the overall studies on
14   incontinence, in general, are moderate to poor.
15   There are very few high quality studies out there.
16      Q.   But my question is specific to the
17   autologous pubovaginal sling.  You would agree for
18   the autologous pubovaginal sling, the quality of
19   evidence on that procedure is poor?
20      A.   As with all the other treatments, I
21   would agree with you, yes.
22      Q.   You mentioned there were a few high
23   quality studies.  What would those be?
24      A.   For which procedure?
25      Q.   For the autologous pubovaginal sling.

Page 64

1       A.   There's a paper by Chaken, et al.
2    There's another one by McGuire's group at
3    University of Michigan, both of which had
4    100 percent patient involvement.  Some up to --
5    involvement.  Contact.  So zero dropout rate
6    except for a death, and up to 10 years of
7    follow-up.
8       Q.   Neither one of those studies are
9    randomized control trials; correct?
10      A.   Correct.
11      Q.   They were both retrospective cohort
12   studies; correct?
13      A.   Yeah.  The data was prospectively
14   gathered, retrospectively reviewed.
15      Q.   And they were single center studies;
16   correct?
17      A.   Correct.
18      Q.   And Ed McGuire is the surgeon you're
19   referring to out of Michigan; correct?
20      A.   Well, he was actually down in Houston
21   at the time that he wrote it, but he had been in
22   Michigan.
23      Q.   For the Burch colposuspension, are
24   there any high quality studies that you're aware
25   of?

Page 65

1       A.   Yeah, there are several.  I have a
2    Langer, et al., 10 to 15 years of follow-up, Burch
3    colposuspension, from internal -- International
4    Urogyn Journal.
5       Q.   Do you recall what the loss to
6    follow-up was in the Langer Burch paper?
7       A.   Of the 156 patients, 29 were admitted
8    for not completing a 10-year follow-up.  8
9    patients died.  Can't blame them for that.  21
10   could not be located.  So actually -- so they
11   had -- death would not factor into it.  So you
12   have 21 out of 1156 were lost to follow-up.
13      Q.   The 29 patients, what happened with
14   them?
15      A.   Well, that's what I'm saying.  29
16   patients were not studied.  8 died.
17      Q.   Okay.
18      A.   And 21 could not be located.  So that
19   equals a percentage of 13 percent lost to
20   follow-up.
21      Q.   And one of the issues or problems with
22   longer term studies is that patients can die,
23   succumb to mortality, as you follow over a decade
24   or more; right?
25      A.   Correct.

17 (Pages 62 to 65)

Daniel Steven Elliott, M.D.

Page 66

1    Q.   And that's recognized in the field as
2 an issue when looking at randomized -- strike
3 that.
4           When looking at longer term studies?
5    A.   Yes and no with that.  Death is looked
6 at differently than loss -- than a true loss to
7 follow-up.  They had the 21 patients that were not
8 able to be located.  Those are important.  The 8
9 that died are still important.  It's sad they
10 died, but you look at that data differently.  And
11 statistically it's different.  And that's a
12 follow-up over 12.4 years, median follow-up.
13          And you also asked the question about
14 other studies.  There's also Herbertsson, et al.,
15 H-e-r-b-e-r-t-s-o-n, and then I'll spell the next
16 one, K-j-o-e-h-e-d-e, which had 14-year follow-up,
17 and those are specifically on Burch.  So here's
18 three studies with greater than 10 years of
19 follow-up.
20    Q.   Can I see the paper you were looking
21 at real quick.  Can we mark this, Doctor, as an
22 exhibit?
23    A.   Sure.
24          MR. SNELL:  What number.
25          (Exhibit 6 marked.)

Page 67

1    Q.   BY MR. SNELL:  Look at table 5,
2 Doctor.
3    A.   I'm there.
4    Q.   There's a 22 percent rate of detrusor
5 instability; correct?
6    A.   That is what they quote, yes.
7    Q.   And what is that?
8    A.   That -- I'd have to see how they
9 define it.  De novo detrusor instability was found
10 in 17 patients.  So that means, following the
11 procedure, it caused de novo overactive bladder
12 symptoms.  So their overall rate they state is 29.
13 But only 17 of those were caused by the procedure.
14    Q.   Okay.  So about two-thirds were caused
15 by the procedure?
16    A.   Yeah.  58 percent.  So 17 out of 127
17 had de novo.  13 percent.  So when you look at
18 graphs and tables, that's why it's difficult to be
19 a good reviewer.  You have to look at the whole
20 big picture.  Not just one graph.
21    Q.   All right.  The rate of dyspareunia
22 was 3.9 percent in this Burch study?
23    A.   That is what they quote.  Again, I'd
24 have to look at the study exactly, if that's
25 de novo or if that's preexisting or not.  I'd have

Page 68

1 to search for that.
2    Q.   Isn't 3.9 percent rate of dyspareunia
3 with the Burch acceptable?
4    A.   Well, I think ideally you want a zero
5 percent dyspareunia, but you'd have to know and
6 which this study does not have, which I would
7 critique if I were reviewing it, is a qualifier of
8 how bad that dyspareunia is.  Is it dryness or is
9 it a complete inability to have intercourse due to
10 pain, but it says 3.9 percent.
11    Q.   Right.  And my question is:  Is that
12 3.9 percent rate of dyspareunia with the Burch in
13 the paper review reference acceptable?
14          MR. CARTMELL:  Object to the form.
15    A.   Again, I need to know if it was
16 de novo or not.
17    Q.   BY MR. SNELL:  So you can't answer my
18 question?
19    A.   I would, if I can find dyspareunia in
20 here, where they discuss it.  Yeah.  I don't see
21 it.  We can take a long time.  I can search for
22 it.  But I would need to see how they're
23 describing it in those things.
24    Q.   I didn't see it either.
25    A.   That is an issue with many studies.

Page 69

1 It is not included.  That's why we keep saying
2 moderate quality.  No.  There's only -- in the
3 document there's only one time they mention
4 dyspareunia, and it's in that graph.  So there's
5 no qualifiers to it.
6    Q.   But it's still a paper you pointed me
7 to as important with regard to the Burch
8 colposuspension; correct?
9    A.   That is correct.
10    Q.   Back to the Cochrane Review.  We were
11 looking at the Results section in the fourth
12 paragraph.  It says, "The overall rate of vaginal
13 tape erosion/extrusion/exposure was low in both
14 groups."  It was 21 out of 1,000 for retropubic
15 mid-urethral sling.
16          Do you see that?
17    A.   That is what they state for the study,
18 yes.
19    Q.   That's 2.1 percent; correct?
20    A.   That is -- that is what they state,
21 yes.
22    Q.   The 2.1 percent would be the incidents
23 of the mesh exposure; correct?
24    A.   Well, that's what they state with the
25 understanding that these are short-term, moderate

18 (Pages 66 to 69)

Daniel Steven Elliott, M.D.

Page 70

1   quality studies, within the hands of high-quality
2   large volume surgeons.
3       Q.    So these 31 trials that they assess,
4   did all of those trials involve short-term
5   follow-up?
6       A.    Well, in the situation of meshes, this
7   is an implantable permanent medical device.
8   Anything short-term -- or short of lifelong
9   follow-up is going to be inadequate, from my
10  perspective.  So this is going to be short-term.
11  I doubt any of these are over 10 years, and even
12  that, in my opinion, is inadequate.  But you'd
13  have to look at each individual study to find out
14  what follow-up duration was.
15          MR. SNELL:  Move to strike as
16  nonresponsive.
17      Q.    BY MR. SNELL:  The 31 trials that were
18  assessed, is it your testimony that all of those
19  trials are short-term trials?
20          MR. CARTMELL:  Object to the form.
21      A.    I would have to see this complete
22  document to see each of those follow-ups to see if
23  they're adequate or not.
24      Q.    BY MR. SNELL:  Is there any lifelong
25  follow-up data on the Burch colposuspension,

Page 71

1   reporting a mean follow-up of 30, 40, 50, 60 years
2   in women?
3       A.    Well, as you've pointed out, it's not
4   a medical device.  There doesn't need to be.
5   There can be for efficacy, but for safety and
6   complications, that's going to be all
7   perioperative.  So there does not need to be.
8   You're comparing apples to oranges.
9           MR. SNELL:  Move to strike as
10  nonresponsive.
11      Q.    BY MR. SNELL:  For the Burch
12  colposuspension, are there any lifelong follow-up
13  studies?
14          MR. CARTMELL:  Objection.  Asked and
15  answered.  He just answered your question.
16          MR. SNELL:  I don't care whether he
17  thinks it's necessary or not.  I'm asking him is
18  it -- all right.  Do those exist.  That's a yes or
19  no or he doesn't know.
20          MR. CARTMELL:  Well, he said no and
21  explained why it's not important.
22          MR. SNELL:  I don't think he said no,
23  Tom.  He gave me a speech.
24          MR. CARTMELL:  Well, you can say no,
25  and explain again why it's not important.

Page 72

1       Q.    BY MR. SNELL:  Let me reask the
2   question.
3           For the Burch colposuspension, are
4   there any studies that have lifelong follow-up of
5   the patients?
6       A.    As I stated, the Burch is not a
7   medical device.  So, no, there are no long-term
8   studies, but there don't need to be because
9   there's no permanent implantable product in the
10  patient.
11      Q.    But the Burch can lead to dyspareunia,
12  just like the paper you showed me; right?
13      A.    No.  I disagree with that.  As I
14  stated, dyspareunia was recorded, but I have no
15  idea the preoperative incidence of dyspareunia.
16      Q.    So it's not important to track
17  dyspareunia with the Burch colposuspension?
18      A.    No.  You are spinning my words.
19  That's incorrect.  I stated, in that paper there's
20  one word of dyspareunia.  I don't know; did
21  10 percent have dyspareunia preop?  They don't
22  mention it.  Hence the quality of the paper goes
23  down.
24          So from your argument, the 10 percent
25  could have been preop, now it's down 3.9.  So they

Page 73

1   did a good job.
2       Q.    Do you know which way it went?
3       A.    As I stated, the paper does not
4   mention that.
5       Q.    Is it important to track dyspareunia
6   with the Burch colposuspension?
7           MR. CARTMELL:  Object to the form.
8       A.    Dyspareunia and safety of the device
9   is always important to track.  It's going to be
10  different for different products.  If you have a
11  permanent implantable device, you have to follow
12  it lifelong.  If you have a device that's
13  absorbed, gone away, it's not as important to
14  follow.
15      Q.    BY MR. SNELL:  So it's not as
16  important to follow dyspareunia with the Burch
17  colposuspension; is that what you're saying?
18      A.    For as long a duration.
19      Q.    Is it important to follow and assess
20  dyspareunia with the Burch colposuspension out to
21  10 years?
22      A.    It would be an interesting fact.
23  However, again, there's no permanent devices
24  placed in a woman.  So I am more concerned about
25  the shorter term, five years, those type things.

19 (Pages 70 to 73)

Daniel Steven Elliott, M.D.

1    But even that, the suture's absorbed.  It's healed
2    up.  So really you can't compare TVT mesh, or any
3    mesh for that matter, and the Burch or autologous
4    fascia for that matter.
5        Q.    There's scarring when you do a Burch
6    colposuspension; correct?
7        A.    Yes.  By six weeks it's healed up.
8        Q.    And it's not important to assess
9    whether there's any painful scarring in a Burch?
10       A.    Absolutely there is, but the duration
11   of the follow-up, the perioperative morbidity is
12   extremely important.  But after you've done the
13   surgery, and there's healing that's happened,
14   which 98 percent happens at six weeks, one, two,
15   five-year data is important to look at.  But it's
16   not as important because you don't have the
17   progressive scarring, et cetera, that you see with
18   the polypropylenes.
19       Q.    How would one go about assessing the
20   lifelong -- give me a second.
21            Can I see the exhibits.  1, 2, 3.  You
22   can hold on to this one.  The Burch study we
23   marked a minute ago.
24       A.    Oh, I'm sorry.  I took that back.
25   There you go.

1        Q.    Okay.  That way she has it.
2        A.    Okay.
3        Q.    You have 5 over there?
4        A.    Oh, I'm sorry.  I'm taking those.
5        Q.    That's okay.
6            All right.  You can hold on to that
7    one.  I still have some questions.
8            How would one go about conducting a
9    lifelong study on the Burch colposuspension?
10       A.    A registry would be mandatory where
11   these individuals are followed.  And you can't
12   have a 30 or 40 or 50 percent fallout rate.  And
13   they have to be monitored on a yearly basis until
14   death.  And then the true complication rate in
15   those highly experienced surgeons' hands would
16   then be known.
17       Q.    And a registry being mandatory
18   monitored yearly until a woman's death has never
19   been performed for the autologous pubovaginal
20   sling; correct?
21       A.    Again, for the same mentioned -- as
22   the reasons I mentioned for the Burch.  There's no
23   permanent implantable device placed in that woman.
24   So the perioperative morbidity is very important,
25   but it has not been done for the pubovaginal

1    sling, as you described.
2            MR. SNELL:  Move to strike everything
3    before "it has not been done."
4        Q.    BY MR. SNELL:  A registry being
5    mandatory with monitoring yearly until the death
6    of all women has never been performed for the
7    Burch colposuspension; correct?
8        A.    As I've mentioned already, because
9    there's no permanent device implanted in the
10   woman, it is not necessary, but to answer your
11   question, yes.
12           MR. SNELL:  Move to strike everything
13   before "to answer your question, yes" as
14   nonresponsive.
15       Q.    BY MR. SNELL:  For any stress urinary
16   incontinence surgery that's ever been performed
17   that you are aware of, has there ever been a
18   registry conducted that was mandatory until
19   monitored every woman yearly until her death?
20       A.    Unfortunately, no.  And that's why
21   we're in the situation we're in now.
22       Q.    Looking back at the Cochrane Review
23   you cited in your expert report --
24       A.    Yes, sir.
25       Q.    -- it says in the next paragraph, "A

1    retropubic bottom-to-top route was more effective
2    than top-to-bottom route for subjective cure."
3            Do you see that?
4        A.    That is what is stated, yes.
5        Q.    And the TVT is the retropubic
6    bottom-to-top route; correct?
7        A.    As far as I know, that is the only
8    bottom -- with the understanding -- let me back
9    up.
10           With the understanding that from my
11   understanding at this point right now, TVT is the
12   only one on the market bottom-up.  So I don't know
13   if there's another one on the market.
14       Q.    You have looked at the -- you looked
15   at the entire Cochrane Review from 4/2015 over --
16   I think it's over 200 pages?
17       A.    Very long document, yes.
18       Q.    Right.  Right.  Right.  And you saw
19   that the retropubic bottom-to-top studies were
20   studies that assessed the TVT retropubic device;
21   correct?
22       A.    I don't recall that.  Again, I have no
23   reason to doubt that.  I'm just saying, there are
24   a lot of companies that used to make slings,
25   Boston Scientific, Bard, et cetera.  I just don't

Daniel Steven Elliott, M.D.

Page 78

1  know of another one.  If that study says there's
2  only one bottom-up and it's the TVT, I can't
3  disagree with that.  I just don't know right now.
4      Q.   You certainly know that the TVT
5  retropubic device has been studied in more
6  randomized control trials than any other stress
7  urinary incontinence surgical device; correct?
8          MR. CARTMELL:  Object to the form.
9      A.   I have -- I have heard a lot of facts
10  like that.  I have never independently verified
11  that to be true, but I don't doubt its existence.
12     Q.   BY MR. SNELL:  It says the retropubic
13  bottom-to-top route also "incurred significantly
14  less voiding dysfunction and led to fewer bladder
15  perforations and vaginal tape erosions"; correct?
16     A.   That is what they state, yes.
17     Q.   And those would be benefits of using a
18  retropubic bottom-to-top route like the TVT
19  retropubic employs as compared to a top-to-bottom
20  route; correct?
21         MR. CARTMELL:  Object to the form.
22     A.   Well, correct except that Ethicon
23  makes a TVT-AA, which is top-to-bottom.  So based
24  upon what they're saying here, TVT-AA would be
25  included in the top-to-bottom.  So this would be

Page 79

1  very worrisome that perhaps that TVT product
2  employed in that fashion is actually more
3  dangerous.
4      Q.   BY MR. SNELL:  Have you ever assessed
5  the literature on the TVT-AA device?
6      A.   There's limited data out there.
7      Q.   But have you assessed it?
8      A.   Yes, I have assessed it, and there's
9  limited data on it.
10     Q.   And how does the voiding rates compare
11  between the TVT retropubic and then the top-down
12  TVT?
13     A.   The data overall with all sling
14  products is very poor.  With TVT-AA it's even
15  worse.  So I don't know.  I cannot quote you a
16  study looking at that, but I'm just saying the
17  Cochrane analysis possibly raises the issue of a
18  TVT-AA.
19     Q.   As you sit here today, you don't know,
20  though whether the TVT-AA was assessed in
21  top-to-bottom in the Cochrane Review?
22     A.   That's what I'm saying.
23     Q.   Do you know whether the Supris was
24  assessed in this Cochrane Review?
25     A.   I don't know.

Page 80

1      Q.   It wouldn't surprise you to learn that
2  there were no randomized control trials on the
3  Supris; correct?
4      A.   As I stated earlier, I was unaware of
5  any, and hence the reason why sling data is bad.
6  Or poor quality, let's put it that way.
7      Q.   Have you conducted an analysis of the
8  literature regarding slings to see whether any of
9  the other manufacturers' polypropylene slings have
10  been subjected to more randomized control trials
11  than the Ethicon TVT retropubic device?
12     A.   I have not done any independent
13  research on that.
14     Q.   Have you done any PubMed searches to
15  assess how many hundreds or thousands of studies
16  there are on the TVT retropubic?  And when I say
17  TVT -- strike that.
18         When I say studies, I'm not limiting
19  it just to randomized control trials.
20     A.   I understand.
21     Q.   I mean cohort studies, studies that
22  would comport with the level of evidence pyramid,
23  levels 2 and 3 that you identified.
24         MR. CARTMELL:  Object to the form.
25     A.   My methodology that I use when I

Page 81

1  approach any of these projects is going to involve
2  multiple different facets, but one of them is
3  using the PubMed search engine, which is -- as far
4  as I know, the largest search engine available,
5  funded by the NIH.  And when I search just TVT,
6  only TVT, it comes up with about 1300 papers.  But
7  that's going to be TVT-Secur, TVT-AA, TVT -- all
8  the TVTs.
9      Q.   BY MR. SNELL:  Did you do any other
10  search string modifiers like "tension-free vaginal
11  tape"?
12     A.   I don't recall that --
13     Q.   TVT retropubic?
14     A.   I don't -- well, TVT is going to
15  capture all TVTs.  Tension-free vaginal tape -- I
16  don't recall if I used that, I may have.  But I
17  searched multiple different factors looking at,
18  you know, mesh complications associated with those
19  things.
20     Q.   How many studies on TVT did you locate
21  on PubMed?
22     A.   I found roughly 1300 on all TVT
23  products, the entire product line.
24         On just TVT retropubic or TVT classic,
25  I can't give you a number.

21 (Pages 78 to 81)

Daniel Steven Elliott, M.D.

Page 82

1       Q.   Okay.  How would the TVT retropubic
2   have less voiding dysfunction than a top-to-bottom
3   device like the Sparc that you used?
4       A.   With my training in neurophysiology,
5   neuroanatomy and bladder dysfunction, it does not
6   make any intuitive sense what that difference would
7   be.  You're passing a trochar up -- from bottom up
8   or top down, you should be -- there's -- the
9   voiding dysfunction should be identical.
10          There's going to be variables, such as
11  the mesh, the experience of the surgeon, the
12  amount of tension placed on it, the patient
13  factors in there.  That's where the Cochrane
14  analysis -- we don't know; were the patients
15  morbidly obese; were they diabetics; their
16  previously existing bladder dysfunction.  All
17  those factors I don't know.
18      Q.   So I guess the answer to my question
19  then would be, you do not know how there would be
20  less voiding dysfunction seen with the TVT
21  retropubic as compared to a top-to-bottom device
22  like the Sparc; correct?
23          MR. CARTMELL:  Object to the form.
24  Asked and answered.
25      A.   Well, the statement, quote/unquote, I

Page 83

1   don't know, implies I haven't thought about it.
2   I've thought a lot about it.  It does not -- I
3   cannot come up, to answer your question, with a
4   logical explanation why that's occurring.  There's
5   a variable we don't know.  Is it poor quality
6   studies?  Patient variables?  Those issues.  As I
7   mentioned earlier in the previous question.
8       Q.   Okay.  How is it that the TVT
9   retropubic would have less vaginal tape erosions
10  than a top-to-bottom route, such as the Sparc that
11  you use?
12      A.   Well, I do not use the Sparc and
13  haven't used it for 10 years or so.  Or less than
14  that.  Excuse me.
15          But, again, we have to include in
16  there -- unless you can show me in the Cochrane
17  study does not include the TVT-AA, that there can
18  be some of the Ethicon product in there.
19          But to answer your question, it does
20  not make logical sense, based upon the anatomical
21  approach, to have more or less or vaginal
22  extrusions.  That's why there's going to be some
23  of a variable in there that we don't know in these
24  studies.
25      Q.   What was the size of the vaginal

Page 84

1   incision you did when you used the Sparc?
2       A.   Be 1 to 1.5 centimeters.
3       Q.   And what was the other top-to-bottom
4   device you used?
5       A.   The Supris.
6       Q.   Supris.  What was the size of the
7   vaginal incision you used with the Supris?
8       A.   Same thing.  1 to 1.5 centimeters,
9   mid-urethral.
10      Q.   And did you do blind passage of the
11  trochars with any of those devices?
12      A.   Correct.  With the Supris and the
13  Sparc, that is the identical length of blind
14  passage as with the TVT.
15      Q.   And did you do blind passage with any
16  of the transobturator slings you performed?
17      A.   Yes.  But it's a degree -- significant
18  degree less, because you have your finger in the
19  obturator foramen.  So you're passing that around
20  the obturator foramen, which is about
21  1 centimeter, but that would be blind.
22      Q.   All right.  You would use your finger
23  and that's known as haptic or tactile feedback;
24  correct?
25      A.   I suppose.  It is tactile.  It's

Page 85

1   feedback.  Yes, you're right.
2       Q.   And that's commonly done in pelvic
3   surgery?
4       A.   Pelvic surgery does a lot of surgery
5   by proprioception.  Yes, by feel.
6       Q.   And for the autologous transobturator
7   pubovaginal sling, part of that procedure is
8   blind; correct?
9       A.   No.  I disagree with that because when
10  you do a different dissection, you dissect through
11  the endopelvic fascia bilaterally.  You dissect
12  along the pubic bone up to the rectus muscle.
13  Then you're able to palpate from your incision in
14  the abdomen, feel right where your finger is.  So
15  you pass it through the rectus muscle and then on
16  to your finger.  So there's no blind passage of 5
17  to 10 centimeters like with the Sparc or the TVT.
18      Q.   But there is a blind package in that
19  procedure.  It's just shorter; correct?
20      A.   A significant -- well, no, there's no
21  organs that can get away.  That's why there's no
22  bladder perforation, or extremely rare.  In my
23  experience, I've never perforated the bladder with
24  it.  Where I had a 10 percent Sparc bladder
25  perforation.  And you're passing it right onto

22 (Pages 82 to 85)

Daniel Steven Elliott, M.D.

Page 86

1    your finger. So there's -- you know, we can
2    splice and say, yes, there is some blind passage,
3    but it's right onto your finger. So you're
4    passing it through the rectus muscle. So you're
5    talking a centimeter.
6        Q.   In the autologous pubovaginal sling
7    placement there's blind passage performed;
8    correct?
9        A.   I've already answered that. That's
10   what I just stated.
11       Q.   I'm not talking about the
12   transobturator.
13       A.   Oh, I'm sorry. You said
14   transobturator?
15       Q.   In the autologous pubovaginal sling
16   that you do.
17       A.   Isn't that what I just answered
18   already?
19           Okay. I mean, that's the same answer
20   as what I just stated. That your finger's right
21   up there against the rectus muscle. The needle
22   goes right through the rectus muscle onto your
23   finger. So there's no blind passage, like the 5
24   to 10 centimeters like with the TVT or the Sparc.
25       Q.   I may have got confused or maybe you

Page 87

1    didn't hear my earlier question right.
2            For the autologous transobturator
3    pubovaginal sling, that was my initial set of
4    questions.
5            Those involve blind passage; correct?
6        A.   That would be the same -- actually,
7    less than with the mesh slings because we dissect
8    deeper right underneath the muscle. So the same
9    answer would be for the abdomen as with this.
10   We're passing it through the obturator foramen
11   onto your finger. So it has no chance of getting
12   into the bladder. So if you want to define that
13   as blind, I'll give that to you, but it's a --
14   it's a safe passage. It's right on your finger.
15   I'm sorry. I misunderstood your first question.
16           MR. SNELL: It's okay. Let's take a
17   break. We've been going for a bit. I want to use
18   the restroom, if that's okay.
19           MR. CARTMELL: Sure.
20           (Recessed from 11:22 a.m. to
21           11:41 a.m.)
22       Q.   BY MR. SNELL: Back on the record.
23           Two of the studies you mentioned in
24   addition to this study by Langer, L-a-n-g-e-r,
25   were studied by Herbertsson, which is reference 8

Page 88

1    in the Langer paper; correct?
2        A.   Correct.
3        Q.   And then the Kjoehede. And I'm not
4    sure if I'm pronouncing that correct.
5            Do you know if that's right?
6        A.   Yeah. My Swedish is not very good.
7    But that would be reference number 9.
8        Q.   Okay.
9        A.   Correct.
10       Q.   And do you know what percent of the
11   women were dry in follow-up in the Kjoehede study?
12       A.   I do not. I'd have to look at the
13   study.
14       Q.   Do you know what percentage of the
15   women were dry in follow-up of the Herbertsson
16   study?
17       A.   No, I'd have to look at the study.
18       Q.   And I think that's spelled can
19   H-e-r-b-e-r-t-s-s-o-n, published in Acta, A-c-t-a,
20   Obstet Gynecol Scand, 1993, volume 72, pages 298
21   to 301.
22           Correct?
23       A.   That is correct, yes.
24       Q.   And looking back at the Cochrane
25   Review that we were discussing, under the author's

Page 89

1    conclusions.
2        A.   Yes, sir. Sorry.
3        Q.   You have it there?
4        A.   Yes, I do. I have both. I have my
5    copies and then your copy.
6        Q.   Great. For the record, can we mark
7    your copy, too, then?
8        A.   Sure.
9        Q.   Just so I can look at it at some
10   point.
11           (Exhibit 7 marked.)
12       Q.   BY MR. SNELL: So Exhibit 7 is your
13   copy of this Cochrane Review by Ford, et al. we've
14   been discussing?
15       A.   That is correct. This is the abstract
16   off of PubMed.
17       Q.   Okay. And under the author's
18   conclusions, it says, "mid-urethral-urethral sling
19   operations have been the most extensively
20   researched surgical treatment for stress urinary
21   incontinence."
22           You see that?
23       A.   Yes, I do.
24       Q.   And you will agree with that; correct?
25           MR. CARTMELL: Object to the form.

23 (Pages 86 to 89)

Daniel Steven Elliott, M.D.

Page 90

1      A.   Again, I have no reason to doubt it.
2  But I've not done independent research on that
3  knowledge.
4      Q.   BY MR. SNELL:  Okay.  And also it
5  says, "and have a good safety profile."
6          You would agree with that; correct?
7          MR. CARTMELL:  Object to the form.
8      A.   That statement needs to be taken in
9  the entirety of the paragraph, where they say
10 longer term studies are needed.  But that is what
11 they state.
12     Q.   BY MR. SNELL:  And you agree with
13 that; correct?
14         MR. CARTMELL:  Object to the form.
15 You just asked him the question.  And he answered
16 it.
17     A.   I agree that's what they state.  And
18 then it has to be looked at in the entirety of the
19 paragraph where they say longer studies are
20 needed.
21     Q.   BY MR. SNELL:  And my question to you
22 is:  You agree with that conclusion; correct?
23         MR. CARTMELL:  Object to the form.
24 Asked and answered.
25     A.   I disagree with the conclusion because

Page 91

1  longer studies have not been done.
2      Q.   BY MR. SNELL:  Well, you agree that
3  mid-urethral sling operations have a good safety
4  profile with the caveat that you would like to see
5  more long-term studies done; correct?
6          MR. CARTMELL:  Object to the form.
7  That misstates his testimony.  And I'm not going
8  to let you do this thing where you do -- you ask
9  four different times the same question, like we
10 did the last time.
11         MR. SNELL:  That's fine.
12         MR. CARTMELL:  He's asked -- don't
13 answer that.  You've answered it three times.
14         MR. SNELL:  No, he hasn't.  No, he
15 hasn't.
16         MR. CARTMELL:  Yes, he has.
17         MR. SNELL:  No.
18         MR. CARTMELL:  He answered your
19 question.  You asked if he agreed with the
20 conclusion.  He said no.
21         MR. SNELL:  You're wrong, Tom.  He
22 said not because of the caveat that it needs more
23 long-term study.  So there's my follow-up
24 question, Tom.  You're playing games with me.
25         MR. CARTMELL:  No, I'm not.

Page 92

1          MR. SNELL:  Stop it.  Knock it off,
2  Tom.
3          MR. CARTMELL:  No, I'm not.
4          MR. SNELL:  Knock it off, Tom.
5          MR. CARTMELL:  He answered your
6  question no.
7          MR. SNELL:  No.
8          MR. CARTMELL:  And I'm not going to
9  let you do this again.  We're not going to sit in
10 here for seven hours where you ask the same
11 question five times because you don't like his
12 answer.
13         MR. SNELL:  It's not about whether I
14 like his answer.
15         MR. CARTMELL:  He told you he
16 disagrees with the conclusion.  So move on.
17         MR. SNELL:  No, he didn't.  You're
18 misstating, Tom.
19         MR. CARTMELL:  Tell him again.
20         MR. SNELL:  You're giving speaking
21 objections on the record.
22         MR. CARTMELL:  We're going to do this
23 once.
24         MR. SNELL:  This is my question.
25         MR. CARTMELL:  We're not going to do

Page 93

1  it again.
2          MR. SNELL:  Just knock it off.  This
3  is my question.  You're wasting your time.  This is
4  your time you're burning here, not mine.
5      Q.   BY MR. SNELL:  You would agree
6  mid-urethral sling have a good safety profile with
7  the caveat that you, Dr. Elliott, would like to
8  see more long-term data on those procedures;
9  correct?
10         MR. CARTMELL:  Object to the form.  It
11 misstates his testimony.  He's already answered
12 it.
13     A.   I disagree with that.
14     Q.   BY MR. SNELL:  Very well.  Would you
15 like to see more long-term data on the autologous
16 pubovaginal sling?
17     A.   Long-term studies are always going to
18 be important.  However, when we're talking about
19 safety and complications, it's comparing apples to
20 oranges because there is no medical device placed
21 in those patients that's permanent.
22     Q.   Can you answer it yes or no?
23         Would you like to see more long-term
24 data on the autologous pubovaginal sling?
25         MR. CARTMELL:  Objection.

24 (Pages 90 to 93)

Daniel Steven Elliott, M.D.

Page 94

1    Q.   BY MR. SNELL:  A procedure that you
2  perform.
3        MR. CARTMELL:  Objection.  Asked and
4  answered.
5    A.   I don't necessarily know if it is
6  actually needed.  On efficacy, I would agree with
7  you.  On safety, I disagree.
8    Q.   BY MR. SNELL:  This paper you gave me
9  by Langer on the Burch says that more longer term
10  studies are needed on the Burch because of safety;
11  doesn't it?
12    A.   I'd have to look at the study.
13    Q.   Here.  How about we look at the very
14  last sentence.  "The most significant
15  complications are de novo detrusor instability
16  (16.6 percent) and anatomical defects
17  (18.9 percent), half of which appeared only 5
18  years postoperatively, stressing the need for
19  long-term follow-up."
20    A.   I never denied --
21    Q.   Did I read that correctly?
22    A.   I have no reason to doubt that you --
23  that's the editorial comment.  You said the
24  author's conclusion.  So you read the editorial
25  comment.  I have it highlighted there.

Page 95

1    Q.   That's not what I read.  I read this.
2    A.   Okay.  Now, number one, you didn't
3  show this what you were reading so I don't know
4  what you're reading.  I go down here, and they say
5  longer term studies.
6    Q.   I'm not reading your highlights.  I'm
7  reading what I stated.
8    A.   Okay.  That's what the author states.
9  I'm not disagreeing with that at all.
10    Q.   So there is long-term follow-up needed
11  on the Burch to assess safety considerations;
12  correct?
13        MR. CARTMELL:  Objection.  Asked and
14  answered.
15    A.   They never say safety.  They're
16  talking about de novo instability and anatomical
17  defects, which anatomical defects can occur in any
18  woman with any type of -- as long as they have a
19  vagina there could be prolapse happening.  They're
20  not talking safety.  They're talking contraction,
21  roping, those type of things.
22    Q.   BY MR. SNELL:  They're talking safety;
23  aren't they?
24    A.   They're talking de novo instability.
25  Okay.  That's new afterwards.  Anatomical defects,

Page 96

1  which can occur, but it's not an issue of safety.
2    Q.   Those authors categorized those two
3  issues as complications; didn't they?
4    A.   They record them as complications;
5  that's correct.
6    Q.   Back to the Cochrane Review that you
7  cite in your report.  It says that "The
8  mid-urethral sling-urethral slings are highly
9  effective in the short and medium term, and
10  accruing evidence demonstrates their effectiveness
11  in the long-term; correct?
12    A.   That's what they state, yes.
13    Q.   And you would agree with this paper
14  you cited in your report that mid-urethral slings
15  are highly effective in the short and medium term?
16        MR. CARTMELL:  Object to the form.
17    A.   I will never say that the -- I will
18  not -- I agree with you as far as effectiveness.
19  I'm never going to be challenging the
20  effectiveness of the TVT as far as causing -- or
21  in treating urinary incontinence.  The question is
22  always going to be at what cost.
23    Q.   BY MR. SNELL:  We can agree that the
24  TVT retropubic device is effective in the
25  treatment of stress urinary incontinence in women?

Page 97

1        MR. CARTMELL:  Object to the form.
2    A.   Correct.  With the caveat, at what
3  cost.
4    Q.   BY MR. SNELL:  All right.  There is no
5  stress urinary incontinence surgery that is
6  performed in women that is more effective than the
7  TVT retropubic; correct?
8        MR. CARTMELL:  Object to the form.
9    A.   More effective?  I would have to look
10  at all the literature out there on pubovaginal
11  slings, including the Burch.  I would say it's
12  safe to say that the TVT, as far as efficacy, on
13  the average, is going to be -- specifically
14  dealing with stress urinary incontinence
15  recurrence, is going to be as efficacious as
16  pubovaginal and Burch, in properly trained hands.
17    Q.   BY MR. SNELL:  And you've seen a
18  conclusion very similar to that which you stated
19  about TVT being efficacious in the treatment of
20  stress urinary incontinence, as compared to
21  pubovaginal slings and the Burch in the
22  Ogah/Cochrane Review; correct?
23    A.   That's correct.  Yeah.
24    Q.   That's a paper --
25    A.   They state that that -- yeah.

25 (Pages 94 to 97)

Daniel Steven Elliott, M.D.

1    Q.   That's a paper you reviewed; correct?
2    A.   Correct. Yes.
3    Q.   You didn't cite the Ogah review in
4  your report. Why not?
5    A.   Because I stayed the Ford one, which
6  is an update. So I'm not going to go back to
7  Ogah. I'm going to go to the most updated
8  literature.
9    Q.   Ogah compared TVT to the Burch and
10 pubovaginal slings, though?
11   A.   Okay.
12   Q.   You're aware of that; right?
13   A.   Yeah.
14   Q.   Any reason you didn't cite that
15 comparative data by Cochrane?
16   A.   Because that's going to be a Cochrane
17 analysis of compiling a meta-analysis, so to
18 speak.
19   Q.   Okay.
20   A.   So using my methodology there's going
21 to be some papers that are not going to included
22 and others are going to be included.
23   Q.   You would agree that there's accruing
24 evidence that -- demonstrating the efficacy of TVT
25 retropubic in the long-term?

1    MR. CARTMELL:  Object to the form.
2  Are you talking just efficacy?
3    A.   Well, again, I'd have to see what
4  you're talking about as far as which papers you're
5  referring to. But since the product has been in a
6  long time, naturally there's going to be longer --
7  or hopefully there's going to be longer term
8  studies.
9    Q.   BY MR. SNELL:  You're aware there are
10 several studies that have a duration of follow-up
11 of seven years or more with the TVT retropubic
12 device?
13   A.   Correct.
14   Q.   I'm not talking about other
15 manufacturers' devices.
16   A.   Yes. There are studies out there,
17 yes.
18   Q.   Due to your -- let me back up.
19      I don't know if I asked you this
20 question. If I did, I apologize.
21      You and I can agree that with regard
22 to long-term studies following up on a
23 mid-urethral sling that the original TVT
24 retropubic has the most long-term data of any of
25 those devices?

1    A.   You'd have to show me that study.
2    Q.   Well, it's not just one study. I'm
3  just saying from your general awareness, are you
4  aware that for the original TVT retropubic device
5  it has the largest volume of longer term data
6  compared to other manufacturers' stress
7  incontinence mid-urethral sling devices?
8    A.   I think that's probably a fair
9  statement, yes.
10   Q.   Have you assessed the literature to
11 ascertain how many studies with 10 years follow-up
12 or more exist on the TVT retropubic device?
13   A.   Have I -- I'm sorry. I'm not really
14 following your question.
15      Have I assessed how many 10-year
16 studies there are?
17   Q.   10-year or more. Yes, sir.
18   A.   I looked at the literature. I
19 reviewed it. There are studies out there. I
20 can't give you a number, though.
21   Q.   Are you aware if studies that look at
22 10 years duration or more specific to the TVT
23 retropubic device assess safety issues, such as
24 mesh exposure or dyspareunia?
25   A.   I am unaware of any study that the

1  primary end point is on safety with the TVT.
2  There can be a paper here and there with large
3  amounts of follow-up -- with large amounts of lost
4  follow-up that can refer to an erosion or
5  exposure.
6    Q.   So you are aware that in the longer
7  term studies with TVT they do assess safety?
8    A.   You'd have to show me those studies.
9  I'm sorry. Because I have to look at those
10 studies very carefully. As I mentioned, I am not
11 aware of any with the primary end point being on
12 safety.
13   Q.   I didn't ask you about primary end
14 point. I asked you about assessing safety, okay?
15      Are you aware of TVT retropubic device
16 studies looking at it long-term that assess
17 safety?
18      MR. CARTMELL:  Object to the form.
19 It's vague and ambiguous as to what you mean by
20 assess.
21   A.   There can be random --
22   Q.   BY MR. SNELL:  They look on and report
23 about whether there were mesh erosions, mesh
24 exposures, dyspareunia, detrusor instability.
25      Are you aware of that?

26 (Pages 98 to 101)

Daniel Steven Elliott, M.D.

Page 102

1    A.   They can mention -- there are studies
2  out there that mention those various different
3  facts.  They also, you know, very rarely talk
4  about contraction because it's not -- those
5  patients aren't examine.  They're telephone
6  follow-ups.  So, again, I'd have to look at those
7  specific studies and we can analyze that.  I'm all
8  for that.  But otherwise you're talking somewhat
9  vague for me.
10    Q.   What studies, long-term studies on TVT
11  are you referencing where patients were not
12  assessed?
13    A.   Well, no.  I'm saying that we'd have
14  to pull out a study and look at it, how many of
15  those patients came back and had a physical exam.
16  How many of them did quality of life surveys.  How
17  many of them did global bother index.  And those
18  studies are very few.  Hence, the reason why all
19  these different societies, the AUA, for example,
20  keep talking about moderate to low quality of
21  studies.
22         MR. SNELL:  Move to strike as
23  nonresponsive.
24    Q.   BY MR. SNELL:  Admit your primary end
25  point on safety.

Page 103

1         How many Burch or pubovaginal sling
2  studies are you aware of that have long-term
3  follow-up that have a primary end point of safety?
4    A.   And you -- with -- oh, Burch or
5  pubovaginal.
6         I'm aware of pubovaginal because
7  that's the procedure I'm doing.  So I'm going to
8  be more focused on that.  That have 8 to 10-year
9  follow-up where global bother index and distress
10  inventories have been obtained.
11    Q.   Right.  But how many of those had a
12  primary end point of safety?
13    A.   It was part of the study.  It was not
14  the primary end point.
15    Q.   Just like the TVT studies; right?  It
16  was part of the study?
17         MR. CARTMELL:  Object to the form.
18    A.   Incorrect.  As I've mentioned before,
19  pubovaginal slings and Burch are not a permanent
20  medical device that's implanted in a woman.
21  Therefore, the bar is changed for the pubovaginal
22  and Burch, okay.
23         But to answer your question, I am
24  aware -- I am not aware of any primary end point
25  on safety with those other ones.  But, again,

Page 104

1  we're comparing apples to oranges.
2         MR. SNELL:  Move to strike everything
3  before "But to answer your question."
4    Q.   BY MR. SNELL:  On the Cochrane Review
5  that you cite in your report, the last page they
6  say, referencing mid-urethral sling operations,
7  are suitable for women who have -- who are having
8  their first operation to prevent incontinence and
9  also women who have had unsuccessful surgery
10  previously.
11    A.   I'm sorry.  I don't know where you
12  are.
13    Q.   Back --
14    A.   You're in the Author's conclusions?
15    Q.   Background information.
16    A.   Oh, Background.
17    Q.   It's the next page, if you flip it
18  over.  Are you with me now?
19    A.   Yeah.  Which paragraph are you on on
20  Background?
21    Q.   Second paragraph.
22    A.   Second paragraph starting with, "Over
23  the years"?
24    Q.   Second sentence.
25    A.   It starts, "Over the years"?

Page 105

1    Q.   Yes.
2    A.   And second sentence, "These operations
3  are suitable for women...."
4         Okay.  Yes, I see that statement.
5  Yes.
6    Q.   Would you agree that the TVT
7  retropubic device is suitable for women who are
8  having their first operation to prevent
9  incontinence?
10    A.   I disagree strongly with that unless
11  the caveat is that the woman and the physician
12  have been fully warned of all the complications
13  known.
14    Q.   A little bit further down, we were
15  talking about long-term studies.  And they talk
16  about the main findings of this review.
17    A.   Under Author's conclusions?
18    Q.   Right here.  We were here.
19    A.   Yeah.
20    Q.   So Main findings.
21    A.   Yes, sir.
22    Q.   So under the Main findings of the
23  review, they stated that the trial showed over
24  80 percent of women with stress urinary
25  incontinence are cured or have significant

27 (Pages 102 to 105)

Daniel Steven Elliott, M.D.

Page 106

1 improvement in their symptoms with either
2 operation for up to five years after surgery.
3 A. Yes, I see that statement.
4 Q. Is that an accurate statement?
5 A. That is the findings of their studies.
6 Q. Do you --
7 A. And I have never -- and as you look at
8 my expert report, ever challenged TVT's efficacy.
9 That's not an issue with me. It's at what cost.
10 Q. At the end of that paragraph it says,
11 "The evidence that we have been able to assess
12 indicates that the positive effects persist."
13 Do you see that?
14 A. Yes, I see it.
15 Q. You did not challenge that statement
16 either; correct?
17 MR. CARTMELL: Object to the form.
18 A. The evidence that they're saying is
19 they're talking about the durability of the
20 treatment for stress urinary incontinence. As I
21 mentioned, I'm not challenging that. The question
22 is at what cost.
23 Q. BY MR. SNELL: Yeah. We can agree TVT
24 retropubic -- that that device has durability for
25 treating stress urinary incontinence in women?

Page 107

1 A. Yes, I believe that the data, in my
2 clinical experience, would agree with that
3 statement.
4 Q. And that is a utility of the TVT
5 retropubic device; correct?
6 MR. CARTMELL: Object to the form.
7 It's vague and ambiguous with respect to what you
8 mean by "utility."
9 A. The device is designed specifically to
10 treat female stress urinary incontinence.
11 Q. BY MR. SNELL: Okay.
12 A. And so to answer your question then,
13 it has durable results in the long-term, but the
14 question is at what cost.
15 Q. Okay. The TVT retropubic device is
16 useful in treating female stress urinary
17 incontinence; correct?
18 MR. CARTMELL: Object to the form.
19 It's vague and ambiguous with respect to what you
20 mean by "useful."
21 A. It has been shown to be efficacious.
22 The question is at what cost.
23 Q. BY MR. SNELL: In this study -- strike
24 that.
25 In this Cochrane Review you cite, they

Page 108

1 also talk about main findings pertaining to
2 adverse effects; correct?
3 A. Correct.
4 Q. And it says, "Tapes passing behind the
5 pubic bone (retropubic) seem to carry a greater
6 risk of injuring the bladder"; correct?
7 A. Oh, that is correct.
8 Q. All right. And that's been reported
9 in the literature; correct?
10 A. Yes. And that's pertaining to either
11 bottom-up, top-down.
12 Q. But even for the TVT retropubic, going
13 bottom-up, it's been known that there's a risk of
14 hitting the bladder with the trochars. That's why
15 a cystoscopy is done; correct?
16 A. That is correct. And the big question
17 then becomes the ramifications of that
18 perforation, long-term erosions and those
19 things -- erosions and extrusions, yes.
20 Q. When you did your top-down passage
21 with the mid-urethral sling, I take it you also
22 did cystoscopies as well?
23 A. Always, yes.
24 Q. I know the AUA recommends cystoscopies
25 for all incontinence procedures, surgeries, as I

Page 109

1 understand it.
2 Is that consistent with your
3 understanding, based upon their updated stress
4 incontinence guidelines published by Dmochowski,
5 et al.?
6 A. Dmochowski. Yeah. I don't even know
7 how to spell his name, but I know how to say it.
8 It's no problem.
9 I'd have to look at the specific
10 guidelines. For retropubic procedures, whether
11 they're top-up, bottom-down, mandatory cystoscopy.
12 Transobturator tends to be -- they say
13 they suggest it's strongly supported, but it can
14 be at the discretion of the treating physician.
15 Q. Do you do any cystoscopy when you do
16 any transobturator procedures?
17 A. I do not, no.
18 Q. You don't?
19 A. No.
20 Q. Why is that?
21 A. Because in having done 400, 500 or
22 more of those, I've never once hit the bladder,
23 because I'm dissecting right onto my finger, and I
24 bring it right out. I don't use the helical
25 trochar. Now, I've seen and taken care of a lot

28 (Pages 106 to 109)

Daniel Steven Elliott, M.D.

Page 110

1    of patients with it, but I've never caused it.
2        Q.   Okay.  A little further down in that
3    paragraph in the Cochrane Review, under Adverse
4    effects, it says, "There is moderate quality
5    evidence that overall reported rates of
6    tape-related complications are low, such as
7    erosion of the tape into the vagina at about
8    2 percent for both routes of tape insertion."
9        Did I read that correctly?
10       A.   Yes, you did.
11       Q.   And do you agree with that?
12       A.   Disagree.
13       Q.   I didn't see in your expert report
14   where you identify what the rate of mesh exposure
15   was with the TVT device.
16       A.   That's because the true rate is not
17   known.
18       Q.   I didn't see where you reported any
19   rates of mesh exposure based on any studies for
20   the TVT retropubic device.
21           MR. CARTMELL:  Is that a question or
22   statement?
23       Q.   BY MR. SNELL:  Am I correct, Doctor?
24           MR. CARTMELL:  We'll stipulate that
25   that's not in there.

Page 111

1        A.   I don't believe and I don't recall
2    stating a specific number, no.
3        Q.   BY MR. SNELL:  And this Cochrane
4    Review you cite to in your report does say that
5    "The reported occurrence of problems with sexual
6    intercourse including pain was low"; correct?
7        A.   That's what they state, yes.
8        Q.   And you didn't acknowledge that point
9    in your report; did you?
10       A.   I talk about dyspareunia in there.
11       Q.   Did you acknowledge that the Cochrane
12   Review that you cite to states that problems with
13   sexual intercourse, including pain, were low in
14   your report?
15       A.   I don't recall using those specific
16   words, no.
17       Q.   Why not?
18       A.   Because, again, this is a
19   meta-analysis of poor quality or moderate quality
20   studies that do not focus on dyspareunia.  And
21   specifically they're short-term studies.  It does
22   not tell -- also, these are in the hands of
23   experts, high-volume surgeons.  Does not tell us
24   the rate of the true average surgeon out there,
25   which is known to be much higher.

Page 112

1        Q.   You say these studies are done by
2    expert high-volume surgeons.
3        First of all, how do you define an
4    expert high-volume surgeon?
5        A.   Well, Kuuva, et al., defined it as
6    anybody doing -- they said the learning curve on
7    the TVT is 15 or greater.
8        Okay.  So any -- most surgeons in the
9    United States, based upon people sitting for the
10   oral boards for urology, are doing 1 to 2 slings a
11   year.  Those people are not experts, but those are
12   the people putting in the majority of slings.
13       Okay.  Now, to answer your question,
14   how do we define an expert, it's going to be tough
15   to say, but they're going to be doing more than
16   that number.
17       Q.   Do you have a definition or a number
18   in your mind, when you keep mentioning expert
19   high-volume surgeons, what that is to you?
20       A.   It also -- because there's not a
21   specific answer to that because it depends upon
22   their level of training coming into the procedure
23   or did they do a fellowship.  Did they learn from
24   an expert.  Did they have Ulmsten or Nilsson come
25   in and teach them how to do it.  Those numbers are

Page 113

1    going to be different than an average person who
2    goes and has a three-hour Ethicon meeting and then
3    goes back out in the middle of nowhere USA and
4    puts them in.  For me, I would have to say if
5    they're not doing at least 25 or greater slings --
6    specific sling a year, they are going to possibly
7    be putting that patient at risk for complications.
8        Q.   Well, this study -- strike that.
9        This Cochrane Review included 81
10   trials.  So of all the investigators in all of
11   those 81 trials, how many of them performed at
12   least 25 or more TVT slings in a given year?
13           MR. CARTMELL:  Do you want him to look
14   at the underlying data and tell you that?
15           MR. SNELL:  I want him to answer my
16   question, Tom.
17           MR. CARTMELL:  Well, but you know --
18       A.   Let's get the Cochrane analysis out
19   and I'll look at that.
20           MR. CARTMELL:  Yeah.
21       Q.   BY MR. SNELL:  Well, did you bring it
22   here?
23       A.   No, I don't have that.
24       Q    BY MR. SNELL:  So you can't answer my
25   question?

29 (Pages 110 to 113)

Daniel Steven Elliott, M.D.

Page 114

1      A.   Well, no, but you brought up the
2  issue.  And so you have a question that I can't
3  answer based upon -- we have two pieces of paper,
4  81 studies.  That should be roughly, what, 150
5  pages of data.  I'd have to go through and look at
6  that.
7      Q.   So as you sit here today, you can't
8  answer that?
9      A.   I just answered -- I just already
10  answered that because you have not provided me
11  with the information I need.
12     Q.   I asked that you bring your file to
13  this deposition.  You didn't bring it.
14     A.   Because with this study --
15          MR. CARTMELL:  Wait.  For the record.
16  Let me just say this.  You have been provided his
17  reliance list that has every single document on it
18  he reviewed and relied on.  It has this
19  document that you only -- the full document.  You
20  only provided a summary document.  So if you
21  wanted to ask him questions about the full
22  document, you knew he reviewed it and relied on
23  it.  You could have brought it.
24          MR. SNELL:  Here's why, Tom, I'd like
25  him to bring his file.  The document he did

Page 115

1  produce has notes on every single page of the
2  studies.  So whatever I could pull off the
3  internet or elsewhere, will not be the version
4  that he has that has his notes on it.
5          MR. CARTMELL:  Okay.  Now, he didn't
6  have to provide you that today.  He brought it
7  with him today.  I mean all you -- the rules say
8  that we got to give you is the reliance list and
9  the materials.  And I've told you, I'll give you
10  the materials on a -- what do you call it?
11          MR. SNELL:  Thumb drive.
12          MR. CARTMELL:  Thumb drive.  But you
13  have it all.  You have it all.
14          MR. SNELL:  I would like those with
15  his notes on them.  Not your version of them.  I
16  want Dr. Elliott's file.
17          MR. CARTMELL:  He gave you a study
18  that has his notes on it.  I don't know what he
19  has that has notes on it or not, okay?  But the
20  bottom line is you have the reliance materials and
21  you know every single study and paper and internal
22  document he's relied on.
23          MR. SNELL:  I don't think I know that.
24          MR. CARTMELL:  Yes, you do.
25          MR. SNELL:  All right.  So move on.

Page 116

1          (Exhibit 8 marked.)
2      Q.   BY MR. SNELL:  So, Doctor, I've handed
3  you the American Urological Association's position
4  statement on the use of vaginal mesh for the
5  surgical treatment of stress urinary incontinence
6  from October 2013.
7          You're aware of this; correct?
8      A.   Yes.
9      Q.   And this is the same association
10  you're a member of; correct?
11     A.   Yes.
12     Q.   And the AUA says suburethral synthetic
13  polypropylene mesh sling placement is the most
14  common surgery currently performed for stress
15  urinary incontinence"; correct?
16     A.   Yes.
17     Q.   Do you know whether that statement is
18  accurate or not?
19     A.   I don't know if it's accurate or not.
20  I have no reason to doubt its validity, though.
21     Q.   I think you're familiar with the paper
22  by Chughtai, et al., that reports on the different
23  types of stress urinary incontinence surgeries
24  performed by urologists certifying or recertifying
25  for their boards that found the mid-urethral sling

Page 117

1  to be the dominantly used procedure?
2      A.   I recall the name of that study.  I
3  don't recall the data.  But, again, I have no
4  reason to doubt that it's the most common.  But I
5  have not done independent research to verify that.
6      Q.   Okay.  The AUA statement says,
7  "Extensive data exist to support the use of
8  synthetic polypropylene mesh suburethral slings
9  for the treatment of female SUI."
10     A.   That's what they state, yes.
11     Q.   And that's an accurate statement;
12  correct?
13          MR. CARTMELL:  Object to the form.
14     A.   No.  That's what they state.
15     Q.   BY MR. SNELL:  I know that's what they
16  state, but that is an accurate statement; correct?
17          MR. CARTMELL:  Well, is that a
18  statement by you, or are you asking him if he
19  agrees that's accurate?
20     Q.   BY MR. SNELL:  I'm asking you if you
21  agree that's accurate.  What I just read to you.
22          MR. CARTMELL:  Object to the form.  He
23  just answered that question.
24          MR. SNELL:  He said that's what they
25  say.  I know that.

Daniel Steven Elliott, M.D.

Page 118

1     A.   The document, as it says now,
2  Extensive data exist to support the use of
3  synthetic polypropylene mesh suburethral slings
4  for the treatment of SUI."
5         As we've stated before, it is
6  effective, along with pubovaginal slings and
7  Burch, to treat SUI.  So I agree with that.
8     Q    BY MR. SNELL:  Okay.
9     A.   Minimal morbidity compared to the
10 alternatives, I disagree with.  So I guess, I
11 can't --
12    Q.   Okay.
13    A.   It's a complicated or -- not a
14 compound sentence, whatever the -- multiple
15 aspects of t the sentence.
16    Q.   What Cochrane reviews or meta-analyses
17 or randomized control trials report that the TVT
18 retropubic has -- strike that.
19         When you say you disagree that the
20 mid-urethral sling have minimal morbidity compared
21 with alternative surgeries, why do you say that?
22    A.   Because there have been very few
23 randomized control trials, none which are
24 long-term, comparing head-to-head autologous
25 pubovaginal slings versus TVT.  The only one I can

Page 119

1  think of off the top of my head is Amaro, et al.,
2  from International Journal of Urology, I believe.
3     Q.   Do you agree that with regard to the
4  TVT retropubic as compared to the pubovaginal
5  sling and the Burch that it has an advantage,
6  including shorter operative time?
7     A.   It is shorter.  Whether that's an
8  advantage or not -- surgeons get too caught up in
9  doing something in, say, 15 minutes.  So it is
10 shorter.  I'll give that to you.
11    Q.   Okay.
12    A.   Is it an advantage?  That's debatable.
13    Q.   Okay.  Is it an advantage of the TVT
14 retropubic device that it can be done, if chosen,
15 locally, as compared to the Burch and the
16 pubovaginal slings?
17    A.   Well, that's a difficult question.  Is
18 that an advantage?  I suppose in some highly
19 select patients.  In all my years of doing this at
20 a high-volume tertiary center, I've never once had
21 to do a procedure under a local, as far as a
22 sling.  I mean, so that's a theoretical potential
23 advantage.
24    Q.   I'm not even going to ask you about
25 Burch.

Page 120

1         When you do the autologous pubovaginal
2  slings, you do general anesthesia?
3     A.   That is correct.  Or spinal.
4     Q.   Or spinal.  And that's because that's
5  a painful procedure when you have to harvest that
6  tissue from the lady; correct?
7     A.   No.  You don't want them moving during
8  the procedure.
9     Q.   It wouldn't be painful if that was
10 under local anesthesia?
11    A.   You could do it under local.  It's
12 been done under local.
13    Q.   Is the autologous pubovaginal sling
14 commonly done under local anesthesia?
15    A.   No, I would say it is not, no.
16    Q.   Why not?
17    A.   Just as I mentioned, patient's going
18 to be moving.  And you'd have to inject local
19 underneath the rectus fascia.  It could be done.
20 But for patient comfort, most patients don't want
21 to be awake for it.  You just don't do it that
22 way.
23    Q.   So when the AUA says, "Advantages
24 include, and they say anesthetic need, what do
25 they mean by that?

Page 121

1         MR. CARTMELL:  Object to the form.
2     A.   I suspect they're probably meaning
3  postop analgesia.
4     Q    BY MR. SNELL:  Is that a benefit of
5  the TVT retropubic compared to Burch and
6  pubovaginal sling?
7     A.   Well, the statement they say
8  "Advantages include shorter operative time and
9  anesthetic need."
10    Q.   Um-hum.
11    A.   Somewhat ambiguous.  I don't know if
12 they mean intraop or postop.  But if you're
13 looking just at the short-term, just at the time
14 of the perioperative period, that would
15 theoretically be an advantage.  But, again, it's
16 at what cost long-term.
17    Q.   When you say perioperative period,
18 what are you referring to?
19    A.   Meaning right before surgery, meaning
20 10 minutes before surgery, the surgery, and then
21 immediately postoperative.  Like the first few
22 weeks.
23    Q.   They also say, "Another advantage
24 would reduce surgical pain."
25         Do you agree that TVT retropubic has

31 (Pages 118 to 121)

Daniel Steven Elliott, M.D.

Page 122

1   reduced surgical pain, and that is an
2   advantage?
3        A.   Well, but, again, we have to go back
4   to the lack of studies.  Again, I'm always aware
5   of Amaro, et al., TVT randomized versus
6   pubovaginal.  In that study, hospital duration was
7   the same.  And so that is debatable.  But, again,
8   let's look at the short-term.  I got to look at
9   long-term.  As a surgeon, I got to look at
10  long-term, 10 years on down the road.  So I can
11  give that to you with the caveats I mentioned.
12       Q.   So in the short-term you'd agree TVT
13  retropubic has the potential for reduced surgical
14  pain versus the Burch or the autologous
15  pubovaginal sling?
16            MR. CARTMELL:  Object to the form.
17       A.   I agree, in the immediate
18  postoperative period, let's say within the
19  first -- define that as the first six weeks of
20  surgery --
21       Q   BY MR. SNELL:  Okay.
22       A.   -- especially the first week, I think
23  it's acceptable to say that the TVT would have
24  less perioperative pain than the Burch or the
25  pubovaginal sling.

Page 123

1        Q.   When you do your pubovaginal slings,
2   do you give your patients pain medicines?
3        A.   Yes.
4        Q.   Why?
5        A.   To reduce the perioperative pain.
6        Q.   How long do you give them pain
7   medications?
8        A.   We give them 10 to 15 tablets of a
9   narcotic, and they take it if they need it.  They
10  stop it if they don't.  So I don't know how long
11  they take it.
12       Q.   Do you agree that and advantage of the
13  TVT retropubic device is reduced hospitalization?
14       A.   Disagree.
15       Q.   Why is that?
16       A.   Based upon Amaro, et al., that
17  hospital duration was the same for the TVT and the
18  autologous pubovaginal sling.
19       Q.   Do you know of other TVT versus
20  autologous pubovaginal sling randomized control
21  trials?
22       A.   As I sit here right now, I'm not
23  aware.  I'd have to go back and look at the
24  literature.
25       Q.   In general, not isolated to a single

Page 124

1   RCT.  So for the practice of stress urinary
2   incontinence surgery in the United States, over
3   the time period TVT retropubic device has been
4   available, would you agree that there is reduced
5   hospitalization with it compared to the autologous
6   pubovaginal sling and the Burch?
7        A.   I think there's going to be data out
8   there that supports it's a faster, quicker, and
9   less hospital stay on the average.  But, again, we
10  have to look at the randomized control studies.
11  But, again, that's not an issue I'm debating.
12  It's the long-term risks that I'm talking about.
13       Q.   It says another advantage is reduced
14  voiding dysfunction.
15            Do you believe that's a potential
16  advantage for the TVT retropubic versus the
17  autologous pubovaginal slings?
18            MR. CARTMELL:  Object to the form.
19  It's vague and ambiguous with respect to what you
20  mean by voiding dysfunction.
21       A.   Well, no, I disagree with that.  I'd
22  have to say show me the -- that one very
23  specifically, you're going to need level 1 data to
24  support that.  You cannot take cohort studies and
25  compare cohort to cohort.  And so that one is

Page 125

1   highly debatable.
2        Q   BY MR. SNELL:  When you see "voiding
3   dysfunction" -- and this is written by the
4   organization that you belong to; right?
5        A.   Oh, yeah, and I know the people who
6   wrote it.  One's on staff with me.
7        Q.   When you see the term "voiding
8   dysfunction" -- Mr. Cartmell objected as vague.
9            What did the AUA mean by "voiding
10  dysfunction" in this position statement?
11            MR. CARTMELL:  Object to the form.
12       A.   Yeah, when these guys and women get
13  together, this is a big argument, because, again,
14  I know the people on this board and I'm at the
15  meetings.  I don't go -- I'm not a member of this
16  and the guidelines.
17            But voiding dysfunction can be
18  anything.  Stress incontinence, overactive
19  bladder, urgency frequency, nocturnal enuresis,
20  bladder pain with urination.  Voiding dysfunction
21  is very vague.  And hence, the reason why Rovner,
22  et al., wrote up a follow-up article in this in
23  the AUA newsletter.
24       Q   BY MR. SNELL:  Actually, Rovner's
25  follow-up was before this was reissued.  You know

32 (Pages 122 to 125)

Daniel Steven Elliott, M.D.

Page 126

1    that; right?
2        A.   This was were the --
3        Q.   October 2013.
4        A.   2013 is the one I'm referring to.
5        Q.   This paper was issued after Rovner's
6    commentary?
7        A.   Well, no, this is a revision of the
8    original; wasn't it?  I'd have to look at when the
9    first one came out, and it's a revision of it.
10   Update.
11       Q.   On the very back page, October 2013,
12   revised.  Correct?
13       A.   Yeah.
14       Q.   They state that "mesh-related
15   complications can occur following polypropylene
16   sling placement, but the rate of these
17   complications is acceptably low."
18            Do you see that?
19       A.   Yes, I do.
20       Q.   "It is the AUA's opinion that any
21   restriction on the use of synthetic polypropylene
22   mesh suburethral slings would be a disservice to
23   women who choose surgical correction of SUI."
24            Do you see that?
25       A.   Yes, I do.

Page 127

1        Q.   "Multiple case series and randomized
2    control trials attest to the efficacy of synthetic
3    polypropylene mesh slings at 5 to 10 years."
4            Do you see that?
5        A.   Yes, I do.
6        Q.   "The efficacy is equivalent or
7    superior to other surgical techniques."  Correct?
8        A.   That's what it states, yes.
9        Q.   And you've seen literature and data
10   that supports that statement?
11       A.   As it pertains to efficacy, I agree.
12   I mean, equivalent, I think is fine.  And superior
13   is debatable, and you have to look at those
14   specific studies, but I'm not going to argue that.
15       Q.   "There is no significant increase in
16   adverse events observed over this period of
17   follow-up"; correct?
18       A.   Yeah.  And that's the actual key right
19   there, "over this period of follow-up," which is
20   short-term.
21       Q.   How do you define -- did I ask you how
22   you define "short-term"?  I know you've mentioned
23   that term.
24       A.   Yeah.
25       Q.   Can you define "short-term" for me as

Page 128

1    you have used it?
2        A.   It's going to depend upon the
3    procedure we are discussing, but when specifically
4    in TVT, from my perspective, based upon the
5    literature and what's out there, as far as
6    degradation, et cetera, anything short of lifelong
7    is going to be insufficient.
8            MR. SNELL:  I don't think -- move to
9    strike as nonresponsive.
10       Q   BY MR. SNELL:  I'm trying to get a
11   definition from you.  So when you use the term
12   "short-term," what do you mean by that?
13       A.   Short-term specifically relative to
14   polypropylene meshes --
15       Q.   Okay.
16       A.   -- because it is a permanent
17   implantable device, shown to have degradation in
18   Klinge, et al., up to 15 years, Ethicon's
19   statement showing that degradation continues,
20   contraction, et cetera.  Anything less than
21   lifelong, to me, is short-term and insufficient.
22       Q.   And you like to apply a different bar
23   to the Burch colposuspension; correct?
24       A.   Burch and also the autologous
25   because -- specifically because those are no

Page 129

1    permanent implantable device.  With that said, for
2    example, when the ProteGen sling was used in the
3    past, the Gortex sling was used in the past, then
4    I would say for those, you need to have lifelong
5    follow-up.
6            Okay.  But, again, when we're talking
7    about autologous tissue, the patient's own, or
8    Burch, where there's no tissue used, the
9    products -- there's no product in there to have
10   lifelong problems with.
11       Q.   So how do you define short-term as to
12   the autologous and the Burch?
13       A.   Well, a minimum study criteria
14   established about four, five years ago, said any
15   study less than 12 months for sling procedures was
16   insufficient.
17           So, again, it depends on what you're
18   looking at in a study.  But if we're looking at
19   efficacy, efficacy is a different story.  Efficacy
20   can be lifelong.  But if we're looking at
21   perioperative complications, then really two years
22   out.  Patients heal.  But there is no written in
23   stone what short-term, long-term is.
24       Q.   I was just following up, though,
25   because you used those terms, and I want to know

33 (Pages 126 to 129)

Daniel Steven Elliott, M.D.

Page 130

1    what it means to you.
2         So what is short-term --
3         A.   Short-term --
4         Q.   -- in the context of an autologous
5    pubovaginal sling?
6         MR. CARTMELL:  Are you talking about
7    in the context of a study?
8         MR. SNELL:  Not a particular study.
9    He says short-term.
10        Q.   BY MR. SNELL:  I want to know what you
11   mean by that.
12        A.   I understand.
13        Q.   You've told me about the TVT and
14   stuff, and I hear you.  But now I want to know
15   what standard do you apply to the Burch when you
16   say short-term?
17        A.   Less than 12 months.
18        Q.   Okay.
19        A.   Less than 12 months.  Arguably, 24
20   months.
21        Q.   And what do you mean -- strike that.
22        What standard do you use for the
23   definition of short-term with regard to the
24   autologous pubovaginal sling?
25        A.   Same thing.  12 months definitively.

Page 131

1    Arguably 24 months.
2         Q.   Okay.  Is that for safety, too?
3         A.   Yes.  But, again, we don't have any
4    permanent implantable device with those other
5    procedures.  So perioperative morbidity is a more
6    important issue.
7         Q.   Well, you know there can be permanent
8    sutures placed at the time of the autologous
9    pubovaginal sling or a Burch; correct?
10        A.   Yes.  And those are --
11        Q.   And you know there can be suture or --
12        MR. CARTMELL:  Let him finish.  Hold
13   on?  Yes, and those are?
14        A.   Yes, and those are usually Prolene
15   sutures, which we've been told by Ethicon are
16   safe.  However, in my practice, I've had two
17   patients develop suture granulomas; so I don't use
18   them.  I use Vicryl sutures.
19        Q.   BY MR. SNELL:  And you know that
20   suture erosion can occur with those -- any type of
21   permanent suture; correct?
22        A.   Then that raises the very real
23   possibility of those sutures causing degradation,
24   inflammatory reaction, foreign body response,
25   which we know happens in the dog model.  That's

Page 132

1    been discussed.  Ethicon knows that.  So that
2    actually is a very good point.  Perhaps Prolene is
3    not safe product, as we've been told.
4         MR. SNELL:  Move to strike as
5    non-responsive.
6         Q.   BY MR. SNELL:  My question was:  It's
7    known that permanent sutures can degrade.  In
8    fact, it's known that permanent sutures can have
9    suture erosion if employed with the Burch
10   colposuspension or the autologous pubovaginal
11   sling procedure; right?
12        A.   Incorrect.
13        Q.   You haven't seen publications by
14   people like Ed McGuire and others that report
15   suture erosions following an autologous
16   pubovaginal sling at an average duration follow-up
17   of greater than 24 months?
18        A.   If you're doing a pubovaginal sling in
19   the classic way where it's described, where the
20   Prolene sutures are high up in the abdomen, away
21   from the bladder, there should be zero erosions.
22   If somebody's doing a variant of it, that's a
23   different story.  I can't speak to that.  Burch is
24   the same thing.  You have a Prolene suture, which
25   we know degrades based upon studies, okay, which

Page 133

1    are outlined in my expert report.  Ethicon knows
2    it.  Prolene, as a much suture, degrades.  If you
3    knot it up and put it by the bladder, you can have
4    degradation, foreign body reaction, and then
5    subsequently erosion.  So, yes, the question is
6    why.
7         MR. SNELL:  Move to strike as
8    nonresponsive.
9         Q.   BY MR. SNELL:  My question was:  Do
10   you know there are studies that report suture
11   erosions by people who do the autologous
12   pubovaginal sling, like Ed McGuire, that report
13   suture erosions at a follow-up of greater than
14   24 months?
15        A.   I would have to see that exact study
16   and we'd have to review it, see how they did the
17   study.  But, again, it raises the issue of why
18   that's occurring.
19        Q.   My question is:  Do you know whether
20   or not the data exists?
21        A.   I answered that and said I'd have to
22   see the studies you're talking about and how they
23   did the procedure.
24        MR. CARTMELL:  Lunch is ready when you
25   are.

34 (Pages 130 to 133)

Daniel Steven Elliott, M.D.

Page 134

1      MR. SNELL:  Is it.  Yeah, let's go
2  ahead and do lunch.
3          (Recessed from 12:30 p.m. to
4          1:01 p.m.)
5          (Exhibit 9 marked.)
6      Q    BY MR. SNELL:  Doctor, I've handed you
7  the Position Statement on mid-urethral
8  sling-Urethral Slings for Stress Urinary
9  Incontinence By IUGA.
10         You're familiar with this document?
11     A.   Yes, I am.
12     Q.   This is one of those professional
13  societies to which you belong today?
14     A.   That is correct.
15     Q.   And similar to the AUA statement that
16  we looked at, it talks about efficacy of the
17  mid-urethral slings; correct?
18     A.   Correct.
19     Q.   And it talks about safety of
20  mid-urethral slings; correct?
21     A.   Yeah.  It discusses it, yes.
22     Q.   All right.  In the third paragraph,
23  when they're talking about mid-urethral slings,
24  they state that "They have been shown to be as
25  effective as more invasive traditional surgery

Page 135

1  with major advantages of shorter operating and
2  admission times and a quicker return to normal
3  activities together with lower rates of
4  complications."
5          Do you see that?
6      A.   Yes, I do.
7      Q.   Do you disagree with the IUGA position
8  statement?
9      A.   I disagree.
10     Q.   "This has resulted in the mid-urethral
11  sling becoming the operation of choice in Europe,
12  Asia, South America, South Africa, Australasia,"
13  A-u-s-t-r-a-l-a-s-i-a, "and North America for the
14  treatment of SUI with several million procedures
15  performed worldwide."
16         Do you see that?
17     A.   Yes, I do.
18     Q.   Do you agree or disagree with that
19  statement that it is the operation of choice as
20  amongst the alternative surgeries?
21     A.   It is the most common procedure --
22     Q.   Okay.
23     A.   -- I mean, performed.
24     Q.   A little further down it says, "There
25  is robust evidence to support the use of

Page 136

1  mid-urethral slings from over 2,000 publications
2  making this treatment the most extensively
3  reviewed and evaluated procedure for female stress
4  urinary incontinence now in use."
5          Do you agree with that?
6      A.   I have not looked at that.
7      Q.   "These scientific publications studied
8  all types of patients, including those with
9  co-morbidities, such as prolapse, obesity, and
10  other types of bladder dysfunction."
11         Have you analyzed that?
12     A.   Independently analyzed it, I've read
13  the studies concerning that.
14     Q.   You haven't read all 2,000
15  publications they're referring to; correct?
16     A.   No.  That is correct.  Yes.
17     Q.   It says, "It is, however, acknowledged
18  that any operation can cause complications."
19         And that's a fair statement; correct?
20     A.   There can be different sets of
21  complications, but any procedure can have
22  complications.
23     Q.   "For mid-urethral slings these include
24  bleeding, damage to the bladder and bowel, voiding
25  difficulty, tape exposure and pelvic pain; all of

Page 137

1  these may require repeat surgery, but this is
2  uncommon."
3          Do you see that?
4      A.   Yes, I do.
5      Q.   A little further down, they talk about
6  "long-term effectiveness of up to 80 percent has
7  been demonstrated in studies including one which
8  has followed up a small group of patients for
9  17 years"; correct?
10     A.   That's what it states, yes.
11     Q.   And in this IUGA statement has a list
12  of references -- do you have that?  All right.
13         So for the 17-year study, you
14  understand that to be the Nilsson paper on the TVT
15  retropubic study?
16     A.   That's the only 17-year one.  I'll
17  make an argument that it's not TVT.
18     Q.   What argument would you make that it's
19  not TVT?
20     A.   Based upon the deposition by Arnaud
21  who said it's not a TVT product.  And he doesn't
22  know if it's the polypropylene mesh even used by
23  Ethicon -- or manufactured by Ethicon.
24     Q.   Do you have any -- have you done any
25  independent confirmation of whether or not that

Daniel Steven Elliott, M.D.

Page 138

1  product was TVT other than what you just
2  referenced with regard to Dr. Axel Arnaud's
3  deposition testimony?
4      A.   The only way I'd have access to that
5  is via the deposition.  It's impossible to know
6  that in another independent source, but since Axel
7  Arnaud is very high up in Ethicon and he states
8  it's not TVT, I'm going to believe him.
9      Q.   Do you know whether that mesh was a
10  Prolene -- polypropylene mesh?
11      A.   It was a polypropylene mesh, as what
12  he said.  Maybe made by Ethicon.  Maybe made by
13  Bard.  He doesn't know.
14      Q.   As a result IUGA supports the use of
15  monofilament polypropylene mid-urethral slings for
16  the surgical treatment of female stress urinary
17  incontinence."
18          Do you see that?
19      A.   Yes, I do.
20      Q.   Do you agree or disagree with IUGA's
21  support?
22      A.   Disagree.
23      Q.   You've read the AUGS and SUFU
24  statement on mid-urethral slings?
25      A.   Yes, I have.

Page 139

1          (Exhibit 10 marked.)
2      Q.   BY MR. SNELL:  You don't belong to
3  AUGS, but you do belong to SUFU; right?
4      A.   That -- yeah.  They're sister
5  societies.  So I can attend AUGS meetings as a
6  member, but I am not formally in their membership
7  role.
8      Q.   SUFU has over 500 members?
9      A.   I don't know the number.  It's a lot.
10      Q.   AUGS -- do you know whether they
11  represent more than 1,700 members?
12      A.   They have a lot.  They have more than
13  SUFU.
14      Q.   Do you have to be a urogynecologist or
15  to have passed a subspecialty female pelvic
16  medicine or reconstructive surgery boards to be a
17  member of AUGS as opposed to SUFU?
18      A.   No.  You can be a member of AUGS
19  without having any credentials.  To take the board
20  exam, the female pelvic medicine reconstructive
21  surgery, you just have to supply certain logs,
22  have a certain amount of volume of cases and take
23  the exam.
24      Q.   You took that exam and passed it;
25  right?

Page 140

1      A.   Correct.  In June of 2013.
2      Q.   Did you have to study for that exam?
3      A.   Yes, I did.
4      Q.   Did part of that exam testing concern
5  polypropylene mid-urethral slings?
6      A.   Yes.
7      Q.   Was part of that exam concerning the
8  Burch colposuspension and the autologous
9  pubovaginal sling?
10      A.   It's been two years, and I can't
11  recall exactly.  I know they had Burch questions
12  and I know they had sling questions, yes.
13      Q.   This says, "The polypropylene mesh
14  mid-urethral sling is the recognized worldwide
15  standard of care for the surgical treatment of
16  stress urinary incontinence."
17          Do you see that?  On the first page.
18      A.   Unfortunately, no, I don't see it.
19      Q.   Here.
20      A.   I listen to -- oh, there on the bold.
21  Yes.  I see it.
22      Q.   And you would agree it's within the
23  standard of care for a female urologist or a
24  pelvic floor surgeon to do a polypropylene mesh
25  mid-urethral sling like the TVT retropubic today?

Page 141

1      A.   It is not malpractice to do that
2  procedure.
3      Q.   It, therefore, is within the standard
4  of care; correct?
5          MR. CARTMELL:  Object to the form.
6      A.   Well, as I said, it's not going to be
7  malpractice.  It is an accepted treatment out
8  there.
9      Q.   BY MR. SNELL:  You've reviewed --
10  well, let me ask you:  Have you reviewed the AUA
11  stress urinary incontinence guidelines?
12      A.   Yeah.  It depends which year you're
13  talking about.  There's 2009 and others.
14      Q.   The 2009 and then the update in 2012?
15      A.   Yes.  Yes.
16      Q.   All right.  I think you pronounced the
17  lead author's name --
18      A.   Oh, Dmochowski.  Call him Roger.
19      Q.   For example, in those AUA stress
20  urinary incontinence guidelines, they recognize
21  mid-urethral, retropubic, trans -- they -- strike
22  that.
23          In the AUA stress urinary incontinence
24  guidelines they recognize the retropubic
25  polypropylene mid-urethral sling like the TVT

36 (Pages 138 to 141)

Daniel Steven Elliott, M.D.

Page 142

1  retropubic as being a suitable surgical option for
2  surgeons to turn to; correct?
3      A.  Yeah.  Using the terminology you did,
4  it is one of the treatment options available.
5      Q.  And they looked at the literature, did
6  a systematic review, and they analyzed the data on
7  mid-urethral slings, Burch, and the autologous
8  pubovaginal slings, and came to that conclusion?
9      A.  Yes.  They analyzed more than just
10  those, but, yes, those are some of the ones they
11  analyzed.
12      Q.  Those were the main groups that they
13  reported on; correct?
14      A.  I'd have to look at your question --
15  it was, you know, retropubic, transobturator,
16  pubovaginal, and Burch.
17      Q.  Right.  In the AUGS/SUFU statement
18  they say, "The procedure is safe, effective, and
19  has improved the quality of life for millions of
20  women."
21          Do you see that?  I'm sorry.  Right
22  where we were at.
23      A.  Oh, I'm sorry.  Yes, I see that.
24      Q.  Do you agree or disagree with
25  AUGS/SUFU?

Page 143

1      A.  Disagree.
2      Q.  You disagree that the procedure is
3  effective?
4      A.  No.
5      Q.  Do you disagree that the procedure has
6  improved the quality of lives for millions of
7  women?
8      A.  I have no way of proving that.
9      Q.  You disagree the procedure is safe?
10      A.  Yes.
11      Q.  And do you believe that all
12  polypropylene mesh mid-urethral slings are unsafe?
13      A.  That are currently available on the
14  market now, I agree with you they are all unsafe.
15      Q.  Let me rephrase that.  I don't think I
16  asked you to agree with me.
17      MR. CARTMELL:  You did.
18      MR. SNELL:  No, I didn't.  I think --
19      MR. CARTMELL:  Do you disagree?
20      MR. SNELL:  Disagree the procedure is
21  safe, yes.
22      Q.  BY MR. SNELL:  All right.  My question
23  was:  And do you believe that all polypropylene
24  mesh mid-urethral slings are unsafe?
25      A.  Okay.  All the --

Page 144

1      MR. CARTMELL:  He answered it.
2  Objection.  Asked and answered.
3          We're reading it.  He says that are
4  "currently available on the market, I agree with
5  you, they are all unsafe."
6      MR. SNELL:  He's not agreeing with me,
7  because I didn't posit the question as "please
8  agree with me."  I'm just asking his opinion.
9      Q.  BY MR. SNELL:  Understand.  So let me
10  just -- let's just strike that and make sure we
11  get a clean Q and A.
12          Do you believe, Dr. Elliott, that all
13  of the polypropylene mesh mid-urethral slings
14  available for the treatment of female stress
15  urinary incontinence are unsafe?
16      A.  I believe that all the currently
17  available mesh slings available on the market as
18  of right now and their technique are unsafe.
19      Q.  You do not disagree, I take it, that
20  some women can have, following the TVT retropubic
21  placement, cure of their incontinence and
22  improvement in quality of life?
23      MR. CARTMELL:  Object to the form.
24      A.  It is a hypothetical individual, but
25  there are going to be studies that show, as of

Page 145

1  right now, they have had -- they've reached that.
2  The question is what will happen with long-term
3  follow-up.
4      Q.  BY MR. SNELL:  Do you only treat
5  female stress incontinence or do you also treat
6  male stress incontinence?
7      A.  I treat both female and male voiding
8  dysfunction.
9      Q.  Do males have stress urinary
10  incontinence?
11      A.  Following prostate surgery.  Almost
12  exclusively that's what I see them for.
13      Q.  Do you use any medical devices for the
14  treatment of male stress urinary incontinence?
15      A.  Yes.  The AMS800 -- American Medical
16  Systems 800 artificial urinary sphincter.
17      Q.  And are there any lifelong registries
18  monitoring those patients?
19      A.  Yes.  The AMS -- American Medical
20  Systems keeps a registry of all implants.  Every
21  time I do a surgery on them, they are notified,
22  and I have to fill out a summary of what I did,
23  revision, complications, et cetera.
24      Q.  Do those track the patients lifelong?
25      A.  Yes.

37 (Pages 142 to 145)

Daniel Steven Elliott, M.D.

1    Q.   Where is that data published, if at
2  all?
3    A.   It is not published. It's at AMS.
4  American Medical Systems, which is based in
5  Minnetonka, Minnesota. And that goes back to
6  1972.
7       (Exhibit 11 marked.)
8    Q    BY MR. SNELL: I've handed you
9  Exhibit 11. This is the AUGS -- one of the AUGS
10 position statements; correct?
11   A.   Correct. This one is on pelvic floor
12 disorders, though.
13   Q.   If you look at paragraph 5 where they
14 talk about stress urinary incontinence and mesh
15 slings.
16   A.   On page 3, I think?
17   Q.   Yes.
18   A.   I'm there.
19   Q.   It says, "Full length mid-urethral
20 slings, both retropubic and transobturator" -- and
21 just so we're clear, the TVT retropubic is a full
22 length retropubic mid-urethral sling; correct?
23   A.   I'm sorry to interrupt you. I just
24 don't know where you are -- I see the paragraph.
25 I just don't know which --

1    Q.   The bottom five, six lines.
2    A.   Starting --
3    Q.   Actually, the bottom three lines.
4  That's okay.
5    A.   Starting with "Full-length," yes.
6    Q.   Okay. The TVT retropubic device is a
7  full length retropubic mid-urethral sling; right?
8    A.   Okay. I'm sorry. I was trying to
9  find where you -- I thought you were reading. I'm
10 sorry.
11      The question was, is the
12 full-length -- well, I don't necessarily know what
13 they mean by a full length. Everything is a full
14 length, whether it's short or long, but this is
15 the longest length of mesh.
16   Q.   It says they "have been extensively
17 studied, are safe and effective relative to other
18 treatment options and remain the leading treatment
19 option and current gold standard of care for
20 stress incontinence surgery"; correct?
21   A.   That's what they state, yes.
22   Q.   Do you disagree or agree with AUGS?
23   A.   I disagree.
24   Q.   What exactly do you disagree with
25 there in that paragraph -- sorry. In that

1  sentence?
2    A.   That is outlined in detail in my
3  expert report, going to all those various issues.
4       The extensively studied, I agree with.
5       Safe, I disagree with, as mentioned in
6  my expert report, my clinical experience, my
7  discussion in national and international meetings.
8       Effective relative to other treatment
9  options, I agree with. We've established that
10 already.
11      Remains a leading treatment
12 opposition, I agree. It is common, the use. I
13 don't have a problem with that.
14      Current gold standard of care for
15 stress urinary incontinence. Gold standard means
16 absolutely nothing to me. I don't even know what
17 that means. The term gets thrown around a lot.
18      Is it something that compared to?
19 It is the best. So it is -- I agree with the
20 leading treatment option. There are other things
21 that are available that it could be compared to.
22 Burch sling or the TVT.
23   Q.   The term "gold standard," that's
24 something that you've seen commonly in the medical
25 literature; correct?

1    A.   It is thrown around extensively. It's
2  a bad term.
3    Q.   You've seen people refer to the
4  autologous pubovaginal sling as a gold standard;
5  correct?
6    A.   Correct.
7    Q.   You've seen people refer to the Burch
8  colposuspension as the gold standard; correct?
9    A.   Correct.
10   Q.   You've seen people refer to the TVT
11 retropubic device as a gold standard; correct?
12   A.   Correct.
13   Q.   To your knowledge or understanding, is
14 there a -- strike that.
15      To your knowledge and understanding,
16 what does it mean to be a gold standard within the
17 art of pelvic surgery?
18   A.   It should be -- this is my
19 interpretation of it.
20      Gold standard should be the procedure
21 that has the safest, the best, which everything
22 should be compared to. The gold standard, unlike
23 gold. Gold cannot -- the true iron -- or true
24 element cannot be replaced. Okay. Gold standards
25 have evolved.

38 (Pages 146 to 149)

Daniel Steven Elliott, M.D.

Page 150

1      In the '90s, it was the Raz, R-a-z,
2  urethropexy.  That's gone now.  So gold standard
3  is a shifting thing.  It's what everything should
4  be compared to because it has proven itself to be
5  the best in all factors involved.
6      Q.  Back when the Raz urethropexy was
7  reported in the literature, there weren't any
8  randomized control trials in that procedure,
9  comparing it to the Burch and pubovaginal sling;
10  correct?
11      A.  I'd have to look at the literature.  I
12  don't recall any.
13      Q.  Did people refer to, like, the Raz
14  procedure as the gold standard, not based on
15  comparative -- direct comparative data?
16      A.  The gold standard relative to urinary
17  incontinence has really evolved since TVT came
18  out.  And that's when there was now a comparison.
19  You had some people were for Burch, some people
20  for sling, some people for the Raz.  The Raz fell
21  out.  Wasn't effective.  Then TVT was around.
22  Then the argument came of this gold standard.
23  But, again, it's not like you can type up a paper
24  and put in equations and come up with, oh, this
25  one's gold.  It's relative.

Page 151

1      Q.  There are other procedures for stress
2  urinary incontinence that have also fallen out of
3  favor, like the MMK that you earlier referenced;
4  correct?
5      A.  Correct.  There are many that have
6  faded away.
7      Q.  The anterior repair is another;
8  correct?
9      A.  Well, I don't know if you're talking
10  about the Kennedy Kelly plication.  That is still
11  done somewhat, but it's not, what you would say,
12  in the upper tier of effective treatments.
13      Q.  And that would be based on randomized
14  control trial data or cohort studies?
15      A.  Cohort studies.
16      MR. SNELL:  Let's mark this as the
17  next one.
18          (Exhibit 12 marked.)
19      Q  BY MR. SNELL:  Exhibit 12 is the EAU
20  Guidelines on Surgical Treatment of stress --
21  strike that.
22      EAU Guidelines -- let me get a better
23  question out.
24      Exhibit 12 is the EAU Guidelines on
25  Surgical Treatment of Urinary Incontinence;

Page 152

1  correct?
2      A.  That is correct.
3      Q.  And have you reviewed this document
4  before?
5      A.  Yes, I have.
6      Q.  Okay.  Were you involved in the
7  drafting of this document?
8      A.  No, I was not.  And the interesting
9  thing is, being a member of the female urology
10  section, I don't recognize very many of these
11  names.
12      Q.  This was published in 2012; right?
13      A.  Yes.
14      Q.  And what they did was, using their
15  methodology, they used evidence-based medicine
16  methodology and did individual literature search
17  strategies?
18      A.  Correct.  For the treatment of both
19  men and women.
20      Q.  Fair enough.
21      And for the treatment of stress
22  urinary incontinence in women, they concluded that
23  mid-urethral slings should be offered as the first
24  line treatment; correct?
25      A.  I'd have to see where you're quoting.

Page 153

1  I just don't see it in the document.  The
2  document's fairly long.
3      Q.  Okay.  The third page, go to the
4  surgical algorithm.
5      A.  Yes.
6      Q.  Where you see if a person has -- a
7  woman; right?  The top diagram is for treatment in
8  women; right?
9      A.  Correct.
10      Q.  And for stress incontinent women,
11  first line is "Offer mid-urethral sling"; correct?
12      A.  Yeah.  Or "consider peri-urethral
13  injections"; right.
14      Q.  Right.  So mid-urethral sling would be
15  a first-line surgical option for the treatment of
16  stress urinary incontinence in women, according to
17  the EAU Guidelines; correct?
18      A.  Yeah.  Yes.  This algorithm,
19  established in 2012, that is what they offer as
20  first-line treatment.
21      Q.  And they also identify the
22  mid-urethral sling as a first-line surgical option
23  if there's mixed incontinence, but the stress is
24  predominant; correct?
25      A.  Yes.

39 (Pages 150 to 153)

Daniel Steven Elliott, M.D.

Page 154

1  Q.   And do you disagree with the EAU
2  Guidelines in that regard?
3  A.   Yes, I do.
4      (Exhibit 13 marked.)
5  Q   BY MR. SNELL:  This is the Guidelines
6  on Urinary Incontinence from the EAU 2015.
7      Do you see that?
8  A.   Yes, I do.
9  Q.   So this is when you were in your role
10 in that pertinent group; correct?
11 A.   That's correct.
12 Q.   First page says, "Mid-urethral slings
13 are now the most frequently used surgical
14 intervention in Europe for women with stress
15 urinary incontinence."
16     Do you see that?
17 A.   I don't see it.  But I heard you read
18 it.  Okay.  Yes.  Yes, I see it.  Yes.
19 Q.   And for the purpose of the guidelines,
20 they did a new meta-analysis; correct?
21 A.   Correct.
22 Q.   Were you consulted on these
23 guidelines?
24 A.   No, I was not.
25 Q.   But these are people who are in the

Page 155

1  group that you belong to?
2  A.   They're in -- members of the EAU.  But
3  these are not people in the subsection of female
4  urology and functional urology.  And I'm on the
5  board of those.  And I know some of their names,
6  but they're not sitting on the board.
7  Q.   Were you even aware that these urinary
8  incontinence guidelines were published in 2015 by
9  EAU?
10 A.   No.  I was aware they were published.
11 I was not part of their publishing.
12 Q.   Does the EAU still recognize the
13 mid-urethral polypropylene slings as a surgical
14 option to treat stress urinary incontinence?
15 A.   Yes.  As stated in their document,
16 they do not ban its use.
17 Q.   Do they still, as of today, recognize
18 the mid-urethral polypropylene sling as being the
19 appropriate first-line surgical option?
20 A.   That's what they state in the previous
21 document.  I don't know about this one.
22     (Exhibit 14 marked.)
23 Q.   BY MR. SNELL:  So these are the fact
24 sheets by ICS published July 2013.
25     Do you see that?

Page 156

1  A.   Yes, I do.
2  Q.   ICS is another organization you belong
3  to; correct?
4  A.   That is correct.
5  Q.   And so they cover different
6  conditions, like overactive bladder, and then they
7  have stress urinary incontinence beginning on
8  page 12.
9  A.   Yes.
10 Q.   Have you seen these before?
11 A.   Um-hum.  Yes, I have.
12 Q.   Do you use these statements with any
13 of your patients?
14 A.   No.
15 Q.   I know ACOG and the Urology
16 Foundation, the branch of the AUA, have patient
17 guides, publications, things like that.
18     Do you use any of those materials with
19 your patients?
20 A.   We have them available for education
21 purposes.  We'll go through it.  But to be honest,
22 usually that's so overwhelming for the average
23 individual that we don't rely on them heavily.
24 Q.   Does Mayo Clinic have its own patient
25 education handouts that you use --

Page 157

1  A.   Yeah.  We have a --
2  Q.   -- for stress urinary incontinence?
3  That's what I'm focused on.
4  A.   We have an overarching, for
5  incontinence.  Within it is a subsection of stress
6  incontinence.  But it's not specific just to
7  stress.
8  Q.   Okay.  On page 13 where they're
9  talking about -- it says, "Definitive therapy for
10 SUI is surgical."
11 A.   Correct.
12 Q.   You would agree with that; correct?
13     MR. CARTMELL:  I'm sorry.  What was
14 the question again?
15 A.   Definitive area for SUI is the
16 surgical?
17 Q.   BY MR. SNELL:  No.  Let me repeat it.
18 It's not "area."
19     This states on page 13, "Definitive
20 therapy for SUI is surgical."
21     Do you see that?
22 A.   No.  I see it.
23 Q.   Do you agree with that?
24 A.   I'd say no.  It is -- surgery is an
25 option for some individuals.  But some individuals

Daniel Steven Elliott, M.D.

Page 158

1  with appropriate counseling do not need to have
2  surgery.  So depends how you're defining
3  definitive, I suppose.  There are other things
4  that work.
5      Q.   Right.  So pelvic floor exercises;
6  correct?
7      A.   Correct.  That's one of them.
8      Q.   And bulking agents; correct?
9      A.   Correct.
10      Q.   And you're aware of data showing
11  surgical -- when you compare stress urinary
12  incontinence surgery, the efficacy of that
13  compared to those alternatives, non-surgical
14  alternatives, surgery has better results?
15      A.   Correct.  I agree with that.  I just
16  have a problem with definitive therapy.
17      Q.   Right.
18      A.   It's a little too dogmatic for me.
19      Q.   Okay.  "Worldwide, mid-urethral slings
20  comprised of synthetic mesh have become the
21  treatment of choice for SUI."
22          And we've already discussed that;
23  right?
24      A.   Ad nauseam, yes.
25      Q.   "Long-term data are robust and

Page 159

1  demonstrate durable efficacy with a very low
2  complication rate, particularly in experienced
3  hands."
4          You would agree with that?
5      MR. CARTMELL:  Object to the form.
6      A.   I agree with parts and disagree with
7  other parts.  So in totality, I would have to say
8  I disagree.
9      Q.   BY MR. SNELL:  What do you agree with
10  in that sentence?
11      A.   Long-term -- oh, what do I agree with?
12  Sorry.
13      Q.   Yes.
14      A.   I think, as we established, "durable
15  efficacy," I'm okay with that.
16          And then, "particularly in experienced
17  hands," as I've stated before, more experienced
18  surgeons, the data is very clear.  Arnaud even
19  admitted they're going to have better results.
20          "Very low complication rates," I
21  disagree with.  Strongly.
22      Q.   For any type of stress incontinence
23  surgery, we can agree that more experienced
24  surgeons are going to typically give better
25  results; right?

Page 160

1      A.   Yes, that is a fair statement.
2      Q.   And I mean, you're a better surgeon,
3  don't you think, today than when you were coming
4  out of your fellowship; correct?
5      A.   Correct.
6      Q.   And part of that is because you've
7  amassed more surgical volume experience; correct?
8      A.   That is one aspect of it.  And I have
9  read hundreds of journal articles, attend all the
10  national and international meetings, and discuss
11  with high level colleagues.  But, yes, there
12  should be progress.  But individuals who don't
13  have the advantages I do, aren't necessarily going
14  to progress.  They could actually worsen.
15      (Exhibit 15 marked.)
16      Q   BY MR. SNELL:  This is the NICE,
17  N-I-C-E, Clinical Guideline 171 issued
18  September 2013 on urinary incontinence in women.
19          Are you familiar with this?
20      A.   Yes, I am.
21      Q.   Turn to page 24.
22      A.   Okay.
23      Q.   And just as background, you're aware
24  then that in the generation of this NICE guideline
25  they searched the medical literature?

Page 161

1      A.   Yes.  They have done similar to what
2  the AUA guidelines are.  All these societies do
3  essentially the same thing.
4      Q.   And they say for when offering --
5  strike that.
6          They state, paragraph 1.10.3, "When
7  offering a synthetic mid-urethral tape procedure
8  surgeons should:  Use procedures and devices for
9  which there is current high quality evidence of
10  efficacy and safety."
11          Do you see that?
12      A.   Yes, and I agree with that statement.
13      Q.   They also say use only -- "only use a
14  device that they have been trained to use."
15          Do you agree with that?
16      A.   Yes, I do.
17      Q.   Do you use any devices that you
18  weren't trained on?
19      A.   No.
20      Q.   "Use a device manufactured from type 1
21  macroporous polypropylene tape."
22          Do you agree with that?
23      A.   If he's referring to the Amid type 1,
24  I disagree with that.
25      Q.   Well, there's no other type 1 system

41 (Pages 158 to 161)

Daniel Steven Elliott, M.D.

Page 162

1  that reports and identifies macroporous versus
2  microporous than Amid; correct?
3      A.   There is no industry standard
4  regarding that.  However, I'm stating that Amid is
5  archaic.  So macroporous is a relative term.  We
6  have to define what macroporous is.
7      Q.   So there is no -- so macroporous means
8  macro, large; porous, pores; correct?
9      A.   That is the literal translation of the
10  word, yes.
11      Q.   And in the Amid classification,
12  macroporous is defined as greater or equal to
13  75 microns; is that correct?
14      A.   Yeah.  Yeah.  Greater than or equal
15  to, yeah, that's what Amid does.
16      Q.   And that's because the cells involved
17  in tissue ingeneration, combating bacteria are all
18  cells that are smaller than 75 microns; correct?
19      A.   Well, I mean, it goes beyond that,
20  that the 75 microns and be able to have the
21  inflammatory responders, be able to perforate
22  through that.
23          But, again, the data shows, Ethicon
24  agrees as stating, that it's 1,000 microns now and
25  a minimum under strain.  So what I'm saying is the

Page 163

1  Amid is archaic, and not the standard used
2  anymore.
3      Q.   Do any of the professional societies
4  that you belong to state and define macroporous as
5  anything other than that which the Amid
6  classification states it as, greater than or equal
7  to 75 microns?
8      A.   I have yet to see that in any of the
9  society statements that they state that because
10  they don't know the information I've been privy
11  to.
12      Q.   We can agree that those inflammatory
13  cells are all smaller than 75 microns; correct?
14          MR. CARTMELL:  Object to the form.
15      A.   Not necessarily, because some of the
16  macrophages, especially under activated states,
17  can be up to 80 micrometers or greater.
18      Q   BY MR. SNELL:  Well, you know
19  macrophages can enhance pseudopodia, which can get
20  into spaces that are less than 5 microns; don't
21  you.
22      A.   Then if all that were true --
23      Q.   Answer my question.  Do you know that
24  or not?
25      A.   I was answering your question.

Page 164

1          MR. CARTMELL:  Let him answer.
2      A.   And I'm saying, if all that were true,
3  we would not be sitting here with all the
4  degradation problems and inflammatory responses.
5  And then I know what I read with Ethicon
6  depositions, that they all agree that is too small
7  and that is not the standard they go by.  So all
8  I'm saying is I do not agree with this as it's
9  stated.
10      Q   BY MR. SNELL:  But my question to you
11  is: Based on your knowledge and scientific
12  understanding, can macrophages extend pseudopodia
13  to try to get to bacteria in spaces less than
14  5 microns?
15      A.   They can try, but are they successful?
16      Q.   Are they --
17      A.   And this is -- this is 75 microns when
18  it comes out of the box.  But that's not under
19  stress.  So it decreases.  So, again, where
20  they're really insufficient and where I have privy
21  to information is not what it comes out of the
22  box, when it's been implanted in the woman and
23  after contraction of scarring.
24      Q.   The pore size in the mesh for TVT is
25  much larger than 75 microns out of the box.  We

Page 165

1  can agree to that.
2      A.   Out of the box, I have seen numbers
3  all over the board because they don't have a --
4  there's not a circle with a diameter.  There's
5  wires or fibers going everywhere.  So there's not
6  a uniform size.  So you may have one greater than
7  75.  Right next to it, you have one at 10 microns.
8  And that's what P.A. Newell said under oath.
9      Q.   Have you ever put the TVT mesh out of
10  the box next to a millimeter ruler and looked --
11      A.   Yes.
12      Q.   -- and seen whether the pores are
13  larger than a millimeter?
14      A.   Absolutely, I have.
15      Q.   And those pores are larger than a
16  millimeter out of the box; correct?
17      A.   Absolutely not.  A millimeter?
18      Q.   Yes.  100 microns for a TVT.
19      A.   Out of the box.  You might be able to
20  find some, but right next to it it's not.  But,
21  again, that doesn't matter out of the box.  It's
22  when it's implanted in the woman under load.
23      Q.   Yes.  But those inflammatory cells
24  don't just go in circles; do they, sir?
25      A.   Well, there's going to be

42 (Pages 162 to 165)

Daniel Steven Elliott, M.D.

Page 166

1  literature -- and let's go to my expert report on
2  this, on degradation and pore size. I've got the
3  literature stated from individuals like Klinge,
4  Klosterhalfen, Costello, Clave, et al., who will
5  disagree with you, that, no, that pore size is
6  insufficient to have adequate tissue incorporation
7  and prevention of the inflammation which then
8  causes degradation, et cetera.
9      Q.   Klinge and those doctors were
10  assessing hernia mesh, not the TVT device in the
11  application of stress incontinence in women;
12  correct?
13           MR. CARTMELL:  Object to the form.
14      A.   Okay.  And then --
15      Q    BY MR. SNELL:  Is that a yes or no?
16      A.   No.  I can't answer a separate yes or
17  no because my understanding is they're doing
18  hernia meshes in the abdomen.  TVT is a hernia
19  mesh being put into the vagina.  So it's going to
20  be a worse of an environment because of higher
21  bacteria counts.  Different types of strain.  So
22  if it performs poorly in the abdomen, it's going
23  to perform worse in the vagina.
24      Q.   All of the citations where you cite to
25  Klinge and those doctors in your report are in the

Page 167

1  context of hernia; correct?
2      A.   All right.  Let's go to my expert
3  report on pore size, because if we're going to
4  talk about this in detail -- I spent a lot of time
5  on this, and so we can go to that.  So I have it
6  down here beginning around page 18, where I
7  reference internal documents, studies, et cetera.
8      Q.   None of them being TVT retropubic
9  device studies that were in women; correct?
10      A.   Well, if --
11      Q.   That's a yes or no.  So which one is
12  it?
13           MR. CARTMELL:  No.  You can answer.
14  Let him answer.  You cut him off again.  That's
15  twice in the last minute and a half.
16           MR. SNELL:  No, no.  I can say a yes
17  or no question, Tom; you know that.
18           MR. CARTMELL:  So let him answer the
19  question.  Go ahead.
20           MR. SNELL:  It's a yes or no.
21           MR. CARTMELL:  Go ahead.
22      A.   They have done studies looking at the
23  hernia mesh.  Have Klinge, Klosterhalfen and
24  others done it specifically with the TVT?  No.
25  But I have to extrapolate the data.  That would

Page 168

1  have been something very good for Ethicon to have
2  done.
3           MR. SNELL:  Move to strike everything
4  up to the responsiveness about "when they" with
5  regard to TVT, no.
6      Q.   BY MR. SNELL:  You call him Klingel
7      A.   Klinge.
8      Q.   Is it Klingel or Klinge?  Because I
9  heard it all different ways.
10           MR. CARTMELL:  I thought it's Klinge.
11      A.   It's Klinge.
12           MR. CARTMELL:  Klinge, okay.  He said
13  Klinge.
14      Q    BY MR. SNELL:  Oh, I think he said
15  Klingel, like Chris Klingel?  I just want to make
16  sure I know we're talking about the same person.
17  It's the same person; right?
18      A.   Klinge, yeah.
19      Q.   Okay.  Look, I'm even worse than you
20  are with names, and you're pretty good with names.
21  I'm bad with them.  All right.
22           MR. CARTMELL:  Chris Klinge.
23      Q    BY MR. SNELL:  So we were looking at
24  that NICE guideline.  It says down --
25           MR. CARTMELL:  NICE or NICE.

Page 169

1      Q    BY MR. SNELL:  That's a good one.
2  It's abbreviated NICE.
3      A.   I know it.
4      Q.   All right.  So for the NICE guideline
5  under colposuspension, it says, "Do not offer a
6  laparoscopic colposuspension as a routine
7  procedure for the treatment of stress UI in
8  women."
9           Do you see that?
10      A.   Yes, I do.
11      Q.   You've never done a laparoscopic
12  Burch; right?
13      A.   No, I have not.
14      Q.   Why would they say that respect to the
15  laparoscopic Burch?
16      A.   Well, the laparoscopic Burch is really
17  not a -- let me start over.
18           A laparoscopic Burch is not a true
19  Burch procedure.  They have to modify it, and it's
20  not really even a Burch.  And the success has been
21  poor with the laparoscopic procedure called the
22  laparoscopic Burch.
23      Q.   Under Biological slings they say, "Do
24  not offer anterior colporrhaphy, needle
25  suspensions, paravaginal defect repair and the MMK

43 (Pages 166 to 169)

Daniel Steven Elliott, M.D.

Page 170

1    for the treatment of stress UI."
2         Do you see that?
3         A.   Yes, I do.
4         Q.   Is that an accurate, up-to-date
5    statement with regard to the practice of
6    surgically treating female stress urinary
7    incontinence?
8         A.   This is a very simplified, infantile
9    form of it, but anterior colporrhaphy is to treat
10   prolapses, not incontinence.
11        Q.   Okay.
12        A.   Needle suspensions have fallen out of
13   favor because they don't work.  Paravaginal defect
14   repair, it's, again, a prolapse repair.  It's not
15   incontinence.  MMK, in the correct the high-volume
16   surgeon's hands can have decent success with it,
17   but that's not everybody.  So I agree that it's
18   not going to be, by any means, for the
19   overwhelming majority of people a first-line
20   treatment.
21        Q.   Is the MMK taught at all to residents
22   and fellows in Mayo?
23        A.   In the GYN department it may be, but
24   not in urology at all.
25        Q.   Do you think it's a fair statement

Page 171

1    that as between GYNs versus urologists, GYNs tend
2    to do more colposuspension procedures than
3    urologists, like yourself tend to favor slings
4    more?
5              MR. CARTMELL:  Object to the form.
6         A.   Colposuspension just means a vaginal
7    prolapse repair.  So that's what you're talking
8    about.  They do more prolapse than we do?
9         Q    BY MR. SNELL:  No.  They do more like
10   Burch and MMK?
11        A.   Oh, yes.  Oh, okay.  I see what you're
12   saying.
13             That would probably be a fair
14   statement, yes.
15             (Recessed from 1:45 p.m. to
16                1:50 p.m.)
17             (Exhibit 16 marked.)
18        Q    BY MR. SNELL:  Doctor, I've handed you
19   Exhibit 16.  This is from the Mayo Clinic
20   regarding urinary incontinence.
21             Is this the information you had
22   earlier referenced that Mayo puts out regarding
23   urinary incontinence?
24        A.   Well, this is on their web site, yeah,
25   which I had no role in this.

Page 172

1         Q.   I printed this out September 18th,
2    2015.  You see that at the bottom?
3         A.   Yes.
4         Q.   This is where the Mayo Clinic is
5    talking about urinary incontinence, particularly
6    for women; right?
7         A.   Yes.
8         Q.   And you see on the second page, Mayo
9    Clinic.
10             And you still work at Mayo Clinic;
11   right?
12        A.   Correct.
13        Q.   Talks about "Sling procedures to treat
14   stress incontinence"; correct?
15        A.   Correct.
16        Q.   And they say Mayo Clinic -- are you
17   employed by Mayo Clinic or are you an independent
18   contractor?
19        A.   No.  I'm employed by Mayo.
20        Q.   Mayo Clinic says sling procedures and
21   bladder neck suspension procedures are the most
22   common surgical procedures; right?  Falling into
23   those categories?
24        A.   I don't see where you're reading from.
25        Q.   Let me withdraw.  Restate it.

Page 173

1              MR. CARTMELL:  Where's it say that?
2         Q.   BY MR. SNELL:  The topic under Sling
3    procedures to treat stress incontinence on page 2.
4    Are you there?
5         A.   Yes.
6         Q.   All right.  And Mayo Clinic, your
7    employer, says, "Most surgical procedures to treat
8    stress incontinence fall into two main categories:
9    Sling procedures and bladder neck suspension
10   procedures."
11        A.   That's what it states, but the Mayo
12   Clinic doesn't state anything.  It's a building.
13   So this is a writer that has been hired to do
14   this, which I had no role in, but that's what they
15   state there.
16        Q.   Well, Mayo Clinic doesn't put
17   unreliable information on their web site to
18   patients; do they?
19        A.   No.  Again, I'm saying, Mayo Clinic is
20   a building.  So I'm saying it's like saying the
21   White House said something.  Well, no a person
22   said it.
23             But I'm saying, this is what is stated
24   on the Mayo Clinic web site.
25        Q.   Right.  And it says, "During a sling

44 (Pages 170 to 173)

Daniel Steven Elliott, M.D.

Page 174

1    procedure, your surgeon uses strips of synthetic
2    mesh, your own tissue or sometimes animal or donor
3    tissue to create a sling or 'hammock' under your
4    urethra or bladder neck; correct?
5        A.   Correct.
6        Q.   And that's accurate; right?
7        A.   That is correct; yes.
8        Q.   Depending upon which option a surgeon
9    chooses to offer to his or her patients; correct?
10       A.   That's correct; yes.
11       Q.   "The sling procedure that's best for
12   you depends upon your individual situation," it
13   says.
14            You'd agree with that?
15       A.   Correct.
16       Q.   It's got Tension-free sling under
17   that.  You with me?
18       A.   Yes.
19       Q.   "No stitches are used to attach the
20   tension-free sling, which is made from a strip of
21   synthetic mesh tape"; correct?
22       A.   Correct.
23       Q.   And that's like the TVT retropubic
24   device; correct?
25       A.   That would be one of them, but there'd

Page 175

1    be a lot in that category, yes.
2        Q.   "Instead, body tissue holds the sling
3    in place"; correct?
4        A.   Correct.
5        Q.   "Eventually scar tissue forms in and
6    around the mesh to keep it from moving."
7            That's correct?
8        A.   Yeah.  That is part of the problem,
9    but, yes.
10       Q.   And then they talk about retropubic
11   and transobturator approaches that we've discussed
12   today; right?
13       A.   Correct.
14       Q.   Then on the next page, the Mayo Clinic
15   says, "Using surgical mesh is a safe and effective
16   way to treat stress urinary incontinence."
17       A.   That is what --
18       Q.   You agree with that; right?
19       A.   I disagree with that.
20       Q.   So you disagree with your employer,
21   the Mayo Clinic, that surgical mesh is a safe and
22   effective way to treat stress urinary
23   incontinence?
24       A.   And it says, "However, complications
25   can occur in some women, including erosion of the

Page 176

1    material, infection and pain."
2            That part I agree with.  But in my
3    department, in Urology, no one uses meshes, except
4    for me one time in the past 2-1/2 years.  I cannot
5    speak for the gynecologists.  But I was not part
6    of writing this document.
7        Q.   So you disagree with the Mayo Clinic's
8    web site.
9            MR. CARTMELL:  Object to the form.  He
10   has already answered that question.  Okay?  You
11   asked him specifically what the web site says.  He
12   said he disagrees with it.  So don't answer that.
13       Q.   BY MR. SNELL:  How about this?  A
14   little further down it says, "A conventional sling
15   sometimes requires a larger incision than a
16   tension-free sling.  You may need an overnight
17   stay in a hospital and usually a longer recovery
18   period.  You may also need a temporary catheter
19   after surgery while you heal."
20            You agree with that; right?
21       A.   Yes.
22       Q.   Do you teach your patients for whom
23   you do an autologous sling self-catheterization?
24       A.   No.
25       Q.   You had mentioned -- we were talking

Page 177

1    about -- strike that.
2            We were talking about the 17-year
3    paper by Nilsson, et al.?
4        A.   Correct.
5        Q.   And you had said you were not sure as
6    to whether that study followed patients who had
7    received the Prolene mesh?
8        A.   Oh, I said Arnaud was not sure, and so
9    subsequently I'm not sure.
10       Q.   I'm not asking about Arnaud.  I'm
11   asking you.
12       A.   I was clarifying.
13       Q.   Okay.  So what was your methodology in
14   selecting that one quote out of Arnaud's multiple
15   days of testimony?
16            MR. CARTMELL:  Object to the form.
17   I'm not sure what you mean.
18       A.   My methodology was, in this one very
19   straightforward.  I read the deposition.  They
20   asked Arnaud questions, is this TVT, and he says,
21   no, similar, but it is not TVT.
22            They say, is this polypropylene
23   Ethicon, and he says, to the effect, no it could
24   be ours.  It could be Bard's.  I don't know.  So
25   methodology on this one is straightforward.

45 (Pages 174 to 177)

Daniel Steven Elliott, M.D.

Page 178

1      Q    BY MR. SNELL:  So you believe the
2   testimony was in -- that he gave was in regards to
3   the Nilsson study?
4      A    In the original Ulmsten study that has
5   subsequently been carried forward to 17 years.
6      Q    Let's mark that.
7         (Exhibit 17 marked.)
8      Q    BY MR. SNELL:  You recognize this,
9   Doctor, to be that same study we've been
10  discussing by Nilsson, et al.?
11     A    That is correct.  That is a --
12        MR. CARTMELL:  The 17 year?
13     A    That's what I'm trying to find out.
14        MR. CARTMELL:  This isn't the 17 year.
15  This is 2000 --
16     A    This is 2001.
17     Q    BY MR. SNELL:  Right.  This is the
18  same study, but it reported that the mean
19  follow-up of 56 months; right?
20     A    Correct.  I don't know what -- I don't
21  see what the follow-up was on this one.  Was it
22  the 5 year?
23     Q    It's right here.  It's right here.
24  Yeah.  Yeah.
25     A    It's the 5 year.  Approximately 5 year

Page 179

1   range.  Yes.
2      Q    Right.
3      A    This is the 5-year study.
4      Q    You're familiar with this.  They
5   follow the series at 5 years, 7, 11, and 17 years;
6   correct?
7      A    Yes, sir.
8      Q    All right.  And if you go to the
9   Patients and Methods section, in the left column
10  it says, "The TVT set consisted of two 6
11  millimeter needles connected to a handle and a
12  specific polypropylene (Prolene) mesh tape fixed
13  to the needles."
14        Do you see that?
15     A    Yes, I do.
16     Q    So this paper reports that the mesh
17  they used in that Nilsson study was Prolene tape;
18  correct?
19     A    Even the medical director of Ethicon
20  needs to get updated on his data.  I don't know
21  why he would raise those issues then, because he
22  was there during this time frame and involved, as
23  far as knowledge of these studies.  So that would
24  have to be answered by him.  But he said it under
25  oath.  So all I'm doing is parroting back what I

Page 180

1   have read him say.
2      Q    Right.  The jury can ultimately hear
3   testimony and decide whatever they want to.
4      A    Correct.
5      Q    But for you as a doctor, this is
6   medical literature.  Did you read this and ignore
7   it or did you not know about this?
8      A    Oh, I knew it.  I knew it very well.
9   I read all these, including the 17-year one.  I
10  also know that Ulmsten was paid $400,000, which
11  Arnaud said was a conflict of interest and would
12  bias the results.  I also know from other things
13  that they don't necessarily write down what the
14  truth is.  All I know is the authors were getting
15  paid $400,000 originally and are getting money,
16  save TVT.  The medical director of Ethicon says, I
17  don't know if it is, maybe not, but it's not TVT.
18     Q    And you chose to go with the medical
19  director?
20     A    No, I'm keeping an open mind.  I have
21  to have data to show me clearly that this was.
22  Because from my perspective from what Arnaud said,
23  who should be the authority, this is a Mediscan
24  product, and or possibly Bard mesh.  So it raises
25  a major problem for me.  And I am not -- if you

Page 181

1   show me -- if you have data to prove it, I would
2   love to see it.
3      Q    You mentioned the $400,000 that
4   Ulmsten received.  Why does that matter to you?
5      A    Well, conflict of interest and bias,
6   unfortunately, exists in medicine.  And that's why
7   now we have to declare that.  Originally we did
8   not have to declare it.  During my residency you
9   didn't have to do it.  Early on in staff, you
10  didn't have to do it.  But because of events like
11  this, now you have to declare it.
12        So if there is money and you stand to
13  make a lot of money, there's the potential for
14  bias.  I didn't say there is there.  I said
15  there's a potential for it.  There's clearly a
16  conflict of interest, which Arnaud agreed with me
17  on that.  He said there is conflict of interest in
18  this paper.  So that is important.  You have to
19  read this article through that lens of potential
20  bias.
21     Q    And the same would hold true for all
22  the Vypro and other studies you cited by
23  Dr. Klinge who had a financial interest, correct,
24  in promoting that product.
25     A    You --

46 (Pages 178 to 181)

Daniel Steven Elliott, M.D.

Page 182

1          MR. CARTMELL: Wait.  Object to the
2   form.  It's vague and ambiguous with respect to
3   what product you're talking about.
4          MR. SNELL: I said Vypro; didn't I?
5       Q.   BY MR. SNELL: You know Dr. Klinge had
6   an interest in Vypro, don't you, Doctor?
7       A.   I do know that.
8       Q.   You know he's biased with regard to
9   Vypro; don't you?
10      A.   No.  There's a difference between
11  conflict of interest and bias.  I am stating with
12  Nilsson and Ulmsten there is a conflict of
13  interest.  There is the potential for bias.  I
14  didn't say there was bias.  And as a reviewer, I
15  have to keep an open mind and look at that.  I'm
16  not denying at all with the Klinge, Klosterhalfen,
17  whichever one -- I can't remember which one's
18  which.  But with Vypro, if there is a financial
19  interest there, that is a potential for conflict
20  of interest.  If there is a conflict of interest,
21  potential for bias.
22      Q.   All right.  And you know for a fact
23  that exists with Dr. Klinge?
24      A.   I don't know for a fact.  I can't keep
25  track of who's got what where.  But if you are

Page 183

1   stating for me that he has a financial interest in
2   that, that does -- I have to be concerned about
3   that and look at it as objectively as I can.
4       Q.   And you cited to Dr. Klinge more than
5   10 times in your expert report; right?
6       A.   Probably.  And I also cite the Nilsson
7   and Ulmsten studies quite a bit in there, too.
8   Those are all the body of evidence in the
9   methodology that I have to look at is look at the
10  potential for bias in papers.
11      Q.   Tell me if you agree or disagree with
12  these assertions.  The Burch and MMK are very
13  invasive, often result in complications, and
14  usually require prolonged hospital stays.
15      A.   A lot of factors.  It would be easier
16  if we go one by one or if you just want to -- if
17  you want to take the sentence in totality, it all
18  has to be true, I disagree with it.  We can go bit
19  by bit through it, though.
20      Q.   You would agree that Burch and MMK
21  both are very invasive?
22      A.   I disagree.  Compared to what?
23      Q.   Compared to alternative surgeries for
24  stress urinary incontinence.
25      A.   No.  Now, you've lumped MMK and Burch

Page 184

1   together.  So that's not a fair comparison.  The
2   Burch can be done -- you can get it done in a 5,
3   6, 7-centimeter incision.  Outpatient, overnight
4   stay in the hospital.  So, no, I disagree with
5   that.  There are studies out there showing longer
6   stays.  It's all over the board.
7       Q.   But you'd at least agree with the
8   statement that the pubovaginal sling is effective
9   but is known to have a high rate of complications,
10  require long hospital stays, and patients often
11  experience a significant amount of pain?
12          MR. CARTMELL: Object to the form.
13      A.   Again, we're looking at the
14  perioperative period.  So I would agree with that,
15  but we have to always compare it to what.  Are we
16  comparing it to TVT?  Are we comparing it to the
17  synthetics?  Are we comparing it to the MMK or
18  just any transabdominal procedure?
19      Q   BY MR. SNELL: You would agree with
20  the statement that mid-urethral sling procedures
21  are much less invasive than the earlier
22  pubovaginal sling procedures; right?
23      A.   Overall, when you're doing a
24  comparison of synthetics to the pubovaginal or
25  Burch, those are -- the Burch and pubovaginal

Page 185

1   slings are going to be relatively more invasive.
2       Q.   Would you agree or disagree with the
3   statement that tension-free mid-urethral sling,
4   like the TVT retropubic, is a significant
5   advancement in treating stress urinary
6   incontinence?
7       A.   Oh, yes.  And early on I was very --
8   now, again, I never used the TVT because I was
9   described the various different fears of it.  But
10  when TVT came out, it was revolutionary.  It
11  changed the way we did things.  But we didn't know
12  what we know now.  And even comparing myself to
13  two or three years ago, my opinion has changed.
14  So, yeah, it was touted as being revolutionary.
15          (Discussion off the record.)
16          (Exhibit 18 marked.)
17      Q   BY MR. SNELL: Doctor, I've given you
18  the Cochrane Review.  This is the publication in
19  2011.
20      A.   Correct.
21      Q.   You're familiar with this; correct?
22      A.   Yes, I am.
23      Q.   And this was the Cochrane Review where
24  they did a comparative analysis of like the
25  retropubic TVT versus the Burch or pubovaginal

47 (Pages 182 to 185)

Daniel Steven Elliott, M.D.

Page 186

1    slings; correct?
2        A.    I see suburethral slings, open
3    retropubic colposuspension.  I don't see
4    pubovaginal in there.  I'm not saying it isn't
5    there.  I just don't see it.
6        Q.    Well, here, let's -- let me just --
7    we'll go through it quickly.  In the Results
8    section -- I'm on the very front.  They say,
9    "Minimally invasive synthetic suburethral sling
10   operations appeared to be as effective as
11   traditional suburethral slings"; correct?
12       A.    Correct.
13       Q.    And when they talk about traditional
14   suburethral slings, that would be like the
15   autologous pubovaginal sling; correct?
16       A.    That's not nomenclature that's
17   normally used.  It's not called a suburethral
18   sling.  I would have to see what they're referring
19   to.  It's called a pubovaginal sling.  It's not --
20   suburethral slings, normal nomenclature is the
21   synthetics.
22       Q.    On the next page where they go through
23   the different procedures, they put the -- what I
24   read to be the pubovaginal slings and the
25   minimally invasive slings, like TVT, under the

Page 187

1    category of suburethral slings.
2             Do you see that?
3        A.    Yeah.  What they're doing is they're
4    comparing it to the colposuspension, which would
5    be probably supra urethral slings -- or
6    supra urethral suspension.  That's probably what
7    they're doing.
8        Q.    Okay.  But they found that "the
9    minimally invasive synthetic suburethral slings
10   appeared to be as effective as the traditional
11   suburethral slings, but with shorter operating
12   time and less postoperative voiding dysfunction
13   and de novo urgency symptoms; correct?
14       A.    Okay.  That's what they state, yes.
15       Q.    And have you seen data consistent with
16   that conclusion by this Cochrane Review?
17       A.    I've seen data consistent with it and
18   inconsistent with it.  So, again, I'd have to
19   analyze each of the studies, what they're talking
20   about.
21       Q.    Have you seen any other meta-analyses
22   that report that for the TVT retropubic compared
23   to pubovaginal slings, it has a higher rate of
24   complications?
25       A.    Again, I'd have to see the -- I don't

Page 188

1    recall seeing another meta-analysis.  And, again,
2    then I'd have to look at how long the follow-up
3    is.  Is it 12 months or is it 30 years.  That's
4    what matters to me, end of the patient.
5        Q.    "Minimally invasive synthetic slings
6    appeared to be as effective as the open retropubic
7    colposuspension."
8        A.    Yeah.  I don't see where you are.  And
9    I wouldn't challenge --
10       Q.    I wouldn't mislead you.  I'm just
11   reading --
12       A.    No.  I don't doubt.  That's what we've
13   been discussing all along.  The Burch and the
14   pubovaginal sling and the TVT have many studies
15   showing they have similar efficacy.
16       Q.    And here's what I want to ask you
17   about.
18             But the TVT retropubic sling "has
19   fewer perioperative complications, less
20   postoperative voiding dysfunction, shorter
21   operative time and hospital stay, but
22   significantly more bladder perforations."
23       A.    Correct.  And the key with that
24   statement, as you read it, was perioperative.  So
25   that's immediate perioperative.  And I'm not going

Page 189

1    to challenge.  I think it's going to be somewhat
2    of a relative issue.  It's the long-term
3    complications that I'm most concerned about and
4    see on a daily basis in my clinic.
5        Q.    So in the comparative studies for like
6    comparing to the Burch, there are some
7    perioperative complications that appear to be
8    higher with Burch as compared to the TVT; correct?
9        A.    Correct.
10       Q.    Bladder perforation being the one
11   higher with the TVT because of the retropubic
12   passage; correct?
13       A.    Correct.
14       Q.    A little further down they say that
15   the "retropubic bottom-to-top route was more
16   effective than the top-to-bottom route"; correct?
17       A.    That was their conclusion.  It says
18   effective in -- it doesn't say exactly here, but I
19   assume they're talking about stress urinary
20   incontinence.  That's what they state.
21       Q.    That's consistent with the Ford paper
22   you cited; right?
23       A.    Yes.
24       Q.    And the approach used by TVT
25   retropubic "incurred significantly less voiding

48 (Pages 186 to 189)

Daniel Steven Elliott, M.D.

Page 190

1  dysfunction, bladder perforations, and tape
2  erosions"; correct?
3      A.   That's what they state, yes.
4      Q.   That's consistent with the Ford paper;
5  right?
6      A.   I'd have to look back at that, but it
7  sounds similar.
8      Q.   "Monofilament tapes had significantly
9  higher objective cure rates compared to
10  multifilament tapes and fewer tape erosions."
11          Do you see that?
12     A.   Yes.
13     Q.   And TVT is a monofilament tape;
14  correct?
15     A.   Correct.
16     Q.   And that's a benefit of monofilament
17  tapes over multifilament tapes, where they have
18  fewer erosions; correct?
19     A.   Yeah.  The multifilament is going to
20  be a worse product.  Doesn't mean monofilament is
21  safe.  It just says is safer relative to the worst
22  product.  Worse --
23     Q.   And the -- I'm sorry.  You're going --
24     A.   No, no, no, no.
25     Q.   And the monofilament tape had a rate

Page 191

1  of erosion of 1.3 percent; correct?
2      A.   Based upon their analysis here in the
3  hands of experts and short-term follow-up, yes,
4  that's the number they found.
5      Q.   Were you aware of this Ogah/Cochrane
6  Review at the time you wrote your draft -- your
7  expert report?
8      A.   I don't recall when I became aware of
9  it.  It's a -- it's a well-known paper.
10     Q.   In looking at your report, I did not
11  see you citing any TVT retropubic device
12  literature where the device had been used to treat
13  stress urinary incontinence in women and where it
14  was reported that there was contraction.
15          Is that a fair statement with regard
16  to your report?
17     A.   No.  That would be incorrect.
18     Q.   Where in your report do you report
19  studies in TVT in women that reports contractions?
20     A.   Well, wherever there is pain, wherever
21  there is extrusion, that is evidence of
22  contraction.
23     Q.   Where in your report do you report
24  that?
25     A.   Well, if we go to pain or dyspareunia.

Page 192

1  Let's see here.  There's Kuhn, et al.
2      Q.   Let me see where you're at.
3      A.   Which is a TVT paper.  Let me see
4  where Kuhn is referenced.  I'd have to search for
5  it.
6      Q.   Just so I'm on the same page as you,
7  Doctor, I appreciate you telling me what page of
8  your report you're on where you discuss
9  contraction with the TVT.  I'm going to let you --
10  let's take a quick break.
11          (Recessed from 2:17 p.m. to
12          2:28 p.m.)
13     Q   BY MR. SNELL:  All right.  Okay,
14  Doctor, before we took a break, I asked you to
15  show me in your expert report where you discuss
16  contraction rates with regard to the TVT device
17  and its use in women for stress urinary
18  incontinence.
19          Can you point me to that?
20     A.   Well, in the Contraction section,
21  obviously we do a lot of discussion about
22  contraction, various different studies with it.
23  When we limit it specifically to TVT, I think we
24  have to look at Wang, et al., on page 24, where
25  we're talking about infections, erosions and

Page 193

1  exposures, because the complication of contraction
2  is intimately tied to also exposures and
3  infections.
4      Q.   So TVT and contraction -- strike that.
5          So for TVT contraction in women, you
6  point me to Wang on page 24?
7      A.   That's when you specifically limit it
8  just to the TVT product.
9      Q.   Right.
10     A.   Because as I mentioned, all
11  complications are all intertwined.  So exposure,
12  infection is intertwined with inflammation,
13  contraction, degradation, et cetera.
14     Q.   And the other part of your report
15  where you talk about contraction, you talk about
16  Klinge and his discussion of hernia mesh
17  contraction; right?
18     A.   That is correct, because that is a TVT
19  mesh implanted via the abdominal route.
20     Q.   All right.  It's not cut to and
21  configured as TVT is; correct?
22     A.   No.  But without -- no, you are
23  correct.  However, the TVT mesh has different
24  forces placed upon it that the hernia meshes do
25  not, i.e., you can make hernia meshes lay flat.

Daniel Steven Elliott, M.D.

Page 194

1    You can't do that with the vagina.
2        Q.   The hernia mesh does not have a sheath
3    on it; correct?
4        A.   No.  It does not, but it's also not
5    placed in the vagina to have bacterial
6    contamination.
7        Q.   When you say bacterial contamination,
8    you're not referring to infection; are you?
9        A.   I'm referring to bacterial
10   contamination.
11       Q.   Right.  There is a difference between
12   bacterial contamination and infection; correct?
13       A.   Yes, but infection starts with a
14   contamination.
15       Q.   Right.  You're aware of the paper by
16   Pat Culligan where they found and they quantified
17   the different bacteria counts in the vagina?
18       A.   Correct.
19       Q.   In that study there were patients who
20   received the TVT as well; correct?
21       A.   I'd have to look at it.  I don't
22   recall the specifics.
23       Q.   Would it surprise you to learn that
24   there were no infections with the TVT mesh in the
25   Culligan paper.

Page 195

1        MR. CARTMELL:  Object to the form.
2        A.   I would have to look at the
3    methodology, because methodology is very
4    important.  I'd have to look at how they did the
5    study and what they looked at.
6        Q    BY MR. SNELL:  Have you looked at
7    that?
8        A.   Yes, I have, but I don't have it off
9    the top of my head.
10       Q.   Is it your opinion that whenever mesh
11   is placed through the vagina there is bacteria
12   that gets on it?
13       A.   We know that the vagina's impossible
14   to sterilize, and so when you place it through the
15   vagina, you are going to have contact with that.
16   So it's even with the sheath on it, but then when
17   you remove the sheath, there's going to be issues
18   there.  So the risk for contamination on every
19   single one is definitely there.
20       Q.   But that does not translate into
21   infection?
22       A.   It might not translate into a clinical
23   infection/abscess, but it can correlate to a
24   subclinical infection, leading to inflammation,
25   degradation, and that cascade.

Page 196

1        Q.   And you have not stated in your report
2    the rate at which clinical infections occur with
3    TVT; have you?
4        A.   I don't recall that specific, but the
5    way you phrase it, specifically mentioned in
6    there.
7        Q.   I have not seen in your expert report
8    where you calculate and state the complication
9    rates with the TVT retropubic device.
10       A.   Because we don't know the true
11   complication rate.  We can quote studies, as I
12   mentioned, in high volume surgeons with limited
13   follow-up.  We can quote those.  But as I said, we
14   don't know the true complication rate.
15       Q.   Well, there are meta-analyses, and
16   we've gone through a couple of them today and
17   various other studies that report rates of
18   complications, and you're aware of that; correct?
19       A.   Yes.  But that does not reflect what
20   is happening out in the real world and what I see
21   in my daily practice.  That the average low-volume
22   surgeon, who does the majority of the TVTs in the
23   United States, that's what -- you know, because
24   Arnaud even admitted, their complication rates are
25   even going to be higher.  So, yes, we can quote

Page 197

1    extensively the studies that you've done that show
2    these various different complication rates with
3    short-term follow-up and highly experienced
4    surgeons.
5        Q.   In the studies that report on the TVT
6    retropubic device, what percentage of those
7    studies involved surgeons who were of average
8    quality?
9        A.   Well, I can't speak to quality.  All
10   we can speak to is volume.
11       Q.   How many of those then had average
12   volume for the TVT retropubic studies?
13       A.   Most likely very few of those had
14   small volume.  And the Kuuva study, they
15   eliminated the lower volume studies -- lower
16   volume people.  So they falsely raised their
17   success rate and lowered their complication rate.
18   But, no, small volume surgeons aren't going to
19   publish anything because they're small volume.
20       MR. SNELL:  Move to strike.
21       Q.   BY MR. SNELL:  Do you know of all the
22   TVT retropubic device studies which percent of
23   them included surgeons that had average volume or
24   less?
25       MR. CARTMELL:  Object to the form.

50 (Pages 194 to 197)

Daniel Steven Elliott, M.D.

Page 198

1   Asked and answered.  He said a very small
2   percentage of those.  He answered your question.
3   He also said other information, but he
4   specifically answered your question.  So please
5   move on.
6       Q    BY MR. SNELL:  Is that correct; you
7   believe it's a very small number?
8       A    Average or low-volume surgeons aren't
9   going to have their data included because they
10  don't have enough data to analyze.
11          The only way I can answer your
12  question is Kuuva, et al., where they actually
13  eliminated the small volume surgeons who had done
14  less than 15.
15      Q.   I'm familiar with the Kuuva paper.
16  I'm talking about the hundreds of other TVT
17  retropubic papers.  In those, is it correct that
18  you don't know what percent of those papers
19  reported on surgeons who had average to low
20  volume?
21          MR. CARTMELL:  Objection.  Asked and
22  answered.  You can tell him again.
23      A.   As I stated, my opinion is it's going
24  to be a very, very small number of small volume
25  surgeons are going to be included in those

Page 199

1   studies, if any, because you don't write up a
2   paper if you've done 10.  No one's going to get
3   accepted.
4       Q    BY MR. SNELL:  Well, you wrote up a
5   paper where you did 10 transobturator procedures?
6       A.   Absolutely I did, and that was called
7   a feasibility study.  In properly counseled
8   patients.  I am not out there touting that that is
9   the new gold standard.  That's why we called it a
10  feasibility study.
11      Q.   Other than the Kuuva paper, what are
12  you relying on for that statement that it would be
13  a very, very small number?
14      A.   Based upon my experience and
15  attendance at national and international meetings,
16  working at a tertiary care center, working on the
17  journal articles from 15 different journals, that
18  small volume surgeons don't write papers because
19  there's nothing there to publish.  So, therefore,
20  my experience is, and I'll state unequivocally,
21  very, very small percentage.  If you want a
22  number, 1 to 2 percent, if that.  And they're not
23  going to get published anywhere.
24      Q.   Have you surveyed the literature for
25  all the TVT retropubic device studies and done an

Page 200

1   analysis by which you segregated the investigators
2   who had low to average surgical volume as compared
3   to more than that?
4       A.   I have reviewed the literature
5   extensively.  Can I quote to a certain specific
6   paper?  No.  If you have one, show me, and I'll
7   keep an open mind and modify my statement.  But
8   this is based upon experience.  Again, national,
9   international meetings.  Editor -- or reviewer of
10  15 different journals.  And I'm reading these
11  papers constantly.  And you're not seeing
12  low-volume surgeons produce papers.  The only one
13  that comes close to it is Anger, et al., which
14  demonstrated that low-volume surgeons had higher
15  complication rates.
16      Q.   Do you believe lower-volume surgeons
17  with other stress incontinence surgeries, like the
18  Burch or pubovaginal slings, have higher
19  complication rates?
20      A.   I would think that would be true.  And
21  those surgeons usually don't do those surgeries
22  because they are more complicated surgeries to
23  perform.  It takes more talent to do.  So most of
24  those surgeons don't do it.  That was the
25  revolutionary aspect of TVT because it opened up

Page 201

1   minimal -- it opened up stress incontinence
2   surgery to the common surgeon.
3       Q.   Is the common surgeon unqualified in
4   your opinion to do TVTs?
5       A.   The common surgeon needs to -- no, the
6   common surgeon -- let's be careful on the word
7   "common."  I'm saying the average, private
8   practice surgeon, who is doing less than 15 or so
9   a year, based upon the Kuuva study, et al., is
10  going to be having a higher complication rate.
11  Most of these studies also demonstrate in highly
12  experienced hands.
13          So I'm saying as far as the common,
14  the average surgeon out there, they are not going
15  to have the expertise of the high-volume surgeons;
16  hence, complications go up.
17      Q.   Do you believe that surgeons in
18  private practice have less surgical skills than
19  surgeons in universities?
20      A.   Absolutely not.  It just depends upon
21  their experience.  There are some that I know in
22  private practice who do very high volumes.  It's
23  not an issue of the specific individual.  It's an
24  issue of their volumes.  And you know if you look
25  at the Nilsson study, Nilsson is a five-year

Daniel Steven Elliott, M.D.

Page 202

1    study.  That was -- five-year study?  Yeah.  It's
2    a five-year study.
3          See, they very clearly -- all surgeons
4    involved were experienced urogynecologists well
5    trained in TVT surgery.  That's not going to be
6    your average surgeon.  That's are highly qualified
7    people.
8          Q.   How many average pelvic surgeons in
9    the United States use TVT?
10         A.   I can't answer that question.  I don't
11   know the -- a way of referencing it.  We'd have to
12   look at ethical sales and where they go to and the
13   volumes that move off the shelf.  That data would
14   be available.
15         Q.   Have you analyzed that data?
16         A.   That data's been tried to get and
17   can't.
18         Q.   How many high-volume surgeons are
19   there in the United States for TVT retropubic
20   device as you define high volume?
21         A.   There's going to be a certain number.
22   But I don't know what that number would be.
23   Around the nation there's going to be people that
24   are going to be very good surgeons.
25         Q.   Are residents -- do residents

Page 203

1    typically have higher complication rates than the,
2    you know, professors or the surgeons who teach
3    them?
4          A.   It depends.  If the resident is
5    running solo and doing a case without any
6    supervision, that possibly could be the case.
7    However, if they have been well trained in a
8    certain procedure and they're doing it solo and
9    they've done more than anybody else -- they've
10   done an acceptable number, their complications are
11   going to be low.  There's too many variables to be
12   able to answer that question.
13         Q.   If a surgeon is -- strike that.
14         If a surgeon is more than an average
15   surgeon, as you've stated, and he or she uses TVT
16   retropubic device, based upon the data, you would
17   agree then that the rate of complications are
18   acceptable in his or her hands?
19         A.   Number one, acceptable, no.  Number
20   two, it depends upon what -- how much follow-up
21   they have.  And it's true, a surgeon can put in
22   the device and at one year that woman has not
23   experienced any complications yet.  But that
24   device is going to stay in her the rest of her
25   life.  That's why I'm saying all these studies are

Page 204

1    insufficient.
2          Q.   Have you analyzed the studies overall
3    that show that the majority of complications do
4    occur in the first 12 months?
5          MR. CARTMELL:  Object to the form.  I
6    think it misstates the evidence in the studies.
7          A.   Yeah.  And it's also -- the
8    complications they know of at that point.  Because
9    I can give you examples of bladder erosions that
10   I've taken care of that I put in the sling that at
11   7 years they're fine.  At year 8 there's an
12   erosion, which we've examined.  So we have to look
13   at the life of the patient.
14         Q.   BY MR. SNELL:  In the studies that
15   report on TVT retropubic at five years duration or
16   more, what is the rate of mesh exposure occurring
17   after five years.
18         A.   It's unknown.
19         Q.   You mentioned the Wang paper.  Let me
20   just make sure I have it here.  I think I do.
21         (Exhibit 19 marked.)
22         Q.   BY MR. SNELL:  Is this the Wang paper
23   you referenced, Doctor, with regard to TVT?
24         A.   Correct.  2004 publication, yes.
25         Q.   And that paper says on the first page

Page 205

1    "Prolene tape seems unusually biocompatible when
2    used as a suburethral sling"; correct?
3          It's all on the very first page.
4          A.   I'm sorry.  Where are you?
5          Q.   Very first page.  Right here.
6          A.   That's what it states, yes.
7          Q.   And so this paper by Wang is actually
8    inconsistent with your belief that Prolene --
9    strike that.
10         Do you believe Prolene mesh is not
11   biocompatible?
12         A.   I do not believe it is biocompatible,
13   no.
14         Q.   In what percentage of patients is
15   Prolene tape -- strike that.
16         In what percentage of patients is the
17   Prolene mesh used in TVT for the treatment of
18   incontinence not biocompatible?
19         A.   That's impossible to know because
20   there's been no good studies looking long-term at
21   them.
22         Q.   Well, in this paper, out of 700 women
23   that you reference, the rate of exposure was
24   2.4 percent; correct?
25         MR. CARTMELL:  Object to the form.

Daniel Steven Elliott, M.D.

Page 206

1    A.   Correct.  During the time period of
2  this study, of 7 -- I don't see what the follow-up
3  is.
4         MR. CARTMELL:  I think that misstates
5  the evidence.  The question assumes facts that are
6  not in evidence.
7    A.   The paper, at least in the abstract,
8  does not state the follow-up time.  But this paper
9  states defective vaginal healing that became
10  clinically significant was 2.4 percent during the
11  study period.  But, again, I'm trying to find
12  the -- this is at 1 to 3 months.  Defective
13  healing from 1 to 3 months, it looks like.  So
14  it's a very short-term study.
15    Q    BY MR. SNELL:  Well, they actually
16  looked at a longer time period than 3 months in
17  this paper; right?  It's just that the healing
18  problems arose before three months; correct?
19    A.   The acute healing problems arose
20  during that time, yes.
21    Q.   And so that means that 97.6 percent of
22  the women did not have vaginal healing problems;
23  right?
24    A.   At the time the study was conducted.
25    Q.   Fair enough.

Page 207

1         And you see there were four women what
2  complained of dyspareunia?  I'm right here in the
3  Results section.
4    A.   Five complained of pain and four
5  complained of dyspareunia by themselves or their
6  partner.
7    Q.   And so four women complained of
8  dyspareunia by themselves or their partner or
9  partner discomfort; right?
10    A.   Yes.  So nine patients overall
11  complained of pain.
12    Q.   All right.
13    A.   Four complained of dyspareunia.
14    Q.   And as for dyspareunia, that rate is
15  0.57 percent; correct?  This paper you point to.
16    A.   A -- well, it's 4 out of 700 patients
17  at that short-term follow-up.  That's how many
18  complained of dyspareunia.
19    Q.   And does it sound about right that
20  that rate is 0.57 percent.
21    A.   I would have to do the math on it.
22  I'll have to take your word for that.
23    Q.   Well, 4 is certainly -- 4 women out of
24  700 is certainly less than 1 percent; right?
25    A.   Well, if you look at this, 5 women

Page 208

1  complained of pain, 4 complained of dyspareunia, 5
2  complained of vaginal bleeding and irritated
3  voiding.  And so to break it down into specific
4  little complications is disingenuous at best.  But
5  going to that, yeah, 4 out of 700 complained
6  specifically of dyspareunia during this short
7  period of time, short period of follow-up.
8    Q.   And that's less than 1 percent; right?
9    A.   It's whatever the math is.  Again, I
10  don't -- I can trust you on the math, I think.
11    Q.   5 out of 700's less than 1 percent;
12  correct?
13         MR. CARTMELL:  He's answered you.
14  Asked and answered.
15    Q.   BY MR. SNELL:  I'm talking about the
16  pain rate now.  Not dyspareunia.
17    A.   Pain?  Well, pain -- if you want pain,
18  it's going to be different.  So it's going to be
19  9.  Pain is roughly a 2 percent incidence of pain
20  at that point in time.
21    Q.   Where do you get 2 percent?
22    A.   We have five women complained of pain.
23  Four women complained of dyspareunia.  Five women
24  complained of vaginal bleeding and irritated
25  voiding.

Page 209

1    Q.   Doesn't say those five complained of
2  pain.
3    A.   No, they didn't.  But they
4  complained -- they complained of something else.
5  So, again, what is always -- I'll let you have
6  this, but as a doctor that takes care of patients
7  who are crying in my office, you guys break down
8  the complications.  Yeah.  So, yes.  9 patients in
9  this series out of 700 complained of pain.  The
10  other ones weren't happy with vaginal bleeding,
11  irritated voiding.
12    Q.   That was five who weren't happy with
13  vaginal bleeding or irritated voiding; correct?
14    A.   Correct.
15    Q.   And they ended up, 7 patients in this
16  series that you point to required excision of the
17  exposed suburethral part of the sling; is that
18  correct?
19    A.   That's correct.
20    Q.   So that was an excision rate of only
21  1 percent in this entire cohort; right?
22    A.   During the very limited follow-up
23  duration of this study, that is the number they
24  came up with.
25    Q.   When you say limited follow-up

53 (Pages 206 to 209)

Daniel Steven Elliott, M.D.

Page 210

1    duration, why do you say that?
2        A.   What's going to happen in 5 years? 10
3    years? 20 years?
4        Q.   How about this? Why don't we look a
5    little bit further below that. You see the mean
6    follow-up of 68.2 months?
7        A.   Okay. What about 69 months -- I'm
8    sorry.
9        Q.   That's over five years, isn't it,
10   Doctor?
11       A.   And as I have mentioned over and over
12   and over, this is an implantable medical device,
13   as you mentioned. There are studies out there.
14   Klinge, 15 years, degradation continues. This is
15   a progressive process. I see these patients in my
16   clinic that aren't being followed by anybody. So
17   I'm saying 5 years, that's a step in the right
18   direction. But if a woman lives 30 years beyond
19   that, what's going to happen in that time frame?
20   Our data suggests it's going to get worse.
21       MR. SNELL: Move to strike.
22       Q.   BY MR. SNELL: In this paper you point
23   to -- you pointed me to, at over 5 years
24   follow-up, there was only 1 percent rate of mesh
25   excision to treat the exposure; right?

Page 211

1        A.   That is what the study stated at five
2    years, yes.
3        Q.   So that means at a mean follow-up
4    greater than 5 years, 99 percent of the women in
5    this entire large cohort didn't need a mesh
6    excision procedure; correct?
7        A.   The key is yet.
8        Q.   And there are other studies that
9    report --
10       MR. CARTMELL: Just for the record, I
11   want it to be clear, because I think it's unfair
12   to the witness that you've been representing that
13   there was a small number of erosions. And I think
14   there were 17 erosions in the cohort. And I want
15   the record to be clear for that.
16       MR. SNELL: I think -- the study says
17   what it says, so I can't --
18       MR. CARTMELL: Yeah, but you're just
19   kind of trying to trick him, you know, because
20   you --
21       MR. SNELL: I'm not tricking him. He
22   pointed to this study, Tom. He knows this study.
23   Don't try to tell me I'm tricking a witness about
24   a paper he told me -- he's pointing me to.
25       MR. CARTMELL: So don't say --

Page 212

1        MR. SNELL: You're not testifying,
2    Tom, please.
3        MR. CARTMELL: -- there's 7 erosions
4    when there's 17 erosions. In fairness.
5        MR. SNELL: You know what. You're
6    totally off base.
7        MR. CARTMELL: I am?
8        MR. SNELL: Yes.
9        MR. CARTMELL: Tell me how.
10       MR. SNELL: On your time I was asking
11   him about erosions that needed surgical -- where's
12   the paper? We just went through this, didn't we,
13   Doctor.
14       MR. CARTMELL: 17 erosions. 17
15   erosions, it says right here.
16       MR. SNELL: Tom, you're being
17   nonsensical. I asked him about the ones that
18   required excision.
19       MR. CARTMELL: No, you didn't. You
20   said erosions in general, and the record will
21   reflect that.
22       Q.   BY MR. SNELL: Sir, don't you remember
23   me asking you about 7 of those patients required
24   excision of the exposed suburethral part of the
25   sling? Didn't I ask you about that?

Page 213

1        A.   You asked me a question. I can't
2    remember the specific details of it.
3        Q    BY MR. SNELL: But it says seven
4    required excision of the exposed suburethral part
5    of the sling; right?
6        A.   That's what that says there, and the
7    other part says 17 out of 100 had defective
8    vaginal healing.
9        Q.   And it gives the measurement, CA 1
10   times 0.5 centimeters; correct?
11       MR. CARTMELL: Okay. Now, it's all on
12   the record. Now it's fair.
13       MR. SNELL: It was fair before. He
14   cited to the document. He knows the study.
15       (Exhibit 20 marked.)
16       Q    BY MR. SNELL: Giving you one of the
17   publications by Klinge, Alloplastic Implants for
18   the Treatment of Stress Urinary Incontinence and
19   Pelvic Organ Prolapse.
20       You see this?
21       A.   Yes, I do.
22       Q.   Whereas you cited to Klinge about
23   hernia and other papers, you didn't cite to his
24   discussion of the TVT mesh; did you?
25       A.   I don't recall that specifically.

54 (Pages 210 to 213)

Daniel Steven Elliott, M.D.

Page 214

1    Q.   Look for where Klinge was writing
2  about meshes in stress urinary incontinence.
3       You there?
4    A.   Yes.  I mean, I'm sorry.  I'm at the
5  Meshes and Stress Urinary Incontinence.  I'm there
6  now.
7    Q.   All right.  And you saw Dr. Klinge was
8  one of the authors of this section; right?
9    A.   Correct.
10    Q.   And it says, "At present the gold
11  standard in SUI surgery is the suburethral sling
12  using either the tension-free vaginal tape (TVT)
13  or the transobturator tape (TOT) technique";
14  correct?
15    A.   That's what he states, yes.
16    Q.   And do you disagree with Dr. Klinge?
17    A.   I disagree.
18    Q.   It said, the initial concern that the
19  meshes used might lead to high rates of erosions,
20  did not hold true when macroporous polypropylene
21  was used; correct?
22    A.   That's what it states, yes.
23    Q.   And here when Dr. Klinge is talking
24  about macroporous polypropylene in the context of
25  stress urinary incontinence, he's talking about

Page 215

1  the mesh in TVT; correct?
2       MR. CARTMELL:  Object to the form.
3    A.   No.  He doesn't state which he's
4  talking -- referring to.  The sentence prior, it
5  says TVT or transobturator tape.  There's a lot of
6  different ones out there.  And then he says, "The
7  initial concern that meshes."  He does not say
8  TVT.  So all he's saying is meshes.
9    Q.   BY MR. SNELL:  Well, you see below
10  that, right, where he talks about -- he follows up
11  on his point.
12       He says, "There was a zero percent
13  exposure rate using the classical TVT (Type 1
14  macroporous monofilament polypropylene) mesh in
15  the same trial"; correct?
16    A.   Well, that's in the second -- in the
17  next paragraph down.  I'm talking about the
18  sentence you showed me.  Initial concern that
19  meshes.  So it doesn't say TVT.  We can agree it
20  says meshes, and I'll agree that's what it states,
21  but he doesn't say TVT.
22    Q.   We can agree that he says the
23  classical TVT (type 1 macroporous monofilament
24  polypropylene) mesh; right?
25    A.   That's what he's saying when he's

Page 216

1  referencing to the Meschia study.
2    Q.   And you know that that's a study that
3  looks at the Ethicon TVT retropubic device?
4    A.   I'd have to look back at the study.  I
5  don't remember the study.
6    Q.   Okay.  So at least in the context of
7  the intended use to treat stress urinary
8  incontinence with regard to the TVT device, he
9  reports that tape is a type 1 macroporous tape?
10    A.   That's what he reports in 2010.
11    Q.   Right.
12    A.   Which then reflects data from 2008.
13  And that's what he states.
14       I disagree with it.  Be interesting to
15  what he says now.
16    Q.   Now that he's been paid hundreds of
17  thousands of dollars by the plaintiffs' lawyers in
18  the mesh litigation?
19       MR. CARTMELL:  Object to the form.
20  It's argumentative.  Be distracting.
21    A.   If you want to go on the record that
22  he's being biased.
23    Q   BY MR. SNELL:  Do you know how many
24  royalties he -- Dr. Klinge received on Vypro?
25    A.   I'm not familiar with that number

Page 217

1  because I'm doing involvement of TVT case, not
2  Vypro.
3    Q.   Do you know how many royalties
4  Dr. Klinge has received for ULTRAPRO?
5    A.   The same answer as before, because I
6  know what data I've been provided on TVT.  I have
7  not been provided confidential data on Vypro or
8  the other ones.
9    Q.   And you don't disagree that when Amid
10  type 3 mesh, used for intravaginal slingplasty,
11  the vaginal erosion rate was 9 percent, and the
12  rate was 0 percent with TVT?
13       MR. CARTMELL:  Object to the form.
14    A.   I agree with the first part.  I don't
15  agree with the second part.
16       The Amid type 3 like the ObTape, which
17  I'm very familiar with, had an unacceptably
18  significant complication rate with it.
19    Q   BY MR. SNELL:  And you didn't cite to
20  this writing by Klinge in your expert report; did
21  you?
22    A.   I cited Klinge multiple times.  I
23  don't know if this specific -- this is a book
24  chapter.  I quoted this one.  Book chapters I tend
25  not to quote.

55 (Pages 214 to 217)

Daniel Steven Elliott, M.D.

Page 218

1    Q.   Well, this is one place in the medical
2  literature where Dr. Klinge discussed his views on
3  what type of mesh TVT mesh was in the application
4  of treating stress urinary incontinence and
5  whether or not it was the gold standard.
6        Have you seen that published anywhere
7  else?
8        MR. CARTMELL:  Objection.
9    Q   BY MR. SNELL:  By Dr. Klinge.
10       MR. CARTMELL:  Objection.  And move to
11 strike this statement of counsel.
12   A.   And I agree with you completely, and
13 that should tell you something about Klinge's
14 expertise, as far as a stress urinary incontinence
15 surgeon, which he is not.  He's a mesh expert.
16 But he's not a transvaginal surgeon.  He's never
17 been involved in one of these cases.  So you
18 search around and find one reference where he's
19 quoting something in the book, okay, that's what
20 it is.
21   Q   BY MR. SNELL:  He doesn't just quote
22 something in a book.  He's actually citing data,
23 randomized trial data on TVT versus an alternative
24 mesh; doesn't he?
25   A.   I'm saying he is not a surgeon.  He's

Page 219

1  not providing expertise as a pelvic surgeon like I
2  am.  He's a mesh expert, a very good one, but he
3  is not a pelvic surgeon.
4    Q.   Do you know how many royalties
5  Dr. Klinge gets with regard to his work with the
6  German DynaMesh mesh?
7    A.   I have not heard a number, no.
8    Q.   You know he does get money from that
9  mesh; right?
10   A.   I just said I don't know.  I don't
11 know.  I'm not a faithful apostle of Dr. Klinge.
12 I don't know what he does.
13   Q.   Do you acknowledge he's got a
14 conflict --
15       MR. CARTMELL:  All you got to do is
16 answer do you know or not.
17   A.   I do not know.
18   Q   BY MR. SNELL:  You know that he has a
19 conflict of interest when it comes to DynaMesh;
20 don't you?
21       MR. CARTMELL:  What it comes to what?
22       MR. SNELL:  DynaMesh, D-y-n-a-M-e-s-h.
23 It's a mesh that's not even available here in the
24 United States.
25       MR. CARTMELL:  So then why would he

Page 220

1  know?
2        MR. SNELL:  So the question is would
3  you -- well, I take it he's read Dr. Klinge's
4  writings.  He's seen Dr. Klinge's statements.
5        MR. CARTMELL:  What writings are you
6  asking him about?  If you have writings about
7  DynaMesh that you want to ask him about, put them
8  in front of him.  Why all the questions about
9  studies and things that you don't even let him
10 look at.
11       MR. SNELL:  He can look at anything he
12 wants.
13       MR. CARTMELL:  Then put it in front of
14 him.
15       MR. SNELL:  It's not my job to put it
16 in front of him.  It's the job of your witness to
17 bring his file.  Secondly, he cites to Klinge
18 about 100 times in the report, and not once does
19 he acknowledge any of this.
20       MR. CARTMELL:  If you're going to ask
21 him about a study specifically on it that's on his
22 reliance list, then bring it with you and ask him
23 questions and let him look at it so it can be
24 fair.  How about that?  How about that?
25       MR. SNELL:  He could bring his own

Page 221

1  file.  How about that?  That was asked and
2  requested of him, Tom.
3        MR. CARTMELL:  You have everything he
4  has reviewed.
5        MR. SNELL:  Tom, my experts bring
6  their file to the depositions.
7        MR. CARTMELL:  Wrong.
8        MR. SNELL:  You remember when you
9  deposed Denise Selzer she showed up with nine
10 boxes of stuff.
11       MR. CARTMELL:  Denise Selzer did.
12       MR. SNELL:  Christina Pramudji showed
13 up with boxes and boxes and boxes of stuff.
14       MR. CARTMELL:  Not when I deposed her.
15       MR. SNELL:  Get for real.  You know
16 she did.  Crazy.
17   A.   But to address your question, as far
18 as conflict of interest, if he truly does have
19 conflict of interest and bias, then based upon
20 this here he's coming out in support of TVT.  So I
21 see a fault in your logic.
22   Q   BY MR. SNELL:  I don't have a logic.
23 I'm asking you a question.
24   A.   Well, I know you don't have a logic
25 and that's what I've been pointing out.

56 (Pages 218 to 221)

Daniel Steven Elliott, M.D.

Page 222

1    Q.   My question is:  You were aware of
2  these writings by Klinge with regard to TVT
3  and that mesh and the specific intended use of stress
4  urinary incontinence before you wrote your report;
5  right?
6    A.   I'm aware of this reference.
7    Q.   Yes.  You were --
8    A.   The one that I'm holding, Exhibit 20.
9  I don't recall if I've ever been aware of this.
10   Q.   The plaintiffs' lawyers never gave
11  that to you?
12   A.   I don't recall if they have.  I have
13  thousands of pages they've sent me.  It may have
14  been in there somewhere.  I have not seen this.
15  Again, if he were a pelvic surgeon, I would be
16  putting weight into his comments on gold standard
17  and things.  But all he's doing is parroting what
18  he's read somewhere else.  So, again, it is what
19  it is.
20   Q.   Can you point me to any other
21  publications by Klinge where he assesses the TVT
22  retropubic device in the application of stress
23  incontinence and discusses the clinical studies on
24  that device like he did in that paper I just
25  showed you, Exhibit 20?

Page 223

1    MR. CARTMELL:  Object to the form.  It
2  misstates the actual paper.
3    A.   He has studied extensively hernia
4  meshes.  TVT is a hernia mesh.  But to put all the
5  dots together as you very narrowed it down to, the
6  answer to that is no, not that I am aware of.
7    Q   BY MR. SNELL:  My focus is the
8  intended application of the treatment of stress
9  incontinence and those studies alone.
10        You haven't seen that paper or those
11  papers?
12   A.   As you word it there, I have not seen
13  that.  The intended application of the TVT mesh
14  was actually for hernias.  Not for female stress
15  incontinence.  So, again, he has studied the
16  intended purpose of that mesh.  He has not studied
17  it when it's been put into the vagina.
18   Q.   For the TVT device, that's what I'm
19  referring to for its intended -- you've
20  acknowledged that the TVT retropubic device is
21  intended to treat stress urinary incontinence;
22  right?
23   A.   The device is, but the mesh intended
24  use was for hernias, which was then extended to
25  the application of stress urinary incontinence.

Page 224

1  So, again, I'm agreeing with you and disagreeing
2  with you at the same time.  Not to be difficult.
3    MR. SNELL:  Okay.  Let's take a quick
4  break so I can get organized.
5        (Recessed from 3:05 p.m. to
6         3:07 p.m.)
7    Q   BY MR. SNELL:  I want to ask you about
8  your opinions about the mechanical cut of the TVT
9  retropubic device.
10        You've mechanically cut mesh before?
11   A.   Just the sacrocolpopexy mesh.  Not
12  sling mesh.
13   Q.   And did it ever concern you when you
14  were cutting sacrocolpopexy mesh mechanically?
15   A.   It didn't.  And now it does.
16   Q.   Do you still cut sacrocolpopexy mesh?
17   A.   No.  We modified -- well, we're in the
18  process of modifying it to using Restoril, which
19  will not hopefully have that problem.  It's
20  already hemmed.  And that is a concern of mine
21  which I now counsel my patients on.
22   Q.   And is it fair to say that you believe
23  the laser cut TVT mesh is defective?
24   A.   I think it's treated one -- to
25  specifically answer your question, yes.

Page 225

1    Q.   I didn't see in your expert report
2  where you cite to any TVT studies with regard to
3  clinical complications occurring at a
4  statistically higher rate with mechanical cut TVT
5  mesh as compared to laser cut TVT mesh.
6        Is that a fair summary of your report?
7    A.   You are correct.  I have not heard of
8  a study with that.  However, I'm basing that on
9  Nilsson's comment of a four-time -- four times
10  increased risk of vaginal extrusion with a laser
11  cut.
12   Q.   What comment is this by Nilsson?  I'm
13  sorry.
14   A.   That was in one of the documents I
15  read.  I don't know where I read it, but it's in
16  the document.
17   Q.   What methodology did you use to select
18  that one quote by Nilsson?
19   A.   Because he is arguably one of the
20  world's experts on it.  And so I value his opinion
21  on this.
22   Q.   Do you also value his statement in the
23  company documents that he will not use laser cut
24  mesh; that he only uses mechanical cut mesh?
25   A.   Absolutely.  That's supporting what I

57 (Pages 222 to 225)

Daniel Steven Elliott, M.D.

Page 226

1    just said.
2         Q.   So you're aware that Nilsson only --
3    in the company documents, reports that he will
4    only use mechanical cut mesh?
5         A.   That's -- I don't know what his recent
6    statements are, but that the document that I read,
7    which that source can be found, he said he would
8    not use the laser cut because of the four times
9    increased risk of vaginal extrusion, and he would
10   only use the mechanical.  Then I read the other
11   individuals stating the exact opposite.  So I get
12   conflicting evidence.  I have not seen, to the
13   best of my knowledge and it may be out there
14   somewhere, a study, comparative, randomized
15   clinical study of the two.  I've not seen it.
16        Q.   Are you aware of any TVT retropubic
17   clinical data that reports that there's a higher
18   rate of complications with mechanically cut mesh
19   compared to laser cut mesh?
20        A.   I don't think overall there's going to
21   be a higher risk from one or the other.  They're
22   both bad and both have their set of complications.
23   So you're trading one set of problems for another
24   set of problems.
25        Q.   What studies are you specifically

Page 227

1    relying upon for your opinion with regard to the
2    mechanical cut TVT retropubic mesh, if any?
3         A.   Well, that's what I'm talking about.
4    The methodology that I have used with this,
5    concerning specifically mechanically cut, is
6    obviously the internal documentation, with
7    complaints coming in about the fraying, roping,
8    particle loss, the inflammation.  Reviewing of the
9    papers talking about various different
10   complications.  My clinical experience dealing
11   with patients.  Last week alone, there's one
12   patient.  Week before that, three, which were all
13   TVT patients.  Where that I see this mechanically
14   cut mesh.  Then my discussion with colleagues at
15   international and national meetings.  So all that
16   is going into it.
17        Q.   You said the papers.  You reference
18   papers.  Are you talking about Ethicon documents?
19        A.   Correct.  Well, I mean the medical
20   literature, too.
21        Q.   That's what I'm asking.  What medical
22   literature on TVT reports complications
23   attributed -- attributed to the mechanical cut
24   nature of the mesh?
25        A.   The defect in -- and every paper I've

Page 228

1    ever read on TVT.  If you have something
2    different, then I'll keep an open mind.  I have
3    yet to see any paper describe we're using
4    mechanically cut or we're using laser cut.  So I
5    can't base it upon that.
6         Q.   Okay.  So when I was asking about what
7    papers you were talking about, I thought you were
8    talking about Ethicon company documents and not
9    medical literature.
10        A.   No.  That was one of them.  The
11   internal documentation -- I'll just be clear.
12        As I stated in the previous answer,
13   internal Ethicon documentations, medical
14   literature, the emails back and forth, and then my
15   clinical experience.  That's how I came by it.
16        I am not here today to say that laser
17   cut is better or worse.  They're both bad in my
18   opinion.
19        Q.   So with regard to your selection of
20   which company documents to put in your expert
21   report on this mechanical cut issue, what was your
22   methodology in selecting those particular company
23   documents?
24        A.   My methodology of what I reviewed is
25   very simple.  Every document that I was provided

Page 229

1    with internal documentation from Ethicon I
2    reviewed.
3         Q.   So you were provided those by the
4    plaintiffs' lawyers?
5         A.   Correct.
6         Q.   My question to you is this:  Let's
7    focus on your methodology for which ones you
8    decided to cite in your expert report as support
9    for your points.
10        What was the methodology in that?
11        A.   You have to -- you have to analyze --
12        MR. CARTMELL:  Well, just for
13   clarification, you mean because they're all cited
14   in his report.
15        MR. SNELL:  No, they're not.
16        MR. CARTMELL:  There's a reliance
17   list.
18        MR. SNELL:  There's a reliance list,
19   but he cited certain things.
20        MR. CARTMELL:  Okay.  So you're
21   distinguishing between what's in a footnote versus
22   what's in the reliance list that's attached.
23        MR. SNELL:  Of course, because, I'm
24   sure, everything in the reliance list doesn't
25   support the things he says.

58 (Pages 226 to 229)

Daniel Steven Elliott, M.D.

Page 230

1      MR. CARTMELL:  Well, everything on his
2  reliance list is information he used in forming
3  his opinions and relies on.
4      MR. SNELL:  You're speaking -- you're
5  doing a speaking objection.
6      MR. CARTMELL:  Well, I'm responding to
7  your statement you just made.  You're talking
8  about only the citations in the report.
9      MR. SNELL:  Yes.  That is my question.
10 That is my question.  Do I need to repose it again
11 so we have a clear record?
12     THE DEPONENT:  No.
13  Q   BY MR. SNELL:  Why don't we just do it
14 again.
15  A   That's fine.
16  Q   Otherwise there's just going to be
17 four pages of gap.
18     What specific methodology, did you use
19 in determining what Ethicon documents you would
20 cite to in support of your opinions where you
21 listed them in the footnotes?
22  A   Okay.  I have to look at the body of
23 knowledge out there on medical literature, my
24 clinical experience and what I see day to day,
25 correlating that with what was known and discussed

Page 231

1  in the Ethicon documents, whether it be from their
2  scientists, from their medical experts, from their
3  clinicians calling in, correlating that and does
4  it all fit.  Everything has to fit logically,
5  okay, and that was what was included in this.
6  Q   So, for example, did you see company
7  documents that indicated that the majority of
8  surgeons in the United States actually prefer
9  mechanical cut mesh as opposed to laser cut?
10  A   I've seen that, yes.  Well, I'm sorry.
11 Let me take that -- strike that.
12     I do remember seeing and reading that
13 certain physicians would not change to the laser
14 cut.  I can't say that the majority did.  I also
15 see that certain surgeons would not use the
16 mechanical one because of the fraying and the
17 particle loss.  So I don't know the percentage of
18 who uses what.
19  Q   So you were not provided documents
20 that state that the majority of surgeons in the
21 United States who use TVT prefer the mechanical
22 cut mesh as opposed to laser cut; fair?
23  A   I may have been provided that.  I
24 don't recall that specific document.
25  Q   If that document existed, what would

Page 232

1  be your methodology for excluding it or not
2  referencing it in your report?
3      MR. CARTMELL:  It was on his reliance
4  list.
5   A   Yeah.  To a certain extent, surgeon
6  preference is important, and then also not
7  important.  So certain surgeons choose to do one
8  product over the another.  The fact that
9  51 percent like the mechanical cut and 49 don't,
10 it doesn't matter to me.  Again, we're not talking
11 about one product being great and the other one
12 being horrible.  They're both bad.  So to me it's
13 immaterial.
14  Q   BY MR. SNELL:  Did you assess or look
15 at the reported rates of sales of mechanical cut
16 versus laser cut in the United States?
17  A   Well, from my angle as a doctor, the
18 needs of the patient come first.  And sales are
19 not an issue that I'm going to be concerned about.
20  Q   So the answer is, no, you didn't look
21 at that?
22  A   The answer is what I just stated.
23  Q   Sir, my question is very simple, which
24 is:  Did you look at it?
25     I understand you want to give me a

Page 233

1  speech on things, but if you could just give me a
2  yes or no answer, then I can move on.  If you say
3  no, then I'm going to move on.
4   A   Well, no, because my speech, as you
5  did, is based upon my taking care of patients who
6  are crying in my office from pain.  So I don't
7  dismiss it as a speech.  But medical marketing
8  sales are not something that's going to factor
9  into my decision.
10  Q   I believe earlier you were talking
11 about complications, and I think it may have been
12 around mesh exposures, where you said there would
13 be numerous different factors like patient
14 factors, surgeon factors, the mesh.
15     Do you recall that?
16  A   Yeah.  Concerning vaginal exposure.  I
17 don't recall if I mentioned patient factors
18 involved in it, but, I mean, maybe I did.  I
19 don't -- I'd have to see exactly what I said.
20  Q   I wrote it down.
21  A   It's a multifactorial problem that
22 leads to that complication.
23  Q   What are the patient factors involved?
24  A   Well, that's difficult because it's --
25 I don't know of anyone ever studying to show

59 (Pages 230 to 233)

Daniel Steven Elliott, M.D.

Page 234

1  consistently a patient factor being involved in
2  the exposures. Smoking, I'm not aware of.
3  Obesity, I'm unaware of. Vaginal atrophy -- I
4  don't know of patient factors that can be
5  consistently proven to be a factor in vaginal
6  exposure.
7      Q.   You are -- vaginal atrophy is a
8  condition that women have that can progress or get
9  worse as they get older in their postmenopausal
10  years if not supplemented with some type of
11  estrogen; fair?
12      A.   There's the possibility of that, yes.
13  Not in all cases.
14      Q.   But is that a common finding in women
15  who are postmenopausal that there is some degree
16  of vaginal atrophy?
17      A.   It's not uncommon, let's put it that
18  way. So, yeah, it does occur.
19      Q.   Is there a recognized weight
20  classification specific to stress urinary
21  incontinence slings that has been endorsed and put
22  out by any of the pertinent professional medical
23  societies?
24      A.   Pertaining to what? I guess I don't
25  understand your question. That they should or

Page 235

1  should not get a TVT?
2      Q.   No, no. For the intended use of
3  stress urinary incontinence.
4           Is there a recognized weight
5  classification system for slings?
6      A.   Well, no. The BMI is the standard
7  what is used. And but there's not, as it pertains
8  specifically to SUI treatments.
9      Q.   I think you and I -- we weren't on the
10  same wavelength.
11           For the weight of the mesh --
12      A.   Oh, okay.
13      Q.   -- and the intended use of treating
14  stress urinary incontinence, is there a recognized
15  weight classification system that's endorsed by
16  the professional societies?
17      A.   No. As far as -- even in industry,
18  industry and surgical societies, there is -- as
19  far as I know, there is no specific
20  classification. I think they have heavy weight --
21  you know, Cobb and others taught about heavy
22  weight. So there would be that. And above
23  certain -- or below certain numbers would become
24  medium weight and lightweight. I don't know if I
25  can -- I can't quote a society that has this

Page 236

1  standard thing that's out there. Same thing goes
2  for pore size, too.
3      Q.   And my focus is on the intended use
4  with the stress incontinence device and the
5  application to treat stress incontinence.
6      A.   Closest thing I think would have to be
7  a Clave study, breaking it down to the various
8  weights, I think, if I'm answering your question
9  correctly. But that's not as it pertains
10  specifically to SUI.
11      Q.   Right. That's what I'm looking for is
12  SUI.
13      A.   I am not aware of that specific narrow
14  application.
15      Q.   For SUI, the slings are typically
16  around 1 centimeter wide.
17      A.   1 to 1.5, probably.
18      Q.   Ethicon's TVT is reported to be about
19  1.1 centimeters; correct?
20      A.   As it comes out of the box, which is
21  an important distinction.
22      Q.   Yeah.
23      A.   But, yeah, they're all about that
24  width.
25      Q.   Is it a fair statement that all of the

Page 237

1  mesh slings, synthetic mesh slings that are used
2  to treat stress urinary incontinence have a weight
3  of more than 60 grams per meter squared?
4      MR. CARTMELL:  Object to the form.
5  May call for speculation.
6           Answer if you know.
7      A.   Yeah. All I can speak to is Aris,
8  which I know is at 70. TVT at 105. I don't know
9  that the other products.
10      Q.   BY MR. SNELL:  You read Moalli's paper
11  on the biomechanical evaluation of slings?
12      A.   I read it at one point in time. Not
13  recently.
14      Q.   It has a table in there where it has
15  the reported weights of the different slings.
16      A.   Okay.
17      Q.   Is that a paper you're relying on, the
18  Moalli paper?
19      A.   That's in my reliance list. But I'm
20  just saying I haven't read it recently. You're
21  referring to the 2007 paper?
22      Q.   Give me the title and I'll tell you.
23      A.   Tensile Properties of Five Commonly
24  Used Mid-Urethral Slings Relative to the TVT, by
25  Moalli, et al., June of 2007. Published in 2008.

60 (Pages 234 to 237)

Daniel Steven Elliott, M.D.

Page 238

1   Excuse me.
2       Q.   That's it.  Yeah.  Is that a paper
3   you're relying on?
4       A.   Yes.
5       Q.   Are there any studies in the stress
6   incontinence application with the use of TVT that
7   show that a lighter weight mesh is either more
8   efficacious -- strike that.
9           Let me just say is more efficacious
10  than the TVT?
11      A.   Can you rephrase the question, because
12  as I'm reading it.  I can't quite understand.
13      Q.   Absolutely.  Yeah.
14          Are there any clinical studies
15  evaluating efficacy in women with stress urinary
16  incontinence that show that a lighter weight mesh
17  works better than the TVT retropubic device?
18          MR. CARTMELL:  Object to the form.
19      A.   No, I don't think the weight of the
20  mesh --
21          MR. CARTMELL:  Can I -- can I get
22  this?  Can we take a break.
23          MR. SNELL:  Yeah.  An opportune time.
24          (Recessed from 3:31 p.m. to
25          3:32 p.m.)

Page 239

1           MR. SNELL:  Can you read back the
2   question?
3           (The reporter read the record as
4           requested.)
5       A.   As is worded there, I'm not aware of
6   it.  I mean, Cobb and internal Ethicon documents
7   talk about lighter weight being better, fewer
8   complications, sort of things.  But as you
9   specifically narrow it down to TVT, there is not
10  that study.
11      Q.   BY MR. SNELL:  And my question -- the
12  initial question was on efficacy.
13      A.   No.  As far as I know.
14      Q.   Okay.
15      A.   There is nothing out there, as far as
16  the lightweights.
17          The move was in hernias and pelvic
18  organ prolapse to go to lighter weight because of
19  the complications, but that was decided against
20  with TVT.
21      Q.   And so my question is I want to get
22  into -- ask you about the complications.
23          Are you aware of any clinical studies
24  showing a lower rate of complications in women who
25  receive a lighter weight mesh for the intended use

Page 240

1   of treating stress urinary incontinence?
2       A.   No.  I've only seen it in pelvic organ
3   prolapse data and in meshes.  Meshes for hernia
4   repairs, but it was not extrapolated, even though
5   Ethicon knew about it, into stress urinary
6   incontinence.
7       Q.   All right.  And you're not testifying
8   that a lighter weight mesh would have worked
9   better than the TVT mesh in the TVT retropubic
10  application to treat stress urinary incontinence;
11  are you?
12          MR. CARTMELL:  Are you talking about
13  efficacy only?
14          MR. SNELL:  I can go with efficacy
15  first.
16      A.   There is no data out there on it.
17  That would be an important thing to do before a
18  launch is to study that to determine efficacy
19  prior to widespread use.
20      Q.   BY MR. SNELL:  You would agree it's a
21  benefit for the TVT retropubic device that they do
22  have studies of 5 years, 10 years, or more
23  duration in the literature?
24          MR. CARTMELL:  Object to the form.
25      A.   Yes, as we mentioned concerning

Page 241

1   efficacy, but not safety.
2       Q.   BY MR. SNELL:  Well, there's --
3       A.   The lighter meshes, the larger pore,
4   lighter weight meshes are for complications.  Not
5   for efficacy.
6       Q.   And I understand you say that with
7   regard to prolapse and hernia.  My question to you
8   is:  With regard to complications, is it your
9   opinion that a lighter weight mesh was used in the
10  application of TVT for the treatment of stress
11  incontinence, cut to 1.1 centimeters, that there
12  would be a lower complication rate?
13      A.   There's the theoretical possibility of
14  that.  However, my ultimate opinion is no meshes
15  should be placed transvaginally.
16      Q.   Fair enough.
17          You mentioned the Clave study.  That
18  was not a study that reported on the use of the
19  TVT retropubic device in women who had been
20  treated for stress urinary incontinence; correct?
21      A.   Correct.  That was, as I recall, for
22  pelvic organ prolapse.
23      Q.   Is this the Clave 2010 paper?
24      A.   Correct.
25      Q.   Okay.

Daniel Steven Elliott, M.D.

Page 242

1      (Exhibit 21 marked.)
2      Q    BY MR. SNELL:  I've given you
3  Exhibit 21.  This is the paper we were referencing
4  by Clave; correct?
5      A.   Correct.
6      Q.   Okay.  This is the paper where they
7  start out with 100 explants and they only
8  subjected 84 of them to scanning electron
9  microscopy; correct?
10     A.   Well, there were 100 explants, and I'd
11 have to look through how many got evaluated with
12 SEM.  I don't recall the exact number.  If you say
13 it's 82, I'm okay with that.
14     Q.   84.
15     A.   84.
16     Q.   I wouldn't misrepresent to you.  Right
17 there.
18     A.   Okay.  I got it.
19     Q.   You go it?
20     A.   Um-hum.  Thank you.
21     Q.   Under SEM analysis, it found that less
22 than half of the implants had this surface
23 cracking; correct?
24     A.   It's an extremely high number, yes.
25     Q.   There were 35 out of 84?

Page 243

1      A.   Yeah.  That's -- that's a worrisome
2  number to me.  I mean, it's 35 out of 80 women are
3  having this degradation going on.
4      Q.   And besides just looking at the
5  pictures on the SEM and seeing the cracking and
6  saying that must be degradation, when they
7  actually did tests to analyze and see if it was
8  degradation, those testings did not show it was
9  degradation; correct?
10     A.   You'd have to show me where you're
11 referring to.
12     Q.   How about --
13     A.   Because to me, degradation is
14 cracking, brittle --
15     Q.   266.
16     A.   266?
17     Q.   266.  You know that after doing the
18 scanning electron microscopy, they subjected them
19 to FTIR, DSC analyses; correct?
20     A.   Correct.
21     Q.   And if you look at the bottom of
22 page 266, they reported that several hypotheses
23 concerning the degradation of the PP are described
24 below.  None of these, particularly indirect
25 oxidation, could be confirmed in this study.

Page 244

1      I read that correctly; didn't I?
2      A.   I didn't see where you're reading.
3      Q    BY MR. SNELL:  Right here.
4      A.   266 or 267?
5      Q.   266 at the bottom right.
6      A.   Oh, yes.  I see it now.  Yes.  I'm
7  sorry.
8      Q.   So when they try to do the other
9  testings, the FTIR, the DSCs, they did not confirm
10 degradation; correct?
11          MR. CARTMELL:  Object to the form.
12 Misstates the statement.
13     A.   Again, I'd have to see where you're
14 reading.  I don't know where this is coming from.
15     Q    BY MR. SNELL:  This is a question to
16 you based on this study.
17     A.   Again, I'd have to -- it's been a
18 while since I've gone over this paper.  So I'd
19 have to find all the nuances you're discussing.  I
20 mean, they describe degradation.  They describe
21 cracking, and to me that's degradation.
22          But the exact etiology of it, I don't
23 recall from the study what they came up with.
24     Q.   Well, when you see this cracking, that
25 could be polypropylene or something other than

Page 245

1  polypropylene; correct?
2          MR. CARTMELL:  Object to the form.
3      A.   Well, all I can quote, as far as my
4  experience, obviously I have these papers which I
5  reviewed, but I can only correlate that
6  macroscopically to my surgical experience.  When I
7  take out these meshes, which I did, it happened to
8  be a TVT-Secur last week.  Where you hold it, it's
9  brittle, it cracks, it breaks, it's sharp; it
10 pokes the finger.  Okay.  To me that is
11 degradation.
12          Now, on the microscopic level, you
13 know, I don't know what exactly they call and what
14 specific words they use to describe that process.
15     Q    BY MR. SNELL:  They didn't say it was
16 brittle and broke and cracked in your fingers in
17 Clave; correct?
18     A.   No, they didn't say that.  I'm saying
19 that's what me and my daily experience, including
20 just last week -- that's what I feel, and that's
21 what I'm calling degradation of the product.
22     Q.   Clave and them show pictures of
23 scanning electron microscopy with surface
24 cracking?
25     A.   Yes.  But none of these are TVT, you

62 (Pages 242 to 245)

Daniel Steven Elliott, M.D.

Page 246

1  said. So this is a very important study. Seems
2  like they're raising red flags.
3          Next step is Ethicon needs to study it
4  with their specific product.
5      Q.   And in Clave the explants have been
6  explanted because of reported complications;
7  correct?
8      A.   I believe so, yes.
9      Q.   There was no control group in this
10  study of explants for which there was no
11  complication reported; correct?
12      A.   Well, yeah, the complication was a
13  manifestation of underlying pathology. So, no,
14  you don't have a control because you're not going
15  to go operate on women who do not have a
16  complication yet.
17      Q.   And so the authors were unable to
18  state whether or not this amount and this type of
19  surface cracking is something that occurs in
20  non-explanted meshes?
21      A.   I mean, you're really narrowing down
22  the focus of this. Again, it's not a TVT product,
23  but they were not able to say -- I guess, I'm not
24  really following your question. I'm sorry.
25      Q.   What I was getting at is on page 269,

Page 247

1  they say, "For obvious ethical reasons this study
2  did not provide the opportunity to analyze vaginal
3  implants from non-pathological situations.
4  Therefore, prediction of normal in vivo material
5  aging and the range of consequences in the
6  clinical state beyond the observed samples is not
7  possible."
8      A.   That is correct.
9      Q.   Okay. Can you point to any clinical
10  studies, any studies on the TVT device to treat
11  women that showed degradation of that TVT mesh?
12          And if you're looking at your report,
13  just tell me what page so I can --
14      A.   Page 13.
15      Q.   Give me a second. Okay.
16      A.   Specifically if you limit it to just
17  TVT, obviously I quote multiple different studies
18  looking at polypropylene and the foreign body
19  response, the inflammatory response, the
20  degradation, you have Mary, et al., Costello,
21  Clave, Wood. But on page 15 at the very top, the
22  first full sentence says, "In 2015 seven
23  implants." And that is -- if you look down at
24  reference 11, it's a Russian name, I think.
25  T-z-a-r-t-z-e-v-a. In-depth nano-investigation of

Page 248

1  vaginal mesh and tape fibers explants in women,
2  okay. And that included TVT. They were removed
3  four to seven years after, and it demonstrated
4  degradation on SEM, and surface cracks, which
5  corresponds to my clinical experience.
6      Q.   In these seven explants, was there any
7  oxidation found of the TVT mesh?
8      A.   Oxidation is the process by which you
9  get degradation. So in order to study for
10  oxidation, you have to do some pretty
11  sophisticated chemical studies on the microscopic
12  level as far as what macrophages are doing. I
13  don't know -- I'm not an expert on how exactly
14  that would be accomplished. But if there's
15  degradation, I know there's been an inflammatory
16  response, which inflammatory response causes
17  oxidation, is one of the main reasons with
18  peroxides, hypochloric acid, et cetera.
19      Q.   Has the reported degradation in these
20  seven explants been confirmed in any standardized
21  test, such as chemical analyses?
22      A.   I'm unaware. I have to go back to the
23  study and see what they've done from that. From
24  my angle as a surgeon, I would want the company
25  then to go back and look at some of this stuff for

Page 249

1  me.
2      Q.   Are there any studies that you're
3  aware of on the TVT device that correlate and show
4  that a particular complication was caused by
5  degradation?
6      A.   Well, no. Degradation is part of the
7  cascade of events. You have an implantation of a
8  product that causes a foreign body response and
9  inflammatory response, which then the immune
10  system comes in via the various different dumping
11  of various different product to try and to
12  eliminate the foreign body, infection, and then
13  degradation occurs.
14          So you're not going to find something
15  where it's just degradation. It's a cascade of
16  events.
17      Q.   Is there any clinical literature that
18  shows any complications are caused by degradation?
19      A.   Well, I would say every study that
20  there's a vaginal erosion or extrusion is evidence
21  of degradation. Yeah, every time that I do an
22  exam on a patient and find thin, cracking,
23  hard mesh that is evidence of degradation.
24      Q.   Are there any studies that report
25  degradation played any kind of role in a vaginal

63 (Pages 246 to 249)

Daniel Steven Elliott, M.D.

Page 250

1    erosion or extrusion following a TVT?
2         A.   Well, yeah, this T-z-a-r-t-z-e-v-a on
3    page 15. There are seven explants, including TVT,
4    that were removed after implantation. Okay. So
5    some sort of complication. And they found
6    degradation there.
7              (Exhibit 22 marked.)
8         MR. CARTMELL: Just so you know,
9    Doctor, for the record, a lot of times people call
10   it the Zimmern study. It's easier to the
11   pronounce.
12            THE DEPONENT: Yeah. Phillippe at UT
13   Southwestern.
14        Q    BY MR. SNELL: This is the paper you
15   were referencing?
16        A.   Correct. It's an abstract.
17        Q.   It's T-z-a-r-t-z-e-v-a.
18        A.   Yeah. It's Zimmern. Phillippe
19   Zimmern at Utah Southwestern's paper.
20        Q.   And this wasn't seven TVT devices as
21   you put in your report; was it?
22        A.   No. I said including the TVT. So not
23   all were TVT.
24        Q.   Right. In fact, how many of these
25   were TVTs?

Page 251

1         A.   I don't know if it actually says.
2    Seven explants. But I don't think they break it
3    down into what -- which one has what.
4         Q.   Well, they had a Gynemesh; correct?
5         A.   Correct.
6         Q.   And that's not a TVT retropubic
7    device; correct?
8         A.   No. It's an Ethicon product.
9         Q.   Then they had a TVT; correct?
10        A.   Yes.
11        Q.   They identify one TVT in this study
12   you cite; right?
13            MR. CARTMELL: Object to the form.
14   Misstates the paper.
15        A.   Again, I'd have to see where it is.
16        Q    BY MR. SNELL: Well, you cite to it,
17   Doctor. So I'm telling you, they cite to one TVT
18   in this study; right?
19            MR. CARTMELL: That's not what it
20   says. It misstates the paper.
21        A.   That's not what it -- it says seven
22   explants were studied covering a range of
23   currently MT devices, Gynemesh, TVT, TOT, Sparc,
24   and mini sling.
25        Q    BY MR. SNELL: So that's five

Page 252

1    different devices; correct?
2         A.   That's right. That's five different
3    devices. So TVT could be three of them. What I'm
4    saying is this particular abstract does not break
5    it down into which one is which.
6         Q.   And you don't have a clue then as to
7    whether one was a TVT or two or three; correct?
8         A.   As I've stated, the abstract does not
9    state that.
10        Q.   And this abstract doesn't state what
11   complications, if any, occurred with the TVT;
12   correct?
13        A.   No. It states they were explanted for
14   some reason.
15        Q.   And you note in this study they looked
16   for peaks of oxidation, and they didn't find any;
17   right?
18        A.   Okay. You know, they did or didn't.
19   Immaterial to me because it shows degradation.
20   Degradation can occur because of multiple
21   different reasons, but they didn't find it on this
22   particular study.
23        Q.   And they didn't try to say the
24   clinical effect, if any, of a 7-nanometer degree
25   of surface cracking; correct?

Page 253

1         A.   Well, no, you have to extrapolate.
2    There was a complication on all seven of these.
3    They had degradation. They had cracking.
4    Something went wrong. Was it infection? Was it
5    pain? Extrusion? Contraction? Dyspareunia. I
6    don't know. I'm just going -- they don't state in
7    this paper, in this abstract.
8         Q.   Do you believe that there are any
9    clinically significant complications that occur
10   because of degradation?
11        A.   Yes.
12        Q.   And where do you identify them in your
13   report? I'm sorry.
14        A.   That is in the section on Degradation,
15   beginning on page 13 through top of 16.
16        Q.   So what specific complications, if
17   any, arise because of degradation?
18        A.   Well, that's what we've talked about
19   multiple times here. Degradation is one of the
20   steps of the problems. It starts with
21   implantation of a foreign body in a contaminated
22   environment that creates inflammation, foreign
23   body response. Macrophages come in. They dump
24   their hydrogen peroxide, hypochloric acid. The
25   product breaks down. It creates more of an

64 (Pages 250 to 253)

Daniel Steven Elliott, M.D.

Page 254

1    inflammatory process.  And it's a vicious cycle,
2    which leads to then scarring, contraction, scar
3    plate, dyspareunia, pelvic pain, urethral erosion,
4    bladder erosion.
5         So degradation is one of the steps of
6    this cascade.
7         Q.   Are you aware of any reliable
8    scientific studies that show the degree to which
9    degradation causes any of these complications you
10   just identified as compared to surgical technique,
11   patient factors or any other causal elements?
12        A.   See, that's exactly what I've been
13   trying to state this entire time.  The whole
14   device, as marketed, is bad because surgeons play
15   a role.  The patient may or may not.  I think
16   that's questionable.  We talked about that
17   already.  I can't find an identifiable source
18   there.  But then you have a bad product put in.
19        So the whole thing is bad.  It's
20   multifactorial reasons why certain number of these
21   patients have devastating complications.
22        Q.   If a patient has a mesh exposure, do
23   you assume that degradation was a cause?
24        A.   Depends partly on when it occurred.
25   However, I believe Clave said it was independent

Page 255

1    of time of implantation that they found their
2    degradation.  The longer it's in, intuitively and
3    based upon the data and based upon like
4    Klosterhalfen says 15 years, degradation
5    contraction continue, that the longer it's in,
6    there's going to be more problems with it.
7         Q.   Well, Clave, they didn't even find
8    surface cracking in half of the explants.
9         A.   But they found it in half.  So tell a
10   patient, great, half of you aren't going to have
11   it at that point in time, but the other half are.
12        Q.   Maybe we're not communicating.
13        We've already gone through Clave, and
14   it didn't show degradation or surface cracking in
15   more than half of the implants.
16        A.   It was like 55 percent or something
17   like that, or in that ballpark.
18        Q.   Right.  Right.
19        So in those 55 percent, right, some of
20   those patients would have had exposures; right?
21        A.   Possibly.  I don't believe the article
22   states it.
23        Q.   Yet they didn't see surface cracking;
24   right?
25        A.   So that means something else was going

Page 256

1    on.
2         Q.   So that's what I'm asking you then,
3    okay?
4         How do you know which exposures
5    degradation played a role in, when in Clave they
6    didn't even see degradation, except in 45 percent
7    of them?
8         A.   Okay.  Then -- I mean --
9         Q.   That's a scientific question I'm
10   getting at.
11        A.   Well, yes and no with that.  So
12   45 percent of the patients, based on Clave, had
13   degradation and complications.  That means the
14   other 55 had other factors, surgical, implantation
15   technique, roping, curling, whatever, to cause
16   complications.  For myself, as a surgeon who takes
17   care of these patients, I ultimately don't care
18   what causes the problem.  I've got a problem I've
19   got to deal with.
20        So if we want to base it upon Clave,
21   45 percent of these complications could have
22   occurred due to degradation.  It's 45 percent of
23   patients who have been damaged due to degradation
24   of the product.
25        Q.   Is that an opinion you hold

Page 257

1    45 percent --
2         A.   No.
3         Q.   -- of exposures occur because of
4    degradation?
5         A.   No, I don't.  We're saying based upon
6    the Clave study.  I have yet to see -- and this
7    would be a very good study to be done, and it
8    should be done by Ethicon, if there's a concern
9    and they want to take care of patients and prevent
10   women from being damaged of studying these things.
11        Q.   But I'm here to learn your opinion;
12   right.
13        What percent of the women who have an
14   exposure is that caused by degradation?
15        A.   I guess --
16        Q.   If you can't say or you don't know,
17   tell me that.  But if you have a number, then I
18   want to know the methodology by which you come
19   to -- come to that number.
20        A.   If I have a patient who is seeing me
21   two or three days after a mesh sling with
22   exposure, that's not due to degradation, okay.
23        Q.   That's her wound that's hasn't healed up?
24        A.   That's right.
25        Q.   Maybe it was placed superficially;

Daniel Steven Elliott, M.D.

Page 258

1  correct?
2      A.   Within a couple of days, that is not
3  the mesh causing -- now, it will impair healing,
4  because there's a foreign body reaction to things.
5  But it's not due to degradation.
6      Q.   Well --
7      A.   If somebody is occurring longer than
8  that, let's say beyond the initial healing period.
9  Six weeks is traditionally when the body will be
10  at roughly 98 percent of its strength.  That's our
11  usual, going by that six weeks.  Beyond that, if
12  exposure or an event like that occurs, degradation
13  in my opinion is going to be one of the main
14  underlying factors for it, in combination with the
15  infection, inflammatory response.
16      Q.   And what's the methodology for that
17  statement?
18      A.   Exact -- based upon the literature and
19  my clinical experience on a daily basis, including
20  in the past two weeks, four -- three TVT and one
21  TVT-Secur patient I dealt with.
22      Q.   Let's talk about the literature
23  because I can't go and look at your charts, okay.
24          In the literature, what studies show
25  that if an exposure occurs beyond six weeks did

Page 259

1  degradation play a major role, I think you said?
2      A.   Then we go back -- let's go back to
3  Clave then.  And we've said -- we've admitted
4  roughly 45 percent of those patients had
5  degradation.  Okay.  So based purely and just on
6  that paper, that will be my opinion, that
7  45 percent for that paper.
8          But what I'm saying is it has been
9  inadequately studied elsewhere.  Something that
10  needs to be done.
11      Q.   Did Clave rule out other causal
12  factors for the exposures in his study?
13      A.   I have --
14      Q.   If he did, tell me how he did it.
15      A.   No.  I would have to look at the paper
16  and see all that he's looked at.
17      Q.   This study you talk about that you
18  think Ethicon should have done, how would you
19  design that study?
20      A.   The basic unfortunate reality is it --
21  I don't know if it could be done.  Hence the
22  reason why I am anti-mesh in the vagina, because
23  you cannot safely make this thing work and cannot
24  do it in a long-term.
25      Q.   When you say that there are some

Page 260

1  patients who have mesh who have devastating
2  complications, that's a statement you'd made
3  earlier; correct?
4      A.   Multiple times that's based on my
5  clinical experience in talking and discussing it
6  with surgical colleagues.
7      Q.   So you're not relying on any
8  literature to report the rates of devastating
9  complications with TVT retropubic; correct?
10          MR. CARTMELL:  Not relying on what?
11  Object to the form of that.
12      A.   No.  I think certain patients --
13  certain patients.
14          Certain studies like Hou, et al.,
15  which was also Phillippe Zimmern, who I personally
16  talked to about his paper, where they had slings,
17  where after -- they had only removed for pain.
18  19 percent had persistent pain.  Just to beat you
19  to the punch, they did not break it down into TVT
20  or not.
21      Q   BY MR. SNELL:  And they also didn't
22  report a denominator from which all those patients
23  were drawn from; correct?
24      A.   They did not.  That denominator, as
25  far as I know, is not known.

Page 261

1      Q.   And that's an issue with case series,
2  where you do not have a denominator, thus one
3  cannot compute reliably the incidence; correct?
4      A.   The true incidence, unfortunately, is
5  not known, and it needs to be known because some
6  of these people's lives are destroyed.
7      Q.   So in a case series like you
8  mentioned, a major limitation to that series is
9  that it does not speak to the incidence of those
10  complications; correct?
11      A.   I would disagree with you that it's a
12  major limitation.  It is a limit you cannot
13  extrapolate across the board, but in his series,
14  in a very good reconstructive surgeon's hands,
15  19 percent of SUIs had persistent chronic pain.
16      Q.   And you don't know how many were TVT;
17  correct?
18      A.   That is correct.
19      Q.   More likely than not, they were not
20  going to have persistent pain; correct?
21          MR. CARTMELL:  Object to the form.  I
22  think it's vague and ambiguous.  May call for
23  speculation.
24      A.   Oh, I see what you're saying.  Okay.
25          In the follow-up of these individuals,

66 (Pages 258 to 261)

Daniel Steven Elliott, M.D.

Page 262

1  there were 19 percent that had permanent pain.
2  Statically speaking, that means that you get rid
3  of the mesh, 81 percent got better.  Therefore,
4  the mesh is the source for the pain.
5      MR. SNELL:  Move to strike.
6      Q   BY MR. SNELL:  It was more likely that
7  the patients would get better as opposed to having
8  persistent pain in the study you just told me
9  about; correct?
10     A   During the duration of their
11 follow-up, 81 percent of the patients, once the
12 mesh was relieved, had resolution of their pain.
13     Q   You wrote in your report that you
14 believe that the TVT mesh is cytotoxic?
15     A   Correct.
16     Q   You saw that cytotoxicity -- that data
17 were presented to the FDA in the 510K for TVT;
18 right?  I can withdraw it and clean it up.
19         Dr. Elliott, you saw that, in the 510K
20 for TVT retropubic device to treat stress
21 incontinence, Ethicon reported the cytotoxicity
22 data that you reference in your report to the FDA;
23 right?
24     A   I don't -- it's been a long time since
25 I read the 510K submission.  I have to look to see

Page 263

1  if they talk about the severely cytotoxic, marked
2  cytotoxic part of these studies.
3      Q   You know in 2013 the FDA released a
4  statement regarding synthetic slings for the
5  treatment of stress incontinence?
6      A   They had a release.
7      Q   And you saw the FDA wrote in that
8  release that the full length mid-urethral sling
9  like TVT retropubic device has been shown to be
10 safe and effective up to one year; correct?
11     A   I would have to see that study.  And
12 let's just -- or not the study.  But that
13 publication.  But let's just say they say that
14 exactly as you did.
15         At one year.
16     Q   Right.
17     A   Again, that's the limitation of all
18 those statements.
19     Q   And has the FDA, to your knowledge,
20 ever concluded that the TVT retropubic device --
21 that the mesh is cytotoxic?
22     A   I have not seen that in any of their
23 writings.  I don't know also what information
24 they've received.
25     Q   You have not seen any documents from

Page 264

1  the FDA and the people what reviewed the TVT
2  retropubic device 510K with regard to their
3  determination as to whether the TVT retropubic
4  device is safe and effective?
5      A   No.  I mean, I've seen that the --
6  that the FDA has made those statements.  But what
7  I'm saying is, I don't know if they've received
8  all of the documentation and then their opinions
9  on that, as far as the cytotoxicity, et cetera.
10     Q   Okay.
11         (Exhibit 23 marked.)
12     Q   BY MR. SNELL:  I marked as Exhibit 23
13 the FDA's statement, Considerations about Surgical
14 Mesh for SUI, 2013.
15         This is a document you're familiar
16 with?
17     A   Correct.
18     Q   And you see this is off the FDA web
19 site as well?
20     A   That is correct.
21     Q   Page last updated March 27, 2013;
22 correct?  I'll show you?
23     A   Yes, I see it.
24     Q   And it says on the first page, "the
25 safety and effectiveness of multi-incision slings

Page 265

1  is well established in clinical trials that
2  followed patients for up to one year.  Longer
3  follow-up data is available in the literature, but
4  there are fewer of these long-term studies
5  compared to studies with one-year follow-up."
6      Correct?
7      A   Correct.  That's what they state.
8      Q   Let me ask you this question.
9         It would be a true statement that the
10 safety and effectiveness of the Burch
11 colposuspension, the autologous slings, biologic
12 slings, cadaveric slings, all the different stress
13 incontinence options -- that the safety and
14 effectiveness of them has been assessed more, to a
15 greater volume in studies reporting on 12 months
16 or less as compared to longer term studies;
17 correct?
18         MR. CARTMELL:  Object to the form.
19     A   That would be true, that most SUI
20 studies are short-term because they're easier to
21 do, and that's why the data is poor to moderately
22 poor.
23     Q   BY MR. SNELL:  So what you just said
24 there, let me make sure I understand you.
25         Shorter term studies assessing stress

67 (Pages 262 to 265)

Daniel Steven Elliott, M.D.

Page 266

1  urinary incontinence surgery are easier to do than
2  longer term studies?
3       A.   Correct.
4       Q.   That applies across the board?
5       A.   Correct.  I mean, shorter term studies
6  are easier to do because they're short-term.  You
7  have less patient loss to follow-up those things.
8       Q.   What studies, if any, in women show
9  that cytotoxicity causes any complications with
10  the use of TVT retropubic device?
11       A.   There have been none because the issue
12  of cytotoxicity has not been released to the
13  general public.  Therefore, someone is not going
14  to study that if they don't even know it exists.
15       Q.   Do you know the 510K documents on TVT
16  are publicly available at the FDA and available
17  through a Google search on the web sites?
18       A.   They may be.  I don't -- I don't know
19  because I don't search that.
20       Q.   You've never attempted that search?
21       A.   Not with this device.  I've done it
22  with the ObTape, and I couldn't find it.
23       Q.   Okay.  Are there any complications
24  that you believe are due to cytotoxicity?
25       A.   Possible --

Page 267

1       Q.   Let me make sure because I want to
2  focus on TVT, not leave a vague question out there
3  because we were last talking about ObTape.
4            So for the TVT retropubic device, are
5  there complications which you believe are caused
6  by cytotoxicity?
7       A.   In theory, possibly all of them,
8  because cytotoxicity is cell death.  Cell death
9  will increase the foreign body response, the
10  inflammatory response, subsequently increase the
11  degradation, cracking, increase pain, increase the
12  potential for infection.  I'm saying possibly.  It
13  could be.
14       Q.   Okay.
15       A.   That has not been studied to date.
16       Q.   Okay.  For example, you pointed me to
17  the Wang paper earlier, and we looked at it, and
18  there was a 2.4 percent rate of exposure; right?
19       A.   There was 17 out of 700 that had
20  impaired vaginal healing.  And I can't recall the
21  data beyond that.
22       Q.   It was 2.4 percent?
23       A.   Okay.  I remember the 2.4 percent.
24       Q.   Okay.  So working with that number,
25  2.4 percent, and we looked and there was more than

Page 268

1  60 months follow-up.
2            Of that 2.4 percent, can you say how
3  many of those 17 patients had the defective
4  vaginal healing because of cytotoxicity, or is
5  that known?
6       A.   That has not been studied to date,
7  because as I mentioned, I didn't even know the
8  cytotoxicity report even existed until I got
9  involved in this.  So no one out in the community,
10  our physicians, researchers are going to know that
11  exists.  They're not going to study it.
12       Q.   What percent of TVT retropubic devices
13  is the mesh cytotoxic?
14       A.   Well, from what they state here, if
15  this TVT is studied and has been shown to have
16  marked cytotoxicity or severely cytotoxic in these
17  two references and that mesh is put in the
18  patient, then 100 percent of those have the
19  potential for cytotoxicity.
20       Q.   All right.  So if 100 percent have a
21  cytotoxic mesh, why is it that 97.6 percent in the
22  Wang study who were followed out beyond 60 months
23  didn't have any defective vaginal healing?
24       A.   It's going to be, again,
25  multifactorial.  The vaginal healing, the duration

Page 269

1  of follow-up, is smoking going to play a role,
2  obesity, impaired vaginal status.  And, again,
3  what's going to be these people 15, 20, 30 years
4  from now.
5            MR. SNELL:  Move to strike as
6  nonresponsive.
7       Q.   BY MR. SNELL:  My question was:  If
8  100 percent of people have the cytotoxic TVT
9  retropubic mesh, why is it that 97.6 percent of
10  the patients in Wang did not have the defective
11  vaginal healing?
12       A.   See the -- not to be critical, but
13  your logic is impaired.  100 percent of people who
14  smoke don't get lung cancer.  100 percent of
15  people exposed to asbestos don't get mesothelioma.
16  100 percent exposed to TVT aren't going to have
17  those devastating complications, but certain ones
18  do.
19       Q.   And that's what I'm trying to
20  understand and test here.  All right.
21            What is it about the 97.6 percent of
22  the patients who didn't have defective vaginal
23  healing that led this cytotoxic mesh to have no
24  role or no effect on the --
25       A.   Okay.  We decreased it down.  You said

68 (Pages 266 to 269)

Daniel Steven Elliott, M.D.

Page 270

1  defective vaginal healing.
2      Q.   I was trying to use the words you
3  said.
4      A.   You're correct; 2.4 percent had
5  defective vaginal healing.  That is just one of
6  the complications.  Not all cytotoxicity or
7  degradation is going to go just to mesh extrusion.
8  I'm talking pain, contraction, roping, the
9  degradation process.  Pelvic pain, vaginal pain,
10 dyspareunia.
11      So they are just saying, just in this
12 limiting it, 2.4 percent had defective vaginal
13 healing.  Okay.  So that's narrowing the number I
14 talked about before, okay.  I cannot answer the
15 question as to why don't all.  All I know is that
16 to me this is a red flag and patients and doctors
17 need to be warned of that possible cytotoxicity.
18      Q.   For example, we looked at the number
19 of patients who reported dyspareunia and there was
20 four out of that group.
21      A.   Five complained of pain.  Four
22 complained of dyspareunia, and then five
23 complained of vaginal bleeding.
24      Q.   Right.  So for the dyspareunia, I
25 right -- we addressed this somewhat.

Page 271

1  represent to you I calculated that, and it's
2  0.56 percent.  Okay.  4 out of 700.
3      For that 0.56 percent of patients who
4  had dyspareunia, is there a way to scientifically
5  reliably say, which, if any of them, that was
6  caused by cytotoxicity?  And if there is, I want
7  to know the methodology by which you would
8  conclude that.
9      A.   That would require a study by Ethicon
10 to do that.  And so all I know is we have a red
11 flag.  We have marked cytotoxicity.  We have
12 complication.  These are just limiting to the
13 specific one.  I cannot point to a paper and say
14 that because then it has not been studied because
15 individuals didn't know to study it.  It needs to
16 be studied, though.
17      Q.   So I think in fairness, the answer to
18 my question was, no, you don't know that; correct?
19      MR. CARTMELL:  Objection.  Asked and
20 answered.  He just answered your question.
21      A.   No.  And I will reiterate just what I
22 said again.  Cytotoxicity is a red flag of
23 something going on.  We know there's cytotoxicity
24 there.  How much of a role it plays in all the
25 other complications, I don't know.  That needs to

Page 272

1  be studied.
2      Q   BY MR. SNELL:  Okay.  That was my
3  question.
4      Of -- and I was really focused on
5  dyspareunia.  Of the four patients with
6  dyspareunia, you can't say, reliably,
7  scientifically, which if any of those four were
8  caused by cytotoxicity; correct?
9      A.   No.  You are correct because all I can
10 say is there was some defect in the product that
11 caused this.  I cannot attribute that just to
12 cytotoxicity.
13      Q.   And Wang did not rule out other
14 factors besides the mesh; did he?
15      A.   I don't recall Wang giving a specific
16 opinion on that, what necessitated.
17      Q.   How would you design a study like you
18 state Ethicon should do with regard to
19 cytotoxicity to see what effect, if any, it would
20 have on complications for women receiving the TVT
21 retropubic device for stress incontinence?
22      A.   You cannot ethically construct a study
23 of putting a product in that has the possibility
24 of cytotoxicity in a patient for a quality of life
25 study.  You can't do it.  It would never get

Page 273

1  approved and no woman would accept it.
2      Q.   Am I correct that for the pore size of
3  the TVT mesh you cannot reliably say
4  scientifically what complications are caused due
5  to pore size in TVT patients?
6      MR. CARTMELL:  Object to the form.
7      A.   As I've stated multiple times, as
8  outlined in my report, we have an overall system
9  design failure.
10      Specifically small pore, what role is
11 that playing in percentage of the complications.
12 No, I cannot state that.
13      Q   BY MR. SNELL:  You have not studied
14 the rates of complications of stress urinary
15 incontinence slings to see whether there is a
16 statistically significant different rate of
17 complications that occurs dependent upon pore
18 size; correct?
19      A.   You are partly correct.  However, we
20 do know from the hernia mesh data and the Vypro
21 mesh data that complications can be reduced with a
22 large poor lightweight.  It has not been extended
23 down into the TVT like it should have been.  So
24 you are correct.  That data does not exist and it
25 should exist.

69 (Pages 270 to 273)

Daniel Steven Elliott, M.D.

Page 274

1    Q.   Actually, that data do exist to some
2  degree in the application of stress urinary
3  incontinence because there are data like the
4  Cochrane Reviews that show that multifilament
5  meshes have higher complication rates than
6  monofilament meshes; correct?
7    A.   Yes. But we're talking about the TVT
8  here. And I'm talking about lightweight hernia
9  mesh. You know, Ethicon employees all agree,
10  lightweight, small -- or large pore reduce
11  complications. The Cochrane has nothing to do
12  with lightweight, large pore meshes. It doesn't
13  exist, as far as I know, for slings.
14    Q.   The multifilament meshes assessed in
15  the Cochrane Review that had higher rates of
16  complications compared to the monofilament meshes
17  like TVT have a smaller pore size than the TVT
18  mesh; correct?
19    A.   No. You are correct, but we're
20  talking -- yes, I agree with you.
21         The ObTape, the ProteGen, the
22  Gortexes, the Amid 3's have higher implications
23  than TVT. I agree with you. But what I'm saying
24  is the next level up above TVT, the lightweight,
25  large pore meshes, it does not exist. The

Page 275

1  technology exists for it, but the product has not
2  been done in any studies for women in stress
3  incontinence.
4    Q.   Right. Okay. So those larger pore,
5  lighter weight meshes have not been cut down to
6  1.1 centimeters, put into sheaths and tested by
7  anyone; correct?
8    A.   That is correct. In my opinion it
9  should have been.
10    Q.   All right. What physicians and
11  surgeons -- well, strike that.
12         If physicians and surgeons wanted to
13  test larger pore, lighter weight hernia meshes in
14  the application of stress incontinence, couldn't
15  they cut slings made of ULTRAPRO and test it for
16  incontinence?
17    A.   I can't speak to what surgeons could
18  or could not do.
19    Q.   Well, you cut mesh and put it in the
20  body however you wanted; didn't you?
21    A.   No.
22    Q.   You didn't do that for sacrocolpopexy?
23    A.   I configured an already Y-shaped mesh.
24  I did not take something and create something new.
25  I just configured it to fit into the patient's

Page 276

1  body.
2    Q.   No surgeon in the world that you're
3  aware of has ever taken a larger pore, lighter
4  weight hernia mesh, cut it down to 1.1
5  centimeters, put it in a sheath and placed it
6  retropubicly, like the TVT retropubic device;
7  correct?
8    A.   I am unaware of anybody doing that.
9  Including Ethicon.
10    Q.   Therefore, you are unaware of any
11  studies in the application of a stress urinary
12  incontinence tape that show that when put in that
13  configuration and used as the TVT is,
14  retropubicly, with the passage of trochars, that
15  there is a lower complication rate in stress
16  incontinent women; correct?
17         MR. CARTMELL: Object to the form. I
18  believe it misstates his opinions in this case and
19  the report.
20    Q.   BY MR. SNELL: Go ahead.
21    A.   And therein lies a huge deficit of
22  what Ethicon should have done. They knew the data
23  on hernia meshes and prolapse meshes. Large pore,
24  lightweight fewer complications. They did not
25  take the next step of extrapolating that to TVT,

Page 277

1  because, as they said, now their TVT data no
2  longer holds up. So they made a decision not to
3  do that.
4    Q.   BY MR. SNELL: Well, you would
5  criticize Ethicon for wanting to have a product
6  that has longer term data than all the other
7  meshes out there, including ones you, yourself,
8  have used?
9         MR. CARTMELL: Objection.
10  Argumentative.
11    A.   Well, I have no problem with them
12  having long-term studies out there, but I'm saying
13  they're not focused on safety. And I'm saying if
14  they knew, if a corporation knew that there were a
15  better product available and they chose not to,
16  purely for marketing, that is unethical,
17  unacceptable.
18    Q.   BY MR. SNELL: How do they know it's
19  better in the application of stress urinary
20  incontinence when the sling is only 1.1
21  centimeters?
22    A.   They should --
23         MR. CARTMELL: Object to the form. I
24  don't understand the question.
25    A.   No.

70 (Pages 274 to 277)

Daniel Steven Elliott, M.D.

| Page 278 | Page 280 |
|---|---|

**Page 278**

1    MR. SNELL:  I mean, you're -- I mean,
2  what you're talking about is Ethicon's state of
3  mind, and that will not fly with this judge.  So
4  I'm going to withdraw that question.
5    MR. CARTMELL:  Let's take a break.
6    MR. SNELL:  That's fine.
7    (Recessed from 4:25 p.m. to
8    4:42 p.m.)
9    MR. SNELL:  You do know that I'm here
10  to question him on his New Jersey report as well?
11    MR. CARTMELL:  No, I didn't know that.
12    MR. SNELL:  Ben didn't tell you that?
13    MR. CARTMELL:  Hum-um.
14    MR. SNELL:  He said he wanted it all
15  done in one sitting.  So --
16    MR. CARTMELL:  He told me next week in
17  Minneapolis.
18    MR. SNELL:  That's only case specific
19  on Watkins.  I'm doing the New Jersey general
20  stuff today.
21    MR. CARTMELL:  Okay.
22    MR. SNELL:  That's what they told me.
23    MR. CARTMELL:  I'm not doing that.  If
24  you're telling me you're going longer than
25  7 hours --

**Page 279**

1    MR. SNELL:  Yeah.
2    MR. CARTMELL:  -- I ain't doing that.
3    MR. SNELL:  Well, why didn't Ben tell
4  you that, because that's the agreement.
5    MR. CARTMELL:  Nobody told me that.
6    MR. SNELL:  That's the agreement I put
7  in the emails, too.  Ben was having --
8    MR. CARTMELL:  This was the
9  consolidation deposition.
10    MR. SNELL:  Right.  And then but Ben
11  said, but you need to do his New Jersey generally
12  TVT at the same sitting because Watkins case
13  specific is next week.  And I said, okay, I'll
14  start that after I finish the design defect.  It's
15  all in the emails.  I'm surprised he did not tell
16  you that.
17    MR. CARTMELL:  He didn't tell me and
18  I'm not doing it.
19    MR. SNELL:  Is that on the record.  I
20  mean, because I came here and flew here to do
21  both.  And I'm not available next weekend, okay,
22  because I have my own experts.
23    MR. CARTMELL:  I'm not available
24  tonight, and I -- I agreed to do this, and I have
25  something I have to be at at 6:00, and if I'm not

**Page 280**

1  there at 6:00, I'm going to get my brains beat in.
2  I'm not doing that.
3    MR. SNELL:  Well, then we're going to
4  have to agree that whenever I can make it and the
5  doctor make it, we'll do the New Jersey general
6  TVT portion.
7    MR. CARTMELL:  Well, that's fine.  But
8  I'm not --
9    MR. SNELL:  Because the person who's
10  deposing him in Watkins --
11    MR. CARTMELL:  Look, there's --
12    MR. SNELL:  Let me just say something.
13    MR. CARTMELL:  This is ridiculous that
14  you take 7-hour depositions.
15    MR. SNELL:  The person disposing him
16  in Watkins is only case specific.  That was all
17  agreed to and hammered out --
18    MR. CARTMELL:  Nobody told me that.
19    MR. SNELL:  -- between Ben and
20  everybody in these big mass emails.  All right.
21  Well, let's just -- let's jump on it, okay.
22    MR. CARTMELL:  Okay.
23    MR. SNELL:  We'll find something that
24  works.  But I'm telling you -- and you know it.  I
25  know you're tied up and I'm tied up, through the

**Page 281**

1  5th, okay.  But I'm here today, prepared to do the
2  New Jersey general after this one.
3    MR. CARTMELL:  Well, I'm not.
4    MR. SNELL:  I know.  I know.
5    MR. CARTMELL:  I'm not doing that.
6  I'm not doing 9 hours --
7    MR. SNELL:  I don't know why they
8  didn't tell you.
9    MR. CARTMELL:  I'm not making the
10  doctor do 9 hours of deposition.  That's
11  ridiculous.  This is crazy.  We're, again, going
12  over stuff that I think you even covered in his
13  first depo.
14    MR. SNELL:  I've only deposed him on
15  Prolift.
16    MR. CARTMELL:  But that doesn't
17  matter.  A lot of this stuff has been talked
18  about.
19    MR. SNELL:  No.  But this is in the
20  application of the design of TVT for stress
21  incontinence.  That was the agreement.
22    MR. CARTMELL:  Go.  You've got
23  48 minutes.
24    MR. SNELL:  That was the agreement,
25  okay.  That's why I came here.  And I'm prepared

71 (Pages 278 to 281)

Daniel Steven Elliott, M.D.

Page 282

1  to do that.
2       MR. CARTMELL: I wish I had known.
3       MR. SNELL: I wish they would have
4  told you, to be honest with you. And I wish they
5  would have told me, because I was preparing to go
6  out tomorrow. And as for the length of deposition
7  being ridiculous, in New Jersey some of my experts
8  were deposed for more than 13 hours.
9       MR. CARTMELL: I just can't believe
10 this. But go ahead.
11      MR. SNELL: All right. So we'll pick
12 it up. Are you ready, Doc.
13      THE DEPONENT: Yes, I am.
14      Q    BY MR. SNELL: You got your report
15 there handy?
16      A.   Yes, I do.
17      Q.   Can you just turn to page 20.
18      A.   Yes.
19      Q.   The picture there, that is not a
20 picture of the TVT retropubic device to treat
21 stress urinary incontinence; is that correct?
22      A.   That is correct.
23      Q.   All right. The width of whatever that
24 mesh is is a lot more than 1 centimeter; correct?
25      A.   I don't know the dimensions on that.

Page 283

1  I have to go back to the original document.
2       Q.   Well, if you look at the number of
3  pores all the way across it, you and I can agree
4  that that's a lot more than 1 centimeter wide;
5  correct.
6       MR. CARTMELL: Object to the form.
7       A.   Again, I can't say. I just don't
8  know. I'm saying I don't know what it is. I'm
9  not disagreeing with you. I just don't know.
10      Q    BY MR. SNELL: There's no sheath on
11 that mesh; correct?
12      A.   That is correct.
13      Q.   And there's certainly no trochars
14 connected to it; correct?
15      A.   That is correct.
16      Q.   And you don't know how that --
17 whatever mesh it was stretched; is that correct?
18      A.   I'd have to go back to the original
19 document and see what they said.
20      Q.   Okay. Are you aware of any studies
21 that have looked at potential shrinkage with the
22 TVT device in the application of stress
23 incontinence treatment that report that there was
24 no shrinkage with the TVT?
25      A.   We'd have to go to the contraction

Page 284

1  section of my report, which I have down here
2  starting on roughly page 17, it appears.
3       In there I say, Ethicon's medical
4  director stated that TVT can shrink -- generally
5  believe TVT mesh would shrink approximately
6  30 percent post implantation, and that is an
7  internal document.
8       MR. SNELL: So respectfully move to
9  strike.
10      Q.   BY MR. SNELL: My question was: Are
11 you aware of any clinical studies that assess the
12 TVT in the application of stress urinary
13 incontinence and reported that there was no
14 shrinkage with the TVT mesh?
15      A.   That there was no shrinkage? I'm
16 unaware of any studies that's documented no
17 shrinkage.
18      Q.   Okay. The Vypro mesh, you're aware
19 that -- let me back up.
20      So you make reference to Vypro and
21 ULTRAPRO in your report; I believe; correct?
22      A.   Vypro. I'd have to look and see with
23 ULTRAPRO, where I put that. But Vypro, yes.
24      Q.   In the context of a hernia or animal
25 study; correct?

Page 285

1       A.   That's correct. On page 21 of my
2  report.
3       Q.   You know Vypro was assessed even for
4  the application of prolapse and was found to have
5  a greater than 10 percent exposure rate; right?
6       A.   That is correct. But it was less than
7  the existing Gynemesh.
8       Q.   Actually it was assessed and it was
9  found to be 17 percent and Dr. Jacquetin found
10 that it was not tolerated by the body.
11      A.   Okay.
12      Q.   Is that correct?
13      A.   I don't recall that. I have no reason
14 to doubt that it's incorrect.
15      Q.   Okay. And the ULTRAPRO, you're aware
16 that that was ultimately put into the Prolift
17 Plus, and there were mesh exposures with that mesh
18 in the POP application; correct?
19      MR. CARTMELL: Object to the form. Go
20 ahead.
21      A.   Yes. Again, and that reinforces my
22 opinion. Mesh should not be placed in the vagina.
23      Can we just -- I'm sorry to
24 interrupt -- deflect the curtain the opposite
25 direction. Thank you. Feel like God there for a

72 (Pages 282 to 285)

Daniel Steven Elliott, M.D.

Page 286

1   second; I was glowing.
2       Q    BY MR. SNELL:  You know that
3   Dr. Jacquetin in the TVM group assessed Vypro in
4   the transvaginal mesh pelvic organ prolapse
5   application?
6       A.   That is correct.  I've read that, yes.
7       Q.   And they found that tolerance of that
8   material was poor?
9           MR. CARTMELL:  Object to the form.
10  You got the study.  Show it to him.  I think -- I
11  think you're misstating the study.
12      Q    BY MR. SNELL:  You're aware of that;
13  correct?
14      A.   I am aware that they did look at it.
15  I am not aware of the specific details of that
16  study.  It's been a while since I looked at that
17  study.
18      Q.   I have it here on the computer.
19      A.   That's fine.  Which name or title is
20  it?  Or who's the lead author?
21      Q    BY MR. SNELL:  Denis, D-e-n-i-s.
22      A.   Okay.
23      Q.   Denis, Jacquetin.  Here you better --
24  okay.  You need to maximize -- there you go?
25      A.   Oh, so it's an abstract.

Page 287

1       Q.   Right.
2       A.   Okay.
3       Q.   You see that they reported the
4   tolerance was poor?
5       A.   Let me go to their conclusions.
6       Q.   Can I come around and look at it with
7   you.
8       A.   By all means.
9       Q.   Because it's electronic, just so the
10  record reflects -- it says in this study that
11  tolerance of the Vypro mesh is VERY poor; correct?
12      A.   That's what it states, yes.
13      Q.   High rate of erosion, and problems of
14  cicatrisation have been observed.
15      A.   Correct.  C-i-c-a-t-r-i-s-a-t-i-o-n,
16  which just means scars.
17      Q.   Okay.
18      A.   Contraction.
19      Q.   And it also had complications of
20  retraction and rigidity were observed with the
21  Vypro mesh?
22      A.   That is correct.
23      Q.   Frequently with clinical severe
24  consequences; correct?
25      A.   That is correct.

Page 288

1       Q.   And they talk about the use of a half
2   absorbable mesh does not seem to reduce
3   inflammation and could even accentuate it;
4   correct?
5       A.   That's correct.  All right.  And then
6   they go on to say, "Good results of the TVT does
7   not seem to be much modified by the additional" --
8   okay.  That's separate.
9       Q.   Your understanding --
10      A.   I have to see if that Vypro -- they
11  mentioned a bioabsorbable, is if they have Vicryl
12  in there --
13      Q.   Right.
14      A.   -- or a collagen base of some sort.
15  That's associated with increased inflammation.
16          MR. CARTMELL:  Hey, put the name of
17  that study and the citation to it on the record,
18  please.
19          MR. SNELL:  Yeah.  Denis, D-e-n-i-s,
20  Abstract 620.  It was an abstract presentation.
21  And Dr. Jacquetin there, too.  All of the study
22  subjects coming out of Clermont-Ferrand.  Abstract
23  620 at the joint ICS/IUGA 2004 conference in
24  Paris, France.  I'll make that representation.  I
25  know that's where this is from.

Page 289

1           THE DEPONENT:  And I was at that
2   meeting.
3       Q    BY MR. SNELL:  Did you see this
4   presentation?
5       A.   I don't recall seeing it, no.
6       Q.   And you know the Vypro mesh, it's a
7   larger pore mesh than the mesh used in the TVT
8   device; correct?
9       A.   It is.
10      Q.   And the Vypro mesh uses a combination
11  of Vicryl with the Prolene polypropylene; correct?
12      A.   Again, I'd have to refresh my memory.
13  That is my recollection.  It is partially
14  absorbable.
15      Q.   All right.  The Vicryl part is what
16  absorbs over time?
17      A.   That is correct.
18      Q.   And the Prolene polypropylene mesh is
19  what's left behind; correct?
20      A.   That is the permanent portion of the
21  implant, yes.
22          MR. SNELL:  Let's mark this.
23          (Exhibit 24 marked.)
24      Q    BY MR. SNELL:  Exhibit 24 is a study
25  of various meshes, fascia, animal, cadaveric

73 (Pages 286 to 289)

Daniel Steven Elliott, M.D.

Page 290

1 materials, and the rabbit model with implications
2 for sling surgery; correct?
3     A.   That is correct.
4     Q.   This is a paper you were one of the
5 authors of; correct?
6     A.   I was the lead author.
7     Q.   Okay.  And this was published in the
8 Journal of Urology?
9     A.   Correct.  In 2004.
10    Q.   All right.  Is the Journal of
11 Urology -- does it have a poor peer review
12 process?
13    A.   A poor, meaning incompetent?  I
14 mean --
15    Q.   Okay.
16    A.   As opposed to pore, p-o-r-e?  You're
17 talking poor, p-o-o-r?
18    Q.   Yes, sir, p-o-o-r.
19    A.   No.  It would -- in urology, it is
20 probably one of the most strict peer review, along
21 with the European Urology Journal.
22    Q.   All right.  So among the various
23 things assessed, one was polypropylene mesh.
24 Another was autologous fascia; correct?
25    A.   That is correct.  And it was the Sparc

Page 291

1 that we used.
2     Q.   And Sparc was a -- that was a
3 monofilament polypropylene mesh; correct?
4     A.   Correct.  Quite similar to TVT.
5     Q.   And there was a rapid loss of strength
6 and stiffness in the porcine and cadaveric
7 materials; correct?
8     A.   That is correct.
9     Q.   And the autologous fascia, as well as
10 small intestinal submucosa demonstrated the
11 highest rate of contraction; correct?
12    A.   In this short-term limited, yes,
13 that's what we found.
14    Q.   Does the autologous fascia contract in
15 the human body?
16    A.   It is reabsorbed.  And remodeled is
17 the term we usually use.  As opposed to
18 contraction.
19    Q.   I saw in your pilot study with the
20 10 patients with the transobturator autologous
21 sling that you reported that you placed that sling
22 loosely in order to hopefully minimize contraction
23 of the autologous tissues.
24        Do you recall that statement?
25    A.   I don't recall that statement per se.

Page 292

1 However, in the first 10 patients we didn't know
2 the tensioning of this.  No one had ever done it
3 before.  And so we're accounting for a lot of
4 different factors.  Is it going to -- is it going
5 to tighten up or is it going to stretch out.  We
6 didn't know.
7     Q.   Okay.
8     A.   And that's why it's a feasibility
9 study.
10    Q.   Okay.  The last page you talk about
11 "the polypropylene mesh has extremely low
12 stiffness at baseline, but it demonstrated
13 increasing stiffness with time.  This phenomenon
14 is likely caused by the ingrowth of tissues into
15 the interstices of the mesh."
16    A.   That's correct.  That's what we
17 stated.
18    Q.   Is that an accurate statement?
19    A.   That is an accurate statement of what
20 we found.  We did not know at that point in time
21 the potential implications of that.
22    Q.   You concluded that the biomechanical
23 results of the current study support the use of
24 polypropylene mesh for sling surgery relative to
25 other non-autologous materials; right?

Page 293

1     A.   Again, that's what we stated as of
2 2004 in our short-term study because we found the
3 increased stiffness and thought that that would be
4 increased as far as efficacy.  And we didn't
5 realize that that process continues.
6     Q.   You published a subsequent study in
7 follow-up; correct?
8     A.   Correct.  By Krambeck, et al.
9        MR. SNELL:  Go off the record for a
10 second.
11        (Exhibit 25 marked.)
12    Q    BY MR. SNELL:  So Exhibit 25, Doctor,
13 is your follow-up study that you published in 2006
14 in the Urology Journal; correct?
15    A.   Correct.
16    Q.   And this was a study where you found
17 significant differences were found for
18 inflammation, eosinophil infiltrate and
19 inflammatory rind at 12 weeks with polypropylene
20 mesh having the lowest degree; correct?
21    A.   That was one of our findings.
22    Q.   And that was a study looking at
23 polypropylene mesh versus cadaveric fascia,
24 porcine dermis, porcine small intestine submucosa,
25 and autologous fascia; correct?

74 (Pages 290 to 293)

Daniel Steven Elliott, M.D.

Page 294

1    A.   Those were all the properties or the
2   substances we studied.
3    Q.   All right.  And you reported that the
4   inflammation with the cadaveric fascia and porcine
5   may cause rapid clinical deterioration compared to
6   the autologous fascia and polypropylene mesh?
7    A.   That is correct.  That was the main
8   purpose of this study, looking at what happens to
9   the cadaveric and porcine materials.  Does the
10   body rapidly absorb them, which we found out it
11   did.  And the polypropylene had the greatest
12   degree of scar formation.
13    Q.   And that's one of the reasons why
14   cadaveric fascia and porcine materials for use in
15   the sling application never really caught on to a
16   large degree because, with longer term follow-up
17   surgeons found that those slings would actually be
18   absorbed into the body; correct?
19    A.   Partly correct.  The porcine, no
20   question.  The porcine dermis and then the porcine
21   SIS, in my opinion, were horrible products.  It
22   used them and they failed miserably.  It was
23   worthless to do that.  Actually worse than
24   worthless.
25     The -- I forget the rest of what your

Page 295

1   statements were.  But the --
2    Q.   Cadaveric.  With regard to the
3   cadaveric.
4    A.   And the cadaveric -- there's multiple
5   different types of cadaveric and how they are
6   processed.  And some are good and some are not
7   good.  The one we found here raised questionable
8   results.
9    Q.   How do you know which ones are good
10   and not good until you try them?
11    A.   That's a major problem, but pretty
12   much agreed upon, freeze died eradiated cadaverics
13   have a higher -- not degradation.  Decomposition.
14   De --
15    Q.   The eradiation process that you need
16   to do to cadaveric tissue to reduce any potential
17   transmission of disease is known to cause those
18   materials to degrade; correct?
19    A.   Yes.
20    Q.   And you wrote here that the fibrosis
21   and scarring noted with the polypropylene mesh may
22   also contribute to a more lasting repair; correct?
23    A.   You're correct.  That was at that
24   point in time the conclusions that we reached.
25   And we subsequently discovered that we were

Page 296

1   incorrect with that.  We had our facts right, our
2   conclusion wrong.
3    Q.   You wrote that the facial slings using
4   harvested autologous fascia which increases
5   operative time and patient morbidity.
6     And that's true as of today; correct?
7    A.   I would not disagree with that.
8    Q.   And you report other studies have
9   shown a decrease in tensile strength of cadaveric
10   fascia; correct?
11    A.   Correct.  But the issue was -- we
12   assumed at that point in time that increasing
13   tensile strength was a good thing.  We're now
14   realizing that the pelvis and the vagina are
15   elastic and have to bend, and so we're not
16   necessarily agreeing with the conclusions I had in
17   this study.
18    Q.   You found that the xenograft and
19   cadaveric products demonstrated high degrees of
20   inflammatory infiltrate; correct?
21    A.   That is correct.  Specifically with
22   the SIS.  And those had a significant immune
23   response to it.  Yes.  And those are not used in
24   our practice at all anymore because of that.
25    Q.   Okay.  What is the significance of the

Page 297

1   SIS for the porcine?  Is that a single incision
2   sling?
3    A.   No.  It's just like -- instead of
4   using cadaveric tissue for the sling, we use SIS,
5   which is pig intestine, submucosal pig intestines.
6   There's also porcine dermis, but both of them
7   contain porcine DNA and are not recommended to be
8   used.
9    Q.   And you're right.  "We also noted a
10   low degree of inflammation with polypropylene mesh
11   compared to the other materials."
12    A.   Yes.  And that's a relative statement
13   in the short-term in the rabbit model compared to
14   the processes that we know create a significant
15   amount of immune response because they still have
16   porcine DNA.  So there's a major foreign body
17   reaction to that.
18    Q.   And you found that there was a low
19   degree of inflammation with polypropylene mesh,
20   which was similar to what was seen with the
21   autologous fascia; correct?
22    A.   Correct.  In the short-term that is
23   correct.  That's what we found.
24    Q.   And so the polypropylene mesh in your
25   study acted most closely to the autologous fascia;

75 (Pages 294 to 297)

Daniel Steven Elliott, M.D.

Page 298

1  correct?
2      A.   Correct.  In the rabbit model, placed
3  transabdominally, that is the conclusions we
4  reached in 2008.
5      Q.   All right.  I mean, some of the
6  studies you cite to are in dogs and other animals
7  that are not even in the sling application like
8  you tried to do; right?
9      A.   I agree.
10     Q.   So are you saying that your study is
11  not important, or that --
12     A.   No.
13     Q.   -- the findings are inaccurate?
14     A.   No.  I'm saying it has to be looked at
15  as far as -- this is looking what the rabbit model
16  does to these various different slings in the
17  short-term.  I think they're very important
18  findings.
19     Q.   You say, our results -- "the
20  alternatives to biologic material, synthetics are
21  gaining popularity.  The polypropylene mesh has
22  shown promising initial and long-term results
23  similar to that of autologous sling material";
24  correct?
25     A.   Correct.

Page 299

1      Q.   And then you go on to say, "Our
2  results indicated little degree of inflammation
3  and significant fibrosis similar to that with
4  autologous material"; correct?
5      A.   Correct.  And that is the significant
6  finding of that, which we did not correctly
7  interpret our results at that point in time.
8      Q.   Well, you've stated significantly that
9  none of the material appeared grossly infected at
10  explantation in your study either; is that right?
11     A.   That's correct.  In the rabbit model
12  placed transabdominally, that is correct.
13     Q.   All right.  I think in your report
14  somewhere you mentioned -- and maybe I'm
15  misstating this, but you were relying on -- or you
16  found something important coming out of the UCLA
17  Grand Rounds?
18     A.   No.  No.  I don't recall that.
19     Q.   Okay.
20     A.   I attended multiple UCLA meetings
21  which involved discussions of meshes, but I think
22  that's the only thing I could --
23     Q.   Okay.
24     A.   I don't think I ever attended what we
25  call Grand Rounds.

Page 300

1      Q.   You say UCLA State of the Art Urology
2  Meeting --
3      A.   Oh.  Oh.
4      Q.   -- page 4.
5      A.   That's a yearly meeting that they have
6  that Raz and other experts discuss.  That was an
7  attendance-only meeting.  That's not Grand Rounds.
8      Q.   Okay.  I'm sorry.
9      A.   No.
10     Q.   Were you just kind of -- were you
11  identifying different conferences or meetings you
12  go to typically?
13     A.   Correct.  That was continuing medical
14  education.
15     Q.   Okay.
16     A.   Where specifically UCLA is well-known
17  for having Dr. Raz there.  So there's always a
18  strong female urology section to it.  That's all
19  that's stating.
20     Q.   Dr. Raz is one of the proponents of
21  needle suspension procedures over the years;
22  correct?
23     A.   Well, he used to be.  He's not
24  anymore.  He doesn't do his own procedure anymore.
25     Q.   Why not?

Page 301

1      A.   Didn't work.
2      Q.   Okay.  Do you have that Ford Cochrane
3  Review you cited to in your expert report handy?
4  I think it was one of the first exhibits we
5  marked.  Can I just turn to a page.  I have a
6  question for you.
7          With the 2.1 percent mesh exposure
8  rate they saw with the retropubic sling in the
9  Ford Cochrane Review of 2015, would there be a
10  scientifically reliable way of stating which, if
11  any, of those exposures occurred due to the
12  mechanically cut nature of the mesh?
13     A.   You have to look at those studies and
14  see when they were published.  If they're
15  published prior to 2007, you could say all of them
16  were attributed.  If they're published after that
17  we don't know, and they'd have to look at the
18  studies, see if they break it down in mechanical
19  versus laser.
20     Q.   Do any of the randomized control
21  trials report that there was a sawing effect with
22  the TVT mechanically cut mesh in the treatment of
23  stress incontinence?
24     A.   I have not seen that in the
25  literature.  That is based upon my personal

76 (Pages 298 to 301)

Daniel Steven Elliott, M.D.

Page 302

1    experience with Sparc, not the TVT, and then also
2    internal documentation.
3        Q.   So if there was a 2.1 percent rate --
4    if there was a 2.1 percent rate of exposure with
5    the retropubic TVT sling -- and I want you to
6    assume that all of those were mechanically cut,
7    okay -- how would you scientifically, reliably
8    ascertain which of those 21 patients' exposures
9    were because of the mechanical cut nature of the
10   mesh?
11       A.   Looking at this, I have no idea how
12   many of these are TVT or not.  It says retropubic
13   slings, but that could be anything.  It's not
14   talking up-down, top-down, or anything.  They're
15   not comparing TVT right here necessarily.
16       So based upon that, I don't know how
17   to answer your question because I don't know what
18   they're looking at, because they just say
19   retropubic.
20       Q.   You didn't look and see how many of
21   those studies were the TVT study?
22       A.   I did not look through those to find
23   out that information, no.
24       Q.   So let me ask you this hypothetical
25   then.  If there were hypothetically 21 mesh

Page 303

1    exposures out of 1,000 TVT mechanically cut
2    retropubic device cases, how would you -- would
3    you be able to scientifically reliably say which
4    of those 21 exposures were due to the mechanical
5    cut nature of the mesh?  And if so, how did you do
6    that?
7        A.   In a retrospective fashion, you would
8    not be able to determine that with precision.  You
9    could say it's going to be a contributing factor
10   in certain numbers.  Also contributing could be
11   degradation, infection, subclinical infection, all
12   those things.  In a retrospective fashion, you
13   cannot.  That's why it has to be done
14   prospectively.
15       Q.   And as you sit here today, you have
16   never seen, in any prospective TVT retropubic
17   study, any author attribute clinical mesh exposure
18   due to a sawing of the mesh; correct?
19       A.   I'd only have to go off of data on
20   TVT-Secur and TVT -- TOT, the Hinoul study, but
21   that is not a TVT study.  To the best of my
22   knowledge, that has not been evaluated.  It should
23   have been, but it has not been evaluated.
24       Q.   The TVT-Secur, that was the laser cut
25   mesh; correct?

Page 304

1        A.   Correct.
2        Q.   That study didn't assess the TVT
3    retropubic mid-urethral sling to treat stress
4    incontinence; correct?
5        A.   Correct.  It was TVT-Secur versus the
6    TVTO.
7        Q.   And the TVTO, in that study, do you
8    recall if there were any mesh exposures?
9        A.   I'd have to look at the study.  I
10   don't recall.
11       Q.   Do you know if that TVTO mesh was
12   mechanical cut?
13       A.   The Secur was laser cut.  And it was
14   my understanding that the TVTO was mechanically
15   cut.
16       Q.   And the TVTO mechanically cut had a
17   lower rate of exposure than the TVT-Secur;
18   correct?
19       MR. CARTMELL:  Tell him, if you know.
20       A.   Again, I do not know.  I'd have to
21   look at the study.
22       Q   BY MR. SNELL:  Are there any data in
23   women on the TVT used to treat stress incontinence
24   which report how many, if any, of those TVT
25   mechanically cut slings have a sawing effect?

Page 305

1        A.   To the best of my knowledge, in those,
2    they did not use that specific terminology.  The
3    fraying and the sawing is more from internal
4    documentation of complaints coming into Ethicon
5    and their discussions about it.
6        Q.   Do any of the clinical studies on TVT
7    used to treat stress incontinence report the mesh
8    frame and its use in women?
9        A.   Again, just like the last answer, I am
10   unaware of any manuscript that discusses that
11   specific terminology.  That comes from internal
12   documentation and also comes from my experience
13   with the TVT, which did the same thing.  But I
14   didn't write on that either.
15       Q.   Have you ever seen any scientifically
16   reliable studies in women that document the
17   incidents at which there is -- withdrawn.
18       I just didn't remember the word.  You
19   used two words, and I wanted to use one of them.
20       Have you ever seen any scientifically
21   reliable studies in women utilizing the TVT
22   retropubic device to treat incontinence that
23   states the incidence of fraying of the mesh?
24       A.   Again, this is -- what I stated
25   before.  I've not seen that in the literature,

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 306

1  that specific terminology used. That comes from
2  the internal documents and complaints that came
3  in.
4      Q.  Do you know the incidence for which
5  fraying of TVT retropubic mesh in the treatment of
6  stress incontinence occurs?
7      A.  We have to go to my report on page 21,
8  where I talk about fraying --
9      Q.  Um-hum.
10      A.  -- and particle loss, and the sawing
11  effect. And the incidence -- okay. It varies --
12  as you go through the various sections here in the
13  report on that.
14      Say on page 22, testing done by
15  Ethicon. So that after elongation, 18 percent of
16  the weight was lost due to particle loss.
17  Pariente says the point -- 8.5 percent of the
18  particle loss.
19      Q.  But my question is specific to
20  fraying. So what --
21      A.  Fraying?
22      Q.  Yes, sir. What -- I'm sorry. Yes,
23  Doctor.
24      What's the incidence of fraying that
25  occurs? I didn't see that number in your report.

Page 307

1      A.  I don't think I state a specific
2  number in there. However, during the placement of
3  it, where, you know, they talk about 50 percent of
4  these devices are elongated during the
5  implantation with 12 pounds of force, that causes
6  the -- to rope, fray, and particle loss. So I
7  can't give you an exact percentage. But it is a
8  constellation of problems that happen with that.
9      Q.  Other than your paper on the use of
10  the Holmium laser, have you published on treating
11  any mesh complications?
12      A.  Yes.
13      Q.  Where? What paper would that be? For
14  stress urinary incontinence?
15      A.  Stress urinary incontinence.
16      Q.  Yes.
17      A.  I have the copy of my CV, which is an
18  exact copy of yours.
19      My page 17 of 25, I have the Holmium
20  laser complication, as you mentioned. And then
21  number 9 on this is Clifton, et al., where I'm the
22  senior author, of Repeat Anti-Incontinence
23  Procedures Following a Sling Release.
24      So that's a study of individuals who
25  had obstruction following a sling. We treated the

Page 308

1  obstruction, and then what happened to those
2  individuals.
3      Q.  What types of slings were those?
4      A.  Those were all types of slings.
5  Retropubic, suprapubic, transobturator, and
6  vaginal.
7      Q.  Were there any retropubic TVTs in that
8  study?
9      A.  I'd have to look and see what we
10  documented.
11      Q.  What was the main result of that
12  study? What percent of the patients remained
13  continent following sling release.
14      A.  Again, I'd have to look at that study,
15  the exact numbers on it.
16      Q.  Do you have it with you?
17      A.  Yes, I do. I should. Actually I
18  don't have the paper. I would have to guess on
19  the numbers. It was a high -- the issue was --
20      MR. CARTMELL: Don't guess. If you
21  know, you know.
22      A.  All I'll say is there's a high rate of
23  reoperation once we cut the sling over time. That
24  was the significant findings.
25      Q.  BY MR. SNELL: What do you mean by

Page 309

1  that?
2      A.  What I mean is the traditional thought
3  was, based upon a Webster paper, George Webster
4  out of Duke, is that if you cut slings, 85 percent
5  of people stayed dry. But the problem is no one
6  had followed those individuals long-term. So we
7  followed them long-term and found out that over
8  time the rate of incontinence increased, requiring
9  further treatment. So bottom line, it's not like
10  if you obstruct somebody, you treat it, they're
11  done. They're great. No, they have problems
12  later.
13      Q.  What was the mean time for your
14  surgery to release the sling?
15      A.  I'd have to look at the paper.
16      Q.  Was it more than a year or less than a
17  year?
18      A.  I'd have to look at the paper. I
19  don't recall and I don't, for some reason, have a
20  copy of it here.
21      Q.  What was the long-term follow-up that
22  you say that you all conducted? How long was
23  that?
24      A.  Again, that's what I'm saying. I need
25  to see the paper because I can't recall what the

Daniel Steven Elliott, M.D.

Page 310

1    duration was.
2        Q.   As you sit here today, do you know
3    whether 50 percent or more -- strike that.
4            As sit here today, was it more likely
5    than not that those papers who had a sling release
6    would not require reoperation for incontinence?
7        A.   I'll get the paper.
8        Q.   Okay.
9        A.   Because I can't recall.
10       Q.   That's fine.  I don't think I have it.
11   So if you don't remember, that's fine.
12           MR. CARTMELL:  You don't need to get
13   the paper.
14           MR. SNELL:  It would be good if he got
15   the paper.  But that's fine.  If he doesn't
16   remember his own data, that's fine.  I'm not
17   trying to trick him.  I just want to know.
18           MR. CARTMELL:  I mean, if you don't
19   know the answer, then say you don't know, okay.
20       A.   I don't know the exact number.  We
21   worked hard on it, and to do it justice, I'd have
22   to find the paper.
23       Q   BY MR. SNELL:  Fair enough.
24           In your Holmium laser paper, the
25   majority of women got better; right?

Page 311

1        A.   At this point.  But we are still
2    continuing to follow those, and that's what was
3    raised in the SUFU lecture when I talked about
4    this.  We don't know what's going to happen to
5    these people long-term.
6        Q.   Here, I have your paper.  We have it
7    here.  Clifton, you said?
8        A.   Clifton.
9        Q.   This says median follow-up after
10   release was 32 months.  Of the 93 patients,
11   14 percent required repeat anti-incontinence
12   procedure after sling realize.
13       A.   Okay.  All right.
14       Q.   That's your paper; right?
15       A.   I can't see the top of it.  I'll
16   assume you're telling me the truth, though.
17           That's it.  Yes.
18       Q.   All right.  So actually, your data
19   were consistent with other data in the literature,
20   because 86 percent of your patients didn't require
21   repeat anti-incontinence procedure; right?
22       A.   I'll have to see the paper.
23           MR. SNELL:  We can go off the record
24   while he reviews that.
25           MR. CARTMELL:  No.  We're not going

Page 312

1    off the record while he reviews it.
2            MR. SNELL:  It's his own paper.  So
3    you're going to waste my -- you're going to burn
4    my time with him looking at his own paper?
5            MR. CARTMELL:  You wanted him to look
6    at it.  This is your time, period.
7        Q.   BY MR. SNELL:  Okay.  Doctor, could
8    you quickly look at your own paper that you wrote?
9        A.   14 percent of patients after a sling
10   release ultimately went on to a repeat operation.
11   That's what we had in our data.
12       Q.   All right.  So that means 86 percent
13   of those patients did not go on to a repeat sling
14   operation?
15       A.   Yes.  But some of those elected not to
16   because they were scared from previous surgeries.
17       Q.   What percentage of the patients
18   elected not to?
19       A.   I'd have to look at the study.  I
20   don't have that.  So I mean, that's -- again, I'd
21   have to look at the study.
22       Q.   Fair enough.
23           When you do your autologous fascial
24   slings, and the transobturator autologous slings,
25   how do you tension those slings?

Page 313

1        A.   How do I tension them?  I -- well, you
2    said two different things.  Pubovaginal or
3    autologous transobturator.  Which one?
4        Q.   Either one.  Or if there's a
5    difference, just tell me there's a difference.
6        A.   Well, there's a difference between the
7    two.
8        Q.   Fair enough.  How do you tension
9    autologous fascial slings?
10       A.   Well, again, there's two different
11   types.  Pubovaginal or transobturator?
12       Q.   Pubovaginal?
13       A.   Pubovaginal, there's three steps to do
14   this.  Place a cystoscope in the urethra, deflect
15   it 15 degrees.  Up top in the abdomen, you tie
16   initial knot that you can fit two finger breadths
17   in it.  Secure it with a clamp.  Tie multiple
18   knots.  In doing that, you're fairly reproducible
19   as far as the tension goes.
20       Q.   Some surgeons use one finger breadth;
21   correct?
22       A.   It's -- you can -- yeah.  Well, I
23   can't speak to that.  I do two finger breadths and
24   it works.
25       Q.   Is that because that's how you were

79 (Pages 310 to 313)

Daniel Steven Elliott, M.D.

Page 314

1   taught to do that procedure?
2       A.   Yeah, but I'm going to modify it.
3   That's originally how -- oh, I was taught the
4   leave a gap.  The key is you leave it loose.
5       Q.   Okay.
6       A.   And so if you use one finger breadth
7   or two finger breadths might not make all that
8   difference because it's the distance from the
9   fascia to your knot, not necessarily the width.
10  So one finger breadth and two finger breadths is
11  actually going to be the same.
12      Q.   You don't really use any objective
13  measurement to assess tension; correct?
14      A.   That is an objective.  15 degrees and
15  one finger breadth.  So I have objective,
16  reproducible data.  And I have never had, in my
17  pubovaginal slings, a patient go into retention
18  that was not a purposeful retention.
19      Q.   You don't use any type of gauge to
20  assess tension on the sutures; correct?
21      A.   That does not exist for the
22  pubovaginal slings.
23      Q.   All right.  And is there any
24  literature that reports on the effect, if any, of
25  using one, two, or three suture finger breadths of

Page 315

1   detensioning for the autologous pubovaginal sling
2   as opposed to some other method of tensioning?
3       A.   No, there's nothing in the literature
4   like that.  The teaching is to leave it loose.
5       Q.   And realizing you don't really do the
6   Burch.  Do you even remember how you were taught
7   to tension or detension a Burch?
8       A.   No, I don't remember that.
9       Q.   What is wrong with the tensioning of
10  the TVT retropubic device, if anything, in your
11  opinion?
12      A.   It's not reproducible.  The
13  pubovaginal sling, I can tell somebody exactly
14  like I told you.  Cystoscope in, deflect it
15  15 degrees, two finger breadths up, tie it loose,
16  and you won't have retention.
17           TVT, it says tension free, but then
18  there's tension.  And so it's not reproducible.  I
19  can't tell you how to tension it correctly.  I can
20  tell you the pubovaginal sling.
21      Q.   Well, with the pubovaginal sling,
22  there is a fair number of patients who have
23  urinary retention after that procedure; right?
24      A.   I can't speak to those.  I can speak
25  to my own experience.  Like I say, it's

Page 316

1   reproducible in my hands.
2       Q.   Right.  But you don't do all the sling
3   surgeries in this country.  So I'm more interested
4   in out in the masses in the United States.
5            There is a fairly high rate of urinary
6   retention following the autologous pubovaginal
7   sling; right?
8            MR. CARTMELL:  Object and move to
9   strike the statement of counsel.  Object to the
10  form as well.
11           MR. SNELL:  I'll withdraw the
12  statement.
13      Q    BY MR. SNELL:  Let me just -- looking
14  broadly, nationally, okay, across the data, there
15  is a fairly high rate of urinary retention
16  following autologous pubovaginal slings; correct?
17           MR. CARTMELL:  Object to the form.
18      A.   I can't agree with that.  You say
19  fairly high.  I don't know that.  I've not seen
20  that data.
21      Q    BY MR. SNELL:  You've seen reports in
22  the data of rates of retention higher than
23  20 percent following autologous pubovaginal sling?
24      A.   It depends on how you're describing
25  retention.  If you're talking immediately

Page 317

1   postoperatively, yes, that is very commonly.
2   That's why a suprapubic tube or intermittent
3   catheterization is not uncommonly required.
4   Permanent retention after a month or six weeks,
5   that's debatable, the duration, should be very
6   low.  In experienced people's hands, it's
7   essentially zero.  Again, my hands zero.
8       Q.   You've read the sister study by the --
9   that was funded by the NIH that compared the
10  autologous pubovaginal fascial sling to the Burch
11  colposuspension, and they found statistically
12  significant higher rates of not only voiding
13  dysfunction and retention but retention requiring
14  reoperation in the autologous sling arms; correct?
15      A.   That's been a long time since I've
16  read it.  I have to look at that paper.  That was
17  a good paper, but it's been a long time since I've
18  seen it.
19           MR. CARTMELL:  I don't mean to
20  interrupt, but I'd like to check the time, please.
21           THE REPORTER:  7 hours and 13 minutes.
22           MR. CARTMELL:  Okay.  You're done.  If
23  you want to go -- I may have a few questions.  But
24  if -- if -- we can go off the record if you want
25  and talk about what you and Ben agreed to.  It's

80 (Pages 314 to 317)

Daniel Steven Elliott, M.D.

Page 318

1  just nobody told me that, and I really need to be
2  somewhere.
3          But let's go off the record right now.
4          MR. SNELL:  Well, no.  This needs to
5  be put on the record, and I have emails
6  documenting this, where Ben said, Burt, the MDL
7  design defect dep and New Jersey general TVT dep
8  have to done in one sitting on one day; you got to
9  do it today.  And I said, okay, Ben, I will.  And
10  then he and Judy Walberger, are doing the case
11  specific Watkins deposition next weekend.  So that
12  was the agreement.
13          And I emailed Ben, fine, I'll do that.
14  No problem.  I'll start the New Jersey general TVT
15  dep after this deposition, okay.  And nobody ever
16  said that that wasn't going to occur.  And I came
17  here with that expectation.  And I wouldn't lie to
18  you.  I mean, you've seen the email.  Were you on
19  the email?  It's in the email.
20          MR. CARTMELL:  You don't have to
21  answer that.
22          MR. SNELL:  You don't have to answer.
23  You're not under oath.
24          But with that said, what do you want
25  to do?  I understand you have to do something with

Page 319

1  your family.
2          MR. CARTMELL:  We've been here nine
3  hours, and I don't want to put him through -- if
4  you told me you had 30 minutes or an hour, then
5  maybe, but I mean --
6          MR. ROSENBLATT:  Did they agree to
7  extend any deadline?  Will that work?
8          MR. CARTMELL:  What's the deadline in
9  New Jersey we're talking about?
10          MR. SNELL:  I don't know.  I think
11  it's October 5th or something.
12          MR. ROSENBLATT:  I don't know.
13          MR. CARTMELL:  Let me make a call,
14  okay.
15          MR. SNELL:  Yeah.
16          MR. CARTMELL:  I mean, I don't want to
17  get anybody in trouble and all that, and I get the
18  idea of having -- you know, doing them all at
19  once.  But I'm telling you, I knew nothing about
20  this.  And I think the idea of making a
21  deposition -- you know, he's been here 9 hours.
22  We've been on the record over 7 hours.  That's
23  hard.  I don't know that I want him to continue
24  this.
25          MR. ROSENBLATT:  It wasn't Burt's

Page 320

1  idea.
2          MR. SNELL:  Okay.  Yeah, I mean, that
3  wasn't my idea, okay.  One.
4          Two, I understand.  I know -- you
5  know, look, I have a family, too, and I sympathize
6  for you.
7          But, three, I came here with that
8  intention and am ready to go.
9          And four, in New Jersey, my experts
10  have been deposed for pretty much more than
11  12 hours in a sitting.
12          (Recessed from 5:33 p.m. to
13          5:42 p.m.)
14          MR. SNELL:  So I will pass the witness
15  in the MDL design defect case, and I reserve the
16  right to do the New Jersey TVT general deposition,
17  as I told Ben.
18          And I'm looking at my email that I
19  sent to him, where I said, "That's fine.  I will
20  do my MDL design defect deposition first.  And
21  after that we will do the New Jersey general TVT
22  deposition for anything that was not already
23  addressed."
24          I'll stand by that statement I sent to
25  Ben.  I will not be duplicative.  I really only

Page 321

1  have the warning stuff from my quick review of his
2  report left over.  So I am not foregoing my right
3  to do that portion.  And I will make a statement
4  on the record that New Jersey, the deposition of
5  an expert is not limited to 7 hours.  My experts
6  have been deposed in cases in New Jersey for well
7  over 10 hours.  But so that's my position.  And
8  I -- go ahead, Tom.
9          MR. CARTMELL:  Okay.  Just so it's
10  clear.  We took a break.  I called Ben.  He told
11  me that the correspondence back and forth was --
12  or our position, I guess, that he stated was you
13  needed to do both the New Jersey and the MDL
14  deposition today, meaning in 7 hours, because
15  there's a 7-hour requirement from the -- I'm just
16  telling you what he said, from the MDL.  And that
17  the reports are the same.  The general causation
18  reports.
19          You just pointed out to me that in
20  New Jersey there are failure-to-warn opinions that
21  you have not yet been able to question the witness
22  on.  And I do agree with that.  You have not done
23  that.
24          You've said you wanted to continue the
25  deposition for that.  I had not been told -- and

81 (Pages 318 to 321)

Daniel Steven Elliott, M.D.

Page 322

1  we've been here for 9 hours.  I had not been told
2  that that was going to happen today.  I actually
3  have a prior commitment that I really need to go
4  to, and I believe the doctor is tired as well.
5       So I've agreed, and I think you have,
6  too, that we would go ahead and allow you that
7  time for the warnings opinions that you have and
8  set it up at an additional time.
9       MR. SNELL:  And at a mutually
10 convenient date between doctor, myself, and
11 whoever will defend.
12      MR. CARTMELL:  That's right.
13      MR. SNELL:  And I will just state for
14 the record, too, Ben Anderson never told me he
15 expected me to do both in 7 hours, nor does he
16 have a basis under the New Jersey Rules of
17 Procedure to make such a statement.  I have my
18 email that I sent to him, and there was no reply
19 saying, no, Burt, you're wrong.
20      MR. CARTMELL:  Okay.
21      MR. SNELL:  But we have an agreement,
22 and I'm passing the witness.  Let's get this
23 design defect deposition in the books.
24      MR. CARTMELL:  Okay.
25      MR. SNELL:  That way you can go do

Page 323

1  your thing.
2       MR. CARTMELL:  Doctor, I just have a
3  few follow-up questions.
4       You recall that you were asked
5  previously about --
6       MR. SNELL:  Can you give me one
7  second, Tom.  I'm essentially sorry to interrupt
8  you.  I just have to get something to write with.
9  Very, very sorry.  Go ahead.  I'll shut up.
10      EXAMINATION
11 BY MR. CARTMELL:
12      Q.  Do you recall being asked questions by
13 Mr. Snell about large pore lightweight mesh?
14      A.  Yes.
15      Q.  And do you have an opinion within a
16 reasonable degree of medical certainty that
17 lightweight large pore mesh would lead to less
18 complications in the TVT or in a mid-urethral
19 sling than the TVT heavy weight small pore mesh?
20      A.  Yes.
21      MR. SNELL:  Objection.  Leading.  Go
22 ahead.
23      A.  Yes.
24      Q   BY MR. CARTMELL:  And what is your
25 opinion?

Page 324

1       A.  That based upon the medical
2  literature, Klosterhalfen, Klinge, as stated in my
3  report, lightweight large pore meshes have lower
4  complication rates, and that is also including the
5  internal Ethicon documents that state
6  acknowledgment of that fact.
7       Q.  You mentioned, when you were
8  questioned by Mr. Snell, that the TVT, I believe
9  you said during the first six weeks, may result in
10 more pain.
11      Do you recall that?
12      MR. SNELL:  Objection.  Misstates.
13      A.  I don't believe I said that.  That the
14 TVT may result in more pain?  No, I didn't --
15      Q   BY MR. CARTMELL:  You didn't say that?
16      A.  I didn't say that.
17      Q.  I think you were talking about
18 perioperative pain when comparing the TVT to maybe
19 pubovaginal slings or the Burch.
20      A.  Correct.
21      Q.  Okay.  When you were talking about
22 pain during that perioperative period or during
23 the first six weeks, what type of pain were you
24 talking about?
25      A.  I'm talking about incisional pain,

Page 325

1  pain in the suprapubic region, where the tissue
2  may have been harvested.  I'm not talking about
3  vaginal discomfort.  That would be equal.  We're
4  just giving the harvest area.
5       Q.  Are you talking about dyspareunia?
6       A.  No.  I'm talking specifically
7  perioperative incisional pain.
8       Q.  Do you have an opinion within a
9  reasonable degree of medical certainty whether or
10 not TVT, when compared to pubovaginal slings or
11 Burch slings, causes more dyspareunia or vaginal
12 pain on a long-term basis?
13      MR. SNELL:  Objection.  Beyond the
14 scope.  Non-disclosed opinion in the report.
15      Go ahead.
16      A.  Based upon my clinical experience, my
17 discussion with colleagues, review of the
18 literature, and what is outlined in my expert
19 report, TVT, in the long-term, causes increased
20 risk for dyspareunia and the severity of that
21 dyspareunia.
22      Q   BY MR. CARTMELL:  What about with
23 vaginal pain?
24      A.  Vaginal pain would be the --
25      MR. SNELL:  Same objection.  Go ahead.

82 (Pages 322 to 325)

Daniel Steven Elliott, M.D.

Page 326

1 Doctor. I'm sorry.
2     A. They would be the same. Vaginal pain
3 implies a constant vaginal pain. Dyspareunia is
4 just during sexual activity. And, yes, in my
5 experience, I do not see pubovaginals and Burchs
6 come in with that type of pain. On a daily basis,
7 I see the TVT that way.
8     MR. CARTMELL: Okay. That's all I
9 have.
10     MR. SNELL: A couple of quick
11 questions in follow-up.
12         EXAMINATION
13 BY MR. SNELL:
14     Q. Cobb, Klosterhalfen and Klinge, none
15 of those are pelvic surgeons; correct?
16     A. Clave, I don't know what he is. The
17 first two, Klinge and Klosterhalfen are
18 pathologists, I believe.
19     Q. Cobb is not --
20     A. Cobb is not. And I don't know if I
21 mentioned it. I mentioned -- Clave should be on
22 there, and I believe he is a pelvic surgeon, but I
23 don't know his specific credentials.
24     Q. But Cobb, Klosterhalfen, Klinge, none
25 of them published on the TVT device assessed in

Page 327

1 women; correct?
2     A. That is correct, yes.
3     Q. Just so we're clear on the record, the
4 increased perioperative incisional pain that you
5 just talked to Mr. Cartmell about, that actually
6 occurs in the autologous pubovaginal arm; is that
7 correct?
8     A. That is correct. It would be fair to
9 say that, in my experience, the immediate
10 perioperative period, you will have an increased
11 incisional pain that is still treated with
12 medications and tolerable, but it will be more
13 than the TVT.
14     Q. Now, I believe you said that you
15 believe that the long-term dyspareunia rates with
16 the TVT were higher than pubovaginal, did you say,
17 and the Burch?
18     A. I don't recall if I mentioned the
19 Burch in there.
20     What I mentioned was the pubovaginal
21 and the Burch have traditionally been a very
22 common procedure done up until the mid-'90s and
23 into probably early 2000's.
24     And in my practice, I have never seen
25 a woman come in with severe pain, life altering

Page 328

1 pain from either of those aforementioned
2 procedures. But I see it commonly, weekly with
3 the meshes, including the TVT.
4     Q. You can't point to any comparative
5 trials that show a statistically significantly
6 higher rate of dyspareunia for the TVT retropubic
7 device compared to either the Burch or the
8 pubovaginal sling; correct?
9     A. Those studies, as you've mentioned,
10 have not been done.
11     Q. And actually, the one paper you
12 pointed me to earlier about the Burch had the
13 4 percent rate of dyspareunia with that procedure
14 long-term; correct?
15     A. It wasn't 4 percent. It was
16 3.9 percent.
17     Q. So -- okay. If you round up, it's
18 4 percent; correct?
19     A. I don't round up, though.
20     Q. Okay. And you can't point to any
21 studies on TVT that show a rate higher than
22 3.9 percent at that length of follow-up for
23 dyspareunia; can you?
24     MR. CARTMELL: Object to the form.
25     A. Because that study has not been done.

Page 329

1 As I mentioned, no studies focused specifically on
2 output -- end point of dyspareunia have been done.
3     Q BY MR. CARTMELL: So the answer to my
4 question is, yes, you can't point to that study;
5 correct?
6     MR. CARTMELL: Object to the form.
7 Asked and answered.
8     A. That's what I mentioned. Those
9 studies with that specific end point have not been
10 done.
11     Q BY MR. CARTMELL: Except you know that
12 there's a 10-year TVT retropubic study, lead
13 author Heinonen, that reports zero cases of
14 dyspareunia at 10 years follow-up.
15     Did you know that?
16     A. You would have to show me that study.
17     Q. Do you know that study?
18     A. I'm saying, you'd have to show me that
19 study. I've read a lot of studies. I can't
20 recall that one specifically. So I'd have to look
21 at that.
22     Q. So you very well may be wrong when you
23 make statements like there's no long-term studies
24 that look at TVT and dyspareunia?
25     MR. CARTMELL: Object to the form.

83 (Pages 326 to 329)

Daniel Steven Elliott, M.D.

Page 330

1    Q.   BY MR. SNELL:  Correct?
2    A.   Also certain studies I've looked at, I
3  disregard --
4    Q.   Can you say yes or no?
5         MR. CARTMELL:  Let him answer the
6  question?
7    A.   That's not a yes or no.  It's more
8  complicated than that.  I review a lot of studies.
9  Some of them get disregarded because they're so
10  poor quality that they're not worth quoting.  So
11  that particular study I'd like to see and we can
12  dissect that one out.
13    Q.   And if I'm correct --
14         MR. CARTMELL:  You said a couple.  So
15  you went over 7 hours.  And I'm here for the MDL
16  portion.
17         MR. SNELL:  I didn't go over 7 hours.
18         MR. CARTMELL:  You went 7 hours and 13
19  minutes.
20         MR. SNELL:  No, no.  That was 6 hours;
21  wasn't it?
22         MR. CARTMELL:  No.  It was 7 hours and
23  13 minutes.  I let you ask a few.  We done.
24         MR. SNELL:  Okay.
25         MR. CARTMELL:  And you could have

Page 331

1  saved your time.
2         MR. SNELL:  Well, I have two more
3  considering you've asked him to comment and say
4  rates are higher.  That's not even in his expert
5  report, okay.  He doesn't put in his expert report
6  what the rates are for Burch, for the pubovaginal,
7  or the TVT.
8         MR. CARTMELL:  I didn't ask him what
9  the rates were.
10         MR. SNELL:  Yes, you did.
11         MR. CARTMELL:  No, I didn't.  I
12  said --
13         MR. SNELL:  You said higher.
14         MR. CARTMELL:  -- the claim is it's
15  higher, and it says that in his expert report.
16         MR. SNELL:  No, it doesn't.
17         MR. CARTMELL:  Yes, it does.
18         MR. SNELL:  It can't be higher.  He
19  doesn't even have the rates.
20    Q.   BY MR. SNELL:  How about this?  You've
21  seen the AUA guideline from 2012 and the SGS
22  systematic meta-analysis and review, and in both
23  of those systematic reviews, they report higher
24  rates of dyspareunia, pain, and sexual dysfunction
25  with the autologous sling and the Burch as

Page 332

1  compared to the mid-urethral sling; correct?
2    A.   I'd have to look at that.  That's a
3  799-page document.  I'd have to see that.
4    Q.   As you sit here today, you can't
5  answer my question?
6    A.   Oh, I can answer.  Let's pull out the
7  document, take a look at it.
8    Q    BY MR. SNELL:  Do you want to do that?
9         MR. CARTMELL:  I mean, I'm not giving
10  you any more time.  So you don't have the time to
11  do that.  This whole day you've been asking him
12  questions about things and you've been making
13  statements from those documents without showing
14  them to him.
15         MR. SNELL:  No, no.  He's got these
16  documents.
17         MR. CARTMELL:  No, no.
18         MR. SNELL:  I wouldn't misrepresent.
19         MR. CARTMELL:  All day long.
20         MR. SNELL:  Do you want me to show him
21  the numbers?  You know the numbers.  I used them
22  with Dr. Rosenswath.
23         MR. CARTMELL:  No.  I want to be done.
24  You're over your 7 hours.  So let's go.
25    Q    BY MR. SNELL:  As you sit here,

Page 333

1  Doctor, can you answer my question without me
2  showing you those papers?
3    A.   I want to see those papers.
4         MR. CARTMELL:  No.
5         MR. SNELL:  Fair enough.
6         MR. CARTMELL:  The question was:  Can
7  you answer it without seeing the papers.  If you
8  can't answer it without seeing it, just say no.
9    A.   I cannot answer it without it.  It's a
10  799-page document.  I would need to see those
11  papers.
12         MR. SNELL:  Fair enough.
13         MR. CARTMELL:  Go ahead.  Thank you
14  very much.
15         (Deposition concluded at 5:54 p.m.)
16
17
18
19
20
21
22
23
24
25

84 (Pages 330 to 333)

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 334

1    REPORTER'S CERTIFICATE
2
3        I, NAOLA C. VAUGHN, a Certified Court
4    Reporter within and for the States of Missouri and
5    Kansas, hereby certify that the within-named witness
6    was first duly sworn by me to testify to the truth;
7    and that the deposition by said witness was given in
8    response to the questions propounded, as herein set
9    forth; was first taken in machine shorthand by me
10   and afterwards reduced to writing under my direction
11   and supervision; and is a true and correct record of
12   the testimony given by the witness.
13       I further certify that I am not a relative
14   or employee or attorney or counsel of any of the
15   parties, or a relative or employee of such attorneys
16   or counsel, or financially interested in the action.
17       WITNESS my hand and official seal at
18   Tonganoxie, Kansas, this 29th day of September 2015.
19
20
21   _____
22       NAOLA C. VAUGHN, CCR, CRR, RPR
         Missouri CCR No. 1052
23       Kansas CCR No. 0895
24
25

Page 336

1        - - - - - -
2        E R R A T A
3    PAGE LINE CHANGE
4    ____ ____ _____
5        REASON: _____
6    ____ ____ _____
7        REASON: _____
8    ____ ____ _____
9        REASON: _____
10   ____ ____ _____
11       REASON: _____
12   ____ ____ _____
13       REASON: _____
14   ____ ____ _____
15       REASON: _____
16   ____ ____ _____
17       REASON: _____
18   ____ ____ _____
19       REASON: _____
20   ____ ____ _____
21       REASON: _____
22   ____ ____ _____
23       REASON: _____
24   ____ ____ _____
25       REASON: _____

Page 335

1    INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it.  It will be
10   attached to your deposition.
11       It is imperative that you
12   return the original errata sheet to the
13   deposing attorney within thirty (30) days
14   of receipt of the deposition transcript
15   by you.  If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 337

1    ACKNOWLEDGMENT OF DEPONENT
2
3    I,_____, do
     hereby certify that I have read the
4    foregoing pages, and that the same
     is a correct transcription of the answers
5    given by me to the questions therein
     propounded, except for the corrections or
6    changes in form or substance, if any,
     noted in the attached Errata Sheet.
7
8    _____
     DANIEL STEVEN ELLIOTT, M.D.      DATE
9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25

85  (Pages 334 to 337)

Daniel Steven Elliott, M.D.

Page 338

```
 1              LAWYER'S NOTES
 2      PAGE LINE
 3      ____ ____  _____
 4      ____ ____  _____
 5      ____ ____  _____
 6      ____ ____  _____
 7      ____ ____  _____
 8      ____ ____  _____
 9      ____ ____  _____
10      ____ ____  _____
11      ____ ____  _____
12      ____ ____  _____
13      ____ ____  _____
14      ____ ____  _____
15      ____ ____  _____
16      ____ ____  _____
17      ____ ____  _____
18      ____ ____  _____
19      ____ ____  _____
20      ____ ____  _____
21      ____ ____  _____
22      ____ ____  _____
23      ____ ____  _____
24      ____ ____  _____
25      ____ ____  _____
```

86 (Page 338)

# Mid-urethral sling operations for stress urinary incontinence in women (Review)

Ford AA, Rogerson L, Cody JD, Ogah J



## THE COCHRANE COLLABORATION®

This is a reprint of a Cochrane review, prepared and maintained by The Cochrane Collaboration and published in *The Cochrane Library* 2015, Issue 7

http://www.thecochranelibrary.com



**Mid-urethral sling operations for stress urinary incontinence in women (Review)**
Copyright © 2015 The Cochrane Collaboration. Published by John Wiley & Sons, Ltd.

EXHIBIT #   4

D. ELLIOTT. M.D.

9/26/15        ncv

[Intervention Review]

# Mid-urethral sling operations for stress urinary incontinence in women

Abigail A Ford[1], Lynne Rogerson[2], June D Cody[3], Joseph Ogah[4]

[1]Obstetrics and Gynaecology, Bradford Royal Infirmary, Bradford, UK. [2]Gynaecology Department, St James University Hospital, Leeds, UK. [3]Cochrane Incontinence Review Group, University of Aberdeen, Foresterhill, UK. [4]University Hospitals of Morecambe Bay NHS Foundation Trust, Cumbria, UK

Contact address: Joseph Ogah, University Hospitals of Morecambe Bay NHS Foundation Trust, Dalton Road, Cumbria, LA14 4LF, UK. joe.ogah@mbht.nhs.uk. jogah@nhs.net.

Editorial group: Cochrane Incontinence Group.
Publication status and date: New search for studies and content updated (no change to conclusions), published in Issue 7, 2015.
Review content assessed as up-to-date: 26 June 2014.

Citation: Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. *Cochrane Database of Systematic Reviews* 2015, Issue 7. Art. No.: CD006375. DOI: 10.1002/14651858.CD006375.pub3.

Copyright © 2015 The Cochrane Collaboration. Published by John Wiley & Sons, Ltd.

## A B S T R A C T

### Background

Urinary incontinence is a very common and debilitating problem affecting about 50% of women at some point in their lives. Stress urinary incontinence (SUI) is a contributory or predominant cause in 30% to 80% of these women. Mid-urethral sling (MUS) operations are a recognised minimally invasive surgical treatment for SUI. MUS involves the passage of a small strip of tape through either the retropubic or obturator space, with entry or exit points at the lower abdomen or groin, respectively. This review does not include single incision slings.

### Objectives

To assess the clinical effects of mid-urethral sling (MUS) operations for the treatment of stress urinary incontinence (SUI), urodynamic stress incontinence (USI) or mixed urinary incontinence (MUI) in women.

### Search methods

We searched the Cochrane Incontinence Group Specialised Register, which contains trials identified from CENTRAL, MEDLINE, MEDLINE in process, ClinicalTrials.gov and handsearching of journals and conference proceedings (searched 26 June 2014), Embase and Embase Classic (January 1947 to Week 25 2014), WHO ICTRP (searched on 30 June 2014) and the reference lists of relevant articles.

### Selection criteria

Randomised or quasi-randomised controlled trials amongst women with SUI, USI or MUI, in which both trial arms involve a MUS operation.

### Data collection and analysis

Two review authors independently assessed the methodological quality of potentially eligible studies and extracted data from the included trials.

**Main results**

We included 81 trials that evaluated 12,113 women. We assessed the quality of evidence for outcomes using the GRADE assessment tool; the quality of most outcomes was moderate, mainly due to risk of bias or imprecision.

Fifty-five trials with data contributed by 8652 women compared the use of the transobturator route (TOR) and retropubic route (RPR). There is moderate quality evidence that in the short term (up to one year) the rate of subjective cure of TOR and RPR are similar (RR 0.98, 95% CI 0.96 to 1.00; 36 trials, 5514 women; moderate quality evidence) ranging from 62% to 98% in the TOR group, and from 71% to 97% in the RPR group. Short-term objective cure was similar in the TOR and RPR groups (RR 0.98, 95% CI 0.96 to 1.00; 40 trials, 6145 women). Fewer trials reported medium-term (one to five years) and longer-term (over five years) data, but subjective cure was similar between the groups (RR 0.97, 95% CI 0.87 to 1.09; 5 trials, 683 women; low quality evidence; and RR 0.95, 95% CI 0.80 to 1.12; 4 trials, 714 women; moderate quality evidence, respectively). In the long term, subjective cure rates ranged from 43% to 92% in the TOR group, and from 51% to 88% in the RPR group.

MUS procedures performed using the RPR had higher morbidity when compared to TOR, though the overall rate of adverse events remained low. The rate of bladder perforation was lower after TOR (0.6% versus 4.5%; RR 0.13, 95% CI 0.08 to 0.20; 40 trials, 6372 women; moderate quality evidence). Major vascular/visceral injury, mean operating time, operative blood loss and length of hospital stay were lower with TOR.

Postoperative voiding dysfunction was less frequent following TOR (RR 0.53, 95% CI 0.43 to 0.65; 37 trials, 6200 women; moderate quality evidence). Overall rates of groin pain were higher in the TOR group (6.4% versus 1.3%; RR 4.12, 95% CI 2.71 to 6.27; 18 trials, 3221 women; moderate quality evidence) whereas suprapubic pain was lower in the TOR group (0.8% versus 2.9%; RR 0.29, 95% CI 0.11 to 0.78); both being of short duration. The overall rate of vaginal tape erosion/exposure/extrusion was low in both groups: 24/1000 instances with TOR compared with 21/1000 for RPR (RR 1.13, 95% CI 0.78 to 1.65; 31 trials, 4743 women; moderate quality evidence). There were only limited data to inform the need for repeat incontinence surgery in the long term, but it was more likely in the TOR group than in the RPR group (RR 8.79, 95% CI 3.36 to 23.00; 4 trials, 695 women; low quality evidence).

A retropubic bottom-to-top route was more effective than top-to-bottom route for subjective cure (RR 1.10, 95% CI 1.01 to 1.19; 3 trials, 477 women; moderate quality evidence). It incurred significantly less voiding dysfunction, and led to fewer bladder perforations and vaginal tape erosions.

Short-and medium-term subjective cure rates between transobturator tapes passed using a medial-to-lateral as opposed to a lateral-to-medial approach were similar (RR 1.00, 95% CI 0.96 to 1.06; 6 trials, 759 women; moderate quality evidence, and RR 1.06, 95% CI 0.91 to 1.23; 2 trials, 235 women; moderate quality evidence). There was moderate quality evidence that voiding dysfunction was more frequent in the medial-to-lateral group (RR 1.74, 95% CI 1.06 to 2.88; 8 trials, 1121 women; moderate quality evidence), but vaginal perforation was less frequent in the medial-to-lateral route (RR 0.25, 95% CI 0.12 to 0.53; 3 trials, 541 women). Due to the very low quality of the evidence, it is unclear whether the lower rates of vaginal epithelial perforation affected vaginal tape erosion (RR 0.42, 95% CI 0.16 to 1.09; 7 trials, 1087 women; very low quality evidence).

**Authors' conclusions**

Mid-urethral sling operations have been the most extensively researched surgical treatment for stress urinary incontinence (SUI) in women and have a good safety profile. Irrespective of the routes traversed, they are highly effective in the short and medium term, and accruing evidence demonstrates their effectiveness in the long term. This review illustrates their positive impact on improving the quality of life of women with SUI. With the exception of groin pain, fewer adverse events occur with employment of a transobturator approach. When comparing transobturator techniques of a medial-to-lateral versus a lateral-to-medial insertion, there is no evidence to support the use of one approach over the other. However, a bottom-to-top route was more effective than top-to-bottom route for retropubic tapes.

A salient point illustrated throughout this review is the need for reporting of longer-term outcome data from the numerous existing trials. This would substantially increase the evidence base and provide clarification regarding uncertainties about long-term effectiveness and adverse event profile.

# P L A I N   L A N G U A G E   S U M M A R Y

**Mid-urethral sling operations for stress urinary incontinence in women**

### Background information

Stress urinary incontinence (involuntary leakage of urine on effort or exertion; or on sneezing, coughing or laughing) is the commonest form of incontinence in women and leads to a reduction in their quality of life. Women with stress urinary incontinence can also have problems with sexual intercourse, as leakage of urine can occur. One in three women over the age of 18 years will be affected by stress urinary incontinence at some point in her lifetime.

Over the years, surgery to stop this problem has become less invasive, and there are many different types of operations available. Mid-urethral sling operations are commonly undertaken to try and cure stress urinary incontinence. These operations are suitable for women who are having their first operation to prevent incontinence, and also women who have had unsuccessful surgery previously. In a mid-urethral sling operation a tape is placed underneath the urethra, which is the tube that carries urine out of the bladder. When the woman coughs, the tape compresses the tube, thus providing the support necessary to prevent urine leakage.

There are two main ways of carrying out these operations, either by inserting a tape behind the pubic bone through the abdomen ('retropubic'), or through the groin ('transobturator').

### What this review tried to find out

We looked at the effects of mid-urethral sling operations when these two different methods of performing the operations were used. We also compared different ways of inserting the tape, and using tapes made from different materials. The purpose of this review was to find out how effective these operations are in the treatment of stress urinary incontinence and to help determine the rate of potential complications or problems.

### Main findings of this review

We performed a thorough search of the medical literature up to June 2014. We identified 81 trials that had a total of 12,113 women. These trials showed that over 80% of women with stress urinary incontinence are cured, or have significant improvement in their symptoms, with either operation, for up to five years after surgery. We found this to be the case irrespective of the tapes used and the route of tape insertion. The studies used different questionnaires to assess quality of life, which meant that we could not combine their results for analysis. However, the information that is available for quality of life shows that it improves as a result of these operations, though there is no clear difference between the two procedures. Only a few trials provided information about the effectiveness of these tapes more than five years after surgery. The evidence that we have been able to assess indicates that the positive effects persist.

### Adverse effects

Tapes passing behind the pubic bone (retropubic) seem to carry a greater risk of injuring the bladder during the operation and of women experiencing problems emptying their bladder completely after surgery. However, this operation leads to less groin pain in the short term. There is some limited evidence that this way of inserting the tape has a lower risk of requiring a repeat operation in the long term compared to tapes passing through the groin (transobturator). There is moderate quality evidence that overall reported rates of tape-related complications are low, such as erosion of the tape into the vagina at about 2% for both routes of tape insertion. The reported occurrence of problems with sexual intercourse including pain was low, and leakage of urine during intercourse are improved following insertion of these tapes.

### Limitations of the review

Most of our results are based on moderate quality evidence. Most trials did not describe their methods clearly, thus leading to some degree of uncertainty in the findings. At present there are only a limited number of randomised controlled trials (these produce the most reliable results) that have published data beyond five years after surgery. This means that evidence about how effective and safe these procedures are in the longer term lags behind the evidence for them in the short and medium term (up to five years). We encourage researchers to publish longer-term data to help increase the reliability of longer-term results in this area.