# EXHIBIT L

Daniel Steven Elliott, M.D.

Page 1

1    SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION
2       ATLANTIC COUNTY
         CASE NO. 291 CT
3     MASTER CASE NO. L-6341-10
4
                - - -
5  IN RE:
   PELVIC MESH/GYNECARE
6  LITIGATION
7
                - - -
8
9         VOLUME I
      Thursday, November 15, 2012
10
                - - -
11
12        Oral deposition of DANIEL
13  STEVEN ELLIOTT, M.D., held at MAZIE SLATER
14  KATZ & FREEMAN, L.L.C., 103 Eisenhower
15  Parkway, Roseland, New Jersey, commencing at
16  approximately 9:56 a.m., before Rosemary
17  Locklear, a Registered Professional
18  Reporter, Certified Realtime Reporter,
19  Certified Court Reporter (NJ License No.
20  30XI00171000), and Notary Public.
21
22
23
24        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 971.591.5672  Fax
25            deps@golkow.com

Page 2

1  APPEARANCES:
2
3    ANDERSON LAW OFFICES, L.L.C.
     BY:  BENJAMIN H. ANDERSON, ESQUIRE
4    ben@andersonlawoffices.net
     1360 West 9th Street, Suite 215
5    Cleveland, Ohio 44113
     (216) 589-0256
6       and
     THE RESTAINO LAW FIRM, P.C.
7    BY:  JOHN M. RESTAINO, JR., ESQUIRE
     jrestaino@restainolawfirm.com
8    1550 Larimer Street, Suite 527
     Denver, Colorado 80202
9    (720) 924-2006
     Appearing on behalf of the Plaintiffs
10
11
     BUTLER SNOW O'MARA STEVENS & CANNADA, P.L.L.C.
12   BY:  NILS B. (BURT) SNELL, ESQUIRE
     burt.snell@butlersnow.com
13   500 Office Center Drive, Suite 400
     Fort Washington, Pennsylvania 19034
14   (267) 513-1885
     Appearing on behalf of the Defendants Johnson
15   & Johnson and Ethicon
16
17   SILLS CUMMIS EPSTEIN & GROSS, P.C.
     BY:  WILLIAM R. STUART, III., ESQUIRE
18   wstuart@sillscummmis.com
     The Legal Center, One Riverfront Plaza
19   Newark, New Jersey 07102
     (973) 643-7000
20   Appearing on behalf of the Defendant Caldero
     Medical, Inc.
21
22
23              - - -
24
25

Page 3

1           I N D E X
2
3  WITNESS                    PAGE
4
5  DANIEL STEVEN ELLIOTT, M.D.
6
7    By Mr. Snell            8
8
9              - - -
10
11       EXHIBIT INDEX
12                   MAR
   Elliott
13  1   10-page copy of document dated    8
       10/12/12 entitled "Notice to Take
14     Deposition of Dr. Daniel Elliott
       (General)"
15
16  2   4-page copy of letter dated 11/7/12   64
       to Benjamin H. Anderson, Esq., from
17     Daniel S. Elliott, M.D.
18  3   4-page copy of article dated 6/12/03  156
       entitled "Robotic-Assisted
19     Laparoscopic Sacrocolpopexy for
       Treatment of Vaginal Vault Prolapse"
20  4   5-page copy of article dated 2004    165
       entitled "Gynecologic use of
21     robotically assisted laparoscopy:
       sacrocolpopexy for the treatment of
22     high-grade vaginal vault prolapse"
23  5   5-page copy of article dated 9/13/05  172
       entitled "Long-Term Results of
24     Robotic Assisted Laparoscopic
       Sacrocolpopexy for the Treatment of
25     High Grade Vaginal Vault Prolapse"

Page 4

1       EXHIBIT INDEX (Continued)
2                   MAR
   Elliott
3
4  6   4-page copy of article dated 11/14/03  181
       entitled "Time Dependent Variations
5     in Biomechanical Properties of
       Cadaveric Fascia, Porcine Dermis
6     Porcine Small Intestine Submucosa
       Polypropylene Mesh and Autologous
7     Fascia in the Rabbit Model:
       Implications for Sling Surgery"
8  7   6-page copy of article dated 11/11/05  190
       entitled "Time-Dependent Variations
9     In Inflammation and Scar Formation of
       Six Different Pubovaginal Sling
10    Materials in the Rabbit Model"
11  8   1-page copy of document dated       214
       10/17/12 entitled "Financial
12     Disclosure of Daniel Elliott, M.D."
13
14  (Exhibits retained by the court reporter and
   attached to transcript.)
15
16              - - -
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Daniel Steven Elliott, M.D.

| Page 5 |
|---|
| 1       DEPOSITION SUPPORT INDEX |
| 2              - - - |
| 3       Directions to Witness Not to Answer |
| 4              Page    Line |
| 5 |
| 6 |
| 7              - - - |
| 8       Request for Production of Documents |
| 9              Page    Line |
| 10 |
| 11 |
| 12 |
| 13             - - - |
| 14       Stipulations |
| 15             Page    Line |
| 16 |
| 17 |
| 18 |
| 19             - - - |
| 20       Question Marked |
| 21             Page    Line |
| 22 |
| 23 |
| 24             - - - |
| 25 |

| Page 6 |
|---|
| 1       Reserved for Confidential Designation Index as |
| 2              Pursuant to the Protective Order |
| 3 |
| 4       Defendants did not have any Confidential Designations. |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 7 |
|---|
| 1       Reserved for Confidential Designation Index as |
| 2              Pursuant to the Protective Order |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 8 |
|---|
| 1              (Exhibit Elliott-1 was marked |
| 2       for identification.) |
| 3              DANIEL STEVEN ELLIOTT, M.D., |
| 4       having been duly sworn, was examined and |
| 5       testified as follows: |
| 6              EXAMINATION |
| 7       BY MR. SNELL: |
| 8          Q.    Good morning, Doctor. |
| 9          A.    Good morning. |
| 10         Q.    My name is Burt Snell, and I'm |
| 11      here to take your deposition in the |
| 12      litigation involving Ethicon surgical meshes |
| 13      for prolapse and urinary incontinence. |
| 14             Have you ever given a |
| 15      deposition before? |
| 16         A.    Yes. |
| 17         Q.    On how many occasions? |
| 18         A.    A rough estimate would be about |
| 19      15. |
| 20         Q.    So I'll give you a quick, |
| 21      abbreviated instructions list.  You know all |
| 22      these things. |
| 23             You're here under oath, just |
| 24      like if you were at trial; correct? |
| 25         A.    Correct. |

Daniel Steven Elliott, M.D.

Page 9

1    Q.    You need to answer all my
2 questions verbally.  Shaking or nodding of
3 the head does not translate into the record.
4 Try to avoid saying unh-unh or uh-huh
5 because those do get jumbled.
6         If you can wait for my question
7 to end before you answer and I'll do my best
8 not to speak over you before you're finished
9 answering, that way we get a clean record.
10 Sometimes you'll probably know where I'm
11 going and you'll be ready to answer but just
12 let me finish my question so we can get a
13 clear transcript.
14         Is that okay?
15    A.    Sure.
16    Q.    If you don't understand one of my
17 questions, please feel free to tell me, ask
18 me to rephrase it or repeat it.  I don't
19 profess to be a physician, I'm not a doctor,
20 so sometimes I might mix up terminology.
21 It's okay to correct me or tell me, you
22 know, that you'd like me to rephrase it or
23 if you can answer it as best you can if you
24 think you understand it, just feel free to
25 do so.

Page 10

1         Do you have any questions
2 before we begin?
3    A.    No.
4    Q.    When was the first time you gave
5 a deposition?
6    A.    I won't be able to tell you an
7 exact date.  It probably would have been --
8 because I've been on staff at Mayo since
9 2000.  It would have been a year or two
10 after that, probably.  That's a very rough
11 estimate.
12    Q.    Your best approximation is
13 somewhere around 2002?
14    A.    That's a fair estimate.
15    Q.    Have you ever given testimony at
16 trial?
17    A.    Yes.
18    Q.    On how many occasions?
19    A.    Once.
20    Q.    Where was that trial at?
21    A.    Tacoma, Washington.  The district
22 courthouse there, I believe.
23    Q.    What type of case was it?
24    A.    Patent infringement.
25    Q.    Besides today, when was the last

Page 11

1 time you gave a deposition?
2    A.    I believe June, maybe May, of
3 this year, 2012.
4    Q.    Have you ever testified in a case
5 as an expert witness?
6    A.    Yes.
7    Q.    On how many occasions?
8    A.    Once.
9    Q.    The 15 depositions that you have
10 given, was one of those your testimony as an
11 expert witness?
12    A.    No.  Oh, wait.  Excuse me.  Yes,
13 that would have probably been included in
14 there because I'm giving you a rough
15 estimate.  So, yes, that would have included
16 that.
17    Q.    What were the other approximate
18 14 cases about that you gave deposition
19 testimony in?
20    A.    They were patients that I took
21 care of at Mayo that were being -- the
22 outside physician was being sued.  So it was
23 pertaining to my medical care at Mayo, from
24 the first day that I saw them to the last
25 day that I saw them.

Page 12

1    Q.    So these depositions involved
2 your role as a treating physician for the
3 patient?
4    A.    Correct.  Yes.  I was not the one
5 being sued.
6    Q.    Have you ever been sued?
7    A.    No.
8    Q.    And all of these patients were
9 patients whom you had seen at Mayo Clinic?
10    A.    Correct.
11    Q.    Were all of these patients seen
12 after your medical schooling and training
13 through fellowship?
14    A.    Correct.
15    Q.    So it was after your training
16 time.
17    A.    My fellowship finished June 30th
18 of 2000, so all this took place after --
19 when I was on staff.
20    Q.    Did any of the depositions that
21 you gave as a treating physician involve the
22 use of a medical device?
23    A.    Yes.
24    Q.    Which ones?
25    A.    They were meshes.  The roughly --

Daniel Steven Elliott, M.D.

Page 13

1    I'm only going to give you a rough estimate.
2    The first six, seven depositions were all
3    involving non-medical devices, surgical
4    issues, and then the last seven or so --
5    again, that's a rough estimate -- were all
6    pertaining to meshes for transvaginal use.
7        Q.   Can you tell me the names of the
8    patients or the case names of these meshes
9    -- sorry -- of the cases that involved
10   transvaginal mesh?
11       A.   I don't understand your question.
12   You changed it.  What are you asking?
13       Q.   Can you tell me the names of the
14   patients, the plaintiffs, in these cases
15   where you've testified as a treater where
16   the case involved transvaginal mesh use?
17       A.   Well, for confidentiality
18   purposes, I can't be giving you patient
19   names.  Number one, I won't be able to
20   remember them.  But if I could remember
21   them, I can't give you their names.
22       Q.   You can give the names.  If you
23   were testifying in a litigation, in a
24   deposition, that's public.
25       A.   Okay.  Then I -- well, I can't

Page 14

1    remember them.  I can't recall them.  Even
2    the one in June I can't recall.  I remember
3    some issues pertaining to the case but not
4    the patient name.
5        Q.   Can you tell me the issues you
6    recall pertaining to the case?
7        A.   Most specifically, the one in May
8    or June was a transvaginal mesh for
9    prolapse.  I don't recall which company
10   product it was.  The woman had it placed in
11   Atlanta, I do know that, and she had
12   complications.
13       Q.   What type of complications?
14       A.   Pelvic pain, dyspareunia, voiding
15   dysfunction, ambulatory difficulties.  Off
16   the top of my head, that's fairly thorough.
17       Q.   Do you recall the name of the
18   physician involved or any of the physicians?
19       A.   Excuse me.  No, I do not.
20       Q.   Do you recall the name of the
21   lawyers who took your deposition?
22       A.   They were based in Atlanta so I
23   don't -- I'm not familiar.
24       Q.   Did anyone represent you at that
25   deposition?

Page 15

1        A.   Well, no one -- I mean, Mayo has
2    their team of 30 or 40 lawyers.  So no one
3    was in the room with me representing me.  I
4    had access to the Mayo legal team if I asked
5    for it, but I didn't ask for it.  So I don't
6    know if that answers your question or not.
7        Q.   No.  That does.
8            Can you tell me the details of
9    any of the other cases in which you gave
10   testimony as a treating physician that
11   involved mesh use or mesh used
12   transvaginally?
13       A.   I won't be able to give you
14   specifics just because I don't recall.
15           There was various different
16   with anti-incontinence procedures, bladder
17   perforations, urethral perforations, pain.
18   And then with the meshes for transvaginal
19   purposes it would be, again, somewhat
20   similar, though usually it was pain, pelvic
21   pain or dyspareunia.  But I must emphasize,
22   that's a rough estimate because I just don't
23   recall.
24       Q.   You don't have a good
25   recollection.

Page 16

1        A.   No, I do not.
2        Q.   Do you have a recollection, then,
3    as to whether any of these were Prolifts®
4    which you gave testimony on as a treating
5    doctor?
6        A.   I don't recall.  All I can
7    remember, again, just the most recent one
8    was in May or June and that was not.  That
9    was Avaulta, I believe.
10       Q.   Avaulta.
11       A.   Again, just to emphasize, that is
12   a guess.  I believe that's what it was.
13       Q.   As you sit here today, your best
14   recollection is it was Avaulta?
15       A.   Correct.
16       Q.   Were any of the mesh products for
17   which you gave testimony as a treater that
18   involved transvaginal placement, did they
19   involve the Prosima® product?
20       A.   I don't recall.
21       Q.   Did any of these cases involving
22   the transvaginal mesh for which you gave
23   testimony as a treating physician involve
24   the Prolift® M?
25       A.   I don't recall.

4 (Pages 13 to 16)

Daniel Steven Elliott, M.D.

Page 17

1    Q.    Plus M?
2    A.    I don't recall.
3    Q.    Have you ever given testimony as
4  a treating physician in a case that involved
5  TVT®?
6    A.    Yes.
7    Q.    On how many occasions?
8    A.    Again, I'm going to have to only
9  give you a rough estimate.  It was probably
10  one or two times.  There's definitely once
11  but, again, beyond that, I can't really
12  accurately recall.
13    Q.    When was the first TVT® case that
14  you gave testimony in?
15    A.    I don't recall.  It would have
16  been probably in the three or four or five
17  years ago time range.
18    Q.    Were you also testifying in that
19  case as a treating physician?
20    A.    Yeah.  I -- I was not the one who
21  put the product in.  I was the one who took
22  care of the problem afterwards.  So yes, it
23  was the -- my care -- it was specifically my
24  care from the first day she showed up in the
25  office until the last day I saw her.

Page 18

1    Q.    And where was that case situated
2  at?  Do you recall?
3      MR. ANDERSON:  The TVT®?
4      MR. SNELL:  Yes.
5      THE WITNESS:  Where the TVT®
6  was placed?
7  BY MR. SNELL:
8    Q.    Where was the TVT® case situated,
9  filed?  Was it a Minnesota case or somewhere
10  else?
11    A.    Oh.  I have no idea.  Because
12  Mayo gets people from all over the world, so
13  all 50 states, so I don't -- I don't recall.
14      Again, the only reason I
15  remember the one in -- the last one, the
16  mesh case in June, was because it was a
17  recent one and I had just been in Atlanta
18  for another meeting so it's kind of stuck in
19  my mind.
20    Q.    The TVT® case that you gave
21  testimony in, the first one, did it involve
22  the retropubic or transobturator product?
23    A.    No.  It was the -- yeah, the
24  retropubic approach.
25    Q.    Do you recall the name of the

Page 19

1  plaintiff's counsel or the defense lawyer
2  there?
3    A.    No, I do not.
4    Q.    Were you represented in that
5  matter, in that case?
6    A.    Same answer as before.  To the
7  best of my knowledge, only one time I've had
8  the Mayo lawyer team in the room with me,
9  and that was not pertaining to a mesh.  So
10  Mayo legal team represents me but, again,
11  they were not in the room.
12    Q.    Can you tell me the case where
13  you had the Mayo Clinic legal in the room
14  with you?
15    A.    It was my first or second
16  deposition and it was a rectourethral
17  fistula following -- for prostate cancer,
18  brachytherapy seeds, and a hole developed
19  between the rectum and the prostate.
20    Q.    And how did it develop?
21    A.    As a result of radiation therapy
22  for brachytherapy.
23    Q.    And this was radio -- radiation
24  or radiotherapy?
25    A.    Radiation, yeah.

Page 20

1      Radiation can be given either
2  external beam or with seed implants for
3  prostate cancer.  Seed implants, another
4  term for that is brachytherapy.  And then
5  the hole developed following that.
6    Q.    And this was brachytherapy given
7  by some other physician and not you?
8    A.    Correct.  I did not give it.
9  Yeah.
10    Q.    What do you recall about the TVT®
11  retropubic case in which you gave testimony
12  in as a treating physician?
13    A.    The one that I can remember in
14  particular, it was a bladder perforation.
15    Q.    Was the bladder perforation
16  recognized at the time of surgery?
17    A.    No, it was not.  Specifically, I
18  can tell you there was a cystoscopy note
19  said there was no perforation.
20    Q.    What did your course of care
21  consist of in that matter in which you gave
22  deposition testimony upon?
23    A.    Briefly, the patient came to see
24  me for recurrent urinary tract infections,
25  irritative voiding symptoms, burning with

Daniel Steven Elliott, M.D.

Page 21

1  urination and pelvic pain.
2       We performed a physical exam,
3  which, as I recall, was negative, performed
4  a cystoscopic exam, which showed two meshes
5  going through bilaterally in the bladder or
6  one on each side of the bladder.
7    Q.   Do you know who placed that mesh?
8    A.   It was an outside physician.  I
9  don't recall who it was.
10    Q.   In any of the 15 cases where you
11  gave deposition testimony in as a treating
12  physician did you opine that another
13  physician breached the standard of care in
14  any manner?
15    A.   Again, it's going to be difficult
16  to recall each one in particular.
17       From my recollection, no,
18  because specifically I was to offer an
19  opinion specifically from the day they
20  showed up at my office to the day they left.
21  So I was instructed by the legal team not to
22  offer an opinion --
23    Q.   I don't want you to tell me what
24  your legal team instructed you.
25       MR. ANDERSON:  Listen to the

Page 22

1  question and answer his question.
2       THE WITNESS:  Okay.
3  BY MR. SNELL:
4    Q.   Now, you said that there was --
5  you testified in TVT® cases one or two times
6  and we talked about the TVT® retropubic
7  case.
8       Can you tell me, what was the
9  sum of your testimony in that TVT®
10  retropubic case beyond, you know, the
11  patient came to you as you testified --
12    A.   Uh-huh.
13    Q.   -- you know, you did a workup and
14  you found mesh?
15       What else, if anything, did you
16  testify to in that matter?
17    A.   They asked how did I treat the
18  situation, which that was at that point in
19  time an open surgical repair.  We went
20  through the abdomen and took out the mesh.
21       They wanted to know what was
22  the end result of it, if it cured the
23  problem that she presented with, which, as I
24  recall, the answer was yes, as far as I
25       And then, again, as far as I

Page 23

1  recall, the discussion ended at that point
2  in time.  I'm sure there were other
3  questions.  I don't recall them, though.
4    Q.   Who removed the mesh in that
5  case?
6    A.   I did.  And my surgical team.  It
7  wasn't just me.
8    Q.   Did you remove the entire mesh or
9  just the portion that was in the bladder?
10    A.   We removed -- that's an excellent
11  question because that pertains to overall
12  care and recurrence.
13       We removed from the --
14  everything we get from beneath the skin
15  through the rectus, through the fascia, into
16  the bladder, and then deep down into the
17  pelvis to the level of the endopelvic
18  fascia.  As I recall, we did not perforate
19  the endopelvic fascia and remove the
20  suburethral portion.
21    Q.   The other TVT® case that you gave
22  testimony in as a treater, what type of TVT®
23  product was that?
24    A.   It was a retropubic also.
25    Q.   And for the first TVT® case that

Page 24

1  we were discussing, where did you physically
2  sit when you gave that deposition testimony?
3    A.   At the Mayo Clinic in the legal
4  office.
5    Q.   In the second TVT® retropubic
6  case where did you physically give
7  deposition testimony from?
8    A.   Same place.  All my depositions
9  except for the patent infringement have been
10  in the legal office at Mayo.
11    Q.   And do you remember the names of
12  the attorneys in the second TVT® retropubic
13  case?
14    A.   No, I do not.
15    Q.   Do you remember approximately
16  when you gave that deposition?
17    A.   Again, it would have been -- no.
18  To answer your question, no, I can't.  I
19  mean, I can give you a five-year time frame.
20    Q.   The first TVT® retropubic case
21  that we've discussed, was that the first one
22  chronologically that you gave testimony in?
23    A.   That's the first one that I can
24  remember.
25    Q.   That's fine.

6 (Pages 21 to 24)

Daniel Steven Elliott, M.D.

Page 25

1    And then now this second one we
2 were talking about is sometime after that?
3    A.   I don't -- I don't recall the
4 dates.
5    Q.   Okay.
6    A.   I just happen to remember the
7 bladder perforation most notably.
8    Q.   Now, the second TVT® retropubic
9 case, can you tell me the sum and substance
10 of your testimony in that case?
11    A.   I don't -- I -- on that one I do
12 not remember any specifics.
13    Q.   Earlier you testified that the
14 last seven or so cases you gave deposition
15 testimony in involving transvaginal mesh --
16 strike that.
17    You testified there were seven
18 or so depositions you gave pertaining to
19 transvaginal mesh use; correct?
20    A.   Correct.
21    Q.   And of those seven or so, two of
22 them were TVT®.
23    A.   That's a rough estimate.  Yes.
24    Q.   That's fine.
25    One may have been Avaulta,

Page 26

1 which is the most recent one; correct?
2    A.   Can you go back?  Your question,
3 then, so I make sure I understand, as I can
4 recall --
5    Q.   How about this?  Let me withdraw
6 it.
7    Of the seven cases that you
8 gave deposition testimony in involving the
9 transvaginal use of mesh, tell me the
10 products that were involved.
11    A.   Okay.  I -- the only ones I'll be
12 able to specifically tell you would be TVT®
13 and then Avaulta.  I do not recall all the
14 others.
15    Q.   As you sit here today, we've
16 discussed two TVT® cases; correct?
17    A.   Correct.
18    Q.   Are those the only two that you
19 recall?
20    A.   That I recall, yes.
21    Q.   And as you sit here today, we've
22 discussed one case that was this year, I
23 believe you testified in May or June.
24    A.   Correct.
25    Q.   And that you believe involved

Page 27

1 Avaulta.
2    A.   Correct.
3    Q.   Are there any other Avaulta cases
4 that you recall?
5    A.   Not that I can recall, no.
6    Q.   For any of the other seven cases
7 that involved the use of transvaginal mesh
8 do you recall the names of any of those
9 patients?
10    A.   No.
11    Q.   Do you recall the names of any of
12 the lawyers?
13    A.   No.  I could only give you the
14 location that the last one was.  They were
15 based in Atlanta.  That's all I remember.
16    Q.   And do you know where any of
17 those lawsuits were filed?
18    A.   Just the one in Atlanta.  I don't
19 know if a case was filed, I have no
20 knowledge of that, but all -- I was giving a
21 deposition.
22    Q.   And do you have the deposition
23 transcripts from any of these depositions?
24    A.   No, I do not.
25    Q.   Does the Mayo Clinic have these

Page 28

1 transcripts?
2    A.   I would assume they would.
3    Q.   Have you ever testified in
4 Federal Court?
5    A.   I don't know what that -- the
6 case in Tacoma, was that a district court.
7 I don't know the hierarchy of courts.
8    Q.   Tell me about the case in Tacoma.
9    What was your role giving
10 testimony there?
11    A.   It was a patent infringement
12 case, Coloplast versus GMD, which was
13 Generic Medical Devices.  And my role was
14 with Coloplast as far as my opinion, whether
15 the GMD product infringed upon the
16 transobturator approach that is owned by
17 Coloplast, I assume.
18    Q.   You testified for Coloplast in
19 that patent infringement matter?
20    A.   Correct.
21    Q.   Were you hired as an expert
22 witness --
23    A.   Yes.
24    Q.   -- in that matter?
25    A.   Excuse me.  Yes.

7 (Pages 25 to 28)

Daniel Steven Elliott, M.D.

Page 29

1    Q.    And what was your expert opinion
2  in that Coloplast matter with regard to the
3  transobturator approach?
4    A.    That the use of the GMD
5  transobturator trochars and mesh infringed
6  upon the Coloplast-held patent.
7    Q.    And when did you give this
8  deposition testimony in the patent
9  infringement case for Coloplast?
10   A.    The deposition was given in
11 November of 2011.
12   Q.    When were you retained as an
13 expert?
14   A.    The summer of 2009.
15   Q.    And I believe you earlier
16 testified that you also testified at trial
17 in that case as well.
18   A.    Correct.
19   Q.    Was that a jury trial or a judge?
20   A.    Jury.
21   Q.    Did you issue any opinions about
22 -- strike that.
23        In this patent infringement
24 case that you gave deposition testimony in
25 for Coloplast am I correct that it involved

Page 30

1  the transobturator use of synthetic mesh?
2    A.    It would have been specifically
3  the transobturator surgical approach.  There
4  was -- the mesh itself was not a part of --
5  as far as I recall, not a part of the
6  patent.  It was the surgical approach, the
7  transobturator, that Coloplast owned.  So it
8  was not inclusive or exclusive of a mesh
9  being used.
10   Q.    And besides the synthetic mesh,
11 can you tell me what other mesh material,
12 cadaveric, autologous or whatever, is placed
13 through a transobturator approach?
14        And I assume this is for -- let
15 me back up.  This -- I assume this is for
16 stress urinary incontinence, this patent
17 infringement?
18   A.    Correct.
19   Q.    So for stress urinary
20 incontinence can you tell me what other
21 material besides the synthetic mesh is
22 placed via the transobturator approach?
23   A.    As far as I know, only synthetic
24 meshes are.  But that was not what the
25 patent was involving.

Page 31

1    Q.    And you've used synthetic meshes
2  in placing -- strike that.
3        You've used synthetic meshes in
4  the past to treat stress urinary
5  incontinence via the transobturator route;
6  correct?
7    A.    Correct.
8    Q.    Did you give any opinions in this
9  patent infringement case about the condition
10 of stress urinary incontinence and whether
11 it needed to be treated?
12   A.    I gave as far as my expert report
13 a description of stress urinary
14 incontinence.  But, again, the patent was
15 not pertaining to what is being treated.
16 The patent was the transobturator approach
17 using those products.
18   Q.    And the transobturator approach
19 to treat stress urinary incontinence;
20 correct?
21   A.    Again, specifically, the patent
22 was the transobturator surgery.  That's what
23 was being discussed.  And if the GMD product
24 was infringing upon that patent.
25   Q.    Did you give any opinions about

Page 32

1  whether the transobturator surgery was a
2  safe procedure?
3    A.    Yes.
4    Q.    What did you testify in that
5  regard?
6    A.    I felt when it was done
7  correctly, it was a safe procedure.
8    Q.    Did you give testimony about the
9  efficacy of the transobturator surgery to
10 treat stress urinary incontinence versus
11 other surgical options?
12   A.    I don't recall that question ever
13 coming up or me offering an opinion.
14   Q.    You didn't put that in your
15 report?
16   A.    I don't recall that specifically,
17 no.
18   Q.    You mentioned you issued a report
19 in that patent infringement case.
20        Did you issue your report
21 before your deposition testimony?
22   A.    Yes.
23   Q.    How many times were you deposed
24 in that patent infringement case?
25   A.    Once.

Daniel Steven Elliott, M.D.

Page 33

1    Q.    And you gave trial testimony on
2  one occasion.
3    A.    Correct.  Over two days, but
4  yeah, one trial.
5    Q.    Did the General Medical Devices,
6  the party, have an expert opposite you?
7    A.    Yes.
8    Q.    What was his or her name?
9    A.    Dr. George Webster.
10    Q.    Before being involved in that
11  case, did you know Dr. George Webster?
12    A.    Yes.
13    Q.    How did you know Dr. Webster?
14    A.    Through meetings.
15    Q.    What type of physician is
16  Dr. Webster?
17    A.    Urologist.
18    Q.    Where does he practice?
19    A.    Duke.
20    Q.    Are you still retained in the
21  patent infringement case?
22    A.    No, I'm not.
23    Q.    Do you have a list of testimony
24  that you've given?
25    A.    I don't understand the question.

Page 34

1    Q.    Do you have a document, a list of
2  testimony, that you have given in the past?
3    A.    I still don't understand it.  A
4  list of testimony?  I don't --
5    Q.    Do you have a document which
6  contains a list of the prior depositions,
7  trial testimonies --
8    A.    Oh.
9    Q.    -- you've given in the past?
10    A.    No, I do not.
11    Q.    You did not serve such a document
12  with your expert report in the patent
13  infringement case?
14    A.    No.  So I just want to clarify,
15  you're asking do I have a list of all the
16  depositions I've given?  I mean, okay, no, I
17  do not have that at all.
18    Q.    A list of all the depositions
19  you've given in any matter.
20    A.    Yeah.
21    Q.    Not just involving Mayo.
22    A.    No.  I have not given any
23  depositions except being at Mayo.  So during
24  my training -- well, my training is Mayo.  I
25  did one year of fellowship at Baylor College

Page 35

1  of Medicine at Houston.  I did not give
2  anything there.
3    Q.    In any of the cases where you
4  testified with regard to the use of
5  transvaginal mesh did you testify that the
6  use of mesh was improper in that case?
7         MR. ANDERSON:  Objection.
8         Go ahead.
9         THE WITNESS:  I'd have to
10  clarify the question.  Please rephrase it so
11  I can understand.
12  BY MR. SNELL:
13    Q.    In the seven or so cases you gave
14  testimony pertaining to transvaginal use of
15  mesh did you ever give deposition testimony
16  that the use of mesh was improper?
17    A.    To the best of my recollection,
18  no.  I was giving testimony pertaining to
19  the complications that happened afterwards
20  and specifically, no, I did not say they
21  were improper.
22    Q.    Did you give any deposition
23  testimony in those seven or so cases
24  involving transvaginal mesh that some other
25  surgical procedure to treat the condition

Page 36

1  should have been performed?
2    A.    No.  You -- I -- again, let me go
3  back to clarify.
4    Q.    Uh-huh.
5    A.    Are you asking should a non-mesh
6  procedure have been performed?
7    Q.    Any other type of procedure.
8    A.    Okay.  No, I did not.
9    Q.    For example, just to make sure
10  we're on the same page, if it was a case
11  involving the Avaulta product, that's a
12  product to treat prolapse; correct?
13    A.    Correct.
14    Q.    In that case, did you give
15  deposition testimony that some other
16  surgical procedure should have been
17  performed instead of Avaulta, such as
18  sacrocolpopexy, colporrhaphy, any other
19  prolapse surgery?
20    A.    No, never.  That was not my role.
21  My role was dealing with the complications.
22  So no, I did not give an opinion that way.
23    Q.    So now that we're on the same
24  page and, hopefully, we're understanding
25  each other, just so I'm clear, in those

Daniel Steven Elliott, M.D.

Page 37

1    seven cases involving transvaginal use of
2    mesh did you give testimony that some other
3    surgical procedure should have been
4    performed instead of the particular
5    procedure in a case?
6        A.    Okay.  To the best of my
7    knowledge, no, never.
8        Q.    The first six or seven
9    depositions you gave involved surgical
10   issues.
11       A.    Correct.
12       Q.    Can you tell me what they
13   involved?
14       A.    Most of them were rectourethral
15   fistulas, like I mentioned earlier, from
16   radiation damage.
17            There was one that I can
18   recall, again, neurogenic bladder following
19   a fall, an inability to work.  And that's
20   all I can recall.
21            And to be honest, there are
22   probably other ones, I just cannot recall.
23   Majority of them early on were definitely
24   rectourethral fistulas, though.
25       Q.    Besides the patent infringement

Page 38

1    case where you've issued an expert report,
2    have you issued an expert report in any
3    other case, setting aside the present case
4    that we're here for today?
5        A.    No.  That's the only one.
6        Q.    Was Coloplast the plaintiff or
7    defendant in that patent infringement case?
8        A.    I'm not that great on legal
9    terms, but they were -- Coloplast was suing
10   GMD for infringement so I assume that's
11   plaintiff.
12       Q.    Do you have transcripts of your
13   deposition or trial testimony from the
14   Coloplast case?
15       A.    No, I do not.  Those have all
16   been returned to Coloplast.  I have reviewed
17   them but they all were returned to -- not
18   Coloplast.  The legal firm that was
19   representing them.
20       Q.    So you reviewed the deposition
21   transcripts and trial transcripts in your
22   Coloplast case?
23       A.    Only the deposition, not the
24   trial.
25       Q.    Did you make any corrections to

Page 39

1    those deposition transcripts?
2        A.    We had -- there were
3    clarifications so -- an errata or whatever
4    you call that form was filled out.  I read
5    over it.  There were spelling errors,
6    grammar errors, those types of things.
7        Q.    Any substantive changes you
8    recall?
9        A.    According to me and according to
10   what the lawyer told me --
11       Q.    I don't want to know about the
12   lawyer, just you, in your mind, as a
13   surgeon.
14       A.    There would be one where the --
15   the question came up and I misunderstood the
16   question and then we corrected it in the
17   form of the deposition.  And so we went
18   back, I went back, and made sure it was
19   clear that this was a misunderstanding.
20       Q.    Do you recall the question and
21   your answer?
22       A.    Yes, I do.
23       Q.    What is it?  Or strike that.
24            What was it?
25       A.    And can I disclose that?  I

Page 40

1    don't --
2        Q.    It was in a deposition.
3        A.    It was in a deposition.
4        Q.    I don't see why not.
5             Was the deposition sealed?
6             MR. ANDERSON:  Unless it's
7    filed under seal.  I don't know.
8    BY MR. SNELL:
9        Q.    Well, you gave trial testimony.
10       A.    Yeah.
11       Q.    Did you give trial testimony and
12   opinions that concerned this errata --
13       A.    Yes.
14       Q.    -- change or issue?
15       A.    No, not the trial, that issue did
16   not come up.  The GMD did not challenge the
17   change.  I mean, I know what it is.  I just
18   want to make sure I can talk about it.
19       Q.    Do you have any basis or reason
20   to believe that the transcript was sealed?
21       A.    No.  But I'm not a lawyer so I --
22            MR. ANDERSON:  Objection.
23            He wouldn't know that.
24            THE WITNESS:  Yeah.  I don't
25   know.

Daniel Steven Elliott, M.D.

Page 41

BY MR. SNELL:
1   BY MR. SNELL:
2       Q.   When you reviewed it, did you see
3   any designation that the transcript was
4   confidential?
5       A.   Many of the documents -- many of
6   the documents had "confidential" on it.
7            Again, I'm not trying to be
8   difficult.
9       Q.   That's okay.
10      A.   I know exactly what it is and I
11  could tell you.  I don't --
12           MR. ANDERSON:  If he feels like
13  it's ground-breaking stuff, we'll figure it
14  out after the deposition.
15           MR. SNELL:  No.  Don't worry
16  about it.
17           THE WITNESS:  Okay.
18  BY MR. SNELL:
19      Q.   Have you ever issued any expert
20  Affidavits?
21      A.   I don't know what that is.
22      Q.   It's a written document where, it
23  can be like a report except you swear under
24  penalty of perjury that things you wrote and
25  said in the Affidavit are true and correct,

Page 42

1   to the best of your knowledge and belief.
2       A.   I don't recall ever doing that,
3   no.  I would think I would remember
4   something like that but I don't recall that.
5       Q.   Besides this matter, are there
6   any cases in which you expect to testify in
7   with regard to the use of transvaginal mesh?
8       A.   No.
9       Q.   How did you come to be retained
10  in this litigation?
11      A.   Mr. Anderson contacted me.
12      Q.   When was that?
13      A.   September of last year, 2011.
14      Q.   Besides Mr. Anderson, can you
15  tell me the names of any other attorneys
16  you've spoken with on behalf of the
17  plaintiffs?
18      A.   Mr. Adam Slater, Mr. John
19  Restaino.  I mean, if you want to know
20  everybody that I can think of, Mr. Tom
21  Cartmell.  And I don't recall.  There may
22  have been another one I don't recall.  Those
23  are the ones that I can think of.
24      Q.   Now, you've obviously met
25  Mr. Anderson and Mr. Restaino.

Page 43

1            Have you met any of the other
2   lawyers in person?
3       A.   Yes, I've met them.  I don't know
4   their names.  I mean, I've been sitting in
5   here for a couple of days and they all come
6   walking in and talk to me.  I don't know who
7   they are.  I mean --
8            MR. ANDERSON:  Including Bill.
9            THE WITNESS:  So, again, I
10  cannot state my list is complete.
11  BY MR. SNELL:
12      Q.   What is your rate of
13  compensation?
14      A.   700 an hour.
15      Q.   And how many hours have you
16  billed?
17      A.   I have no idea.  I don't keep
18  track.
19           MR. SNELL:  Mr. Anderson, do
20  you have a list of the number of hours he's
21  billed and paid?
22           MR. ANDERSON:  Yeah.  We
23  submitted that back in October to Kelly Maha
24  and Mary Ellen with our other notices of
25  materials reviewed, hourly rate, number of

Page 44

1   hours to date, total amount paid was all
2   submitted on I believe October 21st.
3            MR. SNELL:  Is there a chance
4   we can get that on the break?  I don't have
5   that.  I have the list of disclosures and I
6   went through them and I saw --
7            MR. ANDERSON:  Off the record.
8            (Discussion off the record.)
9            MR. SNELL:  Back on.
10  BY MR. SNELL:
11      Q.   Can you give me an estimate of
12  the number of hours you've spent?
13      A.   I can't give you an accurate
14  estimate because this has been over roughly
15  a year now and many months.  There's no --
16  so I don't know.
17      Q.   Has your rate of compensation
18  always been $700 per hour for your work in
19  this matter?
20      A.   Yes.
21      Q.   Do you have a separate
22  compensation rate for testimony?
23      A.   No.
24      Q.   Do you have a separate
25  compensation rate for if you present

11 (Pages 41 to 44)

Daniel Steven Elliott, M.D.

Page 45

1  testimony at trial?
2      A.   No.
3      Q.   Have you attended any meetings
4  where other experts for the plaintiffs have
5  been present?
6      A.   Experts for the plaintiffs.
7          THE WITNESS: That's your side.
8          MR. ANDERSON: Yeah.
9          THE WITNESS: I pointed to
10  Doctor -- Mr. Anderson.
11         To the best of my knowledge,
12  no. But we attend -- there's an overlap of
13  meetings, uro-gyne and female urology, that
14  overlaps. I do not recall ever meeting them
15  in person, no.
16  BY MR. SNELL:
17      Q.   Have you ever attended any
18  meetings focused on this litigation with
19  other experts for the plaintiff?
20      A.   No.
21      Q.   Have you ever spoken with or
22  communicated with in any manner any other
23  expert for the plaintiff in this litigation?
24      A.   Yeah. With Dr. Weber.
25      Q.   When was that?

Page 46

1      A.   It was on a Saturday roughly --
2  I'd have to look at the calendar. I would
3  be able to tell you exactly if I looked at
4  the calendar. A week and a half or so ago,
5  something like that.
6      Q.   November 3rd sound right?
7      A.   Again, I'd have to look at the
8  calendar. I -- days are all a blur right
9  now.
10      Q.   Saturday before last.
11      A.   Today -- it would have been the
12  Saturday before that. That sounds about
13  right. And she was involved in a conference
14  call.
15      Q.   Who all was on that conference
16  call?
17      A.   Just Mr. Slater, and then
18  Dr. Weber showed up half hour into the
19  conversation.
20      Q.   What did you say to Dr. Weber?
21      A.   It was a half-hour conversation.
22  I mean, I said hello to start off with and
23  then we talked from there.
24      Q.   Tell me everything you recall
25  discussing with Dr. Weber.

Page 47

1      A.   Okay. I asked her about the
2  drive from Baltimore down. I wanted to know
3  if there was traffic, which she said there
4  was none. I complimented her on her
5  manuscripts that she's written.
6          Mr. Slater talked a lot and
7  wanted to know her opinion on interstitial
8  cystitis, which she then deferred to me
9  since in urology we tend to deal with that
10  more.
11          I then discussed diagnostic
12  criteria for interstitial cystitis. And we
13  talked about dates of when she was going to
14  give her deposition and then we talked about
15  dates of when I was giving my deposition.
16  And that's pretty much all I recall. That
17  is all I recall.
18      Q.   You mentioned a conversation
19  about the drive from Baltimore down? Were
20  you in Baltimore?
21      A.   No. No. She -- from what I
22  recall, Adam said she just drove down from
23  Baltimore. Or up. Where is Baltimore?
24  Baltimore is south.
25      Q.   Baltimore is south.

Page 48

1          MR. RESTAINO: South.
2          THE WITNESS: I thought she
3  said she drove in from Baltimore.
4          MR. SNELL: Okay. Just the
5  down threw me off, that's all.
6          THE WITNESS: Yeah. I'm an
7  L.A. boy and Minnesota, so the East Coast
8  states are too small. I don't know where
9  they are.
10  BY MR. SNELL:
11      Q.   Now, you complimented Dr. Weber
12  on the manuscript she had written; is that
13  correct?
14      A.   Manuscripts.
15      Q.   Scripts.
16          And what manuscripts were
17  those?
18      A.   I'd have to look at the -- the
19  exact title of them. The -- there was the
20  original one that she was involved with
21  defining prolapses, and then the other one I
22  believe the first author was, it was like
23  Chmielewski, something like that. I'd --
24  again, I'd have to look at the -- I know the
25  content of the paper but not the exact

title.
Q. Well --
A. It was redefining prolapse.
Q. And how was the prolapse being redefined in the paper? Or strike that.
How was the prolapse redefined in the manuscript by Dr. Weber?
A. Well, I'd have to get out the paper and we'd have to go over it.
Q. Just your general recollection.
A. Well, again, that was a very large paper with a lot of details in it, but what they were doing -- and it's in my expert report in a great amount of detail so that would probably be the best way, to go to it. Because off the top of my head, I'm not going to do the paper justice.
Q. But you said you recall complimenting Dr. Weber on the manuscript that she was involved in where she and others redefined prolapse.
A. No. All I said was, is, I've read your papers and they've -- I've appreciated your work. Roughly, that's the statement I made. We did not go into detail

as far as the paper itself, but that's what I was referring to.
Q. So you appreciated Dr. Weber's work in redefining prolapse.
A. I think it's a -- I did not state that. That was my underlying intent, though.
Q. And was the manuscript that you're referring to Chmielewski, C-H-M-I-E-L-E-W-S-K-I, Walters, Weber, et al., "Re-analysis of a Randomized Trial of Three Techniques of Anterior Colporrhaphy Using Clinically Relevant Definitions of Success," Journal of Obstetrics and Gynecology, 2011?
A. That is correct.
Q. Besides your expert reports in this case, have you done any other analyses on the use of transvaginal mesh?
MR. ANDERSON: Objection.
Go ahead.
THE WITNESS: Well, transvaginal mesh -- you mean -- analyses, what do you mean as far as -- I need clarification. Studies? Expert reports?

What?
MR. SNELL: Fair question.
BY MR. SNELL:
Q. Have you done any other expert reports on transvaginal mesh besides the ones in this matter?
A. No. The only thing that would be close would be that patent infringement case. But, again, that was not dealing with meshes specifically.
Q. Have you done any meta-analyses involving the use of transvaginal mesh?
A. No.
Q. Have you done any randomized, controlled trials involving the use of transvaginal mesh?
A. No.
Q. Have you done any randomized, controlled trials involving the use of mesh --
A. No.
Q. -- in any application?
A. No.
Q. Have you done any meta-analyses involving the use of mesh to treat prolapse?

A. No.
Q. Have you performed any analyses comparing the use of transvaginal mesh to other treatment, other surgical treatment options to treat prolapse?
A. Well, analyses is a very broad term; therefore, the answer would be yes.
Q. And can you tell me what analyses you have done?
A. That would be reviewing of manuscripts, formulating papers, offering public opinion. No, that's not the right phrase. Statements regarding meshes.
Q. Have you ever been involved in a clinical study that used transvaginal mesh to treat prolapse?
A. No.
Q. Have you ever been involved in a clinical study that used transvaginal mesh to treat stress urinary incontinence?
A. Depends what you're defining clinical trial as.
Q. How do you define a clinical trial?
A. Well, clinical trial is a

Daniel Steven Elliott, M.D.

Page 53

1    nondescript or nonspecific term.
2        We are doing analyses and
3    studies on management of mesh
4    complications.  And just to clarify your
5    previous question, that would also include
6    transvaginal POP meshes as well as urinary
7    incontinence meshes.  And that's dealing
8    with the laser, dealing with the urologic
9    complications and perforations.  That is an
10   ongoing process.
11       Q.   Have you done any retrospective
12   cohort studies involving the use of
13   transvaginal mesh?
14       A.   Well, if that involves
15   anti-incontinence procedures, yes.
16       Q.   And what study or studies were
17   those?
18       A.   Those would be presentations
19   we've made over the years.  I'd have to get
20   my CV out and review those.  But dealing
21   with the efficacy -- the one specific I can
22   remember is the suprapubic ARC or SPARC by
23   EMS.  That's the one I can recall.
24       I mean, we've done robotic
25   sacrocolpopexy data, which is involving,

Page 54

1    obviously, abdominal mesh.  I'd have to look
2    at my CV to give you a complete list,
3    though.
4        Q.   Do you have your CV here today?
5        A.   I do not have a copy, no.
6        Q.   Have you been involved in any
7    prospective studies involving the use of
8    mesh?
9        A.   No.
10       Q.   Have you performed any
11   randomized, controlled trials with the
12   robotic sacrocolpopexy?
13       A.   No.
14       Q.   Have you done any prospective
15   studies involving the robotic
16   sacrocolpopexy?
17       A.   Did you just ask that?  I thought
18   it was the same question.
19       Q.   I'm sorry.  If I did, I
20   apologize.  Let me back it up and just ask
21   it again.  It's a little different.
22       A.   Okay.
23       Q.   Have you performed any
24   prospective studies involving robotic
25   sacrocolpopexy?

Page 55

1        A.   No.
2        Q.   When was the last time you
3    performed a robotic sacrocolpopexy?  I mean
4    you as the lead surgeon.
5        A.   It would have been -- I'm just
6    going to give you a guess.  It was in the
7    past month.  That may or may not be
8    completely accurate.  It would have been
9    roughly that time frame.
10       Q.   So in the last month you believe
11   you performed a robotic sacrocolpopexy?
12       A.   Well, we're -- we're a team that
13   performs it.  So, yes, I am -- I am the lead
14   surgeon, I am the primary surgeon, but there
15   is a team.  And it's roughly within the past
16   month.
17       Q.   And I assume you used synthetic
18   mesh in that robotic sacrocolpopexy?
19       A.   Correct.
20       Q.   Was that a polypropylene mesh?
21       A.   Correct.
22       Q.   And the sacrocolpopexy was
23   performed to treat prolapse?
24       A.   Correct.
25       Q.   Was it a case of recurrent

Page 56

1    prolapse?
2        A.   I don't -- I don't recall the
3    details on it.
4        Q.   Do you remember which
5    manufacturer's polypropylene mesh you used
6    in this robotic sacrocolpopexy that you
7    performed within the last month?
8        A.   It was American Medical Systems,
9    abbreviated AMS, the IntePro, E-N-T-E
10   capital P-R-O.
11       Q.   Are you specifically
12   credentialed by the Mayo Clinic to use
13   polypropylene mesh?
14       A.   I'm not aware of there being a
15   credentialing process for use of mesh.  I
16   am credentialed for all female urology and
17   prolapse.
18       Q.   So you can perform any procedure
19   you see fit to treat prolapse at Mayo
20   Clinic, under their credentialing
21   guidelines.
22       A.   Excluding uterine prolapse.  I do
23   not perform that.
24       Q.   So am I correct that Mayo Clinic
25   credentialed you to allow you to perform

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 57

1 prolapse surgeries that include the use of
2 synthetic mesh?
3     A.   No.  They have credentialed me
4 or they have approved my credentials for all
5 prolapse repair, transvaginal or
6 transabdominal, including robotic and
7 laparoscopy, excluding uterine prolapse and
8 hysterectomy.
9     Q.   And did Mayo Clinic credential
10 you to perform repairs for stress urinary
11 incontinence?
12     A.   Yes.
13     Q.   Did Mayo Clinic specifically
14 credential you for the use of synthetic mesh
15 to treat stress urinary incontinence?
16     A.   I don't recall --
17         MR. ANDERSON:  Object.
18 Objection.
19         Go ahead.
20         THE WITNESS:  I don't recall
21 the specifics of it other than they say I
22 have to provide documentation that I know
23 how to treat stress urinary incontinence.  I
24 do not recall specifically a mesh being
25 involved in there.

Page 58

1 BY MR. SNELL:
2     Q.   Did you provide documentation
3 that you know how to treat prolapse to the
4 Mayo Clinic as part of your credentialling?
5     A.   That would have been back in
6 2000.  And, as I recall, we had to have a
7 letter from my fellowship director
8 documenting the number of cases, complexity
9 of cases, variety of cases that I had done
10 during fellowship to ensure that they had
11 reached an acceptable number to show talent
12 or competency, I suppose.
13     Q.   When you performed this last
14 robotic sacrocolpopexy case involving
15 polypropylene synthetic mesh, did you select
16 the specific mesh or do you just -- how do
17 you requisition that mesh?
18     A.   Early on, years ago, so it would
19 have been seven, eight, nine years ago, when
20 we were trying to determine this procedure
21 and how we were going to perform it, I
22 reviewed multiple different meshes.
23         Then it goes to an acquisition
24 committee, so to speak, who then contacts
25 the various different companies for

Page 59

1 purchasing.  And there were several that I
2 was okay with, and then for financial
3 reasons the IntePro was chosen.  There's...
4     Q.   And was Prolene mesh one of the
5 meshes that you were okay with?
6     A.   They were all Prolene meshes,
7 polypropylene meshes.
8         MR. ANDERSON:  You got that
9 clarification?  You said Prolene, he said
10 polypropylene, so maybe we can do --
11         MR. SNELL:  Yeah.
12 BY MR. SNELL:
13     Q.   Did you evaluate Gynemesh® PS
14 during this review of meshes?
15     A.   To the best of my knowledge, no.
16     Q.   Why not?
17     A.   I wasn't familiar with the
18 product.
19     Q.   And this would have been
20 approximately seven or eight years ago?
21     A.   It would have been our first
22 robot -- I'll back up.
23         I was originally trained to use
24 Gore-Tex sacrocolpopexies during my
25 fellowship.  So when I returned on staff, I

Page 60

1 continued to use Gore-Tex; however, I found
2 problems with it of erosion, extrusion --
3 excuse me.  Not erosion.  Extrusion into the
4 vagina.  So it was roughly 2002, 2003 is
5 when I made the changeover to polypropylene.
6     Q.   Your original training where you
7 used Gore-Tex, was that your fellowship?
8     A.   Correct.
9     Q.   And that was your fellowship at
10 Baylor.
11     A.   Baylor, correct.  In Houston,
12 Texas.
13         MR. SNELL:  Why don't we take a
14 little break.
15         (Recess, 11:03-11:18 a.m.)
16 BY MR. SNELL:
17     Q.   We spoke a little earlier about
18 the conference call you attended with
19 Dr. Weber.
20         What did Dr. Weber say to you?
21     A.   She didn't speak.  I mean, she
22 spoke to me but it was nothing of substance
23 other than that she felt my knowledge of
24 interstitial cystitis and practice was more
25 involved than hers or just because of my

Daniel Steven Elliott, M.D.

Page 61

1  practice, the variations between the two of
2  us.
3          We talked about patients that I
4  had seen, and she had mentioned, you know,
5  as far as her seeing patients with pelvic
6  pain, I believe.
7          Again, it was -- it was -- the
8  majority of the time was actually me
9  talking, not necessarily her.
10     Q.   Have you been on any other phone
11  calls with any of the plaintiffs' experts
12  besides this one conference call?
13     A.   No.  Just Miss Weber or
14  Dr. Weber.
15     Q.   Have you had any other form of
16  communication with any expert for the
17  plaintiffs?
18     A.   No.  Communication, I mean, I've
19  read depositions but no verbal or
20  face-to-face communications with any
21  plaintiff experts.
22     Q.   Any E-mails or letters --
23     A.   None.
24     Q.   -- correspondence between you and
25  any other plaintiffs' expert?

Page 62

1     A.   None.
2     Q.   And which depositions of the
3  plaintiffs' experts have you read?
4     A.   I'd have to look at the list.  My
5  supplemental list would be most thorough.
6          Klinge.  I'm not pronouncing
7  that correctly, but it's the one I can think
8  of off the top of my head.  But, again, I'd
9  have to go look at it.
10     Q.   Have you read Dr. Weber's
11  deposition transcript?
12     A.   Yes.
13     Q.   When did you read Dr. Weber's
14  deposition transcript?
15     A.   It was a few days after or
16  following the deposition.
17     Q.   Besides Drs. Klinge and Weber,
18  can you think of any other plaintiffs'
19  expert deposition transcripts you've read?
20     A.   I'd have to get my supplemental
21  report out.  If we have that, I can go
22  through the list.  Because it's a fairly
23  long list.  And I have a -- I have a copy of
24  my --
25          MR. ANDERSON:  No.  Just --

Page 63

1  you've answered the question.
2  BY MR. SNELL:
3     Q.   Do you have a copy handy?
4     A.   Yes, I do.
5          MR. ANDERSON:  You mean of the
6  supplemental?
7          THE WITNESS:  The supplemental.
8          MR. SNELL:  Whichever the
9  doctor wants to look at.
10          MR. ANDERSON:  Oh, okay.
11  BY MR. SNELL:
12     Q.   Just so the record is clear,
13  you're looking at your supplemental expert
14  report, which is dated what?
15     A.   This is dated November 7th.  It
16  is the copy that has been signed by me.  I
17  don't have it signed.
18          THE WITNESS:  You have -- do
19  you have an official one?
20          MR. ANDERSON:  Yeah.
21  That's the one I handed to you
22  this morning, Burt.
23          THE WITNESS:  The only one that
24  is signed by me is the only one that is the
25  correct -- this is it.  So the one you just

Page 64

1  handed me is the official one or the correct
2  one, let's say.
3          And so experts -- excuse me.
4  Can you ask your question then again?
5          MR. SNELL:  Sure.
6          Let's just make the record
7  clear.
8          I'm going to mark Deposition
9  Exhibit Number 2 the supplemental report
10  that I handed you that you have signed, just
11  so we're clear on the record.
12          (Exhibit Elliott-2 was marked
13  for identification.)
14  BY MR. SNELL:
15     Q.   Is that okay, Doctor?
16     A.   Correct.
17          So the report I have, which is
18  marked as Exhibit 2, is the only one that is
19  that one that I have signed and --
20          MR. ANDERSON:  That's -- just
21  answer the question.
22  BY MR. SNELL:
23     Q.   My question was, besides Drs.
24  Weber and Klinge, what other deposition
25  testimony have you reviewed of the

Daniel Steven Elliott, M.D.

Page 65

1  plaintiffs' experts?
2      A.   That would be it.
3      Q.   When did you review Dr. Klinge's
4  deposition testimony?
5      A.   Oh, I can't recall.  After --
6  after it became available at some point in
7  time, but I reviewed many in different
8  days.  I can't recall.
9          MR. SNELL:  Off the record for
10  a second.
11         (Discussion off the record.)
12  BY MR. SNELL:
13     Q.   While we're talking about
14  reports, let's just make sure I have a full
15  list of all the reports you've authored in
16  this case.
17         The first I have is your June
18  15th, 2012, general report in this matter;
19  is that correct?
20     A.   Correct.  Yes.
21     Q.   And on November 8th, 2012, it was
22  served on defense counsel and it included
23  annotations or citations; is that correct?
24     A.   Correct.
25     Q.   Are there any changes besides

Page 66

1  adding in the annotations and citations to
2  that June 15th, 2012, general report?
3      A.   Absolutely none that I'm aware
4  of.
5      Q.   And in the June 15th, 2012,
6  general report you did not issue any
7  case-specific opinions with regard to Linda
8  Gross; correct?
9      A.   That is correct.
10     Q.   And in your June 15th, 2012,
11  general report you did not issue any
12  case-specific opinions regarding Pamela
13  Wicker; correct?
14     A.   Correct.
15         MR. SNELL:  For the record, the
16  defense has filed a Motion to exclude the
17  November 7th, 2012, report issued by
18  Dr. Elliott.
19  BY MR. SNELL:
20     Q.   And, Dr. Elliott, this November
21  7th, 2012, report which we marked as Elliott
22  Exhibit Number 2, this is the first time
23  you've issued opinions with regard to Linda
24  Gross; correct?
25     A.   Correct.

Page 67

1      Q.   This is the first time you've
2  issued case-specific opinions with regard to
3  Mrs. Wicker; correct?
4      A.   Correct.
5      Q.   Before issuing your June 15th,
6  2012, general report you did not look at any
7  medical records for Mrs. Gross; correct?
8      A.   To my knowledge, no.
9      Q.   Am I correct?
10     A.   To the best of my knowledge, no,
11  I did not review any records of Miss Gross.
12     Q.   And before issuing your June
13  15th, 2012, general report you did not issue
14  -- sorry -- you did not review any medical
15  records involving Pamela Wicker; correct?
16     A.   To the best of my knowledge, you
17  are correct, I did not review any.
18     Q.   Prior to issuing your June 15th,
19  2012, general report you did not review any
20  of the depositions in the Linda Gross case;
21  correct?
22     A.   Yeah.  To the best of my
23  knowledge, no, I did not review any.
24     Q.   And prior to issuing your June
25  15th, 2012, general report you did not

Page 68

1  review any depositions in the Pamela Wicker
2  case; correct?
3      A.   Correct.
4      Q.   Prior to issuing your June 15th,
5  2012, general report you did not review any
6  radiology on Linda Gross; correct?
7      A.   Correct.
8      Q.   Prior to issuing your June 15th,
9  2012, general report you did not review any
10  urologic studies on Linda Gross; correct?
11     A.   Correct.
12     Q.   Prior to issuing your June 15th,
13  2012, general report you did not review any
14  radiology on Pamela Wicker; correct?
15     A.   Correct.
16     Q.   Prior to issuing your June 15th,
17  2012, general report you did not review any
18  urologic studies on Pamela Wicker; correct?
19     A.   Correct.
20     Q.   The third and last report that I
21  have is dated November 14th, 2012, which is
22  a letter by you addressed to Mr. Anderson
23  stating, I have reviewed the following
24  documents, which further support my opinions
25  in this case as set forth in my original

Daniel Steven Elliott, M.D.

Page 69

1  report.
2      A.    May I see it?
3      Q.    Sure.
4          MR. ANDERSON:  For the record,
5  I'll just stipulate that I sent that because
6  I saw that we had inadvertently left two
7  off, which is what the cover E-mail said
8  when I sent it to you guys yesterday.
9          THE WITNESS:  So your question
10  -- I -- I'm sorry.  What's your question?
11  BY MR. SNELL:
12      Q.    Is this the third and last report
13  or supplement that you have?
14      A.    Yes.
15      Q.    When you say, I have reviewed the
16  following documents which further support my
17  opinions in this case as set forth in my
18  original report, when you say "original
19  report," do you mean your June 15th, 2012,
20  report?
21      A.    Yes.
22      Q.    I'm going to hand you what's been
23  marked as Exhibit Number 1.  It's your
24  Notice of Deposition.
25          Have you ever seen that

Page 70

1  document before?
2      A.    No, I have not.
3      Q.    Can you turn towards the back,
4  the appendix?  It asks that you bring
5  certain materials to the deposition.
6      A.    What page are we on?  Six?
7      Q.    Let me get there and follow with
8  you.
9          Let me take a look at it,
10  Doctor.
11      A.    (Witness complies.)
12      Q.    Under all this paper, I seem to
13  have lost mine.
14          So you're correct, Doctor, Page
15  6 through 9 asks that you bring certain
16  materials to the deposition.
17          MR. ANDERSON:  Well, just to
18  clarify, I have to object, that it's sent to
19  me, so it asks me to bring.  And he's
20  already said that he didn't see this.
21          MR. SNELL:  Besides the reports
22  and the compensation information, are there
23  any other materials that are forthcoming in
24  response to the Notice of Deposition?
25          MR. ANDERSON:  No.

Page 71

1          MR. SNELL:  And what's the
2  basis for the non-production?
3          MR. ANDERSON:  It's my
4  understanding that everything that we are
5  required to produce has been produced.
6  BY MR. SNELL:
7      Q.    Doctor, I'd like to -- you can
8  set that aside.
9          I'd like to talk to you about
10  your background.  You did your medical
11  school at Loma Linda?
12      A.    Correct.
13      Q.    And you graduated in 1993?
14      A.    Yes.
15      Q.    And during your medical schooling
16  did you do a rotation in obstetrics and
17  gynecology?
18      A.    Yes.
19      Q.    In your medical school training
20  at Loma Linda did you learn human anatomy?
21      A.    Yes.
22      Q.    In your medical school training
23  did you learn the anatomy of the female
24  pelvic floor?
25      A.    In a superficial manner, yes.

Page 72

1      Q.    Did you learn the location of the
2  nerves in the pelvic floor in your medical
3  school training?
4      A.    In a very general way, yes.
5      Q.    Did you learn the location of the
6  blood vessels in the pelvic floor during
7  your medical school training?
8      A.    Again, in a very general way,
9  yes.
10      Q.    Were you taught about pelvic
11  organ prolapse during your OB-GYN rotation
12  during medical school?
13      A.    I don't recall.
14      Q.    What do you recall about the
15  subjects you were taught on in your OB-GYN
16  rotation during medical school?
17      A.    That giving heroin to a mother
18  that's giving birth is not a good thing.  We
19  saw that all the time at the county
20  hospital.  So if you want a stark memory,
21  that's it.
22          The OB-GYN rotation, depending
23  upon where you were, would also divide up
24  with peds, so it was not a true specific.
25  So we just followed the babies afterwards on

18 (Pages 69 to 72)

Daniel Steven Elliott, M.D.

Page 73

1    heroin and things.
2        Then I did a GYN-ONC, which is
3    a GYN cancer rotation, two weeks.  And so
4    that was dealing with ovarian, uterine,
5    vaginal cancers.
6        Q.    Did you see any surgeries --
7    strike that.
8        Did you see any gynecologic
9    surgeries during your medical school?
10       A.    Yes.
11       Q.    Which were they?
12       A.    Specifically limited to, again,
13   GYN-ONC just because -- hysterectomies from
14   malignancies, debulking procedures for
15   malignancies just because that's the
16   rotation I was assigned to.  Others would
17   have different experiences than I.
18       Q.    Did you see any C-sections
19   performed?
20       A.    In the OB, but that was not GYN.
21       Q.    Did you see episiotomies
22   performed?
23       A.    Yes.
24       Q.    Did you see surgeries for stress
25   urinary incontinence performed during

Page 74

1    medical school?
2        A.    To the best of my knowledge,
3    unfortunately, we're going back 20-some
4    years now, I do not recall any
5    anti-incontinence procedures in OB-GYN -- or
6    it would be GYN, actually -- or urology.
7        Q.    Did you see any prolapse surgical
8    procedures during your medical school?
9        A.    I don't recall any, no.
10       Q.    You then did an internship in
11   general surgery at Mayo in 1994?
12       A.    '93 to '94, yeah.  One year.
13       Q.    How did you come to choose to do
14   that general surgery internship?
15       A.    I didn't have a choice.  Every
16   urology residency you have to do general
17   surgery.  You either do one or two years or
18   some of them will do one and a half years.
19   At Mayo it's one year.  So, again, there was
20   no choice in the matter.
21       Q.    And what did that internship
22   consist of?  What types of surgeries did you
23   see or were you involved in?
24       A.    You do rotations varying between
25   6 to 12 weeks in vascular, colorectal,

Page 75

1    transplant, trauma, and there's something
2    else.  There was one more rotation in there.
3    I can't recall.  There's one more rotation.
4    It was basically just covering the entire
5    abdomen.
6        Q.    And did you perform surgeries
7    during your internship or were you just
8    watching or helping out in some manner?
9        A.    You're an assistant.  You may
10   perform -- put in some stitches, but you're
11   not doing much.
12       Q.    During your internship in general
13   surgery did you see any hernia surgeries?
14       A.    Yes.
15       Q.    Did you help assist in any
16   hernia --
17       A.    Yes.
18       Q.    -- hernia surgeries?
19       A.    Excuse me.  Yes.
20       Q.    Did these hernia surgeries
21   involve the use of mesh?
22       A.    To the best of my recollection,
23   no.  And I think that's fairly accurate.  It
24   was an older general surgeon who did not
25   believe in meshes, actually.

Page 76

1        Q.    Did you see or were you involved
2    in any hernia surgeries that involved mesh
3    during your internship?
4        A.    I don't recall any.
5        Q.    Did you see or were you involved
6    in any prolapse surgeries during that
7    internship?
8        A.    For pelvic organ prolapse?
9        Q.    Yes.
10       A.    No.
11       Q.    You hesitated there for a second.
12       Was there some type of other
13   prolapse procedure that you saw during your
14   internship?
15       A.    Well, there's, you know, mitral
16   valve prolapse, diaphragmatic.
17       Prolapse is just a generic
18   term, so I just wanted to make sure I was
19   clear what you were talking about.
20       Q.    That's fair.  Thank you for
21   clarifying that.
22       I'm not here talking about
23   mitral valve prolapse or any other valve
24   prolapse.  When I say prolapse today and
25   tomorrow, I just want you to assume that I'm

Daniel Steven Elliott, M.D.

Page 77

1    talking about pelvic organ prolapse.  Okay?
2        A.    I'll still ask for clarification.
3        Q.    That's fine.  But --
4        A.    Sure.
5        Q.    -- I'm going to tell you I'm not
6    getting into mitral valves.
7              Did you see any surgeries for
8    urinary incontinence during your internship?
9        A.    Male or female?
10       Q.    Either.
11       A.    Probably -- probably male,
12   because you do actually do a six-week
13   urology rotation.  I can't recall exactly.
14   The staff I worked with did deal with male
15   incontinence.
16       Q.    During your internship in general
17   surgery were you trained on anatomy?
18       A.    Yes.
19       Q.    And you were trained on that
20   anatomy as it has bearing upon performing
21   surgical procedures in those areas?
22       A.    Correct.
23       Q.    During your internship were you
24   trained on the location of nerves in the
25   pelvic floor?

Page 78

1        A.    Not that I recall, no.
2        Q.    During your internship were you
3    trained on the location of blood vessels in
4    the pelvic floor?
5        A.    Yes.
6        Q.    During your internship were you
7    trained on the location of ligaments and
8    connective tissues within the pelvic floor?
9        A.    Yes.
10       Q.    For example, were you trained on
11   the location of the sacrospinous ligament
12   during your internship?
13       A.    I can't state that specific
14   ligament, but in colorectal surgery I was
15   working in the same general region, and the
16   aggressive surgeries with malignancies,
17   those ligaments in that general region would
18   have been exposed and shown.
19       Q.    And that would include the --
20       A.    Or --
21       Q.    I'm sorry.  I didn't mean to cut
22   you off.  Were you going to say something
23   else?
24       A.    I was.  I forgot what I was going
25   to say, though.

Page 79

1        Q.    I apologize.
2              Would that have included the
3    sacrospinous ligament?
4        A.    Yes.
5        Q.    Would that have included the
6    arcus tendineus?
7        A.    Most likely, not, because that
8    would be more superficial.  Colorectal
9    surgeons would be working deeper in the
10   pelvis.
11       Q.    Would you have been trained on
12   the location of the arcus tendineus during
13   your medical school training, then?
14       A.    It would have been shown and
15   discussed in anatomy lab, cadaveric labs,
16   and probably in the GYN-ONC rotation too.
17       Q.    Would the location of the
18   sacrospinous ligament also have been shown
19   and discussed during the cadaver labs during
20   your medical school training?
21       A.    Yes.
22       Q.    You then performed a residency in
23   urologic surgery at Mayo from 1994 to 1999;
24   correct?
25       A.    Correct.

Page 80

1        Q.    Is that a standard five-year
2    program or did -- why did it take five
3    years?
4        A.    Well, the residency, urology
5    residency, when I did it, was a total of six
6    years, so from start to finish is six years.
7              Some programs will do one or
8    two or one and a half years of general
9    surgery.  So it just happens to be at Mayo
10   you do one year general surgery, five years
11   of urology.  So there would be some minor
12   variation of it around the country.
13       Q.    Okay.
14       A.    But it's all six years.  Now it's
15   down to five years, actually.
16       Q.    And during your urologic surgery
17   residency did you see prolapse surgeries?
18       A.    In urology?  Yes.
19       Q.    During your urologic surgical
20   residency at Mayo from 1994 to 1999 did you
21   also see urinary incontinence surgeries?
22       A.    Yes.
23       Q.    Now, during your urologic surgery
24   residency, with regard to urinary
25   incontinence procedures, how much assistance

Daniel Steven Elliott, M.D.

Page 81

1 would you give during those surgeries?
2 A. That depends upon your level of
3 training. At times, you will do minimal, at
4 times, you'll do nearly the entire case.
5 That depends upon your skill level and the
6 surgeon you happen to be working with.
7 Q. For you --
8 A. That would depend, because I
9 can't answer the question specifically.
10 Because if I'm in the second year, I'm going
11 to do a little bit; if I'm a chief, six
12 years, I will do a lot or essentially the
13 entire case with supervision, obviously.
14 Q. So as you got more and more
15 experience, you were allowed to do more and
16 more of the procedure.
17 A. As your experience and skill
18 level advanced, you did more.
19 Q. Now, with prolapse surgeries
20 during your residency does the same hold
21 true, basically, that as your experience and
22 skill level increase, you are able to
23 perform more and more of the case?
24 A. Correct.
25 Q. What prolapse surgeries did you

Page 82

1 observe or participate in during your
2 urologic surgery residency between 1994 and
3 1999?
4 A. Anterior colporrhaphy, posterior
5 colporrhaphy, McCall's culdoplasty or Mayo
6 culdoplasty. There's going to be subtle
7 variations between those two. That should
8 be it.
9 Q. So during your residency you
10 didn't observe or perform any sacrospinous
11 ligament fixations?
12 A. No.
13 Q. During your residency you didn't
14 perform any sacrocolpopexies?
15 A. No.
16 Q. Do you know why you didn't
17 perform any sacrocolpopexies at Mayo during
18 your residency?
19 A. During my training, the female
20 urology was somewhat in its infancy. The
21 staff was not trained in that so did not do
22 that, and they went to the GYN department to
23 do those.
24 Q. During your residency did you
25 have occasion to go to the GYN group and

Page 83

1 observe those surgeries for prolapse?
2 A. I don't recall ever doing that.
3 Q. During your residency what stress
4 urinary incontinence procedures were you
5 trained on?
6 A. Artificial urinary sphincter, Raz
7 urethropexy, and autologous pubovaginal
8 sling, cadaveric pubovaginal sling.
9 Q. During your residency can you
10 estimate the number of colporrhaphies that
11 you participated in?
12 A. Yeah. My female urology rotation
13 was 1997 so I'll only give you a rough
14 estimate. Maybe ten. And you asked,
15 actually anterior?
16 Q. I just asked for either, for
17 either anterior or posterior.
18 A. Oh. Combined, roughly ten
19 anterior and ten posterior.
20 Q. How about the number of McCall's
21 culdoplasty or Mayo culdoplasty, as you
22 termed it?
23 A. It would be probably two or
24 three.
25 Q. Was there a particular surgeon

Page 84

1 who trained you on the prolapse surgeries
2 during your residency?
3 A. Dr. Lightner. Dr. Deborah
4 Lightner.
5 Q. How do you spell her last name?
6 A. It's Lightner.
7 Q. Okay.
8 A. L-I-G-H-T-N-E-R.
9 Q. And then you went and did your
10 fellowship at Baylor that we earlier
11 discussed with regard to neurology,
12 urodynamics and voiding dysfunction?
13 A. Correct.
14 Q. Why did you seek to do that
15 fellowship?
16 A. That was -- I was asked to come
17 back on staff, and so the chair and
18 executive committee selected the program for
19 me to go to which they would feel would give
20 me the best education.
21 Q. Can you tell me what that course
22 -- I'm sorry -- that fellowship course
23 consisted of?
24 A. Uh-huh. It is voiding
25 dysfunction, urinary incontinence with a

Daniel Steven Elliott, M.D.

Page 85

1   Dr. Tim Boone, B-O-O-N-E, and where he
2   managed the voiding dysfunction,
3   incontinence and neuroanatomy.  He was a
4   neuro Ph.D., M.D.  And then all the
5   prolapses I did with the GYNs while he
6   managed the incontinence.  That's
7   specifically why the program was chosen for
8   me.
9       Q.   And the prolapse surgeries you
10  did during your fellowship were what?
11      A.   Well, we -- we -- we did them
12  all:  Anterior/posterior colporrhaphies, the
13  McCall's culdoplasty, sacrospinous fixation,
14  abdominal sacrocolpopexy, perineorrhaphies,
15  colpocleisis.
16      Q.   Can you spell those last two for
17  the court reporter?
18      A.   Colpocleisis is a tough one.
19  C-O-L-P-O-C-E-I-S.  And that's not even
20  going to be correct, actually.
21          MR. ANDERSON:  C-L-E-I-S-I-S.
22          THE WITNESS:  Do you know what?
23  It's a tough one.  There's E's and I's
24  everyone.  That's why we just say
25  colpocleisis, say it fast and --

Page 86

1           MR. RESTAINO:  And write it
2   sloppily.
3           THE WITNESS:  And write it
4   sloppily, yeah.
5           It's a closure of the vagina,
6   essentially.
7   BY MR. SNELL:
8       Q.   And the perineo -- I missed it.
9       A.   Oh, perineorrhaphy.  I'd have to
10  write that one out to be able to --
11      Q.   Well, what did that consist of?
12  You don't have to write it out.
13      A.   That is a rebuilding of the
14  peroneal body, usually which has been --
15  destroyed is a harsh term -- attenuated,
16  thinned out due to multiple childbirths.  So
17  you rebuild it.  It's right at the introitus
18  of the vagina on the posterior aspect.
19      Q.   And who was the surgeon who
20  trained you on these prolapse surgeries?
21      A.   Multiple surgeons because I
22  worked with the GYN department at Baylor.  I
23  worked specifically with the chair, who I
24  can't recall his name, and then another
25  surgeon at Texas Woman's Hospital, again,

Page 87

1   who I cannot recall his name top of my head.
2   Dr. Cone.  Excuse me.  I don't know his
3   first name.  Who is the one who mainly
4   taught me the sacrocolpopexy.  But there
5   were other surgeons in there.
6       Q.   And during your fellowship
7   training did you have training on the
8   anatomy of the pelvic floor?
9       A.   Yes.
10      Q.   Was that in-depth training?
11      A.   I would say very much so, yes.
12      Q.   Did you have training on the
13  nerves in the pelvic floor?
14      A.   Yes.
15      Q.   Did you have training on the
16  blood vessels in the pelvic floor?
17      A.   Yes.
18      Q.   Did you have training on the
19  ligaments and supporting structures in the
20  pelvic floor?
21      A.   Yes.
22      Q.   How long was that fellowship?
23      A.   12 months.
24      Q.   Did you also perform stress
25  urinary incontinence surgeries?

Page 88

1       A.   Yes.
2       Q.   Which ones?
3       A.   Autologous pubovaginal sling,
4   cadaveric pubovaginal sling, artificial
5   urinary sphincter.
6       Q.   During your fellowship, when you
7   were involved in the prolapse surgeries,
8   were you the lead surgeon or were you, you
9   know, second to one of the doctors which you
10  identified?
11      A.   The staff would be the lead
12  surgeon technically, primarily surgeon;
13  however, I would be the one doing the
14  surgery with his or her assistance.
15      Q.   Did you have patients fill out
16  informed consents during your fellowship?
17      A.   Yes.
18      Q.   You agree that all surgeries have
19  risks?
20      A.   Yes.
21      Q.   All pelvic organ prolapse
22  surgeries have risks?
23      A.   Yes.
24      Q.   The risk with hysterectomies;
25  correct?

Daniel Steven Elliott, M.D.

Page 89

1    A.   Yeah.  I don't perform
2  hysterectomies, but yes.
3    Q.   You have been trained and you are
4  aware as a medical physician that there are
5  risks attendant to hysterectomy.
6    A.   Yes.
7    Q.   There's risks with episiotomies?
8    A.   Yes.
9    Q.   There's risks with Caesarean
10 section surgery?
11   A.   Yes.
12   Q.   Is it correct that all prolapse
13 surgeries have a risk of bleeding?
14   A.   Yes.
15   Q.   All prolapse surgeries have a
16 risk of infection?
17   A.   Yes.
18   Q.   All prolapse surgeries have a
19 risk to injury to other organs?
20   A.   Yes.
21   Q.   All prolapse surgeries have a
22 risk to nerves?
23   A.   Yes.
24   Q.   All prolapse surgeries have a
25 risk of pain; correct?

Page 90

1    A.   Correct.
2    Q.   All prolapse surgeries have a
3  potential risk of dyspareunia; correct?
4    A.   Yes.
5    Q.   All prolapse surgeries have a
6  potential risk of pelvic pain; correct?
7    A.   Yes.
8    Q.   What was the first mesh or graft
9  material you ever used during your training?
10   A.   The SPARC by AMS.
11   Q.   And when was that?
12   A.   Roughly 2002.
13        I'm going to have to actually
14 after reading this go back and correct my
15 answer because you said first mesh or graft
16 material you ever used during your training.
17 I understood the question as incontinence.
18        During my training, we used
19 Gore-Tex on sacrocolpopexies.  That's what I
20 was originally trained with.  So I
21 misunderstood your question.
22   Q.   That's okay.
23        The SPARC was for urinary
24 incontinence; correct?
25   A.   Correct.

Page 91

1    Q.   First time you performed a
2  sacrocolpopexy was during your fellowship at
3  Baylor; correct?
4    A.   Correct.  Yes.
5    Q.   And who trained you on performing
6  the sacrocolpopexy with the Gore-Tex mesh?
7    A.   Dr. Cone, C-O-N-E, at Texas
8  Medical Center -- Texas Woman's Hospital.
9    Q.   And the sacrocolpopexy that you
10 -- strike that.
11        Did you perform a
12 sacrocolpopexy with Gore-Tex mesh during
13 your fellowship?
14   A.   Yes.
15   Q.   The sacrocolpopexy you performed
16 with Gore-Tex mesh during your fellowship,
17 was that to treat prolapse?
18   A.   Correct.
19   Q.   And you performed the
20 sacrocolpopexy with Gore-Tex mesh to treat
21 prolapse between 1999 and 2000; correct?
22   A.   1999 until roughly 2001, 2002.  I
23 don't remember when I made the switchover.
24   Q.   I'm not going that far yet.  And
25 let me back up.

Page 92

1        The sacrocolpopexy procedures
2  you performed with Gore-Tex mesh to treat
3  prolapse during your fellowship was between
4  1999 and 2000; correct?
5    A.   Correct.  To June -- June 31st --
6  June 30th of 2000.  That's when my
7  fellowship ended.
8    Q.   And when did it begin?
9    A.   July 1st of '99.
10        Those are going to be rough
11 dates but those are pretty accurate.
12   Q.   Sound pretty exact to me.
13   A.   You remember the year.
14   Q.   Did you use any other mesh
15 products besides the Gore-Tex mesh during
16 your fellowship?
17   A.   No.  During the fellowship, the
18 only mesh that I can recall using or
19 synthetic agent was the Gore-Tex.
20   Q.   And why did you use Gore-Tex mesh
21 during the sacrocolpopexies performed during
22 your fellowship to treat prolapse?
23   A.   Because that's what the staff
24 chose.
25   Q.   In 1999 and 2000 during your

Daniel Steven Elliott, M.D.

Page 93

1  fellowship, when you performed
2  sacrocolpopexies with Gore-Tex mesh, you
3  were aware that there was a potential risk
4  of mesh exposure; correct?
5      A.   Yes.
6      Q.   And you were aware during that
7  same time period of your fellowship that
8  mesh exposure with Gore-Tex mesh performed
9  during sacrocolpopexy could lead to the need
10  for re-operation.
11      A.   Yes.
12      Q.   And you are aware in 1999 and
13  2000 that any time you place a synthetic
14  mesh, be it Gore-Tex or another mesh
15  material, that there is a potential risk of
16  mesh exposure; correct?
17      A.   Yes, you're right.
18      Q.   Do you guarantee success in the
19  surgeries you perform with your patients?
20      A.   No.
21      Q.   Why is that?
22      A.   Because I cannot guarantee
23  success.
24      Q.   Can any prolapse procedure be
25  guaranteed to be performed 100 percent

Page 94

1  successfully?
2      A.   No.
3      Q.   Have you ever guaranteed such
4  performance?
5      A.   As I said, no.
6      Q.   Have you ever guaranteed patients
7  that they will not have complications in
8  association with a prolapse surgery?
9      A.   No.
10      Q.   Why is that?
11      A.   Because you cannot guarantee it.
12      Q.   And as a surgeon, you know that
13  any time you perform a prolapse surgery,
14  re-operation is a potential risk going into
15  it; correct?
16      A.   That is correct.
17      Q.   And that can be a re-operation
18  because of a failure of the prolapse surgery
19  in performing its intended job to hold the
20  prolapse; correct?
21      A.   I -- I assume you're asking
22  because of failure reoccurrence?  Yes.
23      Q.   And there can also be need for
24  re-operation because a complication has
25  occurred which necessitates further surgical

Page 95

1  treatment; correct?
2      A.   That is correct.
3      Q.   And you learned that back during
4  your internship in general surgery; correct?
5          MR. ANDERSON:  Objection.
6          THE WITNESS:  Well, no.
7  BY MR. SNELL:
8      Q.   The surgeries will require --
9      A.   Well, you --
10      Q.   -- in some cases re-operation.
11  That's my question.
12      A.   Surgeries will require -- yes.  I
13  thought your original question was
14  pertaining to prolapse, and I didn't learn
15  that during my internship year.  But all
16  surgeries have the inherent risk of
17  re-operation or complications.
18      Q.   Now, during your fellowship, when
19  you performed the sacrocolpopexy with the
20  Gore-Tex mesh, you knew that mesh
21  contraction was a potential risk; correct?
22      A.   I would say actually I did not
23  know that.
24      Q.   When did you first become aware
25  that mesh contraction could potentially

Page 96

1  occur with the placement of a mesh?
2          MR. ANDERSON:  Objection.
3          Go ahead.
4          THE WITNESS:  Probably
5  beginning in 2004, 2005.
6  BY MR. SNELL:
7      Q.   So before 2004, you had not read
8  any medical literature that talked about the
9  potential risk of mesh contraction?
10      A.   That is correct.
11      Q.   How did you become aware of the
12  potential risk of mesh contraction in 2004
13  or 2005?
14      A.   Through some of the studies that
15  I'd performed along with residents on the
16  animal lab -- I'm sorry.  Animal model.
17      Q.   What type of mesh did you use
18  there?
19      A.   It was a polypropylene mesh.
20      Q.   And was there mesh contraction
21  with the polypropylene mesh that you studied
22  in 2004 to 2005?
23      A.   We saw increased fibrosis.  We
24  did not call it contraction because we
25  didn't understand it at that point in time.

Daniel Steven Elliott, M.D.

Page 97

1 Looking back at it, we realized there was
2 contraction, but we called it fibrosis in
3 our manuscripts.
4     Q.    So when you did these studies --
5 what animal model was this?
6     A.    Rabbit.
7     Q.    Rabbit?
8         When you did these animal
9 studies in the rabbit model back in 2004 or
10 2005, you saw fibrosis with the
11 polypropylene mesh?
12     A.    Correct.
13     Q.    And in these rabbit studies in
14 2004 or 2005 that involved polypropylene
15 mesh you didn't call what you saw mesh
16 contraction; correct?
17     A.    Correct.
18     Q.    As you sit here today as an
19 expert for the plaintiffs, it's your
20 testimony that now you believe what you saw
21 back then was mesh contraction?
22     A.    Correct.
23     Q.    Did you ever do any publications
24 on these rabbit studies?
25     A.    Yes.  Two.

Page 98

1     Q.    Did you ever write -- what
2 journal were they published in?
3     A.    I'd have to look.  General -- I
4 would suspect General Urology and Urology.
5 It's in my CV.
6     Q.    Did you ever issue a letter to
7 the editor or an errata to your studies up
8 to today, as we sit here today, to say what
9 we previously described as fibrosis I now
10 believe to be mesh contraction?
11     A.    No.
12     Q.    Why not?
13     A.    Others have done it for me.
14     Q.    Who has done it for you with
15 regard to those two articles?
16     A.    Dr. Chris Winters, president of
17 the SUFU, Society of Urodynamics and Female
18 Urology, goes around the nation speaking
19 about, quoting that paper as one of the
20 earliest manuscripts talking about fibrosis
21 and contraction.
22     Q.    He talks about it with regard to
23 fibrosis and contraction?
24     A.    Uh-huh.  Uh-huh.  Yes.
25         MR. ANDERSON:  Is that yes?

Page 99

1         THE WITNESS:  Yes.  Yes.
2 Correct.
3 BY MR. SNELL:
4     Q.    What's his name?
5     A.    Dr. Christian Winters, the
6 president of the Society of Urodynamics and
7 Female Urology.
8         Then there's Dr. Gregory Bales
9 at the University of Chicago, who I've heard
10 lectures quoting that paper.  Those are the
11 two I can think of off the top of my head.
12     Q.    When did you first perform a
13 hernia surgery involving mesh, if ever?
14     A.    I never have.
15     Q.    Never have?
16         In 2001 did you continue to use
17 the Gore-Tex mesh with sacrocolpopexy?
18     A.    Yes.  I don't remember when I
19 changed over to using polypropylene.  It
20 would have been, as I mentioned earlier,
21 2002, 2003.  So, again, I don't recall
22 exactly when.
23     Q.    When you used the Gore-Tex mesh
24 for sacrocolpopexy to treat prolapse between
25 1999 and 2001 -- strike that.

Page 100

1         When was Gore-Tex mesh
2 FDA-cleared for the treatment of pelvic
3 organ prolapse?
4     A.    I have no idea.
5     Q.    When you performed the
6 sacrocolpopexies with Gore-Tex mesh to treat
7 prolapse in 1999 to 2001, had it been
8 FDA-cleared for the treatment of prolapse?
9         MR. ANDERSON:  Objection.
10         Go ahead.
11         THE WITNESS:  I have no idea.
12 I would have trusted the company that it had
13 been.
14 BY MR. SNELL:
15     Q.    Well, you know Gynemesh® PS was
16 the first mesh that was FDA-cleared for the
17 treatment of prolapse; correct?
18         MR. ANDERSON:  Objection.
19         Go ahead.
20         THE WITNESS:  I didn't know
21 that.
22 BY MR. SNELL:
23     Q.    You didn't know that?
24     A.    That's what I said.
25     Q.    You didn't know that in 2002

25 (Pages 97 to 100)

Daniel Steven Elliott, M.D.

Page 101

1  Gynemesh® PS was the first mesh cleared by
2  the FDA for the treatment of prolapse?
3     A.   I've already answered that
4  question.
5     Q.   I'm asking a specific date now to
6  see if this refreshes your recollection.
7     A.   It does not, no.
8     Q.   Would you agree that pelvic organ
9  prolapse can be burdensome to many women?
10    A.   Absolutely.
11    Q.   Would you agree that it can
12 affect their quality of life?
13    A.   Absolutely.
14    Q.   Women with prolapse can report
15 feelings of heaviness or pressure?
16    A.   Correct.
17    Q.   They can report the feeling of a
18 bulge or see an actual protrusion from their
19 vagina; correct?
20    A.   Correct.
21    Q.   And this can be distressing to
22 many women; correct?
23    A.   Absolutely.
24    Q.   Patients with prolapse can have
25 interference with their sexual activity from

Page 102

1  the prolapse; correct?
2     A.   Yes.
3     Q.   And women with prolapse can have
4  dyspareunia at baseline with that --
5  associated with that prolapse; correct?
6     A.   Yes.
7     Q.   And some women are actually not
8  sexually active because of the effect their
9  prolapse has upon them; correct?
10    A.   Yes.
11    Q.   And that can be because of the
12 physical effects of the prolapse; correct?
13    A.   As one of the factors, yes.
14    Q.   But also the way the woman feels
15 about herself because of the prolapse;
16 correct?
17    A.   Absolutely.
18    Q.   And you know that because of your
19 training; right?
20    A.   Experience.
21    Q.   You know that because of your
22 experience?
23    A.   Yes.
24    Q.   But also your training; correct?
25    A.   They're one and the same.

Page 103

1     Q.   Patients with prolapse can have
2  pain in their pelvic floor from changes to
3  their pelvic floor musculature; correct?
4     A.   Pain is highly unlikely to be
5  associated with pelvic organ prolapse, and
6  in the exception, there can be pain.  That
7  is rare.
8     Q.   Some patients with prolapse are
9  not sexually active because of factors
10 associated with their partner; correct?
11    A.   There are a lot of variables in
12 that one.
13          Some patients with prolapse are
14 not sexually active because of factors
15 associated with their partner.  Are we
16 talking male or female?  I mean, I guess I'm
17 not following your question.  I need that
18 one rephrased.
19    Q.   Well, let's back up, then.
20          Some patients with prolapse are
21 not sexually active because of their
22 prolapse; correct?
23    A.   Yes.  Correct.
24    Q.   And some patients who are not
25 sexually active who have prolapse may not --

Page 104

1  may be not sexually active because of
2  partner factors as opposed to the factor
3  specific to the prolapse; correct?
4     A.   Okay.  Thank you.  I understand
5  the question now.
6          Yes, you are correct.
7     Q.   Treatment options for prolapse
8  involve conservative and surgical measures;
9  correct?
10    A.   Yes.
11    Q.   They involve the use of what's
12 called a pessary; correct?
13    A.   Yes, that is one option.
14    Q.   Do you believe that option is
15 appropriate in all patients?
16    A.   No.
17    Q.   And in the majority of cases
18 treated conservatively -- strike that.
19          In the majority of prolapse
20 cases treated conservatively, the condition
21 does not get better; correct?
22          MR. ANDERSON:  Objection.
23          Go ahead.
24          THE WITNESS:  Answering your
25 question specifically, no.  Pelvic organ

26 (Pages 101 to 104)

Daniel Steven Elliott, M.D.

Page 105

1  prolapse tends not to improve.  It does not
2  necessarily worsen, however.
3  BY MR. SNELL:
4      Q.   Some women do not want to use a
5  pessary; correct?
6      A.   Absolutely.
7      Q.   And women who have pessaries need
8  to be seen by their physician periodically
9  to check on the pessary; correct?
10     A.   Correct.
11     Q.   And how often do you see your
12 patients who use pessaries --
13     A.   I don't see them --
14     Q.   -- for the maintenance of them?
15     A.   I don't see them -- I don't
16 implant or deal with pessaries.
17     Q.   Okay.
18     A.   I refer them to our urogynecology
19 colleagues.
20     Q.   And you know some women are given
21 pessaries as an option and they just refuse
22 to use a pessary; correct?
23     A.   You're correct.
24     Q.   There can be vaginal discharge
25 with pessaries?

Page 106

1      A.   Yes.
2      Q.   There can be vaginal odor
3  associated with the use of pessaries?
4      A.   Yes.
5      Q.   There can be ulceration
6  associated with the use of a pessary?
7      A.   Yes.
8      Q.   There can be bleeding associated
9  with the use of a pessary?
10     A.   Yes.
11     Q.   There can be tissue erosion
12 associated with the use of a pessary;
13 correct?
14     A.   Yes.
15     Q.   And these are all potential
16 complications from a pessary that you've
17 known about since the time of your training?
18     A.   Yes.
19     Q.   And these symptoms may lead a
20 woman to discontinue the use of a pessary;
21 correct?
22     A.   Yes.
23     Q.   Do pessaries need to be removed
24 and cleaned on a regular basis?
25     A.   Yes.

Page 107

1      Q.   The Gore-Tex mesh you used
2  between 1999 and 2001, who was the
3  manufacturer of that?
4      A.   Gore-Tex.
5      Q.   And what was the porosity of that
6  Gore-Tex mesh that you used between 1999 and
7  2001?
8      A.   I don't know.
9      Q.   What was the flexural rigidity of
10 that Gore-Tex mesh you used between 1999 and
11 2001?
12     A.   I don't --
13          MR. ANDERSON:  Objection.
14          Go ahead.
15          THE WITNESS:  I don't know.
16 BY MR. SNELL:
17     Q.   What was the burst strength of
18 that Gore-Tex mesh you used between 1999 and
19 2001?
20          MR. ANDERSON:  Objection.
21          Go ahead.
22          THE WITNESS:  I don't know.
23 BY MR. SNELL:
24     Q.   What was the rate of the mesh
25 exposure you saw with the Gore-Tex mesh

Page 108

1  between 1999 and 2001?
2      A.   I don't recall.
3          MR. ANDERSON:  We've been going
4  about an hour and 20 and I think lunch will
5  be here any minute, so I'm not telling you
6  to stop now, I'm just suggesting that
7  whenever you get to a good break, I think
8  it's probably a good time to break.  But
9  continue, please.
10 BY MR. SNELL:
11     Q.   During your fellowship you
12 performed sacrospinous ligament fixation
13 surgeries to treat prolapse; correct?
14     A.   I assisted on those cases, yes.
15     Q.   And you are aware that any time
16 one is targeting the sacrospinous ligament,
17 there is a potential risk to the pudendal
18 nerves; correct?
19     A.   Yes.
20     Q.   And you knew this back in 1999 to
21 2000; correct?
22     A.   Yes.
23     Q.   And you know there's also a
24 potential risk to the blood vessels that
25 course in and around the pudendal nerves;

27 (Pages 105 to 108)

Daniel Steven Elliott, M.D.

Page 109

1    correct?
2        A.    Yes.
3        Q.    And you knew this back in 1999
4    and 2000; right?
5        A.    Yes.
6        Q.    And when you were trained on
7    targeting the sacrospinous ligament --
8    strike that.
9              When you were trained on
10   targeting the sacrospinous ligament during
11   the fixation surgery you were assisting in
12   in 1999 and 2000, you were trained to target
13   the sacrospinous ligament two finger
14   breadths medial to the ischial spine;
15   correct?
16       A.    Actually, I don't recall because
17   I never did pass the needle.  The staff
18   didn't feel it was safe for training on it,
19   we only did a few, and so I never did it.
20       Q.    No one ever said this is how far
21   you should go medial to the ischial spine
22   when placing a suture in the sacrospinous
23   ligament fixation?
24       A.    I'm sure they had mentioned it.
25   I don't recall it.

Page 110

1        Q.    Is there a particular textbook or
2    surgical textbook that you received during
3    your fellowship that you used?
4        A.    I don't recall ever receiving
5    one, no.  I mean, I may have.  I don't
6    recall it.
7        Q.    Did you recall looking at
8    surgical textbooks during your fellowship to
9    aid or assist you in performing prolapse
10   surgeries?
11       A.    Say no for prolapse surgeries.
12       Q.    Were there general urologic or
13   gynecologic surgical textbooks you used
14   during your fellowship?
15       A.    Yeah.  Raz's I would suspect
16   would be -- Raz's Transvaginal Surgery text.
17       Q.    Back in 1999 and 2000, when you
18   did your fellowship, when you performed the
19   sacrocolpopexy, these were open abdominal
20   sacrocolpopexies, I take it?
21       A.    Correct.
22       Q.    During your fellowship you were
23   not trained on laparoscopic sacrocolpopexy;
24   correct?
25       A.    Correct.

Page 111

1        Q.    During your fellowship you
2    learned that there was a risk of bowel
3    adhesion with sacrocolpopexy; correct?
4        A.    Bowel adhesion to what?
5        Q.    Or injuries to the bowels.
6        A.    It is a theoretical risk, yes.
7        Q.    What's an ileus?
8        A.    Intestines that don't move,
9    they're slowed.
10       Q.    And did you learn during your
11   fellowship that ileus is a potential risk
12   with sacrocolpopexy?
13       A.    No.
14       Q.    When did you learn about that
15   risk?
16       A.    I already knew that coming into
17   fellowship.
18       Q.    Where did you learn about the
19   risk of ileus with sacrocolpopexy?
20       A.    Well, no.  In general surgery you
21   know with any abdominal procedure,
22   regardless of what procedure it is, there
23   will be an ileus.
24       Q.    You did colporrhaphies during
25   your residency and fellowship; right?

Page 112

1        A.    Yes.
2        Q.    And during your residency and
3    fellowship you were aware that there was a
4    potential risk of dyspareunia with
5    colporrhaphies; correct?
6        A.    Yes.
7        Q.    And during your fellowship you
8    were also aware that there was a risk of
9    dyspareunia with other prolapse surgeries;
10   correct?
11       A.    Yes.
12       Q.    Have you ever performed a
13   sacrospinous ligament fixation --
14       A.    I --
15       Q.    -- with you as the principal
16   surgeon?
17       A.    As me as the primary surgeon, no,
18   I have not.
19       Q.    Have you ever performed a
20   Prolift® surgery?
21       A.    No.
22       Q.    Have you ever performed a
23   Prosima® surgery?
24       A.    No.
25       Q.    Have you ever performed surgery

Daniel Steven Elliott, M.D.

Page 113

1  with Prolift+M®?
2      A.    No.
3      Q.    Did you ever undergo any of the
4  Prolift® training?
5      A.    No.
6      Q.    I would assume you never
7  underwent Prosima® training either.
8      A.    Correct.  I have not.
9      Q.    Why did you switch from Gore-Tex
10  mesh to polypropylene mesh?
11      A.    Because I --
12          MR. ANDERSON:  Objection.
13  Asked and answered.
14          Go ahead.
15          THE WITNESS:  I was having too
16  many problems with the Gore-Tex,
17  specifically erosion.  Extrusion.  Excuse
18  me.  Vaginal extrusion.
19  BY MR. SNELL:
20      Q.    And with the Gore-Tex mesh you
21  were having that mesh extrude into the
22  vagina?
23      A.    Correct.
24      Q.    And this was a potential
25  complication that you were aware of during

Page 114

1  your fellowship; correct?
2      A.    Yes.
3      Q.    And when -- was this in 2002 or
4  2003, approximately, when you switched over
5  to polypropylene mesh?
6      A.    In that time frame.  In the time
7  frame from 2001 to 2003, it was in there
8  somewhere.
9      Q.    So sometime around 2001 to 2003
10  you began using polypropylene mesh in your
11  sacrocolpopexies instead of Gore-Tex mesh?
12      A.    That is correct.
13      Q.    After 2003 what other meshes have
14  you used during your sacrocolpopexies?
15      A.    It's only been the polypropylene.
16      Q.    How many sacrocolpopexies have
17  you done since 2003?
18      A.    Roughly 150.
19      Q.    And those are sacrocolpopexies in
20  which you were the lead surgeon?
21      A.    Yes.
22      Q.    Besides the AMS IntePro --
23      A.    IntePro, yeah.
24      Q.    -- that you earlier identified as
25  the polypropylene mesh that you used for

Page 115

1  your sacrocolpopexies, can you tell me the
2  other types of polypropylene meshes you've
3  used for sacrocolpopexy?
4      A.    In 2002, 2003, whenever I made
5  the switchover, I -- as the best I can
6  recall, we used an AMS product, American
7  Medical Systems, and then when IntePro came
8  out, started using IntePro.  And I don't
9  recall when that was because it was a minor
10  variation between the product.  And so I've
11  only used, to the best of my knowledge, only
12  used that product.
13      Q.    In the time period of 2003 to --
14  strike that.
15          In the time period of 2002 to
16  2009 did Mayo have other manufacturers'
17  polypropylene mesh that you could choose or
18  did they only have AMS products, for
19  whatever reason?
20      A.    No.  We could choose.  We chose
21  the product that we felt was the best and
22  then it went to a selection committee, which
23  then looked at the pricing.  And if there
24  were another variant that was the same price
25  or less that we agreed with, we could go

Page 116

1  with that.  But it wasn't like I was forced
2  to use that product.  I chose to use it.
3      Q.    And the AMS, was it a particular
4  AMS polypropylene mesh that you chose in
5  2002 that's different from the IntePro?
6      A.    They --
7      Q.    I'm not following it.
8      A.    No.  I understand.  Because they
9  had a product that was used for
10  sacrocolpopexy, I don't recall the name of
11  it, and --
12      Q.    Can I stop you right there?
13          Before you came back from your
14  fellowship, did they already have a mesh for
15  sacrocolpopexies at Mayo?
16      A.    No.
17      Q.    Okay.
18      A.    Well, I don't recall.  Nobody
19  that I know used it.  The GYN department may
20  have.
21      Q.    Okay.
22      A.    But not -- not anybody in my
23  department.
24      Q.    Okay.
25      A.    So then AMS had a certain

29 (Pages 113 to 116)

Daniel Steven Elliott, M.D.

Page 117

1    product, I don't recall the name.  It was
2    polypropylene.  I used it.  And then they
3    came out with this IntePro, which is just a
4    mild variation.  I think they sutured the
5    mesh together a little differently.  And I
6    used that.  It was a very subtle difference.
7         Q.    Was this a mesh that you cut to
8    shape?
9         A.    It was already Y-shaped.
10   Actually, it's called IntePro Y-shaped mesh,
11   as I recall.  I haven't looked at the box in
12   a long time.  And it was Y-shaped.  You
13   trimmed the limbs to fit to the patient.
14        Q.    The first polypropylene mesh you
15   used for sacrocolpopexies, was that already
16   Y-shaped or did you have to cut it into that
17   configuration?
18        A.    It was Y shapes.  So by Y I mean
19   there's a long strip and another strip comes
20   off like this, so it's a Y like this, it's
21   not a Y like this (indicating).  Do you
22   understand what I'm saying?  As far as --
23   like a quarterback, you know.
24        Q.    Right.
25        A.    In the center.

Page 118

1         And that Y is then the -- the
2    anterior limb is then sewn to this, the
3    longer strip.  So the only trimming that
4    takes place is trimming the anterior and
5    posterior arms for the length of the vagina
6    and then trimming the sacrum part.
7         Q.    What's the pore size on the AMS
8    IntePro?
9         A.    I don't know.
10        Q.    What's the pore size on the
11   initial polypropylene mesh you began using
12   from AMS?
13        A.    I don't know.
14        MR. ANDERSON:  Lunch is here
15   whenever you're ready there.
16        MR. SNELL:  All right.  This is
17   good.
18        MR. ANDERSON:  All right.
19        (Luncheon recess,
20   12:36-1:40 p.m.)
21        AFTERNOON SESSION
22   BY MR. SNELL:
23        Q.    Dr. Elliott, you earlier
24   testified that you were trained on the
25   sacrospinous ligament fixation during your

Page 119

1    fellowship; correct?
2         MR. RESTAINO:  Object.
3         THE WITNESS:  I was shown the
4    procedure.  I was shown the procedure.  I
5    think it would be an exaggeration to say I
6    was trained in it.  Yeah, I was shown two
7    times, two or three times.
8    BY MR. SNELL:
9         Q.    During your fellowship you were
10   shown the sacrospinous ligament fixation
11   surgery; correct?
12        A.    Yes.
13        Q.    And you were aware from all the
14   training that you had received up to date
15   that the sacrospinous ligament fixation
16   surgery to treat prolapse had been performed
17   for decades by surgeons in the United States
18   prior to the time of your fellowship; right?
19        A.    Yeah.  I don't know when the
20   procedure was introduced.  I knew it was a
21   long-standing procedure.  So I can't say
22   decades or not.  It was a preexisting
23   surgery.
24        Q.    Does it refresh your recollection
25   if I say that Richter introduced the

Page 120

1    sacrospinous ligament fixation surgery
2    decades before your fellowship?  Is that --
3         A.    No, it doesn't refresh my memory.
4         Q.    -- consistent or inconsistent
5    with your memory?
6         A.    I just know it's been around a
7    long time.  I don't know who invented it.
8         Q.    We can agree that the
9    sacrospinous ligament fixation surgery has
10   been around a long time; correct?
11        A.    Yes.  Yes.  Correct.
12        Q.    And there's a potential risk of
13   urinary dysfunction with the sacrospinous
14   ligament fixation surgery; correct?
15        A.    Yes.
16        Q.    And there is a risk of urinary
17   dysfunction with other prolapse surgeries;
18   correct?
19        A.    Well, I mean, other, I mean,
20   that's -- that's broad.
21        Q.    It's meant to be broad.
22        A.    Well, then make it specific.
23        Q.    You can answer specific if you'd
24   like.  I just would like to know whether you
25   would agree that urinary dysfunction is a

Daniel Steven Elliott, M.D.

Page 121

1    potential complication with prolapse
2    surgeries other than the sacrospinous
3    ligament fixation; correct?
4        A.    That is correct.
5        Q.    Were you ever trained on the
6    transvaginal placement of mesh to treat
7    pelvic organ prolapse?
8        A.    Transvaginal, no, I was not.
9        Q.    And during your time at the Mayo
10   Clinic were you ever trained on the
11   transvaginal placement of mesh for prolapse?
12       A.    No.  No one at the Mayo Clinic
13   uses mesh for prolapse, for transvaginal
14   pelvic organ prolapse.
15       Q.    I'm not talking about currently.
16   I mean 2002 to let's say 2010.
17       A.    Well, I thought I answered the
18   question.  No, I was not trained.  No one at
19   the Mayo Clinic uses transvaginal pelvic
20   organ prolapse mesh.
21       Q.    Ever, to your knowledge?
22       A.    To my knowledge, ever.  Yeah.
23       Q.    You have been trained on the
24   transvaginal placement of mesh to treat
25   stress urinary incontinence; correct?

Page 122

1        A.    Yes.
2        Q.    And surgeons at the Mayo Clinic
3    used transvaginal mesh to treat stress
4    urinary incontinence; correct?
5        A.    I was the first one.  Yes.
6        Q.    In fact, the majority of surgeons
7    at the Mayo Clinic use transvaginal mesh to
8    treat stress urinary incontinence; correct?
9        A.    They --
10            MR. ANDERSON:  Objection.
11            Go ahead.
12            THE WITNESS:  They all do.
13   BY MR. SNELL:
14       Q.    And at the Mayo Clinic the most
15   common procedure done with transvaginal mesh
16   placement to treat stress urinary
17   incontinence is via the transobturator
18   route; correct?
19       A.    I can only speak to my practice
20   because I don't know the other practices,
21   the breakdown, but in my practice that is a
22   correct statement.
23       Q.    And you have described the
24   transvaginal use of mesh via the
25   transobturator route to treat stress urinary

Page 123

1    incontinence as a minimally invasive
2    procedure, haven't you?
3        A.    Have I -- have I used those
4    words?
5        Q.    Yes.
6        A.    I -- I may have.  I don't recall
7    an incidence, but I would not deny it or say
8    I haven't done it.  I'd have to look at the
9    reference.
10       Q.    Well, you would agree that the
11   use of transvaginal mesh to treat stress
12   urinary incontinence via the transobturator
13   route is a minimally invasive procedure;
14   correct?
15       A.    Has to be what you're comparing
16   it to.  If you're comparing it to the
17   traditional autologous sling, by all means.
18   If you're comparing it to DEFLUX injection
19   for stress urinary incontinence, then it is
20   much more invasive.  So "minimally invasive"
21   is a relative term.  There is not a
22   definition of that.
23       Q.    And who trained you on the
24   transobturator placement of slings to treat
25   stress urinary incontinence?

Page 124

1        A.    Well, I was familiar with the
2    other approaches already, the much more
3    invasive autologous, so the -- specifically
4    the transobturator, that would have been in
5    2002, 2003.  I took several courses with
6    Carl Klutke, who was at St. Louis, Rodney
7    Appell, who's passed away, used to be at
8    Baylor, and there was somebody else that I
9    learned with -- oh, and actually George
10   Webster, there was a female urology course
11   at some point in time that I took, talking
12   with them, their feelings about it and the
13   technique, and then watching surgical videos
14   too.
15       Q.    Where were those surgical videos
16   from?
17       A.    They were provided by Coloplast.
18   Actually, at the time they were provided by
19   Mentor Corporation.
20       Q.    And you used polypropylene mesh
21   during your stress urinary incontinence
22   surgeries performed via the transobturator
23   approach; correct?
24       A.    Yeah, that's what I use now.
25   Yes.

31 (Pages 121 to 124)

Daniel Steven Elliott, M.D.

Page 125

1    Q.    The traditional pubovaginal
2  slings, that would include the autologous
3  slings that you referenced a few minutes
4  ago; correct?
5    A.    Correct.
6    Q.    And you would agree that compared
7  to these autologous slings, the
8  transobturator placement of polypropylene
9  mesh to treat stress urinary incontinence is
10  less invasive; correct?
11    A.    I would agree.  Comparing it as
12  you -- just so we're clear, comparing it
13  next to autologous slings, yes, it would be
14  less invasive.
15    Q.    Autologous slings to treat stress
16  urinary incontinence are more invasive than
17  the transobturator slings; correct?
18    A.    Yes.
19    Q.    And you have said that the
20  traditional pubovaginal slings are rarely
21  done nowadays because of the minimally
22  invasive outpatient approaches with the
23  transobturator approach.
24    A.    Correct.
25    Q.    The traditional pubovaginal

Page 126

1  slings include cadaveric slings; correct?
2    A.    Uh-huh.  Yes.
3    Q.    As well as autologous, as you
4  earlier testified; correct?
5    A.    Yes.
6    Q.    The autologous is the patient's
7  own tissue; correct?
8    A.    Yes.
9    Q.    And that tissue has to be
10  harvested from the patient; correct?
11    A.    Yes.
12    Q.    The harvesting of tissue from a
13  patient for any type of sling material
14  increases morbidity; correct?
15    A.    Yes.
16    Q.    And, in fact, for the
17  sacrocolpopexy, surgeons sometimes use
18  rectus fascia harvested and then that will
19  be used to attach the vagina to the sacrum;
20  correct?
21        MR. ANDERSON:  Objection.
22        Go ahead.
23        THE WITNESS:  I'm not familiar
24  with anybody doing that anymore because
25  there have been studies by Brubaker, et al.,

Page 127

1  and others showing that autologous fascia
2  does not work well for it, and that's why
3  the transition over to synthetics.  Some
4  individuals may be doing it but there are
5  some very good data against it.
6  BY MR. SNELL:
7    Q.    There are very good data against
8  the use of pubovaginal -- strike that.
9        There are good data against the
10  use of autologous tissues for the treatment
11  of prolapse via sacrocolpopexy; correct?
12        MR. ANDERSON:  Objection.
13        Go ahead.
14        THE WITNESS:  I agree with
15  that, yes.
16  BY MR. SNELL:
17    Q.    But I am correct that at some
18  point in time in the surgical history of
19  treating prolapse surgeons did attempt to
20  use autologous tissues in connection with
21  their sacrocolpopexy procedures; correct?
22    A.    That is correct.
23    Q.    And ultimately, the data showed
24  that that autologous tissue use in the
25  sacrocolpopexy was not a feasible option

Page 128

1  long term; correct?
2    A.    No.  It's a feasible option long
3  term.
4    Q.    I'm sorry?
5    A.    It's a feasible option long term.
6    Q.    Well, what's the data you
7  referred to by Brubaker, et al.?
8    A.    That the failure rate was high.
9        Brubaker might have been the
10  lead author.  I can't say it was actually
11  her.  Et al. implies she's the lead author.
12  I don't believe she's the lead author.
13  She's probably the senior author.  Just in
14  case you want to find that article.
15    Q.    Linda Brubaker's article?
16    A.    Correct.  Yes.
17    Q.    What year?  2000?
18    A.    Around that time period, yeah.
19    Q.    I know which one you're talking
20  about.
21        The autologous tissue can be
22  digested by the body; correct?
23    A.    That -- yeah, that is a theory of
24  what happens to it.  Yes.
25    Q.    How was it that you came to use

Daniel Steven Elliott, M.D.

Page 129

1  the Mentor sling for stress urinary
2  incontinence?  And what I'm talking about is
3  specifically that sling as opposed to some
4  other manufacturer of sling.
5      A.   That was the transobturator sling
6  specifically.  Because I was already using
7  the suprapubic, the SPARC, by AMS.  Okay?
8          So in 2002, 2003 the
9  transobturator was introduced to the United
10 States.  It had been in Europe prior to that
11 time.  So I was aware of it.  Mentor
12 Corporation, as I -- I believe was the first
13 one to be able to offer it in the United
14 States.  At least I was -- I was contacted.
15 So they came to me saying, hey, we have our
16 transobturator sling here.  It was the OB
17 Tape.
18      Q.   And for how long did you use the
19 OB Tape?
20      A.   100 cases.
21      Q.   What years?
22      A.   Oh, I don't know.  2000 --
23 actually, I -- I just don't know.  It was
24 when it was introduced, 2003, 2004, '5,
25 something like that.

Page 130

1      Q.   So --
2      A.   In that time frame.
3      Q.   Until when?
4      A.   Well, when I got the 100 cases.
5  I do about roughly 80 to 150 cases a year.
6  There's wide variation in my practice.  And
7  so however long it took me to do 100 cases.
8      Q.   And after using the OB Tape did
9  you switch to a different type of
10 polypropylene mesh to treat stress urinary
11 incontinence?
12     A.   Yes.  We went to -- well, no.  I
13 continued using the SPARC and then -- but
14 that's suprapubic.  And so then
15 transobturator, then I started using the
16 Monarc by AMS.
17     Q.   So TVT-O was OB Tape, then --
18     A.   Well, TVT-O was a product.  I
19 don't use TVT-O.
20     Q.   The transobturator polypropylene
21 meshes you've used have been OB Tape and
22 then --
23     A.   Monarc.
24     Q.   -- Monarc.
25     A.   Yeah.  M-O-N-A-R-C.

Page 131

1      Q.   And the suprapubic sling that you
2  used was SPARC.
3      A.   SPARC.  And it stands for
4  suprapubic ARC.  And that's by AMS.
5      Q.   Have you used any other type of
6  -- is that also called the retropubic
7  approach by some?
8      A.   Retropubic, suprapubic.  It gets
9  -- it gets very confusing.  Technically
10 speaking, the TVT® type product would be
11 retropubic.  You go from bottom up.  I've
12 used because I felt it was in my hands
13 easier to use, go top down, which is
14 technically suprapubic.  So it's confusing.
15     Q.   Ultimately, urethral support is
16 provided by a U-shaped polypropylene mesh
17 sling with the suprapubic or the retropubic
18 approach; correct?
19     A.   You're absolutely right.
20     Q.   And forgive me.  When did you
21 begin using the SPARC?
22     A.   2001, roughly.
23     Q.   Now, you earlier testified that I
24 believe you were the first surgeon at the
25 Mayo Clinic who used the transobturator

Page 132

1  approach with the polypropylene sling.  Is
2  that correct or am I misstating?
3      A.   To be correct, no question, I was
4  the first to use suprapubic --
5      Q.   Okay.
6      A.   -- and transobturator, and I most
7  likely was the first in the state of
8  Minnesota to do both also.  That I can't
9  prove.  That's what I've been told.  It's
10 one of those things.
11     Q.   Okay.
12         MR. ANDERSON:  Off the record.
13         (Discussion off the record.)
14 BY MR. SNELL:
15     Q.   For the SPARC polypropylene mesh
16 slings you began using in 2001, what was the
17 pore size for that mesh?
18     A.   I don't know the pore size, no.
19     Q.   Do you know what the density in
20 grams per squared is for that mesh is?
21     A.   Density in --
22         MR. ANDERSON:  Grams per meter.
23         MR. SNELL:  In grams per meter
24 squared.
25         THE WITNESS:  No, I do not know

33 (Pages 129 to 132)

Daniel Steven Elliott, M.D.

Page 133

1  that.
2  BY MR. SNELL:
3      Q.    Do you know the thickness in
4  millimeters of that mesh?
5      A.    No.
6      Q.    Do you know the flexural rigidity
7  of that mesh?
8      A.    Flex?
9         MR. ANDERSON:  Objection.
10 BY MR. SNELL:
11     Q.    Flexural rigidity.
12     A.    Flexural rigidity?  Do you have a
13 math equation for that one?  Maybe I'll
14 figure it out.  Flexural rigidity, because
15 that's a math -- we can figure that on a
16 math equation.
17     Q.    As you sit here, do you know it?
18     A.    No.  That's why I was asking.  So
19 the answer then would be no.
20     Q.    For the OB Tape mesh that you
21 used beginning around 2002, do you know what
22 the pore size was for that?
23     A.    That is a very interesting
24 question because with OB Tape -- I am not a
25 materials expert so I have to be very clear

Page 134

1  on that.  You look at OB Tape, hold it up to
2  the light, there are essentially no pores in
3  it.  It's a thick band.  Looks like a piece
4  of ribbon, almost.  So I can't answer your
5  question; however, I can theorize it's tiny
6  and -- go ahead.
7      Q.    I didn't mean to interrupt you.
8  Go ahead.
9      A.    No.  No.
10     Q.    I thought you were done.  I
11 apologize.
12     A.    I'm sorry.
13     Q.    Do you know the density of the OB
14 Tape mesh?
15     A.    No, I do not.
16     Q.    Well, what about the thickness of
17 it; do you know that, by chance?
18     A.    No, I do not.
19     Q.    The mesh used in the Monarc
20 transobturator, that's a polypropylene mesh;
21 correct?
22     A.    It's the same mesh as SPARC.
23     Q.    So the same answers would hold
24 true, then.  You don't know what the pore
25 size is of that mesh.

Page 135

1      A.    Correct.
2      Q.    Or the density or thickness;
3  correct?
4      A.    Correct.
5      Q.    When was the last time you used
6  polypropylene mesh to treat stress urinary
7  incontinence?
8      A.    Last week.
9      Q.    You earlier testified that you
10 switched from using Gore-Tex mesh to
11 polypropylene mesh.
12        Why did you make that switch --
13     A.    Because --
14     Q.    -- specific to polypropylene?
15     A.    Why did I switch to
16 polypropylene?
17     Q.    Yes.
18     A.    Because that was the product that
19 the AMS company came to me with.
20     Q.    So you didn't do any individual
21 scientific analysis of materials that were
22 available --
23     A.    I --
24     Q.    -- at the time?
25     A.    Sorry.  No.  I reviewed their --

Page 136

1  their product brochures, reviewed lectures
2  provided to me by outside -- their
3  clinicians, but no independent research, no.
4      Q.    Have you ever used Vipro to treat
5  pelvic organ prolapse?
6      A.    Vipro.  I'm not -- no.
7      Q.    Do you know what Vipro is?
8      A.    I believe it's a Vicryl-related
9  absorbable type of mesh.
10     Q.    Since you've been at Mayo Clinic,
11 is it correct that the only meshes you have
12 used since switching from Gore-Tex are
13 polypropylene-based meshes for the treatment
14 of prolapse?
15     A.    I don't know what OB Tape was
16 made of so --
17     Q.    I thought -- I thought OB Tape
18 was urinary incontinence.
19     A.    It is.  Did you say meshes?
20        MR. ANDERSON:  He said --
21        MR. SNELL:  Here.  Let me give
22 it.
23 BY MR. SNELL:
24     Q.    Since you've been at Mayo Clinic,
25 is it correct that the only meshes you have

Daniel Steven Elliott, M.D.

Page 137

1  used since switching from Gore-Tex are
2  polypropylene-based meshes -- I see where
3  you're going.  Okay.  I should have put that
4  in the beginning.
5      For the treatment of
6  prolapse --
7      A.  Okay.  Yeah.
8      Q.  -- since switching from Gore-Tex
9  mesh, are the only meshes that you have been
10  using the polypropylene-based meshes?
11      A.  Yes.
12      Q.  Besides harvesting flesh from the
13  rectus fascia, surgeons also harvested flesh
14  from patients, from their fasciae latae, to
15  have an autologous band of tissue; correct?
16      A.  Yes.
17      Q.  When is the last time you did
18  that to a patient?
19      A.  Never.
20      Q.  Why not?
21      A.  Seemed very morbid to me.
22      Q.  What they do is they create an
23  incision for the fasciae latae --
24      A.  No.  I know how to do the
25  procedure.  That's not the -- my answer was

Page 138

1  not I don't understand it.  I understand it.
2  I said it's morbid.
3      Q.  And it's morbid because they
4  create an incision, they tunnel under the
5  skin, use something like a Lausanne stripper
6  to strip out the flesh to be used as an
7  autologous sling; correct?
8      A.  Yes.
9      Q.  And, in your mind, that's a very
10  morbid procedure; correct?
11      A.  Yeah.  Yes.  Correct.
12      Q.  And that's why you don't do
13  autologous sling placements; correct?
14      A.  I still will do autologous
15  slings.  They're rare.  There's unique
16  circumstances I will do it.  I will not
17  harvest from the fasciae latae, though.
18      Q.  You will use cadaveric?
19      A.  No.  Autologous is autologous.
20  Cadaveric is cadaveric.
21      Q.  I'm sorry.  Where would you
22  harvest from?
23      A.  The rectus.
24      Q.  Rectus fascia?
25      A.  Correct.

Page 139

1      Q.  And even when you harvest from
2  the rectus fascia, you tell patients that
3  there can be additional complications or
4  morbidity from that harvesting alone and
5  apart from the procedure in which you're
6  going to use that tissue; right?
7      A.  Correct.
8      Q.  In the last 1990s, the POPQ scale
9  was adopted by the International
10  Incontinence Society; correct?
11      A.  Yes.
12      Q.  And that brought with it a
13  standardized way of measuring prolapse for
14  the first time.
15      A.  Correct.
16      Q.  And since that time surgeons in
17  clinical studies have used the POPQ scale to
18  assess prolapse; correct?
19      A.  Some have, yes.
20      Q.  Sacrocolpopexy, does it have a
21  risk of rectal injury?
22      A.  Theoretically, yes.
23      Q.  Has rectal injury been reported
24  in any clinical studies that you're aware of
25  with regard to sacrocolpopexy?

Page 140

1      A.  I suspect it probably has.
2      Q.  When you say theoretical, what do
3  you mean by that term?
4      A.  Well, the rectum is actually
5  quite a ways away from the vagina when
6  you're doing your dissection.  It is -- it's
7  not close.  The bladder is close and
8  adherent but the rectum is a long ways away,
9  unless they've had some type of previous
10  operations and it will be scarred in.  So
11  yes, theoretically, it is a risk.
12      Q.  Okay.  I understand.
13      A.  But --
14      Q.  Injury to the bladder is a risk
15  with sacrocolpopexy.
16      A.  Yes.
17      Q.  And that's because of the
18  proximity of the bladder to the planes in
19  the dissection areas for the sacrocolpopexy;
20  correct?
21      A.  Yes.  And frequently, that
22  there's previous scar tissue there from
23  previous surgeries.  So it's much more
24  stuck.
25      Q.  There's a life-threatening injury

Daniel Steven Elliott, M.D.

Page 141

1  to the great vessels when you do a
2  sacrocolpopexy; correct?
3         MR. ANDERSON:  Objection.
4         THE WITNESS:  Again, that falls
5  in line with theoretically.  The great
6  vessels aren't really where you're working.
7  We have a good amount of distance away from
8  them.
9  BY MR. SNELL:
10     Q.    Is there a risk of injury to the
11  internal iliac vessel with sacrocolpopexy?
12     A.    Yes, there's going to be a
13  potential risk.  Yes.  That risk should be
14  very uncommon and remote.
15     Q.    What's a presacral hemorrhage?
16     A.    Presacral is from the presacral
17  vessels on the sacrum itself.  So the veins
18  bleed.
19     Q.    So there's a risk of presacral
20  hemorrhage with sacrocolpopexy?
21     A.    Yes.  That's been very well
22  described.
23     Q.    And that's because you're
24  attaching part of that mesh up to the
25  sacrum; correct?

Page 142

1     A.    No.  It's because you've cut into
2  veins that are the presacral veins.  So it
3  has nothing necessarily to do with the mesh
4  itself.  It's your dissection.
5     Q.    So part of the risk with
6  dissection in a sacrocolpopexy is the risk
7  to cutting into the presacral veins.
8     A.    Yes.
9     Q.    Osteomyelitis has been described
10  as a complication associated with
11  sacrocolpopexy; correct?
12     A.    Yes.
13     Q.    Sacral bone infection --
14     A.    Yes.
15     Q.    -- is a risk with sacrocolpopexy?
16     A.    Yes.
17     Q.    The abdominal sacrocolpopexy is a
18  procedure that can take over three hours;
19  correct?
20         MR. ANDERSON:  Objection.
21         Go ahead.
22         THE WITNESS:  I can only answer
23  for myself.  And it shouldn't.  You should
24  be out of there in two hours.
25  BY MR. SNELL:

Page 143

1     Q.    You never had cases where it's
2  taken you more than three hours to perform a
3  sacrocolpopexy?  An open abdominal
4  sacrocolpopexy.
5     A.    Yeah, open abdominal.
6         I may have.  I mean, it's
7  within the realm of possibility, but it --
8  but it should move along.
9     Q.    One of the reasons why you began
10  performing robotic laparoscopic
11  sacrocolpopexies is because of the high
12  degree of morbidity associated with an open
13  abdominal sacrocolpopexy; isn't that
14  correct?
15     A.    Higher degree of morbidity.
16  There's a difference to me.
17     Q.    Were you performing laparoscopic
18  sacrocolpopexy before you began doing
19  robotic laparoscopic sacrocolpopexy?
20     A.    No.
21     Q.    Your first case of robotic
22  laparoscopic sacrocolpopexy was in 2001;
23  correct?
24     A.    I'd have to look at the date on
25  it.  I don't recall the manuscript out there

Page 144

1  on it but...
2     Q.    What's your recollection of your
3  first case of robotic sacrocolpopexy?
4     A.    I was thinking it was in 2002,
5  but I don't -- it was in that time frame.
6     Q.    Your first case of robotic
7  sacrocolpopexy took you about four hours and
8  45 minutes long.
9         Do you recall ever saying that?
10     A.    Correct.  Yeah.
11     Q.    When you first began doing the
12  robotic laparoscopic sacrocolpopexy to treat
13  prolapse, did you use the da Vinci machine?
14     A.    Yes.
15     Q.    Robot?
16     A.    That's the only robot
17  commercially available that I'm familiar
18  with.
19     Q.    So in your first case of robotic
20  sacrocolpopexy in either 2001 or 2002, that
21  was done with the da Vinci robot.
22     A.    Correct.
23     Q.    And all of your subsequent cases
24  of robotic laparoscopic sacrocolpopexy to
25  treat vaginal prolapse have been with the da

36 (Pages 141 to 144)

Daniel Steven Elliott, M.D.

Page 145

1  Vinci robot?
2      A.   Correct.
3      Q.   And how were you trained on the
4  da Vinci robot?
5      A.   I am not. Dr. Chow, my partner,
6  is. As I mentioned earlier, this is a team.
7  We do this.
8      Q.   How do you -- Dr. Chow?
9      A.   Dr. Chow, C-H-O-W. George Chow.
10     Q.   So when you would do a robotic
11 laparoscopic sacrocolpopexy, it would be you
12 and Dr. George Chow performing the procedure
13 on a patient for prolapse treatment?
14     A.   Correct.
15     Q.   Do you operate the robot?
16     A.   He drives the robot, as we say.
17 He droves the robot. I'm the one actually
18 with the patient directing where Chow --
19 where dissection goes, sutures go. He is
20 trained in, fellowship trained in robotics,
21 and so we do -- that's why we do it as a
22 team.
23     Q.   So Dr. Chow is -- is he
24 fellowship trained in robotics?
25     A.   Yes. He did his residency at

Page 146

1  Cleveland Clinic in urology and fellowship
2  at Hopkins. And his fellowship is
3  specifically robotics. Well,
4  robotics/laparoscopy. It's a combined
5  fellowship.
6      Q.   When you switched from the
7  Gore-Tex mesh to the polypropylene mesh for
8  your sacrocolpopexies, is it correct that
9  you thereafter continued to do open
10 abdominal sacrocolpopexies?
11     A.   Yes. I -- I changed from
12 Gore-Tex to polypropylene prior to us doing
13 it robotically.
14     Q.   So when was the last time you
15 performed an open abdominal sacrocolpopexy?
16     A.   Probably within the last month.
17     Q.   Okay.
18     A.   More or less.
19     Q.   Since 2002, what prolapse
20 surgeries have you done besides open
21 abdominal sacrocolpopexy and the robotic
22 laparoscopic sacrocolpopexy which was done
23 with you and Dr. Chow?
24     A.   Uh-huh. The anterior
25 colporrhaphy, posterior colporrhaphy, Mayo

Page 147

1  culdoplasty.
2      Q.   What's the Mayo culdoplasty? How
3  is it different from the McCall's?
4      A.   It's essentially the same thing.
5  It's fixation to the uterosacral ligaments.
6  There's minimal difference between the two.
7  You can call it McCall's culdoplasty. It
8  would be fine.
9      Q.   And do you view the robotic
10 laparoscopic sacrocolpopexy as a minimally
11 invasive prolapse surgery?
12     A.   Comparing it to the open, yes.
13 Minimally invasive is not a defined term so
14 you have to compare it to whatever -- you
15 have to have a frame of reference.
16     Q.   So compared to the open abdominal
17 sacrocolpopexy, it's your opinion that
18 robotic laparoscopic sacrocolpopexy is
19 minimally invasive.
20     A.   Correct.
21     Q.   When you would be using the
22 robotic laparoscopic sacrocolpopexy, would
23 the patient be under general anesthesia?
24     A.   Yes. For the robotic, yes, they
25 would, under general.

Page 148

1      Q.   There's a higher risk to the
2  patient the longer she is under general
3  anesthesia; correct?
4      A.   Well, you have to define what the
5  risk you're talking about is.
6      Q.   What are the risks, Doctor, with
7  general anesthesia?
8      A.   I think the longer -- well, then
9  general anesthesia in and of itself, MI,
10 embolic event, other cardiac events,
11 prolonged ileus. I mean, those are some of
12 them I can think of just off the top of my
13 head. There's going to be more. You'd have
14 to talk to an anesthesiologist about that.
15     Q.   Embolic, you mean things like PE
16 and DVT?
17     A.   Correct. Thromboembolic event.
18 Yes.
19     Q.   The longer a patient is under
20 general anesthesia, isn't it correct that
21 there is a higher risk of pulmonary
22 embolism?
23     A.   Yes. I would assume so. I have
24 not reviewed the anesthesia data on that,
25 but that's pretty much the dogma out there,

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 149

1  that the longer you sleep, the more
2  complications.
3      Q.   Is that something that you
4  disagree with?
5      A.   No.  I agree with it.
6      Q.   Okay.
7      A.   I have not studied it myself.
8      Q.   And the ileus you identified as
9  what we earlier discussed, the intestinal
10  blockage?
11     A.   Not blockage.  Slowed down.
12  There is no blockage.  There's a huge
13  difference.  It's just that the intestines
14  are somewhat stunned after anesthesia.  They
15  take a while to wake up.
16     Q.   In your robotic laparoscopic
17  sacrocolpopexy cases, some of them have
18  taken up to five hours to complete; correct?
19     A.   I'd have to review our data on
20  it.  I don't recall.
21     Q.   As you sit here, you don't
22  recall?
23     A.   I don't -- no.  I have a paper
24  out, our first 30.  I'd have to look at
25  that.  But now we're up to 90.  So now we're

Page 150

1  routinely around two hours, 2:15.  I'm not
2  denying it may have taken five hours.  I
3  just don't recall.
4      Q.   When you first began using
5  Gore-Tex during your fellowship for the
6  sacrocolpopexies, did you investigate
7  whether the FDA had cleared it for the
8  treatment of pelvic organ prolapse?
9          MR. ANDERSON:  Objection.
10  Asked and answered.
11         Go ahead.
12         THE WITNESS:  No, I -- I
13  assumed the company had done that.  I
14  trusted their opinion, if they're providing
15  it for me, that it had been approved.
16  BY MR. SNELL:
17     Q.   When you first began using the
18  Gore-Tex mesh -- strike that.
19         During your use of the Gore-Tex
20  mesh in your fellowship to treat
21  sacrocolpopexy, did you read the IFU to
22  check the indications of use?
23     A.   The IFU that was -- yes.  The IFU
24  that was provided for us, this was a sheet
25  of Gore-Tex, I don't remember how large, but

Page 151

1  it was like let's just say eight by eight or
2  something like that.  It was a sheet.  And
3  then the surgeon would cut it out to form
4  whatever shape he needed.  And so I do
5  remember he gave it to me, I reviewed it
6  because I was writing up a paper at the
7  time, which is in my CV, about
8  sacrocolpopexy.
9      Q.   Okay.
10     A.   Because I rely on those.
11     Q.   Do you recall what specific
12  Gore-Tex product that was?
13     A.   No.  I would be able to track it
14  down on my CV, if I could get ahold of the
15  original manuscript.
16     Q.   I have a copy of your CV here.
17     A.   Uh-huh.  2004.
18     Q.   What paper are we talking about,
19  Doctor?
20     A.   That's what I'm getting at.
21         MR. ANDERSON:  He's looking.
22         THE WITNESS:  Here we go.
23  Under "Non-peer-reviewed Articles," Elliott
24  Cone, Boone.  Mark Cone, that was the name
25  of the GYN I worked with.  "Transabdominal

Page 152

1  Sacrocolpopexy for Severe Vaginal Vault
2  Prolapse:  Indications and Results,"
3  published in "Issues In Incontinence," 2000.
4  Number 1 on the non-peer reviewed.
5  BY MR. SNELL:
6      Q.   Turn, if you would, to Page 4 of
7  your CV.
8      A.   Okay.
9      Q.   Under "Presentations,
10  International," it says,
11  "Colloquium-ICS/IUGA, 2004, Paris, France,"
12  August 2004.
13         Do you see that?
14     A.   Yes.
15     Q.   Did you attend ICS/IUGA 2004 in
16  Paris, France?
17     A.   Yes.
18     Q.   Did you see any of the
19  presentations there concerning transvaginal
20  mesh?
21     A.   Not that I recall, no.
22     Q.   Did you make any presentations at
23  ICS/IUGA 2004?
24     A.   Yes.
25     Q.   Which one?

38 (Pages 149 to 152)

Daniel Steven Elliott, M.D.

Page 153

1    A.   I don't know.  It doesn't state
2  it there.  For some reason, it's not on the
3  CV.
4    Q.   It's not listed anywhere in your
5  CV what presentation you made at ICS/IUGA
6  2004?
7    A.   No.  It was a poster.  I know
8  that.
9    Q.   What was it a poster about?
10    A.   That's what I don't know.  I know
11  I had that poster because I had to carry it
12  all the way from Minneapolis to Paris, but I
13  don't remember what the subject matter was.
14    Q.   As you sit here today, you don't
15  know whether it was prolapse, urinary
16  incontinence or some other condition that
17  you treated back then at that time?
18    A.   It would have been one of those
19  two because it's essentially a female
20  urology or voiding dysfunction.
21    Q.   Was it a poster in connection
22  with any consulting you were doing at the
23  time?
24    A.   No.
25    Q.   When you first began performing

Page 154

1  robotic laparoscopic sacrocolpopexies, were
2  there any randomized, controlled trials of
3  that procedure?
4    A.   We were the first in the world to
5  do it so it was impossible to have that.
6    Q.   So when you began performing
7  robotic laparoscopic sacrocolpopexies, there
8  were no randomized, controlled trials on
9  that procedure anywhere in the world;
10  correct?
11    A.   That I am familiar with,
12  correct.  Yes.
13    Q.   When was the first randomized,
14  controlled clinical trial involving robotic
15  laparoscopic sacrocolpopexy published?
16    A.   I'm not familiar.  I don't know.
17    Q.   You don't even know of one that's
18  ever been published; correct?
19    A.   There may have been.  I don't
20  know.  I'd have to do a literature search.
21    Q.   You've never been involved in a
22  randomized, controlled trial involving the
23  robotic laparoscopic sacrocolpopexy;
24  correct?
25    A.   Correct.

Page 155

1    Q.   And since 2001, how many
2  laparoscopic -- strike that.
3        Since 2001, how many robotic --
4  God, I can't talk.
5        MR. ANDERSON:  Great
6  commercial.
7  BY MR. SNELL:
8    Q.   Since 2001, how many robotic
9  laparoscopic sacrocolpopexies have you done?
10    A.   90.
11    Q.   Let's just finish up with the CV
12  real quick.
13        The 2000 "Issues in
14  Incontinence" --
15    A.   Uh-huh.
16    Q.   -- non-peer-reviewed article that
17  you identified --
18    A.   Yes.
19    Q.   -- is that something you have
20  with you on a computer or anywhere that's
21  convenient or is that back at your office or
22  what?
23    A.   I don't have any copies, period.
24    Q.   So you've performed 90 robotic
25  laparoscopic sacrocolpopexies since 2001.

Page 156

1        That's less than ten a year;
2  correct?
3    A.   Correct.
4        MR. SNELL:  Let's mark this as
5  the next exhibit.
6        (Exhibit Elliott-3 was marked
7  for identification.)
8  BY MR. SNELL:
9    Q.   Doctor, I've handed you Exhibit
10  Number 3.
11        Do you recognize this as one of
12  the articles that you published on
13  robotic-assisted laparoscopic sacrocolpopexy
14  for the treatment of vaginal vault prolapse?
15    A.   Correct.
16    Q.   This was an article published in
17  2004; correct?
18    A.   By the copyright date, that's
19  what it says, yes.
20    Q.   And was this one of the
21  publications you earlier referenced in your
22  deposition with regard to some of the early
23  robotic laparoscopic sacrocolpopexy cases
24  you had performed?
25    A.   I was referring to the one with

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 157

1    30 patients.  This is one -- this is our
2    five -- first five.  It was a feasibility
3    study.  That's why it's in "Surgical
4    Techniques in Urology."
5         Q.    Over on the right-hand column in
6    the paragraph that begins with
7    "Realizing" -- are you with me there?
8         A.    Yes.
9         Q.    You say, "The difficulties in
10   performing the procedure and the duration of
11   the operation has, however, limited its
12   use."
13              You're referring to the
14   laparoscopic sacrocolpopexy there?
15        A.    That's what it states, yes.
16        Q.    Turn to the next page, Figure 1.
17   This is a picture of the different ports and
18   -- strike that.
19              Figure 1 is a picture of the
20   different port placements associated with
21   the da Vinci robotic laparoscopic
22   sacrocolpopexy that you were performing?
23        A.    Correct.
24        Q.    And for the robotic laparoscopic
25   sacrocolpopexy, that involves the use of

Page 158

1    trocars; correct?
2         A.    Yes.
3         Q.    What's the largest size trocar
4    used during this robotic laparoscopic
5    sacrocolpopexy?
6         A.    Currently, I don't know because
7    they've decreased in size.
8         Q.    Back then it would have been 12
9    millimeters --
10        A.    That --
11        Q.    -- to place the camera port?
12        A.    That's correct.
13        Q.    There would be a 10-millimeter
14   trocar; correct?
15        A.    Yes.
16        Q.    A couple 8-millimeter trocars;
17   correct?
18        A.    Yes.
19        Q.    A 5-millimeter trocar port one
20   hand breadth inferior laterally?
21        A.    Yeah, that's what it states.
22   Yes.
23        Q.    A little below that you note that
24   the two 8-millimeter robotic ports are
25   placed lateral to the rectus; correct?

Page 159

1         A.    Well, it states, 8-millimeter
2    robotic ports placed at inferior lateral
3    rectus.  So that's --
4         Q.    I'm sorry.  We must be at the
5    wrong --
6         A.    I'm still on Figure 1.
7         Q.    Okay.
8         A.    That's what it describes there.
9         Q.    I'm in the text now at the bottom
10   of Page 374, the last sentence in the first
11   column.
12        A.    Yeah.  Two 8-millimeter robotic
13   ports are placed lateral to the rectus two
14   finger breadths superior to the iliac crest.
15        Q.    And when you use the term "two
16   finger breadths," that's a term that's been
17   used in your medical training; correct?
18              MR. ANDERSON:  Objection.
19              Go ahead.
20              THE WITNESS:  Well, two finger
21   breadths is just a -- a rough estimate.  In
22   subsequent papers we actually use
23   centimeters.  But in here it does say two
24   finger breadths.
25   BY MR. SNELL:

Page 160

1         Q.    In your first description of your
2    use of the da Vinci robot to do prolapse
3    surgery you described the distance in finger
4    breadths.
5         A.    Correct.
6         Q.    Figure 3 is a -- says, "Silastic
7    Y-graft"; correct?
8         A.    Yes.
9         Q.    Is this the AMS graft that you
10   earlier identified or is this the Gore-Tex
11   graft?
12        A.    No, this is not -- this is the
13   one in between the Gore-Tex and then the AMS
14   polypropylene.  And then it says here,
15   "Silastic Y-graft."  We used this only a
16   very short period of time.
17        Q.    So tell me about this Silastic Y
18   graft.  What kind of graft is that?
19        A.    I -- well, it says, "Silastic
20   Y-graft."  That's about all I know because I
21   don't -- I don't recall.  Usually in the
22   manuscripts we put in who makes it and
23   things.  We didn't do it in this.
24        Q.    Take a look and you tell me.
25        A.    Well, on quick review I don't see

Daniel Steven Elliott, M.D.

Page 161

1  any indication of a manufacturer.
2      Q.   Well, what's your understanding
3  of what type of material a Silastic graft
4  is?
5      A.   Well, Silastic is Silastic.  I
6  don't -- I don't know anything else beyond
7  that.
8      Q.   Is it mono-filament,
9  multi-filament?
10     A.   I don't know.
11     Q.   Is it macro-porous or
12  micro-porous?
13         MR. ANDERSON:  Objection.
14         THE WITNESS:  Yeah.  I'm not a
15  biomaterials expert, and I'd have to look at
16  it and measure it and things.
17  BY MR. SNELL:
18     Q.   Is it a synthetic material?
19     A.   Yes.
20     Q.   The Silastic grafts that you were
21  using for prolapse, do you know if they were
22  FDA approved for the treatment of prolapse?
23     A.   Well, since it was provided to me
24  by a company, I don't know what, I'm going
25  to assume it is.

Page 162

1      Q.   I'm not asking what you assumed.
2  I'm asking if you know.
3         Do you know, Doctor, whether
4  the Silastic grafts you used in patients in
5  your first robotic sacrocolpopexy series
6  were FDA-cleared for the treatment of pelvic
7  organ prolapse?
8      A.   I'm going to trust the company
9  and say yes, it is.
10     Q.   What's the name of this company?
11     A.   That's what I don't know.
12     Q.   I'm not asking you to trust the
13  company.  I want to know, when you were
14  placing this Silastic graft in patients in
15  this sacrocolpopexy series, was that
16  specific material FDA-cleared for the use of
17  prolapse?
18         MR. ANDERSON:  Objection.
19  Asked and answered a couple different times.
20         MR. SNELL:  I'm not asking what
21  he suspects about a company.  I'm saying,
22  what did you know?
23         MR. ANDERSON: I --
24  BY MR. SNELL:
25     Q.   Did you know whether it was or

Page 163

1  not?
2         MR. ANDERSON:  Objection.  Same
3  objection.  Asked and answered.
4         You may answer it one more
5  time.
6         THE WITNESS:  I assumed since
7  it's a Y-shaped mesh specifically for
8  sacrocolpopexy and no other indication for
9  use that it would be -- gone through the
10  appropriate channels of being approved for
11  use.
12  BY MR. SNELL:
13     Q.   So you assumed.
14     A.   Correct.
15         MR. ANDERSON:  Asked and
16  answered.
17  BY MR. SNELL:
18     Q.   But you do not know; correct?
19     A.   No.  I tend to trust the
20  companies.
21     Q.   Over on the right side --
22     A.   Page 375?
23     Q.   Correct.
24         It says your operative -- your
25  average operative time was 3 hours, 42

Page 164

1  minutes; correct?
2      A.   Yes.
3      Q.   With a median of 3 hours, 30
4  minutes; correct?
5      A.   Yes.
6      Q.   Average follow-up was four months
7  in this publication; correct?
8      A.   Correct.
9      Q.   A little bit further down in the
10  Comment section you talk about the placement
11  in a non-invasive fashion while avoiding a
12  midline abdominal incision; correct?
13     A.   I have to find out where you are.
14     Q.   First paragraph.
15         MR. ANDERSON:  I think it's,
16  "The advantage of."
17         THE WITNESS:  Oh.  "The
18  advantage of using a robotic."
19         Yeah, I see where it says
20  that.  Yes.
21  BY MR. SNELL:
22     Q.   The midline abdominal incision,
23  am I correct that there can be herniation at
24  the site of that incision following an open
25  abdominal sacrocolpopexy?

Daniel Steven Elliott, M.D.

Page 165

1    A.    Yes.
2    Q.    Is that what you were referring
3  to there in that particular sentence?
4    A.    I wasn't referring to -- I was
5  referring to everything entailed in doing a
6  midline lower abdominal incision, so not
7  just limiting it to hernia.
8         (Exhibit Elliott-4 was marked
9  for identification.)
10 BY MR. SNELL:
11   Q.    Doctor, I've handed you Exhibit
12 Number 4.
13        This is another publication in
14 which you are one of the authors from 2004;
15 correct?
16   A.    Yes.
17   Q.    Concerning the gynecologic use of
18 robotically assisted laparoscopy, colon,
19 sacrocolpopexy for the treatment of
20 high-grade vaginal vault prolapse; correct?
21   A.    Yes.
22   Q.    This is in the "American Journal
23 of Surgery"; correct?
24   A.    Yes.
25   Q.    And this is a series of 20

Page 166

1  patients; correct?
2    A.    Yes.
3    Q.    Who had undergone robotic-
4  assisted laparoscopic sacrocolpopexy at the
5  Mayo Clinic in the past 18 months; correct?
6  I'm looking at the abstract.  I'm not trying
7  to trick you at all.
8    A.    I'm trying to find it.
9    Q.    Total of 20 patients?
10   A.    Yeah, I see the 20 patients at
11 our institution, past 18 months.  Yes.
12   Q.    So the answer to my question is
13 yes?
14   A.    Yes, it is.
15   Q.    And under the "Surgical
16 technique," this was using that same da
17 Vinci Surgical System; correct?
18   A.    Yes.
19   Q.    By the way, back in 2004 how much
20 did that da Vinci Surgical System cost?
21   A.    I don't know.
22   Q.    You know it cost over a million
23 dollars; correct?
24   A.    I just said I don't know.
25   Q.    You've never heard or seen in the

Page 167

1  literature that the cost of a da Vinci
2  Surgical System is over a million dollars.
3    A.    Well, actually, at Mayo they were
4  given to me, so they were free.
5    Q.    For other institutions that
6  aren't so fortunate as the Mayo Clinic to
7  get free things given to them have you seen
8  in the literature that it may cost over a
9  million dollars for the da Vinci Surgical
10 System?
11        MR. ANDERSON:  Objection.
12        THE WITNESS:  No, I have not.
13 BY MR. SNELL:
14   Q.    How did the Mayo Clinic come to
15 get these da Vinci Surgical Systems --
16   A.    I don't know.
17   Q.    -- for free?
18   A.    I don't know.
19   Q.    How do you know they were given
20 to the Mayo Clinic?
21   A.    That's what I heard.
22   Q.    Who did you hear it from?
23   A.    Chairman of my department.
24   Q.    Chairman of surgery or --
25   A.    Urology.

Page 168

1    Q.    Urology?
2         Figure 1 is a similar figure to
3  what we looked at in your earlier papers
4  showing the different port placements;
5  correct?
6    A.    It is the same picture.
7    Q.    Whose hand is that demonstrating?
8    A.    Mine.  At least, I assume it's
9  mine.  That's where I stand so...
10   Q.    Who placed the ports when you do
11 this procedure?
12   A.    Dr. Chow.
13   Q.    Who places the trocars first?
14   A.    Dr. Chow.
15   Q.    Now, in these 20 patients there
16 is a Y-sling silicone mesh that was placed?
17   A.    Correct.
18   Q.    Is this the same mesh that we saw
19 in the initial case series of five patients?
20   A.    Yes.
21   Q.    Was this mesh recut by whoever
22 supplied it or did the surgeon team cut the
23 mesh?
24   A.    It comes like this.  This picture
25 is what's right out of the box.

Daniel Steven Elliott, M.D.

Page 169

1    Q.    So the Silastic Y-graft and the
2  silicone Y-sling are both the exact same
3  thing.
4    A.    Correct.  Yes.
5    Q.    In this group of 20 patients
6  there were some complications identified on
7  Page 54-S; correct?
8    A.    54-S.
9        MR. ANDERSON:  54.  This one
10  right here, I think.
11  BY MR. SNELL:
12    Q.    Let me just ask a question.
13    A.    Oh.  Sorry.
14    Q.    There were some complications
15  reported in your paper; correct?
16    A.    Yes.
17    Q.    They included mild port site
18  infections in two patients; correct?
19    A.    Yes.
20    Q.    You had a patient who developed a
21  recurrent grade-three rectocele; correct?
22    A.    Yes.
23    Q.    Another patient developed a small
24  erosion six months after the procedure?
25    A.    Yes.

Page 170

1    Q.    Correct?
2    A.    That was managed with
3  outpatient transvaginal excision; correct?
4    A.    Yes.
5    Q.    Significant incontinence was
6  present in 2 of your 20 patients; correct?
7    A.    Correct.
8    Q.    Turn to the next page.
9    A.    (Witness complies.)
10    Q.    Does this refresh your
11  recollection as to what the purchase cost of
12  a da Vinci Surgical System is --
13    A.    Yes.
14    Q.    -- that you put in your paper?
15    A.    Yep.
16    Q.    And what is it?
17    A.    $1 million.
18    Q.    And in many facilities the cost
19  is prohibitive; correct?
20    A.    I -- I -- I can't agree with
21  that, actually, no.
22    Q.    Well, you wrote, Doctor,
23  "Although it is true that the device reduces
24  operative time, for many facilities the cost
25  is prohibitive"; correct?

Page 171

1    A.    Uh-huh.  That was in 2004, when I
2  wrote it.  We're talking now 2012.
3        Many facilities, if they do not
4  have a robot, will not find themselves
5  competitive so many hospitals, even small
6  ones, are buying these.  Specifically in
7  Minnesota, there are hospitals much smaller
8  than Mayo who have more robots than Mayo
9  because it's a competition issue.  It
10  doesn't mean that competition is right, but
11  it happens.
12    Q.    The trocars with the da Vinci
13  robotic system, am I correct that they are
14  designed to stop functioning after ten uses?
15    A.    I don't -- I don't know on that
16  because I'm not a robot expert, but there is
17  -- there is a life expectancy to the actual
18  arms, you know.  I don't know what the
19  number is, though.
20    Q.    Do you know if there are chips in
21  these robots that program them to shut down
22  after a certain number of uses?
23    A.    Yes, I do know that.
24    Q.    How many?
25    A.    I don't know.

Page 172

1    Q.    The series, Doctor, you mentioned
2  earlier, was it 30 cases or --
3    A.    I believe 30, yes.
4    Q.    Can you point me to the
5  publication in your CV?  Maybe that will
6  help me find it and we can discuss it.  Did
7  you give it back to me?
8    A.    Yeah.  I believe it's --
9        MR. ANDERSON:  Let's see if
10  it's here.  Yeah.
11        THE WITNESS:  It might be 28 or
12  -- Number 28, 29, because I -- because I'm
13  continually evolving.
14        MR. SNELL:  Okay.
15        THE WITNESS:  I'd have to --
16  see, there's another one, Number 42.  So I
17  don't know which one it is.  Because each
18  one, we're reviewing the same patients and
19  following them longer.
20        (Exhibit Elliott-5 was marked
21  for identification.)
22        THE WITNESS:  Oh, that's 30
23  patients.  This is the one.
24        MR. SNELL:  Okay.
25  BY MR. SNELL:

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 173

1      Q.    So, Doctor, you've been given
2  Exhibit Number 5; correct?
3      A.    Correct.
4      Q.    This is a paper in which you're
5  one of the co-authors.  The title is
6  "Long-Term Results of Robotic Assisted
7  Laparoscopic Sacrocolpopexy for the
8  Treatment of High Grade Vaginal Vault
9  Prolapse"?
10     A.    That is correct.
11     Q.    And it looks like this was
12 published August 2006 in the Journal of
13 Urology; correct?
14     A.    Journal of Urology, 2006, yes.
15     Q.    And was this the paper in which
16 you referred to the 30-patient cohort?
17     A.    Yes.
18     Q.    Doctor, the two articles we
19 looked at that you are a co-author in from
20 2004 involved 5 patients and then 20
21 patients, they all involved this silicone
22 mesh; correct?
23     A.    Correct.
24     Q.    Now, this paper has a photo at
25 Figure 3 of a polypropylene Y-graft;

Page 174

1  correct?
2      A.    That is correct.
3      Q.    Is this a different cohort of
4  patients?
5      A.    No.  It's both.  It's included --
6  it's the entire series.  At some point in
7  time we changed over to using this new mesh.
8      Q.    So you did at least 20 cases with
9  the silicone mesh; correct?
10     A.    I would have to -- whatever --
11 yeah.  I know -- I remember, recall.  It was
12 20 patients on that.  So I would assume we
13 used the same silicone mesh on all those.
14     Q.    And at most, this would be 10 new
15 patients with polypropylene mesh.
16     A.    Yes.  Apparently so, yes.
17     Q.    Figure 1, the laparoscopic port
18 placement, is this the same photo that we
19 saw in the earlier two publications from
20 2004?
21     A.    Yes.
22     Q.    What is shown in Figure 2?
23     A.    It's a hand-held retractor that's
24 used, that I am actually the one holding at
25 the time of surgery to help facilitate the

Page 175

1  dissection and placement of the sutures.
2  It's placed into the vagina.
3      Q.    How is this used?
4      A.    The patient is --
5      Q.    Strike that.  Let me ask an
6  intelligible question that makes sense on
7  the record.
8            How is this hand-held vaginal
9  retractor used, as depicted in Figure 3 of
10 your --
11     A.    Figure 2.
12     Q.    I'm sorry.  Let me try it again.
13           How is this hand-held vaginal
14 retractor used, which is depicted in Figure
15 2 of your 2006 publication, Doctor?
16     A.    The patient is in lithotomy
17 position, which means she's on her back with
18 legs in stirrups.  The robot is then placed
19 between the legs.
20           This vaginal retractor is, as
21 it says, hand-held, where I am holding it
22 and elevating, retracting, moving the vagina
23 various different directions to aid in the
24 robot's dissection and suture placement.  So
25 we're able to do more precise, under direct

Page 176

1  vision exactly where we want our sutures to
2  go.
3      Q.    So this is inserted into the
4  vagina.
5      A.    Correct.
6      Q.    The robot does the dissection
7  then.
8      A.    Correct.
9      Q.    Turn to the next page, 658.
10           So two patients in this series
11 have developed small vaginal extrusions of
12 mesh; correct?
13     A.    Yes.
14     Q.    Each extrusion developed six
15 months following the procedure; correct?
16     A.    Yes.
17     Q.    And they were managed with
18 transvaginal excision and primary closure;
19 correct?
20     A.    Yes.
21     Q.    Now, by this time in August 2006,
22 had any randomized, controlled trials been
23 done on the robotic laparoscopic
24 sacrocolpopexy?
25     A.    I am unaware of any.

44 (Pages 173 to 176)

Daniel Steven Elliott, M.D.

Page 177

1    MR. SNELL:  We've been going
2  for a while.  Why don't we take a little
3  break.
4          MR. ANDERSON:  Okay.
5          (Recess, 3:04-3:20 p.m.)
6  BY MR. SNELL:
7    Q.    Doctor, I wanted to circle back
8  around.
9          Do you have Exhibit 4 handy?
10   A.    Yes, I do.
11         MR. ANDERSON:  Let me hold that
12  for you.
13         THE WITNESS:  Yes, I have it.
14  BY MR. SNELL:
15   Q.    Under the "Surgical technique" --
16   A.    Okay.
17   Q.    -- on the right side you talk
18  about patients placed in the dorsal
19  lithotomy position.
20         Do you see where I'm at?
21   A.    Second or first full paragraph,
22  yes.
23   Q.    Yeah.  Next paragraph, it says
24  that abdominal insufflation is performed
25  using a varus needle; correct?

Page 178

1    A.    Yes.
2    Q.    That's where a needle is placed
3  through the abdomen to --
4    A.    Well, not through.
5    Q.    -- separate the space?
6    A.    Not through the abdomen.  Into
7  the abdomen.
8    Q.    Into the abdomen.  And it's to
9  separate the space.
10   A.    Well, it's to fill it with air or
11  CO2, yes.
12   Q.    Let's see if we can break that
13  down.
14         A needle is placed into the
15  abdomen; correct?
16   A.    Correct.
17   Q.    Varus needle, is that a
18  particular type of needle or is that --
19   A.    Yeah, it's a specific type of
20  needle.  I don't know what gauge it is.
21  It's a little bit larger, to allow --
22  roughly, it's about 8 centimeters long, to
23  allow the air to get in or the CO2 to get
24  access into the abdomen.
25   Q.    And the CO2 is placed through the

Page 179

1  needle into the abdomen.
2    A.    Correct.
3    Q.    And that separates the space.
4    A.    Well, not separates it.  It fills
5  it with CO2 so you can see inside.  I mean,
6  technically, yes separates.  Yeah.
7    Q.    And the abdominal insufflation
8  using this varus needle is performed
9  blindly; correct?
10   A.    Yes.
11   Q.    And there can be injury with
12  abdominal insufflation using a varus needle;
13  correct?
14   A.    Yes.
15   Q.    And this was known to you back in
16  2004, when you were performing this part of
17  the procedure; correct?
18   A.    Yes.
19   Q.    As a surgeon, were you trained to
20  use your hands and palpate during surgery?
21   A.    That would be part of it, yes.
22   Q.    That's how you were trained;
23  correct?
24   A.    Well, no.  I mean, I was also
25  trained to hold instruments and tie knots

Page 180

1  so --
2    Q.    I'm not saying that's the
3  entirety of how you were trained.
4    A.    Well, palpate what?
5    Q.    When you were performing surgical
6  procedures, were you trained to palpate
7  during those procedures to aid you?
8    A.    Well, "palpate" is not a word I
9  use.
10         You use all the senses given to
11  you -- not all of them, majority of them --
12  to perform the surgery appropriately.  So
13  the tactile feedback and feeling is one of
14  them.  I'd prefer to use that as opposed to
15  palpate.
16   Q.    So the tactile feeling and
17  feedback is one of the modes in which you
18  were trained on as a surgeon.
19   A.    Correct.
20   Q.    And you would agree that injury
21  can occur during a surgery, even under
22  direct visualization.
23   A.    Yes.
24         MR. SNELL:  Let's mark another
25  exhibit.

Daniel Steven Elliott, M.D.

Page 181

1          (Exhibit Elliott-6 was marked
2    for identification.)
3    BY MR. SNELL:
4          Q.    Doctor, you mentioned studies
5    that you have been involved in on rabbits
6    and different types of materials, autologous
7    materials, polypropylene.
8                Was this one of the studies you
9    were referring to?
10         A.    Yes.
11         Q.    And this was a study that was
12   published in 2004; correct?  May 2004;
13   right?
14         A.    May 2004.  You are correct.
15         Q.    It was a study in 15 rabbits,
16   white New Zealand rabbits, I believe?
17         A.    New Zealand -- yes, 15 rabbits.
18         Q.    And what you did was each rabbit
19   was implanted with different materials;
20   correct?
21         A.    Yes.
22         Q.    Human cadaveric fascia, porcine
23   dermis, porcine small intestine, submucosa,
24   polypropylene mesh and autologous fascia;
25   correct?

Page 182

1          A.    Yes.
2          Q.    And that was implanted along the
3    anterior rectus fascia; correct?
4          A.    Yes.
5          Q.    Figure 1 has a depiction of the
6    actual different materials as implanted;
7    correct?
8          A.    That is correct.
9          Q.    And you wanted to investigate
10   time-dependent variations in tensile
11   strength, stiffness, shrinkage, and
12   distortion; correct?
13         A.    Yes.
14         Q.    In six materials commonly used
15   for transvaginal anti-incontinence surgery;
16   correct?
17         A.    Yes.
18         Q.    So shrinkage is one of the things
19   you looked at in 2004; right?
20         A.    I'm just reviewing the paper.
21         Q.    First line under "Purpose."
22         A.    "Purpose."  Shrinkage, yes.
23         Q.    So you looked at the degree of
24   shrinkage with these different materials,
25   including polypropylene mesh, in 2004;

Page 183

1    correct?
2          A.    That is correct.
3          Q.    You earlier mentioned -- strike
4    that.
5                You earlier referenced that
6    fibrosis was later recognized to be
7    shrinkage.
8                Do you recall, in general, your
9    testimony?
10         A.    I remember mentioning something
11   along that lines, yes.
12         Q.    Just so -- and you -- and I
13   believe you testified you thought you later
14   came to learn that?
15         A.    Yeah.  When we're looking at
16   shrinkage in this manuscript, we're focusing
17   mainly on autologous and cadaveric tissues,
18   and then what I was referencing in the
19   deposition was the increased fibrosis, as we
20   mentioned in here, and we're looking --
21   because this is 2003 when the study was
22   done.
23         Q.    Right.
24         A.    Or actually it was started in
25   2002.

Page 184

1                Looking back now, that
2    increased fibrosis we would say would be
3    leading to contraction and shrinkage.
4          Q.    Just so I'm clear, this study was
5    completed in 2003; correct?
6          A.    Yes.
7          Q.    And it included shrinkage of the
8    mesh in it; right?
9          A.    Yes, that is one of the factors.
10   Yes.
11         Q.    In fact, if you turn to Figure 3,
12   of the different materials where you
13   assessed the percent reduction in surface
14   area --
15         A.    Uh-huh.
16         Q.    And that's shrinkage; correct?
17         A.    Yes.
18         Q.    -- the polypropylene mesh had the
19   lowest percent reduction of surface area of
20   any of the materials you studied; correct?
21         A.    That is correct.  Which is known
22   by Johnson & Johnson.  I found this paper in
23   their internal documents referencing it.
24         Q.    Besides your paper in 2003, mesh
25   contraction had been reported in the

Daniel Steven Elliott, M.D.

Page 185

1    literature long before that time; correct?
2        A.   I suppose so, yes.  I don't know.
3        Q.   The human cadaveric fascia and
4    porcine allografts showed marked decrease in
5    tensile strength; correct?
6        A.   Again, I'd have to go back and
7    look at the paper.  Off the top of my
8    head --
9        Q.   I'm right there, right in the
10   "Results."
11       MR. ANDERSON:  He's looking
12   at --
13       THE WITNESS:  Yes.
14   BY MR. SNELL:
15       Q.   And they had marked decrease in
16   stiffness from baseline; correct?
17       A.   Yes.
18       Q.   Polypropylene mesh and autologous
19   fascia did not differ in tensile strength
20   from baseline; correct?
21       A.   Yes.
22       Q.   Polypropylene mesh increased in
23   stiffness from baseline; correct?
24       A.   Yes.
25       Q.   The autologous fascia and small

Page 186

1    intestinal submucosa demonstrated a 41
2    percent and 50 percent decrease in surface
3    area respectively at 12 weeks.
4        A.   I'm sorry.  I lost where you are.
5        Q.   Right there on the "Results"
6    section of the abstract of your paper in
7    2003.
8        MR. ANDERSON:  Well, he's just
9    trying to get to the point where you're
10   reading from.
11       THE WITNESS:  Okay.  I heard
12   what you had to say.  I just wanted to know
13   where we are.  Page 1971, second column.
14   BY MR. SNELL:
15       Q.   "Results."
16       A.   "Results."
17       Q.   At the very front.  No.  No.  I'm
18   sorry.  Doctor.  In the very front, in the
19   "Abstract."
20       A.   Oh, in the "Abstract."  Okay.
21       Q.   So you were looking at the
22   "Results" section.
23       A.   Yes.
24       Q.   I was looking at the "Results"
25   part of the abstract.  I see.  No problem.

Page 187

1        "Autologous fascia and small
2    intestinal submucosa demonstrated a 41% and
3    50% decrease in surface area, respectively,
4    at 12 weeks"; correct?
5        A.   Yes.  Correct.
6        Q.   On Page 1970 on the right-hand
7    column.  I'm going to show you where I'm
8    looking, Doctor.
9        A.   Yes.  I saw it highlighted.
10       Q.   "Polypropylene mesh slings can
11   typically be placed in an outpatient
12   setting."
13       So you wrote that?
14       A.   Yes.
15       Q.   That's consistent with your
16   clinical practice as well; correct?
17       A.   Correct.
18       Q.   In fact, you've said that
19   placement of these slings can be performed
20   in about 15 minutes; correct?
21       A.   15 to 20, yes.
22       Q.   But they have a finite risk of
23   erosion, extrusion and infection; correct?
24       A.   Yes.
25       Q.   You were aware of the risk of

Page 188

1    mesh erosion in 2003 when you wrote this
2    paper; correct?
3        A.   Yes.
4        Q.   You were aware of the risk of
5    mesh extrusion in 2003 when you wrote this
6    paper; correct?
7        A.   Yes.  In the -- in the setting of
8    slings, yes, which is a very important
9    aspect of that.
10       Q.   Towards the end of your paper --
11       A.   Okay.
12       Q.   -- second-to-last paragraph, you
13   say, "Recent studies showed higher than
14   expected intermediate failure rates for
15   cadaveric fascia lata slings"?
16       A.   Yes.
17       Q.   Is that some of the data which
18   you were earlier referring to when you
19   discussed your preference to use synthetic
20   slings over autologous and cadaveric slings?
21       A.   No.  What I was referring to was
22   Brubaker's paper on sacrocolpopexy
23   specifically.  So, no, I was not -- was not
24   referencing this.
25       Q.   You say, "processed cadaveric

47 (Pages 185 to 188)

Daniel Steven Elliott, M.D.

Page 189

1  fascia lata grafts have been shown to retain
2  antigenicity."
3      A.   Uh-huh.
4      Q.   Did I --
5      A.   Yeah.
6      Q.   -- pronounce it correctly?
7      A.   Yeah.  Pretty good.
8      Q.   What is that, Doctor?
9      A.   That just means that -- you know,
10  I'm not an immunologist so I'll give an
11  infantile answer for it.  It is that the
12  theoretical possibility that fascia lata
13  from a cadaver can still retain some of its
14  antigens, so that the body views it as not
15  them.
16      Q.   And in the literature that's been
17  discussed in the context of patients who
18  rejects cadaveric slings.
19      A.   Not reject.  They're worried
20  about the long-term, 20-, 30-, 40-year
21  history with prions, P-R-I-O-N-S, and the
22  potential transmission of disease processes
23  such as Creutzfeldt-Jakob.  There's several
24  of those names.  But no, we're not worried
25  about rejection necessarily.  No, actually

Page 190

1  not at all.  It's infectious transmission.
2      Q.   So the concern with cadaveric
3  fascia lata grafts in this context that you
4  wrote in 2003 pertained to the transmission
5  of infection.
6      A.   Correct.  That's specifically
7  antigenicity, which you pronounced better
8  than I just did, is pertaining to that
9  infectious transmission long term.
10      Q.   At the end of that paragraph you
11  say, "The biomechanical results of the
12  current study support the use of
13  polypropylene mesh for sling surgery
14  relative to other nonautologous materials";
15  correct?
16      A.   Yes.
17          (Exhibit Elliott-7 was marked
18  for identification.)
19  BY MR. SNELL:
20      Q.   All right.  Doctor, I've handed
21  you Exhibit Number 7, which is another paper
22  in which you are a co-author on from 2006 --
23      A.   Yes, I have it.
24      Q.   -- in the Journal of Urology;
25  correct?

Page 191

1      A.   Yes.
2      Q.   And this was a study that you
3  completed in 2005; correct?
4      A.   Well, no.  The paper was finished
5  in 2005 so I don't know, actually, when the
6  study was completed.  It would have been in
7  that time frame, 2004, 2005.
8      Q.   And this was another study in
9  rabbits?
10      A.   Correct.  Same kind of rabbits,
11  New Zealand rabbits, I believe.
12      Q.   And one of the things you looked
13  at in this study was inflammation associated
14  with the different implants; correct?
15      A.   Yes.
16      Q.   And of the different materials,
17  polypropylene mesh had the lowest degree of
18  inflammation; correct?
19      A.   That's what we found at our
20  12-week study, yes.
21      Q.   Did you ever do a follow-up study
22  to this longer-term data that showed
23  something different than that?
24      A.   No.  No.
25      Q.   Whenever you do a surgery,

Page 192

1  Doctor, any kind of surgery, and you make
2  incisions, the body's natural response is to
3  try to heal; correct?
4      A.   Yes.
5      Q.   Setting aside cases where
6  somebody is, you know, highly
7  immunosuppressed, in general, we can agree
8  that the body normally tries to heal.
9      A.   Yes.
10      Q.   And for a surgery involving basic
11  incisions, the body's natural response is to
12  try to heal that area and form a scar;
13  correct?
14      A.   I don't know what you mean by the
15  basic incisions.
16      Q.   If an incision is made on your
17  arm during surgery to place pins in one of
18  the bones, the body's natural response is to
19  try to heal that incision area and form a
20  scar; correct?
21      A.   The body -- the body -- the goal
22  of the body is to heal itself, yes.
23  Correct.
24      Q.   And scar formation is the way
25  that the body heals itself.

Daniel Steven Elliott, M.D.

Page 193

1  A.  I --
2         MR. ANDERSON:  Objection.
3         Go ahead.
4         THE WITNESS:  Yes.  But in your
5  example, putting the pins in the body, now
6  you've got a foreign body reaction.  So now
7  the body might not be able to heal itself or
8  it may go into overdrive and attempt to heal
9  itself and now you have a -- a poor
10 environment for healing.
11 BY MR. SNELL:
12     Q.    You know pins have been used in
13 orthopedic surgeries for decades?
14     A.    I -- I assume so.  I don't know.
15 Because I'm not an orthopedic surgeon.
16     Q.    Explain to me the process, then,
17 Doctor, by which the body heals itself when
18 you have something like an incision and you
19 put stitches in the incision.  How does the
20 body go about healing itself?
21     A.    It is an incredibly complicated
22 and still to this date poorly understood
23 process.  Myself as a urologist are not
24 going to understand all the nuances.
25 Actually, it gets into immunology.

Page 194

1         There is a whole cascade of
2  events that happens as soon as there is a
3  break in the skin and blood is spilled
4  because that sets off this cascade, which
5  I'm not, by no means, am going to be an
6  expert on.  But then that sets off
7  platelets, it sets off the immune response,
8  neutrophils, which incorporate macrophages.
9         It is an amazingly complicated
10 and incredible cascade of events.  Anything
11 that inhibits that, whether it be a pin in
12 the arm, which can get infected or create
13 any type of foreign body response or
14 infection, will -- can inhibit that proper
15 cascade.
16     Q.    How large are neutrophils?
17     A.    That is a question that is still
18 evolving.  Again, I'm not an immunologist;
19 however, it depends upon what type of
20 neutrophils you're talking about because
21 neutrophils are different throughout the
22 body.  Are you talking in the lung?  Are you
23 talking in the pelvis?  All the --
24     Q.    Let's talk about neutrophils in
25 the pelvis, neutrophils that are involved in

Page 195

1  the body's tissue integration with regard to
2  pelvic mesh.
3     A.    Okay.  Now then I'll have to ask
4  more questions.  Is this when these
5  neutrophils are at rest, so to speak, or are
6  these neutrophils, once they have been
7  activated and are starting to be involved in
8  phagocytosis and moving around and picking
9  up debris?  Because neutrophils, i.e.,
10 macrophages, gobble up -- again, that's not
11 a good academic term, but they -- they
12 incorporate debris.  So they can become very
13 large.  So I cannot give you --
14     Q.    Before they incorporate debris.
15     A.    I would say you can have a range
16 of 20 to 80 microns.
17     Q.    So just so I have this correct,
18 neutrophils before they gobble up anything
19 can be up to the size of 80 microns.
20     A.    I've seen reports with
21 macrophages up to 4,000 microns.
22     Q.    Macrophages, yeah.  I want to
23 talk about --
24     A.    Well, but that's a subset.
25     Q.    Okay.

Page 196

1     A.    I think the immune system is
2  insanely complicated.  There's no lawyer in
3  this room who understands them.  I am a
4  surgeon who has been studying them.  I don't
5  understand it.  And immunologists are just
6  beginning to understand it.  Okay.
7         So I can give you a preliminary
8  explanation, actually, from what I've read.
9  But, yes, alveolar macrophages, 4,000
10 microns is in the data out there.
11        So when you say neutrophils,
12 you are actually by default saying
13 macrophages because that is a subset.
14     Q.    So are alveolar macrophages
15 involved in tissue integration with mesh?
16     A.    They sure can be.
17     Q.    I'm not talking about can be.
18 I'm asking, are they?  I want to know, are
19 they?
20        MR. ANDERSON:  Objection.
21        Go ahead.
22        THE WITNESS:  Well, I just
23 answered that.  See, the -- what I can -- I
24 can be a smart aleck and say, do you know
25 what alveolar macrophages are?

49 (Pages 193 to 196)

Daniel Steven Elliott, M.D.

Page 197

1  BY MR. SNELL:
2      Q.   No.
3      A.   The answer is going to be no.
4      Q.   But I'm not the doctor.
5      A.   But if you have thoracic wall
6  hernias that are repaired, then the alveolar
7  macrophages can be involved in that, yes.
8      Q.   I thought we were talking about
9  for prolapse.
10     A.   Read your question.
11         MR. ANDERSON:  But you changed
12  it to mesh and that's why he was having a
13  problem when you just said mesh.
14         See?  Alveolar macrophages
15  involved in tissue integration with mesh is
16  what you said.
17         MR. SNELL:  Okay.
18  BY MR. SNELL:
19     Q.   Are alveolar --
20     A.   Alveolar.
21     Q.   -- alveolar macrophages involved
22  in tissue integration with the mesh used in
23  pelvic organ prolapse?
24     A.   Well, the mesh used in pelvic
25  organ prolapse can also be used up in

Page 198

1  thoracic wall hernias.
2      Q.   But I'm not talking about
3  thoracic wall hernias right now.
4      A.   I'm sorry.  But I was answering
5  your question.
6          If you want to be specific in
7  the mesh, that is used for the purpose of
8  healing pelvic organ prolapse.  Alveolar
9  macrophages are not in that.
10     Q.   Have you seen it reported in the
11  medical literature that macrophages that are
12  associated with tissue integration for mesh
13  in pelvic organ prolapse are approximately
14  20 to 30 microns in size?
15     A.   Well, that goes back to my
16  answer.  I said 20 up to 80.  And I am not
17  an expert in this.  I'm just saying what I
18  have read in the work of others.
19     Q.   What type of neutrophils or
20  macrophages involved in the tissue response
21  for mesh for pelvic organ prolapse are
22  between 50 and 80 microns?
23         MR. ANDERSON:  I'm going to
24  object.
25         He's not being offered as an

Page 199

1  expert in the area of immunology or
2  pathology or pathophysiology.  So with those
3  objections in mind, if you want to continue
4  asking questions, I'm going to continue
5  objecting, but he's not being offered as an
6  expert witness on this.
7  BY MR. SNELL:
8      Q.   You mentioned up to 80.  I just
9  want to know which ones are between let's
10  say 50 and 80.
11         MR. ANDERSON:  Same objection
12  applies to that so --
13         THE WITNESS:  The subset, I'm
14  not familiar with the name of the subset.
15         MR. SNELL:  Okay.
16  BY MR. SNELL:
17     Q.   Figure 3 in this paper shows a
18  comparison of the different degrees of
19  inflammation between the polypropylene mesh,
20  which is on the left; correct?
21     A.   Yes.
22     Q.   And the two different cadaveric
23  fascia latas at 12 weeks?
24     A.   Yes.
25     Q.   Were you involved in the taking

Page 200

1  of these photographs?
2      A.   No.  That would have been the
3  pathologist.  I believe it was Tom Sebo.
4      Q.   Do you know at what power those
5  photographs were taken?  I didn't see it in
6  here.
7          MR. ANDERSON:  Objection.
8          He just said he wasn't involved
9  in it.
10         MR. SNELL:  I'm just asking if
11  he knows from the paper.  I didn't see it in
12  the paper, the magnification, but I want to
13  know if he has a recollection or a knowledge
14  that I, obviously, I don't know.
15         THE WITNESS:  I have no
16  recollection.  I'd have to go to where I'm
17  describing Figure 3 and say if we describe
18  it.
19         MR. SNELL:  Figure 2.  I'm
20  sorry.
21         THE WITNESS:  Oh, Figure 2.
22         MR. SNELL:  Oh, no.  You're
23  right, Doctor.  Figure 3.  Figure 3.  You're
24  right.  I misspoke.
25         THE WITNESS:  I don't see

50 (Pages 197 to 200)

Daniel Steven Elliott, M.D.

Page 201

1  Figure -- where I'm just talking about
2  Figure 3.
3          MR. ANDERSON:  That's all
4  right.
5          There's not a question pending;
6  right?  Because he said I don't see it.  You
7  asked him if he saw the magnification and he
8  said I don't see it.
9          THE WITNESS:  I'm sorry.  I
10  said I don't see it.
11         MR. SNELL:  Okay.  I didn't
12  hear you.  I thought you were just looking
13  for the reference to Figure 3.
14         THE WITNESS:  I --
15         MR. ANDERSON:  Off the record.
16         (Discussion off the record.)
17  BY MR. SNELL:
18     Q.    At the last page, Doctor, under
19  "As alternatives," looking at the bottom
20  left corner --
21     A.    I see it, yes.
22     Q.    So that in this paragraph you're
23  talking about the use of polypropylene mesh;
24  correct?
25     A.    In the setting for mid-urethral

Page 202

1  slings, yes.
2     Q.    Correct.
3          And you say, "Our results
4  indicated little degree of inflammation";
5  correct?
6     A.    Yes.
7     Q.    "And significant fibrosis";
8  correct?
9     A.    Yes.
10     Q.    "Similar to that of autologous
11  material"; correct?
12     A.    Yes.
13     Q.    Moving a little further, you also
14  note, none of the material appeared grossly
15  infected at explantation in your study;
16  correct?
17     A.    Yes.
18     Q.    In this paper you talk about some
19  of the limitations of your study; correct?
20     A.    Yes.
21     Q.    One of it is that you used an
22  animal model; correct?
23     A.    Yes.
24     Q.    And there's differences between
25  humans and animals, obviously; correct?

Page 203

1     A.    Yes.
2     Q.    There's differences in studies
3  that seek to look at clinical conditions in
4  humans and compare those with animal models;
5  correct?
6     A.    Yes.
7     Q.    Towards the end you note in the
8  "Conclusions" section, "These results add
9  additional objective evidence to distinguish
10  the different synthetic materials used in
11  anti-incontinence surgery"; correct?
12     A.    Yes.  I mentioned that in the
13  "Conclusions" section and also warn of the
14  differences in the microenvironment of the
15  vagina and infection.  So yes, it has to be
16  taken in its totality, these conclusions, so
17  you have to --
18     Q.    Right.
19     A.    But yes, that's the -- my
20  statement that you said, that's what I state
21  here.
22     Q.    The slings that you use
23  transvaginally, the synthetic polypropylene
24  slings, have you published on your infection
25  rate with those slings?

Page 204

1     A.    I do not believe I have.
2     Q.    As you sit here today, what is
3  your infection rate for your polypropylene
4  slings?
5     A.    Are you talking about vaginal
6  extrusion or infection of the mesh?  Because
7  there's a -- like I said, I just want
8  clarification of what you're asking.
9     Q.    Infection with the mesh.
10     A.    One out of 1,500.
11     Q.    So one out of 1,500 --
12     A.    That I know of.  I'm sorry to
13  interrupt you.
14     Q.    That's okay.
15     A.    You have to put that preface in
16  there, that I know of, one out of 1,500.
17     Q.    I don't want you to testify about
18  things you don't know about.  So one out of
19  1,500 polypropylene slings that you've
20  placed, that you're aware of, has become
21  infected.
22     A.    Correct.  And required explant,
23  yes.
24         And let me actually be more
25  clear on this one also because I -- in

Daniel Steven Elliott, M.D.

Page 205

1  making that statement, I excluded the OB
2  tape.  Our series of OB tapes, which are no
3  longer on the market, we had 8 out of 100
4  become infected, very significant, severe
5  infections.  Okay.  So when I -- I gave that
6  number, I actually should preface by
7  excluding OB Tape.
8      Q.   Well, the 1,500 slings that you
9  identified, you have one mesh infection out
10  of, let's just focus on that one.
11     A.   Correct.
12     Q.   That's a macroporous sling;
13  correct?
14     A.   It's the SPARC suburethral sling,
15  so I don't know as far as the macroporous.
16  It's --
17     Q.   Do you know if it's a larger pore
18  size than the OB Tape?
19     A.   Yes, definitely, it is.
20     Q.   Do you know how that pour size of
21  the SPARC tape compares to the pour size of
22  the mesh used with, say, TVT®-O?
23     A.   All I would be able to do is not
24  on a scientific level, of saying just
25  eyeballing it, for lack of a better phrase,

Page 206

1  eyeballing it, they appear to be very
2  similar.
3      Q.   Now, you also mentioned
4  extrusion --
5      A.   Extrusion.
6      Q.    -- when you were asking me for
7  clarification?
8      A.   Yes.
9      Q.   In these 1,500 polypropylene
10  slings, can you tell me what your extrusion
11  rate was?
12     A.   Excluding the OB Tape.
13     Q.   Let's just set that aside.
14     A.   It's two that I know of.
15     Q.   Two of 1,500?
16     A.   Correct.
17     Q.   Have you ever published on the
18  rate of mesh exposure or extrusion in the
19  abdominal sacrocolpopexies that you have
20  done?
21     A.   We have not published
22  specifically on it; however, it is
23  referenced in the manuscripts.
24     Q.   Sorry.  My question was about the
25  abdominal sacrocolpopexies.

Page 207

1      A.   Oh, sorry.
2      Q.   Let me just check my question and
3  make sure that was what I thought.
4          MR. ANDERSON:  You were right.
5          THE WITNESS:  Yeah.  I
6  misunderstood your question.  I'm sorry.
7          MR. SNELL:  That's okay.
8  BY MR. SNELL:
9      Q.   Let me just ask, have you ever
10  published on the rate of mesh exposure or
11  extrusion in the abdominal sacrocolpopexies
12  that you have done?
13     A.   No, I have not.
14     Q.   Do you know the rate of mesh
15  exposure for the abdominal sacrocolpopexies
16  that you have performed?
17         Well, let me back up, actually.
18  Maybe you told me this before, and if you
19  did, I apologize, because I've forgotten,
20  clearly.
21         How many abdominal
22  sacrocolpopexies have you performed over
23  your career?
24     A.   Roughly, we're looking at, what,
25  14 years now, 100, 150.  Something like

Page 208

1  that.
2      Q.   Have you ever published on your
3  experience in abdominal sacrocolpopexy?
4      A.   No.
5      Q.   Have you ever presented on your
6  experience with abdominal sacrocolpopexy
7  with like a poster or, you know, a meeting,
8  anything like that?
9      A.   No.
10     Q.   Are there any studies or
11  publications or presentations that you have
12  been involved with which concern the use of
13  mesh to treat either stress urinary
14  incontinence or prolapse that are not
15  included in your CV?
16         MR. ANDERSON:  Objection.
17         MR. SNELL:  Can you tell me
18  what's wrong, Counsel?  I just want to --
19         MR. ANDERSON:  That he's been
20  involved with.  I don't know --
21         MR. SNELL:  Okay.  That's fair.
22  That's fair.
23  BY MR. SNELL:
24     Q.   Are there any studies or
25  publications or presentations that you have

Daniel Steven Elliott, M.D.

Page 209

1    been a co-author on or the presenter on that
2    concern the use of mesh to treat urinary
3    incontinence or prolapse that are not
4    identified in your CV?
5        A.    No.  Specifically, to answer your
6    question, no; however, we have submitted for
7    meetings, like the SUFU meeting in February,
8    robotic sacrocolpopexy in obese patients,
9    and so -- but that has not been presented.
10       Q.    Got you.
11       A.    And then we will be submitting to
12   the AUA that manuscript and then the other
13   one is artificial -- so no, that would be --
14   there is no publication pending out there
15   that I'm aware of off the top of my head
16   other than those two presentations.
17       Q.    And both of that involved
18   robotic sacrocolpopexy in an obese cohort?
19       A.    Correct.
20       Q.    How large of a series is this
21   obese cohort?
22       A.    I believe it's involving all of
23   our 90 patients.
24       Q.    Were all of the 90 patients
25   obese?

Page 210

1        A.    No.  What we're doing is we're
2    comparing moderate -- normal BMI to
3    enlarged, elevated BMI.
4        Q.    So is it normal BMI as compared
5    to overweight and obese, as defined by the
6    BMI scale, CDC, or normal weight versus
7    obese BMI of 30 or above?
8        A.    Your first statement, that we are
9    comparing the various BMIs, so we have --
10       Q.    Okay.
11       A.    -- normal, mildly elevated and
12   then morbidly obese.
13       Q.    Is this a retrospective cohort
14   study?
15       A.    Yes.
16       Q.    So within the 90 patients for
17   whom you have been involved with robotic
18   laparoscopic sacrocolpopexy, that's the
19   cohort and it's just stratified by BMI
20   category.
21       A.    Correct.
22       Q.    Were there any findings that you
23   considered significant or specific -- strike
24   that.
25             Were there any findings in this

Page 211

1    study which you considered to be specific to
2    the use of mesh?
3        A.    No.  It would be specific to
4    obesity and its impact upon robotic
5    sacrocolpopexy.
6        Q.    What effect, if any, did the
7    obesity have?
8        A.    The very impressive data that the
9    larger an individual is as far as obese, the
10   complications increased.  There's almost a
11   linear one-to-one association as far as
12   that.
13       Q.    Any particular type of
14   complications or just overall?
15       A.    Overall, and wound infection,
16   delayed hospital stay, increased risk for
17   bleeding and also longer procedure.
18       Q.    Do you know why there was an
19   increased risk of wound infection with the
20   obese cohort?
21       A.    Basically, there's a lot of fat.
22   The more fat -- fat does not heal well at
23   all.  So that goes for plastic surgery,
24   general surgery, and this robotics.
25             That would have surprised us

Page 212

1    somewhat because we felt that robotics would
2    actually reduce that, but still it was
3    reduced compared to open but still
4    significant increased risk compared to thin.
5    Thin is easy, obese is difficult.
6        Q.    And the obese cohort had a longer
7    procedure time, in general?
8        A.    Slightly.  Yeah, it was 20 to 30
9    minutes longer.
10       Q.    Any difference in the rate of
11   mesh exposure or extrusion?
12       A.    We haven't had any beyond our
13   first eight patients.  Our first eight
14   patients, which is described in that study
15   of 30, we had, I believe, two and I think we
16   had one after that, a total of three
17   patients with mesh extrusion, which were all
18   in the first eight or nine, maybe ten
19   patients.  Since that, the subsequent 80,
20   we've had zero mesh extrusion.
21       Q.    That you're aware of; correct?
22       A.    That I'm aware of, yes.
23             And I also forgot, so just in
24   case you look it up, the SUFU, we are
25   presenting 100 urethrolyses for obstruction

53 (Pages 209 to 212)

Daniel Steven Elliott, M.D.

Page 213

1  following slings.  That's at the AUA.  I'm
2  sorry.
3      Q.    What's a urethrolysis?
4      A.    Oh.  Cutting of sling.  They're
5  obstructed.  And that's, again, at the AUA,
6  not the SUFU.  I'm sorry.
7      Q.    What types of slings are these?
8      A.    The majority are autologous, 53;
9  30, roughly, are synthetics, suprapubic or
10  TVT®; they had a few transobturators and
11  then some Burch and MKs.  That was the
12  minority.
13      Q.    Where did these cases come from?
14  Were they original surgeries done at Mayo or
15  somewhere else?
16      A.    No.  They were all referred in.
17      Q.    So the majority of these
18  urethrolyses involved autologous slings?
19      A.    Correct.
20      Q.    What was the N on the obese
21  cohort?
22      A.    90.  Oh, on the obese, the
23  subset?  I don't recall.
24          MR. SNELL:  Take another little
25  break, if you don't mind.

Page 214

1          (Recess, 4:13-4:32 p.m.)
2          MR. SNELL:  Could we mark this.
3          (Exhibit Elliott-8 was marked
4  for identification.)
5  BY MR. SNELL:
6      Q.    Doctor, I've handed you Exhibit
7  Number 8.  You see it's a document that
8  states that you have been paid one thousand,
9  six hundred -- back up.
10          Doctor, I've handed you Exhibit
11  Number 8.
12          Do you have it in front of you?
13      A.    Yes, I do.
14      Q.    And that document states that you
15  have been paid $167,727 to date; correct?
16      A.    That's what it states, yes.
17      Q.    And that document is dated
18  October 17th, 2012; correct?
19      A.    Correct.
20      Q.    And is it correct that as of
21  October 17th, 2012, you have been paid
22  $167,727?
23      A.    Well, as I stated before, I don't
24  know how much I've been paid, but that's how
25  much it states here.  I have no reason to

Page 215

1  suspect it's wrong.
2      Q.    Now, your rate is $700 an hour
3  even though that document states it is 750;
4  correct?
5      A.    Yes.  It is 700 but, you know, it
6  does say 750.  But yes, I am getting paid
7  700 per hour.
8      Q.    When did you arrive in New Jersey
9  to give your deposition?
10      A.    Monday night, whatever that was.
11  Touched down at 11:00 at night.
12      Q.    How many hours have you spent
13  preparing for this deposition between the
14  time when you got on the plane to come to
15  New Jersey up until this morning before you
16  sat down?
17      A.    Okay.  Travel time was six, seven
18  hours.  I don't know what it was.  But there
19  was no prep time in it.  That was just
20  travel.
21          And then in the morning of
22  Tuesday there was an hour and a half, two
23  hours in the morning.  There was roughly
24  eight or nine, maybe up to ten hours with
25  Mr. Anderson on Tuesday.  And then in the

Page 216

1  evening I put in another hour to two hours.
2  And the same would be said then for
3  Wednesday.  Essentially, the -- roughly, the
4  same amount.
5      Q.    Roughly somewhere between 10 and
6  14 hours on Tuesday and Wednesday --
7      A.    Correct.
8      Q.    -- altogether.
9      A.    Correct.  That is correct.  Each
10  day.
11      Q.    Per day.
12      A.    Per day.  And then this morning,
13  roughly an hour and a half.
14      Q.    So somewhere between 22 and 28
15  hours, altogether.
16      A.    Yeah.  I'd have to add it up, but
17  that sounds about right, yeah.
18      Q.    And you haven't billed for that,
19  obviously.
20      A.    No, I have not.  Yes.
21      Q.    When was the last time you issued
22  a bill?
23      A.    October 31st.
24      Q.    Do you bill at the end of every
25  month?

54 (Pages 213 to 216)

Daniel Steven Elliott, M.D.

1    A.   Yes.  If I've done work, I bill,
2  obviously.
3    Q.   Besides the 22 to 28 hours that
4  you've spent -- strike that.
5         Do you know if this $167,727
6  includes your bill from October 2011?
7    A.   I would assume it did not because
8  I submitted it to them on October 31st.
9    Q.   Can you give me your best
10  approximation how many hours you billed for
11  in October?
12    A.   I don't know the number of hours
13  on that.
14    Q.   Your best approximation is
15  that --
16    A.   I can give you a dollar amount
17  because I know that because I just deposited
18  the check.
19    Q.   Okay.
20    A.   It was roughly 25,000.
21    Q.   And for the month of November,
22  other than the 22 to 28 hours you spent
23  preparing in the past couple of days, have
24  you spent any other time on this matter?
25    A.   Yeah.  I continued from November

1  1st until leaving of doing review work.  I
2  don't know what -- I -- I do have a record
3  of it.  I don't have it with me.  That's at
4  my home.  And I don't know the number of
5  hours.  It would be in the range of 20 to
6  30, maybe.  Maybe.  I could be quite off,
7  actually.
8    Q.   So approximately 20 --
9    A.   20 to 30.
10    Q.   -- to 30 hours.
11    A.   Prior to leaving to come to New
12  Jersey.
13    Q.   And approximately 22 to 28 hours
14  since you've arrived here in New Jersey.
15    A.   Correct.  Except that has not --
16  not counted the deposition today.  So --
17    Q.   Yeah.
18    A.   -- each minute counts.
19    Q.   Do you have a separate company
20  which the checks are made payable to?
21    A.   No.
22    Q.   They're just made out to you
23  personally?
24    A.   Correct.
25    Q.   Did you seek any approval from

1  the Mayo Clinic with regard to your role as
2  an expert in the mesh litigation?
3    A.   No.  This is all private time.
4    Q.   Do you have your report handy,
5  the annotated one?
6    A.   Yes, I do.
7    Q.   Is that your version of the
8  report?
9    A.   No.
10         MR. ANDERSON:  It's mine.
11         THE WITNESS:  This is
12  Mr. Anderson's.
13  BY MR. SNELL:
14    Q.   The November 7th, 2012,
15  supplemental report to which we have
16  objected and I've stated our grounds for
17  said objection --
18         MR. ANDERSON:  Yes.
19  BY MR. SNELL:
20    Q.   -- you did not in that report
21  disclose any new general opinions; correct?
22         MR. ANDERSON:  Objection.
23         THE WITNESS:  No.  That was
24  pertaining specifically to Gross and Wicker.
25  BY MR. SNELL:

1    Q.   Are all opinions you plan to
2  offer, are all your general opinions that
3  you plan to offer contained within this June
4  15th, 2012, report and the supplemental
5  November 14th, 2012, report, which you state
6  that they further supported your opinions as
7  set forth in the original report?
8         MR. ANDERSON:  Just objection
9  to the question.
10         THE WITNESS:  I cannot say.  I
11  mean, I am ongoing continuing to do research
12  and thought with this.  If something new
13  does arrive, that could change it, but right
14  now I have no knowledge of anything.
15  BY MR. SNELL:
16    Q.   As we sit here today, all of your
17  general opinions are contained in the
18  general report and the November 14th, 2012,
19  supplement; correct?
20         MR. ANDERSON:  Objection.
21         Go ahead.
22         THE WITNESS:  Yes.
23  BY MR. SNELL:
24    Q.   On Page 8, this contains a
25  summary of your opinions?

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 221

1    A.    Yes.
2    Q.    And that's Pages 8 to 11?
3    A.    Yes.
4    Q.    And do you believe that this is a
5  fair summary of the opinions you plan to
6  offer at trial?
7    A.    Yes.
8    Q.    I'm going to ask you about a
9  couple of these.
10        The first one -- are you with
11  me?
12    A.    Yes, I am.  Number one, I assume
13  but --
14    Q.    Yes.
15    A.    On Page 8.  Yes?
16    Q.    Page 8.  Yes.  Thank you, Doctor.
17        This says, "patients implanted
18  with non-absorbable, transvaginal synthetic
19  mesh for pelvic organ prolapse, including
20  the Prolift System, do not have demonstrable
21  improvement in symptomatic results over
22  traditional, non-mesh repair"; correct?
23    A.    Yes.
24    Q.    You have reviewed clinical
25  studies -- let me back up.

Page 222

1        Is it your opinion that any
2  non-absorbable transvaginal synthetic mesh
3  for the use in pelvic organ prolapse is not
4  an appropriate option for surgeons?
5    A.    That's not what I state.
6    Q.    I'm asking --
7    A.    That's just what I state right
8  here.  Not demonstrable improvements in
9  symptomatic results over the traditional
10  repair.
11    Q.    My question is, is it your
12  opinion that doctors should not use
13  non-absorbable transvaginal synthetic mesh
14  for pelvic organ prolapse?
15    A.    My opinion, again, we've got it
16  outlined very well in here, stated but,
17  briefly, my opinion is the routine, common
18  use of mesh for pelvic organ prolapse is not
19  appropriate, based upon the data.
20    Q.    Do you believe a surgeon who
21  chooses to use transvaginal mesh to treat
22  prolapse is violating the standard of care
23  by using transvaginal mesh --
24        MR. ANDERSON:  Objection.
25  BY MR. SNELL:

Page 223

1    Q.    -- for prolapse?
2        MR. ANDERSON:  Sorry.
3        Objection.
4        Go ahead.
5        THE WITNESS:  I don't believe a
6  standard -- a standard of care -- let me
7  back up.
8        A standard of care regarding
9  pelvic organ prolapse is still evolving.  It
10  would be incorrect for me to say that a
11  surgeon is violating the standard of care.
12  It is not malpractice to implant a mesh,
13  okay, because that's not established.  Is it
14  efficacious, does it benefit the patient is
15  a different story.  That's what I'm having a
16  very strong opinion on.
17  BY MR. SNELL:
18    Q.    And is it your opinion that say
19  Prolift® mesh does not benefit any patients
20  whatsoever?
21    A.    I have not stated that, no.
22    Q.    Is it your opinion that the use
23  of non-absorbable transvaginal synthetic
24  mesh does not benefit any patients out
25  there?

Page 224

1    A.    There is -- as you stated that
2  question, just now --
3    Q.    Yes.
4    A.    -- there is a, I think, a benefit
5  in stress urinary incontinence.
6    Q.    Do all patients who receive
7  Prolift® have complications?
8    A.    No.
9    Q.    Do all patients who receive
10  transvaginal mesh to treat prolapse have
11  complications?
12    A.    No.
13    Q.    You will acknowledge that in the
14  medical literature that patients who have
15  received Prolift® have received efficacious
16  treatment of their prolapse; correct?
17    A.    I --
18        MR. ANDERSON:  Objection.
19        Go ahead.
20        THE WITNESS:  I -- I do agree
21  with that.  I also agree that the majority
22  of Pinto cars did not kill people or the
23  majority of Firestone tires are good.  So
24  I'm not saying banning all.  I'm saying that
25  the complications.  That was the issue.

Daniel Steven Elliott, M.D.

Page 225

1        MR. SNELL:  Move to strike
2  everything after "I do agree with that."
3  BY MR. SNELL:
4        Q.    You would agree that patients
5  implanted with Prolift® have demonstrated
6  improvement in symptomatic results,
7  according to the medical literature?
8        A.    Yeah.
9        MR. ANDERSON:  Objection.
10       THE WITNESS:  Yes.
11  BY MR. SNELL:
12       Q.    You would agree that patients
13  implanted with Prolift® have demonstrated
14  improvements in quality of life, according
15  to the medical literature.
16       A.    Yes, some of them have.  Yes.
17       Q.    That's what I'm asking.
18            Some patients, not every single
19  one; right, Doctor?  Because is there a
20  surgical procedure you can point me to to
21  treat prolapse where every patient has
22  efficacy and no complications?
23            MR. ANDERSON:  Objection to the
24  form.
25            Go ahead.

Page 226

1        THE WITNESS:  No.
2        MR. SNELL:  Okay.
3  BY MR. SNELL:
4        Q.    Patients implanted with Prolift®,
5  in general, have improvement in their PSI
6  scores; correct?
7            MR. ANDERSON:  Objection.
8            Go ahead.
9            THE WITNESS:  I can't answer
10  that.
11  BY MR. SNELL:
12       Q.    Why not?
13       A.    Because there is an extensive
14  amount of data out there that mesh
15  degradation, shrinkage, contraction, et
16  cetera, continues for years, so I cannot
17  comment what will be happening 10, 20, 30
18  years on down the road.
19            Your comment in general implies
20  51 percent, and I don't know, will we cross
21  that at some point in time.
22       Q.    Overall, patients who have been
23  implanted with Prolift® have had improvement
24  in their anatomic prolapse scoring; correct?
25            MR. ANDERSON:  Objection.

Page 227

1            Go ahead.
2            THE WITNESS:  And your
3  definition of overall is -- just so I'm
4  clear, so I'm answering your question,
5  overall means?
6  BY MR. SNELL:
7        Q.    The majority.
8        A.    The majority.
9        Q.    You've seen in the studies that
10  they identified POPQ scoring; correct?
11       A.    Yes.
12       Q.    In the prospective studies;
13  correct?
14       A.    Yes, I've seen it.
15       Q.    In the retrospective cohort
16  studies; correct?
17       A.    Yes, I have.
18       Q.    In the randomized, controlled
19  trials; correct?
20       A.    Yes, I have.
21       Q.    And overall, patients on Prolift®
22  have improvement in their anatomic prolapse
23  scoring after Prolift® implantation;
24  correct?
25            MR. ANDERSON:  Objection.

Page 228

1            Go ahead.
2            THE WITNESS:  I believe the
3  anatomic repair has been vastly and
4  incorrectly reported as being good.  And
5  then to answer your question, yes, I agree,
6  Prolift® has anatomic improvement in the
7  majority of patients.
8            MR. SNELL:  Move to strike.
9  BY MR. SNELL:
10       Q.    You would agree that Prolift® has
11  anatomic improvement in the majority of
12  patients; correct?
13            MR. ANDERSON:  Objection.
14  Asked and answered.
15            THE WITNESS:  Yes.
16  BY MR. SNELL:
17       Q.    Opinion Number 5 on Page 9,
18  Doctor.
19       A.    Yes.
20       Q.    You state, "There was no need for
21  the Prolift® system...to be sold and
22  marketed as a surgical treatment and
23  procedure for pelvic organ prolapse as there
24  were safe, effective and reasonable
25  alternative surgical treatments available at

Daniel Steven Elliott, M.D.

Page 229

1    the time," et cetera; correct?
2        A.    Yes.
3        Q.    If a surgeon has used Prolift®
4    and he or she believes that it has, in
5    general, benefitted his or her patients --
6        A.    There was no question there, was
7    there?
8        Q.    No.  I'm in the process of
9    formulating it.
10            MR. ANDERSON:  Formulating.
11            THE WITNESS:  You looked at me.
12    I thought --
13            MR. ANDERSON:  Off the record.
14            (Discussion off the record.)
15    BY MR. SNELL:
16        Q.    If a surgeon has used -- strike
17    that.
18            If a surgeon used Prolift® in
19    his or her patients and they believe that
20    Prolift®, in general, benefitted his or her
21    patients, would you be critical of that
22    surgeon's decision to continue to use
23    Prolift®?
24            MR. ANDERSON:  Objection.
25            Go ahead.

Page 230

1            THE WITNESS:  With the
2    available data present, readily present in
3    the literature, with no improvement in
4    symptomatic results, regardless of what a
5    surgeon believes, they are taking those
6    patients and increasing their potential risk
7    for devastating complications.
8            I would be very confident and
9    have at meetings stated surgeons better be
10    very, very careful in selecting these
11    individuals because they are going to be
12    damaging some people permanently.
13    BY MR. SNELL:
14        Q.    I thought we earlier agreed that,
15    in general, patients who have received
16    Prolift®, per the medical literature, do
17    receive symptomatic improvements.
18        A.    I agree with that.
19        Q.    You just made a statement that
20    there was no improvement of symptomatic
21    results in your previous answer.
22            Were you taking making some
23    type of comparison or --
24        A.    I see.
25        Q.    I just don't track you.

Page 231

1        A.    No.  I misspoke.
2            In comparison -- what I should
3    have stated in there is no symptomatic
4    improvement in comparison to traditional
5    repair.
6        Q.    Okay.
7        A.    So, yeah, that's a very good
8    pickup.
9            Yes, Prolift® has symptomatic
10    improvement but not more than traditional
11    repair.
12        Q.    You've read the Altman New
13    England Journal 2011 article involving
14    Prolift® versus anterior colporrhaphy?
15        A.    Many times, yes.
16        Q.    The primary point there was a
17    composite primary end point of POPQ
18    staging --
19        A.    That was --
20        Q.    -- and subjective reporting of
21    bulge; correct?
22        A.    That is -- I'd have to look at it
23    but, as I recall, yes, that's correct.
24        Q.    And in the Altman study Prolift®
25    was statistically significantly better than

Page 232

1    colporrhaphy in that primary composite end
2    point; correct?
3        A.    Now, is this the manuscript where
4    he states in there there was no Ethicon
5    involvement to The New England Journal of
6    Medicine editors and Ethicon employees
7    knowingly changed the document or suggested
8    to him to change the document, which to me
9    is medical fraud?
10        Q.    It's The New England Journal
11    article by Altman.  You and I know exactly
12    which one it is.
13            MR. ANDERSON:  Objection to
14    that characterization.
15    BY MR. SNELL:
16        Q.    I'm the one asking the questions,
17    Doctor, not you, so just answer my
18    questions, if you can.
19        A.    That article --
20        Q.    Let me back up and ask my
21    question because I actually didn't get an
22    answer.
23        A.    That's fine.  Sure.
24        Q.    In the Altman 2011 study Prolift®
25    was statistically significantly better than

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 233

1  colporrhaphy in the primary end point;
2  correct?
3      A.   I will politely, not to be
4  difficult, refuse to answer that question
5  because this is medical/scientific fraud.
6          Altman lied on that declaration
7  to The New England Journal of Medicine.  I
8  cannot trust any of that data on there.
9  This is based upon my experience as being an
10  editor and reviewer in eight different
11  medical journals.
12          If anybody were to know that
13  there was a lie like that, that data is
14  excluded, he would never be allowed to
15  publish in the United States.  So I cannot
16  trust that data at all, no matter what was
17  said.
18          MR. SNELL:  Objection.  Move to
19  strike.
20  BY MR. SNELL:
21      Q.   Are you aware of any changes with
22  the underlying data, with the whole, entire
23  transvaginal Nordic group during the
24  collection of that study?
25          MR. ANDERSON:  Objection.

Page 234

1          THE WITNESS:  How can -- how
2  can I trust it?  I mean, I --
3  BY MR. SNELL:
4      Q.   I'm asking you, are you aware?
5      A.   I am aware --
6          MR. ANDERSON:  Same objection.
7          THE WITNESS:  I am aware in the
8  deposition of Hinoul --
9          MR. ANDERSON:  Hinoul?
10          THE WITNESS:  -- Hinoul where
11  he describes changes that were made in the
12  manuscript.
13          I cannot trust the data and nor
14  can any urologist or gynecologist.
15          MR. SNELL:  Objection.  Move to
16  strike.
17  BY MR. SNELL:
18      Q.   So you can't answer any questions
19  about the Altman study because of this issue
20  you've identified.
21      A.   Anything I state about the data
22  in there, I can't believe that necessarily
23  that data is true.
24      Q.   So you don't believe the rate of
25  erosion in that study?

Page 235

1      A.   I don't know.
2      Q.   You don't --
3      A.   Everything is suspect.
4      Q.   You don't --
5      A.   That paper will get rejected from
6  The New England Journal of Medicine if the
7  editors find out about it.
8          MR. SNELL:  Objection.  Move to
9  strike.
10  BY MR. SNELL:
11      Q.   You're not -- you don't believe
12  the rates of complications reported in the
13  Altman study?
14      A.   How could I --
15          MR. ANDERSON:  Objection.
16  Asked and answered.
17          Go ahead.
18          THE WITNESS:  How can I trust
19  it?  Every --
20  BY MR. SNELL:
21      Q.   I'm asking you, I'm just saying,
22  it's a yes or no answer.  Either you don't
23  or you do.
24          MR. ANDERSON:  Objection.
25          THE WITNESS:  I do not trust

Page 236

1  the data.
2  BY MR. SNELL:
3      Q.   And, therefore, you're not
4  prepared to answer questions about it, other
5  than this same spiel that you've given so
6  far?
7          MR. ANDERSON:  Objection to the
8  characterization of his testimony.
9          THE WITNESS:  Yeah.  Actually,
10  I'm going to be quite offended at calling it
11  a spiel.
12          The honesty -- everything that
13  we rely upon as editors of journals and in
14  scientific publication is trusting that what
15  we are presented is accurate and truthful,
16  to the best of the author's capabilities.
17          When I read in New England
18  Journal of Medicine that he states no
19  Ethicon involvement, no employees'
20  involvement -- I'd have to get the actual
21  document and see exactly what the words were
22  saying -- then I read internal documentation
23  and Hinoul's, whatever his name is, how you
24  pronounce it, where he says there was
25  multiple changes made, which Dr. Anne Weber

Daniel Steven Elliott, M.D.

Page 237

1   in her supplemental report details
2   extensively the changes, subsequently,
3   everything is suspect. The complications
4   that -- he reports 16.9 percent erosion.
5   How do I know it's not 24? How do I know
6   it's not 5? I can't trust it.
7          MR. SNELL: Okay. Move to
8   strike.
9          MR. ANDERSON: That was your
10  question.
11         THE WITNESS: It is an issue of
12  integrity.
13  BY MR. SNELL:
14     Q.   When you said there was no
15  improvement in symptomatic results in
16  comparison to traditional repairs, are you
17  basing that on -- on Page 14, the up-to-date
18  prolapse definitions as articulated by
19  Dr. Weber?
20     A.   That was pertaining to anatomic
21  results. I have a detailed explanation in
22  my expert report, Page -- beginning on Page
23  38 where I talk about symptomatic results,
24  which spells it out in detail.
25     Q.   And just so I'm clear, too, when

Page 238

1   you talk about in comparison to traditional
2   repairs, what repairs are you referring to?
3      A.   Well, that's going to be specific
4   if we're talking about anterior Prolift® and
5   we're comparing it to anterior colporrhaphy.
6      Q.   Okay.
7      A.   If we're talking about posterior
8   colporrhaphy, then we're talking about
9   posterior Prolift®, and then total Prolift®
10  is then the various different procedures,
11  which there are going to be several in
12  there.
13     Q.   Can you give me those?
14     A.   Well, there would be sacrospinous
15  fixation, sacrocolpopexies, and then again
16  we're probably talking about the McCall's
17  culdoplasty, the Mayo culdoplasty. There's
18  other ones in there. Those are going to be
19  the major percentage-wise.
20     Q.   Is it correct that in patients
21  who have prolapse in more than just the
22  vaginal vault, if a doctor chooses to do a
23  sacrocolpopexy in the majority of cases,
24  they will also do a concomitant adjunct
25  procedure like a colporrhaphy or something

Page 239

1   else?
2      A.   Well, your question is more than
3   the vaginal vault. The vaginal vault is
4   everything. So, I mean, are you referring
5   to something else?
6          The vaginal vault is implying,
7   I mean, everything is coming on out, the
8   entire eversion of the vagina, so, by
9   definition, that's anterior, posterior and
10  apical. So are you referring to something
11  else, suggesting that I'm missing?
12     Q.   Yeah.
13     A.   I think I'm missing the question,
14  then.
15     Q.   Yeah, I think we're not
16  communicating.
17         Well, let me ask it this way:
18  Are concomitant prolapse surgeries commonly
19  done alongside a sacrocolpopexy?
20     A.   Okay. Now I understand your
21  question.
22         That depends on what you're
23  doing at the time of sacrocolpopexy.
24     Q.   Okay.
25     A.   The way I do it and those

Page 240

1   pictures that you saw were using, having
2   those anterior and posterior arms, which are
3   quite long. That way, you can elevate the
4   entire vaginal vault with that, anterior,
5   posterior, and apical.
6          There have been descriptions of
7   just putting a cap at the apex of the
8   vagina. If you do that, you will not be
9   supporting anterior or posterior, at least
10  very well.
11     Q.   Okay.
12     A.   And so then that answers your
13  question, would they do a concurrent
14  anterior/posterior colporrhaphy. I do not
15  in my practice.
16     Q.   Are you familiar with the
17  randomized, controlled trial by Withagen --
18     A.   Yes.
19     Q.   -- involving Prolift®?
20     A.   Yes.
21     Q.   And what did that study show with
22  regard to primary end point?
23     A.   I'd have to get the paper out and
24  review it.
25     Q.   Did you discuss the Withagen

Daniel Steven Elliott, M.D.

Page 241

1  paper in your report?
2      A.   Yes, I did.
3      Q.   Can you just point to me where?
4      A.   Well, it will be in here -- Page
5  38 under the subsection "Anatomic Results,"
6  the very top line, first paragraph,
7  Reference Number 40 discusses her paper.
8  And it's referencing anatomic superiority
9  over traditional repair, which there was
10  none in the paper.
11      Q.   I'm sorry. Say that again?
12      A.   Specifically, and then reading
13  directly out of my document, Page 30,
14  transvaginal mesh posterior and transvaginal
15  mesh apical POP repairs did not produce any
16  -- it says, provide any anatomic superior
17  results benefit compared to traditional
18  transvaginal non-mesh POP procedures,
19  Reference 40, which that is one of them,
20  Withagen. There's three others in there
21  that I reference.
22      Q.   The Inglesia study you referenced
23  in your --
24      A.   Yes.
25      Q.   -- report.

Page 242

1          Do you know if that study was
2  adequately powered?
3      A.   I'd have to look at it to
4  determine that.
5      Q.   Do you know what the rate of mesh
6  exposure was with the Prolift® arm?
7      A.   I -- I would have to look again
8  at it. Off the top of my head, it was like
9  15, 17 percent, something like that, and
10  then the study was terminated prior to
11  significant enrollment.
12      Q.   Do you recall what the rate of
13  suture erosion was in the other arm?
14      A.   No, I do not. I'd have to look
15  at the manuscript.
16      Q.   Do you know if the authors
17  reported a statistically significant
18  difference in the rate of mesh exposure
19  versus suture erosion in the two arms?
20      A.   Again, I'd have to look at the
21  manuscript to determine that.
22      Q.   Page 9.
23      A.   Okay.
24      Q.   Back to Paragraph 5, we were
25  talking about.

Page 243

1      A.   Okay.
2      Q.   You mentioned there's the risk of
3  serious injury.
4      A.   Yes.
5      Q.   Do you see that in Paragraph 5?
6      A.   I do.
7      Q.   Would you agree that there's a
8  potential risk of serious injury with the
9  sacrocolpopexy?
10      A.   Yes.
11      Q.   Would you agree there's a
12  potential risk of serious injury with the
13  sacrospinous ligament fixation?
14      A.   In a magnitude and frequency and
15  intensity and delayed onset difference but,
16  yes, there is risk there.
17          MR. SNELL: Move to strike.
18  BY MR. SNELL:
19      Q.   Would you agree that there's a
20  potential risk of serious injury with the
21  sacrospinous ligament fixation?
22          MR. ANDERSON: Objection.
23  Asked and answered.
24          THE WITNESS: There is -- there
25  is risk there for serious injury, yes.

Page 244

1  BY MR. SNELL:
2      Q.   Would you agree that there's a
3  risk of serious injury with colporrhaphy?
4      A.   Yes.
5      Q.   In the next paragraph, B-1 --
6      A.   Number 1? Yes.
7      Q.   Yes. On Page 9 of your report.
8      A.   Yes, I'm looking at it.
9      Q.   You say, Synthetic transvaginal
10  meshes for POP, including...
11  Prolift®...subject patients to needless
12  danger through increased risks not present
13  in traditional, non-mesh surgery."
14          Do you see that?
15      A.   Yes, I do.
16      Q.   Is that the same data set we're
17  talking about? Strike that.
18          Is that the same surgery set we
19  were referring to before, anterior/posterior
20  colporrhaphy, sacrospinous ligament,
21  sacrocolpopexy, McCall's culdoplasty, Mayo
22  culdoplasty?
23      A.   Yes. Any time I use the words
24  "traditional, non-mesh," unless we're
25  talking about a specific compartment, it

Daniel Steven Elliott, M.D.

Page 245

1  would be all inclusive.
2      Q.   And what increased risks do you
3  believe are attendant with the Prolift®
4  system as compared to traditional, non-mesh
5  surgery?
6      A.   Again, I outlined that in the
7  expert report very thoroughly, which we can
8  go through that complications section.
9      Q.   Okay.
10     A.   Go through each one.  It -- it's
11 on Page 5 of the Table of Contents.  I go
12 through the safety, which then starts on
13 Page 42 or so.  Actually, on Page 41 is the
14 introduction and then we have it all -- all
15 the subsets of impaired vaginal healing,
16 contiguous organ injury, voiding
17 dysfunction, contraction.
18     Q.   I'm sorry.  Where are you at,
19 Doctor?
20     A.   Oh, I'm sorry.  I'm just reading
21 off of the Table of Contents beginning in --
22 the text itself begins on Page 41 and then
23 I'm just reading the points because you
24 asked what was increased and so that's what
25 I was going through.

Page 246

1      Q.   Okay.
2      A.   And then I -- foreign body
3  reaction, increased foreign body reaction,
4  degradation, pain syndrome, sexual function,
5  dysfunction.
6      Q.   And is it your opinion that these
7  potential risks are increased with Prolift®
8  compared to the traditional surgical
9  repairs?
10     A.   Yes.
11     Q.   Are they statistically
12 significantly increased?
13     A.   I can't speak to statistically
14 significant.  We'd have to go to study by
15 study.
16     Q.   Have you done that?  Have you
17 done that?
18     A.   I have looked at the frequency of
19 it looking at the TVM studies, the Hinoul
20 study, the various different French group
21 studies and looked at them.
22     Q.   Have you compared them
23 statistically, though, to see if there's any
24 statistically significant difference?
25     A.   Well, there's the randomized,

Page 247

1  controlled studies by Withagen, who compares
2  the erosion rates versus the non-mesh groups
3  showing what, 16.9 percent erosion,
4  something like that, I might not be exact,
5  which is statistically significant over the
6  other groups.
7           And then we also have to
8  compare in there, you can't compare apples
9  to apples because you have like, again, the
10 severity of the problem.  Suture erosion
11 versus mesh erosion are two completely
12 separate problems.
13     Q.   In the cohort of mesh exposures
14 in Withagen do you happen to remember how
15 many of those were conservatively treated
16 with just either watchful waiting or
17 estrogen cream?
18     A.   I would have to look at the study
19 to get the specific number.  By and large,
20 it's roughly 50 percent could be treated
21 conservatively, 50 percent require surgical
22 re-operation.
23     Q.   So it's your opinion that 50
24 percent of women who have mesh exposures can
25 be treated conservatively?

Page 248

1      A.   Well, that's a rough,
2  across-the-board statement.  It's pretty
3  much -- in many of the literature, it's
4  roughly that number.
5      Q.   With regard to Prolift®, is it
6  your opinion that approximately 50 percent
7  of mesh exposures can be treated
8  conservatively?
9      A.   Correct.  And the other 50
10 percent require surgical exploration.
11     Q.   And the conservative ways of
12 treating a mesh exposure with Prolift® would
13 include just watching it and doing nothing;
14 correct?
15     A.   Yes.
16     Q.   You can use the topical
17 application of estrogen; correct?
18     A.   Yes.  As long as there's not a
19 contraindication.
20     Q.   Any other conservative way of
21 treating mesh exposure with Prolift®?
22     A.   I believe those are the two big
23 ones.
24     Q.   And of the 50 percent of patients
25 who you believe with Prolift® have to have

Daniel Steven Elliott, M.D.

Page 249

1  some type of surgical intervention for their
2  mesh exposure, a majority of them are able
3  to have the mesh excised and treated on one
4  occasion, according to the literature;
5  correct?
6      A.   I'd have to look at the
7  literature.  I don't know off the top of my
8  head the percentage that one treatment.
9  Probably many can, but I don't know of the
10  exact number.
11     Q.   Have you seen any studies on
12  Prolift® that demonstrate that a high number
13  of the patients with mesh exposure who need
14  an intervention have to undergo multiple
15  mesh revisions?
16     A.   I've seen a significant number
17  and taken care of them myself in my own
18  practice where one treatment does not do it
19  and they require multiple treatments.
20     Q.   In the literature is there a
21  number that you are aware of that you think
22  accurately describes the number of Prolift®
23  mesh exposure patients who need more than
24  one surgical procedure to excise that mesh
25  exposure?

Page 250

1      A.   I don't believe there's an
2  accurate number out there because we don't
3  know the denominator in the situation.
4      Q.   In some patients who need
5  excision for a mesh exposure is it correct
6  that the surgeon can in 10 or 15 minutes
7  perform an excision and resuture of that
8  mesh exposure?
9          MR. ANDERSON:  Objection.
10         Go ahead.
11         THE WITNESS:  It depends upon
12  the magnitude of the erosion.  So to answer
13  your question, if it were a very small
14  erosion, that possibly could be done.  If
15  it's a large erosion, it can't be done.
16  BY MR. SNELL:
17     Q.   If it's a mesh exposure of two to
18  three millimeters, would you agree that in
19  those types of mesh exposures a surgeon can
20  go in, excise that exposure and re-suture it
21  within 10 to 15 minutes?
22     A.   Too many variables in that:  The
23  patient, her degree of pain, if there's a
24  concurrent infection.  If any of those are
25  present, you would not be able to do that.

Page 251

1  If all of those are excluded, then you might
2  be able to.  So I can't give you a
3  definitive answer because, again, there's
4  too many variables.
5      Q.   How many Prolift® mesh exposures
6  have you treated?
7      A.   I wouldn't be able to break it
8  down because I have not looked at
9  specifically Prolift®.
10         In my practice, the majority
11  are Apogee®, Perigee®, Elevate®.  I think
12  that's just because of the regional
13  differences of where they're implanted.  I
14  know I've taken care of at least -- well,
15  let me back up.  Well, I cannot recall a
16  Prolift® exposure.
17     Q.   So as you sit here today in your
18  deposition, you cannot recall ever treating
19  a Prolift® mesh exposure; correct?
20     A.   I cannot recall.  It doesn't mean
21  it didn't happen, but I cannot recall it.
22     Q.   But the answer to my question is
23  correct.
24         MR. ANDERSON:  Well --
25  BY MR. SNELL:

Page 252

1      Q.   Correct, you do not recall it.
2      A.   I do not recall it, yes.
3      Q.   The majority of mesh exposures
4  that you have treated for prolapse surgeries
5  involved Apogee®, Perigee® and the Elevate®
6  products; correct?
7      A.   That is correct.
8      Q.   How many, in combination,
9  Apogee®, Perigee® and Elevate® mesh
10  exposures have you treated?
11     A.   I'm going to give you a rough
12  number:  15 to 20.
13         MR. ANDERSON:  Can I just get a
14  clarification?
15         By exposures are we including
16  erosions, extrusions?
17         MR. SNELL:  That's a good --
18         MR. ANDERSON:  Because
19  sometimes you're saying "exposure" and he's
20  answering with "erosion."  I just want to
21  make sure that the record is clear on what
22  we're all talking about.
23         Is that fair?
24         THE WITNESS:  Absolutely.
25  Yeah.

63 (Pages 249 to 252)

Daniel Steven Elliott, M.D.

Page 253

BY MR. SNELL:
1    Q.   So, Doctor, when I'm talking
2  about mesh exposures, are we communicating,
3  were you talking about the same thing --
4    A.   Yeah.
5    Q.    -- or are you talking about
6  something totally different?
7    A.   For the record, let's put it
8  down, when I hear "erosion," that means
9  perforation into an organ.  Bladder is what
10  I usually see, that's what usually gets sent
11  to me, and urethra.  Exposure and extrusion
12  are essentially going to be synonyms to me.
13    Q.   Yeah.  What I was talking about
14  is mesh exposure, and I think you and I were
15  on the same page.
16    A.   I believe so, yes.  And that
17  would -- the answer would be roughly 20
18  vaginal exposures.
19    Q.   And then the same holds true, as
20  you sit here today, you cannot recall ever
21  treating a Prolift® mesh exposure; correct?
22    A.   I cannot, no.
23    Q.   Now mesh erosion.  Have you ever
24  treated a Prolift® mesh erosion, as you have

Page 254

1  defined how you consider erosion?
2    A.   I've had to deal with roughly 15
3  or 20 mesh erosions, which that's what's
4  more commonly sent to me as opposed to the
5  gynecologists at our institution.  Which
6  ones were Prolift® versus the other ones, I
7  just can't recall because I didn't keep
8  track of that.
9    Q.   Would it be accurate that the
10  majority of mesh erosions that you have
11  treated have been Apogee®, Perigee® or
12  Elevate®?
13    A.   I can't say that because, again,
14  I don't -- I don't know --
15    Q.   Okay.
16    A.    -- which ones.
17    Q.   In the 15 to 20 cases of mesh
18  erosion that you have treated, were the
19  majority of them where the mesh eroded into
20  the bladder?
21    A.   Bladder, correct.  And then one
22  -- two that I can think of were urethral.
23    Q.    Now, when we're talking 15 to 20
24  mesh erosions, are you talking just prolapse
25  or are you including urinary incontinence

Page 255

1  meshes in there too?
2    A.   I'm including both.
3    Q.   Of the 15 to 20 mesh erosions, do
4  you know how many were for urinary
5  incontinence meshes versus prolapse mesh?
6    A.   The majority probably would be
7  for incontinence.
8    Q.   How many prolapse mesh erosions
9  have you treated?
10    A.   We're talking ten or so.
11    Q.    Now I'm confused.  You said
12  you've treated 15 to 20 mesh erosions, which
13  included prolapse and urinary incontinence;
14  correct?
15    A.   Yes.
16    Q.   And you also testified the
17  majority of those were urinary incontinence;
18  correct?
19    A.   Okay.  Yes.  Yes.
20    Q.   So --
21    A.    Well, it gets confusing because I
22  don't keep a record.
23        I can tell you I have had nine
24  where we've done laser resections of, using
25  Holmium laser when they're in the bladder or

Page 256

1  in the urethra.  I would have to review the
2  database as far as what was causing what,
3  but I don't have those records.  So that's
4  why a lot of this is I'm, you know,
5  guesstimating over five, six, seven years.
6    Q.   Uh-huh.
7    A.   So that's why there's going to be
8  a little bit of difficulty.
9    Q.   Well, is it your best estimate
10  that you've treated less than ten mesh
11  erosions specific for prolapse mesh?
12    A.   I would say it's accurate.
13    Q.   And you've treated less than ten
14  mesh erosions specific to prolapse mesh over
15  the last five to six years; correct?
16    A.   In the guess, yes.
17    Q.   And for the prolapse mesh
18  erosions, how did you go about treating
19  those, the revisions?
20    A.   If there is an isolated piece
21  within the bladder and where it is very easy
22  to get to, we will attempt to do, use a
23  laser on it to resect it to avoid the
24  morbidity of an open surgery.  If it is a
25  large area of erosion, then we'd have to do

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 257

1    that open.
2        Q.    So in your practice you attempt
3    to treat both mesh exposure and mesh erosion
4    in the most conservative manner first.
5        A.    Absolutely.
6        Q.    Are you of the opinion that every
7    case of mesh exposure, regardless how --
8    strike that.
9            There are some cases of mesh
10   exposure that are actually asymptomatic;
11   correct?
12       A.    Well, I assume so.  If they're
13   asymptomatic, we might not be seeing the
14   patient, so I don't know.  Yes.
15       Q.    You've seen it described in the
16   literature in clinical studies involving
17   Prolift® and other prolapse meshes that
18   there are mesh exposures which are
19   asymptomatic and, as described, that means
20   the patient doesn't complain of it, it is
21   detected upon vaginal examination; correct?
22       A.    Yes.
23       Q.    And are you of the opinion that
24   regardless of how small the mesh exposure
25   is, a surgeon should seek to go in and take

Page 258

1    out all the mesh?
2        A.    Take out, explant the entire
3    mesh?
4        Q.    Yes.
5        A.    I would not be of that opinion.
6    That is a very, very difficult surgery, very
7    morbid surgery.  So no.  My opinion -- and
8    this may vary from others -- you have to do
9    the -- attempt the most conservative first.
10       Q.    That makes sense; right?
11           Doctor, if you can treat it
12   with estrogen cream, why not treat it that
13   way as opposed to doing surgery on it;
14   correct?
15       A.    Yes.  The individuals I'm seeing
16   have already been treated with estrogen and
17   it's failed, so very rarely am I seeing
18   those individuals.
19       Q.    But for an individual who
20   presents with a mesh exposure and it's the
21   first-time presentation, you would agree
22   that conservative treatment is the best
23   option.
24       A.    Not necessarily.  It depends upon
25   the size of the erosion.

Page 259

1        Q.    I didn't say erosion.  Did I say
2    erosion?  I thought I said exposure.
3        A.    Okay.  Yeah.  That's -- yes.  I
4    heard "exposure," I said "erosion."
5        Q.    Let's just back up.
6            For an individual who presents
7    with a mesh exposure for the first time you
8    would agree conservative treatment is the
9    best option; correct?
10       A.    And then what I'd say is it
11   depends upon the size of the exposure, if
12   there is pelvic infection going on or not.
13           So large exposures, painful
14   patient, obvious induration of the tissues,
15   then estrogen may not be advisable.  Small
16   exposures, otherwise healthy, minimally
17   symptomatic, then yes, estrogen replacement.
18       Q.    If it's a smaller -- let's take
19   large exposures out of the picture.
20           How do you -- well, how do you
21   define large exposures?  Do you have a
22   benchmark?  More than 10 millimeters, 20
23   millimeters?
24       A.    No.  I would say in my practice,
25   if we're talking greater than one centimeter

Page 260

1    square, we are now into the larger realm.
2    And then certainly two centimeters square.
3        Q.    So this, what I've drawn, is this
4    something you would consider a large
5    exposure?
6        A.    I would consider that larger
7    because that's not the entire area of the
8    problem because underneath that bacteria has
9    gotten into the mesh.
10           So if you start exposing that,
11   you're going to have denuded, devascularized
12   vaginal mucosa.  So a one-centimeter
13   exposure, one-centimeter-square exposure,
14   visually corresponds to possibly two or
15   three centimeters of underlying degraded
16   tissue and mesh.  So that's what I'm saying
17   is you can't -- that's the tip of the
18   iceberg is the best analogy.
19       Q.    Well, is that the case in all
20   cases -- in all cases of one-centimeter
21   exposures, is it your opinion that two to
22   three centimeters of tissue below that are
23   compromised?
24       A.    No.
25       Q.    Are you aware that one-centimeter

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 261

1  exposures have been able to have been
2  treated conservatively without surgery?
3      A.   I'm also aware of --
4      Q.   That's a yes or no answer.  Give
5  me the answer and then we can talk about
6  what you're also aware of.
7          Is that correct?
8      A.   Yes.  Yes.
9      Q.   All right.  What were you about
10 to say you're also aware of?
11     A.   Okay.  What -- you have to look
12 at each individual differently.  Again, the
13 pain tolerance, the anxiety level of the
14 patient, those factors, also, the vaginal
15 exam.
16         You are absolutely correct, an
17 isolated, small, one centimeter, where the
18 tissue is growing through the mesh and you
19 can just barely feel it is one thing versus
20 another one where you can look at it,
21 there's a foul smell, the patient is very
22 uncomfortable when you touch it, and you get
23 the impression this is a bigger situation.
24 So you cannot go off of just a
25 one-centimeter-square rule.

Page 262

1      Q.   Okay.
2      A.   I'm saying we have to think about
3  all of the options when we see somebody.
4      Q.   What percent of your mesh
5  exposure cases had concomitant infection?
6      A.   We never cultured them so I
7  cannot say on that.  When you look at the
8  mesh and there's granulation tissue and the
9  mesh is exposed, that is a colonized mesh.
10 That, by very strict definition, is an
11 infected mesh.  The severity of the
12 infection may be mild.
13     Q.   So you never cultured any of
14 these mesh exposures for different types of
15 organisms --
16     A.   No.
17     Q.   -- to see the count of pathogenic
18 versus non-pathogenic bacteria?
19     A.   It will be all contaminated.  If
20 we put a probe into the vagina, it's going
21 to be contaminated because we don't know
22 what to do with those kinds of results.
23         I have done it where there's
24 tracking.  Just last week, there was
25 tracking going up the -- toward the

Page 263

1  obturator foramen, where you could actually
2  put your finger in a full digit's worth.
3  That I cultured.  I don't know what the
4  results are on it because I'm not back home.
5          So, again, there can be no
6  absolutes.  Case-by-case situation.
7      Q.   Well, in those cases of mesh
8  exposure you treated, how many of them had
9  concomitant elevations of white blood
10 counts?
11     A.   We don't routinely check a CBC
12 unless they're going to the operating room.
13     Q.   Well, I thought you said that by
14 the time, when they got to you, the majority
15 of them, you were doing some type of mesh
16 excision.
17     A.   Yes.  And then the CBC,
18 specifically the white count, is not
19 necessarily part of the routine evaluation.
20 White count is only going to be elevated if
21 we're talking about a systemic type of
22 infection.  These individuals that I have
23 dealt with have not had systemic infections.
24     Q.   So on the mesh exposure cases
25 you've treated they have not had systemic

Page 264

1  infections; correct?
2      A.   No.  They've been afebrile.
3      Q.   And they haven't had elevated
4  fevers; correct?
5      A.   That's what afebrile is.  Yeah.
6  No.  No, they have not had an elevated
7  temperature.
8      Q.   Now, for the mesh erosion cases,
9  you've said if there was an isolated piece
10 of mesh in the bladder, you would use a
11 laser to resect the mesh?
12     A.   That would be one of the options.
13 They'd have to be -- so we would attempt to
14 do that if the mesh were in an ideal
15 location, we could get to it, and it
16 appeared that we could easily resect it.
17         And that is an evolving study.
18 At this point, we have nine patients that
19 we've done that in, and we are going to be
20 attempting to publish that data or present
21 that data to AUA in 2013.
22     Q.   That is a more conservative way
23 of treating the mesh erosion, in your
24 opinion; correct?
25     A.   Correct.  Yes.

Daniel Steven Elliott, M.D.

Page 265

1    Q.   Than the open surgery; correct?
2    A.   That's correct. I have done the
3  open surgery. It is very difficult. And
4  I'm not necessarily convinced that we can
5  adequately solve the problem with that. So
6  I try -- my goal is to try as conservative
7  as possible.
8    Q.   What type of open surgery are we
9  talking about?
10    A.   Transabdominal.
11    Q.   So you make a transabdominal
12  incision so you can get to and visualize the
13  bladder --
14    A.   Yeah.
15    Q.   -- see if there's a mesh
16  exposure, mesh erosion to the bladder?
17    A.   Yeah. Mesh exposure to the
18  bladder or if there's banding also. But
19  yes, because we can't -- to do it
20  transvaginally you -- the tissues are
21  densely adherent to this mesh.
22  Transvaginally, I don't know a way of being
23  able to do that without creating a bigger
24  hole and creating a vesicovaginal fistula,
25  so that's why we attempt it

Page 266

1  transabdominally.
2    Q.   Are you aware of surgeons who --
3  strike that.
4       Are you aware of surgeons who
5  treat mesh erosions transvaginally?
6    A.   I am not aware of that. The
7  treatment as far as dealing with this --
8  just like the nomenclature of the problem is
9  evolving, I am by no means stating that the
10  way I do it is the absolute correct way. We
11  are all figuring this thing out, and that's
12  why the attendance at meetings in national,
13  international are key to talk about this.
14    Q.   So is it correct that as you sit
15  here today, you do not know how to treat a
16  mesh erosion transvaginally?
17    A.   No. I know how to -- I could do
18  it. I'm -- I can take care of vesicovaginal
19  fistulas transvaginally. I'm prepared to do
20  that.
21       I don't know of the ones that I
22  have seen that I would be able to get the
23  mesh out and get the bladder healthy, trim
24  off the ischemic or infected sections, close
25  that without injury to the ureteral orifices

Page 267

1  and then subsequently close the bladder --
2  close the vagina and hope it's going to
3  work. If somebody can do it, great. I'd
4  like to see that study and video and
5  follow-up.
6    Q.   In the mesh erosion cases that
7  you've had -- strike that.
8       In the mesh erosion cases you
9  have had involving prolapse mesh for which
10  you --
11    A.   Prolapse. Okay. Yes. I'm
12  sorry.
13    Q.   SUI on the side.
14    A.   Yeah.
15    Q.   For the mesh erosion cases you
16  have dealt with involving prolapse mesh for
17  which we agreed that it's likely less than
18  ten -- correct?
19    A.   That is correct.
20    Q.   How many of those patients had
21  systemic infections?
22    A.   None of them had clinical
23  evidence of fever to suspect that. They had
24  localized discomfort and discharge.
25    Q.   And if there was a -- if there

Page 268

1  was a mesh erosion for prolapse surgery that
2  you treated -- strike that.
3       For one of these mesh erosion
4  surgeries that you've performed regarding
5  prolapse did you attempt to remove all the
6  mesh in every case or did you start more
7  conservatively and kind of handle things as
8  they came?
9    A.   I -- first of all, I think it is
10  next to impossible to remove all of the
11  mesh, with the arms, to -- to burrow it out
12  of the muscles. Physically, that is very,
13  very difficult.
14       In comparison, a recent case of
15  a TVT® erosion, it was horribly difficult,
16  where we used big scissors to chomp the
17  thing out. And those are easy, compared to
18  pelvic organ prolapse meshes. So no, my
19  goal is not to go and get rid of all the
20  mesh. My goal is to go in there and to
21  remove what problem can be easily done.
22       And the reason is not because
23  I'm afraid of the work, it's that I'm
24  concerned that I might not solve the
25  problem, I might create more issues in

Daniel Steven Elliott, M.D.

Page 269

1  trying to deal with it.  And that's my
2  personal technique.  Others at my
3  institution have a different approach.
4      Q.    Mesh erosions from prolapse can
5  come in different sizes; correct?
6      A.    Yes.
7      Q.    Different degrees of severity;
8  correct?
9      A.    Yes.
10     Q.    And if you had a small mesh
11 erosion from a prolapse mesh, you wouldn't
12 need to remove all the mesh that had been
13 put in in the first place; correct?
14     A.    Again, you have to look at the
15 totality of the patient, what all they're
16 describing.
17         My philosophy, which is
18 specifically me, is try and do as little as
19 possible because the mesh in the belly is a
20 viper.  You start opening it up, you expose
21 more of it, spill urine on it, and you might
22 be creating more of an inflammatory
23 response.
24         So to answer your question, if
25 there's a small mesh erosion, my goal is to

Page 270

1  do as little as possible.  But I have been
2  burned doing that, also.
3      Q.    So if there's a small mesh
4  erosion, your goal is to do as little as
5  possible for treating that mesh erosion for
6  prolapse; correct?
7      A.    Again, looking at the patient in
8  the totality, what all is she describing?
9  If she's only describing voiding issues,
10 dysuria, those types of things, then, yes,
11 as little as possible.  If she is describing
12 intense pelvic pain and on pelvic exam I can
13 feel banding or folding, then I will do
14 more, maybe.  It's patient by patient.
15     Q.    It depends upon how the patient
16 presents and her symptomatology; correct?
17     A.    That is -- that is a fair
18 statement, yes.
19     Q.    And so for mesh erosion cases
20 involving prolapse you're not of the opinion
21 that the mesh needs to be taken out in every
22 case; correct?
23     A.    That is my personal opinion.
24 And, again, this is evolving.  I don't know
25 if the -- the right answer is known yet.

Page 271

1  But that is my personal opinion, yes.
2      Q.    What type of laser are you using
3  for these resections on the more
4  conservative way of treating mesh erosion?
5      A.    Holmium.  Holmium, H-O-L-I-U-M.
6      Q.    Is that the brand name or is that
7  the actual type of beam?
8      A.    No.  That's the actual beam.  I
9  don't know what company makes it.
10     Q.    How many cases of mesh
11 contraction --
12     A.    Too --
13     Q.    -- have you treated?
14     A.    Too numerous to count.  I don't
15 know.  I don't keep track.  I mean, but
16 contraction and pain and banding all in the
17 same category, and I will not even be able
18 to give you an estimate.
19         Well, I can tell you an
20 example.  The Friday before I talked to Adam
21 Slater, November 2nd, I believe, I saw five.
22 And the numbers are increasing from...
23     Q.    How many cases of mesh
24 contraction have you seen for prolapse mesh?
25     A.    That's what I'm talking about.  I

Page 272

1  mean, they're too numerous to count.  I
2  don't know.
3      Q.    When was the first case of mesh
4  contraction that you treated from a prolapse
5  mesh?
6      A.    Good question.  I don't know.  It
7  slowly started, like a snowball or whatever
8  that rolling down the hill, whatever that
9  thing is called.  I have no idea to give you
10 a fair estimate or when that began.  Because
11 it wasn't really registering.  It was an
12 isolated problem that became more and more
13 frequent.
14     Q.    As you sit here today, you're not
15 able to tell me when you first began -- when
16 you first treated a mesh contraction case
17 for Prolift®.
18     A.    No, I --
19         MR. ANDERSON:  Objection.
20         MR. SNELL:  Strike that.  That
21 was a bad question.  I got my words mixed
22 up.
23 BY MR. SNELL:
24     Q.    As you sit here today, is it
25 correct that you cannot tell me when you

Daniel Steven Elliott, M.D.

Page 273

1  first treated a case of mesh contraction
2  from prolapse mesh?
3      A.   I --
4          MR. ANDERSON:  Asked and
5  answered.
6          Go ahead.
7          THE WITNESS:  I can tell you
8  the first that I remember, which is not the
9  first case.  The first case that I remember.
10         MR. SNELL:  Okay.
11         THE WITNESS:  2009.  It was a
12 patient from Minneapolis who came down to me
13 who had a Prolift® by Dr. Kirkemo.
14         MR. SNELL:  Okay.
15         THE WITNESS:  And I can
16 remember it very clearly because I asked,
17 who did your surgery and she said
18 Dr. Kirkemo, who I knew of his name.  And
19 she says he had died.
20         And so I hadn't heard that so
21 that's why I remembered it.  And that was
22 for pelvic pain.  On exam, there was
23 contraction and banding.  And I didn't think
24 anything more of it beyond that until I got
25 involved in this and I realized that

Page 274

1  Dr. Kirkemo was still alive.
2  BY MR. SNELL:
3      Q.   So you're talking about Dr. Aaron
4  Kirkemo?
5      A.   Correct.  Yes.
6      Q.   Do you know Dr. Aaron Kirkemo?
7      A.   I have only encountered him
8  briefly at the Minnesota Urological
9  Association meeting.  I'd have to look -- I
10 don't know if it's in my CV or not -- we
11 gave a talk or sacrocolpopexy, my resident
12 did, Dr. Igor Frank, not that that's --
13 that's not pertinent.
14         And we made the comment that
15 the robotic -- the sacrocolpopexy itself
16 puts the vagina in a more normal access,
17 which is pretty much an undisputed comment
18 or conclusion.
19         And he says, "I disagree.  I
20 think sacrospinous fixation is more normal."
21         And I said, "No, there's no
22 data to support that.  It puts it off to the
23 right angle."  And that was it.
24         And so that was in 2003, 2004,
25 around that time.  So that's -- that's my

Page 275

1  only interaction that I know of as
2  encountering him, until that one patient.
3  And that was not directly with him.
4      Q.   And so you were talking about
5  sacrospinous ligament fixation that's
6  performed where the vagina is moved over to
7  anchor it towards one side of the
8  sacrospinous ligament.
9      A.   Correct.  Usually the right side,
10 just because the surgeons are, the majority,
11 right-handed.
12     Q.   As opposed to the other technique
13 where it is actually attached to both
14 sacrospinous ligaments.
15     A.   Correct.  Yes.  Which is done
16 sometimes.  But this one happened to be
17 because he was talking off of the right
18 side.
19     Q.   Were you trained on -- what's
20 that approach for the sacrospinous ligament
21 where it's attached to both sides?
22     A.   Yeah, I know what you're
23 referring to, and no, I was not.
24     Q.   That's the only time you've ever
25 spoken to or seen Dr. Kirkemo?

Page 276

1      A.   Yeah.  And I wouldn't say I was
2  necessarily speaking to him.  I was speaking
3  to the audience, addressing his comment,
4  which I didn't think was accurate, based
5  upon the medical literature.
6      Q.   Was he talking about the
7  unilateral sacrospinous ligament fixation --
8      A.   Yeah.
9      Q.   -- or the bilateral attachment?
10     A.   Unilateral.  I believe
11 unilateral.  I can't recall it specifically.
12     Q.   What about Dr. Dennis Miller; do
13 you know him?
14     A.   No, I do not.
15     Q.   Dr. Piet Hinoul, do you know him?
16     A.   No.  Never met him, either of
17 those.
18     Q.   Dr. Charlotte Owens, do you
19 know --
20     A.   No, never met her.
21     Q.   Do you know anyone from Ethicon,
22 besides this interaction you had with
23 Dr. Kirkemo, who subsequently was there?
24     A.   Yeah.  To the best of my
25 knowledge, only Dr. Kirkemo, which, again,

69 (Pages 273 to 276)

Daniel Steven Elliott, M.D.

Page 277

1  is brief.  Dr. Robinson I believe was in
2  Kansas City or something like that, so I've
3  given talks in Kansas, I believe.  I don't
4  recall exactly.  So, I mean, I could have --
5  I don't know him.
6      Q.    You don't have any specific
7  recollection of knowing him, of talking
8  with --
9      A.    None.  Absolutely not.
10     Q.    -- Dave Robinson or --
11     A.    Absolutely none.
12     Q.    Other than the one case of
13  Prolift® mesh contraction, are you aware of
14  any other mesh contraction cases you've
15  dealt with that concerned Prolift®?
16     A.    Yeah.  One recently where there
17  was banding deep into the vagina.  You could
18  feel a -- a 52-or-so-year-old woman, it was
19  actually done in the same group,
20  Dr. Kirkemo's old group, which I get a fair
21  bit of business from, and a very specific
22  band and severe dyspareunia.
23     Q.    Was that a more recent case?
24     A.    Yes.  In the past -- actually --
25  actually, it's been probably about three

Page 278

1  months, because I saw her back, and what we
2  -- we initially had success and then the
3  pain came, returned.
4      Q.    The first case that you talked
5  about of mesh contraction, were you
6  successful in treating that?
7      A.    No.
8      Q.    What was the course of that?
9      A.    Well, if you're referring to that
10 Prolift® Kirkemo patient --
11     Q.    Yes.
12     A.    -- no, I was not.  It was diffuse
13 pelvic pain.
14         The majority of what I see,
15 like those five patients just recently, is
16 this diffuse pelvic pain, which I don't have
17 any treatment for.
18     Q.    Do you refer them to anyone who
19 has treatment modalities?
20     A.    Yes.  Either our -- our pain
21 clinic, sometimes our physical medicine and
22 rehab, which deals with pelvic floor
23 myalgia, or Dr. Antolak is close, and I will
24 send it to him.
25     Q.    What's Dr. Antolak's first name?

Page 279

1      A.    Stanley.
2      Q.    What type of doctor is he?
3      A.    He -- well, he's a urologist and
4  he was at Mayo and specializes in pelvic
5  pain, and then he retired and then restarted
6  practice up in the Minneapolis area.  So if
7  you -- if you -- just so we're clear, I do
8  know him quite well.  He is -- has given a
9  deposition in I believe Gross's or Wicker's.
10     Q.    Okay.
11     A.    So I do know -- I have not
12 personally spoken with him in four or five
13 years but I do know him quite well from my
14 work at Mayo.
15     Q.    And you say he used to be at Mayo
16 but now he's where?
17     A.    Minneapolis area.  And he runs
18 the -- I think it's called the Midwest
19 Pelvic Pain Clinic or something like that.
20 It's -- it's some variant of that.  And so
21 if the patient is from the Minneapolis area
22 and there's nothing I can do, frequently,
23 I'll send it to him.
24     Q.    Mayo Pelvic Pain Clinic actually
25 collects data on how successful they are in

Page 280

1  treating pain syndromes; correct?
2      A.    Well, they don't have a pelvic
3  pain clinic, that I'm aware of.  They have a
4  pain clinic.
5      Q.    I thought that's what I said.
6      A.    You said --
7      Q.    Oh, you're right.  You're right.
8  You're right.  Let me rephrase it because I
9  didn't mean to say that.
10         The Mayo Pain Clinic actually
11 collects data on how successful they are in
12 the outcomes of things such as lessening
13 patients' pain; correct?
14     A.    I -- I -- not to be difficult, I
15 have no idea if they do or not.
16     Q.    Would it surprise you that over
17 75 percent of the patients treated at the
18 Mayo Pain clinic report improvements in
19 their pain symptomatology?
20     A.    Yeah.  Improvement doesn't mean a
21 whole lot to me because improvement could be
22 pain going from a seven to a six,
23 statistically improved, significant but
24 clinically not significant.
25     Q.    So as you sit here today, do you

Daniel Steven Elliott, M.D.

Page 281

1  know whether Mayo Clinic's Pain Clinic
2  offers treatment for patients which is
3  statistically significant but not clinically
4  significant?
5      A.    No, that's not what I said.  I'm
6  just saying improvement in pain is good, but
7  is it good enough?  And I don't know.  I
8  have not seen or talked to anybody in the
9  clinic of what their results are.
10      Q.    You haven't looked at their
11  Website to see what the Mayo Clinic, pain
12  clinic, reports as their rates of success
13  for outcomes?
14      A.    No, I have not.
15      Q.    When you refer your patients to
16  the pain clinic at the Mayo Clinic, why do
17  you make those referrals?
18      A.    Because there's nothing I can do
19  for them, and we're trying to help the
20  individual out in any way we can.
21      Q.    Well, would you agree that
22  actually sending them to the pain clinic
23  first instead of doing surgery on them is a
24  more conservative approach to treating their
25  pain syndrome?

Page 282

1      A.    If they have banding in the
2  vagina where I can actually palpate it, I
3  touch it and the woman literally screams,
4  then I don't believe any physical therapy is
5  going to be resolving that.  If they have
6  diffuse pelvic discomfort with movement,
7  doing anything, then, by all means, you're
8  right, I send them to the pain clinic, if
9  they can get in.
10      Q.    If they have banding in the
11  vagina, you've seen it reported in the
12  literature that in many cases that can be
13  successfully treated by releasing the band;
14  correct?
15          MR. ANDERSON:  Objection.
16          Go ahead.
17          THE WITNESS:  Yeah.  Yeah.
18  That's why I do it.
19  BY MR. SNELL:
20      Q.    And that's how you treat the
21  cases where there is banding.  You attempt
22  to go in and release that band that's in
23  tension; correct?
24      A.    Correct.  And that is a very
25  specific situation where on pelvic exam I

Page 283

1  can touch the specific area, you can feel
2  it, it's like a rope, and other places it's
3  not that way.  And then I do that.  I try
4  and -- I cut it and resect as much of the
5  mesh as I can to hope to reduce that
6  tension.
7      Q.    So when there's a band, you cut
8  it and resect the mesh in that particular
9  area; correct?
10      A.    Only that particular area.
11  Correct.
12      Q.    You're not a doctor or surgeon
13  who goes in and removes mesh over in another
14  part of the vagina that's not banded and is
15  not symptomatic upon examination; correct?
16      A.    That is correct.  If it ain't
17  broke, I don't go over there.
18      Q.    And in many cases you've been
19  able to release that band and alleviate the
20  painful response; correct?
21      A.    Temporarily.  I'd have to say
22  that, again, I have not statistically
23  analyzed this.  I've had very good results
24  for a week or two and the woman -- the last
25  one I mentioned roughly three months ago

Page 284

1  came back and the pain is back.  So it's
2  very frustrating for everybody.
3      Q.    You've had cases where there has
4  been specific banding to one area of the
5  vagina and you released that band and that
6  has resulted in a positive outcome for the
7  patient; correct?
8          MR. ANDERSON:  Objection.
9  Asked and answered.
10          Go ahead.
11          THE WITNESS:  Yes.  But you
12  have to put the qualifier in there,
13  temporarily.
14  BY MR. SNELL:
15      Q.    In every case in which you've
16  done a band release is it your testimony
17  that in every one of those cases they have
18  had further pain?
19          MR. ANDERSON:  Objection.
20          Go ahead.
21          THE WITNESS:  No.  Without
22  really looking at the data closer, because I
23  don't have that tabulated, I have to go on a
24  gut feeling on it, which is not a very
25  accurate way of looking at this problem.

71 (Pages 281 to 284)

Daniel Steven Elliott, M.D.

Page 285

1 I would say some are improved
2 and they have not come back. See, if they
3 don't come back, I've kind of forgotten
4 about them. So what I do is I see the ones
5 who do come back, so they stick out in your
6 mind more.
7 BY MR. SNELL:
8 Q. So in some of your patients who
9 have had banding in the vagina you've been
10 able to release that banding and it has
11 alleviated their pain --
12 A. But --
13 Q. -- such that they have not come
14 back to you; correct?
15 A. That -- I can't answer --
16 MR. ANDERSON: Objection.
17 Go ahead.
18 THE WITNESS: I can't answer
19 that because they have not come back to me.
20 BY MR. SNELL:
21 Q. Well, that's what I'm qualifying.
22 A. No. That may mean they've gone
23 to a different doctor.
24 Q. All right. I've got you.
25 A. So that's why I can't -- I can't

Page 286

1 be statistically --
2 Q. How about this? In some of your
3 patients who have had banding in their
4 vagina for which you've gone in and released
5 the band, they have come back to you and
6 they have reported improvements; correct?
7 A. No.
8 Q. No?
9 A. They come back to me -- they've
10 come back to me and said, I was good for a
11 while and it is now back.
12 Q. I think I'm getting confused now.
13 Patient has a band.
14 A. Uh-huh. Yes.
15 Q. You decide I need to release that
16 band. You do that procedure; correct?
17 A. Yes.
18 Q. We're together.
19 A. Yes.
20 Q. Do you ask those patients to come
21 back for postoperative follow-up or do you
22 just send them on their way?
23 A. We ask them -- well, to say to
24 send them on their way sounds very cruel.
25 What we do is say we have treated this --

Page 287

1 Q. Okay.
2 A. -- we have cut this. If you are
3 -- if you have problems, you come back and
4 see us.
5 Q. Okay.
6 A. If you're doing fine, there's no
7 reason for you to come back and see me for
8 me to tell you you're doing fine because my
9 practice is set up such that I have people
10 all over the world.
11 I cannot have somebody from
12 Florida fly back for five minutes for me to
13 say, oh, good, you're happy, go back home.
14 Then I have an angry person on my hands. So
15 my practice will not necessarily reflect
16 other people's practices.
17 Q. I understand.
18 So you have -- all right. Let
19 me see.
20 So after you -- you've treated
21 patients by releasing the band in surgery;
22 correct?
23 A. Yes.
24 Q. And you told them, if you have
25 any problems, come back to me; correct?

Page 288

1 A. Correct.
2 Q. And you told them, if you're
3 doing fine, you don't need to come back to
4 me; correct?
5 A. Yes.
6 Q. And you would agree that there
7 are patients who have not come back to you;
8 correct?
9 A. Yes. That is correct.
10 Q. Do you expect patients to follow
11 your recommendations?
12 MR. ANDERSON: Objection.
13 Go ahead.
14 THE WITNESS: I would hope they
15 would follow my instructions.
16 BY MR. SNELL:
17 Q. If you told a patient they should
18 go to the pain clinic at the Mayo Clinic,
19 would you expect them to go?
20 A. Not necessarily. I have lots of
21 instructions. Patients get overwhelmed,
22 they're under stress, they're worried. They
23 probably only hear a fraction of what I
24 say. That's why I tend to write things down
25 for them. I go over it. And there is

Daniel Steven Elliott, M.D.

Page 289

1 always going to be a concern of
2 communication issues.
3         If you have somebody who's in
4 an intense amount of pain and crying in your
5 office, which happens on a daily basis for
6 me, they might not necessarily retain
7 everything I say. Now, I'm quite cognizant
8 of that.
9     Q.    That's why you give them written
10 referrals; correct?
11     A.    That's why we -- a copy of my
12 notes always go to them and to their doctor
13 back home.
14     Q.    That's why if you make a referral
15 to the Mayo Pain Clinic, sometimes you'll
16 have the pain clinic contact the -- contact
17 the patient to see if they are going to
18 follow that recommendation; correct?
19     A.    I can't say that because the
20 problem with our pain clinic is they can be
21 out months. So if a patient is in my
22 office, I put an order through for it and a
23 patient is from a long ways away or has
24 family, they can't make it to it. Because
25 it's not like a same-day service. And they

Page 290

1 can't travel -- if you're in the Dakotas,
2 the Dakotas are huge states. You can be 14
3 hours away and still be in one of the
4 Dakotas. And you can't make that trip back.
5     Q.    Besides the two cases of Prolift®
6 mesh contraction that you've recalled, do
7 you recall any others specific to Prolift®?
8     A.    I don't recall any, no.
9     Q.    I'm not sure if I asked this, but
10 for prolapse-specific mesh contraction was
11 the first case that you remember the 2009
12 case?
13     A.    There were --
14     Q.    Was that the first Prolift®
15 prolapse cases?
16     A.    No. There were more before then,
17 but it's a blur. That's the 2009 one, it's
18 just because that happened to be very
19 significant with Kirkemo's death, which was
20 not accurate.
21         MR. ANDERSON: Greatly
22 exaggerated?
23         THE WITNESS: Yeah. That's
24 right.
25         MR. ANDERSON: Can we take a

Page 291

1 break here in a couple of minutes? We've
2 been going for an hour and a half.
3         MR. SNELL: Oh, yeah. Yes.
4 BY MR. SNELL:
5     Q.    In the past year, can you give me
6 an estimate as to the number of mesh
7 contraction cases you have treated for
8 prolapse?
9     A.    It's difficult to ascertain. The
10 only reason, I'm not trying to be difficult
11 as far as answering your question, because
12 in August, when that FDA report came out, I
13 believe it was at -- well, whenever it was.
14 I think it was in August.
15         It was in August when that FDA
16 announcement came out about pelvic organ
17 prolapse meshes, and then in September when
18 I had a document with Public Citizen, Ralph
19 Nader's group, read, the number of my
20 consults started to rapidly rise and the
21 telephone calls.
22         And so I can give you an idea
23 of the number of telephone calls or requests
24 for consultation per week are roughly three
25 or four, maybe, per week. How many of those

Page 292

1 actually make it into my clinic is going to
2 be in a given week probably five a week.
3         And that's a really tough guess
4 because sometimes there's going to be a
5 whole bunch and sometimes there's going to
6 be none.
7         MR. SNELL: Okay. Take a
8 break.
9         (Recess, 6:06-6:19 p.m.)
10 BY MR. SNELL:
11     Q.    Ready to go?
12     A.    Yes, sir.
13     Q.    You're aware that Prolene has
14 been used for about half a century?
15     A.    Since 1958, as I recall.
16     Q.    Have you used Prolene sutures in
17 your surgeries?
18     A.    Rarely. Yes.
19     Q.    Do you use different types of
20 sutures for different surgeries?
21     A.    Yes.
22     Q.    In the 1950s, surgical meshes for
23 hernia repairs were introduced; correct?
24     A.    Yes.
25     Q.    In around the 1970s, surgical

73 (Pages 289 to 292)

Daniel Steven Elliott, M.D.

Page 293

1  mesh was used to treat prolapse via the
2  abdominal sacrocolpopexy; correct?
3      A.   I don't know when it was started
4  using there.  And that sounds roughly the
5  right time frame.
6      Q.   In the 1990s, vaginal mesh was
7  used to treat prolapse via the transvaginal
8  route; correct?
9      A.   Mesh, transvaginal, in the 1990s.
10  I was unaware of that.  The only ones I know
11  about is the French group, and I don't know
12  when they started.
13      Q.   So you're not aware of when the
14  French TVM group began looking at meshes to
15  use in the TVM study?
16      A.   No.  What I know is some of their
17  original studies and discussions, I saw one
18  paper in I believe 2001, 2002, talking about
19  the hypothesis or the possibility of doing
20  this.  So when they actually began, we'd
21  have to predate that, which would be the
22  late '90s.
23      Q.   One of your criticisms of the
24  Prolift® is that -- and any transvaginal
25  mesh for pelvic organ prolapse is that it's

Page 294

1  placed through the vagina; correct?
2      A.   Correct.
3      Q.   And as you opine, the vagina is a
4  contaminated environment.
5      A.   Clean contaminated, which was
6  supported by the depositions of Hinoul and
7  Robinson and others.
8      Q.   So it would be accurate that the
9  vagina is a clean contaminated environment?
10      A.   At the time of surgery it's a
11  clean contaminated.
12      Q.   Tell me what you mean by that.
13      A.   That means that it -- you can
14  prep the vagina -- it has to be -- well,
15  let's back up.  Let's go back to the
16  contrast to say like an abdominal procedure
17  where you can place Betadine and other
18  substances, alcohol, those types of things,
19  and get the bacterial count markedly down to
20  as close to zero as possible for a time.
21          Orifice surgery, as we call it,
22  whether it be mouth, ears -- maybe I
23  shouldn't say ears, the ENT people would
24  probably disagree with that -- vagina or
25  rectum, bowel surgery, you can never even

Page 295

1  remotely get them sterile.  You can just get
2  them clean.  You can decrease the bacterial
3  count but it's still a contaminated field.
4      Q.   For the abdomen, you can get the
5  bacterial count down but not totally wipe it
6  out; correct?
7      A.   No.  You can -- I've done one
8  study as far as in artificial sphincters,
9  that's a treatment for male incontinence,
10  where we would have the patient with an
11  antibiotic scrub for several days, then we'd
12  do a ten-minute prep, and then we'd culture
13  the skin at the time of surgery, and the
14  bacterial count was essentially zero in most
15  individuals.
16          So the bacteria will come
17  back.  And then you can also on the abdomen,
18  especially if you're using prosthetics, put
19  down -- gosh, what do you call it?  There's
20  a name, a plastic cover that sticks to the
21  body that you cut into so that the skin is
22  not exposed at all.  So you can have it be a
23  sterile environment.
24      Q.   For the sacrocolpopexy?
25      A.   You could do it for the

Page 296

1  sacrocolpopexy.  I don't.
2      Q.   Do you do it at Mayo Clinic as
3  standard treatment, to put this plastic
4  covering on the body?
5      A.   No.  But the hernia surgeons do
6  it for the meshes.
7      Q.   But for your sacrocolpopexies do
8  you do it?
9      A.   No.
10      Q.   And when you do a sacral --
11  abdominal sacrocolpopexy, are you saying you
12  put like Betadine and stuff on the stomach
13  where you're going to make your incision?
14      A.   That's correct.  There's a
15  standard prep we do, which is a ten-minute
16  Betadine prep, followed by waiting five or
17  six minutes, something, there's a certain
18  waiting time that my surgical team does,
19  that they have to let it dry.  In the
20  process, that theoretically decreases the
21  bacterial count as much as possible.
22      Q.   Does it reduce it all the way
23  down to zero?
24      A.   I have not studied it.
25      Q.   Have you studied for how long

Daniel Steven Elliott, M.D.

Page 297

1  that bacterial -- what do you call it,
2  Doctor, where it brings the bacterial count
3  down?  Bacterial reduction?
4      A.   Well, bacterial count.
5      Q.   Bacterial count reduction?
6      A.  I have --
7      Q.   Let me just get the question
8  because I just want to make sure I'm not
9  using terminology that's crazy.
10        Do you know for how long with
11 the Betadine prep that you've identified
12 that is effective in reducing the bacterial
13 count?
14     A.   All I can correlate with that is
15 studies that I've done with the artificial
16 sphincter, which is roughly a 45-minute to
17 hour-long case, we compare the culture at
18 the beginning and the end.  There are
19 studies out there specifically in ortho, in
20 ortho hip surgery, where they would culture
21 the skin repeatedly.  I don't know that
22 data, though.
23     Q.   Do you know data, though, for
24 prolapse surgery like the sacrocolpopexy,
25 for how long the bacterial count is reduced?

Page 298

1      A.   No, I do not.
2      Q.   And your sacrocolpopexies take
3  more than 45 minutes; correct?
4      A.   Yes.
5      Q.   They take more than 60 minutes;
6  correct?
7      A.   Yes.
8      Q.   Some of your sacrocolpopexies
9  take more than three hours; correct?
10     A.   The open sacrocolpopexies?  They
11 may have.  I don't recall them taking that
12 long.
13     Q.   There's a risk of infection with
14 the robotic laparoscopic sacrocolpopexy as
15 well; correct?
16     A.   It is a very, very small.  In our
17 series we have never had one because the
18 mesh is taken out of the box and immediately
19 put through the ports, never has any contact
20 with the skin, has only sterile gloves on
21 it, and it's put inside the patient.  So
22 unless there's any contamination from a
23 bowel injury, which we've never had, the
24 mesh never has contact with bacteria.
25     Q.   Have you done any studies or

Page 299

1  culturing of the mesh which shows that it
2  has no bacteria on it at the time when you
3  place it in your robotic laparoscopic
4  sacrocolpopexy?
5      A.   No.
6      Q.   The ports you make into the
7  lady's abdomen for the robotic laparoscopic
8  sacrocolpopexy, those ports exist from the
9  outside skin down into the peritoneal
10 cavity?
11     A.   Correct.
12     Q.   And how do you prep those ports?
13     A.   That's with the standard Betadine
14 prep at the beginning of the case.
15     Q.   And so is it fair to say you do
16 not know how much of the bacterial count is
17 reduced for your robotic laparoscopic
18 sacrocolpopexies two hours into the
19 procedure?
20     A.   There's no way to prove a
21 hypothesis that it is still at a low level.
22     Q.   What studies, if any, do you rely
23 upon that show a higher rate of systemic
24 infection with Prolift® as opposed to other
25 prolapse surgeries?

Page 300

1      A.   Your question as asked, I am
2  unaware of any higher incidence of systemic
3  infections.
4      Q.   Next question:  What studies, if
5  any, do you rely upon which show a
6  statistically significantly higher rate of
7  infection for Prolift® versus other forms of
8  prolapse surgery?
9      A.   I'll go to my Exhibit B.  I have
10 a section on infection; however, briefly,
11 Number 53, de Tayrac, Letouzey --
12     Q.   Let me just get to you.  I'm
13 sorry.
14     A.   De Tayrac, Letouzey, "Basic
15 Science and Clinical Aspects of Mesh
16 Infection in Pelvic Floor Reconstruction."
17     Q.   Oh.  Page 53.
18     A.   Oh, I'm sorry.  I'm sorry.
19     Q.   I was looking at Reference 53.
20     A.   Exhibit B, I believe.  Yeah,
21 Exhibit B.
22        MR. ANDERSON:  Reference 53, if
23 you look in the back.
24        THE WITNESS:  Oh, I'm sorry.
25        MR. ANDERSON:  Well, what do

Daniel Steven Elliott, M.D.

Page 301

1  you have?  I say look at the back.
2         THE WITNESS:  The Exhibit B,
3  the reference material.
4         MR. SNELL:  Okay.
5         THE WITNESS:  Number 53.  I'm
6  sorry.
7         MR. SNELL:  I don't know if I
8  have it.  Maybe I do have it.
9  BY MR. SNELL:
10     Q.   Is this the materials list that
11  was served in connection with your June
12  15th, 2012, report, Doctor?
13     A.   Correct.
14     Q.   I'm having trouble putting my
15  hands on it.
16     A.   I can actually show you.
17     Q.   I don't want you to show me
18  anything that Mr. Anderson secretly marked
19  on there.
20     A.   No, there's nothing marked.
21         Number 53 -- let's go back to
22  what the question was.
23     Q.   The question was --
24         MR. SNELL:  Actually, Madam
25  Court Reporter, can you read it back to the

Page 302

1  doctor?
2         (The court reporter read back
3  the requested portion of the record.)
4         MR. SNELL:  That was actually
5  not the question I wanted.
6         THE WITNESS:  Start over.
7         MR. SNELL:  Now that I hear it.
8  BY MR. SNELL:
9     Q.   What clinical studies in humans
10  do you rely upon which show a statistically
11  significant higher rate of infection with
12  Prolift® versus other prolapse surgeries?
13     A.   Well, I have to go with that
14  Number 53 there.
15     Q.   Number 53?
16     A.   De Tayrac, talking about
17  infections in the pelvic reconstructions.
18  And you'd have to then compare it to other
19  standard procedures out there.
20         We could use Withagen's as one,
21  that randomized, control, because infections
22  in the traditional repair are very uncommon
23  because you're not putting a foreign body
24  in.  Any surgery with a foreign body is

Page 303

1  going to be increasing the risk, whether it
2  be in eye, hip, whatever.  And so that de
3  Tayrac one is one that I think was a very
4  eloquently written paper on infection in the
5  meshes.
6     Q.   That's not a clinical study;
7  correct?
8     A.   Then Withagen.
9     Q.   And it's your -- in Withagen was
10  there an increased rate of abscess with
11  Prolift® versus the traditional arm?
12     A.   Let's -- well, let's get the
13  Withagen paper out and we'll go over it.
14     Q.   I'll get that.  We'll go over it
15  tomorrow.  Is that fair?  I don't have it on
16  me right here.  I have it out in my car, but
17  I have to make a copy.  So Withagen.
18     A.   That's fine.
19         But you're limiting it to
20  abscess.  Multiple depositions I've read,
21  they keep talking about abscess, abscess,
22  abscess.  Those are pyogenic bacteria.  Not
23  all bacteria are pyogenic.  Candida albicans
24  is not a pyogenic infection.  Pyogenic is
25  what forms pus.

Page 304

1         The one patient I talk about
2  that had an infection after the mesh, okay,
3  she had a diffuse cellulitis.  It was a
4  Strep. infection.  So if I relied on abscess
5  and I said, oh, no abscess, you're not
6  infected, that's incorrect.
7     Q.   So other than the Withagen paper,
8  you've mentioned a bacteria, you say Candida
9  albicans?
10     A.   Candida albicans.  It's a fungal
11  infection.  A fungus.  Excuse me.  Yeah,
12  it's a fungus located in the vagina.
13     Q.   Is it pathogenic such that it
14  causes complications?
15     A.   No.  It's a normal -- part of the
16  normal flora.  And there are papers in my
17  supplement referring to the normal bio --
18  excuse me -- the normal flora of the vagina,
19  so that the vagina is -- has a large number
20  of multiple different types of bacteria that
21  are present within it.
22     Q.   Some of which are pathogenic,
23  some of which are non-pathogenic; correct?
24     A.   No.
25     Q.   No?

Daniel Steven Elliott, M.D.

Page 305

1     A.   No.  I mean, just because --
2   there's bacteria on your skin.  It's not
3   pathogenic until you cut it and it gets in
4   there.  Okay.  It's just there.  It's a
5   colonization is the best way to say it.
6          There are billions, literally,
7   in the colon.  It's not a problem unless you
8   perforate your colon.  So it has to be --
9   you have to look in that frame of reference.
10          Specifically in the vagina,
11  which the vagina is unique, is the presence
12  of the Candida albicans and the other
13  variants of the fungi.
14     Q.   So if the Candida albicans gets
15  on a mesh during transvaginal placement,
16  what's the result, if any, from an infection
17  standpoint?
18     A.   That would be a great one for the
19  Ethicon to have studied.  And I saw nothing
20  in their documentations, no deposition of
21  anybody ever considering that.
22          Everybody knows women can get
23  yeast infections because why?  Candida
24  albicans.  But I never saw anybody take the
25  time to think, oh, no, what happens if this

Page 306

1   gets attached to the mesh put inside the
2   body.  It can be devastating, potentially.
3      Q.   Have you ever done any studies on
4   Candida albicans?
5      A.   No.
6      Q.   Besides the Withagen study, are
7   you aware of any other studies upon which
8   you rely that show, clinical studies, that
9   show a statistically significant increased
10  risk of infection with Prolift® versus some
11  other prolapse surgery?
12     A.   Iglesia.
13     Q.   It's your opinion that there were
14  more infections in Iglesia than -- in the
15  Prolift® arm than the native repair arm?
16     A.   I have to look at the --
17  infection of a mesh can manifest itself in
18  multiple different ways, which one of the
19  own TVM surgeons talk about that possibly
20  infection can increase your risk for
21  erosion.  So in the Inglesia study that had
22  a significant amount of erosions, which
23  ultimately prompted them to stop the study.
24  Correlating that with the TVM de Tayrac, you
25  could theorize then that possibly that

Page 307

1   infection led to their erosions, at least in
2   part.
3      Q.   I don't really want theory.  I
4   want what you're going to testify to to a
5   reasonable degree of medical certainty --
6      A.   I just --
7      Q.   -- at the time of trial.
8          Are you going to say that the
9   15 percent erosions in Iglesia, all of those
10  patients had concomitant infection?
11     A.   That's not what I said.
12     Q.   Do you believe all 15 percent --
13  do you believe all of the erosion cases in
14  the Iglesia study had concomitant infection?
15     A.   That's not what I said.
16     Q.   I'm asking what you believe.  I
17  know that's not what you've said or that's
18  not how we're interpreting each other.  I'm
19  asking you if you believe that.
20     A.   Well, I --
21     Q.   If you're going to come into
22  court at trial and say, those people who had
23  mesh exposures in the Prolift® arm in the
24  Iglesia study all had infections.
25     A.   Here's what -- exactly what I

Page 308

1   will say --
2      Q.   Okay.
3      A.   -- with scientific data to back
4   me up, that a TVM surgeon, highly
5   experienced in Prolift® and Gynemesh®,
6   states in a paper that erosion can possibly
7   be caused by infection.
8          I will then say that the vagina
9   is a clean contaminated environment.  It
10  cannot -- physically impossible to be
11  sterilized.  So, therefore, every time there
12  is an erosion -- excuse me -- extrusion or
13  possibly erosion, contamination and
14  infection can specifically be playing a
15  significant role.  That's what I'll say on
16  the stand, which, according to Hinoul's,
17  Hinoul --
18          MR. ANDERSON:  Hinoul.
19          THE WITNESS:  -- Hinoul's
20  deposition, he stated he knew, Ethicon knew,
21  every possible complication prior to launch;
22  therefore, they knew this was a risk.
23  BY MR. SNELL:
24     Q.   They knew that mesh exposure was
25  a risk?  Is that what you're going to come

Daniel Steven Elliott, M.D.

Page 309

1 in and say?
2      A.    Mesh exposure is a risk?  Yes,
3 they knew that.
4      Q.    They knew that infection was a
5 potential risk.  Is that what you're going
6 to come in and say?
7      A.    Yes.
8      Q.    Who's this TVM surgeon you're
9 referring to?
10      A.    De Tayrac.  He's Number 53 there.
11      Q.    So you believe that de Tayrac was
12 one of the TVM group.
13      A.    No.  I believe I've seen his name
14 in some of the French studies on Gynemesh®.
15 I don't know -- I have not looked at, at
16 least I can't recall, all of the specific
17 TVM surgeons.
18      Q.    And because this surgeon said
19 that erosion can possibly be caused by
20 infection, you will extrapolate that
21 statement by a single physician to your
22 opinion that every time there is an erosion,
23 contamination and infection can specifically
24 be playing a significant role.
25           MR. ANDERSON:  Objection.

Page 310

1 Misstates prior testimony.
2 BY MR. SNELL:
3      Q.    Is that correct?
4           MR. ANDERSON:  Objection.
5 Misstates prior testimony.
6           THE WITNESS:  Well, no.  We can
7 go to Number 69 on there.
8           MR. SNELL:  Okay.
9           THE WITNESS:  Is that --
10 BY MR. SNELL:
11      Q.    That's Falagas?
12      A.    Falagas.
13           There's Number 121, which is
14 M-A-M-Y.  All of which are stating and
15 theorizing the possibilities of infections
16 and the consequences of infections, which
17 erosions are.
18      Q.    So 69, Falagas, and what was the
19 next one?
20      A.    121, I believe, M-A-M-Y.
21           And the other one would be
22 general surgery in my supplemental report.
23 Her name -- I think it's a her.  C-H-O-I.
24 That is general surgery looking at clean
25 contaminated wounds in general surgery

Page 311

1 markedly increasing the risk of
2 complications.
3           So I'm -- I'm talking -- you
4 asked me specifically, as I told you, a few.
5 We could go point by point through my report
6 for more.
7      Q.    I'm not sure if we're
8 communicating.
9           What I'm actually looking for
10 is clinical data where there were higher
11 rates of infection with the Prolift® versus
12 some other prolapse procedure, not theory,
13 not what some doctor said in France or what
14 some surgeon said based upon bench research.
15 I'm talking about clinical data from a
16 study, retrospective, prospective,
17 randomized, controlled trial.  That's what
18 I'm looking for.
19      A.    Okay.
20           MR. ANDERSON:  Objection.
21           If that's how you're defining
22 clinical data, that's the first time that
23 you've done that.  Before, you just said
24 clinical data.
25           MR. SNELL:  I thought I said

Page 312

1 clinical study data, clinical trial data.
2           MR. ANDERSON:  Well, you
3 didn't.  So that does change the question.
4 Is that your question?
5           MR. SNELL:  Yes.
6           MR. ANDERSON:  How many --
7 clinical trial data regarding this
8 statistically significant increase in
9 infection with Prolift® versus a
10 non-surgical -- non-transvaginal mesh
11 repair.
12           MR. SNELL:  Non-traditional.
13           MR. ANDERSON:  Okay.  Okay.
14           MR. SNELL:  Let me say it.  I
15 mean, you were pretty good there.
16           MR. ANDERSON:  I'm just trying
17 to make sure I understand it.
18           MR. SNELL:  No.  You were
19 pretty good there, actually.
20           MR. ANDERSON:  I think it's
21 really good myself but, you know.
22 BY MR. SNELL:
23      Q.    So are you aware of clinical
24 trial data that shows a statistically
25 significant increased risk with Prolift®

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 313

1 versus some other type of prolapse repair
2 surgery that you relied upon, with the
3 caveat that when I say clinical trial data,
4 I mean data in humans from retrospective,
5 prospective, clinical studies and/or
6 randomized, controlled trials.
7         MR. ANDERSON:  Objection.
8 Asked and answered to some extent of the
9 ones he's already mentioned.
10         Go ahead.
11         THE WITNESS:  I am physically
12 incapable of thinking into a putting up all
13 these borders and definition of data.
14         If you exclude volumes of data,
15 say, oh, no, we're not talking about de
16 Tayrac, Letouzey, not Letouzey, the other
17 ones, just a specific clinical study that
18 looked only at infection, by that
19 definition, no, I cannot.  But I think that
20 is academically, intellectually incompetent
21 and wrong.  You have to look at the totality
22 of knowledge and not narrow it.
23         (Discussion off the record.)
24 BY MR. SNELL:
25     Q.    Doctor, some of the articles you

Page 314

1 cite to in your expert report and materials
2 list involve the abdominal sacrocolpopexy;
3 correct?
4     A.    I'd have to look back.  I don't
5 -- I don't -- I'm sure I would have included
6 it in there because I'm looking at all of it
7 but I don't recall off the top of my head.
8     Q.    You would agree, Doctor, that in
9 clinical studies looking at
10 sacrocolpopexy -- and I'm talking about the
11 open abdominal sacrocolpopexy and
12 laparoscopic sacrocolpopexy.  Are we
13 together?
14     A.    Yes.  Is that including robotics?
15     Q.    I'm setting aside your robotics.
16     A.    Laparoscopic.  Okay.
17     Q.    So you would agree that in
18 studies involving open abdominal and
19 laparoscopic sacrocolpopexy, as I've defined
20 it, some of those patients also have
21 hysterectomies at the time of the surgery;
22 correct?
23     A.    That is correct.
24     Q.    And you would agree that the
25 vagina would be exposed to these same

Page 315

1 bacterium -- strike that.
2         You would agree that the
3 abdomen and the peritoneal cavity would be
4 exposed to these same bacteria from the
5 vagina if a hysterectomy is done at the time
6 of a sacrocolpopexy; correct?
7     A.    Then you have the ability to wash
8 it out.
9     Q.    Let's just answer my question
10 first and then we can get into washing.
11     A.    Yes.
12     Q.    When a hysterectomy is done at
13 the time of an abdominal sacrocolpopexy, the
14 bacteria from the vagina can get into the
15 peritoneal cavity; correct?
16     A.    Yes.
17     Q.    Any time there is a fresh
18 incision to the cuff where the uterus was at
19 the time of an abdominal sacrocolpopexy,
20 those vaginal organisms can get into the
21 abdominal cavity; correct?
22     A.    Yes.
23     Q.    If you are doing an abdominal
24 sacrocolpopexy and a suture is passed
25 through the full thickness of the vaginal

Page 316

1 wall, the abdominal cavity is, therefore,
2 exposed to these same vaginal bacteria;
3 correct?
4     A.    No.  The suture is exposed, the
5 part that's inside the vagina.  I wouldn't
6 say the abdomen is exposed.
7     Q.    Is it your belief that when the
8 suture is withdrawn or passed through, the
9 bacteria cannot get through that same space?
10     A.    It could.
11     Q.    How large are bacteria?
12     A.    Tiny.
13     Q.    One, two microns.
14     A.    I don't know.  They're tiny.
15     Q.    They're smaller than the gauge of
16 the needle that you use when you suture;
17 correct?
18     A.    I don't know.  Well, I don't know
19 how big the gauge -- I understand they are
20 very, very small.
21     Q.    Now, you mentioned you can wash
22 the abdomen out if you do a hysterectomy at
23 the time of a sacrocolpopexy; is that
24 correct?
25     A.    Yeah.  I don't do hysterectomies

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 317

1  so I'm going to be theorizing on what other
2  people's works are.  Remember, if a woman
3  needs a hysterectomy, that goes to my
4  gynecology colleagues.
5      Q.    Okay.
6      A.    But what I mean by washing it out
7  is in my OR specifically there is standard
8  practice of constantly washing out any
9  wound.  The solution to pollution is
10  dilution.  Okay.  So we will use several
11  liters of antibiotic solution multiple times
12  throughout the case and at times actually
13  use Betadine.
14      Q.    And what scientific literature or
15  data are you aware of that shows that if you
16  do that, what you just said, in a case where
17  there's a concomitant hysterectomy done that
18  the bacteria from the vagina would come --
19  be rendered either impotent or are
20  physically removed out of the entire
21  abdomen?
22      A.    I rely on data outside the
23  hysterectomy group for that, for that
24  conclusion.
25      Q.    What data is this?

Page 318

1      A.    Penile prostheses infections by
2  Dr. John Mulcahy at the University of
3  Indiana.
4           Infected penile prosthetics, a
5  prosthetic, if it comes infected, there's a
6  protocol for washing it out.  You can
7  actually wash out the bacteria under high
8  pressure and put a penile prosthesis in and
9  then the prosthesis has a high chance of
10  survival.  So that is in a worst-case
11  scenario.
12      Q.    But this clean contaminated
13  vagina area has different bacteria than this
14  penile prosthesis procedure; correct?
15      A.    The only one that would probably
16  be potentially different would be the
17  Candida.
18      Q.    Do you know the difference in the
19  amount of bacteria released from performing
20  a hysterectomy when the uterus is cut out
21  and removed as compared to the amount of
22  bacterium released when there is this penile
23  prosthesis?
24      A.    No.
25      Q.    So is it correct, Doctor, that

Page 319

1  you are essentially extrapolating some data
2  from penile prostheses into the
3  sacrocolpopexy with concomitant hysterectomy
4  situation?
5      A.    I'm extrapolating infection data.
6      MR. SNELL:  What time is it,
7  gentlemen?
8      MR. ANDERSON:  7:00.
9      MR. SNELL:  Let's shut down.
10      (Whereupon the deposition
11  adjourned at 6:56 p.m.)
12           TESTIMONY ADJOURNED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 320

1           CERTIFICATE
2
3
4      I HEREBY CERTIFY that the witness was
duly sworn by me and that the deposition is a true
5  record of the testimony given by the witness.
6
      It was not requested before
7  completion of the deposition that the witness,
DANIEL STEVEN ELLIOTT, M.D., have the opportunity
8  to read and sign the deposition transcript.
9
10
11      ------------------------------
      ROSEMARY LOCKLEAR
12      REGISTERED PROFESSIONAL REPORTER
      CERTIFIED COURT REPORTER (NJ)
13      30XI00171000
      CERTIFIED REALTIME REPORTER
14      NOTARY PUBLIC
      Dated:  12/10/12
15
16
17
      (The foregoing certification of
18
this transcript does not apply to any
19
reproduction of the same by any means,
20
unless under the direct control and/or
21
supervision of the certifying reporter.)
22
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS

Daniel Steven Elliott, M.D.

Page 321

1
2  LAWYER'S NOTES
   PAGE  LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS