# EXHIBIT M

Confidential - Attorneys' Eyes Only

---

Page 322

```
1        SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION
2              ATLANTIC COUNTY
               CASE NO. 291 CT
3          MASTER CASE NO. L-6341-10
4
                   - - -
5   IN RE:
    PELVIC MESH/GYNECARE
6   LITIGATION
7
                   - - -
8      CONFIDENTIAL - ATTORNEYS' EYES ONLY
9                 VOLUME II
           Friday, November 16, 2012
10
                   - - -
11
12      Continued oral deposition of
13   DANIEL STEVEN ELLIOTT, M.D., held at MAZIE
14   SLATER KATZ & FREEMAN, L.L.C., 103 Eisenhower
15   Parkway, Roseland, New Jersey, commencing at
16   approximately 8:25 a.m., before Rosemary
17   Locklear, a Registered Professional Reporter,
18   Certified Realtime Reporter, Certified Court
19   Reporter (NJ License No. 30XI00171000), and
20   Notary Public.
21
22
23
24        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 971.591.5672  Fax
25           deps@golkow.com
```

---

Page 323

```
1   APPEARANCES:
2
3   ANDERSON LAW OFFICES, L.L.C.
    BY:  BENJAMIN H. ANDERSON, ESQUIRE
4   ben@andersonlawoffices.net
    1360 West 9th Street, Suite 215
5   Cleveland, Ohio 44113
    (216) 589-0256
6   Appearing on behalf of the Plaintiffs
7
8   BUTLER SNOW O'MARA STEVENS & CANNADA, P.L.L.C.
    BY:  NILS B. (BURT) SNELL, ESQUIRE
9   burt.snell@butlersnow.com
    500 Office Center Drive, Suite 400
10  Fort Washington, Pennsylvania 19034
    (267) 513-1885
11  Appearing on behalf of the Defendants Johnson &
    Johnson and Ethicon
12
13
    SILLS CUMMIS EPSTEIN & GROSS, P.C.
14  BY:  WILLIAM R. STUART, III., ESQUIRE
    wstuart@sillscummmis.com
15  The Legal Center, One Riverfront Plaza
    Newark, New Jersey 07102
16  (973) 643-7000
    Appearing on behalf of the Defendant Caldero
17  Medical, Inc.
18
19                - - -
20
21
22
23
24
25
```

---

Page 324

```
1              I N D E X
2
3   WITNESS                    PAGE
4
5   DANIEL STEVEN ELLIOTT, M.D.
6
7     By Mr. Snell          328
8
9              - - -
10
11        EXHIBIT INDEX
12                        MAR
    Elliott
13   9    11-page copy of article dated 8/10    410
         entitled "Vaginal Mesh for Prolapse"
14
15   10   9-page copy of article dated 2/11     420
         entitled "Trocar-Guided Mesh Compared
         With Conventional Vaginal Repair in
16       Recurrent Prolapse"
17
    (Exhibits retained by the court reporter and
18  attached to transcript.)
19
               - - -
20
21
22
23
24
```

---

Page 325

```
1     DEPOSITION SUPPORT INDEX
2                - - -
3   Directions to Witness Not to Answer
4        Page      Line
5
6
7                - - -
8   Request for Production of Documents
9        Page      Line
10
11
12
13               - - -
14        Stipulations
15        Page      Line
16
17
18
19               - - -
20        Question Marked
21        Page      Line
22
23
24               - - -
25
```

---

1 (Pages 322 to 325)

Confidential - Attorneys' Eyes Only

Page 326

1    Reserved for Confidential Designation Index as
2          Pursuant to the Protective Order
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 327

1    Reserved for Confidential Designation Index as
2          Pursuant to the Protective Order
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 328

1          DANIEL STEVEN ELLIOTT, M.D.,
2    having been previously duly sworn, was
3    examined and testified as follows:
4          EXAMINATION (Continued)
5    BY MR. SNELL:
6    Q.   Good morning, Doctor.  How are
7    you doing this morning?
8    A.   Fine.
9    Q.   We're going to resume your
10   deposition.
11         Between the end of the
12   deposition yesterday and this morning did
13   you review any materials, any literature,
14   anything like that?
15   A.   Just my private notes.
16   Q.   I'm sorry.  Your what?
17   A.   My notes.
18   Q.   What notes are these?
19   A.   Just notes that I've taken on the
20   depositions.
21   Q.   Of the different Ethicon
22   witnesses?
23   A.   Correct.
24   Q.   Any notes that you've taken on
25   any other witnesses?

Page 329

1    A.   No.  Just Ethicon depositions.
2    Q.   So no notes on depositions in the
3    Gross case; correct?
4    A.   No.  No.  I can tell you Gauld or
5    Gauld, Walji, Robinson, Kirkemo, Hinoul.
6    I'll never get that one.
7          MR. ANDERSON:  You did great on
8    that.
9          THE WITNESS:  There may be
10   another one in there.  Those are the ones
11   I've --
12   BY MR. SNELL:
13   Q.   Do you know Larry Sirls, a
14   urologist?
15   A.   I do not believe I've ever met
16   him.  He is in our same north central
17   section of the AUA, which incorporates
18   Michigan, so I believe he's in Michigan.  So
19   I may have encountered him at a meeting but,
20   again, I don't recall ever meeting him.
21   Q.   Have you ever seen him speak or
22   present, that you recall?
23   A.   I do not recall.  I may have,
24   actually.  I don't recall.
25   Q.   Do you have any criticisms of him

2 (Pages 326 to 329)

Confidential - Attorneys' Eyes Only

Page 330

1 as a surgeon?
2   A.   No. I don't know him as a
3 surgeon at all so I -- but I have no
4 criticism.
5   Q.   Do you know Elizabeth Kavaler,
6 also a urologist?
7   A.   No. To the best of my knowledge,
8 I've never met her.
9   Q.   Do you know Miles Murphy,
10 urogynecologist?
11   A.   No.
12   Q.   Never met him or seen him?
13   A.   To the best of my knowledge, no.
14   Q.   Any criticisms of Miles Murphy
15 that you have?
16   A.   Well, I mean, ethically, no,
17 surgically, no. I don't agree with some of
18 the conclusions he reached in his papers,
19 but that's limited to that.
20   Q.   Vince Lucente, have you ever met
21 him?
22   A.   No.
23   Q.   Have you ever seen him speak or
24 present at any conferences?
25   A.   Not that I know of. But we

Page 331

1 attend meetings that are going to be
2 overlapped. I may have encountered him, but
3 I don't recall ever doing that.
4   Q.   That's what I was going to ask
5 you.
6       Do you attend the AUGS
7 conferences in addition to the urologic
8 conferences that you -- strike that. That
9 was a bad question.
10       Do you attend the AUGS
11 conferences?
12   A.   No. I attend primarily urologic
13 meetings. However, with that said, the IUGA
14 meetings I've attended at times, especially
15 when they're in concert with the
16 International Continence Society, which I'm
17 much more involved in.
18   Q.   What type of urologic conferences
19 do you attend regularly, let's say in the
20 past, since 2001 since you've been back at
21 Mayo following your fellowship?
22   A.   Regularly, the north central
23 section of the AUA, which is the American
24 Urologic Association. Then the AUA meeting,
25 our national meeting. International

Page 332

1 Continence Society. I'd have to look at my
2 -- because I attend meetings all over.
3 There's a number of robotic ones.
4   Q.   Okay.
5   A.   In my CV it has the ones that
6 were given presentations.
7   Q.   Do you have any criticisms of
8 Dr. Vince Lucente?
9   A.   Again, the same as with
10 Dr. Murphy: I don't have any surgical,
11 ethical. My conclusions are different than
12 his, but that's on an academic level.
13   Q.   What conclusions do you have at
14 an academic level that are different than
15 Dr. Lucente's?
16   A.   On the very broad thing -- broad
17 scale, he is pro-mesh, I am anti-mesh in the
18 case of pelvic organ prolapse done
19 transvaginally.
20   Q.   So you're pro-mesh for stress
21 urinary incontinence; correct?
22       MR. ANDERSON: Objection.
23       Go ahead.
24       THE WITNESS: I use meshes for
25 stress urinary incontinence. In my own

Page 333

1 personal experience, I have not encountered
2 significant problems with it, so relative to
3 specifically my personal experience, it
4 would be fair to say I'm pro-mesh.
5 BY MR. SNELL:
6   Q.   And you're pro-mesh for the use
7 of mesh to treat pelvic organ prolapse as
8 long as it's not transvaginally placed.
9   A.   Correct.
10       MR. ANDERSON: Objection.
11       Go ahead.
12       THE WITNESS: Correct. From
13 transabdominal, laparoscopic or robotic, I
14 am pro-mesh for that.
15 BY MR. SNELL:
16   Q.   Yesterday we were talking about
17 doing a concomitant hysterectomy with
18 sacrocolpopexy.
19   A.   Yes.
20   Q.   Do you recall, in general, that?
21   A.   Yes.
22   Q.   We were talking about the risk of
23 infection. Do you recall that?
24   A.   Yes.
25   Q.   When a hysterectomy is done at

Confidential - Attorneys' Eyes Only

Page 334

1   the same time as a sacrocolpopexy, the
2   peritoneal cavity is exposed to the same
3   bacterial -- strike that.
4          When a hysterectomy is done at
5   the same time as a sacrocolpopexy, the
6   peritoneal cavity is exposed to the same
7   type of vaginal flora.
8      A.   Flora, yes.
9      Q.   And you're aware that clinical
10  studies continue to be done in
11  sacrocolpopexy cohorts that include patients
12  who have a hysterectomy at the same time;
13  correct?
14     A.   I'm not aware of any ongoing
15  studies.  That's not to say they're not
16  ongoing, I'm just not aware of any.
17     Q.   In the past couple years you've
18  seen studies where a certain percentage of
19  the sacrocolpopexy patients did have a
20  concomitant hysterectomy at the same time;
21  correct?
22     A.   Yes.
23     Q.   Has the American Urologic
24  Association come out with any type of
25  statement that says that a hysterectomy

Page 335

1   should not be done at the same time as a
2   sacrocolpopexy?
3      A.   I'm not aware of any.
4      Q.   Do you know if the American
5   College of Gynecology has come out with a
6   statement that says that hysterectomy should
7   not be done at the same time as a
8   sacrocolpopexy?
9      A.   Again, I'm not aware of any.
10     Q.   We talked yesterday about some of
11  the different surgical procedures that
12  you've performed for prolapse, such as
13  colporrhaphy, sacrospinous ligament
14  fixation, sacrocolpopexy, McCall's
15  culdoplasty and the Mayo culdoplasty.
16     A.   Culdoplasty, yes.
17     Q.   And colporrhaphy was the first
18  surgery that you were trained on for pelvic
19  organ prolapse?
20     A.   Yes.  The anterior and posterior
21  colporrhaphy.
22     Q.   And that was in the early 1990s
23  or mid-1990s?
24     A.   Mid-1990s.  1997, probably, to be
25  specific.  That's when I had my first female

Page 336

1   urology rotation.
2      Q.   And you know colporrhaphies had
3   been performed for decades before that by
4   surgeons in the field; correct?
5      A.   Yes.
6      Q.   And when you began performing
7   colporrhaphies in 1997, there were no
8   randomized, controlled trials with that type
9   of procedure; correct?
10     A.   Well, I can't recall what -- what
11  the data was for 1997, but in 1997 the
12  anterior colporrhaphy, there were not
13  anything to randomize it to.  There were
14  tissue repairs.
15         I am not aware of any meshes
16  used at that point in time transvaginally
17  for anterior colporrhaphies.  So, again, to
18  have a randomized, controlled study, you
19  have to have something to randomize it to.
20     Q.   Correct.  So there were no
21  randomized, controlled trials for
22  colporrhaphy versus sacrospinous ligament
23  fixation; correct?
24     A.   Those were going after different
25  problems.  Sacrocolpopexy is designed to

Page 337

1   treat apical prolapse.  Anterior
2   colporrhaphy is designed to treat anterior
3   prolapse.
4      Q.   So the answer to the question is,
5   no, there were no randomized, controlled
6   trials in colporrhaphy when I started doing
7   them in 1997; correct?
8      A.   Yes.
9      Q.   And for the sacrospinous ligament
10  fixation surgery that you were trained on
11  were there any randomized, controlled trials
12  in that procedure before 1990, that you're
13  aware of?
14     A.   I would have to review the
15  literature.  I am not aware.
16     Q.   As you sit here today, you cannot
17  identify any randomized, controlled trials
18  with sacrocolpopexy before 1990; correct?
19     A.   I'd have to -- to answer your
20  question very specifically, as I sit here
21  right now, no, I would be unable to come up
22  with any; however, give me 15 minutes on
23  PubMed, I'd come up with a large number.
24     Q.   When we take a break, I'll give
25  you 15 minutes to look on PubMed, and I want

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 338

1  you to identify all of the randomized,
2  controlled trials before 1990 with
3  sacrospinous ligament fixation that you are
4  able to come up with.
5      A.   So --
6          MR. ANDERSON:  Objection.
7      You said sacrocolpopexy before.
8          MR. SNELL:  No.  I --
9          THE WITNESS:  You said
10  sacrocolpopexy and the sacrospinous.
11  Because you're going to have to be very
12  specific what we're going to be comparing.
13  And I'll need to have a computer that can
14  access to and print off the manuscripts.
15         MR. SNELL:  Give me one second.
16  I thought my question was sacrospinous.
17         Okay.  I see what you're
18  saying.
19  BY MR. SNELL:
20      Q.   The McCall's culdoplasty that you
21  were performing during your training, had
22  that been studied in a randomized,
23  controlled trial?
24      A.   I'm not aware of any on the top
25  of my head, no.

Page 339

1      Q.   The Mayo McCall culdoplasty, had
2  that been studied in any randomized,
3  controlled trials before you began doing it?
4      A.   What would be the random -- what
5  would be the control group in that?
6      Q.   I'm not the doctor.  I'm asking
7  you, were there any randomized, controlled
8  trials with the Mayo McCall's culdoplasty?
9      A.   Well, I have to know what it's
10  randomized to.  It's a very vague question
11  for me.  Randomized to people driving a car,
12  heart surgery, or what?
13      Q.   No.  Of course, randomized to
14  other prolapse surgeries, Doctor.
15      A.   Well, which one is the --
16      Q.   I'm not talking about randomizing
17  to people driving cars and things like that.
18      A.   Yeah.  That was an example.  I
19  need to know, randomized to which one?
20  Because, again, there's going to be multiple
21  different possible ones to be randomized to.
22      Q.   What are the ones that Mayo
23  McCall's culdoplasty could be randomized to?
24      A.   It could be to sacrospinous
25  fixation, it could be to McCall's

Page 340

1  culdoplasty, it could be to sacrocolpopexy.
2      Q.   When you began performing the
3  Mayo McCall's culdoplasty, were you aware of
4  any randomized, controlled trials that
5  studied it compared to the McCall's
6  culdoplasty?
7      A.   I am not -- sitting here right
8  now, no, I'm not aware of any.
9      Q.   When you began performing the
10  Mayo McCall's culdoplasty, were there any
11  randomized, controlled trials comparing it
12  to sacrospinous ligament fixation?
13      A.   As I'm sitting here right now,
14  no, I cannot recall that.
15      Q.   When you began performing the
16  Mayo McCall's culdoplasty, were there any
17  randomized, controlled trials comparing it
18  to sacrocolpopexy?
19      A.   As I'm sitting here right now, I
20  can't recall it.
21      Q.   Is it correct that during your
22  fellowship training, you observed the
23  sacrospinous ligament fixation being
24  performed?
25      A.   That is correct.

Page 341

1      Q.   Now, did you testify yesterday
2  that your instructors did not let you
3  actually perform the sacrospinous ligament
4  fixation during your fellowship?
5      A.   There were two instructors that I
6  worked with most significantly, two GYNs,
7  the chair GYN at Baylor and then the other
8  one was Dr. Cone, who was also on staff at
9  Baylor.
10         The chair of the department at
11  Baylor, he performed the procedure
12  completely, palpation.  It is his estimate
13  that we did so few that it would be
14  difficult to become proficient in it.
15  Dr. Cone never performed a sacrospinous
16  fixation.  That's who I learned
17  sacrocolpopexy from.
18      Q.   So the chair at your fellowship
19  did not allow you to perform the
20  sacrospinous ligament fixation surgery
21  during the fellowship; correct?
22      A.   He didn't -- I assisted him.  So
23  he was the one who actually put the needles
24  through.
25      Q.   How did you assist him during the

5 (Pages 338 to 341)

Confidential - Attorneys' Eyes Only

Page 342

1  sacrospinous ligament fixation?
2      A.    As far as initial dissection,
3  retraction, holding sutures, closure.
4      Q.    And this was in 1999 to 2000?
5      A.    July of '99 to June of 2000.
6      Q.    Are you aware that other
7  fellowship programs in either the type of
8  curriculum you were in for urologists or
9  urogynecology had fellows who actually
10  passed the suture through the sacrospinous
11  ligament -- through the sacrospinous
12  ligament during that procedure?
13          MR. ANDERSON:  Objection as to
14  time period.
15          THE WITNESS:  Yeah.  I cannot
16  -- I cannot, you know, comment on what
17  happened in other programs but I fully
18  suspect they did.  I have no reason to doubt
19  they wouldn't.
20  BY MR. SNELL:
21      Q.    During the sacrospinous ligament
22  fixation, when you did the dissection, how
23  did you do that?
24      A.    It is the vaginal dissection
25  through a midline vaginal incision,

Page 343

1  elevating the vaginal mucosa off the
2  underlying tissues, and then Dr. Law --
3  actually, I believe it was Dr. Law was the
4  chairman but that I could be wrong on --
5      Q.    Okay.
6      A.    -- would then take over and do
7  the remainder of the dissection.
8      Q.    And the retraction, how did you
9  do that?
10      A.    That is just with -- I mean, I
11  can't recall the procedure exactly, but it
12  would be -- you have some form of either
13  malleable retractor, hand-held retractor of
14  some sort exposing the underlying tissue as
15  best you can, which is somewhat difficult.
16      Q.    So it can be somewhat difficult
17  to expose the underlying tissue during the
18  retraction of a sacrospinous ligament
19  fixation?
20      A.    It can be difficult to set it up
21  appropriately, but with the correct
22  instruments it can be done.
23      Q.    And what type of instruments are
24  these that you would use during the
25  sacrospinous ligament fixation retraction?

Page 344

1      A.    Again, I can't recall.
2          MR. ANDERSON:  Objection.
3  Asked and answered.
4          Go ahead.
5          THE WITNESS:  I can't recall
6  that exact surgery, what we used.  Most
7  likely, it would be something called a
8  narrow Deaver -- D-E-V-O-R, I believe -- or
9  there's a renal retractor which is a similar
10  thing.  It's long, narrow and deep.
11          Again, there's the -- the
12  various different malleable retractors,
13  which are variable sizes, and you can adjust
14  them to custom fit them to your -- whatever
15  you need and the patient's anatomy.
16  BY MR. SNELL:
17      Q.    So a malleable retractor is a
18  type of retractor, it's not an attribute of
19  the retractor.
20      A.    No.  It is -- it is a -- the
21  answer to your question is yes to both your
22  questions.
23      Q.    Okay.
24      A.    Malleable retractor is a piece of
25  metal, a flat piece of metal, that is long,

Page 345

1  that can be any size, though for vaginal
2  surgeries they tend to be long, they tend to
3  be narrow.  By narrow I mean 2 to 3
4  centimeters in width.  And they can be 18
5  inches long.  And then you can bend it
6  anywhere, hence, the name malleable so, then
7  again, you can get a custom fit to your
8  surgery.  Unlike a Deaver or a renal, which
9  is a set size and you cannot adjust it,
10  malleables are sizes of all ranges.
11      Q.    And when you did the dissection
12  for the sacrospinous ligament fixation, what
13  surgical tools did you use for that?
14      A.    Hydrodissection with a needle, a
15  hypodermic needle filled with normal saline,
16  a scalpel to dissect through to make your
17  incision to gain access, then you'd use
18  Metzenbaum's scissors to actually do the
19  elevation along with Allis clamps, spelled
20  A-L-L-I-S.  And then you'd use the various
21  different retractors.  And that's probably a
22  fairly comprehensive list of tools.
23      Q.    Do all prolapse surgeries use
24  surgical tools?
25      A.    Well, I can't comment on all

6 (Pages 342 to 345)

Confidential - Attorneys' Eyes Only

Page 346

1  surgeries.  They --
2      Q.    All surgeries -- let me -- do all
3  surgeries that you have performed, such as
4  colporrhaphy, sacrospinous ligament
5  fixation, sacrocolpopexy, do they all use
6  surgical tools?
7      A.    Yes.
8      Q.    And the laparoscopic and robotic
9  sacrocolpopexies that you've performed also
10  use trocars?
11      A.    Correct.
12      Q.    And trocars are also used during
13  stress urinary incontinence surgeries?
14      A.    Technically speaking, yes.  But
15  trocar is a generic term.  It just means --
16  it's a French word meaning three sides.  And
17  so, again, the trocars are vastly different
18  in shape, function, but they are technically
19  trocars.
20      Q.    You mentioned that you were
21  trained on hydrodissection during your
22  fellowship in connection with sacrospinous
23  ligament fixation; correct?
24      A.    Specific -- I was trained prior
25  to that in residency.  I wouldn't say they

Page 347

1  trained me in fellowship.  We used it in
2  fellowship.  I already knew how to do it.
3      Q.    When were you trained to do
4  hydrodissection?
5      A.    It would have been 1997 when I
6  did my female urology rotation.
7      Q.    During your residency?
8      A.    Correct.
9      Q.    When was the Mayo McCall's
10  culdoplasty first performed?
11      A.    I would have to do a literature
12  search on that.  I believe it was Dr. Lee at
13  Mayo who did it.  His career spanned the
14  '60s into mid-2000-something.  I don't know
15  exactly.  Somewhere in there.
16      Q.    Can you give me your best
17  approximation?
18      A.    If I were to guess, it would be
19  in the '60s and '70s.
20      Q.    Now, the McCall's culdoplasty was
21  a procedure that was before the Mayo
22  McCall's culdoplasty; correct?
23      A.    I don't know.  I would suspect it
24  was because the Mayo culdoplasty is somewhat
25  of a variation of the McCall's, and so I

Page 348

1  don't know the exact chronology of those.
2      Q.    That's what I thought your
3  testimony was yesterday, that the Mayo
4  McCall's culdoplasty is similar to the
5  original McCall's culdoplasty but it has
6  some different anchoring technique or
7  location.
8      A.    Subtle, mild differences.
9          Again, I don't know which came
10  first, if it was the McCall's variation of
11  Mayo or Mayo is the variation of McCall's.
12  So I don't know.
13      Q.    The mesh that you use in your
14  sacrocolpopexies that is made of
15  polypropylene, does it come in a precut
16  shape?
17      A.    Yes.  As you -- yeah, as you saw
18  in the manuscript, it comes in a Y-shape.
19      Q.    The da Vinci robot that you use
20  to perform your robotic laparoscopic
21  sacrocolpopexies -- strike that.
22          Does the da Vinci robot that
23  you use to perform your robotic laparoscopic
24  sacrocolpopexies have surgical tools that
25  help aid in the surgery?

Page 349

1      A.    Yes.
2      Q.    Does the da Vinci robot have
3  tools that allow dissection?
4      A.    Yes.
5      Q.    Does the da Vinci robot have
6  tools that allow parts of the body to be
7  grafts by the robot?
8      A.    Yes.
9      Q.    Does the da Vinci robot have
10  tools which allow surgeons to tie knots
11  during the procedure?
12      A.    Yes.
13      Q.    Do you use the patient brochures
14  that da Vinci puts out for its robotic
15  laparoscopic sacrocolpopexy?
16          MR. ANDERSON:  Objection.
17          Go ahead.
18          THE WITNESS:  I don't believe
19  they have any brochures on the
20  sacrocolpopexy.
21  BY MR. SNELL:
22      Q.    Do you use any patient brochures
23  that da Vinci puts out?
24      A.    No.
25      Q.    In your general expert report you

Confidential - Attorneys' Eyes Only

Page 350

1  note that the traditional non-mesh POP
2  repairs have failure rates up to 30 to 40
3  percent; correct?
4      A.   I note that -- well, I have to
5  see what page you're on.
6      Q.   Page 14 is one of the places
7  where you say that.
8      A.   Okay.  Yes.  You have to read in
9  the totality of that sentence.  The
10 misconceived notion that traditional repairs
11 have failure rates up to 30 to 40 percent.
12     Q.   The traditional non-mesh POP
13 repairs had failure rates up to 30 to 40
14 percent when they were originally published;
15 correct?
16     A.   Well --
17          MR. ANDERSON:  Objection.
18          THE WITNESS:  -- I mean, I'd
19 have to say that I put a lot of thought into
20 what I said here and you're deleting "the
21 misconceived notion."
22          MR. SNELL:  No.  No.  I
23 understand what your position is, Doctor.
24          THE WITNESS:  Okay.
25 BY MR. SNELL:

Page 351

1      Q.   But what I'm saying is, at the
2  time these data were published on
3  traditional non-mesh POP repairs, the
4  failure rates were 30 to 40 percent, as
5  reported back then; correct?
6      A.   Correct.  As you've stated there,
7  yes, in the literature failure rates were
8  reported up to 30 to 40 percent.
9      Q.   In fact, Doctor, in the
10 literature failure rates were reported at
11 over 50 percent; correct?
12     A.   I'd have to look at that.  I
13 don't know what reference you're talking
14 about.  If you show it to me, I could review
15 that.
16     Q.   Turn to Page 23, Doctor.
17     A.   Okay.  I'm there.
18     Q.   Now, Figure 2 you have the
19 different shapes of the Prolift® meshes;
20 correct?
21     A.   Correct.
22     Q.   Total, anterior and posterior;
23 correct?
24     A.   Yes.
25     Q.   From where did you obtain this

Page 352

1  Figure 2?
2      A.   As I recall -- because, again,
3  I've gone through so many documents -- as I
4  recall, I got this off the Internet.
5      Q.   Now, the shapes -- let me back
6  up.
7          The Prolift® meshes are
8  polypropylene meshes; correct?
9      A.   Correct.
10     Q.   And the shapes of the Prolift®
11 meshes depicted in Figure 2 of your report
12 at Page 23, those shapes were assessed by
13 surgeons; correct?
14     A.   I have no idea who assessed them.
15     Q.   Isn't it your understanding,
16 Doctor, that the French TVM surgeons
17 assessed and determined these particular
18 shapes for the Prolift® mesh?
19     A.   My understanding is the TVM
20 surgeons had a large piece of Gynemesh® and
21 they cut them.  I have seen in their
22 documents -- excuse me -- their manuscripts
23 shapes.
24          I don't know who was all
25 involved in the design of this product, I

Page 353

1  mean, as far as the -- how the shapes got
2  involved.
3      Q.   Okay.  I'm not sure if I asked
4  you this yesterday:  When was the last time
5  you did a transobturator-placed sling?
6      A.   Last week.  Yeah, it would have
7  been last week sometime, I believe.  I do a
8  large number and so I believe I did one last
9  week.  If not, then it was the week before
10 that.
11     Q.   And when you perform a
12 transobturator sling placement, is it
13 correct that you go in through the
14 transobturator space?
15     A.   I go through the obturator
16 foramen.
17     Q.   And you use trocars during that
18 procedure?
19     A.   Yes.
20     Q.   Is the obturator foramen the same
21 area where the anterior Prolift® mesh
22 trocars pass?
23     A.   They both go through the
24 obturator foramen.
25     Q.   When you do your obturator

Confidential - Attorneys' Eyes Only

Page 354

1 foramen passage during a transobturator
2 sling, is that a blind passage?
3    A.   Yes.
4    Q.    At the top of Page 30 of your
5 report, Doctor --
6    A.   Okay.  Page 30.
7    Q.    -- here you're talking about the
8 surgical technique with Prolift® and in
9 particular you are discussing the dissection
10 of the vaginal tissue off of the bladder and
11 surrounding tissues must be carefully
12 performed so as to avoid injury.
13        Do you see where I'm at?
14    A.   I see on 29 start talking about
15 hydrodissection, incisions made.  Oh, here
16 you go.  Yes, starting on the bottom of 29.
17 The dissection of the -- yes, I see that.
18    Q.   So we're at the same place?
19    A.   Yes.  Top of Page 30.
20    Q.   So you're talking about the
21 dissection of the vaginal tissue off of the
22 bladder and surrounding tissues must be
23 carefully performed so as to avoid injury;
24 correct?
25    A.   Yes.

Page 355

1    Q.    You would agree that dissections
2 for any pelvic organ prolapse surgery must
3 be carefully performed; correct?
4    A.   Correct.
5    Q.    During the sacrocolpopexy
6 procedures that you perform, Doctor, do you
7 ever trim or make any alterations at all to
8 the Y-shape mesh?
9    A.   Yes.
10        MR. ANDERSON:  Objection.
11 Asked and answered.
12        Go ahead.
13        THE WITNESS:  Yes.
14 BY MR. SNELL:
15    Q.   Under what circumstances would
16 you do that?
17        MR. ANDERSON:  Same objection.
18        Go ahead.
19        THE WITNESS:  The mesh as it
20 comes in the box is quite large.  The
21 anterior and posterior limbs are quite long
22 and so is the tail, so you have to trim it
23 to customize it to the patient's size.
24 BY MR. SNELL:
25    Q.   Do you also at times have to trim

Page 356

1 the mesh you use during the sacrocolpopexy
2 because of findings you encounter once you
3 enter the abdomen and see the surgical field
4 in which you're working, such as scarring or
5 any other medical condition you may
6 encounter, Doctor?
7    A.   No.  The only thing -- the only
8 reason we trim it is because preoperatively,
9 we don't know the full extent of the vaginal
10 length and its relationship to the sacrum.
11        So that's why when it comes in
12 the box, the actual device is quite long, so
13 we always have to trim it to shorten the
14 limbs and the tail.  But it would be no
15 bearing upon what we find inside the
16 patient's body, it's just the vaginal length
17 relative to the sacrum.
18    Q.   Is it correct that you perform
19 standard mesh attachment to the -- strike
20 that.
21        Is it correct that you attach
22 one part of the polypropylene mesh that you
23 use in sacrocolpopexy to the sacrum?
24    A.   Correct.
25    Q.   Do you always attach that

Page 357

1 polypropylene mesh to the sacrum in the same
2 location?
3    A.   We are -- the exact same, no, but
4 we are very, very close.  We're looking to
5 the S-2, 3, 4 region, the promontory.  We
6 may vary half centimeter or more between
7 patients.
8    Q.    You would agree that with any
9 pelvic organ prolapse surgery, even in the
10 hands of the most highly skilled surgeon,
11 there can be significant complications;
12 correct?
13    A.   Yes.
14    Q.   Turn, if you would, to Page 38 of
15 your report, Doctor.
16    A.   Okay.
17    Q.   And I'm on the paragraph that
18 begins, "Also, very interesting data has
19 emerged."
20        Are you with me?
21    A.   Yes, I see it.
22    Q.   Tell me what studies or data you
23 are referring to when you say, "Also, very
24 interesting data has emerged this" -- it
25 should be "that"; right?

Confidential - Attorneys' Eyes Only

Page 358

1    A.    This shows -- yeah, that.  Yeah.
2  Grammatical error, yeah.
3    Q.    What studies or data are you
4  referring to and relying upon for the
5  statement, also, comma, very interesting
6  data has emerged that shows that women
7  following POP procedures that have perfect
8  vaginal support actually have a lower QOL
9  and subjective improvement compared with
10  women with lesser degrees of support?
11    A.    Well, if we continue down, we
12  have that reference at the bottom which is
13  referencing internal documentation,
14  depositions I've read, these manuscripts
15  that are referenced, specifically that the
16  vagina and the pelvis is dynamic, and that's
17  what is evolving the thought process, that
18  fixed is not good, movement is good.
19        A vagina, the pelvic floor
20  needs to be more like, for lack of a better
21  phrase, like a trampoline as opposed to like
22  plywood.  There has to be give to it to
23  accommodate movement.
24    Q.    For the statement that they
25  actually have a lower quality of life and

Page 359

1  subjective improvement compared with women
2  of -- with lesser degrees of support, is
3  there a clinical study in humans that
4  demonstrates that, lower quality of life and
5  subjective improvement?
6    A.    The one that I can think of off
7  the top of my head was Jacquetin.  That's
8  the French gentleman, who, again, I believe
9  he is in the TVM study, a lecture I read of
10  his in the IUGA meeting in Lake Como, Italy,
11  2009, talking about the dynamic nature and
12  fixed and contraction results in pelvic pain
13  where he had a 19.6, he referred to it as
14  painful contraction or painful pelvis --
15  painful fixation.  I'd have to look at the
16  exact study, how he phrased it.
17    Q.    Was this based upon quality-
18  of-life scale scores?
19    A.    I did not see that referenced in
20  his -- in his presentation.
21    Q.    Okay.  Turn to Page 41.
22        Are you critical of the use of
23  POPQ scoring in prolapse studies?
24    A.    No.
25    Q.    Is there any other anatomic

Page 360

1  prolapse scoring classification system that
2  you are aware of that has been endorsed and
3  recognized by the International Continence
4  Society?
5    A.    Well, there's the Baden-Walker
6  grading system, B-A-D-E-N-Walker.
7    Q.    Was that system before or after
8  the POPQ system was recognized by ICS in
9  1997, '98?
10    A.    I --
11        MR. ANDERSON:  Objection.
12        Go ahead.
13        MR. SNELL:  Let me clean it up,
14  then.
15  BY MR. SNELL:
16    Q.    Was the Baden-Walker system
17  before the POPQ system?
18    A.    It pre-existed it, yes.
19    Q.    Page 41, a little ways down in
20  that paragraph, "At this same time Ethicon
21  knew."
22        Do you see me there?
23    A.    Yes.
24    Q.    When you note that the French
25  results showed an 18.4 percent failure rate

Page 361

1  at 12 months after surgery, you are
2  referring to the POPQ scoring?
3    A.    I am referring -- I'd have to
4  look at the reference specifically, which we
5  have down there, the Ethicon internal
6  documents.  I believe that we're referring
7  to anatomic failure, so anatomic POPQ
8  failure.
9        MR. ANDERSON:  Next time you
10  get to a breaking point.
11        MR. SNELL:  Okay.
12  BY MR. SNELL:
13    Q.    When you talk about the
14  complication rates with Prolift®, you note
15  that the true incidence is not known due to
16  multiple factors.
17    A.    Yes.
18    Q.    Do you know if complications with
19  colporrhaphies are routinely submitted to
20  the MAUDE database?
21    A.    Standard non-tissue repairs would
22  not be because my understanding is the MAUDE
23  database is medical device recording, and so
24  since there's no implant or substance put
25  in, it should not be reported.

Confidential - Attorneys' Eyes Only

Page 362

1    Q.    In your report you discuss
2  granulation tissue; correct?
3    A.    Yes.
4    Q.    Not all granulations lead to mesh
5  exposure; correct?
6    A.    Correct.
7          MR. SNELL:  We can take a
8  break.
9          (Recess, 9:20-10:13 a.m.)
10         MR. ANDERSON:  Can I make my
11 statement on the record now?
12         MR. SNELL:  Oh, yes.  Of
13 course.  Of course.
14         MR. ANDERSON:  So counsel has
15 referred a couple of times to the fact that
16 Ethicon has, in fact, filed a Motion to
17 exclude the supplemental report of
18 Dr. Elliott, and that Motion is on file with
19 the Court.
20         Two points that I would like to
21 make on the record regarding that.  One is
22 that, as far as I understand it, part of the
23 subject of that Motion would be that any
24 opinions he has with regard to the Linda
25 Gross case and the Pamela Wicker case were

Page 363

1  developed after his initial report was
2  filed.
3          And with regard to that first
4  point, I would just state that Dr. Elliott
5  is here, he's -- for two days and he is
6  prepared to answer any questions that
7  counsel may have with regard to his review
8  of the Pamela Wicker case and the Linda
9  Gross case and that it's going to be
10 virtually impossible, given his schedule at
11 Mayo, to have him back for a deposition, to
12 sit for a deposition to answer questions
13 about those two prior to the trial as it is
14 currently scheduled.
15         And so I would just ask that if
16 counsel has any questions, even if later on
17 that part of his deposition is stricken and
18 his opinions in that regard are excluded,
19 that that would be a better time to deal
20 with that rather than waiting to see how the
21 Court is going to rule and then being in a
22 position where they don't have an
23 opportunity to depose Dr. Elliott.
24         The second point that I would
25 like to make on the Motion is

Page 364

1  that the supplemental report by Dr. Elliott
2  is not in its entirety related to just the
3  Pamela Wicker case and the Linda Gross case,
4  rather, there are materials that he has
5  reviewed since the time of his initial
6  report, like depositions of Ethicon
7  employees, documents that were produced
8  after we would have had an opportunity to
9  have him look at them prior to his initial
10 report, et cetera, that are also contained
11 in the list of materials reviewed and he has
12 stated in his report, in agreement with New
13 Jersey law, that the additional materials
14 that he has reviewed support his initial
15 opinions as set forth in his initial expert
16 report dated June 15, 2012.
17         MR. SNELL:  As I've stated a
18 couple of times during this deposition, we
19 are seeking and have filed a Motion to
20 exclude Dr. Elliott's, what is termed the
21 November 7th, 2012, supplemental report.
22 This report is, in fact, a brand-new series
23 of case-specific reports.
24         Dr. Elliott testified yesterday
25 that he had not reviewed any records,

Page 365

1  depositions, radiology, urologic testing or
2  any case-specific materials particular to
3  the Gross or Wicker cases before issuing his
4  general report in June 2012.  I will not
5  reiterate all of the bases in the Motion.
6  Counsel is on notice of it.
7          I will say, if I do choose to
8  ask Dr. Elliott questions about his
9  supplemental report from November 7, 2012,
10 of which there is only a single paragraph
11 about Mrs. Gross and a single paragraph
12 about Mrs. Wicker and which falls well short
13 of the New Jersey standard of setting forth
14 opinions and bases for those opinions, I am
15 not in any way waiving our Motion and our
16 arguments.
17         Thank you.
18         And for the record, the
19 supplemental report that plaintiff and
20 myself are referring to has been marked to
21 this -- in this deposition as Elliott
22 Exhibit Number 2.
23         MR. ANDERSON:  Okay.
24 BY MR. SNELL:
25    Q.    Now, let's do some questioning.

Confidential - Attorneys' Eyes Only

Page 366

1  All right.
2       Doctor, can you tell me the
3  medical areas in which you are Board-
4  certified?
5       A.    Urology.
6       Q.    Are there any urology
7  subspecialty Board certifications?
8       A.    Pediatrics, and then it's going
9  to be female urology, reconstructive
10 surgery.
11      Q.    And you're not Board-certified in
12 female urology, reconstructive surgery?
13      A.    No one is at this point.
14      Q.    Is that a Board that's coming
15 down the road?
16      A.    June 21st is the exam.  You had
17 to submit application and your -- your
18 clinical practice, surgical practice has to
19 be reviewed and approved to be able to sit
20 for the exam.  So June 21st I'll be sitting
21 for the exam.
22      Q.    Did you pass your Board
23 certification for urology on the first
24 attempt?
25      A.    Yes.

Page 367

1       Q.    All parts of it?
2       A.    Well, there are -- yeah.  There
3  are three components to it, when I took the
4  exam, and I passed all three.
5       Q.    I understand you're a Medical
6  Doctor, but beyond your standard medical
7  training, do you have any advanced training
8  in pathology?
9       A.    No.
10      Q.    How about radiology?
11      A.    No.
12      Q.    What about psychiatry?
13      A.    No.
14      Q.    What about infectious disease?
15      A.    No.
16      Q.    You're not Boarded in infectious
17 disease; correct?
18      A.    Correct.
19      Q.    I want to focus on the time
20 period after your fellowship when you came
21 back to the Mayo Clinic.  Okay, Doctor?
22      A.    Okay.
23      Q.    Can you tell me, in general, how
24 you spend your clinical week, work week?
25      A.    It's every other day either in

Page 368

1  clinic or surgery, so 50 percent of my time
2  is in one or the other, so it varies from
3  week to week.  One week will be Monday,
4  Wednesday and Friday in the operating room
5  with Tuesday, Thursday being clinic, the
6  subsequent week will be just the reverse of
7  that, Monday, Wednesday, Friday clinic and
8  then Tuesday, Thursday OR.
9       Q.    Do you do any teaching?
10      A.    Yes.
11      Q.    When do you do teaching?
12      A.    When?
13      Q.    Yes.
14      A.    You mean what time of the day?
15 What do you mean?  Time of the year or --
16      Q.    What time -- can you tell me --
17 do you teach medical students, residents,
18 fellows at the Mayo Clinic?
19      A.    Yes.
20      Q.    Can you tell me about the
21 teaching you do at the Mayo Clinic?
22      A.    I teach medical students every
23 year or every other year.  That would be
24 when I'm requested to speak about general
25 urology issues, speak with the residents on

Page 369

1  a usually two to three times a year on
2  voiding dysfunction-specific topics, which
3  the fellows are involved with that.
4       I then also teach a
5  recertification -- internal medicine
6  recertification exam where every year two
7  times a year a medicine resident -- excuse
8  me -- medicine staff from around the nation
9  come in and it's an update course, so I
10 teach Board-certified internal medicine
11 individuals.
12      Q.    Do you have certain amounts of
13 time you set aside for administrative
14 responsibilities?
15      A.    No.  My responsibilities are only
16 clinical, so I'm 100 percent clinical.
17      Q.    Can you tell me what the risk
18 factors are for prolapse?
19      A.    It's a fairly comprehensive --
20 excuse me -- a very detailed list.  You want
21 to go through point by point or --
22      Q.    Just tell me what they are and,
23 if you can, can you tell me them in order of
24 importance, if you have them in such an
25 order?

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 370

1      A.    Okay.  If it's relative of
2  importance, it depends upon whose
3  perspective, the patient's or mine, because
4  those -- there have been studies showing
5  that there's a difference of what a patient
6  wants to gain out of surgery versus what the
7  doctor expects to gain, those things.
8           So that's not to be difficult,
9  I just kind of need to know if I'm talking
10 to a patient in what they want to know
11 versus giving a lecture to other surgeons
12 and what to expect.
13     Q.    Okay.  I think we strayed off and
14 lost communication.  I was looking for the
15 risk factors for prolapse, not --
16     A.    Okay.
17     Q.    -- the surgery itself.  So can
18 you tell me the risk factors?
19     A.    Oh, risk factors for prolapse.
20 I'm sorry.  I misunderstood your question.
21     Q.    It's okay, Doctor.
22     A.    Risk factors for prolapse:
23 previous surgery for prolapse; previous
24 hysterectomy; obesity; questionably,
25 menopause; questionably, age; indirectly,

Page 371

1  smoking; repetitive lifting; heavy lifting,
2  that would be a lifestyle issue; genetic
3  predisposition.  Off the top of my head,
4  that's it.  I can't say that's a
5  comprehensive list.
6      Q.    Can you tell me the number of
7  sacrospinous ligament fixation surgeries you
8  have performed at Mayo Clinic?
9      A.    Zero.
10     Q.    The use of mesh in abdominal
11 sacrocolpopexy was a use that was developed
12 by physicians; correct?
13     A.    I don't know who developed it.  I
14 would -- I would assume it was developed by
15 surgeons doing the procedure themselves.
16     Q.    I think we discussed this
17 yesterday, but surgeons were using materials
18 like autologous materials for sacrocolpopexy
19 and they found less than satisfactory rates
20 of recurrence, according to the medical
21 literature; correct?
22     A.    Correct.
23     Q.    And then surgeons began looking
24 towards synthetic meshes as an option to,
25 hopefully, reduce that incidence of

Page 372

1  increased recurrence; correct?
2      A.    Correct.
3      Q.    What other procedures do you
4  ordinarily do at the time of an abdominal
5  sacrocolpopexy?
6           MR. ANDERSON:  Objection.
7           Go ahead.
8           THE WITNESS:  Usually we'll be
9  putting in an -- doing an anti-incontinence
10 procedure at the same time.
11 BY MR. SNELL:
12     Q.    Is that a sling procedure like we
13 discussed earlier today?
14     A.    Usually it would be a sling, yes.
15     Q.    And what type of sling would that
16 most commonly be?
17     A.    Most commonly would be a
18 suprapubic sling.
19     Q.    A suprapubic sling made of
20 polypropylene mesh; correct?
21     A.    Correct.  Correct.
22     Q.    A suprapubic sling using
23 polypropylene mesh placed transvaginally;
24 correct?
25     A.    Correct.

Page 373

1      Q.    If you were going to counsel one
2  of your patients on the potential risks of
3  an abdominal sacrocolpopexy, what risk would
4  you identify to your patient?
5      A.    Risk of bleeding, risk of wound
6  infection, risk of bowel abnormalities,
7  specifically bowel obstruction from the
8  surgery itself.
9           Again, as long as we're being
10 very clear we're talking about abdominal
11 sacrocolpopexy because the discussion is
12 different for robotic sacrocolpopexy.
13     Q.    Okay.
14     A.    Bleeding -- I can't talk because
15 she keeps doing it -- wound infection, and
16 then erosion of the mesh.
17          And then the inherent ones as
18 far as just anesthesia itself.  That's
19 cardiac event, thromboembolic event, which
20 are not necessarily specific to the surgery,
21 it's just undergoing anesthesia.  And then
22 recurrence also.
23          And then lastly, specifically,
24 treating urinary incontinence when you're
25 concurrently treating prolapse is tricky,

Confidential - Attorneys' Eyes Only

Page 374

1  and so an individual may not have
2  incontinence at the time of preoperatively,
3  it's due to -- it's occult, and when you
4  reduce the prolapse, you can uncover the
5  incontinence. So that's why I'll do a
6  prophylactic sling now in my practice. That
7  has evolved. So I warn them very clearly
8  about the possibility of developing stress
9  urinary incontinence following surgery.
10     Q.   For the robotic laparoscopic
11 sacrocolpopexy what risks would you inform
12 your patient of?
13     A.   Most importantly, the 5 percent
14 risk of converting to open, meaning we would
15 not be able to accomplish the procedure
16 using the robot. So they have to understand
17 that there's a chance they could end up with
18 an incision.
19         The risk of bladder injury at
20 the time of the procedure would be slightly
21 higher than doing it open so we focus more
22 time on that.
23         The risk of bleeding is less in
24 our series so I don't spend too much time on
25 that. Risk of small bowel obstruction we

Page 375

1  have not seen. It is highly unlikely
2  because of the minimal manipulation of the
3  bowel at the time of the procedure.
4         And then also then mesh
5  extrusion again. That would be the same
6  discussion as with the abdominal
7  sacrocolpopexy.
8         And then the same as far as
9  with the urinary incontinence. There's no
10 difference there.
11     Q.   Would you also have the same
12 discussion with regard to the risk with the
13 anesthesia?
14     A.   Yes. Yes.
15     Q.   Now, for the abdominal
16 sacrocolpopexy you used the term "mesh
17 erosion" and in the robotic you said "mesh
18 extrusion," and I just want to understand,
19 is there some difference in the discussion
20 or was that just a difference of terms you
21 happened to use in the last minute or two?
22     A.   Yeah. That -- I misspoke. It's
23 extrusion. And that is a problem with our
24 nomenclature at this point in time. There's
25 -- the words are too similar. It's very

Page 376

1  confusing.
2     Q.   If you were doing a colporrhaphy,
3  what are the risks you would identify to
4  your patient?
5     A.   Okay. We'd have to break it up
6  to either anterior or posterior because I
7  would say the risks are going to be
8  different between the two.
9         So if you want to start with
10 anterior colporrhaphy, same risk as far as
11 bleeding. I do -- we do not -- then
12 incontinence following the procedure.
13         Almost always at the time of
14 anterior colporrhaphy I am putting in a
15 concurrent sling is my practice, again,
16 because of the occult incontinence.
17         I briefly discuss wound
18 infection; however, I just don't see that in
19 my practice. Let's see. What else?
20 Inadvertent bladder injury.
21         And then lastly, I inform them
22 that I always do a cystoscopy because
23 there's the possibility of inadvertently
24 obstructing a ureter.
25         And then the other risks as far

Page 377

1  as the -- just the anesthesia itself.
2     Q.   Are you familiar with the CARE
3  study that looked at abdominal
4  sacrocolpopexy?
5     A.   I vaguely remember -- I -- we
6  don't walk around talking about the CARE
7  study but I remember reading it or
8  something. I know the authors involved with
9  it.
10     Q.   For colporrhaphy do you also tell
11 your patients that they may develop de novo
12 dyspareunia?
13     A.   We discuss it. In my practice
14 and in my experience, it's been exceedingly
15 rare.
16     Q.   You're aware in the literature
17 that it's been, de novo dyspareunia has been
18 reported in over 15 percent of patients in
19 different studies for colporrhaphy?
20     A.   Well, according to what I've read
21 in the depositions, according to Ethicon,
22 that's rare. Because they talk about
23 extrusions being that rate and they called
24 it rare.
25         MR. SNELL: Move to strike.

14 (Pages 374 to 377)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 378

1  BY MR. SNELL:
2      Q.   I'm not asking you to
3  characterize one thing versus another one as
4  a concept.  I'm just asking you, you're
5  aware in the medical literature that there
6  has been de novo dyspareunia seen in over 15
7  percent of patients in different studies
8  involving colporrhaphy?
9          MR. ANDERSON:  Objection.
10         Go ahead.
11         THE WITNESS:  You'd have to
12  break it down to anterior versus posterior.
13  Posterior does have a higher incidence of
14  dyspareunia, anterior has less.
15         So the 15 percent number, I
16  just want to make sure what study, if,
17  again, it's anterior versus posterior.
18  Because, no question -- see, we haven't
19  gotten to posterior yet.
20         When I talk about posterior
21  colporrhaphies, I do discuss dyspareunia in
22  a lot more detail because it is definitely a
23  larger risk with that procedure.
24  BY MR. SNELL:
25     Q.   Sacrocolpopexy, do you discuss

Page 379

1  the potential risk of dyspareunia?
2      A.   We spend some time on it.
3  However, we also talk a lot with the sexual
4  history preoperatively to know if there's --
5  if, number one, if they're sexually active.
6          If they're not sexually active
7  and there's no anticipated future sexual
8  activity, I do not spend much time with it.
9          If they are sexually active,
10  then we usually state that it is -- tends to
11  be improved following it because we restore
12  more normal anatomy.  I don't guarantee that
13  but we -- we do it very -- each patient is
14  going to be managed differently depending
15  upon where they're coming in with their
16  sexual history at that point in time.
17     Q.   And you're aware that the medical
18  literature reports rates of de novo
19  dyspareunia in patients who have undergone
20  sacrocolpopexy -- strike that.
21         You're aware that the medical
22  literature reports rates of de novo
23  dyspareunia exceeding 10 percent in patients
24  who underwent sacrocolpopexy; correct?
25         MR. ANDERSON:  Objection.

Page 380

1          Go ahead.
2          THE WITNESS:  Well, number one,
3  I'd like to actually see that study;
4  however, that does sound appropriate.
5  BY MR. SNELL:
6      Q.   Pelvic organ prolapse surgery is
7  a fairly complex surgery; correct?
8      A.   I would agree with that, that it
9  takes learning to know how to do it.  The
10  surgical dissection, the knowledge of the
11  anatomy, the consequences of surgery, I
12  would agree with your statement.
13     Q.   It's the type of surgery that's
14  best performed in the hands of a specialist;
15  correct?
16     A.   Well, it depends what you're
17  defining as specialist.  It needs to be done
18  by a urologist who's familiar with the
19  pelvic anatomy and pelvic organ prolapse or
20  a gynecologist or a urogynecologist who's
21  familiar with it.
22         A specialist, I would not say a
23  general surgeon should do it, but it is not
24  somebody who necessarily needs to have a
25  fellowship.

Page 381

1      Q.   Do you know, how many urology
2  fellowships were there in the United States
3  like the one that you attended where you
4  focused on female reconstructive prolapse
5  surgeries, urinary incontinence surgeries,
6  in 2005?
7      A.   2005.  I won't be able to give
8  you a number in 2005 because it is evolving
9  because starting in 2008 or 2009 is when the
10  GYN Board and the American Urologic
11  Association -- or no, that's wrong.  The
12  Board of American Urology, ABU, American
13  Board of Urology, when they combined to set
14  up criteria for a female
15  urology/urogynecology fellowship.
16         So in 2005 I don't know the
17  number.  Currently, there are I believe like
18  15, 16, my last check.
19     Q.   Is that urology only or --
20     A.   It's both.
21     Q.   -- is that a combination of
22  urology and urogynecology fellowships?
23     A.   There is now no such thing as
24  urology or gynecology.  All fellowships that
25  have been approved are combined.

Confidential - Attorneys' Eyes Only

Page 382

1    Q.   In 1999 and 2000, when you did
2  your fellowship, how many other similar
3  fellowships were there for urologists, such
4  as yourself?
5    A.   Yeah.  I don't know because it
6  was in the stages where things were coming
7  about so it was not an issue that it was
8  discussed.  I don't know.  I would think,
9  actually, there would be fewer back then.
10    Q.   So you would agree it's a fairly
11  small group of surgeons who are being
12  trained in these fellowships currently;
13  correct?
14         MR. ANDERSON:  Objection.
15         Go ahead.
16         THE WITNESS:  Relative to the
17  number of urologists and gynecologists being
18  trained every year, it is correct to say
19  that those going through fellowships either
20  in, again, this combined fellowship, I tend
21  to call it female urologists because I'm a
22  urologist, but the combined fellowship
23  percentage-wise, that would be a select
24  group.
25  BY MR. SNELL:

Page 383

1    Q.   When a patient comes to you for
2  prolapse, your consultation and treatment
3  are geared towards that specific patient;
4  correct?
5    A.   Correct.
6    Q.   And that takes into account that
7  specific patient's symptoms; correct?
8    A.   Correct.
9    Q.   And you would agree it's
10  important to discuss the different possible
11  alternative treatments with patients?
12    A.   Absolutely.
13    Q.   And you, obviously, counsel
14  patients on different surgical options which
15  you believe may be appropriate for a given
16  case; correct?
17    A.   Correct.
18    Q.   Let me say that again.
19         As a surgeon, you, obviously,
20  counsel patients on different surgical
21  options which you believe may be appropriate
22  for that particular patient; correct?
23    A.   Correct.
24    Q.   And as a surgeon, one of the
25  issues that would be important for a surgeon

Page 384

1  to consider with respect to the procedures
2  is those procedures with which he or she
3  feels comfortable with; correct?
4    A.   Not just comfortable with but
5  also competent in performing.
6    Q.   I'm going to get there.
7         You would agree that it's
8  important for the surgeon when considering
9  what surgical options to offer that he or
10  she feel comfortable with the surgical
11  options offered; correct?
12    A.   Correct.
13    Q.   And if the surgeon is not
14  comfortable with doing a particular surgery
15  that the patient needs, then it would be
16  appropriate to refer the patient elsewhere;
17  correct?
18    A.   In my opinion, yes.
19    Q.   And if a surgeon is not familiar
20  with doing a particular surgery that the
21  patient needs, it would be appropriate to
22  refer the patient elsewhere as well.
23    A.   Yes.  Correct.
24    Q.   And in offering potential
25  surgical options, it's your opinion that the

Page 385

1  surgeon should be competent in those
2  particular surgical options he or she
3  offers; correct?
4    A.   Yes.  Yes, that is correct.
5    Q.   And only that surgeon knows the
6  surgeries with which he or she is competent
7  to perform; correct?
8    A.   No.  I'd say probably also his OR
9  staff would also know.  You are correct, but
10  there are other people who can -- on the
11  inside who would know.
12    Q.   We earlier talked about your
13  credentialling.
14         How did you actually go about
15  determining which surgeries you would seek
16  credentialling for?
17    A.   Well, based upon my fellowship
18  and the surgical numbers that I compiled and
19  the staff, the chair at Baylor then writes
20  up a letter to send to the Mayo surgical
21  committee saying, Dr. Elliott during his
22  fellowship with me on such and such a date
23  to such and such a date completed X number
24  of surgeries, I have witnessed these
25  surgeries and follow-up and feel he is above

16 (Pages 382 to 385)

Confidential - Attorneys' Eyes Only

Page 386

1   and beyond competence.  Competence is the
2   entry level.  Okay?
3          And so then I go for the
4   credentialing committee and I have to say,
5   here's what I feel comfortable doing, the
6   procedures, and then they credential it.
7          You have then, I can't recall
8   exactly now, it's a one- or two-year time
9   period that you are then observed by a
10  colleague competent in those procedures to
11  make sure you are performing those
12  procedures to the highest level possible.
13     Q.   So you only sought credentialing
14  on those procedures in which you had been
15  trained; correct?
16     A.   No, not necessarily.  It was yes,
17  but it was also in management and treatment
18  of pelvic organ prolapse.  So it was not
19  limiting me to the development of future
20  techniques.
21     Q.   You sought credentialing with
22  respect to the procedures that you felt
23  comfortable with?  Is that a fair statement?
24     A.   Yes, that is.
25     Q.   Switch to a different topic.

Page 387

1          I believe you testified
2   yesterday that you've never used or
3   implanted Prolift®; correct?
4      A.   Correct.
5      Q.   Have you ever used or implanted
6   Apogee®?
7      A.   No.
8      Q.   Have you ever used or implanted
9   Perigee®?
10     A.   No.
11     Q.   You never underwent or
12  participated in any of the professional
13  education programs for Prolift®; correct?
14     A.   Correct.  I did not.
15     Q.   You never did any cadaver
16  training with respect to Prolift®; correct?
17     A.   I did not.
18     Q.   And you never underwent cadaver
19  training with respect to the use of any mesh
20  products for prolapse repair; correct?
21     A.   No.  I'm just trying to remember.
22  In fellowship we may have had cadaver labs
23  on the sacrocolpopexy because our staff was
24  involved in AUA as far as the individual to
25  come in for learning and I may have been

Page 388

1   involved in cadaver labs with the
2   sacrocolpopexy, but not transvaginal.
3      Q.   It's correct you never underwent
4   any cadaver lab training with respect to
5   transvaginal placement of mesh.
6      A.   Correct.
7      Q.   I take it you never talked with
8   any of Ethicon's sales representatives about
9   Prolift®?
10     A.   I don't recall ever meeting with
11  one.  I run it so that I very rarely have
12  any interaction with the industry.  But when
13  we go to meetings, they swarm around you.
14  So I could have encountered one.
15     Q.   As you sit here today, do you
16  have any specific recollection of having
17  conversations with an Ethicon sales rep
18  regarding Prolift®?
19     A.   None, no.
20     Q.   Before being engaged in this
21  litigation, you had never reviewed any of
22  the marketing materials for Prolift®;
23  correct?
24     A.   That is correct.
25     Q.   Before being engaged in this

Page 389

1   litigation, you had never observed a surgery
2   involving Prolift®; correct?
3      A.   Not to my recollection, no.
4      Q.   Now, have you seen surgical
5   videos of the Prolift® surgery?
6      A.   Yes.
7      Q.   The surgical videos that you saw
8   on the Prolift® surgery were within the
9   context of this litigation; correct?
10     A.   Correct.
11     Q.   They were surgical videos
12  provided to you by the plaintiffs' lawyers;
13  correct?
14          MR. ANDERSON:  Me.
15  BY MR. SNELL:
16     Q.   Mr. Anderson; correct?
17     A.   Correct.  Yes.
18     Q.   Have you participated in any
19  professional education programs for any
20  manufacturer of pelvic mesh?
21     A.   For pelvic mesh?  So participated
22  with pelvic mesh?
23     Q.   Yeah.
24     A.   No.
25     Q.   Okay.

17 (Pages 386 to 389)

Confidential - Attorneys' Eyes Only

Page 390

1     A.    For prolapse, no.
2     Q.    Have you ever participated in any
3  professional education programs for a
4  manufacturer of mesh used to treat stress
5  urinary incontinence?
6     A.    Yes.
7     Q.    And which manufacturers were
8  those?
9     A.    AMS and Coloplast.
10    Q.    Now, obviously, you were never a
11  Prolift® preceptor; correct?
12    A.    Correct.  I was not.
13    Q.    And you were never a Prolift®
14  proctor; correct?
15    A.    No, I was not.
16    Q.    Have you ever called and spoken
17  to a Prolift® preceptor?
18    A.    No.
19    Q.    Have you ever called and spoken
20  to a Prolift® proctor?
21    A.    No.  But I've had conversation --
22  when I have patients referred to me with
23  complications, I have spoken to the outside
24  physician who put the device in.  I don't
25  know if -- what their status was.

Page 391

1     Q.    Before becoming engaged in this
2  litigation, had you ever reviewed the
3  Prolift® instructions for use?
4     A.    No, I had not.
5     Q.    Before becoming involved in this
6  litigation, had you ever read the
7  instructions for use for Gynemesh® PS?
8     A.    No.
9     Q.    Before becoming involved in this
10  litigation, had you ever reviewed the IFU
11  for any other mesh used in pelvic floor
12  reconstruction?
13    A.    Yes.  The Coloplast product.  And
14  then I believe I was also provided one for
15  the AMS product.  That was quite a long time
16  ago but, yes, they had provided that for me.
17    Q.    And the Coloplast product was a
18  sling product?
19    A.    No.  They're mesh.
20    Q.    The AMS product was also a mesh?
21    A.    A mesh, correct.
22    Q.    Is that the IntePro that you
23  referenced yesterday --
24    A.    No.  No.
25    Q.    -- or something else?

Page 392

1     A.    This was something else.  It was
2  the Apogee®, Perigee®, one of those two, or
3  Elevate®.  And then the Coloplast product, I
4  don't even recall what their name was, but
5  the reps were pushing it.
6     Q.    Have you ever been requested by a
7  manufacturer or a regulatory agency to
8  consult on the contents of an instructions
9  for use?
10    A.    No.
11    Q.    Have you ever been requested to
12  advise on the content of a surgical
13  technique manual?
14    A.    For a manufacturer?
15    Q.    By a manufacturer or some
16  governmental agency.
17    A.    No.  No.  I mean, I've given
18  opinions for journals in their surgical
19  descriptions section for various different
20  surgeries I perform but not for an industry
21  or a regulatory body.
22    Q.    Before being engaged in this
23  litigation had you ever seen a surgical
24  technique manual published by a
25  manufacturer?

Page 393

1     A.    Yes.
2     Q.    Which one?
3     A.    Well, that would be AMS and
4  Coloplast also.
5     Q.    The same ones you earlier
6  referred to.
7     A.    Yes.  And then also for their
8  suprapubic sling and transobturator sling
9  and their male incontinence procedure for
10  Coloplast.
11    Q.    Did you have any criticism of
12  those surgical technique manuals?
13    A.    What I'm looking at -- well, it
14  depends on what procedure, if I'm coming in
15  with little knowledge or a lot of knowledge.
16          If I have a lot of knowledge,
17  I'm usually going to be quite critical
18  because I'm going to see where I feel there
19  are deficiencies or warnings.
20          If I am a novice to it, like
21  when I first started doing transobturators,
22  I didn't know enough to know where the pros
23  and cons are.
24    Q.    When you first started doing
25  transobturator sling surgeries, you didn't

Confidential - Attorneys' Eyes Only

Page 394

1  know enough to know what the pros and cons
2  were of that procedure?  Is that what you're
3  saying?
4      A.   What I'm saying is, when I
5  started doing transobturator in, whenever
6  that was, 2002 to 2004 -- and, again, I
7  stated that I believe I was the first one to
8  do it in the State of Minnesota -- no one
9  had experience in it.
10        It was designed, invented and
11  patented in France and so the U.S.
12  introduction was, as I recall, through
13  Mentor, because they had the patent on it.
14  So no one had knowledge of it.
15        I understood vaginal
16  dissections, I did not understand the
17  transobturator route because no one had ever
18  heard of it before.  So that's why I say as
19  far as novice.  I had knowledge of
20  anti-incontinence procedures but not the
21  transobturator route.
22      Q.   And as you gained experience with
23  using the transobturator route, you became
24  more and more comfortable with it?
25      A.   Yes.

Page 395

1      Q.   And you still consider it an
2  important option in your armamentarium today
3  to treat women with stress urinary
4  incontinence; correct?
5      A.   For a select group of
6  individuals, yes, it's a very important part
7  of my practice.
8      Q.   Prior to becoming involved in
9  this litigation, you had never seen a
10  patient brochure for Prolift®; correct?
11      A.   Correct.
12      Q.   Prior to becoming involved in
13  this litigation, had you seen the patient
14  brochure for any prolapse mesh product?
15      A.   Yes.  The Coloplast and the AMS
16  product.
17      Q.   Did you ever use those patient
18  brochures?
19      A.   No.  No.  It was the
20  representative, it was the reps for
21  Coloplast, it was the vice-president of AMS
22  who gave me the brochures, and I never did
23  do the procedure nor hand them out to any
24  patients.
25      Q.   Do you know if other surgeons at

Page 396

1  Mayo Clinic were doing those procedures?
2        MR. ANDERSON:  Those
3  procedures?
4        MR. SNELL:  The ones that you
5  identified, the Coloplast and the AMS mesh
6  procedures.
7        THE WITNESS:  Well, no, those
8  -- to the best of my knowledge, nobody at
9  Mayo does any mesh for pelvic organ
10  prolapse, for transvaginal route.
11  BY MR. SNELL:
12      Q.   Do you ever use patient brochures
13  -- strike that.
14        Before this, becoming involved
15  in this litigation, did you ever use patient
16  brochures for sling products?
17      A.   I -- yes, I give the patient
18  brochures for the transobturator sling by
19  Coloplast, the suprapubic sling -- well,
20  actually, they're both, they're encompassing
21  both, suprapubic and transobturator, and
22  they also give the brochures for the
23  artificial urinary sphincter.
24      Q.   And the patient brochures are
25  designed to be used in consultation with the

Page 397

1  surgeon, like yourself; correct?
2      A.   Correct.
3      Q.   Would you ever perform a surgery
4  on a patient who came to you who said,
5  Doctor, I've looked at a patient brochure
6  and I want to have this particular type of
7  surgery without actually counseling and
8  examining the patient?
9      A.   No.
10      Q.   Do you know what patient
11  brochures were available to patients in your
12  clinic at Mayo -- strike that.  Let me back
13  up.
14        Would you actually give these
15  patients the brochures for the urinary
16  incontinence products?
17      A.   Yeah.  Either myself or my
18  physician assistant would.
19      Q.   Did you keep them in your office
20  or were they out in the waiting area or some
21  other place?
22      A.   In my office.  We are not allowed
23  at Mayo to have any industry products out.
24      Q.   Did you prepare any materials
25  yourself for your patients for whom you

Confidential - Attorneys' Eyes Only

Page 398

1  would use mesh in to treat their prolapse?
2      A.   No.
3      Q.   In the course of your teaching,
4  did you train any residents or fellows on
5  how to treat mesh erosions or exposure that
6  occur following a sacrocolpopexy?
7      A.   In the past.  But we haven't had
8  one in six or seven years.  So the current
9  group of fellows have not -- residents have
10  not seen it.
11      Q.   Have you trained them on -- let
12  me re-ask it.
13          Have you trained residents or
14  fellows on how to treat mesh erosion or
15  exposure should it occur following a
16  sacrocolpopexy?
17      A.   Yeah.  I say if trained as in
18  past tense, yes, I have.
19      Q.   And if you had a mesh erosion or
20  exposure with a sacrocolpopexy, how would
21  you go about telling residents or fellows
22  the step-wise progression of treating that
23  complication following the sacrocolpopexy
24  procedure?
25          MR. ANDERSON:  Objection.

Page 399

1          Go ahead.
2          THE WITNESS:  I would first
3  counsel them that any patient that calls up
4  who has had a mesh, whether it be sling or
5  prolapse, to have a high index of suspicion
6  if a patient calls up with a discharge.
7  Okay.  So, first of all, it's a warning.
8  Always be thinking about that.
9          Then I would have them say that
10  we cannot treat this over the telephone,
11  meaning I can't just call in something.  You
12  always have to see the patient, talk to
13  them, get a good history, get a kind of feel
14  for what's going on and the severity of it,
15  then do a very thorough pelvic exam.
16  Possibly, if there's any urinary complaints,
17  then do a cystoscopy, make sure there's no
18  bladder perforation or erosion specifically.
19          Then on the pelvic exam
20  specifically with a speculum and also just a
21  bimanual because sometimes you can't see it
22  but you can feel it so you have to do both,
23  and you have to take your time because the
24  small ones are easier to miss, the large
25  ones are not.

Page 400

1          You also have to, when you do
2  your exam be looking, is there a discharge,
3  does it look erythema, erythematous, is
4  there a specific amount of granulation
5  tissue?  Then once all those things are
6  done, then you have to evaluate, again, like
7  we talked about yesterday, the size of the
8  infection, all those things.
9  BY MR. SNELL:
10      Q.   And then the same would hold true
11  then in the case of a sacrocolpopexy, as our
12  discussion yesterday, you would attempt to
13  treat it most conservatively first.
14      A.   Dependent upon, yeah, the
15  severity of the problem.  But yes, you --
16  you start as conservative as possible for
17  that given patient.
18      Q.   So for a mesh exposure or erosion
19  with sacrocolpopexy, you would still try to
20  treat it as conservative as possible for a
21  given patient.
22      A.   Correct.
23      Q.   And based upon the patient's
24  unique presentation and your findings on
25  exam.

Page 401

1      A.   Correct.
2      Q.   And if you believe that you need
3  to do a mesh excision of the mesh exposure
4  following a sacrocolpopexy, what route would
5  you go in to -- first to do that mesh
6  rescission?
7      A.   Again, that depends upon all the
8  different factors and things.  But I have to
9  think back to, again, the last time we had
10  one, which was roughly seven years ago, when
11  we swapped over to IntePro.
12          Sacrocolpopexy meshes, you have
13  to be careful what you're going after
14  because that's a lot -- there's mesh that
15  extends all the way up to the sacrum.  So
16  you're going to be then counseling the
17  patient on as far as the dissection, if it's
18  just limited, just cutting it out.
19          If -- now, I have not seen this
20  in my practice, however, I've talked to my
21  urogynecology colleagues about this.  If you
22  have a patient who comes in with, obviously,
23  a purulent discharge, a large, gaping hole
24  and a large amount of mesh coming back and
25  the patient has systemic symptoms of

20 (Pages 398 to 401)

Confidential - Attorneys' Eyes Only

Page 402

1  infection, now you're probably going to be
2  approaching that transabdominally.
3      Q.   Is it correct that you would try
4  to do a transvaginal mesh excision following
5  a sacrocolpopexy if -- strike that.
6           Is it correct that you would
7  first attempt -- let me see how I can say
8  this.
9           If you have a patient who has a
10  mesh excision following a sacrocolpopexy and
11  it is a --
12      A.   It's mesh exposure.
13      Q.   Yeah.  I'll just call it that.
14  Yeah.
15           If you have a patient, Doctor,
16  who has a mesh exposure following
17  sacrocolpopexy and you believe that you can
18  do the mesh excision transvaginally or
19  transabdominally, which option do you
20  choose?
21      A.   Well, I can always do it
22  transabdominally.  That's a major and morbid
23  procedure.  So the question is, can I
24  accomplish it transvaginally?  And that's
25  when all those other criteria I talked

Page 403

1  about, the patient-specific issues.
2      Q.   So it's correct, then, that if
3  you can do a transvaginal mesh rescission,
4  you prefer to do so over the transabdominal
5  mesh excision; correct?
6      A.   If it can be safely and
7  successfully accomplished transvaginally,
8  that is, no question, my preferred route.
9      Q.   And that's because transabdominal
10  surgery is a major and morbid surgery;
11  correct?
12      A.   That is fair to say, yes.
13      Q.   Before becoming involved in this
14  litigation, had you ever looked at mesh that
15  had been removed from a patient under a
16  microscope?
17      A.   No.
18      Q.   Have you done that since becoming
19  involved in this litigation?
20      A.   Not of my own patients.  I've
21  seen photographs and microscopies and
22  papers.
23      Q.   Prior to being engaged as an
24  expert witness in this matter, had you ever
25  performed any examination of the porosity of

Page 404

1  meshes?
2      A.   No.
3      Q.   You don't hold yourself out to be
4  a polymer chemist; correct?
5      A.   That is correct.
6      Q.   If you were counseling a patient
7  on the sacrospinous ligament fixation
8  surgery, what risk would you identify to her
9  with that procedure?
10      A.   Well, I wouldn't have that
11  counsel, consultation because I would send
12  them to my urogynecology colleagues.
13      Q.   Because you don't do sacrospinous
14  ligament fixation procedures; correct?
15      A.   That is correct.
16      Q.   Can you tell me what independent
17  research you did in connection with your
18  role as an expert in this litigation, other
19  than reviewing the materials that
20  plaintiffs' counsel provided to you?
21      A.   Well, I reviewed, as you
22  mentioned, the internal documents, I
23  reviewed roughly, what, 200 manuscripts,
24  scientific journal manuscripts, and then the
25  depositions, which would be the -- from the

Page 405

1  litigation.
2      Q.   The internal documents were
3  documents that Mr. Anderson or the other
4  plaintiffs' lawyers gave you; correct?
5      A.   Correct.
6      Q.   Before becoming involved in this
7  litigation, had you ever reviewed any other
8  company's internal documents?
9      A.   Only pertaining to that patent
10  infringement case.
11      Q.   The deposition transcripts, those
12  were given to you by Mr. Anderson or
13  plaintiffs' counsel; correct?
14      A.   Correct.  Yes.
15      Q.   The medical literature, the
16  manuscripts that you reviewed, were those
17  given to you by plaintiffs' counsel as well?
18      A.   They gave me a few.  So roughly
19  we're looking at 200 or so manuscripts in my
20  report and supplemental report.  When this
21  all started, I believe Mr. Anderson gave me
22  20, maybe 30.  So everything else is from
23  me.
24      Q.   So the independent research you
25  did besides reviewing the materials that

Confidential - Attorneys' Eyes Only

Page 406

1  plaintiffs' counsel sent to you was you
2  reviewed some of the medical literature and
3  manuscripts.
4      A.   Yeah.  It's fair to say that
5  except for what I received from Mr. Anderson
6  and colleagues, everything would be journal
7  reviews.
8      Q.   Do you know any of the study
9  investigators involved in clinical studies
10  concerning Gynemesh® PS?
11      A.   No, I -- I don't know any of
12  those.
13      Q.   Do you know Doug Hale?
14      A.   I don't recognize the name.
15      Q.   Do you know anyone involved in
16  the Prolift® clinical studies?
17      A.   Not that I know of, no.
18      Q.   Now, you've never been employed
19  by the FDA; correct?
20      A.   No.
21      Q.   I'm not correct?
22      A.   No.  You are correct.  I have
23  never been employed --
24          MR. ANDERSON:  Your bad
25  question.

Page 407

1          THE WITNESS:  -- or never
2  anticipate being employed by the FDA.
3  BY MR. SNELL:
4      Q.   Have you ever been a consultant
5  to the FDA?
6      A.   No.  The closest would be through
7  that Public Citizen, Ralph Nader's group,
8  where I had comments read at the FDA.  But I
9  wouldn't think I would be a consultant for.
10      Q.   Has the FDA ever paid you to be a
11  consultant to provide information to them?
12      A.   No.
13      Q.   Have you ever served on an FDA
14  advisory committee board?
15      A.   No.
16      Q.   Have you ever testified at any
17  government institution, setting aside, you
18  know, the patent case and any other
19  depositions or trial testimony you've given?
20      A.   No.
21      Q.   Have you ever testified at an FDA
22  advisory committee?
23      A.   No.  Again, other than that
24  Public Citizen comments.  But I was not
25  personally there.

Page 408

1      Q.   Have you reviewed the federal
2  regulations that pertain to medical devices?
3      A.   No.
4      Q.   Have you ever reviewed any FDA
5  regulations pertaining to devices before
6  becoming engaged as an expert witness in
7  this case?
8      A.   No.
9          MR. ANDERSON:  Off the record.
10          (Discussion off the record.)
11  BY MR. SNELL:
12      Q.   Have you ever been involved in
13  the clinical trial designed to evaluate the
14  safety and efficacy of a medical device?
15  When I say clinical trial, I mean in humans.
16      A.   Yes.
17      Q.   What was that?
18      A.   1998 to '99, it was a new design
19  of an artificial urinary sphincter for men,
20  and I was involved in the original dog
21  studies and then it went into human trials,
22  which my name was on.  However, I was not
23  involved because I went down to my
24  fellowship.  But my name would be attached
25  to it.

Page 409

1      Q.   So it's correct that you were not
2  involved in the human clinical trials with
3  regard to this artificial urinary sphincter;
4  correct?
5      A.   I was not involved in the
6  implantation.  I was involved heavily as far
7  as the write-up, the documentation.  And
8  then timing, I was sent down to my
9  fellowship so I left.  I did the work but
10  didn't get to do the surgery.
11      Q.   You've never been involved in a
12  clinical trial designed to evaluate the
13  safety and efficacy of a prolapse device;
14  correct?
15      A.   Correct.
16      Q.   You've never been involved in a
17  clinical trial designed to evaluate the
18  safety and efficacy of a stress urinary
19  incontinence synthetic sling; correct?
20      A.   Correct.  I have not.
21          MR. SNELL:  Why don't we take a
22  break.
23          (Recess, 11:15-11:52 a.m.)
24  BY MR. SNELL:
25      Q.   Doctor, you've never been

22 (Pages 406 to 409)

Confidential - Attorneys' Eyes Only

Page 410

1  involved in a clinical trial designed to
2  assess the safety and efficacy of a stress
3  urinary incontinence device; correct?
4      A.   Correct.
5      Q.   Prior to becoming involved in
6  this litigation, you had never reviewed a
7  device design safety assessment; correct?
8      A.   From an industry, I guess I don't
9  know -- I just want to make sure I'm clear
10 in understanding your question.
11     Q.   Yes.
12     A.   Would this be an industry --
13     Q.   From a manufacturer, yes.
14     A.   No, I have not.
15     Q.   You're not an FDA regulatory
16 expert, are you?
17     A.   No, I'm not.
18     Q.   Yesterday, Doctor, you mentioned
19 the Iglesia study?
20     A.   Yes.
21          MR. SNELL:  Can we mark it as
22 the next exhibit.
23          (Exhibit Elliott-9 was marked
24 for identification.)
25 BY MR. SNELL:

Page 411

1      Q.   Doctor, I've handed you Exhibit
2  Number 9, which is the Iglesia randomized,
3  controlled trial in which you referred to
4  yesterday; correct?
5      A.   Yes.
6      Q.   And you know that in this study
7  only 65 women were ultimately recruited into
8  the study; correct?
9      A.   That is correct.
10     Q.   And of those, there were 32 women
11 who received mesh placement; correct?
12     A.   Yes.
13     Q.   And the 32 women were recruited
14 between January 2007 to August 2009;
15 correct?
16     A.   That is correct.
17     Q.   You mentioned the mesh exposures
18 with this study yesterday in your testimony;
19 correct?
20     A.   That is correct.
21     Q.   Turn, if you would, Doctor, to
22 the bottom of Page 298.
23     A.   (Witness complies.)
24     Q.   And do you see it says, "Of the
25 32 mesh patients, five developed erosions"?

Page 412

1          Do you see that?
2      A.   Yes.
3      Q.   Now, this is something that we've
4  discussed over the course of your
5  deposition, the terminology of exposure
6  versus erosion; correct?
7      A.   Correct.
8      Q.   As you look at these data in this
9  study, these are not mesh erosions, as you
10 would call them, such that they eroded into
11 another organ like bladder; correct?
12     A.   From my recollection -- I'd have
13 to go look at it specifically because,
14 again, that nomenclature is confusing.  My
15 recollection is that they were what we call
16 now extrusions or exposures.
17     Q.   I didn't know if you were
18 continuing.
19     A.   Oh, no.  No.  I was waiting for
20 you.  I'm sorry.
21     Q.   On Page 299, Doctor --
22     A.   Yes.
23     Q.   -- it discusses the treatment of
24 these mesh exposures; correct?
25     A.   Let me just -- yeah.  No.  That's

Page 413

1  where I'm -- I'm just seeing what their
2  treatment was.  Yes, it does discuss that,
3  what they did.
4      Q.   Three of them required a
5  procedure in the operating room to remove
6  the mesh; correct?
7      A.   Oh.  Three, I missed it.  Yes,
8  three of the five required procedures in the
9  operating room.  Yes, you are correct.
10     Q.   And the other two exposures, one
11 was described as small and resolved after
12 in-office trimming; correct?
13     A.   Yes.
14     Q.   And local estrogen use; correct?
15     A.   Correct.
16     Q.   And one of the exposures was
17 persistent but not symptomatic enough to
18 require intervention; correct?
19     A.   Correct.
20     Q.   A little further down, in the
21 next paragraph, it's correct that none of
22 the patients in the Prolift® group had a
23 major infection, requiring use of
24 postoperative antibiotics; correct?
25     A.   Well, it says here one patient in

23 (Pages 410 to 413)

Confidential - Attorneys' Eyes Only

Page 414

1 each group had a febrile illness while
2 hospitalized, and that would usually mean
3 you're going to have to -- you're going to
4 give antibiotics.  So your question was --
5    Q.    My question is, the authors
6 report that none of the Prolift® patients
7 had a major infection, requiring use of
8 postoperative antibiotics; correct?
9    A.    Major infection.  Well, that's
10 what it says there but that's not congruent
11 with what they say, one patient in each
12 group had a febrile illness while
13 hospitalized.
14        You don't get a fever unless
15 you have an infection.  So I see what you're
16 saying but I see incongruency in the data.
17 If I were reviewing this manuscript, I would
18 say I need clarification.
19    Q.    Well, only one patient in the
20 Prolift® group had a febrile illness while
21 hospitalized; correct?
22    A.    That is correct.  That's what
23 they assess, yes.
24    Q.    And only one patient in the
25 non-mesh group -- strike that.

Page 415

1        And one patient in the non-mesh
2 group had a febrile illness while
3 hospitalized; correct?
4    A.    That is correct.
5    Q.    And the rate of febrile illness
6 while hospitalized with Prolift® was not
7 higher than that with the non-mesh group;
8 correct?
9    A.    Well, statistically speaking, it
10 was higher because there are 32 in mesh and
11 33 in the non-mesh so one patient in each,
12 statistically speaking, would be different.
13 But I know what you're saying.
14        MR. SNELL:  No.  Move to
15 strike.
16 BY MR. SNELL:
17    Q.    One patient in each group had a
18 febrile illness while hospitalized; correct?
19    A.    That is correct, yes.
20    Q.    And there was 32 patients in one
21 group and 33 patients in the other group;
22 correct?
23    A.    That is correct.
24    Q.    And are you saying that there is
25 a statistically significant difference

Page 416

1 between that one febrile illness in each
2 group?
3    A.    What I'm saying is there is a
4 percentage, you're correct, not
5 statistically significant, but there's a
6 percentage difference just because one out
7 of 32 is different than one out of 33.
8        MR. ANDERSON:  You asked about
9 the rate of illness, not the number of
10 illnesses.  That's what he was referring to.
11        MR. SNELL:  Okay.
12 BY MR. SNELL:
13    Q.    The number of febrile illnesses
14 was not different for the Prolift® versus
15 the non-mesh group; correct?
16    A.    Correct.  Just because when I
17 review manuscripts, which I take a lot of
18 pride in, and hence The Journal of Urology
19 awarded me the award as far as the best
20 reviewer in female urology, that's why I
21 just, when I hear words, I want to be more
22 specific about it.
23    Q.    And the difference between one in
24 32 and one in 33 is what?
25    A.    I'd have to get a calculator and

Page 417

1 do it, the difference.
2    Q.    One in 33 is 33.33 repeating
3 percent; correct?
4    A.    Yes.
5    Q.    One in 32 is 31.25; correct?
6    A.    I'll take your word for it.
7    Q.    There's no statistically
8 significant difference reported between
9 these febrile illnesses in the two cohorts;
10 correct?
11    A.    They do not report it, no.
12    Q.    What are the reasons why a
13 patient would develop a febrile illness?
14    A.    There will be many potential
15 reasons, so it's going to be difficult to
16 narrow it down to just a few.
17        It could be a complication of
18 surgery itself, bowel perforation, bladder
19 perforation, wound infection, rectal injury,
20 sigmoid injury, atelectasis, pulmonary
21 embolism, stroke.  You know, there's a --
22 there's an extensive list.
23    Q.    Can you, as you look at this
24 paper by Iglesia, Dr. Sokol and others, can
25 you tell me, see the percentage of patients

24 (Pages 414 to 417)

Confidential - Attorneys' Eyes Only

Page 418

1  who developed mesh exposure was 15.6
2  percent; right?
3      A.   Yes.
4      Q.   And the study was stopped because
5  the rate of mesh exposure was more than 15
6  percent; correct?
7      A.   Yeah.  Again, I'd have to look at
8  the paper specifically but --
9      Q.   I'm on Page 302.
10         MR. ANDERSON:  Right here
11 (indicating).
12         THE WITNESS:  302.  Yeah.
13 BY MR. SNELL:
14     Q.   It says, "Weakness include the
15 short follow-up and lack of statistical
16 power due to premature stopping as a result
17 of reaching predetermined mesh erosion rates
18 of more than 15%."
19         Do you see that, Doctor?
20     A.   Yes.
21     Q.   So the study was stopped because
22 of the exposure rate of more than 15
23 percent; correct?
24     A.   Yes.  They had a -- they had a
25 predetermined threshold once crossed, it

Page 419

1  would be terminated, and I would imagine
2  that was established by an ethics committee.
3      Q.   And as you look at this paper, do
4  you know what the rate of erosion was in the
5  non-mesh group?
6      A.   In the non-mesh group?  I would
7  have to look through it.  I don't -- I don't
8  recall.
9      Q.   Would you expect the rate of
10 suture erosion to be reported in this study?
11     A.   Again, I would have to look at
12 the paper, see how they did their anterior
13 colporrhaphies or the prolapse repairs.
14         Many surgeons, including
15 myself, do not use permanent sutures so
16 erosion is -- or extrusion is not an issue.
17 I don't recall how they did their repairs.
18     Q.   If the rate of suture erosion was
19 15 percent or more, would you expect it to
20 be in this paper by Dr. Iglesia?
21     A.   I think it should be reported,
22 yes.  But I see the sutures they used in
23 here.  They used absorbable -- oh, PDS.
24 Well, I don't know what size they used.
25 PDS.  That's what I use.  And also they do

Page 420

1  use polytetrafluoroethylene.
2      Q.   Is that Gore-Tex?
3      A.   Yes.  That's for their
4  culdoplasties, according to what they say
5  here.
6      Q.   One of the other articles you
7  mentioned yesterday was the Withagen paper;
8  correct, Doctor?
9      A.   Yes.
10     Q.   And that being the Withagen
11 randomized, controlled trial; correct?
12     A.   Correct.
13         (Exhibit Elliott-10 was marked
14 for identification.)
15 BY MR. SNELL:
16     Q.   Doctor, you've been handed
17 Exhibit Number 10.  Is this the randomized,
18 controlled trial by Withagen to which you
19 referred yesterday in your deposition?
20     A.   Yes.
21     Q.   And this was a study of the use
22 of Prolift® versus conventional vaginal
23 repair; correct?
24     A.   Correct.
25     Q.   And the cohort of patients were

Page 421

1  those who had recurrent prolapse; correct?
2      A.   Yes.
3      Q.   And ultimately, 97 women
4  underwent conventional repair and 93
5  underwent the Prolift® repair; correct?
6      A.   Yes.
7      Q.   And there was a 98 percent
8  follow-up rate at one year; correct?
9      A.   93 -- excuse me.  I'm sorry.  Can
10 you repeat that again?  I'm sorry.
11     Q.   Sure.  There was a 98 percent
12 follow-up rate after 12 months; correct?  In
13 the "Results" section.
14     A.   Yes.
15     Q.   12 months, so -- strike that.
16         One year after surgery,
17 anatomic failure in the treated compartment
18 was observed in 45.2 percent of the
19 conventional vaginal repair group; correct?
20     A.   That is correct.
21     Q.   And one year post surgery
22 anatomic failure in the treated compartment
23 was observed in only 9.6 percent in the
24 Prolift® group; correct?
25     A.   Correct.

25 (Pages 418 to 421)

Confidential - Attorneys' Eyes Only

Page 422

1    Q.    And that difference was
2  statistically significant; correct?
3    A.    It's a very significant anatomic
4  difference, yes.
5    Q.    Turn, if you would, Doctor, to
6  Page 247.  And I'm on the left column in the
7  text.  Let me know whenever you're ready.
8    A.    Left.  Yeah.  Uh-huh.
9    Q.    On Page 247 the study authors
10  report, in the conventional group failure
11  rates were higher in both anterior as well
12  as in the posterior compartment compared
13  with the tension-free vaginal mesh group,
14  citing Table 5; correct?
15    A.    That is correct.  They were
16  referring to anatomic failure.
17    Q.    Correct.  And if we look at Table
18  5, where they're looking at POPQ stage two
19  or greater failure; correct?
20    A.    They don't say POPQ.  I would
21  assume they would have used POPQ, though.
22  I'd have to go to Table -- where they refer
23  to Table 5.  For it to have gotten published
24  in 2011, it has to be POPQ.
25    Q.    So in all patients at six months

Page 423

1  the vaginal mesh Prolift® group had a lower
2  rate of POPQ failure; correct?
3    A.    Correct.
4    Q.    And in all patients at 12 months
5  there was a lower rate of POPQ failure at 12
6  months; correct?
7    A.    Yeah.  Correct.
8    Q.    I think I said that twice.  Let
9  me just back up.
10       In all patients at 12 months
11  there was a lower rate of POPQ failure in
12  the Prolift® group compared to the
13  conventional group; correct?
14    A.    That is correct.
15    Q.    And for those patients undergoing
16  anterior compartment repair at six months
17  there was a lower rate of POPQ failure for
18  the Prolift® group as compared to the
19  conventional group; correct?
20    A.    Correct.
21    Q.    And at 12 months for those
22  patients undergoing anterior repair there
23  was a lower rate of POPQ failure with the
24  Prolift® group compared to the conventional
25  group; correct?

Page 424

1    A.    Correct.
2    Q.    At one year in the anterior
3  compartment cohort there were 7.8 percent
4  POPQ failures in the Prolift® group;
5  correct?
6    A.    Yes.
7    Q.    And there were 55.1 percent
8  failures in the conventional non-mesh group;
9  correct?
10    A.    Correct.
11    Q.    There was a lower rate of POPQ
12  failure in the posterior compartment for
13  Prolift® compared to the conventional
14  non-mesh group; correct?
15    A.    Where are you at?  Six months or
16  at -- you're at 12 months?
17    Q.    I'm at both of them.
18    A.    Okay.  Yes.
19    Q.    P value is less than .05;
20  correct?
21    A.    Yes.  And then you left out
22  apical at 12 months, conventional versus
23  mesh.  Maybe it was an oversight.
24    Q.    In the apical, in the apical
25  compartment there was no statistically

Page 425

1  significant difference; correct?
2    A.    No.  They had equal results,
3  anatomic, POPQ.
4    Q.    Why don't we look at Table 3.
5    A.    Okay.
6    Q.    For pain in the lower abdomen or
7  genital area, do you see that?
8    A.    Yes, I do.
9    Q.    There was no difference between
10  Prolift® and the conventional repair;
11  correct?
12    A.    When limited to 12 months, you
13  are correct.
14    Q.    Well, there was no statistically
15  significant difference in de novo pain
16  between Prolift® and conventional surgery in
17  this study; correct?
18    A.    At 12 months, you're correct.
19    Q.    And there was no significant
20  difference between dyspareunia seen for
21  Prolift® versus the conventional group;
22  correct?
23    A.    Correct.  And they must have
24  discussed symptomatic results in here
25  somewhere too.  Because, as we mentioned, we

Confidential - Attorneys' Eyes Only

Page 426

1  have to also look at the patient in
2  totality.  Anatomy alone is not sufficient.
3          MR. SNELL:  Objection.  Move to
4  strike.
5          MR. ANDERSON:  He didn't --
6          MR. SNELL:  I don't have a
7  question pending.
8          MR. ANDERSON:  He doesn't want
9  to ask you about that.
10         THE WITNESS:  I was continuing
11 to think.
12         MR. ANDERSON:  He doesn't --
13         THE WITNESS:  I'm not supposed
14 to think anymore?
15         MR. SNELL:  You're here to
16 answer my questions.  I know you have your
17 opinions and prerogative, and I hear you.
18         THE WITNESS:  Understood.
19 BY MR. SNELL:
20     Q.   Since you did bring up
21 symptomatic, in the Withagen paper there
22 were symptomatic improvements in the
23 Prolift® group; correct?
24     A.   Absolutely.  Roughly 80 percent.
25         MR. SNELL:  Let's go off the

Page 427

1  record.
2          (Discussion off the record.)
3  BY MR. SNELL:
4      Q.   Doctor, I believe you earlier
5  testified that before you became involved in
6  this litigation, you had not looked at any
7  pathology slides of mesh; correct?
8      A.   I've seen, well, gross
9  photographic specimens from patients that I
10 have explanted.  But pathology study, you
11 mean microscopic slides, is that what you're
12 referring to?
13     Q.   Yes.
14     A.   Probably at lectures.  But it
15 would be fairly limited.
16     Q.   Yesterday you recall two patients
17 for Prolift® for whom you had treated for
18 complications; correct?
19     A.   Correct.
20     Q.   And in your treatment of those
21 patients you did not see degradation of the
22 mesh, did you?
23     A.   Well, what I'm describing as far
24 as degradation, I don't know if these are
25 extrusion individuals.  In those

Page 428

1  individuals, I mean, I can't recall
2  specifically.
3          What I'm referring to as
4  degradation is the gross inspection.  It's
5  brittle, firm, breaks easily when you touch
6  it or if a clamp is put on it.  To me, I'm
7  calling that degradation.  But that's coming
8  from a clinician's perspective, not a
9  biomaterials expert or pathologist's
10 perspective.
11     Q.   And for the two Prolifts® that
12 you recall, did you believe that they were
13 degraded?
14     A.   I can't -- to be specific, I
15 can't recall the specifics on that.
16     Q.   In your report you cite to a
17 paper by Costello, 2007, with regard to
18 degradation?
19     A.   Yes.
20     Q.   You know the Costello paper was
21 not a paper about the Prolift®; correct?
22     A.   It was about polypropylene in
23 general.  To answer your question, yes.
24     Q.   The mesh analyzed in the Costello
25 paper was not the exact same mesh used in

Page 429

1  Prolift®; correct?
2      A.   Well, I would have to look at the
3  manuscript to know which products were used.
4  All I can recall is that it was
5  polypropylene.
6      Q.   You mentioned a Dr. Donald
7  Ostergard?
8      A.   Yes.
9      Q.   Do you know him?
10     A.   I've had correspondence with him
11 a long time ago, I believe probably even
12 when I was a resident, concerning writing a
13 paper.  In fact, I recall now, it was an
14 artificial urinary sphincter in women.  He
15 contacted my chairman of my department, I
16 was a resident, I had correspondence with
17 him, and that would have been 12, 14 years
18 ago.  But nothing since then.
19     Q.   Do you know whether he is an
20 expert for the plaintiffs' lawyers in the
21 mesh litigation?
22     A.   I have not heard that he is.  I
23 have no knowledge of that.
24     Q.   The 2010 article by Clave --
25     A.   Yes.

Confidential - Attorneys' Eyes Only

Page 430

1    Q.    -- you don't know how many, if
2  any, of those 100 explants in that study
3  were Prolift®; correct?
4    A.    No, I don't.  From my knowledge,
5  all I know is they were polypropylene.  I'd
6  have to review the manuscript to determine
7  that.
8    Q.    The barbed-wire effect that you
9  note on Page 58 --
10   A.    Yes.
11   Q.    -- that is a quote from
12 Dr. Klinge; correct?
13   A.    Actually, I don't know if that's
14 his or mine, because I felt that.  So I
15 would have to -- if I give a reference, 88.
16 I don't know if Dr. Klinge said it.  I -- I
17 don't recall when I wrote this if I was
18 quoting, just making the -- putting aside
19 because that's what I have felt.  He may
20 have said the same thing also.
21   Q.    When you say that is what you had
22 felt, what do you mean by that?
23   A.    Meaning when I've taken explants
24 of mesh material, it's this friable, broken,
25 you can -- that's why when I instruct the

Page 431

1  residents, you have to look and feel for the
2  mesh.  And many times, it's so encased in
3  scar that you have to go by feel, then you
4  can feel the poking sensation of it.  It's
5  sharp.
6    Q.    And in the Prolift® mesh that you
7  have examined, you don't recall it being
8  barbed wire; correct?
9    A.    No.  I cannot recall.  I did not
10 keep records if it was specifically
11 Prolift®.  I do know specifically TVT® but
12 not Prolift®.
13   Q.    Can you tell me any clinical
14 human studies in TVT® that reported a
15 barbed-wire effect with the mesh?
16   A.    I don't recall off the top of my
17 head, no.  Barbed wire is a descriptive
18 term, not a scientific term.
19        MR. SNELL:  Okay.  Let's have
20 some lunch.
21        (Luncheon recess,
22 12:29-1:15 p.m.)
23        AFTERNOON SESSION
24 BY MR. SNELL:
25   Q.    Am I correct that you never

Page 432

1  looked at any FDA guidance documents before
2  becoming involved in this litigation?
3    A.    I'm not familiar what guidance
4  documents are.
5    Q.    As you sit here today, do you
6  know what FDA guidance documents are?
7    A.    No, I do not.
8    Q.    Do you know whether the mesh that
9  was used in sacrocolpopexies by surgeons
10 between the 1970s and the 1990s, whether
11 that use was cleared by the FDA for use in
12 prolapse?
13   A.    I do not know that.
14   Q.    The FDA has never begun, to your
15 knowledge, any type of enforcement
16 proceedings against Ethicon for the
17 Prolift®; correct?
18   A.    I don't know.  Proceedings,
19 again, that falls under regulation
20 territory.  I'm a clinician.  I know of the
21 only -- the event in I believe 2008 where
22 letters were sent, from what I reviewed in
23 depositions, about not having 510
24 clearance.  But I'm not a regulatory
25 individual.

Page 433

1    Q.    You're not a regulatory expert on
2  510(k) clearance.
3    A.    By no means.
4    Q.    And you're not a lawyer; correct?
5    A.    No.
6    Q.    You don't have any legal
7  specialization in what is illegal versus
8  legal conduct; correct?
9    A.    Correct.
10   Q.    I'd like to ask you a couple of
11 questions, Doctor, about Exhibit Number 2.
12   A.    Yes.
13   Q.    And this is your November 7th,
14 2012, supplemental report; correct?
15   A.    Yes, it is.
16        MR. SNELL:  And, again, for the
17 record, we have filed a Motion to strike
18 this report and identified the bases for
19 that.  And I'm not waiving any arguments or
20 rights by questioning the doctor on this
21 report.
22 BY MR. SNELL:
23   Q.    Doctor, in your November 7th,
24 2012, report, this is the first time that
25 you identified any opinions with regard to

28 (Pages 430 to 433)

Confidential - Attorneys' Eyes Only

Page 434

1    Mrs. Gross; correct?
2          MR. ANDERSON:  Objection.
3    Asked and answered.
4          Go ahead.
5          THE WITNESS:  Correct.
6    BY MR. SNELL:
7       Q.    And the opinions you offer in
8    this report consist of one paragraph with
9    regard to Mrs. Gross; correct?
10      A.    Well, two paragraphs in which her
11   name is mentioned, one paragraph specific to
12   her.
13      Q.    There's one paragraph where you
14   set forth opinions with regard to
15   Mrs. Gross; correct?
16      A.    Yes.
17      Q.    And you referred -- I'm sorry.
18   Let me start over.
19          And you reviewed certain
20   medical records of Linda Gross, as
21   identified in this report?
22      A.    That is correct.
23      Q.    These were medical records of
24   Linda Gross that were given to you by
25   plaintiffs' counsel; correct?

Page 435

1       A.    That is correct.
2       Q.    When did you receive the medical
3    records of Linda Gross?
4       A.    I don't recall exact date.
5       Q.    Give me your best approximation
6    under oath.
7          MR. ANDERSON:  Objection.
8          THE WITNESS:  November 7th.  I
9    would -- this is a very rough guess because
10   there was a flood of information coming to
11   me.  Roughly a month prior to this.
12   BY MR. SNELL:
13      Q.    Now, you haven't reviewed all of
14   Mrs. Gross's records; correct?
15      A.    I have reviewed, covered the
16   medical records and I believe there's
17   depositions pertaining specifically to her
18   that I've reviewed, so I can't say if I've
19   read all because I don't know -- I don't
20   know what I don't know.
21      Q.    So you don't know if this is a
22   complete list of all of the records by Linda
23   Gross; correct?
24      A.    What I can state --
25          MR. ANDERSON:  Objection.

Page 436

1          Go ahead.
2          THE WITNESS:  What I can state
3    is what is on here is what I've reviewed.
4    BY MR. SNELL:
5       Q.    And so it would be correct that
6    you do not know whether this is all of Linda
7    Gross's records, then; correct?
8       A.    That is a fair statement, yes.
9       Q.    And have you ever asked to look
10   at all of Linda Gross's records?
11      A.    No.  I have requested Linda
12   Gross's records.  I don't know if I ever
13   used the word "all."
14      Q.    For Pamela Wicker, when did you
15   receive her medical records?
16      A.    It would have been roughly the
17   same time as Miss Gross's.
18      Q.    So roughly one month before your
19   November 7th, 2012, report?
20      A.    Correct.  Yes.
21      Q.    Do you know if you've reviewed
22   all of Pamela Wicker's records?
23      A.    Same answer as with Miss Gross.
24   It would -- everything that is on this
25   report is what I reviewed, so I don't know

Page 437

1    if there are other records out there.
2       Q.    Did you ask to look at all of
3    Pamela Wicker's records?
4       A.    Again, I asked to review the
5    records.  I can't say I used the word "all."
6       Q.    Now, at the same time you had
7    these records for Linda Gross and Pamela
8    Wicker and were working on your November
9    7th, 2012, report, you also had expert
10   reports by the defense experts; correct?
11      A.    That is correct.
12      Q.    You also had the case-specific
13   reports by the defense experts; correct?
14      A.    Correct.
15      Q.    You had other case-specific
16   reports by other plaintiffs' experts
17   already; correct?
18      A.    Correct.
19      Q.    Did you examine Mrs. Gross?
20      A.    No.
21      Q.    Did you ask to examine
22   Mrs. Gross?
23      A.    No.
24      Q.    Did you examine Mrs. Wicker?
25      A.    No.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 438

1    Q.    Did you ask to examine
2  Mrs. Wicker?
3    A.    No.
4    Q.    Did you conduct any independent
5  testing on Mrs. Gross?
6    A.    No.
7    Q.    Did you ask to conduct any
8  independent testing on Mrs. Gross?
9    A.    No.
10   Q.    Did you conduct any independent
11 testing on Mrs. Wicker?
12   A.    No.
13   Q.    Did you ask to conduct any
14 independent testing on Mrs. Wicker?
15   A.    No.
16   Q.    If a patient has urinary
17 dysfunction, what are the tests that you
18 perform to come to that conclusion?
19   A.    Depends upon the symptoms.
20   Q.    Can you tell me the tests and the
21 symptoms that would lead you to conduct such
22 a test?
23   A.    Well, it, number one, depends if
24 it's a male or a female.
25   Q.    Let's only focus on females.

Page 439

1    A.    Females.  And then it depends
2  upon the history as far as what they are
3  presenting with, i.e., idiopathic
4  symptomatology versus a causative factor.
5  That's going to direct me if they've had
6  surgery or not, what type of surgery they've
7  had, also, the severity of the problem.
8          Then laboratory testing,
9  urinalysis would affect the evaluations,
10 past evaluations that have been done, the
11 quality of the testing that had been done
12 elsewhere, if any.
13         So I can't give you a simple
14 answer because there's so many variables
15 that go into the equation.
16   Q.    Are there certain urinary tests
17 that can be done to help determine the
18 etiology of urinary dysfunction?
19   A.    Yes.
20   Q.    What might those be, Doctor?
21   A.    Screening uroflow or post void
22 residual check.  That would just be an
23 ultrasound to see if the bladder is elevated
24 capacity -- excuse me -- elevated residual
25 or does the bladder empty out or somewhere

Page 440

1  in between.
2          The flow rate, how fast the
3  urine can come out, the pattern on the flow
4  rate, is the woman straining or does it
5  appear to be a bladder contraction type of a
6  flow?
7          Another study could be a
8  urodynamics that looks at the function of
9  the bladder, spelled U-R-O-D-Y-N-A-M-I-C-S,
10 urodynamics, or cystometrogram is another
11 term.
12         Again, that depends upon
13 multiple different factors of what got the
14 patient to see me.  It's a fairly expensive
15 study so I don't order them on everybody.
16 And that evaluates the bladder, how much the
17 patient can hold, the sensation levels, the
18 -- their bladder spasms, bladder pain with
19 filling.  Then during the urination phase,
20 is the bladder working or not to get the
21 urine out?  How much is left behind?
22         Other studies can be cystoscopy
23 but, again, there has to be a reason why I'm
24 going to do that.  Other studies, possibly
25 pelvic ultrasound versus transvaginal

Page 441

1  ultrasound.  Possibly a CAT scan of the
2  abdomen and kidneys versus possibly an MRI.
3  I think that's pretty much it.
4    Q.    And in your report regarding
5  Mrs. Gross did you identify any testing that
6  was done on Mrs. Gross with respect to her
7  urinary retention or dysfunction at any
8  time?
9    A.    Yeah.  I'd have to go back and
10 look at specifically all that was done.  It
11 was fresh in my mind when I wrote the report
12 but I do recall, as I recall, there was a
13 residual urine check, there may or may not
14 have been cystoscopies.  Again, for
15 specifics for each individual, I'd have to
16 check on that and look at the records again.
17   Q.    Well, you didn't put the results
18 of any residual urine check in your report;
19 correct?
20   A.    That is correct.
21   Q.    You didn't put the results of any
22 cystoscopy in your report; correct?
23   A.    Yes -- well, yes, there is.
24   Q.    Where is that, Doctor?
25   A.    Mrs. Gross, last sentence, "I

30 (Pages 438 to 441)

Confidential - Attorneys' Eyes Only

Page 442

1 also note that the findings seen by
2 Dr. Benson on cystoscopy were not
3 'interstitial cystitis.'"
4     Q.    So other than the cystoscopy, you
5 did not identify any other testing that
6 Mrs. Gross had undergone.
7     A.    I do not --
8     Q.    Correct?
9     A.    I do not state it in there, no.
10     Q.    As you sit here today, do you
11 recall the results of any urodynamic studies
12 on Mrs. Gross?
13     A.    I do not recall.
14     Q.    Do you know whether urodynamic
15 studies were even done on Mrs. Gross?
16     A.    At this point in time right now,
17 I cannot recall.
18     Q.    Do you know the pattern on
19 Mrs. Gross's flow rate, if any such testing
20 was performed?
21     MR. ANDERSON:  Are you just
22 asking from memory or do you want him to
23 look at records?
24     MR. SNELL:  I'm asking him as
25 he sits here and recalls --

Page 443

1     MR. ANDERSON:  Okay.
2     MR. SNELL:  -- based upon what
3 he reviewed and what he did or did not put
4 in his report.
5     THE WITNESS:  As I sit here,
6 going by memory, I cannot recall the
7 specific studies that were done on her.
8 BY MR. SNELL:
9     Q.    You reference the sentence where
10 you opine that the findings seen by
11 Dr. Benson on cystoscopy were not
12 interstitial cystitis but, rather, due to
13 urinary retention and irritation of the
14 bladder by the Prolift® mesh.
15     Do you see that?
16     A.    That's correct.
17     Q.    What's your basis for that
18 statement?
19     A.    Well, with cystoscopy there are
20 no pathognomonic findings for interstitial
21 cystitis to the point that cystoscopies are
22 not recommended in interstitial cystitis.
23     Any findings within the bladder
24 are not consistent to rule out or include,
25 and by exclusion, interstitial cystitis

Page 444

1 cannot have any other concurrent pathology
2 in the pelvis and bladder, so the findings,
3 based upon that, were consistent with the
4 irritation and previous surgeries and the
5 mesh.
6     Q.    Can you rule out interstitial
7 cystitis in Mrs. Gross's case, based upon
8 what you've reviewed?
9     MR. ANDERSON:  Objection.
10     Go ahead.
11     THE WITNESS:  Can I rule out
12 interstitial -- yes, actually, I can.  The
13 diagnosis -- the most recent criteria from a
14 paper by Hanno, et al., H-A-N-N-O, which is
15 in my supplemental report, make sure I --
16 yeah, Hanno, this is written by Hanno, the
17 last to the bottom, "Interstitial Cystitis -
18 Epidemiology, Diagnostic Criteria, Clinical
19 Markers."
20     In that manuscript and others
21 as far as from the International Continence
22 Society, you cannot have interstitial
23 cystitis when there's other concurrent
24 pathology present, as which was stated in
25 Doctor -- pertaining to Doctor -- excuse me.

Page 445

1     Pertaining to Mrs. Wicker in
2 the deposition by Dr. Raz, it says my
3 opinion and his are the same.  So I can rule
4 out interstitial cystitis.
5     MR. SNELL:  I'm going to move
6 to strike the stuff about Mrs. Wicker
7 because my question was focused on
8 Mrs. Gross.  I'm going to move to strike the
9 testimony concerning Mrs. Wicker in that
10 answer since my question pertained to
11 Mrs. Gross.
12 BY MR. SNELL:
13     Q.    What is -- are there diagnostic
14 criteria for diagnosing interstitial
15 cystitis?
16     A.    Yes.
17     Q.    And who puts out those criteria?
18     A.    Well, that would be a consortium
19 of physicians in the various different
20 societies.  Most likely, I believe, the
21 International Continence Society.  I'd have
22 to look at that.
23     In the reference the Hanno
24 paper was talking about the -- this
25 consortium and the latest diagnostic

31 (Pages 442 to 445)

Confidential - Attorneys' Eyes Only

Page 446

1  criteria.  So that is not decided by one
2  person; it's a consortium.
3      Q.    And what are the diagnostic
4  criteria for interstitial cystitis?
5      A.    I would need that paper to be
6  thorough, so if we have that paper, that
7  would be the best.
8          From memory, you have specific
9  bladder pain with filling, tends to be
10  relieved by urination, you do not have
11  generalized pelvic pain, acute onset of
12  urgency to urinate with leakage usually
13  rules out IC.  Those are off the top of my
14  head.  The paper is much more thorough.
15      Q.    The statement where you make that
16  one cannot have interstitial cystitis if
17  other concurrent pathology is present, what
18  do you mean by other concurrent pathology?
19      A.    Meaning an etiology for bladder
20  dysfunction.
21      Q.    Can you explain that in laymen's
22  terms?
23      A.    Like an example would be a
24  urinary tract infection, surgery, trauma,
25  something else that can be causing it.

Page 447

1          Interstitial cystitis is a
2  diagnosis of exclusion.  What that means is
3  you rule out everything else and if you
4  can't find anything and they meet the pain
5  symptom criteria, pain with filling,
6  relieved by urination are the classic ones,
7  then that's interstitial cystitis because
8  there is no biopsy, there is no cystoscopy,
9  there is no imaging that -- used in the
10  diagnosis of IC.
11      Q.    What objective testing on
12  Mrs. Gross's case showed irritation of the
13  bladder by the Prolift® mesh?
14      A.    Well, that's the cystoscopy.
15      Q.    Did the cystoscopy report that
16  there was Prolift® mesh in the bladder?
17      A.    I don't recall.  I'd have to look
18  at it.  But I do not recall erosion being a
19  factor, no.
20      Q.    What objective testing showed
21  urinary retention by the Prolift® mesh?
22      A.    Well, I mean, an elevated
23  residual urine.
24      Q.    Is an elevated residual urine a
25  finding that's specific to Prolift® mesh or

Page 448

1  can that be from other causes?
2      A.    There can be other causes.
3      Q.    Can an irritation of the bladder
4  occur with other causes besides Prolift®
5  mesh?
6      A.    In the situation of a urinary
7  tract infection, yes.
8      Q.    Is urinary tract infection the
9  only other thing that would cause irritation
10  of the bladder?
11      A.    No.  There would be other issues,
12  other things.
13      Q.    Like what?
14      A.    Fistula formation, again, trauma,
15  surgery, foreign body, stones.
16      Q.    When did Mrs. Gross first have
17  urinary retention symptoms?
18      A.    I would have to review the
19  records.
20      Q.    There was a delay in the onset of
21  Mrs. Gross's urinary retention symptoms;
22  correct?
23      A.    As I recall, yes.
24      Q.    Do you recall how long that delay
25  was?

Page 449

1      A.    Off the top of my head, no.
2      Q.    How is injury to the pelvic
3  neuroanatomy objectively diagnosed?
4      A.    Pelvic neuroanatomy is incredibly
5  complicated and it's still evolving as far
6  as the thought process on it, but objective
7  evidence would be clinical symptomatology,
8  probably urodynamics, and then chronologic
9  association with events.
10      Q.    Are there particular tests that
11  one can do to diagnose pelvic -- I'm
12  sorry -- to diagnose injury to the pelvic
13  neuroanatomy?  And when I say tests, I'm
14  talking about diagnostic testing like nerve
15  testing or something like that.
16      A.    No, you cannot do -- EMGs I doubt
17  would be sufficient.  There is no way to do
18  an EMG of small nerve fibers, only large
19  nerve fibers, so you can't do EMG.  The
20  closest would be the urodynamics or
21  cystometrogram.
22      Q.    What is a cystometrogram?
23      A.    The same thing as the
24  urodynamics.  They're synonyms.  CMG or UDS
25  for abbreviations is a whole lot easier to

Confidential - Attorneys' Eyes Only

Page 450

1  say.
2      Q.    Did Mrs. Gross undergo
3  urodynamics?
4      A.    Either Miss Gross or Miss Wicker
5  did.  I cannot recall off the top of my
6  head.  I'd have to look at the records
7  again.
8      Q.    Did Mrs. Gross have any urinary
9  problems before her Prolift® implantation?
10     A.    Again, I'd have to go back to the
11 records to review that because I can't
12 recall.
13     Q.    You know that she had a long
14 history of stress urinary incontinence.
15     A.    Again, I'd have to go back to the
16 records and...
17         MR. ANDERSON:  I'm happy to go
18 to try to grab any record that you would
19 like for him to refer to, Burt.  Counsel.
20 BY MR. SNELL:
21     Q.    You did not in your expert report
22 regarding Mrs. Gross state an opinion about
23 whether Prolift® was a proper surgical
24 option to offer by her surgeon, did you?
25     A.    That is correct.  I did not.

Page 451

1      Q.    And as you -- do you plan to
2  offer an opinion at trial as to whether
3  Prolift® was an appropriate surgical option
4  to offer to Mrs. Gross by her doctors?
5      A.    No.  I was instructed, was
6  Prolift® a causative factor in the voiding
7  dysfunction, not whether or not the Prolift®
8  was the correct treatment or not.
9      Q.    So the only opinions you plan to
10 offer at trial is in connection with the
11 analysis of was Prolift® a causative factor
12 in any urinary problems with Mrs. Gross.
13 And I'm talking about opinions specific to
14 the Gross case.
15     A.    Sure.  I understand.
16     Q.    Is that correct or not?
17         MR. ANDERSON:  Objection.
18         Go ahead.
19         THE WITNESS:  Well, unless
20 somebody asks me, was it the correct thing?
21 But I'm not volunteering that information.
22 Because my understanding when asked to
23 review Gross and Wicker, it was specifically
24 what caused their voiding dysfunction.
25 BY MR. SNELL:

Page 452

1      Q.    In your report regarding
2  Mrs. Gross and Mrs. Wicker you have not
3  identified any criticism that you have with
4  regard to her doctors; correct?
5      A.    Correct.
6      Q.    And you don't plan to offer at
7  trial any criticisms about treatment
8  provided by her doctors; correct?
9      A.    Well, only if somebody asks me a
10 question, I can't just sit there.  So I'm
11 not -- again, my job was, what caused their
12 voiding dysfunction?  If you or someone else
13 asks me specifically, I guess somebody will
14 object.  I don't know what the answer is to
15 that, I mean.
16     Q.    This is the predicament I'm in,
17 Doctor:  You didn't issue any opinions in
18 that regard.
19     A.    Correct.
20     Q.    And I'm not going to sit here on
21 the second day of your deposition and ask
22 you about opinions for which you haven't
23 formulated and offered in this litigation.
24         I'm just trying to understand
25 and make sure that at the time of trial you

Page 453

1  don't plan to come out and start talking
2  about things that Mrs. Gross's doctors did
3  incorrectly.
4      A.    From what I understand, just so
5  we're very, very clear, my opinion on Gross
6  and Wicker as outlined in here is
7  specifically to their voiding dysfunction
8  and what I felt caused it.
9          MR. ANDERSON:  So unless you
10 ask him or one of your team asks him those
11 questions, I can't control what you guys may
12 ask.  My team is not going to ask him those
13 questions, those specific ones that you're
14 referencing.
15         MR. SNELL:  Okay.
16         MR. ANDERSON:  Out of fairness
17 to you.  I understand where you're coming
18 from.
19         MR. SNELL:  Okay.
20         MR. ANDERSON:  We want to be
21 offering him for the specific reason that he
22 just stated.
23         MR. SNELL:  So in the Gross and
24 Wicker cases, Dr. Elliott is being offered
25 to testify and opine about the voiding

Confidential - Attorneys' Eyes Only

Page 454

1   dysfunction that Mrs. Gross and Mrs. Wicker
2   has, according to his opinions, and the
3   cause thereof.
4         MR. ANDERSON:  And voiding
5   dysfunction encompasses a number of things,
6   pelvic neuroanatomy, damage to that area, a
7   number of things that you can ask him about
8   in terms of exploring his opinions as to
9   what is related to that general opinion of
10  voiding dysfunction or pelvic -- sustained
11  injury to the pelvic neuroanatomy or
12  neurologic function, et cetera.
13        But I think you're homing in on
14  the area in which we've asked him or will
15  ask him to opine.
16  BY MR. SNELL:
17    Q.   Urinary dysfunction can be a
18  potential complication of numerous prolapse
19  surgeries other than Prolift®; correct?
20    A.   Yes.
21    Q.   Persistent pain is a potential
22  complication with other prolapse surgeries
23  besides Prolift®; correct?
24    A.   Yes.
25    Q.   When you say the injuries caused

Page 455

1   by the Prolift® -- I'm just going to read
2   the whole sentence.
3     A.   Yes, I see it.
4     Q.   You state, "The injuries caused
5   by the Prolift are appear to be permanent";
6   correct?
7     A.   Yeah.  That's an error.  It
8   should say the injuries caused by Prolift®
9   appear to be permanent.  That "are," A-R-E,
10  should not be there.
11    Q.   When you say the injuries caused
12  by Prolift® appear to be permanent, are you
13  talking about her voiding dysfunction?
14    A.   I'm talking about the -- the
15  pain, pelvic floor myalgia --
16    Q.   Hold on.
17    A.   -- and voiding dysfunction.
18    Q.   When you say the pain, what pain
19  are you referring to?
20    A.   Pelvic pain.
21    Q.   Is this pelvic pain specifically
22  associated with voiding dysfunction?
23    A.   Can be.
24    Q.   In Mrs. Gross's case, I'm asking
25  you, is this pelvic pain you're discussing

Page 456

1   specifically tied to her voiding dysfunction
2   or is this pelvic pain like one can see with
3   other forms of prolapse surgery?
4     A.   No.  We're talking a different --
5   it is -- it is in the continuum.  Pain in
6   and of itself can cause urinary retention,
7   voiding dysfunction.  Pain can be a sign of
8   irritation within the pelvic neuroanatomy
9   where there's other nerves like the vaginal
10  plexus being irritated.
11        So it becomes a very
12  complicated issue.  That's why -- that's why
13  people do what I do as far as taking --
14  doing fellowships I do, because this is very
15  complicated.
16    Q.   What's your opinion about
17  Mrs. Gross's pelvic pain?
18    A.   That she has a lot of it.
19    Q.   Anything else?
20    A.   That it appears to be a -- the
21  causative factor is the surgery itself and
22  the implantation of the Prolift® and the
23  subsequent treatments have set off a cascade
24  of pelvic floor dysfunction.
25    Q.   You know Dr. Weber opines on that

Page 457

1   subject, pelvic pain, in Mrs. Gross?
2     A.   I believe I read that, yes.
3     Q.   You know Dr. Margolis opines on
4   that same subject, pelvic pain, in
5   Mrs. Gross.
6     A.   Yes.
7     Q.   Pelvic floor myalgia, what is
8   that?
9     A.   It's a descriptive term just
10  saying that the pelvic floor, the neuro --
11  excuse me -- the musculature hurts.  That's
12  all it is is a descriptive term.  It's not
13  pathognomonic of a specific etiology but
14  it's saying the entire pelvic floor hurts.
15        That's what -- or are inflamed.
16  That's what myalgia means is inflamed
17  muscles, basically.
18    Q.   One of the ways that you can
19  treat pelvic floor myalgia is to send the
20  patient to special therapy to treat that
21  problem; correct?
22    A.   You're correct.
23    Q.   Has Mrs. Gross ever undergone
24  that specific therapy to treat pelvic floor
25  myalgia?

34 (Pages 454 to 457)

Confidential - Attorneys' Eyes Only

Page 458

1     A.    I know in reviewing the records,
2  specifically the Mayo records and
3  Dr. Trabucco, that it was offered at Mayo.
4     Q.    What opinions are you going to
5  offer about her pelvic floor -- strike that.
6          What opinions are you going to
7  offer about Mrs. Gross's pelvic floor
8  myalgia?
9     A.    Depends upon the question I'm
10  asked.
11     Q.    Well, I want to know what you're
12  going to offer because all I have is one
13  paragraph, Doctor.  So tell me.
14     A.    Well, that I have to look at the
15  chronology of her pelvic floor myalgia.  Did
16  she have it preop versus postop?  If there
17  were evidence that she had pelvic floor
18  myalgia preop and it continued in the same
19  intensity postop, then surgery was not a
20  causative factor.
21          If she had no pelvic floor
22  myalgia preop, then postop at some point in
23  time developed severe pelvic floor myalgia,
24  then I have a causative factor.
25     Q.    As you sit here today, Doctor, in

Page 459

1  this deposition, have you formed an opinion
2  to a reasonable degree of medical certainty
3  whether the surgery was a causative factor
4  in pelvic floor myalgia?
5     A.    From my recollection of the
6  records, she did not have significant or any
7  pelvic floor myalgia preoperatively.  Again,
8  I'd have to review the records for that to
9  make sure.  And from my recollection, it all
10  began after surgery.
11          MR. ANDERSON:  And, again, I'll
12  offer to get whatever record that you would
13  like for me to try to get in the room next
14  door, Counsel.
15          (Discussion off the record.)
16  BY MR. SNELL:
17     Q.    Do you have any opinions on how
18  Mrs. Gross's pelvic pain should be treated?
19     A.    Having seen these patients
20  extensively, this is a very difficult
21  situation.
22          My review of Dr. Trabucco's
23  management of the patient appears to be
24  appropriate and I don't have any further
25  ways of altering the situation.

Page 460

1     Q.    With regard to Mrs. Gross's
2  pelvic floor myalgia, do you have any
3  opinions on how that should be treated?
4     A.    I personally send these patients
5  to a physical medicine and rehab for pelvic
6  -- we have a pelvic floor myalgia clinic.
7     Q.    And that's a pelvic floor myalgia
8  clinic at Mayo --
9     A.    Correct.
10     Q.    -- or some other location?
11     A.    Sorry.  Yes, it is at Mayo.  But,
12  unfortunately, for most patients it's
13  physically impossible for them to stay just
14  because it's a prolonged evaluation and
15  treatment.  Individuals who are local can do
16  it but ones far away cannot do it.
17     Q.    How long is the treatment course,
18  Doctor?
19     A.    Very good question.  It depends
20  upon the patient.  The three physical
21  therapists I use, the first consultation is
22  three hours, where they evaluate the
23  individual's overall situation, their
24  strengths and their weaknesses, where the
25  pain is.

Page 461

1          And then they will either have
2  a one-week intensive therapy sessions, which
3  usually they don't do, more likely it's
4  usually spread out over eight weeks, it's
5  one treatment a week, hence, the reason why
6  it's difficult for people from a long ways
7  away to stay.
8     Q.    How is voiding dysfunction
9  treated?
10     A.    Again, that's a complicated
11  situation.  Voiding dysfunction is a
12  descriptive term of anything bad that can go
13  on, running a spectrum from a bladder that
14  does not empty out to one that empties out
15  too much.  And so the treatment is dependent
16  upon the problem or the symptoms.
17     Q.    Mrs. Gross's voiding dysfunction,
18  in your opinion you say appears to be
19  permanent; correct?
20     A.    Correct.
21     Q.    Voiding dysfunction can improve
22  over time; correct?
23     A.    Depending upon the etiology, yes,
24  that is a possibility.
25     Q.    Post surgical voiding dysfunction

Confidential - Attorneys' Eyes Only

Page 462

1  can improve over time; correct?
2      A.    It depends upon the surgery.
3  Radical hysterectomy, colon surgery, it does
4  not improve over time.  Smaller surgeries,
5  yes, there's a chance.  So, again, I have to
6  be specific.  I'm not trying to be
7  difficult.  I have to be specific to the
8  cause.
9      Q.    Post prolapse surgery voiding
10  dysfunction can improve over time; correct?
11      A.    Again, it depends upon the
12  surgery because prolapse surgery encompasses
13  a lot of different types of surgeries.  So
14  native, non-mesh, yes, I've seen that
15  recover.  I've also seen it not recover.
16          Sacrocolpopexy, usually I don't
17  see voiding dysfunction.  And I don't have
18  enough long-term experience to see what will
19  happen with mesh long term.
20      Q.    Can voiding dysfunction following
21  a mesh prolapse surgery improve over time?
22      A.    Specific transvaginal mesh?
23      Q.    Yes.
24      A.    I suppose it could.
25      Q.    Can you rule out that Linda

Page 463

1  Gross's voiding dysfunction will not improve
2  over time?
3      A.    Can I rule out will not improve?
4  Is that the same way as saying it's
5  permanent or can I -- I guess I don't
6  understand your --
7          MR. ANDERSON:  Vernacular.
8          MR. SNELL:  Yeah.  That's fair.
9  BY MR. SNELL:
10      Q.    You would agree that Linda
11  Gross's voiding dysfunction may at some
12  point down the road get better.
13      A.    Again, correct.  And that's why I
14  put the word "appear" or "appears" to be
15  permanent.  But no, I cannot prove it will
16  not at some point in time improve.  We don't
17  have that long-term data yet.
18      Q.    And does she need to
19  self-catheterize currently?
20      A.    I don't know her current status.
21      Q.    You would agree that at some
22  point in the future with further treatment
23  and the passage of time, she may not need to
24  self-catheterize; correct?
25      A.    Again, depends upon the etiology.

Page 464

1  If the etiology is disruption of the vaginal
2  plexus, pelvic splanchnics, due to a
3  degradation or inflammation, it will not.
4          If those nerves are still
5  intact and the insult is removed, then there
6  is the chance with time it will improve.  I
7  don't know that data and nobody knows that
8  data yet.
9      Q.    As you sit here today -- let me
10  say, in your report you did not state that
11  you believe to a reasonable degree of
12  medical certainty that there was a
13  disruption to the vaginal plexus and
14  splanchnic nerve that you just said;
15  correct?
16      A.    I did not state in my report --
17  well, yeah, actually, I did.  I said
18  including the --
19      Q.    Where is it?
20      A.    The first line, I said -- it says
21  with -- starts "with regard" and then it
22  goes, you know, then the comma and the
23  second says, "including injury to the pelvic
24  neuroanatomy."  So that is what I said.
25          The vaginal plexus is the

Page 465

1  nerves on top of the vagina extending to the
2  bladder that include the sympathetic and
3  parasympathetic nervous system.  So if those
4  were disrupted, cut or injured in any way,
5  it is most likely it will be a permanent
6  condition.
7      Q.    Were those nerves disrupted?  And
8  if so, what's the testing or data that
9  showed that?
10      A.    She has a bladder that does not
11  work.  The only nerves that create bladder
12  function is the vaginal plexus.  So if the
13  vaginal plexus, you know, if they are cut,
14  the bladder won't work.  So I guess your
15  question was -- what was your question?
16          MR. ANDERSON:  He wanted to
17  know if disrupted was the first part.
18          THE WITNESS:  Oh, okay.  Were
19  those nerves disrupted.  We have evidence of
20  a bladder that does not work, we have a mesh
21  -- excuse me.  We have a dissection in the
22  region where those nerves are.  We have a
23  mesh that was put in.
24          We have a mesh that was
25  multiply operated on and she has a bladder

Confidential - Attorneys' Eyes Only

Page 466

1  that does not work, so I have a lot of
2  evidence pointing towards the fact that
3  those nerves have been injured.  If those
4  nerves were perfectly intact, she would be
5  able to urinate.
6  BY MR. SNELL:
7      Q.   I think we got off on this
8  tangent when I asked you about your opinion
9  regarding the need to self-catheterize.  I'm
10  just trying to understand it because this is
11  complex.
12     A.   Neuroanatomy is very complicated.
13     Q.   Is it correct that at some point
14  in the future Mrs. Gross may not need to
15  self-catheterize?
16     A.   That is a possibility, yes.
17     Q.   Is it correct that she may only
18  need to self-catheterize in the future on an
19  intermittent basis?
20     A.   Yes, that is a possibility.
21     Q.   And the self-catheterization is
22  related to the voiding dysfunction; correct?
23     A.   That is to treat the voiding
24  dysfunction, which her specific voiding
25  dysfunction is retention.

Page 467

1      Q.   Are there different degrees of
2  urinary retention?
3      A.   Yes.
4      Q.   Can you tell me from a medical
5  standpoint what those degrees are?
6      A.   Well, there's no -- not a defined
7  but we can have an individual who cannot
8  empty their bladder at all to individuals
9  who empty, you know, a certain percentage of
10  their urine.
11     Q.   Is there any recognized gradation
12  of the degree of retention associated with
13  voiding dysfunction?
14     A.   No.  Technically, anything over
15  100 milliliters is elevated, and there's no
16  gradation beyond that.
17     Q.   Interstitial cystitis, what
18  symptomatology can that condition manifest
19  itself in?
20     A.   Bladder pain with filling.
21     Q.   When you say with filling, what
22  do you mean by that?
23     A.   That the bladder when empty or
24  following urination, the pain is relieved or
25  markedly subsides and then as the bladder

Page 468

1  fills up, as it stretches, it hurts.
2      Q.   Did you see that Dr. Weber opined
3  on Mrs. Gross's urinary dysfunction?
4      A.   You said Mrs. Gross?
5      Q.   Yes.
6      A.   Yes.
7      Q.   Did you see that Dr. Margolis
8  opined on Mrs. Gross's urinary dysfunction?
9      A.   Yes.
10     Q.   And you saw those opinions before
11  you finalized your November 7th, 2012,
12  report; correct?
13     A.   Correct.
14     Q.   You saw that Dr. Weber and
15  Margolis had issued opinions about
16  Mrs. Gross's pelvic pain before you
17  finalized your November 7th, 2012, report;
18  correct?
19     A.   Correct.
20     Q.   You saw that Drs. Weber and
21  Margolis issued opinions about Mrs. Gross's
22  pelvic floor myalgia before you completed
23  your November 7th, 2012, report; correct?
24     A.   Correct.
25     Q.   With regard to Mrs. Wicker, you

Page 469

1  have one paragraph in your report that
2  outlines your opinions; correct?
3      A.   Yes.
4      Q.   And it's your opinion that
5  Mrs. Wicker has bladder pain?
6      A.   Yes.
7      Q.   Urinary frequency?
8      A.   Yes.
9      Q.   And urinary urgency.
10     A.   Yes.
11     Q.   What's the difference between
12  urinary frequency and urinary urgency?
13     A.   Frequency is going frequently,
14  just the sheer number of voids during the
15  day.  Urgency is the acute onset of needing
16  to void.  They're describing two separate
17  voiding issues.
18     Q.   How is urinary frequency
19  evaluated?
20     A.   Usually a voiding diary.
21     Q.   Did you look at a voiding diary
22  for Mrs. Wicker?
23     A.   I looked at somebody's voiding
24  diary.  I don't recall whose it was.
25     Q.   Is there a recognized method for

37 (Pages 466 to 469)

Confidential - Attorneys' Eyes Only

Page 470

1  coming to a diagnosis of urinary frequency?
2      A.   Well, yeah.  I think it may be a
3  combination of things:  A urinalysis to rule
4  out infection and the concentration of
5  urine, the voiding diary to actually
6  document how frequent it actually is, and I
7  believe that would be it.
8      Q.   Is there specific criteria for
9  diagnosing urinary frequency?
10     A.   No, there's not a set number of
11 voids per day.  No.
12     Q.   Why is that?
13     A.   Well, there is going to be a
14 variation in the frequency of the day that
15 is within the realm of a range of normal.
16 It's like saying what's the appropriate foot
17 size or how tall -- what is the correct
18 height?  That does not exist.  There's a
19 range that's acceptable or normal.
20         And so urinary frequency, a
21 normal bladder holds 400 to 600 milliliters.
22 A normal person, on average, consumes one to
23 two liters of urine per -- fluid per day, so
24 subsequently they're going to void a certain
25 number of times.

Page 471

1         However, if they've been in a
2  meeting drinking Coke and coffee all day,
3  the frequency goes up.  But, see, that's an
4  aberrancy.  That's why the voiding diary
5  looks at multiple days.
6      Q.   The 400 to 600 milliliters you
7  referenced, that's the normal bladder
8  capacity?
9      A.   That's a range that is quoted as
10 being somewhat consistent as being normal,
11 yes.
12     Q.   Is that in men or women or both?
13     A.   Both.  And there will be
14 acceptable ranges outside of that.  So it's
15 not like it's clearly defined.
16     Q.   For Mrs. Wicker, do you know how
17 her -- how big of a woman she is?
18     A.   No, I do not.
19     Q.   Do you know what's the size of
20 her particular bladder?
21     A.   I don't know.  I'd have to look
22 back at the records and see what Dr. Raz
23 said.
24     Q.   And how is the size of a bladder
25 determined?

Page 472

1      A.   Well, if you performed a
2  urodynamics, you would know because you
3  would fill them up until they're full, or if
4  you'd had what's called a uroflow where they
5  urinate into a container, you'd be able to
6  know at least how much they could hold on
7  that event if they are full.
8      Q.   Well, how do you know when
9  they're full?
10     A.   When they say I'm full.  So you
11 cannot perform urodynamics or uroflow on
12 somebody who is cognitively impaired in any
13 way.  You're relying on the interaction of
14 the patient.
15     Q.   Can the size of a bladder differ
16 in relation to the size of a woman, such
17 that obese women tend to have larger
18 bladders versus smaller-framed, normal
19 weight or underweight women?
20     A.   No, we know of no correlation
21 that way.
22     Q.   And so if a woman drinks fluids
23 frequently throughout the day, there will be
24 more frequency of urgency.
25     A.   Not urgency but frequency.

Page 473

1      Q.   So if a woman drinks fluids
2  frequently throughout the day, there will be
3  more urinary frequency; correct?
4      A.   But just drinking frequently, if
5  she's taking sips, that will not.  You have
6  to look at -- that's why the voiding diary
7  is basically the in and out of the day, how
8  much in, fluid in, versus how much fluid
9  out.
10         So frequent drinking in and of
11 itself does not mean anything.  If they're
12 drinking three liters of fluid a day and
13 they're not a marathon runner, that means
14 something.  But I've had marathon runners
15 drink three liters and it's okay because
16 they're out there running all the time.
17         So, again, that's where you
18 have to look at the whole, big picture.  But
19 on the average, large volume, greater than
20 say two liters a day is above the average.
21 That will lead to frequent urination because
22 the bladder will just fill up.
23     Q.   So if a woman drinks more than
24 one to two liters of fluid a day, that will
25 lead to frequent urination because the

38 (Pages 470 to 473)

Confidential - Attorneys' Eyes Only

Page 474

1  bladder will just fill up.
2      A.   Well, no.  I said -- I said more
3  than two.  Average consumption a day is one
4  to 1.5 liters of fluid but that's also not
5  counting food because about a third of your
6  urine can be from breakdown of food.  So,
7  again, it gets very complicated.
8      Q.   So if a woman drinks more than
9  two liters a day, there will be more
10  frequent urination because the bladder will
11  fill up?
12      A.   Unless they're exercising a lot
13  and then they'll burn the fluid off or if
14  it's hot or they're in a humid environment.
15  So that's why you have to look at the whole
16  totality.
17      Q.   Urinary urgency, how is that
18  diagnosed?
19      A.   The most accurate way to diagnose
20  urgency is by history, what the patient
21  tells you.
22      Q.   Does a history of -- what are the
23  factors that are involved in urinary
24  urgency?
25      A.   Factors that are involved?  I

Page 475

1  guess I don't understand what you mean by
2  factors that are involved.
3      Q.   What are the things that lead to
4  the acute onset of the need to void?
5      A.   Well, that indicates the
6  possibility of a bladder that is
7  malfunctioning, meaning it does spasms, but
8  urgency can also be in the setting of a
9  bladder that does not empty out very well
10  either.
11         And so bladder sensation is
12  immensely complicated and those patterns can
13  then be learned in the spinal cord, which
14  actually the glial cells or astrocytes in
15  the spinal cord can learn behavior.
16         Everything we do is learned,
17  whether it's typing on a computer or
18  reading, driving, that's learned, but then
19  also a body can learn bad habits.
20      Q.   Can urinary urgency be a sporadic
21  symptom?
22      A.   If there is something in the
23  bladder that is an irritant, most likely
24  example in that situation would be something
25  like a bladder infection, then you treat the

Page 476

1  bladder infection, the bladder goes back
2  down to its baseline.  So urgency of
3  urination can occur in that.  If it's a
4  neurologic or idiopathic, it's going to be
5  the same, maybe precipitated by caffeine
6  consumption, stress, nicotine.
7      Q.   Medications?
8      A.   Certain medications, cold
9  medication, anything that is to clear the
10  respiratory tract can cause it.
11      Q.   Did Mrs. Wicker have bladder pain
12  before her Prolift® procedure?
13      A.   I'd have to look back at the
14  records.
15      Q.   Did Mrs. Wicker have urinary
16  frequency before her Prolift® procedure?
17      A.   Again, I'd have to go back and
18  look at the records.
19      Q.   Did Mrs. Wicker have urinary
20  urgency before her Prolift® procedure?
21      A.   I don't recall them ever saying
22  that.  I do recall that they said right
23  prior to surgery, no urinary symptoms but
24  she may have had a history of interstitial
25  cystitis.

Page 477

1      Q.   You're aware that she did have a
2  history of interstitial cystitis.
3      A.   Yes.
4      Q.   And that was before Prolift®;
5  correct?
6      A.   Correct.
7      Q.   Can interstitial cystitis also
8  lead to urinary frequency?
9      A.   Yes.
10      Q.   Can interstitial cystitis also
11  lead to urinary urgency?
12      A.   No.  Urgency is an -- excludes
13  the diagnosis.  It is -- that indicates
14  overactive bladder.  Interstitial cystitis
15  has pain with filling, not urgency.
16      Q.   And you say that those symptoms
17  she experienced since Prolift® surgery is a
18  result of irritation of the bladder and
19  pelvic neuroanatomy?
20      A.   Correct.
21      Q.   Is that different from what you
22  believe occurred with regard to Mrs. Gross?
23      A.   Well, Mrs. Gross had different
24  symptomatology, different manifestation of
25  the injury, hence, that indicates to me

Confidential - Attorneys' Eyes Only

Page 478

1  different pelvic neuroanatomy was involved
2  because, again, you have the sympathetic and
3  parasympathetic nervous system right in that
4  area.  They do different things.
5       And also you have with the
6  trocars of the Prolift® with the potential
7  for pudendal nerve issues, too.  And that
8  controls a completely different aspect of
9  urination and sensation.
10      Q.   In your report did you
11  specifically opine that the trocars from the
12  Prolift® caused some type of injury to
13  Mrs. Wicker?
14      A.   Well, no.  I say the Prolift®
15  surgery.  That's all-encompassing so that
16  could include or it does not exclude trocar
17  use.
18      Q.   Did the trocar use in
19  Mrs. Wicker's surgery cause her any of these
20  symptoms or injuries that you have set forth
21  in your report?
22      A.   I can't say they did or did not.
23  I said they could be a contributing factor
24  but I've not -- I have not opined that they
25  did or did not.

Page 479

1       Q.   And you comment on the pain of
2  pelvic floor myalgia with Mrs. Wicker;
3  correct?
4       A.   Yes.
5       Q.   You saw that Dr. Weber also
6  opined on that subject?
7       A.   Yes.
8       Q.   You saw that Dr. Margolis also
9  opined on that subject?
10      A.   Yes.
11      Q.   Do you believe that something
12  different should have been done by
13  Mrs. Wicker's physicians to treat her pain?
14      A.   No.  I think they're -- they're
15  doing everything they can.
16      Q.   Do you believe that something
17  different should have been done with regard
18  to Mrs. Wicker's pelvic floor myalgia?
19      A.   No.  I think they're doing
20  everything they can.  And according to
21  Dr. Raz's deposition, which I watched the
22  video on, he would -- he's doing exactly
23  what I would have done.
24      Q.   You saw Dr. Raz performed a
25  prolapse surgery on Mrs. Wicker, then?

Page 480

1       A.   No.  I saw the -- his deposition,
2  his video deposition.  I didn't see his
3  surgery.
4       Q.   Didn't he testify about that
5  surgery he performed in Mrs. Wicker for
6  prolapse?
7       A.   Yeah.  But you say you saw
8  doctor, it's Raz, R-A-Z, not Rose, you saw
9  Dr. Rose -- Dr. Raz performed a prolapse
10  surgery.
11      Oh, I see.  I thought you said
12  did I actually visualize the surgery.  I
13  misunderstood your question.
14      Yes, I saw that he performed a
15  prolapse surgery.  Yes.  That's my fault.
16      Q.   And in it Dr. Raz described it as
17  a procedure by which he wove different
18  sutures to form a net.
19      A.   Yeah.  He used, as I recall,
20  interlocking Prolene sutures.
21      Q.   To form a net.
22      A.   I wouldn't call it a net.  I'd
23  call them interlocking sutures in a row.
24  And I don't recall how many he used to help
25  -- help hold up the bladder.

Page 481

1       Q.   Are you aware of any randomized,
2  controlled trials looking at that Raz
3  surgery of interlocking sutures --
4       A.   No.
5       Q.   -- to treat prolapse?
6       A.   No.
7       Q.   For Mrs. Wicker, is it possible
8  that her bladder pain will at some point go
9  away?
10      A.   I -- I hope so.  I have no idea.
11      Q.   You cannot say for certain
12  whether her bladder pain will go away or
13  not.
14      A.   No.  No.  These mesh
15  complications are too soon.  We don't know
16  long term.
17      Q.   Is it possible that Mrs. Wicker's
18  urinary frequency will go away?
19      A.   It is possible.
20      Q.   Urinary frequency can diminish
21  over time; correct?
22      A.   Depending on the underlying
23  insult or the etiology of it, yes.
24      Q.   Urinary urgency can go away with
25  the passage of time; correct?

Confidential - Attorneys' Eyes Only

Page 482

1     A.    Again, that depends upon the
2  etiology.  If it's idiopathic, usually no.
3  If there's some insult that can be corrected
4  and there's been no damage to the
5  neuroanatomy, then yes.
6     Q.    How is urinary frequency treated,
7  non-idiopathic urinary frequency?
8     A.    Trying to relieve the underlying
9  insult or etiology.  If you're not able to
10  treat the underlying etiology, then you can
11  try medications like -- well, you can do
12  time voiding, meaning the patient goes to
13  the bathroom on a schedule.
14          You can try avoidance of
15  dietary irritants, big three, caffeine,
16  nicotine and then stress is not a dietary
17  irritant but it's an irritant.
18          Pelvic floor retraining,
19  bladder retraining.  At times, vaginal
20  estrogen replacement.  Then if you're into
21  the medication, then it's the
22  anticholinergic medications, which there's a
23  whole host of those.
24          If that fails, then you have
25  Botox injections to the bladder, which need

Page 483

1  to be repeated on the average every four to
2  six months.
3          If that fails, interstim, which
4  is -- or peripheral nerve stimulation of
5  some sort.
6          If that fails and the patient
7  is miserable, bladder augmentation surgery,
8  which is a major step, which is not done
9  very often anymore.
10     Q.    Do you know if Mrs. Wicker was
11  compliant with recommendations for her to
12  use vaginal estrogen?
13     A.    I don't know.
14     Q.    Do you know if Mrs. Gross was
15  compliant with recommendations for her to
16  use vaginal estrogen?
17     A.    I don't know.  I don't recall
18  reading that in the -- or hearing it in the
19  deposition.
20     Q.    What type of medications can one
21  take for urinary urgency?
22     A.    It's the same thing as frequency.
23  It's the anticholinergics, which is a large
24  family of medication.  I shouldn't say a
25  large family.  There's six or seven of them.

Page 484

1     Q.    Can you tell me the names of just
2  a couple so I --
3     A.    Oxybutynin, which is the trade
4  name is Ditropan, then there's oxybutynin
5  ER, trade name Ditropan XL, Detrol, Detrol
6  LA, Vesicare, Enablex, Sanctura.  Imipramine
7  is an old medication I don't use.  That's a
8  good list.
9          (Recess, 2:39-2:50 p.m.)
10  BY MR. SNELL:
11     Q.    You make mention of recurrent
12  erosions in Mrs. Wicker's case in your
13  November 7th, 2012, report.
14     A.    Yes.
15     Q.    I assume you mean recurrent
16  exposures.
17     A.    Exposures, yes.
18     Q.    There was no mesh erosion in
19  Mrs. Wicker; correct?
20     A.    I am not familiar within the
21  records of any mesh erosions.  It was all
22  exposures.
23     Q.    With regard to Mrs. Wicker's
24  pelvic floor myalgia, is it possible that
25  that will get better over time?

Page 485

1     A.    If the underlying irritation,
2  inflammation gets better, there's the
3  possibility of that, yes.
4     Q.    Do you have an opinion as to
5  whether the underlying irritation or
6  inflammation will get better?
7     A.    I don't think we know yet.  The
8  mesh complications, as I mentioned, are
9  still evolving.  We don't know the long term
10  yet.  And I think -- I'm afraid it's going
11  to take us many years to get to that
12  conclusion.
13     Q.    You would agree that if
14  Mrs. Wicker's cystocele can be repaired, her
15  dysfunctional voiding condition will get
16  better; correct?
17     A.    Yeah.  If the obstruction due to
18  the cystocele, as Dr. Raz described, if that
19  can be corrected, then usually the voiding
20  dysfunction will improve.  However, the
21  bladder can learn or the spinal cord can
22  learn habits, so you don't always have
23  complete resolution of the symptoms.
24     Q.    The obstruction due to the
25  cystocele is actually a mechanical

Confidential - Attorneys' Eyes Only

Page 486

1  obstruction; correct?
2      A.    That is correct.
3      Q.    And once that mechanical
4  obstruction is removed from the equation,
5  then the voiding dysfunction can return to
6  -- strike that.  Start all over again.
7          And once that mechanical
8  obstruction is removed from the equation,
9  voiding conditions can normalize; correct?
10     A.    There is -- there is a chance of
11 it, yes.
12     Q.    Prolapse can lead to voiding
13 dysfunction; correct?
14     A.    Yes.
15     Q.    Is it a certain type of prolapse
16 or any prolapse, be it anterior, posterior,
17 apical?
18     A.    It would be specifically related
19 to the bladder.  So posterior prolapse and
20 rectum is unlikely to be causing much in the
21 way of voiding dysfunction.
22          Apical prolapse also is
23 unlikely to.  It possibly could but, again,
24 if it doesn't involve the bladder, it should
25 not impede much.

Page 487

1          Anterior prolapse can cause
2  urinary urgency, frequency, poor emptying,
3  those things; however, it is relatively rare
4  for a prolapse to cause much in the way of
5  voiding dysfunction.
6      Q.    Cystocele is a prolapse of the
7  bladder?
8      A.    Correct.  Specifically, yes,
9  cystocele.
10     Q.    And with a cystocele a woman can
11 have voiding dysfunction; correct?
12     A.    That is correct.
13     Q.    And it's your opinion that the
14 rate of voiding dysfunction with cystocele
15 is rare?
16     A.    The rate of obstruction from a
17 cystocele is rare, causing urinary urgency,
18 frequency, is also somewhat rare but a
19 little bit more common.  I don't know
20 specific statistics on that.
21     Q.    Have we covered the case-specific
22 opinions you intend to offer on Mrs. Gross
23 and Mrs. Wicker?
24     A.    I believe so, yes.
25          MR. ANDERSON:  Objection.

Page 488

1  Except anything I may ask him.
2          MR. SNELL:  Let's go off the
3  record.  Let me just check and see if I have
4  anything else.
5          MR. ANDERSON:  Okay.
6          (Discussion off the record.)
7          MR. SNELL:  Let's go back on.
8  BY MR. SNELL:
9      Q.    In Mrs. Wicker's case, when you
10 refer to irritation of the pelvic
11 neuroanatomy --
12     A.    Yes.
13     Q.    -- what are you referring to
14 there?
15     A.    Specifically, pudendal nerve,
16 parasympathetic, sympathetic nervous system.
17     Q.    Is it your opinion that
18 Mrs. Wicker had an injury to her pudendal
19 nerve?
20     A.    No.  I'm saying that's within the
21 realm of possibility.
22     Q.    Is it your opinion that
23 Mrs. Wicker had an injury to her
24 parasympathetic nerves?
25     A.    I'm saying that she has symptoms

Page 489

1  consistent with injury or irritation or
2  insult to the pudendals and the sympathetic
3  and parasympathetic.
4      Q.    So you have an opinion that her
5  symptoms are consistent with an injury to
6  the pudendal, sympathetic and
7  parasympathetic nerves; correct?
8      A.    Correct.
9      Q.    But you have not formed an
10 opinion as to whether there was an actual
11 injury to her pudendal, sympathetic or
12 parasympathetic nerves; correct?
13     A.    Well, I have an opinion in that
14 she was fine before surgery or minimum
15 symptomatology.  Following surgery, she had
16 severe symptomatology.  So, yeah, there --
17 there is injury to those nerves.  We know
18 based upon her symptoms because those
19 symptoms are carried in those nerve fibers.
20     Q.    How do you know that she does not
21 have injury to the sympathetic but no
22 injuries to the pudendal and
23 parasympathetic?
24     A.    Sympathetic would be responsible
25 for contraction of the bladder neck and

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 490

1   filling of the bladder neck, filling of the
2   bladder.  If you have irritation to those
3   nerves, that's going to impair the filling
4   phase.  So subsequently you can get
5   frequency, you can get urgency because these
6   nervous systems, all three, work in concert
7   and they all have to be finely tuned, and if
8   you disrupt one without affecting the other,
9   that will throw everything off.
10          And so based upon the
11  symptomatology, I can go down the nervous
12  system of what may be responsible for that.
13      Q.   Well, what I want to understand
14  is, do you have an opinion to a reasonable
15  degree of medical certainty that
16  Mrs. Wicker's pudendal nerves were injured,
17  not that they may have been injured but that
18  they actually were injured?
19          MR. ANDERSON:  Objection.
20  Go ahead.
21          THE WITNESS:  I cannot say
22  since I was not in the surgery that a trocar
23  or mesh were put through those nerves.  I
24  can't say that.  All I can go off of is the
25  symptomatology following surgery.

Page 491

1          Pudendal nerve irritation can
2   present with urinary frequency, slowed
3   urinary stream due to effects of the
4   external sphincter muscle, and so that can
5   cause those symptoms.  What I can say is
6   it's consistent with.  I cannot prove.
7   BY MR. SNELL:
8       Q.   Can pelvic -- can urinary
9   dysfunction be a result of pelvic floor
10  spasms?
11      A.   Well, pelvic floor spasms aren't
12  -- aren't a diagnosis.  I think that's along
13  the lines of pelvic floor myalgia.  And then
14  yes.  Your question was dysfunction, yes.
15          To answer your question, yes,
16  urinary dysfunction can be a result of
17  pelvic floor myalgia, as I call it, not
18  spasms.
19      Q.   Urinary dysfunction can be a
20  result of pelvic floor myalgia; correct?
21      A.   Yes.
22      Q.   What is the difference, Doctor,
23  between pelvic floor myalgia and pelvic
24  floor spasms?
25      A.   Well, spasms is kind of a

Page 492

1   description of -- of literally a muscle
2   spasm.  Myalgia is indicating pain or
3   tightening of the pelvic floor.  You're
4   technically correct, it's just not the terms
5   that we use in the voiding dysfunction
6   world.
7       Q.   Okay.
8           MR. SNELL:  Can we just go
9   off?
10          (Discussion off the record.)
11          MR. SNELL:  Back on.
12  BY MR. SNELL:
13      Q.   You would agree, Doctor, that
14  surgeons obtain information pertinent to
15  surgery from numerous sources; correct?
16      A.   Yes.
17      Q.   Surgeons obtain information
18  relevant to a surgery they may seek to
19  perform from their education; correct?
20      A.   Yes.
21      Q.   Their training; correct?
22      A.   Yes.
23      Q.   They may obtain information
24  relevant to a surgery they will perform from
25  their colleagues.

Page 493

1       A.   Yes.
2       Q.   They can obtain information
3   relevant to a surgery they may perform by
4   attending conferences such as those you have
5   attended?
6       A.   Yes.
7       Q.   Surgeons can obtain information
8   relevant to a surgery they may perform from
9   the medical literature?
10      A.   Yes.
11      Q.   Do you regularly read the medical
12  literature?
13      A.   Yes.
14          MR. ANDERSON:  Objection.
15          THE WITNESS:  Yes.
16  BY MR. SNELL:
17      Q.   Are there certain -- strike that.
18          Are there certain journals that
19  you have regularly read in the medical
20  literature since you graduated from medical
21  school?
22      A.   Yeah.  That -- that has changed
23  over time with the access to the Internet.
24  It used to be limited to specifically the
25  ones we'd get paper copies, which would be

Confidential - Attorneys' Eyes Only

Page 494

1    Journal of Urology, Urology, and then
2    Journal of Neurourology and Urodynamics, I
3    think, but now with the Internet we have
4    access to PubMed, which actually is better
5    because now we get gynecology and OB. It's
6    easy access.
7        Q.    When did you obtain access to
8    PubMed at the Mayo Clinic?
9        A.    I don't know when it became
10   available.  I mean, it would have been
11   2000-something.  I'd have to go back and
12   look for it.  I don't know.  We always had a
13   Medline search or something like that.
14       Q.    So if you wanted to do research
15   on a medical issue when you were at Mayo
16   Clinic, you could perform that type of
17   literature search?
18       A.    Correct.
19       Q.    Surgeons obtain information
20   relevant to surgery from their actual
21   clinical experience with that surgery as
22   well; correct?
23       A.    That is correct.
24       Q.    And that is a very important
25   source of information with regard to a

Page 495

1    surgery; correct?
2        A.    Yes.
3        Q.    The first da Vinci robot surgery
4    you performed was in approximately 2001 or
5    2002; correct?
6        A.    Correct.
7        Q.    And you performed that with your
8    colleague, Dr. George Chow; correct?
9        A.    Correct.
10       Q.    And he is actually the one who is
11   fellowship trained in robotics; correct?
12       A.    Correct.
13       Q.    He is actually the one who drives
14   the robot; correct?
15       A.    Yes.
16       Q.    Do you feel comfortable driving
17   the robot during a robotic laparoscopic
18   sacrocolpopexy?
19       A.    No.
20       Q.    Do you agree that it takes a high
21   degree of training to perform robotic
22   laparoscopic sacrocolpopexy?
23       A.    It takes experience above and
24   beyond just a normal surgeon.
25       Q.    Are you credentialled to perform

Page 496

1    the da Vinci robotic laparoscopic
2    sacrocolpopexy?
3        A.    No.
4        Q.    Does Mayo Clinic have a specific
5    credentialling program for a surgeon who
6    would wish to do the da Vinci robotic
7    laparoscopic sacrocolpopexy?
8        A.    No.  As long as you've been able
9    to show proficiency in robotic procedure,
10   you would be able to do it.  But you have to
11   be able to show proficiency in robotics and
12   have to -- I mean, you're going to have to
13   be in the urogynecology or urology
14   department to do it.  A general surgeon is
15   not going to do it.
16       Q.    If you wanted to perform a
17   robotic laparoscopic sacrocolpopexy, you
18   meaning drive the robot, would Mayo Clinic
19   allow you to do that?
20       A.    After performing a certain number
21   under supervision, yes.
22       Q.    Is the credentialling process at
23   Mayo Clinic for being able to perform a
24   laparoscopic sacrocolpopexy versus a robotic
25   laparoscopic sacrocolpopexy any different?

Page 497

1        A.    I don't know the answer to that
2    because Dr. Chow is fellowship trained in
3    both so there was never an issue as far as
4    credentialling and nobody at Mayo that I
5    know of does a pure laparoscopic
6    sacrocolpopexy.  That's a difficult
7    procedure.
8        Q.    A laparoscopic sacrocolpopexy you
9    would agree is a difficult procedure?
10       A.    Yes.
11             MR. SNELL:  That's all the
12   questions I have for right now.
13             (Whereupon the deposition
14   concluded at 3:12 p.m.)
15             TESTIMONY CLOSED
16
17
18
19
20
21
22
23
24
25

Confidential - Attorneys' Eyes Only

Page 498

CERTIFICATE

1
2
3
4    I HEREBY CERTIFY that the witness was
   duly sworn by me and that the deposition is a true
5   record of the testimony given by the witness.
6
    It was not requested before
7  completion of the deposition that the witness,
   DANIEL STEVEN ELLIOTT, M.D., have the opportunity
8  to read and sign the deposition transcript.
9
10
    -------------------------------
11
   ROSEMARY LOCKLEAR
12  REGISTERED PROFESSIONAL REPORTER
   CERTIFIED COURT REPORTER (NJ)
13  30XI00171000
   CERTIFIED REALTIME REPORTER
14  NOTARY PUBLIC
   Dated: 12/10/12
15
16
17
18    (The foregoing certification of
19  this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24
25

Page 499

LAWYER'S NOTES

PAGE   LINE

1
2
3 _____ _____ _____
4 _____ _____ _____
5 _____ _____ _____
6 _____ _____ _____
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____
25 _____ _____ _____