# EXHIBIT D

Steve Goldwasser, M.D.

```
 1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    CHARLESTON DIVISION
 3

    IN RE:  ETHICON, INC., PELVIC REPAIR
 4  SYSTEM PRODUCTS LIABILITY        Master File No.
    LITIGATION                       2:12-MD-02327
 5                                   MDL No. 2327
    THIS DOCUMENT RELATES TO ALL
 6  WAVE 5 AND SUBSEQUENT WAVES
    CASES AND PLAINTIFFS:            JOSEPH R. GOODWIN
 7                                   U.S. DISTRICT JUDGE

    Debbie Avant
 8  Case No. 2:12-cv-07413
 9  Patricia Bell
    Case NO. 2:12-cv-06750
10
    Patsy Frame
11  Case No. 2:12-cv-07524
12  Patricia Hosbrook
    Case No. 2:12-cv-07843
13
    Mary Alice Landeche
14  Case No.  2:12-cv-07962
    _____
15
16        DEPOSITION OF STEVE GOLDWASSER, M.D.
            PURSUANT TO NOTICE OF DEPOSITION
17
18        Taken on Behalf of the Plaintiffs
19  DATE TAKEN:  July 1, 2017
    TIME:        9:30 a.m. - 1:27 p.m.
20  PLACE:       Courtyard Marriott Jacksonville Flagler
                 Center
21               14402 Old St. Augustine Road
                 Jacksonville, FL 32258
22
23       Examination of the witness taken before:
24            Stephanie Powers Cusimano
           Registered Professional Reporter
25          Florida Professional Reporter
```

Page 2

A P P E A R A N C E S
JOHN M. RESTAINO, ESQUIRE
Restaino Law, LLC
1011 S. Josephine Street
Denver, CO  80209
Appearing on behalf of Plaintiffs.

ERIC RUMANEK, ESQURIE
Troutman Sanders LLP
Bank of America Plaza
Suite 5200
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
Appearing on behalf of Defendant.

Page 3

I N D E X
WITNESS:
STEVE GOLDWASSER, M.D.
DIRECT EXAMINATION BY MR. RESTAINO ...........4
CROSS EXAMINATION BY MR. RUMANEK ...........138
REDIRECT EXAMINATION BY MR. RESTAINO ........164
RECROSS EXAMINATION BY MR. RUMANEK ..........177

E X H I B I T S
FOR IDENTIFICATION
EXHIBIT 1 deposition notice ...................7
EXHIBIT 2 Goldwasser CV ....................10
EXHIBIT 3 general reliance list ..............40
EXHIBIT 4 supplemental reliance list .........53
EXHIBIT 5 expert report .....................54
EXHIBIT 6 Nilsson study .....................55
EXHIBIT 7 TVT-Exact document ................70
EXHIBIT 8 Gynecare TVT ......................70
EXHIBIT 9 TOMUS study .......................73
EXHIBIT 10 Goldwassaer website printout ......84
EXHIBIT 11 '15 Bladder Dysfunction Report ..100
EXHIBIT 12 Koo/Gromley article  .............106
EXHIBIT 13 FDA public healthupdate ..........107

Page 4

S T I P U L A T I O N
It was stipulated and agreed by and between counsel for the respective parties, and the witness, that the reading and signing of the deposition by the witness not be waived.
- - -
STEVE GOLDWASSER, M.D., having been produced and first duly sworn as a witness, having responded, "Yes," testified as follows:
DIRECT EXAMINATION
BY MR. RESTAINO:
Q   Good morning, Dr. Goldwasser.
A   Good morning.
Q   We met informally before the depo started. My name is John Restaino.  Stating the obvious, I'll be asking some questions today.
To my understanding you've had your deposition taken before, correct?
A   Correct.
Q   So how many times?
A   I want to say maybe three times total. One in regards to this all litigation and so forth.
Q   So you're somewhat familiar with the process.  And I think probably the two things that

Page 5

are of the most importance is the lady to your left, my right, is going to try to take down everything we say.  Normal conversation some evening at a bar and we're talking and we're talking over each other's lines, that's just normal conversation, but today I'll try to extend to you the courtesy of waiting for that final period before I ask the next question.  If you would do the same and try to wait for that question mark for her benefit.  You understand that?
A   Correct.
Q   This is not an endurance test.  This is not a memory test.  If you need to refresh your memory or look at anything, that's absolutely allowable.  And if the Coca-Cola exerts a physiological effect that you want to call time-out at any time, there's no set time that we take breaks.
A   Okay.
Q   Okay.  If you don't understand any question I have, I can't imagine any of my questions being ambiguous, but if you can't, just please ask me and I'll try to rephrase it into something that's less legalistic and more normal.
A   Okay.

Steve Goldwasser, M.D.

Page 6

1       MR. RUMANEK:  Sarcasm doesn't show up on
2   the record either.
3       Q   That being said, if you answer a question,
4   it's going to be presumed that you understood the
5   question --
6       A   Okay.
7       Q   -- does that make sense?
8       A   Yes.
9       Q   I don't think there's going to be any
10  questions along this line, but I use the example of
11  the length of this table and ask you to estimate it
12  versus the length of my dining room, which, of
13  course, would be a pure guess.  No one wants you
14  guessing, but if we can get an estimate where -- if
15  and when necessary, that would be appropriate; do
16  you understand that?
17      A   Yes.
18      Q   Okay.  And any reason why today's
19  deposition shouldn't be going forward?
20      A   Not at all.
21      Q   Do you have -- do you have patients,
22  critical care, anything where you might have to
23  leave early?
24      A   No, just a phone call away.
25      Q   Okay.  I've asked the court reporter to

Page 7

1   mark the deposition notice that was sent out, and
2   this says deposition 1 and it's right in front of
3   you at this time.  Have you seen this before?
4       (Exhibit 1 was marked for identification.)
5       A   Yes.
6       Q   And have you had a chance to go through it
7   on your own or with anyone?
8       A   Yes.
9       MR. RESTAINO:  Eric, we've received
10  objections to the notice.
11      MR. RUMANEK:  Yes.
12      MR. RESTAINO:  I'm not sure if you want to
13  put them on the record, if we need to put them
14  on the record.  I'm not going to spend a lot of
15  time going through this.  There's, I think -- I
16  think we have everything we need.
17      MR. RUMANEK:  No.  I mean, I've got the
18  objections that were filed.  I don't think
19  there's any reason to put them on the record.
20  BY MR. RESTAINO:
21      Q   If we could just run through it quickly.
22  I have a copy of your CV.  To the best of your
23  understanding, is the -- is the copy of your CV the
24  most current?
25      A   Correct.

Page 8

1       Q   And regarding any pertinent germane
2   documents in your possession regarding this
3   litigation and your report, have you produced those?
4       A   Correct.
5       MR. RUMANEK:  Well, let me just make sure
6   that's clear on the record.  So we have brought
7   some documents with us to the deposition this
8   morning in response to the notice.  We brought
9   some extra copies of his report, I assume you
10  have those.  I've got a copy of the
11  supplemental reliance list --
12      MR. RESTAINO:  I have that.
13      MR. RUMANEK:  -- that was served.  I've
14  also got a thumb drive, which, it's my
15  understanding, contains the materials that are
16  included on the supplemental reliance list, if
17  you want that.
18      MR. RESTAINO:  Okay.
19      MR. RUMANEK:  That's it.
20      MR. RESTAINO:  Okay.  As far as the thumb
21  drive with the supplemental list, I'll speak
22  off the record at the end of the deposition
23  with the court reporter and perhaps we -- it
24  would be best to have that sent along with the
25  exhibits and the original to the Aylstock firm

Page 9

1   when everything is sent, if that's acceptable.
2       MR. RUMANEK:  And just -- let's go off the
3   record.
4       (Off-the-record discussion.)
5   BY MR. RESTAINO:
6       Q   We've covered that.
7       Other than what has been produced, do you
8   have any other Ethicon products in your possession?
9       A   No.
10      Q   And have you produced time sheets, records
11  for billing, invoices, anything like that?
12      A   Not for this.
13      Q   Okay.  Do you have them?
14      A   No.
15      Q   Number 14 is documents related to your
16  involvement with Ethicon's professional education,
17  including PowerPoints, course materials, outlines.
18  Do you have any of those, and, if so, did you
19  produce those?
20      A   No, I don't have any -- I don't.
21      Q   And number 17 is any correspondence,
22  transcripts or statements, documents between you and
23  any governmental agency.  Does anything like that
24  exist?
25      A   No.

Steve Goldwasser, M.D.

Page 10

1    Q   I think that's good enough.
2        Now, those -- the one that you've been
3    given is the one that's been marked as the exhibit,
4    so we're not going to come back to that, but there
5    will be some that we'll come back to, and I'll try
6    to remember to say, that one you might want to keep
7    readily available, but -- so there's others that
8    we'll just go ahead and put to the side.
9        I'm going to ask the court reporter to
10   mark as Plaintiff 2 the copy of your CV that I was
11   provided.
12       (Exhibit 2 was marked for identification.)
13   BY MR. RESTAINO:
14   Q   And, Doctor, as we discussed earlier, this
15   is the most current, or at least the closest to
16   being the most current version of your CV?
17   A   Yeah.  Yes, it is.
18   Q   And do you have any publications that have
19   been accepted for -- I should ask, any submissions
20   that have been accepted for publication that are
21   pending?
22   A   No.
23   Q   You did your undergrad school -- schooling
24   at UC San Diego?
25   A   Correct.

Page 11

1    Q   And then medical school was at Tulane?
2    A   Correct.
3    Q   A little bit difference of humidity.
4    A   Yes, a few degrees.
5    Q   And then your residency was at the
6    University of Tennessee at Memphis, correct?
7    A   Correct.
8    Q   Followed by a fellowship?
9    A   Correct.
10   Q   Now, what I was a little confused with is
11   looking at fellowship as listed on the front page,
12   on the right side of fellowship, it says Clinical
13   Instructor, underneath that Urogynecology and
14   Reconstructive Pelvic Surgery.  Were you, in fact,
15   in the position of a clinical instructor while you
16   were doing your fellowship?
17   A   You know, I believe that when we were
18   doing the fellowships back then, we were teaching
19   the residents, so I guess we were considered
20   clinical instructors.  I think that's where that
21   comes from.
22   Q   That's normal for --
23   A   Yeah.
24   Q   -- trainees as fellows --
25   A   Correct.

Page 12

1    Q   -- though, you engage in teaching,
2    correct?
3    A   Correct.
4    Q   Okay.  And how was your fellowship in
5    urogynecology and reconstructive pelvic surgery
6    different from your residency in obstetrics and
7    gynecology?
8    A   Well, it was a focus specifically on
9    urogynecology as opposed to obstetrics and general
10   gynecology.
11   Q   During your fellowship, for example, did
12   you -- were you on call to deliver babies?
13   A   Yes.
14   Q   Okay.  So it was still gyn- -- obstetrics
15   also?
16   A   Well, that was an outside, you know,
17   moonlighting type of activity, but it wasn't a
18   formal part of the fellowship.
19   Q   Okay.  Just a way to make some extra money
20   and survive?
21   A   Yeah, exactly.  Exactly.
22   Q   So during your fellowship, here the
23   emphasis was on urogynecological and pelvic
24   reconstructive surgery itself?
25   A   Correct.

Page 13

1    Q   But there's also medicine involved in that
2    specialty, correct?
3        MR. RUMANEK:  Object to form.
4    Q   Let me rephrase.  That might have been one
5    of those ambiguous questions.
6        You're a physician and a surgeon, correct?
7    A   Correct.
8    Q   And there are conditions in urogynecology
9    and gynecology that can be treated medically --
10   A   Correct.
11   Q   -- or with pelvic -- or physical therapy?
12   A   Correct.
13   Q   Testing can be done that is not surgical
14   in nature --
15   A   Correct.
16   Q   -- like urodynamic testing?
17   A   Correct.
18   Q   Have you -- were you trained in that?
19   A   Yes.
20   Q   Trained in uroflowmetry?
21   A   Correct.
22   Q   Post-voiding residual measurements?
23   A   Correct.
24   Q   Cystometric testing?
25   A   Correct.

Steve Goldwasser, M.D.

Page 14

1    Q   Leak point pressure measuring?
2    A   Correct.
3    Q   Pressure flow studies?
4    A   Correct.
5    Q   These are various urodynamic studies that
6  you were trained in, have expertise in?
7    A   Correct.
8    Q   A couple of these might be considered
9  invasive procedures.  Do you consider them invasive?
10       MR. RUMANEK: Object to the form.
11   Q   Let me retract that.  Do you consider any
12 of those procedures to be substantially invasive
13 procedures?
14       MR. RUMANEK: Object to the form.
15   A   Not surgical procedures, but invasive,
16 yes.
17   Q   Dangerous to the patient?
18       MR. RUMANEK: Object to the form.
19   A   It's a broad question, but --
20   Q   Okay.  I'll withdraw it.
21       Now, there are subspecialties within the
22 specialty of gynecology, correct?
23   A   Correct.
24   Q   Gynecological oncology, did you receive
25 specific formal training in that as part of your

Page 15

1  residency and/or fellowship?
2    A   In residency.
3    Q   Okay.  But not in your fellowship?
4    A   Correct.
5    Q   Do you consider yourself an expert in
6  gynecologic oncology?
7        MR. RUMANEK: Object to the form.
8    A   No.
9    Q   Maternal fetal medicine, another
10 subspecialty?
11   A   Correct.
12   Q   And did you receive training in that in
13 your residency and/or fellowship?
14   A   Residency, correct.
15   Q   And are you an expert in maternal fetal
16 medicine?
17       MR. RUMANEK: Object to the form.
18   A   No.
19   Q   Reproductive endocrinology and
20 infertility, is that another subspecialty?
21   A   Correct.
22   Q   And did you receive training in that in
23 residency and/or fellowship?
24   A   Residency.
25   Q   Are you considered an expert in maternal

Page 16

1  fetal medicine?
2    A   No.
3        MR. RUMANEK: Object to the form.
4    Q   And then not the last, but the, say, final
5  one is the urogynecological and pelvic
6  reconstructive surgical subspecialty, and that you
7  did receive training in, correct?
8    A   Correct.
9    Q   And do you consider yourself an expert in
10 urogynecology and pelvic reconstructive surgery?
11   A   Yes.
12       MR. RUMANEK: No objection.
13   Q   I saw five publications is listed in your
14 CV; is that correct?
15   A   I believe so.
16   Q   And, now, is that a representative sample
17 of your publications or the publications in total?
18   A   I believe that's in total.
19   Q   Okay.  So I notice that your first
20 publication was in 1999 and was titled Randomized
21 Comparison Of Oral Misoprostol Versus Foley Catheter
22 And Xylocaine For Induction Of Labor At Term.  Did I
23 read that correctly?
24   A   I'm trying to find it, but it sounds
25 right.

Page 17

1    Q   I think it's the third page, bottom --
2  right above Abstracts and Procedures.
3    A   Oh, yeah, yeah.  Okay.  I see it.
4    Q   And what I'll do now is I'll just work
5  myself up with these publications.  When you say a
6  randomized comparison, was this a randomized study?
7    A   Yes.
8    Q   I guess to be clear for the record, was
9  this a randomized controlled trial?
10   A   I'm trying to remember exactly.  Let me
11 read it over again.  Yeah, the control was the Foley
12 catheter group, correct.
13   Q   Okay.  Now, this was published when you
14 were a fellow; is that correct?
15   A   No, resident.
16   Q   Oh, okay.  Sorry.  I'm getting ahead of
17 myself.
18       And this has nothing to do with vaginal
19 mesh?
20   A   Correct.
21   Q   And then in 2000 you published Suprapubic
22 Bladder Drainage After Extraperitoneal Cystotomies;
23 did I read that correctly?
24   A   Correct.
25   Q   Was that a case report, a case series, or

Steve Goldwasser, M.D.

Page 18

1  review of the literature, do you recall?
2      A   I don't recall.
3      Q   Was this published during your fellowship?
4      A   Yes.
5      Q   And again, this doesn't have anything to
6  do with vaginal mesh?
7      A   No.
8          MR. RUMANEK:  Let me just note, the first
9      publication it says is 1999.  I think he asked
10     you was that published during your residency or
11     fellowship.  Was that --
12         THE WITNESS:  You know --
13         MR. RUMANEK:  I'm just looking at the
14     dates.
15         THE WITNESS:  It's probably '98.  It's
16     probably -- well, no, it may have been
17     published after I graduated, because it was a
18     project, a senior project, and I graduated in
19     '98, and so it was probably published in '99.
20  BY MR. RESTAINO:
21     Q   Okay.  The next one up, moving up, is
22  Failure Of Intraoperative Cystoscopy To Identify
23  Partial Ureteral Obstruction, and that, I believe,
24  was also published in 2000?
25     A   Correct.

Page 19

1      Q   As you sit here today, do you remember if
2  that was a case report, a case series, or review of
3  the literature?
4      A   It was a case report.
5      Q   So in a case report, I'm just jumping
6  ahead now, is a report of a single case that might
7  be of interest; is that correct?
8      A   Correct.
9      Q   And there's no randomization involved?
10     A   No.
11     Q   No control?
12     A   Correct.
13     Q   No placebo?
14     A   Correct.
15     Q   Moving up, the next article is High
16  Uterosacral Vaginal Vault Suspension With Fascial
17  Reconstruction For Vaginal Repair Of Enterocele And
18  Vaginal Vault Prolapse.  Did I attempt to read that
19  correctly?
20     A   You got it.  Pretty good.
21     Q   It's -- the coffee hasn't kicked in yet.
22         Now, again, was this a case report or
23  review of the literature to the best of your
24  recollection?
25     A   This is actually -- this was basically

Page 20

1  looking back at our data from fellowship in terms of
2  surgical outcomes from that type of procedure, if I
3  recall correctly.
4      Q   Okay.  Does it have anything to do with
5  vaginal mesh?
6      A   No.
7      Q   And then the -- the top one published in
8  2002 is Predicting Postoperative Voiding Efficiency
9  After Operation For Incontinence And Prolapse
10  published in 2002, correct?
11     A   Correct.
12     Q   And, once again, was this a review of
13  literature or case reports or the result of an
14  actual clinical trial?
15     A   I believe this was an actual trial that we
16  did.
17     Q   And do you know if it was a randomized
18  controlled trial, a cohort case control, or any
19  other form of epidemiological study?
20     A   I do not recall.
21     Q   Now, the best I could ascertain, this is
22  your last publication in the peer-reviewed medical
23  literature; is that correct?
24     A   Correct.
25     Q   Now, I saw under Abstracts and

Page 21

1  Proceedings, the bottom one on that third page
2  titled A Simplified Technique For Apical Fixation Of
3  Grafts In Repair Of Anterior Genital Prolapse, The
4  Anterior Perirectal Pass; did I read that correctly?
5      A   Correct.
6      Q   Now, the grafts that you're referring to
7  there, that is native issue or mesh or both?
8      A   Mesh.
9      Q   Now, was this presented as a poster in a
10  -- in this meeting?
11     A   I believe that was presented as -- that
12  was an oral presentation actually.
13     Q   Okay.  Following that meeting, it did not
14  turn into a full-blown peer-reviewed medical
15  article -- did it turn into a full-blown medical
16  article published in the peer-reviewed literature?
17     A   No.
18     Q   And at this meeting did you hold yourself
19  out to your colleagues as an expert in the use of
20  transvaginal mesh?
21     A   Yes.
22     Q   This was a regional conference?
23     A   Correct.
24     Q   And have you ever presented at a national
25  conference and hold yourself out as an expert in

Steve Goldwasser, M.D.

Page 22

1  transvaginal mesh?
2      A   No, I have not presented at a national
3  conference.
4      Q   Other than your own institution, has any
5  academic institution invited you to come in and give
6  a guest lecture on the use of vaginal mesh,
7  specifically DVT -- DVT and DVT-Exact [sic]?
8      A   No.
9          MR. RESTAINO:  Something I should have put
10  on the record --
11         MR. RUMANEK:  Okay.  Are you saying DVT or
12  T --
13         MR. RESTAINO:  T.
14         MR. RUMANEK:  TVT, okay.
15  BY MR. RESTAINO:
16     Q   Something I should have put -- we should
17  have discussed earlier on, throughout your report
18  and in questioning, today your -- your testimony is
19  limited to the two devices, the transvaginal TVT
20  mesh and the TVT-Exact; is that correct?
21     A   Correct.
22         MR. RUMANEK:  I just want to object just
23  to the extent that you've already asked him
24  about -- some questions about prolapse, so I
25  think his report is limited to those things.

Page 23

1      His testimony, depending on the questions
2  asked, may or may not be.
3          MR. RESTAINO:  I understand.  And I'm just
4  trying to clear this up.
5      Q   There is a product that has been described
6  as TVT-Retropubic; am I correct?
7      A   Correct.
8      Q   When your report and when I and hopefully
9  you say TVT as compared to TVT-Exact, can we agree
10  that we're referring to TVT-Retropubic?
11     A   Well, they're both retropubic, but yes.
12     Q   But they're two different devices?
13     A   Correct.
14     Q   I just want to make it clear for the
15  record and so -- for everyone.
16         And also for the court reporter, has been
17  pointed out, and it was pointed out the last time I
18  took deposition too, I have a tendency to say, for
19  whatever reason, DVT.  I'm far more experienced with
20  deep vein thrombosis than I am with trans-- so
21  when I say DVT, that's just senile and dementia
22  setting in.
23         Doctor, have you -- have you ever been
24  invited to be a visiting professor on any topic at
25  any academic institution?

Page 24

1      A   No.
2      Q   And have you had formal training and --
3  and I'll be happy to discuss my definition of that,
4  if need be, if you don't understand.  Have you had
5  any formal training in epidemiology?
6      A   No.
7      Q   You're not degreed as an epidemiologist?
8      A   Correct.
9      Q   Have you ever personally designed a
10  randomized controlled trial?
11     A   No.
12     Q   And do you understand that the strength of
13  a randomized controlled trial is the randomization,
14  which greatly diminishes the possibility of bias?
15         MR. RUMANEK:  Object to the form.
16     A   Yes.
17     Q   Of the other epidemiological studies, and
18  I'm not playing word games, including cohort or case
19  control or case series, case report, they don't
20  involve randomization, correct?
21     A   Correct.
22     Q   Do you consider the randomized controlled
23  trial to be the gold standard of epidemiology?
24         MR. RUMANEK:  Object to the form.
25     A   I mean, it's the highest level of

Page 25

1  evidence, but --
2      Q   Fair enough.  And as a resident and
3  fellow, did you rely upon published randomized
4  controlled trials to further your education?
5          MR. RUMANEK:  Object to the form.
6      A   It's part of the educational process.
7      Q   Okay.  And do you consider yourself an
8  expert in the design -- the epidemiological design
9  of a randomized controlled trial?
10     A   No.
11     Q   Why not?
12     A   I don't pursue that.  I mean, I don't know
13  what else to tell you.
14     Q   Did you ever design a cohort
15  epidemiological study?
16     A   No.
17     Q   During residency, fellowship, did you
18  utilize cohort studies in your education?
19         MR. RUMANEK:  Object to the form.
20     A   I would assume so.
21     Q   You said with the randomized controlled
22  trial, that it was the highest form of
23  epidemiological evidence.  Would you consider the
24  cohort study to be a rung below the RCT?
25     A   Correct.

Page 26

1  Q   And do you consider yourself an expert in
2  the design of an epidemiological cohort study?
3  A   No.
4  Q   During residency, fellowship, or private
5  practice, have you ever designed a case controlled
6  study?
7  A   No.
8  Q   During training did you utilize case
9  controlled studies or read and study case controlled
10  studies as part of your education?
11  A   Yes.
12  Q   Do you consider the case controlled study
13  to be epidemiologically weaker than the cohort
14  study?
15  A   Yes, it is.
16  Q   Today do you rely upon case control
17  studies to assist you in your decision making as a
18  physician and surgeon?
19      MR. RUMANEK:  Object to the form.
20  A   As one of many things I rely on, correct.
21  Q   And do you consider yourself an expert in
22  the design of a case control epidemiological study?
23  A   No.
24  Q   Now, we touched upon, I'll get into a
25  little more detail here, what is a case report?

Page 27

1  A   A case report is where you simply make an
2  observation in your practice, for example, and you
3  report upon what you found and -- your observations
4  basically.
5  Q   And as I believe we touched upon, in a --
6  your typical case report, there isn't a control; is
7  that correct?
8  A   Correct.
9  Q   And there typically is not a placebo,
10  correct?
11  A   Correct.
12  Q   Would you agree that, epidemiologically
13  speaking, the case report is the weakest of all
14  evidence?
15      MR. RUMANEK:  Object to the form.
16  A   I think expert opinion may really be the
17  weakest, if I recall, but it's down there on the
18  lower part of the food chain, I'd say.
19  Q   Now, if you report on a patient that you
20  see an effect in, I'm paraphrasing you, and correct
21  me if I'm wrong, that is a case report, correct?
22  A   Correct.
23  Q   If you were to report on five of those
24  patients, that would be a case series?
25  A   I don't know the exact definition of a

Page 28

1  series, but I'd say probably more than one would be
2  considered a series.
3  Q   Again, to the best of your knowledge,
4  understanding no formal training in epidemiology,
5  but case series, once again, does not involve
6  randomization, correct?
7  A   Correct.
8  Q   And it does not involve a placebo?
9  A   Correct.
10  Q   And there's typically not a controlled
11  element to it, correct?
12  A   Agree.
13  Q   It's publication of observations and
14  nothing more, correct?
15      MR. RUMANEK:  Object to the form.
16  A   Yes.
17  Q   It might fight it out with the expert
18  opinions, but, once again, it's at the bottom of the
19  epidemiological rung strength, would you agree?
20  A   Agree.
21  Q   Okay.  And as you sit here today, do you
22  have -- do you understand the difference between an
23  incidence rate and a prevalence rate?
24  A   The exact definition escapes me, but I
25  know that there is a difference in the two.  So

Page 29

1  yeah, more or less I do.
2  Q   Okay.  Now, have you had any formal
3  training in pathology since medical school or
4  residency?
5  A   No.
6  Q   During your residency and fellowship, did
7  you rely upon pathological analyses?
8      MR. RUMANEK:  Object to the form.
9  A   During residence and fellowship, we came
10  across them.  I mean, it was case-by-case basis, but
11  to some degree.
12  Q   Well, I don't mean to be confusing and I'm
13  not playing a word game.  If, for example, during
14  fellowship you were involved in a surgery involving
15  a serious ovarian tumor, would you be required to
16  take the tissue to the laboratory, look under the
17  microscope, and make the ultimate pathological
18  diagnosis of what it is?
19  A   No.
20  Q   You rely upon a pathologist to do that?
21  A   Correct.  They have to have a job, right?
22  Q   Well, do you consider yourself an expert
23  in the field of pathology?
24      MR. RUMANEK:  Object to the form.
25  A   No.

Steve Goldwasser, M.D.

Page 30

1    Q   Have you had any formal training in
2  material sciences, whether undergrad or medical
3  school or post grad?
4    A   No.
5    Q   Once again, as a resident, surgeon, and
6  fellow, did you rely upon published material,
7  science, studies?
8        MR. RUMANEK:  Object to the form.
9    A   In what?
10    Q   In -- well, I'll choose mesh.  At that
11  time if there was a publication on the material
12  science of mesh published, did you -- would you
13  review that and interpret that article to your own
14  satisfaction?
15    A   Yeah, to some degree.
16    Q   Would you rely upon published material,
17  science, studies to assist you in making -- your
18  final decision making?
19        MR. RUMANEK:  Object to the form.
20    A   Potentially.
21    Q   Do you consider yourself an expert in the
22  field of material sciences?
23        MR. RUMANEK:  Object to the form.
24    A   No.
25    Q   Have you ever conducted any animal

Page 31

1  research involving polypropylene mesh?
2    A   No.
3    Q   And I'll get a little bit more specific
4  just for the record, have you considered -- have you
5  conducted animal research involving TVT mesh?
6    A   Have I conducted it, no.
7    Q   Yes.  Have you conducted any
8  epidemiological study involving TVT mesh?
9    A   No.
10    Q   Have you conducted any animal research
11  involving TVT-Exact mesh?
12    A   No.
13    Q   Have you conducted any epidemiological
14  study involving TVT-Exact mesh?
15    A   No.
16    Q   Have -- I think I asked that.
17        Has Ethicon ever approached you about
18  designing for them an animal study to look at
19  polypropylene mesh?
20    A   No.
21    Q   Have they ever approached you to and
22  consulted with you -- have they approached with you,
23  consulted with you, asking you to design any form of
24  polypropylene mesh to be used in women?
25    A   No.

Page 32

1    Q   Have you ever removed a TVT mesh product
2  from a woman?
3    A   Yes.
4    Q   Can you estimate how many you've removed?
5        MR. RUMANEK:  And you're referring to just
6  the TVT specifically?
7        MR. RESTAINO:  Yes.
8    A   I would say probably less than 20.
9    Q   When you've removed them, have you asked
10  for electro-microscopic analysis of the mesh itself?
11    A   No.
12    Q   Do you have any formal training in
13  electro-microscopy?
14    A   No.
15    Q   As a practicing physician and surgeon,
16  will you read and perhaps rely upon published EM
17  studies regarding any materials germane to your
18  specialty?
19        MR. RUMANEK:  Object to the form.
20    A   I don't know that I necessarily rely upon
21  them, but I come across them in the literature.
22    Q   And do you consider yourself an expert in
23  electro-microscopic analyses?
24        MR. RUMANEK:  Object to the form.
25    A   No.

Page 33

1    Q   Now, my understanding is you're being paid
2  $500 an hour for your time to review medical records
3  and draft written reports; is that correct?
4    A   Correct.
5    Q   And then $600 an hour for in-town
6  depositions?
7    A   Correct.
8    Q   I don't know where you live.  Is this
9  considered in town or out of town?
10    A   In town.
11    Q   Okay.  And you charge $6,000 per day for
12  out-of-town depositions?
13    A   Correct.
14    Q   $5,000 per day for in-town depositions --
15    A   Correct.
16    Q   -- in-town trial testimony?  I'm sorry.
17        MR. RUMANEK:  Yeah, I just -- let me just
18  say that his fees are reflected in the report.
19  And I'll just -- to the extent that the
20  questions may be somewhat confusing, that's set
21  forth in his expert report.  Go ahead.
22    Q   Counsel raises a very good point.  These
23  were written with my not understanding what in town
24  and out of town was.  Let's just clear that up, that
25  right now here is -- in south Jacksonville is

Steve Goldwasser, M.D.

Page 34

1 considered in town.  Anywhere outside of
2 Jacksonville would be out of town?
3    A   Correct.
4    Q   Okay.  You mentioned that you had given a
5 previous deposition in -- involving the mesh
6 litigation?
7    A   Correct.
8    Q   And was that in town or out of town?
9    A   In town.
10    MR. RUMANEK:  He was sitting right here
11 actually.
12    Q   Now, have you testified in any mesh
13 trials?
14    A   No.
15    MR. RUMANEK:  And let me just say, because
16 I don't want the record to be -- I think when
17 he was referring to testifying in mesh, he was
18 referring to as an expert witness.  He's also
19 been deposed in mesh cases before, but I just
20 want to make sure that distinction was clear.
21    MR. RESTAINO:  I believe I understood
22 that --
23    MR. RUMANEK:  Okay.
24    MR. RESTAINO:  -- so I think the record's
25 clear on that.

Page 35

1 BY MR. RESTAINO:
2    Q   And just to make sure, earlier on when I
3 asked you if you had given depositions before, I
4 believe you answered in this litigation, but as
5 explained by Counsel, we have an understanding of
6 what was meant.
7    Now, did -- did you undergo any
8 preparation for today's deposition?
9    A   Yes.
10    Q   And briefly explain without -- if you met
11 with Counsel, I'm not entitled to know what you
12 discussed, but I'm entitled to know if you met and
13 for how long and where it was, that kind of stuff.
14    A   Okay.
15    Q   So can you briefly describe what you did
16 to prepare for today's deposition.
17    A   I've reviewed my report.  I reviewed part
18 of the literature contained within my report and
19 literature on my reliance list.  I met with Counsel
20 for probably an hour and a half yesterday evening.
21    Q   Did you meet in an office or at a
22 restaurant?
23    A   In this room.
24    Q   In this room.  I ate at Clark's Fish Camp
25 last night.  Have you been there?

Page 36

1    A   A long time ago.  I think so.  I remember
2 no cell phone reception out there.  It was a long
3 time ago.
4    MR. RESTAINO:  Off the record.
5    (Off-the-record discussion.)
6 BY MR. RESTAINO:
7    Q   Now, for your preparation for the
8 deposition, your meeting last night, are you going
9 to be charging Ethicon?
10    A   Yes.
11    Q   I'm correct in assuming that you charge
12 Ethicon for all the work that you do as an expert
13 witness for them?
14    A   Correct.
15    Q   So if you were sent or you found a new
16 medical article that's on point to your role as an
17 expert, did you ever read that article in
18 preparation for your report or your discussion or
19 today and not charge for it?
20    MR. RUMANEK:  Object to the form.
21    A   I'm sure at some point, yes.
22    Q   Now, you mentioned that you have a general
23 reliance list, which we're going to go ahead and
24 mark, and a supplemental reliance list, correct?
25    A   Correct.

Page 37

1    Q   Can you tell me what they are.
2    A   Well, I'm not exactly sure what the
3 supplemental one is, but the general reliance list,
4 excuse me, is -- is the literature that was
5 available to me to look over and review as part of
6 the preparation of writing the report.
7    Q   Is it a list of materials for you to look
8 over in preparation for your report that you relied
9 upon that was given to you or is this something that
10 you've created and found the articles, added the
11 articles yourself?
12    MR. RUMANEK:  Object to the form.
13    A   A combination of the two.
14    Q   You need some water?
15    A   No, I'm good.
16    Q   In the -- for your expert report, there's
17 a list of company witness depositions listed --
18    A   Correct.
19    Q   -- is there not?  And you've read those?
20    A   Yes.
21    Q   And typically, because lawyers can talk,
22 those depositions tend to be several pages long,
23 will you agree upon that?
24    A   I agree.
25    Q   And did you sit and read any of those

Steve Goldwasser, M.D.

Page 38

1  depositions and not charge for that time?
2      A   I don't recall.  I would say that it was
3  probably part of my lump sum of hours and research
4  to my best recollection.
5      Q   Do you have a record of how many hours you
6  have spent, let's break it down, first preparing for
7  and drafting/writing this current expert report?
8      A   Yes.
9      Q   And can you estimate how many hours that
10 was?
11     A   Again, it would be an estimate.  I would
12 say probably -- with the review of all the
13 literature, actually writing the report, I'd say
14 probably in the 30- to 40-hour range.
15     Q   And in preparation for your reports, would
16 you spend time reviewing or, for example -- or as an
17 example, PubMed to find germane articles?
18     A   Yes.
19     Q   And then you would download those articles
20 and read the article?
21     A   Correct.
22     Q   Okay.  And then charge Ethicon for that,
23 correct?
24         MR. RUMANEK:  Object to form.
25     A   Correct.

Page 39

1      Q   Okay.  Were you given by anyone articles
2  that you did not yourself find and download?
3      A   Yes.
4      Q   And who gave you those articles?
5      A   Counsel for Ethicon.
6      Q   And did you review those articles?
7      A   To some degree.
8      Q   Did you charge Ethicon for that review?
9      A   Yes.
10     Q   Is -- do you have or do you plan on having
11 an invoice that is specific to, for example, how
12 much time you spent reviewing the medical articles
13 as cited in your expert report, your general
14 reliance, and your supplemental reliance?
15         MR. RUMANEK:  Object to the form.
16     A   I have a -- can you repeat the question
17 one more time?
18     Q   I'll try to make it clearer in that you
19 said that you estimated there was approximately 30
20 to 40 hours that you have spent.  Was that in
21 response to preparing your expert report, correct?
22     A   Correct.
23     Q   That's different from the time you spent
24 preparing for this deposition?
25     A   Correct.

Page 40

1      Q   So in that 30 or 40 hours, did you -- have
2  you broken it down to X number of hours searching,
3  downloading, reading medical records versus how many
4  hours actually writing the report?
5      A   No, I did not separate those out.
6      Q   It's all included in one?
7      A   Correct.
8      Q   Okay.  And the same thing for your expert
9  report, there -- is there a specific line listing X
10 hours writing expert report?
11     A   No.
12     Q   Okay.  When were you first contacted about
13 being an expert on behalf of Ethicon in the mesh
14 litigation?
15     A   I'd say in the last portion of 2016.
16     Q   And who contacted you?
17     A   Counsel for Ethicon.
18     Q   And have you ever worked with counsel for
19 Ethicon in the past in any capacity?
20     A   Not that I recall.
21     Q   Okay.  Now, I'll go ahead and have the
22 court reporter mark as the next exhibit the general
23 reliance list.
24         (Exhibit 3 was marked for identification.)
25

Page 41

1          MR. RESTAINO:  Counsel, I've got one for
2  you in case you need it.
3          MR. RUMANEK:  Thanks.
4  BY MR. RESTAINO:
5      Q   Now, as per the title itself, are you
6  relying upon the materials within the document to
7  support your general opinions in this regard?
8      A   Correct.
9      Q   Okay.  And as far as actually, I'll try to
10 make it clear, typing up the document, did you type
11 this up or did someone else?
12     A   I typed it up.
13         MR. RUMANEK:  He's talking about the
14 reliance list --
15         THE WITNESS:  Oh.
16         MR. RUMANEK:  -- not your expert report.
17     A   No, I did not type the reliance list.
18     Q   Do you know who did?
19     A   No.
20     Q   Did you give whomever the listing of what
21 should be in your general reliance list?
22     A   No.
23     Q   Have you gone through the general reliance
24 list to make sure that everything that's in there
25 you are relying upon in supporting your expert

Steve Goldwasser, M.D.

Page 42

1  opinion?
2      MR. RUMANEK:  Object to the form.
3  A   I've -- I've --
4      MR. RUMANEK:  No, I just want to make
5  clear.  So part of what included in the --
6  on the reliance list were the materials that
7  were provided to Dr. Goldwasser by counsel.
8      MR. RESTAINO:  Understood.
9      MR. RUMANEK:  Okay.  I just want to make
10  sure that's --
11  BY MR. RESTAINO:
12   Q   And was there anything provided to you
13  that you reviewed and say, no, I disagree with this
14  and I'm not relying upon it?
15   A   Yeah, I mean, I came across articles that
16  I didn't necessarily rely on, but, I mean, there was
17  no formal discussion over it.  It's all part of the
18  research going into the report.
19   Q   Okay.  Now --
20      MR. RUMANEK:  And I just want to make --
21  again, I just want to make sure this is clear
22  on the record just so -- so you're
23  understanding.
24      So some of the materials that were
25  provided, you may characterize as not

Page 43

1  supporting his opinions.  You just said
2  supporting your opinions, and I just -- it's
3  materials that were provided to him to
4  consider.  Whether or not somebody may
5  characterize them as supporting or not
6  supporting, I just --
7      MR. RESTAINO:  Okay.
8      MR. RUMANEK:  I just didn't want that
9  question to be unclear.
10      MR. RESTAINO:  I appreciate that.  Thank
11  you.
12  BY MR. RESTAINO:
13   Q   Is -- from my perspective, if I sit down
14  and read everything in there, it's your general
15  reliance list, so my assumption is that you are
16  relying upon the information in there as -- to
17  support the bases of your expert opinion.  So if
18  there's something in the document that you disagree
19  with, how would I know that unless we go through
20  every document?
21   A   You wouldn't.
22   Q   Okay.  Now, that general reliance list is,
23  from what I -- when I looked at it and counted, 68
24  pages in length, including the cover page, and it
25  includes 46 pages of medical records.  So I counted

Page 44

1  down and I estimated there's approximately 20
2  medical articles on every page.  And doing just some
3  really crude calculations using my slide ruler,
4  there's over 900 medical records on the general
5  reliance list.
6   A   Yeah, probably --
7   Q   Did you review those 900 articles?
8   A   Not in detail.
9   Q   Did you review them at all?
10   A   Yes.
11   Q   Each one?
12   A   No.
13   Q   Any way of knowing which ones are listed
14  in there, in your general reliance that you haven't
15  looked at?
16   A   No.
17   Q   As far as the expert report, that has
18  other references or citations specifically in it,
19  correct?
20   A   Repeat that one more time.
21   Q   Within your expert report, as we'll get
22  to, you actually, then, have a reference for certain
23  points, correct?
24   A   Correct.
25   Q   And those references are also listed in

Page 45

1  there.  How did you decide which ones you would use
2  and cite or reference in your expert report versus
3  those that you wouldn't use?
4      MR. RUMANEK:  And let me just -- also just
5  before you make an objection, the reliance list
6  specifically says "general reliance list in
7  addition to materials referenced in the
8  report."  They may be exact -- all reference,
9  but to the extent that there are additional
10  references in the report that are not on the
11  reliance list, it's certainly possible.
12      MR. RESTAINO:  Thank you.  I don't think
13  there are.
14      MR. RUMANEK:  Okay.  It may not be in
15  there.
16      MR. RESTAINO:  I think they're consistent,
17  but, of course, there's a lot more in here.
18  BY MR. RESTAINO:
19   Q   How did you determine the existence of the
20  medical records that are listed in your general
21  reliance list and your supplemental reliance list?
22      MR. RUMANEK:  Object to form.
23   A   How did I determine -- say that one more
24  time.  How did I determine what?
25   Q   How did you determine their existence?

Steve Goldwasser, M.D.

Page 46

1  How did you find each article that's listed in your
2  expert report, your general reliance report, your
3  supplemental report?
4      A   Well, when I was doing a literature
5  search, I would look up certain topics, come across
6  articles, review them, see if it was something I
7  wanted to include in my report, and if so, it would
8  wind up in the reliance list.  So it was a -- just a
9  process.
10      Q   Okay.
11          MR. RUMANEK:  And again, on the -- just
12  there were also materials that were provided to
13  Dr. Goldwasser by counsel that are on the
14  reliance list as well.
15      Q   If you look at the first article in the
16  general reliance list, top of the third page, I
17  believe it's the Aaron LA and Buchwald D article; is
18  that correct?
19      A   Correct.
20      Q   And it's titled Diffuse -- Chronic Diffuse
21  Musculoskeletal Pain, Fibromyalgia, And Co-Morbid
22  Unexplained Clinical Conditions; is that correct?
23      A   Correct.
24      Q   Now, that is one of the articles that's
25  not cited in your expert report?

Page 47

1      A   Correct.
2      Q   Did you read this article?
3      A   Yeah, I actually did.
4      Q   And how long did it take for you to read
5  it?
6      A   You know, I honestly could not give you
7  even a guesstimate.
8          MR. RESTAINO:  Let's go off the record for
9  one moment.
10          (Off-the-record discussion.)
11  BY MR. RESTAINO:
12      Q   Now, this is published in Best Practice &
13  Research Clinical Rheumatology, correct?
14      A   Correct.
15      Q   And how did you find this article?
16      A   I don't recall whether this was one of the
17  ones -- it was probably one of the ones provided
18  that, you know, I could have the option of looking
19  through, obviously, but I don't recall specifically
20  pulling this one myself.
21      Q   Okay.  Now, this article, I'll represent
22  to you, if you don't recall, is -- it is 12 pages
23  long with five pages of references.  Do you recall
24  as you sit here what it is about this article that
25  you are relying upon for -- to support your opinions

Page 48

1  in this litigation?
2          MR. RUMANEK:  Object to the form.
3      A   No, I mean, I don't think it's part of my
4  report, so I don't think I was relying upon it to
5  support any of my -- my opinions in the report.
6      Q   Can you estimate for an article like this
7  and the articles in your expert report and the
8  remainder in the general supplemental listing how
9  long it takes to read such a medical article?
10      A   Well, it's hard to give you a good
11  guesstimate.  I mean, it could range anywhere from
12  reviewing the abstract in a minute to actually
13  delving into the whole methods and details of the --
14  of the article.  And you said it's 12 pages, that
15  may take, I don't you know, ten, 15 minutes or so to
16  get through it.
17      Q   Okay.  If you turn to page 47 of your
18  general reliance list --
19      A   I don't think they're numbered.
20      Q   Are they numbered?
21      A   Oh, no.  Unh-unh.
22          THE WITNESS:  Is yours numbered?
23      Q   How did I get page 47?
24      A   I'm going to count back now and we'll find
25  it.

Page 49

1      Q   Well, how did I come up with page 47?  It
2  just showed up in my computer as the pdf page number
3  there on the left.  I apologize for that.
4      A   I think I'm on approximately page 47.
5  Anything in particular?
6      Q   Yes, there's an article -- there's a
7  study, 2003, and then in parenthesis 14-day Rabbit
8  Study.
9      A   These are all -- my page 47 here are all
10  internal documents.  Is that -- is it an internal
11  document?
12      Q   I believe so.
13      A   14 Day-rabbit Study.  I don't see a 14-day
14  Rabbit Study in here.
15      Q   Let me see.  Oh, here's what I did.  If
16  you -- it should be in the title of the -- the upper
17  left, it's called Production Materials.  Prior to
18  that it was all called Medical Records.
19      A   Yeah, these are production materials.
20      Q   The very first one is dated -- of the
21  production materials.
22      A   Here we go.
23          MR. RUMANEK:  I'll just note, I think the
24  earlier section was Medical Literature.
25      A   Okay.  Now I see it.  14-day Rabbit Study,

Steve Goldwasser, M.D.

Page 50

1   okay.
2     Q   Okay.  Do you recall reading this study?
3     A   Not specifically.
4     Q   Did you read it?
5     A   I don't recall.
6     Q   Did you read the -- in the production
7   materials, did you read each of the materials that's
8   listed there?
9     A   I don't recall.  I reviewed a tremendous
10  amount of information in this, and I couldn't
11  specifically tell you.
12    Q   And so as you sit here today, you have no
13  recollection about this 14-day Rabbit Study?
14    A   Now, have you -- do you have it and I can
15  take a look through it?
16    Q   No, I don't have specific questions.  It's
17  more along the lines of just a general question.
18  Just there's 900 medical articles listed.
19    A   Right.
20    Q   There are -- in the 13 pages of -- or, I
21  mean, in the production materials, there's 13 pages
22  of production materials, and I'm just trying to get
23  to how much time did you spend reviewing all of
24  this.
25    A   Right.  Right.

Page 51

1     Q   Now, one aspect of it is you testified
2   that your charge -- you've charged Ethicon between
3   30 to -- for 30 to 40 hours.  If we spent ten
4   minutes on 900 medical articles, we're into the
5   hundreds of hours.
6     A   Well, I can take a look back and tell you
7   exactly how much time I've spent.  I'm giving you,
8   you know, my best guess, but, yeah, no, it is what
9   it is.
10    Q   Okay.  In the -- the section of Production
11  Materials -- and I wish I had picked up that there
12  weren't page numbers on this, but in glancing
13  through it and looking at the various production
14  materials in your general reliance, I noted that ten
15  of the materials listed there -- I'll represent to
16  you that ten of them are listed as anatomy videos.
17  Do you recall seeing that?
18    A   I don't recall going through every single
19  anatomy video, but I did review some anatomy videos.
20    Q   Can you estimate how long each video is?
21    A   No.  Some of the videos that I actually
22  saw for anatomy videos, if we're talking about the
23  same thing, are things that, you know, over the past
24  what, 18 years I've looked at videotapes of, you
25  know, anatomy that were part of the training courses

Page 52

1   and -- you know, so some of these things I may have
2   seen outside of, you know, specifically putting
3   together a report that may be in here.  But no, I
4   mean, back then I didn't specifically charge Ethicon
5   for reviewing those because there wasn't anything
6   that I engaged in at the time.
7     Q   Okay.  That just saved a lot of questions
8   because I was going to ask why would you watch ten
9   videos of human anatomy after medical school,
10  fellowship, residency, private practice, and now
11  you're going to sit back and watch -- has the
12  anatomy changed since --
13    A   No, but I watched everything on You Tube
14  and I ran out of stuff to do, you know.  No, it has
15  not changed.
16    Q   Let's go ahead and --
17        MR. RUMANEK:  Once again, I will note that
18  sarcasm does not show up on a written
19  transcript.
20    Q   I will mark as -- I believe we're up to 4,
21  your -- just to get it out of the way, the
22  supplemental general reliance list in addition to
23  materials referenced in report MDL wave number 5.
24        MR. RESTAINO:  Eric, another tree.
25        MR. RUMANEK:  This is 4.

Page 53

1         (Exhibit 4 was marked for identification.)
2         THE WITNESS:  Can we take a break?  I have
3     a question for you.
4         (Recess from 10:19 a.m. to 10:20 a.m.)
5   BY MR. RESTAINO:
6     Q   Just to close this section, Doctor, did
7   you charge Ethicon for the time you spent reviewing
8   anatomy videos?
9     A   Not if they weren't part of this directly.
10    Q   Can you tell us briefly, what is the
11  supplemental general reliance list?
12    A   I honestly do not know exactly what that
13  refers to.
14    Q   I share that with you.  I'll represent
15  that it's also -- I guess it doesn't have page
16  numbers, but it's about 68 pages long and -- but at
17  the same -- starts with the same medical articles
18  and I started getting lost.
19    A   Okay.
20    Q   So that will save us some time too.
21    A   Okay.
22    Q   Now, let's move on to your actual expert
23  report, which I'll go ahead and ask the court
24  reporter to mark as next in line, which I think
25  we're up to 5?

Steve Goldwasser, M.D.

Page 54

1      (Exhibit 5 was marked for identification.)
2 BY MR. RESTAINO:
3    Q   Okay.  And, Doctor, we've previously
4 discussed TVT and TVT-Exact and we have agreement
5 about what each of those terms means, correct?
6    A   Correct.
7    Q   Okay.  Now, I've asked you how much time
8 you've spent on this.  The first very sentence says
9 your report contains your "general opinions
10 regarding design, safety, and efficacy of the
11 Gynecare TVT and TVT-Exact"; is that correct?
12   A   Correct.
13   Q   And what do you mean when you say your
14 general expert opinions?
15   A   It is -- it's a general report on these
16 two devices.  That's what I mean, just -- I don't
17 know.  I don't know what else to say about that word
18 "general" in particular.
19   Q   Okay.  For the record, there isn't any
20 case-specific opinions regarding any one woman
21 listed in the report, correct?
22   A   Correct.
23   Q   Give me one second.  Okay.  I had a page
24 wrong -- numbered wrong, I'm sorry.  I apologize.
25      If you would turn to page 3 of your

Page 55

1 report, the top paragraph, the last sentence, you
2 write, "In a 17-year follow-up study on the TVT
3 procedure, Nilsson," N-i-l-s-s-o-n, "et al., found
4 that over 90 percent of the women were objectively
5 continent, 87 percent were subjectively cured or
6 significantly improved," period, followed by the
7 citation.  Did I read that correctly?
8    A   Yes.
9       MR. RESTAINO:  Now, if -- I'll go ahead
10    and have that marked as -- as Exhibit 6.
11      (Exhibit 6 was marked for identification.)
12 BY MR. RESTAINO:
13   Q   And, Doctor, if you would look at the
14 Abstract and Methods on the first page, they write
15 here that, "A cohort of 90 women operated upon with
16 the TVT procedure at 3 Nordic centers has been
17 prospectively followed for 17 years."  Did I read
18 that correctly?
19   A   Yes.
20   Q   Now, as used here, the word "cohort"
21 actually refers to the group of patients and not a
22 cohort study, correct?
23   A   Correct.
24   Q   Okay.  Now, this is a -- in fact, a
25 prospective case series of women receiving TVT mesh,

Page 56

1 correct?
2    A   I'd agree.
3    Q   And as we previously described, the case
4 series, along with expert opinions, is the weakest
5 of epidemiological evidence, correct?
6    A   With expert opinion, yeah, correct.
7    Q   And this case series doesn't have a
8 control group, correct?
9    A   Correct.
10   Q   And there was no randomization involved,
11 correct?
12   A   Correct.
13   Q   And there was no blinding described by --
14 of the patients or the researchers, correct?
15   A   Correct.
16   Q   And if you look at -- on the second page
17 in Figure 1, you have the typical flowchart that
18 we'll see in such a -- such a study, and they
19 started with 90 women that were operated on with TVT
20 in Figure 1, correct?
21   A   Correct.
22   Q   And then following down, 11 of the women
23 over the 17 years died; is that correct?
24   A   Correct.
25   Q   Leaving 79 women eligible for the study,

Page 57

1 but of those, five women developed impaired mental
2 capacity and 16 women were lost to follow-ups,
3 correct?
4    A   Correct.
5    Q   So the analysis and conclusions reported
6 by Nilsson in this case series is based upon a total
7 of 58 women with no controls; is that correct?
8    A   Correct.
9    Q   In your expert report, you don't describe
10 this study as a case series of 58 women, do you?
11   A   No, not specifically.
12   Q   And if you turn to the fourth page of the
13 case series, and the right column, it's page -- it
14 doesn't have a page listing, but --
15   A   Is it Table 1 that you're referring to?
16   Q   There's -- Table 3 is on the left.
17   A   Okay.
18   Q   On the right, the first full paragraph,
19 they write there that, "A weakness of the present
20 study is the fact that urodynamics were not
21 performed, as the women did not consent to such an
22 invasive examination," period.  Did I read that
23 correctly?
24   A   Correct.
25   Q   And we discussed urodynamics as you went

Steve Goldwasser, M.D.

Page 58

1  through in your training, correct?
2      A   Correct.
3      Q   And while urodynamic studies are invasive,
4  it's not a dangerous invasive procedure, correct?
5      A   Not necessarily.
6      MR. RUMANEK:  Object to form.
7      Q   Did you ever have a patient die undergoing
8  urodynamic studies?
9      A   No, but you can have patients who develop
10 infections.  There's certain risks involved with any
11 procedure.
12     Q   Any invasive procedure specifically --
13     A   Correct.
14     Q   -- agreed?
15     Okay.  So what we have here that you're
16 relying upon is a 58-patient case series, no
17 randomization, no placebo, no blinding, and no
18 objective urodynamic testing, correct?
19     A   Correct.  And I'd also add that I'm
20 relying on it in the context of prior studies, you
21 know, of these women being followed.  I believe
22 there's some seven -- a seven-year study, a 12-year
23 study looking at the same cohort of women as they
24 aged in terms of their symptomatic response to the
25 procedure, and also my own clinical experience.

Page 59

1      Q   Sure.  On this same page in the fourth
2  paragraph -- fourth full paragraph, it starts with,
3  "Mesh complications"; do you see that?
4      A   Correct.
5      Q   And they write there, "The mesh
6  complications seen in association with urogenital
7  prolapse surgery that have alerted the FDA might not
8  be caused by the mesh material itself.  As long as a
9  type 1 material is used, the complications could be
10 the result of improper training of the surgeon,
11 resulting in an inappropriate surgical technique or
12 choosing the wrong indication or wrong patient for
13 the graft procedure."  Did I read that correctly?
14     A   Correct.
15     Q   Now, that's not a very definitive
16 statement in the sense that in the first sentence,
17 "The mesh complications seen in association with
18 urogenital prolapse surgery that have alerted the
19 FDA might not be caused by the mesh material
20 itself," correct?
21     MR. RUMANEK:  Object to the form.  It
22 speaks for itself.
23     A   Correct.
24     Q   And the flip side to that is that they
25 could just as easily write, the mesh complications

Page 60

1  seen in association with urogenital prolapse surgery
2  that have alerted the FDA might be caused by the
3  mesh itself, correct?
4      MR. RUMANEK:  Object to the form.
5      A   It's possible.
6      MR. RUMANEK:  It speaks for itself.  Let
7      me -- and if I object, make sure I finish the
8      objection.
9      Q   And then he writes, "As long as a type 1
10 material is used, the complications could be the
11 result of improper training of the surgeon,
12 resulting in inappropriate surgical technique or
13 choosing the wrong indication or wrong patient for
14 graft procedure," correct?
15     A   Correct.
16     Q   Again, not a definitive statement.
17     MR. RUMANEK:  Object to form.  Speaks for
18     itself.
19     A   Correct.
20     Q   And they could have easily have said, as
21 long as type 1 material is used, the complications
22 could be the result of the type 1 material itself?
23     MR. RUMANEK:  Object to the form.  It
24     speaks for itself.  Calls for speculation.
25     A   Correct.

Page 61

1      Q   Now, this paper, which you're relying
2  upon, if you turn to the last page, right above the
3  References, you see Conflicts of Interest, and they
4  have the letters CGN and CF have acted as
5  consultants for Astellas, A-s-t-e-l-l-a-s, Ethicon,
6  and Pfizer, correct?
7      A   Correct.
8      Q   And CGN is actually the lead author of the
9  study, C.G. Nilsson, and CF is the senior or last
10 author, C. Falconer, correct?
11     A   Correct.
12     Q   And so this case series of 58 women upon
13 which you're relying upon, two of them were -- are
14 consultants for Ethicon, the defendant in this
15 litigation, correct?
16     MR. RUMANEK:  Object to the form.
17     A   Correct.
18     Q   And in recent years, medical articles --
19 medical journals have required that authors disclose
20 conflicts of interest because of concerns about
21 bias; is that correct?
22     MR. RUMANEK:  Object to the form.
23     A   Correct.
24     Q   So if you were training in the '90s, were
25 conflict-of-interest disclosures required when you

Steve Goldwasser, M.D.

Page 62

1  were a resident?
2        MR. RUMANEK:  Object to the form.
3  A   I don't recall.  I don't recall.
4  Q   I don't either.
5  A   I don't know when it came about.
6  Q   It wasn't in the '80s.
7  A   It wasn't in the '80s.
8  Q   Okay.
9        MR. RUMANEK:  Are you -- your phone, I
10  just am seeing it's -- are you recording it
11  or --
12        MR. RESTAINO:  Sorry.  I can't take in all
13  those words -- oh, Siri came on.
14        (Off-the-record discussion.)
15  BY MR. RESTAINO:
16  Q   Now, returning to the expert report,
17  the -- your report, as we've now discussed, is on
18  Ethicon's TVT-Retropubic device and the TVT-Exact
19  device; is that correct?
20  A   Correct.
21  Q   And today you're not -- won't be offering
22  any opinions on any other device; is that correct?
23        MR. RUMANEK:  Object to the form.
24  A   Correct.
25  Q   Okay.  Have you heard of Boston

Page 63

1  Scientific's ProtoGen device?
2  A   Yes.
3  Q   And what do you know about that?
4  A   Nothing in particular.
5  Q   I'll represent to you that it was approved
6  in 1996.  And are you familiar with the term
7  "predicate device"?
8  A   Correct.  Yes.
9  Q   Do you know that the Boston Scientific
10  ProtoGen device as approved in 1996 is the predicate
11  device for subsequent transvaginal mesh devices?
12        MR. RUMANEK:  Object to the form.
13  A   No, I wasn't aware of that.
14  Q   Do you know there's no clinical testing of
15  the TVT or the TVT-Exact because they follow the
16  predicate device?
17        MR. RUMANEK:  Object to the form.
18  A   There was some clinical testing.
19  Q   Premarket approval?
20        MR. RUMANEK:  Object to the form.
21  A   Yeah, I believe so.
22        MR. RUMANEK:  Object to the form.
23  Q   Do you know that the -- that the Boston
24  Scientific ProtoGen device was recalled in 1999?
25  A   Yes.

Page 64

1  Q   And do you know why it was recalled?
2  A   I believe -- purely just off of recall, I
3  believe that there were some infections or
4  wound-healing issues.
5  Q   Have you studied the FDA analysis of the
6  ProtoGen adverse event reports in preparation for
7  being an expert regarding TVT and TVT-Exact?
8        MR. RUMANEK:  Object to the form.
9  A   No.
10  Q   And are -- as you sit here today, are you
11  familiar with any similarities between the predicate
12  device and the TVT and the TVT-Exact?
13        MR. RUMANEK:  Object to the form.
14  A   You know, I don't remember the details of
15  the ProtoGen device to be able to answer that
16  question.
17  Q   Okay.  And you are in private practice,
18  correct?
19  A   Correct.
20  Q   You have an office with a staff where you
21  see patients?
22  A   Correct.
23  Q   Do you allow detailing by pharmaceutical
24  representatives?
25  A   Pharmaceutical representatives, yes.

Page 65

1  Q   Hypothetically speaking, if a
2  pharmaceutical representative came to your office on
3  Monday and said they're finishing Phase 3 trials of
4  a new drug that has a 95 percent cure rate for
5  incontinence, would that be something you'd be
6  interested in hearing about?
7  A   Sure.
8  Q   Incontinence is a major part of your
9  practice, correct?
10  A   Correct.
11  Q   And it's a major problem that women and
12  men, but in your specialty women, suffer from,
13  correct?
14  A   Correct.
15  Q   So a drug with a 95 percent cure rate
16  would be something of interest?
17  A   Correct.
18  Q   If, however, the representative said, now,
19  there's a 95 percent cure rate, but there's also an
20  association of ovarian cancer, would you want to
21  know about that?
22        MR. RUMANEK:  Object to the form.
23  A   Yeah, I mean, I'd be interested in the
24  details of it, yeah.
25  Q   Ovarian cancer can be a fatal disease,

Steve Goldwasser, M.D.

Page 66

1  correct?
2      A   Correct.
3      Q   Would you want to know what the incidence
4  was of ovarian cancer in the study?
5          MR. RUMANEK:  Object to the form.
6      A   Ovarian cancer in a drug study?
7      Q   Yes.
8      A   Yeah, that, amongst all the data that went
9  into it, I mean, the general -- the context of which
10 this came about, correct.
11     Q   As a physician, is the incidence of an
12 adverse event associated with a drug something that
13 you'd want to know before you prescribed that drug
14 to your patients?
15         MR. RUMANEK:  Object to the form.
16     A   Amongst other things, correct.
17     Q   Okay.  Now, when adverse events are
18 reported to the FDA by physicians, patients, or
19 whomever, do you know that that report is also sent
20 on to the pharmaceutical or medical device company?
21         MR. RUMANEK:  Object to the form.
22     A   Yeah, I believe I've heard that that's the
23 chain of events.
24     Q   And if a -- an adverse event is reported
25 by a physician such as yourself and sent directly to

Page 67

1  the pharmaceutical company or a medical device
2  company, they have the duty to send that to the FDA?
3          MR. RUMANEK:  Object to the form.
4  Mischaracterizes the regulation.
5      A   I don't know specifically what their
6  obligation is.
7      Q   Okay.  Do you have an opinion as to
8  whether a pharmaceutical company and/or a medical
9  device company should disclose incidences of known
10 adverse events to physicians who are prescribing or
11 utilizing their products?
12         MR. RUMANEK:  Object to the form.
13     A   It's hard to say.  I mean, that's a very
14 broad question.  I mean, there's information out in
15 the environment.  And I think that if I'm
16 specifically interested in that, then yes, I'm going
17 to find it.  I mean, I don't necessarily always
18 think it's the company's responsibility, though.
19     Q   If the company's receiving the adverse
20 event reports from the FDA, then they would have a
21 handle on the total number of adverse events being
22 reported to the FDA on that drug or that product,
23 correct?
24         MR. RUMANEK:  Object to the form.
25     A   To some degree.

Page 68

1      Q   Now, if you did a review of the literature
2  on incidence rate of a drug that you use in your
3  practice and you were lecturing at your hospital or
4  a national proceeding, you can only lecture on the
5  incidence of adverse events that's published or
6  given to you in one form or another, you don't have
7  all that data, do you?
8          MR. RUMANEK:  Object to the form.
9      A   Okay.  So you're saying -- repeat that
10 again.
11     Q   Sure.  If -- if the pharmaceutical company
12 or medical device company gets reports -- all the
13 reports of the adverse events that are sent to the
14 FDA, then they have knowledge of X.  And if you're
15 invited to give a talk on the adverse events
16 associated with that drug or that medical device and
17 you review the medical literature for what has been
18 reported, you have some fraction of X, would you
19 agree?
20         MR. RUMANEK:  Object to the form.
21     A   Well, there's -- there's multiple sources
22 where you can get this information from.  I mean,
23 it's one piece of information.  I mean, there may be
24 separate case studies or randomized controlled
25 studies where these adverse events become apparent.

Page 69

1  I mean, it's all within the context of what you're
2  looking at.
3      Q   Is it your understanding that the total
4  number of adverse events that are reported to the
5  FDA and a pharmaceutical company is available in the
6  medical literature?
7          MR. RUMANEK:  Object to the form.
8      A   I don't know specifically about that.
9      Q   Okay.
10         MR. RESTAINO:  Can we take just a moment
11 or two?  I could use some water actually.
12         MR. RUMANEK:  Sure.
13         (Recess from 10:40 a.m. to 10:48 a.m.)
14 BY MR. RESTAINO:
15     Q   In preparation for writing your expert
16 report and/or your deposition today, did you review
17 the instructions for use manuals with the
18 TVT-Retropubic and TVT-Exact products?
19     A   Yes.
20     Q   Okay.  Did you see in either document a
21 listing of adverse events associated with the
22 devices?
23     A   Yes.
24     Q   Did you see the listing of incidence of
25 adverse event associated with any adverse event?

Steve Goldwasser, M.D.

Page 70

1    A   I don't recall.  Do you have the document?
2    Q   I do.  Let's go ahead and mark the
3  TVT-Exact as, I think, 7.
4        (Exhibit 7 was marked for identification.)
5        MR. RESTAINO:  And then we'll mark the
6  Gynecare TVT as next.
7        (Exhibit 8 was marked for identification.)
8        MR. RUMANEK:  Let me just say these don't
9  have Bates numbers on them, so I'll just state
10  on the record, Exhibit 7 looks like it's -- at
11  the bottom of the first page, it says Ethicon,
12  Inc., 2009.  Exhibit 8 also at the bottom of
13  the first page says Ethicon, Inc., 2009.
14        MR. RESTAINO:  Yes.  And I wasn't really
15  expecting on using them, and I downloaded those
16  off of the net yesterday.  So I'll limit my
17  questions to that time period, is it 2009 and
18  2000- --
19        MR. RUMANEK:  Well, this says 2009 on the
20  front.
21  BY MR. RESTAINO:
22    Q   Doctor, have you seen this -- this copy
23  that -- the one that's dated 2009 before?
24    A   Yeah, I believe that was when it was.
25    Q   And just glancing through, and you can

Page 71

1  take as much time as you want, can you see listed
2  anywhere what the incidence is of any adverse event?
3    A   No.
4    Q   And again, as we had discussed in our
5  hypothetical about ovarian cancer in a drug, the
6  incidence of an adverse event is important, isn't it
7  not?
8        MR. RUMANEK:  Object to the form.
9    A   Depends on the circumstance.
10    Q   Well, let's use the circumstance of a mesh
11  device.  If someone came -- a rep came up to you and
12  said, we would like for you to start using our
13  new -- brand new device, I want to share with you
14  that there was mesh erosion noted in the trials, and
15  the mesh erosion was 95 percent, but they don't tell
16  you that, that would be important to know, wouldn't
17  it?
18    A   Well, the -- I would be more interested in
19  the ramifications of it.  I mean, you can have
20  asymptomatic mesh erosions in 95 percent of people
21  and they don't know it and don't have any issues
22  with it.  So it's all in the context of the
23  incidence.
24    Q   And if they were severe mesh erosions, but
25  the incidence wasn't listed, that is something you

Page 72

1  still would want to know as a physician, wouldn't
2  you?
3        MR. RUMANEK:  Object to the form.
4    A   I'd be looking at, you know, the general
5  milieu of this procedure relative to the other
6  things available in terms of incidence of events to
7  give myself a -- you know, an overall idea of how
8  this stacks up against what I may be using
9  alternatively or so forth.
10    Q   Do you prescribe Cymbalta?
11    A   No.  Probably have, but yeah.
12        I know about the medication.
13    Q   Do you know that it's associated with
14  hepatotoxicity?
15    A   Not specifically, no.
16    Q   Do you know what the incidence of
17  hepatotoxicity is with Cymbalta?
18    A   Not off the top of my head.
19    Q   Do you know that if you look at the
20  product for -- insert for Cymbalta, it will tell you
21  the incidence of hepatotoxicity?
22        MR. RUMANEK:  Object to the form.
23    A   It may, if you say so.
24    Q   When you -- do you look at product inserts
25  for new drugs that you prescribe?

Page 73

1    A   Not necessarily.
2    Q   In your general and supplemental reliance
3  list, there's an article by Brubaker,
4  B-r-u-b-a-k-e-r, L, et al., and it's titled Adverse
5  Events Over Two Years After Retropubic Or
6  Transobturator Midurethral Sling Surgery:  Findings
7  From The Trial Of Midurethral Slings (TOMUS) Study.
8  Do you recall that -- that study?
9    A   Yes.
10        MR. RESTAINO:  And I'm going to go ahead
11    and ask the court reporter to mark this as
12    Number 9.
13        (Exhibit 9 was marked for identification.)
14  BY MR. RESTAINO:
15    Q   Now, Doctor, I didn't see where this study
16  was included in your expert report.  Did you utilize
17  this study?
18    A   I don't recall if I had it.  I'll have to
19  look back, but I know I've looked at this study.
20    Q   And TOMUS, T-O-M-U-S, or TOMUS, however
21  it's pronounced, this stands for The Trial of
22  Midurethral Slings; is that correct?
23    A   Correct.
24    Q   And this is a randomized controlled trial,
25  correct?

Steve Goldwasser, M.D.

Page 74

1    A   I believe it was. Let's see. I thought I
2  saw randomized control someplace. Is there a place
3  specific on here? I'm looking under Materials and
4  Methods.
5    Q   You know, unfortunately if you look at
6  reference number 4, which is what I -- I relied upon
7  and I pulled, but I did not publish -- print it out
8  for you.
9    A   You talking about in this article?
10    Q   Yes. Reference number 4 in this article,
11  which is on page 6 --
12    A   Okay.
13    Q   -- it's by Albo, A-l-b-o, ME, The Trial Of
14  Midurethral Slings (TOMUS): Design And Methodology
15  as published there in the Journal of Applied
16  Research in 2008. I will represent to you, Doctor,
17  that this is a randomized controlled trial.
18    A   Okay. Yeah, that was the original one
19  that this is based on, I believe.
20    Q   Yes.
21    A   Okay.
22    Q   Yes. And as we discussed, the randomized
23  controlled trial is the gold standard of
24  epidemiological studies, correct?
25    A   The highest level of evidence, correct.

Page 75

1    Q   All right. Now, if you turn to again that
2  same page, page 6, where the references were -- are,
3  are you there, sir?
4    A   Page 6, yeah, uh-huh.
5    Q   See under Acknowledgments, "This study was
6  supported by cooperative agreements from the
7  National Institute of Diabetes and Digestive and
8  Kidney Diseases," with all the various grant numbers
9  there. And then it's also, "Supported" -- it says,
10  "Supported was also provided by the National
11  Institute of Child Health and Human Development and
12  Office Of Research in Women's Health, the NIH." Do
13  you see where I read that from?
14    A   Yes, I believe so, correct.
15    Q   And then down below the authors, in
16  addition to the research funding, they list, as
17  required, whatever support they had received and
18  whatever consultations they had done in the past,
19  correct?
20    A   Correct.
21    Q   And none of these authors are paid by
22  Ethicon, correct?
23    A   Let's see. Al- -- no, I don't see
24  Ethicon.
25    Q   Now, if you look at the first page, the

Page 76

1  Abstract and Objectives, the objective was to
2  "Describe surgical complications in 597 women over a
3  24-month period following randomization to
4  retropubic or transobturator midurethral sling."
5  Did I read that correctly?
6    A   Correct.
7    Q   So 597 here is over ten times the final 58
8  women that Nilsson, et al., looked at, correct?
9    A   Right.
10    Q   And the -- would it be okay with you if I
11  pronounced this study as the TOMUS study?
12    A   Sure.
13    Q   And in the TOMUS study, the patients were
14  randomized, were they not?
15    A   Correct.
16    Q   And, once again, randomization is to
17  minimize bias, which does not occur in the Nilsson
18  case series report, correct?
19      MR. RUMANEK: Object to the form.
20    A   It's a case series.
21    Q   Without randomization?
22    A   Without randomization, right.
23    Q   Now, if you go to page 5, the very bottom
24  sentence going onto page 6, they write, "Two years
25  postoperatively, the retropubic procedures

Page 77

1  demonstrate higher rates of voiding dysfunction and
2  UTI, while the transobturator procedures were
3  associated with higher rates of transient neurologic
4  symptoms." Did I read that correctly?
5    A   Correct.
6    Q   Now, transient means temporary, correct?
7    A   Correct.
8    Q   And UTI stands for urinary tract
9  infection?
10    A   Correct.
11    Q   Now, turn to page 7, there's a table,
12  Table 1. And on the left side, within the table
13  itself, they have Total Number of Patients and then
14  below that SAEs; do you see that, sir?
15    A   Yes.
16    Q   And SAEs, do you understand that to stand
17  for serious adverse events?
18    A   Correct.
19    Q   And the first one listed is bladder
20  perforation, correct?
21    A   Correct.
22    Q   And if you look under the columns to the
23  right under Retropubic, there's 15/15 and then
24  (5 percent), correct? --
25    A   Correct.

Steve Goldwasser, M.D.

Page 78

1    Q   -- versus zero/zero under transobturator,
2  correct?
3    A   Correct.
4    Q   And if you look at the P-value of less
5  than .001, that would indicate statistical
6  significance; is that correct?
7    A   Correct.
8    Q   So 5 percent of the women in this study
9  sustained a bladder perforation versus zero that
10 received the obturator device; is that correct?
11   A   Correct.
12   Q   And, now, this 5 percent incidence of
13 bladder perforation with retropubic device is not
14 listed in the TVT-Retropubic or TVT-Exact IFU, is
15 it?
16       MR. RUMANEK:  Object to the form.
17   A   Well, bladder perforation is a common --
18 not common, it's a known complication of any
19 incontinence procedure or any surgical incontinence
20 procedure regarding slings, Burches, pubovaginal
21 slings.  Regardless of the type of procedure, it's a
22 known complication.
23       And specifically to this, it's not -- it
24 has no serious ramifications unless it's
25 unrecognized.  You simply remove it and you're done.

Page 79

1    Q   In this study of 597 women, how do you
2  know that there was no serious ramification of this
3  as listed serious adverse event?
4    A   Well, because simply from clinical
5  experience when you have a bladder perforation, you
6  simply just replace the device and it's the same --
7  it's the same clinical circumstance as when you
8  place the suprapubic catheter, it's a small
9  perforation of the bladder.  You simply pull the
10 catheter out when you're done, and so there really
11 isn't any sequelae from that.
12   Q   There are bladder perforations that have
13 required surgical intervention, are there not?
14   A   Well, not to the size that you experience
15 with that -- with a retropubic sling in this
16 circumstance.  It's smaller than a suprapubic
17 catheter, so you simply pull it out and you're done.
18   Q   These authors listed the bladder
19 perforation under serious adverse event, did they
20 not?
21   A   Correct, but the urinary tract infection
22 isn't necessarily a serious event either.  I mean,
23 it's an event, but it's not a -- necessarily a
24 life-threatening circumstance, nor is a vaginal
25 epithelial perforation.  So it all depends on how

Page 80

1  you define serious.
2    Q   And do you know how they define serious?
3    A   No, I don't.
4    Q   Going just by this table under Serious
5  Adverse Event, 5 percent of the women receiving the
6  retropubic device sustained this injury versus zero
7  with the transobturator; is that correct?
8    A   Correct.
9    Q   And so my only question is, this 5 percent
10 incidence rate is not listed in any instruction for
11 use manual that you've seen, correct?
12   A   Correct.
13   Q   And it's statistically significant?
14   A   But I think it's --
15       MR. RUMANEK:  Object to the form.
16   A   I think it's inconsequential clinically.
17   Q   Okay.
18   A   It wouldn't affect my use of the device or
19 not.
20   Q   If you look further down between the
21 bolded black line, do you see Voiding Dysfunction
22 Requiring Surgery (and/or catheter use)?  Do you see
23 where I am now?
24   A   Correct.
25   Q   And 3 percent receiving the retropubic

Page 81

1  device received -- sustained voiding dysfunction
2  requiring surgery and/or a catheter, once again,
3  versus zero with the transobturator; is that
4  correct?
5    A   Correct.
6    Q   And that incidence of 3 percent is not
7  listed in either IFU, correct?
8        MR. RUMANEK:  Object to the form.
9    A   It actually is favorable in the grand
10 scheme of incontinence procedures because this is
11 actually a lower number than other randomized
12 controlled trials looking at other incontinence
13 procedures.  So, you know, again, taking it within
14 the context of a number versus the circumstance of
15 that number, I see it as being actually a -- an
16 advantage over other alternative surgeries.
17   Q   It would not appear to be an advantage
18 over the transobturator in this case, in this
19 randomized controlled trial, would you agree?
20   A   Correct.
21   Q   And the finding is statistically
22 significant, correct?
23       MR. RUMANEK:  Object to the form.
24   A   Yes.
25   Q   And so therefore it rules out the

Steve Goldwasser, M.D.

Page 82

1 likelihood of chance, correct?
2     MR. RUMANEK:  Object to the form.
3     A   Clinically speaking, it's -- it's an
4 advantage over the other procedures.
5     Q    And then just below that two lines down
6 or -- comes Other, and then Total Serious Adverse
7 Events, the incidence was 15.4 percent versus
8 8.7 percent, once again, statistically significant;
9 is that correct?
10    A   Correct.
11    Q    And 15.4 percent, I'll represent to you,
12 is -- is a 77 percent increased risk over the
13 obturator device.
14    MR. RUMANEK:  Object to the form.  Speaks
15 for itself.
16    MR. RESTAINO:  Agreed, it speaks for
17 itself.
18    Q   I'll let you know that I used my slide
19 ruler and it came out with 77 percent.  And, once
20 again, this is a statistically significant finding,
21 correct?
22    A   Right.
23    Q    And have you seen in any IFU or that --
24 has any representative for Ethicon informed you that
25 with their device, there was a 77 percent increased

Page 83

1 risk of a serious adverse event based upon a
2 randomized controlled TOMUS study?
3     MR. RUMANEK:  Object to the form.
4     A   I would say that this information's
5 readily available to any physician who wants to find
6 it.  And so I think it's available, it's not
7 hidden.
8     Q   It's available if one goes searching for
9 it versus just picks up the IFU, which comes with
10 the device, correct?
11    MR. RUMANEK:  Object to the form.
12    A   But you don't necessarily have the IFU
13 before you're doing the -- you know, you're -- the
14 IFU is in the box, okay.  So if I'm in my office and
15 I don't know something, it's a lot easier for me to
16 go pull it up -- a report rather than go find the
17 box.  You know, in terms of readily available, I
18 think it's just as readily available as any of this.
19    Q   Okay.  Are you familiar with the TVT-Secur
20 device, S-e-c-u-r?
21    A   I am, correct.
22    Q    And have you used that?
23    A   I think probably less than two times.
24    Q    Do you know it's listed as one of the TVT
25 devices on your web page?

Page 84

1     A   On my web page?  No, I didn't know that.
2     Q   I'll go ahead and mark as Exhibit 10, and
3 I will represent to you that I pulled this off the
4 internet last night here.
5     (Exhibit 10 was marked for
6 identification.)
7     A   Let me see.  I didn't know it was on
8 there.
9     Q   Do you recognize this as being your
10 website?
11    A   Yeah.  I think this is a video, but it's
12 not a video of the TVT-Secur.  It's a retropubic
13 sling.
14    Q   Well, on the top of the second page,
15 you'll see the transobturator sling, brand names
16 include, and then you have mini slings, brand names
17 include TVT-Secur from Gynecare, but nowhere on your
18 page is the TVT-Retropubic or the TVT-Exact, and
19 I'm -- quite honestly, I was just confused as to
20 why --
21    A   Oh, I don't even use those other products,
22 so I don't -- you know, I'll -- I don't know when
23 this was updated, but at no time recently because
24 I've never used the Obtryx sling or the Monarch
25 sling.  I don't use the TVT-O.  I did use the Uretex

Page 85

1 sling, but I haven't used the mini slings.
2     Q   I'm not sure if it printed here or not,
3 but I'll -- yeah, the final page, it's copyright
4 2017, so I was assuming this was a current,
5 up-to-date version of your website.
6     A   Well, I'm sure it's been updated, but
7 that's not what I use.
8     Q   Okay.  Do you understand the Secur, if
9 it's -- if I'm pronouncing that correctly, has been
10 removed from the market?
11    A   I think I'm mentioning it over here as one
12 of the many devices, but it says, "Not all slings
13 are the same," and I have the TVT, "Find out
14 specifically what your doctor means.  Is it a
15 retropubic, transobturator?"  So I think I was
16 listing these as a lot of different types of
17 products out there, but I'm saying, you know, to me
18 at least, specifically knowing what your physician's
19 using and their experience with it is the crux of
20 what I'm getting at, not all slings are the same.
21    Q   Do you understand that Secur was removed
22 from the market?
23    A   Yes.
24    Q   Do you understand it was removed from the
25 market because of an increase reporting of adverse

Steve Goldwasser, M.D.

Page 86

1 events to the FDA?
2 MR. RUMANEK: Object to the form. That is
3 inaccurate and mischaracterizes the evidence.
4 Q I'll strike the question. What is your
5 understanding as to why this occurred, the device
6 was removed from the market?
7 A I never even looked into it, so I don't
8 know.
9 Q Did you see news reports that it had been
10 removed from the market?
11 A No.
12 Q Did you read anything in the newspaper
13 about it being removed from the market?
14 A I've come across the fact that it was
15 removed. I don't specifically know. I wasn't using
16 the product, so I wasn't, you know, following the
17 chain of events with it.
18 Q Inasmuch as you weren't using the product,
19 do you have any personal or objective data to argue
20 against it having been removed from the market?
21 A No.
22 Q Okay. When a device such as Secur is --
23 Secur is removed from the market, do you believe
24 it's inappropriate for television news or newspapers
25 to carry such an announcement?

Page 87

1 MR. RUMANEK: Object to the form.
2 A I believe it's freedom of speech, so it's
3 public information.
4 Q Now, have you -- are you familiar with the
5 MAUDE, M-A-U-D-E, database?
6 A Correct. Yes.
7 Q And as compared to the FAERS or the FDA's
8 drug adverse event database, do you understand that
9 MAUDE has adverse events associated with medical
10 devices?
11 A Yes.
12 Q Have you ever searched the MAUDE database
13 to see if there are and, if so, how many adverse
14 events are present regarding the TVT and TVT-Exact
15 devices?
16 A Not specifically.
17 Q Forgive me if I'm misquoting you, but I
18 think you estimated that you have taken out
19 approximately 20 of the TVT or TVT-Exact mesh
20 devices?
21 A No, not specifically those. I mean, I've
22 been --
23 Q Okay.
24 A You know, I was -- I think you asked how
25 many slings I had removed or something, and I said I

Page 88

1 don't recall, probably less than 20, but, you know,
2 various devices.
3 MR. RUMANEK: And I just want to make sure
4 it's clear, because I do think his question
5 originally was TVT, specifically TVT slings.
6 THE WITNESS: Oh.
7 MR. RESTAINO: So let's ask him again.
8 MR. RUMANEK: Yeah, because I want to make
9 sure that's clear.
10 BY MR. RESTAINO:
11 Q Assuming no evidence were asked in the
12 answer, but just for the record and make sure it's
13 clear, have you removed a TVT-Retropubic or
14 TVT-Exact sling?
15 A Yes.
16 Q Can you estimate for us how many?
17 A I'd say probably less than five.
18 Q Of the less than five that you estimate,
19 did you have an opinion as a surgeon how many of the
20 cases the reason for the surgery was the device
21 itself?
22 MR. RUMANEK: Object to the form.
23 A It's hard to know exactly because, you
24 know, for the instance of pain, pain can be
25 multifactorial. The device may happen to be there

Page 89

1 too, so it's hard to make that exact A to B
2 correlation. So a lot of times, you know, when
3 you're removing something, it's a suspicion, a
4 risk/benefit analysis.
5 Q In any procedure where you've removed any
6 mesh slings, so regardless of manufacturer, did you
7 ever feel that the indication for the surgery was an
8 adverse event of the mesh itself?
9 MR. RUMANEK: Object to the form.
10 A It's hard to know. It's really hard to
11 know.
12 Q Have you ever filed a report with the FDA
13 for an adverse event associated with mesh?
14 A I don't recall.
15 Q Okay. Now, if we could turn to -- well, I
16 think we're already there, page 3 of your expert
17 report --
18 A Okay.
19 Q -- five lines up from the bottom, the
20 sentence starts, "In the past several years"; do you
21 see that, sir?
22 A Yes.
23 Q You write -- or in your report is written,
24 "In the past several years, Plaintiffs' attorneys
25 have embarked on a huge self-serving campaign to

Steve Goldwasser, M.D.

Page 90

1 actively encourage patients to enter into lawsuits
2 by advertising unsubstantiated and exaggerated
3 claims. This has created a wave of unfounded
4 patient fear and anxiety that I have personally seen
5 in my practice." Did I read that correctly?
6    A   Yes.
7    Q   Did you write that -- those sentences
8 yourself?
9    A   Yeah.
10    Q   Now, you write "a huge self-serving
11 campaign." How would you define huge?
12    A   I can't really give you an exact
13 definition, but I think it's -- it's -- it's big and
14 I -- I mean, I think that, you know, over here, a
15 30 percent reduction in the number of patients
16 undergoing surgery for stress incontinence and
17 pelvic reconstructive surgery, I mean, that's a
18 bigger number than 1 percent. It's certainly not
19 100 percent, but it's a big number.
20    Q   Do you have any objective evidence of how
21 much money is spent by lawyers on advertising?
22    A   No, I don't.
23    Q   Okay.
24    A   No.
25    Q   Now, a lawsuit, if it's successful, which

Page 91

1 serves the law firm financially, but primarily
2 benefits the person who's been injured in the
3 lawsuit, wouldn't you agree?
4       MR. RUMANEK: Object to the form.
5    A   I disagree.
6    Q   You disagree that it primarily benefits
7 the person who's been injured?
8    A   I'd say it benefits more so the law firm.
9 I say that the plaintiff usually tends to get less
10 money in aggregate once you take out expenses and
11 all the other peripheral, you know, points. I think
12 that a lot of times the plaintiffs receive a very
13 small degree of the reward.
14    Q   Do you know of law firms in the country
15 which have an internal standing order that the
16 plain- -- that the client never receives less than
17 50 percent of the recovery, therefore, receives
18 after expenses more than the law firm?
19       MR. RUMANEK: Object to the form.
20    A   No, I don't know anything about that.
21    Q   Well, I'll represent to you that's a
22 standing in my law firm. We never make more money
23 than the patient -- or the client.
24    A   Well, that's good. I mean, I -- it's been
25 my understanding that after you look at the amount

Page 92

1 of money awarded in a judgment and the law firm
2 takes out their whatever percentage of it it is and
3 you subtract all the expenses, a lot of times the
4 plaintiffs will wind up walking away with less money
5 than went to the law firm and the expenses combined.
6 That's the way I'd see it.
7    Q   That's a fair analysis if there's such a
8 case where the damages are X, but the expert
9 expenses are very high.
10    A   Correct. Correct.
11    Q   But I'll share with you that the client is
12 informed of that, if you want to proceed, this is
13 what it's going to cost, and then they make the
14 decision. Sometimes they're not looking for money,
15 but they're seeking justice.
16    A   Yeah. No, I think in some cases, that's a
17 fair point, correct.
18    Q   Now, as you sit here today, can you share
19 with us one advertisement where -- by lawyers
20 regarding mesh where there was false information
21 presented?
22    A   It's how the information is presented.
23 It's not specific to types of surgeries. Like, for
24 example, using mesh for sacrocolpopexies, I think
25 the public interprets, you know, mesh, however it's

Page 93

1 used, as being a red flag for a lawsuit.
2       And so, for example, in sacrocolpopexies,
3 mesh complications in general, and the research are
4 reported less often due to a lot of different
5 circumstances, but I think a lot of people see these
6 advertisements and apply what's advertised to all
7 these different types of surgeries. They just refer
8 to everything as a mesh procedure.
9    Q   Are you speculating to that or do you have
10 objective evidence that that's what people --
11    A   Personal experience, correct. If I have a
12 patient who comes in having a sacrocolpopexy, on
13 numerous occasions patients have interpreted the
14 commercials to include the mesh used for a
15 sacrocolpopexy as being the mesh involved in
16 litigation for vaginal surgeries. And I think that
17 patients also interpret mesh involved with slings as
18 on the same par as the circumstances involved with
19 prolapse surgery. And I think the FDA has actually
20 made a distinction between those as well as various
21 organizations, AUGS, SUFU and so forth.
22    Q   Now, that misunderstanding on behalf of
23 your patients, is that the fault of the attorney
24 advertisement or just misunderstanding on the part
25 of the patient?

Steve Goldwasser, M.D.

Page 94

1    A  I think it's a combination of both. I
2  mean, I don't think -- I think that if you put a
3  broad statement out there about if you've had pelvic
4  mesh, you could be entitled to damages, people don't
5  know exactly what they've had done. I mean, I've
6  had patients who have come in who have pain and
7  they're, hey, I saw this commercial and I've got
8  this pain, and, you know, I want this mesh taken
9  out. And when I can find their old operative note,
10  you didn't have any mesh in your surgery. Well, why
11  do I have my pain? Oh, because pain occurs from
12  pelvic surgery.
13    Q  Is that the fault of the lawyer
14  advertising or the fault of the lack of education of
15  the patient?
16    A  Well, if you plant the seed, then hysteria
17  can grow. You know, if you say, hey, if you drink
18  bottled water and you got hiccups, give us a call,
19  you're going to have a lot of people calling
20  regardless of whether it's a causative point or not.
21    Q  Some of the advertisements state that --
22  that the mesh devices have been removed from the
23  market, correct?
24    A  You know, I don't specifically know. You
25  know, I can't recall one specifically off the top of

Page 95

1  my head, but if you say so, I'll believe it.
2    Q  Mesh devices have been removed from the
3  market, correct?
4    A  Yes.
5    MR. RUMANEK:  Object to the form.
6  Certain -- certain mesh devices have been
7  removed from the market. Neither of the
8  devices that we're here for today.
9    Q  Specifically, for example, as we
10  discussed, the ProtoGen device was removed from the
11  market, correct?
12    A  Correct.
13    Q  And you're familiar with ObTAPE,
14  ObT-A-P-E, which was made by Mentor Corporation?
15    A  Correct.
16    Q  Removed from the market, correct?
17    A  Correct.
18    Q  Avaulta Plus, A-v-a-u-l-t-a Plus, made by
19  C.R. Bard, Incorporated, has been removed from the
20  market, correct?
21    A  Correct.
22    Q  Gynecare ProLift made by the defendant in
23  this litigation, Ethicon, has been removed from the
24  market, correct?
25    A  Correct.

Page 96

1    Q  Gynecare Prolift+M made by Ethicon has
2  been removed from the market, correct?
3    A  But you have to look at the circumstances
4  of some of these removals. I mean, it's not
5  necessarily a bad product, but, you know, sometimes
6  the litigation factors that play into it completely
7  make it a product not worth pursuing for a company.
8    Q  And what is the objective basis for that
9  statement?
10    A  I think just, logically speaking, if
11  there's no market for your product, you don't
12  produce the product anymore.
13    Q  But that's subjective, correct?
14    A  Correct.
15    Q  You don't have any evidence that --
16    A  I think logic -- I think logic would
17  dictate that. I mean --
18    MR. RUMANEK:  Let him -- make sure -- let
19    him finish the question.
20    THE WITNESS:  I'm sorry.
21    Q  But you don't have any objective basis
22  that any of the devices I've mentioned so far have
23  been removed because of a decrease of sales
24  secondary to litigation, do you?
25    MR. RUMANEK:  Object to the form.

Page 97

1    A  My assumption would be that the two go
2  hand in hand.
3    Q  Okay. The Gynecare TVT-Secur System, as
4  we discussed, has been removed from the market,
5  correct?
6    A  Correct.
7    Q  And that was made by Ethicon?
8    A  Correct.
9    Q  The Gynecare Prosima, P-r-o-s-i-m-a,
10  Pelvic Floor Repair System made by Ethicon has been
11  removed from the market, correct?
12    A  Correct.
13    Q  Now, I'll represent to you that each
14  withdrawal was followed by news stories, both on
15  television and in newspapers, which we can find on
16  Google.
17    A  Sure.
18    Q  How do you rule out the news stories on
19  television and/or in the print as being the source
20  of, as you write, "the wave of anxiety" you have
21  observed in your patients?
22    A  State that question again, please.
23    Q  How do you rule out your patients hearing
24  of these withdrawals on television and in the print,
25  or internet these days, and that being the source of

Steve Goldwasser, M.D.

Page 98

1  "the wave of anxiety," as you write, versus lawyer
2  advertising?
3      A   Because I think it's the advertising that
4  came first that led to -- you know, legal
5  advertising that came first that led to patient fear
6  over this that sort of spirals into lack of use of
7  the products that leads to news stories and so on
8  and so forth.  So one begets the next.
9      Q   Are you familiar with cases where the FDA
10  has asked for a voluntary withdrawal of a device
11  based upon the number of adverse events it's
12  receiving, which then begets litigation, which then
13  begets news stories, and then potentially and
14  probably begets anxiety?
15      MR. RUMANEK:  Are you -- with respect to
16  the devices that you've just mentioned or
17  generally speaking?
18      MR. RESTAINO:  The devices that have been
19  mentioned.
20      MR. RUMANEK:  Okay.  Object to the form.
21  Mischaracterizes the evidence.
22      A   You know, I don't know the exact
23  chronology of those individual devices, how the end
24  result came about.
25      Q   Have you conducted a formal study of your

Page 99

1  patients that have presented with anxiety as a
2  result of the mesh they may or may not have in them
3  and the source of that anxiety, that being lawyer
4  advertising, TV news, internet, or newspapers?
5      A   No formal study, observation only.
6      Q   Now, you wrote, "Subsequently, there has
7  been a 30 percent reduction in the number of
8  patients undergoing stress incontinence and pelvic
9  reconstructive surgery."  Do you recall writing
10  that?  It's the final --
11      A   Yeah, that was --
12      Q   -- on page 3.
13      A   -- part of these -- from these articles
14  that I cited.
15      Q   And that's going to be my question, is,
16  has there been there a 30 percent reduction in your
17  private practice or was that 30 percent nationwide
18  or worldwide?
19      A   I'm just basing it on these articles, not
20  specific to my practice.
21      Q   And, now, these articles that you're
22  basing upon, they're at the page -- top of page 4?
23      A   Correct.
24      Q   And you've pulled these articles and
25  you've read these articles?

Page 100

1      A   Yes.
2      Q   So I'll go ahead and ask the reporter to
3  mark the first one as Exhibit 11.
4      (Exhibit 11 was marked for
5  identification.)
6  BY MR. RESTAINO:
7      Q   This article is titled The Role of
8  Midurethral Slings in 2014:  Analysis of the Impact
9  of Litigation on Practice, published in Current
10  Bladder Dysfunction Report 2015, correct?
11      A   Yeah, yeah, yeah, okay.  Yeah.
12      Q   And, now, again, you're relying upon this
13  paper as the basis for your opinion regarding
14  everything we just discussed, the lawyer
15  advertising, correct?
16      MR. RUMANEK:  Object to the form.
17      A   No, unh-unh.
18      Q   What are you relying upon this article
19  for?
20      A   Well, I think I took some general
21  information out of here.  I couldn't tell you
22  whether that 30 percent was specifically in here or
23  not.  There was some other articles cited here, but,
24  you know, I'm also relying on my own observation in
25  my clinical practice.

Page 101

1      Q   Have you charted the number of midurethral
2  sling surgeries that you've done in the last several
3  years and noted a 30 percent reduction in your
4  practice?
5      A   Well, I couldn't say I did the formal
6  numbers, but when I look at, you know, my practice
7  in general, the number of slings that I've done and
8  prolapse surgeries and so forth, it's definitely
9  decreased.
10      Q   And you attribute that to advertising,
11  lawyer advertising?
12      A   I attribute it to patient fear.
13      Q   But in your report, the only basis for
14  patient fear you list is lawyer advertising.
15      A   Well, I think, look, we don't live in a
16  bubble.  I mean, people hear things on TV, they --
17  you know, whether it's lawyer advertising, whether
18  it's TV shows, whether it's talking to friends of
19  theirs, whatever the case might be.  I mean, the end
20  result has been a decreased number of procedures
21  being performed.
22      Q   Okay.  I'll give you as much time that you
23  need to look at it, but does this article support
24  your opinion that there's been a 30 percent
25  reduction in number of midurethral sling surgeries?

Steve Goldwasser, M.D.

Page 102

1    A   I'll have to go through and see.  I don't
2   exactly recall where I came up with the number, but
3   I can go through it and take a look.
4    Q   To perhaps save some time, if I could, if
5   you would look on page 43 --
6    A   Okay.
7    Q   -- in the lower -- the left column lower
8   paragraph, and take your time to read that, other
9   than go through this paragraph, but you see they
10   actually quote 34.1 percent --
11    A   34.1.
12    Q   -- in there.
13    A   Okay.
14    Q   I just wanted to point that out to you,
15   that is actually higher in this one particular
16   article.
17    A   Okay.
18    Q   And again, that just might save you some
19   time.
20    A   Sure.  That's fine.
21    Q   Now, with this paragraph itself, let's
22   take a look at it.
23        Well, before we do that, turn to the next
24   page, and right above the references, once again,
25   there's the conflict of interest that journal

Page 103

1   articles -- journals are required today, correct?
2    A   Correct.
3    Q   Do you see that?
4        MR. RUMANEK:  Object to the form.
5    Q   And do you see that the final sentence of
6   that, that J. Anger declares that she is an expert
7   witness for Boston Scientific Corporation?  Do you
8   see that?
9    A   Yeah, it says investigator for FDA 522,
10   Boston Scientific.
11    Q   And then the sentence after that.
12    A   Yeah.  Okay.  Correct.
13    Q   So one of the authors is actually an
14   expert witness for the defense -- one of the
15   defendants in the mesh litigation?
16    A   Correct.
17    Q   Now, returning to page 43 in this
18   paragraph, they write, "Although providers report
19   that their use of MUS" -- and, I'm sorry, for the
20   record, that stands for midurethral sling?
21    A   Correct.
22    Q   -- "did not change in 2011, a study of
23   utilization of MUS shows that, in fact, MUS use
24   decreased significantly in 2011.  The Humana
25   Administrative Claims Database was analyzed between

Page 104

1   January 2007 and November of 2012.  In 2011, the
2   rate of MUS procedures decreased by 34.1 percent
3   (Figure 1) [reference 59].  It is interesting to
4   note that" -- "that there was no change in the use
5   of slings after the 2008 FDA communication, which
6   included MUS, yet there was a decrease following the
7   2011 communication, which did not include MUS.  The
8   source of this shift may be multifactorial,
9   including provider fear of litigation, lack of
10   clarity around safety concerns associated with
11   different uses of vaginal mesh, and patient fear
12   from legal advertisements and media coverage that
13   occurred after the 2011 warning."  Did I read that
14   directly?
15    A   Yes.
16    Q   So the authors here, including a defense
17   expert, writes that there are four potential
18   factors, and that patient fear from legal
19   advertisement is but one of the four factors in the
20   opinion of these writers, correct?
21        MR. RUMANEK:  Object to the form.
22    A   It's, yeah, one of many factors, correct.
23    Q   And, in fact, in looking at this paper in
24   total, this -- they do not provide any original data
25   in this article.  It's not an original study, it's a

Page 105

1   review of materials already provided, would you
2   agree?
3    A   I agree.
4    Q   Now, while your expert reports the anxiety
5   from legal advertisement, your expert report and --
6   which relies upon this article doesn't state that
7   the anxiety is multifactorial and that it may, in
8   fact, be due to provider fear of litigation, may be
9   due to lack of clarity around safety concerns
10   associated with different uses of vaginal mesh,
11   from -- patient fear from legal advertisements and
12   media coverage, the only one you've taken out of
13   this is fear from legal advertisement; is that
14   correct?
15        MR. RUMANEK:  Object to the form.
16   Mischaracterizes the testimony.
17    A   So I answer that?
18    Q   Yeah, you can answer, sure.
19    A   Let me just re-read what I said over here.
20        Well, it was my interpretation.  I'm using
21   this 30 percent number, but there were some other
22   articles in here that we could pull and see if
23   there's a specific -- I don't remember exactly where
24   I got that percentage from, and it could be in one
25   of these other articles over here.

Steve Goldwasser, M.D.

Page 106

1    Q    Well, my question, sir, is not even the
2  30 percent --
3    A    Right.
4    Q    -- but is the fact that one of the two
5  papers that you referenced here in your paper cites
6  that the source of the anxiety was multifactorial,
7  they list four sources of that anxiety, only one of
8  which was patient fear from legal advertisement,
9  that's the only one that made it into your
10  article -- in your expert report, correct?
11        MR. RUMANEK:  Object to the form.
12    A    That's the only one that I specifically
13  mentioned.
14    Q    So let's look at the second citation here
15  for this area, and that's Koo, K-o-o, and then the
16  letter K, and Gromley, G-r-o-m-l-e-y, EA.  It said
17  Transvaginal Mesh In The Media Following The 2011
18  U.S. Food And Drug Administration Public Health
19  Notification Update.  Followed in Neuro-urology and
20  Urodynamics, February of 2017.  We'll have this
21  marked as 12?
22        (Exhibit 12 was marked for
23  identification.)
24  BY MR. RESTAINO:
25    Q    Now, in the title, again, if I can address

Page 107

1  your attention there, it's the Transvaginal Mesh In
2  The Media Following The 2011 U.S. Food And Drug
3  Administration Public Health Notification Update,
4  correct?
5    A    Correct.
6    Q    So before we get to the article, let's go
7  ahead and mark as 13 the actual safety update from
8  the FDA.
9        (Exhibit 13 was marked for
10  identification.)
11  BY MR. RESTAINO:
12    Q    There you go, sir.  Now, have you seen
13  this safety update before?
14    A    Yes, I believe I have.
15    Q    And it's -- it is the 2011 U.S. FDA Public
16  Health Notification Update.  This was sent out by
17  the FDA, correct?
18    A    Correct.
19    Q    And this was sent to "notify healthcare
20  practitioners and patients about a serious public
21  health concern," correct?
22    A    Correct.
23        MR. RUMANEK:  Object to the form.
24    Q    And it's dated July 13, 2011?
25    A    Correct.

Page 108

1    Q    And if you look at the audience on the
2  first page, it's -- the first bullet point,
3  "Healthcare providers who implant surgical mesh to
4  repair pelvic organ prolapse and/or stress urinary
5  incontinence," correct?
6    A    Correct.
7    Q    And that would be you?
8    A    Correct.
9    Q    And the second bullet point is,
10  "Healthcare providers involved in the care of
11  patients with surgical mesh implanted to repair
12  pelvic organ prolapse and/or stress urinary
13  incontinence."  And I take that to mean other
14  healthcare providers, for example, your staff or
15  nurses, and do you interpret it the same way, not to
16  exclude you?
17    A    Right.  I mean --
18        MR. RUMANEK:  Object to the form.
19    A    -- healthcare providers, period.
20    Q    And then finally it's -- the last bullet
21  point is, "Patients who are considering or have
22  received a surgical mesh implant to repair pelvic
23  organ prolapse and/or stress urinary incontinence,"
24  correct?
25    A    Correct.

Page 109

1    Q    Now, if we turn to the second page of the
2  update, you see the purpose they have listed right
3  near the top of the page --
4    A    Uh-huh.
5    Q    -- is that, "On October 20th" -- "October
6  20, 2008, the FDA issued a Public Health
7  Notification and Additional Patient Information on
8  serious complications associated with surgical mesh
9  placed through the vagina (transvaginal placement)
10  to treat POP and SUI," period.  And you understand
11  POP to stand for pelvic organ prolapse?
12    A    Correct.
13    Q    And SUI is stress urinary incontinence?
14    A    Correct.
15    Q    And today we're basically discussing SUI,
16  correct?
17    A    Correct.
18    Q    And then paragraph -- two paragraphs down
19  from that, they write, "The FDA is issuing this
20  update to inform you that serious complications
21  associated with surgical mesh for transvaginal
22  repair of POP are not rare."  Did I read that
23  correctly?
24    A    Correct.
25    Q    And not rare is bolded by the FDA,

Steve Goldwasser, M.D.

Page 110

1  correct?
2      A   Correct.
3      Q   Now, do you recall receiving this on or
4  about -- let me take that back.
5          Do you recall seeing the 2008 initial
6  safety update from the FDA?
7      A   Yes.
8      Q   And at that time, I don't have it in front
9  of me, but again, it's not a memory test, but my
10  understanding was they said that the conditions were
11  considered to be rare --
12     A   Correct.
13     Q   -- would you agree?
14         MR. RUMANEK:  Object to the form.
15     Q   Now, in 2011 they're saying these
16  complications are not rare --
17         MR. RUMANEK:  Object --
18     Q   -- correct?
19         MR. RUMANEK:  Object to the form.
20     A   Correct.
21     Q   Okay.  Now, if we could turn back to the
22  Koo article, which we -- I've marked as an exhibit
23  just before this, so I think it's 12, the Koo
24  article is the Transvaginal Mesh In The Media
25  Following the 2011 U.S. Food And Drug Administration

Page 111

1  Public Health Notification Update.
2          Again, this is the second reference in
3  your expert report following your writing that, "In
4  the past several years, Plaintiffs' attorneys have
5  embarked on a huge self-serving campaign to actively
6  encourage patients to enter into lawsuits by
7  advertising unsubstantiated and exaggerated claims.
8  This has created a wave of unfounded patient fear
9  and anxiety I have personally seen in my practice.
10  Subsequently, there has been a 30 percent reduction
11  in the number of patients undergoing stress
12  incontinence and pelvic reconstructive surgery."
13  And that is then followed on the next page by the
14  two citations, correct?
15     A   Correct.
16     Q   Now, if we turn to the abstract of the Koo
17  article, you see at the very top they write,
18  "Prompted by patients' changing perceptions of
19  transvaginal mesh, this study examines how mesh has
20  been reported in the news following the 2011 U.S.
21  Food and Drug Administration (FDA) updated
22  notification about the use of mesh in the treatment
23  of pelvic organ prolapse."  Their methods, "Two
24  national newspaper databases were queried for
25  articles discussing transvaginal mesh published

Page 112

1  within three years of the FDA announcement."  Did I
2  read that correctly?
3      A   Correct.
4      Q   Now, if you slide down a couple lines, you
5  see Results, "90-5 articles met inclusion criteria.
6  Mesh-related litigation was the most common headline
7  subject (36 articles, 38 percent) and 54 percent of
8  all articles referenced legal action.  57 articles
9  (60 percent) cited at least one mesh-related
10  complication."
11         And then finally at the conclusions, they
12  write, "Despite frequent media coverage of
13  transvaginal mesh and its complications since 2001,
14  very few news sources that cited the FDA warning
15  distinguished between prolapse and incontinence.
16  Given prevalent reporting of mesh-related
17  litigation, the findings raised concern about how
18  patients perceive safety and efficacy of
19  transvaginal mesh, regardless of indication."  Did I
20  read that correctly?
21         MR. RUMANEK:  I'm just going to object.
22  It speaks for itself.  To the extent you
23  misspoke or skipped a word or said something
24  incorrectly, it speaks for itself.
25         MR. RESTAINO:  Agreed.  English is my

Page 113

1  second language.
2          MR. RUMANEK:  I do think you said 2001 at
3  one point when the article says 2011, but --
4  BY MR. RESTAINO:
5      Q   Now, Dr. Goldwasser, this article reviewed
6  newspapers' articles.
7      A   Uh-huh.
8      Q   There's not a single description of lawyer
9  advertising in this reference that you provide as
10  support for your expert statement that lawyer
11  advertising by self-serving lawyers has led to this
12  wave of anxiety, correct?
13         MR. RUMANEK:  Object to form.
14     A   No, because it talks about mesh-related
15  litigation.
16     Q   It talks about newspaper articles about
17  the litigation, not lawyer advertising.
18         MR. RUMANEK:  Object to the form.
19     A   It's not specifically talking about lawyer
20  advertising, but it encompasses advertising as part
21  of that news reports.
22     Q   Sir, if we go back to the methods, they
23  search two national newspaper databases.
24     A   Right.
25     Q   They pulled the articles about ongoing

Page 114

1  litigation.
2    A   Right.
3    Q   I've read this very carefully, there's not
4  a single mention in here of television legal
5  advertising at all.
6    A   Well, I don't know that that is in those
7  articles.  I mean, mention -- I mean, yeah, it
8  doesn't specifically say, you know, legal
9  commercials here, but it's about the whole crux of
10  litigation regarding this whole topic.
11    Q   If there's a lawsuit brought by someone --
12    A   Right.
13    Q   -- who has true injury from a device that
14  has been removed from the market --
15    A   Right.
16    Q   -- and a newspaper reports on that
17  litigation --
18    A   Uh-huh.
19    Q   -- that has nothing to do with lawyer
20  advertising, would you agree?
21        MR. RUMANEK:  Object to the form.
22    A   Potentially, correct.
23    Q   But you're using this study as the basis
24  for your opinion that lawyer advertising is what's
25  creating this wave of anxiety, and this article does

Page 115

1  not support that opinion.
2        MR. RUMANEK:  Well, hold up.  He hasn't
3    asked a question.  That was a statement.
4    Q   Would you agree that this article does not
5  support that legal advertising that's creating a
6  wave of anxiety?
7        MR. RUMANEK:  Object to the form.
8    A   I would state that my interpretation of
9  what I see clinically and take from these articles
10  is that -- is that there's a lot of legal
11  advertising that goes into the hysteria that has
12  come about.  I mean, yes, there are media reports,
13  like you're mentioning over here, but my perception
14  in talking with patients is that they -- all they
15  talk about is commercials they see on TV.
16    Q   That may be, and I don't doubt the
17  veracity of that statement, but you would agree that
18  that's anecdotal evidence with you and your
19  patients, and this published article does not
20  support -- does not even mention legal
21  advertising --
22        MR. RUMANEK:  Object to the form.
23    Q   -- does it?
24        MR. RUMANEK:  Asked and answered.
25    A   Answer again?

Page 116

1    Q   Yeah.
2    A   Okay.  I'm sort of losing train of what
3  you just -- this specific article does not mention
4  direct- -- directly mention legal advertising,
5  correct.
6    Q   Okay.  We can move on, then.
7        Now, you have spent -- during the course
8  of -- of -- you've dedicated a considerable amount
9  of time to cadaver lab dissection during the course
10  of product development as an instructor for
11  physician training with Ethicon?
12        MR. RUMANEK:  Object to the form.
13    A   As part of my lab experience, correct.
14    Q   And did you charge Ethicon for your time
15  or did Ethicon pay you for your time?
16        MR. RUMANEK:  Object to the form.
17    A   Well, part of that -- part of that lab
18  stuff that I'm talking about had to do with
19  development of a prolapse project, but -- and a lot
20  of this has to do with, you know, during training
21  sessions doing cadaveric dissections.  So I guess
22  when I was an instructor for Ethicon, it would be --
23  it would fall into that.  So some of this lab stuff
24  that I'm referring to has to do with a lot of
25  different projects.

Page 117

1    Q   What's the purpose of cadaveric dissection
2  and cadaveric study in -- with devices?
3        MR. RUMANEK:  Object to the form.
4    A   Learning anatomy.
5    Q   Same anatomy that was present on the
6  videotapes?
7    A   Different anatomy, three dimensional.
8    Q   Now, you wrote that, "My extensive
9  clinical training and cadaveric dissection
10  experience led to my development and implantation of
11  several devices and techniques for reconstructive
12  pelvic surgery."  Do you recall writing that, sir?
13    A   Yes.
14    Q   Have you patented any devices you've
15  developed for reconstructive pelvic surgery?
16    A   Provisional, but not a full patent.
17    Q   Would that be the Exair, E-x-a-i-r?
18    A   Correct.
19    Q   Is that available in the United States?
20    A   No longer.
21    Q   When was it available?
22    A   I don't remember the exact time frame.
23    Q   Why is it no longer available?
24        MR. RUMANEK:  Object to form.
25    A   Product demand.

Page 118

1    Q   Did -- did it go through premarket
2  approval clinical testing?
3       MR. RUMANEK:  Object to the form.
4    A   I believe it was on one of the five 10K
5  market -- you know, like similar device project.
6  That's a prolapse procedure.
7    Q   So it would fall under the predicate
8  device, the ProtoGen?
9    A   If I remember --
10      MR. RUMANEK:  Object to the form.
11   Q   But simply -- the only reason I'm
12 asking -- or trying to ask in a terrible way is, did
13 you have to conduct Phase 3 clinical trials with
14 this device?
15   A   No.
16   Q   Okay.  Is -- I'll be honest with you,
17 it -- I'm sharing with you that when I searched
18 PubMed, I did not find any publications regarding
19 this.  Has there been anything published about the
20 device in the peer-reviewed medical literature?
21   A   No.
22   Q   And then you also wrote that, based upon
23 your experience, quote, My extensive clinical
24 training and cadaver dissection experience led to my
25 development/implantation of several devices and

Page 119

1  techniques for reconstructive pelvic surgery.
2       Regarding the techniques themselves, have
3  any of the new or -- techniques that you've
4  developed been published and subjected to peer
5  review?
6    A   They've been published but not
7  peer-reviewed.
8    Q   Where have they been published?
9    A   I think it was in some of these -- in the
10 CV, I think it was some presentation -- maybe it was
11 a presentation.  I can't remember whether some of
12 these were published or not.  I forgot exactly what
13 it was.
14      MR. RUMANEK:  Your CV was 2.
15   A   Somewhere in there I have it.
16      MR. RUMANEK:  Here is your CV.
17      THE WITNESS:  Oh.
18   A   Let's see.  So this was a presentation.  I
19 don't see a publication here.  For some reason I was
20 thinking there was a publication, but I must be
21 mistaken.
22   Q   Has any of the techniques that you've
23 developed for reconstructive pelvic surgery -- you
24 know, sometimes you have the bi- -- the individual
25 themself or others around them will put the name on

Page 120

1  it.  So is there a Wasserman technique for anything
2  within pelvic reconstructive surgery?
3       MR. RUMANEK:  Goldwasser.
4    Q   Goldwasser, I'm sorry.
5       MR. RUMANEK:  Yeah, not Wasserman.
6    A   No, there's not.
7    Q   If any -- do you know if any of the
8  surgical techniques you developed as an instructor
9  for Ethicon is now generally accepted by the general
10 pelvic reconstructive surgery community?
11      MR. RUMANEK:  Object to the form of the
12      question to the extent you're characterizing
13      develop within Ethicon -- I can't remember
14      exactly how you phrased it, but object to the
15      form of the question.
16      MR. RESTAINO:  You know, yes, you're
17      right.  Let me retract it.
18   Q   Has any technique that you've developed at
19 any time for pelvic reconstructive surgery, is it
20 generally accepted now as accepted technique within
21 the urogynecological society?
22   A   Yes.
23   Q   And what technique is that?
24   A   The Exair.
25   Q   I'm sorry, is the Exair a device or a

Page 121

1  technique?
2    A   It's a technique.
3    Q   Oh, okay.
4       MR. RUMANEK:  Let's go off the record for
5      just a second.
6       (Off-the-record discussion.)
7  BY MR. RESTAINO:
8    Q   Doctor, it's my understanding that the
9  surgical technique that you described within your
10 expert report has to do with the Exair mesh device,
11 correct?
12   A   Correct.
13   Q   Now, you write, "A portion of my practice
14 involves re-operative management of recurrent
15 urinary incontinence and prolapse, as well as
16 treating and managing complications associated with
17 both mesh and non-mesh surgical procedures."  Is
18 that a fair description of your practice?
19   A   Yes.
20   Q   Can you estimate what percentage of your
21 practice time involves re-operative management of
22 recurrent urinary incontinence secondary to previous
23 mesh surgical procedures?
24      MR. RUMANEK:  Object to the form.
25   A   I couldn't give you a specific number.

Steve Goldwasser, M.D.

Page 122

1    Q   Okay.  In surgery there may be situations
2  where either because of training or desire a surgeon
3  may elect to take on the more difficult cases that
4  other surgeons either don't want to handle or
5  haven't had the training to handle, does that make
6  sense?
7    A   Yes.
8    Q   In this area are -- do you readily accept
9  the more difficult cases?
10      MR. RUMANEK:  Object to the form.
11   A   It depends upon the circumstances.
12   Q   Okay.  Can -- do you know when was the
13 last time you removed a TVT-Retropubic mesh device?
14   A   Yes.
15   Q   When was that?
16   A   Probably about two months ago.
17   Q   And did you send that explanted or removed
18 mesh device on for electro-microscopic examination
19 of the mesh itself?
20   A   No.
21   Q   As you sit here today, do you have any
22 objective evidence to show whether the mesh had
23 degraded in vivo?
24      MR. RUMANEK:  Object to the form.
25   A   No.

Page 123

1    Q   And how about TVT-Exact, do you have
2  knowledge as to when the last time you took one of
3  those out?
4    A   It was an Exact that I was referring to.
5    Q   Oh, okay.  Okay.  So then I'll reverse it.
6       Do you have knowledge as to when you took
7  out a TVT-Retropubic device, just a TVT?
8    A   I don't recall.
9    Q   Okay.
10      MR. RESTAINO:  He answered a lot of these
11      questions already.
12   Q   Now, as with any surgery, you would expect
13 patients to whom you implant the TVT or the TV-Exact
14 to experience some immediate postoperative pain,
15 would you agree?
16      MR. RUMANEK:  Object to the form.
17   A   Not necessarily.
18   Q   Do most of your patients upon -- into whom
19 you implant one or both of these devices or either
20 of these devices experience some degree of
21 postoperative pain?
22   A   I wouldn't say the majority do.
23   Q   Do you typically give patients when
24 they're released from the office, clinic, or
25 hospital a prescription for pain medication?

Page 124

1       MR. RUMANEK:  Object to the form.
2    A   Yes.
3    Q   And do you know how many times that
4  prescription is filled?
5       MR. RUMANEK:  Object to the form.
6    A   I do not.
7    Q   Okay.  As a physician and surgeon, do you
8  have a knowledge of difference between acute
9  postoperative pain from any surgery versus chronic
10 pain?
11   A   Yeah, I think I have a pretty decent feel
12 for the difference.
13   Q   And how would you describe in your patient
14 population, and let's limit it with pain with mesh,
15 chronic pain?
16      MR. RUMANEK:  Are you -- with respect to
17      TVT or any mesh generally?  I just want to make
18      sure --
19      MR. RESTAINO:  Let's keep it to TVT, if we
20      can.
21   A   How would I describe chronic pain?
22   Q   How would you differentiate chronic pain
23 from acute postoperative pain, if there is any?
24   A   I would say that chronic pain is
25 something -- in my mind is something that's been

Page 125

1  going on more than six months.
2    Q   Is there a specific test that you can --
3  enables you to determine chronic pain or is it the
4  period of time for which the pain exists?
5    A   Period of time.
6    Q   And would you then agree that chronic pain may
7  in and of itself be multifactorial?
8    A   Yes.
9    Q   And may one of those factors be a foreign
10 body reaction?
11      MR. RUMANEK:  Object to the form.
12   A   It could be.
13   Q   And could one of the factors be scarring
14 within the vagina?
15   A   Could be.
16   Q   If there is chronic pain that you feel as
17 a clinician is a foreign body reaction, is that
18 chronic pain more likely than not going to be
19 obviated by removing the foreign body?
20      MR. RUMANEK:  Object to the form.
21   A   Well, it's difficult to say because there
22 is no way to deduce the etiology of chronic pain.
23 So you can hypothesize that it could be a foreign
24 body reaction, but sometimes when you remove the
25 foreign body, their pain doesn't change and so it's

Steve Goldwasser, M.D.

Page 126

1 hard to say.
2     Q   Okay.  With any of the patients into whom
3 you've implanted the TVT or TVT-Exact mesh, did any
4 of them postoperatively develop urinary retention?
5     A   How do you define retention?
6     Q   The holding of urine longer than the
7 normal physiological time which one would expect to
8 urinate.
9     A   That's -- that's not -- can I go off the
10 record and help you with the definition?
11    Q   Yeah, I would prefer using your
12 definition.
13    A   Well, there is no -- there is no
14 universally agreed-upon definition of retention, but
15 retention refers to inability to empty the bladder
16 as opposed to time period which one -- between which
17 one voids.  That's more frequency of urination.  So
18 you're asking about -- so you're asking about
19 retention of urine as in incomplete emptying or are
20 you talking about frequency of urination?
21    Q   Well, in my study of the germane
22 literature, predominantly that that was within your
23 expert report and your reliance lists, there are
24 studies that report urinary retention and they don't
25 go into any further description --

Page 127

1     A   Right.
2     Q   -- within the table other than that.  So
3 my question was a general one.  Have you ever had to
4 make the diagnosis of urinary retention using your
5 own diagnosis in any patient postoperatively
6 following implantation of TVT or TVT-Exact?
7     A   I can't recall of any patient that has had
8 an ongoing problem with urinary retention.
9     Q   Okay.  I've also seen reports in the
10 literature of voiding dysfunction, however that's
11 defined, following TVT and TOT procedures.  Have you
12 seen reports about that?
13    A   Yes.
14    Q   Have you ever made the diagnosis of
15 voiding dysfunction in any patient to whom you've
16 implanted the TVT or the TVT-Exact?
17    A   I have seen patients with some voiding
18 dysfunction with any incontinence procedure --
19    Q   Okay.
20    A   -- not specific to those two procedures.
21 But, again, the definition of voiding dysfunction
22 is -- is a moving target, you know.
23        For example, some patients may say that
24 they have to sit in a certain position to void, but
25 they void just fine.  So some may say that's voiding

Page 128

1 dysfunction but of no clinical consequence, so
2 again, it's the trying to distinguish somebody who's
3 got clinically significant problems versus just an
4 observation.
5     Q   In any of the patients in which you have
6 made a diagnosis of voiding dysfunction following
7 any mesh procedure, did you report that to the FDA
8 as an adverse event?
9     A   No.
10    Q   Following implantation of the TVT or
11 TVT-Exact, have you had any patients who developed
12 on overactive bladder, using your definition of an
13 overactive bladder?
14    A   Well, any incontinence procedure has a
15 certain number of, you know, reported events of
16 developing overactive bladder.
17        And by the same token, specifically with
18 the midurethral slings, a lot of times
19 pre-procedural overactive bladder will resolve in up
20 to 50 percent of people.  So it's a common finding.
21 It's a known finding with any incontinence
22 procedure.
23    Q   And whenever you've seen that and made a
24 diagnosis, did you report that as an adverse event
25 with the FDA?

Page 129

1     A   No, I have not seen it as being an adverse
2 event.
3     Q   The overactive bladder can also be
4 associated with the neurogenic bladder, correct?
5         MR. RUMANEK:  Object to the form.
6     A   No, they're actually two different
7 diagnoses.
8     Q   Let me ask a better question.  When a
9 patient is diagnosed with a neurogenic bladder,
10 that -- one form of a neurogenic bladder can be
11 overactive, agreed?
12    A   Correct, but when you use the term
13 "neurogenic," it means there's an underlying
14 neurologic problem such as Multiple sclerosis or
15 something along those lines.
16    Q   Or local nerve injury?
17    A   Yeah.  Well, I mean, neurogenic in general
18 has to do with a neurologic underlying basis for the
19 problem, but it's usually thought of as being like a
20 central nervous system disorder, not always, but, I
21 mean, it's open for interpretation.  I didn't mean
22 to throw you a curve ball there.
23    Q   No, no, no, I just lost the name of it,
24 but there's a major nerve, starts with a P.
25    A   The pudendal nerve.

Steve Goldwasser, M.D.

1    Q    Thank you, the pudendal nerve.  An injury
2  to the pudendal nerve during surgery can result in a
3  neurogenic bladder, correct?
4    A    Pudendal nerve injuries aren't associated
5  with retropubic slings or transobturator slings.
6    Q    No, I was just limiting that to general
7  surgery, pelvic surgery.
8    A    Oh.  Yeah, pelvic surgery, you can
9  de-innervate the bladder, then cause either a long,
10  you know, chronic or temporary voiding difficulties
11  resulting in catheterization.
12    Q    Now, have you made that diagnosis in any
13  patient into whom you've implanted a TVT or a
14  TVT-Exact?
15    A    Not specifically that I can recall.
16    Q    Okay.  On page, I think it's 13 of your
17  expert report -- no, it's on page 12 of the expert
18  report, you have a section on development of --
19  well, let me -- before I go into this, do you need
20  to take a break?
21    A    No.
22    Q    I'll just share with you that I'm on page
23  30 of 397.
24    A    That's it?
25    Q    I'm on page 30 of 32.  So if you can hold

1  it, we're probably approaching that light at the end
2  of the tunnel, okay, but you're welcome to take a
3  break.
4    A    I'm fine.
5    Q    Development of the TVT, and you give a
6  history here somewhat of the TVT development,
7  correct?
8    A    Correct.
9    Q    Fair and balance, there's no mention in
10  here of the number of trans- -- TVT meshes that have
11  been taken off of the market, correct?
12        MR. RUMANEK:  Object to the form.
13    Mischaracterizes the testimony and the report.
14    A    Correct, I did not specifically -- that
15  wasn't my intent in that portion.
16    Q    Do you need to take a call?
17    A    No.
18        MR. RUMANEK:  I just want to state on the
19    record, what's being discussed in this section
20    is the development of the retropubic TVT, which
21    has not been taken off the market.  So I'm just
22    not clear -- object to the form of your last
23    question, unclear what you're referring to.
24    Q    Okay.  To the best of your knowledge, has
25  any TVT-Retropubic device been taken off the market?

1    A    No.
2    Q    If we turn to page 28 of your report, and
3  in the top paragraph, you -- you write a sentence
4  about and then you again reference Nilsson,
5  N-i-l-s-s-o-n, "The 17-year follow-up of
6  tension-free vaginal tape procedure for female
7  stress urinary incontinence," and that's the Nilsson
8  we discussed earlier in the deposition, correct?
9    A    Correct.
10    Q    Then there's right below that a section on
11  mechanical and laser cut.  And did you write this
12  paragraph -- did you write everything in your report
13  yourself?
14    A    Yes.
15    Q    Okay.  Now, you -- the second sentence in
16  the first paragraph is, "The material in any
17  particles would be the same prolene polypropylene
18  material used in the mesh that, as discussed above,
19  is a well-tolerated, biocompatible material."  Did I
20  read that correctly?
21    A    Correct.
22    Q    And, in fact, polypropylene is also used
23  in many of the sutures available, correct?
24    A    Correct.
25    Q    Have you ever had a patient experience and

1  have you made the diagnosis of what's -- may be
2  called a spitting suture?
3    A    Yeah, I've seen it before.
4    Q    And can you describe for the record what
5  is meant by someone spitting a suture.  I mean, it's
6  not literally coming out of their mouth, correct?
7    A    Correct.  Typically it's referred to when,
8  you know, maybe the sutures start popping out of the
9  incision.  Maybe it was either an incision on the
10  surface of the skin and they start falling out, or
11  maybe subcutaneous sutures starting to come out
12  through the incision, so generally -- and, I mean,
13  it's not a great scientific term, but it's been an
14  observation.
15    Q    There's an inflammatory component
16  associated with a spitting suture, isn't there?
17        MR. RUMANEK:  Object to the form.
18    A    Not necessarily.  I mean --
19    Q    But there can be an inflammatory process
20  which results in the pain, correct?
21        MR. RUMANEK:  Object to the form.
22    A    Well, you're referring to spitting of
23  sutures or pain?  You're --
24    Q    Referring to the pain that's secondary to
25  the inflammation as the body forms a granuloma

Steve Goldwasser, M.D.

Page 134

1 around the polypropylene as it tries to extrude it
2 from the body, that is an immune reaction, correct?
3     MR. RUMANEK: Object to the form.
4     A   So let's go back.  So you're talking about
5 a -- are you talking about polypropylene sutures
6 being spit out?  I'm thinking more --
7     Q   Prolene.
8     A   Typically when I've seen it, it's been
9 more of a VICRYL suture, a delayed absorbable
10 multifilament suture.  That's when I typically see
11 spitting of sutures, per se.
12     Q   Have you seen spitting of sutures with
13 polypropylene suture material?
14     A   Not that I can really recall.
15     Q   Have you studied about it?
16     A   I haven't specifically embarked on that
17 study, no.
18     Q   Okay.  Would you agree that all foreign
19 material is recognized as foreign by the body which
20 leads to some degree of a foreign body reaction?
21     MR. RUMANEK: Object to the form.
22     A   It depends on the circumstance.  I mean,
23 you can have an organ transplant and you suppress
24 the immune response to a foreign body.  I mean, yes,
25 in general, foreign bodies are foreign bodies and so

Page 135

1 the body, you know, may in some circumstances have a
2 hyperacute immune response, may be a very subtle
3 immune response.  I mean, it varies from person to
4 person and probably situational.
5     Q   And that same response which can vary
6 will -- can manifest itself, can it not, as pain in
7 the patient, which can vary from patient to
8 patient --
9     MR. RUMANEK: Object to the form.
10     Q   -- would you agree?
11     A   If you go by the premise that a foreign
12 body reaction is always going to be painful, it may
13 not necessarily cause pain, but it's possible.
14     Q   So if there was particle loss because of a
15 mechanically cut mesh, one would expect that each
16 particle being a foreign body would elicit a foreign
17 body response, whatever that may entail, including
18 white blood cells and form granuloma formation
19 around the particle, do you agree?
20     MR. RUMANEK: Object to the form.
21     A   You could have a foreign body response,
22 but, clinically speaking, I mean, the vast majority
23 of patients, like we discussed, you know, when they
24 have slings, they typically don't need any pain
25 medication postoperatively, and so theoretically

Page 136

1 they're all exposed to a foreign body and may or may
2 not have that foreign body response and don't
3 necessarily need pain medicine.
4     Q   Do you agree that the laser-cut
5 methodology was specifically developed to eliminate
6 particle loss --
7     MR. RUMANEK: Object to --
8     Q   -- as seen in the mechanically cut?
9     MR. RUMANEK: Object to form.
10     Q   I'm sorry, I hesitated there.  That was my
11 bad.
12     A   Say it one more time.
13     Q   Yeah.  Would you agree that the laser-cut
14 methodology was specifically developed to eliminate
15 particle loss seen with mechanically cut mesh
16 material?
17     MR. RUMANEK: Object to the form.
18     A   I can't interpret exactly why Ethicon
19 developed the laser cut over the mechanical cut.  I
20 mean, they're both available to some degree.  I
21 don't know if they're -- if they're both available
22 right -- I don't -- I think the mechanical cut is
23 still available.  But, you know, in reviewing the
24 internal documents, they have reasons cited as to
25 why they introduced two different types of mesh.

Page 137

1     Q   Have you seen any e-mails that
2 specifically discuss why the laser-cut methodology
3 was developed?
4     A   Yes.
5     Q   And do they specifically mention particle
6 loss from the mechanically cut mesh?
7     MR. RUMANEK: Object to the form.
8     A   Well, they specifically mention it in
9 terms of context of the company has been very open,
10 in looking through their documents that -- and
11 looking into reports from physicians.  And so some
12 of the e-mails that I read mention some of the
13 physicians who are big users of the product
14 mentioning that in some circumstances, they may see
15 small particles of the mesh coming off, you know.
16 And a lot of the documents discuss that saying they
17 really don't find any clinical relevance to, but
18 it's a perception.  And in a lot of cases,
19 perception goes a long way.
20     And so I think the whole impetus to come
21 up with a different type of mesh manufacturing
22 process was to get rid of that perception, and so I
23 think that's why they looked at two different --
24 again, my interpretation of their documents is why
25 they came up with two different types of ways to

Steve Goldwasser, M.D.

Page 138

1  produce the sling.
2      MR. RESTAINO:  I don't have any further
3  questions.
4      THE WITNESS:  Good answer.  I took all
5  your questions.
6      MR. RESTAINO:  You took away three
7  documents.
8      THE WITNESS:  Oh, really?  Man.
9      MR. RUMANEK:  Let me take a five-minute
10  break and I'll have a few.
11      (Recess from 12:14 p.m. to 12:29 p.m.)
12          CROSS EXAMINATION
13  BY MR. RUMANEK:
14      Q   All right.  All right.  Dr. Goldwasser,
15  I've just got -- and it won't be nearly as long, but
16  I have some questions for you as well.
17      Let's take a look at your expert report,
18  which is marked as Exhibit 5.
19      A   Okay.
20      Q   And you note in the first paragraph of
21  your expert report that the opinions that are set
22  forth in your report are held to a reasonable degree
23  of medical certainty; do you see that?
24      A   Yes.
25      Q   Do you recall being asked questions by

Page 139

1  Opposing Counsel as to whether you considered
2  yourself to be an expert in various fields?  I can't
3  remember what all of them were, but pathology,
4  material science, I think maternal --
5      A   Maternal fetal medicine.
6      Q   -- maternal fetal medicine.  Do you recall
7  those questions?
8      A   Yes.
9      Q   To the extent that any of those fields of
10  study could be characterized to touch on the
11  opinions that you've given in your report, do you
12  believe as you sit here today that you have
13  sufficient expertise to give the opinions that
14  you've set forth in your report to a reasonable
15  degree of medical certainty?
16      A   Yes.
17      MR. RESTAINO:  Objection.
18      Q   And do you have expertise in the areas of
19  practice necessary to give your opinions set forth
20  in your report?
21      A   Yes.
22      Q   And so to the extent that any of the
23  opinions -- let me strike that.
24      Do you have knowledge as a physician, as a
25  urogynecologist, of certain -- of pathology to a

Page 140

1  certain degree?
2      A   Yes.
3      Q   You're not a practicing pathologist, are
4  you?
5      A   Correct, no.
6      Q   But you have understanding of pathology as
7  it relates to the -- your practice and the practice
8  of urogynecology?
9      A   Yes.
10      Q   And to the extent that any of the opinions
11  that you've given in this report relate to pathology
12  as it relates to mesh or urogynecology, do you
13  believe that you have experience and expertise to
14  give those opinions to a reasonable degree of
15  medical certainty?
16      A   Yes.
17      Q   And the same would be true for the other
18  areas of medicine that Opposing Counsel asked you
19  about?
20      A   Yes.
21      Q   Counsel marked your reliance list and your
22  supplemental reliance list as Exhibits 3 and
23  Exhibits 4.  And do you recall being asked questions
24  about the information that's included in Exhibits 3
25  and 4?

Page 141

1      A   Yes.
2      Q   When you were initially asked to serve as
3  an expert witness, were you provided a large body of
4  medical literature that you could consider in
5  forming your opinions?
6      A   Yes.
7      Q   And was that literature provided to you by
8  counsel for Ethicon?
9      A   Correct.
10      Q   Did counsel for Ethicon tell you which
11  articles you had to review and which ones you
12  shouldn't review?
13      A   Not at all.
14      Q   Were you also provided internal company
15  documents, documents from Ethicon, e-mails and
16  things of that nature?
17      A   Yes.
18      Q   Did anybody from Ethicon tell you which
19  documents you had to review and which ones -- that
20  you shouldn't review any of them?
21      A   No.
22      Q   Okay.  And were you also provided with
23  deposition transcripts and videos and IFUs, other
24  materials that are reflected on your materials list
25  from counsel for Ethicon?

Steve Goldwasser, M.D.

Page 142

1    A   Yes.
2    Q   And did anyone from Ethicon or any counsel
3  for Ethicon tell you that you had to review certain
4  materials or that you shouldn't review any of those
5  materials?
6    A   No.
7    Q   Okay.  Is it fair to say that those
8  materials were given to you to consider as you felt
9  it was necessary in forming your opinions?
10    A   Yes.
11    Q   Dr. Goldwasser, we're here today to be --
12  so that you could give your deposition with respect
13  to your TVT and TVT-Exact general report, correct?
14    A   Correct.
15    Q   In the course of serving as an expert
16  witness in this litigation, did you also put
17  together a Prolift general report?
18    A   Yes.
19    Q   And have you reviewed expert reports of
20  plaintiffs' experts in the course of serving as an
21  expert for Ethicon?
22    A   Yes.
23    Q   And have you also reviewed individual
24  cases of plaintiffs who have brought claims against
25  Ethicon related to either the Prolift, the TVT, or

Page 143

1  the TVT-Exact?
2    A   Yes.
3    Q   In the course of drafting your Prolift
4  report, did you review medical literature?
5    A   Yes.
6      MR. RESTAINO:  Objection.
7    Q   And did you also review company documents
8  that were provided to you by Ethicon when you were
9  putting together your Prolift general report?
10      MR. RESTAINO:  Objection.
11    A   Yes.
12    Q   And some of the information that's
13  contained in your Prolift general report was -- I
14  don't know if it's word for word, but was similar
15  information -- some of the information contained in
16  the Prolift report also applicable to the opinions
17  that you've given in your TVT and TVT-Exact general
18  report?
19    A   Yes.
20    Q   And so is it fair to say that some of the
21  documents and literature that you reviewed in
22  putting together your Prolift general report also
23  applied to your TVT and TVT-Exact general report?
24    A   Yes.
25    Q   Okay.  Counsel showed you some articles

Page 144

1  that were cited in your general report.  I don't
2  know the exact number, maybe four or five articles.
3  Do you recall getting questions about some of the
4  articles?
5    A   Yes.
6    Q   And he didn't ask you about all the
7  articles that were cited in your report, correct?
8    A   Correct.
9    Q   So one of the articles that he asked you
10  about was the Nilsson 17-year study, correct?
11    A   Correct.
12    Q   Is that the only article that you're
13  relying on to support your opinions that the TVT and
14  TVT-Exact are safe and effective?
15    A   No.
16    Q   In your opinion, are the -- are the
17  opinions that you've set forth in your report --
18  strike that.
19      You were asked questions about different
20  study types, randomized clinical trials, cohort
21  studies, case series, things of that nature, do you
22  recall Counsel asking you those questions?
23    A   Yes.
24    Q   With respect to the literature discussing
25  midurethral slings, are there also Cochrane Reviews

Page 145

1  and meta-analysis?
2    A   Yes.
3    Q   What is -- can you explain, what is a
4  Cochrane Review?
5    A   A Cochrane Review, it's a database with,
6  you know, a lot of different data, different
7  subjects.  In this case, they'll -- you know, the
8  author for the study may go through and do a
9  meta-analysis looking at the statistics in that
10  database, or possibly a systematic review would be
11  another type of paper that might be published
12  looking at just the overall findings from the
13  database.
14    Q   And when you -- when you're talking about
15  the systematic review or the database, is it fair to
16  say that there are a number of randomized clinical
17  trials that evaluated midurethral slings?
18    A   Yes.
19    Q   And are these meta-analysis, is it fair to
20  say that those look at various randomized clinical
21  trials and kind of pull the data from various
22  randomized clinical trials?
23    A   Correct.
24    Q   And there was some question of levels of
25  evidence and a randomized controlled trial being,

Steve Goldwasser, M.D.

Page 146

1  you know, at the top or gold standard.  Would a
2  meta-analysis or a Cochrane Review, which looks at
3  data from multiple randomized controlled trials,
4  would that be even higher than one individual
5  randomized clinical trial?
6      MR. RESTAINO:  Objection.
7   A   Yes.
8   Q   Can you explain -- since there was an
9  objection, let me just clarify that.
10      In terms of ranking studies, where does a
11  Cochrane Review or a large meta-analysis or
12  systematic analysis, where does that rank in terms
13  of levels of evidence?
14   A   It would be the highest level of evidence.
15   Q   Even higher than one individual randomized
16  clinical trial, controlled trial?
17   A   Correct.
18   Q   Do you have Exhibit 9 -- can you pull
19  Exhibit 9 in front of you, which was the TOMUS
20  study?  Do you have a copy of that?
21   A   Yeah.
22   Q   And this study was a comparison of adverse
23  events with respect to retropubic and transobturator
24  midurethral slings, correct?
25   A   Correct.

Page 147

1   Q   So on one arm was a retropubic
2  polypropylene midurethral sling, the other arm was a
3  transobturator polypropylene sling, correct?
4   A   Correct.
5   Q   If you will flip over to page 5 of the
6  study, about halfway down, do you see where it
7  references a sister trial comparing Burch and
8  pubovaginal slings?
9   A   Correct.
10   Q   And is that trial cited in your expert
11  report?
12   A   Yes, I believe it is.  Yeah.
13   Q   And was that a trial that looked -- that
14  looked at the Burch procedure and pubovaginal
15  slings, the sucess- --- the efficacy and
16  complications associated with those two procedures?
17   A   Yes.
18   Q   Okay.  And does this TOMUS study note that
19  comparing the Burch and pubovaginal slings,
20  concomitant surgery was associated with
21  significantly higher rates of both adverse events
22  and serious adverse events?  Do you see that?
23   A   Correct.
24   Q   And so when you flip over to page 7, which
25  is the table that Counsel asked you about, that has

Page 148

1  data related to the retropubic and transobturator,
2  the results from this study for the retropubic and
3  transobturator, it doesn't have data for non-mesh
4  procedures, does it?
5   A   Correct.
6   Q   Okay.  And are there studies and
7  meta-analysis that look at the efficacy and
8  complications associated with not only midurethral
9  slings but also non-mesh procedures?
10   A   Yes.
11   Q   Okay.  And have you set out data comparing
12  those things in your report?
13   A   Yes.
14   Q   Okay.  Counsel asked you if you look at
15  Table 1 for voiding dysfunction, for example, that
16  there was a 3 percent -- in this TOMUS study, a
17  3 percent voiding dysfunction requiring surgery in
18  the retropubic arm, correct?
19   A   Correct, 3 percent.
20   Q   And zero in the transobturator arm?
21   A   Correct.
22   Q   And Counsel asked you whether that
23  specific percentage was reflected in the IFU, do you
24  recall those questions?
25   A   Correct.

Page 149

1   Q   Dr. Goldwasser, do you agree with me that
2  if we looked at various studies, that 3 percent
3  number in the retropubic arm, if you looked at a
4  different study, would that number potentially
5  change?
6      MR. RESTAINO:  Objection.
7   A   Yes.
8   Q   Are there some studies where voiding
9  dysfunction could be higher than 3 percent?
10   A   Yes.
11   Q   And there's some studies perhaps where
12  that number would be lower for retropubic?
13   A   Correct.
14   Q   Are you aware of literature that would
15  suggest that transobturator slings can have a risk
16  of voiding dysfunction?
17   A   Yes.
18   Q   Counsel asked you some questions about
19  whether or not the incidence of adverse event
20  reports were included in the IFUs for the TVT and
21  TVT-Exact, do you recall those questions?
22   A   Yes.
23   Q   What -- can you explain, what is an
24  adverse event report?
25   A   That's any event that's other than what

Steve Goldwasser, M.D.

Page 150

1 would anticipate the goal of the procedure.
2    Q   Okay.  And if -- is there any restriction
3 on who can report an adverse event to a
4 pharmaceutical company or to the FDA?
5    A   No.
6    Q   Would it be possible for a patient to call
7 the FDA and report an adverse event that they
8 contend to be associated with any medical device?
9    A   Yes.
10    Q   And so if -- if I had a knee implant and
11 my fingernail fell off, could I call and report that
12 to the FDA that after my knee implant, my fingernail
13 fell off?
14    A   Yes.
15    Q   Would that be something -- in terms of
16 levels of evidence, where does an adverse event
17 report fall in levels of evidence?
18    A   The lowest, around the idea of a case
19 report per se or an incident report.
20    Q   And a case report to the extent it's --
21 strike that.
22        In terms of midurethral slings, as a
23 physician, what data do you look to -- strike that.
24        What's more significant in terms of levels
25 of evidence between incidence of adverse events and

Page 151

1 systematic reviews of randomized controlled trials?
2    A   Definitely the randomized control
3 systematic reviews are a higher level of evidence.
4    Q   And are those available to physicians in
5 the medical literature?
6    A   Yes.
7    Q   And are those cited in your report?
8    A   Yes.
9    Q   Counsel asked you a question -- let me
10 strike that.
11        Are adverse event reports, do you expect
12 that a manufacturer of medical devices would alert
13 you every time they had an adverse event report
14 related to their product?
15        MR. RESTAINO:  Objection.
16    A   No.
17    Q   Is that something that you would want in
18 your practice?
19    A   No.
20    Q   Can you explain why that is.
21    A   Because you would be pretty much inundated
22 with reports all day long from every single thing
23 out there.  And it would be tough to just practice
24 medicine, you'd be listening to reports all day.
25    Q   And what would be the -- from a medical

Page 152

1 evidence perspective, what is the significance of
2 adverse event reports?
3    A   Well, it depends on the circumstance.  I
4 mean, there's a lot of just false alarms constantly
5 going off.
6    Q   And let me say this, if there exists
7 systematic reviews, meta-analysis, and Cochrane
8 Reviews, what would be the -- how would you as a
9 physician use an adverse event report compared to
10 that data?
11    A   As a very low level of evidence.
12    Q   Okay.  Counsel asked you some questions
13 about the IFU for TVT and TVT-Exact, do you recall
14 that?
15    A   Yes.
16    Q   Prior to the TVT midurethral sling coming
17 onto the market, were there non-mesh procedures that
18 doctors were performing to treat stress urinary
19 incontinence?
20    A   Yes.
21    Q   Let me strike -- let me ask that a
22 different way.  Before any mesh surgeries were
23 performed to treat stress urinary incontinence, were
24 doctors treating stress urinary incontinence
25 surgically using non-mesh procedures?

Page 153

1    A   Yes.
2    Q   Okay.  And if we look at your expert
3 report, beginning at page 7, you note, "Prior to the
4 advent of the modern midurethral sling, traditional
5 surgical approaches over the past hundred years have
6 included abdominal retropubic urethropexies (Burch,
7 the MMK), bladder neck slings, and needle urethral
8 suspensions and the Kelly plication"; do you see
9 that?
10    A   Yes.
11    Q   And with respect to those procedures, do
12 all of those procedures have potential risks and
13 complications?
14    A   Definitely.
15    Q   Do all of those procedures have the risk
16 or potential complication of pain?
17    A   Yes.
18    Q   Do all of those procedures have the
19 potential risk or complication of dyspareunia?
20    A   Yes.
21    Q   Did all of those procedures have the risk
22 of potential complication of urine retention or
23 voiding dysfunction?
24    A   Yes.
25    Q   With respect to any of these procedures,

Steve Goldwasser, M.D.

Page 154

1 is there an IFU that a doctor gets for how to do a
2 Burch procedure?
3    A   No.
4    Q   Is there an IFU for how to do an MMK?
5    A   No.
6    Q   Is there an IFU for how to do a needle
7 urethral suspension?
8    A   No.
9    Q   Is there an IFU for how to do a Kelly
10 plication procedure?
11    A   No.
12    Q   How is it that doctors learn about or
13 become aware of risks associated with those
14 procedures, which, according to your report, have
15 been around for hundred years if there's no IFU?
16    A   Through literature, through clinical
17 experience, through practice.
18    Q   Okay.  And in your opinion, were doctors
19 able to know about the risks of those procedures
20 based on the factors that you just gave without
21 having an IFU that specifically listed potential
22 risks?
23    A   Definitely.
24    Q   If you look at the TVT IFU that was marked
25 as Exhibit 8 -- do you have a copy of that?

Page 155

1    A   I do have a copy of -- I had one.  Oh,
2 here we go.
3    Q   If you'd flip over to the second page,
4 there's a paragraph that says Important; do you see
5 that?
6    A   Yeah.
7    Q   And important is bolded, correct?
8    A   Correct.
9    Q   And if you read the -- starting in the
10 second sentence, it says -- or the first sentence
11 talks about it's "a package insert to provide
12 instructions for use on the Tension-free Vaginal
13 Tape single-use device, the Reusable Introducer, and
14 Reusable Rigid Catheter Guide"; do you see that?
15    A   Yes.
16    Q   So does the document state that, "The
17 design is to provide the instructions for use for
18 using the device"; is that fair?
19    A   Yes.
20    Q   The second sentence says, "It's not a
21 comprehensive reference to surgical technique for
22 the" correction -- "for correcting stress urinary
23 incontinence"; do you see that?
24    A   Yes.
25    Q   The next sentence notes, "The device

Page 156

1 should only be used by physicians trained in the
2 surgical treatment of stress urinary incontinence
3 and specifically in implanting the Gynecare TVT
4 device"; do you see that?
5    A   Yes.
6    Q   And then the next sentence says, "These
7 instructions are recommended for general use of the
8 device"; do you see that?
9    A   Correct.
10    Q   Dr. Goldwasser, as a surgeon, do you
11 expect an IFU to be a comprehensive reference for
12 the surgical correction of stress urinary
13 incontinence?
14    A   Definitely not.
15    Q   Where would you look -- if you were
16 looking for a comprehensive reference for
17 information on adverse events, incidence of adverse
18 events, percentages of adverse events, where would
19 you go to look for that as a physician?
20    A   I'd do a literature search.  There is no
21 one encompassing reference that embodies all these
22 numbers.
23    Q   Dr. Goldwasser, do you agree that there
24 are certain risks that are commonly known to
25 physicians who perform surgical treatment of stress

Page 157

1 urinary incontinence that apply regardless of the
2 type of surgery that's performed?
3    A   Yes.
4    Q   Okay.  And if a physician is trained in
5 the surgical treatment of stress urinary
6 incontinence, would it be expected that they would
7 be aware of those commonly known risks?
8    A   Yes.
9    Q   Does the IFU also note that the TVT should
10 be used by doctors who are specifically trained in
11 implanting the TVT device?
12    A   Yes.
13    Q   And did you actually teach doctors how to
14 use the TVT device?
15    A   Yes.
16    Q   In your experience, did Ethicon -- if
17 physicians had questions, did you as a preceptor for
18 Ethicon make yourself available to answer questions
19 that other doctors might have about the use of the
20 TVT product?
21    A   Definitely.
22    Q   If you'll turn to Exhibit 11, which was
23 the article by the -- Colby Perkins is the led
24 author.
25    A   Okay.

Steve Goldwasser, M.D.

Page 158

1    Q   If you look in the introduction in the
2  first paragraph, does this article note that, "The
3  current gold standard for the management of stress
4  urinary incontinence is the midurethral sling"?  Do
5  you see that?
6    A   It's -- yes, correct.
7    Q   Based on your knowledge, experience,
8  training, review of the literature, do you agree
9  with that assessment, that, "The current gold
10  standard for the management of stress urinary
11  incontinence is the midurethral sling"?
12    A   Definitely.
13    Q   If you flip over to the second page on the
14  right-hand column, about two-thirds of the way down,
15  do you see where it notes, "In March 2013, the FDA
16  followed up on their promise to provide more
17  information on the safety of mesh for SUI"?  Do you
18  see that?
19    A   About a third of the way down --
20    Q   Two-thirds of the way down.
21    A   Oh, yeah, okay.
22    Q   And does this article note that, "After
23  reviewing the complaints in the MAUDE database,
24  conducting a literature review, and synthesizing the
25  input from the 2011 Obstetrics and Gynecology

Page 159

1  Devices Panel of the Medical Device Advisory
2  Committee meetings, the FDA determined that the
3  safety and effectiveness of multi-incision slings is
4  well-established in clinical trials that followed
5  patients up to one year"?  Do you see that?
6    A   Yes.
7    Q   Is that information that physicians in
8  your field relied on in determining which products
9  to offer patients?
10    MR. RESTAINO:  Objection.
11    A   Yeah, I mean, I think that it's definitely
12  helpful in making decisions.
13    Q   And is the TVT -- are the TVT and the
14  TVT-Exact, are those multi-incision slings that
15  would have been referenced in this March 2013 --
16    A   Yes.
17    Q   -- FDA communication?
18    A   Yes.
19    Q   Counsel asked you some questions about
20  page 43, the sentence that noted, "The source of
21  this shift may be multifactorial, including provider
22  fear of litigation, lack of clarity around safety
23  concerns associated with the uses of vaginal mesh,
24  and patient fear from legal advertisements, and
25  media coverage that occurred after the 2011

Page 160

1  warning"; do you see that?
2    A   Yes.
3    Q   Do you recall him referring to that as
4  four separate factors?
5    A   Correct.
6    Q   Dr. Goldwasser, have you seen in your
7  practice and is it your opinion that part of the
8  lack of clarity around the safety concerns
9  associated with different uses of vaginal mesh was
10  brought about by attorney advertising?
11    A   Yes.
12    MR. RESTAINO:  Objection.
13    Q   And have you seen in your practice and
14  through your discussions with colleagues, has
15  provider fear of litigation been impacted by
16  attorney advertising?
17    A   Yes.
18    Q   Have you seen in your practice and through
19  your discussions with colleagues media coverage that
20  occurred after the 2011 warning, has that been
21  impacted by attorney advertising?
22    A   Yeah.  I think it has, yes.
23    Q   Okay.  So while only one of these factors
24  mentions legal advertising, is it your opinion that
25  legal advertising from plaintiffs' attorneys

Page 161

1  contributed to the fear that is reflected in all
2  those categories?
3    MR. RESTAINO:  Objection.
4    A   Yes.
5    Q   And do you believe that that's consistent
6  with this article that you've cited in your report?
7    A   Yes.
8    Q   Let's take a look at Exhibit 13.  Keep
9  that with you, but take a look at Exhibit 13, which
10  is the FDA communication from July 13, 2011.
11    A   Okay.
12    Q   Dr. Goldwasser, do you agree that the
13  safety concerns that are discussed in this 2011 FDA
14  notification relate to use of mesh for pelvic organ
15  prolapse repair?
16    A   Yes.
17    Q   Do they discuss complications or adverse
18  events associated with use of mesh for stress
19  urinary incontinence?
20    A   I think it's mainly just -- I don't think
21  it mentions stress urinary incontinence, but I think
22  it's really focusing on the pelvic organ prolapse
23  mainly.
24    Q   And Counsel read you a statement from this
25  FDA notification that said, "The FDA's issuing this

Steve Goldwasser, M.D.

Page 162

1 update to inform you that serious complications
2 associated with surgical mesh for transvaginal
3 repair of POP are not rare"; do you recall that?
4    A   Correct.
5    Q   Would the TVT or the TVT-Exact fit within
6 that sentence?
7    A   No.
8    Q   Okay.  Do you agree that this FDA
9 notification makes clear that the complications that
10 are not rare that's being referred to there is use
11 of mesh for pelvic organ prolapse repair?
12    A   Correct.
13    Q   Dr. Goldwasser, within even the medical
14 field, are there occasions when doctors will do
15 interviews or be on television programs where
16 perhaps they're not getting paid, but yet they do an
17 interview or part of a television program?
18    A   Sure.
19    Q   And although that's not paid advertising,
20 is that sometimes used as a means to increase a
21 doctor's profile or to generate publicity and
22 advertising even if it's not paid advertising?
23        MR. RESTAINO:  Objection.
24    A   Sure.  Yes.
25    Q   It was a terrible question.  Let me

Page 163

1 rephrase that.
2        Can -- are there instances when doctors
3 will use media interviews with newspapers or
4 television stations where they're not being paid as
5 a means of advertising for their practice and their
6 expertise?
7    A   Yes.
8    Q   And have you also seen -- let me strike
9 that.
10        Is it also possible -- looking at Exhibit
11 12, which is the Koo study, and we don't have the
12 media things that mentioned litigation -- the media
13 articles that mentioned litigation here, but do you
14 agree that it's possible that when attorneys are
15 interviewed or when things can -- that there can be
16 a discussion of litigation within newspapers that is
17 not paid advertising but can help generate publicity
18 or referrals for attorneys?
19    A   Yes.
20    Q   And in your report where you talk about
21 the advertising campaign that occurred, were you
22 limiting that only to paid television commercials?
23    A   No, just in general.
24    Q   Dr. Goldwasser, as part of your review of
25 materials in these cases, have you had occasion to

Page 164

1 review expert reports that were cited -- I mean from
2 plaintiffs' experts?
3    A   Yes.
4    Q   And have you seen the articles and
5 documents that are referred to in those expert
6 reports?
7    A   Yes.
8    Q   And did you consider those as you put
9 together your report in formulating your opinions?
10    A   Yes.
11    Q   And as you sit here today, even after
12 questioning by Counsel, you still hold the opinions
13 set forth in your report to a reasonable degree of
14 medical certainty?
15    A   Yes.
16        MR. RUMANEK:  That's all the questions
17    I've got.
18        REDIRECT EXAMINATION
19 BY MR. RESTAINO:
20    Q   Doctor, working backwards, does the Koo
21 article mention anywhere interviews with attorneys?
22    A   Koo article.  I don't recall off the top
23 of my head, but -- here we are.  Would you like me
24 to go through and read it?
25    Q   If you need to glance through it or if you

Page 165

1 want to look at the methodology where they describe
2 exactly what it is that they did.
3        MR. RUMANEK:  And I just -- it does note
4    paid advertisements are included.  Oh, I'm
5    sorry, it says were excluded.  Strike that.
6    A   Rephrase your question again.
7    Q   Is there any evidence in the methodology
8 or in the entire study that they utilized paid or
9 unpaid attorney interviews as part of their
10 methodology?
11    A   It does not specifically mention that.
12    Q   The very last page and last paragraph of
13 the Koo article --
14    A   The same article.
15    Q   -- I'm sorry, the very last paragraph
16 specifically states, "This study did not assess
17 advertisements and non-news sources of information
18 about transvaginal mesh, particularly those related
19 to litigation."  Did I read that correctly?
20    A   You're looking under Conclusions or are
21 you looking at the last paragraph?
22    Q   I'm sorry, right above Conclusions.
23 Forgive me.  I'm sorry.
24    A   Yes, yes.  I see it.
25    Q   So any testimony regarding paid or unpaid

Steve Goldwasser, M.D.

Page 166

1  attorney interviews in news reports or wherever is
2  just speculation, wouldn't you agree?
3      MR. RUMANEK:  Object to the form.
4      A   Yes, it does not specifically mention
5  those citations, correct.
6      Q   Now, the 2011 FDA safety announcement, as
7  pointed out by Counsel and specifically within the
8  report itself, the title of the safety announcement
9  is specifically for pelvic organ prolapse, correct?
10     A   Correct.
11     Q   And, in fact, in the second page above the
12  bold underlined verbiage, it specifically says that,
13  "The FDA continues to evaluate the effects of using
14  surgical mesh to repair SUI and will communicate
15  these findings at a later date," period, correct?
16     A   Correct.
17     Q   So there's no intent to use this for
18  purposes of midurethral slings -- slings or
19  incontinence at this time, correct?
20     A   I don't understand your question.
21     Q   The FDA's intent here is not to provide
22  data on SUI, but as it says in the title, it's
23  strictly for pelvic organ prolapse?
24     A   Correct.
25     Q   Okay.  And there was no intent on my part

Page 167

1  to use it for SUI, it was introductory to the Koo
2  article, which is about this update --
3      MR. RUMANEK:  Object --
4      Q   -- you understand that?
5      MR. RUMANEK:  -- to form.
6      A   Okay.  Yes, I see transition, okay.
7      Q   And then you were asked some questions
8  about the Perkins study also.  And again, regarding
9  Perkins, is there any evidence whatsoever that
10  interviews with attorneys, paid or unpaid, in any
11  way contributed to the wave of anxiety?
12     A   I'm looking for that.  Which -- what
13  exhibit is that?
14     MR. RUMANEK:  Exhibit 11.
15     A   All right.  Let's see.  Can you repeat
16  that question again?
17     Q   Yes.  Does -- does the Perkins study
18  itself talk about unpaid or paid attorney
19  interviews?
20     A   I would have to read through and read the
21  methods, but I don't --
22     MR. RUMANEK:  Can we go off the record for
23  just a minute?
24     MR. RESTAINO:  Sure.
25     (Off-the-record discussion.)

Page 168

1      MR. RUMANEK:  Back on the record.
2  BY MR. RESTAINO:
3      Q   Let me reask my question, try to make it a
4  little bit more clearer.  Does this article at all
5  that you've cited and you rely upon discuss
6  interviews, paid or unpaid, of attorneys within news
7  stories?
8      A   I don't know that it specifically
9  discusses them.
10     Q   Now, when you're asked about the lack of
11  clarity around safety concerns associated with
12  different uses of vaginal mesh, you don't know the
13  basis for which these authors are relying upon when
14  they say lack of clarity around safety concerns, do
15  you?
16     A   I'm simply going by my reading of this
17  article and my clinical experience and patient
18  perceptions.
19     Q   Would you agree, though, it's speculating
20  as to whether or not the lack of clarity is due to
21  legal advertisements when legal advertisements is
22  then specifically mentioned as the next factor in
23  this multifactorial model?
24     MR. RUMANEK:  Object to the form.
25     A   I'm not sure I'm following you.  I mean,

Page 169

1  they mention over here -- they mention here fear of
2  litigation and they mention legal issues being
3  potentially a lack of -- the way it's interpreted by
4  people is being a lack of clarity, but I'm not sure
5  I follow you.  Repeat it.
6      Q   They specifically state in the next page
7  patient fear from legal advertisements.
8      A   Right.
9      Q   They do not specifically say lack of
10  clarity around safety concerns as a result of legal
11  advertisements, do they?
12     A   That's my interpretation.
13     Q   Okay.  And right after everything we read
14  on the right-hand column, the very first full
15  paragraph, they actually then state, "Law experts
16  have indicated that the lack of appropriate informed
17  consent is the most likely reason that a provider
18  would be named in a mesh lawsuit"; do you see that?
19     A   Correct.
20     Q   And would you then agree that that's generally
21  known within the medical community, that lack of
22  informed consent is a primary reason for physicians
23  being sued?
24     A   Not -- it's hard to say.
25     Q   Okay.  Regarding provider fear of

Steve Goldwasser, M.D.

Page 170

1 litigation, as a result of the current environment
2 that is multifactorial, do you share the known
3 adverse events associated with your -- the mesh
4 product with your patients prior to surgery so they
5 can make an informed decision as to whether or not
6 to have the surgery?
7      MR. RUMANEK: Object to the form.
8   A   Yes. Yes.
9   Q   Do you think that's a good thing that you
10 do?
11   A   I think it's -- it's a double-edged sword
12 because I think it can provide -- it can cause some
13 fear where it's not necessarily warranted, but at
14 the same time, it's providing information for
15 decisions.
16   Q   The Exhibit 8 that you were asked about,
17 which is the TVT IFU, at the conclusion of a
18 residency and especially at the conclusion of a
19 residency and fellowship, do you know of any surgeon
20 that then would read an IFU for how to do a
21 procedure?
22   A   No.
23   Q   You learn that in training -- hands-on
24 training with your attendings and then with
25 experience, correct?

Page 171

1   A   Correct.
2   Q   Experience is that thing you get right
3 after you needed it.
4      But if you turn to the fifth page, they do
5 have a heading for Adverse Reactions, correct?
6   A   Correct.
7   Q   And for any new device that comes on the
8 market, would you as a surgeon before you implanted
9 it in your patient, would you want to know of the
10 clinically significant known adverse reactions?
11   A   I think that it's a good idea to have a
12 general awareness of the device you're using, the
13 indications for it, some of the consequences, but
14 again, I don't rely necessarily on the IFU to
15 provide all that. I think it's just part of the --
16 of the world in which you live. You get information
17 from multiple sources and you put it together to
18 form conclusions.
19   Q   If a medical device such as TVT-Exact is
20 released on January 1st of a year, would you agree
21 that at that point, the only data available as to
22 its safety and efficacy would be from the published
23 results of the clinical trials?
24      MR. RUMANEK: Object to the form.
25   A   The only data available. The only

Page 172

1 possibly peer-reviewed data, but there is also
2 information available from the people who have been
3 using it potentially in the study. I think there's
4 a lot of information out there that's not
5 necessarily just contained in published studies.
6 There's meetings, there's colleague discussions and
7 so forth.
8   Q   But the meetings and discussions can only
9 talk about the safety and efficacy from the clinical
10 trials that has been reported either by the
11 investigators themselves or by the manufacturer,
12 correct?
13      MR. RUMANEK: Object to the form.
14   A   Yeah, typically meetings. I mean, you're
15 going to be looking at studies that were set up to
16 look at this specifically, but I don't necessarily
17 know that all that information -- that
18 information -- I wouldn't anticipate all that
19 information necessarily being contained in an IFU.
20   Q   Okay. Looking at the adverse reactions
21 here for this product on page 5, as we've discussed
22 during my time in questioning, the device has been
23 associated with voiding dysfunction, using your
24 definition, correct?
25   A   Let's see.

Page 173

1   Q   I'm just saying generally we discussed the
2 fact that voiding dysfunction has been reported with
3 this device, correct?
4   A   As with all procedures for incontinence,
5 correct.
6   Q   Voiding dysfunction is not listed as an
7 adverse reaction with this procedure in the IFU, is
8 it?
9      MR. RUMANEK: Object to the form.
10   A   Well, it's my understanding too that one
11 of the exclusions is commonly known adverse
12 reactions to procedures like this don't necessarily
13 need to be contained in an IFU.
14      So, for example, voiding dysfunction is
15 common to all incontinence procedures. And in
16 looking at randomized controlled studies, voiding
17 dysfunction is actually higher in non-midurethral
18 sling procedures. So relatively speaking, this is
19 less likely to cause voiding dysfunction.
20      But back to the bigger point is that it's
21 a known ramification of any surgery for
22 incontinence, and so it's my understanding it
23 doesn't necessarily need to be discussed here
24 because it's a known factor.
25   Q   Okay. Now, in addition to known factors,

Steve Goldwasser, M.D.

Page 174

1  as we discussed, bladder perforation is a known
2  complication of pelvic surgery --
3      A   Correct.
4      Q   -- correct?  And yet we looked at the
5  Brubaker study where the -- where the -- there was a
6  study -- significant increased risk of bladder
7  perforation, and I believe that was the one that was
8  5 percent versus zero, though the record speaks for
9  itself, the bladder perforation is not listed as an
10  adverse reaction, is there?
11      MR. RUMANEK:  Object to the form.
12      A   It is.  It says, "Punctures or lacerations
13  of vessels, nerves, bladder, or bowel" in number --
14  the first bullet under Adverse Reactions.
15      Q   Ah, okay.  Yes, I see that.
16      The incidence of each of these
17  complications is not listed, correct?
18      A   In each study there was different reported
19  incidence, so there's no way that -- there's no one
20  solitary number that represents the number of
21  adverse events for any event.  It's all study
22  dependent.
23      Q   But the studies occur -- multiple studies
24  occur once a product is available for mass
25  marketing.  The -- I was trying to get to the fact

Page 175

1  that on day one, when the device is released, at
2  that time the only data that's available is that
3  data done in the premarketing clinical trials, would
4  you agree?
5      MR. RUMANEK:  Object to the form.
6      A   Potentially.
7      Q   And based upon that data, the incidence
8  rate is not listed, correct?
9      MR. RUMANEK:  Object to the form.
10      A   It's not listed here, correct.
11      Q   And so, therefore, you as a surgeon, if
12  there was, in fact, a 15 percent increased risk of
13  bowel perforation, you, with your training and
14  experience, know that's markedly higher than I would
15  expect with any pelvic procedure, wouldn't you want
16  to know that?
17      MR. RUMANEK:  Object to the form.
18      A   Not necessarily in this form.
19      Q   Okay.  Okay.  And then finally, I believe
20  you said, I'll paraphrase because I don't remember
21  your exact words, but that you consider the
22  meta-analysis to be the highest form of
23  epidemiological evidence.
24      A   Of randomized clinical trials, correct.
25      Q   Meta-analysis of randomized controlled

Page 176

1  trials.  Wouldn't that depend on the quality of the
2  underlying randomized controlled trials?
3      A   Correct.  I mean, what you put into it
4  is --
5      Q   Are you familiar with the word
6  "heterogenicity"?
7      A   Correct.
8      Q   So if we're looking at, and I believe
9  Counsel used the example, the Burch procedure, that
10  doesn't involve mesh, does it?
11      A   No.
12      Q   If one's looking at complication rates of
13  Burch versus mesh, that's a different study than
14  mesh -- a comparator of mesh versus mesh, would you
15  agree?
16      A   Correct.
17      Q   Now, if we have 20 small, poorly designed
18  randomized controlled trials with high level of
19  heterogenicity, that meta-analysis is going to
20  reproduce that weak evidence, correct?
21      MR. RUMANEK:  Object to the form.
22      A   It could, but in this case, there are some
23  large, good quality randomized controlled trials
24  that have been subject to meta-analysis and
25  systematic reviews.  So it depends --

Page 177

1      Q   My --
2      A   It depends on --
3      Q   I'm sorry.
4      A   Yes, what you include in a meta-analysis,
5  you know, affects the results of the meta-analysis.
6      Q   So the term -- leading to the term
7  "garbage in, garbage out"?
8      A   Correct, but there are good meta-analyses
9  of the retropubic sling procedure.
10      MR. RESTAINO:  Yes.
11      MR. RUMANEK:  I've just got one question.
12      RECROSS EXAMINATION
13  BY MR. RUMANEK:
14      Q   Dr. Goldwasser, you've cited in your
15  report on page 20- -- and are familiar with the
16  AUG/SUFU position statement?
17      A   Yes.
18      Q   Looking at page 21, one of the bullet
19  points that you've cited, I'll just read it, "The
20  monofilament polypropylene mesh midurethral sling is
21  the most extensively studied anti-incontinence
22  procedure in history.  A broad evidence base,
23  including high quality scientific papers and medical
24  journals in the U.S. and the world, supports the use
25  of midurethral sling as a treatment of stress

Page 178

1  urinary incontinence.  There are greater than 2,000
2  publications in the scientific literature describing
3  the midurethral sling in the treatment of stress
4  urinary incontinence.  These studies include the
5  highest level of scientific evidence in the
6  peer-reviewed scientific literature.  No other
7  surgical treatment for stress urinary incontinence
8  before or since has been subjected to such extensive
9  investigation"; do you see that?
10     A   Yes.
11     Q   And is that consistent with your knowledge
12  and understanding of the medical literature as it
13  relates to polypropylene midurethral slings?
14     A   Yes.
15     Q   And TVT and TVT-Exact are both
16  polypropylene mesh midurethral slings, correct?
17     A   Correct.
18        MR. RUMANEK:  That's all the questions
19  I've got.
20        MR. RESTAINO:  I don't have any other.
21        THE WITNESS:  All right.
22        (Witness excused.)
23        (Deposition concluded at 1:27 p.m.)
24             - - -
25

Page 179

1          CERTIFICATE OF OATH
2
3  STATE OF FLORIDA )
4  COUNTY OF DUVAL  )
5
6      I, the undersigned authority, certify that
7  STEVE GOLDWASSER, M.D., personally appeared before me
8  on July 1, 2017, and was duly sworn.
9
10     WITNESS my hand and official seal this 17th day
11  of July 2017.
12
13
14        _____
          Stephanie Powers Cusimano, RPR, FPR
15        Notary Public - State of Florida
          My Commission No. GG 013532
16        Expires:  August 3, 2020
17
18
19
20
21
22
23
24
25

Page 180

1          REPORTER'S CERTIFICATE
2  STATE OF FLORIDA )
3  COUNTY OF DUVAL  )
4
5      I, Stephanie Powers Cusimano, Registered
6  Professional Reporter, Florida Professional Reporter,
7  and Notary Public in and for the State of Florida at
8  Large, hereby certify that I was authorized to and did
9  stenographically report the deposition of STEVE
10  GOLDWASSER, M.D.; that a review of the transcript was
11  requested; and that the foregoing transcript, pages 1
12  through 178, is a true record of my stenographic
13  notes.
14
15      I further certify that I am not a relative,
16  employee, attorney, or counsel of any of the parties,
17  nor am I a relative or employee of any of the parties'
18  attorney or counsel connected with the action, nor am
19  I financially interested in the action.
20
21      DATED this 17th day of July 2017.
22
23        ____ _____
          Stephanie Powers Cusimano, RPR,
24        FPR, Court Reporter
25

Page 181

1          E R R A T A  S H E E T
2  STATE OF FLORIDA:
   COUNTY OF DUVAL:
3
4      I, STEVE GOLDWASSER, M.D., the undersigned
5  deponent, have this date read the foregoing pages of
6  my deposition, numbered 1 through 178, and with the
7  suggestions noted below, if any, these constitute a
8  true and accurate transcription of my deposition
9  given on the 1st day of July 2017, at the time and
10  place stated therein.
11
12  PAGE NUMBER    LINE NUMBER    SUGGESTION/REASON
13  _____    _____    _____
14  _____    _____    _____
15  _____    _____    _____
16  _____    _____    _____
17  _____    _____    _____
18  _____    _____    _____
19  _____    _____    _____
20  _____    _____    _____
21  _____    _____    _____
22
23        _____
          STEVE GOLDWASSER, M.D.
24
25

Steve Goldwasser, M.D.

Page 182

```
 1         IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2              CHARLESTON DIVISION

 3
   IN RE:  ETHICON, INC., PELVIC REPAIR
 4 SYSTEM PRODUCTS LIABILITY  Master File No. 2:12-MD-02327
   LITIGATION           MDL No. 2327
 5
   THIS DOCUMENT RELATES TO ALL
 6 WAVE 5 AND SUBSEQUENT WAVES
   CASES AND PLAINTIFFS:
 7
   Debbie Avant
 8 Case No. 2:12-cv-07413
 9 Patricia Bell
   Case NO. 2:12-cv-06750
10
   Patsy Frame
11 Case No. 2:12-cv-07524
12 Patricia Hosbrook
   Case No. 2:12-cv-07843
13
   Mary Alice Landeche
14 Case No.  2:12-cv-07962
   _____
15
16
17
18
19
20
21
22
23
24
25
```

Page 183

```
 1          LAWYER'S NOTES
 2 PAGE  LINE
 3  _____ _____  _____
 4  _____ _____  _____
 5  _____ _____  _____
 6  _____ _____  _____
 7  _____ _____  _____
 8  _____ _____  _____
 9  _____ _____  _____
10  _____ _____  _____
11  _____ _____  _____
12  _____ _____  _____
13  _____ _____  _____
14  _____ _____  _____
15  _____ _____  _____
16  _____ _____  _____
17  _____ _____  _____
18  _____ _____  _____
19  _____ _____  _____
20  _____ _____  _____
21  _____ _____  _____
22  _____ _____  _____
23  _____ _____  _____
24  _____ _____  _____
25  _____ _____  _____
```