# Exhibit D

Ragnvald Mjanger, M.D.

```
 0   01



 2                 UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF WEST VIRGINIA

 4                     CHARLESTON DIVISION

 5     _____

 6     IN RE: ETHICON, INC., PELVIC    Master File No.

 7     REPAIR SYSTEM PRODUCTS           2:12-MD-02327

 8     LIABILITY LITIGATION             MDL No. 2327

 9     _____

10     THIS DOCUMENT RELATES TO ALL

11     WAVE 5 AND SUBSEQUENT WAVE CASES    JOSEPH R. GOODWIN

                                      U.S. DISTRICT JUDGE

12     AND PLAINTIFFS

13     Betty McCumber

14     Case No. 2:12-cv-08083

15     General re TVT

16     General re TVT-O

17     _____

18

19

20                      Deposition of

21                 RAGNVALD MJANGER, M.D.

22             taken on Thursday, July 20, 2017

23                 commencing at 9:03 a.m.

24           REPORTER:  Sandra D. Burch, RPR, CRR
```

Ragnvald Mjanger, M.D.

Page 2

1    APPEARANCES:
2    FOR THE PLAINTIFF:
3       ANDREW N. FAES, ESQ.
4       Attorney-at-Law
5       WAGSTAFF & CARTMELL LLP
6       4740 Grand Avenue, Suite 300
7       Kansas City, Missouri 64112
8       (816) 701-1100
9       Afaes@wcllp.com
10
11   FOR THE WITNESS:
12      TRACY J. VAN STEENBURGH, ESQ.
13      Attorney-at-Law
14      NILAN JOHNSON LEWIS
15      120 South Sixth Street, Suite 400
16      Minneapolis, Minnesota 55402
17      (612) 305-7521
18      Tvan@nilanjohnson.com
19
20
21
22
23
24

Page 4

1              I N D E X
2            (Continued)
3    EXHIBITS:
4    Number          Description          Marked
5    12 - E-mail string Bates-stamped ETH.MESH.24564541
6          through '4544 ........................ 133
7    13 - Pendix II: Surgeon Questionnaire Bates-
8          stamped ETH.MESH.16202253 through
9          '260 ................................... 140
10   14 - Barriers Artisyn will need to overcome
11         Bates-stamped ETH.MESH.25002260 ....... 162
12   15 - Artisyn Y-Shaped Mesh Advisory Board
13         Bates-stamped ETH.MESH.25002707 through
14         '725 ................................... 185
15   16 - E-mail string Bates-stamped ETH.MESH.24183152
16         through '153 ........................ 193
17   17 - E-mail Bates-stamped ETH.MESH.24564418 ..... 200
18   18 - E-mail Bates-stamped ETH.MESH.05830989 ..... 205
19   19 - Minnesota Physician, December 2013 ......... 236
20   20 - Metro OBGYN two-page document .............. 275
21   21 - Removal or Revision of Vaginal Mesh Used for
22         the Treatment of Stress Urinary
23         Incontinence .......................... 279
24

Page 3

1              I N D E X
2    EXAMINATION
3    By                    Page
4    Mr. Faes .................. 5
5    Ms. Van Steenburgh ........ 277
6    EXHIBITS:
7    Number          Description          Marked
8    1 - Notice to Take Deposition of Ragnvald
9          Mjanger, M.D. ........................ 7
10   2 - General Report of Ragnvald Mjanger, M.D. .... 9
11   3 - General Reliance List in Addition to
12         Materials Referenced in Report ........ 14
13   4 - Curriculum Vitae ............................ 28
14   5 - E-mail Bates-stamped ETH.MESH.00031987 - '88  66
15   6 - One-Time Preceptorship Agreement Bates-stamped
16         ETH.MESH.25695016 - '080 ............. 67
17   7 - E-mail Bates-stamped ETH.MESH.24175750 ..... 87
18   8 - E-mail string Bates-stamped ETH.MESH.24177455
19         through '456 ........................ 90
20   9 - E-mail Bates-stamped ETH.MESH.24177795 ...... 99
21   10 - Evaluation Form Bates-stamped
22         ETH.MESH.24178311 .................... 102
23   11 - Surgery New Product/Procedure Request Form
24         Bates-stamped ETH.MESH.24179483 ....... 117

Page 5

1         Deposition of RAGNVALD MJANGER, M.D.,
2    taken pursuant to Notice of Taking Deposition,
3    taken before Sandra D. Burch, RPR, CRR, a Notary
4    Public in and for the County of Scott, State of
5    Minnesota, at the Law Offices of Nilan Johnson
6    Lewis, 120 South Sixth Street, Suite 400,
7    Minneapolis, Minnesota 55402.
8         WHEREUPON, the following proceedings were duly had:
9         (Oath administered to the witness by the
10   court reporter.)
11         RAGNVALD MJANGER, M.D.,
12      The Witness in the above-entitled
13      matter, after having been duly
14      sworn, testifies as follows:
15            EXAMINATION
16   BY MR. FAES:
17   Q  Good morning, Dr. Mjanger.
18   A  Good morning.
19   Q  My name is Andy Faes.  I represent
20      plaintiffs across the country who are
21      bringing lawsuits against Ethicon and
22      Johnson & Johnson regarding the pelvic mesh
23      products.
24         Do you understand that?

Page 6

1  A  Yes, I do.
2  Q  And I'm here today to take your deposition
3     regarding the TVT and TVT-O products.
4        Do you understand that?
5  A  Yes, I do.
6  Q  And you understand you're under oath and
7     sworn to tell the truth; right?
8  A  I do.
9  Q  I think you've only ever given one
10    deposition before; is that right?
11 A  I've given multiple.
12 Q  Okay.  But in the last five to ten years,
13    you've only given one?
14 A  No.  I've given several.
15 Q  We'll get into that later.  So, you kind of
16    understand the process.  Let me reiterate
17    that if I ask a question at any time today
18    that, for any reason, doesn't make sense to
19    you, just let me know and I'll try to
20    rephrase the question.
21       Okay?
22 A  Okay.
23 Q  If you do answer my question, I'll assume
24    that you understood my question as asked.

Page 7

1        Fair enough?
2  A  I understand.
3  Q  All right.  Doctor, I'm going to mark as
4     Exhibit No. 1 the notice of your deposition
5     today because it's like our thing to do as
6     lawyers.
7        (Exhibit No. 1 Marked.)
8
9  BY MR. FAES:
10 Q  And this is the notice of your deposition
11    here today, and it contains various document
12    requests.
13       Have you seen that document before?
14 A  (Witness reviews the document.)
15       I have.
16 Q  And counsel has brought a material of flash
17    drives.
18       Other than this material of flash
19    drives that's in front of me that's marked
20    Mjanger, is there anything else that you
21    brought here today that's responsive to the
22    document requests --
23 A  No.
24 Q  -- in the notice?

Page 8

1  A  No.
2  Q  Okay.  And what is your understanding of
3     what's on this flash drive that's in front
4     of us?
5  A  It's various articles about the mesh in this
6     case.
7  Q  So, it's just articles?  Is that your
8     understanding?
9  A  I can't remember everything, unless you put
10    it in front of me on a hard copy.
11       MS. VAN STEENBURGH:  I'll
12    represent to you that we put that together
13    and it's all of the reliance materials that
14    are on the list that was provided to you
15    before.
16       MR. FAES:  Okay.
17 BY MR. FAES:
18 Q  I don't know if you know the answer to this,
19    but is there anything on this flash drive in
20    front of me that -- is there anything that's
21    on the flash drive that's not already
22    reflected on your reliance list that was
23    served with your expert report?
24 A  No.

Page 9

1  Q  And is there anything on your reliance list
2     that wouldn't be on the flash drive that you
3     know of?
4  A  Not that I recall, no.
5  Q  And Doctor, I'll mark Exhibit No. 2 to your
6     deposition.
7        (Exhibit No. 2 Marked.)
8
9  BY MR. FAES:
10 Q  And can you tell me what that is?
11 A  This is the statement that I made about this
12    case.
13 Q  So, this is your expert report regarding the
14    TVT and TVT-O dated June 14th of 2014;
15    right?
16 A  That is correct, yeah.
17 Q  And that's when you signed this report?
18 A  That's correct.
19 Q  Does this report contain each of the
20    opinions that you reached regarding the TVT
21    and TVT-O products?
22 A  Ask that again.
23 Q  Does this report marked as Exhibit No. 2
24    contain each of the opinions that you've

Ragnvald Mjanger, M.D.

1    reached regarding the TVT and TVT-O
2    products?
3    A  Yes, it do.
4    Q  Yes, it does?
5    A  Yes, it does.
6    Q  Okay.  Now, in this report, you go through
7       various facts and discuss various articles.
8          Did you discuss the facts and
9       articles that you felt were most important
10      to you in drawing the opinions in your
11      report?
12   A  Yes, I did.
13   Q  There are also several articles that are
14      cited throughout your report.
15         In terms of your decision-making, why
16      did you decide to cite those particular
17      articles in your report?
18   A  The articles that I picked are the ones
19      that, you know, I feel reflect the
20      information the way I use it and know it.
21   Q  I'm not sure I understand.
22   A  There's very many articles.  There's
23      hundreds and hundreds.  I read some of them.
24      I don't necessarily read them all.  And some

1    of them I use and -- some of the articles
2    I've used here and some of them I haven't.
3    There's no way to cite them all.
4    Q  I understand.  My question is:  In terms of
5       the ones that you decided to cite, why did
6       you choose to cite those articles in
7       particular?
8    A  Because they were good articles, I felt.
9    Q  When you say they were good articles, what
10      was good about them that made you decide to
11      discuss them specifically in the body of
12      your report?
13   A  Well, they provide information that I think
14      is relevant.
15   Q  Is there any information that you
16      specifically thought was more or less
17      relevant to include within the body of your
18      report?
19   A  I can't answer that question directly the
20      way it's asked because it's too general.
21      You would have to look at each article and
22      talk about them.  I can't just give one
23      blanket statement all articles.
24   Q  Fair enough.  But in terms of your

1    decision-making when you were deciding, I
2    want to discuss this article or that
3    article, was there any factors involved in
4    those articles, such as patient sample size,
5    length of follow-up, type of study that was
6    more or less important to you in determining
7    what to specifically discuss in the body of
8    your report?
9    A  All of the above.
10   Q  So, patient sample size, length of
11      follow-up --
12   A  Right.
13   Q  -- those were all factors that you
14      considered in deciding whether or not to
15      include those studies in the body of your
16      report?
17   A  That is correct.
18   Q  Is the type of safety outcomes that's
19      measured one of the selection criteria for
20      documents that you chose to include within
21      the body of your report?
22   A  I don't understand that question.
23   Q  Which part do you not understand?  The
24      safety outcomes part?

1    A  Repeat the question.
2    Q  Okay.  The question was:  Was safety
3       outcomes one of the selection criteria --
4       strike that.
5          Was measuring safety or adverse event
6       outcomes one of the selection criteria that
7       you used in deciding what articles to
8       discuss within the body of your report?
9    A  I did not state it or use it the way you
10      worded it there.  I don't really know how to
11      answer that other than that was not a
12      specific criteria in selecting, no.
13   Q  So then, safety outcomes was not one of the
14      selection criteria for articles that you
15      chose to discuss within your expert report?
16   A  Safety outcome is important in the whole
17      field, the whole study, every article,
18      everything you do, safety outcome is the
19      main thing.  And I don't sit it down as
20      picking articles that give certain outcomes.
21      You read them no matter what outcome is in
22      the article and you compare them all to get
23      an impression of the whole picture.
24   Q  In terms of selecting articles to discuss

Ragnvald Mjanger, M.D.

Page 14

1    within the body of your report, did you try
2    to select the articles that were most
3    supportive of your opinions that the TVT and
4    TVT-O is relatively safe?
5    A   No.  My opinion comes the other way.  My
6    opinion as far as safety comes from working
7    in the field for years, seeing many, many
8    patients and reading articles of all kinds
9    of all outcomes.  You want to see articles
10   that show bad outcomes just as much as good
11   outcomes.
12   Q   What articles that were discussed in the
13   body of your expert report did you feel show
14   bad outcomes?
15   A   I can't list them right off my head.  You
16   would have to put the article in front of me
17   to look at.  When it comes to the slings,
18   I'm the user of them.  I'm interested in
19   slings that work well.  I don't have any
20   skin in this as far as what is good and what
21   is bad.  I want only the good stuff.
22   Q   Doctor, I'm going to mark as Exhibit No. 3
23   your reliance list to your expert report.
24            (Exhibit No. 3 Marked.)

Page 15

1    BY MR. FAES:
2    Q   And does this contain all of the materials
3    that you reviewed and relied upon in forming
4    your opinions in this case?
5    A   I have reviewed some of these articles.
6    Some of them are given to me by the law firm
7    to review.  I've reviewed most of them, but
8    I can't say I've reviewed every one of them.
9    Q   So, the document that's in front of you
10   marked as Exhibit No. 3 was not put together
11   by you.  It was put together by counsel for
12   Ethicon --
13   A   No.  A hundred percent.
14   Q   Let me get the whole question out.  Doctor,
15   so the document marked in front of you as
16   Exhibit No. 3, was that put together by you
17   or counsel for Ethicon and
18   Johnson & Johnson?
19   A   It was mostly put together by the lawyers.
20   Q   Okay.  And I think you testified a minute
21   ago that there were materials on this
22   reliance list that you haven't actually
23   reviewed.  Is that accurate?
24   A   There's a lot of material here.  I have read

Page 16

1    much of it.  I can't say that I've read all
2    of it.
3    Q   So, how would I -- how would we get a list
4    of all the materials you have actually
5    reviewed and relied upon in forming your
6    opinions in this case if it's not accurately
7    reflected in Exhibit No. 3?
8            MS. VAN STEENBURGH:  Object to
9    form.
10           THE WITNESS:  I don't know if I
11   can produce a list of everything I read.  You
12   know that's impossible.  These articles here,
13   this information I'm willing to discuss
14   that's laid in front of me and willing to go
15   over it.  I read a good sample of this list
16   here, and I think those articles are picked
17   well.
18   BY MR. FAES:
19   Q   So, am I correct then that as we sit here
20   today, you don't have any kind of list you
21   can give me of materials that you've
22   actually reviewed and relied upon in forming
23   your opinions in this case?
24           MS. VAN STEENBURGH:  Object to

Page 17

1    form.
2            THE WITNESS:  I cannot --
3    correct.  I cannot give you everything that
4    I've read.
5    BY MR. FAES:
6    Q   Now, in your expert report -- and it doesn't
7    have page numbers.  I kind of went through
8    and numbered them myself, excluding -- I
9    start here (indicating) with page 1.  But on
10   page number 1, which is the first page that
11   actually has, you know, the body of your
12   report at the bottom, you state that you
13   have also reviewed the plaintiffs' expert
14   reports and materials cited by plaintiffs'
15   experts.
16       Do you see that?
17   A   Yes.
18   Q   Is that a true statement?
19   A   Yes.  Well, I have not received information
20   about several plaintiffs and I have not yet
21   read them all, but I've read some.  Yes,
22   they are on the desk to be read.
23   Q   So, if you turn to the last page of Exhibit
24   No. 3, which is your reliance list, under

Page 18

1    Expert Reports --
2  A  Right.
3  Q  -- are those all expert reports that you
4     reviewed?
5  A  I have read Elliott, Klinge, Margolis.  I
6     have read one of these plaintiffs -- I
7     started reading some other ones, but they
8     were canceled.  There's one of them that
9     I've read.  I read Rosenzweig.
10  Q  You read all the Rosenzweig ones?
11  A  I can't say if I read them all.
12  Q  Are there any expert reports that you
13     reviewed and relied upon for your opinions
14     in this case that are not listed on this --
15     on the last page of your reliance list
16     marked as Exhibit No. 3?
17  A  No.
18  Q  Now, it states in your expert report that
19     you've reviewed the materials cited by
20     plaintiffs' experts as well.
21        Is that accurate?
22  A  Well, I assume so.  I have read everything
23     that I was given.
24        MS. VAN STEENBURGH:  To the

Page 19

1     extent that some of those are articles that
2     they've cited, I believe that he's looked at
3     those.
4  BY MR. FAES:
5  Q  So, I guess my question is:  First of all,
6     when you say that you've reviewed materials
7     cited by plaintiffs' experts, are you saying
8     that you've reviewed materials cited in the
9     main body of the report, or are you saying
10     that you've reviewed everything on those
11     experts' reliance list?
12  A  I haven't reviewed everything, but I've
13     looked at a good number of it.  It's too
14     much to have reviewed all of it.  I've
15     reviewed a good number of it, yes.
16  Q  Again, is there any list or document
17     anywhere that would reflect what materials
18     are cited within plaintiffs' expert reports
19     that you've actually reviewed --
20  A  No.
21  Q  -- versus -- let me get the whole question
22     out.
23        -- versus materials cited in expert
24     reports which you have not actually

Page 20

1     reviewed?
2  A  No.
3  Q  When you state that you've read materials
4     cited by plaintiffs' experts, if you -- in
5     the case where you actually reviewed that
6     material, do you review the entire document
7     cited by plaintiffs' experts, or do you just
8     review part of the document?
9  A  Some of them full document and some of them
10     part of the document.
11  Q  So, for example, Dr. Rosenzweig cites in his
12     expert report the testimony of a particular
13     medical director in a deposition or in trial
14     testimony.  Is it your typical practice to
15     go and review just the section that
16     Dr. Rosenzweig is discussing, or do you
17     review the deposition in its entirety?
18  A  I don't have a typical practice, but
19     whatever deposition Dr. Rosenzweig gave, one
20     of them I read.  I'm sure I haven't read it
21     all.
22  Q  If you turn, I guess, two pages back on your
23     reliance list marked as Exhibit No. 3,
24     there's a list labeled "Company Witness

Page 21

1     Depositions."
2  A  Where?
3  Q  Here (indicating).  It's the page where the
4     header is "Company Witness Depositions" at
5     the top.
6  A  (Witness reviews the document.)
7        I have not read those yet.
8  Q  So, you haven't read any of the depositions?
9  A  No, not yet.
10  Q  Do you know why those are on your reliance
11     list or why they were selected?
12  A  No.  I was probably supposed to read them
13     eventually.  There's so much reading here, I
14     haven't gotten to it yet.
15  Q  So, in terms of your selection for materials
16     that review and rely upon in reaching your
17     opinions in this case, do you generally rely
18     on counsel for Ethicon and Johnson & Johnson
19     to get you what you need?
20        MS. VAN STEENBURGH:  Object to
21     form.
22        THE WITNESS:  Can you tell me
23     what you mean with "this case"?  I don't know
24     if that's a general discussion.

Page 22

BY MR. FAES:

1  Q  When I say "this case," I mean the general
2     opinions in your expert report marked in
3     front of you as Exhibit No. 2.
4  A  Well, when it comes to the slings and the
5     patients, each one has to be looked at, you
6     know.  We have to look at the case.  This is
7     general information.  I haven't read
8     everything yet.  I'm working on it.  We
9     haven't had a single case in front of me
10    yet.  It's general background information.
11    There's many things here I've read and many
12    things I'm still working on.
13 Q  Right.  But my question is --
14 A  None of my opinions are premade.  I'm still
15    in the process of working on this.
16 Q  So, you're still in the process of working
17    on your expert report?
18             MS. VAN STEENBURGH:  Object to
19    form.
20             THE WITNESS:  On the literature
21    involved and the articles.  They're numerous.
22    You can sit and read every day, all day,
23    forever if you wanted.  There's so much to

Page 23

1     read.  With my schedule, I haven't read it
2     all, but I'm still working on it.
3  BY MR. FAES:
4  Q  I understand.  My question -- I don't think
5     I -- maybe I asked a poor question.  But
6     what I am trying to ask is:  In terms of the
7     materials that you felt you needed to review
8     in order to form your opinions regarding the
9     TVT and TVT-O, which is reflected in your
10    expert report that we're here to discuss
11    today, how did you decide what materials you
12    needed to review and what materials you
13    didn't need to review?  What was your
14    process?
15 A  My -- my experience and knowledge with
16    slings go back many years.  I work with them
17    all the time.  I go to conferences.  I go to
18    classes.  I read articles.  It's a work in
19    progress.  I have sat down and read a whole
20    bunch of these articles that relate to this
21    lately.  I've reviewed things that I've read
22    before.  I've read a few things that I've
23    not read before.  It's a work in progress.
24             But my opinions are not just based on

Page 24

1     a few things that I've read lately.  It's
2     based on years of reading.  I cannot list
3     for you everything that's involved in that.
4     It's many years of acquiring knowledge about
5     the products.
6  Q  So, do you feel like you could have written
7     this report without reviewing any new or
8     additional materials within the last six
9     months to a year?
10 A  No.  But I have reviewed and I haven't seen
11    any very new and different information come
12    out lately.  It is more information about
13    the same.  Different angle, different
14    article.  Nothing has been a revolutionary
15    change that I've seen.  That's the main
16    thing I have gotten out of the reading is I
17    haven't seen anything very new.
18 Q  Okay.  Let me back up a little bit and see
19    if I can maybe get at what I'm asking.
20             When were you first approached to be
21    an expert regarding the TVT and TVT-O?
22 A  I have to refer that to you.  When was that?
23    I got a call sometime -- was it in the
24    spring or -- winter or spring.

Page 25

1  Q  Just do the best you can, if you can,
2     Doctor, to the best of your recollection.
3  A  I got a call asking if I would come to a
4     meeting and talk to me about possibly doing
5     this expert work.  We had a couple meetings.
6     It hasn't been that long ago since I started
7     getting some material to read.
8  Q  So, was it the spring of this year, or was
9     it the spring of last year?
10 A  No, spring of this year.
11 Q  So, sometime in the spring of 2017 --
12 A  Right.
13 Q  -- someone working for Ethicon and
14    Johnson & Johnson approached you to
15    potentially be a general expert witness on
16    the TVT and TVT-O devices; is that accurate?
17 A  Yeah.
18 Q  And who is that who approached you?
19 A  Tracy.
20 Q  Who?
21 A  Tracy.
22             MS. VAN STEENBURGH:  Me.
23 BY MR. FAES:
24 Q  Tracy.  I'm sorry.

Ragnvald Mjanger, M.D.

1      And have you -- I'm not sure if it's
2   in your report or it was disclosed anywhere,
3   but what's your hourly rate for working
4   on --
5   A  $500.
6   Q  Okay.  And how many hours would you say
7   you've spent working on your expert report
8   and reliance list on this case?
9   A  I haven't submitted any invoice yet.  But I
10  would guess over the -- more than -- I don't
11  know exactly how many hours I have spent
12  yet.  I would have to look at it.
13  Q  Have you been keeping track of those hours
14  each month?
15  A  Yes, I have.  I have it at home, but I have
16  not submitted an invoice yet, so I haven't
17  added it up.  I can't give you an exact
18  number.
19  Q  You haven't submitted any invoices for your
20  work on the TVT and TVT-O case since you
21  started working on it in about the spring of
22  this year?
23  A  No, I have not.
24      MR. FAES:  Of course, we'll

1   request that we get a copy of those invoices
2   when they're submitted.
3      MS. VAN STEENBURGH:  Absolutely.
4   BY MR. FAES:
5   Q  And as you sit here today, you don't have --
6   you don't have any kind of estimate on the
7   total number of hours you've spent so far
8   working on the case?
9   A  No, I can't just tell you that.  I would
10  have to look it up.
11      MS. VAN STEENBURGH:  We'll
12  submit those invoices to you.
13      THE WITNESS:  I can look it up.
14  I don't have it in front of me.
15  BY MR. FAES:
16  Q  For your time sitting in your deposition
17  here today, is it the same rate, $500 an
18  hour?
19  A  That hasn't even been discussed, as far as I
20  recall.
21  Q  Do you know if you have a different rate if
22  you're called to testify at the trial?
23  A  I haven't even discussed it with the law
24  firm, no.

1      (Exhibit No. 4 Marked.)
2
3   BY MR. FAES:
4   Q  Doctor, I'm going to hand you what's been
5   marked as Deposition Exhibit No. 4.
6      What is that document?
7   A  This is my CV.
8   Q  And when was this CV last updated?
9   A  It was updated recently.  I updated it just
10  recently for this situation here.
11  Q  On the last page they're just kind of
12  dangling there, June 2015.
13      Is that when this was last updated?
14  A  I think that is probably a misprint, because
15  I updated this when I sent it to you.  Was
16  that a month or two ago?  That June 2015
17  probably shouldn't be there.  I'm sure that
18  was the previous update.
19  Q  But anyway, the CV marked in front of you as
20  Exhibit No. 4, that represents your most
21  current and updated CV or curriculum vitae;
22  correct?
23  A  Yes.
24  Q  On your CV, I don't see that you have any

1   list of any kind of peer-reviewed
2   publications; is that correct?
3   A  Yeah.  No.
4   Q  Have you written or published any articles
5   in peer-reviewed journals or articles?
6   A  No.
7   Q  Have you written any articles that have been
8   published elsewhere?
9   A  As an undergraduate student, I was part of a
10  research project in chemistry and have my
11  name on it.
12  Q  So, you haven't written anything, like, in
13  the last five years that's been published in
14  any kind of journals or articles at all?
15  A  That's correct.
16  Q  How much time did you spend preparing for
17  your deposition today?
18  A  A couple days.  Not full days.  A couple
19  half days.
20  Q  So, a couple half days yesterday --
21  A  Yes.
22  Q  -- and Tuesday?
23  A  No.  I was operating on Tuesday.  Last week.
24  Q  Okay.  And how long did you prepare for each

Raghvald Mjanger, M.D.

1  day?
2  A  For --
3  Q  How much time did you spend each of those
4  two days preparing for your deposition here
5  today?
6  A  Yesterday, I spent three hours.  And last
7  week, I spent three hours one day and I
8  think I spent two hours one day.
9  Q  And who did you meet with?
10  MS. VAN STEENBURGH:  Object to
11  form.
12  THE WITNESS:  This was at home
13  reading, going through some of these papers.
14  I met with her, Tracy, a week and a half ago,
15  two weeks ago.  We had a two-hour meeting
16  here.
17  BY MR. FAES:
18  Q  So, am I correct that you are not doing any
19  current research on any polypropylene
20  meshes?
21  A  That is correct.
22  Q  Is it true that you've never written a
23  peer-reviewed journal article on
24  polypropylene mesh?

1  A  That is correct.
2  Q  Is it correct that you've never written on
3  the Burch procedure?
4  A  That's correct.
5  Q  You've never written any peer-reviewed
6  journal or article on the Burch procedure?
7  A  That is correct.
8  Q  You've never written any peer-reviewed
9  medical journal article or co-written any
10  article on the pubovaginal sling or
11  biological slings?
12  A  That's correct.
13  Q  Do you consider yourself an academic
14  physician?
15  A  No.
16  Q  Would you agree that you're not an expert or
17  you don't hold yourself out as an expert in
18  chemical engineering?
19  A  That is correct.
20  Q  You're not an expert in pathology?
21  A  That is correct.
22  Q  You're not an expert in polymer chemistry?
23  A  That is correct.
24  Q  Do you have any background in polymer

1  chemistry?
2  A  No.
3  Q  Have you ever done any bench research on
4  polypropylene or polypropylene meshes?
5  A  No.
6  Q  Have you ever done any lab research on
7  polypropylene or polypropylene meshes?
8  A  No.
9  Q  Have you ever done any kind of pathological
10  analysis on any explanted polypropylene
11  meshes?
12  A  No.
13  Q  Would you agree that you're not a
14  biomaterials specialist?
15  MS. VAN STEENBURGH:  Object to
16  form.
17  THE WITNESS:  That's correct.
18  BY MR. FAES:
19  Q  Have you ever published -- strike that.
20  Would you agree that you've never
21  published any opinions, other than your
22  expert report that we'll discuss in a little
23  bit, that polypropylene does not degrade in
24  the human body?

1  A  That is correct.
2  Q  Have you ever published any opinions that
3  polypropylene does not create a foreign body
4  response?
5  A  That is correct.
6  Q  Do you consider yourself an expert on
7  warnings regarding medical devices?
8  A  Say that again.
9  MS. VAN STEENBURGH:  Form.
10  BY MR. FAES:
11  Q  Do you consider yourself an expert on
12  warnings of medical devices?
13  A  No.
14  Q  Would you agree that you're not an expert on
15  what risk information medical devices are
16  required to put in their IFUs, or
17  instructions for use?
18  A  That is correct.
19  Q  Would you agree you're not an expert
20  regarding what industry standards govern
21  warnings on medical devices?
22  A  That is correct.
23  Q  Do you have any kind of knowledge or
24  understanding regarding what departments of

Raghvald Mjanger, M.D.

Page 34

1    a medical device company are involved in
2    creating warnings that go in an IFU or
3    instructions for use?
4    A  No.
5            MS. VAN STEENBURGH:  Counsel,
6    we're not offering him an as IFU expert based
7    on industry standard or FDA.
8            MR. FAES:  I understand.
9    BY MR. FAES:
10   Q  Have you ever read any testimony from any
11   Ethicon or Johnson & Johnson employees
12   regarding Ethicon's position or policies
13   regarding what needs to be in an IFU or
14   instruction for use?
15   A  No, no.
16   Q  And I'm correct that you don't know what the
17   FDA requirements are regarding warnings for
18   medical devices?
19   A  Correct.
20   Q  Have you ever drafted an IFU or DFU for a
21   medical device?
22   A  No.
23   Q  Have you ever worked on any kind of warnings
24   for a medical device?

Page 35

1    A  No.
2    Q  Have you ever worked on any kind of warnings
3    or instructions for use for prescription
4    drugs?
5    A  No.
6    Q  Would you agree that physicians should be
7    made aware of all of the significant safety
8    risks associated with a product in the IFU
9    or instructions for use?
10           MS. VAN STEENBURGH:  Objection
11   to form.
12           THE WITNESS:  I do.
13   BY MR. FAES:
14   Q  Would you agree that a manufacturer of a
15   medical device that will be implanted in a
16   woman's body is required to disclose all
17   significant risks to doctors that come with
18   the use of the device?
19   A  Ask that question again.
20           MS. VAN STEENBURGH:  Form.
21   BY MR. FAES:
22   Q  Would you agree that a manufacturer of a
23   medical device that will be implanted in a
24   woman's body is required to disclose all the

Page 36

1    significant risks to doctors that come with
2    the use of that device?
3            MS. VAN STEENBURGH:  Form,
4    foundation.
5            THE WITNESS:  Yes.
6    BY MR. FAES:
7    Q  Do you hold yourself out as an expert in the
8    design of pelvic mesh products?
9    A  No.
10   Q  So, I take it, then, that you don't know
11   what standards a manufacturer must follow in
12   designing a mesh product like the TVT or
13   TVT-O?
14   A  Correct.
15   Q  You'd agree that you don't know what
16   responsibility the manufacturer holds in
17   designing a mesh product like the TVT and
18   TVT-O?
19           MS. VAN STEENBURGH:  Object to
20   form.
21           THE WITNESS:  I would assume
22   they have a responsibility to make safe
23   products, but I can't say that I know that
24   I -- I don't think that was a good question.

Page 37

1    Ask it again and I'll try.
2    BY MR. FAES:
3    Q  So, you'd agree, then, that a medical device
4    company has a responsibility to make safe
5    products?
6    A  Absolutely.
7    Q  Do you have any idea how a medical device
8    company goes about designing a medical
9    device like the TVT or TVT-O?
10   A  No.
11   Q  You don't have any kind of idea of what
12   experts or what kind of people are involved
13   in designing a medical device like the TVT
14   or TVT-O?
15   A  Some idea but no detailed information, no.
16   Q  You don't expect to offer any expert
17   opinions regarding what type of people are
18   involved in the design of a medical device
19   like the TVT or TVT-O?
20   A  No.
21   Q  Do you know what a design history file is?
22   A  No.
23   Q  So, I take it, then, that you haven't
24   reviewed the design history file for the TVT

Raghvald Mjanger, M.D.

1   or TVT-O in coming to your conclusions in
2   this case?
3   A   I can't say if I reviewed it, because I
4   don't know what -- what --
5   Q   Do you know what a failure modes effects
6   analysis is?
7   A   No.
8   Q   Do you know what a design modes effects
9   analysis is?
10  A   Technical term from a --
11  Q   I want to know if you know what that term
12  means or not.
13  A   No, I don't.
14  Q   To the best of your knowledge, have you ever
15  reviewed any of the failure modes effects
16  analysis, whether it be the design failure
17  modes, the process failure modes, or the
18  application failure modes effects analysis
19  for the TVT or TVT-O device?
20  A   Where would I see that or find that or get
21  that?  I don't -- where would that be?
22  Q   So, let me back up.
23      So, my question is:  As you sit here
24  today, you don't recall reviewing any of

1   those things --
2   A   For the company or --
3   Q   For the TVT or the TVT-O products.
4   A   Where would they be supplied?
5   Q   Well, you'd have to get them from Ethicon or
6   Johnson & Johnson.
7   A   No, I don't.
8   Q   Is that something that you feel like you
9   should review or would want to review in
10  forming your opinions in this case?
11  A   I don't have any opinion on that, because I
12  don't know what it is.  I don't believe I've
13  ever seen it.
14  Q   So, let's talk about your medical practice a
15  little bit.  Okay?
16  A   Okay.
17  Q   You -- first of all, what -- back up.
18      First of all, what surgical
19  procedures do you currently perform for the
20  treatment of stress urinary incontinence?
21  A   Synthetic midurethral retropubic sling,
22  synthetic midurethral obturator sling, and
23  the Burch procedure.
24  Q   So, you do still perform the Burch procedure

1   in your practice today?
2   A   Yes, I do.
3   Q   You do the laparoscopic as opposed to the
4   open?
5   A   Yes.
6   Q   When's the last time you did a Burch
7   procedure?
8   A   A few weeks ago.
9   Q   So, since you're still performing the Burch
10  procedure, I assume that you'll agree with
11  me that the Burch procedure for the
12  treatment of stress urinary incontinence is
13  still within the standard of care?
14  A   Yes, it is.
15  Q   Are those the only procedures that you
16  currently perform for surgical procedures
17  for stress urinary incontinence, the
18  retropubic sling, the obturator sling and
19  the Burch procedure?
20  A   Primary procedures, yes.  I also do
21  paravaginal repairs, surgery for prolapse.
22  But primarily for --
23  Q   But for stress urinary incontinence --
24  A   It's the two slings and the Burch procedure

1   are the ones I use today.
2   Q   Right.  So, for stress urinary incontinence,
3   the only surgical procedures that you
4   currently perform in your practice is the
5   retropubic polypropylene sling, the
6   obturator polypropylene sling, and the Burch
7   procedure; correct?
8   A   That is correct.
9   Q   Okay.  Now, in terms of the -- so, you don't
10  currently perform any kind of sling
11  procedures with a nonpolypropylene mesh,
12  such as natural tissue or cadaver?
13  A   No, not currently.
14  Q   But you've done that in your practice
15  before; correct?
16  A   Yes.
17  Q   Would you agree that the sling procedure
18  with a piece of fascia or cadaveric tissue
19  is still within the standard of care today
20  for the treatment of stress urinary
21  incontinence?
22  A   Yes.
23  Q   In terms of the retropubic and obturator
24  slings that you put in in your practice

Raghvald Mjanger, M.D.

Page 42

1 currently, what slings do you use?
2 A Ethicon.
3 Q What kind of Ethicon slings?
4 A For retropubic, I use TVT-Exact. And for
5 obturator, I use TVT-O.
6 Q TVT-O?
7 A Yes.
8 Q So, currently, you're not using the TVT
9 retropubic sling that's the subject -- one
10 of the subjects of your expert report.
11 You're using the TVT-Exact; right?
12 A Yes.
13 Q When did you stop using the TVT retropubic
14 or TVT classic sling?
15 A The minute I got the first TVT-Exact sling,
16 I don't know what year it was, but when it
17 came out.
18 Q Why did you stop using the TVT retropubic or
19 TVT classic sling when you first used the
20 TVT-Exact?
21 A The TVT-Exact was a newer and better model,
22 thinner insertion instrument. It made a
23 smaller tract.
24 Q So, do you feel that the TVT-Exact device is

Page 43

1 safer than the TVT retropubic device?
2 A I don't know if it's safer, but it is less
3 invasive. The idea here is minimal invasive
4 surgery. Smaller cuts and smaller sticks is
5 usually better.
6 Q Before you switched -- strike that.
7 You do have an understanding that the
8 TVT-Exact is only offered in laser-cut mesh
9 and isn't offered in mechanical-cut mesh;
10 correct?
11 A Yes, I do.
12 Q And you had that understanding before --
13 strike that.
14 You actually had that understanding
15 when you switched to the TVT-Exact, that it
16 was only offered in the laser-cut mesh
17 configuration; is that correct?
18 A That is correct.
19 Q Before you switched from the TVT retropubic
20 to the TVT-Exact, what version of the TVT
21 retropubic were you using? Were you using
22 the laser cut or mechanical cut or both or
23 do you not know?
24 A Both.

Page 44

1 Q So, were you using both simultaneously, or
2 was there a point where you switched over
3 from the mechanically cut TVT to the
4 laser-cut TVT exclusively?
5 A I can't recall exactly how it went, but it
6 probably went this way: that we used up what
7 we had and then we went to the newer ones
8 once they came in.
9 Q When you say the newer ones, do you mean the
10 laser-cut TVT retropubic?
11 A Yes. I remember there was a switch over
12 there.
13 Q Now, with regard to the TVT-O device that
14 you currently use in your practice, what
15 version of that do you use? The
16 mechanically cut or the laser cut?
17 A I think all of them are laser cut now. I
18 don't think I've seen a nonlaser cut one in
19 a long time. I use at the moment probably
20 99 percent retropubic sling. Occasionally
21 will still put in an obturator but rare. I
22 used to use obturator a lot more.
23 Q Why has your use of TVT-O slings declined?
24 Well, strike that.

Page 45

1 Let me first ask you: So, you would
2 agree with me that currently, the TVT
3 retropubic is your sling of choice for
4 stress urinary incontinence; right? Or the
5 TVT-Exact.
6 A For me, it is, right.
7 Q Yes. And not the obturator.
8 A That's correct.
9 Q And there was a time where you used to put
10 in more of the TVT-Os in your practice;
11 right?
12 A That is correct, yes.
13 Q Why has your use of the TVT-O declined in
14 favor of a retropubic approach sling?
15 A Why do I use the retropubic over the
16 obturator?
17 Q Yes. Why is that your sling of choice?
18 A Several reasons. One reason is the way the
19 sling sits, it's easier to get the obturator
20 too loose and the retropubic sling is
21 sitting different in the body and it causes
22 a little bit better support. I think
23 there's better long-term results with the
24 retropubic sling. Some studies say they're

Raghvald Mjanger, M.D.

Page 46

1    the same.  There's more studies -- I think
2    the general feeling in the field is that the
3    retropubic is a little sturdier sling and it
4    has better long-term results.  It also can
5    work for intrinsic sphincter defect while
6    the obturator -- personally, I don't think
7    it works as well for that problem.  And many
8    of the patients have mixed incontinence.
9        Another thing is, the insertion of
10   the sling is so much up to the -- it's the
11   surgeon and the hands and it is a judgment,
12   how tight you put the sling.  And if you
13   do -- if you use one kind of sling, it's
14   easier to become consistent when it comes to
15   how tight you put it.  If you go from
16   different slings -- they all have to be
17   tightened a little bit different and it's
18   easier to -- I think you get better results
19   if you stick with one sling.  That's been my
20   experience.
21 Q  So, you feel that the TVT retropubic sling
22   has better results than the TVT-O slings?
23 A  I think for a person that does the TVT all
24   the time, if you choose to do that, you get

Page 47

1   really good at putting it in and tensioning
2   it right.  You can tension a sling three
3   ways: too tight, too loose, or just right.
4   Every patient wants it just right, but when
5   they're sleeping under anesthesia and all
6   the muscles are relaxed and it looks good
7   and then you stand up when you wake up,
8   muscles tension and the whole thing is
9   different and it may be too tight or too
10   loose.
11       I think it's a very, very fine line
12   to get it adjusted right.  If you stick with
13   one sling, it's easier to be consistent than
14   if you switch between slings.
15       I also think the body of the
16   literature pretty much states that the
17   TVT -- or the retropubic sling in the
18   long-term is a better sling.  I see fewer
19   patients come back leaking after a
20   retropubic sling than a TVT-O sling.
21 Q  So, do you feel that the TVT sling overall
22   is more efficacious or has better cure rates
23   than the TVT-O sling?
24 A  Yes.  The goal is to make the patient dry

Page 48

1   and to have her dry forever, if you could.
2   I think the TVT-Exact or retropubic sling is
3   a better sling.
4 Q  Do you feel that the TVT retropubic sling
5   has a lower rate of complications than the
6   TVT-O sling?
7 A  No, I wouldn't say that.  Complications are
8   related to the insertion and I think if you
9   do many of them and if you do -- you learn
10   how to do it right and the complication rate
11   is very low in both of them if you do enough
12   of them and get experience with them.  I
13   think if you focus on one sling rather than
14   two, it's even better.
15 Q  Do you feel like there's no difference
16   between the complication rates between the
17   TVT and the TVT-O?
18 A  They're different because they go in
19   different parts of the body.  One goes
20   behind the pubic bone, almost in the pelvis,
21   so to speak.  The other one goes up in the
22   groin.  There's more leg pain with the
23   obturator sling.  And the retropubic sling,
24   I would say there's less pain, but there can

Page 49

1   be other complications if you don't do it
2   right.
3       I would say the retropubic is more
4   invasive, but the obturator causes more --
5   even though it's less invasive, it causes
6   more leg pain.
7 Q  So, you'd agree with me that sometimes a
8   surgery, even though it's more invasive, may
9   have less complications and less pain?
10 A  That is correct.
11 Q  Earlier, we were talking about your use of
12   the TVT obturator device and currently, you
13   only use laser-cut mesh; right?  Laser-cut
14   mesh for --
15 A  As far as I know, I think all the mesh now
16   is laser cut.
17 Q  Right.  That's what I wanted to follow up
18   on.
19 A  Yes, yes.
20 Q  Is it your belief that the mechanically cut
21   mesh for the TVT-O is no longer available,
22   or is it just no longer available in the
23   facilities where you practice?
24 A  I can't answer that.  I don't know.

Raghvald Mjanger, M.D.

Page 50

1  Q  So, you just don't know one way or the
2     other?
3  A  No.
4  Q  But as you sit here today, you believe that
5     the TVT laser-cut mesh is what you use
6     exclusively when you do the TVT-O procedure?
7  A  That's correct.
8  Q  Do you believe that the TVT-O laser-cut mesh
9     allows the mesh to lie flatter beneath the
10    urethra than the mechanically cut TVT-O
11    mesh?
12 A  I don't think it makes much difference if
13    you put it in right.  The laser cut is a
14    little bit more tolerant when it comes to
15    pulling it when adjusting it.  The nonlaser
16    cut, it takes very little to overstretch it
17    when you adjust it.  It's supposed to be
18    adjusted inside the sleeve.  And if you tug
19    on the sling itself, which I don't think you
20    should do, the laser cut tolerates a little
21    bit more before it frays.  But if you do it
22    right, it shouldn't matter, because you
23    shouldn't pull on the sleeve.
24 Q  Do you feel that the laser-cut mesh of the

Page 51

1     TVT-O prevents banding of the mesh better
2     than the mechanically cut mesh of the TVT-O?
3        MS. VAN STEENBURGH:  Object to
4     form.
5        THE WITNESS:  I think it does.
6     But the point is that the mesh doesn't bend
7     itself.  It's the surgeon pulling on it.  If
8     you put it in and you pull the sleeve off and
9     you think "Maybe I should have it a little
10    tighter, like two millimeters," and you try
11    to pull on it, that's where roping and bending
12    comes in.
13 BY MR. FAES:
14 Q  Do you feel like you have to tension the
15    mesh differently between a laser-cut TVT-O
16    and the mechanically cut TVT-O?
17 A  I don't think so.  I think -- you set them
18    the same way, but one is more forgiving than
19    the other if you tug a little bit on it.  I
20    think that was the improvement with the
21    laser cut.  It's a little -- it's kind of
22    like some eggs break easier than others but
23    they all break if you drop them.
24       If you tug on either one of them, you

Page 52

1     ruin them.  But the laser cut may tolerate a
2     little bit more adjustment.
3  Q  Do you recall actually -- well, strike that.
4     Let me back up.
5        What hospitals do you currently have
6     privileges to practice in?
7  A  I have at all the HealthEast hospitals.
8     They just sold out to Fairview so now
9     they're going to be called Fairview
10    Hospitals.  There's three of them that I
11    operate at: St. John's, St. Joseph's, and
12    Woodbury.  And United Hospital.  And then
13    multiple surgery centers.  But I go mostly
14    to St. John's and United, because they have
15    robots and I do a lot of robot surgery, so I
16    focus on those two places.
17 Q  What percentage of your slings would you say
18    is obturator slings?  Would you say less
19    than 2 percent?
20 A  Now it's less than 2 percent.
21 Q  When you do opt to use an obturator sling as
22    opposed to a retropubic sling, why do you
23    make that choice?  Is there a certain set of
24    patients that you feel that the obturator

Page 53

1     sling is a better option for?
2  A  Yeah.  There are some patients that have had
3     surgeries that set them up for -- it would
4     be more riskier to put it in retropubic, so,
5     in order to stay out of the abdomen, I go
6     transobturator.
7  Q  Have you used the TVT Abbrevo product
8     before?
9  A  Yes.  That's the one that -- yes, I have.
10 Q  And you know that's a product manufactured
11    by Ethicon and Johnson & Johnson; right?
12 A  I believe so.
13 Q  And how many times did you use the TVT
14    Abbrevo product?
15 A  I can't recall.
16 Q  Why is it that you used the laser-cut TVT-O
17    product as opposed to the Abbrevo product
18    when you have a patient that you're
19    implanting using the obturator approach?
20       MS. VAN STEENBURGH:  I think
21    we're getting a little far afield.
22       THE WITNESS:  Well, first of
23    all, I don't make a choice.  I use whichever
24    TVT-O we have.  You don't get to make

Ragnvald Mjanger, M.D.

Page 54

1  choices.  That goes through the committees
2  and the hospital.  They buy one kind.  Right
3  now, I'm using almost exclusively retropubic
4  slings.  I can still use an obturator if I
5  don't want to go in the belly, if I want to
6  just be outside the body.  And what slings
7  they have on the shelf right now, I can't
8  tell you.  I would have to call the hospital
9  and ask them.
10 BY MR. FAES:
11 Q  So, is it your testimony that you don't have
12    a choice about what slings to put in your --
13 A  I don't know what they have, because I
14    haven't used it lately, whether it's Abbrevo
15    or a full-length sling.  The Abbrevo has a
16    suture at the end, so there's less sling
17    material that goes into the body.  It's a
18    shorter sling.
19 Q  But you'd agree that if there's a medical
20    device that you want to use, such as the TVT
21    Abbrevo, you can go to the hospital and
22    actually request that they make that product
23    available; correct?
24 A  Yes.  But it's not an easy process.  It's a

Page 55

1  long process and I may not get it.
2  Q  Right.  Do you recall doing that
3    specifically for the TVT Abbrevo?
4  A  No.  I haven't needed it.  I believe it is
5    available in the hospital.  It's been awhile
6    since I used it.  I don't know which model
7    they have on the shelf.  Either one works.
8  Q  So, as you sit here today, you don't recall
9    ever signing a document or a form requesting
10   one of your hospitals that you practice in
11   make the TVT Abbrevo available?
12 A  I haven't had a need for it.  I haven't had
13   a need to fill out anything for it because
14   they do -- last time I asked, they did have
15   a TVT and it was an Abbrevo.  What they have
16   today, I don't know, because I haven't used
17   it for a while.
18 Q  Do you recall when the TVT-Exact became
19   available that you requested that one of
20   your hospitals make that available, as
21   opposed to using the TVT retropubic?
22 A  Yes, I remember that.  But I did not have to
23   fill out anything.  It was just we switched
24   from one to the other.  It was just a newer

Page 56

1  version of the same, pretty much.
2  Q  So, when was it that you -- well, strike
3    that.
4        First, when was it during your career
5    that you first implanted your -- I'm asking
6    a bad question.
7        When was it that you first implanted
8    a polypropylene midurethral sling in your
9    career?
10 A  It was early, but I can't recall exactly.
11   Did we talk about that once?  I can't -- I
12   can't -- I don't have a log of it.  Some
13   reason why I -- I know I went to Milwaukee
14   and observed Miller -- Dr. Miller -- do
15   slings.  It was early on when the slings had
16   come on the market.
17        MS. VAN STEENBURGH:  Okay.
18 Hold on.
19        THE WITNESS:  I don't know a
20 year.
21        MS. VAN STEENBURGH:  Before
22 going any further, I see you're going to
23 switch subjects, do you mind --
24        MR. FAES:  Oh, sure, sure.

Page 57

1  Let's go off the record.
2        (Recess began - 9:59 a.m.)
3        (Recess ended - 10:04 a.m.)
4  BY MR. FAES:
5  Q  Doctor, we're back on the record after a
6    short break.
7        Are you ready to proceed?
8  A  Yes, I am.
9  Q  Before we went on break, we were talking
10   about your use of polypropylene midurethral
11   slings and you said you think you first used
12   it about when it first came on the market.
13        Do you think that would have been
14   1999 or 2000?
15 A  I cannot give you the year.  It was early in
16   my career, but I can't recall when.
17 Q  Do you recall what the first polypropylene
18   sling was?  Was it the Ethicon TVT or was it
19   something else?
20 A  Ethicon TVT.
21 Q  Have you used any other polypropylene
22   midurethral slings for stress urinary
23   incontinence other than the TVT, TVT-O,
24   TVT-Exact and Abbrevo?

Raghvald Mjanger, M.D.

Page 58

1  A  Yes, I have.
2  Q  What else have you used?
3  A  I have used AMS mini sling and I have used
4    Coloplast mini sling.
5  Q  Any others?
6  A  Not that I can recall.
7  Q  Never used a Bard Align or Ajust sling?
8  A  Not that I recall.
9  Q  Never used a Boston Scientific sling:
10   Obtryx, Solyx or --
11  A  No.
12  Q  But you do believe you used the AMS MiniArc
13   sling and the Coloplast Aris mini sling?
14  A  I have.
15  Q  When did you use those?
16  A  Some years ago.
17  Q  Why did you stop using them?
18  A  I just tried them on a few patients.
19  Q  And how was the results with those?
20  A  I can't recall.
21  Q  Have you ever used Ethicon's TVT Secur
22   device?
23  A  Yes.
24  Q  And how many times did you use that?

Page 59

1  A  Three.
2  Q  Why did you stop using that?
3  A  Didn't like inserting it.  I didn't like it.
4    I didn't like the feel of inserting it.
5  Q  Did you feel like the results were good, in
6    terms of safety and efficacy, with that
7    device, or do you have an opinion?
8  A  I have no opinion on that.
9  Q  How many days a week are you currently in
10   surgery?
11  A  Two full days.  Sometimes more.
12  Q  And how many polypropylene midurethral
13   slings a year would you say that you
14   currently implant in your practice?
15      MS. VAN STEENBURGH:  Did you
16   say per year?
17      MR. FAES:  Yes.
18      THE WITNESS:  I do anywhere
19   from zero to five a week.
20  BY MR. FAES:
21  Q  So, you'd say that approximately 150 to 250
22   a year?
23  A  Whatever it adds up to, yeah.
24  Q  Was there a time when you did more

Page 60

1    polypropylene midurethral slings than you're
2    currently doing?
3  A  No.
4  Q  So, would you say the amount that you do has
5    remained fairly consistent over the course
6    of your career since you've been using it?
7  A  Yeah.
8  Q  What percentage of your practice is treating
9    women as opposed to men?
10  A  A hundred percent.
11  Q  Okay.  How many times a year would you say
12   that you currently do mesh removal or
13   excision procedures?
14  A  I can't give you an exact number.
15  Q  What's your best estimate of how many mesh
16   removal or excision procedures you're
17   currently performing a year?
18  A  I do some, but I can't give you an exact
19   number.
20  Q  Do you know if it's more or less than 20 a
21   year, on average, currently?
22  A  Probably less.
23  Q  Do you know how many polypropylene
24   midurethral slings you've implanted over the

Page 61

1    course of your career?
2  A  No.
3  Q  Do you know how many meshes you've removed
4    over the course of your career?
5  A  No.
6  Q  Do you currently use any meshes for the
7    treatment of pelvic organ prolapse?
8  A  Yes.
9  Q  What meshes do you currently use for the
10   treatment of pelvic organ prolapse?
11  A  Coloplast Y-Mesh.
12  Q  Is that the Restorelle?
13  A  Yes.
14  Q  But you've used the Ethicon Artisyn Y mesh
15   in the past; correct?
16  A  I've tried it, yeah.
17  Q  Have you tried it in actual live patients?
18  A  Yes, I have.
19  Q  Okay.  How many times did you try it in
20   actual live patients?
21  A  I don't recall.
22  Q  And you've also used the Prolene Soft mesh
23   during the course of your career, right, for
24   pelvic organ prolapse?

Raghvald Mjanger, M.D.

Page 62

1   A   I can't recall that.
2   Q   We'll take a look at something a little bit
3       later, but as you sit here today, can you
4       recall whether or not you've ever used the
5       Prolene Soft mesh in your practice for the
6       repair of pelvic organ prolapse?
7   A   I can't remember.
8   Q   Do you know whether or not that's made from
9       the same material as the TVT or not?
10  A   I don't know anything about it.
11  Q   Okay.  But you have used the Prolift and the
12      Prolift+M in your practice before; right?
13  A   Yes.
14  Q   Do you know whether the Prolift is made from
15      the Gynemesh PS mesh?
16  A   I think it is.  I can't recall.  It's been
17      awhile.
18  Q   Do you know whether the Prolift is made from
19      Prolene?
20  A   Yes.
21  Q   Okay.  Are there any other meshes that
22      you've used for pelvic organ prolapse during
23      the course of your career?
24  A   I can't recall that.

Page 63

1   Q   But currently, the Coloplast Y-Mesh or the
2       Restorelle is the only surgical mesh you use
3       for the treatment of pelvic organ prolapse;
4       is that accurate?
5   A   Correct.
6   Q   Why do you use that mesh as opposed to a
7       different mesh such as the Ethicon Artisyn
8       or the Ethicon Prolene Soft?
9           MS. VAN STEENBURGH:  Counsel,
10      we're here for a general deposition on TVT
11      and TVT-O and not --
12          MR. FAES:  Your objection's
13      noted.
14          MS. VAN STEENBURGH:  Well, at
15      some point, we're going to have to move on.
16          MR. FAES:  I disagree.
17  BY MR. FAES:
18  Q   You can answer, Doctor, if you know.
19          THE WITNESS:  Ask the question
20      again.
21          MR. FAES:  Can we have the
22      court reporter read back the last question?
23          MS. VAN STEENBURGH:  Why do you
24      use the Restorelle?

Page 64

1           MR. FAES:  Let's have the court
2       reporter read back the actual question,
3       please.
4           (The record was read as requested.)
5   BY MR. FAES:
6   Q   And that mesh I am referring to is the
7       Restorelle.
8   A   I've been happy with the Restorelle.  I have
9       no reason to look for something else.
10  Q   What percentage of your practice would you
11      say is treating mesh complications or
12      complications from mesh?
13  A   I can't answer that.
14  Q   You don't know if it's more or less than 10
15      percent?
16          MS. VAN STEENBURGH:  Object to
17      form.
18          THE WITNESS:  Less than 10
19      percent.  Oh, yeah.  Less than 10 percent.
20  BY MR. FAES:
21  Q   Now, as it's stated in your expert report,
22      before you became a -- well, strike that.
23          First of all, prior to being
24      contacted by counsel for Ethicon and

Page 65

1       Johnson & Johnson in the spring of this
2       year, have you ever worked as a litigation
3       consultant for Ethicon and
4       Johnson & Johnson?
5   A   No.
6   Q   Are you currently a litigation consultant
7       for any other mesh companies?
8   A   No.
9   Q   Have you ever been an expert witness before
10      in any case?
11  A   No.
12  Q   So, you've never -- this is your first time
13      ever doing any kind of expert work; is that
14      accurate?
15  A   Yes.
16  Q   Now, before you became a litigation
17      consultant for Ethicon and Johnson &
18      Johnson, you were a consultant or preceptor
19      for Ethicon and Johnson & Johnson; correct?
20  A   Yes.
21  Q   When was it that you first became a
22      consultant for Ethicon and
23      Johnson & Johnson?
24  A   I can't recall.

Raghvald Mjanger, M.D.

Page 66

1        (Exhibit No. 5 Marked.)
2
3   BY MR. FAES:
4   Q   I'm going to hand you what's been marked as
5       Exhibit No. 5 to your deposition.  And this
6       is an e-mail dated April 10th of 2005, and
7       it's from a Scott Prefer at Ethicon.  And if
8       you look down, it states that, "I talked
9       with Dr. Mjanger, a new TVT-O user and he is
10      interested in single-event training
11      contracts.  He has five surgeons lined up to
12      train in St. Paul and I think we should
13      compensate him for his training efforts on
14      the TVT and TVT-O.  Can we pay him $500 per
15      event?  He has a lot of credibility with
16      many of the doctors in the St. Paul area.
17      He is also very interested in obtaining
18      Prolift training when we open it up to more
19      surgeons."
20          Do you see that?
21  A   Yes, I do.
22  Q   Does this refresh your recollection at all
23      that approximately in April of 2005, you
24      were first approached by Ethicon and

Page 67

1       Johnson & Johnson to be a consultant with
2       them regarding the TVT and TVT-O?
3   A   Probably correct, yeah, sure.
4   Q   Okay.  And you ultimately have signed
5       consulting contracts with them over the
6       years; right?
7   A   Yes, yes.
8   Q   Do you remember when the first consulting
9       contract that you signed with them was?
10  A   No.
11          (Exhibit No. 6 Marked.)
12
13  BY MR. FAES:
14  Q   I'm going to hand you what's been marked as
15      Exhibit No. 6 to your deposition.  I
16      apologize, Doctor.  I'm glad you have your
17      reading glasses there, Doctor.  I apologize
18      for the small print.  This is the way the
19      document was produced by the company to us.
20          MS. VAN STEENBURGH:  Then I
21      apologize on behalf of the company if it was
22      produced in that small of print, but okay.
23  BY MR. FAES:
24  Q   So, I'll represent to you that this is a

Page 68

1       file that Ethicon and Johnson & Johnson
2       keeps regarding consulting contracts it has
3       with you.  Okay?
4   A   Yeah.
5   Q   And it looks like the first page of this
6       document is a one-time preceptorship
7       agreement, and it looks like it's dated --
8       at the top, it looks like it's dated April
9       10th of 2006.  And the first date of the
10      event that you're supposed to work at is on
11      a cadaver lab on May 12th of 2006.
12          Do you see that on the first page?
13  A   Yes.
14  Q   And you were to be paid $1500 for that
15      event?
16  A   Yes, I see that.
17  Q   Do you recall that this was -- would have
18      been the first time that you signed a
19      consulting contract with Ethicon and
20      Johnson & Johnson?
21  A   No, I don't recall that.
22  Q   Do you have any reason to believe that you
23      didn't sign this contract with Ethicon and
24      Johnson & Johnson --

Page 69

1   A   No.
2   Q   -- in April of 2006?
3   A   No.  Johnson & Johnson.
4   Q   If I can have you turn in this document to
5       the Bates number ending in '5021.
6   A   (Complying.)
7   Q   And this is an ongoing preceptorship
8       agreement dated November 5th of 2006.
9          Do you see that on the first page?
10  A   Yes.
11  Q   And if you see down in paragraph three, it
12      states that the amount of this contract is
13      not to exceed $20,000.
14          Do you see that?
15  A   Right.
16  Q   And if you turn ending in '5026.  Again, I
17      apologize.  The copy on this is terrible,
18      but it does appear that this was signed by
19      you.
20  A   I can't tell.
21  Q   Do you have any reason to believe that's not
22      your signature here and you didn't sign this
23      contract in 2006?
24  A   No.

Raghvald Mjanger, M.D.

Page 70

1  Q  So, you'd agree that after signing -- it
2     appears that after signing a one-time
3     preceptorship agreement in April of 2006,
4     you then signed an ongoing preceptorship
5     agreement in November of 2006 with a maximum
6     value of $20,000; correct?
7            MS. VAN STEENBURGH:  Object to
8     form.
9            THE WITNESS:  Yes.
10 BY MR. FAES:
11 Q  If I can have you turn on this document to
12    the page ending in '5032, and this
13    appears -- tell me when you're there.
14 A  Yes.
15 Q  This appears to be another consulting
16    contract between you and Ethicon and
17    Johnson & Johnson, and it looks like the
18    date at the top is June 6th of 2008.
19        Do you see that?
20 A  Yes.
21 Q  And if you turn to the page ending in '5037,
22    again, the copy is not great, but does that
23    appear to be your signature there on this
24    contract?

Page 71

1  A  Yes.
2  Q  If I can have you turn back on the contract
3     to the page ending in '5034, I want to
4     direct your attention to paragraph 12.  And
5     if you look about three-quarters of the way
6     down in that paragraph, it states that "You
7     shall not make any representation relating
8     to the company's products or to the
9     company's clinical outcomes unless such
10    representations have been reviewed and
11    approved in advance by the company."
12        Do you see that?
13 A  Yes.
14 Q  Is that one of the terms that you agreed to
15    when you were a consultant for Ethicon and
16    Johnson & Johnson, that any representations
17    that you made regarding the safety or
18    efficacy of the TVT or TVT-O had to be
19    reviewed and approved in advance by the
20    company?
21            MS. VAN STEENBURGH:  Object to
22    form.
23            THE WITNESS:  I see the same
24    issue here.  It is on here, but I can't

Page 72

1     recall any of these papers.  But yes, I see
2     it here.
3  BY MR. FAES:
4  Q  Did you have an understanding, when you were
5     a consultant for Ethicon and Johnson &
6     Johnson, that any representations you made
7     regarding the safety of its products needed
8     to be reviewed and approved in advance by
9     the company?
10            MS. VAN STEENBURGH:  Object to
11    form.
12            THE WITNESS:  I don't recall
13    that at all.
14 BY MR. FAES:
15 Q  If you turn to page '5038 of this document,
16    this appears to be an Exhibit A to your 2008
17    contract that lists services and fees.
18 A  (Witness reviews the document.)
19        Yes.
20 Q  And actually, can you turn to the next page
21    ending in '5039.
22 A  (Complying.)
23 Q  And if you look under the last paragraph
24    there, it states that "The parties agree

Page 73

1     that the compensation to be paid to the
2     consultant," which would be you, "is not to
3     exceed $30,000 per year"; correct?
4  A  Yes.
5  Q  So, you'd agree that in 2008, you had a
6     consulting contract with Ethicon and Johnson
7     & Johnson that was worth up to $30,000 a
8     year; correct?
9            MS. VAN STEENBURGH:  Object to
10    form.
11            THE WITNESS:  Yes.
12 BY MR. FAES:
13 Q  If you look under Section 8, "Other," it has
14    a description of services.  And we're still
15    on the page ending on '5039.
16 A  Yes.  Yes.  What's the question?
17 Q  The question here is under the description
18    of services, it states that the service --
19    at least some of the services to be
20    performed are "Annual Summit and Forum
21    meetings to provide consulting inputs to
22    improve education and effectiveness of the
23    clinical education programs" --
24            MS. VAN STEENBURGH:  No, "of

Ragnvald Mjanger, M.D.

Page 74

1   the professional."  He was reading from here
2   (indicating).  I think he just misread that.
3   Sorry.  Can you just start again?
4         MR. FAES:  Sure.
5   BY MR. FAES:
6   Q  So, we're under paragraph 8 of Exhibit No.
7      6 --
8         MS. VAN STEENBURGH:  '5039?
9         MR. FAES:  Right.
10  BY MR. FAES:
11  Q  Description of the services in your contract
12     is "Annual Summit and Forum meetings to
13     provide consulting inputs to improve
14     education in the effectiveness of the
15     professional education programs.  Also will
16     include discussions of clinical and market
17     developments regarding products."
18        Do you see that?
19  A  I see that, yeah.
20  Q  So, were those part of the services that you
21     provided to Ethicon and Johnson & Johnson as
22     a consultant in 2008?
23  A  I don't think I ever went to summits.  I
24     know there was a request, but I don't think

Page 75

1   I ever went, if I remember correctly.
2   Q  You don't think you went to any summits in
3      2008?
4   A  No, no.
5   Q  Do you think you went to any summits ever
6      for Ethicon and Johnson & Johnson?
7   A  No.
8   Q  You don't recall going to a summit in 2012
9      to develop -- to evaluate the Artisyn
10     product?
11  A  What's the Artisyn product?
12  Q  The Y mesh.
13  A  I went one time to Florida, I think it was,
14     to a lab where, as part of the FDA approval,
15     it had to be inserted in a cadaver, I think,
16     and I did a cadaver placement of a Y Mesh
17     and we had a discussion afterwards with the
18     various doctors involved, what we thought
19     about it.  I remember going to that one.  I
20     don't think I went to any of those other
21     summits.  I know they were scheduled.  I
22     know I was requested.  I don't know if I
23     ever went.
24  Q  Do you know if you provided other consulting

Page 76

1   services for Ethicon and Johnson & Johnson
2   under this contract in 2008, such as
3   precepting or teaching TVT or TVT-O events?
4   A  I can't remember years.  I know over a
5   number of years, I did precepting in the
6   operating room in St. Paul, in my own
7   operating room.
8   Q  How many times would you say you've done
9   precepting for Ethicon and Johnson & Johnson
10  between 2006 and the present?
11  A  I can't give you a number, but I can tell
12  you it was mostly local doctors that were
13  learning the slings and they would come in
14  and watch me do it.  And I would sometimes
15  watch them do their first.  That's all I can
16  remember I did for Ethicon, plus that trip
17  to Florida.
18  Q  Okay.  And actually, if you -- sorry.  Let
19  me know when you're done.
20  A  That's all I have.  Yeah.
21  Q  Okay.  And actually, if you turn a page
22  forward in the same contract to the page
23  ending in '5038, under paragraph 4, it also
24  states, under Preceptor Surgical Training

Page 77

1   and it's checked "Yes" there --
2   A  Show me again the page.
3   Q  The page before, '5038.
4   A  What was the question again?
5   Q  So, in paragraph 4 of this same contract, it
6   states that, under Preceptorship Surgical
7   Training, the "Yes" box is checked.
8        Do you see that?
9   A  Yes.
10  Q  It states, "Consultant shall allow visiting
11  surgeons and visiting company sales
12  representatives to observe surgical
13  procedures involving the practice of
14  continence health and pelvic floor repair
15  procedures."
16        Do you see that?
17  A  Yes.
18  Q  And that's something that actually occurred,
19  is that Ethicon would send other doctors or
20  sales reps to observe procedures that you
21  were doing; is that correct?
22        MS. VAN STEENBURGH:  Object to
23  form.
24        THE WITNESS:  Yes.

Raghvald Mjanger, M.D.

BY MR. FAES:

Q   And you were compensated under this contract
for those activities; correct?

A   Yes.

Q   If I can have you turn in this document to
the page ending '5041.

A   (Complying.)

Q   And this appears to be another contract, the
next one between you and Ethicon and Johnson
& Johnson, dated June 5th of 2009.  Do you
see that at the top?

A   Yes.

Q   And if you turn in the same contract to the
page ending in '5048 --

A   Yes.

Q   And it states there that "Parties agree that
the compensation paid to the consultant
shall not exceed $12,000 per year, except as
mutually agreed upon by the parties";
correct?

A   That is correct.

Q   This appears that this is another contract
that you had with Ethicon and Johnson &
Johnson on June 5th of 2009 that was worth a

maximum of $12,000 per year; correct?

A   That is correct.

Q   And then the next contract is on page
ending '5051.

A   Yes.

Q   And it's dated January 25th of 2010.
Do you see that?

A   Yes.

Q   And if you turn to the page ending in '5056
of this contract, it appears that the
maximum value of this contract between you
and Ethicon and Johnson & Johnson from
January 2010 is $6,800; right?

A   That is correct.

Q   And if you turn to page '5059 of this
document, and this is a consulting contract
between you and Ethicon and Johnson &
Johnson dated February 1st of 2011.
Do you see that?

A   That's correct.

Q   And on this one, if you turn to the Exhibit
A of this contract, on the page
ending '5066, it appears that the maximum
value of this contract from 2011 between you

and Ethicon and Johnson & Johnson is $16,800
a year as well; correct?

A   Correct.

Q   And if you can turn to page '5070 of this
document, and this is a contract between you
and Ethicon and Johnson & Johnson dated
February 5th of 2012; is that correct?

A   Correct.

Q   And if you turn on this one to page ending
in '5078, and if you look down at the
bottom, there's a maximum amount of $28,000
per year?

A   Right.

Q   So, it appears that as of March of 2012, you
had another contract with Ethicon and
Johnson & Johnson that was worth a maximum
of $28,000 a year; correct?

A   Correct.

Q   So, would you agree that you were under
contract with Ethicon and Johnson & Johnson
as a consultant pretty much continuously
between April of 2006 through 2012?

        MS. VAN STEENBURGH:  I'm going
to object to the characterization for all

these questions that he was a consultant for
Johnson & Johnson.  As I look at these, it's
all with Ethicon, Inc.  I'm not aware that
Johnson & Johnson was signatory to any of
these contracts.

        So, as it pertains to Ethicon, you
can answer the question.  But I don't see
anything from --

        MR. FAES:  You don't see
"Johnson & Johnson" at the top of every page?

        MS. VAN STEENBURGH:  I see the
page, but I see the signature lines say
"Ethicon Inc."  And I also see the contract
says "Dear Dr. Mjanger, Ethicon (the company)
is pleased to have you consult."  So --

        MR. FAES:  All right.  Let's
not argue about it.

        MS. VAN STEENBURGH:  That's
fine.  I just want to make sure I get my
objection in there.

BY MR. FAES:

Q   Would you agree that you were under contract
as a consultant to Ethicon pretty much
continuously between April of 2006 through

Raghvald Mjanger, M.D.

Page 82

1    2012?
2              MS. VAN STEENBURGH: Object to
3    form.
4              THE WITNESS: Right.
5    BY MR. FAES:
6    Q  And did you understand that you were a
7       consultant both to Ethicon and also Johnson
8       & Johnson, the parent company?
9    A  That, I don't know.
10   Q  Well, you can see at the top of the first
11      contract that you signed, if you look at the
12      first page of Exhibit No. 6, see it says
13      Johnson & Johnson at the top; right?
14             MS. VAN STEENBURGH: It says "a
15      Johnson & Johnson company."
16             THE WITNESS: Right.
17   BY MR. FAES:
18   Q  And you understood that Ethicon was a
19      Johnson & Johnson company; correct?
20   A  Yes.
21   Q  Was this the last consulting agreement that
22      you signed with Ethicon and Johnson &
23      Johnson, the one dated March 5th of 2012?
24   A  I don't know.

Page 83

1    Q  But we can agree that in total, between 2006
2       and 2012, you've had contracts with Ethicon
3       and Johnson & Johnson worth up to $120,000;
4       right?
5              MS. VAN STEENBURGH: Object to
6       form.
7              THE WITNESS: I was a
8       practicing doctor using their products and
9       the sales rep asked if I would allow new
10      users to come in and watch me use it. So,
11      Scott Prefer was mentioned in here, would
12      bring doctors in to look over my shoulder.
13      That was the consulting. And each year, they
14      laid a paper in front of me that I had to
15      sign. I got a little bit of money for it.
16      It was very small amounts. It wasn't even
17      close to what you're mentioning.
18             They had an upper limit on those
19      contracts. But I did my own work. They
20      just watched me and I would answer a few
21      questions before and after. Before having
22      them in the OR, they did compensate me some.
23      It could be maybe two doctors one month and
24      half a year no doctors.

Page 84

1    BY MR. FAES:
2    Q  We can agree that if we add up the maximum
3       amount of all these contracts that you had
4       with Ethicon and Johnson & Johnson over the
5       years from 2006 to 2012, the maximum value
6       combined of all these contracts is in excess
7       of $120,000; correct?
8              MS. VAN STEENBURGH: Objection
9       to form.
10             THE WITNESS: I see that. In
11      reality, what they paid me is a fraction of
12      that.
13   BY MR. FAES:
14   Q  Well, how much have they paid you between
15      2006 through today?
16   A  I can't say, but --
17             MS. VAN STEENBURGH: I think we
18      produced that information.
19             THE WITNESS: I can't say that.
20      They would bring a doctor here and there in
21      to watch me, and that is common with any kind
22      of products we used. Visitors are interested
23      in maybe using it or learning it and they're
24      watching it; there's usually compensation for

Page 85

1    letting someone in the OR.
2    BY MR. FAES:
3    Q  So, I think I already asked this, but to the
4       best of your knowledge, the last consulting
5       contract, other than in litigation, that
6       you've signed with Ethicon or Johnson &
7       Johnson was in March of 2012; right?
8    A  I can't recall. I see there's one, yeah. I
9       haven't done any work for them. Of course,
10      there's not been that many doctors. They
11      learn it in residency. But there was a time
12      when doctors had to learn and they would
13      come and watch.
14   Q  When did you stop doing consulting work for
15      Ethicon and Johnson & Johnson?
16   A  I can't recall.
17   Q  Why did you stop doing consulting work for
18      Ethicon and Johnson & Johnson?
19   A  I'm sure there was no need for it anymore.
20   Q  Why was there no -- what was your
21      understanding of why there was no need for
22      your consulting work anymore?
23   A  The new doctors doing this work, they are
24      trained from residency to put in slings.

Raghvald Mjanger, M.D.

1   There was a time when the sling was
2   relatively new and there were practicing
3   doctors who were brought in by the
4   salespeople to watch and observe.  That's
5   what I did.  It was not much money and it
6   was not much time.  It was just letting them
7   stand and watch while I operate and ask
8   questions.
9   Q  So, when was the last time that you trained
10   someone on either the TVT or TVT-O?
11   A  I can't totally recall.  I think it's been
12   several years since I've had an observer in
13   the OR for that purpose.
14   Q  And I should have asked this in my question.
15   But is the answer the same with regard to
16   the TVT-Exact as well?
17   A  Yeah.  Whatever TVT I did, they would come
18   in and observe sometimes.  But it's been a
19   long time, I can't recall.
20   Q  And have you -- you've never been a trainer
21   or preceptor on the TVT Abbrevo; correct?
22   A  Way back -- no, no, I can't recall.  I can't
23   recall that.  It's been so many years.  I
24   know I've had people in the operating room

1   watching.  I can't recall all the details on
2   the training.  I can't recall.
3   Q  Okay.
4       (Exhibit No. 7 Marked.)
5
6   BY MR. FAES:
7   Q  Doctor, I'm going to hand you what's been
8   marked as Exhibit No. 7 to your deposition.
9   A  Okay.
10   Q  And this is a document dated August 17th of
11   2009.
12       Do you see that at the top?
13   A  Yes, I see that.
14   Q  And this is from a Laura Mettner.
15       Do you see that at the top?
16   A  Yes.
17   Q  Do you know who Laura Mettner is?
18   A  Yeah.  She's the sales rep for Ethicon.
19   Q  Do you know, is she still a sales rep for
20   Ethicon and Johnson & Johnson?
21   A  I haven't seen her for a long time, so I
22   don't know.
23   Q  Who is your current sales rep for Ethicon
24   and Johnson & Johnson?

1   A  I don't even know.
2   Q  Do you remember when the last time it was
3   that you saw a sales rep for Ethicon and
4   Johnson & Johnson?
5   A  There is a lady -- it's hard to remember.
6   Emily Egan I think works for them.
7   Q  But you don't recall the last time you've
8   ever seen a sales rep for Ethicon and
9   Johnson & Johnson?
10   A  No.  I see Emily Egan.  She does other
11   products for them, too.  There's been no
12   interest around slings for a long time.
13   Q  What other products does she have that you
14   use?
15   A  Sutures.
16   Q  And if you look in the body of this e-mail,
17   it states that "Dr. Mjanger asked me to
18   inquire about getting the TVT-O sling
19   stocked in our laser-cut mesh.  The sling is
20   exactly the same as the TVT-O that you now
21   order, only the mesh is laser cut versus
22   mechanically cut."
23   A  Yes.
24   Q  "The product code is 810081L (regular

1   product code is 810081) and the price is
2   exactly the same as the regular TVT-O
3   sling."
4       Do you see that?
5   A  Yes.
6   Q  Do you recall, in 2009, asking the sales rep
7   for Ethicon and Johnson & Johnson if you
8   could get the laser-cut TVT-O sling stocked
9   in the hospital?
10   A  I can't recall that.
11   Q  Do you have any reason to dispute this
12   fact --
13   A  No.
14   Q  -- that -- reflected by Ms. Mettner that you
15   had asked your sales rep to inquire about
16   getting the TVT-O laser cut stocked in the
17   hospital?
18   A  No.
19       MS. VAN STEENBURGH:  Let him
20   finish the question before you answer.  You
21   know where he's going.
22       THE WITNESS:  Okay.  But no.
23   BY MR. FAES:
24   Q  This is to Rjgary@healtheast.org.

Ragnvald Mjanger, M.D.

Page 90

1    Do you know who that is?
2  A  No.  I know HealthEast.
3  Q  So, HealthEast would have been one of the
4     hospitals where you had privileges to
5     practice in 2009; is that right?
6  A  Right.  Yeah.
7       (Exhibit No. 8 Marked.)
8
9  BY MR. FAES:
10 Q  Doctor, I'm going to hand you what's been
11    marked as Exhibit No. 8 to your deposition.
12    And this is an e-mail dated May 25th of
13    2010.
14       Do you see that?
15 A  Yes.
16 Q  And these e-mails kind of go in reverse
17    order, so I'm going to actually start with
18    the first communication on the string which
19    actually starts at the bottom of the first
20    page, at 8-25 under Tricia and Katy.
21       Do you see that?
22 A  Yes.
23 Q  It's an e-mail from Laura Mettner, who was
24    your Ethicon sales rep in 2010; is that

Page 91

1     right?
2  A  I see it, yeah.
3  Q  And it states, "We are also launching a new
4     retropubic sling (TVT-Exact) in June 2010.
5     This sling could replace your current TVT
6     retropubic (810041B or 810041BL in the laser
7     cut form).  TVT-Exact already comes in laser
8     cut.  I have shown Dr. Mjanger and he would
9     like to try this sling when it becomes
10    available and foresees using this
11    exclusively for his retropubic slings."
12       Do you see that?
13 A  Yes.
14 Q  Is this accurate, that in or around May of
15    2010, that your sales rep showed you the
16    TVT-Exact and you foresaw using it
17    exclusively for your retropubic slings?
18 A  I cannot remember that, but it makes sense.
19 Q  Did you have an understanding at that time
20    that the TVT-Exact only came in laser cut
21    and was not available in mechanical cut?
22 A  I cannot remember that.
23 Q  Do you remember if you believed that that
24    was a potential clinical benefit from the

Page 92

1     TVT-Exact, that it was only available in the
2     laser-cut mesh?
3  A  I cannot remember that.
4  Q  And then it goes on to state, "I have talked
5     to Dr. Ashford about it as well.  I do see
6     all the surgeons who use TVT to switch to
7     TVT-Exact."
8       Do you see that?
9  A  Yes.
10 Q  Who's Dr. Ashford?
11 A  It's a gynecologist in St. Paul.  Or
12    Maplewood.
13 Q  He's not someone that you work with; right?
14 A  No.
15 Q  Okay.  Did you have an understanding, in
16    2010, that sales reps from Ethicon and
17    Johnson & Johnson believed that all surgeons
18    who were using the TVT device would switch
19    to the TVT-Exact?
20       MS. VAN STEENBURGH:  Object to
21    form.
22       THE WITNESS:  No.  I cannot
23    recall any of it.
24

Page 93

1  BY MR. FAES:
2  Q  If you turn to the following page in the
3     same communication string, just flip it
4     over, it states that "The advantages of the
5     TVT-Exact are that a disposable handle is
6     now included in the packaging (no need for
7     the reusable introducer - this will save
8     processing time).  The needle is smaller
9     (three millimeters).  The existing TVT sling
10    is 5 millimeters."
11       Do you see that?
12 A  Yes, I see that.
13 Q  Is that your understanding of the
14    differences between the TVT-Exact and the
15    TVT retropubic?
16 A  Yes.
17 Q  Is the fact that the TVT-Exact needling is
18    smaller than the TVT retropubic a potential
19    benefit to patients?
20       MS. VAN STEENBURGH:  Object to
21    form.
22       THE WITNESS:  Yes.
23 BY MR. FAES:
24 Q  Do you feel like using a 3 millimeter needle

Ragnvald Mjanger, M.D.

Page 94

1　in the TVT-Exact is a potentially safer
2　alternative to using the 5 millimeter needle
3　in the TVT retropubic?
4　A　No.
5　Q　You don't feel like a smaller needle leaves
6　　less -- strike that.
7　　　You don't feel like a smaller needle,
8　　as used in the TVT-Exact, makes it less
9　　likely that you'll do damage to surrounding
10　　tissues and organs when you're doing the TVT
11　　procedure?
12　A　No.
13　Q　Isn't that one of the reasons, though, why
14　　you use the TVT-Exact exclusively now as
15　　opposed to the TVT retropubic?
16　A　Not for safety but for ease of insertion.
17　　It's a smaller -- it's a lot easier to
18　　insert it.  It's a smaller hole, two
19　　millimeters smaller.
20　Q　Would you agree that if a medical device is
21　　easier to insert for a physician, that is a
22　　potential safety benefit to the patient?
23　A　Yes/no.  If you put it in the wrong place,
24　　it matters.  But if you put it in the right

Page 95

1　place, it shouldn't really matter.  It's
2　　easier for me to insert it.  I have a better
3　　feel with a thinner one.  If it's done
4　　right, it shouldn't really be any different
5　　risk.
6　Q　But you'd agree that if one device is easier
7　　to insert than another, over time, the
8　　safety and efficacy rates for that device
9　　that's easier to insert will be higher than
10　　the one that's more difficult to insert;
11　　correct?
12　　　MS. VAN STEENBURGH:  Object to
13　　form.
14　　　THE WITNESS:  It's not more
15　　difficult.  It just takes a little more force
16　　to put it in.  It's not more difficult.
17　BY MR. FAES:
18　Q　So, are you saying -- so, are you now saying
19　　that the TVT-Exact is not easier to place
20　　than the TVT retropubic --
21　　　MS. VAN STEENBURGH:  Object to
22　　form.
23　　　THE WITNESS:  No.  It feels
24　　better in my hand.  It's a better tool.  I

Page 96

1　think it feels better when I put it in.  If
2　　it goes in the right track, two millimeters
3　　doesn't really make a difference in safety,
4　　if it's put where it should be.  It's hard to
5　　answer your question.
6　BY MR. FAES:
7　Q　Okay.  If you go on and read the same
8　　document, it states, "The TVT-Exact" -- well
9　　strike that.  Let me back up.
10　　　When the sales rep described the
11　　TVT-Exact to you, is one of the things that
12　　they showed and explained to you that the
13　　TVT-Exact needle is smaller than the TVT
14　　retropubic needle?
15　　　MS. VAN STEENBURGH:  Object to
16　　form.
17　　　THE WITNESS:  What was the
18　　question?
19　BY MR. FAES:
20　Q　When you were first shown the TVT-Exact
21　　product by representatives from Ethicon and
22　　Johnson & Johnson, is one of the things they
23　　explained to you was that the TVT-Exact
24　　needle was smaller than the TVT retropubic

Page 97

1　needle?
2　A　I saw that when I got it in my hand.
3　Q　Okay.  And did they explain to you that that
4　　was an advantage, as the sales rep says in
5　　this e-mail here?
6　A　I can't recall what he said to me.
7　Q　It also goes on to state in the same e-mail
8　　that the TVT-Exact only requires one cysto
9　　during the procedure.  Traditional TVT
10　　required two cystos, because you could not
11　　place both needles and then place the cysto
12　　in the urethra (the needles were too large
13　　to allow that)."
14　　　Do you see that?
15　A　Yes.
16　Q　Do you have an understanding that that's one
17　　of the differences between the TVT-Exact and
18　　the traditional TVT?
19　A　Yes.
20　Q　Did you have an understanding that that's a
21　　potential advantage to both the doctor and
22　　the patient with the TVT-Exact over the TVT?
23　　　MS. VAN STEENBURGH:  Object to
24　　form.

Ragnvald Mjanger, M.D.

Page 98

1    THE WITNESS: Yes.
2  BY MR. FAES:
3  Q  And the line below it states, "Dr. Mjanger
4    is the biggest proponent of this (and I
5    believe he is the largest user of the TVT
6    retropubic)."
7        Do you see that?
8  A  Yes.
9  Q  Do you agree with this statement, that you
10    were a big proponent of the TVT-Exact at
11    this time, in 2010?
12        MS. VAN STEENBURGH: Object to
13    form.
14        THE WITNESS: I can't recall
15    that. What I recall was when the TVT-Exact
16    was stuck in my hand, it felt good. It's
17    like getting two different screw drivers.
18    One feels good in your hand but they do the
19    exact same thing. I can do the exact same
20    procedure. One felt a little bit better in
21    the hand. There's less cysto, a little
22    quicker. You save a step. The advantages of
23    the newer model is better than the old model,
24    I think.

Page 99

1  BY MR. FAES:
2  Q  Okay. You would agree that at least in your
3    hands, the TVT-Exact feels better than the
4    classic TVT retropubic?
5        MS. VAN STEENBURGH: Object to
6    form.
7        THE WITNESS: Correct.
8  BY MR. FAES:
9  Q  If you see in the paragraph above, it
10    states, "Lastly, the design of the handle
11    offers more tactile feel to the surgeon when
12    they place the sling. A rigid catheter
13    guide is still required."
14        Do you see that?
15  A  Yeah.
16  Q  Is that an accurate description of what you
17    were telling me about earlier, that the
18    TVT-Exact handle offers a more tactile feel
19    to the surgeon when you place the Exact?
20  A  Yes.
21        (Exhibit No. 9 Marked.)
22
23  BY MR. FAES:
24  Q  Doctor, I'm going to hand you what's been

Page 100

1    marked as Exhibit No. 9 to your deposition.
2        And this is an e-mail from Laura
3    Mettner, which is your sales rep from
4    Ethicon and Johnson & Johnson, to you; is
5    that right?
6  A  Yes.
7  Q  And this is dated June 28th of 2010?
8  A  Yes.
9  Q  Do you recall getting this e-mail?
10  A  No.
11  Q  You don't have any reason to dispute that
12    this is an e-mail that would have been
13    received and reviewed by you, do you? Take
14    your time to review it, if you need to, in
15    its entirety.
16  A  (Witness reviews the document.)
17  Q  Let me know when you're ready.
18  A  Okay. Let me read it.
19        (Witness reviews the document.)
20        I see this. I can't recall it, but I
21    see it.
22  Q  But as you sit here today, you don't have
23    any reason to dispute that you would have
24    received this e-mail in 2010, do you?

Page 101

1  A  No.
2  Q  And you see it states, "Dear Dr. Mjanger,
3    Just wanted to update you on the status of
4    getting the TVT-Exact and the laser-cut mesh
5    for the TVT-O into United and Same Day."
6        Do you see that?
7  A  Yes.
8  Q  And United and Same Day are hospitals where
9    you were performing surgeries and had
10    privileges at this time, in 2010; correct?
11  A  Right.
12  Q  And "All the information and requests have
13    been made for both and we are simply waiting
14    for the value analysis committee to meet and
15    approve them."
16        Do you see that?
17  A  Yes.
18  Q  Do you recall at this time, in 2010, that
19    you were wanting to get both the TVT-Exact
20    with the laser-cut mesh and the TVT-O with
21    the laser-cut mesh into the hospitals where
22    you were practicing so you could use them?
23  A  I don't remember that.
24  Q  If you see in the paragraph below, it asks,

Page 102

1    "What can we do in the meantime to bypass
2    the value analysis committee by talking to
3    either Dr. Foley or Joan Kidd at United?"
4        Do you see that?
5    A  Yes.
6    Q  Do you recall being asked for assistance by
7    the sales rep from Ethicon and Johnson &
8    Johnson in expediting the entry of the
9    TVT-Exact and the TVT-O laser cut into the
10   hospitals where you practiced?
11   A  No.
12   Q  Do you remember doing anything to help get
13   those --
14   A  No.
15   Q  -- products into the hospitals?
16   A  I don't remember.
17       (Exhibit No. 10 Marked.)
18
19   BY MR. FAES:
20   Q  Doctor, I'm going to hand you what's been
21   marked as Exhibit No. 10 to your deposition.
22   And this is a document titled "Valuation
23   Form." And you see the product is for a
24   TVT-O laser cut.

Page 103

1        Do you see that?
2    A  Yes.
3    Q  And you see down at the bottom, it states,
4    under Requesting Physician, "Dr. Mjanger."
5        That's you; right?
6    A  Yes.
7    Q  And it states that "Evaluation occur within
8    United and Same Day Surgery." And it
9    states, "Yes, 2 TVT-O laser-cut mesh were
10   brought in and one has been used to date."
11       Do you recall the sales rep bringing
12   in a laser-cut mesh for you to use before
13   the hospital actually was ordering it and
14   making it available?
15   A  No, I can't remember that.
16   Q  Do you remember that from time to time, a
17   sales rep would bring you in a TVT or TVT-O
18   or other mesh device for you to use or try
19   for the first time?
20   A  I can't remember.
21   Q  So, you don't think that's ever happened in
22   the course of your 20-plus year career?
23   A  I can't remember.
24   Q  And it states, on this Evaluation Form,

Page 104

1    "Clinical Benefit to new product." And it
2    states "Yes."
3        Do you see that?
4    A  I see that. But this is not signed by me,
5    so I don't know if I ever saw this form.
6    Q  Do you recall whether or not you actually
7    signed this form?
8    A  I can't recall, no.
9    Q  Let me get through the rest of it and I'll
10   ask you some questions about that.
11       And it states, "TVT-O laser-cut mesh
12   is also laser cut which allows the mesh to
13   lie flatter beneath the urethra and prevents
14   banding of the mesh (better for patient).
15   There is no difference in price between the
16   laser cut and mechanical cut."
17       Do you see that?
18   A  Yes.
19   Q  And it's got a spot for your signature, but
20   at least this version of the document is not
21   signed; right?
22   A  Correct.
23   Q  Do you recall ever seeing this document
24   before?

Page 105

1    A  No.
2    Q  Do you recall if you signed this document?
3    A  No.
4    Q  Would you sign this document today if you
5    were asked to sign it?
6    A  I can't answer that. This looks to me like
7    it's something that's written by the sales
8    rep. I have not signed it. I can't recall
9    ever seeing this thing.
10   Q  You don't answer whether or not -- well,
11   strike that.
12       You can't answer whether you'd sign
13   this document today?
14   A  No, I can't answer that.
15   Q  So, if -- for example, now you use the TVT-O
16   laser-cut mesh; right?
17   A  Right.
18   Q  If, for some reason, the hospital switched
19   back to TVT-O mechanically cut mesh, would
20   you want the laser-cut mesh in the TVT-O to
21   still be available, or would you not care?
22   A  I don't know. I would have to -- I would
23   have to look into it. I just can't answer
24   that right now.

Raghvald Mjanger, M.D.

Page 106

1    Q  Do you remember from the documents that
2       we've looked at in the last five, ten
3       minutes or so whether or not you were
4       actually trying to get the TVT-O laser-cut
5       mesh into your hospitals in 2010?
6    A  I saw a document, but I can't remember
7       anything from 2010 that we did.  I just
8       cannot.
9    Q  So, let me ask you about this document.  It
10      states that the TVT-O laser-cut mesh
11      clinical benefit to the new product, yes.
12           Do you agree with that statement or
13      disagree with that statement, that there's a
14      clinical benefit to the TVT-O laser cut over
15      the TVT-O mechanical cut?
16   A  All I can remember is that years ago,
17      probably back this time here, there was some
18      talk about laser cut or no laser cut.  I
19      haven't heard more talk about it ever since,
20      before you brought it up here.  I'm curious
21      if they had one or the other.  I can't -- I
22      can't answer that.
23   Q  So, you can't answer the question, as you
24      sit here today, whether or not you agree or

Page 107

1       disagree with the statement that the TVT-O
2       laser-cut mesh provides a clinical benefit
3       over the TVT mechanical?
4    A  No, I can't.
5    Q  It also states, "Laser-cut mesh is also" --
6       strike that.
7            It also states that "The laser-cut
8       mesh allows the mesh to lie flatter beneath
9       the urethra and prevents banding of the
10      mesh."
11           Do you see that?
12   A  Yes, I see that, sir.
13   Q  Do you agree or disagree with that
14      statement?
15   A  I can't answer it like that.  This seems
16      like it's a form letter written by the sales
17      rep.  That's her or his words here.  It's
18      not mine.  I didn't write this.  The
19      discussion about laying flat or not laying
20      flat is a whole different discussion.  I
21      can't give any answer to this form here
22      really.
23   Q  So, as you sit here today, you have no
24      opinion as to whether the laser-cut mesh

Page 108

1       allows the mesh to lie flatter beneath the
2       urethra and prevents banding of the mesh?
3    A  I spoke about it earlier today, that if you
4       don't tug on it, it makes no difference.  If
5       you tug on it, it makes a difference.  You
6       shouldn't tug on it.  If you inadvertently
7       tug on it, I think the laser mesh is a
8       little stiffer and lays better.
9    Q  But irregardless of who wrote this or
10      whether you tug on the mesh or any of those
11      other factors, do you have an opinion, as
12      you sit here today, as to whether or not
13      laser-cut mesh allows the mesh to lie
14      flatter under the urethra and prevents
15      banding of the mesh?
16           MS. VAN STEENBURGH:  Objection,
17      asked and answered.  You can answer that
18      question.
19           THE WITNESS:  When you lay it
20      in, if you just lay it there without tension
21      on it, it makes no difference.  If you tug on
22      it, it makes a difference.
23   BY MR. FAES:
24   Q  So, is it your testimony that if it's

Page 109

1       laser-cut mesh and you tug on it, the
2       laser-cut mesh allows the mesh to lie
3       flatter beneath the urethra and prevents
4       banding of the mesh?
5    A  Yes.  It frays less.  It takes a little bit
6       more to distort it.  It's like a rubber
7       band.  You pull it and it won't go back.  It
8       takes a little more pulling before it won't
9       go back.
10   Q  So, you'd agree that the laser-cut mesh is
11      more resistant to deformation than the
12      mechanically cut mesh if you pull on it,
13      which allows it to lie flatter beneath the
14      urethra and prevents banding of the mesh;
15      correct?
16   A  That, I'd agree with.
17   Q  And that's better for the patient; correct?
18   A  It can be.
19   Q  And you don't recall one way or the other if
20      you signed this document in 2010 or at any
21      time?
22   A  No.
23   Q  If it turns out that you did sign this in
24      2010, would you stand by the statements that

Raghvald Mjanger, M.D.

| Page 110 |
|---|
| 1  you made in this document that you signed? |
| 2        MS. VAN STEENBURGH:  Object to |
| 3  form. |
| 4        THE WITNESS:  I didn't make the |
| 5  statement.  I -- this is written by someone |
| 6  else and my signature is not on it.  I cannot |
| 7  answer in that form.  I can't speculate that. |
| 8  BY MR. FAES: |
| 9  Q  So, if someone brought this to you to sign |
| 10  today, let's say your current rep for |
| 11  Ethicon and Johnson & Johnson brought this |
| 12  to you to sign because they wanted to make |
| 13  sure that the TVT-O laser-cut mesh stayed in |
| 14  the hospitals where you're practicing now, |
| 15  would you feel comfortable signing this |
| 16  document today or not? |
| 17        MS. VAN STEENBURGH:  Object to |
| 18  form. |
| 19        THE WITNESS:  I don't see any |
| 20  reason why I should feel comfortable signing |
| 21  it.  She's put a whole sales pitch into this. |
| 22  There's someone she's talking to.  Who does |
| 23  this form go to? |
| 24 |

| Page 111 |
|---|
| 1  BY MR. FAES: |
| 2  Q  Well, I assume it goes to your hospital to |
| 3  convince them to put the -- let's assume for |
| 4  the purpose of this question that this form |
| 5  goes to your hospital to -- for them to |
| 6  evaluate whether or not to put that product |
| 7  in the hospital. |
| 8        MS. VAN STEENBURGH:  Object to |
| 9  form. |
| 10        THE WITNESS:  I can't speculate |
| 11  on the form.  It doesn't say who it goes to. |
| 12  It doesn't say who wrote it.  It's some |
| 13  salesperson writing it.  I can't answer it. |
| 14  There's no address to.  There's no signature |
| 15  on it.  I don't know who made this statement. |
| 16  I just can't say much about that form.  It's |
| 17  a blank form. |
| 18  BY MR. FAES: |
| 19  Q  Okay.  So, you stated that you can't think |
| 20  of any reason why you would feel comfortable |
| 21  signing this today. |
| 22        Did I hear that testimony correctly? |
| 23        MS. VAN STEENBURGH:  Object to |
| 24  form. |

| Page 112 |
|---|
| 1        THE WITNESS:  Well, if my goal |
| 2  was to get it in -- I don't know.  The way |
| 3  it's written, it's more like a sales pitch |
| 4  than anything else. |
| 5  BY MR. FAES: |
| 6  Q  Okay.  So, let's assume for the purposes of |
| 7  this question that there was a potential |
| 8  that the TVT-O laser-cut mesh might be -- no |
| 9  longer be available in the hospitals where |
| 10  you have privileges and practice. |
| 11        If an Ethicon sales rep came to you |
| 12  and said "Hey, I'd like you to sign this |
| 13  form in order to convince the hospital to |
| 14  continue to make the TVT-O laser-cut mesh |
| 15  available in your hospital," would you feel |
| 16  comfortable signing this form today? |
| 17        MS. VAN STEENBURGH:  Object to |
| 18  form. |
| 19        THE WITNESS:  I would ask for |
| 20  more information.  I would have to know why |
| 21  isn't it available?  Is there something -- |
| 22  have you discovered something wrong with it? |
| 23  Is there any article on it?  I would need |
| 24  more information.  I wouldn't just sign it |

| Page 113 |
|---|
| 1  blind. |
| 2  BY MR. FAES: |
| 3  Q  Is there something in particular about |
| 4  anything in this form that makes you |
| 5  uncomfortable about signing it? |
| 6        MS. VAN STEENBURGH:  Object to |
| 7  form. |
| 8        THE WITNESS:  I don't know what |
| 9  it's for.  I don't know who it's for or who |
| 10  it's going to. |
| 11        You know, at that time I didn't know |
| 12  anything bad about laser mesh.  If they took |
| 13  it away today, it's a whole different |
| 14  situation.  I would have to find out why |
| 15  it's taken away. |
| 16  BY MR. FAES: |
| 17  Q  So, other than you don't know what this form |
| 18  is for and you don't know where it goes, is |
| 19  there anything about the content of this |
| 20  form that makes you uncomfortable?  Do you |
| 21  feel like anything is factually inaccurate |
| 22  on this form? |
| 23        MS. VAN STEENBURGH:  Object to |
| 24  form. |

Page 114

1     THE WITNESS: You know, this
2  looks like -- they're talking about the price
3  of it and all this stuff. It seems like it's
4  not really meant for -- I don't know. I
5  don't think I would sign it unless I would
6  have more information. I wouldn't just sign
7  it.
8  BY MR. FAES:
9  Q   What more information would you need in
10     order to sign it?
11  A   Why isn't it available? Why are they taking
12     it away? Maybe there's more information I
13     didn't have. I would have to figure it out.
14     MR. FAES: Off the record.
15     (Recess began - 11:07 a.m.)
16     (Recess ended - 11:14 a.m.)
17  BY MR. FAES:
18  Q   Doctor, we're back on the record after a
19     short break. Are you ready to proceed?
20  A   I'm ready.
21  Q   Okay. Sorry. I didn't hear you.
22     So, earlier, before we went on break,
23     we were looking at an evaluation form for
24     the laser-cut TVT-O product.

Page 115

1     Do you remember that?
2  A   Right.
3  Q   And you're not sure, as you sit here today,
4     whether you ultimately signed that form back
5     in 2010 or at any other time; right?
6  A   Right. I'm quite sure I didn't sign it. My
7     signature's not on it.
8  Q   But do you remember ever signing a similar
9     form for the TVT Abbrevo product?
10  A   No.
11  Q   Did you have an understanding that the TVT
12     Abbrevo product is also only offered in
13     laser-cut mesh?
14  A   In laser cut?
15  Q   Yes.
16  A   No.
17  Q   So, you don't know whether the TVT Abbrevo
18     is offered in mechanically cut mesh or not?
19  A   I don't know.
20  Q   When was the TVT Abbrevo first described to
21     you?
22  A   I can't remember.
23  Q   You put a few of them in before; right?
24  A   Yeah.

Page 116

1  Q   Do you remember if there were any clinical
2     benefits to that product that made it better
3     than the TVT-O sling?
4  A   I don't know what the result turned out to
5     be, but I know it was suggested as a less
6     mesh sling, shorter sling, that hopefully
7     would not cause the groin pain. I think
8     that was the motivation. How it turned out,
9     I don't know. I haven't heard much about
10     it, because I haven't used TVT much lately.
11     I've kind of been away from it.
12  Q   So, did you have an understanding that the
13     TVT Abbrevo had less mesh and would
14     potentially cause less inner thigh pain for
15     the patient which would be a benefit for the
16     patient?
17  A   That was supposed to be the idea.
18  Q   But you don't currently use the TVT Abbrevo
19     today when you use TVT obturator slings?
20  A   It's been so long, I can't remember which
21     one I put in last time. I can't remember.
22     MS. VAN STEENBURGH: You mean
23     as to the Abbrevo?
24     THE WITNESS: I can't recall

Page 117

1     which one it was.
2     (Exhibit No. 11 Marked.)
3
4  BY MR. FAES:
5  Q   Doctor, I'm going to hand you what's been
6     marked as Exhibit No. 11 to your deposition.
7     And this is a form entitled "Surgery New
8     Product/Procedure Request Form."
9     Do you see that at the top?
10  A   Yes.
11  Q   And if you see about a third of the way
12     down, under Physician/Requested By, it says
13     "Dr. Ron Mjanger."
14     Do you see that?
15  A   Yes.
16  Q   And that's you; right?
17  A   Yes.
18  Q   And this document is actually signed by you;
19     right?
20  A   Yes.
21  Q   Is that your signature there?
22  A   Yes, it is.
23  Q   Did you sign this document?
24  A   I assume so.

Raghvald Mjanger, M.D.

| Page 118 |
|---|
| 1   Q  Do you recall signing this document? |
| 2   A  No, no. |
| 3   Q  And it states, under Impact on Outcome, |
| 4      Clinical Benefits, it states, "Less tissue |
| 5      dissection, 83 percent less mesh in the |
| 6      adductor muscles, 32 percent less mesh |
| 7      overall." |
| 8         Do you see that? |
| 9   A  Yes. |
| 10  Q  Do you believe that a device like the |
| 11     Abbrevo that has less tissue dissection |
| 12     offers a clinical benefit over the TVT-O? |
| 13  A  That was the theory. |
| 14  Q  Do you agree that a mesh device which leaves |
| 15     83 percent -- strike that. |
| 16        Would you agree that a mesh device |
| 17     such as the Abbrevo which leaves 83 percent |
| 18     less mesh in the adductor muscles and 32 |
| 19     percent less mesh overall offers a clinical |
| 20     benefit over the TVT-O device? |
| 21  A  Like I said, that was a theory when it came |
| 22     out. |
| 23  Q  Well, it states here that this is a clinical |
| 24     benefit that's expected to be achieved from |

| Page 119 |
|---|
| 1      the TVT Abbrevo; right? |
| 2   A  Yeah.  You see that it's not checked off. |
| 3   Q  So, when you signed this document, did you |
| 4      believe that you were stating that you |
| 5      believed that this was a potential clinical |
| 6      benefit, that there would be less tissue |
| 7      dissection and 83 percent less mesh in the |
| 8      adductor muscles or not? |
| 9   A  I cannot recall signing it, but I can recall |
| 10     that that was the theory when this thing |
| 11     came out. |
| 12  Q  And you'd agree that if those theories are |
| 13     true, that that's a clinical benefit to |
| 14     patients; right? |
| 15  A  That could be. |
| 16  Q  If that's true, that would make the Abbrevo |
| 17     device a safer alternative than the TVT-O; |
| 18     right? |
| 19        MS. VAN STEENBURGH:  Object to |
| 20     form. |
| 21        THE WITNESS:  I can't answer |
| 22     that. |
| 23  BY MR. FAES: |
| 24  Q  If a product has a clinical benefit over a |

| Page 120 |
|---|
| 1      different product, does that not make it a |
| 2      safer alternative product? |
| 3   A  Theoretically, yes. |
| 4   Q  It also states that it's a hundred percent |
| 5      adjustable. |
| 6         Do you see that? |
| 7   A  Yes. |
| 8   Q  What's your understanding of what that |
| 9      means, that the Abbrevo is a hundred percent |
| 10     adjustable? |
| 11  A  I don't understand that. |
| 12  Q  Do you think a sling such as the Abbrevo, |
| 13     which is a hundred percent adjustable, is a |
| 14     potential clinical benefit over a sling |
| 15     which is not adjustable, such as the TVT? |
| 16        MS. VAN STEENBURGH:  Object to |
| 17     form. |
| 18        THE WITNESS:  I can't answer |
| 19     that, because I don't remember what -- I |
| 20     don't understand what "a hundred percent |
| 21     adjustable" means. |
| 22  BY MR. FAES: |
| 23  Q  Did you understand what "a hundred percent |
| 24     adjustable" meant when you signed this form |

| Page 121 |
|---|
| 1      in 2010? |
| 2   A  No.  And it's not checked off, either.  I |
| 3      don't think I signed that.  It's just on the |
| 4      form. |
| 5   Q  So, when you signed this form, you didn't |
| 6      have an understanding that you were agreeing |
| 7      with the statements in this document? |
| 8   A  I can't recall. |
| 9   Q  Before you signed this form, if there were |
| 10     anything that you disagreed with, you could |
| 11     have requested that it be taken off or be |
| 12     changed; correct? |
| 13  A  It is not checked off, so essentially it is |
| 14     off.  You have to check it to agree with it, |
| 15     and I had not checked it.  So, that's all I |
| 16     can say. |
| 17  Q  So, you believe that you did not agree to |
| 18     the statements on this form when you signed |
| 19     it in 2010 because it's not checked off? |
| 20        MS. VAN STEENBURGH:  Object to |
| 21     form. |
| 22        THE WITNESS:  I can't recall. |
| 23     What I see on the form that's in front of me, |
| 24     it is not checked off.  So, therefore, I have |

Raghvald Mjanger, M.D.

Page 122

1  to assume that -- I don't know why it isn't
2  checked off.
3  BY MR. FAES:
4  Q  It also -- sorry.
5  A  Maybe I didn't agree with it. Maybe it was
6     irrelevant. I can't remember.
7  Q  It also states that "Proven efficacy as
8     TVT-O Abbrevo is launching with one year of
9     Level One RCT data 97.7 success (compared in
10    head to head study with our proven TVT-O
11    sling)."
12       Do you see that?
13 A  Yes. Same thing. It's not checked off. I
14    can't speak to it, really.
15 Q  So, let me ask you this: As you sit here
16    today, do you believe that the TVT Abbrevo
17    requires less tissue dissection than the
18    TVT-O device?
19 A  No. It's the same dissection.
20 Q  Would you agree that a device that does have
21    less tissue dissection than the TVT-O, that
22    that's a potential clinical benefit to the
23    patient?
24 A  Yes.

Page 123

1  Q  As you sit here today, do you believe that
2     the TVT Abbrevo has 83 percent less mesh in
3     the adductor muscles and 32 percent less
4     mesh overall than the TVT-O?
5  A  I don't know. I see it's an unchecked thing
6     on the form here. That's all I can say
7     about it.
8  Q  So, as you sit here today, you don't know
9     one way or the other whether it's true that
10    the Abbrevo, when it's placed, has 83
11    percent less mesh in the adductor muscles
12    and 32 percent less mesh overall?
13 A  I don't know that. I just know that the
14    Abbrevo is a shorter sling. It doesn't go
15    all the way through the body. It goes
16    partially through and then there's a suture.
17    It has less mesh.
18 Q  So, would you agree that a mesh device which
19    leaves 83 percent less mesh in the adductor
20    muscles and 32 percent less mesh overall is
21    a potential clinical benefit to patients
22    receiving that device?
23 A  In theory.
24 Q  And since you don't know whether that's

Page 124

1  actually true regarding the Abbrevo device,
2  would you agree with me that you don't have
3  any opinions, as you sit here today, as to
4  whether or not the Abbrevo device is the
5  safer alternative to the TVT-O?
6  A  That's correct.
7  Q  It also states that it's a hundred percent
8     adjustable. I think I'll move on from that,
9     because you said you don't even know what
10    that means; right?
11 A  I don't know what it means. On the form, it
12    looks like it's written by the salesperson.
13    I can't answer that.
14 Q  So, you believe that this form was filled
15    out by your sales representative, Laura
16    Mettner?
17 A  Wasn't her name on it here somewhere?
18 Q  Actually, it is. "Manufacturer/Supplier
19    Contact Name: Laura Mettner."
20       MS. VAN STEENBURGH: Her name
21    is right here (indicating).
22       THE WITNESS: Yeah, I see that.
23    It's a product request form. All I signed to
24    is it's a TVT Abbrevo obturator sling for SUI

Page 125

1  in the hospital. All that information you
2  asked me, I just can't answer it. I see her
3  name on it. This was likely laid in front of
4  me by a salesperson.
5  BY MR. FAES:
6  Q  So, I guess my question was: Is it true
7     that you believe that this form that you
8     signed was likely filled out by a
9     salesperson?
10 A  Yeah, I think so.
11 Q  And at any time did you tell that
12    salesperson that you felt uncomfortable with
13    any of the statements being made in this
14    form before you signed it?
15 A  I cannot recall that.
16 Q  If you look under Other Impacts, it states,
17    "Less inner thigh pain for patient."
18       Do you see that?
19 A  In her statement?
20       MS. VAN STEENBURGH: No, right
21    here (indicating).
22 BY MR. FAES:
23 Q  Under "Other Impacts" in the same section.
24 A  Yeah. That was a theory.

Page 126

1  Q  Would you agree that a device that results
2     in less inner thigh pain for the patient is
3     a potential clinical benefit for that
4     patient?
5  A  That's correct.  And that's why we wanted to
6     try it.
7  Q  Do you have any opinions in this case as to
8     whether or not the Abbrevo device does, in
9     fact, result in less inner thigh pain for
10    the patient than the TVT-O?
11 A  I don't.
12 Q  If you also look under the section where it
13    states, "Is there a comparable
14    product/procedure in the HealthEast system
15    now?  (i.e., What will this
16    product/procedure be used in place of?)"
17    And this box is checked "Yes."  And it
18    states, "If yes, explain.  "TVT-O, Aris, and
19    MiniArc."
20       Do you see that?
21 A  Yes.
22 Q  Did you have an understanding at the time
23    you signed this form that the Abbrevo
24    device -- whether -- well, strike that.  Let

Page 127

1     me ask a better question.
2         Did you have an understanding, when
3     you signed this form, whether or not the TVT
4     Abbrevo device is considered a full-length
5     sling or a mini sling, more like the Aris or
6     MiniArc?
7  A  I can't remember my thinking when I signed
8     this form, other than similar forms are once
9     in a while in front of me if I want anything
10    in the OR that isn't there.  But I looked at
11    the TVT Abbrevo as a full sling -- in
12    between.  It was neither a mini sling or a
13    full sling.  It was a shorter sling.
14 Q  Would you agree with me that you've never
15    engaged in the study of whether or not the
16    TVT Abbrevo device results in less inner
17    thigh pain for the patient than the TVT-O?
18 A  That's correct.
19 Q  Would you agree with me that you've never
20    engaged in the study of whether or not there
21    is, in fact, less mesh with the Abbrevo
22    device in the adductor muscles than the
23    TVT-O device?
24 A  Correct.

Page 128

1  Q  Would you agree with me that you've never
2     engaged in the study of whether or not the
3     use of the TVT Abbrevo device results in
4     less chronic pain syndromes for the patient
5     than the use of the TVT-O device?
6  A  Right.
7  Q  Are you familiar with the term "chronic pain
8     syndrome" as it relates to the TVT-O device?
9         MS. VAN STEENBURGH:  Object to
10    form.
11        THE WITNESS:  No.
12 BY MR. FAES:
13 Q  You've never read any literature by anyone
14    describing chronic pain syndromes after
15    placement of the TVT-O?
16        MS. VAN STEENBURGH:  Object to
17    form.
18        THE WITNESS:  Yes.  Yes, I have
19    read about the pain, yes.
20 BY MR. FAES:
21 Q  Do you believe that development of chronic
22    pain syndromes as a result of the mesh being
23    in the obturator space in the adductor
24    muscles of the patient is a unique risk with

Page 129

1     the TVT-O as opposed to the TVT retropubic?
2         MS. VAN STEENBURGH:  Object to
3     form.
4         THE WITNESS:  I have to answer
5     that in two parts.  There's a big difference
6     between the two slings, number one.  Number
7     two, most of the groin pain that I have
8     experienced with the TVT-O sling has been
9     temporary pain, not so much as chronic.  I
10    can't recall anyone I've seen with chronic
11    pain from the TVT-O.  If there are, they are
12    few and far between.  Temporary pain I've
13    seen, and that's why we tried out the shorter
14    sling.
15 BY MR. FAES:
16 Q  So, is it your testimony that you never had
17    an experience -- never had a patient that's
18    experienced chronic pain with the TVT-O
19    sling?  And defining chronic pain as pain
20    lasting a year or longer.
21 A  I can't say that.  I can't recall anyone
22    with chronic pain.  But I can recall people
23    with temporary pain.
24 Q  And do you know how many TVT-O devices

Raghvald Mjanger, M.D.

Page 130

1    you've implanted over the course of your
2    career?  Do you have an approximation?
3    A   No.
4    Q   And you don't know how many TVT retropubic
5        devices you've implanted over the course of
6        your career?
7    A   No.
8    Q   What about TVT-Exact?
9    A   No.
10   Q   When's the last time you excised or removed
11       a TVT or TVT-O mesh?
12   A   About a month ago.
13   Q   And what was the -- first of all, do you
14       remember if it was a TVT or TVT-O?
15   A   It was a TVT.
16   Q   What was the indications for removal?
17   A   She had leukemia and she had an abscess
18       formation, and she wasn't able to fight it,
19       because she didn't have enough blood cells
20       to fight it.  So, we ended up having to go
21       in and remove the sling to help fight the
22       infection.
23   Q   So, the indication for removal was an
24       abscess?

Page 131

1    A   Yes.
2    Q   Have you ever had to excise or remove or --
3        that's a bad question.
4            Have you ever had to excise or remove
5        or cut -- actually, let me ask you two
6        different questions, make it less confusing.
7            Have you ever had to excise, or
8        remove, a mesh that was not actually exposed
9        or extruded?
10   A   Yes.
11   Q   What were the indications for the excision
12       or removals when the mesh wasn't actually
13       eroded or exposed?
14   A   Different -- different cases.
15   Q   What are some of the indications for
16       excision or removal of a mesh where the mesh
17       is not actually exposed or extruded?
18   A   The mesh has been placed in the wrong place.
19   Q   Is that the only indication for removing a
20       mesh --
21   A   No.
22   Q   -- that's not exposed?  Sorry.
23           MS. VAN STEENBURGH:  And when
24       you say not "exposed," you mean in the

Page 132

1    vaginal canal?
2            MR. FAES:  I mean exposed or
3    extruded anywhere.
4            THE WITNESS:  Sling or --
5            MS. VAN STEENBURGH:  He's
6    talking about sling.
7    BY MR. FAES:
8    Q   Actually, first, let's talk about all
9        meshes, all pelvic meshes.
10   A   What's the question?
11   Q   What are some of the indications, besides it
12       being in the wrong place, where you've had
13       to remove or revise a pelvic mesh that was
14       not either exposed or extruded?
15   A   Too tight --
16           MS. VAN STEENBURGH:  Just a
17   second.  Object to form.  I think his
18   testimony was it was placed in the wrong
19   place, not that it was just in the wrong
20   place.
21       Go ahead.
22           THE WITNESS:  Too tight.  Too
23   loose.  Pain.
24

Page 133

1    BY MR. FAES:
2    Q   Any others?
3    A   Or not placed right.
4    Q   So, you'd agree that there are situations
5        where -- strike that.
6            Are there situations where you've had
7        to excise or remove a pelvic mesh where the
8        only indication for removal was pain?
9    A   Yes.
10   Q   And how many times --
11   A   Let me answer that again.  That's the only
12       indication was pain?
13   Q   Yes.
14   A   Yes, it has happened.
15       (Exhibit No. 12 Marked.)
16
17   BY MR. FAES:
18   Q   Doctor, I'm going to hand you what's been
19       marked as Exhibit No. 12 to your deposition.
20       This is an e-mail string dated February 2nd
21       of 2012.  And this is regarding the meeting
22       that you went to in Florida regarding the
23       Artisyn mesh.
24           Do you remember talking about that?

Raghvald Mjanger, M.D.

1    A   Uh-huh.
2    Q   And actually, if you can turn to, I think,
3        what is the third page which is where the
4        string starts, and the string starts with an
5        e-mail from Brian Luscombe to you on January
6        30th, 2012.
7            Do you see that?
8    A   Yes.
9    Q   First of all, do you remember who Brian
10       Luscombe is?
11   A   I can't remember right now.
12   Q   Do you remember when the last time you had
13       contact with him was?
14   A   I can't remember that, either.
15   Q   And you can see that he copied your sales
16       rep at the time, which was Laura Mettner.
17           You do know and remember her; right?
18   A   Yes.  Laura Mettner.
19   Q   Yes.  And it starts, "Dear Dr. Mjanger, I am
20       hoping to touch base with you regarding your
21       possible participation in a commercial
22       advisory board (including a cadaver lab with
23       robot particular and straight-stick
24       stations) being held by Ethicon Women's

1        Health & Urology."
2            Do you see that?
3    A   Yes.
4    Q   And it states, "The purpose of this meeting
5        is to gather thought-leading surgeons from
6        around the U.S. who are experts in
7        laparoscopic sacrocolpopexy to discuss
8        surgical techniques and to evaluate a new
9        product that we currently have under
10       development."
11           Do you see that?
12   A   Yes.
13   Q   And it states that you would receive an
14       honorarium for your participation in this
15       event.
16           Do you see that?
17   A   Yes.
18   Q   And it states that the honoraria that you
19       would receive would be $3300, plus travel
20       and room.
21           Do you see that?
22   A   Right.
23   Q   And if you look higher up on the page, it
24       looks like you replied on Tuesday, January

1    31st, "I can go to Florida.  Ron Mjanger."
2            Right?
3    A   Yes.
4    Q   And so, you agreed to participate in this
5        commercial advisory board --
6    A   Yes.
7    Q   -- for the Artisyn product and you received
8        $3300 plus travel and room for that event;
9        right?
10   A   That's correct.
11   Q   What was your understanding, when you
12       accepted this invitation, of what your
13       duties and responsibilities would be when
14       you went to this event?
15           MS. VAN STEENBURGH:  Objection,
16       asked and answered.
17           Go ahead.
18           THE WITNESS:  They asked me if
19       I would come down to Florida and participate
20       in a cadaver lab.  They invited surgeons from
21       around the country and they had this new Y
22       mesh which they came fairly late to market
23       with and they wanted us to put it in a
24       cadaver and then answer some questions, if we

1        liked it or didn't like it.  And they wanted
2        us to be honest and tell them anything that
3        we wanted to tell them.  And I was asked to
4        use laparoscopic technique to do that
5        sacrocolpopexy on a cadaver.  The person next
6        to me did robotic insertion.  There was a
7        whole room full of us.  We all switched
8        around and we all tried it and then we went
9        into a conference room and there were
10       engineers and developers from the company
11       asking us what we thought about it.
12           We basically slaughtered them.  We
13       told them what we thought about it.  They
14       asked if we would think of switching from
15       the product we used to that product.  I
16       don't think it went very well for Ethicon.
17       It was just to give an honest opinion about
18       what the product felt like, what it looked
19       like.  Would you quit using Restorelle to
20       use this?  And I said no.
21   BY MR. FAES:
22   Q   Did you say you don't think it went very
23       well for Ethicon?
24   A   No.  They told us to give them our honest

Page 138

1  opinion and everybody did.  They said,
2  "Don't you have anything good to say about
3  us?"  You asked us to be honest.  And it was
4  not an education.  It was not sales.  They
5  just wanted to show us their product and say
6  what we thought about the product.
7      What was discussed was the mesh and
8  the feel and the color and the shape.  These
9  are surgeons like me that were using a
10  product already.
11 Q  And was this the only commercial advisory
12 board that you ever participated in with
13 Ethicon and Johnson & Johnson?
14 A  Yes, yes.
15     I don't know if the product went to
16 market after that or not.  I know they came
17 out with a Y mesh later.
18     MS. VAN STEENBURGH:  There's no
19 -- he hasn't asked you a question.
20     THE WITNESS:  Sorry.
21     MR. FAES:  No.  But I'm loving
22 it.
23 BY MR. FAES:
24 Q  So, before your counsel stopped you there,

Page 139

1  you stated that you don't know whether or
2  not the Artisyn Y mesh actually went to
3  market or not; is that correct?
4  A  I know they have a product.  I don't know
5  much about it.  I haven't used it.
6  Q  Do you recall being asked several months
7  later by sales reps for Ethicon and Johnson
8  & Johnson to try to get you to use that in
9  your practice?
10 A  I can't remember that.
11 Q  And at this commercial advisory board that
12 you participated at with Ethicon in January
13 of 2012, you -- we talked about you gave
14 them your honest feedback.
15     Do you remember giving them --
16 filling out a written evaluation form on the
17 Artisyn mesh?
18 A  I can't remember that.
19 Q  If you did fill out a written evaluation
20 form regarding the Artisyn mesh, would you
21 have been truthful and accurate in your
22 feedback to Ethicon and Johnson & Johnson
23 regarding the mesh?
24 A  I would think so.

Page 140

1      (Exhibit No. 13 Marked.)
2
3  BY MR. FAES:
4  Q  Doctor, I'm going to hand you what's been
5  marked as Exhibit No. 13 to your deposition.
6  And this is a document that states at the
7  top "Pendix II, Surgeon Questionnaire."  And
8  the evaluator name at the top, it states
9  "Ron Mjanger."
10     Do you see that?
11 A  Right.
12 Q  And it states the evaluator signature and
13 date was March 11th of 2012.  And if you
14 look at the location, it's Orlando Hospital,
15 Florida.  And the nature of the procedure is
16 sacrocolpopexy.
17 A  Yes.
18 Q  Does this appear to be the form that you
19 would have filled out at that commercial
20 meeting in Florida in February of 2012?
21 A  Uh-huh.  Yeah.
22 Q  And I want to ask you about some of the
23 comments that it looks like you made on the
24 very last page.  If you can turn to the very

Page 141

1  last page of the document.
2  A  (Complying.)
3  Q  It's page 8 of 8.
4  A  Okay.
5  Q  And it states "Comments/Observation Sheet."
6  It states "Dr. Mjanger also thought that the
7  stiffness of the mesh was important for the
8  sacral edge that is plase [sic] to the
9  arteries (pulsing) and prefers to leave very
10 soft material in this area."
11     Do you see that?
12 A  Yes.
13 Q  Is that feedback that you gave to Ethicon
14 and Johnson & Johnson regarding the vaginal
15 mesh --
16 A  Right.
17 Q  -- that you evaluated in February?
18 A  Right.
19 Q  Would you agree that stiffness of mesh is
20 very important when you're placing surgical
21 mesh anywhere in the pelvic floor or pelvic
22 area?
23 A  Not anywhere.
24 Q  When is it not important?  When is stiffness

Raghvald Mjanger, M.D.

Page 142

1    not important?
2    A  I didn't like the stiffness here.  That's
3    what I'm saying here.
4    Q  Right.  So, you would agree that if a mesh
5    is too stiff, you don't want to have that
6    edge too close to arteries, because it can
7    cause --
8    A  Right.
9    Q  -- irritation or problems; right?
10          MS. VAN STEENBURGH:  Object to
11   form.
12          THE WITNESS:  Right.
13   BY MR. FAES:
14   Q  And in general, you prefer to have very soft
15   material in the vaginal area when you're
16   placing mesh?
17          MS. VAN STEENBURGH:  Object to
18   form.
19          THE WITNESS:  Yes, yes.
20   BY MR. FAES:
21   Q  Would you agree that it's possible for a
22   mesh to be too stiff for placement in a
23   woman's vaginal tissues?
24          MS. VAN STEENBURGH:  Object to

Page 143

1    form.
2          THE WITNESS:  What mesh are you
3    talking about?
4    BY MR. FAES:
5    Q  I'm not talking about any specific mesh.
6    I'm just saying as a general concept, would
7    you agree that it's possible that a surgical
8    mesh can be too stiff to be safely placed in
9    a woman's vaginal tissues for stress urinary
10   incontinence?
11   A  I don't think I would say "safely."  It's an
12   advantage to have soft mesh for the vagina.
13   "Safely," I don't think I would say.
14   Q  So, you don't think that if the mesh is
15   potentially too stiff or stiffer than other
16   products, it can't potentially cause more
17   erosions or pain for the patient?
18   A  What mesh are you talking about?
19   Q  I'm not talking about any mesh specifically.
20   I'm just talking about in general, would you
21   agree that it's possible that a mesh can be
22   too stiff for placement for stress urinary
23   incontinence and the use of that stiff mesh
24   could potentially cause more erosions for a

Page 144

1    patient?
2          MS. VAN STEENBURGH:  Object to
3    form.
4          THE WITNESS:  Yes, yes.
5    BY MR. FAES:
6    Q  You stated earlier that you felt that soft
7    mesh was an advantage.
8       Did I hear you right?
9          MS. VAN STEENBURGH:  Object to
10   form.
11          THE WITNESS:  In some
12   situations.
13   BY MR. FAES:
14   Q  In what situations is it advantageous to
15   have a very soft mesh?
16   A  What I stated on this form.  It goes right
17   back to it, that stiffness of the mesh line
18   up against pulsating vessels.  I don't like
19   that.  I like soft mesh.  That's why I made
20   this comment right here that we started
21   with.
22   Q  So, are there any other situations where
23   it's advantageous to have a soft mesh?
24          MS. VAN STEENBURGH:  Object to

Page 145

1    form.
2          THE WITNESS:  Yes.
3    BY MR. FAES:
4    Q  What are those situations?
5    A  I like soft mesh when I do sacrocolpopexy.
6    Q  So, we talked about what situations it's
7    advantageous to have a soft mesh.  What are
8    the advantages to the physician and the
9    patient of a soft mesh?
10          MS. VAN STEENBURGH:  In a
11   sacrocolpopexy.  That's what he said.
12          THE WITNESS:  It feels good.
13   It doesn't poke against arteries.
14   BY MR. FAES:
15   Q  Do you feel that there are situations where
16   it's advantageous to have a soft mesh for
17   stress urinary incontinence?
18   A  I don't remember that being an issue in
19   stress urinary incontinence.  I don't know
20   we've had obstacles there.  I don't know how
21   to answer that.
22   Q  Have you --
23          MR. FAES:  Can you read back
24   his answer?

Raghvald Mjanger, M.D.

Page 146

1    (The record was read as requested.)
2  BY MR. FAES:
3  Q   So, have you ever evaluated any mesh that
4     you felt was a soft mesh for a stress
5     urinary incontinence?
6  A   In a study?
7  Q   In a study or anywhere.
8  A   No.
9  Q   So, is it your opinion that all of the
10    meshes that you've ever evaluated for the
11    treatment of stress urinary incontinence are
12    not stiff?
13         MS. VAN STEENBURGH:  Object to
14  form.
15  BY MR. FAES:
16  Q   Strike that.
17       So, is it your opinion that all of
18    the meshes that you've evaluated for stress
19    urinary incontinence are not soft?
20         MS. VAN STEENBURGH:  Object to
21  form.
22         THE WITNESS:  I haven't done
23    any evaluation of the soft versus hard mesh.
24

Page 147

1  BY MR. FAES:
2  Q   So, you'd agree then since you haven't done
3     any evaluations of any hard versus soft mesh
4     for the treatment of stress urinary
5     incontinence, you have no opinions as to
6     whether a softer mesh would be a safer
7     alternative design to the mesh used in the
8     TVT and TVT-O?
9  A   That's correct.
10  Q   If you look down under "Comments and
11    Intraoperative Sheet," it looks like you cut
12    the mesh and placed a suture on the sacral
13    flap for orientation, trimmed the mesh on
14    both anterior and posterior side, did not
15    round the edges.  "He cut the seam and was
16    surprised that it would not unravel."
17       Do you see that?
18  A   Yes.
19  Q   So, you gave feedback that when you cut this
20    Artisyn mesh on the seam, that you were
21    surprised that it didn't unravel?
22  A   Let me read that.
23       (Witness reviews the document.)
24         MS. VAN STEENBURGH:  I'm

Page 148

1  missing the word "surprised."  Is it there?
2         MR. FAES:  "...and was
3  surprised that it would not unravel."
4  BY MR. FAES:
5  Q   I'm reading right here (indicating).
6  A   (Witness reviews the document.)
7       You want my comment about that?
8  Q   So, my question is:  That was a feedback
9     that you gave during this evaluation, is
10    that you cut the Artisyn mesh along the seam
11    and was surprised that it would not unravel.
12       First of all, is that correct, that
13    that was feedback that you gave?
14  A   Yeah, that's the feedback that I gave.
15         MS. VAN STEENBURGH:  Objection
16  to form.  Go ahead.
17         THE WITNESS:  All of this is
18  feedback I gave.  I know what it means, too.
19  BY MR. FAES:
20  Q   So, the follow-up question is:  Why were you
21    surprised that when you cut along the seam,
22    that the mesh wouldn't unravel?
23  A   It was a mesh that had one string going
24    across creating that Y flap.  And when you

Page 149

1  trimmed it narrower, cut that one string and
2  the whole thing would fall apart.
3       This one here was made in a different
4  way so that I could trim the width down and
5  it didn't fall apart.  That was an
6  advantage.
7  Q   Right.  So, you've encountered other meshes
8     in the past where if you cut along the seam,
9     it would unravel?
10  A   Not along the seam.  You would make it
11    narrower.  Like a Band-Aid.  You cut it off
12    and make it narrower.
13  Q   Okay.  So, you had experience with other
14    meshes where when you've cut the mesh, it
15    would unravel?
16  A   Yeah.  You couldn't trim it.  This one you
17    could trim.  I think it was an AMS you
18    couldn't trim.  This one you can trim.
19  Q   So, you'd agree that a mesh that becomes
20    unraveled is a potential safety concern for
21    a patient; right?
22         MS. VAN STEENBURGH:  Object to
23  form.
24         THE WITNESS:  No, no.  We're

Raghvald Mjanger, M.D.

1  not talking about the same thing. When you
2  try to narrow the mesh, the older kind that I
3  used, it was destroyed. So, I was prevented
4  from making it narrower for a smaller person.
5  This one here had an advantage that I could
6  take the mesh strip like this (indicating)
7  and I could take my scissor and cut off the
8  side without the Y part of it falling apart.
9       So, it has nothing to do with
10  unraveling mesh. It had to do with a suture
11  that was used to hold it together. It was
12  the way it was sewed together.
13      So, this one here (indicating), I can
14  cut to different sizes, while the old one
15  you couldn't. So, that was considered an
16  advantage.
17  BY MR. FAES:
18  Q  So, I guess my follow-up question is: You'd
19    agree with me that you wouldn't want to use
20    a mesh that might become unraveled after it
21    was placed in the patient; right?
22         MS. VAN STEENBURGH: Object to
23    form.
24         THE WITNESS: Yeah.

1  BY MR. FAES:
2  Q  Okay. Another feedback that you gave --
3    actually, let me back up.
4       You said that an earlier mesh that
5    you cut would become unraveled.
6       What mesh were you referring to?
7  A  I can't recall for sure, but I think it was
8    AMS.
9  Q  Okay. An AMS Y-Mesh, do you think?
10  A  Yes.
11  Q  Like an IntePro Y-Mesh?
12  A  I can't remember. I know there was a Y mesh
13    that couldn't be trimmed. You would cut a
14    suture out of it. It was sewn together.
15  Q  Okay. And the next feedback you give is
16    that "During sewing, [you] complained that
17    the mesh curled up (edges) and it would be a
18    concern for the bladder (irritation)."
19       Do you see that?
20  A  Yes.
21  Q  And that was a feedback that you gave
22    regarding this vaginal mesh prototype that
23    you were evaluating; correct?
24         MS. VAN STEENBURGH: Object to

1    form.
2         THE WITNESS: Yes.
3  BY MR. FAES:
4  Q  You'd agree that a mesh that becomes curled
5    up could be a clinical concern for the
6    patient; right?
7  A  Yes.
8  Q  You'd agree that a mesh that becomes curled
9    up can be a clinical concern for the patient
10    regardless of whether it's used for SUI or
11    pelvic organ prolapse; right?
12         MS. VAN STEENBURGH: Object to
13    form.
14         THE WITNESS: Disagree.
15  BY MR. FAES:
16  Q  So, you don't agree that a mesh that becomes
17    curled up for stress urinary incontinence
18    has any potential to cause any kind of
19    adverse clinical outcomes for a patient?
20         MS. VAN STEENBURGH: Object to
21    form.
22         THE WITNESS: You're talking
23    about two totally different situations and
24    different things.

1  BY MR. FAES:
2  Q  I am.
3  A  Yes. This mesh, when you sew it to the
4    vagina, if you put the stitches close to the
5    edge, it rises the cut edge and that can
6    irritate the outside of the bladder. When
7    you deal with a sling, there's no stitches,
8    there's no sewing. That phenomenon doesn't
9    exist with a sling.
10  Q  So, you've never seen any kind of reports in
11    the clinical literature of a sling becoming
12    curled and causing adverse outcomes for a
13    patient?
14  A  I have never seen or heard about anyone
15    sewing into the sling rising the edge.
16    That's what I'm talking about in the Y mesh.
17    Sewing a seam close to the edge curling the
18    edge up, that wouldn't happen with a sling,
19    because we're never sewing a sling.
20  Q  I understand that. But you'd agree that
21    irrespective of whether a -- strike that.
22       With a sling, there's no sewing of
23    the sling with a suture; right?
24  A  Right.

Raghvald Mjanger, M.D.

Page 154

1  Q  But if that sling were to become curled up,
2     it could also cause a clinical concern for
3     the patient; right?
4            MS. VAN STEENBURGH:  Object to
5     form.
6            THE WITNESS:  Never seen it
7     curl up.  We're talking about two completely
8     different phenomenons.
9  BY MR. FAES:
10 Q  I just want to make sure your testimony is
11    clear on this.
12           You're not aware and you've never
13    seen any reports in the clinical literature
14    of a sling becoming curled up and causing
15    clinical problems for a patient?
16 A  What do you mean with "curled up"?  I don't
17    understand the question.  I don't understand
18    what a "curled up" sling is.  Slings are
19    taped.  Here we're talking about sewing.  I
20    don't see the connection.  I don't
21    understand the question.
22 Q  I know.  Let's forget about this document
23    for a minute.
24           I'm asking, have you ever seen --

Page 155

1     first of all, let's break it down.
2            Are you aware or have you ever seen,
3     either in your clinical practice or reported
4     in the medical literature or in documents
5     you've reviewed from Ethicon and Johnson &
6     Johnson, reports of an SUI sling, like the
7     TVT, becoming curled up?
8            MS. VAN STEENBURGH:  Object to
9     form.
10           THE WITNESS:  Explain to me
11    what "curled up" means.  I just don't know
12    what that means.  I see fraying.  I see
13    roping from overstretching a sling.  Curling
14    up I don't understand.
15 BY MR. FAES:
16 Q  You don't know what the word "curled" means?
17 A  No.  I don't see it curl.  If you pull on
18    it, it may look like it's curled.  It's from
19    overstretching.  I haven't seen a sling curl
20    up, no.
21 Q  So, you've never seen, either in the medical
22    literature, your clinical practice, or in
23    documents from Ethicon and Johnson &
24    Johnson, any reports of any mesh sling

Page 156

1     becoming rolled or curled up?
2  A  Rolled is a different story.  I just don't
3     get it.  Pulling on a sling -- a sling
4     doesn't curl up by itself.  Someone is doing
5     something to it.  It's a -- if someone
6     overstretched it or put it in wrong, you can
7     destroy it.  I've seen that.
8  Q  Okay.  So, you have seen instances where a
9     sling has been curled up?
10 A  I've seen a sling damaged.  I wouldn't call
11    it "curled up."
12 Q  Would you call it "rolled up"?
13 A  It looks like it's rolled up.  You take it
14    between your hands and pull it.  Instead of
15    flat, it becomes round.
16 Q  So, is it your opinion that the only way
17    that a mesh sling like the TVT can become
18    rolled up or curled is if someone puts too
19    much tension or force on the tape?
20 A  Yeah, I believe so.
21 Q  So, in any case where the -- where a sling
22    is found to be rolled or curled up, you
23    believe that the physician did that
24    procedure incorrectly?

Page 157

1            MS. VAN STEENBURGH:  Object to
2     form.
3            THE WITNESS:  I believe there's
4     been too much tension.  There's been an
5     attempt to adjust it after the sleeve is
6     pulled out.
7  BY MR. FAES:
8  Q  And subjecting --
9  A  If you don't pull on it, it doesn't pull
10    itself.
11 Q  So, do you believe that if you subject a
12    sling to too much tension, you've done the
13    sling incorrectly?
14 A  Yes.
15 Q  How much tension do you believe you can
16    apply to a sling in order for it to still be
17    done correctly?
18 A  You can slide the sling up and down as long
19    as it is inside the sleeve.  The minute the
20    sleeve is gone, it's done.  If you pull it
21    down, you destroy it.
22 Q  When you say "sleeve," just to make sure
23    we're on the same page, you mean the clear
24    plastic sleeve that's over the mesh; right?

Raghvald Mjanger, M.D.

Page 158

1  A  Yes.
2  Q  So, you believe that if you put any kind of
3     force on the sling once the sheaths are
4     removed, you're doing the procedure
5     incorrectly?
6          MS. VAN STEENBURGH:  Objection.
7          THE WITNESS:  Yes.
8  BY MR. FAES:
9  Q  Even when you have the sling, when you
10     implant it, there's actually a little
11     section of the mesh, the part that goes
12     underneath the urethra, that's never covered
13     by the sleeve; right?
14  A  Right.
15  Q  Are you familiar with the Babcock technique
16     at all for --
17  A  Absolutely, absolutely.
18  Q  Okay.  So, have you ever seen procedure
19     videos from Ethicon and Johnson & Johnson
20     where they place a Babcock on the piece of
21     the mesh that's not covered by the
22     sheaths --
23  A  Yes.
24  Q  -- and then tension the mesh?

Page 159

1  A  It has to be in the sleeve.  If the sleeve
2     is out, you can reach up on the sides with a
3     Babcock or whatever and pull it down a
4     little bit.
5  Q  So, have you ever seen any procedure videos
6     for the TVT that were produced by Ethicon
7     and Johnson & Johnson --
8  A  Yes.
9  Q  -- where they did exactly that.  They placed
10     the Babcock on the portion of the mesh that
11     was not covered by the sleeves and put
12     tension on it?
13  A  I can't recall that right now.
14  Q  But if there were such a video, you think
15     that would be an incorrect way to teach
16     someone how to do the TVT procedure because
17     you're putting pressure on the mesh?
18          MS. VAN STEENBURGH:  Object to
19     form.
20          THE WITNESS:  Are you talking
21     about pulling right below the urethra?
22  BY MR. FAES:
23  Q  Yes.
24  A  That would be incorrect.  That would damage

Page 160

1     the sling.
2  Q  So, if, hypothetically, Ethicon did produce
3     an educational procedure video showing that
4     the TVT was to be done in that manner, you
5     believe that they would be instructing
6     physicians incorrectly?
7  A  I would like to see that before I make an
8     opinion about the video.
9  Q  And I see that you state that your
10     preference is for a very light mesh.
11          Do you see that?
12  A  Correct.
13  Q  And is that accurate feedback that she gave
14     regarding the use of this product?
15  A  I don't understand the question.
16  Q  I'll strike that.
17          And it states that you characterized
18     the Artisyn product as "stiff."
19          Do you see that?
20  A  Yes.
21  Q  Did you feel that this mesh was too stiff
22     for its intended use?
23          MS. VAN STEENBURGH:  Object to
24     form.

Page 161

1          THE WITNESS:  Say that again.
2  BY MR. FAES:
3  Q  Did you feel that this Artisyn mesh that you
4     were evaluating was too stiff for its
5     intended use?
6  A  No.  I just liked the other one better.
7  Q  Do you think it's possible for a mesh that's
8     used in the vaginal space to be too stiff
9     for use in that space?
10  A  Possible.
11  Q  How would you know when a mesh is too stiff
12     to be safely used for stress urinary
13     incontinence?
14          MS. VAN STEENBURGH:  Form.
15          THE WITNESS:  I think it's
16     wrong to say it's too stiff to be safe.  I
17     think if I have a choice between a lighter
18     mesh versus a heavier mesh for
19     reconstruction, I would pick the lighter.
20     But I would not say they aren't safe because
21     of the weight.  I like better the lighter
22     weight.
23          MR. FAES:  Do you want to stop
24     now?

Page 162

1 MS. VAN STEENBURGH: Sure.
2 MR. FAES: Okay. Let's go off
3 the record.
4 (Recess began - 12:07 p.m.)
5 (Recess ended - 12:50 p.m.)
6 BY MR. FAES:
7 Q Okay. Doctor, we're back on the record
8 after a short break. Are you ready to
9 proceed?
10 A Yes.
11 Q Doctor, before we took a break, we were
12 talking about the Artisyn advisory board
13 committee that you took part in in 2012.
14 Do you remember that?
15 A Yes.
16 (Exhibit No. 14 Marked.)
17
18 BY MR. FAES:
19 Q I'm going to hand you a document which I
20 have marked as Exhibit No. 14. And the top
21 of this document states "Barriers Artisyn
22 will need to overcome."
23 Do you see that?
24 A Yeah.

Page 163

1 Q And the first item listed is "Our mesh will
2 be too stiff. It doesn't feel as soft as
3 current meshes on the market. They worry
4 that they'll see an increase in exposures
5 and more palpable mesh."
6 Do you see that?
7 A Yes.
8 Q Do you remember if that was one of the
9 feedbacks that came from you and the other
10 physicians that were evaluating the Artisyn
11 mesh in 2012?
12 A No. It was a big room with many doctors
13 with different forums. A few of them spoke
14 a little bit. This seemed to me -- this is
15 what we got out of the meeting.
16 MS. VAN STEENBURGH: Listen to
17 his question. Was this one of the things
18 that you said?
19 THE WITNESS: No, no. Not me.
20 BY MR. FAES:
21 Q So, you don't remember that being discussed
22 at this meeting?
23 A No. Well, yeah, they talked about soft
24 versus not soft and this and that. I can't

Page 164

1 remember any specific things from the
2 meeting.
3 Q Do you believe that if a surgical mesh is
4 too stiff, that that can cause an
5 increase -- potentially cause an increase in
6 exposures and more palpable mesh?
7 A I don't know what mesh you're talking about.
8 I don't know what surgeries you're talking
9 about.
10 Q Well, would you agree in general that if a
11 mesh is too stiff, it can potentially cause
12 an increase in exposures and more palpable
13 mesh?
14 A I can't answer that.
15 Q You don't think it's possible for a mesh to
16 be too stiff to where it can cause an
17 increase in exposures and more palpable
18 mesh?
19 A Hernia meshes. You have all kinds of
20 meshes. I just don't know -- I can't give
21 you a general statement.
22 Q Do you think it's possible for a stress
23 urinary incontinence mesh to be too stiff to
24 where you see an increase in exposures and

Page 165

1 more palpable mesh?
2 A No. Can you make it? If you make it hard
3 as steel, yeah. Can you make it? Probably
4 could. Anything that I know of that is
5 being used that is so stiff? No.
6 Q At what point do you -- well, strike that.
7 Is there any objective standard that
8 you apply to determine when a mesh would be
9 too stiff to be used for stress urinary
10 incontinence?
11 A I don't evaluate mesh stiffness.
12 Q So, when you're issuing your opinions in
13 this case regarding the TVT and TVT-O, mesh
14 stiffness is not one of the factors that you
15 evaluated in issuing your opinions?
16 A No.
17 Q Look down on number three, looks like it's
18 got a comment from you where it states, "One
19 of the concerns from Dr. Mjanger is that all
20 of these Y meshes come laser cut which is
21 great."
22 A Where is this?
23 Q It's number three.
24 A Number five?

Raghvald Mjanger, M.D.

1  Q  Number three. I'm starting on the first
2     sentence -- the second sentence in. So,
3     I'll start over.
4         "One of the concerns from Dr. Mjanger
5     is that all these Y meshes come laser cut,
6     which is great. But when you trim the mesh,
7     the edges are prickly. He feels the prickly
8     edges can cause irritation to the bladder
9     which will cause urge incontinence."
10        Do you see that?
11 A  Yes. What I was not aware of at first is
12    that stiff mesh was made extra stiff on
13    purpose by adding in Prolene. It was some
14    dissolvable component. It was made stiff on
15    purpose. That's what that discussion was
16    about.
17 Q  But my first question is: Is this feedback
18    that you gave during your evaluation of the
19    Artisyn mesh?
20 A  Yeah. I thought it was too stiff. I didn't
21    like the stiffness.
22 Q  But you also stated that -- strike that.
23        You also stated the fact that the
24    mesh came laser cut, which was great.

1         Is that feedback that you gave, that
2     having a laser-cut mesh was great?
3  A  I can't recall that. Today, I don't even
4     know how it's cut. I can't recall that part
5     of the discussion. I can just recall that
6     there were -- when I complained of it being
7     stiff, they told me that was just -- it
8     would soften up after a few weeks.
9  Q  Well, in your practice today, if someone
10    tells you that a mesh that you're going to
11    use for stress urinary incontinence is laser
12    cut, do you think that's great?
13        MS. VAN STEENBURGH: Object to
14    form.
15        THE WITNESS: I don't think
16    it's relevant today in a prolapse surgery. I
17    use the same over and over again.
18        MS. VAN STEENBURGH: No, no.
19    He said stress urinary incontinence.
20 BY MR. FAES:
21 Q  Okay. Let me re-ask the question.
22 A  Yeah.
23 Q  If you're evaluating a potential surgical
24    mesh for the treatment of stress urinary

1     incontinence and you're told, before using
2     that mesh, that the mesh is laser cut, do
3     you think that that's great?
4  A  I can only compare the two that I'm using
5     which, in the old days, the nonlaser cut.
6     In the new days, the laser cut. I think the
7     laser cut is a little more forgiving when I
8     handle it. I don't see any difference in
9     the results. I don't think one is more
10    dangerous for the patient. The new one is a
11    little more stronger when it comes to
12    handling it.
13 Q  And it also states that when you trim the
14    mesh, the edges are prickly and that you
15    felt that prickly edges can cause irritation
16    to the bladder which will cause urge
17    incontinence.
18 A  That's strictly to sacrocolpopexy.
19 Q  So, you don't think that a mesh for stress
20    urinary incontinence can have prickly edges
21    which can cause irritation to the bladder?
22 A  I don't think we trim that at all and
23    there's no sewing into it, so there's no
24    bending up of the edges. It's a whole

1     different phenomenon for a sacrocolpopexy.
2  Q  In theory, if a mesh for stress urinary
3     incontinence did have prickly edges, that
4     could cause irritation to the bladder, just
5     like the sacrocolpopexy mesh; right?
6  A  Theoretically, if you were on a planet where
7     they sew the slings, yes --
8         MS. VAN STEENBURGH: Object to
9     form.
10        THE WITNESS: -- but in reality
11    on planet Earth where we don't sew it, I
12    don't think it's relevant.
13 BY MR. FAES:
14 Q  And have you ever seen any reports of
15    complaints to physicians -- from physicians
16    to Ethicon and Johnson & Johnson complaining
17    of TVT and TVT-O meshes having prickly
18    edges?
19 A  I can't recall that. You would have to show
20    me that report. I can't recall that.
21 Q  So, if there are, in fact, multiple reports
22    by physicians to Ethicon and Johnson &
23    Johnson of physicians experiencing prickly
24    edges with the TVT and the TVT-O devices,

Raghvald Mjanger, M.D.

1  does that change your opinion at all of
2  whether or not those prickly edges can cause
3  irritation to the bladder which can cause
4  urge incontinence?
5          MS. VAN STEENBURGH:  Object to
6  form.
7          THE WITNESS:  Number one, I
8  would have to see a report before I say what
9  I think about it.  Second of all, in my
10  practice, I can't say that I noticed anything
11  different with the two different cuts, other
12  than ease of handling.  One I have to be a
13  little more delicate with.
14  BY MR. FAES:
15  Q  So, as you sit here today, in forming your
16  opinions in this case, do you recall whether
17  or not you've seen reports by physicians to
18  Ethicon and Johnson & Johnson reporting
19  prickly edges of the TVT and TVT-O devices?
20  A  I can't recall that, no.  No.
21  Q  Do you recall whether or not you've seen in
22  any documents indicating that frayed edges
23  of the mesh was actually the number one
24  complaint to Ethicon and Johnson & Johnson

1  regarding the TVT and the TVT-O?
2          MS. VAN STEENBURGH:  Object to
3  form.
4          THE WITNESS:  Well, my point is
5  that the edges don't fray themselves.  The
6  surgeon would have to tug on them to fray
7  them.  If they're put in right and no pulling
8  on them, then there is no fraying.  So, I
9  think either sling could if you use it right.
10  BY MR. FAES:
11  Q  If it turns out that mesh in the TVT and the
12  TVT-O can, in fact, become frayed without
13  any excessive tension or misuse by the
14  physician, would that change any of your
15  opinions in this case as to whether or not
16  the TVT and TVT-O is safe and effective?
17          MS. VAN STEENBURGH:  Object to
18  form.
19          THE WITNESS:  That's a
20  hypothetical, because I haven't seen that.  I
21  can't speak to it if I haven't seen it.
22  BY MR. FAES:
23  Q  So, have you seen any memorandums from
24  Ethicon's medical directors stating that

1  fraying is actually inherent in the
2  construction of the TVT mechanically cut
3  mesh?
4  A  I can't recall the document, but I know it's
5  possible I've seen it.  If I see it again, I
6  might recognize it.
7  Q  If fraying is, in fact, inherent in the
8  construction of the TVT and TVT-O
9  mechanically cut mesh, would that indicate a
10  product defect to you?
11  A  Ask that again, please.
12  Q  If fraying is actually inherent in the
13  construction of the TVT and TVT-O mesh,
14  would that indicate to you a potential
15  product defect in the TVT and TVT-O?
16          MS. VAN STEENBURGH:  Object to
17  form.
18          THE WITNESS:  No.  One was an
19  older version and one is a newer version.
20  Just because you get a new car in 2017
21  doesn't mean the 2016 was defective.  There's
22  a new development.
23          I've heard talk about fraying and all
24  that stuff.  I think there was an advantage

1  with the laser cut in the fact that it is a
2  little bit more tolerant to manhandling.  We
3  have to handle this.  I mean, we have to
4  adjust them.  It's nice to have a product
5  that tolerates a little bit more.  The other
6  one, I've never seen it be a problem for me
7  with my patients.  I know I had to take one
8  out and put another one in.  I put too much
9  tension on it.  I see less of that with the
10  new product.  I don't think one is more
11  unsafe or safer than the other.
12  BY MR. FAES:
13  Q  So --
14  A  I know there's been discussion that I'm
15  aware of.  In reality, I don't think it
16  makes a heck of a lot of difference if you
17  handle it carefully.
18  Q  If a medical device company makes two
19  devices to treat the same condition and one
20  is shown to be -- conclusively shown to be
21  safer than the other, do you think the
22  medical device company has an obligation to
23  stop selling the less safe device?
24          MS. VAN STEENBURGH:  Object to

Raghvald Mjanger, M.D.

Page 174

1    form.
2          THE WITNESS:  Well, of course.
3    But it has also to do with the benefits.  You
4    have to weigh benefits against risk.  So,
5    there's a whole evaluation.
6  BY MR. FAES:
7  Q  If it's shown that there's two medical
8    devices for the same indication and they
9    have the same benefits but one is shown to
10   be safer than the other, do you think the
11   medical device company has an obligation to
12   tell doctors and patients the fact that one
13   device is safer than the other?
14         MS. VAN STEENBURGH:  Object to
15   form.
16         THE WITNESS:  If it's safer,
17   yeah.
18  BY MR. FAES:
19  Q  So, regardless of how it occurs, whether
20   it's from the physician or it's inherent in
21   the construction, would you agree that if
22   the TVT mesh or the TVT-O mesh has prickly
23   edges, that those prickly edges can
24   potentially cause irritation to the bladder

Page 175

1    which will cause urge incontinence?
2          MS. VAN STEENBURGH:  Object to
3    form.
4          THE WITNESS:  Are you talking
5    about slings?
6  BY MR. FAES:
7  Q  Yes.
8  A  They're not even around the bladder.
9    They're around the urethra.  They're far
10   away from the bladder.
11  Q  Well, it's possible for a midurethral sling
12   to actually erode into the bladder, isn't
13   it?
14  A  If the surgeon put it in the wrong place.
15  Q  So, it's your testimony that the only way
16   that a TVT mesh can become eroded into the
17   bladder is if the surgeon placed it
18   incorrectly?
19  A  Yes.
20  Q  So, you don't believe that a surgeon can
21   place a TVT retropubic sling correctly and
22   that the TVT mesh can migrate on its own and
23   erode through the bladder?
24  A  No.

Page 176

1  Q  So, in any case where you've seen where the
2    TVT erodes into the bladder, you believe
3    that that physician has done the procedure
4    incorrectly; is that correct?
5          MS. VAN STEENBURGH:  Object to
6    form.
7          THE WITNESS:  Yes, I do believe
8    that.
9  BY MR. FAES:
10  Q  If a physician performs the TVT retropubic
11   procedure incorrectly to where the mesh
12   erodes through the bladder, would you say
13   that that physician has fallen below the
14   standard of care in the treatment of that
15   patient?
16  A  That's not a fair general statement.  You
17   would have to look at what -- are you
18   dealing with a 400-pound patient or are you
19   dealing with a normal-size patient?  There
20   are things that make the procedure
21   difficult.
22  Q  So, if it's a normal-size patient and that
23   occurs, do you feel that that physician has
24   fallen below the standard of care?

Page 177

1          MS. VAN STEENBURGH:  Object to
2    form.
3          THE WITNESS:  If everything is
4    normal, slings could not go in the bladder,
5    no.  We do look in the bladder.  So, we check
6    on it.
7  BY MR. FAES:
8  Q  Right, during the procedure.
9  A  Right.
10  Q  But have you had instances where a physician
11   has implanted the TVT, done the cystoscopy
12   to look for eroded mesh in the bladder, the
13   cystoscopy is clean, and later the TVT mesh
14   has eroded into the bladder?
15         MS. VAN STEENBURGH:  Object to
16   form.
17         THE WITNESS:  No.
18  BY MR. FAES:
19  Q  It's never happened?
20  A  I don't believe that that migrates on its
21   own.  I've never seen it.
22  Q  So, I take it -- okay.  So, you've never
23   seen it.  Have you ever reviewed any reports
24   in the medical literature where that's

Raghvald Mjanger, M.D.

1    occurred?
2          MS. VAN STEENBURGH:  Evidence
3    of migration?
4          THE WITNESS:  I don't believe
5    slings migrate at all.  They don't migrate.
6    If you came in the OR, I would show you.
7    They don't migrate.  They sit where you put
8    them.
9    BY MR. FAES:
10   Q   Do you know whether that's one of the
11   potential adverse events warned of in the
12   TVT IFU?
13   A   Say that again.
14   Q   Do you know whether or not that's one of the
15   potential adverse events Ethicon warns of in
16   the TVT IFU, instructions for use?
17   A   I don't believe a sling migrates any more
18   than an earring can migrate from one ear to
19   another.  It stays where you pierce it in.
20   Q   So, I take it then -- strike that.
21         Have you ever reviewed the IFU, or
22   instructions for use, for any polypropylene
23   midurethral sling and seen a warning that
24   the sling can migrate as one of the

1    potential adverse reactions?
2    A   I have read the document.  I don't believe
3    this thing migrates.
4    Q   So, any manufacturer who puts that as a
5    potential adverse reaction in their IFU, you
6    believe that that company is putting
7    incorrect information in their IFU?
8          MS. VAN STEENBURGH:  Object to
9    form.
10         THE WITNESS:  I don't know what
11   they put in the meaning of "migrate."  I just
12   don't know what they're talking about there.
13   Because the way I see it, things -- if you
14   pierce something in, it usually sits where
15   you pierce it.  The thing is the piercing
16   goes in.  I've never seen them migrate.  I
17   don't believe they migrate.  Can it slide in
18   the hole?  Possibly.  Does it migrate?  No, I
19   don't believe that.
20         So, I'm sure there's some language
21   misunderstanding here or something.  We're
22   talking about two different things.  I don't
23   believe they migrate in that form there.
24

1    BY MR. FAES:
2    Q   So, you'd agree that if a manufacturer warns
3    of potential for migration of the mesh or
4    the device in their instructions for use,
5    that you're not even sure what that means;
6    correct?
7    A   If I stuck it in the wrong place, it would
8    be nice if I could say it migrated there.  I
9    think I'm responsible for where I stick it.
10   If you find it where it should be, it's most
11   likely I put it there.
12   Q   I understand, but my question is a little
13   different than that.
14         My question is:  If a medical device
15   manufacturer warned of mesh or device
16   migration as a potential adverse event of
17   that device, are you saying that you don't
18   even know what that means if they put that
19   warning in there?
20         MS. VAN STEENBURGH:  Object to
21   form.
22         THE WITNESS:  I don't believe
23   it migrates.  I would like to know -- I
24   just -- I don't think it migrates, meaning

1    moving from one point to another.
2    BY MR. FAES:
3    Q   So, Doctor, we've talked a little bit about
4    the fact that you are basing your opinions
5    regarding differences between the
6    mechanically cut mesh and laser-cut mesh for
7    the TVT and TVT-O on your clinical
8    experience, is that accurate, that you're
9    basing your opinions on part of your
10   clinical experience?
11   A   Clinical experience and also my education,
12   my going to review courses and meetings,
13   seminars every year, reading texts,
14   reviewing articles.  The whole body of
15   learning.
16   Q   So, let me ask you this:  Do you keep track
17   of how many mechanically cut slings you've
18   placed versus laser-cut slings that you've
19   placed?
20   A   No.
21   Q   So, you've never tracked whether -- so, I
22   take it since you can't even -- strike that.
23         I take it since you haven't even
24   tracked how many laser-cut slings you've put

Raghvald Mjanger, M.D.

Page 182

1  in versus mechanically cut slings, you've
2  never tracked whether that difference
3  impacts your complication rates; correct?
4  A  No, I never noticed any difference at all
5  once the sling is put in correctly.
6  Q  But my question is:  You've never done any
7  kind of formal analysis of your own clinical
8  practice regarding difference in
9  complication rates between the mechanically
10  cut mesh and the laser-cut mesh; correct?
11  A  Correct.
12  Q  A couple of the articles that you discuss in
13  your expert reports are from Dr. Ulmsten's
14  original cohort of patients in 1996;
15  correct?
16  A  Correct.
17  Q  Are you aware that Dr. Nilsson was actually
18  paid by Ethicon and Johnson & Johnson for
19  the results of that study?
20  A  No.
21  Q  So, you haven't seen any documents or
22  testimony indicating that Ethicon and
23  Johnson & Johnson actually paid Dr. Ulmsten
24  $450,000 to publish the results of that

Page 183

1  study but would only pay that amount if the
2  results were similar to his 1996 study?
3        MS. VAN STEENBURGH:  Object to
4  form.
5        THE WITNESS:  No.
6  BY MR. FAES:
7  Q  Do you think such an incentive payment would
8  inject potential bias into the reporting of
9  those results if the doctor is told "We'll
10  pay you to publish this article but only if
11  the results are as good as your previous
12  paper"?
13        MS. VAN STEENBURGH:  Object to
14  form.
15        THE WITNESS:  That went on in
16  the last century.  I have no opinion about
17  what they did back then.
18  BY MR. FAES:
19  Q  But those original patients are the same
20  patients that were followed up for 17 years
21  in Nillson's follow-up study; right?
22  A  I think that results -- there's been so many
23  studies on these things, so many, probably
24  more than on anything else ever used for

Page 184

1  incontinence.  We have today a large amount
2  of data about these.  What the original
3  inventors dealt with and how they came about
4  their findings, I just don't know anything
5  about it.  I think at this point today, it's
6  irrelevant.  It's taken on a life of its own
7  and it's been used around the world for so
8  long.
9  Q  But you'd agree that the Ulmsten/Nilsson
10  series of studies is actually the longest
11  follow-up for the TVT at this point in time;
12  right?
13  A  Yes.
14  Q  In fact, it's the longest follow-up of any
15  polypropylene midurethral sling on the
16  market; right?
17  A  It would have to be.  They invented it.
18  They are the first to publish on it.  Their
19  information is the oldest.
20  Q  And you don't think the fact that Ethicon
21  and Johnson & Johnson paid for the
22  clinical -- strike that.
23        You don't think the fact that Ethicon
24  and Johnson & Johnson paid Dr. Ulmsten to

Page 185

1  publish the original results of that
2  clinical study in any way effects or injects
3  potential bias into those results?
4        MS. VAN STEENBURGH:  Object to
5  form.
6        THE WITNESS:  I can't speak to
7  it.  I don't know enough about it.  There are
8  probably many sides to that.  I have no clue
9  about that.
10        MR. FAES:  Kind of off track
11  there.  I'm going to go back to the Artisyn
12  lab that you participated in.
13        (Exhibit No. 15 Marked.)
14
15  BY MR. FAES:
16  Q  I'm going to hand you, Doctor, what's been
17  marked as Exhibit No. 15 to your deposition.
18  And this is a PowerPoint entitled "Artisyn
19  Y-Shaped Mesh Advisory Board, March 11,
20  2012."
21        Do you see that?
22  A  Uh-huh.
23  Q  And if you turn to the inside page, it lists
24  a number of doctors that are faculty, and

## Page 186

1  you're listed there on the bottom, Ron
2  Mjanger; right?
3  A  Yeah.
4  Q  So, you were faculty for this event?
5  A  I was one of the guys that told them what I
6  thought about it.  There was no teaching or
7  anything.  Just seeing it and feeling it for
8  the first time and sewing it into a cadaver
9  and answering questions about what it felt
10  like.
11  Q  And if you look at the next page, there's
12  also a number of Ethicon Gynecare attendees
13  listed?
14  A  Uh-huh.
15  Q  Do you know who any of these individuals
16  are, as you sit here today?
17  A  One of them.
18  Q  Who is that?
19  A  Aaron Kirkemo.
20  Q  And is that because Dr. Kirkemo actually
21  used to practice in the Minnesota area?
22  A  Uh-huh.  Yes.
23  Q  Have you -- when's the last time you've
24  spoken to Dr. Kirkemo?

## Page 187

1  A  Some years ago I ran across him at a meeting
2  where he was working for a company -- I
3  don't know which company.  I don't know what
4  he was there for.  But he was not there as a
5  doctor.  He was there as a corporate person.
6  He's quit surgery.  He's retired from that.
7  Q  But at this time, in 2012, he was an
8  associate medical director with Ethicon and
9  Johnson & Johnson; right?
10          MS. VAN STEENBURGH:  Object to
11  form.
12          THE WITNESS:  I don't know.  I
13  don't know what he was.
14  BY MR. FAES:
15  Q  If you turn to I think it's page 2 of this
16  document, pages ending in '2717 --
17  A  Okay.
18  Q  -- and if you see in the section here, it
19  talks about the unique +M material having
20  better handling and better tissue in-growth.
21          Do you see that?
22  A  Yes.
23  Q  Did you understand that to be referring to
24  the +M mesh material that was used in the

## Page 188

1  Artisyn Y mesh?
2  A  First time I've seen it.  I don't know.
3  Q  So, you don't remember that being discussed
4  at any --
5  A  No.
6  Q  -- of the Artisyn ad boards that you
7  attended?
8  A  No.
9  Q  If you look at the bottom left corner in
10  here, it states, "Less
11  contracture/shrinkage."
12          Do you see that?
13  A  Yep.
14  Q  Do you recall -- well, strike that.
15          Was that one of the things that was
16  discussed at the Artisyn Y mesh meeting,
17  that the +M material in the Artisyn mesh
18  shrank less or would have less contracture
19  than other meshes that were currently
20  available?
21          MS. VAN STEENBURGH:  Object to
22  form.
23          THE WITNESS:  I can't remember
24  that.  What year is this?

## Page 189

1  BY MR. FAES:
2  Q  This is dated March 11, 2012, if you look on
3  the front cover.
4  A  I don't remember this.
5  Q  Do you have an understanding of whether or
6  not a lighter-weight, larger-core mesh like
7  the +M material that's used in the Artisyn
8  is less susceptible to mesh contracture and
9  shrinkage than heavier-weight meshes?
10          MS. VAN STEENBURGH:  Object to
11  form.
12          THE WITNESS:  I don't know.  I
13  don't use it, so I don't have experience with
14  that.
15  BY MR. FAES:
16  Q  So, you wouldn't have -- strike that.
17          You would agree that you wouldn't
18  have any opinion then if this Ultrapro or +M
19  material were used in a sling for stress
20  urinary incontinence as to whether or not
21  that would result in less contracture or
22  shrinkage than a TVT sling?
23  A  No, no opinion on that.
24  Q  Have you ever reviewed any peer-reviewed

Ragnvald Mjanger, M.D.

Page 190

1   medical journals that discuss the use of
2   Ultrapro mesh used in a sling for stress
3   urinary incontinence and what those clinical
4   results were?
5   A  I can't recall it.
6   Q  It also states, over on the other page, that
7      the +M mesh and the Artisyn mesh results in
8      less foreign material being left behind.
9         Do you remember that being discussed
10     as a potential clinical benefit in any of
11     your Artisyn board meetings?
12  A  Artisyn board meetings?
13        MS. VAN STEENBURGH:  This
14     particular one.
15  BY MR. FAES:
16  Q  This is discussing the --
17  A  I only went to one thing.  Like I said, we
18     sewed in mesh in a cadaver and answered some
19     questions.  I don't remember any of these
20     details.
21  Q  Okay.  Do you remember being told that the
22     +M mesh in the Artisyn device had the
23     potential to reduce dyspareunia, or painful
24     sexual intercourse?

Page 191

1   A  No, no.
2   Q  Do you have any understanding of whether or
3      not a lighter-weight, larger-core mesh,
4      likely the Ultrapro or the Artisyn mesh, has
5      the potential to reduce dyspareunia in a
6      patient?
7   A  I don't know.
8   Q  It also states that one of the -- strike
9      that.
10        If you look down in the bottom
11     right-hand corner, it also states that the
12     Artisyn Y-Shaped mesh material prevents
13     shortening of the vagina and pain
14     associated.
15        Do you see that?
16  A  I don't remember that.
17  Q  Do you have an understanding of whether or
18     not the Artisyn Y mesh or the Ultrapro mesh
19     would reduce shortening of the vagina and
20     pain associated when used instead of a mesh
21     like the TVT?
22        MS. VAN STEENBURGH:  Object to
23     form.
24        THE WITNESS:  I don't know much

Page 192

1   about the Artisyn mesh.  I never used it.
2   BY MR. FAES:
3   Q  So, you'd agree that you wouldn't -- I
4      wouldn't expect you to offer any opinions in
5      this case as to whether or not the use of
6      this +M mesh or Ultrapro mesh would prevent
7      shortening of the vagina and pain associated
8      with the mesh?
9   A  I have -- like I said, I have not used it,
10     don't know much about it, never showed any
11     interest in it.
12  Q  I'm just about finished with this document,
13     but if you can turn to page 15 of this.
14  A  (Complying.)
15  Q  If you look at the second bullet point on
16     this, it asks, "Defining the Value
17     Proposition of Artisyn."  It asks, "What
18     should we say about Artisyn to convert a
19     Y-Mesh user?"
20        Do you see that?
21  A  Why would I say anything about it --
22        MS. VAN STEENBURGH:  No, no,
23     no.  First, he's asking whether you see this.
24        THE WITNESS:  I see it, yes.

Page 193

1   BY MR. FAES:
2   Q  Were you ever asked, during any of your
3      Artisyn board meetings, for any assistance
4      in what Ethicon or people who work for
5      Ethicon should say to convert an existing
6      Y-Mesh user, like yourself, because you were
7      using the Restorelle at that time; right?
8   A  First of all, I was never to any Artisyn
9      board meetings.  I went to one cadaver lab.
10  Q  Okay.
11  A  I can't recall and I was not trying to
12     convince anyone to use it.  I don't use it
13     myself.
14  Q  Okay.
15  A  I sewed it in a cadaver and said what I felt
16     in my hand.
17        (Exhibit No. 16 Marked.)
18
19  BY MR. FAES:
20  Q  Doctor, I'm going to hand you what's been
21     marked as Exhibit No. 16 to your deposition.
22     This is an e-mail.  At the top, it's dated
23     March 23rd of 2012.  Actually, what I want
24     to ask you about is the e-mail that starts

Ragnvald Mjanger, M.D.

Page 194

1  on May 22nd, 2012, at 4:16, at about the
2  middle of the page, from your sales rep,
3  Laura Mettner.
4      Do you see that?
5  A  Say that again.
6  Q  What I want to ask you about on this
7  document is this e-mail from your sales rep,
8  Laura Mettner, on May 22nd of 2012.
9  A  Okay.  Right.
10  Q  "Dr. Mjanger, who attended the advisory
11  board in March, posed a question to me that
12  I thought was interesting and we should use
13  to our advantage."  And it states, "When
14  doing studies on Y Mesh strength, he said it
15  would be important to test the strength at
16  different widths because no surgeon is
17  placing the mesh without trimming it and it
18  wouldn't be a fair strength test not to trim
19  it first."
20      Do you see that?
21  A  Yes.
22  Q  Was that feedback that you gave to Ethicon
23  and Johnson & Johnson following the Artisyn
24  advisory board that you attended in March?

Page 195

1  A  Yes.  This look like something I probably
2  said to the sales rep when she approached
3  me.  She usually came in the operating room
4  area and tried to sell me things while I was
5  scrubbing my hands.  As far as I remember --
6  I don't remember saying this, but I know
7  what it's alluding to.  The mesh was a
8  pretty good size and you can trim it to any
9  size you want.  They talked about the
10  strength of this.  I probably made a comment
11  saying that, you know, saying we can trim
12  it.  Maybe you should have more than one
13  size and not just one big piece and you can
14  trim it to this.  So, that's probably a
15  comment I made to her along the way
16  somewhere.
17  Q  So, this was a comment that you made that
18  you thought more testing needed to be done
19  on this particular mesh before it was
20  reached to the market for general use;
21  right?
22          MS. VAN STEENBURGH:  Object to
23  form.
24          THE WITNESS:  Well, the mesh

Page 196

1  came to market.  The rep was in St. Paul and
2  asked me to use it.  I never switched to use
3  it.  I had a few comments to her when she
4  approached me to tell me I should switch.  I
5  had no reason to leave what I was using.  It
6  might be as good as what I had.  I didn't see
7  it as better.
8  BY MR. FAES:
9  Q  You'd agree then that it's important for a
10  medical device company to do testing of a
11  mesh before that mesh is released into the
12  marketplace; right?
13  A  Yeah.
14  Q  And, in fact, even with regard to the TVT,
15  do you believe it would be important for
16  Ethicon to test and know what different
17  forces can be expected to be applied to that
18  mesh during placement before it's released
19  to the market?
20          MS. VAN STEENBURGH:  Object to
21  form.
22          THE WITNESS:  I don't think it
23  mixes at all.  My comment to her about this
24  mesh -- this mesh was meant to be trimmed.

Page 197

1  The TVT slings are not meant to be trimmed.
2  You don't trim them.  They are what they are.
3  This was a trimmable mesh, so we can cut them
4  to any size.  So, my comment was -- I was
5  trying to come up with reasons why not to use
6  it.  I wasn't interested in using it.
7  BY MR. FAES:
8  Q  But you know at least the mechanically cut
9  mesh with the TVT, while it's not trimmed by
10  the physician, it is trimmed or cut before
11  it's sold; right?
12  A  Yeah.
13  Q  By something mechanical.
14  A  Yeah.
15  Q  Do you know how it's cut?
16  A  Pardon me?
17  Q  Do you know how it's cut?
18  A  Not really.
19  Q  Okay.  So, you don't know, for instance, on
20  essentially a guillotine machine?
21  A  I don't know how they cut it.  I just know
22  the product when I get it in my hand.
23  Q  So, being the -- knowing that the TVT mesh
24  is actually -- or at least the TVT

Page 198

1 mechanically cut mesh is actually cut not by
2 the physician but by the company prior to
3 the physician using it, you think it would
4 be important for the company to test and
5 know what different forces are applied to
6 that mesh during implantation before they
7 sell it to the public?
8             MS. VAN STEENBURGH: Object to
9 form.
10             THE WITNESS: Yeah, but I don't
11 see the relevance with a sling. I've never
12 in my life seen a sling break. I've seen Y
13 mesh break.
14 BY MR. FAES:
15 Q  But you've seen it deform; right?
16 A  If you yank on it, pull it.
17 Q  Right. Have you seen any -- strike that.
18       Do you intend to offer any opinions
19 in this case as to how much the sling can
20 become elongated during normal implantation
21 according to the instructions for use?
22 A  No.
23 Q  So, if one of Ethicon's engineers, for
24 example, stated that he believed that during

Page 199

1 normal implantation of the TVT, that the
2 sling may elongate up to 50 percent at the
3 maximum, you have no reason to agree or
4 disagree with that statement; is that
5 accurate?
6 A  I never heard that statement. It sounds far
7 off to me.
8 Q  As you sit here today, do you intend to
9 offer any opinions, either agreeing or
10 disagreeing, with that statement?
11 A  What's the statement? I don't quite
12 understand your statement.
13 Q  The statement is: During implantation of
14 the TVT mesh, that Ethicon engineers have
15 found that the TVT mesh can elongate up to
16 50 percent at the maximum.
17             MS. VAN STEENBURGH: Object to
18 form.
19             THE WITNESS: I just don't
20 believe that. I've never heard that. It
21 just doesn't make sense to me.
22 BY MR. FAES:
23 Q  Okay. Do you intend to offer an opinion in
24 this case to a reasonable degree of medical

Page 200

1 certainty that that number is correct or
2 incorrect, or you just don't know one way or
3 the other?
4 A  That 50 percent number, I have no
5 recollection of seeing that anywhere.
6             MS. VAN STEENBURGH: The
7 question is: Are you going to offer an
8 opinion as to whether that's correct or not?
9 That's not in your report.
10             THE WITNESS: No, I'm not going
11 to have an opinion on that. I don't know if
12 anybody would have an opinion on that. No.
13       (Exhibit No. 17 Marked.)
14
15 BY MR. FAES:
16 Q  Doctor, I'm going to hand you what's been
17 marked as Exhibit No. 17 to this deposition.
18 I'll try to go over this with you real
19 quickly.
20             MS. VAN STEENBURGH: There
21 isn't much to it. You have to go quick.
22 Just kidding.
23             MR. FAES: Right.
24             MS. VAN STEENBURGH: A little

Page 201

1 levity.
2 BY MR. FAES:
3 Q  This is an e-mail from your Ethicon sales
4 rep, Laura Mettner, dated August 7 of 2017
5 [sic] to a Lindsay Mason. And the subject
6 is "Mjanger," which is you; right?
7 A  Right.
8             THE COURT REPORTER: You just
9 said August 7 of 2017. Is that right?
10             MR. FAES: No. Let me start
11 over.
12 BY MR. FAES:
13 Q  So, this is an e-mail dated August 7, 2012,
14 from your sales rep Laura Mettner, to a
15 Lindsay Mason.
16       Do you see that?
17 A  Yes.
18 Q  And the subject is you.
19 A  Yes.
20 Q  Do you know who Lindsay Mason is?
21 A  No.
22 Q  You never met any sales rep from Ethicon and
23 Johnson & Johnson named Lindsay Mason?
24 A  I may have. I've met many of them. I have

Ragnvald Mjanger, M.D.

Page 202

1  no idea. I don't know the name.
2  Q It says this is what she texted Dr. Mjanger.
3  "Hi, Dr. Mjanger. Artisyn Y-Mesh is
4  approved at St. John's. I will have a
5  sterile sample (no charge) available to you
6  to try next Friday for your 7:30 case. Have
7  you requested Artisyn at United yet to begin
8  the value analysis process there? I cannot
9  bring it into United without you beginning
10  the process with Ginger."
11      Do you see that?
12      MS. VAN STEENBURGH: "If you
13  want it brought in, of course."
14      THE WITNESS: Yeah, I remember
15  her pestering to get me to start using this.
16  I don't know if it ever got approved at
17  United. I don't use it. I believe I used
18  three of these and I think they were
19  implanted at St. John's. I can't recall that
20  far back. If I don't remember wrong, I did
21  sew in three of them. They were okay. But I
22  never switched.
23  BY MR. FAES:
24  Q So, that was my question. Is this what you

Page 203

1  were referring to earlier, that people from
2  Ethicon and Johnson & Johnson were kind of
3  after you to try out this new Artisyn Y
4  mesh?
5  A Yes.
6  Q And you ultimately decided not to use it
7  regularly in your practice; right?
8  A No. I can't say for sure, but I think I
9  sewed in three of them. I know for sure I
10  did one. I think it was three. And
11  basically told them I tried it; I'm going to
12  stay with what I use.
13  Q It talks about "the value analysis process
14  at United."
15      Do you know what that refers to?
16  A Yeah. When you're going to get in a new
17  product, it goes through a big evaluation.
18  You have to -- it has to do with money. The
19  hospital will not just go out and buy
20  something because one doctor requested it.
21  They have to do a whole evaluation.
22  Q Is one of the elements of that process
23  filling out a form describing the clinical
24  benefit of the product, like you signed for

Page 204

1  the TVT Abbrevo?
2  A Yeah. You have to sell them some benefit
3  with something new or different or a better
4  price or something.
5  Q Do you recall if anyone -- well, strike
6  that.
7      Did anyone at Ethicon and
8  Johnson & Johnson ever bring you any kind of
9  form to sign regarding the Artisyn mesh?
10  A I can't remember. We had an unsigned form
11  here. I'm sure there --
12      MS. VAN STEENBURGH: You don't
13  know.
14      THE WITNESS: I don't know.
15  I've never seen it or recall it. The rep
16  probably has them in her suitcase all the
17  time if anyone will sign them. I don't know.
18  I can't answer it.
19  BY MR. FAES:
20  Q Do you see the last paragraph of this, it
21  looks like Lindsay Mason is covering this
22  Artisyn Y mesh case for Laura Mettner. And
23  it states, "Thanks for covering the case.
24  Take notes and ask him (and Tina. Do not

Page 205

1  forget to get her opinion) what their
2  thoughts are on it. I know I'm putting a
3  lot of pressure on you about this
4  case...he's my biggest target."
5      Do you see that?
6  A I see this.
7  Q Did you have an understanding at this time
8  that you were Ethicon's biggest target to
9  get them -- strike that.
10      Did you have an understanding at this
11  time that you were Ethicon's biggest target
12  for the use of the Artisyn Y mesh?
13      MS. VAN STEENBURGH: Object to
14  form.
15      THE WITNESS: Yes. I know
16  that -- I have a large-volume practice and
17  that's the only reason why.
18      (Exhibit No. 18 Marked.)
19
20  BY MR. FAES:
21  Q Doctor, I'm going to hand you what's been
22  marked as Exhibit No. 18 to your deposition.
23  And this is an e-mail dated March 2nd of
24  2012 to you from Brian Luscombe.

Raghvald Mjanger, M.D.

Page 206

1      Do you see that?
2  A   Yeah.
3  Q   And it states, "As per our discussion
4      earlier, below are links to the assets
5      requested.  Please click on an individual
6      link to view."  And then it's got a link to
7      the Prolift+M IFU, the TVT Abbrevo IFU, and
8      the TVT Exact IFU.
9          Do you see that?
10  A   Yeah, I see it.
11  Q   And it states, "Please contact me with any
12      questions or concerns"; right?
13  A   Yes.
14  Q   What discussion did you have with Brian
15      Luscombe in March of 2012 that prompted him
16      to send you the IFUs for these three
17      products?
18  A   I have no clue.  These salespeople send me
19      e-mails by the dozens; most of them I glance
20      at them and don't read them.  They call me
21      constantly.  I have no clue what this is.
22      None.  I can't recall it.
23  Q   So, you can't recall any reason why you
24      would have had an occasion to request IFUs

Page 207

1      or instructions for use?
2          MS. VAN STEENBURGH:  Object to
3      form.
4          THE WITNESS:  I cannot recall.
5  BY MR. FAES:
6  Q   So, the Prolift+M, that's a product that
7      you've used in your practice; right?
8  A   I think it came at the end of the time.  I
9      can't really recall it.  I think it came
10      about the time I quit using it.  I probably
11      have used a few, but I quit using those a
12      long time before Ethicon quit making them.
13  Q   Okay.  So, this time, March of 2012, you
14      probably weren't even using the Prolift or
15      the Prolift+M?
16  A   No.
17  Q   Okay.  Why did you stop using the Prolift
18      and the Prolift+M products?
19          MS. VAN STEENBURGH:  Form.
20          THE WITNESS:  Because we got
21      the first robot and I started just doing
22      sacrocolpopexy.
23  BY MR. FAES:
24  Q   So, when was it that you first got your

Page 208

1      first robot for I'll call it ASC?
2  A   2007.
3  Q   So, was it around 2007 that you stopped
4      using the Prolift?
5  A   Probably.
6  Q   I don't think the Prolift+M actually came
7      out until 2009.  So, if it didn't come out
8      until 2009 --
9  A   I know there was talk about it.  I can't
10      really recall much about that.
11  Q   Okay.  So, once you started using the robot
12      for ASCs, when you use the robot, do you
13      always implant the mesh abdominally as
14      opposed to transvaginally?
15  A   Yes.
16  Q   Do you feel that that's a better approach to
17      implant meshes abdominally for pelvic organ
18      prolapse as opposed to transvaginally?
19          MS. VAN STEENBURGH:  Objection.
20          THE WITNESS:  For me, it is.
21  BY MR. FAES:
22  Q   Why do you feel it's better?
23  A   I'm an experienced laparoscopic robotic
24      surgeon.  That's my specialty.

Page 209

1  Q   And what do you use, the da Vinci robot?
2  A   Yes.
3  Q   Doctor, I want to ask you about some things
4      in your expert report which I think is
5      Exhibit 2.  You might have to go back to
6      that to refer to it when I ask you
7      questions.
8  A   (Complying.)
9  Q   So, if you look in the paragraph titled
10      "Disclosure of Opinions," in about the
11      middle of that paragraph, you state, "In
12      summary, in my opinion, the TVT-O and TVT --
13      strike that.
14          It states, "In summary, in my
15      opinion, the TVT and TVT-O designs are
16      reasonably safe for their intended use."
17          Do you see that?
18  A   Yes.
19  Q   And if you look at the last page of your
20      report, you actually give a similar
21      statement where you say, "In conclusion, the
22      TVT and TVT-O, whether mechanically cut or
23      laser cut, has been shown to be
24      appropriately designed for the reasonably

Raghvald Mjanger, M.D.

Page 210

1  safe and effective use for treating female
2  stress urinary incontinence."
3          Do you see that?
4  A  Yes.
5  Q  Are those opinions that you intend to offer
6     in this case?
7  A  Yes.
8  Q  So, is there some particular reason why in
9     both of these opinions you've used the
10    qualifier "reasonably"?
11 A  Because they are reasonably safe.
12 Q  Is it your opinion that the designs are safe
13    or that they're reasonably safe?
14         MS. VAN STEENBURGH:  Object to
15    form.
16         THE WITNESS:  They're the
17    safest we have, the best we have this year.
18    What we have next year, I don't know.  But
19    they are reasonably safe.
20 BY MR. FAES:
21 Q  So, when you're giving your opinion that
22    they're reasonably safe, you're saying
23    they're reasonably safe in comparison to
24    other available treatment options; right?

Page 211

1  A  Yes.
2  Q  What other treatment options do you believe
3     they're reasonably safe in comparison to?
4  A  Burch.
5  Q  Any others?
6  A  Bladder neck sling.
7  Q  When you say "bladder neck sling," are you
8     referring to, like, an autologous fascial
9     sling with either the patient's own tissue
10    or cadaveric fascia?
11 A  Yes.  Bladder neck, where it says
12    midurethral, two different locations.
13 Q  One of your other opinions is that no other
14    design or mesh has been demonstrated to be
15    more effective, safer, or has been studied
16    as much, as long, or in as many patients or
17    types of patients as the TVT has showing
18    it's safe and effective and the TVT and the
19    TVT-O" -- actually, that's where I wanted to
20    stop.  Let me strike that and see if I can
21    ask a better question.
22         Is it going to be one of the opinions
23    that you'll offer in this case that no other
24    design or mesh has been demonstrated to be

Page 212

1  more effective, safer, or has been studied
2  as much or as long as the TVT or the TVT-O?
3  A  Yes.
4  Q  But you'd agree that you haven't engaged in
5     the study of whether or not, for example,
6     the TVT Abbrevo is a safer alternative
7     design to the TVT-O?
8  A  That's correct.
9  Q  And you haven't engaged in the study of
10    whether a sling made from the mesh -- a
11    softer, lighter-weight, larger-core mesh,
12    such as the Ultrapro, is a safer alternative
13    design to the TVT or TVT-O?
14 A  That's correct.
15 Q  So, it's fair to say that you don't know
16    whether or not those meshes have been
17    demonstrated to be more safe or effective
18    than the TVT or TVT-O, because you haven't
19    looked at that question?
20 A  Correct.
21 Q  Do you believe that a design or a mesh has
22    to be studied for as long or in the same
23    number of patients before it can be
24    demonstrated to be as safe or effective as

Page 213

1  the TVT and TVT-O?
2          MS. VAN STEENBURGH:  Object to
3  form.
4          THE WITNESS:  I don't
5  understand the question.
6  BY MR. FAES:
7  Q  First of all, one of the opinions that
8     you're giving is that the TVT and TVT-O
9     devices are one of the most studied devices
10    out there; right?
11 A  Correct.
12 Q  When you give that opinion, are you
13    referring to the number of patients, the
14    length of the studies, or both?
15 A  I'm not sure what you're asking me here.
16 Q  Well, let me maybe ask it in a way that you
17    can answer.
18         What do you mean when you give the
19    opinion that no device has been studied as
20    much or as long in patients as the TVT or
21    TVT-O?
22 A  I don't know if any other stress urinary
23    incontinence treatment has been researched
24    more than the TVT sling.  I don't think

Ragnvald Mjanger, M.D.

1    there's any other methods of treatment that
2    have as many scientific and peer-reviewed
3    articles about it as this.
4    Q   So, is it your opinion that TVT and TVT-O
5    devices have the best quality of studies?
6    A   I didn't say that. They have the highest
7    number of studies and many of them are very
8    good quality studies.
9    Q   So, you're not going to give an opinion in
10   this case that the TVT or the TVT-O has the
11   highest quality of studies of any stress
12   urinary incontinence device out there, just
13   the highest number?
14   A   By far, they have been the most studied
15   method in incontinence in the world, in the
16   industry.
17   Q   But just so we're clear, you're not giving
18   any opinion that they have the highest
19   quality of studies?
20   A   That, I can't say. I don't have an opinion
21   about that right now. That's a whole
22   different research.
23   Q   So, I guess what I'm trying to get at, is it
24   possible for another design or another mesh

1    to be demonstrated to be more safe or
2    effective than the TVT or TVT-O without
3    having the same number or quantity of
4    studies as the TVT and TVT-O device has?
5    A   It's possible.
6    Q   So, one of the opinions that you intend to
7    offer in this case is that the TVT and TVT-O
8    IFUs are adequate to warning of the risks of
9    the TVT and TVT-O devices; is that accurate?
10   A   Say that again.
11   Q   Is one of the opinions that you intend to
12   offer in this case is that the IFU, or the
13   instructions for use, of the TVT and TVT-O
14   are adequate to warn for the risks in those
15   devices?
16   A   I don't quite understand the question. The
17   package insert lists a lot of warnings, yes.
18   I don't quite understand what you're asking
19   about.
20   Q   You're offering an opinion in this case that
21   the IFU, or instructions for use --
22   A   Yes.
23   Q   -- are adequate to inform physicians of
24   those risks; right?

1    A   Yeah, I would think so. Adequate -- it's --
2    I would think so, yeah. They list probably
3    most of it if not all of it.
4    Q   So, when you give that opinion, which IFU
5    are you referring to, from which time
6    period?
7    A   There are a couple different ones. I would
8    tie the package insert to a time when it was
9    used.
10   Q   You understand that there have been multiple
11   versions of both the TVT and TVT-O IFU over
12   the years; right?
13   A   Yes.
14   Q   And is it going to be your opinion that any
15   one of those TVT IFUs, or instructions for
16   use, were sufficient to warn physicians --
17   A   No. There's one from 2015 and after. You
18   can't apply that to 2005 because there's
19   more information coming along always. If
20   they update it, it's for a reason. There's
21   new or more information. No, I don't think
22   you can mix them.
23   Q   So, what are you relying on for your opinion
24   that the TVT and TVT-O IFUs are adequate to

1    warn of those risks? What standard are you
2    applying?
3            MS. VAN STEENBURGH: Object to
4    form.
5            THE WITNESS: I don't know if
6    the way you worded it is the way I would word
7    it -- answer that. The package insert is a
8    listing of a lot of different things that can
9    happen. You can't, for example, start
10   inserting those things by just reading the
11   packaging. It is a list of warnings. It's
12   in just about anything we buy nowadays,
13   there's a listing. There always are.
14   BY MR. FAES:
15   Q   So, for the TVT-O and the TVT devices, what
16   adverse reactions do you think need to be
17   included in the IFU or instructions for use?
18   A   You want the whole list? Pull out the list
19   and look at them. That list is important at
20   two times. One is when you decide you want
21   to start using this product, you need to
22   study it. The other one is when you want to
23   talk to the patient. And I don't think
24   necessarily you have to sit and discuss

Raghvald Mjanger, M.D.

Page 218

1 every detail that's listed in the packaging.
2 But there are certain things you should
3 certainly discuss.
4 Q  In your practice, do you read the IFU for
5 each mesh device before using it for the
6 first time?
7 A  The first time?  Yeah.
8 Q  Okay.  When you read an IFU, or instructions
9 for use, do you assume that the IFU is
10 disclosing to you all of the risks and
11 complications that the company knew could
12 occur with the device that you're using?
13         MS. VAN STEENBURGH:  Object to
14 form.
15         THE WITNESS:  I would never
16 rely on that paper for that information for
17 everything for inserting a sling.  You have
18 to go through a learning process.  You have
19 to read papers and books and go to class and
20 talk to peers.  It's a long process before
21 you independently put those in a patient.
22 The whole process is important, not just the
23 packages.
24

Page 219

1 BY MR. FAES:
2 Q  Do you feel like a physician should be able
3 to rely on the IFU, or instructions for use,
4 as a complete source of all the adverse
5 events that may occur with a particular
6 medical device?
7 A  I don't know what the legality is of that.
8 I think personally, yeah.  But if there's
9 any serious complication or risk, it should
10 be in the document, because I would want to
11 know that.  But sometimes there's too much
12 information in there.  You don't always know
13 what to rely on and what is for real and
14 what is possible but not hardly ever seen.
15 Q  I may have asked this earlier and I
16 apologize if I did.
17         Have you ever -- it's true that
18 you've never helped draft an IFU, or
19 instructions for use; right?
20 A  No, no.
21 Q  You've never worked for a medical device
22 company on an IFU?
23 A  Never.
24 Q  You have consulted for other medical device

Page 220

1 companies, though; is that right?
2 A  I do.  I have.
3 Q  What other medical device companies have you
4 consulted for?
5 A  I have done a little bit of work with --
6 what is the one that closed?  AMS.
7 Q  American Medical Systems?
8 A  Yeah, yeah.  I've done a little bit of work
9 for them.
10 Q  Okay.  Anybody else?
11 A  It's possible, but I can't recall.  I
12 haven't done much of that work at all,
13 but -- oh, yeah.  Da Vinci robot, I've been
14 a trainer for them.
15 Q  Yeah.  I think that's actually on your CV,
16 that you're a trainer for the company that
17 makes the da Vinci surgical robot; right?
18 A  Yeah.
19 Q  Any other medical device companies or
20 pharmaceutical companies, for that matter,
21 that you've done consulting for?
22 A  No pharmaceutical.  Device, I can't recall
23 now.  If it's in my list.  But I can't
24 recall.

Page 221

1 Q  What list are you referring to?
2 A  My CV.  I can't -- I don't think I have.
3 Q  Have you ever done any kind of educational
4 talks or anything like that on behalf of
5 pharmaceutical companies for overactive
6 bladder medications or anything like that?
7 A  No.  I have had -- I had a meeting with --
8 yes, two things.  It was Coloplast.  I made
9 a recommendation to taper the Y-Mesh they
10 have.  And that's called Restorelle, I
11 think.  And I met with an engineer from
12 there and they did come out with a version
13 that was a little tapered.  I was just
14 involved with that.
15         There's a hydraulic arm that holds a
16 vaginal or uterine manipulator.  It's
17 attached to that.  I was involved with some
18 feedback and advice and testing of a new
19 arm.  And that's a -- I forget.  Cooper
20 Surgical.  I didn't get any money from them.
21 I think I got a dinner and a bottle of wine.
22         Besides that, I haven't done any work
23 for any company.
24 Q  As you sit here today, do you have an

Raghvald Mjanger, M.D.

Page 222

1  understanding of any standard whatsoever as
2  to what risks and complications are supposed
3  to be disclosed in an IFU, or instructions
4  for use?
5             MS. VAN STEENBURGH:  Object to
6  form.
7             THE WITNESS:  I don't know
8  anything about how they design and what needs
9  to go in.
10 BY MR. FAES:
11 Q  So, it's true then that you're not relying
12    on any objective standard from any source
13    regarding what should or shouldn't be
14    included in an IFU with regard to risks?
15            MS. VAN STEENBURGH:  Object to
16 form.
17            THE WITNESS:  I don't know the
18 answer to that, no.
19 BY MR. FAES:
20 Q  So, when you state that the TVT and the
21    TVT-O IFUs are adequate to warn of the
22    risks, you just mean that they're adequate
23    to warn you personally, or do you think that
24    they're adequate to warn all physicians?

Page 223

1  A  Well, I didn't use the word "adequate."  The
2     way I see it, it's a listing of things that
3     can go wrong, but it's up to me to research
4     it further.  I look at it more as a list of
5     dangers than complete information.  I don't
6     know how they design them or legally what
7     goes in them.  The way I use them, I look at
8     them for what warnings they have for me.
9  Q  So, you don't think that you used the term
10    "adequate" to discuss the risks that are
11    listed in the TVT and TVT-O instructions for
12    use?
13 A  Well, my general experience in life with
14    package inserts are that they list a lot of
15    things, and I don't use them in practical
16    life that much.  I have to go to other
17    sources to really find out the details about
18    it.  I look at them more as a list.
19 Q  So, let me go to page 2 of your report, the
20    last half of the steps in the Disclosure of
21    Opinions.
22            MS. VAN STEENBURGH:  Look at
23 that.
24            THE WITNESS:  Which one is

Page 224

1  that?
2             MS. VAN STEENBURGH:  The expert
3  report, page 2.
4  BY MR. FAES:
5  Q  So, it states, "the TVT and TVT-O IFU are
6     adequate to warn of the risks of the TVT and
7     TVT-O devices discussed below."
8         Do you see that?
9  A  Yes.
10            MS. VAN STEENBURGH:  Counsel,
11 he also used the word "sufficient."
12 BY MR. FAES:
13 Q  Is there a difference, in your mind, as to
14    "adequate" and "sufficient"?
15 A  It depends on how you interpret it.
16    Adequate to warn.  But that doesn't package
17    the whole story.  It's a sheet.  It's a
18    list.  You can't use it to insert equipment.
19    You have to be aware of it.  You have to
20    read it.  It's a warning list, basically.
21 Q  Right.  Is one of the opinions that you're
22    going to offer in this case is that the
23    warnings in the TVT and TVT-O IFU are
24    adequate to warn of the risks?

Page 225

1  A  If you talk about adequate in actual listing
2     everything, I think so; but they're not
3     complete information, that they're an
4     adequate list of information.
5  Q  So adequate to who?  To you or to any
6     physician?
7  A  To me.  To me, yes.
8  Q  Okay.  So, you're not --
9  A  I don't expect them to leave out anything
10    serious, like this can kill you.  It has to
11    be in there.  So, when I read it, I see all
12    that's in there.  But I need to know way
13    more than that.  I have to research some of
14    these things.  I read about them.
15 Q  So, you're not offering any opinions in this
16    case as to whether or not the warnings in
17    the adverse reaction section of the TVT and
18    TVT-O IFU are adequate to other physicians.
19            MS. VAN STEENBURGH:  Object to
20 form.
21            THE WITNESS:  I think we're
22 talking past each other.  I think package
23 inserts sometimes list almost too much.  It's
24 hard sometimes to distinguish between what is

Raghvald Mjanger, M.D.

Page 226

1   important or not because everything is listed
2   in there.  So, my experience, it's not that
3   they leave out things.  It's just that
4   there's almost too much.
5   BY MR. FAES:
6   Q   Right.  My question is:  Are you going to
7   offer an opinion in this case that the TVT
8   and TVT-O IFU are adequate to warn other
9   physicians of the risks of those devices?
10  A   Yeah, I think it's adequate as far as
11  listing all the different concerns.  I think
12  I've been talking a little bit past you,
13  because what I'm thinking is that whole
14  relevant is that list.  Sometimes it's
15  difficult for me to interpret because
16  there's too much information, too many
17  things.  They list everything.  Everything
18  is in there.  While it's probably a good
19  thing, but it's hard to decipher it
20  sometimes.
21  Q   So, I guess my question, which I don't think
22  I quite got an answer to earlier, is:  Are
23  you offering an opinion that the IFU for the
24  TVT and TVT-O -- strike that.

Page 227

1       Are you offering an opinion that the
2   adverse reactions section of the TVT and
3   TVT-O IFU was adequate for other physicians
4   at all times that the products have been on
5   the market?
6   A   I would think so.
7   Q   You would think so or --
8   A   I would think so.  I think all
9   information -- all the warnings are there,
10  but like I said, sometimes there's too much
11  there.
12  Q   Do you think so to a reasonable degree of
13  medical certainty?
14  A   Yes.
15  Q   Have you engaged in any kind of study or
16  formal analysis of what other physicians
17  knew about the risks of the TVT and TVT-O
18  devices at any particular times during the
19  17-year history of the marketing of the TVT?
20  A   No, no.
21  Q   So, for example, you haven't done any kind
22  of study or formal analysis to see what
23  risks of the TVT or the TVT-O physicians who
24  might implant that device know of today?

Page 228

1   A   No.
2   Q   And you haven't done that analysis of what
3   they knew or didn't know in, say, 2010?
4   A   No.
5   Q   Or any other year; correct?
6   A   No.
7   Q   Okay.  So, do you believe that the adverse
8   reactions section of the TVT IFU needs to
9   include a warning for acute and/or chronic
10  pain in order to be adequate?
11      MS. VAN STEENBURGH:  Why don't
12  we -- do you have one?  Are you saying it's
13  not in there?
14      MR. FAES:  I'm just asking as
15  he sits here today.
16  BY MR. FAES:
17  Q   Do you think that needs to be included in
18  the IFU, or instructions for use, in order
19  to be adequate?
20  A   Acute pain?
21  Q   Yes.
22  A   I would think so, yeah.
23  Q   You think it needs to be included in there?
24  A   Yeah.

Page 229

1   Q   Do you think it needed to be included in
2   there at all times that the company marketed
3   the device, that the company was aware that
4   was a risk?
5   A   I don't know how far back they were aware of
6   it.
7   Q   But you'd agree as soon as they -- once they
8   were aware that that was a potential adverse
9   event of the TVT or TVT-O, they needed to
10  include that as a potential adverse event in
11  the IFU; right?
12  A   Probably.
13  Q   Do you think that pain with intercourse,
14  which in some patients may not resolve, is a
15  necessary risk that needs to be included in
16  the TVT instructions for use?
17      MS. VAN STEENBURGH:  Object to
18  form.
19      THE WITNESS:  That's something
20  that can be discussed, I think, because I
21  think pain with intercourse can be so many
22  things.  It can be a hard thing to evaluate.
23  To put it in there that any time -- well, I
24  don't know if I would include that in there

Raghvald Mjanger, M.D.

Page 230

1  because it's such a wide spectrum of things
2  that can cause that.  I would hate to tie it
3  down to a sling.
4         Most people I see that have pain with
5  intercourse never have a sling.  Would a
6  person with a sling have the same pain?  It
7  isn't necessarily the sling that causes it.
8  It has to be evaluated.  I don't know how
9  important it is to put that in there.
10 BY MR. FAES:
11 Q  So, if I understand you correctly, you don't
12    think that specifically pain with
13    intercourse needs to be in the adverse
14    reactions section of the IFU in order for it
15    to be adequate?
16 A  You may want to put it in there.  But on the
17    other hand, I don't think it has anything to
18    do with safety.  I don't think it's that big
19    a part of a discussion before putting in a
20    sling because there's so many other things
21    that cause pain with intercourse.  I
22    wouldn't pull it out as a big deal before
23    putting in a sling.  Most people getting
24    slings don't have pain with intercourse.  I

Page 231

1  don't even know if people with slings have
2  more pain than people without slings.
3  That's something that needs to be discussed.
4  I don't know if it's there or not.
5  Q  Do you think that the TVT and the TVT-O IFU
6     needs to include a warning regarding
7     neuromuscular problems, including acute
8     and/or chronic pain in the groin, thigh,
9     leg, pelvic, and/or abdominal area in order
10    for it to be adequate?
11 A  Isn't that in there?  I can't recall that.
12    I would have to look at it.
13 Q  Well, it's in there now.
14 A  I think it should be in there.  I think I've
15    seen it in there.
16 Q  Do you think that it should have been
17    included in the IFU, or instructions for
18    use, as soon as the company was aware that
19    that was a potential adverse event?
20 A  I don't know about that.  I can't answer
21    that.  In the past, no.  I think it is in
22    there now and I think it should be in there,
23    if I recall it right.
24 Q  So, why do you think it should be in there

Page 232

1  now but shouldn't have been there in, say,
2  2010?
3  A  I didn't say it shouldn't be back then.  I
4     don't know enough to know whether -- I don't
5     know how much they knew about it back then.
6     I just don't know.
7  Q  Well, assuming that Ethicon and
8     Johnson & Johnson knew that that was a
9     potential adverse event since the launch of
10    the TVT-O in 2003, do you think that that
11    adverse event should have been inclued in,
12    say, 2008 or 2009?
13 A  I can't answer that.
14 Q  Why don't you answer that?
15 A  I don't have enough information.
16 Q  What information would you need to have in
17    order to answer the question?
18 A  I think it's in there now.  I think it
19    should be in there.  I think there's enough
20    known about it now.  The problem is in the
21    past, there's so many things in there.  We
22    learn things every day.  I'm sure -- what
23    they should have done or could have done in
24    the past, I just can't make a statement on

Page 233

1  that.
2  Q  So, you're not offering an opinion in this
3     case as to whether or not Ethicon and
4     Johnson & Johnson should have included that
5     statement in the IFU earlier than when it
6     was added in 2015?
7  A  I don't know enough about it to make an
8     opinion about that.  I would have to see
9     what was available and what was known.  I
10    just don't know that.
11        MR. FAES:  We have about 44
12    minutes left.  Do you want to take a quick
13    break?
14        MS. VAN STEENBURGH:  Sure.
15    (Recess began - 2:13 p.m.)
16    (Recess ended - 2:22 p.m.)
17 BY MR. FAES:
18 Q  Doctor, we're back on the record after a
19    short break.  We were talking about the
20    adverse reaction section of the TVT products
21    instructions for use.
22        Do you remember that?
23 A  Yes.
24 Q  Do you feel that in order for the IFU for

Raghvald Mjanger, M.D.

Page 234

1  the TVT and TVT-O to be adequate, that it
2  needs to contain a warning about urge
3  incontinence in order for it to be adequate?
4  A  Yeah.
5  Q  And do you believe that that's true, that it
6  should have been included as soon as Ethicon
7  and Johnson & Johnson was --
8  A  I think it is included, isn't it?
9  Q  Let me finish my question.
10  A  Yeah.
11  Q  Do you believe that that should have been
12  included in the IFU as soon as Ethicon and
13  Johnson & Johnson was aware that that was a
14  potential adverse effect?
15  A  I can't answer to that at all.  I cannot.  I
16  think it is in there.  I think I've seen it
17  in there.  In the past, I don't know.
18  Q  Okay.  So, you don't know if it --
19  Do you have an opinion as to whether
20  or not it should have been included in the
21  IFU once Ethicon and Johnson & Johnson was
22  aware of it?
23  A  I don't have any information about what they
24  were aware of and when.  I can't say

Page 235

1  anything about that.
2  Q  I understand.  But assuming that they were
3  aware of it since the product was launched
4  in 1998, do you think that that should have
5  been included in the IFU, or instructions
6  for use?
7  MS. VAN STEENBURGH:  Object to
8  form.
9  THE WITNESS:  I don't have an
10  opinion on that.
11  BY MR. FAES:
12  Q  Do you have an opinion as to whether or not
13  the adverse reaction of urinary frequency
14  needs to be included in the IFU for the TVT
15  products in order for the warnings to be
16  adequate?
17  A  Yeah, probably.
18  Q  And I assume the answer to my question is
19  the same as the previous one, that you don't
20  have any opinion as to whether or not it
21  should have been included in the
22  instructions for use since its launch if
23  Ethicon was aware that that was a potential
24  risk?

Page 236

1  A  Were they totally aware of it or had
2  suspicion of it or strong proof of it, I
3  don't know.  I don't have an opinion about
4  that.  I have no information to base it on.
5  Q  And what about urinary retention?  Do you
6  think urinary retention needs to be
7  included --
8  A  Yes.
9  Q  Let me get the whole question out.
10  Do you think that urinary retention
11  needs to be included as a potential adverse
12  event of the TVT and TVT-O in order for the
13  IFU to be adequate?
14  A  At this point, yes.
15  Q  At what point do you think it was necessary
16  for it to be included in the IFU or
17  instructions for use?
18  A  I don't know if they knew about it in the
19  past.  I can't pass judgment on that.
20  (Exhibit No. 19 Marked.)
21
22  BY MR. FAES:
23  Q  Doctor, I'm going to hand you what's been
24  marked as Exhibit No. 19 to your deposition.

Page 237

1  And this is Minnesota Physician dated
2  December of 2013.
3  Have you seen this document before?
4  A  Yes.
5  Q  And, in fact, you wrote an article that
6  appears in this publication; right?
7  A  Let me see here.
8  Q  It starts on page 24, I think.
9  A  (Witness reviews the document.)
10  Yes.
11  Q  So, this is an article that you wrote in
12  November of 2013; right?
13  A  That's correct.
14  Q  This isn't an article that's listed or
15  disclosed in your CV; right?
16  A  I can't recall that.  I had forgotten this
17  article, so it may not be in there.
18  Q  Does this article refresh your recollection
19  as to any other articles that you may have
20  written that aren't disclosed in your CV?
21  A  No, there are no other ones.
22  Q  I want to ask you some things that you wrote
23  in this, starting at the bottom right-hand
24  corner of the page 24.  You write,

Ragnvald Mjanger, M.D.

Page 238

1    "Sometimes mesh is used to hold up the
2    vagina in an attempt to reduce incontinence.
3    For many women, this mesh offered a good
4    solution, but others experienced significant
5    scarring and pain, necessitating mesh
6    removal and surgery to reconstruct the
7    anatomy"; correct?
8    A   Yeah.  That's correct.
9    Q   Is that a statement that you stand by today?
10   A   Yes.
11   Q   It goes on to state, "Recently, the U.S.
12   government issued warnings about the use of
13   certain transvaginal nylon mesh use in the
14   treatment of urinary incontinence."
15       Do you see that?
16   A   Where was that again?
17   Q   It's going to the following page.  It
18   states, "Recently, the U.S. government
19   issued warnings about the use of certain
20   transvaginal nylon mesh used in the
21   treatment of urinary incontinence."
22       Do you see that?
23   A   Yes.
24   Q   What are you referring to?  What nylon mesh?

Page 239

1    A   Well, it's -- any -- I can't remember any
2    specific -- which one I was thinking about
3    at that time.  It would probably relate to
4    any kind of mesh.
5    Q   Is it possible that you meant to refer to
6    polypropylene mesh and not nylon mesh?
7    A   Probably.
8    Q   It goes on to state, "As a physician who has
9    performed a large number of these mesh
10   removals, I can attest to the fact that
11   removal can be tricky."
12   A   That is correct.
13   Q   And that's a correct statement today?
14   A   Yes.
15   Q   So, it's a correct statement that you're a
16   physician that's done a large number of
17   vaginal mesh removals for stress urinary
18   incontinence mesh?
19   A   That's correct, yes.
20   Q   And frequently, the removal can be tricky;
21   is that accurate?
22   A   That's correct, yeah.
23   Q   If you go -- and then it talks about the da
24   Vinci surgical robot that you use.

Page 240

1    A   Right.
2    Q   And you use that frequently for mesh
3    removal; is that right?
4    A   When I do remove mesh, I usually nowadays
5    use the da Vinci, yes.  Not all the time.
6    Most of the time.
7    Q   Do you still use, for instance, Metzenbaum
8    scissors sometimes to remove mesh, or is it
9    pretty much always the robot that you use?
10   A   Metzenbaum scissors?
11   Q   Yeah.
12   A   In the vagina, yes.  But if it's in the
13   pelvis, I use the robot.
14   Q   And then it goes on to state, "In the past,
15   the mesh was inserted vaginally.  Every time
16   a physician operates through the vagina, he
17   or she needs a seam allowance and the vagina
18   gets smaller."
19   A   That's correct.
20   Q   And that's a true statement today, that
21   every time that mesh is inserted vaginally,
22   the vagina gets smaller or shortens; right?
23   A   Correct.
24   Q   Do you think that's a potential risk that

Page 241

1    physicians should be made aware of, is that
2    there can be a vaginal shortening as a
3    result of the implant of a TVT or TVT-O
4    mesh?
5        MS. VAN STEENBURGH:  Object to
6    form.
7        THE WITNESS:  I think the
8    physicians have been aware of that, that the
9    vagina gets shorter and narrower with every
10   surgery, a long time before the mesh.
11   BY MR. FAES:
12   Q   But my question is:  Do you think that
13   that's a risk that needs to be included in
14   the TVT or TVT-O IFU in order for that IFU
15   to be adequate?
16       MS. VAN STEENBURGH:  Object to
17   form.
18       THE WITNESS:  I don't know
19   about that because any surgery -- any surgery
20   where you cut the vagina open, whether it's
21   mesh or not, will make the vagina smaller,
22   and that's been known forever.  I don't think
23   that's new or different with mesh.  It's not
24   the mesh in itself.  It's the cutting through

Raghvald Mjanger, M.D.

Page 242

1   the vaginal wall and sewing it up.
2   BY MR. FAES:
3   Q  So -- well, first of all, you believe it's
4       not the mesh itself that causes the vaginal
5       shortening; right?
6   A  No.  It's the cutting.  When you cut and
7       sew, every time, it's shorter, tighter.
8   Q  So, if, indeed, it were shown that the
9       surgical mesh actually did cause or
10      contribute to vaginal shortening in addition
11      to just the cutting, do you think that's an
12      adverse event that should be warned of in
13      the TVT IFU in order for it to be adequate?
14              MS. VAN STEENBURGH:  Object to
15      form.
16              THE WITNESS:  Possible.
17  BY MR. FAES:
18  Q  And then it goes on to talk about the fact
19      that you use -- now use the da Vinci robot
20      to do ASC procedures and with that, that
21      there's no further vaginal shrinkage making
22      it a nice option to offer women; is that
23      right?
24  A  That's right.  You don't have to cut into

Page 243

1   the vagina.
2   Q  So, you agree that a procedure that doesn't
3       involve cutting in the vagina is a nice
4       option to offer women because you don't have
5       that risk of vaginal shortening; right?
6              MS. VAN STEENBURGH:  Object to
7       form.
8              THE WITNESS:  Right.
9   BY MR. FAES:
10  Q  It goes on to state that "This procedure,
11      combined with newer, smaller pieces of mesh,
12      has become state-of-the-art repair for
13      vaginal prolapse."
14          Do you see that?
15  A  That's correct.
16  Q  So, you'd agree that now for vaginal
17      prolapse procedures, that you're trying to
18      use smaller pieces of mesh or the least
19      amount of mesh possible to get the job done;
20      right?
21  A  That is correct.
22  Q  And it states that these "Minimally invasive
23      surgeries result in faster recovery, along
24      with less pain, bleeding, and scarring";

Page 244

1   right?
2   A  Yes.
3   Q  So, you'd agree that the use of the
4       procedure that you're describing here, which
5       also includes the use of smaller pieces of
6       mesh, results in less pain, bleeding, and
7       scarring for the patient; right?
8              MS. VAN STEENBURGH:  Object to
9       form.
10             THE WITNESS:  Right.
11  BY MR. FAES:
12  Q  So, on page 8 of your expert report, if you
13      can turn back to that, please, I'm going to
14      ask you some questions about the section
15      entitled "Alleged Complications Associated
16      with TVT."
17  A  (Complying.)
18  Q  So, under Inflammation, you state on, I
19      think it's the second sentence or third, you
20      state, "In my practice, I have not
21      experienced a chronic inflammatory response
22      with TVT that resulted in clinical
23      consequences such as pain."
24          Do you see that?

Page 245

1   A  Yes.
2   Q  Is that an opinion that you intend to offer
3       in this case?
4   A  Yes.
5   Q  But as I think we discussed earlier, you
6       can't state how many implants you've even --
7       strike that.
8          You can't state how many vaginal mesh
9       implants you've actually removed in the
10      course of your career; right?
11  A  No.  I can't give you an exact number.
12  Q  Do you regularly review the -- strike that.
13          First of all, is it your normal
14      practice, when you remove or excise a
15      vaginal mesh, to send that mesh to
16      pathology?
17  A  Not always.  Most of the stuff we take out
18      goes to pathology.  I'm not sure all the
19      mesh pieces go.
20  Q  You don't know the percentage of cases of
21      the mesh you send to pathology?
22  A  No.
23  Q  And do you know how many of those cases
24      where the mesh was removed for pain, that

Raghvald Mjanger, M.D.

Page 246

1    the pathology report indicated mild,
2    moderate, or chronic inflammation?
3    A   No, I can't recall that.
4    Q   So, you'd agree that this statement, that
5        you haven't experienced a chronic
6        inflammatory response in TVT that resulted
7        in clinical consequences such as pain, isn't
8        as a result of any kind of formalized
9        analysis of your patients or your patients'
10       medical records; correct?
11   A   Yeah.
12   Q   And you couldn't state with any kind of
13       certainty what percentages -- what
14       percentage of the patients are where you
15       removed a mesh due to pain and those
16       pathology reports indicated mild, moderate,
17       or chronic inflammation; right?
18   A   That's correct.
19   Q   It also states in this paragraph that in
20       your experience, "this inflammation remains
21       stable or contained in an area immediately
22       adjacent to the mesh and does not continue
23       to expand in size."
24   A   That's correct.

Page 247

1    Q   What's that opinion based on?
2    A   Say that again.
3    Q   What's that opinion based on?
4    A   The tissue around looks very soft and normal
5        and there's really a mark where the
6        inflammation is and no inflammation.  You
7        can really see it.
8    Q   So, this opinion is basically based on what
9        you see in general when you remove meshes?
10   A   Yes.
11   Q   If there is inflammation that isn't stable,
12       is that something that you would note in
13       your operative report?
14   A   If I saw it, yeah.
15   Q   Have you done any kind of formalized
16       analysis of your patients' records to see if
17       that was actually noted in any of their
18       records?
19   A   No.
20   Q   Would you agree that if a pathology report
21       or a formal analysis indicated that the
22       inflammation around the TVT mesh was, in
23       fact, not stable but was chronic and
24       ongoing, would that be an indication to you

Page 248

1    of a defect or problem with the mesh?
2           MS. VAN STEENBURGH:  Object to
3    form.
4           THE WITNESS:  I haven't seen
5    that, so I wouldn't be able to make a
6    statement on a case that I recall seeing
7    that.
8    BY MR. FAES:
9    Q   So, hypothetically, if you saw a TVT mesh
10       that was removed and the pathology report
11       showed chronic, ongoing inflammation that
12       was continuing even more than one year past
13       the implant, would that be indicative of a
14       problem to you with the mesh or with the
15       patient?
16          MS. VAN STEENBURGH:  Object to
17   form.
18          THE WITNESS:  The thing is when
19   you operate on people, you don't just go and
20   cut out tissue that looks normal.  So,
21   there's no way I can say what looks normal to
22   me is not normal to you.  If it looks normal,
23   we leave it.  The affected tissue or whatever
24   it is seems to be right up on the mesh.  It

Page 249

1    doesn't spread out.  And I can't just go and
2    cut tissue out of a person to prove that it's
3    normal.  When it looks normal to me, I leave
4    it alone.
5    BY MR. FAES:
6    Q   But you would agree that in order to know
7        for sure whether inflammation was chronic or
8        ongoing, you would need to actually have a
9        pathologist look at that mesh implant or the
10       tissue surrounding that mesh; right?
11   A   That super narrow area right around the mesh
12       is a little fibrotic and it's hard.  That
13       gets cut out and sent in.  The normal tissue
14       around that we don't send in.  It's very
15       limited what gets sent to pathology.
16   Q   So, you would agree that in many cases when
17       you excise or remove a vaginal mesh, that a
18       lot of times there's fibrotic or hardened
19       tissue surrounding the mesh?
20   A   Right on the mesh or in the mesh.  There's
21       very little spread.
22   Q   In your experience, can that fibrotic or
23       hard tissue surrounding the mesh cause pain
24       or discomfort for the patient?

Raghvald Mjanger, M.D.

Page 250

1    A   Do you want me to tell you what I see?  Most
2        of the mesh, if there's mesh and pain, it's
3        because the mesh is not sitting right, it's
4        sewed into the wrong thing, put in crooked,
5        put in too tight.  Mesh sitting normal, I
6        have a hard time recalling anyone that hurt.
7    Q   You also go on to offer opinions regarding
8        cytotoxicity in the following paragraph.
9            Do you see that?
10   A   Yes.
11   Q   It states that "A study by Wang and his
12       colleagues upon which they rely reporting a
13       rate of persistent defective healing of 1
14       percent has not been replicated in other
15       clinical studies in women."
16           Do you see that?
17   A   Right.
18   Q   So, have you seen any studies indicating
19       that the rate of erosion or persistent
20       defective healing with the TVT can be as
21       high as 19 percent?
22           MS. VAN STEENBURGH:  Object to
23       form.
24           THE WITNESS:  That it can be

Page 251

1        cytotoxicity?
2    BY MR. FAES:
3    Q   No, no.  That it can be -- that the rate of
4        persistent defective healing or erosions
5        with TVT has been as high as 19 percent.
6            MS. VAN STEENBURGH:  Object to
7        form.
8            THE WITNESS:  No, I don't
9        recall that.  Erosion as high as 19 percent?
10   BY MR. FAES:
11   Q   Yes.
12   A   I don't know what study that is, no.
13   Q   Have you ever reviewed the Tseng study,
14       T-S-E-N-G study, comparing the TVT to the
15       SPARC mesh?
16   A   I can't remember.
17   Q   Do you know whether or not the results of
18       that study were actually reported on
19       Ethicon's website at one time and reported
20       the erosion rate as high as 19 percent?
21   A   No, I don't know that.  That would be way
22       higher than what I've seen in real life.
23   Q   What percentage of erosions or persistent
24       defective healing would you need to see in

Page 252

1        order for you to conclude that the TVT mesh
2        may be cytotoxic?
3            MS. VAN STEENBURGH:  Object to
4        form.
5            THE WITNESS:  Cytotoxic is
6        something else.  I don't believe Prolene is
7        cytotoxic.  We use Prolene in every operating
8        room in every hospital in the country.
9        There's been Prolene put in every day.  I
10       don't believe it's cytotoxic or we would know
11       way more about it.
12   BY MR. FAES:
13   Q   Well, you would agree with me that if the
14       TVT mesh were cytotoxic, that that would
15       indicate -- that that would be a defect with
16       the product and that it shouldn't be used;
17       right?
18           MS. VAN STEENBURGH:  Object to
19       form.
20           THE WITNESS:  Yes.  Or the
21       material in the product.  But I don't believe
22       in that.
23   BY MR. FAES:
24   Q   Right.  It's not that you don't believe that

Page 253

1        cytotoxicity is not a defect.  You just
2        don't believe that the TVT mesh is
3        cytotoxic; correct?
4    A   I don't believe it's cytotoxic.
5    Q   Have you seen testing done by Ethicon and
6        Johnson & Johnson in 1997 and in 1998 where
7        the tests actually came back positive for
8        cytotoxicity on the TVT mesh?
9    A   No, I haven't.
10   Q   Is that information that you would want to
11       see before forming your opinions in this
12       case?
13           MS. VAN STEENBURGH:  Object to
14       form.
15           THE WITNESS:  I have seen other
16       discussions of this and I thought it was
17       pretty much decided that it was not
18       cytotoxic.  I can't cite every study.  I
19       would like to see it if it's relevant.  But
20       so far, I don't believe it.
21   BY MR. FAES:
22   Q   Well, one of the opinions that you give in
23       your expert report is that Ethicon
24       extensively studied cytotoxicity and its

Raghvald Mjanger, M.D.

Page 254

1  results satisfied the FDA that the mesh was
2  not cytotoxic.
3  A  Right.
4  Q  Is that an opinion that you intend to offer
5  in this case?
6  A  Yes.
7  Q  How do you know that the FDA was satisfied
8  that the mesh was not cytotoxic?
9  A  I haven't seen anything to the fact that
10  they were not satisfied.
11  Q  Well, do you know if Ethicon and Johnson &
12  Johnson ever shared the results of the 1997
13  or 1998 studies that they did on the TVT
14  mesh that showed it was cytotoxic?
15  A  If they didn't share it, I wouldn't have
16  known it.
17  Q  So, you don't know whether or not if they'd
18  actually shared that with the FDA, that the
19  FDA would not have been satisfied that the
20  mesh was cytotoxic?
21  A  I don't know about that.
22  Q  Do you even know what standards or what
23  kinds of things the FDA relies on or
24  requires in order to determine that a

Page 255

1  material is or isn't cytotoxic?
2  A  No.
3  Q  Do you know what ISO testing is?
4  A  No.
5  Q  Okay.  Do you know what testing that -- as
6  you sit here today, what testing Ethicon and
7  Johnson & Johnson did on the TVT device in
8  order to demonstrate that it was not
9  cytotoxic?
10  A  No.
11  Q  So, on the next page, you discuss
12  contraction of the mesh and you state in
13  your experience, "the TVT mesh does not
14  curl, rope, shrink, contract, or experience
15  poor collapse when implanted as directed in
16  the IFU."
17  Do you see that?
18  A  Yes, I do.
19  Q  First of all, have you ever seen documents
20  from Ethicon's own medical directors
21  indicating that the mesh shrinks 30 percent
22  as a rule of thumb?
23  A  Yes.  I have seen that number.
24  Q  Do you believe that Ethicon's medical

Page 256

1  directors are just wrong about that?
2  MS. VAN STEENBURGH:  Objection.
3  THE WITNESS:  No.  Let me take
4  a look here.
5  I believe -- I've seen the number 30
6  percent, and I believe that when you put a
7  mesh in and it gives you no injury, that
8  there's some shrinkage of the tissue.  I
9  don't think the mesh shrinks.  I can't
10  imagine how the mesh would shrink.  But the
11  tissue shrinks.  And we know that.  That's a
12  consideration when we operate.
13  BY MR. FAES:
14  Q  Well, if the tissue surrounding the mesh
15  shrinks, it would take the mesh along it;
16  right?
17  A  Yes.
18  Q  And it would encapsulate it.
19  A  Yes.
20  Q  That's how the mesh would shrink; right?
21  A  Right.
22  Q  So, would you agree that the shrinkage of
23  mesh inside the contracted tissue could
24  potentially entrap nerves which can cause

Page 257

1  pain for the patient?
2  MS. VAN STEENBURGH:  Object to
3  form.
4  THE WITNESS:  If there were
5  nerves in the area.  You would have to put a
6  nerve in there first.
7  BY MR. FAES:
8  Q  Isn't the pelvic floor a ready source of
9  nerves in the human body?
10  MS. VAN STEENBURGH:  Object to
11  form.
12  THE WITNESS:  Yeah.  It's not
13  really where you put the slings.  There are
14  no major nerves there.  You're talking about
15  the slings.
16  BY MR. FAES:
17  Q  Do you think that -- strike that.
18  Can the contracture surrounding a
19  mesh which, in turn, takes the mesh with it
20  in the contracture, do you believe that that
21  can present unique risks to a patient as
22  opposed to just contraction of tissue that
23  isn't surrounding mesh?
24  MS. VAN STEENBURGH:  Object to

Raghvald Mjanger, M.D.

Page 258

1 form.
2 THE WITNESS: I don't
3 understand the difference.
4 BY MR. FAES:
5 Q Well, we've discussed the fact that tissue
6 contraction can occur in every surgery;
7 right?
8 A Right.
9 Q But when there's mesh involved and tissue
10 contraction occurs, that means that the mesh
11 can shrink as well because it's -- if it's
12 encapsulated within that shrinking tissue;
13 right?
14 A Anywhere there's scarring, there's
15 contracture.
16 Q Right.
17 A There's scarring from any surgery.
18 Q So, my question is: Do you believe that the
19 contracture of that mesh in a procedure that
20 involved mesh presents unique risks to the
21 patient?
22 MS. VAN STEENBURGH: Object to
23 form.
24 THE WITNESS: Such a play with

Page 259

1 words. It's scarring around the mesh.
2 Scarring around the cut is always there. And
3 that has to be taken into consideration when
4 you do these things. The mesh itself I don't
5 believe shrinks.
6 BY MR. FAES:
7 Q So, do you think that nerves can become
8 entrapped in the interstices of the mesh and
9 that can cause pain as the mesh shrinks in a
10 patient?
11 MS. VAN STEENBURGH: Objection.
12 THE WITNESS: Yes. If you put
13 the mesh over a nerve, yes; or on the nerve
14 or in a nerve, yes.
15 BY MR. FAES:
16 Q And, in fact, have you reviewed any kind of
17 documents or anything from Ethicon and
18 Johnson & Johnson indicating that that was a
19 concern with their pelvic meshes?
20 A I can't recall exactly the document. But
21 it's a fact and known, yes.
22 Q So, you state that in your experience, "the
23 TVT mesh does not curl, rope, shrink,
24 contract, or experience poor collapse when

Page 260

1 implanted as directed in the IFU."
2 Is that an opinion you intend to
3 offer in this case?
4 A Yes.
5 Q So, if it's not implanted as directed in the
6 IFU, do you believe the TVT mesh can curl?
7 A Yes.
8 Q Do you believe that the only time the TVT
9 mesh can curl is if it's not implanted
10 correctly?
11 A That, I can't say.
12 Q Do you believe that the TVT mesh can rope if
13 it's not implanted as directed in the IFU?
14 A There has to be some tension.
15 Q Do you believe that the only way that the
16 TVT mesh can rope is if it's not implanted
17 as directed in the IFU?
18 MS. VAN STEENBURGH: Object to
19 form.
20 THE WITNESS: There's maybe a
21 possibility if the patient is doing too
22 strenuous exercise or having intercourse too
23 early that they can put some tension on the
24 tape. I think if they follow the rules and

Page 261

1 don't lift too heavy, don't exercise too
2 heavy, don't have intercourse for a while,
3 the mesh will heal in flat. If they do
4 strenuous things, I don't know if this has
5 ever been tested, but it's a thought that
6 maybe there's tension on it, it can do it.
7 But I think most of the time when there's
8 issues with the mesh, it's because it's been
9 tugged on during surgery.
10 BY MR. FAES:
11 Q So, do you believe that the TVT mesh can
12 shrink or contract if it's not implanted as
13 directed in the IFU?
14 MS. VAN STEENBURGH: Objection,
15 form.
16 THE WITNESS: If it shrinks,
17 you can end up with overcorrection, and we
18 test for that. Every person gets tested. If
19 it is on the tight side by the surgeon and
20 then it shrinks a little bit, scars a little
21 bit, possibly. We look for it and we deal
22 with it if it is there.
23 BY MR. FAES:
24 Q But my question is: Do you believe that the

Raghvald Mjanger, M.D.

## Page 262

1  TVT mesh can shrink or contract even if it's
2  implanted exactly as directed in the IFU, or
3  instructions for use?
4          MS. VAN STEENBURGH: Object to
5  form.
6          THE WITNESS: Unlikely. But
7  could it possibly? Probably. If she's
8  overactive. I don't know how she would get
9  tension on it after it's in. I can't say
10  never.
11  BY MR. FAES:
12  Q  Do you believe that the TVT mesh can
13  experience poor collapse when -- strike
14  that.
15          Do you believe that the TVT mesh can
16  experience poor collapse if it's not
17  implanted as directed in the IFU?
18  A  Yeah. If it's tugged on.
19  Q  So, do you think the only way that a TVT
20  mesh can experience poor collapse is if it's
21  put in wrong?
22          MS. VAN STEENBURGH: Object to
23  form.
24          THE WITNESS: These are

## Page 263

1  questions that are asking for absolute
2  answers. I can't give you absolute answers
3  for almost anything in medicine.
4  BY MR. FAES:
5  Q  You go on to state here that "If the TVT
6  mesh had significant contracture, it would
7  contract uniformly, chronically elevating
8  the bladder and leaving almost all patients
9  with voiding dysfunction."
10          Do you see that?
11  A  Yes, that's what I'm saying.
12  Q  So, it's your belief that in order for the
13  TVT mesh to have significant contracture,
14  that all patients have to experience the
15  same kind of uniform contraction?
16          MS. VAN STEENBURGH: Object to
17  form.
18          THE WITNESS: Yeah. It's like
19  if I put a rope around my neck and tighten
20  it so you almost couldn't breathe, that's the
21  way the things have to be to work. And then
22  the rope shrunk, you wouldn't be able to
23  breathe. We wouldn't know it.
24

## Page 264

1  BY MR. FAES:
2  Q  So, you don't believe that different
3  patients can have different reactions to the
4  TVT mesh where some might have a significant
5  inflammatory response which could cause a
6  lot of contracture but another person might
7  not have the same reaction to the mesh?
8          MS. VAN STEENBURGH: Object to
9  form.
10          THE WITNESS: If that was a big
11  problem, we would see a lot more patients
12  with obstruction after it was put in.
13  BY MR. FAES:
14  Q  How many patients -- what percentage of
15  patients would you need to see in order for
16  you to conclude that there was a significant
17  problem with mesh contracture?
18  A  I can't give you a number. A statistician
19  would have to give you that. I can say that
20  when we put slings in, if over time there's
21  anything that happened is that some of them
22  will start leaking after a while indicating
23  that there's more slacking than shrinking.
24  I don't think shrinking of a sling after

## Page 265

1  it's been put in is a big problem or we
2  would have seen it. It's more like if I can
3  get her dry today, she's more likely to leak
4  after a while than she is to become
5  obstructed after a while.
6  Q  Well, what percentage of patients would you
7  need to see with shrinkage or contraction of
8  the sling before you would conclude that the
9  device is not -- that the design of the
10  device is not reasonable?
11  A  That's a statistical question and I cannot
12  answer that.
13  Q  So, you don't have any objective standard
14  that you're applying for your opinion that
15  the fact that the TVT mesh can shrink is not
16  a defect or problem with the mesh?
17  A  If it shrunk, it probably would be a good
18  thing. It would be leaking less. The
19  problem is that you may not hold tight
20  forever and some start leaking after a
21  while. Sometimes we even put in a new
22  sling. I cannot remember any that have had
23  a normal post procedure after surgery and
24  then a month or two or three later have

Raghvald Mjanger, M.D.

Page 266

1　retention.  I haven't seen that.  I would
2　have to see at least one before I would
3　start thinking that's an issue.
4　Q  So, how many would it take?  Would it take
5　more than one?
6　A  It would take at least one.  I haven't seen
7　one yet.  If they're too tight, they're too
8　tight the day of or the day after surgery.
9　We even let them go for a while to see if
10　they loosen up over time.  We don't look for
11　them to tighten.  If someone has this thing
12　too tight, it doesn't help to let her go for
13　a month to see if it tightens up.
14　Theoretically, it might be a problem.  In
15　reality, it's not a problem.
16　Q  So, you've never seen reports in the medical
17　literature of someone who developed urinary
18　retention after the TVT sling -- a year
19　after the TVT was implanted?
20　A  I haven't seen that.
21　Q  Okay.
22　A  Not that I can recall.
23　Q  If there were reports in the medical
24　literature that indicated that to be the

Page 267

1　case, is that something you want to see
2　before you form any opinions on it?
3　A  Yeah, I'd be interested in it.  I haven't
4　seen it that I can recall.
5　Q  So, that might change your opinion regarding
6　whether or not the TVT mesh shrinks or
7　contracts, if there were multiple reports of
8　that in the medical literature?
9　　　　　MS. VAN STEENBURGH:  Object to
10　form.
11　　　　　THE WITNESS:  I don't see the
12　point of contracting or not contracting.  I'm
13　looking for a healthy patient that don't leak
14　and don't have pain.
15　BY MR. FAES:
16　Q  So, I'm looking at your next paragraph in
17　your expert report regarding degradation.
18　And let me just start off with this
19　question, because your report's a little bit
20　unclear to me.
21　　　　　Is it your opinion that the TVT mesh
22　doesn't degrade in vivo or that it degrades
23　but it's not clinically significant?
24　A  I don't see it being clinically significant.

Page 268

1　I'm looking for -- I don't see it being
2　clinically significant.
3　Q  So, you do believe -- but you do believe
4　that the TVT mesh degrades in vivo?
5　A  I've seen some theories about it.  I know a
6　lot of people don't believe in it.  I have
7　never seen it being a clinical relevance.  I
8　don't know what the relevance is.
9　Q  Would you agree with me that if the
10　degradation of the TVT is shown to have
11　clinical significance, that that would
12　indicate a problem or defect with the mesh?
13　　　　　MS. VAN STEENBURGH:  Object to
14　form.
15　　　　　THE WITNESS:  I can't answer
16　that.
17　BY MR. FAES:
18　Q  What would you need to know in order to
19　answer that?
20　A  I know so little about degradation.  I have
21　never seen it or heard of it being a
22　problem.  It's not something we deal with or
23　worry about.  So, I just cannot make a
24　statement.  I think it's clinically

Page 269

1　irrelevant.
2　Q  In your report on the following page, you
3　state that based on your experience and from
4　the literature, "there's no difference
5　between laser-cut versus mechanically cut
6　mesh from a clinical standpoint."
7　　　　　Do you see that?
8　A  Yes.
9　Q  And that's an opinion you intend to offer in
10　this case?
11　A  Yeah.  I don't think there's really that
12　much practical difference except in the
13　ending of it.
14　Q  So, you don't think there's that much
15　difference or you think there's no
16　difference?
17　A  There's a slight difference, like I talked
18　about earlier today.
19　Q  I think I already asked you enough about
20　your clinical experience on that point, but
21　I want to ask with regard to the literature,
22　are you aware of any randomized clinical
23　study specifically comparing laser-cut TVT
24　mesh to mechanically cut TVT mesh with

Raghvald Mjanger, M.D.

Page 270

1    regard to safety?
2    A  I believe I've seen article about it.
3    Q  Which articles?
4    A  I can't recall right now.  If you put it in
5       front of me, I'll look at it.  But I just
6       don't recall the article right now.
7    Q  Same question with regard to TVT-O.  Do you
8       think that there's been any randomized
9       clinical -- strike that.
10           Are you aware of any randomized,
11       controlled clinical study specifically
12       evaluating safety comparing the laser-cut
13       TVT to the mechanically cut TVT-O?
14   A  I think everything we use now is laser cut.
15       I don't see the relevance of the whole
16       discussion of one versus the other.  I don't
17       think there's more incontinence if you use
18       one or the other.
19   Q  So, you've issued an opinion in this case
20       that you believe that the design of the TVT
21       is reasonably safe; right?
22   A  Yes.
23   Q  Would you agree with me that with regard to
24       erosions, there could be a level of erosion

Page 271

1    seen with the TVT where that could indicate
2    that that device -- that the design of that
3    device was not safe?
4           MS. VAN STEENBURGH:  Object to
5    form.
6           THE WITNESS:  I don't believe
7    that.  Erosion is when it goes into the
8    urethra.  And it's very easy to cut the
9    urethra if you're not experienced enough.
10   I've seen people do that.
11   BY MR. FAES:
12   Q  I think I asked a bad question, so let me
13       try to ask another one.
14           Would you agree that there could be a
15       rate of erosions, extrusions, and exposures
16       seen with a stress urinary device like the
17       TVT that would indicate to you that that
18       device is not reasonably safe for use?
19           MS. VAN STEENBURGH:  Object to
20   form.
21           THE WITNESS:  No, no.
22   BY MR. FAES:
23   Q  So, there's no percentage in your mind that
24       that --

Page 272

1    A  No, no.  I don't believe it has as much to
2       do with the sling itself as it has to do
3       with the condition of the tissue in the
4       woman, her age and years of estrogen, and
5       the surgeon's surgical technique.
6    Q  So, theoretically, a study -- strike that.
7           Theoretically, the TVT device could
8       have an erosion rate of 99 percent, erosion
9       exposure, extrusion rate of 99 percent, and
10      you might still find that the design of that
11      device is safe for its intended use?
12           MS. VAN STEENBURGH:  Object to
13      form.
14           THE WITNESS:  I've never heard
15      of an erosion rate of 99 percent.  It
16      probably wouldn't even be on the market.
17   BY MR. FAES:
18   Q  That's kind of what I'm getting at, Doctor.
19          What percentage of erosions,
20      extrusions, and exposures combined would
21      indicate to you that that device, like the
22      TVT, is not acceptable for its intended use
23      for stress urinary incontinence?
24           MS. VAN STEENBURGH:  Object to

Page 273

1    form.
2           THE WITNESS:  I cannot give you
3    a figure.  It has no base in clinical
4    practice, the question.  It's far more that
5    goes into a decision on using a sling than a
6    number in a hypothetical case.
7    BY MR. FAES:
8    Q  And I assume that you're --
9    A  It makes no sense.
10   Q  So, you can't articulate any objective
11       standard that you're applying for an
12       acceptable complication rate for the TVT or
13       TVT-O to conclude that the design is
14       reasonably safe for its intended use?
15   A  That's for a researcher to do that.  As far
16       as I'm concerned, the TVT is very, very
17       safe.  We put them in a variety of patients
18       with other issues that don't come up here.
19   Q  Are you familiar with -- well, strike that
20       and let me back up.
21          As you sit here today, are there any
22       medical devices for the treatment of stress
23       urinary incontinence that you consider to be
24       not reasonably safe for its intended use?

Raghvald Mjanger, M.D.

Page 274

1    A   Not reasonably safe?
2    Q   Yes.
3    A   No.  The ones we use, I think they're all
4        reasonably safe.
5    Q   So, I guess my question is:  If you're
6        concluding that the design of the TVT and
7        TVT-O devices is reasonably safe, how would
8        I know a design of an SUI device wasn't
9        reasonably safe?
10            MS. VAN STEENBURGH:  Object to
11       form.
12            THE WITNESS:  You would have to
13       ask people who are in the business of
14       designing them.  I'm in the business of using
15       it.  I think it's a very safe product,
16       compared to the other option which is far
17       more invasive surgery with its own risks.  It
18       may not be a risk of erosion but there are
19       other risks involved.
20   BY MR. FAES:
21   Q   So, is there any objective standard that you
22       can give me to where you would say that a
23       device for the treatment of stress urinary
24       incontinence is not reasonably safe for its

Page 275

1        intended use?
2    A   No, I cannot give you that.
3            (Exhibit No. 20 Marked.)
4
5            MS. VAN STEENBURGH:  How much
6        time do we have left?
7            THE COURT REPORTER:  None.
8            MR. FAES:  Sixty more seconds?
9            MS. VAN STEENBURGH:  Sure.
10   BY MR. FAES:
11   Q   Doctor, I'm handing you what's been marked
12       as Exhibit No. 20.  This is a printout that
13       I took yesterday from your website.
14           Do you see that?
15   A   Yes.
16   Q   And that's you at the top?
17   A   Yes.
18   Q   And is that your partner, Dr. Hallman?
19   A   Hallman.  Yes.
20   Q   If you look over on the left side, "If you
21       suffer from urinary incontinence and would
22       like free treatments as part of a new study,
23       please click here to contact us for more
24       information."

Page 276

1            Do you see that?
2    A   That's correct.
3    Q   What's that referring to?
4    A   We're doing a clinical study on a product
5        for muscle training.
6    Q   What product is that?
7    A   It is a sensor that senses when she's using
8        the right muscles to guide her in
9        exercising.
10   Q   Is that a medical device?
11   A   It is a medical device that is -- I think
12       the FDA doesn't consider it risky or
13       dangerous.  You can almost go and sell it.
14       It's almost like a vibrator.  The study is
15       being done at the University of Minnesota, a
16       university in Seattle, and our group.  And
17       it basically has to do with training of
18       muscles in the pelvic floor.
19   Q   Last question.
20           What's it called and who makes it?
21   A   It's not in production yet.  I don't even
22       know what the name of it is.
23           MS. VAN STEENBURGH:  And I
24       don't know if you're under some kind of

Page 277

1        agreement in terms of confidentiality.
2            MR. FAES:  I'm just curious who
3        makes it.
4            THE WITNESS:  I don't know.
5        The study hasn't even started.
6            MR. FAES:  Fair enough.  I have
7        many more questions for you, but I'm out of
8        time.
9            THE WITNESS:  I'm in the
10       process of taking a class on confidentiality
11       and studies.
12           MS. VAN STEENBURGH:  All right.
13       I have a few questions but I need to take a
14       break and get a couple of documents.
15           (Recess began - 3:10 p.m.)
16           (Recess ended - 3:20 p.m.)
17           EXAMINATION
18   BY MS. VAN STEENBURGH:
19   Q   Doctor, you were asked some questions about
20       what would or wouldn't be an acceptable or
21       unacceptable rate of complications.  So, for
22       example, erosion.
23           Do you remember those questions?
24   A   Yes.

Raghvald Mjanger, M.D.

Page 278

1  Q  So, what is acceptable or not acceptable, is
2     that the analysis, or is there a
3     risk/benefit analysis when you're looking at
4     patients?  In science, is there any
5     absolute, acceptable rate?
6  A  I don't know if there's an absolute.
7  Q  Right.  And so when you talk with your
8     patients, what are you analyzing in terms of
9     what you provide relative to the risks and
10    benefits to them?
11 A  Well, I sit and I draw pictures and I
12    explain and I go over the benefits of the
13    surgery and the risks involved.  I can guide
14    them a little bit.  Some of them have very
15    strong opinions.  Some ask me what I
16    recommend.  I have to make sure I go over
17    the risks as well as the benefits.
18 Q  And as part of your analysis of what those
19    risks and benefits are, you've taken a look
20    at some of the literature, have you not?
21 A  Right.
22 Q  And you've taken a look at some of the
23    complication rates?
24 A  Right.

Page 279

1  Q  I'm going to show you a couple of things.
2        (Exhibit No. 21 Marked.)
3
4  BY MS. VAN STEENBURGH:
5  Q  Doctor, I'm showing you what's marked as
6     Deposition Exhibit No. 21.  This is an
7     article by first author of Welk.
8        And that's something that's on your
9     reliance list, is it not?
10 A  Yes.
11 Q  Okay.  And this article is entitled,
12    "Removal or Revision of Vaginal Mesh Used
13    for the Treatment of Stress Urinary
14    Incontinence"; correct?
15 A  Yes.
16 Q  All right.  And if you'd go to page E3, this
17    was an analysis of -- they identified over
18    59,000 women who underwent procedures for
19    stress urinary incontinence and overall 1307
20    underwent mesh removal or revision after
21    having received a mesh implant for stress
22    urinary incontinence.
23       Do you see that there?
24       MR. FAES:  Object to form.

Page 280

1        THE WITNESS:  Yes.
2  BY MS. VAN STEENBURGH:
3  Q  And what was the complication rate that the
4     authors found based on their analysis here?
5     What was the percentage that --
6  A  What page are you on?
7  Q  What was the percentage that underwent
8     removal or revision?
9  A  What page?
10 Q  E3.
11 A  Here it is.  Okay.  2.2 percent.
12 Q  And is that consistent with what you see in
13    your practice, Doctor?
14       MR. FAES:  Object to form.
15       THE WITNESS:  Yes.  It's more
16 in that range.
17 BY MS. VAN STEENBURGH:
18 Q  And Doctor, as part of your practice, do you
19    perform removal on patients that you have
20    not implanted mesh -- for whom you have not
21    implanted mesh?
22 A  Yes.
23 Q  Okay.  So, you are referring, Doctor, from
24    other doctors; is that right?

Page 281

1  A  Yes.
2  Q  So, some of your patient population includes
3     mesh removal for patients who had a
4     different person as an implanter; is that
5     right?
6  A  That's correct.
7  Q  And Doctor, when you tell patients about
8     what the possible percentage is that they
9     may have to go in for mesh removal, is that
10    a number that you give to them as one of the
11    risks and benefits that you talk about?
12 A  Yes.  I don't have a log of my own, so I
13    have to quote pretty much what's in the
14    literature.  And this is a number that comes
15    up.  2.2 percent.
16 Q  And is that consistent with other literature
17    that you reviewed in connection with the
18    risk factors for the midurethral sling
19    revision?
20       MR. FAES:  Object to form.
21       THE WITNESS:  Say that again.
22 BY MS. VAN STEENBURGH:
23 Q  And is that number consistent with other
24    studies that you've reviewed regarding the

Raghvald Mjanger, M.D.

Page 282

1   risk for revision for the midurethral sling?
2        MR. FAES:  Object to form.
3        THE WITNESS:  That's correct.
4   BY MS. VAN STEENBURGH:
5   Q   Doctor, with respect to the article that you
6       were shown in the Minnesota Physician, when
7       there's a reference to the use of the da
8       Vinci Surgical System, that is for mesh
9       removal and reconstructive surgery.  That's
10      not something that you use to put in slings;
11      correct?
12  A   That's correct.
13  Q   And that's something used for prolapse
14      surgery as well; correct?
15  A   That's correct.
16  Q   So, in this article, are you talking about
17      slings and prolapse surgery?
18  A   That is something that was put in there
19      around the time when I also sent out letters
20      to doctors in the area about removal of mesh
21      using a robot to avoid cutting in the
22      vagina, and that's what it's alluded to
23      there.  It's a newer way of removing mesh
24      causing less harm.

Page 283

1   Q   Doctor, you talked a little bit about some
2       of the complications -- or counsel asked you
3       some questions about complications relating
4       to mesh surgery.  And one of them is acute
5       and chronic pain.
6           Do you recall that?
7   A   Yes.
8   Q   Is that a risk or possible complication with
9       any pelvic surgery?
10  A   Yes.
11  Q   And is that something that was known as a
12      risk or complication relative to pelvic
13      surgery prior to the use of mesh?
14          MR. FAES:  Object to form.
15          THE WITNESS:  Yes.
16  BY MS. VAN STEENBURGH:
17  Q   Same question about dyspareunia.
18          I think you indicated that
19      dyspareunia is a risk or complication for
20      any pelvic surgery; is that correct?
21  A   That's correct.
22  Q   And based upon your experience and your
23      knowledge, was that a risk that was known to
24      yourself or other surgeons prior to the use

Page 284

1   of mesh as a treatment for stress urinary
2   incontinence?
3        MR. FAES:  Object to form.
4        THE WITNESS:  Yes.
5   BY MS. VAN STEENBURGH:
6   Q   Is neuromuscular pain or problems, is that a
7       risk or possible complication from any
8       pelvic surgery?
9        MR. FAES:  Object to form.
10       THE WITNESS:  Yes.
11  BY MS. VAN STEENBURGH:
12  Q   And that's not unique to mesh, is it?
13       MR. FAES:  Object to form.
14       THE WITNESS:  No.
15  BY MS. VAN STEENBURGH:
16  Q   Is urge incontinence a possible risk or
17      complication from any pelvic surgery?
18       MR. FAES:  Object to form.
19       THE WITNESS:  Yes, it is.
20  BY MS. VAN STEENBURGH:
21  Q   And is that a complication or risk that is
22      unique to mesh?
23       MR. FAES:  Object to form.
24       THE WITNESS:  No.

Page 285

1   BY MS. VAN STEENBURGH:
2   Q   What about urinary frequency?  Is that a
3       risk or complication of general pelvic
4       surgery?
5        MR. FAES:  Object to form.
6        THE WITNESS:  Yes, it is.
7   BY MS. VAN STEENBURGH:
8   Q   And is that a risk or complication that is
9       unique to mesh?
10       MR. FAES:  Object to form.
11       THE WITNESS:  No.
12  BY MS. VAN STEENBURGH:
13  Q   And finally, urinary retention, is that a
14      risk or complication that is consistent
15      with -- one of the risks or complications
16      for any pelvic surgery?
17       MR. FAES:  Object to form.
18       THE WITNESS:  That is correct.
19  BY MS. VAN STEENBURGH:
20  Q   Okay.  Is that a unique risk or complication
21      to mesh?
22       MR. FAES:  Object to form.
23       THE WITNESS:  No.
24

Raghvald Mjanger, M.D.

Page 286

BY MS. VAN STEENBURGH:

1 BY MS. VAN STEENBURGH:
2 Q Doctor, you mentioned that you thought that
3 the information provided in the IFU was
4 adequate or satisfactory. And I think you
5 mentioned something about the IFU is not
6 necessarily the only source of information
7 that a physician relies on.
8      Do you remember that testimony?
9          MR. FAES: Object to form.
10         THE WITNESS: Yes.
11 BY MS. VAN STEENBURGH:
12 Q What are some of the other sources, if any,
13 that you as a clinician rely on besides the
14 IFU?
15 A Published articles, review courses,
16 continuing medical education. I belong to
17 an organization called Minimal Invasive
18 Surgery and Pelvis. So, it's a whole body
19 of information.
20 Q So, to summarize, you said that information
21 regarding risks or complications include the
22 literature; is that right?
23 A Yes.
24 Q And seminars and other things that you

Page 287

1 attend.
2          MR. FAES: Object to form.
3          THE WITNESS: Yes.
4 BY MS. VAN STEENBURGH:
5 Q Conversations with colleagues?
6          MR. FAES: Object to form.
7          THE WITNESS: Yes.
8 BY MS. VAN STEENBURGH:
9 Q And your own clinical experience?
10         MR. FAES: Object to form.
11         THE WITNESS: Yes.
12 BY MS. VAN STEENBURGH:
13 Q Doctor, are you aware of any studies
14 regarding the safety or efficacy of using
15 Ultrapro as a material for a urinary sling?
16 A I don't think so. I can't recall.
17 Q Have you seen any scientific evidence
18 showing that Ultrapro would be a safer or
19 more effective material for a stress urinary
20 sling?
21 A No.
22 Q Do you even know when Ultrapro became
23 available as a material for any use in any
24 mesh product?

Page 288

1 A No.
2 Q Doctor, you indicated that you have removed
3 slings where there has been no extrusion and
4 you said that sometimes you've seen that
5 it's been placed in the wrong place, that
6 it's too tight or too loose and sometimes
7 for pain.
8      Do you remember that?
9          MR. FAES: Object to form.
10         THE WITNESS: Yes.
11 BY MS. VAN STEENBURGH:
12 Q In the cases regarding pain, what, if any,
13 conclusion have you reached as to whether
14 the mesh is the cause of that pain?
15         MR. FAES: Object to form.
16         THE WITNESS: It's extremely
17 important that it's inserted correctly. And
18 if it's deviated from the perfect position,
19 there's a much greater chance there could be
20 pain involved. Most of the slings that I go
21 in and take out for pain are sitting wrong.
22 BY MS. VAN STEENBURGH:
23 Q And Doctor, as I understand it, you have
24 implanted the TVT, both the mechanically cut

Page 289

1 mesh as well as a laser-cut mesh for that
2 product; right?
3 A Right.
4 Q And in your clinical experience, have you
5 noted any differences in terms of
6 performance relative to efficacy, whether
7 it's mechanically cut or laser cut?
8 A No.
9 Q And how about with respect to safety?
10 A No.
11 Q And is it -- my understanding is your
12 testimony is your preference is for
13 laser-cut mesh because of the way you like
14 to handle it as a surgeon as opposed to any
15 clinical impact on the patient?
16         MR. FAES: Object to form.
17         THE WITNESS: That's right.
18 BY MS. VAN STEENBURGH:
19 Q Doctor, in reaching your opinions in
20 connection with the TVT and the TVT-O, do
21 you differentiate in terms of the different
22 kinds of levels of evidence that you
23 consider important or significant?
24 A Yes.

Ragnvald Mjanger, M.D.

Page 290

1  Q  And what are those levels of evidence?

2  A  One, two, and three.

3  Q  And what is level one evidence?

4  A  That is the one with the most appropriate

5     statistics.

6  Q  So, a random, controlled study or meta

7     analysis of that?

8  A  Correct.

9  Q  And what's level two?

10 A  Now you're testing me.  Where's the pyramid?

11 Q  That's all right.  We'll go to level three.

12    Level three is about the case reports

13    and those kind of things; right?

14 A  Yes.  That's the least reliable.

15    MR. FAES:  Object to form.

16 BY MS. VAN STEENBURGH:

17 Q  And in considering whether -- strike that.

18    And in reviewing the literature in

19    connection with your opinions relative to

20    your report, what was the level of evidence

21    that you relied on primarily for your

22    opinions?

23 A  Level one studies.

24    MS. VAN STEENBURGH:  That's all

Page 291

1     I have.  Thank you, Doctor.

2

3     (Time Noted:  3:35 p.m., Thursday, July

4     20, 2017.)

5     (The signature was reserved.)

6

7              * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 292

1  STATE OF MINNESOTA  )
                       ) ss.
2  COUNTY OF SCOTT     )

3

4  Be it known that I took the deposition of RAGNVALD
   MJANGER, M.D. on the 20th day of July, 2017, in
5  Minneapolis, Minnesota;
   That I was then and there a Notary Public in and for
6  the County of Scott, State of Minnesota and that by
   virtue thereof, I was duly authorized to administer
7  an oath;

8

   That the witness before testifying was by me first
9  duly sworn to testify the whole truth and nothing but
   the truth relative to said cause;
10

   That the testimony of said witness was recorded in
11 Stenotype by myself and transcribed into typewriting
   under my direction, and that the deposition is a true
12 record of the testimony given by the witness to the
   best of my ability;
13

   That the cost of the original transcript has been
14 charged to the party noticing the deposition, unless
   otherwise agreed upon by Counsel, and that copies
15 have been made available to all parties at the same
   cost, unless otherwise agreed upon by Counsel;
16

   That I am not related to any of the parties hereto
17 nor interested in the outcome of the action;
   That the reading and signing of the deposition by the
18 witness and the Notice of filing were not waived;

19

   WITNESS MY HAND AND SEAL this 26th day of July, 2017.
20

21    _____

22      Sandra D. Burch, RPR, CRR

23    My Commission expires January 31, 2020

24

Page 293

1     - - - - - -

        E R R A T A

2     - - - - - -

3

4  PAGE  LINE  CHANGE

5  ____  ____  _____

6        REASON: _____

7  ____  ____  _____

8        REASON: _____

9  ____  ____  _____

10       REASON: _____

11 ____  ____  _____

12       REASON: _____

13 ____  ____  _____

14       REASON: _____

15 ____  ____  _____

16       REASON: _____

17 ____  ____  _____

18       REASON: _____

19 ____  ____  _____

20       REASON: _____

21 ____  ____  _____

22       REASON: _____

23 ____  ____  _____

24       REASON: _____

Ragnvald Mjanger, M.D.

Page 294

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5    hereby certify that I have read the
6    foregoing pages, and that the same is
7    a correct transcription of the answers
8    given by me to the questions therein
9    propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   RAGNVALD MJANGER, M.D.          DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20_____.
20   My commission expires:_____
21
     _____
22   Notary Public
23
24