# EXHIBIT A

GUELCHER EXHIBIT A

| Case Name | Docket Number |
|---|---|
| Bell, Patricia D. & Joseph | 2:12cv06750 |
| Blake, Patricia & Dale | 2:12cv07901 |
| Clark, Phyllis | 2:12cv06481 |
| Deaton, Sherry P. | 2:12cv05774 |
| DuBois, Virginia L. & Ronald | 2:12cv08070 |
| Friberg, Gloria & Henry | 2:12cv06500 |
| Gray, Ora Kay & Clarence Allen | 2:12cv07251 |
| Greenwood, Kassandra & Cody | 2:12cv07889 |
| Harrison, Lela B. & Larry | 2:12cv06160 |
| Hosbrook, Patricia | 2:12cv07843 |
| Jennings, Iris A. & Michael | 2:12cv06217 |
| Phelps, Teresa L. | 2:12cv05790 |
| Underwood, Martha A. | 2:12cv06162 |
|  |  |

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

| | |
|---|---|
| IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 |
| THIS DOCUMENT RELATES TO<br><br>WAVE 5 CASES | JOSEPH R. GOODWIN<br><br>U.S. DISTRICT JUDGE |

## EXPERT REPORT OF SCOTT GUELCHER, PH.D.

The opinions which are held and expressed to a reasonable degree of scientific certainty are as follows:

### I.        QUALIFICATIONS

**Scott Guelcher, Ph.D.**

I received my Bachelor's Degree in Chemical Engineering from Virginia Tech in 1992, my Master's Degree in Chemical Engineering from the University of Pittsburgh in 1996, and my Ph.D. in Chemical Engineering from Carnegie Mellon University in 1999.  I completed my training as a Post-Doctoral Research Associate in Biomedical Engineering at Carnegie Mellon University in 2005.

I am currently a Professor of Chemical and Biomolecular Engineering at Vanderbilt University.  Prior to my current appointment, I was an Associate Professor from 2012 through 2016 and an Assistant Professor from 2005 through 2012.  I was recently appointed a Chancellor's Faculty Fellow for the period 2015 – 2017, and in December 2016 I was appointed the Director of the Vanderbilt Center for Bone Biology in the Department of Medicine at Vanderbilt University Medical Center.  In 2016, I taught Design Projects (Spring) and Applied Chemical Kinetics (Fall).  In 2017, I am teaching Design Projects (Spring).

My professional experience includes: Associate Scientist and Senior Associate Scientist at Bayer Corporation, Polyurethanes Division, in South Charleston, West Virginia from 1999-2003; Trainee at Philips Research, in Eindhoven, The Netherlands in 1998; Limited Service Employee at Eastman Chemical Co. from 1995-1997; and Chemical Engineer at Eastman Chemical Co. from 1992-1994.  I am active in several professional societies, including the American Institute of Chemical Engineers, the American Chemical

Society, the Society for Biomaterials, the Cancer and Bone Society, and the Interdisciplinary Research Society for Bone and Joint Injectable Biomaterials. My research interests include biomaterials design and development, drug and gene delivery, tissue engineering, and *in vitro* models for cancer metastasis to bone.

My experience, education and training and a complete list of my published articles are summarized in my Curriculum Vitae attached to this report as Exhibit A. I have published 83 peer-reviewed articles, including four on the design of scaffolds that degrade in response to secretion of reactive oxygen species and two on oxidation and degradation of polypropylene pelvic mesh. I also have experience in the design of biologic and tissue-engineered grafts for regeneration of cutaneous tissue and bone, having published 24 peer-reviewed papers on biologic tissue grafts. I have co-authored 9 book chapters, given 53 invited presentations, and co-authored 184 abstracts presented at scientific meetings, two of which relate to oxidation of polypropylene in biomedical devices. I am a co-inventor on 11 issued U.S. and European Patents and 20 pending applications.

## II.    SUMMARY OF OPINIONS

This report is an examination and assessment of the polypropylene mesh utilized in devices manufactured by Ethicon to treat Stress Urinary Incontinence (SUI) and pelvic organ prolapse (POP).  All of the opinions presented herein are made to a reasonable degree of scientific certainty and within my field of expertise.

1) Polypropylene reacts with molecular oxygen by autoxidation outside the body at elevated temperatures, resulting in chain scission and deterioration in its mechanical properties;

2) After implantation in the body, polypropylene reacts with reactive oxygen species secreted by inflammatory cells, resulting in oxidation, chain scission and mesh embrittlement;

3) The dynamic environment where the polypropylene mesh is implanted coupled with the foreign body reaction leads to oxidation, chain scission, reduction in molecular weight, embrittlement, degradation, flaking, pitting, and cracking;

4) The human body does not stop responding to an implanted mesh, or any frayed particles of mesh released during implantation,  unless the product is removed in its entirety;

5) The mesh devices examined for this report are intended to last for the lifetime of the patient, but the presence of antioxidants does not permanently protect the PP against degradation, and thus it is not possible to guarantee that it will perform its intended function after implantation;

6) The effects of oxidation on the stability of Prolene were known to Ethicon prior to launching its SUI and POP devices, but the company did not consider the risks associated with polypropylene oxidation on the stability of Prolene mesh, to the detriment of patients implanted with the devices;

7) Polypropylene mesh is not inert and its properties change after implantation, which can lead to adverse events in an implantee; the use of heavy-weight meshes directly correlates with more exposure of polypropylene to the Foreign Body Reaction and greater changes after implantation, which increases the risk of complications.

8) Using autologous fascia lata, allograft, sutures (including polypropylene sutures), or polyvinylidene fluoride (PVDF) mesh does not present with the same chronic complications associated with the material properties of Ethicon's PP mesh.  All of these alternative materials, including using a less dense version of its PP mesh, were available when Ethicon's SUI and POP meshes were first commercialized.

### III.   BACKGROUND

Ethicon sells permanently implantable polypropylene-based meshes intended to treat Stress Urinary Incontinence (SUI) and Pelvic Organ Prolapse (POP). All of the products in this litigation use the same Prolene resin to make the polypropylene-based meshes examined in this report.[1] Prolene was developed by Ethicon in the late 1960s for use as a suture material[2] and is more than 97% polypropylene. Additives are blended with polypropylene to modify its properties, including the antioxidants dilauralthiodipropionate (DLTDP) and Santonox-R to protect Prolene during high-temperature processing and long-term storage[3], and the blue pigment copper phthalocyanate (CPC) to enhance its visibility.[4] Prolene resin is manufactured as pellets, which are extruded into monofilaments that are subsequently knit into a specific mesh pattern.[5]

Ethicon's SUI devices consist of their instructions for use (IFU), insertion tools, and a high-density mesh (105 $g/m^2$) knit from Prolene monofilaments that are 6 mil (0.006 inches) in diameter.[6] The Prosima, Prolift, and Gynemesh POP devices all consist of their IFU, insertion tools, and a lower density mesh (45 $g/m^2$, known as Gynemesh[7]) knit from Prolene monofilaments that are 3.5 mil (0.0035 inches) in diameter.[8] The mesh used in the Prolift+M POP device is a hybrid material comprising a blend of absorbable Monocryl (poly(glycolide-*co*-ε-caprolactone)) and Prolene. After the Monocryl is absorbed, the density of the remaining Prolene mesh is 28 $g/m^2$.[9]

---

[1] ETH.MESH.04941016; ETH.MESH.01310578; ETH.MESH.03987419; ETH.MESH.07876572; ETH.MESH.00019863; ETH.MESH.0181699
[2] ETH.MESH.02268619
[3] ETH.MESH.02268619
[4] *Id.*
[5] ETH.MESH. 03987419; ETH.MESH.01310578
[6] ETH.MESH.04941016
[7] ETH.MESH.01310578
[8] ETH.MESH.00074499
[9] *Id.*

## IV.    DISCUSSION

### 1)  Polypropylene reacts with molecular oxygen outside the body by the process of autoxidation

Polypropylene (PP) is a plastic that is formed by a chemical reaction that joins the monomer propylene (which is composed of three carbon atoms and six hydrogen atoms) into a long repeating chain in a process called polymerization.[10] All forms of PP are susceptible to oxidation at the tertiary hydrogen-carbon bond.[11]

Oxidative attack at the tertiary hydrogen bond is the rate-controlling step in degradation process and results in the PP molecular chain being broken, a process known as chain scission, with the consequent loss in molecular weight. The mechanism of PP autoxidation is shown in Figure 1.[12]  The process is autocatalytic, resulting in generation of more PP radicals (PP•) as the reaction progress. Thus, the reaction continues until no more PP can be broken down. The mechanism of PP autoxidation has been investigated extensively since the 1960s and was well known at the time that Ethicon was designing the mesh used in SUI and POP products.    As shown in Figure 1, the products of autoxidation include shorter PP chains with carbonyl (C=O) and hydroperoxide (COOH) groups covalently bound to the PP.  The presence of these groups can be detected by surface techniques such as FTIR and x-ray photoelectron spectroscopy (XPS) as evidence of





**Figure 1. Mechanism of PP autoxidation.** Initiation, propagation, and branching reactions lead to chain scission (loss of molecular weight). Products from autoxidation include hydroperoxide and carbonyl groups, which can be detected by analytical methods such as FTIR.

---

[10] EA Campo. Industrial Polymers. Hanser 2008, p. 74.
[11] HH Kausch.  The effect of Degradation and Stabilization on the Mechanical Properties of Polymers Using Polypropylene Blends as the Main Example.  *Macromol. Symp*. 225:165-178, 2005.
[12] Reference for Figure 1:  C Maier, T Calafut. Polypropylene: The Definitive User's Guide and Databook. Norwich, NY: Plastics Design Library, 1998.

oxidation.[13]

As shown in Figure 2, heat and UV radiation accelerate oxidation of PP.[14] Absorption of oxygen is diffusion-controlled, and the amorphous regions of the semi-crystalline PP are the most accessible to diffusion of $O_2$. The amorphous phase of PP comprises non-crystallizable segments of the PP chains as well as tie molecules that connect two neighboring crystalline domains. Since the toughness of PP depends on the number of tie molecules, cutting of the tie molecules during autoxidation is the primary factor contributing to embrittlement. The key features of oxidation of PP, in terms of the amount of molecular weight loss that is critical for embrittlement to occur is summarized in Figure 3.[15] An important finding from this study is that embrittlement occurs much earlier (~150 hours) than the induction time (~250 hours) determined by the concentration of carbonyl groups and hydroxyl groups associated with the hydroperoxide (COOH) under these conditions. Thus, the induction time overestimates the useful life of PP with respect to its mechanical properties.



**Figure 2. Autoxidation of PP is accelerated at elevated temperatures**. Oxygen absorption of stabilized PP increases with time and temperature in 100% $O_2$. The induction time is determined by extrapolating the autocatalytic constant rate portion of the curve (steeper slope) to the x-axis (dashed line). Reproduced from Oswald and Turi 1965.

The storage stability of unstabilized PP at ambient conditions has also been studied (Figure 4). When PP films were stored at room temperature and atmospheric $O_2$ concentration, the molecular weight (as measured by intrinsic viscosity) of PP dramatically decreased at 500 days (1.4 years).[16] Thus, while oxidation is accelerated at elevated temperatures and oxygen concentrations (Figure 2), even at ambient temperature and atmospheric oxygen concentration there is chain scission and molecular weight loss.

**2) After implantation in the body, polypropylene reacts with reactive oxygen species secreted by inflammatory cells, resulting in oxidation, chain scission and mesh embrittlement;**

Liebert et al.[17] (1976) reported the oxidation of unstabilized PP filaments in vivo in a subcutaneous implantation model in hamsters. An induction time of 108 days was determined based on FTIR measurements of hydroxyl (which includes the hydroperoxide

[13] B Fayolle, L Audouin, J Verdu. Oxidation-induced embrittlement in polypropylene – a tensile testing study. *Polym Degrad Stability* 70:333-40, 2000.

[14] HJ Oswald, E. Turi. The Deterioration of Polypropylene by Oxidative Degradation. *Polymer Engineering and Science*, 1965.

[15] B Fayolle, L Audouin, J Verdu. Oxidation-induced embrittlement in polypropylene – a tensile testing study. *Polym Degrad Stability* 70:333-40, 2000.

[16] HJ Oswald and E. Turi. The Deterioration of Polypropylene by Oxidative Degradation. *Polymer Engineering and Science*, 1965.

[17] TC Liebert, RP Chartoff, SL Cosgrove, RS McCuskey. Subcutaneous implants of polypropylene filaments. *Journal Biomedical Materials Research* 10:939-51, 1976.

COOH) and carbonyl groups. FTIR measurements of hydroxyl and carbonyl groups showed behavior similar to that observed by Fayolle (Figure 3), consistent with the oxidation mechanism. However, Liebert estimated that the induction time for oxidation under *in vivo* conditions ($37^{\circ}$C in 3.3% $O_2$) is approximately 20 years, which is dramatically higher than the measured value of 108 days. The authors suggested that enzymes or other chemicals secreted by cells accelerate the oxidation reaction. Recent papers have shown that this shorter induction time can be explained by the secretion of reactive oxygen species (ROS) by inflammatory cells near the PP fibers that oxidize and degrade the PP fibers *in vivo*.

Upon implantation, the body recognizes PP mesh as a foreign body, which elicits an inflammatory response known as the foreign body reaction.[18] In the early stages, mononuclear cells migrate to the surface of the PP fibers, where they can adhere and participate in the events of the foreign body reaction (Figure 5). Adherent macrophages on the surface of the implanted biomaterial fuse to form foreign body giant cells (FGBCs). Adhesion of macrophages and FBGCs at the biomaterial surface results in an isolated microenvironment between the surface of the biomaterial and the plasma membrane of the cell.[19] In a process known as frustrated phagocytosis, macrophages and FBGCs secrete reactive oxygen species (ROS), acids, and enzymes into this micro-environment. Consequently, the surface of the biomaterial is exposed to high concentrations of ROS, and the chemical composition of the biomaterial



**Figure 3. Degradation of unstabilized PP.** (A) Molecular weight decreases with time when exposed to oxygen at elevated temperatures (Fayolle et al. 2000). On the right y-axis, the concentration of hydroxyl (triangles) and carbonyl (squares) groups are shown. (B) Evolution of ultimate elongation (diamonds) and hydroxyl (triangles) and carbonyl (squares) groups during exposure to oxygen at elevated temperatures (Fayolle et al. 2000).

will determine its susceptibility to oxidative degradation. As an example, the polyether soft segment of poly(ether urethane)s is known to undergo oxidative degradation. The morphological progression of the foreign body reaction on a poly(ether urethane) surface is shown in Figure 6.[20]

---

[18] JM Anderson, A Rodriguez, DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol.* 20(2): 86–100, 2008.

[19] *Id.*

[20] *Id.*

While initial studies identifying adherent macrophages and FBGCs as sources of ROS focused on poly(ether urethane)s, these cell populations have also been reported to infiltrate PP mesh.[21]   In a recent study characterizing the foreign body reaction of PP implants in a rat abdominal wall model, macrophages and foreign body giant cells were observed both in the tissue surrounding the implant and also the implant itself.[22]  Thus, within one week after implantation PP mesh was colonized by macrophages and FBGCs.   Furthermore, PP mesh samples showed more inflammatory cells than PP sutures.   The hernia literature also provides evidence that the foreign body reaction alters PP *in vivo*.  In a study evaluating non-degradable meshes explanted from 17 patients that had surgery for repair of abdominal wall defects, a foreign body reaction characterized by granulation tissue and inflammatory cells 3 – 24 months post-implantation was seen.[23]   The authors observed that inflammation near synthetic materials implanted in the abdominal wall persists for years.  They further noted that this persistent foreign body reaction can lead to long-term complications, and that further studies are required to evaluate the long-term response of the host tissue to the implanted synthetic graft.  Costello et al. also examined explanted PP hernia mesh and noted that the observed degradation of PP fibers was consistent with the oxidation of PP mediated by phagocytic cells during the foreign body reaction.[24]



**Figure 4. Stability of unstabilized PP at room temperature**. Significant molecular weight loss occurs at 500 days. Reproduced from Oswald and Turi 1965.



**Figure 5.** *In vivo* transition from blood-borne monocyte to biomaterial adherent monocyte/macrophage to foreign body giant cell at the tissue/biomaterial interface. There is ongoing research to elucidate the biological mechanisms that are considered to play important roles in the transition to foreign body giant cell development.  From Anderson et al. Seminars in Immunology 2008.

---

[21] C Mary, Y Marois, MW King, G Laroche, Y Douville, L Martin, R Guidoin. Comparison of the In Vivo Behaviour of Polyvinylidene Fluoride and polypropylene Sutures Used in Vascular Surgery. *ASAIO Journal* 44:199-206, 1998; VV Iakovlev, ET Carey, J Steege. Pathology of Explanted Transvaginal Meshes. *Int. J. Medical, Health, Pharmaceutical and Biomedical Eng*. 8(9):510-513, 2014

[22] ML Konstantinovic, E Pille, M Malinowska, E Verbeken, D De Ridder, J Deprest. Tensile strength and host reponse towards different polypropylene implant materials used for augmentation of fascial repair in a rat model. *Int Urogynecol J* 18:619-26, 2007.

[23] U Klinge, B Klosterhalfen, M. Müller, V Schumpelick. Foreign Body Reaction to Meshes Used for the Repair of Abdominal Wall Hernias. *Eur J Surg* 165: 665–673, 1999.

[24] CR Costello, SL Bachman, BJ Ramshaw, SA Grant. Materials Characterization of Explanted Polypropylene Hernia Meshes. *J. Biomed. Mater. Res. Part B Appl. Biomat* 83:44-49, 2007; CR Costello, SL Bachman, SA Grant, DS Cleveland, TS Loy, BJ Ramshaw. Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants from a Single Patient. *Surg. Innov*. 14:168-76, 2007.

Three key studies published in 2015 that characterize the host inflammatory response to implanted PP provide further evidence that PP mesh undergoes oxidative degradation *in vivo*. Gynemesh PS and UltraPro, which are Prolene meshes used in Ethicon's POP products, were implanted in rhesus macaques by sacrocolpopexy after an abdominal hysterectomy.[25] After 12 weeks implantation time, the vagina-mesh tissue complexes were harvested and processed for histological and immunohistochemical analysis. Explanted Gynemesh PS and UltraPro meshes showed evidence of a foreign body reaction characterized by a dense mononuclear cell infiltrate near the surface of the mesh fibers. Mononuclear cells staining positive for the pan-macrophage marker CD68 were the cell type present at the highest density adjacent to the mesh fibers. The inflammatory response to all implanted PP meshes was characterized primarily by activated, pro-inflammatory M1 macrophages (an example of macrophages on Elasthane 80A are shown in Figure 7, Top Left).[26] The ratio of regenerative M2 macrophages to M1 macrophages was higher for the lower density UltraPro mesh compared to the



**Adhesive Events at Implanted Biomaterial Surface**

**Figure 6**. Scanning electron microscopy images of an Elasthane 80A Polyurethane surface from an in vivo cage study showing the morphological progression of the foreign body reaction. The sequence of events at the Polyurethane surface includes (A) monocyte adhesion (0 days), (B) monocyte-to-macrophage development (3 days), (C) ongoing macrophage-macrophage fusion (7 days), and (D) foreign body giant cells (14 days). From JM Anderson, A Rodriguez, DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol.* 20(2): 86–100, 2008.

[25] BN Brown, D Mani, AL Nolfi, R Liang, S Abramowitch, PA Moalli. Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque. *Am J Obstet Gynecol.* 213(5):668.e1-668.e10, 2015.

[26] JM Anderson, A Rodriguez, DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol.* 20(2): 86–100, 2008.

higher density Gynemesh PS. This finding is consistent with the mesh burden concept that the magnitude of the foreign body reaction increases with the amount of mesh in contact with host tissue. Thus, the work by Moalli et al. establishes that the foreign body reaction to implanted PP mesh is dominated by pro-inflammatory M1 macrophages. In a study I co-authored with Dr. Vladimir Iakovlev in 2015, we examined 164 explanted PP pelvic meshes by microscopy.[27] Examination of histological sections revealed the presence of inflammatory cells near the surface of PP fibers, and staining for the oxidative enzyme myeloperoxidase expressed by adherent inflammatory cells was positive on the surface of the



Figure 7. Oxidative degradation of PP mesh *in vivo*. Top Left: Table listing the total number of cells, percent of positive cells, and ratio of M2/M1 macrophages seen in x20 field (fiber) (Moalli et al., Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque.) Bottom Left: Additional stains of PP mesh, all images taken with 100x oil immersion objective and cropped to a different magnification, polypropylene degrada-tion layer is pointed between arrowheads: (a) Von Kossa stain is negative for calcium in the brittle "bark" (would stain calcium black), (b) trichrome stain shows that the deeper parts of the "bark" have smaller staining porosity (red) than those close to the surface (green) which correlates with TEM findings [Figure 6(b)], (c) immunohistochemical stain for immunoglobulin G (IgG, stained brown). IgG is present in almost all human tissues and fluids. It is deposited on the surface of degraded polypropylene but is not mixed within it. (d) Immunostain for the oxidizing enzyme of inflammatory cells myeloperoxidase (stains brown). (VV Iakovlev. *In vivo* degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. ) Right: A) SEM of explanted Pinnacle Mesh fibers [XP-7]. B) SEM of explanted Pinnacle Mesh fibers [XP-7]. C) SEM of explanted Pinnacle Mesh fibers [XP-7]. D) SEM image with regions selected for EDS. E) EDS Spectra from region 1 in D. F) EDS Spectra from region 2 in D. (A Imel, T Malmgren, M Dadmun, S. Gido, J Mays. In vivo oxidative degradation of polypropylene pelvic mesh, *Biomaterials*, 2015.).

degraded layer of the PP fibers (Figure 7, Bottom Left). Another study published in 2015 confirmed that the foreign body reaction to implanted PP mesh results in oxidative degradation of the mesh.[28] PP pelvic meshes explanted from 11 patients were characterized by FTIR, GPC, SEM with energy-dispersive x-ray spectroscopy (EDS), TEM, and TGA and compared to meshes that had not been implanted. FTIR spectra of explanted PP mesh showed broad peaks centered at 3400 $cm^{-1}$, which correspond to hydroxyl and peroxide groups, and at 1700 – 1750 $cm^{-1}$, which correspond to carbonyl

---

[27] VV Iakovlev, SA Guelcher, R Bendavid. *In vivo* degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *J Appl Biomed Mater Res B: Appl Biomater* 105(2):237-248, 2017.

[28] A Imel, T Malmgren, M Dadmun, S. Gido, J Mays. In vivo oxidative degradation of polypropylene pelvic mesh. *Biomaterials* 73:131-141, 2015.

groups associated with ketones, aldehydes, and carboxylic acids. Importantly, this study demonstrated that oxidized PP, which does not contain nitrogen, and biological material, which does contain nitrogen, could be distinguished by a combination of EDS and SEM. Regions of PP fibers with transverse cracks that were free of biological material were found to contain oxidized PP (Figure 7 Right). Furthermore, clean PP fibers that showed no evidence of transverse cracking revealed evidence of PP oxidation.

Two recent studies by the Moalli group at the University of Pittsburgh have reported the effects of PP mesh on host tissue and the inflammatory response. When PP mesh was implanted in the vaginal wall of rhesus macaques, mesh stiffness and density were negatively correlated with muscle outcomes, including myofiber function, contraction, and innervation.[29] Moalli et al. also examined the inflammatory response in fifteen SUI and twelve POP meshes explanted from 27 women, including two TVT meshes.[30] Histological analysis revealed evidence of macrophages, which were predominantly of the M1 pro-inflammatory phenotype, surrounding PP mesh fibers. Matrix metalloproteinase-9 (MMP-9) and MMP-2, which are associated with chronic inflammation, were significantly upregulated in mesh-vagina explants compared to vaginal tissue without mesh.[31] Mesh explants that were removed due to exposure exhibited significantly higher pro-MMP-9 than those removed due to pain. These findings show that mesh exposure correlates with expression of factors associated with inflammation.

In a manuscript recently accepted for publication, I have shown that PP mesh oxidizes and degrades *in vitro*.[32] TVT, Advantage (Boston Scientific), and Lynx (Boston Scientific) mesh specimens were incubated in oxidative medium that mimics the reactive oxygen species (ROS) secreted by adherent inflammatory cells.[33] PP oxidized and degraded *in vitro* in the absence of proteins, as evidenced by the appearance of oxygen (measured by FTIR) and pitting, peeling, and flaking on the surface (measured by SEM). In a patient explant, manual dissection of mesh not fixed in formalin successfully removed protein

---

[29] Z Jallah, R Liang, A Feola, W Barone, S Palcsey, SD Abramowitch, N Yoshimura, and P Moalli. The impact of prolapse mesh on vaginal smooth muscle structure and function. *BJOG* 23:1076–1085, 2016.

[30] AL Nolfi, BN Brown, R Liang, SL Palcsey, MJ Bonidie, SD Abramowitch, PA Moalli. Host response to synthetic mesh in women with mesh complications. *Am J Obstet Gynecol* 215:206.e1-8, 2016.

[31] *Id.*

[32] AD Talley, BR Rogers, V Iakovlev, RF Dunn, and SA Guelcher. Oxidation and degradation of polypropylene transvaginal mesh. *Journal of Biomaterials Science: Polym Ed* 28(5):444-458, 2017.

[33] QH Zhao, AK McNally, KR Rubin, M Renier, Y Wu, V Rose-Caprara, JM Anderson, A Hiltner, P Urbanski, K Stokes. Human plasma macroglobulin promotes in vitro oxidative stress cracking of Pellethane 2363-80A: In vivo and in vitro correlations. *J Biomed Mater Res* 27: 379-389, 1993. AE Hafeman, KJ Zienkiewicz, AL Zachman, HJ Sung, LB Nanney, JM Davidson, SA Guelcher. Characterization of degradation mechanisms of biodegradable lysine-derived aliphatic polyurethanes. *Biomaterials* 32(2):419-29, 2011. JL Martin, MK Gupta, JM Page, F Yu, JM Davidson, SA Guelcher, CL Duvall. Synthesis of a Porous, Biocompatible Tissue Engineering Scaffold Selectively Degraded by Cell-Generated Reactive Oxygen Species. *Biomaterials* 35(12):3766-76, 2014. MAP McEnery, S Lu, MK Gupta, KJ Zienkiewicz, JC Wenke, K Kalpakci, D Shimko, CL Duvall, SA Guelcher. Resorbable Poly(thioketal urethane)/Ceramic Composite Bone Cements with Bone-Like Strength. *RSC Advances* 6:109414 - 109424, 2016. JR Martin, CE Nelson, MK Gupta, F Yu, KM Hocking, JM Davidson, SA Guelcher, CL Duvall. Local delivery of PHD2 siRNA from ROS-degradable scaffolds to promote diabetic wound healing. *Adv Healthc Mater* 5(21):2751-2757, 2016.

from the surface, revealing an underlying layer of oxidized PP. XPS analysis of these mechanically scraped fibers showed negligible nitrogen but a significant amount of oxygen on the surface. Furthermore, oxygen was present in C=O and COOH bonds as predicted by the oxidation mechanism. These findings cannot be explained by the notion that the surface is coated by a crosslinked protein-formaldehyde complex as proposed by Thames et al [34], since the samples were never fixed in formalin.

Thames et al. recently published a study reporting that the surface of PP is coated by a crosslinked protein-formaldehyde complex.[35] However, both internal Ethicon studies from the 1980s as well as recently published papers have reported that the surface cracked layer is a complex composite of oxidized PP and adsorbed protein. Thus, while the Thames et al. cleaning protocol may be adequate for removing all of the adsorbed protein, it is not sufficient to characterize the composition and structure of the surface cracked layer. Alternative cleaning procedures that remove only the proteins in the "layer structure" should be used to avoid removing the "protein trapped by microcracks"[36] (Figure 8), which enables a more rigorous analysis of the surface cracked layer. Procedures previously used to clean PP sutures, hernia mesh, and pelvic mesh utilized sodium hypochlorite (bleach) solution, enzymatic solutions, or Soluene[37] to selectively remove proteins and tissue from the "layer structure" (Figure 1). Recommended protocols for analyzing explanted biomedical devices are described in ISO 12891. While no method is listed for cleaning PP explants, the standard recommends cleaning with sodium hypochlorite (bleach) solution for the closely related polyolefin, ultra-high molecular weight polyethylene.[38] In contrast, sonication is used to clean metals and jewels, remove dental plaque, and pulverize renal calculi.[39] Consequently, sonication for long periods of time (as reported by Thames et al.[40]) can remove all detachable materials non-specifically, and is therefore not suitable for investigating the composition and structure of the surface



**Figure 8**. Three protein deposition mechanisms proposed by Dr. Peter Moy. ETH.MESH.15958445

[34] SF Thames, JB White, KL Ong. The myth: in vivo degradation of polypropylene-based meshes. *Int Urogynecol J* 28(2):285-297, 2017. M Thompson, SA Guelcher, R Bendavid, V Iakovlev, DR Ostergard. In vivo polypropylene mesh degradation is hardly a myth. *Int Urogynecol J* 28(2):333-335, 2017. SF Thames, JB White, KL Ong KL. Reply to "In vivo polypropylene mesh degradation is hardly a myth". *Int Urogynecol J* 28(2):337-338, 2017.

[35] SF Thames, JB White, KL Ong. The myth: in vivo degradation of polypropylene-based meshes. *Int Urogynecol J* 28(2):285-297, 2017. M Thompson, SA Guelcher, R Bendavid, V Iakovlev, DR Ostergard. In vivo polypropylene mesh degradation is hardly a myth. *Int Urogynecol J* 28(2):333-335, 2017. SF Thames, JB White, KL Ong KL. Reply to "In vivo polypropylene mesh degradation is hardly a myth". *Int Urogynecol J* 28(2):337-338, 2017.

[36] ETH.MESH.15958445.

[37] http://www.perkinelmer.com/product/soluene-350-0-5-l-6003038

[38] A Imel, T Malmgren, M Dadmun, S. Gido, J Mays. In vivo oxidative degradation of polypropylene pelvic mesh. *Biomaterials* 73:131-141, 2015

[39] M Thompson, SA Guelcher, R Bendavid, V Iakovlev, DR Ostergard. In vivo polypropylene mesh degradation is hardly a myth. *Int Urogynecol J*. 28(2):333-335, 2017.

[40] SF Thames, JB White, KL Ong. The myth: in vivo degradation of polypropylene-based meshes. *Int Urogynecol J*. 28(2):285-297, 2017.

cracked layer. Dan Burkley, an Ethicon employee, noted the appearance of the surface scrapings form explanted Prolene sutures as resembling a "waxy snow"[41], which implies a friable material and is in agreement with a recent study reporting that the surface of explanted PP mesh fibers is cracked and porous.[42] Step #8 of the Thames et al. cleaning protocol comprised immersion in bleach solution in an ultrasonic bath for 1.5 h. This step is the second bleach treatment, after which the peaks ranging from $1500 - 1750$ cm$^{-1}$, which are associated with carbonyl groups in proteins and oxidized PP, disappeared from the FTIR spectrum. This observation is consistent with the notion that sonication non-selectively debrides the surface of the PP fiber and removes all adherent material, including adsorbed proteins and oxidized PP. Thames et al. neglected to note that oxidized PP exhibits absorbance frequencies ($1600 - 1699$ cm$^{-1}$ for carbonyl groups and $3409$ cm$^{-1}$ for hydroxyl groups) over ranges similar to those of the protein frequencies reported in their study, as described in internal Ethicon documents[43] and published studies.[44] Thus, Thames et al. cannot exclude the possibility that the cracked surface layer was composed of a complex mixture of oxidized PP and protein. Clave et al. noted that "FTIR absorption bands between $1,615$ and $1,650$ cm$^{-1}$ could be attributed either to carboxylate carbonyl or to residual products of biological origin. Therefore, these results cannot confirm the formation of carboxyl groups in vivo."[45] While Clave et al. did not speculate further on the composition of the cracked layer, it is important to note that their observations did not exclude the possibility of protein or oxidized PP. However, Thames et al. assumed that the cracked surface layer was protein on the basis of FTIR absorption frequencies associated with proteins (amide N-H stretching in the $3,300$ cm$^{-1}$ region and amide I carbonyl stretching in the region of $1,600–1,690$ cm$^{-1}$) without noting the existence of overlapping peaks in the FTIR spectra of oxidized PP ($1600 - 1699$ cm$^{-1}$ for carbonyl groups and $3409$ cm$^{-1}$ for hydroxyl groups).

More rigorous methods than those used by Thames et al. are required to correctly identify the composition of the cracked surface layer. Published studies as well as internal Ethicon studies have determined that the cracked surface layer contains oxidized PP. Mr. Burkley analyzed the surface scrapings removed from Prolene sutures explanted from patients using melting point analysis and FTIR, which led him to conclude that the surface contained oxidized PP and protein.[46] His experiments using Soluene to selectively extract tissue from the surface led him to conclude that Soluene could remove the protein adhering to the surface of the fibers but not protein that had penetrated into the pores.[47] Iakovlev et al. used microscopic analysis of axial cross sections of explanted PP mesh fibers to show that surface cracks were predominantly oxidized PP.[48] Imel et al. used EDS[49] and Talley et al. used XPS[50] to identify regions of PP fibers from explanted mesh

[41] ETH.MESH.12831391

[42] VV Iakovlev, SA Guelcher, R Bendavid. *In vivo* degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *J Appl Biomed Mater Res B: Appl Biomater* 105(2):237-248, 2017.

[43] ETH.MESH.12831391; ETH.MESH.15958452; Memo to Dr. AJ Melveger from Dr. P Moy, Prolene Microcracking, November 5, 1984.

[44] AD Talley, BR Rogers, V Iakovlev, RF Dunn, and SA Guelcher. Oxidation and degradation of polypropylene transvaginal mesh. *J Biomater Sci Polym Ed* 28(5):444-458, 2017.

[45] A Clave, H Yahi, J-C Hammou, S Montanari, P Gounon, H Clave. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. *Int Urogynecol J* 21:261-270, 2010.

[46] ETH.MESH.12831391; ETH.MESH.15958452

[47] ETH.MESH.15958336

[48] VV Iakovlev, SA Guelcher, R Bendavid. *In vivo* degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *J Biomed Mater Res: Part B Appl Biomater* 105(2):237-248, 2017.

[49] A Imel, T Malmgren, M Dadmun, S. Gido, J Mays. In vivo oxidative degradation of polypropylene pelvic mesh. *Biomaterials* 73:131-141, 2015.

that showed evidence of oxygen on the surface but not nitrogen, which can be explained by oxidation but not protein adsorption. Thames et al. could have used any of these methods to independently characterize the composition of the cracked surface layer rather than simply assume it was protein on the basis of FTIR measurements. Without a more rigorous analysis of the cracked surface layer, it cannot be concluded that it did not include oxidized PP.

3) **The dynamic environment where the Prolene mesh is implanted coupled with the foreign body reaction leads to oxidation, chain scission, reduction in molecular weight, embrittlement, degradation, flaking, pitting, and cracking**;

In an early study, Prolene sutures implanted for 1 – 2 years in a canine thoracoabdominal bypass model showed evidence of transverse cracks and peeling (Mary 1998).[51]  Several more recent studies have reported degradation of explanted PP pelvic mesh.   In the first study characterizing explanted pelvic mesh, Clavé et al. reported that 42% of the explants showed evidence of chronic inflammation, characterized by an infiltrate of mononuclear cells and FGBCs.   SEM analysis revealed that the implants were degraded, and that degradation was observed in meshes that had been implanted for at least 3 months.[52]

In 1985, Ethicon implanted 24 beagles with PROLENE, PVDF, Ethilon, and Novafil sutures subcutaneously in a 10-year study.  The study was ended at 7 years due to the unexpected death of one of the dogs at 6 years and 10.5 months. At 7 years, Dr. Lindemann noted that "degradation in Prolene is still increasing" [53] and that three of the seven explanted Prolene sutures showed evidence of surface cracking.[54]  Mr. Burkley noted that IR spectra for cracked Prolene specimens "showed possible evidence of slight oxidation (a broadened weak absorbance at about 1650 $cm^{-1}$)."[55]  Differences in the crosshead (XH) speed of the testing device can explain the increased elongation at break reported for the 7-year explants, as summarized in Table 1 below:

Table 1. Crosshead speed used to measure tensile properties of the Prolene sutures explanted from dogs.

[50] AD Talley, BR Rogers, V Iakovlev, RF Dunn, and SA Guelcher. Oxidation and degradation of polypropylene transvaginal mesh. *J Biomater Sci Polym Ed* 28(5):444-458, 2017.

[51] C Mary, Y Marois, MW King, G Laroche, Y Douville, L Martin, R Guidoin. Comparison of the In Vivo Behaviour of Polyvinylidene Fluoride and Polypropylene Sutures Used in Vascular Surgery. *ASAIO Journal* 44:199-206, 1998.

[52] A Clave, H Yahi, J-C Hammou, S Montanari, P Gounon, H Clave. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. *Int Urogynecol J* 21:261-270, 2010.

[53] ETH.MESH.09888187.

[54] ETH.MESH.09888187.

[55] ETH.MESH.09888187.

| Reference | Date | Action |
|---|---|---|
| ETH.MESH.11336184 | 5/30/85 | XH speed was specified as 5 in / min for all products in the protocol |
| ETH.MESH.11336184 | 8/21/87 | XH speed was changed to 10 in / min for all products |
| ETH.MESH.11336071 | 8/18/88 | XH speed was reported as 1 in / min for the 1 yr and 2 yr Prolene explants and 5 in / min for all other 1- and 2-yr explants |
| ETH.MESH.11336071 | 9/20/88 | XH speed was reported as 10 in /min for all products in the 2-yr interim report |
| ETH.MESH.05453719 | 10/19/92 | XH speed was reported as 1 in / min for the 7-yr Prolene explants and 5 in / min for all other 7-yr explants |

The crosshead speed is a measure of the rate at which the test specimen is strained. As the crosshead speed decreases, the tensile modulus of the polymer being tested decreases while the elongation rate increases.[56] Thus, the crosshead speed is an important experimental parameter, but it is not clear what the crosshead speed was at each of the experimental conditions. As shown in Table 1, the crosshead speed was initially specified as 5 in / min in the original animal protocol. Two years later, the crosshead speed was changed to 10 in / min for all products. However, other documents state that crosshead speeds different from those specified in the protocol were used for 1-, 2-, and 7-year explants, and that these speeds were different for Prolene sutures compared to the other sutures.[57] Therefore, I find the tensile testing of sutures from the dog study to be unreliable due to these discrepancies in the crosshead speeds used for the testing.

In the study that I co-authored with Dr. Iakovlev[58], a layer of degraded PP was observed by optimal microscopy near the surface of the fibers in the explanted mesh (Figure 7). Micro-cracks were present in the degraded PP layer. Degradation and cracking of the polypropylene fibers was observed as early as 18 months for a cohort of 23 explanted PP SUI devices.

Mays et al. also observed degradation of fiber in explanted PP mesh using SEM. Using a combination of SEM and EDS, the authors were able to distinguish between fibers that were clean and those that were coated with biological material. Explanted fibers were observed that showed evidence of severe transverse cracks (Figure 7), which was accompanied by oxidative degradation of the fibers. The authors identified the mechanism of PP degradation as comprising the following steps: infiltration of inflammatory cells that secrete ROS in close proximity to the PP mesh fibers, oxidative degradation of the PP fibers characterized by the appearance of hydroxyl and carbonyl groups in the FTIR spectra, a reduction in molecular weight, embrittlement, cracking, and fragmentation of the PP fibers.

## 4) PP mesh is known to fray under tension and release particles while being handled

---

[56] EA Campo. *Selection of Polymeric Material: How to Select Design Properties from Different Standards.* A volume in Plastics Design Library, William Andrew Applied Science Publishers, Norwich, NY 2008.
[57] ETH.MESH.11336071; ETH.MESH.05453719.
[58] VV Iakovlev, SA Guelcher, R Bendavid. In vivo degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *Journal of Applied Biomedical Materials Research B: Applied Biomaterials* 105(2):237-248, 2017.

**and implanted. The human body does not stop responding to these particles or to the PP mesh unless the product is removed in its entirety;**

As an example of how oxidation of an implanted biomaterial affects its performance, poly(ether urethane)s (PEUs) were used as pacemaker lead insulation due to their improved mechanical properties as compared to silicone rubber. While PEU elastomers were believed to be biocompatible for many years, they are now known to undergo environmental stress cracking due to oxidative degradation of the polyether component and subsequent loss in molecular weight.[59] Adherent macrophages and FBCGs were shown to be responsible for environmental stress cracking. Thus oxidative degradation and environmental stress cracking comprise a vicious cycle in which oxidative degradation drives the embrittlement of the polymer surface and its subsequent cracking, which in turn exposes new surfaces of the material to oxidative degradation. Another study has shown that ROS actively degrades lysine-derived poly(ester urethane)s *in vivo* by an oxidative mechanism.[60] Thus, oxidative degradation of biomaterials *in vivo* in response to ROS secreted by inflammatory cells is well known.

Since the foreign body reaction is present at the biomaterial surface for the lifetime of the implant, the oxidative process is ongoing as long as the implant is present.[61] Considering the ongoing foreign body reaction as well as the known susceptibility of PP to oxidation, the mechanical and physical properties of Ethicon's PP mesh will change after it is implanted.

In addition, the properties of Ethicon's PP mesh have been shown to change under tension and while the mesh is being handled.[62] The medical literature and Ethicon's internal studies have reported that particles are lost or shed from the TVT mesh while it is in the box and while it is being implanted.[63] The foreign body reaction to shed particles will be similar to that for the TVT mesh. The body will not stop responding to any particles that are shed inside the body during implantation until those particles are removed in their entirety.

5) **Ethicon's pelvic meshes are intended to last for the lifetime of the patient, but the presence of antioxidants does not permanently protect the PP against degradation, and thus it is not possible to guarantee that these meshes will perform their intended function after implantation.**

Although PP can never be considered inert, it is stabilized against oxidation by adding antioxidants to the molten polymer, which are intended to act as scavengers that will react

---

[59] *Id.*

[60] AE Hafeman, KJ Zienkiewicz, AL Zachman, HJ Sung, LB Nanney, JM Davidson, SA Guelcher. Characterization of degradation mechanisms of biodegradable lysine-derived aliphatic polyurethanes. *Biomaterials* 32(2):419-29, 2011; J Martin, MK Gupta, JM Page, F Yu, JM Davidson, SA Guelcher, CL Duvall. Synthesis of a Porous, Biocompatible Tissue Engineering Scaffold Selectively Degraded by Cell-Generated Reactive Oxygen Species. *Biomaterials* 35(12):3766-76, 2014.

[61] JM Anderson, A Rodriguez, DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol* 20(2): 86–100, 2008.

[62] ETH.MESH.01813975;          ETH.MESH.01317515;          ETH.MESH.03905472; ETH.MESH.00541379; ETH.MESH.00863391.

[63] *Id.*

with oxidative species.[64]  The enduring nature of the foreign body reaction emphasizes the need for antioxidants to be added to biomaterials such that the time to oxidation, degradation, and embrittlement is extended.[65]  PP in its pure (i.e., unstabilized) form degrades rapidly *in vivo*, with an induction period of only 108 days[66], and carbonyl groups were detected in unstabilized PP by infrared spectroscopy within 50 – 90 days.[67]  Liebert et al. also tested stabilized PP in the hamster subcutaneous implant model. Oxidation of stabilized PP was observed, but the experiment ended at 100 days, at which time induction had not been observed for stabilized PP filaments.  Consequently, the eventual *in vivo* induction time for stabilized PP has not been reported.

Stabilization with antioxidants is not permanent, since the purpose of using antioxidants is to react with any oxidative species (such as ROS) to prevent their reaction with PP.[68] These stabilizers are distributed throughout the PP, however, and can only protect the polymer if they are in the proper location and only until they are exhausted.  The antioxidant package must be optimized for the intended use to achieve maximum service life of the polymer. Neither the Santonox R nor the dilauralthiodipropionate (DLTDP) antioxidant in the Prolene resin used to manufacture Prolene mesh [69] is designed to protect against the ROS secreted by inflammatory cells *in vivo*.  Santonox R is a hindered phenolic antioxidant designed to protect Prolene during high-temperature processing (compounding and extrusion), while DLTDP is designed to protect Prolene from oxidation during long-term storage.  Because *in vivo* oxidation and degradation are ongoing in response to the foreign body reaction, the antioxidant will eventually be depleted, resulting in oxidation and degradation of the PP mesh and changes to its properties over time.  This cycle of depletion of antioxidants through reaction with ROS followed by the eventual degradation of the surface of the mesh will not stop until all of the mesh is removed, since cracking exposes new surfaces to ROS and the reaction begins anew.[70]

In a manuscript recently accepted for publication, I have reported that TVT, Advantage (Boston Scientific), and Lynx (Boston Scientific) PP meshes, all of which are stabilized with antioxidants, oxidize *in vitro* when incubated in oxidative medium that mimics the reactive oxygen species (ROS) secreted by adherent inflammatory cells.[71] FTIR spectra of

---

[64] E. Rene de la Rie.  Polymer Stabilizers. A Survey with Reference to Possible Applications in the Conservation Field.  Studies in Conservation 33:9-22, 1988.

[65] JM Anderson, A Rodriguez, DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol* 20(2): 86–100, 2008.

[66] Liebert et al. Subcutaneous implants of PP filaments. *JBMR* 10:939-51, 1976.

[67] *Id*.

[68] *Id*.

[69] ETH.MESH.02268620

[70] JM Anderson, A Rodriguez, DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol* 20(2): 86–100, 2008.

[71] QH Zhao, AK McNally, KR Rubin, M Renier, Y Wu, V Rose-Caprara, JM Anderson, A Hiltner, P Urbanski, K Stokes. Human plasma macroglobulin promotes in vitro oxidative stress cracking of Pellethane 2363-80A:  In vivo and in vitro correlations. *J Biomed Mater Res* 27: 379-389, 1993. AE Hafeman, KJ Zienkiewicz, AL Zachman, HJ Sung, LB Nanney, JM Davidson, SA Guelcher. Characterization of degradation mechanisms of biodegradable lysine-derived aliphatic polyurethanes.  *Biomaterials* 32(2):419-29, 2011. JL Martin, MK Gupta, JM Page, F Yu, JM Davidson, SA Guelcher, CL Duvall. Synthesis of a Porous, Biocompatible Tissue Engineering Scaffold Selectively Degraded by Cell-Generated Reactive Oxygen Species. *Biomaterials* 35(12):3766-76, 2014.  MAP McEnery, S Lu, MK Gupta, KJ Zienkiewicz, JC Wenke, K Kalpakci, D Shimko, CL Duvall, SA Guelcher. Resorbable Poly(thioketal urethane)/Ceramic Composite Bone Cements with Bone-Like Strength. *RSC Advances* 6:109414 - 109424, 2016. JR Martin, CE

PP incubated in oxidative medium for 5 weeks revealed evidence of carbonyl and hydroxyl bonds as predicted by the oxidation mechanism. These findings show that antioxidants cannot stabilize PP mesh indefinitely.

6) **The effects of oxidation on the stability of Prolene were known to Ethicon prior to launching its SUI and POP devices, but the company did not consider the risks associated with polypropylene oxidation on the stability of Prolene mesh, to the detriment of patients implanted with the devices.**

Ethicon first reported evidence of Prolene oxidation and degradation in internal documents from the 1980s. These documents report evidence of chronic inflammation, oxidation, and degradation (micro-cracking) of Prolene sutures similar to that published in the scientific literature described above. Several relevant studies are reviewed in greater detail below.

In 1981, the depth of surface cracks was measured for explanted cardiovascular and ophthalmic Prolene sutures.[72] The crack depth varied from 0.5 – 4.5 microns. Another memo in 1983 reported cracking of explanted Prolene sutures.[73] One of the explanted sutures showed only 54% of its original strength. The memo noted that the histological evaluation of explanted sutures was consistent with previous studies, characterized by a foreign body reaction and a "degraded acellular infiltrate." This document also refers to a Prolene Microcrack Committee. Thus, Ethicon was sufficiently aware of Prolene surface cracking to form a committee to investigate the mechanism of cracking.

Two memos written in 1984 investigated the cause of microcracking of explanted PP sutures from both ophthalmic and cardiovascular applications[74]. Sutures that were in the body for more than two years exhibited surface or severe transverse cracks. The thickness of the crack layer ranged from 2 – 5 microns thick. Dr. Peter Moy recognized in a November 5, 1984 report that "oxidative degradation is another mechanism through which transverse cracks may be produced on oriented fibers."[75] In an attempt to reproduce the observed cracking *in vitro*, Prolene sutures were incubated in aqueous 30% hydrogen peroxide for up to 1 year. Despite the fact that transverse cracks were not observed, infrared spectroscopy revealed evidence of oxidation products, which prompted Dr. Moy to note that "the possibility of a highly specific *in vivo* oxidation process remains." These findings are consistent with the foreign body reaction, which produces ROS stronger than hydrogen peroxide.[76] If treatment with 30% hydrogen peroxide caused oxidation of the PP suture (as reported by Dr. Moy), then ROS secreted by adherent macrophages would also be expected to cause oxidation. Dr. Moy also cited thermal stability and electron microdiffraction data supporting his hypothesis that at least a portion of the cracked layer contained protein. He recommended that an additional study was necessary to test this hypothesis by performing TEM analysis of known oxidized Prolene samples. Another memo dated November 13, 1984, reported that Prolene microcracks were evaluated by

Nelson, MK Gupta, F Yu, KM Hocking, JM Davidson, SA Guelcher, CL Duvall. Local delivery of PHD2 siRNA from ROS-degradable scaffolds to promote diabetic wound healing. *Adv Healthc Mater* 5(21):2751-2757, 2016.

[72] ETH.MESH.12831405.

[73] ETH.MESH.15955438-15955473.

[74] ETH.MESH.15958452, ETH.MESH.15406978, ETH.MESH.15958470

[75] ETH.MESH.1595843

[76] QH Zhao, AK McNally, KR Rubin, M Renier, Y Wu, V Rose-Caprara, JM Anderson, A Hiltner, P Urbanski, K Stokes. Human plasma macroglobulin promotes in vitro oxidative stress cracking of Pellethane 2363-80A: In vivo and in vitro correlations. *J Biomed Mater Res* 27: 379-389, 1993.

Attenuated Total Reflectance (ATR) and FTIR.[77]  These studies found that the cracked Prolene surface is a composite of oxidized polypropylene and adsorbed protein.  Surface protein was removed with Soluene treatment, but adsorbed protein remained in the microcracks.  Thus, the November 13, 1984 memo by Dan Burkley concludes that the cracked layer contained both oxidized Prolene as well as protein.

In 1985, a series of experiments was proposed, including microscopic FTIR, TEM, and histology, to determine the clinical functionality of cracked sutures, the cracking mechanism, and effects of antioxidant concentration.[78]  Dr. Moy further noted that laboratory experiments had not yet replicated the cracking observed in explants, and proposed a systematic evaluation of explanted Prolene sutures.

In 1987, Professor Guidoin provided Ethicon with his explanted sutures, which had been cleaned using a bleach solution as explained in Mr. Burkley's laboratory notebook.[79]  SEM images of sutures explanted after 8 years revealed evidence of severe cracking.  Another cohort of explanted sutures was scraped with a needle and the scrapings tested by calorimetry and FTIR.  The waxy scrapings showed a melting point of $147 – 156^{o}C$, which is comparable to that of degraded Prolene.  Non-degraded Prolene melts over the range $155 – 165^{o}C$.  Scrapings were also melted on a KBr window to obtain FTIR spectra, which showed peaks associated with β-keto esters known to be formed during PP oxidation.  Mr. Burkley noted in his notebook and memo that "no protein species or peptide bonds were suggested."  A memo reporting on a follow-up meeting confirmed the findings that no protein was found on the surface and that Prolene degradation occurred on the surface of the fibers.[80]  Several follow-up studies were proposed, including investigating the relationship between antioxidant concentration and polypropylene degradation and cracking.  However, to my knowledge these studies were not performed.

In 1991, a 91-day rat subcutaneous implantation study was performed to assess the tissue reaction for several PP-based surgical meshes, including the Prolene mesh used in the SUI and POP devices.[81]  All meshes, including Prolene and Prolene Soft, showed evidence of chronic inflammation at 7 and 91 days.  Drs. Barbolt and Hutchinson concluded that all meshes showed evidence of a mild inflammatory reaction and infiltration of connective tissue.  Furthermore, images of histological sections revealed evidence of adherent macrophages on the surface of the Prolene fibers.

---

[77] ETH.MESH.15958336
[78] ETH.MESH.15958445
[79] ETH.MESH.00000367, ETH.MESH.12831391
[80] ETH.MESH.12831407
[81] ETH.MESH. 02319001, ETH.MESH.01425079

As noted above, Ethicon researchers sought to replicate the surface cracking of Prolene sutures in an *in vitro* experiment. In the 1990s, the effects of the foreign body reaction on biomedical implants were first elucidated. All implantable medical devices are susceptible to the dynamic nature of the environment in which they are implanted. Environmental stress cracking of implanted biomaterials is controlled by three factors: (1) residual stress in the biomaterial, (2) a source of chemical degradation in the body, and (3) the chemical structure of the biomaterial.[82] Poly(ether urethane)s used as pacemaker lead insulation are an example of how oxidation of an implanted biomaterial can lead to Environmental Stress Cracking (ESC) and device failure. While poly(ether urethane) elastomers were believed to be biocompatible for many years, they are now known to undergo ESC due to oxidative degradation of the polyether component and subsequent loss in molecular weight.[83] As shown in Figure 9, adherent macrophages and FBCGs were responsible for environmental stress cracking of poly(ether urethane)s *in vivo*.[84] A later study found that *in vivo* stress cracking of this poly(ether urethane) was reproduced *in vitro* by treating pre-stressed polymer specimens with an oxidative medium (10% hydrogen peroxide with 0.10 M cobalt chloride).[85] The cobalt chloride catalyzes the decomposition of the hydrogen peroxide to form hydroxyl radicals, a form of ROS that attacks the polymer. Under these conditions



Figure 9. (A) SEM photograph of pre-stressed Pellethane 80A specimen implanted for 5 weeks. The specimen had severe cracking. Original magnification x66. (B) SEM photograph (at higher magnification) of pre-stressed Pellethane 80A specimen implanted for 5 weeks. Cellular adhesion was present. Original magnification x2000. From Zhao et al. JBMR 24:621, 1990.

simulating the isolated microenvironment between the surface of the biomaterial and the cell, *in vitro* stress cracking was similar in appearance to that observed *in vivo*. Furthermore, infrared spectroscopy showed that ROS participated in the oxidative degradation process.[86] Thus, oxidative degradation and environmental stress cracking have a synergistic effect on the failure of poly(ether urethane) catheter lead insulation, by which oxidative degradation drives the embrittlement of the polymer surface and its subsequent cracking, which in turn exposes new surfaces of the material to oxidative degradation and

---

[82] JM Anderson et al. Cellular interactions with biomaterials: in vivo cracking of pre-stressed Pellethane 2363-80A. *JBMR* 24: 621-37, 1990.

[83] *Id.*

[84] JM Anderson et al. Cellular interactions with biomaterials: in vivo cracking of pre-stressed Pellethane 2363-80A. *JBMR* 24: 621-37, 1990.

[85] QH Zhao, AK McNally, KR Rubin, M Renier, Y Wu, V Rose-Caprara, JM Anderson, A Hiltner, P Urbanski, K Stokes. Human plasma macroglobulin promotes in vitro oxidative stress cracking of Pellethane 2363-80A: In vivo and in vitro correlations. *J Biomed Mater Res* 27: 379-389, 1993.

[86] MJ Wiggins, B Wilkoff, JM Anderson, A Hiltner. Biodegradation of polyether polyurethane inner insulation in bipolar pacemaker leads. *J Biomed Mater Res* 58(3):302–7, 2001.

ultimately clinical device failure.[87]   Similar to poly(ether urethane)s, PP is susceptible to oxidation, which results in chain scission, loss of ductility (e.g., embrittlement),[88] and degradation, such as pitting, peeling, and cracking[89]. Embrittlement occurs at a very low conversion in the chain scission process, and surface embrittlement of the PP fibers leads to crack initiation.  Mechanical stress on the fibers will in turn enhance stress cracking and expose new PP surface to the oxidative environment. I have published two papers in the scientific journal *Biomaterials*, one in 2011 and one in 2014, using the same 20% $H_2O_2$ /0.1 M cobalt chloride system to measure the oxidative degradation rate of poly(ester urethane) and poly(thioketal urethane) scaffolds.  Thus, this *in vitro* oxidative degradation test is well established in the scientific literature, and was available to Ethicon at the time it developed the SUI and POP devices. However, to my knowledge, this test was never done.

Ethicon has also been made aware of the specific risks inherent to using PP in an implantable medical device through the Material Safety Data Sheet (MSDS), which stated that PP is incompatible with strong oxidizers.[90] As explained above, implanted mesh is exposed to reactive oxygen species, which are strong oxidizers, as a result of the foreign body reaction.

The report from Mesh Repair of Uterovaginal Prolapse meeting in May 1997 noted that an ideal mesh would have lower density compared to that of the TVT to minimize the foreign body reaction.[91] Similar concerns were noted in a discussion document for the design of new mesh for prolapse repair, in which it was noted that the mesh used in the TVT is not the ideal material for anterior prolapse, and that the amount of foreign body should be minimized to reduce the risk of complications.[92]

The hernia literature also provides evidence that the foreign body reaction alters polypropylene *in vivo*.  In a study evaluating non-degradable meshes explanted from 17 patients that had surgery for repair of abdominal wall defects, a foreign body reaction characterized by granulation tissue and inflammatory cells 3 – 24 months post-implantation was seen.[93]  The PP meshes from this study showed more inflammatory cells and fibroblasts near the mesh interface when compared to PTFE and polyester.

Despite internal and published studies to the contrary, Ethicon documents further indicate that their sales force was instructed to "[r]eassure [surgeons] that PROLENE is proven to be inert and there are hundreds of papers going back 25 years to reinforce this point."[94] However, Daniel F. Burkley, a Principal Scientist at Ethicon, testified that in his 34 years at the company, he was only familiar with one study that was conducted regarding the changes that occurred due to oxidative degradation of explanted polypropylene suture or

---

[87] JM Anderson, A Rodriguez, and  DT Chang. Foreign Body Reaction to Biomaterials. *Semin Immunol* 20(2):86–100, 2008.
[88] Fayolle et al. Initial steps and embrittlement in the thermal oxidation of stabilized polypropylene films. *Polym Degrad Stability* 75:123-9, 2002.
[89] VV Iakovlev, ET Carey, J Steege. Pathology of Explanted Transvaginal Meshes. *Int. J. Medical, Health, Pharmaceutical and Biomedical Eng*. 8(9):510-513, 2014.
[90] ETH.MESH.05439518
[91] ETH.MESH.12006257
[92] ETH.MESH.12009027
[93] U Klinge, B Klosterhalfen, M. Muller, V Schumpelick. Foreign Body Reaction to Meshes Used for the Repair of Abdominal Wall Hernias. *Eur J Surg* 165:665–673, 1999.
[94] ETH.MESH. 00865322

mesh.[95]  Mr. Burkley also testified that this study showed that changes due to oxidation were still progressing after seven years of implantation.[96]

**7) PP mesh is not inert and its properties change after implantation, which can lead to adverse events in an implantee; using heavy-weight mesh directly correlates to more PP being exposed to the foreign body reaction and greater changes after implantation, which increases the risk of complications.**

The literature has confirmed that the properties of PP mesh change after implantation, causing adverse events like, pain, scarring and inflammation.  In addition, Ethicon employees and consultants, both before and after the TVT was launched, have noted that heavy-weight meshes like the TVT comprise significantly more polypropylene than sutures or light-weight meshes, and therefore the foreign body reaction and resulting changes on the surface of the TVT device will be much greater than that for a lightweight mesh or a non-load bearing suture.[97]  These findings are supported by the conclusions drawn by external consultants and Ethicon employees, as well as the available scientific literature reporting PP oxidation in response to cell-secreted ROS and complications associated with the mesh used in the TVT.[98]

More recently, Wood et al. published a comparison of three different explanted synthetic meshes (polypropylene, expanded polytetrafluoroethylene (ePTFE), and polyethylene terephthalate (PET)) from a single patient who had undergone three recurrent ventral hernia repairs.[99]  Implantation times for the meshes were 3 years for the PP and PET meshes and 2 years for the ePTFE mesh. SEM images of explanted PP mesh "showed significant surface cracking" while the PET and ePTFE meshes did not.  FTIR analysis also confirmed PP degradation from "free radical formation and oxidation of the polypropylene mesh while *in vivo."*

The Wood study supports the conclusions published by Clavé et al., which examined explanted pelvic meshes for degradation.  Clavé reported that 42% of the explants showed evidence of chronic inflammation, characterized by an infiltrate of mononuclear cells and FGBCs.  SEM analysis revealed that the implants were degraded, and that degradation was observed in meshes that had been implanted for at least 3 months.[100]

The findings of the Clavé study findings reinforced work done by Costello et al., who reported PP mesh oxidation and embrittlement as being a cause of mesh degradation and

---

[95] Burkley Deposition 05/23/2013 P.312:23-313:24

[96] Burkely Deposition 05/23/2013 P.315:8-13

[97] Are Meshes With Lightweight Construction Strong Enough?; Jorge L. Holste; *ETHICON GmbH, R&D Europe, D-22841*, Norderstedt, Germany; J. Otto, E. Kaldenhoff, R. Kirschner-Hermanns, T. Muhl, U. Klinge. W.S. Cobb, K.W. Kercher, and B.T. Heniford.The Argument for Lightweight Polypropylene Mesh in Hernia Repair. *Surg Innov*. 12(1):63-9, 2005.

[98]ETH.MESH.05479411, ETH.MESH.07192929, ETH.MESH.07192412.

[99] AJ Wood, et al. Materials Characterization and Histological Analysis of Explanted Polypropylene, PTFE, and PET hernia meshes from an Individual Patient. *J Mater Sci Mater Med* 24(4): 1113-1122, 2013.

[100] A Clave, H Yahi, J-C Hammou, S Montanari, P Gounon, H Clave Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants.  *Int Urogynecol J* 21:261-270, 2010.

complications *in vivo*.[101]   Costello derived his conclusions from comparisons made between pristine and explanted samples via molecular weight, SEM imaging, and compliance testing.  Those authors reported that all three of these methods confirmed that PP mesh had degraded *in vivo*, most likely by oxidation.[102]

Another study investigated 14 explanted hernia mesh samples observed by SEM that 85% of the samples showed evidence of cracking, fissures, and peeling.[103]   After host tissue was removed, the mesh samples remained folded and contracted, evidencing that mesh samples were permanently changed after implantation.

In a 2015 study I co-authored with Dr. Vladimir Iakovlev analyzing 164 explanted PP pelvic meshes, we reported the presence of adherent inflammatory cells expressing the oxidative enzyme myeloperoxidase, degradation of polypropylene, and micro-cracking near the surface of the polypropylene fibers.  Degradation of explanted meshes was observed as early as 18 months.[104]   Similar findings were reported by Mays et al., who observed oxidative degradation and transverse cracking of explanted PP pelvic mesh.[105]

Most importantly, these studies linked complaints of chronic pain and sclerosis to the foreign body reaction to implanted PP mesh and the consequent degradation and micro-cracking near the surface of PP fibers.  These principles also apply to PP particles shed from the mesh during implantation, which is consistent with the testimony of Ethicon medical director Piet Hinoul that when particle loss occurs during implantation, the released particles result in inflammation that can cause pain.[106]

Large animal models, such as sheep, enable evaluation of PP mesh at longer time points and under conditions more representative of the clinical environment for SUI and POP repair.[107]   A pilot study evaluated Prolene mesh implanted vaginally in sheep at 6 and 12 weeks.[108]   The incidence of vaginal erosion was observed to be 33%.  Macrophages and foreign body giant cells were also observed at 12 weeks.  Two more recent studies have investigated differences between PP meshes implanted vaginally and abdominally using a sheep model.[109]   PP mesh implanted vaginally showed more contraction and exposures,

---

[101] CR Costello, SL Bachman, SA Grant, DS Cleveland, TS Loy, BJ Ramshaw. Characterization of heavyweight and lightweight polypropylene prosthetic mesh explants from a single patient. *Surg Innov*. 14:168–176, 2007; CR Costello, SL Bachman, SA Grant. Materials characterization of explanted polypropylene hernia meshes. *J Biomed Mater Res Part B: Appl Biomater* 83B:44-49, 2007.

[102] *Id.*

[103] *Id.*

[104] VV Iakovlev, SA Guelcher, R Bendavid. In vivo degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *J Appl Biomed Mater Res B: Appl Biomater* 105(2):237-248, 2017.

[105] A Imel, T Malmgren, M Dadmun, S. Gido, J Mays. In vivo oxidative degradation of polypropylene pelvic mesh. *Biomaterials* 73:131-141, 2015.

[106] Trial Testimony of Piet Hinoul, Batiste v. Ethicon, page 26-28

[107] A Feola, M Endo, I Urbankova, J Vlacil, T Deprest, S Bettin, B Klosterhalfen, J Deprest. Host reaction to vaginally inserted collagen containing polypropylene implants in sheep. *Am J Obstet Gynecol* 212:474.e1-8, 2015.

[108] R de Tayrac, A Alves, M Thérin M. Collagen-coated vs noncoated low-weight polypropylene meshes in a sheep model for vaginal surgery. A pilot study. *Int Urogynecol J Pelvic Floor Dysfunct*. 18(5):513-20, 2007.

[109] S Manodoro, M Endo, P Uvin, M Albersen, J Vláčil, A Engels, B Schmidt, D De Ridder, A Feola, J Deprest. Graft-related complications and biaxial tensiometry following experimental

which are both mesh-related complications, than mesh implanted abdominally.[110]  The authors further noted that the 15% incidence of vaginal exposures in all animals was comparable to that observed clinically, and found that mesh-related complications can be induced by vaginal mesh implantation.  Contraction and folding, which have also been associated clinically with pain,[111] were also observed to be higher for vaginally implanted mesh compared to that implanted abdominally.  In a follow-up study, the same authors investigated the effects of a collagen coating on mesh complications and made similar findings.[112]  Vaginal exposures were observed in 33%, while no abdominal exposures were observed.  Macrophages and foreign body giant cells were observed at 60 and 180 days in both vaginal and abdominal meshes.  These findings led the authors to conclude that the sheep is an effective model to study complications of vaginal mesh.  They further noted that the differential wound healing response and mechanical forces between the vaginal and abdominal wall environments may be responsible for the differences in mesh-related complications between the two implantation sites. Ethicon could have performed a similar sheep study at any time before or after the launch of its any of its mesh products to investigate the incidence of similar mesh-related complications.   However, to my knowledge these studies have not been done.

Ethicon documents indicate that the company was aware of the Costello article in 2007, but never considered the effect of PP oxidation during these meshes design or product lifecycle. An Ethicon Medical Affairs employee, Tom Divilio, M.D., indicated that the Costello authors were "challenging our perception of polypropylene as an 'inert' material after implantation." He went on to note that "I think it's important that we understand what they are seeing as this group has a well-funded lab that will be looking at explanted mesh in great volume over the next couple of years and our current concepts are going to be challenged. Would appreciate it if we could think of some study designs that would confirm or refute their assumptions."[113]   In 2012, Ethicon responded to a request by a British regulatory agency to explain how the 2010 publication by Clave et al impacts the performance of their products.[114] In this document, Ethicon noted "[we] are not aware of any findings that would impact the clinical performance of polypropylene monofilament"[115], and that "[p]olymers may be subject to surface degradation by these

---

vaginal implantation of flat mesh of variable dimensions. *BJOG* 120(2):244-50, 2013.; A Feola, M Endo, I Urbankova, J Vlacil, T Deprest, S Bettin, B Klosterhalfen, J Deprest. Host reaction to vaginally inserted collagen containing polypropylene implants in sheep. *Am J Obstet Gynecol* 212:474.e1-8, 2015.

[110] S Manodoro, M Endo, P Uvin, M Albersen, J Vláčil, A Engels, B Schmidt, D De Ridder, A Feola, J Deprest. Graft-related complications and biaxial tensiometry following experimental vaginal implantation of flat mesh of variable dimensions. *BJOG* 120(2):244-50, 2013.

[111] BT Haylen, RM Freeman, SE Swift, M Cosson, GW Davila, J Deprest et al. An International Urogynecological Association (IUGA)/ International Continence Society (ICS) joint terminology and classification of the complications related directly to the insertion of prostheses (meshes, implants, tapes) and grafts in female pelvic floor surgery. *Neurourol Urodyn* 30:2–12, 2011.

[112] Haylen BT, Freeman RM, Swift SE, Cosson M, Davila GW, Deprest J, et al. An International Urogynecological Association (IUGA)/ International Continence Society (ICS) joint terminology and classification of the complications related directly to the insertion of prostheses (meshes, implants, tapes) and grafts in female pelvic floor surgery. Neurourol Urodyn 30:2–12, 2011; A Feola, M Endo, I Urbankova, J Vlacil, T Deprest, S Bettin, B Klosterhalfen, J Deprest. Host reaction to vaginally inserted collagen containing polypropylene implants in sheep. *Am J Obstet Gynecol* 212:474.e1-8, 2015.

[113] ETH.MESH. 05588123

[114] ETH.MESH. 07226481

[115] Id

24

reactive species, the  impact of which has not been clinically assessed."[116]

In summary, Ethicon scientists reported evidence of chronic inflammation, oxidation, and degradation (micro-cracking) of Prolene in preclinical studies and in human explants. These observations are consistent with the known susceptibility of polypropylene to oxidation outside the body, the known effects of the foreign body reaction on implanted biomaterials, and published studies on explanted PP mesh.[117]  Despite the fact that Ethicon scientists recommended additional testing to confirm or exclude the oxidation mechanism, I have found no evidence that these tests (which were available to Ethicon during development of the SUI and POP devices) were performed. Consequently, the risks inherent to Prolene oxidation and degradation are detrimental to all of those who have been implanted with the SUI and POP devices.

**8) Using autologous fascia lata, allograft, sutures (including polypropylene sutures), or polyvinylidene fluoride (PVDF) mesh, does not present with the same chronic complications associated with the material properties of Ethicon's PP mesh.  All of these alternative materials, including using a less dense version of its PP mesh, were available when Ethicon's SUI and POP meshes were first commercialized.**

Implantable sutures, including PP sutures, have been used in procedures such as the Burch retropubic urethropexy, autologous and allograft biologic slings, and needle suspension procedures to treat SUI.[118]  As described above, the foreign body reaction is less persistent for sutures than for polypropylene mesh.  In an early study investigating the effects of the foreign body reaction on Prolene sutures implanted in dogs, sutures were surrounded by fibroblasts, collagen, and a few macrophages at 1 – 3 months.[119]  From 3 months to 2 years, Prolene sutures were encapsulated in collagen with minimal adherent inflammatory cells.[120] In a later study characterizing the foreign body reaction associated with PP sutures and mesh in a rat abdominal wall model, PP mesh samples showed more adherent inflammatory cells than PP sutures.[121] Recent studies investigating PP mesh explanted from human patients[122] have reported adherent inflammatory cells near the surface of the PP

---

[116] Id

[117] VV Iakovlev*, SA Guelcher, R Bendavid. In vivo degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *J Appl Biomater Res: Part B Appl Biomater* 105(2):237-248, 2017.

[118] ETH.MESH.00141933; AP Cameron, AM Haraway. The treatment of female stress urinary incontinence: an evidenced-based review. Open Access Journal of Urology 3:109-120, 2011; EC Trabuco, CJ Klingele, RE Blandon, JA Occhino, AL Weaver, ME McGree, MA Lemens, JB Gebhart. Burch Retropubic Urethropexy Compared With Midurethral Sling With Concurrent Sacrocolpopexy: A Randomized Controlled Trial. Obstet Gynecol. 2016 Oct;128(4):828-35

[119] C Mary, Y Marois, MW King, G Laroche, Y Douville, L Martin, R Guidoin. Comparison of the In Vivo Behaviour of Polyvinylidene Fluoride and Polypropylene Sutures Used in Vascular Surgery. *ASAIO Journal* 44:199-206, 1998. ML Konstantinovic, E Pille, M Malinowska, E Verbeken, D De Ridder, J Deprest. Tensile strength and host reponse towards different polypropylene implant materials used for augmentation of fascial repair in a rat model. *Int Urogynecol J* 18:619-26, 2007.

[120] Id.

[121] ML Konstantinovic, E Pille, M Malinowska, E Verbeken, D De Ridder, J Deprest. Tensile strength and host reponse towards different PP implant materials used for augmentation of fascial repair in a rat model.  Deprest et al. *Int Urogynecol J* 18:619-26, 2007.

[122] VV Iakovlev, SA Guelcher, R Bendavid. *In vivo* degradation of polypropylene: microscopic analysis of meshes explanted from 130 patients. *J Appl Biomater Res: Part B Appl Biomater*, 2015 Aug 28 doi: 10.1002/jbm.b.33502; A Clavé, H Yahi. J-C Hammou, S Montanari, P Gounon, H

fibers at periods of time from 3 months to multiple years. These studies show that the foreign body reaction in response to mesh implantation continues until the mesh is explanted and is dose-dependent (*i.e.*, more PP mesh both in density and amount promotes a more persistent foreign body reaction). Thus, since the foreign body reaction associated with implantable PP sutures is less persistent compared to PP mesh, the use of sutures is preferred from a biomaterials perspective. Furthermore, there is the additional benefit that the suture procedures do not present the risk of mesh-related complications.

Biologic grafts are derived from natural tissue that has been processed to remove cells and antigens that trigger an immune response while preserving the extracellular matrix that stimulates ingrowth of cells and tissue remodeling.[123] They are preferred from a biomaterials perspective because they promote a regenerative versus a scarring response. Biologic grafts can be classified into three general categories: (1) autologous fascia lata (autograft), (2) cadaveric fascia or dermal tissue (allograft), and (3) bovine or porcine tissue (xenograft). [124] In contrast to synthetic grafts, biologic grafts are designed to promote vascularization and tissue remodeling, not scarring.[125] Biologic grafts are resorbed and replaced by new tissue, thereby eliminating the types of complications associated with PP mesh. In contrast, the foreign body reaction associated with implantation of PP mesh persists for years and is not resolved until the mesh is removed, resulting in oxidation, embrittlement, and degradation. Thus, autografts and allografts eliminate the types of complications associated with the degradation of PP products in the pelvis.

Allografts are medical products that have been prepared from human cadaveric fascia [126] and human dermis. [127] Allografts include DuraDerm (Bard, decellularized human dermis,) FasLata (Bard, cadaveric fascia lata), and Repliform (Boston Scientific, decellularized human cadaveric dermis). They are indicated for repair or replacement of damaged or inadequate integumental tissue, such as in the treatment of urinary incontinence, and for pelvic floor reinforcement or other conditions resulting from inadequate or damaged integumental tissue. Dermal allografts such as Repliform are processed under unique conditions to maintain the structure of the collagen and stimulate fibroblast remodeling of the extracellular matrix, resulting in cellular infiltration, vascularization, and new tissue ingrowth to achieve regenerative repair with reduced scarring and risk of exposure. [128] In a prospective series of 253 patients with SUI treated with a transvaginal sling using a Repliform cadaveric human dermal allograft and a bone anchor fixation kit, 234 of 253 patients were followed up at an average of 18 months.[129] 78% of the patients were cured or

---

Clavé. PP as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. *Int Urogynecol J* 21:261-270, 2010; A Imel, T Malmgren, M Dadmun, S. Gido, J Mays. In vivo oxidative degradation of polypropylene pelvic mesh. *Biomaterials* 73:131-141, 2015; AL Nolfi, BN Brown, R Liang, SL Palcsey, MJ Bonidie, SD Abramowitch, PA Moalli. Host response to synthetic mesh in women with mesh complications. *Am J Obstet Gynecol* 215:206.e1-8, 2016.

[123] ETH.MESH.00141933
[124] ETH.MESH.04941016
[125] ETH.MESH.04941016
[126] SL Brown, FE Govier. Cadaveric versus autologous fascia lata for the pubovaginal sling: surgical outcome and patient satisfaction. *J Urology* 164, 1633—1637, 2000.
[127] S Crivellaro, JJ Smith, E. Kocjancic, JF Bresette. Transvaginal sling using acellular human dermal allograft: safety and efficacy in 253 patients. *J Urology* 172, 1374–1378, 2004.
[128] ETH.MESH.00141933
[129] S Crivellaro, JJ Smith, E. Kocjancic, JF Bresette. Transvaginal sling using acellular human dermal allograft: safety and efficacy in 253 patients. *J Urology* 172, 1374–1378, 2004

improved according to patient questionnaires.  Most significantly, there were no cases of vaginal or urethral erosion.[130]

Polyvinylidene fluoride (PVDF) is a synthetic polymer manufactured by polymerization of vinylidene difluoride.  As shown in Figure 10, PVDF is one of the least readily oxidized polymers, while PP is one of the most.[131]  PVDF sutures are used extensively in orthopaedic and cardiovascular surgery.[132]  In 1988, Mary et al. compared PROLENE to PVDF sutures in a canine thoracoabdominal bypass model for 10 periods of implantation ranging from 4 hours to 2 years.[133]  PROLENE sutures explanted after 1 or 2 years implantation time showed evidence of surface cracking by SEM.  In contrast, PVDF sutures explanted after 1 or 2 years did not show evidence of surface cracking when analyzed by SEM.  These findings led the authors to conclude that PVDF "may be more biostable than polypropylene in the long term."  In another long-term study, PVDF sutures preserved 92.5% of their initial strength after 9 years of implantation compared to 54.4% for PP sutures due to oxidation of the PP.[134]

In 1985, Ethicon implanted 24 beagles with PROLENE, PVDF, Ethilon, and Novafil sutures implanted subcutaneously in a 10-year study. Sutures were explanted at 5 or 7 years (the study was ended prematurely due to the unexpected death of one of the dogs at 6 years and 10.5 months). At 5 years, surface cracking was observed by SEM for 2 of the 5 PROLENE sutures, while surface cracking was not observed for any of the PVDF sutures. At 7 years, PROLENE sutures explanted from 3 of the 7 sites showed surface cracking by SEM, while only 1 of the 6 PVDF sutures showed evidence of surface cracking.  The authors noted that only PDVF and Novafil sutures showed only marginal surface changes.  The authors concluded that "degradation in PROLENE is still increasing and PVDF, even though a few cracks were found, is still by far the most surface resistant in-house made suture in terms of cracking."[135]  These findings are consistent with those from the Mary et al. study[136] and the resistance of PVDF to oxidative degradation.[137]



Figure 10. Tendency of various polymers to undergo oxidation. Reproduced from Compositional and Failure Analysis of Polymers, 2000, p. 398, 426.

---

130    SL Brown, FE Govier. Cadaveric versus autologous fascia lata for the pubovaginal sling: surgical outcome and patient satisfaction. *J Urology* 164, 1633—1637, 2000. BJ Flynn, WT Yap. Pubovaginal sling using allograft fascia lata versus autograft fascia for all types of stress urinary incontinence: 2-year minimum followup. *J Urology* 167, 608–612, 2002.

131    Compositional and Failure Analysis of Polymers, 2000, p. 398, 426.

132    K Junge, M Binnebösel, KT von Trotha, R Rosch, U Klinge, UP Neumann, PL Jansen. Mesh biocompatibility: effects of cellular inflammation and tissue remodeling. *Langenbecks Arch Surg* 2011, DOI 10.1007/s00423-011-0780-0.

133    C Mary, Y Marois, MW King, G Laroche, Y Douville, L Martin, R Guidoin. Comparison of the In Vivo Behaviour of Polyvinylidene Fluoride and polypropylene Sutures Used in Vascular Surgery. *ASAIO Journal* 44:199-206, 1998.

134    G Laroche, Y Marois, E Schwarz, et al. Polyvinylidene fluoride monofilament sutures: can they be used safely for long-term anastomoses in the thoracic aorta? *Artif Organs* 19 (11):1190–9, 1995.

135    ETH.MESH.05453719; ETH.MESH.11336474

136    C Mary, Y Marois, MW King, G Laroche, Y Douville, L Martin, R Guidoin. Comparison of

In an Ethicon-funded study, two PVDF hernia meshes were compared to PROLENE to assess differences in function tissue response. Mesh was implanted in a rat abdominal wall inlay model for 3, 14, 21, 42 and 90 days.[138] PVDF meshes showed significantly decreased inflammatory and fibrous tissue reactions compared to PROLENE mesh. After day 3, the PVDF meshes showed a significantly lower volume fraction of inflammatory cells compared to PROLENE mesh. PROLENE mesh showed an increased volume fraction of granulocytes, macrophages, and fibroblasts compared to PVDF meshes. In contrast, PVDF meshes showed a higher volume fraction of foreign body giant cells, which are indicative of a primarily chronic response. The authors further noted that PVDF meshes showed similar cellular responses despite their differences in weight. The moderate foreign body reaction observed for the PVDF meshes showed fewer granulocytes, macrophages, and fibroblasts, and a greater number of foreign body giant cells. Based on these findings, the authors concluded that both PVDF meshes induced significantly lower inflammation and fibrosis compared to PP mesh, and that PVDF is a possible alternative material to PP.

Internal Ethicon documents reveal that Ethicon employees and consultants were aware of the improved biostability of PVDF compared to PP. In 2007, Dr. Kersin Spychaj, an Ethicon employee, wrote a memo on mesh shrinkage based on a literature review.[139] Dr. Spychaj noted that PP induces a rapid and acute inflammatory response, and concluded that the ideal mesh induces a "mild but not excessive FBR." Also in a 2007 email, Dr. Dieter Engel, an Ethicon employee, stated that Ethicon will move to Pronova (a copolymer of PVDF and hexafluoropropylene) as the future material for mesh due to its reduced foreign body reaction compared to PROLENE.[140] In a 2011 interview on mesh erosion conducted by PA consulting group on behalf of Ethicon, Professor Klosterhalfen noted that PP meshes degrade over time, and that Dynamesh, a PVDF mesh manufactured by FEG Textiltechnik, is one of the most stable materials he has seen.[141] Also in 2011, the PA Consulting Group issued a report on mesh exposure in the pelvic floor.[142] They noted that investigation of the causes of mesh exposure is "further complicated by known factors, such as the propensity of polypropylene (PP) to suffer degradation." They further noted that while PP has a long history of use, it is subject to degradation, which has been observed in animal studies. The authors proposed PVDF as an alternative polymer for manufacture of pelvic mesh.

### FACTS OR DATA CONSIDERED IN FORMING OPINIONS

The opinions and the bases for those opinions are set forth above. In addition to my knowledge, skill training and experience as an engineer, the following depositions of Ethicon employees and the exhibits thereto were supplied to me: Cliff Volpe, Piet Hinoul, David Robinson, Sunny Rah, Aaron Kirkemo, Sean O'Bryan, Scott Ciarrocca, Vincenza Zaddem, Elizabeth Vailhe, Christophe Vailhe, Joerg Holste, Boris Batke, Daniel Burkley, Thomas Barbolt, Brigitte Hellhammer, Juergen Trzewik, Martin Weisberg, Axel Arnaud, Dan Smith, Prof Thomas Muehl, Dr. Bernd Klosterhalfen, Kevin Ong, Whenxin Zheng,

the In Vivo Behaviour of Polyvinylidene Fluoride and polypropylene Sutures Used in Vascular Surgery. *ASAIO Journal* 44:199-206, 1998.

[137]   Compositional and Failure Analysis of Polymers, 2000, p. 398, 426.

[138]   U Klinge, B Klosterhalfen, AP Ottingerc, K Junge, V Schumpelick. PVDF as a new polymer for the construction of surgical meshes. *Biomaterials* 23 (2002) 3487–3493.

[139]   ETH.MESH.01218361.

[140]   ETH.MESH .05447475.

[141]   ETH.MESH.07192412.

[142]   ETH.MESH.07192412.

Daniel Sexton, and Jeffrey Brent.

I have also considered the following material identified in Exhibit B.

In addition, the following reports were supplied to me: Dr. Howard Jordi, Dr. Russell Dunn, Prof Thomas Muehl, Prof. Bernd Klosterhalfen, Thomas Barbolt, Dr. Wenxin Zheng, and B. Todd Heniford, M.D. The findings of these experts are consistent with my opinions.

### COMPENSATION

A fee sheet has been attached as Exhibit C.

## LISTING OF CASES IN WHICH TESTIMONY HAS BEEN GIVEN IN THE LAST FOUR YEARS

- IN RE PELVIC MESH AMS LITIGATION, SERRANO ET AL – SEPTEMBER 2013

- IN RE PELVIC MESH ETHICON LITIGATION, HUSKEY ET AL. - MARCH 2014

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, ALBRIGHT ET AL – JULY 2014

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, CARDENAS ET AL – AUGUST 2014

- IN RE PELVIC MESH ETHICON LITIGATION, HUSKEY ET AL – AUGUST 2014

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, BARBA ET AL - FEBRUARY 2014

- IN RE PELVIC MESH BARD LITIGATION, CORRIVEAU ET AL – NOVEMBER 2014

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, FRANKUM ET AL – DECEMBER 2014

- IN RE PELVIC MESH ETHICON LITIGATION, PERRY - DECEMBER 2014

- IN RE PELVIC MESH ETHICON LITIGATION, PERRY – JANUARY 2015

- IN RE PELVIC MESH AMS LITIGATION, KILGORE ET AL - FEBRUARY 2015

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, BARBA ET AL - MAY 2015

- IN PELVIC MESH ETHICON LITIGATION, BRYANT ET AL – SEPTEMBER 2015

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, CARLSON ET AL – OCTOBER 2015

- IN RE PELVIC MESH ETHICON LITIGATION, WAVE 1 – MARCH 2016

- IN RE PELVIC MESH BOSTON SCIENTIFIC LITIGATION, VESTER ET AL – OCTOBER 2016

- IN PELVIC MESH BARD LITIGATION – APRIL 2017

_____
Scott Guelcher, Ph.D.
Guelcher Consulting, LLC

# EXHIBIT C

JOURNAL OF BIOMATERIALS SCIENCE, POLYMER EDITION, 2017
http://dx.doi.org/10.1080/09205063.2017.1279045



Taylor & Francis
Taylor & Francis Group

# Oxidation and degradation of polypropylene transvaginal mesh

Anne D. Talley[a], Bridget R. Rogers[a], Vladimir Iakovlev[b,c], Russell F. Dunn[a,d] and Scott A. Guelcher[a,e,f]

[a]Department of Chemical and Biomolecular Engineering, Vanderbilt University, Nashville, TN, USA; [b]Laboratory Medicine and Pathobiology, University of Toronto, Toronto, Canada; [c]Division of Pathology and Keenan Research Centre of the Li Ka Shing Knowledge Institute, St. Michael's Hospital, Toronto, Canada; [d]Polymer and Chemical Technologies, LLC, Nashville, TN, USA; [e]Department of Biomedical Engineering, Vanderbilt University, Nashville, TN, USA; [f]Center for Bone Biology, Vanderbilt University, Nashville, TN, USA

**ABSTRACT**

Polypropylene (PP) transvaginal mesh (TVM) repair for stress urinary incontinence (SUI) has shown promising short-term objective cure rates. However, life-altering complications have been associated with the placement of PP mesh for SUI repair. PP degradation as a result of the foreign body reaction (FBR) has been proposed as a contributing factor to mesh complications. We hypothesized that PP oxidizes under *in vitro* conditions simulating the FBR, resulting in degradation of the PP. Three PP mid-urethral slings from two commercial manufacturers were evaluated. Test specimens ($n = 6$) were incubated in oxidative medium for up to 5 weeks. Oxidation was assessed by Fourier Transform Infrared Spectroscopy (FTIR), and degradation was evaluated by scanning electron microscopy (SEM). FTIR spectra of the slings revealed evidence of carbonyl and hydroxyl peaks after 5 weeks of incubation time, providing evidence of oxidation of PP. SEM images at 5 weeks showed evidence of surface degradation, including pitting and flaking. Thus, oxidation and degradation of PP pelvic mesh were evidenced by chemical and physical changes under simulated *in vivo* conditions. To assess changes in PP surface chemistry *in vivo*, fibers were recovered from PP mesh explanted from a single patient without formalin fixation, untreated ($n = 5$) or scraped ($n = 5$) to remove tissue, and analyzed by X-ray photoelectron spectroscopy. Mechanical scraping removed adherent tissue, revealing an underlying layer of oxidized PP. These findings underscore the need for further research into the relative contribution of oxidative degradation to complications associated with PP-based TVM devices in larger cohorts of patients.

**ARTICLE HISTORY**
Received 11 November 2016
Accepted 3 January 2017

**KEYWORDS**
Degradation; oxidation; polypropylene; transvaginal mesh

## Introduction

Surgical treatment options for stress urinary incontinence (SUI) and pelvic organ prolapse (POP) include reconstruction of connective tissue with biological or synthetic grafts. The

---

**CONTACT** Scott A. Guelcher ✉ Scott.guelcher@vanderbilt.edu
ⓑ Supplemental data for this article can be accessed at http://dx.doi.org/10.1080/09205063.2017.1279045

© 2017 Informa UK Limited, trading as Taylor & Francis Group



**Figure 1.** Proposed mechanism of PP oxidation.

most common synthetic grafts are non-resorbable polypropylene (PP) meshes, which have shown promising results in some studies [1,2]. While PP was initially considered inert *in vivo*, despite the fact that it is readily oxidized outside the body [3], its use in transvaginal mesh (TVM) implantations has recently been associated with high complication rates [4–7]. Complications arising from mesh implantation can lead to pain, graft exposure, and specific urinary symptoms [6,8].

Several studies have reported that PP mesh explanted from patients following graft complications revealed evidence of degradation, such as cracking, pitting, and flaking. In the first study explant study, SEM analysis of mesh removed from 100 patients revealed evidence of degradation for the majority of PP monofilament meshes implanted for more than 3 months [9]. In a more recent study, microscopic analysis of 164 explanted TVM devices revealed a layer of degraded PP, which grew thicker with implantation time [10]. Degradation and microcracking of the PP fibers were observed by conventional light microscopy as early as 18 months post-implantation.

Oxidation has been proposed as a potential mechanism of PP degradation *in vivo* [9,11–13]. PP oxidation proceeds through a stable hydroperoxide (–COOH) intermediate prior to chain scission and the formation of a carbonyl (–C=O) end group (Figure 1) [14,15], resulting in a reduction in PP molecular weight, loss of ductility, embrittlement, and crack formation [16]. In a recent study, TVM explanted from 11 patients showed evidence of PP oxidation using FTIR and SEM with X-ray dispersive spectroscopy (SEM/EDS), which distinguished oxidized PP from adsorbed biological material [12]. Oxidation of PP fibers was accompanied by transverse cracking of PP fibers, providing evidence of embrittlement.

Secretion of reactive oxygen species (ROS) by adherent inflammatory cells has been reported to promote oxidative degradation of implanted biomaterials [17–20]. Implantation

JOURNAL OF BIOMATERIALS SCIENCE, POLYMER EDITION  3

**Table 1.** Physical properties of mid-urethral slings evaluated in this study. All slings are macroporous monofilament Type I meshes with pore sizes >75 µm.

| Product | Abbrev. | Manu-facturer | Weight (g m$^{-2}$) | Pore size (µm) | Filament Size (mm) | Mesh thick-ness (mm) |
|---|---|---|---|---|---|---|
| Gynecare TVT™ retropubic system | TVT | Ethicon | 105 | 1379 | 0.15 | 0.63 |
| Advantage™ transvaginal Mid-urethral sling system | ADV | Boston Scientific | 100 | 1182 | 0.15 | 0.66 |
| Lynx™ suprapubic mid-ure-thral sling system | LYNX | Boston Scientific | 100 | 1182 | 0.15 | 0.66 |

of TVM induces a chronic inflammatory response characterized by adherent macrophages and giant cells that persists for years after implantation [8–10,21]. Recent studies have reported that the foreign body reaction (FBR) is pro-inflammatory, characterized by predominantly M1 macrophages [21] and significantly higher expression of MMP-9 [8]. Furthermore, elevated MMP-9 expression was found to correlate with mesh exposure.

In the present study, we hypothesized that PP mesh oxidizes in response to ROS secreted by adherent inflammatory cells. To test our hypothesis, we investigated the oxidative degradation of three commercial mid-urethral slings (MUSs) *in vitro* using an oxidative medium comprising 20% hydrogen peroxide ($H_2O_2$) and 0.1 M cobalt chloride ($CoCl_2$), which react to form hydroxyl radicals (OH•) [18,22] that attack the tertiary C–H bond in the PP backbone (Figure 1). This *in vitro* assay recapitulates the oxidative microenvironment between an adherent macrophage and the PP surface [17]. MUS products, which are stabilized with antioxidants to protect against oxidation during high-temperature processing and long-term storage [20], were evaluated to test the hypothesis that the antioxidants do not prevent eventual oxidation and degradation under simulated *in vivo* conditions. Oxidation of PP mesh was measured by Fourier Transform Infrared Spectroscopy (FTIR), and degradation was assessed by Scanning Electron Microscopy (SEM). We also characterized PP mesh fibers explanted from a single patient by X-ray photoelectron spectroscopy (XPS) to analyze PP oxidation *in vivo*. The advantage of the XPS technique is that the composition of atoms and chemical bonds near the surface can be determined, which enables oxidized PP to be differentiated from tissue.

## Materials and methods

### Materials

Three commercial MUSs were obtained from two device manufacturers: Gynecare TVT™ Retropubic System (Ethicon, Somerset, New Jersey), Advantage™ Transvaginal Mid-Urethral Sling System (Boston Scientific, Marlborough, MA), and Lynx™ Suprapubic Mid-Urethral Sling System (Boston Scientific). All slings are macroporous monofilament Type I meshes with pore sizes >75 µm. Other mesh properties are summarized in Table 1. For the oxidative media, $CoCl_2$ was obtained from Sigma-Aldrich (St Louis, MO) and 30 wt.% $H_2O_2$ from Fisher Scientific (Pittsburgh, PA).

4  😐  A. D. TALLEY ET AL.

**Table 2.** In vitro study design.

| Time week | FTIR | | SEM | |
|---|---|---|---|---|
| | Specimens | Regions/Specimen | Specimens | Regions/Specimen |
| 0 | 3 | 2 | 1 | 5–13 |
| 1 | 3 | 2 | 0 | N/A |
| 3 | 3 | 2 | 0 | N/A |
| 4 | 3 | 2 | 0 | N/A |
| 5 | 3 | 2 | 1 | 7–15 |

### In vitro *oxidation*

For each of the three products listed in Table 1, 17 MUS specimens (approximately 6–7 mg, 1.1 cm by 0.6 cm) were prepared. The study design is listed in Table 2. Thirteen specimens were incubated at 37 °C for up to 5 weeks in oxidative media composed of 0.1 M $CoCl_2$ in 20 wt.% $H_2O_2$, which simulates the privileged microenvironment between an adherent macrophage and the PP surface [18–20,22,23]. In this medium, the $H_2O_2$ and cobalt ions react to form hydroxyl radicals (OH·, Figure 1) [22]. Samples were submerged by being weighted down using glass beads and were incubated at 37 °C in the oxidative medium on a shaker. At each time point (week 1, 3, 4, or 5), 3 specimens were removed, washed in DI water, and dried. FTIR analysis was performed to test for the presence of hydroxyl (–OH) groups present in the hydroperoxide intermediate and for terminal carbonyl (–C=O) end groups. Two locations on each of the 3 MUS mesh specimens were tested via FTIR, giving $n = 6$ replicates at each time point. At 5 weeks, one specimen was removed, washed in DI water, and dried for SEM analysis to identify evidence of oxidative degradation, such as pitting, flaking, and cracking. The oxidative media was changed every 3–4 days (3). Four pristine mesh specimens (three for FTIR and one for SEM) not incubated in oxidative medium were assessed as the 0-week group.

### Fourier transform infrared spectroscopy (FTIR)

FTIR spectra were obtained using a Thermo Electron IR200 spectrometer. FTIR peak areas were quantified using Omnic 8.3 software. The area under the hydroxyl peak was integrated over 3600–3050 $cm^{-1}$. Carbonyl peaks were integrated from 1750 to 1500 $cm^{-1}$. For each spectrum, the baseline was manually corrected around the peak of interest in the case of any baseline shifts.

### Scanning electron microscopy (SEM)

Meshes were examined for degradation at 5 weeks, since at this time point evidence of significant oxidation was observed in the FTIR spectrum. At 5 weeks, one mesh specimen was removed from oxidative media, dried at room temperature, and sputter-coated for 45 s using a Cressington Q108 sputter coater, which deposited gold at a 30-mA current. One mesh specimen that was not incubated in oxidative medium was imaged as a control (0 weeks group). Specimens were imaged using SEM (Hitachi S-4200 SEM) at a voltage of 1 kV. A total of 5–15 images were taken of each specimen. Images were taken at low (40–150X) and medium (150–1000×) magnification to identify regions of the mesh that showed evidence of degradation. High-magnification images (1000–2000×) were taken of 5-week specimens



to show surface degradation, characterized by flaking (feature size >10 μm), peeling (feature size >10 μm), or pitting (>1 μm deep). These features were not present on control (0 weeks) mesh samples, which showed only specks <1 μm deep, spots, and longitudinal striations on the surface.

### X-ray photoelectron spectroscopy (XPS) of explanted PP mesh

After approval of the St. Michael's Hospital Research Ethics Board, an explanted American Medical Systems PP MUS specimen from a single patient, preserved dry without formalin and received by the pathology department at St. Michael's, was selected for testing. The mesh was explanted for complications other than mucosal erosion. A part of the specimen was processed for histology, which showed evidence of a FBR in response to implantation of the mesh with no superimposed acute (bacterial) inflammation. Tissue-free fibers of the PP mesh at the specimen edges were separated from the specimen using ophthalmic tweezers and scissors. To assess the effects of mechanical cleaning on the surface chemistry of the fibers, three distinct regions were characterized by XPS: (1) one area of interest (AOI) on untreated fibers showing no evidence of residual tissue by microscopy (Untreated residue-free group), (2) one AOI on the same untreated fibers showing evidence of residual tissue (Untreated residue-present group), and (3) one AOI on scraped fibers in which the outer layer was mechanically removed using tweezers and a scalpel blade under a dissection microscope (Scraped group). Five Untreated fibers and five Scraped fibers were analysed by XPS with a PHI Versaprobe using Al kα x-rays (1486 eV). A 20-μm diameter X-ray spot (AOI) was rastered across the analysis area, and a take-off angle of 45 degrees off sample normal was used. Pass energies of 187.7 and 23.5 eV were used for the survey and high-resolution acquisitions, respectively. Charge neutralization was accomplished using 1.1 eV electrons and 10 eV Ar$^+$ ions. The energy scales of the high-resolution spectra were calibrated to place –CH$_2$– bonding in the carbon 1s spectrum at 284.8 eV. Relative atomic concentrations were calculated using peak areas and handbook sensitivity factors.

### Statistical analysis

For each *in vitro* FTIR data-set ($n = 6$) measured for a specific type of mesh at a specific time point, the one-sample Komogorov-Smirnov test failed to reject the null hypothesis that the data-set came from a standard normal distribution ($\alpha < 0.05$). Thus, the data were assumed to be normally distributed. Carbonyl and hydroxyl peak areas were plotted as mean ± SEM and analyzed using a two-way ANOVA for mesh composition and time. Pairwise comparisons were performed by a Tukey's honestly significant difference (HSD) test.

For each *in vivo* XPS data-set ($n = 5$) measured for a specific surface treatment (Untreated residue-free, Untreated residue-present, and Scraped), the one-sample Komogorov-Smirnov test failed to reject the null hypothesis that the data-set came from a standard normal distribution ($\alpha < 0.05$). Thus, the data were assumed to be normally distributed. Surface atomic concentrations, atomic ratios, and C1s bonding concentrations were plotted as mean ± SD and analyzed by a one-way ANOVA and Tukey's HSD test for pairwise comparisons. For all FTIR and XPS analysis, the significance level was defined as $p < 0.05$.

## Results

### In vitro *oxidation assessed by FTIR spectroscopy*

FTIR spectra taken after 0 weeks immersion time showed minimal hydroxyl (–OH) or carbonyl (–C=O) peaks for each of the PP mesh devices (Figure 2). However, after 5 weeks incubation time, FTIR spectra of all three meshes showed the appearance of both –OH and –C=O groups, which indicates that the PP had oxidized, resulting in the formation of hydroperoxide (–COOH, gray arrow) intermediate and terminal –C=O (black arrow) groups (Figure 2). A two-way ANOVA with Tukey's HSD test for pairwise comparisons showed that the areas of the hydroxyl and carbonyl peaks at 5 weeks were significantly ($p < 0.05$) higher than those at the other time points. No significant differences between the three mesh groups were observed at any time point. These findings confirm our hypothesis that PP mesh oxidizes in response to ROS, such as hydroxyl radicals.

### *Surface degradation assessed by SEM*

Low- (40–60×) magnification SEM images at 0 weeks (untreated control, Figure 3(A) top row) and at 5 weeks (Figure 3(B) top row) revealed the knitted monofilament structure of the meshes. Medium- (800–1000×) magnification images showed dark spots and longitudinal striations along the axis of extrusion as well as specks <1 μm deep (Figure 3(A), bottom row). No evidence of features associated with surface degradation was observed, such as flaking (>10 μm long), peeling (>10 μm long), or pitting (>1 μm deep). In contrast, medium-magnification SEM images of PP mesh incubated for 5 weeks in oxidative media (Figure 3(B) middle row) revealed evidence of pits >1 μm deep (black arrows), peeling flakes >10 μm long (double white arrows), and shallow craters >10 μm long (white arrows) on the surface. High- (1500–2000×) magnification images showed that small pits <5 μm in diameter and >1 μm deep had formed on the surface of the mesh. These pits were observed in all fields of view examined at medium and high magnification. Some regions of the mesh showed evidence of larger scale features, such as detachment of peeling flakes >10 μm (double white arrows) from the surface, resulting in the formation of shallow craters (white arrows). These observations at 5 weeks are consistent with our hypothesis that PP mesh oxidizes in response to ROS, resulting in PP embrittlement and surface degradation (16).

### *Oxidation of explanted PP mesh*

A survey spectrum was collected from each of the Untreated residue-free, Untreated residue-present, and Scraped AOIs analyzed. An X-ray-induced secondary electron micrograph shows the AOI (white box in Figure 4(A)) analyzed on representative Untreated residue-free and Scraped samples (the complete set of images, spectra, and surface composition data for all groups are presented in the Supplemental Data). A one-way ANOVA with Tukey's HSD test for pairwise comparisons showed no significant ($\alpha < 0.05$) differences in surface atomic concentrations, atomic ratios, or C1s bonding between the residue-free and residue-present AOIs on Untreated fibers. This finding suggests that the AOIs tested are representative of the fiber (within the error of the measurement), since the two AOIs that appeared visibly different showed no significant differences in surface composition. After



**Figure 2.** Effects of incubation time in oxidative medium on the composition of PP mesh assessed by FTIR spectroscopy. (A) FTIR spectra of PP mesh samples incubated in oxidative medium for up to 5 weeks at 37 °C. Carbonyl (−C=O, black arrow) and hydroxyl (−OH, gray arrow) peaks increase with time for each mesh. (B−C) Plots of the area of the (B) −OH peak (integrated over 3600−3000 cm$^{-1}$) and (C) −C=O peaks (integrated over 1750−1500 cm$^{-1}$) show a significant increase in carbonyl and hydroxyl peak areas at week 5. Note: *Denotes statistical significance ($p < 0.5$).

8   A. D. TALLEY ET AL.



**Figure 2.** (*Continued*).

scraping, the atom-% C significantly increased, the atom-% O significantly decreased, and the atom-% N significantly decreased ($p < 0.05$, Figure 4(B)). Consequently, the atomic ratios O:C, N:C, and N:O significantly decreased after scraping ($p < 0.05$, Figure 4(C)). While all the Untreated samples showed nitrogen on the surface, only one of the Scraped samples, which were mechanically debrided to remove oxidized PP and protein from the surface, showed nitrogen. In contrast, all of the Scraped fibers exhibited oxygen on the surface, which is attributed to the presence of residual oxidized PP on the surface after scraping. Thus, mechanical scraping removed adherent tissue to reveal an underlying layer of oxidized PP in this specific patient explant. These findings highlight the potential of XPS analysis of mechanically scraped fibers from explanted mesh without formalin fixation for assessing oxidation of PP mesh *in vivo*.

High-resolution carbon 1s (C1s) spectra from Untreated and Scraped fibers are shown in Figure 4(D). These spectra were curve-fitted to extract the contributions of different carbon bonding configurations present in the spot [24]. All Untreated fibers exhibited some fraction of the carbon present bonded in carbonyl and hydroperoxide configurations. One-way ANOVA with Tukey's HSD test for pairwise comparisons showed that scraping significantly ($\alpha < 0.05$) reduced the percent of C1s bonding configurations comprising carbonyl and hydroperoxide bonds (Figure 4(E)). However, all scraped fibers showed evidence of oxygen on the surface: two showed carbonyl bonding and four showed hydroperoxide bonding. Since nitrogen was observed on the surface of only one scraped fiber, the carbonyl and/or hydroperoxide bonds present on the scraped fibers cannot be attributed to protein adsorption. Thus, the data in Figure 4(D) and (E) reveal evidence of carbonyl and hydroperoxide peaks on Untreated residue-free and Scraped fibers that are consistent with the oxidation reaction mechanism for PP. Explanted mesh from only one patient was evaluated, which precludes statistical analysis of the data to identify differences between patients. However, the XPS findings support our hypothesis that oxidation of PP mesh in response to ROS secreted by adherent inflammatory cells occurred *in vivo* in this specific patient explant.

## Discussion

In this study, we hypothesized that PP mesh oxidizes in response to ROS secreted by inflammatory cells that infiltrate the mesh after implantation. To test our hypothesis, we investigated the oxidative degradation of three commercial MUSs using an oxidative medium that recapitulates the microenvironment between adherent macrophages and the PP surface [17].

JOURNAL OF BIOMATERIALS SCIENCE, POLYMER EDITION   9



**Figure 3.** SEM images of PP mesh before and after incubation in oxidative medium. (A) SEM images of pristine TVT, ADV, and LYNX meshes (0 weeks incubation time). Low-magnification (40–60×, top row) images show the knitted monofilament structure of the meshes. Medium-magnification (800–1000×, bottom row) images show dark spots and longitudinal striations along the axis of extrusion as well as specks <1 μm deep. No evidence of features associated with surface degradation was observed, such as flaking, peeling, or pitting. (B) SEM images of TVT, ADV, and LYNX meshes incubated in oxidative medium for 5 weeks. Low-magnification (40–60×, top row) images show the knitted monofilament structure. Medium-magnification (800–1000×, middle row) images revealed evidence of pits (black arrows), peeling flakes (double white arrows), and shallow craters (white arrows) on the surface. High-magnification (1500–2000×, bottom row) images showed small pits <5 μm in diameter and >1 μm deep on the surface of the mesh for all regions examined. Some regions of the mesh showed evidence of larger scale features, such as detachment of peeling flakes >10 μm long (double white arrows) from the surface, resulting in the formation of shallow craters >10 μm long (white arrows).

10    A. D. TALLEY ET AL.



**Figure 4.** *In vivo* oxidation of explanted PP mesh fibers assessed by XPS. Five explanted Untreated and five Scraped fibers were analysed by XPS to assess the surface concentration of carbon, oxygen, and nitrogen atoms and C1s bonding configurations. One-way ANOVA with Tukey's HSC test for pairwise interactions showed no significant differences between residue-free and residue-present Areas of Interest (AOI) on Untreated fibers, so only Untreated residue-free fibers are shown. Both residue-free and residue-present AOIs on Untreated fibers were significantly different from Scraped fibers. (A) X-ray induced SEM showing the AOI analyzed for a representative sample. (B) Average atomic-% of C, O, and N for the AOI analyzed for each fiber. (C) Average O:C, N:C, and N:O ratios measured for each AOI. (D) High-resolution C1s spectra from Untreated and Scraped fibers. (E) Percent of C1s bonding configurations present on Untreated and Scraped fibers. The complete set of XPS data are shown in the Supplemental Data.
Note: *Denotes statistical significance ($p < 0.05$).

We observed significant increases in carbonyl and hydroxyl peak areas for each mesh after 5 weeks' incubation time in oxidative media by FTIR spectroscopy. In contrast to pristine mesh, which showed longitudinal striations and specks resulting from the extrusion process, SEM images of PP mesh samples at 5 weeks revealed evidence of large-scale pitting, flaking, and peeling associated with surface degradation. Analysis of fibers recovered from an explanted PP mesh by XPS also showed evidence of oxidation *in vivo*. These observations suggest that antioxidants added to PP mesh to protect it during processing and long-term storage do not prevent eventual oxidation in response to ROS, such as hydroxyl radicals present in the oxidative medium (Figure 1), which recapitulates the *in vivo* microenvironment. Thus, antioxidants do not protect the mesh against *in vivo* oxidation and degradation indefinitely.

PP is highly susceptible to oxidation due to its chemical structure, and the mechanism of PP oxidation at elevated temperatures *in vitro* has been known since the 1960s [3,16,25].

However, the effectiveness of antioxidants designed to protect PP against thermal oxidation [25,26] has not been systematically investigated under *in vivo* conditions. Considering recent studies reporting that the body's response to TVM is pro-inflammatory and persists for many years after implantation [8–10,21], the effects of ROS secreted by adherent inflammatory cells on PP should be considered in the design of TVM implants. We investigated oxidation of TVM using a synthetic medium known to recapitulate the oxidative microenvironment between an adherent macrophage and the biomaterial surface [17,18]. This approach enables the investigation of oxidation of PP fibers without the potentially confounding effects of protein adsorption that occurs *in vivo*. Thus, the significant increase in carbonyl and hydroxyl peaks at week 5 (Figure 2) can be explained by oxidation of the PP resulting from the reaction with hydroxyl radicals (Figure 1). Recent attempts to explain the presence of carbonyl peaks on the surface of explanted PP fibers as a crosslinked protein-formalin complex [27], biofilms [28], or residual antioxidants [27] cannot account for the increase in carbonyl and hydroperoxide groups observed after *in vitro* incubation in oxidative medium in the absence of proteins.

Our *in vitro* findings are consistent with previous studies reporting that PP oxidizes *in vivo* [9,12,13,29,30]. In an early study, stabilized PP fibers were solvent-extracted to remove the antioxidant. Extracted PP fibers (which contained a trace of residual antioxidants) and stabilized PP fibers were implanted subcutaneously in hamsters. Extracted PP fibers showed significant oxidation at 108 days, but stabilized PP fibers did not [13]. Thus, the question of whether stabilized PP can oxidize *in vivo* remained unanswered due to insufficient study duration (5 months). In a later study, Prolene® (Ethicon) monofilament PP sutures were implanted in a canine thoracoabdominal bypass model for up to 2 years [30]. Carbonyl absorbance of explanted PP sutures measured by FTIR peaked within 1–3 months post-implantation and subsequently decreased to steady-state values for 2 years.

A more recent study examining TVM explanted from 11 patients reported oxidation of PP fibers as evidenced by carbonyl peaks in the FTIR spectrum [12]. Oxidized PP was distinguished from adsorbed proteins using SEM-EDS to identify regions of PP fibers containing oxygen but not nitrogen. Similarly, we characterized the surface of PP fibers recovered from a mesh explanted from a single patient by XPS, a technique that provides quantitative analysis of the atoms and chemical bonds present at the surface. Collagen has atomic ratios N:C = 0.33 and N:O = 0.83 [31], which are 2–5-fold larger than those measured by XPS for Untreated fibers (Figure 4(C)). After scraping, the N:C and N:O ratios significantly decreased. Furthermore, nitrogen was observed on only 1 of the 5 Scraped fibers, while oxygen was observed on all Scraped fibers. Taken together, these observations suggest that both oxidized PP and adsorbed proteins are present on the surface of the Untreated fibers, which is consistent with previous studies reporting that cleaning explanted PP mesh reduces the carbonyl and hydroxyl peak areas [9,27]. Thus, the presence of oxygen (and absence of nitrogen) detected on the surface of explanted PP fibers by SEM-EDS [12] and XPS (Figure 4) cannot be attributed to protein adsorption [27] alone. Both our findings and those from the SEM-EDS analysis of explanted mesh from 11 patients [12] show that oxidation of PP mesh occurs *in vivo*. Additional studies with larger numbers of patients are warranted to investigate how PP oxidation correlates with mesh degradation and complications in humans.

The methods by which explanted samples are prepared for FTIR and XPS analysis can impact the findings. In the present study, fibers were manually dissected to remove adherent

tissue from an explanted mesh that had not been previously fixed in formalin. Other stud-
ies have utilized cleaning solutions, including bleach (sodium hypochlorite) [12,32] or
enzymatic [30] treatment to remove biological material from explanted PP fibers fixed
in formalin. Cleaning explanted biomedical devices with bleach is recommended in ISO
12,891 for removal of biological tissue from ultra-high molecular weight polyethylene,
which has a similar chemical composition to PP [12]. Bleach and enzymatic treatment,
as well as microscopic dissection, offer the advantage of selectively removing the tissue
without disturbing the integrity of the brittle surface layer. A recent study has proposed
a new method for cleaning explanted PP pelvic mesh using twelve cycles of bleach, enzy-
matic, and ultrasonic treatment, which completely removed the brittle surface layer [27].
Explanted PP fibers cleaned using this method showed no evidence of oxygen, prompting
the authors to conclude that the PP fibers were not oxidized and that surface layer comprised
crosslinked protein alone. However, ultrasonication cannot selectively separate oxidized
PP and adsorbed protein, and thus it is likely that the aggressive twelve-cycle cleaning pro-
cedure completely removed the mixed layer of adsorbed proteins and oxidized PP. Testing
the composition of the cleaning solutions after ultrasonication for oxidized PP is necessary
to support the conclusion that the surface layer contains only protein. In the present study,
mechanical scraping of PP fibers from a single explant that was not previously fixed in
formalin removed adherent tissue without disturbing the underlying layer of oxidized PP.
Further studies with larger numbers of specimens are warranted to confirm the utility of this
mechanical scraping without formalin fixation cleaning procedure in additional patients.

Implantation of TVM has been associated with chronic inflammation characterized by
predominantly M1 macrophages [8–10,21], PP oxidation [9,12,30], and PP degradation
[9,10,12,33]. These findings point to an oxidative degradation mechanism comprising the
following steps: (1) attachment of inflammatory cells to the PP surface, (2) secretion of ROS
near the PP surface, (3) oxidation and embrittlement of PP, and (4) transverse cracking
of PP fibers [12]. Using an established *in vitro* assay, we have shown that ROS secreted by
adherent inflammatory cells can oxidize PP mesh stabilized by conventional antioxidants.
Consistent with the well-known effect of thermal oxidation on PP degradation [3,16], our
data highlight the contribution of ROS-mediated PP oxidation to embrittlement and surface
degradation. Clinical studies correlating chronic inflammation with PP degradation [9,10]
and mesh exposure [8] establish a potential link between oxidative degradation and mesh
complications in patients.

The combination of a biomaterial that undergoes oxidative degradation, an oxidative
microenvironment (i.e. the adherent macrophage-biomaterial interface), and residual
mechanical stress can result in environmental stress cracking (ESC) [17]. As an example,
transverse cracks in explanted poly(ether urethane) catheter leads have been attributed
to ESC [17,20,22,34], which has been reproduced *in vitro* by treating pre-strained test
specimens in oxidative medium [17]. Previous studies have reported transverse cracks in
the surface of explanted PP sutures and mesh [9,29,30]. While PP is generally considered
resistant to ESC, the embrittlement of PP by oxidative or other chemical degradation is
described as corrosion stress cracking (CSC) [35]. Thus, when PP is exposed to strong oxi-
dizing agents (e.g. ROS) and mechanical stress, it can undergo CSC, resulting in acceleration
of the degradation process [25,35]. In the present study, we observed oxidation and surface
degradation *in vitro* but did not reproduce the transverse cracking observed for explanted PP
sutures and mesh *in vivo*, since the samples were not pre-strained [17] prior to incubation

Case 2:12-md-02327   Document 4573-1   Filed 08/31/17   Page 47 of 393 PageID #: 150645



in the oxidative medium. Thus, future studies in which mesh specimens are pre-strained using forces comparable to those applied *in vivo* (5–15 N [36,37]) prior to treatment with oxidative medium are warranted in order to reproduce cracking of PP mesh *in vitro*.

## Conclusions

Oxidative degradation of PP pelvic mesh was evidenced by chemical and physical changes under simulated *in vivo* conditions. PP has been known to be highly susceptible to thermal oxidation at elevated temperatures *ex vivo* since the 1960s [3], and cellular mechanisms of oxidation have been suggested since the 1970s [13,38], but the present study is the first to confirm an ROS-mediated mechanism of PP oxidation and degradation. Since most commercial sources of PP use the same types of antioxidants [25], our findings suggest that oxidation would be expected during the lifetime of the device, and thus antioxidants cannot protect the device from degradation indefinitely. These findings underscore the need for further research into the relative contribution of oxidative degradation to complications associated with PP-based POP and SUI devices.

## Disclosure statement

Anne D. Talley and Bridget R. Rogers have no conflicts to disclose. Russell F. Dunn is the Owner of Polymer and Chemical Technologies, which sponsored the work. He has also provided opinions for medico-legal cases on matters related to polypropylene mesh. Vladimir Iakovlev and Scott A. Guelcher have provided opinions for medico-legal cases on matters related to polypropylene mesh.

## Funding

This work was supported by Polymer and Chemical Technologies, LLC [grant Number VU-1349].

## References

[1] Caquant F, Collinet P, Debodinance P, et al. Safety of trans vaginal mesh procedure: retrospective study of 684 patients. J Obstet Gynaecol Res. 2008;34(4):449–456.

[2] Nilsson CG, Palva K, Aarnio R, et al. Seventeen years' follow-up of the tension-free vaginal tape procedure for female stress urinary incontinence. Int Urogynecol J. 2013;24(8):1265–1269.

[3] Oswald HJ, Turi E. The deterioration of polypropylene by oxidative degradation. Polym Eng Sci. 1965 July;5:152–158.

[4] Deffieux X, de Tayrac R, Huel C, et al. Vaginal mesh erosion after transvaginal repair of cystocele using Gynemesh or Gynemesh-Soft in 138 women: a comparative study. Int Urogynecol J. 2007;18(1):73–79.

[5] Tsui KP, Ng SC, Tee YT, et al. Complications of synthetic graft materials used in suburethral sling procedures. Int Urogynecol J. 2005;16(2):165–167.

[6] Jia X, Glazener C, Mowatt G, et al. Efficacy and safety of using mesh or grafts in surgery for anterior and/or posterior vaginal wall prolapse: systematic review and meta-analysis. BJOG: An Int J Obstet Gynaecol. 2008;115(11):1350–1361.

[7] Feiner B, Jelovsek JE, Maher C. Efficacy and safety of transvaginal mesh kits in the treatment of prolapse of the vaginal apex: a systematic review. BJOG: An Int J Obstet Gynaecol. 2009;116(1):15–24.

[8] Nolfi AL, Brown BN, Liang R, et al. Host response to synthetic mesh in women with mesh complications. Am J Obstet Gynecol. 2016;215(2):206.e1–206.e8.

[9]   Clavé A, Yahi H, Hammou JC, et al. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J. 2010;21(3):261–270.

[10]  Iakovlev VV, Guelcher SA, Bendavid R. Degradation of polypropylene *in vivo*: a microscopic analysis of meshes explanted from patients. J Biomed Mater Res Part B. 2015. doi: http://dx.doi.org/10.1002/jbm.b.33502; PubMed PMID: 26315946.

[11]  Costello CR, Bachman SL, Grant SA, et al. Characterization of heavyweight and lightweight polypropylene prosthetic mesh explants from a single patient. Surg Innovation. 2007;14(3):168–176.

[12]  Imel A, Malmgren T, Dadmun M, et al. *In vivo* oxidative degradation of polypropylene pelvic mesh. Biomaterials. 2015;73:131–141.

[13]  Liebert TC, Chartoff RP, Cosgrove SL. Subcutaneous implants of polypropylene filaments. J Biomed Mater Res. 1976;10:939–951.

[14]  Kausch HH. The effect of degradation and stabilization on the mechanical properties of polymers using polypropylene blends as the main example. Macromol Symp. 2005;225:165–178.

[15]  Hoff A, Jacobsson S. Thermal oxidation of polypropylene in the temperature range of 120–280°C. J Appl Polym Sci. 1984;29:465–480.

[16]  Fayolle B, Audouin L, Verdu J. Oxidation induced embrittlement in polypropylene – a tensile testing study. Polym Degrad Stab. 2000;70:333–340.

[17]  Zhao QH, McNally AK, Rubin KR, et al. Human plasma alpha2-macroglobulin promotes *in vitro* oxidative stress cracking of Pellethane 2363-80A: *in vivo* and *in vitro* correlations. J Biomed Mater Res. 1993;27:379–388.

[18]  Hafeman AE, Zienkiewicz KJ, Zachman AL, et al. Characterization of the degradation mechanisms of lysine-derived aliphatic poly(ester urethane) scaffolds. Biomaterials. 2011;32(2):419–429.

[19]  Martin JR, Gupta MK, Page JM, et al. A porous tissue engineering scaffold selectively degraded by cell-generated reactive oxygen species. Biomaterials. 2014;35(12):3766–3776.

[20]  Anderson JM, Rodriguez A, Chang DT. Foreign body reaction to biomaterials. Semin Immunol. 2008;20:86–100.

[21]  Brown BN, Mani D, Nolfi AL, et al. Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque. Am J Obstet Gynecol. 2015;213(5):668. e1–668.e10.

[22]  Schubert MA, Wiggins MJ, Anderson JM, et al. Role of oxygen in biodegradation of poly(etherurethane urea) elastomers. J Biomed Mater Res. 1997;34(4):519–530.

[23]  Christenson EM, Anderson JM, Hiltner A. Oxidative mechanisms of poly(carbonate urethane) and poly(ether urethane) biodegradation: *in vivo* and *in vitro* correlations. J Biomed Mater Res. 2004;70A(2):245–255.

[24]  Beamson G, Briggs D. High resolution XPS of organic polymers. Chichester, UK: Wiley; 1992.

[25]  Maier C, Calafut T. Polypropylene: the definitive user's guide and databook. New York (NY): William Andrew; 1998.

[26]  de la Rie ER. Polymer stabilizers. A survey with reference to possible applications in the conservation field. Stud Conserv. 1988;33:9–22.

[27]  Ong KL, White J, Thames SF. The myth: *in vivo* degradation of polypropylene meshes. In Urogynecol J. 2016;27(Suppl 1):S37–S38.

[28]  de Tayrac R, Letouzey V. Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery. Int Urogynecol J. 2011;22(7):775–780.

[29]  Costello CR, Bachman SL, Ramshaw BJ, et al. Materials characterization of explanted polypropylene hernia meshes. J Biomed Mater Res Part B. 2007;83B(1):44–49.

[30]  Mary C, Marois Y, King MW, et al. Comparison of the *in vivo* behavior of polyvinylidene fluoride and polypropylene sutures used in vascular surgery. ASAIO J. 1998;44(3):199–206.

[31]  Szpak P. Fish bone chemistry and ultrastructure: implications for taphonomy and stable isotope analysis. J Archaeolog Sci. 2011;38:3358072.

[32]  Coda A, Bendavid R, Botto-Micca F, et al. Structural alterations of prosthetic meshes in humans. Hernia. 2003;7(1):29–34.

[33]  Gopal S, Majumder S, Batchelor AG, et al. Fix and flap: the radical orthopaedic and plastic treatment of severe open fractures of the tibia. J Bone Jt Surg. 2000;82(7):959–966.



[34] Zhao Q, Agger MP, Fitzpatrick M, et al. Cellular interactions with biomaterials: *in vivo* cracking of pre-stressed pellethane 2363-80A. J Biomed Mater Res. 1990;24(5):621–637.

[35] Chatten R, Vesely D. Environmental stress cracking of polypropylene. In: Karger-Kocsis J, editor. Polypropylene: an A–Z reference. Dordrecht: Kluwer Publishers; 1999. p. 206–214.

[36] Moalli PA, Papas N, Menefee S, et al. Tensile properties of five commonly used mid-urethral slings relative to the TVT. Int Urogynecol J. 2008;19(5):655–663.

[37] Dietz HP, Vancaillie P, Svehla M, et al. Mechanical properties of urogynecologic implant materials. Int Urogynecol J Pelvic Floor Dysfunction. 2003;14(4):239–243; discussion 43.

[38] Williams DF. Biodegradation of surgical polymers. J Mater Sci. 1982;17:1233–1246.

**Supplemental Data**

**Supplemental Materials and Methods**

Fibers from an explanted polypropylene (PP) mid-urethral sling (MUS) not previously fixed in formalin were received Dr. Vladimir Iakovlev at St. Mary's Hospital (Toronto, Ontario, Canada). Fibers were supplied in numbered and sealed micro centrifuge tubes. A total of ten fibers were analyzed. Five fibers (numbered 5, 8, 23, 24, and 31) had been mechanically scraped by Dr. Iakovlev to remove tissue from the fiber surface. Another five fibers (numbered 3, 9, 11, 14, and 17) had not been scraped. Two areas were analyzed on the untreated fibers: (1) a region that appeared residue-free, and (2) a region that showed residual material. Fibers that had been cleaned were visually free of residual material, and therefore only one region of interest was examined on these fibers. Due to the small size of the fibers, no more than two independent regions could be reliably analyzed.

XPS analyses were performed in a PHI Versaprobe using Al kα x-rays (1486 eV). A 20-μm diameter x-ray spot was rastered across the analysis area, and a take-off angle of 45 degrees off sample normal was used. Pass energies of 187.7 eV and 23.5 eV were used for the low- and high resolution acquisitions, respectively. Charge neutralization was accomplished using 1.1 eV electrons and 10 eV $Ar_+$ ions. The energy scales of the high-resolution spectra were calibrated to place -CH2- bonding in the carbon 1s spectrum at 284.8 eV. Relative atomic concentrations were calculated using peak areas and handbook sensitivity factors. Resulting concentrations have high precision, and therefore can be used to qualitatively compare samples collected under similar conditions.

**Supplemental Results**

*Images of fibers.* Supplemental Figure 1 shows an x-ray induced secondary electron micrograph showing the area analyzed on each sample. The area indicated on the Untreated samples is that of the residue-free area. The Scraped fibers were rougher than the Untreated fibers. Therefore, the XPS analysis volume on scraped fibers included material from deeper into the fiber



Figure S1. X-ray-induced secondary electron micrographs of the area analyzed on each fiber.

compared to fibers that had not been scraped. X-ray induced secondary electron micrographs images are not as well-defined as those obtained in an SEM because the primary x-ray beam is much larger than the electron beam used in an SEM. However, the imaging capability of this instrument enables us to define analysis areas which contain only the material of interest, which facilitates accurate interpretation of the acquired data.

*Survey spectra and surface composition*. A survey spectrum was collected from each fiber analyzed. Carbon, oxygen, nitrogen, and silicon were present to different degrees on all samples. Fiber number 5, which had been scraped, also contained a small amount of chlorine. Tables I and II summarize the elemental compositions determined for the Untreated and Scraped fibers, respectively. A one-way ANOVA testing the effects of surface treatment on surface chemistry found no significant ($\alpha < 0.05$) difference in atomic percents, atomic ratios, or C1s binding



Figure S2. Survey spectra for the area analyzed on each fiber.

between residue-free and residue-present areas on the Untreated fibers. However, scraping resulted in significant differences in atomic percents, atomic ratios, and C1s bonding (Figure 4 of the manuscript). Figure S2 shows the high-resolution carbon 1s spectrum from Untreated (residue-free), Untreated (residue present), and Scraped fibers. The atomic% of carbon (C), oxygen (O), nitrogen (N), silica (Si), and chlorine (Cl) are listed in Tables S1-3.

Table S1. Summary of atomic composition of Untreated fibers (residue-free areas).

| Fiber # | Atomic % | | | | |
|---|---|---|---|---|---|
| | C | O | N | Si | Cl |
| 3 | 72.7 | 17.7 | 9.5 | 0 | 0 |
| 9 | 84.3 | 11.1 | 4.6 | 0 | 0 |
| 11 | 78.3 | 14.4 | 4.2 | 3.0 | 0 |
| 14 | 78.2 | 15.7 | 4.3 | 1.7 | 0 |
| 17 | 87.4 | 9.7 | 1.1 | 1.8 | 0 |
| Mean ± SD | 80.2 ± 5.8 | 13.7 ± 3.3 | 4.7 ± 3.0 | 1.3 ± 1.3 | 0 ± 0 |

Table S2. Summary of atomic composition of Untreated fibers (areas with residue).

| Fiber # | Atomic % | | | | |
|---|---|---|---|---|---|
| | C | O | N | Si | Cl |
| 3 | 77.5 | 14.2 | 8.3 | 0 | 0 |
| 9 | 81.5 | 13.1 | 5.4 | 0 | 0 |
| 11 | 74.9 | 17.3 | 5.4 | 2.4 | 0 |
| 14 | 82.9 | 12.6 | 3.9 | 0.6 | 0 |
| 17 | 87.7 | 10.3 | 0.0 | 2.0 | 0 |
| Mean ± SD | 80.9 ± 4.9 | 13.5 ± 2.6 | 4.6 ± 3.0 | 1.0 ± 1.1 | 0 ± 0 |

Table S3. Summary of atomic composition of Scraped fibers.

| Fiber # | Atomic % | | | | |
|---|---|---|---|---|---|
| | C | O | N | Si | Cl |
| 5 | 93.9 | 6.9 | 0.0 | 0 | 0.2 |
| 8 | 93.5 | 5.9 | 0.0 | 0.6 | 0 |
| 23 | 93.1 | 5.5 | 0.4 | 1.0 | 0 |
| 24 | 97.4 | 2.4 | 0.0 | 0.2 | 0 |
| 31 | 96.6 | 3.4 | 0.0 | 0.0 | 0 |
| Mean ± SD | 94.9 ± 2.0 | 4.8 ± 1.9 | 0.1 ± 0.2 | 0.4 ± 0.4 | 0.1 ± 0.1 |

*Analysis of carbon bonding.* Spectra were curve-fitted to extract the contributions of different carbon bonding configurations present in the analysis area. All fibers that were not scraped exhibited some fraction of the carbon present bonded in carbonyl and carboxylate configurations. Two Scraped fibers (numbers 5 and 8) showed some carbonyl type bonding, while Scraped fibers numbered 23 and 24 contain both carbonyl and carboxylate type bonding. Figure S2 includes a spectrum of fiber 24 with an expanded y-axis to highlight the carbonyl and

3

carboxylate contributions to the carbon spectrum. The C1s spectrum from Scraped fiber number 31 shows no carbonyl nor carboxylate type bonding on this sample. Tables S4 – S6 summarize the percent of C1s bonding configurations present on each Untreated (residue-free and residue-present) and Scraped fibers, respectively.

Table S4. Summary of relative amounts (%) of the various C 1s bonding configurations present on the residue-free areas of Untreated fibers.

| Fiber # | ≈288 eV C=O | ≈287 eV R-C*COOH | ≈284.8 eV -CH | ≈284.3 eV |
|---------|-------------|------------------|---------------|-----------|
| 3 | 10.6 | 10.3 | 78.9 | ND |
| 9 | 3.7 | 7.9 | 93.2 | ND |
| 11 | 4.5 | 4.2 | 91.3 | ND |
| 14 | 5.0 | 5.8 | 89.2 | ND |
| 17 | 1.9 | 3.5 | 72.6 | 21.9 |
| Mean ± SD | 5.1 ± 3.3 | 6.3 ± 2.8 | 85.0 ± 8.9 | 4.4 ± 9.8 |

Table S5. Summary of relative amounts (%) of the various C 1s bonding configurations present on the residue-present areas of Untreated fibers.

| Fiber # | ≈288 eV C=O | ≈287 eV R-C*COOH | ≈284.8 eV -CH | ≈284.3 eV |
|---------|-------------|------------------|---------------|-----------|
| 3 | 8.9 | 6.9 | 83.2 | ND |
| 9 | 6.9 | 3.0 | 88.9 | ND |
| 11 | 7.6 | 7.7 | 84.7 | ND |
| 14 | 4.8 | 5.2 | 90.0 | ND |
| 17 | 1.8 | 3.2 | 71.6 | 23.5 |
| Mean ± SD | 6.0 ± 2.8 | 5.2 ± 2.1 | 83.7 ± 7.3 | 4.7 ± 10.5 |

Table S6. Summary of relative amounts (%) of the various C 1s bonding configurations present on Scraped fibers.

| Fiber # | ≈288 eV C=O | ≈287 eV R-C*COOH | ≈284.8 eV -CH | ≈284.3 eV |
|---------|-------------|------------------|---------------|-----------|
| 5 | ND | 2.5 | 97.5 | ND |
| 8 | ND | 2.3 | 97.7 | 0.6 |
| 23 | 1.5 | 2.6 | 95.9 | 1.0 |
| 24 | 0.4 | 1.2 | 98.4 | 0.2 |
| 31 | ND | ND | 100 | 0.0 |
| Mean ± SD | 0.4 ± 0.6 | 1.7 ± 1.1 | 0.1 ± 0.2 | 97.9 ± 1.5 |

4

# EXHIBIT D

Scott A. Guelcher, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN RE: ETHICON, INC., PELVIC
REPAIR SYSTEM PRODUCTS LIABILITY
LITIGATION,
        Plaintiff,
v.                        MASTER FILE 2:12-MD-02327
                               MDL 2327
THIS DOCUMENT RELATES TO CASE:
WAVE 5 CASES,
        Defendant.           JOSEPH R. GOODWIN
                            U.S. DISTRICT JUDGE

_____

DEPOSITION OF SCOTT A. GUELCHER, PH.D.

AUGUST 17, 2017

- - -

Deposition of SCOTT A. GUELCHER, PH.D. held at

Butler Snow, LLP, 150 3rd Avenue South, Suite 1600,

Nashville, Tennessee, commencing at 8:30 a.m., on the above

date, before Gina Hawkins, Tennessee Licensed Court

Reporter.

Scott A. Guelcher, Ph.D.

I N D E X

WITNESS                                         PAGE
SCOTT A. GUELCHER, PH.D.
Examination by Mr. Thomas                         4

E X H I B I T S
Number

1    Article entitled "Oxidation and           4
     degradation of polypropylene transvaginal
     mesh"

2    Document entitled "Supplemental Data,      5
     Supplemental Materials and Methods"

3    Expert Report of Scott Guelcher, Ph.D.    52

4    Published Conference Proceedings          68

5    Second Amended Notice of Deposition       86

A P P E A R A N C E S

(Appearing on behalf of the Plaintiff)
TIMOTHY E. JACKSON, ESQUIRE
Wexler Wallace, LLP
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
tej@wexlerwallce.com

(Appearing on behalf of the Defendant)

DAVID B. THOMAS, ESQUIRE
Thomas, Combs & Spann, PLLC
300 Summers Street
Charleston, West Virginia 25301
dthomas@tcspllc.co

1         SCOTT A. GUELCHER, PH.D.
2    after having been first duly sworn, was examined and
3    testified as follows:
4              EXAMINATION
5    BY MR. THOMAS:
6    Q   Good morning, Dr. Guelcher.
7    A   Good morning.
8        (Exhibit 1 was marked for identification.)
9    BY MR. THOMAS:
10   Q   Dr. Guelcher, I'm going to hand you Deposition
11   Exhibit Number 1.  This is a paper from the Journal of
12   Biomaterials Science, Polymer Edition, 2017 titled
13   "Oxidation and degradation of polypropylene transvaginal
14   mesh."
15       You're familiar with that document, aren't you?
16   A   Yes.
17   Q   You're one of the authors on this paper?
18   A   Yes.
19   Q   And in fact, you're the corresponding author?
20   A   Yes.
21   Q   What does it mean to be a corresponding author?
22   A   That means that I handle all the correspondence
23   with the editor, editorial office.
24   Q   And do you handle any questions that people might
25   have about the content of the study for readers?

1    A   Well, yeah, all the authors together respond to
2    comments from reviewers, and then I send the final response
3    to the journal.
4    Q   Okay.  You're the point person for any issues
5    that might arise around the article?
6    A   That's right.
7        (Exhibit 2 was marked for identification.)
8    BY MR. THOMAS:
9    Q   Let me show you Deposition Exhibit Number 2.  And
10   Deposition Exhibit Number 2 is titled "Supplemental Data,
11   Supplemental Materials and Methods."
12       Do you recognize this document?
13   A   Yes.
14   Q   And is this the supplemental data that's
15   referenced on the first page of Exhibit Number 1 down at the
16   bottom?
17   A   Yes, I believe so.
18   Q   And this is the data -- Exhibit Number 2 is the
19   data that Exhibit Number 1 refers to for the tables and
20   figures contained in that Exhibit Number 1; is that correct?
21   A   Yeah.  There's a citation to the supplemental
22   data in the paper.
23   Q   Was the supplemental data made available at the
24   same time as the original study?
25   A   What do you mean by "made available"?

Golkow Litigation Services  - 877.370.3377

Scott A. Guelcher, Ph.D.

Page 6

1    Q    At the time that you published Exhibit Number 1,
2    was Exhibit Number available?
3         MR. JACKSON:  Objection to form.
4    A    I didn't check that, but that's usually the
5    standard practice in the papers published.  It's typically
6    published with the supplemental data at the time.
7    BY MR. THOMAS:
8    Q    That was -- I'm sorry.  I didn't mean to
9    interrupt you.
10        That was your intent at the time to have the
11   Exhibit Number 1 and Exhibit No. Number 2 available to the
12   reader at the same time?
13   A    Yeah, but that's the editorial office.  I mean,
14   you know, I submit the documents to the editor at the same
15   time, and then the Journal makes it available online.  So I
16   can't control that.
17        That's the way it's typically done, but what I
18   control is what I submit to the editorial office.
19   Q    Okay.  Who is Anne Talley?
20   A    She was my former graduate student.
21   Q    And what contribution did Anne Talley make to
22   this Exhibit Number 1?
23   A    I believe that she -- let's see if I addressed
24   that in the paper.  I don't remember if I did or not.
25   Q    I don't believe that you did, but take your time.

Page 7

1    A    Yeah, so Anne, I think, did the analysis of the
2    FTIR data to calculate the peak areas.  I believe she did
3    some of that work.
4         It's hard to remember exactly what else.  She
5    contributed to the writing, probably some of the methods,
6    but it's hard to say, you know, exactly who wrote what.  I
7    would say she contributed to writing and analysis of the
8    FTIR data.
9    Q    And what is her area of expertise?
10   A    Well, biomaterials.  She works for FDA now, so
11   has expertise in biomaterials.
12   Q    And who is Bridget Rogers?
13   A    So Bridget Rogers is an associate professor in my
14   Department of Chemical Engineering at Vanderbilt.
15   Q    And what contribution did Ms. Rogers make to this
16   Exhibit Number 1?
17   A    So her area of expertise is in films, XPS.  So
18   her contribution was, she did the XPS experiments, she
19   analyzed the data.  She largely wrote a lot of the parts of
20   the paper on XPS.  That's her area of expertise.
21   Q    And in the report I note that Dr. Iakovlev, who's
22   also an author, contributed the AMS explant and also cleaned
23   the AMS explant.
24        Did Dr. Iakovlev make any other contribution to
25   Exhibits 1 or 2?

Page 8

1    A    He assisted with writing the manuscript.
2    Q    I'll note that Dr. Dunn, Russell Dunn, who's also
3    an author, his company is noted as a sponsor of the study.
4         What other contribution did Russell Dunn have in
5    Exhibits 1 and 2?
6         MR. JACKSON:  Object to form of the last
7    question.
8    A    So Dr. Dunn, his company, as you said, funded the
9    study.  He performed the experiments.  I should be more
10   specific.
11        The FTIR and the SEM measurements were performed
12   by Dr. Dunn and people that were being supported by the
13   grant, I believe.  He would know more of the details, but I
14   would say that he did the FTIR and SEM experiments.
15   BY MR. THOMAS:
16   Q    And what contribution did you have to Exhibit
17   Number 1?
18   A    So I wrote the first draft of the paper.  I
19   compiled all the data from my collaborators, my student.  I
20   prepared some of the figures, I think, and I did most of the
21   writing.
22   Q    Who owns the FTIR equipment that was used in the
23   study?
24   A    I don't -- I don't know.  Russell Dunn would know
25   the details of that.  I don't know who owns that equipment.

Page 9

1    Q    Same answer for the scanning electron microscope
2    and XPS?
3    A    No.  The SEM is a Vanderbilt resource, and so is
4    the XPS.
5    Q    Who was the person responsible for discussing
6    with Vanderbilt the use of the XPS and SEM equipment for
7    purposes of Exhibit Number 1 and 2?
8    A    Well, that would be Dr. Dunn.
9    Q    Did you have any involvement in that?
10   A    Any involvement in what specifically?
11   Q    In any negotiations or discussions with
12   Vanderbilt about the use of the XPS and SEM for the work
13   that's reflected in Exhibits 1 and 2.
14   A    No, I don't believe so.  That was Dr. Dunn's
15   responsibility.
16   Q    Did you have any control over the disbursement of
17   funds that were provided by Russell Dunn's group for this
18   study?
19        MR. JACKSON:  Objection to form.
20   A    No, I didn't.
21   BY MR. THOMAS:
22   Q    Do you know whether Vanderbilt was compensated
23   for the use of their XPS and SEM equipment?
24   A    So the SEM is a core resource at Vanderbilt.
25   What that means is, you pay a user fee to use it.  And when

3 (Pages 6 to 9)

Scott A. Guelcher, Ph.D.

Page 10

1    it says -- so in the acknowledgments we say that this work
2    was supported by Polymer Chemical Technologies. Polymer
3    Chemical Technologies paid the user fee for that SEM.
4            I don't remember how the XPS was handled. For
5    the SEM it's a core resource, so the University was paid
6    through that billing agreement.
7        Q    What do you mean by "core resource"?
8        A    So large pieces of equipment like SEM are -- it's
9    not possible for individual professors to own things like
10   this because they're so expensive to maintain, but many
11   people want to use it. So we have large equipment like SEM
12   that isn't a core. In this case it's the Institute for
13   Nanoscale -- Nanoscience and Engineering. And in order to
14   recover the costs of using the equipment, that core charges
15   an hourly rate, and then that rate has to be paid. In this
16   case it was paid by PCT.
17           So it's a facility that's owned by the
18   University, and anybody can access it by paying the user
19   fee. It's an hourly fee.
20       Q    And did I understand you to say you do not know
21   how the University was compensated for use of XPS equipment?
22       A    I do not. That would be -- so the XPS is owned
23   by the University. Dr. Rogers is the one who coordinates
24   the use of the XPS.
25           There have been some changes to how that is

Page 11

1    managed, and I just don't remember what was in place at that
2    time.
3        Q    At the time that you used the University's
4    equipment, are you required to disclose the purpose for
5    which you're using it?
6        A    No. It's -- you just pay the user's fee. I
7    mean, you would have to disclose it if it's potentially --
8    you know, if it's a concern about safety, but this is a
9    pretty standard analysis. So typically that's not done.
10       Q    Did you -- did you or any of the other authors,
11   to your knowledge, disclose to the University that you were
12   using their XPS and SEM machines for this specific study?
13       A    No, there would be no reason for that.
14       Q    Okay.
15       A    That was handled through the -- Dr. Dunn had
16   his -- PCT had a contractual relationship with the
17   University, and so once that relationship is established,
18   you're free to use the resources like you would for
19   another --
20       Q    Doctor, what was the purpose of Exhibit Number 1?
21   What were you trying to set out to do?
22       A    I believe we addressed that in the abstract. So
23   in the study we hypothesized that polypropylene oxidizes
24   under in-vitro conditions simulating the foreign body
25   reaction so that the purpose was to test that hypothesis

Page 12

1    that polypropylene would oxidize under stimulated in-vivo
2    conditions.
3        Q    What does this study tell us about any oxidation
4    under in-vivo conditions?
5        A    Well, we used a test solution. I believe that's
6    addressed on page 3, the last paragraph in the introduction.
7    We used an oxidized media that comprised 20 percent hydrogen
8    peroxide and the cobalt chloride, which causes this reaction
9    to form hydroxyl radicals, which are a form of reactive
10   oxygen species that's present in-vivo, so we were simulating
11   that -- those oxidative conditions.
12           That paper has been known for some time and cited
13   a number of times. So that was the -- that was the
14   approach.
15       Q    You also just tested an AMS explant; correct?
16       A    That's right.
17       Q    And for what purpose did you test the AMS
18   explant?
19       A    I hope it's okay, what I'd like to do is read --
20   discuss right from the paper what I said because it's been a
21   while. I don't -- I'm just taking a little time, if that's
22   okay.
23       Q    Sure. Let me ask you this question: Did you
24   review Exhibits 1 and 2 prior to your deposition?
25       A    I did, but I didn't have a lot of time. This

Page 13

1    just came about pretty fast, and I published this awhile
2    ago.
3            So I've reviewed these documents. I just want to
4    be careful. So I believe that you asked me what's the
5    purpose of the -- why did we test the explanted fiber?
6    That's what you asked?
7        Q    That's right.
8        A    I can't find what I'm looking for right now, but
9    basically we were testing the hypothesis that this oxidation
10   could also happen in-vivo. That was the question we were
11   asking is, can fiber also be oxidized in-vivo in the body.
12       Q    And you obtained this AMX -- sorry.
13           Doctor, you obtained this AMS implant from Dr.
14   Iakovlev?
15       A    That's right.
16       Q    Do you know what kind of implant it was?
17       A    We had some discussion about this. I can tell
18   you if it's in the -- because of patient confidentiality, we
19   were limited in what we knew, but I can tell you what we did
20   know.
21           So all we know is that it was an AMS midurethral
22   sling. We don't know the product. We just know that it was
23   a sling.
24       Q    Do you know how long it was in the patient?
25       A    We do not.

4 (Pages 10 to 13)

Scott A. Guelcher, Ph.D.

Page 14

1    Q   Do you know the reasons the midurethral sling was
2   removed?
3    A   Well, it was explanted for complications other
4   than mucosal erosion.  This is what we know from the
5   records.
6    Q   Is that all that you know?
7    A   Yeah.  We put in the paper what we knew about the
8   explant.
9    Q   I'm sorry if I asked this already.  My head is a
10  little fuzzy, too.
11       Doctor, do you know how long the AMS implant was
12  in the patient before it was removed?
13   A   Yeah, I said unfortunately we don't.  This is all
14  we could get from the patient records is that we
15  explanted for some complication other than erosion.
16   Q   Doctor -- sorry.  You finished?
17   A   Yes.
18   Q   Doctor, the paper reports that Dr. Iakovlev
19  cleaned this AMS explant; correct?
20   A   That's right.  He did that work.
21   Q   Did he do that at his laboratory in Toronto?
22   A   He did.
23   Q   Did he record his methodology in removing the
24  tissue, as he's explained in the report?
25   A   So we explained -- he does a microscopic

Page 15

1   dissection where he can remove pieces of tissue using some
2   small tweezers under a microscope, and a scalpel blade he
3   used as well.
4        So he developed this technique, and I believe
5   he's been using it for some time.
6    Q   Have you seen a written protocol for the cleaning
7   of the mesh that's described in Exhibits 1 and 2?
8    A   I don't remember.  I don't know that I've seen a
9   written protocol.  I mean, the level of detail that we
10  provided in the paper is consistent with what, you know, you
11  typically would do in a paper.
12       I haven't seen -- I don't know if he has a
13  detailed protocol.  I just know that he's done this for some
14  time.
15   Q   Do you know whether he has any notes or records
16  of the procedure he followed to clean the AMS explant?
17   A   I don't know the answer to that either.
18   Q   Do you know if he has any photographs that he
19  took during the cleaning procedure?
20   A   Again, I suspect that he does, but I haven't seen
21  them.  He would be able to provide that information.
22   Q   As a part of this study, was it your practice to
23  keep laboratory notebooks of the work that you performed?
24   A   Again, Dr. Dunn did all of that.  So, again, just
25  to make it clear, Dr. Iakovlev prepared the fibers.  Dr.

Page 16

1   Rogers performed the XPS.  Dr. Dunn did the FTIR and SEM.
2   So they would have that experimental data.  I don't have it.
3   I didn't do the work.
4    Q   Have you reviewed any of the experimental data,
5   written experimental date upon which Drs. Dunn, Iakovlev,
6   Talley and Rogers relied to generate the data that's in
7   Exhibits 1 and 2?
8    A   Yeah, I've reviewed the raw data with them as we
9   were writing the paper, but I don't have it.  I mean, as we
10  were preparing the figures and writing the manuscript, I
11  reviewed the data with them.
12   Q   Did you have it in electronic form or hard copy?
13   A   I don't remember.  I think -- I don't remember.
14  Usually what I do with my students is, I get the figures,
15  and then in some cases I'll put the figures together into
16  panels, but I don't -- we don't -- I don't necessarily keep
17  the raw data on the studies on my computer.  We store that
18  elsewhere.  I mean, I don't --
19   Q   Where did you store the raw data that was used to
20  generate Exhibits Number 1 and 2?
21   A   Again, that would be Dr. Dunn's data.  I didn't
22  do it.
23   Q   Dr. Guelcher, I'm not trying to be difficult.
24  You testified that you reviewed the raw data generated by
25  these folks as you did their work with them.

Page 17

1    A   Yeah.
2    Q   At some point you had access to that data.  What
3   did you do with the data that you reviewed with your
4   co-authors as they generated the data that goes into
5   Exhibits 1 and 2?
6        MR. JACKSON:  I think that's asked and answered
7   at this point.
8    A   I don't remember the details.  This was awhile
9   ago.  But, for example, you would run an FTIR spectrum on
10  the FTIR machine, and those data would be stored in that
11  computer, and then we would pull them up and look at the
12  data.
13       And then the final disposition of those data, I
14  don't know if Dr. Dunn left it on that computer or moved it
15  off and stored it somewhere else.  I don't know.  It's not
16  my data.
17  BY MR. THOMAS:
18   Q   Is it fair to understand that as you sit here
19  today, you don't have access to any of the raw data
20  underlying Exhibits Number 1 and 2?
21   A   What do you mean by "access"?
22   Q   Could you get it if you wanted to?
23   A   Yeah.  I would go to Dr. Dunn and get the data.
24   Q   And you would expect Dr. Dunn to have all of the
25  data that underlies Exhibits Number 1 and 2?

5 (Pages 14 to 17)

Scott A. Guelcher, Ph.D.

Page 18

1    A    That would be my -- I mean, when you do
2  collaborative scientific research projects like this, each
3  investigator controls his or her -- it's just the way -- the
4  collegial way to do it.  Each investigator controls his or
5  her raw data, is responsible for storing that under some
6  kind of long-term conditions, but we do so many runs on the
7  instrument, it's not typical to leave all the data there.
8  At some point somebody takes it off and stores it somewhere,
9  but I don't typically do that.
10    Q    I understand.  I'm just trying to figure out
11  where it might be.
12    A    Well, Dr. Dunn would have it.  I mean --
13    Q    Would he have -- are you finished?
14    A    Yeah.
15    Q    Would Dr. Dunn, as far as you're concerned as the
16  corresponding author, have control of the data from Talley,
17  Rogers, Iakovlev and Dunn?
18    A    I want to be really clear because I feel like
19  there's some confusion.  I may take a little bit of time to
20  answer.
21    Q    Sure.
22    A    So just to make it clear, Dr. Dunn did the FTIR
23  and the SEM, or people that worked for Dr. Dunn.  I don't
24  know the details of his arrangement.  He's the PI for that
25  part of the work, principal investigator for that part of

Page 19

1  the work.  For the FTIR and the SEM, he would have those raw
2  data.
3    Now, my student didn't do those measurements.
4  She did the analysis.  But again, everything was given
5  back -- Dr. Dunn would have all of that.  The XPS was done
6  by Dr. Rogers, so he would have -- any additional data on
7  the XPS Dr. Rogers would have.
8    And then the only thing that Dr. Iakovlev would
9  have would be protocols and pictures, et cetera, of how he
10  prepared the fibers.  He would have that.
11    So if you wanted all that, you'd have to go to
12  them to get it because it's their work.  It's not my work.
13  I worked with them to write the paper.  I concede to the
14  hypothesis and took the lead on writing the paper, but I
15  relied on my colleagues to provide the raw data.  So that's
16  why I don't have it.
17    It is -- I don't want to give the impression that
18  it's not accessible.  It's just under the control of my
19  colleagues who prepared it.
20    Q    But to be clear, if you wanted access to the
21  data, you could request it of them, and they would give it
22  to you?
23    A    I'm not comfortable doing that because it's not
24  my work, and it's a legal proceeding.  I think it would have
25  to go through them, not through me.  That's just a collegial

Page 20

1  way -- this was a research project.  I want to make it
2  really clear.  This was not testing for litigation.  This
3  was a research project.
4    Q    Doctor, is it fair to understand you didn't ask
5  Dr. Dunn or any of the other co-authors for their data in
6  order to prepare for this deposition?
7    A    I did not because I didn't think it was
8  appropriate.
9    Q    All right.  Let's go to Exhibit Number 1, please,
10  and go to page 7.
11    By the way, in preparation for your deposition,
12  have you read the expert reports of Dr. Thames and
13  Dr. McLean?
14    A    I've read them in the past several months.  I
15  didn't have time to go through them again last night, but I
16  have read them in the past several months, I'd say.
17    Q    Have you read their criticisms of this -- what
18  I'll call the Talley paper?
19    A    I have, but I don't remember exactly what those
20  were.
21    Q    When you read the criticisms of the Talley paper,
22  did you go back to investigate those criticisms?
23    MR. JACKSON:  Objection, form.
24    A    Investigate?  I don't remember.  I mean, I don't
25  know how appropriate it is to talk about other litigation

Page 21

1  other than this but, you know, I am working on other cases,
2  and in the context of that I read their comments, and I made
3  some replies in some reports.  But I don't -- I just -- it
4  would help me if you had me look at something.  I'm going on
5  my memory.  It's just a little tough.
6    Q    All I can ask you to do, Doctor.
7    When you say you made some replies in some
8  reports, are those expert witness replies?
9    A    Yes.  It's not public.
10    Q    Are these the ones you submitted in Australia?
11    A    Yeah, I believe that I did, but I just can't
12  remember -- I have read it, and I have thought about it, and
13  I thought that I responded to it, but I just can't remember
14  the details.
15    Oh, well, maybe one thing I can remember is
16  that -- well, you know what?  I'm going from my memory, so I
17  just want to be -- I just can't remember details right now.
18    Q    Sure.  What's your best recollection?
19    A    I just can't -- I can't remember right now what I
20  wrote.
21    Q    Okay.  Are you on page 7 of your report?
22    A    Yeah.
23    MR. JACKSON:  When you say "report," do you mean
24  the article?
25

Scott A. Guelcher, Ph.D.

Page 22

1   BY MR. THOMAS:
2      Q   I need to start over because I got the wrong
3   page. Would you go to Exhibit 1, please, and page 10.
4      A   Oh, okay.
5      Q   Page 10 has a Figure 4 that has four categories
6   of images marked A through E. What's the purpose of
7   Figure 4?
8      A   Would you like me to talk through the message in
9   Figure 4? Is that what you're asking me?
10     Q   That's right.
11     A   So in Panel A -- and again, this is Dr. Rogers'
12  experiments. But in Panel A, these are SEM images of the
13  explanted fibers from the AMS mesh, and she focused on
14  what's called an area of interest, which is that white box.
15  And that area of interest is exposed to X-rays, and then in
16  response you get photoelectrons that you can basically use
17  to determine the composition of what -- of that surface in
18  that small box.
19     Q   What does it mean for untreated and scraped?
20     A   That's defined in the paper. Let me give you a
21  precise definition.
22         So the untreated, basically -- it wasn't scraped.
23  We just -- Dr. Iakovlev literally -- my understanding was,
24  he explanted the fibers from the mesh under the microscope,
25  and he didn't do the dissection. And then the scrape -- he

Page 23

1   did the microscopic dissection. So that would be the
2   difference between the two groups.
3      Q   Okay.
4      A   So what's shown in Panel D, those are the --
5   those are the peaks that come off, and there's a
6   mathematical analysis that Dr. Rogers did for those peaks to
7   actually come up with what's shown in Panels B, C and E.
8   Sorry, did you --
9      Q   Just to make it clear, Panel D is the XPS
10  testing?
11     A   Yeah. So Panel D is the emission spectra. So in
12  Panel D you're looking at the energy of those photoelectrons
13  that come off the surface, and so you get these
14  distributions. And then those raw data are analyzed to
15  prepare the plots in Panels B, C and E.
16     Q   What is the data that's represented in Panel B?
17     A   So the emissions spectra tell us something about
18  both the specific atoms that are on the surface as well as
19  the binding states. So in Panel B, this is, we show,
20  carbon, oxygen and nitrogen. And the point in Panel B is
21  that the untreated fibers had nitrogen and oxygen, as you
22  would expect, because these weren't treated, right, so there
23  were -- again, the purpose of the scraping that Dr. Iakovlev
24  did was to remove the protein, right, and so you would see
25  oxygen and nitrogen on the surface, but after scraping we

Page 24

1   don't see any nitrogen. So that would suggest there's no
2   protein.
3      Q   What's the atomic percentage figure on the -- I
4   guess that's the -- on that axis?
5      A   Well, that's the percentage of each atom that's
6   in the spectra. So it's 80 percent carbon, 15 percent --
7   it's the percentage of each atom.
8      Q   Do you expect, do all these add up to
9   100 percent?
10         MR. JACKSON: Objection, form.
11     A   I think so, but the raw data are in the
12  supplement.
13  BY MR. THOMAS:
14     Q   I'll get to that in just a minute.
15     A   You know, lit's the percentage of the total of
16  everything that comes off the surface.
17     Q   Okay. What is Panel C?
18     A   So in Panel C we calculated the ratios of each of
19  those atoms. So its oxygen to carbon -- so Panel C is
20  basically calculated from Panel B. That would be oxygen to
21  carbon, nitrogen to carbon and nitrogen to oxygen ratios.
22     Q   Why do you do that?
23     A   Well, the purpose here was to see, again, the
24  nitrogen to carbon and nitrogen to oxygen ratios go way down
25  after scraping, which basically the same point here is to

Page 25

1   show that your scraping is removing the proteins, but
2   there's still oxygen on the surface. So the only
3   explanation for that would be oxidation. That's the
4   message.
5      Q   Just to nail this down, is there any purpose
6   other than to show the effect of the scraping for Panels B
7   and C?
8      A   Well, it's not quite that black and white. I
9   mean, I think -- the purpose of doing the scrape and the
10  untreated is to show that, you know, before cleaning there's
11  protein on the surface, and then after cleaning the protein
12  is almost completely removed. There's very little nitrogen.
13  In a lot of samples we didn't see any nitrogen, but there's
14  still oxygen. And so the question then is, where does that
15  oxygen come from? And what we believe is, it's coming from
16  oxidation because there's no nitrogen on the surface, which
17  would imply there's no protein.
18         So that's why we did both was to look at the
19  change, you know, to try to be rigorous about it. That's
20  why we did both.
21     Q   What's the purpose of Panel E?
22     A   So Panel E shows the bonding configurations.
23     Q   What is a bonding configuration?
24     A   So if we look at mechanism of degradation of
25  polypropylene. You would expect carbonyl groups, which is

Scott A. Guelcher, Ph.D.

Page 26

1    the C over on the left. That's the carbonyl.
2         And then the other binding configuration is what
3    Dr. Rogers would call carboxylate, and this is similar to
4    the hydroperoxide degradation product.
5         So the point here is to show that before and
6    after scraping we see both of those. Again -- and this is a
7    point that, you know, Dr. Thames has made in his work about
8    the protein. Proteins have carbonyl and carboxylate bonds.
9    So if you have protein on the surface, you would expect to
10   see quite a bit of bonding, which we do. But even after
11   that protein has been removed manually, and then you don't
12   see any nitrogen, you still see these carboxylate and
13   carbonyl groups. That's the purpose. So it's further
14   supporting what we saw in Panels B and C. We see the types
15   of bonds that you would see for oxidized polypropylene even
16   after the protein has been removed.
17        Q   What's the significance of the carbonyl numbers
18   standing alone?
19            MR. JACKSON: Objection, form.
20   BY MR. THOMAS:
21        Q   Or do you have to look at them side by side in
22   order to make --
23        A   Oh, no -- well, how do I answer that? I'm going
24   to try to answer your question. If you don't like it, try
25   again. I won't be offended. I'm trying to deal with this

Page 27

1    in a rigorously scientific way.
2         Q   Maybe I can help you a little bit.
3             MR. JACKSON: He was going to answer the
4    question.
5    BY MR. THOMAS:
6         Q   Fine. I'm just trying to make it easier on him.
7    Go ahead.
8         A   The reason we did both groups because I think
9    it's scientifically more rigorous to took at the change.
10        So you could just -- you could just clean the
11   fiber and see carbonyl and carboxylate on the surface and
12   conclude that it oxidized, but I think it's more rigorous to
13   look at the untreated fiber as well, where you would expect
14   to see a lot of carbonyl and a lot of carboxylate, which we
15   do. Okay, there's protein on the surface. When I remove
16   what I believe to be protein, those bonds come down, which I
17   would expect, but they're still there.
18        So I think it's -- I prefer to really talk about
19   it like it is in the paper, discussing in its totality.
20   And the reason we did those controls was to really give a
21   good rigorous analysis and scientific perspective on what we
22   did.
23        So I would say if I look at -- I know it's a long
24   answer. But the fact that I see carbonyl on a scraped fiber
25   would tell me -- this shows no nitrogen -- I would conclude

Page 28

1    that it's oxidized. I think having the untreated groups
2    strengthens the rigor of that conclusion. That's the way I
3    would answer your question.
4         So I do think it stands alone, but I like the way
5    I present it in the paper where we do both.
6         Q   What is the takeaway from Panel E?
7         A   Panel E. Well, the takeaway would be that after
8    you remove the protein, you still see carbonyl and
9    carboxylate bonds that are consistent with the degradation
10   products of oxidized polypropylene.
11        Q   Let's go to page 4 of Exhibit 2. Keep that page
12   open. You're going to need it.
13        A   Okay. Page 4, okay.
14        Q   Do you have that in front of you?
15        A   Yes.
16        Q   Do you see Table S6?
17        A   Yes.
18        Q   Table S6, page 4, Exhibit 2, is titled "Summary
19   of relative amounts (percentage) of the various C 1S bonding
20   configurations present on scraped fibers."
21        A   That's right.
22        Q   And that is the basis for the scraped fibers
23   figure in Figure E on page 10 of Exhibit 1; correct?
24        A   That's correct.
25        Q   And S6 is where Ms. Rogers has recorded the data

Page 29

1    that she collected from her XPS; correct?
2         A   Yes.
3         Q   And if you looked at Table 6 on page 4 of Exhibit
4    Number 2 where it says, 288 eV, that's the XPS column for
5    carbonyl group; correct?
6         A   Yes.
7         Q   And of the five measurements she took, three were
8    nondetect; correct?
9         A   That's right.
10        Q   And then she recorded measurements for fibers 23
11   and 24. At the bottom is a column for mean plus or minus
12   SD. What does that mean?
13        A   That's the mean plus or minus the standard
14   deviation of those five numbers.
15        Q   What's the purpose for including that column in
16   this kind of table?
17        A   You mean the row?
18        Q   Yes, the row. I'm sorry.
19        A   Well, we calculate the average in the standard
20   deviation so we can compare the different groups. We can
21   quantitatively compare the groups.
22        Q   From an analytical perspective, what's the
23   meaning of the mean plus or minus the standard deviation for
24   the carbonyl group, which is .4 plus or minus .6?
25        A   Well, that would be the standard deviation of the

8 (Pages 26 to 29)

Scott A. Guelcher, Ph.D.

Page 30

1  measurement.  It's to measure the spread of the distribution
2  of the data.
3       Q    And so .4 is the mean --
4       A    Yes.
5       Q    -- of the values; correct?
6       A    That's right.
7       Q    And .6 is the standard deviation or the error
8  rate; correct?
9       A    I don't know if I'd call it error.  It's the
10 distribution of the samples.
11      So we have -- like you pointed out, there were
12 three of them that basically were zero.  We couldn't see
13 anything.  It's probably not zero, but practically speaking,
14 it's zero.  We couldn't measure it.  So for two of them we
15 measured it.  We averaged them together to give -- that's
16 what we did.
17      So there's a distribution of measurements.
18 That's what's reflected by the standard deviation.
19      Q    What does it mean when the measurement is .4 plus
20 or minus .6?  What does it mean to you as a chemist looking
21 at this data?
22      A    It's the spread of the distribution.
23      Q    Does it tell anything to you about the validity
24 of the data?
25      A    What do you mean "the validity of the data"?

Page 31

1       Q    The accuracy of the data as reported.
2            MR. JACKSON:  Objection, form.
3       A    I mean, the data that are reported.  There are
4  five measurements for the amount of carbonyl on each of the
5  fibers.  That's what reported.  This is a statistical
6  calculation.
7            The data are reported as they are, and some --
8  I'm going to say zero, even though, just to make it easier.
9  It's not zero.  It's some number that was so small we
10 couldn't measure it, but we'll call it zero.
11           Three of them we didn't see the carboxylate, and
12 two of them we did.  So what that tells me is that those
13 regions, those very small regions that were probed, after
14 removing the protein, what we thought was the protein, it
15 could have removed some of the oxidized polypropylene.
16 Maybe that particular region didn't see much oxidation.  We
17 don't know, but we couldn't measure oxidation.  We didn't
18 see it.  When I say we couldn't measure it, we didn't
19 measure the presence of the carbonyl on those three regions.
20 That's what it means.
21 BY MR. THOMAS:
22      Q    Doctor, in statistical analysis, in order to have
23 reportable data, don't you want the mean to be greater than
24 the standard deviation?
25      A    I mean, standard deviation, it's a measure of the

Page 32

1  spread of the distribution.
2            I explain in the paper how we did that.  I mean,
3  it's just a measure of the spread of the distribution.  I'm
4  not really sure what you're asking.
5       Q    Can you answer the question?
6       A    I'm trying to, but I'm not really sure what
7  you're asking me.
8       Q    In reporting compiled data like you have here,
9  when you subject it to the mean versus the standard
10 deviation, don't you want to have the mean to be greater
11 than the standard deviation in order to have reportable
12 data?
13           MR. JACKSON:  Objection, form.
14      A    But that doesn't -- no, I don't agree with what
15 you're saying.  I mean, that's a calculation of the data to
16 enable comparisons between groups.  The data stands as it
17 is, you know.  I said there's three of them we did not
18 detect carboxylate.  Two of them we did.  From that
19 distribution, we can calculate mean and the standard
20 deviation, but we -- it doesn't detract from the data.  The
21 data are the data.  They're distributed as they are.
22           This is just a means for modeling the data or
23 explaining it.  It doesn't detract from the data.
24      Q    Why didn't you report, in Exhibit Number 1, the
25 fact that the mean was less than the standard deviation?

Page 33

1       A    I mean, I wouldn't normally report that.  I mean,
2  we did the -- we tested -- we compared the groups using
3  different tests, and we plotted it.  We showed the standard
4  deviation.  It's just a means of characterizing the
5  distribution.
6            I mean, if you have a distribution centered at
7  zero, then the means is going to be zero, and the
8  distribution is going to be -- it's an analysis technique.
9  It's not -- you can't control how the data distributed, how
10 it is distributed.
11      Q    But the meaning of the data is impacted by the
12 mean compared to the standard deviation; correct?
13      A    Well, the statistical testing is -- no, no.  When
14 I did the -- I'd have to go back and look at exactly what I
15 did.
16           We compared distributions.  This is just written
17 here as a means for the reader to, you know, get some kind
18 of understanding of how the data are distributed, but it
19 doesn't impact it.  The data are the data.
20      Q    Next column on Table S6, again, which was used
21 for Table E in Exhibit 1; correct?
22      A    You know, Figure 4E, that's what you mean, right?
23      Q    Correct.
24      A    Yeah, okay.
25      Q    It says, "287 eV, RC COOH."  What does that

9 (Pages 30 to 33)

Scott A. Guelcher, Ph.D.

Page 34

1  represent?
2      A    Well, it's just the nature of that carboxylate
3  bond.
4          My understanding -- again, this is Dr. Rogers'
5  work.  But, you know, my understanding is, you can basically
6  see that it's -- 287 electron volts is consistent with
7  carboxylate type of bonding where you have a COOH -- and it
8  doesn't tell you the actual details of the bond, but you
9  know that you have that kind of configuration where you have
10  carbon bonded to oxygen bonded to oxygen bonded to hydrogen.
11  There could be several different types of bonding
12  configurations, but it has this general structure.
13         So it's just too difficult to you, know, say
14  exactly what the bonding configuration is, but it's some
15  form of this.
16     Q    Okay.  Now, Doctor, if you look at S6 under the
17  carboxylate bond column, they record values for fibers 5 and
18  8; correct?
19     A    5 and 8, yeah.  2.5 and 2.3, is that what you
20  mean?
21     Q    That's correct.  If you go to page 2 of Exhibit 2
22  --
23     A    Yeah.
24     Q    Go to page 2 of Exhibit 2.
25     A    Okay.

Page 35

1      Q    Do you have that?
2      A    Yeah.
3      Q    And page 2 of Exhibit 2 shows the XPS images on
4  which the author relied to generate the figures that are
5  contained in Table S6; correct?
6      A    Yes.
7      Q    And under scraped fiber, Figure S2, there are
8  images for Figures 5 and 8; correct?
9      A    Yes.
10     Q    And on S6 on page 4 for fiber 5, it shows a
11  carboxylate bond value of 2.5.  Do you see that?
12     A    Yeah.
13     Q    If you look at fiber 5 on page 2, there is no
14  carboxylate peak of 2.5.  Do you agree with that?
15     A    I don't know.  She didn't label it.  She
16  prepared -- Dr. Rogers prepared these figures.  I don't know
17  that I would say it's not there.  Just, it's not labeled.
18     Q    Do you see anything that resembles a carboxylate
19  peak of 2.5 on Figure 5?
20     A    I can't tell by looking at this resolution.  I'm
21  having a hard time seeing it.
22     Q    You can't see it?
23     A    Yeah, again, it's not my data.  You know, Dr.
24  Rogers did this analysis.  There's an analysis that's done
25  of these data that you have to deconvolute the peaks, and

Page 36

1  Dr. Rogers did that work.  She would be the one to answer
2  details about that.
3          It's not -- I agree that it's not labeled in the
4  diagram.
5      Q    And you can't see a peak that resembles 2.5 in a
6  carboxylate area, can you?
7          MR. JACKSON:  Objection, asked and answered.
8      A    Yeah, I mean, I think I answered it.  You know,
9  it's very small.  I'd have to look at her analysis of how
10  she did that.
11  BY MR. THOMAS:
12     Q    Okay.  The same question for fiber 8 in Table S6.
13  It shows a carboxylate peak of 2.3?
14     A    Yes.
15     Q    If you look at fiber 8 in Figure S2 on page 2 of
16  Exhibit 2, there's no carboxylate peak of 2.3 appearing in
17  that image as well?
18     A    Same answer for number 5.  I mean, again, she
19  didn't label it.  I'd have to look at her analysis to figure
20  out what she did there.
21     Q    Did you -- did you prepare Figure E -- Figure 4E
22  on page 10 of Exhibit 1?
23     A    I think so.  I know I prepared Figure 4.  I don't
24  know.  I can't remember if I did it or if Anne did it.
25     Q    Would you agree with me that Figure 4E includes

Page 37

1  the values 2.5 for fiber 5 and 2.3 for fiber 8 in the bar
2  chart for the carboxylates?
3          MR. JACKSON:  Objection to form.
4      A    Those are the numbers that are plotted in the
5  panel.
6  BY MR. THOMAS:
7      Q    Okay.  And do you know the statistical impact of
8  removing those values from what you show in 4E?
9          MR. JACKSON:  Objection to form.
10     A    I haven't looked at that.  I relied on Dr. Rogers
11  for this analysis, so I'd have to go back to her and discuss
12  this with her.  We calculated -- Anne and I did this
13  together.  I can't remember who did what.  We were relying
14  on the numbers that she provided in the table.
15  BY MR. THOMAS:
16     Q    And the table you're referring to, Table S6?
17     A    S6, yeah.  We didn't go back and -- this is
18  her -- this is what she did.  She did the analysis of the
19  XPS.  So we were relying on her analysis, so I'd have to go
20  back to her and discuss that with her.
21     Q    Since you wrote this paper, you've become aware
22  that both Dr. Thames and Dr. McLean have raised this
23  criticism of this paper, haven't you?
24         MR. JACKSON:  Objection to form.
25     A    I haven't heard -- I don't remember seeing this

10 (Pages 34 to 37)

Scott A. Guelcher, Ph.D.

Page 38

1    point. They wrote some other things about it. They -- I
2    mean, they wrote other things. I've never seen this,
3    though.
4    BY MR. THOMAS:
5        Q    Since the publication --
6        A    Just to clarify, this is the first time I've been
7    aware of this viewpoint.
8        Q    Since publication of the Talley paper, have you
9    had discussions with -- is it Dr. Rogers?
10       A    Yes.
11       Q    -- with Dr. Rogers about the data in Table 6 as
12   compared to the XPS on page 2 of Exhibit 2?
13       A    I haven't discussed this with her for a while,
14   probably since we wrote the paper.
15       Q    Okay. Staying on page 4 of Exhibit 2, who
16   prepared the tables in S4, S5 and S6?
17       A    Dr. Rogers produced these. I mean, I may have --
18   I can't remember who did -- I may have made the table based
19   on the numbers that she gave us, but she produced those
20   numbers.
21       Q    Okay. Who designed the tables, for lack of a
22   better word? Who came up with the format for the tables?
23       A    Dr. Rogers.
24       Q    Do you see the column on S4 of 284.8 eV?
25       A    Mm-hmm.

Page 39

1        Q    It's labeled "CH." What does CH mean?
2        A    Well, that would be the percent of carbon in that
3    carbon hydrogen bonding configuration. So that would be
4    like a hydrocarbon bond. CH is what percentage of the
5    carbon is bound to the hydrogen. The carbon bond is what
6    percentage of your hydrogen bonds, is my understanding.
7        Q    And you mentioned before the concept of
8    deconvolution. What is that?
9        A    Well, my understanding is, you have these
10   overlapping peaks, you know, and these are distributions of
11   energy. So they overlap in their mathematical methods that
12   you can use to determine, you know, which peak corresponds
13   to which type of bond or atom. That's the type of work
14   that -- that's what Dr. Rogers does.
15       Q    Do you consider yourself an expert in the area of
16   deconvolution?
17           MR. JACKSON:  Objection to form.
18       A    Well, this is -- this is a method that -- I mean,
19   I think I've used it before where you have it any kind of
20   overlapping peaks and any kind of analysis. We can see this
21   in GPC or HPLC or different chromatography. You can have
22   these overlapping peaks. So you have to find a way to
23   calculate which is which because the peaks -- I'm not
24   explaining it very well.
25           You have to be able to separate that region of

Page 40

1    overlap. Like I said, there are methods that have been --
2    that are used for this. I don't remember the details of
3    those right now, but it's a pretty standard approach.
4    BY MR. THOMAS:
5        Q    Okay.
6        A    Again, with XPS, this is again Dr. Rogers' work.
7    And I've published other papers with her on XPS, and she did
8    the separation of the peaks.
9        Q    In Tables 4, 5 and 6, the last column is 284.3
10   eV, and there's no description of what that area is. Do you
11   know what that is?
12       A    So my understanding, that particular peak is
13   often what people refer to as adventitious carbon. I think
14   it's in the paper. Let me see if I can find it here.
15       Q    I'm not familiar with that term. What did you
16   call it, adventitious?
17       A    I think the technical term is "adventitious."
18   Let me see if it's discuss in here, and then I can give you
19   a more precise answer. Maybe we didn't discuss it.
20       Q    I don't remember seeing it.
21       A    Basically, I think the best way I can answer that
22   is, it's some form of carbon bond that we can't attribute.
23   It's difficult to say exactly which bonding configuration it
24   could be. So it's a carbon bond, but we don't -- like with
25   these other bonds we can say it's carbonyl or carboxylate,

Page 41

1    but we can't say specifically which type of carbon bond
2    probably because of overlapping peaks. That's my
3    understanding.
4            So I would say that it's a carbon bond, but we
5    can't provide the details, so we listed it just because --
6    the numbers need to add up. We listed everything that we
7    saw. It's some form of carbon bond that we don't know the
8    details about. I would probably say it that way.
9        Q    Would you defer to Dr. Rogers for an answer on
10   that?
11       A    Yeah, she could give a more -- Dr. Rogers could
12   give a more maybe detailed answer on that. I mean, I think
13   she would say the same thing. We just don't -- it's a
14   limitation of the method. You can't -- you see a peak
15   there, but ascribing that to a specific bonding
16   configuration is challenging, so we just report the number
17   at the peak.
18           That's why we report it. Like you can see in the
19   table, we don't list a bonding configuration because we
20   don't know.
21       Q    If you look at page 1 of Exhibit 2, at page 1 of
22   Exhibit 2 right in the middle of the page it says, "The
23   energy scales at the high-resolution spectra were calibrated
24   to place CH2 bonding in the carbon 1s spectrum at 284.8 eV."
25   Do you see that?

11 (Pages 38 to 41)

Scott A. Guelcher, Ph.D.

Page 42

1    A   Yeah.
2    Q   And we go back now to page 4 of the same exhibit,
3    you see 284.8 eV.  It says, "CH" as opposed to "CH2."  Are
4    those the same?
5    A   I think so.  I think the CH2 bonding, I think
6    what that's referring to is a methyl group, which would be a
7    carbon bonded to two other carbons bonded to hydrogens.  So
8    I think these are the -- I think what she's saying here is
9    that basically the scale was calibrated so that those methyl
10   carbons are showing up here at 284.8.  I think it's
11   consistent.  That's my understanding.
12   Q   Has anybody ever told you the column that's
13   marked "CH" should be "CH2," and the column that's left
14   blank should be "CH"?
15   A   I've not heard that before.  Yeah, I'm not --
16   Q   Do you know why that wouldn't be true?
17       MR. JACKSON:  Objection to form.
18   BY MR. THOMAS:
19   Q   Does that sound implausible or impossible to you,
20   as a person involved in this study or as a person with
21   knowledge of this test?
22       MR. JACKSON:  Objection to form.
23   A   Well, I think as I answered you before, it's not
24   consistent with my understanding of the test.
25       My understanding is that this is a carbon

Page 43

1    hydrogen bond and this is some form of carbon bonding
2    configuration that we can't -- I mean, if we could ascribe
3    this to a specific bonding configuration, we would have done
4    that.  That's my understanding.  I'm going to look at it
5    more.  I hadn't heard that before.
6    Q   So just to be clear, the first one you mentioned
7    is the CH, 284.8.  The second one you described was the last
8    one, which was 284.3, which is the one not labeled in the
9    exhibit; correct?
10   A   Yeah, and I think we didn't label it because,
11   again, we can't say with certainty what that bonding
12   configuration is.  It's an observation that we needed to
13   report, but we did not assign a bonding configuration
14   because we weren't confident in that.  It's part of the
15   total signal that came of the fiber, so we reported it.
16   Q   Okay.  So in Figures 4 and 5, if you note, that
17   you have four nondetects in the last unlabeled column and
18   then values of 21.9 and 23.5.
19       Do you have any explanation for a nondetect in 4
20   and a value of over 20 percent for the fiber 17?
21   A   I'm confused about where you're talking about.
22   That table?  I don't, other than what I gave you, that it's,
23   you know, it's a form carbon bonding that's -- I would say
24   that we don't believe it's carbon and oxygen bonding like
25   the first two columns, but it's some form of carbon bonding

Page 44

1    that we can't say what the exact nature of the bond is.
2    Q   If you look at Table S4, fiber 9.
3    A   Yeah.
4    Q   If you go across, those columns should add up to
5    about 100; right?
6        MR. JACKSON:  Objection to form.
7    A   I think they should, yeah.
8    BY MR. THOMAS:
9    Q   If you add them up, they add up to 104.8.  Do you
10   have any explanation for that?
11   A   No.  I'd have to look at that.
12   Q   Would you defer to Dr. Rogers for her explanation
13   of that, or could you answer that question?
14   A   I would have to talk to her to find out whether,
15   you know, that was in what she gave me or whether, when I
16   typed the table out in the supplement.  I don't know.  I'd
17   have to check.  I'd have to go back and talk to her.  I
18   couldn't answer that right now.
19   Q   Let's go back to page 2 of Exhibit 2.  Page 2 of
20   Exhibit 2 are the XPS -- do you call them spectra or images?
21   What do you call them?
22   A   Spectra.
23   Q   -- spectra that Dr. Rogers took.  You mentioned
24   the concept of deconvolution.
25       Do you see any deconvolution in any of the images

Page 45

1    that are on page 2 of Exhibit 2?
2    A   Let me be more specific about my answer.  I
3    thought this was addressed.  I can't seem to find what I'm
4    looking for.
5        These are -- my understanding, these are the raw
6    data, so these are just showing the peaks.  I don't think
7    we're showing here the analysis to get those peak areas.  I
8    mean, these are just the peak -- these are the raw data, I
9    think.  She's not showing that here.
10   Q   You mentioned that she did deconvolution of the
11   samples she tested; correct?
12   A   I need to find this because I'm relying on my
13   memory.  Wait a minute.  Maybe it's in here.  Okay.  I think
14   I found it.  I'm going to be more specific in my answer.  I
15   don't want to necessarily use this term "deconvolution."
16       Basically, what we say in the paper is that the
17   curve fitting to extract the contributions of different
18   carbon bonding configurations present in the analysis area.
19   So she did that curve fitting.  I don't believe that's shown
20   on this spectra, but she did that analysis to come up with
21   the numbers on the table.
22   Q   Okay.
23   A   That's what she did.
24   Q   And the analysis that she used to come up with
25   the figures in the table are not available to us today; is

Scott A. Guelcher, Ph.D.

Page 46

1   that correct?
2        A    I don't -- I don't know that -- she has that. I
3   don't have that. Dr. Rogers would have that.
4        Q    And it's not in Exhibit 2?
5        A    No. That sort of work is beyond the scope of
6   what people would typically publish.
7        Q    So is it your best recollection that Dr. Rogers
8   did or did not do deconvolution?
9        A    Well, like I said, I don't think I want to use
10  that term. I want to use the term that's in the paper.
11  I'll just be more precise that she did her fitting and
12  mathematical analysis to resolve these, in some cases,
13  overlapping peaks, and she did her fitting to come up with
14  the numbers in the table. That's what she did. Exactly how
15  she did that, I don't know.
16       Q    How is curve fitting different from
17  deconvolution?
18       A    I don't -- it's the same idea. I mean, I was
19  using those words interchangeably. I should be really
20  precise that she analyzed the spectra to come up with the
21  numbers in the table. She produced -- for the paper we
22  showed the spectra, and we listed the results of what she
23  called curve-fitting analysis in the paper to come up with
24  the numbers.
25            The details of how she did that, we probably

Page 47

1   discussed this at some point, but I don't remember the
2   details of how she did it.
3        Q    As you sit here today, do you know any difference
4   that you can explain to me between curve fitting and
5   deconvolution?
6        A    I was -- I was using those terms interchangeably.
7   The point I was trying to make is that there are overlapping
8   peaks in the spectra, and you have to use various
9   mathematical methods to resolve those overlapping peaks, and
10  that's what Dr. Rogers did. At some point I've been
11  referring to that as "deconvolution." At other times I've
12  been referring to it as "curve fitting." Basically what I'm
13  saying is that there are overlapping peaks, and Dr. Rogers
14  did the analysis to address that and come up with the
15  numbers in the table. That's what she did.
16       Q    And for questions about the analysis that Dr.
17  Rogers undertook to come up with the numbers in the table,
18  you would defer to Dr. Rogers?
19       A    I would refer to her. I've done this in other --
20  I mean, I just published another paper this year doing very
21  similar things, using XPS to look at a surface. I did the
22  same thing with her there. She typically does the XPS. She
23  does the XPS experiments herself. She does the data
24  analysis. We talk about it, she explains the limitations.
25  She explains what she did, and then we publish it, but I

Page 48

1   don't remember the details of exactly how she processed
2   those data.
3        Q    So to answer my question concisely, if you can,
4   you defer to Dr. Rogers for the analysis that she used,
5   whether it be curve fitting or deconvolution, to come up
6   with the data in the tables?
7            MR. JACKSON: Objection to form.
8        A    How do I say this? Yeah, she made those
9   decisions. She made the decision about, here's the spectra.
10  You can look at the spectra, and you can see there are
11  overlapping peaks. And then the XPS field, there are
12  various accepted methods. There are, again, mathematical
13  approaches where you could address that issue of overlapping
14  peaks and come up with -- I mean, she makes some comments
15  like that she's using methods that are standard and
16  published and known, but she did it, and I don't remember
17  the details of what she did.
18       Q    Okay. On page 2 of Exhibit 2 --
19       A    Okay.
20       Q    -- the document says, "A survey spectrum was
21  collected from each fiber analyzed. Carbon, oxygen,
22  nitrogen and silicon were present on all samples."
23            Why would silicon be present on any of these
24  samples?
25       A    Not knowing the manufacturing history -- we

Page 49

1   suspected it's something from the manufacturing process, but
2   without knowing all of those details, it's hard to say for
3   certain, but I would say probably typically, if you find
4   something like that on the fiber, that it's going to be
5   something related to the manufacturing of the fiber. That's
6   our best guess.
7        Q    Do you know the chemical composition of the
8   Boston Scientific meshes you analyzed?
9        A    The chemical, you mean -- the polypropylene, you
10  mean like the formulation?
11       Q    That's right.
12       A    I can't remember it. I don't know. If it's a
13  Boston Scientific product, I don't know how much detail I
14  can give, but it's --
15       Q    All I want to know is, does the Boston Scientific
16  formulation of the polypropylene mesh that you analyzed
17  contain silicon?
18       A    Oh, I see what you're getting at. I don't know.
19  We didn't -- that's not in the paper. I don't know.
20       Q    And you know that the TVT formulation does not
21  contain silicon?
22            MR. JACKSON: Objection to form.
23       A    I'm trying to remember. I don't remember the
24  formulation off the top of my head, but I can't really say.
25

13 (Pages 46 to 49)

Scott A. Guelcher, Ph.D.

Page 50

1    BY MR. THOMAS:
2       Q   Let me ask you to assume.  We've done this
3    before.  Let me ask you to assume that the TVT formulation
4    of polypropylene and its proline does not contain silicon.
5    What could be the source of the silicon that appeared in
6    your XPS spectra?
7            MR. JACKSON:  Objection, asked and answered.
8       A   Well, these are AMS fibers, so it's hard to say.
9    I mean, I don't know.  I mean, these are AMS fibers.  I
10   don't know what the formulation of AMS fiber is.  We didn't
11   look at it.
12   BY MR. THOMAS:
13      Q   Okay.  Fiber number 5 that had been scraped
14   contained a small amount of chlorine.  Any explanation for
15   why chlorine might be present on fiber number 5?
16      A   I would say it's probably similar to the silica
17   case.  We don't typically -- that would come from something
18   in the manufacturing processing, but we don't know the
19   source of the chlorine.
20      Q   Okay.
21      A   Do you want to take a break for a few minutes?
22      Q   Sure, whenever you're ready.  Let's do that.
23      (Recess was taken from 9:45 to 9:51.)
24   BY MR. THOMAS:
25      Q   Dr. Guelcher, was there any consideration given

Page 51

1    to conducting an FTIR analysis of the AMS explanted mesh?
2       A   Yes, we discussed it.  I can't remember if it's
3    explained in the paper.
4            The problem was, as these fibers were very small,
5    and so we were pretty constrained to -- the advantage of the
6    XPS is, you can examine those very small regions of the
7    fiber.  I think we were really just limited on sample size
8    to do the FTIR.  We just didn't have much sample.  That's
9    what I remember.
10      Q   Okay.  Would FTIR have been your first choice?
11      A   No, I don't think so, because, you know -- I
12   think this is in my report.  Again, with the FTIR, it's --
13   it has been -- you know, Clave brings it up in his paper.
14   I've talked about it in when I wrote about Dr. Thames'
15   study.  FTIR, it's harder to be more conclusive about oxygen
16   and nitrogen.
17           As I explain in the report, the EDS and the XPS
18   are more -- they can tell you about these specific atomic
19   concentrations.  By testing fibers that have been scraped
20   and unscraped, you know, I think XPS is a more specific
21   technique.  That's why we chose that because we can actually
22   look at the amount of nitrogen and the amount of oxygen on
23   the surface of the fibers.
24      Q   Would FTIR of the scraped, explanted AMS mesh
25   tell you the extent of your success in cleaning the mesh?

Page 52

1            MR. JACKSON:  Objection to form.
2       A   Can I go to my report on that?  I don't know if
3    that has been entered into evidence, has it?
4            Can you ask that again?
5            MR. THOMAS:  Can you read that back?  I'm not
6    sure I can remember it that well.
7            (Last question was read back.)
8            MR. JACKSON:  Counsel, he said he'd like to look
9    at a copy of his report to possibly answer that
10   question.  Is that something you could provide him?
11   BY MR. THOMAS:
12      Q   I sure can, if you think that would help him.
13   I'm trying to save time.
14      A   I think it would.  As I said, this deposition
15   came very quickly.
16      Q   For me, too.
17      A   I reviewed the documents, but it helps to have
18   things in front of me so I can, you know --
19      Q   Doctor, I can assure you, we're both under time
20   constraints, and I assure you I'm trying to be as efficient
21   as I can.
22      A   No, I understand.
23      (Exhibit 3 was marked for identification.)
24   BY MR. THOMAS:
25      Q   I marked as Exhibit No. 3 your copy of the Wave 5

Page 53

1    report, not the exhibits, just the text of the report.
2       A   So the question is, would FTIR be a method for --
3    it's hard -- I'm going to answer to the best I can.
4       Q   Sure.
5       A   So with FTIR I would -- if I did -- maybe I can
6    try answering this way.
7            If I did FTIR on these scraped fibers, I would
8    probably -- I think I would expect to see carboxylate and
9    hydroxyl bonds, as we did in the XPS.  I would think I would
10   see those in the FTIR as well.
11           But again, the challenge with the FTIR is that
12   there are peaks in the proteins, and there are peaks in the
13   oxidized polypropylene that overlap, so it's more difficult
14   to say whether it's, you know, specifically from the protein
15   or the oxidized polypropylene.
16           What the XPS again tells you is the atoms.
17   There's so much nitrogen, so much oxygen.  That's why we
18   chose -- I think FTIR would tell you something, and of
19   course we did FTIR in vitro.  It's not that we didn't want
20   to do it.  It's just that we didn't have enough sample.
21      Q   You relied on your visual observation of the
22   scraped AMS explant to satisfy yourself that it had been
23   cleaned?
24      A   I don't think that's -- no, I wouldn't say that.
25   I think I answered that earlier.  I mean, that's why we

14 (Pages 50 to 53)

Scott A. Guelcher, Ph.D.

Page 54

1   did -- just going back to the paper. That's why we did -- I
2   mean, that's why I preferred this more rigorous approach of
3   looking at the uncleaned fiber and the scraped in
4   considering the differences because -- Dr. Iakovlev cleaned
5   it as effectively as he could, but by doing the XPS and
6   looking at the atoms and the bonding, you can be much more
7   rigorous about it.
8         When the nitrogen goes away, I think that's a
9   reasonable indication that the protein was removed.
10  That's -- so I wouldn't say we relied on visual
11  observations. We tested both. That's sort of the basis for
12  the conclusions in the paper.
13     Q   So had you had more sample, would it have been
14  your preference to do both FTIR and XPS?
15     A   We would have liked to have done FTIR. I mean, I
16  think in these studies, the more methods you can do, you
17  know, reviewers like to see that.
18         Like I said, FTIR does give you some information,
19  but I think you need other methods in addition to that.
20  That's what we attempted to do here.
21     Q   Okay.
22     A   To clarify, in-vitro we don't have the
23  complication of the protein. FTIR in vitro is a different
24  situation. But for explants, as I said in my report, I
25  think there are methods that are more specific than FTIR.

Page 55

1     Q   Let's go to Exhibit No. 1, please, and go to
2   page 7.
3     A   Okay.
4     Q   Page 7 in Figure 2 contains FTIR spectroscopy of
5   three different meshes over a five-week period; correct?
6     A   That's right.
7     Q   And is this testing that people -- Dr. Dunn and
8   people under his supervision prepared?
9     A   Yeah. Dr. Dunn -- to my knowledge, Dr. Dunn ran
10  these FTIR spectra.
11     Q   Okay. And who prepared the text for Figure 2?
12     A   You mean the caption?
13     Q   Yeah, bottom of the page on page 7.
14     A   I would say we wrote that together, probably. I
15  mean, it's, you know -- I don't remember who exactly wrote
16  it.
17     Q   Do you see down at the bottom it says, "The
18  carbonyl peak is indicated with the black arrow." Do you
19  see that?
20     A   Oh, yeah.
21     Q   It's a mistake, isn't it?
22     A   The black arrow, yeah. The carbonyl is the gray
23  arrow. It's switched in the caption.
24     Q   The hydroxyl peak, which is indicated as the gray
25  area, is actually the black arrow?

Page 56

1     A   Yeah. Those are switched.
2     Q   Okay. And we decided the XPS and the SEM are
3   owned by the University?
4     A   Yeah. Yeah, those are University resources.
5     Q   Who owns the FTIR equipment?
6     A   I'm not sure about that. You'd have to ask Dr.
7   Dunn.
8     Q   Do you know what kind of FTIR equipment he used?
9     A   I don't know that we go into that in much detail
10  in the paper, but...
11     Q   Did you review any protocols for the FTIR testing
12  of the three meshes that are seen in Figure 2 in Exhibit 1?
13     A   The actual testing the acquisition of the data?
14     Q   Right.
15     A   I mean, we talked about it. Dr. Dunn has been
16  doing FTIR for a very long time, so he was using methods
17  that he's used in the past.
18         We didn't necessarily talk about the detailed
19  protocol that he used. We talked about the general ideas,
20  you know, how he would do the experiment. I mean, I just --
21  he has a lot of expertise in that area, so I just relied on
22  him to do it. I knew what he was doing, but details of how
23  he put the fibers on the instrument, he did all of that.
24     Q   So these are three different meshes; correct?
25     A   What are three different meshes?

Page 57

1     Q   TVT, ADV and Lynx.
2     A   Oh, yeah. Yeah, those are the three materials
3   that we tested.
4     Q   And these are three materials that you placed in
5   what I'll describe as an oxidated medium?
6     A   That's right.
7     Q   And then you took FTIRs before the test began?
8     A   Yes.
9     Q   And at week 1, week 3, week 4 and week 5;
10  correct?
11     A   Yeah, that's right.
12     Q   And do you know how many -- strike that.
13         Are you familiar with the term "scaling" as used
14  in FTIR?
15     A   Scaling, that could mean -- what exactly do you
16  mean by that?
17     Q   Do you have any understanding what it might mean
18  in the FTIR?
19     A   It's kind of a broad -- kind of a broad general
20  word. I don't -- I'm not sure what exactly you're referring
21  to.
22     Q   That's fine. Do you know who conducted the
23  tests, the FTIR tests?
24     A   Dr. Dunn, I believe.
25     Q   You mentioned before that it might have been

15 (Pages 54 to 57)

Scott A. Guelcher, Ph.D.

Page 58

1    someone under his direction.  Do you know anybody else under
2    his direction that might have conducted the test?
3         A    I don't know.  It's been some time.  I don't
4    know.  He would have to answer that.  He may have done the
5    FTIR spectra himself.  He was pretty -- I don't know the
6    details of how he actually did it.
7         Q    Do you know how many scans he ran each week?
8         A    Other than what's reported in the paper, I don't
9    remember those kind of details.  Let me see what I wrote.
10            We didn't report the number of scans, but again,
11   he would have that.  I just don't remember how many we did.
12        Q    Do you know the number of scans that are
13   generally regarded as appropriate for reporting FTIR data?
14            MR. JACKSON: Objection to form.
15        A    Not off the top of my head.
16   BY MR. THOMAS:
17        Q    Do you know why you run multiple scans?
18        A    Well, I mean, I would run multiple scans to --
19   you know, that helps you address sort of the error in
20   measurement.  So I would run multiple scans.  I just don't
21   know how many he did here.  These are details Dr. Dunn would
22   have to address.
23        Q    How many scans would you believe you, Dr.
24   Guelcher, believe were appropriate to address the error in
25   your measurement?

Page 59

1            MR. JACKSON: Objection to form.
2         A    I just don't know off the top of my head.  I
3    can't remember.
4    BY MR. THOMAS:
5         Q    And what errors can occur in measurement that you
6    would need to address with multiple scans?
7            MR. JACKSON: Objection to form.
8         A    I don't know.  Just generally speaking, it's just
9    good practice just in case there's some artifact in the
10   measurement.  You run things multiple times.  I can't recall
11   right now.
12   BY MR. THOMAS:
13        Q    Dr. Guelcher, I want to direct your attention to
14   Figure 2, the TVT, which is the top FTIR spectra that's
15   listed there.
16        A    Okay.
17        Q    Do you see in week 1 that about halfway across
18   the scan there's a dip in the spectra?  Do you see that?
19        A    Oh, yeah.
20        Q    And that is a change from week 1.  Do you see
21   that?
22            MR. JACKSON: Objection, form.
23        A    Yeah, but I believe you can see peaks like this
24   with carbon dioxide.  So you basically -- that's not -- we
25   can see peaks like that in the spectra -- again, I'm going

Page 60

1    off my memory here -- but it's not related to any of the
2    actual bonds that we're looking at in the spectra.
3    BY MR. THOMAS:
4         Q    I understand.  Do you have an explanation for
5    what happened between week -- from the baseline, week zero,
6    and the first week to result in that change in that peak in
7    the middle of the week 1 spectra?
8            MR. JACKSON: Objection to form.
9         A    I can't really address that without looking at
10   the raw data.  Again, this is a published paper.  These are
11   published data.  I said that Dr. Dunn collected all these
12   data.  I mean, it's kind of hard to go through -- we've seen
13   these types of things before.
14   BY MR. THOMAS:
15        Q    Do you know what it is?
16        A    I think it's carbon dioxide, but I can't remember
17   off the top of my head.
18        Q    Would you defer to Dr. Dunn?
19        A    Yeah.  I know I've seen this before in some of my
20   papers where we're looking at isocyanates.  Basically,
21   sometimes these types of things will happen in the FTIR
22   spectra.  I can say I don't think this is associated with a
23   change in the sample.  I think this came up in another
24   deposition, to be honest with you.  I'm trying to remember
25   what I said then, but I don't think it's an actual change in

Page 61

1    the material.
2         Q    Is it a change in the testing environment?
3            MR. JACKSON: Objection to form.
4         A    What do you mean by the environment?  Maybe like
5    the gas --
6    BY MR. THOMAS:
7         Q    Something about the testing environment that
8    altered the FTIR spectra.
9         A    I just can't remember off the top of my head.
10        Q    That's fine.  Week 3, it looks like that peak
11   that we just mentioned in week 1 is gone.  Do you see that?
12        A    Yeah.
13        Q    And then in week 4 it appears again, but it's
14   going a different direction.
15        A    Yeah, but I don't think this is -- this is -- I
16   think you see this in FTIR spectra, and I can't remember the
17   details exactly of why it's there, you know.  Reviewers
18   didn't have a hard time with this.  It's not relevant to the
19   findings of the carbonyl, and it's in a totally different
20   part of the spectra.  I mean, it's -- I just don't think
21   it's significant.  It's not a significant finding.  It
22   doesn't significantly impact the finding from the FTIR data.
23        Q    Okay.  Doctor, as you look at the TVT mesh, going
24   from weeks 1, 2, 3, 4, week 4 in the areas that you're
25   looking at, that is, the carbonyl and hydroxyl, week 4 show

Scott A. Guelcher, Ph.D.

Page 62

1  no peaks. Do you agree with that?
2      A   You know, they're not -- if there's a peak there,
3  it's not as big as it is in week 5. Week 5 is where we saw
4  the peak showing up.
5      Q   Okay. And you'll agree that the week 4 spectra
6  is actually smoother than the spectra from weeks 1 and 3?
7          MR. JACKSON: Objection to form.
8      A   I mean, there's less noise in the --
9  BY MR. THOMAS:
10     Q   Yes.
11     A   It might appear that way.
12     Q   Do you have any explanation for that?
13     A   Again, these are Dr. Dunn's raw data. I can't
14  really -- I mean, again, this is peer-reviewed. People
15  looked at this and didn't have a problem with it. I mean,
16  this is FTIR. You get noisy spectra sometimes.
17     Q   Is noisy spectra the reason why you do multiple
18  scans?
19         MR. JACKSON: Objection, form.
20     A   Could be.
21  BY MR. THOMAS:
22     Q   In any event, you'd defer to Dr. Dunn to answer
23  this?
24     A   I mean, you're going down this line of
25  questioning that I'm really -- it's Dr. Dunn's work. It's

Page 63

1  kind of hard for me to speculate on these things.
2      Q   Okay. Now, for all three of these spectra --
3  actually, there are 15 spectra, three different devices,
4  five spectra for each. The spectra themselves are
5  truncated. They're stopped at about the 1,100 level. Do
6  you see that?
7      A   Yeah.
8      Q   Why is that?
9      A   Well, again, the peaks that we were interested in
10  were the carbonyl and hydroxyl. And just to make it easier
11  for the reader to read the paper, in that range of the
12  spectrum we're not necessarily expecting changes, so they're
13  not shown here.
14         Now, whether Dr. Dunn went out to those wave
15  numbers, I don't know. But what we tried to show here,
16  these are representative spectra to give the reader of the
17  paper an idea of the changes that we saw. That's the
18  purpose of this figure. So over what range he ran it, I
19  don't know. You'd have to talk to him.
20     Q   Okay. Have you ever seen spectra for the meshes
21  that are depicted in Figure 2 that are complete FTIR
22  spectra?
23     A   I can't remember. I don't know.
24     Q   Do you remember Dr. Thames and Dr. McLean opining
25  in their report that had you displayed the additional data

Page 64

1  that you would have showed that this was water confounding
2  your FTIR spectra?
3          MR. JACKSON: Objection, form.
4      A   I haven't heard that before. I don't know how
5  they could have that opinion without seeing the spectra. I
6  haven't seen that.
7  BY MR. THOMAS:
8      Q   You haven't seen that?
9      A   No.
10     Q   All right. But any questions in that regard
11  would be best directed to Dr. Dunn?
12     A   You're just going to have to talk to Dr. Dunn
13  because that's not -- I didn't do it. I think the question
14  that we're going after in the papers was clear, and we
15  explained the methods we used, and reviewers accepted it.
16  There were no concerns about this. That's why it got
17  published.
18         And those types of detailed questions about the
19  data and how far you ran the spectra, Dr. Dunn would be the
20  one that would have to answer that. It's not my data.
21     Q   If you go to the Lynx mesh in Figure 2, week 4,
22  you agree that they show no peaks either at the carbonyl or
23  the hydroxyl peak?
24     A   You know, again, same as before. I don't know
25  that I'd say there's no peak, but it's much smaller.

Page 65

1      Q   And then in week 5 there's, at least for the
2  Lynx, there's a much larger change than either the ADV or
3  the TVT. Do you agree with that?
4      A   Yeah, that peak is bigger.
5      Q   Do you have any reason or opinion about why the
6  peaks that you found in the Lynx are so much higher and
7  bigger than the peaks that you found in either the ADV or
8  the TVT?
9      A   No, that really wasn't the purpose of the paper.
10  The purpose of the paper was not to compare meshes. The
11  purpose of the paper was to answer the question whether mesh
12  stabilized with antioxidants can oxidize. That was the
13  question.
14         We were not trying to look for differences
15  between the meshes. That was -- that's not a question we
16  were really addressing.
17     Q   But does this analysis -- strike that. But the
18  three meshes were both subjected to the same conditions?
19     A   Yeah.
20     Q   And the same tests?
21     A   Yeah.
22     Q   So is it unreasonable to compare the finding in
23  week 5 to the TVT to the finding in week 5 to the Lynx?
24     A   Well, you can make whatever comparison you want,
25  but that's not a question we're going after in this study.

17 (Pages 62 to 65)

Scott A. Guelcher, Ph.D.

Page 66

 1    That wasn't -- you know, we weren't trying to make
 2    comparisons between different types of mesh.
 3              We were just -- we know that they're all
 4    stabilized with antioxidants, so we were asking the
 5    question, can it happen?  It happened in all three of them.
 6    That's what I can say.
 7         Q    Okay.  Now, based on past litigation, I know that
 8    you're aware of the antioxidants that are contained in TVT.
 9         A    Yes.
10         Q    Are you aware of the antioxidants that are
11    contained in Boston Scientific?
12         A    I'm aware of them.  I don't remember exactly what
13    they were and can't really -- even if I did, I can't really
14    say what they are.  I believe that I have seen those
15    formulations.
16         Q    Is it different than the TVT?
17         A    I can't remember.
18         Q    Do the different peaks that you see in weeks 5
19    for the TVT and the Lynx tell you anything about the
20    differences in the mesh?
21         A    Again, I think -- I thought I answered that.  I'm
22    not willing to -- based on these data, that's not discussed
23    in the paper.  That's not a question we were trying to
24    answer.  I'm not going to look at these spectra and conclude
25    that there were significant differences because that's not a

Page 67

 1    question we were testing.  That's outside of scope of what
 2    we did.
 3         Q    Okay.
 4         A    Anybody can look at that and draw any opinion
 5    that they want, but that's not my opinion.  I don't have an
 6    opinion about that.
 7         Q    That's fine.  Now, the analysis that you show in
 8    Figure 2, is it fair to describe this as an accelerated
 9    oxidation study?
10              MR. JACKSON:  Objection, form.
11         A    I've answered this before, too, but I don't know
12    that I would use the term "accelerated."
13              I mean, essentially I think the way I've answered
14    this before is that you -- this medium simulates that
15    privileged pocket between the macrophage and the material
16    surface, and so it's essentially like you're exposing the
17    entire material to that privileged environment.
18              So I don't know that I'd call it accelerated.  I
19    think what this method does is, it produces hydroxyl
20    radicals, which are reactive oxygen, and so it simulates
21    what can happen in the body.  That's what I think has been
22    published about this medium, and I've published other papers
23    on it.  We talked about it before.
24         Q    That was the prior paper that you presented,
25    different organizations, correct?

Page 68

 1         A    It what?
 2         Q    I haven't talked to you about the Talley paper
 3    before.  I've never asked you questions about that before.
 4         A    No, but some other Ethicon attorneys have.
 5         Q    Not in the context of Talley?
 6         A    No, but it's the same answer.  I've been asked
 7    about this medium before.  I mean, the medium simulates the
 8    microenvironment between the macrophage and the adherent --
 9    well, I didn't answer that very well.  It simulates the
10    environment between the macrophage and polypropylene
11    surface.
12              MR. THOMAS:  Let me show you Exhibit No. 4.
13              (Exhibit 4 was marked for identification.)
14    BY MR. THOMAS:
15         Q    This is the paper that we've talked about before;
16    correct?
17         A    Yeah.  This isn't a paper.  This is a published
18    conference proceedings.
19         Q    Just so we're clear, you don't rely upon this
20    test and this data in the opinions that you're giving in
21    this case; correct?
22              MR. JACKSON:  Objection to form.
23         A    I don't remember if I cited it in the report, but
24    this is a conference proceedings that was published before
25    the paper.  So the paper basically, I think, includes all of

Page 69

 1    these data.  I haven't looked at it recently, but I believe,
 2    just looking at it right now, the paper includes the data in
 3    this conference proceedings.
 4              So I don't want to say I'm not relying on it, but
 5    it's, you know, it's a paper -- most of what's in this
 6    abstract is incorporated in the paper.
 7              MR. JACKSON:  I just want to state for the record
 8    this was Exhibit 3 at his last deposition.
 9              MR. THOMAS:  I understand that.  The reason why I
10    asked is because I understood --
11              THE WITNESS:  I'm not sure what you're getting
12    at, I guess.
13              MR. THOMAS:  I'm not either.  I don't want to
14    plow old ground.
15              THE WITNESS:  I understand that.  I'm not sure
16    what you're asking.
17              MR. THOMAS:  I didn't take the last deposition.
18    I think Mr. Hutchinson did.
19    BY MR. THOMAS:
20         Q    Let me back up because I think I may be talking
21    about different things.
22         A    Okay.
23         Q    There is yet other papers about other work that
24    you did that you presented I think in Europe, and that was
25    the subject of a motion in the Boston Scientific litigation,

18 (Pages 66 to 69)

Scott A. Guelcher, Ph.D.

Page 70

1  and after that time you stopped relying upon that data in
2  your opinions in the case.
3       MR. JACKSON: I'm going to object to form of the
4  last question. I think we're getting pretty far afield
5  here. We're talking about a different litigation.
6       MR. THOMAS: All I'm trying to do, Tim, is to
7  limit his opinions because -- I don't mean to make it a
8  speech, but I'm trying to shortcut this.
9  BY MR. THOMAS:
10      Q   You did some earlier work that you presented, and
11  we went through the background data. We went through all
12  the stuff.
13      A   I think I know where you're going.
14      Q   At some point you stopped relying on that data in
15  your opinions in the case. All I want to do is establish
16  that you haven't changed your mind and are now relying on
17  testing and results that you reported before and presented
18  before that you previously withdrew.
19      A   I know this is your question on the table. It
20  would really help me out to just deal with this head-on if I
21  could talk with counsel for a few minutes.
22      Q   Sure.
23      MR. JACKSON: Could we take a two-minute break?
24      THE WITNESS: I'm not trying to give you a hard
25  time.

Page 71

1       MR. THOMAS: I'm not worried about that because I
2  want to make this quick and easy too. Let's go off the
3  record.
4       (Recess was taken from 10:22 to 10:32.)
5  BY MR. THOMAS:
6       Q   Doctor, are the FTIR spectra that are on Figure 2
7  of Exhibit No. 1 the result of tests that we've previously
8  discussed in deposition, or have you done a second set of
9  tests?
10      A   No, we haven't done a second set of tests.
11      Q   Okay. Just so we're clear -- and I think we
12  talked about this before because I think I asked you
13  questions about it -- some time ago you conducted a
14  five-week oxidation study that you presented at least at one
15  conference and disclosed those opinions in an expert report;
16  correct?
17      A   That's right.
18      Q   After the disclosure of those expert opinions,
19  for whatever reason you stopped relying upon the test
20  results in that report for your opinions.
21      A   Yes. Yeah, I didn't rely on the test data.
22      Q   Is it fair to understand that now that the data
23  has been published that you are now relying on that data for
24  your opinions in this case?
25      A   I don't -- well, I don't remember exactly what

Page 72

1  was in those test data. I don't think we had a lot of the
2  analysis that we presented in this paper.
3       Q   Exactly right.
4       A   So the raw data we looked at and did some
5  additional analysis and thinking and submitted paper, a
6  publication which was peer-reviewed and published. So we
7  did not repeat the experiment, but we did more work on the
8  analysis to basically present the paper in a form that could
9  be published.
10      Q   Right. To be fair, I think the XPS data is new?
11      A   I believe it is, but I can't remember exactly
12  what was in that report.
13      Q   And the AMS explant analysis is new?
14      A   I don't think that was in any test data -- I
15  can't remember. To the best of my knowledge, I believe it's
16  new, but I just can't remember what Dr. Dunn disclosed in
17  his test data.
18      Q   Okay. Dr. Guelcher, if you look back at Figure 2
19  on page 7, the carbonyl peaks that are there that are
20  mislabeled with the gray arrow, do you know if those
21  carbonyl peaks appear at the same place for each mesh?
22      A   I'd have to go back and look at the raw data.
23  There are multiple -- there can be multiple carbonyl peaks.
24  I can't remember if they're different for each.
25          Again, that's not what -- we weren't answering

Page 73

1  that question in this paper, so I really don't think we
2  looked at it. We were just looking at that -- well, we
3  explained what we did. This is all even in 1,500 to 1,750, is where you'll see
4  those carbonyl peaks, and we weren't looking for differences
5  between products or materials.
6       Q   You agree that an FTIR is designed to generate a
7  fingerprint for a particular substance?
8       A   I don't know that I'd say it that way. Basically
9  the FTIR gives you information about bonds based on
10  vibration frequencies. But carbonyls -- I mean, I think
11  this has come up in previous depositions -- there can be
12  multiple peaks. This is all even in some of the Ethicon
13  documents that I cite in my report. There can be multiple
14  carbonyl peaks, and we just didn't look for differences
15  between materials.
16      Q   Would you expect polypropylene in different
17  meshes that are exposed to the exactly the same conditions
18  as you did in your study in Exhibit 1 to display the same
19  carbonyl peak if in fact it was oxidized polypropylene?
20      A   I'm going to have to go to my report for that
21  one. I know that it's in here.
22          I think the best I can answer is like I did.
23  There are multiple species. There are a number of Ethicon
24  documents reporting different carbonyl peaks that could be
25  resulting from different species. I wouldn't necessarily

Scott A. Guelcher, Ph.D.

Page 74

1  expect different materials from different manufacturers to
2  have different peaks. I can't rule it out. I don't know
3  that -- it's just, there's just multiple species, and it can
4  be difficult to assign some of them to specific bonds, you
5  know, real precisely.
6         This goes back to what I was saying about the
7  difference between XPS and FTIR. I mean, I can say broadly
8  that if the polypropylene is oxidizing based on reaction
9  mechanism, I would expect to see carbonyl peaks, and that's
10  what we tested in this paper, but we just weren't looking at
11  that level of detail for differences between groups.
12        Q   I want to talk now about the AMS explant that
13  Dr. Iakovlev supplied. Do you know how he scraped it?
14        A   Again, you'd have to talk to him about those
15  details. I think you know Dr. Iakovlev's papers, but he
16  prefers to work with dry mesh to get around this protein
17  cross-linking issue that Dr. Thames referred to.
18        So Dr. Iakovlev has been doing it for some time.
19  I've seen his microscope. I've seen his lab. Exactly how
20  he does that procedure, I don't have the details.
21        Q   It's fair to understand, from a review of
22  Exhibit 1 or Exhibit 2, there's no way for another
23  researcher to replicate this cleaning technique. Do you
24  agree with that?
25        A   I don't agree with that. I think he gave enough

Page 75

1  detail in the paper that obviously satisfied the reviewers
2  as to how those materials can be cleaned. He manually
3  dissected it under a microscope with tweezers and a scalpel
4  blade. I think that can be replicated. I don't see a
5  problem with that.
6         Q   With all due respect, the only place I saw for a
7  description of his methodology is on page 1 of Exhibit 2.
8         A   I was looking at page 5 in the paper where he
9  says -- the X-ray photoelectron spectroscopy paragraph, he
10  says, "Scraped fibers in which the outer layer was
11  mechanically removed using tweezers and a scalpel blade
12  under dissection microscope."
13        Q   Is that the extent of methodology that you're
14  aware of?
15        MR. JACKSON: Objection to form.
16        A   Yeah. I mean, I think it sounds pretty
17  straightforward. He's been doing it for some time. The
18  reviewers were fine with it. I mean, it's a mechanical
19  dissection of tissue. People do that.
20        Again, if you wanted all the details, if he has a
21  protocol and all that, he would have to address that. I
22  mean, I think for a paper, this is a reasonable description
23  of the methodology. I'm looking on Exhibit 2 to see what's
24  written there.
25

Page 76

1  BY MR. THOMAS:
2         Q   The first page.
3         A   Yeah, so we don't describe -- referring back,
4  this is just supplemental material. So I think the primary
5  description of what he did is in the paper.
6         Q   Okay. Can you tell how much force he used in
7  scraping, from the paper?
8         A   Well, I mean, I think the point of what he was
9  trying to do was to be as gentle as possible without --
10  basically the purpose is -- you know, when you say the outer
11  layers mechanically removed, that means that when you look
12  at these under a microscope, you'll see these layers of
13  tissue, and you can gently remove them with a pair of
14  tweezers. That's what I understand that he did.
15        Q   How thick is the layer of protein that's absorbed
16  onto the mesh material?
17        MR. JACKSON: Objection to form.
18        A   Absorbed, or do you mean adherent protein? I'm
19  not sure what you mean.
20  BY MR. THOMAS:
21        Q   I'll use your term, "adherent protein." How
22  thick was that layer?
23        A   I'm not sure.
24        Q   On the order of a few microns?
25        A   I don't know.

Page 77

1         Q   Do you know how thick the blade is on a scalpel
2  that he used, how it compares to the thickness of the
3  proteins on the mesh?
4         A   I don't. Again, these types of detailed
5  questions -- I don't know those types of details. Dr.
6  Iakovlev did this, and I can't speculate on those types of
7  things.
8         Q   Was there any consideration to testing the
9  scraped mesh explant for other oxygen-containing molecules
10  such as esters or cholesterols?
11        A   Well, I mean, again, we have to rely on what the
12  XPS can tell us, and the XPS can tell us information about
13  atoms that are there and the bonding. So esters are going
14  to have carbonyl groups in them. It tells us about what
15  molecules are there and the way that they're bound to each
16  other.
17        Q   So you're looking at the data on the table that's
18  on page 4, Exhibit No. 2?
19        A   I was referring back.
20        Q   Is there anything about the data on page 4 of
21  Exhibit No. 2 that tells you that the oxygen that was found
22  on the mesh explant was not an ester or a cholesterol?
23        A   I mean, it is an ester. I mean, I'm not sure
24  what you mean by ester. I mean, it's an ester bond. I
25  mean, it's -- well, it's not ester bond. It's a COO.

Scott A. Guelcher, Ph.D.

Page 78

1    That carbonyl is present in an ester. If you
2  look at the degradation products -- I have to go back to
3  this. So I see what you're saying. I mean, an ester bond
4  would also have that carbonyl. It could also be, I think,
5  carboxylate. So it's not -- the XPS is just telling you
6  about those specific types of bonds. So, like in protein,
7  you could have esters, right. So it's -- I'm not being very
8  clear.
9        The XPS tells you again about the type of bond.
10  You could have a carbonyl and an ester bond. It's also
11  present in the degradation of product from the
12  polypropylene.
13    Q    Right. And cholesterol may also appear in the
14  carbonyl group?
15    A    Maybe. I'd have to look at the structure.
16    Q    Why didn't you do a controlled experiment on a
17  pristine AMS mesh?
18    A    What do you mean by "controlled experiment"?
19    Q    Do the same testing XPS on a pristine AMS mesh.
20    A    I don't remember.
21    Q    Did you have that discussion?
22    A    I don't remember.
23    Q    Did you have pristine AMS mesh available to you?
24    A    I don't remember that either. Dr. Dunn had all
25  those materials. So I can't remember that one either.

Page 79

1    Q    What did you do to rule out contamination of the
2  explant?
3        MR. JACKSON: Object to form.
4    A    Contamination?
5  BY MR. THOMAS:
6    Q    Yes. Something from the environment that didn't
7  come from the mesh when it was implanted in the patient.
8    A    I mean, we use standard methodology for XPS
9  analysis, according to Dr. Rogers' papers. We removed the
10  protein mechanically the best we could. We tested, compared
11  the untreated to the treated -- and I'm sorry -- untreated
12  to the scraped. That's what we can do. I mean, we have no
13  evidence to believe there was significant contamination that
14  would alter the results.
15    Q    But you didn't take any steps to confirm that the
16  AMS explant had not been contaminated?
17        MR. JACKSON: Objection to form.
18    A    I'm not really sure. Again, Dr. Rogers did that
19  work. It's difficult for me to -- I mean, we used existing
20  methods that we've used before to clean the mesh and to
21  analyze it. Dr. Rogers has published on XPS. I've
22  published with her on XPS. We use standard methods and
23  protocols for doing that work. There's no evidence to
24  suggest there was contamination. So that's kind of the way
25  the science is done.

Page 80

1  BY MR. THOMAS:
2    Q    Doctor, would you turn to page 6 of Exhibit 1.
3  Page 6 of Exhibit 1 includes a paragraph called "Surface
4  degradation caused by SEM."
5    A    Yes.
6    Q    And who conducted this work?
7    A    Dr. Dunn.
8    Q    Do you know what kind of scanning electron
9  microscope was used?
10    A    That's hard to answer. We've replaced that
11  instrument at Vanderbilt. I can't remember where we were on
12  that when this work was done. Maybe -- well, let me see.
13  It might say in the -- we have several different SEMs. It's
14  Hitachi. We have a newer one now, I think.
15    Q    What is it about the Hitachi SEM that allows
16  measurement of peak depth?
17    A    Peak depth?
18        MR. JACKSON: Objection to form.
19    A    Well, we used --
20  BY MR. THOMAS:
21    Q    You have a number of measurements in this
22  paragraph going from 1 micron to 10 microns. How are you
23  able to measure that?
24    A    Well, I mean, as you can see, these are -- we're
25  saying greater than -- you know, these are not -- we didn't

Page 81

1  do statistical analysis on these measurements.
2        So the flaking, we have a scale bar on the SEM,
3  and you can see that those flakes and peeling features are
4  greater than 10 microns based on that scale bar. The depth
5  of the pits is a little bit more difficult. You could
6  estimate that to be in the range of a micron. We were just
7  trying to give some idea of the length scale of the
8  features.
9    Q    Is it fair to say the numbers there are
10  estimates?
11    A    I would say they're semiquantitative numbers
12  based on the images that are shown in the paper.
13    Q    If you go to page 9, there are scanning electron
14  microscopy images. Are there more images than what are
15  contained in the report?
16    A    So, I mean, it's the same for Figure 2. These
17  are representative images to give the reader some
18  perspective on what we saw. We -- I think we list them in
19  the report. I'm sorry. I keep saying -- this is a paper.
20    Q    I understand.
21    A    A published paper. I'm getting confused. So in
22  this paper we are -- so I basically -- we used low, medium,
23  high-magnification images. I think in the methods we
24  discussed how many images we took of each one, 5 to 15
25  images of each specimen. It just depended, it seems, on the

21 (Pages 78 to 81)

Scott A. Guelcher, Ph.D.

Page 82

1  specimen. So we have multiple images. These are
2  representative ones to give some perspective on what we saw.
3      Q   And you would expect Dr. Dunn to have those
4  images?
5      A   Yeah.
6      Q   Was he the one that provided the measurements and
7  data that went into the paragraph I've just described on
8  page 6?
9      A   That was probably me. I can't remember exactly.
10 I probably did that.
11     Q   How did you do that? By looking at the scale
12 bars?
13     A   Yeah. So you can look at the scale bar, and you
14 can kind of draw a line on the feature. You can see that
15 it's -- the purpose of like the greater than is to show that
16 it is semiquantitative. We're giving some idea of a length
17 scale. We didn't do specific measurements on those
18 features. We just were trying to provide some perspective
19 on the length scale.
20     Q   So other than the scale within the SEM itself,
21 there was no effort to have a more precise measurement?
22         MR. JACKSON: Objection to form.
23     A   You know, it's just difficult to measure that.
24 The depth of a pit, you know, you could do profilometry, but
25 it's not a flat surface. It's difficult to measure that

Page 83

1  depth precisely. So we were doing the best we could from
2  these images.
3  BY MR. THOMAS:
4      Q   And using the scale that's in there?
5      A   Yeah.
6      Q   Do you recognize in the paper that the flaking
7  and pitting that you observed and report on page 9 in the
8  SEMs is different from the transverse tracking that's been
9  reported in other papers; correct?
10         MR. JACKSON: Counsel, when you say "report,"
11     we're talking about the published paper, right?
12 BY MR. THOMAS:
13     Q   Dr. Guelcher, it's fair to understand that you
14 reference in your paper the fact that the flaking and the
15 pitting that you report and show in Figure 3 on page 9 of
16 this paper is different from the transverse cracking that
17 has been reported by others?
18     A   I think we addressed that in the discussion. So
19 there's some -- yeah, so the last paragraph of discussion,
20 you know, the point that we're making there is, this
21 corrosion and stress cracking can happen when you have a
22 combination of mechanical forces and chemical degradation,
23 and in this experiment we only had chemical degradation.
24         So we would not expect to see necessarily those
25 transit cracks. It's the combination of forces, say

Page 84

1  contractile forces from cells that infiltrate the mesh. So
2  it's a combination of those forces and the chemical
3  environment, chemical degradation that causes those cracks,
4  and we believe that's why we didn't see it. That's what
5  this discussion is saying.
6      Q   Was there anything about this experiment that
7  prevented you from including some application mechanical
8  force to try to replicate the transverse cracks?
9      A   Well, it can be done. It's just this was a first
10 step. I mean, the first question we wanted to answer really
11 is, can something oxidize? That was a question in this
12 paper.
13         I mean, to answer the cracking question, you
14 would have to include some kind of stretching protocol, and
15 that takes considerably more resources, time, effort and
16 work. And we thought it made sense to start with the
17 oxidation question since, you know, the degradation is a
18 consequence of the oxidation. So that's why we started with
19 that question, and that's why we didn't do mechanical forces
20 in this study.
21     Q   Do you have plans to do any further study which
22 would include the application of forces to try to replicate
23 the transverse cracking?
24     A   I mean, these are research studies that are
25 funded by external sponsors, so I can't really talk about

Page 85

1  what we're doing.
2      Q   You can't answer the question?
3      A   No, I can't. It's research. I mean, I can't
4  really talk about any research that we're doing. For this
5  Wave 5 report on the line and these documents we've been
6  talking about -- I just can't really talk about what we're
7  doing right now. We're not relying on it.
8      Q   Do you have ongoing studies into the oxidation of
9  polypropylene?
10     A   I just can't talk about it.
11     Q   Can you answer yes or no?
12     A   No, I can't answer yes or no. I can't really
13 talk about what we're doing. It's an externally funded
14 research project. It's confidential.
15     Q   Can you tell me who's funding the research
16 project?
17     A   I mean, I never said there was a research
18 project. I'm saying that, you know, our plans and ideas,
19 these are all -- it's research. It's confidential.
20     Q   Okay. We may have to come back to that. How do
21 you measure embrittlement?
22         MR. JACKSON: Objection, form.
23     A   I think it's in my report, but I'll --
24 embrittlement you could -- you could measure by mechanical
25 testing, dynamic mechanical testing. It's a mechanical-type

22 (Pages 82 to 85)

Scott A. Guelcher, Ph.D.

Page 86

1  test.
2  BY MR. THOMAS:
3    Q   Have you done any embrittlement testing of any of
4  the meshes that you've tested in Exhibit No. 1?
5    A   We have not.  Again, it's a very technically
6  challenging test to do, so we decided to start with things
7  we could do using known and established methods.
8        Embrittlement requires a certain kind of -- it
9  would be more difficult to do, and we have to -- we haven't
10  done it.
11       MR. THOMAS:  Let me take a break.  Give me a few
12  minutes.  I may be close to wrapping up.
13       MR. JACKSON:  All right.
14       (Recess was taken from 11:00 to 11:05.)
15       (Exhibit 5 was marked for identification.)
16  BY MR. THOMAS:
17    Q   I'm going to hand you now what's been marked as
18  Deposition Exhibit Number 5, the Second Amended Notice of
19  Deposition.  This requested that you bring with you to the
20  deposition a number of things.  I've received the filing by
21  your counsel about objections.  I've also received some
22  billing information, a copy of the 2017 published article,
23  which is Exhibit 1, supplemental data which is Exhibit
24  Number 2.
25        There is a deposition request that you also

Page 87

1  produce all of the underlying data for the Exhibit Number 1
2  and Exhibit No. 2, and I believe we've covered that today in
3  your deposition, that is, to the extent that that data is
4  available, it's in the custody or control of the people who
5  conducted the work and not in your current possession.  Is
6  that fair?
7    A   That's right.
8    Q   And you did not ask them to give that information
9  to you for purposes of this deposition; correct?
10    A   I did not because that's just not how things are
11  done.  I think if you want somebody's data, you have to ask
12  them directly.
13    Q   Have you had any -- as corresponding author, have
14  you had any inquiries about the work that went into the
15  Talley study?
16    A   I've had requests for the paper, and I've sent
17  that to people, but I haven't had any detailed questions
18  about it.
19    Q   Other than producing the paper, have you
20  discussed with anybody else your methodology or the results
21  that you've reached?
22    A   Not that I can remember.
23    Q   Where does Ms. Talley live now, Dr. Talley?
24    A   She lives in Maryland.  She works for FDA.
25    Q   When did she take her job with FDA?

Page 88

1    A   Maybe a year ago.  No, six months.  Within a
2  year.
3    Q   What does she do for FDA?
4    A   She is a reviewer of medical device applications.
5    Q   Where does she work in Maryland?
6    A   She works at FDA.
7    Q   I understand that, but Maryland is a big state.
8  I don't mean to be flip, but I'm just trying to find out
9  which city.
10    A   I don't know.  I don't know where exactly she
11  lives.
12    Q   Is it closer to Washington D.C. or closer to
13  Baltimore?  Do you have any idea?
14    A   Probably D.C.
15    Q   And Dr. Rogers still work at Vanderbilt?
16    A   Yes.
17    Q   Dr. Dunn still at Vanderbilt?
18    A   Yes.
19    Q   Were you the person who was responsible for
20  organizing the study?
21       MR. JACKSON:  Objection, form.
22    A   I would say that Dr. Dunn and I did that
23  together.  We thought about what question we want to ask,
24  how we could design the study, then we maybe talked to Dr.
25  Iakovlev about explants.

Page 89

1        So probably mostly it was probably Dr. Dunn and
2  me planning the study.
3  BY MR. THOMAS:
4    Q   On page 13 of Exhibit No. 1 under the disclosure
5  statement and funding it says, "Russell F. Dunn is the owner
6  of Polymer Chemical Technologies, which sponsored the work."
7    A   Yes.
8    Q   Are there other employees of Polymer Chemical
9  Technologies, to your knowledge?
10    A   I don't know at the moment.  You would have to
11  ask Dr. Dunn about that.  I don't know if he has any
12  employees right now.
13    Q   There's been a time when that was just him?
14    A   I mean, his business has changed over the years.
15  Sometimes he's had employees, sometimes not.  So I don't
16  know right now.  When this work was done, I don't know.
17    Q   The work was supported by Polymer and Chemical
18  Technologies, LLC, Grant Number VU1349.  Did you prepare a
19  grant request to Polymer and Chemical Technologies for this
20  work?
21    A   No.
22    Q   What is -- is VU Vanderbilt University?
23    A   Yes.
24    Q   So how does Vanderbilt University 1349 obtain a
25  grant from Polymer and Chemical Technologies?

23 (Pages 86 to 89)

Scott A. Guelcher, Ph.D.

Page 90

1    A    I mean, any company can enter into an agreement
2  called a sponsored research agreement. I've done this
3  before with other companies. Any company can enter into an
4  agreement with the University to sponsor research. It's a
5  standard thing.
6    Q    Is it your suggestion that Vanderbilt is a
7  sponsor of this research?
8    A    No.
9    Q    Okay.
10    A    It's a sponsored research agreement so an
11  external sponsor -- could be a foundation, could be federal
12  government, could be a company -- enters into a contractual
13  relationship with Vanderbilt University where they agree to
14  sponsor research at Vanderbilt. So they pay for the
15  research, but the research is done at Vanderbilt. So
16  there's a contract that regulates that.
17    Q    So there's a contract for this study between
18  Polymer Chemical Technologies and Vanderbilt University?
19    A    I don't know if it's for the study. Again, you'd
20  have to ask Russell about the details of how his company --
21  his relationship between his company and Vanderbilt is
22  something I can't really address.
23        What I can tell you is that when this says Grant
24  Number VU1349, that means that there's some sponsored
25  research agreement between Polymer Chemical Technologies and

Page 91

1  Vanderbilt. The scope of that agreement, I don't know the
2  details. That's all I can say from that sentence.
3    Q    How much was the grant?
4    A    I don't know.
5    Q    Was there any other financial support to the work
6  in Exhibits Number 1 and 2 beyond what was supplied by
7  Polymer and Chemical Technologies, LLC?
8    A    No.
9    Q    Do you know whether Polymer and Chemical
10  Technologies, LLC obtained money from any other source to
11  fund this research?
12    A    I don't -- again, I don't know the details of how
13  the company contracted with Vanderbilt. I don't know those
14  details. I can just -- from the way that's written, I can
15  infer that there's a contract.
16    Q    If you had any conversations with any lawyers
17  about obtaining money to be supplied to Polymer and Chemical
18  Technologies, LLC that would be used as a grant to fund the
19  work in Exhibits Number 1 and 2?
20        MR. JACKSON: This is clearly privileged
21  information you're asking him about.
22        MR. THOMAS: Oh, I don't think so.
23        MR. JACKSON: No?
24    A    Again, I have no relationship with Polymer
25  Chemical Technologies. This is Russell Dunn's company.

Page 92

1  He's the owner, as it says here. I don't -- I don't know --
2  I mean, I can't answer these questions. You're asking
3  questions about how Polymer Chemical Technologies, who I
4  have no relationship with, is doing business. I can't
5  answer that.
6  BY MR. THOMAS:
7    Q    I asked you whether you've been party to any
8  conversations where it was determined that lawyers in this
9  litigation would fund Polymer Chemical Technologies, LLC to
10  supply the grant for the work that's done in Exhibits 1 and
11  2.
12        MR. JACKSON: I think to the extent you're asking
13  about conversations between attorneys and the witness,
14  that's privileged information.
15        MR. THOMAS: Are you directing him not to answer?
16        MR. JACKSON: I think he's already answered the
17  question.
18        MR. THOMAS: Are you directing him not to answer?
19        MR. JACKSON: No, I'm not, because I think he's
20  already answered the question.
21  BY MR. THOMAS:
22    Q    The question is, have you been party to any
23  conversations with lawyers where it's been discussed lawyers
24  funding Polymer Chemical Technologies, LLC grant for the
25  work that's done in Exhibits Number 1 and 2?

Page 93

1    A    I mean, I can't really discuss all the
2  conversations we have with counsel. I mean, I --
3    Q    He hasn't instructed you not to answer. He's
4  permitted you to answer the question.
5        MR. JACKSON: I'm instructing him not to answer
6  to the extent it calls for any communications between
7  himself and attorneys.
8        MR. THOMAS: That's fine. We'll fight that one.
9    A    Let me think about this for a second, all right.
10  I'm trying not to --
11        MR. JACKSON: I think he's already given you an
12  answer to the question.
13        MR. THOMAS: I'm not going to argue with you.
14    A    Let's just -- can we just go with what's written
15  here? Can we do that?
16  BY MR. THOMAS:
17    Q    I can read it as well as you can. I'm just
18  trying to figure out what else is involved that's not here.
19    A    Well, what did we disclose? Russell and I --
20  Dr. Dunn and I have disclosed these matters to the
21  University, and we have -- we have an annual disclosure, and
22  all of this has been disclosed.
23        In the paper we disclose several things. We say
24  that Russell Dunn is the owner of Polymer Chemical
25  Technologies. Polymer Chemical Technologies sponsored the

Scott A. Guelcher, Ph.D.

Page 94

1 work.
2        I mean, that means that that company, through
3 this grant, VU1349, gave money to Vanderbilt, and this work
4 was done within that context.
5        I don't know the details of that contract.  I
6 don't know if it funded other work.  All I know is, there's
7 a contract between PCT and the University, and this work was
8 done within the context of that contract.  Dr. Iakovlev and
9 I disclosed the fact that we provided opinions in these
10 cases.  So this is what we disclosed.
11        To go into like conversations with attorneys
12 about paying for experiments, I can't talk about that.
13 That's -- this is, you know, privileged information with
14 attorneys.
15    Q    Okay.
16    A    We did not say that they funded the study.  This
17 study was funded by the company.  But I can't go any further
18 than that.  I can't --
19        MR. THOMAS:  I keep forgetting I've got more time
20 than I thought I did.  I'm on eastern time.  Doctor,
21 I'm going to quit.  Thank you very much for your time.
22        THE WITNESS:  Thank you.
23        MR. THOMAS:  Have a safe trip to Australia.
24        MR. JACKSON:  I have no questions.
25        (Deposition concluded at 11:17.)

Page 95

1                CERTIFICATE
2        I, Gina Hawkins, Licensed Court Reporter for the
3 State of Tennessee, do certify that the above deposition was
4 reported by me and that the foregoing transcript is a true
5 and accurate record to the best of my knowledge, skills, and
6 ability.
7        I further certify that I am not an employee of
8 counsel or any of the parties, nor a relative or employee of
9 any attorney or counsel connected with the action, nor
10 financially interested in the action.
11        I further certify that I am duly licensed by the
12 Tennessee Board of Court Reporting as a Licensed Court
13 Reporter as evidenced by the LCR number following my name
14 below.
15        Subscribed and sworn to before me when taken this
16 17th day of August, 2017.
17
18        _____
19        GINA HAWKINS, LCR #780
         Expiration Date:  6/30/2019
20
21
22
23
24
25

Page 96

1            ACKNOWLEDGMENT OF DEPONENT
2
3        I, SCOTT GUELCHER, Ph.D., do hereby certify that
4 I have read the foregoing pages and that the same is a
5 correct transcription of the answers given by me to the
6 questions therein propounded, except for the corrections or
7 changes in form or substance, if any, noted in the attached
8 Errata Sheet.
9
10
11
12    _____
13 SCOTT GUELCHER, Ph.D.                    Date
14
15 Subscribed and sworn to before me this
16 ___ day of _____, 20___.
17 My commission expires:_____
18
19    _____
20 Notary Public
21
22
23
24
25

Page 97

1        _ _ _ _ _ _ _
2            ERRATA
         _ _ _ _ _ _ _
3
4 PAGE LINE              CHANGE/REASON
5 ___ ____    _____
6 ___ ____    _____
7 ___ ____    _____
8 ___ ____    _____
9 ___ ____    _____
10 ___ ____    _____
11 ___ ____    _____
12 ___ ____    _____
13 ___ ____    _____
14 ___ ____    _____
15 ___ ____    _____
16 ___ ____    _____
17 ___ ____    _____
18 ___ ____    _____
19 ___ ____    _____
20 ___ ____    _____
21 ___ ____    _____
22 ___ ____    _____
23 ___ ____    _____
24 ___ ____    _____
25 ___ ____    _____

25 (Pages 94 to 97)

# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

_____

JO HUSKEY AND ALLEN HUSKEY,                :

           Plaintiffs,                     :   CASE NUMBER

      v.                                   :   2:12-cv-05201

ETHICON, INC., ET AL.,                     :

           Defendants.                     :

_____


TRANSCRIPT OF TRIAL - DAY TWO

AUGUST 25, 2014

BEFORE THE HONORABLE JOSEPH R. GOODWIN,

UNITED STATES DISTRICT JUDGE


Court Reporter:          Carol Farrell, CRR, RMR, CCP, RPR
                         (304)347-3188
                         carol_farrell@wvsd.uscourts.gov

                         Anthony Rolland, CRR, RMR, RPR
                         (407)760-6023
                         rolland.crr@gmail.com


Proceedings recorded by machine stenography; transcript
produced by computer.

Page 78

1    here. This would be considered a large bore mesh, this is a
2    larger bore mesh. This is the pore size of the TVT-O.
3        Now, the only reason that I raise that with you is
4    that in some of the documents that you will see, and maybe
5    even some of the testimony that you will hear, there's going
6    to be reference to -- in fact, on the plaintiff's slide they
7    suggested that there's old construction hernia mesh. There's
8    a suggestion that the old construction hernia mesh and the
9    mesh that was used in the TVT-O is somehow a small bore mesh
10   that has problems with it. And I have to tell you, frankly,
11   ladies and gentlemen, that there's some sloppy language in the
12   documents where they refer to it as small bore mesh, probably
13   because subsequently a larger bore mesh used in other
14   applications for pelvic or repair surgery and hernia surgery
15   was developed. The right way to do it would have been to call
16   it large bore and extra large, or large and larger. But as
17   you can see how it happens, somebody referred to it as small.
18   It may be confusing to you when you look at some of the
19   documents. I'm going to ask you when we talk and look through
20   the documents and you hear the testimony of some of the
21   witnesses, it will be important to discern or listen to which
22   mesh they're actually talking about.
23       What is important is that it is a large bore mesh.
24   It was a large bore mesh when initially tested by Dr. Ulmsten
25   in the mid 1990s, it's still a large bore mesh, and study

Page 79

1    after study after study has shown it to be safe and effective.
2        Now, it's time for me to slow down. This will be the
3    last time I have an opportunity to address you until at the
4    end of the case. As Judge Goodwin has told you, the plaintiff
5    gets to present her evidence first, and I do ask you, as Judge
6    Goodwin cautioned you, to keep an open mind until you hear
7    from our witnesses, which will probably be several days from
8    now.
9        At the end of this case I think what you will find,
10   based upon all of the evidence, is that, in fact, the TVT-O
11   was an appropriate device to treat Ms. Huskey's stress urinary
12   incontinence, that Ethicon warned of all of the conditions
13   that Ms. Huskey claims to have experienced, and these were all
14   done by Dr. Byrkit, and that the product was not defective.
15       Stress urinary incontinence, ladies and gentlemen, is
16   a condition for which women need treatment and have been
17   seeking treatment for decades and decades. The proof will
18   show that the TVT and the TVT-O were remarkable devices needed
19   by women and doctors, and that they're safe and effective.
20       And so at the end of the case, I'll come back to you
21   and I'll ask you to return a verdict in favor of Johnson &
22   Johnson and Ethicon.
23       Thank you.
24       Thank you, Your Honor.
25       THE COURT: Ladies and gentlemen of the jury, I

Page 80

1    rarely vary from the schedule, but we would barely get the
2    witness sworn and it would be noon, so we'll be back at five
3    minutes till one. We'll take a break for lunch.
4        During the lunch hour do not discuss the case among
5    yourselves, permit anyone to discuss it with you, or in your
6    presence. Don't read anything about it, watch anything about
7    it, listen to anything about it, use any social device, social
8    media, computer. I think you'll get the drift after I say
9    this about 50 times. Actually I know you got it the first
10   time, but I've got to be sure somebody doesn't think I got it
11   wrong.
12       Have a good lunch. We'll see you back.
13       (The Jury left the courtroom at 11:55 a.m.)
14       THE COURT: Court's in recess.
15       (A recess was taken at 11:56 a.m.)
16       (The jury entered the courtroom at 12:55 p.m.)
17       COURT SERVICES OFFICER: All rise.
18       THE COURT: Good afternoon. I trust you had a
19   pleasant lunch. We're ready to begin the presentation of the
20   evidence.
21       The plaintiff, if you will call your first witness.
22   Mr. Wallace?
23       MR. WALLACE: Yes, Your Honor. Dr. -- the plaintiffs
24   would call Dr. Scott Guelcher to the stand, please.
25       THE DEPUTY CLERK: Sir, if you'll please raise your

Page 81

1    right hand.
2    (SCOTT GUELCHER, Ph.D., HAVING BEEN DULY SWORN, TESTIFIED AS
3    FOLLOWS:)
4        THE WITNESS: I do.
5        THE DEPUTY CLERK: Thank you. Please take the
6    witness stand.
7        THE COURT: You may proceed.
8        MR. WALLACE: Thank you, Your Honor.
9    (DIRECT EXAMINATION OF SCOTT GUELCHER, PH.D., BY MR. WALLACE:)
10   Q. Could you please introduce yourself to the jury.
11   A. My name is Scott Guelcher. I'm currently an associate
12   professor of chemical engineering at Vanderbilt University in
13   Nashville.
14   Q. How many years of experience have you had in chemical
15   engineering?
16   A. Over 20 years. Yeah.
17   Q. And have you ever worked with medical device companies
18   before?
19   A. Yes, sir. My current research, I'm a professor of
20   chemical engineering, but my research is in the area of
21   biomedical materials and a number of these materials, we're
22   working with companies to determine the products for human
23   health such as bone void fillers, other types of bone grafts
24   and products for healing foot ulcers and these types of
25   products.

21  (Pages 78 to 81)

Page 82

1   Q.  Dr. Guelcher, rather than marching through your C.V.,
2   what I'd like to do is I have prepared a PowerPoint that
3   outlines some of your qualifications and some of the topics
4   you'll talk about today.  If we could show that on the screen,
5   please.  Counsel?
6           MR. THOMAS:  Do you mind if have a copy?
7           MR. WALLACE:  We are getting a printer.
8           THE COURT:  Do you have -- do you have any problem
9   with just going ahead?
10          MR. THOMAS:  No, Your Honor.
11          THE COURT:  I figured you looked at it before.
12          MR. THOMAS:  I haven't seen the PowerPoints, but
13  that's fine.  We'll go ahead.
14          THE COURT:  All right.  Go ahead.
15          MR. WALLACE:  Thank you, Your Honor.
16  BY MR. WALLACE:
17  Q.  You've already talked about working at Vanderbilt
18  University.  Can you tell me about the textbook on
19  biomaterials that's listed there on that slide?
20  A.  So, a number of years ago, I co-edited a textbook on
21  biomaterials, and this covered a number of different types of
22  biomaterials that are used for implants and we talked about
23  properties of the materials that are used in the clinic, and
24  this was intended primarily as a teaching textbook for
25  undergraduate and graduate students.

Page 83

1   Q.  Okay.  When you talk about biomaterials, what are you
2   referring to?
3   A.  So, these are materials that their purpose is to be
4   implanted in the human body and to serve some goal, either
5   healing bones, say, or hernia mesh or these different types of
6   materials that have been designed to achieve a medical goal.
7   Q.  It says that you've given over 200 scientific
8   presentations.  We obviously don't want to hear about all of
9   them.  But can you tell us what you mean when you refer to
10  scientific presentations?
11  A.  So, these are presentations given in meetings or
12  scientists working in a certain area.  For example, there is a
13  Society for Biomaterials, and we all meet once a year and
14  present our latest research, my students and I present at
15  these meetings, and there is a number of them that are listed
16  there that I attend regularly.
17          MR. WALLACE:  Can we go to the next slide, please.
18          THE COURT:  Do we have copies for defendants now?
19          MR. WALLACE:  Yeah.
20          The one -- just a housekeeping issue.
21  Dr. Guelcher --
22          THE COURT:  We have the jury monitors on.  That's one
23  of the reasons I wanted to have the defendants look at it, to
24  be sure there's no objection before we go further.
25          MR. WALLACE:  Sure, thank you, Your Honor.

Page 84

1           THE COURT:  So let's just hold for a second.
2           MR. WALLACE:  Sure.
3           MR. THOMAS:  Do you want me to review what's on the
4   monitor, Your Honor?
5           THE COURT:  No, I asked them to go get the rest of
6   them.  I didn't realize there was going to be more than one.
7           MR. THOMAS:  Thank you.
8           MR. WALLACE:  We had a -- Your Honor, we just had a
9   slight IT problem over lunch.
10          THE COURT:  Okay.
11          MR. WALLACE:  There's, apparently, the first-day
12  jitters somehow infected the IT.
13          THE COURT:  There is a what?
14          MR. WALLACE:  We had some first-day jitters, I think,
15  in the room outside where we're printing some things, and we
16  weren't able to print.  So I apologize, Your Honor.
17          THE COURT:  Well, you're apologizing to the right guy
18  because I never have a problem with IT.
19          (Laughter.)
20          MR. WALLACE:  I don't, either, Your Honor.
21          THE COURT:  If you can't print it, we'll -- could you
22  take it over and show it to them?
23          MR. WALLACE:  Sure.  And I will represent to -- I
24  believe counsel has seen something like this previously, but
25  I'll represent to you that the first three pages and perhaps

Page 85

1   the first 15 or so minutes is strictly going through the
2   doctor's background, if that's okay with you.
3           MR. THOMAS:  That's fine.
4           THE COURT:  All right.  Let's go ahead and proceed
5   with it.
6           MR. WALLACE:  Thank you.
7   BY MR. WALLACE:
8   Q.  So let's go back to that screen, Dr. Guelcher.  I see a
9   lot of what I call acronyms, DOD, AFIRM, et cetera.  Can you
10  just quickly walk through each of those and tell the jury what
11  they mean and a little bit about the grant process?
12  A.  So, as a professor in the engineering school at
13  Vanderbilt, one of my responsibilities is to write grant
14  applications to federal agencies, to receive money to support
15  the research that I use to pay students that I pay for
16  materials.  And these are a number of funding agencies.  So
17  the first, the NIH, is the National Institutes of Health.
18          There is an institute that focuses on arthritis and
19  bone diseases.  I have funding from them.
20          The NCI is the National Cancer Institute, and in
21  these types of programs, we're interested in the problem of
22  how does breast cancer damage bone, how does it metastasize in
23  bone, why does that happen, how do we treat it?
24          The last one is probably familiar to everyone.  DOD
25  is the Department of Defense, and the Department of Defense

Page 86

1   has a very large program called Armed Forces Institute of
2   Regenerative Medicine, that's AFIRM, and that's a program that
3   involves about 20 universities and we're all working together
4   to find better treatments for soldiers that are injured in the
5   conflicts in Iraq and Afghanistan.
6        So, my primary contribution there is on bone grafts
7   to repair the mandible, so there's some very bad craniofacial
8   injuries.  Survival rates are high in these wars, but soldiers
9   have devastating injuries that affect their quality of life.
10  So we're working to improve that through that program.
11        And the last one is the National Science Foundation,
12  which is -- has a very important education mission as well,
13  training grad students, so those are currently agencies that
14  I've applied for funding and have grants through them right
15  now.
16  Q.  Do you have a particular area of research as it relates
17  to wound healing, Dr. Guelcher?
18  A.  So, we are designing tissue grafts for healing skin, so
19  that would include things like diabetic foot ulcers.  It would
20  also include problems with the wound vac, so you have a very
21  bad wound, they can put a vacuum on it to kind of clear it out
22  and help it heal better.  We're working with a company to
23  design better foams for this procedure.  So we work with a
24  number of wound-healing companies.
25  Q.  Beyond the experience that you've described, you actually

Page 87

1   worked at chemical companies before.  Is that right?
2   A.  That's right.
3   Q.  Can you tell us a little bit about that?
4   A.  So, right after college, I worked for Eastman Chemical
5   Company in Upper East Tennessee.  There I was working on
6   polyesters, nutritional supplements such as vitamin E, vitamin
7   A.
8        After my Ph.D., I worked here in South Charleston, at
9   the Tech Center for about three years, so I was there when
10  Bayer had a facility at the Tech Center, as well as Dowe.  I
11  worked a lot with the South Charleston plant, just
12  trouble-shooting problems there, improving their processes,
13  and this was all polyurethane intermedia when I was at Bayer.
14  Q.  Okay.  Can you do me a favor?  I just want to break that
15  up into two parts because you mentioned polyurethane.  You
16  mentioned plant.  You mentioned South Charleston.  Could you
17  just take those one at a time for us?
18  A.  Okay.  So I started off at Bayer as a research engineer,
19  working in the polyurethanes division, and my responsibilities
20  there included designing new products that we would then
21  translate to the plant.  So we would make some improvement in
22  the lab, and then we'd work with the plant to make sure that
23  they could do this in a cost-effective way.  I did that for
24  about three years, until I left in 2003.
25  Q.  From Charleston?

Page 88

1   A.  From South Charleston, yeah.
2   Q.  And when you left South Charleston, West Virginia, where
3   did you go?
4   A.  Then I went back to Pittsburgh for a post-doctoral
5   fellowship in biomedical engineering.  That's when I shifted
6   fields somewhat.
7   Q.  In addition to working for chemical companies as an
8   employee in your research, have you ever consulted with
9   medical device companies or other chemical companies?
10  A.  Yes.  So, I've done a fair amount of consulting work with
11  biomedical device companies, we're working with a -- a major
12  goal in my research is what we would call "translational."
13  So, that is, we try to discover things in the laboratory that
14  are new and then translate that to help people by making
15  better products.  That's a very difficult thing to do because
16  universities do research and companies make products.
17        So, a lot of these I've been working on for some time,
18  but we work with the company to translate what we do in our
19  laboratory to make a product better, and then the company will
20  license this and then turn this into a commercial product.  So
21  I have several projects like that going on right now.  So, a
22  very keen interest of mine is innovation in the biomedical
23  device industry, is a very important thing to me.  So...
24  Q.  Have you worked in the field of polymers, Dr. Guelcher?
25  A.  So, I've been working in polymers since I graduated from

Page 89

1   college, even while I was in college, so working with
2   different types of materials, polyesters, polyurethanes, a
3   number of different polymers over 20-plus years.
4   Q.  What is a polymer?
5   A.  So, a polymer is -- you might think of it in terms of a
6   plastic, so you think about the seats that you're sitting on
7   right now, they have a polyurethane foam inside.  That's what
8   makes it more comfortable than a slab of wood.  Your mattress
9   has a polyurethane foam.  So, essentially, it's a plastic
10  material that, many cases, is typically derived from oil
11  chemicals, petrochemicals, that -- and you start with a very
12  small molecule and you grow it into a long one, and then the
13  properties of these polymers are very important, yeah.
14  Q.  Does the work that you've done in this case concern
15  polymers?
16  A.  Yes.  Specifically, an active area of my research is how
17  the body responds to polymers.  If you place a polymer in the
18  body, what does it do?  Do you want it to go away, do you want
19  it to be stable?  So a lot of my work focuses on how cells and
20  tissues in the body respond to polymers.  And I certainly
21  think that this case falls within the scope of that question.
22        MR. WALLACE:  Your Honor, at this time, plaintiffs
23  would offer Dr. Guelcher as an expert in the field of chemical
24  engineering and biomaterials.
25        THE COURT:  Any voir dire?

Page 90

1     MR. THOMAS:  No, Your Honor.
2     THE COURT:  He may offer his opinions.
3     MR. WALLACE:  Thank you, Your Honor.
4  BY MR. WALLACE:
5  Q.  Before we get to those opinions, Dr. Guelcher, have you
6  been paid for the time that you've spent working on this case?
7  A.  Yes, I have been.
8  Q.  And how long have you been working on the issues of
9  polypropylene mesh?
10  A.  I'd say at this point probably in the range of hundreds
11  of hours.  I spent a lot of time reading many scientific
12  papers and documents.
13  Q.  Can you tell us just approximately how many scientific
14  publications you've reviewed in the work that you've done in
15  polypropylene, if you know?
16  A.  Probably exceeding 50, 60 papers, maybe more.  There's a
17  lot.
18     MR. THOMAS:  Your Honor, may we approach?
19     THE COURT:  You may.
20     MR. THOMAS:  Thank you.
21     THE COURT:  Ladies and gentlemen, I forgot to tell
22  you, there will be occasions when we go to sidebar, just like
23  we did earlier today.  When we do, you're not supposed to hear
24  what we're talking about so I turn on the sound machine, but I
25  ask you to talk among yourselves and be your own sound

Page 91

1  machine.
2     (The following occurred at sidebar.)
3     THE COURT:  All right.  Mr. Thomas.
4     MR. THOMAS:  Thank you, Your Honor.  Counsel, as the
5  Court is aware, has tendered us a PowerPoint presentation of
6  Dr. Guelcher's testimony.
7     THE COURT:  Um-hum.
8     MR. THOMAS:  Paragraph E is an opinion, more mesh
9  equals more foreign body response, which is not contained in
10  the summary of opinions in the expert report, and it's an
11  opinion that goes beyond both his expert report and the
12  depositions I took of Dr. Guelcher.
13     MR. WALLACE:  I would only add, Your Honor, that he
14  filed a supplemental report shortly after that that addresses
15  the more-mesh concept which is on Page 2 of his supplemental
16  report --
17     MR. THOMAS:  I thought the supplemental --
18     MR. WALLACE:  -- which I will go get if you want me
19  to.
20     THE COURT:  Let's see what he's got.
21     MR. WALLACE:  But I can tell you -- I will just wait.
22     THE COURT:  Wait.
23     MR. WALLACE:  Thank you, sir.
24     MR. THOMAS:  Your Honor, I brought the Court the
25  supplemental report of Dr. Guelcher, and Page 2 of the

Page 92

1  supplemental report has exactly the same opinions that are in
2  the original report.
3     MR. WALLACE:  No, there is a -- let me get you the
4  right report, Dave.  Let me go get the right report for him.
5     THE COURT:  Get whatever report you have.
6     MR. WALLACE:  More --
7     THE COURT:  That's all right.  It was represented
8  that he was not offering any new opinions on his supplemental
9  report when I was considering Daubert motions.
10     MR. WALLACE:  Your Honor, this is a rebuttal report
11  that was done many, many, many months ago, not the matter that
12  you addressed.  So --
13     THE COURT:  So it either was or wasn't in the report.
14     MR. WALLACE:  It is in the report, Your Honor.  I can
15  point it to you and point it to Dave, if you'd like me to.
16     THE COURT:  Why don't you two take a minute.  I need
17  to know the sequence --
18     MR. WALLACE:  Sure.
19     THE COURT:  -- because when I was ruling on the
20  reports, as I recall, the -- issue came up with regard to
21  whether he was offering any new reports in supplement -- any
22  new opinions in the supplement.  And the answer I got from you
23  all was "no."
24     MR. WALLACE:  And that is correct, Your Honor.
25     THE COURT:  All right.  Why don't you all talk about

Page 93

1  it, whatever this is.
2     MR. WALLACE:  Sure.
3     (Discussion held off the record between Mr. Wallace
4  and Mr. Thomas.)
5     THE COURT:  Yes, sir.
6     MR. THOMAS:  Your Honor, I have spoken with
7  Mr. Wallace, and Dr. Guelcher did, in fact, supply a rebuttal
8  report to the expert reports of Ethicon.  And we did file a
9  motion, a Daubert motion -- let me back up.  The rebuttal
10  report does refer to Paragraph E, more mesh equals more
11  foreign body response.  We moved on Dr. Guelcher and the Court
12  found in the order, I have the Daubert order if you'd like,
13  and limited Dr. Guelcher to the four opinions in the original
14  report --
15     THE COURT:  I don't remember a reference to a
16  separate supplemental report.  I remember -- give me that
17  sheet of paper.
18     MR. THOMAS:  I have the Daubert order if the Court
19  likes.
20     THE COURT:  Ethicon moved to exclude Dr. Guelcher's
21  testimony as it relates to supplemental reliance material
22  list.  Did you go beyond that?
23     MR. THOMAS:  That's a different motion -- no, Your
24  Honor.  That was a motion -- they filed a supplemental
25  reliance list adding new documents, right before trial, that I

Page 94

1  hadn't had an opportunity to depose Dr. Guelcher on.
2      MR. WALLACE: Right.
3      MR. THOMAS: The Court denied that motion because
4  they were late-produced documents, as I recall the Court's
5  order. What I'm referring to is the Daubert motion that we
6  filed --
7      THE COURT: Let me see a copy of the opinion that you
8  are referring to.
9      (Pause.)
10     THE COURT: Show me. Show me where I limited
11 Dr. Guelcher's opinion. I don't recall doing that.
12     MR. THOMAS: Page 17 of the order, Your Honor.
13     THE COURT: Where is it that you moved to limit his
14 testimony about the opinion you're talking about?
15     MR. THOMAS: The opinion that he's talking about
16 here --
17     THE COURT: Where is it that you moved to limit that?
18 I don't remember that.
19     MR. THOMAS: I understood that was part of the
20 Daubert ruling, and the Court -- what I relied on is the Court
21 specifically laid out what the opinions were going to be. The
22 other alternative is this is not a true rebuttal opinion, but
23 we can get to that later.
24     THE COURT: What I'm trying to understand -- I'm
25 sorry. Did you object and raise an issue, when -- in your

Page 95

1  Daubert motions in this particular opinion and his
2  qualifications to offer it?
3      MR. THOMAS: I'm hesitant to represent that, Your
4  Honor, because it's been a long time since I looked at the
5  actual papers, to be honest with you, so I can't represent
6  that to the Court.
7      MR. WALLACE: Your Honor?
8      THE COURT: Yes.
9      MR. WALLACE: Your Honor, you asked a question about
10 the chronology, just so it's clear, and Mr. Thomas and I agree
11 on this, this rebuttal report was offered before
12 Dr. Guelcher's deposition was even taken the second time
13 around. So we hope that it's a nonissue, we can move through
14 quickly on the stand. In other words, he's been deposed. I
15 just want --
16     THE COURT: Was he cross-examined on that opinion?
17     MR. WALLACE: Well, there was lots of hours of
18 testimony by Mr. Thomas, from which Mr. Guelcher still --
19     THE COURT: He didn't testify, did he? I'm teasing.
20     (Laughter.)
21     THE COURT: Go ahead and finish your thought.
22     MR. WALLACE: No, I was just saying, Your Honor, and
23 Mr. Thomas agrees with this, we provided this rebuttal report,
24 Mr. Thomas and I agreed that even Mr. Guelcher can come back
25 and be deposed a second time, and Mr. Thomas and I mutually

Page 96

1  agreed, worked out the second deposition.
2      This was months and months before the Daubert motions
3  were ever filed, and so I would suggest that this opinion has
4  been out there. It's nothing new.
5      THE COURT: But it's not in his report.
6      MR. WALLACE: It is in his report, Your Honor. It is
7  in his expert rebuttal report that he filed which is the
8  subject of the --
9      THE COURT: Let's make it clear so the record is
10 clear.
11     MR. WALLACE: Thank you.
12     THE COURT: What is the objection?
13     MR. THOMAS: One, it's not in his original report.
14 When we moved on Daubert grounds to strike his testimony
15 entirely, for a number of reasons, the Court found these were
16 the four opinions which he was to express at trial. That's
17 what I --
18     THE COURT: To be clear, are you saying that he did
19 not offer this opinion before you made your motion?
20     MR. THOMAS: No, I'm not, Your Honor.
21     THE COURT: And did you move to say he wasn't
22 qualified to offer this opinion?
23     MR. THOMAS: I'm sure that I did, but I can't tell
24 you specifically that I did, Your Honor.
25     THE COURT: Well, I'll let the jury go take a break

Page 97

1  and you show me what you did.
2      MR. THOMAS: I'm not going to be able to put my hands
3  on it very quickly and I'm reluctant to take that much time
4  with the jury. I don't want to do that to the Court or --
5      MR. WALLACE: Dave, can I offer a suggestion?
6      MR. THOMAS: Sure.
7      THE COURT: Off the record.
8      (Discussion held off the record between Mr. Wallace
9  and Mr. Thomas.)
10     MR. THOMAS: Your Honor, I think we have reached an
11 accommodation on it.
12     THE COURT: Okay. Let's go.
13     (Sidebar concluded.)
14     THE COURT: Okay. Mr. Wallace?
15     MR. WALLACE: Can we move to the next slide. Let's
16 just go ahead and try to move ahead a little.
17 BY MR. WALLACE:
18 Q. Did you provide an expert report, a rebuttal report and
19 some reliance lists in this case?
20 A. Yes, I did.
21 Q. Okay. And in those documents, did you provide certain
22 opinions?
23 A. Yes, I did.
24 Q. Okay. And would you agree with me that the reports that
25 you filed and the rebuttal report you filed were much more

Page 98

1    extensive than what we have here represented on the slide?
2    A.  Yes.
3    Q.  Okay.  Well, just to move forward, is this your summary
4    of opinions?
5    A.  This is my summary of opinions.
6    Q.  Okay.  And, Dr. Guelcher, before we get to the summary of
7    your opinions, what I want to do is just establish some
8    definitions for the jury.
9         And I'm going to start with, Dr. Guelcher, what is
10   polypropylene?
11   A.  So, polypropylene is a manmade or a synthetic material,
12   in a chemical plant.  It's based on a petrochemical, and it's
13   produced in pellet form as shown in the picture there.  And an
14   important point about this is that polypropylene is known to
15   be unstable, due to its molecular structure, the reactive
16   oxygen, and so, like many other products, antioxidants are
17   added to extend the service life of the polypropylene, to make
18   it last longer for the application it's designed for.  That's
19   the purpose of the antioxidants.
20   Q.  Can you tell the jury what -- some products that are made
21   with polypropylene?
22   A.  Well, polypropylene parts are important in automotive
23   applications, toys, fishing line.  It's a very well-known
24   industrial chemical that's used in a lot of applications.
25   Q.  Let's go back to your summary opinion slide,

Page 99

1    Dr. Guelcher.  It says, "Polypropylene plus oxygen equals
2    degradation."  What do you mean by that?
3    A.  So, polypropylene will react with oxygen and degrade.
4    This is known as an oxidation reaction.  And that changes the
5    chemical structure of the polypropylene, is the most important
6    point.  So, by reacting with the oxygen, its chemical
7    structure is changed.  It's not stable.
8    Q.  And I first want to talk about polypropylene outside of
9    the body.
10   A.  Yes.
11   Q.  Okay?  So, when you're talking about polypropylene
12   reacting with oxygen equalling degradation, are you referring
13   to polypropylene outside of the body?
14        MR. THOMAS:  Your Honor, objection, leading.
15        THE COURT:  Sustained, but you can ask it directly
16   pretty easy.
17   BY MR. WALLACE:
18   Q.  What happens to polypropylene out of the body?
19   A.  Outside of the body, polypropylene can react with oxygen,
20   molecular oxygen just in the air that we breathe, O2.  This is
21   a faster reaction rate at higher temperatures, so in order to
22   make polypropylene useful, we saw the pellets.  A pellet's not
23   very useful.  So what you'll do is you'll heat it up and
24   either extrude it or mold it, but you have to heat it to high
25   temperatures in order to process it into a useful part.  And

Page 100

1    these oxidation reactions can become very important at those
2    conditions.
3    Q.  Let's just try to march through these, and then maybe
4    we'll come back to a few of them.
5         Number -- I'm sorry, Letter B, it says, "Antioxidants
6    can slow down degradation, but they cannot prevent it."  What
7    do you mean by that?
8    A.  So, this relates to the concept of a service life.  So,
9    just about anything that you make or buy has is -- it's useful
10   for a certain period of time.  Then it wears out.  And the
11   same applies to plastics.  And so antioxidants can slow this
12   degradation process, these chemical changes, for a period of
13   time, they can extend the service life, but they can't prevent
14   it forever.  This process will continue, and eventually these
15   changes will happen.  The question is when.
16   Q.  When you talk about changes, are you talking about the
17   degradation process?
18   A.  Yes.  Changes to the structure of the molecule, of the
19   polypropylene.
20   Q.  How long has this been known in the chemical field,
21   Dr. Guelcher?
22   A.  Since the 1960s.  When polyurethane -- polypropylene was
23   first invented, it was noticed that it had these degradation
24   problems, and that's when scientists started adding
25   antioxidants to make it last longer.

Page 101

1    Q.  Let's move on to C.  It says, "The body's natural defense
2    mechanism -- the foreign body response -- attacks the
3    polypropylene."
4         Let's take those one at a time.  Dr. Guelcher, what are
5    you referring to when you say "the body's natural defense
6    mechanism"?
7    A.  So, this is the response that your body has when a
8    foreign material is implanted, the material that your body
9    knows is not part of your body, and there's a defense
10   mechanism that the body has to deal with this to reject it or
11   to destroy it, and this is essentially the natural defense
12   mechanism.
13   Q.  What do you mean by -- could you give us an explanation
14   of "foreign body response," or is that what you just --
15   A.  So, the foreign body response or the foreign-body
16   reaction is a scientific term that's used to explain this
17   defense mechanism.  So, there's a reaction that happens when a
18   foreign body is implanted at the cellular level, so this
19   happens actually to specific cells that attack the material.
20   That's what I'm referring to by the foreign body reaction.
21   It's just this natural defense mechanism.
22   Q.  Dr. Guelcher, "attack" seems like a pretty strong word,
23   so could you explain that to the jury?
24   A.  So, cells in your body, known as inflammatory cells,
25   these would be things like white blood cells, macrophages,

Page 102

1  foreign-body giant cells, these are inflammatory cells that
2  their job is to attack the foreign body.
3      A simple example would be a bacterial infection.
4  Bacteria is not supposed to be there, and so there's
5  specialized cells in the body that attack that and try to
6  destroy it so it doesn't harm the body.  That's the response.
7  Q.  Letter D says, "The foreign body response will not stop
8  until the mesh is removed."  Do you see that?
9  A.  Yes.
10  Q.  And what do you mean by it?
11  A.  So, the mesh is a foreign body.  It -- it's not naturally
12  in your body.  Like I said, it's a synthetic polymer that's
13  made in a chemical plant.  It's planted in the body to
14  accomplish a certain purpose.  And the body recognizes it as a
15  foreign material, and it will continue to attack it in this
16  way until it's removed or destroyed or it's gone.
17      Think of a splinter that you get in your finger.  If
18  you never remove it, it over time will extrude.  It's a simple
19  example, but that's the idea.  It's ongoing until the foreign
20  body is gone.
21  Q.  And you use the word "mesh."  What are you referring to?
22  A.  I'm referring to the polypropylene Prolene mesh that
23  we're discussing here today.
24  Q.  When you say, "More mesh equals more foreign body
25  response," what do you mean?

Page 103

1  A.  So, this is sort of a logical consequence of the other
2  opinions, in that if you have more mesh present -- this is
3  happening at the surface of the material, at the surface is
4  where it's happening.  If you have more mesh, well, you're
5  going to have more response.  It's going to be an elevated
6  response.  More cells, more reactive oxygen, more -- it's an
7  elevated response, yeah.
8  Q.  Well, you talked about more reactive oxygen and gave a
9  couple of other words that I think we're going to need to
10  define.
11  A.  Yes.
12  Q.  But why don't we try to go, just keeping moving through
13  it, and we'll come back to that.
14      Next slide.  Keep going.  Okay.  What -- first of all,
15  before we get into the structure here, what are you trying to
16  explain to the jury?
17  A.  So, this slide is explaining how this reaction that's
18  known as oxidation -- oxidation is a reaction with oxygen --
19  how this oxidation reaction alters the structure of
20  polypropylene.  So you start off with the structure of
21  polypropylene, and you end up with something that's different.
22  That's the purpose of this slide.
23  Q.  And so on the left, does that represent the chemical --
24  A.  So --
25  Q.  Let me -- excuse me, Doctor.

Page 104

1  A.  I'm sorry.
2  Q.  I'm sorry, let me finish.
3      Let me ask it this way:  What is the box on the left?
4  A.  Okay.  So the molecule on the left is the structure of
5  polypropylene.  That's a unit that repeats, so it's a very
6  long chain of these units.  And the box in red, that's the
7  carbon-hydrogen tertiary bond.  Why is it a tertiary bond?
8  Well, that carbon is bonded to other carbons, except for that
9  hydrogen.  That's why it's a carbon-hydrogen tertiary bond.
10  So this is kind of the chemistry concept.
11      So -- and that bond is vulnerable to attack by the
12  oxygen.  That's where the attack is happening.  And there is a
13  series of reactions in this step that lead to changes in the
14  polypropylene structure, but that particular bond is the one
15  that reacts.
16      THE COURT:  Hold just a second.  It's not usual, just
17  so the jury knows, it's not usual for me to be showing you
18  things on here that the witness hasn't first tried to explain
19  or -- and I have a series of slides, it appears.
20      Have you had an opportunity to review them?
21      MR. THOMAS:  I'm looking at them right now, Your
22  Honor.
23      THE COURT:  What I want -- what I want to do is not
24  put them up until I see if there's an objection.
25      MR. WALLACE:  Sure, Your Honor.  I didn't realize --

Page 105

1      THE COURT:  So before you get ready to go to your
2  next one, we'll see it.
3      MR. THOMAS:  I have no objection to the next one,
4  Your Honor.
5      THE COURT:  All right.
6      MR. WALLACE:  Okay.
7      THE COURT:  If we could just keep that process up, I
8  would appreciate it.
9      MR. WALLACE:  And going forward, that will absolutely
10  be the case, Your Honor.
11      THE COURT:  Thank you.
12  BY MR. WALLACE:
13  Q.  When you said "vulnerable to attack," can you just tell
14  the jury what concept you're trying to explain?
15  A.  There's a reaction between the oxygen and that bond.
16  Q.  What's the next red box represent?
17  A.  So, the next red box shows how that bond changes, so you
18  start off with this tertiary carbon-hydrogen bond.  The next
19  red box shows that bond turn into what's called a
20  hydroperoxide bond, so it changes.  Its chemical structure
21  changes.  That's what's denoted there.
22  Q.  When you say "chemical structure changes," you're saying
23  that the polypropylene actually changes because of oxidation
24  or something else?
25  A.  Yes.  It's a different molecule now, because you have

1   this hydroperoxide group instead of the hydrogen that's
2   changed.
3   Q.   And we talked a little bit about antioxidants already.
4   But why don't we look at that second bullet point, where it
5   refers to structural changes.  Can you tell the jury what
6   you're trying to say there?
7   A.   So, these changes in the structure, for example, the
8   carbon-hydrogen bond going to a hydroperoxide bond, that could
9   be measured using analytical techniques such as spectroscopy,
10  so we could measure that, we can measure that change, and we
11  can also measure the change in the following reaction when it
12  goes to a carbonyl, which is the last red box.  That's another
13  chemical change that we can measure by different analytical
14  changes.
15  Q.   When you say "we," who are you referring to?
16  A.   Scientists, engineers.
17       MR. WALLACE:  Let's go to the next slide, please.
18       MR. THOMAS:  That's fine.
19       MR. WALLACE:  Okay.  Thank you.
20  BY MR. WALLACE:
21  Q.   You say at the top, "Implant materials selection."  And
22  at the top you have "polypropylene," and then you have an
23  arrow.  What do you mean?
24  A.   So, this slide is showing several different types of
25  materials, and how easily they are oxidized or how easily this

1   reaction with oxygen can occur.  And so at the bottom, where
2   it says, "Difficult to oxidize," these are materials that
3   react very slowly with oxygen.  For example, Teflon, Teflon
4   reacts slowly with oxygen.
5       Polypropylene, on the other hand, is one of the more
6   easily oxidized materials.  So it's reacting much faster with
7   oxygen than a large number of other materials.  It's much more
8   easily oxidized in that respect.
9   Q.   How long have chemical scientists like yourself known
10  that polypropylene is easily oxidized?
11  A.   This has been known for decades, I think.  Since the
12  1960s, it was known that polypropylene is easily oxidized.
13       MR. WALLACE:  Can you go to the next slide, please.
14  Dave --
15       MR. THOMAS:  That's fine.
16       MR. WALLACE:  Thank you.
17  BY MR. WALLACE:
18  Q.   All right.  You've talked a little bit about foreign body
19  reaction.  You've got some photos here.  Can you take us
20  through them?
21  A.   So I mentioned the foreign-body reaction earlier.  This
22  is the body's response to something that's implanted.  It's
23  caused -- it's called the foreign-body reaction because that
24  refers specifically to the types of cells that respond.  So
25  it's a reaction.  You implant the material, and certain cells

1   respond.
2       And so these are polyurethane films that were in the
3   body, and it shows the progression of this reaction.  So in
4   the upper left-hand corner it says, "Monocytes, zero days," so
5   very quickly after an implantation of the device, or this
6   material, this foreign body, monocytes, which are very small
7   mononuclear cells, they have one nucleus, they attach to the
8   surface.  They recognize it as a foreign body and they attach.
9   And that's what starts off this reaction.
10      Now, as you see the arrow there, it points to
11  macrophages at three days.  Then these monocytes over a period
12  of several days change to form another cell called
13  "macrophage."  And it's important to remember these cells are
14  attached to the surface.  They're what we call an adherent
15  cell.  They're attached to the surface of the material.
16      And then after about a week, some of these macrophages
17  will fuse.  That means they join together to form a great big
18  cell that has multiple nuclei instead of just one, and then
19  finally, after about two weeks, that FBGC 14 days, those are
20  called foreign-body giant cells.  That's just what they are,
21  they're giant cells, they're very large cells that have
22  multiple nuclei.  And, again, all these cells are adherent to
23  the surface.
24      So, what happens at the surface is they're secreting
25  what's known as reactive oxygen species.  And this is oxygen

1   that's -- these are oxygen species that are much more reactive
2   than molecular oxygen, so they're much more potent.  They
3   react faster.  And that material surface is exposed to these
4   species.  So it's exposed to these oxidizing agents.
5       This is what's known as the foreign-body reaction.  But
6   it's driven by these types of cells that attach to the surface
7   and secrete reactive oxygen species with an aim to destroy the
8   material.  That's why they're there.  They want to remove this
9   material because it's a foreign body.
10  Q.   Okay.  So, if I understand you correctly, the monocytes
11  work with the macrophages to combine the foreign-body giant
12  cells and adhere to the surface of a foreign body; is that
13  right?
14  A.   Yes, they're adherent, yes.
15  Q.   All right.  Going back to this "attack" word that you
16  used, is that what you're describing there?
17  A.   This is the scientific explanation of the word "attack."
18  It's a chemical attack.  It's, again, reactive oxygen species
19  or ROS.
20  Q.   What are the -- what are these foreign-body giant cells
21  actually tying to do to the implant?
22  A.   Well, they're trying to remove it from the body.  That's
23  the response, to destroy it.
24  Q.   What does ROS do in the body?  What function does it
25  serve?

Page 110

1    A.  So, much like if you take polypropylene and you heat it
2    in the air, your source of oxygen in the air is molecular
3    oxygen that we breathe, so if you heat it up, that molecular
4    oxygen in the air will react.
5        Well, in the body, it's a much lower temperature.  So
6    you don't have this thermal oxidation, at high temperatures,
7    but the reactive oxygen species serves the same purpose.
8    They're much more reactive than oxygen at the body conditions,
9    and so they can cause these changes to polypropylene because
10   of their high reactivity.
11   Q.  Dr. Guelcher, if I heard you correctly, are you offering
12   an opinion that reactive oxidative species is actually --
13   has -- is stronger than the oxygen --
14       MR. THOMAS:  (Stands.)
15       THE COURT:  Sustained.
16   BY MR. WALLACE:
17   Q.  What effect -- let me ask this question:  Does ROS have
18   an effect on polypropylene implanted in the human body?
19   A.  Yes, it does, because polypropylene reacts with oxygen.
20   This is simply a much more potent form of oxygen, so it's a
21   similar reaction.
22   Q.  Thank you.
23       And how long has the foreign-body reaction been
24   understood by scientists and biomedical engineers like
25   yourself?

Page 111

1    A.  So, this was discovered in the early 1990s in a few very
2    important papers.  It was discovered that the failure of
3    certain biomaterials could be traced in this foreign-body
4    reaction.  So materials that were thought to be safe, such as
5    insulation and cardiac pacemaker leads, thought to be safe,
6    but in the early 1990s, we realized that, in fact, it wasn't
7    because this foreign-body reaction was causing it to degrade.
8    That's what -- so it was in the early '90s.
9        MR. THOMAS:  This is the polyurethane slide?
10       MR. WALLACE:  Okay.
11       MR. THOMAS:  Yes.
12       MR. WALLACE:  Okay.  We'll just go to the next slide.
13   BY MR. WALLACE:
14   Q.  Can you describe to the jury what you have done with this
15   slide?  And can I withdraw the question and ask you a
16   different one?
17       Did you actually create this slide yourself?
18   A.  Yes, I did.
19   Q.  Okay.  So, tell the jury what you're trying to explain
20   there.
21   A.  So, I spent some time talking about the foreign-body
22   reaction.  And this happens no matter what you implant.  Even
23   it can happen with other types of dead tissue.  It -- it
24   happens with anything you implant into the body.
25       The important question as an engineer, someone

Page 112

1    designing a material, is:  How is the material that I'm
2    implanting going to respond to that foreign body reaction?
3    That's something I can control, as an engineer, and it's a
4    very important question.
5        So, here I'm using the example of the
6    poly(ether)urethane pacemaker lead to explain this point.
7        And so these were, again, materials that were believed
8    to be safe, and then some patients started having problems and
9    the leads were taken out of the body or explanted, and some
10   studies were done, and it was shown that the combination of
11   chemical degradation that results from the foreign-body
12   reaction, that's the reactive oxygen, causes chemical
13   degradation, just like I explained for polypropylene.  That
14   combined with physical damage such as cracking, in response to
15   this, embrittlement, led to device failure in a number of
16   patients, so it can be a very serious problem.  And it doesn't
17   stop until the device is removed.  And this has led to the
18   discovery of replacing materials for this application.
19       So, in this little chart here, I tried to show what I
20   consider to be really a vicious cycle of this problem.  So if
21   you look at the bottom, when the device is implanted, you have
22   this infiltration of inflammatory cells, that's at the bottom.
23   And that happens once the device is implanted.  So you get
24   these cells that attach to the surface, and then oxidation,
25   that's in response to the reactive oxygen secreted by the

Page 113

1    cells.
2        So, now we have oxidation of the material or reaction,
3    it's changing, it becomes embrittled.  This can result in loss
4    of flexibility, cracking, which leads to more exposed surface.
5    So this reaction starts at the surface and it keeps going down
6    into the bulk of the material, can result in mechanical
7    failure.  So this is the effect that the foreign-body reaction
8    can have on an implant that's not resistant, that's not --
9    that is susceptible to reaction with oxygen.  That's what's
10   summarized in this slide.
11   Q.  Dr. Guelcher, have you -- are you aware of any instance
12   where degradation might be desired in an implant?
13   A.  So, in my own research at Vanderbilt, these are some
14   papers we published just in the past few years.  And we're
15   interested in a different problem, that is, if I have a bone
16   void and it's not healing, can I put a scaffold in there or a
17   graft that will help it to heal.  In other words, it won't
18   heal because there is a large hole, but if I put a structure
19   that has a scaffold to it, cells can migrate in and heal it.
20       Now, in this application, we want that scaffold to go
21   away once the wound is healed, but it's very important that we
22   control the rate at which it goes away.  So we've actually
23   designed materials that respond to this foreign-body reaction,
24   in other words, they are designed to go away once cells start
25   to cause a new matrix, they degrade the scaffold, and the end

Page 114

1    result of this process is you have a healed wound.
2         So we're actually using this foreign-body reaction to
3    design new materials that will improve healing. That's quite
4    different from the polypropylene case where you want it to be
5    stable. That's a very different application. But my point is
6    that we can -- as an engineer, we can actually design
7    materials that respond to this foreign-body reaction, to
8    accomplish healing. That's the work that I'm doing now.
9    Q. I want to make sure I've heard you correctly, going back
10   to whether or not the process ever stops. Is there any time
11   that the reactive oxidative species will stop attacking the
12   mesh?
13        MR. THOMAS: Asked and answered, Your Honor.
14        THE COURT: Sustained.
15   BY MR. WALLACE:
16   Q. Does polypropylene degrade inside the human body?
17   A. Yes, it does.
18   Q. Can you explain that to the jury?
19   A. It's the same process of attachment of inflammatory cells
20   that then secrete reactive oxygen, the polypropylene reacts
21   with that oxygen, and the composition changes.
22   Q. When you use the word "embrittlement," what do you mean?
23   A. So, "embrittlement" is a technical term that refers to
24   the transition from a plastic that starts off being very
25   compliant or stretchy, you can pull on it like a rubber band,

Page 115

1    and it becomes more brittle, so it's -- then it's like a hard,
2    rigid plastic. It's hard, it's rigid, it cracks. That's what
3    we mean by "embrittlement."
4    Q. Do you have an opinion on whether polypropylene becomes
5    embrittled inside the human body?
6    A. Yes. So, the consequence of this response to the
7    foreign-body reaction is embrittlement. That's one
8    consequence, that's one response.
9    Q. Do you have an opinion on whether polypropylene suffers
10   from a loss of flexibility inside the human body as a result
11   of embrittlement?
12   A. Yes. So, loss of flexibility would happen when it
13   becomes brittle. It's no longer compliant or stretchable.
14   Q. We talked earlier about antioxidants.
15        MR. WALLACE: Can we go to the next slide?
16        MR. THOMAS: Yes.
17   BY MR. WALLACE:
18   Q. Can you explain to the jury the reason for this slide?
19   A. So, as I mentioned before, because of the susceptibility
20   of reactivity of polypropylene with oxygen, we have to add
21   antioxidants. And these are typically packaged as primary and
22   secondary antioxidants, and this technology, again, was worked
23   out largely in the 1960s.
24        So, what do I mean by "primary" and "secondary"? Well,
25   a primary antioxidant is one that is intended to protect it

Page 116

1    while it's being processed at high temperatures. So you have
2    a pellet, and you want to make something useful out of the
3    pellet. You have to heat it up and remold it. This requires
4    high temperatures, and so these antioxidants are designed to
5    protect while it's being processed at high temperatures, and
6    some of them are expended, at this time. They're consumed,
7    they're used up.
8         Now, a secondary oxidant essentially enhances the
9    primary one. It's intended to improve long-term storage.
10   It's intended to protect against ultraviolet light. So
11   different antioxidants do different things and they're used in
12   combinations that have an overall good effect to stabilize it.
13   Q. Why is that important to you, as an expert in biomedical
14   and chemical engineering in this case?
15   A. Well, the question that I would have is these
16   antioxidants are designed to protect during processing and
17   during long-term use, exposure for several years to summers in
18   Tennessee, for example, but they're not optimized to protect
19   polypropylene against this reactive oxygen in vivo.
20   Q. Dr. Guelcher, can I interrupt you there?
21   A. Yes.
22   Q. What do you mean by that?
23   A. Well, they are not designed or they not intended to
24   protect polypropylene against this reactive oxygen, against
25   this foreign-body reaction.

Page 117

1    Q. What do you mean by "intended"?
2         MR. THOMAS: Objection, Your Honor, testifying to the
3    state of mind of Ethicon.
4         MR. WALLACE: I'm not talking about Ethicon, Your
5    Honor. I'm asking --
6         THE COURT: Overruled. Go ahead.
7         THE WITNESS: So the purpose of the antioxidant is to
8    protect against processing at thermal -- sorry -- processing
9    at higher temperatures, long-term exposure to atmospheric
10   oxygen that we breathe. Its purpose is not to protect against
11   reactive oxygen in vivo. It's not possible because the
12   reactive oxygen, foreign-body reaction, wasn't discovered
13   until 1990.
14        So these antioxidant packages, when they were
15   created, they simply didn't know about the foreign-body
16   reaction, so this wasn't taken into account when they were
17   designed.
18   BY MR. WALLACE:
19   Q. Do you know whether or not -- well, why is that important
20   to the TVT-O device?
21   A. Well, because it's -- it's not guaranteed that these
22   antioxidants are going to protect against the reactive oxygen
23   in the body. It's not been studied. It wasn't looked at. It
24   wasn't taken into account when these devices were designed.
25   Q. Do you know whether or not the Prolene mesh that is the

1  TVT-O mesh, do you know whether or not that has an antioxidant
2  package added to it?
3  A.  So, Prolene has this package of secondary anti--
4  primary and secondary antioxidants.  It has a primary
5  antioxidant, this is what's referred to as a hindered phenolic
6  compound.  What that means is it reacts with free radicals,
7  and it doesn't evaporate when you heat it to high
8  temperatures, it stays in the material, it doesn't evaporate
9  into the air.
10      It also has a secondary antioxidant which is a typical
11  one that's used.  This is a thioester and, again, this is
12  intended to improve long-term storage at atmospheric
13  conditions, not in the body, but atmospheric conditions.
14  Q.  Do you have an opinion on whether the antioxidant package
15  that is added to the Prolene mesh that is the TVT-O stops
16  degradation?
17      MR. THOMAS:  Objection, Your Honor.  Sidebar, please.
18      THE COURT:  Hold just one second.
19      All right.  Let's see you at sidebar.
20      (The following occurred at sidebar.)
21      MR. THOMAS:  Your Honor, Ethicon objects to the
22  question as phrased because not only is it an opinion that is
23  not expressed in the four, now five, which he's been permitted
24  to testify, but he has not done any testing and analysis with
25  respect to Prolene specifically to give an opinion about the

1  extent to which the antioxidants in Prolene would deplete over
2  time and lead to degradation.
3      MR. WALLACE:  Your Honor, if I were to respond, I
4  would say it would be comprised within Opinion 1, and
5  Mr. Guelcher, as I understand it, has been extensively
6  questioned by Mr. Thomas on the antioxidant issue here in
7  connection with his opinion about 1.
8      THE COURT:  Excuse me.
9      (Pause.)
10      THE COURT:  It is not listed precisely, but it was
11  explained by you and included in the opinion.  There was an
12  extensive explanation about the evidence.  What's your point?
13  I'm sorry.
14      MR. THOMAS:  I'm trying to understand the ruling.
15  The witness has not done any testing to determine the extent
16  to which the antioxidants may deplete over time.
17      THE COURT:  He has not and he is not --
18      MR. THOMAS:  (Indicating.)
19      THE COURT:  Don't shush me.
20      MR. THOMAS:  I'm sorry.  That's a mannerism, not a
21  shush.  I apologize.
22      THE COURT:  He has not.  I didn't understand the
23  question to be, had he done testing.  Was that the question?
24      MR. THOMAS:  That's the objection, to him giving that
25  opinion as phrased because there is no basis in science or no

1  testing to say, to a reasonable degree of certainty, that the
2  Prolene, polypropylene mesh, leaches antioxidants or depletes
3  antioxidants over time so it would degrade.
4      THE COURT:  I'm going to allow him to testify and be
5  subject to cross-examination.
6      MR. WALLACE:  Thank you, Judge.
7      (Sidebar concluded.)
8  BY MR. WALLACE:
9  Q.  Dr. Guelcher, with the indulgence of counsel, I just want
10  to go back and reorient us to where we were.  We were talking
11  about the polypropylene antioxidants that are added during the
12  manufacturing process to the Prolene mesh.  Is that correct?
13  A.  That's right.
14  Q.  Okay.  And, just to get us back to where we were, you
15  said that, if I'm correct, you had an opinion on whether or
16  not those antioxidants that are added to the Prolene mesh
17  stopped the mesh from degrading.  Is that right?
18  A.  Yes.
19  Q.  Okay.  Can you explain why it is, why is it your opinion
20  that the antioxidant package that's added to the Prolene mesh,
21  that is ultimately made into the TVT-O, does not stop
22  degradation?
23  A.  Well, I've seen evidence that Prolene sutures undergo
24  this reaction with oxygen and showed evidence of surface
25  cracking.  Based on that evidence that I've seen, I don't

1  believe these antioxidant packages stabilize polypropylene
2  against ROS in vivo, in the body.
3  Q.  And what specifically -- what evidence are you
4  specifically referring to?
5  A.  There were -- there are two studies that I've reviewed.
6  One was a study in dogs where these sutures were followed up
7  to seven years, and the other is studies of sutures that were
8  explanted from human patients for up to eight years.  That's
9  the evidence.
10      MR. WALLACE:  2026, Dave.
11      MR. THOMAS:  Do you have a copy for me?
12      MR. WALLACE:  I'm sorry.
13      MR. THOMAS:  Thank you.
14      MR. WALLACE:  Your Honor, I was able to talk to
15  Mr. Thomas during the break about the four documents we'll be
16  referencing.
17      THE COURT:  Yes.
18  BY MR. WALLACE:
19  Q.  So, Dr. Guelcher, you've -- do you have Exhibit 2026 in
20  front of you?
21  A.  Yes.
22  Q.  Okay.
23      MR. WALLACE:  Dave -- I'm sorry, counsel, do you have
24  it?
25      MR. THOMAS:  I do, thank you.

Page 122

1     MR. WALLACE:  Okay.
2  BY MR. WALLACE:
3     Q.  Is this one of the studies that you're referring to?
4     A.  Yes.
5     MR. WALLACE:  Your Honor, may I publish it on the
6  screen?
7     THE COURT:  Do you want to move its admission?
8     MR. WALLACE:  Well --
9     MR. THOMAS:  I have no objection, Your Honor.
10    THE COURT:  It may be received.
11    MR. WALLACE:  Thank you, Your Honor.
12 (PLAINTIFFS' EXHIBIT P-2026 WAS RECEIVED IN EVIDENCE.)
13    THE COURT:  Make sure that the paper copy is provided
14 to the Courtroom Deputy -- after.  You don't have to do it
15 this minute.  But just be sure.
16    MR. WALLACE:  Thank you.
17 BY MR. WALLACE:
18    Q.  And what is in front of you, Dr. Guelcher?
19    A.  So, this is a document explaining the analysis of Prolene
20 sutures that were explanted from humans.
21    Q.  And if you look at the top of the left-hand page, where
22 it says, "IR microscopy of explanted Prolene."  Do you see
23 that?
24    A.  Yes.
25    Q.  In your review of this study, what does that mean to you?

Page 123

1     A.  So, IR is infrared, spectroscopy, and infrared
2  spectroscopy is useful for identifying specific chemical bonds
3  in the material, so it tells us what bonds are there.  And
4  this a spectroscopy technique that's used to assess that.
5     Q.  And do you know whether or not this is an Ethicon study?
6     A.  Yes, it has Ethicon letterhead on it, so this was --
7     Q.  And do you -- do you know the date that this document was
8  published?
9     A.  So it's September 30th, 1987.
10    MR. WALLACE:  Can you pull that up and also the
11 "Samples" paragraph at the top?
12 BY MR. WALLACE:
13    Q.  When you said that it was a human -- that it came from a
14 human, if you can look at that language and explain to the
15 jury what they're seeing.
16    A.  So, this is a human vascular graft, that's a blood vessel
17 graft, that was explanted -- that means it was taken out of a
18 human -- by this Professor Guidoin in Quebec, I believe, and
19 examined by IR spectroscopy.
20    Q.  And if you could go to Page 2 and look at the
21 conclusions, please.
22    Tell us, Dr. Guelcher, what you found significant about
23 the conclusions in this Ethicon study.
24    A.  So, the first conclusion states that the amount of DLTDP,
25 that's a secondary antioxidant -- that's the secondary

Page 124

1  antioxidant that's used in Prolene -- is reduced in the
2  explanted sutures.  So no DLTDP is observed in the surface
3  scrapes, so there were cracks on these regions that they
4  scraped.  They didn't see --
5     Q.  Can we stop there for a second --
6     A.  Yes.
7     Q.  -- so we can take it one step at a time, Dr. Guelcher.
8     When you say "DLTDP," are you referring to the
9  antioxidant?
10    A.  Yes, that's the antioxidant.
11    Q.  And can you explain in practical terms what the
12 significance of this conclusion is as it relates to your
13 opinions?
14    A.  Well, the way I interpret this statement is there are
15 cracked regions, so, again, this foreign-body reaction can
16 lead to cracking, embrittlement, because brittle things crack.
17 These cracked regions show no evidence of this stabilizer, so
18 that means that the stabilizer is expended, it was used.  It
19 was used up in this region.  And once it's used up, there's
20 nothing to protect the polypropylene from reacting.  So it
21 tells me that the antioxidant in this cracked region was
22 consumed and that the polypropylene had oxidized.  This is
23 what this tells me.
24    THE COURT:  May I interrupt just a second?  This is
25 1987.  I thought you said they didn't figure this out until

Page 125

1  the '90s.
2     THE WITNESS:  Well, sir, I meant that the
3  foreign-body reaction wasn't discovered until the '90s, but
4  this was an observation that was made independent of that
5  discovery.
6     THE COURT:  What's the difference?
7     THE WITNESS:  Well, so the discovery in 1990 was why
8  this happens.  So there were a number of observations in the
9  '70s and '80s that this was happening.  And it wasn't until
10 the 1990s where it was explained on sort of a cell and
11 molecular level what exactly was happening.  This is an
12 observation.
13    THE COURT:  Proceed.
14    MR. WALLACE:  Thank you, Your Honor.
15 BY MR. WALLACE:
16    Q.  With respect to Conclusion Number 2, what is the
17 significance of Conclusion Number 2 to your opinion of -- on
18 whether or not the antioxidants stop the degradation process?
19    A.  Well, I think Number 2 is consistent with Number 1, in
20 that these cracks cannot be attributed to protein or tissue
21 that's sticking to the material.  It's not material from the
22 body.  It's cracked polypropylene, oxidized polypropylene.  So
23 this is consistent with the notion that the antioxidant was
24 consumed and the polypropylene had reacted.
25    Q.  What -- with respect to the word "protein" in these kinds

Page 126

1  of studies, what are they referring to?
2  A.  Well, protein would be -- it's a component of tissue.  So
3  tissue from the body, this is essentially, in my
4  interpretation, saying that there's no tissue that's stuck to
5  these sutures.  It was successfully cleaned, and what you're
6  looking at is the polypropylene.  You're not looking at tissue
7  that's stuck.
8  Q.  Thank you.
9      Can we just move to 3 then, please.
10     What's the significance of Conclusion Number 3 to your
11  opinion, Dr. Guelcher?
12  A.  So, Statement Number 3 is again saying there are these
13  cracked regions of the suture, where we see cracking, that was
14  scraped off, and that scraped-off material that had cracked,
15  they did an experiment to measure at what temperature does it
16  melt.  So we know that pure polypropylene melts at a certain
17  temperature, and this material melted at a temperature below
18  that, so that's a change in the melting temperature.  That
19  tells us there's a change in the polypropylene because pure
20  polypropylene melts at a specific temperature just like, you
21  know, ice melts at zero degrees, you know, zero degrees
22  Celsius.  Ice melts at a defined temperature.
23     In the same sense, polypropylene melts at a very
24  defined temperature as determined by the structure, and if
25  that structure changes, the melting temperature will change,

Page 127

1  and that's what was seen here.  So there's a change in the
2  melting temperature that's consistent with this notion that it
3  oxidized and changed.
4  Q.  What effect, if any, does Paragraph Number 4 have on your
5  opinions?
6  A.  Well, I find Paragraph Number 4 to be a subjective
7  statement.  Again, this reaction starts at the surface and
8  works its way down.  And some of the cracks -- I mean, again,
9  it's happening at the surface, and to say that it's only a
10  minor portion of the entire suture, I think that needs to be
11  tested further.
12  Q.  Do you know whether or not there were any images taken of
13  these -- of this polypropylene?
14  A.  From my understanding, there were, yes.
15     THE COURT:  Where did you get that idea?
16     THE WITNESS:  From the report.
17     THE COURT:  All right.
18     THE WITNESS:  Sorry.  I'll be more direct.
19     THE COURT:  I was just trying to see if there was a
20  foundation to be laid here.
21     MR. WALLACE:  Sure.  2026, any objection, Dave?
22     MR. THOMAS:  Yeah, there is.  I need to approach with
23  counsel on this.
24     THE COURT:  Okay.
25     MR. WALLACE:  We'll try to work it out ourselves.

Page 128

1     THE COURT:  All right.  2026, when it's finished --
2  go ahead and bring her 2026 so we won't get behind here.  All
3  of this has been about 2026.
4     MR. WALLACE:  Thank you.
5     THE COURT:  Got it worked out?
6     MR. WALLACE:  I hope so.  I believe so.
7     THE COURT:  All right.
8     MR. THOMAS:  That's my -- I'm sorry.
9     THE COURT:  I'm sorry.
10    MR. THOMAS:  That's my copy, I think you took.
11    (Laughter.)
12    MR. THOMAS:  Got to have a program.
13    THE COURT:  All right, Mr. Wallace.
14  BY MR. WALLACE:
15  Q.  Dr. Guelcher, I made a mistake.  When I spoke about the
16  SEM image, images that you might have seen, I linked them to
17  this human study.  So I'm going to make my question really
18  simple and very clear for the record.
19     Have you seen any Ethicon documents where there are SEM
20  images of Prolene explants?
21  A.  Yes.
22  Q.  Okay.
23    MR. WALLACE:  14461 is the exhibit I'd like to offer,
24  Your Honor, and move it into evidence at the conclusion of the
25  case, absent counsel's position on it.

Page 129

1     MR. THOMAS:  Your Honor, these are just kind of SEM
2  images in the air.  They're not tied to anything.  They're
3  scanning electronic microscopy images that aren't tied to
4  anything, and I don't think there's an adequate foundation for
5  them to be --
6     THE COURT:  This time I have to sustain the
7  objection.
8     MR. WALLACE:  That's fine.  Thank you, Your Honor.
9  BY MR. WALLACE:
10  Q.  You mentioned a dog study.  Can you tell me whether or
11  not you reviewed any Ethicon documents relating to a dog study
12  and whether -- I will just leave it there.
13  A.  Yes, I did.
14  Q.  Okay.  And did you review those documents in connection
15  with reaching your opinions in this case?
16  A.  Yes, I did.
17    MR. WALLACE:  13152 would be the exhibit I'd like to
18  offer, Your Honor, absent an objection.
19    THE COURT:  Is there an objection?
20    MR. THOMAS:  No, Your Honor.
21    THE COURT:  It may be received.
22    MR. WALLACE:  Thank you, Your Honor.
23  (PLAINTIFFS' EXHIBIT P-13152 WAS RECEIVED IN EVIDENCE.)
24    THE COURT:  Make sure there's a paper copy provided
25  to the Courtroom Deputy.

Page 130

1      MR. WALLACE:  Can we pull up --
2      THE COURT:  And provide it to the Courtroom Deputy.
3  BY MR. WALLACE:
4  Q.  Can you please -- do you have it in front of you,
5  Dr. Guelcher?
6  A.  Yes.
7  Q.  Can you tell the jury what the document you have in front
8  of you is and the document that they have on the screen in
9  front of them?
10  A.  So this is titled "Seven-Year Data for a Ten-Year Prolene
11  Study."
12  Q.  And what is the date of that?
13  A.  October 15th, 1992.
14  Q.  And, in reviewing this document in connection with the
15  work that did you in this case, what conclusions did you draw?
16  A.  Well, this document, again, showed evidence that the
17  polypropylene was changing and cracking on the surface of the
18  suture, that the Prolene suture was changing with time and
19  cracking.
20  Q.  In the interest of time, Dr. Guelcher, I want you to look
21  at the conclusions that are found on the second page in the
22  middle of the document.
23  A.  Yes.
24  Q.  And I'm just going to take those, again, one at a time.
25      Can you -- and you have reviewed the entirety of this

Page 131

1  document?
2  A.  Yes.  It's very long.  Yes.
3  Q.  Can you tell me what impact that first bullet point
4  that's the conclusion there had on your opinions in this case?
5  A.  The seven-year in vivo results generally substantiated
6  the five-year findings.  They closely correspond to the
7  observations of the explanted sutures of the dog that died
8  prematurely, and these findings were that the Prolene was
9  cracking with time and that was increasing with time.
10  Q.  I'd like just -- just to take a step back and give the
11  jury a little bit of context for this study.  What do you
12  understand the study, this study to be about and how long it
13  went?
14  A.  So, from my reading of the document, this study was
15  designed to be a ten-year study in dogs, to understand the
16  stability of the Prolene suture.  So what happens -- how does
17  the Prolene suture change over time, and it's implanted in a
18  dog because this is -- we can do this in animals.  You can't
19  do these type of experiments in humans, and the dog is a good
20  model, it's a large animal model.  And so we can use these
21  data to tell us something about how Prolene sutures would
22  respond and how stable they are, how they'll react in a human.
23      And, again, it was designed to be a ten-year study.
24  One of the dogs died prematurely, not related to the suture,
25  at six years and ten-and-a-half months, and so they sacrificed

Page 132

1  all the dogs at seven years so they could get the data.
2  That's my understanding.
3  Q.  And let's move on to the second bullet point.  Tell me
4  what, if anything, this second conclusion -- what impact, if
5  any, it had on your opinions.
6  A.  So the second conclusion states that degradation in
7  Prolene is still increasing, and PVDF, which is another
8  material that is less susceptible, so it's less reactive with
9  oxygen, PVDF was more stable, in terms of cracking.  So my --
10  what I learned from this was that, with the increased time,
11  the degradation of Prolene is continuing.  This is consistent
12  with the idea that the foreign-body reaction doesn't stop.  It
13  just keeps going until the material is removed.
14  Q.  Can you move on to the third conclusion and tell the
15  jury, what, if any, impact that had on your opinions in this
16  case?
17  A.  Well, this is, again, noting that this reaction starts at
18  the surface, so the eight explanted Ethilon sutures all showed
19  heavy cracking, in many cases abrasion of the dyed outer
20  layer.  A decrease in the suture diameter was apparent in
21  several cases.  So Ethilon is a different type of material.
22  It was also degrading.  And they noticed a decrease in the
23  diameter of the suture which, again, is consistent with the
24  idea that it starts at the surface and works its way in, until
25  you're gradually losing material until it works its way to the

Page 133

1  middle of the suture.
2  Q.  Just a point of clarification, Dr. Guelcher.  Are --
3  PVDF, that's not Prolene, is it?
4  A.  No, that's a different material.  That's polyvinylidene
5  fluoride.  That's chemically different from polypropylene.
6  Q.  Thank you.
7      Let's just move right on to the fourth bullet point.
8  And tell the jury what impact, if any, that had on your
9  opinions in this case.
10  A.  Well, in this other type of material, they did not find
11  any cracks.  There were some scratches.  What this tells me,
12  that these four materials that they implanted were all
13  degrading at different rates.  Some of them were more affected
14  by the reactive oxygen than others.
15  Q.  Is Novafil polypropylene?
16  A.  No.
17  Q.  How -- how have the human Prolene suture study and this
18  dog study, how have they impacted your opinions on mesh, if at
19  all?
20  A.  So, both the human explants that were explanted from
21  humans out to eight years and the seven-year dog study both
22  show that the polypropylene, the Prolene polypropylene, reacts
23  with the oxygen that's secreted by these inflammatory cells
24  and it changes the structure over time.  So, as we progress
25  from one to five, seven, eight years, these changes get more

Page 134

1  severe, we see more cracking, more oxidation, more changes in
2  the properties of the polypropylene.
3      This is basically happening because of this
4  foreign-body reaction. And, in my opinion, these changes,
5  because the mesh is also made from propylene, this reaction
6  with oxygen, these changes in the surface will also occur with
7  the mesh because it's made from the same base material,
8  propylene.
9  Q. So, I'll try to ask it this way, Dr. Guelcher. Does the
10 fact that this is a Prolene suture affect at all your opinion
11 on what you referred to as the more-mesh opinion?
12 A. So, I think it's very important to remember that a suture
13 implanted under the skin or in a blood vessel is very
14 different than mesh implanted in the pelvic floor. Mesh has a
15 lot more polypropylene, a lot more Prolene, a lot more
16 surface, that can react with this oxygen.
17     So, I think what we can learn from the suture study is
18 that the Prolene is unstable and it reacts in the body.
19 Whether in this -- in my view, would lead to more studies
20 with the mesh actually in the anatomic location where I want
21 to use it, in the pelvic floor.
22     How does this oxidation affect the mesh in the pelvic
23 floor? This is, to me, an important unanswered question. But
24 what these studies point to is that Prolene does change over
25 time. That's my conclusion.

Page 135

1  Q. Well, since we're talking about Ethicon documents, beyond
2  the documents that the jury has seen and that have been
3  offered into evidence, did you review any other Ethicon
4  documents?
5  A. I reviewed a number of other Ethicon documents. These
6  are the two that struck me as the most -- in forming my
7  opinions.
8  Q. And in reviewing those Ethicon documents, did you see any
9  other studies like these that were actually done on the TVT-O
10 mesh or mesh of any kind?
11 A. There are a number of other studies looking at mesh,
12 complications of mesh, and what happens to mesh when it's
13 implanted in the body.
14 Q. Well, my question is more specific than that,
15 Dr. Guelcher.
16     My question is, specifically, in all of the internal
17 company documents that you reviewed, did you see whether or
18 not Ethicon ever did any sort of explant studies on their
19 mesh?
20 A. I haven't seen those documents, no.
21 Q. Is that at all important to you as a biomedical engineer
22 and how it might impact your opinions in this case?
23     MR. THOMAS: Objection, Your Honor.
24     THE COURT: Sustained.
25 BY MR. WALLACE:

Page 136

1  Q. Now, when you looked at these Ethicon documents, who
2  provided those to you?
3      MR. THOMAS: I'm going to object to the generic
4  description of documents. I really don't know what he's
5  talking about. I don't think the witness does either.
6      THE COURT: Sustained. The documents that have been
7  admitted into evidence, you may inquire about certainly.
8      MR. WALLACE: Thank you.
9      THE COURT: I'm not trying to limit you. I'm just
10 trying to hurry it.
11     MR. WALLACE: Okay. Sure. Then why don't I move on.
12 BY MR. WALLACE:
13 Q. Did you -- in connection with the work that you've done
14 on polypropylene, have you reviewed any literature?
15 A. Yes. There is a number of published papers on these
16 meshes and how they respond.
17 Q. In connection -- are you familiar with Drs. Costello and
18 Clavé?
19 A. Yes.
20 Q. Have you reviewed their work?
21 A. Yes, I have.
22 Q. Can you tell the jury -- can we go to the --
23     MR. THOMAS: Before you publish anything, may I have
24 a copy of whatever you're going to publish?
25     MR. WALLACE: It's in the PowerPoint.

Page 137

1      MR. THOMAS: Well, it's quotes from the study. I
2  object to this, isolated quotes from the study, Your Honor, as
3  opposed to the full study.
4      THE COURT: Do you have a copy of the full study that
5  you can provide counsel? If that's what you plan to
6  introduce.
7      MR. WALLACE: It's just the articles. They're marked
8  as exhibits. I'll give you the exhibit numbers, David. I
9  believe you have a copy in front of you.
10     THE COURT: Why don't you two get together.
11     MR. WALLACE: Sure.
12     THE COURT: Maybe over that way a little bit.
13     (Discussion held off the record between Mr. Wallace
14 and Mr. Thomas.)
15     MR. WALLACE: Your Honor, may I proceed?
16     THE COURT: You may.
17     MR. WALLACE: And, Mr. Thomas, you have the article.
18 BY MR. WALLACE:
19 Q. In connection with your work, did you perform a
20 literature search?
21 A. Yes, I did. I searched a number of papers on this.
22 Q. And in connection with your work, did you come across any
23 articles that dealt with polypropylene degradation in
24 explants?
25 A. Yes, I did.

Page 138

1    Q.   And what articles were those?
2    A.   Well, I've selected three that I believe make the point,
3    by Clavé, et al., and published in 2009; by Costello, et al.,
4    published in 2007; and by Wood, et al., published in 2013.
5    Q.   And, for the record, the Clavé article is Exhibit 21457.
6    A.   Yes, that's right.
7         MR. WALLACE:  And absent an objection, I'd like to be
8    able to publish it to the jury.
9         THE COURT:  21 -- the number is?
10        MR. WALLACE:  21457.
11        THE COURT:  21457 may be admitted when presented to
12   the Courtroom Deputy.
13   (PLAINTIFFS' EXHIBIT P-21457 WAS RECEIVED IN EVIDENCE.)
14        MR. WALLACE:  Thank you.
15        Your Honor, as a learned treatise, we'd -- it's my
16   understanding we would not be ultimately providing that to the
17   jury.
18        THE COURT:  All right.
19        THE DEPUTY CLERK:  It does not go to the jury?
20        THE COURT:  That's correct.
21        MR. WALLACE:  Correct.  But we would like to publish.
22        MR. THOMAS:  Yes.
23        MR. WALLACE:  Thank you.
24   BY MR. WALLACE:
25   Q.   So let's keep moving on, Dr. Guelcher.  The article is in

Page 139

1    front of the jury, at least the first page is.  Can you tell
2    us why you found that article significant?
3    A.   So, this article was interesting because the authors
4    looked at a hundred explants, a hundred meshes removed from
5    human patients, and tried to understand what was happening in
6    terms of the response these materials had on the body.
7    Q.   Could you turn to what would be the fourth page, second
8    column on the right, beginning with the word "analysis"?  Do
9    you see that?
10   A.   Yes.
11   Q.   Okay.  Do you recall what sort of analysis was done by
12   the authors that conducted this study?
13   A.   Well, they did scanning electron microscopy, or SEM,
14   which is a way for looking at the surface of the material.
15   They did this infrared spectroscopy, which is a way of looking
16   at the chemical groups, chemical bonds on the surface.
17   Q.   What does it mean when it says "uneven way"?
18   A.   Well, "uneven way" would mean that it's -- it's maybe
19   random, it's associated with manufacturing, not other types of
20   responses.
21   Q.   If you could turn to Page 267, please, and look at the
22   area -- the jury has it highlighted in front of them --
23   talking about the chronic inflammatory reaction.  Can you tell
24   us --
25   A.   Yes.

Page 140

1    Q.   -- whether or not this is at all consistent with your
2    opinions in this case?
3    A.   So, this first paragraph explains the chronic
4    inflammatory reaction, in a way that I was explaining as a
5    foreign-body reaction.  So this is free radical synthesis as
6    peroxide, superoxide and hypochlorite.  These are all reactive
7    oxygen.  They're forms of oxygen that are much more reactive
8    than oxygen that's in the air you breathe.  So this would be
9    what I was referring to as reactive oxygen species.
10        And then the next sentence says, "Once in contact with
11   the polypropylene implant, these radical species could infer
12   oxidation of the carbon-hydrogen bonds."  This is what I was
13   explaining earlier.  These radical species or reactive oxygen
14   species that are secreted by inflammatory cells, that oxidize
15   that carbon-hydrogen bond.  That is what I was explaining
16   earlier.
17   Q.   Do you know -- I'm sorry.  Did I interrupt you?
18   A.   No.  I'm done.
19   Q.   Do you know where these 100 explants came from, what part
20   of the body?
21   A.   I believe these were pelvic mesh explants, vaginal mesh.
22   Q.   Is there anything else that -- in connection with this
23   study, that -- well, let's just move on to the next article.
24   Why don't we do that.
25        The Costello article which is 21468, do we have that?

Page 141

1         THE COURT:  Another learned treatise?
2         MR. WALLACE:  Yes, Your Honor.
3         THE COURT:  All right.
4    (PLAINTIFFS' EXHIBIT P-21468 WAS RECEIVED IN EVIDENCE.)
5    BY MR. WALLACE:
6    Q.   Why did you select this article, Dr. Guelcher?
7    A.   Well, this was another article, this is from hernia mesh,
8    but it also explains very clearly how the body can react to
9    implanted polypropylene mesh.
10   Q.   What else, if anything, did you find significant about
11   this article?
12   A.   Well, this article found evidence of surface cracking,
13   just like we saw in the Ethicon studies.  There was surface
14   cracking, there was also surface degradation of the material,
15   by spectroscopy, and there was also a change in the
16   molecular weight of the polypropylene that was explanted from
17   these --
18        THE COURT REPORTER:  I'm sorry.  The what.
19        THE WITNESS:  The molecular weight -- not the
20   molecular weight.  I'm sorry.  I spoke incorrectly.
21        The melting temperatures changing in these, as well.
22        And so these meshes are showing changes in response
23   to this foreign-body reaction, just like we've seen
24   previously.
25   BY MR. WALLACE:

Page 142

1      Q.  If you look at the second page of the article reporting
2  on this study, beginning with the paragraph that says, "As a
3  result of this chronic inflammatory response" --
4      A.  Yes.
5      Q.  -- "the mesh material is exposed to a continuous bath of
6  oxidants."
7      A.  Yes.
8      Q.  Do you see that paragraph?
9      A.  Yes.
10     Q.  Can you tell the jury the significance of this paragraph
11  to your opinions in this case?
12     A.  So this paragraph supports my opinions that this chronic
13  inflammatory response, this is a foreign-body reaction.  The
14  mesh material is exposed to a continuous bath of oxidants.
15  Again, these oxidants are reactive oxygen species, more
16  reactive than molecular oxygen, and the mesh is continuously
17  exposed to these materials because the cells are adherent and
18  they secrete these reactive oxygen, and this reaction
19  continues as long as the mesh is there.  So these statements
20  are supporting the opinions I --
21     Q.  This study talks about both chemical degradation and
22  physical degradation.  What is -- what does that mean in
23  connection -- as it relates to your opinions?
24     A.  Well, chemical degradation would be these changes in the
25  chemical structure of the polypropylene and this degrading,

Page 143

1  and, again, these chemical changes can lead to physical
2  changes such as embrittlement and cracking, which is what was
3  observed in this study is these chemical changes lead to
4  physical changes such as cracking in the material.
5      Q.  Let's keep moving, Dr. Guelcher.  And you mentioned the
6  Wood article.
7          MR. WALLACE:  Counsel, that would be 21925.  Again,
8  another learned treatise, Your Honor.
9          THE COURT:  All right.
10  (PLAINTIFFS' EXHIBIT P-21925 WAS RECEIVED IN EVIDENCE.)
11  BY MR. WALLACE:
12     Q.  And, Dr. Guelcher, have you reviewed this study in
13  connection with your work?
14     A.  Yes, I have.
15     Q.  And do you know when it was published?
16     A.  This study was published just last year, 2013.
17     Q.  And what is the significance of this study to you in
18  connection with your opinions in this case?
19     A.  So, what I found interesting about this study is these
20  were three different types of materials that were removed from
21  the same patient, so it gives us a reference for how three
22  different types of materials respond to the foreign-body
23  reaction in the same patient.  So it takes out of
24  consideration the patient-to-patient changes.
25     Q.  Do these studies that you've looked at in these three

Page 144

1  articles confirm your opinion on degradation?
2      A.  Yes, they do.  Again, this study saw evidence of changes
3  in the polypropylene, cracking, changes in the physical
4  properties of the polypropylene over time.
5      Q.  Are these the only three studies that exist in the
6  literature on these issues, Dr. Guelcher?
7      A.  No.  There are other studies that have shown this as
8  well, that polypropylene responds to this foreign-body
9  reaction and changes, its chemical properties change and its
10  mechanical structural properties change.
11     Q.  You talked about the less-mesh concept in the summary of
12  your opinions.  I'd like us to move to Slide 17, please.
13          MR. WALLACE:  If that's -- before we go there, let's
14  make sure there is no objection.
15          MR. THOMAS:  I just have one of the studies
16  referenced on the slide.  Are you going to introduce both
17  studies on the slide?
18          MR. WALLACE:  We're just going to talk about them.  I
19  won't introduce them.
20          MR. THOMAS:  I object to the reference to the slide
21  if they're not going to be part of the record in the case.
22          THE COURT:  Just ask the question.
23          MR. WALLACE:  Fair enough.
24  BY MR. WALLACE:
25     Q.  Have you reviewed the Cobb study regarding lightweight

Page 145

1  mesh in hernia repair?
2      A.  Yes, I have.
3      Q.  And have you reviewed that in connection with the
4  opinions that you'd offered on the less-mesh concept?
5      A.  Yes.
6      Q.  Okay.  And what, if anything, does the Cobb paper -- or
7  how does the Cobb paper inform your opinions in this case?
8      A.  So, the argument in the Cobb paper is that less mesh is
9  better.  And this relates back to my opinions in that if the
10  polypropylene is causing the surface reaction and the
11  polypropylene is responding to that foreign-body reaction and
12  changing, the more polypropylene surface that's present, the
13  greater those changes would be, the more hazardous they could
14  be, and so because of this reaction, the polypropylene in
15  response to the body, it's best to minimize the amount of
16  polypropylene that's present in the mesh.  This is the
17  argument that Cobb, et al., are making and is consistent with
18  my opinions.
19     Q.  Have you reviewed the work of Dr. Klinge and
20  Klosterhalfen in the foreign-body reaction to mesh's paper?
21     A.  Yes, I have.
22     Q.  And did that --
23          MR. THOMAS:  Your Honor --
24          THE COURT:  Yes.
25          MR. THOMAS:  That's not sufficiently identified.

Page 146

1    There are dozens, as the Court's well aware, of papers between
2    Klinge and Klosterhalfen on different issues.
3            THE COURT:  All right.  If you would identify which
4    studies or papers you're talking about.
5            It's time for our afternoon break, I think, if you're
6    going to be going for a little bit longer.
7            MR. WALLACE:  Actually, no, Your Honor.
8            THE COURT:  Oh, really?
9            MR. WALLACE:  I will be done -- if we take a break, I
10   can probably get organized and get done relatively quickly.
11           THE COURT:  All right.  Ladies and gentlemen, we'll
12   take our afternoon break.  I'll call you back in 15 minutes.
13           Don't discuss the case among yourselves.  Prevent
14   anyone from discussing it with you or in your presence.  I
15   will call you back shortly.  Don't use any social media.
16   COURT SERVICES OFFICER:  All rise.
17           (The jury left the courtroom at 2:30 p.m.)
18           (The jury entered the courtroom at 2:47 p.m.)
19           THE COURT:  You may resume the stand.
20           Mr. Wallace.
21           MR. WALLACE:  Thank you.  Dr. Guelcher, we're going
22   to proceed.
23   BY MR. WALLACE:
24   Q.  I want to go back really briefly just to try to finish up
25   to 21925, and that is the Wood article, and the section on

Page 147

1    polypropylene on page 1120.
2    A.  Yes.
3    Q.  And I'm going to ask you to look at the words beginning
4    with "unfortunately".  And I'll read it for you, Dr. Guelcher.
5    "Unfortunately, polypropylene will degrade in an oxidizing
6    environment such as the environment during a foreign body
7    response.  Because of this, polypropylene has been shown to
8    oxidize in vivo.  Oxidization of polypropylene results in
9    surface cracking and cracking, changes in mechanical strength
10   and increased brittleness."
11           Did I read that correctly.
12   A.  Yes.
13   Q.  And what impact, if any, did this Wood article and what I
14   just read have on your opinions in this case?
15   A.  So this Wood article, again, is consistent with my
16   opinion that this oxidizing environment, this is the space
17   between the cell, the cell and the material where we have all
18   this reactive oxygen, that's an oxidizing environment.  It
19   says, "such as the environment during a foreign body
20   response."  That's the environment I was speaking about.  And
21   polypropylene oxidizes in vivo which can cause these changes
22   in chemical composition and also mechanical properties such as
23   brittleness and cracking.
24   Q.  Did you address mechanical failure in your report in this
25   case?

Page 148

1    A.  I did.  I mentioned that these types of chemical changes
2    can result in mechanical failure of the devices as was
3    observed with the pacemaker lead problem.
4    Q.  You gave the jury a few dates about, for example, when
5    foreign body reaction was known and when degradation outside
6    the body was known.  Do you know, in connection with reviewing
7    these articles and the work that you've done in the case, when
8    the first study was done to evaluate vaginal mesh implants and
9    the concepts of degradation?
10   A.  Well, the Clavé paper that we were discussing earlier,
11   this Clavé paper was published in 2005, so in 2005 they noted
12   that --
13   Q.  Let's make sure we're looking at the right document.  I'm
14   looking at 21457 which was actually a 2010 publication.
15   A.  Yes.  Oh, I got the date mixed up.  I'm sorry.
16           21457 is this Clavé study, I was looking at the date
17   wrong.
18   Q.  And are you looking at the conclusion section?
19   A.  I'm looking at the conclusions where they state this is
20   the first study to evaluate synthetic implants used in the
21   vaginal approach.
22   Q.  And have you seen any evidence in the work that you've
23   done in this case or any of the work that you've done with
24   respect to polypropylene that Ethicon has done such research?
25   A.  I've not seen any research from Ethicon in this area, and

Page 149

1    again after seeing the degradation of the sutures, as an
2    engineer I would want to know how the Prolene responds to this
3    oxidated environment in the pelvic floor and the mesh, quite
4    different than a suture, but to my knowledge that study has
5    not been done.
6    Q.  In connection with your work, did you have to determine
7    whether or not polypropylene was inert?
8    A.  Yes, I did.
9    Q.  And what did you find?
10   A.  Well, based on the testimony that I provided earlier, I
11   do not believe polypropylene is inert.  It is oxidatively
12   unstable, it reacts with oxygen, and its chemical composition
13   changes, so I would not call this an inert material because of
14   its reactivity with oxygen.
15   Q.  Are there any limitations on the use of polypropylene in
16   the pelvis for a permanent implant as it relates to your
17   opinions in this case?
18           MR. THOMAS:  Objection, Your Honor.
19           THE COURT:  Let me see you at sidebar.
20           (The following occurred at sidebar.)
21           THE COURT:  Mr. Thomas.
22           MR. THOMAS:  Yes, Your Honor.  That's an opinion that
23   goes directly to the use of mesh in the pelvic floor which is
24   beyond the scope of his expert report.
25           MR. WALLACE:  Your Honor, I would just say that I

## Page 150

1    could probably word the question differently and I would go
2    back and just say with respect to his qualifications as a
3    biomedical engineer who's offered his opinions on the case,
4    whether or not as a biomedical engineer there are any
5    limitations with respect to the use of polypropylene inside
6    the pelvis as a biomedical engineer, not a clinical.
7        THE COURT:  I'm not sure you still would have
8    established an adequate foundation even if you asked that, but
9    if you want to try to establish a foundation, I'll let you,
10   but that alone I would sustain the objection.
11       MR. WALLACE:  Okay.  If I could ask, and when you
12   speak of foundation, Your Honor --
13       THE COURT:  Well, that is to say as a biomedical
14   engineer, are you familiar with and have you studied chemical
15   composition of the tissues and so forth, and do you have
16   medical training?
17       MR. WALLACE:  Okay.  And I'll clarify just so with
18   respect to other witnesses, Your Honor, I will be clarifying
19   that he's not a medical doctor, not offering a clinical
20   opinion.
21       THE COURT:  Yes.  Great.  Thank you.
22       MR. WALLACE:  Thank you.
23       (Sidebar concluded.)
24       MR. WALLACE:  Dr. Guelcher, I have just a few more
25   questions.

## Page 151

1    BY MR. WALLACE:
2    Q.  With respect to polypropylene's use inside the body, a
3    very simple question, are you anti-polypropylene when it comes
4    to using polypropylene in other parts of the body?
5    A.  No, I'm not opposed to the idea of using polypropylene in
6    the body.  One of the important definitions about --
7        MR. THOMAS:  Objection, Your Honor.  I object to the
8    narrative.  He answered the question.
9        THE COURT:  I'll sustain it.  He gave a direct answer
10   to the question, so I'll sustain it.
11       MR. WALLACE:  Yes, Your Honor.
12       If you'll indulge me for one minute, Your Honor.
13       THE COURT:  Certainly.
14       MR. WALLACE:  I have one more thing.
15       (Discussion was held off the record.)
16       MR. THOMAS:  Your Honor, I expect we're going to need
17   to talk about this.
18       THE COURT:  All right.  Excuse us.
19       (The following occurred at sidebar.)
20       THE COURT:  Mr. Thomas.
21       MR. THOMAS:  Mr. Wallace advises the next exhibit he
22   wants to use with this witness is an instructions for use and
23   I can't imagine what this witness brings.  There's nothing
24   about instructions for use in the opinions that he's disclosed
25   in this case.

## Page 152

1        MR. WALLACE:  Do you want me to respond, Your Honor?
2        THE COURT:  Sure.
3        MR. WALLACE:  I understand that he's not a medical
4    doctor.  My question is going to be very simple, whether or
5    not he believes that the statement that polypropylene is not
6    subject to degradation is true or false.  He's not offering a
7    clinical opinion.  I believe he can say as a matter of fact
8    just what he reviewed and we would still be able to, allowed
9    to offer admission of the IFU and those issues.  Would that be
10   acceptable, Your Honor?
11       MR. THOMAS:  He's already given his opinion about
12   polypropylene degradation and I think this is inappropriate
13   for this witness.
14       THE COURT:  I'll overrule the objection.
15       MR. WALLACE:  Your Honor, may I publish the document?
16       THE COURT:  You may.
17       (Sidebar concluded.)
18       MR. WALLACE:  Your Honor, rather than -- I'm sorry, I
19   might have interrupted.
20       THE COURT:  I was going to see if you were going to
21   introduce that.
22       MR. WALLACE:  What I would like to do, so that the
23   next witness can talk about it from a clinical perspective,
24   Your Honor, is that I would use one of my opening slides as
25   just a demonstrative with this witness.

## Page 153

1        THE COURT:  Why don't I just allow you to ask the
2    question again?
3        MR. WALLACE:  Okay.
4    BY MR. WALLACE:
5    Q.  Let me ask it this way:  If the instructions for use that
6    come with this product, the TVT-O product, say that the
7    product does not degrade, is that a true or false statement?
8        MR. THOMAS:  Objection, Your Honor, to the
9    characterization.
10       THE COURT:  Overruled.
11       THE WITNESS:  So what I've spoken about today is the
12   response of the body -- the response of polypropylene to the
13   foreign body reaction.
14       MR. THOMAS:  Objection, Your Honor.
15       THE COURT:  Sustained.  Non-responsive.
16   BY MR. WALLACE:
17   Q.  Can you just answer whether it's true or false?
18   A.  I'm trying to give an explanation.
19       THE COURT:  You can answer it and then give an
20   explanation.
21       THE WITNESS:  Well, last time I tried that I wasn't
22   allowed.
23       THE COURT:  Well, consistency is the hobgoblin of
24   small minds.
25       THE WITNESS:  That's a good one for a professor, I

Page 154

1   think.
2       I don't believe that's true.  I believe that I
3   pointed to evidence today that shows that polypropylene reacts
4   in response to a reactive oxygen secreted by the foreign body,
5   by inflammatory cells, by inflammatory cells the polypropylene
6   degrades, its chemical composition changes, it becomes
7   brittle, cracks, and undergoes other changes, and this could
8   have negative effects on a patient's health when implanted in
9   the pelvic floor.  So I don't believe --
10      THE COURT:  The jury will disregard last part of the
11  witness's answer.
12      MR. WALLACE:  Thank you, Your Honor.
13      Let's go to the summary of opinions slide so we can
14  finish, Dr. Guelcher.
15      THE COURT:  I meant the part about his idea that it
16  could have effect on the patient's health.  You're to
17  disregard that and not consider it.
18      I can't answer your questions.
19      THE DEPUTY CLERK:  They want to be able to see the
20  slide.
21      THE COURT:  Oh, the slide coming up.  Sure.  You're
22  ahead of me.  All right.
23      MR. WALLACE:  Thank you, Judge.
24  BY MR. WALLACE:
25  Q.  With respect to the opinions that you've offered in your

Page 155

1   report and your testimony today and this summary of opinions,
2   have you held each of these opinions to a reasonable degree of
3   biomedical engineering and chemical engineering certainty?
4   A.  Yes, I have.
5       MR. WALLACE:  I have no further questions.
6       THE COURT:  Thank you, Mr. Wallace.
7       Cross examination.
8       MR. THOMAS:  Thank you, Your Honor.
9   CROSS EXAMINATION OF SCOTT GUELCHER, Ph.D., BY MR. THOMAS:
10  Q.  Dr. Guelcher, how are you today?
11  A.  Good.  How are you?
12  Q.  Doctor, you testified on direct that polypropylene is a
13  polymer?
14  A.  Yes.
15  Q.  It was invented in 1950s, correct?
16  A.  Yes.
17  Q.  And when polypropylene was invented, it was very
18  innovative, wasn't it?
19  A.  I mean all materials when they're invented, they're
20  innovative.
21  Q.  Plastics, right?  The age of plastics and that was a
22  plastic, correct?
23  A.  Yes, it is a plastic.
24  Q.  Now, Prolene is the brand name for the polypropylene
25  Ethicon uses in its medical devices, correct?

Page 156

1   A.  Prolene is a brand name, it's essentially polypropylene
2   with antioxidants and lubricants.
3   Q.  And Ethicon first used Prolene in its sutures?
4   A.  That's my understanding.
5   Q.  And sutures are what we in West Virginia call stitches,
6   right?
7   A.  Call them that in Virginia, too, where I grew up.
8   Q.  Down in Blacksburg?
9   A.  Yes, sir.
10  Q.  And so Ethicon Prolene stitches or sutures have been
11  around since the late Sixties?
12  A.  That's my understanding, they've been around since the
13  Sixties.
14  Q.  And what makes Prolene Prolene as opposed to simple
15  polypropylene are the additives that you talked about,
16  correct?
17  A.  Yes.  The brand name Prolene is defined by the additives
18  that are added to the polypropylene.
19  Q.  And those additives are calcium stearate, do you remember
20  that?
21  A.  Calcium stearate is added as a lubricant.
22  Q.  And DLTDP because I can't pronounce the full word.
23  A.  It's a long word.  It's an antioxidant.
24  Q.  Santonox R?
25  A.  Another antioxidant.

Page 157

1   Q.  Procol LA-10?
2   A.  I think that's another surfactant.
3   Q.  And a CPC --
4       THE COURT:  That's another what?  I didn't hear it.
5       THE WITNESS:  I'm sorry.  It's another surfactant or
6   a lubricant.
7       THE COURT:  All right.
8   BY MR. THOMAS:
9   Q.  And then the coloring, the CPC pigment, correct?
10  A.  Yes, sir.
11  Q.  And those additives are what make Prolene different from
12  the other polypropylene medical devices on the market,
13  correct?
14  A.  There are many different grades of polypropylene; Marlex,
15  Prolene, different grades --
16      THE COURT:  Is that a yes or a no?
17      THE WITNESS:  I'm sorry.  Yes.
18      MR. THOMAS:  Thank you.
19  BY MR. THOMAS:
20  Q.  Now, Ethicon Prolene sutures are what is known as
21  non-absorbable sutures, correct?
22  A.  They're marketed as non-absorbable.
23  Q.  Okay.  And what that means is they are supposed to be in
24  the body for life?
25  A.  They're supposed to be without changing, yes.

## Page 158

1  Q.  Do you know where Ethicon gets the polypropylene resin
2  used to make Prolene sutures?
3  A.  My understanding it comes from Sunoco and is compounded
4  in a plant in Kenova on the Kanawha River.
5  Q.  It's made here in West Virginia?
6  A.  Yes, it is.
7  Q.  And it has been since the beginning of the time they made
8  these sutures, correct?
9  A.  My understanding is the plant has changed control, but
10  it's still made in the same plant, it's been bought and sold
11  though.
12  Q.  And you know when Ethicon buys this resin from this plant
13  in Kenova, it actually comes down to Kenova and takes over the
14  plant and makes special runs of the Prolene polypropylene at
15  this plant, correct?
16  A.  I wouldn't agree that they take over the plant.  My
17  understanding is that they work with the personnel in the
18  plant to make sure that Ethicon's concerns are addressed
19  during the campaign.
20  Q.  Do you agree that Ethicon personnel thoroughly clean the
21  mixing and compounding equipment before running our Prolene
22  material, Ethicon's Prolene material?
23  A.  You're reading that from a document.
24    THE COURT:  Would you agree with that or not, or do
25  you know?

## Page 159

1    THE WITNESS:  I don't know the level of detail that
2  -- I know that they're there and that they're working.  This
3  is a common practice, you work with a sole manufacturer to
4  make sure things are done.  I'm speaking on my experience.
5    THE COURT:  Well, Doctor, the important thing here is
6  just listen to the question and try to answer it as asked.  He
7  has asked you a question, whether you know -- would you finish
8  it again there, Mr. Thomas?
9    MR. THOMAS:  Your Honor, with the court's permission,
10  I'm going to try to make it a little easier.  May I approach
11  the witness?
12    THE COURT:  You may.
13  BY MR. THOMAS:
14  Q.  Doctor, I'm going to hand you what's been marked as
15  defendant's exhibit 23600.  It's a document dated January 23,
16  2003.
17  A.  Yes.
18  Q.  And it's titled Prolene resin manufacturing
19  specifications.
20  A.  Yes.
21  Q.  You've seen this document before, haven't you?
22  A.  I have seen this document.
23  Q.  And this 2003 document discusses the Prolene
24  manufacturing process in Kenova, West Virginia, doesn't it?
25  A.  Yes, sir, it does.

## Page 160

1    MR. THOMAS:  And Jamie, would you give me the first
2  page of that, please, so the jury can see it?
3    THE COURT:  Do you want to move its admission?
4    MR. THOMAS:  I do, Your Honor.  Thank you.
5    THE COURT:  Is there objection?
6    MR. WALLACE:  No, Your Honor.
7    THE COURT:  It may be received and displayed.
8    (DEFENDANTS' EXHIBIT 23600 WAS RECEIVED IN EVIDENCE.)
9    MR. THOMAS:  Let's go to the first paragraph, Jamie.
10  BY MR. THOMAS:
11  Q.  Do you recall from reading this document, Mr. Guelcher,
12  that back in the Sixties Ethicon went to a company in New York
13  to try to figure out what kind of polypropylene they were
14  going to use in their Prolene sutures, correct?
15  A.  That's what it says here.
16  Q.  Okay.  And they obtained numerous different fiber samples
17  and tested those samples before they chose the one they wanted
18  to use, correct?
19  A.  Yes.  It doesn't say how, but it says that.
20  Q.  Okay.  And down in the second paragraph it says that
21  Ethicon personnel could go into the plant to insure that the
22  resin was made under proper conditions of cleanliness,
23  etcetera, and to verify that the formulations were as stated
24  on the run sheets.  You knew that, didn't you?
25  A.  I'm sorry.  What page are you on?

## Page 161

1  Q.  On the front page in the second paragraph, right in the
2  middle.
3  A.  Okay.  Mine is organized a little differently.  I see.
4  Various deals were struck, Ethicon could go into the plant.
5  That's what I was saying earlier, yes.
6  Q.  Okay.  And they bought multi-year supplies at one time,
7  do you remember that from reading the document?
8  A.  What I understand is they would do a campaign every
9  couple years, they would make a lot of material.
10  Q.  So the current practice, end of that paragraph, of week
11  to two week long campaigns every two years, that's how they
12  made their Prolene, correct?
13  A.  That's what it says.
14  Q.  And so you down to the bottom of the third paragraph.
15  From the beginning of the Sixties, Ethicon has always bought
16  its Prolene from the same plant using the same equipment, with
17  the exception of the polymer reactor, and made by the same
18  people, except for those who have been retired or replaced,
19  correct?
20  A.  That's what it says, yeah.
21  Q.  Now, the second page of that document lists the additives
22  that are in Prolene that we talked about a minute ago,
23  correct?
24  A.  Yes, sir.
25  Q.  And the next paragraph tells about the manufacturing

Page 162

1  process for Prolene. And Ethicon insists that the mixing and
2  compounding equipment be thoroughly cleaned prior to running
3  our material. Do you see that? Right under the additives.
4  A. Under the additives. Yes. I see it.
5  Q. And Aristech, the owner, and Ethicon inspect the
6  equipment before commencing operations; do you see that?
7  A. That's what it says.
8  Q. And once they start the compounding campaign, the first
9  500 to a thousand pounds that are compounded are discarded as
10  a matter of course; do you see that?
11  A. That's a fairly common practice, yeah, I understand.
12  Q. And if the molecular weight of the natural, paren,
13  unpigmented material is acceptable as measured by melt float,
14  we then start collecting material. You know the importance of
15  molecular weight here, don't you?
16  A. I do, but I don't know what's acceptable means, the
17  specification.
18  Q. What's the importance of an appropriate molecular weight
19  for polypropylene?
20  A. Well, the molecular weight has an effect on the
21  properties, but again, it should be within some specification.
22  I don't know what's acceptable --
23  Q. I didn't ask you that question. I'm asking you about
24  molecular weight. And so it's important to have an
25  appropriate molecular weight for the product before it's

Page 163

1  released, you'd agree with that?
2  A. Molecular weight is typically something we put a
3  specification on.
4  Q. Okay. And you know this process hasn't changed over the
5  last 50 years?
6  A. That's what this document says.
7  Q. Do you have any reason to disagree with that?
8  A. There were some changes to the formulation, I understand,
9  the antioxidants were changed in the early 1990s. That was
10  changed. The plant actually changed owners I think a number
11  of times.
12  Q. But the equipment's the same?
13  A. The facility and the equipment seem to be the same.
14  Q. Do you have any idea of the uses of polypropylene Prolene
15  sutures in the human body?
16  A. I know that they're used as sutures for a number of
17  applications.
18  Q. Do you know whether they come in different sizes?
19  A. I know that they come in different sizes.
20  Q. Why do they come in different sizes?
21  A. Well, I'm not a clinician, but I would assume you'd want
22  different sizes for different types of surgeries that are
23  being done.
24  Q. Do you know how many Prolene sutures have been implanted
25  in people around the world since the Sixties?

Page 164

1  A. That's not a statistic that I'm aware of.
2  Q. Billions, with a B?
3  A. Okay.
4  Q. Do you have any idea whether to disagree with that or
5  not?
6  A. I said I don't know what the number is. It sounds like
7  it's --
8  Q. A bunch?
9  A. It's a lot of hamburgers, yeah.
10  Q. That's a legal term. I'm sorry. I apologize.
11      You know from your review of your documents in this
12  case that Ethicon began using Prolene polypropylene in hernia
13  mesh in the mid 1970s, correct?
14  A. Yes, that's my understanding.
15  Q. And the, I think you testified that the mesh used in
16  hernia mesh is a bigger piece of mesh, but exactly the same
17  design as that used in TVT, correct?
18  A. I don't think I said that. I don't think I was comparing
19  hernia to --
20  Q. Let me ask it this way: Do you know how the Ethicon
21  Prolene hernia mesh compares to the Ethicon Prolene mesh used
22  in TVT?
23  A. My understanding is that similar mesh is just used in
24  similar products but cut to different shapes, that's my
25  general understanding.

Page 165

1  Q. Do you know whether the hernia mesh comes in bigger
2  sheets than the mesh that's in the TVT?
3  A. I would presume that it would since it's used for a
4  different use than a sling.
5  Q. And the Prolene used in the hernia mesh is the same
6  chemical composition as the Prolene used in the sutures,
7  correct?
8  A. It's the same composition, but that doesn't mean it's
9  going to respond the same.
10  Q. I understand. I just asked you the composition.
11  A. The composition is the same.
12  Q. Okay. Do you know how many millions of Prolene
13  polypropylene hernia meshes have been implanted in people
14  around the world since 1975?
15  A. I assume it's millions and not billions from what you --
16      THE COURT: I couldn't hear you.
17      THE WITNESS: I said it sounds like it's millions and
18  not billions. I don't know the number.
19  BY MR. THOMAS:
20  Q. Okay. Now, you're aware from your work in this case that
21  Ethicon polypropylene mesh began being used for the treatment
22  of stress urinary incontinence in a TVT mesh in 1996; you know
23  that, don't you?
24  A. That's correct. To my knowledge.
25  Q. And the Prolene mesh used for the treatment of stress

Page 166

1  urinary incontinence in the TVT mesh is the same chemical
2  composition as the Prolene polypropylene mesh in the hernia
3  mesh, correct?
4  A.  It's all sold as Prolene mesh, so I would assume it has
5  the same composition.
6  Q.  Do you know?
7  A.  It's called Prolene, it's Prolene --
8       THE COURT:  Do you know?
9       THE WITNESS:  Yes.  It's the same.
10 BY MR. THOMAS:
11 Q.  So the Ethicon TVT mesh used for the treatment of stress
12 urinary incontinence is also the same chemical composition as
13 the Prolene suture, correct?
14 A.  It's the same chemical composition.
15 Q.  Do you know how many people have received, around the
16 world, the Prolene mesh for the treatment of stress urinary
17 incontinence?
18 A.  I don't know the exact number.  I think it's in the
19 thousands.
20 Q.  Okay.  Now, prior to getting involved in litigation of
21 these cases, you had not seen in any of your research that
22 there was a problem with polypropylene mesh, true?
23 A.  I'm not studying in my research, research standard on
24 polypropylene mesh --
25 Q.  Is that true?

Page 167

1  A.  I think it's true.  I'm not aware of any.
2  Q.  Now, prior to your work on these cases, you had never
3  done research on polypropylene as an implantable biomaterial,
4  true?
5  A.  Not researched polypropylene as an implantable
6  biomaterial, but I've --
7       THE COURT:  True or not true?
8       THE WITNESS:  I've not done research on it as an
9  implantable biomaterial.
10      THE COURT:  True or not true?
11      THE WITNESS:  True.
12 BY MR. THOMAS:
13 Q.  Prior to getting involved in litigation of these cases,
14 you had never published an article on the use of polypropylene
15 in mesh, true?
16 A.  That's true.
17 Q.  And prior to getting involved in this litigation, you had
18 never published any article on polypropylene specifically,
19 true?
20 A.  That's true.
21 Q.  And prior to getting involved in this litigation, you had
22 never given a presentation to any of your colleagues on
23 polypropylene, true?
24 A.  That's true, but I am this fall.
25 Q.  Thank you.  And indeed, prior to getting involved in this

Page 168

1  litigation, you had not even studied polypropylene, true?
2  A.  No, that's not true.  And I know you're going to pull out
3  my deposition on this, but --
4       MR. THOMAS:  Excuse me, Your Honor.
5       THE COURT:  Just wait.  Just wait.  Not a question
6  pending right now.
7       THE WITNESS:  Yes, sir.
8       MR. THOMAS:  May I approach the witness, Your Honor?
9       THE COURT:  You may.
10 BY MR. THOMAS:
11 Q.  Now, Dr. Guelcher, you've given depositions in this
12 litigation before, correct?
13 A.  Yes, I have.
14 Q.  And the way depositions work, for the jury, maybe they
15 don't know what a deposition is, you meet with a lawyer in the
16 room and you swear to tell the truth and you answer questions
17 about the litigation before you come in here to testify,
18 correct?
19 A.  That's right.
20 Q.  And when you're asked questions you give truthful
21 answers?
22 A.  I give truthful answers, but sometimes the context of the
23 question can change from the deposition to a trial.
24 Q.  If you'll look at your March 25, 2014 deposition on page
25 79, line three, and the question is asked -- do you have that?

Page 169

1  A.  I do.
2  Q.  Okay.  And the question is asked at line three, "And
3  you've not studied polypropylene before your work in this
4  case, correct?"
5       "No.  But I've studied oxidating degradation of other
6  polymers?"
7       Did I read that correctly?
8  A.  You read it correctly, but I think the word studied is
9  vague.
10 Q.  Thank you.
11 A.  He's trying to impeach my testimony.  Can I give an
12 explanation?  I have one.
13      THE COURT:  Stop.  Now.  I'm not going to put up with
14 quarreling from either side.  The answer is "no".  You've
15 asked me if you may explain your "no" answer.  The answer to
16 that is "yes".
17      THE WITNESS:  Thank you, sir.  I appreciate it.
18      THE COURT:  Go ahead.
19      THE WITNESS:  I'm sorry for the court.
20      THE COURT:  That's all right.  I'm just doing what I
21 do.
22      THE WITNESS:  I understand.
23      I think the word studied in different contexts can
24 mean different things.  I had not done research on
25 polypropylene prior to this litigation.  I'm not hiding

Page 170

1    anything.  But I have taught a course, developed a course on
2    polymer science and engineering at Vanderbilt, I taught it for
3    two semesters, other professors teach it now, and we talked
4    about many types of polymers in this course.  So I am familiar
5    with polypropylene, but I do agree that I've not studied it in
6    my research.  So it's just this word that I am struggling a
7    little bit with.  If you asked me if I've done research, I
8    would say no, I have not, but I have studied and I am aware of
9    the material.
10       THE COURT:  All right.  Next question.
11       MR. THOMAS:  Thank you, Your Honor.
12   BY MR. THOMAS:
13   Q.  Now, you obviously know that Ethicon's TVT mesh is
14   designed to be implanted in the human body?
15   A.  Yes, that's correct.
16   Q.  And you know when those meshes are removed from the human
17   body then they're called an explant?
18   A.  That's what I was explaining earlier.
19   Q.  You have never analyzed a TVT mesh explant manufactured
20   by Ethicon for the treatment of stress urinary incontinence,
21   true?
22   A.  I've not had any explant to --
23   Q.  True?
24   A.  -- characterize, so --
25   Q.  I'm sorry.  I don't mean to stop you, but --

Page 171

1        THE COURT:  I'll take that as an objection as
2    non-responsive.  I'll sustain the objection and direct the
3    witness to answer the question as asked.
4        THE WITNESS:  That's true, I've not tested it.
5        THE COURT:  Can I see counsel at sidebar?
6        (The following occurred at sidebar.)
7        THE COURT:  We're coming close or at least it seems
8    to me to discussing the other mesh cases.  I want just to be
9    very sure we don't do that.
10       MR. THOMAS:  I'm trying to tailor my questions to
11   Ethicon specifically, Your Honor.
12       MR. WALLACE:  Just fair warning, he has looked at
13   mesh and you're about to open a can of worms.
14       THE COURT:  He was specific that it was only Ethicon
15   and I'm worried about the witness --
16       MR. WALLACE:  I'm not sure he completely gets where
17   he's going.
18       THE COURT:  Are you going to ask more questions about
19   that, explant testimony?
20       MR. THOMAS:  Just Ethicon specific.
21       THE COURT:  Make it clear that you only want an
22   answer about Ethicon.
23       MR. THOMAS:  Yes, sir.
24       THE COURT:  Just this particular case.
25       (Sidebar concluded.)

Page 172

1        THE COURT:  I apologize to Mr. Wallace and Mr.
2    Thomas, to you, Doctor.  Proceed.
3    BY MR. THOMAS:
4    Q.  In fact, Dr. Guelcher, you've never requested to analyze
5    a mesh manufactured by Ethicon for the treatment of stress
6    urinary incontinence, true?
7    A.  Not directly.  The company I work for has, I believe.
8    Q.  Do you have your deposition in front of you again?
9    A.  Yes.
10   Q.  Turn to page 21, please, of your March 25 deposition.
11       Are you there?
12   A.  Yes.
13   Q.  "Question:  Have you ever requested to analyze a mesh
14   manufactured by Ethicon for the treatment of stress urinary
15   incontinence?"
16       "Answer:  Not to my knowledge."
17   A.  Yes.
18   Q.  Thank you.
19   A.  That's what I said.
20   Q.  I need a little help from --
21       MR. WALLACE:  Your Honor -- go ahead.
22       Your Honor, there was no impeachment there.  I'd just
23   move to just strike the entire questioning from the
24   deposition.  It wasn't the question that was asked.
25       THE COURT:  Well, everybody's doing, ladies and

Page 173

1    gentlemen, everybody is doing their job as best they see fit.
2    I'll help out a little bit.
3        If you just answer the question and leave it to the
4    lawyer who called you, if he thinks that something needs
5    further explanation, he'll get back up on redirect and get
6    back into it.
7        THE WITNESS:  I understand.
8        THE COURT:  All right.
9        MR. WALLACE:  Thank you.
10       THE COURT:  You're welcome.
11       MR. THOMAS:  I need some help with the plaintiff's
12   Power Point presentation.  Can we go to page seven of the
13   plaintiff's Power Point presentation, please?
14   BY MR. THOMAS:
15   Q.  Dr. Guelcher, on the direct examination you were talking
16   about, the title is Oxidation Alters the Structure of
17   Polypropylene, and what you're explaining there is the
18   chemical reaction between oxygen and polypropylene, correct?
19   A.  That's right.
20   Q.  And when you have oxidation impacting polypropylene, you
21   have a change in molecular structure, don't you?
22   A.  That's right.
23   Q.  And you have a change in molecular weight, don't you?
24   A.  That's right.  It happens at the surface layer.
25   Q.  You have a change in molecular weight, didn't you?

Page 174

1   A.  Yes.
2   Q.  And one of the ways that you measure the extent to which
3   a chemical -- strike that.
4        One of the ways that you measure the extent to which a
5   substance degrades or oxidizes is by a change in molecular
6   weight, true?
7   A.  That's one way of measuring it, yes.
8   Q.  Okay.  And this oxidation that you've described in this
9   chemical structure is also intended to show that the
10  mechanical properties of the product can also change, correct?
11  A.  Well, what's being shown here is just the chemical
12  reaction.  I'm not sure what you mean.
13  Q.  But the progression of that is, as you've testified on
14  direct examination, that you ultimately have a change in the
15  physical properties of that substance, correct?
16  A.  Yes.
17  Q.  Like tensile strength, correct?
18  A.  That's true, yes.
19  Q.  Or toughness, correct?
20  A.  Yes.
21  Q.  And so that you can actually measure, by analytical
22  chemistry and benchtop testing, the extent to which a
23  substance has undergone degradation as you've described it in
24  this slide, correct?
25  A.  That's right.  That's one way of measuring it.

Page 175

1   Q.  Now, if you go to the next slide in this set, you're
2   talking about the implant materials selection.  This
3   polypropylene, does the polypropylene in this slide, is this
4   Prolene?
5   A.  No, this isn't Prolene; this is polypropylene.
6   Q.  Okay.  And we talked about before that Prolene without
7   antioxidants?
8   A.  That's not Prolene.
9   Q.  Exactly.
10  A.  It's polypropylene.
11  Q.  And as you add antioxidants to it, you do so to stabilize
12  the polypropylene, correct?
13  A.  To get the oxidation, yes.
14  Q.  And the reason why you do that is to extend the life of
15  the polypropylene for whatever it's being used for, correct?
16  A.  That's right, yes.
17       MR. THOMAS:  May I approach, Your Honor?
18       THE COURT:  You may.
19  BY MR. THOMAS:
20  Q.  Now, Dr. Guelcher, I've handed you what's been marked as
21  defendants' exhibit 30884 and this is a 1976 study called
22  Subcutaneous Implants of Polypropylene Filaments, first author
23  Liebert, correct?
24  A.  Yes.
25  Q.  And you're familiar with this paper, aren't you?

Page 176

1   A.  I cited this paper in my report.
2   Q.  And in the Liebert paper, the authors there tested
3   polypropylene without antioxidants against polypropylene with
4   antioxidants, correct?
5   A.  They did, but they were different components, but they
6   did, yes.
7   Q.  Thank you.
8        And if you go to page two of this exhibit, 3884.2, down
9   at the bottom it says, "The objectives of the study were
10  determined the length of time required for observable
11  degradation to occur, the type of degradation products formed,
12  the rate of degradation, and four, the effect of the presence
13  of an antioxidant on degradation and the rate of degradation."
14       Do you see that?
15  A.  That's right.  That's what it says.
16  Q.  And what the Liebert article found was that there was no
17  oxidation of the polypropylene treated with antioxidants,
18  correct?
19  A.  At 90 days they found that.
20  Q.  Correct?
21  A.  At 90 days, yes.
22  Q.  And at paragraph five on the last page under conclusions,
23  the Liebert group concludes, "Infrared spectra and mechanical
24  testing of implanted and non-implanted filaments containing an
25  antioxidant show no changes in chemical or physical properties

Page 177

1   as a result of implantation."  Correct?
2   A.  I would agree with that statement up to 90 days.
3   Q.  Thank you.
4        THE COURT:  I'm sorry.  You can't agree or disagree?
5   You have a partial agreement, is that right?
6        THE WITNESS:  I have a partial -- I don't know how
7   much -- I don't want to step out of line again.  I don't know
8   how much I can say.
9        THE COURT:  All right.  Okay.
10       THE WITNESS:  Partial agreement is fair.
11  BY MR. THOMAS:
12  Q.  Now, you are of the opinion that there is no antioxidant
13  package available that can effectively stabilize polypropylene
14  against the threat of oxidation, correct?
15  A.  I believe that I said the antioxidants are depleted in
16  time, so that they don't last forever.  I believe that's what
17  I said.
18  Q.  Do you agree with the statement that I made?
19  A.  Could you read it again?
20  Q.  You are of the opinion that there is no antioxidant
21  package available that can effectively stabilize polypropylene
22  against the threat of oxidation.
23  A.  I don't know of any.  I guess I would agree.  I don't
24  know of any that would.
25  Q.  And you know what a peer-reviewed study is, don't you?

Page 178

1    A.  Yes, I've published a lot of peer-reviewed studies.
2    Q.  And a peer-reviewed study is one that somebody writes and
3    subjects to review by your peers before it's published,
4    correct?
5    A.  That's how it works.
6    Q.  And in the 50 years that Prolene polypropylene has been
7    used for implantation in humans, you're not aware of any
8    peer-reviewed study which suggests that Ethicon Prolene loses
9    its antioxidant package such that it oxidizes and becomes
10   embrittled, are you?
11   A.  I've not seen that in a peer-reviewed study.
12   Q.  You don't have an opinion in this case about whether Mrs.
13   Huskey's mesh degraded, do you?
14   A.  I believe it degraded based on the foreign body reaction,
15   but I don't have the data, is that fair?
16   Q.  You don't know whether the mesh is brittle, do you?
17   A.  I've not tested it.
18   Q.  You don't know whether it's oxidized at all, do you?
19   A.  As I said, I believe it is, but I've not tested it
20   because I don't have it.
21   Q.  That's because you don't have the material to test,
22   correct?
23   A.  Yes, sir, that's right.
24   Q.  Let's go to page 10 of the Power Point presentation,
25   please.

Page 179

1        Now, you talked to the jury at some length about this
2    flow chart, the effect of the foreign body reaction on
3    implants, and just so it's clear, what you depict here is not
4    your experience with polypropylene, correct?
5    A.  What I show here is based on the experience with the
6    pacemaker lead insulation and what I believe is happening to
7    polypropylene.
8        MR. THOMAS:  Your Honor, move to strike.  Ask him to
9    answer the question.
10       THE COURT:  Sustained.  The witness is directed to
11   answer the question.
12       THE WITNESS:  Okay.  Sorry.  What's the question
13   again?
14   BY MR. THOMAS:
15   Q.  Dr. Guelcher, what you showed here is not related to your
16   experience with polypropylene?
17   A.  Not my experience.
18   Q.  What you show here is your experience with polyether
19   urethane, correct?
20   A.  It's not my experience.  It's published experience, yes.
21   Q.  You've not done this analysis, testing it, analyzing it,
22   published it, with respect to polypropylene, have you?
23   A.  No.  But I'm in the process of doing that.  I'm sorry.
24       MR. THOMAS:  Your Honor, move to strike.
25       THE COURT:  Sustained.

Page 180

1        THE WITNESS:  I have not done it yet.
2    BY MR. THOMAS:
3    Q.  Now, you talked about the seven-year dog study.  There
4    was no evidence of embrittlement in the sutures tested in the
5    seven-year dog study, do you agree with that?
6    A.  Yes, there was no embrittlement reported in that study.
7    Q.  Thank you.
8    A.  Well, can I qualify it?
9    Q.  And there was no evidence of mechanical breakage in the
10   seven-year dog study, correct?
11   A.  I believe on the surface there was evidence of
12   embrittlement, but what you've asked me --
13   Q.  There's no evidence of mechanical breakage in the
14   seven-year dog study?
15   A.  I agree that there's no evidence of mechanical
16   breakage.
17   Q.  And no evidence of loss of the mechanical properties of
18   the sutures in the seven-year dog study, do you agree with
19   that?
20   A.  Can I be specific?  There was tensile strength,
21   elongation and modulus, and those parameters were not changed.
22   Well, they were changing, but --
23       THE COURT:  Can you answer the question?
24   A.  Those three prongs.
25   Q.  Thank you.

Page 181

1        MR. THOMAS:  May I approach, Your Honor?
2        THE COURT:  You may.
3    BY MR. THOMAS:
4    Q.  Dr. Guelcher, I'm handing you what's been marked as
5    defendants' exhibit 23228.
6    A.  Yes.
7    Q.  And 23228 is entitled, Seven-Year Dog Study.
8    A.  Yes, I've seen this.
9    Q.  It's a bigger version of what you talked about on direct?
10   A.  Yes, sir.
11   Q.  Has more information than what we talked about on your
12   direct examination, do you realize that?
13   A.  Yes.  I've seen the entire study.
14   Q.  And the last three pages of that study are the mechanical
15   properties testing conducted on the mesh after seven years,
16   correct?
17   A.  Yes.
18   Q.  And it's this testing after seven years that showed that
19   the mesh explanted from the dogs after seven years did not
20   lose any of its physical properties, correct?
21   A.  I would not say it does not lose any of its physical
22   properties.  They measured strength, elongation and modulus.
23   Q.  For what they tested they didn't lose any of their
24   physical properties, correct?
25   A.  For what they tested.

Page 182

1 Q. Is that true?

2 A. Yes.

3 Q. Thank you.

4    And also, if you go to page 115 -- are you at 115?

5 A. I'm at 115.

6 Q. Okay. Turn the page briefly. 116 is the area where you

7 testified to the jury about the conclusions, correct?

8 A. That's right.

9 Q. And it's conclusions under optical microscopy and

10 scanning electron microscopy, correct?

11 A. Right.

12 Q. And those would be visual observations of the test,

13 correct?

14 A. Well, it's scanning -- it's high magnification, it's

15 visual.

16 Q. It is visual, correct?

17 A. It is visual of the surface, yes.

18 Q. Well, Ethicon also conducted some analytical chemistry on

19 the mesh they explanted from the dogs too, didn't they?

20 A. They it.

21 Q. And if you go to page 115, they talk about GPC testing,

22 correct?

23 A. Yes.

24 Q. GPC testing is gel permeation chromatography, correct?

25 A. That's what it stands for.

Page 183

1 Q. And gel permeation chromatography measures molecular

2 weight, right?

3 A. That's right, measures molecular weight.

4 Q. And what the company found when it measured the molecular

5 weight after of these sutures after 17 years is that there was

6 no significant difference in molecular weight, correct?

7 A. A couples things. Not 17 years, seven years.

8 Q. I misspoke. Let me ask the question again so it's clear.

9 Isn't it true that the company reported on October 15, 1992

10 that the results of the gel permeation chromatography test run

11 on Prolene sutures explanted from dogs after seven years

12 showed no significant difference in molecular weight, correct?

13 A. That's the way they explain it, but there's not much

14 detail that's given there.

15 Q. Thank you.

16    Do you have the Wood article in front of you?

17 A. Yes, sir, I've got it right here.

18 Q. Wood?

19 A. Wood.

20 Q. The Wood article addressed hernia meshes, correct?

21 A. Yes, sir.

22 Q. It doesn't address Prolene polypropylene, does it?

23 A. It doesn't say Prolene, it says polypropylene.

24 Q. Okay. The Costello article.

25 A. Yes.

Page 184

1 Q. I'm sorry, I don't have the number in front of me. Do

2 you have the number?

3 A. Yes. It's 21468.

4 Q. The Costello article to which you referred on direct, if

5 you go to page two, that's a different mesh company

6 altogether, isn't it? It's a Bard mesh, see under materials

7 and methods?

8 A. It's a Bard mesh with a polypropylene component.

9 Q. Okay. But it's not Prolene polypropylene, is it?

10 A. It's not Prolene.

11 Q. Now, let's go to the Clavé article. Would you bring that

12 up, please? It's 21457.

13    If you go to the sixth page of that, under discussion?

14 A. Yes.

15 Q. Just the first paragraph under discussion, please.

16 A. I'm looking for it.

17 Q. It says, "The primary objectives of this study were to

18 objectively observe a series of prosthetic explants and to

19 characterize potential degradation which may occur in vivo."

20 Correct?

21 A. That's what it says.

22 Q. Those are the goals. And they did it by a number of

23 analytical chemistry tests, correct?

24 A. Yes.

25 Q. And if you go to the bottom right-hand corner of that

Page 185

1 same page, under several hypotheses, last paragraph? Can we

2 blow that up for the jury, please?

3    "Several hypotheses concerning the degradation of the

4 polypropylene are described below. None of these,

5 particularly direct oxidation, could be confirmed in this

6 study."

7    Did I read that correctly?

8 A. You read that correctly. That's the author's opinion.

9 Q. They're the ones that did the study, correct?

10 A. That doesn't mean I agree with that statement.

11 Q. Well, you've not done this study, have you?

12 A. No, but it's common to see papers --

13 Q. Okay. Thank you.

14    THE COURT: I cautioned you about argument. Let's

15 just stop arguing.

16    THE WITNESS: Okay. Sorry.

17 BY MR. THOMAS:

18 Q. Next page, please.

19    Under direct oxidation of the polypropylene, last

20 sentence.

21 A. Yes.

22 Q. FTIR is an analytical chemistry technique where you

23 determine the extent to which there's oxidation in

24 polypropylene, correct?

25 A. I spoke about that in my direct, yes.

Page 186

1    Q.  And what you didn't speak about on direct is the last
2    line of that paragraph that says, "The FTIR analysis neither
3    confirmed nor excluded oxidation of polypropylene in the in
4    vivo environment."  Correct?
5    A.  Again, I don't share that opinion, but that's what they
6    wrote.
7    Q.  That's what the people who did the testing said, correct?
8    A.  I don't want to argue.
9    Q.  Go to the next page, number eight.  And on the right side
10   they're doing DSC analysis, correct?
11   A.  Yes.
12   Q.  And DSC analysis is like a melting point type of analysis
13   so you can determine whether the melting point of a substance
14   changed to determine whether the chemical composition changes,
15   correct?
16   A.  So DSC measures transitions in melting temperature and
17   heat of fusion.
18   Q.  Okay.  And you look under in this study, do you see this?
19   "In this study, no difference between DSC thermograms of
20   pristine and degraded samples was found.  Additionally FTIR
21   analysis did not conclusively confirm that the degradation was
22   due to oxidation."
23       Did I read that correctly?
24   A.  The FTIR -- yes, you read it correctly.  The FTIR refers
25   to the previous comment.

Page 187

1    MR. THOMAS:  Your Honor, may I have a moment?
2    THE COURT:  You may.
3    MR. THOMAS:  That's all the questions I have, Your
4    Honor.
5    THE COURT:  Redirect.
6    MR. WALLACE:  Your Honor, may I proceed?
7    THE COURT:  You may.
8    REDIRECT EXAMINATION OF SCOTT GUELCHER BY MR. WALLACE:
9    Q.  You were asked some questions by Mr. Thomas about the
10   Costello article and the Wood article, and asked whether or
11   not the polypropylene in those articles were Prolene.  Do you
12   remember that?
13   A.  Yes, sir.
14   Q.  But you weren't asked by Mr. Thomas about the Clav
15   article and whether or not there was Prolene in that article.
16   A.  Yes.
17   Q.  Were you?
18   A.  No, I was not.
19   Q.  Can we pull up the images on page 265?
20   LDPMMF, the one on the right.
21   A.  Yes.
22   Q.  Do you see that?
23   A.  This is not Clavé.
24   Q.  Yes, that's Wood.  We'd like to put up Clavé.  Let me
25   give you the number.  That is 21457.

Page 188

1    Dr. Guelcher, just to refresh your recollection, you
2    weren't asked about whether or not this article, the Clav
3    article, which has a hundred explanted vaginal mesh devices,
4    had any of the polypropylene as Prolene, were you?
5    A.  I was not asked that question.
6    Q.  And isn't it true that in this article Prolene was
7    examined and degradation was found?
8    THE COURT:  Sustained.  It is leading.  I know it's
9    tempting.
10   MR. WALLACE:  Very tempting, Your Honor.
11   BY MR. WALLACE:
12   Q.  In examining the Clavé article, did you find that Prolene
13   was a polypropylene mesh that was examined in this study?
14   A.  So on this same page it says the DSC thermograms of
15   treated degraded and non-degraded LDPPMF explants were similar
16   to those of treated Prolene soft.  Additionally, the DSC
17   thermograms of degraded --
18   THE COURT:  Could you slow down a bit?
19   THE WITNESS:  I can.  Being a professor is hard, you
20   talk too fast.
21   The DSC thermograms of degraded and non-degraded
22   HDPPMF explant were also similar to those of treated pristine
23   Prolene samples.
24   Q.  Thank you.  Let's move on in the article, Doctor.  Let's
25   move to page 270 and you'll probably see in your copy there is

Page 189

1    some things at the top of the page.
2    A.  Yes.
3    Q.  I'm going to refer you to the left-hand column beginning
4    with the word polypropylene that's already highlighted.  If
5    you could highlight down to the bottom of the column there.
6    A.  Yes.
7    Q.  And I ask if you could read that first paragraph, please,
8    and tell me whether or not Mr. Thomas asked you about that
9    paragraph.
10   A.  "Polypropylene, in particular, LDPPMF, is the most used
11   material in the PFD surgery.  It is generally considered an
12   inert material.  This study contradicts this established fact
13   and confirms the results of other studies on polypropylene
14   materials used in other areas of medical specialization."
15       I was not asked about this paragraph.
16   Q.  And with respect to the LDPPMF, is that what was referred
17   to as the Prolene?
18   A.  From the previous page that I read, yes.
19   Q.  Thank you.
20       And you were asked now -- well, you were asked about
21   Clavé, Wood and Costello.  Did each of those studies confirm
22   degradation?
23   MR. THOMAS:  Objection, Your Honor.  Asked and
24   answered.  Beyond the scope.
25   THE COURT:  I'm going to allow it.  And it's leading.

1  But I want to get.
2      THE WITNESS:  In my direct examination I testified
3  that those papers point to degradation either through surface
4  cracking, changes in other types of properties.  In my opinion
5  they all point to degradation.
6  BY MR. WALLACE:
7  Q.  Did Mr. Thomas present you with one study that says --
8      THE COURT:  Let's don't do argumentative stuff.
9      MR. WALLACE:  I'm sorry, Your Honor.
10 Q.  Did Mr. Thomas present you with any studies that say
11 pelvic floor mesh does not degrade?
12 A.  He did not present me with any studies and I've not seen
13 any studies that state that.
14 Q.  You were asked some questions about embrittlement on
15 cross examination.  In your review of Ethicon documents, did
16 you see whether or not Ethicon did any research on its meshes
17 whatsoever for embrittlement?
18 A.  I've not seen the studies in the meshes.  The sutures
19 studies did point to embrittlement on the surface.  And it
20 starts at the surface --
21     MR. THOMAS:  Your Honor, object.  It's
22 non-responsive.
23     THE COURT:  First part of the answer is directly to
24 the question and may be considered by you.  When the doctor
25 started going on, you're to ignore that.

1      THE WITNESS:  My students do that, too.
2  BY MR. WALLACE:
3  Q.  As a biomedical engineer that's offered opinions in this
4  case and the evidence you've reviewed and your experience
5  working on polypropylene mesh, do you think it's important for
6  a medical device manufacturer to test for embrittlement before
7  putting polypropylene mesh into women?
8      MR. THOMAS:  Objection, Your Honor.  Beyond the
9  scope.
10     THE COURT:  I sustain it as beyond the scope.
11 BY MR. WALLACE:
12 Q.  You were asked some questions about a plant at the
13 beginning of your cross examination.  Do you recall that line
14 of questioning?
15 A.  Yes, I do.
16 Q.  Whether or not there's a clean plant, does that affect
17 your opinions in this case?
18 A.  No.  It just tells me that there's a reproducible way to
19 manufacture the material, that it's not changed.
20 Q.  Does clean polypropylene degrade?
21 A.  All polypropylene degrades.
22 Q.  Have you -- you were asked some questions about your
23 experience with vaginal mesh.  Have you given any scientific
24 presentations on vaginal mesh failures at any scientific
25 conferences?

1      MR. THOMAS:  Your Honor, I'm --
2      THE COURT:  Can I see counsel?
3      (The following occurred at sidebar.)
4      THE COURT:  Let me just shortcut this.  I don't
5  recall him being asked about his experience with vaginal mesh.
6      MR. WALLACE:  Sure.  He was asked about his
7  experience with researching polypropylene and the work done in
8  this case.  All I was simply pointing out is that he's been
9  asked to present at conferences regarding his research.  So if
10 I phrase the question differently, I could do that and just
11 move on.
12     THE COURT:  I don't quite know what you're doing.
13     MR. THOMAS:  Your Honor, that's really getting into
14 the area that we're trying to avoid because if he has any
15 research at all, it's not in this case, it's in the other
16 cases.  And if I'm going to cross examine him at all -- and
17 just for court's benefit, I know for a fact that he and his
18 co-expert, Dr. Dunn, have conducted extensive analytical
19 testing on other meshes.  I could have gone into that at great
20 length because he didn't do the same kind of testing here, and
21 it's the same kind of issue.  That's the kind of research that
22 he's doing that they're presenting at these conferences and I
23 just don't want to get into this.
24     THE COURT:  Okay.  Don't get us into a mess.
25     MR. WALLACE:  Okay.  I'll be very careful.

1      (Sidebar concluded.)
2  BY MR. WALLACE:
3  Q.  Dr. Guelcher, I'm going to ask a very simple yes or no
4  question and I just want you to answer it yes or no without an
5  explanation.
6      Have you given any presentations to scientific peers on
7  the failure of vaginal mesh?
8  A.  Have I given any?  No.
9  Q.  Well, let me ask, I'm going to give you your CV and ask
10 if I can refresh your recollection.
11     THE COURT:  Yes, sir.
12     MR. THOMAS:  I'll let him ask the question first.
13 BY MR. WALLACE:
14 Q.  I'm going to direct you to page 18 of your CV, page 153.
15 I'd ask that you don't say anything else other than whether or
16 not you've given a presentation to scientific communities
17 about the failure of vaginal mesh.
18     MR. THOMAS:  Your Honor, asked and answered.  The
19 question is whether it refreshes his recollection.
20     THE COURT:  I'll let him answer.
21     THE WITNESS:  I'd like to explain my answer.
22     THE COURT:  No.
23     THE WITNESS:  It's --
24     THE COURT:  No.  Honestly, we're almost finished here
25 -- go ahead.

Page 194

1       THE WITNESS:  I'm trying to do this the right way.
2   BY MR. WALLACE:
3   Q.  Can you just answer yes or no?  Have you ever given a
4   presentation or gone or been invited to any conferences to
5   speak on that issue?
6       THE COURT:  I overrule your objection.  He may
7   impeach his own witness.
8       THE WITNESS:  But there's a very simple 15-second
9   explanation.
10      THE COURT:  I am telling you, if you don't answer
11  this question directly, you're excused.
12      THE WITNESS:  No.
13  BY MR. WALLACE:
14  Q.  You were asked some questions -- I've just got a couple
15  more questions.  You were asked some questions about FTIR
16  tests and whether or not they could find degradation.
17  A.  Yes.
18  Q.  Are there limits to FTIR testing and whether or not
19  that's a valid way to find degradation?
20  A.  FTIR probes, it measures the sample surface and also the
21  interior, so you're typically measuring the entire volume and
22  not specifically what happens at the surface.
23      THE COURT:  So I bet that's a yes.
24      THE WITNESS:  Yes.
25  BY MR. WALLACE:

Page 195

1   Q.  Have any of Mr. Thomas's questions changed your opinion
2   in this case?
3   A.  No.
4       MR. WALLACE:  Thank you.
5       THE COURT:  All right.  May the witness be excused
6   from the trial?  Or do you want him --
7       MR. THOMAS:  Yes, Your Honor.
8       MR. WALLACE:  Yes, sir.
9       THE COURT:  All right.  Thank you very much, Doctor.
10  Call your next witness.
11      Doing all right, ladies and gentlemen?  All right.
12      MR. WALLACE:  We're going to play the video
13  deposition of Brigette Helhammer, Your Honor.
14      THE COURT:  Ladies and gentlemen, the next testimony
15  you will be presented with is by way of video deposition.  As
16  you've already heard from the lawyers, a deposition is sworn
17  testimony.  This particular testimony is taken and is done so
18  under oath and you are to consider it as offered to you just
19  the same as if that witness was sitting here today live.
20  You're to give it no greater weight or no lesser weight
21  because it's on TV.
22      You may proceed.
23      MR. WALLACE:  Thank you, Your Honor.
24      (The video testimony of Brigette Helhammer was
25  played.)

Page 196

1       MR. KUNTZ:  Judge, that concludes the deposition of
2   Brigitte Helhammer.
3       THE COURT:  All right.  Call your next witness.
4       MR. COMBS:  Judge, there will be a very short defense
5   cross examination.
6       THE COURT:  Okay.  Well, let's do that.
7       (The video testimony of Brigitte Helhammer
8   continued.)
9       MR. KUNTZ:  Short redirect.
10      THE COURT:  Redirect.
11      (The video testimony of Brigitte Helhammer
12  continued.)
13      THE COURT:  All right.  Thank you.
14      Ladies and gentlemen of the jury, that concludes the
15  videotaped testimony of this witness.  You are to consider
16  that testimony the same way you would as if the witness were
17  here testifying.  As to the technical quality of the video, I
18  want to assure you that the lighting technician has been hired
19  by Steven Spielberg and will not be available for later work.
20      Call your next witness.
21      MR. KUNTZ:  Plaintiffs call Dr. Bruce Rosenzweig.
22  BRUCE A. ROSENZWEIG, called as a witness, having been first
23  duly sworn according to law, testified as follows:
24  DIRECT EXAMINATION OF BRUCE A. ROSENZWEIG BY MR. KUNTZ:
25  Q.  Please state your name for the record.

Page 197

1   A.  Bruce Alan Rosenzweig.
2   Q.  And are you a physician?
3   A.  Yes, I am.
4   Q.  What kind of doctor are you?
5   A.  My specialty is gynecology and my subspecialty is
6   urogynecology.
7   Q.  Please describe to the jury your medical training and
8   experience.
9   A.  I went to the University of Michigan for medical school.
10  After that I did a postgraduate residency program in
11  obstetrics and gynecology.  Following that -- which is a four
12  year residency.  I spent one year after that doing what's
13  called a pelvic surgery fellowship, which is an advanced
14  pelvic surgery.  And then I did a two-year fellowship in
15  urogynecology.
16  Q.  Are you licensed to practice medicine?
17  A.  Yes, sir.
18  Q.  What states?
19  A.  I have an active license in the state of Illinois.
20  Q.  What teaching positions have you held?
21  A.  Currently I'm an assistant professor at in obstetrics and
22  gynecology at Rush University Medical Center.
23  Q.  Have you published any articles related to the treatment
24  of stress urinary incontinence?
25  A.  Yes, I have.

Page 210

1   Q.  And when was that?
2   A.  October of 2004.
3   Q.  And where did that training take place?
4   A.  In Liege, Belgium.
5   Q.  And did that training with the TVT-O take place with Dr.
6   de Leval, the inventor of the product?
7   A.  That is correct.
8   Q.  And you were invited by Ethicon and they paid for you to
9   go over to Belgium and train with Dr. de Leval?
10  A.  That is also correct.
11  Q.  Tell us a little bit about that training class over in
12  Belgium.
13  A.  Well, it was a three-day course.  The first day was in a
14  classroom where we had didactic lectures.  The second day we
15  spent in a cadaver laboratory where we got to do dissections
16  to show the area where the tape was going to go anatomically,
17  and also on a cadaver actually place the tape.  And then the
18  third day we spent in the operating room with Dr. de Leval and
19  I had the opportunity of placing the tape in two live
20  patients.
21          THE COURT:  All right.  It's five o'clock.  I'm quite
22  certain this witness will take more than just a few more
23  minutes.  We're going to recess for the day.
24          Thank you, Doctor, you may step down.
25          Ladies and gentlemen of the jury, that concludes the

Page 211

1   testimony for today.  We will -- you can go ahead, Doctor.
2          We'll start again in the morning right at 9:00
3   o'clock.  I appreciate your promptness.  We'll begin on time.
4   I missed it by ten minutes this morning, I'm not going to miss
5   it tomorrow.
6          Very important.  Don't watch TV, local news, don't
7   read the newspaper, local newspaper.  You can read the New
8   York Times or something like that.  You can watch the national
9   news.  If you want to stay happy, just don't watch the news,
10  it's depressing.
11         You're not to listen to, read anything about, see
12  anything, do any research about, use any social media, talk to
13  anyone about, answer any questions about this case.
14  Everything that you're allowed to do about this case you're
15  allowed to do right in here.  Don't discuss it with anyone or
16  among yourselves.  Have a very pleasant evening and I'll see
17  you right at 9:00 o'clock.
18         You're excused.
19         Counsel, do you want to stay a minute?
20         (The Jury left the courtroom at 5:02 p.m.)
21         THE COURT:  Anything you need me for?
22         I appreciate the nice professional relationship
23  between counsel and the way this is going.  Keep it up.  See
24  you tomorrow morning.
25         MR. KUNTZ:  Thank you, Your Honor.

Page 212

1          (A recess was taken at 5:03 p.m.)
2                  - - - - -
3
4          REPORTERS' CERTIFICATE
5
6          Carol Farrell, CRR, RMR, CCP, RPR, Official Court
7   Reporter of the United States District Court for the Southern
8   District of West Virginia, and Anthony Rolland, CRR, RMR, RPR,
9   do hereby certify that the foregoing is a true and accurate
10  transcript, to the best of our ability, of the proceedings as
11  taken stenographically by and before us at the time, place,
12  and on the date hereinbefore set forth.
13
14
15  /S/ Carol Farrell, CRR, RMR, CCP, RPR       08/25/2014
16  _____     _____
17          Court Reporter            Date
18  /S/ Anthony Rolland, CRR, RMR, RPR          08/25/2014
19  _____     _____
    Court Reporter            Date
20
21
22
23
24
25

# EXHIBIT F

Scott Guelcher

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN RE: ETHICON, INC., PELVIC          )
REPAIR SYSTEM PRODUCTS                )
LIABILITY LITIGATION                  )
_____     )
                                      )
THIS DOCUMENT RELATES TO THE          )Master File No.
FOLLOWING CASES IN WAVE 1 OF          )2:12-MD-02327
MDL 200:                              )   MDL 2327
                                      )
Marty Babcock v. Ethicon, Inc.        )JOSEPH R. GOODWIN
Civil Action No. 2:12-cv-01052        )U.S. DISTRICT
                                      )JUDGE
[Complete caption below]              )
_____

DEPOSITION OF

SCOTT GUELCHER

Taken on behalf of the Defendants

March 23, 2016

8:51 a.m.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Scott Guelcher

Page 2

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   AT CHARLESTON
 3   IN RE: ETHICON, INC., PELVIC  )
     REPAIR SYSTEM PRODUCTS        )
 4   LIABILITY LITIGATION          )
                                   )
 5                                 )
     THIS DOCUMENT RELATES TO THE  )Master File No.
 6   FOLLOWING CASES IN WAVE 1 OF  )2:12-MD-02327
     MDL 200:          )  MDL 2327
 7                                 )
     Marty Babcock v. Ethicon, Inc. )JOSEPH R. GOODWIN
 8   Civil Action No. 2:12-cv-01052 )U.S. DISTRICT
                                   )JUDGE
 9   Daphne Barker, et al. v.      )
     Ethicon, Inc., et al.         )
10   Civil Action No. 2:12-cv-00899 )
11   Dorothy Baugher v. Ethicon,   )
     Inc., et al.                  )
12   Civil Action No. 2:12-cv-01053 )
13   Harriet Beach v. Ethicon,     )
     Inc., et al.                  )
14   Civil Action No. 2:12-cv-00476 )
15   Myra Byrd, et al. v. Ethicon, )
     Inc., et al.                  )
16   Civil Action No. 2:12-cv-00748 )
17   Fran Denise Collins v.        )
     Ethicon, Inc., et al.         )
18   Civil Action No. 2:12-cv-00931 )
19   Dennis W. Dixon, Estate of    )
     Virginia M. Dixon,            )
20   Deceased v. Ethicon, Inc., et al.)
     Civil Action No. 2:12-cv-01081 )
21                                 )
     Lois Durham, et al. v.        )
22   Ethicon, Inc., et al.         )
     Civil Action No. 2:12-cv-00760 )
23                                 )
     Karen Forester, et al. v.     )
24   Ethicon, Inc., et al.         )
```

Page 4

```
 1   Beverly Kivel v. Ethicon,     )
     Inc., et al.                  )
 2   Civil Action No. 2:12-cv-00591 )
 3   Cheryl Lankston v. Ethicon,   )
     Inc., et al.                  )
 4   Civil Action No. 2:12-cv-00755 )
 5   Heather Long v. Ethicon, Inc., )
     et al.                        )
 6   Civil Action No. 2:12-cv-01275 )
 7   Donna Massey, et al. v.       )
     Ethicon, Inc., et al.         )
 8   Civil Action No. 2:12-CV-00880 )
 9   Angela Morrison, et al. v.    )
     Ethicon, Inc., et al.         )
10   Civil Action No. 2:12-cv-00800 )
11   Maria Eugenia Quijano v.      )
     Ethicon, Inc., et al.         )
12   Civil Action No. 2:12-cv-00799 )
13   Penny Rhynehart v. Ethicon,   )
     Inc., et al.                  )
14   Civil Action No. 2:12-cv-01119 )
15   Victoria Rock v. Ethicon,     )
     Inc., et al.                  )
16   Civil Action No. 2:12-cv-00867 )
17   Denise Sacchetti v. Ethicon,  )
     Inc., et al.                  )
18   Civil Action No. 2:12-cv-01148 )
19   Debra A. Schnering, et al. v. )
     Ethicon, Inc., et al.         )
20   Civil Action No. 2:12-cv-01071 )
21   Sheri Scholl, et al. v.       )
     Ethicon, Inc.                 )
22   Civil Action No. 2:12-cv-00738 )
23   Donna Shepherd v. Ethicon,    )
     Inc., et al.                  )
24   Civil Action No. 2:12-cv-00967 )
```

Page 3

```
 1   Shirley Freeman, et al. v.    )
     Ethicon, Inc., et al.         )
 2   Civil Action No. 2:12-cv-00490 )
 3   Monica Freitas, et al. v.     )
     Ethicon, Inc., et al.         )
 4   Civil Action No. 2:12-cv-01146 )
 5   Susan Guinn v. Ethicon, Inc., )
     et al.                        )
 6   Civil Action No. 2:12-cv-01121 )
 7   Wendy Hagans v. Ethicon, Inc., )
     et al.                        )
 8   Civil Action No. 2:12-cv-00783 )
 9   Beth Harter, et al. v. Ethicon, )
     Inc., et al.                  )
10   Civil Action No. 2:12-cv-00737 )
11   Rocio Herrera-Nevarez v.      )
     Ethicon, Inc., et al.         )
12   Civil Action No. 2:12-cv-01294 )
13   Mary Holzerland, et al. v.    )
     Ethicon, Inc., et al.         )
14   Civil Action No. 2:12-cv-00875 )
15   Lois Hoy, et al. v. Ethicon,  )
     Inc., et al.                  )
16   Civil Action. 2:12-cv-00876   )
17   Myndal Johnson v. Ethicon,    )
     Inc., et al.                  )
18   Civil Action No. 2:12-cv-00498 )
19   Holly Jones, et al. v. Ethicon, )
     Inc., et al.                  )
20   Civil Action No. 2:12-cv-00443 )
21   Debra Lynn Joplin v. Ethicon, )
     Inc., et al.                  )
22   Civil Action No. 2:12-cv-00787 )
23   Margaret Kirkpatrick v.       )
     Ethicon, Inc., et al.         )
24   Civil Action No. 2:12-cv-00746 )
```

Page 5

```
 1   Cindy Smith v. Ethicon, Inc., )
     et al.                        )
 2   Civil Action No. 2:12-cv-01149 )
 3   Cherise Springer, et al. v.   )
     Ethicon, Inc., et al.         )
 4   Civil Action No. 2:12-cv-00997 )
 5   Margaret Stubblefield v.      )
     Ethicon, Inc., et al.         )
 6   Civil Action No. 2:12-cv-00842 )
 7   Lisa Thompson, et al. v.      )
     Ethicon, Inc., et al.         )
 8   Civil Action No. 2:12-cv-01199 )
 9   Mary Thurston, et al. v.      )
     Ethicon, Inc., et al.         )
10   Civil Action No. 2:12-cv-00505 )
11   Shirley Walker, et al. v.     )
     Ethicon, Inc., et al.         )
12   Civil Action No. 2:12-cv-00873 )
13   Cathy Warlick v. Ethicon,     )
     Inc., et al.                  )
14   Civil Action No. 2:12-cv-00276 )
15   Laura Waynick, et al. v.      )
     Ethicon, Inc., et al.         )
16   Civil Action No. 2:12-cv-01151 )
17   Rebecca Wheeler, et al. v.    )
     Ethicon, Inc., et al.         )
18   Civil Action No. 2:12-cv-01088 )
19   Nancy Williams v. Ethicon,    )
     Inc., et al.                  )
20   Civil Action No. 2:12-cv-00511 )
21   Thelma Wright v. Ethicon,     )
     Inc., et al.                  )
22   Civil Action No. 2:12-cv-01090 )
23
24
```

2 (Pages 2 to 5)

**Page 6**

```
 1    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
      Michael H. Bowman, Esquire
 4    Wexler Wallace LLP
      55 West Monroe Street, Suite 3300
 5    Chicago, Illinois 60603
      312.346.2222
 6    mhb@wexlerwallace.com
 7
 8    FOR THE DEFENDANTS:
      Chad R. Hutchinson, Esquire
 9    Butler Snow, LLP
      1020 Highland Colony Parkway, Suite 1400
10    Ridgeland, Mississippi 39157
      601.948.5711
11    chad.hutchinson@butlersnow.com
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 7**

```
 1         E X A M I N A T I O N
 2
 3                   PAGE
      Examination by Mr. Hutchinson          9
 4
 5
 6         E X H I B I T S
 7
                     PAGE
      Exhibit 1  Notice to Take Deposition      9
 9
      Exhibit 2  Expert Report of Scott Guelcher,   10
10        Ph.D., CV, Billing Information,
          Reliance List
11
      Exhibit 3  Abstract - Oxidative Degradation   28
12        of Polypropylene
          Pelvic Mesh in Vitro
13
      Exhibit 4  Characterization of the host   44
14        inflammatory
          response following implantation
15        of prolapse
          mesh in rhesus macaque
16
      Exhibit 5  Blank Piece of Paper      113
17
      Exhibit 6  In vivo oxidative degradation of   130
18        polypropylene pelvic mesh - Imel
19    Exhibit 7  Seven Year Dog Study      166
20    Exhibit 8  Stress-Strain Curve - Graph   179
21
22
23
24
```

**Page 8**

```
 1
 2      QUESTIONS INSTRUCTED NOT TO ANSWER
 3
                    PAGE
 4
      I understand that.  But I'm -- my question    96
 5    is related to these 44 women.  Can you tell
      us, to a reasonable degree of scientific
 6    certainty, whether or not the mesh, in any
      of these 44 women, ever oxidized?
 7
      I'm asking, Doctor, can it ever        162
 8    be completely -- can oxidation ever be
      completely eliminated?
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 9**

```
 1            SCOTT GUELCHER
 2    was called as a witness, and after having been
 3    first duly sworn, testified as follows:
 4
 5         (Whereupon Exhibit 1 was marked as an
 6    exhibit.)
 7
 8    EXAMINATION BY MR. HUTCHINSON:
 9      Q.    Good morning, Dr. Guelcher.  Chad
10    Hutchinson, counselor for Ethicon.
11         I'll hand you what we've marked as
12    Exhibit 1 to your deposition.  Have you seen that
13    deposition notice before?
14      A.    Yes.
15      Q.    And did you bring any documents with
16    you responsive to that deposition notice?
17      A.    I did not.
18         MR. HUTCHINSON:  Counsel, I understand
19    you're producing a flash drive right now, more or
20    less as we speak, that will contain what?
21         MR. BOWMAN:  It will contain everything
22    he reviewed, and it is on his reliance list.
23         MR. HUTCHINSON:  And it will not
24    contain any new testing; is that correct?
```

                              3 (Pages 6 to 9)

Scott Guelcher

Page 10

1    MR. BOWMAN:  There -- the testing
2  that's been done has been produced in the past.
3  There's nothing new produced today.
4  BY MR. HUTCHINSON:
5    Q.   Dr. Guelcher, what are the names of the
6  products that you're -- you're here to give
7  testimony about?
8    A.   I believe the SUI slings and the POP
9  devices that would include the GYNEMESH, the TVT,
10  TVT-O, is my understanding.  I have to look at my
11  report for all the list of the names.
12    Q.   Sure.  And I'll hand you what we'll
13  mark as Exhibit 2 to your deposition.
14    A.   Okay.
15    (Whereupon Exhibit 2 was marked as an
16  exhibit.)
17    THE WITNESS:  That would help me.
18    MR. HUTCHINSON:  Sure.  Counsel.
19    MR. BOWMAN:  Thank you.
20    THE WITNESS:  Did you -- is there still
21  a question?
22  BY MR. HUTCHINSON:
23    Q.   Yes, sir.
24    A.   Oh.

Page 11

1    Q.   I'm waiting for your answer.
2    A.   Oh.
3    Well, as I stated in my report, these
4  are the SUI, stress urinary incontinence, and the
5  pelvic organ prolapse, POP, devices.  This would
6  include PROSIMA, PROLIFT, GYNEMESH, the TVT
7  devices.  All of these devices are made from
8  PROLENE.
9    Q.   All right.  Which specific SUI slings
10  are you here to give testimony about?
11    A.   There's 200 cases in this wave.  My
12  understanding is some of these are TVT, TVT-O.
13  Those are the ones I can remember right now.
14    My report was directed more toward the
15  polypropylene, PROLENE, polypropylene that's used
16  to make those devices.
17    Q.   TVT and TVT-O are the only two names of
18  the products that you can remember for SUI devices?
19    A.   There's a -- I'm sorry.  There's a
20  TVT-S.  Those are the ones that I can remember
21  right now.
22    Q.   Okay.  Can you remember any others?
23    A.   I think that's what I can remember
24  right now.

Page 12

1    Q.   What does TVT-S stand for?
2    A.   That's the -- the shorter sling, so
3  the -- the -- the TVT is a longer sling.  The TVT-S
4  is shorter.
5    Q.   Okay.  And what does TVT-S stand for?
6    A.   I -- I don't remember the meaning
7  behind the acronym right now.  The TVT is a
8  transvaginal tape, but I don't -- I don't -- I
9  don't remember exactly what the S stands for right
10  now.
11    Q.   Which -- which POP or pelvic organ
12  prolapse devices are you here to give testimony
13  about?  Which specific ones?
14    A.   Well, they're listed in the report, the
15  PROSIMA, the PROLIFT, and the GYNEMESH.
16    Q.   Any others?
17    A.   Those are the ones I can think of right
18  now.
19    Q.   What about PROLIFT+M?  Are you here to
20  give testimony today about PROLIFT+M?
21    A.   Yes.  The PROLIFT+M is also mentioned
22  in the report.  That -- well -- okay.  It's -- it's
23  a hybrid material that has the -- the MONOCRYL
24  polyester resin with the PROLENE.  So that's in the

Page 13

1  report as well.
2    Q.   And, Doctor, you're referring to
3  Exhibit 2, which is your expert report; is that
4  correct?
5    A.   I am.
6    Q.   Is this report complete and accurate?
7    A.   Yes.
8    Q.   Is this a final version?
9    A.   Yes.  I -- I -- I believe so.
10    Q.   How many hours did you spend on this
11  report?
12    A.   I -- I don't know.  I don't -- I don't
13  track the hours.  I don't -- I don't know how many
14  hours I spent.
15    Q.   Okay.  How do you bill the attorneys
16  for your time?
17    A.   So that was a -- a billing sheet that I
18  believe I produced with the report, where we just
19  bill by the report.  And this was, I believe, a --
20  what I would call a medium report.
21    Q.   What is a medium report?
22    A.   It's -- in the billing, I just break it
23  down and do a short report, a medium, and a long
24  report.  This one would have been in the medium

4 (Pages 10 to 13)

Scott Guelcher

Page 14

1    category.
2        Q.    So would that be a flat fee for this
3    report?
4        A.    That's correct.
5        Q.    What is the flat fee for this report
6    that --
7        A.    It's $10,000.  Yeah.
8        Q.    Marked as Exhibit 2?
9        A.    That's correct.
10       Q.    And are all -- are all of the opinions
11   that you intend to offer in this litigation
12   contained in your expert report marked as Exhibit
13   2?
14       A.    Yes, they are.
15       Q.    I've handed you, also, a CV, which is
16   part of Exhibit 2.
17       A.    Yes.
18       Q.    Is that the most recent version of your
19   CV?
20       A.    I believe so.  I have to check it
21   briefly.  But I believe this is the -- this is the
22   current version.  Okay.  Yes.
23       Q.    And your reliance list is also marked
24   as Exhibit 2.  Is that the most current reliance

Page 15

1    list?
2        A.    I believe so.  Again, I'd like to check
3    it for just a second.  I believe so.
4        Q.    Okay.  Doctor, other than attorneys,
5    have you discussed your opinions, as they relate to
6    pelvic organ -- pelvic organ prolapse products,
7    with anyone else?
8        A.    With -- Dr. Dunn and I have been
9    working together on this litigation with the
10   attorneys.
11       Q.    And other than Dr. Dunn, have you
12   discussed your opinions regarding pelvic organ
13   prolapse products with anyone else?
14       A.    No.  I'm sorry.  Dr. Iakovlev.
15             (Reporter interruption for
16   clarification.)
17             THE WITNESS:  I'm sorry.  Dr. Iakovlev,
18   I-a-k-o-v-l- -- do you mean -- can I clarify?  Do
19   you mean in this specific report the opinions --
20   like this --
21   BY MR. HUTCHINSON:
22       Q.    (Indicating yes.)
23       A.    Are you talking about this specific
24   report or -- yeah.  I've not discussed this report

Page 16

1    with Dr. Iakovlev.  I -- I wrote the paper with
2    him, but. . .  I guess I'm a little confused about
3    the question.
4        Q.    Okay.  So the question is I want you to
5    talk about your opinions as they relate to pelvic
6    organ prolapse products.
7        A.    Yes.
8        Q.    Have you discussed those opinions with
9    anybody other than Dr. Dunn and Dr. Iakovlev?
10       A.    Not other than attorneys, I can't
11   think. . .
12       Q.    Never spoken to any other scientist or
13   medical doctor about those opinions; is that
14   correct?
15       A.    So I -- I have presented at -- at
16   meetings, the IUGA meeting last year in Nice.
17       Q.    And we're going to get to that --
18       A.    Okay.
19       Q.    -- but I want to talk about your
20   opinions as they relate to pelvic organ prolapse
21   products.
22       A.    Okay.
23       Q.    Have you discussed those with any
24   scientist or medical doctor?

Page 17

1        A.    At the meeting there was some
2    discussion among the meeting participants.  But --
3        Q.    Was this -- excuse me.
4        A.    Sorry.  Go ahead.  Yeah.
5        Q.    Was this that meeting in France?
6        A.    Yeah.  That's right.
7        Q.    Other than in France, have you ever
8    discussed any of those opinions with anyone else?
9        A.    I've presented it at a meeting at -- at
10   the American Institute of Chemical Engineers in the
11   fall of 2014.  Presented a talk there.
12       Q.    Your opinions as they relate to pelvic
13   organ prolapse products?
14       A.    I don't -- you know, I don't know that
15   we had the POPs in that talk.  I think that was
16   slings.
17       Q.    Okay.
18       A.    So we talked about polypropylene
19   oxidation.
20       Q.    I understand that.
21       A.    Not necessarily about the POP devices.
22       Q.    Okay.
23       A.    I'm just trying to understand what
24   you're asking.

5 (Pages 14 to 17)

Scott Guelcher

Page 18

1    Q.    Fair enough.  My question, though, as
2  it relates to pelvic organ prolapse products, have
3  you discussed those opinions as they relate to
4  pelvic organ prolapse products with anyone else?
5    A.    I -- I don't believe so.
6    Q.    Doctor, have you -- have you ever told
7  any doctor at Vanderbilt that you have concerns
8  about the safety of polypropylene or PROLENE mesh?
9    A.    I had some email correspondence with a
10 Vanderbilt OB/GYN.  I had some -- we -- it wasn't
11 about -- it wasn't about opinions about the
12 products.  It was about research on polypropylene
13 oxidation.  But I haven't discussed my opinions
14 with them.
15   Q.    Okay.  Do you know how many doctors
16 practice medicine at Vanderbilt?
17   A.    No.
18   Q.    Have you ever told a doctor at
19 Vanderbilt that you believe PROLENE mesh degrades
20 via oxidation?
21   A.    No.  I haven't had the opportunity.
22   Q.    Doctor, you -- your lawyers -- or a
23 lawyer sitting to the right of you is producing me
24 a flash drive with all the documents you have

Page 19

1  reviewed; is that correct?
2    A.    That's right.
3    Q.    And would those be internal Ethicon
4  documents, at least some of them?
5    A.    Some of them are.  Yeah.
6    Q.    Have you ever signed a confidentiality
7  agreement with respect to the documents that you've
8  reviewed from Ethicon?
9    A.    I can't remember.  Probably.  I don't
10 remember.
11   Q.    Where would it be if you did?
12   A.    I don't know.  I don't know that I have
13 that agreement.
14   Q.    Where would you look for it if you had
15 it?
16   A.    Well, I would think the attorneys would
17 have it.  I -- I don't -- I just don't know that
18 I've ever signed it.
19   Q.    Do you remember being deposed in the
20 Mullins litigation?
21   A.    Mullins?
22   Q.    Mullins.  It's the -- was -- it was 37
23 consolidated --
24   A.    It was consolidated in West Virginia?

Page 20

1    Q.    (Indicating yes.)
2    A.    Okay.
3    Q.    Do you -- do you remember that?  It was
4  in September of 2015.
5    A.    Yes.  I think that's the last time I
6  was here.
7    Q.    In fact, you were in the same seat.
8    A.    Probably.  I don't -- I don't remember.
9    Q.    Do you remember -- have you been
10 deposed in any mesh litigation since September of
11 2015?
12   A.    I don't believe so.
13   Q.    Have you testified in any trials
14 regarding mesh litigation since 2000 -- since
15 September 2015?
16   A.    There was a Boston Scientific trial in
17 Statesville, North Carolina, in October.
18   Q.    And you testified live in that trial?
19   A.    Live?
20   Q.    (Indicating yes.)
21   A.    Yes.
22   Q.    Are you still active in the
23 professional societies of American Institute of
24 Chemical Engineers?

Page 21

1    A.    Yes, I am.
2    Q.    The Society for Biomaterials?
3    A.    Yes.
4    Q.    Research Society For Bone and Joint
5  Injectable Biomaterials?
6    A.    Yes.
7    Q.    I noticed that your expert report,
8  which is marked as Exhibit 2, doesn't include those
9  professional societies.  Why not?
10   A.    They're listed on my CV, which is part
11 of the report.  I -- I don't know why.  I just
12 didn't list them.
13   Q.    Doctor, do you recall -- did you ever
14 read the deposition transcript from the Mullins
15 litigation?
16   A.    I don't remember.  I've -- I just don't
17 remember.
18   Q.    Have any of your opinions changed since
19 you were deposed in the Mullins litigation?
20   A.    No.
21   Q.    What has been your total billing amount
22 that you have billed plaintiff attorneys since the
23 Mullins litigation?
24   A.    Oh, in this particular case.  I

6 (Pages 18 to 21)

Scott Guelcher

Page 22

1    submitted a bill for the report, for 10,000 for the
2    medium report.
3        Q.    What about any charges for your time?
4        A.    For this litigation?  I don't think so.
5    Oh.  No.  This -- this is the only -- that was the
6    only one for this litigation.
7        Q.    Have you done any additional work since
8    the Mullins deposition regarding mesh?
9        A.    What do you mean by "work"?  Do you
10   mean testing or reading?  I'm not sure what you
11   mean.
12       Q.    Well, any other work that you believe
13   is applicable to the mesh litigation since you were
14   deposed in Mullins in September 2015.
15       A.    I -- I've not done any -- any testing.
16   I've done more reading, research.  But I've not
17   done any testing since that time.
18       Q.    What additional research have you done?
19       A.    Reviewing the newer papers that were in
20   the report, reviewing the -- the Ethicon internal
21   documents, that sorts of activities.
22       Q.    The "newer papers" that you're
23   referring to, are those contained in your expert
24   report?

Page 23

1        A.    I believe they are.  Yes.  That would
2    be -- yes, they are.
3        Q.    Have you published any additional
4    articles?
5        A.    On polypropylene mesh?
6        Q.    (Indicating yes.)
7        A.    No.
8        Q.    Do you have any pending?
9        A.    No.
10       Q.    Have you worked on any since?
11       A.    No.
12       Q.    The last paper that you authored
13   regarding mesh was the one with Dr. Iakovlev
14   entitled "Degradation of Polypropylene in Vivo"?
15       A.    Yes.
16       Q.    Doctor, as we sit here today, are you
17   planning on doing any additional testing of mesh?
18       A.    I don't know at this time.  There are
19   no definite plans.
20       Q.    Are you considering any additional
21   testing of mesh?
22       A.    I am.
23       Q.    All right.  What are you considering?
24       A.    Well, I don't -- I can't really answer

Page 24

1    this question because it's a research project.
2    It's not part of these opinions in the litigation.
3    So it's -- I would call that a research project.
4        Q.    Is it a research project for
5    litigation?
6        A.    Not necessarily.
7        Q.    So who is sponsoring the research
8    project?
9        A.    Well, this is part of the work, as an
10   academic, is finding funding to support the work,
11   so. . . I don't -- I don't have any funding for it
12   right now.
13       Q.    Okay.  Are you -- but you're trying to
14   get funding for a research project?
15       A.    I'm considering it, but I haven't done
16   anything definitive at this time.
17       Q.    Have you asked anybody specifically for
18   funding?
19       A.    No.
20       Q.    Have you asked any plaintiff lawyer for
21   funding of this research project?
22       A.    No.
23       Q.    Can you give me just a general idea of
24   the research project that you're contemplating?

Page 25

1        A.    I'm really not comfortable doing that.
2    Just -- I -- I need to -- I just -- I don't -- I
3    don't think that would be good.
4        Q.    Okay.  Are you refusing to tell me?
5        A.    "Refusing" is kind of a strong word.  I
6    mean, I -- I don't want to discuss it in this
7    deposition.  It's a research project that's outside
8    this litigation.  So I -- to me it's not
9    something --
10       Q.    Does it --
11       A.    -- I -- I -- I would like to discuss
12   here.
13       Q.    Does it relate to PROLENE mesh?
14       A.    I don't know.  I haven't -- I don't
15   know at this time.
16       Q.    Does it relate to any of Ethicon's
17   products?
18       A.    Again, at this time, I -- I don't know.
19       Q.    Okay.
20       A.    I haven't gotten that far.
21       Q.    We talked about the IUGA meeting that
22   you went to in France --
23       A.    Yes.
24       Q.    -- back in -- in the summer of last

7 (Pages 22 to 25)

Scott Guelcher

Page 26

1  year; is that correct?
2      A.    That's right.
3      Q.    Have you attended any other
4  professional meetings since then regarding mesh?
5      A.    Regarding mesh?  No.  Not that I can
6  remember.
7      Q.    Were you ever reimbursed for your time
8  going to France for this meeting by the plaintiffs'
9  lawyers?
10     A.    No.
11     Q.    Did anybody ever compensate you for
12 your time?
13     A.    So I -- I paid for my expenses
14 through -- through a fund I have at Vanderbilt that
15 I use for international travel.
16     Q.    There was some discussion, if I recall,
17 about you submitting a research grant to the
18 National Institution of Health regarding mesh with
19 a Dr. Carey; do you remember that?
20     A.    Yes.  And for the record, can I just --
21 when you asked previously about who I have talked
22 with, she would be one that I discussed -- I just
23 forgot until you brought it up.  Okay?  I just --
24     Q.    That's fine.

Page 27

1      A.    Yeah.  For the record, Dr. Carey would
2  be another person that I've talked with.
3      Q.    Okay.  You can answer that question --
4      A.    I'm sorry.  Okay.  Ask the question
5  again.  I -- I -- I forgot.
6      Q.    You discussed an idea about submitting
7  a research grant to the NIH regarding mesh with
8  Dr. Carey; do you remember that?
9      A.    Vaguely.  Yeah, I think it came up.
10     Q.    What is -- what was the topic?
11     A.    I don't remember.
12     Q.    What's the status of it?
13     A.    I haven't submitted anything.
14     Q.    Okay.  But what's the status of it?
15     A.    What do you mean the status?  Like --
16     Q.    Where does it stand?
17     A.    Well, as I was saying earlier, I just
18 haven't been working on it and I haven't drafted
19 anything.  I haven't submitted anything.  I
20 just. . .
21     Q.    Was this the same research grant idea
22 that we discussed earlier?
23     A.    I don't remember.  I -- I don't
24 remember what I was talking with her about doing.

Page 28

1      Q.    Were you talking to her about doing
2  anything as it relates to mesh?
3      A.    I just don't remember what I talked to
4  her about.  It's been awhile, and I haven't really
5  acted on it.  So I just -- I have lots of
6  discussions about new research projects.  I -- I
7  just don't remember.
8            (Whereupon Exhibit 3 was marked as an
9  exhibit.)
10 BY MR. HUTCHINSON:
11     Q.    I understand.  I'll hand you what we've
12 marked as Exhibit 3 to your deposition.
13     A.    Okay.
14     Q.    This is the -- the paper that you
15 presented on at the meeting in France; is that
16 right?
17     A.    Let me review it for -- briefly.
18 This -- this -- yes, this appears to be that
19 abstract that I submitted to the IUGA, and then I
20 presented on it at the IUGA meeting.
21     Q.    And what contribution did Dr. Dunn
22 make?
23     A.    So Dr. Dunn did the FTIR and the SEM
24 analysis.  He and his student.

Page 29

1      Q.    And what did -- what contributions were
2  yours?
3      A.    So my contributions were more on the
4  design of the experiment, the selection of the
5  oxidative medium, the -- those would have been my
6  contributions.
7      Q.    Do you have any current or pending
8  experience with -- experiments with Dr. Dunn?
9      A.    I do not.
10     Q.    What about Dr. Iakovlev?
11     A.    I do not.
12     Q.    Do you have any current or pending
13 experiments regarding mesh with anyone, as we sit
14 here today?
15     A.    No.  I do not.
16     Q.    Do you have any mesh explants in your
17 custody or control?
18     A.    No.
19     Q.    What about any pristine mesh exemplars
20 in your custody or control?
21     A.    No.
22     Q.    You don't have any mesh whatsoever
23 available to you in your custody or control?
24     A.    No.

8 (Pages 26 to 29)

Scott Guelcher

Page 30

```
 1      Q.    Do you still defer to Dr. Dunn on the
 2  interpretations of the FTIR spectra?
 3      A.    I do.
 4      Q.    And you disclosed this work in the
 5  Perry litigation, didn't you?  That was for TVT
 6  ABBREVO?
 7      A.    The ABBREVO would be another product.
 8  Yes.
 9      Q.    And you attempted to rely on this paper
10  in the Perry litigation, didn't you?
11          MR. BOWMAN:  Object to form.
12          THE WITNESS:  I -- I just don't
13  remember.  It may have been on the -- on the -- on
14  the reliance list, but I don't -- I know it came up
15  in the deposition, but I deferred to Dr. Dunn for
16  the experimental details in the deposition.  That's
17  what I remember.
18  BY MR. HUTCHINSON:
19      Q.    Did you rely on this, Doctor, in
20  forming your opinions in the Perry litigation
21  regarding TVT ABBREVO?
22      A.    I don't believe so.  I mean, my
23  opinions have not changed in some time.  So this
24  was supplemental information that supported my
```

Page 31

```
 1  opinion, but -- and it was on the reliance list
 2  but -- I think it was.  I just -- I can't remember
 3  the details.
 4      Q.    Doctor, you relied on this work, that
 5  we've marked as Exhibit 3 to your deposition, in
 6  the Winebarger versus Boston Scientific litigation;
 7  is that correct?
 8      A.    Winebarger?  What product was this?  I
 9  can't remember the names -- the plaintiff name.
10      Q.    It was a lawsuit styled Winebarger,
11  W-i-n-b-a-r-g-e-r, versus Boston Scientific.
12      A.    That name just doesn't sound -- was it
13  part of a wave?  Was it -- I just don't remember
14  the plaintiffs' names probably.
15      Q.    Do you recall relying on this work that
16  was marked as Exhibit 3 in the Winebarger versus
17  Boston Scientific litigation?
18      A.    I don't.  Because I don't recall the
19  litigation.  I just -- I don't -- the -- the
20  plaintiff's name is -- that doesn't sound familiar
21  to me.
22      Q.    Okay.  Doctor, when we look at Exhibit
23  3, what product was used in your work?
24      A.    It's been some time.  I don't remember.
```

Page 32

```
 1  These were sutures.  I -- I -- we did -- no.  No.
 2  This was mesh.  This was -- this was mesh.  I -- I
 3  don't remember the actual product that we were -- I
 4  mean, it's been some time.  I think there was a --
 5  I think there was -- I think it was -- there were
 6  definitely two Boston Scientific meshes, maybe the
 7  Pinnacle.  There were slings.  Maybe the TV -- I
 8  think the TVT, too.
 9      Q.    So you used a TVT and a Pinnacle device
10  in your work --
11      A.    Perhaps --
12      Q.    -- regarding oxidative degradation of
13  polypropylene in pelvic mesh in vivo attached as --
14  I mean, marked as Exhibit 3 to your deposition?  Is
15  that your testimony, sir?
16      A.    That's what I remember.  I didn't -- I
17  mean, I wasn't -- yeah, I wasn't -- I'd have to
18  review this.  But I believe it was a TVT and two
19  Boston Scientific meshes that were included -- I
20  just need to read -- can I read this again?
21  Because I can't remember, you know, exactly --
22      Q.    Absolutely.
23      A.    This was written two years ago
24  almost --
```

Page 33

```
 1      Q.    Absolutely.
 2      A.    -- so I'm trying to remember exactly
 3  what I wrote.
 4      Q.    And this was also presented a year ago,
 5  correct?
 6      A.    Yes.
 7      Q.    Okay.  So if you'll read through it and
 8  tell me, sir, what the name of the products were
 9  that were used in this experiment.
10      A.    Okay.  I can -- give me a minute
11  to. . .
12          Okay.  So this was the mesh study.
13  Again, it's not stated in the abstract, but -- let
14  me just look at it again.  (Reviews document.)
15          Okay.  I -- I believe it was the TVT
16  and the Boston Scientific Advantage and Links,
17  maybe.  It's just been so long, I -- I can't
18  remember the exact devices.
19      Q.    So the products that you used were from
20  two different manufacturers, in this abstract; is
21  that correct, sir?
22      A.    I believe so.
23      Q.    Was the TVT mechanically cut or laser
24  cut?
```

9 (Pages 30 to 33)

Scott Guelcher

Page 34

1    A.    I don't remember.
2    Q.    How can you find out?
3    A.    Dr. Dunn would have all that
4  information.  He -- he had the mesh.  He put it in
5  the medium.  He was the one that physically did the
6  work.  He and, I think, maybe one of his students
7  did some of it, but he -- he's the one that had the
8  exemplars and cut the samples and put them in the
9  medium.  I didn't do that.  And so --
10   Q.    Okay.
11   A.    And I never had the mesh in my
12  possession that I remember.
13   Q.    Oh, you didn't.  So, Doctor, can you
14  testify, to a reasonable degree of scientific
15  certainty, that the two products that were used in
16  this experiment were TVT and a Boston Scientific
17  product?
18       MR. BOWMAN:  Object to form.
19       THE WITNESS:  Again, I'm going based on
20  my memory.
21  BY MR. HUTCHINSON:
22   Q.    I understand.
23   A.    And --
24   Q.    But I'd like for -- I'd like -- I need

Page 35

1  an answer, based upon a reasonable degree of
2  scientific certainty.  Can you testify today, to a
3  reasonable degree of scientific certainty,
4  regarding the specific names of the products used
5  in this experiment?
6    A.    I mean, I believe, to a reasonable
7  degree of scientific certainty, that's what we --
8  that's what we used.  That's what I remember.  You
9  know, I work closely with Dr. Dunn.  Our offices
10  are right beside each other.  So, I mean, he --
11  he -- that's what I believe he did.
12   Q.    Okay.  And, Doctor, when you were
13  deposed in September in the Mullins litigation, you
14  didn't rely on this abstract for your opinions in
15  that; is that correct?
16   A.    I don't believe so.
17   Q.    And you're not relying on the abstract
18  that you published for your opinions in this
19  litigation; is that correct?
20   A.    No, I'm not.
21   Q.    Okay.  Why not?
22   A.    Well, we -- we -- we would like to
23  publish it.  And that's something -- that's part of
24  what we're -- we -- we just -- we're -- we're

Page 36

1  working on it.  We don't know what we're going to
2  do yet.  It's just -- you know, we have -- very
3  busy, and it's -- I don't -- I don't know what the
4  plan is.  But I'm not relying on it because we
5  haven't published it.
6    Q.    Okay.  Any other reasons?
7    A.    No.  That's the main reason.  I -- I
8  believe the Court likes to see published studies
9  and that's --
10   Q.    Okay.
11   A.    -- that -- that's our plan.
12   Q.    But it's fair to say that you've
13  written a paper that investigated oxidative
14  degradation of polypropylene mesh in vitro using an
15  oxidative medium and you're not relying on that
16  work in this litigation?
17       MR. BOWMAN:  Object to form.
18       THE WITNESS:  Can you repeat that?  I'm
19  sorry.
20  BY MR. HUTCHINSON:
21   Q.    Yes.
22   A.    It was long.
23   Q.    It's fair to say that you've written a
24  paper --

Page 37

1    A.    Okay.
2    Q.    -- that investigated oxidative
3  degradation of polypropylene using an oxidated
4  medium and you're not relying on it in this
5  litigation; is that fair to say?
6    A.    I would say it's a submitted abstract.
7  This is a submitted abstract.  I wouldn't call this
8  a paper.  It's a published abstract, and it is peer
9  reviewed but not like a paper.  It's not -- I'm not
10  relying on it.
11   Q.    And --
12   A.    And that -- go ahead.
13   Q.    What is the status of this work,
14  Doctor?
15   A.    As I said, I -- I -- I don't know.  We
16  don't know what we're going to do with it yet.
17   Q.    When is the last time you talked to
18  Dr. Dunn about this?
19   A.    I don't remember.
20   Q.    Has it been more than six months?
21   A.    Probably not.  But I just don't -- I
22  don't remember what we said about this.  We
23  haven't -- I haven't relied on it in the recent
24  litigation in some time.  And it's -- you know,

Scott Guelcher

Page 38

1    it's just one of these unpublished studies that we
2    did, published an abstract, submitted at a meeting,
3    and just haven't followed up on it for the paper.
4    That's what I would say.
5        Q.    Is this work finished?
6        A.    Well, this study is finished. But when
7    you were asking me about research earlier, I -- I
8    mean, I -- I'm trying to be honest without
9    revealing, you know, what I consider to be, you
10   know, associated with my research being
11   confidential. But I don't know what we're going to
12   do next.
13       Q.    Okay. But this study was finished,
14   correct?
15       A.    This study is completed. Yes.
16       Q.    Right. And this study was peer
17   reviewed in an abstract in the International
18   Urogynecology Journal, correct?
19           MR. BOWMAN: Object to form.
20           THE WITNESS: It was -- it was reviewed
21   for the meeting. I -- I wouldn't -- it's not --
22   yes, it was reviewed. Okay.
23   BY MR. HUTCHINSON:
24       Q.    And, Doctor, were the chemical

Page 39

1    conditions, to which you subjected the mesh,
2    intended to represent an actual in vivo condition
3    in the body?
4        A.    So they were intended to simulate the
5    adherent macrophage pocket, the -- the space
6    between the adherent cell and the surface of the
7    material.
8        Q.    I under - --
9        A.    That's been published. Right? Yeah.
10       Q.    I understand. But was it intended to
11   represent actual in vivo conditions in the body?
12   Yes or no?
13       A.    Well, I thought I answered your
14   question. That would be the -- the -- it's
15   simulating that -- that situation where you have an
16   inherent macrophage attached to a biomaterial in
17   the body and there's a privileged microenvironment
18   between the cell and the material. And that medium
19   has been shown to -- published to simulate those
20   oxidative conditions between the cell and the
21   surface of the material.
22       Q.    Are the chemical conditions intended to
23   represent actual in vivo conditions in the body,
24   sir? Yes or no?

Page 40

1        A.    I think I just answered the question.
2        Q.    You didn't.
3        A.    I did.
4        Q.    I need "yes" or "no," and then you can
5    answer. . .
6        A.    I can't give you a yes or no because
7    I -- I feel like you're trying to put -- I need to
8    be very specific about what that medium is
9    simulating.
10       Q.    Absolutely.
11           And my question to you, sir, is the
12   oxidative medium designed to represent the actual
13   in vivo conditions in the body? Yes or no?
14       A.    But "actual in vivo conditions" is what
15   I'm hung up on. That's a very vague term. It
16   is -- it's meant to simulate the
17   microenvironment -- in vivo microenvironment that
18   the material is exposed to. That's what it's meant
19   to simulate. That's, I think, an answer to your
20   question. You're asking me -- that's my answer.
21       Q.    Is that the best you can do?
22       A.    That's the best I can do. I'm sorry.
23   I just -- I don't want to agree to some very
24   vaguely stated question.

Page 41

1        Q.    Doctor, do you write about in vivo
2    conditions in this abstract?
3        A.    I'd have to read it again. (Reviews
4    document.)
5        Q.    Let's look on the last page.
6        A.    Okay.
7        Q.    At the conclusion. "Oxidative
8    degradation of polypropylene pelvic mesh was
9    evidenced by chemical and physical changes under
10   simulated in vivo conditions."
11       A.    Okay.
12       Q.    Did you write that?
13       A.    I wrote that.
14       Q.    Okay. So my question to you, sir, are
15   the chemical conditions, to which you subjected the
16   mesh, intended to represent simulated in vivo
17   conditions in the body? Yes or no?
18       A.    Yes. I wrote that. I stand by what I
19   wrote.
20       Q.    All right. Since the Mullins
21   deposition, Doctor, have you done any work to
22   determine if oxidized polypropylene will stain?
23       A.    Since the Mullins deposition last fall?
24       Q.    Yes, sir.

11  (Pages 38 to 41)

Scott Guelcher

Page 42

1    A.    No.
2    Q.    Have you ever done any work in your
3  life to determine if oxidized polypropylene will
4  stain?
5    A.    No.
6    Q.    When is the last time you've spoken
7  with Dr. Iakovlev?
8    A.    That's been some time.  Maybe -- I need
9  to think for a minute.  Probably last summer at the
10 meeting.
11   Q.    Doctor, are you aware of any literature
12 that discusses the extent to which oxidized
13 polypropylene traps and holds stain?
14   A.    Well, we discussed it in the paper with
15 Dr. Iakovlev, but I -- I'm not aware, at this
16 moment, off the top of my head, of another paper
17 that would -- I'd have to look at the paper again.
18 It's been some time.
19   Q.    You testified in the Mullins deposition
20 that you've never done an XPS analysis.  Does that
21 remain true?
22   A.    I'd like to -- I've -- I've never
23 physically done it myself.  My students have done
24 it. But I've never actually done the measurement.

Page 43

1    Q.    Have you ever done any molecular weight
2  testing of PROLENE?
3    A.    Not of PROLENE.
4          Oh, I'm sorry.  Can I --
5    Q.    (Indicating yes.)
6    A.    We -- we did some molecular weight
7  testing with Dr. Dunn on exemplars some time ago.
8  It's been a long time.  And I don't remember if
9  PROLENE or TVT devices were included.  I can't
10 remember the devices.
11   Q.    Okay.
12   A.    But we -- we sent those to another lab.
13 It was in one of his reports.
14   Q.    What were the results?
15   A.    I don't remember.  I haven't been
16 relying on that, so I just don't remember.
17         (Reporter interruption for
18 clarification.)
19         THE WITNESS: You know, I'm. . .
20 BY MR. HUTCHINSON:
21   Q.    Well, my question --
22   A.    Yeah.
23   Q.    I'm not sure I understood your answer.
24 Have you ever done -- have you personally ever done

Page 44

1  any molecular weight testing of PROLENE?
2    A.    Well, I'm trying to -- I'm trying to
3  answer.  So -- I mean, I don't -- I mean, being a
4  professor, I don't actually work in the lab.  I
5  have graduate students and a lab manager that do
6  the work that we discuss, right?  And I -- I'm --
7  sort of direct of work, if you want to call it
8  that.
9          And what I -- what I was saying is that
10 some time ago, a couple years at least, we --
11 Dr. Dunn and I sent some samples to -- Dr. Dunn
12 handled the samples -- to another laboratory to do
13 molecular weight measurements.  And whether PROLENE
14 meshes -- you know, meshes made out of PROLENE were
15 in those samples, I can't remember.  It's been a
16 long time. So. . .
17   Q.    Okay.  And you don't know the results;
18 is that correct?
19   A.    I don't remember the results.
20   Q.    Doctor, have you ever done any
21 molecular weight testing of PROLENE explants?
22   A.    I don't think so.  The samples -- no, I
23 don't think so.
24         (Whereupon Exhibit 4 was marked as an

Page 45

1  exhibit.)
2  BY MR. HUTCHINSON:
3    Q.    Doctor, handing you what we'll mark as
4  Exhibit 4 to your deposition --
5    A.    Okay.
6    Q.    -- you cite this on page 9 of your
7  expert report.  Do you remember that?
8    A.    Yes.
9    Q.    Okay.  And, in fact, if you look on
10 your expert report, under "Summary of Opinions,"
11 Number 7.
12   A.    Okay.
13   Q.    It's on page 3.  It states --
14   A.    Okay.
15   Q.    -- ". . .the use of heavy-weight meshes
16 directly correlates with more exposure of
17 polypropylene to the Foreign Body Reaction and
18 greater changes after implantation. . ."
19         Do you see that?
20   A.    Yes.
21   Q.    All right.  Doctor, how do you define
22 "heavy-weight"?
23   A.    My understanding is that the TVT mesh
24 has a weight of around -- a surface density of

12  (Pages 42 to 45)

Scott Guelcher

Page 46

1    around 100, would be a heavy-weight mesh.
2         Let me look at this paper again for a
3    minute.  I believe it was discussed in here, the
4    densities of the specific meshes that she tested.
5         Yeah.  So this would be the GYNEMESH
6    that had a density of 44 grams to square meter;
7    ULTRAPRO, which was 31; and Restorelle was 19.
8         Q.    Doctor, how do you define
9    "heavy-weight"?
10        A.    How do I define "heavy-weight"?
11        Q.    Yes, sir.
12        A.    I think -- I think something greater
13   than 50 grams per square meter would be a heavier
14   weight mesh.
15        Q.    And how do you come up with the number
16   50 grams per square meter?
17        A.    I -- I can't remember.  There's some
18   papers -- there's a paper where this is -- these
19   are classified, and I just can't remember the
20   numbers right now.
21        Q.    Well, you mean you can't remember the
22   cite right now?
23        A.    Yeah.  Well, the -- I can't remember
24   the citation, and I can't remember the actual

Page 47

1    ranges that were listed in the -- in the table.
2    I'd have to look at this --
3         Q.    I understand.  But, Doctor, sitting
4    here today, and one of your opinions on Number 7 is
5    the -- is about heavy-weight meshes.  So my
6    question to you is --
7         A.    Okay.
8         Q.    -- how do you define a heavy-weight
9    mesh?
10        A.    So a heavy-weight mesh would be a mesh
11   in the range of -- I'd probably say 100 grams per
12   square meter.  Those are the heavy-weight meshes
13   that -- in my recollection.
14        Q.    Okay.  And if something is less than
15   100 grams per square meter, according to your --
16   your definition, would that be a light-weight mesh?
17        A.    No.  I don't think I would call it a
18   light-weight mesh.  I mean, what I was really
19   trying to say in this opinion is that the more
20   polypropylene is there, the more intense the
21   foreign body reaction.  That's what the point of
22   that opinion is.
23        Q.    Right.  But my --
24        A.    So it's a sliding scale.  I mean --

Page 48

1    right?  I mean, as the density increases, it's
2    going to be more intense.  That's what I was
3    saying.
4         Q.    Right.  My question to you, sir, is how
5    do you define a heavy-weight mesh?  Is it something
6    greater than 50 -- I'm sorry -- something greater
7    than a 100 grams per meter squared?  Is that
8    Dr. Guelcher's definition?
9         MR. BOWMAN:  Object to form.
10        THE WITNESS:  Again, there's lots of
11   different definitions of polypropylene mesh.  100
12   grams per square meter is -- I would consider that
13   to be a heavy-weight mesh.
14   BY MR. HUTCHINSON:
15        Q.    Okay.  And if something is less than
16   100 grams per square metered, would that be a
17   medium-weight mesh or a light-weight mesh?  What
18   would it be?
19        A.    I don't -- I don't know specifically.
20   I mean, everybody has a different range that they
21   use to define that.  I don't -- I mean, there's not
22   a lot of -- there's not a lot of agreement in the
23   literature.
24        Q.    You can't tell me whether or not

Page 49

1    something would be a light-weight mesh if it was
2    less than 100 grams per meter squared; is that
3    correct?
4         A.    Some would call that a -- a
5    light-weight mesh --
6         Q.    All right.
7         A.    -- if it's less than 100.
8         Q.    Do you -- do you, Doctor, as a polymer
9    scientist and as an expert in this litigation, have
10   a definition for a light-weight mesh?
11        A.    No.  Because I was looking at it from
12   the perspective of the amount of polypropylene
13   increases with mesh density.  It's not just a
14   simple classification, as the mesh increases, the
15   foreign body reaction increases, because it's
16   dependent on that surface of polypropylene.  That's
17   what I'm saying.
18        Q.    Are you aware of any medical device
19   industry standard that measures or defines
20   heavy-weight mesh?
21        A.    Industry standard?  I -- I'm -- I -- I
22   think that's what I was saying.  There's different
23   investigators and maybe companies who have
24   defined -- but it's -- it's not -- I don't -- I

13 (Pages 46 to 49)

Scott Guelcher

Page 50

1    don't -- I guess what I'm saying is I don't
2    consider it a -- something that's agreed upon, say,
3    like in an ASTM standard.  It's somewhat
4    discretionary, I would say.
5        Q.    All right.  So you're not aware of any
6    medical device industry standard that measures or
7    defines heavy-weight mesh; is that correct?
8        A.    There may be a standard that mesh -- I
9    can't think of it right now.  I -- I can't
10   remember.
11       Q.    Okay.  Doctor, are you aware of any
12   medical device industry standard that measures and
13   defines pore size?
14       A.    I mean, pore size isn't really what I
15   was talking about in my opinions.  So that's not
16   something --
17       Q.    All right.  I can cut to the chase.
18       A.    Okay.
19       Q.    Do you have any opinions whatsoever
20   regarding the pore size of the PROLENE mesh
21   contained in any of the products that you're giving
22   opinions about today?
23             MR. BOWMAN:  Object to form.
24   BY MR. HUTCHINSON:

Page 51

1        Q.    We can short circuit that.
2        A.    Okay.  Let me just think for a second.
3             So I -- I don't believe that I
4    discussed pore size in my report.
5        Q.    Is it fair to say, Doctor, you have no
6    opinions regarding pore size of the mesh of the
7    products that you're here to give testimony about
8    today; is that right?
9             MR. BOWMAN:  Object to form.
10            THE WITNESS:  Maybe other than it could
11   change in the mechanical environment and in the
12   chemical changes that happen to the mesh, pore size
13   could change, that could affect infiltration.
14   BY MR. HUTCHINSON:
15       Q.    Is that an opinion you're going to
16   stand by today?
17       A.    I don't believe so.  It's not in my
18   report.
19       Q.    Okay.  Thank you.
20            So fair so say you have no opinions
21   regarding pore size on the products that you're
22   designated to give testimony about today?
23            MR. BOWMAN:  Object to form.
24            THE WITNESS:  I think so.  I'm not

Page 52

1    discussing pore size in the report.
2    BY MR. HUTCHINSON:
3        Q.    Okay.  Well, Doctor, what is your
4    opinion regarding the ideal weight of mesh?
5        A.    I don't believe I've expressed an
6    opinion about the ideal weight.  My opinion has
7    been the more mesh, the more intense the foreign
8    body reaction.  So I haven't really expressed an
9    opinion about ideal weight.
10       Q.    Okay.  Do you have an opinion, as we
11   sit here today, regarding the ideal mesh -- mesh in
12   terms of weight?
13       A.    It would help me if you could be
14   specific.  I -- I -- I'm not saying that there's an
15   ideal weight for the mesh.  All I'm saying is that
16   the intensity of the foreign body reaction
17   increases with the weight density of the mesh.
18   That's -- and I'm not saying that that should be 30
19   or it should be 20.  I'm saying that -- it's -- as
20   the amount of polypropylene increases, the
21   intensity of foreign body reaction.  That's --
22   that's what I'm saying.
23       Q.    Okay.  But can you tell us -- can you
24   tell us the ideal weight of the mesh?

Page 53

1        A.    No.  I've not testified about an ideal
2    weight of mesh.
3        Q.    Doctor, you'll agree that any implanted
4    material will elicit some form of foreign body
5    reaction or inflammatory response?
6        A.    Yes.  That's a foreign body reaction.
7    When a material is implanted, it induces and
8    elicits a foreign body reaction.
9        Q.    And the microphage's response is an
10   essential component of tissue incorporation,
11   correct?
12       A.    What do you mean by "essential"?  I'm
13   not --
14       Q.    You must have a microphage response to
15   have tissue incorporation in the mesh, correct?
16       A.    Well, macrophages infiltrate the mesh
17   like they do any foreign body.  It just happens.
18   It's not -- it's not necessarily something that can
19   be controlled.  It just happens.  It's a foreign
20   body reaction.
21       Q.    Let's look at the Moalli paper --
22       A.    Okay.
23       Q.    -- that we've marked --
24       A.    Okay.

14 (Pages 50 to 53)

Scott Guelcher

## Page 54

1    Q.    -- Exhibit 4. Are you there with me?
2    A.    I am.
3    Q.    This paper studied two meshes with
4    PROLENE: GYNEMESH PS and ULTRAPRO; is that right?
5    A.    Yes. I believe so.
6    Q.    And this is the one the newer papers
7    that you're relying on; is that correct?
8    A.    It is.
9    Q.    What does GYNEMESH PS stand for?
10    A.    I -- I don't remember the PS. I know
11    that the GYNEMESH is -- is -- I believe it's used
12    in the POP kits. It's a lower-density mesh than
13    the TVT. I don't know what the PS -- I'd have to
14    look at the paper again. I don't. . .
15    Q.    All right. It's on page 1 under
16    "Results," last paragraph. They compare ULTRAPRO
17    with Restorelle --
18    A.    Uh-huh.
19    Q.    -- and GYNEMESH PS. Do you see that?
20    A.    I do.
21    Q.    My question, Doctor, is what does the
22    PS in GYNEMESH stand for?
23    A.    I -- I just don't remember.
24    Q.    Did you make any effort to find out?

## Page 55

1    MR. BOWMAN: Object to form.
2    THE WITNESS: I don't remember. I was
3    looking at the density in the table. I don't know
4    the specific formulation of that --
5    BY MR. HUTCHINSON:
6    Q.    Do you know how GYNEMESH PS may be
7    different than GYNEMESH?
8    A.    I -- I -- I -- I don't remember how
9    it's different from GYNEMESH.
10    Q.    Do you have any idea, as we sit here
11    today, what the PS stands for?
12    MR. BOWMAN: Object to form. Asked and
13    answered.
14    THE WITNESS: I mean, it's a company
15    acronym. I don't -- I don't know why they call it
16    a GYNEMESH PS. I don't remember.
17    BY MR. HUTCHINSON:
18    Q.    Do you know if it's 100 percent
19    PROLENE?
20    A.    I'd have to look at this again. I
21    can't remember. One of these was -- maybe it was
22    the Restorelle that had a -- had a resorbable
23    component I thought.
24    Q.    Right. Let's talk about GYNEMESH PS.

## Page 56

1    Do you know if the mesh made in GYNEMESH PS is 100
2    percent PROLENE?
3    A.    I mean, I believe it is. They -- they
4    say the -- we sought to determine the predominant
5    cell type within the area of implantation of the
6    prototypical polypropylene mesh, GYNEMESH PS.
7    Q.    ULTRAPRO has an absorbable component,
8    doesn't it?
9    A.    It's my understanding there's a
10    resorbable polyester component. Wait a minute.
11    Let me look at my report again. I can't. . .
12    Yeah, so the PROLIFT, I know, has
13    the -- the resorbable component. But she says
14    these are polypropylene meshes in the objective.
15    So that's what I read it, is that these are
16    polypropylene meshes with different densities.
17    That was what I understood to be the -- the purpose
18    of this study.
19    Q.    Doctor -- Doctor, do you know the
20    weight of the adsorbable component in ULTRAPRO?
21    MR. BOWMAN: Object to form.
22    THE WITNESS: I -- I don't remember
23    right now.
24    BY MR. HUTCHINSON:

## Page 57

1    Q.    Let's talk about the -- the products
2    that you're designated for. I will represent to
3    you, Dr. Guelcher, and also represent to the Court
4    that you've been designated for -- to give opinions
5    for TVT, TVT-O, TVT ABBREVO, TVT-SECUR, TVT EXACT,
6    PROSIMA, GYNEMESH PS, PROLIFT, and PROLIFT+M. Have
7    you heard of all those products?
8    A.    I have.
9    Q.    Okay.
10    THE WITNESS: Can we take a break for a
11    few minutes? My stomach's a little bit -- is that
12    okay?
13    MR. HUTCHINSON: Yes, sir.
14    THE WITNESS: Thank you.
15    (Brief recess.)
16    BY MR. HUTCHINSON:
17    Q.    Dr. Guelcher, are you okay?
18    A.    Yeah. I'm okay.
19    Q.    All right. If you need to take another
20    break, let me know. Okay?
21    A.    Okay. Thanks.
22    Q.    Doctor, do you know the weight of
23    TVT-O?
24    A.    The weight? The density?

15 (Pages 54 to 57)

Scott Guelcher

Page 58

1    Q.    In grams -- yes.  In grams per meter
2  squared.
3    A.    I believe it's similar to the TVT,
4  which is around 100.
5    Q.    What about TVT ABBREVO?
6    A.    I think it's similar.  I think it's
7  made from the same mesh.
8    Q.    Do you -- but do you know the weight,
9  sir?
10   A.    100.
11   Q.    Do you know the weight of TVT-SECUR?
12   A.    Let me look back at my report.
13  Again -- well. . . (Reviews document.)
14        Yeah.  So it's in my report.  The --
15  the -- those SUI devices, the slings, the TVT-S,
16  TVT ABBREVO, TVT-O, TVT are made from this
17  105-gram-per-square-meter mesh.  So they're all
18  made from the same mesh, in my understanding.
19   Q.    And -- and, Doctor, is it your
20  testimony for all TVT products the weight of the
21  mesh per meter squared is the same?
22   A.    That's my understanding --
23   Q.    All right.  Doctor --
24   A.    -- for the slings.

Page 59

1    Q.    And, Doctor, for the POP products, do
2  you know the weight of the mesh per meter squared?
3    A.    I don't remember that all.  The
4  GYNEMESH is 45 grams per square meter.  The -- the
5  PROLIFT+M, that's the one that's the blend, has the
6  resorbable polyester.  After the polyester resorbs,
7  the density is 28.  So it's probably, roughly, you
8  know, half, something in that range.  So as the
9  polyester resorbs, the density goes down.
10   Q.    And, Doctor, if we look at the Moalli
11  paper --
12   A.    Okay.
13   Q.    -- that you have, the mesh didn't
14  oxidize after 12 weeks, did it?
15   A.    Well, she wasn't testing for oxidation.
16  She was looking at the cellular response.  So I
17  wouldn't say that it didn't oxidize.  I just -- I
18  don't think she reported that it did.  But I don't
19  know that she really did any testing for that.
20   Q.    A causal relationship wasn't
21  established in that paper, was it, sir?
22   A.    A causal relationship --
23   Q.    Correct --
24   A.    -- between what?

Page 60

1    Q.    The weight of the mesh and clinical
2  problems; is that correct?
3    A.    Well, this wasn't really addressing
4  that question.  The -- the relationship was between
5  the density of the mesh and the nature of the
6  inflammatory infiltrate.  That was the question she
7  was looking at.  It wasn't related.  This was a
8  preclinical study, I believe.  So it wasn't -- this
9  was in Rhesus macaque.  So it wasn't --
10        (Reporter interruption for
11  clarification.)
12        THE WITNESS:  Rhesus macaque, which is
13  the -- it's a -- it's a primate.  So it's not a
14  clinical study.
15  BY MR. HUTCHINSON:
16   Q.    There were a number of limitations in
17  that study, weren't there?
18   A.    So she has a paragraph in the
19  discussion about limitations of the study, which is
20  typical in scientific research.  That's what we do.
21   Q.    Okay.  And, Doctor, if we look back at
22  your expert report --
23   A.    Okay.
24   Q.    -- under "Summary of Opinions" --

Page 61

1    A.    Okay.
2    Q.    -- Number 1 --
3    A.    So we -- okay.  Go ahead.  Sorry.
4    Q.    Number 1 discusses "polypropylene
5  reacts with molecular oxygen by autoxidation
6  outside the body at elevated temperatures,
7  resulting in chain scission and deterioration. . ."
8        Do you see that?
9    A.    Yes.
10   Q.    At what elevated temperatures outside
11  the body?
12   A.    I have to look at the details again.
13  Temperatures above 100 C.  That is 100 Celsius.
14   Q.    And -- and what is the normal body
15  temperature in Celsius degrees of the human body?
16   A.    37.
17   Q.    And what is autoxidation, Doctor?
18   A.    Well, "autoxidation" is a term that
19  some use to describe the reactive -- the reaction
20  of the polypropylene with molecular oxygen at
21  elevated temperatures.
22   Q.    And we don't have elevated temperatures
23  in the body, in vivo, do we, to the point where it
24  would autoxidate?

16 (Pages 58 to 61)

Scott Guelcher

Page 62

1       MR. BOWMAN:  Object to the form.
2       THE WITNESS:  Well, the body
3  temperature is 37 degrees C.  So that reaction with
4  molecular oxygen would be slow.  I mean. . .
5  BY MR. HUTCHINSON:
6       Q.   In fact, have you quantified how slow
7  it would be?
8       A.   Well, I mean, Leibert addressed that
9  question with molecular oxygen.
10      Q.   But my question to you, sir, is have
11  you personally quantified that?
12      A.   No.  Because I don't think it's
13  relevant because there's more reactive forms of
14  oxygen in the body that are causing the reaction.
15  So. . .
16      Q.   What is -- is required for PROLENE
17  to undergo autoxidation?
18      A.   Well, PROLENE will undergo oxidation
19  with molecular oxygen.  It -- it -- it can happen
20  at lower temperatures.  It's just very, very slow.
21      Q.   Okay.
22      A.   So, I mean, it happens faster.  Like
23  any chemical reaction --
24      Q.   I understand.

Page 63

1       A.   -- it's -- it's faster at higher
2  temperatures.
3       Q.   But what is required for PROLENE to
4  undergo autoxidation in the body?
5       A.   In the body?  You're asking a different
6  question.  I'm confused.
7       Q.   I am.
8       A.   Okay.
9       Q.   In general, what is -- strike that.
10      A.   Okay.
11      Q.   In general, what is required for
12  PROLENE to undergo autoxidation?
13      A.   A -- I thought I answered it.  It's --
14  again, it would be the reaction with molecular
15  oxygen is happening at faster rates at higher
16  temperatures.
17      Q.   Okay.
18      A.   In -- in -- under body conditions, that
19  reaction with molecular oxygen would be slow.
20      Q.   And --
21      A.   That's what I said.
22      Q.   And at what temperature, Doctor,
23  would --
24      A.   Well, I mean, at what temperature -- it

Page 64

1  increases with temperature.
2       Q.   Okay.
3       A.   As the temperature gets higher, it gets
4  faster.
5       Q.   Can you -- can you tell me a
6  temperature for PROLENE to undergo autoxidation?
7  Can you tell me a specific temperature?
8       MR. BOWMAN:  Object to form.
9       THE WITNESS:  Well, I'm trying to
10  answer.  I -- I mean, it -- it's a chemical
11  reaction.  And the Arrhenius equation tells us that
12  these reactions get faster as the temperature goes
13  up.  So the reaction can occur at physiological
14  temperatures.  It's just very slow.
15      People do the studies at higher
16  temperatures because they want to do them quickly.
17  So if you increase the temperature to 100 degrees
18  or 200 degrees Celsius, the reaction is faster.
19  And that's why a lot of these older studies did it
20  at higher temperatures.
21  BY MR. HUTCHINSON:
22      Q.   Right.  But my question is what
23  temperature is required for PROLENE to undergo
24  autoxidation?

Page 65

1       A.   I'm really trying to answer it.  I
2  mean, it's a chemical reaction.  It -- it -- it --
3  PROLENE is polypropylene with antioxidants.  And
4  the antioxidants can delay the reaction, but,
5  eventually, it's going to happen.  So. . .
6       Q.   At what rate -- excuse me.
7       A.   Go ahead.  I -- I'm finished.
8       Q.   At what rate does PROLENE undergo
9  autoxidation in the body?
10      A.   I don't know the rate.  I've not
11  measured it.  But I wasn't really -- no.  I don't
12  know the rate that -- that thermal oxidation is
13  going to. . .
14      Q.   If we -- if we look at the summary of
15  opinions, Number 3 --
16      A.   Okay.
17      Q.   -- you discuss the dynamic environment
18  where polypropylene mesh is implanted.  Do you see
19  that opinion?
20      A.   Yes.
21      Q.   What scientific evidence do you have,
22  Dr. Guelcher, for chain scission having occurred
23  with PROLENE in vivo?
24      MR. BOWMAN:  Object to form.

17 (Pages 62 to 65)

Scott Guelcher

Page 66

1    THE WITNESS:  Well, I mean, the paper
2  published in 2015 by Mays, et al., showed
3  reductions in molecular weight.  Now, that wasn't
4  PROLENE, but it was still polypropylene with
5  antioxidants.
6  BY MR. HUTCHINSON:
7    Q.    Okay.
8    A.    It's very similar material.
9    Q.    Okay.  Let's -- let's focus on PROLENE,
10  though, Doctor.
11    What scientific evidence do you have
12  for chain scission having occurred with PROLENE in
13  vivo.
14    MR. BOWMAN:  Object to form.
15    THE WITNESS:  PROLENE in vivo.  I don't
16  know of a study that specifically looked at chain
17  scission of PROLENE in vivo.
18  BY MR. HUTCHINSON:
19    Q.    And, Doctor, what scientific evidence
20  do you have for any PROLENE implant having oxidized
21  to produce a carbonyl group, a C double bond O?
22    A.    Can we go back to the chain scission
23  one?  I just remembered something or -- or I need
24  to answer this first.

Page 67

1    Q.    Well, let's stick with this one.
2    A.    Okay.  So can you say it again?
3    Q.    What scientific evidence do you have
4  for any PROLENE implant having oxidized to produce
5  a carbonyl group?
6    A.    Let me look at my report again.  There
7  was some studies done at Ethicon that reported
8  oxidation.  And I'm trying to remember the details
9  of exactly what they reported.  I -- I believe they
10  saw in those -- in those -- let me read my report
11  again because I'm -- I'm. . . (Reviews document.)
12    So there were some studies by Dr. Moy
13  that noted the presence of oxidation products by
14  FTIR.  I believe that was incubated in hydrogen
15  peroxide.  There were some human explants where
16  they observed degradation.  And this question of
17  oxidation of the materials was referred to in those
18  studies.
19    Q.    Okay.
20    A.    They found that the cracked PROLENE
21  surface is a composite of oxidized polypropylene,
22  an adsorbed protein.  So there was some internal
23  Ethicon studies that looked at these questions of
24  antioxidant depletion, oxidation of the surface,

Page 68

1  cracking, and molecular weight degradation.
2    Q.    Outside of Ethicon's internal
3  studies --
4    A.    Okay.
5    Q.    -- are you aware of any scientific
6  evidence that a PROLENE implant has oxidized to
7  produce a carbonyl group?
8    MR. BOWMAN:  Object to form.
9    THE WITNESS:  So Clavé addressed --
10  BY MR. HUTCHINSON:
11    Q.    Okay.
12    A.    No.  Clavé didn't -- he didn't -- he
13  just says that he tested these different explants.
14  So he doesn't necessarily divide it out by
15  manufacturer, so it's --
16    Q.    I understand.
17    A.    -- it's not totally clear, right?
18    Q.    Okay.
19    A.    But, I mean, he does say -- he does
20  observe evidence -- I've talked about this
21  before -- evidence in the FTIR spectrum that I
22  believe is indicative of oxidation.  I know it's --
23  we talked about this before.  I don't --
24    Q.    Are you basing this solely on Clavé?

Page 69

1    A.    Clavé would be the one that -- I think
2  Céline Mary discussed this as well.
3    Q.    Okay.  And is that the only scientific
4  evidence that you're relying on is Clavé and the
5  internal Ethicon documents for a PROLENE implant
6  having oxidized to produce a carbonyl group?
7    MR. BOWMAN:  Object to form.
8    THE WITNESS:  Those are the documents
9  that come to mind that I've testified about before.
10  BY MR. HUTCHINSON:
11    Q.    Okay.  Doctor, do you have -- and let's
12  talk about -- my question is very specific as it
13  relates to the nine specific products that you're
14  here to give testimony about.
15    A.    Okay.
16    Q.    TVT, TVT-O, TVT ABBREVO, TVT-SECUR, TVT
17  EXACT, PROSIMA, GYNEMESH PS, PROLIFT, and
18  PROLIFT+M.  Okay?
19    A.    Yes.
20    Q.    So my question, when I talk about the
21  nine products, that's what I'm talking about.
22    A.    I understand.
23    Q.    All right.  Do you have any scientific
24  evidence that any of those nine products were

18  (Pages 66 to 69)

Scott Guelcher

Page 70

1    implanted and oxidized to produce a carbonyl group?
2        A.    Again, the only study that could have
3    included those devices would be the Clavé study
4    where he took the 100 explants. And also the study
5    with Dr. Iakovlev, but that was looking more at --
6    that was explanted mesh as well, that looked at the
7    degradation layer. But not -- well, he did look at
8    the question of oxidation indirectly with the
9    myeloperoxidase staining that we saw.
10       Q.    Right. But not specifically for those
11   nine products, correct?
12       A.    Those nine products were not
13   specifically mentioned in the Iakovlev study that I
14   remember.
15       Q.    Thank you.
16             So the only -- the only paper that
17   you're relying on as it relates to whether any of
18   those nine products oxidized to produce a carbonyl
19   group, after it was implanted in vivo, is the Clavé
20   study; is that correct?
21             MR. BOWMAN: Object to form.
22             THE WITNESS: For those nine products,
23   that would be the one that I would. . .
24   BY MR. HUTCHINSON:

Page 71

1        Q.    That would be the one that you would
2    what?
3        A.    I'm just thinking. I'm sorry. I'm
4    just thinking. You're -- you're referring
5    specifically to the question of the carbonyl bond
6    and the oxidation, right?
7        Q.    (Indicating yes.)
8        A.    Yeah. That would be the one that would
9    come to mind.
10       Q.    Okay.
11       A.    That's the one I would rely on.
12       Q.    Okay. And Clavé is the same one that
13   you rely on that states that the FTIR could
14   neither -- neither confirm nor rule out oxidation,
15   correct?
16       A.    Clavé states that.
17       Q.    Yes.
18       A.    I don't necessarily agree with it. But
19   that's what the paper says.
20       Q.    And, Doctor, going back to these nine
21   products, do you have any evidence that any of
22   these nine products became embrittled in vivo?
23             MR. BOWMAN: Object to form.
24             THE WITNESS: I mean, again, in the

Page 72

1    Iakovlev study, we -- there were a lot of explants,
2    but they weren't specifically named. They were
3    slings, POPs, maybe some hernia mesh, too. But
4    they -- the products weren't specifically named.
5    So I -- I -- I can't -- I mean, it was a number of
6    devices, right?
7    BY MR. HUTCHINSON:
8        Q.    Yeah.
9        A.    Not -- not -- those specific products
10   were not named.
11       Q.    Right. So I'm not asking about whether
12   or not Iakovlev named them. My question to you,
13   sir, is do you have any scientific evidence that
14   any of those nine products have become embrittled
15   in vivo?
16             MR. BOWMAN: Object to form.
17             THE WITNESS: Again, not direct -- what
18   did you say? Embrittled? I mean, there's no
19   direct evidence that those specific products has
20   been published.
21   BY MR. HUTCHINSON:
22       Q.    And nor do you have any scientific
23   evidence that any of those nine products have
24   become embrittled, do you?

Page 73

1             MR. BOWMAN: Object to form.
2             THE WITNESS: I guess I'm a little hung
3    up on scientific evidence. I mean, you mean
4    directly measured, right? Reported?
5    BY MR. HUTCHINSON:
6        Q.    (Indicating yes.)
7        A.    I mean, I believe -- well, you know my
8    opinions. But I --
9        Q.    Well, I'm trying to find out your
10   opinions.
11       A.    Okay.
12       Q.    So my opinions are -- that's the goal
13   of today.
14       A.    No. I understand. But -- okay. So
15   I'll state it again. I mean, I believe -- I don't
16   want to argue about it. I mean, I believe that
17   those devices are made of polypropylene, which
18   these fundamental chemical reactions apply to.
19   Now, has anyone specifically measured for those
20   devices? I -- I -- I don't know that that's been
21   reported, but I believe the body of scientific
22   evidence says that that's what's happening. That's
23   my opinion. Okay?
24       Q.    But my question to you, do you know of

19 (Pages 70 to 73)

Scott Guelcher

Page 74

1    any scientific evidence, as we sit here today, that
2    any of those nine products have become embrittled
3    in vivo?
4        A.    Again, I'm hung up on the scientific
5    evidence.  I mean, I -- I believe there's
6    evidence --
7            MR. BOWMAN:  Object to the form.
8            THE WITNESS:  Okay.
9            I don't know how to answer that.  I
10   mean, I --
11   BY MR. HUTCHINSON:
12       Q.    Have you ever used the word "scientific
13   evidence" as a polymer scientist?
14       A.    Well, I mean, it's a word.  I mean, I
15   know this word.  But it can mean lots of things to
16   lots of people, right?
17       Q.    Okay.
18       A.    Like anything.
19       Q.    So my --
20       A.    So I -- I'm just -- I'm just saying
21   like a direct measurement of that phenomenon,
22   I've -- I've not seen published.
23       Q.    Okay.  You've not seen published it.
24       A.    Yeah.

Page 75

1        Q.    Nor are you aware of any evidence that
2    any of those nine products, specific products, have
3    become embrittled in vivo, are you?
4            MR. BOWMAN:  Object to form.
5            THE WITNESS:  Again, I've not seen
6    anybody actually measure that, I mean, if that's
7    what you're. . .
8    BY MR. HUTCHINSON:
9        Q.    And you haven't measured that, have
10   you?
11       A.    No.
12       Q.    And, Doctor, are you aware of any
13   scientific evidence that any of those nine products
14   have lost molecular weight in vivo?
15           MR. BOWMAN:  Object to form.
16           THE WITNESS:  For those nine specific
17   products, no one has shown -- published that they
18   lose molecular weight.
19   BY MR. HUTCHINSON:
20       Q.    And are you aware, personally, of any
21   evidence that any of those nine specific products
22   have lost molecular weight in vivo?
23       A.    Could you rephrase that?  I didn't --
24       Q.    Are you personally aware of any

Page 76

1    evidence that any of those nine specific products
2    have lost molecular weight in vivo?
3        A.    Again, no direct measurements of that.
4        Q.    And, Doctor, are you aware -- other
5    than Clavé, are you aware of any literature that
6    shows PROLENE produced a carbonyl group after it
7    was implanted?
8        A.    Let me look at my report again.  I know
9    Mary was looking at -- Céline Mary did the PROLENE
10   implant study with Guidoin.
11           (Reporter interruption for
12   clarification.)
13           THE WITNESS:  Guidoin, G-u-i-d-o-i-n.
14   I just need to review what I wrote about that.
15   (Reviews document.)
16           Could you repeat the question?  I'm --
17   I'm sorry.  I'm -- I'm not feeling well.  I forgot
18   it.  I -- could you repeat the question, please?
19           Oh, you're going to read it?  Okay.
20   That's fine.
21   BY MR. HUTCHINSON:
22       Q.    I can remember it.  Other than Clavé,
23   are you aware of any literature that shows PROLENE
24   produced a carbonyl group after it was implanted?

Page 77

1        A.    Okay.  I just need to find where I
2    wrote about Céline Mary to answer that question.
3    (Reviews document.)
4        Q.    But you would -- but other than Céline
5    Mary, are you aware of any literature?
6        A.    Carbonyl and PROLENE due to oxidation.
7        Q.    After it was implanted.
8        A.    After it was implanted --
9        Q.    Yes, sir.
10       A.    -- in PROLENE.  (Reviews document.)  I
11   can't think of anything other than those two
12   studies.
13       Q.    Doctor, have you ever examined an
14   explant of PROLENE from a patient?
15       A.    With Dr. Dunn, yes.  And Dr. Iakovlev.
16       Q.    Was it -- what type of PROLENE explant
17   was it?
18       A.    Oh, PROLENE.
19       Q.    Oh, I'm sorry.  Maybe you might --
20   might not have understood my question.
21       A.    I -- I --
22       Q.    Let's make sure the record's clear.
23       A.    I miss -- yeah.
24       Q.    That's fine.  Don't worry about it.

20  (Pages 74 to 77)

Scott Guelcher

Page 78

1      Have you ever examined a PROLENE
2  explant from a patient?
3      A.    Not specifically PROLENE.
4      Q.    Sitting here today, do you have any
5  evidence that a PROLENE explant has failed in the
6  patient?
7            MR. BOWMAN:  Object to the form.
8            THE WITNESS:  Wow.  Failed.  What do
9  you mean by "failed"?  That's a -- could mean a lot
10  of things.  So what do you mean -- can you be more
11  specific about failed?
12  BY MR. HUTCHINSON:
13      Q.    It didn't do what it was intended to
14  do.
15            MR. BOWMAN:  Object to form.
16            THE WITNESS:  Are you talking about
17  mesh or sutures?  I'm -- I -- it just seems like a
18  broad question.
19  BY MR. HUTCHINSON:
20      Q.    Right.
21      A.    If you could --
22      Q.    You're here about -- you're here about
23  nine mesh products, correct?
24      A.    Yes.

Page 79

1      Q.    All right.
2      A.    Because you keep saying PROLENE and
3  mesh.  I'm just getting confused.
4      Q.    All right.  Have you ever examined --
5  strike that.
6            Do you have any scientific evidence
7  that any of the nine products that you're giving
8  testimony about today have failed in vivo?
9            MR. BOWMAN:  Object to form.
10            THE WITNESS:  I mean, that's why
11  there's a lawsuit because there's an injury because
12  of the device.  So, I mean, I'm not focusing on the
13  clinical aspects of that.  I -- I guess I really
14  don't understand what you're asking me.
15  BY MR. HUTCHINSON:
16      Q.    Are you aware of any evidence that a
17  patient's mesh, from any of the nine products --
18      A.    Yeah.
19      Q.    -- failed to do what it was intended to
20  do?
21      A.    I mean, I know there are clinical
22  studies that have looked at this, but I just -- I
23  don't -- I mean, I have to look at -- I can't
24  remember -- I mean this wasn't what I was focusing

Page 80

1  on in the report, right?  It was more what happens
2  to polypropylene.  So there are studies that -- you
3  know, I mean, the Clavé study is these meshes --
4  you know, they were explanted because they failed
5  so. . .
6      Q.    Can you tell us the name of a patient
7  whose product did not work as intended?
8      A.    I mean, I didn't even -- I didn't look
9  at patient records.  I'm not a medical doctor.
10  My -- my -- my report was focused on what happens
11  to polypropylene that's implanted in the body and
12  if there are --
13      Q.    And you can't tell us the name of
14  somebody whose product has failed once it's in the
15  body, correct?
16      A.    Well, I mean, I know that there's a --
17  you know, the Huskey case, the Edwards case.  I
18  mean, these patients had complications associated
19  with the mesh.  So those are -- those are the cases
20  that I have worked on.
21      Q.    Doctor, let's talk about
22  biocompatibility.
23      A.    Okay.
24      Q.    You'll agree that Ethicon performed

Page 81

1  biocompatibility testing for the PROLENE --
2      A.    If you could be a little more specific.
3  You mean ISO 10993 testing?
4      Q.    (Indicating yes.)
5      A.    Yeah.  This is standard for any -- any
6  biomedical device.
7      Q.    Do you have any criticisms of the
8  biocompatibility testing that Ethicon did for any
9  of the nine products?
10      A.    I've not testified about the ISO 10993
11  biocompatibility testing, other than it's in my
12  report that I -- I believe they should have done
13  some of this testing with the oxidative medium, but
14  that's -- that's not necessarily part of the -- I
15  mean, there's -- there's a -- there are some tests
16  on degradation with ISO 10993, but that medium is
17  typically not used.  My testimony has been that
18  they should have looked at that.
19            But I've not critiqued -- I've not
20  expressed opinions about whether that -- could you
21  repeat your question?  I -- I'm sorry.
22      Q.    Well, do you have any criticisms --
23      A.    Criticism --
24      Q.    -- of Ethicon's biocompatibility

21 (Pages 78 to 81)

Scott Guelcher

Page 82

1    testing of the PROLENE contained in any of the nine
2    products, other than the oxidative opinions that
3    you're --
4        A.    I've not discussed the ISO testing in
5    my report.  I've not opined on that.
6        Q.    But my question is, yes or no, do you
7    have any opinions, other than the oxidative
8    opinions that you're giving, regarding the
9    biocompatibility testing of any of the nine
10   products?
11       A.    No.  It's not in my report.  I've not
12   discussed it.
13       Q.    You stated earlier that you have
14   inspected mesh explants with Dr. Dunn.
15       A.    I've seen mesh -- mesh explants with
16   Dr. Dunn and Dr. Iakovlev.
17       Q.    What products were those explants from?
18       A.    I believe it was an AMS mesh.  I don't
19   remember the -- it was -- I think it was POP, but I
20   can't remember the exact device name.
21       Q.    AMS, American Medical Systems?
22       A.    That's right.
23       Q.    Have you ever inspected a PROLENE mesh
24   explant from any of the nine products that we're

Page 83

1    here today about?
2            MR. BOWMAN:  Objection.  Asked and
3    answered.
4            THE WITNESS:  I've seen -- I -- in
5    visiting Dr. Iakovlev with plaintiff's counsel a
6    few years ago, I looked at a number of mesh.  I
7    don't remember him identifying any of those as
8    PROLENE, but I've -- I've -- I've seen those
9    explanted meshes.
10   BY MR. HUTCHINSON:
11       Q.    But you've never seen an explanted
12   PROLENE mesh from any of the nine products,
13   correct?
14       A.    Perhaps.  I just -- I -- I don't know
15   if it was PROLENE or not.
16       Q.    You can't tell us about it, sitting
17   here today; is that right?
18       A.    No.
19       Q.    And you've never done any testing of a
20   PROLENE mesh explant from any of the nine products,
21   correct?
22       A.    Not from these nine products.  Right.
23       Q.    Doctor, going to these nine products,
24   have you ever seen these?

Page 84

1        A.    Seen these specific products?
2        Q.    Yes, sir.
3        A.    I've seen, I believe, the TVT, the
4    TVT-O, the TVT-S, the ABBREVO because of previous
5    litigation.  The POP kits, I can't remember.
6        Q.    Have you ever seen TVT EXACT?
7        A.    I don't remember.
8        Q.    You don't remember if you've ever seen
9    PROSIMA, GYNEMESH PS, PROLIFT or PROLIFT+M?
10       A.    Not those specific -- I mean, I've seen
11   POP devices, but I -- I -- I can't remember, you
12   know, who exactly they were manufactured by.
13       Q.    Have you ever held any of these
14   products, these nine different products in your
15   hand?
16       A.    Well, I mean, the -- the slings, the
17   TVT, yeah.  I've seen them and. . .
18       Q.    I'm sorry?
19       A.    Yeah, I mean, I've held them, stretched
20   them, you know, these kinds of things.
21       Q.    Where?
22       A.    With Dr. Dunn at Vanderbilt.  I mean,
23   the testing that he did, right?  So --
24       Q.    Does Dr. Dunn still has these exemplars

Page 85

1    that you handled --
2        A.    I don't know.  I'm sorry.  I don't
3    know.  I don't know what he has right now.
4        Q.    But you've never retained a PROLENE
5    exemplar, have you?
6        A.    I have not.
7        Q.    Do you know how long any of these nine
8    products have been on the market?
9        A.    Well, the TVT has been out for a while,
10   since the '90s.  I -- I don't remember the exact
11   dates they were introduced.  But the TVT was the
12   first.
13       Q.    Do you know the physical dimensions of
14   any of these products?
15       A.    No.  No, I don't.
16       Q.    Do you know how many newtons of force
17   are placed on the mesh from any of these nine
18   products once -- once they're implanted in vivo?
19           MR. BOWMAN:  Object to form.
20           THE WITNESS:  There are some studies
21   that have looked at that.  I don't -- I didn't
22   really discuss that in this report.  So I don't
23   remember what those forces are.  But there have
24   been some studies that looked at the force on a

22 (Pages 82 to 85)

Scott Guelcher

Page 86

1  sling.  And I'm familiar with some of those
2  studies.
3  BY MR. HUTCHINSON:
4      Q.    Do you -- do you know -- well, do you
5  have any opinions -- strike that.
6          You're not an expert in the
7  manufacturing process of PROLENE, pelvic mesh, are
8  you?
9      A.    Manufacturing PROLENE?  I'm -- I'm not
10 expressing opinions about the specific
11 manufacturing process.
12     Q.    Are these meshes -- are they woven or
13 are they knitted for the nine different products?
14     A.    For the nine products?
15         MR. BOWMAN:  Object to form.
16         THE WITNESS:  Could you explain what
17 you mean by woven versus knitted?  That's kind of
18 a --
19 BY MR. HUTCHINSON:
20     Q.    Getting deep?
21     A.    I mean, what do you mean by "woven"?  I
22 mean, is it like --
23     Q.    Can you answer the question as it's
24 phrased?

Page 87

1          MR. BOWMAN:  Object to form.
2          THE WITNESS:  I'd have to refresh
3  myself with the documents.  I -- I -- I can't
4  remember them.
5  BY MR. HUTCHINSON:
6      Q.    And as a material scientist, you'll
7  agree that PROLENE has a different chemical
8  composition than pure polypropylene, correct?
9      A.    So PROLENE has two antioxidants, one
10 designed to prevent oxidation during
11 high-temperature processing, another during
12 storage.  There are flow additives designed to make
13 extrusion easier, calcium stearate, some
14 surfactants.  So there's other additives in there,
15 but those additives are added mainly for
16 manufacturing, in my understanding.
17     Q.    Right.  But PROLENE has a chemical
18 different composition -- strike that.
19         PROLENE has a different chemical
20 composition than pure PROLENE, correct?
21         MR. BOWMAN:  Object to form.
22 BY MR. HUTCHINSON:
23     Q.    I'm sorry.  PROLENE has a different
24 chemical composition than pure polypropylene,

Page 88

1  correct?
2      A.    Well, the -- yeah, the composition's
3  different because it has these additives.
4          MR. HUTCHINSON:  I'm sorry.  Did he say
5  "well, yeah"?
6          (Whereupon the previously mentioned
7  answer was read back by the reporter.)
8          THE WITNESS:  I probably said -- yes,
9  it's -- it has additives.
10 BY MR. HUTCHINSON:
11     Q.    Doctor, turn to Exhibit 1.  I'll
12 represent to you and the Court that there are 44
13 different plaintiffs named on the notice of
14 deposition, starting with Marty Babcock --
15     A.    Okay.
16     Q.    -- and ending with Thelma Wright.
17 That's 44 different cases.
18     A.    I see.
19     Q.    Did you know you were designated in 44
20 cases in this litigation?
21     A.    I -- I didn't know the exact number of
22 44.  I knew it was a wave.  So I knew there were a
23 number of cases, but I wasn't familiar with the
24 specific plaintiffs because I'm not giving

Page 89

1  plaintiff-specific opinions.
2      Q.    Do you know what products any of these
3  44 different women received?
4      A.    No.  As I said, I didn't review the
5  medical records.  I'm -- I'm discussing -- my
6  opinions are all related to PROLENE and
7  polypropylene in -- in the body.
8      Q.    And you don't know any of the implant
9  or explant dates for any of these women, correct?
10     A.    I don't.  I haven't reviewed them.
11     Q.    And do you know the reason why any of
12 these women had their mesh removed?
13     A.    Again, it's not -- I haven't reviewed
14 their clinical records, medical records, so I
15 wouldn't know.
16     Q.    Do you even -- do you even know if any
17 of these women had their mesh removed?
18     A.    I know that some of them do because I
19 know that some of these cases have specimens for
20 pathology.  I know Dr. Iakovlev and Dr. Timms have
21 looked at that.  So some of the patients have
22 explants.  Some don't.
23     Q.    Do you know who has an explant and who
24 does not?

23  (Pages 86 to 89)

Scott Guelcher

Page 90

1    A.    No.  Again, I didn't review the medical
2   records.
3    Q.    Doctor, do you think it would have been
4   helpful for you to have reviewed or inspected a
5   plaintiff's explant in this litigation?
6         MR. BOWMAN:  Object to form.
7         THE WITNESS:  I mean, again,
8   Dr. Iakovlev is providing those patient-specific
9   opinions.  My opinions are -- I mean, it would have
10  been helpful, but it's a lot of cases.  It's a lot
11  of explants.  It's a lot going on.
12  BY MR. HUTCHINSON:
13   Q.    Right.  But you wish you would have at
14  least had the opportunity to have reviewed an
15  implant -- I mean, I'm sorry -- an explant,
16  correct?
17        MR. BOWMAN:  Object to form.
18        THE WITNESS:  It would have been
19  helpful, but not realistic.  I mean, it's just --
20  BY MR. HUTCHINSON:
21   Q.    Why wouldn't it have been realistic?
22   A.    Well, there's -- there's just a lot of
23  plaintiffs.  There's a lot of patients.  There's a
24  lot of explants and there's other experts that are

Page 91

1   working with those explants.  So they have to be
2   managed in a -- in a way that's appropriate.  And
3   if Dr. Iakovlev needs explants to do the microscopy
4   then -- for a patient-specific opinion, then he
5   needs to have priority to look at that explant.
6    Q.    And, Doctor, have you ever asked to
7   inspect any of the explants available from these
8   women?
9    A.    I've not asked in a specific case.
10   Q.    Why not?
11   A.    Again, there just isn't time.  I mean,
12  it's -- it's not a realistic request.
13   Q.    Doctor, if you were giving an opinion
14  about a specific product, would you not want to
15  have all the evidence available to you before
16  giving that opinion?
17        MR. BOWMAN:  Object to form.
18        THE WITNESS:  Again, I wasn't giving a
19  patient-specific opinion.  I was giving an opinion
20  about what happens to polypropylene when it's
21  implanted in the body.  That's -- so --
22  BY MR. HUTCHINSON:
23   Q.    I understand.  But are you going to
24  tell the jury that Marty Babcock's mesh oxidized

Page 92

1   when it was in her body?
2         MR. BOWMAN:  Object to form.
3         THE WITNESS:  I didn't specifically
4   look for oxidation in her mesh.  What I've been
5   telling the jury is that my opinion is that
6   there's -- there's a significant risk of this
7   happening.  It's a -- that's been the body of my
8   opinions and my testimony.  But I'm not giving a
9   patient-specific opinion about Ms. Babcock.  I -- I
10  didn't look at that.
11  BY MR. HUTCHINSON:
12   Q.    Then, Doctor, are you -- did you
13  specifically look for oxidation for any of these
14  women listed on Exhibit 1, the notice of
15  deposition?
16   A.    No.  My understanding is that
17  Dr. Iakovlev is -- is doing that explant work.  And
18  so this is -- this is an effort where there's lots
19  of experts involved.  And Dr. Iakovlev is giving
20  those patient-specific opinions.
21   Q.    Doctor, is it fair to say that you've
22  never done any analytical testing of explants of
23  PROLENE mesh?
24   A.    I mean, I think you asked this before.

Page 93

1   Not PROLENE, but the AMS mesh.
2    Q.    And you've never done any physical
3   property testing of PROLENE explants, have you?
4    A.    Not for PROLENE.
5    Q.    And not of pristine PROLENE, have you?
6    A.    Well, again, the work that I referred
7   to earlier with Dr. Dunn, I believe there were some
8   Ethicon meshes in those measurements of molecular
9   weight, but it's been a long time and we haven't
10  been relying on that.  But -- but we did something
11  like that a couple years ago.
12   Q.    Doctor, you've never done any tests to
13  confirm oxidation of the mesh contained in any of
14  these women listed on the notice of deposition,
15  correct?
16   A.    Again, I -- I thought I answered that,
17  too.  Dr. Iakovlev is doing that.  I'm not giving
18  those patient-specific opinions.
19   Q.    And, Doctor, can you make any
20  prediction about when the mesh, from any of these
21  44 women, would oxidate in vivo?
22        MR. BOWMAN:  Object to form.
23        THE WITNESS:  Again, I -- my testimony
24  has been that it's -- it's a risk.  There's a lot

24 (Pages 90 to 93)

Scott Guelcher

Page 94

1  of factors that affect it and in what patient and
2  at what time. It's not -- that's the problem is
3  you -- you -- you can't predict it. I mean,
4  that's -- that's the problem is it's unpredictable.
5  BY MR. HUTCHINSON:
6     Q.   In fact, you can't make any type of
7  prediction of when Marty Babcock's mesh oxidized in
8  her body, can you?
9        MR. BOWMAN: Object to form.
10       THE WITNESS: That's not in my opinions
11 in my report. My report is that this is a risk.
12 This -- this happens. And it depends on, you know,
13 it's -- it's a risk. You can't predict when it's
14 going to happen. You can't design around it.
15 That's my opinion. It's not -- I didn't write an
16 opinion specific to Ms. Babcock when it's going to
17 oxidize or did it. I. . .
18 BY MR. HUTCHINSON:
19    Q.   And you can't even sit here today
20 telling us whether or not Marty Babcock's mesh
21 oxidized in the body, can you?
22       MR. BOWMAN: Object to form.
23       THE WITNESS: I believe it's oxidizing.
24 That's the chemical reaction. But the implications

Page 95

1  of that are difficult to predict.
2  BY MR. HUTCHINSON:
3     Q.   But my question is, sir, are you
4  testifying, to a reasonable degree of scientific
5  certainty, without having reviewed an explant, that
6  Marty Babcock's mesh is oxidizing in her body?
7        MR. BOWMAN: Object to form.
8        THE WITNESS: I mean, I believe that
9  the science tells you it's oxidizing. I did not
10 specifically measure it.
11 BY MR. HUTCHINSON:
12    Q.   Thank you. In fact, you didn't
13 specifically measure oxidation of any of the women
14 listed in Exhibit Number 1, correct?
15    A.   I've already answered that. No.
16    Q.   Okay.
17    A.   Yeah, I didn't do that.
18    Q.   And you can't tell us whether or not
19 the mesh of any of the women listed in Exhibit 1
20 oxidized in their body, can you?
21       MR. BOWMAN: Object to the form. Asked
22 and answered.
23       THE WITNESS: I believe I've asked --
24 I've answered this. I mean, it's -- the science

Page 96

1  tells you that that would be -- you would expect it
2  to oxidize and degrade. The -- the timing of that
3  is unpredictable. That's what I've said. I didn't
4  measure it. But scientific evidence --
5  polypropylene oxidizes. There are cells in the
6  body that make reactive oxygen species, and you
7  would expect it to oxidize in the body based on
8  the -- what we know scientifically.
9  BY MR. HUTCHINSON:
10    Q.   I understand that. But I'm -- my
11 question is related to these 44 women. Can you
12 tell us, to a reasonable degree of scientific
13 certainty, whether or not the mesh, in any of these
14 44 women, ever oxidized?
15       MR. BOWMAN: Object to form. This is
16 asked and answered.
17       THE WITNESS: I feel like we're going
18 to go round and round on this.
19       (Simultaneous speaking.)
20       MR. BOWMAN: I'm going to instruct him
21 not to answer.
22       (Reporter interruption for
23 clarification.)
24       MR. BOWMAN: I said if we're going to

Page 97

1  keep asking the same question, I'm going to start
2  instructing him not to answer.
3  BY MR. HUTCHINSON:
4     Q.   I need a clean answer, then I'll move
5  on.
6        MR. BOWMAN: Objection.
7        THE WITNESS: I'm giving you my clean
8  answer. I've said this in trials. I've said this
9  in depositions. You know the record of my
10 testimony. It hasn't changed.
11       The scientific principles states that
12 this chemical reaction is going to occur. It's
13 going to oxidize. The clinical implications of
14 that are unknown. I did not specifically look at
15 oxidation in these meshes. My testimony has been
16 that these reactions are occurring. And the
17 clinical implication of that in a specific patient
18 is unknown. It's unpredictable. That's been my
19 testimony. I --
20 BY MR. HUTCHINSON:
21    Q.   And you can't tell us when it's
22 occurring, can you, in any of these 44 women?
23    A.   I think that's what unpredictable means
24 is you don't -- you don't know when it's -- when it

25 (Pages 94 to 97)

Scott Guelcher

Page 98

```
1    could happen, when it -- when it happens.  You
2    don't -- you don't know when that's going to occur.
3         Q.   Doctor, can you tell us the name of a
4    patient who has had their mesh removed specifically
5    because of oxidations?
6         A.   I mean, in the papers, the patient
7    names aren't provided.  It's a violation of
8    confidentiality rules.  I mean, in the --
9         Q.   Okay.  Then let's not --
10        A.   In a specific case.
11        Q.   Okay.  Then let's not look --
12        A.   I mean, all these case --
13        Q.   Let's look at the -- let's not look at
14   the papers or the literature.
15        A.   I mean, I don't want to get into
16   patient names.  That's kind of -- there's all these
17   cases, and this is a specific case.  I mean, we've
18   looked at the plaintiffs in this specific case.  I
19   don't -- I'm not comfortable discussing specific
20   patients from other litigations.
21        Q.   I understand.  And I'm not asking you
22   to discuss any patients from any literature or any
23   other litigation.  What I'm asking about is the
24   Ethicon litigation.
```

Page 99

```
1         Can you tell us the name of a patient,
2    who received any one of the nine products, who had
3    their mesh specifically removed because of
4    oxidation?
5         A.   Why would you remove a mesh for
6    oxidation?  You remove it for another complication.
7    I mean, it's not -- oxidation leads to
8    embrittlement and degradation.  So -- I mean,
9    they're -- they're removed because they become
10   embrittled.  They extrude.  They cause pain.  Not
11   because -- I mean, there's not -- you wouldn't --
12   I'm confused.  I'm sorry.  Go ahead.
13        MR. HUTCHINSON:  Move to strike as
14   nonresponsive.
15   BY MR. HUTCHINSON:
16        Q.   Doctor, I'm asking for a name of
17   somebody who received any one of these nine
18   products who had their mesh specifically removed
19   because of oxidation.  Can you tell us a name?  Yes
20   or no?  And then I'll move on.
21        A.   This is a strange question.  You
22   wouldn't remove a mesh for oxidation.  It's a very
23   early event.  I mean, I don't know that any of
24   these patients had it removed for oxidation.  Like
```

Page 100

```
1    I said, I haven't reviewed their records.  I don't
2    know why their mesh was removed.
3         Q.   Okay.  And you -- you don't -- you
4    can't tell us the name of one patient, of any of
5    these nine products, who had their mesh removed
6    specifically because of oxidation?
7         A.   I just answered that.
8         Q.   No.  You told me it was a strange
9    question.
10        A.   Well, it is a strange question.  I
11   stick by that.
12             But meshes are removed because of
13   complications, like pain, erosion, and extrusion
14   that a clinician can see.  So -- I -- I just don't
15   want to be trapped in some kind of answer, yes or
16   no, to a question like that.  They --
17        Q.   Well, Doctor, I'm entitled to flesh out
18   your opinions.  And my question is can you tell us,
19   sitting here today, the name of a person, who
20   received any one of these nine products, who had
21   their mesh specifically removed because of
22   oxidation?
23             MR. BOWMAN:  You can answer yes or no.
24             THE WITNESS:  No, none of these
```

Page 101

```
1    patients --
2              MR. BOWMAN:  If you can.
3              THE WITNESS:  To my knowledge, none of
4    them -- I don't -- I don't know that any of them --
5    BY MR. HUTCHINSON:
6         Q.   I'm sorry.  "To my knowledge none of
7    them" what?
8         A.   I don't know -- I said I don't know why
9    the mesh was removed in these patients.  So I
10   wouldn't know if it was removed to oxidation
11   [verbatim].  I don't know that any of them had it
12   removed for -- because of oxidation.
13        Q.   Okay.
14        A.   I don't know that.
15        Q.   And you can't tell us the name of one
16   person who had their mesh removed because of
17   oxidation, can you?
18        A.   Why are you --
19             MR. BOWMAN:  Object to form.
20             THE WITNESS:  I'm really -- I'm getting
21   a little frustrated.  Can we answer this and take a
22   break?  I don't want to get angry.
23   BY MR. HUTCHINSON:
24        Q.   That's fine.  Just answer it, and then
```

26 (Pages 98 to 101)

Scott Guelcher

Page 102

1   we can take a break.
2       A.      The name -- the 44 names on this
3   list --
4       Q.      My question to you is can you tell us
5   the name, sir, of one patient who received any one
6   of the nine products who had their mesh
7   specifically removed because of oxidation?
8       A.      I've already answered that. I don't
9   know of a patient that had it removed because of
10  oxidation of these 44 patients.
11      Q.      Okay. Or of any patients, not
12  necessarily the 44.
13      A.      I'm going with these 44 patients
14  because it's this litigation. I don't want to
15  answer questions about other litigation.
16      Q.      Okay.
17      A.      I thought I made that clear. I'm
18  talking about these 44 patients.
19      Q.      Okay. Thank you.
20      A.      Can we take a break? I don't want to
21  get agitated.
22          MR. HUTCHINSON: That's fine.
23          (Brief recess.)
24  BY MR. HUTCHINSON:

Page 103

1       Q.      Dr. Guelcher, do you have any evidence
2   to confirm that any of the -- these women had
3   molecular weight loss of their explants?
4       A.      You know, I didn't look at molecular
5   weight in -- as I said before, I didn't look at
6   their explants. I didn't look at their patient
7   records.
8       Q.      Doctor, do you have any evidence to
9   confirm that any of these women -- and, again, I'm
10  talking about the women that you're here to give
11  testimony about today -- had explants that had a
12  change in physical properties?
13      A.      No. I didn't look at patient explants,
14  so I don't know the change in physical properties.
15      Q.      And, Doctor, do you have any evidence
16  to confirm that these women's explants lost any
17  antioxidants?
18      A.      No. Again, that wasn't measured,
19  whether they lost antioxidants.
20      Q.      And, Doctor, using solid scientific
21  data is good science, isn't it?
22          MR. BOWMAN: Object to form.
23          THE WITNESS: That's a very vague --
24  I'm not -- I'm not sure what you mean by that

Page 104

1   question.
2   BY MR. HUTCHINSON:
3       Q.      All right. Doctor, have you ever
4   instructed your students at Vanderbilt to use
5   scientific data in reaching a conclusion?
6          MR. BOWMAN: Object to form.
7          THE WITNESS: Again, we do experiments,
8   make measurements and test hypotheses.
9   BY MR. HUTCHINSON:
10      Q.      All right. And, Doctor, let's talk
11  about these nine specific products that you're here
12  to give testimony about.
13          Are you aware of any data that confirms
14  these nine specific products degraded to the extent
15  it compromised the functionality of the product?
16          MR. BOWMAN: Object to form.
17          THE WITNESS: Again, you've asked this
18  many times. I've not looked at physical changes in
19  these specific products, these patients. I've not
20  looked at that. I didn't test the explants.
21  BY MR. HUTCHINSON:
22      Q.      I understand that. But my question is
23  a little bit more general, is -- and it relates to
24  these nine specific products, okay? Are you aware

Page 105

1   of any data that confirms these nine products will
2   degrade to the extent their intended function is
3   compromised during a woman's lifetime?
4          MR. BOWMAN: Object to the form.
5          THE WITNESS: Again, you asked this
6   before and I said, no, for these products that's
7   not been directly measured.
8   BY MR. HUTCHINSON:
9       Q.      And, Doctor, do you know -- we talked
10  about -- well, strike that.
11          Do you know what the mechanism of
12  action of tissue negatively reacting to any of
13  these nine products is?
14          MR. BOWMAN: Object to form.
15          THE WITNESS: Can you repeat that?
16  BY MR. HUTCHINSON:
17      Q.      Right. Doctor, do you believe that the
18  tissue in women negatively reacts to any of these
19  nine products?
20      A.      The --
21      Q.      Or are you qualified to give that
22  opinion?
23      A.      Well, I believe I'm -- that's what my
24  report is about. That's what these papers are

27 (Pages 102 to 105)

Scott Guelcher

Page 106

1    about, is that the -- the macrophage is to treat
2    reactive oxygen that degrades the polypropylene.
3    Has that been tested for these nine specific
4    products?  Well, you asked about this earlier.  And
5    I -- I said I don't know of any study looking at
6    these nine specific projects, but that's --
7        Q.    You mean products, not projects?
8        A.    Products.  But that's -- but the nature
9    of the chemistry in the inflammatory reaction and
10   the nature of the material tells us that these
11   things will happen, but --
12       Q.    All right.  Well, Doctor, what is --
13       A.    -- it's not been specifically measured,
14   for these products.
15       Q.    What is the mechanism of action of how
16   tissue negatively reacts to any of these nine
17   products?
18           MR. BOWMAN:  Object to form.
19           THE WITNESS:  I mean -- but -- but
20   my -- my struggle is your question is very vague.
21   I mean, there's a number of tissue reactions.
22   There can be a fibrotic response, which is
23   fibroblasts migrating in and laying down a scar
24   plate, by depositing extra cellular matrix

Page 107

1    resulting in a scar plate.  I should be more
2    precise.
3           There's the macrophages and other
4    inflammatory cells, foreign body giant cells, that
5    migrate into the mesh, adhere to the mesh, secrete
6    reactive oxygen species, including hydroxyl
7    radicles, that oxidize the polypropylene.  That --
8    that -- that's in my report.  That's the -- that's
9    the tissue response.  The primary components are
10   the fibroblasts and -- and with the collagen matrix
11   deposition and the -- and the macrophages.
12   BY MR. HUTCHINSON:
13       Q.    Doctor, can you tell us from a
14   physiological standpoint how oxidation causes pain
15   in a woman?
16       A.    Again, it's in my report.  Oxidation
17   leads to reduction of molecular weight,
18   embrittlement, and that can lead to cracking, which
19   can lead to erosions and pain.  It's hard plastic
20   in the pelvic floor.  That's going to cause pain.
21       Q.    And oxidation also leads to reduction
22   in physical properties, correct?
23           MR. BOWMAN:  Objection to form.
24           THE WITNESS:  What -- physical

Page 108

1    properties, again, is -- is broad.  I mean, it's --
2    BY MR. HUTCHINSON:
3        Q.    Of the -- of the material.
4        A.    It --
5        Q.    Oxidation -- you talked about oxidation
6    leads to reduced molecular weight.  Oxidation also
7    leads to reduced physical properties, correct?
8        A.    Like what physical properties are you
9    referring to?  I'd like you to be more specific.  I
10   mean, it's -- it's reducing the molecular weight,
11   which leads to embrittlement.  That's the science
12   of polypropylene oxidation.  It's in the report.
13           I'm not sure what you mean by other
14   physical properties.  It would help me if you could
15   be more specific.
16       Q.    Well, oxidation, Doctor, causes a
17   reduction in tensile strength, doesn't it?
18       A.    Reduction -- that's a mechanical
19   property, right?  So. . .
20       Q.    Well, strike that.
21           So let me be clear, and we can just
22   move on.
23       A.    Okay.  I'm just struggling to
24   understand your question.

Page 109

1        Q.    That's fine.  Oxidation -- stay with
2    me.  Do you need to take another break?
3        A.    No.  I'm fine.
4        Q.    All right.  Oxidation leads to a
5    reduction in mechanical properties of the mesh,
6    correct?
7        A.    Yeah.  It leads to changes.  It leads
8    to embrittlement, which would be the material
9    becomes brittle rather than a ductile polymer.
10       Q.    And a loss of molecular weight leads to
11   reduced tensile strength, doesn't it?
12       A.    Yeah, I mean, it can.  If you have a
13   reduction in molecular weight, it -- it depends
14   on -- reduction in molecular weight can lead to
15   reduced strength.
16       Q.    Okay.  And we're talking about strength
17   is how -- is how tough a polymer is; is that right?
18       A.    Well, I wouldn't say -- tough is an
19   area under the stress versus strain curve, but
20   strength is the force or the -- you know, the --
21   the stress, the force per unit area required to
22   break the fiber or the mesh.
23       Q.    Well, loss of molecular weight leads to
24   a decease in toughness under the stress-strain

28 (Pages 106 to 109)

Scott Guelcher

1    curve, doesn't it?
2         A.    I mean, it can. It's -- it's -- if
3    it's -- if it becomes embrittled, it's going to
4    fail at a lower elongation or strain, and that
5    would lead to reduction in toughness.
6         Q.    In fact, that's what you would expect
7    as a polymer scientist. If a polymer becomes
8    embrittled there will be a decease in toughness
9    under the stress-strain curve, correct?
10        A.    It -- generally speaking, it would, but
11   the problem is this is happening at the surface of
12   the fiber. So it's difficult to measure it. It's
13   not uniformly distributed across the diameter of
14   the fiber. So you may not be able to measure a
15   difference in strength even if the fiber is
16   cracked. It -- it just depends on other things.
17   Because strength is a bulk volume average property
18   versus what's happening at the surface.
19        Q.    Sir, would a crack in a polymer
20   increase or decease its mechanical properties?
21        A.    Depends on how deep it is. If it's --
22   if it's -- if it's a penetrating -- you can have
23   crack propagation which can lead to failure of the
24   fiber.

1         Q.    Doctor, would you expect a crack in a
2    polymer to ever increase the mechanical properties
3    of that polymer?
4         A.    Seems unlikely.
5         Q.    Thank you.
6              And, Doctor, if there was a crack in a
7    PROLENE fiber, you would expect that PROLENE fiber
8    to have reduced mechanical properties, wouldn't
9    you, sir?
10        A.    As I said, it depends on the depths of
11   the crack. It depends on -- I mean, the
12   embrittlement -- these reactions all occur at the
13   surface of the fiber, and they move inwards. So
14   it -- it just depends. I mean, if the crack were
15   deep enough, it would affect the mechanical
16   properties. But it's not always going to be --
17   it's difficult to say every single time. I mean,
18   cracks generally reduce mechanical properties, but
19   it -- it's going to depend on the depth of the
20   crack and crack propagation and all that.
21        Q.    I understand. And -- and -- and,
22   Doctor, you would expect a crack in a PROLENE fiber
23   to decease the toughness of that PROLENE fiber,
24   wouldn't you?

1         A.    Well, if the strain and stress to
2    break -- if the tensile strength or the elongation
3    at break --
4              (Reporter interruption for
5    clarification.)
6              THE WITNESS: Elongation at break --
7    sorry -- is reduced, then the toughness would be
8    reduced if it's the area under the stress-strain
9    curve.
10   BY MR. HUTCHINSON:
11        Q.    In fact, Doctor, you're familiar with
12   the area under the stress-strain curve, aren't you?
13        A.    Familiar with it?
14        Q.    Yeah. You're familiar with the
15   concept --
16        A.    Yes.
17        Q.    -- toughness as defined --
18        A.    Yeah, I've published on that. Yes.
19        Q.    Yes. Okay. And that's something you
20   teach your students about; is that right?
21        A.    I've taught that before.
22        Q.    Doctor, when we get -- let's go -- go
23   back to antioxidants for a minute. I think you and
24   I can agree that the formulated product PROLENE has

1    antioxidants in it, correct?
2         A.    It does. DLTDP -- and I don't remember
3    the name of the other one. There are two
4    different -- one is a radical scavenger. The
5    other, I think, is a sulfa compound, thio compound.
6    I can't -- thioester. I can't remember the exact
7    chemical formula.
8              (Whereupon Exhibit 5 was marked as an
9    exhibit.)
10   BY MR. HUTCHINSON:
11        Q.    Doctor, I'll hand you what we'll mark
12   as Exhibit 5 to your deposition.
13        A.    Okay.
14        Q.    Can you draw out the chemical structure
15   of DLTDP as used in PROLENE in any of these nine
16   products?
17             MR. BOWMAN: Object to form.
18             THE WITNESS: I don't remember the
19   chemical structure of the -- of the antioxidant.
20   BY MR. HUTCHINSON:
21        Q.    Doctor, can you draw out the chemical
22   structure of Sanotox R, on that sheet of paper I've
23   handed you marked as Exhibit 5, as used in any of
24   these nine products?

29 (Pages 110 to 113)

Scott Guelcher

Page 114

1    A.    I don't remember the chemical structure
2  that I could write it down.
3    Q.    You could?
4    A.    No.  I don't remember what it exactly
5  is.
6    Q.    You can't draw the chemical structures
7  on Exhibit 5 of DLTDP or Sanotox R, can you?
8        MR. BOWMAN:  Object to form.
9        THE WITNESS:  I mean, I haven't
10  memorized their chemical structures.  I know what
11  they do and what they are, but I haven't memorized
12  their chemical structures.  I don't typically do
13  that in my. . .
14  BY MR. HUTCHINSON:
15    Q.    Doctor, can you show me chemically how
16  they perform in oxidation -- I'm sorry.
17        Can you show me chemically how they
18  perform as antioxidants, on that piece of paper as
19  Exhibit 5?
20        MR. BOWMAN:  Object to form.
21        THE WITNESS:  Again, that's a complex
22  reaction mechanism.  I haven't memorized it.  It's
23  in a number of books.  But my understanding is it's
24  basically, you know, radical scavenger.  I mean,

Page 115

1  scavenging free radicles that -- that are produced
2  in this oxidation reaction.  Whether they come
3  from -- I'll leave it at that.
4  BY MR. HUTCHINSON:
5    Q.    Doctor, on Exhibit 5, can you draw the
6  chemical structure for PROLENE as used in any of
7  these nine products?
8        MR. BOWMAN:  Object to form as to
9  "draw."
10        THE WITNESS:  Again, it's a difficult
11  question.  I mean, PROLENE is polypropylene with
12  some additives in it.  So it's -- I don't remember
13  the exact compositions of the additives.  It's in
14  the, you know, half percent to percent range.  It's
15  pretty low.
16  BY MR. HUTCHINSON:
17    Q.    Right.  And my question, Doctor, is not
18  whether you remember, but can you draw the chemical
19  structure for PROLENE as used in any of these nine
20  products on the piece of paper I've marked as
21  Exhibit 5 to your deposition?
22        MR. BOWMAN:  Object to form.
23        THE WITNESS:  But you can't draw the
24  composition of PROLENE.  It's a -- it's a -- it's a

Page 116

1  blend.  It's a composite.  It's polypropylene with
2  these other additives in it.  So I'm not -- you
3  want me to draw the -- I mean, I'm not sure what
4  you want me to do.
5  BY MR. HUTCHINSON:
6    Q.    I want you to draw the chemical
7  structure for PROLENE.  Can you do that on Exhibit
8  5?
9        MR. BOWMAN:  Object to form.
10        THE WITNESS:  You can't draw the
11  chemical structure of PROLENE because it's
12  polypropylene with all these other -- other
13  additives in it.  So it's not a -- it's not a
14  specific molecule.  It's a formulation.  It's a
15  blend.  It's not --
16  BY MR. HUTCHINSON:
17    Q.    Sir, do you know what the chemical
18  structure for polypropylene looks like?
19    A.    Yeah.  I mean, it's in my report.  I
20  mean, it's --
21    Q.    I mean, Doctor, where, on that chemical
22  chain, are the additives of DLTDP and Sanotox R
23  added?  Can you tell us that?
24        MR. BOWMAN:  Object to form.

Page 117

1        THE WITNESS:  I don't -- I don't think
2  that they're added to the chain.  They're blended
3  in with the polymer.  I don't -- I don't think
4  they're necessarily reacting with it.
5  BY MR. HUTCHINSON:
6    Q.    Doctor, do you know what step in the
7  manufacturing process DLTDP or Sanotox R is added?
8    A.    In the manufacturing process of
9  PROLENE?
10    Q.    Yes, sir.
11    A.    Could you repeat the question?  I'm
12  not, again, sure what you're asking.
13    Q.    Do you know what step in the
14  manufacturing process where DLTDP and Sanotox R are
15  added?
16        MR. BOWMAN:  Object to form.
17        THE WITNESS:  I mean, these are
18  added -- it's in my report.  They're -- they're
19  added to protect PROLENE.
20  BY MR. HUTCHINSON:
21    Q.    Right.  We're going to get to the
22  reason in a minute.  But I'm asking you what step
23  in the manufacturing process --
24    A.    Well, it's --

30 (Pages 114 to 117)

Scott Guelcher

Page 118

1    Q.    -- these additives are added to
2    polypropylene?
3    A.    Well, I was getting there.  But -- so
4    the PROLENE is manufactured as pellets that are
5    then extruded into a monofilament, and my
6    understanding is it's added to those pellets prior
7    to the extrusion step.  That some of the flow
8    additives can help with flow of the melt polymer
9    during extrusion, and then the antioxidants, one of
10   them at least, is protecting it from high
11   temperature oxidation during extrusion.  So that's
12   my understanding of when those additives are added.
13   Q.    Doctor, have you ever done any type of
14   analysis to determine whether or not the
15   antioxidants, contained in any of these nine
16   products, have been depleted?
17   MR. BOWMAN:  Object to form.
18   THE WITNESS:  I've not done that, but
19   Ethicon had done that.
20   BY MR. HUTCHINSON:
21   Q.    And you had the equipment at your lab
22   at Vanderbilt to do that testing, didn't you, sir?
23   A.    I could do that at Vanderbilt, but
24   it -- it -- it takes funding to do that.  I don't

Page 119

1    have any research grants on that.  It's not what I
2    do.  I mean, I -- I can't -- I -- I -- I don't have
3    funding to answer that question, so I haven't done
4    that.
5    Q.    And, Doctor, can you tell us what the
6    rate is for the antioxidants allegedly depleting
7    from each of these nine products?
8    A.    Again, I thought I answered that.  I
9    haven't measured the degradation of the
10   antioxidants in the -- in the PROLENE other than
11   those Ethicon studies that reported loss of
12   antioxidants from oxidized polypropylene.  That was
13   the study that I was relying on, my opinions, one
14   of the studies.
15   Q.    And, Doctor, it's fair to say that you
16   have never tested the effect antioxidants have, in
17   vivo, on Ethicon's nine products that we're here
18   about today on?
19   MR. BOWMAN:  Object to form.
20   THE WITNESS:  I've not looked at the
21   antioxidant depletion in these products, in vitro
22   or in vivo.
23   BY MR. HUTCHINSON:
24   Q.    Doctor, do you have any evidence, as we

Page 120

1    sit here today -- or strike that.
2    Do you have any scientific data that
3    shows antioxidants from any of these nine products
4    are toxic to the adjacent tissue surrounding the
5    product?
6    A.    I've not opined that they're toxic to
7    the tissue.  My opinions is limited to that they
8    are being depleted during this oxidation.  That was
9    my opinion in the report.
10   Q.    And, Doctor, can you tell us at what
11   point in time these antioxidants are depleted?
12   A.    Again, it's unpredictable.  It's --
13   it's -- the oxidation reactions happen and when the
14   antioxidants are depleted, when the degradation
15   starts, all of these events are -- are
16   unpredictable.  That's why -- that's part of my
17   opinion, that that's a problem, that that needs to
18   be controlled.
19   Q.    Doctor, we were talking about physical
20   properties of mesh in -- just a minute ago.
21   Have you ever tested the physical
22   properties of the mesh in any of these nine
23   products, such as durability?
24   A.    What do you mean by "durability"?

Page 121

1    Q.    The physical property of durability.
2    A.    I mean --
3    MR. BOWMAN:  Object to form.
4    THE WITNESS:  How are you defining
5    that?
6    BY MR. HUTCHINSON:
7    Q.    Sir, have you ever -- have you ever
8    heard the word "durability" before as a polymer
9    scientist?
10   A.    Yeah, I've heard -- I've heard the
11   word, but it would help me if you would --
12   Q.    Well, my question is --
13   A.    -- tell me the definition.
14   Q.    -- using your definition, have you ever
15   tested the durability of the mesh of any of these
16   nine products?
17   A.    I mean, I --
18   MR. BOWMAN:  And I just want to stress
19   right here this is asked and answered.  He already
20   testified that he hasn't tested any exemplar meshes
21   or anything about this -- that was before the last
22   break.  I just want to keep moving.  We've only got
23   about an hour left.  I mean, I don't want to spend
24   20 minutes on this if we can help it.  But that's

31 (Pages 118 to 121)

Scott Guelcher

Page 122

1    my opinion.
2    BY MR. HUTCHINSON:
3        Q.    Doctor, durability, tensile strength,
4    elongation, toughness, Young's modulus, have you
5    ever studied those physical properties of the mesh
6    in any of these nine products?
7        A.    No. As I've said, I've not tested
8    these meshes, these nine meshes, these nine
9    products, other than the work we did with the TVT
10   on the molecular weight analysis and the IR with
11   Dr. Dunn. That's what we did.
12       Q.    But, Doctor, have you done any tests,
13   tests, on any of these nine products that can be
14   repeated and confirmed?
15       A.    Well, I just answered your question, I
16   thought. We did FTIR, and we did the molecular
17   weight analysis, I believe, on the TVT a couple
18   years ago.
19       Q.    And you're talking about --
20       A.    It was one of Dr. Dunn's earlier
21   reports.
22       Q.    Right. But you're talking about the
23   FTIR analysis --
24       A.    No, I'm not talking about that. I'm

Page 123

1    talking about exemplars. I'm talking about --
2    well, okay. So this study, too, we -- we did the
3    FTIR and the SEM and --
4        Q.    But you're deferring to Dr. Dunn on the
5    FTIR and SEM for that -- for the study marked as
6    Exhibit 3, aren't you?
7        A.    For the details of the experiments?
8        Q.    Correct.
9        A.    Yeah. We talked about that already.
10   Multiple times.
11           MR. BOWMAN: If I can just clear
12   something up for you.
13           MR. HUTCHINSON: (Indicating.)
14           MR. BOWMAN: There was some molecular
15   weight testing done for an AMS report that was like
16   2013 or 2014. And that got into -- they got into
17   that in the very first deposition that he had
18   taken. I can produce it to you, whatever you like,
19   but all that stuff's already been turned over and
20   discussed is my understanding.
21           MR. HUTCHINSON: Okay.
22   BY MR. HUTCHINSON:
23       Q.    And I may have asked this already. But
24   chain scission lowers molecular weight, doesn't it?

Page 124

1        A.    Yes.
2        Q.    And forgive me -- and chain scission
3    also produces carbonyl bands, correct?
4        A.    It's in the report, that -- that --
5    hydrox- -- hydroperoxide and carbonyl groups result
6    in the chain --
7           (Reporter interruption for
8    clarification.)
9           THE WITNESS: Yeah. So it's in the
10   report that -- that -- I'll just keep it simple.
11   The carbonyl groups are part of the oxidation
12   process.
13   BY MR. HUTCHINSON:
14       Q.    Right. But you've never seen a
15   carbonyl band on an FTIR from any of the nine
16   products after it's been implanted in vivo, have
17   you?
18       A.    After it's been implanted in vivo, I've
19   not -- as I said, I've not tested explant on those
20   nine products. So I have not done that.
21       Q.    Doctor, you'll -- you -- when you were
22   preparing for this litigation, you understood that
23   PROLENE is what sutures are made out of, correct?
24       A.    Some sutures. I mean, PROLENE is a --

Page 125

1    is the trademark name that Ethicon has given to its
2    polypropylene --
3        Q.    Right. And do you know how long --
4        A.    -- formulation.
5        Q.    And do you know how long Ethicon
6    sutures have been on the market?
7        A.    Since the '60s.
8        Q.    Do you have any criticisms of Ethicon
9    sutures?
10           MR. BOWMAN: Object to form.
11           THE WITNESS: Criticisms? That's -- I
12   mean, this report is about mesh. It's not about
13   sutures.
14   BY MR. HUTCHINSON:
15       Q.    Okay. But your report is also about
16   PROLENE, correct?
17       A.    Yes. There's PROLENE --
18       Q.    And sutures are made out of PROLENE,
19   aren't they?
20       A.    They can be. Some sutures are made out
21   of PROLENE.
22       Q.    And do you have any criticisms of
23   sutures made out of PROLENE, as you sit here today?
24           MR. BOWMAN: Object to form.

32 (Pages 122 to 125)

Scott Guelcher

Page 126

1          THE WITNESS: I mean, PROLENE sutures
2    are also made of polypropylene. I would believe
3    they will oxidize and degrade as well. So I think
4    that tells us something about what the mesh will
5    do. But I'm not opining about the effects of
6    sutures and the failure of sutures or -- I'm --
7    I'm -- the report's about pelvic mesh --
8    BY MR. HUTCHINSON:
9        Q.    I understand that.
10       A.    -- made of PROLENE.
11       Q.    And you're --
12       A.    I'm not clear what you're asking me.
13   I'm sorry.
14       Q.    You're opining about the failure of
15   PROLENE mesh, aren't you?
16       A.    Yeah. I mean, I -- yes.
17       Q.    All right. Do you -- do you have
18   any -- do you have any criticisms of Ethicon's
19   PROLENE sutures, is my question?
20       A.    I think I'm hung up on the word
21   "criticisms." Could you --
22       Q.    Well, Doctor, are you --
23       A.    -- could you be a little more --
24       Q.    I cannot.

Page 127

1        A.    Okay.
2        Q.    All right. I cannot.
3        Do you have any criticisms -- that word
4    speaks for itself -- of Ethicon's PROLENE sutures?
5        A.    But "criticisms" is a broad word. I --
6    I believe that PROLENE sutures oxidize and degrade
7    just like the mesh but --
8        Q.    Have you -- well, what --
9        A.    Can I finish my answer, please?
10       Q.    Yes.
11       A.    I'm hoping my answer will make it go
12   away. But -- the -- it's implanted in a different
13   part of the body. It's -- it's a suture. It's not
14   a wo-- -- you know, a multi -- it's not a -- it's
15   not a mesh. It's a suture. And so the
16   inflammatory response could be different. Location
17   in the body is different. The -- the chemical
18   reactions are going to be the same.
19       Q.    Okay.
20       A.    But the clinical implications are
21   different. And I'm not opining about the clinical
22   implications of oxidation and degradation on
23   PROLENE sutures used -- single fiber monofilaments
24   used as sutures. Is that --

Page 128

1        Q.    I understand. I understand that,
2    Doctor.
3        A.    I'm really struggling here.
4        Q.    But is your opinion -- is it your
5    opinion that every person who has ever had a
6    PROLENE suture has oxidized material in their body?
7            MR. BOWMAN: Object to form.
8            THE WITNESS: I believe that PROLENE is
9    made from polypropylene. It will oxidize in the
10   body. The chemistry, the biology of the
11   inflammatory response tells us these reactions are
12   going on. It's the clinical implications of those
13   reactions that are different. And I'm not speaking
14   about that with regard to sutures. It's about with
15   regard to the mesh.
16   BY MR. HUTCHINSON:
17       Q.    I understand that, Doctor. But my
18   question is, is it your opinion that every person
19   who has a PROLENE suture has oxidized material in
20   their body?
21           MR. BOWMAN: Object to form. Asked and
22   answered.
23           THE WITNESS: I believe that I answered
24   it. The material --

Page 129

1    BY MR. HUTCHINSON:
2        Q.    Respectfully, you haven't.
3        A.    I have.
4        Q.    My question is about PROLENE sutures.
5            MR. BOWMAN: He did -- he did just
6    answer that question.
7            THE WITNESS: I just answered that.
8    PROLENE sutures are made out of polypropylene, and
9    they will be subject to the same oxidation
10   reactions as -- how much oxidized compared to mesh,
11   I don't know. I'm not talking about that. But
12   it's implanted at a different point in the body.
13   It's a single fiber instead of a woven mesh. But
14   it's -- because it's polypropylene, I believe it
15   still will oxidize. It's just the extent of those
16   reactions may be very different because the
17   inflammatory response may be different. I --
18   BY MR. HUTCHINSON:
19       Q.    Have you investigated why there's been
20   a long-term effective use of PROLENE sutures in the
21   body?
22           MR. BOWMAN: Object to form.
23           THE WITNESS: Can you repeat it,
24   please. I'm -- could you repeat the question?

33 (Pages 126 to 129)

Scott Guelcher

Page 130

1    BY MR. HUTCHINSON:
2        Q.    Have you investigated why there's been
3    a long-term effective use of PROLENE sutures in the
4    body?
5            MR. BOWMAN:  Object to form.
6            THE WITNESS:  I don't know how to
7    answer that.  I've looked at PROLENE sutures.
8    There are papers that I've cited.  There's Ethicon
9    studies about PROLENE sutures that I've looked at.
10   And I believe those studies point to evidence of
11   oxidation and degradation like I've been
12   testifying.
13           But the -- the effects of the oxidation
14   of a PROLENE suture are going to be different than
15   for a PROLENE mesh.  It's implanted in a different
16   part of the body.  It's a different type of device.
17   So I don't think you can necessarily infer that the
18   safety record with PROLENE sutures translates to
19   the mesh.
20           (Whereupon Exhibit 6 was marked as an
21   exhibit.)
22   BY MR. HUTCHINSON:
23       Q.    Handing you what we'll mark as Exhibit
24   6 to your deposition.  And by the way, before we

Page 131

1    move on, Exhibit 5 remains blank, does it not?
2        A.    I didn't write anything on Exhibit 5.
3        Q.    This is the -- Exhibit 6 is the Imel
4    article that you cite --
5        A.    Okay.
6        Q.    -- in your report.  You've seen this,
7    Doctor?
8        A.    Yes.
9        Q.    And the first paragraph, first sentence
10   says, "Polypropylene has been used as a mesh for
11   hernia repairs since 1958."
12           My question, sir, is do you have any
13   criticisms of Ethicon's hernia mesh?
14       A.    My -- my opinions about hernia mesh are
15   similar to the sutures.  It's implanted in a
16   different part of the body.  Because it's made from
17   polypropylene, it will be subjected to these same
18   reactions.  But because it's in a different part of
19   the body, the clinical implications are different,
20   and that's not the subject of my report, what
21   happens to a hernia mesh if it's oxidized and
22   degraded.  That's not --
23       Q.    Sir, is it your testimony that every
24   person has -- that has a hernia PROLENE mesh

Page 132

1    implanted in their body has oxidized material in
2    their body?
3        A.    Again, I would say how I answered that
4    before, that these reactions are ongoing.  It's
5    reasonable to expect that that material would be
6    oxidized.  It's just the extent and the clinical
7    implications of that are very different because
8    it's in a different part of the body.
9        Q.    Okay.  So if I -- I'm just trying to
10   understand your answer.  But it's your testimony
11   that every person that has a PROLENE hernia mesh
12   has oxidized material in their body; it's just to
13   what extent; is that a fair summary?
14       A.    To what extent?  I would -- I would say
15   that --
16       Q.    No.  My -- I'm asking is that a fair
17   summary of your testimony?
18       A.    Could you say it again?
19       Q.    I did it so good the first time.
20       A.    Perhaps.  But I want to be very clear
21   about what I'm saying.
22       Q.    Let's be clear.  Is it your testimony
23   that every person who has a PROLENE hernia mesh has
24   oxidized material in their body; it's just a matter

Page 133

1    of to what extent that oxidation has occurred,
2    correct?
3        A.    I want to be very clear about this.
4    I -- the science -- the science tells us that
5    this -- you would expect this material to oxidize.
6    I've not measured it, but I believe the science
7    tells us that will happen.  And to what extent is
8    going to depend on other factors.  I -- I -- it's
9    possible -- I can't predict it.  It's
10   unpredictable, the extent of the oxidation and the
11   clinical significance.  But I believe that the
12   chemistry, to a reasonable degree of scientific
13   certainty, tells us that these materials will
14   oxidize when implanted in the body.
15       Q.    And every person that has a hernia mesh
16   that's made out of PROLENE has oxidized material in
17   their body; it's just a -- it's just a matter of to
18   what degree; is that fair?
19       A.    I mean, when exactly these reactions
20   start is not exactly clear, so there is some time
21   that it takes to happen.  But, you know, I believe
22   these materials will oxidize.  It's just --
23       Q.    How long does it take to happen?
24       A.    It's unpredictable.  It depends on the

34 (Pages 130 to 133)

Scott Guelcher

Page 134

1    anatomic site.  It depends possibly on the patient.
2    It depends on lots of factors, but it's something
3    that you can't predict, and it's something you
4    can't design for.
5         Q.    If we look at Exhibit 6 to your
6    deposition --
7         A.    Okay.
8         Q.    -- none of the specimens that Imel,
9    I-m-e-l, studied were PROLENE, were they?
10        A.    These were Boston Scientific meshes, so
11   they -- they did not include PROLENE.
12        Q.    And when a medical device is first
13   implanted in the body, it comes in contact with
14   body fluids, fair to say?
15        A.    Yes.
16        Q.    And macrophages are some of those body
17   fluids.
18        A.    Well, macrophage is a cell, not a
19   fluid.
20        Q.    Okay.  Or -- or body -- body material.
21   And macrophages contain proteins, correct?
22        A.    Well, I mean, all cells contain
23   proteins, but it's a -- it's a cell.  I mean, a
24   cell --

Page 135

1         Q.    But -- but we can agree that proteins
2    adsorb to the surface of the medical implant,
3    correct?
4         A.    Well, the -- the proteins adsorb to
5    facilitate cell attachment.  I mean, that the
6    adsorbed proteins facilitate --
7         Q.    And --
8         A.    -- the attachment to cells.
9         Q.    And that occurs -- and that reaction
10   occurs within seconds of the implant; is that
11   right?
12        A.    Proteins adsorb very -- fast, yeah.
13        Q.    Can proteins be removed manually from
14   the explant?
15              MR. BOWMAN:  Object to form.
16   BY MR. HUTCHINSON:
17        Q.    Once it's taken out of the body?
18        A.    Manually?  What do you mean by
19   "manually"?
20        Q.    Can they be scrubbed off?  Can they be
21   removed with tweezers?
22        A.    I mean, tissue can.
23        Q.    But the protein, sir, is my question.
24        A.    The adsorbed proteins?  I mean, this

Page 136

1    protein can --
2         Q.    That's with a D.
3         A.    With a D.  Yeah.  Sorry.
4              Can the adsorbed proteins be removed
5    mechanically?  Is that what you mean?
6         Q.    Yes, sir.
7         A.    Probably not.  It's --
8         Q.    It -- it would be a chemical -- it
9    would have to be a chemical reaction or a chemical
10   protocol to remove the proteins; is that right?
11        A.    Typically, you would -- you could
12   desorb them, you could break them with a
13   proteinase.  Yeah.  Something not mechanical.
14        Q.    Okay.  And, Doctor, do you know how to
15   remove proteins from a medical device after it's
16   taken out of the body?
17        A.    Well, in my work, we're more concerned
18   with removing cells.  So we'll use different
19   enzymes and -- and materials to remove the cells
20   from the material.
21        Q.    Do you know how to clean and remove
22   proteins from an explanted piece of mesh, from a
23   chemical standpoint?
24        A.    I thought I answered it; but, I mean, I

Page 137

1    know Dr. Timms used proteinase.  A lot of people
2    are using --
3         Q.    I know what they do.
4         A.    Yeah.
5         Q.    But I'm asking what you know.
6         A.    Well, I haven't specifically --
7         Q.    Okay.
8         A.    -- done that.  Like I said, I'm
9    typically removing cells.  But you still have to
10   digest the matrix.  So we add these types of --
11   because the cells are embedded in some matrix, and
12   if you want the cells, you have to digest the
13   matrix.
14        Q.    And, Doctor, you'll agree that an
15   increased layer of proteins can build up on a
16   foreign body object over time?
17        A.    Yeah, protein adsorption is typically
18   going to reach some equilibrium.  Now --
19        Q.    But it will build up over time.  The
20   proteins will build up on a medical device over
21   time?
22        A.    I would like to be a little more
23   specific in my answer, if I could.  The -- the
24   proteins will adsorb which can facilitate cell

35 (Pages 134 to 137)

Scott Guelcher

Page 138

1  attachment and cells can deposit matrix and that
2  combined -- it's a very complex event. It's not --
3  it's not a -- you know, I -- I guess -- I don't
4  know that -- I mean, my understanding of protein
5  adsorption is, if you're going to reach some
6  equilibrium, there's going to be some competitive
7  adsorption with different proteins. But the
8  over-time part, to me, would be more matrix
9  deposition by the cells.
10  Q.   On page 1 of Exhibit 6 --
11  A.   Okay.
12  Q.   -- we talked about polypropylene being
13  used as a mesh for hernia repairs since the 1950s.
14        Doctor, does the pelvic region have
15  more reactive oxygen species than the abdomen? Or
16  do you know?
17        MR. BOWMAN:  Object to form.
18        THE WITNESS:  There have been some --
19  there's -- I know there's one paper that's been
20  published about the increased prevalence of the --
21  of ROS, things like peroxides in the vaginal space.
22  BY MR. HUTCHINSON:
23  Q.   But can you quantify reactive oxygen
24  species found in the pelvic region?

Page 139

1  A.   I've -- I mean, I've not done that, but
2  I believe this paper -- I would have to review the
3  paper to see exactly what -- but I believe it has
4  been looked at.
5  Q.   What's the name of the paper?
6  A.   I just can't remember right now.
7  Q.   Is it cited in your report that we've
8  marked as Exhibit 2 to your deposition?
9  A.   It's probably on the reliance list. I
10  would have to check. I just don't remember. I
11  wasn't -- yeah.
12  Q.   Doctor, sitting here today, can you
13  quantify -- without looking at your literature, can
14  you quantify the reactive oxygen species found in
15  the pelvic region?
16  A.   I've not done that.
17  Q.   Doctor, can you tell us the amount of
18  peroxides that are secreted in vivo?
19  A.   Well, it's not just peroxides. It's
20  hydroxyl radicles, hypochlorous acid. There's a
21  lot of these reactive oxygen species that are
22  secreted by different types of cells.
23  Q.   Okay. Well, let's take -- let's take
24  one by one. Can you tell us the amount of

Page 140

1  peroxides that are secreted in vivo?
2  A.   Well, maybe we can make this a little
3  faster by -- all of these reactive oxygen
4  species -- how much is secreted by adherent cells
5  on the mesh, that's not been measured, but, again,
6  it's a very localized environment. There's an
7  adherent cell on the surface and that
8  microenvironment is different from the broader
9  tissue microenvironment.
10        So it's difficult to know exactly what
11  the composition of that -- we know what's in it.
12  That's why the simulated oxidation test was
13  developed. But the exact concentrations of all
14  those species are difficult to know.
15  Q.   In fact, you don't know those exact
16  concentrations of all those species sitting here
17  today, do you?
18        MR. BOWMAN:  Asked and answered.
19        THE WITNESS:  I mean, I thought I
20  answered it. Not for -- I mean, not -- for this
21  adherent macrophage on the surface of the
22  polypropylene, I don't -- I don't know what the
23  concentrations of all these relative species are,
24  but they're there.

Page 141

1  BY MR. HUTCHINSON:
2  Q.   But -- and, sir, do you have -- can you
3  give us a percentage?
4  A.   I -- I -- I -- I don't know. I'd have
5  to look at some papers. I don't know the -- the
6  exact composition of that.
7  Q.   And how -- how do they -- how does that
8  compare to 30 percent hydrogen peroxide?
9  A.   Well, that's -- that test is -- you're
10  referring to -- okay. I'm confused. Are you
11  referring to just 30 percent hydrogen peroxide or
12  with the cobalt catalyst? I'm not -- I'm not
13  sure --
14  Q.   The 20 percent. Let's use 20 percent.
15  A.   Just the hydrogen peroxide?
16  Q.   Uh-huh.
17  A.   Well, I mean, that test was done to
18  give some estimate of what the effects could be.
19  Q.   And -- and, Doctor, you'll agree that
20  20 percent hydrogen peroxide is higher than what is
21  usually seen in a clinical setting in the body?
22  A.   Well, I think that's very vaguely
23  stated -- the -- again, these -- these compositions
24  are in a -- are in a privileged microenvironment.

36 (Pages 138 to 141)

Scott Guelcher

Page 142

1    There's a pocket between the adherent macrophage
2    and the surface of the material.
3        Q.    Right.
4        A.    So the composition there in that
5    microenvironment is different than -- and that's
6    the concentration that matters because that's what
7    the polypropylene is exposed to.
8        Q.    I understand.
9        A.    So the concentration everywhere else in
10   the body doesn't really matter --
11       Q.    Doctor --
12       A.    -- as much.
13       Q.    -- do you have any idea how much
14   hydrogen peroxide is produced by the body in a
15   foreign response -- foreign -- in a foreign
16   response to any of these nine products that we're
17   here today on?
18       A.    Again, I thought I've answered that.
19   It's this -- there's this microenvironment, and how
20   much hydrogen peroxide is in there is -- is not --
21   I don't -- I can't -- I just can't answer that
22   right now without looking at some studies.
23       Q.    Okay.  And, Doctor, what studies would
24   you need to look at?

Page 143

1        A.    I'd have to -- I just don't -- I'd have
2    to look for some papers on that.  I don't -- I
3    don't -- I don't know -- I don't have it in my
4    memory what --
5        Q.    Are those paper on your reliance list?
6        A.    I don't know.
7        Q.    Doctor, you'll agree that 20 percent
8    hydrogen peroxide is higher than what is usually
9    seen in a clinical setting?
10       A.    I'm not going to agree with that.  You
11   can keep asking it over and over.  I'm not going to
12   agree with it.  Because "clinical setting" is a
13   vague term.
14             Clinical setting, are you talking about
15   everywhere in the body or are you talking about
16   that specific microenvironment between the cell and
17   the biomaterial?  I mean, it's -- it's -- it's too
18   vague of a question.
19       Q.    Do you know how many micromoles of
20   hydrogen peroxide are found in the body?
21             MR. BOWMAN:  Object to form.
22             THE WITNESS:  Again, it's too vague of
23   a question.  What's in the body -- what matters is
24   what's in that microenvironment, not what's all

Page 144

1    over the body.
2    BY MR. HUTCHINSON:
3        Q.    Okay.  And, Doctor, can you tell us how
4    much hydrogen peroxide would be needed to oxidize
5    PROLENE in vivo?
6             MR. BOWMAN:  Object to form.
7             THE WITNESS:  Again, it's a question of
8    rate.  The more hydrogen peroxide, other oxidative
9    species, the faster it's going to occur.  What
10   exactly those concentrations are, I don't know that
11   it's been studied for polypropylene oxidation,
12   what -- what those concentrations are.
13   BY MR. HUTCHINSON:
14       Q.    And I'm not asking about polypropylene
15   oxidation.  I'm talking about PROLENE oxidation.
16   So let's be clear.
17       A.    PROLENE's --
18       Q.    Hold on just a minute.  Let me finish
19   my question.
20       A.    I thought you were finished.
21       Q.    Doctor, can you tell us how much
22   hydrogen peroxide would cause PROLENE to oxidize in
23   vivo?
24             MR. BOWMAN:  Object to form.

Page 145

1             THE WITNESS:  I would answer it the
2    same -- there's that microenvironment and how much
3    hydrogen peroxide is in there is -- I -- I don't
4    know.  If there's some, it will oxidize.  But if
5    it's going to -- it's a question of concentration.
6    The more that's there, the more it's going to
7    oxidize.
8    BY MR. HUTCHINSON:
9        Q.    You can't tell us how much hypochlorous
10   acids would cause PROLENE to oxidize in the body,
11   can you?
12             MR. BOWMAN:  Object to form.  He's --
13   he's already made it clear that he's talking about
14   concentrations and not --
15             MR. HUTCHINSON:  Understood.
16   Understood.
17             MR. BOWMAN:  Okay.
18             MR. HUTCHINSON:  Understood.
19             THE WITNESS:  I'm just going to keep
20   saying --
21   BY MR. HUTCHINSON:
22       Q.    Same question with hydrochloric acid.
23       A.    So hydrochloric acid, again, it's --
24       Q.    Can you tell us how much would cause

37 (Pages 142 to 145)

Scott Guelcher

Page 146

1    PROLENE to oxidize?
2        A.    Well, I don't know that hydrochloric
3    acid would cause oxidation.  I mean, polypropylene
4    is relatively resistant to acids and bases.  It's
5    the oxidizers that it's not.  So I would say that
6    all of these reactive oxygen species are -- are --
7    you know, they're present in that privileged
8    microenvironment, and they're going to cause
9    oxidation.  That's what we know.
10       Q.    But you can't tell us how much is
11   required to cause oxidation, can you, is my
12   question?
13           MR. BOWMAN:  Object to the form.
14           THE WITNESS:  I feel like I've answered
15   it.  If it's there, it will cause oxidation.
16   BY MR. HUTCHINSON:
17       Q.    I understand.
18       A.    It's a question of the rate and the
19   extent.
20       Q.    But can you tell us how -- how much
21   will cause oxidation?  That's my question.
22       A.    If there's some there, it will cause
23   oxidation.  It's just a question of the extent.  So
24   if there's more or less, there will be more or less

Page 147

1    oxidation.  But if the reactive oxygen species are
2    there, you would expect these reactions to be going
3    on.  I guess I'm really. . .
4        Q.    That's fine.
5           MR. HUTCHINSON:  Move to strike as
6    nonresponsive.
7    BY MR. HUTCHINSON:
8        Q.    My question to you, sir, is can you
9    tell us how much would cause PROLENE to oxidize in
10   the body?
11       A.    And I believe I've answered --
12           MR. BOWMAN:  Objection --
13           THE WITNESS:  -- that question multiple
14   times.
15           (Simultaneous speaking.)
16           (Reporter interruption for
17   clarification.)
18           MR. BOWMAN:  I have to object as
19   compound and vague.  He's already made it clear
20   that he's asking -- he wants you to include
21   concentrations in -- in the amount of material
22   that's -- that's going to be oxidized, that kind of
23   thing.
24   BY MR. HUTCHINSON:

Page 148

1        Q.    Can you answer that question, Doctor?
2        A.    I'm going to answer it the same way
3    I've been answering it.  That if there is reactive
4    oxygen species in that privileged microenvironment,
5    there will be -- you would expect there to be
6    oxidation going on, and it's a question of
7    concentration.  The more that's there, the more
8    oxidation you're going to get.
9        Q.    And can you quantity -- and strike
10   that.
11           And can you quantify that
12   concentration?
13           MR. BOWMAN:  Object to the form.  Asked
14   and answered.
15           THE WITNESS:  I don't know, off the top
16   of my head, by my memory, what the concentrations
17   of those reactive oxygen species are.  I think you
18   asked me about that already.  But I know that
19   they're there.  And I -- and that -- they're there.
20   Those reactions would be expected to occur.
21   BY MR. HUTCHINSON:
22       Q.    Doctor, let's go back to Sanotox R and
23   DLTDP.  Do you have criticisms of Ethicon for using
24   those two specific antioxidants in their

Page 149

1    formulation of PROLENE?
2        A.    I believe my opinion on this matter is
3    that those antioxidants were added to protect the
4    polypropylene during the manufacturing process and
5    whether or not they're doing anything -- protecting
6    any in vivo oxidation was not looked at very much.
7    There are some studies where they show depletion of
8    oxidation in the -- depletion of antioxidants in
9    the oxidized polypropylene on the surface.
10       Q.    Okay.  But my question is are you
11   criticizing Ethicon for using DLTDP and Sanotox R
12   in the formulation of PROLENE?
13           MR. BOWMAN:  Object to form.
14           THE WITNESS:  Are you asking
15   criticizing the selection of those?
16   BY MR. HUTCHINSON:
17       Q.    (Indicating yes.)
18       A.    I don't know how to answer it, other
19   than I did.  Those antioxidants were chosen for
20   stabilization during manufacturing and storage, not
21   for in vivo use.  That's -- that's my opinion.
22       Q.    So --
23       A.    And they're well known to stabilize --
24   I mean, they're well known stabilizers for

38 (Pages 146 to 149)

Scott Guelcher

Page 150

1     manufacturing purposes, but not for -- necessarily
2     for in vivo oxidation.
3          Q.    Doctor, but that's not my question.
4     Are you criticizing Ethicon for selecting Sanotox R
5     and DLTDP as two antioxidants used in the
6     formulation of PROLENE?
7                MR. BOWMAN:  Object to form.  Asked and
8     answered.
9                THE WITNESS:  Again, I believe I've
10    answered it.  I'm not --
11    BY MR. HUTCHINSON:
12         Q.    And in all due respect -- in all due
13    respect, Doctor, you haven't.  I'm just -- do you
14    criticize Ethicon?  That's all my question --
15               MR. BOWMAN:  He did answer that today,
16    and he's already testified about this in the Huskey
17    case.  And -- but he has --
18               THE WITNESS:  I'll try one more time.
19    So those two antioxidants are well known for
20    protecting polypropylene during manufacturing.  I'm
21    not --
22               MR. HUTCHINSON:  And move it strike as
23    nonresponsive.
24    BY MR. HUTCHINSON:

Page 151

1          Q.    I'm not asking you how well known they
2     are.  I'm asking you if criticize Ethicon for
3     selecting --
4          A.    I was trying to finish.  Just let me
5     finish.
6          Q.    All right.  But please answer the
7     question.
8          A.    Just --
9          Q.    Do you criticize Ethicon for selecting
10    DLTDP and Sanotox R as antioxidants?
11         A.    I'm -- I'm not criticizing them for
12    using those in the manufacturing process.  I am
13    criticizing the logic that they're going to be
14    effective in vivo because that was never really
15    looked at carefully.
16         Q.    Do you have a solution?
17         A.    I'm not proposing a solution.  I'm
18    not -- I'm not providing an opinion other than
19    that -- that that should be looked at, what -- how
20    effective are these antioxidants in vivo.  That's
21    my opinion.
22         Q.    And what's the alternative to these
23    antioxidants, Doctor?
24         A.    Well, antioxidants are a -- are a

Page 152

1     complex matter.  There are many different
2     combinations that can be used.  Just because a
3     certain set of antioxidants is useful for
4     protecting during manufacturing and -- and
5     long-term storage doesn't mean they'll be effective
6     in the body.  That needs to be studied with in vivo
7     studies and perhaps testing different
8     concentrations, different types of antioxidants.
9                My -- my criticism has been that that
10    work has not been done, at least to a very
11    extensive degree, other than that study that showed
12    antioxidant depletion in the -- in the oxidized
13    polypropylene.
14         Q.    Doctor, can you tell us the names of --
15    of the antioxidants that you believe Ethicon should
16    have used?
17         A.    I believe I just answered your
18    question.  I'm not -- I'm not proposing any
19    specific set of antioxidants.  I'm saying that
20    studies should have been done to consider different
21    combinations, different formulations other than
22    just protecting it during the manufacturing
23    process.
24         Q.    And do you have any alternatives,

Page 153

1     sitting here today, to Sanotox R and DLTDP?
2          A.    I'm not proposing alternatives.  Those
3     two antioxidants could have been studied in vivo,
4     or they could have looked at other antioxidants.
5     There -- but -- but but that wasn't done.  That's --
6     that's my opinion, that I've stated many times in
7     trial and depositions and courts, and that hasn't
8     changed.
9          Q.    Doctor, if we look the Imel study that
10    we've marked as Exhibit 6 --
11         A.    Exhibit 6, that's -- those are -- I'm
12    sorry.  You said what?  Oh, Imel.
13         Q.    Yeah.  I-m-e-l.
14         A.    I thought you said animal.  Sorry.
15         Q.    That's okay.  Are you there with me?
16         A.    I am.
17         Q.    The fibers from these mesh explants
18    were not 100 percent cleaned of proteins, were
19    they?
20         A.    I don't know how to answer that.  In
21    this study, he found regions of oxidized
22    polypropylene that had no protein because there was
23    no nitrogen present, and he found regions where
24    there appeared to be a mix of oxidized

39 (Pages 150 to 153)

Scott Guelcher

Page 154

1    polypropylene and protein.  So there were regions
2    where there were still adsorbed proteins, but there
3    are regions where there were not.  That's what he
4    reports in the study.
5        Q.    Okay.  And, Doctor, he also reports in
6    this study a carbonyl peak at 1740; is that right?
7        A.    In the IR spectra and his supplemental
8    data, he's seen a carbonyl peak at 1740 that's not
9    in the explants -- I'm sorry -- that's not in
10   the nonimplanted exemplars, but it -- it does
11   appear in the explants.
12       Q.    Doctor, do you know where DLTDP has
13   a -- has a FTIR spectra showing up on the --
14       A.    There's some --
15       Q.    -- on the reciprocal centimeter line?
16       A.    There is some internal Ethicon
17   documents that reported in that range.
18       Q.    In 1740?
19       A.    Uh-huh.  I think so.
20       Q.    Is that a "yes"?
21       A.    Yes, that's what I remember.
22       Q.    Okay.
23       A.    There are some internal Ethicon
24   documents that show depletion, but when they took

Page 155

1    those IR spectra, they blew them way up so the
2    normal -- the peaks are very small.  They're
3    difficult to see.
4        Q.    Doctor, have -- and I may have asked
5    you this earlier.  Have you ever designed a medical
6    device product?
7        A.    Have I ever designed a medical device
8    product?  In my research, I work with device
9    companies on -- I have work ongoing in that area.
10       Q.    And do any of the products that you
11   have worked on have a lifetime warranty?
12       A.    Lifetime warranty?  I mean, these are
13   degradable grafts.  So they're intended to --
14       Q.    The products that you're working on?
15       A.    Yes.
16       Q.    Okay.
17       A.    So they're intended to be replaced by
18   tissue over time and go away.
19       Q.    Doctor, are you aware of any medical
20   product on the market that will never oxidize?
21       A.    Wow.  That's a really broad question.
22   A product that will never oxidize?  I don't know.
23           MR. BOWMAN:  Object to form.
24           THE WITNESS:  That's so vague.  I . . .

Page 156

1    I mean, it depends on the product and what it's
2    supposed to do, where it's implanted, what -- what
3    the expected response is.
4            MR. HUTCHINSON:  Move to strike as
5    nonresponsive.
6            And this is not going to count as my
7    time.  I mean, it's a very clear question.
8    BY MR. HUTCHINSON:
9        Q.    My question to you is are you aware of
10   any medical device on the market that will never
11   oxidize?
12       A.    This is such an extreme question.  I
13   don't -- I don't know.  I mean, there are -- there
14   are materials that oxidize -- that -- that oxidize
15   very slowly or not much at all that can be
16   measured, but -- I mean, there's a lot of
17   biomedical devices on the market.  I haven't looked
18   at that specific question.
19       Q.    Can you answer that question, Doctor,
20   sitting here today?
21       A.    A device that's never oxidized?  I
22   don't know.  I mean, I'd have to look into that.
23   This is so broad.  It's hard to answer.
24       Q.    Doctor, can you tell me the name of a

Page 157

1    medical device on the market that will never
2    oxidize?
3        A.    And, again, it's a -- it's just a -- I
4    don't know how to answer that.  That's a broad
5    question.  Never oxidize.  I don't -- I don't know.
6            MR. HUTCHINSON:  Move to strike
7    everything before "I don't know."
8    BY MR. HUTCHINSON:
9        Q.    Doctor, are you aware of any foreign
10   body material that will never oxidize in the body?
11       A.    Any foreign body material?
12       Q.    That will never oxidize in the body.
13       A.    I don't know.  Again, it's -- it's
14   extremes of oxidation.  I mean, it's -- it's --
15   these are misleading questions.  I don't -- I don't
16   know of any material that just doesn't oxidize.
17   I'd have to -- I don't know.
18           MR. HUTCHINSON:  And move to strike
19   everything other than I don't know any material
20   that doesn't oxidize.
21   BY MR. HUTCHINSON:
22       Q.    Doctor, can oxidation in pelvic mesh
23   ever be completely eliminated?
24       A.    Can oxidation in pelvic mesh be

Scott Guelcher

Page 158

1    completely eliminated?  I mean, I think it's in my
2    report.  No.  These -- these antioxidants --
3        Q.    It's not in your report.
4        A.    It is in my report.
5        Q.    Listen to my question.
6        A.    Okay.
7        Q.    Can oxidation of pelvic mesh ever be
8    completely eliminated?  That's the question.
9            MR. BOWMAN:  Object to form.
10           THE WITNESS:  I believe it's in my
11   report.  I -- the antioxidants are depleted over
12   time.  The mesh oxidizes.  And the clinical
13   implications are unpredictable.  You can't design
14   for it.  That's my answer.
15   BY MR. HUTCHINSON:
16       Q.    My -- my question is can oxidation of
17   pelvic mesh ever be completely eliminated?
18       A.    I just answered it.  The antioxidants
19   deplete over time, and the mesh will oxidize as
20   they're depleted, and that's going to lead to these
21   other events that are unpredictable.  That's the
22   answer to the question.
23       Q.    So it can be completely eliminated in
24   pelvic mesh?

Page 159

1        A.    I answered the question.  I don't
2    really want to play this game.
3            THE WITNESS:  Can I -- can we take a
4    break again?  I --
5    BY MR. HUTCHINSON:
6        Q.    No.  I need the question answered first
7    and then we'll take a break.
8        A.    We can answer it for an hour.  I'm
9    going to give you the same answer I just gave you.
10   I feel like I've made these opinions very clear.
11       Q.    My question is can oxidation of pelvic
12   mesh ever be completely eliminated?  Yes or no?
13           MR. BOWMAN:  Object to form.
14           THE WITNESS:  The antioxidants are
15   depleted.  As the antioxidants are depleted, you
16   expect oxidation of the polypropylene in the mesh,
17   which can lead to these other unpredictable events.
18   BY MR. HUTCHINSON:
19       Q.    But can it ever be completely
20   eliminated?  That is my question.
21       A.    The antioxidants are --
22           MR. BOWMAN:  Object to form.
23           THE WITNESS:  -- depleted over time.
24   As they're depleted, the polypropylene in the mesh

Page 160

1    can oxidize.
2    BY MR. HUTCHINSON:
3        Q.    But can oxidation ever be completely
4    eliminated, sir?
5        A.    As the antioxidants are depleted,
6    oxidation of the mesh would be expected to occur.
7    I don't know what else to say.
8        Q.    My question is can it ever be
9    completely eliminated?
10       A.    As the antioxidants are depleted in the
11   mesh, the polypropylene would oxidize.
12           MR. HUTCHINSON:  Move to strike as
13   nonresponsive.
14   BY MR. HUTCHINSON:
15       Q.    My question is --
16           MR. BOWMAN:  He's actually answered
17   this question.
18           MR. HUTCHINSON:  No, he hasn't.  My
19   question is --
20           MR. BOWMAN:  He said he wasn't giving
21   you any --
22           (Simultaneous speaking.)
23           THE WITNESS:  We can sit here for --
24           (Reporter interruption for

Page 161

1    clarification.)
2            THE WITNESS:  We can sit here for an
3    hour if you want.  I mean, it's over at 1:00.
4            As the antioxidants are depleted --
5            MR. HUTCHINSON:  And move to strike as
6    nonresponsive.
7            THE WITNESS:  -- the polypropylene --
8    BY MR. HUTCHINSON:
9        Q.    I'm trying to be respectful to you,
10   Doctor.
11           MR. BOWMAN:  No, wait a minute.  I need
12   to --
13           MR. HUTCHINSON:  Then we'll take a
14   break.
15           MR. BOWMAN:  I need to get my objection
16   on the record.  He's already said he's not offering
17   you alternatives.  He's telling you what's going on
18   with the pelvic mesh that's involved here.  All
19   right?  Now I'm going to object as asked an
20   answered.
21           And if you want to rephrase the
22   question, go ahead.
23           MR. HUTCHINSON:  All right.
24   BY MR. HUTCHINSON:

41 (Pages 158 to 161)

Scott Guelcher

Page 162

1      Q.    I'm asking, Doctor, can it ever
2   be completely -- can oxidation ever be completely
3   eliminated?
4            MR. BOWMAN: I'm going to instruct you
5   not to answer.
6            THE WITNESS: I'm not going to answer.
7   BY MR. HUTCHINSON:
8      Q.    Doctor, are you giving any alternatives
9   to PROLENE mesh? And your counsel said no. I just
10  want to make sure, and then we'll take a break.
11           MR. BOWMAN: Object to form.
12  BY MR. HUTCHINSON:
13     Q.    Are you giving any alternatives to
14  PROLENE mesh?
15     A.    I've not opined that there are
16  alternatives to PROLENE mesh. My opinions relate
17  to what happens to PROLENE implanted in the body.
18     Q.    And I understand that. I know there's
19  none in your report. But are you giving, here
20  today, any opinions?
21     A.    I -- I just said that. I'm not giving
22  any opinions about alternatives to PROLENE mesh.
23  I'm stating what happens to PROLENE mesh in the
24  body.

Page 163

1            MR. HUTCHINSON: Okay. We can take a
2   break.
3            MR. BOWMAN: All right.
4            (Brief recess.)
5            MR. HUTCHINSON: Doctor, we're back on
6   the record. Are you ready to go?
7            THE WITNESS: Yes.
8   BY MR. HUTCHINSON:
9      Q.    Is there anything -- have you
10  understood all my questions so far?
11     A.    Most of them.
12     Q.    Have you -- is there anything about the
13  testimony that you have given that you would like
14  to change?
15     A.    No.
16     Q.    Doctor, do you have any opinions about
17  how Ethicon's nine products should be changed or
18  modified in the way that they are manufactured, and if
19  so, how?
20     A.    Specific to manufacturing, no. I don't
21  have any opinions about the manufacturing of the
22  devices.
23     Q.    Do you have any opinions about how
24  Ethicon's nine products should be significantly

Page 164

1   changed?
2      A.    Other than what I said before, I
3   believe more testing could have been done to
4   address the question of oxidation, degradation and
5   the clinical implications of that and bench scale
6   testing, preclinical testing could have been done
7   to answer that question. That's also in my report.
8      Q.    All right. But outside of more
9   testing -- I want to talk about specifically how
10  you believe Ethicon's nine different products
11  should be significantly changed. Do you have any
12  opinions of how they should be changed?
13     A.    How they should be changed?
14     Q.    Yes, sir. These nine different
15  products.
16     A.    Well, conceptually, they could be made
17  more resistant to in vivo oxidation by looking at
18  the antioxidant package. That could be an
19  improvement. That's consistent with my opinions.
20     Q.    And, Doctor, how would you make the
21  mesh in these nine products more resistant to in
22  vivo oxidation?
23     A.    I think it needs to be studied. You
24  would have to do testing to identify an antioxidant

Page 165

1   package that's effective in vivo. I -- I don't
2   know a specific package without doing testing.
3      Q.    Doctor, on -- let's talk about the
4   women on Exhibit Number 1 that you're here to
5   testify for.
6      A.    Okay. What about the doctors for any
7   of these women? Did any of these doctors commit
8   malpractice by using these Ethicon products in
9   pelvic floor repair?
10           MR. BOWMAN: Object to form.
11           THE WITNESS: I've not expressed any
12  opinion about the conduct of the doctors in
13  implanting these women. I -- I have no opinion
14  about the doctors.
15  BY MR. HUTCHINSON:
16     Q.    And, Doctor, do you believe that these
17  doctors who implanted these Ethicon products in
18  these women did anything wrong?
19           MR. BOWMAN: Object to form.
20           THE WITNESS: I've not opined that
21  they've done anything wrong. They implanted the
22  device. I don't know how it was implanted. I
23  don't know when. I haven't reviewed the medical
24  records. So I have no way to assess the conduct of

42 (Pages 162 to 165)

Scott Guelcher

Page 166

1    the doctors.
2        MR. HUTCHINSON: And, Doctor, we'll
3    hand you what we'll mark as Exhibit 7 to your
4    deposition.
5        (Whereupon Exhibit 7 was marked as an
6    exhibit.)
7    BY MR. HUTCHINSON:
8        Q.    You've seen this study before, haven't
9    you?
10       A.    Yes.
11       Q.    And this is the seven-year dog study
12   done by Dan Burkley?
13       A.    It is.
14       Q.    And you've relied on this study in
15   support of your opinions; is that correct?
16       A.    Yes.
17       Q.    And, Doctor, do you -- if you'll look
18   with me, please, on page 09888221 -- 221 is the
19   last. . .
20       A.    09888221?
21       Q.    221.
22       A.    Okay.
23       Q.    Down there at the bottom, it states
24   under "Conclusions": "Comparison of 7-year

Page 167

1    explants to current PROLENE indicate no molecular
2    weigh degradation."
3        Did I read that correctly?
4        A.    That's what it says.
5        Q.    And, Doctor, do you have an explanation
6    of why the findings in the Ethicon dog study showed
7    no molecular weight degradation?
8        MR. BOWMAN: Object to form. Misstates
9    the document.
10       THE WITNESS: Well, my understanding
11   is, what they did in this study, they sampled the
12   entire volume of the suture and the molecular
13   weight degradation is occurring near the surface,
14   in the outer layers. And so they may have not been
15   able to detect it because mostly what they were
16   testing was bulk polypropylene or PROLENE in the
17   interior of the -- of the fiber.
18       And so in the human explant study, they
19   did see degradation on the surface, but in this
20   study, it was -- it just might have been a sampling
21   problem as to why they couldn't see the loss in
22   molecular weight that I would expect.
23   BY MR. HUTCHINSON:
24       Q.    Is that your explanation? It's a

Page 168

1    sampling problem?
2        MR. BOWMAN: Object to form.
3        THE WITNESS: Well, I'll be more
4    specific. They -- they sampled the whole fiber.
5    Whereas, the molecular weight loss would be
6    expected to occur near the surface of the fiber.
7    And so if the bulk of the fiber had not yet
8    degraded, you wouldn't see it, but you would still
9    see the effects at the surface. You have to sample
10   the polypropylene on the surface as they did in
11   that human explant study. But in this I think it
12   was just the bulk fiber.
13   BY MR. HUTCHINSON:
14       Q.    And, Doctor, any time there's a chain
15   scission, there's loss of molecular weight; is that
16   correct?
17       A.    Yes.
18       Q.    And, Doctor, if you look at the
19   seven-year dog study, other than -- other than a
20   sampling size, do you have any other explanation of
21   why --
22       MR. HUTCHINSON: On page 221, Counsel.
23   BY MR. HUTCHINSON:
24       Q.    -- there was a finding of no molecular

Page 169

1    weight degradation?
2        MR. BOWMAN: Object to form.
3        THE WITNESS: You know, I do have some
4    questions about the controls. You know, this --
5    this control suture is, I don't think, the same as
6    what was implanted.
7    BY MR. HUTCHINSON:
8        Q.    It's just not the same size in
9    diameter; is that correct?
10       A.    Well, it's -- it's -- it's current
11   PROLENE 40. And so is that what was implanted
12   seven years prior? I -- I don't know the answer to
13   that.
14       Q.    Did you make any effort to find out?
15       A.    I -- I couldn't tell. I mean --
16       Q.    And, Doctor, you'll agree that the
17   control they used was PROLENE, correct?
18       A.    It was PROLENE.
19       Q.    And, Doctor, if -- what did you notice
20   about mechanical properties of the sutures after
21   seven years of implantation?
22       A.    They didn't see changes in the
23   strength, but, again, it's -- it's strength is a
24   volume average quantity averaged over the entire

43 (Pages 166 to 169)

Scott Guelcher

Page 170

1    volume of the suture, where these changes are
2    occurring at the surface.
3        Q.    In fact, Doctor, the physical
4    properties -- or the mechanical properties, rather,
5    of the sutures increased after seven years, didn't
6    they?
7        A.    I mean, can you -- what are you looking
8    at? I mean, can you -- I need to look at
9    specific -- to answer that.
10       Q.    Did the -- well, did the mechanical
11   properties of the sutures increase after seven
12   years, Doctor?
13       A.    I need to look at the -- the data
14   summary again. I need to look -- I need to refresh
15   myself with the data before I answer that.
16            So on page 11336182, there's the
17   seven-year data summary that includes the straight
18   strength, elongation and the modulus.
19       Q.    Just focus on my question.
20       A.    Well, I'm trying to answer it. I just
21   need to look at the data.
22       Q.    You're just kind of reading aloud.
23   Just why don't you look at the data, and then let's
24   focus on my question.

Page 171

1        A.    Okay. I was trying to establish
2    where... so the PROLENE showed -- looks like
3    essentially not -- I mean, it's difficult to say
4    because there's no standard deviations here. So
5    what's significantly different -- I don't -- I
6    don't see standard deviations. But the PROLENE
7    sutures from zero to seven years, the changes in
8    the strength are pretty small.
9        Q.    Okay. So, Doctor --
10           MR. HUTCHINSON: So what was my
11   question?
12           THE WITNESS: Well, you said the --
13           MR. HUTCHINSON: No. What's my
14   question?
15           (Whereupon the following question was
16   read back by the reporter: Did the -- well, did
17   the mechanical properties of the sutures increase
18   after seven years, Doctor?)
19   BY MR. HUTCHINSON:
20       Q.    That's my question.
21       A.    But "mechanical properties" is a broad
22   term. Mechanical properties would include breaking
23   strength, elongation, Young's modulus, that are
24   listed here.

Page 172

1        Q.    Okay. What about toughness? Is that a
2    mechanical property?
3        A.    Well, it is, but it's not measured.
4        Q.    Okay.
5        A.    I mean, what's -- what's reported --
6        Q.    So --
7        A.    I'm going by what's reported, which is
8    the breaking strength, the elongation and the
9    Young's modulus. The breaking strength, as I said,
10   is staying about the same. The elongation is
11   getting longer and the modulus is going down.
12       Q.    Okay. So let's just make sure you and
13   I are on the same page, Doctor.
14       A.    Okay.
15       Q.    If you can kind of just sit up and look
16   at me.
17            Breaking strength is a mechanical
18   property, correct?
19       A.    It's a -- it's a -- it is a mechanical
20   property.
21       Q.    Okay. Elongation -- elongation and
22   Young's modulus are also mechanical properties,
23   correct?
24       A.    That's right.

Page 173

1        Q.    All right. So if we look at the
2    breaking strength of PROLENE, after seven years, it
3    decreased 5 percent from baseline; is that right?
4        A.    That's the percentage that's shown.
5    Right.
6        Q.    And elongation increased 111 percent;
7    is that right?
8        A.    That's what it says.
9        Q.    Any reason to disagree with that,
10   Doctor?
11       A.    That's what they measured. I mean,
12   that's. . .
13       Q.    In fact, any reason to disagree with
14   any of these numbers on page 183?
15       A.    I mean, that's what's reported in the
16   study.
17       Q.    Okay. And you --
18       A.    So that's what I'm going by.
19       Q.    Right. And you have no reason to
20   believe that these numbers are incorrect; is that
21   right?
22       A.    Not -- I mean, not incorrectly
23   measured. They --
24       Q.    And if we look at Young's modulus, the

44 (Pages 170 to 173)

Scott Guelcher

Page 174

1    PROLENE decreased 70 percent; is that correct?
2        A.    That's right.
3        Q.    All right.  And Young's modulus, that's
4    just another word for stiffness; is that right?
5        A.    No.  Stiffness is a different material
6    property.  Modulus is the initial slope
7    approximately of the stress-strain curve.  So it's
8    a different property.
9        Q.    Right.  And -- and, Doctor, what's your
10   explanation for the increase -- mechanical -- or
11   the improvement in the mechanical -- strike that.
12           Doctor, what's your explanation for the
13   improvement of the mechanical properties of the
14   sutures from the seven-year dog study?
15       A.    I'm not sure why they're reporting this
16   increase in elongation.  I was looking mainly at
17   the comments on degradation, oxidation.  I'm not
18   sure why they're reporting this increase in
19   elongation at seven years.
20       Q.    Do you have an explanation?
21       A.    I just said I don't know why it's
22   increasing at seven years.
23       Q.    All right.  And, in fact, Doctor, you
24   understood -- we talked about toughness earlier on;

Page 175

1    is that correct?
2        A.    Yes.
3        Q.    Do you know if these sutures in the
4    seven-year dog study became tougher after seven
5    years of implantation?
6        A.    They didn't report it.  I mean, the
7    toughness is the slope under the stress-strain
8    curve, but that's difficult to assess because the
9    elongation is going up, but the stress is -- looks
10   like it's going down.  So I -- they didn't report
11   that.  So I -- I can't comment on that.
12       Q.    Okay.  And -- but how would you -- what
13   would you need to be able to comment on toughness?
14   Would you need a stress-strain curve plotting this
15   out?
16       A.    That's --
17           MR. BOWMAN:  Object to form.
18           THE WITNESS:  -- one way to measure the
19   toughness, is the area under the stress-strain
20   curve.
21   BY MR. HUTCHINSON:
22       Q.    Okay.  And would you need any other
23   data points on your stress-strain curve?
24       A.    Other data points on the curve?

Page 176

1        Q.    Yes, sir.
2        A.    Well, this is one point, right?  So
3    what's -- what you have here is initial slope,
4    which would be the modulus, and then you've got a
5    strength, which would be the -- the -- the endpoint
6    of the test.
7        Q.    Okay.  So if I understand correctly,
8    what you would need is a stress-strain curve where
9    breaking strength is the y-axis and elongation is
10   the x-axis; is that right?
11       A.    No.  The y-axis is the stress that's
12   measured, and the x-axis is the strain --
13       Q.    Okay.
14       A.    -- or the elongation.
15       Q.    Okay.
16       A.    But it's not a -- what's reported here
17   is the elongation at break, I believe --
18       Q.    And --
19       A.    -- strength at break.
20       Q.    And then what you would also need to
21   look at is the area under the curve at time zero
22   compared to the area under the curve at time -- at
23   after year seven; is that right?
24       A.    No.  Not really.  I mean, it's -- it's

Page 177

1    a curve.  So you can't -- oh -- okay.  I think
2    maybe I see what you're saying, look at the whole
3    stress-strain curve measured at zero and then the
4    whole curve measured --
5        Q.    Correct.
6        A.    -- at seven years.
7        Q.    That's correct.
8        A.    Yeah, I think that would give you the
9    toughness.
10       Q.    Okay.  And, in fact, if the area under
11   the curve, after seven years, increased, that would
12   mean the mechanical properties of the suture
13   increased after seven years; is that right?
14       A.    No.  It would mean that -- the
15   toughness is measured -- approximated by the area
16   under the curve was higher than if the area under
17   the stress-strain curve is higher.
18       Q.    Okay.  But we can assume that if the
19   area under the curve, after seven years increased,
20   then the sutures used in the dog study became
21   tougher; we can agree to that?
22           MR. BOWMAN:  Object to form.
23           THE WITNESS:  I don't know.  It's a
24   strange finding.  It's -- it's very surprising.

45 (Pages 174 to 177)

Scott Guelcher

1   It's not -- it's -- I -- I have a difficult time --
2   that just doesn't usually happen.  It's --
3   BY MR. HUTCHINSON:
4       Q.   But -- but my question is can you and I
5   agree that if the area under the curve, after seven
6   years, increased, then toughness of the sutures
7   increased after seven years in the dog study?
8       A.   I don't know.  I'd have to look at the
9   data without answering that question.  I don't -- I
10  need to see -- I need to see those curves and look
11  at it.  It just wasn't calculated here.  So I don't
12  want to make inferences from their data something
13  that wasn't reported.
14      Q.   Okay.
15      A.   I mean. . .
16      Q.   So you would need to see a
17  stress-strain curve?
18      A.   Well, I need to see all the
19  calculations to form an opinion.  I'm just going by
20  what was provided.  And this is a strange result,
21  that it doesn't do anything for two years and all
22  of a sudden you go to two to seven years, there's
23  this increase in elongation.  It's very surprising.
24  You know, I need to see more analysis to make

1   conclusions about toughness and all those things.
2   I mean, I just -- it's not in here, not in this
3   document.
4           MR. HUTCHINSON:  Okay.  Doctor, I'll
5   hand you what we'll mark as Exhibit 8 to your
6   deposition.
7           (Whereupon Exhibit 8 was marked as an
8   exhibit.)
9   BY MR. HUTCHINSON:
10      Q.   This is a stress-strain curve where
11  stress is the y-axis and strain is the x-axis.  Do
12  you see that?
13      A.   I do.  But I have no idea where this
14  came from.  It's not in this document, and it's not
15  in this report.  And it's --
16      Q.   Well, stick with me on my questions for
17  just a second.  This shows toughness as -- under --
18  as red at year zero using the same data points in
19  the dog study; is that right?
20      A.   I don't know where this came from.
21  This is --
22      Q.   I want you to compare it to the dog
23  study.
24      A.   You just gave it --

1       Q.   And my question is are these the same
2   numbers that are used in the dog study?
3       A.   I -- I don't -- I -- this just
4   doesn't -- I don't -- I need to think about this.
5           MR. BOWMAN:  Yeah.  I'm having trouble,
6   actually, figuring out what you're talking about as
7   well.  Is there -- is there somewhere you could
8   point to where this data is taken from?
9           THE WITNESS:  I need to see the data in
10  this report.  I need to see -- this is break
11  strength versus elongation.  I need to see the full
12  stress-strain curve that was measured for these
13  materials.  That's how toughness is -- in my
14  understanding, it's the stress-strain curve.  This
15  is the break strength versus percent elongation.  I
16  need to see the raw data where these -- from the
17  actual test, the stress-strain curve that's used to
18  get the toughness.  But I -- I can't comment on
19  this.  This is break strength versus elongation
20  which is -- it's a different concept than what I
21  think of in terms of what I've done in my work, in
22  my papers where you plot the stress versus the
23  strain, and you calculate the area under the curve
24  is the toughness.  I --

1   BY MR. HUTCHINSON:
2       Q.   In fact, Doctor, what we have here is
3   breaking strength on the y-axis, correct?
4       A.   This is breaking strength.  I'm --
5       Q.   All right.  And then -- just stick with
6   me and my questions and we'll get through this.
7           We have elongation on the x-axis,
8   correct?
9       A.   But elongation at what?  Elongation at
10  break?  It just says "percent elongation."
11      Q.   And then, Doctor, my question to you is
12  are these the same numbers on Exhibit 8 that are in
13  the dog study for breaking strength and elongation?
14      A.   I -- I can't answer that question.
15  It's --
16      Q.   Well --
17      A.   I can't pull numbers off of this graph
18  and say that they're the same from this.  I don't
19  know where this came from.  I mean, it's not
20  plotted in the right way.  It's not plotted as a --
21  as a tensile strength versus strain.  It's -- it's
22  not plotted in a way that I'm accustomed -- so it's
23  difficult to infer anything from this sort of
24  analysis.

Scott Guelcher

Page 182

1    Q.    So, Doctor, at year zero, the breaking
2    strength of PROLENE was 1.68, correct?
3    A.    Year zero, from the table it says 1.68.
4    Q.    Right.  And, in fact, Doctor, the
5    elongation at year seven was 1.6, correct?
6    A.    Elongation at year seven?  No.
7    Q.    I'm sorry.  The elongation at year --
8    at time zero was 37; is that right?
9    A.    That's the number in the table.  But is
10   that elongation at break?  I assume it is.  That's
11   not the stress-strain curve.  That's the terminal
12   point of the stress-strain curve.
13   Q.    And, Doctor, stay with me.  At year
14   seven, elongation is 78 percent; is that right?
15   A.    That's what's listed in the table.
16   Q.    And the table also lists at year seven
17   breaking strength at 1.6 pounds, correct?
18   A.    That's the breaking strength.  That's
19   the point at the end of the stress-strain curve and
20   my understanding the way they did this experiment.
21   Right?
22   Q.    And the area under the curve at year
23   zero is smaller than the area under the curve at
24   year seven, isn't it?

Page 183

1    A.    I'm not -- I cannot answer that
2    question.  This is not -- in order to answer, I --
3    I -- I don't want to be difficult.  But in order to
4    answer this toughness question, I need to see raw
5    data.  These are -- these are -- these -- these
6    data are plotted at the end of the experiment.  I
7    need to see the actual stress-strain curve.  I need
8    to know the stress at 1 percent elongation, 5
9    percent elongation, 10 percent, until it breaks.
10   And from that stress-strain curve, you can do more
11   analysis.
12        But this is simply a plot of break
13   strength versus elongation at break.  And I -- I
14   can't make those kinds of inferences that you're
15   trying to get me to agree to.
16   Q.    Well, Doctor, are you -- have you
17   attempted, in any way, to create a toughness curve
18   to measure the PROLENE sutures from the dog study
19   at year zero and year seven?
20        MR. BOWMAN:  Object to form.
21        THE WITNESS:  As I said --
22   BY MR. HUTCHINSON,
23   Q.    I'm asking you, have you attempted to
24   do that?

Page 184

1    A.    I've not attempted to do it.  They
2    report a strength.  They report a elongation.  They
3    report a modulus.  There's this surprising increase
4    from year two to year seven, but --
5    Q.    And, Doctor, how would you create a
6    stress-strain curve to evaluate the toughness using
7    the information from the dog study?
8        MR. BOWMAN:  Object to form.  He just
9    testified that can't be done.
10        THE WITNESS:  I can't make it from this
11   table.  I would need to see the raw data.  Maybe
12   it's in here.  I don't know.  I haven't -- I don't
13   know.
14   BY MR. HUTCHINSON:
15   Q.    But have you looked for the raw data,
16   Doctor, that would support a stress-strain curve
17   analysis?
18        MR. BOWMAN:  Object to form.  Asked and
19   answered.
20   BY MR. HUTCHINSON:
21   Q.    Have you looked for the data, Doctor?
22   A.    I haven't looked for those data because
23   it's already shown in the table what I need to
24   know.  There's a breaking strength.  There's a

Page 185

1    elongation.  There's a modulus.  And so I -- I see
2    the elongation and the modulus data at break.
3    Q.    In fact, Doctor, can you explain the
4    elongation increase of 111 percent at year seven?
5    Can you explain that?
6        MR. BOWMAN:  Object to form.  Asked and
7    answered.
8        THE WITNESS:  Again, these are volume
9    -averaged tests.  You're not looking at the changes
10   at the surface.  My testimony has been about these
11   changes that happen at the surface, oxidation.  The
12   degradation at the surface is confirmed in this
13   study.  This is a volume-averaged mechanical
14   property, and I don't know how to interpret it
15   because it's volume averaged, and they're not
16   looking specifically at what's happening at the
17   surface.  That's -- that's the same way I would
18   explain the molecular weight.
19   BY MR. HUTCHINSON:
20   Q.    And, Doctor, do you know how to
21   interpret the finding of a decease of 70 percent of
22   Young's modulus at year seven?
23        MR. BOWMAN:  Object to form.
24        THE WITNESS:  I'll answer that the way

47 (Pages 182 to 185)

Scott Guelcher

Page 186

1    I just answered.  It's like molecular weight.  It's
2    a -- it's a bulk property measurement, volume
3    averaged across the fiber, and it doesn't tell you
4    about what's happening on the surface.  It doesn't
5    tell you whether the surface is embrittled.  All
6    it's telling you is about the bulk properties of
7    the fiber.  It's the same as the molecular weight.
8    I think limited information can be gained from
9    this.
10   BY MR. HUTCHINSON:
11       Q.    Doctor, how -- how can a PROLENE fiber
12   be embrittled if its elongation increases 111
13   percent?
14       A.    PROLENE fibers were embrittled in those
15   human explants, and they scraped it off.  It was
16   embrittled, oxidized polypropylene.  It was in the
17   reports that it was embrittled, oxidized material
18   on the surface.  And doing these volume-averaged
19   bulk tests is not going to the tell you what's
20   happening at the surface.
21       Q.    And, Doctor, does the data from the dog
22   study support your opinions about whether or not
23   PROLENE degrades?
24       A.    It says in the report that they were

Page 187

1    going through -- I believe it says --
2        Q.    The data summary.  I'm talking about
3    the data summary, Doctor.  Stick with me.  On page
4    193, the bottom --
5        A.    Well, you have to be a little more
6    specific.  The mechanical property summary.
7        Q.    Excuse me.  Excuse me.
8        A.    Yeah.
9        Q.    Do the mechanical properties, shown on
10   page 183 of the seven-year dog study, support your
11   opinions that PROLENE degrades in vivo?
12       A.    I -- I don't think they're relevant to
13   my opinions because they -- this is a
14   volume-averaged quantity, just like the molecular
15   weight.  It's averaged over the entire volume of
16   the suture.  So it doesn't tell you what's
17   happening at the surface, where the degradation is
18   occurring.
19       Q.    Does the data summary support your
20   opinions about degradation in vivo, Doctor?
21           MR. BOWMAN:  Object to form.  Asked and
22   answered.
23           THE WITNESS:  I don't think it can
24   inform my opinions because these are

Page 188

1    volume-averaged data that don't look at what's
2    happening at the surface.
3    BY MR. HUTCHINSON:
4        Q.    Do they support your opinions, Doctor?
5        A.    I don't think they inform my opinions
6    because it's a volume-averaged property.  It
7    doesn't look at what's happening at the surface.
8        Q.    You don't --
9           MR. HUTCHINSON:  Move to strike as
10   nonresponsive.
11   BY MR. HUTCHINSON:
12       Q.    You don't think they inform your
13   opinions.  My question, Doctor, is do the -- do the
14   data summary support -- not inform -- support your
15   opinions that degradation occurs in vivo in
16   PROLENE?  Does this data support -- does this data
17   summary support your opinions?
18       A.    Again, it doesn't -- I -- I don't know
19   what to do with these data.  These are
20   volume-averaged properties.  It doesn't tell you
21   what's happening at the surface.
22       Q.    I'm not asking you what -- to do
23   anything with them.  I'm asking you whether or not
24   this data summary supports your opinions that

Page 189

1    PROLENE degrades in vivo?
2           MR. BOWMAN:  Object to form.
3           THE WITNESS:  It's --
4           MR. BOWMAN:  Asked and answered.
5           THE WITNESS:  It's difficult to form an
6    opinion about it because they're not measuring the
7    right thing.  They're measuring a volume-averaged
8    property, not what's happening at the surface.  So
9    it's difficult to form an opinion.
10          MR. HUTCHINSON:  Move to strike as
11   nonresponsive.
12   BY MR. HUTCHINSON:
13       Q.    Doctor, does the data summary support
14   your opinions?
15          MR. BOWMAN:  I'm instructing you not to
16   answer.
17          THE WITNESS:  I'm not answering.  I
18   don't -- I don't want to go back and forth anymore.
19   I believe I've answered it.
20   BY MR. HUTCHINSON:
21       Q.    Doctor, I forgot to ask you one
22   question when we were talking about the nine
23   different products.  Can you tell the jury what the
24   difference is between TVT EXACT and TVT and any

48 (Pages 186 to 189)

Scott Guelcher

Page 190

1    other -- and in any of the other TVT products?
2         MR. BOWMAN:  Object to form.
3         THE WITNESS:  I don't remember the
4    specific differences.  There's differences in how
5    the mesh can be cut, machine cut, laser cut.
6    They're all made from the same mesh, which is what
7    I was looking at in my report.  They're all made
8    from the same PROLENE, from the same -- from the
9    same mesh, as I said earlier.
10   BY MR. HUTCHINSON:
11        Q.    Doctor, is TVT ABBREVO laser cut or
12   mechanically cut?
13        MR. BOWMAN:  Object to form.
14        THE WITNESS:  I can't remember.  I
15   believe it's laser cut.  TVT's mechanically cut.  I
16   don't remember the details of it.
17   BY MR. HUTCHINSON:
18        Q.    Doctor, do you know -- can you tell the
19   jury whether or not TVT-O is mechanically cut or
20   laser cut?
21        A.    I believe TVT-O is mechanically cut.
22        Q.    Doctor, are you aware of whether or not
23   TVT-O is available in any type of other -- strike
24   that.

Page 191

1         Are you aware if TVT -- if TVT-O is
2    available in laser cut mesh?
3         A.    I can't remember.  Some of these
4    products are offered as machine cut and laser cut.
5    It's not always specified which the cut is.
6    Sometimes it's difficult to figure out.  But --
7         Q.    Is it your testimony, Doctor, it's not
8    always specified in the product literature how the
9    mesh is cut?
10        A.    I don't remember how the -- how the --
11   the specifics of how the mesh is cut.  Again, I was
12   focusing on the specific PROLENE used in the mesh
13   and its implantation in the body.
14        Q.    Doctor, can you tell us how the mesh in
15   the TVT SECUR is cut?
16        A.    I believe that's a machine cut.
17        Q.    And can you tell us, Doctor, how the
18   mesh in TVT EXACT is cut?
19        MR. BOWMAN:  Object to form.
20        THE WITNESS:  I don't remember about
21   TVT EXACT.
22   BY MR. HUTCHINSON:
23        Q.    Can you tell us how the mesh in PROSIMA
24   is cut?

Page 192

1         A.    PROSIMA is not a sling.  It's a --
2         Q.    I'm not asking about the product.  I'm
3    asking about can you tell us how the mesh in
4    PROSIMA is cut?
5         A.    I -- I don't remember.  I wasn't
6    stating opinions about the cutting of the mesh in
7    my report.
8         Q.    Doctor, does the cutting of the mesh
9    influence your opinions whatsoever regarding
10   oxidizing PROLENE?
11        MR. BOWMAN:  Object to form.
12        THE WITNESS:  Well, the cutting of the
13   mesh could affect the oxidation reaction.
14   BY MR. HUTCHINSON:
15        Q.    Is that stated in your report marked as
16   Exhibit 2, Doctor?
17        A.    I don't believe that's in my report.
18        Q.    Okay.  Doctor, can you tell us how the
19   mesh in GYNEMESH PS is cut?
20        MR. BOWMAN:  Object to form.
21        THE WITNESS:  I don't remember how that
22   mesh is cut.
23   BY MR. HUTCHINSON:
24        Q.    Can you tell us how the mesh in PROLIFT

Page 193

1    is cut?
2         A.    I don't remember how that mesh is cut.
3         Q.    Can you tell us how the mesh in
4    PROLIFT+M is cut?
5         A.    I don't remember how that mesh is cut
6    either.
7         Q.    Doctor, do you have any opinions
8    whatsoever regarding how the mesh is cut as it
9    relates to its reaction with tissue?
10        MR. BOWMAN:  Object to form.
11        THE WITNESS:  I mean, I thought I
12   answered it.  Those opinions are not in this
13   report.
14   BY MR. HUTCHINSON:
15        Q.    And you're not offering any opinions
16   about that in relation to the nine different
17   products at issue here today, correct?
18        A.    I'm not offering any opinions about
19   that.
20        Q.    Doctor, have --
21        MR. BOWMAN:  Counsel, I actually have
22   that the three hours are up.
23        MR. HUTCHINSON:  Okay.
24   BY MR. HUTCHINSON:

49 (Pages 190 to 193)

Scott Guelcher

Page 194

1      Q.     Doctor, do you intend to offer any
2    opinions in this case that we've not already
3    discussed?
4      A.     No.
5      Q.     Do you plan on supplementing your
6    opinions?
7      A.     I don't know.
8      Q.     Okay.  Have you understood all of my
9    questions so far?
10     A.     Mostly.
11     Q.     Is there a question that's lingering in
12   your mind that you don't understand that I need to
13   reask?
14            MR. BOWMAN:  I did instruct him not to
15   answer at least two questions.
16            THE WITNESS:  No.
17   BY MR. HUTCHINSON:
18     Q.     Doctor, is there anything about the
19   testimony you've given today that you would like to
20   change?
21     A.     No.
22     Q.     Do you feel good about how you did
23   today as an expert witness?
24            MR. BOWMAN:  Object to form.

Page 195

1            THE WITNESS:  I don't know.  Our three
2    hours is up.  I think we're done.
3            MR. HUTCHINSON:  Thank you.
4            Counsel, before we go -- we go off the
5    record, just to make a housekeeping note, counsel
6    has given me a flash drive that contains what?
7            MR. BOWMAN:  Reliance materials, pretty
8    much everything that was reviewed or referenced in
9    the report.
10           MR. HUTCHINSON:  Okay.
11           (Proceedings concluded at 12:17 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 196

1            C E R T I F I C A T E
2    STATE OF TENNESSEE )
     COUNTY OF DAVIDSON )
3            I, Lise S. Matthews, RMR, CRR, CCP, LCR
     353, Licensed Court Reporter and Notary Public, in
4    and for the State of Tennessee, do hereby certify
     that the above deposition was reported by me, and
5    the transcript is a true and accurate record to the
     best of my knowledge, skills, and ability.
6            I further certify that I am not related
     to nor an employee of counsel or any of the parties
7    to the action, nor am I in any way financially
     interested in the outcome of this case.
8            I further certify that I am duly
     licensed by the Tennessee Board of Court Reporting
9    as a Licensed Court Reporter as evidenced by the
     LCR number and expiration date following my name
10   below.  I further certify that this transcript is
     the work product of this court reporting agency and
11   any unauthorized reproduction and/or transfer of it
     will be in violation of Tennessee Code Annotated
12   39-14-104, Theft of Services.
             IN WITNESS WHEREOF, I have hereunto set
13   my hand and affixed my notarial seal this _____
     day of _____, 2016.
14
15
     _____
16   Lise S. Matthews, RMR, CRR, CRC
     LCR 353 Expiration Date 6/30/2016
17   Notary Public Commission Expires
     March 6, 2018
18
19
20
21
22
23
24

50 (Pages 194 to 196)

# EXHIBIT G

Jimmy W. Mays, Ph.D.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  ETHICON, INC., PELVIC          Master File No.
REPAIR SYSTEM PRODUCTS                 2:12-MD-02327
LIABILITY LITIGATION
                                       MDL NO. 2327
THIS DOCUMENT RELATES TO THE
FOLLOWING CASES IN WAVE 1 OF MDL       JOSEPH R. GOODWIN
200:                                   US DISTRICT JUDGE

Bonnie Blake, et al., v. Ethicon,
Inc., et al.,
Civil Action No. 2:12-cv-00995

Robin Bridges v. Ethicon, Inc.,
et al.,
Civil Action No. 2:12-cv-00651

Carey Beth Cole, et al., v.
Ethicon, Inc., et al.,
Civil Action No. 2:12-cv-00483

(Continued on next page)

- - -

MARCH 2, 2016

- - -

        Deposition of JIMMY W. MAYS, PhD, held at
Marco Island Marriott Beach Resort, South Collier
Boulevard, Marco Island, Florida, commencing
at 8:36 a.m., on the above date, before Joan L.
Pitt, Registered Merit Reporter, Certified
Realtime Reporter, and Florida Professional
Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

| Page 2 |
| --- |

1  Angela Coleman, et al.,
2   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-01267
3  Dina Destefano-Raston, et al.,
   v. Ethicon, Inc., et al.,
4   Civil Action No. 2:12-cv-01169
5  Dennis W. Dixon re: Estate of
   Virginia M. Dixon, Deceased
6   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-01081
7
8  Karyn E. Drake, et al.,
   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00747
9
10 Paula Fisk v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00848
11 Pamela Free v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00423
12
13 Teresa Georgilakis et al.,
   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00829
14
15 Louise Grabowski v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00683
16 Dawna Hankins v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00369
17
18 Nancy Hooper et al.,
   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00493
19
20 Alfreda Lee, et al.,
   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-01013
21
22 Deborah Lozano, et al.,
   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00347
23
24 (Continued on next page)

| Page 3 |
| --- |

1  Charlene Miracle v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00510
2
3  Noemi Padilla v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00567
4  Jennifer Reyes, et al.,
   v. Ethicon, Inc., et al.,
5   Civil Action No. 2:12-cv-05664
6  Jennifer Sikes v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00501
7
8  Carrie Smith v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00258
9  Isabel Swint, et al.,
   v. Ethicon, Inc., et al.,
10  Civil Action No. 2:12-cv-00786
11 Krystal Teasley, v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00500
12
13 Susan Thaman v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00279
14 Kimberly Thomas v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00499
15
16 Barbara J. Vignos-Ware, et al.,
   v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00761
17
18 Cathy Warlick v. Ethicon, Inc., et al.,
   Civil Action No. 2:12-cv-00276
19 Elizabeth Blynn Wilson Wolfe v. Ethicon, Inc., et
   al.,
20  Civil Action No. 2:12-cv-001286
21 Julie Wroble, et al.,
   v. Ethicon, Inc., et al.,
22  Civil Action No. 2:12-cv-00883
23
24

| Page 4 |
| --- |

1  APPEARANCES:
2   DOUGLAS C. MONSOUR, ESQUIRE
   Monsour Law Firm
3   404 North Green Street
   Longview, Texas 75601
4   903.758.5757
   doug@monsourlawfirm.com
5   Representing Plaintiffs
6   JIM M. PERDUE JR., ESQUIRE
   Perdue and Kidd
7   510 Bering Drive, Suite 500
   Houston, Texas 77057
8   713.520.2500
   jperduejr@perdueandkidd.com
9   Representing Plaintiffs
10
   CHAD R. HUTCHINSON, ESQUIRE
11  Butler Snow LLP
   1020 Highland Colony Parkway, Suite 1400
12  Ridgeland, Mississippi 39157
   601.985.4401
13  chad.hutchinson@butlersnow.com
   Representing Defendants
14
15
16
17
18
19
20
21
22
23
24

| Page 5 |
| --- |

1              - - -
2            I N D E X
3              - - -
4  Testimony of:  JIMMY W. MAYS, PhD
5
6   DIRECT EXAMINATION BY MR. HUTCHINSON    6
7
8
9        E X H I B I T   I N D E X
10
11 MAYS        DESCRIPTION        PAGE
12 No. 1  NOTICE TO TAKE DEPOSITION OF JIMMY MAYS    6
13 No. 2  FILE MATERIALS                7
14 No. 3  RULE 26 EXPERT REPORT OF JIMMY W. MAYS    12
15 No. 4  MEMO RE: PROLENE MICROCRACKING DATED    110
       NOVEMBER 5, 1984
16     ETH.MESH.15958452 - ETH.MESH.15958469
17 No. 5  ARTICLE - IN VIVO OXIDATIVE DEGRADATION    129
       OF POLYPROPYLENE PELVIS MESH, IMEL, ET
18     AL., BIOMATERIALS 73 (2-15) 131-141,
       ACCEPTED SEPTEMBER 9, 2015
19
20 No. 6  SEVEN YEAR DOG STUDY          148
21 No. 7  TABLE - BREAK STRENGTH (LBS.) AND %    159
       ELONGATION
22
23
24

2 (Pages 2 to 5)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 6

1              - - -
2         THE COURT REPORTER:  Raise your right hand,
3     please.  Do you swear or affirm the testimony you
4     give will be the truth, the whole truth, and nothing
5     but the truth?
6         THE WITNESS:  Yes.
7         THE COURT REPORTER:  Thank you.
8         JIMMY W. MAYS, PhD, called as a witness by the
9     Defendants, having been first duly sworn, testified
10    as follows:
11               DIRECT EXAMINATION
12    BY MR. HUTCHINSON:
13        Q.  Good morning.
14        A.  Good morning.
15        Q.  My name is Chad Hutchinson.  I'm counsel for
16    Ethicon and Johnson & Johnson.
17        Dr. Mays, you understand you're under oath?
18        A.  I do.
19        Q.  And do you understand you're giving testimony
20    subject to the penalty of perjury?
21        A.  Yes.
22        (Mays Exhibit No. 1 was marked for
23    identification.)
24

Page 7

1     BY MR. HUTCHINSON:
2         Q.  I've handed you what's been marked as Exhibit 1
3     to your deposition.  Have you seen that document before?
4         A.  Yes.
5         Q.  And that's a notice of deposition; correct?
6         A.  Correct.
7         Q.  And that notice lists all the cases in which
8     you're designated as an expert witness in this -- in
9     this litigation; correct?
10        A.  As far as I know, yes.
11        Q.  And you brought with you some documents today?
12        A.  I did.
13        Q.  And you're handing those documents to me.  It's
14    a file approximately 2 inches thick in a manila folder.
15    We'll mark it as Exhibit 2 to your deposition.
16        (Mays Exhibit No. 2 was marked for
17    identification.)
18    BY MR. HUTCHINSON:
19        Q.  What does this include?
20        A.  It's got the bill that I've submitted thus far
21    in this case and also the papers and documents that I've
22    reviewed in preparing for the depo today; not everything
23    I've seen, but everything I basically reviewed for
24    today.

Page 8

1         Q.  When you say it's not everything you've seen,
2     what do you mean by that?
3         A.  Well, I've got a whole electronic file of
4     documents that I've gone through.
5         Q.  Why did you choose to bring the documents in
6     Exhibit 2 today rather than the documents that you have
7     on the electronic file?
8         A.  I thought those were the most relevant to the
9     matter at hand.
10        Q.  Okay.  I see 49 hours on the invoice.  Does
11    that represent the total amount of time that you've
12    spent on the Ethicon litigation?
13        A.  No, that was as of the time I submitted that
14    bill, which I think was late December or maybe early
15    January.
16        Q.  Okay.  And so up until the time when you were
17    first retained, up until January 4, 2016, you spent 49.5
18    hours; correct?
19        A.  Correct.
20        Q.  All right.  And since January 4, 2016, up until
21    today, March 2, how many hours have you spent?
22        A.  Probably about 20.
23        Q.  So that's approximately 70 hours total that
24    you've spent?

Page 9

1         A.  Yes.
2         Q.  Thank you.  And do you still charge $300 an
3     hour for review and $500 an hour for testimony?
4         A.  Correct.
5         Q.  Doctor, you've been an expert witness before;
6     is that correct?
7         A.  Yes.
8         Q.  And you've been deposed at least twice as an
9     expert against Boston Scientific?
10        A.  Yes.
11        Q.  And you read those transcripts?
12        A.  Yes.  It's been a while, but I've read them.
13        Q.  And you stand by the testimony that you've
14    given?
15        A.  I do.
16        Q.  What's your area of expertise?
17        A.  I'm a polymer scientist.
18        Q.  Do you have a specialty as a polymer scientist?
19        A.  Well, I've been involved with polymers broadly.
20    I've worked in the industry for a while.  I've been at
21    the university since 1988.  I've got an affiliation with
22    Oak Ridge National Lab.  So I've worked broadly in the
23    area of polymer science, including polypropylene.
24        Q.  Do you have a specialty, sir?

3 (Pages 6 to 9)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 10

1    A.  I would say my specialty is two things, polymer
2  synthesis and polymer characterization.
3    Q.  You don't have a specialty in organic coatings,
4  do you?
5    A.  No.
6    Q.  Doctor, all the work that you've done in mesh
7  litigation has been for the plaintiffs; is that correct?
8    A.  Yes.
9    Q.  And you've been retained to offer opinions
10  against Boston Scientific?
11    A.  Yes.
12    Q.  And Ethicon?
13    A.  Yes.
14    Q.  What about AMS?
15    A.  No.
16    Q.  Bard?
17    A.  No.
18    Q.  Any other mesh manufacturers?
19    A.  No.
20    Q.  Any other polypropylene manufacturers?
21    A.  Actually, I have been involved with litigation
22  involving polyolefins, including polypropylene, at one
23  point in time, but this was years ago.
24    Q.  Was that a patent matter?

Page 11

1    A.  It was a patent matter.
2    Q.  When were you first contacted in this Ethicon
3  mesh litigation?
4    A.  In this litigation, it was sometime in the fall
5  of last year.
6    Q.  The fall of 2015?
7    A.  Yes.
8    Q.  And who contacted you?
9    A.  I think it was Mr. Perdue initially.
10    Q.  And what were you asked to do?
11    A.  I was basically asked if I might be available
12  to work with them on this matter.
13    Q.  And what did you tell them?
14    A.  I said, "Yeah, I think I have time and can do
15  it."
16    Q.  Did you ask any questions about the scope of
17  the engagement?
18    A.  I really didn't, as I recall.
19    Q.  Have you ever worked with Mr. Perdue before?
20    A.  We worked together in the Boston Scientific
21  matter.
22    Q.  What about Mr. Monsour?  Have you ever worked
23  with him before?
24    A.  Yes.

Page 12

1    Q.  In what matters?
2    A.  It was the same thing, Boston Scientific.
3       (Mays Exhibit No. 3 was marked for
4  identification.)
5  BY MR. HUTCHINSON:
6    Q.  Doctor, I'll hand you what we'll mark as
7  Exhibit 3 to your deposition.  That's a copy of your
8  expert report; correct?
9    A.  Yes.
10    Q.  And is it complete?
11    A.  That's what I'm looking at.
12       It looks to be complete.
13    Q.  Is it accurate?
14    A.  Yes.
15    Q.  Are you aware of any errors?
16    A.  I caught a couple of typos, but they were just,
17  you know, nonconsequential-type things.
18    Q.  Doctor, how many hours did you spend preparing
19  that report?
20    A.  I could go back and review my bill and tell you
21  exactly, but it was something of the order of probably
22  30 hours actually preparing the report.
23    Q.  Okay.  So if we look at that bill that has 49
24  hours, that would be 30 hours preparing your report and

Page 13

1  19 hours reviewing documents and literature; correct?
2    A.  Roughly that, yeah.
3    Q.  Okay.  Thank you.
4       Did you draft that report, sir?
5    A.  I did.
6    Q.  Did you have any assistance in drafting that
7  report?
8    A.  No, I pecked it out with two fingers on my --
9  on my laptop.
10    Q.  Did anybody have access to that document, sir,
11  during the drafting stage?
12    A.  I did send it at the point when it was a full
13  draft, with references included, at that point I did
14  send it to the attorneys to have a look.
15    Q.  Okay.  But that expert report is your work and
16  your work only; correct?
17    A.  Correct.
18    Q.  And does that report contain all the opinions
19  that you intend to offer in this case?
20    A.  Well, I can't say that with absolute certainty.
21  It might depend on what you ask me, but the gist of what
22  I plan to testify about is in this report.
23    Q.  Okay.  But when you began preparing that
24  report, did you intend to include all the opinions that

4 (Pages 10 to 13)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 14

1  you intend to assert against Ethicon and Johnson &
2  Johnson in this litigation?
3      A.  That was my intent, yes.
4      Q.  Doctor, did you review or rely on any documents
5  or literature other than what's contained in your
6  reliance list?
7      A.  As I mentioned, I certainly read a lot of
8  literature in preparing for this.  I've worked in the
9  area of polypropylene for years, and things I've been
10 exposed to 30 years ago, I still rely on some of that
11 knowledge.  Right?  But basically what I relied on is in
12 the references listed at the end of this report.
13     Q.  A copy of your CV is included within that
14 report; correct?
15     A.  Correct.
16     Q.  And is that the most recent version of your CV?
17     A.  It changes often as new papers are published
18 and new presentations are made.  Let me take a look at
19 it and I can tell you how up-to-date it is.
20          This one is about a month old, so it's quite
21 up-to-date, but not perfect.
22     Q.  What would make it perfect?
23     A.  A couple of additional papers that were
24 submitted at the time have been accepted, and maybe one

Page 15

1  additional paper that's been submitted for publication.
2      Q.  What papers?
3      A.  Again, I'd have to go back and look.
4      Q.  Do the papers have anything to do with
5  polypropylene?
6      A.  They don't.
7      Q.  Anything to do with pelvic mesh?
8      A.  No.
9      Q.  Doctor, are you currently working on any
10 articles that you intend to submit for publication?
11     A.  Yes.  I'm continually working on articles that
12 I plan to submit for publication.
13     Q.  Do they have anything to do with Prolene?
14     A.  No.
15     Q.  Pelvic mesh?
16     A.  No.
17     Q.  Doctor, Imel was the first publication where
18 you discussed pelvic mesh products; correct?
19     A.  Correct.
20     Q.  And you didn't do the hands-on testing on those
21 explants referenced in the Imel paper, did you?
22     A.  I did not.
23     Q.  Have you ever published anything regarding SUI
24 or POP?

Page 16

1          MR. MONSOUR:  Objection.  Form.  Would you just
2  state those out for me?
3      Q.  Stress urinary incontinence or pelvic organ
4  prolapse.
5      A.  No.
6      Q.  Doctor, have you ever published any articles on
7  Prolene?
8      A.  I can't say with certainty that I haven't,
9  because I've been in the game a while.  I worked for
10 Hercules, one of the largest polypropylene producers in
11 the world at that time, for five years, but I don't
12 explicitly recall anything.
13     Q.  Okay.  And my question is specifically about
14 Prolene.
15     A.  I understand.
16     Q.  Okay.  Doctor, have you ever given any
17 presentations regarding Prolene?
18     A.  Again I'll say the same thing I just said
19 regarding the publication.  I've been in the area a long
20 time, I've worked with polypropylene before, but I don't
21 recall anything explicitly with Prolene.
22     Q.  Thank you.  Doctor, is all your research
23 experience included on your CV?
24     A.  Yes, I think it's a good representation of my

Page 17

1  research experience.
2      Q.  Have you ever done any research regarding
3  Prolene?
4      A.  You mean laboratory experiments?
5      Q.  Yes, sir.
6      A.  No laboratory experiments.  Literature
7  research, yes.
8      Q.  And, Doctor, since 2014 when you were deposed
9  in the Boston Scientific litigation, have you ever
10 worked with a medical device company specifically
11 regarding pelvic mesh products?
12     A.  I'm sorry.  Could you repeat that?
13     Q.  Sure.  Since 2014, have you ever worked with a
14 medical device company regarding pelvic mesh products?
15     A.  No.
16     Q.  And, Doctor, before litigation against Boston
17 Scientific, had the focus of your research interests
18 been on pelvic mesh?
19     A.  No.
20     Q.  Doctor, have you ever talked with any of the
21 plaintiffs in this litigation?
22     A.  No.
23     Q.  Have you ever talked with any of the
24 plaintiffs' family members or friends in this

5 (Pages 14 to 17)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 18

1  litigation?
2      A.  Not to my knowledge.
3      Q.  What about any of the doctors?
4      A.  No.
5      Q.  Other than attorneys, have you discussed your
6  opinions with anyone else?
7      A.  No.
8      Q.  None of your colleagues?
9      A.  No.
10     Q.  Any type of scientific organization?
11     A.  No.
12     Q.  Doctor, did you sign a confidentiality
13 agreement with respect to the documents you reviewed for
14 Ethicon?
15     A.  Yes.
16     Q.  Where is that?
17     A.  I don't know.
18     Q.  Would it be at your house, or your office,
19 rather?
20     A.  It probably would be in my office in Knoxville.
21     Q.  Do you advertise your services?
22     A.  I do not.
23     Q.  Would the time sheet that we have in the
24 collective Exhibit No. 2 reflect all the time that you

Page 19

1  spent in this litigation for Ethicon?
2      A.  This reflects the time I spent in this
3  litigation as of January 4 of this year.
4      Q.  All right.  Thank you.
5          Doctor, do you anticipate doing any additional
6  work or research in this Ethicon litigation?
7      A.  I'm not sure.
8      Q.  You don't have any plans to, sitting right
9  here, sitting here today?
10     A.  Not as I sit here.
11     Q.  Have you asked counsel for any information or
12 documents that you've not received yet that you believe
13 may be helpful?
14     A.  No.
15     Q.  I believe it's your testimony you're not an
16 expert in biomaterials?
17     A.  Well, I have worked in the area of
18 biomaterials.  I have considerable expertise in
19 polymeric biomaterials.
20     Q.  You are holding yourself out as an expert in
21 biomaterials; is that correct?
22     A.  Yes.
23     Q.  Are you an expert in biocompatibility?
24     A.  No.

Page 20

1      Q.  Are you an expert in female anatomy?
2      A.  No.
3      Q.  Doctor, based on your review of the documents,
4  you'll agree that Ethicon performed biocompatibility
5  testing on its Prolene?
6      A.  Yes.
7      Q.  And do you have any opinions whatsoever
8  regarding the biocompatibility testing of Prolene?
9      A.  I've already said I'm not an expert in
10 biocompatibility, but it seemed to be standard-type
11 biocompatibility testing.
12     Q.  And based upon your review, do you believe that
13 Ethicon appropriately did its biocompatibility testing?
14     A.  I -- as far as I can tell, they did.  What they
15 didn't do that I think they should have done is actually
16 performed clinical trials with the material in the
17 application in which it was intended.
18     Q.  Doctor, have you ever designed or participated
19 in a clinical trial regarding mesh?
20     A.  Not regarding mesh.
21     Q.  Have you ever designed or participated in any
22 type of clinical trial regarding Prolene?
23     A.  No.
24     Q.  Have you ever been involved in any clinical

Page 21

1  research regarding mesh?
2      A.  No.
3      Q.  Have you ever received any grants for studying
4  mesh in your positions at UT or UAB?
5      A.  No.
6      Q.  Have you ever designed pelvic mesh?
7      A.  No.
8      Q.  And you've never done any biomechanical testing
9  of pelvic mesh; correct?
10     A.  Correct.
11     Q.  Have you ever personally inspected a mesh
12 explant of any kind?
13     A.  Yes.
14     Q.  Would that be for the 11 explants in the Boston
15 Scientific litigation?
16     A.  Yes.
17     Q.  Anything else?
18     A.  Concerning polypropylene mesh?
19     Q.  Correct.
20     A.  I've certainly looked at literature that
21 describes it.
22     Q.  I'm talking about actually inspecting an actual
23 explant specimen.
24     A.  No, not other than those Boston Scientific

6 (Pages 18 to 21)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 22

1  materials.
2      Q.  And you've never personally inspected a mesh
3  explant of Prolene, have you?
4      A.  No.
5      Q.  Have you ever done any testing of a mesh
6  explant of Prolene?
7      A.  Not of Prolene.
8      Q.  And, Doctor, are you -- do you know what
9  medical products you're here and designated to testify
10  about and give opinions about?
11      A.  Yes, I do.  They're listed at the beginning of
12  my report.
13      Q.  Where do you see that?
14      A.  If you go over on page 4, under background, the
15  various Prolene mesh products are listed there.
16      Q.  Sir, do you know if all those products -- and
17  just for the record, we're looking at Prolene Mesh,
18  Gynemesh PS, Prolift, Prolift +M, Prosima, TVT-Secur --
19  I'm sorry -- Gynecare TVT System, TVT Retropubic, TVT-O,
20  TVT-Abbrevo, TVT-Secur, and TVT-Exact; is that correct?
21      A.  I'm sorry.  Could you --
22      Q.  Is that the list of the medical --
23      A.  That is the list, yes.
24      Q.  And, Doctor, do you know if all those products

Page 23

1  are made up of 100 percent Prolene?
2      A.  It's my understanding that those materials are
3  made of Prolene, yes.
4      Q.  And 100 percent of Prolene?
5      A.  Well, Prolene is a formulation, so there's
6  additives in there.  It's polypropylene plus appropriate
7  additives.
8      Q.  But my question, sir, is it your testimony that
9  these products are made of 100 percent Prolene?
10      A.  Well, the mesh is in there, but there's also a
11  delivery device and packaging, so there are things other
12  than Prolene, but the mesh itself is Prolene.
13      Q.  Okay.  So, Doctor, is it your testimony that
14  the Prolift +M is made of 100 percent Prolene?
15      A.  No.  There could well be other things in some
16  of these materials, yes.
17      Q.  In the mesh?
18      A.  There could be biodegradable material, for
19  example.
20      Q.  Okay.  What other material other than Prolene
21  does Prolift +M consist of in the mesh?
22      A.  I'd have to go back and review that.
23      Q.  You don't know today?
24      A.  As I sit here, I can't say.

Page 24

1      Q.  Doctor, what about TVT-Secur, the mesh in
2  TVT-Secur?  Strike that.
3          Prosima.  Doctor, do you know what other
4  materials other than Prolene are in the mesh material in
5  Prosima?
6      A.  Not as I sit here.
7      Q.  Doctor, have you ever seen -- and when I say
8  "these medical devices," just so you and I are
9  communicating, I'm talking about the medical devices
10  that you're here to give testimony about.  Are we
11  communicating?
12      A.  Yes, sir.
13      Q.  Okay.  Doctor, have you ever seen these medical
14  devices?
15      A.  No.
16      Q.  Have you ever held them in your hands?
17      A.  No.  I've seen pictures, but that's as far as
18  it goes.
19      Q.  Doctor, have you ever held a piece of Prolene
20  in your hand?
21      A.  I very well could have with my years of
22  experience in polymer science.  Just as an example, our
23  polymer characterization lab at the University of
24  Tennessee, we perform a lot of outside analyses for

Page 25

1  companies, for individuals, and it's certainly possible
2  that some passed through at some time.
3      Q.  Doctor, sitting here today, can you ever recall
4  an instance where you've held a piece of Prolene in your
5  hand?
6      A.  No.
7      Q.  And, Doctor, have you ever done any hands-on
8  testing of Prolene?
9      A.  No.
10      Q.  Doctor, when is -- I want to go back to these
11  products, if you will, okay?
12      A.  Okay.
13      Q.  When's the first time you've ever heard of
14  these products?
15      A.  I've certainly heard of Prolene, having been in
16  the polypropylene game for a long time, but these
17  particular mesh products, I knew pelvic mesh was out
18  there, I may have heard the names, but they certainly
19  didn't stick.
20      Q.  When was the first time that you'd heard the
21  name of these products, sir?
22      A.  I would say, these products, at the time I got
23  involved in this litigation.
24      Q.  And that would have been in the fall of 2005?

7 (Pages 22 to 25)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 26

1    A.  2015.
2    Q.  Thank you, sir.  I like it when a scientist is
3  accurate.
4        Doctor, do you have any idea what the
5  indications are for these products?
6    A.  You mean the medical indications?
7    Q.  Yes, sir.
8    A.  Well, stress urinary incontinence, pelvic organ
9  prolapse.
10    Q.  Do you know how long these products have been
11  on the market?
12    A.  The exact date for these individual products, I
13  don't.
14    Q.  Do you know the physical dimensions of the mesh
15  in these individual products?
16    A.  No.
17    Q.  And, Doctor, do you know the weight of the mesh
18  in these individual products?
19    A.  No, not as I sit here.
20    Q.  Doctor, do you know a woman's lifetime risk of
21  developing SUI or POP?
22    A.  I don't.
23    Q.  Do you know the natural progression of the
24  disease?

Page 27

1    A.  No.
2    Q.  Do you know any of the nonsurgical options?
3    A.  No.
4    Q.  And, Doctor, all of your opinions contained in
5  your report, which was marked as Exhibit 3, refer to
6  these individual products; correct?
7    A.  Yes.
8    Q.  Doctor, do you know how many newtons of force
9  are placed on the mesh once it's in vivo?
10    A.  No.
11    Q.  Do you have any idea about how these individual
12  products are implanted in the body?
13    A.  I have some idea.
14    Q.  Have you ever -- certainly you've never
15  implanted any of these devices in the body?
16    A.  I have not.
17    Q.  Have you ever watched any videos regarding how
18  these devices were implanted in the body?
19    A.  Not videos, but I have seen pictures showing
20  how it's done, basically.
21    Q.  And do you know the differences in how these
22  individual products are implanted in the body?
23    A.  No.
24    Q.  What do you know about the manufacturing

Page 28

1  process Ethicon uses to make Prolene?
2    A.  Well, I know how the polypropylene is produced
3  and I know that the material is thin-mixed with various
4  additives, processing aids, antioxidants.
5    Q.  Anything else?
6    A.  Then it's extruded.  Fibers are produced by
7  passing through a spinneret.  Those fibers then get
8  woven into a mesh product.
9    Q.  Do you know at what temperature?
10    A.  The exact temperature of the extrusion, it
11  would have to be well above the melting temperature of
12  the polypropylene, which is 165 degrees C, so it's
13  something of the order of 200 degrees C.
14    Q.  Do you know where Prolene is made?
15    A.  The documentation I've seen leads me to believe
16  that it's made in Pennsylvania somewhere, near
17  Philadelphia.
18    Q.  And, Doctor, is the mesh that's contained in
19  these individual products, is it woven or knitted?
20    A.  It's actually knitted.
21    Q.  And what do you base that testimony on?
22    A.  Just documentation that I've reviewed.
23    Q.  Are you an expert in the manufacturing process
24  of pelvic mesh?

Page 29

1    A.  Well, I'm knowledgeable in the production of
2  polypropylene fibers.  When I was at Hercules, as I
3  mentioned earlier, I was there for five years right
4  after graduate school, for about three years of that
5  time I was technical liaison between Hercules' central
6  R & D center in Wilmington, Delaware, and Hercules'
7  fibers technical center in Oxford, Georgia, where they
8  produce polypropylene fibers on a massive scale.
9    Q.  Well, but do you hold yourself out as an expert
10  in the manufacturing process of pelvic mesh?
11    A.  I'm certainly knowledgeable about production of
12  polypropylene fibers.  Once it gets into the actual
13  knitting process and the exact geometry of these various
14  mesh products, I'm not an expert in those areas.
15    Q.  Doctor, you know the difference between
16  polypropylene and Prolene; correct?
17    A.  Yes.
18    Q.  And as a materials scientist, you'll agree that
19  polypropylene is chemically different than Prolene;
20  correct?
21    A.  Well, Prolene is mostly polypropylene.  It's
22  isotactic polypropylene, to be exact.
23    Q.  I understand.
24    A.  But it does contain additives, but those

8 (Pages 26 to 29)

Jimmy W. Mays, Ph.D.

Page 30

1    additives are present at a very low level.
2        Q.   But to be exact, polypropylene is chemically
3    different than Prolene; correct?
4        A.   Well, polypropylene as it's encountered in the
5    marketplace essentially always has these additives in
6    it.  Processing aids and antioxidants are always put
7    into polypropylene.
8        Q.   Right, but, Doctor, my question is more
9    specific.  Is it your testimony that polypropylene and
10   Prolene are chemically different or chemically the same?
11       A.   Prolene is a particular formulation of
12   polypropylene.
13       Q.   So they're chemically different; correct?
14       A.   There are additives added.
15       Q.   But they are chemically different?
16   Polypropylene is chemically different than Prolene;
17   correct?
18       A.   Well, Marlex versus Prolene, the base polymer
19   in both is isotactic polypropylene.  There may be
20   different additives in there.  There may be different
21   molecular weights of polypropylene use.  There may be
22   different molecular weight distributions of the
23   polypropylene that's used.  So Prolene is a particular
24   formulation of polypropylene.

Page 31

1        Q.   I understand that, Doctor, but Prolene has a
2    different chemical composition compared to pure
3    polypropylene; correct?
4        A.   Compared to pure polypropylene, that's correct.
5        Q.   Thank you.  And Prolene and polypropylene are
6    not identical from a chemical composition standpoint,
7    are they?
8        A.   Polypropylene is the major component in
9    Prolene.
10       Q.   Right, but they are not chemically identical,
11   are they, sir?
12       A.   The additives make them different.  Prolene has
13   the additives.  Pure polypropylene would not.
14       Q.   And you'd never teach your polymer students at
15   UT that Prolene and polypropylene have the same chemical
16   composition, would you?
17       A.   No, I would teach them that Prolene is an
18   isotactic polypropylene with a certain additive package
19   in it.
20       Q.   Let's talk about polypropylene specifically, if
21   you will.  You've studied polypropylene before, I take
22   it, as a scientist?
23       A.   Yes.
24       Q.   When did you begin doing that?

Page 32

1        A.   My biggest focus on polypropylene was when I
2    was at Hercules.  We performed a lot of analytical work
3    on polypropylene.  But I actually synthesized
4    polypropylene and polypropylene copolymers and
5    characterized the products when I was a graduate student
6    at the University of Akron in the very early 1980s.
7        Q.   Have you ever done any independent study or lab
8    work regarding the biocompatibility of polypropylene?
9        A.   Could you repeat that question?
10       Q.   Sure.  Have you ever done any independent study
11   or lab work regarding the biocompatibility of
12   polypropylene?
13       A.   What do you mean by "biocompatibility"?
14       Q.   Whether or not polypropylene is biocompatible
15   with the human body.
16       A.   You mean cell culture studies, things like
17   that?
18       Q.   Whether it's biocompatible with the human body.
19       A.   Well, I've examined explanted polypropylene and
20   seen degradation in the material.
21       Q.   Doctor, I may have asked you this.  If I did, I
22   apologize.  You've never designed a polypropylene
23   implant; correct?
24       A.   I have not.

Page 33

1        Q.   And -- well, let's talk about Prolene for a
2    minute.  Has any of the work that you've done as a
3    scientist involved Prolene other than the litigation
4    that we're here about today?
5        A.   As I said earlier, I've been involved with
6    polymers for a long time.  We've got our polymer
7    characterization lab at the university.  Something could
8    have passed through, but I don't recall it.
9        Q.   Thank you.  And, Doctor, have you ever done any
10   type of study to determine the biocompatibility of
11   Prolene?
12       A.   No.
13       Q.   And have you ever done any testing to determine
14   if Prolene degrades?
15       A.   Well, we've done studies to determine whether
16   or not polypropylene formulations degrade.
17       Q.   But, Doctor, my question is specifically about
18   Prolene.  Have you ever performed any testing to
19   determine if Prolene degrades?
20       A.   I've reviewed the literature, including the
21   literature in-house at Ethicon, where they observed what
22   they attributed as oxidative degradation.
23       Q.   Doctor, have you ever performed any -- strike
24   that.

9  (Pages 30 to 33)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 34

1        Have you personally performed any testing to
2    determine if Prolene degrades?
3        A.  We have performed testing to determine whether
4    or not polypropylene --
5        Q.  And I'm not -- I don't mean to cut you off, but
6    I am under a time limit.  I'm talking about Prolene.
7        Have you personally done any testing to
8    determine if Prolene degrades?
9        A.  We have tested polypropylene pelvic mesh.  That
10   was a Boston Scientific product.  But these materials
11   are 99.8 percent polypropylene.
12       Q.  And move to strike as nonresponsive.
13       Doctor, I'm asking you a specific question.  I
14   need a yes or no.  Have you personally performed any
15   testing to determine if Prolene degrades?
16       A.  We have tested polypropylene, but we have not
17   tested Prolene.
18       Q.  Thank you.  And, Doctor, you've not tested the
19   mechanical properties of Prolene, have you?
20       A.  We have not.
21       Q.  Doctor, have you done any tests on Prolene that
22   can be repeated and confirmed?  I'm talking about
23   Prolene, not polypropylene.
24       A.  Yeah.  We have not in my laboratory tested

Page 35

1    Prolene.
2        Q.  Doctor, have you ever done -- and when you say
3    you have not in your laboratory tested Prolene, would
4    that include a pristine piece of Prolene and also an
5    explanted piece of Prolene?
6        A.  Yeah, again, as I said earlier, we may have
7    characterized some material that was sent to us by
8    someone at some point, probably in terms of a molecular
9    weight analysis or something like that, but I don't
10   recall testing Prolene.
11       Q.  Doctor, have you ever personally seen a Prolene
12   explant that has degraded?
13       A.  I've seen pictures, but I haven't actually with
14   my own two eyes seen the degraded Prolene explant.
15       Q.  And, Doctor, with your own two eyes, have you
16   ever seen oxidated Prolene?
17       A.  With my own two eyes, I'd have to say no.
18       Q.  Doctor, with your own two eyes, have you ever
19   personally seen Prolene with embrittlement?
20       A.  No.
21       Q.  Have you ever with your own two eyes personally
22   seen Prolene that has a loss of mechanical properties?
23       A.  What do you mean by "loss of mechanical
24   properties"?

Page 36

1        Q.  A reduction in the physical properties.
2        A.  Which ones?
3        Q.  Any of them.
4        A.  Have I actually seen that material with my own
5    eyes?
6        Q.  Yes, sir.
7        A.  No.
8        Q.  Thank you.  And, in fact, Doctor, you've never
9    tested the durability of Prolene, have you?
10       A.  No.
11       Q.  You've never tested the tensile strength of
12   Prolene, have you?
13       A.  No.
14       Q.  You've never tested the toughness of Prolene,
15   have you?
16       A.  No.
17       Q.  You've never tested any type of physical
18   property of Prolene, have you?
19       A.  No.
20       Q.  You've never done any type of benchtop testing
21   of Prolene, have you?
22       A.  No.
23       Q.  And you've never done any root cause analysis
24   to determine if Prolene is defective, have you?

Page 37

1        A.  Yes, I think I have.
2        Q.  What?
3        A.  Basically, I reviewed extensive literature,
4    both Ethicon internal literature where they observed
5    degradation of explanted Prolene, and I also reviewed
6    extensive literature.  I could go through paper by
7    paper, if you like, and they observed degradation of
8    Prolene implants.
9        Q.  And we're going to get to that, but outside of
10   literature, Doctor, have you ever done any -- outside of
11   your literature review, have you ever done any type of
12   root cause analysis to determine if Prolene is
13   defective?
14       A.  We have explored the mechanism by which
15   polypropylene mesh degrades inside the body.
16       Q.  Okay.  And I'm sorry if my question wasn't
17   clear.  I was asking about Prolene.
18       So outside of literature, Doctor, have you ever
19   done any type of root cause analysis to determine if
20   Prolene is defective?
21       A.  What do you mean by "root cause analysis"?
22       Q.  Any type of analytical study to determine if
23   Prolene is defective.
24       A.  You mean actually perform experiments on

10 (Pages 34 to 37)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 38

1  Prolene?  No.
2  Q.  Doctor, have you ever performed any type of
3  accelerated aging tests for Prolene?
4  A.  No.
5  Q.  Doctor, you've cleaned mesh before, have you
6  not?
7  A.  Yes.
8  Q.  Have you personally been involved in that
9  process?
10  A.  Yes, I have.
11  Q.  And was that with the 11 explants in Boston
12  Scientific?
13  A.  Yes.
14  Q.  Have you ever personally cleaned Prolene mesh?
15  A.  No.
16  Q.  Have you ever been involved in any type of
17  cleaning protocols for Prolene mesh?
18  A.  With developing the cleaning protocol?
19  Q.  For Prolene mesh.  Not polypropylene.  Prolene
20  mesh.
21  A.  No, we haven't cleaned Prolene mesh.
22  Q.  And -- but you haven't been involved in any
23  cleaning protocols for Prolene mesh; correct?
24  A.  There's an ASTM protocol, and that's what we

Page 39

1  use when we clean polypropylene.
2  Q.  Right, but I'm asking about your personal
3  experience, Doctor.  You've never been involved in any
4  cleaning protocols for Prolene mesh; correct?
5  A.  No.  Correct.
6  Q.  Doctor, look back at Exhibit 1 for me, please.
7  That's a notice of deposition?
8  A.  Yes.
9  Q.  I'll represent to you that you're designated in
10  28 different lawsuits.  Does that look about right?
11  A.  That looks about right.
12  Q.  Do you know what -- and each lawsuit represents
13  the name of a plaintiff that received a Prolene implant;
14  correct?
15  A.  Correct.
16  Q.  Do you know what product these 28 women
17  received?
18  A.  All I know is it was Prolene, a Prolene-based
19  mesh.
20  Q.  You never reviewed medical records?
21  A.  No.
22  Q.  Never talked to any of the doctors?
23  A.  No.
24  Q.  Never inspected any of the explants from these

Page 40

1  28 women?
2  A.  No.
3  Q.  Have you ever even seen the explants from these
4  28 women?
5  A.  No.
6  Q.  Do you know if any exist?
7  A.  I don't.
8  Q.  Do you know why their mesh was removed?
9  A.  Because they had a problem.  It's not ethical
10  to take mesh out if a person's not having a problem with
11  it.
12  Q.  What do you base that on?
13  A.  It's a horribly invasive surgery.
14  Q.  What problem did Bonnie Blake have, Doctor,
15  that required her mesh to be removed?
16  A.  I don't know.
17  Q.  And, Doctor, what problem did Robin Bridges
18  have that required her mesh to be removed?
19  A.  The specific complaints of the individuals, I
20  don't know.
21  Q.  And, Doctor, do you know the specific reasons
22  why any of the 28 plaintiffs' mesh were removed?
23  A.  As I said before, because they were having a
24  problem with it.

Page 41

1  Q.  But my question is:  Do you know the specific
2  reason why any of these 28 plaintiffs' mesh was removed?
3  A.  No, I don't.
4  Q.  You don't know when these 28 plaintiffs' meshes
5  were implanted, do you?
6  A.  I do not have those records, no.
7  Q.  And you don't know when they were explanted?
8  A.  No.
9  Q.  Do you know how many pieces of an explant was
10  removed?
11  A.  No.
12  Q.  And do you know if these 28 plaintiffs'
13  explants were stored in formalin?
14  A.  No.
15  Q.  You would agree that if explants exist for
16  these 28 plaintiffs, that would be an important piece of
17  evidence in this litigation; correct?
18  A.  That would be, yes.
19  Q.  And would you like to review those explants?
20  A.  Sure.
21  Q.  And have you asked the plaintiffs' lawyers for
22  the permission to review those explants?
23  A.  I have not.
24  Q.  Why not?

11 (Pages 38 to 41)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 42

1    A.  Well, I might very well at some point in time.
2  The first step was to get familiar with the case and
3  file my report.
4    Q.  Doctor, have you ever seen any type of
5  histology slides from any of these 28 plaintiffs?
6    A.  Not to my knowledge.
7    Q.  Would you review histology slides if they were
8  available?
9    A.  I'd certainly look at them.
10   Q.  Have you asked for them?
11   A.  I have not.
12   Q.  Doctor, have you ever performed -- strike that.
13       Fair to say that you've never performed any
14  type of analytical testing on the explants of these 28
15  plaintiffs; correct?
16   A.  Correct.
17   Q.  You've never done any type of SEM, FTIR, DSC,
18  EDS, GPC on these plaintiffs' explants; correct?
19   A.  Correct.
20   Q.  Doctor, have you -- strike that.
21       I think we talked about this earlier, but it's
22  undisputed that degradation affects the physical
23  properties of mesh; correct?
24   A.  Yes.

Page 43

1    Q.  And you've never performed any physical or
2  mechanical testing on the explants of these 28
3  plaintiffs; correct?
4    A.  Correct.
5    Q.  That would include tensile strength,
6  elongation, toughness, or Young's modulus; correct?
7    A.  Correct.
8    Q.  Also, we would include creep, stress,
9  relaxation, and fatigue; correct?
10   A.  Correct.
11   Q.  You've not done any of that?
12   A.  Correct.
13   Q.  Doctor, the tests, the analytical tests that we
14  just talked about, the SEMs, the FDIRs, those show
15  oxidation; correct?
16   A.  Yes.
17   Q.  And have you done any type of testing
18  whatsoever on these 28 plaintiffs to show oxidation?
19   A.  I have not.
20   Q.  And, Doctor, can you make any type of
21  prediction about whether or not the mesh from these 28
22  plaintiffs will oxidize?
23   A.  Yes, I can.
24   Q.  And what do you base that on?

Page 44

1    A.  My experience with polypropylene, my
2  characterization of polypropylene-based meshes.
3    Q.  Do you base --
4    A.  The literature that Ethicon has in-house going
5  back to the early '80s where they again and again see
6  evidence of oxidative degradation of polypropylene
7  implants.
8    Q.  Doctor, you've never personally run any type of
9  oxidation tests on Prolene; correct?
10   A.  To my knowledge, not on Prolene.
11   Q.  And you've never done a molecular weight test?
12   A.  We've done a lot of molecular weight tests.
13   Q.  On Prolene?
14   A.  As I said earlier, we may have in the polymer
15  characterization lab at some time, but I don't recall
16  explicitly doing molecular weight determinations on
17  Prolene.
18   Q.  Okay.  And you would have done that by GPC;
19  correct?
20   A.  Yes.  It's not the only way to determine
21  molecular weight, but it's a very common way to do it.
22   Q.  And, Doctor, those analytical testing
23  techniques were available to you at your lab at UT;
24  correct?

Page 45

1    A.  We have those techniques available, yes.
2    Q.  And, Doctor, when I asked you could you make
3  any prediction about whether or not the mesh from these
4  28 plaintiffs will oxidize, do you -- are you supporting
5  that opinion on any literature specifically about
6  Prolene?
7    A.  Yes.
8    Q.  What literature?
9    A.  Okay.  Let's look in my report.
10   Q.  And I'm not talking about polypropylene.  I'm
11  talking about Prolene.  Okay?
12   A.  Okay.
13       MR. MONSOUR:  Just so you know, I've seen you
14  look at your watch about 20 times, we're not going
15  to hold your feet to the fire on three hours.  I
16  mean, if you need some more time, let us know.
17  Within reason, but just let us know.
18       MR. HUTCHINSON:  I appreciate it.
19       MR. MONSOUR:  Don't worry.
20   A.  The Reference 20 in my report, this is
21  Jongebloed, I guess that's how you say it, and Worst,
22  they reported an SEM study on a Prolene suture that had
23  been implanted in the human eye for one year, and they
24  reported that both Prolene loops showed severe

12 (Pages 42 to 45)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 46

1  degradation of the surface layer.
2       Then Mary, et al., in 1998, that's Reference 21
3  in my report, they looked at polypropylene, Prolene
4  sutures used in vascular surgery, and the explanted
5  suture showed visible evidence of surface stress
6  cracking.
7       Costello, et al., those are two papers from
8  2007.
9    Q.  And did those -- but my question, sir, is about
10 Prolene.  Did those Costello papers reference Prolene?
11   A.  Yes.
12   Q.  Okay.  All right.  Other than Jongebloed -- and
13 you spell that J-o-n-g-e-l-b-o-e-d [sic] --
14   A.  I'm not sure we're pronouncing it right.  Who
15 knows?
16   Q.  -- Mary and Costello --
17   A.  Yeah, there's two Costello papers.
18   Q.  Correct.  Any other literature that you're
19 supporting your opinions on?
20   A.  Actually, Clave reports analysis of 100
21 explants, these were pelvic meshes from various
22 suppliers, but they're really not explicit about where
23 they came from, but it may well be that there are some
24 Ethicon materials in there.

Page 47

1    Q.  But you don't know for sure, do you, sir?
2    A.  Not in the case of Clave.
3    Q.  Okay.  Thank you.
4    A.  I haven't seen firm evidence.  But then I've
5  also got the internal Ethicon documents.
6    Q.  We're going to get to those in a minute, but
7  I'm talking about the peer-reviewed literature.  Okay?
8    A.  Okay.
9    Q.  So we'll get to those in a minute, but let's
10 stick with the peer-reviewed literature.
11   A.  Okay.
12   Q.  Jongebloed, Mary, and Costello are the only
13 literature regarding Prolene that you base your opinions
14 on; is that correct?
15   A.  Yes.
16   Q.  Okay.  And, Doctor, I forgot to ask you about
17 this earlier, but when we were talking about physical
18 and mechanical property testing, you'll agree that
19 mechanical properties and the evaluation of mechanical
20 properties is relevant when determining whether or not
21 mesh degrades?
22   A.  I don't think it's necessarily relevant.  One
23 can determine if a material is degrading by
24 spectroscopic means, chemical changes in the material,

Page 48

1  or one could look at molecular weight changes in the
2  material.  If chains are being broken, degradation is
3  happening.
4       Those changes manifest themselves in changes in
5  mechanical properties, but they're not the direct
6  observation of the degradation process.  You're
7  measuring the consequences of degradation with those
8  studies.
9    Q.  Doctor, but, nevertheless, evaluating
10 mechanical properties and physical properties are an
11 important part in your analysis of whether or not a
12 material degrades; correct?
13   A.  No.  As I just said, degradation can be
14 established with spectroscopy, with microscopy, with gel
15 permeation chromatography, with light scattering, and
16 other molecular methods.
17   Q.  Can degradation be established by reduction in
18 physical properties?
19   A.  If one measures a material and sees a reduction
20 in mechanical properties, again, just speaking
21 generically about mechanical properties at this point,
22 if one sees a change, then one might suspect degradation
23 is taking place, yes.
24   Q.  All right.  And just so the record's clear,

Page 49

1  degradation can be established by reduction in physical
2  properties; correct?
3    A.  No, molecular level degradation needs
4  spectroscopy or molecular weight measurements.
5  Mechanical properties -- changes in mechanical
6  properties are merely an outcome of the chemical
7  changes.  They're not direct.
8    Q.  Doctor, would you ever tell your students at UT
9  to disregard the results of physical properties when
10 making a determination of whether or not a polymer has
11 degraded?
12   A.  Well, if they had that material at hand,
13 certainly they would factor it into the analysis, but
14 it's not the direct analysis of whether or not a
15 material has degraded.
16   Q.  I understand that, sir, but you will agree that
17 it is one piece of the puzzle on whether or not a
18 polymer has degraded; correct?
19   A.  It's a piece of the puzzle, but it's a
20 secondary piece of the puzzle.  It's not a primary one.
21   Q.  Doctor, do you have any evidence that any of
22 these 28 plaintiffs experienced any type of chronic pain
23 related to Prolene?
24   A.  No direct evidence, but they had their mesh

13 (Pages 46 to 49)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 50

1  taken out, and I assume they had problems with it, or
2  they wouldn't be suing Ethicon.
3      Q.  That's an assumption on your part; correct?
4      A.  It is.  It is.
5      Q.  And, Doctor, can you identify by name a single
6  person who has had a failure of their mesh for the
7  reasons that you outline in your report?
8      A.  I would say that oxidative degradation is at
9  the heart of the problems that all of these people had
10  with the mesh and it's the reason that there's multiple
11  mesh companies with thousands of lawsuits around.
12  People are having problems with polypropylene mesh.
13  It's fundamentally the wrong material to make a pelvic
14  mesh out of.
15      Q.  Doctor, can you identify by name a single
16  person who has had a failure of their mesh for the
17  reasons outlined in your report?
18      A.  Again, all these people --
19      Q.  I'm just asking for a name.
20      A.  All of these people, Bonnie Blake, Robin
21  Bridges, Carey Beth Cole, these people had problems with
22  their mesh.
23      Q.  How did Bonnie Blake's mesh fail?
24      A.  Oxidative degradation is at the core of what's

Page 51

1  happening to these materials inside the human body.
2      Q.  And, Doctor, my question is:  If you've not
3  reviewed Bonnie Blake's explant, how can you tell the
4  jury that Bonnie Blake's explant failed because of
5  oxidative degradation?
6      A.  We have examined explants, to the extent that
7  we could lay our hands on them, and there's indication
8  of oxidative degradation in all the ones that we've
9  seen.
10      Q.  I understand that, but you've never examined
11  Bonnie Blake's explant, have you?
12      A.  I have not.
13      Q.  And, Doctor, can you identify by name a person
14  who has had mesh removed because of specifically
15  degradation?
16      A.  Well, again, it's what I'm saying.  There's
17  this list of women here, and they had problems with
18  their mesh.  And polypropylene is fundamentally
19  susceptible to oxidative degradation.  It's inherent to
20  its chemical structure.
21      Q.  Doctor, can you identify the name of a person
22  who has had their mesh specifically removed because of
23  degradation?
24      A.  I believe oxidative degradation is behind all

Page 52

1  of these removals, so every individual listed here.
2      Q.  Okay.  And, Doctor, how do you know that Bonnie
3  Blake's mesh was removed because of degradation without
4  reviewing the medical records?
5      A.  It's made out of polypropylene.  Polypropylene
6  is attacked inside the human body with strong oxidizing
7  agents.
8      Q.  Does Bonnie Blake have any mesh that's made out
9  of Prolene?
10      A.  I have to assume that her mesh was made out of
11  Prolene because she's suing Ethicon.
12      Q.  Do you know if Bonnie Blake has mesh that's
13  made out of Prolene?
14      A.  I think it's a logical conclusion to reach.
15      Q.  My question is:  Do you know, sir, whether or
16  not Bonnie Blake has mesh that's made out of Prolene?
17      A.  I have not reviewed her medical records.  Okay?
18      Q.  But my question is:  Do you know if Bonnie
19  Blake has mesh that's made out of Prolene?  Yes or no?
20      A.  Yes.
21      Q.  And what do you base that on?
22      A.  The fact that she's suing Ethicon.
23      Q.  Doctor, you're not a clinician?
24      A.  I'm not.

Page 53

1      Q.  And you haven't -- have you ever reviewed a
2  medical record that says the surgeon is removing Prolene
3  mesh as a result of degradation?
4      A.  I don't review medical records normally.  I'm a
5  polymer scientist.  I'm a polymer chemist.  The
6  chemistry of polymers, the characterization of polymers,
7  is my thing.  I'm not a medical doctor.
8      Q.  I understand that, Doctor, but my question is:
9  Have you ever reviewed a medical record that says a
10  surgeon is removing Prolene mesh as a result of
11  degradation?
12      A.  I have not.
13      Q.  Doctor, have you done anything whatsoever to
14  explain how the alleged effects of degradation have
15  caused clinical harm to any of these 28 plaintiffs?
16      A.  Well, my report describes what happens to the
17  properties of polypropylene when they undergo
18  degradation, and it's the mechanical mismatch between
19  the degraded implants and the soft tissue that surrounds
20  it that's the root cause of these problems.
21      Q.  Do you know the symptoms that any of these 28
22  plaintiffs were complaining about?
23      A.  Individual symptoms will vary, but pain is a
24  very common one.

14 (Pages 50 to 53)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 54

1    Q.  Do you -- but do you know the specific symptoms
2  of these 28 plaintiffs in these cases that you're
3  designated as an expert in?
4    A.  No, I don't.
5    Q.  And, Doctor, are you qualified to teach
6  students at UT how degradation can cause clinical harm?
7    A.  Yes, I am.  I've taught a lot of biomedical
8  students in the past.
9    Q.  And, Doctor, have you ever taught any students
10  at UT that degradation causes clinical harm?
11    A.  Certainly I have done that, yes.
12    Q.  And, Doctor, have you ever taught any of your
13  students at UT how Prolene causes clinical harm?
14    A.  Explicitly with Prolene, no, but with a variety
15  of biomaterials, whether it's bone cement or what have
16  you.  Degradation is a bad thing.
17    Q.  And, Doctor, have you ever taught your students
18  at UT anything about Prolene?
19    A.  Yes.  I teach them about polypropylene, and
20  Prolene is made of polypropylene.
21    Q.  Doctor, have you ever taught your students
22  about Prolene specifically?
23    A.  Specifically by name, Prolene, no, but
24  isotactic polypropylene with the usual package of

Page 55

1  additives, such as processing aids and antioxidants,
2  yes.
3    Q.  Doctor, I know that you've worked for --
4  against, rather -- Boston Scientific.  Have you ever
5  done any type of analytical testing of pelvic mesh
6  explants other than in Boston Scientific?
7    A.  No.
8    Q.  And, Doctor, are you -- did you perform any
9  type of physical property testing of the pelvic explants
10  in the Boston Scientific litigation?
11    A.  We measured the materials by spectroscopy, we
12  did GPC, we looked at the materials with
13  thermogravimetric analysis, SEM with EDS, but we did not
14  measure mechanical properties of those materials.
15    Q.  Why not?
16    A.  We were interested in determining what caused
17  the degradation of those materials once we noted the
18  degradation, and we used spectroscopy and GPC to do it.
19  As I mentioned earlier, those are the primary tools that
20  one would use to get direct evidence of degradation and
21  to identify what's causing the degradation.
22    Q.  Doctor, you'll agree that the adherence to
23  protocols and controls is the hallmark of good science?
24    A.  Yes.

Page 56

1    Q.  And, Doctor, are you aware that a West Virginia
2  federal judge ruled that your testing of the Boston
3  Scientific products was unreliable and excluded it?
4    A.  That's correct, but those data were eventually
5  published in the top biomaterials journal in the world
6  after undergoing, not only rigorous peer review, but
7  also the paper was reviewed for merit by the editorial
8  advisory board because the work was done under
9  litigation, for litigation purposes.
10    Q.  Doctor, have you ever done any type of testing
11  of mesh explants that's been admitted in a court?
12    A.  Not yet.
13    Q.  In the Boston Scientific, Doctor -- I'm sorry.
14  Strike that.
15        In the Boston Scientific litigation, you
16  testified that you're not an expert in the design of
17  surgical mesh.  Do you stand by that?
18    A.  I'm not an expert in the design of surgical
19  mesh.  I'm an expert in the polymers that the surgical
20  meshes are made of, whether they're polypropylene,
21  polyethylene terephthalate, polyvinylidene fluoride.
22  I'm knowledgeable broadly about polymer chemistry and
23  characterization of polymers.
24        MR. MONSOUR:  At the end of this, you're going

Page 57

1  to have to spell, probably, a few of those.
2        THE WITNESS:  We'll do that.
3        MR. HUTCHINSON:  Yeah.
4        THE WITNESS:  We'll do that.
5  BY MR. HUTCHINSON:
6    Q.  But -- I'm sorry.  You're not an expert in the
7  design of surgical mesh?
8    A.  Actually designing the mesh, the geometry, the
9  shape, no, I'm not.
10    Q.  And, Doctor, you testified in Boston Scientific
11  that polypropylene meshes should not be available to
12  doctors to treat SUI or POP.  Do you recall that?
13    A.  Yes.
14    Q.  And do you stand by that?
15    A.  Yes, I do.
16    Q.  Doctor, you testified that polypropylene
17  vaginal mesh is a very bad idea.  Do you stand by that?
18    A.  I do.
19    Q.  And you've never shared those views with any
20  physicians at UT; is that right?
21    A.  Yes, I have.
22    Q.  When did you do that?
23    A.  I did that late summer/early fall of last year.
24    Q.  And you did that after you were cross-examined

15 (Pages 54 to 57)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 58

1  about that; correct?
2     A.  Yeah, I did.
3     Q.  Doctor, have you ever told the doctors at UT
4  that Prolene mesh should not be used to treat SUI or
5  POP?
6     A.  I cautioned them about polypropylene mesh
7  broadly.
8     Q.  Okay.  But my question is specifically about
9  Prolene.  Have you ever told the doctors at UT that
10  Prolene mesh should not be used to treat SUI or POP?
11     A.  When I told them that polypropylene mesh should
12  not be used, that it's a bad idea, that it's susceptible
13  to degradation inside the human body, they should know
14  that Prolene is polypropylene-based pelvic mesh, just
15  like Marlex is.
16     Q.  But, Doctor, have you ever told doctors at UT
17  that using Prolene mesh should not be done in treating
18  SUI or POP?
19     A.  Not yet.
20     Q.  Doctor, you testified in the Boston Scientific
21  litigation that you couldn't cite any literature that
22  states there's a clinical effect of degradation on a
23  patient.  Do you remember that?
24     A.  Yes, I do.

Page 59

1     Q.  And, Doctor, to this day, are you still unaware
2  of any literature that states there's a clinical effect
3  of degradation on the patient?
4     A.  No.  I've gone and reviewed literature.
5     Q.  And, Doctor, are you aware of any literature
6  that states there's a clinical effect of degradation on
7  the patient?
8     A.  Yes.
9     Q.  And what literature is that?
10     A.  The book by Williams is the key reference.
11     Q.  What's the name of the book?
12     A.  Let me find it.  It's in my reference list
13  here.
14        Yeah, it's Reference 44, Essential Biomaterials
15  Science.
16     Q.  And that's the key reference that you rely on?
17     A.  Yes.
18     Q.  Doctor, does the Williams book say anything at
19  all about the clinical effect of degradation of Prolene?
20     A.  I don't recall it calling out Prolene by name,
21  but it basically lays out that implants have to be
22  mechanically compatible with the tissue that they're
23  implanted in, and initially a polypropylene mesh,
24  including the Ethicon meshes, are supple and they move

Page 60

1  with this soft vaginal tissue, but as the oxidative
2  process takes place, the mesh stiffens, and then it can
3  no longer move with that material.
4        So you've got soft flesh moving and the mesh
5  isn't moving, so there's an abrasion, and this is a sort
6  of thing that can lead to the abrasions that are seen
7  with this mesh.
8     Q.  Doctor, stick with me.  Are you aware of any
9  literature that states there's a clinical effect of
10  Prolene degradation on a patient?  That's my question.
11     A.  I may have -- I may very well have seen that in
12  all of my literature review, but I can't call it out as
13  I sit here right at this moment.
14     Q.  And you didn't cite any reference in your
15  report that says there's a clinical effect of Prolene
16  degradation on a patient; correct?
17     A.  Actually, on thinking about it, I think this
18  Klinge article, Reference 42, calls this out.
19     Q.  And what does it say about the clinical effect
20  of Prolene degradation on a patient?
21        MR. MONSOUR:  I'm going to object to form.  Can
22  I ask you one question just for clarity's sake?  Are
23  you talking about polypropylene articles, or are you
24  talking --

Page 61

1        MR. HUTCHINSON:  Prolene.
2        MR. MONSOUR:  -- about, like, medical articles?
3        MR. HUTCHINSON:  I'm talking about any medical
4  article referring to Prolene, which is different
5  than polypropylene.
6  BY MR. HUTCHINSON:
7     Q.  Doctor, that's the question.
8        MR. MONSOUR:  You can answer.  You can answer.
9  The only thing I'm trying to get at is just -- you
10  can keep asking your question.
11     A.  You know, I'd have to go back and look at this
12  Reference 42 to make absolutely sure, but I believe that
13  one does call out Prolene by name.  I believe he was
14  actually a consultant with Ethicon at the time, and so
15  he was looking at their materials.
16     Q.  Doctor, in Boston Scientific you testified
17  you're not an expert in the biological response to
18  foreign bodies.  Do you stand by that?
19     A.  Well, I don't do research in that area day in
20  and day out, so I'm not a card-carrying expert in that
21  area, but I understand a bit about it, a bit about what
22  the body does to foreign matter when it's placed inside
23  it.  So I'm not -- I'm not ignorant about it.  I'm just
24  not --

16  (Pages 58 to 61)

b29398ab-07f4-4f4e-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 62

1    Q.  And, Doctor, you testified in the Boston
2  Scientific trial about degradation, didn't you?  About
3  degradation?
4    A.  Can you be more specific?
5    Q.  Well, in the Boston Scientific trial, when you
6  gave opinions -- strike that.
7      In the Boston Scientific litigation, did you
8  give opinions about degradation without knowing what
9  antioxidants were put into the product?
10   A.  I gave opinions about degradation of
11 polypropylene in general and about degradation of
12 polypropylene with antioxidants added, and I knew what
13 antioxidants were added, just as I know what
14 antioxidants were added to the Prolene.
15   Q.  And, Doctor, is it your testimony under oath
16 that you knew what antioxidants were added to Boston
17 Scientific's products before you gave opinions about
18 degradation?
19   A.  I did not know initially exactly what additives
20 were in there, but later on as I worked more on that
21 case I gained information on the antioxidants were
22 there.  The expert on Boston Scientific's side actually
23 denied that antioxidants were in there at the beginning.
24   Q.  Doctor, you'll agree with me that there's been

Page 63

1  a long-term effective use of Prolene in the human body?
2    A.  Yes.  I don't -- I don't condemn polypropylene
3  broadly as a biomaterial.  It has applications,
4  certainly, in sutures.  That's fine.  It's been used for
5  a long time there.
6    Q.  Do you condemn Prolene for use in the human
7  body?
8    A.  As a vaginal mesh, as a pelvic mesh, yes.
9    Q.  For a vaginal mesh only?
10   A.  There are issues with it in possibly other
11 applications, but I -- because it is degrading.  There
12 is oxidative degradation that's taking place in the
13 material.
14   Q.  Right, but my question is for vaginal mesh
15 only.
16   A.  Yes, I think -- I think Prolene is a very bad
17 idea for vaginal mesh.
18   Q.  And vaginal mesh only; correct?
19   A.  No, I wouldn't -- I wouldn't say that.  It
20 could extend to other applications.
21   Q.  Where else do you condemn the use of Prolene in
22 the human body?
23   A.  There may be issues with hernia mesh.
24   Q.  Where else?

Page 64

1    A.  I don't know.  That's all that comes to mind
2  now.
3    Q.  Doctor, since your deposition -- by the way,
4  the last time you were deposed was in December of 2014;
5  correct?
6    A.  In the Boston Scientific matter, yeah, I think
7  so.  That sounds about right.  But I've actually been
8  deposed in another matter since then.
9    Q.  Was it a matter relating to vaginal mesh?
10   A.  No.
11   Q.  What was it about?
12   A.  It was about surgical sealants.  It was a
13 patent dispute.
14   Q.  Have anything to do with polypropylene?
15   A.  No.
16   Q.  Doctor, since your last deposition in the mesh
17 litigation in 2014, have you undertaken any type of
18 investigation as to why there's been long-term effective
19 use of Prolene in the human body?
20   A.  Certainly I've read a lot of literature about
21 the use of Prolene as a biomaterial.  And, you know, a
22 little surface cracking caused by oxidation isn't a big
23 issue if you're using the material as a suture.  The
24 material can become stiffer and still perform.  The

Page 65

1  suture's put in; the body heals quickly.  Right?
2      But this mesh is designed to be a permanent
3  implant and it's designed to move with the body.  One
4  has to consider the function that the material is going
5  to be used for inside the body.
6    Q.  Doctor, you know that sutures, Prolene sutures,
7  are designed to be permanently implanted in the body,
8  don't you?
9    A.  Yes, I do.
10   Q.  And, Doctor, you know that hernia mesh is
11 designed to be permanently implanted in the body, don't
12 you?
13   A.  I do.
14   Q.  Doctor, since 2014, your last deposition, have
15 you found any scientific or medical literature that says
16 Prolene should not be used for mesh implants in the
17 human body?
18   A.  Actually, I have.  I've seen Ethicon's own
19 documentation, which indicates that Prolene is far from
20 an ideal material.
21   Q.  I'm asking you, sir, about scientific
22 literature, medical literature.
23   A.  Well, this is literature, internal literature,
24 but it's from Ethicon scientists.

17 (Pages 62 to 65)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 66

1    Q.  Doctor, my question is about peer-reviewed
2  literature.  Have you seen any peer-reviewed literature
3  that says Prolene should not be used as mesh implants in
4  the human body?
5    A.  Well, I can go back to the Clave paper.  They
6  looked broadly at polypropylene meshes from a variety of
7  suppliers.
8    Q.  Did Clave conclude that Prolene mesh should not
9  be used in the human body?
10   A.  They've had issues with use of
11  polypropylene-based meshes.
12   Q.  But did they conclude that Prolene mesh should
13  not be used in the human body?
14   A.  Not explicitly.
15   Q.  Are you aware of any other article, Doctor?
16   A.  Costello.
17   Q.  That says -- that concludes -- my question is
18  specific.  Are you aware of any peer-reviewed literature
19  that says Prolene mesh should not be used in the human
20  body?
21   A.  I'm not aware of any literature that has that
22  exact statement in there.
23   Q.  Doctor, have you ever told the doctors at UT
24  that Prolene mesh should not be used for hernia repair?

Page 67

1    A.  I cautioned them about use of polypropylene
2  mesh broadly, that the material is degrading, whether
3  it's hernia or pelvic.
4    Q.  But have you ever told doctors at UT that
5  Prolene mesh should not be used for hernia repair?
6    A.  Explicitly Prolene by name, no, but when I say
7  "polypropylene mesh," logically that includes the whole
8  range of manufacturers, including Prolene.
9    Q.  And, Doctor, have you concluded that -- have
10  you ever concluded that Prolene is toxic to the human
11  body?
12   A.  I have not.
13   Q.  Doctor, can you tell us the mechanism of action
14  by which oxidation causes pain in the human body?
15   A.  Yes, I can.  Oxidation in polypropylene takes
16  place in the amorphous regions of the polypropylene.
17  Polypropylene is really a composite.  It's about half
18  crystals.  That's what gives polypropylene its strength.
19   Q.  Well, I'm going to get to the -- we're actually
20  going to get to that in just a minute.  My question is
21  about how the mechanism of action of oxidation causes
22  pain in the human body.
23   A.  Okay.  Oxidation causes the mesh to stiffen.
24  The mesh is designed to be flexible and to move with the

Page 68

1  soft pelvic tissue in a woman.  And being a mesh, tissue
2  grows into it, nerves grow into it, and when the
3  oxidative degradation occurs and the polypropylene
4  stiffens, the mesh can no longer move in concert with
5  that soft tissue that it's implanted in, so this creates
6  a sliding force or friction.
7         And in my report I liken it to taking fine
8  fishing line, which is basically what this mesh is,
9  polypropylene is widely used as fishing line, and
10  rubbing it across delicate skin.  If you've been fishing
11  and you've done that, it can hurt.  And that's what's
12  happening.  That's the root cause of the pain.
13   Q.  And, Doctor, in your fishing line example, if
14  the fishing line was oxidized, would it have cracks on
15  the outer layer?
16   A.  If it's oxidized, it will have cracks on the
17  outer layer.
18   Q.  And in your fishing line example, would those
19  cracks on the outer layer reduce physical properties of
20  the fishing line?
21   A.  Cracks can certainly reduce physical
22  properties.
23   Q.  It would reduce the toughness of the fishing
24  line?

Page 69

1    A.  It would reduce toughness.
2    Q.  It would reduce the tensile strength of the
3  fishing line?
4    A.  It would reduce tensile strength if those
5  cracks were large enough.
6    Q.  Doctor, you know that Ethicon has a long
7  history of use of Prolene sutures, don't you?
8    A.  Yes.
9    Q.  Do you know how long the sutures have been on
10  the market?
11   A.  Many years.  Probably around 50 years.
12   Q.  And do you know if the sutures, Ethicon
13  sutures, were approved by FDA as safe and effective?
14   A.  I must assume that they were, yes.
15   Q.  Doctor, do you have any criticisms whatsoever
16  regarding Ethicon's Prolene sutures?
17   A.  No, I think the sutures are perfectly fine.
18   Q.  Doctor, is it your testimony that patients --
19  strike that.
20        Doctor, is it your opinion that every doctor
21  who uses a Prolene mesh product for pelvic floor repair
22  is committing malpractice?
23   A.  No.
24   Q.  Doctor, what about the surgeons, the implanting

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 70

1  surgeons for these 28 plaintiffs, Ms. Bonnie Blake, all
2  the way down through Ms. Wroble, did these doctors
3  commit malpractice by using a Prolene implant in these
4  plaintiffs?
5      A.  I don't believe they did.  They used a product
6  that Ethicon represented to them was safe for use.
7      Q.  Doctor, do you know what "the gold standard"
8  means?
9      A.  I've certainly heard the term.
10     Q.  Have you ever heard or read that TVT is known
11  as the gold standard?
12     A.  I have read that.
13     Q.  And, Doctor, do you disagree with the doctors
14  and scientists who have called TVT the gold standard?
15         MR. MONSOUR:  Objection.  Form.
16     A.  Could you repeat the question?
17     Q.  Do you disagree with the doctors and scientists
18  who have called TVT the gold standard?
19         MR. MONSOUR:  Objection.  Form.
20     A.  They can certainly call it the gold standard.
21  That's fine.  That's their opinion.
22     Q.  Do you disagree with that?
23     A.  I do.  I'm an expert in the material that these
24  meshes are made of, and the mesh, in my opinion, is

Page 71

1  unsuitable for use in pelvic applications.
2      Q.  Doctor, is it your opinion that every person
3  who has had a Prolene vaginal mesh implant will
4  experience product failure?
5      A.  Not everyone will experience product failure.
6  People are different.  There can be -- you can put the
7  same mesh in two different people and they'll respond
8  differently.
9          But what I do believe is, if you leave that
10  mesh in there long enough, you will have oxidative
11  degradation of that mesh occurring, and it will stiffen.
12     Q.  And that would be for hernia repair too?
13     A.  Yes.
14     Q.  Doctor, how can you tell which particular
15  person will have product failure that have received a
16  Prolene vaginal mesh?
17     A.  I don't know.
18     Q.  And, Doctor, is it your opinion that every
19  person who has had a Prolene hernia mesh implant will
20  experience product failure?
21     A.  No.
22     Q.  Why not?
23     A.  Well, the record bears it out.  A lot of people
24  have these implants and they never experience problems,

Page 72

1  but there's a certain percentage of people that do.
2      Q.  Do you know that percentage?
3      A.  Well, I don't, and I'm not here to guess.
4      Q.  Okay.  Doctor, what would the gold standard be,
5  in your opinion, for the material used to treat pelvic
6  floor repair?
7      A.  From the literature I've reviewed, it looks
8  like polyvinylidene fluoride might be a better choice.
9      Q.  PVDF; is that correct?
10     A.  Yes.  It looks like PET might also be a better
11  choice.
12     Q.  And what does PET stand for?
13     A.  Polyethylene terephthalate.
14     Q.  And PVDF is polyvinylidene fluoride; correct?
15     A.  Yes.
16     Q.  And, Doctor, is it your testimony that -- which
17  one is -- well, let me back up.
18         Are you aware of any other materials that
19  should be used for pelvic floor repair other than PVDF
20  and PET?
21     A.  I think those are the ones that people have
22  done some studies on and they show some promising
23  results.
24     Q.  And is it your testimony that PVDF and PET are

Page 73

1  the safer alternatives than Prolene, Doctor?
2      A.  They're less susceptible to degradation inside
3  the human body.
4      Q.  Are safer alternatives than Prolene,
5  Doctor?
6      A.  More studies would have to be carried out.
7      Q.  Can you testify to a reasonable degree of
8  scientific certainty whether or not PVDF and PET are
9  safer alternatives compared to Prolene?
10     A.  I can only say that they're less susceptible to
11  degradation inside the human body.
12     Q.  My question, sir, can you testify to a
13  reasonable degree of scientific certainty on whether or
14  not they are safer alternatives compared to Prolene?
15  Yes or no?
16     A.  No, I'd need more data.
17     Q.  Doctor, are you aware of any -- and, by the
18  way, which material are you advocating, PVDF or PET?
19     A.  I'm not really an advocate for any of these
20  materials.
21     Q.  Which materials do you believe would be safer
22  between PVDF and PET?
23     A.  I'm not here to testify about that.  I'm here
24  to testify that polypropylene, including Prolene, is a

19 (Pages 70 to 73)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 74

1  bad choice.
2    Q.  Do you have an opinion, sir, to a reasonable
3  degree of scientific certainty on whether or not PVDF or
4  PET is a safer alternative?
5    A.  I think they're worth investigating.
6    Q.  Can you make a difference between the two?
7    A.  No.
8    Q.  Doctor, are you aware of any medical device on
9  the planet that's made out of PVDF for use in vaginal
10  reconstructive surgery?
11    A.  The actual product name?  I could go into some
12  of these papers and find out.  Would you like for me to?
13    Q.  Yeah, I'd like for you to --
14    A.  We can go to the Mary, for example.
15    Q.  My question, sir, are you aware of any mesh,
16  vaginal mesh, on the market that is made out of PVDF?
17    A.  I am not aware of one.
18    Q.  And, Doctor, you've never tested the
19  durability, the tensile strength, or the toughness of
20  PVDF or PET, have you?
21    A.  We have done some testing of PET for sure.
22    Q.  What about PVDF?
23    A.  I don't believe we have.
24    Q.  And, Doctor, would you ever give PVDF a

Page 75

1  lifetime guarantee if it was implanted in a woman?
2    A.  I would need some more data before I would do
3  that.
4    Q.  Same for PET?
5    A.  Yes.
6    Q.  PVDF is a different chemical composition of
7  Prolene; correct?
8    A.  Yes.
9    Q.  So is PET?
10    A.  Yes.
11    Q.  And you've never done a study to determine
12  whether or not PVDF or PET is a safer alternative;
13  correct?
14    A.  I have not.
15    Q.  And are you aware of any literature that says
16  PVDF or PET is a safer alternative than Prolene?
17    A.  No.  As I said earlier, you asked me this
18  before, I said that I've seen literature that says
19  they're less susceptible to degradation inside the human
20  body.
21    Q.  You've never done a study to determine whether
22  or not tissue will adhere to PVDF, have you?
23    A.  I have not.
24    Q.  Okay.  And you understand that tissue is

Page 76

1  comprised of proteins?
2    A.  Tissue's certainly got proteins in there.
3    Q.  And do you know the adhesion properties of PVDF
4  compared to Prolene?
5    A.  I haven't measured those, no.
6    Q.  Fair to say, based on your chemical background,
7  Doctor, that PVDF is a hybrid between polypropylene and
8  Teflon?
9    A.  I would characterize it as more of a hybrid
10  between polyethylene and Teflon.
11    Q.  Nevertheless, it's right in the middle; right?
12    A.  It's right in the middle, but that one methyl
13  group makes a big difference on polypropylene.
14    Q.  And, Doctor, you've -- strike that.
15       You've never designed a PVDF or PET implant of
16  any kind; correct?
17    A.  I have not.
18    Q.  Doctor, could any mesh product be reasonably
19  safe and effective for its intended use in the pelvic
20  floor region?
21    A.  Repeat that, please.
22    Q.  Could any mesh product be reasonably safe and
23  effective for use in the pelvic floor region?
24    A.  It's certainly possible, yes.

Page 77

1    Q.  And could you tell us what that composition
2  consists of?
3    A.  I can tell you what it's not, and that's
4  polypropylene.
5    Q.  Can you tell us what the composition should be,
6  sir?
7    A.  I cannot.
8    Q.  Can you tell us the thickness?
9    A.  No.
10    Q.  Can you tell us the weave?
11    A.  No.
12    Q.  Can you tell us the pore size?
13    A.  No.
14    Q.  Can you tell us the tensile strength?
15    A.  No.
16    Q.  Can you tell us the density?
17    A.  No.
18    Q.  Are you aware of anybody who has done a
19  design -- strike that.
20       Doctor, as a materials scientist, are you aware
21  of any material that's completely inert?
22    A.  No.
23    Q.  And, Doctor, are you aware of any product on
24  the market for treatment of stress urinary incontinence

20 (Pages 74 to 77)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 78

1  or pelvic organ prolapse that is completely inert?
2      A.   No.
3      Q.   Doctor, are you aware of any medical device in
4  the world that is completely inert?
5      A.   No.
6      Q.   Degradation.  How do you define degradation?
7      A.   Change in the chemical structure.
8      Q.   And it also means a loss of molecular weight;
9  correct?
10     A.   Well, again, we're back to where we were a
11  couple of times previously.  Degradation means a change
12  in structure.  It's detected with spectroscopy as
13  introduction of different chemical groups.  It can also
14  be detected in polymers by degradation, decrease in the
15  molecular weight.
16         Mechanical properties are a consequence of
17  the -- mechanical properties changes are a consequence
18  of these chemical changes.
19     Q.   Doctor, have you ever testified that
20  degradation means loss of molecular weight?
21     A.   That degradation means loss of molecular
22  weight?  Degradation of a polymer can certainly be loss
23  of molecular weight, but you could have oxidative
24  degradation of a material.  In its early stages, you're

Page 79

1  actually increasing the molecular weight because you're
2  incorporating oxygen into it.
3      Q.   Doctor, there must be a loss of molecular
4  weight for degradation to occur; correct?
5      A.   Must be a loss of?  Well, with polymers, if
6  you're talking about oxidative degradation of
7  polypropylene, you will see a reduction in molecular
8  weight.
9      Q.   Thank you.  And there must be -- there must be
10  a reduction in molecular weight for degradation for a
11  polymer; correct?  You can't have one without the other?
12     A.   Degradation?  Yes, you can.  You can have
13  chemical changes.  Remember, I defined degradation as
14  chemical changes in the polymer.  You could have
15  oxidation occurring at some level not to the point where
16  it actually starts to cleave the chain and you will see
17  increase in the molecular weight of the material.
18     Q.   But, Doctor, for oxidative degradation to
19  occur, there must be loss of molecular weight; correct?
20     A.   Yes, when oxidative degradation of
21  polypropylene occurs, there is degradation of molecular
22  weight.
23     Q.   And when oxidative degradation of Prolene
24  occurs, there must be loss of molecular weight; correct?

Page 80

1      A.   There will be reduction in molecular weight.
2  And I want to be specific about molecular weight.
3  Molecular weight is a term that gets tossed around
4  loosely a lot with polymers, but there are different
5  types of average molecular weights.
6      Q.   Right.
7      A.   Number average, weight average.
8      Q.   I'm going to get to those in just a minute.
9  But if oxidation occurs, you must have cleavage of the
10  polymer chain?
11     A.   Oxidative degradation of polypropylene does
12  lead to chain cleavage, that's correct.
13     Q.   And oxidative degradation of Prolene leads to
14  strong carbonyl bands present on FTIR that weren't there
15  before; correct?
16     A.   Correct.
17     Q.   And strong -- I'm sorry.
18         Oxidative degradation of Prolene leads to
19  reduced physical properties; correct?
20     A.   It changes physical properties.  It depends on
21  the particular one whether it's reduced or not.
22     Q.   And when the polymer chain is cleaved, there's
23  a reduction in physical properties; correct?
24     A.   Well, you have to specify which one.

Page 81

1      Q.   All right.  My question, sir, is the polymer
2  chain of Prolene.  When the polymer chain of Prolene is
3  cleaved, there will be a reduction in physical
4  properties?
5      A.   Again, it's which one?  Are you talking about
6  tensile strength?  Are you talking about compliance?
7  Are you talking about modules?
8      Q.   I'm talking about, actually, any physical
9  property.
10     A.   Well, the tensile strength when molecular
11  weight decreases will generally decrease.  Tensile
12  strength will decrease.  But if you have this oxidative
13  degradation occurring in the material, the modulus of
14  the material will actually increase, but the compliance
15  decreases.
16     Q.   Will toughness decrease when there's oxidative
17  degradation?
18     A.   Yes.  The material becomes embrittled.
19     Q.   And, Doctor, you know what toughness is, don't
20  you?
21     A.   I do.
22     Q.   And that's the area -- that's the area under
23  the curve under a stress-strain?
24     A.   That's one good measure of toughness, yes.

21 (Pages 78 to 81)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 82

1  Q.  In fact, that's probably the best measure of
2  toughness, isn't it?
3     A.  It's a great one, yes.
4     Q.  Okay.  And that's the one you teach your
5  students at UT?
6     A.  I certainly do, yes.
7     Q.  Okay.  And when a material increases in
8  toughness, what does that tell you about the property,
9  physical properties?
10    A.  It tells me it got tougher.
11    Q.  And when a material increases in toughness,
12 what does that tell you about whether or not degradation
13 has occurred?
14    A.  It would -- it might depend on the material.
15 You can't just make a broad, sweeping statement with
16 every material that it's going to be the same.
17    Q.  Okay.  What about Prolene?  What does that tell
18 you about the toughness of Prolene?
19    A.  It's known that when polypropylene oxidatively
20 degrades, it becomes embrittled.  So less tough, more
21 brittle.
22    Q.  And for Prolene, when -- if Prolene oxidatively
23 degrades, Prolene toughness will decrease; correct?
24    A.  Yes.

Page 83

1  Q.  Do you know Dr. Howard Jordi?
2     A.  I've heard the name.  I don't know him.
3     Q.  Do you know if he has ever found a loss of
4  molecular weight in an explant?
5     A.  I don't know.
6     Q.  We talked about this earlier, and if we did, I
7  apologize.  If there is a loss of molecular weight,
8  there is a decrease in toughness; correct?  Of Prolene?
9     A.  A decrease in molecular weight?
10    Q.  If there's a loss of molecular weight in
11 Prolene, there's a decrease in toughness of Prolene;
12 correct?
13    A.  Yes, there generally would be a decrease in
14 toughness with decrease in molecular weight, but it's
15 not that simple, because people have tried with
16 ultrahigh molecular weight polymers like polyethylene to
17 get the degree of crystallinity as high as possible
18 through processing tricks, and if you do that, you can
19 actually cause the material to become brittle.  So
20 processing plays a role.  I'm not trying to be
21 difficult.  It's just -- it's more complicated.
22    Q.  Doctor, are you aware of any peer-reviewed
23 literature that shows Prolene has lost molecular weight?
24    A.  You mean has actually been degraded?

Page 84

1  Q.  No, sir.  My question is:  Are you aware of any
2  peer-reviewed literature that shows Prolene has lost
3  molecular weight?
4     A.  You mean it's become lower molecular weight
5  after a degradation process?
6     Q.  My question is:  Are you aware of any
7  peer-reviewed literature that shows Prolene has lost
8  molecular weight specifically?
9     A.  Has lost molecular weight due to what?  That's
10 what I'm asking.
11    Q.  For any reason.
12    A.  If one just takes the material and puts it in
13 an extruder and keeps heating and shearing it, it's
14 going to lose molecular weight.
15    Q.  Right.  But my question is about peer-reviewed
16 literature.  Are you aware of any peer-reviewed
17 literature that shows Prolene has lost molecular weight
18 specifically?
19    A.  As I sit here, I don't know a paper with
20 Prolene specifically.
21    Q.  And are you aware of any studies that shows
22 Prolene has lost molecular weight?
23    A.  Again, your question is vague and I don't
24 understand your question.

Page 85

1  Q.  My question is, sir:  Are you aware of any
2  studies that shows Prolene has specifically lost
3  molecular weight?
4     A.  It has become reduced in molecular weight, one
5  average or the other, after some physical encounter?  As
6  I sit here, no.
7     Q.  And, Doctor, have you ever seen any type of
8  specific molecular weight tests that have been done on
9  Prolene?
10    A.  I saw a little bit of GPC data in some of the
11 internal Ethicon documents.
12    Q.  And what did it show?
13    A.  What they showed in that limited data was
14 marginal changes, small changes, in molecular weight.
15    Q.  Doctor, are you aware of any evidence to
16 confirm that these 28 plaintiffs' explants lost
17 molecular weight?
18    A.  I have not seen molecular weight data on
19 explants of these patients.
20    Q.  And, Doctor, have you seen any evidence to
21 confirm that these 28 patients' explants had a change in
22 the physical properties of their mesh?
23    A.  Just back to what I said earlier,
24 polypropylene, including Prolene, undergoes oxidative

22 (Pages 82 to 85)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 86

1  degradation.
2      Q.  Doctor, we've talked about antioxidants
3  already?
4      A.  Yes.
5      Q.  Do you know the antioxidants that are added to
6  turn pure polypropylene into Prolene?
7      A.  Yes.  There's several additives that are put in
8  there.  I've actually got a document here that lists the
9  amounts of all of them, but there's Santonox, the
10  primary antioxidant, there's calcium stearate, a
11  processing aid, and there's a secondary antioxidant.  I
12  forget the name.  It's a long, complicated name.  You
13  probably wouldn't want to type it.
14      Q.  Dilauryl thiodipropionate?
15      A.  That's it.  That's it.
16      Q.  Doctor, do you know the concentration levels of
17  these antioxidants?
18      A.  Again, I would have to --
19      Q.  Excuse me -- that are -- do you know the
20  concentration levels of these antioxidants that are
21  added to make polypropylene Prolene?
22      A.  I could go and review it, but I can't off the
23  top of my head remember the exact amount.
24      Q.  Doctor, have you ever done a TGA analysis to

Page 87

1  determine what antioxidants Prolene contains?
2      A.  I have not performed TGA on Prolene.
3      Q.  And, Doctor, have you ever done any type of TGA
4  analysis to determine whether or not antioxidants had
5  been depleted from Prolene?
6      A.  I have not.
7      Q.  You did that for Boston Scientific, didn't you?
8      A.  Yes.
9      Q.  Why didn't you do it here?
10      A.  Because I didn't have the explants.
11      Q.  That could have been -- you could have done
12  that by other means; correct?
13      A.  One could use an oxidation induction test.
14  That's an alternate way.
15      Q.  And that's something that you had available to
16  your lab at Tennessee?
17      A.  We did, yeah.  We could have done that.
18      Q.  And that's something you didn't do in this
19  case; correct?
20      A.  We didn't.
21      Q.  Doctor, you've never tested the effect of
22  antioxidants -- strike that.
23          You've never tested the effect antioxidants
24  have in vivo in Ethicon's Prolene, have you?

Page 88

1      A.  No.
2      Q.  And you've never studied how long the
3  antioxidants in Prolene will delay oxidation in vivo;
4  correct?
5      A.  I've seen literature both internal to Ethicon
6  and peer-reviewed literature that shows degradation of
7  Prolene biomaterials after certain times of implantation
8  in the body, but I haven't tested it with my own hands.
9      Q.  And, Doctor, do you know the step in the
10  manufacturing process where these antioxidants are
11  added?
12      A.  Yes.  It's during the extrusion process.  These
13  pellets basically are produced by that process.
14      Q.  It's your testimony under oath that the pellets
15  are produced during the extrusion process?
16      A.  Well, the polypropylene comes out of the
17  reactor, and as I understand it, then then are
18  introducing the antioxidant into the material by a
19  mixing process, basically.
20      Q.  So my question is:  At what stage of the
21  manufacturing process are the antioxidants added?
22      A.  It's put in before the fibers are actually
23  spun.  It's in there in the polypropylene.
24      Q.  Is it put -- is it put before the fibers are

Page 89

1  extruded?
2      A.  Yes, it's in there before the fibers are
3  extruded.
4      Q.  Doctor, you'll agree that these antioxidants
5  work in a synergistic manner; correct?
6      A.  You mean the two that are in?  Yeah, it's
7  common to use primary and secondary antioxidants.
8      Q.  But they work in a synergistic manner?
9      A.  Yes, they do.
10      Q.  Okay.  And, Doctor, do you know the rate at
11  which antioxidants from Prolene are depleted?
12      A.  Based on the literature that shows the
13  oxidation of the material, you can certainly tell when
14  depletion has occurred, because that's when you start to
15  see signs of oxidative degradation.
16      Q.  Right, but I'm talking about, Doctor, the rate
17  that antioxidants of Prolene are depleted.
18      A.  Under what conditions?
19      Q.  In vivo.
20      A.  The exact rate, some actual study of what's
21  happening to the concentration over time, I'm not aware
22  of.
23      Q.  And, Doctor, you're not aware of any
24  peer-reviewed literature that shows the rate the

23 (Pages 86 to 89)

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76ccd12324c5c

Jimmy W. Mays, Ph.D.

Page 90

1  antioxidants are depleted, are you, in Prolene?
2      A.   The direct measure of the depletion at the
3  surface, which is where the antioxidant does its work,
4  I'm not aware of that exact data, that's correct.
5      Q.   And, Doctor, you've never done any -- you've
6  never done any time studies to determine the rate at
7  which the antioxidants of Prolene are depleted, have
8  you?
9      A.   We have not tested Prolene for that.
10     Q.   Doctor, I didn't see anything in your report
11 about leaching, or did I miss it?
12     A.   I did not have anything in there about
13 leaching.
14     Q.   Okay.  And if you don't have anything in your
15 report, is it fair for me to assume that you have no
16 opinions regarding leaching of antioxidants; correct?
17     A.   Well, certainly antioxidants can be leached out
18 of a material.
19     Q.   But my question is, sir:  Are you testifying to
20 a reasonable degree of scientific certainty in this
21 litigation on whether or not the antioxidants can leach
22 out of Prolene?
23     A.   Antioxidants on the surface can leach out.
24     Q.   And is that included in your -- is that opinion

Page 91

1  included in your report?
2      A.   No, but we talk about how the antioxidants are
3  depleted over time.
4      Q.   Why are none of your leaching -- strike that.
5          Why are none of your opinions regarding
6  leaching included in your expert report?
7      A.   I think leaching is a relatively minor cause of
8  depletion as opposed to the antioxidants simply being
9  used up doing their job.
10     Q.   Doctor, my question is:  Why did you not
11 include any opinions regarding leaching in your expert
12 report?
13     A.   I don't think they're really relevant here.
14 The oxidizing agents inside the body react with the
15 antioxidants on the surface of the fiber, and that's the
16 primary cause for depletion of the antioxidants, and
17 then the subsequent oxidative degradation process.
18     Q.   As a polymer scientist, you're familiar with
19 formalin; correct?
20     A.   Yes.
21     Q.   And you know that formalin extracts Santonox R;
22 correct?
23     A.   Yes.
24     Q.   And you know formalin extracts DLTDP; correct?

Page 92

1      A.   I believe it would, yes.
2      Q.   And, in fact, formalin is a good solvent;
3  correct?
4      A.   Yes.
5      Q.   Doctor, do you have any evidence that these 28
6  plaintiffs had a loss of antioxidants in their mesh?
7  Any data to confirm that their explants lost
8  antioxidants?
9      A.   When you put a material inside the human body,
10 you get the foreign body response, and that generates
11 strong oxidizing agents, and those oxidizing agents use
12 up the antioxidant.  The antioxidant's put in there to
13 preferentially react with oxidizing species and with
14 free radicals.
15     Q.   Doctor, can you tell us how any of these 28
16 plaintiffs' antioxidants -- strike that.
17         Can you tell us how any -- strike that.
18         Can you tell us the rate at which the
19 antioxidants of any of these 28 plaintiffs were
20 depleted?
21     A.   The exact rate, no.
22         MR. HUTCHINSON:  Can we take a quick break?
23         MR. MONSOUR:  Yes.
24         (Recess from 10:20 a.m. until 10:35 a.m.)

Page 93

1          MR. HUTCHINSON:  Back on the record.
2  BY MR. HUTCHINSON:
3      Q.   Doctor, is there anything about the testimony
4  you've given me you'd like to change?
5      A.   No.
6      Q.   Let's look at the expert report, Exhibit 3.
7      A.   Okay.
8      Q.   Page 2.  Middle paragraph.  It states you have
9  developed new biomaterials?
10     A.   Yes.
11     Q.   Are they sold to anyone right now, sir?
12     A.   No.  We've got a patent on a new orthopedic
13 bone cement.
14     Q.   Do they have a lifetime warranty?
15     A.   Well, as I say, we haven't actually made the
16 product, but --
17     Q.   You haven't made the product?
18     A.   We haven't made the commercial product.
19     Q.   Okay.  Well, but will this commercial product
20 have a lifetime warranty?
21     A.   I don't know.
22     Q.   Will it have any warranty at all?
23     A.   I don't know.
24     Q.   And it's a biomaterial product?

24  (Pages 90 to 93)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 94

1    A.  It's a biomaterial.
2    Q.  And what's it used for?
3    A.  It would be used for hip replacement surgeries,
4  knees.
5    Q.  And sitting here today, sir, do you have any
6  plans to give this hip implant that you're creating a
7  lifetime warranty?
8    A.  I have no plans one way or the other.
9    Q.  You only have one patent; correct?
10    A.  No.
11    Q.  I'm looking at the top of page 3.  It says "a
12  patent," which I think is singular.  How many patents do
13  you have?
14    A.  There's a list in here.  If you go to my CV,
15  it's after the publications.  There's a list of patents.
16  There's several issued patents there and there's a total
17  of 17 things listed in various stages.  It's right after
18  the publications but before the presentations start.
19       MR. MONSOUR:  Maybe next time we ought to
20    number at the bottom to make it easier.  This is
21    pretty long.
22       THE WITNESS:  That would make it easier.
23  BY MR. HUTCHINSON:
24    Q.  Doctor, none of those patents have anything to

Page 95

1  do with pelvic mesh; correct?
2    A.  Correct.
3    Q.  And, Doctor, looking at the top of page 3, it
4  says: "My work."  Are you there with me?
5    A.  Yes.
6    Q.  "My work in this area includes development of
7  novel bone cements, dental biomaterials, tissue
8  engineering, drug delivery systems, surgical sealants,
9  and polypropylene pelvic mesh."
10       Did I read that correctly?
11    A.  Yes.
12    Q.  And, Doctor, what development of polypropylene
13  pelvic mesh have you done?
14    A.  Well, actually, I was referring to the study
15  that we did on the materials.
16    Q.  Okay.  So you've never developed polypropylene
17  pelvic mesh, have you, sir?
18    A.  No, not actually developed it.
19    Q.  Is that a little misleading?
20    A.  Yeah, I probably was a little clumsy in terms
21  of how I phrased it.
22    Q.  Doctor, are you aware of any foreign body
23  material that will never oxidize?
24    A.  Any foreign body material which will never

Page 96

1  oxidize?  What do you mean by "foreign body material"?
2  Do you mean something that's being implanted in the
3  human body?
4    Q.  Yes.
5    A.  Maybe Teflon.
6    Q.  You said "maybe."  You don't sound too sure.
7    A.  I'm not sure.  The human body is pretty
8  aggressive.
9    Q.  Yeah.  And, in fact, Doctor, sitting here
10  today, can you tell us the name of one medical product
11  commercially available that will never oxidize in the
12  human body?
13    A.  No.
14    Q.  Doctor, turning to page 5, at the top, you
15  state: "This report focuses on" -- do you see that?
16    A.  Yes.
17    Q.  -- "degradation of polypropylene by
18  thermo-oxidative processes."
19       What do you mean by "thermo"?
20    A.  Combination of heat combined with oxygen.
21    Q.  And are you talking about a process of heat
22  initiated in the body?
23    A.  No, it's degradation of polypropylene by
24  thermo-oxidative processes and in vivo.  So they're two

Page 97

1  separate things.
2    Q.  Doctor, you're not telling the ladies and
3  gentlemen of the jury that Prolene oxidizes via thermal
4  means; correct?
5    A.  Well, polypropylene is susceptible to thermal
6  oxidative degradation.  You heat Prolene up in the
7  presence of oxygen and it will degrade.
8    Q.  Right.  But, Doctor, are you offering any
9  opinions on Prolene oxidizing in the human body as a
10  result of high temperatures?
11    A.  Not high temperature.  In the body, it's
12  obviously at body temperature, 37 degrees.
13    Q.  And, Doctor, have you proven using the
14  scientific method that Prolene oxidizes in the body at
15  37 degrees C?
16    A.  We've proven that polypropylene oxidizes inside
17  the body at 37 degrees C.
18    Q.  I understand.
19    A.  And Ethicon's own scientists have shown that
20  polypropylene oxidizes in vivo.
21    Q.  My question to you, Doctor, is:  Have you
22  personally proven using the scientific method that
23  Prolene oxidizes in vivo at 37 degrees C?
24    A.  I have not done the experiment with

25 (Pages 94 to 97)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 98

1  polypropylene, but as I say, the Ethicon people have,
2  and others have looked at degradation of Prolene
3  implants inside the body.
4      Q.  Doctor, turning to page 5, under summary of
5  opinions, No. 1, it discusses the chain scission and
6  diminished mechanical properties, reduced compliance and
7  brittleness.  Do you see that?
8      A.  Yes.
9      Q.  And as a polymer scientist, you know what solid
10  scientific data is, don't you?
11      A.  Yes.
12      Q.  In fact, you use that in your practice?
13      A.  Yes.
14      Q.  And using good scientific, solid data is good
15  science; right?
16      A.  Yes.
17      Q.  And, Doctor, are you aware of any solid
18  scientific data that shows where Prolene has diminished
19  physical properties?
20      A.  Yes.
21      Q.  What?
22      A.  It would be the papers of Costello.
23      Q.  Anyone else?
24      A.  Those are the primary ones that have looked at

Page 99

1  Prolene.
2      Q.  Right.  But, Doctor, I'm asking you for solid
3  scientific data.  Other than Costello, are you aware of
4  any solid scientific data that shows Prolene has
5  diminished physical properties?
6      A.  There's also data in Ethicon's own studies
7  where in one instance material retained only 54 percent
8  of its initial strength after oxidative degradation.
9      Q.  Doctor, you're talking about the 1983 document
10  from Ethicon?
11      A.  I'd have to look at it.  There's a couple of
12  1983 documents, but that sounds about right.
13      Q.  But when we're talking about the suture
14  retained only 54 percent of its original strength,
15  you'll agree that in that study only one explanted fiber
16  was tested?
17      A.  I'd have to look at that study to say.
18      Q.  Okay.  Do you have that study with you?
19      A.  I believe I do.
20          What was the number on that one?  I'd have to
21  go back to my report and track it down that way.
22      Q.  ETH.MESH.15955438?
23      A.  Okay.
24      Q.  Are you there with me, Doctor?

Page 100

1      A.  I am in that document, yes.
2      Q.  And, Doctor, you'll agree that only one
3  explanted fiber was tested, would you not?
4      A.  It was 5-0 Prolene from Specimen 2.
5      Q.  But one explanted fiber was tested; correct?
6      A.  They performed tests on one explanted fiber,
7  but there's no indication of how many times that might
8  have been tested.
9      Q.  And, Doctor, as a scientist, would you ever
10  rely on one data point in drawing conclusions for a
11  paper that you'd present to the American Chemical
12  Society?
13      A.  Well, my point is, they may have actually
14  tested that sample multiple times.
15      Q.  But my question to you, Doctor, and listen
16  closely to my question:  Would you ever rely, as a
17  scientist, on one data point in drawing a conclusion for
18  a paper that you'd present to the American Chemical
19  Society?
20      A.  I would rely on one data point, but I would
21  want more data, and what they show in this paper is
22  there's evidence of other fibers cracking.
23      Q.  And, Doctor, did you rule out that the fiber
24  had been damaged by a scalpel?  Did you rule that out?

Page 101

1      A.  You would think that they would not test
2  material that had been damaged by a scalpel.
3      Q.  How did you rule that out?
4      A.  I don't have the fiber to examine.
5      Q.  And you didn't rule that out that the fiber had
6  been damaged by a scalpel, had you?
7      A.  Well, I trust that Ethicon hires good
8  scientists who would be careful.
9      Q.  Did you rule out the fact that Ethicon's fiber
10  was damaged by a scalpel?
11      A.  I have no evidence that it was.
12      Q.  If you look at -- going back to your report, on
13  page 5, where we discussed chain scission, chain
14  scission produces carbonyl bands; correct?
15      A.  Chain scission in polypropylene accompanies the
16  formation of carbonyl bands.  It's not that chain
17  scission produces it, but --
18      Q.  And chain scission in Prolene accompanies the
19  formulation of carbonyl bands; correct?
20      A.  Yes.
21      Q.  In fact, Doctor, a carbonyl band from oxidation
22  is one of the most intensely absorbing functional groups
23  on FTIR; correct?
24      A.  Yes, it's one that's easy to see.

26  (Pages 98 to 101)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 102

1    Q.  You can't miss it if there's oxidation; is that
2  right?
3    A.  If there's oxidation, you'll see it, yes.
4    Q.  And, in fact, it's a strong and tall peak on
5  the FTIR spectra; correct?
6    A.  Yes.
7    Q.  And do you know where oxidized -- strike that.
8     Do you know where on the reciprocal centimeter
9  range there would be a peak for oxidized Prolene?
10   A.  Yeah, there's several different oxidized
11 species, but you see them, in general, around 1750,
12 roughly.
13   Q.  And, Doctor, have you ever seen any literature
14 that confirms there's a peak at 1740 reciprocal
15 centimeters for oxidized Prolene?
16   A.  Yes.
17   Q.  And what paper is that?
18   A.  Well, it's certainly there in the documents of
19 Ethicon, but I believe it's there also in the Costello
20 paper.
21   Q.  Are you aware of any other peer-reviewed
22 literature other than Costello that confirms there's a
23 peak at 1750 reciprocal centimeters for oxidized
24 Prolene?

Page 103

1    A.  For oxidized Prolene, I think that's the one.
2    Q.  Costello is the one you're relying on?
3    A.  Yeah.  There's actually two Costello papers,
4  yeah.
5    Q.  Doctor, have you ever seen carbonyl bands from
6  Prolene after it was implanted in vivo?
7    A.  Well, as we just said, I've seen evidence
8  gathered by Ethicon scientists and also from Costello.
9    Q.  But outside of the documents that you've
10 reviewed, the internal documents and peer-reviewed
11 literature, Doctor, have you ever seen an FTIR spectra
12 that has a carbonyl band at or around 1750 for oxidized
13 Prolene?
14   A.  You mean with my -- something we generated in
15 the lab?
16   Q.  Yes, sir.
17   A.  No.
18   Q.  With your own eyes.
19   A.  No, we have not.
20   Q.  And, Doctor, have you ever done an FTIR spectra
21 for Prolene?
22   A.  For polypropylene, yes.  For Prolene, no.
23   Q.  Doctor, you had the equipment at your lab at UT
24 to do an FTIR spectra on Prolene, didn't you?

Page 104

1    A.  Yes.
2    Q.  In fact, that was something easy for you to do;
3  correct?
4    A.  It is easy, yes.
5    Q.  In fact, that's something you could have done;
6  correct?
7    A.  Yes.
8    Q.  Are you an expert in FTIR?
9    A.  I would say I'm quite experienced with it.  We
10 use it routinely to characterize polymers that we've
11 made.
12   Q.  But do you hold yourself as an expert in FTIR?
13   A.  Well, I'm not a person who's specialized in
14 spectroscopy my whole career, but we use it as a tool
15 routinely.
16   Q.  Doctor, do you tell the students you teach at
17 UT that you're an expert in FTIR analysis?
18   A.  I wouldn't classify myself as an expert.
19 There's certainly people that practice it day in and day
20 out that know more about it than I do.
21   Q.  And, Doctor, do you know -- well, by the way,
22 FTIR is a way to confirm oxidation?
23   A.  Yes.
24   Q.  And do you know where on an FTIR spectra a

Page 105

1  functional group for DLTDP shows up?
2    A.  There's one that comes in about 1740, in that
3  general vicinity, as well.
4    Q.  Doctor, looking on page 5 of your report, it
5  says, No. 2:  "The addition of antioxidants to the
6  Prolene polypropylene does not permanently prevent mesh
7  degradation."
8     Do you see that?
9    A.  Yes.
10   Q.  Doctor, have you proven that using the
11 scientific method?
12   A.  Well, polypropylene routinely contains
13 antioxidants.
14   Q.  But I'm talking about Prolene.  Have you
15 proven, Doctor, that the addition of antioxidants to
16 Prolene does not permanently prevent mesh degradation,
17 by the scientific method?
18   A.  It's there in the published peer-reviewed
19 literature and also in the Ethicon documents.  As I keep
20 saying, we have not done the experiments on Prolene.
21   Q.  Doctor, what's the longest time that you're
22 aware of where Prolene material has been used in the
23 body?
24   A.  There were some seven-year studies I saw from

27 (Pages 102 to 105)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 106

1  Ethicon.
2      Q.  I'm talking about used in the body in a
3  clinical sense.
4      A.  I'd have to go back to some of the papers to
5  see, really, what the longest time was, but periods of
6  years.
7      Q.  Doctor, look at page 11 for me, please.  Down
8  at the middle, you have a sentence regarding -- that
9  starts with "macrophages."  Do you see that?
10     A.  Yes.
11     Q.  Doctor, do you know what amount of peroxides
12  are secreted in the body?
13     A.  I don't know the exact amount.
14     Q.  Do you know the amount of acids that are
15  secreted in the body?
16     A.  Exact amounts, no.
17     Q.  What about the amount of enzymes?
18     A.  Exact amounts, no.
19     Q.  Doctor, have you ever studied the amount of
20  peroxides, acids, or enzymes that are secreted in the
21  body?
22     A.  I have not.
23     Q.  Can you quantify the concentration of reactive
24  oxygen species produced by microphages?

Page 107

1      A.  It might be available in the literature if I
2  would go and look for it.  I suspect it is.
3      Q.  Can you quantify it, Doctor?
4      A.  As I sit here, no.
5      Q.  Have you ever looked for any type of
6  quantification of reactive oxygen species produced by
7  macrophages?
8      A.  I have not tried to quantify it, no.
9      Q.  Doctor, are you aware, sitting here today, of
10  any peer-reviewed literature where that's been
11  quantified?
12     A.  I am not, as I sit here, but it may very well
13  be there.  I suspect it is.
14     Q.  And when we talk about the concentration of
15  reactive oxygen species produced by macrophages, you'd
16  be guessing at the amount of how much is produced by the
17  body; correct?
18     A.  As I've said, I don't know the exact amount.
19     Q.  Okay.  Do you have -- do you have any idea?
20     A.  I can't give you a hard number, no.
21     Q.  Can you give me a best guess?
22     A.  I'm not here to guess.
23     Q.  Doctor, have you ever exposed Prolene to what
24  you would consider an appropriate amount of peroxides,

Page 108

1  acids, or enzymes to determine if it oxidizes?
2      A.  I have not.
3      Q.  Doctor, the amount of reactive oxygen species
4  in the body, how does that compare to 30 percent
5  hydrogen peroxide?
6      A.  I'm not sure.
7      Q.  Certainly, Doctor, you would expect that the
8  amount of reactive oxygen species in the body is going
9  to be much lower than 30 percent hydrogen peroxide,
10  wouldn't you?
11     A.  30 percent hydrogen peroxide is a pretty high
12  concentration.
13     Q.  And that's a high enough concentration that you
14  would expect something to happen to a material; correct?
15     A.  It depends on the material and the conditions
16  under which it's exposed.  If you look inside the human
17  body, you have not only hydrogen peroxide being
18  generated by this foreign body reaction, but you also
19  have oxidative enzymes.  So catalysts can accelerate the
20  process even if the concentration of the peroxide is
21  lower.  And there are also other highly reactive
22  species, like hypochlorous acid, that are generated by
23  this process.
24     Q.  And, Doctor, do you have any idea how much

Page 109

1  hypochlorous acid is found in the body in vivo?
2      A.  I can't quantify it.
3      Q.  And, Doctor, are you aware of any literature
4  whatsoever that quantifies the amount of hypochlorous
5  acid in the body?
6      A.  As I sit here, I'm not sure of it, but I might
7  be able to quantify it.
8      Q.  Have you ever looked for any literature,
9  Doctor, before today's deposition, that quantifies the
10  amount of hypochlorous acid found in the body?
11     A.  I have not set out to try to quantify it.
12     Q.  And have you ever looked in the literature to
13  determine how much hydrogen peroxide is found in the
14  body, the concentration level?
15     A.  Again, as I've already said, I haven't tried to
16  quantify it.
17     Q.  Thank you.  And, Doctor, these reactive oxygen
18  species that you're discussing on page 11 of your
19  report, are those stronger than nitric acid?
20     A.  Certainly under the conditions where there are
21  these enzymes present, these oxidative enzymes, they can
22  be very potent.
23     Q.  Doctor, do you have any opinion regarding how
24  much hydrogen peroxide would cause Prolene to oxidize?

28 (Pages 106 to 109)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 110

1    A.  Inside the body, or without?
2    Q.  Inside the body.
3    A.  I'm not sure what the minimum level is.
4    Q.  Do you have any opinion regarding how much
5  hydrogen peroxide would cause Prolene to oxidize outside
6  the body?
7    A.  Well, I could go to the study that the Ethicon
8  scientists carried out.
9    Q.  Before we do that, do you have an opinion?
10    A.  Could you be more specific?
11    Q.  Well, do you have an opinion about how much
12  hydrogen peroxide it takes to oxidize Prolene outside
13  the body?
14    A.  It depends on the exact conditions.  30 percent
15  hydrogen peroxide, under the conditions Ethicon used,
16  wasn't enough.
17    Q.  It was not enough?
18    A.  Over the time period that they carried out the
19  experiment.
20    Q.  And you're talking about the November 5, 1984,
21  memo?
22    A.  Yes, I think so.
23        (Mays Exhibit No. 4 was marked for
24  identification.)

Page 111

1  BY MR. HUTCHINSON:
2    Q.  We'll mark it as Exhibit 4.  This is a document
3  that you received before you rendered your opinions; is
4  that right?
5    A.  Yes.
6    Q.  And, in fact, you relied upon this document in
7  reaching your opinions, didn't you, sir?
8    A.  Yes.
9    Q.  And there at the top, on page 3, it states:
10  "Prolene sutures in 30 percent hydrogen peroxide
11  solution after a year's time at room temperature do not
12  produce visible surface cracking on any of the fibers."
13        Did I read that correctly?
14    A.  Yes.
15    Q.  And, in fact, Doctor, this shows that Prolene
16  is exposed to 30 percent hydrogen peroxide for a year
17  and didn't produce visible surface cracks; is that
18  right?
19    A.  That's what it says.
20    Q.  Sir, how do you account for the fact -- strike
21  that.
22        How do you account for that in reaching your
23  conclusion that hydrogen peroxide oxidizes Prolene?
24    A.  As I said before, it's not hydrogen peroxide in

Page 112

1  the laboratory, but it's hydrogen peroxide and other
2  oxidizing agents generated in vivo where there's also
3  oxidative enzymes present.
4        In fact, if we continue on page 3 to the next
5  paragraph in this same article, it says:  "Infrared
6  spectroscopic examination of Prolene explants, however,
7  do show the presence of oxidative end products.  While
8  the combination of a proportionally small but severely
9  oxidized surface and" --
10    Q.  Doctor, I'm not going to --
11        MR. MONSOUR:  Let him finish.
12    A.  -- yeah -- "a small but severely oxidized
13  surface and an unaffected core has not been duplicated
14  in laboratory oxidation studies, the possibility of a
15  highly specific in vivo oxidation process remains.  The
16  kinetic features of such a process may deviate from
17  conventional oxidation and would be difficult to predict
18  or duplicate in an artificial environment."
19    Q.  Doctor, my question to you is:  Is hydrogen
20  peroxide in a lab different than hydrogen peroxide in
21  the body?
22    A.  Yes, because inside the body it's not just
23  hydrogen peroxide.
24    Q.  I understand that, but --

Page 113

1    A.  It's other things.
2    Q.  Let's focus on hydrogen peroxide first.
3    A.  Yes, sir.
4    Q.  Hydrogen peroxide is hydrogen peroxide is
5  hydrogen peroxide, regardless of the environment;
6  correct?
7    A.  H2O2, yes.
8    Q.  Thank you.  Doctor, can you explain why the
9  30 percent hydrogen peroxide ate away the cap of the
10  vial?
11    A.  It was a material that was more susceptible to
12  degradation.
13    Q.  And, Doctor, the cap of the vial was Bakelite;
14  correct?  Top paragraph.
15    A.  Yes.
16    Q.  And, Doctor, do you know what Bakelite --
17  strike that.
18        Do you know what a Bakelite cap is made of?
19    A.  I think it's some sort of phenolic resin, is it
20  not?
21    Q.  And, Doctor, can you explain why the hydrogen
22  peroxide solution ate away the cap of the vial but did
23  not produce visible cracks in the Prolene?
24    A.  Because it's chemically different and it's a

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 114

1 material that's even more susceptible to oxidative
2 degradation by hydrogen peroxide than is the Prolene.
3 Q. And, Doctor, let's look at page 11.
4 MR. MONSOUR: Of the report or of the document?
5 MR. HUTCHINSON: I'm sorry. Of the report. My
6 bad.
7 Q. You write in the third paragraph: "Degradation
8 starts at the surface of the implant where it's in
9 contact with its surroundings."
10 Do you see that?
11 A. Where are we now?
12 Q. Page 11. Third paragraph. Or, actually, it's
13 the first paragraph under "effect of polypropylene
14 degradation."
15 A. I see it, uh-huh.
16 Q. And, Doctor, you write: "Degradation starts at
17 the surface of the implant."
18 Do you see that?
19 A. Yes.
20 Q. And if this occurs with Prolene, you would
21 expect to see a reduction in physical properties?
22 A. Yes, once the degradation proceeds to some
23 level, you would see a change in the physical properties
24 of the material.

Page 115

1 Q. Okay. And you'd never expect to see an
2 increase in physical properties with degradation?
3 A. Certain properties could be improved with
4 oxidation.
5 Q. What properties -- what physical properties
6 would be improved with oxidative degradation occurring
7 in the body?
8 A. It might improve solvent resistance. It might
9 improve something else. I just hate to say never.
10 Q. I understand that, but my question to you is,
11 Doctor: Would you ever expect to see an increase in
12 physical properties if a material is degraded
13 oxidatively in vivo?
14 A. For example, with Prolene, you see an
15 improvement in modulus. If you're looking for
16 stiffness, you can stiffen the material by an oxidative
17 degradation process.
18 Q. Doctor, let's look on page 13 of your report.
19 At the very bottom, it states -- well, at the bottom of
20 page 13, you discuss Santonox R and DLTDP. Do you see
21 that?
22 A. Yes, I do.
23 Q. And at the bottom of 13, you say: "Neither of
24 these antioxidants," i.e., Santonox R or DLTDP," is

Page 116

1 designed to protect Prolene from attack."
2 Do you see that?
3 A. I do.
4 Q. And, Doctor, if that's true, how do you account
5 for the fact that Prolene sutures have been used since
6 the 1960s?
7 A. Well, they can be used and they can have some
8 degradation, but as we said earlier, the suture, it just
9 has to hold a wound closed and the wound heals around it
10 and it's basically done its job. It can have cracking
11 in it, and it can stiffen, and that's okay.
12 That's different from a pelvic mesh where the
13 mesh has to be flexible to move with the soft tissue.
14 Q. The attack that you reference is by reactive
15 oxygen species; correct?
16 A. Yes.
17 Q. And reactive oxygen species, they possess a
18 free radical?
19 A. They generate radicals, yes.
20 Q. And -- well, but they possess a free radical,
21 don't they, sir?
22 A. Well, if you consider hydrogen peroxide to be a
23 reactive oxygen species, it's H2O2, it does not have a
24 radical in there, but if you heat it up or expose it to

Page 117

1 appropriate conditions, then it can form free radicals.
2 Q. Well, a reactive oxygen species has a nonbonded
3 electron that wants to bond to something, doesn't it?
4 A. Well, you could consider it to be a reactive
5 oxygen species, even that H2O2, in its molecular form.
6 It's still a reactive oxygen-containing species.
7 Q. Right, but a free radical is not bonded, is it,
8 sir?
9 A. A free radical has an unpaired electron, that's
10 right.
11 Q. Okay. And an unpaired electron means that it's
12 not bonded; correct?
13 A. That's right.
14 Q. Okay. And a free radical is a free radical is
15 a free radical, regardless of the origin?
16 A. Well, there are all sorts of different free
17 radicals with all different sorts of reactivity or
18 stability, depending on how you want to look at it.
19 They're not all the same.
20 Q. Is there any difference between a free radical
21 formed in the body and one that's formed in the
22 extrusion or heating process?
23 A. There may well be different things that are
24 formed.

30 (Pages 114 to 117)

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 118

1    Q.  Santonox R and DLTDP are free radical
2    scavengers, aren't they?
3    A.  Actually, Santonox preferentially reacts with
4    the oxygen-containing species, but the -- what's it
5    called? --
6    Q.  DLTDP?
7    A.  -- that guy is a free radical scavenger.
8    Q.  Okay.  And it's your testimony that Santonox R
9    is not a free radical scavenger?
10   A.  Well, it primarily works by reacting with the
11   oxygen itself.
12   Q.  But is it a free radical scavenger, sir?
13   A.  At some level, yes.
14   Q.  Thank you.  And, in fact, that's their job is
15   to remove free radicals that want to bond?
16   A.  That's certainly part of their job, yes.
17   Q.  And, at a minimum, you'll agree that Santonox R
18   and DLTDP are designed to retard the formation of free
19   radicals?
20   A.  Yes.
21   Q.  Okay.  And, Doctor, do you have a solution for
22   what types of antioxidants should be used to prevent
23   oxidation in the pelvic floor region?
24   A.  I simply don't think that there's adequate

Page 119

1    antioxidants out there to render polypropylene
2    permanently stable to oxidative effects inside the body.
3    Q.  And, Doctor, do you have an alternative to
4    DLTDP or Santonox R to prevent oxidizing degradation?
5    A.  I don't think there's an antioxidant package
6    out that that will do it, as I just said.  You can try
7    to add more, but the antioxidants themselves have
8    toxicity issues.
9    Q.  And, Doctor, you have no opinion on the
10   concentration levels of Santonox R or DLTDP, do you?
11   A.  Well, in general, if you're trying to prevent
12   the oxidative degradation, more is better, but the human
13   body, the fact that it's to be used inside the body and
14   the fact that the Santonox and the DLTDP come with MSDS
15   sheets that have cautions regarding their use in the
16   body, might cause one not to put as much as possible in
17   there.
18   Q.  Do you have an opinion, sir, on whether or not
19   Ethicon's Prolene material has too much or too little
20   Santonox R and DLTDP as far as concentration levels are
21   concerned?
22   A.  Too much or too little for what?
23   Q.  To prevent oxidation.
24   A.  There's not enough in there to prevent

Page 120

1    oxidative degradation inside the body for the lifetime
2    of an implant.
3    Q.  Okay.  And how much antioxidants should be put
4    in there to prevent lifetime degradation of an implant?
5    A.  There would have to be more.
6    Q.  Can you tell us that concentration level?
7    A.  I cannot tell you the exact concentration
8    level.  One would have to do experiments.
9    Q.  And you've not done any of those experiments;
10   correct?
11   A.  No, and I don't think Ethicon has either.
12   Q.  And if you'd look at page 14 of your report,
13   you cite Liebert?
14   A.  Yes.
15   Q.  I presume you'd consider Liebert authoritative?
16   A.  Yes.
17   Q.  And you'll agree that there was no loss of
18   molecular weight with the fiber that Liebert studied
19   that had antioxidants in it?
20   A.  Not under the conditions that they carried out
21   the study.
22   Q.  Thank you.  And, Doctor, you will also agree
23   that the fiber with antioxidants showed no changes in
24   molecular weight?

Page 121

1    A.  They did observe changes in molecular weight.
2    Q.  Of the fiber with antioxidants?
3    A.  But that was for a fiber without antioxidants
4    in there.
5    Q.  But for the fiber with antioxidants, there was
6    no change in molecular weight; correct?
7    A.  They did not detect any, that's correct.
8    Q.  Right.  And, in fact, sir, the fiber with
9    antioxidants showed no lowering of the glass transition
10   temperature, did it?
11   A.  I would have to go back and look at that.
12   Q.  Liebert didn't do any cleaning of the fibers,
13   did he?
14   A.  I don't recall that Liebert did cleaning.
15   Again, I'd have to look at the paper.
16   Q.  Sir, do you know if Liebert even used Prolene?
17   A.  As I recall, Liebert was using a Pro-fax
18   polypropylene, and I know Pro-fax pretty well, because
19   that was a Hercules polypropylene.
20   Q.  But, Doctor, you can't testify under oath that
21   Liebert used a Prolene product, can you?
22   A.  No.
23   Q.  Turning to page 15, Jongebloed, we've talked
24   about that; right?

31 (Pages 118 to 121)

b29398ab-07f4-4f6d-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 122

1    A.   Yes.
2    Q.   Doctor, that's -- it was a suture implanted in
3  the eye for six and a half years?
4    A.   Yes, the first study was.
5    Q.   And you'll agree that UV light causes
6  degradation?
7    A.   UV light can cause degradation, yes.
8    Q.   Doctor, do you believe that there were hydrogen
9  peroxides in the eye that caused degradation of the
10  sutures?
11    A.   There certainly could have been, yes.
12    Q.   And you'll agree that the eye is full of
13  proteins, wouldn't you?
14    A.   There's proteins in the eye.
15    Q.   In fact, that's what builds up on contacts?
16    A.   Yes.
17    Q.   That's what you've seen in your work?
18    A.   Yes.
19    Q.   The authors didn't do any SEM or FTIR analyses,
20  did they?
21    A.   They did SEM analysis.
22    Q.   But they didn't do any FTIR, did they?
23    A.   Again, we could go back and look at the paper.
24  I don't recall any.

Page 123

1    Q.   Okay.  Let's look at -- continuing on page 15,
2  at the bottom, you cite the Mary article?
3    A.   Yes.
4    Q.   And we've talked about Mary already; is that
5  right?
6    A.   Yes.
7    Q.   And, Doctor, you'll agree that the authors in
8  Mary did not recognize 1740 as a wavelength for DLTDP?
9    A.   I don't know that, but I have no evidence that
10  they explicitly pointed that out.
11    Q.   Well, did the study -- did the Mary study, sir,
12  recognize a 1740 wavelength for DLTDP?
13    A.   I did not see that called out in there.
14    Q.   And, in fact, sir, if -- how would you know
15  that -- first of all, Prolene has DLTDP in it, doesn't
16  it?
17    A.   Yes, it does.
18    Q.   And if the Mary article did not have a
19  wavelength at 1740 reciprocal centimeters for DLTDP, how
20  in the world do you know it's Prolene that they were
21  looking at?
22    A.   I'm not sure I follow you.
23    Q.   Okay.  Well, the FTIR analysis in Mary did not
24  show a peak at 1740 reciprocal centimeters?

Page 124

1    A.   Can we look in there?
2    Q.   Absolutely.
3    A.   They did carry out a cleaning study.
4    Q.   My question is, sir:  The FTIR analysis in Mary
5  did not show a peak at 1740 reciprocal centimeters for
6  the DLTDP wavelength; correct?
7    A.   They measured the absorbance at 1740.
8    Q.   Yes, sir, but did they recognize that
9  wavelength for DLTDP, is my question?
10    A.   They did not, but they had cleaned the sample,
11  and that would remove surface antioxidants.  Plus, the
12  sutures had been in the body for two years, which would
13  also deplete antioxidants present at the surface.
14    Q.   The authors in Mary didn't compare the
15  elongation of Prolene to PVDF, did they?
16    A.   Compare the elongation of the Prolene and the
17  PVDF?
18    Q.   That's correct.
19    A.   PVDF?  I don't see the comparison.
20    Q.   Doctor, on page 20 of your expert report,
21  there's an SEM photograph?
22    A.   Yes.
23    Q.   That's not a -- that's not a Prolene product,
24  is it?  Top of page 20.

Page 125

1    A.   Let me see.  That's from Lefranc, and that's
2  actually from Clave's study, so Clave obtained the
3  polypropylene vaginal meshes from a variety of
4  manufacturers, and so it could be, but it may not be.
5    Q.   You can't testify to a reasonable degree of
6  scientific certainty that the photograph on the top of
7  page 20 is a Prolene product, can you?
8    A.   No, I can't.
9    Q.   And, Doctor, on page 21 of your expert report,
10  you discuss plasticization?
11    A.   Yes.
12    Q.   Do you believe that the Prolene implants on
13  these 28 plaintiffs plasticized in vivo?
14    A.   I believe there is the possibility that some
15  plasticization could take place during the process
16  inside the body, along with oxidative degradation.
17    Q.   And, Doctor, is it your opinion to a reasonable
18  degree of scientific certainty that the implants in
19  these 28 plaintiffs plasticized?
20    A.   There certainly could have been some
21  plasticization of those implants.
22    Q.   Is that a yes?
23    A.   Yes, I believe it could happen.
24    Q.   What effect does plasticization have on the

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 126

1  physical properties of Prolene?
2      A.  That will actually soften the material.
3      Q.  And it softens it by a small molecule being
4  absorbed into it?
5      A.  That's correct.
6      Q.  You've never tested plasticization, have you,
7  sir?
8      A.  Well, I've actually encountered plasticization
9  in the course of my career, but I haven't tested it
10  with --
11      Q.  Prolene?
12      A.  -- directly with Prolene.
13      Q.  Thank you.  And, Doctor, page 25, in the full
14  paragraph in the middle, where you discuss the waxy
15  scrapings, do you see that?
16      A.  Yes.
17      Q.  Now, Bracco, which is one of your references,
18  that shows that cyclohexane extracts nonpolar fatty
19  acids, correct?
20      A.  Correct.
21      Q.  And nonpolar fatty material would be a
22  contaminant of Prolene, would it not?
23      A.  It could be a contaminant in there, yes.
24      Q.  And the presence of nonpolar fatty material

Page 127

1  would lower a melting point, would it not, sir?
2      A.  It would not lower the melting point.  It would
3  not get into the crystalline region of the material.  It
4  would get into the amorphous material and lower its
5  class transition temperature.
6      Q.  Doctor, on page 26 of your expert report, you
7  discuss a material safety data sheet.  Do you see that?
8      A.  Okay.  We're on page 26 now, at the top.  Okay.
9      Q.  Yes, sir.
10      A.  Yes.
11      Q.  And I may have asked you this earlier and I've
12  forgotten.  Have you ever developed or designed a
13  polypropylene product?
14      A.  I have synthesized polypropylene.
15      Q.  And what did the -- when you say "synthesized,"
16  what did you do?
17      A.  Made it from small molecule precursors by the
18  polymerization process.
19      Q.  For a medical product?
20      A.  Not for a medical product.
21      Q.  For what type of product?
22      A.  Research.  R & D.
23      Q.  And, Doctor, you state here at the top of page
24  26 that the MSDS should not be used with strong

Page 128

1  oxidizers.  Did I read that correctly?
2      A.  No, the MSDS sheet states that polypropylene is
3  incompatible with strong oxidizers.
4      Q.  Sorry.  You said "incompatible"?
5      A.  Yeah, polypropylene is incompatible with strong
6  oxidizers.
7      Q.  Do you have that material safety data sheet
8  with you, sir?
9      A.  Yes.
10      Q.  That's the Sunoco material safety data sheet;
11  is that right?
12      A.  Yes, it's Sunoco.  At least I did have it.
13          There we go.
14      Q.  And it states that polypropylene is
15  incompatible with strong oxidizers, on page 4?  That's
16  what you wrote in your report; right?
17      A.  Yeah, on page 4, it says:  "The following
18  materials are incompatible with this product."
19      Q.  And if you -- I'm sorry --
20      A.  It lists a variety of strong oxidizers.
21      Q.  Right.  And, Doctor, if you look at page 5, it
22  says:  "No epidemiological studies or case reports
23  suggest any serious chronic health hazards from
24  long-term exposure to polypropylene."

Page 129

1          Did I read that correctly?
2      A.  No.  Actually, it says:  "No epidemiological
3  studies or case reports suggest any serious chronic
4  health hazards from long-term exposure to polypropylene
5  decomposition products below the irritation level."
6      Q.  Why didn't you quote that in your report,
7  Doctor?
8      A.  Well, I very well could have quoted that.
9      Q.  Why did you not quote that, Doctor?
10      A.  My report is basically about oxidative
11  degradation of polypropylene.
12          (Mays Exhibit No. 5 was marked for
13  identification.)
14  BY MR. HUTCHINSON:
15      Q.  I'll hand you what we'll mark as Exhibit 5 to
16  your deposition.  This is a copy of peer-reviewed
17  literature that you're one of five authors on; is that
18  right?
19      A.  Yes.
20      Q.  And, Doctor, before we start this, let me ask
21  you this:  If you were going to submit an article to
22  your peers at the American Chemical Society about the
23  degradation of polyurethane, you'd want to study a
24  polyurethane product; right?

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 130

1    A.  Yes.
2    Q.  Okay.  None of these products that are
3  referenced in the Imel article are Prolene, are they,
4  sir?
5    A.  These particular polypropylenes are isotactic
6  polypropylene of the Marlex variety.  Prolene is an
7  isotactic polypropylene.
8    Q.  But I'm not talking about the chemistry,
9  Doctor.  I'm asking you whether or not your study used
10 Prolene products.  Yes or no?
11   A.  No, we used polypropylene from Marlex.  Marlex
12 polypropylene.
13   Q.  In fact, Doctor, your study did not even
14 study -- strike that.
15      Your study didn't even discuss Prolene
16 products, did it?
17   A.  We do mention Ethicon products at several
18 points in here.  If you look on page 1, the last
19 paragraph, we're talking about Costello, References 9
20 and 10.  They studied explanted polypropylene hernia
21 meshes from CR Bard and Ethicon.
22   Q.  I'm not talking about the literature.  I'm
23 talking about Prolene products.
24   A.  As I've already said, the polypropylene samples

Page 131

1  that we characterized in this work were explanted Marlex
2  samples.
3    Q.  Doctor, page 1, under the abstract, it says:
4  "SEM revealed the formation of transverse cracking on
5  the fibers which generally, but with some exceptions,
6  increased with implantation time."
7      Do you see that?
8    A.  Yes.
9    Q.  And, Doctor, it's well-known that proteins
10 adhere to biomaterials within seconds; is that right?
11   A.  Yes.
12   Q.  And, Doctor, what did you do to rule out an
13 increased layer of proteins building up over
14 implantation time?
15   A.  Yeah.  We did a couple of things.  We cleaned
16 the materials before we performed the FTIR by using a
17 bleach solution.  That's the ASTM protocol for cleaning
18 up the material.
19      Also, that's what was done by Dr. Gajanan, I
20 guess, the gentleman who provided the explanted Prolene
21 samples to Ethicon scientists that they then studied
22 with FTIR.
23      So we cleaned the materials up to remove the
24 tissue, the proteins that were on there.

Page 132

1      Also, when we examined the materials under the
2  SEM, we used EDS.  EDS is spectroscopy that detects
3  whether certain elements are there.  So by looking for
4  the presence of oxygen, we could see where oxidation had
5  taken place on the fiber.  If we saw oxygen and
6  nitrogen, the nitrogen would tell us that we could have
7  proteins there.
8    Q.  Doctor, on page 1, the first sentence under
9  "introduction" says:  "Polypropylene has been used for
10 hernia repair since 1958."
11      Do you see that?
12   A.  Yes, sir.
13   Q.  How do you reconcile the fact that Prolene mesh
14 has been used since 1958 in hernia repair with your
15 opinions regarding oxidation?
16   A.  Well, again, as I've said before, I don't
17 condemn polypropylene universally as a biomaterial, and
18 that includes Prolene polypropylene.  It has uses.
19      This oxidative degradation is occurring for
20 polypropylenes inside the human body, but you can have
21 some oxidative degradation in a suture or some oxidative
22 degradation in a hernia mesh and not have a problem.  I
23 think a pelvic mesh, because of how the mesh is supposed
24 to function inside the body, it's a different material.

Page 133

1    Q.  And, Doctor, on page 132 you cite Lefranc;
2  correct?
3    A.  I'm sorry.  On page --
4    Q.  132.
5    A.  Yes.
6      Yes, I see that now.
7    Q.  Lefranc didn't do any testing, did he?
8    A.  He did not.
9    Q.  He just recited the literature that was out
10 there?
11   A.  It's a review article, basically.
12   Q.  And, Doctor, page 134 states that the samples
13 were preserved in glass jars of formalin?
14   A.  Yes.
15   Q.  And this is where you're talking about the 11
16 explants of Boston Scientific patients?
17   A.  Yes.
18   Q.  And do you know how long these explants were
19 preserved in formalin?
20   A.  I can't recall as I sit here.  I think I did
21 see that information at some point.
22   Q.  And, Doctor, you'll agree that the explants had
23 protein on them before they were put in the glass jars
24 of formalin?

34 (Pages 130 to 133)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 134

1    A.  Yes.
2    Q.  And, Doctor, did you consider the chemical
3  reaction between formalin and protein in its formation
4  of a new polymer?
5    A.  No, we basically removed the tissue that was on
6  there with the bleach treatment.
7    Q.  Doctor, what effect does formalin have on
8  tissue?
9    A.  The detailed interaction between formalin and
10  tissue I'm not familiar with.
11    Q.  And, Doctor, you'll agree that formaldehyde, or
12  formalin -- strike that.
13        You'll agree that formalin and proteins
14  crosslink to form a new polymer?
15    A.  I don't know that.
16    Q.  And, Doctor, do you know whether or not
17  formalin and protein create a polymer that acts as a
18  hard casing around the fiber?
19    A.  We saw absolutely no evidence to support that.
20  In fact, we have strong evidence to shoot down that
21  theory.  We simply did not see that.
22    Q.  And, Doctor, you'll agree that formaldehyde and
23  proteins chemically bond to form a new polymer?
24    A.  I don't see any evidence of that happening in

Page 135

1  this case, so I don't agree.
2    Q.  I'm asking you as a materials scientist.  Is it
3  your opinion that formaldehyde and proteins do not
4  chemically bond to form a new polymer?
5    A.  I don't know of a situation where that occurs.
6  You'd have to show me the literature.
7    Q.  Doctor, can you draw out the chemical structure
8  of a polymer?
9    A.  Yes.
10    Q.  Can you draw out the chemical structure of a
11  formaldehyde and protein polymer?
12    A.  I'm not really sure how that interaction would
13  occur.  It would depend on what kind of protein you're
14  talking about and what kind of functional groups were
15  present on it.
16    Q.  Doctor, if you look on page 134 -- well, before
17  we move there, Doctor, you will agree that formaldehyde
18  fixes tissue; correct?
19    A.  Yes, I've heard that said, yes.
20    Q.  In fact, you'll agree that formaldehyde makes
21  tissue hard enough so that it could be sliced in the
22  microtoming process when creating histology slides;
23  you'll agree with that?
24    A.  Yes, I'll agree with that.

Page 136

1    Q.  And you would agree that formaldehyde is a
2  fixation agent, wouldn't you?
3    A.  Yes, I would agree with that.
4    Q.  All right.  And formaldehyde, if it fixes
5  something on a slide, that means that it makes that
6  biological material hard; correct?
7    A.  Yes.
8    Q.  Okay.  Doctor, if you look at page 134, you
9  discuss the cleaning of these explanted specimens.  Do
10  you see that?  Middle of page 134.
11    A.  Yes, I see that now.
12    Q.  And you followed ISO 12891?
13    A.  Yes.
14    Q.  And that's not a protocol for cleaning
15  polypropylene, is it?
16    A.  It's a protocol for cleaning polyethylene.  I
17  looked for an ASTM or ISO protocol for cleaning
18  polypropylene, and I couldn't find one.  And
19  polypropylene is chemically very similar to
20  polyethylene.
21        Also, I'll add, this is the same method that
22  Professor Gajanan, or however his name is pronounced,
23  used when he had Prolene explanted samples.  He cleaned
24  them with the same bleach treatment before he provided

Page 137

1  them to Dr. Buckley of Ethicon.
2    Q.  Doctor, are you aware of any ISO protocol
3  specifically for cleaning polypropylene or Prolene?
4    A.  I was not able to find one for polypropylene or
5  Prolene.
6    Q.  And, Doctor, are you aware of any protocol
7  whatsoever to remove a protein-formaldehyde polymer?
8    A.  I haven't explicitly looked for it, but when we
9  did our SEM with EDS, we found clean regions with only
10  carbon and oxygen, no protein present on the material.
11    Q.  Doctor, you only did one cycle of cleaning;
12  correct?
13    A.  Yes.
14    Q.  And you only did 24 hours?
15    A.  Yes, that's correct.
16    Q.  Why did you choose 24 hours?
17    A.  Because it was standard protocol.  It's what we
18  saw in the ISO standard.  It's what we saw that others
19  had used in the literature when they cleaned up
20  polypropylene explants.
21    Q.  And you only used sodium hypochlorite and not
22  an enzyme; correct?
23    A.  That's correct.
24    Q.  Why didn't you use an enzyme?

35 (Pages 134 to 137)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

| Page 138 | Page 140 |
|---|---|
| 1    A.   Because this seemed to be the best protocol to<br>2  use.<br>3    Q.   Doctor, did this protocol clean 100 percent of<br>4  the biological residue off the fibers?<br>5    A.   As I keep saying, our SEM with EDS can tell us<br>6  where clean regions are and where they're not.  There<br>7  were regions which were not completely clean, that's<br>8  correct.<br>9    Q.   And, Doctor, you followed extensively by<br>10 rinsing?<br>11   A.   Yes.<br>12   Q.   With water?<br>13   A.   Yes.<br>14   Q.   What was the temperature of the water?<br>15   A.   Room temperature.<br>16   Q.   Why wasn't that included in your report?<br>17   A.   Didn't seem relevant.  You can't include<br>18 everything in the report.<br>19   Q.   Did you do any sonication?<br>20   A.   We did not sonicate.<br>21   Q.   Did you use distilled water?<br>22   A.   Yes.<br>23   Q.   Was the water changed out?<br>24   A.   Yes. | 1  look at the polypropylene with no oxidation, just as it<br>2  comes out of the package.<br>3    Q.   Doctor, are you aware that you can go to the<br>4  library and get the spectra of polypropylene without<br>5  having to do a spectra?<br>6    A.   Of course we know that.<br>7    Q.   And, Doctor, were FTIRs done before the<br>8  cleaning process to confirm the presence of proteins?<br>9    A.   We did not.<br>10   Q.   And, Doctor, why not?<br>11   A.   Well, it was clear just visually that protein<br>12 was on there.<br>13   Q.   And, Doctor, were FTIRs done after the cleaning<br>14 process to confirm the complete removal of protein?<br>15   A.   Yes, FTIRs were run.<br>16   Q.   And, Doctor, were FTIRs done after the cleaning<br>17 process to confirm that you were analyzing completely<br>18 clean polypropylene fibers?<br>19   A.   FTIR was done on the clean fibers.  We used the<br>20 SEM with EDS to look at the materials, and we could see<br>21 that we had done a very good job of cleaning, although<br>22 we could in some instances find regions where there was<br>23 still some tissue there.<br>24   Q.   Doctor, is this the only cleaning process that |

| Page 139 | Page 141 |
|---|---|
| 1    Q.   Why wasn't that included in the report?<br>2    A.   Again, when you're publishing a peer-reviewed<br>3  paper, you can't include every single detail.<br>4    Q.   Was the water tested at all, sir?<br>5    A.   We used deionized water.<br>6    Q.   Okay.  But my question is:  Was the water<br>7  tested?<br>8    A.   We have a conductivity meter connected to it,<br>9  and it has to pass a certain standard for deionization.<br>10   Q.   Was the water tested, sir, to determine if any<br>11 proteins were removed?<br>12   A.   No, we did not.<br>13   Q.   Was the water tested, sir, to determine if any<br>14 polypropylene was removed?<br>15   A.   No.<br>16   Q.   Doctor, what FTIRs -- I'm sorry.  Strike that.<br>17     Were FTIRs done on pristine polypropylene?<br>18   A.   Yes.<br>19   Q.   And that was done to determine what the spectra<br>20 looks like?<br>21   A.   Yes.<br>22   Q.   Why did y'all do FTIRs on pristine<br>23 polypropylene?<br>24   A.   Because we wanted the baseline.  We wanted to | 1  you used to remove the protein-formaldehyde polymer?<br>2    A.   Yes, this is the process we used.<br>3    Q.   And, Doctor, sitting here today, is this the<br>4  first time you've ever heard of the formation of a<br>5  protein-formaldehyde polymer when those two agents<br>6  interact?<br>7    A.   I'm not familiar with the exact structure of<br>8  what's being formed there.  I know you use formaldehyde<br>9  and formalin to fix tissue.<br>10   Q.   My question, though, is:  Sitting here today,<br>11 is this the first time that you've ever heard of the<br>12 formation of a protein and formaldehyde polymer?<br>13   A.   I'm not familiar with what you're referring to<br>14 there.<br>15   Q.   All right.  But my question is:  Today,<br>16 March 2, 2016, is this the first time that you've ever<br>17 heard of the formation of a protein-formaldehyde<br>18 polymer?<br>19   A.   Yes.<br>20   Q.   And, Doctor, you can't testify to a reasonable<br>21 degree of scientific certainty that all the protein was<br>22 removed from these fibers, can you?<br>23   A.   Well, it's all summarized in our report here.<br>24 We did see some regions that contained biological tissue |

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 142

1  on the material even after the cleaning process, but we
2  observed a lot of areas where there was damaged surface
3  of the fiber and we only saw carbon and oxygen present.
4    Q.  And, Doctor, for the biological tissue that was
5  present, that was on the mesh explants; right?
6    A.  Yes.
7    Q.  And you put those mesh explants into a vacuum,
8  didn't you?
9    A.  Yes.
10   Q.  And, in fact, you put them into a vacuum oven,
11 didn't you?
12   A.  Yes.
13   Q.  And how long were they put into the vacuum
14 oven?
15   A.  They were in that vacuum oven overnight.
16   Q.  At what temperature were they in the vacuum
17 oven?
18   A.  At room temperature, as it indicates on page
19 134.
20   Q.  But the purpose of putting them in a vacuum
21 oven was to dry them; correct?
22   A.  Correct.
23   Q.  And that would have dried any type of
24 protein-formaldehyde polymer; correct?

Page 143

1    A.  Yes, it would have dried whatever was there,
2  yes.
3    Q.  In fact, it would have dried that
4  protein-formaldehyde fiber -- strike that.
5      It would have dried that formaldehyde-protein
6  polymer on the fiber itself, wouldn't it?
7    A.  If it were there, it would have dried it, yes.
8    Q.  Doctor, on page 134 of your report -- I'm
9  sorry -- of your article, in the right-hand side, it
10 says: "Previous published work has shown that
11 preservation of explanted samples in formalin did not
12 alter the structure and chemistry."
13     Do you see that?
14   A.  Yes, I see that.
15   Q.  You cite Bracco; correct?
16   A.  Yes.
17   Q.  In fact, Bracco did not analyze Prolene in his
18 article, did he?
19   A.  No.
20   Q.  Doctor, on page 135, you discuss EDS; is that
21 right?
22   A.  Yes.
23   Q.  And EDS, that can only determine elements
24 present, not compounds; right?

Page 144

1    A.  That's correct.
2    Q.  And, in fact, a formaldehyde-protein polymer
3  would be a compound, wouldn't it?
4    A.  It would.
5    Q.  And it wouldn't be detected by EDS, would it?
6    A.  Well, it would have nitrogen in there because
7  that's always in proteins, and it would have carbon in
8  there, and it would have oxygen in there.
9    Q.  But, in fact, sir, nitrogen is the hardest
10 thing to find on an EDS, isn't it?
11   A.  You can find nitrogen in there.
12   Q.  Is it hard to find on EDS, sir?
13   A.  No.  We found it readily.  In the SEM with EDS,
14 we see nitrogen readily.
15   Q.  EDS cannot tell you or determine the origin of
16 the element, can it?
17   A.  Only that the element's there.
18   Q.  Can't tell you where oxygen came from, can it?
19   A.  Only that it's there.
20   Q.  And if oxygen is present, sir, that means you
21 can be looking at biological material?
22   A.  No.  If you've got only carbon and oxygen
23 present, that's strongly suggestive of an oxidative
24 process.  Also, we see chain cleavage of these

Page 145

1  materials.  If you're seeing carbon and oxygen and
2  nitrogen, then you've got biological material.
3    Q.  Biological material such as proteins contains
4  nitrogen -- I'm sorry -- oxygen, doesn't it?
5    A.  Yes, but you would see nitrogen too.
6    Q.  Doctor, on page 138, you state, at the bottom:
7  "FTIR shows peaks."
8      Do you see that?
9    A.  Let's see.
10   Q.  Bottom of page 138.
11   A.  On the left side?
12   Q.  Yes, sir.
13   A.  Okay.  I see -- under the discussion?
14   Q.  Yep.
15   A.  Okay.
16   Q.  My question is:  How can you distinguish a
17 carbonyl band at 1740 as a result of oxidation and
18 carbonyl bands of ketones, aldehydes, and carboxylic
19 acids in the same range?
20   A.  All those peaks show up in that same general
21 regime.
22   Q.  And how can you distinguish between them, sir?
23   A.  It's relatively difficult to do.
24   Q.  Can you distinguish them, sir?

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 146

1    A.  I wouldn't say it's impossible, but it's
2  difficult.
3    Q.  Can you, as an expert in this litigation,
4  distinguish between those peaks, sir?
5    A.  Between the ketone, aldehyde, and carboxylic
6  acid?
7    Q.  And oxidation.  Can you distinguish between all
8  those peaks on a FTIR spectra?
9    A.  Oxidative degradation gives a mixture of
10  products, and all of these contain the carbonyl, and so
11  you have overlapping peaks, so it's hard to resolve them
12  and really tell exactly how much you have of one versus
13  how much you have of the other.
14    Q.  My question is:  Yes or no, can you distinguish
15  between all these peaks?
16    A.  Well, you're going to have to ask me a more
17  clear question that I can really understand.
18    Q.  You as an expert in this mesh litigation, can
19  you distinguish between the peaks of oxidation, ketones,
20  aldehydes, or carboxylic acids?
21    A.  Well, oxidation gives ketones, aldehydes, and
22  carboxylic acids, so, you know, these are three
23  different oxidative degradation products.
24    Q.  I'm sorry, but are you testifying that

Page 147

1  oxidation causes ketones?
2    A.  Yes.
3    Q.  Are you testifying that oxidation causes
4  aldehydes?
5    A.  Yes.
6    Q.  And can you tell, sir, as an expert in this
7  mesh litigation, can you distinguish between the peaks
8  of aldehydes, ketones, or carboxylic acids?
9    A.  In the case where they're all being formed and
10  there's a mixture of them, they're overlapping and
11  they're so close together, we didn't even try to
12  deconvolute the peaks and separate out how much of one
13  we have versus the other.
14    Q.  Doctor, on page 140:  "Antioxidants are
15  preferentially consumed by the oxidizing species."
16    Do you see that?
17    A.  Yes.
18    Q.  And you can't tell us the rate that is
19  consumed; correct?
20    A.  Not the exact, right, no.
21    Q.  And, Doctor, can you tell us the point in time,
22  a specific point in time when the oxidizing agents --
23  I'm sorry -- the antioxidants are consumed?
24    A.  Well, if you go over and look on the next page,

Page 148

1  that's page 141, at Figure 8, what we're seeing in those
2  materials is the fiber cracking, which is a strong sign
3  of oxidation in these materials, and we see that
4  cracking is occurring, you know, after a year in most of
5  the samples.  Not all of them, but most of the samples
6  show cracking after a year.  So I would say sometime
7  around a year is a good ballpark.
8    Q.  But you can't tell us a specific time; correct?
9    A.  I can tell you about a year.  And it's going to
10  vary from individual to individual, as we talked about
11  earlier.  You put the same mesh in two different women
12  and they might respond differently to it.  Bodies are
13  different.
14    Q.  Doctor, did you review the Ethicon's seven-year
15  dog study?
16    A.  Yes, I saw that document.
17    (Mays No. 6 was marked for identification.)
18  BY MR. HUTCHINSON:
19    Q.  Hand you what we'll mark as Exhibit 6.  And,
20  Doctor, this is a document you relied on; is that right?
21    A.  I have seen this document.
22    Q.  And you relied on it; correct?
23    A.  Yes.
24    Q.  Did you notice anything -- what did you notice

Page 149

1  about the change in mechanical or physical properties of
2  the sutures after they'd been implanted for seven years?
3    A.  Again, you'd have to take me back to that.
4  I've seen so many of these documents.
5    Q.  Well, Doctor, before we go from that, without
6  looking at -- without looking at the specific data
7  points, what do you recall about the physical properties
8  of the sutures analyzed in the seven-year dog study?
9    A.  I don't recall the specifics of the mechanical
10  properties.  I just remember that there were indications
11  of oxidation.
12    Q.  Did you look, sir, when you reviewed the
13  Burkley dog study, or the seven-year dog study, did you
14  look to see what the results of the physical property
15  testing were?
16    A.  I looked at it, but I can't remember at this
17  point as I sit here.
18    Q.  Doctor, let's look at page 221.  It's
19  ETH.MESH.221.  Are you there with me?
20    A.  I am there.
21    Q.  And we have two computations of molecular
22  weight, weighted average molecular weight, number
23  average molecular weight?
24    A.  I think we're looking at different pages.

38 (Pages 146 to 149)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 150

1      MR. MONSOUR:  I think we've got different
2  pages.  My page looks like -- 221 looks like this.
3      Oh, there's a second 221 in the back.  We were
4  at 336221.  You're at 888221.  Okay.  Gotcha.
5      MR. HUTCHINSON:  Always put the good stuff in
6  the back.
7      MR. MONSOUR:  Of course.
8  BY MR. HUTCHINSON:
9      Q.  Are you there with me, Doctor?
10     A.  Yes, I'm there.
11     Q.  Have you seen this particular page with the dog
12  study before today?
13     A.  I have seen this before, yes.
14     Q.  And did you account for this in reaching your
15  opinions?
16     A.  What do you mean by did I "account" for it?
17     Q.  Did you consider this particular page 221 when
18  reaching your opinions?
19     A.  Yes.
20     Q.  And you will agree that the molecular weight
21  differences are very, very small; correct?
22     A.  Could you show me which ones you're referring
23  to?
24     Q.  The ones discussing current Prolene 4/0 suture

Page 151

1  compared to Dog Site 3 and Dog Site 2.  Do you see that?
2  Down at the bottom.
3      A.  Yes.
4      Q.  And what do you notice about the change of
5  molecular weight, Doctor?
6      A.  I notice that those are not changing very much.
7      Q.  And that was done by GPC; correct?
8      A.  Yeah, I would assume so.  That's how these
9  values are normally derived.
10     Q.  And, in fact, at the bottom, under conclusions,
11  it says:  "Comparison of 7-year explants to current
12  Prolene indicate no molecular weight degradation."
13     Did I read that correctly?
14     A.  That's what it says.
15     Q.  Any reason to dispute that, Doctor?
16     A.  Well, I would need to have more details about
17  what they did, because they're also carrying out
18  intrinsic viscosity measurements here, these IV
19  measurements, and it's not clear to me whether they're
20  deriving these MW values from that IV measurement.
21  That's commonly done.
22     And maybe they're getting these number average
23  molecular weights from GPC.  I simply don't know.  They
24  don't clearly tell me where these values are coming

Page 152

1  from.
2      Q.  Well, have you made any efforts to find out
3  more details?
4      A.  This is all I've had to date.
5      Q.  Have you made any efforts to find out more
6  details, sir?
7      A.  I haven't.  This is what I had at the time I
8  prepared my report.  If they have more data, I would
9  love to see it.
10     Q.  But sitting here today, Doctor, with all the
11  data that you have so far, do you have any reason to
12  dispute that Dr. Burkley found no molecular weight
13  degradation?
14     A.  Based on what I see in this document, I cannot
15  tell how these values were derived, and what I will say
16  is one has to do the GPC analysis carefully.  It's
17  difficult to perform high temperature GPC.  We happen to
18  be experts in it.  We've had years and years of
19  experience in it.
20     And it's the Z average molecular weight which
21  is most sensitive to degradation, and then the weight
22  average molecular weight is sensitive to degradation as
23  well.  The number average molecular weight is not
24  sensitive to degradation.

Page 153

1      So I don't know enough about where these values
2  came from and the protocol that they use to speculate,
3  and I don't want to speculate.
4      Q.  I understand, Doctor, but in all fairness,
5  these values do not support your opinions, do they?
6      A.  I don't know enough about these values to be
7  able to say whether they're valid or not.
8      Q.  But my question is, Doctor, the values that are
9  on this sheet of paper, do these values support your
10  opinions; yes or no?
11     A.  These values here show similar number average
12  molecular weights and similar weight average molecular
13  weights.
14     Q.  And do these values, Doctor, support your
15  opinions; yes or no?
16     A.  It's impossible for me to say.  It really is.
17  I'd have to know more.  GPC calibration can change over
18  time.  We ran our controls at the same time we were
19  running the explanted studies.  I don't know that they
20  did this here.  I simply don't have enough data.
21     Q.  Doctor, do you have any explanation whatsoever
22  why Dr. Burkley found no loss of molecular weight?
23     A.  I don't know whether his conclusion is valid or
24  not.  I don't see enough data here for me to make a

Jimmy W. Mays, Ph.D.

Page 154

1  decision.
2    Q.  Do you have any reason to believe that these
3  sutures were plasticized?
4    A.  It is possible that polypropylene does undergo
5  some plasticization inside the body.
6    Q.  And, Doctor, plasticization would improve
7  toughness, wouldn't it?
8    A.  Plasticization would soften the material.
9    Q.  But it would improve toughness?  I'm asking
10 about toughness.  I'm not asking about softening the
11 material.  Toughness.
12   A.  Plasticization at a reasonable level would
13 probably improve the toughness of the material.
14   Q.  Okay.  And, Doctor, if toughness of the
15 material improves, then we can rule out degradation,
16 can't we?
17   A.  That's not strictly true.
18   Q.  But, Doctor, as a general rule, you will agree
19 that as toughness improves, degradation can be ruled
20 out; correct?
21   A.  I would not make a general statement about
22 that.  I'd have to consider the specific material.
23   Q.  Doctor, would that be consistent with the
24 principles of polymerization that you used to teach your

Page 155

1  students with at UT?
2    A.  Plasticization has nothing to do with the
3  principles of polymerization.
4    Q.  Would that be consistent with anything you've
5  ever discussed with your students at UT about whether or
6  not plasticization can improve toughness?
7    A.  Plasticization --
8    Q.  I'm sorry.  Strike that.
9        Doctor, turn to the last page of the Burkley
10 dog study with me, please.
11   A.  All right.
12   Q.  Doctor, you will see breaking strength at the
13 top.  Do you see that?
14   A.  Yes.
15   Q.  And, by the way, did you ever consider this
16 data summary when reaching your opinions, Doctor?
17   A.  I saw this, so, yeah, I considered it.
18   Q.  Okay.  And do the data shown here on page 183,
19 do the data support your opinions that the sutures
20 degraded via oxidation?
21   A.  I see the breaking strength of Prolene staying
22 roughly the same.  It would be nice to see some error
23 bars on this.  The elongation percent of Prolene
24 actually decreased a bit in Year 2 but seemingly

Page 156

1  increased in the third year.  But I have no idea how
2  many samples were here.  Is this a case of a single
3  sample?
4    Q.  Doctor, my question is:  Does the data shown on
5  page ETH.MESH.183 support your opinions that Prolene
6  degrades; yes or no?
7    A.  It's impossible for me to say.
8    Q.  You can't answer that question one way or the
9  other?
10   A.  I can't.
11   Q.  And, Doctor, why can you not answer that
12 question one way or the other?
13   A.  I'd have to know more details about the study.
14   Q.  And have you made any efforts to find out more
15 details about the study?
16   A.  I have not.
17   Q.  And, Doctor, you will agree that -- let's look
18 at breaking strength.  Prolene changed from baseline
19 percentage, at Year 7, it decreased 5 percent; correct?
20   A.  The breaking strength of Prolene, yes.
21   Q.  Yes.  And, in fact, the elongation percentage
22 of Prolene increased, from baseline, at Year 7,
23 111 percent; correct?
24   A.  That's what this says, but how many samples?

Page 157

1    Q.  Doctor, let's look at the Young's modulus.
2  That's just another name for stiffness, isn't it?
3    A.  Modulus is related to stiffness of the
4  material.
5    Q.  And stiffness of Prolene at Year 7 decreased
6  70 percent; correct?
7    A.  That's what this says.
8    Q.  And, Doctor, do you have any reason to believe
9  that these values are wrong?
10   A.  I'm very suspicious of these values, yes.
11   Q.  Do you have any reason to believe the values
12 are wrong, though, Doctor?  I'm not asking if you're
13 suspicious.
14   A.  I need more data to really draw a firm
15 conclusion.
16   Q.  You can't tell us if these values are wrong or
17 right, can you?
18   A.  I can tell you I don't believe them.
19   Q.  And why don't you believe them?
20   A.  Because they're not realistic.
21   Q.  Which one is not realistic?
22   A.  And they're not supported.
23   Q.  Which one is not realistic?  Which figure?  Of
24 the -5 percent, 111, or 70 --

40 (Pages 154 to 157)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 158

1    A.  I simply --
2    Q.  -- hold on just a minute, the court reporter is
3  going to get made at us -- which figure do you not
4  believe is realistic, Doctor?
5    A.  I simply cannot place faith in anything in this
6  table.  I'd have to know more about it.
7    Q.  Okay.  And, Doctor, if you can't place faith in
8  any data in this particular paper, or page, 183, can you
9  place faith in any particular page in this dog study?
10   A.  Can you show me which one?
11   Q.  No, that's my question.  My question stands.
12   A.  You know, mechanical testing of material like
13  polypropylene has to be done carefully.  You need to
14  test multiple samples.  You need to follow a protocol.
15  I don't really see enough of the protocol here to be
16  able to evaluate it.
17      These data have not stood the scrutiny of peer
18  review, to my knowledge.  If they're peer-reviewed and
19  somebody looked at them, I would accept them, but you're
20  asking me to accept a table of data where I don't even
21  know how many times the test was run, and so I can't
22  comment, I can't accept it.
23   Q.  Well, Doctor, if you can't rely on the page
24  that gives the test data, you can't rely on the

Page 159

1  conclusions of the dog study, can you?
2    A.  There may be some things in here that I think
3  are adequately documented.
4    Q.  My question is a yes or no, and I need a yes or
5  no.  If you can't rely on the page that gives the test
6  data, you can't rely on the conclusions of the dog
7  study, can you; yes or no?
8    A.  Yes.
9    Q.  Yes, I'm right?
10   A.  Yes, I agree with you.
11      (Mays Exhibit No. 7 was marked for
12  identification.)
13  BY MR. HUTCHINSON:
14   Q.  Doctor, handing you what we'll mark as Exhibit
15  No. 7 to your deposition.  Here we have a toughness
16  curve; right?
17   A.  Yes.
18   Q.  And we have breaking strength as the Y axis and
19  elongation as the X axis; correct?
20   A.  Yeah, this is kind of a peculiar way to present
21  the data.
22   Q.  And, Doctor, this shows that toughness -- well,
23  strike that.
24      You can see the red where the breaking strength

Page 160

1  and the elongation is plotted out at Time 0; is that
2  right?
3    A.  It says it's plotting break strength --
4    Q.  Break strength and elongation at Time 0.
5    A.  -- versus elongation, but break strength has to
6  do with the material actually breaking.  So how do you
7  measure break strength when the material continues to
8  elongate?  These sort of data are normally presented
9  stress versus strain.  That's where you get toughness.
10   Q.  I understand.  And, in fact, stress and strain
11  is another word for breaking strength and elongation,
12  isn't it?
13   A.  No.  Breaking means failure of the sample.
14  Stress is force per unit area.  Now, percent of
15  elongation, elongation and strain, I'll agree they're
16  very related.
17   Q.  Elongation and strain; correct?
18   A.  Yeah, they're definitely related.
19   Q.  And breaking strength and stress are related,
20  aren't they?
21   A.  Well, a breaking strength is the ultimate
22  tensile strength of a material.
23   Q.  Until it breaks; correct?
24   A.  Yes.

Page 161

1    Q.  And then if you --
2    A.  But how can you plot it down here where it
3  hasn't broken?
4    Q.  Just stay with me and my questions, Doctor.
5  Okay?
6    A.  Okay.
7    Q.  If you look at this, this plots out at Year 0
8  the elongation and breaking strength data points from
9  the seven-year dog study; correct?  At Year 0, under
10  red?
11   A.  It shows elongation 37 percent and that it
12  broke at 1.68 pounds.
13   Q.  And that's the exact data that was found in the
14  Burkley dog study; correct?
15   A.  This looks familiar, yes.
16   Q.  And, Doctor, when we look at Year 7 on
17  Exhibit 7, that shows the elongation at 1.6 pounds and
18  the breaking strength -- I'm sorry, strike that.
19      At Year 7, do you see Year 7 --
20   A.  Yes.
21   Q.  -- it shows breaking strength at 1.6 pounds; is
22  that right?
23   A.  That's what it says, yes.
24   Q.  And it shows 78 percent elongation; correct?

41 (Pages 158 to 161)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 162

1    A.  That's what it shows.
2    Q.  And if we look at the area under the curve for
3  Year 7, it's much greater than at Time 0; correct?
4    A.  The area under the curve is greater, yes.
5    Q.  And, in fact, it almost doubled, didn't it?
6    A.  That would be about right, yes.
7    Q.  And, Doctor, what does this tell you about
8  toughness when you look at the physical and mechanical
9  properties of the sutures?
10   A.  Again, I would have to know more about this
11  test.  Was it performed 10 times and this is an average?
12  Was it a single run?  I would have to know more.  I
13  can't just take this plot out of context and draw
14  conclusions on it.
15   Q.  Doctor, a nick in a fishing line wouldn't
16  increase toughness, would it?
17   A.  No.
18   Q.  Doctor, can you explain -- first of all, do you
19  agree that the data from the seven-year dog study shows
20  an increase in toughness of the sutures?
21   A.  I don't know enough to establish the validity
22  of this data and exactly what was done.
23   Q.  You can't answer that question yes or no?
24   A.  No.

Page 163

1    Q.  You can't answer that question one way or the
2  other, can you?
3    A.  No.
4    Q.  Doctor, I see in your -- I see in your CV that
5  you have an interest in charged polymers; is that
6  correct?
7    A.  Yes.
8    Q.  You're an expert on charged polymers?
9    A.  Well, we've done a fair bit of work with
10  charged polymers.
11   Q.  You know enough about them to talk about them
12  intelligently, don't you?
13   A.  I think so.
14   Q.  And you'll agree that polypropylene is
15  nonionic?
16   A.  That's correct.
17   Q.  So is Prolene?  Prolene is nonionic?
18   A.  Correct.
19   Q.  It doesn't have an ionic charge one way or the
20  other; is that right?
21   A.  That's right.
22   Q.  And polypropylene is hydrophobic?
23   A.  Yes.
24   Q.  And polypropylene is pH neutral?

Page 164

1    A.  Yes.
2    Q.  And so is Prolene?
3    A.  Yes.
4    Q.  And if Prolene does not have an ionic charge,
5  then that means a material will not -- or a compound
6  will not bind to it; correct?
7    A.  That's not necessarily so.
8    Q.  Why not?
9    A.  A lot of materials bind to other materials
10  where there's no charge present.
11   Q.  Well, Prolene is neither acidic nor basic; is
12  that right?
13   A.  That's correct.
14   Q.  And a dye staining to Prolene requires an
15  acidic group or a basic group to bond with it, doesn't
16  it?
17   A.  To bond with it.
18   Q.  To bond with it; correct?
19   A.  It might bond through some other mechanism.  It
20  might bond through a carbonyl that's been introduced by
21  oxidation.  There's some level of residual double bonds
22  in polypropylene as an impurity, and it might add across
23  that double bond.
24   Q.  Doctor, based on the chemistry, will oxidized

Page 165

1  Prolene show any color if subjected to a staining
2  process?
3    A.  Oxidized Prolene could very well show color.
4    Q.  How so?
5    A.  By interacting with the dye.
6    Q.  And with a chemical interaction?
7    A.  It could be physical.  It could be chemical.
8    Q.  All right.  Describe the chemical reaction for
9  me, please, sir.
10   A.  There might be some functional group on the dye
11  that might react with the carboxylic acid group.
12   Q.  Let's talk about hematoxylin.  Are you familiar
13  with hematoxylin?
14   A.  I'm really not familiar with hematoxylin.
15   Q.  Any reason to dispute it's a positive compound?
16   A.  I simply don't know one way or the other.
17   Q.  And I want you to assume for purposes of this
18  question that hematoxylin is a positive compound.  Okay?
19   A.  Positively charged?
20   Q.  Correct.
21   A.  Okay.
22   Q.  If it's positively charged, will it bind to
23  Prolene?
24   A.  It might.

42 (Pages 162 to 165)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 166

1    Q.  How so?
2    A.  I simply would need to know more about its
3  structure.
4    Q.  But my question is:  How so, sir?
5    A.  You know, it might just do it through
6  hydrophobic group interactions.  Hydrophobic things bind
7  to hydrophobic things all the time.
8    Q.  Can you testify to a reasonable degree of
9  scientific certainty whether or not hematoxylin will
10  bind to Prolene?
11    A.  I simply don't know.
12    Q.  And, Doctor, can you testify to a reasonable
13  degree of scientific certainty whether eosin will bind
14  to Prolene?
15    A.  I simply don't know.
16    Q.  You will agree that there must be a chemical
17  reaction between the dye and Prolene for there to be
18  stain in color; correct?
19    A.  I don't think it necessarily has to be a
20  chemical reaction.  It could just be a physical
21  phenomenon.  Hydrogen bonding or something like that
22  could do it.
23    Q.  Can you testify to that to a reasonable degree
24  of scientific certainty?

Page 167

1    A.  Yes.
2    Q.  Have you ever attempted to stain a Prolene?
3    A.  I have not.
4    Q.  Have you ever seen Prolene hold any type of
5  color?
6    A.  I have not.
7    Q.  Doctor, before we wrap up, I want to ask you
8  one question.  Does the pelvic region have more reactive
9  oxygen species than the abdomen?
10    A.  I don't know.
11    Q.  And have you ever seen a study comparing the
12  two areas of the body?
13    A.  In terms of?
14    Q.  The concentration level of reactive oxygen
15  species.
16    A.  No.
17    Q.  Your alma mater is University of Southern
18  Mississippi?
19    A.  Yes, I did my undergraduate studies there.
20    Q.  Proud of your education?
21    A.  Yes.
22    Q.  Did you study at the Shelby Freland Thames
23  School of Polymer Science?
24    A.  It wasn't there when I was there.

Page 168

1    Q.  You'll agree that that's one of the best
2  polymer science schools in the country, wouldn't you,
3  sir?
4    A.  It's a good one.  The one I did my PhD at is,
5  arguably, number one.
6    Q.  Were you a student of Dr. Thames?
7    A.  I was not.
8    Q.  Do you know him?
9    A.  I did.
10    Q.  Do you have an opinion of him?
11    A.  Yes.
12    Q.  And what's your opinion of his polymer science
13  expertise?
14    A.  I think he's a good paint chemist.
15    Q.  Anything else?
16    A.  That's all.
17    Q.  Do you intend to offer any opinions regarding
18  this litigation that we've not already discussed or
19  contained in your expert report?
20    A.  I may.  My expert report contained the issues
21  at the time I wrote it, but I may become aware of
22  additional information.  I may get samples to test.  Who
23  knows?
24    Q.  Doctor, going back to Exhibit 7, you can't

Page 169

1  explain why toughness increased, can you?
2    A.  I'm not convinced that toughness did increase.
3    Q.  Can you explain, Doctor, why toughness
4  increased in Exhibit 7; yes or no?
5    A.  No, I can't.
6    Q.  Thank you.  Have you understood all my
7  questions?
8    A.  Most of them.  I tried to ask for clarification
9  when I didn't.
10    Q.  And did I give you clarification at that time?
11    A.  In most instances, yes.
12    Q.  Is there one particular question that sticks
13  out in your mind that I asked that you simply don't
14  understand?
15    A.  No.  You kept asking about improvement of
16  properties as a very generic, and, you know, sometimes
17  when one property improves, another property diminishes.
18  So I was a little confused by that, but I think we got
19  through it.
20    Q.  That's exactly what we saw in the Burkley dog
21  study when we look at page 183.  We saw one property
22  decrease, such as breaking strength, and one property
23  increase, such as elongation; correct?
24    A.  That's what that page says, but I don't -- I'm

43 (Pages 166 to 169)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

| Page 170 |
| --- |

1 unable to really evaluate that data with what I have at
2 hand.
3      MR. HUTCHINSON:  I don't have any further
4 questions.  Thank you for your time.  Questions?
5      MR. MONSOUR:  We're done.
6      MR. HUTCHINSON:  Thank you.
7      (Whereupon, the deposition concluded at
8 12:17 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| Page 171 |
| --- |

1           C E R T I F I C A T E
2
3      I, JOAN L. PITT, Registered Merit Reporter,
4 Certified Realtime Reporter, and Florida Professional
5 Reporter, do hereby certify that, pursuant to notice,
6 the deposition of JIMMY W. MAYS, PhD, was duly taken on
7 March 2, 2016, at 8:36, before me.
8      The said JIMMY W. MAYS, PhD, was duly sworn by
9 me according to law to tell the truth, the whole truth,
10 and nothing but the truth, and thereupon did testify as
11 set forth in the above transcript of testimony.  The
12 testimony was taken down stenographically by me.  I do
13 further certify that the above deposition is full,
14 complete, and a true record of all the testimony given
15 by the said witness.
16
17      _____
18      JOAN L. PITT, RMR, CRR, FPR
19
20      (The foregoing certification of this transcript
21 does not apply to any reproduction of the same by any
22 means, unless under the direct control and/or
23 supervision of the certifying reporter.)
24

| Page 172 |
| --- |

1           INSTRUCTIONS TO WITNESS
2
3
4      Please read your deposition over carefully and
5 make any necessary corrections.  You should state the
6 reason in the appropriate space on the errata sheet for
7 any corrections that are made.
8
9      After doing so, please sign the errata sheet
10 and date it.  It will be attached to your deposition.
11
12      It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty (30)
14 days of receipt of the deposition transcript by you.  If
15 you fail to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

| Page 173 |
| --- |

1           - - - - - -
2           E R R A T A
3           - - - - - -
4 PAGE  LINE  CHANGE
5 ____ ____ _____
6   REASON: _____
7 ____ ____ _____
8   REASON: _____
9 ____ ____ _____
10   REASON: _____
11 ____ ____ _____
12   REASON: _____
13 ____ ____ _____
14   REASON: _____
15 ____ ____ _____
16   REASON: _____
17 ____ ____ _____
18   REASON: _____
19 ____ ____ _____
20   REASON: _____
21 ____ ____ _____
22   REASON: _____
23 ____ ____ _____
24   REASON: _____

44 (Pages 170 to 173)

b29398ab-07f4-4f64-b8d4-76cd12324c5c

Jimmy W. Mays, Ph.D.

Page 174

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3      I, _____, do hereby
 4   acknowledge that I have read the foregoing pages,
 5   1 - 175, and that the same is a correct transcription of
 6   the answers given by me to the questions therein
 7   propounded, except for the corrections or changes in
 8   form or substance, if any, noted in the attached Errata
 9   Sheet.
10
11
12   _____
13   JIMMY W. MAYS, PhD              DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   ____ day of _____, 20___.
20   My Commission expires: _____
21
22   _____
     Notary Public
23
24
```

Page 175

```
 1            LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Golkow Technologies, Inc. - 1.877.370.DEPS

b29398ab-07f4-4f64-b8d4-76cd12324c5c

# EXHIBIT H

Duane Priddy, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: ETHICON, INC., PELVIC )
REPAIR SYSTEM PRODUCTS       ) Master File No.
LIABILITY LITIGATION         ) 2:12-MD-02327
THIS DOCUMENT RELATES TO THE ) MDL 2327
FOLLOWING CASES IN WAVE 1 OF ) JOSEPH R. GOODWIN
OF MDL 200:                  ) U.S. DISTRICT JUDGE
-----------------------------)
HARRIET BEACH                )
v.                           ) CIVIL ACTION FILE
                             ) No. 2:12-CV-00476
ETHICON, INC., et al.        )
-----------------------------)
SHARON BOGGS, et al.         )
                             ) CIVIL ACTION FILE
v.                           ) No. 2:12-CV-00368
                             )
ETHICON, INC., et al.        )
-----------------------------)
JUDITH BRUHN, et al.         )
                             ) CIVIL ACTION FILE
v.                           ) No. 2:12-CV-00888
                             )
ETHICON, INC., et al.        )
-----------------------------)
JANICE COLONNA               )
                             ) CIVIL ACTION FILE
v.                           ) No. 2:12-CV-01274
                             )
ETHICON, INC., et al.        )
-----------------------------)
MARY F. CONE                 )
                             ) CIVIL ACTION FILE
v.                           ) No. 2:12-CV-00261
                             )
ETHICON, INC., et al.        )
-----------------------------)
SANDRA CYRUS                 )CIVIL ACTION FILE
v.                           ) No. 2:12-CV-01283
ETHICON, INC., et al.        )
-----------------------------)
      Videotaped Deposition of DUANE PRIDDY, PH.D.
                  March 8, 2016

Duane Priddy, Ph.D.

## Page 2

```
 1    AMANDA DELEON, et al.     )
 2    v.            ) CIVIL ACTION FILE
                    ) No. 2:12-CV-00358
 3    ETHICON, INC., et al.     )
      ---------------------------)
 4    ROSE GOMEZ, et al.        )
                    ) CIVIL ACTION FILE
 5    v.            ) No. 2:12-CV-00344
                    )
 6    ETHICON, INC., et al.     )
      ---------------------------)
 7    DONNA HANKINS, et al.     )
                    ) CIVIL ACTION FILE
 8    v.            ) No. 2:12-CV-01011
                    )
 9    ETHICON, INC., et al.     )
      ---------------------------)
10    BETH HARTER, et al.       )
                    ) CIVIL ACTION FILE
11    v.            ) No. 2:12-CV-00737
                    )
12    ETHICON, INC., et al.     )
      ---------------------------)
13    MARY HENDRIX, et al.      )
                    ) CIVIL ACTION FILE
14    v.            ) No. 2:12-CV-00595
                    )
15    ETHICON, INC., et al.     )
      ---------------------------)
16    WILMA JOHNSON            )
                    ) CIVIL ACTION FILE
17    v.            ) No. 2:11-CV-00809
                    )
18    ETHICON, INC., et al.     )
      ---------------------------)
19    JANET JONES             )
                    ) CIVIL ACTION FILE
20    v.            ) No. 2:12-CV-00762
                    )
21    ETHICON, INC., et al.     )
      ---------------------------)
22
23
24        Videotaped Deposition of DUANE PRIDDY, PH.D.
```

## Page 3

```
 1    PAULA KRITZ, et al.       )
                    ) CIVIL ACTION FILE
 2    v.            ) No. 2:12-CV-00938
                    )
 3    ETHICON, INC., et al.     )
      ---------------------------)
 4    EDITH NOLAN             )
                    ) CIVIL ACTION FILE
 5    v.            ) No. 2:12-CV-00864
                    )
 6    ETHICON, INC., et al.     )
      ---------------------------)
 7    NOEMI PADILLA           )
                    ) CIVIL ACTION FILE
 8    v.            ) No. 2:12-CV-00567
                    )
 9    ETHICON, INC., et al.     )
      ---------------------------)
10    MIRANDA PATTERSON       )
                    ) CIVIL ACTION FILE
11    v.            ) No. 2:12-CV-00481
                    )
12    ETHICON, INC., et al.     )
      ---------------------------)
13    REBECCA PRATT           )
                    ) CIVIL ACTION FILE
14    v.            ) No. 2:12-CV-01273
                    )
15    ETHICON, INC., et al.     )
      ---------------------------)
16    STACY SHULTIS           )
                    ) CIVIL ACTION FILE
17    v.            ) No. 2:12-CV-00654
                    )
18    ETHICON, INC., et al.     )
      ---------------------------)
19    JANET SMITH            )
                    ) CIVIL ACTION FILE
20    v.            ) No. 2:12-CV-00861
                    )
21    ETHICON, INC., et al.     )
      ---------------------------)
22
23
24        Videotaped Deposition of DUANE PRIDDY, PH.D.
```

## Page 4

```
 1    RACHEL TAYLOR, et al.     )
                    ) CIVIL ACTION FILE
 2    v.            ) No. 2:12-CV-00765
                    )
 3    ETHICON, INC., et al.     )
      ---------------------------)
 4    PATRICIA TYLER          )
                    ) CIVIL ACTION FILE
 5    v.            ) No. 2:12-CV-00469
                    )
 6    ETHICON, INC., et al.     )
      ---------------------------)
 7    VIRGINIA WHITE, et al.    )
                    ) CIVIL ACTION FILE
 8    v.            ) No. 2:12-CV-00958
                    )
 9    ETHICON, INC., et al.     )
      ---------------------------)
10
11              - - -
12
13           Videotaped Deposition of DUANE
14    PRIDDY, PH.D., taken on behalf of the
15    Defendants, pursuant to the stipulations
16    agreed to herein, before Maxyne Bursky,
17    Registered Professional Reporter, at 111
18    Perimeter Center West, Atlanta, Georgia,
19    on the 8th day of March, 2016, commencing
20    at the hour of 9:59 a.m.
21
22
23
24
```

## Page 5

```
 1              INDEX TO EXAMINATION
 2    Examination                    Page
 3      By Mr. Hutchinson           8,168
 4      By Mr. Jackson               158
 5
 6              INDEX TO EXHIBITS
 7    Exhibit      Description         Page
 8    1   Notice to take videotaped
          deposition of Dr. Priddy       8
 9
10    2   Flash drive (retained by counsel)   9
11    3   Expert report of Dr. Priddy       12
12    4   ASTM D3895-14, 8 pages          26
13    5   ASTM F1980-02, 6 pages          57
14    6   Polymer Stabilizers, A Survey with
          Reference to Possible Applications
15        in the Conservation Field by Dr.
          de la Rie                     61
16    7   Report of Dr. Moy from Ethicon,
          ETH.MESH.15958452-469          72
17
18    8   Antioxidant Plaox-DLTDP, 1 page    95
19    9   Seven Year Dog Study by Thomas
          Barbolt, 4 pages plus
20        ETH.MESH.11336183-259, 11336071-088,
          11336165-177, 09888187-223 and
21        11336181-183                 135
22    10   Diagram of elongation and break
          strength, 1 page              140
23
24              - - -
```

Duane Priddy, Ph.D.

---

Page 6

```
 1   APPEARANCES OF COUNSEL:
 2   On behalf of the Plaintiffs:
 3        EDWARD A. WALLACE, Esq.
          TIMOTHY E. JACKSON, Esq.
 4        Wexler Wallace LLP
          55 West Monroe Street
 5        Suite 3300
          Chicago, Illinois 60603
 6        312.346.2222
          312.346.0022 (facsimile)
 7        eaw@wexlerwallace.com
          tej@wexlerwallace.com
 8
          FIDELMA L. FITZPATRICK, Esq.
 9        Motley Rice LLC
          321 South Main Street
10        Providence, Rhode Island 02903
          401.457.7728
11        401.457.7708 (facsimile)
          ffitzpatrick@motleyrice.com
12
13   On behalf of the Defendants:
14        CHAD R. HUTCHINSON, Esq.
          Butler Snow, LLP
15        Suite 1400
          1020 Highland Colony Parkway
16        Post Office Box 6010
          Ridgeland, Mississippi 39158-6010
17        601.948.5711
          601.985.4500 (facsimile)
18        chad.hutchinson@butlersnow.com
19
20   Also Present:
21        PHILIP KIMBALL, Videographer
22
23                - - -
24
```

Page 7

```
 1        (The signature of the witness to the
 2        deposition was reserved.)
 3        THE VIDEOGRAPHER:  We are now on the
 4   record.  My name is Philip Kimball.  I'm
 5   a videographer for Golkow Technologies.
 6   Today's date is March 8, 2016, the time
 7   is 9:59 a.m.  This video deposition is
 8   being held in Atlanta, Georgia, in the
 9   matter of Harriet Beach versus Ethicon,
10   Incorporated, et al., Case Number
11   2:12-CV-00476.
12        This case is being heard in the
13   United States District Court, Southern
14   District of West Virginia at Charleston.
15   The deponent is Duane Priddy.
16        Counsel, will you please identify
17   yourselves for the record.
18        MR. HUTCHINSON:  Chad Hutchinson,
19   counsel for Ethicon and Johnson &
20   Johnson.
21        MR. JACKSON:  Tim Jackson on behalf
22   of the plaintiffs.
23        MR. WALLACE:  Ed Wallace on behalf
24   of the plaintiffs.
```

Page 8

```
 1        MS. FITZPATRICK:  Fidelma
 2   Fitzpatrick on behalf of the plaintiffs.
 3        THE VIDEOGRAPHER:  The court
 4   reporter is Maxyne Bursky and will now
 5   swear in the witness.
 6             DUANE PRIDDY,
 7   having been first duly sworn, testifies as follows:
 8   EXAMINATION
 9   BY MR. HUTCHINSON:
10        Q.  Good morning, Dr. Priddy.  How are you?
11        A.  I'm doing well.
12        Q.  Good.  My name is Chad Hutchinson.  I'm
13   counsel for Ethicon and Johnson & Johnson.  Do you
14   understand you are under oath?
15        A.  I do.
16        Q.  Do you understand you are giving testimony
17   subject to the penalty of perjury?
18        A.  Yes.
19        Q.  What is your specialty?
20        A.  Polymer chemistry, materials science.
21        Q.  Do you have any subspecialty?
22        A.  No.
23        (Priddy Deposition Exhibit 1 was
24        marked for identification.)
```

Page 9

```
 1   BY MR. HUTCHINSON:
 2        Q.  I have handed you what we will mark as
 3   Exhibit 1 to your deposition.  Did you bring some
 4   documents responsive to that notice?
 5        (Witness reviewing document.)
 6        A.  I read through this and I believe the
 7   documents provided to me are responsive, yes.
 8        (Priddy Deposition Exhibit 2 was
 9        marked for identification.)
10   BY MR. HUTCHINSON:
11        Q.  You have handed me a flash drive that
12   we'll mark as Exhibit 2.
13        MR. HUTCHINSON:  And, Counsel, I will
14        just retain, since this is my copy, we're
15        going to mark it Exhibit 2, but I'll just
16        retain control over it; is that fair?
17        MR. JACKSON:  That's fine.
18   BY MR. HUTCHINSON:
19        Q.  What is included on the flash drive that
20   your counsel handed me?
21        A.  A copy of my report, some documents that I
22   have reviewed, my billing record, my time log in
23   this matter.  That's all I recall offhand.
24        Q.  Does the flash drive contain all of the
```

3 (Pages 6 to 9)

Duane Priddy, Ph.D.

Page 10

1    documents that you reviewed and relied upon in
2    reaching your opinions?
3        A.  I believe so.
4        Q.  Have you reviewed this flash drive that
5    your lawyer has handed me?
6        A.  Yes.
7        Q.  Have you been deposed as an expert in the
8    AMS litigation?
9        A.  Yes.
10       Q.  Was that the mesh litigation?
11       A.  Yes.
12       Q.  Were you an expert, a polymer science
13   expert in that litigation?
14           MR. JACKSON:  Objection, form.
15       A.  Yes.
16   BY MR. HUTCHINSON:
17       Q.  How many times have you been deposed in
18   the AMS litigation?
19       A.  Once.
20       Q.  Have you read your testimony transcript?
21       A.  No.
22       Q.  When were you first contacted in this
23   case?
24       A.  I'd say last September maybe.

Page 11

1        Q.  Of 2015?
2        A.  Yes.
3        Q.  Who contacted you?
4        A.  Mr. Wallace.
5        Q.  What did he ask you to do?
6           MR. JACKSON:  Objection, form.
7        A.  Serve as an expert witness in the Ethicon
8    mesh matter.
9    BY MR. HUTCHINSON:
10       Q.  Anything else specifically that he asked
11   you to do?
12       A.  No.
13       Q.  Have you ever had any contacts with Mr.
14   Wallace before?
15       A.  Yes.
16       Q.  In the AMS litigation?
17       A.  Correct.
18       Q.  Did you reach opinions similar in the AMS
19   litigation as you have in this litigation?
20           MR. JACKSON:  Objection.
21       A.  I did not review my AMS testimony, so I
22   don't recall.
23   BY MR. HUTCHINSON:
24       Q.  Did you opine in the AMS litigation that

Page 12

1    the mesh degrades with oxidation?
2           MR. JACKSON:  Objection, form.
3        A.  I believe so.
4           (Priddy Deposition Exhibit 3 was
5        marked for identification.)
6    BY MR. HUTCHINSON:
7        Q.  Doctor, I will hand you what we'll mark as
8    Exhibit 3 to your deposition.  Do you recognize that
9    as the report that you submitted in this case?
10           (Witness reviewing document.)
11       A.  Yes.
12       Q.  Is it complete and accurate?
13           MR. JACKSON:  Counsel, I just want
14       to note on the record that there are two
15       emails at the end of this document which
16       are not part of Dr. Priddy's report.
17   BY MR. HUTCHINSON:
18       Q.  Doctor, is that complete and accurate?
19       A.  It looks, yes, it looks like I might have
20   to update my list of scientific articles and
21   publications, but other than that, it's accurate.
22       Q.  Are you talking about you need to update
23   your CV in there?
24       A.  Yes.

Page 13

1        Q.  Otherwise, that report is complete and
2    accurate; is that fair?
3        A.  Yes.
4        Q.  Did anybody else work on that report other
5    than you?
6        A.  No.
7        Q.  How much time did you spend preparing that
8    report?
9        A.  Maybe twelve hours.  I'm not sure.
10       Q.  Would the time that you spent preparing
11   that report be reflected on the flash drive that you
12   handed me before the deposition?
13       A.  Probably not completely because normally I
14   under-record the time I actually spend.  I actually
15   generally spend more than what I write down.
16       Q.  Why do you under-record your time?
17       A.  Just because I -- I just like to make sure
18   that I'm not overcharging, so I tend to be
19   conservative when I'm recording my time.
20       Q.  Doctor, are all the opinions that you
21   intend to offer in this case included in your expert
22   report?
23       A.  I may end up doing a supplemental report.
24       Q.  But as we sit here right now, are all the

4 (Pages 10 to 13)

Duane Priddy, Ph.D.

Page 14

1  opinions that you have so far included within your
2  expert report marked as Exhibit 3?
3      A.  Yes.
4      Q.  Do you have plans sitting here now to do a
5  supplemental report?
6      A.  Not specifically, but I may.
7      Q.  Why are you considering doing a
8  supplemental report?
9      A.  While I was preparing for my deposition,
10  reading through everything, I just thought it might
11  be wise for me to do a supplemental report in the
12  future.
13      Q.  On what specific issue would you do a
14  supplemental report on, sir?
15          MR. JACKSON:  Objection, form.
16      A.  I'm not sure at this point.  Maybe my
17  review of the results in the 80s of Ethicon's
18  research, some things caught my eye that I thought
19  were important and I might generate some opinions
20  about those in the future.
21  BY MR. HUTCHINSON:
22      Q.  But sitting here today, if you do a
23  supplemental report, it is your plan to do a
24  supplemental report only on the 1980 documents from

Page 15

1  Ethicon; is that fair?
2          MR. JACKSON:  Objection, form.
3      A.  At this point, that's -- yeah.
4  BY MR. HUTCHINSON:
5      Q.  Your reliance list, Doctor, included in
6  your expert report, is it complete and accurate?
7      A.  I believe so, yes.
8      Q.  Your CV that's included in your expert
9  report, is that the most recent version if you added
10  the publications that you referenced earlier?
11      A.  Yes.
12      Q.  What publications would you need to add to
13  your CV to make it current?
14      A.  I published a paper -- well, it was just
15  accepted by the peer reviewers -- that I am going
16  to present at a conference here in May, and I'll
17  add that.
18      Q.  What did you present about?
19      A.  It was understanding the science behind
20  the failure of exercise balls.
21      Q.  Doctor, have you ever published anything
22  regarding mesh or Prolene?
23      A.  No.
24      Q.  Have you ever published anything regarding

Page 16

1  polypropylene?
2      A.  Not that I recall.
3      Q.  Doctor, have you ever given any
4  presentations on mesh, Prolene, or polypropylene?
5      A.  No.
6      Q.  Have you ever worked for a medical device
7  company before?
8      A.  Yes.
9      Q.  Did your work focus on mesh or
10  polypropylene?
11      A.  No.
12      Q.  Other than the attorneys here, have you
13  ever discussed your opinions with anybody else?
14          MR. JACKSON:  Objection, form.
15      A.  Are you talking about the opinions in this
16  report?
17  BY MR. HUTCHINSON:
18      Q.  Yes.
19      A.  No.
20      Q.  Is it fair to say you have never discussed
21  your opinions with any type of scientist or medical
22  doctor or engineer; is that fair?
23      A.  That is correct.
24      Q.  Never communicated your opinions to FDA,

Page 17

1  correct?
2      A.  That's correct.
3      Q.  Or any scientific organization?
4          MR. JACKSON:  Objection, form.
5      A.  That's correct.
6  BY MR. HUTCHINSON:
7      Q.  Doctor, how many hours did you spend
8  reviewing the internal Ethicon documents?
9      A.  I would say probably 14, 15 hours.
10      Q.  Did you sign a confidentiality agreement
11  with respect to the documents you received from
12  Ethicon?
13      A.  Well, I mean, as part of my retainer
14  agreement there's confidentiality in there that I'm
15  not going to share or publish or discuss.
16      Q.  I understand.  Is that retainer agreement
17  included on Exhibit 2 which is the flash drive that
18  was handed to me before the deposition?
19      A.  I'm not sure.
20      Q.  Where is the retainer agreement?
21      A.  I would have a copy probably on my
22  computer, or if not, a hard copy in my files.
23      Q.  When is the last time you have seen the
24  retainer agreement?

5 (Pages 14 to 17)

Duane Priddy, Ph.D.

Page 18

1   A.  I don't recall.
2   Q.  Any reason to believe that it's been lost
3   or destroyed?
4   A.  No.
5   Q.  Other than your retainer agreement,
6   though, did you sign any type of paper regarding a
7   confidentiality agreement with respect to the
8   Ethicon documents you reviewed?
9   A.  I don't believe so.
10  Q.  Do you advertise your services?
11  A.  Yes.
12  Q.  On the internet?
13  A.  Yes.
14  Q.  Anywhere else?
15  A.  Yes.
16  Q.  Where?
17  A.  I'm listed as an expert on three or four
18  different websites, I believe, that aren't mine.
19  Q.  Other than the internet, do you advertise
20  your services anywhere?
21  A.  No.
22  Q.  Your billing rate is $375 an hour for
23  record review and 550 for testimony?
24  A.  Correct.

Page 19

1   Q.  You don't consider yourself an FDA expert,
2   do you?
3       MR. JACKSON:  Objection, form.
4   A.  I mean, I have done a lot of interaction
5   with the FDA when I was at Dow, I did a lot of
6   extraction studies and those kind of things to help
7   fill out paperwork for FDA applications.
8   BY MR. HUTCHINSON:
9   Q.  Do you consider yourself a regulatory
10  expert?
11      MR. JACKSON:  Objection, form.
12  A.  Again, I have done a lot of interaction
13  with government regulatory agencies.
14  BY MR. HUTCHINSON:
15  Q.  I understand that, but do you hold
16  yourself out as an expert, sir?
17      MR. JACKSON:  Objection to form.
18  A.  With regard to FDA?
19  BY MR. HUTCHINSON:
20  Q.  Yes.
21  A.  I know a lot about it.  That's all I can
22  say.
23  Q.  I understand, but my question is:  Do you
24  consider yourself a regulatory or FDA expert?

Page 20

1       MR. JACKSON:  Objection, calls for a
2   legal conclusion.
3   A.  Let's put it this way:  I don't advertise
4   myself as an expert for FDA.
5   BY MR. HUTCHINSON:
6   Q.  Is there anything on your CV that reflects
7   your expertise as a regulatory or FDA expert?
8   A.  No.
9   Q.  Doctor, you are not a pathologist?
10  A.  I am not a pathologist.
11  Q.  Not a medical doctor?
12  A.  I am not a medical doctor.
13  Q.  Not a toxicologist?
14  A.  No.
15  Q.  Not a biostatistician?
16  A.  What?
17  Q.  A biostatistician?
18  A.  A biostatistician, I do a lot of
19  statistical analysis, but bio, not a
20  biostatistician.
21  Q.  Are you an epidemiologist?
22  A.  No, I'm not.
23  Q.  Are you an expert in biomaterials?
24      MR. JACKSON:  Objection, form.

Page 21

1   A.  I have done a lot of work with different
2   biomaterials.  Again, it's difficult to quantify
3   expert or non-expert, but I have experience working
4   with biomaterials.
5   BY MR. HUTCHINSON:
6   Q.  So it is difficult for you to quantify
7   whether or not you are an expert in biomaterials?
8   Did I understand your testimony correctly?
9       MR. JACKSON:  Objection, form.
10  A.  It's a non-quantifiable question, in my
11  thinking.
12  BY MR. HUTCHINSON:
13  Q.  Do you consider yourself an expert, sir,
14  in biomaterials?
15      MR. JACKSON:  Objection, asked and
16      answered.
17  A.  All I can say is I know a lot about
18  biomaterials.
19  BY MR. HUTCHINSON:
20  Q.  Do you consider yourself an expert, is my
21  question?
22      MR. JACKSON:  Objection to form.
23  A.  I'm an expert in materials.
24  BY MR. HUTCHINSON:

6 (Pages 18 to 21)

Duane Priddy, Ph.D.

Page 22

1    Q.  What about biomaterials?
2    A.  And biomaterials are included in
3  materials.
4    Q.  Are you an expert in biocompatibility?
5    A.  Again, I know a lot about
6  biocompatibility.  It's just difficult for me to
7  give a yes-no answer to that when I know a lot about
8  it, but, yeah.
9    Q.  Doctor, are you an expert in the
10  biological response to foreign bodies?
11      MR. JACKSON:  Objection, form.
12    A.  Again, I know a lot about it but I'm
13  not a pathologist, so.
14  BY MR. HUTCHINSON:
15    Q.  Do you consider yourself an expert in the
16  biological response to foreign bodies?
17      MR. JACKSON:  Objection, form.
18    A.  I'll just say I know a lot about it.
19  BY MR. HUTCHINSON:
20    Q.  You won't answer that question?
21    A.  I just did.
22      MR. JACKSON:  He just gave the
23  answer.
24    A.  It's not a simple yes-no answer.

Page 23

1  BY MR. HUTCHINSON:
2    Q.  Do you consider yourself an expert in the
3  design of surgical mesh?
4      MR. JACKSON:  Objection, form.
5    A.  As far as the design includes materials
6  selection for it, yes.
7  BY MR. HUTCHINSON:
8    Q.  Do you consider yourself an expert in
9  female anatomy?
10    A.  No.
11    Q.  Doctor, let's talk about the testing you
12  did.  You did some accelerated aging testing; is
13  that correct?
14      MR. JACKSON:  Objection, form.
15    A.  The testing I did was called oxidation
16  induction time testing.  It is an accelerated test,
17  yes.
18  BY MR. HUTCHINSON:
19    Q.  And at what temperature did you do it?
20    A.  200 degrees Centigrade.
21    Q.  Why did you choose that number?
22    A.  Because it's the recommended temperature
23  in the ASTM D3895 OIT testing standard.
24    Q.  And you followed the protocols from the

Page 24

1  ASTM D3895 and ASTM 1980, correct?
2      MR. JACKSON:  Object to the form.
3    A.  1980, no, I did the ASTM D3895.
4  BY MR. HUTCHINSON:
5    Q.  Did you follow the protocols from the ASTM
6  1980?
7    A.  I would say no.  The 1980 is specific to
8  packaging for medical devices, and so I didn't,
9  since this was not packaging for a medical device, I
10  did not follow that.
11    Q.  Doctor, your expert report, Page 3, states
12  that you followed the Q10 protocol as described in
13  ASTM F1980, correct?
14    A.  Correct.
15    Q.  What was the Q10 protocol that you
16  followed?
17    A.  That protocol is basically a mathematical
18  protocol where you operate under the assumption, and
19  it is an assumption, that the oxidation rate or
20  reaction rate doubles the kinetics of the oxidation
21  reaction, doubles every 10 degrees Centigrade
22  increase in temperature.  So that protocol is used
23  to extrapolate from the elevated temperature to make
24  predictions, and I emphasize the word predictions,

Page 25

1  because that's all it is, of what would happen at
2  the lower temperatures.  So that's what's referred
3  to by the Q10 protocol.
4    Q.  Is the Q10 protocol defined in the ASTM
5  1980 protocol?
6      MR. JACKSON:  Objection, form.
7    A.  Yes.
8  BY MR. HUTCHINSON:
9    Q.  Is that what you followed?
10      MR. JACKSON:  Objection, form.
11    A.  I followed the Q10 protocol regarding the
12  doubling of reaction rate every 10 degrees.  That
13  methodology for calculation is what I followed.
14  BY MR. HUTCHINSON:
15    Q.  Did you follow anything else from ASTM
16  1980?
17      MR. JACKSON:  Objection, form.
18    A.  No.
19  BY MR. HUTCHINSON:
20    Q.  Are you giving any life expectancy
21  opinions regarding Prolene?
22      MR. JACKSON:  Objection, form.
23    A.  No, other than just general, not specific.
24  BY MR. HUTCHINSON:

7 (Pages 22 to 25)

Duane Priddy, Ph.D.

Page 26

1    Q.  Are your general life expectancy opinions
2  regarding Prolene included in your expert report?
3    A.  My expert opinion is that its life
4  expectancy is not indefinite, that it degrades so
5  it's not going to last forever.
6    Q.  But you are not giving any specific life
7  expectancy opinions, are you, sir?
8        MR. JACKSON:  Objection, form.
9    A.  No.
10       (Priddy Deposition Exhibit 4 was
11       marked for identification.)
12  BY MR. HUTCHINSON:
13    Q.  I hand you what we'll mark as Exhibit 4 to
14  your deposition.
15       (Witness reviewing document.)
16    Q.  This is the ASTM that you followed,
17  correct?
18    A.  Yes.
19    Q.  Is this the version that you followed?
20    A.  I'm not sure if it's the dash 14 version
21  or not.  I would think it probably is not the dash
22  14 version.  It's probably an earlier version,
23  because I have been doing OIT for many years, much
24  earlier than 2014.

Page 27

1    Q.  But 2014 -- or 14, rather, stands for
2  the year, correct?
3    A.  Correct.
4    Q.  You used an older version of the ASTM
5  3895?
6        MR. JACKSON:  Objection, form.
7    A.  Yes.
8  BY MR. HUTCHINSON:
9    Q.  Why?
10    A.  Because I have been doing it for many
11  years preceding '14, and once I get the lab set up
12  doing a specific test, following a specific standard
13  in a specific way, I just don't deviate it.
14    Q.  Sir, did you ever compare the version, the
15  older version that you used of 3895 to the most
16  recent ASTM 3895 2014?
17    A.  No.
18    Q.  Are you aware of any changes between those
19  two ASTM protocols?
20    A.  I would have to study it in depth to look
21  for those differences.
22    Q.  But you can't tell us those differences
23  now?
24    A.  No.

Page 28

1    Q.  Doctor, on Page 2 of your expert report,
2  you did what is called oxidative induction time
3  testing; is that correct?
4    A.  Correct.
5    Q.  You generated some -- I'm going to call
6  that, by the way, OIT for short.  Are you and I on
7  the same page?
8    A.  Absolutely.
9    Q.  You generated some OIT values contained in
10  your report; is that right?
11    A.  That is correct.
12    Q.  And you used OIT to compare the oxidative
13  stability of 10 different Ethicon mesh samples?
14    A.  That's correct.
15    Q.  Who conducted the tests?
16    A.  A technician at Materials Engineering,
17  Inc. located in Virgil, Illinois.  They are an A2LA
18  certified laboratory.
19    Q.  How far away is that from your office?
20    A.  About 180 miles probably.
21    Q.  Do you know the names of the person who
22  did the testing?
23    A.  Yes.
24    Q.  What were their names?

Page 29

1    A.  Steve Johnson is the technician that runs
2  that test.
3    Q.  Were you present when Steve Johnson did
4  any of the tests?
5    A.  No.
6    Q.  Did you direct the work of Steve Johnson
7  in any way?
8        MR. JACKSON:  Objection, form.
9    A.  To the extent of how I wanted the mesh
10  samples analyzed, yes.
11  BY MR. HUTCHINSON:
12    Q.  Did you provide any written correspondence
13  to Steve Johnson on how to do the tests?
14    A.  No.
15    Q.  Do you know how long Steve Johnson took to
16  do the tests?
17        MR. JACKSON:  Objection, form.
18    A.  About a week.
19  BY MR. HUTCHINSON:
20    Q.  Eight hours a day?
21    A.  I wasn't there to watch him.  I don't
22  know.
23    Q.  Do you know how much specific time Steve
24  Johnson did in doing the tests?

8 (Pages 26 to 29)

Duane Priddy, Ph.D.

Page 30

1     A.  No.
2     Q.  Has Steve Johnson sent you a bill for
3  doing those tests?
4     A.  I have a credit card on file with him and
5  when he's done, he just charges my card.
6     Q.  Has he charged your card yet?
7     A.  I have to check.  I don't recall offhand.
8     Q.  Do you have any idea how much money Steve
9  Johnson is going to charge you to do the tests that
10  are outlined in your expert report?
11     A.  Well, I know that he charges me about $200
12  to run an OIT test and since he ran these ten tests,
13  I can do the math.
14     Q.  Doctor, do you know if Steve Johnson had
15  any help doing the tests?
16     A.  He has another technician that works with
17  him.
18     Q.  What's that technician's name?
19     A.  It was a new hire.  I don't even recall,
20  Mark somebody.
21     Q.  Do you know how this new hire has been
22  trained?
23     A.  I don't.
24     Q.  Have you ever met this new hire?

Page 31

1     A.  No.
2     Q.  Do you know how much time this new hire
3  named Mark spent on this test?
4        MR. JACKSON:  Objection, form.
5     A.  I don't think he has done anything on the
6  test.  I think Steve Johnson did it all.
7  BY MR. HUTCHINSON:
8     Q.  And Steve Johnson did this DSC test,
9  correct?
10     A.  That's correct.
11     Q.  Differential scanning calorimetry?
12     A.  That's correct.
13     Q.  He used some samples of Ethicon's mesh,
14  right?
15     A.  That's correct.
16     Q.  Did you give the samples to Steve Johnson?
17     A.  I sent them to him.
18     Q.  Is that reflected in the chain of custody
19  documents?
20     A.  It is.
21     Q.  Have you ever received any chain of
22  custody documents from Steve Johnson?
23     A.  No.
24     Q.  Steve Johnson was the one who actually

Page 32

1  handled the mesh, correct?
2     A.  That is correct.
3     Q.  Have you ever asked for any chain of
4  custody documents from Steve Johnson?
5     A.  I just talked to him to make sure that he
6  received them.  He said yes, I have.  But I confirmed
7  his receipt of the meshes that I sent to him.
8     Q.  But you have no chain of custody documents
9  showing what Steve Johnson did with the mesh,
10  correct?
11        MR. JACKSON:  Objection, form.
12     A.  I know he received them and analyzed them
13  and he still has them.
14  BY MR. HUTCHINSON:
15     Q.  How did you ship the samples to Steve
16  Johnson?
17     A.  UPS.
18     Q.  Where did you get the samples to ship to
19  Steve Johnson?
20     A.  From Fidelma, an attorney.
21     Q.  When did you receive them?
22     A.  I'd have to look at the chain of custody
23  documents.  I believe it was mid-December.
24     Q.  What products did you receive?

Page 33

1     A.  I received six different TVTs and four
2  different Gynemeshes.
3     Q.  Would you describe the Gynemeshes that you
4  received?
5     A.  Describe them?
6     Q.  Yes, sir.
7        MR. JACKSON:  Objection, form.
8  BY MR. HUTCHINSON:
9     Q.  Describe them for the jury.  What did they
10  look like?
11     A.  It's just a strip of polypropylene mesh
12  between, I assume, some stainless steel rods.
13     Q.  How else would you describe the Gynemesh
14  that you received?
15        MR. JACKSON:  Objection, form.
16     A.  That's about all I can say about it.
17  BY MR. HUTCHINSON:
18     Q.  How was the Gynemesh that you received
19  with the two stainless rods different from the six
20  TVTs that you received?
21        MR. JACKSON:  Objection, form.
22     A.  They both had mesh between metal rods and
23  I didn't specifically study exactly how they were
24  different so I can't answer that question.

9 (Pages 30 to 33)

Duane Priddy, Ph.D.

Page 34

1    BY MR. HUTCHINSON:
2        Q.  So all products that you received had mesh
3    between two stainless steel rods; is that correct?
4        A.  That's my recollection, yes.
5        Q.  Doctor, let's talk about the sampling that
6    was used for the DSC.  DSC is a test, by the way,
7    right?
8        A.  Yes.
9        Q.  That's an analytical test?
10       A.  It's a piece of equipment.
11       Q.  And the purpose of the equipment is in
12   essence to melt the product inside, fair enough?
13           MR. JACKSON:  Objection, form.
14       A.  No.
15   BY MR. HUTCHINSON:
16       Q.  What's the purpose of the equipment?
17       A.  It's to detect thermal heat flow, whether
18   it be cooling or heating with plastic materials.
19       Q.  But you do that by melting the plastic
20   material, correct?
21           MR. JACKSON:  Objection, form.
22       A.  Not necessarily.
23   BY MR. HUTCHINSON:
24       Q.  Did you melt the samples that you received

Page 35

1    in this case?
2        A.  At 200 degrees, that's above the melting
3    point so they would be melted, yes.
4        Q.  How did you make the specimen sample?
5        A.  It was cut with scissors.
6        Q.  In your lab or in Steve Johnson's lab?
7        A.  Steve Johnson did the cutting.
8        Q.  Were you supervising the cutting of the
9    samples with Steve Johnson?
10       A.  I was not present, but we discussed the
11   protocol of how to collect the samples.
12       Q.  What was the average sheet thickness of
13   the sample?
14           MR. JACKSON:  Objection, form.
15       A.  I don't recall.
16   BY MR. HUTCHINSON:
17       Q.  Did you ever ask Steve Johnson about what
18   the average sheet thickness was of the sample?
19       A.  I asked him what the thickness was.
20       Q.  What did he tell you?
21       A.  I don't recall.  It was less than -- I
22   don't recall.
23       Q.  Why is that not included in your expert
24   report?

Page 36

1        A.  Because it wasn't relevant to my opinion.
2        Q.  Doctor, was this test sample compressed or
3    molded into a sheet format?
4        A.  No.
5        Q.  Why not?
6        A.  Because that would have given the sample
7    another heat history, and I wanted to have the
8    samples tested in their original use shape as
9    monofilaments.
10       Q.  How many times was the DSC test run?
11           MR. JACKSON:  Objection, form.
12       A.  It's run once, and I had him run it in
13   pure oxygen, switching from nitrogen to oxygen, and
14   I also asked him to run it switching from nitrogen
15   to air, so he ran it twice for each sample.
16   BY MR. HUTCHINSON:
17       Q.  Do you know how long he ran it in pure
18   nitrogen?
19       A.  You run it for so many minutes until the
20   equipment is stable, get a smooth baseline.  That's
21   generally five minutes or so at 200.
22       Q.  But my question is, do you know how long
23   Steve Johnson ran it in pure nitrogen?
24       A.  Whatever the standard dictates, and I

Page 37

1    believe it's five minutes.
2        Q.  Do you know how long Steve Johnson ran the
3    sample or ran the test, rather, in pure oxygen?
4           MR. JACKSON:  Objection, asked and
5    answered.
6        A.  It's in the data.  Once you switch from
7    nitrogen to oxygen, that's time 0, and then you run
8    it in pure oxygen until the exotherm is over and
9    that gives you your OIT data.
10   BY MR. HUTCHINSON:
11       Q.  Let's look at Exhibit 4 and turn with me
12   to Page 2.
13       A.  Okay.
14       Q.  Under "9. sampling."  Do you see that?
15       A.  Yes.
16       Q.  9.1 says, "The following sample
17   preparation procedures are recommended:  the test
18   sample is compression molded into sheet format."
19           Did I read that correctly?
20       A.  Absolutely.
21       Q.  Why did you not follow that protocol?
22           MR. JACKSON:  Objection, form.
23       A.  Because it's recommended and, as I said
24   previously, that would require another heat history

10 (Pages 34 to 37)

Duane Priddy, Ph.D.

Page 38

1    on the sample, and I wanted to look at pristine mesh
2    samples in their use state.  And I didn't want to
3    alter that.
4         So that would have affected the results to
5    have done it that way.  And I emphasize the word
6    "recommended," because you don't have to do it that
7    way, it's just the recommended.
8         Q.  I understand, but fair to say that you
9    didn't follow the recommended sampling procedure in
10   ASTM 3895, correct?
11        MR. JACKSON:  Objection, form.
12        A.  Absolutely for good reason, it would have
13   affected the results negatively.
14   BY MR. HUTCHINSON:
15        Q.  Doctor, there is nothing in your expert
16   report about how the samples were prepared, is
17   there?
18        A.  Not in the report directly, no.
19        Q.  Why did you not include that in your
20   expert report?
21        A.  Because it has no bearing on my opinions.
22        Q.  Doctor, did you do any type of statistical
23   calculations to confirm that the results you got
24   from this test that Steve Johnson did were

Page 39

1    statistically significant?
2         MR. JACKSON:  Objection, form.
3         A.  What I did do --
4    BY MR. HUTCHINSON:
5         Q.  We are going to get to what you did do in
6    a minute.  I want to know the answer to my question
7    first and then we'll get there.
8         MR. JACKSON:  Counsel, you have to
9         let him answer the question.
10   BY MR. HUTCHINSON:
11        Q.  Did you do any type of statistical
12   calculations to --
13        A.  Yes.
14        Q.  Are those statistical calculations
15   included in your expert report?
16        A.  No.
17        Q.  Why not?
18        A.  Just didn't include it.
19        Q.  Any reason?
20        A.  No.
21        Q.  What type of statistical calculations did
22   you do?
23        A.  I had Steve Johnson extract the additives
24   from the mesh samples and to determine if the OIT

Page 40

1    numbers data gave a correlation with the level of
2    antioxidant in the mesh samples.  And the reason I
3    did that is just to confirm that there's a
4    statistical correlation between the level of
5    antioxidant and the OIT values because if there
6    hadn't have been, then I would have been concerned
7    about the validity of the results.
8         Q.  Doctor, let's look at Exhibit 4 for a
9    minute.  This is that ASTM 3895.
10        A.  Yes.
11        Q.  Bottom of Page 1, 4.3 states, "Unless
12   otherwise specified, the analysis temperature used
13   in this test has been arbitrarily set at 200 degrees
14   C."
15        Do you see that?
16        A.  Yes.
17        Q.  That's the temperature you used?
18        A.  Correct.
19        Q.  You used an arbitrary number?
20        MR. JACKSON:  Objection, form.
21        A.  I used the number specified in the
22   standard, yes.
23   BY MR. HUTCHINSON:
24        Q.  And the number specified in the standard

Page 41

1    is an arbitrary number, correct?
2         MR. JACKSON:  Objection, form.
3         A.  It is the number that I run.  Every time I
4    do an OIT test I do it at 200 degrees.  That's just
5    always the way I run it.
6    BY MR. HUTCHINSON:
7         Q.  I understand that, but the number that you
8    used is an arbitrary number according to the ASTM
9    standard, correct?
10        MR. JACKSON:  Objection, form.
11        A.  If they -- they define it as an arbitrary
12   number, so.
13   BY MR. HUTCHINSON:
14        Q.  Doctor, would you ever attempt to publish
15   a paper in a peer-reviewed journal using arbitrary
16   data?
17        MR. JACKSON:  Objection, form.
18        A.  I certainly would attempt to publish an
19   article in a paper based upon following an ASTM
20   standard.
21   BY MR. HUTCHINSON:
22        Q.  Would you ever attempt to publish anything
23   in a peer-reviewed journal with an arbitrary number?
24        MR. JACKSON:  Objection, form.

11 (Pages 38 to 41)

Duane Priddy, Ph.D.

Page 42

1    A.  If it is specified in the standard, yes.
2    BY MR. HUTCHINSON:
3    Q.  Doctor, your report states that the mesh
4    sample was heated to 200 degrees under pure
5    nitrogen; is that right?
6    A.  Yes.
7    Q.  That's the temperature at which you
8    conducted this aging study?
9         MR. JACKSON:  Objection, form.
10   A.  Correct.
11   BY MR. HUTCHINSON:
12   Q.  That's also known as the accelerated aging
13   temperature, correct?
14   A.  Yes.
15   Q.  That equates to roughly 392 degrees
16   Fahrenheit?
17   A.  Correct.
18   Q.  That's about 300 degrees Fahrenheit above
19   the normal temperature of a human being; is that
20   correct?
21   A.  Correct.
22   Q.  And it is well above the melting point of
23   Prolene, isn't it?
24        MR. JACKSON:  Objection, form.

Page 43

1    A.  Yes, it is.
2    BY MR. HUTCHINSON:
3    Q.  What is the melting point of Prolene?
4    A.  165 degrees Centigrade approximately.
5    Q.  Doctor, moving to Page 2, at the top under
6    Significance and Use, are you there with me?
7    A.  Yes.
8    Q.  It says, "The OIT is a qualitative
9    assessment of the level (or degree) of stabilization
10   of the material tested."
11        Do you see that?
12   A.  Yes.
13   Q.  And a qualitative test is different from a
14   quantitative test, isn't it, sir?
15   A.  That's correct.
16   Q.  A qualitative test doesn't give you a
17   lifetime prediction, does it?
18        MR. JACKSON:  Objection, form.
19   BY MR. HUTCHINSON:
20   Q.  Doctor?
21   A.  It's standard practice to use data from
22   these kind of tests to do lifetime predictions,
23   realizing it's only a prediction.  With that
24   understanding that it has to be validated by actual

Page 44

1    testing.  If there's a red flag there, it will just
2    give you a red flag.  And so with that
3    understanding, as I say, I routinely use this test
4    for doing lifetime predictions.
5    Q.  I understand, but with that understanding,
6    a qualitative test does not give you lifetime
7    predictions, does it?
8         MR. JACKSON:  Objection, form.
9    A.  Yeah, It gives you predictions, certainly.
10   BY MR. HUTCHINSON:
11   Q.  It doesn't give you lifetime facts or
12   lifetime specifics, does it?
13        MR. JACKSON:  Objection, form.
14   A.  Every time you use an accelerated test
15   protocol to get a prediction, it's only a prediction
16   and you have to follow it up with real life, live
17   tests to validate.
18   BY MR. HUTCHINSON:
19   Q.  And you have to follow it up with real
20   time aging tests, correct?
21        MR. JACKSON:  Objection, form.
22   A.  That is correct.
23   BY MR. HUTCHINSON:
24   Q.  Doctor, you wouldn't rely on a qualitative

Page 45

1    test to determine how long a polymer would retain
2    its physical properties, would you?
3         MR. JACKSON:  Objection, form.
4    A.  I would use it for predictive purposes,
5    yes.
6    BY MR. HUTCHINSON:
7    Q.  Doctor, let's move on to the top of Page
8    2.  Under Note 2 it states, "The OIT measurement is
9    an accelerated thermal-aging test and as such can be
10   misleading."
11        Did I read that correctly?
12   A.  Yes.
13   Q.  What does misleading mean?
14        MR. JACKSON:  Objection, form.
15   A.  What they are trying to say there is, if I
16   have different materials, say two different
17   polypropylenes with two different stabilizer
18   packages, one polypropylene has additive stabilizer
19   antioxidant A in it and another one has antioxidant
20   stabilizer package B in it and I run an OIT and I
21   get different values, that it would be misleading
22   for me to say that one is better than the other.
23   BY MR. HUTCHINSON:
24   Q.  Did you consider this statement before

12  (Pages 42 to 45)

Duane Priddy, Ph.D.

Page 46

1    doing your testing?
2         MR. JACKSON:  Objection, form.
3         A.  Yes.
4    BY MR. HUTCHINSON:
5         Q.  Doctor, one would never expect to use
6    Prolene in the body at 200 degrees C, would they?
7         A.  That's correct.
8         Q.  In fact, you would never expect Prolene to
9    be exposed to a hundred percent nitrogen in vivo,
10   would you?
11        A.  No.
12        Q.  You'd never expect Prolene to be exposed
13   to a hundred percent oxygen in vivo, would you?
14        MR. JACKSON:  Objection, form.
15        A.  Not pure oxygen.  I certainly would expect
16   it to be exposed to oxidizing species, but not a
17   hundred percent pure oxygen, no.
18   BY MR. HUTCHINSON:
19        Q.  Moving on down on Note 2, last sentence it
20   says, "Volatile antioxidants may generate poor OIT
21   results even though they may perform adequately at
22   the intended use temperature of the finished
23   product."
24        Did I read that correctly?

Page 47

1         A.  Yes.
2         Q.  Did you consider that before you did your
3    testing, Doctor?
4         A.  Yes.
5         Q.  Do you know whether there is a volatile
6    antioxidant in Prolene?
7         A.  The Santonox R and the dilauryl
8    thiodipropionate, both of those additives are not
9    volatile.  At 200 degrees they would not vaporize
10   from the Prolene.
11        Q.  What do you base that on, Doctor?
12        A.  Just my polymer chemistry and experience
13   working with these types of antioxidants.
14        Q.  Did you account for the volatility of
15   DLTDP before you did your testing?
16        A.  Yes.
17        Q.  How?
18        A.  I actually asked the technician to inject
19   a sample of pure dilauryl thiodipropionate -- this
20   is Steve Johnson -- into the gas chromatograph to
21   determine its relative volatility.  In other words,
22   you do that by retention time, how long does it take
23   this chemical to -- before it makes its way through
24   the gas chromatograph, and you get a feel for its

Page 48

1    level of volatility.
2         If it comes through in less than 10
3    minutes, it is volatile.  If it takes 20 minutes to
4    come off the GC column, you know that at
5    200 degrees, it is not volatile.  And I did the same
6    thing for Santonox R.
7         Q.  Doctor, did you account for the volatility
8    of any other additives contained in Prolene?
9         A.  No, I was focused on the antioxidant
10   species.
11        Q.  Did you focus any on Procol LA-10?
12        A.  No.
13        Q.  Did you ever focus on calcium stearate?
14        A.  No.  Those are lubricants, not
15   antioxidants.
16        Q.  Doctor, the intended use temperature of
17   the finished product, what is the intended use
18   temperature of the finished product?
19        MR. JACKSON:  Objection, form.
20        A.  37 degrees C or 98.6 Fahrenheit.
21   BY MR. HUTCHINSON:
22        Q.  It is not 200 degrees C, is it?
23        A.  No.
24        Q.  Doctor, moving on down to Note 3, "There

Page 49

1    is no accepted sampling procedure, nor have any
2    definitive relationships been established for
3    comparing OIT values on field samples to those on
4    unused products.  Hence, the use of such values for
5    determining life expectancy is uncertain and
6    subjective."
7         Did I read that correctly?
8         A.  Absolutely, yes.
9         Q.  Doctor, what would the field sample be in
10   this particular case?
11        A.  The Prolene mesh.
12        Q.  It would be an explant, correct?
13        MR. JACKSON:  Objection, form.
14        A.  No, it's a virgin, unused implant.
15   BY MR. HUTCHINSON:
16        Q.  That's what you consider to be a field
17   sample?
18        A.  Yes.
19        Q.  What's the difference between a virgin,
20   unused piece of Prolene and an unused product?
21        MR. JACKSON:  Objection, form.
22        A.  There is no difference.
23   BY MR. HUTCHINSON:
24        Q.  Doctor, the ASTM that you quote says

13 (Pages 46 to 49)

Golkow Technologies, Inc. - 1.877.370.DEPS

Duane Priddy, Ph.D.

Page 50

1 there have been no definitive relationships
2 established for comparing values on field samples to
3 those for unused products.
4 MR. JACKSON: Objection, misstates
5 witness testimony.
6 BY MR. HUTCHINSON:
7 Q. That's what the ASTM says, correct?
8 A. Okay.
9 Q. And in fact, Doctor, there's been no
10 definitive relationships established for comparing
11 the OIT values of explant to mesh that's never been
12 used in surgery; is that fair?
13 A. That is fair, yes.
14 Q. In fact, Doctor, can you stand by your
15 opinions to a reasonable degree of scientific
16 certainty, given that the ASTM that you used says
17 "determining life expectancy is uncertain and
18 subjective"?
19 MR. JACKSON: Objection, form.
20 A. I'm sorry, I don't understand that
21 question. Would you repeat it, please?
22 BY MR. HUTCHINSON:
23 Q. Can you stand by your opinions, given that
24 the ASTM that you used says "determining life

Page 51

1 expectancy is uncertain and subjective"?
2 MR. JACKSON: Objection, form.
3 A. What I can say is this, the life
4 expectancy is uncertain, that's correct.
5 BY MR. HUTCHINSON:
6 Q. And the life expectancy is also
7 subjective, isn't it, sir?
8 MR. JACKSON: Objection, form.
9 A. All I can say is in a nutshell, this data
10 shows that the Prolene material will not last
11 indefinitely in the body. It is susceptible to
12 oxidative degradation over time.
13 BY MR. HUTCHINSON:
14 Q. But the life expectancy is subjective,
15 isn't it, sir?
16 MR. JACKSON: Objection, form.
17 A. It is subject to the conditions in the
18 body, yes, certainly.
19 BY MR. HUTCHINSON:
20 Q. It is also subjective according to the
21 ASTM protocol, correct?
22 A. It's always subjective, lifetime of any
23 article is subject to the conditions that the part
24 is under, exposed to.

Page 52

1 Q. Doctor, would you ever publish anything in
2 the "American Chemical Society" journal that was
3 uncertain and subjective?
4 MR. JACKSON: Objection, form.
5 A. Yes, I would.
6 BY MR. HUTCHINSON:
7 Q. Doctor, moving on down to Note 7, it
8 states, "The material composition of the specimen
9 holder can influence the OIT test result
10 significantly."
11 Do you see that?
12 A. I'm sorry, where are you at?
13 Q. At the bottom of Page 2, note 7.
14 A. Reagents and Materials?
15 Q. No, bottom of Page 2. It says, "The
16 material composition of the specimen holder."
17 Do you see that?
18 A. I'm sorry, I'm still not with you.
19 Could you point to where you?
20 Q. I'll be happy to.
21 A. Okay, thank you. Okay.
22 Q. Do you see that, Doctor?
23 A. Yes.
24 Q. What type of specimen holder was used by

Page 53

1 Steve Johnson?
2 A. It's called a DSC pan.
3 Q. What is the DSC pan that Steve Johnson
4 used made out of?
5 A. He told me. It's in the report and I
6 don't recall offhand.
7 Q. It is in your expert report?
8 A. No, it's in his report to me.
9 Q. Steve Johnson prepared a report and gave
10 it to you?
11 MR. JACKSON: Objection, form.
12 A. It's data. He gives me the data with a
13 little note and it tells what the pan is, but I
14 don't recall offhand what the pan is.
15 BY MR. HUTCHINSON:
16 Q. Where is the data that Steve Johnson gave
17 you?
18 A. It would be on my computer.
19 Q. It is not included on this flash drive, is
20 it, sir?
21 A. It probably is.
22 Q. Can you testify under oath that this data
23 that Steve Johnson gave you is contained on this
24 flash drive?

14 (Pages 50 to 53)

Duane Priddy, Ph.D.

Page 54

1           MR. JACKSON:  Objection, form.
2       A.  Not without checking to confirm for sure.
3   I believe I put it on there.
4   BY MR. HUTCHINSON:
5       Q.  Doctor, sitting here today, can you tell
6   us the type of specimen holder that Steve Johnson
7   used?
8       A.  A DSC pan, and I don't recall what the
9   metal was.
10      Q.  Do you know if Steve Johnson used more
11  than one specimen holder?
12      A.  The little DSC pans are disposable.  In
13  other words, for the OIT test, he uses a specific
14  type of pan that he knows to be, not influence the
15  data and that's the type of pan he uses.  I just
16  don't recall offhand what the metal is.
17      Q.  Doctor, have you done anything to
18  determine if the specimen holder that Steve Johnson
19  used affected the results?
20          MR. JACKSON:  Objection, form.
21      A.  As I say, he in the past has run tests,
22  since he runs the OIT for me all the time, to
23  confirm the OIT test as he runs it is unaffected by
24  the pan that he uses.  It's just I don't recall what

Page 55

1   metal it is.
2   BY MR. HUTCHINSON:
3       Q.  I understand that, Doctor, but I'm asking
4   you, have you done anything personally to determine
5   if the specimen holder that Steve Johnson used
6   affected the test results?
7       A.  I don't run DSC, so technicians do that.
8       Q.  Have you done anything, sir, personally to
9   determine if the specimen holder affected the
10  results?
11          MR. JACKSON:  Objection, asked and
12      answered.
13      A.  As I say, it was done in the past, on past
14  projects.
15  BY MR. HUTCHINSON:
16      Q.  I am talking about this project, sir.
17  Have you personally done anything to determine if
18  the specimen holder affected the results, yes or no?
19          MR. JACKSON:  Objection, asked and
20      answered.
21      A.  In the sense that I made sure that he is
22  using his standard pan under the standard operating
23  procedures for the laboratory as an A2LA certified
24  laboratory.  They are annually audited, all their

Page 56

1   processes checked by auditors.
2           And so the DSC pan is always the same.
3   It's been confirmed by him not to affect the
4   results.  That's the pan he used.  I just can't
5   recall what the metal is offhand.
6       Q.  That's right. But my question to you is:
7   Have you personally -- I'm not talking about Steve
8   Johnson, I'm talking about you personally -- have
9   you personally done anything to determine if the
10  specimen holder affected the results?
11          MR. JACKSON:  Objection, asked and
12      answered.
13      A.  Other than how I have just answered it,
14  no.
15  BY MR. HUTCHINSON:
16      Q.  Doctor, can you use your DSC data to make
17  lifetime calculations when one is in pure oxygen and
18  the other is implanted in vivo?
19          MR. JACKSON:  Objection, form.
20      A.  I wasn't trying to do that.  That wasn't
21  the purpose.  My purpose for running the test was to
22  look at variability of ten different mesh samples.
23  That was my intent.  And so I was looking to see if,
24  when these different samples with the same

Page 57

1   antioxidant formulations in them, when they are
2   suddenly exposed to oxygen, do they have the same
3   OIT value or is it extremely variable.  And I saw up
4   to 150 percent variability from the low to the high
5   end.
6           The key message is that these implants
7   have variability in their oxidation resistance.
8   They aren't all the same.  That's it.  That's the
9   only message that I was trying to figure out there.
10          (Priddy Deposition Exhibit 5 was
11      marked for identification.)
12  BY MR. HUTCHINSON:
13      Q.  Doctor, handing you what we'll mark as
14  Exhibit 5 to your deposition.  This is the ASTM
15  that you quoted in your expert report, correct?
16          MR. JACKSON:  Objection, form.
17      A.  Yes.
18  BY MR. HUTCHINSON:
19      Q.  I believe it is your testimony, you didn't
20  follow this ASTM 1980 protocol; is that right?
21      A.  The only portion that I followed is this
22  Q10 estimate for trying to get a feel for predicting
23  lifetimes.
24      Q.  Why didn't you follow anything else?

15 (Pages 54 to 57)

Duane Priddy, Ph.D.

Page 58

1    MR. JACKSON:  Objection, form.
2    A.  Because it's not a -- it has to do with
3  sterile medical device packages, not what's inside.
4  So it's really not a standard that's directly
5  applicable to this situation.
6  BY MR. HUTCHINSON:
7    Q.  Doctor, fair to say you never did any
8  real-time aging studies to confirm the accelerated
9  aging study results that you generated, correct?
10    A.  That is correct.
11    Q.  All of the studies that you did are
12  contained in your expert report; is that correct?
13    MR. JACKSON:  Objection, form.
14    A.  I mean, I mentioned a few minutes ago, I
15  ran the OIT test under pure oxygen and then
16  switching from nitrogen to air, and I believe that's
17  the only deviation that was done that wasn't
18  included in the report.
19  BY MR. HUTCHINSON:
20    Q.  Doctor, turn with me to Page 2.
21    A.  Of?
22    Q.  Of Exhibit 5 which is ASTM 1980.
23    A.  Yes.
24    Q.  There on Page 2, note 6.4, this is a

Page 59

1  protocol that you followed in determining the Q10
2  level, correct?
3    MR. JACKSON:  Objection, form.
4    A.  Q10.
5  BY MR. HUTCHINSON:
6    Q.  Am I correct?
7    A.  Not really, because they talk about three
8  temperatures here and I only ran one temperature,
9  200.
10    Q.  Doctor, did you follow any type of
11  protocol in your Q10 calculations for determining
12  the temperature that you used?
13    MR. JACKSON:  Objection, form.
14    A.  The temperature that I used?
15  BY MR. HUTCHINSON:
16    Q.  Strike that.  What did you use Q10 for?
17    A.  The only portion of this that I used was
18  just what I described earlier, the doubling,
19  approximately doubling of reaction rate every
20  10 degrees.  That's the only -- I just referenced
21  this to support that concept for doing that crude
22  calculation.  That's all.
23    Q.  Doctor, the double reaction rate for every
24  10 degrees, is that based on any ASTM standard?

Page 60

1    MR. JACKSON:  Objection, form.
2    A.  No, it's just a normal, understood
3  scientific principle that reaction rates
4  approximately double every 10 degrees.
5    Q.  Is that based on any scientific literature
6  that you can tell me sitting here today?
7    A.  I could, if I was pressed to do so, I
8  could come up with textbook references, organic
9  chemistry 101, polymer chemistry 101 where they
10  teach this doubling of a reaction rate every
11  10-degree principle.  As I say, it's crude and it's
12  just for ballpark, is there a flag, kind of
13  calculations.
14    Q.  But it is your testimony, if I understand
15  it, under oath that ASTM 1980 does not apply to the
16  testing you did, correct?
17    MR. JACKSON:  Objection, form.
18    A.  Yes, because it's for packaging.  The only
19  reason I reference it is because of that Q10
20  doubling of reaction rate principle.
21    MR. JACKSON:  Chad, we have been
22  going just about an hour.  Are we at a
23  good time for a break?
24    MR. HUTCHINSON:  One more thing and

Page 61

1  we'll take a quick break, okay?
2    (Priddy Deposition Exhibit 6 was
3  marked for identification.)
4  BY MR. HUTCHINSON:
5    Q.  Doctor, handing you what we'll mark as
6  Exhibit 6 to your deposition.  This is the
7  de la Rie article that you quoted in your expert
8  report; is that correct?
9    (Witness reviewing document.)
10    A.  Yes.
11    Q.  Did you read this before you quoted it in
12  your expert report?
13    A.  Yes.
14    Q.  Turn to Page 17 with me, please.
15    A.  Okay.
16    Q.  At the bottom of the column on the left,
17  the paragraph starting out with "Materials," are
18  you there with me?
19    A.  Yes.
20    Q.  It states, "Materials which are not
21  exposed to light" -- and by the way, mesh when
22  planted in vivo is not exposed to light, is it?
23    MR. JACKSON:  Objection, form.
24    A.  No.  Not while it is in vivo, it is not.

16  (Pages 58 to 61)

Duane Priddy, Ph.D.

Page 62

1  BY MR. HUTCHINSON:
2      Q.  "Materials which are not exposed to light
3  during their normal life could be tested in heat
4  aging experiments."
5          In fact, that's what you did, correct, a
6  heat aging experiment, correct, on mesh?
7          MR. JACKSON:  Objection, form.
8      A.  Yes, I did.
9  BY MR. HUTCHINSON:
10     Q.  It goes on to say, "But if temperatures
11 are used which are considerably higher than the ones
12 the material is exposed to under normal
13 circumstances, the danger exists of introducing new
14 degradation reactions."
15         Did I read that correct?
16     A.  Yes, you did.
17     Q.  Doctor, did you consider that before you
18 did your accelerated aging tests?
19     A.  Yes.
20     Q.  Did you know what de la Rie said about
21 using higher temperatures?
22     A.  Yes.
23     Q.  How did you account for that?
24     A.  By stating that it is only a rough

Page 63

1  approximation and has to be validated with actual
2  real-time studies because of this possibility.
3      Q.  Doctor, did you do any type of calculation
4  regarding the Arrhenius rate reaction for
5  polypropylene?
6          MR. JACKSON:  Objection, form.
7      A.  That has been done in the literature
8  before.
9  BY MR. HUTCHINSON:
10     Q.  I am asking you:  Did you do any
11 calculation for the Arrhenius rate reaction for
12 polypropylene?
13         MR. JACKSON:  Objection, form.
14     A.  Not on my data, no, I couldn't, because I
15 only ran at one temperature.  I did not run at
16 three temperatures.  You have to run at three
17 temperatures to do the Arrhenius calculations.
18         MR. HUTCHINSON:  We can take a quick
19 break.
20         THE VIDEOGRAPHER:  We are now off
21 the video record.  The time is 10:01 a.m.
22         (Recess.)
23         THE VIDEOGRAPHER:  We are back on
24 the video record with Tape Number 2.  The

Page 64

1  time is 10:08 a.m.
2  BY MR. HUTCHINSON:
3      Q.  Doctor, we are back on the record.  Have
4  you understood all my questions so far?
5      A.  Yes.
6      Q.  Is there anything about the testimony
7  that you have given that you would like to change?
8          MR. JACKSON:  Objection, form.
9      A.  Not at this point.
10 BY MR. HUTCHINSON:
11     Q.  Turn with me to Exhibit 2.  That's your
12 expert report.
13     A.  Okay, got it.
14     Q.  On Page 3 you state you are a plastics
15 consultant for medical supply companies?
16     A.  Yes.
17     Q.  What type of products?
18     A.  Oh, boy.
19     Q.  Let me ask you this:  Any products
20 regarding polypropylene?
21     A.  I mean, I have done materials selection
22 work for Baxalta.
23     Q.  Let's focus on polypropylene.
24     A.  I considered polypropylene as I was

Page 65

1  selecting material, so they just asked me to
2  recommend a material for a certain application.  And
3  I considered polypropylene and ruled it out, just
4  didn't have the right properties for the
5  application.
6      Q.  Doctor, have you ever selected a polymer
7  that has a lifetime warranty?
8          MR. JACKSON:  Objection, form.
9      A.  I don't believe so.
10 BY MR. HUTCHINSON:
11     Q.  Doctor, would you ever guarantee to the
12 recipients of these medical devices that you
13 consulted for, would you ever guarantee to them that
14 their material would never oxidize?
15         MR. JACKSON:  Objection, form.
16     A.  No.
17 BY MR. HUTCHINSON:
18     Q.  Doctor, on Page 3 of your expert report,
19 you reference ISOT.  That stands for incipient
20 surface oxidation time; is that correct?
21     A.  Yes.
22     Q.  Is ISOT in any ASTM standard?
23     A.  It is nowhere.  That is my own acronym.
24     Q.  Doctor, you didn't use a publication to

17 (Pages 62 to 65)

Duane Priddy, Ph.D.

| Page 66 | Page 68 |

**Page 66**

1  come up with your own acronym, did you?
2      A.  I did not.
3      Q.  You made it up just for this experiment,
4  didn't you?
5          MR. JACKSON:  Objection, form.
6      A.  No.
7  BY MR. HUTCHINSON:
8      Q.  Where did you come up with your own
9  acronym?
10         MR. JACKSON:  Objection, form.
11     A.  As I say, I have been using OIT testing
12 for years.
13 BY MR. HUTCHINSON:
14     Q.  I want to talk about ISOT.
15     A.  Yes, I know.  And as part of that, I look
16 at the shape of the OIT curve because normally it is
17 a nice, smooth transition with two slopes and when
18 you get the baseline meandering around and doing
19 strange things, you know that there's something
20 going on that's not normal.  And so I always, just
21 for my own thought processes, identify the point to
22 where something chemically starts to happen and I
23 call that the incipient oxidation point.
24     Q.  But that's something you made up?

**Page 67**

1      A.  I did, yes.
2      Q.  Doctor, if you look at Page 5, it states,
3  polypropylene is subject to degradation or weakening
4  by oxidative agents.
5      A.  Where are you at now?
6      Q.  Page 5.
7          MR. JACKSON:  Chad, can you let us
8      know which paragraph you are on?
9          MR. HUTCHINSON:  Yes, I'm sorry.
10     Second paragraph, second sentence.
11         THE WITNESS:  Okay.
12 BY MR. HUTCHINSON:
13     Q.  It states, the "chemical reactions
14 continue to occur so long as any oxidizing agents,
15 such as those present in the human body, are
16 present."  Do you see that?
17     A.  Yes.
18     Q.  Doctor, what are the names of the
19 oxidizing agents?
20         MR. JACKSON:  Objection, form.
21     A.  Excuse me?
22     Q.  What are the names of the oxidizing agents
23 that you reference here?
24         MR. JACKSON:  Objection, form.

**Page 68**

1      A.  Are you talking about in the human body?
2  BY MR. HUTCHINSON:
3      Q.  Yes, sir.
4      A.  Hydrogen peroxide, there's all sorts of
5  oxidizing agents.
6      Q.  All right, hydrogen peroxide.  What else?
7      A.  Again, I'm not a medical doctor or a
8  pathologist, but I have read many reports that refer
9  to oxidizing agents being present in the body,
10 especially with foreign body reactions.  The body
11 will generate oxidizing species.
12     Q.  Those are called reactive oxygen species,
13 correct?
14     A.  Right, ROS.
15     Q.  My question to you is, though, can you
16 name the oxidizing agents that you are aware of in
17 the human body?
18         MR. JACKSON:  Objection, asked and
19     answered.
20     A.  I just named one, hydrogen peroxide.
21 BY MR. HUTCHINSON:
22     Q.  Can you name any others?
23         MR. JACKSON:  Objection, asked and
24     answered.

**Page 69**

1      A.  There's all sorts of peroxidases which are
2  oxidative enzymes.
3  BY MR. HUTCHINSON:
4      Q.  Other than hydrogen peroxide and enzymes,
5  can you name any other type of oxidizing agents?
6          MR. JACKSON:  Objection, misstates
7      witness testimony.
8      A.  Oxygen.
9  BY MR. HUTCHINSON:
10     Q.  Anything else?
11     A.  That's all I can recall at this point.
12     Q.  Doctor, do you know the amount of hydrogen
13 peroxide that's secreted in the body?
14         MR. JACKSON:  Objection, form.
15     A.  No.
16 BY MR. HUTCHINSON:
17     Q.  Can you quantify it?
18         MR. JACKSON:  Objection.
19     A.  I cannot.
20 BY MR. HUTCHINSON:
21     Q.  Have you ever attempted to quantify it?
22     A.  No.
23     Q.  Have you ever used any type of
24 concentration of hydrogen peroxide to determine how

18  (Pages 66 to 69)

Duane Priddy, Ph.D.

Page 70

1    it affects Prolene?
2        A.  I have not done that.
3        Q.  Doctor, do you have any idea how many or
4    what type of -- strike that.
5            Do you have any idea of the amount of
6    enzymes, oxidizing enzymes that are secreted from
7    the body?
8            MR. JACKSON:  Objection, form.
9        A.  I have never measured it, no.
10   BY MR. HUTCHINSON:
11       Q.  To your knowledge, has it ever been
12   quantified?
13       A.  I do not know.
14       Q.  Doctor, sitting here today, can you
15   quantify the amount of oxidizing agents that are
16   produced by the human body?
17           MR. JACKSON:  Objection, asked and
18   answered.
19       A.  Are you asking have I done it or could it
20   be done?
21   BY MR. HUTCHINSON:
22       Q.  I am asking, have you done it?
23       A.  I have not done it.
24       Q.  Do you know the amount of oxidizing agents

Page 71

1    produced by the human body?
2            MR. JACKSON:  Objection, asked and
3    answered.
4        A.  No.
5    BY MR. HUTCHINSON:
6        Q.  Doctor, do you have any opinions regarding
7    the quantity of oxidizing agents it would take to
8    oxidize Prolene?
9        A.  Well, Prolene is an oxidizable material,
10   so any oxidant is capable of oxidizing Prolene.
11       Q.  My question, sir:  Do you have any idea
12   about the concentration level of oxidizing agents
13   that it would take to oxidize Prolene?
14       A.  Any detectable, measurable amount of an
15   oxidizing species is capable of oxidizing Prolene.
16       Q.  Can you quantify that, Doctor?
17           MR. JACKSON:  Objection, form.
18       A.  A detectable, I don't know what the
19   detection limit of a test you want to use, but if it
20   is detectable, it is capable of oxidizing Prolene.
21   BY MR. HUTCHINSON:
22       Q.  What about a micromole, can a micromole
23   oxidize Prolene?
24           MR. JACKSON:  Objection, form.

Page 72

1        A.  Absolutely.
2    BY MR. HUTCHINSON:
3        Q.  Doctor, do you have any idea how the
4    concentration level of hydrogen peroxide found
5    naturally in the body compares to 30 percent of
6    hydrogen peroxide?
7            MR. JACKSON:  Objection, form.
8        A.  I do not.
9    BY MR. HUTCHINSON:
10       Q.  You would expect 30 percent hydrogen
11   peroxide to be much stronger than the amount of
12   peroxide found in the body, correct?
13           MR. JACKSON:  Objection, form.
14       A.  Absolutely, yes.
15           (Priddy Deposition Exhibit 7 was
16   marked for identification.)
17   BY MR. HUTCHINSON:
18       Q.  Doctor, I will hand you what's been marked
19   as Exhibit 7 to your deposition.  Doctor, this is a
20   memo from Ethicon dated November 5, 1984.  Do you
21   see that?
22           (Witness reviewing document.)
23       A.  I do.
24       Q.  If you look with me, please, and by the

Page 73

1    way, this is a document that you reviewed or relied
2    on in reaching your opinions?
3        A.  I have, yes.
4        Q.  If you look with me on Page 3 at the
5    top --
6            MR. JACKSON:  Chad, can you give us
7    the Bates number of the page you are on?
8            MR. HUTCHINSON:  Yes, it's 15958454.
9            MR. JACKSON:  Thank you.
10   BY MR. HUTCHINSON:
11       Q.  Top paragraph, middle sentence, it says,
12   "Immersion, with Peroxide Changes."
13           Do you see that?
14       A.  Yes.
15       Q.  "To ensure strength of Prolene sutures, in
16   30 percent hydrogen peroxide after a year's time at
17   room temperature do not produce visible surface
18   cracks on any of the fibers."
19           Do you see that?
20       A.  I do.
21       Q.  Doctor, do you have any reason to disagree
22   with this statement?
23       A.  No.
24       Q.  This shows that Prolene exposed to

19 (Pages 70 to 73)

Duane Priddy, Ph.D.

Page 74

1    30 percent hydrogen peroxide for a year did not
2    produce visible surface cracks; is that correct?
3        A.  That's what that's saying, yes.
4        Q.  Doctor, how did you account for that when
5    reaching your opinions in this case?
6        A.  Irrelevant.
7        Q.  Why?
8        A.  Because they didn't do anything to
9    determine whether the material had oxidized or not.
10       Q.  Doctor, how do you know that?
11       A.  I don't see the data where they detected
12   whether or not oxidation had actually, degradation
13   of the material had occurred.  They just looked for
14   surface cracks.
15       Q.  Doctor, surface cracks are a form of
16   degradation, are they not?
17       A.  Yes.
18       Q.  In fact, visible surface cracks are a form
19   of oxidation via degradation, correct?
20       A.  Yes.
21       Q.  Doctor, what is a Bakelite cap?
22       A.  A Bakelite what?
23       Q.  Spelled B-A-K-E-L-I-T-E, do you know what
24   a Bakelite cap is on a glass vial?

Page 75

1        MR. JACKSON:  Objection, form.
2        A.  Yes.
3    BY MR. HUTCHINSON:
4        Q.  What are Bakelite caps generally made of?
5        A.  Bakelite, which is a phenolic resin.
6        Q.  Doctor, can you explain why the hydrogen
7    peroxide ate away the Bakelite cap and did not
8    affect the Prolene?
9        A.  Yes.
10       Q.  How so?
11       A.  Bakelite is a very hydrophilic,
12   water-loving, resin because phenolics are
13   hydroxylated materials which are hydrophylic.
14   Polypropylene is very hydrophobic, water-hating, so
15   polypropylene repulses and does not absorb water,
16   whereas Bakelite does absorb water.  So the water,
17   the hydrogen peroxide would penetrate into the
18   Bakelite and allow chemical oxidation to occur.
19       Q.  Let's look at Page 5 of your expert
20   report, Doctor.
21       A.  Page 5, okay.
22       Q.  Bottom paragraph, about the middle of the
23   paragraph.  It states, "These chemicals act to
24   extract the antioxidant stabilizers."

Page 76

1        Do you see that?
2        A.  Yes.
3        Q.  Doctor, have you tested that opinion?
4        MR. JACKSON:  Objection, form.
5        A.  That is basic polymer chemistry 101.
6    BY MR. HUTCHINSON:
7        Q.  My question is:  Have you tested that
8    opinion?
9        MR. JACKSON:  Objection, form.
10       A.  Yes.
11   BY MR. HUTCHINSON:
12       Q.  Are the test results included in your
13   expert report?
14       A.  No.
15       Q.  Doctor, what is the rate that chemicals
16   extract the antioxidant stabilizers?
17       MR. JACKSON:  Objection, form.
18       A.  It is dependent upon conditions.
19   BY MR. HUTCHINSON:
20       Q.  What about conditions in vivo, what is the
21   rate that conditions in vivo extract Santonox R or
22   DLTDP?
23       A.  That will be dependent upon a lot of
24   variables.

Page 77

1        Q.  Doctor, can you sit here today and
2    quantify that rate of extraction?
3        MR. JACKSON:  Objection.
4        A.  No.
5    BY MR. HUTCHINSON:
6        Q.  Doctor, can you explain to us in chemical
7    terms how blood extracts antioxidant stabilizers?
8        A.  You mean scientifically how?
9        Q.  Yes, sir.
10       A.  Blood contains water plus a lot of other
11   things, it contains triglycerides, lipids, different
12   things.  And it is the oil or the hydrophobic
13   components in blood, the fats, the oils, the lipids,
14   that extract the stabilizers from the plastic, and
15   even Dr., it starts with B, the Ethicon guy that did
16   the FTIR work, he measured the level of dilauryl
17   thiodipropionate in the surface of sutures that had
18   been removed and saw that there was no detectable,
19   it was all extracted out of the surface.  So even
20   Ethicon knows that these antioxidants are
21   extractable from the material.
22       Q.  Doctor, do you know what formalin is?
23       A.  Yes.
24       Q.  You understand that formalin contains

20  (Pages 74 to 77)

Duane Priddy, Ph.D.

Page 78

1    formaldehyde?
2        A.  Yes.
3        Q.  Is formaldehyde a solvent?
4        A.  It is normally 37 percent concentration of
5    water, but is it a solvent?  Not really.
6        Q.  Would you consider formalin to be a
7    solvent?
8        A.  Formalin is 37 percent formaldehyde and
9    water.  Water is a terrible solvent.  It is not
10   going to extract anything of consequence from
11   polypropylene.  Polypropylene is repulsive to water.
12       Q.  But my question, sir:  Is formalin a
13   solvent?
14       A.  It is a solvent for ionic species, but it
15   is not a solvent for like additives.
16       Q.  Doctor, would you be able to draw out the
17   chemical structure for the reaction between blood
18   and Santonox R?
19           MR. JACKSON:  Objection, form.
20       A.  The Santonox R does not react with blood,
21   it reacts with oxidizing species that would be
22   in the blood.
23   BY MR. HUTCHINSON:
24       Q.  Doctor, if we turn to Page 7 of your

Page 79

1    expert report, top paragraph, last sentence, you
2    reference antioxidant Santonox R that interferes
3    with the oxidative chain reaction.
4        A.  Yes.
5        Q.  Is that correct?
6        A.  Yes.
7        Q.  Doctor, we talked about ROS earlier, just
8    a minute ago, correct?
9            MR. JACKSON:  Objection, form.
10       A.  Yes.
11   BY MR. HUTCHINSON:
12       Q.  And that stands for reactive oxygen
13   species?
14       A.  Correct.
15       Q.  And reactive oxygen species, they possess
16   a free radical, don't they?
17           MR. JACKSON:  Objection, form.
18       A.  They can, yes.
19   BY MR. HUTCHINSON:
20       Q.  And a reactive oxygen species has a
21   non-bonded electron that wants to bond with
22   something, doesn't it?
23       A.  The ones that are free radicals, yes.
24       Q.  And a free radical is not bonded, is it?

Page 80

1        A.  That's correct.
2        Q.  And a free radical is -- strike that.
3            There is no difference between a free
4    radical formed in the body or a free radical formed
5    during the heat extrusion process, correct?
6            MR. JACKSON:  Objection, form.
7        A.  In the sense they are both free radicals.
8    BY MR. HUTCHINSON:
9        Q.  In fact, Santonox R and DLTDP are free
10   radical scavengers, aren't they?
11       A.  DLTDP is not a free radical scavenger,
12   Santonox R is a free radical scavenger.
13       Q.  Why do you say DLTDP is not a free radical
14   scavenger?
15       A.  Because it works by a different mechanism.
16   What it does is the sulfur reacts with oxygen
17   species.
18           It doesn't have to be a free radical
19   oxygen, it can just be oxygen, specifically
20   hydroperoxides, to become a higher, either a sulfone
21   or a sulfoxide which is a higher oxidized form.  The
22   sulfur converts the hydroperoxide group to an
23   alcohol.  But that's a different chemistry.  That's
24   not free radical-based.

Page 81

1        Q.  Let's talk about the chemistry for
2    Santonox R.
3            MR. JACKSON:  Chad, he wasn't
4    through answering his question.  You got
5    to let him finish.
6    BY MR. HUTCHINSON:
7        Q.  Santonox R is designed to remove free
8    radicals when they are formed, correct?
9        A.  I wouldn't say remove, but negate the
10   effects of free -- interferes with free radical
11   chain reactions.
12       Q.  Doctor, let's look at Page 8 at the top.
13   You reference the testing you did, the gas
14   chromatography, mass spectroscopy, did I say that --
15       A.  That's correct.
16       Q.  Is that the testing that you did?
17       A.  Yes.
18       Q.  Did you personally do the GS-MC testing?
19       A.  GC-MS.
20       Q.  GC-MS testing?
21       A.  I don't run lab equipment.  Trained
22   technicians run lab equipment.  I worked with a
23   technician to tell him how I wanted the test
24   performed, yes.

21 (Pages 78 to 81)

Duane Priddy, Ph.D.

Page 82

1      Q.  Who did the GC-MS testing, Doctor?
2      A.  Steve Johnson.
3      Q.  He did it too?
4      A.  Yes, he is the technician that does GC-MS
5   and the OIT test.
6      Q.  Which did Steve Johnson do first, did he
7   do the GC-MS or the DSC testing?
8      MR. JACKSON:  Objection, form.
9      A.  He did the OIT first and then I wanted to
10   see if it correlated with the additives so I asked
11   him to do GC-MS so I could see if there was a
12   statistical correlation.
13   BY MR. HUTCHINSON:
14      Q.  Let's talk about the GC-MS testing that
15   Steve Johnson did.  Did Steve Johnson's GC-MS
16   experiment follow any standard or published
17   procedure?
18      A.  It followed what's called SOP, standard
19   operating procedure.  Again, all certified
20   laboratories need SOPs for everything they do.
21   Those SOPs are audited annually, and he followed
22   his SOP for GC-MS.
23      Q.  Which SOP did Mr. Johnson follow?
24      A.  The one for GC-MS in the lab.

Page 83

1      Q.  But what number?
2      A.  I don't -- it's probably in the lab report
3   he sent me, but I don't have the number memorized.
4      Q.  Doctor, did you ever touch the GC-MS
5   equipment?
6      MR. JACKSON:  Objection, form.
7      A.  No.
8   BY MR. HUTCHINSON:
9      Q.  Did you ever touch the DSC equipment?
10      MR. JACKSON:  Objection, form.
11      A.  No.
12   BY MR. HUTCHINSON:
13      Q.  Have you ever even seen the GC-MS or DSC
14   equipment?
15      MR. JACKSON:  Objection, form.
16      A.  Yes, I have.
17   BY MR. HUTCHINSON:
18      Q.  At Steve Johnson's lab?
19      A.  At Steve Johnson's lab.  As a matter of
20   fact I have watched him in the past run it.
21      Q.  But you didn't watch him do this
22   experiment --
23      A.  No.
24      Q.  -- that we are here about today?

Page 84

1      A.  No, I did not.
2      Q.  Doctor, did Steve Johnson perform any
3   controls in his GC-MS experiment?
4      A.  Yes.
5      Q.  What were they?
6      A.  He always puts in an internal standard in
7   the solvent that he extracts, the additives from the
8   plastic, and that internal standard he looks at the
9   size of the response and the retention time to make
10   sure that the equipment is operating.  In other
11   words, it is a known material spiked into the
12   solvent and if that peak is not right, he knows
13   there's an issue.
14      Q.  Did that generate data?
15      MR. JACKSON:  Chad, you have to let
16   the witness finish his answer.
17   BY MR. HUTCHINSON:
18      Q.  I'm sorry, Doctor, if I interrupted you.
19   Did that generate data?
20      A.  What do you mean?
21      Q.  Using the control, when Mr. Johnson used
22   the control, did it generate any data?
23      A.  Yes.
24      Q.  Where is that data?

Page 85

1      A.  It would be in his GC-MS data report.
2      Q.  Is Mr. Johnson's GC-MS data report
3   included on the flash drive that you gave me before
4   the deposition?
5      A.  I believe so.
6      Q.  Why wasn't that GC-MS data included in
7   your expert report?
8      A.  I included just this comment of the
9   correlation, but I did not include the data in the
10   report.
11      Q.  But why not?  Why didn't you include the
12   data in your report?
13      A.  I just didn't.
14      Q.  Doctor, did Steve Johnson ever try to
15   measure the concentration level of DLTDP?
16      A.  Yes.
17      Q.  What was the result of the concentration
18   level of DLTDP?
19      A.  When he ran the test, he did not see the
20   DLTDP.  He couldn't detect it.
21      Q.  Doctor, have you personally ever tried to
22   measure the concentration level of DLTDP in Prolene?
23      A.  Through Steve Johnson I have attempted to
24   do it.

22 (Pages 82 to 85)

Duane Priddy, Ph.D.

Page 86

1    Q. But you personally?
2        MR. JACKSON: Objection, asked and
3    answered.
4        A. I have not run the equipment, no.
5    BY MR. HUTCHINSON:
6        Q. Doctor, are you aware of any studies that
7    show DLTDP is lost from Prolene once it is implanted
8    in vivo?
9        A. Yes.
10       Q. What's the name of the study?
11       A. That was done by Dr. Burkley, I think his
12   name was.
13       Q. You are talking about an internal Ethicon
14   scientist?
15       A. Yes.
16       Q. Doctor, are you aware of any published
17   peer-reviewed literature that shows DLTDP is lost
18   from Prolene in vivo?
19       A. Just Dr. Burkley's work.
20       Q. And nothing else, correct?
21       A. That's correct.
22       Q. Doctor, have you ever read Dr. Howard
23   Jordi's expert reports?
24       A. I don't recall.

Page 87

1        Q. Do you know Dr. Howard Jordi?
2        A. I know there's a Jordi Lab.
3        Q. Do you know if the Jordi Labs ever
4    detected DLTDP in Prolene?
5        A. I don't know.
6        Q. If Dr. Jordi's lab did detect DLTDP in
7    Prolene, that would be inconsistent with the results
8    of your tests, correct?
9        MR. JACKSON: Objection, form.
10       A. No.
11   BY MR. HUTCHINSON:
12       Q. I thought you told me your tests did not
13   detect DLTDP.
14       A. No, I'm saying that the way the test was
15   run, it did not detect it. He only saw a peak for
16   the Santonox R.
17       Q. Doctor, is it your testimony under oath
18   that the Prolene sample that Mr. Johnson used did
19   not have any DLTDP in it?
20       A. No, it likely did. It's just the way
21   that particular test was run, it was
22   non-detectable. But -- yeah, that's all.
23       Q. It probably wasn't the best test to
24   determine whether or not DLTDP was in the Prolene?

Page 88

1        MR. JACKSON: Objection, form.
2        A. That's correct, yes.
3    BY MR. HUTCHINSON:
4        Q. Doctor, did you do any type of appropriate
5    testing to determine the level of DLTDP in Prolene?
6        MR. JACKSON: Objection, form.
7        A. Yes, I tried to. I actually had him
8    experiment with different conditions to try to
9    detect the DLTDP. He did find a condition where he
10   was able to see it. It's just not -- so it's there,
11   it's just not reported in this data.
12       Q. What test did he use to detect DLTDP?
13       A. GC-MS, again. It's just he ran it under
14   different conditions.
15       Q. Doctor, why is that information not in
16   your expert report?
17       A. Because the purpose for doing it was to
18   just make sure that it was there. I wanted to make
19   sure it was there.
20       Q. And you confirmed it was there?
21       A. I confirmed it was there.
22       Q. Or rather Mr. Johnson confirmed it was
23   there?
24       MR. JACKSON: Objection, form.

Page 89

1        A. Yes.
2    BY MR. HUTCHINSON:
3        Q. Doctor, let's go back to the GC-MS test.
4    Did you determine the weight loss for Santonox R
5    before Steve Johnson did his testing?
6        A. Weight loss?
7        Q. The weight loss rate?
8        A. I don't understand the question. You mean
9    by TGA?
10       Q. Yes, by glass transition, correct.
11       A. No, TGA is thermogravimetric analysis.
12   It measures weight loss of materials versus
13   temperature.
14       Q. TGA?
15       A. TGA.
16       Q. Did you do any type of TGA analysis to
17   determine the weight loss for DLTDP?
18       A. No.
19       Q. Did you do any type of TGA analysis to
20   determine the weight loss of Santonox R?
21       A. No.
22       Q. Why not?
23       A. As I say, the only time I was looking for
24   volatility, if you will, in other words, loss during

Duane Priddy, Ph.D.

Page 90

1  the heat process, was by retention time and the gas
2  chromatograph which gives me a feel for volatility.
3      Q.  Doctor, do you know what the recommended
4  ranges are for DLTDP and Santonox R by weight?
5          MR. JACKSON:  Objection, form.
6      A.  I mean, that's application-specific.  I
7  know what the formulation for Prolene, has a target
8  range of weight.
9  BY MR. HUTCHINSON:
10     Q.  Do you know what the target range of
11 weight of DLTDP and Santonox R is for Prolene?
12     A.  I have seen it.  It seems like it was
13 between 2,000 and 4,000 parts per million or .2 to
14 .4 percent, I think, in that range.  It's probably
15 not correct, but in that ballpark.
16     Q.  Doctor, do you know what the weight loss
17 rate is for DLTDP?
18     A.  From Prolene?
19     Q.  Yes.
20     A.  Under what conditions?
21     Q.  In vivo.
22     A.  In vivo, again, the only data point I got
23 is Dr. Burkley's data where he saw it was totally
24 depleted from the surface after a period of time in

Page 91

1  vivo.
2      Q.  Doctor, do you know what the weight loss
3  rate is for DLTDP in vivo?
4      A.  That's what I just answered.  The only
5  thing I know is from Dr. Burkley's work.
6      Q.  Same question for Santonox R:  Do you know
7  what the weight loss rate is for Santonox R in vivo?
8      A.  No.
9      Q.  Doctor, do you know what the melting point
10 is for DLTDP?
11     A.  Not offhand.
12     Q.  Do you know what the melting point for
13 Santonox R is?
14     A.  Again, not offhand.
15     Q.  Doctor, when we talk about the GC-MS
16 testing, what color was the exemplar that Steve
17 Johnson tested?
18     A.  It's in the lab report he sent me.  He
19 listed the lot number and the color.
20     Q.  What color was it?
21     A.  I don't recall if it was blue or white.
22 I'd have to look at the lab report.
23     Q.  What temperature was the GC-MS set for?
24     A.  It's a program.  Its oven temperature is

Page 92

1  ramped up over time because these additives, like
2  if the oven temperature was set at 40 degrees and
3  you injected the sample, the additive would never
4  come through the instruments.  So you've got to keep
5  raising the temperature until it comes through.
6      Q.  What temperature was it when the material
7  began coming through?
8          MR. JACKSON:  Objection, form.
9      A.  I can't tell you precisely.  I can tell
10 you it was over 200 degrees.
11 BY MR. HUTCHINSON:
12     Q.  Was a solvent used by Mr. Johnson with
13 this GC-MS?
14     A.  Yes.
15     Q.  Do you know what type of solvent Mr.
16 Johnson used?
17     A.  Methylene chloride.
18     Q.  Do you know what quantity of methylene
19 chloride that Mr. Johnson used?
20     A.  Again, it is in his lab procedure he sent
21 me.  I don't know the number offhand.
22     Q.  Doctor, you will agree that that solvent
23 only extracts volatile materials, correct?
24         MR. JACKSON:  Objection, form.

Page 93

1      A.  No.
2  BY MR. HUTCHINSON:
3      Q.  Does it extract volatile materials?
4      A.  Yes.
5      Q.  Doctor, did you know -- my understanding
6  in reading your report is that the GC-MS test only
7  found Santonox R; is that right?
8      A.  That's the only stabilizer that it saw,
9  that he identified as a stabilizer.
10     Q.  Did it pick up any other type of additives
11 to the Prolene?
12         MR. JACKSON:  Objection, form.
13     A.  I do not believe so.
14 BY MR. HUTCHINSON:
15     Q.  Doctor, did the GC-MS that Mr. Johnson
16 did, did it detect Procol LA-10?
17     A.  No.
18     Q.  Why not?
19     A.  It was probably not volatile enough to
20 make it through the instrument.
21     Q.  Do you know what the flash point is for
22 Procol LA-10?
23     A.  Not offhand, no.
24     Q.  Do you know the melting point?

Duane Priddy, Ph.D.

Page 94

1  A.  No.
2  Q.  Do you know the flash point for Santonox
3  R?
4  A.  No.
5  Q.  Do you know the flash point for DLTDP?
6  A.  I do not.
7  Q.  Do you know the flash point or melting
8  point for calcium stearate?
9  A.  No.
10  Q.  Do you have any idea why Mr. Johnson's
11  GC-MS test did not detect calcium stearate?
12  A.  Yes.
13  Q.  Why?
14  A.  It wouldn't be soluble in methylene
15  chloride.  It's only going to extract out what's
16  soluble in that solvent.
17  Q.  Did the GCMS test detect any blue pigment?
18  A.  No.
19  Q.  Why not?
20  A.  Either it's not soluble in methylene
21  chloride or its boiling point is too high to make
22  it through the gas chromatograph, one of the two.
23  Q.  Do you know what the boiling point is of
24  the CPC blue pigment?

Page 95

1  A.  I do not.
2  Q.  Doctor, did you ever do any type of FTIR
3  analyses on Prolene?
4  A.  No.
5  Q.  Did Mr. Johnson to your knowledge do any
6  type of FTIR analyses on Prolene?
7  A.  No.
8  Q.  Doctor, let's look at Page 12 of your
9  expert report.  Are you there with me?
10  A.  I am.
11  Q.  It states, "The mesh sample," in the top
12  of the first paragraph.
13  A.  Yes.
14  Q.  "The mesh sample is heated to 200 degrees
15  C under pure nitrogen."
16  Is that right?
17  A.  Yes.
18  Q.  Doctor, do you know, we talked about this
19  earlier, do you have any idea what the flash point
20  is for DLTDP?
21  MR. JACKSON:  Objection, asked and
22  answered.
23  A.  No.
24  (Priddy Deposition Exhibit 8 was

Page 96

1  marked for identification.)
2  BY MR. HUTCHINSON:
3  Q.  Doctor, I want to hand you what we'll mark
4  as Exhibit 8 to your deposition.
5  (Witness reviewing document.)
6  Q.  Exhibit 8 is for an antioxidant DLTDP, do
7  you see that?
8  A.  I do.
9  Q.  The flash point for DLTDP is 150 degrees
10  C; is that correct?
11  A.  That's what it says, yes.
12  Q.  And Doctor, do you have any reason to
13  believe that the flash point for DLTDP would be
14  significantly different than 150 degrees C?
15  A.  No.  It sounds low but I don't have any
16  reason to dispute it.
17  Q.  Doctor, a sample of mesh heated to
18  200 degrees C is 50 degrees Celsius hotter than the
19  flash point for DLTDP, isn't it?
20  A.  That's correct.
21  Q.  Doctor, that would volatize DLTDP,
22  wouldn't it?
23  A.  No.
24  Q.  Why not?

Page 97

1  A.  Flash point has nothing to do with boiling
2  point.
3  Q.  A flash point is the temperature at which
4  an organic compound gives off enough vapor to ignite
5  in air; is that right?
6  A.  It's ignitable in air by a spark, yes.
7  MR. JACKSON:  Chad, I am going to
8  object to the use of this document just
9  on foundation.  I don't know what it is.
10  BY MR. HUTCHINSON:
11  Q.  Doctor, what did you do to ensure that
12  DLTDP or Santonox R were not burned off when Mr.
13  Johnson heated the mesh to 200 degrees C?
14  A.  As I explained to you, I had him determine
15  its retention time in the GC which gave me a feel
16  for its level of volatility and based upon that
17  data, I knew it was not a very volatile chemical.
18  And of course when chemicals are embedded in a
19  plastic, it's very difficult to drive them, vaporize
20  them and get them out of the plastic at low levels.
21  Q.  Doctor, on Page 13 of your expert report
22  under Section 11 it states, "The antioxidants,"
23  plural, "present in the ten meshes were then
24  extracted."

25 (Pages 94 to 97)

Duane Priddy, Ph.D.

Page 98

1          Did I read that correctly?
2      A.  That's correct.
3      Q.  DLTDP was found as an antioxidant in this
4  case; is that correct?
5          MR. JACKSON:  Objection, form.
6      A.  Just a minute.  Let me read through this
7  real quick.
8          (Witness reviewing document.)
9      A.  Now, what's your question?
10  BY MR. HUTCHINSON:
11     Q.  My question is, sir:  Was DLTDP extracted
12  using the methylene chloride solvent?
13     A.  All I can say is that in this particular
14  test referred to right here, it was not detected,
15  and I don't know exactly why it wasn't detected.  I
16  don't know if it wasn't extracted or if the
17  conditions for the GC-MS analysis just were such
18  that it didn't detect it.
19     Q.  Did you ever make any effort to find out
20  why?
21         MR. JACKSON:  Objection, form.
22     A.  I asked him to try to detect DLTDP and he
23  played around and was finally able to come up with
24  conditions that he could see it.  But it was not

Page 99

1  this particular test right here, he couldn't see it.
2  BY MR. HUTCHINSON:
3      Q.  What concentration level did Mr. Johnson
4  find DLTDP in?
5      A.  The particular -- I remember numbers,
6  hundreds of parts per million.
7      Q.  Right, but can you quantify the amount of
8  DLTDP concentration level that Mr. Johnson found?
9      A.  I'm sorry, the question again?
10     Q.  Can you quantify the concentration level
11  of the DLTDP that Mr. Johnson found?
12     A.  As I said, it was hundreds of parts per
13  million.  I just don't remember the exact number.
14     Q.  Did Mr. Johnson ever tell you that exact
15  number?
16         MR. JACKSON:  Objection, form.
17     A.  Yes.
18  BY MR. HUTCHINSON:
19     Q.  Where would that data be included?
20     A.  In the data report.
21     Q.  Where is the data report?
22     A.  Should be on the flash drive.
23     Q.  Look at Page 9 for me, please, of your
24  expert report under Summary, Number 2.

Page 100

1      A.  Okay.
2      Q.  It states, "The polymer chain is
3  disentangled."
4          Do you see that?
5      A.  Yes.
6      Q.  Doctor, would you agree that
7  disentanglement of polymer chains allows a polymer
8  to elongate?
9          MR. JACKSON:  Objection, form.
10     A.  No.
11  BY MR. HUTCHINSON:
12     Q.  Doctor, if polymers, if polymer chains do
13  not disentangle, would the polymer become brittle?
14     A.  If the polymer chains do not disentangle,
15  would the polymer become brittle?
16     Q.  Correct.
17     A.  Yeah, it can, yes.
18     Q.  But you disagree that disentanglement of
19  polymer chains allows a polymer to elongate?
20         MR. JACKSON:  Objection, misstates
21     witness testimony.
22     A.  A polymer will elongate under stress
23  whether or not it is entangled.  So I guess I'm
24  not --

Page 101

1  BY MR. HUTCHINSON:
2      Q.  Should the polymer chains become
3  disentangled for a polymer to elongate?
4      A.  No.
5      Q.  Doctor, when you reviewed the internal
6  documents from Ethicon, did you review any documents
7  on biocompatibility?
8          MR. JACKSON:  Objection, form.
9      Q.  Doctor?
10     A.  I'm thinking.  I guess I'm not sure
11  specifically what you are referring to, but I would
12  say yes.
13     Q.  Do you have any opinions about the
14  biocompatibility testing of Prolene that Ethicon
15  did?
16     A.  I don't have an opinion on that.
17     Q.  Doctor, have you ever designed pelvic
18  mesh?
19         MR. JACKSON:  Objection, asked and
20     answered.
21     A.  No.
22  BY MR. HUTCHINSON:
23     Q.  Have you ever done any type of
24  biomechanical testing of pelvic mesh?

26 (Pages 98 to 101)

Duane Priddy, Ph.D.

Page 102

1          A.   The only testing I have done regarding
2    Prolene mesh are listed in my report.
3          Q.   So we are clear, you have never done any
4    biomechanical testing of Prolene mesh, correct?
5          A.   That's correct.
6          Q.   You have never done any type of
7    biomechanical testing of Prolene, have you?
8          A.   No.
9          Q.   Have you ever been involved in any type of
10   clinical research regarding Prolene?
11         A.   Other than reviewing a lot of documents on
12   the research, no.
13         Q.   My question is, sir:  Have you personally
14   ever been involved in any type of clinical research
15   regarding Prolene?
16         A.   Not as far as conducting the research, no.
17         Q.   Or mesh, have you ever been involved in
18   any clinical research regarding mesh?
19              MR. JACKSON:  Objection, form.
20         A.   Just reviewing the results of the studies,
21   that's it.
22   BY MR. HUTCHINSON:
23         Q.   Have you ever tested a mesh explant?
24              MR. JACKSON:  Objection, form.

Page 103

1          A.   I served as a consultant on a project
2    several years ago involving Kugel mesh and at that
3    point I received a mesh sample, but I don't recall
4    actually evaluate -- or testing it.
5    BY MR. HUTCHINSON:
6          Q.   Do you know what the chemical composition
7    is of the Kugel mesh?
8          A.   Yes, it was a polyester.
9          Q.   It wasn't Prolene, correct?
10         A.   No.
11         Q.   Doctor, you will agree that Prolene has a
12   chemical composition difference compared to
13   polypropylene?
14         A.   Absolutely, yes.  Compared to what?
15         Q.   Compared to polypropylene.  Polypropylene
16   and Prolene are chemically different, aren't they,
17   sir?
18              MR. JACKSON:  Objection, form.
19         A.   Prolene meshes are polypropylene.
20   BY MR. HUTCHINSON:
21         Q.   Doctor, as a materials scientist, would
22   you agree that Prolene has a different chemical
23   composition compared to pure polypropylene?
24              MR. JACKSON:  Objection, form.

Page 104

1          A.   It's got stabilizers and additives, yes.
2    BY MR. HUTCHINSON:
3          Q.   Prolene and polypropylene are not
4    identical, are they?
5          A.   Prolene is polypropylene with additives.
6          Q.   And pure polypropylene is not identical to
7    Prolene, correct?
8              MR. JACKSON:  Objection, asked and
9    answered.
10   BY MR. HUTCHINSON:
11         Q.   Pure polypropylene?
12         A.   Because pure, with no additives, is
13   different than a formulation with additives, yes.
14         Q.   And Ethicon's product is a formulation
15   with additives, correct?
16         A.   That's correct.  All polypropylene
17   products contain additives.  They have to.
18         Q.   But they are different polymers?
19         A.   Polymer is the same.
20         Q.   Doctor, what medical products are you
21   designated to give opinions about?
22         A.   You mean in legal cases?  I've done
23   consulting.
24         Q.   No, in the deposition that you are here

Page 105

1    for today, In Re Ethicon Pelvic Repair System
2    Products Liability Litigation.
3              MR. JACKSON:  Objection, form.
4          A.   I was asked to opine on the use of
5    polypropylene in the TVT and the Gynemesh product
6    lines for urinary incontinence and the pelvic
7    products.
8    BY MR. HUTCHINSON:
9          Q.   Doctor, do you know the names of the
10   products that you are designated to give testimony
11   about for the plaintiffs?
12         A.   As I said, the TVT products, there's like
13   four or five of those and then the prolapse
14   products, there are several of those.
15         Q.   Do you know the names of those products?
16         A.   Boy, I'm terrible at names.  I don't
17   remember the details of all the names, no.  I was
18   shown the names and have seen the names and, yes,
19   but I just don't recall all the names.
20         Q.   Do the opinions that you are giving today
21   relate to all of these products?
22         A.   If they contain polypropylene, yes.
23         Q.   Doctor, have you ever seen a TVT -- strike
24   that.

27 (Pages 102 to 105)

Duane Priddy, Ph.D.

Page 106

1    I am going to represent to you that you
2  are designated in cases involving Prolene Soft mesh,
3  Gynemesh PS, TVT, Prolift, TVT-O, Prolift+M, TVT
4  Exact, TVT Secur, Prosima and TVT Abbrevo?
5      A.  I have seen all those names, yes.
6      Q.  Thank you.  Doctor, have you ever held any
7  of those devices in your hand?
8          MR. JACKSON:  Objection, form.
9      A.  Yes.
10  BY MR. HUTCHINSON:
11      Q.  When?
12      A.  Back in December when I received the
13  samples for lab testing.
14      Q.  Did you receive one sample of each
15  product?
16      A.  No, I received, I think, four of the
17  Gynemesh products and six of the TVT products.
18      Q.  So fair to say you have never held Prosima
19  or Prolift or Prolift+M in your hands?
20          MR. JACKSON:  Objection, form.
21      A.  That's correct.
22  BY MR. HUTCHINSON:
23      Q.  Doctor, do you know what the indications
24  are for those products?

Page 107

1      A.  Indications?
2      Q.  Yes.
3      A.  What do you mean by indications?
4      Q.  What the product is indicated for from a
5  medical standpoint.
6      A.  In general, yes.
7      Q.  Doctor, do you know how long those
8  products have been on the market?
9      A.  The years vary but it started back in the
10  1990s and then there's recent introductions as
11  recent as, I think 2010 or '11.
12      Q.  Can you tell us the date that each of
13  those products were introduced to the market?
14          MR. JACKSON:  Objection, form.
15      A.  Again, I have seen the dates, I just don't
16  recall.
17  BY MR. HUTCHINSON:
18      Q.  Do you know the physical dimensions of the
19  mesh of each of those products?
20          MR. JACKSON:  Objection, form.
21      A.  Again, I have seen pictures and photo-
22  graphs of them, but I don't recall exact dimensions.
23  BY MR. HUTCHINSON:
24      Q.  Do you know the weight of the mesh of

Page 108

1  those particular products?
2      A.  Again, I've seen that information.  I just
3  don't recall it.
4      Q.  Do you know how many newtons of force are
5  placed on the mesh in vivo?
6      A.  I do not.
7      Q.  Doctor, what do you know about the
8  manufacturing process Ethicon uses to make Prolene?
9          MR. JACKSON:  Objection, form.
10      A.  I know that the resin is manufactured in
11  West Virginia and then it's converted to fiber in
12  Georgia, and then woven into mesh and sent over to
13  Europe where it's cut and then it's shipped back to
14  the US for sale.
15      Q.  Doctor, is the mesh woven or knitted?
16      A.  Oh, boy, I'm not sure of the semantics of
17  the difference between those to be able to answer.
18      Q.  Doctor, do you know if Prolift+M, the mesh
19  in Prolift+M is made of a hundred percent Prolene?
20      A.  I remember, when I looked through the data
21  in the data sheets, I remember that some of the
22  products have polypropylene plus another
23  biodegradable kind of material, either
24  polycaprolactone or glycolate biodegradable

Page 109

1  material.  So it is a hybrid system.
2      Q.  Doctor, my question is is:  Do you know what
3  type of biodegradable material Prolift+M has in its
4  mesh?
5          MR. JACKSON:  Objection, form.
6      A.  I have seen it, I just don't recall.
7  BY MR. HUTCHINSON:
8      Q.  Doctor, did you make any efforts to find
9  out what type of biodegradable material is in
10  Prolift+M?
11      A.  Other than reading the sheets that
12  describe them, no.
13      Q.  Do you consider yourself an expert in the
14  manufacturing process of pelvic mesh?
15          MR. JACKSON:  Objection, form.
16      A.  Just the manufacture as far as it goes to
17  making the fibers.  Once the fibers are made, I'm
18  not an expert from that point on.
19  BY MR. HUTCHINSON:
20      Q.  Doctor, have you ever invented any type of
21  polypropylene product that's turned into a fiber?
22      A.  Invented a polypropylene product, I have
23  worked on polypropylene additive formulations.  I
24  led a group at Dow for several years in the 1990s

28 (Pages 106 to 109)

Duane Priddy, Ph.D.

Page 110

1  where we experimented with different Dow products
2  including polypropylene and the additives and
3  stabilizers that need to be added to those to make
4  various types of products including fibers.
5       Q.  Doctor, have you personally ever performed
6  any testing to determine if Prolene degrades in
7  vivo?
8       A.  I have not done any in vivo testing
9  myself, no.
10      Q.  And you haven't done any loss of
11 mechanical property testing in vivo, have you?
12      A.  I just reviewed the Ethicon documents
13 which showed the loss of strength properties from in
14 vivo implanted Prolene sutures.
15      Q.  But you have never done any testing, have
16 you?
17          MR. JACKSON:  Objection, form.
18      A.  Just reviewed work of others, yes.
19 BY MR. HUTCHINSON:
20      Q.  In fact, you have never tested the
21 durability of Prolene?
22      A.  In vivo?
23      Q.  Yes.
24      A.  Not directly, no.

Page 111

1       Q.  Have you ever tested the durability of
2  Prolene in any form or fashion?
3          MR. JACKSON:  Objection, form.
4       A.  Well, yes, the OIT testing.
5  BY MR. HUTCHINSON:
6       Q.  What about tensile strength, have you ever
7  tested tensile strength of Prolene, whether it be in
8  vivo or outside the body?
9       A.  I just reviewed the Ethicon documents
10 which do that kind of testing.
11      Q.  You have never done tensile strength
12 testing, have you?
13      A.  I have done tensile strength testing.
14      Q.  Of Prolene?
15      A.  Not of Prolene, no.
16      Q.  You have never done elongation testing of
17 Prolene, have you?
18      A.  Just reviewed those documents.
19      Q.  You have never done any toughness testing
20 of Prolene, have you?
21          MR. JACKSON:  Objection, form.
22      A.  No, just reviewed the documents.
23 BY MR. HUTCHINSON:
24      Q.  You have never done any Young's modulus

Page 112

1  testing of Prolene, have you?
2       A.  I sure reviewed the Ethicon documents on
3  the Young's modulus of Prolene.  I was shocked by
4  what I saw.
5       Q.  You have never done any testing of that,
6  have you?
7       A.  I have done modulus testing.
8       Q.  On Prolene?
9       A.  Not on Prolene, no.
10      Q.  You have had the resources available to do
11 all of this testing of Prolene, haven't you?
12      A.  I've had it, but I had all those documents
13 which gave me the data that I needed to opine on
14 that issue.
15      Q.  You will agree with me that degradation
16 affects the physical properties of the polymer?
17      A.  Absolutely, yes.
18      Q.  And it will affect the physical properties
19 of the mesh and/or suture, correct?
20      A.  That's correct.
21      Q.  You will agree that evaluation of the
22 physical properties of mesh is an important part in
23 your analysis on degradation, correct?
24      A.  Absolutely, yes.

Page 113

1       Q.  As well as oxidation?
2          MR. JACKSON:  Objection, form.
3       A.  Yes.
4  BY MR. HUTCHINSON:
5       Q.  Doctor, have you ever done any type of
6  testing or analysis on an explanted Prolene mesh?
7       A.  Just reviewed the literature and the
8  documents.
9       Q.  But you have never done any actual testing
10 of an actual explanted Prolene mesh, have you?
11      A.  Not myself, no.
12      Q.  Have you ever seen a Prolene explanted
13 mesh?
14      A.  Yes.
15      Q.  Where?
16      A.  In the literature.
17      Q.  Have you ever seen an actual Prolene
18 explanted mesh?
19      A.  No.
20      Q.  Have you ever seen an actual Prolene
21 explant that has become degraded?
22      A.  Yes.
23      Q.  Where?
24      A.  In the literature.

29 (Pages 110 to 113)

Duane Priddy, Ph.D.

Page 114

1    Q.  Outside the literature, have you ever seen
2  personally a Prolene explant that has become
3  brittled?
4    A.  No.
5    Q.  Or degraded?
6    A.  No.
7    Q.  Or oxidized?
8    A.  No.
9    Q.  Or lost physical properties?
10         MR. JACKSON:  Objection, form.
11    A.  Just in pictures in the literature.
12  BY MR. HUTCHINSON:
13    Q.  In fact, you have never done any testing
14  or analysis on the degradation of Prolene before
15  your involvement in this case; is that correct?
16         MR. JACKSON:  Objection, asked and
17      answered.
18    A.  Before involvement in the case, no.
19  BY MR. HUTCHINSON:
20    Q.  Am I correct?
21    A.  That's correct.
22    Q.  Thank you.  Doctor, you were designated
23  in -- let's look at Exhibit 1 for me, please, it is
24  the notice of deposition.

Page 115

1    A.  Yes.
2    Q.  You were designated as an expert in 23
3  case-specific cases starting with Harriet Beach,
4  Sharon Boggs and going on down all the way to
5  Virginia White.  Do you see that?
6    A.  Yes.
7    Q.  Do you know what type of product these 23
8  women received?
9         MR. JACKSON:  Objection, form.
10    A.  No.
11  BY MR. HUTCHINSON:
12    Q.  Have you ever reviewed the medical records
13  for these 23 plaintiffs?
14    A.  No, I have not.
15    Q.  By the way, Doctor, have you ever
16  attempted to clean an explanted piece of mesh?
17    A.  No.
18    Q.  Why do you laugh?
19    A.  Because I was sent a sample of explanted
20  mesh and asked to analyze it and it made me very
21  nervous.
22    Q.  Who sent it to you?
23    A.  This was the Kugel mesh case and I got to
24  the point of where I just didn't want to handle a

Page 116

1  piece of explanted mesh because of various obvious
2  reasons.
3    Q.  Biohazardous --
4    A.  Biohazardous, yes, until I was assured
5  that there was no issue.
6    Q.  Doctor, fair to say you have never
7  inspected the explanted mesh from any of these 23
8  women, correct?
9    A.  That is correct.
10         MR. JACKSON:  We have been going
11      about another hour.  Can we take a break
12      soon?
13         MR. HUTCHINSON:  Yes.
14  BY MR. HUTCHINSON:
15    Q.  Do you know the date that these women had
16  implanted or explanted mesh in them?
17    A.  No.
18    Q.  Do you have any idea how long these women
19  had their mesh in their bodies before it was
20  explanted?
21    A.  No.
22    Q.  Do you know why from a medical or clinical
23  standpoint, why any of these 23 plaintiffs had their
24  mesh removed?

Page 117

1         MR. JACKSON:  Objection, form.
2    A.  I can only make assumptions.
3  BY MR. HUTCHINSON:
4    Q.  You don't have any hard facts on why the
5  mesh --
6    A.  No.
7    Q.  Excuse me, no hard facts regarding why the
8  mesh was removed, correct?
9    A.  Correct.
10    Q.  Doctor, can you make any prediction about
11  when the mesh from any of these 23 different
12  plaintiffs would have oxidized in vivo?
13         MR. JACKSON:  Objection, form.
14    A.  Based upon the results of Ethicon's
15  testing, yes.
16         MR. JACKSON:  Chad, let's take a
17      break now.
18         MR. HUTCHINSON:  Actually, just two
19      more questions and we'll take a break.
20         MR. JACKSON:  I will give you two
21      questions.
22  BY MR. HUTCHINSON:
23    Q.  Doctor, can you tell us a specific date
24  when Harriet Beach's mesh oxidized?

30 (Pages 114 to 117)

Duane Priddy, Ph.D.

Page 118

1     MR. JACKSON:  Objection, form.
2   A.  No.
3     MR. HUTCHINSON:  Thank you.  We'll
4   take a quick break.
5     THE VIDEOGRAPHER:  We are off the
6   video record.  The time is 11:08 a.m.
7     (Recess.)
8     THE VIDEOGRAPHER:  We are back on
9   the video record with Tape Number 3.  The
10  time is 11:18 a.m.
11  BY MR. HUTCHINSON:
12  Q.  Doctor, back on the record.  Anything
13  about the testimony you have given you would like to
14  change?
15  A.  No.
16  Q.  Going back to Exhibit 1 and the list of
17  the 23 different plaintiffs, can you tell us the
18  date on which any of these 23 different plaintiffs
19  had their mesh oxidized?
20    MR. JACKSON:  Objection, form.
21  A.  I could probably tell you if I had the
22  literature when the meshes were removed.
23  BY MR. HUTCHINSON:
24  Q.  Right, but I am asking when they were

Page 119

1   oxidized.
2   A.  There's so many variables in the human
3   body, it's impossible to know when a mesh, at what
4   point it oxidizes to the point of degradation to be
5   an issue.
6   Q.  Doctor, can you identify by name one
7   person who has had their mesh surgery removed
8   because of degradation?
9     MR. JACKSON:  Objection, form.
10  A.  My best is all of them had them, they were
11  degraded by oxidation.  Every mesh that was removed
12  from these women, I'm very confident would show
13  evidence of degradation by oxidation.  It is because
14  of my knowledge of polypropylene oxidation.
15  BY MR. HUTCHINSON:
16  Q.  You have never talked to the doctors?
17  A.  I have not.
18  Q.  You have never looked at the medical
19  records?
20  A.  That's correct.
21  Q.  You have never talked to any of these
22  plaintiffs?
23  A.  That's correct.
24  Q.  Or any of these family members?

Page 120

1   A.  That's correct.
2   Q.  Doctor, can you state to a reasonable
3   degree of scientific certainty whether or not any of
4   these 23 plaintiffs have had their mesh removed
5   specifically because of degradation?
6   A.  All I can say is that the meshes removed
7   from these women had undergone oxidation.  I can say
8   that unequivocally.
9   Q.  Doctor, did the mesh from any of these
10  women fail?
11    MR. JACKSON:  Objection, form.
12  A.  Depends on how you define failure.
13  BY MR. HUTCHINSON:
14  Q.  Did the mesh from any of these women stop
15  providing tissue support?
16  A.  I do not know that.
17  Q.  Did the mesh from any of these women lose
18  molecular weight?
19  A.  Yes.
20  Q.  Have you ever done any molecular weight
21  analyses on the explants from these women?
22  A.  No.
23  Q.  How can you tell us that these meshes lost
24  molecular weight without having examined the

Page 121

1   explant?
2   A.  Because I understand the chemistry of
3   polypropylene, and the fact that it interacts with
4   oxidizing species and degrades, and as part of the
5   oxidation process, molecular weight is lowered.  And
6   the fact that they were implanted for a period of
7   time, I'm a hundred percent confident that if I had
8   a sensitive way to measure molecular weight, or I
9   should say applied a sensitive technique for
10  measuring molecular weight of all of these explanted
11  meshes, I can detect a loss of molecular weight.  I
12  have full confidence of that.
13  Q.  A loss of molecular weight means
14  degradation has occurred, correct?
15  A.  That's correct.
16  Q.  Let's take, for example, Harriet Beach,
17  the first named plaintiff.  Do you have any evidence
18  to confirm that Harriet Beach, her explant, lost
19  molecular weight?
20    MR. JACKSON:  Objection, asked and
21    answered.
22  A.  Do I have data?
23  BY MR. HUTCHINSON:
24  Q.  Yes, sir.

31 (Pages 118 to 121)

Duane Priddy, Ph.D.

Page 122

1      A.  Other than my knowledge of polypropylene
2  oxidation chemistry, no.
3      Q.  Doctor, do you have data on any of the 23
4  plaintiffs that would show their mesh lost molecular
5  weight?
6      A.  I have not actually done the measurements
7  to collect the data, no.
8      Q.  In fact, Doctor, you have not done
9  anything according to the scientific method to prove
10 whether or not any of these plaintiffs' mesh
11 degraded in vivo, have you?
12     MR. JACKSON:  Objection, form.
13     A.  I have done a ton of research using the
14 scientific method to study the degradation chemistry
15 of polypropylene.
16 BY MR. HUTCHINSON:
17     Q.  But have you proven that using the
18 scientific method for any of these 23 plaintiffs,
19 yes or no?
20     A.  Not those specific samples, no.
21     Q.  Doctor, are you aware of any peer-reviewed
22 literature that shows there is a clinical effect of
23 degradation in vivo?
24     A.  I've read a ton of literature put out in

Page 123

1  the last ten years on explanted meshes that show
2  degradation.
3      Q.  Doctor, are you aware of any clinical data
4  that shows degradation is clinically significant?
5      MR. JACKSON:  Objection, form.
6      A.  Clinically, I can't equate to that,
7  clinically significant.
8  BY MR. HUTCHINSON:
9      Q.  Doctor, are you aware of any clinical data
10 that shows degradation causes clinical harm?
11     A.  Again, since I'm not a medical doctor, I
12 can't equate the clinical.
13     Q.  Are you aware of any data that shows
14 degradation causes harm in women?
15     A.  Any data?
16     Q.  As a scientist.
17     A.  Other than reading the scientific
18 literature that I've talked about on explants.
19     Q.  Doctor, have you concluded that Prolene is
20 toxic?
21     MR. JACKSON:  Objection, form.
22     A.  I know from reading the MSDS sheets on the
23 different additives in Prolene, I know that the
24 colorant, the copper phthalocyanine pigment is

Page 124

1  cytotoxic, so that tells me that any dye that exudes
2  from the surface in the neighboring tissue would be
3  toxic to it.
4      Q.  Are you offering opinions today to a
5  reasonable degree of scientific certainty that
6  Prolene is toxic in the human body?
7      MR. JACKSON:  Objection, form.
8      A.  No, just that pigment is cytotoxic.
9  That's all I can say.
10 BY MR. HUTCHINSON:
11     Q.  Doctor, as a material scientist, are you
12 aware of any material that's completely inert?
13     A.  Completely inert, about the closest to
14 completely inert is diamond.
15     Q.  Are you aware of any medical device on the
16 market that's completely inert?
17     A.  Again, probably the closest would be
18 titanium, but even that is not, completely is a
19 pretty, 100.00 percent is completely and there's no
20 such thing.
21     Q.  Doctor, are you aware of any mesh, medical
22 device on the market that is inert in the human
23 body?
24     A.  All I can tell you is from reading the

Page 125

1  literature, it appears that PDVF is the closest to
2  being inert but even that's not inert.
3      Q.  Thank you.  Doctor, when we talked about
4  degradation, you will agree that there must be loss
5  of molecular weight for degradation to occur?
6      MR. JACKSON:  Objection, misstates
7  the witness' testimony.
8      A.  No.
9  BY MR. HUTCHINSON:
10     Q.  What happens to a polymer when it loses
11 molecular weight, does it degrade?
12     A.  Yes.
13     Q.  There must be loss of molecular weight for
14 degradation to have occurred, correct?
15     A.  No.
16     Q.  Why not?
17     A.  There's intermediate species like, for
18 example, before molecular weight loss occurs, there
19 is generally oxidation.  There's a hydroperoxide
20 chemical functionality on the polymer and that
21 precedes molecular weight loss.
22     Q.  But for oxidation to have occurred, there
23 must be loss of molecular weight, correct?
24     A.  No.

32 (Pages 122 to 125)

Duane Priddy, Ph.D.

Page 126

1   Q.  Why not?
2   A.  The additives oxidize so they are
3   constantly dynamic, changing in their structure.  As
4   I mentioned earlier, the DLTDP changes to a sulfone,
5   ultimately to a sulfoxide.  That's an oxidized
6   species, so it is changing --
7   Q.  I'm not asking about --
8      MR. WALLACE:  Chad, you have to let
9      him finish.  This has been going on for a
10     while.  Just let him finish.  We have
11     been good all day.
12  BY MR. HUTCHINSON:
13  Q.  Let's talk about oxidation.
14  A.  Okay.
15  Q.  For oxidation to occur, there must be a
16  chain scission in the cleavage of the polymer chain,
17  correct?
18  A.  No, just to explain, you can have
19  oxidation going on of the additives of the polymer
20  chain without degradation that precedes molecular
21  weight loss.
22  Q.  If a polymer oxidizes, will there be loss
23  of molecular weight?
24     MR. JACKSON:  Objection, asked and

Page 127

1      answered.
2      A.  There can be, but there doesn't
3   necessarily have to be.
4   BY MR. HUTCHINSON:
5   Q.  If oxidation occurs, will there be strong
6   carbonyl bands on the FTIR?
7   A.  Again, that's a later stage.  The
8   hydroperoxide group that forms first is not a
9   carbonyl.  You don't see an FTIR carbonyl band.
10     If it changes to another species, then it
11  generates a carbonyl band.  But the first stage of
12  oxidation is generated to a hydroperoxide.  That's
13  still oxidation, but it hasn't formed a carbonyl
14  band yet.
15  Q.  At what point does a loss of molecular
16  weight occur in oxidation?
17  A.  At the point that the hydroperoxide group
18  changes to a carbonyl, it is accompanied by chain
19  scission and you lose molecular weight.
20  Q.  So when you have chain scission, you lose
21  molecular weight?
22  A.  That's correct.
23  Q.  For oxidation to occur, you must always
24  have chain scission of the polymer chain, correct?

Page 128

1      MR. JACKSON:  Objection, form.
2      A.  No.  As I mentioned earlier, you can have
3   oxidation without chain scission.
4   BY MR. HUTCHINSON:
5   Q.  If oxidation occurs, you always have
6   reduced physical properties of the polymer?
7      MR. JACKSON:  Objection, form.
8      A.  In the early stages, it's probably
9   non-detectable.
10  BY MR. HUTCHINSON:
11  Q.  If oxidation occurs, you will have
12  embrittlement?
13  A.  Ultimately.
14  Q.  If oxidation occurs, you will have loss of
15  tensile strength?
16  A.  Ultimately.
17  Q.  If oxidation occurs, you will have loss of
18  elongation?
19  A.  That's dependent.  If body fluids, lipids,
20  oils, fats are absorbed into the polymer, it
21  actually increases elongation.
22  Q.  You will have loss of toughness if
23  oxidation occurs, correct?
24     MR. JACKSON:  Objection, form.

Page 129

1      A.  Depends on how you define toughness, but
2   generally, yes.
3   BY MR. HUTCHINSON:
4   Q.  Let's define it as the area under the
5   curve on a stress-strain diagram.  With that
6   definition, you will have a loss of toughness,
7   correct?
8      A.  Give me a minute to think about that.
9      Yes.
10  Q.  Doctor, would you ever expect to see an
11  increase in physical properties in a polymer that is
12  oxidized?
13  A.  Which physical property?
14  Q.  Tensile strength.
15  A.  Yes.
16  Q.  Young's modulus?
17  A.  Can I explain?  Tensile strength, as a
18  material becomes more brittle, generally increases.
19  Young's modulus, if there's no chemicals absorbed
20  into the material to alter its plastic nature,
21  Young's modulus will generally increase as the
22  material embrittles.
23  Q.  What about toughness?
24  A.  Toughness generally decreases even though

33 (Pages 126 to 129)

Duane Priddy, Ph.D.

Page 130

1   the tensile strength -- of course, you are getting
2   into some issues here which require a lot of
3   materials science explanations.  But in general, as
4   materials embrittle, the Young's modulus and the
5   tensile strength actually increase but the area
6   under the stress-strain curve decreases.
7       Q.  Doctor, are you aware of any product on
8   the market --
9           MR. HUTCHINSON:  We are going to
10          have to take a quick break, and this
11          obviously does not count as my time.  We
12          are going to have to take a quick break
13          because of the noise outside.
14          THE VIDEOGRAPHER:  We are off the
15          video record.  The time is 11:33 a.m.
16          (Recess.)
17          THE VIDEOGRAPHER:  We are back on
18          the video record.  The time is 11:33 a.m.
19   BY MR. HUTCHINSON:
20       Q.  Doctor, are you aware of any medical
21   product on the market that will never oxidize?
22       A.  No.
23       Q.  Doctor, can oxidation of pelvic Prolene
24   mesh -- strike that.

Page 131

1           Can oxidation of Prolene pelvic mesh ever
2   be completely eliminated in vivo?
3           MR. JACKSON:  Objection, form.
4       A.  No.
5   BY MR. HUTCHINSON:
6       Q.  Doctor, you talked about a PVDF earlier;
7   is that correct?
8       A.  Yes.
9       Q.  Is that what you believe would have been a
10  safer alternative than polypropylene?
11          MR. JACKSON:  Objection, form.
12      A.  I have no basis to make that kind of a
13  conclusion other than my understanding of the
14  relative oxidative stability of PVDF versus
15  polypropylene.
16  BY MR. HUTCHINSON:
17      Q.  Doctor, what in your opinion is a safer
18  alternative for Prolene in pelvic floor repair?
19          MR. JACKSON:  Objection, form.
20      A.  I'm not here to opine on that.  I was just
21  asked to talk about polypropylene meshes.  So I'd
22  rather not get into that kind of a discussion.
23  BY MR. HUTCHINSON:
24      Q.  I understand, but do you have an opinion

Page 132

1   sitting here today what the safer alternative for
2   Prolene would be?
3           MR. JACKSON:  Objection, asked and
4           answered.
5       A.  Well, I know from my experience as a
6   polymer scientist, I have worked with PVDF.  It is
7   used in water filtration membranes, and the reason
8   is because it's like a rock when it comes to
9   oxidative stability.
10          They actually clean these membranes by
11  soaking them in concentrated bleach for several days
12  to burn off the organics.  And yet even though it
13  tolerates that for a while, eventually even those
14  membranes eventually oxidize and degrade and have to
15  be replaced.
16      Q.  And there are risks associated with PVDF,
17  correct?
18          MR. JACKSON:  Objection, form.
19      A.  Risks?
20  BY MR. HUTCHINSON:
21      Q.  Yes, medical risks associated with PVDF,
22  correct?
23          MS. FITZPATRICK:  You can't just put
24          an expert up here and ask anything that

Page 133

1   you want.  So if it is tied to his
2   report, fine; but other than that, you
3   are going to have to move on.
4   BY MR. HUTCHINSON:
5       Q.  Can you answer that question?
6       A.  Repeat the question.
7       Q.  Yes.  Are you aware of any medical risks
8   using PVDF as a medical device?
9           MS. FITZPATRICK:  I am going to
10          instruct the witness not to answer unless
11          you can show for some reason it is in his
12          report.
13  BY MR. HUTCHINSON:
14      Q.  Doctor, have you ever tested the
15  durability of PVDF as a mesh material inside the
16  human body?
17          MS. FITZPATRICK:  Same objection,
18          same instruction.
19  BY MR. HUTCHINSON:
20      Q.  Doctor, would you ever guarantee, would
21  you ever provide a lifetime guarantee for PVDF mesh?
22          MR. JACKSON:  Same instruction, same
23          objection.
24  BY MR. HUTCHINSON:

34 (Pages 130 to 133)

Duane Priddy, Ph.D.

Page 134

1    Q.  Doctor, are you aware of any mesh made, on
2  the market made out of PVDF?
3        MS. FITZPATRICK:  Objection, same
4  instruction.
5        MR. HUTCHINSON:  Instructing the
6  witness not to answer?
7        MS. FITZPATRICK:  I am.  You want to
8  show us why you think that's in his
9  report, I'd be happy to reconsider and
10  look at it; but otherwise, just having an
11  expert witness sitting in the chair and
12  having him opine on things that are well
13  beyond his report is not appropriate.
14  BY MR. HUTCHINSON:
15    Q.  Doctor, could you tell us what would be a
16  reasonably safe alternative to Prolene mesh?
17        MR. JACKSON:  Objection to form.
18    A.  Not without investigating and researching
19  that question.
20  BY MR. HUTCHINSON:
21    Q.  Doctor, have you done any efforts to
22  research or investigate that question?
23    A.  A safer alternative, no.  That's beyond
24  the scope of what I was asked to do.

Page 135

1    Q.  Doctor, what's your opinion about what
2  Ethicon should have done differently to prevent
3  oxidation of Prolene?
4        MR. JACKSON:  Objection, form.
5    A.  There is no technology that I'm aware of
6  where you can prevent the oxidation of
7  polypropylene.
8  BY MR. HUTCHINSON:
9    Q.  Doctor, if we talk about the physical
10  properties of mesh, have you read the seven-year dog
11  study?
12    A.  I have indeed.
13        (Priddy Deposition Exhibit 9 was
14  marked for identification.)
15  BY MR. HUTCHINSON:
16    Q.  I want to hand you what we'll mark as
17  Exhibit 9 to your deposition.
18        (Witness reviewing document.)
19    Q.  Doctor, this is the seven-year Burkley dog
20  study that you relied on?
21    A.  Yes.
22        MR. JACKSON:  I am just going to
23  object because it says Barbolt on the
24  cover.  You said Burkley.

Page 136

1  BY MR. HUTCHINSON:
2    Q.  Doctor, turn with me to the last page of
3  the seven-year dog study marked as Exhibit 9 to your
4  deposition.  Are you there with me?
5    A.  Yes.
6    Q.  Have you ever seen this particular page
7  before?
8    A.  Absolutely, yes.
9    Q.  Did you look at the breaking strength,
10  elongation and Young's modulus for Prolene?
11    A.  I certainly did.
12    Q.  Doctor, what did you notice about it?
13    A.  I noticed the Young's modulus was
14  ridiculously low after seven years.
15    Q.  Doctor, do you have any reason to believe
16  that the negative 70 shown for Prolene is incorrect?
17    A.  No.
18    Q.  Doctor, do you have any reason to believe
19  that the 111 percent increase of elongation for
20  Prolene is incorrect?
21    A.  No.
22    Q.  What about for the breaking strength of
23  negative 5 percent, any reason to believe that's
24  incorrect?

Page 137

1    A.  No.
2    Q.  Doctor, have you ever done any type of
3  analysis using this data from the dog study?
4    A.  Yes.
5    Q.  For Prolene?
6    A.  Yes.
7    Q.  Is it included in your report?
8    A.  No.
9    Q.  Why not?
10    A.  If I do a supplemental report, I'll
11  probably include it, but I didn't include it in this
12  report.
13    Q.  Why not?
14    A.  I can't answer the question.  I just
15  didn't do it.
16    Q.  Did the lawyers that hired you instruct
17  you not to include that in your supplemental report?
18        MR. JACKSON:  Objection, form.
19  BY MR. HUTCHINSON:
20    Q.  I mean in your original report.
21    A.  No.
22    Q.  But you are currently working on
23  evaluating this data, is that your testimony?
24    A.  No, I just said I have evaluated it.

35 (Pages 134 to 137)

Duane Priddy, Ph.D.

Page 138

1    Q.  Are you currently doing an analysis using
2   this type of data?
3          MR. JACKSON:  Objection, asked and
4          answered.
5   BY MR. HUTCHINSON:
6    Q.  Currently?
7    A.  No, I have analyzed this data.
8    Q.  But I thought you said you have done some
9   tests that are not included in the report.
10         MR. JACKSON:  Objection, misstates
11         witness' testimony.
12   A.  I have in the past, yes.  I have done
13  quite a few tests.
14   Q.  What type of tests of the breaking
15  strength, elongation and Young's modulus of Prolene
16  have you done?
17   A.  I haven't done tests, I have evaluated
18  this data.
19   Q.  Doctor, does this data that we are looking
20  at now support your opinions that Prolene degrades?
21   A.  Absolutely.
22   Q.  How so?
23   A.  The 70 percent loss of modulus, that's
24  huge.

Page 139

1    Q.  That means Young's modulus is stiffness,
2   correct?
3    A.  Yes, it does.
4    Q.  And Young's modulus -- strike that.
5          This means that the Prolene lost
6   70 percent of its stiffness after seven years?
7    A.  That's correct.
8    Q.  And why do you believe that supports your
9   opinion?
10   A.  Going from a 700,000 modulus down to
11  200,000, I took that data and plotted it out.  So I
12  took the tensile, the Young's modulus which is
13  tensile modulus times 0 after one year, after two
14  years, after seven years, plotted it.  It's a
15  straight line, with 98 percent statistical linear
16  straight line.  When I extrapolate that until the
17  time it hits 0 modulus, it predicts ten years, three
18  more years, that material would have been water.
19         A stiffness of 200,000 modulus is the,
20  Prolene, if it had been held up, it would have
21  sagged.  There's no stiffness whatsoever, no
22  integrity.  It would have been like jello.  That's
23  huge.
24   Q.  Is that information in your expert report,

Page 140

1   Doctor?
2    A.  No.
3    Q.  Why not?
4    A.  I focused on the other issues and didn't
5   include that.
6    Q.  You will agree that the physical
7   properties that are shown of the Prolene sutures in
8   the dog study improved after seven years?
9    A.  Absolutely not, no.  Loss of modulus is
10  huge.  That means the material has no integrity.  If
11  it had been any stress at all on it, it would have
12  stretched right out.
13         (Priddy Deposition Exhibit 10 was
14         marked for identification.)
15  BY MR. HUTCHINSON:
16   Q.  Doctor, I want to hand you what we will
17  mark as Exhibit 10 to your deposition.  This shows
18  toughness as the area under the curve, correct?
19         MR. JACKSON:  Objection, form.
20   Q.  The stress-strain chart.
21         (Witness reviewing document.)
22   A.  Yes.
23   Q.  Doctor, these are the same plots or the
24  same data that we saw from the Burkley dog study

Page 141

1   that we just looked at, correct?
2    A.  I don't know.
3    Q.  Why don't you compare the data on this
4   chart to the data on the last page of the seven-year
5   dog study.
6    A.  These stress-strain curves look strange.
7   I would have to actually see the plot-outs from the
8   instruments that ran this stress-strain curve
9   because you normally don't get a 0 point and a point
10  up here that's a perfect straight line.  It's always
11  an arc.
12         So it looks like somebody took a ruler and
13  hand-drew this out.  It doesn't look right.
14   Q.  Doctor, looking at the red at time 0,
15  elongation was 1.68 pounds according to the Burkley
16  dog study, correct?
17   A.  That's percent.
18   Q.  I'm sorry, percent.
19   A.  Right.
20   Q.  Elongation times 0 is 37 percent; is that
21  right?
22   A.  Again, this data doesn't look -- something
23  is wrong with the data.
24   Q.  What's wrong with the data?

36 (Pages 138 to 141)

Duane Priddy, Ph.D.

Page 142

1      A.  I mean, elongation is not to pounds, it's
2  in percent and above it you have got 37 percent.  I
3  mean, that looks correct, year 0, 37 percent.  It
4  must be the breaking strength is 1.68 pounds.  Okay,
5  now I understand.
6      Q.  Now that you have looked at it, you will
7  agree that the data is correct on Exhibit 10?
8      MR. JACKSON:  Objection, form.
9      A.  Well, again, I can't make that leap.
10  BY MR. HUTCHINSON:
11      Q.  Why not?
12      A.  As I say, the curves look weird.  It looks
13  like somebody hand-drew with a ruler.  The plot-outs
14  from a tensile, an Instron, don't look like this.
15  They are not "blocky" like this.  They are nice,
16  smooth curves.  Somebody has taken the data and
17  hand-drawn this.
18      Q.  Doctor, you will agree that the numbers
19  for the breaking strength and elongation at year
20  zero are the same as the Burkley dog study, correct?
21      A.  Hang on.
22      (Witness reviewing document.)
23      A.  Yes.
24      MR. JACKSON:  Chad, are you asking

Page 143

1  him to compare data in Exhibit 9 and
2  Exhibit 10?  Is that what you are asking
3  him?
4  BY MR. HUTCHINSON:
5      Q.  I'm sorry, did you say yes?
6      A.  Yes, I did.
7      THE WITNESS:  That was what I assume
8  he was asking.
9      Q.  And Doctor, at year 7 --
10      MS. FITZPATRICK:  Chad, can he
11  answer the question so it is clear on the
12  record?
13      MR. JACKSON:  Chad, I just asked,
14  were you asking Dr. Priddy to compare
15  Exhibit 9 and Exhibit 10?  Is that what
16  you just asked him to do?
17      MR. HUTCHINSON:  Yes, I did.  I
18  thought the witness answered your
19  question.  My bad.
20  BY MR. HUTCHINSON:
21      Q.  Doctor, at year 7, is the data on
22  Exhibit 10 the same as the data in the Burkley dog
23  study?
24      A.  Yes, it is.

Page 144

1      Q.  Thank you.  And Doctor, you will agree
2  that the area under the curve is a measure of
3  toughness, correct?
4      MR. JACKSON:  Objection, form.
5      A.  As I say, there's something wrong here.
6  What I'm seeing here with modulus does not equate to
7  what I'm seeing here (indicating).  There's
8  something wrong.
9  BY MR. HUTCHINSON:
10      Q.  But can you tell us sitting here today
11  what's wrong?
12      A.  What I'm saying, modulus is listed here.
13  It's not reflected here (indicating).  There's a
14  problem.  Something is wrong.
15      Q.  I understand.  My question is:  Sitting
16  here today, can you tell us what is wrong?
17      MR. JACKSON:  Objection, asked and
18  answered.
19      A.  I can't.  I have to figure it out.  I
20  cannot figure it out based on what I'm seeing.  It
21  just doesn't equate, is what I'm saying.  There's
22  something, there's a problem.
23  BY MR. HUTCHINSON:
24      Q.  Have you made any efforts to determine

Page 145

1  what that problem is?
2      MR. JACKSON:  Objection, form.
3      A.  Until I just noticed the problem now, no.
4  I should say yes, I have been trying to figure it
5  out the last five minutes and I can't.  It doesn't
6  add up.
7      I've done literally thousands of
8  stress-strain tensile studies on different samples
9  and this doesn't look right.  Something's wrong.
10      Can I interject something at this point?
11  It's not an answer to a question, it is kind of
12  answering your question.
13      Modulus is slope.  There's a huge
14  difference between a slope of a Young's modulus of
15  200,000 and 700,000.
16      These two curves have almost the same
17  slope, and this does not reflect a difference of 200
18  to 700,000.  As I say, something is clearly wrong.
19      Q.  Doctor, can you quantify the rate at which
20  you believe antioxidants are depleted from Prolene?
21      MR. JACKSON:  Objection, asked and
22  answered.
23      A.  In which?
24  BY MR. HUTCHINSON:

Duane Priddy, Ph.D.

Page 146

1    Q.  In vivo.
2    A.  It's too many variables.  It's impossible.
3  It's going to be dependent upon the amount of
4  tension, the amount of inflammation, the amount of
5  oxidizing species, but the foreign body response,
6  there's too many variables, plus you've got the
7  variability in the mesh and its oxidative stability.
8  So you just can't predict that.
9    Q.  Have you made any efforts to test that
10  whatsoever?
11    MR. JACKSON:  Objection, form.
12    A.  Test the rate at which it would, just my
13  OIT work.
14  BY MR. HUTCHINSON:
15    Q.  Doctor, you agree that sutures, Prolene
16  sutures have been on the market for a long time?
17    A.  Yes.
18    Q.  Doctor, are you criticizing Ethicon's
19  Prolene sutures in any way?
20    A.  I was not asked to opine on that.
21    Q.  Do you have any criticisms of Ethicon's
22  sutures?
23    MR. JACKSON:  Objection, asked and
24    answered.

Page 147

1    A.  Again, I wasn't -- I haven't even thought
2  about that.
3  BY MR. HUTCHINSON:
4    Q.  Doctor, have you thought about whether or
5  not sutures made out of Prolene oxidize in the body?
6    A.  If they are made out of polypropylene,
7  they oxidize in the body.  That's a given.
8    Q.  Doctor, do you know if Ethicon's sutures
9  were approved by FDA as safe and effective?
10    A.  I remember reading they were approved by
11  FDA.
12    Q.  Doctor, is it your opinion that every
13  person who has a Prolene suture implanted in their
14  body has an oxidized product in their body?
15    A.  Of course, yes, I am.
16    Q.  What about hernia mesh?  Do you know how
17  long hernia mesh has been on the market?
18    A.  I don't know precisely.  I know a long
19  time.
20    Q.  Is it your opinion that Prolene hernia
21  mesh oxidizes in the body?
22    A.  Yes.
23    Q.  And it is your opinion that every person
24  who has ever received a hernia mesh implant has

Page 148

1  oxidized mesh in their body?
2    MR. JACKSON:  Objection, form.
3    A.  Yes.
4  BY MR. HUTCHINSON:
5    Q.  Doctor, is it your opinion that every
6  medical doctor who uses Prolene in the body is
7  committing malpractice?
8    MR. JACKSON:  Objection, form.
9    A.  I'm not going to go there.  I'm a plastics
10  scientist.  I'm not into that kind of stuff.
11  BY MR. HUTCHINSON:
12    Q.  Do you believe that every medical doctor
13  who is implanting Prolene in the body is doing
14  something wrong?
15    A.  They are probably relying upon the
16  literature provided to them by Ethicon that said
17  it's safe and effective and they are just relying on
18  that, I presume.
19    Q.  My question to you, though, is:  Do you
20  believe that doctors who implant Prolene in the body
21  are doing something wrong?
22    MR. JACKSON:  Objection, asked and
23    answered.
24    MS. FITZPATRICK:  Beyond the scope

Page 149

1  of his opinions.
2    A.  How can I opine on that?  That's beyond
3  my, what I'm asked to do here.
4  BY MR. HUTCHINSON:
5    Q.  Can you answer that question?
6    A.  I'd rather not.  That's an opinion outside
7  my area of expertise.
8    Q.  Can you answer that question?
9    A.  Can I answer it?  I can give you an
10  opinion for what it's worth.
11    MR. JACKSON:  All asked and
12    answered.
13  BY MR. HUTCHINSON:
14    Q.  What's your opinion?
15    A.  Are they doing something wrong?
16    Q.  Yes, by using Prolene in the body as an
17  implant?
18    MR. JACKSON:  Objection, this is
19  outside the scope of the report.
20    A.  I don't think the doctor is doing anything
21  wrong.  He is just relying upon the information he
22  has, his best judgment.  I think Ethicon is doing
23  something wrong but the doctor isn't doing anything
24  wrong.

38 (Pages 146 to 149)

Duane Priddy, Ph.D.

Page 150

1      MR. HUTCHINSON: Move to strike as
2  non-responsive.
3      MR. WALLACE: Move to strike because
4  you don't like his answer.
5      MS. FITZPATRICK: How is that
6  non-responsive?
7      MR. WALLACE: All right, we are
8  close to done.
9      MR. HUTCHINSON: How much longer do
10  we have?
11      THE VIDEOGRAPHER: 20 minutes.
12      MR. WALLACE: We may have some
13  questions so you might want to reserve a
14  couple minutes if you need it.
15  BY MR. HUTCHINSON:
16      Q.  Doctor, let's go back to your expert
17  report on Page 15.  Are you there with me?
18      A.  I am there, yes.
19      Q.  Doctor, are these charts, say, for
20  example, the chart on Page 15.
21      A.  Yes.
22      Q.  What do you call these charts?
23      A.  OIT curves.
24      Q.  Curves.  Doctor, would you expect the

Page 151

1  additives in Prolene to have an exothermic peak?
2      A.  They will, but it's going to be barely
3  detectable.
4      Q.  Why would it be barely detectable?
5      A.  Excuse me, I got to sneeze.
6      Because they are there in such low
7  concentration relative to the polymer that like,
8  when, for example, the DLTDP is oxidized from the
9  sulfur or the sulfide to the sulfone, ultimately to
10  the sulfoxide, that's an exothermic reaction.  But
11  the DLTDP is such low concentration, the instrument
12  is not sensitive enough to detect it.  So you get a
13  slight elevation in the baseline.
14      This curve is not -- if I was to draw a
15  perfectly horizontal line, you would see this
16  deviating up slightly.  That's probably the Santonox
17  R and the DLTDP slowly oxidizing, but you really
18  don't see a significant response until they are
19  depleted and the polypropylene takes over.
20      Q.  Is that the signs of the additives that
21  you are seeing in your thermogram data?
22      A.  Excuse me?
23      Q.  Is that the signs of the additives that
24  you are seeing in your thermogram data?

Page 152

1      MR. JACKSON: Objection, form.
2      A.  Signs?
3  BY MR. HUTCHINSON:
4      Q.  Do you see any signs --
5      A.  I would say it's an indication that they
6  are reacting, yes, they are oxidizing.
7      Q.  Just so the record is clear, what are you
8  referring to specifically?
9      A.  The slight, gradual elevation here is
10  probably due to the antioxidants oxidizing,
11  probably.
12      Q.  That's at the curve, the DSC curve on the
13  top of Page 15, correct?
14      A.  Yes.
15      Q.  Doctor, do you have any opinion regarding
16  the specific concentration level of Santonox R and
17  DLTDP that should have been in Prolene?
18      A.  Just based upon the data sheet I was
19  provided that gave me a target loading level.
20      Q.  Right, but do you have an opinion about
21  Ethicon's Prolene, about what the specific
22  concentration level of Santonox R and DLTDP should
23  have been?
24      MR. JACKSON: Objection, asked and

Page 153

1  answered.
2      A.  Should have been for the Prolene
3  application?
4  BY MR. HUTCHINSON:
5      Q.  Yes, sir.
6      A.  My opinion is, it's not appropriate to use
7  polypropylene, stabilized polypropylene with those
8  additives in for that application.  It's not
9  appropriate.
10      Q.  Can you tell us what additives if not
11  Santonox R and DLTDP, can you tell us what
12  antioxidants should have been used?
13      A.  Let me restate.  I do not know of any
14  antioxidant stabilizer formulation that's totally
15  non-extractable by oils and fats in the body that
16  you could put into polypropylene and guarantee that
17  it's going to last for decades in the body because
18  they are going to be extracted from the surface.  It
19  is just a given basic polymer science.
20      Q.  Can you tell the ladies and gentlemen of
21  the jury what additives, specific additives should
22  have been used if not Santonox R and DLTDP?
23      MR. JACKSON: Objection, asked and
24  answered.

39 (Pages 150 to 153)

Duane Priddy, Ph.D.

Page 154

1      A.  Again, I do not believe it's possible to
2   stabilize polypropylene with any additives to make
3   an implantable mesh product that would last for
4   decades, just not going to happen.
5          MR. HUTCHINSON:  I want to take just
6   a quick break, go off the record.
7          THE VIDEOGRAPHER:  We are off the
8   video record.  The time is 12:01 p.m.
9          (Recess.)
10         THE VIDEOGRAPHER:  We are back on
11  the video record.  The time is 12:04 p.m.
12  BY MR. HUTCHINSON:
13     Q.  Doctor, have you understood all my
14  questions so far?
15     A.  Yes.
16     Q.  Is there anything about the testimony that
17  you have given you would like to change?
18         MR. JACKSON:  Objection, form.
19     A.  Not at this point.
20  BY MR. HUTCHINSON:
21     Q.  Has a court ever determined that you could
22  not give an expert opinion?
23     A.  That I could not?
24     Q.  Yes.

Page 155

1      A.  Yes.
2      Q.  How many times?
3      A.  Twice that I'm aware of.
4      Q.  In what circumstances?
5      A.  One was a patent infringement matter
6   involving, against Nike for a shoe sole design and
7   because I had never designed shoe soles and didn't
8   really have experience working with shoes or shoe
9   soles, they deemed my testimony was not admissible.
10         And the other time was a portion of my
11  testimony was deemed as being not admissible.
12     Q.  In what particular instance?
13     A.  See, that was Jarden versus Hearthmark, et
14  al.  Do you want to know the details of that?
15     Q.  Yes.
16     A.  Okay, it involved a company that decided
17  to use hand sanitizer, this gel that we squirt from
18  a bottle on our hands to sanitize them, to market
19  that as a fire starter.  So they used a bottle made
20  out of PVC to dispense that and a child was using it
21  to ignite a fire.  And the flame came up the stream
22  of gel as it was squirting out of the bottle,
23  entered into the bottle, the bottle exploded and
24  blew flaming gel all over him.

Page 156

1          And I made the analogy of napalm.  The
2   judge said that that wasn't acceptable.
3      Q.  Doctor, on this DSC curve at the top of
4   Page 15.
5      A.  Yes.
6      Q.  Is oxidation showing as a smooth
7   transition from time 0?
8          MR. JACKSON:  Objection, form.
9      A.  On this one?
10  BY MR. HUTCHINSON:
11     Q.  Yes.
12     A.  Yes, that's typical, that's a smooth,
13  normal transition, yes.
14     Q.  But you would say that that is showing a
15  smooth transition?
16     A.  Yes.
17     Q.  Did you do any resampling?
18     A.  Any what?
19     Q.  Resampling?
20         MR. JACKSON:  Objection, form.
21     A.  Yes, I had duplicates on a couple samples
22  run, yes.
23  BY MR. HUTCHINSON:
24     Q.  Did you do any retesting?

Page 157

1      A.  Retesting, I had the same mesh run a
2   couple times, yes.
3      Q.  But did you do any retesting of that
4   particular DSC curve?
5      A.  I don't understand what you are asking me.
6      Q.  Did you do the test again to see if you
7   could generate the same curve?
8      A.  Oh, yes.
9          MR. HUTCHINSON:  I don't have
10  anything further.
11         MR. JACKSON:  We'll just take about
12  five minutes.
13         THE VIDEOGRAPHER:  We are off the
14  video record.  The time is 12:07 p.m.
15         (Recess.)
16         THE VIDEOGRAPHER:  We are back on
17  the video record.  The time is 12:20 p.m.
18         MR. JACKSON:  I just want to note on
19  the record that Dr. Priddy said that the
20  materials that were available to him in
21  this case were on the flash drive.  They
22  are not on that drive.  We can provide
23  those later if needed.
24         MR. HUTCHINSON:  I'm sorry?

40 (Pages 154 to 157)

Duane Priddy, Ph.D.

Page 158

1          MR. JACKSON:  The literature and the
2    Ethicon documents are not on there, just
3    his work papers.
4          MR. HUTCHINSON:  This may be, where
5    is the literature and documents?
6          MR. WALLACE:  Since they were your
7    documents, we typically don't include
8    those, but if you want them, we'll give
9    them to you.  Typically, you guys don't
10   like to be bothered with your own
11   documents.  That was the issue.
12         MR. HUTCHINSON:  That was the reason
13   they weren't included on the flash drive?
14         MR. WALLACE:  Yes.  I think we have
15   done that before.
16   EXAMINATION
17   BY MR. JACKSON:
18   Q.  Dr. Priddy, do you remember being asked
19   some questions earlier about your work with AMS?
20   A.  Yes.
21   Q.  You were a fact witness in AMS?
22   A.  I was, yes.
23   Q.  You were not an expert?
24         MR. HUTCHINSON:  Objection, leading.

Page 159

1    A.  Correct.
2    BY MR. JACKSON:
3    Q.  You did not give an expert report?
4    A.  Right.
5    Q.  Mr. Hutchinson asked you earlier if you
6    were an expert in various fields.  Do you remember
7    that?
8    A.  Yes.
9    Q.  What did you understand that word expert
10   to mean to you?
11   A.  That that was my primary job function of,
12   specific area of expertise he was mentioning.
13   Q.  But just because you said you are not an
14   expert in a particular area doesn't mean you don't
15   have knowledge and expertise in that area?
16         MR. HUTCHINSON:  Object, form.
17   A.  That is correct.
18   BY MR. JACKSON:
19   Q.  Do you remember being asked some questions
20   earlier about Steve Johnson?
21   A.  Yes.
22   Q.  Steve Johnson is someone who does this
23   testing regularly; is that right?
24   A.  Yes.

Page 160

1    Q.  You interact with people like Steve
2    Johnson all the time in your professional career?
3    A.  I do.  I use laboratories all over the US
4    and he is one of the, he's the lab I use for OIT.
5    Depending on the core area of expertise of the lab,
6    I will use different labs for different types of
7    testing.  I always use Steve for OIT and GC-MS
8    analysis.
9    Q.  So you rely on Steve's work regularly?
10         MR. HUTCHINSON:  Form.
11   A.  I do.
12         MR. HUTCHINSON:  Counsel, if you
13   will give me a just a second to lodge my
14   objection.  Form to the last question.
15   BY MR. JACKSON:
16   Q.  Dr. Priddy, when Steve Johnson runs a test
17   for you, it is your job to interpret that data?
18   A.  That's correct.
19         MR. HUTCHINSON:  Form.
20   BY MR. JACKSON:
21   Q.  And you do that regularly in your
22   profession?
23   A.  I do.
24   Q.  Do you recall Mr. Hutchinson asking you

Page 161

1    some questions earlier today about the names of
2    various Ethicon products?
3    A.  Yes.
4    Q.  Did the names of those products have
5    anything to do with your opinions in this case?
6    A.  No.
7    Q.  Dr. Priddy, Mr. Hutchinson asked you some
8    questions earlier today about Dr. Jordi.  Do you
9    remember that?
10   A.  Yes.
11   Q.  Can you determine anything about Dr.
12   Jordi's report without seeing his data?
13   A.  No.
14   Q.  Can you evaluate the hypothetical that Mr.
15   Hutchinson gave you earlier today without seeing Dr.
16   Jordi's data?
17         MR. HUTCHINSON:  Object to form.
18   A.  No.
19   BY MR. JACKSON:
20   Q.  Did anything you were asked by Mr.
21   Hutchinson today change any of your opinions in this
22   case?
23   A.  No.
24   Q.  Did anything that Mr. Hutchinson asked you

41 (Pages 158 to 161)

Duane Priddy, Ph.D.

Page 162

1  today change how you view your methodology in this
2  case?
3      A.  No.
4      Q.  Why didn't you review any plaintiff
5  medical records in this case?
6      A.  It wasn't relative to my opinions, didn't
7  affect my opinions.
8      Q.  Dr. Priddy, you were asked some questions
9  earlier about life expectancy of certain products.
10  Do you remember that?
11     A.  Yes.
12     Q.  Can you explain for the jury why you did
13  your testing in this case?
14     A.  Yes, I was looking specifically at the
15  product variability.  Normally, when products are
16  manufactured, they are manufactured to a
17  specification to minimize variability and I just
18  wanted to see if these products, these mesh products
19  were highly variable in their oxidation resistance
20  or if they were all very similar in their oxidation
21  resistance.
22     Q.  Do you remember being asked some questions
23  earlier about how blood in the body interacts with
24  these products?

Page 163

1      A.  Yes.
2      Q.  Is it fair that you need to understand how
3  chemicals in the body interact with these mesh
4  devices to offer your opinions in this case?
5          MR. HUTCHINSON:  Object to form.
6      A.  Well, just the fact that knowing that I
7  do, that bodies contain chemicals which are fats and
8  oils and have the capability to plasticize and
9  extract and affect the properties of plastics that
10  are implanted in the body, the nature of these
11  chemicals, the types of chemicals they are, I
12  understand that and how those types of chemicals
13  interact with materials.  That's all part of my core
14  area of expertise.
15  BY MR. JACKSON:
16     Q.  Dr. Priddy, as the founder and CEO of
17  Plastic Expert Group, what do you do professionally?
18     A.  Consult, serve as an expert witness.
19  Companies are constantly sending me plastic parts
20  that have failed and ask me to figure out the root
21  cause of the failure and make recommendations to
22  them once I determine the cause why they are
23  failing, how to fix it, how to remediate, how to
24  redesign the part, change the material, do what

Page 164

1  needs to be done so they don't have failures
2  anymore.
3          Those are the three main -- it all has to
4  do with plastics.
5      Q.  In your profession, you provide consulting
6  services to medical device companies?
7      A.  I do.
8      Q.  You have been hired by medical device
9  companies to work on implantable medical devices?
10     A.  Correct.
11     Q.  You have provided expert testimony on
12  behalf of medical companies?
13     A.  Expert testimony -- most of my work has
14  been consulting.  I'm trying to think.  Of course,
15  the AMS work I did, my recollection is they were
16  trying to get FDA approval on a mesh product and
17  they asked me to opine, to evaluate and opine on the
18  usefulness of accelerated laboratory testing of
19  their packaging of their device.
20          So it wasn't part of a litigation, it was
21  part of a petition to the FDA.  And I was -- as far
22  as being hired by a medical device manufacturer, to
23  my knowledge, it's all been consulting work except
24  for that.

Page 165

1      Q.  Is the work you have done for medical
2  device companies any different than the work you
3  have done in this case?
4      A.  I have run OIT testing for medical device
5  companies to, for example -- can I give an example?
6      Q.  Sure.
7      A.  Spectranetics was having a problem with
8  degradation of one of their tubing materials that
9  was failing, medical tubing.  So they had me do a
10  failure analysis and I determined that the tubing
11  had degraded.
12          And so I ran OIT testing to determine if
13  it was an oxidation issue, for example.  So to
14  answer your question, it's a little bit different,
15  but I'm using the same kinds of tests, yes.
16     Q.  You have run OIT tests for medical device
17  companies?
18     A.  Yes.
19     Q.  You did an OIT test in this case?
20     A.  Yes.
21     Q.  Is there anything special or unique about
22  the antioxidants used in the Prolene mesh?
23     A.  No, they are just basic workhorse
24  antioxidants.

42 (Pages 162 to 165)

Duane Priddy, Ph.D.

Page 166

1     Q.  You have published peer-reviewed
2   literature discussing antioxidants in plastics?
3          MR. HUTCHINSON:  Object to form.
4     A.  Yes, I have.
5   BY MR. JACKSON:
6     Q.  Have you done work with antioxidants as
7   part of your day job in your profession?
8     A.  Yes.
9     Q.  Your opinions in this case are based on
10  your professional expertise as well as the documents
11  you have reviewed in the peer-reviewed literature?
12         MR. HUTCHINSON:  Object to form.
13    A.  That's correct.
14  BY MR. JACKSON:
15    Q.  The plaintiffs in this case asked you to
16  opine on the chemical stability of Prolene; is that
17  right?
18         MR. HUTCHINSON:  Form.
19    A.  Yes.
20  BY MR. JACKSON:
21    Q.  If Ethicon had reached out to you 15 or
22  20 years ago and asked you to do the same thing, if
23  they had asked you to offer the same -- strike that.
24         If Ethicon had reached out to you 15 or

Page 167

1   20 years ago and asked you to offer the same
2   opinions for them, would you have done it?
3     A.  Yes.
4     Q.  Would you have run the same tests and
5   analysis that you have run in this case?
6     A.  Most likely.
7     Q.  Is the testing and analysis that you have
8   done in this case widely accepted in your industry?
9     A.  Yes.
10    Q.  As someone who has worked for medical
11  device companies, is accelerated aging testing alone
12  sufficient to determine the suitability of a
13  material?
14    A.  No.
15    Q.  Why not?
16    A.  Because it is only an approximation.  It
17  just lets you know if there is a red flag there that
18  needs to be followed up on or not.
19    Q.  Why did you review Ethicon documents in
20  this case?
21    A.  I wanted to see the kind of testing that
22  they performed and the data they generated on their
23  Prolene mesh products.
24    Q.  You are not a medical doctor?

Page 168

1     A.  No.
2     Q.  So why are you here to offer an opinion on
3   a medical device?
4     A.  Because the medical device is plastic and
5   I'm a plastics expert.
6     Q.  Dr. Priddy, you were asked a lot of
7   questions earlier today about both DLTDP and
8   Santonox R.  Do you remember that?
9     A.  Yes.
10    Q.  Does the presence of either of those
11  antioxidants in the Prolene mesh alter your opinions
12  in this case?
13    A.  No.
14         MR. HUTCHINSON:  Are you done?
15         MR. JACKSON:  I have no more
16  questions.
17         MR. HUTCHINSON:  I got a couple of
18  follow-up questions.
19  EXAMINATION (Continued)
20  BY MR. HUTCHINSON:
21    Q.  Doctor, you testified that you were
22  deposed in the AMS litigation as a fact witness?
23  Did I understand that correctly?
24    A.  Yes.

Page 169

1     Q.  What did you witness?
2     A.  I didn't write a report.  I had done work
3   as a consultant for AMS and so I was deposed, I
4   guess, to just talk, as I recall, just talk about
5   polypropylene oxidation and stability.
6     Q.  Was it a patent type litigation or was it
7   a personal injury type of litigation?
8     A.  I think it was a class action litigation
9   against AMS for their meshes, as I recall.
10    Q.  What was the substance of your testimony
11  in the AMS litigation?
12         MR. JACKSON:  Objection, form.
13  BY MR. HUTCHINSON:
14    Q.  Just in general.
15    A.  It was generally similar to this, the
16  oxidative stability of polypropylene.  It was
17  focused pretty much on chemistry of oxidation of
18  polypropylene.
19    Q.  But you were not designated as an expert
20  in that litigation; is that correct?
21    A.  That's correct.
22    Q.  Did you have a lawyer representing you?
23    A.  Representing me, I had one that hired me.
24    Q.  What did that lawyer hire you to do?

43 (Pages 166 to 169)

Duane Priddy, Ph.D.

Page 170

1          MR. JACKSON:  Objection, form.
2      A.   Just deposed me just as a consultant on
3  the issues involving polypropylene oxidative
4  chemistry.
5  BY MR. HUTCHINSON:
6      Q.   What's the name of the lawyer that hired
7  you?
8      A.   Ed Wallace.
9      Q.   What did Ed Wallace ask you to do?
10     A.   Just deposed me and asked me a bunch of
11 questions during the deposition.
12     Q.   Ed Wallace asked you --
13     A.   I'm sorry, the AMS attorney asked me.  Ed
14 Wallace asked me some questions too, I believe, but
15 yes.
16     Q.   My question is specifically, sir:  Were
17 you designated as an expert in the AMS litigation?
18         MR. JACKSON:  Objection, asked and
19     answered.
20     A.   No, sir, I don't believe so.
21 BY MR. HUTCHINSON:
22     Q.   Did you provide anybody expert opinions in
23 any type of deposition?
24         MR. JACKSON:  Objection, form.

Page 171

1      A.   That deposition I presented information,
2  yes.
3      Q.   As an expert?
4          MR. JACKSON:  Objection, asked and
5      answered.
6      A.   I assume I was considered a plastics
7  expert.
8      Q.   What were your opinions regarding
9  degradation in the AMS litigation, sir?
10     A.   You know, that was what, three years ago.
11 I don't recall the details.  All I remember, it had
12 to do with polypropylene oxidation.
13     Q.   Did it have anything to do with vaginal
14 mesh?
15     A.   I don't even remember that, too long ago.
16     Q.   That was within the last three years?
17     A.   That was about three years ago, I believe.
18     Q.   Did you do any testing of AMS mesh?
19     A.   No, sir.
20         MR. HUTCHINSON:  Let's call it a
21     day.  Thank you, sir, for your time.
22         THE VIDEOGRAPHER:  Now off the video
23     record, the time is 12:37 p.m.
24         (Deposition concluded: 12:37 p.m.)

Page 172

1          E R R A T A  S H E E T
2          Pursuant to Rule 30(e) of the Federal Rules
   of Civil Procedure and/or the Official Code of
3  Georgia Annotated 9-11-30(e), any changes in form or
   substance which you desire to make to your
4  deposition testimony shall be entered upon the
   deposition with a statement of the reasons given for
5  making them.
6          To assist you in making any such
   corrections, please use the form below.  If
7  supplemental or additional pages are necessary,
   please furnish same and attach them to this errata
8  sheet.
                    - - -
9
10         I, the undersigned, DUANE PRIDDY, do hereby
   certify that I have read the foregoing deposition
11 and that to the best of my knowledge said deposition
   is true and accurate (with the exception of the
12 following corrections listed below).
13 Page No.____ Line No.____ should read:_____
14 Reason for change:_____
15 Page No.____ Line No.____ should read:_____
16 Reason for change:_____
17 Page No.____ Line No.____ should read:_____
18 Reason for change:_____
19 Page No.____ Line No.____ should read:_____
20 Reason for change:_____
21 Page No.____ Line No.____ should read:_____
22 Reason for change:_____
23 Page No.____ Line No.____ should read:_____
24 Reason for change:_____

Page 173

1  Page No.____ Line No.____ should read:_____
2  Reason for change:_____
3  Page No.____ Line No.____ should read:_____
4  Reason for change:_____
5  Page No.____ Line No.____ should read:_____
6  Reason for change:_____
7  Page No.____ Line No.____ should read:_____
8  Reason for change:_____
9  Page No.____ Line No.____ should read:_____
10 Reason for change:_____
11 Page No.____ Line No.____ should read:_____
12 Reason for change:_____
13 Page No.____ Line No.____ should read:_____
14 Reason for change:_____
15 Page No.____ Line No.____ should read:_____
16 Reason for change:_____
17 Page No.____ Line No.____ should read:_____
18 Reason for change:_____
19
   Signature _____
20
   Sworn to and Subscribed before me
21
   _____, Notary Public.
22
   This _____ day of _____, 20___.
23
24 My Commission Expires:

44 (Pages 170 to 173)

Duane Priddy, Ph.D.

Page 174

1           C E R T I F I C A T E
2
G E O R G I A :
3
HENRY COUNTY:
4
            I hereby certify that the foregoing
5       deposition was reported, as stated in the
        caption, and the questions and answers
6       thereto were reduced to the written page
        under my direction; that the foregoing
7       pages 1 through 168 represent a true and
        correct transcript of the evidence given.
8       I further certify that I am not in any
        way financially interested in the result
9       of said case.
            Pursuant to Rules and Regulations of
10      the Board of Court Reporting of the
        Judicial Council of Georgia, I make the
11      following disclosure:
            I am a Georgia Certified Court
12      Reporter.  I am here as an independent
        contractor for Golkow Global Litigation
13      Services.
            I was contacted by the offices of
14      Golkow Global Litigation Services to
        provide court reporting services for this
15      deposition.  I will not be taking this
        deposition under any contract that is
16      prohibited by O.C.G.A. 15-14-37 (a) or
        (b).
17          I have no written contract to provide
        reporting services with any party to the
18      case, any counsel in the case, or any
        reporter or reporting agency from whom a
19      referral might have been made to cover
        this deposition.  I will charge my usual
20      and customary rates to all parties in the
        case.
21      This, the 9th day of March, 2016.
22
23          _____
        MAXYNE BURSKY, CCR-2547
24

45 (Page 174)

# EXHIBIT I

Scott A. Guelcher, Ph.D.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF KERN
CASE NO. S-1500-CV 279123 LHB

COLEEN M. PERRY,                          PLAINTIFF

vs.

HUNG T. LUU, M.D.,                        DEFENDANTS
JOHNSON & JOHNSON, a New Jersey
Corporation; ETHICON, INC., a
New Jersey Corporation; and
DOES 1-60,

        The deposition of SCOTT A. GUELCHER, Ph.D.,

called by the Defendants for examination, taken

before Michelle E. Kerr, RPR, a Notary Public in and

for the Commonwealth of Kentucky, Daviess County, at

1719 West End Avenue, Nashville, Tennessee, on

December 18, 2014, commencing at 9:40 a.m.

Scott A. Guelcher, Ph.D.

Page 2

1   A P P E A R A N C E S
2
3   APPEARANCE FOR PLAINTIFF:

4   Jeffrey M. Kuntz, ESQUIRE
    WAGSTAFF & CARTMELL
    4740 Grand Avenue, Suite 300
5   Kansas City, MO  64112
    jkuntz@wcllp.com
6
    Michael H. Bowman, ESQUIRE
7   WEXLER WALLACE, LLP
    55 West Monroe Street, Suite 3300
8   Chicago, Illinois  60603
    mhb@wexlerwallace.com
9
10  APPEARANCE FOR DEFENDANT:  Hung T. Luu, M.D.
    (Via Telephone)
11
    Zachary S. Rosen, ESQUIRE
12  BOYCE SCHAEFFER MAINIERI, LLP
    500 Esplanade Drive, Suite 950
13  Oxnard, California  93036
    zrosen@boyceschaefferlaw.com
14
15  APPEARANCE FOR DEFENDANTS:  Johnson & Johnson and
    Ethicon, Inc.
16
    Nils B. (Burt) Snell, ESQUIRE
17  BUTLER SNOW, LLP
    500 Office Center Drive, Suite 400
18  Fort Washington, Pennsylvania  19034
    burt.snell@butlersnow.com
19
20
21
22
23
24
25

Page 3

1           I N D E X
                          PAGE
2
    Direct Examination by Mr. Snell        4
3
    Cross-Examination by Mr. Rosen       265
4
    Cross-Examination by Mr. Kuntz       265
5
    Redirect Examination by Mr. Snell    267
6
7
8
9
10          E X H I B I T S
                          PAGE
11
    1 - Article by Clave             49
12
    2 - Pathology Slides - Coleen Perry    90
13    (Three Sets)
    3 - Thumb Drive Containing Reliance  150
14    Documents
15
    4 - Summary of Opinions by Dr. Guelcher   192
16
    5 - Document Containing Listing of    241
17    Cases
18  6 - Curriculum Vitae               242
19  7 - Printout from Vanderbilt University  257
      Medical Center Website
20
21
22
23
24
25

Page 4

1       SCOTT A. GUELCHER, Ph.D.,
2   HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH, THE
3   WHOLE TRUTH, AND NOTHING BUT THE TRUTH, TESTIFIED AS
4   FOLLOWS:
5        DIRECT EXAMINATION
6   BY MR. SNELL:
7   Q   State your name for the record, sir.
8   A   Scott Guelcher.
9   Q   What profession are you in, Dr. Guelcher?
10  A   I'm an Associate Professor of Chemical
11      Engineering at Vanderbilt University.
12  Q   You understand we're here today to take your
13      deposition in the Coleen Perry case, which is
14      currently pending in California?
15  A   I do.
16  Q   And you're here today to give your opinions
17      and the bases for those opinions, correct?
18  A   Yes.
19  Q   When were you first contacted to serve as an
20      expert in the Perry case?
21  A   I believe it was September, September '14.
22  Q   So in September of 2014, you were contacted
23      to be an expert in the Perry case?
24  A   That's what I remember.
25  Q   Who were you contacted by?

Page 5

1   A   By plaintiff's counsel, Jeff Kuntz and Tom
2       Cartmell.
3   Q   And what did you understand your assignment
4       to be in relation to the Coleen Perry case?
5   A   Assignment, I'm not sure what you mean by
6       that.
7   Q   What did you understand your purpose was to
8       be as an expert involved in the Perry case?
9   A   Well, I was testifying about defects in the
10      Abbrevo mesh.
11  Q   Did you say effects?
12  A   Defects in the Abbrevo mesh product.
13  Q   You have given other deposition and trial
14      testimony in mesh litigation, correct?
15  A   Yes, I have.
16  Q   You testified in the Huskey case that
17      involved Ethicon's TVT-O product, correct?
18  A   I did.
19  Q   You were deposed and gave trial in West
20      Virginia, correct?
21  A   That's correct.
22  Q   And at the time that you gave that testimony,
23      it was under oath as well, correct?
24  A   That's correct.
25  Q   And did you tell the truth in that testimony?

Scott A. Guelcher, Ph.D.

Page 6

1  A  Yes.
2  Q  How many hours have you spent on the Perry
3     case?
4  A  I'm not sure.  I haven't billed any invoices
5     for time yet, so I don't know the total
6     number of hours.
7  Q  Can you give me your best estimate?
8  A  I don't know.  Maybe 20.  But when I submit
9     my invoices, that will be the more reliable
10    number.  I haven't added it up yet.
11 Q  Well, do you have the invoices on your
12    calendar?
13 A  No.
14 Q  In the Huskey case, you testified that you
15    submitted your invoices to Dr. Dunn in
16    connection with that matter.  Do you recall
17    giving that testimony?
18 A  That's correct.
19 Q  Are you submitting your invoices to Dr. Dunn
20    in the Perry case?
21 A  I'm not sure yet how that will be.  I'll be
22    billing -- my plan is -- it's not resolved
23    yet, whether I will independently or through
24    Dr. Dunn's company.
25 Q  How do you track your time that you spend in

Page 7

1     the Perry case?
2  A  I have some paper records, but it's not --
3     nothing is official.  I've not been
4     releasing -- in the past, all the invoices
5     have been submitted through Dr. Dunn's
6     company.  Nothing is official until I submit
7     the invoices.  I don't have the invoices
8     right now.
9  Q  Well, in the Huskey case, you testified under
10    oath that you submitted monthly invoices to
11    Dr. Dunn, which included the time spent, the
12    time of day spent and a brief description of
13    your activities.  Do you recall giving that
14    testimony?
15 A  I do.
16 Q  And at what point in time has that changed?
17 A  Very recently.  In the past maybe month or
18    two.
19 Q  When was the last time you sent an invoice to
20    Dr. Dunn with regard to your work as an
21    expert in mesh litigation?
22 A  I don't remember.  Maybe a month or two ago.
23    I don't remember the date.
24 Q  As I understand it, Dr. Dunn received a cut
25    from the amount billed for your work in the

Page 8

1     Huskey case.  Do you recall giving that
2     testimony?
3            MR. KUNTZ:  Objection.
4  A  I'm not sure what you mean by a cut.
5  BY MR. SNELL:
6  Q  In the Huskey case, as I recall it, you
7     received $200 per hour for review and work,
8     correct?
9  A  I don't believe that's -- well, it was 200 or
10    210.  He raised the rates.  Okay.  It was 200
11    or 210.  The rates have been changed, and I
12    don't remember if it was before or after
13    Huskey.  It may have been 200.  It may have
14    been 210.  I can't remember.
15 Q  And Dr. Dunn billed $275 an hour for your
16    review time, correct?
17 A  If I bill 200, then Dr. Dunn would have
18    billed 275.
19 Q  And is it your testimony that that
20    arrangement has changed within the last one
21    to two months?
22 A  Yes.  I have not submitted any invoices for
23    this case, but the plan for moving forward is
24    for me to submit invoices independent of
25    Dr. Dunn's company.

Page 9

1  Q  Do you have your own company that you will be
2     submitting invoices under?
3  A  I do.
4  Q  What's the name of that company?
5  A  Guelcher Consulting, LLC.
6  Q  In the Huskey matter, you testified that you
7     kept a calendar and a recording of your time
8     spent and the days that you worked as an
9     expert.  Do you recall giving that testimony?
10 A  I do.
11 Q  Have you done the same thing here?
12 A  I have not.  Not in the same way.
13 Q  Why not?
14 A  I just changed it.  I have a right to change
15    the way I keep the time.
16 Q  So what materials or documents do you have
17    that would reflect the time you've spent up
18    until the time of this deposition for the
19    Perry case?
20 A  I don't have them yet because I haven't
21    submitted the invoices.  That's what I said.
22 Q  I'm not asking about invoices.
23    I'm asking what other materials or
24    documents -- what would you look to to draft
25    an invoice so that you would know the

3 (Pages 6 to 9)

Scott A. Guelcher, Ph.D.

Page 10

1     accurate amount of hours for your billing
2     that you would submit?
3   A  I have some paper at home.
4   Q  What paper at home?
5   A  Well, I have a piece of paper that has hours
6     written on it, but I haven't added everything
7     up yet because I haven't submitted the
8     invoice.
9   Q  Is this a piece of paper in a notebook or --
10  A  No, it's just a note.
11  Q  Do you have a copy of that that you can give
12    to counsel?
13  A  No, I don't, because we haven't been doing
14    that.  We've been providing invoices, and
15    Dr. Dunn was providing invoices, and I just
16    don't have an invoice yet that I've sent in.
17    Until it's finalized, I don't -- I've not
18    been submitting records of time until there
19    is a final invoice.
20        MR. SNELL:  Well, I'm going to
21    make a request that you get a copy of that to
22    counsel, and we'll attach it to the
23    deposition.
24        MR. KUNTZ:  We'll get you a
25    copy.

Page 11

1   A  I can send an invoice after today and that
2     will make it official.  Is that okay?
3  BY MR. SNELL:
4   Q  Well, that's fine.  But I'd like to know what
5     it is because I will have questions about
6     that potentially.
7   A  What is?  I don't understand.  You said you'd
8     like to know what it is if I send you an
9     invoice.  You know what it is.  It's an
10    invoice that says my hours and what I did, so
11    I'm not sure what you're looking for.
12  Q  Well, right now you currently have -- you
13    testified you have a document that has your
14    hours and the time you spent.  That's the
15    document I would like.  If you draft an
16    invoice, I would like that as well.
17  A  Okay.
18  Q  When did you form Guelcher Consulting, LLC?
19  A  It's been very recent.  In the past few weeks
20    maybe.
21  Q  What happened between you and Dr. Dunn that
22    led you to believe that you should go out
23    independent of Dr. Dunn?
24  A  Nothing happened with Dr. Dunn.  I'm not sure
25    what you're asking me.

Page 12

1   Q  For over a year, you submitted invoices
2     through Dr. Dunn and his company, correct?
3   A  That's correct.
4   Q  Is it your testimony that there was nothing
5     that made you decide to go out and become
6     independent of Dr. Dunn?
7   A  Well, that's not what you asked me the first
8     time.  You ask me what happened, implying
9     that something disruptive happened in our
10    working relationship, which nothing happened.
11    It's just a decision to do this
12    independently.
13  Q  How much are you billing now for your work --
14  A  The same rate.
15  Q  Let me finish my question.
16  A  Sure.
17  Q  How much are you billing for your time as an
18    expert in the Perry case for review of
19    materials?
20  A  The same rates as Dr. Dunn.
21  Q  Can you tell me how much per hour?
22  A  Dr. Dunn raised his rates from 275 to 285 for
23    report writing, reviewing of documents, etc.
24    I will be charging that rate.  For testimony,
25    I just can't remember the number right now.

Page 13

1     I think it's maybe 385 is a number for
2     testimony, but that would be on the invoice.
3     I can't remember the number right now.
4   Q  So it's your intention to bill $285 per hour
5     for reviewing materials and report writing
6     and things like that?
7   A  That's what Dr. Dunn was billing.  And since
8     I'm doing the same activities, I thought it
9     reasonable to bill the same rate.
10  Q  Dr. Dunn is not an expert in this case.
11    You're aware of that, correct?
12  A  My understanding is that Dr. Dunn has not
13    been produced as an expert witness for
14    Plaintiffs.
15  Q  All right.  So for you -- I just want to get
16    a clean answer without injecting Dr. Dunn
17    into this Q and A.  The rates that you,
18    Dr. Guelcher, are charging for report writing
19    and review of documents for this matter in
20    the Perry case will be $285 per hour; is that
21    correct?
22  A  That's correct.
23  Q  The rate that you will charge for testimony,
24    as best as you can figure at this point in
25    time, is $385 per hour?

Scott A. Guelcher, Ph.D.

Page 14

1    A  That's correct.
2    Q  Will you have a different rate for trial
3       testimony if you are called to testify at
4       trial?
5    A  I don't believe so.  I intend to use the same
6       rates that were being billed in the past, and
7       there was no difference between trial and
8       deposition testimony.  Those numbers were the
9       same.  So whatever those numbers are, it will
10      be the same.  There won't be a difference.
11   Q  You understand that this trial will be in
12      California?
13   A  Yes.
14   Q  And you're agreeable to traveling to
15      California for trial?
16   A  Yes.
17   Q  Your expenses of traveling to California,
18      would you bill for those?
19   A  That's what Dr. Dunn has done in the past,
20      and I would continue that practice.
21   Q  So if you come to trial in California, you
22      will bill for your expenses, such as air
23      fare, and hotel room, and meals, correct?
24   A  Yes, that's correct.
25   Q  Have you ever met Mrs. Perry?

Page 15

1    A  I have not.
2    Q  Have you spoken to Mrs. Perry?
3    A  I have not.
4    Q  Have you ever spoken to any of Mrs. Perry's
5       family or friends?
6    A  No.
7    Q  Have you ever spoken with any of Mrs. Perry's
8       doctors?
9    A  No.
10   Q  Okay.  Have you spoken with any other experts
11      about the Perry case?
12   A  Any other experts defined as --
13   Q  Defined as -- let me ask you this.  Besides
14      yourself, who do you understand to be the
15      other experts besides yourself in the Perry
16      case?
17   A  I don't know who the other experts are that
18      they are calling.  I haven't spoken with
19      them.
20   Q  So you have not spoken with a Dr. Rosenzweig
21      about the Perry case?
22   A  I have not.
23   Q  Have you ever spoken with Dr. Rosenzweig?
24   A  I have not.
25   Q  Dr. Michael Thomas Margolis from California,

Page 16

1       have you ever spoken to him?
2    A  No.
3    Q  Okay.  Dr. Donald Marks, he is another
4       expert --
5    A  I have not.
6    Q  You have not spoken with him?
7    A  No.
8    Q  Have you reviewed any expert reports or
9       expert declarations in the Perry case?
10   A  Yes.
11          MR. KUNTZ:  Aside from his own?
12          MR. SNELL:  Yes, of course.
13   BY MR. SNELL:
14   Q  Let me just take that off the table and
15      reformulate.
16          Setting aside your expert declaration
17      listed opinions, have you reviewed any other
18      experts' declarations or listed opinions?
19   A  Declarations, no, I don't believe so.
20   Q  Okay.  For your opinions in this case, you're
21      not relying on the declarations or reports of
22      any other experts, correct?
23   A  No, I'm not relying on any other
24      declarations.
25   Q  You're not relying on any other experts'

Page 17

1       opinions, correct?
2    A  Yes.
3    Q  Do you know if any independent medical
4       examinations have been done on Mrs. Perry?
5    A  I'm not aware of any of those outcomes of
6       those medical examinations.  I've not
7       reviewed that.
8    Q  So you haven't reviewed any of the IME
9       outcomes or reports in this Perry case,
10      correct?
11   A  No.
12   Q  I'm not correct?
13   A  I have not reviewed, yeah.  I'm sorry.
14   Q  Okay.  And you're not relying on the outcomes
15      of any IME reports; is that correct?
16   A  Yes, that's correct.
17   Q  When you do issue your invoices or invoice
18      for the Perry case, will the check be made
19      payable to Guelcher Consulting, LLC, or to
20      you personally?
21   A  It will be made to the LLC.  I'm the sole
22      owner of the LLC, so it will be made to the
23      LLC.
24   Q  Is Guelcher Consulting, LLC, a Tennessee
25      corporation?

5 (Pages 14 to 17)

Scott A. Guelcher, Ph.D.

Page 18

1   A  Yes.  It's been registered with the secretary
2      of state.
3   Q  As I understand it from your testimony at
4      Huskey and other matters, you believe your
5      expertise is in the field of biomaterials
6      design?
7   A  That's one way of saying it.  I have
8      expertise in biomaterials science and
9      engineering.  Another way you could say it is
10     that my work involves design of materials for
11     use as bone grafts or skin grafts, design of
12     biomaterials as diagnostics for studying
13     cancer metastasis.
14  Q  You have a Ph.D., correct?
15  A  Yes.
16  Q  Any higher education than that?
17  A  I did a postdoctoral research training at
18     Carnegie Mellon in biomedical engineering.
19  Q  But that was not something for which a degree
20     was earned; is that correct?
21  A  It's not a degree, but it's postdoctoral
22     training.  It counts as training.
23  Q  You're not a medical doctor, correct?
24  A  No, I'm not a medical doctor.
25  Q  You're not a pathologist?

Page 19

1   A  I'm not a pathologist.
2   Q  You don't treat any patients, correct?
3   A  I don't treat patients.
4   Q  You're not a toxicologist, correct?
5   A  I'm not a toxicologist.
6   Q  What is the difference between your expertise
7      and Dr. Dunn's expertise?
8   A  So Dr. Dunn and I have overlapping expertise
9      in polymer science and engineering.  My
10     expertise is differentiated from Dr. Dunn's
11     in biomaterials, preclinical testing of
12     biomaterials, evaluation of biomaterials
13     using in vitro and in vivo models.  Those
14     would be some examples of how my expertise is
15     differentiated from Dr. Dunn's.
16  Q  Is Dr. Dunn more of a polymer chemist than
17     you are?
18  A  I would not state it this way.  I've had
19     extensive experience in polymer chemistry,
20     science and engineering.  I've worked for
21     several companies in the area of polymers.
22     My postdoctoral training was in polymers for
23     bone scaffolds.  And for the past ten years
24     at Vanderbilt, I've been working on polymers
25     and I taught -- and I developed and taught a

Page 20

1      course on polymer science and engineering at
2      Vanderbilt.
3   Q  In prior cases, as I understand it, and have
4      read your testimony, Dr. Dunn, if testing was
5      done, he would have been the one to perform
6      the testing on meshes?
7   A  That's correct, Dr. Dunn did the testing.
8   Q  Is there a certain reason for that?
9   A  The reason relates to the nature of our
10     employments at Vanderbilt.  Dr. Dunn is a
11     professor of the practice.  I'm a tenured
12     associate professor with a federally-funded
13     research program.  And so we have different
14     appointments, that's the reason.
15  Q  I don't understand that.
16        Can only professors do the type of
17     testing that he performed in the prior cases?
18  A  I'm qualified to do the testing.  It's that I
19     have graduate students working in my
20     laboratory on federal research grants.
21     Dr. Dunn has a company with employees.  It's
22     simpler for him to do the testing than for me
23     from an administrative perspective.  So that
24     doesn't have anything to do with
25     qualifications or ability.  It's more because

Page 21

1      of these practical reasons.
2   Q  So you have graduate students working under
3      you who are being subsidized, whose work is
4      being subsidized by federal funding; is that
5      correct?
6   A  I wouldn't say it's being subsidized.  The
7      work is being funded by federal funding, and
8      in some cases, by corporate funding.  Their
9      stipends are paid either from fellowships or
10     from the grants, not from the consulting.
11  Q  Okay.  Well, what about the fact of graduate
12     students working under you who are supported
13     by federal funding, what affect does that
14     have on why Dr. Dunn did the testing and you
15     didn't?
16  A  Well, to have graduate students working on
17     that sort of testing would require a
18     disclosure to the university, so I haven't
19     had them involved.  I've disclosed the
20     consulting activity to the university
21     required by the policy, but to have graduate
22     students involved would require more, and I
23     just haven't done that at this time.
24  Q  What type of disclosure did you make to the
25     university with regard to your goal as an

6 (Pages 18 to 21)

Scott A. Guelcher, Ph.D.

Page 22

1    expert witness?
2    A  Every year we are required to file a
3       disclosure report that would include --
4       because I have NIH grants, the NIH requires
5       us to disclose travel funded by third
6       parties.  I'm required to disclose
7       relationships with companies that I have had
8       grants from companies in the past, consulting
9       relationships with companies.  These
10      activities are disclosed.
11         In the past what I've disclosed is that I
12      was a consultant working for Polymer and
13      Chemical Technologies.
14   Q  So your disclosure stated that you worked as
15      a consultant in polymer and --
16   A  For Polymer and Chemical Technologies.
17      That's Dr. Dunn's company.  So last year's
18      disclosure, that's what I have filed.  I have
19      to update it this year again.
20   Q  Did you identify in your disclosure that you
21      were serving as an expert on behalf of
22      plaintiffs in the transvaginal mesh
23      litigation?
24   A  We're not required to disclose the activity,
25      only the fact that we're consulting.

Page 23

1    Q  So you did not disclose that you were
2       consulting with plaintiffs' attorneys in
3       transvaginal mesh litigation?
4    A  I don't remember what I disclosed right now,
5       the exact details.  I disclosed that I had a
6       consulting relationship.  I don't remember
7       the detail of what I exactly disclosed.  I
8       would have to look at it again.
9    Q  Now, that you're billing your services
10      directly through your own corporation, are
11      you going to disclose that you are consulting
12      and serving as an expert to plaintiffs in
13      transvaginal mesh litigation?
14   A  When I submit the invoices, I will update the
15      disclosure, but that hasn't been finalized
16      yet.  When I submit the invoices, I will
17      update the disclosure.
18   Q  Where does this disclosure get submitted to
19      within Vanderbilt?
20   A  At the dean's office, dean of engineering.
21   Q  If you do any testing of meshes in your role
22      as a plaintiff's expert, and you utilize any
23      of Vanderbilt's equipment, personnel, or any
24      other assets owned by Vanderbilt, do you have
25      to give prior notice of that to Vanderbilt?

Page 24

1    A  That's a complex question.  It depends on
2       what's being used and the specific faculty
3       member.  It would have to be discussed with
4       the university.  I don't know the answer to
5       that.  There is not a fixed answer to that
6       question.
7    Q  If you have one of your graduate students who
8       is supported by federal funding analyze
9       meshes from the mesh litigation, would you
10      have to disclose that to anyone?
11   A  I would discuss that with the dean's office.
12      But Dr. Dunn's company did the testing, so --
13   Q  Where is Dr. Dunn's company located at?
14   A  At his residence in Nashville.
15   Q  He has employees working out of his home in
16      Nashville?
17   A  I can't speak to those details about
18      Dr. Dunn's company.  I don't know how he
19      operates his company other than his business
20      relationship with me.
21   Q  Do you know if Dr. Dunn utilized any of the
22      graduate students at Vanderbilt in any
23      analyses pertaining to transvaginal mesh?
24   A  Not to my knowledge.
25   Q  Do you know if Dr. Dunn utilized any

Page 25

1       Vanderbilt personnel besides yourself in any
2       analyses or investigation pertaining to
3       transvaginal mesh?
4    A  Again, Dr. Dunn would have to speak to that.
5       I don't know.
6    Q  Who is your immediate supervisor currently?
7    A  My department chair, Kane Jennings.
8    Q  Could you spell that?
9    A  K-A-N-E Jennings.
10   Q  And that's within the department of what?
11   A  Chemical and biomolecular engineering.
12   Q  So you work within the Department of Chemical
13      and Biomolecular Engineering at Vanderbilt?
14   A  That is correct.
15   Q  Is that a particular school at Vanderbilt?
16   A  That department is within the school of
17      engineering.
18   Q  Besides Dr. Dunn, who, if anyone else at
19      Vanderbilt is aware that you are serving as
20      an expert for plaintiffs in the transvaginal
21      mesh litigation?
22   A  Professor Ken Debelak, D-E-B-E-L-A-K.  He's
23      an Associate Professor of Chemical and
24      Biomolecular Engineering at Vanderbilt.
25      Dr. Dunn retained him through his company as

7 (Pages 22 to 25)

Scott A. Guelcher, Ph.D.

Page 26

1    an expert in prior litigation over a year
2    ago. I believe Dr. Debelak was deposed in
3    this first case, but not since.
4    Q  Have you had anyone at Vanderbilt perform any
5    activity on your behalf with regard to
6    anything you've done in the transvaginal mesh
7    litigation as an expert?
8    A  So I have a graduate student who was doing
9    oxidative degradation testing through her
10   dissertation project, and she provided --
11   well, I asked my graduate students to write
12   standard operating procedures for everything
13   we do. I review and discuss those procedures
14   with them and approve them, and she gave that
15   protocol to Professor Dunn.
16   Q  What's the name of this graduate student?
17   A  Anne Talley, T-A-L-L-E-Y.
18   Q  Let me see if I understand this. So you
19   asked all of your graduate students to write
20   SOP's?
21   A  So for anything that we do in the laboratory,
22   for any polymer that we make, for any
23   analysis that we run, such as oxidative
24   degradation testing, we review the literature
25   and prepare a standard operating procedure or

Page 27

1    an SOP for the procedure, and I believe
2    that's part of student training. These are
3    the types of activities they will do in the
4    industry, so I ask my students to write these
5    types of documents.
6    Q  What did you ask Anne Talley to do
7    specifically that pertained to your work as
8    an expert in the transvaginal mesh
9    litigation?
10   A  I didn't ask her -- I asked her to write the
11   SOP for the medium, preparing the medium.
12   And then Dr. Dunn asked her for that SOP is
13   my understanding.
14   Q  Why did you ask Ms. Talley to write the SOP
15   for the preparation of the medium?
16   A  Well, she was the one that was working in
17   this area on her research project, so she had
18   the most knowledge about it.
19   Q  When you say medium, what medium are you
20   referencing?
21   A  The medium that was used in the in vitro
22   testing with the mesh.
23   Q  What was that medium?
24   A  It's a solution of 20 percent cobalt chloride
25   -- I'm sorry. Strike that. It was a

Page 28

1    solution of 20 percent hydrogen peroxide with
2    cobalt chloride, and I don't remember the
3    exact amount. That's the solution.
4    Q  And this solution is used for the in vitro
5    testing of mesh?
6    A  This solution was first developed by Dr. Jim
7    Anderson in 1993. It was first published --
8    his group published a number of papers on it.
9    I published two papers with it. It's used to
10   assess the degradation of biomaterials under
11   oxidative conditions that are similar to
12   those in the human body, more specifically,
13   that are similar to those under conditions
14   where there are adherent inflammatory cells
15   in the biomaterial, the foreign body
16   reaction, I should say, the effects of the
17   foreign body reaction on the stability of the
18   biomaterial.
19      It's a very general well-known
20   established test that's been cited dozens of
21   times.
22   Q  So did Ms. Talley or any of your other
23   graduate students do any in vitro testing on
24   the mesh?
25   A  No. As I said before, that testing was done

Page 29

1    by Dr. Dunn's company.
2    Q  Was the testing done by Dr. Dunn's company
3    before or after Ms. Talley's SOP was given to
4    Dr. Dunn?
5    A  I believe it was after, because they used
6    that SOP to prepare the solution. These
7    activities were done by Dr. Dunn, but I don't
8    know who in his company did what. I just
9    know that my lab through Anne provided them
10   with a solution with a -- strike that -- with
11   an SOP for preparing the solution, and then
12   they did the testing.
13   Q  Did Ms. Talley know that she was writing an
14   SOP that would be given to plaintiffs'
15   experts in the transvaginal mesh litigation
16   for utilization in certain testing?
17   A  She did not prepare the SOP for plaintiffs.
18   She prepared the SOP for use in my
19   laboratory. She was aware of the mesh
20   litigation, but she was not -- she did not
21   write it for this. It's an SOP for my
22   laboratory. It falls within the scope of her
23   activities on her funded research project.
24      MR. SNELL: Move to strike.
25   BY MR. SNELL:

8 (Pages 26 to 29)

Scott A. Guelcher, Ph.D.

Page 30

1  Q  Did Ms. Talley know that she was preparing an
2     SOP that would be given to a plaintiff's
3     expert for use in transvaginal mesh
4     litigation?
5  A  The way you asked that question, no, I don't
6     believe so.  It was written for my
7     laboratory.  She did not write it for the
8     testing.  It's an SOP that was in my
9     laboratory.
10  Q  How long did it take Ms. Talley to write this
11     SOP?
12  A  I don't know.
13  Q  Did you assign Ms. Talley to write this
14     particular SOP regarding this testing?
15  A  I believe so.  I asked her to write the SOP
16     for the procedure in general to use in our
17     lab.  We use it for other projects as well.
18  Q  You were aware when you asked Ms. Talley to
19     write the SOP regarding the testing, that it
20     would be used by Dr. Dunn in his role as an
21     expert for plaintiffs in the mesh litigation?
22  A  I was aware of that.
23  Q  Did Dr. Dunn give Ms. Talley any money or
24     renumeration for writing this SOP that he
25     used in his role as an expert in the mesh

Page 31

1     litigation?
2  A  He wouldn't give her renumeration because it
3     was written within the course of her work at
4     Vanderbilt and her project.
5  Q  So the answer is, no, he didn't give her any
6     money?
7  A  No.
8  Q  And did you give Ms. Talley any money or
9     renumeration for writing the SOP that you
10     were aware of that would be used in testing
11     meshes in transvaginal litigation?
12  A  I didn't give her money because it was
13     written for her research project for her work
14     at Vanderbilt.
15  Q  So the answer is no, you didn't give her any
16     money, correct?
17  A  No, but for that reason.  It wasn't written
18     for the mesh litigation.
19  Q  Other than Ms. Anne Talley, have you involved
20     any of your other graduate students in any
21     testing or analyses pertaining to your work
22     as an expert in the transvaginal mesh
23     litigation?
24  A  No.
25  Q  How long ago was it that Ms. Talley wrote

Page 32

1     this SOP?
2  A  I don't remember.  I don't know when exactly
3     she wrote it or when it was revised or
4     finalized.  I don't remember.
5  Q  Well, was it this year or last year?
6  A  I don't know.
7  Q  When did Dr. Dunn do this testing that he
8     utilized Ms. Talley's SOP that she wrote
9     while as a graduate student for you?
10  A  It was done in September.
11  Q  Of 2014?
12  A  Yeah.
13  Q  So, certainly, Ms. Talley would have been
14     working on this SOP during the calendar year
15     of 2014, correct?
16  A  She would have been working on it.
17     Typically, these are documents that we write
18     and we revise, so I have had students write
19     SOP's, and then other students come back and
20     revise them.  That's how we do it.  We revise
21     them based on new papers that have been
22     published, new information, so I don't know
23     the history of the document.  I can't
24     remember that.
25  Q  Is Ms. Talley currently a graduate student at

Page 33

1     Vanderbilt?
2  A  Yes.
3  Q  If you had done any of the types of testing
4     that Dr. Dunn has performed in his role as an
5     expert in the transvaginal mesh litigation on
6     the mesh, what type of paperwork or
7     disclosures would you have had to give to
8     Vanderbilt?
9  A  I don't know.  It's difficult to answer these
10     questions.  We tend to address them when --
11     I just -- as I said earlier, I have not been
12     doing testing of materials for litigation at
13     Vanderbilt, so I don't know what I would have
14     to do.  So far I've disclosed the consulting
15     activity.  I may very well make additional
16     disclosures as we move along and the
17     situation changes, but it's a very fluid
18     situation.
19        We disclose these types of things as they
20     arise.  So it's difficult to say without
21     actually seeing the situation.
22  Q  Does Vanderbilt require you to disclose any
23     relationships upon which you receive outside
24     monies?
25  A  I already answered this.  We're required to

9 (Pages 30 to 33)

Scott A. Guelcher, Ph.D.

Page 34

1    disclose consulting relationships. When I
2    submit a grant application, I'm required to
3    disclose whether I have a significant
4    financial interest. The NIH changed the
5    rules in 2012. I disclose whether there is a
6    significant financial interest, and then the
7    dean's office works with me to figure out if
8    there is a conflict, and if there is, how do
9    we manage it.
10        So there is no fixed set procedure. It's
11   very much handled on a case-by-case basis.
12   And disclosures are continuously updated as
13   new information becomes available.
14   Q   How is significant financial interest
15       defined?
16   A   The NIH defines a significant financial
17       interest as $5,000 a year. That's one way to
18       define it. Another is equity. Strike that.
19       The NIH defines it as $5,000 or greater.
20       Financial interest, that could be cash. That
21       could be equity. That could be any form of
22       compensation, but the threshold is $5,000.
23   Q   Have all monies you received in your role as
24       an expert in the transvaginal mesh litigation
25       for the calendar year 2014 been paid to you

Page 35

1    through Dr. Dunn's company?
2    A   The money I have received has all been
3        received through Dr. Dunn's company, that's
4        right, yes. The money I received, yes.
5    Q   Does anyone at Vanderbilt know the scope of
6        Dr. Dunn's company?
7    A   I can't speak to Dr. Dunn's company. I don't
8        know the details of his arrangement with the
9        university. I just don't. He has a
10       different type of appointment than I have.
11       He doesn't do federally-funded research.
12       That's what I know. I don't know the details
13       of his arrangement with Vanderbilt.
14   Q   Is Dr. Dunn in a position of authority over
15       you at Vanderbilt?
16   A   No.
17   Q   If Dr. Dunn wanted to do federally-funded
18       research, would he be able to in light of his
19       activities and the amount of money his
20       company bills for expert work in the
21       transvaginal mesh litigation?
22   A   I can't speak to that. I don't know how much
23       his company bills or makes. I don't know
24       that information.
25   Q   Have you investigated what affect your

Page 36

1    independent role now as an expert and
2    billing as an expert will have on your
3    ability to work or run a lab that has
4    federally-funded research?
5    A   Yes, I have.
6    Q   And what affect, if any, have you learned
7        about that?
8    A   I'm contemplating updating my disclosure.
9        And -- well, I will leave it at that.
10   Q   Have you had any discussions with anyone at
11       Vanderbilt about ways you could work around
12       the ramifications that the receipt of federal
13       funding has on your role as an expert?
14           MR. KUNTZ: Objection.
15   A   I don't like this word work around. That's
16       not what we do. We identify conflicts. We
17       disclose information to the dean's office.
18       We work with the dean's office to identify
19       conflicts. If conflicts are identified, we
20       work with the dean's office and the general
21       counsel's office to identify and manage a
22       plan, which is then approved -- approved by
23       the conflict of interest committee.
24           I've been through this process multiple
25       times. I've had management plans. I've been

Page 37

1    disclosing conflicts to Vanderbilt since I
2    started there. There is a very standard and
3    routine process. Faculty are allowed and
4    encouraged to participate in activities
5    outside of Vanderbilt. I do this in the
6    course of my research with licensing,
7    start-up companies. This is routine.
8        There is a process and a procedure. And
9    we're not working around anything. We're
10   trying to find a way to work within the
11   framework of the federal regulations and
12   university policy. It's very standard for
13   universities.
14   BY MR. SNELL:
15   Q   Have you told Vanderbilt how much money you
16       have earned as an expert in the transvaginal
17       mesh litigation?
18   A   You have asked me this before. And I said we
19       are not required in the course of our work to
20       disclose that. If I believe that I see a
21       conflict between my research and the
22       consulting, then I will disclose that and the
23       university will -- we will have those
24       discussions, but we are not required to
25       disclose this information for consulting

Scott A. Guelcher, Ph.D.

Page 38

1    work.
2    Q  So the answer to my question is, no, you have
3      not disclosed that to Vanderbilt, correct?
4    A  I'm not required -- strike that.
5    Q  My question is simple.  Have you disclosed to
6      Vanderbilt --
7    A  And I believe I have answered your question.
8    Q  I think you are telling me about what you're
9      required to do.
10       I'm asking you, have you, Dr. Guelcher,
11     disclosed to Vanderbilt the monies, the
12     amount of monies you have earned as a
13     plaintiff's expert in transvaginal mesh
14     litigation?
15              MR. KUNTZ:  Object.  Answer it.
16   BY MR. SNELL:
17   Q  It's a yes or no answer.
18   A  No, I've not disclosed, but I'm not --
19   Q  Have you informed your dean of your current
20     intention to bill as an independent
21     consultant to attorneys in the transvaginal
22     mesh litigation?
23   A  Why would I inform the dean of this?  I've
24     not informed the dean.  I have to inform the
25     dean when I believe there is a conflict.  And

Page 39

1    if and when I make that assessment, I will
2      update my disclosure.  But according to
3      Vanderbilt policy, we're not required to do
4      those things.
5    Q  Well, if you spent approximately 20 hours at
6      $285 an hour thus far, that is over $5,000.
7      Are you telling me that if you have a greater
8      than $5,000 interest in your role as an
9      independent billing consultant to
10     transvaginal mesh litigation, you do not need
11     to tell that to the dean?
12              MR. KUNTZ:  Objection.
13   A  No, you are misinterpreting and
14     misunderstanding what I have said.  The
15     question is, whether the proposed research,
16     when I submit a grant application, I submit
17     an application to the NIH for federal
18     funding.  I have to answer the question, do
19     you have a significant financial interest in
20     the outcome of this federally-funded project.
21       Significant financial interest is defined
22     as more than $5,000.  But at this point in
23     time and in the past there -- at this time,
24     there is no overlap between the consulting
25     work and the federally-funded research.  So

Page 40

1    if and when I submit a grant application,
2      that would create the conflict, but that's
3      tied to INH funding.  That's not -- why I'm
4      not required to disclose it unless there is a
5      conflict of the federally-funded research
6      project.
7    Q  Have you performed any testing on Ms. Perry's
8      mesh?
9    A  I have not.
10   Q  Have you looked at Ms. Perry's mesh under a
11     scanning electron microscope?
12   A  I have not.
13   Q  What are all of the different tests, methods
14     that one can do to try to determine whether
15     there is degradation of polypropylene?
16   A  So degradation of polypropylene could be
17     assessed by SEM imaging.  That's typically
18     how we assess it.
19   Q  FTIR --
20   A  FTIR -- I'm sorry.
21   Q  FTIR is a way that one can go about trying to
22     assess whether there is degradation of
23     polypropylene, correct?
24   A  No, that's not why we use FTIR.  We use FTIR
25     to assess for oxidation, chemical changes in

Page 41

1    the polypropylene.  That can be assessed by
2      the FTIR.
3    Q  And when you look for oxidation via FTIR,
4      what you are looking for is to see if there
5      is a potential that would lead to
6      degradation; is that correct?
7    A  No.  We are looking at oxidation to answer
8      the specific question of is the surface
9      oxidizing, is it chemically changing.  And we
10     can see that by peaks in the FTIR spectra
11     that are not there in the normal
12     polypropylene, but do appear for oxidized
13     polypropylene.
14   Q  Now, as I understand it, Dr. Dunn, in prior
15     work did FTIR in connection with assessing
16     the question of is there degradation of
17     polypropylene?
18   A  And why is that -- I don't know what you're
19     referring to.
20   Q  I recall in your Huskey testimony, in your
21     deposition, you testified that all of the
22     testing done was by Dr. Dunn.  And I
23     believe you identified FTIR, XPS, and I don't
24     know if there were others.
25   A  I don't remember the testing that Dr. Dunn

11 (Pages 38 to 41)

Scott A. Guelcher, Ph.D.

Page 42

1  did for the Huskey trial. I do believe we
2  did FTIR. I don't remember the others, but
3  oxidation and degradation are related, but
4  they're -- in terms of -- and there may be
5  times that people use the word degradation to
6  consider all of these effects, but I'm
7  speaking specifically about oxidation as a
8  chemical process, and degradation as a
9  physical one, and they're assessed by
10  different techniques.
11      And I remember all of the testing
12  that Dr. Dunn did for the Huskey trial. I
13  don't remember that.
14  Q  So if one does FTIR testing and sees that the
15  surface is oxidized, that does not
16  necessarily mean that the material is
17  degraded, correct?
18  A  There are different tests to assess -- they
19  could be degraded, but we would assess
20  degradation using a different technique than
21  FTIR. FTIR, as I said, is for chemical
22  oxidation, which is a chemical change. There
23  may be degradation, but we would confirm that
24  with a technique such as SEM.
25  Q  So if a scientist has a positive FTIR finding

Page 43

1  for oxidation on the surface, he would then
2  need to confirm that with SEM in order to
3  reasonably say with scientific certainty that
4  there was degradation?
5          MR. KUNTZ: Objection.
6  A  I would say that the literature teaches us
7  that these processes are related, oxidation.
8  Chemical oxidation leads to physical
9  degradation. And so if I see evidence of
10  oxidation, I would expect to see physical
11  degradation in time. To visibly see that
12  physical degradation, I would do the
13  technique such as SEM.
14      But if I see oxidation, I would certainly
15  expect based on published literature findings
16  that there would be degradation in time to
17  some extent.
18  BY MR. SNELL:
19  Q  Well, if you see chemical oxidation, it is
20  not a guarantee that physical degradation has
21  taken place, correct?
22          MR. KUNTZ: Objection.
23  A  I think I just answered that. It's a strong
24  indicator that there is also physical
25  degradation.

Page 44

1  BY MR. SNELL:
2  Q  The fact that it's a strong indicator,
3  though, that in and of itself means that
4  there is some possibility that you will not
5  see physical degradation, and there is a
6  possibility as well that you will see it,
7  physical degradation, if you look at SEM,
8  correct?
9          MR. KUNTZ: Objection.
10  A  Again, the literature tells us that you would
11  expect degradation. Is it -- unless you
12  actually see it, you can't prove -- you can't
13  guarantee that it's there, but you would
14  certainly expect it. It's within a
15  reasonable degree of scientific certainty to
16  expect that you would have degradation in
17  time if that surface is being oxidized.
18      There are numerous papers that teach
19  about this, about polymers in general,
20  polymers that are susceptible to oxidative
21  attack showed signs of physical degradation.
22  This was all worked out a number of years
23  ago.
24          MR. SNELL: Move to strike.
25  BY MR. SNELL:

Page 45

1  Q  My question is this. It's straight forward.
2  The fact that you see chemical oxidation,
3  that does not mean that you would also see
4  under SEM analysis physical degradation if
5  you were to look at that particular time; is
6  that correct?
7          MR. KUNTZ: Objection. Asked
8  and answered. Calls for speculation, and is
9  an incomplete hypothetical. But go ahead.
10  A  This is a speculative question. What I'm
11  saying is, if there is oxidative changes, the
12  body of literature teaches within a
13  reasonable degree of scientific certainty
14  that there will be at some time physical
15  degradation. That's what the literature is
16  teaching us.
17  BY MR. SNELL:
18  Q  You keep saying at some time there will be
19  physical degradation. At what time will
20  there be physical degradation?
21  A  As I've said in my previous testimony, it's
22  unpredictable. And that's a problem for the
23  design of the device, because it's subject to
24  changes that can happen that you can't
25  predict the timing of these changes and what

12 (Pages 42 to 45)

Scott A. Guelcher, Ph.D.

Page 46

1    the implications will be.
2    Q  Do you have an opinion as to what is the
3       earliest point in time where there can be
4       physical degradation of Ethicon's Prolene
5       polypropylene used in TVT Abbrevo?
6    A  Again, that's a speculative question. I
7       believe that upon implantation, the device
8       will be colonized by adherent inflammatory
9       cells. This is well-known in the literature,
10      the foreign body reaction. Those cells will
11      secrete species that oxidize it. The timing
12      of all these events can depend on a number of
13      factors, the nature of the inflammatory
14      response where it's implanted, the mechanical
15      stresses in the environment, whether there is
16      a bacterial infection.
17         The timing can be highly variable. It
18      can happen early or it can happen late. The
19      point is that it's unpredictable. That's
20      what I've been saying.
21   Q  Well, I would like to know what does the
22      literature teach you about the earliest point
23      in time when you can say there is physical
24      degradation of the Prolene polypropylene
25      mesh?

Page 47

1       I don't want to rehash everything you
2       talked about in Huskey. I know you talked
3       about what was seen in two years and I
4       believe five or seven years in a dog study
5       and things like that. So with all of those
6       principles that you've already testified
7       about, let me just back up and re-ask it.
8    A  Okay.
9            MR. KUNTZ: Objection.
10   BY MR. SNELL:
11   Q  What is the earliest point in time that you
12      can say that there is physical degradation of
13      the Prolene polypropylene mesh?
14   A  I just can't answer that question. There are
15      too many factors that can influence it. To
16      say -- again, it's too speculative. It
17      depends on many factors in addition to the
18      chemical oxidation.
19   Q  Based on all of the literature that you saw,
20      what was the earliest time reported that
21      there was physical degradation of the Prolene
22      polypropylene mesh?
23   A  For Prolene polypropylene, I can say from the
24      Clave paper and the explants that were
25      studied in Clave, he recorded degradation in

Page 48

1    time periods of three months and later.
2    That's what Clave reported.
3    Q  And you have a list of materials here today.
4       Where in Clave does it say that --
5    A  I would have to see the paper. I know that
6       in Clave, it says that -- he notes that
7       explants -- I would have to see it to give a
8       precise answer. The number I remember is
9       three months.
10         (Deposition Exhibit No. 1 was
11      marked for identification.)
12   BY MR. SNELL:
13   Q  Doctor, I've handed you Exhibit No. 1. Is
14      that the Clave paper you were referring to,
15      sir?
16   A  That is correct.
17   Q  So can you show me where in Clave it states
18      that physical degradation occurred in the
19      Prolene polypropylene mesh at a certain time
20      period?
21   A  I'm looking for that. So on Page 264 of
22      Clave, it states degradation was observed
23      only in samples implanted for at least three
24      months.
25   Q  That is a general statement about the overall

Page 49

1    cohort of explants, correct?
2    A  That's my understanding.
3    Q  That statement is not necessarily particular
4       to a Prolene polypropylene mesh implant,
5       correct?
6    A  There could have been Prolene implants in
7       this study. That statement doesn't specify
8       whether that applies to Prolene or not.
9    Q  So my question is, can you point to any
10      literature which informs you of the earliest
11      time which the Prolene polypropylene mesh
12      physically degrades?
13           MR. KUNTZ: Objection.
14   A  I don't know of this -- you mean in vivo of
15      patients?
16   BY MR. SNELL:
17   Q  Yes, sir.
18   A  I don't know of a study that has specifically
19      reported that.
20   Q  In the dog study -- and you're still relying
21      on the dog study as well with the Prolene
22      sutures?
23   A  The dog study, it's in my reliance materials,
24      so it's part of the documents I have
25      reviewed.

13 (Pages 46 to 49)

Scott A. Guelcher, Ph.D.

Page 50

1  Q  At what point in time was physical
2     degradation observed in that study?
3  A  I can't remember. I would have to look at
4     the document.
5  Q  Okay. At a break, I would like for you to
6     look at that document. And I will have the
7     same question for the vascular graft Prolene
8     suture study, what is the earliest point in
9     that study if at any point in time it showed
10    physical degradation?
11 A  Again, I would have to look at it. I don't
12    remember that level of detail.
13 Q  Am I correct that although Clave reports
14    there were 100 explanted samples, a smaller
15    number were actually analyzed?
16 A  What do you mean analyzed? I'm not sure what
17    you mean.
18 Q  Let me ask you, how many explants were
19    analyzed in the Clave study?
20 A  I would have to look at it. There were 100
21    explants. I'm still not sure what you're
22    asking, though. I mean, there were 100
23    explants.
24 Q  How many of those 100 explants were actually
25    analyzed?

Page 51

1  A  Well, I think it depends on the method, so --
2     they did a chemical analysis on 32 explants.
3     It doesn't necessarily say in the methods.
4  Q  Why did Clave do less than one-third of the
5     overall sample size for chemical analysis?
6  A  I don't know. I would have to look at this
7     to --
8  Q  By only analyzing 32 out of 100 explants for
9     a chemical analysis, what limitations does
10    that place upon the interpretation one can
11    draw from the Clave paper?
12 A  Well, what I believe Clave is saying is
13    consistent with my opinions, that these
14    events can happen and can lead to problems
15    and complications. He's not saying it
16    happens all the time in every mesh at this
17    particular time.
18       He is saying that these meshes change,
19    which is consistent, which is my opinion in
20    this case, that the meshes change, and that
21    introduces an extra level of risk because
22    these changes make the meshes -- make their
23    behavior unpredictable. That is what he is
24    saying.
25       MR. SNELL: Move to strike.

Page 52

1  BY MR. SNELL:
2  Q  My question was not what is he saying. My
3     question was to you, what limitations does
4     that place upon what one can draw from Clave
5     due to the fact that only 32 out of 100
6     explants were submitted for chemical testing?
7  A  I don't see how it limits the finding that he
8     sees changes. That's what he is reporting,
9     whether he sees it in 32 or 50, whether he
10    looked at 32 or 100. I mean, you may be
11    implying that he was cherry-picking data, but
12    I have no reason to believe that. This is a
13    peer-reviewed journal.
14       I mean, he studied what he could study,
15    but it doesn't limit the finding that these
16    changes happened. Whether he did 32 or 100,
17    he still saw changes. So I don't understand
18    how that limits that finding.
19 Q  Well, he had 100 explants, and he only
20    subjected 32 to chemical analysis. We can
21    agree to that, right?
22 A  That's what it states. But beyond that, I
23    don't --
24 Q  And you don't know the methodology by which
25    he selected the particular 32 for chemical

Page 53

1     analysis, correct?
2  A  Well, let me read it. I need to read this,
3     because I'm not quite following where you are
4     going with this.
5        Okay. So he says -- I mean, he explains
6     himself. The samples were divided into four
7     groups. Because of the small sample size and
8     physical condition of the explanted
9     materials, extensive and complete chemical
10    analysis was difficult, which I think most
11    would agree is true. And he has several
12    groups listed here, four groups.
13       One of the fourth group is a control with
14    pristine implants, which he has a number of
15    pristine implants listed. So he grouped one
16    as degraded polypropylene that he analyzed by
17    SEM.
18       Group two is a group of nondegraded
19    explants, which again looks like
20    polypropylene mesh. And then the fourth
21    group of PET explants. That's what he says
22    he did. And he says it was difficult. He
23    probably didn't have much material to work
24    with, but these are explants. This isn't a
25    clinical trial. These are explants, so that

14 (Pages 50 to 53)

Scott A. Guelcher, Ph.D.

Page 54

1    is what he had to work with.
2  Q  But do you know then the methodology by which
3    he determined the cut point for whether it
4    was too difficult or not to do SEM analysis?
5  A  He doesn't provide more detail, but this is
6    what I understand that he did.
7  Q  So we have no way of knowing what chemical
8    analysis would have shown for those 68
9    explants that were not subjected to chemical
10   analysis; is that fair?
11 A  Say that again.  I didn't catch it.
12 Q  Sure.
13    We do not know what, if anything, would
14   have been shown for the 68 other explants
15   that were not subjected to chemical analysis
16   because the chemical analyses were not done;
17   is that fair?
18 A  We don't know.  He didn't report it, for
19   reasons that I'm not entirely sure.
20 Q  And in Clave's paper, am I correct that not
21   all of the polypropylene explants were even
22   -- had physical degradation?
23 A  Yes.  But I talked about this earlier, Clave
24   is not trying to report the incidents of --
25   strike that.  He's not trying to report

Page 55

1    frequency.  He is saying that he observed it.
2    With what he had, with what he could test, he
3    observed evidence.  He doesn't say he
4    observed it in every sample, but he did
5    observe it.  That's what he is saying.  So he
6    did not observe it in every sample, but we've
7    talked about this.
8  Q  Dr. Clave did report the rate of degradation
9    that he saw in the samples that he actually
10   did analyze, correct?
11 A  He did report that number but --
12 Q  So for polypropylene monofilament at the
13   table at the top of Page 266, do you see
14   that?
15 A  I see that number.  I know what you're
16   saying.
17 Q  And you understand the Prolene polypropylene
18   mesh in the TVT Abbrevo to be a monofilament
19   polypropylene?
20 A  Yes.
21 Q  And what Clave found was that only one-third
22   of that sample of polypropylene monofilament
23   that he actually looked at was degraded,
24   correct?
25 A  I look at it a little differently.  I look at

Page 56

1    it as, wow, one-third were degraded, that's a
2    lot.  That's how I look at it.
3  Q  Regardless of how you want to characterize
4    it, let's see if we can agree to this.
5    Dr. Guelcher, we can both agree that
6    Dr. Clave reported that the rate of
7    degradation in the polypropylene monofilament
8    was one-third or 33.33 percent, correct?
9  A  That's what he reported.  But to try to
10   construe that that is a good number is beyond
11   my understanding.  That's what he reported.
12   He reported that one-third were degraded.
13    MR. SNELL:  Move to strike.  I'm
14   just looking for a yes or no.
15 BY MR. SNELL:
16 Q  If we can agree to this basic fact.  How you
17   characterize it, I know what position you're
18   coming from.  All right.
19    In the Clave paper for the polypropylene
20   monofilament, the rate of degradation seen
21   was one out of three or 33.33 precent,
22   correct?
23 A  That's what's in the table.
24 Q  Fair enough.
25    And you have your interpretation of that?

Page 57

1  A  I do.
2  Q  And let me ask you, if more likely than not
3    it's 51 percent or higher, you can't look at
4    the Clave paper and say it's more likely than
5    not that there would be degradation to
6    polypropylene monofilament mesh, correct?
7    MR. KUNTZ:  Objection.  You can
8    answer.
9  A  If I were a patient looking at that number, I
10   would be concerned.
11    MR. SNELL:  Move to strike.
12   Nonresponsive.
13 BY MR. SNELL:
14 Q  When you look the Clave paper, you can't say
15   it's more likely than not that there was
16   degradation to the polypropylene monofilament
17   mesh, correct?
18    MR. KUNTZ:  Objection.
19 A  I don't even know how to answer that
20   question.  I mean, it's -- he reported 33
21   percent.  I will agree that he reported that
22   in this table, in table two, he reports -- or
23   figure two, he reports that 33 percent were
24   degraded.  Beyond that, I can't -- that's
25   what he says.

15 (Pages 54 to 57)

Scott A. Guelcher, Ph.D.

Page 58

BY MR. SNELL:
1  BY MR. SNELL:
2  Q  So you would agree that Dr. Clave's paper in
3     this table and report, that it's more likely
4     than not that the mesh was actually not found
5     to be degraded, correct?
6  A  I cannot answer that question. That doesn't
7     make any sense. I mean, this is what he
8     reported. To try to construe that -- that's
9     what he reported and what he tested. To try
10    to construe more out of this, this wasn't a
11    controlled study where he was trying to
12    measure race of degradation. He made
13    observations and he reported a number, this
14    percentage that I saw to be degraded.
15       He was not aiming to estimate some -- he
16    is just reporting. This is the way I read
17    this paper. So I can't answer this question
18    that it's more likely than not on anything.
19    That's just the number he provides.
20  Q  So the Clave paper we can agree does not
21    stand for the proposition that it's more
22    likely than not that polypropylene
23    monofilament is degraded?
24        MR. KUNTZ: Objection.
25  A  I can't agree to this line of questioning.

Page 59

1     This is -- why can't we not just agree that
2     -- I agree this is what he reported. And
3     beyond that, I'm not going to agree to any
4     other interpretation of that number. That's
5     what he reports. It's an observation saying
6     that this can happen, which is what I've been
7     saying in my trial and deposition testimony,
8     that these events can happen and Clave
9     observed it. That's what it says.
10  Q  So you believe these events of degradation
11    can happen, and Clave observed it in
12    one-third of the sample, correct?
13  A  He observed it in 33 percent of the samples
14    that he tested.
15  Q  And an expert can take Clave and say, because
16    it was seen in Clave, and it was seen in
17    33.33 percent, that means that all meshes
18    will be degraded, correct?
19        MR. KUNTZ: Objection. Asked
20    and answered.
21  A  But I've not been saying that. I've been
22    saying specifically that oxidation and
23    degradation can occur in these meshes, and it
24    can lead to adverse events. The timing of
25    when -- these things are unpredictable.

Page 60

1     That's what I'm saying. Unpredictable means
2     you can't predict, and that's a problem.
3     That's why the design is flawed is because
4     you can't predict. The changes can happen,
5     and you can't predict when or the
6     implications of those changes.
7        My simple point is that Clave sees those
8     events and reports them, but this is not a
9     study designed to investigate the number of
10    meshes that got -- that were degraded.
11    That's not what he is saying. He is
12    observing -- he is reporting an observation.
13    I think you're misinterpreting. You're
14    trying to put me in a position to
15    misinterpret Clave, and I can't do that. I
16    can only report on what I see.
17  BY MR. SNELL:
18  Q  So you can only report that for the samples
19    that Clave did decide to analyze for
20    degradation, it was 33.33 percent for the
21    polypropylene monofilament, and to try to
22    take that number and extrapolate it is not
23    something you're willing to do?
24        MR. KUNTZ: Objection.
25  A  When have I done that in trial testimony?

Page 61

1     You've seen my depositions.
2        MR. SNELL: Move to strike.
3  BY MR. SNELL:
4  Q  We are going to be here all day. I'm not
5     asking about when did I see you doing
6     something. I'm really not.
7  A  I just feel like you're covering old ground
8     that I've been over so many times, and you're
9     trying to get me to misrepresent a paper that
10    I've testified about so many times. And I
11    don't understand why you're doing that.
12    That's why I'm frustrated.
13  Q  Well, it's a simple yes or no answer.
14  A  But the questions are convoluted. And the
15    way you're asking them is implying certain
16    things. When you say he decided to analyze.
17    Why could we not say, Clave analyzed -- in
18    the number of samples that Clave estimated by
19    SEM, he observed 33 percent of them were
20    degraded. I agree with that. That's what
21    Clave says.
22       But I don't want to agree to any other
23    questions that infer some kind of intent or
24    something in Clave. That's what I'm
25    resisting. I'm not trying to be difficult.

16 (Pages 58 to 61)

Scott A. Guelcher, Ph.D.

Page 62

1    I just feel like I have been very clear about
2    what I think about this paper.  And I'm just
3    saying that it is consistent with my
4    testimony that these events can happen.
5    That's what I am saying.  That's what I have
6    always been saying.
7    Q  I just want to get an answer to my question.
8       You interpret Clave as being consistent
9       with your opinion in that it can happen.  And
10      Clave observed it in 33.33 percent, correct?
11   A  Yes, he observed it in 33 percent, that's
12      fine.
13   Q  But you not take Clave and extrapolate Clave
14      to say that a certain rate of degradation
15      will be seen in the mesh samples?  Yes or no.
16              MR. KUNTZ:  Asked and answered.
17      Eight times.
18   A  I've not done that and I'm not doing that
19      now.
20   BY MR. SNELL:
21   Q  Okay.  That's all I wanted to know was is
22      that something you would do or would not do.
23   A  Well, where you ended up with the question, I
24      was fine with it.  I'm not trying to be
25      difficult.  I'm sorry.

Page 63

1              MR. SNELL:  All right.  Let's
2      take a break.
3              (A brief recess was taken from
4      10:40 to 10:50 a.m.)
5    BY MR. SNELL:
6    Q  Doctor, you didn't look at Mrs. Perry's
7       medical records, correct?
8    A  I did not look at her records.
9    Q  Did you look at any of the depositions taken
10      in Mrs. Perry's case, hers or any of her
11      doctors or family members?
12   A  I looked at some depositions, but I can't
13      remember exactly those -- I don't know.
14   Q  Are you certain that they were depositions in
15      the Perry case or could they have been from
16      some other matter?
17   A  It could have been.  There has been so many
18      cases, it's hard for me to keep all of the
19      documents straight.
20   Q  I'm looking at your reliance list, and I gave
21      you this back.
22   A  The reliance list?
23   Q  Your list of materials on there that you
24      provided --
25              MR. KUNTZ:  I will tell you that

Page 64

1    there is no case specific depositions on
2    there.
3              MR. SNELL:  Well, that is what I
4    was going to say.
5    BY MR. SNELL:
6    Q  So, Dr. Guelcher, I looked at your reliance
7       list.  It's on the thumb drive.  And I didn't
8       see any case specific depositions,
9       particularly from Mrs. Perry's case.  Is that
10      consistent or inconsistent with your
11      knowledge?
12   A  I have -- it's consistent with my knowledge,
13      yeah.
14   Q  You're not relying on any case specific
15      depositions in the Perry case for your
16      opinions are you, sir?
17   A  I am not.
18   Q  All right.  Thank you.
19   A  Okay.
20   Q  Earlier we were talking about some testing.
21      And you didn't do any SEM testing on
22      Mrs. Perry's explant, correct?
23   A  No, I did not.
24   Q  Did you have anybody else do any testing of
25      Mrs. Perry's explant on your behalf?

Page 65

1    A  I did not.
2    Q  Okay.  You didn't do any FTIR testing on
3       Mrs. Perry's explant, correct?
4    A  I did not.
5    Q  Did you do any GPC testing on Mrs. Perry's
6       explant?
7    A  No.  The only explant I received was in the
8       form of sections of the slides of tissue, so
9       it's -- I didn't do any of this type of
10      testing on that material.
11   Q  You did not do XPS testing on Mrs. Perry's
12      mesh, correct?
13   A  That's correct.
14   Q  You did not do DSC testing on Mrs. Perry's
15      mesh, correct?
16   A  No.
17   Q  You did not do EDX testing on Mrs. Perry's
18      mesh; is that correct?
19   A  That's correct.
20   Q  Are there any tests besides SEM, FTIR, GPC,
21      XPS, DSC and EDX that someone can do to look
22      for either chemical or structural
23      degradation?
24   A  So Dr. Iakovlev, who has testified in other
25      litigation, not in this particular case I

17 (Pages 62 to 65)

Scott A. Guelcher, Ph.D.

Page 66

1    don't believe, but he has a microscopic
2    method for evaluating degradation of the mesh
3    by microscopy.
4    Q  Dr. Iakovlev is a pathologist as you
5    understand it?
6    A  He is a pathologist at a hospital in Toronto.
7    Q  And Dr. Iakovlev is not an expert in this
8    case to your knowledge; is that correct?
9    A  To my knowledge. I've not discussed this
10   case with Dr. Iakovlev.
11   Q  Do you know if Dr. Iakovlev has looked at
12   Mrs. Perry's mesh or slides?
13              MR. KUNTZ: Objection.
14   A  Not to my knowledge.
15   BY MR. SNELL:
16   Q  Do you know if Dr. Iakovlev's microscopic
17   method for evaluating mesh has been analyzed
18   by any of the pathology medical societies,
19   like the American Association of Surgical
20   Pathologists or the American College of
21   Pathology?
22   A  I don't know the answer to that. But we are
23   preparing a manuscript on explaining mesh
24   that will be submitted soon. And I'm a
25   co-author on that manuscript.

Page 67

1    Q  Does this manuscript concern Mrs. Perry's
2    explant to your knowledge?
3    A  I am not aware of Dr. Iakovlev -- strike
4    that. From my perspective, the patients are
5    de-identified. I don't know the identity of
6    any patients in that study. What
7    Dr. Iakovlev knows, I don't know.
8    Q  And were these explanted meshes received by
9    you or Vanderbilt or were they received by
10   Dr. Iakovlev or someone else?
11   A  They were all received by Dr. Iakovlev from
12   varying sources. And all of those details,
13   he knows. I did not handle the specific
14   materials. I was never involved in that.
15   Q  For this testing, who did the testing that is
16   going to be the subject of this manuscript?
17   A  So Dr. Iakovlev did the testing. My
18   contribution was suggesting disdain for
19   myeloperoxidase, which is a marker for
20   reactive oxygen. And that information is
21   concluded and discussed in the manuscript.
22   And I have assisted Dr. Iakovlev with
23   revising and editing the manuscript.
24       I have made my changes and sent these to
25   him. And that's been my role in the

Page 68

1    manuscript.
2    Q  As you sit here today, is it correct, sir,
3    that you do not know the particular patients
4    for whom those slides were made that are
5    going to be the subject of this manuscript?
6    A  That is correct. I do not know their
7    identity.
8    Q  Okay. Actually, some slides from Mrs. Perry
9    were brought to the deposition today,
10   correct?
11   A  That's correct.
12   Q  Have you looked at those slides?
13   A  I looked at them visually, but I did not look
14   at them under the microscope.
15   Q  Okay. Now, the Perry slides that you looked
16   at visually, how did you come to obtain
17   those?
18   A  Through plaintiff's counsel.
19   Q  You didn't get those through from
20   Dr. Iakovlev?
21   A  No, I did not. Plaintiff's counsel.
22   Q  And you have not sent Mrs. Perry's slides to
23   Dr. Iakovlev, correct?
24   A  I received the slides from Plaintiff's
25   counsel, and they have been in my possession

Page 69

1    since.
2    Q  Okay. When did you receive those slides that
3    are particular to Mrs. Perry?
4    A  A few weeks ago maybe. I don't remember
5    exactly.
6    Q  What is this myeloperoxidase stain that you
7    referenced earlier?
8    A  It's myeloperoxidase. It's spelled
9    M-Y-E-L-O-P-E-R-O-X-I-D-A-S-E.
10   Q  And what is the purpose of the
11   myeloperoxidase stain?
12   A  So myeloperoxidase is an enzyme that converts
13   hydrogen peroxide and other substrates to
14   hydroxl radicals and other forms of reactive
15   oxygen species. And so if we see a stain
16   that is positive for myeloperoxidase, that
17   tells us that the inflammatory cells are
18   secreting reactive oxygen species, that the
19   mesh is being exposed to the reactive oxygen
20   species and would therefore be a marker of
21   this initiation of events of oxidation and
22   degradation. That's the purpose of the
23   stain.
24   Q  Okay. To your knowledge, Mrs. Perry's
25   pathology slides have not been stained with

18 (Pages 66 to 69)

Scott A. Guelcher, Ph.D.

Page 70

1     this myeloperoxidase stain; is that correct?
2  A  That's my understanding.
3  Q  So as I understand it, the myeloperoxidase
4     stain --
5  A  You can call it MPO.
6  Q  Thank you.  That makes it a lot easier.
7        The MPO stain is a stain that one can do
8     to look for reactive oxygen?
9  A  That's correct.  I published two papers on
10    this in my work at Vanderbilt.  So it's a
11    routine essay.
12 Q  And reactive oxygen is what these
13    inflammatory cells secrete or can secrete; is
14    that correct?
15 A  So the Dr. Anderson review that's in my
16    reliance materials from the 2008 seminars in
17    immunology teaches that within days of
18    implantation, the biomaterial, including
19    polypropylene, including Prolene mesh, is
20    colonized by these inflammatory cells that
21    adhere to the surface.  And the enzymes that
22    they secrete, such as MPO, are these --
23    result in the formation of reactive oxygen
24    species to which the surface of the material
25    is exposed.

Page 71

1        That's what's happening.  That's what I
2     have testified to in the past.
3  Q  Okay.  We can't say in Mrs. Perry's case that
4     there is MPO at the site of her mesh,
5     correct?
6  A  I would say that with a reasonable degree of
7     scientific certainty, he's talking about
8     Anderson's 2008 paper.  Adherent macrophages,
9     when they adhere, they become activated, and
10    they begin to secrete ROS or reactive oxygen
11    species.  And the explants that Dr. Iakovlev
12    has looked at, he has seen myeloperoxidase
13    staining in the ones that he's stained.
14       And so from a reasonable degree of
15    scientific certainty, I would expect to see
16    myeloperoxidase, but we did not -- those
17    stains, those slides to my knowledge have not
18    been stained for MPO, and so I could not
19    assess that.
20 Q  Is it fair to say you could not assess in the
21    Perry case MPO's presence at the mesh; is
22    that correct?
23 A  I don't think I like the words could not.
24    They could be stained.  This work could be
25    done, but that's a decision for plaintiff's

Page 72

1     counsel.  So just to clarify your question,
2     the slides as I received them to my knowledge
3     were not stained for MPO, and so that
4     assessment could not be made.  It could be
5     possible to do that work, but that's a
6     decision for the attorneys to work out, not
7     me.
8  Q  All right.  To your understanding, it could
9     be possible that plaintiff's counsel could
10    have those slides stained for MPO, correct?
11 A  It's a complicated question how these samples
12    are handled, whether or not they're in the
13    right form that it can be done.  I would
14    think we would need the blocks to cut new
15    slides.  I don't know what material is
16    available.  I would say in theory it could be
17    done, but I don't know how practical that is.
18    I don't know the history of the slides,
19    that's the history of the explants.
20 Q  You would not be the one looking at the
21    slides under the microscope if an MPO stain
22    was done in any event?
23 A  I would.  I would look at that under the
24    microscope and I would take a picture.  My
25    students have done that in the past.  But

Page 73

1     this is evidence, I'm not going to just take
2     those slides and stain them for MPO not
3     knowing their history.  There are legal
4     ramifications to that.  You know, both sides
5     have to agree to testing procedures.
6        This is a complicated question.  All I'm
7     saying is that to my knowledge these are H&E
8     sections.  And to assess the presence of
9     myeloperoxidase, they would need to be
10    stained.
11 Q  To assess the presence of MPO, the slides
12    would need to be stained?
13 A  To confirm it.  I need to be very clear what
14    I'm saying.  Based on a reasonable degree of
15    scientific certainty, my work with
16    Dr. Iakovlev, my reading of the literature, I
17    would fully expect to see positive stain from
18    myeloperoxidase.  That has not been visibly
19    confirmed in a section because the slides
20    have not stained for that enzyme.
21 Q  What is the literature that you are
22    referencing with regard to your opinion that
23    you would expect the MPO stain to be positive
24    if it was done in Mrs. Perry's case?
25 A  The paper that comes to mind would be a

19  (Pages 70 to 73)

Scott A. Guelcher, Ph.D.

Page 74

1    review paper by Professor Jim Anderson at
2    Case Western from 2008 where he cites a very
3    large number of papers in this review.
4        And he teaches that upon implantation,
5    the surface is colonized by these monocytes,
6    inflammatory cells, that differentiate in the
7    macrophages, foreign body giant cells, and
8    become activated when they adhere to that
9    surface and secrete reactive oxygen species,
10   such as myeloperoxidase or they produce.
11   Q  This work by Dr. Iakovlev, has it been
12      published anywhere that you have seen, in a
13      peer-reviewed journal?
14   A  It's not been published.  We're preparing to
15      submit it, the manuscript.  It's not been
16      published yet, though.  It's still a
17      confidential work product that will be
18      submitted.
19   Q  Do you have a copy of the manuscript on the
20      thumb drive?
21   A  No.  It's a confidential work product with
22      Dr. Iakovlev, so we have to maintain strict
23      confidentiality when we submit to the
24      journals so we don't compromise the review
25      process.

Page 75

1    Q  Do you know the rate at which the MPO
2       standing was positive in the samples that
3       Dr. Iakovlev did?
4    A  When you say rate, I think you mean
5       frequency?
6    Q  Sure.
7    A  From my understanding, all of the explants
8       that I've seen from Dr. Iakovlev stained
9       positive for myeloperoxidase.  So I'm not
10      saying that everything I've seen is positive
11      for myeloperoxidase.
12   Q  These are other litigation explants, correct?
13   A  In some cases.  I have seen explants from
14      Dr. Iakovlev for other litigation, and there
15      is also the manuscript.  So I should say, the
16      explants that I've seen stain for
17      myeloperoxidase from Dr. Iakovlev.  All have
18      tested positive for myeloperoxidase or MPO.
19   Q  Do you have those explants or samples in your
20      possession?
21   A  I do not.  That's Dr. Iakovlev's work
22      product.  I've seen -- Dr. Iakovlev has sent
23      me images, pictures of the slides that I've
24      included in expert reports in previous
25      testimony.

Page 76

1    Q  How large of a cohort is this?
2    A  130 patients, explants from 130 patients.
3    Q  And this is a cohort for whom you do not know
4       which patients are particularly involved?
5    A  I am blind to patient identity.
6    Q  Okay.  Would it be fair to say you do not
7       know which manufacturer's meshes are involved
8       for whichever particular patient in that
9       study?
10   A  I believe that in the manuscript,
11      Dr. Iakovlev mentions some of the devices,
12      but I don't know which device went in which
13      patient.  And I don't know if Dr. Iakovlev
14      has that information.
15   Q  As you sit here, you do not personally have
16      knowledge about what device went into which
17      patient?
18   A  I do not.
19   Q  As you sit here, you do not personally know
20      which particular manufacturer's devices were
21      the subject of the 130 patients?
22   A  I believe I have that information.  It may be
23      in the manuscript.  I just can't remember.  I
24      don't remember.  That information may be in
25      the manuscript, but certainly I don't know

Page 77

1    which device was with which patient.  I would
2    not  know that because I don't know the
3    patients.
4    Q  You don't have personal knowledge such that
5       you have confirmed that a particular
6       manufacturer's device was the subject of the
7       130-patient study, correct?
8    A  Yeah, I can't disclose that right now.  I
9       can't even remember it.  I'm just saying for
10      the record, it may be in the manuscript, but
11      I don't remember those devices.
12   Q  If it may be in the manuscript, it's
13      something that Dr. Iakovlev would have put in
14      there and not you?
15   A  Yes, that's fair.
16   Q  So you don't have personal knowledge, you've
17      been relying on what Dr. Iakovlev said, if
18      indeed he even said it in the manuscript,
19      correct?
20   A  That's correct.
21   Q  So I guess you would not know if there were
22      any TVT Abbrevos that were the subject of
23      this manuscript?
24   A  I don't remember.  But I'm not relying on the
25      manuscript for my opinions in this case,

20  (Pages 74 to 77)

Scott A. Guelcher, Ph.D.

Page 78

1    because it's not been published yet, and
2    we're not disclosing it, so --
3  Q  Okay.
4  A  You're asking me about my experience with
5    mesh and I'm telling you. That's my
6    understanding.
7  Q  Fair enough.
8      You're not relying on that manuscript in
9    the 130-patient analysis for your opinions in
10   this case, in the Perry case?
11 A  Yes, I would say those findings confirm my
12   opinions, but I am not relying on them
13   because that manuscript is still a work in
14   progress.
15 Q  So when the inflammatory cell attaches to the
16   mesh or to a foreign body, MPO is one of the
17   substances it can release?
18 A  Well, I would say that MPO is an enzyme in
19   the cell that catalyzes the reaction of
20   substrates, such as peroxides, to form,
21   reactive oxygen species such as, you know,
22   hydroxl radicals, superoxide. There is a
23   very large number of these reactive oxygen
24   species, but MPO is an enzyme that generates
25   those reactive oxygen species.

Page 79

1  Q  It's your opinion that the reactive oxygen
2    species produce compounds, chemicals, which
3    has an affect on the mesh?
4  A  So the reactive oxygen species do impact the
5    mesh. They -- through this oxidation
6    chemistry of polypropylene, the tertiary
7    carbon hydrogen bond is subject to attack,
8    and those radicals will attack that bond and
9    oxidize the polypropylene.
10 Q  If the radicals don't attack the bond, does
11   the polypropylene get oxidized?
12 A  It may be other mechanisms. The most
13   well-known is this radical attack.
14 Q  Are you going to come in and testify that
15   there are other methods by which the
16   polypropylene gets degraded besides this, you
17   know, attacking the bond that you've talked
18   about? I don't see it here in your summary
19   of opinions.
20 A  So in my summary of opinions, I discussed the
21   interactions between oxidation and
22   degradation. And my point is that oxidation
23   as we're saying is a very early event. It
24   happens immediately upon implantation. And
25   at some point, the materials become induced,

Page 80

1    and the properties change very dramatically.
2    But degradation can occur prior to induction,
3    and it certainly can occur after induction,
4    so the two processes are related.
5      The mechanical stresses can certainly
6    impact this as well. That's known as
7    environmental stress cracking. So they are a
8    factor, so you can't separate the two. The
9    mechanical stresses and the chemical stresses
10   are interrelated.
11 Q  You've not seen any embrittlement of
12   Mrs. Perry's mesh, correct?
13 A  I have not tested for it and have not seen
14   it.
15 Q  You've not seen any cracking of Mrs. Perry's
16   mesh, correct?
17 A  Correct. I haven't tested for it and seen
18   it.
19 Q  You have not seen any molecular weight loss
20   from Mrs. Perry's mesh, correct?
21 A  No. I've not tested for that and seen it.
22 Q  Besides the macrophages, are there any other
23   cells that you will plan to testify can
24   release these reactive oxygen species?
25 A  Well, Dr. Anderson teaches that monocytes,

Page 81

1    which are very small mononuclear cells,
2    colonize the implant, and then those cells --
3    and they adhere to the implant. And when
4    they attach or adhere to the surface of the
5    implant, they become activated. They can
6    differentiate to become macrophages or
7    macrophages can fuse to form foreign body
8    giant cells.
9      And these cells all come from a common
10   lineage, so they're all inflammatory cells.
11   So when they're adhered, they're activated to
12   secrete ROS. Other types of cells, such as
13   neutrophils, which is commonly seen during
14   acute inflammation or infection, also secrete
15   ROS. So there are other cell populations.
16   Really just many, many types of cells secrete
17   ROS. But in my previous testimony, I was
18   focusing specifically about these adherent
19   macrophages in giant cells.
20 Q  It's fair to say you're going to focus on the
21   adherent macrophages in giant cells in the
22   Perry case?
23 A  Yes.
24 Q  Okay. What happens with the macrophages is
25   -- do they get signaled to the site?

21 (Pages 78 to 81)

Scott A. Guelcher, Ph.D.

Page 82

1    A  So the signaling is very complex and it's
2       reviewed in Dr. Anderson -- and it's just
3       part of the foreign body reaction. When you
4       implant a foreign body, many different types
5       of cells infiltrate that site of injury, and
6       there are various chemical signaling factors
7       that are involved. It's just very complex.
8    Q  Well, let's not go down that road. I was
9       trying to get to a simplistic step-by-step
10      process.
11         So the macrophages are signaled to the
12      site of the mesh or wherever there would be a
13      foreign body?
14   A  I would say that monocytes are recruited due
15      to the injury, and that mechanism is very
16      complex. But they go to the site of injury,
17      and they adhere to the foreign body.
18   Q  Okay. I guess the question I want to ask is,
19      monocytes in the foreign body giant cells,
20      it's correct that they can persist at the
21      site of a foreign body for years, correct?
22   A  So Dr. Anderson teaches in that review that
23      they're present --
24   Q  Can you answer my question yes or no and then
25      the basis after?

Page 83

1    A  Okay. It's just the way you're phrasing it,
2       I don't necessarily want to say yes or --
3       that's the only problem.
4    Q  All right. Fair enough.
5    A  I want to answer. I just want to make sure
6       that there is a clean record of what I'm
7       saying.
8    Q  All right. So macrophages formed by giant
9       cells can persist at the site of the mesh or
10      foreign body; is that correct?
11   A  Yes, they are there -- again, in the Anderson
12      paper, they are there for the lifetime of the
13      device. They're persisting.
14   Q  And when you say the Anderson paper, is that
15      the one you identified earlier on the record,
16      sir?
17   A  Yes, sir.
18   Q  Okay. Thank you.
19         Now, isn't it true, Doctor, that those
20      macrophages in foreign body cells that
21      persist at the site of the foreign body can
22      become quiescent?
23   A  I've seen this idea proposed. Again, I'm
24      relying on Dr. Anderson's 2008 review. And
25      Dr. Anderson is a member of the National

Page 84

1       Academy, and his seminal work is in this area
2       of foreign body reaction. And in this paper,
3       he is saying that the cells adhere and become
4       activated. And I know that there is a fair
5       amount of scientific research aimed at this
6       idea of inactivating macrophages. I'm aware
7       of this.
8          But, again, to my knowledge, the teaching
9       in the field is that they are activated. The
10      work I've done with Dr. Iakovlev is saying
11      that when we see these cells, we see
12      myeloperoxidase when we stain for it. So
13      that's why I'm expressing the opinion with a
14      reasonable degree of scientific certainty
15      that these cells are activated and secrete
16      ROS when they are attached, when they adhere
17      to the foreign body.
18   Q  Did you look for literature that was contrary
19      to your opinion that these cells remain
20      activated?
21   A  I'm aware of work in this area just through
22      my work that I do. I can't think of a
23      specific paper right now. If you have one
24      you want me to look at, I can. I'm just
25      expressing my general understanding in the

Page 85

1       field without any documents in front of me.
2    Q  You're aware of the belief in the field that
3       these inflammatory cells can become
4       quiescent, and they do not necessarily remain
5       activated at the site of the foreign body?
6    A  I don't -- there are ideas that -- I don't
7       know that -- quiescent I think is a strong
8       word. Maybe there are varying levels of
9       activity, but I don't know that I've seen
10      convincing proof that they are just
11      completely quiescent. Again, if you would
12      like me to look at a paper, I will look at
13      one, but this is my understanding.
14   Q  What are lysosomal constituents?
15   A  Can you put some context to that? I'm not
16      -- just to give me a phrase. Lysosomal
17      constituents, I mean, what's the context of
18      it?
19   Q  With regard to foreign body giant cells,
20      whether they remain activated releasing their
21      lysosomal constituents?
22   A  I'm just not -- I could look at something.
23      It's hard for me to answer that just in the
24      way that question is phrased. I would have
25      to look at what you're referring to, because

22  (Pages 82 to 85)

Scott A. Guelcher, Ph.D.

Page 86

1    I am just not sure what you mean.
2  Q  Did you research the question of whether
3     inflammatory cells become quiescent or
4     deactivated at the site of a foreign body?
5  A  I don't remember specifically doing that for
6     this particular litigation.
7  Q  Are there any books in your field considered
8     authoritative or important to these general
9     principles of foreign body reaction?
10 A  I don't know.  There is lots of -- I mean,
11    I've got a book on biomaterials that has --
12    Professor David Williams has just released a
13    book on biomaterials.  There is a book
14    Biomaterials Science by four very well-known
15    senior scientists that discuss these ideas.
16    You know, these are all important books.
17 Q  Let me ask you this.  Is there any way to
18    test to know whether the cells are remaining
19    activated?
20 A  Well, that's the myeloperoxidase stain.  When
21    I see a positive stain for MPO, that's
22    staining for that enzyme, and that's telling
23    us that the cells are generating ROS.  That's
24    how you do it.
25 Q  Is there any other test that you can do that

Page 87

1     would actually show those substances released
2     by the ROS?
3  A  It's more difficult to do because they are
4     such small molecules.  The myeloperoxidase
5     is just a very -- you know, it's a relatively
6     straight forward stain to do.
7  Q  Do you know if the MPO stain is recognized by
8     the American College of Pathology as a proper
9     stain for assessing the release of that
10    substance by ROS?
11 A  I don't know.  We looked at -- you know, I
12    published this, so it's been peer-reviewed.
13    It was accepted as a marker of presence of
14    oxidative conditions.
15 Q  Does Dr. Williams' paper that you referenced
16    state with certainty that those macrophages
17    of foreign body giant cells continue to
18    remain activated and release substances on
19    the surface of the biomaterial?
20 A  I think you're getting papers confused.  I
21    was referring to the Anderson 2008 paper.
22 Q  Okay.  I'm sorry.  So let me just ask a
23    better question.  Anytime you need to the
24    correct me, let me know.  I get these things
25    confused.

Page 88

1  A  I understand.
2  Q  In the paper by Jim Anderson, does he state
3     that those macrophages in foreign body cells
4     continue to release the substances at the
5     site of the foreign body as years continue to
6     progress and they remain activated?  Is that
7     conclusively stated in the paper?
8  A  So I'd like to answer that by stating what
9     Dr. Anderson does say in that paper.  He says
10    that the cells become activated, and that the
11    foreign body reaction is present throughout
12    the lifetime of the device.  And then he
13    qualifies that as, albeit, in some cases at a
14    low level.
15    So what he is saying, and then what his
16    point is, is that as long as the device is
17    there, this foreign reaction body is ongoing,
18    and that these factors need to be considered
19    in the design of the medical device.  That's
20    what he says.
21 Q  Okay.  So Dr. Anderson does not state that if
22    the cells are there, they are going to be
23    activated and producing these substances?
24 A  I would say it's implied.  It doesn't
25    necessarily specifically state that.  And I

Page 89

1     would be happy to read it from the paper, but
2     it's very strongly implied that that's what's
3     happening in the way that is stated.
4     THE WITNESS:  I have to go to
5     the bathroom if you don't mind.
6     MR. SNELL:  Let's take a break.
7     (A lunch recess is taken from
8     12:00 to 12:50 p.m.)
9     THE COURT:  Let's take a break.
10 BY MR. SNELL:
11 Q  Doctor, we are going to mark the Perry
12    pathology slides that you have in your
13    possession as Exhibit No. 2.
14    (Deposition Exhibit No. 2 is
15    marked for identification.)
16 BY MR. SNELL:
17 Q  And I will hand you Exhibit 2.  Just confirm
18    for the record that those are the slides,
19    sir.
20 A  Yes, these are the slides I was presented.
21 Q  It looks like there is three different sets,
22    each of them wrapped in bubble wrap?
23 A  Yes.
24 Q  Am I correct, sir, that you're not relying on
25    those pathology slides for your opinions?

23 (Pages 86 to 89)

Scott A. Guelcher, Ph.D.

Page 90

1   A  That's correct.
2   Q  Do you know what type of inflammatory cells,
3       if any, are present in Mrs. Perry's mesh?
4   A  I don't know.  I didn't look at the slides
5       under a microscope.
6   Q  You therefore would not know how many of any
7       inflammatory cells, if they are present, were
8       actually there, correct?
9   A  That's correct.
10  Q  When we were talking about the inflammatory
11      cells, just so we're on the same page, I'm
12      referring to the macrophages in foreign body
13      giant cells?
14  A  Yes.
15  Q  Okay.  So when we say chronic inflammatory
16      cells --
17  A  Yes.
18  Q  -- are we talking about macrophages in the
19      foreign body giant cells?
20  A  Yes.
21  Q  Okay.  Do you know whether there were any
22      chronic inflammatory cells present in
23      Mrs. Perry's vaginal tissue before her
24      surgeries, one of which included mesh?
25  A  I'm not aware of that information.

Page 91

1   Q  Did you attempt to look at any of the
2       pathology reports in Mrs. Perry's case?
3   A  No, I did not review those reports.
4   Q  Have you attempted to measure any of the
5       reactive oxygen species in Mrs. Perry?
6   A  We talked about this earlier.  I didn't do
7       that.
8   Q  Have you attempted to do any mechanical
9       testing of Mrs. Perry's mesh?
10  A  No.
11  Q  Are you aware of any testing done on
12      Mrs. Perry's mesh to determine whether it
13      became tougher after implantation?
14  A  I'm not aware of any other testing on her
15      mesh.
16  Q  And you would not have done such testing to
17      determine whether it became tougher, correct?
18  A  Seems like -- I'm not sure what you mean by
19      the mesh became tougher.  I mean, it seems
20      like it would be difficult to do.
21  Q  You could test to determine whether the mesh
22      became embrittled in Mrs. Perry, correct?
23  A  Test the outer layer, that could be done by a
24      nanoindentation.  But, again, you need an
25      appropriate amount of mesh in the right form.

Page 92

1       It's not going to work on a histological
2       section.  You would need mesh from the
3       patient before it's been processed for
4       histology to do those measurements.
5   Q  You said that was nano --
6   A  Nanoindentation could measure the brittleness
7       of the surface degraded layer.
8   Q  Is that a particular type of test,
9       nanoindentation?
10  A  It is.
11  Q  Is it separate and apart from some of the
12      other testing that we've discussed?
13  A  It is.  It is mechanical testing at a very
14      small scale.  I've done testing like this
15      with a collaborator at Vanderbilt where we
16      probed the surface with a cantilever beam,
17      and we measure the response and the
18      mechanical force.  You can measure an elastic
19      modulus doing this.
20  Q  You have not done any of this
21      nanoindentation testing on Mrs. Perry's mesh,
22      correct?
23  A  That's correct.
24  Q  Have you seen any photographs of Mrs. Perry's
25      mesh that showed cracking?

Page 93

1   A  I've not seen any photographs of her mesh.
2   Q  Earlier you were talking about the bonding
3       that can occur leading to degradation of the
4       particular atom.  I don't recall if it was
5       carbon or hydrogen.
6   A  You are referring to oxidation and a free
7       radical attack on a tertiary carbon hydrogen
8       bond?
9   Q  Yes, sir.
10  A  Yeah.
11  Q  So for oxidation, is that oxygen which comes
12      and bonds with carbon or the other way
13      around?
14  A  The details of the reaction are very complex.
15      But, essentially, it's a radical attack, a
16      hydroxl radical or oxygen radical can attack
17      that bond.  The chemistry is very
18      complicated.
19  Q  What is the difference between an oxygen
20      molecule and an oxygen radical?
21  A  Well, it's just the nature of the chemical
22      reaction.  In the body -- and in our in vitro
23      testing -- I can speak specifically from our
24      in vitro testing, the solution that we
25      created generated hydroxl radicals, and those

Scott A. Guelcher, Ph.D.

Page 94

1  hydroxl radicals attacked that carbon
2  hydrogen tertiary bond -- tertiary carbon
3  hydrogen bond.
4      The hydroxl radicals attacked that bond,
5  and that's where the pollen becomes oxidized.
6  And then there is a number of steps in this
7  reaction, I would have to look at a paper to
8  explain it, but there is just a number of
9  steps in that chemical reaction. It's very
10  complex.
11  Q  When you say the hydroxl radicals attacked
12    the bond, is that that tertiary bond you were
13    referring to?
14  A  Yes. It extracts the -- I would have to look
15    at the paper to show the exact mechanism, but
16    that tertiary carbon hydrogen bond is
17    vulnerable to an oxidative attack. But the
18    physical chemistry of that reaction is,
19    again, complex.
20  Q  Is it correct that you have not seen the
21    presence of a hydroxl radical in Mrs. Perry's
22    case?
23  A  Yeah. As we have discussed before, I have
24    not done the myeloperoxidase staining or
25    looking for a radical, which would be very

Page 95

1  difficult to do in her case. I have not done
2  that.
3  Q  As I understand it, the presence of hydroxl
4    groups on a surface would be indicative of
5    oxidation?
6  A  It's the OH group forms in a hydroperoxide
7    intermediate. There is a hydroperoxide that
8    forms on the oxidized polypropylene, and we
9    can see that peak by IR spectroscopy.
10  Q  Have you attempted to do any IR spectroscopy
11    in Mrs. Perry's case?
12  A  No, I have not done that.
13  Q  As I understand it, there is testing that can
14    be performed to try to assess atomic
15    percents, such as the percent carbon, percent
16    oxygen, and percent nitrogen; is that
17    correct?
18  A  There is a method called x-ray photoelectron
19    spectroscopy. We will call it XPS. XPS
20    tells us what percentage of the carbon is
21    bound to other atoms. So in pure
22    polypropylene, all of the carbons should be
23    bound. Either the hydrogen or carbon, it's a
24    hydrocarbon. When polypropylene becomes
25    oxidized, we see the formation of

Page 96

1  carbon-oxygen bonds that we can detect by
2  XPS.
3  Q  Have you attempted to look for the presence
4    of carbon-oxygen bond in Mrs. Perry's case?
5  A  I have not done that.
6  Q  Have you attempted to look for the percent of
7    carbon in Mrs. Perry's mesh?
8  A  I have not done that.
9  Q  Have you attempted to look for the percent of
10    oxygen in Mrs. Perry's mesh?
11  A  No.
12  Q  You earlier mentioned different biomaterial
13    books, one of which was your own, I believe?
14  A  I edited a book, Introduction to Bond
15    Materials. It's on my CV.
16  Q  What biomaterial books are used at
17    Vanderbilt?
18  A  So the BME department -- I mean, chemical
19    engineering department, the biomedical
20    engineering department, teaches a course in
21    biomaterials. I'm not sure what they're
22    using now. In the past, they have used a
23    book by Johnna Temenoff on biomaterials. I
24    think they have made some changes to that
25    course. I've never taught that course, so I

Page 97

1  don't know all the details.
2  Q  Is your book used in teaching biomaterials
3    at Vanderbilt?
4  A  Not to my knowledge. But that book was
5    written for a somewhat different purpose than
6    for a teaching textbook.
7  Q  I think earlier you mentioned another book
8    called Biomaterials Sciences, and it had a
9    couple of different editors or authors?
10  A  So there were two well-known books. The
11    older one is -- well, I think it's called
12    Biomaterials Sciences. It was --
13    maybe endorsed isn't the word, but the
14    Society for Biomaterials endorses this book.
15    Endorses may be a strong word. They
16    recognize this book as being an important
17    book, and there are four senior authors on
18    this book.
19      It's written more as a reference text.
20    It's difficult to teach from, because it's an
21    edited book. So it's an excellent resource
22    for study. But for teaching undergraduates,
23    it's not as accessible. So Professor David
24    Williams, who is also a lead world expert in
25    biomaterials, has written a new textbook. I

Scott A. Guelcher, Ph.D.

Page 98

```
1    contributed some figures to that textbook.
2         And Professor Williams' textbook has been
3    assessed by my colleagues in BME at
4    Vanderbilt for teaching. I'm not sure if
5    they've made a final decision whether to use
6    it. What's attractive about that book for
7    teaching is it's written by one author. So
8    it's a single-author book, and so this is
9    good for teaching undergraduates.
10        My textbook, I edited, so there are
11   chapters by individual contributors. So it's
12   just a different book.
13 Q  When you were going about compiling your
14   book, did you reach out to people who you
15   felt were experts in certain fields to write
16   or contribute to particular chapters?
17 A  That's how we approached editing the book,
18   that's right. That was in 2005 when I was a
19   postdoc.
20 Q  What is the most recent edition of your book?
21   Is it on your CV?
22 A  Well, I co-edited the first edition. There
23   is a second edition, but I didn't co-edit
24   that one. The only one that I have co-edited
25   has been published in 2006. It's on my CV.
```

Page 99

```
1  Q  The Society for Biomaterials, you referenced
2     you're a member of that society?
3  A  I am.
4  Q  And the book they recognize as being an
5     important book is Biomaterials Sciences. Is
6     the title An Introduction to Materials and
7     Medicine by --
8  A  That sounds right.
9  Q  -- Buddy Ratner?
10 A  Buddy Ratner, Hoffman, Schoen. They're all
11    founders of the Society for Biomaterials,
12    very well-known. Jack Lemons is the other
13    author.
14 Q  Did any of those authors contribute to your
15    book?
16 A  I don't remember. I don't think so.
17 Q  I want to ask you some questions about TVT
18    Abbrevo. I am trying to give you an idea
19    of where I'm going.
20 A  Okay.
21 Q  Because I know we went back and kind of
22    covered some things that we addressed earlier
23    with further questions.
24 A  Okay.
25 Q  Have you done any testing of any type on TVT
```

Page 100

```
1     Abbrevo?
2  A  I have not.
3  Q  Have you done any testing of any type on TVT
4     product for stress incontinence? And when I
5     stay TVT, I mean Ethicon's particular TVT
6     product.
7  A  So only the testing performed at Dr. Dunn's
8     laboratory. Just to be clear, Dr. Dunn did
9     that testing. I consulted and advised. We
10    discussed it, agreed to do it, but Dr. Dunn
11    physically performed the testing.
12 Q  Tell me what testing did Dr. Dunn do on an
13    Ethicon TVT device. As I had read -- and
14    I'll tell you why I'm asking. As I had read
15    your Huskey deposition testimony, he had done
16    some testing on maybe one or more AMS meshes
17    and Boston Scientific meshes.
18 A  These are new testing that we've done.
19 Q  Let me just back up then. So as I understand
20    it, Dr. Dunn has done some testing on Ethicon
21    TVT products?
22 A  Yes.
23 Q  Are you relying on that testing for your
24    opinions in the Perry case?
25 A  Let me look at my opinions for a minute.
```

Page 101

```
1     Yes, I am relying on that testing. So I
2     should say, I formed my opinions based on the
3     literature review. My opinions are the same
4     as they were in the Huskey case on this
5     particular topic of oxidation and
6     degradation, and this testing further
7     confirms my opinions.
8         And the testing was specifically done to
9     answer the question that Ethicon raised
10    during the trial in August, that Prolene is
11    different from polypropylene and doesn't
12    oxidize because it has antioxidants.
13        So in the testing done by Dr. Dunn, the
14    goal was to answer the question can Prolene
15    in a TVT device oxidize and degrade. And we
16    saw oxidation and degradation of the surface
17    pitting in that testing, in the oxidative
18    medium that I was describing earlier. So the
19    testing was performed to answer a very
20    specific question of -- and to answer the
21    specific question of can the Prolene
22    polypropylene oxidize. That was the purpose
23    of the test.
24 Q  Where is this testing, all of the notebooks,
25    the results, the data generated from it that
```

26 (Pages 98 to 101)

Scott A. Guelcher, Ph.D.

Page 102

1      you are relying on?
2    A  So this is on the disk that was provided.
3    Q  Okay.  Show me where on the disk that that is
4      this TVTG testing is located.
5    A  I don't have a computer but --
6    Q  Can you use Mr. Kuntz'?
7         MR. KUNTZ:  He can.
8      Let's go off the record for a second.
9         (Off-the-record discussion.)
10  BY MR. SNELL:
11   Q  Counsel is looking at the thumb drive.
12     Obviously, I can't look at it and question
13     the witness about 6,000 files today.  Let me
14     just get some basic information about this
15     testing.
16         The testing that was performed on
17     Ethicon's TVT mesh, what specific device or
18     devices were the subject of the testing?
19   A  I believe it was the TVT.
20   Q  The original TVT retropubic?
21   A  I believe so.  And we also tested an
22     unstabilized polypropylene controlled, it had
23     no antioxidant.
24   Q  Okay.  You said it was an unstabilized
25     Prolene polypropylene?

Page 103

1    A  No.  It's polypropylene without antioxidants.
2      So it would be the equivalent of -- in the
3      Liebert paper where they tested the
4      monofilament with no stabilizers.  It's a
5      polypropylene that has no antioxidants.  So
6      it's unstabilized polypropylene I would call
7      it.
8    Q  So you didn't test the TVT retropubic mesh
9      with antioxidants to the TVT retropubic mesh
10     with antioxidants?
11   A  No, we can't get TVT without the -- the TVT
12     is made from Prolene that has that Prolene
13     antioxidant package, because that's what we
14     tested, that's what we could get.  So we had
15     that exemplar, Dr. Dunn had it, and we
16     compared that to the unstabilized
17     polypropylene.  We also tested two Boston
18     Scientific meshes, but that's not in the
19     materials that we presented.  That's
20     different.
21   Q  You are not relying on this Boston Scientific
22     testing for your opinions in this matter,
23     correct?
24   A  I am not.
25   Q  Okay.

Page 104

1    A  I am just disclosing what we did.
2    Q  This TVT retropubic device that Dr. Dunn
3      tested, was it one single device or was it a
4      batch or numerous ones?
5    A  I believe it was one device with three
6      replicate pieces, three distinct pieces cut
7      from -- it was three or four.  I can't
8      remember the details.  I would have to look
9      at it.  But there were multiple replicates
10     cut from the same mesh.
11   Q  And the unstabilized polypropylene control,
12     where was that obtained from?
13   A  I would have to look at the document to look
14     at the documents for the exact source, but it
15     was purchased from a third-party vendor that
16     sells polypropylene with antioxidants,
17     unstabilized polypropylene.
18   Q  Do you know the vendor?
19   A  I can't remember.  It's in the documents.  I
20     would have to find it.
21   Q  Do you know who purchased this control?
22   A  Dr. Dunn purchased it and did all of this
23     work.
24   Q  You personally were not the one who did any
25     of this testing on the TVT retropubic device,

Page 105

1      correct?
2    A  No.  As I said previously, Dr. Dunn and I
3      consulted, and Dr. Dunn did all of the work
4      physically through his company.
5    Q  So am I correct that you did not do any of
6      the physical testing of this TVT or the
7      control?
8    A  That's right.  Dr. Dunn did.
9    Q  And that was done at his company?
10   A  Yes.
11   Q  Was that testing done out of his house?
12   A  I don't know.  Maybe some of it was done from
13     his house.  I don't remember.
14   Q  Do you know where the testing took place on
15     this TVT retropubic compared to the
16     polypropylene control?
17   A  It was done in his lab at Vanderbilt.
18   Q  Who paid for the testing that Dr. Dunn
19     performed comparing the TVT retropubic to the
20     unstabilized polypropylene control?
21   A  I should clarify that all of these responses
22     I'm telling you to the best of my knowledge.
23     And if Dr. Dunn contradicts what I'm saying,
24     it's because I didn't remember it correctly.
25     I believe that this testing was billed to the

27 (Pages 102 to 105)

Scott A. Guelcher, Ph.D.

Page 106

1    litigation, but Dr. Dunn would have to
2    confirm that.
3    Q   Is your basis for your testimony in that
4        regard something that Dr. Dunn told you?
5    A   Yes, I'm basing it on -- I have not seen
6        those invoices.  That would be between
7        Dr. Dunn and plaintiff's counsel.
8    Q   Did Dr. Dunn physically do all of his
9        testing?
10   A   Again, I believe that he did, but I don't
11       know the details of -- he would be the one
12       that would have to speak to that.
13   Q   Unfortunately, he is not identified as an
14       expert here.
15   A   I understand that.
16   Q   Were you present for any of the physical
17       testing of the TVT retropubic or the
18       unstabilized polypropylene control?
19   A   Was I present?
20   Q   Present meaning on the premises where the
21       testing was performed, such that you could
22       yourself observe the testing.
23   A   Well, the testing was just very simple.
24       Dr. Dunn placed the -- I'm trying to answer
25       your question as best I can.  So Dr. Dunn

Page 107

1    placed the specimens in vials.  They were
2    weighted down with glass beads in this
3    oxidative medium that I was describing that
4    simulates the environment between the
5    adherent inflammatory cells and the
6    biomaterial.  I have seen those vials.
7        And then at different time points,
8    Dr. Dunn removed the test specimens, rinsed
9    and dried them, and measured RI spectra.  And
10   I've seen those dried specimens.  I've seen
11   the specimens, and so I have seen aspects of
12   the testing, but I didn't watch him do the
13   testing.  But the testing essentially
14   involves incubating  the material in a
15   solution, and then taking it out and testing
16   it by FTIR and SEM.
17   Q   When was this testing on the TVT retropubic
18       device done?
19   A   September and October of 2014.
20   Q   And it was on a single TVT retropubic
21       exemplar, meaning that mesh had not been in
22       the body at all?
23   A   That's correct.
24   Q   When did you first discuss with Dr. Dunn this
25       testing on the TVT retropubic exemplar?

Page 108

1    A   Same time frame.  Maybe August -- it would
2        have been September of 2014 after the Huskey
3        trial.  And, again, the motivation for the
4        tests was based on Ethicon's statements
5        during trial that we had not tested it and
6        couldn't -- we could not say definitively
7        that Prolene polypropylene oxidizes, and that
8        was the motivation for the test.
9            So this is what was said in Huskey trial,
10       we decided to do the test to answer that
11       specific question, can Prolene polypropylene
12       oxidize.
13   Q   Now, Dr. Dunn's Vanderbilt lab, is that on
14       the premises here at Vanderbilt?
15   A   Yes, his lab is at Vanderbilt.
16   Q   Do you know if any graduate students or
17       other people were involved in the testing?
18   A   Dr. Dunn has employees.  I know that.  To
19       what extent they were involved in the
20       testing, I can't speak to.  Again, Dr. Dunn
21       just did all of his.  I don't know those
22       details.
23           I should qualify my comment.  Dr. Dunn
24       does not have employees, but I know that he
25       does pay contractors for services like he

Page 109

1    pays me.  But, again, I cannot speak to how
2    he conducts his business.
3    Q   Why did Dr. Dunn choose to test only one TVT
4        retropubic device?
5    A   That was what we had at the time.  And we
6        knew these depositions and report deadlines
7        were approaching quickly, so we moved forward
8        with what we had.
9    Q   Would you have preferred to have more than
10       one TVT retropubic to test?
11   A   We requested additional exemplars from
12       plaintiff's counsel.  My understanding is
13       that this is a complex request and takes
14       time.  We have requested additional items
15       recognizing the need to test multiple
16       meshes.  But as I said, these requests can
17       take time to process, so we tested what we
18       had.
19   Q   Why is there a need to test multiple meshes?
20   A   I should qualify my answer I need to test.
21       By testing multiple products, it's possible
22       to show that it would happen in many of these
23       products.  It's not possible to test every
24       one.  But considering that the oxidation of
25       polypropylene is due to the inherent

Scott A. Guelcher, Ph.D.

Page 110

1    intrinsic molecular structure of
2    polypropylene, as well as the antioxidant
3    package, if those things are all the same,
4    you would expect a very similar response.
5        Like I said, it's a chemical reaction.
6    So if it's the same material with the same
7    antioxidants, you would expect to see a very
8    similar chemical reaction. We tested two
9    Boston Scientific meshes because we had to.
10    If we had had more, we could have tested more
11    and would have liked to have done that, but
12    we were limited to what we had at the time.
13            MR. SNELL: I'm going to move to
14    strike the part about Boston Scientific.
15    A  I understand. I shouldn't have said that.
16    I'm sorry.
17    BY MR. SNELL:
18    Q  So you would expect to see a similar response
19    you said, correct?
20    A  Yes.
21    Q  If you tested multiple meshes, correct?
22    A  I would.
23    Q  But we know from the teachings of Clave that
24    not all findings will be consistent with
25    regard to degradation, correct?

Page 111

1            MR. KUNTZ: Objection.
2    A  I think that the conditions are very
3    different. Clave is in vivo explant, so
4    there are many different factors affecting
5    oxidation. This study was purely isolating
6    the chemical reaction. The medium that we
7    used has been published by a number of
8    investigators, including me, that simulates
9    the oxidative conditions in the body.
10        So we're simulating a chemical reaction,
11    not -- there is no cells. There is no
12    tissue. It is simply examining that chemical
13    reaction, will that chemical reaction cause a
14    change in Prolene polypropylene. That was
15    the purpose of the test, so it's very
16    different from, say, Clave's study. It is
17    very specific.
18        That is why I would expect to see the
19    same changes in any mesh that we tested.
20    BY MR. SNELL:
21    Q  So this study done in a lab is not under the
22    same conditions as one would see in vivo?
23    A  I wouldn't -- I would qualify that -- there
24    are two papers in my reliance materials by
25    Dr. Jim Anderson from 1990 and 1993 in the

Page 112

1    Journal of Biomedical Materials Research. In
2    the 1990 paper is a seminal paper where
3    Dr. Anderson discovered the effects of the
4    foreign body reaction on a biomedical device.
5        The 1993 paper he simulated. He
6    reproduced or recapitulated that same
7    oxidation and degradation in that same
8    biomaterial in vitro outside the body. So he
9    was able to show that this solution, this
10    oxidative solution that I've been talking
11    about recapitulates the oxidative conditions
12    that the biomaterial was exposed to in vitro.
13        I should qualify my previous comment when
14    I said there is no cells. There is no other
15    cell populations like fibroblasts that are
16    exerting contractile forces. There is no
17    tissue that is exerting forces. So this test
18    is isolating the effects of chemical
19    oxidation and was found to agree with in vivo
20    observations. That's the purpose of the
21    test, and those two papers have shown that.
22        So I hope I'm answering your question.
23    It reproduces certain aspects of the
24    reaction, but not every -- but the ones that
25    I just mentioned.

Page 113

1    Q  The test that was done on the TVT device does
2    not establish that an oxidative condition
3    occurs in vivo; is that correct?
4            MR. KUNTZ: Objection.
5    A  Let me -- the in vitro test does not
6    establish the in vivo conditions. It's
7    recapitulating those in vivo conditions. We
8    know that this happens in the foreign body
9    reaction, and so the test is designed to
10    recapitulate that foreign body reaction in
11    the laboratory.
12    Q  What are the limitations to the test as it
13    was conducted by Dr. Dunn utilizing only one
14    TVT device?
15    A  Well, the limitation of the test is -- I want
16    to be very careful about my opinion. The
17    question we were asking was -- and what I was
18    presented with in trial, and I believe what
19    Dr. Shelby Thames testified for defense was
20    Prolene polypropylene doesn't oxidize. It's
21    stabilized. It's different. It's Prolene.
22    So we asked a very simple question, can
23    Prolene polypropylene oxidize.
24        We tested one mesh. And we showed that
25    in that one mesh that we tested, Prolene

29 (Pages 110 to 113)

Scott A. Guelcher, Ph.D.

Page 114

1    polypropylene oxidized. We have also showed
2    evidence of pitting and surface degradation.
3    So the limitation would be, we're not saying
4    that we saw it in every mesh, we're not
5    saying we saw it in 10,000 meshes. We're
6    saying we saw it in one mesh. And we
7    answered this question that it can oxidize.
8    Because it's a chemical reaction, I believe
9    we would see it in other meshes if we tested
10   those, but I recognize that we didn't. We
11   tested one mesh, but we did show that it can
12   happen in that one mesh.
13   Q  So with that said, let's go back to my
14   question. What are the limitations of the
15   testing that Dr. Dunn did given there was
16   only one TVT mesh?
17          MR. KUNTZ: Objection, asked and
18   answered.
19   A  I thought I answered it. I will try a
20   briefer answer. The limitation would be that
21   we tested one mesh. We showed that it can
22   happen. We did not estimate a probability
23   that it would happen. We tested one mesh and
24   saw that it happened in that mesh that we
25   tested.

Page 115

1          I believe the literature teaches with a
2    reasonable degree of scientific certainty
3    that it would happen in other meshes because
4    presumably they are chemically the same. I
5    didn't look at necessarily the manufacturing
6    doc, but I would presume based on my industry
7    experience that there are specifications for
8    antioxidants and Prolene. I've seen some
9    documents showings those numbers. Provided
10   those compositions are the same, I would
11   expect to see a very similar result, because
12   it is a chemical test testing the effects of
13   a specific chemical reaction.
14   BY MR. SNELL:
15   Q  Is it fair to say that one of the limitations
16   with that test is that it does not establish
17   that Prolene polypropylene degrades in vivo?
18          MR. KUNTZ: Objection.
19   A  I would say it doesn't establish the timing
20   in which Prolene polypropylene oxidizes in
21   vivo. The time scale at which this happens
22   would depend on many other factors, the
23   environment, the patient, I understand that,
24   but I do believe that it shows that it would
25   oxidize. It's just the timing of those

Page 116

1    events.
2          It starts to oxidize immediately when
3    it's implanted. It's colonized by
4    macrophages. I believe with a reasonable
5    degree of scientific certainty it will start
6    to oxidize upon implantation. When it
7    becomes induced, and there are much more
8    dramatic changes in physical properties is
9    unpredictable, as I've said in previous
10   testimony. Those events are unpredictable.
11          But I do believe that the test tells us
12   that the mesh can oxidize, and I would expect
13   it to oxidize under in vivo conditions due to
14   the nature of the inflammatory response that
15   we discussed.
16          MR. SNELL: Move to strike.
17   BY MR. SNELL:
18   Q  One of the limitations to the test that
19   Dr. Dunn did on the single TVT retropubic
20   device was that it does not establish that
21   Prolene polypropylene degrades in vivo; is
22   that correct?
23   A  It does not establish? I'm having a hard
24   time with this word establish. It supports
25   my opinions that these meshes are -- can

Page 117

1    oxidize and degrade in vivo.
2    Q  I'm not asking you whether your
3    interpretation as to whether it supports your
4    opinion.
5          MR. SNELL: So I would
6    respectfully move to strike.
7    BY MR. SNELL:
8    Q  The limitation to this test that Dr. Dunn did
9    on the single TVT is that it does not
10   establish that Prolene polypropylene degrades
11   in vivo; is that correct?
12          MR. KUNTZ: Objection. He said
13   the exact same opposite.
14   A  I'm struggling with the way you phrased the
15   question. I don't want to agree to that. I
16   believe with a reasonable degree of
17   scientific certainty that this test predicts
18   susceptibility to oxidative degradation. And
19   if we see it in vitro, we will see it in
20   vivo.
21          It's just the timing and the severity are
22   unpredictable, but I do believe it will
23   happen. I think that it's -- the timing and
24   the severity, the clinical consequences are
25   unpredictable. That's what I've been saying.

Scott A. Guelcher, Ph.D.

Page 118

1        MR. SNELL:  Well, I respectfully
2    move to strike again.
3    BY MR. SNELL:
4    Q  Again, I'm not asking you about
5        susceptibility to oxidation, and I'm not
6        asking you about oxidation, that particular
7        step.  I'm asking you about degradation in
8        vivo.
9            So the question again.  One of the
10       limitations to those tests by Dr. Dunn on the
11       single TVT is that it does not establish that
12       Prolene polypropylene degrades in vivo; is
13       that a fair statement?
14           MR. KUNTZ:  Objection.
15    A  You're speaking specifically of degradation?
16    BY MR. SNELL:
17    Q  Yes, sir.  That's why my question only said
18       degradation.
19    A  Okay.  I would like to explain my answer on
20       this.
21    Q  Can you first agree or disagree and then
22       please feel free to explain?
23    A  So you're saying that it does not establish
24       that it degrades --
25    Q  I will ask it one more time.

Page 119

1    A  I'm trying to give you an accurate answer,
2        and I'm struggling with how to answer this.
3    Q  One of the limitations to the test that
4        Dr. Dunn performed on this single TVT
5        retropubic device was that it does not
6        establish that Prolene polypropylene degrades
7        in vivo; is  that a fair statement?
8            MR. KUNTZ:  Objection.
9    A  I just don't know if I can agree to that.  I
10       believe it -- it -- we didn't see -- I'm just
11       having a hard time with this sentence.  The
12       way you phrase it, I would need to move on,
13       so I will leave this for the attorneys later.
14       But the way you are phrasing that question,
15       for now I will agree to it.  But I have
16       reservations, because I don't believe it
17       captures what I'm really testifying about.
18    BY MR. SNELL:
19    Q  It is a simple fact, isn't it, Doctor, that
20       this test that Dr. Dunn performed on the
21       single TVT device, it is not an in vivo test?
22       Can we agree to that?
23    A  I will agree that it is not an in vivo test.
24    Q  There were no macrophages put on the TVT
25       retropubic device and this test that Dr. Dunn

Page 120

1        performed; is that correct?
2    A  You're misunderstanding the purpose of the
3        test.
4    Q  Sir, you have to listen to my questions and
5        answer them yes or no or whatever.  I'm not
6        asking you about the purpose of the test and
7        all of that.
8    A  That cannot be answered by a yes or no
9        question.  The macrophage is not there, but
10       the consequence of the macrophage is there.
11       That's the test.
12           MR. SNELL:  Move to strike.
13    BY MR. SNELL:
14    Q  What macrophage --
15    A  I'm not going down on this.  Go ahead.  I'm
16       sorry.
17    Q  Were macrophages present in the test that
18       Dr. Dunn did on the single TVT retropubic?
19    A  Macrophages were not present, but what
20       macrophages produce, meaning radicals and
21       reactive oxygen was present.  We generated
22       those reactive species using a chemical
23       reaction instead of a macrophage, but this is
24       an acceptable accepted approach to doing
25       that.

Page 121

1            Just because a macrophage was not there
2        doesn't mean -- it's the same oxidative
3        conditions.  It's just accomplished through a
4        different chemical reaction.
5            MR. SNELL:  Move to strike
6        everything after macrophage was not present.
7    A  I'm not going to back down.  We can stay here
8        'til 5:00 arguing about this.  I'm not going
9        to back down the test.
10    BY MR. SNELL:
11    Q  Sir, we are going to be here multiple days.
12       I can tell you that now.
13    A  Fine.  But I'm not -- you're trying to put
14       words in my mouth.
15    Q  No, sir.
16           MR. KUNTZ:  We're not going to
17       be here multiple days.  We'll get your seven
18       hours and we'll stay here as late as we can.
19       So --
20           MR. SNELL:  No.  First of all,
21       you produced 6,000 pages.
22           MR. KUNTZ:  It doesn't matter.
23       That's the rules under California.  We have
24       no obligation to produce at the start of his
25       depo materials he relied on.  There is no

31 (Pages 118 to 121)

Scott A. Guelcher, Ph.D.

Page 122

1      obligation under California state law to do
2      that.  We have complied.  We have brought a
3      disk and brought the materials responsive to
4      the deposition.  That is the only thing that
5      is required under California law.  I want to
6      make this clear.  We have no duty to produce
7      before the depo anything, zero.
8              MR. SNELL:  That's fine, if
9      that's your position.
10             MR. KUNTZ:  Okay.
11   BY MR. SNELL:
12     Q  Am I correct, sir, that there were no foreign
13        body giant cells that were used in Dr. Dunn's
14        test?
15     A  My answer is the same.  The cells weren't
16        there, but the reaction products were.
17             MR. SNELL:  Move to strike after
18        the cells were not there.
19     A    These are unreasonable questions.  And this
20        deposition is going to get more hostile if
21        you keep going down this line of questioning,
22        just to put it out there.
23     Q  Sir, as the witness, I'm allowed to ask you
24        questions.  You may not like the question,
25        but you have to answer the questions.

Page 123

1      A  But the questions are being phrased that
2         you're trying to misrepresent my testimony
3         and misrepresent what I'm saying.
4      Q  I'm not trying to misrepresent your
5         testimony.
6      A  You are.
7      Q  I'm asking you a factual question.
8      A  And the question is --
9      Q  Was there a horse in the room at the time of
10        the test, yes or no?  No.
11            Was there a macrophage in the test, yes
12        or no?
13            The interpretation, I will get to that,
14        but I have simple questions, sir, and I'm
15        entitled to simple answers if they're simple
16        questions.  You can talk to Mr. Kuntz all
17        night long about your interpretation.  That's
18        fine.  But I'm actually going to ask you
19        about your interpretation too.
20     A  And I'm entitled to answer questions as I
21        need to.  And I'm not going to be put into
22        this difficult position of having things
23        recorded as my testimony that's not what I've
24        ever been saying.
25     Q  You would agree that -- let me back up.  What

Page 124

1      is it that you believe this test on this
2      single TVT device compared to the control
3      shows?
4    A  I believe that it shows Prolene polypropylene
5      used to manufacture the TVT device can
6      oxidize and degrade under oxidative
7      conditions similar to those experienced in
8      the human body after implantation.
9    Q  What documents or files out of those 6,000
10     plus show the oxidation?
11   A  The oxidation is evidenced by FTIRs spectra
12     that were measured in weeks zero, one, two,
13     three, four and five.  In the FTIRs spectra,
14     we saw minimal hydroxl and carbonyl peaks
15     until week five, where we saw a significant
16     increase in the magnitude of the hydroxl
17     and/or carbonyl peaks, which was indicative
18     of a chemical induction.
19   Q  So what are the file names and the documents
20     that showed this out of the 6,000?
21   A  I don't remember the file names.
22   Q  Well, I'm entitled to know them.
23   A  I know.  And I have to look at it.  I don't
24     have it here with me.  I know that you're
25     entitled to have it, but I don't have it here

Page 125

1      in front of me.
2              MR. KUNTZ:  He does have it.
3              MR. SNELL:  Out of the 6,000,
4      you think I am some kind of scientist and can
5      pick out this FTIR testing?
6              MR. KUNTZ:  The rules are the
7      rules, Burt.  You gave us testing two weeks
8      before trial.  I don't cry about it.  We
9      follow the rules.
10             MR. SNELL:  All I'm asking him
11     is to identify it.
12             MR. KUNTZ:  That's fine.  We'll
13     sit here and he can identify it.  Let's pull
14     it up.
15             MR. SNELL:  That's what I
16     thought we were doing.
17             MR. KUNTZ:  If that's how you
18     want to spend your seven hours with him,
19     let's do it.
20             MR: BOWMAN:  There is a folder
21     named FTIR on the drive that was given to
22     you.  It's already been disassembled and
23     separated out.  There's FTIR, and there's
24     SEM, and XPS.
25             MR. KUNTZ:  I'm trying to get

32 (Pages 122 to 125)

Scott A. Guelcher, Ph.D.

Page 126

1    you a link, so you can pull them up.
2  BY MR. SNELL:
3    Q  What documents, if any, in this study that
4    Dr. Dunn did on the single TVT device show
5    that the Prolene polypropylene degrades?
6    A  There are SEM images at weeks zero and five,
7    I believe.  What the name of that file is, I
8    don't know.  I will have to look at the
9    folders to try to find it.
10   Q  Okay.  And what is it about those SEM images
11   that you believe shows degradation?
12   A  There are changes in the surface, including
13   pitting, flaking, changes to the surface that
14   can be observed by SEM.
15   Q  How deep is the pitting?
16   A  I don't know.  I would have to look at the
17   image again to see it.
18   Q  How much material is flaking off?
19   A  Again, I would have to look at it to see
20   that.  We saw SEM is -- we were just really
21   looking to see if it's there or not.  It's
22   difficult to be more quantitative as we can
23   be with the FTIR, but we saw evidence of
24   changes to the surface.
25   Q  Did you attempt to quantify the pitting?

Page 127

1    A  We were working on it.  In the amount of time
2    we had to pull this together, we haven't had
3    time to do it yet.
4    Q  You attempted to quantify the amount of
5    flaking?
6    A  Same answer.
7    Q  Not yet?
8    A  Not yet.
9    Q  Is there anything else about this test that
10   Dr. Dunn did on the single TVT device?
11   A  Anything else that -- I'm sorry.  Go ahead.
12   Q  That's okay.
13   A  It shows degradation.
14   Q  It shows degradation besides the SEM images?
15   A  No, degradation was assessed by SEM.
16   Q  Oxidation was assessed by FTIR?
17   A  That's correct.  And there was XPS testing
18   for some of those samples as well.
19   Q  You said there was XPS testing for some of
20   the samples.  What do you mean?
21   A  Well, I didn't say that very accurately.  I
22   can't remember all of the time points at
23   which we ask did XPS.  I know we did FTIR at
24   zero, one, two, three, four and five.  We did
25   SEM at zero and five, but I can't remember

Page 128

1    the time point at which we did XPS.  It's in
2    the data.  I just can't remember it.
3    Q  What, if anything, did the XPS show?
4    A  The XPS revealed the evidence of
5    carbon-oxygen bonds on the surface of the
6    TVT.
7    Q  How many carbon-oxygen bonds were seen?
8    A  So XPS, we did three distinct measurements at
9    three surfaces on the fiber.  We cannot see
10   microscopically where we're testing, so it's
11   not possible to tell whether we're testing
12   where there is an area of active degradation
13   or not.  Does that make sense?
14      There is areas of pitting on the fibers,
15   and then there is areas on the fibers that we
16   don't see the pitting.  When we do the XPS
17   measurements, we're not exactly sure of where
18   on the fiber we're probing.  We actually
19   picked three spots.  And the XPS measurement
20   tells us at that particular spot that is
21   being probed, what the percentage of the
22   carbon is bound to oxygen.  And we saw many
23   spots.  It's in the data.  I just can't
24   remember the exact numbers, but we saw many
25   spots on the surface where we saw the

Page 129

1    existence of carbon-oxygen bonds.
2    Q  Should there be no carbon-oxygen bonds?
3    A  There should be no carbon-oxygen bonds in
4    nonoxidized polypropylene, polypropylene that
5    has not been oxidized.  I don't want to use
6    pure, because there is other additives.  But
7    polypropylene that has not been oxidized
8    should not reveal evidence of carbon-oxygen
9    bonds.
10      It's similar to FTIR, except FTIR is
11   telling us the functional groups, and XPS is
12   telling us the types of bonds.
13   Q  Were there any inconsistent findings in this
14   test done by Dr. Dunn?
15   A  Not that I'm aware of.
16   Q  Did you put this -- the unstabilized
17   polypropylene control, what was that control?
18   A  It was a polypropylene pellet that was
19   purchased from a third-party vendor.  I don't
20   remember the name of the vendor, but I
21   believe it is in Dr. Dunn's testing documents
22   where the polypropylene has no antioxidant
23   added to it.
24   Q  Are the documents in there that reflect what
25   type of polypropylene pellet and where that

33 (Pages 126 to 129)

Scott A. Guelcher, Ph.D.

Page 130

1     pellet was from?  Is that in the files?
2   A  I believe that it is.  If it's not, we can
3     get that.  That's a known.  Dr. Dunn has that
4     information.  And I should note that Dr. Dunn
5     has all of the samples from this testing as
6     well.  We still have the material.  We saved
7     everything.
8   Q  Is it kept at his lab or his house?
9   A  I'm not sure where he is storing that, but he
10    has stored that in dark containers protected
11    from the light.  He can speak to that.  He's
12    storing the material.  I'm not sure where.
13  Q  So this polypropylene pellet that was used as
14    an unstabilized control, am I correct that it
15    had not been extruded or gone through any
16    manufacturing process whatsoever?
17  A  I believe that it had probably at least been
18    extruded because we bought it as pellets.  So
19    my understanding is they melt the
20    polypropylene -- I don't know the answer to
21    that.  Dr. Dunn would be able to talk about
22    the history of the sample.
23  Q  Do you know if this polypropylene pellet that
24    you tested was a pellet used in any stress
25    incontinence sling devices?

Page 131

1   A  I have no way of knowing that without knowing
2    the supplier of the pellet.
3   Q  How was it that Dr. Dunn came to decide on
4    which particular polypropylene pellet from a
5    certain manufacturer he was going to obtain?
6   A  So in his previous testimony, Dr. Dunn has
7    investigated a number of polypropylene cases,
8    and he's done similar testing before in which
9    he used unstabilized polypropylene controls,
10    so that decision would have been based on his
11    experience with prior testing.
12  Q  The unstabilized polypropylene control, what
13    tests were done that on that?
14  A  The same tests as were done on TVT.  So it
15    would have been XPS, FTIR and SEM.
16  Q  Did you attempt to calculate any clinical
17    significance of any findings in this test
18    that Dr. Dunn did?
19  A  We are still doing the quantitative analysis,
20    but we will calculate -- how shall I say this
21    -- statistical significance between groups as
22    a function of time.  So we would compare the
23    TVT group to the unstabilized polypropylene
24    group.  We would compare at each time point.
25    And we would compare within each group at

Page 132

1     each time point because we have three or four
2     replicates.
3     I can't remember the exact number, but we
4     have enough replicates that we can speak to
5     the significant differences  between groups
6     as a function of time.
7   Q  But that analysis has not been done yet,
8     correct?
9   A  It has not been done because we are still
10    quantifying the results.
11  Q  Who will do the testing for clinical
12    significance?
13  A  I don't know yet.  We're still discussing
14    this.
15  Q  Who are you considering to do statistical
16    significance testing in this test --
17  A  Dr. Dunn or I.  One of us will do it.
18  Q  Are you a statistician?
19  A  I'm not a statistician, but I've done similar
20    statistical testing in any papers that I've
21    published where we compared differences
22    between material groups and time using a one-
23    or two-way ANOVA.  That's a common method.
24  Q  But you're going to be testing over different
25    time points, correct?

Page 133

1   A  You mean statistically?
2   Q  Yeah.
3     So you will be testing over multiple time
4     points, correct?
5   A  Yes.
6   Q  So, therefore, you will need to apply a
7     Bonferroni or some type of multiple testing
8     equation, correct?
9   A  Yes.  We typically do this.  I believe it
10    will be a two-way ANOVA with a Bonferroni
11    correction.  But, again, we haven't decided
12    that yet.
13  Q  So as you sit here today, you cannot state
14    that the test results were statistically
15    significant upon applying the proper
16    statistical testing?
17  A  We haven't done it yet.  The differences
18    appear to be large, but we have to do the
19    statistics for the FTIR testing.  I don't
20    know what we will be able to do yet on the
21    SEM.  We are discussing that.
22  Q  So the FTIR testing is the testing that you
23    intend to do statistical significance testing
24    upon?
25  A  Yes.

34 (Pages 130 to 133)

Scott A. Guelcher, Ph.D.

Page 134

1    Q   And the SEM images, because you only took
2         them at limited time points, zero and five
3         weeks, you do not know whether there is
4         enough data to generate statistical
5         significant findings?
6              MR. KUNTZ:  Objection.
7    A   I wouldn't say it that way.  I would say in
8         SEM, we are looking at specific locations.
9         We can't sample the entire mesh area.  So
10        it's -- we're evaluating.  We haven't decided
11        yet what to do with it.
12   BY MR. SNELL:
13   Q   Is it fair to say as you sit here today, you
14        have not decided whether or not to do
15        statistically significant calculations upon
16        the SEM testing part of the test?
17   A   That's right.
18   Q   For the XPS portion of this test, have you
19        attempted to do any statistical significance
20        calculations?
21   A   Not yet.  XPS is similar to SEM, in that
22        we're limited to a relatively small area on
23        the surface of the mesh, so we have a similar
24        sampling concern.  So we haven't yet decided
25        -- with XPS we were more interested in

Page 135

1         confirming the existence of those
2         carbon-oxygen bonds.
3              XPS is a useful technique for showing
4         that the carbon is, in fact, chemically bound
5         to the oxygen.  And so we use XPS as a method
6         to support the FTIR findings.
7    Q   But to date, no statistical significance
8         testing has been done on the XPS portion; is
9         that right?
10   A   It has not been done.
11   Q   Did you attempt to analyze molecular weight
12        in this test?
13   A   We did not.
14   Q   Why not?
15   A   Molecular weight measurements require a
16        considerable amount of material.  Molecular
17        weight measurements also aren't as -- with
18        molecular weight, we are sampling the entire
19        fiber.  Whereas with these other methods,
20        it's more the surface of the fiber.  So it
21        takes a lot of material, and it's difficult
22        to isolate the effects of what's happening on
23        the surface.  In other words, it would take a
24        lot of material to do that, and we didn't
25        have that much.

Page 136

1    Q   Well, you had a whole sling, correct?
2    A   Yes.
3    Q   That's enough to do molecular weight testing
4         on, correct?
5    A   It's difficult for us because we have to send
6         these samples off to an external laboratory
7         that requires a rather large sample size.
8         And we would also want to analyze the
9         molecular weight of that outside degrade and
10        surface layer would be the most informative.
11        So then the material requirements for doing
12        that testing are pretty limiting, so we
13        didn't do it.
14             We believed that the FTIR and the SEM
15        would provide similar information about the
16        breakdown in the structure at the surface.
17        And FTIR and SEM are commonly used by many
18        investigators in these types of studies.  So
19        that's why we did the study the way that we
20        did.
21   Q   Is it correct or not that you had enough
22        material, considering you had a whole sling,
23        to look at the molecular weight?
24             MR. KUNTZ:  Objection.
25   A   I don't know that we did, because we would

Page 137

1         have required separate replicates for that.
2         And Dr. Dunn can speak to this better than I
3         can, but there is not a lot of polymer in
4         that -- I mean, it's a mesh.  And so we
5         needed to have separate replicates for the
6         GPC.  And we would have to have rather large
7         samples in order to send them off for
8         molecular weight analysis because we can't do
9         it at Vanderbilt.  We don't have the
10        equipment.
11             So it would have taken considerably more
12        material, and I don't know that we had it.
13        But, again, Dr. Dunn can speak to that.
14   BY MR. SNELL:
15   Q   Do you know if Dr. Dunn has done molecular
16        weight GPC testing on other mesh
17        manufacturers' slings?
18   A   He has done some testing on exemplars in the
19        past.  But, again, my recollection of this is
20        we had to send away a fairly significant
21        amount of material.  This is what I remember.
22        Again, Dr. Dunn would be able to address that
23        better.
24   Q   Did you discuss doing GPC molecular weight
25        testing and decided not to do it or is this a

Scott A. Guelcher, Ph.D.

Page 138

1    test that just did not really enter into your
2    mind?
3  A  Oh, we discussed it.  We certainly discussed
4    it.  Our conclusion was with the amount of
5    material that we had and the amount of time
6    that we had, it made the most sense to focus
7    on FTIR and SEM for this round of testing
8    and XPS.  We could do those tests with a
9    single set of replicates and save those
10   samples.
11      Keep in mind too, I don't think I was
12   very clear on this point.  But when I say
13   zero, one, two, three, four, five, that's
14   separate materials for each time point
15   multiplied by three or four replicates for
16   each time point, so you can see this is
17   getting to be a rather large number of mesh
18   particles.
19      Considering the time constraints we had,
20   and the amount of material we had, we
21   considered many different types of testing,
22   XPS, DSC, all of this different testing that
23   has been reported in the literature.  We
24   decided to focus on those three to answer the
25   specific question of can it oxidize.  FTIR

Page 139

1    and XPS, we believe were probably the best
2    choices for answering that question of can it
3    oxidize because they're chemical analyses.
4    That was the rationale for why we did it.
5  Q  This medium that you put the samples into
6    which you believe mimics what a macrophage
7    can produce in the body, what specific
8    compounds or chemicals of the macrophage does
9    this compound consist of?
10 A  I think I know what you mean.  So the
11   chemical reaction, cobalt chloride reacts
12   with hydrogen peroxide.  Again, hydrogen
13   peroxide is a substrate for this enzyme,
14   myeloperoxidase or MPO in the inflammatory
15   cells.  That chemical reaction produces
16   hydroxl radicals, OH radical.  And those
17   hydroxl radicals are the species that attack
18   the polypropylene as we've discussed
19   previously.
20      So it generates those hydroxl radicals,
21   which are a form of reactive oxygen species
22   in the body.  Instead of generating this
23   reactive oxygen species through a
24   myeloperoxidase catalyzed reaction in a cell,
25   we are doing this reaction in vitro by

Page 140

1    different reaction mechanism.  But the end
2    product is the same, these hydroxl radicals.
3  Q  I think you said that you are doing this in
4    vitro.  That's not correct, is it?
5  A  Doing what in vitro?
6  Q  Let me back up.  I heard you say something
7    that just threw me off there.
8  A  Okay.
9  Q  When you put the TVT in this other control --
10   can I call it a solution?
11 A  Yes.
12 Q  Is there a specific common name that I can
13   use?
14 A  We can call it oxidative solution if you
15   like.
16 Q  I don't like that.
17 A  You don't like that.  Of course, you don't
18   like that, do you?
19 Q  Try again.
20      MR. BOWMAN:  I've got a
21   suggestion.
22      MR. SNELL:  What?
23      MR. BOWMAN:  The Anderson
24   solution.
25      THE WITNESS:  We can call it the

Page 141

1    solution, that's fine.
2  BY MR. SNELL:
3  Q  Let's get really simple, though.  Just so I
4    understand, that solution, what is it made
5    of?
6  A  Okay.  I can explain -- and, again, this is
7    in the documents, but we mix a solution of
8    cobalt chloride.
9  Q  Okay.  So that's a molecule of cobalt bound
10   with chloride?
11 A  I believe it's COCL2.  Is it CL2 or CL3?  I
12   can't -- it's cobalt chloride.  It's either
13   COCL2 or CL3.  I just don't have it
14   memorized.  But cobalt chloride reacts with
15   hydrogen peroxide, H202.  So the solution is
16   20 percent H202, hydrogen peroxide.  I don't
17   remember the concentration of cobalt
18   chloride, but it's again in the SOP.
19      We mix those together, and they react to
20   give reaction products, including hydroxl
21   anion, that's OH minus.  That's a basic
22   solution.  Plus OH radical, that's OH dot, so
23   hydroxl radical.  And then there is a valence
24   change on the cobalt.  I can't remember the
25   changes it's valenced.

36 (Pages 138 to 141)

Scott A. Guelcher, Ph.D.

Page 142

1    But the main reaction product is that
2  hydroxl radical that's simulating the
3  reactive oxygen species formed by these
4  inflammatory cells in vivo.
5  Q  Okay.  So the hydroxl radical simulates the
6    reactive oxygen species from the macrophages
7    in foreign body giant cells?
8  A  It is.  So the foreign body giant cells and
9    macrophages produce a number of reactive
10   oxygen species, and hydroxl radicals are one
11   of them.  So in the in vitro test, we are
12   producing those hydroxl radicals and the
13   Bonferroni ROS species produced by the
14   inflammatory cells in vivo or in vitro.  They
15   do this in vitro as well.
16  Q  How do you know that macrophages in foreign
17   giant body cells produce hydroxl radicals in
18   any particular case?
19  A  It's been published in the Dr. Anderson
20   papers that I mentioned that when these
21   inflammatory cells adhere to the biomaterial
22   surface, they secrete a number of these
23   reactive oxygen species, including the
24   hydroxl radicals.
25  Q  How much hydroxl radical do they produce?

Page 143

1  A  I don't know that anybody has measured that.
2  Q  How much hydroxl radical is produced in this
3    test that mesh was put into?
4  A  We don't know.  But the reason we ran the
5    polypropylene control, I can try to answer
6    that.  So we know from Liebert, Liebert took
7    the monofilament, the unstabilized
8    polypropylene, and planted it subcutaneously
9    in a hamster, and he saw a chemical
10   induction.  He saw oxidation induction of
11   this oxidation reaction at 108 days.  Okay.
12      So in our study -- that is 108 days to
13   induction.  That is in vivo in that hamster
14   model, in vivo in the hamster model.  In our
15   study, we saw induction between days 21 and
16   28 for unstabilized polypropylene control.
17   So if you average that, just to give you an
18   approximation to try to answer your question,
19   somewhere between 21 and 28 -- let's call
20   that 25 days, and Liebert saw induction in
21   vivo at around 100 days.
22      That tells us that events are happening
23   in our in vitro test about four times faster
24   than they happen in that in vivo hamster
25   model, which is a subcutaneous suture

Page 144

1  implanted subcutaneously.  That was -- the
2  purpose of that control to give us some
3  idea of the relative time scale to relate our
4  tests to in vivo conditions as an
5  approximation.
6  Q  In vivo in a hamster, though, not a person?
7  A  Yes, in vivo in a hamster in a subcutaneous
8    space, not the pelvic -- it could be much
9    faster in a pelvic floor.  But it was a
10   suture implanted subcutaneously is what
11   Liebert did.
12  Q  What is the rate of induction of Prolene
13   polypropylene in the pelvic floor?
14  A  We cannot determine that from this test.
15   There are many factors that affect that.
16  Q  Is it correct that you do not know how much
17   of the hydroxl radical is produced in the
18   solution used by Dr. Dunn?
19  A  I'm not sure if that's known how -- no, I
20   don't know that we know that, but --
21  Q  Well, let's see if we can do this.  It would
22   seem to me to be common sense that the amount
23   of hydroxl radicals that would be produced in
24   vivo would be somewhat dependent upon the
25   number of macrophages; is that correct?

Page 145

1  A  That would be one factor.  The extent of the
2    inflammatory reaction would be one factor
3    that would affect induction time.
4  Q  So if there were 1,000 macrophages present,
5    the ability of hydroxl radicals to be
6    produced quantity-wise would be much greater
7    than if only ten macrophages were present.
8    Is that a fair scientific statement?
9  A  You're saying that you would expect more ROS
10   with more macrophages?  Is that what you're
11   saying?
12  Q  No.
13  A  Okay.  Say it again.  I didn't get it.
14  Q  The potential amount of hydroxl radicals that
15   could be produced would be higher if there
16   were 1,000 macrophages present as opposed to
17   only ten.  Is that a fair scientific
18   statement?
19  A  Present on like the --
20  Q  Present at the mesh, present at the tissues.
21  A  Per area of something like this, right?
22  Q  Per the same area?
23  A  Yeah.  I mean, I think this is equivalent to
24   what I said.  If you have more macrophages
25   per area, more foreign body giant cells, that

37 (Pages 142 to 145)

Scott A. Guelcher, Ph.D.

Page 146

1    is a factor.  I mean, certainly that's a
2    factor.
3         But, again, I want to emphasize that the
4    point of the tests was not to calculate the
5    rate of -- at which though the time at which
6    induction happens.  It was just to answer
7    this question, can it oxidize, can it become
8    induced, can it degrade.  That was the
9    purpose of the tests.
10        So we were not trying to say use these
11   data to calculate the induction time of
12   Prolene mesh in the vaginal space.  There
13   were a number of factors affecting this.  All
14   this test shows is that it happens.  It can
15   oxidize and degrade.  That was the purpose.
16   Q   What is the size of the solution that you put
17   the single TVT device in?
18   A   These were vials.  I don't know.  Maybe 20
19   milliliter vials.  I can't remember the size
20   of them.  They were maybe that tall and maybe
21   that big around (indicating).  They were
22   vials.
23   Q   So you put a piece of the mesh in the vial,
24   and the vial had the solution?
25   A   Yes.

Page 147

1    Q   Were all of the vials filled with the same
2    amount of solution?
3    A   Yes.  I believe those -- I can't remember the
4    number, but Dr. Dunn controlled for that.
5    Q   As you sit here, do you know how much
6    solution was put in each bottle?
7    A   I don't remember the number.  It was in the
8    range of tens of milliliters.  It wasn't more
9    than 100.  I don't remember the number.
10   Dr. Dunn would know.
11        MR. KUNTZ:  Can we take a break?
12   We've been going for one hour and 45 minutes,
13   almost two hours.
14        MR. SNELL:  Yeah.
15   BY MR. SNELL:
16   Q   One other question while we are taking about
17   these vials and solutions.  How many
18   macrophages does one vial equate to?
19   A   I don't know the answer to that.  The best
20   way I can answer this -- and I want to be
21   responsive.  But the best way I can answer
22   this is compared to Liebert, we are seeing an
23   acceleration of about a factor of four.
24   Could that mean that there is four times as
25   many -- it could, but it could mean other

Page 148

1    things as well.
2         I would rather say that there is lots of
3    factors that can affect this.  And it's
4    basically accelerated by -- it happens about
5    four times faster than what Liebert observed
6    in that hamster model.  I can say that.  But
7    how many macrophages, I -- we don't know how
8    many macrophages Liebert observed.  So it's
9    very difficult to calibrate it to that level
10   of detail.
11        Does that make --
12   Q   I guess maybe if I can back up and just make
13   this question as simple as possible.
14   A   Okay.  Yeah.
15   Q   Are there any documents that are in those
16   test files that say for this solution, for a
17   given amount of the solution, that is the
18   equivalent to the hydroxl radicals that can
19   be produced by Y number of macrophages?
20   A   I don't know that that correlation exists.  I
21   don't know.
22        MR. SNELL:  Okay.  Let's take a
23   break.
24        (A brief recess is taken from
25   3:25 to 3:45 p.m.)

Page 149

1         (Deposition Exhibit No. 3 is
2    marked for identification.)
3    BY MR. SNELL:
4    Q   Dr. Guelcher, we are back on the record.  We
5    have marked as Exhibit 3, the thumb drive,
6    that has the different documents, reliance
7    materials, etc., that you brought to the
8    deposition, correct?
9    A   That's correct.
10   Q   And what we're doing now, we are looking
11   under -- there is a folder called Guelcher
12   Reliance Docs that we're going to look under.
13   And we are going to look for test materials,
14   correct?
15   A   That's correct.
16   Q   And then under that there is a subfolder
17   called In Vitro Testing.  Is that a folder
18   that you're looking at?
19   A   Yes, I believe there is a folder called in
20   vitro testing.
21   Q   And the in vitro testing folder has test
22   information pertaining to this test that you
23   testified about earlier where Dr. Dunn
24   conducted the test on the single TVT
25   retropubic device compared to the

38 (Pages 146 to 149)

Scott A. Guelcher, Ph.D.

Page 150

1          polypropylene pellet?
2      A  That's correct.
3      Q  Now, within that in vitro testing folder,
4          there are additional subfolders, correct?
5      A  That's correct.
6      Q  All right.  So where is the study protocol?
7      A  Okay.  I'm going to have to look for that.
8              MR. KUNTZ:  Again, there is a
9          folder called protocols.
10             MR. SNELL:  I hear you.  I just
11         want the witness to tell me that it's
12         actually in there and show me where it is.
13     A  I'm looking.  Okay.  Study design and
14         protocols is a folder called study
15         design and protocols.
16  BY MR. SNELL:
17     Q  Okay.  Give me a second.  I'm in the study
18         design and protocols folder.  And where is
19         the study protocol?
20     A  Okay.  There is -- I believe it's the
21         oxidative media Preparation file.  Let me
22         look at that and I believe that is it.  So
23         that is what I was calling the SOP.  It says,
24         Guelcher labs standard operating procedure
25         oxidative media preparation.  This is how we

Page 151

1          prepared the medium that you were asking me
2          about.
3              So it has the recipe for -- it's CoCL2,
4          cobalt chloride hexahydrate, 30-percent
5          hydrogen peroxide solution and water.  And
6          these materials are mixed to make the 1 liter
7          master batch, and the procedures are all
8          listed here for that.  That is how we get the
9          solution.
10     Q  And how much is put into each of the vials?
11     A  I will have to look at a different procedure,
12         because I think this is just the master
13         batch.  Let me find it.
14     Q  Before you leave that document, at the bottom
15         left it says, ADT dash last edit 9/15/14?
16     A  Yes.
17     Q  Who is ADT?
18     A  That's my graduate student, Anne Talley.  She
19         is the one who has been maintaining this
20         draft that I have approved.
21             You asked about what, how much is added,
22         the volume?
23     Q  Yes, the volume added to the vial of the
24         solution.
25     A  Okay.  I am going to have to go back and look

Page 152

1          for that.
2              Okay.  So I found it.  I believe the file
3          is called in vitro mesh testing sample ID's.
4          There is an Excel file in that same folder
5          that we were talking about.
6      Q  Okay.
7      A  And you can see that all of the sample
8          numbers are listed here.  And if you scroll
9          to the bottom of that spreadsheet, you will
10         see procedure.  And so if you look on the
11         procedure, line number five, place 5
12         milliliters of oxidative media in each file.
13         So that would be -- and then he has notes on
14         what he did.  So it's 5 mils, approximately 5
15         milliliters of the media, of solution, in
16         each file.
17     Q  In Anderson's paper, did he use 5 milliliters
18         of solution?
19     A  I don't remember the number that he used or
20         that I used in my papers.  I don't remember
21         that number.
22     Q  Do you know if you deviated from the amount
23         that Anderson used in this test?
24     A  I don't know.  I'd have to check it.
25     Q  Did Dr. Dunn decide the procedure to use

Page 153

1          approximately 5 milliliters of oxidated
2          media in each file?
3      A  I don't know that the Anderson paper
4          specified this level of detail.  We did
5          discuss this.  The Anderson paper did not
6          present a procedure in this level of detail
7          that I remember, but I would have to confirm
8          that by looking at the paper.  Do you want me
9          to do that?
10     Q  Who was it who decided to use 5 milliliters
11         of oxidated media in each file?
12     A  I don't remember.  We discussed this test.  I
13         don't remember discussing where exactly that
14         came from.  I know -- I'm trying to find
15         this.
16             Okay.  Is there a question?  What was the
17         question?  I don't remember.  I thought I
18         answered it, but I will answer it again.
19     Q  Let me just ask the question again.  Who
20         decided to use approximately 5 milliliters s
21         of oxidated media to be put in into each
22         vial?
23     A  I know we discussed this, but I don't
24         remember the details.  We discussed all of
25         these points, and I just don't remember that,

Scott A. Guelcher, Ph.D.

Page 154

1    any more details than that.
2    Q  The same number of samples of unstabilized
3    polypropylene control were not used as the
4    TVT; is that correct?
5    A  I need to look at the spreadsheet again.
6    Polypropylene standard -- you say the same --
7    why -- I don't see that.  Where are you
8    looking?
9    Q  I'm looking at the Excel file you pointed out
10   at above PP standard.  Let's just make sure.
11   Is the PP standard, is that the unstabilized
12   polypropylene control?
13   A  Yes.  And to get back to one of your previous
14   questions, the MSDS and the supplier for that
15   material is here.
16   Q  And so for the unstabilized polypropylene
17   control, there were only 15 samples, correct?
18   A  Oh, I see the top of the column, 15 samples.
19   That's probably because it became oxidized
20   more quickly.  I don't -- so we only went out
21   to four weeks with the -- because it became
22   induced faster, the 15 samples.  I don't know
23   the answer to that now, what the number of
24   replicates for each time point was.  I can't
25   tell from this table.

Page 155

1    Q  Why were there only 15 samples of the
2    unstabilized polypropylene control, but 36
3    samples of the TVT?
4    A  Well, one reason would be because we didn't
5    do as many time points.  We did four weeks,
6    it looks like, instead of -- and I don't
7    think that we did as much -- I spoke
8    incorrectly.  I think previously it appears
9    that we actually had separate samples for XPS
10   and FTIR, and it doesn't look like we had as
11   many XPS samples.  I would have to think
12   about that.
13   Q  Do you know why you only analyzed the
14   unstabilized polypropylene control out to
15   four weeks, whereas you analyzed the TVT
16   later?
17   A  It became induced faster, so the unstabilized
18   control became induced between weeks three
19   and four.  So we didn't do as many time
20   limits.
21   Q  You could have still tested it, though, at
22   five and six weeks, right?
23   A  We could have.
24   Q  Did you make an affirmative decision not to
25   test at four and five weeks or is that

Page 156

1    something that Dr. Dunn did?
2    A  I can't remember the details of that decision
3    right now.
4    Q  Who made the decision to only use 15 samples
5    of the unstabilized polypropylene but 36
6    samples of the TVT?
7    A  I don't remember those details either.
8    Q  When you do statistical analyses comparing
9    the unstabilized polypropylene to the TVT,
10   don't you have to take into account
11   differences in sample sizes and differences
12   in the quantity of time points analyzed?
13   A  Yeah, for comparing between -- for comparing
14   between groups, those factors would have to
15   be taken into account, but I just don't
16   remember the details of that study design.
17   Q  Who did the FTIR testing?
18   A  Dr. Dunn.
19   Q  He personally did it or did he have somebody
20   else do it?
21   A  I believe he did it.  But, again, it was done
22   through his company, so I don't know the
23   details of who actually did what
24   measurements, but I believe he did it.
25   Q  Do you know where this FTIR machine was that

Page 157

1    was used in this test?
2    A  Yes.  It's in his laboratory.
3    Q  So he used the Vanderbilt lab FTIR machine
4    for the test?
5    A  Well, I would say he used the FTIR in his
6    laboratory at Vanderbilt.
7    Q  Did he buy that FTIR machine?
8    A  He would have to speak to the details of
9    that.
10   Q  I guess the question is -- you took issue
11   with whether I asked you -- do you know who
12   owns that FTIR machine?  Is it Vanderbilt or
13   Dr. Dunn or --
14   A  I don't know the details of that.  When you
15   said the Vanderbilt lab, that was, I thought,
16   a little vague.  I wanted to clarify that it
17   was -- it's in his laboratory space that he
18   has been assigned at Vanderbilt.
19   Q  Okay.
20   A  That's what I meant.
21   Q  All right.  But it very well could be that
22   that is a machine that is actually owned by
23   Vanderbilt?
24   A  I don't know the details.  As I said,
25   Dr. Dunn has an agreement with the

40 (Pages 154 to 157)

Scott A. Guelcher, Ph.D.

Page 158

1  university. That's all I know. He would
2  have to speak as to the rest of it.
3  Q  Now, the SEM analysis, whose SEM machine was
4  used?
5  A  There is an SEM instrument and it's an
6  institutional resource. It's a shared
7  resource is perhaps a better way of saying
8  it, and so we pay for machine time.
9  Q  Is it located at Vanderbilt?
10  A  It is.
11  Q  In what school?
12  A  Well, it's an institute, so it's between
13  schools and the members of the school of
14  engineering, college of arts and science,
15  medicine. It's a shared resource.
16  Q  It's not in Dr. Dunn's lab?
17  A  No.
18  Q  Physically where is it?  Is it within a
19  building in the department of medicine?
20  Department of engineering?
21  A  Again, it's a building that has shared space
22  between the college of arts and science and
23  the school of engineering.
24  Q  Who did the SEM images?
25  A  Again, it was Dr. Dunn's company. Whether he

Page 159

1  had an employee doing that, I don't know. He
2  was responsible for all of that.
3  Q  The XPS machine that was used to look at the
4  sample, where is that machine?
5  A  So that machine is also administered by the
6  institute I was referring to earlier. It's
7  housed in the laboratory of Professor Bridget
8  Rogers. So to clarify just for the record
9  one of the earlier questions about who else
10  at Vanderbilt was involved, Professor Bridget
11  Rogers is a professor, an associate professor
12  of chemical and biomolecular engineering, and
13  she did the XPS testing.
14  That slipped my mind earlier, I'm sorry,
15  until we talked about it now.
16  Q  So Dr. Rogers was actually the one who did
17  the XPS testing on this single TVT retropubic
18  device and the unstabilized polypropylene
19  control?
20  A  She did.
21  Q  Were you there when she did the testing?
22  A  No, but I don't need to be there when she --
23  it's a -- she ran it and --
24  Q  Why didn't you do the XPS testing?
25  A  That's Dr. Rogers' particular area of

Page 160

1  expertise. She has a lot of experience with
2  it.
3  Q  Is Dr. Rogers an expert for plaintiffs in
4  transvaginal mesh litigation that you're
5  aware of?
6  A  Not to my knowledge. She was contracted by
7  Dr. Dunn to do the work.
8  Q  Do you know how much she was paid by
9  Dr. Dunn?
10  A  I don't know the details of that. Probably
11  the same as my arrangement, but I don't know.
12  Q  Was she aware of Dr. Dunn's role as an expert
13  in transvaginal mesh litigation?
14  A  Yes, she was, to my knowledge.
15  Q  She is aware that Dr. Dunn is being paid by
16  attorneys for plaintiffs in transvaginal mesh
17  litigation?
18  A  I believe she would.
19  Q  So when she sat down to do this XPS analysis,
20  she knew that the money was coming from
21  plaintiffs' lawyers in transvaginal mesh
22  litigation?
23  A  Yes, I believe she knew that. I haven't --
24  I'm hesitating because I can't remember
25  explicitly discussing that with her, but I

Page 161

1  believe based on conversations with Russell
2  that she knew she was being paid by
3  litigation.
4  Q  Did Dr. Dunn have a conversation with
5  Dr. Rogers about doing this XPS testing?
6  A  Yes.
7  Q  Were you present at the time of that
8  conversation?
9  A  For some of the conversations, we did discuss
10  it as a group with Professor Rogers. Was I
11  there for every conversation, I can't say
12  that I was. I did discuss this with
13  Professors Dunn and Rogers.
14  Q  And what was said?
15  A  Well, we discussed how to do the analysis,
16  what we were looking for, how we wanted to do
17  the experiment, and what the goal was. We
18  discussed the approach for the measurements.
19  Q  Who paid for the SEM time?
20  A  Again, I can't answer that -- oh, for the
21  SEM. I'm sorry. I believe that Dr. Dunn has
22  a sponsor research agreement through the
23  university in which he set up a cost center.
24  But, again, he has to speak to all of this.
25  I believe it was paid for by the litigation

41 (Pages 158 to 161)

Scott A. Guelcher, Ph.D.

Page 162

1    through a center number from the university.
2    Q  What do you mean by center number?
3    A  Well, when we do internal billing within the
4    university, we have cost centers associated
5    with different funding sources.  So he would
6    have used the cost center associated with his
7    sponsored research agreement.  But, again, I
8    am hesitant to go -- it's his project.  I
9    don't know the details of that.
10   Q  Who paid Dr. Rogers for her time?
11   A  Dr. Dunn.  She invoiced Dr. Dunn, and then
12   Dr. Dunn invoiced plaintiff's counsel.
13   Q  How much did Dr. Rogers' invoice in
14   connection with this test that you're relying
15   on?
16   A  I don't know the answer to that.
17   Q  Do you know how much Dr. Dunn has invoiced in
18   connection with this test that you're relying
19   on?
20   A  I haven't seen his invoices.  I don't know.
21   Q  Would it be based on your understanding more
22   than $50,000 as an accurate prediction?
23   A  I don't know.  I can't put a number on it
24   because I didn't see the invoices.
25   Q  For the use of the XPS machine, am I correct

Page 163

1    that someone would have to pay for that time
2    or usage as well?
3    A  I don't know the details of that arrangement
4    with the XPS with Dr. Rogers.  I can't speak
5    to that.
6    Q  The unstabilized polypropylene control, is
7    that contained within the file that says
8    polypropylene standard MSDS?
9    A  You were interested about the source?
10   Q  Yes.
11   A  Yes, I believe that it is, and I'm going to
12   look at it right now.  So this is the file,
13   polypropylene standard MSDS, and I'm clicking
14   on this link.
15       Okay.  This is an MSDS.  I believe it is
16   the polypropylene standard.  If you see the
17   ingredient, it says isotactic polypropylene
18   at 100 percent.  So this would be the
19   unstabilized polypropylene control.  It was
20   purchased from Scientific Polymer Products,
21   Incorporated, and that would be the MSDS for
22   that material.
23   Q  And this is the pellets that you were talking
24   about?
25   A  Yes.

Page 164

1    Q  These aren't the same pellets that are used
2    in the TVT device, correct?
3    A  Not to my knowledge.
4    Q  What is isotactic polypropylene?
5    A  That is just a reference to the structure of
6    the polypropylene.  Most polypropylene is
7    sold commercially.  And my understanding is
8    isotactic is the most common isomer.  I will
9    say to my knowledge that polypropylene used
10   to make Prolene is also isotactic, if that
11   helps.
12   Q  Are you certain of that?
13   A  Pretty certain.  I believe that's the case.
14   Q  Section 9 has different physical and chemical
15   properties of this unstabilized polypropylene
16   control?
17   A  Section 9, yes.
18   Q  Do you know if these properties are in any
19   way different than the polypropylene pellets
20   that are used in the TVT device?
21   A  Could you ask that again?  I didn't catch it.
22   Q  Sure.
23       For the chemical and physical properties
24   of the unstabilized polypropylene control
25   that you used, are you aware if the

Page 165

1    properties are any different than the same
2    properties for the pellets that are
3    specifically used in the TVT device?
4    A  These properties appear to me to be very
5    similar.  If I'm looking at Sections 9 and
6    10, the melting point of 160 degrees.  This
7    is the melting point I remember for Prolene
8    from some of the internal documents, the
9    saline water is negligible.
10       If we look at stability and reactivity,
11   it also says materials to avoid, oxidizing
12   materials.  It looks very much like something
13   I would see for the MSDS for the
14   polypropylene used to make Prolene that I
15   saw.  So to answer to your question, I would
16   say it looks similar to me.
17   Q  And for the SEM test results that you --
18   A  Did you open the file?  Is that where you
19   are?
20   Q  Yeah, I was going to ask you.  The SEM test
21   results you believe showed pitting and you
22   said peeling.  Would those be found in that
23   folder PCT-168SEM?
24   A  I'm looking.  SEM, yes.
25       Did you have a question or --

42 (Pages 162 to 165)

Scott A. Guelcher, Ph.D.

Page 166

```
 1     Q  I am just trying to see, are the SEM images
 2        that you referenced in that file PCT-168SEM?
 3     A  I'm looking at a file TVT five week SEM PDF.
 4        I'm not sure what you're asking me.  If you
 5        can just ask me again what you're looking
 6        for.
 7     Q  The particular SEM images that you referenced
 8        that you be believed showed pitting or the
 9        peeling?
10     A  Yes.
11           MR. KUNTZ:  I will object.  But
12        go ahead.
13     A  Okay.  So I'm looking at this.  I'm in this
14        SEM directory.  I'm clicking On TVT five
15        weeks.  There is a folder called TVT five
16        weeks, and I believe these are individual
17        files.  And then I believe this file TVT SEM,
18        TVT five weeks SEM PDF, I believe that that
19        is the file I was talking about earlier.
20           So when I open this file, I see a number
21        of SEM images of PET that show that there is
22        a pitting and flaking on the surface of the
23        TVT.  That's what I was describing earlier.
24   BY MR. SNELL:
25     Q  On the second photo -- can you look at my
```

Page 167

```
 1        computer?
 2     A  The second photo is called PCT168SEM007.
 3     Q  Yes, that's what I'm looking at.
 4     A  Okay.
 5     Q  And towards the middle, that's a fiber that
 6        we're looking at?
 7     A  Yes, that's a specific fiber.
 8     Q  Take a look towards the middle at the bottom,
 9        if you can look at what I'm looking at.
10        Right here.
11     A  Yes.
12     Q  Right above the times 400.
13     A  Yes.
14     Q  And then moving directly north in the middle
15        here.  What is that?
16     A  That looks to me like an area that I would
17        call degradation, where the surface is
18        changing.  It looks like there is some
19        pitting and some residue, blistering perhaps.
20        That looks like an area of surface
21        degradation.
22     Q  In the SEM photos that I've seen in the
23        literature, those typically show cracks
24        running horizontal, correct?
25     A  That's right.
```

Page 168

```
 1     Q  This does not show anything like that,
 2        correct?
 3     A  We don't see the cracking because we did not
 4        apply -- these materials are not under
 5        tension.  There is no residual strain.  So in
 6        the Anderson paper 1993, they prestressed the
 7        materials.  And when they did this -- and
 8        they incubated them in an oxidative medium.
 9        When they did this, they were able to see
10        environmental stress cracking.
11           We did not prestress the materials.
12        Again, the question was really to answer can
13        it oxidize.  So without that mechanical
14        stress, we see more of these effects of
15        peeling and blistering.  And this is
16        described in a number of papers to see
17        environmental stress cracking you need a
18        combination of three things.  One is an
19        oxidative medium, the second is a material
20        that degrades in response to that medium, and
21        the third is mechanical stress.
22           So that -- there is no mechanical stress
23        in this experiment, which would be why I
24        don't believe we were seeing the transverse
25        cracking as noticed in Clave and other
```

Page 169

```
 1        papers.
 2     Q  Isn't another just as plausible answer that
 3        there is no proteins and biofilm on these
 4        images?
 5     A  Not in my opinion.
 6     Q  Let me ask you, were proteins and biofilm
 7        actually put on your samples of the TVT
 8        device?
 9     A  So I want to be specific about this term
10        biofilm.  Biofilm is a polysaccharide matrix.
11        It's deposited by bacteria.  To me that's
12        different than protein absorption.  And I'm
13        not aware of papers that are saying protein
14        absorption is causing cracking.  I mean, but
15        the biofilm to me is the polysaccharide
16        matrix deposited by bacteria.
17           Protein absorption is something
18        different, but it -- I mean, the surface is
19        degrading here is what I see in response to
20        the chemical induction is how I interpret
21        these events.
22     Q  There is no cracking in your photos of the
23        SEMs similar to those seen in the body as in
24        Clave and Costello and de Tayrac, correct?
25     A  Again, there is no cracking here because
```

43 (Pages 166 to 169)

Scott A. Guelcher, Ph.D.

Page 170

1   these materials were not under any mechanical
2   stress. There was no force. They weren't
3   pre-strained like in the '93 Anderson paper.
4   This is a protocol that was used in the '97
5   Anderson paper to answer the question of
6   oxidation. We didn't have mechanical
7   strengths, and that's why we're not seeing
8   cracking.
9   Q   You would agree that another plausible
10   explanation for why you don't see cracking is
11   there was no biofilm used in your testing?
12          MR. KUNTZ: Objection.
13   A   I don't agree with that.
14   BY MR. SNELL:
15   Q   Have you seen anywhere in the literature
16   during your analyses where cracking was seen
17   on an explant, and upon cleaning the explant,
18   it was determined that biofilm was the source
19   of the cracking? First of all, have you seen
20   that in the literature?
21          MR. KUNTZ: Objection. Go
22   ahead.
23   A   I believe the paper you're talking about that
24   I've seen was -- and correct me if I'm
25   describing the wrong paper, but I have seen a

Page 171

1   paper where the mesh was challenged with
2   bacteria. We have a contaminated mesh. And
3   then the SEM images I saw -- this is only 30
4   days, and this SEM image showed what appeared
5   to be a biofilm, which I would expect,
6   because it was challenged with bacteria, and
7   that biofilm showed cracks. But it looked
8   like a biofilm. It didn't look like the SEM
9   images in Clave. And some of the other
10   explanted mesh papers don't look like
11   biofilms to me.
12       We can look at that paper. It's in my
13   reliance materials. I can look for it, but I
14   believe that's the paper you're referring to,
15   and I have considered that. I believe that's
16   a biofilm. And if you wash that biofilm off,
17   it goes away, and there is no damage to
18   underlying substrate, because it's only 30
19   days. And so these events may not have
20   started happening yet, because 30 days is a
21   relative short period of time. That's my
22   explanation of the paper that I believe
23   you're referring to.
24   Q   It's the de Tayrac paper. You're aware of
25   that? There is actually images where they

Page 172

1   show the cracks. And then after they have
2   cleaned off the biofilm, you know, it was
3   clear that the filaments were fine?
4   A   Yes, but I think this is a different
5   question. I agree with what that paper is
6   saying in that -- we can pull it up and look
7   at it again. I'm gong on my memory, but I
8   think it was only 30 days. And I have done
9   these experiments myself. I've contaminated
10   scaffolds and placed them in -- I just
11   published a paper on this last year -- we
12   placed it in a bone defect.
13       We come back four weeks later, and we see
14   a biofilm, and it looks a lot like that
15   biofilm. And they clean it off, and, yeah,
16   there is no damage to the polypropylene
17   because it was only 30 days. It was a very
18   short period of time. And as we've been
19   discussing from Liebert and some of these
20   other papers, we wouldn't -- scientifically,
21   polypropylene would be induced at around 100
22   days.
23       So it's not too surprising to me that in
24   30 days, the polypropylene hasn't started to
25   crack yet. That's a very early time point.

Page 173

1   That's the way I understand that paper. But,
2   again, I would be happy talk about it with
3   you, but that's my memory of that paper.
4   Q   Do we know how much the Prolene polypropylene
5   is induced at 120 days?
6   A   I think I know what you're getting at, but I
7   would like you to ask it a different way.
8   Induction time, it's an event, so we can't
9   say how much it's induced. We can say either
10   it's become induced or it has not. So are
11   you asking -- I guess I'm not sure what
12   you're asking.
13   Q   What is the significance of induction?
14   A   So it's described in many of my reliance
15   materials. But an induction -- just to think
16   of a plot, we see a small change in
17   properties. So it's oxidizing, because there
18   is adherent macrophages in giant cells, and
19   it's oxidizing.
20       And then we reach this point where the
21   reaction becomes autocatalytic, and there is
22   a very strong increase in the slope, kind of
23   like hockey-stick applied. And that change
24   in the slope, we refer to as the chemical
25   induction time. So it's an event.

44 (Pages 170 to 173)

Scott A. Guelcher, Ph.D.

Page 174

1    So to say how much it is induced, I'm --
2    I'm trying to explain why I can't answer that
3    question.
4    Q  When does that chemical induction time take
5    place with the Prolene polypropylene?
6    A  We talked about this earlier.  It's difficult
7    to -- when that happens in the body is going
8    to be affected by a number of factors.  But
9    it's -- I think it's unlikely that that would
10   happen in 30 days.  That's very early.  And
11   that's why I explained the biofilm -- it
12   could happen maybe in some conditions in 30
13   days, but I don't believe in that experiment.
14   Q  Is there a certain point in which it becomes
15   significant?
16   A  What becomes significant?
17   Q  This induction.
18   A  Well, it's an event.  So at induction, there
19   is dramatic changes in physical properties.
20   But embrittlement in these events can happen
21   even before induction.  But, again, that
22   experiment is just -- they have this one --
23   it only went out to 30 days, and I just don't
24   think they went far enough to see the stress
25   cracking.

Page 175

1    Q  I'm looking here, and there is a folder
2    called TVT six week SEM?
3    A  Yes.
4    Q  That would be the six-week images?
5    A  Let me open that.  Let me pull it up.  I
6    think that is what it is, but -- yes, that
7    would be the six-week images.
8    Q  Why were SEMs only done on some of the
9    samples?
10   A  We were limited by the number of samples and
11   just the amount of time to get this work
12   done.  And so we know that, as I was just
13   explaining, once we reach the induction time,
14   that we would expect to see these significant
15   physical changes, physical degradation.
16       And when the FTIR measurements told us
17   that it was induced between weeks four and
18   five, we did SEM images at week five, and
19   then compared to the pristine sample, because
20   we were comparing the period in which it's
21   become induced.  We still have the samples, I
22   believe.
23       And I think we did this really out of
24   time constraints because there was so many
25   samples.

Page 176

1    Q  Under PCT 168 XPS --
2    A  Oh, you're on the XPS now.
3    Q  I'm in a Document 11062014 PCT 168 report.
4    A  Are you looking at the XPS report?
5    Q  Yes.  This is actually from Bridget Rogers.
6    A  Okay.  I am pulling up the report.
7    Q  On the second page, table one, it says
8    fraction of carbon atoms bonded in the RCOOH
9    and the CO configuration?
10   A  Right.
11   Q  What is that RCOOH?
12   A  So RCOOH is the hydroperoxide group that's
13   formed when the polypropylene is oxidized.
14   It's an intermediate in that complex reaction
15   mechanism.
16   Q  And what does it mean when there is zeros in
17   this table?
18   A  So if it's a zero, that means that in that
19   particular spot she was looking at under the
20   microscope, there was no oxidized
21   polypropylene.  In that particular spot, the
22   polypropylene had not been oxidized.  And
23   then where we see the numbers is where we see
24   evidence of oxidation of the polypropylene.
25   Q  What does the C equal sign --

Page 177

1    A  That's a carbonyl bond.  That's also a
2    reaction product.
3    Q  Why is there supposedly a carbonyl bond in
4    sample two in one week?
5    A  I'm not sure.
6    Q  That makes no sense base on the literature
7    and data as you understand it, correct?
8    A  I wouldn't say it makes no sense.  I mean, it
9    could be that small regions of the
10   polypropylene are oxidized before they were
11   implanted.  We have seen that in other
12   exemplars.  It is possible that there is
13   oxidation on the mesh before it's even
14   implanted
15   Q  Where would that oxidation come from on the
16   mesh?
17   A  Thermal processing.  When it's extruded and
18   processed at high temperatures, if those
19   antioxidants get depleted, it's not
20   surprising to me that you would see regions
21   -- we have seen it on exemplars.  And I can't
22   say which meshes, but it's possible for the
23   mesh to be oxidized during processing.
24   Q  Is it your opinion that this shows the TVT
25   mesh is thermally oxidized?

45 (Pages 174 to 177)

Scott A. Guelcher, Ph.D.

Page 178

1    A  That's not what I'm saying.  I'm saying that
2       that could be an explanation for why that
3       number is not zero.
4    Q  Another explanation could be that her test is
5       just wrong, correct?
6              MR. KUNTZ:  Objection.
7    A  I wouldn't say it's just wrong.  I would say
8       that when you look at the XPS as a whole,
9       it's consistent with the FTIR data.  We see
10      regions of oxidation, and those numbers
11      generally increase with time.  And that point
12      at one week -- yeah, there could be multiple
13      explanations for that.
14   BY MR. SNELL:
15   Q  You would not expect to see a reading at one
16      week for the CO bond, correct?
17   A  No, not if -- I mean, if it had regions of
18      oxidation, that could happen.  It could have
19      been that in that particular measurement, she
20      was looking at a region that hadn't been
21      oxidized during processing.  That can't be
22      ruled out.
23   Q  Well, what are all the possible reasons why
24      you could find this CO finding in the second
25      TVT sample at week one, besides there could

Page 179

1       be thermal oxidation that you're saying, I
2       guess?
3           Could her equipment not be calibrated or
4       running properly on that certain day?
5    A  I think that is pretty unlikely.  I think
6       that it could be that there was a region in
7       the mesh where the antioxidants had been
8       depleted and oxidized very quickly.  It could
9       have happened during thermal oxidation.  I
10      mean, those are some examples of what could
11      have happened.
12          But I don't think one data point that is
13      somewhat unexpected can be used to support
14      the notion that the method is flawed.  You
15      can't rule out that the polypropylene wasn't
16      oxidized.  You simply can't really explain
17      that data point.  There is several possible
18      reasons, and none of them is terribly
19      conclusive.
20   Q  Did you ask her why in the world, Doctor, are
21      you showing a positive finding in one week in
22      the CO bond in the second sample?
23   A  We discussed it with her.
24   Q  But what did she say about why that finding
25      was there at one week?

Page 180

1    A  She said that's what she saw.  She trusts her
2       methods.  She stands by her methods.  I'm not
3       shocked, because as I said, we have
4       sufficient oxidation in these meshes.  The
5       exemplars, you open them out of the box, and
6       in some cases, we have seen oxidation.  So
7       I'm not shocked by this.
8    Q  Is it correct that one explanation could be
9       that something was wrong with her equipment
10      on that date, with the calibration or the
11      test methods she did on that particular
12      sample?
13   A  It's a possibility, but an unlikely one.
14   Q  Did you go back and look at any documents or
15      any log books or anything like that with
16      regard to what happened during that testing
17      on week one?
18   A  We looked at -- Dr. Dunn and I and Dr. Rogers
19      reviewed a fair amount of the original data,
20      which she showed us the peaks in the XPS
21      spectra.
22          She has an algorithm for separating the
23      peaks, as described in her report, and that's
24      what she saw.  And, again, this is looking
25      through a microscope at one small spot on the

Page 181

1       surface, and she saw this region where there
2       was some evidence of oxidation.
3    Q  How small of a spot was that?
4    A  I don't know the size of the spot, but I know
5       that she does this through a microscope.
6    Q  Do you have an idea or a range?  I mean, are
7       we talking about couple of microns or 1,000
8       microns?
9    A  It's not -- you know, 1,000 microns would be
10      a millimeter.  It's not that big.  I don't
11      know the exact size of the spot.
12   Q  There were no positive findings at week two,
13      correct?
14   A  When you say positive, there was no evidence
15      -- none of the spots she looked at at week
16      two showed evidence of oxidation.  That's the
17      way I would describe that.
18   Q  And how do you explain that?
19   A  Well, because she didn't see any evidence of
20      carbon-oxygen bonds at week two on any of the
21      spots she looked at.
22   Q  On week three, there were only two findings
23      that were positive, correct?
24   A  On week three, there were two spots where she
25      saw evidence of oxidation.

46 (Pages 178 to 181)

Scott A. Guelcher, Ph.D.

Page 182

1   Q  On week three, second sample, it says 0.0088.
2       What does that mean?
3   A  Let me look at her report in a little more
4       detail and make sure I answer that correctly.
5           So table one presents the fraction of
6       carbon atoms bonded in the RCOOH and RCO
7       configurations.  So that would be -- the
8       fraction of carbon atoms for that would be 88
9       percent of the carbon atoms would bond to
10      that group is what she is reporting.
11  Q  At week four, there was only one positive
12      finding, correct?
13  A  Again, there was one spot that showed
14      evidence of oxidation.
15  Q  Do you know why she didn't have a positive
16      finding in the second and third samples, but
17      had one the week before supposedly?
18  A  I wouldn't say supposedly.  Again, we are
19      looking at individual spots.  And if you look
20      at the SEM images, you can see that there are
21      regions where there is degradation and then
22      regions where there is not.  So there are
23      regions on the surface of this polypropylene
24      that are oxidized, and there are regions that
25      are not.  And this is -- these are the number

Page 183

1       of areas that that is what she observed.
2   Q  You said you all looked at the raw data where
3       there were these peaks and things like that.
4       Where is that in this production?
5   A  I don't see that in her report.  We have that
6       data.  I'm not sure where they are.
7   Q  I'm going to request those.
8   A  Yeah, and that's not going to be a difficult
9       thing to provide.
10  Q  Has she done any statistical testing on that
11      XPS?
12  A  No.  And as I mentioned before, XPS is really
13      a qualitative tool to assess the structure of
14      the bonds.  It's telling us that we see these
15      carbon-oxygen bonds that are indicative of
16      degradation.  It is confirming the FTIR
17      findings.  We are relying on the FTIR
18      findings for a more quantitative analysis
19      where we will run our statistical tests.
20          And it's because with XPS, we are looking
21      at different spots, and we can't distinguish
22      whether it's a degraded spot or whether it's
23      a non-degraded spot.  What the XPS data
24      confirms is that there is regions of
25      degradation, and we can even see evidence of

Page 184

1       induction at week five.
2           At week five, we see these remarkable --
3       we see two spots, where now we have
4       essentially 50 percent of the carbon atoms
5       which she was looking at that are bound to
6       oxygen.  We look at these data in week five.
7       The first two samples -- in the first sample
8       and the second sample, we see a dramatic
9       increase in, so that's what --
10  Q  In the third sample, there is no increase,
11      right?
12  A  That's a region where -- well, there is some
13      carbonyl showing up, but that's a region
14      that was less oxidized than the other two.
15      That's the way I would interpret that.
16  Q  The zero means no oxidation seen, correct?
17  A  Well, I think we have to -- as Dr. Dunn has
18      testified previously, we need to consider
19      these two peaks together, because we are most
20      entered in looking at the fraction of carbons
21      that are bound to oxygen.  That tells us
22      about oxidation.  So we do see some carbonyl.
23      And there is no COOH group in that sample.
24          And, again, it is because we are looking
25      at different -- it depends on the spot that

Page 185

1       you are looking at.
2   Q  The CO, that's the carbon oxygen, the
3       carbonyl?
4   A  The CO is a carbonyl bond.
5   Q  Right.
6           So in the first sample, there was no
7       positive finding of the CO bond at weeks
8       four, five or six, correct?
9   A  That's what it says, right.
10  Q  How do you explain that finding?
11  A  Again, I would look at this as adding
12      because these are -- you know, she is trying
13      to separate these two peaks using a
14      mathematical algorithm.  And, you know, I
15      think we have to consider both numbers when
16      we talk about whether the surface is oxidized
17      or not.  Both of those types of bonds can
18      occur on the surface.  That is the way the
19      test works.
20  Q  Even though there were, as she supposedly
21      records, RCOOH bonding, at weeks four, five
22      and six, there is no CO bonding.  That's
23      fair, correct?
24  A  That is what her analysis shows.
25  Q  And there is zeros at even weeks five and

47 (Pages 182 to 185)

Scott A. Guelcher, Ph.D.

Page 186

1    six, correct?
2    A  Again, it depends on the spot you're looking
3      at.
4    Q  Is it true or not, though, that there is
5      zeros at weeks five and six?
6    A  Yeah, that's what I just said.
7    Q  And these numbers are not consistently
8      showing oxidation across all samples at the
9      same time point either; is that correct?
10   A  That's correct.  And, again, that's because
11     of where you are looking, just like the SEM
12     images, not all regions are degraded.
13   Q  Or it could be because of issues in the test,
14     correct?
15   A  Unlikely.
16   Q  But that's a possibility?
17   A  It's always a possibility.  I mean, it's a
18     possibility of any test.
19   Q  Have you done any analyses on cadaveric
20     slings?
21   A  No.  Cadaveric slings in my understanding
22     aren't made of out of polypropylene.
23   Q  I think I would agree with that.
24       But my question is simple.  Have you done
25     any testing on cadaveric slings?

Page 187

1    A  No.  Why would I?
2    Q  I'm just asking.
3    A  Okay.
4    Q  You're reading too much into my question.
5    A  It's just this kind of came out of no where.
6    Q  Have you ever done any testing on biologic
7      slings?
8            MR. KUNTZ:  Don't do this.
9            MR. SNELL:  I'm going to come
10     back to it, I'm sure.
11   BY MR. SNELL:
12   Q  Are you aware that biologic slings can
13     degrade?
14   A  Okay.  I would not use -- your terms are a
15     little -- when you say biologic, are you
16     talking about like the autograft or the
17     allograft?  What do you mean by biologic?
18   Q  You know like a pig sling.
19   A  You're supposed to call that a xenograft.  I
20     don't know that I would use the word degrade.
21     I would prefer to use a word like remodel.
22     It's reabsorbed, you know, so the old tissue
23     in the xenograft is absorbed, and then new
24     tissue is deposited by it.  That's my
25     understanding of what you're saying, I think.

Page 188

1    Q  Have you ever investigated the
2      biocompatibility of porcine slings?
3    A  What do you mean by biocompatibility?  That's
4      a pretty controversial word.  You mean in an
5      ISO context or -- I'm not sure what you mean.
6    Q  I thought somewhere you talk about
7      biocompatibility.
8    A  Where do I talk about biocompatibility?  I
9      want to be very careful with that word
10     because it has a very evolving meaning.
11     There is an ISO 10993 biocompatibility test
12     that measures certain characteristics of the
13     device.  But biocompatibility really can be
14     best understood in the context of the
15     material and where it's being implanted.  I'm
16     not sure what you're asking about is the
17     problem.
18   Q  Have you done any analysis on cadaveric
19     slings for incontinence?  Meaning, have you
20     searched the literature to try to understand
21     whether they degrade, whether they remodel,
22     anything like that?
23   A  I have looked at that some, but not -- my
24     understanding is that there is this Burch
25     procedure where they can use autograft, I'm

Page 189

1    aware of that, where they harvest autograft,
2    There is the Lynn paper that talks about
3    harvesting autograft and then implanting that
4    as a sling.  I'm less familiar with the
5    allograft and xenograft models.  I don't know
6    where you would get allograft for something
7    like this.
8         But you're saying that there is a pig
9    xenograft --
10   Q  Sling.
11   A  I'm not so familiar with that.
12   Q  Okay.  Have you have done any research or
13     seen any literature that specifically looks
14     at polypropylene slings and determines that
15     they did not degrade?
16   A  Again, I would like to be careful about this
17     word degrade, so I'm going to answer your
18     question as best as I can.  I have seen
19     papers that report findings that the sling
20     does not degrade.
21       There is a paper by Professor Dmochowski
22     at Vanderbilt, he is a co-author on this
23     paper where they looked at -- but they didn't
24     use the types of techniques we're talking
25     about.  My understanding of this paper is

48 (Pages 186 to 189)

Scott A. Guelcher, Ph.D.

Page 190

1  degradation was assessed by a pathologist
2  from an H&E stained section. And it's not
3  clear to me that you would be able to see
4  degradation with a method like this unless it
5  were really bad.
6      So I'm aware of those papers, and I have
7  read them, and I have considered those views.
8  My concern is that they don't always use
9  these same techniques.
10 Q  What doctor was that? Was that a doctor?
11 A  Yes. He's a urologist at Vanderbilt.
12 Q  Dmochowski?
13 A  Dmochowski. That's who I'm talking about.
14 And I think you know him.
15 Q  Any other papers?
16 A  That's the one that comes to mind. I think
17 there are others too, but that is the one
18 that comes to mind. I mean, there are these
19 Nelson studies and these other papers, but,
20 again, they're not specifically looking --
21 they may report that there is no degradation,
22 but when you read the paper, it's -- well,
23 in this case, they do patient surveys.
24     So how are you going to know that the
25 mesh degraded if you're just talking to

Page 191

1  someone in a survey. So I'm aware that those
2  papers are out there, and I have a read a
3  number of them.
4      MR. SNELL: We are going to mark
5  your summary of opinions as the next exhibit.
6      (Deposition Exhibit No. 4 was
7  marked for identification.)
8  BY MR. SNELL:
9  Q  So as we go through your opinions -- and just
10 to perhaps save us a little time, these are
11 the similar or the same opinions that you had
12 at the Huskey case, correct?
13 A  Yes, most of them are. If it would help, I
14 can distinguish which opinions have been
15 modified or are different since Huskey.
16 Q  Yes, that would be great.
17     Let me ask you to look at the exhibit we
18 marked for your summary of opinions in
19 Mrs. Perry's case, and tell us if the
20 opinions have been changed or added or
21 modified as compared to your Huskey opinion.
22 A  So I believe opinions one, and two, and
23 three, four, five, those five opinions are
24 very similar to Huskey. What I would say is
25 new is the testing that we did further

Page 192

1  supports these opinions, but it doesn't
2  change them.
3      So if we look at opinion three -- and we
4  talked about this, but if we look at opinion
5  three, the antioxidants do not eliminate
6  degradation, and they do not guard
7  indefinitely against oxidative -- this is --
8  the testing is relevant to this opinion. But
9  other than that -- again, it's the same
10 opinion. I'm just saying that the testing
11 further supports it. It doesn't change the
12 opinion.
13 Q  The testing you're referring to is the
14 testing that we've been looking at?
15 A  That we've just discussed, yeah.
16 Q  And that's pertinent to opinion number three
17 about the antioxidants?
18 A  I would say it's really pertinent to all
19 five, but most specifically of opinion three
20 I would say. Opinion six, I think, is
21 similar. I did talk in Huskey about
22 Ethicon's internal documents -- I'm referring
23 to oxidative degradation.
24 Q  Which document are you talking about there?
25 A  There is the Guidon study, the eight-year

Page 193

1  explanted suture study. There is some other
2  -- the dog study even shows evidence of
3  degradation. Those are the two that come to
4  mind.
5      There is some comments in those reports
6  about scraping off material that appeared to
7  be degraded polypropylene on the basis of its
8  melting point and appearance, and
9  environmental stress cracking in the sutures.
10 All of that was discussed in Huskey.
11 Q  In the Guidon eight-year explant suture study
12 that you referenced, when did those findings
13 of dyspareunia show?
14 A  When did those findings of dyspareunia -- see
15 that. You're being cheeky now.
16 Q  Yeah.
17     In the Guidon finger explant suture,
18 that's the vascular graft?
19 A  That's right.
20 Q  All right. At what point did the positive
21 findings that you relied on show up on that
22 study?
23 A  So it was the eight-year time point where the
24 surface cracking became -- I think there was
25 some cracking observed at earlier time

49 (Pages 190 to 193)

Scott A. Guelcher, Ph.D.

Page 194

1   points, but in eight years, I remember it
2   being very severe.
3   Q   And the dog study, at what point in time did
4   any of those findings become significant?
5   A   I would have to look at the documents again,
6   but my latest review of them, it was -- what
7   I remember is the conclusion from the study
8   is that the cracking became worse with time,
9   up to seven years.  Again, that was all
10  discussed in Huskey.
11  Q   I didn't see that.  I don't know if you
12  focused on the timing.
13  A   Okay.  Well, I just read this last night when
14  I was preparing, and I remember some
15  statements saying that the cracking appeared
16  to get worse.  We can pull it up if you want
17  to talk about it.
18  Q   Yes, let's just pull it up.  I just want to
19  understand what you're talking about.
20      It would be under reliance documents?
21  A   I believe it would be.
22  Q   Do you remember how you had it labeled?
23      MR. KUNTZ:  Do you want to ask
24  some questions about it?
25      MR. SNELL:  Yes, just that one

Page 195

1   question about the time point.
2       MR. KUNTZ:  You can use my copy,
3   but I don't want it marked as an exhibit.  It
4   has highlights on it.  I mean, just to speed
5   things up.
6       MR. SNELL:  That's fine.
7       (Off-the-record discussion.)
8   BY MR. SNELL:
9   Q   Okay.  Go ahead.
10  A   I'm just going to give you some points here.
11  So there is -- my understanding is that this
12  dog study was designed to be a ten-year
13  study.  There was a five-year report that was
14  issued.  In five years, two out of the seven
15  Prolene explants revealed cracking in five
16  years.  And then there is some SEM images
17  here that show those explants, and I can see
18  the cracking that they're referring to in two
19  of those explants.
20      I would say that at least in the image I
21  have it's difficult to tell, but it looks
22  like there is a third one that might be
23  showing some evidence as well.  This is what
24  I can see in these micrographs that are not
25  terribly clear.  That was the five-year time

Page 196

1   point.  Now, I'm looking at the seven year
2   time point.  And the conclusions I am reading
3   here, the seven-year in vivo results
4   generally substantiated the five-year
5   findings, degradation in Prolene is still
6   increasing.
7       So the way I interpret this is from year
8   five to year seven, the degradation is
9   progressing, but I don't see any SEM images
10  here.
11  Q   Do you know from that study when the cracking
12  first appeared, besides in five years?
13  A   A few time points I have is five years and
14  seven years is what's shown in this study.
15  And then the fact that it got worse from year
16  five to year seven, and that's what is
17  reported in this study.  And that's what I am
18  relying on for this opinion.
19  Q   That study doesn't establish that the
20  cracking was there at, say, three years?
21  A   It doesn't establish it was there at three
22  years because there was no three-year time
23  point.
24  Q   All you know is that at five years, two out
25  of the overall sample had some cracking?

Page 197

1   A   That's right.
2   Q   So you were looking at your list of opinions,
3   and you had talked about number six.  And
4   number seven?
5   A   So number seven, Ethicon ignored the warning
6   contained in the MSDS for the polypropylene
7   use in its products.  It says the strong
8   oxidizing agents, like peroxides, are
9   incompatible with the polypropylene to the
10  detriment of patients implanted with the
11  mesh.  So the MSDS warns that polypropylene
12  is sensitive to oxidation.
13      Again, our testing plays into this
14  because our testing has shown that even with
15  the antioxidants, it can oxidize.  They don't
16  protect it forever, as I've wrote in opinion
17  three.  And this is a detriment to patients
18  implanted with the mesh for two reasons.
19      One is, we've seen that oxidation
20  degradation  can lead to embrittlement, pain,
21  and complications, as I have testified, with
22  Costello and Clave and Huskey in previous
23  testimony, and it increases the risk.  It's
24  unpredictable, so it increases the risk to
25  the patients.  It's a risk that they have to

50 (Pages 194 to 197)

Scott A. Guelcher, Ph.D.

Page 198

1 live with for their entire lives because the
2 device is there.
3 And as long as it's there, it's going to
4 be -- this reaction is ongoing. That's
5 opinion five. And it's important that the
6 antioxidants don't protect it forever.
7 Q  That's basically the same as what you
8 expressed in Huskey?
9 A  I believe it is. I just wanted to qualify
10 that I do believe that the testing data has
11 some impact on that opinion, and we've been
12 discussing that. But it's a similar opinion
13 to that held in Huskey.
14 Q  What about number eight?
15 A  Number eight, I think, is also similar to
16 Huskey.
17 Q  In Huskey, as I recall it -- I mean, the
18 primary studies and documents that you
19 referred to and relied upon were the dog
20 study, the vascular suture graft study,
21 Clave, Costello?
22 A  Yes.
23 Q  The other one you mentioned today, Liebert,
24 is that another one that is important to your
25 opinions?

Page 199

1 A  Yes, all of those studies that we've
2 discussed.
3 Q  Okay.
4 MR. KUNTZ:  I'm just going to
5 object. We have provided everything to you
6 he has relied on. It's not a memory test to
7 point out every single document, but I think
8 I understand your question.
9 A  I testified that on those at Huskey, and my
10 opinion has not changed in that regard.
11 BY MR. SNELL:
12 Q  And so I'm not going to recover those things
13 with you.
14 A  That would be great.
15 Q  You're not offering any medical or clinical
16 opinions with regard to Mrs. Perry at all; is
17 that correct?
18 A  That's correct.
19 Q  That would be totally outside your expertise,
20 correct?
21 A  Medical and --
22 Q  Clinical?
23 A  Medical and clinical? Just for the record, I
24 would not say it would be outside my
25 expertise to test the explanted mesh and

Page 200

1 provide evidence of oxidation and degradation
2 and conclude that that contributed to the
3 embrittlement of the mesh. That could be
4 done. I did not do that in this case. I
5 didn't have the materials, but I don't want
6 to -- I would say from -- I don't -- maybe to
7 give you a better answer, I am not reviewing
8 medical records and --
9 Q  You're not doing a differential diagnoses and
10 drawing causal relationship inferences?
11 A  Not in this case, no.
12 Q  Nor in general, correct?
13 A  I have testified that -- again, I saw
14 evidence of myeloperoxidase, which was
15 evidenced to me that these oxidative
16 processes are ongoing. That would lead to
17 changes in the polypropylene. So in terms of
18 -- you had a question?
19 Q  The myeloperoxidase is not something you have
20 done on an Ethicon mesh?
21 A  That's correct.
22 Q  It's not something you have done on an
23 explant from an Ethicon patient to your
24 knowledge?
25 A  To my knowledge. It may be in

Page 201

1 Dr. Iakovlev's, but I don't know.
2 Q  And you understand that doctors are the ones
3 who actually do differential diagnoses and
4 draw conclusions about what complications
5 patients have?
6 A  Could you explain differential diagnosis,
7 please?
8 Q  Let me ask you, do you know what a
9 differential diagnosis is?
10 A  Not precisely, I don't thinK. So I suppose I
11 wouldn't do that. I mean, it sounds like a
12 medical term to me.
13 Q  Opinion number nine, explain that opinion to
14 me. Clearly, this is different.
15 A  So after reviewing all of the Ethicon
16 documents and some published papers, my
17 conclusion was that this TVT Abbrevo mesh is
18 stiffer. There are several e-mails from
19 inventors of the mesh, such as Dr. Della
20 Valle, Dr. Nelson, that observed this
21 increase in stiffness, complained about an
22 increase in complications, asserted that this
23 mesh was different, and you could not rely
24 upon TVT machine-cut mesh data to support the
25 notion that TVT Abbrevo is the same.

51 (Pages 198 to 201)

Scott A. Guelcher, Ph.D.

Page 202

1    I reviewed mechanical testing done by
2  Ethicon, and an effort by Dr. Kammerer, I
3  believe, who is a fellow at Ethicon, who
4  basically replotted some of those data and
5  argued from Lynn that the mesh is subject to
6  the very small forces in this environment.
7  And when you compare over that very small
8  force range, he reported that the elongation,
9  the mechanical properties are the same.
10    I do not think this is a good way to
11  approach the problem. I think you would have
12  to consider as in the paper by Dietz, where
13  he went out to 80 percent, something -- okay.
14  So with the original Ethicon testing, they
15  went to 14 or 15-percent elongation. The
16  Dietz paper went out to maybe 80-percent
17  elongation. And at those higher elongations,
18  there are significant differences, stiffness
19  of TVT machine-cut and TVT laser-cut.
20    Dr. Kammerer only plotted the data over a
21  range of up to about a 4-percent strain
22  elongation, and that was just a very limited
23  range. He concluded that they were similar,
24  but I questioned the physiological relevance
25  of his approach in asserting that Lynn could

Page 204

1  the decision-making process, not -- I did not
2  test these meshes mechanically. I'm making
3  this opinion on the basis of Ethicon
4  documents where they chose -- they
5  deliberately selected different ranges over
6  which to view the mechanical data. That's
7  what I'm questioning.
8  Q  Well, I'm going to get to that. My focus is
9  on the e-mails.
10    Basically, what you did is you looked at
11  some e-mails that some people wrote, and you
12  adopted what they said, correct?
13  A  Well, what do you mean I adopted what they
14  said?
15  Q  Did you assume what was written on the paper
16  was accurate or true?
17    MR. KUNTZ: I'm just going to
18  object.
19  A  I'm still not getting it. I mean, there was
20  statements by these surgeons that said it's
21  not the same.
22  BY MR. SNELL:
23  Q  Okay. This is what I am just asking -- maybe
24  I'm making it too complex.
25  A  Okay. I'm just not getting something.

Page 203

1  be used to support that assumption. That's
2  my opinion.
3    So the mesh, I believe, is stiffer. And
4  the decision was made to use the TVT
5  machine-cut data that is for the laser-cut
6  product even though it was different. That's
7  my opinion on number nine.
8  Q  So you looked at the e-mails where
9  Dr. Della Valle or others may have written in
10  comments about the mesh being stiffer,
11  correct?
12  A  I reviewed those e-mails, yeah.
13  Q  So you read those the e-mails, and you
14  basically took as what they said to be as
15  true, right?
16  A  I read as much as I could read. I read a lot
17  of documents.
18  Q  How about this, what independent testing did
19  you do, if any, to confirm or not confirm
20  the supposed higher level of stiffness of
21  the mesh?
22  A  Well, honestly I felt like I didn't need to
23  do independent testing. This is Ethicon data
24  that they relied on to make decisions.
25  That's what I'm criticizing. I'm criticizing

Page 205

1  Q  You saw some statements in an e-mail?
2  A  Yes.
3  Q  And you read them and what they meant to you,
4  right?
5  A  Yeah. It seemed like a straight forward
6  statement. And I read it and that's what it
7  said, so I just --
8  Q  You didn't apply any further analysis to this
9  statement?
10  A  What further analysis would I have applied?
11  It is just what it said. There were multiple
12  e-mails and there was an e-mail chain. I
13  read the question, and I read the response,
14  and I -- I mean, I did my best to review it,
15  but some of these comments were rather blunt
16  and direct, so it was --
17  Q  So you interpreted the statements without
18  doing any testing of their veracity or -- of
19  the points?
20  A  I don't know how to test their veracity. It
21  just -- I mean, there were multiple
22  statements and there were multiple e-mails
23  that seemed to -- among Ethicon employees
24  that addressed this as a concern, so it just
25  wasn't one e-mail. It was -- there seemed to

52 (Pages 202 to 205)

Scott A. Guelcher, Ph.D.

Page 206

```
 1    be many documents posing the question is TVT
 2    machine-cut the same as TVT laser-cut Abbrevo
 3    -- laser-cut versus the machine-cut.
 4        There were numerous opinions and
 5    documents going back and forth.  Many were
 6    questioning this decision.  Others were
 7    promoting it.  There was -- it looked like a
 8    fair amount of descension until Dr. Kammerer
 9    did his analysis, and then what appeared to
10    me is that the decision was taken that these
11    products are the same.
12        So I read a lot of documents to form
13    this.  I mean, if there is another one you
14    would like me to read, I would be happy to
15    read it.  That's why I'm here.  But this is
16    what I read, and this is what I saw, and this
17    is the opinion I have.
18  Q  I mean, these were basically e-mails written
19    by other people who wrote into the company.
20    And that's what you looked at, correct?
21  A  Yes, but some were internally e-mails between
22    -- conversations between Ethicon employees
23    and Europe and North America and --
24  Q  Fair enough.
25        These are people writing e-mails to other
```

Page 207

```
 1    people, correct?
 2  A  Yes.
 3  Q  The laser-cut and the mechanical cut mesh,
 4    they are the same mesh, correct?
 5            MR. KUNTZ:  Objection.
 6  A  I would say they are cut from the same
 7    Prolene mesh, but I would not say that they
 8    are the same mesh.  One has cut edges with a
 9    machine, the other has a cut with a laser.
10    That's not the same to me.  But if you want
11    to say they're prepared from the same source
12    mesh, I believe that's correct.
13  BY MR. SNELL:
14  Q  Both of the meshes are made of the same
15    Prolene polypropylene, correct?
16  A  That's my understanding.
17  Q  And it's the same mesh that goes through all
18    of the same extrusion and manufacturing
19    processes up until the point when it's cut to
20    your understanding, correct?
21  A  That's my understanding.
22  Q  Right.
23        The only difference is the edges of the
24    strip of tape, one is cut mechanically and
25    one is cut with a laser, correct?
```

Page 208

```
 1  A  That's the difference -- to my understanding,
 2    that's the only difference in how they are
 3    manufactured, but that could introduce
 4    differences -- well, okay.
 5  Q  But they are the same in that respect,
 6    correct?
 7  A  The same in what respect?
 8  Q  That they are the same up until the point
 9    when they decide to cut the edges of the mesh
10    either mechanically or they do it with
11    laser, correct?
12  A  I understand, yeah.
13  Q  Is that correct?
14  A  I believe so.  I mean, I don't have the
15    details of how these are --
16  Q  So if we have two pieces of mesh, this is
17    mechanical, this is laser, is there any
18    difference in the mesh that is running down
19    the middle?
20  A  I don't know.  That has not been tested.  All
21    I can say is that they are cut differently.
22    What affect that has on the mesh in the
23    middle, I don't know that that's been tested.
24  Q  They are knitted the same, right?
25  A  Yeah, but that cutting operation could change
```

Page 209

```
 1    something.  I just don't know and it's not
 2    been looked at.
 3  Q  Well, Dr. Kammerer looked at it, right?
 4  A  No.  Dr. Kammerer, I don't believe he
 5    actually did any testing.  I believe Dr.
 6    Kammerer took data from previous experiments
 7    and replotted them over a different range of
 8    elongation.  That's what I believe he did
 9    from the documents I saw.
10        I didn't see -- all I saw in his report
11    was that he noted that he was using data from
12    other reports.  I didn't see like he actually
13    did do measurements.  That was my
14    understanding.
15  Q  The elongation of the mesh, the
16    mechanically-cut and the laser-cut, were the
17    same at out to I believe it was 5 percent.
18    Do you have the document?
19  A  It would help if we had the document.  I was
20    going on my memory.  I believe it was 4
21    percent maybe.  It was not very many.  I
22    believe it was 4 percent.  It would help if
23    we had it.  I don't know if it's on the disk
24    or, I mean, how easy it would be to find.
25  Q  It will be on there.  I'm sure if you'd look
```

Scott A. Guelcher, Ph.D.

Page 210

1    at it, it's on there.
2         MR. KUNTZ:  What are you looking
3    for again?
4         MR. SNELL:  Kammerer's paper,
5    the elongation testing.
6         MR. KUNTZ:  Which one?
7         MR. SNELL:  The analysis he did
8    on elongation of the laser-cut versus the
9    mechanical-cut.  I want him to be able to
10   look at it.
11        (Off-the-record discussion.)
12   BY MR. SNELL:
13   Q  Have you ever tested the forces in the
14   pelvis?
15   A  No, I have not.
16   Q  What is your basis for saying that the
17   reliance on the Lynn period paper is wrong?
18   A  Okay.  So there is another -- okay.  There is
19   another e-mail by Dr. Kammerer, where he
20   comments that the elongation on the mesh
21   could be as high as 50 percent when it is
22   implanted.  And, obviously, if the mesh is
23   elongated when it's implanted, that's going
24   to move you down the force-distance curve.
25        And the other point about Lynn is that

Page 211

1    what Lynn was really measuring was a
2    differential force.  So Lynn was measuring --
3    so the patients were grafted with this what
4    looked like the autograft fascia sling, and
5    he was measuring the force when they cough
6    with a full or empty bladder.  That is a
7    differential force.  You don't know what the
8    initial force or tension of the elongation of
9    that sling was.
10        And the differential forces that he was
11   measuring were so small.  They are something
12   in the range of .1 to .2 pounds.  I mean,
13   that's like taking the meat patty from a
14   junior cheeseburger and hanging it on -- I
15   mean, we are talking forces that are really
16   small.  And that's a differential force on a
17   sling when somebody coughs.
18        It just doesn't seem very plausible to
19   me.  It's a very small force.  If the sling
20   is elongated up to 50 percent, when it's --
21   then it's got some strain, and you don't know
22   what that is.  But that's going to make the
23   stiffness higher if you're moving down that
24   force-stiffness curve.  That's what I'm
25   saying.

Page 212

1         Does that make sense?
2    Q  This is the sling under the urethra, correct
3    A  Yeah.
4    Q  Do you know the size of the urethra?
5    A  Probably pretty small.
6    Q  So that low number, that small number -- do
7    you understand that?  Do you know whether
8    that is consistent or inconsistent with basic
9    anatomy and physiology of the urethra, in the
10   support structures lying underneath the
11   urethra?
12   A  It just seems to me that the sling in that
13   study is different from the slings that are
14   being used as the TVT.  It's placed
15   differently.  I just don't know that you can
16   make that same extrapolation, that the force
17   on that autograft sling when somebody coughs
18   is the same.  It just seems --
19   Q  Do you know that you can't?  I mean, have you
20   done any testing or done any research that
21   ever shows that one cannot do that?
22        MR. KUNTZ:  Objection.  From
23   what he has already said?  From what Kammerer
24   has already said?  I just want to make sure
25   we're clear.

Page 213

1         MR. SNELL:  No, I'm asking him.
2    He says he doesn't know.  Well, what I'm
3    asking you is --
4         MR. KUNTZ:  He just referred to
5    Ethicon's own document, where Gene Kammerer
6    said it was different.  Besides that?
7         MR. SNELL:  No, he didn't.
8         MR. KUNTZ:  Yeah, he did.  He
9    said his e-mail -- yes, he said exactly that.
10   And now you're trying to say that he didn't.
11   A  I'm saying that Dr. Kammerer said that when
12   you implant a sling, it can elongate as much
13   as 50 percent.  And 4 percent -- I mean, I've
14   seen these slings.  For 4 percent, that's
15   like -- 4-percent elongation is like folding
16   it out of the box.  I mean, it's such a small
17   amount.
18        When you install it, it could be 40 or
19   50-percent strain, and that moves you much
20   further down that stress-strain curve where
21   these materials become very, very different.
22   That is Dr. Kammerer's email.  And then he
23   takes this paper from Dr. Lynn that says,
24   well, actually, the differential -- he
25   doesn't even call it a differential force, so

54 (Pages 210 to 213)

Scott A. Guelcher, Ph.D.

Page 214

1    that's what it was, because he doesn't know
2    the initial force on that sling.
3        He just knows that when somebody coughs
4    and exerts an additional force, that force
5    was in the range of half a newton.
6    BY MR. SNELL:
7    Q  How do you know what Dr. Kammerer knows?
8    A  Well, that's what he wrote.
9    Q  Well, you just testified that he didn't know
10    something.  How do you know that?
11   A  What did I say?  I don't know what I said he
12    didn't know.  I don't know.  He said that
13    when you implant the sling, it can extend,
14    it can elongate as much as 50 percent.  Well,
15    that's a lot more than 4 percent.
16   Q  Do you know what that was in the context of
17    and what type of testing that was in the
18    context of?
19   A  In my understanding of reading that e-mail,
20    that was in the context of the procedure, of
21    implanting the sling.
22   Q  The 50-percent elongation testing you've seen
23    done, they didn't even have the sheath on the
24    mesh; is that correct?  Do you know what I'm
25    talking about?  Have you seen 50-percent

Page 215

1    elongation testing?
2    A  I'm not talking about testing.  In
3    Dr. Kammerer's e-mail, he talked about with
4    the meshes and the procedures he's observed,
5    the mesh can elongate up to 50 percent.  That
6    was, I think, the language that he used.  So
7    that tells me when it is being implanted,
8    it's elongating.  It's no longer -- it's not
9    4 percent.  I mean, he is saying it could be
10    up to 50 percent.  That is a much bigger
11    number than meaning 4.  So I'm questioning
12    how he got this -- he basically took this
13    number of 4-percent strain, which is very
14    low, so he could argue that -- that's what it
15    looks like, that he could argue that over
16    that very small strain that these meshes are,
17    in fact, the same.
18   Q  That is your inference of what was going
19    through his head?
20   A  That's what he said in this document.  He
21    puts that number for Lynn out, and then he
22    goes to that stress strain curve, and then he
23    plotted the data over that range that he felt
24    was physiologically relevant on the basis of
25    the findings from Lynn.  That's what he did.

Page 216

1    That's what he says in the report.
2        I mean, I can read from it if you want
3    to, but that's to me what he said.  He used
4    Lynn to justify that half a newton of force.
5    Q  Have you read Dr. Kammerer's deposition?
6    A  I can't remember.  I don't know.  I don't
7    remember anything specific from his
8    deposition.
9        Well, I would be interested to --
10   Q  You would be interested to what?
11   A  No, I'm just --
12        MR. KUNTZ:  I would be
13    interested why we got that e-mail after his
14    depo, but we can take that up with somebody
15    else.
16   BY MR. SNELL:
17   Q  Item number ten, I think this was something
18    that was in Huskey, but you tell me if I'm
19    wrong.
20   A  There is an element to that.  What's new here
21    would be referring to this laser-cut versus
22    machine-cut.  I don't believe -- to my
23    knowledge, the studies that were done were
24    this mechanical testing that I was referring
25    to.  There was a 14-day rabbit study where

Page 217

1    they were measuring the infiltration, and
2    they were measuring pull-out strength, but it
3    was a very short time point, only 14 days.
4        And then there were e-mails from some of
5    these clinicians saying that we can't -- you
6    just can't use TVT machine-cut clinical data
7    to support TVT machine-cut, the notion that
8    the TVT laser-cut would perform the same,
9    because the meshes are different.  And I
10    don't think that they did enough testing to
11    establish whether they were different or not.
12    I would have liked to have seen more testing
13    to establish that fact.
14   Q  What testing was done?
15   A  What testing was done?
16   Q  That you're aware of.
17        Well, let me back up.
18   A  Okay.
19   Q  Did you do a PubMed or any other kind of
20    search to see what clinical literature there
21    was on the Abbrevo or laser-cut and
22    mechanical-cut meshes?
23   A  I think there is some study on TVTS, which is
24    a -- but that product is off the market now.
25    I was relying heavily on these Ethicon

55 (Pages 214 to 217)

Scott A. Guelcher, Ph.D.

Page 218

1    documents, what they did, and the conclusions
2    that they drew from the testing that they
3    did.  And I just thought that it wasn't -- it
4    wasn't enough.  It wasn't convincing from the
5    way that the whole Kammerer conclusions were
6    drawn to a 14-day rabbit test.  There should
7    have been more preclinical testing.
8        I mean, why did they not file a new
9    510(k)?  That could have been a relatively
10   straight forward thing to do.
11       But to my knowledge, they didn't even
12   file a new 510(k) for the laser-cut mesh.
13   They  just said it's the same without really
14   enough testing to reach that conclusion.
15   There was a process change that was just made
16   and never really validated.  That's what that
17   opinion  was saying.
18   Q  The e-mails from the clinicians, that's the
19   same ones we talked with about with regard to
20   opinion number nine?
21   A  Yeah.
22   Q  And the 14-day rabbit study?
23   A  That's what I remember.  I think there was a
24   14-day rabbit study.
25   Q  Do you know if that is the type of study that

Page 219

1    is normally done in the industry to assess
2    pull-out force?
3    A  That was my understanding.
4    Q  Have you have ever conducted that type of
5    study?
6    A  I have not.  And I think that answers one
7    question about pull-out force, but I don't
8    know that that addresses his question of
9    differences in stiffness between the mesh.
10   And then these clinicians are saying that
11   they are seeing more complications.  So there
12   were clinical warnings coming back that this
13   -- that something seems different here.
14   Q  Are you a regulatory expert, such that you
15   can cite to any regulations right now that
16   say that Ethicon should have filed a 510(k)
17   specific to laser-cut mesh?
18   A  I'm not -- I have a working knowledge of FDA
19   approaches.
20   Q  If you're going to offer an opinion about a
21   510(k) --
22   A  Let me think about it for a minute.  I know
23   where you are going with this.  I just --
24   Let's see if we can work through this.
25   Q  Well, my question is, are you going to try to

Page 220

1    offer an opinion that a 510(k) should have
2    been filed for laser-cut?  Because if you
3    are, I want you to tell me --
4    A  I know what you want me to tell you.
5    Q  -- the regulations, and I want you to tell me
6    exactly what documents they should have
7    looked at.  I want you to basically sit there
8    and be a regulatory expert.
9    A  I get it.
10           MR. KUNTZ:  He will not be
11       giving that opinion.
12   BY MR. SNELL:
13   Q  Can you just tell me you're not going to give
14   that opinion and then I can move on?
15   A  I'm upset about what was done.  But so we can
16   move on, I'm not going to give that opinion
17   as a regulatory expert.  There were just
18   things that concerned me, but I'm not going
19   -- okay.  I will retract that.
20           MR. SNELL:  Jeff, he is not
21       going to get up at trial --
22           MR. KUNTZ:  He's not going to
23       give a 510(k).
24   A  I'm not giving a 510(k) opinion.
25           MR. KUNTZ:  That's what you want

Page 221

1    to know.
2    A  I'm not giving a 510k opinion.
3    BY MR. SNELL:
4    Q  Because that's a whole other issue.
5    A  I know.
6    Q  There is nothing in your disclosures that say
7    he is a regulatory expert and he's talking
8    510(k)'s.
9    A  I just have enough knowledge of this that I
10   saw things that disturbed me, but I'm not
11   going to give that opinion as a 510(k)
12   expert.  I will stick to what I told you.  I
13   will reign myself in.  You are provoking me a
14   little bit.  I'm not frustrated.  I'm just --
15   Q  You know what they say, some knowledge is
16   dangerous.
17   A  I'm going to stay within the scope of my
18   opinions that are written here.
19   Q  Thank you.  I would like that.
20       Okay.  Are there specific scientific
21   studies that Ethicon should have done that
22   you are going to say would have produced some
23   type of clinically or statistically
24   significant difference as between the meshes?
25   A  I would have liked to see a longer term

56 (Pages 218 to 221)

Scott A. Guelcher, Ph.D.

Page 222

1    implantation test than just 14 days. I think
2    if there were differences in stiffness, you
3    might have seen it in 90 days, but even
4    longer periods would have been -- this mesh
5    could have been tested in preclinical models
6    more relevant to the vaginal wall. So there
7    is something new in my reliance materials.
8        There is an abstract by Deprest,
9    D-E-P-R-E-S-T. That was published in 2013.
10   It's in the reliance materials, where they
11   had a large animal model where they compared
12   mesh in the abdominal wall to mesh in the
13   vaginal wall, and they saw eightfold more
14   contraction in the vaginal wall.
15       So I think these studies could have been
16   done by Ethicon to assess these differences.
17   I think they could have interpreted their
18   own mechanical data more conservatively. We
19   already discussed that, so I don't want to
20   bring that up again, but those are the
21   studies. But more preclinical studies and a
22   more thoughtful evaluation of their own
23   mechanical data is what I would say.
24   Q  You're not saying that Gene Kammerer, who has
25      got 40 years of experience, is incompetent,

Page 223

1    you just disagree with -- let me just finish.
2    You're not saying he is incompetent, you just
3    disagree with what he did?
4    A  He might be too confident. What he did was
5    -- I don't like it. I don't like the way
6    that he handled the mechanical data to say
7    that everything was the same. I think that
8    was a flawed approach. I'm not saying he is
9    incompetent. I don't like the way he
10   approached that problem. I shouldn't say
11   don't like. I disagree with it.
12   Q  But you have not conducted any independent
13      testing or analyses that would show what he
14      did was incorrect?
15   A  I have not done any other testing. I was
16      relying on Ethicon documents at the time of
17      testing.
18   Q  This Deprest 2013 paper, what type of animal
19      model was that? Was that a pig?
20   A  It was a sheep. It is an abstract, I
21      believe, in the IUGA meeting in 2013. It's
22      in the reliance materials. That's new.
23   Q  Do you know whether the laser-cut mesh has
24      ever been subjected to testing in a sheep?
25   A  I don't know if there was testing in that

Page 224

1    model. I don't know.
2    Q  Would it surprise you to learn that laser-cut
3       mesh has been tested in sheep?
4    A  In what model?
5    Q  The sheep model.
6    A  You mean on a wall model? On a subcu model?
7       Where in the sheep was it tested?
8    Q  I guess my question is, would it surprise you
9       if you learned that it was done?
10   A  Would it surprise me? I know that there was
11      a lot of testing done. I wasn't aware of the
12      study that tested in the vaginal wall. If
13      it's a subcu test, then, again, that's a
14      different environment. The interesting
15      aspect of the Deprest study to me was that
16      they looked at differences -- which they
17      asked the question, is it different in the
18      abdominal wall versus the vaginal wall.
19          And I haven't seen a document that -- I
20      mean, I would be happy to look at it if
21      you've got one, but I haven't seen that.
22   Q  This study by Deprest, how big of a size of a
23      mesh was implanted? Do you know?
24   A  I can't remember the details from that. It's
25      in the abstract. I don't know.

Page 225

1    Q  Do you know how they implanted it in the
2       vaginal wall?
3    A  I can't remember how they did that.
4    Q  It wasn't a sling put between the vagina and
5       the urethra?
6    A  I don't believe it was a sling. I believe it
7       was more -- I just would have to look at it
8       again to remember it, but I don't believe it
9       was a sling. I think they implanted the
10      piece of mesh, but I can't remember the
11      details of how they did that.
12   Q  Do you know when was a sheep model where
13      implantation in the sheep's vagina was first
14      perfected?
15   A  I really don't understand. You mean as a
16      sling or you mean as like an implant? I'm
17      not sure what you mean.
18   Q  As a model. Usually animal models, right,
19      you just don't come up with some theory and
20      do the model. Don't you have to test models
21      before you actually do them?
22   A  Yeah. I mean, I work with colleagues where
23      we design new models for bone healing.
24   Q  Is there a way to validate models? I guess
25      that's what -- I'm kind of getting towards,

57 (Pages 222 to 225)

Scott A. Guelcher, Ph.D.

Page 226

1    that area.
2    A  Yes.  So if you want to validate a functional
3    model, that's a different question.  I think
4    what they did in this study is they just
5    implanted it adjacent to the tissue.  I don't
6    think it was intended to be a functional
7    sling model.
8        They were just asking the question, well,
9    if I implant it here at the hernia abdominal
10   wall versus here in the vaginal wall, do I
11   see differences in cellular infiltration and
12   contraction and those kinds -- it wasn't a --
13   this abdominal wall model has been around for
14   a while, right.  So I think what they did
15   that was different is they implanted it in
16   the vaginal wall as well.
17   Q  It wasn't validated, though, as between the
18   vaginal wall of the sheep and the abdominal
19   wall of the sheep?
20   A  I don't know what you mean by validated.
21   When I think of validation, that's like a
22   functional model that you have to validate to
23   make, so if you wanted to make a sheep sling
24   model, you would have to validate that.  I
25   understand that, but I don't think that that

Page 227

1    is what they did.
2    Q  This wasn't a validated sheep model study?
3    A  I would say it wasn't a validated sling
4    model.  They weren't modeling the sling in
5    the sheep and trying to draw some conclusion
6    about how the sling would act in a human.  I
7    think they were just asking a question, how
8    would this mesh infiltrate in these two
9    different environments.  That's what that
10   model was, which I think is a legitimate
11   thing to do.
12       People have been implanting -- there is a
13   number of rat abdominal wall models in other
14   rodents and large animals.  I don't think
15   that is a -- I think that is a good approach.
16   Q  Have you ever seen it done before,
17   implantation of mesh in a sheep or a large
18   animal's vagina?
19   A  That's the first I have seen it, but there
20   may be other studies.
21   Q  Did you do any investigation to see whether
22   the findings were consistent or inconsistent
23   with other testing or whether anyone had
24   tried to do that before?
25   A  I have looked for other studies and that's

Page 228

1    what I've found.  I haven't -- well, I have
2    looked.  That's what I know right now.
3    Q  So have we discussed ten?
4    A  I don't have anything to add to ten.
5    Q  And 11 is similar to number ten -- or how is
6    that different from anything you talked about
7    in Huskey?
8    A  Let me read it for a minute.
9    Q  Sure.
10   A  I think the point in 11 is that when I say
11   did not consider -- I think there is a lot of
12   overlap with Huskey.  They do not consider
13   principles of biomaterial science by not
14   testing it in an oxidative environment using
15   a known test that was known since the early
16   90's.  Even though they knew and from their
17   own studies, they saw evidence of oxidation
18   and degradation, they never tested it.
19       So to me, biomaterial science, if I know
20   something is susceptible to oxidation, I need
21   to test that and assess it.  And I guess what
22   would be new here is that, you know, we have
23   tested that.  In one exemplar of TVT mesh, we
24   found that it can't oxidize.  And that test
25   could have been done by Ethicon.  That is

Page 229

1    what I'm saying in 11 that is new.
2    Q  You're saying that test could have been done
3    by Ethicon?
4    A  Yes.
5    Q  But somebody at Ethicon would actually have
6    to believe that this cobalt study that you
7    referenced and the solutions are what
8    actually occurs from macrophages at an
9    unknown concentration in the body, correct?
10       MR. KUNTZ:  Objection.
11   A  Yes.  And there is some well-trained
12   scientists at Ethicon.  Those papers have
13   been cited dozens of times and are well
14   established in the field.  They are well
15   known in the field.  Those papers were
16   instrumental in discovering the problem of
17   the instability of polyether urethane
18   catheter leads, that these leads would
19   oxidize, degrade, and in some cases fail.
20   Those products were withdrawn from the
21   market.
22       So if I were at Ethicon, and I knew that
23   story, I would be very worried about this,
24   because it's the same type of problem, a
25   chemical attack.  It's just an environmental

58 (Pages 226 to 229)

Scott A. Guelcher, Ph.D.

Page 230

1    stress cracking problem, where you have an
2    oxidative environment and materials sensitive
3    to oxidation and mechanical forces.  All of
4    those can lead to this environmental stress
5    cracking in device failure.
6        So if I were at Ethicon and I knew of
7    those problems with those urethane catheter
8    leads, one of the first things I would have
9    done is tested these meshes in this oxidative
10   environment so I would know.
11   BY MR. SNELL:
12   Q   The urethane catheters, were those Ethicon
13       products?
14   A   No.  But a good biomaterials scientist
15       recognizes that these are two polymers that
16       are sensitive to oxidation.  And I would at
17       least want to know -- I would want to know,
18       does it degrade, does it oxidize, does it
19       degrade.  I think you have to ask that
20       question when you're designing a biomedical
21       device, what's the material made of and is
22       that a problem.
23   Q   Well, there could be folks at Ethicon who
24       have relevant experience who look at the
25       paper by Anderson and this cobalt solution,

Page 231

1    and say that test doesn't actually look like
2    it or is representative of the foreign body
3    reaction in the body.  I mean, couldn't
4    scientists come to that conclusion?
5    A   They could.  But, again, this is a
6        well-accepted test that's been cited a lot
7        and used a lot.  I think it should at least
8        raise some questions, especially when you
9        have your own studies showing evidence of
10       oxidation.  So it's not only the literature,
11       but it's also these own suture studies, the
12       dog study, Guidon study, that showed evidence
13       of oxidation that should have sent off some
14       red flags, hey, this material is sensitive to
15       oxidation, why don't we test it.  That is
16       what I am saying.
17           MR. SNELL:  Let's take a break
18       here.  We've been going for a while.
19           (A brief recess is taken from
20       4:30 to 4:40 p.m.)
21   BY MR. SNELL:
22   Q   Doctor, I want to circle back around to your
23       test, the testing that you were involved in.
24       I just want to make sure that based on
25       that test, you're not going to come into

Page 232

1    trial and tell the Perry jury that based on
2    the testing you did on that single TVT device
3    that there could be degradation in the human
4    body by a certain time point?
5        MR. KUNTZ:  Objection.
6    A   I've not testified and I don't plan -- I've
7        been saying and I still say that it's
8        unpredictable.  There is no certain time
9        point.  It's unpredictable.
10   BY MR. SNELL:
11   Q   Okay.  I just want to make sure I understand
12       how far you were going to try to take this
13       study.
14       Just so we're crystal clear, you're not
15       going to walk into that trial and say, at one
16       year, you can see degradation from the TVT
17       mesh, and I know it because of the study I
18       did on the TVT device?
19   A   No, I'm not saying that.
20   Q   Okay.  Did you do power calculations on your
21       TVT device study?
22   A   It's an in vitro test.  We typically do power
23       calculations on preclinical studies.  But in
24       the in vitro test, it's in vitro, where it's
25       -- you know, it's --

Page 233

1    Q   You need to do power calculations on the
2        front end of this test if you're going to try
3        to do statistical significant testing on the
4        back end, isn't that correct?
5    A   My experience with power calculations, again,
6        is typically in an in vivo study where we
7        estimate -- it's so that we ensure that our
8        study is power enough.  If we estimate a
9        certain variance in a certain number is 10
10       percent, we want to be able to power our
11       study to make sure that we can see that
12       10-percent effect.
13       But this is an in vitro study, so, well,
14       we did the study, and either we will see a
15       significant difference or we won't.  That's
16       what it is.  If we don't see a significant
17       difference, then maybe the study wasn't
18       underpowered, but we report that it is if
19       it's not significant.  But it's either
20       significant or it's not.
21       I mean, the reason you do a power study
22       in a preclinical study is to make sure you
23       have got enough animals to do your study.  In
24       an in vitro study, well, if we don't see
25       significant differences in the in vitro

59 (Pages 230 to 233)

Scott A. Guelcher, Ph.D.

Page 234

```
 1      study, then our conclusion would be that it's
 2      just not a significant difference.
 3   Q  Isn't it true, Doctor, that if you do not do
 4      power calculations on the front end of a
 5      study, you can't say that there are
 6      statistically significant findings on the
 7      back end, because you haven't even assessed
 8      whether you have an adequately powered study?
 9           MR. KUNTZ:  Objection.
10   A  I don't think that's true in in vitro
11      studies.  I don't see people doing this.  I
12      don't see papers where people power their in
13      vitro studies.  We typically do enough
14      replicates that we can calculate a standard
15      deviation and run an ANOVA or a t-test or
16      something, but we don't -- in a clinical
17      trial and in an animal study, we do power
18      analysis all the time, but I just -- I
19      don't --
20 BY MR. SNELL:
21   Q  Did you estimate the potential rate of error
22      in your study before it was done?
23   A  Potential rate of error in --
24   Q  In finding discrepant findings?
25   A  I just don't know where you are going with
```

Page 235

```
 1      this.
 2   Q  Did you do it or didn't you do it?  Did you
 3      do a calculation to assess the potential rate
 4      of error before you started that study on the
 5      TVT device?
 6   A  We didn't do that calculation.
 7   Q  Did you estimate the variance as you noted
 8      earlier?
 9   A  But this isn't the way statistics works.  I
10      mean, if we have two populations, we can
11      compare by a t-test.  We can compare those
12      populations and draw within -- we assess P to
13      be .05, and so with this value of P, we can
14      say it's significant or not significant.
15      That's typically what people do in in vitro
16      studies.  We say P is .05, and then we do
17      this -- we can calculate a P value.  You can
18      do it either way.
19           But if you have two populations, you can
20      compare those populations using statistical
21      analyses.  My experience with these power
22      analyses is a lot of it comes down to an
23      ethics concern.  It's not ethical to do an
24      animal study that is insufficiently powered.
25           Because if you do the study, and you
```

Page 236

```
 1      can't see differences, you don't know -- it's
 2      part of justifying the numbers of animals
 3      that you're going to use in your test.  But
 4      if you have two sets of data, you can compare
 5      whether they are statistically different or
 6      not.  This is what people do.  It's an in
 7      vitro test.  I just don't know where you are
 8      coming from.
 9   Q  When you do studies, you want to have
10      adequate sample sizes so that you can tell if
11      the results are meaningful.  That's a fair
12      statement, right?
13   A  Yes, but you can tell if the results are
14      significantly different if you see a
15      significant difference.  You can calculate a
16      P value.  You can do a t-test.  You can do an
17      ANOVA on that date.  If you don't see a
18      significant difference, then one reason could
19      be you didn't have enough replicates.  But if
20      you see a significant difference, I don't
21      understand how it's not significant.  If you
22      see a significant difference between two
23      groups, they're different.  That means the
24      differences are -- I don't understand.  I
25      mean, this is like statistics that you learn
```

Page 237

```
 1      in school.  I mean, comparing two
 2      populations.
 3   Q  Yeah, but here the two populations was a TVT
 4      device and a polypropylene pellet.  It wasn't
 5      100 TVT devices and 100 pellets, was it?
 6   A  You are so confused on statistics.  I can make
 7      this clear.  We tested one exemplar, but we
 8      cut multiple pieces from each exemplar.  So
 9      we have replicates.  So we can say,
10      statistically, in that mesh that we tested is
11      there more oxidation from the FTIR spectra at
12      week five compared to week four compared to
13      these other weeks.
14           We can do that test through even just --
15      we could do a two-way ANOVA to compare
16      changes in time and changes in the mesh or
17      between groups and as a function of time.  We
18      can do that analysis and that can be --
19      that's what people do all the time.
20   Q  You can't do that analysis as between the
21      control, though, because you didn't run all
22      of the same tests at the same time, correct?
23   A  I don't remember the details of that.  We ran
24      the control went out to four weeks.  We ran
25      the TVT out to five, and I think we might
```

Scott A. Guelcher, Ph.D.

Page 238

1    have had one that went to six weeks, but we
2    just didn't have enough sample to go out that
3    far.
4         But we can do all of these statistical
5    analysis, and I will bring it to trial, and
6    you can come at me with whatever you want
7    about statistics, but I just don't see where
8    you are coming from with this. I mean, we
9    can do a statistical test to see whether
10   there is differences at least in the function
11   of time. That's how we are going to assess
12   whether it is induced is the amount of
13   oxidation at week five significantly greater
14   than what we see at weeks, four, three, two,
15   one or zero.
16   Q   That hasn't been done, though, to this point?
17       Or you didn't bring that with you today,
18       right?
19   A   It hasn't been done. We're working on it.
20   Q   The tensile string, is that anything that you
21       tested in this test of the TVT versus the
22       control?
23            MR. KUNTZ: Objection.
24   A   We didn't measure tinsel strength. This
25       takes a lot of material. And, again, it

Page 239

1    doesn't answer the question of whether it can
2    be oxidized. Tensile strength is a bulk
3    test. So because it is a bulk test, it's
4    testing the whole material. You may or may
5    not see -- the problem with doing a tensile
6    strength test is --
7            MR. SNELL: Can I move to
8    strike? I don't want to keep you here later
9    than I have to. It was a yes or no really.
10   BY MR. SNELL:
11   Q   Do you do tensile strength?
12   A   No.
13   Q   All right. Did you do any elongation testing
14       in your --
15   A   No.
16   Q   I don't see it in your opinion, but I just
17       want to confirm this. You're not going to be
18       giving any testimony on what a suitable
19       alternative device for the treatment of
20       stress urinary incontinence was that was
21       equally safe and effective as TVT Abbrevo; is
22       that correct?
23   A   I did not testify on that and I don't plan
24       to.
25   Q   Okay. Are you aware of any evidence that the

Page 240

1    piece of mesh in Mrs. Perry's body became
2    unstable from a polymer standpoint?
3    A   No, I'm not.
4    Q   Are you aware of any evidence that the piece
5        of mesh in Mrs. Perry became brittle?
6    A   No, I'm not aware of that.
7    Q   Are you aware of any evidence that the piece
8        of mesh in Mrs. Perry degraded?
9    A   No.
10   Q   I didn't ask you at the beginning. Have you
11       given testimony at all since the Huskey trial
12       as an expert --
13   A   I provided this listing.
14   Q   -- against anybody? I think you're right.
15            MR. KUNTZ: He gave you an
16       updated copy since the Huskey trial. I think
17       you have it.
18   A   I gave testimony in Boston Scientific since
19       the Huskey trial.
20            MR. SNELL: I have it right
21       here. I'm going to mark it.
22            (Deposition Exhibit No. 5 was
23       marked for identification.)
24   BY MR. SNELL:
25   Q   Doctor, I'm handing you Exhibit 5. Tell me

Page 241

1    what that is, please.
2    A   This is a listing of cases in which I
3        provided testimony in the last four years.
4        And there are five cases listed here in 2013
5        and 2014.
6            MR. SNELL: I'd like to mark
7        what I believe is your CV as the next
8        exhibit.
9            (Deposition Exhibit No. 6 was
10       marked for identification.)
11   BY MR. SNELL:
12   Q   Doctor, I'm handing you Exhibit No. 6. If
13       you would just identify that for the record.
14   A   This is my CV. It lists all of my academic
15       and professional experience.
16   Q   That's current?
17   A   Yes.
18   Q   Okay. Earlier you talked about environmental
19       stress cracking?
20   A   Yes.
21   Q   Is that something you need to look at on SEM
22       to assess?
23   A   I would assess environmental stress cracking
24       by SEM. There are other methods as well, but
25       SEM is one.

61 (Pages 238 to 241)

Scott A. Guelcher, Ph.D.

Page 242

1   Q   What are the other methods?
2   A   The microscopy methods with Dr. Iakovlev.
3   Q   Are you aware of any evidence that the piece
4       of mesh in Mrs. Perry has or had
5       environmental stress cracking?
6   A   I'm not aware of any evidence.
7   Q   Earlier we talked about the concept of
8       macrophages in foreign giant body cells being
9       quiescent?
10  A   Yes.
11  Q   You are aware that those cells can be
12      quiescent, correct?
13  A   I'm aware that this is an active area of
14      investigation. I'm aware that there is a lot
15      of research activity trying to make these
16      cells quiescent or inactivate them. I'm not
17      aware of any reports that have definitely
18      proven they're quiescent or what makes them
19      quiescent. I would be happy to look at it.
20          I'm familiar with this idea, but I'm not
21      familiar with any studies that have proven
22      that or shown under what conditions that can
23      occur.
24  Q   You are aware actually that scientists are
25      able to now incubate and generate quiescent

Page 243

1       tissue macrophages for use in studies? Don't
2       you know that?
3   A   Well, I would like to see the document you're
4       referring to. I just said I haven't seen
5       that. I am aware of this idea, but I haven't
6       seen that study. I would be happy to look at
7       it, but I --
8   Q   My question is not pertaining to a specific
9       study. It's do you know whether scientists
10      have generated incubated quiescent tissue
11      macrophages for use in studies?
12  A   I'm not sure what you're referring to. I
13      mean, I would have to see a study to -- I'm
14      aware of this area of research, but I can't
15      comment on it without talking about a
16      specific study at least. What am I going to
17      say? I don't know where --
18  Q   Let me ask you this. You know that
19      scientists manufacture different cell lines
20      for use in studies, correct?
21  A   There are different permanent cell lines that
22      are used in cell culture. I use them in my
23      own lab.
24  Q   So somebody, scientists or companies make
25      those, correct?

Page 244

1   A   We can buy those from companies. There is an
2       immortalized cell line that you can buy.
3   Q   So my question to you, then, is, do you know
4       whether there are available for purchase or
5       use quiescent macrophage cells?
6   A   I don't know. I've never purchased them, but
7       that doesn't mean that they happen in the
8       human body. Again, without seeing a
9       document, it's difficult to comment on that.
10  Q   How would one definitively prove that
11      macrophages in giant cells become quiescent
12      in the body?
13  A   Well, I would challenge it with a foreign
14      body, and different time points, harvest the
15      cells, and stain for myeloperoxidase. But
16      it's -- to assess that they are actually
17      quiescent -- I mean, you have to count the
18      number of cells, and then look at the amount
19      of myeloperoxidase, look for degradation. It
20      would be difficult to show that they are
21      completely quiescent.
22  Q   So what would you have to do to prove that
23      those cells are activated every day of the
24      year for ten years? You would have to do the
25      same test, wouldn't you?

Page 245

1   A   We talked about this earlier. What I know is
2       Dr. Iakovlev, whenever we stain for
3       myeloperoxidase, we see it. So does that
4       conclusively prove that every cell is always
5       -- Dr. Anderson's 2008 review says that these
6       cells are activated and adherent, and this
7       reaction doesn't stop. That's what he says.
8   Q   How is that proof? What test has been done
9       under the proper methodology that shows that
10      those cells are always activated every day
11      for a long period of time? Has anybody done
12      such a test?
13  A   Not that I know of. But why would they stop?
14      Why would they --
15  Q   Well, I understand that Dr. Anderson may
16      believe that or he wrote something to that
17      effect. But has that methodology been tested
18      to show that they are always in an activated
19      state day after day after day?
20  A   All I can say is that in my experience with
21      this is that they are activated. When I
22      talked to Dr. Iakovlev, did you stain for
23      myeloperoxidase, his response was, why would
24      I stain for myeloperoxidase, it has to be
25      there.

62 (Pages 242 to 245)

Scott A. Guelcher, Ph.D.

Page 246

1  Q  Dr. Iakovlev assumes it's there. But he has
2     not tested for myeloperoxidase on a
3     continuous basis, daily or weekly basis in
4     samples?
5  A  I tell you what, I think most people will be
6     convinced by it.
7  Q  Can you answer that question, please? That
8     is what Dr. Iakovlev believes, right?
9  A  Yeah.
10 Q  But has he tested for myeloperoxidase in the
11    same samples longitudinally week after week
12    after week after week to see that those are
13    activated?
14 A  Not to my knowledge.
15 Q  All right. And you haven't done that type of
16    testing, correct?
17 A  No. But in my experience, when I see
18    macrophages and stain for myeloperoxidase,
19    I've not seen this type of stain. I need to
20    qualify my comment. When I see this adherent
21    macrophages in the foreign giant body cells
22    in my work, they appear to be activated.
23 Q  All right. You can see macrophages and
24    they're not activated. That is well known,
25    correct?

Page 247

1  A  I don't know that I would say that that is
2     well-known. I don't know under what
3     conditions -- I mean, I would have to see a
4     study.
5  Q  Well, let me make it simple. Can macrophages
6     be present and they're not activated?
7  A  In theory, it's possible. I'm just going by
8     my own experience. When I see these adherent
9     macrophages, they're activated. They're
10    secreting this myeloperoxidase. There is
11    degradation. That is what I've seen. I will
12    be happy to look at an example where that is
13    not the case, but --
14 Q  If there are chronic inflammatory cells
15    present, that does not necessarily mean that
16    they are active. Is that a fair statement?
17 A  It's my opinion that they are active. I
18    mean, I -- can I say that there is a study
19    showing that they are always active all the
20    time, no. But I believe they are active
21    unless somebody shows they are not, and I
22    would like to know under what conditions made
23    them not active.
24 Q  There is no test or study that shows that
25    these inflammatory cells are always active?

Page 248

1  A  You already asked this. I said I don't know
2     of a study that showed that. I'm just going
3     from my own experience.
4  Q  Do you know if Dr. Iakovlev has done any type
5     of longitudinal study of myeloperoxidase and
6     what it should show when properly applied to
7     samples from the same source over time?
8  A  I mean, he's a pathologist. He looks at
9     patient explants. You can't do a study like
10    that in patients, so I don't believe that he
11    has done that study.
12 Q  Did you bring anything else that we haven't
13    marked?
14 A  I think that's it.
15 Q  When you do statistical significance testing,
16    do you try to generate confident symbols as
17    well?
18 A  Sometimes. It depends on what we're trying
19    to do. Sometimes when we establish P at .05,
20    sometimes we can calculate a P value. We've
21    done several different things.
22 Q  Have you actually personally ever calculated
23    a Bonferroni correction for multiple
24    comparison?
25 A  When I was in graduate school. My students

Page 249

1     do those calculations now, and I review them.
2     There are software programs that you can use
3     to do this. It's pretty routine, I think.
4  Q  The software plugs in the number of tests and
5     the time points and it generates --
6  A  We can do this with software, yeah.
7  Q  You haven't published or presented on this
8     test, correct, that was done with the TVT
9     device and the pellet control?
10 A  We presented it at the AICHE annual meeting.
11    And I think those slides are on the reliance
12    list.
13 Q  For the TVT?
14 A  In that presentation, we did not identify the
15    source of the mesh.
16         MR. KUNTZ: I don't think that's
17    on there, Burt. We will get it to you,
18    though.
19 A  We called it mesh 1, 2 and 3. We did not
20    identify it as TVT.
21 BY MR. SNELL:
22 Q  Do you know if it was TVT or would you have
23    to go back and look?
24 A  Yes, it was TVT. We chose not to disclose
25    that at that meeting.

63 (Pages 246 to 249)

Scott A. Guelcher, Ph.D.

Page 250

1    Q   Where was this at?
2    A   The AICHE, it's the American Institute of
3        Chemical Engineers.  If you would like, I can
4        circle it on my CV.  Would that help you?
5    Q   Sure.  That's fine.  Or if you just want to
6        look at your CV and tell me what page or
7        number.
8    A   That's fine too.  On the CV, it's
9        presentation number 154.
10   Q   Was that a presentation that you actually
11       gave and presented or did someone else do it?
12   A   Dr. Dunn and I both gave the presentation.
13   Q   Was it presented orally?
14   A   It was.
15   Q   Okay.  So I would like to request a copy of
16       that.
17          Did you have to prepare a manuscript in
18       connection with that?
19   A   No.  We submitted a short abstract, which is
20       available online.  We elected not to submit
21       an extended abstract.
22   Q   What was the reason why you didn't submit an
23       extended abstract?
24   A   We typically don't do that for that meeting.
25   Q   Is that the only presentation you have made

Page 251

1        concerning the TVT mesh?
2    A   Yes.
3    Q   Have you made any other presentations that
4        concern transvaginal mesh?
5    A   That's the only one.
6    Q   On opinion number one, you say chemical
7        degradation, embrittlement, structural
8        degradation and other changes.
9    A   Yes.
10   Q   Are there any other changes that you're
11       referencing that you're going to be talking
12       about at trial in the Perry case?  That just
13       seems kind of broad based, and I want to make
14       sure I understand where you're coming from
15       with what other changes means.
16   A   I would probably say I think structural
17       degradation, embrittlement, and chemical
18       degradation are the primary ones that come to
19       mind that I've testified about.
20   Q   Okay.  And number two where it seems to --
21       are you going to try to opine that certain
22       complications occur in patients like chronic
23       inflammation, pain and dyspareunia because of
24       the mesh?
25   A   I'm saying that changes in the mesh can lead

Page 252

1        to problems such as pain, erosion.  The basis
2        for this opinion is the Clave, Costello, Wood
3        papers where they show changes in the mesh,
4        and then how that resulted in degradation.
5        And these are all complications, so these are
6        meshes that failed.
7           And my opinion is that these changes in
8        the mesh contributed to those complications
9        like pain and erosion.  Brittle plastic can
10       cause pain.  Embrittlement can cause stress
11       shielding between the host tissue and the
12       implant, which can lead to poor integration,
13       erosions, and things like that.  These are
14       all points that I made previously in Huskey.
15   Q   In Huskey, though, you didn't testify about
16       that at trial as I recall it because you're
17       not a medical doctor.  Is that consistent
18       with your recollection?
19          MR. KUNTZ:  Objection.  Go
20       ahead.
21   A   I think the Judge may have limited what I
22       would have liked to have said, but I believe
23       it's in the deposition.  I don't think
24       there is any change in what I'm saying, in
25       what I've been saying in these depositions.

Page 253

1    Q   And just so I'm clear, you didn't conduct any
2        type of differential diagnosis to assess the
3        cause of dyspareunia or pain or the potential
4        causes, correct?
5    A   No.
6    Q   You didn't rule out any other cause or
7        potential causes?
8    A   I didn't rule out any other causes.
9    Q   And you didn't investigate the rates of
10       dyspareunia or pain in the general background
11       and compare them to these cohorts?
12   A   I did not.
13   Q   And in Clave, it's fair to state that one
14       cannot say that the complications did not
15       occur before the degradation; is that right?
16   A   It's not clear from Clave the timing of those
17       events.  My opinion is that these changes in
18       the mesh led to those events.  The mesh
19       changed and there was an adverse event.
20   Q   And the adverse events are also you mention
21       on items number eight and nine, extrusions,
22       inflammation, pain, and you mention erosions
23       on nine, correct?
24   A   Yes.
25   Q   You didn't not do any differential diagnoses

64 (Pages 250 to 253)

Scott A. Guelcher, Ph.D.

Page 254

1    on those, correct?
2    A  No.
3    Q  You didn't assess causation by ruling in or
4        ruling out different causes, correct?
5    A  No, I didn't do that.
6    Q  In the testing that Dr. Kammerer did we
7        talked about earlier, where in the first
8        5 percent of elongation of the mesh, the
9        mechanical-cut and the laser-cut were
10       similar, do you dispute that finding?
11   A  I don't dispute the finding that of the very
12       low elongation.  They are similar but --
13   Q  Okay.  That's my question.
14   A  Yeah.  Okay.
15   Q  Did you look at the clinical expert report
16       that was done by two medical doctors at
17       Ethicon with regard to the laser-cut mesh and
18       elongation?
19   A  I think I reviewed that document, but I can't
20       remember what it said right now.
21   Q  Did that document affect your opinions?
22   A  I would have to look at it again to see what
23       it says.  I don't remember.
24   Q  Did you consider whether either of those
25       doctors had any experience implanting slings

Page 255

1    in women?
2    A  I would have to look at the document.  I just
3        don't remember the documents to answer these
4        questions.  I'd have to look at it.
5    Q  Have you ever consulted with a
6        urogynecologist or a urologist who has
7        experience implanting mesh slings to discuss
8        with them or learn from them the forces that
9        are in play during implantation?
10   A  No, I have not done that.  I relied on the
11       Ethicon documents.
12   Q  The e-mails you were talking about?
13   A  And the other documents, the reports, the
14       papers.
15   Q  Do you even know Dr. Dmochowski here at
16       Vanderbilt?
17   A  I don't know him.
18   Q  Do you know that Dr. Dmochowski uses
19       polypropylene mesh slings?
20   A  That's my understanding.
21   Q  Have you ever written or said anything to any
22       of the doctors here at Vanderbilt to apprise
23       them of what your opinions are?
24   A  I have.  I have contacted -- there is a
25       urogynecologist in the group there, and she e

Page 256

1    suggested I talk to Dmochowski, but I
2    understand he might have been a defense
3    witness, so I haven't done that.  I don't
4    think I'm supposed to do that.  So I have
5    reached out to them, but it hasn't moved
6    forward.
7    Q  Has Dr. Dmochowski been an expert in any of
8        the other cases you're involved in?
9    A  I don't know for sure.  I don't know if he is
10       an expert or not, because I have to resolve
11       this before I can contact him.  But I have
12       reached out to that group at Vanderbilt.
13            MR. KUNTZ:  I wonder if he has
14       disclosed his stuff to Vanderbilt.
15            (Deposition Exhibit No. 7 was
16       marked for identification.)
17   BY MR. SNELL:
18   Q  I am handing you Exhibit 7 from Vanderbilt.
19       Do you recognize this to be from the
20       Vanderbilt Health Website?
21   A  This appears to be urogynecology in the way
22       it's printed.  I think that's what it is.
23            MR. KUNTZ:  I'm going to object.
24       This is not a complete printout.  Are you
25       going to show him the part two where they

Page 257

1    talk about all the mesh complication that
2    they treat?  Are we going to get the full
3    document or just part of it?
4            MR. SNELL:  You can do whatever
5    you want.  This is Page 3 of 3.
6            MR. KUNTZ:  Well, I'm going to
7    object to an incomplete document.  It's a
8    printout of part of the website.
9    BY MR. SNELL:
10   Q  At the top it says, surgical treatments for
11       stress urinary incontinence, including mid
12       urethral slings.  Do you see that?
13   A  Yes, I'm aware of this.  I've seen it.
14   Q  Well, I guess my question to you is is this a
15       website that you visited on the Vanderbilt
16       website?
17   A  I believe I did, because I had to find who to
18       contact, but I believe they also do a number
19       of revisions.
20            MR. SNELL:  Move to strike.
21            THE WITNESS:  Well, you asked.
22       I'm sorry.
23   BY MR. SNELL:
24   Q  My question was straight forward.
25   A  They always are.

Scott A. Guelcher, Ph.D.

Page 258

1  Q  They really are, sir.
2      MR. KUNTZ:  Hold on.  I'm going
3  to object.  You are showing him one document,
4  and I just made my objection.  It is not a
5  straight forward question when you're not
6  showing him the whole website.  And he just
7  said where is the website that shows all of
8  the complications they're treating for mesh.
9  So that is not a straight forward question.
10      MR. SNELL:  That's not even a
11  proper objection.  That's not a proper
12  objection in California.  That's beyond a
13  speaking objection.
14      MR. KUNTZ:  You just said all of
15  my questions are straight forward.  And this
16  is very much a trick question and not a
17  straight forward question.  So don't make
18  your comments unless you --
19      MR. SNELL:  Let's try it again
20  and knock off the ridiculous speaking
21  objections.
22      MR. KUNTZ:  Show him the whole
23  website.
24      MR. SNELL:  Give the man a
25  computer.  You can have him look at anything.

Page 259

1      MR. KUNTZ:  You bring documents
2  and ask him questions.  My job is to show up
3  with --
4      MR. SNELL:  You are wasting my
5  time.  You're giving speaking objections that
6  are absolutely improper in California.
7      MR. KUNTZ:  You are asking trick
8  questions, and that's what he told you.
9      MR. SNELL:  It's not a trick
10  question.
11  BY MR. SNELL:
12  Q  Doctor, I read to you surgical treatments for
13  stress urinary incontinence include
14  mid urethral slings.  Did you see that?
15  A  Yeah, I've seen it.
16  Q  My question was, have you seen this part of
17  the website?
18  A  I believe so, but it's a printout.  It
19  doesn't really look the same.  I have been on
20  that website.
21  Q  Under what circumstance, would you have gone
22  to the website?
23  A  I was reaching out to that group to discuss
24  mesh.  I have contacted an OB in that group.
25  I can't remember the name right now, but I

Page 260

1  stopped because it's not proper for me to --
2  I don't know whether he is a defense witness
3  or not, so I would have to resolve this
4  before I would really do anything.
5  Q  You did speak to a female urogynecologist?
6  A  Yes.  I can't remember her name.
7  Q  Or do you know if she was a urologist?
8  A  I can't remember.  She was in this group.
9  She has experience with mesh revisions.  And
10  one of my students, one of my medical
11  students, did a rotation with her, and I
12  contacted her, I think, in September, but I
13  dropped it because of this concern about
14  litigation.
15  Q  Okay.  Do you have any understanding of the
16  antioxidants that are in the mesh for the TVT
17  Abbrevo?
18  A  To my knowledge, they are the same as they
19  are in proline resin that I talked about at
20  trial.
21  Q  Okay.  One of the opinions you gave in Huskey
22  was less mesh is better; is that correct?
23  A  That's correct.
24  Q  Why don't you give that opinion here?
25  A  Why don't I give that opinion?

Page 261

1  Q  Why aren't you giving that opinion here?
2  A  I don't think that was specified as an
3  opinion.  I don't recall that.  I thought it
4  was in the body of the report.  I don't
5  remember that being spelled out as a specific
6  opinion.
7  Q  Do you know Abbrevo uses less mesh that
8  TVT-O, don't you?
9  A  What do you mean by uses less mesh?  The area
10  is smaller, but what about the --
11  Q  Well, answer my question.
12  A  I'm trying to clear up the way you're asking
13  it.  I asking you, do you mean as it has a
14  different density or it's a less area?
15  That's what I'm asking.
16  Q  Does TVT Abbrevo have less mesh than the TVT
17  obturator?
18  A  I mean, it has less surface area of mesh, but
19  I believe the density of that mesh is still
20  the same.
21  Q  When you say less surface area, you mean it's
22  not as long as the TVT-O, correct?
23  A  Yes, I think that's what I mean.
24  Q  It's still 1.1 sonometers wide approximately;
25  is that correct?

66 (Pages 258 to 261)

Scott A. Guelcher, Ph.D.

Page 262

1    A  To my knowledge, and I believe the density is
2       the same as well.
3    Q  When you say density, what do you mean by
4       that?
5    A  Grams per square meter.
6    Q  Okay.  But we can agree there is less mesh
7       with TVT Abbrevo than TVT-O?
8    A  There is less mesh -- the way you say it, I
9       guess it's true.
10   Q  Now, do you have an opinion as to whether TVT
11      Abbrevo is the better or a safer device than
12      the TVT-O?
13             MR. KUNTZ:  Objection.
14   A  No.  I'm not comparing it to TVT-O.
15             MR. SNELL:  I think I'm about
16      done.  Let me look back through and see if
17      there is anything else.
18             (A brief recess is taken from
19      5:30 to 5:40 p.m.)
20   BY MR. SNELL:
21   Q  Just a few more questions, Doctor.  So I'm
22      going to request that whatever the materials
23      that weren't provided on the testing that was
24      done be provided.  I'm going to leave the
25      deposition open.

Page 263

1         Is there anything you believe is
2       important to your analysis --
3             MR. KUNTZ:  Hold on.  We're not
4       leaving the deposition open.
5             MR. SNELL:  You can say what you
6       want to say.  I'm leaving it open.  I don't
7       have all of the documents.
8             MR. KUNTZ:  California law is
9       you can argue --
10             MR. SNELL:  I'm not going to
11      argue with you.  I'm either right or wrong.
12             MR. KUNTZ:  Okay.
13             MR. SNELL:  I'm either right or
14      wrong.
15   BY MR. SNELL:
16   Q  Is there anything you believe is important in
17      your opinions and analyses that we have not
18      discussed today?
19   A  I believe we have discussed everything that
20      is important.
21   Q  Now, is there any work that you are planning
22      on doing with this case after today?
23   A  No.
24   Q  Besides the statistical calculations?
25   A  No.  No testing is planned, just analyzing

Page 264

1       what we have, and preparing for trial, those
2       types of activities.
3    Q  All right.  Is there a list of analyses that
4       you can tell me or tell the court reporter
5       that you plan to do?
6    A  Plan to do testing.
7    Q  With the testing or pertaining to this case?
8    A  It's the statistical analysis and writing the
9       paper.  That's it.
10   Q  What will you do if you do the statistical
11      calculations and they turn out to be not
12      statistically significant?
13   A  Report it as not significant, like we always
14      do.
15   Q  What else?
16   A  What do you mean what else?
17   Q  What will you do to try to understand why
18      they were not statistically significant?
19   A  I don't know.  I would have to think about
20      that at the time it -- I don't think that
21      that is what is going to happen.  The peak is
22      ten times bigger, and the aragores (phonetic)
23      aren't that -- I believe it's going to be
24      significant, and if it's not, then I will
25      figure out what to do when that happens.  I'm

Page 265

1       not going to misrepresent data.
2             MR. SNELL:  That's fine.  I'm
3       going to leave the door open.  I know counsel
4       has a question or two.
5             MR. ROSEN:  I've got one
6       question.
7             CROSS-EXAMINATION
8    BY MR. ROSEN:
9    Q  Good evening, Mr. Guelcher.  My name is
10      Dr. Rosen.  I'm with Boyce Schaeffer
11      Mainieri.  We represent Dr. Luu.  I just have
12      one question.
13         Do you intend to offer any opinions
14      regarding Dr. Luu at trial in this matter?
15   A  I do not.  My testimony is about the mesh and
16      how it changes after implantation.
17             MR. ROSEN:  That's all.  Thank
18      you.
19             MR. KUNTZ:  Dr. Guelcher, I have
20      a few questions for you.
21             CROSS-EXAMINATION
22   BY MR. KUNTZ:
23   Q  With respect to the studies you've talked
24      about, and the testing you did with Dr. Dunn,
25      in the SEM, FTIR, and XPS, those are all

67 (Pages 262 to 265)

Scott A. Guelcher, Ph.D.

Page 266

1    studies or documents or data that you can
2    review independently of Dr. Dunn, correct?
3    A  Yes, that's correct.
4         MR. SNELL:  Objection.  You've
5    got to give me a chance to object.  Leading,
6    compound.  Go ahead.
7    BY MR. KUNTZ:
8    Q  You repeatedly in your practice are going to
9    have expertise reviewing those types of
10   studies, SEM, FTIR, and XPS?
11        MR. SNELL:  Objection.  Leading
12   compound.  Go ahead.
13   A  Yes, I do.
14   Q  And if Ethicon did those studies or had those
15   types of documents, you could review those
16   independently, correct?
17        MR. SNELL:  Same objections.
18   A  Yes, I could.
19   Q  The last question I have.  Is there any
20   peer-reviewed article that you're aware of
21   that shows or supports the notion that
22   macrophages in foreign body giant cells can
23   be deactivated?
24   A  I'm not aware of such an article.
25        MR. KUNTZ:  Okay.  No more

Page 267

1    questions.
2         REDIRECT EXAMINATION
3    BY MR. SNELL:
4    Q  Are you aware of any book chapters, any
5    articles in the peer-reviewed literature that
6    says that macrophages can indeed be
7    deactivated?
8    A  I'm not aware of those articles.  That's what
9    I said earlier.
10   Q  But you have seen it in the literature or in
11   books that macrophages can be quiescent?
12   A  That's not what I said.  I'm familiar with
13   this idea of reprogramming macrophages, but I
14   am not familiar with any studies that have
15   shown that this has been done or under what
16   conditions it happens.  I mean, I'm familiar
17   with the idea.  I'm just not familiar with
18   such a study is what I'm saying.
19   Q  You're not familiar with such a study that
20   shows that macrophages are activated
21   longitudinally every day for years and years?
22   A  No one has proven that, but Anderson teaches
23   they're activated when they adhere.  That's
24   what it says.
25        MR. SNELL:  Move to strike part

Page 268

1    of the response, part of the answer.
2         I'm done.  Thank you.
3         (Deposition was adjourned at 5:50
4    p.m.)
5              * * *

Page 269

1    STATE OF KENTUCKY    )
2                        )
3    COUNTY OF DAVIESS    )
4
5         I, MICHELLE E. KERR, A NOTARY PUBLIC AT LARGE IN
6    AND FOR THE COMMONWEALTH OF KENTUCKY, DO HEREBY
7    CERTIFY:
8         THAT SAID DEPOSITION WAS TAKEN STENOGRAPHICALLY
9    AND ELECTRONICALLY BY ME AND THAT THE TYPEWRITTEN
10   TRANSCRIPT ABOVE IS A TRUE RECORD OF THE
11   TESTIMONY GIVEN; THAT I ALSO RECORDED AND
12   TRANSCRIBED ANY AND ALL OBJECTIONS MADE BY COUNSEL
13   AND THE REASONS THEREFORE; AND THAT I AM NOT A
14   RELATIVE OR EMPLOYEE OR ATTORNEY OR COUNSEL OF ANY
15   OF THE PARTIES, NOR A RELATIVE OR EMPLOYEE OF SUCH
16   ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED
17   IN THIS ACTION.
18
19
20        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND
21   AND AFFIXED MY NOTARIAL SEAL ON THIS _____ DAY OF
22   DECEMBER, 2014.
23
             _____
             MICHELLE E. KERR, NOTARY PUBLIC
24
25   My Commission Expires:
         March 21, 2017
         March 21, 2017

Scott A. Guelcher, Ph.D.

Page 270

1        INSTRUCTIONS TO WITNESS
2
3            Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8            After doing so, please sign
9    the errata sheet and date it.  It will be
10   attached to your deposition.
11           It is imperative that you
12   return the original errata sheet to the
13   deposing attorney within thirty (30) days
14   of receipt of the deposition transcript
15   by you.  If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 272

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do
     hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7
     _____
8    SCOTT A. GUELCHER, PH.D.      DATE
9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25

Page 271

1            ------
             E R R A T A
2            ------
3    PAGE  LINE  CHANGE
4    ____ ____ _____
5    REASON: _____
6    ____ ____ _____
7    REASON: _____
8    ____ ____ _____
9    REASON: _____
10   ____ ____ _____
11   REASON: _____
12   ____ ____ _____
13   REASON: _____
14   ____ ____ _____
15   REASON: _____
16   ____ ____ _____
17   REASON: _____
18   ____ ____ _____
19   REASON: _____
20   ____ ____ _____
21   REASON: _____
22   ____ ____ _____
23   REASON: _____
24   ____ ____ _____
25   REASON: _____

Page 273

1            LAWYER'S NOTES
2    PAGE  LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25   ____ ____ _____

69 (Pages 270 to 273)

# EXHIBIT J

Scott A. Guelcher, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


IN RE: ETHICON, INC., PELVIC REPAIR)
SYSTEM PRODUCTS LIABILITY          )MASTER FILE NO.
LITIGATION                         )2:12-MD-02327
                                   )MDL 2327
-----------------------------------)
THIS DOCUMENT RELATES TO CASE      )
CONSOLIDATION:                     )JOSEPH R. GOODWIN
                                   )U.S. DISTRICT JUDGE
TERRESKI MULLINS, et al.,          )
                                   )
                Plaintiffs,        )
vs.                                )CASE NO.
                                   )2:12-CV-02952
ETHICON, INC., et al.,             )
                                   )
                Defendants.        )



DEPOSITION OF

SCOTT A. GUELCHER, Ph.D.

Taken on Behalf of the Defendants

September 15, 2015

Scott A. Guelcher, Ph.D.

Page 2

1    APPEARANCES:
2    For the Plaintiffs:
3       MICHAEL H. BOWMAN, ESQ.
         Wexler Wallace, LLP
4       55 West Monroe Street
         Suite 3300
5       Chicago, IL 60603
         304.780.8080
6       mhb@wexlerwallace.com
7    For the Defendants:
8       DAVID B. THOMAS, ESQ.
         Thomas Combs & Spann, PLLC
9       300 Summers Street
         Suite 1380
10      Charleston, WV, 25301
         304.414.1807
11      dthomas@tcspllc.com
12      CHAD R. HUTCHINSON, ESQ.
         Butler Snow, LLP
13      1020 Highland Colony Parkway
         Suite 1400
14      Ridgeland, MS 39157
         601.985.4401
15      chad.hutchinson@butlersnow.com
16
17
18
19
20
21
22
23
24
25

Page 4

1    Exhibit 10  Degradation Of            36  23
                 Polypropylene In Vivo: A
2                Microscopic Analysis Of
                 Meshes Explanted From
3                Patients
4    Exhibit 11  Role Of Oxygen In          44  18
                 Biodegradation Of
5                Poly(etherurethaneura)
                 Elastomers
6
     Exhibit 12  Guelcher PCT-168 Documents 63   1
7
     Exhibit 13  Materials Characterization 64   7
8                And Histological Analysis
                 Of Explanted Polypropylene,
9                PTFE, and PET Hernia Meshes
                 From An Individual Patient
10
11
12                *** Exhibit 8 was retained ***
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                   I N D E X
2    WITNESS: SCOTT A. GUELCHER, PH.D.
3             INDEX OF EXAMINATIONS
4                             Page/Line
5    By Mr. Thomas          6   5
6    By Mr. Bowman          116  2
7             INDEX OF EXHIBITS
8                             Page/Line
9    Exhibit 1   Expert Report Of Scott    6  14
                 Guelcher, Ph.D.
10
     Exhibit 2   Notice of Deposition of Dr.  6  24
11               Scott A. Guelcher
12   Exhibit 3   Scott A. Guelcher      7  20
                 Curriculum Vitae
13
14   Exhibit 4   Fee Schedule          8   1
15   Exhibit 5   Listing Of Cases In Which  10  13
                 Testimony Has Been Given In
                 the Last Four Years
16
     Exhibit 6   August 29, 2015, Invoice  11  15
17
     Exhibit 7   Binder              12  12
18
     Exhibit 8   Flash Drive         13  20
19
     Exhibit 9   Abstract Submitted To The  29  20
20               IUGA Meeting
21
22
23
24
25

Page 5

1        The deposition of SCOTT A. GUELCHER,
2    Ph.D., taken on behalf of the Defendants, on
3    September 15, 2015, at 9:07 A.M., in the offices
4    of Butler Snow, 150 Third Avenue South, Suite
5    1600, Nashville, Tennessee, for all purposes under
6    the Rules of Civil Procedure.
7        The formalities as to notice,
8    caption, certificate, et cetera, are waived.  All
9    objections, except as to the form of the
10   questions, are reserved to the hearing.
11       It is agreed that Gary Schneider,
12   being a Notary Public and Court Reporter for the
13   State of Tennessee, may swear the witness, and
14   that the reading and signing of the completed
15   deposition by the witness are reserved.
16
17
18
19                    ***
20
21
22
23
24
25

Scott A. Guelcher, Ph.D.

Page 6

1           SCOTT A. GUELCHER, Ph.D.,
2   was called as a witness and, after having been
3   first duly sworn, testified as follows:
4           E X A M I N A T I O N
5   BY MR. THOMAS:
6   Q.    Good morning, Dr. Guelcher.
7   A.    Good morning.
8   Q.    We're here today in the deposition -- for
9   your deposition in the Mullins versus Ethicon
10  case, correct?
11  A.    Yes.
12  Q.    Let me hand you what I'm going to mark as
13  Deposition Exhibit No. 1.
14          (Marked Exhibit 1.)
15  BY MR. THOMAS:
16  Q.    And ask you if that's your expert report
17  in this case?
18  A.    Yes.
19  Q.    And does Deposition Exhibit No. 1 contain
20  the complete set of your opinions that you're
21  prepared to offer in this case that you have at
22  this time?
23  A.    Yes.
24          (Marked Exhibit 2.)
25

Page 7

1   BY MR. THOMAS:
2   Q.    Let me show you Deposition Exhibit No. 2.
3   Deposition Exhibit No. 2 is your Notice of
4   Deposition in this case. Have you seen that
5   before today?
6   A.    Yes.
7   Q.    And in response to Deposition Exhibit
8   No. 2, did you seek to collect documents that are
9   responsive to the document requests that are
10  attached to that notice?
11  A.    Yes.
12  Q.    And what did you bring to me today?
13  A.    The notebook is the report with the
14  reliance documents. So the -- I have an updated
15  CV. There's a few papers that have been updated.
16  Q.    Okay.
17  A.    That's an updated CV.
18  Q.    I'm going to mark your updated CV as
19  Deposition Exhibit No. 3.
20          (Marked Exhibit 3.)
21          THE WITNESS: I brought the fee
22  sheet. It's the same as the one in the report.
23  No change there.
24          MR. THOMAS: Okay. I will mark your
25  fee sheet as Deposition Exhibit No. 4.

Page 8

1           (Marked Exhibit 4.)
2   BY MR. THOMAS:
3   Q.    Do you have an hourly rate?
4   A.    No.
5   Q.    Okay. And how many hours is a half a day?
6   A.    I don't know. It's half a day. We decide
7   at the time that the activity was performed.
8   Q.    Last time I saw your fees, I think, I was
9   in the Perry case. You were charging $475 an
10  hour; is that right?
11  A.    I don't remember. That's in the range.
12  Q.    Okay. So Deposition Exhibit No. 4
13  represents your current fees, correct?
14  A.    Yes.
15  Q.    What happens if you only work for an hour?
16  A.    What do you mean only work for an hour?
17  Q.    Well, you --
18  A.    With respect to what --
19  Q.    Well --
20  A.    -- activity?
21  Q.    -- any -- for labor you charge $1,250 for
22  a half a day.
23          What happens if you only work for an hour?
24  A.    Let me look at the fee sheet again.
25  Q.    You have it right there.

Page 9

1   A.    So you're looking at -- you're looking at
2   the -- I'm not sure where you're looking,
3   actually. Was it research and analysis?
4   Q.    Under labor --
5   A.    Yeah.
6   Q.    -- research and analysis, you show half
7   day, full day, $1,250 for a half a day. Are
8   there --
9   A.    Right.
10  Q.     -- days when you only work an hour?
11  A.    I don't typically -- so the way I -- I do
12  the billing is I -- I charge a flat rate for a
13  report. And I charge the half day or the full day
14  for travel and testimony. That's the way the
15  billing is done.
16  Q.    Okay. So are you doing research and
17  analysis for which you bill your time?
18  A.    I don't remember billing time for research
19  and analysis. It's all been -- that I can
20  remember, it's -- I bill for a report or I bill
21  for the testimony or the travel. That's how my
22  billing has been done.
23  Q.    Okay.
24  A.    It's on the fee sheet, but I don't think
25  I've been using that. I've been billing by

3 (Pages 6 to 9)

Scott A. Guelcher, Ph.D.

Page 10

1    reports.
2    Q.    Okay.  And the last entry shows
3    deposition, trial preparation.  Is that a flat
4    rate that you charge to get ready for trial?
5    A.    That's correct.
6    Q.    And then if you're testifying at trial, I
7    see you have an entry here for $2,000 for a half a
8    day and $4,000 for a full day; is that correct?
9    A.    That's correct.
10   Q.    Okay.  What else did you bring?
11   A.    I brought an updated list of previous
12   testimony.
13        (Marked Exhibit 5.)
14   BY MR. THOMAS:
15   Q.    I've marked your updated list of previous
16   testimony as Deposition Exhibit No. 5.
17        Do you have any depositions currently
18   scheduled now -- between now and December?
19   A.    Not that I'm aware.  I don't think so.
20   Q.    Do you have any trials at which you're
21   supposed to appear between now and December?
22   A.    Possibly a Boston Scientific trial in
23   October in North Carolina.
24   Q.    Okay.  Do you know the name of that case?
25   A.    I can't remember.  It's a Boston

Page 11

1    Scientific.  It was part of the wave.  So it
2    was -- it was -- I believe it was part of the
3    Barba wave.
4    Q.    Are you --
5    A.    But I don't remember the case.
6    Q.    Are you planning to attend that trial as
7    you sit here today?
8    A.    That's my intent.
9    Q.    Okay.
10   A.    I think it's the week of the 5th.
11   Q.    Okay.  What else do you have with you
12   today?
13   A.    I have the invoice for the report that I
14   prepared for this case.
15        (Marked Exhibit 6.)
16   BY MR. THOMAS:
17   Q.    I'll mark the invoice for the report that
18   you prepared in this case as Exhibit No. 6.
19        Is that the total amount of time that
20   you've billed plaintiff's counsel for this matter
21   to date?
22   A.    For this -- for this matter, this is what
23   I've billed plaintiff's counsel.
24   Q.    Okay.  What else did you bring with you
25   today?

Page 12

1    A.    That's it.  Well, other than this
2    notebook, which is the report with many of the
3    footnotes.
4    Q.    Okay.
5    A.    Do you want to enter that in?
6    Q.    I always do.  You know that.  I'm going to
7    mark your notebook.
8    A.    I just would like to have it back so I can
9    use it.
10   Q.    Absolutely will.  I'm going to mark your
11   notebook as Deposition Exhibit No. 7.
12        (Marked Exhibit 7.)
13   BY MR. THOMAS:
14   Q.    And is it fair to describe this as your
15   report with all the references that you cite that
16   you need -- want to have to talk about?
17   A.    Not all of the references, but most of the
18   references are there.
19   Q.    Okay.
20        MR. THOMAS:  And, Counsel, I believe
21   you told me before that you have something you
22   need to give me?
23        MR. BOWMAN:  Yes, sir.  It's a thumb
24   drive.
25        MR. THOMAS:  Can you tell me what's

Page 13

1    on the thumb drive?
2        MR. BOWMAN:  Yes.  That is literature
3    and documents that are on his reliance list that
4    was already turned over with his report.  I also
5    have a separate file for testing that was
6    requested in the Notice of Deposition.  It's
7    actually very huge, so I'm going to have to send
8    it to you as a link if that's all right.
9        MR. THOMAS:  So there's additional
10   information; is that right?
11       MR. BOWMAN:  That's right.
12       MR. THOMAS:  Is that the testing that
13   he did on the -- intentionally oxidizing
14   polypropylene?
15       MR. BOWMAN:  So I'm going to let him
16   talk about that, but it's in response to the
17   deposition request 15.
18       MR. THOMAS:  Okay.  I'm going to mark
19   the thumb drive as Exhibit No. 8.
20       (Marked Exhibit 8.)
21       MR. BOWMAN:  For clarity's sake, the
22   thumb drive does not contain the testing.  The
23   testing will be on the link that I send.  Is that
24   all right?
25       MR. THOMAS:  That's fine.  Is there

4 (Pages 10 to 13)

Scott A. Guelcher, Ph.D.

Page 14

1    anything else that you can tell me that is not on
2    the thumb drive, other than the testing that was
3    the subject of the request?
4              MR. BOWMAN: I can. There were
5    objections made to producing all of his testimony
6    and reports from all pelvic mesh litigations. And
7    there was -- there were objections made to
8    producing all of his time as was reported in other
9    pelvic mesh litigations. I believe there were
10   also objections to things beyond the scope of the
11   litigation and as being not responsive per Federal
12   Rule 26.
13             MR. THOMAS: Okay.
14             MR. BOWMAN: And we can get into
15   those if you want. But as far as I know,
16   everything else is being produced.
17             MR. THOMAS: Well, as we discussed, I
18   believe you said the objections were filed last
19   night. I don't have -- we don't have here today,
20   and I don't want to spend time fussing about that
21   because we've -- I'd like to get out of here
22   early, and I'm sure you would too.
23             MR. BOWMAN: Frankly, I couldn't
24   argue with you if I wanted to, so...
25             MR. THOMAS: Well, there we have it.

Page 15

1              MR. BOWMAN: Yes. All right.
2    BY MR. THOMAS:
3    Q.    Doctor, you heard counsel's explanation of
4    the information that's contained on the thumb
5    drive. Did you prepare the thumb drive?
6    A.    I did not.
7    Q.    Okay. You heard him describe some testing
8    that's not on the thumb drive that's going to be
9    supplied to us by a link. What is that?
10   A.    That was the testing that Dr. Dunn did on
11   several meshes. And it was produced at Perry
12   deposition.
13   Q.    Is there anything new and different
14   produced in that testing that I'm going to get by
15   link today that hasn't been produced in the Perry
16   case?
17   A.    Not to my knowledge. I don't -- I believe
18   it's the same information.
19   Q.    Did you review that information before it
20   had been supplied to counsel to give to me?
21   A.    I did not. I -- it came directly from
22   Dr. Dunn.
23   Q.    Okay. Dr. Guelcher, you know I've had the
24   opportunity to take your deposition on a couple of
25   times, and I believe Burt Snell took your

Page 16

1    deposition in the Perry case.
2    A.    Yes.
3    Q.    Have you reviewed your testimony in the
4    Huskey case and the Perry case in preparation for
5    this deposition?
6    A.    Yes, I've reviewed some of that testimony.
7    Q.    Is there anything about your answers in
8    either the Huskey case or the Perry case that you
9    believe are -- to be incomplete or inaccurate?
10   A.    No. I believe my opinions have largely
11   stayed the same, and there's new information that
12   further supports the opinions, but they haven't
13   changed in the basic essence.
14   Q.    And the reason why I asked the question,
15   just to be fair and clear, is that you've already
16   been deposed at length on some very --
17   A.    I understand.
18   Q.    -- basic stuff in your reports, and I just
19   don't want to go over it again.
20   A.    I understand.
21   Q.    Is there any reason for me to ask you
22   about your prior testimony, either the Huskey case
23   or the Perry case, for you -- to give you a chance
24   to further explain your opinions?
25   A.    I don't believe so.

Page 17

1    Q.    Okay. Since your deposition in the Huskey
2    case, have you had any further training in polymer
3    science?
4    A.    What do you mean by training?
5    Q.    Anything that adds to your skill set to
6    you to evaluate these meshes.
7              MR. BOWMAN: Object.
8              THE WITNESS: It's been a year. I
9    have -- I've published several new papers. Do you
10   want me to -- I'm not sure what you're asking me.
11   BY MR. THOMAS:
12   Q.    Well --
13   A.    Do you want me to go through new papers,
14   new presentations? I'm not...
15   Q.    Papers and presentations, I don't need to
16   you go through them in detail, but is that what
17   you're referring to as being the additional work
18   that you've done since we were last together?
19   A.    Well, I'm hung up on the word "training."
20   Training to me means taking a class. I have
21   additional experience.
22   Q.    Okay. Have you had any additional
23   classes?
24   A.    Classes on?
25   Q.    Polymer science.

5 (Pages 14 to 17)

Scott A. Guelcher, Ph.D.

Page 18

1  A.  I mean, I teach classes. I don't
2  generally take them, so...
3  Q.  I understand. But the answer to the
4  question is no, correct?
5  A.  No.
6  Q.  Okay. But you have done additional
7  research?
8  A.  Yes.
9  Q.  And you have presented papers?
10  A.  Yes.
11  Q.  Is that the extent of the additional work
12  that you've done since we were together last in
13  Huskey?
14  A.  It's all research related.
15  Q.  Okay. And research related to this
16  litigation?
17  A.  How does research relate to the
18  litigation? You mean -- I'm not sure what you
19  mean.
20  Q.  Well, what I'm trying to understand is the
21  additional work or knowledge that you've gained --
22  A.  Right.
23  Q.  -- since the Huskey deposition, is that
24  information and knowledge that you've gained
25  through your research in this litigation?

Page 19

1  A.  Well, it's -- it's in my updated CV. My
2  report has some discussion of new references. So
3  I would say that there's new papers and new
4  presentations that are either on the CV or
5  discussed in the report that reflect my updated
6  knowledge and understanding of pelvic mesh over
7  the past year.
8  Q.  And the updated knowledge and
9  understanding that you have about pelvic mesh over
10  the last year has been gained through your work in
11  this litigation, fair?
12  A.  Not exclusively. Not -- not the
13  litigation. When I think in terms of litigation,
14  I'm thinking in terms of what's been billed to the
15  litigation. And what's been billed to the
16  litigation is reports, depositions, trial
17  testimony. That's what's been billed to
18  litigation. The other work is through my
19  professional appointment at Vanderbilt where I do
20  research. So -- so that's all Vanderbilt
21  research.
22  Q.  What Vanderbilt research have you done
23  since we were together last on the -- on pelvic
24  mesh issues?
25  A.  Well, I co-authored a paper with

Page 20

1  Dr. Iakovlev. I'm sorry. Could you repeat the --
2  you're -- you're referring back to Huskey trial?
3  Q.  The Huskey deposition.
4  A.  Huskey deposition.
5  Q.  That's right.
6  A.  Okay. So the new work that's been done is
7  the study with Dr. Dunn that was funded by his
8  company. Mr. Snell deposed me on this in the
9  Perry case. It was produced in Perry by Jeff
10  Kuntz. So Mr. Snell deposed me on it. But it was
11  part of research at Vanderbilt, paid for by
12  Dr. Dunn's company. Then there's the paper with
13  Dr. Iakovlev, and then there's the IUGA meeting
14  that I went to in June.
15  Q.  And where was the IUGA meeting?
16  A.  It was in France.
17  Q.  And who paid for you to attend the IUGA
18  meeting in France?
19  A.  I paid. It was not part of the
20  litigation.
21  Q.  Did you attend -- did any plaintiff's
22  counsel attend that meeting?
23  A.  For any mesh litigation?
24  Q.  Yes.
25  A.  Okay. There either were two attorneys...

Page 21

1  Q.  And who attended that meeting that you
2  knew --
3  A.  Margaret Thompson and Bri Olson (phonetic)
4  from Motley Rice.
5  Q.  And did you work with Ms. Thompson or
6  Ms. Olson while you were in France on the issues
7  presented by this litigation?
8  A.  So Ms. Thompson requested a workshop, a
9  mock trial workshop at the IUGA meeting. And I
10  participated in that mock trial workshop.
11  Q.  And what did you do at the mock trial
12  workshop at the IUGA meeting?
13  A.  I was an expert witness.
14  Q.  Were you compensated for your time?
15  A.  No.
16  Q.  Who else participated in the mock trial
17  workshop?
18  A.  Dr. Iakovlev, Dr. Carey, Dr. Ostergard.
19  That's all I remember.
20  Q.  And was this mock trial workshop put
21  together by Dr. Thompson?
22  A.  It was.
23  Q.  And what did you do to prepare for that
24  mock trial workshop?
25  A.  Well, Ms. Thompson prepared slides for my

6 (Pages 18 to 21)

Scott A. Guelcher, Ph.D.

Page 22

1    direct exam.  And she prepared handouts for the
2    attendees who -- the people who attended the
3    workshop were divided into two juries, and
4    Ms. Thompson gave them several documents.
5        Q.    And who conducted your direct examination?
6        A.    Ms. Thompson.
7        Q.    Were there any other lawyers other than
8    Margaret Thompson and Bri Olson who were present
9    at the IUGA meeting that you met with?
10       A.    I don't know everyone who was in the
11   audience.  I don't know.
12       Q.    And the people who attended the workshop
13   were doctors?
14       A.    There was a mix.  They were doctors,
15   Ph.D.s, maybe some trainees.  There was a mix of
16   people.  I didn't meet all of them.
17       Q.    Do you have a list of attendees?
18       A.    I don't.  The IUGA would have that, the
19   people who registered for the workshop.  Margaret
20   Thompson may have that.  I don't have it that I
21   know.  I don't believe I have that.
22       Q.    Do you still have a set of the slides that
23   you used at the mock trial?
24       A.    I was told by plaintiff's counsel that
25   there are objections pending on that.

Page 23

1        Q.    Okay.  But do you still have a set of
2    those slides?
3        A.    I believe so.  But I haven't looked at --
4    I'm not really sure.
5        Q.    Okay.  And have you -- those are slides
6    that you did not produce to me today?
7        A.    I did not produce them at all.  They're
8    someone else's property.  I mean, Ms. Thompson
9    prepared the slides for me.
10       Q.    Okay.  Have you seen the other slides
11   produced by the other witnesses, Dr. Iakovlev,
12   Dr. Carey, and Dr. Ostergard?
13       A.    I don't believe so.
14       Q.    Okay.
15       A.    I don't think I saw that.  I saw them
16   present their slides, but I don't have their
17   slides.  I have my slides.
18       Q.    Did you take any notes?
19       A.    No.
20       Q.    Did anyone subsidize your expenses for
21   your trip to France for the IUGA meeting?
22       A.    So what do you mean by subsidize my
23   expenses?
24       Q.    Did anybody help you pay for it?
25       A.    Reimburse?

Page 24

1        Q.    That's right.
2        A.    So I -- I paid for it out of my faculty
3    development fund at Vanderbilt as a discretionary
4    expense.
5        Q.    Did you receive any compensation from
6    plaintiff's counsel for your participation in the
7    workshop?
8        A.    No.
9        Q.    You know that all the people you've
10   identified have testified as witnesses for the
11   plaintiffs in the mesh litigation?
12       A.    I do.
13       Q.    Do you know whether there was any effort
14   to present expert witnesses from the defense
15   litigation?
16       A.    Ms. Thompson could speak to that.  I can
17   say that there were no defense witnesses.  I -- I
18   don't know if there was an attempt or not.  She
19   would know.  But there was a cross-exam, but there
20   were no defense witnesses, and I don't know why.
21       Q.    Did -- who conducted the cross-exam?
22       A.    Ms. Olson.
23       Q.    Was the presentation videotaped?
24       A.    I don't know.
25       Q.    Do you know whether the presentation was

Page 25

1    recorded by stenography?
2        A.    I don't know that either.
3        Q.    Is this IUGA meeting the same place where
4    you made a presentation to the group on --
5        A.    Are you referring to the PP29, the in
6    vitro oxidation study?  Yes.
7        Q.    That's right.
8        A.    It was that -- the workshop was on
9    Wednesday, and I think the talk was later.  I'm
10   not -- I don't remember the date.  It was after.
11       Q.    How long was the meeting?
12       A.    Four days.  I don't know.
13       Q.    How long were you in France?
14       A.    Ten or eleven days.
15       Q.    And other than -- did you attend the
16   meeting all four days?
17       A.    Not all day, but I went to the meeting
18   several days.  I don't remember exactly which
19   days.
20       Q.    What else did you do during your time in
21   France?
22       A.    So my wife came with me.  I paid for her
23   to come, and she came with me.
24       Q.    Good.
25             Other than your work with Margaret

7 (Pages 22 to 25)

Scott A. Guelcher, Ph.D.

Page 26

1  Thompson and Bri Olson and the workshop, did you
2  have any other work on the pelvic mesh litigation
3  while you were on your trip?
4      A.   What do you mean work?  On the litigation
5  or on --
6      Q.   Correct.  On the pelvic mesh.  Anything --
7  anything -- I'm sorry.
8      A.   I'm sorry.  Go ahead, yeah.  I --
9      Q.   I just want to --
10     A.   Yeah.
11     Q.   -- define my question.
12     A.   Yeah, that's what...
13     Q.   You obviously spent almost a week more --
14     A.   Mm-hmm.
15     Q.   -- in France while you were there.
16     A.   Mm-hmm.
17     Q.   And you either spent it vacationing with
18  your wife, which I hope you did, or you spent at
19  least part of it doing some other work with
20  plaintiff's counsel or meeting with other --
21     A.   I understand.
22     Q.   -- people over there to talk about the
23  issues about which you're testifying today.
24     A.   Okay.  Now I understand.  So I'll try to
25  be a little more specific.  We were there two

Page 27

1  weekends, so on the weekends we were doing other
2  things.  During the meeting, we -- we met for the
3  workshop, and then everybody went their separate
4  ways.  So there was -- I think I had some
5  conversations with Dr. Iakovlev about our
6  manuscript that was being reviewed.  I talked with
7  Dr. Carey about writing a research grant to the
8  NIH on mesh.  I -- there wasn't -- I don't
9  remember any discussion of the litigation.  It
10  was -- it was research.  What I would call
11  research, which I would call within the context of
12  my position at Vanderbilt, which is writing
13  research proposals, writing papers, and mentoring
14  students.
15     Q.   What's the topic of the research grant to
16  NIH that you discussed with Dr. Carey?
17     A.   Well, I haven't submitted it yet, so it's
18  all, you know, confidential, new ideas.  I don't
19  have any -- I haven't written anything yet.
20     Q.   Do you -- are you -- not that I'm going to
21  argue about it.
22     A.   Yeah.
23     Q.   Are you refusing to share your ideas with
24  me?
25     A.   I don't want to.  It's -- it's still

Page 28

1  confidential.  I mean, I haven't -- these grants
2  are all confidential when they're submitted, so I
3  don't think it's appropriate to -- to discuss my
4  ideas.  It's not part of my testimony.  It's not
5  in my report.  It's not -- I'm not talking about
6  my externally funded research in this report.  I'm
7  talking about, you know, the opinions that are in
8  here.  So that's not part of my report.
9      Q.   Do the -- strike that.
10          Are the ideas that you discussed with
11  Dr. Carey designed to answer questions that are
12  posed in this litigation?
13          MR. BOWMAN:  Object to form.
14          THE WITNESS:  That's very -- what do
15  you mean questions posed by this litigation?
16  Could you be more -- I'm not -- I'm not sure what
17  you're asking me.
18  BY MR. THOMAS:
19     Q.   I'm just trying -- there are various
20  medical and scientific issues that are debated by
21  Ethicon and the plaintiffs in this litigation, and
22  you're involved in some of those issues.
23          My question is whether the research that
24  you discussed with Dr. Carey is designed to
25  further your knowledge and understanding about the

Page 29

1  issues about which you're testifying today.
2      A.   I would say it's more forward looking.
3  It's about finding new solutions, not so much
4  about -- it's separate from this.
5      Q.   Does it concern an alternative to mesh?
6      A.   It could.
7      Q.   You're not -- you're not going to tell me?
8      A.   No.
9      Q.   Okay.
10     A.   I don't --
11     Q.   I'm not going to argue with you anymore.
12     A.   I mean, this is research that's protected.
13     Q.   Protected by what?
14     A.   By confidentiality.  When I submit a grant
15  to the NIH, the reviewers who review these
16  documents all have to keep it confidential.  And
17  it hasn't even been submitted yet.  So it needs to
18  be confidential.
19     Q.   Okay.
20          (Marked Exhibit 9.)
21  BY MR. THOMAS:
22     Q.   You mentioned a minute ago PP29.  Let me
23  hand you what I've marked as Deposition Exhibit
24  No. 9 and ask you if that's the reference that you
25  just discussed.

8 (Pages 26 to 29)

Scott A. Guelcher, Ph.D.

Page 30

1    A.    It is.
2    Q.    Tell me what Exhibit No. 9 is.
3    A.    So this is an abstract that was submitted
4    to the IUGA meeting.  It was accepted for an oral
5    presentation, and it was published in the
6    supplement in the International Urogynecology
7    Journal this year.
8    Q.    And did you write Exhibit No. 9?
9    A.    I co-authored it with Dr. Dunn.
10   Q.    Who was the primary author?
11   A.    Well, I was.
12   Q.    All right.  And what contribution did
13   Dr. Dunn make to the writing of Exhibit No. 9?
14   A.    I don't remember.
15   Q.    Okay.
16   A.    I don't remember.
17   Q.    And Exhibit No. 9 is a discussion of the
18   research that you and Dr. Dunn conducted that was
19   produced and discussed in the Perry litigation,
20   fair?
21   A.    Yeah, it was produced and it was
22   discussed.  But Dr. Dunn was not deposed on it.
23   It wasn't -- it was withdrawn from the Perry
24   litigation.
25   Q.    Okay.  And I believe you said that you

Page 31

1    presented this information orally at the meeting?
2    A.    That's right.
3    Q.    And you presented it to doctors and
4    Ph.D.s?
5    A.    I presume that's who was in the audience.
6    I don't know who was in the audience.
7    Q.    How long was your presentation?
8    A.    Oh, I don't know.  Something around ten
9    minutes.  I'm not sure.
10   Q.    Did you have a PowerPoint presentation
11   with your presentation?
12   A.    I did.  And those have been produced.  I
13   gave them to plaintiff's counsel.  It's on the
14   drive, I believe.
15   Q.    Okay.  Is that on the thumb drive that we
16   have today?
17   A.    I believe so.
18   Q.    Thank you.
19        Okay.  Was Dr. Dunn present for the
20   presentation?
21   A.    No.
22   Q.    And what was the message you were trying
23   to convey to your audience when you made the
24   presentation of the information in Exhibit No. 9?
25        MR. BOWMAN:  Object to form.

Page 32

1         THE WITNESS:  The message?  You mean
2    the conclusions?
3    BY MR. THOMAS:
4    Q.    Right.  What were you trying to convey to
5    your audience?
6    A.    That oxidative -- it's stated in the
7    conclusions.  Oxidative degradation of
8    polypropylene pelvic mesh was evidenced by
9    chemical and physical changes under simulated in
10   vivo conditions.  That was the conclusion from the
11   study.
12   Q.    Okay.  And did you discuss the actual
13   experiment that you and Dr. Dunn conducted with
14   the group?
15   A.    I did.  It's in the slides.
16   Q.    All right.
17   A.    I had a slide showing the methods.
18   Q.    What's your -- strike that.
19        Tell me what expertise you have in FTIR.
20   A.    In FTIR?
21   Q.    Yes.
22   A.    Well, I've published a number of papers
23   with FTIR data.  We -- we use it quite a bit for
24   characterizing the composition of polyurethanes.
25   Q.    Mm-hmm.

Page 33

1    A.    I've also published using FTIR to measure
2    the reaction rate of the injectable polypropylene
3    grafts that we make.  So we follow the isocyanate
4    peak over time, fit it to a kinetic model.
5    There's a paper I published in 2012 or '13, a few
6    years ago, where we used ATR-FTIR to monitor the
7    reaction rate.
8    Q.    Are you trained to perform FTIR analysis
9    of fibers, mesh fibers?
10        MR. BOWMAN:  Object to form.
11   BY MR. THOMAS:
12   Q.    Could you do it?
13   A.    I didn't actually do it myself.  Dr. Dunn
14   did it.
15   Q.    Are you trained, though, in the use of
16   FTIR equipment to conduct analyses of mesh fibers?
17   A.    I've done it before, not in the last year,
18   but as a postdoc I did it.
19   Q.    Tell me about your experience as a postdoc
20   in FTIR analysis.
21   A.    Well, it was very similar.  I mean, when I
22   was a postdoc, I did the analysis of -- to
23   polyurethanes using FTIR.  Now I'm a professor, so
24   I have trainees that work for me that do those
25   measurements, but I direct them.

9 (Pages 30 to 33)

Scott A. Guelcher, Ph.D.

Page 34

1    Q.    Okay.  But do you consider yourself
2    qualified to take a piece of polypropylene mesh
3    and conduct an FTIR analysis of it?
4    A.    Yes.  I've done things like that before.
5    Q.    What kind of FTIR machine was used to
6    analyze the mesh in Exhibit No. 9?
7    A.    I'm not sure.  Dr. Dunn has that
8    instrument in his lab, and I don't know what -- we
9    have a Bruker at Vanderbilt.  We've got -- I'm not
10   sure what's in his lab.  The one that I use in the
11   Nanoscience Institute I believe was a Bruker.
12   Q.    Okay.  But you don't know what machine
13   Dr. Dunn used to analyze --
14   A.    I don't know.
15   Q.    -- this mesh?
16   A.    No.
17   Q.    What experience do you have in conducting
18   XPS analysis?
19   A.    I've never done XPS analysis.  I -- my
20   students have done it under my direction, and
21   I've -- I believe I have some papers with XPS.
22   I'd have to look at my CV.
23   Q.    Is it fair to understand that you rely on
24   data generated by XPS as opposed to conducting
25   that kind of testing yourself?

Page 35

1    A.    I've done both.  I don't do it, but
2    they're my trainees.  They're people that I train,
3    that I pay.
4    Q.    I understand.  But I'm trying to find out
5    what experience you have, Doctor.
6    A.    I mean, I have experience interpreting and
7    working with XPS data.  I don't actually do the
8    measurements.
9    Q.    Okay.  That's fine.
10   A.    Okay.  Go ahead.  Sorry.
11   Q.    You have something else you want to say?
12   A.    No.  I'm -- I'm done.
13   Q.    Okay.  Do you have continuing experiments
14   with Dr. Dunn?
15   A.    Not right -- no, not now.
16   Q.    Do you have plans for additional work with
17   Dr. Dunn?
18   A.    I don't know.  I'm not sure yet.
19   Q.    Okay.  Since you spoke at the IUGA meeting
20   and this Exhibit 9 was published, have you
21   discussed with Dr. Dunn the contents of the test?
22   A.    Since the IUGA meeting?
23   Q.    Yes.
24   A.    I believe we talked about it some.  I
25   can't remember the details.  We probably have

Page 36

1    talked about it.  I just -- I don't know.
2    Q.    Do you still have the mesh that you tested
3    as a part of the experimental work in Exhibit
4    No. 9?
5    A.    Dr. Dunn, I believe, has that material.
6    Q.    Okay.
7    A.    It was done through -- he paid for it, so
8    he has the material.
9    Q.    Did you talk with Dr. Iakovlev about the
10   results of the testing that you conducted in
11   Exhibit 9?
12   A.    I believe we discussed it at the meeting,
13   but I can't remember anything definitive.  We
14   talked about, you know -- I don't -- I don't
15   remember.
16   Q.    You mentioned before that you published a
17   paper with Dr. Iakovlev?
18   A.    That's correct.
19   Q.    And Dr. Iakovlev looks at a different
20   methodology for analyzing the extent to which he
21   suggests polypropylene has degraded, correct?
22   A.    Dr. Iakovlev uses microscopy.
23        (Marked Exhibit 10.)
24   BY MR. THOMAS:
25   Q.    And staining?

Page 37

1    A.    I would -- I would -- yes.
2    Q.    Let me show you what's been marked as
3    Deposition Exhibit No. 10 and ask you if
4    Deposition Exhibit No. 10 is the study to which
5    you just referred that you co-authored with
6    Dr. Iakovlev.
7    A.    It is.  This is the version that's
8    published online on their website.
9    Q.    Contents of the article true and accurate
10   to the best of your judgment?
11   A.    Yes.
12   Q.    And you know that Dr. Iakovlev uses his
13   histological stains in an effort to understand the
14   extent to which polypropylene may have degraded?
15   A.    Yes.
16   Q.    Do you understand the chemistry by which
17   tissue is stained?
18        MR. BOWMAN:  Object to form.
19        THE WITNESS:  There's lots of
20   different stains.  I mean, is there -- is there
21   something more specific?  That's just a really
22   broad question.  There's lots of different stains.
23   Are you talking about fixation or staining or what
24   are you -- what are you talking about?
25

10 (Pages 34 to 37)

Scott A. Guelcher, Ph.D.

Page 38

BY MR. THOMAS:
1 Q.   I'm talking about how various stains stain
2 tissue.  Do you know how that works chemically?
3 A.   Some of them, the ones that I've worked
4 with.
5 Q.   Have you worked with H&E stain before?
6 Hematoxylin and eosin?
7 A.   Mm-hmm, yeah.
8 Q.   How does hematoxylin and eosin stain
9 tissue?
10 A.   I need to think for a minute.
11    MR. BOWMAN:  I'm going to object to
12 form.
13 BY MR. THOMAS:
14 Q.   Just for the record, you're reading
15 through --
16 A.   I'm looking at the paper.
17 Q.   -- Exhibit No. 10?
18 A.   Yeah, I'm looking at the paper.
19 Q.   I don't want to interrupt you --
20 A.   Yeah.
21 Q.   -- but may I ask you a question?
22 A.   Sure.
23 Q.   Are you able to tell me, without review of
24 Deposition Exhibit No. 10, how hematoxylin and

Page 39

1 eosin stain tissues chemically?
2 A.   I don't remember the details of it right
3 now.
4 Q.   Do you remember generally how it happens,
5 just a general concept?  Why hematoxylin stains
6 blue and eosin stains pink or red?
7 A.   I don't remember the reasons for the
8 different stains.  I know that the nuclei are
9 staining blue and the cytoplasm is staining
10 pink --
11 Q.   Is that the --
12 A.   -- or red.
13 Q.   Is that the result of a chemical reaction?
14 A.   I mean, I believe so.  It's -- I just
15 don't remember the details of that chemical
16 reaction.
17 Q.   Okay.  Do you understand that a chemical
18 reaction is required in order for a stain to be
19 left in tissue?
20 A.   That's my understanding.
21 Q.   Okay.  Do you know whether polypropylene
22 stains?
23 A.   I wouldn't expect polypropylene to stain.
24 Q.   Why is that?
25 A.   Well, it's a synthetic polymer, so it

Page 40

1 doesn't have the proteins and the...
2 Q.   Would you expect oxidized polypropylene to
3 stain?
4 A.   No, oxidized polypropylene I would not
5 expect to stain.
6 Q.   Okay.  Doctor, let's go back to Exhibit
7 No. 9, please.
8 A.   Okay.
9    Unless -- let me go back to my answer.  It
10 wouldn't -- I need to clarify a point.  It
11 wouldn't necessarily stain, but the dye could get
12 trapped in the pores of a porous material.
13 That's -- I need to add that just to be specific.
14 Q.   And when you say "the dye could get
15 trapped in the pores," what do you mean by that?
16 You're back referring to the paper again?
17 A.   Yeah.  I need to look at this again.  And
18 I should state for the record, my main
19 contribution to this paper was a myeloperoxidase
20 staining.
21    So the degraded oxidized polypropylene
22 layer is -- it's oxidized.  It's a -- it's a
23 porous material, and the -- and the dye can get
24 trapped in those pores, is the way I understand
25 it.

Page 41

1 Q.   Is that based upon your review of
2 Dr. Iakovlev's work?
3 A.   Yes.
4 Q.   Do you have any other basis for reaching
5 that conclusion, other than your review of
6 Dr. Iakovlev's work?
7 A.   That conclusion is based on my work
8 with -- yeah, with Dr. Iakovlev's staining that he
9 did in this paper.
10 Q.   Okay.  Now, when you and Dr. Dunn
11 performed your study where you intentionally
12 oxidized the TVT mesh --
13 A.   Yes.
14 Q.   -- did you ever attempt to see if those
15 samples would stain?
16 A.   No.
17 Q.   Why not?
18 A.   Because that wasn't the question we were
19 trying to answer.  We were -- we were answering
20 the question can the polypropylene in the mesh
21 oxidize, can it degrade.  And we assessed
22 oxidation by XPS and FTIR.  We assessed
23 degradation by SEM.
24 Q.   Did you ever have any conversations with
25 Dr. Iakovlev about testing, whether intentionally

11 (Pages 38 to 41)

Scott A. Guelcher, Ph.D.

Page 42

1  oxidized polypropylene would hold stain?
2  A.    I believe we may have discussed this at
3  one point for the paper. I can't remember the
4  details, though.
5  Q.    Did you ever have a discussion about using
6  your samples from your test that are contained in
7  Exhibit No. 9 to determine whether intentionally
8  oxidized polypropylene holds stain?
9  A.    I don't remember it specifically that way.
10 He was -- I believe he was -- I can't remember the
11 details, but I believe he was doing his own
12 oxidation experiment. And I don't think we were
13 going to give him samples. I can't remember,
14 though.
15 Q.    What did -- what do you remember about
16 Dr. Iakovlev's own experiment on oxidizing
17 polypropylene?
18 A.    All I remember is that he had some
19 samples, and I don't -- I don't -- to my -- I
20 don't know that he's tested them. I know that he
21 had samples, but I don't know that he ever tested
22 them.
23 Q.    Did you have discussions with Dr. Iakovlev
24 about the methodology that you used to conduct the
25 test that you and Dr. Dunn conducted there in

Page 43

1  Exhibit No. 9?
2  A.    I believe we -- we talked with him about
3  that. He was aware of the work. He was aware of
4  it, of the -- of the -- you're talking about the
5  abstract, right?
6  Q.    That's correct.
7  A.    He was aware of that work, yeah.
8  Q.    Did -- who started their experiments
9  first, do you know?
10 A.    Probably Dr. Iakovlev. He's been working
11 on this for some time.
12 Q.    I'm talking about the intentionally
13 oxidized polypropylene experiments now. Do you
14 know who did that first?
15 A.    I don't know. I --
16 Q.    Before you started your project --
17 A.    Yeah.
18 Q.    -- did you start -- did you talk with
19 Dr. Iakovlev about it?
20 A.    I don't -- I don't remember.
21 Q.    You've been working with Dr. Iakovlev in
22 different contexts for a couple years now,
23 correct?
24 A.    Yeah. But I got the idea to do the
25 oxidative degradation experiment from my work with

Page 44

1  the lysine-based polyurethane. So I published a
2  couple papers on that. That's where I -- that's
3  where I got the idea. Now, he may have gotten it
4  independently and started before me. I -- I don't
5  know that. I don't know when he started it. But
6  Dr. Dunn and I did this together independently.
7  And I have discussed aspects of it with
8  Dr. Iakovlev, but I don't -- I don't remember when
9  or what exactly.
10 Q.    Okay.
11 A.    Other than what I've told you.
12 Q.    Do you know why Dr. Iakovlev has not yet
13 tested the samples that he is testing now?
14     MR. BOWMAN: Object to form.
15     THE WITNESS: I don't know. I
16 don't -- I don't know what -- he may have tested
17 them. I just don't know the status of it.
18     (Marked Exhibit 11.)
19 BY MR. THOMAS:
20 Q.    Let me show you what's been marked as
21 Deposition Exhibit No. 11. Is Deposition Exhibit
22 No. 11 the source document that you used in order
23 to determine the methodology for the tests that
24 are in Exhibit 9?
25 A.    It's -- it's a source. There are other --

Page 45

1  like I said, I've published two papers on this,
2  which, I mean, I used similar methodology. I'll
3  have to look at the details of the medium. I
4  can't remember the...
5  Q.    Well, if you go to page --
6  A.    So where?
7  Q.    -- 520 of --
8  A.    Yeah.
9  Q.    -- Deposition Exhibit No. 11 --
10 A.    Okay.
11 Q.    -- it talks about the in vitro treatments
12 with 20 percent hydrogen peroxide solution, .1
13 cobalt chloride. Do you see that?
14 A.    Yes.
15 Q.    Is that the same methodology you used in
16 your --
17 A.    I'm sorry. Where did you read again?
18 I'm...
19     In vitro treatments, 20 percent peroxide
20 with -- I believe it was the same. Let me check
21 this abstract. It looks to be the same.
22 Q.    Okay.
23 A.    Yeah.
24 Q.    That's one of the references you cite in
25 your abstract?

12 (Pages 42 to 45)

Scott A. Guelcher, Ph.D.

Page 46

1   A.    It is, yeah.
2   Q.    Okay. That's where I concluded that that
3   was a source document that you used for your
4   methodology; is that fair?
5   A.    It's a source document. We're pretty
6   limited on how many references you can show in an
7   abstract. I -- I probably showed this because it
8   was the first time this specific medium
9   composition was published. That's probably -- but
10  I don't remember exactly. But this paper was
11  before mine, so that's probably why I cited it in
12  the abstract because it was published -- I got the
13  idea for my paper from this paper.
14  Q.    And, Doctor, are you aware of any paper
15  that analyzes the extent to which oxidized
16  polypropylene will absorb stain?
17  A.    I don't -- I don't think we're saying that
18  oxidized polypropylene absorbs stain. I think
19  it -- it gets trapped in the pores. I'm not
20  necessarily --
21  Q.    Okay. Let me ask you that question.
22  A.    -- saying it absorbs it.
23  Q.    Let me ask the question that way then.
24  A.    Okay.
25  Q.    Well, first of all, is there -- are you

Page 47

1   aware of any paper that discusses the absorption
2   of stain in oxidized polypropylene?
3   A.    You say "absorption." You mean like the
4   way it would typically work biologically, right?
5   Q.    Correct.
6   A.    No, I'm not aware of that.
7   Q.    Are you aware of any papers which discuss
8   the extent to which oxidized polypropylene traps
9   stain such that it retains the same and shows
10  color?
11  A.    Well, no, I believe that was the point of
12  this study, is to -- I don't believe that's been
13  published. I think that was a new finding in this
14  study.
15  Q.    That's Dr. Iakovlev's study?
16  A.    I'm sorry. Yeah, Dr. Iakovlev's --
17  Q.    Now, those are --
18  A.    -- study.
19  Q.    -- all -- those are all meshes that have
20  been explanted from people, correct?
21  A.    This Dr. Iakovlev study, yes, it's a
22  hundred and some patients, yeah.
23  Q.    And my question is -- I'm referring to
24  pristine mesh intentionally oxidized, whether --
25  question whether that intentionally oxidized

Page 48

1   pristine mesh will trap stains in the pores such
2   that it shows color?
3   A.    I don't know if that's been done.
4   Q.    Okay. And it's fair to understand that
5   appropriate scientific method would require a
6   study intentionally oxidizing polypropylene,
7   exposing it to stain, to determine whether it
8   does, in fact, get trapped in any cracks, pores,
9   or crevasses in order to show color, correct?
10  A.    I don't know that I would say that. I
11  mean, it's -- I don't know how easy it is to do.
12  You know, in these previous studies, they -- they
13  oxidize -- they oxidize -- okay. I'll be more
14  specific.
15        In the -- in Exhibit 11 -- and there's an
16  earlier -- maybe it wasn't this one. There was an
17  earlier paper in '93 where they strained the
18  samples and they -- they looked for transverse
19  cracks and degradation by SEM, but no one's
20  ever -- it might be difficult to do. I wouldn't
21  say that it's not scientifically valid because it
22  wasn't done. That would give further
23  confirmation. But this is a long paper. You just
24  don't -- can't -- you know, this was peer reviewed
25  and it was published, so I wouldn't say that it's

Page 49

1   not scientifically valid because it wasn't done in
2   vitro.
3   Q.    Okay. Until you test it, do you have any
4   scientific basis to conclude that intentionally
5   oxidized polypropylene would, in fact, hold stain
6   such that it shows color?
7         MR. BOWMAN: Object to form.
8         THE WITNESS: If it's -- if it's a
9   nanoporous structure, it has porosity, the stain
10  could defuse into those pores. And it's not
11  necessarily absorbing -- absorbing or reacting
12  like it would with tissue, but it -- it would get
13  trapped within those pores. But that was just one
14  outcome measure. There were others as well. And,
15  you know, typically with paper, you try to show it
16  multiple -- show the same idea multiple ways, and
17  we just didn't do that in vitro experiment in this
18  paper.
19  BY MR. THOMAS:
20  Q.    I understand.
21        Doctor, are you familiar with the process
22  whereby tissue is prepared into histological
23  slides?
24  A.    So, yes. So all the -- the bone work that
25  I do, I have a woman that does my histology in my

13 (Pages 46 to 49)

Scott A. Guelcher, Ph.D.

Page 50

1    lab. She's my lab manager. And we -- we just
2    have some bones that came in just this week. So
3    we do micro CT. We keep them in formalin for two
4    weeks to fix the tissue, then we have to dehydrate
5    it through a series of alcohols. We embed it in a
6    polymethyl methacrylate resin, then we grind it
7    down to -- cut it, grind it down to 80 microns, do
8    different types of stains, do histomorphometry to
9    measure the amount of bone graft that's left over.
10   So we do this pretty routinely.
11   Q.    Do you manually prepare your slides or do
12   you use a machine?
13   A.    What do you mean manually prepare them?
14   Machine? I'm sorry.
15   Q.    I'm sorry too. My fault.
16        In the preparation of histology slides,
17   the way I understand it, it's a very complex
18   series of -- of cleanings, washings with xylene,
19   alcohol, and water?
20   A.    It depends on what you're doing, right?
21   So for the -- I mean, most of the bone work that I
22   do is what we call plastic embedding, hard
23   sections. So we don't cut those on a microtome
24   like what Dr. Iakovlev did. We have a -- we cut
25   them on a band saw, and then we're -- and we glue

Page 51

1    them to a surface and we grind them. We grind
2    them to 80 microns and we -- and then we stain.
3    Q.    Are you familiar with the slide
4    preparation process used by Dr. Iakovlev in the
5    preparation of his slides used in his report,
6    Exhibit 10?
7    A.    I don't know the exact details of how he
8    did it, but typically with soft tissue, you can do
9    the paraffin embedding, which is using different
10   solvents like you described, where you -- you
11   still have to dehydrate the tissue. And you --
12   but you put it in a softer plastic like paraffin
13   so you can cut a thin section on a microtome and
14   see different levels of cellular detail.
15   Q.    And part of that slide preparation process
16   involves the washing away of excess stain, doesn't
17   it?
18   A.    I believe so. There's a protocol.
19   Q.    Do you know how that washing away of
20   excess stain would impact the ability of any
21   oxidized polypropylene to hold stain, as you've
22   postulated?
23        MR. BOWMAN: Object to form.
24        THE WITNESS: I don't know. Again,
25   this is Dr. Iakovlev's work, so he would be the

Page 52

1    one that could speak to those details of the
2    protocol. I didn't -- I don't have his protocol,
3    so I don't know exactly what he did.
4    BY MR. THOMAS:
5    Q.    Okay. Going back to Exhibit No. 9, which
6    is the presentation you made at the IUGA meeting,
7    I want to talk generally about the testing that
8    you conducted with Dr. Dunn.
9    A.    Okay.
10   Q.    Whose idea was it to conduct that testing?
11   A.    It was probably both of ours. I -- I knew
12   of this oxidative medium that was developed by
13   Dr. Jim Anderson in the 1990s. He did some -- so
14   I was aware of that in my own research. Like I
15   said, I've published a couple papers on it, so I
16   knew of the methods. And then I -- we talked with
17   Dr. Dunn about how to actually do the experiment.
18   Q.    Who's "we"? Who talked with Dr. Dunn?
19   A.    Well, I meant Dr. Dunn and me. I mean, we
20   talked --
21   Q.    Okay. Did you have a -- I'm sorry.
22   A.    Yeah, we -- we discussed it together.
23   Q.    Did you have any discussions with
24   plaintiff's counsel about conducting these kinds
25   of experiments?

Page 53

1         MR. BOWMAN: Object to form.
2         THE WITNESS: I don't remember.
3    Maybe. I just don't remember what we -- it's been
4    a while.
5         MR. THOMAS: Okay.
6         THE WITNESS: We did it on our own.
7    I mean, he paid for it. It was our idea. We did
8    it. It was not billed to the litigation.
9    BY MR. THOMAS:
10   Q.    I guess my question is, do you recall
11   having any conversations with plaintiff's counsel
12   about conducting this kind of experiment that's in
13   Exhibit No. 9?
14   A.    I just don't remember. I don't -- I
15   don't...
16   Q.    You talked before about a graduate student
17   in your office doing the protocol for the test?
18   A.    What do you mean by "before"?
19   Q.    At the Perry deposition.
20   A.    Yeah. Yeah.
21   Q.    And how was it that you happened to ask
22   your graduate student to prepare the protocol?
23   A.    Well, she was doing testing for some of
24   her materials on the -- I don't remember the
25   timing of everything, but she was -- she was

14 (Pages 50 to 53)

Scott A. Guelcher, Ph.D.

Page 54

1    doing -- she was using this medium to test her
2    materials as part of her dissertation, and so she
3    had access to the material, the medium. And so my
4    students, I typically ask them to write what we
5    call standard operating procedure, SOP. We -- we
6    write those documents for the common procedures
7    that we do in the lab, and then I review them and
8    approve them. So it was part of her research.
9    You know, she was doing research in this area, so
10   that's why she was involved, I think. I can't
11   remember the details.
12   Q.    Now, the protocol calls for testing after
13   six weeks?
14   A.    I don't remember.
15   Q.    Do you remember --
16   A.    I'd have to look at it. I can't remember
17   the timing.
18   Q.    We'll get to that in a minute.
19        Do you remember why you chose the period
20   that you did?
21   A.    You know, I think we probably wanted to --
22   we were expecting to see changes within about a
23   month, so we figured if we go out six weeks, we
24   would see it, I think.
25   Q.    What kind of changes were you expecting to

Page 55

1    see?
2    A.    Well, changes in the -- in the carbonyl
3    and hydroxyl peaks on the surface of the fibers,
4    the FTIR. And SEM, you know, looking for
5    degradation by SEM. So that's what we were
6    expecting to see.
7    Q.    And did you find changes in the carbonyl
8    and hydroxyl peaks for the mesh from the -- strike
9    that.
10        Did you find changes in the carbonyl and
11   hydroxyl peaks consistent with oxidative
12   degradation from the TVT mesh that you sampled?
13   A.    I believe so, but I'd have to look at the
14   data again. I mean, this wasn't in my report, so
15   I didn't really review any of this stuff.
16   Q.    Well, let's look at the -- let's look at
17   the conclusion of Exhibit No. 9.
18   A.    Yeah.
19   Q.    You say here in the conclusion that
20   "Oxidative degradation of polypropylene, PP,
21   mesh" --
22   A.    Yeah.
23   Q.    -- "was evidenced by chemical and physical
24   changes under simulated in vivo conditions"?
25   A.    Mm-hmm.

Page 56

1    Q.    Now, the simulated in vivo conditions is
2    placing pieces of mesh in this medium, correct?
3    A.    That's right.
4    Q.    What chemical changes did you find in the
5    polypropylene mesh that you tested?
6    A.    Well, that would be in the -- in the
7    figure that's shown here. I'm just trying to
8    refresh my memory. But I believe this figure, we
9    don't -- let me just make sure that I -- I say it
10   correctly. I don't believe this abstract says
11   exactly what these data in Figure 1 are for,
12   but -- so I don't know if it's TVT or a different
13   mesh. But at the zero weeks, we don't really see
14   hydroxyl or carbonyl peaks in the IR spectra, and
15   at five weeks we do.
16   Q.    So the first figure on the second page of
17   Exhibit 11 is at zero weeks?
18   A.    Yeah. So if you look on the SEM image, it
19   says "zero weeks" in the top left corner. That's
20   zero weeks. So there's really no appreciable
21   carbonyl or hydroxyl peaks in the IR spectra.
22   Q.    And so the second figure on the second
23   page of Exhibit 9, is that meant to be a
24   polypropylene mesh FTIR?
25   A.    It was not meant to be, it is. So --

Page 57

1    Q.    So that's an F -- that's a --
2    A.    That's an FTIR scan of -- of a
3    polypropylene mesh -- I don't know the
4    manufacturer -- that was incubated in the
5    oxidative medium for five weeks.
6    Q.    Okay. So the peaks that are shown in the
7    second page of Exhibit 9, on the left you circle,
8    and it says, "Hydroxyl (OH formation.)"
9        What does that show you?
10   A.    That -- well, that's a -- that's where the
11   hydroxyl peak appears in the IR spectra.
12   Q.    Okay. And that's evidence to you of
13   oxidative degradation?
14   A.    Yes.
15   Q.    And the second peak marked there is
16   carbonyl formation, an arrow and a circle. What
17   does that represent?
18   A.    Well, that's the formation of the carbonyl
19   peak in the IR spectra.
20   Q.    And what you're trying to show to the
21   reader of this abstract is that your FTIR data on
22   polypropylene pelvic mesh showed these peaks at
23   five weeks; is that correct?
24   A.    Yes.
25   Q.    And on the right is an image that shows

15 (Pages 54 to 57)

Scott A. Guelcher, Ph.D.

Page 58

1    five weeks. And is that the SEM imaging?
2    A.    It is.
3    Q.    And, again, you're trying to show the
4    readers that at five weeks that the polypropylene
5    mesh that you tested looked like this under SEM?
6    A.    That's right.
7    Q.    Okay.
8          MR. THOMAS: Let's go off the record.
9    I need to take a break, please.
10         (Brief recess observed.)
11   BY MR. THOMAS:
12   Q.    Doctor, going back to Exhibit No. 9, those
13   images at the end that we've just been talking
14   about --
15   A.    Yeah.
16   Q.    -- where you identified for me the FTIR,
17   the polypropylene mesh, what's your basis for your
18   understanding that the peak on the left is -- I
19   think you called it -- is that hydroxyl? Is that
20   the word you used?
21   A.    Hydroxyl peak.
22   Q.    And the peak on the right, I think we
23   called it a carbonyl peak; is that correct?
24   A.    Yes.
25   Q.    What references did you use in order to

Page 59

1    understand that?
2    A.    I -- I don't remember right now. The --
3    there are tables that list where these different
4    peaks occur in materials. I don't remember
5    exactly which reference we used. I mean, this
6    is...
7    Q.    I know very little about FTIR. What I do
8    know is that there are standards or tables that
9    you look at --
10   A.    Right.
11   Q.    -- in order to identify different kinds of
12   levels within the FTIR, correct?
13   A.    Right.
14   Q.    And do you recall as you sit here today
15   what you consulted in order to understand what
16   those peaks meant?
17   A.    The specific reference?
18   Q.    Yes.
19   A.    I don't remember the specific reference
20   that we used. I mean, Dr. Dunn I know has
21   references on these. I guess I've just been doing
22   it so long, I just know that that's where hydroxyl
23   shows up. And that's -- carbonyl's in the 16,
24   1700 inverse centimeters range, and this
25   hydroxyl's in this 34, 3500. It's a broader peak.

Page 60

1    I mean, I know there's references on this. I -- I
2    don't remember exactly which specific one. I
3    mean, they're probably cited in some of my papers.
4    Q.    Okay. And do you remember presenting
5    these slides as a part of your presentation?
6    A.    Well, it wasn't this -- I mean, you have
7    the slides, so it was -- it was similar. It was
8    FTIR data and SEM data. That's what I showed. I
9    didn't present the XPS. Just a FTIR and the SEM
10   is what I showed.
11   Q.    Okay. Let's go back to the first page of
12   Exhibit No. 9, down under "Results."
13   A.    Okay.
14   Q.    And midway through that paragraph it says,
15   "The dramatic increase in the size of the dash 0H
16   and C" -- I think that's called --
17   A.    That's the carbonyl.
18   Q.    "Double -- double bond O peaks from four
19   (not shown) to five weeks is indicative of
20   chemical induction."
21         And what you're referring to is the --
22   again, that image on the page 2 of Exhibit No. 9?
23   A.    Yeah. I'm going from memory because this
24   wasn't in my report, and I'm not relying on it in
25   this case. But, I mean, what -- what I remember

Page 61

1    is that the -- the -- the peaks up to about three
2    or four weeks were really negligible. And then it
3    just says here, four to five weeks, we saw a
4    substantial bump. And this is what's referred to
5    in Liebert's previous paper about induction, where
6    you have a substantial increase in the amount of
7    carbonyl and hydroxyl groups on the surface.
8    That's where -- the basis of that statement.
9    Q.    I don't want to go into great detail on
10   that --
11   A.    No, I know. Yeah.
12   Q.    -- because I don't want to replow this
13   ground.
14   A.    Yeah, I understand.
15   Q.    But chemical induction is -- is basically
16   the tipping point, isn't it?
17   A.    Tipping point? It becomes autocatalytic.
18   Is that what you mean?
19   Q.    Is that how you'd describe it?
20   A.    That's how I would -- I mean, it -- my
21   understanding is that you get so many hydroxyl and
22   carbonyl groups on the surface that they --
23   they -- they just -- they start catalyzing this
24   reaction and it becomes much faster, so you start
25   forming more at a faster rate. That's the idea of

16 (Pages 58 to 61)

Scott A. Guelcher, Ph.D.

Page 62

1    induction that's --
2    Q.    And at that point --
3    A.    -- taught by Liebert and others.
4         Sorry.
5    Q.    My fault.
6         And at that point, you would lead to the
7    embrittlement, cracking, and failure?
8    A.    Yes.  Once it becomes induced, then
9    degradation sets in.  Embrittlement, cracking,
10   those are all the things that are discussed in the
11   report.
12   Q.    And why did you stop at this point?  Why
13   didn't you continue testing?
14        MR. BOWMAN:  Object to form.
15        THE WITNESS:  I don't remember the
16   details, but we just didn't have that many
17   samples.  We were limited on samples.  We had an
18   examplar.  We didn't have a lot of material.  We
19   wanted to have replicates.  We expected to see
20   oxidation within a month, so we didn't want to
21   miss it, so we sampled weekly.  And we just didn't
22   have that much material.  That's what I remember,
23   but, again, I haven't reviewed these documents
24   because it's not part of my -- it's not part of my
25   report.

Page 63

1         (Marked Exhibit 12.)
2    BY MR. THOMAS:
3    Q.    Doctor, I'm going to hand you what I've
4    marked as Exhibit No. 12.  And Exhibit No. 12 is a
5    set of the documents that you produced to us in
6    the Perry case --
7    A.    Yeah.
8    Q.    -- and which I assume to be a complete set
9    of what is on that link that I've just received.
10        The only thing that's different about
11   these documents is that we've numbered them so
12   that they're available for easier reference.  What
13   you supplied to us was not numbered, and so we've
14   had them numbered sequentially from 1 up to 214.
15   And I want to ask you some questions about these
16   documents.
17   A.    I mean...
18        MR. BOWMAN:  How did you say they
19   were numbered?  You just put them in the same
20   number that they were given to you in the folders?
21        MR. THOMAS:  We received them
22   electronically, and then we just numbered them
23   sequentially as we received them.  See the lower
24   right-hand number?
25        MR. BOWMAN:  Mm-hmm.  You put a Bates

Page 64

1    on them?
2         MR. THOMAS:  Well, it's not a Bates.
3    It's just a number.  Whether that's a -- I guess
4    that qualifies as a Bates.  Just so I can call out
5    a page number and make a better record of what
6    he's looking at.
7         (Marked Exhibit 13.)
8         MR. THOMAS:  Fair enough?
9         MR. BOWMAN:  Yes.  But I need to
10   object as -- you know, this isn't part of his
11   report, and we do have a lot to get through,
12   but...
13        MR. THOMAS:  Oh, we'll have plenty of
14   time today.
15        MR. BOWMAN:  Yeah.
16        MR. THOMAS:  I'm not worried about
17   finishing today on time.  Matter of fact, I'm
18   hoping to catch an earlier flight.
19   BY MR. THOMAS:
20   Q.    Let's go to page 11, please.  Page 11,
21   does that show one of the vials with the mesh in
22   the oxidative medium?
23        MR. BOWMAN:  Object to form.
24        THE WITNESS:  That's what it appears
25   to be.

Page 65

1    BY MR. THOMAS:
2    Q.    Okay.  And take your time looking through
3    this as you want to.  I know you haven't seen it
4    in a while.  I -- the first several pages were
5    just a bunch of empty vials, and that's why I
6    didn't ask you any questions about those.  Those
7    are you photographing all of the vials that -- --
8    A.    I mean, this --
9    Q.    -- you used?
10   A.    -- is all Dr. Dunn's work, so I -- you
11   know, I -- I don't know exactly what he did here
12   because I didn't review it for this.  So, I mean,
13   these all look like vials that he used for the
14   experiment and took a picture of.
15   Q.    Okay.
16        MR. BOWMAN:  Yeah, and that's part of
17   my objection to the document, is that, you know,
18   he's already testified that he didn't take these
19   pictures, that this wasn't --
20        MR. THOMAS:  That's fine.
21        MR. BOWMAN:  -- actually produced.
22   I think it was produced in -- in --
23        MR. THOMAS:  In Perry.
24        MR. BOWMAN:  -- the Perry case.
25   But I don't know that he can

Scott A. Guelcher, Ph.D.

Page 66

1   authenticate a single document in here.  I don't
2   know any of that.
3        MR. THOMAS:  Well --
4        MR. BOWMAN:  And, honestly, I don't
5   know the paging numbers or the system that --
6        MR. THOMAS:  Well, I -- your
7   objection's preserved.  If he can answer the
8   questions, great.  If he can't --
9        MR. BOWMAN:  Great.
10       MR. THOMAS:  -- that's fine too.
11       MR. BOWMAN:  Thank you.
12  BY MR. THOMAS:
13  Q.    On page 13.
14  A.    Okay.
15  Q.    Page 13 is a container labeled "AT
16  oxidative media 9."  I think that's 16/14, almost
17  a year ago today.
18  A.    Okay.
19  Q.    Do you recognize that as being the media
20  that was used?
21  A.    I don't know.  I mean, I didn't do this.
22  So it's -- the medium has this kind of color.
23  Q.    Okay.
24  A.    Where this came -- I don't -- I can't
25  really say.  I don't know.

Page 67

1   Q.    On the left is "AT."  Do you know what the
2   AT is?  Is that the initials of the graduate
3   student?
4   A.    Those are her initials.
5   Q.    Do you know if that's why that notation is
6   there?
7   A.    I have no idea why it's there.
8   Q.    On the bottom of that bottle is a white
9   thing.  Do you know what the white thing is?
10  A.    Again, I don't know because I didn't
11  actually make this, but it appears to be -- it
12  might be a magnetic stir bar.  I don't know.
13  Q.    Okay.
14  A.    With a Teflon coating.  I don't -- that's
15  what you'd typically use.
16  Q.    On page 15, 15 shows a series of these
17  containers with what appears to be oxidative media
18  with pieces of TVT in them.  Is that what you
19  recollect to be part of the experiment?
20  A.    That's what it appears to be.
21  Q.    Okay.  And then you go to page 17.
22  Page 17 shows the bottles, and it has three --
23  one, two, three are empty.  Do you know why those
24  three are empty?
25  A.    Again, I did not take these pictures, make

Page 68

1   these vials.  I don't know.  I can't explain these
2   things.
3   Q.    All right.  Now, if you go to page 25,
4   page 25 shows what?
5   A.    So the -- the PP standard, I believe --
6   but, I mean, this is an incomplete document, so, I
7   mean, I don't have the whole thing.  But I -- it
8   may be what he was -- it looks like what he was
9   calling is the -- is the polypropylene standard
10  that didn't have stabilizer in it.
11  Q.    Okay.
12  A.    That's what I believe that is, but I don't
13  know.
14  Q.    And we get back there and we have all the
15  other documents, I think that confirms that, but
16  I --
17  A.    Okay.
18  Q.    I thought you -- I think that's exactly
19  right.
20  A.    All right.
21  Q.    And so the bottle on the left which has
22  the number 68 at the top is a container of the
23  unstabilized polypropylene?
24  A.    I believe that's what it is, but...
25  Q.    And the vials that are off to the right,

Page 69

1   the six of them, are the unstabilized
2   polypropylene in the oxidative medium; is that
3   correct?
4   A.    I believe so.  Again, I didn't do this,
5   so --
6   Q.    Okay.
7   A.    -- I'm speculating.
8   Q.    And if you go to page 40, do you see
9   page 40?  This is the first FTIR.  What do you
10  call this?  A spectra or spectrum?  What's the
11  right word to used?
12  A.    This would be an FTIR spectrum.
13  Q.    Okay.  The FTIR spectrum up in the upper
14  left-hand corner is identified as No. 10.  Do you
15  know what happened to weeks 1 through 9 -- excuse
16  me.
17       Do you know what happened to FTIRs
18  1 through 9?
19  A.    No.  Again, this is Dr. Dunn's data, so I
20  don't -- I don't -- I don't know.
21  Q.    We talked before about standards that
22  people use when they do FTIR where they compare
23  their spectra to a library standard or to an
24  industry standard to see how it matches with that
25  library standard.  Are you familiar with that

18 (Pages 66 to 69)

Scott A. Guelcher, Ph.D.

Page 70

1  process?
2  A.    Yeah, I'm familiar with that.
3  Q.    Do you know whether Dr. Dunn did that in
4  this case?
5  A.    I don't know.
6  Q.    Did you have discussions with Dr. Dunn
7  about that?
8  A.    I don't remember the discussions with
9  Dr. Dunn. I...
10  Q.    As you look at the upper-hand left, this
11  is the PP standard 1. So this is going to be the
12  unstabilized polypropylene, correct?
13  A.    I believe so.
14  Q.    All right. And as I look at the
15  spectra -- spectrum, it shows two peaks, one at
16  2800 to 3000 and one at about 1300 to 1500. What
17  does that tell you?
18  A.    Well, I mean, I believe those are peaks
19  associated with the structure of polypropylene.
20  But I don't -- I don't remember the actual bonds
21  they represent. I'd have to look at those. I
22  don't remember that.
23  Q.    There's a peak that appears right around
24  23 -- excuse me, 22 to 24. Do you know what that
25  represents?

Page 71

1  A.    I can't remember. I'd have to look at it.
2  Q.    And the reason why I ask is, if you go to
3  the next page, and you go to a standard
4  polypropylene sample, it doesn't have that peak.
5  Any explanation for why those peaks are different,
6  even though it's a standard that's tested at week
7  zero?
8  A.    I mean, I don't remember. I haven't
9  reviewed this. I don't -- I don't remember.
10  Q.    Well, as a person who conducts FTIR, do
11  you have an explanation for -- for why two samples
12  of the same material would have different FTIR at
13  the same time?
14  A.    I'd have to look at the details. I
15  don't -- I don't --
16  Q.    What other details would you have to use,
17  look at?
18  A.    I'd have to look at what other peaks show
19  up in that wavelength. I mean, I just -- I'd have
20  to review it. I don't have all those things
21  memorized. I mean, it's --
22  Q.    Okay.
23  A.    -- a lot of different...
24  Q.    Let's look at pages 42 and 43. 42 and 43
25  are FTIRs 12 and 13. And they are run 1 and run 2

Page 72

1  of a TVT sample at week zero, correct?
2  A.    That's what it says.
3  Q.    Okay. If you look at the difference
4  between pages 42 and 43, there's a -- a
5  significant peak at about 2300 in run 2 that is
6  not present in run 1. Do you know what that peak
7  is on -- in FTIR 13 for run 2? Do you know where
8  that is and what that indicates?
9  A.    I said before I have to look -- look up
10  what bonds are absorbing in that. I don't
11  remember the -- the bond that absorbs at that wave
12  number. I'd have to look at it.
13  Q.    Do you know why there's a differences
14  between what is the same sample run at different
15  times?
16  A.    No. I didn't run the samples, so I -- I
17  mean, this is somebody -- this is Dr. Dunn's --
18  Q.    Is the --
19  A.    -- data.
20  Q.    -- difference -- I'm sorry. Go ahead.
21  A.    I mean, it's his data. I don't -- I don't
22  know.
23  Q.    Is the difference in the peak that appears
24  in image 13 compared to image 12 evidence of
25  contamination of the sample?

Page 73

1  A.    I don't know. I don't -- I didn't do it.
2  Q.    Let's go to page 52. Page 52 is week --
3  week 1, TVT 5. That would be the sample number
4  for the TVT, correct?
5  A.    That's right.
6  Q.    Run No. 2. So a week into it, you see a
7  peak again at around 2350 that goes straight down.
8  What's going on there?
9  A.    You're focusing on the wrong peaks. I'll
10  just say that, but...
11  Q.    Well --
12  A.    So -- okay. I didn't do this work. It's
13  uncomfortable being deposed on something that
14  wasn't in my report, I wasn't really prepared to
15  review, and I just had a document thrust in front
16  of me with no references to check. But I know
17  there can -- we typically purge these things with
18  nitrogen, and there can be some carbon dioxide.
19  This -- this might be in that range because when
20  we do the urethane reactions, there's a big NCO
21  peak at 2200 inverse centimeters, and we watch the
22  size of that peak decrease. And we have to be
23  careful sometimes about -- it could be -- I think
24  it might be background CO2 that's shifting that up
25  and down. It looks like it's in that same range,

19 (Pages 70 to 73)

Scott A. Guelcher, Ph.D.

Page 74

1  but I'm speculating.  I have to check my
2  references.  But I know we sometimes have to make
3  corrections if it's not completely purged.
4      Q.    What do you do to make corrections?  How
5  do you do that?
6      A.    Well, when you integrate the peak areas,
7  which we didn't do in this study, but when
8  you're -- when you're tracking an NCO reaction and
9  the -- you're watching the NCO peak decrease --
10  I'm just going to pull out my paper because this
11  may take a little while.  Let me find my -- I
12  wonder if it's in here.  It may not be.  Let's
13  see.
14          On page 42 of my CV is where we studied
15  the reactivity of these injectable polyurethanes,
16  and we're still doing this work.  And if we want
17  to measure a reaction rate constant, you have to
18  measure the rate of disappearance of that peak,
19  and so we have to do baseline corrections.  It's
20  an established thing that's done.  You do a
21  baseline correction to correctly integrate the
22  area under those peaks.  And I think this is
23  like -- has something to do with the carbon
24  dioxide that may be in the -- in the environment
25  if it's not completely purged with nitrogen, but I

Page 75

1  can't remember the details.  But I have seen this
2  type of thing before where it can flip up or down
3  and -- but it doesn't have anything to do with a
4  carbonyl or a -- or a hydroxyl group.  It's --
5  but, again, I'd have to...
6      Q.    Okay.  On the right at about 1600 there's
7  another peak that wasn't there before.  What is
8  that?  And I'm referring now to FTIR 34 --
9      A.    Yeah.
10      Q.    -- on page 52 of Exhibit 12.
11      A.    I'd say it's about 1650.  And this is
12  consistent with some -- I'm just going to have to
13  go to some Ethicon documents here, so it's going
14  to take me a few minutes.  If you want to go
15  through these spectra like this, I need some time
16  to -- because I wasn't prepared for it.
17      Q.    Do you know what this peak is as you look
18  at it?
19      A.    It's -- I believe it's the carbonyl.  But
20  I'm going to give you some exact peak numbers that
21  were reported in Ethicon documents for -- for
22  carbonyls, aldehydes, ketones that can form on
23  polypropylene when it's being oxidized.
24      Q.    Okay.  You can do that if you like.  But
25  do you know as you sit here today whether the peak

Page 76

1  that appears on the right at around between 1500
2  and 1800 is a carbonyl peak?  Is that what your
3  testimony is?
4      A.    Wait a minute.  I need to look.  I need to
5  look for a minute.  This isn't a memory test.
6      Q.    It's at week 1.
7      A.    You know, I -- I really -- I'm
8  uncomfortable -- you're just, like, turning the
9  pages in this document.  If we're going to go
10  through this document, I need some time to sit
11  down and look at it because I feel like I'm being
12  ambushed here.  I'm trying to -- you're trying to
13  trap me or catch me in saying something.  I need
14  some time to review this because it's not on my
15  reliance list -- I mean it's not in my report.  I
16  didn't come here prepared to talk about this.  We
17  didn't produce this as evidence.  And this is the
18  first time I've seen this.  I need some time to go
19  through it and refresh myself with it because I
20  don't think it's fair to just have to go through
21  page by page, tell me what this peak is, tell me
22  what this peak is.  I need to have to be able to
23  review that.
24      Q.    Let me ask you this, Doctor.  I'll stop
25  doing that except for a couple, and we'll talk

Page 77

1  about them here in a second.
2      A.    Okay.
3      Q.    I won't put you through this.  But if you
4  look on the upper left-hand corner of these FTIR
5  spectra, you see identifying numbers, correct?
6      A.    What do you mean "identifying"?
7      Q.    PCT-168.  See that?
8      A.    Okay.
9      Q.    What does that mean?
10      A.    I don't know.  You'd have to ask Dr. Dunn.
11  That's a number that he --
12      Q.    Assigned to the test?
13      A.    I assume, but I don't -- I don't know.
14  You have to ask Dr. Dunn why that says PCT-168.  I
15  didn't write that.
16      Q.    Okay.  And as you look over, you see the
17  FTIR, and that's the number of the image, correct?
18      A.    I don't know.  It says 0034.  I don't know
19  what that number is.
20      Q.    Well, then it says -- after 0034, it says
21  what week the test was run, correct?
22      A.    It says week 1, so I'm assuming that was
23  the week 1 sample.
24      Q.    And TVT 5 would be the TVT 5 sample
25  number, correct?

20  (Pages 74 to 77)

Scott A. Guelcher, Ph.D.

Page 78

1    A.    I don't know.
2    Q.    That's the bottle which we looked at a
3    minute ago with the number on it?
4    A.    It could be, but I don't know.  This is --
5    Q.    Do you have any other explanation for it?
6    A.    I said I don't know.
7          MR. BOWMAN:  Object to form.
8          THE WITNESS:  I don't know.
9    BY MR. THOMAS:
10    Q.    And run No. 2 means it's the second run on
11    that sample, correct?
12    A.    I don't know.  I don't know what any of
13    this means.  I didn't write it.
14          MR. BOWMAN:  Just for the sake of
15    trying to clear something up, I can -- I can
16    stipulate that PCT-168 is how Dr. Dunn recognized
17    his work done in the Ethicon litigation.
18          MR. THOMAS:  Thank you.
19          MR. BOWMAN:  Okay.
20    BY MR. THOMAS:
21    Q.    Let me go to page 78, please.
22    A.    I thought we were done with this.
23    Q.    I said I needed to ask you a couple of
24    questions.
25    A.    Well, then I need to review this stuff.

Page 79

1    Q.    Just -- I'm just -- this is the image that
2    appears in your report, in your publication.  Are
3    you not going to answer the questions about it?
4    A.    Is this for Exhibit 9?
5    Q.    Yes.
6    A.    I mean, I need time to review it.  I mean,
7    I didn't really look at this because it wasn't
8    even part of the report.  I mean, it's -- I don't
9    understand the purpose of this.  I mean...
10    Q.    Doctor, if you're not going to answer the
11    question, you tell me, and we'll be fine with it.
12    If you tell me no, then it's no, and I can move
13    on.
14    A.    I can't -- I need time to look at it.  I'm
15    not going to answer yes or no without time.  You
16    put these two things in front of me that I haven't
17    really looked at for months and ask me -- I don't
18    know.  I need -- I need time to look at it and
19    think.  I can't just...
20    Q.    Can you look at the image on page 78,
21    which is FTIR 78, week 5, TVT 28, run 1, and tell
22    me if that's the same image that appears in
23    Exhibit No. 9?
24    A.    I can't tell that it is or it isn't.  I'd
25    have to confirm with Dr. Dunn where that image --

Page 80

1    which one of these spectra it is.  But I'm not
2    just going to look at a picture in this book you
3    just gave me and a small picture from an abstract
4    and say.  I don't know.  I need to review that.
5    Q.    Doctor, I'm not going to argue with you.
6    I hear what you're saying, and I'll stop asking
7    questions.  But for the record --
8    A.    Well, you said that five minutes ago.
9    Q.    Excuse me.  Excuse me.  For the record,
10    these are documents that you produced to us both
11    in the Perry case and today by a link, and so I --
12    I -- I was hoping that we could answer questions
13    about them and -- we'll just have to come back
14    later.
15    A.    That was the Perry case.  This is a
16    different case.  These documents weren't...
17    Q.    They weren't available in the Perry case
18    because you gave them on a thumb drive and we
19    didn't have them to put -- --
20    A.    They were --
21    Q.    -- in front of you.  They were on a thumb
22    drive.
23    A.    They were on a thumb drive -- I don't want
24    to get angry, but he spent two hours going through
25    this with me, and I told him the same thing.  If

Page 81

1    you want to know about these documents, you have
2    to depose Dr. Dunn because I didn't do these
3    measurements, I didn't write these spectra.  I
4    didn't do it.  I got data from Dr. Dunn for -- for
5    this abstract, but I don't know what the source
6    data is.  He's the one that knows all of that.  I
7    said that in Perry.  Nobody wanted to depose
8    Dr. Dunn.  So I don't understand why we're doing
9    this again.  It's a rerun.
10    Q.    Okay.  Let's go to page 188, please.
11    Pages 187 and 188 of Exhibit No. 12 are a report
12    dated November the 6th, 2014, from Professor
13    Bridget Rogers to -- to Russell Dunn.  You've seen
14    that before, correct?
15    A.    Yes.
16    Q.    Are you able to answer questions about the
17    findings on page 188 of Exhibit No. 12?  The XPS
18    findings?
19    A.    No.  I didn't review it.  I need -- if
20    we're going to talk about that, I need a break to
21    review these.  I will answer them if I have time
22    to review them, but I'm not going to answer them
23    right now.  I need time to review it.  This was
24    not -- I'm not relying on this for this case.  It
25    was produced in Perry.  It wasn't brought up in

Scott A. Guelcher, Ph.D.

Page 82

1  trial.  No deposition of Dr. Dunn was taken.  So I
2  don't understand why I'm being asked these
3  questions again.  It doesn't seem reasonable to
4  me.  And if you want to ask me about it, I need
5  time to look through this book, look through my
6  notebook.  I can write down -- write down all the
7  peak numbers and -- and give you a story, but it's
8  going to take me a couple of hours to do that.
9  And I don't -- I don't know that you want to do
10  that today.
11       Q.    Well, I don't want to waste my time or
12  your time.
13       A.    I live here.  I'm here all day til 5:30,
14  so we can do it if you want to.  But I don't want
15  you to be trying to give the impression that I
16  don't know how to read FTIR spectra just by
17  putting a book in front of me that I haven't seen.
18       Q.    Please don't read anything into my
19  questions.  I'm just asking --
20       A.    Well, that's the way it comes across.  I'm
21  sorry, but --
22       Q.    Well, that's not my intention.
23       Let me ask you this question.  Are you
24  able, without spending a couple hours going
25  through this information as you've just described,

Page 83

1  to tell me what it is about the data in Exhibit
2  No. 12 that you believe shows that
3  polypropylene -- excuse me, that Ethicon TVT mesh
4  underwent oxidative degradation that's indicative
5  of chemical induction?  Are you able to do that
6  without spending the time looking at the report?
7       MR. BOWMAN:  Object to form.
8       THE WITNESS:  I'm not willing to do
9  that without reviewing these documents because I
10  did not rely upon them for my opinions.
11  BY MR. THOMAS:
12       Q.    Okay.  It's not my intention to aggravate
13  you or frustrate you.  It is my intention to get
14  the best answers I can based on the information I
15  do -- I'm not going to argue with you.
16       A.    I don't want to argue either, but I -- I'm
17  just not prepared.  I didn't rely on them.
18  They're not in my report.  If you want to ask me
19  questions about it, I need time to review it.  I
20  think that's reasonable.
21       Q.    Okay.  Doctor, I'm going to hand you now
22  what's been marked as Deposition Exhibit No. 13.
23  Deposition Exhibit No. 13 is a study titled
24  "Materials Characterization and Histological
25  Analysis of Explanted Polypropylene, PTFE, and PET

Page 84

1  Hernia Meshes from an Individual Patient."
2       Have you seen that before?
3       A.    Yes.
4       Q.    If you go to page 1117 of Exhibit No. 13,
5  are you familiar with this in Figure 3, the
6  ATR-FTIR scan?
7       A.    Yes.
8       Q.    And do you see there the indication
9  that -- the carbonyl peak at 1740?
10       A.    Yes.
11       Q.    And you understand that Wood concludes in
12  this article that the carbonyl peak at 1740 is
13  indicative of polypropylene oxidation and
14  degradation?
15       A.    That's his conclusion, I believe.
16       Q.    Do you agree with that?
17       A.    Yes.
18       Q.    Is -- is that the best evidence that you
19  know of of oxidative degradation and a carbonyl
20  peak at 1740?
21       MR. BOWMAN:  Object to form.
22       THE WITNESS:  No.  As I was saying
23  earlier, these peaks can shift.  I mean, and
24  Dr. Burkley has some notes where he talks about
25  ketoesters, sugar-like species, acrylic species

Page 85

1  that have absorptions in the 16 to 1700 inverse
2  centimeters.  So -- so the peaks can shift.
3  It's -- it's...
4  BY MR. THOMAS:
5       Q.    Do you --
6       A.    It's the nature of the work.
7       Q.    Okay.  Do you know whether Dr. Burkley is
8  correct?  Do you have any independent knowledge of
9  these peaks to know whether Dr. Burkley is correct
10  in those documents?
11       MR. BOWMAN:  Object to form.
12       THE WITNESS:  Others cite these
13  ranges as well.  You can see these carbonyl
14  species in the 1600s, you can see them in the 17.
15  Urethane carbonyl we see in my materials at 1720,
16  1730 inverse centimeters.  But they -- they can --
17  they can shift depending on -- it's just -- that's
18  just the nature.  It's a complex reaction, and
19  there's lots of species that are formed.
20  BY MR. THOMAS:
21       Q.    So of what benefit to you is FTIR if these
22  numbers can shift?
23       A.    Well, you're not going to see -- I mean,
24  if you -- the standard poly -- the pure
25  polypropylene that's not been oxidized is not

22 (Pages 82 to 85)

Scott A. Guelcher, Ph.D.

Page 86

1    going to show those peaks at those wave numbers.
2    It's going to be, you know, the -- the ones that
3    we saw in that book you were showing me, more
4    1500.  You're not going to see this broad peak at
5    3400 and you're not going to see this carbonyl
6    peak because if it doesn't have any oxygen, you're
7    just not going to see anything there.  When you
8    start seeing peaks show up in that region, that
9    tells you that there's oxidation.
10   Q.    What's the peak for DLTDP?
11   A.    I don't remember.  I'd have to look at --
12   Dr. Burkley had some comments on that.  It may
13   have been in that 1740 region.  I'd have to look.
14   Q.    That's fine.
15   A.    Well, okay.  I found the document,
16   actually.  So Mr. Burkley says that there is a
17   1740 inverse centimeter band due to the -- the
18   DLTDP antioxidant.
19   Q.    Okay.
20   A.    In the --
21   Q.    I'm sorry.
22   A.    In the eight-year sample spectra, he
23   didn't see it in the scrapings because, obviously,
24   it had been degraded by oxidation.  But then he
25   says the 1718 -- and I see this in my own work,

Page 87

1    this 1718 inverse centimeters is a carbonyl band
2    most likely associated with esters like my
3    materials can be associated with acids.  The 1638
4    and the 1618, these are beta ketone esters, acids,
5    acrylics.  It's just -- there's -- there's a
6    number of oxidized species that can absorb in that
7    range.  That's -- that's what I'm saying.
8    Q.    Okay.  The Wood article is the only source
9    that I found in the information that you provided
10   to me that is suggestive of where one would expect
11   to find a carbonyl peak for oxidative degradation.
12   Are you aware of any other studies?
13   A.    Well, there's the Ethicon studies, the
14   Ethicon -- --
15   Q.    I'm not talking --
16   A.    -- documents.
17   Q.    -- about Ethicon papers now.  I'm talking
18   about peer reviewed publications on which you
19   rely.
20         MR. BOWMAN:  Object to form.
21         THE WITNESS:  There's Clavé.  Clavé
22   did FTIR.
23   BY MR. THOMAS:
24   Q.    Okay.
25   A.    I need to look and see where he was seeing

Page 88

1    peaks.
2    Q.    You remember Clavé couldn't confirm
3    degradation by FTIR?  Do you remember that?
4    A.    Well, that's what he said, but I believe
5    it's --
6    Q.    Do you think he's wrong?
7    A.    I'm not saying that he's wrong.  I'm
8    saying that he -- he wrote that.  That's what he
9    wrote in his paper, but I -- I believe that that's
10   absorbing in the -- in the -- I need to find the
11   number.  That's absorbing in that same range.  Let
12   me just find the number.
13   Q.    Let's go -- I'll mark that as -- where are
14   we?  13?
15   A.    But I -- just for the record, I have
16   testified about all this before, these papers.  I
17   have.
18   Q.    You brought it up.  You said Clavé made
19   some finding about oxidative degradation by FTIR.
20   And if you look at page 267 of the study, it says,
21   "Direct oxidation of the polypropylene, the FTIR
22   analysis neither confirmed nor excluded oxidation
23   of polypropylene in the in vivo environment."
24         Correct?
25   A.    That's what he wrote.

Page 89

1    Q.    Okay.
2    A.    But, again, I mean, I -- I've been asked
3    questions about these papers many times.
4    Q.    Okay.  I'm not going to -- and I didn't
5    intend to ask you about it until you brought it
6    up.
7    A.    Well, you brought it up.  You were asking
8    about FTIR.
9    Q.    Okay.  When you and Dr. Dunn did your
10   testing that we talked about in Exhibit No. 12,
11   did you discuss conducting any molecular weight
12   tests?
13   A.    We did, and there -- there just wasn't
14   enough sample.
15   Q.    Okay.  Did you discuss doing any other
16   analytical chemistry tests on the samples?
17   A.    I don't remember.  The FTIR, the XPS, and
18   the SEM seem to be the -- the best we could do
19   with the materials that we had.
20   Q.    Okay.  Did you and Dr. Jordi -- excuse me.
21         Did you and Dr. Dunn ever discuss doing
22   analytical chemistry testing on actual Ethicon
23   mesh explants?
24   A.    I think that we -- I -- I don't know if we
25   actually did for Ethicon.  I can't remember.

23 (Pages 86 to 89)

Scott A. Guelcher, Ph.D.

Page 90

1    Q.     You did for other manufacturers.  We
2    talked about them before.  I'm not going to plow
3    that ground again.
4    A.     We did do for -- there was another report
5    where we did that, but I don't -- I can't remember
6    specifically if we had a discussion about doing
7    that for an explant for an Ethicon case.  I can't
8    remember.
9    Q.     Do you know Howard Jordi?
10   A.     Yes.
11   Q.     Have you met Dr. Jordi?
12   A.     I've not met him.  I know who he is.
13   Q.     Have you read his reports?
14   A.     It's been a while.
15   Q.     Have you read his expert witnesses reports
16   that he submitted against Ethicon?
17   A.     I believe so, but not recently.
18   Q.     Okay.  And you're aware of the molecular
19   weight testing that he conducted on the Ethicon
20   meshes?
21   A.     I don't remember his molecular weight
22   testing.
23   Q.     What -- what testing do you remember that
24   he conducted?
25   A.     I thought he did some pathology similar to

Page 91

1    what Dr. Iakovlev did, but I don't -- I don't
2    remember the details of what -- I know he talked
3    about oxidation, but I just can't remember the
4    details of what he did.
5    Q.     Do you know he's an expert witness in this
6    case?
7    A.     I didn't know that, but...
8    Q.     Did you know he submitted a report in this
9    case?
10   A.     If he had, I don't remember looking at it.
11   Q.     Do you know the extent to which findings
12   that he makes in the work that he's done on
13   Ethicon mesh are consistent or inconsistent with
14   your work?
15        MR. BOWMAN:  Object to form.
16        THE WITNESS:  I don't know.
17   BY MR. THOMAS:
18   Q.     Do you know the extent to which the
19   findings that he made in his work in this
20   litigation are consistent or inconsistent with the
21   work of Dr. Iakovlev?
22        MR. BOWMAN:  Object to form.
23        THE WITNESS:  I don't know that
24   either.
25

Page 92

1    BY MR. THOMAS:
2    Q.     Let's go back to Exhibit No. 9, please.
3    Dr. Guelcher, in Exhibit No. 9 we talked a minute
4    ago about the oxidative media in which you placed
5    these TVT meshes for a period of up to six weeks.
6    A.     Mm-hmm.
7    Q.     What would happen if this oxidative media
8    in that form was placed in the body?
9         MR. BOWMAN:  Object to form.
10        THE WITNESS:  What do you mean if it
11   were placed in the body?
12   BY MR. THOMAS:
13   Q.     If -- if you cut somebody open in the
14   pelvic floor and placed this oxidative media in
15   the pelvic floor, what would it do to tissue in
16   the body?
17        MR. BOWMAN:  Object to form.
18        THE WITNESS:  Why would you do that?
19   This -- that's not what it's intended to do.  It's
20   intended to simulate the privileged
21   microenvironment between the adherent macrophage
22   and the biomaterial surface.  So it doesn't -- you
23   would never -- it's a -- it's a -- to just pour it
24   in the pelvic floor, I don't -- I don't get it.
25

Page 93

1    BY MR. THOMAS:
2    Q.     Well, whether you get it or not, do you
3    have a -- do you have any idea about what would
4    happen if you introduced this oxidative solution
5    into the tissue in the pelvic floor?
6         MR. BOWMAN:  Object to form.
7         THE WITNESS:  It would oxidize
8    tissue.
9    BY MR. THOMAS:
10   Q.     It would kill tissue?
11   A.     That's what -- I mean...
12   Q.     Yes?
13   A.     I mean, it would react.  I don't
14   know what -- I don't want to use the word kill
15   tissue, but it -- there would be a reaction with
16   the tissue.
17   Q.     And what kind of reaction would take
18   place?
19   A.     An oxidative reaction.
20   Q.     And what would that do to the tissue?
21   A.     I don't know.  I've never done it.  I
22   don't -- I don't know why anybody would do that.
23   That's not what this medium is intended to do.
24   Q.     Well, it is trying to replicate the in
25   vivo conditions, correct?

24 (Pages 90 to 93)

Scott A. Guelcher, Ph.D.

Page 94

1    A.    No, that's not what I said.  I said it's
2    replicating the privileged microenvironment
3    between an adherent macrophage and a surface that
4    it's attached to.  That's what's in my report.
5    Q.    So just so I'm clear, this oxidative...
6    A.    Well, that's what it says here:
7    "Simulates the microenvironment between an
8    adherent macrophage and the biomaterial surface."
9    Q.    So --
10   A.    So it's contained at a very specific
11   location.  It's not just dumped all over the body.
12   Q.    Okay.  So it does not replicate what
13   happens when mesh is placed in the body; is that
14   fair?
15   A.    No, that's not fair at all.
16         MR. BOWMAN:  Object to form.
17         THE WITNESS:  I've already answered
18   the question.  It replicates -- when mesh is
19   placed in the body, the surface is populated by
20   adherent macrophages, and there's a privileged
21   microenvironment between that macrophage and that
22   polymer surface, and that area is exposed to a --
23   a medium like this.  That's what this is -- this
24   is what Dr. Anderson showed in the '90s, is that
25   he could reproduce in vivo oxidation by using

Page 95

1    accelerated in vitro test in this medium.  I don't
2    know how else to say it.
3    BY MR. THOMAS:
4    Q.    Okay.  But you agree it's a bad idea to
5    introduce this oxidative media into the body just
6    by itself?
7          MR. BOWMAN:  Object to form.
8          THE WITNESS:  There's no reason to do
9    it.
10         MR. THOMAS:  Okay.
11         THE WITNESS:  That's not the purpose
12   of the test.
13   BY MR. THOMAS:
14   Q.    Doctor, do you know what protein
15   adsorption is?
16   A.    Yes.
17   Q.    What is protein adsorption?
18   A.    Well, proteins adsorb to a surface.
19         MR. THOMAS:  That's A-D, adsorb, as
20   opposed to absorb.
21         THE WITNESS:  Proteins adsorb to a
22   surface.  If you implant a biomaterial, there's
23   proteins that adsorb to the surface.
24   BY MR. THOMAS:
25   Q.    And those proteins adsorb to the

Page 96

1    biomaterial surface before the macrophages get
2    there, don't they?
3          MR. BOWMAN:  Object to form.
4          THE WITNESS:  Well, they -- they
5    mediate cell attachments, so the proteins adsorb
6    first and then the cells can attach.
7    BY MR. THOMAS:
8    Q.    Okay.  And is the adsorption a chemical
9    reaction?
10   A.    Well, adsorption can be physical or
11   chemical.  It can be a -- physisorption would be a
12   weak bonding, like van der Waals forces, ionic
13   interactions.  That could be a reversible, we
14   call, physisorption.  Chemisorption is when it
15   adsorbs and there's a chemical reaction.  So it
16   could be either one.
17   Q.    Have you studied the extent to which
18   proteins adsorb onto TVT PROLENE mesh upon
19   implantation in the body?
20   A.    Have I studied that?  What do you mean by
21   that?
22   Q.    Just that.  Have you looked at that issue?
23   A.    Have I looked at it?
24   Q.    Yes.
25   A.    Well, I mean, there are -- it's a

Page 97

1    well-known fact that protein adsorbs to many
2    polymers.
3    Q.    And you would expect --
4    A.    So it's in the Ethicon documents.  It's in
5    the papers.  I've published papers with protein
6    adsorption data.  It's -- it's a well-known
7    phenomenon.
8    Q.    And you would expect upon implantation for
9    proteins to adsorb and bind to the PROLENE
10   polypropylene, correct?
11   A.    Yeah.  They would adsorb to the surface.
12   Q.    And create a bond with the surface that
13   varies in strength depending on the circumstances
14   of the adsorption, correct?
15   A.    That's reasonable.
16   Q.    And that that bond will keep those
17   proteins on the polypropylene until they're
18   removed?
19         MR. BOWMAN:  Object to form.
20         THE WITNESS:  I mean, it's reverse --
21   if it's reversible adsorption, there's an
22   equilibrium.  So the amount of protein in
23   concentration in the liquid is going to have an
24   effect on the amount of protein that's adsorbed on
25   the surface if it's a physisorption.  And, you

25 (Pages 94 to 97)

Scott A. Guelcher, Ph.D.

Page 98

1    know, they would -- when you remove the tissue,
2    you're most likely removing these proteins, and
3    this is -- this is what Dr. Iakovlev was doing,
4    removing the tissue.
5    BY MR. THOMAS:
6        Q.   Dr. Iakovlev --
7        A.   I don't know what you're asking.
8        Q.   Dr. Iakovlev doesn't remove any tissue
9    when he does his tissue samples, does he?
10       A.   I was referring to the -- to the XPS
11   measurements that we did.  He manually dissected
12   them so we could do the XPS.  That's what I was --
13   the context of what I was saying.
14       Q.   Okay.  But until these adsorbed proteins
15   are removed from the polypropylene, they're bound
16   to the polypropylene, aren't they?
17       A.   Yes.  And you can remove them.  There was
18   some work done at Ethicon removing them with
19   solvents.  And the conclusions in those documents
20   is there's a mix of protein and oxidized
21   polypropylene on the surface.  This idea that
22   the -- and that the -- that the polymer is
23   degrading, oxidizing, it becomes porous, and then
24   proteins can get trapped in there.  And so the
25   conclusions from a lot of Mr. Burkley's studies is

Page 99

1    it's a mixed of protein and oxidized
2    polypropylene.
3        MR. THOMAS:  Move to strike
4    everything after "yes."
5        THE WITNESS:  Why?
6        MR. THOMAS:  Because the rest of it's
7    not responsive.
8        MR. BOWMAN:  And just FYI, he's
9    asking you questions, you're not allowed to ask
10   him --
11       THE WITNESS:  Okay.  I'm sorry.  I
12   thought we were talking about protein adsorption.
13       MR. BOWMAN:  I have to amend my
14   stipulation earlier.  PCT-168 actually refers to
15   Dr. Dunn's file on Boston Scientific, not Ethicon.
16   I apologize for that.
17   BY MR. THOMAS:
18       Q.   Okay.  I have to ask the question then.
19   Is PCT-168 testing Ethicon meshes or Boston
20   Scientific meshes?
21       A.   I don't know.  That's Dr. Dunn's numbering
22   system.  I don't -- I don't know what --
23       Q.   They call it TVT.
24       A.   I mean, if you really want to know, you
25   should depose Dr. Dunn about it.  I don't --

Page 100

1    that's what I said in December.  I don't know.
2        Q.   Okay.  Doctor, you -- do you have an
3    opinion that the Ethicon TVT should be
4    significantly changed or modified in its design?
5        MR. BOWMAN:  Object to form.
6        THE WITNESS:  I believe that the TVT
7    is a heavyweight mesh.  We know that the foreign
8    body reaction associated with heavyweight mesh can
9    be more severe.  And so, you know, it's going --
10   all these -- the more polypropylene that's there,
11   the more foreign body reaction, oxidation,
12   degradation, is going to be present.
13   BY MR. THOMAS:
14       Q.   Are you of the opinion that there should
15   be a different material used?
16       A.   I've never expressed an opinion about
17   different materials to be used for mesh.
18       Q.   Okay.  Do you have -- strike that.
19       Are you prepared to offer an opinion at
20   all in this case that the Ethicon device needs to
21   be changed or modified in its design?
22       MR. BOWMAN:  Object to form.  Can we
23   just get specific to the device you're talking
24   about?
25       THE WITNESS:  Yeah.

Page 101

1        MR. THOMAS:  The Ethicon TVT device.
2        THE WITNESS:  Could you repeat the
3    question?
4    BY MR. THOMAS:
5        Q.   Dr. Guelcher, do you have the opinion that
6    Ethicon should change or modify the TVT device,
7    and if so, how?
8        A.   Well, I -- I thought I just answered that.
9    It's a -- it's a heavyweight mesh.  Ethicon's own
10   documents even point to the fact that a
11   lighter-weight mesh would elicit a less intense
12   inflammatory response, oxidation, degradation,
13   less mesh is better.  This is a concept that I've
14   testified about previously.  It's in the
15   documents.
16       Q.   Okay.  Do you have an opinion as to how
17   that change in design should be made?
18       A.   I don't believe that opinion was expressed
19   in my report other than just to say a
20   lighter-weight mesh would -- less mesh is better.
21   I mean, there's a -- but I didn't really talk
22   about that.  I mean, I would say that a
23   lighter-weight mesh would be expected to invoke
24   less inflammation, less foreign body reaction,
25   less oxidation, less degradation.

26 (Pages 98 to 101)

Scott A. Guelcher, Ph.D.

Page 102

1    Q.    Do you have an opinion that any mesh
2    product could be reasonably safe and effective for
3    its intended use in the pelvic floor?
4              MR. BOWMAN: Object to form.
5              THE WITNESS: I think I've testified
6    to, and it's in the report, that the pelvic floor
7    is very different from the abdominal wall. These
8    meshes behave differently in the pelvic floor than
9    they do in the abdominal wall, and -- and more
10   testing needs to be done to evaluate their safety
11   in the pelvic floor.
12   BY MR. THOMAS:
13   Q.    So is it fair to understand that you do
14   not have an opinion that any mesh product could be
15   reasonably safe and effective for its intended use
16   in the pelvic floor? You don't have that opinion
17   today?
18   A.    Not without further testing.
19         I -- I should clarify my answer. I don't
20   believe it would be safe unless it were tested to
21   make sure that it was safe because of the problems
22   with polypropylene oxidation, degradation.
23   Q.    Is it fair to understand that whatever
24   design modifications are made in order to reduce
25   the risks as you've identified them in your

Page 103

1    report, that design modification will have to be
2    tested before it will be used in humans?
3    A.    What I testified in Perry is I would have
4    liked to have seen more testing done in in vitro
5    oxidative medium in large animals. This could be
6    done in the sheep models. You could do -- compare
7    abdominal wall to the pelvic floor. There could
8    be more preclinical testing that would be done.
9    That's what's in the report.
10   Q.    I'm not really after what you've testified
11   before.
12   A.    Okay.
13   Q.    This is really a different question.
14   You've told me ways in which you think Ethicon
15   should change the design of its product. You've
16   also told me that you think there should be
17   testing done on any change in the design of the
18   product before it would be introduced into use; is
19   that fair?
20   A.    That's fair.
21   Q.    Okay. And the testing that you describe
22   would be both clinical, preclinical, in vitro, a
23   variety of tests to make sure that this change of
24   design would be safer than the existing TVT
25   design, fair?

Page 104

1    A.    Yeah.
2    Q.    And you'd also expect this change in
3    design to be subject to review by the FDA; is that
4    fair?
5    A.    I'm not -- I can't speak about what -- I'm
6    not really -- it's not in my report about what FDA
7    should and should not do. I mean, I understand
8    that FDA reviews biomedical device applications.
9    I understand that. But I'm not -- I don't want to
10   speculate about what FDA would do or would not do.
11   Q.    You would expect FDA, though, to look at
12   any change in design?
13   A.    It would have to be submitted as a -- as
14   a -- either a 510(k) or a PMA that would be
15   reviewed by FDA.
16   Q.    Okay. So the FDA could make whatever
17   determinations they needed to make in the change
18   of the design and the safety and efficacy of the
19   product, fair?
20   A.    Say that again. I didn't quite catch what
21   you meant.
22              MR. THOMAS: I need your help.
23              (Reporter read back requested
24   material.)
25              THE WITNESS: Well, FDA would not

Page 105

1    change the design. They would ask the company,
2    say, for more information, but they wouldn't -- I
3    don't think that FDA designs products.
4    BY MR. THOMAS:
5    Q.    But they would review the design in the
6    context of the safety and efficacy for the
7    patients it was intended to treat, fair?
8    A.    They would review those data, yeah.
9    Q.    Okay.
10              MR. THOMAS: I need to take a break
11   again. Excuse me.
12              (Luncheon recess observed.)
13   BY MR. THOMAS:
14   Q.    Doctor, the testing that's done in
15   Exhibit 12 is -- is good, sound, reliable testing,
16   isn't it?
17   A.    Yes, I believe so.
18   Q.    And the conclusions that you've -- strike
19   that.
20         The results that are contained in Exhibit
21   12 you believe to be scientifically valid results?
22   A.    Yes.
23   Q.    And the comments that you made to the
24   International Urogynecological Association about
25   those findings were fair and accurate at the time

27 (Pages 102 to 105)

Scott A. Guelcher, Ph.D.

Page 106

1    that you gave them, weren't they?
2    A.    I believe so.
3    Q.    Why aren't you relying on this testing for
4    your report?
5          MR. BOWMAN:  Objection to form.
6          THE WITNESS:  We haven't published it
7    yet.
8    BY MR. THOMAS:
9    Q.    Okay.  Is that the sole reason?
10   A.    Probably the main reason.
11   Q.    Do you plan to publish these -- this data?
12   A.    We're discussing it.
13   Q.    Have you prepared a manuscript?
14   A.    It's in draft form, but we're -- we're
15   deciding what to do.
16   Q.    Has it been submitted to any journals?
17   A.    We submitted it to the IUGA, the
18   International -- since we had a podium
19   presentation, we submitted it to the -- the
20   International Urogynecology Journal.
21   Q.    Okay.  And are they considering it or did
22   they refuse it?
23   A.    They didn't want to publish it.  We didn't
24   have -- yeah, they didn't want to publish it.
25   Q.    Why not?

Page 107

1    A.    We didn't have much clinical data.
2    Q.    Have you submitted it to any other
3    journals?
4    A.    No.
5    Q.    Is there a manuscript form that you
6    submitted to the International Urogynecological
7    Association?
8    A.    There's a PDF that we uploaded to the --
9    the submitted manuscript.
10   Q.    Do you have a file of information that you
11   maintain concerning your submission of this data
12   to the IUGA journal?
13   A.    I have documents related to that, I
14   believe.
15   Q.    Okay.  Now, for Exhibit No. 10, which is
16   the paper that you co-authored with Dr. Iakovlev
17   and Dr. Bendavid, I believe you said your
18   responsibility there was limited to the
19   myeloperoxidase; is that fair?
20   A.    I didn't say it was limited to it.  I said
21   that -- I believe what I said was that my primary
22   contribution, it was my -- I suggested that we
23   stain for myeloperoxidase, and Dr. Iakovlev
24   stained for myeloperoxidase.  We saw positive
25   staining.  And based on that contribution, he

Page 108

1    believed that I should be a co-author on the
2    paper.  But I -- I did -- yeah, it's...
3    Q.    Did you have any involvement in the peer
4    review process for the paper?
5    A.    Dr. Iakovlev handled all of that as a
6    corresponding author.
7    Q.    Do you have -- maintain a file about the
8    submission of this paper to different journals?
9    A.    I don't know what I've got on that.
10   Q.    Was this paper submitted to multiple
11   journals?
12   A.    I believe -- I believe it was submitted to
13   other journals.
14   Q.    Do you know which ones they were submitted
15   to?
16   A.    No, I don't remember right now.
17   Q.    Were there comments made on the journal
18   submission?
19         MR. BOWMAN:  Object to form.
20         THE WITNESS:  Well, we -- I mean,
21   I'm -- there were -- I don't remember what --
22   exactly what happened with those other reviews.
23   That was a while ago.
24   BY MR. THOMAS:
25   Q.    Do you maintain a file of the comments

Page 109

1    that you received on the -- what you submitted to
2    the journals?
3    A.    I don't know.  I don't...
4    Q.    Did -- did you share your draft of
5    Exhibit 9 with plaintiff's counsel before it was
6    published in the International Urogynecological
7    Journal?
8    A.    Well, I submitted it.  I wrote a -- I
9    wrote the abstract and I submitted -- I don't
10   remember sending it to plaintiff's counsel before
11   I submitted it.  I can't remember, but I don't
12   think I did.
13   Q.    Did you discuss your plans to submit this
14   abstract to the International Urogynecological
15   Association with plaintiff's counsel before you
16   did so?
17   A.    I don't remember.  I decided to do it
18   maybe -- when the workshop came up, I think, is
19   when I decided to submit the abstract.  It's not a
20   meeting that I'd normally go to, so I just -- I
21   don't remember the timing of everything.
22   Q.    Okay.  But at the same time that you were
23   having the meeting with plaintiff's counsel to
24   plan for the workshop is the same time that you
25   planned to submit this abstract; is that fair?

28 (Pages 106 to 109)

Scott A. Guelcher, Ph.D.

Page 110

1    A.    No, I don't believe so because the
2   workshop was -- the workshop was probably -- it
3   was a proposal to include in a meeting.  By the
4   time I submitted that abstract, the sessions had
5   already been determined.
6    Q.    Okay.  So you had already signed --
7    A.    The workshop was first, I think.
8    Q.    Okay.
9    A.    That's typical.
10    Q.    All right.  Exhibit No. 10, the article
11   that you co-authored with Dr. Iakovlev and
12   Dr. Bendavid?
13    A.    Yes.
14    Q.    Did -- do you know whether this article
15   was reviewed by plaintiff's counsel before it was
16   submitted?
17    A.    I don't know who -- like I said,
18   Dr. Iakovlev is the corresponding author.  I
19   don't -- I -- I don't know what he did there.
20    Q.    On page -- on -- go back to Exhibit No. 9
21   real quick.  On page 2 under "Disclosure Block,"
22   did you decide what to include under the
23   disclosure block?
24    A.    I'm looking for it.
25        No.  Well, okay.  I need to explain that.

Page 111

1   I -- I'm going by my memory, but these are -- all
2   the meetings have different requirements.  I think
3   that this one may have had specific blocks that I
4   could choose from.  That's probably why -- I --
5   that says "consulted" and "consulting fee."
6   Those -- those look like fields that I had to
7   select, is what I -- but I don't remember what I
8   did exactly.
9    Q.    What did you intend to convey when you
10   said you were a consultant?
11    A.    Well, I think consultant is probably what
12   I had to select to choose expert witness.
13    Q.    Was there --
14    A.    I --
15    Q.    I'm sorry.
16    A.    I'm sorry.  I don't think that I chose --
17   I can't remember, but I -- this -- that doesn't
18   look like words that I would use to describe my
19   activities, which probably tells me that there was
20   a field that I had to fill out, and that was the
21   closest.  That's -- that's my best guess, but I
22   don't -- I don't really remember.
23    Q.    Was there an opportunity to disclose that
24   you were a testifying expert for the plaintiffs in
25   the mesh litigation?

Page 112

1    A.    I don't remember.  That's -- I -- I don't
2   know that it was that detailed.
3    Q.    At the time of this publication and for
4   years prior to that time, Dr. Dunn had also been a
5   consultant who would testify as an expert, hasn't
6   he?
7    A.    That's right.
8    Q.    Do you know why he didn't disclose
9   anything?
10    A.    That's an error.  And I don't -- when I
11   presented this talk, I had a disclosure slide.
12   I don't know why it says nothing to disclose.  It
13   may have been that he had to fill that out and
14   didn't realize it.  I don't -- I don't know.
15   That's an error.  But I did clarify that point --
16    Q.    Is the --
17    A.    -- in the talk.
18    Q.    I'm sorry.
19    A.    Yeah.
20    Q.    Is the disclosure slide one of the ones
21   that you produced to me?
22    A.    Well, it's -- it's in the -- it's -- you
23   have slides for the AIChE presentation and for the
24   IUGA presentation, and I believe there's a
25   disclosure slide that says we were testifying

Page 113

1   in -- in -- in the litigation.
2    Q.    Okay.  Whatever slides you used in your
3   presentation have been produced to me today?
4    A.    Yeah, I believe so.  I -- I produced
5   those.
6    Q.    Doctor, I've tried mightily not to
7   reinvent the wheel and go through the opinions
8   that you've given in previous depositions.  Have
9   we covered all of the opinions that you're
10   prepared to give in this case?
11    A.    Let me look at them one more time to be
12   sure.  I want to be accurate.
13        I believe so.
14    Q.    Okay.  The only question I have is on
15   page 17 of your report.
16    A.    Okay.
17    Q.    You talk about the failure modes and
18   effects analysis.
19    A.    Yes.
20    Q.    That's the first time I've seen that in
21   any of your reports.  Is that new?  Dr. Dunn
22   testified about it in the Huskey case.
23    A.    He was -- he was deposed on -- I don't
24   believe he --
25    Q.    He gave a deposition --

29 (Pages 110 to 113)

Scott A. Guelcher, Ph.D.

Page 114

1    A.    Yes.
2    Q.    -- in that case.  That's what I meant.
3    I'm sorry.
4    A.    Oh, that's what you -- okay.  I
5    understand.  Yeah.  I think that may have been the
6    first -- I can't remember if that's the first time
7    I wrote that or not, if it's in another report.
8    Q.    You cite no documents in connection with
9    that opinion.  Are you prepared to offer that
10   opinion at trial?
11            MR. BOWMAN:  Object to form.
12            THE WITNESS:  I -- I don't intend to
13   speak about failure modes and effects analysis at
14   trial.
15   BY MR. THOMAS:
16   Q.    Okay.  So is it fair for me to be able to
17   eliminate from your opinion the paragraph
18   beginning "finally" to the end?
19   A.    Not -- just that sentence that addresses
20   FMEA --
21   Q.    Okay.
22   A.    -- is -- is not something that I would
23   testify about at trial.
24            I would not testify about FMEA.
25   Q.    Very good.

Page 115

1            And I think everything else is stuff
2    that's been covered in prior depositions.  Is that
3    to the best of your knowledge?
4    A.    To the best of my knowledge, yes.
5            MR. THOMAS:  I'm going to stop.  I'm
6    going to hold the deposition open pending some
7    issues, but we may or may not -- I may or may not
8    seek to return.  But those are all the questions I
9    have right now.
10           MR. BOWMAN:  Can -- do you mind --
11   what the issues are?  Can you tell me what they
12   are?
13           MR. THOMAS:  Questions about those
14   documents, the test results that he's not able to
15   talk about without review.  And I -- I probably
16   won't come back, but I -- I just don't know until
17   I think about it.  And you may have a rebuttal
18   report anyway that may solve all that problem
19   depending on what you see today.
20           MR. BOWMAN:  You know, I have very
21   little, I think, in -- in terms of redirect.  I
22   think I'll just go now, if that's all right.
23           MR. THOMAS:  That's fine.
24           MR. BOWMAN:  Okay.
25

Page 116

1            E X A M I N A T I O N
2    BY MR. BOWMAN:
3    Q.    So, Dr. Guelcher, you've looked at
4    Exhibit 12, the folder for PCT-168?
5    A.    Yes.
6    Q.    And you've already testified that you
7    hadn't reviewed this prior to today?
8    A.    That's right.
9    Q.    You also testified that you're not relying
10   on anything in this document for the opinions that
11   you're expressing at trial; is that right?
12   A.    Yes, that's correct.
13   Q.    Can I ask you, do you know what Ethicon
14   product was examined for this report?
15   A.    I believe it was a TVT laser-cut mesh.
16   Q.    And is it your understanding that your
17   reports being offered in this case are -- are --
18   do they -- do they at all apply to the laser-cut
19   mesh?
20   A.    No.  My understanding, it's machine cut.
21   Q.    Have you at any time ever held in your
22   hand, examined, or looked at a -- to your
23   knowledge, a -- a mechanical-cut TVT?
24   A.    Not to my knowledge.
25   Q.    Do you know, is -- besides the fact that

Page 117

1    Dr. Dunn took the FTIR and that Dr. Rogers
2    compiled the data for the XPS test, and besides
3    what you've already testified about the protocol
4    for the solution used for this testing, is there
5    anything else that you can tell us in regards to
6    Exhibit 12?
7    A.    Not at this time, no.
8    Q.    Doctor, in your report, did you ever, and
9    have you -- and are you offering any opinion as to
10   a specific material or design of the product that
11   could be used instead of what you understand to be
12   the design of the mechanical-cut TVT?
13   A.    No, I'm not referring to a specific
14   design.
15           MR. BOWMAN:  I think that's all I
16   have.
17           MR. THOMAS:  Thank you.  That's all I
18   have.
19           We have a couple of things we need to
20   do.  We're going to take Exhibit 8, which is the
21   thumb drive.  We need to figure out a way to get a
22   copy of this so that Dr. Guelcher doesn't lose his
23   notebook.
24           Last time we did that and got it back
25   to you promptly.  Are you comfortable with that?

30 (Pages 114 to 117)

Scott A. Guelcher, Ph.D.

## Page 118

1       THE WITNESS:  That's fine, as long as
2   I can get it back.
3       MR. HUTCHINSON:  Before we go off the
4   record, can we talk for just one second?
5       MR. THOMAS:  Hang on just a minute.
6       (Brief recess observed.)
7       MR. THOMAS:  That's all.  Thank you,
8   Doctor.
9       THE WITNESS:  Okay.
10      MR. THOMAS:  Good to see you again.
11      THE WITNESS:  Thank you.
12      MR. BOWMAN:  Thank you.
13      Do you wish to read and sign the
14  transcript?
15      THE WITNESS:  I'll read.
16  I'll look at it.  Yes.
17      MR. BOWMAN:  Is that a 30-day window?
18      MR. THOMAS:  I believe so.
19      THE WITNESS:  Okay.
20      MR. BOWMAN:  And I believe I have
21  your address.
22      MR. BOWMAN:  And I think I just want
23  to formally object to extending the deposition or
24  holding it out, just -- just to get it out there.
25      MR. THOMAS:  That's fine.  Thank you

## Page 119

1   all for your cooperation.
2       MR. BOWMAN:  All right.  Thank you.
3       (Proceedings adjourned at 12:32 P.M.)
4       FURTHER DEPONENT SAITH NOT.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 120

1           REPORTER'S CERTIFICATE
2
3       I certify that the witness in the
4   foregoing deposition, SCOTT GUELCHER, PH.D., was
5   by me duly sworn to testify in the within entitled
6   cause; that the said deposition was taken at the
7   time and place therein named; that the testimony
8   of said witness was reported by me, a Shorthand
9   Reporter and Notary Public of the State of
10  Tennessee authorized to administer oaths and
11  affirmations, and said testimony, pages 1 through
12  121 was thereafter transcribed to typewriting.
13      I further certify that I am not of
14  counsel or attorney for either or any of the
15  parties to said deposition, nor in any way
16  interested in the outcome of the cause named in
17  said deposition.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand the 21st day of September 2015.
20
21
22  _____
23  GARY SCHNEIDER, RMR, CRR, TLCR No. 676
24  My commission expires:  1/9/2018
25

## Page 121

1           E R R A T A
2
3       I, SCOTT GUELCHER, PH.D., having read
    the foregoing deposition, Pages 1 through 121,
4   taken September 15, 2015, do hereby certify said
    testimony is a true and accurate transcript, with
5   the following changes, if any:
6   PAGE   LINE    SHOULD HAVE BEEN    REASON
7   ____   ____   _____    _____
8   ____   ____   _____    _____
9   ____   ____   _____    _____
10  ____   ____   _____    _____
11  ____   ____   _____    _____
12  ____   ____   _____    _____
13  ____   ____   _____    _____
14  ____   ____   _____    _____
15  ____   ____   _____    _____
16  ____   ____   _____    _____
17  ____   ____   _____    _____
18      _____
19          SCOTT GUELCHER, PH.D.
20
21
    _____
22  Notary Public
    My commission expires:  _____
23
24
25

31 (Pages 118 to 121)

# EXHIBIT K

# Human plasma $\alpha_2$-macroglobulin promotes *in vitro* oxidative stress cracking of Pellethane 2363-80A: *In vivo* and *in vitro* correlations

Q. H. Zhao,[1] A. K. McNally,[2] K. R. Rubin,[2] M. Renier,[1] Y. Wu,[1] V. Rose-Caprara,[2] J. M. Anderson,[1,2,*] A. Hiltner,[1] P. Urbanski,[3] and K. Stokes[3]

*Departments of [1]Macromolecular Science and [2]Pathology, Case Western Reserve University, Cleveland, Ohio 44106; and [3]Medtronic, Inc., 7000 Central Avenue, Minneapolis, Minnesota 55432*

It is hypothesized in this study that the phenomenon of environmental stress cracking (ESC) in polyetherurethane is caused by a synergistic action of biological components in the body fluids, oxidative agents, and stress. An *in vitro* system is designed to mimic the *in vivo* system; human plasma contains certain biological components that can act as a stress cracking promoter, while $H_2O_2$ (Co) solution provides an oxidative reaction comparable to that observed in the respiratory burst of adherent macrophages and foreign-body giant cells. It is demonstrated that the phenomenon of *in vivo* stress cracking in Pellethane 2363-80A is duplicated by an *in vitro* system that involves a pretreatment of prestressed specimens with human plasma at 37°C for 7 days followed by oxidation in 10% hydrogen peroxide with $0.10M$ cobalt chloride at 50°C for 10 days. The pretreatment with plasma has a synergistic effect with the oxidation by $H_2O_2$ (Co) treatment to produce ESC. A plasma component responsible for promoting stress cracking in Pellethane polyurethane is identified to be $\alpha_2$-macroglobulin ($\alpha_2M$). © 1993 John Wiley & Sons, Inc.

## INTRODUCTION

With their unique and excellent physical, mechanical, and biocompatible properties, polyetherurethane elastomers have been used as constituent materials of many medical devices. Since these medical devices are often intended to perform reliably and safely while implanted in the body for prolonged periods of time, their long-term biostability is of vital importance to ensure safety and effectiveness when in contact with the tissue or body fluids of the living body. In certain limited circumstances, unintended biodegradation and surface cracking of polyurethanes have created increasing needs in biomaterials research to understand further the nature of biodegradation/biostability of the materials.[1,2]

*In vivo* environmental stress cracking (ESC) in polyetherurethanes is believed to be a complex phenomenon. It is related to the chemical property of polyurethanes (e.g., polyether content),[3–5] stress state of the material in use (e.g., design manufacturing processes),[1,6] cell or tissue/polymer interactions (e.g.,

macrophage adhesion and foreign-body giant cell formation),[7] and the body's physiological environment (i.e., so far unknown plasticizing or crack propagating agent).[1,3,8] The mechanism for the ESC is still not clear due to unsuccessful duplication of this phenomenon by an *in vitro* method.[3,6,8]

In this study, the investigation was conducted under a hypothesis that biological components in the body fluids, oxidative agents, and stress or strain act synergistically to produce the stress cracking of polyurethanes. An *in vitro* system that duplicates the ESC observed with polyetherurethane *in vivo* was

**TABLE I**
**Biological Fluids Used for *In Vitro* Treatment of Pellethane 2363-80A**

| |
|---|
| Human blood plasma (citrated) |
| Plasma PEG fraction I |
| Plasma PEG fraction II |
| Plasma PEG fraction III |
| $\alpha_2$-Macroglobulin (2 mg/mL) |
| Ceruloplasmin (1 mg/mL) |
| Transferrin (2.3 mg/mL) |
| Lipoprotein (0.54 mg/mL) |

*To whom correspondence should be addressed.

Journal of Biomedical Materials Research, Vol. 27, 379–389 (1993)
© 1993 John Wiley & Sons, Inc.                    CCC 0021-9304/93/030379-10

developed. Biological component(s) involved in ESC were identified. The relationships among biological components, stress state, and oxidation in PEU biodegradation are also discussed.

## MATERIALS AND METHODS

### Prestressed polyurethane specimens and different treatments

The poly(etherurethane) (PEU) elastomer used in this study was Pellethane 2363–80A. The base polymer was prepared from 4,4'-diphenyl bis(phenylisocyanate) (MDI) and poly(tetramethylene glycol) ($M_w$ = 1000) (PTMEG) and chain extended with 1,4-butanediol. The polymer had a molecular weight of 95,000 relative to polystyrene. The bulk material contained two additives: a phenolic antioxidant and a bis(stearamide wax) processing agent.

The prestressed Pellethane 2363-80A tubing specimens (2 mm in diameter and 12.5 mm in length) were obtained from Medtronic, Inc. The polymer tubing was soaked in acetone for 1 h to extract the additives, prior to being stretched to 400% elongation over a mandrel. A detailed description of the specimen preparation is provided elsewhere.[7] This type of prestressed specimen is known to undergo rapid biodegradation and stress cracking *in vivo* based on our previous study.[7] For comparison, the 5- and 10-week implants in rats from the previous study were analyzed to correlate with the *in vitro* results in this study.

In the *in vitro* treatment, the prestressed specimens were immersed in the biological fluids at 37°C for 7 days, rinsed in distilled water, and put into an oxidizing solution at 50°C for 9 or 10 days. The oxidizing agent was an aqueous solution of 10% hydrogen peroxide (Fisher Scientific) and 0.10$M$ cobalt chloride. The proposed role of cobalt chloride is to facilitate the decomposition of hydrogen peroxide to produce oxygen radical species.[9,10] During the treatment, the peroxide/cobalt chloride solution was changed with fresh solution every 3 days. The biological fluids were human blood plasma, fractionated plasma, and simple protein solutions (Sigma), respectively (Table I). After the treatment, the polymer specimens were rinsed in distilled water, dried in air, and then stored in a vacuum desiccator for scanning electron microscopy (SEM, JOEL 840), ATR-FTIR, and GPC analyses.

The procedure for plasma fractionation with polyethylene glycol (PEG) was adapted from the method described by Hao et al.[11] All procedures were performed at 4°C. A beaker containing 100 mL citrated human plasma was placed in an ice bath. Solid PEG ($M_w$ 4000, Polysciences, Inc.) was added slowly with stirring to plasma in the amount of 10 g/100 mL.

After 60 min, the 10% PEG precipitate, designated fraction I, was removed by centrifugation for 30 min at 2000 rpm. An additional 10 g of PEG was added to the supernatant followed by centrifugation to obtain fraction II (the 10–20% PEG precipitate) and fraction III (the supernatant containing 20% PEG). The precipitates were reconstituted to the original volume of plasma (100 mL) with phosphate-buffered saline (PBS). The distribution of proteins in the three fractions is shown in Table II.[11] Fraction I is rich in fibrinogen, plasminogen, C-3 component of complement, IgG, and $\beta$-lipoproteins. Fraction II is rich in $\alpha_2$-macroglobulin ($\alpha_2$-M), IgA, prothrombin, and other coagulation factors (prothrombin complex). Fraction III contains mainly albumin, $\alpha_1$-acid glycoprotein, transferrin, and 20% PEG.

### ATR-FTIR and GPC analyses

To obtain ATR-IR spectra, the prestressed tubing specimens were opened by an incision along the tubing direction and the mandrels were removed. The ATR-IR spectra were obtained on the outer surface of the opened tubes with a Nicolet 800 spectrometer using the micro-ATR attachment made by Harrick Scientific, Inc., that featured two 4× beam condensers and continuous beam angle variation. To obtain degradation depth profiles, internal reflection elements (IRE) of Germanium with 60°, 45°, and 30° endface angles, and KRS-5 with 60° and 45° endface angles were used and combined with different incident angles of the IR beam.

The instrument employed for GPC analysis was a Varian DS-651 LC Star System with a 9010 Solvent Delivery System, a 9065 Polychrom UV diode-array detector, and a RI-4 refractive index detector set at 40°C. The running eluent was HPLC-grade THF with a flow rate of 1.0 mL/min. The standards and columns were obtained from Polymer Laboratories, Inc. (Amherst, MA). One set of calibration standards were used to calibrate a series of PL-Gel columns of 500, 10,000, and 100,000 Å pore size. Polystyrene calibration standards ranged from 1000 to 2,000,000 molecular weight, with a polydispersity (PDI) of 1.1. Reported molecular weight values were based on the two sets of calibration standards. Deconvolution of the GPC chromatograms was accomplished by using a spectral curve-fitting software (PeakFit 1.0, Jandel); two math functions, gaussian and exponentially modified gaussian, were employed.

### Analysis of adsorbed plasma proteins

The adsorption and extraction of plasma proteins was performed on the original, unstrained Pellethane tubing (2 mm in diameter) material. Fifty milligrams

### TABLE II
### Distribution of Selected Plasma Proteins in PEG Fractions (Ref. 11)

| Plasma Proteins | Amount (mg/dL) | Fraction I wt% (mg/dL) | Fraction II wt% (mg/dL) | Fraction III wt% (mg/dL) |
|---|---|---|---|---|
| Albumin | 3440 | 6 (206) | 4 (138) | 86 (2958) |
| IgG | 740 | 88 (651) | 15 (111) | 1 (7) |
| Transferrin | 223 | 6 (13) | 22 (49) | 58 (129) |
| $\alpha_2$-Macroglobulin | 189 | 35 (66) | 65 (123) | — |
| Fibrinogen | 179 | 88 (158) | — | — |
| IgA | 157 | 34 (53) | 58 (91) | 20 (31) |
| Haptoglobin | 108 | 2 (2) | 40 (43) | 56 (61) |
| $\alpha$-Lipoprotein | 64 | 15 (10) | 25 (16) | 50 (32) |
| C-3 Component | 56 | 93 (52) | 7 (4) | — |
| $\alpha_1$-Acid glycoprotein | 54 | — | — | 100 (54) |
| Ceruloplasmin | 22 | 14 (3) | 23 (5) | 73 (16) |
| Plasminogen | 16 | 69 (11) | 19 (3) | — |
| $\beta$-Lipoprotein | 16 | 100 (16) | — | — |
| Prothrombin | 8 | 25 (2) | 50 (4) | 25 (2) |
| C-1 Esterase inhib. | 4 | — | — | 100 (4) |

of the polymer tubing was cut in half longitudinally to avoid entrapment of fluid while immersed in 10 mL of citrated plasma at 37°C for 7 days. After plasma treatment, the material was placed in a clean test tube and rinsed three times with PBS. The tubing material was then cut into small pieces that were transferred into a clean microtube. The adsorbed proteins were extracted in 0.25 mL of 1% sodium dodecyl sulfate (SDS) or the sample buffer used in SDS-Polyacrylamide Gel Electrophoresis (SDS-PAGE)[12] at room temperature for 24 h. Proteins in the extract were separated by SDS-PAGE using 7.5% or 4–15% acrylamide gradient gels. Separated proteins were visualized by silver stain (BioRad).



**Figure 1.** SEM pictures of prestressed specimens after treatments: (A1 and A2) 35 days (5 weeks) implanted; (B1 and B2) 7 day plasma plus 10-day peroxide/cobalt treated; (C1 and C2) 10-day peroxide/cobalt treated.

AL.

### TABLE II
### Distribution of Selected Plasma Proteins in PEG Fractions (Ref. 11)

| Plasma Proteins | Amount (mg/dL) | Fraction I wt% (mg/dL) | Fraction II wt% (mg/dL) | Fraction III wt% (mg/dL) |
|---|---|---|---|---|
| Albumin | 3440 | 6 (206) | 4 (138) | 86 (2958) |
| IgG | 740 | 88 (651) | 15 (111) | 1 (7) |
| Transferrin | 223 | 6 (13) | 22 (49) | 58 (129) |
| $\alpha_2$-Macroglobulin | 189 | 35 (66) | 65 (123) | — |
| Fibrinogen | 179 | 88 (158) | — | — |
| IgA | 157 | 34 (53) | 58 (91) | 20 (31) |
| Haptoglobin | 108 | 2 (2) | 40 (43) | 56 (61) |
| $\alpha$-Lipoprotein | 64 | 15 (10) | 25 (16) | 50 (32) |
| C-3 Component | 56 | 93 (52) | 7 (4) | — |
| $\alpha_1$-Acid glycoprotein | 54 | — | — | 100 (54) |
| Ceruloplasmin | 22 | 14 (3) | 23 (5) | 73 (16) |
| Plasminogen | 16 | 69 (11) | 19 (3) | — |
| $\beta$-Lipoprotein | 16 | 100 (16) | — | — |
| Prothrombin | 8 | 25 (2) | 50 (4) | 25 (2) |
| C-1 Esterase inhib. | 4 | — | — | 100 (4) |

of the polymer tubing was cut in half longitudinally to avoid entrapment of fluid while immersed in 10 mL of citrated plasma at 37°C for 7 days. After plasma treatment, the material was placed in a clean test tube and rinsed three times with PBS. The tubing material was then cut into small pieces that were transferred into a clean microtube. The adsorbed proteins were extracted in 0.25 mL of 1% sodium dodecyl sulfate (SDS) or the sample buffer used in SDS-Polyacrylamide Gel Electrophoresis (SDS-PAGE)[12] at room temperature for 24 h. Proteins in the extract were separated by SDS-PAGE using 7.5% or 4–15% acrylamide gradient gels. Separated proteins were visualized by silver stain (BioRad).



**Figure 1.** SEM pictures of prestressed specimens after treatments: (A1 and A2) 35 days (5 weeks) implanted; (B1 and B2) 7 day plasma plus 10-day peroxide/cobalt treated; (C1 and C2) 10-day peroxide/cobalt treated.



**Figure 2.**   SEM pictures of prestressed specimens after *in vitro* treatments: (A1 and A2) 7 day fraction I plus 9-day peroxide/cobalt treated; (B1 and B2) 7-day fraction II plus 9-day peroxide/cobalt treated; (C1 and C2) 7-day fraction III plus 9-day peroxide/cobalt treated.

The identities of selected proteins were confirmed by immunoblot analysis (Western blot). Briefly, proteins separated by SDS-PAGE were transferred to nitrocellulose (Mini-Transblot, BioRad) for 1 h at 100 V. Nitrocellulose strips were blocked with 5% nonfat dry milk in Tris-buffered saline for 2 h at 25°C prior to application of rabbit primary antibodies to human $\alpha_2$-macroglobulin, ceruloplasmin, albumin, or $\alpha$-fetoprotein (nonspecific control) diluted 1:100 in blocking buffer. After 18 h at 25°C, the strips were washed, incubated with goat anti-rabbit IgG conjugated to alkaline phosphatase (BioRad) for 2 h, washed again, and developed using an alkaline phosphatase substrate kit (BioRad).

### RESULTS

#### SEM surface examination

After 35 days (5 weeks) implantation, severe cracking on the prestressed (strained) Pellethane 80A was observed under SEM [Fig. 1 (A1), (A2)]. The cracking pattern consisted of independent and interconnecting open cracks. The cracks with a fibrillar structure prop-

agated across the tubing surface along the transverse direction of the applied stress. Similar cracking patterns were found on the *in vitro* specimens after the prestressed samples were first treated with plasma at 37°C for 7 days, and then with 10% $H_2O_2$ (Co) at 50°C for 10 days [Fig. 1 (B1), (B2)]. For the samples treated only in 10% $H_2O_2$ (Co) solution at 50°C for 10 days, isolated open cracks and brittle microcracking were observed [Fig. 1 (C1), (C2)].

Figure 2 shows SEM pictures of the prestressed specimens respectively pretreated with plasma fractions I, II, and III, then followed by $H_2O_2$ (Co) treatment. The pretreatment with fraction II [Fig. 2 (B1, (B2)] produced more severe surface cracking on the specimens than the pretreatment with fraction I or III. The cracking on the specimens treated with fraction II plus $H_2O_2$ (Co) resembled the patterns observed on the 35-day implant [Fig. 1;(A1), (A2)] and the specimens treated with plasma plus $H_2O_2$ (Co), with large cracks interconnecting and propagating across the surface, whereas the specimens pretreated with fractions I and II showed micro-pitting with no crack propagation.

In Figure 3, the specimens pretreated with $\alpha_2$-macroglobulin, $\alpha_2$-M [Fig. 3(A1), (A2)] and cerulo-



**Figure 2.** SEM pictures of prestressed· specimens after *in vitro* treatments: (A1 and A2) 7 day fraction I plus 9-day peroxide/cobalt treated; (B1 and B2) 7-day fraction II plus 9-day peroxide/cobalt treated; (C1 and C2) 7-day fraction III plus 9-day peroxide/cobalt treated.

The identities of selected proteins were confirmed by immunoblot analysis (Western blot). Briefly, proteins separated by SDS-PAGE were transferred to nitrocellulose (Mini-Transblot, BioRad) for 1 h at 100 V. Nitrocellulose strips were blocked with 5% nonfat dry milk in Tris-buffered saline for 2 h at 25°C prior to application of rabbit primary antibodies to human $\alpha_2$-macroglobulin, ceruloplasmin, albumin, or $\alpha$-fetoprotein (nonspecific control) diluted 1:100 in blocking buffer. After 18 h at 25°C, the strips were washed, incubated with goat anti-rabbit IgG conjugated to alkaline phosphatase (BioRad) for 2 h, washed again, and developed using an alkaline phosphatase substrate kit (BioRad).

### RESULTS

**SEM surface examination**

After 35 days (5 weeks) implantation, severe cracking·on the prestressed (strained) Pellethane 80A was observed under SEM [Fig. 1 (A1), (A2)]. The cracking pattern consisted of independent and interconnecting open cracks. The cracks with a fibrillar structure propagated across the tubing surface along the transverse direction of the applied stress. Similar cracking patterns were found on the *in vitro* specimens after the prestressed samples were first treated with plasma at 37°C for 7 days, and then with 10% $H_2O_2$ (Co) at 50°C for 10 days [Fig. 1 (B1), (B2)]. For the samples treated only in 10% $H_2O_2$ (Co) solution at 50°C for 10 days, isolated open cracks and brittle microcracking were observed [Fig. 1 (C1), (C2)].

Figure 2 shows SEM pictures of the prestressed specimens respectively pretreated with plasma fractions I, II, and III, then followed by $H_2O_2$ (Co) treatment. The pretreatment with fraction II [Fig. 2 (B1), (B2)] produced more severe surface cracking on the specimens than the pretreatment with fraction I or III. The cracking on the specimens treated with fraction II plus $H_2O_2$ (Co) resembled the patterns observed on the 35-day implant [Fig. 1;(A1), (A2)] and the specimens treated with plasma plus $H_2O_2$ (Co), with large cracks interconnecting and propagating across the surface, whereas the specimens pretreated with fractions I and II showed micro-pitting with no crack propagation.

In Figure 3, the specimens pretreated with $\alpha_2$-macroglobulin, $\alpha_2$-M [Fig. 3(A1), (A2)] and cerulo-





**Figure 3.** SEM pictures of prestressed specimens after *in vitro*: (A1 and A2) 7-day $\alpha_2$-macroglobulin plus 9-day peroxide/cobalt treated; (B1 and B2) 7-day ceruloplasmin plus 9-day peroxide/cobalt treated; (C1 and C2) 7-day lipoprotein plus 9-day peroxide/cobalt treated.

plasmin [Fig. 3(B1), (B2)] solutions showed cracking patterns similar to the specimens pretreated with fraction II [Fig. 2(B1), (B2)]. Surface pitting, roughening, and brittle cracking were observed on the specimens pretreated with lipoprotein [Fig. 3(C1), (C2)]. Similar brittle cracking was also found on the specimens treated with transferrin solution plus $H_2O_2$ (Co).

## ATR-FTIR and GPC analyses

Figure 4 shows the ATR-FTIR spectra obtained from the specimens before and after different treatments. Among the samples, the 7-day plasma-treated samples showed essentially the same spectral features as the untreated samples. Samples treated with $H_2O_2$ (Co) and plasma plus $H_2O_2$ (Co), as well as the 70-day (10-week) implant, similarly displayed dramatic changes in their spectra, with large decreases in the soft-segment bands (e.g., 1110 $cm^{-1}$ and 2795 $cm^{-1}$) and the non-hydrogen-bonded urethane carbonyl band (1730 $cm^{-1}$). In addition to the decrease in some bands several new bands, were also observed [Fig. 4(A), (B)]. By subtracting the spectra of the treated from the untreated samples, more new bands were revealed. Table III summarizes the new

bands that appeared in the subtracted spectra of the treated samples in the region of 1800–900 $cm^{-1}$. The new bands were tentatively assigned to the formation of acid, ester, alkene, and aldehyde groups. To support these assignments, bands from some model compounds are listed in Table III.

The experimental and deconvoluted GPC chromatograms for the untreated and treated specimens are shown in Figure 5. By deconvolution two peaks at 15.2 and 18.0 min were revealed in the chromatograms of the untreated and plasma treated bulk specimens [Fig. 5(A), (B)]. For the specimens treated with $H_2O_2$ (Co) and plasma plus $H_2O_2$ (Co), the GPC chromatograms showed that, in addition to the two GPC peaks in the untreated, a small peak existed at 23.0–23.5 min [Fig. 5(C), (D)]. Figure 6 depicts the GPC chromatograms of the specimens implanted for 70 days (10 weeks). The *in vivo* specimen had the same peaks found in the untreated polymer, with a small shoulder at 23.0–23.5 min.

The relative percentages of the first, second, and third GPC peaks in the all of the samples are given in Table IV. The percentage of each GPC peak was determined based on the individual peak area compared to the total of all peak areas. The ratios of the



**Figure 3.**  SEM pictures of prestressed specimens after *in vitro*: (A1 and A2) 7-day $\alpha_2$-macroglobulin plus 9-day peroxide/cobalt treated; (B1 and B2) 7-day ceruloplasmin plus 9-day peroxide/cobalt treated; (C1 and C2) 7-day lipoprotein plus 9-day peroxide/cobalt treated.

plasmin [Fig. 3(B1), (B2)] solutions showed cracking patterns similar to the specimens pretreated with fraction II [Fig. 2(B1), (B2)]. Surface pitting, roughening, and brittle cracking were observed on the specimens pretreated with lipoprotein [Fig. 3(C1), (C2)]. Similar brittle cracking was also found on the specimens treated with transferrin solution plus $H_2O_2$ (Co).

### ATR-FTIR and GPC analyses

Figure 4 shows the ATR-FTIR spectra obtained from the specimens before and after different treatments. Among the samples, the 7-day plasma-treated samples showed essentially the same spectral features as the untreated samples. Samples treated with $H_2O_2$ (Co) and plasma plus $H_2O_2$ (Co), as well as the 70-day (10-week) implant, similarly displayed dramatic changes in their spectra, with large decreases in the soft-segment bands (e.g., 1110 cm$^{-1}$ and 2795 cm$^{-1}$) and the non-hydrogen-bonded urethane carbonyl band (1730 cm$^{-1}$). In addition to the decrease in some bands several new bands, were also observed [Fig. 4(A), (B)]. By subtracting the spectra of the treated from the untreated samples, more new bands were revealed. Table III summarizes the new

bands that appeared in the subtracted spectra of the treated samples in the region of 1800–900 cm$^{-1}$. The new bands were tentatively assigned to the formation of acid, ester, alkene, and aldehyde groups. To support these assignments, bands from some model compounds are listed in Table III.

The experimental and deconvoluted GPC chromatograms for the untreated and treated specimens are shown in Figure 5. By deconvolution two peaks at 15.2 and 18.0 min were revealed in the chromatograms of the untreated and plasma treated bulk specimens [Fig. 5(A), (B)]. For the specimens treated with $H_2O_2$ (Co) and plasma plus $H_2O_2$ (Co), the GPC chromatograms showed that, in addition to the two GPC peaks in the untreated, a small peak existed at 23.0–23.5 min [Fig. 5(C), (D)]. Figure 6 depicts the GPC chromatograms of the specimens implanted for 70 days (10 weeks). The *in vivo* specimen had the same peaks found in the untreated polymer, with a small shoulder at 23.0–23.5 min.

The relative percentages of the first, second, and third GPC peaks in the all of the samples are given in Table IV. The percentage of each GPC peak was determined based on the individual peak area compared to the total of all peak areas. The ratios of the

TABLE III
New Bands in the Subtracted ATR-IR Spectra of Pellethane 2363-80A After *In Vivo* and *In Vitro* Treatments[a,b]

| Bands (cm$^{-1}$) | Samples | Intensity | Possible Assignment | Model Compounds[20] | |
|---|---|---|---|---|---|
| | | | | Name | Band (cm$^{-1}$) |
| ~1746 | IV | Weak | C=O str, sat. aliph. esters; | Ethyl butyrate | 1738 |
| | V | Medium | | Ethyl caprylate | 1739 |
| 1683–1630 | III | Medium | C=O str, acids with H-bonding | Fumaric acid | 1670 |
| | IV | Weak | | Butyl vinyl ether | 1635 |
| | V | Medium | C=C str, akenes | | |
| 1603–1587% | III | Weak | | Maleic acid | 1589 |
| | IV | Strong | CO$_2^-$ asym. str, acid salts | | |
| | V | Medium | | | |
| 1402% | III | Strong | C—O str and/or O—H | Butyric acid | 1414 |
| | IV | Medium | def, acids CHO in-plane vibr., | Butyraldehyde | 1391 |
| | V | Strong | aldehydes | | |
| 1327 | III | Weak | C—O str, acids associated O—H def | Succinic acid | 1310 |
| | IV | Medium | and C—O str, alcohols C in-plane vibr., | Butyl vinyl ether | 1320 |
| | V | Medium | alkenes | | |
| 1285 | III | Strong | C—O str and/or O—H def, | Butyric acid | 1282 |
| | IV | Strong | acids O—H def and C—O str, alcohols | | |
| | V | Medium | | | |
| 1230 | V | Weak | C—O str, acids associated C—O str, | Butyric acid | 1221 |
| | | | aliph. esters | Ethyl caprylate | 1256 |
| 1174 | III | Strong | | | |
| | IV | Strong | C—O—C asym. str, esters | Ethyl caprylate | 1175 |
| | V | Strong | | Poly(ester urethane)[21] | 1170 |
| 930 | III | Strong | | Butyric acid | 938 |
| | IV | Strong | O—H def, acid | Succinic acid | 920 |
| | V | Strong | | | |

*Note.* [a]str = stretching; def = deformation; aliph. = aliphatic.
[b]III, Treated with H$_2$O$_2$ (Co); IV, treated with plasma plus H$_2$O$_2$ (Co); V, implanted for 70 days.

first and second peaks for all of the samples were similar. The third GPC peak was the highest in the 7-day plasma plus 10-day H$_2$O$_2$ (Co)-treated samples. The 70-day *in vivo* sample was the intermediate value, while the 10-day H$_2$O$_2$ (Co)-treated samples had the lowest GPC peak area. The molecular weights and molecular weight distributions for each individual peak are shown in Table V. Decreases in molecular weights, M$_n$ and M$_w$, of the two major GPC peaks were found for the samples treated with H$_2$O$_2$ (Co) or plasma plus H$_2$O$_2$ (Co). The third peak molecular weights were higher in the 70-day implant than in the specimens treated with H$_2$O$_2$ (Co) or plasma plus H$_2$O$_2$ (Co).

## Adsorbed plasma protein analysis

Figure 7 shows the protein bands on the SDS-PAGE gel obtained from extracts of plasma-treated Pellethane 2363-80A. The standard (column 1) was a solution of proteins with different molecular weights (Bio-Rad). The extraction in 1% SDS solution gave weaker bands in column 2 due to dilution. More striking bands were seen when the extraction was performed in SDS sample buffer (column 3). The bands from the extracts were compared with bands

from commercially obtained purified protein solutions of $\alpha_2$-macroglobulin, ceruloplasmin, transferrin, and low-density lipoprotein. It was observed that a band ca. 200,000 molecular weight in the extract coincided with a band from $\alpha_2$-macroglobulin. Immunoblotting (Western) with polyclonal antibody to $\alpha_2$-macroglobulin indicated a positive band at the same position.

## DISCUSSION

### *In vivo* and *in vitro* comparisons

The phenomenon of stress cracking in polyurethanes has been observed in implanted materials or devices.[8,13] One characteristic of this *in vivo* stress cracking is the nature of ductile fracture in the stressed material, with crack propagation and a fibril pull-out type of crack structure. It was shown in the SEM study that oxidizing a prestressed Pellethane 2363-80A specimens in H$_2$O$_2$ (Co) solution alone caused isolated cracks and brittle microcracking, but without crack propagation [Fig. 1(C1), (C2)]. However, when the specimens were pretreated with human plasma and then with H$_2$O$_2$ (Co) solution [Fig. 1(B1), (B2)], the cracking became ductile with large open cracks

*IN VITRO STRESS CRACKING OF PELLETHANE 2363-80A* 385

interconnecting and propagating across the surface along the transverse direction of the applied stress (strain) direction. Morphologically, the pattern of *in vitro* stress cracking had remarkable similarity to that of *in vivo* stress cracking [Fig. 1(A1), (A2)].

Chemical analysis by ATR-FTIR revealed similar chemical changes that occurred after the prestressed specimens were subjected to long-term implantation and *in vitro* treatment with $H_2O_2$ (Co) or plasma plus $H_2O_2$ (Co). The oxidative degradation is believed to take place mainly in the poly(tetramethylene ether) soft segments with oxygen radicals attacking either $\alpha$-methylene or $\beta$-methylene groups. This causes a decrease in the intensities of soft-segment bands. Although the attack at the $\beta$ position is less probable than at the $\alpha$ position, it should be noted that when the polymer is under stress, the activation energy of H-abstraction from the $\beta$-methylene is lowered.[14] An attack on $\alpha$-methylene may result in ester, carboxylic acid, or aldehyde groups, while an attack on $\beta$-methylene may result in alcohol, ketone, or alkene. At this point, the formation of some of these functional



**Figure 5.** Experimental and deconvoluted GPC chromatograms of prestressed specimens before and after different treatments: (A) Untreated; (B) 7-day plasma treated; (C) 7-day peroxide/cobalt treated; (D) 7-day plasma plus 9-day peroxide/cobalt treated.

groups is strongly supported by comparison of the observed characteristic bands with those of model compounds. For example, the observed acid and ester groups have bands which may be correlated with those of model compounds as shown in Table III. On the other hand, some functional groups, such as aldehyde and ketone, cannot be confirmed spectrally. This means that their formation is either less likely, or that they are less stable, and after their formation they are rapidly oxidized to acid or ester groups by oxygen radicals.

Quantitative comparison of the extent of degradation between different samples can be achieved using depth profile analysis,[15] in which the concentration profile is assumed to change exponentially from surface to the bulk given by $C(x)/C_\infty = (1 - e^{-\delta x})$,





**Figure 4.** ATR-IR spectra of prestressed specimens before and after different treatments: Untreated; 7-day plasma treated; 7-day peroxide treated; 7-day plasma/9-day peroxide treated; 70 days (10 weeks) implanted.



**Figure 6.** Experimental and deconvoluted GPC chromatograms of a prestressed specimen implanted for 70 days (10 weeks) in a Sprague-Dawley rat in the Cage Implant System.

TABLE IV
Relative Percentage of the Peaks in the GPC Chromatograms Based on the Total Amount of Polymer[a]

| Sample | % Peak 1 | % Peak 2 | % Peak 3[b] |
|---|---|---|---|
| Untreated | 37.97 | 62.03 | — |
| 7-Day plasma | 33.55 | 66.45 | — |
| 10-Day oxidation | 38.43 | 60.70 | 0.87 |
| 7-Day plasma + 10-day oxidation | 38.80 | 59.04 | 2.16 |
| 70-Day in vivo | 32.97 | 65.62 | 1.41 |

[a]Peak 1 at 15.2 min, Peak 2 at 18.0 min, Peak 3 from 23.0–23.5 min.
[b]Percentage of degradation products.

where $C_\infty$ represents the concentration in the bulk, and $\delta$ reflects the concentration change in the depth direction obtainable from the experimental data. A characteristic depth of degradation, $\Delta$, can thus be defined as the depth at which the relative concentration becomes $(1 - e^{-1})$, or $\Delta = 1/\delta$. Since the degradation has been shown to initiate at the surface, the larger the $\Delta$ value, the greater the degree of degradation. Table VI lists the $\Delta$ values of $\alpha$-methylene group from the band at 2795 cm$^{-1}$ for samples treated under different conditions. The samples treated with plasma plus H$_2$O$_2$ (Co) had the greatest depth of degradation, which was about six times greater than that of the samples treated with H$_2$O$_2$ (Co) alone, and about 1.5 times greater than that of the in vivo samples. The plasma treated samples showed no degradation effect since the $\Delta$ value was about the same as the untreated samples. Thus, it is clear that plasma acts as a catalyst which accelerates the oxidative degradation of the prestressed Pellethane 2363-80A.

The GPC results demonstrated that the bulk samples, when treated with H$_2$O$_2$ (Co) or plasma plus H$_2$O$_2$ (Co), underwent a degradative process. The presence of two major peaks in the GPC chromatograms of bulk Pellethane 2363-80A indicated

that the polymer contained a bimodal molecular weight distribution. For the untreated samples, the first GPC peak had an $M_n$ of 95,000 and the second peak an $M_n$ of 86,000 relative to polystyrene. After the samples were oxidized for 10 days in H$_2$O$_2$ (Co), the first and second GPC peaks decreased in molecular weight and a new peak appeared with an $M_n$ of 3600 relative to polystyrene. Seventy days of implantation caused similar GPC changes in the prestressed specimens. The third peak could result from degradation products. As compared to the 10-day oxidized samples, synergistic effects of plasma plus oxidation caused a further decrease in molecular weights of the first and second peaks and a greater increase in area ratio of the third GPC peak.

## Identification of biological stress cracking agents

The fact that the in vitro stress cracking of the Pellethane polyetherurethane requires a pretreatment with human plasma prior to H$_2$O$_2$ (Co) is intriguing. The effect of plasma plus H$_2$O$_2$ (Co) is significantly greater than the effects of plasma alone or H$_2$O$_2$ (Co) alone or the additive effects. This suggests that

TABLE V
Comparison of the Molecular Weights and Molecular Weight Distributions
of the Prestressed Pellethane 80A Specimens After In Vivo and In Vitro Treatments[a]

| Sample | Peak | $M_n$ | $M_w$ | $M_z$ | PDI[b] |
|---|---|---|---|---|---|
| Untreated | 1 | $9.51 \times 10^4$ | $5.52 \times 10^6$ | $9.74 \times 10^5$ | 5.80 |
|  | 2 | $8.63 \times 10^4$ | $2.78 \times 10^5$ | $1.05 \times 10^6$ | 3.22 |
| 7-Day plasma | 1 | $9.48 \times 10^4$ | $5.41 \times 10^5$ | $9.16 \times 10^5$ | 5.71 |
|  | 2 | $8.25 \times 10^4$ | $2.78 \times 10^5$ | $1.07 \times 10^6$ | 3.37 |
| 10-Day oxidation | 1 | $6.48 \times 10^4$ | $5.13 \times 10^5$ | $9.41 \times 10^5$ | 7.93 |
|  | 2 | $5.90 \times 10^4$ | $2.52 \times 10^5$ | $9.43 \times 10^5$ | 4.27 |
|  | 3 | $3.66 \times 10^3$ | $4.87 \times 10^3$ | $6.28 \times 10^3$ | 1.33 |
| 7-Day plasma + 10-Day oxidation | 1 | $5.10 \times 10^4$ | $4.63 \times 10^5$ | $8.75 \times 10^5$ | 9.02 |
|  | 2 | $5.46 \times 10^4$ | $2.11 \times 10^5$ | $6.94 \times 10^5$ | 3.86 |
|  | 3 | $3.21 \times 10^3$ | $4.85 \times 10^3$ | $6.99 \times 10^3$ | 1.51 |
| 70-Day in vivo | 1 | $7.30 \times 10^4$ | $5.15 \times 10^5$ | $9.23 \times 10^5$ | 7.05 |
|  | 2 | $5.70 \times 10^4$ | $2.39 \times 10^5$ | $8.79 \times 10^5$ | 4.21 |
|  | 3 | $4.76 \times 10^3$ | $8.13 \times 10^3$ | $1.20 \times 10^4$ | 1.71 |

[a]Relative to polystyrene, UV detector.
[b]Polydispersity index.

the role of plasma protein is synergistic with the role of the oxidation to produce ESC. It has been hypothesized that certain biological agents may be involved in the $M_n$ of 86,000 relative to polystyrene. After the samples were oxidized for 10 days in $H_2O_2$ (Co), the first and second GPC peaks decreased in molecular weight and a new peak appeared with a $M_n$ of 3600 relative to polystyrene. Seventy days of implantation caused similar GPC changes in the prestressed specimens. The third peak could result from degradation products. As compared to the 10-day oxidized samples, synergistic effects of plasma plus oxidation caused a further decrease in molecular weights of the first and second peaks and a greater increase in area ratio of the third GPC peak.

### Identification of biological stress cracking agents

It is interesting that the in vitro stress cracking of the Pellethane polyetherurethane requires a pretreatment with human plasma prior to $H_2O_2$ (Co). The effect of plasma plus $H_2O_2$ (Co) is significantly greater than the effects of plasma alone or $H_2O_2$ (Co) alone or the additive effects. This suggests that the role of plasma protein is synergistic with the role of the oxidation to produce ESC. It has been hypothesized that certain biological agents may be involved in the stress cracking of polyetherurethane pacemaker insulation during *in vivo* use.[8,13] We have shown that the *in vivo* stress cracking of prestressed Pellethane specimens is dependent on viable cell/polymer interactions.[7] Adherent macrophages and foreign-body giant cells on a polyetherurethane urea film *in vivo* can produce oxidative degradation and surface cracking or embrittlement on the material at the cell/polymer contact zones.[16,17] Based on these findings, our *in vitro* system is designed to mimic the *in vivo* system; human plasma contains certain biological components that can act as a stress cracking promoter, while $H_2O_2$ (Co) solution provides an oxidative reaction comparable to that observed in the respiratory burst of adherent macrophages and foreign-body giant cells.[18]

To identify the biological component(s) in the *in vitro* stress cracking, the plasma was fractionated into three fractions. It was observed that a pretreatment

of the stressed specimens with fraction II caused significant surface cracking where the cracking pattern [Fig. 2(B1), (B2)] resembled the characteristics of *in vivo* stress cracking. Fraction II was dominated by $\alpha_2$-macroglobulin ($\alpha_2$M). To test whether $\alpha_2$M and/or other proteins could cause a similar effect, commercially obtained purified proteins were reconstituted to physiological concentration and employed to pretreat the prestressed specimens (Table I). Among the selected proteins, pretreatment with $\alpha_2$M produced the most significant synergistic stress cracking effect [Fig. 3 (A1), (A2)] and pretreatment with ceruloplasmin a moderate effect [Fig. 3(B1), (B2)], whereas pretreatment with low-density lipoprotein or transferrin did not promote crack propagation to the brittle cracks cause by $H_2O_2$ (Co) oxidation [Fig. 3(C1), (C2)].

Adsorption of human plasma $\alpha_2$M onto the polyetherurethane was confirmed by SDS-PAGE and immunoblotting. Human plasma $\alpha_2$-macroglobulin is a large glycoprotein with four identical subunits of about 185,000 daltons each assembled pairwise by disulfide-bridges.[19] In reducing conditions, SDS-PAGE analysis revealed a protein band migrated slightly ahead of 200,000 dalton molecular weight standard (indicated by the asterisk) in Figure 7. In addition, it was observed that purified $\alpha_2$M migrated to the same position. Immunoblotting with $\alpha_2$M specific antibody confirmed the identity of this band to be $\alpha_2$-macroglobulin.

### CONCLUSIONS

This study demonstrates that the phenomenon of *in vivo* stress cracking in Pellethane 2363-80A is duplicated by an *in vitro* system that involves a pretreatment of the prestressed specimens with human plasma at 37°C for 7 days followed by oxidation in 10% hydrogen peroxide with 0.10$M$ cobalt chloride at 50°C for 10 days. Morphologically, the pattern of *in vitro* stress cracking has remarkable similarity to that of *in vivo* stress cracking with characteristics of ductile failure. Chemical analysis by ATR-FTIR and GPC indicates that *in vitro* and *in vivo* treated samples are degraded by an oxidative reaction that takes place mainly in the polyether soft segments with oxygen

**TABLE VI**
ATR-FTIR Analysis of Treated and Untreated Pellethane 2363-80A:
Parameters of Degradation Depths for $\alpha$-Methylene Group at 2795 cm$^{-1}$

| Parameters | Untreated | Treated with Plasma | Treated with $H_2O_2$ (Co) | Treated with Plasma Plus $H_2O_2$ (Co) | Implanted for 70 days |
|---|---|---|---|---|---|
| $K$ | 0.53 | 0.59 | 0.57 | 0.67 | — |
| $\delta$ ($\mu m^{-1}$) | 6.1 | 5.5 | 2.1 | 0.32 | 0.53 |
| $\Delta$ ($\mu m$) | 0.17 | 0.18 | 0.47 | 3.1 | 1.9 |
| $\Delta_{Tr}/\Delta_{Un}$ | 1.0 | 1.1 | 2.8 | 18.8 | 11.2 |

388                                                                                                                          ZHAO ET AL.



**Figure 7.** Photograph of SDS-PAGE bands of adsorbed proteins on Pellethane 2363-80A. The protein band indicated by the asterisk is confirmed to be $\alpha_2$-Macroglobulin by immunoblotting.

radicals attacking $\alpha$- and $\beta$-methylene groups. *In vitro* pretreatment with plasma has a synergistic effect with the oxidation facilitated by $H_2O_2$ (Co) treatment to produce ESC.

A plasma component responsible for promoting stress cracking in Pellethane 2363-80A polyurethane is identified to be $\alpha_2$-macroglobulin ($\alpha_2$M). Pretreatment with $\alpha_2$M-rich plasma fraction or commercially obtained purified protein solution has a significant stress cracking effect on the prestressed specimens. Adsorption of human plasma $\alpha_2$M onto the polymer is confirmed by SDS-PAGE and immunoblotting.

## References

1. K.B. Stokes and B. Chem, "Environmental stress cracking in implanted polyether polyurethanes," in *Polyurethanes in biomedical engineering*, H. Planck, G. Egbers, and I. Syré (eds.), Elsevier, Amsterdam, 1984, pp. 243–255.
2. M. Szycher, D. Dempsey, and V.L. Poirier, "Surface fissuring of polyurethane-based pacemaker leads," *Second World Congress on Biomaterials, 10th Annual Meeting of the Society for Biomaterials,* Washington, D.C., 1984, p. 24.
3. K.B. Stokes, A.W. Frazer, and E.A. Carter, "The biostability of various polyether polyurethanes under stress," *Advances in biomaterials,* S.M. Lee (ed.), Technomic, Lancaster, PA, 1987, pp. 235–245.
4. K. Stokes, A. Coury, and P. Urbanski, "Autooxidative degradation of implantable polyether polyurethane devices," *J. Biomater. Appl.,* **1**, 471 (1987).
5. A. Takahara, A. Coury, R.W. Hergenrother, and S.L. Cooper, "Effect of soft segment chemistry on the biostability of segmented polyurethanes. I. *In vitro* oxidation," *J. Biomed. Mater. Res.,* **25**, 341–356 (1991).
6. K. Stokes, P. Urbanski, and K. Cobian, "New test methods for the evaluation of stress cracking and metal catalyzed oxidation in implanted polymers," in *Polyurethanes in biomedical engineering II,* H. Planck, et al. (eds.), Elsevier, Amsterdam, 1987, pp. 109–127.
7. Q. Zhao, M.P. Agger, M. Fitzpatrick, J.M. Anderson, A. Hiltner, K. Stokes, and P. Urbanski, "Cellular interactions with biomaterials: *in vivo* cracking of prestressed Pellethane 2363-80A," *J. Biomed. Mater. Res.,* **24**, 621–637 (1990).
8. K.B. Stokes and B. Chem, "Polyether polyurethanes: Biostable or not?," *J. Biomater. Appl.,* **3**(2), 228–259 (1988).
9. A.J. Coury, P.T. Cahalan, E.I. Schultz, and K.B. Stokes, "*In vitro* aging of implantable polyurethane in metal ion solutions," *Trans. 2nd World Congr. on Biomatrls,* 1984, p. 7, 252.
10. K. Stokes, P. Urbanski, and J. Upton, "The *in vivo* auto-oxidation of polyether polyurethane by metal ions," *J. Biomater. Sci. Polym. Ed.,* **1** (3), 207–230 (1990).
11. Y.L. Hao, K.C. Ingham, and M. Wickerhauser, "Fractional precipitation of proteins with polyethylene glycol," in *Methods of plasma protein fractionation,* J.M. Curling (ed.), Academic Press, New York, 1980, pp. 57–74.
12. U.K. Laemmli, "Cleavage of structural proteins during the assembly of the head of bacteriophage T4," *Nature,* **227**, 680–685 (1970).
13. M. Szycher, "Biostability of polyurethane elastomers: A critical review," *J. Biomater. Appl.,* **3**, 297–401 (1988).
14. N.Y. Rapoport and G.E. Zaikov, "Kinetics and mechanism of the oxidation of stressed polymers," *Dev. Polym. Degrad.,* **6**, 207–258 (1985).
15. Y. Wu, C. Sellitti, J.M. Anderson, A. Hiltner, C.G. Lodoen, and C.R. Payet, "An FTIR-ATR investigation of *in vivo* poly(ether urethane) degradation," *J. Appl. Polym. Sci.,* **46**, 201–211 (1992).
16. Q. Zhao, N. Topham, J.M. Anderson, A. Hiltner, G. Lodoen, and C.R. Payet, "Foreign-body giant cells and polyurethane biostability: *In vivo* correlation of cell adhesion and surface cracking," *J. Biomed. Mater. Res.,* **25**, 177–183 (1991).
17. Y. Wu, Q. Zhao, J.M. Anderson, A. Hiltner, G.A. Lodoen, and C.R. Payet, "Effect of some additives on the biostability of a poly(etherurethane)," *J. Biomed. Mater. Res.,* **25**, 725–739 (1991).
18. S.J. Klebanoff, "Phagocytic cells: products of oxygen metabolism," in *Inflammation: Basic principles and clinical correlations,* J.I. Callin et al. (eds.), Raven Press, New York, 1988.
19. L. Sottrup-Jensen, "$\alpha$-Macroglobulins: Structure, shape, and mechanism of proteinase complex formation," *J. Biol. Chem.,* **264**, 11539–11542 (1989).
20. C.J. Pouchert, *The Aldrich library of FTIR spectra,* Vol. 1, Aldrich Chem. Co., Inc., Milwaukee, 1985.
21. J.G. Dillon, *Infrared spectroscopic atlas of polyurethanes,* Technomic Pub. Co., Inc., Lancaster, PA, 1989.

Received April 16, 1992
Accepted August 27, 1992

388                                                                                                    ZHAO ET AL.



**Figure 7.** Photograph of SDS-PAGE bands of adsorbed proteins on Pellethane 2363-80A. The protein band indicated by the asterisk is confirmed to be $\alpha_2$-Macroglobulin by immunoblotting.

radicals attacking $\alpha$- and $\beta$-methylene groups. *In vitro* pretreatment with plasma has a synergistic effect with the oxidation facilitated by $H_2O_2$ (Co) treatment to produce ESC.

A plasma component responsible for promoting stress cracking in Pellethane 2363-80A polyurethane is identified to be $\alpha_2$-macroglobulin ($\alpha_2M$). Pretreatment with $\alpha_2M$-rich plasma fraction or commercially obtained purified protein solution has a significant stress cracking effect on the prestressed specimens. Adsorption of human plasma $\alpha_2M$ onto the polymer is confirmed by SDS-PAGE and immunoblotting.

### References

1. K. B. Stokes and B. Chem, "Environmental stress cracking in implanted polyether polyurethanes," in *Polyurethanes in biomedical engineering,* H. Planck, G. Egbers, and I. Syré (eds.), Elsevier, Amsterdam, 1984, pp. 243–255.
2. M. Szycher, D. Dempsey, and V. L. Poirier, "Surface fissuring of polyurethane-based pacemaker leads," *Second World Congress on Biomaterials, 10th Annual Meeting of the Society for Biomaterials,* Washington, D.C., 1984, p. 24.
3. K. B. Stokes, A. W. Frazer, and E. A. Carter, "The biostability of various polyether polyurethanes under stress," *Advances in biomaterials,* S. M. Lee (ed.), Technomic, Lancaster, PA, 1987, pp. 235–245.
4. K. Stokes, A. Coury, and P. Urbanski, "Autooxidative degradation of implantable polyether polyurethane devices," *J. Biomater. Appl.,* 1, 471 (1987).
5. A. Takahara, A. Coury, R. W. Hergenrother, and S. L. Cooper, "Effect of soft segment chemistry on the biostability of segmented polyurethanes. I. *In vitro* oxidation," *J. Biomed. Mater. Res.,* 25, 341–356 (1991).
6. K. Stokes, P. Urbanski, and K. Cobian, "New test methods for the evaluation of stress cracking and metal catalyzed oxidation in implanted polymers," in *Polyurethanes in biomedical engineering II,* H. Planck, et al. (eds.), Elsevier, Amsterdam, 1987, pp. 109–127.
7. Q. Zhao, M. P. Agger, M. Fitzpatrick, J. M. Anderson, A. Hiltner, K. Stokes, and P. Urbanski, "Cellular interactions with biomaterials: *in vivo* cracking of prestressed Pellethane 2363-80A," *J. Biomed. Mater. Res.,* 24, 621–637 (1990).
8. K. B. Stokes and B. Chem, "Polyether polyurethanes: Biostable or not?," *J. Biomater. Appl.,* 3(2), 228–259 (1988).
9. A. J. Coury, P. T. Cahalan, E. I. Schultz, and K. B. Stokes, "*In vitro* aging of implantable polyurethane in metal ion solutions," *Trans. 2nd World Congr. on Biomatrls,* 1984, p. 7, 252.
10. K. Stokes, P. Urbanski, and J. Upton, "The *in vivo* auto-oxidation of polyether polyurethane by metal ions," *J. Biomater. Sci. Polym. Ed.,* 1 (3), 207–230 (1990).
11. Y. L. Hao, K. C. Ingham, and M. Wickerhauser, "Fractional precipitation of proteins with polyethylene glycol," in *Methods of plasma protein fractionation,* J. M. Curling (ed.), Academic Press, New York, 1980, pp. 57–74.
12. U. K. Laemmli, "Cleavage of structural proteins during the assembly of the head of bacteriophage T4," *Nature,* 227, 680–685 (1970).
13. M. Szycher, "Biostability of polyurethane elastomers: A critical review," *J. Biomater. Appl.,* 3, 297–401 (1988).
14. N. Y. Rapoport and G. E. Zaikov, "Kinetics and mechanism of the oxidation of stressed polymers," *Dev. Polym. Degrad.,* 6, 207–258 (1985).
15. Y. Wu, C. Sellitti, J. M. Anderson, A. Hiltner, C. G. Lodoen, and C. R. Payet, "An FTIR-ATR investigation of *in vivo* poly(ether urethane) degradation," *J. Appl. Polym. Sci.,* 46, 201–211 (1992).
16. Q. Zhao, N. Topham, J. M. Anderson, A. Hiltner, G. Lodoen, and C. R. Payet, "Foreign-body giant cells and polyurethane biostability: *In vivo* correlation of cell adhesion and surface cracking," *J. Biomed. Mater. Res.,* 25, 177–183 (1991).
17. Y. Wu, Q. Zhao, J. M. Anderson, A. Hiltner, G. A. Lodoen, and C. R. Payet, "Effect of some additives on the biostability of a poly(etherurethane)," *J. Biomed. Mater. Res.,* 25, 725–739 (1991).
18. S. J. Klebanoff, "Phagocytic cells: products of oxygen metabolism," in *Inflammation: Basic principles and clinical correlations,* J. I. Callin et al. (eds.), Raven Press, New York, 1988.
19. L. Sottrup-Jensen, "$\alpha$-Macroglobulins: Structure, shape, and mechanism of proteinase complex formation," *J. Biol. Chem.,* 264, 11539–11542 (1989).
20. C. J. Pouchert, *The Aldrich library of FTIR spectra,* Vol. 1, Aldrich Chem. Co., Inc., Milwaukee, 1985.
21. J. G. Dillon, *Infrared spectroscopic atlas of polyurethanes,* Technomic Pub. Co., Inc., Lancaster, PA, 1989.

Received April 16, 1992
Accepted August 27, 1992

# EXHIBIT L

Int Urogynecol J
DOI 10.1007/s00192-011-1405-4

CLINICAL OPINION

# Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery

**Renaud de Tayrac · Vincent Letouzey**

Received: 3 February 2011 / Accepted: 20 February 2011
© The International Urogynecological Association 2011

**Abstract**
*Introduction and hypothesis* Bacterial colonization following mesh-augmented pelvic floor reconstructive surgery for pelvic organ prolapse is probably an underestimated consideration.
*Methods* Although clinical infections are rare, subclinical contamination of the polypropylene mesh has been systematically demonstrated by bacteriological analyses during mesh implantation and on explanted meshes.
*Results* A model of subclinical mesh infection does exist and bacterial colonization and mesh shrinkage have recently been correlated experimentally.
*Conclusions* New meshes with surface modifications or an antibiotic or antiseptic coating should be explored.

**Keywords** Polypropylene mesh · Vaginal surgery · Infection · Erosion · Shrinkage

## Introduction

Non-absorbable polypropylene meshes are widely used for pelvic floor reconstructive surgery by the vaginal route.

A related article can be found at DOI 10.1007/s00192-011-1399-y.

R. de Tayrac · V. Letouzey
Obstetrics and Gynaecology Department,
Caremeau University Hospital,
Nîmes, France

R. de Tayrac (✉)
Service de Gynécologie-Obstétrique, Hôpital Carémeau,
Place du Professeur Robert Debré,
30029, Nîmes Cedex 9, France
e-mail: renaud.detayrac@chu-nimes.fr

Published online: 22 April 2011

Although they provide appropriate support, their use is restricted by complications of poorly understood origin such as erosion, pain and shrinkage. Many factors have been suspected such as the characteristics of the polypropylene mesh (weight, pore size, stiffness and elasticity), surgical technique, surgeon experience and associated hysterectomy, but even when these factors are controlled, some patients still experience incomprehensible painful shrinkage. Several hypotheses may be put forward to explain this: firstly, an immune reaction to a foreign body [1], but this does not explain the relatively better tolerance of the same material by the abdominal route; secondly, a prolonged inflammatory response (oxidative attack), as previously shown in abdominal hernia [2] and thirdly, a chronic infection.

Our objective is to review the basic science and recent clinical aspects of mesh infection in pelvic floor reconstructive surgery.

## Pathophysiology of mesh infection

In other surgical specialities, such as orthopaedics, where the number of patients requiring biomaterials implant surgery is steadily increasing, biomaterials-related infection is one of the main causes of implant failure [3]. In a very interesting paper published by Gristina in *Science* in 1987, it was admitted that one of the major barriers to the extended use of implanted devices is the possibility of bacterial adhesion to biomaterials through the highly adaptive ability of bacteria to colonize the surfaces of "inert" biomaterials or adjacent damaged tissue cells [4]. Biomaterial implantation is followed immediately by a "race for the surface", a contest between tissue cell integration and bacterial adhesion to that same surface. If

the bacteria win, the surface is occupied and is thus less available for tissue integration. Furthermore, adhesion-mediated infections are notoriously resistant to antibiotics and host defences, and tend to persist until the biomaterial is removed.

In other words, microorganisms can interfere with the integration process through adhesion to mesh surfaces, and such adhesion is an important stage in the infection [5]. The first stage of adhesion is physical and reversible, but the second is molecular and irreversible [6]. And, it has been suggested that this second stage is dependent upon the adaptative mechanisms of the bacteria itself. A low density of bacteria can produce a protective polysaccharide "biofilm" (slime) that allows the bacteria to remain quiescent. These bacteria may then multiply following an intercurrent event, e.g. an alteration in host immune defences [5]. Chronic infections may therefore appear several months or even several years after mesh implantation [7]. This mechanism of chronic infection may also explain the low bacterial density usually found on explanted meshes [8].

Vaginal surgery is a "clean–contaminated surgery" since the vagina is naturally colonized by bacteria and is located close to the anus. Bacterial contamination may occur when the mesh is initially inserted through faulty asepsis in handling, prepping the vagina or because of the proximity of the anus [8]. Contamination may occur during vaginal closure, when vaginal flora comes in contact with the mesh.

*Escherichia coli* is common in vaginal infections and is one of the most frequent bacteria responsible for infected biomaterial [4]. Such bacteria on the mesh may also be explained by the conversion of typically non-pathogenic bacteria into virulent colonies adherent to the material [9].

### Clinical evidence of mesh infection

Clinical data and experiments have shown that polypropylene is the synthetic material least susceptible to infection and that monofilament should be preferred to multifilament meshes [9]. A large contact area favours bacterial persistence and development in multifilament meshes. As the distance between the filaments is less than 10 μm, bacteria that are around 1 μm in diameter can colonize the mesh, but inflammatory cells (macrophages, neutrophils) are too big to enter [10]. And, whereas the macropores in polypropylene meshes allow inflammatory cells to reach the site of infection [11], microporous suburethral tapes were withdrawn from the market because of the many infectious complications reported [12]. However, even if the rate of clinical infection (periprosthetic abscess) with monofilament, large-pore polypropylene meshes is low (<1%), clinical evidence points to chronic infection occurring frequently.

In a prospective study of 64 consecutive patients undergoing vaginal implantation of a lightweight, collagen-coated monofilament polypropylene mesh, Vollebregt et al. [13] showed that 83.6% of the meshes were colonized by different types of bacteria. These results were obtained using culture swabs of the core mesh during surgery. The rate of bacterial colonization was high despite double disinfection of the surgical area with iodine, prophylactic antibiotic therapy with intravenous cephazolin and metronidazole, a separate drape covering the anal region, a change of gloves and instruments and mesh kept in its sterile pack as long as possible. The bacteria swabbed from the meshes were potentially pathogenic in 13.4% of cases (*Staphylococcus aureus*, *E. coli*, *Bacteroides*, *Enterococcus*, *Proteus mirabilis*), but were present at a very low density (<$10^3$ CFU/mL). Postoperatively, 4.7% of the women presented unexplained fever but none showed any signs of infection up to 6 months later.

The bacteriological analysis of 16 meshes removed because of complications following the surgical management of urinary incontinence or pelvic organ prolapse showed multimicrobial infection in 31% of cases, including *P. mirabilis* (in 25%), *E. coli*, *Staphylococcus*, *Streptococcus* and *Enterococcus* [8]. Bacterial contamination was found in all meshes, even in a case of repeat surgery for mesh shrinkage with no erosion. Bacterial density was low (<$10^3$ CFU/mL) in 43% of cases but in others reached $10^5$ CFU/mL.

Another study reported by Marcus-Braun and von Theobald concerned the retrospective analysis of 83 patients who underwent 104 repeat operations mainly for complete or partial mesh removal [14]. The main indications for mesh removal consisted of erosion ($n$=44) and infection ($n$=30). Among infected cases, only five patients showed abscess (16.7%), and cultures were positive in only seven cases (23.3%), with *E. coli* and *S. aureus* as principal bacteria. In this study, repeat erosion was associated with underlying infection, and recurrent infection was resolved only by complete mesh removal. Furthermore, 66.6% of infections were detected more than 2 years, and some up to 4 years, after mesh implantation.

Clave et al. recently reported on an analysis of 84 meshes explanted for erosion (69%), infection (17%), or shrinkage or pain (14%) [15]. Histological examination revealed mainly two types of periprosthetic tissue reaction, including infection in 44% of cases (altered polymorphonuclear neutrophils) and chronic inflammation in 42% of cases (giant cells and mononuclear cells). A minor contamination process was suspected even in the second type because of the presence of unaltered polynuclear cells associated with partial mesh colonization. Monofilament polypropylene was less frequently associated with infection than multifilament and composite meshes (39% versus

70%, $p=0.02$). Clave et al. reported signs of polymer degradation with polypropylene, particularly in the case of infection (59% of cases).

Finally, several cases of chronic infection due to *Actinomyces israelii* have been reported, particularly in cases of recurrent vaginal erosion following TVT, bone anchored sling and sacrospinous ligament suspension [16–18]. The diagnosis of such an infection requires biopsies of eroded mesh and vaginal tissue around the erosion area for both histological examination and bacterial samples for aerobic and anaerobic culture.

**Risk factors for mesh infection**

Significant risk factors for mesh infection following ventral hernia repair consist of prolonged operative time [OR 1.38 (95%CI 1.2–1.6)], steroid use [OR 4.15 (95%CI 1.5–11.1)] and smoking [OR 2.46 (95%CI 1.3–4.6)] [19].

In vaginal surgery with mesh, age (>60 years old) and smoking (>6.85 pack years) are associated with vaginal erosion, with relative risks at 1.6 and 3, respectively [20]. Age is responsible for changes in the function of inflammatory cells, reduced extracellular matrix and impaired angiogenesis. Smoking is responsible for vasoconstriction, the formation of microthrombi, decreased fibrinolytic activity and direct endothelial injury. In the same study, smoking was also significantly associated with postoperative infection.

Although other factors such as poor vaginal tissue vascularity, inadequate vaginal tissue coverage and postoperative hematoma are probably also risk factors for infection, there is no evidence for this in the literature. Therefore, no recommendations (such as prolonged antibioprophylaxis, time to repeat operation) can be made for the management of postoperative hematoma around the mesh or for early mesh exposure.

**Mesh infection in an animal model**

We have previously described an animal model of mesh infection based on the well-known model of incisional abdominal hernia in Wistar rats. Here, the bacterial inoculate is injected immediately after mesh implantation and skin closure, and a bacterial analysis is performed 1 month later [21]. Such a model could be used to compare the in vivo bacterial infectivity of the different biomaterials used in vaginal surgery. But, such a model must be reproducible and to achieve this, it is essential to control the virulence of the bacteria and the quantity of bacterial inoculate employed. Our model uses strains of uropathogenic *E. coli* whose virulence is tested by polymerase chain reaction for the presence or absence of a panel of genes encoding known virulence factors (toxins, adhesins, siderophores and capsules). And, with regard to the bacteriological analysis, samples are cultured on Muller–Hinton solution, then tissues are crushed using a sterile scalpel and pots containing the meshes are incubated for 18 h at 37°C.

Rats have already been used in the past to test for the infection of prostheses, but excision was in all cases early, on day 7 [9, 22]. We chose late explantation 30 days after surgery, and this is for two reasons. First, we considered it important to wait until after the immediate inflammatory reaction, and, second, postoperative complications due to meshes implanted by the vaginal route seldom occur soon after surgery. We chose to inoculate animals with *E. coli* as this bacterium is often implicated in urogenital infections and often colonizes the vaginal mucosa. It may become offensive, acquiring pathogenic islets that include genes coding for a variety of virulence factors (toxins, siderophores and capsules). In our first experiment, the persistent infection of all meshes on day 30 with the same *E. coli* validated our decision to use this bacterium. Yet, culture swabs were polymicrobial, with mainly commensal microorganisms (*Staphylococcus epidermidis*, *Corynebacteriae*) or colonizing saprophytes (*S. aureus*). *P. mirabilis* was the only pathogenic bacteria, and may have been the consequence of surgical contamination. We chose model parameters in such a manner to result in the slightest possible infection of the mesh for infection in clinical practice probably arises from involuntary contamination with a small number of microorganisms. In confirmation of this, when meshes are removed because of clinical complications (erosion, infection) and cultured, only a low bacterial density is usually found. Our minimal infection of the mesh therefore more closely matches clinical conditions.

**What have we learned from basic science?**

A subclinical mesh infection, acquired during the initial implantation, may result in wound separation with subsequent mesh exposure [23].

If vaginal erosion is detected, it raises the question of whether mesh colonization is a risk factor for erosion, or whether erosion exposes the mesh to vaginal bacteria that then colonize it [13].

In a recent study, we put forward the hypothesis that mesh infection stemming from bacterial contamination during the implantation phase is an independent risk factor for shrinkage [24]. A low concentration of bacterial cells ($10^6$ CFU) was injected onto the mesh intraoperatively in order to mimic subclinical bacterial contamination. A significant correlation was observed between infection and shrinkage.

**Fig. 1** Scanning electron microscopy of low-weight, macroporous, monofilament knitted polypropylene mesh extracted after 30 days with infection by *E. coli* in an incisional abdominal hernia model in Wistar rats. The explanted infected mesh shows transverse cracks (**a**). After washing with DMSO (**b**) and ultrasonic shock (**c**), it appears marked modifications in mesh surface corresponding to the biofilm (**a**), and after biofilm removal, no polymer degradation was seen any more (**c**)



Using the same model of mesh infection, we also experimentally tested Clave's conclusion [15] regarding a correlation between infection and polypropylene "degradation". Polypropylene meshes were implanted in the incisional abdominal hernia model in Wistar rats and inoculated with $10^6$ CFU of *E. coli*, as described previously [24]. After 30 days the meshes were explanted and washed with dimethyl sulfoxide (DMSO) and ultrasonic shock, then examined by environmental scanning electron microscope (ESEM). At the same time, polypropylene meshes were inoculated in vitro with the same isolate of *E. coli*, then explanted after 2–15 days and washed with the same process. In these studies we also observed signs of superficial degradation and transverse cracks (Figs. 1 and 2), but this appeared to concern only the biofilm, with no effect on the implant thread itself (unpublished data).

**Fig. 2** ESEM of in vitro infection of low-weight polypropylene macroporous knitted mesh extracted from a bacterial culture medium infected by *E. coli* after 2 (**a**), 5 (**b**) and 15 days (**c**). **a** Beginning of biofilm formation. **b** Cracks in the biofilm at mesh interstices. **c** Transverse cracks in the biofilm. **d** Non-degraded polymer thread after washing out the biofilm





## Perspectives

Although the short- to medium-term risk of infection and subsequent erosion, shrinkage or repeat operation for partial or complete mesh removal is now better understood, knowledge is still lacking for the long term. Recently, two case reports, one concerning an enterocutaneous fistula 14 years after prosthetic mesh repair of a ventral incisional hernia [25] and the other a suprapubic vaginocutaneous fistula 18 years after a bladder-neck suspension [26], were interviewed if pelvic reconstructive surgery using polypropylene mesh by the vaginal route is a lifelong risk.

Tissue ingrowth around synthetic implants is a complex phenomenon, indissociable from the inflammatory reaction. An immunochemical analysis of infected implanted mesh would be of great interest, with a particular focus on transforming growth factor (TGF)-beta1 which is a determinant of foreign body reaction to alloplastic materials in rat fibroblast cultures [27]. This type of study should be able to differentiate between the respective responsibilities in mesh shrinkage of bacterial contamination and non-infectious foreign body reactions. Should the hypothesis be confirmed, the use of antibacterial products on synthetic implants would be greatly beneficial in women.

Antibiotics may be used protectively during the initially vulnerable period before the surface is stabilized, when random colonization by bacteria might occur [4]. Parallel to the potential advantages of coating with antibiotics, silver coated-mesh has been shown to reduce bacterial colonization around the mesh [28].

Biomaterial surfaces must be modified to improve compatibility and tissue integration, and resist microbial colonization in the "race for the surface" [4]. Modifications of the mesh surface, such as brush coating, have been shown to be effective in reducing the development of a less mature and less organized bacterial biofilm, resulting in decreased bacterial contamination of the implant [3]. With no antibiotic or antiseptic on the mesh, this simple physicochemical modification could give prophylactic intravenous antibiotics a better chance of killing any bacteria that have adhered to a brush-coated implant surface during surgery, and this prior to the formation of a more mature and thus more resistant biofilm.

## Conclusion

Bacterial colonization following mesh-augmented pelvic floor reconstructive surgery for pelvic organ prolapse is probably an underestimated consideration. Prolonged inflammatory response and chronic infection could be two different mechanisms, which may coexist, explaining local complications such as painful shrinkage. However, the exact role of infection must be explored by further experimental and clinical studies.

**Conflicts of interest**  None.

## References

1. Kaupp HA, Matulewicz TJ, Lattimer GL, Kremen JE, Celani VJ (1979) Graft infection or graft reaction? Arch Surg 114(12):1419–1422
2. Costello CR, Bachman SL, Ramshaw BJ, Grant SA (2007) Materials characterization of explanted polypropylene hernia meshes. J Biomed Mater Res B Appl Biomater 83B:44–49
3. Nejadnik MR, van der Mei HC, Norde W, Busscher HJ (2008) Bacterial adhesion and growth on a polymer brush-coating. Biomaterials 29:4117–4121
4. Gristina AG (1987) Biomaterial-centered infection: microbial adhesion versus tissue integration. Science 237(4822):1588–1595
5. An YH, Friedman RJ (1998) Concise review of mechanisms of bacterial adhesion to biomaterial surfaces. J Biomed Mater Res 43:338–348
6. Marshall K (1985) Mechanisms of bacterial adhesions at solid-water interfaces. In: Savage D, Fletcher M (eds) Bacterial adhesion. Mechanisms and physiological significance. Plenum, New York
7. Klosterhalfen B, Klinge U, Hermanns B, Schumpelick V (2000) Pathology of traditional surgical nets for hernia repair after long-term implantation in humans. Chirurg 71:43–51, German
8. Boulanger L, Boukerrou M, Rubod C et al (2008) Bacteriological analysis of meshes removed for complications after surgical management of urinary incontinence or pelvic organ prolapse. Int Urogynecol J Pelvic Floor Dysfunct 19:827–831
9. Klinge U, Junge K, Spellerberg B, Piroth C, Klosterhalfen B, Schumpelick V (2002) Do multifilament alloplastic meshes increase the infection rate? Analysis of the polymeric surface, the bacteria adherence, and the in vivo consequences in a rat model. J Biomed Mater Res 63:765–771
10. Bafghi A, Benizri EI, Trastour C, Benizri EJ, Michiels JF, Bongain A (2005) Multifilament polypropylene mesh for urinary incontinence: 10 cases of infections requiring removal of the sling. Br J Obstet Gynaecol 112(3):376–378
11. Bellon JM, G-Honduvilla N, Jurado F, Carranza A, Bujan J (2001) In vitro interaction of bacteria with polypropylene/ePTFE prostheses. Biomaterials 22(14):2021–2024
12. Caquant F, Collinet P, Deruelle P, Lucot JP, Cosson M (2005) Perineal cellulitis following trans-obturator sub-urethral tape Uratape. Eur Urol 47(1):108–110
13. Vollebregt A, Troelstra A, van der Vaart CH (2009) Bacterial colonisation of collagen-coated polypropylene vaginal mesh: are additional intraoperative sterility procedures useful? Int Urogynecol J Pelvic Floor Dysfunct 20(11):1345–1351
14. Marcus-Braun N, von Theobald P (2010) Mesh removal following transvaginal mesh placement: a case series of 104 operations. Int Urogynecol J Pelvic Floor Dysfunct 21:423–430
15. Clavé A, Yahi H, Hammou JC, Montanari S, Gounon P, Clavé H (2010) Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J Pelvic Floor Dysfunct 21(3):261–270
16. Bafghi A, Colomb F, Vandenbos F, Iannelli A, Bongain A, Jean A (2005) Recurrent vaginal erosion of tension free vaginal tape due to *Actinomyces* infection. Br J Obstet Gynaecol 112:1661–1662



17. Abramov Y, Sand PK, Gandhi S, Botros-Brey S, Goldberg RP (2004) Chronic pelvic actinomycosis following a bone anchored sling procedure. J Urol 171(6 Pt 1):2381

18. Wai CY, Nihira MA, Drewes PG, Chang JS, Siddiqui MT, Hemsell DL (2005) *Actinomyces* associated with persistent vaginal granulation tissue. Infect Dis Obstet Gynecol 13(1):53–55

19. Finan KR, Vick CC, Kiefe CI, Neumayer L, Hawn MT (2005) Predictors of wound infection in ventral hernia repair. Am J Surg 190(5):676–681

20. Araco F, Gravante G, Sorge R, De Vita D, Piccione E (2008) Risk evaluation of smoking and age on the occurrence of postoperative erosions after transvaginal mesh repair for pelvic organ prolapses. Int Urogynecol J Pelvic Floor Dysfunct 19 (4):473–479

21. Mathe ML, Lavigne JP, Oliva-Lauraire MC, Guiraud I, Mares P, de Tayrac R (2007) Comparison of different biomaterials for vaginal surgery using an in vivo model of meshes infection in rats. Gynecol Obstet Fertil 35:398–405, French

22. Yasim A, Gul M, Atahan E, Ciragil P, Aral M, Ergun Y (2006) Efficacy of vancomycin, teicoplanin and fusidic acid as prophylactic agents in prevention of vascular graft infection: an experimental study in rat. Eur J Vasc Endovasc Surg 31(3):274–279

23. Huang KH, Kung FT, Liang HM, Chang SY (2005) Management of polypropylene mesh erosion after intravaginal midurethral sling operation for female stress urinary incontinence. Int Urogynecol J Pelvic Floor Dysfunct 16:437–440

24. Mamy L, Letouzey V, Lavigne JP et al (2011) Correlation between shrinkage and infection of implanted synthetic meshes using an animal model of mesh infection. Int Urogynecol J Pelvic Floor Dysfunct 22(1):47–52

25. Chew DKW, Choi LH, Rogers AM (2000) Enterocutaneous fistula 14 years after prosthetic mesh repair of a ventral incisional hernia: a life-long risk? Surgery 127:352–353

26. Giles DL, Davila GW (2005) Suprapubic-vaginocutaneous fistula 18 years after a bladder-neck suspension. Obstet Gynecol 105(5 Pt 2):1193–1195

27. Weyhe D, Hoffmann P, Belyaev O et al (2007) The role of TGF-beta1 as a determinant of foreign body reaction to alloplastic materials in rat fibroblast cultures: comparison of different commercially available polypropylene meshes for hernia repair. Regul Pept 138(1):10–14

28. Badiou W, Lavigne JP, Bousquet PJ, O'Callaghan D, Marès P, de Tayrac R (2011) In vitro and in vivo assessment of silver-coated polypropylene mesh to prevent infection in a rat model. Int Urogynecol J 22:265–272



# EXHIBIT M

Int Urogynecol J
DOI 10.1007/s00192-016-3131-4

CrossMark

ORIGINAL ARTICLE

# The myth: in vivo degradation of polypropylene-based meshes

Shelby F. Thames[1] · Joshua B. White[2] · Kevin L. Ong[2]

Received: 20 May 2016 / Accepted: 18 August 2016
© The International Urogynecological Association 2016

**Abstract**

*Introduction and hypothesis* Polypropylene is a base polymer used in biomaterial applications, including sutures and mesh products, for the treatment of pelvic organ prolapse, stress urinary incontinence, and hernia repairs. Previous studies have dismissed the value of formulation additives employed in polypropylene, and the importance and necessity of an effective mesh explant cleaning protocol when characterizing explanted devices. However, both are critical to understanding the alleged degradation of polypropylene-based meshes.

*Methods* An effective, nondestructive, hydrolytic cleaning process, supplemented with light microscopy (LM), Fourier transform infrared spectroscopy (FTIR), and scanning electron microscopy (SEM) data, was used to evaluate 78 explanted Prolene meshes (with duration of implantation ranging from 0.4 to 11.7 years).

*Results* The cleaning process exposed clean, unoxidized, nondegraded Prolene fibers with smooth surfaces and with no visible evidence of gradient-type or ductile damage. LM showed identical translucent and sometimes clear, cracked/flaking material on both blue and clear fibers, instead of clear cracked/flaking material on the clear fibers and blue cracked/flaking material on the blue fibers. FTIR confirmed progressive protein removal and loss of protein absorption intensity after each cleaning step.

*Conclusions* Our effective cleaning of explanted Prolene meshes and subsequent analyses showed that they did not degrade in vivo, confirming the in vivo stability of properly formulated polypropylene. Instead, the cracked layer that some researchers have identified as degraded Prolene is an adsorbed protein–formaldehyde coating, resulting from the well-established formalin–protein fixation process, which occurs immediately upon placing an explant in formalin.

**Keywords** Polypropylene · Mesh · Explant analysis · Stability · Formalin fixation

## Introduction

The polymer polypropylene (PP) is the basic building block of surgical mesh products used for hernia repair in addition to pelvic organ prolapse (POP) and stress urinary incontinence (SUI). In the early 1960s, Usher began using PP surgical meshes for the treatment of hernias, thus changing the approach for treating abdominal wall defects [1] and subsequently other tissue repair procedures. The use of PP for urogynecological repairs was reported for surgeries in the late 1960s, and became more popular for POP [2] and SUI with the introduction of tension-free vaginal tape (TVT) in the 1990s [3]. The American Urogynecology Society (AUGS) and the Society of Urodynamics, Female Pelvic Medicine, and Urogenital Reconstruction (SUFU) [4] have even stated that the use of PP midurethral slings is not only the recognized worldwide standard of care for the surgical treatment of SUI, but it is safe and effective, and has improved the quality of life for millions of women. They further noted that polypropylene mesh is widely studied and recognized as being safe and effective as a surgical implant.

✉ Kevin L. Ong
kong@exponent.com

[1] The University of Southern Mississippi, Hattiesburg, MS, USA

[2] Exponent, Inc., 3440 Market Street, Suite 600, Philadelphia, PA 19104, USA

Published online: 06 September 2016

 Springer

Int Urogynecol J

Over the past few years, a number of researchers have claimed that PP is not stable in vivo, but rather is oxidized and consequently experiences a loss of molecular weight, deterioration of physical properties, embrittlement, chain scission, the generation of carbonyl-containing byproducts, and in general, results in an overall loss of efficacy [5–12]. These researchers based their conclusions on the observation of a cracked layer on PP fibers, claiming that infrared spectroscopy demonstrated the presence of oxidative species and the absorption of histological dyes by pathological specimens. However, these studies failed to consider the natural adsorption of biological material when medical devices come into contact with bodily fluids [13], and the reaction of fixatives with biological materials coating the devices [14–16], thereby creating a polymerized proteinaceous layer covering the fiber (Fig. 1). They also either do not attempt to remove or do not adequately remove biological materials, which are generally fixed in formalin, from the devices. Formalin fixation may further affect chemical analysis, because it can shift and alter the intensity of absorptions in Fourier transform infrared spectroscopy (FTIR) analysis of tissue [17].

It is well documented that unstabilized PP oxidizes readily under ultraviolet (UV) light and upon exposure to high temperatures [18]. The well-known end results of PP oxidation are the formation of carbonyl compounds, molecular weight loss, and significant degradation of physical properties. However, properly formulated PP with high performance additives is stable in oxidizing media, including elevated temperatures, in vivo applications, and to a lesser extent, under UV light. For example, although Liebert et al. [19] reported the oxidation of unstabilized PP, his 1976 manuscript also established the profound stabilizing effects of antioxidants.

Liebert's work was followed by that of Williams, who reviewed polymer degradation in physiological environments [20]. He referenced Liebert, concluding that "activation energies for the degradation of high molecular weight polymers used in surgery vary from 30 kcal mol$^{-1}$ to 80–90 kcal mol$^{-1}$ and such reactions generally require heat, UV light, or high energy radiation, preferably in the presence of oxygen, to proceed. It seems certain from these conditions that no such degradation should occur within the confines of the human body." Williams followed with a 1992 *Clinical Materials* article, stating that "hydrophobic homochain polymers should be stable under in vivo conditions" [21].

Publications have identified a cracked surface on explanted polypropylene meshes and strongly attributed its presence to in vivo oxidation. However, the associated compositional analysis has been limited and inconclusive [5–12]. Given the limitations of previous explant studies, the purpose of the present study was to analyze the morphology and material chemistry of explanted Prolene urogynecological meshes cleaned via a novel and effective cleaning process.

## Materials and methods

Explanted Prolene (Ethicon, Somerville, NJ, USA) meshes ($N = 78$) were obtained as part of medicolegal proceedings. The repository included eight different mesh designs for SUI or POP applications with implantation duration ranging from 0.4 to 11.7 years (Table 1). Twelve explants were received dry, whereas the remaining 66 explants were received in fixative. The explants were stored for an additional 0.1 to 6.4 years before cleaning and analysis. Institutional Review Board approval (Exponent, Philadelphia, PA, USA) was received for this study. Exemplar Prolene meshes (Ethicon) were also cleaned and analyzed to serve as control samples (TVT, $n = 8$; TVT Secur, $n = 3$; TVT Abbrevo, $n = 1$; Gynemesh, $n = 3$; Prolift, $n = 6$; Prolift + M, $n = 3$; Prosima, $n = 1$; and Prolene mesh, $n = 1$).

To reverse the well-known chemistry of fixative crosslinking, the meshes were cleaned using a process that exposed them to several reagents under varying conditions (Fig. 2). The cleaning process started with an initial distilled water soak; later rounds of cleaning used combinations of incubations in distilled water at an elevated temperature (70–80 °C) [15, 22], agitation using ultrasonication (with or without previous use of an orbital shaker) with sodium hypochlorite (bleach or NaOCl) [23], incubation in a proteinase K solution (enzymatic digestion) at an elevated temperature (58 °C) [14, 22], and corresponding treatment by ultrasonication in proteinase K. The meshes were rinsed to

**Fig. 1** Protein–formaldehyde "fixation" reaction





Int Urogynecol J

**Table 1** Explant summary

| Patient number | Explanted Prolene mesh | Duration of implantation (years) | Duration of storage (years) | Condition explants were received in |
|---|---|---|---|---|
| 001 | TVT | 7.8 | 0.1 | Fixative |
| 002 | TVT | 2.3 | 4.5 | Fixative |
| 003 | TVT Abbrevo | 0.5 | 4.0 | Fixative |
| 004 | Prolift | 7.4 | 1.9 | Fixative |
| 005 | Prolift | 2.2 | 4.2 | Fixative |
| 006 | Prolift | 4.4 | 2.9 | Fixative |
| 007 | TVT | 9.4 | 3.0 | Dry |
| 008 | TVT | 2.0 | 3.7 | Dry |
| 009 | Prolift | 4.4 | 3.5 | Fixative |
| 010 | Prolift | 4.1 | 3.8 | Fixative |
| 011 | Prolift | 3.9 | 3.7 | Dry |
| 012 | TVT | 9.3 | 3.6 | Fixative |
| 013 | Gynemesh | 9.0 | 0.2 | Fixative |
| 014 | TVT | 5.3 | 2.4 | Fixative |
| 015 | TVT | 4.2 | 4.2 | Fixative |
| 016 | TVT | 5.2 | 4.3 | Fixative |
| 017 | Gynemesh | 2.1 | 3.0 | Dry |
| 018 | Prolift | 6.4 | 1.2 | Fixative |
| 019 | Prolift | 4.8 | 2.0 | Fixative |
| 020 | TVT | 4.6 | 1.0 | Fixative |
| 021 | Prolift | 4.0–4.3[b] | 3.3 | Fixative |
| 022 | Prolift | 7.3 | 1.7 | Fixative |
| 023 | Prolift | 4.0 | 3.7 | Fixative |
| 024 | Prolift | 4.1 | 2.7 | Fixative |
| 025 | Prolift | 5.9 | 2.0 | Dry |
| 026 | Gynemesh | 4.6 | 6.4 | Fixative |
| 027 | Prolift | 7.1 | 0.2 | Fixative |
| 028 | TVT | 5.2 | 0.9 | Fixative |
| 029 | Prolift, TVT Secur | 6.3 | 1.5 | Fixative |
| 030 | Prolift + M | 5.8 | 0.1 | Fixative |
| 031 | Prolift + M | 2.1 | 3.8 | Dry |
| 032 | TVT | 2.4 | 5.7 | Fixative |
| 033 | Gynemesh | 4.2 | 3.7 | Fixative |
| 034 | TVT | 2.6 | 0.1 | Fixative |
| 035 | Prolift | 3.0 | 2.0 | Fixative |
| 036 | TVT | 2.6 | 2.3 | Fixative |
| 037 | Prolift | 4.7 | 2.1 | Dry |
| 038 | Gynemesh | 11.7 | 1.2 | Fixative |
| 039 | TVT | 3.7–4.7[c] | 0.1 | Fixative |
| 040 | Prolift + M | 1.9 | 1.7 | Fixative |
| 041 | Prosima | 3.1 | 0.7 | Fixative |
| 042 | TVT | 4.5 | 0.2 | Fixative |
| 043 | TVT | 6.0 | 0.4 | Fixative |
| 044 | Prolift, TVT Secur | 7.4 | 0.3 | Fixative |
| 045 | Prolift | 2.7 | 2.2 | Dry |
| 046 | Prolift | 8.0 | 1.0 | Fixative |
| 047 | Prolift + M | 1.1–2.4[d] | 2.8–4.1[d] | Fixative ($n = 2$) |
| 048 | Prolift + M | 5.8 | 1.2 | Fixative |
| 049 | Gynemesh | 3.2 | 1.6 | Fixative |
| 050 | ??[a] | ??[a] | 2.9 | Fixative |
| 051 | TVT | 9.8 | 3.1 | Fixative |
| 052 | Prolift | 3.1 | 4.0 | Fixative |
| 053 | Prolift, TVT Secur | 5.8 | 3.2 | Fixative |
| 054 | TVT | 1.8 | 4.7 | Dry |
| 055 | TVT | 1.3 | 4.7 | Fixative |
| 056 | TVT | 2.1–8.1[d] | 0.1–6.0[d] | Dry ($n = 1$)/fixative ($n = 1$) |
| 057 | TVT | 6.3 | 3.9 | Fixative |
| 058 | Prolift | 4.3 | 4.0 | Fixative |
| 059 | Prolift, TVT | 2.8 | 4.5 | Fixative |
| 060 | Prolift | 4.8 | 2.8 | Fixative |
| 061 | TVT | 0.4 | 4.3 | Fixative |
| 062 | TVT | 2.5 | 4.3 | Fixative |
| 063 | TVT | 5.8 | 1.1 | Fixative |
| 064 | Prolift | 7.6 | 0.1 | Fixative |
| 065 | Prolift | 3.8 | 3.6 | Fixative |



**Table 1** (continued)

| Patient number | Explanted Prolene mesh | Duration of implantation (years) | Duration of storage (years) | Condition explants were received in |
|---|---|---|---|---|
| 066 | Prolift | 2.3 | 4.2 | Fixative |
| 067 | Prolene mesh | 9.4 | 4.1 | Fixative |
| 068 | Prolift | 4.9 | 3.9 | Fixative |
| 069 | TVT | 6.2 | 2.0 | Fixative |
| 070 | TVT | 6.8 | 3.5 | Fixative |
| 071 | Prolift | 4.4–6.7[d] | 1.0–3.3[d] | Fixative ($n=2$) |
| 072 | Gynemesh | 2.3 | 3.7 | Fixative |
| 073 | TVT | 6.9 | 0.2 | Fixative |
| 074 | TVT | 10.3 | 2.6 | Dry |
| 075 | TVT | 4.6 | 2.5 | Dry |

*TVT* tension-free transvaginal tape

[a] The operative report for the implantation surgery was not available for review

[b] Devices were implanted on two dates

[c] Only the year of implantation was available

[d] Devices were explanted on two dates

remove residual reagent solution from the samples after each intermediate cleaning step and before conducting materials analysis. The cleaning process shown was used for the majority of explants (85 %; 66 out of 78) analyzed; this evolved from earlier iterations of the protocol, which had used fewer steps (e.g., two cleaning cycles of NaOCl instead of

**Fig. 2** Explant and exemplar cleaning protocol



| Before Cleaning Rinse | | |
|---|---|---|
| **1st Step** | **2nd Step** | **Before Cleaning** |
| Distilled water. Rinse; soak 1h; rinse | Desiccation drying, 1h | Materials Characterization |

| Cleaning Sequence #1 | | | | |
|---|---|---|---|---|
| **3rd Step** | **4th Step** | **5th Step** | **6th Step** | **After Cleaning 1** |
| Distilled water. Water bath (70˚C-80˚C), up to one day | NaOCl. Shaker, 5 min to 6.5h (depending on bulk tissue) | Distilled water. Rinse; soak 1h; Rinse | Desiccation drying, 1h | Materials Characterization |

| Cleaning Sequence #2 | | | | |
|---|---|---|---|---|
| **7th Step** | **8th Step** | **9th Step** | **10th Step** | **After Cleaning 2** |
| Distilled water. Water bath (70˚C-80˚C), up to one day | NaOCl. (1.5-2h) (shaker/ ultrasonicator) | Distilled water. Rinse, ultrasonic bath 1h, rinse | Desiccation drying, 1h | Materials Characterization |

| Cleaning Sequence #3 | | | | |
|---|---|---|---|---|
| **11th Step** | **12th Step** | **13th Step** | **14th Step** | **After Cleaning 3** |
| Distilled water. Water bath (70˚C-80˚C), up to one day | NaOCl. (4-6h) (shaker/ ultrasonicator) | Distilled water. Rinse, ultrasonic bath 1h, rinse | Desiccation drying, 1 h | Materials Characterization |

| Cleaning Sequence #4 | | | | |
|---|---|---|---|---|
| **15th Step** | **16th Step** | **17th Step** | **18th Step** | **19th Step** | **After Cleaning 4** |
| Distilled water. Water bath (70˚C-80˚C), up to one day | 0.8 mg/ml Proteinase K. Water bath (58˚C), up to one day | 0.8 mg/ml Proteinase K. Ultrasonic bath, 2 h | Distilled water. Rinse, ultrasonic bath 1h, rinse | Desiccation drying, 1 h | Materials Characterization |

| Cleaning Sequence #5 | | | | |
|---|---|---|---|---|
| **20th Step** | **21st Step** | **22nd Step** | **23rd Step** | **After Cleaning 5** |
| Distilled water. Water bath (70˚C-80˚C), 8 h | NaOCl. (4-20h) (shaker/ ultrasonicator) | Distilled water. Rinse, ultrasonic bath 1h, rinse | Desiccation drying, 1 h | Materials Characterization |

four), additional reagents (e.g., nitric acid), and different cleaning durations.

At each intermediate cleaning step, explanted meshes and exemplar meshes underwent materials characterization and the data from the respective cleaning steps were designated as follows: Before Cleaning, After Cleaning 1, After Cleaning 2, After Cleaning 3, After Cleaning 4, and After Cleaning 5. The characterization performed at each step included light microscopy (LM), Fourier transform infrared microscopy (FTIR-Micro), and scanning electron microscopy (SEM). This technique allowed fiber examination after each step, thereby confirming loss of adhered proteins in a sequential fashion.

Light microscopy was performed using a Keyence VHX-600 digital microscopy system (Itasca, IL, USA). FTIR spectroscopy was conducted in transmission mode [24] with 64 scans at 2 cm$^{-1}$ resolution using a Thermo Nicolet 6700 FTIR equipped with a Continuum™ Infrared Microscope (Thermo Fisher Scientific, Waltham, MA, USA). SEM imaging was performed via variable pressure mode using a Zeiss Sigma VP FEG-SEM (Carl Zeiss Microscopy, Jena, Germany) and a FEI Quanta 600 FEG (FEI, Hillsboro, OR, USA).

## Results

Initial examination of the explants showed varying amounts of bulk tissue adhering to the sample after removal from the patient. Some explants were heavily covered in tissue and mesh fibers could only be observed if they protruded from the dissected edges of the specimens; other samples had less tissue adherence following explantation and mesh fibers were either clearly visible through the bulk tissue or were exposed (Fig. 3).

Light microscopy evaluation showed identical translucent and sometimes clear, cracked/flaking material on both blue and clear fibers (Fig. 4), instead of clear cracked/flaking material on the clear fibers and blue cracked/flaking material on the blue fibers. This observation was consistent across all explants containing blue fibers.

The "Before Cleaning" FTIR spectra (Fig. 5) showed spectral components of proteins as noted by the prominent 3,299- and 1,652-cm$^{-1}$ frequencies and polypropylene via absorption frequencies at 1,452 and 1,379 cm$^{-1}$. The protein frequencies are due to amide N-H stretching in the 3,300-cm$^{-1}$ region, and amide I carbonyl stretching in the region of 1,600–1,690 cm$^{-1}$ [25]. FTIR data confirmed protein removal after each cleaning step for the explants' blue and clear Prolene fibers (Fig. 6), as demonstrated by the progressive loss of protein absorption intensity. This was confirmed via LM (described previously) and SEM (described later). The effectiveness of the cleaning process was further illustrated by overlaying the FTIR spectra of the exemplar fibers and explant fibers after the final cleaning step (Fig. 7).

In the Before Cleaning step in the Prolene explant, fibers were surrounded by bulk tissue and encased in a dry and cracked proteinaceous layer, as observed on explant surfaces via SEM (Fig. 8). In some locations, the bulk tissue had peeled from the cracked layer, exposing two surfaces that had once been a contiguous layer (see "lock and key" morphology of the tissue and cracked layer). The observable "lock and key" pattern of the formalin–protein coating demonstrated cohesive failure of the composite coating and partial adhesive failure of this same composite layer. The proteinaceous structure of the cracked layer and bulk tissue was confirmed by FTIR-Micro (described above). Cleaning progressively removed the bulk tissue and the proteinaceous shell surrounding the Prolene

**Fig. 3** Overall optical microscopy images of explant samples from patients 017 (*top left*), 014 (*top right*), 022 (*bottom left*), and 021 (*bottom right*). Patient samples had varying amounts of bulk tissue and exposed mesh fibers before cleaning. Image magnification: ×20





**Fig. 4** Patient 033 explant: **a** before and **b–f** after various cleaning steps. Image magnification: ×200. Had Prolene been oxidized, blue fiber flakes would be blue and clear fiber flakes would be clear; instead, identical translucent/sometimes clear, cracked and flaking material reside on both blue and clear fibers. The light microscopy images also demonstrate the successive removal of tissue using the cleaning protocol



fibers. The cleaning process exposed clean, unoxidized, nondegraded Prolene fibers with smooth surfaces and with no visible evidence of gradient-type or ductile damage (Fig. 9). The cleaned fibers retained the manufacturing extrusion lines created during fiber manufacture similar to those found with the exemplar meshes (Fig. 10). Generally, the

**Fig. 5** Patient 033 explant: blue fiber Fourier transform infrared spectroscopy (FTIR) before cleaning. Protein frequencies for the amide N-H stretching in the 3,300-cm$^{-1}$ region and amide I carbonyl stretching in the region of 1,600–1,690 cm$^{-1}$ were observed





Int Urogynecol J



**Fig. 6** FTIR of blue (*top*) and clear (*bottom*) fibers after progressive cleaning steps for Patient 033 explant, demonstrating progressive loss of proteins

tissue and biological layer appeared to be more easily removed for the explants that were received in a dry condition than those received in fixatives (Fig. 11).

## Discussion

With the implementation of a novel and effective cleaning process followed by microscopy and chemical analyses, we confirmed that the explanted Prolene meshes we examined did not degrade or oxidize in vivo. FTIR absorption frequencies previously attributed by others to byproducts of oxidative degradation were observed. However, these frequencies are within the protein absorption region and are expected to be present given mesh exposure to bodily fluids, tissue ingrowth, and subsequent exposure to formalin fixatives after explantation. FTIR analyses confirmed progressive protein removal and loss of protein absorption intensity after each cleaning step.

Microscopy demonstrated progressive removal of bulk formalin fixed tissue and regions with the proteinaceous explant shell after each cleaning step. The cleaning process exposed smooth, clean, unoxidized and nondegraded fibers, with no evidence of gradient-type or ductile damage with non-uniform crack depths. Based on effective fiber cleaning and subsequent analyses, there is no evidence to support in vivo Prolene degradation.

Over the past several years, a number of researchers have claimed that PP oxidizes in vivo [5–12]. Oxidation of PP is known to result in the loss of molecular weight, deterioration of physical properties, embrittlement, chain scission, and production of carbonyl-containing byproducts [26]. In an animal study, Liebert et al. demonstrated that unprotected PP oxidizes to carbonyl compounds [19]. However, their study also found no change in the infrared spectra or tan delta of implants containing antioxidants; it was concluded that PP filaments implanted subcutaneously in hamsters degrade by an



**Fig. 7** Patient 033 explant and Gynemesh exemplar: FTIR of blue fibers after all the cleaning steps, illustrating overlapping spectra

oxidation process, but that the process is effectively retarded by the use of antioxidants. The authors did not observe any changes in mechanical properties or infrared spectra for any of the filaments containing antioxidants either.

Some researchers have identified cracked surfaces on explanted PP meshes and suggested that they might be a consequence of PP oxidation, although the associated compositional analysis has been limited and inconclusive [5–12]. Furthermore, these claims are based on explants whose analyses have failed to consider the effects of the fiber fixation process and the need for more effective cleaning. For example, Clavé et al. [5] has been frequently cited as supporting the notion that PP degrades in vivo. Although their manuscript title suggests that PP might not be inert, their findings clearly did not support in vivo degradation. For instance:

- DSC analyses showed that "no modification was observed in the melting temperature or heat of fusion of these samples." Their study also reported that "no difference

between DSC thermograms of pristine and degraded samples was found."
- Furthermore, they clearly indicated that "Several hypotheses concerning the degradation of the polypropylene are described below. None of these, particularly direct oxidation, could be confirmed in this study."
- In addition, their "FTIR analysis neither confirmed nor excluded oxidation of PP in the in vivo environment" nor did it "conclusively confirm that the degradation was due to oxidation."

Despite utilizing FTIR, SEM, and DSC, Clavé et al. [5] was unable to prove PP oxidation, yet continued to speak of degraded PP with no supporting data. Their observations clearly reflect artifacts from the cracked surfaces of "fixed" proteins.

Similar to Clavé et al., Costello et al. also examined formalin-fixed explanted hernia meshes [6], but used an inadequate cleaning process, which consisted only of a 2-h soak in

**Fig. 8** Scanning electron microscopy micrographs from Patient 007 (*left*) and Patient 033 (*right*) before cleaning. Image magnification: ×1,000 (*left*) and ×200 (*right*)





**Fig. 9** Scanning electron microscopy micrographs from Patient 033 at progressive time points in the cleaning process. Images are shown for two locations: *a* (*left*) and *b* (*right*). Image magnification: ×500



sodium hypochlorite at 37 °C followed by rinsing with distilled water. Our work has shown this to be an inferior and insufficient cleaning procedure that does not completely remove "formalin-fixed" tissue. Moreover, Costello et al. did not perform FTIR analyses, which would have confirmed that the explants were not free of "fixed" proteins. Iakovlev et al. [9] did not perform any elemental or chemical analyses to support their conclusions either. Imel et al. [10] also attributed cracks on explanted PP fibers to oxidized and degraded polypropylene, using the presence of nitrogen from energy dispersive spectroscopy (EDS) analyses to distinguish between biological material and polypropylene. Yet, their own EDS analyses showed the presence of nitrogen and sodium in the cracked region; these are elements consistent with biological matter, including proteins. The findings from these previous studies are also significantly affected by the lack of any/or adequate cleaning. As discussed by Imel et al. [10], all but

one of the explanted samples were rinsed in ultrapure water and allowed to air dry. Only their sample XP-11 was treated with sodium hypochlorite solution in an attempt to remove biological tissue; however, the SEM images of XP-11 still showed the presence of biological matter. The specimens prepared by Iakovlev et al. [9] were devoid of reagents used to remove tissue and biological material from the meshes before performing histological analyses. Gross tissue and biological material were still present on the mesh fibers. As we demonstrated in our study, effective cleaning of the mesh is necessary to be able to remove the remnant biological material and examine the fiber surface that is underlying the cracked layer. This allows visualization of the transition from the cracked surface layer to the bulk fiber material to determine whether a gradient of damage exists, i.e., PP crack propagation, or whether there is a distinct interface exposing smooth, clean, unoxidized, and nondegraded fibers, i.e., a biological layer



**Fig. 10** The cleaning process exposed clean, unoxidized, nondegraded Prolene explant fibers with smooth surfaces and with no visible evidence of gradient-type or ductile damage. *Left* Patient 038 after cleaning sequence 1 and *middle* Patient 042 after cleaning sequence 5. The cleaned explant fibers retained the manufacturing extrusion lines created during fiber manufacture, similar to those found with the exemplar meshes that also went through the same cleaning process. *Right* tension-free transvaginal tape after cleaning sequence 5

overlaying the PP fiber. Fiber pitting was not observed either. The FTIR analysis further demonstrated that the initial carbonyl absorption of proteins disappeared as proteins were removed from the fiber surface during cleaning because of their solubility in water. On the other hand, if polypropylene had oxidized to form carbonyl bonds, the newly created hydrocarbon–carbonyl product would not have been soluble in water, would thus have remained part of the explant, and would have been detected by FTIR microspectroscopy, which was not the case.

These studies failed to consider the natural adsorption of biological material when medical devices come into contact with bodily fluids, the reaction of fixatives with biological materials adsorbed onto PP, and inadequate removal of formalin-fixed proteins. Foreign body implantation elicits immediate formation of tenaciously adsorbed and adhered "protein coating(s)" onto surfaces of implanted material(s) [13]. Almost instantaneously following implantation, proteins interact with and adhere to the biomaterial surface through protein adsorption, creating a layer of proteinaceous coating. Even before cells reach the implant, body proteins are adsorbed onto implanted material surfaces. The adsorbed proteins form an encapsulating coating around the biomaterial (implant) surface before cells arrive and begin proliferation. Consequently, cells do not come in contact with the foreign material, but with an adsorbed and adhered protein surface.

Of great significance is that explanted PP meshes are typically stored in fixatives such as formaldehyde (formalin) or glutaraldehyde following surgical explantation. The formalin fixation involves a chemical reaction between adsorbed biological material (proteins) and formaldehyde that creates a strong bond with the mesh fiber. The strongly adhering formalin–protein fixation product is resistant to removal/digestion from fiber(s) [14, 16]. Generally, we observed that

**Fig. 11** Explants from Patient 056. *Left* sample that was received dry; *right* sample that was received in fixative after cleaning sequence 1. Light microscopy images are shown at the top (magnification: ×200; examples of the cracked layer are denoted by *arrows*; note the difference in translucency of the fibers) and scanning electron microscopy images are shown at the bottom. The cracked biological layer overlaying the fibers was not as evident in the dry sample (*left*) following cleaning sequence 1 as in the fixed sample (*right*)





the tissue and biological layer appeared to be more easily removed for the explants that were received dry than those received in fixatives (Fig. 11). However, although 12 of the explants were received dry, we were unable to verify if they had been exposed to fixative at any point before we received and analyzed them.

The chemistry of formaldehyde fixation, i.e., the chemical reaction of formaldehyde with proteins, is the chemical reaction that produces "fixed tissues." Yet this concept has been ignored or misunderstood by nonchemists when evaluating explants. Exposure to a fixative (formaldehyde) causes adsorbed proteins on mesh fibers to crosslink immediately and form a hard, brittle, protective composite layer. Fixatives are used expressly to preserve tissue and to crosslink in preparation for further study [15, 16]. A notable consequence with the use of formaldehyde, or any fixative, is the amount of distortion produced by the fixation process, which can be associated with tissue shrinkage [27]. The distortion caused by exposure to fixative can further exacerbate the effects of tissue retraction following excision, which occurs because of a loss of tension between the mesh/tissue explant and the surrounding tissue when it is excised [28, 29], thereby leading to the production of cracks in the protein coating. Previous researchers who used histological analyses to support their claims of PP degradation [13] have also failed to consider that their sample embedding processes cause tissue distortion and shrinkage [30, 31], which produces further post-excision artifacts in their analyses. Formalin fixation can also further affect chemical analysis because it can shift and alter the intensity of absorption frequencies in FTIR analysis of tissue [17]. Zhang et al. [16] notes that "In order to study the surface chemistry of explanted prostheses, it is necessary to remove all the tissue that may have grown over and within the prosthetic structure." The author also states that the degree of crosslinking may require strong chemicals and/or extreme hydrolysis to adequately clean the fiber(s).

Based on knowledge of protein adsorption onto foreign body surfaces and the "reversible" formalin fixation reaction, we developed the mild but highly effective cleaning process that we report herein. The cleaning process involves heating "formaldehyde-fixed" bulk tissue-covered explants in excess distilled water at elevated temperatures for several hours, with the inclusion of additional steps, such as treatment with sodium hypochlorite to remove excess bulk tissue, and proteinase K to assist with removal of residual and strongly adhering, formalin-fixed proteins.

Some researchers have claimed that the mesh material degrades and speculated that this might have an impact on the clinical performance of the device, through stiffening of the mesh, decreasing the mechanical properties of the mesh, playing a role in inflammation-mediated tissue damage, and increasing the need for revision surgeries due to material incompatibility [7, 9, 10]. Yet, the claimed cracking and

degradation of the mesh have not produced any published reports of physical mesh breakage, nor have they been observed in our series of explants with implantation durations of up to 11.7 years. Furthermore, if there was indeed degradation of the Prolene material, the explants would be expected to exhibit a wide range of crack morphology in terms of nonuniform crack penetration at different locations for a given explant, and across explants from different patients, but this was not present in our study.

Questions and confusion about the clinical performance of transvaginal meshes had also arisen following the US Food and Drug Administration's (FDA) communication on the safety and effectiveness of transvaginal meshes for pelvic organ prolapse and mesh litigation that ensued [4, 32]. However, the professional societies have recognized that polypropylene is safe and effective as a surgical implant [4], and that polypropylene midurethral sling meshes are the standard of care for the surgical treatment of stress urinary incontinence [4]. Additionally, transvaginal meshes are not only accepted, but preferred in certain clinical situations for the treatment of pelvic organ prolapse [32]. In terms of the Prolene meshes that were examined in the present study, the polypropylene monofilaments have the same composition as Prolene sutures, which have been in use since 1969. The TVT mesh dates back to 1998, when it was cleared by the FDA [3] and has shown positive results. In a randomized controlled trial comparing TVT with colposuspension in 344 women with stress incontinence, there was a higher cure rate for the TVT patients [33]. Systematic reviews of transvaginal mesh kits have also reported a mean objective success rate of 87 % for the Prolift in treating apical prolapse [34]. Randomized controlled trials have also reported a reduction in prolapse recurrence and higher anatomical success rates for Prolift compared with other treatments, such as sacrospinous fixation [35] and anterior colporrhaphy [36], although surgical and postsurgical complication rates were higher. Studies involving the Gynemesh PS mesh have also shown improvements in the quality of life and associated improvements in prolapse symptoms, with overall anatomical success rates of 88.0 % at 1 year and 66.7 % at 5 years, in addition to a net positive effect on sexual activity following prolapse surgery, despite the use of mesh [37]. Durable prolapse repairs with 80 % anatomical success rates at 3 years have also been described following the use of Gynemesh PS [38]. Although some have claimed that mesh stiffening occurs [9], Jacquetin et al. observed moderate or severe vaginal stiffness in only 12.6 % of Gynemesh PS patients after 1 year, but this rate had not increased over time at 3 years [38].

Owing to the nature of explant analysis, our study was limited to devices that were removed during revision surgeries for various clinical reasons and we were unable to analyze implants from other patients who did not undergo revision surgery or from autopsy specimens. Because of the sample

size, statistical analysis was not performed; for example, the effects of implantation time, mesh type, storage time, patient age, and storage condition were not examined for the ease of removing the biological layer, but the results and conclusions were consistent for all our specimens. We did not quantify how much of the fiber surface was covered with the cracked biological layer for each sample after each cleaning sequence. This was due to the variability in the amount of bulk tissue that was excised with the explants during resurgery, which also appeared to affect how much biological matter was removed from location to location within a given explant. Our findings are also limited to Prolene mesh and may not necessarily apply to other polypropylene formulations, because the types and concentrations of additives, particularly stabilizers, may vary among manufacturers/suppliers.

## Conclusion

Adequately formulated polypropylene, in terms of having adequate in vivo stability, along with adequate types and concentrations of additives, or in this case, Prolene, is a well-accepted biomaterial with a long history of safe and effective clinical use as a permanent implant. Our effective cleaning of explanted Prolene meshes and subsequent analyses showed that they did not degrade in vivo. Instead, the cracked layer that some researchers have identified as degraded Prolene is an adsorbed protein–formaldehyde coating, resulting from the well-established formalin–protein fixation process that occurs immediately upon placing an explant in formalin.

**Compliance with ethical standards**

**Funding**   Although no company directly funded this manuscript, the manuscript was based on findings from earlier work that was paid for by Ethicon, Inc.

**Conflicts of interest**   SFT has provided litigation consulting services to Ethicon, Inc. In addition, as employees for Exponent, a science and engineering consulting company, JBW and KLO provide consulting services for a number of medical device companies. Exponent has been paid fees by such companies for their consulting services, which include both litigation and pro-active services. Exponent's client list is confidential and proprietary. However, the list of KLO's publicly disclosed consulting clients includes the following: Ethicon, Inc.; St. Jude Medical; Zimmer-Biomet; Stryker; Paradigm Spine; Medtronic; DJO; Ossur; Ferring Pharmaceuticals; Pacira Pharmaceuticals.

## References

1. Usher FC. Hernia repair with knitted polypropylene mesh. Surg Gynecol Obstet. 1963;117:239–40.
2. Julian TM. The efficacy of Marlex mesh in the repair of severe, recurrent vaginal prolapse of the anterior midvaginal wall. Am J Obstet Gynecol. 1996;175(6):1472–5.
3. US Food and Drug Administration. Summary of safety and effectiveness, Tension Free Vaginal Tape (TVT) System. 1998. Accessed 3 May 2016. Available from: https://www.accessdata.fda.gov/cdrh_docs/pdf/K974098.pdf.
4. Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction, and American Urogynecologic Society. Position statement on mesh midurethral slings for stress urinary incontinence. 2014. Accessed 3 May 2016. Available from: http://sufuorg.com/docs/news/augs-sufu-mus-position-statement-approved-1-3-2014.aspx.
5. Clavé A, Yahi H, Hammou JC, Montanari S, Gounon P, et al. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J. 2010;21(3):261–70.
6. Costello CR, Bachman SL, Ramshaw BJ, Grant SA. Materials characterization of explanted polypropylene hernia meshes. J Biomed Mater Res B Appl Biomater. 2007;83(1):44–9.
7. Cozad MJ, Grant DA, Bachman SL, Grant DN, Ramshaw BJ, et al. Materials characterization of explanted polypropylene, polyethylene terephthalate, and expanded polytetrafluoroethylene composites: spectral and thermal analysis. J Biomed Mater Res B Appl Biomater. 2010;94(2):455–62.
8. Guelcher SA, Dunn RF. Oxidative degradation of polypropylene pelvic mesh in vitro. Int Urogynecol J. 2015;26 Suppl 1:S23–174.
9. Iakovlev VV, Guelcher SA, Bendavid R. Degradation of polypropylene in vivo: a microscopic analysis of meshes explanted from patients. J Biomed Mater Res B Appl Biomater 2015;DOI: 10.1002/jbm.b.33502.
10. Imel A, Malmgren T, Dadmun M, Gido S, Mays J. In vivo oxidative degradation of polypropylene pelvic mesh. Biomaterials. 2015;73: 131–41.
11. Mary C, Marois Y, King MW, Laroche G, Douville Y, et al. Comparison of the in vivo behavior of polyvinylidene fluoride and polypropylene sutures used in vascular surgery. ASAIO J. 1998;44(3):199–206.
12. Wood AJ, Cozad MJ, Grant DA, Ostdiek AM, Bachman SL, et al. Materials characterization and histological analysis of explanted polypropylene, PTFE, and PET hernia meshes from an individual patient. J Mater Sci Mater Med. 2013;24(4):1113–22.
13. Kyriakides TR. Molecular events at tissue-biomaterial interface. In Badylak SF, editor. Host response to biomaterials. Amsterdam: Elsevier; 2015.
14. Baxter RM, Steinbeck MJ, Tipper JL, Parvizi J, Marcolongo M, et al. Comparison of periprosthetic tissue digestion methods for ultra-high molecular weight polyethylene wear debris extraction. J Biomed Mater Res B Appl Biomater. 2009;91(1):409–18.
15. Puchtler H, Meloan SN. On the chemistry of formaldehyde fixation and its effects on immunohistochemical reactions. Histochemistry. 1985;82(3):201–4.
16. Zhang Z, King MW, How TV, Laroche G, Guidoin R. Chemical and morphological analysis of explanted polyurethane vascular prostheses: the challenge of removing fixed adhering tissue. Biomaterials. 1996;17(19):1843–8.
17. O'Faolain E, Hunter M, Byrne J, Kellehan P, McNamara M. A study examining the effects of tissue processing on human tissue sections using vibrational spectroscopy. Vib Spectrosc. 2005;38: 121–7.
18. Al-Malaika S. Photostabilizers. In: Karger-Kocsis J, editor. Polypropylene—an A–Z Reference. Dordrecht: Springer; 1999.
19. Liebert TC, Chartoff RP, Cosgrove SL, McCuskey RS. Subcutaneous implants of polypropylene filaments. J Biomed Mater Res. 1976;10(6):939–51.
20. Williams DF. Biodegradation of surgical polymers. J Mater Sci. 1982;17(5):1233–46.
21. Williams DF. Mechanisms of biodegradation of implantable polymers. Clin Mater. 1992;10(1–2):9–12.



22. American Society for Testing and Materials. ASTM F561-05a: Standard practice for retrieval and analysis of medical devices, and associated tissues and fluids. West Conshocken: ASTM International; 2005.

23. Guidoin MF, Marois Y, Bejui J, Poddevin N, King MW, et al. Analysis of retrieved polymer fiber based replacements for the ACL. Biomaterials. 2000;21(23):2461–74.

24. Bhargava R, Wang SQ, Koenig JL. FTIR microspectroscopy of polymeric systems. Adv Polym Sci. 2003;163:137–91.

25. Kong J, Yu S. Fourier transform infrared spectroscopic analysis of protein secondary structures. Acta Biochim Biophys Sin Shanghai. 2007;39(8):549–59.

26. Gahleitner M, Fiebig J. Long term properties and lifetime prediction for polypropylene. In: Karger-Kocsis J, editor. Polypropylene—an A-Z reference. Dordrecht: Springer; 1999.

27. Lester SC. Manual of surgical pathology. 3rd ed. Philadelphia: Saunders; 2010.

28. Kerns MJ, Darst MA, Olsen TG, Fenster M, Hall P, et al. Shrinkage of cutaneous specimens: formalin or other factors involved? J Cutan Pathol. 2008;35(12):1093–6.

29. Kumar S, Maxwell IZ, Heisterkamp A, Polte TR, Lele TP, et al. Viscoelastic retraction of single living stress fibers and its impact on cell shape, cytoskeletal organization, and extracellular matrix mechanics. Biophys J. 2006;90(10):3762–73.

30. Sanderson C, Emmanuel J, Emmanual J, Campbell P. A historical review of paraffin and its development as an embedding medium. J Histotechnol. 1988;11(1):61–3.

31. Dobrin PB. Effect of histologic preparation on the cross-sectional area of arterial rings. J Surg Res. 1996;61(2):413–5.

32. American Urogynecologic Society. Position statement on restriction of surgical options for pelvic floor disorders. 2013. Accessed 21 June 2016. Available from: http://www.augs.org/d/do/1859.

33. Ward KL, Hilton P, UK and Ireland TVT Trial Group. A prospective multicenter randomized trial of tension-free vaginal tape and colposuspension for primary urodynamic stress incontinence: two-year follow-up. Am J Obstet Gynecol. 2004;190(2):324–31.

34. Feiner B, Jelovsek JE, Maher C. Efficacy and safety of transvaginal mesh kits in the treatment of prolapse of the vaginal apex: a systematic review. BJOG. 2009;116(1):15–24.

35. Halaska M, Maxova K, Sottner O, Svabik K, Mlcoch M, et al. A multicenter, randomized, prospective, controlled study comparing sacrospinous fixation and transvaginal mesh in the treatment of posthysterectomy vaginal vault prolapse. Am J Obstet Gynecol. 2012;207(4):301.e1–7.

36. Altman D, Vayrynen T, Engh ME, Axelsen S, Falconer C, et al. Anterior colporrhaphy versus transvaginal mesh for pelvic-organ prolapse. N Engl J Med. 2011;364(19):1826–36.

37. Miller D, Lucente V, Babin E, Beach P, Jones P, et al. Prospective clinical assessment of the transvaginal mesh technique for treatment of pelvic organ prolapse-5-year results. Female Pelvic Med Reconstr Surg. 2011;17(3):139–43.

38. Jacquetin B, Fatton B, Rosenthal C, Clave H, Debodinance P, et al. Total transvaginal mesh (TVM) technique for treatment of pelvic organ prolapse: a 3-year prospective follow-up study. Int Urogynecol J. 2010;21(12):1455–62.

