# EXHIBIT P

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

# Chem Soc Rev

**RSC** Publishing

## REVIEW ARTICLE

View Article Online
View Journal | View Issue

# Waveguide-enhanced mid-infrared chem/bio sensors

Boris Mizaikoff

Cite this: *Chem. Soc. Rev.*, 2013, **42**, 8683

Despite providing the opportunity for directly sensing molecular constituents with inherent fingerprint specificity in the 2.5–20 μm spectral regime, mid-infrared optical sensing technologies have not yet achieved the same penetration in waveguide-based chem/bio sensing compared to related sensing schemes operating at visible and near-infrared frequencies. In this review, current advances in mid-infrared chem/bio sensor technology will be highlighted and contrasted with the prevalent bottlenecks that have to date limited a more widespread adoption of mid-infrared sensing devices. However, with the increasing availability of advanced light sources such as quantum cascade lasers and the advent of on-chip semi-conductor waveguide technologies, a prosperous future of this sensing concept for label-free detection in environmental analysis, process monitoring, and bioanalytics is perceived.

Received 29th May 2013

DOI: 10.1039/c3cs60013k

www.rsc.org/csr

## 1. Introduction

The mid-infrared (MIR) spectral range extending from 2.5 to 20 μm is known for providing highly discriminatory information due to the excitation of inherently specific fundamental vibrational and vibro-rotational transitions that are characteristic of molecular species in the liquid phase and in the vapor phase. In particular, organic molecules may be characterized *via* their fingerprint spectra, thus rendering infrared spectroscopy among the classical analysis techniques for identifying and structurally characterizing molecular species. With the advent of MIR transparent fiberoptic waveguide materials in the late 1980s, the comparatively young history of MIR fiberoptic chem/bio sensors has been initiated taking advantage of materials including heavy metal fluorides, chalcogenide glasses, poly-crystalline silver halides (AgX), tellurium halides (TeX), single-crystalline sapphire, and hollow waveguide (HWG) structures.[1] Comparable to the evolution of fiberoptic chem/bio sensing technology in the visible (VIS) and near-infrared (NIR) spectral range, a diverse field of applications in environmental analysis, process monitoring/control, safety/security/surveillance, and the clinical/biomedical field was also anticipated for the MIR regime.[2] Since last reviewing MIR fiberoptic sensors a decade ago,[3] and despite the continuous evolution and increased availability of mid-infrared light sources, waveguide technology, and detection devices chem/bio sensors in the 2.5–20 μm spectral window have not yet seen the breadth of applications in the analytical sciences that has been observed for optical sensing schemes in adjacent spectral ranges. Evidently, the fundamental

sensor technology is to date not as mature compared to other frequency ranges, thus rendering MIR chem/bio sensors still a rather unconventional option in optical sensing.

Hence, prior to reviewing the current state-of-the art and recent advances in waveguide-based MIR chem/bio devices, we should briefly discuss the reasons for MIR technology lagging behind VIS/NIR optoelectronics, and even ask the provocative question 'Do we need to advance into the MIR spectral regime given the maturity of optoelectronics and photonics in the VIS and NIR?'

## 2. Why mid-infrared is different. . .

Waveguide-based – and in particular fiberoptic – sensing schemes have matured in recent decades around the development of optical communication technologies. With a distinct wavelength of 1.55 μm set as the standard frequency for optical telecommunications, the corresponding light sources (*e.g.*, semi-conductor laser diodes), waveguides (*e.g.*, silica, quartz, and polymer fibers), and detectors (*e.g.*, Si photodiodes) have rapidly evolved to performance levels close to or at their theoretical limits at coincidentally decreasing costs. NIR (800–2500 nm) spectroscopy and sensing technologies have tremendously bene-fitted from this development *via* optoelectronic components directly derived from these technologies. Despite spectrally signifi-cantly broader molecular overtone vibrations, chemical analysis based on NIR spectroscopic techniques has become ubiquitous. Likewise, on-chip NIR sensing schemes nowadays utilize advanced integrated optics concepts such as ring resonators initially developed as on-chip telecommunication components (*e.g.*, for wavelength-division multiplexing).[4]

Given the distinct and spectrally much narrower vibrational/rotational features distributed over a much broader wavelength

*Institute of Analytical and Bioanalytical Chemistry, University of Ulm, Albert-Einstein-Allee 11, 89081 Ulm, Germany. E-mail: boris.mizaikoff@uni-ulm.de; Web: http://uni-ulm.de/iabc; Fax: +49 731 50-22763; Tel: +49 731 50-22750*

This journal is © The Royal Society of Chemistry 2013

*Chem. Soc. Rev.*, 2013, **42**, 8683–8699 | **8683**

Chem Soc Rev

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

View Article Online

region in the MIR regime, it is immediately evident that molecule-specific analytics in the 2.5–20 µm band requires a wide variety of optical components and materials; or, in other words – the 'telecom model' simply does not apply. While a few optical materials are sufficient to bridge a comparatively narrow spectral band as in the NIR, a range of materials covering an arguably larger spectral window is required for optoelectronic devices operating in the MIR, which affects all crucial sensor components: the light source, waveguide, and detector. In addition, most commonly applied optical materials (*e.g.*, waveguides) in the VIS and NIR are opaque at MIR frequencies, and the bandgap of Si as the currently dominating semiconductor material (*e.g.*, detectors) in the NIR is of limited use. Given this required diversity in materials, properties, and components, the costs per device remain significantly higher in comparison to the NIR.

For a short period of time during the last decade, it was on the horizon that MIR (opto)material science may receive a similarly dynamic boost, as short-range telecommunication was considered advantageous in the MIR and THz spectral band. Albeit the apparent lack of – at least compared to the NIR – cheap light sources and detectors, and limitations due to the available atmospheric windows, it was anticipated that the concepts for data transfer at short ranges may rapidly advance long-wavelength optoelectronic technology. However, with (organic) light emitting diode ((O)LED) technology developing at such an incredible pace, it is proposed that short-range optical communications rather progress towards the VIS regime based on the ubiquitous and nowadays even mandated prevalence of LED light sources, which may simultaneously serve as optical communication transmitters and hubs, if appropriately modulated.[5] Clearly, sensing technologies operating in the visible spectral regime directly benefit from these developments, similar to NIR sensing during the first telecommunications revolution.

Hence – where does that leave MIR optical technologies? Evidently, technological advancements may in contrast be problem-driven by the demands and challenges inherent to molecular specific analysis and sensing, rather than telecommunications. While it should be noted here that of course military and security applications in the areas of countermeasures (*i.e.*, MIR laser technology) and imaging (*i.e.*, focal plane mercury–cadmium–telluride (MCT) arrays) are the main driving forces, label-free chem/bio sensing – an inherent advantage and unique to molecular spectroscopy – may fertilize developments in waveguide technology and system miniaturization even toward on-chip MIR devices. In the latter case and with particular focus on potential microfabrication of waveguides, optical structures and surfaces, *etc.* fabrication tolerances are significantly higher at longer wavelengths, *i.e.*, defect size, surface roughness, feature dimensions, and feature distances are on the order of magnitude of a couple of 100 nm. In principle, manufacturing and (micro)fabrication should be easier, less costly, and with higher yield for integrated optical components and photonics at MIR wavelengths.

Hence, despite this distinctly different evolution and less mature technology base compared to conventional optical sensing technologies, if we ask again the question 'Do we need

to advance into the MIR spectral regime given the maturity of optoelectronics and photonics in the VIS and NIR?', the answer is clearly – yes:

(i) No other spectral range offers the level of molecular selectivity that is inherent to the MIR window.

(ii) Narrow and sharp spectral features enable discrimination and quantification of multiple constituents even in complex mixtures and matrices.

(iii) There is significant potential for label-free (bio)diagnostics based on molecular fingerprints.

(iv) (Micro)fabrication tolerances increase with increasing wavelength when adopting semiconductor/on-chip technologies.

(v) Multivariate calibration, data evaluation, and classification methods (*i.e.*, chemometrics) provide enhanced performance with more pronounced spectral features.

In conclusion, if the main technological bottlenecks discussed above can be adequately addressed, clearly a more widespread adoption of the 3–20 µm spectral window in chem/bio sensing is not only envisaged, but indeed ensured.

## 3. Waveguide-enhanced diagnostics

Conventionally, this critical review would have been called 'fiberoptic mid-infrared chem/bio sensors' – why 'waveguide-enhanced'? A wide variety of optical (chem/bio) sensors use optical fibers or other waveguides (*e.g.*, planar structures, hollow waveguides, *etc.*) for propagating photons from a light source to a measurement location, and after interaction with the sample/analyte to an optical detector.[6] Yet, this review is focused on sensing schemes that take 'functional advantage' of waveguides as an active transducer, rather than merely serving as a light conduit. From an analytical perspective, this is an essential function, as the transducer is the vital component of an optical sensor ensuring reproducible interaction between photons and molecules for producing an analytical signal with appropriate precision and accuracy.

Currently and with only few exceptions, absorption phenomena are utilized as the signal-generating optical mechanism in MIR sensing. The waveguide may in addition enhance the generated optical signal, as discussed below.

In contrast to chem/bio sensing schemes based *e.g.*, on the excitation of fluorescence or Raman scattering, optical absorption techniques lack a distinct variable for analytical signal enhancement, *i.e.*, the intensity of the light source. While increasing the power of the light source directly and positively affects the scattering probability in Raman sensing and the fluorescence quantum yield, following the Beer–Lambert law (*i.e.*, the absorbance $A = \varepsilon c l = \log(I_0/I)$ with $I_0$ as the light intensity before interaction with the sample, and $I$ after interaction, $\varepsilon$ as the molar absorption coefficient, and $c$ as the analyte concentration) it is evident that the absorption is independent of the intensity of the light source. Consequently, for increasing the sensitivity of absorption-based optical sensors, we have to focus on amplifying the analytical signal *vs.* the background noise level, *i.e.*, maximizing the signal-to-noise ratio (SNR).

 This journal is © The Royal Society of Chemistry 2013

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

View Article Online

In essence, we have two complementary options to achieve this: (i) chem/bio amplification, and (ii) optical amplification.

Chem/bio amplification entails modifying the waveguide surface with chemical or biological molecular recognition and enhancement schemes. For example, the target constituents are attracted *via* a bioreceptor such as an enzyme or antibody or a biomimetic receptor such as an aptamer or imprinted polymer to the waveguide surface. Alternatively, they may be enriched/preconcentrated – usually *via* a polymer, sol–gel, or hydrogel membrane – within the analytically probed volume, which constitutes the classic concept of chemical sensors and biosensors, respectively.

Optical amplification comprises a variety of strategies for improving the SNR such as *e.g.* focusing radiation using free-space optics or taking advantage of near-field effects. Being less suitable for – ideally portable – optical sensing devices, confining photons within a waveguide enables efficient propagation of radiation to an active transduction region of the same or a different waveguide structure, thereby ensuring that a maximum of photons interacts with the molecules of interest in a potentially small analytical volume. On top of that, resonating structures such as ring-, race-track-, or disc-resonators as well as free-space optical cavities enable the photons to interact multiple times with the constituents of interest, thereby giving rise to enhanced optical signals with a further improved SNR.

Hence, by smartly designing the waveguide and the waveguide geometry (*e.g.*, tapered fibers, resonating structures, *etc.*) one may optically enhance the signal, thereby leading to an increased SNR, which in turn benefits the detection of reduced analyte concentrations. Of course, both signal amplification strategies are mutually complementary and may be jointly utilized within one sensing scheme. Consequently, rather than only focusing on conventional fiberoptic sensors, any kind of waveguide is considered herein, with particular emphasis on structures that assist in optically enhancing the generated analytical signal, *i.e.*, waveguide-enhanced diagnostics, which has been the most significant advancement toward increasing the sensitivity in MIR sensor technology in the past decade.

## 4. Emerging technologies

The main optical components of waveguide-based sensor systems are (i) the light source, (ii) the waveguide/transducer, and (iii) the detector (Fig. 1). Due to the fact that conventional MIR spectrometers such as Fourier transform (FT-IR) instruments essentially utilize the same detector technology applied in waveguide-based IR sensor systems ranging from sophisticated semiconductors devices (*e.g.*, mercury–cadmium–telluride (MCT), indium–antimonide (InSb), *etc.*) to comparatively simple pyroelectric detectors and thermopiles, a discussion of recent advances is omitted here. It should be noted though that most recently and in analogy to quantum heterostructures serving as MIR laser light sources first quantum cascade detectors (QCD) have been demonstrated, which may in future facilitate the integration of highly miniaturized detector technology.[7,8]

The major breakthrough in MIR sensor technology during recent decades has certainly been the introduction of the quantum



**Fig. 1** Overview of the most prevalent waveguide-enhanced MIR sensing principles. FT-IR – Fourier transform infrared spectrometer; SiC + Filt. – silicon carbide filament IR emitter with filters for spectral region selection; TDL – tunable (lead salt) diode lasers; QCL – quantum cascade laser; EC-QCL – external cavity coupled QCL; Pyroel. – pyroelectric detector (room temp. operation); DTGS – deuterated triglycine sulfate detector (room temp. operation); Thermo. – thermopile detector (room temp. operation or thermoelectrically cooled); MCT–mercury–cadmium–telluride semiconductor detector (room temp. operation up to liquid nitrogen cooled); QCD – quantum cascade detector (room temp. operation). For chem/bio sensing, liquid phase sensing schemes may entail appropriate waveguide surface modification. In vapor phase sensing, enrichment/preconcentration is usually performed off-line via trapping at appropriate sorbent materials and subsequent thermal desorption into a small and defined gas volume.

cascade laser (QCL). While QCLs already celebrate their 20th anniversary of 'experimental demonstration' in 2014,[9] a comprehensive discussion is provided herein, as their development is among the major driving forces in advanced IR sensor technology.

Likewise, the recent emergence of semiconductor on-chip waveguides paves the way toward fully integrated MIR photonic systems rendering 'IR-lab-on-a-chip' a conceivable concept. Last but not least, substrate-integrated hollow waveguides promise a new level of integration for vapor phase MIR sensor technology.

In contrast to MIR detector technology, these critical components are of specific use in waveguide-based sensors with little applicability in conventional IR spectroscopy.

### 4.1  Quantum cascade lasers

While conventional narrow bandgap semiconductor laser diodes made from *e.g.*, lead salt materials or IV–VI compound semiconductors generate photons by radiative recombination of electrons from the conduction band, and holes from the valence band, QCLs take advantage of repeating intersubbands within the conduction band, which are tailored by designing appropriate quantum well heterostructures.[10] As schematically shown in Fig. 2, electrons introduced to the upper intersubband relax into the lower intersubband generating MIR photons with an energy corresponding to the energy difference between these bands. Since QCLs provide a cascade (typically up to 40) of such active regions, each electron may generate several photons. Of particular importance is the fact that using one material system, laser diodes emitting throughout the entire MIR band may be designed.

Some of the main disadvantages of conventional narrow band gap semiconductor lasers have recently been resolved by QCLs.

This journal is © The Royal Society of Chemistry 2013

*Chem. Soc. Rev.*, 2013, **42**, 8683–8699 | **8685**

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.



**Fig. 2** (top left) Simplified scheme of a quantum heterostructure under bias with its electronic transitions. Electrons enter the heterostructure *via* an injector region (left of the heterostructure) and relax into a lower energy state (red arrow) releasing a photon. Population inversion is achieved, if the electron is rapidly ejected from that quantum well *via* a longitudinal-optic (LO) phonon transition (green arrow), and may enter the next injector region. This process is repeated for each active structure (typically up to 40 periods), thereby providing a cascade effect, *i.e.*, a single electron may produce multiple photons. (top right) In the schematic QCL structure electrons are injected *via* the wire bonds shown on the lateral contact layer, and then tunnel through the gain medium. Photon generation occurs in the gain medium layer with photon emission toward the reader. (bottom) Lasers and laser-based light sources emitting in the MIR widely vary in their power output, tunability, and spectral coverage. QCLs are the only MIR laser source that may cover the entire MIR spectrum based on a single material system.

Meanwhile, a wide variety of studies have demonstrated superior sensitivity and selectivity in gas sensing applications using QCL light sources in combination with various types of gas cells and different laser tuning ranges.

Using appropriate emission wavelength tuning strategies, such laser diodes potentially serve as miniaturized spectrometers. Conventional tuning of the lasing wavelength *via* temperature or injected current yield limited tuning ranges (*i.e.*, few wavenumbers). Advanced strategies therefore utilize arrays of fixed wavelength QCLs each providing a different lasing wavelength,[11,12] or couple the laser diode to an external cavity (EC-QCL), whereby an angle-scanned grating provides wavelength-selective feedback.[13,14]

While QCLs remain significantly more expensive compared to corresponding light sources in the VIS and NIR, it is anticipated that their increased adoption for military applications and in MIR sensor technology will reduce costs to a competitive level.

### 4.2 Semiconductor on-chip waveguides

Despite the evident progress in light source technology, complementary waveguide structures maintaining the advantageous properties of the emitted laser radiation (*i.e.*, single-mode waveguides) have only very recently been introduced (Fig. 3).

Among the variety of MIR transmitting waveguide materials polycrystalline silver halides, and amorphous chalcogenide glasses are the most prevalent ones with only few recent reports demonstrating waveguides facilitating single-mode behavior.[15,16] The group of Mizaikoff and collaborators has pioneered the first entirely semiconductor-based thin-film IR waveguides made from GaAs/AlGaAs, which were epitaxially grown as a 6/6 μm layer across an entire wafer substrate *via* molecular beam epitaxy (MBE) or using metal–organic vapor-phase epitaxy (MOVPE).[17] Hence, for the first time the useful spectral window for on-chip MIR waveguides has been extended to 13 μm providing a sound basis for chip-integrated MIR sensor technology and complex MIR photonic structures taking advantage of mature microfabrication techniques for GaAs.

First GaAs/AlGaAs thin-film IR waveguides were grown *via* MBE on a Si-doped GaAs wafer substrate with a refractive index of $n = 2.8$. A 6 μm $Al_{0.2}Ga_{0.8}As$ optical buffer layer ($n = 3.2$) was epitaxially deposited followed by a 6 μm GaAs waveguide core ($n = 3.3$). The obtained mode profile along the *x*-axis was single-mode. After cleaving the wafer into waveguide slabs, TM polarized light emitted by a DFB QCL at a wavelength of 974 cm$^{-1}$ was directly coupled into the GaAs core layer and detected at the distal end of the waveguide using a MCT detector. With this system,

8686 | *Chem. Soc. Rev.*, 2013, **42**, 8683–8699

This journal is © The Royal Society of Chemistry 2013

View Article Online

Chem Soc Rev

Review Article

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.



**Fig. 3** (top left) Extrusion of a planar silver-halide waveguide with a layer thickness $d = 43$ μm $\pm$ 2 μm. (top right) Normalized FT-IR spectra obtained through the substrate vs. the planar silver-halide waveguide. A drop in intensity is clearly evident around 9 μm, which is the cut-off wavelength for a non-polarized measurement. (middle) Far-field intensity distribution at 10.6 μm measured at a distance of approx. 10 mm from a 36 cm long single-mode Ga-coated chalcogenide fiber prepared by the rod-in-tube vacuum method. (bottom left) Thin-film single-mode GaAs/AlGaAs waveguide structure with computed optical mode profile (right axis: refractive index profile; left axis: optical mode profile). (bottom right) Single wavelength emitting QCL coupled to GaAs waveguide slab. Experimental setup for QCL-based evanescent field absorption measurements with the QCL pigtail coupled to a GaAs waveguide and a droplet of absorbing analyte at the waveguide surface. Reproduced and adapted with permission from ref. 15–17.

the detection of 0.5 μL droplets of acetic anhydride at the wave-guide surface via evanescent field absorption was demonstrated.

These pioneering measurements have established the first generation of MIR semiconductor thin-film waveguide structures based

This journal is © The Royal Society of Chemistry 2013

Chem. Soc. Rev., 2013, **42**, 8683–8699 | **8687**

on GaAs/AlGaAs initializing the development of on-chip MIR chem/bio sensing devices.

### 4.3   Substrate-integrated hollow waveguides

Hollow waveguides (HWGs) are essentially hollow-core light-pipes initially designed for high-power surgical laser applications,[18] and have only recently attracted interest for MIR sensing applications (Fig. 4).[19] Conventional HWGs comprise a structural tube (*e.g.*, silica) coated on the inside hollow core wall with a metal (*e.g.*, Ag), and a protective dielectric (*e.g.*, AgI). Thus, MIR radiation propagates *via* reflection along the inside walls. Advantageously for sensing applications, they may simultaneously serve as a optically highly efficient miniaturized IR absorption cell for vapor analysis. The hollow core with typical diameters in the range of 2000–200 μm encloses a minute gas volume (few hundreds of μL), while simultaneously establishing a well-defined absorption path length. As discussed later, this optical efficiency leads to comparable or even enhanced sensitivity *vs.* conventional multi-pass gas cell configurations. Given the small volume of probed gas, and the resulting short sample transition times, this configuration provides significant benefits over conventional multi-pass gas cells.

However, integration of HWGs into compact sensing devices is limited due to the length and mechanical flexibility of the fiberoptic HWGs resulting in a large system operational footprint, if extended absorption path lengths are required.

Furthermore, mechanical motion or vibrations of the waveguide affect quantitative measurements. While coiling of the waveguide for reducing the footprint is conceivable, substantial signal attenuation losses due to bending, and mechanical stresses imposed onto the internal coatings limit the utility of this approach.

Consequently, Mizaikoff and collaborators have developed a new generation of HWG structures termed substrate-integrated hollow waveguides (iHWGs) based on a meandering hollow waveguide channel structure for vapor phase sensing applications.[20] With the waveguide embedded into a solid-state, planar substrate material combination with any MIR light source (*e.g.*, QCL, SiC filament, FTIR, *etc.*) is facilitated. Now maintaining a possibly compact device footprint (Fig. 4) renders this concept ideally suited for vapor phase sensing *e.g.*, in exhaled breath diagnostics.[21]

## 5. Fundamental sensing principles

As discussed above, with few exceptions, absorption-based MIR sensors currently dominate the field taking advantage of the waveguide serving as an active optical transducer: (i) evanescent field absorption for liquid phase sensing, and (ii) absorption inside a hollow waveguide structure for vapor phase sensing. First concepts toward surface plasmon resonance sensors in the MIR have recently emerged, and will be briefly outlined.



**Fig. 4**   (top) Structure of a conventional silica hollow core waveguide along with coupling cells for simultaneously serving as a miniaturized gas cell and propagating MIR photons. (bottom) Substrate-integrated hollow waveguide structure (iHWG) based on Al substrates with cover plates (one substrate has been additionally modified with an Au reflective layer) along with an assembled device for breath gas sensing.

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

View Article Online

## 5.1 Evanescent field absorption

While fundamentally most optical sensing techniques known throughout the more common frequency ranges from the VIS to the NIR may in principle be translated into the MIR frequency regime, practically relevant liquid phase IR sensing suffers from a major limitation – the absorbance characteristics of water (Fig. 5). Hence, only few unobstructed spectral windows provide access to the spectral fingerprints of *e.g.*, dissolved organic molecules. In conventional transmission-absorption IR spectroscopy, this problem is significantly reduced by using thin-film transmission cells, which ensure a liquid layer thickness of usually 20–300 µm. Thereby, the absorption of the aqueous background matrix is limited. This concept has successfully been used for coupling a tuneable EC-QCL to a thin-film transmission-absorption experiment for detecting glucose, lactate, and triglycerides in blood serum.[22] However, such thin film cells are prone to clogging, especially if real-world samples with complex matrices are analyzed. Thus, they are considered less suited for sensing applications. Hence, evanescent field spectroscopy has emerged as the dominating optical sensing principle for liquid phase IR sensing especially within aqueous matrices, as the sampled volume is defined by the penetration depth ($d_p$) of the evanescent field, which is only a few micrometers at MIR frequencies.

In brief, the penetration depth ($d_p$) of the evanescent field is defined as

$$d_p = \frac{\lambda}{2\pi \sqrt{n_1^2 \sin^2 \theta - n_2^2}}$$

where $\lambda$ is the wavelength of the incident radiation, $n_1$ is the refractive index of the waveguide, $n_2$ is the refractive index of the adjacent medium, $\theta$ is the incidence angle of the photons at the waveguide/sample interface (Fig. 6). How can we now maximize the sensitivity in evanescent field absorption sensing?



**Fig. 5** Typical IR spectrum of liquid water collected *via* evanescent field absorption spectroscopy using a silver halide fiberoptic waveguide as the active transducer (approx. 10 cm of the fiber was immersed into aqueous solution) externally coupled to a FT-IR spectrometer. The four major absorption features of water are indicated (minor atmospheric $CO_2$ absorbance (approx. 2350 cm⁻¹) during recording under ambient conditions, and of polymer ferrules at approx. 1150 cm⁻¹, which have been used to seal the fibers into the measurement cell). The detector cut-off occurs at ~680 cm⁻¹. This spectrum is an average of 250 sample scans collected at 0.5 cm⁻¹ resolution (Lib. = libration).



**Fig. 6** (top) Schematic representation of evanescent field absorption spectroscopy. A trapezoidal internal reflection element (IRE) is exemplarily shown (modeled for internal reflections: ZnSe), although photons propagate in a similar fashion along fiberoptic waveguides. Discrete internal reflections give rise to an evanescent wave, which emanates at the waveguide surface and exponentially decays into the adjacent medium, if the refractive index of the core-only waveguide $n_1$ exceeds the refractive index of the adjacent medium $n_2$. Analytes present within the penetration depth $d_p$ of the evanescent field may absorb radiation, and therefore attenuate the field at the resonance frequencies of the molecular vibrations, *i.e.*, attenuated total reflection spectroscopy and sensing. In contrast to VIS and NIR sensing, the evanescent field in the MIR typically penetrates several micrometers into the sample, thus forming a quasi thin-layer sample cell defined by $d_p$ around the waveguide structure. Consequently, even highly opaque or strongly absorbing media such as *e.g.*, aqueous solutions may readily be probed. (bottom) If the surface of the waveguide is modified with a chem/bio sensing interface, *e.g.*, a polymer membrane enriching molecules, the obtained information is generated by the convolution of the time dependent concentration profile of the analyte diffusing into a chemical recognition layer, and the intensity profile of the evanescent field.

The critical angle $\theta_c$ at which total internal reflection occurs is defined as

$$\theta_c = \arcsin \frac{n_2}{n_1}$$

The theoretical number of internal reflections ($n$) in a waveguide may be calculated as

$$n = \frac{L}{a} = \frac{L}{d \tan \theta}$$

where $L$ is the length of the active transducing (sensing) region of the waveguide, $d$ is the waveguide thickness, and $a$ is the

View Article Online

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

distance between each reflection. Thus, at the same sensing length $L$ and at a given angle of incidence $\theta$, a decreasing waveguide thickness results in more internal reflections. Furthermore, the amplitude of the evanescent field $E(x)$ decreases exponentially with increasing distance $x$ from the waveguide surface following

$$E(x) = E_0 \exp\left(-\frac{x}{d_p}\right)$$

where $E_0$ represents the intensity directly at the waveguide/sample interface. Thus, after $n$ internal reflections within the waveguide, a total $E_{total}(x)$ may be obtained (with $x_1 = x_2 = \ldots = x_n$) as

$$E_{total}(x) = \sum_{i=1}^{n} E_i(x_i) \approx nE(x) = nE_0 \exp\left(-\frac{x}{d_p}\right)$$

Therefore, the absorbance increases with $n$, i.e., more internal reflections result in enhanced absorbance signals, which in turn provides the fundamental argument for the current trends in thin-film waveguide technology discussed in Section 4.

## 5.2 Absorption-based sensing in hollow waveguides

Vapor phase IR sensing is usually less affected by water, however, typically requires an extended absorption path length to ensure sufficient interaction between photons and molecules. Consequently, conventional gas phase IR spectroscopy takes advantage of so-called multi-pass gas cells (e.g., White cell, Herriott cell, etc.), which utilize a series of mirrors folding the IR beam multiple times within a defined gas volume. While this strategy enables effective absorption path lengths of several tens of meters, the volume of such systems also ranges from a minimum of usually 200 mL up to several liters. Hence, the required sample gas volume, transient sample time, and bulkiness of such gas cell assemblies render them less suitable for sensing applications. As a viable alternative, hollow waveguides have emerged, which provide a distinctly higher efficiency briefly discussed herein (Fig. 7).

The optical efficiency of such a hollow optical structure used in vapor sensing may be defined as the ratio of the optical path length to the cell volume. In a multi-pass gas cell, the reflections produce a series of radiation between the objective and the field mirrors, i.e., the IR beam does not pass through the entire cell volume. Exemplarily, for a 3 m multi-pass gas cell (Gemini Scientific, Buena Park, CA, USA) with a volume of 375 mL, the IR beam only occupies approx. 85% of that volume. Given that HWGs are non-imaging optical elements, even after a short propagation length nearly the entire void volume is occupied by IR photons, therefore ensuring possible intimate interaction between MIR radiation and vapor phase molecules within the entire available sample volume.

In turn, the response time of a vapor sensing system is dependent on the optical efficiency of the gas cell as described above, and the flow response time of the gas cell, i.e., the transient time of a sample through the void volume. For sensing applications in process monitoring, security/surveillance, for studying rapid combustion processes, or in exhaled breath diagnostics



**Fig. 7** (top) Schematic of a simple multi-pass gas cell (four passes) conventionally used in vapor phase IR spectroscopy. The optical efficiency is defined as the ratio of the optical path length and the cell volume. Evidently, the IR beam does not pass through the entire volume of the gas cell. (bottom) Schematic of infrared radiation propagating through a hollow waveguide as derived from Monte-Carlo ray tracing simulations indicating that eventually a much larger fraction of volume is occupied by photons. Dimensions not to scale.

timely feedback is required, therefore rendering analysis systems with extended response times less suitable.

Using concentration decay curves, a comparison between a 3 m multi-pass gas cell and a conventional hollow waveguide based on a silica structural tube coated on the inside with Ag/AgI with a length of 55 cm and an inner diameter of 2 mm (both coupled to a FT-IR spectrometer) was performed.[23] The resulting optical efficiency of the HWG was 32 vs. 0.8 for the multi-pass gas cell with the response time being 1/10th of the response time obtained with the multi-pass gas cell. Furthermore, it could be demonstrated that the HWG provides up to 60% more sensitivity (per meter optical path) compared to the multi-pass gas cell. This is related to the superior optical efficiency maximizing the photon density within the vapor phase sample volume, thereby impressively demonstrating the advantage of HWG structures for chem/bio sensing.

## 5.3 Emerging concepts: MIR surface plasmon resonance

Surface plasmon resonance (SPR) is nowadays considered a well-established optical principle that finds widespread use in chem/bio sensing.[24] Most commonly, internal total reflection configurations are used for the excitation of surface plasmons,[25] along with an increasing number of fiberoptic SPR sensors.[26]

It is quite surprising though that the spectral range of operation for SPR-devices is currently limited to the VIS-NIR regime, even though the MIR would provide significant advantages in terms of molecular information. However, since the obtained vibrational modes are comparatively weak, electric field enhancement techniques based on noble metal nanostructures are frequently required,[27] which in turn suggests that utilizing the advantageous characteristics of SPR devices in the MIR may be a viable option.

View Article Online

Review Article

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

In a seminal study, Chen has shown a MIR SPR sensor system that may be used in air or water.[28] Surface plasmons were excited *via* a periodic doping profile embedded into an intrinsic silicon film, whereby the optical constants were tailored by the doping concentration. Thus, the obtained dispersion curves between the doped silicon and the analyte medium were effectively tuned according to the SPR wavelength such that the presence of an analyte gives rise to a reflectance dip, as demonstrated *e.g.*, for ammonium sulfate in water (Fig. 8). However, the optical configuration of this system requires angular interrogation of the active structure, which is of limited utility in sensing, *e.g.*, for lab-on-a-chip devices. Nevertheless, the fundamental feasibility of MIR-SPR sensing has impressively been demonstrated.

A novel concept for SPR-MIR waveguide-based sensing has recently been theoretically introduced by Esteban *et al.* describing the potential for exciting surface plasmons in corrugated GaAs/AlGaAs thin-film waveguide structures, which is ideally compatible with on-chip integration strategies (Fig. 9).[29]

Herein, the phase-matching conditions between the effective refractive index of a noble metal (Au) coated semiconductor structure and the surface plasmon were calculated proposing a multi-layered device. The grating/corrugation period $\Lambda$ is calculated following

$$\Lambda = \frac{\lambda}{\mathrm{Re}(n_{\mathrm{eff,W}}) - \mathrm{Re}(n_{\mathrm{eff,SP}})}$$

where $\lambda$ is the desired resonance wavelength, $n_{\mathrm{eff,W}}$ is the effective index of the fundamental TM mode for the waveguide, and $n_{\mathrm{eff,SP}}$ is the effective refractive index for the surface plasmon mode. A variation in the outer refractive index of the structure therefore translates into a change of the $n_{\mathrm{eff,SP}}$.

Subsequently, the dispersion relations of the guided modes for the planar substrate, the metallic layer, and the outer (sample)



**Fig. 8** (top) Schematic of the optical setup for MIR SPR sensing in air or water based on a periodically doped silicon structure, as shown in the magnified cross-section of the sensor structure. (bottom left) Spectral reflectance spectra for MIR-SPR doped silicon sensors with different filling ratios ($f = 0.2$, 0.5, and 0.8) and intrinsic silicon thickness ($d_g = 0.3$, 0.4, and 0.5 μm). The sample medium is water with the surface plasmon excited at 4 μm for all sensors. (bottom right) Detection of ammonium sulfate in water (binary mixture; 20% weight fraction $(NH_4)_2SO_4$) at 298 K. Reproduced and adapted with permission from ref. 28.

This journal is © The Royal Society of Chemistry 2013

*Chem. Soc. Rev.*, 2013, **42**, 8683–8699 | **8691**

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.



**Fig. 9** (top) Schematic of a GaAs/AlGaAs waveguide-based MIR-SPR sensor comprising a corrugated GaAs waveguide with an Au layer. (bottom) Transmittance of the proposed device and expected shift. From left to right, the values of the outer refractive index are 1.57, 1.56, 1.55 and 1.54 respectively. The device has been calculated for a MIR wavelength of 6 µm. Reproduced and adapted with permission from ref. 29.

medium were calculated. In contrast to previous study, the substrate itself serves as a waveguide, thereby avoiding external (angular) interrogation for excitation of the surface plasmons, thus facilitating full device integration for future MIR-SPR chem/bio sensing applications.

## 6. Applications of waveguide-based MIR chem/bio sensors

In the following, a representative selection of waveguide-based MIR sensing applications is discussed highlighting recently published measurement scenarios along with future trends in the field; a corresponding overview is provided in Table 1.

### 6.1   MIR chemosensors vs. MIR biosensors

While optical chemical sensors nowadays increasingly take advantage of MIR technologies, only few representative examples of biosensors have been published so far. This is mainly attributed to the fact that – with few recent exceptions – the sensitivity of waveguide-based IR liquid phase sensors remains insufficient for detecting small quantities of relevant biomolecules such as *e.g.*,

proteins or DNA. The fundamental feasibility of label-free evanescent field absorption detection of biomolecular interactions such as antibody–antigen interactions or ssDNA binding to a complementary strand has recently been demonstrated after immobilizing probe ssDNA at the surface of a ZnSe waveguide.[30] However, only if sufficient sensitivity is achieved using the strategies outlined in Section 4, label-free MIR bioassays may be envisaged.

Even enzymatic biosensing schemes combined with MIR transducers do not provide the same advantages generally known *e.g.*, for electrochemical biosensors. The rather complex molecular surface architectures required for the immobilization of biocatalysts usually gives rise to substantially cluttered background spectra in addition to spectral interferences by water, which results in limited spectral windows that are available for (bio)analyte detection.

Consequently, only if advanced waveguide-enhanced sensing and diagnostic concepts significantly improve the sensitivity while reducing the required sample amount, label-free MIR bioassays and MIR-lab-on-a-chip systems may be successful, as shown for first promising approaches discussed at the end of this section.

In contrast to biosensors, most chemosensors usually rely on a chemical recognition element, *i.e.*, a polymer membrane,

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

**Table 1**  Summary of recent waveguide-based MIR chem/bio sensor applications

| Waveguide material | Light source | Application | Analyte(s) | Ref. |
|---|---|---|---|---|
| Zinc selenide | FT-IR | Label-free mid-infrared DNA hybridization assay *via* surface-immobilized ssDNA | ssDNA | 30 |
| Calcium fluoride coupled to silver halide fibers | QCL | Hand-held safety/security sensing devices using fiber-coupled ATR prisms | Triacetonetriperoxide (TATP) | 31 |
| Various MIR waveguides | FT-IR | Review on environmental sensing of water pollutants using polymer-coated MIR waveguides | Aromatic and halogenated hydrocarbons in general | 32 |
| Zinc selenide | FT-IR | Simultaneous sensing of aromatic hydrocarbons in water with polymer-coated waveguides | Benzene, toluene, *o*-, *m*-, *p*-xylene | 33 |
| Silver halide | QCL | Sensing of organic constituents at high concentrations with quantum cascade laser and cylindrical fibers | α-Tocopherol, acetone | 34 |
| Silver halide | QCL | Trace sensing of organic constituents with quantum cascade laser and planar tapered fibers | Acetic anhydride, urea | 35 |
| Silver halide | FT-IR | Silver halide fibers with surface-deposited grating couplers | Pesticides (diazinon, dichlorovos (DDVP), parathion) | 36 |
| Silver halide | QCL | Planar silver halide fibers with integrated FIB-fabricated grating couplers | Acetic acid | 37 |
| Ge-doped chalcogenide (GeSbSe) | FT-IR | Mid-infrared biosensor using antibody-decorated waveguide surfaces | *E. coli* O157:H7, *E. coli* K12, *S. enteritidis* | 38 |
| Zinc selenide | FT-IR | Quantitative determination of salt ions *via* their individual effects on the bulk water IR spectrum | Cl⁻, Na⁺, SO₄²⁻, Mg²⁺, Ca²⁺, K⁺, Br⁻ | 39 |
| Zinc selenide | FT-IR | Determination of metal ions *via* chelating agents immobilized at the waveguide surface | Cu²⁺ | 40 |
| Silver halide | FT-IR | Trace detection of aromatic hydrocarbons *via* fiber-coupled planar polymer-coated silver halide transducers | Benzene, toluene, *o*-, *m*-, *p*-xylene | 41 |
| Silver halide | FT-IR | Deep-sea MIR sensor coupling polymer-coated silver halide transducers to submersible FT-IR systems | 1,2-Dichlorobenzene (DCB), tetrachloroethylene (TeCE), *o*-, *m*-, *p*-xylene | 42 and 43 |
| Silver halide | FT-IR | Studying the mechanisms of gas hydrate formation under simulated deep sea conditions | Propane clathrate (with SDS) | 44 |
| Silver halide | FT-IR | Detection of oil-in-water with uncoated and epoxidized polybutadiene-coated silver halide transducers | Crude oil | 45 |
| Silver halide | FT-IR | Detection of water-in-oil with uncoated and polyacrylic acid-coated silver halide transducers | Water | 46 |
| Zinc selenide, silver halide | FT-IR | Analysis of oil constituents dissolved in water *via* polymer-coated waveguides | Benzene, toluene, *o*-, *m*-, *p*-xylene, ethylbenzene, naphthalene | 47 |
| Silver halide | FT-IR | General analysis of biomedical samples with waveguide-based MIR sensing techniques | Skin tissues, biopsy samples, urine, blood, microdialysates | 48 |
| Zinc selenide | FT-IR | Selective detection of amino acids *via* selective ligands immobilized at the waveguide surface | Tyrosine, argenine | 49 and 50 |
| Hollow waveguides | FT-IR | Environmental and workplace health gas phase trace monitoring with fiberoptic hollow waveguides with/without preconcentration | Benzene, toluene, *o*-xylene, ethylbenzene, trichloroethylene, ethene | 51–53 |
| Various MIR waveguides | FT-IR, TDL, QCL | Summary on relevant volatile breath constituents and review on breath gas analysis with MIR sensing devices | Various | 54 and 55 |
| Hollow waveguides | FT-IR, QCL | Breath gas analysis with hollow waveguides coupled to FT-IR and broadly tunable QCLs | ¹²CO₂ and ¹³CO₂ | 56–58 |
| GaAs/AlGaAs | QCL | On-chip MIR sensor technology based on semiconductor thin-film waveguides | Acetic anhydride, water | 59–61 |

FT-IR – Fourier transform infrared spectrometer. ATR – attenuated total reflection. MIR – mid-infrared. QCL – quantum cascade laser. FIB – focused ion beam. SDS – sodium dodecyl sulfate. TDL – tunable diode laser.

a sol–gel layer, *etc.* decorating the active transducer/waveguide surface. Besides comparatively simple attachment strategies, membrane-based chemical sensors take advantage of enriching/preconcentrating molecules within the chemical recognition layer, thereby capitalizing on chemical signal amplification strategies. As shown in Fig. 6, this entails accumulating molecules within the probed analytical volume (*i.e.*, in most cases the evanescent field emanating at the waveguide surface). Consequently, a membrane thickness of few micrometers is required; if in addition the membrane is hydrophobic, water – as

an interfering molecule – is largely excluded from the analytically probed volume. The background interference is efficiently reduced, which in turn benefits the SNR. Of course, such chemical amplification may be complemented by additional optical enhancement, as shown in Section 6.3 by using flat-tapered waveguide segments. Finally, the spectral characteristics of polymer or sol–gel membranes provide for a constant and relatively simple spectral background, which still provides sufficient transparency in the MIR regime for detecting analytes of interest.

This journal is © The Royal Society of Chemistry 2013

*Chem. Soc. Rev.*, 2013, **42**, 8683–8699 | **8693**

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

### 6.2   Security and surveillance

Despite the inherent molecular selectivity, only few waveguide-based MIR sensors claim applications in safety, homeland security, and surveillance applications. Why is that the case?

The main issue when considering such applications – besides the to date rather limited portability – remains associated with a limitation that (in the humble opinion of the author) most other chem/bio sensing schemes also suffer from: chem/bio sensors are usually so-called point sensing devices. Considering the 'analytical field-of-view' of a transducer with dimensions as large as 10 cm or as small as 100 μm, it is immediately evident that only a very localized measurement may be performed recruiting molecules from the vicinity of the transducer. Hence, considering surveillance of large spaces or even open spaces with respect to the release of e.g., toxic chemicals or for explosives monitoring at locations including airports, train stations, or subway platforms – not even speaking of open stadium scenarios, etc. – one has to consider distributing hundreds if not thousands of sensors for providing a surveillance network that would capture a localized adverse event. Even if used as additional alarm sensors, it is highly questionable whether a localized measurement may be performed in such a strategically selected location that is indeed representative for the large area or volume under observation.

Hence, the only useful deployment scenarios for such point sensing systems may be limited to monitoring restricted access areas or supplies, i.e., if e.g. in a building safety monitoring scenario the entire water or air supply is centrally delivered and distributed, thus offering strategic locations for monitoring the majority of the sample in a representative way despite using a highly localized sensing system.

Albeit being proposed for such surveillance applications to date, it is much more likely that such devices have a practical impact if used by e.g., first responders or in-field military personnel reacting to events that are localized by nature. Exemplarily, Bauer et al. have coupled a quantum cascade laser via silver halide fibers to an ATR prism, which enabled the detection of triacetonetriperoxide (TATP) with a device of hand-held size (Fig. 10).[31] While the principal feasibility has been demonstrated, reports on the analytical figures-of-merit and potential airborne interferences remain to be reported.

### 6.3   Water quality

A major field of application for waveguide-based MIR sensors is the detection of volatile organic constituents (VOCs) and bacterial pathogens in aqueous matrices with potential usage in environmental analysis and water quality monitoring.[32] Of particular interest is the detection of species that are difficult to detect after sampling (e.g., aromatic hydrocarbons (AHCs) such as benzene, toluene, and the xylenes or chlorinated hydrocarbons (CHCs) such as tetrachloroethylene, chlorobenzenes, etc.),[33] as they rapidly partition into the supernatant atmosphere or e.g., into the wall material of the sampling device. As previously discussed, appropriate modification of waveguide surfaces with chemical



**Fig. 10** MIR open path absorption sensor for TATP detection. (a) Sensor setup, (b) image of the sensor head, (c) tuning characteristics of the quantum cascade laser and raw data for the absorption of TATP, and (d) evaluated extinction of the TATP signal at approx. λ = 8 μm using the raw data from (c). Reproduced and adapted with permission from ref. 31.

View Article Online

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

recognition interfaces reduces the spectral water background and allows for the discrimination of water pollutants with sufficient SNR even in complex real-world samples. However, to date none of the reported studies has discussed the long-term stability of such sensors, if continuously deployed for extended measurement periods in real-world scenarios, e.g., rivers, lakes, aquifer systems, etc. Yet, most devices utilize a transducer configuration that facilitates rapid exchange of the active sensor head, thus mitigating potential effects of biofouling, surface contamination, or degradation of the molecular recognition interface.

In 2005, the first combination of QCLs with silver halide waveguides for aqueous phase sensing was reported. While Chen et al. have used unclad silver halide fibers for analyzing the chemical composition of liquid droplets (i.e., organic constituents in water) at percentage concentration levels,[34] Charlton et al. have introduced the first thin-film planar silver halide waveguide segments facilitating the detection of 80.7 μg of urea and 0.01 μL of acetic anhydride present at the waveguide surface.[35] Later, Dekel and Katzir and Schaedle et al. further refined the concept of efficiently coupling MIR radiation into such planar silver halide waveguides by integrating

first reflective gratings and then grating couplers microfabricated via focused ion beam (FIB) milling at the surface of the waveguide slab.[36,37]

One of the few examples of functional MIR biosensors has been demonstrated by Yu et al. by immobilizing antibodies (i.e., human IgG, anti-E. coli O157:H7, and anti-Salmonella) complexes via thiol-linking to 20 nm-thick gold islands decorating the surface of Ge-containing chalcogenide glass waveguides.[38] In this approach, label-free detection and discrimination of bacterial targets was achieved for E. coli and S. enteritidis, thereby confirming that the concept of MIR bioassays is indeed feasible.

Two rather exotic albeit highly interesting concepts of MIR evanescent field sensors discuss the detection of species without inherent vibrational signature (Fig. 11).

In neat seawater, eight types of ions are prevalent at millimolar or higher concentrations, i.e., $Cl^-$, $Na^+$, $SO_4^{2-}$, $Mg^{2+}$, $Ca^{2+}$, $K^+$, $Br^-$, and $HCO_3^{3-}$, whereby the first six species contribute >99% of the salinity (in order); bicarbonate is rapidly decomposed via biological activity, while $HCO_3^{3-}$ is considered a minor constituent. Of the dominant ions, only $SO_4^{2-}$ has an inherent IR signature. In a seminal study, Vogt et al. have shown that once ions dissolve and are hydrated with a shell of



Acidified tris(2-aminoethyl)amin (ATAA)

**Fig. 11** (top) Influence of various concentrations of salts on the water absorption band shape shown as difference spectra against deionized water as reference. (bottom left) Chemical structure of the sensing membrane based on acidified tris(2-aminoethyl)amine (ATAA). (bottom middle) Detection time profiles based on the signal at approx. 1400 cm$^{-1}$ for concentrations of copper ions of 5 to 500 μM at pH 6. Each point was averaged from triplicate runs. One standard deviation is shown for each data point. (bottom right) Relationship between the obtained IR signals and the concentration of copper ions (recorded after detection of 5 and 20 min, respectively). Reproduced and adapted with permission from ref. 39 and 40.

This journal is © The Royal Society of Chemistry 2013

Chem. Soc. Rev., 2013, **42**, 8683–8699 | **8695**

View Article Online

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

water molecules, they interact with the surrounding water matrix, which cause significant changes of the hydrogen-bond network of liquid water.[39] These changes directly reflect in the evanescent field absorption spectrum of water, whereby each ion differently affects the bulk water structure, which facilitates the quantitative analysis of individual ionic species at concentrations below 0.1 mol L$^{-1}$ using appropriate multivariate statistics.

In a similar approach, the group of Yang has shown the detection of trace amounts of copper ions – which also provide no inherent vibrational features – via a band-shifting technique after interaction with an acidified tris(2-aminoethyl)amine (ATAA) membrane coated onto the surface of an evanescent field sensing element.[40]

As a final example, in a recent study Lu et al. have significantly improved the sensitivity of detecting benzene, toluene, and the xylenes in water using a novel silver halide waveguide structure based on a planar active transducer segment with cylindric fiberoptic extensions. Thereby, radiation coupling from a broad band light source (FT-IR spectrometer) was facilitated while taking advantage of an increased sensitivity during evanescent field absorption measurements by maximizing the number of internal reflections within the planar sensing segment. Additionally coating the planar transducer segment with a polymeric enrichment membrane demonstrates the utility of combined chemical and optical amplification strategies, as direct simultaneous quantification of these AHCs at ppb (µg L$^{-1}$) levels has been achieved for the first time.[41]

## 6.4 Oil and gas

In the past decade, a growing number of publications have demonstrated the potential of utilizing evanescent field MIR sensors under increasingly harsh conditions.

With the first demonstration of deep sea FT-IR spectrometers complemented with polymer-coated fiberoptic evanescent field transducers for sensing chlorinate hydrocarbons in marine settings, the utility of MIR chemosensors for such extreme environments has been confirmed.[42,43]

Thereafter, it has been shown that simulating the deep sea environment within pressure vessels in a laboratory environment providing a feed-through option for fiberoptic waveguides enables unique studies on e.g., the formation of gas hydrates under simulated real-world conditions.[44]

The feasibility of waveguide-based evanescent field sensors for detecting traces of oil-in-water[45] and water-in-oil[46] allows monitoring of environmentally relevant parameters, as well as studying the quality and/or ageing of petroleum products.

MIR transparent silver halide fibers with grafted epoxidized polybutadiene layers were utilized as optical transducers for probing oil-in-water emulsions via evanescent field absorption. Thereby, direct chemical sensing of crude oil IR signatures without prior sample preparation at concentration levels as low as 46 ppb was achieved with response times of few seconds. Complementarily, water is a frequent contaminant at trace levels in industrial oils and petroleum products. Using hexane as a model matrix, silver halide fiberoptic waveguides coupled to

a FT-IR spectrometer were coated with tin-crosslinked polyacrylic acid, and then deployed for probing water-in-hexane emulsions. Thereby, detection limits of 10 ppm could be achieved.

Last but not least, Pejcic and collaborators have shown an improved concept for directly and rapidly quantifying monocyclic and polycyclic aromatic hydrocarbons (MAHs, PAHs) in oil–water mixtures after enrichment into thin poly(isobutylene) polymer membranes coated onto the surface of an evanescent field transducer.[47]

In summary, the MIR chemosensor technologies discussed herein have significant potential for in-field geochemical mapping and for in situ monitoring of concentration profiles for a variety of hydrocarbons in geological formations (e.g., petroleum systems) and marine ecosystems.

## 6.5 Life sciences and health

Liquid phase sensing in bioanalytics and health relevant applications remain rare utilizing waveguide-enhanced MIR sensing devices. Heise et al. have reported on a series of studies studying various biomedical samples ranging from skin tissues and biopsy samples to bodily fluids such as urine, blood, and microdialysates within in vitro settings (e.g., clinical laboratory) for non-invasive diagnostics.[48] In these studies, silver-halide fibers have mostly been used as the active transducer element.

In 2006, Lee and Yang presented an intriguing concept for evanescent field-based sensing of tyrosine in aqueous solution.[49] α-Cyclodextrin was immobilized as a ligand at the surface of a MIR waveguide for selectively attracting tyrosine into the evanescent field. Evaluating the unique absorption feature of tyrosine (at 1500 cm$^{-1}$), the selective detection of tyrosine even in mixtures with amino acids and other interferents was shown with a response time of <10 min and a detection limit of approx. 0.4 µM. This study was later complemented by a variation of the molecular recognition interface using sulfonate capturing groups for selectively attracting argenine (via the guanidine moieties).[50]

Detecting molecules in the vapor phase using HWGs coupled to MIR light sources has initially been discussed predominantly for environmental gas analysis.[51,52] However, a first application for workplace health monitoring has demonstrated that the quantitative detection of e.g., benzene at low ppb (v/v) concentration levels is feasible after preconcentration with a thermal sorption–desorption system during field measurements preconcentration.[53]

More recently, the potential for analyzing exhaled breath utilizing HWGs coupled with FT-IR spectrometers and QCLs has been explored, thereby revealing significant potential for correlating molecular profiles or fingerprints with certain disease, disease status, or treatment progress. Breath analysis is a long known, yet to date little exploited non-invasive strategy for disease recognition and therapeutic progress monitoring. Without further detailing herein, the quantitative compositional analysis of exhaled breath provides useful biomarker panels characteristic for specific disease conditions invoked by e.g., pulmonary diseases, lung cancer, and breast cancer.[54] The exhaled breath matrix apparently contains comprehensive information on the metabolic state and certain disease pathologies

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

*via* patterns of VOCs. Consequently, sensor technologies for advanced breath diagnostics should be capable of molecular discrimination and quantification of selected constituents at ppm–ppb concentration levels, which renders MIR technologies among the methods of choice.[55] So far, it was demonstrated that this sensing concept may be applied for quantitatively discriminating $^{12}CO_2$ *vs.* $^{13}CO_2$ in exhaled mouse breath. Analyzing mouse breath samples under real-world conditions by combining either a compact FT-IR spectrometer or a broadly tunable EC-QCL with conventional HWGs, an accuracy and precision comparable to gas chromatography/mass spectrometry as the

gold standard has been achieved.[56–58] Considering the possibility of simultaneously analysing selected VOCs, it is apparent that in future waveguide-enhanced vapour phase sensing platforms operating in the MIR spectral range could complement conventional breath analyzer technologies providing highly relevant molecularly selective information.

### 6.6 Toward MIR bioassays and MIR-lab-on-a-chip

Given the state-of-the-art in MIR sensing applications and considering the current progress based in semiconductor MIR waveguide technology and miniaturization, the development of



**Fig. 12** Schematic working principle of a MIR Mach–Zehnder interferometer (MZI) fabricated on-chip utilizing GaAs/AlGaAs waveguides. The presence of a sample on the measurement arm of the interferometer gives rise to a phase delay *vs.* the unaffected reference arm, thus resulting in a concentration-dependent change of the observed interference pattern in the time domain.

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

label-free biodiagnostic devices and lab-on-a-chip concepts operating in the 2.5–20 μm spectral regime appears entirely conceivable.[59] However, a major prerequisite is demonstrating that sample quantities comparable to current microarray platforms (e.g., DNA or protein arrays) operating with sample spot diameters of several tens of micrometers may be addressed. Recent progress demonstrating highly efficient on-chip waveguide structures certainly fertilize the optimistic perspective that such devices are indeed on the horizon.

Taking advantage of the previously discussed GaAs/AlGaAs waveguide technology, Wang et al. have recently shown arrays of strip waveguide structures fabricated from epitaxially grown (MOVPE) GaAs/Al$_{0.2}$Ga$_{0.8}$As layers via photolithography and reactive ion etching.[60] Coupling of the waveguide array chip to a QCL and using a micro-capillary with a tapered tip for depositing series of 2 nl analyte droplets at the surface of individual waveguide strips, reliable detection of sample volumes as low as 18 pL detecting approx. 20 ng of dissolved acetic anhydride as an exemplary analyte has been demonstrated.

An even more sophisticated transducer has been published by Sieger et al. with the first on-chip Mach–Zehnder interferometer operating at MIR wavelengths (Fig. 12).[61] Providing single-mode photon propagation along with excellent surface sensitivity it is anticipated that these devices pave the way toward investigating changes of protein conformation or (bio)-molecular interactions in a label-free bioassay format using minute sample quantities. With the integration of appropriate micro- and nanofluidic architectures, even MIR-lab-on-a-chip concepts appear within reach.

# 7. Conclusions

While waveguide-based mid-infrared chem/bio sensors have come a long way, it is evident that significant quantum leaps in system technology and broadly accepted applications are still ahead. However, the continuous evolution of MIR photonics, on-chip integration, and system miniaturization promises progressively compact sensing and diagnostic platforms ideally taking advantage of the smart combination of chem/bio amplification and optical enhancement schemes. Without doubt, the resulting 'good vibrations' may in the true meaning of the words provide a viable solution for in situ sensing techniques demanding molecularly discriminatory information without requiring labels or markers.

The author would like to thank all students and scientists who have contributed during recent years to the studies discussed herein. Furthermore, all funding agencies supporting mid-infrared sensor research & technology are greatly acknowledged.

## Notes and references

1  B. Mizaikoff and B. Lendl, in Handbook of Fiber Optic Sensing Technology: Principles and Application, ed. J. M. Lopez-Higuerra, Wiley, 2002, p. 729.

2  G. Holst and B. Mizaikoff, in Handbook of Vibrational Spectroscopy, ed. J. M. Chalmers and P. R. Griffiths, Wiley, 2002, vol. 2, p. 1560.

3  B. Mizaikoff, Anal. Chem., 2003, 75, 258A.

4  Q. Xu, B. Schmidt and J. Shakya, et al., Opt. Express, 2006, 14, 9430.

5  Z. Ghassemlooy, W. Popoola and S. Rajbhandari, Optical Wireless Communications, CRC Publishers, 2012.

6  M. D. Marazuela and M. C. Moreno-Bondi, Anal. Bioanal. Chem., 2002, 372, 664.

7  M. Graf, G. Scalari and D. Hofstetter, et al., Appl. Phys. Lett., 2004, 84, 475.

8  L. Gendron, C. Koeniguer and V. Berger, et al., Appl. Phys. Lett., 2005, 86, 121116.

9  J. Faist, F. Capasso and D. L. Sivco, et al., Science, 1994, 264, 553.

10  F. Capasso, C. Gmachl and D. L. Sivco, et al., Phys. Today, 2002, 55, 34.

11  B. G. Lee, J. Kansky and A. K. Goyal, et al., Appl. Phys. B: Lasers Opt., 2009, 92, 16216–16224.

12  C. Young, R. Cendejas and S. S. Howard, et al., Appl. Phys. Lett., 2009, 94, 0911091.

13  G. P. Luo, C. Peng and H. Q. Le, et al., IEEE J. Quantum Electron., 2002, 38, 486.

14  R. Maulini, M. Beck and J. Faist, et al., Appl. Phys. Lett., 2004, 84, 1659.

15  R. Grille, G. Martin and L. Labadie, et al., Opt. Express, 2010, 17, 12516.

16  P. Houizot, C. Boussard-Plédel and A. J. Faber, et al., Opt. Express, 2007, 15, 12529.

17  C. Charlton, M. Giovannini and J. Faist, et al., Anal. Chem., 2006, 78, 4224.

18  J. Harrington, Fiber Integr. Opt., 2000, 19, 211.

19  C. Charlton, B. T. Thompson and B. Mizaikoff, in Chemical Sensors and Biosensors, Springer, 2005, vol. 3, p. 133.

20  A. Wilk, C. Carter and M. Crisp, et al., Substrate-integrated hollow waveguide sensors, 2012, US 13/631,936.

21  P. R. Fortes, A. Wilk and F. Seichter, et al., Proc. SPIE, 2013, 8570, 85700Q.

22  M. Brandstetter, L. Volgger and A. Genner, et al., Appl. Phys. B: Lasers Opt., 2013, 110, 233.

23  B. T. Thompson, A. Inberg and N. Croitoru, et al., Appl. Spectrosc., 2006, 60, 266.

24  J. Homola, Chem. Rev., 2008, 108, 462.

25  H. S. Leong, J. Guo and R. G. Lindquist, et al., J. Appl. Phys., 2009, 106, 124314.

26  F. J. Bueno, Ó. Esteban and N. Díaz-Herrera, et al., Appl. Opt., 2004, 43, 1615.

27  B. Neuner III, D. Korobkin and C. Fietz, et al., J. Phys. Chem. C, 2010, 114, 7489.

28  Y.-B. Chen, Opt. Express, 2009, 17, 3130.

29  O. Esteban, A. González-Cano and B. Mizaikoff, et al., Plasmonics, 2012, 7, 647.

30  C. S. Riccardi, D. W. Hess and B. Mizaikoff, Analyst, 2011, 136, 4906.

31  C. Bauer, A. K. Sharma and U. Willer, et al., Appl. Phys. B: Lasers Opt., 2008, 92, 327.

32  B. Pejcic, M. Myers and A. Ross, Sensors, 2009, 9, 6232.

View Article Online

Published on 30 August 2013. Downloaded by University of Southern Mississippi on 24/08/2017 19:42:26.

33 M. Karlowatz, M. Kraft and B. Mizaikoff, *Anal. Chem.*, 2004, **76**, 2643.

34 J. Chen, Z. Liu and C. Gmachl, *et al.*, *Opt. Express*, 2005, **13**, 5953.

35 C. Charlton, A. Katzir and B. Mizaikoff, *Anal. Chem.*, 2005, **77**, 4398.

36 B. Dekel and A. Katzir, *Proc. SPIE*, 2010, **7838**, 783806.

37 T. Schaedle, A. Eifert and C. Kranz, *et al.*, *Appl. Spectrosc.*, 2013, DOI: 10.1366/12-06898.

38 C. Yu, A. Ganyoo and H. Jain, *et al.*, *Anal. Chem.*, 2006, **78**, 2500.

39 F. Vogt, M. Kraft and B. Mizaikoff, *Appl. Spectrosc.*, 2002, **56**, 1376.

40 H.-C. Lin, Y.-H. Chou and J. Yang, *Anal. Chim. Acta*, 2008, **611**, 89.

41 R. Lu, G. Sheng and W. Li, *et al.*, *Angew. Chem., Int. Ed.*, 2013, **52**, 2265.

42 M. Kraft, M. Jakusch and M. Karlowatz, *et al.*, *Appl. Spectrosc.*, 2002, **13**, 1294.

43 M. Kraft, M. Karlowatz and B. Mizaikoff, *et al.*, *Meas. Sci. Technol.*, 2003, **57**, 591.

44 Y. Luzinova, G. T. Dobbs and Y. Raichlin, *et al.*, *Chem. Eng. Sci.*, 2011, **66**, 5497.

45 Y. Luzinova, B. Zdyrko and I. Luzinov, *et al.*, *Anal. Chem.*, 2012, **84**, 1274.

46 Y. Luzinova, B. Zdyrko and I. Luzinov, *et al.*, *Analyst*, 2012, **137**, 333.

47 B. Pejcic, L. Boyd and M. Myers, *et al.*, *Org. Geochem.*, 2013, **55**, 63.

48 H. M. Heise, L. Küpper and L. N. Butvina, *Spectrochim. Acta, Part B*, 2002, **57**, 1649.

49 C.-J. Lee and J. Yang, *Anal. Biochem.*, 2006, **359**, 124.

50 Y. K. Wei and J. Yang, *Talanta*, 2007, **71**, 2007.

51 R. H. Micheels, K. Richardson and D. J. Haan, *et al.*, *Proc. SPIE*, 1999, **3540**, 64.

52 O. A. Pogodina, V. V. Pustogov and F. de Melas, *et al.*, *Anal. Chem.*, 2004, **76**, 464.

53 C. Young, N. Menegazzo and A. E. Riley, *et al.*, *Anal. Chem.*, 2011, **83**, 6141.

54 A. S. Kharitonov and P. J. Barnes, *Chest*, 2006, **130**, 1541.

55 S.-S. Kim, C. Young and B. Vidakovic, *et al.*, *IEEE Sens. J.*, 2010, **10**, 145.

56 A. Wilk, F. Seichter and S.-S. Kim, *et al.*, *Anal. Bioanal. Chem.*, 2012, **402**, 397.

57 F. Seichter, A. Wilk and K. Woerle, *et al.*, *Anal. Bioanal. Chem.*, 2013, **405**, 4945.

58 K. Woerle, F. Seichter and A. Wilk, *et al.*, *Anal. Chem.*, 2013, **85**, 2697.

59 X. Wang, M. Sieger and B. Mizaikoff, *Proc. SPIE*, 2013, **8631**, 86312M.

60 X. Wang, S.-S. Kim and R. Roßbach, *et al.*, *Analyst*, 2012, **137**, 2322.

61 M. Sieger, F. Balluff and X. Wang, *et al.*, *Anal. Chem.*, 2013, **85**, 3050.

# EXHIBIT Q

Vladimir Iakovlev, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

IN RE: ETHICON, INC.,                    Master File No.

PELVIC REPAIR SYSTEM PRODUCTS            2:12-MD-02327

LIABILITY LITIGATION                     MDL 2327

---------------------------------

THIS DOCUMENT RELATES TO CASE

CONSOLIDATION:

Terreski Mullins, et al., v.

Ethicon, Inc., et al.

Case No. 2:12-CV-02952

---------------------------------

DEPOSITION OF

VLADIMIR IAKOVLEV, M.D.

* * * *

HIGHLY CONFIDENTIAL PORTION

* * * *

September 11, 2015

9:00 a.m. - 5:05 p.m.

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 2

1    Deposition of VLADIMIR IAKOVLEV, M.D.,
2  a witness herein, called for examination by counsel
3  for the Defense, in the above-mentioned matter, the
4  witness having been affirmed, taken at the law
5  offices of Siskinds LLP, 100 Lombard Street,
6  Toronto, Ontario, commencing at 9:03 a.m. on
7  Friday, September 11, 2015, and the proceedings
8  taken down by Stenotype and transcribed by
9  JUDITH M. CAPUTO, RPR, CSR, CRR.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        A P P E A R A N C E S:
2
3  On Behalf of the Consolidated Plaintiffs:
4  JONATHAN ORENT, Esquire
5  Motley Rice, LLC
6  321 South Main Street, Suite 200
7  Providence, Rhode Island  02903
8  410.457.7700
9  jorent@motleyrice.com
10
11  On Behalf of the Defendants, Ethicon:
12  DAVID B. THOMAS, Esquire
13  Thomas, Combs & Spann, PLLC
14  300 Summers Street, Suite 1380
15  Charleston, West Virginia
16  304.414.1807
17  dthomas@tcspllc.com
18
19  M. ANDREW SNOWDEN, Esquire
20  Butler Snow, LLP
21  The Pinnacle at Symphony Place
22  150 3rd Avenue South, Suite 1600
23  Nashville, Tennessee  37201
24  615.651.6700
25  andy.snowden@butlersnow.com

Page 4

1              I N D E X
2
3  WITNESS:   VLADIMIR IAKOVLEV
4                          PAGE
5  DIRECT EXAMINATION BY MR. THOMAS.................5
6  CROSS-EXAMINATION BY MR. ORENT.................296
7  **Highly Confidential Portion noted on page 40**
8
9
10       INDEX OF EXHIBITS
11  NUMBER/DESCRIPTION                    PAGE NO.
12  NO. 1:  Expert Report of Dr.  Iakovlev in the     5
13  Mullins consolidated cases.
14  NO. 2:  Supplemental Expert Report of          5
15  Dr. Iakovlev in the Mullins consolidated cases.
16  NO. 3:  Notice of Deposition of Dr. Iakovlev.    5
17  NO. 4:  Thumb drive.                  5
18  NO. 5:  Study Entitled, "Safety Considerations    259
19  for synthetic sling surgery."
20  NO. 6:  Article entitled, "Degradation of       271
21  polypropylene in vivo: A microscopic analysis
22  of meshes explanted from patients."
23  Authored by  Vladimir Iakovlev, et al.
24
25  -- NOTE: Exhibit 4 was retained by Mr. Thomas.

Page 5

1          EXHIBIT NO. 1:  Expert Report of
2  Dr. Vladimir Iakovlev in the Mullins
3  consolidated cases.
4          EXHIBIT NO. 2:  Supplemental Expert
5  Report of Dr. Vladimir Iakovlev in the
6  Mullins consolidated cases.
7          EXHIBIT NO. 3:  Notice of Deposition of
8  Dr. Vladimir Iakovlev.
9          EXHIBIT NO. 4:  Thumb drive.
10
11  Whereupon,
12          VLADIMIR IAKOVLEV, M.D.,
13  called for examination by counsel for Defendant
14  and having been affirmed by me, was examined and
15  testified as follows:
16          DIRECT EXAMINATION BY MR. THOMAS:
17          Q.  Good morning, Doctor.
18          We've met before.  My name is David
19  Thomas.  I'm going to ask you a number of questions
20  about your expert witness opinion in the Mullins
21  case pending in the MDL in West Virginia; fair
22  enough?
23          A.  Yes.
24          Q.  I'm going to hand you what I've
25  marked as Exhibits 1 and 2 and ask you if Exhibit

2 (Pages 2 to 5)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 6

1  Nos. 1 and 2 are the expert reports that you
2  prepared in the Mullins case.
3       A.  Yes, that's correct.  This one is
4  on the left, the thicker one, is a combination of
5  several patients and this one on the right, Exhibit
6  No. 2, is a supplemental set of figures
7  specifically from the specimen of Ms. Mullins.
8       Q.  And Exhibits No. 1 and 2 represent
9  the complete opinions you're prepared to give in
10  this case; is that fair?
11       A.  That's correct.
12       Q.  I show you now what's been marked
13  as deposition Exhibit No. 3.  That's a Notice of
14  Deposition in this case.
15       A.  Yes, I do see it.
16       Q.  Have you seen that before today?
17       A.  Yes, I did.
18       Q.  As a part of Exhibit 3, there's a
19  request attached to it that you produce documents
20  in response to that.
21       A.  There are 27 requests.  Yes, I've
22  seen that.
23       Q.  Did you review those requests?
24       A.  Yes, I did.
25       Q.  Did you attempt to collect the

Page 7

1  information contained in those requests and produce
2  it to me today?
3       A.  Yes, I gathered all what I could
4  on the thumb drive.
5       Q.  And counsel has given me today
6  what I've marked as Exhibit No. 4, which is a thumb
7  drive.  Is this the thumb drive that you just
8  described where you attempted to load all of the
9  documents responsive to the Notice of Deposition
10  that you could find to put on the thumb drive?
11       A.  That is correct.
12       MR. ORENT:  At this point I want to
13  place an objection and notification.  We did file a
14  written objection so subject to those written
15  objections that material has been produced.
16       BY MR. THOMAS:
17       Q.  To save the time of going through
18  the notice or the thumb drive for right now, can
19  you recall any documents responsive to the Notice
20  of Deposition that you did not include on the thumb
21  drive?
22       A.  Well, the communication with
23  lawyers I didn't put.
24       Q.  Okay.
25       A.  The rest, I think I included

Page 8

1  everything I had pertinent to this case.
2       MR. ORENT:  Just to clarify though
3  again, the communication, I believe, was outside of
4  the three areas specified on Number 27.
5       MR. THOMAS:  I'm sorry, I did not hear
6  you.
7       MR. ORENT:  Under the federal rules
8  your request Number 27, to make the federal rule
9  recognizing the privilege existing between expert
10  and attorneys.
11       With the exception of the three areas
12  that you requested, I believe there were no
13  responsive communications specifically to those
14  three areas.
15       I believe other communications exist
16  that are not discoverable, and that's what the
17  doctor is referring to.
18       MR. THOMAS:  Okay.
19       MR. ORENT:  I don't believe he withheld
20  anything responsive to the request as written.
21       BY MR. THOMAS:
22       Q.  Doctor, you've given depositions
23  before in the Ethicon MDL, correct?
24       A.  That is correct.
25       Q.  You've testified in connection

Page 9

1  with the Bellew case?
2       A.  Yes, I did.
3       Q.  And you've testified in connection
4  with the Huskey and Edwards cases, correct?
5       A.  That is correct.
6       Q.  And in those depositions you
7  testified to a methodology that you used to collect
8  specimens, create histopathological slides where
9  appropriate and review those slides.
10       Did you follow the same process in the
11  Mullins case that you followed in the Bellew and
12  Huskey Edwards cases?
13       A.  The process is standard.  It's not
14  specifically for medical-legal cases or mesh cases.
15  It's a standard histology protocols in a diagnostic
16  pathology lab, so I don't change it.  I follow them
17  for each specimen regardless if it's medical-legal
18  or a regular hospital patient.
19       Q.  Doctor, my question really meant
20  to eliminate re asking all those questions that
21  were asked in Huskey, Edwards and Bellew.
22       And if we can confirm that you followed
23  the same procedures in the Mullins case that you
24  followed in the prior depositions where you were
25  asked about your procedures then I'm not going to

3 (Pages 6 to 9)

Vladimir Iakovlev, M.D.

Page 10

1  go over that again.  Can we confirm that you
2  followed the same steps?
3       A.  Yes, I can confirm that.
4       Q.  Doctor, what is a neuropathologist?
5       A.  Neuropathologist?
6       Q.  Yes.
7       A.  Neuropathologist is a surgical
8  pathologist who is specializing in examining brain
9  tissue or spinal cord.  Sometimes it's the
10  subspecialty people do just neuropathology;
11  sometimes there is cross-coverage.
12       In our institution we have a
13  neuropathologist but it's only one.  Sometimes he
14  goes away on meetings, so we cover neuropathology.
15       Q.  Are you a neuropathologist?
16       A.  I'm cross-covering neuropathology
17  when he is away but I have not specialized in
18  neuropathology.
19       Q.  Are you board certified in
20  neuropathology?
21       A.  No, and you don't have to be board
22  certified in neuropathology because surgical
23  pathology includes neuropathology.
24       I mean, you can sub specialize further
25  down, but it depends on specific institution.

Page 11

1  Because some institutions have a large number of
2  specialized cases and some institutions they cover
3  broad range.
4       Q.  You said you had a
5  neuropathologist at St. Michael's?
6       A.  Yes, we do.
7       Q.  What is the person's name?
8       A.  Dr. David Munoz.
9       Q.  Is that the only neuropathologist
10  at St. Michael's?
11       A.  Right now, yes.
12       Q.  Did you consult with Doctor --
13  what's his last name?
14       A.  Munoz.
15       Q.  M-U-N-O-Z?
16       A.  Yes.
17       Q.  Did you consult with Dr. Munoz in
18  connection with any of the opinions that you've
19  given in this case?
20       A.  No.
21       Q.  Did you consult with any
22  neuropathologist in connection with the opinions
23  you've given in this case?
24       A.  We're not talking about brain
25  tumors; we're talking about sub tissue

Page 12

1  transvaginal.  I mean, why would I consult a
2  neuropathologist?
3       Q.  Just a simple yes or no question?
4       A.  No, I didn't.  There was no
5  purpose.
6       Q.  Did you consult any neuropathology
7  textbooks in connection with your opinions in this
8  case?
9       A.  Specifically just recently?
10       Q.  Any time during your work in this
11  case?
12       A.  Not in this case.  I opened and
13  read several neuropathology books when I was doing
14  research in meshes.  It's not just neuropathology
15  books, I mean, neuropathology is described in
16  general surgical pathology books.  Because I've
17  been in this field for three years.
18       Q.  I understand.  Just specific
19  questions, we'll get done quicker if you answer
20  "yes" or "no", if you can, and I'm not trying to
21  pin you down.
22       Is it your belief that neuropathology
23  has no role in understanding the presence of nerves
24  in the pelvic floor?
25       MR. ORENT:  Objection to form.

Page 13

1       THE WITNESS:  Yeah, actually the form
2  of the question is quite bizarre.
3       Because neuropathology is part of
4  surgical pathology.  So I'm a surgical pathologist
5  I'm examining -- yes, there is a field of
6  neuropathology when you specialize in that.
7       If you take a combination of peripheral
8  nerves as part of neuropathology, then I can say
9  yes, there is a part of neuropathology.  But as I
10  said, it's still within surgical pathology.
11       This separation is somewhat artificial.
12  You probably don't understand exactly how such
13  specialization works.  Probably that's where it's
14  coming from.
15  BY MR. THOMAS:
16       Q.  Perhaps.  Do you know a Kenneth
17  Aldape, A-L-D-A-P-E?
18       A.  No.
19       Q.  Lorraine Kalia, K-A-L-I-A?
20       A.  No.
21       Q.  Julia Keith?
22       A.  No.
23       Q.  Tim Rasmus Kiehl, K-I-E-H-L?
24       A.  The names might be similar.  I
25  mean, a couple of those names are the same as a

4 (Pages 10 to 13)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 14

1    couple of neuropathologists in Toronto, I believe,
2    but I don't know their first names.
3         Q.   My information is these
4    neuropathologists are affiliated with the
5    University of Toronto.
6         A.   Yes, so Dr. Kiehl is practicing at
7    UHN and I think there was another name that also
8    practices at UHN.  It's a different institution.
9    The U of T affiliated hospital is called UHN.
10        Q.   There's special neuropathology
11   journals, aren't there?
12        A.   Yes, there are.
13        Q.   Do you subscribe to any?
14        A.   No.
15        Q.   So fair to say you don't serve on
16   the editorial board of any neuropathology journals,
17   true?
18        A.   No, that's true.
19        Q.   Is there any reason for you to
20   consult a neuropathologist to understand how
21   nerves function in the pelvic floor?
22        A.   Not really.  The only reason I
23   would go to a neuropathologist when there is
24   something I don't know and I cannot find answers in
25   regular books, something which comes from

Page 15

1    experience.  We are talking about basic function.
2         Q.   In Canada, is there a board
3    certification for your position as anatomical
4    pathologist?
5         A.   Yes, there is.
6         Q.   Is there a board certification for
7    neuropathologists?
8         A.   I'm not sure, but we are
9    practicing neuropathology with this anatomical
10   pathology certification.
11        Q.   As far as you recall, you haven't
12   consulted with any neuropathologists in connection
13   with your work in this mesh litigation; fair?
14        MR. ORENT:  Objection.
15        THE WITNESS:  Not for this specific
16   case.  Earlier, when I started research, I ask a
17   few questions which stain sometimes it was better
18   to use when there is pathology of nerves.
19        BY MR. THOMAS:
20        Q.   Who did you ask?
21        A.   Dr. Munoz, but I think it was even
22   before the litigation started.
23        Q.   And what did you ask Dr. Munoz?
24        A.   Which stains he was using, if he
25   was using something different that I was using.

Page 16

1         Q.   And what question did you ask him?
2    What stain do you use for what?
3         A.   When we started our research in
4    meshes, the question was, if the nerve's ingrown.
5    So this is kind of basic question.
6         Q.   Sorry, if the nerves what?
7         A.   Grow into the mesh.  So this was a
8    basic question.  But then I was thinking, okay, so
9    I need to make sure that I'm not missing anything
10   and I started thinking of possible scenarios, how
11   nerves can be affected by the mesh.
12        Are they going atrophic, can they
13   disappear completely?  And if they go atrophic, you
14   can see atrophy in the nerve with any stain,
15   because the area becomes empty, sort of ooze, the
16   Schwann cells disappear, their axons, this is a
17   basic knowledge.
18        And I ask him if he's using something
19   else, and he was using exactly what I was using.
20        Q.   So is it fair to understand that
21   you confirmed with Dr. Munoz your choice of the
22   S100 stain for nerves?
23        A.   No, that was not about the S100.
24        Q.   What stain specifically was it
25   about?

Page 17

1         A.   If anything else he's using to
2    examine nerve atrophy or degeneration.
3         Q.   And what were you using to analyze
4    that question?
5         A.   Just locating H&E.
6         Q.   And Dr. Munoz said that was what
7    he was using to analyze the same question?
8         A.   He said that you can see it on
9    H&E, but there are a number of other stains to
10   examine for nerve atrophy.
11        Q.   And what stains did he tell you
12   that you could use, other than H&E?
13        A.   Well, you can see some of the
14   atrophy on S100 -- I don't remember exactly what he
15   said because it was three years ago, because now
16   what I remember it might be coming from different
17   sources, so from my own experience.
18        Q.   Do you have a specific
19   recollection of talking to any neuropathologist who
20   gave you any information about how to conduct your
21   investigation into these meshes?
22        A.   I don't understand your question.
23        Q.   You've told me about conversation
24   you had with Dr. Munoz.  Do you have a specific
25   recollection, you remember having any conversations

5 (Pages 14 to 17)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 18

1   with any neuropathologists about how to conduct
2   your work in these cases?
3         A.  Why would I?
4         Q.  I'm just asking you if you did or
5   not?
6         A.  No, I didn't.
7         Q.  Thank you.  Now, Exhibit No. 1 and
8   Exhibit No. 2 are your reports in this case; we
9   talked about that already.  They contain a number
10  of images?
11        A.  That's correct.
12        Q.  Have you supplied copies of all
13  those images on this thumb drive?
14        A.  No, because they're already
15  included in the report.  I can produce them for you
16  separately.
17        Q.  Do you have digital images of the
18  slides in this report?
19        A.  Of course.
20        Q.  But they're not on the thumb
21  drive?
22        A.  No, because they're already in the
23  report.
24        Q.  Do you have images of the tissue
25  samples that are contained in the report that are

Page 19

1   not in the report?
2         A.  But we took those images together
3   with your expert.
4         Q.  I'm just asking you if you have
5   them?
6         A.  I should have them, yeah.
7         Q.  Okay?
8         A.  Because we were taking them -- he
9   would take picture.  I would take picture of the
10  same field.
11        Q.  But there are images that you have
12  of the tissue samples that are contained in your
13  report that are not produced on this thumb drive,
14  correct?
15        MR. ORENT:  Objection.
16        THE WITNESS:  There should be.  I was
17  not using them.  I was just recording together with
18  your expert when I received the specimens.
19        BY MR. THOMAS:
20        Q.  Okay.  And if you go to -- let me
21  just ask this question.
22        What is the source of the images that
23  are contained in your report?  Where did you get
24  them?
25        A.  I took them.

Page 20

1         Q.  Okay.  And from what tissue
2   samples did you take them?
3         A.  From explanted TVT and
4   TVT-O meshes.
5         Q.  How many TVT?
6         A.  Oh, that I would have to check
7   with my records now.  I don't remember now.
8         Q.  And TVT-O?
9         A.  It's there, but I don't remember
10  now.
11        Q.  And the TVT and the TVT-O
12  specimens that are contained in your report are
13  that, are those specimens from the set of specimens
14  that you obtained from Dr. Klinge?
15        A.  No.  It's a combination of earlier
16  medical-legal cases, patients of St. Michael's
17  Hospital, and samples which came within this
18  consolidated trial.
19        The earlier cases came from different
20  law firms.
21        Q.  Do you know what I'm referring to?
22  You talked about the Bellew case, the set of slides
23  that you received from Dr. Klinge, and Dr.
24  Kreutzer, 22 TVT and TVT-O samples?
25        A.  My recollection is I was contacted

Page 21

1   by Anderson Law and I'm not sure when -- I don't
2   remember exactly where the package came from, but
3   all my communication was with the Anderson Law.
4         Q.  I understand that, Doctor, but in
5   the Bellew case you testified at length about a set
6   of 22 TVT and TVT-O samples that you had received
7   from Mr. Anderson that had previously been reviewed
8   by Dr. Kreutzer and by Doctor Klinge?
9         A.  Kreutzer for sure; I'm not sure
10  about Doctor Klinge.  There were no records, or
11  maybe there was records but I just don't remember
12  them.
13        I didn't contact specifically Doctor
14  Klinge, or he didn't contact me specifically about
15  these samples.
16        Q.  Are the images of the TVT and the
17  TVT-O slides that are in your report in this case
18  from the same set of slides that Dr. Kreutzer
19  reviewed?
20        A.  Some of them could be.  Again, I
21  don't remember now.  It would be difficult to trace
22  them back.
23        Q.  Do you have somewhere a key that
24  shows whose tissue this is in the report?
25        A.  In the report, the way the images

6  (Pages 18 to 21)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 22

1  were saved during my work, they would be usually
2  saved in folders for specific expert report.
3       Q.  Let's go to page 19 of your
4  report, please, Exhibit No. 1?
5       A.  So if we open these images, I
6  specify if the image is coming from consolidated
7  trial cases, which I received just recently, or if
8  the images are of additional cases, and additional
9  I meant previous TVT and TVT-O cases which I
10  received during the course of my work on expert of
11  possible Bellew case and others.
12       Q.  How many consolidated cases do you
13  have images for, individual plaintiffs?
14       A.  Like four, three.  Three, four.
15  Some specimens came as bare mesh, had difficulty
16  embedding -- well, we embedded them but there was
17  not much in there.
18       Q.  I understand.  I'm just trying to
19  understand what you're working from.
20       So you have three or four tissue
21  samples from plaintiffs in the consolidated cases,
22  correct?
23       A.  That is correct.
24       Q.  What kind of mesh is that?
25       A.  TVT or TVT-O.

Page 23

1       Q.  Okay.  And so in your report,
2  where you refer to images of consolidated cases, is
3  it fair to say that those images come from the
4  three to four tissue samples that you got from the
5  consolidated cases?
6       A.  That's correct.
7       Q.  If you go to page 21?
8       A.  Yes.
9       Q.  Page 21 identifies in Figure Set
10  1c, images of additional TVT cases; what does that
11  mean?
12       A.  That means this image comes from
13  previous TVT and TVT-O cases, or cases I received
14  previously.
15       Q.  Can you tell by looking at this
16  whether it's a medical-legal or whether it's
17  something that came through St. Michael's?
18       A.  It would have to be sort of
19  picture matching.  I would have to open the folders
20  which contain previous reports.
21       It all depends how the figure was
22  taken.  If it was taken by older camera, it didn't
23  record the case number.
24       Now, for some newer cases the images
25  were scanned and when the scanner works, there is

Page 24

1  embedded surgical number.
2       Because they're all spread within
3  almost three years, some of them can be traced;
4  some of them would be difficult to trace.
5       Q.  Is it fair to understand that
6  looking at the report, where you identify images
7  from additional TVT cases, you're unable to tell me
8  from what case that image comes from?
9       MR. ORENT:  Objection.
10       THE WITNESS:  In some cases I can, and
11  some cases I cannot.  I can tell that you all of
12  them came from TVT and TVT-O because I kept strict
13  records for that.
14       But I didn't keep strict records for
15  specific cases, at least at the beginning.
16       BY MR. THOMAS:
17       Q.  Okay.  In those places where you
18  can identify the patient, did you do so in your
19  report?
20       A.  No.
21       Q.  Why not?
22       A.  But they are not in this trial --
23  and they may be confidential.  And why would I?
24       Q.  But there are images in this
25  report that don't have identifying information --

Page 25

1  none of them have identifying information?
2       A.  They have one single identifying
3  information which is important:  TVT or TVT-O.
4  Everything else doesn't matter.
5       Q.  But I can't take this, go into
6  your file and figure out where this slide is, can
7  I?
8       A.  I'm telling you it's all TVT and
9  TVT-O.  What else do you need to know?
10       Q.  Am I able to take this thumb drive
11  and figure out which slide is which patient on
12  page 21?
13       MR. ORENT:  Objection.  I think what
14  the doctor is explaining is that these are all from
15  prior reports served on you.
16       THE WITNESS:  Most of them are.  You
17  can go to older reports and find them.
18       BY MR. THOMAS:
19       Q.  Why didn't you say "from the
20  Edwards case" to tell us where it came from?
21       A.  Why would I?  I don't understand
22  the question.  I mean, this is an opinion about TVT
23  and TVT-O.
24       I am not making an opinion about
25  Edwards or any other specific patient.  I am giving

7 (Pages 22 to 25)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 26

1  you opinion about TVT-O as a product.
2      Q.  Do you maintain your sets of these
3  slides by individual plaintiff?
4      A.  In some cases, yes.  If there is a
5  generated report because that is a specific
6  plaintiff, I save them as separate folder.
7      But remember those 23 or 22 cases when
8  they came as a bulk and I did not produce any
9  specific reports for specific patients, individual
10  patients.  They were all saved in one folder.
11      Q.  Okay?
12      A.  Which was just additional --
13  didn't keep record for that.
14      Q.  Are the files on this thumb drive,
15  Exhibit 4, marked by individual plaintiff?
16      A.  No.  As I said, I didn't include
17  figures because they were included in the report
18  already.
19      If you want me to include these
20  specific figures, I can do that.  But it will not
21  be possible to trace specific picture, specific
22  patient.
23      And that was not the purpose because
24  the purpose was to give an opinion about TVT-O or
25  TVT as a product, not to give opinion for specific

Page 27

1  plaintiffs.
2      Q.  Exhibit No. 2 is a supplemental --
3  micro photographs.  You identify those as from the
4  specimen of Ms. Elizabeth Mullins?
5      A.  That is correct.
6      Q.  Is Elizabeth Mullins -- strike
7  that.  Did you share this tissue with Ethicon?
8      A.  Yes, I mailed it a week ago.
9      Q.  Why did you identify this by
10  patient name and not identify the others in your
11  report by patient name?
12      A.  Because it was a single case
13  specifically supplemented for one specific patient.
14      Q.  So this is one of the three or
15  four TVT, TVT-O cases that you reviewed for
16  consolidated plaintiffs?
17      A.  Might be an additional to the
18  three or four.
19      Q.  Okay?
20      A.  So it could be fifth, or fourth.
21      Q.  Okay.  Do you expect to receive
22  any more tissue samples from the consolidated
23  plaintiffs?
24      A.  No.  As far as I would understand
25  this is all what we have at this point.

Page 28

1      Q.  For the original tissue samples
2  that you received from Dr. Kreutzer, the 22 or 23
3  TVT or TVT-O, did you know that those samples,
4  tissue samples, were also analyzed by Dr. Jordi,
5  using analytical chemistry?
6      A.  The name sounds familiar but I
7  don't know details.  I don't remember, sorry.  I
8  don't remember specific details, what was done in
9  that time.
10      Q.  Have you ever seen any analytical
11  chemistry testing on the 22 or 23 TVT samples that
12  you received from Dr. Kreutzer?
13      A.  I don't recall specific details.
14  I could have seen something, I could have not, it's
15  been quite a long time ago.
16      Q.  Did you ever request that
17  analytical chemistry testing be conducted on any of
18  the mesh samples that you've analyzed?
19      A.  No.  I have my own methodology in
20  this; I describe what I see.  Why would I ask
21  somebody else to do something else?
22      Q.  So is it fair to understand that
23  for Exhibits Number 1 and 2, which is your report
24  and supplemental report, that all of the images in
25  here are TVT or TVT-O manufactured by Ethicon?

Page 29

1      A.  Yes.  Some images were taken from
2  publications, so there was one or two panels from
3  different mesh manufacturer.
4      But the rest, when the pictures were
5  individual, they were all of TVT or TVT-O explanted
6  specimens.
7      Q.  Are you able to tell me sitting
8  here today -- strike that.
9      Let's go to Exhibit 3, please.  Number
10  15?
11      A.  Yes.
12      Q.  Number 15 asks for all materials
13  including but not limited to any protocol
14  specimens, slide raw data interim and final test
15  results, log laboratory books, notes, photographs,
16  photo micrographs and any other documents relating
17  to the pristine polypropylene control you tested by
18  exposure to formalin for up to four months
19  referenced on page 17 of your report in this case.
20      Is there any information on the thumb
21  drive from Exhibit 4 for that?
22      A.  The entire protocol is really
23  simple.  It was included in the paper, so it is on
24  the thumb drive; the paper is on the thumb drive.
25  I didn't have anything in addition to that.

8 (Pages 26 to 29)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 30

1    Q.   Is there any lab notebook?
2    A.   No, I mean --
3    Q.   Are there any photographs?
4    A.   All photographs I had, I included
5    there.
6    Q.   So whatever you have related to
7    the formalin exposed polypropylene control is on
8    the thumb drive?
9    A.   In the report.  The pictures are
10   on the report.  The paper with description of the
11   experiment is on the thumb drive.
12   Q.   What kind of polypropylene was
13   tested with formalin?
14   A.   What do you mean, what kind?  I
15   tested meshes of different manufacturers including
16   Ethicon TVT.
17   Q.   So you did use an Ethicon Prolene
18   mesh in the formalin control test?
19   A.   It was TVT.
20   Q.   Okay.
21   A.   It was a piece of TVT, a few
22   pieces of TVT put in formalin.
23   Q.   When you say you put it in
24   formalin, did you do anything other than just put
25   it in a jar?

Page 31

1    A.   They were kept in formalin, in a
2    jar, and then they were put in the cassette for
3    tissue processing and then they went through the
4    whole process of xylene alcohol and everything else
5    and then I had slides made.
6    Q.   And no analytical chemistry done
7    of that control, correct?
8    A.   Why would I?  I'm doing histology.
9    Q.   I understand.  No analytical
10   chemistry; is that correct?
11   A.   That is correct.
12   Q.   Thank you.  Number 19.
13   A.   Yes.
14   Q.   "Request all materials related
15   to testing of intentionally oxidized
16   polypropylene that had not been
17   implanted or exposed to formalin."
18   Do you see that?
19   A.   Yes, I do.
20   Q.   Is there any information on
21   Exhibit No. 4 related to that kind of testing?
22   A.   No, because the test is still in
23   progress.  I mean, I kept part of mesh in different
24   solutions and I haven't taken them out yet.  I
25   haven't examined them yet.

Page 32

1    Q.   Okay.  Tell me what that
2    experiment does?
3    A.   I did the same thing as I did for
4    formalin exposure.  I took pieces of mesh and put
5    them in solutions of hydrogen peroxide, hydrogen
6    peroxide with catalysts, few strong acids,
7    solvents, and just they are stored in these
8    solutions.
9    Q.   How many pieces of mesh are you
10   testing?
11   A.   It's hard to say now.  It might be
12   over 20 small pieces.
13   Q.   And how are they stored right now?
14   A.   In a dark room in a cabinet.
15   Q.   In a vial?
16   A.   What do you mean, vial?
17   Q.   Are they in a container with a
18   cover on them?
19   A.   Yes, of course.  Some of them are
20   acids and they're in glass containers.
21   Q.   What temperature are they being
22   stored?
23   A.   Just room temperature.
24   Q.   Do you have a protocol that you
25   wrote up for this test?

Page 33

1    A.   No.  The only protocol I used was
2    there was a published paper, they introduced this
3    stimulated body environment -- simulated, not
4    stimulated.  Simulated body environment.  Hydrogen
5    peroxide was the catalyst.  Catalyst is a chromium
6    salt.
7    Q.   Cobalt chloride?
8    A.   Probably.
9    Q.   That's Dr. Guelcher's paper?
10   A.   I'm not sure if it's his paper,
11   it's another paper.  But anyway, I'm testing his
12   protocol.  I followed exactly the description in
13   the paper and kept it in the solution for almost a
14   year by now, but it's still too early to take it
15   out.
16   Q.   Why is it still too early to take
17   it out?
18   A.   Because based on my analysis of
19   the specimens explanted from the body I can barely
20   see the degradation bark after a year in the body.
21   So if I take them now it would be too early.
22   I may just waste samples, so I have to
23   wait for probably a few extra months or maybe
24   another year.  Because by year two or 1 1/2 years
25   in the body, the bark becomes visible in

9 (Pages 30 to 33)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 34

1    100 percent of the cases.
2        If I take them out by 12 months, I may
3    or may not see something and then it would -- I'll
4    just waste samples.
5        Q.  Did you prepare the solution in
6    which these samples are stored?
7        A.  Yes, I did.
8        Q.  And what is the recipe for the
9    solution that you used?
10       A.  It's written in the original paper
11   I used for the --
12       Q.  Can you tell me what the original
13   paper is?
14       A.  I'd have to check now.
15       Q.  And how many samples are stored?
16       A.  As I said, probably over 20.
17       Q.  And how many different kinds of
18   mesh are being tested?
19       A.  There is one from one
20   manufacturer, and then -- four types of mesh.
21       Q.  How many Ethicon meshes are being
22   tested?
23       A.  At least one.
24       Q.  What kind?
25       A.  It's written on the jars.  I may

Page 35

1    have to check later.
2        Q.  Doctor, do you have an inventory
3    of what's in each vial written down?
4        A.  It's written on the jar.
5        Q.  Is it written down on a piece of
6    paper anywhere?
7        A.  No.
8        MR. ORENT:  Objection.
9        BY MR. THOMAS:
10       Q.  Is it written in a computer
11   somewhere?
12       A.  No, just on jars.  Jars label when
13   the case was put and what type of mesh was put in.
14       Q.  When did you start this
15   experiment?
16       A.  Last September.
17       Q.  So it's been a full year?
18       A.  Yes.
19       Q.  And did you put the mesh in this
20   solution in these 20 or so samples all at the same
21   time?
22       A.  Within two weeks.
23       Q.  All right.  As I understand it,
24   there are at least four different mesh
25   manufacturers that are a part of this experiment?

Page 36

1        A.  At least four different type of
2    mesh.  I would have to check with the labels what
3    is written there, what manufacturers, what mesh was
4    put in there.  I don't remember.  It's been a year.
5        Q.  Are you working with anybody else
6    on that experiment?
7        A.  No.
8        Q.  This is solely your work?
9        A.  Yes.
10       Q.  Did you consult with anybody about
11   the kind of solution that you would use for your
12   experiment?
13       A.  No.  Whom I would consult?  Nobody
14   did it before.  The only information I extracted
15   was from that specific simulation body environment
16   simulation from the paper.
17       Q.  You know Dr. Guelcher has tried to
18   insulate oxidized polypropylene, don't you?
19       MR. ORENT:  Objection.
20       THE WITNESS:  I know that he did an
21   experiment, and he asked me what I see.  I said
22   it's too early, I'm not going to take them out yet.
23   I will keep them a little longer.
24       BY MR. THOMAS:
25       Q.  Did Dr. Guelcher tell you he had

Page 37

1    intentionally oxidized polypropylene by exposing it
2    to some chemical solution?
3        MR. ORENT:  Objection.
4        THE WITNESS:  Yes, he did.
5        BY MR. THOMAS:
6        Q.  Did you ask him to have that mesh
7    so that you could determine whether this
8    intentionally oxidized polypropylene absorbed
9    stain?
10       MR. ORENT:  Objection.
11       THE WITNESS:  No.
12       BY MR. THOMAS:
13       Q.  Why not?
14       MR. ORENT:  Objection.
15       THE WITNESS:  Because I'm doing my own
16   experiment and I believe I need to keep it for at
17   least a year and a half.
18       BY MR. THOMAS:
19       Q.  Did you discuss with Dr. Guelcher
20   the scope of his experiment?
21       MR. ORENT:  Objection.  At this point,
22   Counsel, I think you're getting into -- I think you
23   need to clarify whether your questions are in the
24   context of litigation or research.
25       To the extent it's in litigation it's

10  (Pages 34 to 37)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 38

1    covered by privilege and I would instruct the
2    witness not to answer under the rules.  But to the
3    extent that you're discussing research, I think
4    that's fair game to discuss.
5        BY MR. THOMAS:
6        Q.  Okay.  From a research
7    perspective, did you have any discussions with Dr.
8    Guelcher about his experiment?
9        A.  It's work in progress so it's
10   privileged to researchers, I guess, at this point.
11       Q.  Are you going to assert a
12   privilege for your research?
13       A.  For research information, yes.
14       Q.  Okay.  And you asserted a
15   litigation privilege, which I don't think is
16   appropriate -- I'm not arguing with you.  You said
17   there's no research privilege.  Now he's trying to
18   assert a research privilege?
19       MR. ORENT:  No, what I said was in
20   terms of legal -- in terms of legal privileges that
21   I can, that I have, that I have an attorney-client --
22   excuse me, a attorney work product under the Rule
23   26.
24       Rule 26 specifically allows for expert
25   witnesses to consult with one another under the

Page 39

1    2010 amendments to the federal rules.
2        So, what I was clarifying is that it is
3    my privilege to seek and to utilize for my client,
4    and that's what I was exercising with regard to
5    non-research thought processes for litigation.
6        To the extent Dr. Iakovlev has
7    proprietary interests in research that is ongoing
8    or may be ongoing, that's up to him as to whether
9    or not -- and I know that on both sides in this
10   mesh litigation have previously taken a position
11   that those sort of things are not discoverable.
12       To the extent the doctor is
13   comfortable, I'd be happy to designate this portion
14   of the transcript highly confidential and allow the
15   witness to answer.
16       THE WITNESS:  I also need to add that
17   that experiment is not in my opinions.  I was not
18   base my opinions on any part of that experiment.
19   And I'm not really sure why you asking me these
20   questions.
21       BY MR. THOMAS:
22       Q.  Because I get to ask them.
23       MR. ORENT:  If I can just have a minute
24   with the witness and explain what the highly
25   confidential designation means, that may clarify

Page 40

1    this.
2        MR. THOMAS:  Thank you.
3        -- RECESS AT 9:42 --
4        -- UPON RESUMING AT 9:43 --
5        MR. ORENT:  We can go back on the
6    record.
7        I'll just say for the record over the
8    break I just explained to Dr. Iakovlev what the
9    highly confidential designation is and that all the
10   lawyers in this litigation have all signed on to
11   it.
12       Confidentiality agreement whereby there
13   are limited distribution on each side as to who can
14   receive highly confidential information and that
15   after discussing it I believe the witness is
16   comfortable with the designation and will proceed
17   to answer.
18       BY MR. THOMAS:
19       Q.  Thank you.  Have you have
20   discussed with Dr. Guelcher the results of his
21   test?
22       A.  Yes, I asked him what he saw.
23       Q.  And what did he tell you?
24       A.  He said that there is flaking on
25   the surface early, it's not confluent but there are

Page 41

1    some flakes forming.
2        I said it might be too early, because
3    he did it I think on six weeks or so, maybe more,
4    maybe up to three months.
5        I said, well, I keep my specimens for
6    at least a year and a half because I believe that
7    that's much time you need to make it visible by my
8    techniques.  Maybe by SCM we can see a little bit
9    earlier, and we stopped at that.
10       Q.  Do you know whether he conducted
11   any analytical chemistry testing on any of the mesh
12   he analyzed?
13       A.  I think he did.
14       MR. ORENT:  Objection.
15       THE WITNESS:  I don't remember at this
16   point.  It's not my specifically methodology, so I
17   didn't do these things.
18       BY MR. THOMAS:
19       Q.  Did you have discussions with Dr.
20   Guelcher about trying to stain the polypropylene
21   that he had intentionally oxidized?
22       A.  He asked me.  I said it's too
23   early.
24       Q.  Okay?
25       A.  So I said maybe by your methods

11 (Pages 38 to 41)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 42

1   you can detect it.  By my methods, probably I
2   cannot.  And I said I will keep my pieces for
3   longer and then we'll see what happens.
4         Q.   And how did you decide -- strike
5   that.  Did I understand you to say that you have
6   chosen 18 months as the time when you think it will
7   be appropriate to test for oxidation?
8         MR. ORENT:  Objection to form.
9         THE WITNESS:  Yes.
10        BY MR. THOMAS:
11        Q.   And at 18 months is it your
12   intention to remove all of those meshes from the
13   chemical solution and determine whether it's
14   intentionally oxidized?
15        A.   Part of it.  Probably not all of
16   them in one shot.  I will start taking some pieces
17   and examining them see what happens and if I --
18   depends on what I see, I may keep them longer.
19        Q.   And what kind of tests do you
20   propose to run on them after 18 months?
21        A.   Histology, what I've done -- what
22   I showed in the paper.
23        Q.   The same kind of tests that you've
24   run on the meshes that are contained in your
25   reports?

Page 43

1         A.   Similar.
2         Q.   Any differences?
3         A.   Don't plan on anything different
4   at this point.  I may, I mean, it's work in
5   progress research.  Maybe I'll find something else,
6   I don't know.
7         Q.   Are you consulting with anybody
8   else on this particular experiment?
9         A.   We discussed it only with Scott
10   Guelcher.
11        Q.   And is the mesh that's being
12   tested pristine new mesh?
13        A.   Yes.
14        Q.   Never been exposed to tissue?
15        A.   That is correct.
16        Q.   Never been exposed to formalin?
17        A.   That is correct.
18        Q.   Who is paying for this testing?
19        A.   Nobody.  I just took chemicals
20   from our histo lab.
21        Q.   Did counsel fund this experiment?
22        A.   No, there is no additional
23   funding.  What funding would I need for it?
24   Chemicals are in the lab.
25        Q.   Where did you get the mesh?

Page 44

1         A.   They came from some law firms
2   during earlier cases.
3         Q.   Okay.  And where did you get the
4   chemicals?
5         A.   I said, they are in the lab.
6         Q.   Okay.  So you used materials from
7   the St. Michael's histo lab to put them, and you
8   combined those chemicals in a recipe that you're
9   now exposing this polypropylene to?
10        A.   That is correct.  These are
11   regular chemicals that are used in histo lab.
12        Q.   And the reason why you're doing
13   this test is to determine whether, first, after
14   18 months this polypropylene will oxidize due to
15   exposure to this chemical mixture, correct?
16        A.   Could you repeat the question?
17        MR. THOMAS:  Can you read it back?
18        -- REPORTER'S NOTE:  Question read back
19   as recorded above.
20        THE WITNESS:  That's correct.
21        BY MR. THOMAS:
22        Q.   And how will you determine whether
23   it's oxidized?
24        A.   I would see degradation layer on
25   the surface.

Page 45

1         Q.   And that would be by light
2   microscopy?
3         A.   Yes.
4         MR. ORENT:  Objection.
5         BY MR. THOMAS:
6         Q.   Any other analytical technique
7   that you propose to use?
8         A.   As I said, none at this point.
9         Q.   And as a part of your experiment
10   do you then intend to see whether -- if you are
11   able to oxidize polypropylene, according to your
12   visual observation by light microscopy, will you
13   then see whether the oxidized polypropylene holds
14   stain?
15        A.   Yes, that's the way to see it.
16   This just becomes porous and after absorbs stain.
17        Q.   And the way you will test that is
18   the same way you've processed the slides in Exhibit
19   No. 1 and 2 -- you'll put them through the sample
20   preparation histology analysis that you've done in
21   all your other cases?
22        A.   Can be tried without putting them
23   through histology; you can immerse exposed mesh
24   into the dye solution.
25        Q.   Just drop it in the jar?

12 (Pages 42 to 45)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 46

1    A.  Pretty much.  If it stains, then
2 you can see staining on the surface.  That means
3 there is a layer of porous polypropylene on the
4 surface.
5    It's like, this is not stain, this is
6 anodized aluminum.  So there's porous layer on
7 aluminum.  If you drop unprepared aluminum in the
8 jar with black ink it will not absorb anything
9 because it's sealed.
10    If you drop it with anodized layer it
11 will become black because it will absorb it.  It's
12 the same technique; it's pretty basic.
13    Q.  I understand.  Thank you.
14    Are you aware of a method where you can
15 take a piece of pristine mesh that's been exposed
16 as you've described, and prepare a histological
17 slide of that exposed material without embedding it
18 in some other medium?
19    A.  Let me ask you if I got your
20 question right.
21    Am I aware of a histological technique
22 which will allow me to cut through the mesh without
23 embedding it into anything?
24    Q.  Correct.
25    A.  No.  It has to be embedded into

Page 47

1 some form of medium to hold it for the knife to cut
2 through.
3    Q.  Have you devised or thought of a
4 method to do that?
5    A.  No.  Why would I?
6    Q.  If you're going to do a histology
7 slide of this mesh that's been exposed to chemicals
8 after a year and a half, you're going to have to
9 put it in some medium before the microtome can cut
10 it, correct?
11    A.  Paraffin.
12    Q.  So you're going to put the mesh by
13 itself in paraffin and cut it from there?
14    A.  Yes.
15    Q.  Okay.
16    A.  That's how it's done.
17    Q.  That's fine.  Doctor, on page 82
18 of your report?
19    A.  Yes.
20    Q.  Are you on page 82?  That's where
21 I want you to be.
22    A.  Oh, yes, okay.
23    Q.  I'm sorry, 83.  I apologize, I was
24 wrong.
25    Page 83 of your report has two images,

Page 48

1 A and B, identified as Figure Set 16 A, is
2 identified as "cracking on the surface of TVT mesh
3 fibers immediately after removal from the body".
4    Where did you get this?
5    A.  This was a St. Michael's patient.
6 So when it was excised I immediately placed it
7 under the microscope.
8    Q.  How did you know it was being
9 excised?
10    A.  What do you mean how do I know?
11 We receive specimens.
12    Q.  Just so I understand -- strike
13 that.
14    Typically after a surgical procedure
15 when mesh is excised the surgeon immediately places
16 it in formalin, correct?
17    A.  Not always.
18    Q.  Okay.
19    A.  We receive it fresh, so in this
20 case it was fresh.
21    Q.  And did you discuss with the
22 surgeon any of the circumstances of removal?
23    A.  This was a St. Michael's specimen,
24 so I did ask, but I'm not sure if I can go there
25 because of the confidentiality issues.  It was not

Page 49

1 a medical-legal case.
2    Q.  Who was the doctor that you
3 discussed it with?
4    A.  I don't know if I can disclose it.
5    Q.  I'm going to ask you to and if you
6 tell me no, you tell me no?
7    A.  Again, I'm not sure if I can
8 disclose that because it is confidential
9 information.
10    Q.  Are you telling me you're not
11 going to?  That's fine.  Tell me you're not going
12 to and I'll move on.
13    A.  No, I will not.  I will not
14 because I don't want to compromise confidentiality.
15    Q.  Okay.  Can you tell me the nature
16 of the conversation you had with this doctor?
17    A.  Oh, I asked her later on what was
18 -- because then I would ask how long it's been in
19 the body, some information was on the records and
20 just basic information.
21    Q.  Did you get medical records for
22 this mesh?
23    A.  It was in medical -- in the
24 medical records of St. Michael's Hospital.
25    Q.  Did you produce on the thumb

13 (Pages 46 to 49)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 50

1  drive, Exhibit No. 4, the medical records for the
2  patient that's on page 83?
3         MR. ORENT:  Objection.
4         THE WITNESS:  No, it's confidential
5  information, St. Michael's Hospital information.
6  And the picture is not coming from a case itself;
7  picture is coming from a publication.
8         BY MR. THOMAS:
9         Q.  Well, it's your publication; is
10 that fair?
11        A.  Yes.
12        MR. ORENT:  Objection.
13        BY MR. THOMAS:
14        Q.  Okay?
15        A.  But it's not coming from a set of
16 TVT or TVT-O cases which are received within the
17 litigation process.  It's coming from a publication
18 and for that publication I had REB approval and
19 there are strict rules what can be disclosed, what
20 cannot be disclosed.
21        Q.  How long from the removal of this
22 mesh until the time you looked under the
23 microscope?
24        A.  I would say an hour, maybe
25 40 minutes, maybe less.

Page 51

1         Q.  How did you manage to get it so
2  quickly?
3         A.  We have a lab in the OR.  OR is
4  practically -- I mean, our receiving area for
5  specimens is in OR, it's like there.
6         Q.  Did you tell the doctor if she
7  ever got a TVT specimen that you'd like to have it
8  before it was put in formalin?
9         A.  No, but I told, I told several
10 physicians and several -- everybody knows that I'm
11 working on meshes, so people know that I'm
12 interested in meshes.
13        Q.  My question was, did you tell a
14 doctor to give one to you before it was exposed to
15 formalin?
16        MR. ORENT:  Objection.  Can I just ask
17 for clarification.  Your prior question was --
18 included the word TVT.  Prior testimony on this was
19 that this was not a TVT, I believe.  Oh, this is a
20 TVT, I apologize.
21        THE WITNESS:  In the earlier, very
22 early when we started working on these meshes, the
23 question was how do I process them for scanning of
24 -- transmission of electron microscopy, and I
25 needed fresh samples.

Page 52

1         Not only specifically for this case, I
2  asked if you can sometimes help me with what you're
3  excising, or submit it in saline, so it's not
4  exposed to formalin because I needed samples to be
5  put in a glutaraldehyde.  This came in saline.
6         BY MR. THOMAS:
7         Q.  Was this put in glutaraldehyde
8  before you made this image?
9         A.  No, it was put in saline.  I
10 received it in saline, I examined it, took pictures
11 and put it in formalin.
12        Q.  Other than putting it in saline,
13 was any effort made to clean the mesh prior to the
14 time that you took these images?
15        A.  No, just washed them in saline,
16 that's it.
17        Q.  Was it washed in saline or just
18 soaked in saline?
19        A.  What's the difference?
20        Q.  Well, there was no effort to wash
21 it, it was merely stored in saline before you took
22 your images; is that fair?
23        A.  You immerse something in fluid;
24 it's being washed.
25        Q.  Okay.  Go to page 5 of your

Page 53

1  report, please.
2         A.  Yes.
3         Q.  Down at the bottom of the page,
4  the sentence, it reads:
5             "Immediately after placement in
6             the body, foreign objects become
7             coated with human proteins before
8             appearance of the inflammatory
9             cells."
10        Do you see that?
11        A.  Yes.
12        Q.  What does that mean?
13        A.  It means that anything you put in
14 the body will get coated by serum proteins.
15        Q.  How many different kinds of
16 proteins are there in the body?
17        A.  Very large number, thousands,
18 maybe millions.
19        Q.  Is there a special kind of protein
20 that surrounds the foreign body?
21        A.  It's non-specific.  The area will
22 be filled with blood immediately, so main proteins
23 are in the serum, so it will be albumin, some
24 immuglobins, then the blood clotting cascade sets
25 in.

14 (Pages 50 to 53)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 54

1     So there will be more of a fibrinogen
2  and fibrin, all of those proteins which are
3  involved in blood clotting.  It depends what
4  timeframe we're talking about, immediate coating,
5  or minutes or hours or days after.
6         Q.  Do you know what protein
7  adsorption is, A-D-S-O-R-P-T-I-O-N?
8         A.  You mean adherence of the protein
9  to the surface?
10        Q.  Are you familiar with that?
11        A.  I mean, that's the term as I
12 understand it.
13        Q.  Do you know chemically how that
14 works?
15        A.  For all proteins?
16        Q.  For protein adsorption to foreign
17 bodies; do you know how it works?
18        A.  Not the specific chemical details.
19        Q.  Do you know the extent to which
20 the proteins form a bond with the foreign body?
21        A.  Not the specific details.
22        Q.  Do you specifically with
23 polypropylene -- or strike that.  Specifically with
24 Prolene, do you have any information about the
25 extent to which human proteins form a bond with the

Page 55

1  Prolene polypropylene?
2         MR. ORENT:  Objection.
3         THE WITNESS:  No.
4  BY MR. THOMAS:
5         Q.  Do you have any information about
6  the extent to which saline is adequate to remove
7  any proteins that are adsorbed on to the Prolene
8  mesh?
9         A.  No, I think it's irrelevant
10 because that mesh which was examined didn't have
11 time to dry and couldn't dry because it was in
12 saline.
13        So if it cracks it means that it had
14 time to crack.  In this case it couldn't dry.
15        Q.  There's no analytical chemistry
16 done on this, correct?
17        A.  No.
18        Q.  There are none; am I correct?
19        A.  You are correct.
20        Q.  Thank you.  So, you're basing your
21 opinion on the cracking, which you claim to be the
22 Prolene, based on your visual observation?
23        A.  That is correct.
24        Q.  Let's go back to page 82, please
25 which is your statistical analysis of TVT meshes

Page 56

1  analyzed as groups?
2         A.  Which page number?
3         Q.  I'm on 82.
4         A.  Okay.
5         Q.  82 is called, "Figure Set 15, TVT
6  Meshes Analyzed as a Group".
7         And you're doing a statistical analysis
8  here of the TVT meshes; is that correct?
9         A.  That's correct.
10        Q.  Are the TVT meshes described on
11 page 82 the meshes that you got from Dr. Kreutzer?
12        A.  Some of them.
13        Q.  How many of them?
14        A.  I don't remember now.  Probably
15 about 20 or 19.
16        Q.  And how many are in this group?
17        A.  23.
18        Q.  So probably 19 or 20 out of 23
19 were meshes you got from Dr. Kreutzer?
20        A.  Probably, but I'm not sure.  I
21 don't remember now.
22        Q.  Are you a trained statistician?
23        A.  No, but I had my statistics when I
24 did my research training.
25        Q.  Okay.  Who chose the statistical

Page 57

1  method that's employed here?
2         A.  I did.
3         Q.  And why?
4         A.  What do you mean why?
5         Q.  Why was this method the method you
6  chose?
7         A.  Because it's the method to check
8  what I was intending to check.
9         Q.  And tell me why that is an
10 appropriate method for what you have done?
11        A.  What do you mean?
12        Q.  Why is this Pearson coefficient?
13        A.  Pearson coefficient?  It's a
14 standard correlation coefficient method.
15        Q.  Are you aware of other statistical
16 methods to test your results?
17        A.  What do you mean?  For
18 correlation?
19        Q.  Yes.
20        A.  Could be Spearman.
21        Q.  Spearman?
22        A.  Yes.
23        Q.  Any others, R-squared?
24        A.  For correlation?
25        Q.  Yes.

15 (Pages 54 to 57)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 58

 1    A.   There might be others, but the
 2  main are Pearson and Spearman; there is not much
 3  difference between them.
 4       Q.   Is the raw data you used to do
 5  your statistical correlation on Exhibit 4?
 6    A.   Yes, it is.
 7       Q.   And how is it marked, so if I
 8  wanted to find it, I could see it?
 9    A.   It's in a separate file it's
10  called 23 TVT-O and something else for the chart.
11       Q.   So if I wanted to have a
12  statistician run a different model, all of the data
13  he would need to do it is on Exhibit 4?
14    A.   Yes.  It's there.
15       Q.   Okay.  Doctor, since you were last
16  deposed, you've had a couple of studies published
17  in journals?
18    A.   Probably more than a couple, yes,
19  I did.
20       Q.   And your deposition notice
21  requested communications with the journals about
22  publications that you produced.  Are those on
23  Exhibit 4?
24       MR. ORENT:  Objection.
25       THE WITNESS:  I believe it's

Page 59

 1  confidential to me as a researcher, privileged.
 2  They've been published, they've been accepted, they
 3  are publicly available.
 4       BY MR. THOMAS:
 5       Q.   Is the answer to my question no,
 6  you didn't produce any of those communications?
 7    A.   No, I didn't.
 8       Q.   Do you have such communications?
 9    A.   Acceptance letters, that's about
10  it.
11       Q.   Do you have any comments or
12  criticisms from any peer reviewers?
13       MR. ORENT:  Objection.
14       THE WITNESS:  There were some.
15       BY MR. THOMAS:
16       Q.   Do you still have those?
17    A.   Yes, I do.
18       Q.   Were any of these articles
19  rejected by any journals?
20    A.   Sometimes I submit to one journal
21  they say it's out of scope it's probably best
22  suited for another journal so it bounces back.
23       I don't remember specific rejection,
24  saying that the data isn't reliable.  The only way
25  -- the only time when the paper was not accepted it

Page 60

 1  was quick answer, right away, that's not in our
 2  scope.
 3       Q.   So how many journals did not
 4  accept your publication?
 5       MR. ORENT:  Objection.
 6       THE WITNESS:  I don't remember now.
 7       BY MR. THOMAS:
 8       Q.   Okay.  Do you have that
 9  information?
10    A.   Probably somewhere in the replies
11  I can find it.
12       Q.   Okay.  Did you ever disclose to
13  the journals to which you submitted these
14  publications that some of the work contained in the
15  journal publication had been funded by plaintiff's
16  counsel?
17       MR. ORENT:  Objection.
18       THE WITNESS:  Nothing was funded by
19  plaintiff's counsel.  They were litigation cases
20  but I didn't get any additional funding to conduct
21  the study.
22       BY MR. THOMAS:
23       Q.   Certainly the slides from Dr.
24  Kreutzer were provided to you by plaintiff's
25  counsel?

Page 61

 1       MR. ORENT:  Objection, argumentative.
 2       THE WITNESS:  I didn't use them.
 3       BY MR. THOMAS:
 4       Q.   In your study?  Isn't that what --
 5    A.   I meant I didn't use the stains he
 6  used.  I re-stained on stain slides.  Maybe even
 7  cut the blocks.
 8       Q.   So is it your testimony that all
 9  of the information that you submitted to the
10  journals was unrelated to your medical-legal work?
11    A.   No.  It's not unrelated because
12  some samples came for medical-legal purposes.
13       Q.   And for which you were paid to
14  analyze by plaintiff's counsel, correct?
15    A.   To provide reports.
16       Q.   And what percentage of the cases
17  that you report in the study were cases for which
18  you were compensated by plaintiff's counsel?
19       MR. ORENT:  Objection.
20       THE WITNESS:  The study was not
21  compensated by anyone.  I did it on my own time,
22  during my own time, and I don't know why you're
23  saying that.
24       The percentage of cases which came
25  through medical-legal litigation process is

16 (Pages 58 to 61)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 62

1    indicated in the paper.
2         BY MR. THOMAS:
3         Q.  Okay.  We'll get to that in a
4    minute.
5         In the last year you've traveled and
6    made presentations around the world on the research
7    that you've done?
8         A.  Yes, I did.
9         Q.  Who has funded that work?
10        A.  Pretty much I did.
11        Q.  Did anybody subsidize your trips?
12        A.  No, I mean, we have a specific
13   portion of our salary from St. Michael's Hospital
14   which is dedicated for presentations.  But it's
15   within my salary, it's more or less a way of
16   getting it through a different tax bracket because
17   it's money spent for -- it's within my contract.
18        Q.  Did you receive any funds from
19   plaintiff's counsel for your presentations in the
20   last year?
21        A.  Never.
22        Q.  The articles that you had worked
23   on --
24        A.  The full answer would be I paid
25   for all the trips and I never received any money

Page 63

1    for making presentations or publishing the papers.
2         Q.  Okay.  Let's go back to page 83.
3    83 again is the mesh fiber that you looked at under
4    light microscopy 40 minutes to an hour after it was
5    removed and before it was stored in formalin,
6    correct?
7         A.  That is correct.
8         Q.  Where is that fiber today?
9         A.  It's embedded in formalin.  The
10   specimen went into formalin -- sorry.  The specimen
11   went to formalin and now it's embedded in paraffin.
12        Q.  Why is it in paraffin?
13        A.  To take histological section.
14        Q.  Have you taken histological
15   sections of it yet?  Have you taken histological
16   sections of this mesh fiber yet?
17        A.  Yes, I did.
18        Q.  Are those reported anywhere?
19        A.  What do you mean?  This was St.
20   Michael's Hospital patient.  I described it, and I
21   reported whatever I saw in the microscope.
22        Q.  Okay.
23        A.  It's not within the litigation
24   process.  It's a patient outside of litigation and
25   the only way this picture made it into this report

Page 64

1    because it was in a publication.
2         Q.  Did you obtain permission from the
3    patient to do that?
4         A.  For using the -- we have a
5    standard protocol for research.  We use material
6    for research purpose and I had REB approval.
7         Q.  Did you obtain permission from the
8    patient to use this image?
9         A.  As I said, each person who enters
10   the hospital, academic hospital, St. Michael's
11   Hospital, signs agreements or release form and it's
12   covered by blanket research regulations.
13        Q.  Does the patient know that her
14   mesh fiber was featured in a publication?
15        A.  No, I didn't tell her specifically
16   to the patient.
17        Q.  Okay.  So the entirety of the
18   excised mesh was then placed in paraffin?
19        A.  I believe so.
20        Q.  Is there any remaining of the mesh
21   explant that was not put in paraffin?
22        A.  I don't think so.  It depends.  If
23   it's a large piece, which I don't suspect it is,
24   there are some remnants which are stored in
25   formalin.  In this case, probably everything went

Page 65

1    to paraffin.
2         Q.  So there still exists some mesh
3    material in paraffin that could be available for
4    analysis; fair?
5         MR. ORENT:  Objection.
6         THE WITNESS:  For histology?
7         BY MR. THOMAS:
8         Q.  Yes.
9         A.  Yes.
10        Q.  And have you prepared histological
11   slides of the mesh fibers that are contained on
12   page 83 of your report?
13        A.  Yes.
14        MR. ORENT:  Objection.
15        BY MR. THOMAS:
16        Q.  As I understand it, they are not
17   part of your report in this case, true?
18        A.  No.  As I said, this patient has
19   nothing to do with this report.  The only mechanism
20   that this paper appeared in this report because it
21   was in peer-reviewed publication, that's it.  Why
22   are we talking about this patient?  I don't
23   understand.
24        Q.  And if I wanted you to produce the
25   paraffin with the remaining mesh and the slides

17 (Pages 62 to 65)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 66

1 that you have for this mesh, which is depicted on
2 83, would you do that for me?
3         MR. ORENT:  Objection.  I think you
4 need to deal with the hospital and privacy laws of
5 Canada.  I don't think Dr. Iakovlev owns that
6 property, nor --
7         MR. THOMAS:  If he's not going to do
8 it, that's all I want to know.
9         THE WITNESS:  No, I will not do that.
10 As I said, the paper is published.  It's public,
11 that is why it made it into this report.
12 Everything which belong to St. Michael's and
13 individual patients outside of litigation has
14 nothing to do with this report.
15         BY MR. THOMAS:
16         Q.  Did you wait until it was
17 published before you used it in the report?
18         A.  Yes, I did.  I mean, it was
19 published by the time I produced the report.
20         Q.  Okay.  Did you use it in any other
21 report prior to the time that it was published in
22 the journal?
23         A.  I don't think so.
24         Q.  That would have been
25 inappropriate?

Page 67

1         A.  Before it was published, or
2 accepted -- it depends.  It's my research project
3 and I'm covered by REB.
4         So if it's within my research and
5 knowledge it would be appropriate because I conduct
6 research, that's information I extract during my
7 research.
8         Q.  So if you used it in a report
9 against Ethicon prior to the time that it was
10 published in the journal, that's okay, because it's
11 a product of your independent research under the
12 REB; is that correct?
13         A.  Yes.
14         (Reporter sought clarification.)
15         A.  Research Ethics Board.
16         Q.  Is the Research Ethics Board the
17 Canadian equivalent of the American Institutional
18 Review Board; do you know?
19         A.  No, no.
20         Q.  What's the difference?
21         A.  Ethics board is individual for
22 specific institutions.  Each institution has their
23 specific research ethics board.
24         Q.  What does the REB do?
25         A.  They review your application.

Page 68

1 They see if there can be any harm to the patients,
2 then they approve your methodology.
3         Q.  And do you have a written document
4 from the REB that approves your mesh research work?
5         A.  Yes.
6         Q.  Is there more than one that you
7 have from there?
8         A.  There was renewal.
9         Q.  Did you submit an application to
10 them for this REB approval?
11         A.  Yes, of course.
12         Q.  And you have that application
13 still?
14         A.  Yes, I should.
15         Q.  What other documents did you have
16 in your possession related to your request for, or
17 their approval of your research in meshes?
18         A.  Nothing.  Just application and
19 their approval letter.
20         Q.  Did you have to appear before the
21 REB to represent on your research?
22         A.  No, it's a simple, it is a very
23 simple project.  I don't do anything to the
24 patient.  I don't do anything specific.
25         I do exactly what I do every day, so it

Page 69

1 was straightforward.  It couldn't be any hard, just
2 examining histologically.
3         Q.  Let's take a break.
4         -- RECESS AT 10:19 --
5         -- UPON RESUMING AT 10:26 --
6         BY MR. THOMAS:
7         Q.  Doctor, going back to the images
8 on page 83 of your report, did you write a
9 pathology report of your findings for your review
10 of the histology?
11         A.  Probably did.  Maybe I haven't
12 completed it yet.  With the meshes, I'm slow, so I
13 could have completed the report, could have not.  I
14 don't remember now.
15         Q.  What's your practice for doing a
16 pathology report for a patient in the hospital who
17 is not involved in medical-legal?  Do you turn that
18 around pretty quickly?
19         A.  What do you mean is not involved
20 in medical-legal?
21         Q.  I thought you told me this was not
22 a medical-legal case, this mesh that's on page 83
23 of your report?
24         A.  That's correct.
25         Q.  So, have you done a pathology

18  (Pages 66 to 69)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 70

1    report for this patient based on your review of the
2    histology of her mesh?
3            A.   Doesn't matter medical-legal or
4    not medical-legal, when I collect mesh specimens
5    because my work is done so slow, I think and it
6    takes me time.  It has nothing to do with
7    medical-legal or not.  The difference is mesh
8    versus no mesh.
9            Q.   Have you prepared any -- have you
10   dictated anything related to the histology from the
11   mesh ex-plant that's depicted on page 83 of your
12   report?
13           MR. ORENT:  Objection.
14           THE WITNESS:  I don't remember.
15   BY MR. THOMAS:
16           Q.   Have you written anything about
17   your review of the histology from the explanted
18   mesh that's based on page 83 of your report?
19           MR. ORENT:  Objection.
20           THE WITNESS:  As I said, I don't
21   remember.  I've written something, because there
22   was a gross description at least there at the
23   beginning of the report.  Maybe it's signed out, I
24   don't remember now.  I use exactly the same format
25   for all mesh specimens litigation, non litigation.

Page 71

1            BY MR. THOMAS:
2            Q.   I understand that.
3            A.   And because there are so many
4    items I'm checking it takes me time and I don't
5    want to do it in a rush.
6            With cancer cases it is a different
7    story.  I rush, I try to make sure diagnostic
8    process is not involved.  In this case the mesh is
9    out already so there is no pressure.
10           Q.   So to your knowledge, you don't
11   know whether the doctor or the patient had the
12   benefit of your pathological review of the
13   histology, correct?
14           A.   I think I described it for the
15   physician.
16           Q.   How did you describe it to her?
17   In writing or voicemail or person to person?
18           A.   I don't remember now.  I'm not
19   sure where we're going with this, this is
20   confidential, and I'm not comfortable getting into
21   confidential information of a St. Michael's
22   Hospital patient.
23           The paper has been published and the
24   picture made it in the report after the publication
25   was peer reviewed and accepted.

Page 72

1            Now we're getting into completely
2    different area and I said I'm not getting
3    comfortable in getting into confidential
4    information of a St. Michael's patient.
5            Q.   I'm trying to figure out whether
6    anything in writing exists to your knowledge that
7    describes the findings you made based upon
8    histological review of this explanted mesh.
9            MR. ORENT:  I think he's answered those
10   questions.  I think he's gone far beyond his
11   comfort level.  Let's move on.
12           MR. THOMAS:  Are you instructing him
13   not to answer?
14           MR. ORENT:  I'm not.  However, if he
15   believes that he's confined by Canada's
16   confidentiality laws it's up to him in terms of his
17   knowledge, and what he can share as a doctor over a
18   patient who is not at issue in this lawsuit and not
19   put their medicals at issue.
20           THE WITNESS:  As I said, I'm not
21   comfortable getting into further details.  I think
22   it's inappropriate.  This picture appeared in the
23   report because it was published.
24           BY MR. THOMAS:
25           Q.   Doctor, on page 8 through 11 of

Page 73

1    your report, you have a section titled
2    "Polypropylene Degradation and Review of Ethicon's
3    Internal Documents"?
4            A.   That is correct.
5            Q.   How did you determine what
6    documents to review from Ethicon?
7            A.   I asked to send me anything which
8    was available pertinent to polypropylene
9    degradation, specifically if Ethicon scientists
10   performed testing using similar technology and
11   methodology, histology mainly.
12           Q.   Did you rely on counsel to provide
13   to you the documents that you reviewed?
14           A.   Yes.
15           Q.   Did you produce for us on
16   Exhibit 4 all of the documents that you reviewed?
17           A.   Yes, I did.
18           Q.   Were there other documents that
19   plaintiff's counsel supplied to you that you did
20   not include on Exhibit 4?
21           A.   Not to the best of my knowledge.
22           Q.   All right.  You also refer to
23   deposition testimony of Thomas Barbolt?
24           A.   Yes.
25           Q.   Is Dr. Barbolt's deposition on

19 (Pages 70 to 73)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 74

1    Exhibit 4?
2         A.   Yes, it is.
3         Q.   Do you remember how many days his
4    deposition was?
5         A.   I think there were two days.
6         Q.   Did you read the whole thing?
7         A.   I read most of the deposition.
8    Skimmed, I mean it's really long document.
9         Q.   Do you recall what his job was at
10   Ethicon?
11        A.   I don't recall now.
12        Q.   Do you know what his training was?
13        A.   No.
14        Q.   Do you know what kind of testing
15   Dr. Barbolt conducted while he was at Ethicon?
16        A.   I don't remember now.
17        Q.   Do you know whether he conducted
18   any animal testing of mesh?
19        A.   I saw documents of animal testing,
20   many documents.  If he was part of all of them or
21   some of them, I don't remember.
22        Q.   Do you know whether he conducted
23   any tissue reaction studies?
24        A.   I don't remember that, no.
25        Q.   Do you know whether Dr. Barbolt

Page 75

1    compiled and reviewed testing on Prolene
2    polypropylene from the 1960s to the present?
3         A.   As I said, there were many
4    documents and it's hard for me to remember now.
5         Q.   Do you know -- strike that.  Is it
6    fair to understand that to the extent Dr. Barbolt
7    presented any testing in his depositions you have
8    not reviewed that testing?
9         MR. ORENT:  Objection.
10        THE WITNESS:  As I said, I was asking
11   counsel to provide specific information, specific
12   topics.  So they provided this information and I
13   received a number of documents.
14        I specifically didn't even check
15   whoever signed this, who were the names.
16        BY MR. THOMAS:
17        Q.   Did you review any of the testing
18   Dr. Barbolt reviewed in his deposition?
19        A.   As I said --
20        MR. ORENT:  Objection.
21        THE WITNESS:  I don't remember the
22   names.  The only reason I remember his name because
23   it was the only deposition I had specifically for
24   that specific subject.
25

Page 76

1         BY MR. THOMAS:
2         Q.   What testing do you recall
3    reviewing as a part of your review of the Ethicon
4    documents in the case?
5         A.   As I said, I was focused mainly on
6    histological examination but I also skimmed through
7    the testing which was done using scanning electron
8    microscopy and just regular light microscopy.
9         Q.   Did you have see any histological
10   examination of what was described as cracked
11   polypropylene sutures?
12        A.   Yes.
13        Q.   And what did you find in your
14   review of the histological examination?
15        A.   I was really surprised.  They
16   found exactly what I found 30 years before I did.
17   I did it independently; I didn't have those
18   documents before.  So I thought I was Columbus, but
19   I guess I wasn't.
20        Q.   And you say they found exactly
21   what you found?
22        A.   Yes, exactly the same.  Even
23   arrows were so much like mine.
24        Q.   What was it that they found which
25   was exactly what you found?

Page 77

1         A.   There is a degradation bark and it
2    retains histological dyes, and it also retains the
3    granules of blue fibers.  And they also used
4    polarized light.
5         I think you asked me earlier in the
6    deposition who was using polarized light before.
7    Your scientists were.
8         Q.   Is it your opinion that Ethicon
9    conclusively found exactly what you found?
10        A.   Yes.
11        Q.   And that's based on the documents
12   that have been provided to you?
13        A.   Yes.
14        Q.   Did you see any histological
15   examination of the sutures that analyze to the
16   extent to which it created any risk of harm to
17   patients?
18        A.   I don't think I understand your
19   question.
20        Q.   What don't you understand about
21   it?
22        MR. ORENT:  Objection.
23        BY MR. THOMAS:
24        Q.   Let me start over again.  During
25   the course of your review of Ethicon documents, did

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 78

1  you review any documents where Ethicon scientists
2  reviewed histological slides of tissue samples
3  containing mesh that was described as having
4  cracks?
5      A.  Yes, I did.
6      Q.  And do you recall what the tissue
7  reaction was that they described in those samples?
8      A.  Yes, I do.
9      Q.  And what is that?
10     A.  It is the same thing which I saw,
11 fibrosis foreign body reaction formation.
12     Q.  Do you know how the description
13 they found in their documents compares to what the
14 tissue reaction as described for Prolene sutures at
15 the time that it was approved by the FDA in 1969?
16     MR. ORENT:  Objection.
17     THE WITNESS:  The documents I reviewed
18 they were dated in '80s.
19     BY MR. THOMAS:
20     Q.  I understand that.
21     A.  They had exactly the same
22 description as earlier papers or papers after that.
23 So I don't think there is any difference in any of
24 the descriptions.
25     Q.  Okay.

Page 79

1      A.  Either at time of filing of the
2  FDA application or after, it's all the same.
3      Q.  And the findings that they found
4  in the '80s and the findings that they found
5  earlier, and the findings that they reported later
6  are just the same as yours are?
7      A.  Pretty much.
8      Q.  Okay.  You say on page 9 of your
9  report at the end of the first paragraph:
10         "An important conclusion should
11         be made that if chemical and
12         physical properties have material
13         change while it is in the body, it
14         should not be used for permanent
15         applications and for anatomical
16         sites from which the devices cannot
17         be safely removed."
18     Did I read that correctly?
19     A.  Yes, you did.
20     Q.  Does St. Michael's use Prolene
21 sutures?
22     A.  Yes, I understand they do.
23     Q.  Does St. Michael's use Prolene
24 hernia mesh?
25     MR. ORENT:  Objection.

Page 80

1      THE WITNESS:  I see it removed.
2  Probably it's used for hernia mesh as well.
3  Prolene or Marlex, I'm not sure.  There are newer
4  meshes coming on the market.
5      BY MR. THOMAS:
6      Q.  Does St. Michael's use Prolene
7  polypropylene mesh for the treatment of stress
8  urinary incontinence in TVT and TVT-O?
9      MR. ORENT:  Objection.
10     THE WITNESS:  I don't think so.
11     BY MR. THOMAS:
12     Q.  Do you know?
13     A.  Maybe in the past.  Right now I
14 just receive them when they're removed.
15         They've been using them before.  I
16 don't know if they still using it right now.
17     Q.  Have you told St. Michael's to
18 stop using Prolene polypropylene sutures?
19     A.  Not sutures.  I talk to
20 gynecologist.  I show them what my research found,
21 what I found, let them know, what's, what's my
22 opinion about this.
23     Q.  Who did you talk to at St.
24 Michael's about that?
25     A.  Our gynecologist.

Page 81

1      Q.  I'm sorry?
2      A.  Our gynecologist.
3      Q.  And who is that?
4      A.  I don't think I can go there.
5  Again, I'm not comfortable getting into specific
6  information which is not relevant to my report.
7      Q.  What did you tell that person?
8      A.  I shared my research, what I
9  shared in my papers.
10     Q.  Did you tell them that St.
11 Michael's should not use Prolene polypropylene?
12     A.  I'm not making any guidelines.
13 I'm not a regulating body.  As a researcher I can
14 share my opinion, my findings, with colleagues.
15 And that's what I do in my publications and that's
16 what I did in my personal conversations and
17 personal contacts with St. Michael's physicians.
18     Q.  When did you have those
19 conversations?
20     A.  Throughout.  I've been involved in
21 these meshes for the last year, maybe over a year,
22 I don't remember now.  First it was hernia
23 surgeons, then gynecologists.
24     Q.  So you've spoken to hernia
25 surgeons at St. Michael's about the use of

21  (Pages 78 to 81)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 82

1    polypropylene mesh?
2         A.  That's how it came, it came
3    through hernia surgeons.  The whole research
4    project came through hernia surgeons.
5         Q.  Do you know whether hernia
6    surgeons at St. Michael's are still using
7    polypropylene mesh?
8         A.  Probably they do.  But not all of
9    them.  Some of them do, some of them don't.
10        Q.  Do you know whether St. Michael's
11   continues to use polypropylene mesh for the
12   treatment of stress urinary incontinence?
13        A.  As I said, I know they've used it.
14   I don't know if they're still using it right now as
15   we speak.
16        Q.  Did you ever tell them as a
17   scientist and pathologist that they should stop
18   using Prolene polypropylene mesh because it was
19   harming their patients?
20        MR. ORENT:  Objection.
21        THE WITNESS:  I described pathological
22   findings and I disclosed everything I found in the
23   specimens which were coming to me as part of St.
24   Michael's Hospital and what I found during the
25   course of my research.  Yes, I did disclose all of

Page 83

1    this.
2         They are independent practitioners.
3    They collect information from peer-reviewed
4    studies.  They see the evidence which is published.
5    I'm one piece of the puzzle, one piece of the
6    information.
7         They make their own decision.  They're
8    licensed physicians and there are regulating bodies
9    which give guidelines.
10        Again, they are free to use my
11   guidelines in my research or anything else and
12   advise their patients what is the best course and
13   what can be complications.
14        BY MR. THOMAS:
15        Q.  Who was the person at St.
16   Michael's who makes the decision whether to use
17   polypropylene mesh?
18        A.  Each individual physician makes
19   own decisions after discussion with the patient.
20   That's my understanding.
21        I don't think there is any guiding body
22   in specific hospital which can stop physicians from
23   using specific device.
24        Q.  When you said you went to the
25   gynecologist, there's more than one gynecologist at

Page 84

1    St. Michael's, isn't there?
2         A.  Yes, but not all of them are
3    dealing with stress urinary incontinence.  There is
4    a degree of specialization.  Some of them do it,
5    sometimes some people specialize more in the field.
6         Q.  There's more than one hernia
7    surgeon, isn't there?
8         A.  Yes, correct.
9         Q.  Is there someone over both of
10   those specialties that can determine that the
11   hospital should not use polypropylene sutures or
12   mesh?
13        A.  I don't know if it can be done.
14        Q.  Have you ever made an effort to do
15   that?
16        A.  To stop them?
17        Q.  (Nods).
18        A.  As I said, I don't know if it can
19   be done.
20        Q.  Have you ever made an effort to
21   stop St. Michael's Hospital from using Prolene
22   sutures or Prolene mesh other than the
23   conversations you had with a gynecologist and a
24   hernia surgeon?
25        A.  No.

Page 85

1         Q.  Thank you.
2         What did Dr. Barbolt say about the
3    clinical significance, if any, of surface cracks on
4    polypropylene implanted in the dog study?
5         A.  I don't remember now.
6         Q.  What did Dr. Barbolt say about the
7    molecular weight of the Prolene sutures implanted
8    in the dog study after seven years?
9         A.  I don't remember now.
10        Q.  What did he say about the --
11   strike that.  What did Dr. Barbolt say about the
12   physical properties of the Prolene sutures
13   implanted in the dogs after seven years?
14        MR. ORENT:  Objection.
15        THE WITNESS:  I don't remember now.
16        BY MR. THOMAS:
17        Q.  Page 11 of your report.  You talk
18   about effect on the tissue, we're talking about
19   pain -- sorry, I'm on the wrong page.
20        It's on page 12, I'm sorry.
21        A.  Okay.
22        Q.  Page 12, it says:
23        "It is important to note that
24   in hernia surgery, chronic pain
25   after mesh repair is a growing

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 86

1    problem.  Prophylactic neurectomy is
2    offered as a method to reduce
3    incidence of pain after mesh
4    repair."
5         What is a prophylactic neurectomy?
6         A.  When you cut the nerves before you
7    put the mesh in anticipating the mesh is going to
8    cause pain.
9         Q.  When you say cut the nerve, what
10   kind of nerve are you going to cut in the hernia
11   surgery?
12        A.  There are three main nerves
13   branches:  Genitofemoral, inguinal, um, some names,
14   um...
15        Q.  Any other nerves as a part of the
16   hernia surgery?
17        A.  There are three branches, which
18   can be identified visually.  They are thicker
19   trunks.  There is a variability between people, but
20   they're called triple neurectomy because in most
21   people there will be three branches supplying
22   innervation to the area.
23        Q.  So tell me what is done and why
24   it's done in hernia surgery with prophylactic
25   neuroectomy?

Page 87

1         A.  It depends.  There's different
2    techniques.  Either the branches can be cut in the
3    area, so there will be three branches identified
4    and transected, buried in muscle.  The stumps will
5    be buried in muscle.
6         It could be also arthroscopic
7    techniques when they go and try and cut the nerve
8    trunks closer to the spinal cord.
9         Then I'm not sure if it will be three
10   branches, because if you go proximally it will be
11   less branches, they will all merge into larger
12   trunks.  So you cannot call it triple neurectomy at
13   that level.
14        But the basic rule, we try to identify
15   supply innervation, either larger trunk or smaller
16   branches, transect them and bury the stump in the
17   muscles, so it doesn't form traumatic neuroma.
18        It's done because you want to denervate
19   the area where you anticipate the mesh is going to
20   cause pain.
21        Q.  Why is it important to note the
22   prophylactic neurectomy in your report?
23        A.  Because when chronic pain due to
24   mesh occurs, going back into the scarred area,
25   obstructed by the mesh, proved to be hard.

Page 88

1         So historically, first there were
2    meshes put in, and then more meshes put in, and
3    then more patients started coming back as chronic
4    pain, taking the mesh out was difficult, there was
5    large defect.
6         So somebody came up with the idea,
7    let's leave the mesh in but try to denervate the
8    area, either bury the nerves with some chemicals
9    like alcohol, or put nerve blocks, which was an
10   effective strategy.
11        You anesthetize the area, so the nerve
12   doesn't work for few weeks, and then the pain would
13   be gone.
14        And then somebody came up with this
15   idea of more permanent denervation, when the area
16   is anesthetized by cutting the nerve.
17        And then first surgeons try to do
18   neurectomy or transection of the nerve after mesh
19   repair, and after some experience they figure out
20   it's really hard to do to find the nerves from the
21   old scarred area.
22        So somebody offered, okay, if we
23   anticipate the pain developing from mesh, let's cut
24   the nerve before, when the area is clean and there
25   are no scarring or mesh in the area.

Page 89

1         Q.  Is that an accepted surgical
2    technique to do a nerve neurectomy prior to mesh
3    implantation?
4         A.  Yes, it is.  It's offered, it's
5    published and there are results.
6         Q.  Is that a common occurrence with
7    mesh implantation?
8         MR. ORENT:  Objection.  Vague.
9         THE WITNESS:  Depends on the surgeons.
10   Some surgeons believe in this and they do it.
11   Depends probably on the group of surgeons' practice
12   habits.
13        BY MR. THOMAS:
14        Q.  Right above that section on the
15   prophylactic neurectomy, you discuss the mesh scar
16   complex and its "interlocking and
17   compartmentalizing nature".  What is the
18   interlocking and compartmentalizing nature of the
19   mesh scar complex?
20        A.  So if we look at the mesh, mesh is
21   a structure, three-dimensional structure made out
22   of mesh fibers or mesh filaments.
23        So filament of fiber, circles around,
24   loops around, and then it forms in pores, and in
25   these tissues.  And each pore has 360 degrees of

23 (Pages 86 to 89)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 90

1    surrounding fibers, that's why it is a pore.
2            So it becomes a compartment. An area
3    which is surrounded by something or a physical
4    structure with volume inside, that is a
5    compartment. So the mesh introduces all these
6    micro compartments.
7            Q.   There aren't walls around each of
8    these compartments, are there?
9            A.   Yes, there are. Fibers, mesh
10   fibers, they form the walls of this compartment.
11           Q.   But they don't totally encapsulate
12   -- strike that.
13           The compartment though, has an opening
14   on either side much like a screen, correct?
15           A.   Yeah, more like a screen or a
16   tube. To a degree, because mesh is not completely
17   flat, it's a more of a three-dimensional. If you
18   go with microscopic level, it's three-dimensional.
19           So I would compare it with each pore as
20   a very complex irregular tube, more or less.
21           Q.   My point is, instead of a
22   compartment it is a tube with openings on either
23   side?
24           A.   A compartment is a tube. All
25   compartments in human body are tubes.

Page 91

1            Q.   That has an opening on either
2    side?
3            A.   Yes, that's how they are in the
4    body. If we talk about tunnel syndromes in the
5    hand or in the chest, all these compartments form a
6    tube.
7            And the tube lets nerves and blood
8    vessels through and if compartment syndrome occurs,
9    it compromises the nerves in the vessel, in the
10   tube-like structure.
11           Q.   Doctor, in your report you
12   discussed the concept of mesh stiffening?
13           A.   Yes, I did.
14           Q.   Please tell me how mesh stiffens?
15           A.   Immediately after placement, it
16   can fold and curve. So two layers or three layers
17   of mesh is different than one layer. So this is
18   initial step, if it folds or curls or wrinkles
19   immediately after placement.
20           Then next step which will increase
21   stiffness of the structure is scar encapsulation.
22   So scar immobilizes the fibers in the structures so
23   they can not move inside the elasticity of the
24   meshes, mainly because of the bending ability of
25   the fibers and movement within the structure.

Page 92

1            When it's used with scar it cannot so
2    that is lost. When it's incorporated in scar
3    tissue, the movement and bendability of fibers is
4    limited.
5            Q.   Let me ask you a question here; I
6    don't mean to interrupt you. Is folding or curling
7    a necessary part of mesh stiffening?
8            A.   No. It's one of the processes
9    which increases mesh stiffness if you compare it
10   with the flat product.
11           Q.   So you could have, as far as you're
12   concerned, mesh stiffening if the mesh does not
13   fold or curl?
14           A.   Then other mechanisms will set in.
15           Q.   But the first one deals with
16   folding, curling and then the scar that you just
17   described?
18           A.   Yes.
19           Q.   I didn't mean to interrupt you.
20   Is there anything else you wanted to say about that
21   mechanism?
22           A.   And then slowly over the years,
23   the degradation layer will start building up and we
24   know it's brittle. Like any other plastic, we see
25   over time it starts cracking. It becomes harder

Page 93

1    and less flexible and it breaks.
2            Q.   The degradation layer you
3    described is four to five microns?
4            A.   It depends. It depends how long
5    it's been in the body.
6            Q.   Is four to five microns about the
7    largest you've seen?
8            A.   No, I've seen up to seven or
9    eight. Depends on the type of mesh, I guess --
10           Q.   Well, Prolene polypropylene, what
11   is the largest you've seen?
12           A.   It's hard to say because it's for
13   -- currently that mesh is -- 80 percent of the time
14   I don't actually know what the product is.
15           Q.   80 percent of the time you don't
16   know what the product is?
17           A.   Yes.
18           Q.   And the reason why I ask is, in
19   all the reports I've seen, I've never seen you give
20   an opinion that is greater than five microns to a
21   Prolene mesh?
22           A.   That's just happened with any
23   litigation process, but I have over 300 meshes in
24   my office.
25           I'm just telling you the thickest bark

24 (Pages 90 to 93)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 94

1    as far as I remember was up to seven, probably just
2    over seven microns thick.
3            And I think it was a hernia mesh and
4    for hernia meshes, when they've been in the body
5    for like 12 or 14 years, it's very difficult to
6    trace what type of mesh was put in.
7        **Q.   Your best recollection insofar as**
8    **you're dealing with Prolene mesh for the treatment**
9    **of stress urinary incontinence, the largest you've**
10   **seen is five microns, correct?**
11           MR. ORENT: Objection.
12           THE WITNESS: Probably six, I don't
13   remember now.
14           BY MR. THOMAS:
15       **Q.   This bark, as you've described it,**
16   **by definition is cracking?**
17       A.   Yes.
18       **Q.   And when you get past the bark**
19   **layer the interior of the polypropylene as best as**
20   **you can tell is unaffected?**
21       A.   Yes.
22       **Q.   Okay.**
23       A.   The core of the fibers remains, at
24   least, the same by my methods.
25       **Q.   And by your methods, as far as you**

Page 95

1    **can tell, past the five microns or so, the physical**
2    **properties of the polypropylene remain the same,**
3    **true?**
4            MR. ORENT: Objection.
5            THE WITNESS: By my methods, yes.
6            BY MR. THOMAS:
7        **Q.   Have you described -- you've**
8    **described two ways that you believe that mesh**
9    **becomes stiff.**
10           **Are there any other ways that you**
11   **believe mesh becomes stiff in the body?**
12       A.   Three.  So multi layering, scar
13   encapsulation and then degradation.  No, I don't
14   know any other mechanism for stiffening.
15       **Q.   And the way that you're able to**
16   **identify multi layering is when you analyze the**
17   **mesh after it's been sent to you in formalin from**
18   **the surgeon, correct?**
19       A.   As I said, sometimes I receive
20   meshes fresh in saline or not just -- and I see
21   it's folded already.
22       **Q.   The only polypropylene meshes that**
23   **you've given us, other than the one that you've**
24   **given us limited information about, come to you in**
25   **formalin, correct?**

Page 96

1            MR. ORENT: Objection.
2            THE WITNESS: For litigation cases?
3    Meshes come in formalin, that is correct.  But in
4    St. Michael's Hospital, when they receive mesh, as
5    I mentioned, everybody knows I'm the mesh guy.
6    They call me when they receive a mesh, sometimes I
7    receive them fresh.
8            BY MR. THOMAS:
9        **Q.   Do you have any documents, images**
10   **or any other information about meshes that you've**
11   **received fresh, without formalin, that show folding**
12   **or curling?**
13           MR. ORENT: Objection to form.
14           THE WITNESS: I describe them when I
15   receive them.  But again, we're going to the St.
16   Michael's Hospital patients and I don't want to go
17   there.  I'm not comfortable discussing this
18   confidential information.
19           BY MR. THOMAS:
20       **Q.   Okay.**
21       A.   Probably took some pictures at
22   some time.
23       **Q.   You have not produced those**
24   **pictures to us?**
25       A.   They're not in the report.

Page 97

1    They're confidential information and I took them
2    because in the course of my work as a pathologist
3    at St. Michael's.
4        **Q.   Do you have any information about**
5    **the incidents of folding or curling in mesh**
6    **implanted -- in Prolene mesh implanted for the**
7    **treatment of stress urinary incontinence?**
8        A.   For stress urinary incontinence,
9    the degree of curling is visible in most of the
10   cases.
11       **Q.   More than half?**
12       A.   I would say more than half.
13   Again, it depends.  Sometimes one piece is curled,
14   the other one is completely flat.
15       **Q.   And again, these are cases where**
16   **you've received the mesh in formalin?**
17       A.   Yes.  But I mean we're talking
18   about curling, not curling on the whole specimen.
19   We're talking about curling as it sits in scar
20   tissue.
21           So whatever curling I'm assessing as is
22   significant is on that, that which can -- which is
23   immobilized by scar tissue.
24           So I'm not talking about curling which
25   occurs secondary to fixation.  I'm talking about

25 (Pages 94 to 97)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 98

1  curling which occurred in the body.  I'm able to
2  distinguish between one and the other.
3          Q.  How?
4          A.  I just said.  If it's curled and
5  it's completely surrounded, integrated in scar
6  tissue in curled shape, it occurred in the body.
7          If the entire specimen is curled
8  together with scar, that could have been an
9  artifact.  So I immediately disregard the shape or
10  the formation which occurred as an artifact.
11          Q.  Let's go to page 19 of your
12  report, please.
13          A.  Um-hum.
14          Q.  I'm going to refer you back to
15  page 14, because I think that that's the commentary
16  that you have on that.  So you've got 19, which is
17  the images, and page 14 is the text.
18          A.  Yes.
19          Q.  Okay.  As you look at page 19,
20  Figure Set 1a is described as:
21              "A foreign body inflammatory
22              reaction H&E, 40X images
23              consolidated cases."
24          What are you showing here?
25          A.  Foreign body type inflammatory

Page 99

1  reaction.
2          Q.  Is there anything unusual about
3  this foreign body reaction?
4          A.  What do you mean unusual?
5          Q.  Is there anything remarkable about
6  it?  There's a foreign body reaction anytime you
7  have an implant, correct?
8          A.  Then usually it's not normal
9  tissue.  Normally there shouldn't be any
10  inflammation in the tissue.
11          Q.  Okay.  And so would there be
12  inflammation regardless of what kind of foreign
13  body is placed in there?
14          A.  Yes, because having a foreign body
15  in the body is not normal thing.
16          Q.  And so is it fair to say that
17  Figure Set 1a describes a typical foreign body
18  reaction to implanted materials?
19          MR. ORENT:  Objection.
20          THE WITNESS:  I wouldn't say typical,
21  although you can use that word.  I would say
22  non-specific reaction to a foreign body.  The body
23  is trying to destroy the foreign body because it's
24  a noxious stimulus, a noxious or damaging object.
25

Page 100

1          BY MR. THOMAS:
2          Q.  The images on the left show that
3  the polypropylene was removed as part of the
4  microtoming process; correct?
5          A.  Could you repeat that question.
6          Q.  I'm looking at the figures on the
7  left, which show the white images, compared to the
8  right, which show the yellow.
9          And on the left it shows that the
10  polypropylene that used to be where the white is
11  has been removed as a part of the microtoming
12  process; correct?
13          A.  No, actually, there might be all
14  of them present there.  They're just clear;
15  polypropylene is clear.  If it is not degraded,
16  it's completely clear.
17          If the fibers were blue fibers, they
18  would be visible.  If it's clear fiber they would
19  not.
20          So technically, looking at these
21  images, we cannot say which hole is the actual MTM,
22  and which sort of appear in holes, still contain
23  polypropylene.  You would need polarized light to
24  see that.
25          Q.  So what can you tell me about the

Page 101

1  part of the mesh that we're seeing in Figure 1a?
2          A.  Specifically, I don't -- do you
3  want me to discuss a specific feature?
4          Q.  For example, you don't have a
5  clean cut where you're looking at a perfectly round
6  portion of the mesh, correct?
7          MR. ORENT:  Objection to form, to the
8  use of the term "clean cut".
9          THE WITNESS:  Some of them are closer
10  to perpendicular orientation.  Some of them are
11  angled.
12          BY MR. THOMAS:
13          Q.  Okay.  For example, when you have
14  a microtoming process and you pull the knife across
15  the histological slide, sometimes you will create
16  an artifact by pulling the tissue away from the
17  polypropylene, correct?
18          A.  Yes, because polypropylene is
19  harder than tissue, you can damage tissue during
20  cutting.
21          Q.  And you can't tell if you look at
22  set 1a whether the polypropylene is there or not;
23  true?
24          A.  Yes, that's true.
25          Q.  You can't tell by looking at the

26 (Pages 98 to 101)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 102

1  figures in set 1a whether those are the actual size
2  of the hole that was occupied by the polypropylene,
3  and whether that is an artifact from microtoming?
4       A.  That I can tell you because
5  artifact from microtoming looks completely
6  different.  These are holes from fibers.
7       Q.  Completely?
8       A.  For these specific holes?
9       Q.  How can you tell the difference?
10      A.  Well, you have to work as I
11 pathologist for so many years and then you can
12 tell.
13      But generally, how we go for that
14 specific feature, it would be shape, rounded shape,
15 oblique, assuming, if we look at this image here --
16 if you want me to point, circle.
17      Q.  I'll give you a red pen -- let's
18 give you a blue pen.  That will show up better.
19      A.  Assuming if we see this tissue,
20 this specific, this is displaced.  So when the
21 fiber was not cut, it probably had different
22 position, different orientation.  Because it's
23 misplaced, it doesn't completely circle here.
24      Q.  Is that an artifact from the
25 microtoming process?

Page 103

1       A.  To a degree.
2       Q.  Okay.
3       A.  Now, see this empty space here?
4       Q.  Mark that A.  Mark the first one
5  A, and the next one B, so the record is clear what
6  you've just done.
7       A.  (Witness complies).
8       Q.  This one will be A.  That's the
9  one you've discussed first.  The other one you're
10 discussing now is B.
11      A.  So this circle labelled A moved
12 during microtomy.  It was within the fibers and now
13 it moved, it changed position slightly.
14      The area B appears empty, but it was
15 occupied in vivo, and this is an artifact.  Another
16 artifact here is artifact C, which is tissue
17 retraction.  Now, if we --
18      Q.  And those are all caused by the
19 microtoming process?
20      A.  No.  Different combination of
21 factors which cause all of this.
22      Now, if we look at the entire opening
23 marked as D, is perfect round shape, no tissue is
24 displaced.  So this would be as close as it gets to
25 the area which is occupied by a cross-section of

Page 104

1  the mesh fiber.  Okay.  Let's go now to the next
2       Q.  Okay.  Let's go now to the next
3  page, page 20.  Anything else remarkable about that
4  page, page 19?
5       A.  It depends what you want me to
6  describe.
7       Q.  Well, I've seen you testify
8  before.  And you put these images up on the screen
9  and you tell the jury what you think is remarkable
10 about them?
11      A.  Do you want me to go through this
12 description?
13      Q.  Do you have anything other than a
14 foreign body reaction, as depicted in the tissue,
15 is there anything other than that that's remarkable
16 about the images on 19?
17      A.  This picture is actually good in
18 terms of it shows this layering.
19      So the fibers are surrounded by this
20 dense foreign body type inflammation, and then the
21 inflammation is actually encapsulated by dense scar
22 on the outside, so this very dense pink area is a
23 scar.  So it goes on the outside of the
24 inflammation.
25      And then beyond the scar plate, here is

Page 105

1  the transition into normal lighter tissue not as
2  densely scarred or densely collagenized.
3       So this picture is a good example of
4  showing this multilayering, sort of onion skin
5  around the mesh fibers.
6       Q.  Anything else?
7       A.  No.
8       Q.  Let's go to page 20 now.
9       A.  Now, I have the mark coming
10 through.  Should I use a pen?
11      Q.  We'll do that next time, we'll
12 take that away.
13      Now on page 20, again, this is an image
14 from the consolidated cases?
15      A.  That's correct.
16      Q.  And as you look in the top on 1b,
17 you see blue.  And that is polypropylene mesh.
18      A.  Yeah, that's a cross-section of a
19 blue polypropylene fiber.
20      Q.  And it looks like it's been folded
21 as a part of the microtoming process; is that fair?
22      A.  It's not microtoming process; it
23 folds, curls.  Polypropylene just tends to curl.
24      Q.  But this is a four-micron thick
25 slice of polypropylene, correct?

27 (Pages 102 to 105)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 106

1    A.   Then it curls up like this.  Some
2  of them just stay flat.  Some of them curl up.
3       Q.   But this is an artifact of the
4  sample preparation process?
5       A.   Curling?  Yes.
6       Q.   So the curling of the blue
7  polypropylene in set 1b on page 20 is an artifact
8  of the sample preparation process?
9       A.   That's correct.
10      Q.   All right?
11      A.   The exact shape of that slice is
12 better to be estimated by the tissue which
13 surrounds it because tissue didn't curl, didn't
14 move much.  There is more movement of the
15 polypropylene slices.
16      Q.   What does that mean?  I don't
17 understand.
18      A.   Well, see, when the tissue is cut
19 it doesn't curl, it doesn't wrinkle most of the
20 time because of the technology of the slides and
21 knives.  Everything was designed to keep it flat.
22      So over the years, over the hundred
23 years we learned how to keep it flat.  With
24 polypropylene, because it is a different material,
25 doesn't stick.  The histological slides don't hold

Page 107

1  it as well so it's not firmly attached.
2      So, when it's cut initially, it may
3  stay flat.  But then after drying and some chemical
4  treatment, starts curling up, while tissue stays
5  flat.
6       Q.   Okay.
7       A.   Curling up or moving, I mean curls
8  up, lifts up, and then starts floating around.
9       Q.   What are you going to say at trial
10 about Figure Set 1b on page 20?
11      A.   Just an example of foreign body
12 type inflammatory reaction.
13      Q.   Okay.  Let's go to page 21.
14      A.   Yes.
15      Q.   Page 21 is Figure Set 1c:
16      "Foreign body inflammatory
17      reaction, H&E 40X, image of
18      additional TVT cases."
19      Now, I think you told us before that
20 these are previous TVT and TVT-O cases?
21      A.   Yes.
22      Q.   Do you know whether this is a TVT
23 or a TVT-O?
24      A.   No.
25      Q.   Can you tell me today whether this

Page 108

1  slide comes from the set of 22 patients that you
2  received from Dr. Kreutzer?
3      MR. ORENT:  Objection.
4      THE WITNESS:  My recollection is it was
5  later, one of the later cases.
6      BY MR. THOMAS:
7       Q.   Do you know which one it is?
8       A.   I can probably trace it but...
9       Q.   Is it a medical-legal case?
10      A.   I think so, but again it would be
11 hard for me -- just what I recall, it is a TVT that
12 I kept track quite well, TVT or TVT-O.
13      Q.   If I asked you to, could you tell
14 me where it came from?
15      A.   I can make an effort to figure it
16 out.
17      Q.   Okay.
18      A.   If I can't, I can't.
19      Q.   I'm going to want to know where
20 all these came from.  That's what we asked for in
21 advance and I understand we don't have it today?
22      A.   I never had the purpose to trace
23 individual cases unless it's for a specific -- the
24 report is prepared for a specific patient.
25      Q.   Okay.

Page 109

1      A.   Because of it wasn't my purpose.
2  My purpose was to collect information and
3  photographs for TVT or TVT-O as device.  That's why
4  I have difficulty tracing all of them back.  Some
5  of them can be traced; some of them cannot.
6       Q.   If you look at Figure Set 1c, top
7  left, again, you see the blue polypropylene,
8  correct?
9       A.   Yes, I do.  And the other hole
10 above it may still contain polypropylene but it's
11 clear because the way it's done two fibers are
12 combined together.
13      One filament is blue, one filament is
14 clear.  And they go through the knitting product
15 together, this pair.
16      Q.   Does the fact that the hole that
17 you just identified above the presence of blue
18 polypropylene has an irregular shape, does that
19 impact your opinion as to whether the polypropylene
20 is present or not?
21      A.   Not irregular.  It's more regular
22 curvilinear shape, and there is inflammation around
23 it, so there are several features which tell me
24 that this is space where polypropylene either still
25 is or used to be.

28 (Pages 106 to 109)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 110

1    If I had polarized light or if I had
2    microscope right now and it would be in the
3    microscope, I could flip polarized light and see.
4        Q.   Now, is that tissue that is in
5    that large white area above the polypropylene?
6        A.   It is a small fragment of tissue.
7        Q.   Is that part of a microtoming
8    artifact?
9        MR. ORENT:   Objection.
10        THE WITNESS:   Microtomy or processing,
11    it's hard to say, but it's an artifact.  It's
12    displaced.
13        BY MR. THOMAS:
14        Q.   As you look down to the piece of
15    polypropylene in set 1c, on the top of that blue
16    portion it appears to be some tissue?
17        A.   Yes.
18        Q.   And that tissue looks to fit right
19    into the tissue above it?
20        A.   That's correct.
21        Q.   So that's pulled away from the
22    tissue as a part of the microtoming process,
23    correct?
24        MR. ORENT:   Objection.
25        THE WITNESS:   You have good eyes.

Page 111

1        BY MR. THOMAS:
2        Q.   Why don't I see any bark on that
3    polypropylene?
4        A.   Two reasons.  Not enough
5    resolution of the picture, and second, not in
6    focus.
7        Q.   And do you know how long this mesh
8    was implanted in the person?
9        A.   No, I don't remember.
10        Q.   But you have those records?
11        A.   Most likely.  But again, some
12    patient samples came without much records.  Most of
13    the samples I received had implantation dates.
14        Q.   So what is remarkable about the
15    slides in Figure Set 1c which you'll talk to the
16    jury about?
17        A.   It shows a blue fiber.  It shows
18    that some of the fibers are blue, but otherwise it
19    shows exactly the same feature as before.
20        It's kind of onion skin mesh fiber
21    covered by inflammation, and then outside of that
22    everything is encapsulated in scar tissue.
23        Q.   And the scar tissue would be
24    reflected in your notations in the ones on the
25    right?

Page 112

1        A.   Yes, sometimes I do that.
2        Q.   Okay.  Anything else remarkable
3    about the figures on page 21?
4        A.   No.
5        Q.   Let's go to page 22, Figure Set
6    2a.  Again, this is images of additional TVT cases.
7    And these would be cases that were not part of the
8    consolidated group that you've just reviewed,
9    correct?
10        A.   That is correct.
11        Q.   And can you tell me by looking at
12    this whether it was part of the set of cases that
13    you received from Dr. Kreutzer?
14        A.   No, that was later case.
15        Q.   How can you tell me that?  How do
16    you know that?
17        A.   Quality of the picture.  I see it
18    was not taken with the camera that I had at the
19    time that I received the, those specimens.
20        Q.   Was this taken from an active
21    medical-legal case involving Ethicon?
22        MR. ORENT:   Objection to the form.
23        THE WITNESS:   I don't remember.  Most
24    likely it is.
25

Page 113

1        BY MR. THOMAS:
2        Q.   But you can't tell me today what
3    it might be?
4        A.   It's hard to say.
5        Q.   And what is remarkable about the
6    image in Figure Set 2a on page 22 for purposes of
7    the jury?
8        A.   Can I have a pen?
9        Q.   I'll give you a blue pen.
10        A.   Remember, earlier you asked me
11    about why you cannot see bark?  Now you can see the
12    bark, so this is the bark.  Right there.
13        Q.   What you've indicated is on the
14    left?
15        A.   This is the bark right there.
16    This is the bark right there.
17        Q.   Now are you assuming for purposes
18    of that statement that polypropylene is still
19    present in that slide?
20        A.   Well, degraded part of the
21    polypropylene is still present for sure, because I
22    can see it stained.  If the core remains unlocked,
23    there's a different question.  In this area, most
24    likely it is.
25        Q.   You say most likely it is?

29 (Pages 110 to 113)

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 114

1      A.  Because this bark layer is free in
2   the space, and doesn't happen that often.  Because
3   if it was free in this area, it would flow all the
4   way.  So the way it remains in the tissue it
5   remains attached to tissue.
6           So the bark which is firmly attached to
7   tissue like in this area is most likely detached.
8   So there is no fiber core in this area.  But in
9   this specific area, I suspect the core of the fiber
10  is still there.
11      Q.  Let me do something so the record
12  is clear.
13          You've made some arrows on Figure 2 A,
14  on the upper image, and there's two arrows on the
15  upper left-hand portion and you suggest that
16  indicates bark -- you suggest that indicates bark,
17  correct?
18      A.  I didn't suggest.  I just pointed
19  where it is.
20      Q.  Okay, fine.  And then down in the
21  lower right-hand corner, you've drawn several
22  diagonal lines in addition to two arrows.
23          The two arrows indicate bark, as you
24  understand it, and you believe that the diagonal
25  lines represent polypropylene which is present in

Page 115

1   the slide, correct?
2       A.  Most likely.
3       Q.  Okay.  Now, we requested that all
4   of the slides that were used in your report be
5   forwarded to our pathologist for their review.
6           Was this slide forwarded to them, to
7   your knowledge?
8           MR. ORENT:  Objection.
9           THE WITNESS:  No, it's an additional
10  case.
11          BY MR. THOMAS:
12      Q.  Okay.
13          MR. ORENT:  By the way, just for the
14  record, we have not received any slides from your
15  pathologist either and we have requested that
16  repeatedly.
17          MR. THOMAS:  We don't have any to give
18  you.  We're working from the same set of slides.
19          MR. ORENT:  So you're using the
20  plaintiff's stained slides --
21          MR. THOMAS:  So far we have.  We figure
22  it's better off using one set of slides.  And to
23  the extent we make any, you will have them
24  promptly.
25          THE WITNESS:  If it was a litigation

Page 116

1   case, you have the report.
2           BY MR. THOMAS:
3       Q.  Are you familiar with whole slide
4   imaging?
5       A.  Yes, I am.
6       Q.  Do you do whole slide imaging of
7   these cases?
8       A.  Yes, I do.
9       Q.  So you have --
10      A.  Not for all of them.  For some
11  cases, especially the later ones.
12      Q.  Okay.  And who maintains your
13  whole slide imaging equipment; who has that?  St.
14  Michael's?
15      A.  Yes, St. Michael's.  It's standard
16  equipment.
17      Q.  Do you have to pay St. Michael's
18  for use of the whole slide imaging equipment?
19      A.  No.
20      Q.  Okay.
21      A.  It's free for researchers.
22      Q.  What kind of machine do they have?
23      A.  Aperio.
24      Q.  So, you could supply to us digital
25  images of the slides that you have on whole slide

Page 117

1   imaging, correct?
2       A.  As long as you're entitled to
3   receive material or information about the case.
4       Q.  Okay.  What else is remarkable
5   about Figure Set 2a on page 22?
6       A.  Oh, it is a very nice example,
7   again of this layering, onion skinning.
8           The mesh fibers are surrounded by halo
9   of foreign body reaction and everything is encased
10  in solid scar plate.
11          And then normal tissue is beyond the
12  solid scar plate so it is a good example of how it
13  happens.
14      Q.  And in terms of -- you've told me
15  that on the upper left of the area where you had
16  the arrows, there's likely not polypropylene but in
17  the lower right there likely is polypropylene?
18      A.  Yes.
19      Q.  How about in the white area to the
20  right where you've written; can you tell whether
21  polypropylene is present or not?
22      A.  Not without polarized light.
23          MR. ORENT:  Counsel, we've been going
24  about another hour.  Shall we take a short break?
25          MR. THOMAS:  Good time, yes.

30 (Pages 114 to 117)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 118

1     -- RECESS AT 11:27 --
2     -- UPON RESUMING AT 11:44 --
3     BY MR. THOMAS:
4         Q.   Doctor, going back to image 2a on
5     page 22 of your report, you described this scar
6     area in your testimony, and then showed how the
7     scar then changed to normal tissue, correct?
8         A.   That' is correct.
9         Q.   How thick is the area between what
10    you show to be the polypropylene mesh and the scar
11    to the normal tissue?  How thick is that area
12    between the polypropylene and the normal tissue?
13        A.   You mean in this specific image or
14    in general?
15        Q.   In this image.
16        A.   It depends on which part of the
17    mesh.  The thinnest part is within the hundred
18    microns.  The thickest part can be as thick as
19    couple of millimeters, if we measure the whole
20    thing like this.
21        Q.   And just for the record, when you
22    say within a hundred microns, you're referring to
23    the area on the left side of the lower image in the
24    yellow, through the scar to the normal tissue.  And
25    when you're referring to the couple of millimeters,

Page 119

1     you were referring to normal tissue to normal
2     tissue in between the two mesh fibers; is that
3     fair?
4         MR. ORENT:  Objection.
5         THE WITNESS:  That's correct.
6         BY MR. THOMAS:
7         Q.   And similarly, down below on the
8     lower left, where you show the polypropylene mesh,
9     you show scar and then you do show normal tissue;
10    how far is it from the polypropylene to the normal
11    tissue; how wide is the scar band?
12        A.   The same, within 100 microns.
13    Sometimes you have normal tissue pushing into the
14    pores, sometimes not.  Sometimes the scar plate is
15    within a hundred microns -- I mean, the scar
16    capsule.  Sometimes it goes to the millimeters,
17    three, four millimeters, it depends.
18        Q.   Okay.  Anything else remarkable
19    about the images on page 22?
20        A.   No, we discussed everything, I
21    think.
22        MR. ORENT:  Objection.
23        BY MR. THOMAS:
24        Q.   Let's go to page 23 please, Figure
25    Set 2b.  Let's talk about this a little bit.

Page 120

1     Where does this come from?
2         A.   It came from, if I remember
3     correctly, Edwards case.  If I remember correctly.
4         Q.   What is it about this that makes
5     you think it's the Edwards case?
6         A.   It is an old photograph.
7         Q.   And in the top, on the right-hand
8     side of the image, it looks like a piece of blue
9     polypropylene that's displaced in its location; is
10    that fair?
11        A.   Slightly displaced, most of it
12    sits right there, it was in vivo.
13        Q.   The other blue pieces that appear
14    there other than the -- why don't you just mark
15    that with an "X" for me so it's clear what we're
16    talking about.
17        A.   (Witness complies).
18        Q.   There are other blue pieces
19    throughout that image, is that polypropylene or is
20    that stain?
21        A.   You mean the blue areas here?
22        Q.   Yes.
23        A.   Some of it is probably displaced
24    polypropylene, it's hard to say because of the
25    resolution.  It could just be inflammation because

Page 121

1     there is a weird color coming into the pictures.
2         Q.   If the blue that appears there is
3     in fact displaced polypropylene, then that's part
4     of the microtoming artifact; is that fair?
5         A.   Yes, that's fair.
6         Q.   All right.
7         A.   Anywhere where cross-section of
8     the fiber overlaps with tissue, is a displacement.
9         Q.   All right.  And you title this,
10    "Fibrous Bridging and Scar Encapsulation".  And
11    it's four times power.  What does this show?
12        A.   All pores in this section of the
13    mesh are filled with scar tissue.  So normal tissue
14    is beyond the scar plate, and all the pores are in
15    the spaces in between, and mesh walls are filled
16    with scar tissue.
17        Q.   Okay.  The magnification of the
18    image on the prior page is five times this
19    magnification, correct?
20        A.   About, yes.
21        Q.   Okay.  And can you tell me by
22    looking at the image on page 23 in the cluster of
23    four circles, how close it is from the
24    polypropylene across the scar tissue to the normal
25    tissue?

31 (Pages 118 to 121)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 122

1     A.  In this area?
2     Q.  Yes.
3     A.  It would be within the 100 microns
4  or so.
5     Q.  Mark that -- good.
6     A.  (Witness complies).
7     In this case, it's thicker, could be as
8  thick as 200 microns.
9     Q.  Okay.
10     A.  It could be .2 millimeters,
11  roughly.
12     Q.  If you wanted to measure that on
13  the slides that you have, can that be done?
14     A.  With a eyepiece micrometer, yes.
15     Q.  Anything else remarkable about
16  Figure 2b other than showing the scar?
17     A.  Fiber bridging, and completely
18  encapsulating the entire structure of mesh pores
19  that fill the scar tissue, and normal tissue is
20  outside.  This is the mesh scar complex, or mesh
21  scar plate.
22     Q.  As you look at this image, is this
23  a complete slide?
24     A.  No, there is tissue beyond
25  slightly.  And this end, I think is here on the

Page 123

1  next page, page 24.
2     Q.  Okay.  We'll come to that in a
3  second.
4     A.  That's my recollection.
5     Q.  The figure on 2a, page 22, is
6  obviously a smaller part of a bigger slide, correct?
7     A.  That's correct.
8     Q.  And you believe that the image on
9  page 23 is also a smaller part of a bigger slide?
10     A.  I think most of the mesh is here
11  on the slide --
12     Q.  Um-hum.
13     A.  -- so there's not much mesh
14  beyond.
15     Q.  That's why I'm asking the
16  question.
17     Does the image that's shown on page 23
18  represent the outer boundaries of the mesh in that
19  slide?
20     A.  I think so.
21     Q.  Okay.
22     A.  I think so, there's an edge of
23  tissue here.  Now, this exactly piece of this --
24     Q.  You've now turned the page, you're
25  on page 24.  So you believe this is probably from

Page 124

1  the Edwards case, your best recollection?
2     A.  Yes.
3     Q.  And it's magnified ten times, and
4  this is the one that is a magnification of the far
5  right side of the image on page 23?
6     A.  Likely at different level.
7     Q.  What do you mean, a different
8  slide?
9     A.  Different slide, yes.
10     Q.  Okay.
11     A.  So it's the same piece, but cut
12  little deeper.
13     Q.  Now if you look on the top page of
14  page 24, top image, on the right side there's a
15  blue, that's again, displaced polypropylene?
16     A.  Yes, this is displaced
17  polypropylene.  And this as well (indicating).
18     Q.  Okay.  And that's an artifact due
19  to the microtoming process?
20     A.  It could've done that, yes.
21     Q.  And the description down below
22  again is "fibrous bridging and scar encapsulation",
23  does this image show anything in addition to what
24  we've talked about in the prior slides?
25     A.  This is a terminal pore.

Page 125

1     Q.  Sorry?
2     A.  This is a terminal pore of the
3  mesh.  So this is the edge of the mesh and the
4  terminal pore contains normal non-scar tissue.
5     Q.  When you say "terminal pore"
6  that's the outside pore?
7     A.  Yes, it is.
8     Q.  So what is the significance of the
9  terminal pore having normal tissue?
10     A.  It just shows comparison.  Pores
11  which are not filled with scar tissue, and pores
12  which are filled with scar tissue.  So this
13  specific pore contained normal scar tissue.  So
14  within that specific pore, there's no fibrous
15  bridging.
16     Q.  Is it fair to say every place we
17  see the blue, we see displaced polypropylene?
18     A.  Most of the time.  It can be just
19  a weird color of inflammation.
20     Q.  Okay.  Anything else remarkable
21  about the slide on page 24?
22     A.  No.
23     Q.  Okay.  Let's go to page 25.
24     A.  Yes.
25     Q.  This is cited to an article.  Do

32 (Pages 122 to 125)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 126

1  you know off the top of your head what article that
2  is?
3         A.  On the safety of synthetic sling
4  surgery, I believe.
5         Q.  Are you able to tell me what slide
6  that is, what plaintiff?  Strike that.
7             Is that a medical-legal slide?
8         A.  The picture comes from the same
9  case, as you can see it's exactly the same.
10        Q.  Okay.  Is B part of A?
11        A.  No, I don't believe so.
12        Q.  Let's talk about A.  And what does
13  the "BF" mean?
14        A.  "Bridging fibrosis".
15        Q.  And the "AT"?
16        "Adipose tissue"?
17        A.  Adipose tissue, yes.
18        Q.  What is the significance of the
19  adipose tissue?
20        A.  It's a normal non-scar tissue.
21        Q.  So what is the significance of
22  including this slide in your report if it's the
23  same thing that you had in the prior two slides?
24        A.  It's a little bit different.
25  Because, see, on the bottom, B, it shows scar

Page 127

1  tissue in a different stain.
2             Scar tissue may have some smooth
3  muscle, when the scar tissue is being remodeled by
4  myofibroblast.  Myofibroblast can have smooth
5  muscle.  But once it's mature scar tissue, there is
6  no contractile filament in the cells anymore, and
7  it doesn't stain with smooth muscles stain.
8             But, normal tissue of vaginal wall
9  contains smooth muscle.  So here you can see that
10  the fibers bridging, can be separated from normal
11  tissue by using smooth muscle stain.
12        Q.  And so the smooth muscle, or the
13  normal tissue is represented by the brown?
14        A.  Yes.
15        Q.  And this is another representation
16  of the fibrous bridging and scar encapsulations
17  depicted in blue?
18        A.  Yes.
19        Q.  Is that the only significance of
20  that stain?
21        A.  Yes.
22        Q.  Okay.
23        A.  For this specific picture, yes, it
24  is.
25        Q.  All right.  Are you able to tell

Page 128

1  me the magnification of that image?
2         A.  Close to times four maybe --
3  because there's cropping and then the size was --
4  now it's hard to -- it's much larger than it
5  appears in the publication.  So I would say for
6  this specific, it would be close to times four
7  objective.
8         Q.  If you go down here it says:
9             "Scar encapsulating mesh in
10            surrounding pre-existent normal
11            adipose tissue and muscle tissues, a
12            2.5 image of histological sections."
13            That means it's magnified 2.5 times.
14        A.  It means that the objective you
15  would use to produce this appearance in the
16  microscope, this would be times 2.5.
17        Q.  Okay.  But the degree of
18  magnification is different from that?
19        A.  On this page?
20        Q.  Yes.
21        A.  Yes.  Because it's cropped and
22  resized and the publication is much smaller.
23        Q.  I see.
24        A.  So if you trace it, if more
25  correctly to trace it, to trace is the objective,

Page 129

1  you would use to see like this in the microscope.
2         Q.  And you could use the optical
3  micrometer in order to measure to the extent
4  necessary?
5         A.  Yes, I can.
6         Q.  Anything else about this image?
7         A.  No.
8         Q.  Let's go to page 26, image 3a.
9         A.  Yes.
10        Q.  What's the purpose of this image?
11        A.  This image shows the nerve in H&E
12  stain.
13        Q.  What is the significance of
14  showing the nerve; just the fact that you can show
15  it?  Is there any damage to it or any issues
16  associated with it?
17        A.  It's normal nerve, it's present
18  within this mesh scar plate, it innervates the
19  tissue which is inside and outside of the mesh.  It
20  can become trapped.
21        Q.  Is it trapped in this image?
22        A.  Well, it is in scar tissue.  So
23  it's trapped in scar tissue.
24        Q.  Is there any indication that this
25  nerve is damaged in this image?

33 (Pages 126 to 129)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 130

1    A.  Not from this power, I don't see
2  any -- "damage", you mean atrophic degenerated or
3  damaged in terms of physical damage?
4    Q.  Any kind of damage.
5    A.  It is in scar tissue.  For a nerve
6  to be in scar tissue, is not a healthy environment.
7    Q.  But not all nerves in scar tissue
8  produce symptoms, correct?
9    A.  Not all.
10    Q.  And you can't tell by looking at
11  this image, whether the nerve in Figure Set 3a is
12  producing any symptoms, correct?
13    A.  Again, it depends on timing.  It
14  may produce symptoms at one time and not produce at
15  another time.
16    If this specific nerve was producing
17  pain sensation, it would be difficult to determine.
18    Q.  But you can't tell, looking at the
19  nerve in Figure Set 3a, whether that nerve is
20  producing symptoms for this patient, correct?
21    A.  I can tell you that this nerve is
22  in a situation when it can produce symptom.  This
23  is the main thing I can say, it can because it is
24  in an abnormal environment.
25    Q.  And the abnormal environment is

Page 131

1  the presence in the scar tissue?
2    A.  Yes.  In addition to be present
3  inside the mesh.
4    Q.  Okay.  Well, it's adjacent to the
5  mesh, correct?
6    A.  I don't know.  There might be
7  fiber right there.
8    Q.  Okay.
9    A.  So it can be inside or outside, it
10  doesn't matter.  It's in scar tissue, it's abnormal
11  environment, it can produce mesh.  And we know that
12  traumatic neuromas, which is the formation of a
13  mesh in scar tissue, is a painful lesion.  This is
14  an established fact.
15    Q.  But there's no traumatic neuroma
16  in this image, correct?
17    A.  A mesh is deformed, we can see
18  it's getting there.
19    Q.  Can you see a traumatic neuroma in
20  this image, 3a on page 26?
21    A.  The formation is not significant
22  to call it a traumatic neuroma.  So in this
23  specific image, I would not use that term.
24    Q.  Now, can you tell whether the
25  nerve on page 26 that you show is a motor nerve?

Page 132

1    A.  It's a mixed nerve.
2    Q.  What do you mean by "mixed nerve"?
3    A.  "Mixed" means they're both
4  afferent and efferent, or motor and sensory signals
5  going back and forth.
6    Q.  How can you tell it does both?  Do
7  all nerves do both?
8    A.  Peripheral nerves, yes.
9    Q.  All of them?
10    A.  Except for head.
11    Q.  Okay.  So are all nerves in the
12  body, peripheral nerves, capable of mediating pain?
13    A.  Except for cranial nerves.
14    Q.  Okay.  And what's the basis for
15  your understanding in that regard?
16    A.  It's a basic knowledge, it's in
17  the textbooks.
18    Q.  Okay.
19    A.  There is some very small
20  proportion of nerves, peripheral nerves, less than
21  5 percent, which are only sensory.  So some of the
22  nerves will be only sensory.  But there are almost
23  no, only motor nerves outside of the cranial
24  nerves.
25    Q.  Can you, by light microscopy,

Page 133

1  distinguish among the type of nerves which you see?
2    A.  What do you mean, what type of
3  nerves?
4    Q.  Well, sensory and motor nerves?
5    A.  We just agreed that they're all
6  mixed.
7    Q.  You said that, okay.
8    Is there any way for you to distinguish
9  by light microscopy which nerves are capable of
10  mediating pain?
11    A.  They all are.
12    Q.  Okay.  5 percent you said, where
13  are they?
14    A.  5 percent is still sensory.  So
15  all of them can deliver pain.  Some of them,
16  5 percent, may not be able to do any motor
17  function, but they will still be able to transmit
18  pain.  And it also depends on the size, because
19  once you go into the very small branches, they
20  become more specialized.  If you go into the large
21  trunk, then you get all of them mixed together.
22    Q.  When you talk about going into the
23  nerve twigs, that's what you're talking about,
24  right?
25    A.  Fibers, individual fibers, yes.

34 (Pages 130 to 133)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 134

1    Q.   Then they become more specialized;
2  what do you mean by that?
3    A.   So they may have more function for
4  sensory or motor function.
5    Q.   So as the nerves break into twigs,
6  will there be some nerves that don't mediate pain,
7  or they still mediate pain?
8    A.   Fibers.  If you go into fibers
9  which is even smaller than twigs, which is
10  individual axon, those will have individual
11  function.
12    Q.   And what are we looking at nerves
13  here; are we looking at twigs, fibers, or are we
14  looking at nerves?
15    A.   It's a nerve.  It's thicker than a
16  twig.
17    Q.   Okay.  And what is remarkable
18  about what you see in Figure 3a; anything more than
19  you've just described, the presence of a nerve
20  adjacent to mesh?
21    A.   No, just everything else -- we
22  discussed everything significant.
23    Q.   Now, the polypropylene in the
24  lower left-hand corner image, that's blue
25  polypropylene, correct?

Page 135

1    A.   That's correct.
2    Q.   And it's folded over as a part of
3  the sample preparation process or microtoming
4  process, correct?
5    A.   That's correct.
6    Q.   This is a 4 micron thick slide,
7  correct?
8    A.   About 4 microns, plus or minus.
9    Q.   I don't see bark on that
10  polypropylene.  Do you see any bark on the
11  polypropylene?
12    A.   There is a faint line here, I
13  don't know if it's there or not.
14    Q.   When you say "there," you're not
15  pointing to the polypropylene.  You're pointing to
16  the circular area to the left of the polypropylene
17  adjacent to the tissue, correct?
18    A.   Yeah.  Curving linear, yes.
19    Q.   And you're suggesting that that
20  may be some bark?
21    A.   Yes.
22    Q.   And why do you say that?
23    A.   Because it looks like it.
24    Q.   Okay.  And this is magnified at 20
25  times?

Page 136

1    A.   Yes.  For this specific image,
2  about 20 times -- 20 times objective magnification.
3    The magnification itself is higher,
4  because there's also an eyepiece, but eyepiece is
5  fixed.
6    Q.   Look at the right side of that
7  image with the polypropylene.  It's folded over, on
8  the right side; you'd agree with me there is no
9  bark?
10    A.   Not visible bark.
11    Q.   Okay.  If we go to page 27, set
12  3b.
13    So 3a comes from the images from the
14  consolidated cases, correct?
15    A.   That is correct.
16    Q.   So we should have this slide, I
17  think.  So paragraph 3b, so set 3b on page 27 says,
18  "additional TVT cases".
19    Are you able to tell me from which case
20  this slide comes?
21    A.   I can only tell you that the top
22  panel is from a newer case, and the bottom is
23  likely from an older case.
24    Q.   So they're two separate cases?
25    A.   Yes.

Page 137

1    Q.   Do you have any idea from looking
2  at this, how long the mesh was implanted in these
3  people?
4    A.   No.  Not at this magnification.
5    Q.   And other than showing the
6  presence of nerves within the mesh scar plate like
7  you did on page 26, is there anything significant
8  about your findings on page 27?
9    A.   The only difference is that in top
10  panel, you can clearly see that this nerve is
11  within the pore.
12    Q.   Are you suggesting that this nerve
13  is inside of a single pour in the mesh?
14    A.   Somewhere within the mesh.
15    Q.   Okay.  Not within the pore itself?
16    A.   It can be within the pore.
17    Q.   Do you know?
18    A.   It also depends how you define the
19  pore.  Pore is a hole in the mesh structure, yes,
20  it is within the space in the mesh structure.
21    Q.   This is 20 times magnification,
22  how far is it from one yellow to the other yellow?
23    A.   At 1.5 millimeter.  Between 1 and
24  1.5 millimeter.
25    Q.   Is there anything abnormal about

35 (Pages 134 to 137)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 138

1    the nerve that's depicted on page 27 in the top
2    frame?
3              A.   It's in the scar and it's in the
4    mesh, that is abnormal.
5              Q.   Other than being in the scar
6    plate, is there anything you can tell by light
7    microscopy about abnormality in that nerve?
8              A.   Otherwise, the nerve looks
9    healthy, it would conduct pretty healthy pain
10   signals.
11             Q.   Okay.  Same thing for the lower
12   frame.  Other than the presence of the nerve within
13   the scar tissue, is there anything that you can
14   tell from light microscopy about the general health
15   of the nerve?
16             A.   Same thing, it's not degenerated,
17   therefore, it can conduct pain signal.
18             Q.   As you look at the image on the
19   lower left on 3b, the white in that image, again,
20   is where polypropylene was?
21             A.   Yes.
22             Q.   And as you come down around from
23   about 6 o'clock to about 9 o'clock, there's no bark
24   there, is there?
25             A.   No.  I don't think so.

Page 139

1              Q.   Let's go to page 28.  Page 28 is
2    additional TVT cases.
3              Is this one mesh or two?  One patient
4    or two, I guess I should say.
5              A.   This is hard to say, both are come
6    from earlier cases.  I probably have thousands of
7    images by now, so it will be hard.
8              Q.   But you can't tell me from which
9    patient they come, or which case they're from?
10             A.   I may or may not be able.  It
11   would be checking if it's in a specific folder or
12   just in pooled images.
13             Q.   And your description again, below
14   is, "Innervation within the mesh scar plate, H&E,
15   20 times magnification."
16             Other than showing the presence of
17   these nerves in the mesh scar plate, is there
18   anything that indicates to you by light microscopy
19   that these nerves are unhealthy?
20             A.   Well, it's the location.  You see,
21   it's slightly curved, it's inside the pore.
22             Q.   Which one are you talking about
23   now, please?
24             A.   The upper panel.
25             Q.   Okay, thank you.

Page 140

1              A.   There are two nerves, one is here,
2    one is there (indicating).
3              Q.   And you indicate that with your
4    two arrows --
5              A.   This one is gone.
6              Q.   Okay.
7              A.   So it is a location -- it's not
8    the nerve itself, it's the location is abnormal.
9              Q.   Is there anything that you can
10   tell me by looking at this image by light
11   microscopy that these nerves were producing
12   symptoms in the patient?
13             A.   The question is, if they can.
14             Q.   Can you tell me by looking at this
15   image in set 3c, that these nerves are causing
16   symptoms in the patient?
17             MR. ORENT:  Objection.
18             THE WITNESS:  Again, as a pathologist,
19   I can only estimate the probability.  If it can, if
20   it's in abnormal location, if it's causing a lot --
21   first of all, it's out of the body now, so it
22   cannot cause anything.  But when it was in the
23   patient, it could.
24             BY MR. THOMAS:
25             Q.   Could?

Page 141

1              A.   Could produce symptoms all the
2    time, or one specific time, or only once in a
3    specific moment, it's hard to say.
4              Q.   And it could be a nerve positioned
5    as it is, that never produced any symptoms, true?
6              MR. ORENT:  Objection.
7              THE WITNESS:  Some of them probably not
8    producing anything.
9              BY MR. THOMAS:
10             Q.   Okay.  And the same thing about
11   the image below on Figure Set 3c on page 28, other
12   than presence of the nerves in the mesh scar plate,
13   anything remarkable about this image?
14             A.   No.  Nothing beyond what we've
15   discussed.
16             Q.   Let's go to page 29.
17             A.   Yes.
18             Q.   What are we showing on page 29?
19             A.   The same features of innervation
20   of the mesh scar plate.  But now in S100 stain.
21             Q.   Now, is there anything other than
22   presence of these nerves in the mesh scar plate
23   that indicates to you that these nerves were
24   causing pain in the patient?
25             A.   They are in abnormal location.

36 (Pages 138 to 141)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 142

1    Q.  And we've already agreed that
2  nerves, even in an abnormal location, may not be
3  producing pain, correct?
4    A.  Yes, but more likely they will
5  produce pain.
6    Q.  Are you saying that every nerve
7  within the mesh scar plate more likely than not is
8  going to cause pain?
9    A.  Through one mechanism or the
10  other, there will be zero mechanism at one point
11  that can produce pain, it may not be chronic pain
12  continuous, but I mean, in a specific movement you
13  have start forming the mesh, so it can cause pain.
14    Q.  Let's talk about this for a
15  minute.  Doctor, if you look at page 29, and 28,
16  and 27 and 26 --
17    A.  Yes?
18    Q.  -- it's fair to understand that
19  for every mesh implantation, there are going to be
20  nerves that are going to be in scar tissue.
21    A.  Are you talking for all meshes?
22  Regardless of location, or just --
23    Q.  I'm talking about slings.  Stress
24  urinary incontinence slings, TVT, Prolene.
25    A.  So for slings, there will be

Page 143

1  innervation, at least those samples I examined,
2  there will be innervation in all of them.
3    Q.  Okay.  And complaints of pain for
4  slings, TVT slings, you'll agree is less than 5
5  percent?
6    MR. ORENT:  Objection.
7    THE WITNESS:  For the specimens I
8  received?
9    BY MR. THOMAS:
10    Q.  I'm talking about the studies on
11  the topic?
12    MR. ORENT:  Objection.  Outside the
13  scope.
14    THE WITNESS:  Now we're talking about
15  what I received and what is still in the body.
16  Because studies were clinically done based on
17  clinical -- clinical symptoms for the samples or
18  slings which are still in the body.
19    BY MR. THOMAS:
20    Q.  Very simple question.
21    How do you explain findings in the
22  clinical studies that pain is a complaint of
23  patients in less than 5 percent of the time, when
24  you say in every mesh that you see, that there are
25  nerves within the scar plate?

Page 144

1    A.  Well, first of all, let's start
2  with 5 percent.
3    That number would have to be specific
4  for our study.  There is a range of reported pain
5  anywhere from 5 to 40 plus percent.  It depend on
6  methodology, if the patients were followed in time
7  correctly, if there was correctly of follow up
8  time.  So the 5 percent is a questionable number.
9    Q.  Can I interrupt you there, if you
10  don't mind.  Let's take your upper bound of
11  40 percent?
12    A.  Yes.
13    Q.  So you have, by your own
14  statement, even in the worse case scenario, you
15  have 60 percent of the sling patients who don't
16  experience pain, correct?
17    A.  Who do not complain to the point
18  when it's recorded.
19    There are multiple reasons why it may
20  not be recorded, they may still experience some
21  pain.  Maybe it's not serious enough to be
22  recorded, maybe it's not serious enough -- there
23  will be some patients which have no pain at all.
24  There will be some patients which have so little
25  pain, only in a specific moment, that it's not

Page 145

1  worth reporting.  Some of them don't report it and
2  so forth.
3    And then there will be patients that
4  there is so severe pain, the mesh needs to come
5  out.  There will be a range of sensations and
6  personal perception.
7    So, from my perspective, when I examine
8  specimens, I report what is abnormal.  To what
9  degree it's causing clinical symptoms, it depends
10  on many factors.  If you want to -- you cannot look
11  at the human body as a machine.  I mean, there is
12  part missing, it's not going to work.  Or if there
13  is wire loose, I mean, it may cause some problems.
14    So, there will be a range of -- or
15  degree of pain sensation and a range of personal
16  attitude so this will effect the recording of
17  clinical symptoms.
18    On the histology side, again, there
19  will be a range of how many nerves are involved,
20  one or two, or a really high density.  To what
21  degree they are involved, some of them will have
22  such a strong deformation, that there is
23  100 percent probability that it will cause pain.
24    Q.  Let me ask this question --
25    A.  So that's the complexity of the

37 (Pages 142 to 145)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 146

1    situation. I mean you cannot separate it sharply,
2    okay, 5 percent for this, 5 percent for that. It
3    can cause a pain. This is abnormal location, this
4    is abnormal situation, this is a pathological
5    finding.
6         Q. Let's talk about this for a
7    minute. So the pages we've just been through,
8    we've talked about, on pages 26, 27, 28 and 29, and
9    it goes on to 30 and 31, and on to 33. But just
10   for those for now.
11        Is it fair to understand that in every
12   mesh that you've analyzed - regardless of
13   manufacturer - in the pelvic floor, for treatment
14   of stress urinary incontinence, you find nerves in
15   scar tissue?
16        A. Yes.
17        Q. Okay.
18        A. The degree of innervation will be
19   different, there will be a degree of also nerve
20   deformation within the mesh, but strictly saying
21   there will be innervation of the scar plate in
22   almost all patients.
23        Q. Have you made any attempt to
24   differentiate across manufacturers, the extent to
25   which the innervation of the scar plate varies?

Page 147

1         A. No.
2         Q. Have you made any attempt to
3    differentiate across types of mesh products, the
4    extent to which nerve innervation varies?
5         A. I may in the future, I haven't
6    done it yet. But I may in the future.
7         Q. Okay. So is it fair for me to
8    understand, and the record to reflect, that for
9    every mesh implanted for the treatment of stress
10   urinary incontinence, it's your opinion that there
11   will be nerve innervation within scar plate, that
12   you think is capable of causing pain?
13        MR. ORENT: Objection. I think his
14   testimony is every mesh that he's looked at.
15   Manufactured, that he's looked at.
16        I don't think Dr. Iakovlev has any
17   opinions about mesh he's never looked at, brands
18   he's never looked.
19        THE WITNESS: Yeah, that's correct.
20        BY MR. THOMAS:
21        Q. Okay. Let me ask you this question --
22        A. Let's repeat the question, then I
23   can answer it in more...
24        MR. THOMAS: Would you read it back,
25   please?

Page 148

1         -- REPORTER'S NOTE: Question read as
2    recorded above.
3         THE WITNESS: Oh, as I said, I can only
4    testify or make opinions of what came out of the
5    specimen. And I told you earlier, that there is --
6    I have been dealing with those specimens which
7    caused complications already.
8         BY MR. THOMAS:
9         Q. For every mesh sample that you've
10   looked at for mesh use for the treatment of stress
11   urinary incontinence, have you found mesh
12   innervation in the scar tissue?
13        A. Almost all, yes.
14        Q. Any you haven't?
15        A. If it was a small sample, maybe
16   one or two, I couldn't find nerves.
17        Q. Is that because -- do you have an
18   opinion, is that because the sample was too small,
19   because it didn't exist, or do you have an opinion?
20        A. I cannot say beyond that, I just
21   didn't find it. It could be sampling issue, it
22   could be not. Again, I cannot state what I don't
23   know.
24        Q. And how many have you seen?
25        A. Individual cases.

Page 149

1         Q. How many have you seen?
2         A. Less than five.
3         Q. How many total cases have you
4    seen?
5         A. Oh, from slings?
6         Q. Yes.
7         A. About 100.
8         Q. About 100. And less than five you
9    have not seen nerve innervation within scar tissue?
10        A. Yes.
11        Q. And you don't know whether that's
12   because it is a sampling error or because there
13   wasn't any nerves in the scar plate?
14        A. That's correct.
15        Q. Is it fair to say, based on your
16   experience as a pathologist, that you would expect
17   that when mesh is placed for the treatment of
18   stress urinary incontinence, that nerves would be
19   encapsulated by the scar tissue in the healing
20   process?
21        A. They can. If they become trapped
22   in the scar tissue, each single implanted mesh, we
23   would have to do autopsy series. I cannot go
24   beyond what I see in explanted meshes, and all
25   explanted meshes came out for complications. And

38 (Pages 146 to 149)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 150

1    almost all of them, or a large proportion had pain
2    as a symptom.
3         Q.   Again, the cases you've received
4    have been complications?
5         A.   Yes.
6         Q.   And of course you know that people
7    have mesh removed for reasons other than pain,
8    don't you?
9         A.   In hernia surgery, yes.
10        Q.   Do you know whether or not
11   patients have mesh removed for reasons other than
12   pain?
13        MR. ORENT:   Objection.
14        THE WITNESS:   There might be an
15   overwhelming other complaint, like erosion or
16   infection, but in almost -- I don't want to stick a
17   number, but most of these patients complain of some
18   degree of pain.
19        BY MR. THOMAS:
20        Q.   Have you have investigated, as a
21   part of your work in this case, the reasons why
22   patients have mesh removed?
23        A.   There's always a reason.
24        Q.   I understand that.  Do you know
25   what they are, and percentage wise, how they

Page 151

1    breakout across a patient population?
2         A.   You mean the driving reasons for
3    implantation?
4         Q.   Yes.
5         A.   It's in the paper.  At least in
6    those 164 samples.
7         Q.   And that's the paper you did with
8    Dr. Blaivas?
9         A.   No.  The degradation paper.
10        Q.   Okay.
11        A.   But there's always a driving
12   reason for explantation.  There may be driving
13   reason for explantation is erosion, but then pain
14   is attributed to erosion.  So it's not indicated as
15   a main reason of explantation.
16        Q.   You can have voiding dysfunction?
17        A.   Okay.  In a voiding dysfunction,
18   but again, voiding dysfunction usually what
19   happens, you have a strong compression against
20   urethra, and this produces pain due to compression.
21   So there will be a mixture of mechanisms for pain.
22        Q.   Are you suggesting that voiding
23   dysfunction is subsumed within the pain that's
24   reported in these studies?
25        MR. ORENT:   Objection.

Page 152

1         THE WITNESS:   No, it's combined.  It
2    can be combined, this pain.
3         BY MR. THOMAS:
4         Q.   Okay.
5         A.   To cause void and dysfunction,
6    even to compress urethra to a degree that the
7    outflow is obstructed.
8         Q.   Are you aware of any studies which
9    have analyzed meshes removed because of pain,
10   compared to meshes removed for other reasons in
11   comparing the histology of those meshes?
12        A.   We're doing some work in hernia
13   specimens.
14        Q.   But in terms of published
15   peer-reviewed studies today, are you aware of any
16   studies out there, which compare the histology of
17   meshes removed for pain, and meshes removed for
18   non-pain reasons?
19        A.   That's a very good question.  Why,
20   after 50 years and a large proportion of specimens
21   removed for pain, there is no histology study.  Why
22   has this not been done?
23        Q.   So did you do a literature search
24   of that?
25        A.   Of course I did.

Page 153

1         Q.   And you didn't find any studies
2    that compared the histology of mesh removed from
3    patients who complained of pain, compared to the
4    histology of patients who had mesh removed for
5    non-pain reasons?
6         A.   There were descriptions in hernia
7    publications.  I mean in meshes removed for hernia
8    repair.
9         Q.   Which studies, do you remember?
10        A.   2005, Klosterhalfen.  He put the
11   picture of deformed nerve, and he states that in
12   his experience, over 60 percent of the meshes
13   removed for pain have some degree of nerve
14   involvement.
15        Q.   Do you view Dr. Klosterhalfen as
16   authoritative in this area?
17        A.   Yes.  He's an authority, he's one
18   of the oldest researchers.
19        Q.   Do you know whether Dr.
20   Klosterhalfen has ever investigated the precise
21   question about whether the histology of mesh
22   removed for indications of pain is different from
23   the histology of mesh for -- from patients removed
24   for non-pain reasons?
25        A.   That's what he stated.  Over

39 (Pages 150 to 153)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 154

1    60 percent of the specimens removed for pain showed
2    nerve involvement.
3         MR. ORENT: Before we go on to the next
4    question, you had cut Dr. Iakovlev off from
5    answering. He started to say "but there are other
6    authors", if you want to just continue.
7         THE WITNESS: Yes. There are other
8    descriptors of meshes removed for pain, and they
9    would find nerve involvement with traumatic
10   neuroma. Those are, I think individual cases, not
11   the series.
12        Again, same histology. They were
13   trying to figure out what was wrong, what was
14   causing pain, and they found nerve involvement.
15   And that was done before I started researching my
16   nerves.
17   BY MR. THOMAS:
18        Q.  Would you expect more or less
19   inflammation to be seen in histology of meshes
20   removed for pain than meshes removed for non-pain
21   reasons?
22        A.  To a degree. My research in
23   hernia showed that foreign body inflammation is a
24   component of pain mechanism. So those meshes which
25   were removed for pain only, they continue to have

Page 155

1    relatively steady, pronounced foreign body reaction
2    many years after implantation.
3         And those which were removed for
4    recurrence, they show a trend down. So at the
5    beginning, there is inflammation, then it goes
6    down.
7         So by the time of explantation, if it
8    happens eight years or ten years after
9    explantation, foreign bodies subsided; which is
10   different from those which were removed for pain.
11        Q.  So are you able, from your
12   research, in your work, to form an opinion as to
13   whether mesh removed for purposes of pain, the
14   histology will show higher rates of inflammation
15   than the histology for meshes removed for non-pain
16   reasons?
17        A.  So before we go into the
18   individual findings, you're trying to split it into
19   what is causing the pain, nerve entrapment and
20   inflammation or something else.
21        This is a complex process. There are
22   multiple factors which are playing, together with
23   patient perception of pain and reporting of pain.
24        So with this type of complexity, we
25   cannot separate one individual feature. Overall,

Page 156

1    there's a pool, if we collect enough, we can see
2    the difference. For each individual patient, how
3    much of this feature, or that feature is playing a
4    role in each individual symptom, will be very
5    different from patient to patient.
6         So overall, the higher degree of
7    foreign body reaction is associated with higher
8    rates for chronic pain.
9         Q.  And that's based on your research
10   or other published research?
11        A.  Foreign body has been worked up
12   quite a bit in published histological studies. How
13   much of that was specifically determined, comparing
14   two groups or three groups, it's difficult to say,
15   I don't remember right now.
16        So it is a combination of what was
17   published before, and what I find in my samples, so
18   that's -- that would be a basis for my opinion.
19        Q.  Is it your opinion that results in
20   the hernia literature on the issue of association
21   between inflammation and pain, are transferrable to
22   the pelvic floor?
23        A.  Some are, yes. Not everything,
24   but some are.
25        Q.  Okay. And why would it not be?

Page 157

1        A.  There are different anatomical
2    locations, different physical factors acting on the
3    scar plate. It also crosses many anatomical planes
4    in the pelvis. While in the abdominal wall, and
5    it's parallel to anatomical planes.
6         Q.  I'm trying to get through this for
7    a second. If you'll look at pages 30, 31, 32 and
8    33. Are the images on those pages additional
9    depictions of nerves within the mesh scar plate?
10        A.  That's correct.
11        Q.  Is there anything else significant
12   about those images other than they show innervation
13   within the mesh scar plate?
14        A.  No.
15        Q.  On page 33, Figure Set 3h, in the
16   upper right-hand corner, you've called out what
17   you've described as a "neurovascular bundle"; what
18   is that?
19        A.  Most of the larger nerves in the
20   medium size arteries, become together. One artery,
21   two veins, and one nerve, that's how it works. And
22   the nerve just starts bleeding, so the nerve goes
23   its way and artery goes its own way.
24        So in this specific case, an artery and
25   a nerve are still together.

40 (Pages 154 to 157)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 158

1    Q.   Okay.  The brown is the nerve,
2  correct?
3    A.   Yes.  I mean, there are some other
4  brown, probably picking up some other stuff, but
5  this is --
6    Q.   Where is the artery?
7    A.   In the blue.  You can see
8  streaming, it's not a really high resolution.
9    Q.   What is the significance of the
10  neurovascular bundle as depicted in that image?
11    A.   Well, see, it is in the tight
12  spot.  So this is really as compartmentalized as it
13  gets, and slightly deformed.
14    So if you move this mesh around, the
15  fibers will start compressing on the neurovascular
16  bundle.  It may cause obliteration of the artery,
17  or can impinge the nerve.
18    Q.   Is there any impingement shown in
19  this image?
20    A.   Well, it's deformed.
21    Q.   Is there any impingement shown?
22    A.   It does, because it's deformed,
23  it's curved.
24    Q.   And you're referring now to the
25  lower right-hand image?

Page 159

1    A.   That's correct.
2    Q.   Is there anything you can tell by
3  looking at that image, whether that curved nerve
4  was causing pain in this patient?
5    A.   I can say the probability of this
6  causing pain is much higher than a nerve which is
7  not deformed.  Like something like this on page 31.
8    Q.   You can't rule out by looking at
9  the image on page 33, where you show the curved
10  nerve, you can't rule out that that nerve is not
11  causing pain, correct?
12    A.   I think we're going back to the
13  same issue.  You're taking human body as a machine,
14  it's not.  Medicine doesn't happen like that.  So
15  there are many, many, many factors which cause.
16    If the same image we put in MRI image,
17  and this deformation would be on the root coming
18  from the back, the radiologist would report that
19  there's impingement of a root.  And that's how back
20  pain occurs that's radiating to the leg, and so
21  forth.  So this is a much smaller scale, the same
22  mechanism.
23    Q.   Do you know whether this patient
24  was complaining of pain?
25    A.   Most likely she was.

Page 160

1    Q.   Do you know?
2    MR. ORENT:  Objection.
3    THE WITNESS:  With 100 percent
4  certainty, no.
5    BY MR. THOMAS:
6    Q.   Okay.  And you talked about an
7  obliteration of the artery.  Does the image on
8  page 33 in the upper right show an obliteration of
9  the artery?
10    A.   No, not this image.
11    Q.   Other than the nerve impingement
12  that you've described, and the potential for
13  obliteration of the artery, is there anything
14  unusual about the depiction of the nerves in those
15  images?
16    A.   No.
17    Q.   And I need you to go back, because
18  I didn't ask you that question about the prior two
19  pages, 30 through 32.
20    Other than the depiction of the nerves
21  within the scar plate, is there anything about the
22  nerves that are seen there that cause you any
23  concern about the potential of those nerves to
24  cause injury?
25    MR. ORENT:  Objection.

Page 161

1    THE WITNESS:  So going back to
2  mechanisms of pain.  So there are two mechanisms,
3  or two major groups of mechanisms to cause pain.
4  First, you affect the nerve itself.  So you impinge
5  it, squeeze it, becomes deformed and that can be
6  felt as pain, the nerve itself, the nerve trunk.
7    The second group of mechanisms is when
8  you affect the receptors.  And the receptors can be
9  affected, it can be again a mechanical trauma,
10  cutting, compressing, burning, chemical trauma,
11  ischemia, then the receptors are signalling pain
12  through the nerve.  So for smaller branches, the
13  significance is that the receptors now can pick up
14  the signal of nerves -- of pain, and then it will
15  be delivered through these branches, so it just
16  shows that this tissue can sense pain.
17    BY MR. THOMAS:
18    Q.   Okay.  This tissue is capable of
19  sensing pain?
20    A.   Yes.
21    Q.   Not that it is in fact sensing
22  pain in the body at the time?
23    A.   If you have other mechanisms to
24  deliver pain, it will be -- it will be causing
25  pain.

41 (Pages 158 to 161)

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 162

1    Q.   Correct.
2    A.   Now, if you go to page 33, this
3  will be an example where it would be directly
4  effecting the nerve trunk.  Impingement of the
5  nerve.
6         Q.   Now, are you able, in these
7  images, 30 to 33, to show me any nerve receptors?
8    A.   You mean receptors, nerve endings.
9  When it goes really small, you can see really
10  fiber, and it is -- most of the ends will have no
11  staining, because they just disappear.  But I mean,
12  you'd have to go in higher magnification.
13         Q.   So with the magnification you have
14  here, you're not able to identify any nerve
15  receptors; is that fair?
16    A.   No, not in these pictures.  It's
17  too small magnification.
18         Q.   I have to ask the question again
19  because you answered "no" to a negative question.
20  It's fair to understand that based on
21  the magnification that you have in these images on
22  pages 30 to 33, you can't identify any nerve
23  receptors, correct?
24    A.   I cannot see nerve receptors at
25  this degree of magnification.

Page 163

1         Q.   Thank you.
2         If you go to page 34, what is the
3  significance of this image?
4    A.   This shows another severely
5  deformed nerve.  So this would be a mechanism for
6  pain through impingement.
7         Q.   And the severely deformed nerve as
8  you described it, is the brown portion, stained
9  brown?
10    A.   The dark brown portion or dark
11  brown structure.
12         Q.   And in the lower left-hand corner,
13  the white area is where the polypropylene is or
14  was, correct?
15    A.   That's correct.
16         Q.   And what's the significance of the
17  dark blue and the border of that area?  Is that the
18  staining mechanism, or does that tell you anything?
19    A.   Can you point it?  So significance
20  of what?
21         Q.   The darker blue.
22    A.   This dark blue?
23         Q.   Yes.
24    A.   That's inflammation.
25         Q.   Okay.  And the upper is 2.5 power,

Page 164

1  and the lower one was four times; is that correct?
2    A.   It's a typo, it should be 40.
3         Q.   40?
4    A.   40.  Somewhere between 40 X and 50 X.
5  Again, the cropping factor there, the magnification
6  there is not exactly...
7         Q.   And these are, again, additional
8  TVT cases, and you have not supplied us the slides
9  for these cases, correct?
10         MR. ORENT:  Objection.
11         BY MR. THOMAS:
12         Q.   In this case?
13    A.   That's correct.  These are
14  previous TVT cases.
15         Q.   On page 35 --
16    A.   Yes.
17         Q.   -- you suggest degeneration of
18  affected nerves; tell me what you mean by that?
19    A.   So you see the inner portion of
20  the nerve lost myelination.  So there is
21  degeneration of myelin sheath in the nerves.  It
22  means that these nerves cannot deliver, or most
23  likely not deliver irregular signals.
24         So earlier you were asking about the
25  abnormality, this is the abnormality that we're

Page 165

1  talking about, this is the nerve degeneration.  In
2  this case, if this part is sensory, inside, it
3  means that the area is numb.
4         This part of the nerve cannot sense
5  pain or innervation of that part of the body, which
6  goes through this nerve, may not experience any
7  pain; it's numb.
8         Q.   And that's the portion you're
9  referring to in the lower right-hand image with the
10  arrow, correct?
11    A.   That's correct.  So the
12  abnormality of the neural section indicates the
13  other process, of loss of sensation, loss of pain
14  sensation.
15         Q.   Do you know what a Renaut body is?
16    A.   Say that again.
17         Q.   Do you know what a Renaut body is?
18  R-E-N-A-U-T.
19    A.   I think I've seen this term, but I
20  don't remember it.
21         Q.   Okay.  Does the S100 stain all
22  components of the nerve?
23    A.   It only stains schwann cells.
24         Q.   When you reached the opinion on
25  page 35 that that shows a degeneration of the

42 (Pages 162 to 165)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 166

1  nerve, did you rule out the presence of nerve
2  structures other than schwann cells that might be
3  present?
4          A.  There might be axons still there,
5  but that's not the point.  The point is the nerve
6  is degenerating.
7          Q.  And what's the clinical impact of
8  the degenerated nerve?
9          A.  I just told you.  There are
10  fibers, which are in the area, mainly not function.
11  It means that if they are sensory fibers, they may
12  not deliver signals.  So that area which is
13  innervated through those fibers, will be numb.  You
14  will not feel anything in that area.
15          Q.  So it will not cause pain?
16          A.  In the reverse, it will not feel
17  anything.
18          Q.  But if it doesn't feel anything,
19  does that mean that it does not cause pain?
20          A.  Including pain.  It will not feel
21  touch, it will not feel temperature, it will not
22  feel pain.
23          Q.  Okay.  Anything else remarkable
24  about it then?
25          A.  No.

Page 167

1          Q.  If you go to page 36, Figure Set 4.
2          A.  Yes.
3          Q.  You have, "A neural ganglia in
4  additional TVT cases."
5          Again, these are cases that you
6  previously worked up?
7          A.  That is correct.
8          Q.  What is a neural ganglia?
9          A.  Neural ganglion is like a switch
10  box, or connection box for the autonomous
11  neuro system.  The neuro system which is
12  innervating in the organs rather than skin and
13  mucosa.
14          Q.  What is the significance of the
15  presence of this image of the neural ganglion?
16          A.  It tells you that some of the
17  nerves, which we see in the specimens are
18  autonomous.  So some of them go into the bladder.
19  That's one -- well, one important aspect of this.
20          The second important aspect is that the
21  ganglia themselves can be affected by the image.
22          So in first case, the nerves can be
23  affected, which are further away from the ganglia.
24  And second case scenario, the ganglia themselves.
25          Q.  Is there anything about this image

Page 168

1  on page 36 -- strike that.
2          This is one image, the second one
3  you've labeled, so it's just one image?
4          A.  That is correct.
5          Q.  Is there anything about the image
6  on page 36, that you can tell by light microscopy,
7  that there's anything abnormal about the ganglia
8  that's depicted there?
9          A.  To begin with, as we saw the
10  nerves, the location was abnormal.  So it's in the
11  scar tissue and it's inside the mesh.
12          Q.  Is that the only thing about this
13  image and the ganglia that causes you concern?
14          A.  No.
15          Q.  What else?
16          A.  I mean, that's about it.  I don't
17  have any other concerns.
18          Q.  Thank you.  Page 37 you have:
19  "Innervation of mucosa overlying the mesh, H&E and
20  S100 of the same tissue area, four times.
21  Additional TVT cases."
22          Again, these are cases outside of the
23  consolidated group, correct?
24          A.  That is correct.
25          Q.  And are all these images just four

Page 169

1  times?
2          A.  The degree of magnification on the
3  top image is slightly lower, and magnification on
4  the lower is slightly higher.  Again, this is
5  not -- it's hard to say exactly what's the degree
6  of magnification.  Because they've been taken
7  through a camera and sort of objective, and then
8  cropped, and then resized to be reprinted so...
9          Q.  What is the significance of the
10  image on the top where you showed mucosa, distorted
11  mucosa, and a measurement of 1 millimeter?
12          A.  Significance is that the mesh is
13  right under the mucosa.  So, if you touch the
14  mucosa, even if it's light pressure, it immediately
15  gets compressed into the mesh.  It can be exposed,
16  I mean, the mucosa can breakdown.
17          Q.  This is from the Edwards case,
18  isn't it?
19          A.  It could be, I don't know.  It's
20  old picture, it could be from the Edwards case.
21          Q.  And this does not show an
22  exposure, correct?
23          A.  It's not exposed, yes.
24          Q.  It's not an erosion either yet?
25          A.  In this specific image, it's not

43 (Pages 166 to 169)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 170

1    exposed.
2         Q.  Okay.  And what's the significance
3    of the distorted mucosa?
4         A.  Probably, it was getting close to
5    the exposure site.  I don't remember specifics.
6         Q.  Okay.  But is it simply the fact
7    of the location of this mesh related to the mucosa
8    that you're pointing out here?
9         A.  That is correct.
10        Q.  Is that a surgical placement issue?
11        A.  Not exactly.  It can migrate, it
12   can move centimeters within the body.
13        Q.  Or a surgeon can place it there,
14   correct?
15        A.  Both.
16        Q.  Yes.  And you're not able to tell
17   from this image, whether the surgeon placed it
18   there or it moved there from somewhere else,
19   correct?
20        A.  No.  I know that all of them are
21   covered by mucosa after surgery.  That's what
22   surgeons are trying to do.
23        Q.  So again, I asked a bad question.
24        You can't tell from looking at the
25   image, whether the surgeon placed it there, or

Page 171

1    whether it migrated there, correct?
2         A.  That's correct.
3         Q.  Thank you.  And what's the
4    significance of the two images below that on
5    Figure Set 5?
6         A.  It's the same image, the right
7    copy is labeled, the left one is not labeled.  It
8    shows that the tissue in between mucosa and the
9    mesh is innervated.
10        Q.  I see.
11        A.  So if you compress mucosa, you are
12   hitting the receptors, hence small nerve branches
13   at the same time.
14        Q.  Anything abnormal about the nerve
15   branches and twigs that you depict in those images?
16        A.  Just the location.
17        Q.  Okay.  Page 38, "Additional TVT
18   cases."  What does this show?
19        A.  The same as it says on the
20   previous page, superficial location of the mesh,
21   overlying mucosa, innervation of the tissue and the
22   mucosa.
23        Q.  And other than the presence of the
24   nerves in the mucosa, and the position of those
25   nerves relative to the mesh in the mucosa, is there

Page 172

1    anything else remarkable about that image?
2         A.  No.
3         Q.  If we go to page 39, what is
4    vascular dilatation?
5         A.  When the vessels are being
6    distended, so the outflow from the vessels is
7    obstructed for varying reasons.  So there is more
8    fluid coming in, than fluid coming out.
9         Q.  And what does mesh have to do with
10   vascular dilatation?
11        A.  It caused it.
12        Q.  How do you know that?
13        A.  Because normally vessels are not
14   distended like this, there is a reason why the
15   outflow is obstructed.
16        Q.  Are there any other causes for
17   vascular dilatation?
18        A.  In normal tissue?
19        Q.  Yes.
20        A.  There are some other, like typical
21   example is hemorrhoids.
22        Q.  I'm sorry?
23        A.  Hemorrhoids.
24        Q.  Hemorrhoids?
25        A.  Hemorrhoids.

Page 173

1         Q.  I'm sorry.  That's a southern West
2    Virginia way of saying it, I apologize.
3         A.  Okay.  So there is dilatation of
4    the vascular structure, blood stays in.  If it's
5    lymphatic vessel, lymph will stay, so it will
6    distend and it becomes larger.
7         Q.  Now, what is statis, S-T-A-T-I-S?
8         A.  Stasis, sorry.
9         Q.  Stasis.  So stasis and tissue
10   edema; what does that mean?
11        A.  Stasis means that the fluid is
12   stagnant in the vessels.  So it accumulates there,
13   it doesn't outflow.  And then after some time, this
14   fluid starts seeping into the tissue.  So because
15   the blood vessels, or lymphatics are so backed up,
16   fluid starts going into the tissue; that's how
17   edema happens.
18        Q.  Okay.  The blue in the image is
19   polypropylene?
20        A.  Yes.
21        Q.  And that is moved in the image by
22   sample preparation?
23        A.  That's correct.
24        Q.  The artifacts?
25        A.  Yes.

44 (Pages 170 to 173)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 174

1      Q.   And do you see any bark around the
2  polypropylene in those images?
3      A.   Here.
4      Q.   You pointed to the white.  I'm
5  looking at the blue polypropylene itself.  There's
6  no bark attached to any of the polypropylene, is
7  there?
8      A.   Probably there is, but so low
9  magnification.  I can see it clearly in this space.
10      Q.   And you're referring now to the
11  upper right-hand corner and the black mark at the
12  lower right, correct?
13      A.   Just above it -- no, no, here.
14      Q.   Are you talking about --
15      A.   The faint line.  This faint line.
16  (Indicating).
17      Q.   Oh, I see, okay.
18      And what's the clinical significance of
19  the vascular dilatation and statis tissue edema?
20      A.   There's pressure inside.  If fluid
21  accumulates to a degree, and then it starts
22  pressing in tissue, there will be pressure
23  accumulating.
24      Q.   And to what extent can you
25  determine whether this pressure is present in an

Page 175

1  area larger than what is presented in this one
2  slide?
3      A.   What do you mean?
4      Q.   Well, this obviously depicts these
5  findings within this slide.  This slide is
6  4 microns thick, and I don't know how far across.
7      A.   About two and a half, three
8  millimeters.
9      Q.   Okay.  Can you tell whether this
10  finding is present anywhere else in the woman from
11  which this was explanted?
12      A.   Oh, it's patches.  Somewhere it's
13  dilated, some areas are edematous, some are not.
14  Sometime the entire mesh is just sewed, or is shown
15  edema or dilatation.  It depends, variables.
16      Q.   And so you're unable to say,
17  looking at this figure on page 39, Figure Set 6a,
18  whether what you've described here was causing
19  symptoms in this woman, correct?
20      MR. ORENT:  Objection.
21      THE WITNESS:  Oh, I think we talked
22  about this before.  Causing symptoms is a complex
23  process, and perceptions.
24      So this is abnormal mechanism, it is a
25  factor in pain mechanisms in some other areas.

Page 176

1  Take hemorrhoids, you ask some patients, have them
2  painful; some patients have them not painful.
3      BY MR. THOMAS:
4      Q.   I understand that.  But it's also
5  fair to understand that this woman may have had
6  this issue in the histology, as you've described
7  it, but not be experiencing any symptoms because of
8  it, correct?
9      A.   That's correct.  The main thing is
10  it's an abnormal finding and it can cause pain.
11      Q.   Okay.  Do you know whether the
12  images that are on page 40 are --
13      A.   Stasis.
14      Q.   It's the same patient, 6a, 6b?
15      A.   Could be, I'm not sure.
16      Q.   You don't know, okay.
17      Again, the blue is polypropylene?
18      A.   Yes.
19      Q.   Are you able to tell in 6b, the
20  long, narrow white line in the lower left hand,
21  whether that is polypropylene that's present or not
22  present?
23      A.   I'm not sure.  The largest part is
24  difficult.  I can see a little bit of the
25  degradation bark can be sitting on the non-degraded

Page 177

1  bark and -- oh, I can see some of the mesh fibers
2  left here in this space.
3      Q.   Okay.  I'm looking at the area
4  above that one, though.  This one (indicating).
5      A.   Yes, it's folded and it trapped
6  some of the dye.
7      Q.   Now how do you know that's folded
8  as opposed to just mesh, part of the interstitialcy
9  or part of the mesh being right adjacent to it?
10      A.   Do you see this line, or this
11  slice, or cross-section of the fiber, it's folded
12  like this, and then there's a little bit of a dye
13  in this space, you can see it.
14      Q.   So what you're showing here is
15  vascular dilatation stasis again?
16      A.   Yes.
17      Q.   Tissue edema?
18      A.   Yes.
19      Q.   Anything else remarkable about
20  this slide?
21      A.   No.
22      Q.   And the top is four times
23  magnification, and the bottom is ten times
24  magnification?
25      A.   That's the best approximation.

45 (Pages 174 to 177)

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 178

1    Q.  And my expert should have this
2  slide, correct?
3    A.  Yes.
4    Q.  Since you did 6a, 6b, 6c, does
5  that mean that it's from the same patient?
6    A.  No.  They group by the feature.
7    Q.  Okay.  So you don't look at it?
8    (Reporter sought clarification.)
9    A.  Feature.  So if it's the same
10  feature, it's the same figure number, but if it's
11  different images on different pages, they are
12  labeled A, B, C, D.
13    Q.  What is the significance of the
14  edematous scar; the edema, loose scar?
15    A.  It's edema, the same thing we
16  discussed before.  The fluid stays in it, it builds
17  up pressure and can compress the structures.
18    Q.  The same on page 41, 6c?
19    A.  That's correct.
20    Q.  Anything remarkable about the
21  image on page 41 beyond what you've described?
22    A.  No.
23    MR. ORENT:  Counsel, I'm wondering if
24  it's a good time to take a quick lunch break?
25    THE WITNESS:  It feels like it.

Page 179

1    MR. THOMAS:  Sure, absolutely.
2    -- OFF THE RECORD DISCUSSION --
3    -- RECESS AT 1:01 --
4    -- UPON RESUMING AT 2:11 --
5    BY MR. THOMAS:
6    Q.  Let's go to page 42 of your
7  report, please.  I see you're open to it already.
8    A.  Um-hum.
9    Q.  Figure 7a says, "Involvement of
10  striated muscle by the mesh, H&E, 4 times.
11  Additional TVT cases."
12    Again, this is a case that is not
13  contained within the consolidated cases?
14    A.  That is correct.
15    Q.  Can you tell whether this is
16  TVT or TVT-O?
17    A.  No.
18    Q.  Does the fact that it's involved
19  striated muscle help you at all?
20    A.  To a degree.
21    Q.  Why would that influence which
22  kind of mesh it is?
23    A.  It helps, because most frequently
24  if I see striated muscle, it's transobturator tape,
25  but occasionally I see striated muscle in

Page 180

1  retropubic tapes as well.
2    Q.  And what are you showing in Figure 7a?
3    A.  I'm showing involvement of
4  striated muscle in the mesh.
5    Q.  Tell me what you mean by that.
6    A.  Striated muscle can be
7  incorporated right in the mesh, most likely mesh
8  migrated into the striated muscle.  Or sometimes
9  it's just attached to it, so the fibrous capsule.
10    Q.  On the left side is the actual
11  slide, and on the right side you've filled in with
12  a red, orange and a yellow, correct?
13    A.  Yellow and red.
14    Q.  Okay.  The yellow is the
15  polypropylene?
16    A.  That is correct.
17    Q.  And the red is what?
18    A.  Red is striated muscle.
19    Q.  All right.  And you said
20  "involvement of striated muscle by the mesh."
21    This shows striated muscle adjacent to,
22  but not incorporated in the mesh, correct?
23    A.  Some parts of this incorporated,
24  sometimes it's just been fused, surface scar
25  tissue.

Page 181

1    Q.  Help me.  Show me where it's
2  incorporated in it.
3    A.  Well, in this case --
4    Q.  You're referring to the lower
5  right?
6    A.  In the lower panel, striated
7  muscle is encircling one of the mesh fibers.
8    Q.  Okay.  What's the distance, in
9  four times magnification from the muscle and the
10  mesh?
11    A.  Within 1 to 2 hundred microns,
12  probably 100.
13    Q.  Okay.  And what's the significance
14  of that finding to your opinions in this case?
15    A.  Well, if the mesh is fused with
16  the striated muscle, any contraction of the muscle
17  will tug on the mesh and prevent muscle from free
18  contraction.
19    Q.  And what symptoms does that create?
20    A.  The mesh is tugged, and you can
21  feel the mesh moving, pulling the nerves and other
22  tissues.  So it's related to discomfort, feeling of
23  pressure and pain.
24    Q.  Once again, is it true that you
25  can't say by looking at the images in 7a, that this

46 (Pages 178 to 181)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 182

1    patient was experiencing pain or discomfort due to
2    the presence of the striated muscle next to the
3    polypropylene mesh?
4         A.   I cannot say the degree of
5    sensation, but in this specific location, any
6    contraction of the muscle will tug on the mesh.  So
7    there will be a degree of sensation, to what degree
8    I cannot say.
9         Q.   All right.  Anything else
10   remarkable about the images on 42?
11        A.   No.  Just striated muscle
12   involvement by the mesh.
13        Q.   So let's go to Figure 7b on
14   page 43.  You're using a different stain here, the
15   desmin stain.
16        A.   That is correct.
17        Q.   What is the significance of Figure
18   Set 7b on page 43 of your report?
19        A.   Clearly, more visible in the
20   picture.
21        Q.   What is more visible?
22        A.   Striated muscle.
23        Q.   And that's yellow in this image?
24        A.   No, brown.  Brown is striated
25   muscle.

Page 183

1         Q.   Brown, I'm sorry.
2         A.   Because for a non-pathologist, it
3    would be hard to see where striated muscle is in
4    H&E section, but when we use desmin stain, it
5    demonstrates even the presence of striated muscle.
6         Q.   I see.  Are you able to tell me
7    whether the image in 7b is from the same patient as
8    the image in 7a?
9         A.   No, likely not.
10        Q.   Why do you say that?
11        A.   Just my recollection.
12        Q.   Are you able to tell me from what
13   patient 7b comes from?
14        A.   I may or may not.
15        Q.   How about 7a, do you know who that
16   came from?
17        A.   Same thing, I may or may not.
18        Q.   Okay.  Tell me, please, the
19   significance of the image in 7b.
20        A.   Now, we can see clearly that
21   muscle is on both sides of the mesh.  So the mesh
22   is sandwiched between striated muscle, surrounded
23   by it.
24        Q.   The same answers for 7b as 7a,
25   that when the striated muscles touch the mesh there

Page 184

1    would be a tugging, discomfort and possible pain?
2         A.   That is correct.
3         Q.   But you don't know the extent to
4    which those may manifest themselves from this
5    figure?
6         A.   The degree of sensation is
7    difficult to predict, it depends on multiple
8    factors.
9         I mean, it's clear that in this
10   location striated muscle contraction will be
11   restricted, and will cause movement of the mesh.
12   But the degree of sensation cannot be determined.
13        Q.   What about page 44?  Sorry, let's
14   go back to 43.
15        Did that cover the remarkable findings
16   in Figure 7b?
17        A.   No, I mean --
18        Q.   Is there anything else remarkable
19   about this?
20        A.   We've covered everything.
21        Q.   Thank you.  Figure 8a, on page 44.
22        A.   Yes.
23        Q.   "Involvement of smooth muscle by
24   the mesh, H&E, 10 times.  Consolidated cases."
25        Are you able to tell me whether this is

Page 185

1    a TVT or TVT-O?
2         A.   No.
3         Q.   Okay.  And you can't tell me which
4    patient it's from as you sit here?
5         A.   I can determine for this specific
6    figures which patient it came from, because this
7    image has been numbered by this time.
8         Q.   And can you tell right now, or do
9    you have to consult something?
10        A.   No, no. I would have to go back
11   and check the names of the files.
12        Q.   I see, okay.
13        And what's the purpose of depicting the
14   smooth muscle in this image?
15        A.   To show that smooth muscle can
16   also be involved by the mesh.
17        Q.   Is the smooth muscle impacted in
18   the same way as the striated muscle that you
19   described in the last two slides?
20        A.   In a similar way, yes.
21        Q.   Okay.  Is the point here to show
22   that the smooth muscle is in close proximity to the
23   polypropylene mesh?
24        A.   That's correct.
25        Q.   And similar to 7a and 7b, any

47 (Pages 182 to 185)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 186

1    contact with polypropylene with the smooth muscle
2    may cause some discomfort, tugging or possible
3    pain?
4            A.   There is a little bit more to
5    smooth muscle. Because smooth muscle is present in
6    both vaginal wall and urethra and bladder.
7            So urethra and bladder have thicker
8    bundles of smooth muscle.  Vaginal wall has wisps
9    of smooth muscle.
10           If mesh is in the vaginal wall, smooth
11   muscle, which is in the vaginal wall, can be either
12   attached to the scar plate.  Or, if the mesh
13   migrates, it incorporates smooth muscle inside the
14   pores.
15           So if the smooth muscle of the vaginal
16   wall contracts, the mesh will interfere.  So this
17   will be more of a sensation in the vagina, more
18   likely during intercourse, whether the vaginal wall
19   contracts.
20           Now, if we compare it with the smooth
21   muscle of the bladder and the urethra, it's a
22   different organ.  So if mesh is interfering with
23   those bundles, they may not contract correctly.  So
24   there may be interference with the function of
25   urethra and voiding, urination.  And also,

Page 187

1    sensation in the area.
2            Also, you should obstruct urethra
3    through compression of it.  The mesh is pressing
4    against these thick bundles, and then compresses
5    the urethra.  So it's indication that position of
6    the mesh was such that it was causing urinary
7    symptoms.
8            Q.   Are you able to tell from Figure
9    8a, whether this tissue sample is from the vagina
10   or in the area underneath the urethra?
11           A.   For Figure 8a, it would be
12   difficult because it's an H&E slide.  If I stain it
13   with smooth muscle, then I can see exactly borders
14   and position of the muscle.  Or, I can see it in
15   the microscope.
16           It's likely to be urethra, because the
17   area is more compact and there are bundles of it,
18   but I would have to look at the slide.  But
19   comparing between these two applications, I would
20   favor the urethral muscle in this specific image.
21           Q.   And it's fair to say that the
22   muscle here has not yet been incorporated into the
23   mesh, correct?
24           A.   Not fully, but you can see that
25   the mesh is --

Page 188

1            Q.   Adjacent to?
2            A.   Moving, or pressing against this
3    bundle.  It's partially compressed; you see the
4    indentation made with the mesh here.
5            Q.   Okay.  And again, you don't know
6    the extent to which the situation, circumstances
7    described in this slide, may cause or contribute to
8    discomfort, tugging or pain?
9            A.   If it's urethral muscle, it can
10   cause urinary outflow obstruction, because it's
11   clearly pressing on this part of the muscle.  So
12   it's pressing on the whole urethra.
13           Q.   But you don't know the extent to
14   which it was removed for obstruction, or why the
15   mesh was removed; do you?
16           MR. ORENT:  Objection.
17           THE WITNESS:  Yeah.  Again the degree
18   of the symptoms would depend on many factors.  I
19   can say that this picture shows that there was a
20   degree of compression of the muscle.
21           BY MR. THOMAS:
22           Q.   Can you say from this slide, that
23   there was urinary dysfunction based upon this
24   slide?
25           A.   Complete obstruction of the

Page 189

1    urinary outflow, no, I cannot say that.  I mean
2    there is interference, but the degree of it is more
3    complex question.
4            Q.   Page 45, Figure Set 8b is the same
5    issue using a smooth muscle actin stain.  And
6    because this is additional TVT cases, this is going
7    to be a different patient than 8a, correct?
8            A.   That's correct.
9            Q.   Is this a TVT or a TVT-O?
10           A.   I cannot say.
11           Q.   And is this the smooth muscle
12   stain that you referred to a few minutes ago?
13           A.   That's correct.
14           Q.   And what does the stain in Figure
15   Set 8b tell you?
16           A.   So you can see clearly that the
17   smooth muscle is in wisps.  So this is the smooth
18   muscle of vaginal wall, and it became incorporated
19   into the mesh.
20           So the mesh migrated in the tissue, and
21   this part of smooth muscle became incorporated in
22   the mesh pore.
23           Q.   How can you tell from Figure 8b
24   that the mesh migrated or moved?
25           A.   Because it contains normal structure.

48 (Pages 186 to 189)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 190

1    Q.  How does this figure -- how are
2  you able to tell from this figure that the mesh
3  wasn't placed there in the first place, as opposed
4  to migrated or moved there?
5    A.  This space didn't exist before the
6  mesh was placed (indicating).
7    Q.  Okay.  And "this space" is what
8  you just drew as a circle?
9    A.  Yes.
10    Q.  And what does that space represent?
11    A.  It's the space within the mesh.
12  So it was created in the body, when the mesh was
13  placed.  When the mesh was placed, it's empty space
14  because tissue is disrupted.  The mesh goes in, and
15  everything inside needs to be filled in with brand
16  new tissue.  So this area was filled with tissue
17  after the mesh was placed.
18    But, we know that smooth muscle is a
19  more specialized type of tissue.  It has very
20  limited ability for regeneration, so the scar which
21  can be produced.  So if there is normal tissue
22  within the mesh pore, it means that it had been
23  incorporated later on, either through scar
24  contraction, which pulls normal tissue in, or
25  through mesh migration, which migrates into this

Page 191

1  (indicating).
2    Q.  What types of symptoms are present
3  from the findings that you have in Figure Set 8b?
4    A.  I don't remember exact history for
5  this specific patient, but this position of smooth
6  muscle inside the mesh, is at risk for pain,
7  especially during intercourse, dyspareunia.  Again,
8  the degree of these symptoms is difficult to
9  predict.  But this is an abnormal position of
10  smooth muscle.
11    Q.  Are you suggesting that every time
12  this patient would have sexual intercourse, that
13  she experienced pain due to this condition?
14    MR. ORENT:  Objection.
15    THE WITNESS:  How much of this will
16  contribute to her symptoms would be difficult to
17  predict.  But as I said, this is an abnormal
18  position, and this abnormality provides a risk
19  factor for pain during intercourse.
20    BY MR. THOMAS:
21    Q.  Okay.
22    A.  Or just simply chronic pain.
23    Q.  So as we've talked about before,
24  this is a risk factor in conjunction with other
25  things that may cause the conditions you're talking

Page 192

1  about?
2    A.  That's correct.
3    Q.  Anything else remarkable about 45?
4    A.  No.
5    Q.  46, Figure Set 8c.
6    Again, this is more smooth muscle with
7  smooth muscle actin stain, additional TVT cases.
8  Is this a third patient, do you know?
9    A.  This is an older case.
10    Q.  So is this a third patient within
11  this set?
12    A.  Most likely.
13    Q.  And it's an older case given the
14  camera that's used?
15    A.  Yes.
16    Q.  Can you tell whether it's a TVT or
17  TVT-O?
18    A.  No.
19    Q.  What is the significance of Figure 8c?
20    A.  This is a nice picture, this is
21  urethral wall.
22    Q.  You're talking about the muscle on
23  the right side of the image on the left?
24    A.  Yup.
25    Q.  Okay.

Page 193

1    A.  It's a thicker bundles of urethra,
2  and this part is vaginal wall.  So this is part of
3  vaginal wall.  And you can see the curve of the
4  sling was compressing urethra (indicating).
5    So this part of the sling was excised
6  with some of the urethral muscle.
7    Q.  What is the significance of this
8  finding in this figure?
9    A.  It shows the difference between
10  smooth muscle in the vaginal wall and smooth muscle
11  in the urethra, and the relationship of the mesh,
12  how it sits right on the muscle of the urethra.
13    Q.  If you look at this, as it's going
14  to be in-situ, is it going to look like this?
15    A.  Eventually it will look like this.
16    Q.  So this is the urethral muscle,
17  and I'm holding Figure 8 sideways.  So this shows
18  how the mesh has either the U-shape or the hammock
19  shape underneath the urethra; correct?
20    A.  That is correct.
21    Q.  Okay.  So the positioning of this
22  mesh is really consistent with the way it should be
23  placed; is that correct?
24    A.  It's the normal position.  It's
25  not normal, intended position.

49 (Pages 190 to 193)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 194

1        Q.  Intended position, okay.
2        So what is significant about Figure 8c,
3   insofar as it relates to your opinions in this
4   case?
5        A.  Well, I'm demonstrating that the
6   mesh is compressing right against urethra.  And if
7   it was more pressure, it would start migrating into
8   urethra and sometimes I see that as well.
9        Q.  When you say migrating, are you
10  talking about eroding into the urethra?
11       A.  Yes.
12       Q.  Okay.  There's no evidence here,
13  though, of evidence of erosion into the urethra,
14  correct?
15       A.  In this specific case, I don't
16  remember.
17       Q.  Well, you don't see it in the
18  slide.  You can't offer the opinion to a reasonable
19  degree of medical certainty that this mesh has
20  eroded into the urethra here, correct?
21       MR. ORENT:  Objection.
22       THE WITNESS:  Not in this image.  And
23  the purpose of this different.
24       So you can see clearly, I should have
25  probably turned it.  I should have turned it like

Page 195

1   this (indicating).  And this would demonstrate that
2   with more pressure, it would start migrating; in
3   this specific case, it didn't.
4        BY MR. THOMAS:
5        Q.  Isn't this supposed to be right
6   underneath the urethra in order to control the
7   urine flow?
8        A.  Yes, but I mean --
9        Q.  Is this not placed properly?
10       MR. ORENT:  Objection.
11       THE WITNESS:  I wouldn't go and I
12  cannot testify exactly for placement.
13       To me, as a pathologist, I examine what
14  is abnormal and what can cause symptoms.
15       So if there are specific requirements
16  for placement or positioning, it would be a
17  clinical question.
18       BY MR. THOMAS:
19       Q.  Okay.
20       A.  So to me, this position, right
21  against smooth muscle of urethra, indicates that
22  sling is compressing against urethra directly.
23       So, with extra pressure, you can
24  collapse or compress urethra and cause urinary
25  outflow.  And this is repeated in medical histories

Page 196

1   that slings can cause urinary outflow and
2   obstruction.
3        And with more pressure, it will start
4   going through the muscle and become eroded.  Also,
5   it will describe the clinical phenomena.
6        Q.  And when you talk about disrupting
7   urinary outflow, is that the same thing as
8   retention?
9        A.  Yes.
10       Q.  And that's a recognized complication
11  from mesh placement?
12       A.  Yes, it is.
13       Q.  Anything else remarkable about
14  this slide?
15       MR. ORENT:  Objection.
16       THE WITNESS:  No.
17       BY MR. THOMAS:
18       Q.  Is it fair to understand that
19  you're not able to diagnose urinary retention based
20  upon this single slide, correct?
21       A.  Retention is a symptom, as we've
22  discussed before, symptoms are caused by multiple
23  factors together, so...
24       Q.  Answer my question.  Based on this
25  slide alone, you can't make that finding?

Page 197

1        A.  You can say that this position
2   creates a risk for obstruction.
3        Q.  Yeah.
4        A.  And a degree of compression of the
5   urethra.
6        Q.  But like everything else, that's a
7   risk factor that you'd have to combine with other
8   things to determine whether, and to what extent
9   this could cause any problems in her, right?
10       MR. ORENT:  Objection.
11       THE WITNESS:  Not necessarily.  It may
12  not need other factors.  It may cause symptom on
13  its own.  But the degree of the symptom is clinical
14  presentation.
15       BY MR. THOMAS:
16       Q.  And you don't know what that
17  clinical presentation is as you sit here today?
18       A.  That's correct.
19       Q.  Page 47, Figure 8d.  This is,
20  "Innervation within the mesh and between the mucosa
21  and the mesh.  Also, images of muscle movement
22  involvement by the mesh."  And this is a
23  publication?
24       A.  That's correct.
25       Q.  Do you know what kinds of mesh are

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 198

1   involved here?
2        A.  I don't remember.  I think two of
3   these images are from TVT or TVT-O.  And two of
4   these images are from different mesh.
5        Q.  Which ones are from TVT or TVT-O?
6        A.  I don't remember now.  I would
7   have to sort of do matching.
8        Q.  Okay.  What other manufacturers
9   did you look at?
10       A.  AMS, Boston Scientific, Bard.
11       Q.  And do you know which of those
12   manufacturers are depicted in this image?
13       A.  No, I know for sure that there's
14   at least one TVT mesh here.
15       Q.  At least one?
16       A.  At least one.  I don't remember --
17       Q.  Do you know whether it was a TVT
18   or a TVT-O?
19       A.  No.
20       Q.  Okay.  And what is the purpose of
21   this image?
22       A.  It demonstrates same smooth muscle
23   involvement.
24       Q.  Are you able to tell -- as I
25   understand the smooth muscle is either going to be

Page 199

1   in the vagina or around the urethra, correct?
2        A.  That's correct.
3        Q.  Are you able to tell in Figure 8
4   whether this is the vagina or the urethra?
5        A.  Let me see, because the pictures
6   are cropped to a degree.
7        Q.  They're "cropped", did you say?
8        A.  Cropped, yes.  So I need the
9   larger pictures to -- let me see.
10       Maybe it's described in the caption.
11   (Witness reviews document.)
12       Just representative image.  From what I
13   see, but it's not 100 percent, it may not be
14   100 percent correct.
15       C, would reflect urethral muscle.  And
16   D would reflect vaginal muscle.  But I'm not sure,
17   because most of the structures are cropped.  It
18   just describes the fact that the mesh can
19   incorporate smooth muscle, from either origin.
20       Q.  And just so we're clear.  You're
21   pretty sure that one of these is a TVT or a TVT-O,
22   but you don't know which of the four figures in
23   Figure Set 8d is a Johnson & Johnson product?
24       MR. ORENT:  Objection.
25       THE WITNESS:  It would be either these

Page 200

1   two or both (indicating).
2        BY MR. THOMAS:
3        Q.  Okay.  C and D, correct?
4        A.  C and D.  That is my recollection.
5        Q.  What is it about those images that
6   cause you to believe it's an Ethicon TVT or TVT-O?
7        A.  Oh, maybe not.  Wait a second.
8   (Witness reviews document).
9        Sorry.  I have to retry this.  I don't
10   remember which exactly are TVT or TVT-O.  It could
11   be one of these images in one of these.
12       Q.  It could be any one of the four?
13       MR. ORENT:  Objection.
14       THE WITNESS:  Yes, I would have to go
15   back and check.
16       BY MR. THOMAS:
17       Q.  Now this is smooth muscle; is that
18   what you're saying?
19       A.  These are smooth muscle.
20       Q.  In A, B, C and D?
21       A.  No.  Figure A shows neurovascular
22   bundle in the pore, we saw similar images before
23   that.
24       Figure B shows innervation between
25   sling and mucosa.

Page 201

1        Figure C -- (witness reviews document.)
2        Q.  Are you reading the text now?
3        A.  Yes.  So Figure C shows striated
4   muscle.
5        And Figure D, shows smooth muscle
6   unspecified, either from vagina or urethra.
7        Q.  Okay.  And is the purpose of this
8   image just to show the innervation of the mesh in
9   general?
10       A.  Well, the purpose of the image is
11   to show all these pictures together.  And I
12   included it because I knew that at least one
13   contains TVT or TVT-O, it is a supplementary
14   picture.
15       Q.  Anything else significance for the
16   figures on page 47?
17       A.  No.
18       Q.  Page 48, Figure Set 9a.  "Arterial
19   obliteration in the mesh scar plate, H&E 10 times.
20   Consolidated cases."
21       This obviously is from one of the
22   plaintiffs in the consolidated cases.
23       A.  Yes.
24       Q.  And you've indicated on the image
25   an obliterated artery.  How can you -- what is it

51 (Pages 198 to 201)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 202

1  about this image that tells you that this artery is
2  obliterated?
3       A.  The lumen is collapsed.
4       Q.  The lumen is collapsed?
5       A.  Yes.  The arterial wall is
6  degenerated, so clearly non-functional.
7       Q.  And what does it mean to have an
8  obliterated artery?
9       A.  It means that there is an area in
10  the body which had insufficient or disrupted blood
11  supply.
12       Q.  Okay.  When you say "insufficient
13  or disrupted", it can be disrupted without being
14  insufficient; can't it?
15       A.  That's correct.  There might be a
16  collateral circulation sufficient to supply.
17       Q.  And you're not able to tell from
18  looking at this image in Figure Set 9a, that if
19  this is an obliterated artery, that it has any
20  clinical impact on the patient, correct?
21       MR. ORENT:  Objection.
22       THE WITNESS:  Again, could have had
23  only short-term impact, could have had longer term
24  impact.  Short term would be necrosis, right after
25  the obliteration, or thrombosis, it's like heart

Page 203

1  attack.
2       And then long-term would be scarring
3  and fibrosis.  The same thing as a heart, people
4  who have insufficient cardiac output.  If heart
5  muscle doesn't work as well as before the infarct,
6  so the same thing here, it would be a short term,
7  shortly symptoms or changes in the body.  And then
8  longer term.  Longer term would be caused more
9  fibrosis.
10       BY MR. THOMAS:
11       Q.  And longer term there may or may
12  not be a problem, correct?
13       A.  You mean how they would translate
14  into clinical symptoms?
15       Q.  Yes.
16       A.  The degree of translation into
17  clinical symptoms is more a complex process.
18       Q.  Okay.  Is there necrosis in this
19  image?
20       A.  No.  Because artery has supplied
21  the blood to somewhere else further down, so...
22       Q.  Okay.  So given your finding of an
23  obliterated artery, there are no clinical symptoms
24  manifested in this image, at this time that you can
25  point to, correct?

Page 204

1       MR. ORENT:  Objection.
2       THE WITNESS:  Not in this area.
3       BY MR. THOMAS:
4       Q.  Okay.
5       A.  But it tells us that somewhere
6  else beyond this square picture, there was damage
7  for the tissue.
8       Q.  There was or may be?
9       A.  There was.
10       Q.  Okay.
11       A.  The degree of it is difficult to
12  determine.  But there was.
13       Q.  You'd have to see the tissue in
14  order to make that evaluation, correct?
15       MR. ORENT:  Objection.
16       THE WITNESS:  Yes.
17       BY MR. THOMAS:
18       Q.  Where is the mesh in Figure 9a?
19       A.  Somewhere beyond it.
20       Q.  It's not in the slide?
21       A.  Maybe right at the corners, I
22  don't know.
23       Q.  But you didn't capture any mesh in
24  the slide on 9a?
25       A.  I didn't crop it in.

Page 205

1       Q.  Let's go to page 49, Figure Set 9b.
2       A.  Yes.
3       Q.  It says, "Examples of capillary
4  thrombosis in the mesh scar plate."
5       What is "capillary thrombosis"?
6       A.  When there are small thrombi
7  formed in the capillaries.
8       Q.  What is the significance of
9  capillary thrombosis in the mesh scar plate?
10       A.  The same as for arteries, just on
11  a small scale.  So there's interruption of blood
12  supply in the smaller area.  Artery can cover large
13  area, capillaries are covering small.
14       Q.  Is there anything about what you
15  see in Figure Set 9b, that would tell you that this
16  patient is experiencing any clinical symptoms?
17       A.  Again, the degree of manifestation
18  of this finding would be difficult to determine.
19       Q.  It could be nothing?
20       A.  May not be clinically apparent.
21       Q.  And is this a single plaintiff or
22  is it two different plaintiffs?  It says,
23  "additional TVT cases."  I can't tell if it's one
24  patient or two.
25       A.  I think it's from the same patient.

52 (Pages 202 to 205)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 206

1      Q.  Is it a TVT or TVT-O?
2      A.  I think it was the Edwards case.
3  That's as far as I can recollect.
4      Q.  Okay.  Is there any mesh in Figure
5  Set 9b?
6      A.  Right there (indicating).
7      Q.  So that's on the lower left, okay.
8      Is there any mesh in the image above?
9      A.  Not in the image.  It was probably
10  right beside it.
11      Q.  Okay.  Let's go to Figure Set 10a
12  on page 50.  It says, "TVT sling curled into a roll
13  cross-section through parallel walls.  H&E stain
14  2.5 power magnification.  Consolidated cases."
15      This shows a piece of curled mesh,
16  doesn't it?
17      A.  That is correct.
18      Q.  And this is the curled mesh that
19  you talked about before when you place it in
20  formalin that it will curl over on itself, correct?
21  When it's placed in formalin?
22      A.  Did I say that it curls in
23  formalin?  I said that mesh, which is curled in
24  scar tissue, curled in the body.
25      Q.  I see.  So you believe that this

Page 207

1  curled in the body?
2      A.  Yes.
3      Q.  And on what basis do you believe
4  that?
5      A.  Because that curl shape is
6  immobilized within the scar tissue, it's
7  incorporated in the scar tissue, in this shape.
8      Q.  Okay.  Anything other than the
9  curling phenomena that you've just described as the
10  purpose of Figure Set 10a?
11      A.  Curling phenomena, scarring, it's
12  all encased in scar tissue.
13      Q.  Okay.
14      A.  That's about it.
15      Q.  Okay.  And at the top where we see
16  the blue, those are going to be artifacts?
17      A.  No.  The blue ones are
18  cross-sections of the blue filaments.
19      Q.  I should have said, in places
20  where they don't fill the holes?
21      A.  It can't be clear filament.
22  Because remember, half of the fibers in the sling
23  are blue, half of them are clear.
24      Q.  Okay.  Let's look at the top, off
25  of the slide there is a blue fragment.  That

Page 208

1  obviously has been pulled away from the slide,
2  correct?
3      A.  That's correct.
4      Q.  That's polypropylene?
5      A.  That's correct.
6      Q.  Let's go to set 10b.  Is set 10b
7  from the same patient or a different patient?
8      A.  I suspect it is the same patient.
9      Q.  Do you know?
10      A.  Not with 100 percent certainty.
11  But I think it is.  It's just a different part the
12  of the same curled mesh.
13      Q.  Okay.  And does Figure Set
14  10b show anything new beyond what you've showed in
15  10a, or is it the same?
16      A.  It's the same, just tighter roll.
17      Q.  And if you look at the images at
18  the top, there's a blue line coming out of the top
19  right, and that's a polypropylene artifact?
20      A.  Displaced polypropylene fibers.
21  You can also see dilated vascular channels.
22      (Reporter sought clarification.)
23      A.  So in this area, there is vascular
24  dilation.
25      Q.  Can you tell from these images,

Page 209

1  10a and 10b, whether this mesh caused any symptoms
2  in the patient when it was implanted?
3      MR. ORENT:  Objection.
4      THE WITNESS:  My answer is the same.
5  Clinical symptoms is a multifactorial, complex
6  phenomena.
7      BY MR. THOMAS:
8      Q.  This is a risk factor?
9      A.  No, this is not a risk factor,
10  this is a mechanism, how the complications occur.
11      But then there is a patient in between
12  who feels the symptoms, and the body however reacts
13  and so forth.  But in this case, the mesh is
14  rolled, so the pressure is distributed in a small
15  area.
16      The probability that it will compress
17  urethra is higher, because if it was flat, it would
18  have much larger distribution of pressure.
19      Q.  So is the risks from this curl
20  mesh compression against the urethra and urinary
21  retention?
22      A.  Yes, one of those.
23      Q.  Do you know whether this patient
24  had urinary retention?
25      MR. ORENT:  Objection.

53 (Pages 206 to 209)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 210

1      THE WITNESS:  I don't remember now.
2  Because my purpose for this report was to actually
3  show these things which can happen, and the
4  pathological changes which happen after mesh
5  placement.
6      And, symptoms which can factor in.
7      BY MR. THOMAS:
8      Q.  Okay.
9      A.  But I wasn't working on specific
10  connection between this pathological change, caused
11  that symptom in this specific patient.
12      Q.  Okay.  Anything else remarkable
13  about the images on 50 and 51?
14      A.  No.
15      Q.  Go to page 52.  And you get
16  "Neurovascular bundle within curled mesh, four
17  times magnification.  Consolidated cases."
18      Is this a different patient than was
19  depicted in 10a and 10b?
20      A.  One of these, because I say that
21  it's curled mesh --
22      (Witness reviews document).
23      So likely it was one of these two.
24      Q.  I think you told me -- well, maybe
25  I didn't hear this right.  I thought you told me

Page 211

1  that A and B were from the same person?
2      A.  Most likely.
3      Q.  Do you know?
4      A.  I can tell you, but not right now.
5  I can just check the name of the files.
6      Q.  And do you think that 10c, is the
7  same or different person?
8      A.  Most likely it is the same person,
9  or one of the two.  It could all be from one
10  patient, it could be from two patients.
11      Q.  Okay.  In the top part on 10c, on
12  page 52, you have a displaced piece of
13  polypropylene?
14      A.  Yes.
15      Q.  And what's the significance of
16  identifying this neurovascular bundle in the
17  figure?
18      A.  As before, we were talking about
19  entrapment of the neurovascular bundle before.  But
20  in this case, it's not just in pore.  It goes in
21  the pore, and became entrapped in the curls.
22      So it's in between two layers of the
23  mesh right inside the curl.  So it's secondary type
24  of compartment.  Because before we're talking about
25  compartmentalizing nature of the mesh, and then we

Page 212

1  talk about flat mesh, it's sort of third dimension.
2  So compartments are within the thickness of the
3  mesh.  But when it curls, it creates secondary
4  compartment.  Compartment which is encircled by the
5  mesh or between the folds.
6      Q.  Anything that you can see in
7  Figure 10c, on page 52 that is abnormal or
8  symptomatic about that neurovascular bundle, other
9  than its presence in the scar tissue?
10      A.  It's abnormal location.
11      Q.  It's simply that, the abnormal
12  location?
13      A.  Yes.
14      Q.  Anything else?
15      A.  The surroundings are abnormal.
16      Q.  Okay.  Anything else remarkable
17  about that image?
18      A.  No.
19      Q.  Let's go to page 53, section 10d.
20  This is, "A twisted TVT sling" from additional TVT
21  cases."
22      So this is one of your older cases,
23  correct?
24      A.  Yeah.  Earlier or concurrent.
25      Q.  Is this a TVT or TVT-O?

Page 213

1      A.  I don't know.
2      Q.  What is the significance of what
3  you've done in Figure 10d?
4      A.  It shows that the mesh just
5  curled, and also twisted.  To get the shape like
6  this out of flat tape, it has to curl and then one
7  end is twist.
8      Just think about it, how they put these
9  sections in this shape.  So one end like this, and
10  the other one is probably like that (indicating).
11  Or maybe like this (indicating).
12      Q.  Okay.  Does that happen by
13  placement, or by migration in the body, or do you
14  know?
15      A.  It's hard to figure out if you can
16  place it like this.
17      Q.  Do you know?
18      A.  I don't know.  One thing I can
19  tell you, this shape was formed in the body and
20  then it became incorporated in scar tissue like
21  this.
22      Q.  But you don't know whether that
23  happened on placement or in some other way?
24      A.  No.
25      Q.  Okay.  Now, in Figure 2 and

54 (Pages 210 to 213)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 214

1    **Figure 3, you show different images of the yellow.**
2    **What's the purpose of doing gradations of the**
3    **yellow?**
4         A.   Well, this shows the planes of the
5    mesh.  Just to help you to understand that we're
6    talking about the mesh which twisted.
7         **Q.   Okay.  Figure 10e is explanted**
8    **mesh.  This has been in formalin, correct?**
9         A.   Yes.  I believe it was in
10   formalin.
11        **Q.   Okay.  And no attempt to clean it**
12   **at all, correct?**
13        A.   That is correct.
14        **Q.   And the purpose here is to show**
15   **what you believe to be the curling of the mesh?**
16        A.   Well, it's not what I believe.  I
17   observe curling.  It's hard to show in the picture,
18   but when you look at it with just magnifying glass
19   or if you have good eyes, you can see that the mesh
20   is curled up and then it's all filled with scar
21   tissue.
22        **Q.   Is the purpose of this just to**
23   **show the simple curling, or are you trying to show**
24   **something beyond other than that?**
25        A.   No, just curling.  And that the

Page 215

1    curled shape is actually filled with scar tissue.
2    It's not formalin, as you'd like to say, causing
3    the curling.  It was removed from the body in that
4    shape.
5         **Q.   Can you tell whether, assuming**
6    **this is curled in the body, whether it was curled**
7    **upon placement or curled after placement?**
8         A.   The only thing I can say, it can
9    happen, and it happened.
10        **Q.   Okay.  But you don't know whether**
11   **it happened during placement or after placement?**
12   MR. ORENT:  Objection.
13   THE WITNESS:  I don't know.
14   BY MR. THOMAS:
15        **Q.   If you go to page 55, Figures A**
16   **and B, set 10f.  "A TVT sling with curled edges.**
17   **Right sling is TVT."**
18        **Are these two different slings or one;**
19   **do you know?**
20        A.   These are two different slings,
21   this is AMS, this one I remember.
22        **Q.   AMS is on the left?**
23        A.   Yes.
24        **Q.   And TVT is on the right?**
25        A.   Yes.

Page 216

1         **Q.   Is it TVT or TVT-O?**
2         A.   I don't know.
3         **Q.   Does the AMS figure have any**
4    **relevance to your discussion in this case?**
5         A.   Not necessarily, no.
6         **Q.   Okay.  Tell me what is significant**
7    **to you about the TVT in part B of set 10f?**
8         A.   See, the images which were taken
9    from publications were not cropped, so I don't
10   remove any panels.  So in this image, I think I had
11   a TVT, I provided the entire --
12        **Q.   I understand, that's okay.**
13        A.   So in this case I can tell exactly
14   this is TVT, and this is a different manufacturer.
15        **Q.   All right.  So what is the**
16   **significance of slide B?**
17        A.   It's curled, it's roped.  You can
18   see it's not tightly -- it's not flat.  It's
19   tightly curled.
20        **Q.   Can you tell whether it was placed**
21   **that way or whether that happened after placement?**
22   MR. ORENT:  Objection.
23   THE WITNESS:  I can't say.  The only
24   thing I can say is that it happened in the body.
25

Page 217

1    BY MR. THOMAS:
2         **Q.   Okay.  Anything else remarkable**
3    **about 10f on page 55?**
4         A.   No, just roping.
5         **Q.   Page 56, you have Figure Set**
6    **10f again.  Is that a typo, or is that the same**
7    **mesh?  It looks like a different mesh, it looks**
8    **like one of yours.**
9         A.   It's a typo.
10        **Q.   So this would be 10f --**
11        A.   No, it should be 10d.
12        **Q.   10d?**
13        A.   I think it's the same specimen as
14   10e.
15        **Q.   Okay.**
16        A.   The same case, I believe.  So this
17   case took two pieces.  One piece was rolled like
18   this, like 10e.
19        **Q.   Okay.**
20        A.   And the second piece was flat
21   area.  Sometimes one piece, especially if it's
22   heat-treated doesn't curl.  So there is a segment
23   of mesh --
24        **Q.   What do you mean heat-treated,**
25   **during removal?**

55 (Pages 214 to 217)

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 218

1      A.  No, during manufacturing.
2      Q.  Are you talking about heat-treated
3  as in laser cut?
4      A.  No, the entire surface is
5  heat-treated, not just edges.
6      Q.  And so what impact -- I didn't see
7  it anywhere in your report, that heat somehow in
8  the manufacturing process will impact the ability
9  of the mesh to lay flat in the body?
10     A.  It doesn't curl -- oh, doesn't
11  curl as much.
12     Q.  Okay.
13     A.  It's more stable structure because
14  fibers are welded together, or to a degree
15  connected together.
16     Q.  Okay.
17     A.  I know that some of the tapes --
18     Q.  Some other manufacturers?
19     A.  Other manufacturers, middle
20  portion is heat-treated.
21     Q.  Okay.  So did Boston Scientific
22  mention it?
23     A.  I don' know.
24     Q.  It's all right.
25     A.  I don't remember now.  I mean some

Page 219

1  of them were coming out first, with no heat
2  treatment, and then later on they became
3  heat-treated.
4      So some portions don't curl because of
5  heat treatment, or just don't curl because of other
6  factors.  So in this specific case, there was a
7  segment of the sling removed, and it was curled.
8  And in another segment of the sling removed and it
9  remained flat in the body.
10     Q.  Okay.  Do you know why?
11     A.  No, I don't know.  One of the
12  reasons can be heat treatment.
13     Q.  It could also be placement?
14     A.  It could also be placement or
15  location.
16     Q.  And what is the purpose of the red
17  and the yellow on the image on 10f on page 56?
18     A.  It just demonstrates how flat
19  section of the mesh looks, and how a curled section
20  of the mesh looks.  Because here, cross-section,
21  this mesh.
22     Q.  Yes?
23     A.  And then it came on histological
24  sections like this.
25     Q.  Is this from a case, additional

Page 220

1  TVT cases?
2      A.  Yes.
3      Q.  Has this been produced in a report
4  somewhere?  I've never seen this image in a case
5  anywhere, I'm just curious to know if it's been
6  published in a report someplace.
7      A.  I don't want to disclose that if
8  it has not been produced, so it have been produced.
9      Q.  Let me ask you this.  Here is why
10  I ask:  Generally, as you know, at least with
11  Ethicon, we divide these meshes before any work is
12  done on them.
13     Did you divide this mesh with Ethicon
14  before you did this work on 10f?
15     A.  It could be that was divided with
16  your expert, so we were taking pictures together.
17     Q.  Okay.  Well maybe that's right.
18     A.  I think it was the case.  Now I
19  can vaguely remember the issue because we were
20  discussing how we're going to cut this diagonal or
21  cut it --
22     Q.  I see.
23     A.  And so I remember him standing
24  beside me, and I was taking those pictures.
25     Q.  I see.

Page 221

1      A.  I took this picture, then this
2  picture, then we probably have similar pictures
3  from him.
4      Q.  And I apologize, I've been asking
5  this question a lot, and I don't know if I've asked
6  you about this slide, so if I have, I apologize.
7      You don't know whether the curling
8  depicted in 10f, on page 56 occurred during
9  placement or after placement, do you?
10     A.  No, I don't.
11     MR. ORENT:  Objection.
12     BY MR. THOMAS:
13     Q.  Page 57, Figure Set 10g.  "A TVT
14  sling with curled edges."  Is this a different TVT
15  than the ones we've looked at?
16     A.  I think these are the pictures of
17  the same case.  Again, that is my recollection, I'm
18  not 100 percent sure, but I think.
19     Q.  Do you know if this is a TVT or a
20  TVT-O?
21     A.  No.
22     Q.  Are you trying to show anything by
23  these images on 10g other than a different
24  depiction of what's in 10f?
25     A.  Well, no.  This just shows the

56 (Pages 218 to 221)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 222

1    curling state, this cross-section (indicating).
2         Q.  Okay.  So it's your best
3    recollection that the images in 10e, 10f and 10g,
4    are from the same mesh, same patient?
5         A.  Yes, likely than not, these are
6    all from the same patient.
7         Q.  But you're not sure?
8         A.  No.  As I said, the purpose of
9    this report was to analyze the device as a whole,
10   not the individual patients.
11        Q.  10h:  "TVT sling with curled
12   edges.  Additional TVT cases"?
13        A.  Yes.
14        Q.  Do you know where -- is this a new
15   patient; do you know?
16        A.  It's older pictures, taken by old
17   camera.
18        Q.  Do you know whether this is a
19   TVT or TVT-O?
20        A.  No.
21        Q.  What is the purpose of this image?
22        A.  It show the cross-section of the
23   curl.  And you can see it clearly, the whole field
24   is scar tissue.  This indicates that this curl
25   shape was formed in the body and then the scar

Page 223

1    tissue growing inside and filled the two-block
2    structure.
3         Q.  And are you able to tell from this
4    image, whether it was curled on placement or curled
5    after placement?
6         MR. ORENT:  Objection.
7         THE WITNESS:  No.
8         BY MR. THOMAS:
9         Q.  Anything else remarkable about
10   Figure Set 10h?
11        A.  No.  Curling, scar encapsulation,
12   scar filling.
13        Q.  Page 59, Figure Set 10i:
14   "Neurovascular bundle with rolled TVT tape, S100
15   stain.  Additional TVT cases."
16        Is this from the same or a different
17   patient as set 10h?
18        A.  I don't remember now.
19        Q.  Do you know if it's a TVT or
20   TVT-O?
21        A.  No.
22        Q.  What are you trying to show in
23   Figure 10h?
24        A.  It's a single picture for single
25   purpose as 10c, on page 52.  A neurovascular bundle

Page 224

1    is inside the roll of the curled tape.
2         Q.  And is there anything about the
3    depiction in the neurovascular bundle in set 10i on
4    page 59 that is irregular or abnormal other than
5    its presence in the scar plate?
6         A.  Well, it's bent by the mesh fiber,
7    you can see clearly that it deviates from straight
8    course.
9         Q.  Anything about that that makes you
10   have an opinion that this is causing any symptoms
11   in the person who has this mesh?
12        MR. ORENT:  Objection.  Form.
13        THE WITNESS:  Probably, the nerve is
14   irritated by these fibers higher, because it is a
15   direct compression on the nerve.
16        BY MR. THOMAS:
17        Q.  But there's nothing about this
18   slide, just like the other slides, which tells you
19   that the neurovascular bundle in Figure Set 10i,
20   actually caused symptoms in the person who had this
21   mesh?
22        MR. ORENT:  Objection.
23        THE WITNESS:  We discuss this before.
24   The degree of symptoms, the expression by the
25   patient is a complex process.

Page 225

1         So I can say that this is abnormal,
2    this is a mechanism for symptoms, and then that can
3    happen.
4         BY MR. THOMAS:
5         Q.  And the reason why you say it's
6    abnormal is because the mesh fiber causes this
7    bundle to alter its path?
8         A.  Yes.
9         Q.  Anything else?
10        A.  No.
11        Q.  Page 60.
12        A.  Yes.
13        Q.  Figure Set 10j:  "A rolled TVT
14   sling sectioned parallel and perpendicular to the
15   roll.  Additional TVT cases."
16        Do you know whether this is a TVT or
17   TVT-O?
18        MR. ORENT:  Objection.
19        THE WITNESS:  No.
20        BY MR. THOMAS:
21        Q.  What is the significance of this
22   slide to show what you showed in previous slides.
23   That is, the fact of the curling?
24        A.  Fact of the curling and mechanism
25   for erosion on page 61, I demonstrate how the

57 (Pages 222 to 225)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 226

1  erosion occurred.  Because one end of this curled
2  tape became eroded.
3          Q.  Okay.  So this is, the dark end of
4  the tape on page 60 and on 61, it is in fact an
5  erosion?
6          A.  Yes, it's --
7          Q.  Where did it erode?
8          A.  In the mucosa, in vaginal mucosa.
9          Q.  Did it erode into another organ?
10          A.  No, it eroded through the mucosa
11  into the vagina.
12          Q.  Do you distinguish between an
13  erosion and an exposure?
14          A.  Technically, there is a
15  distinction.  The terms are used interchangeably,
16  so there is no agreement which one is --
17          Q.  Let's use the technical terms,
18  just so you and are communicating.  Is this an
19  erosion or an exposure?
20          A.  Both.
21          Q.  Okay.
22          A.  Because the mucosa eroded on top
23  of it and mesh became exposed.
24          Q.  Okay.  But in terms of the mesh
25  going into or eroding into another organ, that

Page 227

1  didn't happen here?
2          A.  Well, it eroded into the mucosa.
3          Q.  Okay.  But just the mucosa, not
4  the bladder, not the rectum?
5          A.  Not the organs.  Because it is a
6  different location.
7          Q.  All right.  And do you remember
8  this patient?
9          A.  No.
10          Q.  Do you know how this patient was
11  treated?
12          A.  By sling excision.
13          Q.  Do you know how it worked out?
14  How she recovered from the excision?
15          A.  Better that she didn't have eroded
16  mesh anymore after surgery.  Maybe it eroded again
17  in a different place.
18          Q.  Do you know whether she
19  experienced pain as a part of this?
20          A.  Most likely she did.
21          Q.  Do you know whether she
22  experienced pain as part of this?
23          A.  The degree of pain, as I said, I
24  don't remember now.  But most likely she did.
25          Q.  You have not consulted her records

Page 228

1  to see the extent to which this was a painful
2  experience for her?
3          A.  This is commonsense.  This is a
4  chronic and open wound; would it hurt?  Of course
5  it would.
6          Q.  Go to page 61.  Figure Set 11b.
7  Is this the same mesh?
8          A.  No, it's a different one.
9          Q.  All right.  Is this a TVT or a
10  TVT-O?
11          A.  I don't know.
12          Q.  And what are you trying to show in
13  Figure Set 11b?
14          A.  Similar mechanism for erosion, the
15  mesh somehow rotated, probably through curling of
16  the edges and then became exposed.  The edge
17  pierced through the mucosa.
18          Q.  And this is an erosion, as you've
19  defined it, in the last section, some people may
20  call it an exposure, correct?
21          A.  Yes.  It's called -- if you want
22  to call exposure, we will call it exposure.  So the
23  mesh became exposed.
24          Q.  And what does the mesh in this
25  tissue sample tell you?

Page 229

1          A.  The position, see the position is
2  towards the mucosa.  So it's not bilateral to the
3  mucosa, it's angled.  And the edge, the end of
4  the tape became exposed, pierced through the
5  mucosa.  And the site of exposure became infected
6  and now there is acute inflammation surrounding.
7          Q.  How do you know that this mesh was
8  infected?
9          A.  Because there is acute
10  inflammation in there.
11          Q.  Do you know how long this woman
12  had this sling before it was removed?
13          A.  I don't remember.
14          Q.  Are you able to tell from this
15  slide whether this mesh was placed this way or
16  whether it changed after it was placed?
17          A.  It's hard to place it like this,
18  because you can see it's clearly perpendicular.  So
19  I just cannot imagine it.
20          Q.  Do you know?
21          MR. ORENT:  Objection.
22          THE WITNESS:  I don't know for sure,
23  but this would be a really difficult position to
24  achieve during placement.
25

58 (Pages 226 to 229)

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 230

1      BY MR. THOMAS:
2          Q.  Anything else remarkable about
3   your description of set 11b?
4          A.  No, we discussed most of it.
5          Q.  Anything else you want to talk
6   about?  You said "most".
7          A.  Sorry.
8          Q.  Page 63, Figure Set 11c:  "Exposed
9   edge of TVT sling rotated towards the mucosa.
10  Additional TVT cases".
11         Do you know whether this is a TVT or
12  TVT-O?
13         A.  No, I don't.
14         Q.  And what is your purpose of
15  including Figure Set 11c?
16         A.  Just mechanism of exposure,
17  because the edge is pointing towards mucosa.
18         So it's a near exposed position in this
19  case.  Probably exposure occurred somewhere either
20  more superficial, or deeper in the block.
21         Q.  As you're looking at that mesh, is
22  the mesh -- you show the yellow portion of the mesh
23  going from the bottom of the figure to the top of
24  the figure.  Is that the width of the mesh?
25         A.  With the length, it's very hard to

Page 231

1   determine in this place.  So the mesh is either in
2   this shape (indicating), or this shape
3   (indicating).
4          In any case, one of the edges is
5   pointing towards mucosa.
6          Q.  When you talk about -- strike
7   that.  This mesh when placed, is going to stretch
8   from one side of the abdomen to the other, isn't
9   it?
10         A.  Yes.  But we are talking about
11  mucosa.  So it is a very short stretch of the mesh
12  right where it goes between the urethra and vaginal
13  wall.
14         Q.  I understand that.  But my point
15  is, the only thing that can be exposed there is the
16  midpoint, not the ends, correct?
17         A.  Unless you cut one end, and then
18  it becomes exposed again.
19         Q.  Okay.  And in order to cut the
20  end, you'd have to cut the end at the vaginal
21  mucosa, correct?
22         A.  Inside.  So what happens -- first
23  exposure occurs, it curls up like this.  So this
24  part is exposed, there is a revision surgery, one
25  end is cut, the patient is left and sometimes it

Page 232

1   curls up like this.
2          Q.  Is this a multiple revision?
3          A.  I don't know.
4          Q.  You don't know?
5          A.  (Witness nods.)
6          Q.  Okay.  For the other mesh
7   erosions, or exposures that you've discussed on 58,
8   59, 60, 61, 62 and now 63, do you know whether
9   those are first revision cases, second revision
10  cases, or multiple revision cases?
11         MR. ORENT:  Objection.
12         THE WITNESS:  I don't remember exactly.
13  Sometimes it's first revision, sometimes five, six
14  revisions.
15         BY MR. THOMAS:
16         Q.  You just don't know?
17         MR. ORENT:  Objection.
18         THE WITNESS:  If I go through records,
19  if it was individual report of a case, I go through
20  records thoroughly, so I know exactly how many
21  revisions it was.
22         BY MR. THOMAS:
23         Q.  Go to page 64.  Figure Set 11b, is
24  that part of Figure Set 11c, or is that different?
25         A.  No, it's different.

Page 233

1          Q.  How can you tell?
2          A.  It's a different slide.
3          Q.  Okay.  Is it a different patient?
4          A.  I don't remember.
5          Q.  Okay.
6          A.  It may or may not be.
7          Q.  Okay.  Do you know if it's TVT or
8   TVT-O?
9          A.  No.
10         Q.  Page 65, Figure Set 11e; isn't
11  that the same as Figure Set 11c?
12         A.  I just noticed, something
13  happened.
14         Q.  You liked that one?
15         A.  Could have been pasted twice or
16  selected and pasted -- I don't remember.  Something
17  happened here.  So I probably intended to insert
18  different picture, but this one made it.
19         Q.  Okay.  I think we can say that
20  63 and 65 came from the same patient?
21         A.  Yes.  It just shows you that I
22  don't have an army of people helping me, I'm just
23  alone.
24         Q.  I understand.  Let's go to
25  page 66, Figure Set 12.

59 (Pages 230 to 233)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 234

1    A. Yes.
2    Q. This is additional TVT cases. Do
3 you know whether this is a single mesh or multiple
4 meshes?
5    A. What do you mean a single mesh --
6    Q. There are four frames here.
7 Excuse me, there are two frames here.
8    Do you know if it's the same one
9 patient or two?
10    A. No.
11    Q. You don't know whether it's one or
12 two?
13    A. No.
14    Q. Do you know whether it's TVT or
15 TVT-O?
16    A. No.
17    Q. What are you trying to show in the
18 top image on page 66, Figure Set 12.
19    A. Acute inflammation at the site of
20 exposure.
21    Q. When you say acute inflammation,
22 is that different from infection?
23    A. No. Acute inflammation is
24 reaction to infection. Technically, it's the same
25 pathological process.

Page 235

1    Q. I was just going to ask you that.
2 Can you diagnose infection from this slide?
3    A. Yes, I can.
4    Q. And based on what?
5    A. Based on the acute inflammation.
6    Q. Okay. And what is it about the
7 slide that shows the acute inflammation?
8    A. The neutrophils.
9    Q. And the slide below that, again,
10 shows acute inflammation, and that may or may not
11 be the same patient?
12    A. That's correct. I have feeling
13 that they are different patients. I think one
14 of -- the top one is the later case, the bottom one
15 is an earlier case.
16    Q. As you sit here, do you know which
17 ones they are?
18    A. The quality of the histology and
19 the quality of the picture.
20    Q. In the top image, where you show
21 the acute inflammation, is there mesh in that
22 image?
23    A. Underneath, if you go a little bit
24 over.
25    Q. This doesn't appear in the image,

Page 236

1 correct?
2    A. You're correct.
3    Q. Thank you. And in the lower image
4 on Figure Set 12, the yellow represents
5 polypropylene?
6    A. That is correct.
7    Q. And the presence of neutrophils
8 again shows the acute inflammation?
9    A. That's correct.
10    Q. Anything else remarkable about
11 that slide?
12    A. No.
13    MR. THOMAS: I need to take a break,
14 please.
15    -- RECESS AT 3:19 --
16    -- UPON RESUMING AT 3:23 --
17    BY MR. THOMAS:
18    Q. Doctor, I understand from prior
19 depositions that when you analyzed your
20 medical-legal cases that you prepared your own, for
21 lack of a better description, your own pathology
22 report. I think you called it a synoptic recording
23 for each of the plaintiffs?
24    A. Not for medical-legal. I do it
25 for all mesh cases, it's a part of research.

Page 237

1    Q. Do you have those kinds of
2 recordings for all of the patients that are in your
3 report?
4    MR. ORENT: Objection.
5    THE WITNESS: May or may not. Probably
6 I don't have for all patients. Some cases are
7 probably not even signed out, so the report is not
8 completed yet.
9    BY MR. THOMAS:
10    Q. I guess my point is that we didn't
11 get any of those on your thumb drive. And I'm
12 curious if there's some of those that we don't
13 have. We have a lot of them in the Huskey, Edwards
14 case or the Bellew case -- in the Bellew case, you
15 produced those to us for the --
16    A. Yes. When I started doing my
17 research, I realized that I needed more or less
18 standardized approach when I examined the meshes.
19    And I started entering them as a
20 synoptic report, which is a specific pre-set number
21 of parameters, so I don't forget and they're all
22 analyzed in the same manner so they can compare
23 them. It has nothing to do with medical-legal
24 cases, or nothing else. It's pure documentation
25 for research purposes.

60 (Pages 234 to 237)

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 238

1        Q.  Do you have that for each of the
2   slides that are in this report?
3        A.  As I said --
4        MR. ORENT: Objection.
5        THE WITNESS: -- I don't have all of
6   these patients, some of the reports are not
7   finalized.
8        BY MR. THOMAS:
9        Q.  I'm going to ask you to produce
10   those that you do have.
11        I have a --
12        A.  If it's medical-legal case and
13   you're entitled to see the information.
14        Q.  Okay.  I have a title of a study,
15   we talked before about your chemical oxidation
16   study you were performing, and I asked you about
17   the recipe for the chemicals to which you're
18   exposing the TVTs to.
19        A.  You mean hydrogen peroxide with
20   chromium salt catalyst?
21        Q.  Yes.
22        A.  Okay.  I remember.
23        Q.  And there was a study we found
24   called, "Controlled Peroxide Degradation of
25   Polypropylene - Rheological Properties and

Page 239

1   Prediction of MWD From Rheological Data".  Lead
2   author, Azizi, A-Z-I-Z-I.  Including I. Ghasemi,
3   G-H-A-S-E-M-I, and M. KARRABI, K-A-R-R-A-B-I; does
4   that ring a bell?
5        MR. ORENT: Objection.
6        THE WITNESS: You're asking the wrong
7   person, I'm really bad with names.  I'm a
8   pathologist, I remember the slides but I don't
9   remember the names.
10        BY MR. THOMAS:
11        Q.  Do you have the study that you
12   used to come up with the recipe?
13        A.  Yes, I do.  I can find it in my
14   hard drive, and I can find it.
15        Q.  Okay.  Good.
16        A.  It's most likely at least in the
17   reference materials as well.
18        Q.  In the reference materials to your
19   report?
20        A.  Yes.
21        Q.  Okay.  How did you determine which
22   of the slides from your total number of TVT-O and
23   TVT cases to include in the report?
24        A.  I went to features.  So every time
25   I would be describing a specific feature in the

Page 240

1   opinions, I would go back in my pool of images, for
2   TVT and TVT-O cases, and search for best images
3   representing that specific feature.
4        Q.  I see.  So when you say "best
5   images", you went back through about 100 different
6   TVTs and TVT-Os did you say?
7        A.  No, I said slings.
8        Q.  I'm sorry.  How many TVTs and
9   TVT-Os have you looked at?
10        A.  Ballpark of 30 to 40.
11        Q.  Okay.  And so you went back
12   through your 30 to 40 to identify those that best
13   represented the features that you wanted to show?
14        A.  Images.
15        MR. ORENT: Objection.
16        BY MR. THOMAS:
17        Q.  Okay.  Images?
18        A.  I didn't take new images of
19   various cases, I just used those images which were
20   taken already.  The only new images that I produced
21   are the cases I received as a consulting trial set.
22        (Reporter sought clarification.)
23        A.  Trial set, as a set to facilitate
24   at trial.
25        Q.  Let's go to Exhibit No. 2.

Page 241

1        Exhibit No. 2 is your supplemental
2   report served two days ago.
3        A.  Yes.
4        Q.  And when you received this, you
5   received slides from CAMC?
6        A.  Yes.
7        Q.  You didn't create your own slides?
8        A.  No, I did the staining.
9        (Reporter sought clarification.)
10        A.  My lab did staining.
11        Q.  Do you know whether this is a TVT
12   or a TVT-O?
13        A.  No, I don't remember now.
14        Q.  Okay.
15        A.  I didn't review any medical
16   records for the consolidated trial cases.
17        Q.  And if you look at -- your pages
18   aren't numbered, but the first image, which is
19   identified as supplemental Figure EM1, it says:
20   "Portion of excised mucosa with underlying mesh,
21   H&E magnification equivalent to 1.6X objective".
22        What is the significance of this image?
23        A.  It's just from my review showing
24   where the mesh is and how it relates to the mucosa.
25        Q.  Is there anything significant

Vladimir Iakovlev, M.D.

Page 242

1  about this image in terms of risk factors or issues
2  related to symptoms, clinical symptoms?
3          A.  Well, it's close.  So it's an
4  overview of the part which didn't get exposed but
5  it shows the proximity.  You know, that's
6  significant.
7          Q.  And again, you don't know whether
8  that was placed there or if it migrated there after
9  placement, correct?
10          MR. ORENT:  Objection.
11          THE WITNESS:  That's correct.
12          BY MR. THOMAS:
13          Q.  Okay.  Anything else remarkable
14  about supplemental Figure EM1?
15          A.  No, there's scar tissue which
16  encapsulates and fills the pore; that's about it.
17          Q.  Okay.  Supplemental Figure EM2.
18  Is this part of the same slide or is this a
19  different slide?
20          A.  Oh, it's the same block.
21          Q.  Got it.
22          A.  Yeah, I think it's the same slide
23  because I had only one H&E slide.
24          Q.  It says in the first page you
25  received unstained histological slides, plural.

Page 243

1  Did you only have one?
2          A.  For H&E, I stain only one slide.
3  So one slide was stained by H&E method, one slide
4  smooth muscle actin, and one slide S100 protein.
5          Q.  Okay.  So supplemental Figure EM2
6  is just more of a magnification of Figure EM1,
7  correct?
8          A.  Yes, I think you can match it,
9  it's from here.
10          Q.  And again, what you're trying to
11  show is the foreign body reaction and inflammation?
12          A.  That is correct.
13          Q.  Where is the bark in this image?
14          A.  Which image?  The EM2?
15          Q.  Yes.
16          A.  Maybe out of focus, maybe not
17  there.
18          Q.  Okay.  If you go to supplemental
19  Figure EM3, this is another portion of the same
20  image, correct?
21          A.  I think it's a different fragment,
22  from the same slide but from a different piece of
23  tissue.  There were several pieces of tissue on the
24  slide.
25          Q.  I see.  And what is the purpose of

Page 244

1  showing supplemental Figure EM3?
2          A.  Again, shows mucosa and proximity
3  of the mesh to mucosa.  There is less than a half
4  millimeter between the mesh and mucosa.
5          Q.  What is the distance between those
6  two mesh fibers that are shown there?
7          A.  About a millimeter.
8          Q.  Okay.  Supplemental Figure EM4,
9  again, you're showing the foreign body inflammatory
10  reaction?
11          A.  That's correct.
12          Q.  If you go to supplemental Figure
13  EM5?
14          A.  Yes.
15          Q.  You indicate in the description,
16  "acute inflammation and indication of mesh erosion
17  and bacterial infection".
18          Do you know whether this patient was
19  diagnosed with an infection?
20          A.  No, I didn't read the records.  I
21  can see clearly there is bacterial infection
22  triggering acute inflammation.  If they saw it
23  clinically or they didn't, I don't know.  But even
24  if they didn't, I would tell them there was an
25  infection.

Page 245

1          Q.  Okay.  Are you able to tell from
2  these images that there was in fact a mesh erosion
3  or mesh exposure?
4          A.  Yes.
5          Q.  And how can you tell that?
6          A.  There was a breakdown of mucosa
7  and entry for infection.  That's why I can see
8  acute inflammation.
9          Q.  Where is the breakdown of the
10  mucosa?
11          A.  I don't know.  It didn't get in
12  the section.
13          Q.  Are you assuming there's a
14  breakdown of mucosa?  You don't show one on the
15  slide, correct?
16          A.  It's not an assumption.  I can
17  tell you with 100 percent certainty that there was
18  a breakdown in the mucosa.  Because if mucosa is
19  not broken down, there is no bacterial insemination
20  and acute inflammation.
21          Q.  Supplemental Figure EM6, you
22  identify an obliterated artery?
23          A.  That is correct.
24          Q.  Anything remarkable about that
25  finding beyond what we've talked about before, the

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 246

1    other obliterated artery?
2         A.  No.  Exactly the same finding;
3    interrupted blood supply.
4         Q.  Which may or may not have clinical
5    significance?
6         MR. ORENT:  Objection.
7         THE WITNESS:  The degree of the changes
8    may or may not be clinically apparent.
9         BY MR. THOMAS:
10        Q.  Okay.  Because if the blood flow
11   is reduced or interrupted, they may receive blood
12   flow from other sources that would vascularize this
13   area?
14        A.  Yes.  And then that was fibrosis,
15   and then you mix up fibrosis which is caused by the
16   mesh, then fibrosis lead to ischemia.
17        It's a complex setting; how much of
18   that would translate from one specific symptom
19   would be difficult to discern.
20        Q.  Obliteration of arteries is a risk
21   in any surgery of the pelvic floor, isn't it?
22        MR. ORENT:  Objection.
23        THE WITNESS:  Yes, there would be a
24   risk for obliterated artery.  But when you say
25   obliterated artery in the tissue, which is not

Page 247

1    changed otherwise, because to obliterate an artery
2    during surgery, you have to transect it.
3         So by the time of mesh placement, this
4    part would be separated.  So this is an intact
5    structure, which was not transected during surgery.
6    It became obliterated later on.
7         BY MR. THOMAS:
8         Q.  If you go to supplemental -- how
9    can you tell that it happened after placement?
10        A.  It's not transected during
11   surgery.
12        Q.  I see.
13        A.  See how are the arteries being
14   damaged --
15        Q.  I understand.
16        A.  -- they get transected.
17        Q.  I understand.  Supplemental Figure
18   EM7a, "innervation of the scar tissue encapsulating
19   the mesh, S100".  What are you showing in EM7a?
20        A.  Nerve branch.  EM7a and 7b is the
21   same image; 7b is labeled copy of 7a.
22        Q.  Okay.  And the arrows are pointing
23   to what?
24        A.  Nerve branches, or nerves.
25        Q.  And for the nerve and nerve branch

Page 248

1    on the upper right-hand corner, how far is that
2    from the mesh?
3         A.  This one is --
4         Q.  I'm talking about this one, upper
5    right?
6         A.  Oh, this one.  See, with this one
7    I don't even know.  Maybe there is fiber right
8    there, so it's pinching it.
9         Q.  Do you know whether that's fiber
10   or not?
11        A.  That is hard to determine, I
12   suspect there is, but I wasn't sure therefore I
13   didn't put it.
14        Now, looking at this image, I think
15   there was a fiber.  So that curvilinear shape is
16   actually fiber compressing.
17        Q.  How do you know that without
18   looking at it?
19        A.  Well, there's density, increased
20   density.  Similar to this area, the collagen is
21   compacted right around the fibers.
22        Q.  The tissue itself is pretty
23   irregular, isn't it?
24        A.  Well, see, this is clearly not the
25   place where mesh fiber was.  Because there is no

Page 249

1    capsule.  If you look here, there is a capsule
2    around the fiber, and if you look there, there is a
3    capsule around the fiber.  So I suspect there was a
4    fiber here.
5         Q.  Okay.
6         A.  Not here, but there.
7         Q.  Looking at those nerves, is there
8    anything about the appearance of those nerves on
9    light microscopy that suggests to you they were
10   causing pain to the patient while the mesh was in
11   place?
12        A.  Could you repeat the question.
13   I'm getting tired, sorry.
14        MR. THOMAS:  Would you repeat it for
15   me, please?
16        -- REPORTER'S NOTE:  Question read back
17   as recorded above.
18        THE WITNESS:  They're healthy nerves
19   which can conduct pain.  This is one of the main
20   findings.
21        BY MR. THOMAS:
22        Q.  Okay.  But again, there's nothing
23   about those that allow you to state that those
24   nerves were in fact reacting in a way to cause pain
25   in a patient while the mesh was implanted?

63 (Pages 246 to 249)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 250

1          A.  The point of the picture is to
2    show that that tissue is sensitive, so it can sense
3    pain.
4          Those nerve branches are not directly
5    affected or at least one may, but the others are
6    not directly affected by the mesh.
7          The point is that tissue around it is
8    innervated, so if you get a formation, if you get
9    distortion, mechanical compression, then it can
10   sense pain.
11        Q.  Okay.  Page 67 of your first
12   report, Figure Set 13a, you're talking about the
13   Prolene degradation layer.
14        Do you know if this is TVT or TVT-O?
15        A.  No.
16        Q.  Do you know from what case this
17   comes?
18        MR. ORENT:  Objection.
19        THE WITNESS:  One of the consolidated
20   cases.
21        It's so similar to this study, which I
22   think our scientists did in 87.  I mean, even the
23   arrow there is so similar.
24        BY MR. THOMAS:
25        Q.  So all of these images are from

Page 251

1    the consolidated cases through 72, and our experts
2    have these images, correct?
3          A.  Images -- they have slides.
4          Q.  Slides, that's what I meant.
5          A.  Yes.
6          Q.  I've talked to you, you've been
7    talked to at length about these images in prior
8    cases.  Is there anything new and different about
9    what's expressed in these images that you haven't
10   seen before?
11        A.  It is exactly what I described in
12   the published papers and previous reports.  Exactly
13   all, everything is the same.
14        Q.  For the other cases that you begin
15   on 73, you had images from additional TVT cases.
16   Do you know whether those are TVT or TVT-O?
17        A.  No.
18        MR. ORENT:  Objection.
19        BY MR. THOMAS:
20        Q.  If you go to page 72, please?
21        A.  Yes.
22        Q.  On page 72, you show an empty
23   space of detached core on the right image.  And a
24   separated degradation bark.  The empty space means
25   that the polypropylene dropped out of the image?

Page 252

1          A.  Not image, slide.
2          Q.  Slide, I'm sorry.  Thank you.
3          A.  It came detached and displaced.
4          Q.  Okay.  And left what you have
5    described as the bark behind?
6          A.  Yes, that's correct.
7          Q.  All right.  Now, if you go to the
8    next page, page 73, again, additional TVT cases you
9    show an image where you show the polypropylene
10   still in place, correct?
11        A.  Yes.  So now there is a
12   separation.  The core separated from the bark, but
13   the core didn't detach completely and floated away.
14   It's still close, but there was a split.
15        Q.  And this is detached as a part of
16   the sample preparation process, correct?
17        MR. ORENT:  Objection.
18        THE WITNESS:  I don't know when it
19   became detached.  During surgery or during
20   sectioning or during processing of the specimen.
21        BY MR. THOMAS:
22        Q.  Didn't happen in vivo, didn't
23   happen in the body?
24        A.  No.  I suspect it doesn't happen
25   that often.  I very rarely see the bark actually in

Page 253

1    the tissue, being displaced in the tissue away from
2    the fibers.
3          Q.  Have you studied how mechanically
4    that happens?
5          A.  It just breaks off.  There is a
6    shear force, a breaking force.
7          Q.  When you say a shear force, does
8    it shear off at the point where -- at about five
9    microns as the degradation ceases?
10        A.  It shears off in the interface
11   between degraded and non-degraded.
12        Q.  That's my point.  Let's see if we
13   can agree with this.  We're dealing with visual
14   observations here, correct?
15        A.  Yes, that's correct.
16        Q.  And is it fair to understand with
17   respect to the images on page 73, where you show
18   detached core and degradation bark separated, are
19   you telling me that the detached core no longer has
20   a bark on it?
21        A.  They have a really thin layer of
22   degraded material.  Because the bark itself is not
23   uniform.  There is a higher degree of degradation
24   on the outside and then smaller, smaller, smaller,
25   smaller, smaller.

Vladimir Iakovlev, M.D.

Page 254

1    Q.  Right.
2    A.  And then the degradation blends
3  into not degraded polypropylene.
4    Q.  Right.
5    A.  So at certain point these micro
6  cracks, and mono cracks, they cannot go into this
7  completely solid material, so it shears off
8  somewhere there.
9    I don't know if it's right at the end
10  of them, close to them or how far they are.  So
11  there might be a layer of degraded polypropylene on
12  the core.  How thick it is, I wouldn't know.
13    Q.  It's too small to measure by your
14  technique?
15    A.  That's correct.
16    Q.  And your best estimate is that the
17  degradation bark that appears, as you've described
18  it in 73, is much as five microns?
19    A.  This is thinner.  By looking at
20  it, it is around two microns.
21    Q.  Now what you show on page 75,
22  again from additional TVT cases, are the cracks
23  which you believe to be oxidized polypropylene,
24  correct?
25    A.  I don't believe -- I know.

Page 255

1    Q.  Okay.  And Figure Set 13i, do you
2  know if this is a TVT or TVT-O?
3    A.  No.
4    Q.  Do you know how long this was in
5  the body?
6    A.  Certainly more than a year.
7    Q.  Why do you say that?
8    A.  It's relatively thick.  So if I
9  check here where it's less tangential, this is the
10  thickness, so it's definitely more than a year.
11    Q.  When you devised your experiment
12  to intentionally oxidize polypropylene, did you
13  look at any methods that would allow you to
14  intentionally oxidize polypropylene in a time of
15  less than a year and a half?
16    A.  No, I didn't take them out.
17    Q.  You misunderstood my question.
18    Did you attempt to identify any kind of
19  chemical recipe that would allow you to
20  intentionally oxidize Prolene more quickly than a
21  year and a half?
22    A.  No.
23    Q.  Why not?
24    A.  I'm busy enough with other things.
25    Q.  Okay.

Page 256

1    A.  And I figure I just leave it long
2  enough, soon enough it will form and I will see
3  which would -- in which fluid the bark is thicker.
4    Q.  We talked before, I believe at
5  trial, about xylene and that you were conducting a
6  test to determine the extent to which xylene
7  impacted Prolene polypropylene; do you remember
8  that?
9    A.  Yes, I do.
10    Q.  You told me, I believe, that you
11  were currently testing xylene to determine whether
12  xylene would impact Prolene polypropylene.  Are you
13  still conducting that test?
14    A.  It's in the same set of jars.  One
15  of the jars contains xylene.
16    Q.  Is that the only test that you're
17  doing with xylene?
18    A.  Well, previously I did testing for
19  processing.  So new mesh was put in regular xylene
20  solution for time when it happens during tissue
21  process.
22    Q.  Did you produce that to me in the
23  jump drive Exhibit 4.
24    A.  No, these are the images of new
25  pristine mesh.  So this mesh had been through

Page 257

1  xylene.
2    Q.  Okay.  Did you do any other
3  testing of pristine mesh impact on xylene over a
4  period of time?
5    A.  No.  These only two.  I did
6  experiment for our routine processing, routine
7  exposure to xylene, and then I started this
8  experiment.
9    I was testing it within month or two
10  after it became exposed.  I was thinking maybe it
11  would get dissolved; it didn't.  But the long-term
12  effect will be studied later on together with other
13  solutions.
14    Q.  When you put the pristine mesh
15  through the sample preparation process, did you
16  perform any analytical chemistry on the mesh to
17  determine the extent to which xylene may have
18  altered the chemical structure of polypropylene?
19    A.  No.
20    Q.  On page 84?
21    A.  Yes.
22    Q.  Is page 84 another image of what
23  we had talked about at length on page 83?
24    A.  No, this is a different case.
25  This is a case consolidated case.  This is

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 258

1  appearance of case from -- you can see the name of
2  the patient.
3       Q.  Okay.  So this is -- strike that.
4       Did you do any analysis for bark on the
5  mesh depicted in Figure 16a?
6       A.  It's embedded in histology.  It's
7  there.  I mean --
8       Q.  Have you ever done it?
9       A.  I didn't do anything specific.
10  It's embedded in histology.  I can pull the slide
11  and take picture of the bark.
12       But again, this is a St. Michael's
13  patients, I'm not comfortable disclosing or giving
14  pictures specifically for trial or anything else.
15  I can tell you that I saw the bark.
16       Q.  So, Figure 16b on page 84 is
17  cracking on the surface of TVT mesh fibers.  And
18  this is from the consolidated cases for patient
19  Dameron; is that correct?
20       A.  That is correct.
21       Q.  And these are the tissue samples
22  that you show on 84 that you had available to you?
23       A.  Yes.
24       Q.  And they had been stored in
25  formalin?

Page 259

1       A.  No.  We received it dry.  Your
2  expert was there.
3       Q.  Okay.
4       A.  It was jar without formalin.
5       Q.  Do you know whether it was in
6  formalin?
7       A.  I don't.  Probably it was at one
8  time, it leaked out but... that's my assumption.
9       Q.  You do know how long this was in
10  the body?
11       A.  No.
12       Q.  And obviously you don't know how
13  it was handled before it got to you, correct?
14       A.  No.
15       EXHIBIT NO. 5:  Study Entitled "Safety
16       Considerations for Synthetic Sling
17       Surgery" in which Dr. Vladimir Iakovlev
18       appears as an author.
19  BY MR. THOMAS:
20       Q.  Doctor, I'm going to hand you
21  what's been marked as deposition Exhibit No. 5.
22       A.  Yes.
23       Q.  Deposition Exhibit No. 5 is a
24  review study in which you appear as an author --
25       A.  Yes.

Page 260

1       Q.  -- entitled, "Safety
2  Considerations for Synthetic Sling Surgery".
3       I know Dr. Blaivas.  Who is Dr.
4  Purohit?
5       A.  I don't know.  It's a team of
6  urologists and fellows working with Dr. Blaivas.
7       Q.  Okay.  Did you consult with Dr.
8  Blaivas on the content of this article?
9       A.  Well, we wrote it together.
10       Q.  And that's my point.  Did you work
11  with this whole team in writing the article?
12       A.  Yeah.  We were changing, everybody
13  was contributing.  It was changed several times,
14  redacted and...
15       Q.  Did you work with any individual
16  specifically, or did you write your own piece and
17  just look after your own section of the article?
18       A.  Oh, it's a joint effort.  I mean,
19  the manuscript consult, everybody contributes, puts
20  one piece there, puts one piece there.
21       It's been changed and then editorial
22  office changes and then we change back and then so
23  forth.  By the end of the day each single word may
24  be coming from a different person.
25       Q.  How many drafts did this Exhibit 5

Page 261

1  go through?
2       A.  Five, six.
3       Q.  Do you still have those drafts?
4       MR. ORENT:  Objection.
5       THE WITNESS:  Yes, I do.  But I mean
6  this is more of a delicate issue because there are
7  many authors involved and there is research
8  produced information, and it's a work in progress.
9       What became public is what we see right
10  in front of us.  What we decided to be correct to
11  be exposed to the public.
12       BY MR. THOMAS:
13       Q.  Other than the journal itself, was
14  anybody else involved in the preparation of
15  Exhibit 5?
16       A.  What do you mean?
17       Q.  Did you have any contribution from
18  any other source other than the authors that were
19  listed in the preparation of the article?
20       A.  Everybody listed as authors,
21  everybody who contributed is here.  Well, editorial
22  office was working with it also.
23       Q.  And who did you work with at the
24  editorial office?
25       A.  I don't remember now.

66 (Pages 258 to 261)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 262

1    **Q.  Okay.**
2        A.  I mean, they send their paper,
3    they said, okay, this revision needs to be
4    reviewed, please check this, please check that,
5    they suggest some changes, mainly just style.  Very
6    strict regarding style.
7        **Q.  You said something earlier today,**
8    **I want to make sure I understand.  In this**
9    **document, there is reference to work that you have**
10   **done on different meshes in the medical-legal**
11   **setting.**
12       **I thought I understood you to say that**
13   **you didn't use the slides that were provided to you**
14   **by Dr. Kreutzer, but that you cut new slides from**
15   **existing blocks and conducted your analysis on**
16   **those new slides; is that correct?**
17       A.  For some cases, I received only
18   slides, stained and unstained.  For some cases I
19   received blocks.  As far as I remember, it's been
20   long time.
21       So I could either use unstained slides
22   which came together with stained slides, or I could
23   ask my lab to do recuts from the blocks which were
24   made before me.
25       **Q.  All right.  So, your best**

Page 263

1    recollection it was a mixture of previously
2    **existing slides or recuts from this mesh that you**
3    **had obtained from Dr. Kreutzer, correct?**
4        A.  Yes.
5        **Q.  Is the same thing true with your**
6    **other mesh specimens that were involved in**
7    **medical-legal field, that on some occasions you'd**
8    **use existing slides and some occasions you'd use**
9    **recuts or you'd have recuts made of existing**
10   **blocks?**
11       A.  That's correct.  Depends on
12   situation.
13       **Q.  I assume you stand by all the**
14   **findings in this report, correct?**
15       A.  It's not findings; this report is
16   a review.  So it's more based on the other papers.
17       **Q.  Okay?**
18       A.  The only thing which was produced
19   in this paper from us personally was figures.
20       **Q.  Let's go to one of those figures**
21   **on page 4.**
22       A.  You mean the table?
23       **Q.  Table two on page 4?**
24       A.  Yes.
25       **Q.  And this review paper, in**

Page 264

1    reporting longer-term complications, reports pain
2    greater than six weeks for either retropubic or
3    transobturator tape slings at 3.5 percent, correct?
4        A.  Which line?
5        **Q.  Third from the bottom, longer-term**
6    **complications.  Do you see it, for refractory pain**
7    **greater than six weeks?**
8        A.  So the incidence range is from 4.1
9    to 30 percent.
10       **Q.  The complications percentage of**
11   **patients that report refractory pain greater than**
12   **six weeks is 3.5 percent, correct?**
13       A.  What I see is 4.1 to 30 percent.
14       **Q.  Well --**
15       A.  Third line from the bottom.
16       **Q.  I understand that's the mean and**
17   **the range, correct?**
18       A.  Yes.
19       **Q.  4.1?**
20       A.  Sorry, 4.1 is mean.  Yes, you're
21   correct.  I need my glasses.
22       So this is -- the range is from 0 to
23   30 percent.
24       **Q.  But the average -- excuse me --**
25   **the percentage of patients at 7,084 that report**

Page 265

1    pain greater than six weeks, is 247 or 3.5 percent,
2    correct?  Is that right?
3        A.  Yes and no.  So this is a review
4    of previously published studies.  So the quality of
5    the studies is different, methodology is different.
6    But when you check them, the pain over six weeks is
7    reporting anywhere from 0 to 30 percent.
8        **Q.  Okay.**
9        A.  With a mean, or average
10   4.1 percent.
11       **Q.  But these numbers are correct,**
12   **aren't they?**
13       A.  Well, from what we extracted at
14   that stage from the papers, that's what we have.
15       **Q.  Okay.  You went out and tried to**
16   **obtain complication rates for retropubic or TOT**
17   **slings, didn't you?**
18       A.  Yes.  The whole paper is just for
19   slings.
20       **Q.  And as a part of looking at**
21   **long-term pain which is greater than six weeks, you**
22   **looked at 7,084 patients, correct?**
23       A.  No, we didn't.  The papers in
24   combination.
25       **Q.  I understand.  But you gathered**

67 (Pages 262 to 265)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 266

1   papers that looked at over 7,000 patients?
2       MR. ORENT:  Objection.
3       THE WITNESS:  That's what it says
4   there, yes.
5       BY MR. THOMAS:
6       Q.  And in gathering the papers, who
7   was in charge of picking which studies you looked
8   at?
9       A.  That part -- it's not a study; it
10  is a review.
11      Q.  I apologize.
12      A.  That part of the review was done
13  mainly by urologist.
14      Q.  Do you know who that was?
15      A.  It's a team working with Dr.
16  Blaivas.
17      Q.  So the urologist, the clinicians,
18  are the people who are responsible for identifying
19  the studies to identify the complication rates?
20      A.  That's correct.
21      Q.  And through their best efforts,
22  they identified a percentage of patients that have
23  pain more than six weeks at 3.5 percent, correct?
24      A.  That was an estimate of a minimal,
25  a minimum number.  So this is the bottom line.  So

Page 267

1   it's minimum of 3.5 percent of the patients will
2   develop chronic pain.
3       Q.  Okay.
4       A.  Which is -- probably doesn't say
5   right away, but that was the minimum.  It wasn't
6   that we were implying that it's a true number.
7       Q.  Do you know how many, for how many
8   of those 3.5 percent that the pain was ultimately
9   resolved?
10      A.  Again, 3.5 percent was minimum
11  number.
12      Q.  I understand.  But for some of
13  those people they were cured of the chronic pain,
14  weren't they?
15      MR. ORENT:  Objection.
16      THE WITNESS:  After mesh removal?
17      BY MR. THOMAS:
18      Q.  Or for whatever treatment?
19      MR. ORENT:  Objection.
20      BY MR. THOMAS:
21      Q.  Do you know that?
22      A.  No, I don't know.  I don't think
23  it was in the published literature.
24      Q.  That's fine.  Do you know whether
25  the urologist group who were looking at the mesh

Page 268

1   complications looked to see how many people had
2   their pain resolved by surgery or some other
3   treatment?
4       A.  Those papers are reviews.  Most of
5   them didn't provide that information.  They just
6   provided numbers for complications.
7       Q.  Did you do a literature search
8   yourself to determine the extent to which long-term
9   complications of chronic pain were resolved by
10  surgery or other treatment?
11      A.  Not to answer that specific
12  question.  Again, I mean, I only can read what is
13  published.  Because studies don't concentrate,
14  don't focus on this question; I cannot get an
15  answer.
16      Q.  Well, this was your group's best
17  effort at presenting, in a reviewed paper, the rate
18  of complications for long-term pain, correct?
19      MR. ORENT:  Objection.
20      THE WITNESS:  Yes, you're correct.
21      BY MR. THOMAS:
22      Q.  Thank you.
23      A.  But the question is that if I made
24  an effort to look for something which is barely
25  ever published; that's why I answered that it's

Page 269

1   specifically to that question, would be difficult
2   to do.
3       -- RECESS AT 4:08 --
4       -- UPON RESUMING AT 4:15 --
5       BY MR. THOMAS:
6       Q.  Doctor, let's go back to Exhibit
7   No. 5, page 5.  I asked you about the wrong chart.
8   I asked you about the chart on page 4.
9       The chart on page 4 does retropubic and
10  obturator slings.  The one on page 5 is limited to
11  retropubic slings; do you see at the top?
12      A.  Yes.
13      Q.  And retropubic slings are what TVT
14  slings are, correct?
15      A.  Yes.
16      Q.  And the long-term refractory pain
17  greater than six weeks reported by your group is
18  1.8 percent, correct?
19      A.  Yes, but it's not reported by our
20  group.
21      Q.  Collected by your group?
22      A.  Collected from other papers by our
23  group, yes.
24      Q.  And as a part of that, the group
25  looked at studies reporting on about 2,328

68 (Pages 266 to 269)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 270

1  patients, correct?
2       A.  Yes.
3       Q.  Okay.  For the slide on page 82,
4  about the -- 83, I'm sorry.  About the image of the
5  TVT mesh fibers immediately after surgery removal?
6       A.  Yes.
7       Q.  Did you submit any histology to
8  the journal for publication?
9       A.  For this case?
10      Q.  For the journal.  For --
11      A.  Which one?
12      Q.  In one of the studies you have the
13  image of that --
14      A.  It's --
15      Q.  Is it the other journal?
16      A.  Yes, this one.
17      Q.  I'll come back to that.
18      A.  You mean histology of that
19  specific case?
20      Q.  Yes.
21      A.  No.
22      Q.  Have you shared the histology of
23  that specific slide with anybody period?
24      MR. ORENT:  Objection.
25      THE WITNESS:  No.

Page 271

1       BY MR. THOMAS:
2       Q.  So you're the only one that's ever
3  looked at it?
4       A.  Pardon?
5       Q.  You're the only one that's ever
6  looked at it?
7       A.  Yes.  I don't think I have
8  pictures, I didn't take pictures.
9       Q.  Okay.  Why not?
10      A.  What for?
11      Q.  Okay.
12      EXHIBIT NO. 6:  Article entitled,
13      "Degradation of Polypropylene in Vivo:
14      A Microscopic Analysis of Mesh
15      Explanted from Patients."
16      BY MR. THOMAS:
17      Q.  Let me show you what's been marked
18  as deposition Exhibit No. 6.
19      Deposition Exhibit No. 6 is an article
20  entitled, "Degradation of Polypropylene in Vivo: A
21  Microscopic Analysis of Mesh Explanted from
22  Patients".  That was just recently released,
23  correct?
24      A.  That is correct.
25      Q.  And you worked with Dr. Guelcher

Page 272

1  and Dr. Bendavid on this?
2       A.  Yes.
3       Q.  Did you receive any funding for
4  your work in Exhibit 6?
5       A.  No.
6       Q.  Did Dr. Guelcher or Dr. Bendavid
7  receive any funding for their work on Exhibit 6?
8       A.  No.  The work actually was done
9  mainly by me.  Dr. Guelcher and Dr. Bendavid just
10  contributed to the drafting of the manuscript.
11      Q.  What did Dr. Guelcher contribute
12  to the manuscript?
13      A.  The drafting of the manuscript, we
14  discussed mechanism of degradation, mechanically
15  how it happens, oxidation and other aspects.
16      Q.  Do you view Dr. Guelcher as
17  authoritative on the issue of oxidative
18  degeneration -- excuse me.
19      Do you view Dr. Guelcher as
20  authoritative in the area of oxidative degradation
21  of polypropylene?
22      A.  He's a bio engineer.  He works in
23  the area.
24      Q.  How do you feel about him?  Do you
25  view him as authoritative in the field?

Page 273

1       MR. ORENT:  Objection.
2       THE WITNESS:  I'm not sure if I can
3  answer that question.
4       BY MR. THOMAS:
5       Q.  Okay?
6       A.  He's a specialist who works in the
7  area and works in the field.
8       Q.  At any time, have you relied upon
9  Dr. Guelcher to tell you, chemically, how
10  polypropylene oxidizes?
11      A.  No.  In fact, it wasn't my purpose
12  to answer the question how it oxidizes.  It only
13  describes that it does oxidize.
14      Q.  So what role did Dr. Guelcher play
15  in the preparation of Exhibit 6?
16      A.  Drafting of the manuscript, mainly
17  the discussion part.  He also suggested at one
18  point when we started working on this, doing a
19  myeloperoxidase stain.  Again, in relation to
20  oxidative degradation.
21      Q.  What role did Dr. Bendavid have in
22  this study?
23      A.  Well, he actually brought me to
24  this mesh field and he supplied, or some samples
25  came from Shouldice Hospital, where he worked.  And

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 274

1    he also helped drafting the manuscript.
2         Q.  In terms of the data gathering and
3    the conclusions contained herein, is this basically
4    your work?
5         A.  For the most part.
6         Q.  And I hate to ask you again, but
7    what data gathering or conclusions did Dr. Guelcher
8    or Dr. Bendavid provide?
9         A.  Dr. Guelcher didn't gather any
10   data.  As you can read the manuscript or paper,
11   it's all histology.
12        Q.  Okay?
13        A.  So I've been collecting data and
14   analyzing the samples.
15        But Dr. Bendavid contributed with idea
16   of degradation and contributing some samples,
17   hernia samples, and Dr. Guelcher contributed in
18   drafting the manuscript and also suggesting
19   myeloperoxidase stain and suggesting what is the
20   mechanism of degradation.
21        But the histology itself, data
22   collection and analysis, was done by me.
23        Q.  As part of the preparation of this
24   paper, did you and your coauthors discuss
25   intentionally oxidizing polypropylene to see if it

Page 275

1    would hold stain?
2         A.  No.  This paper was started, or
3    most of the data was collected even before I
4    learned about this simulation model.  So it wasn't
5    a part.
6         Q.  Did you ever discuss with Dr.
7    Guelcher different ways to intentionally oxidize
8    polypropylene?
9         A.  Later on.  I mean, the manuscript
10   was mainly written already and then we started
11   discussing plans for the future.  And then that's
12   how I used the paper he suggested as a recipe for
13   simulation.
14        Q.  Okay.  So Dr. Guelcher suggested
15   to you the paper that you used for the simulation?
16        A.  I think so.
17        Q.  Okay?
18        A.  Maybe I saw it before, but he
19   pointed that, that's the recipe he was using as
20   well.
21        Q.  Got it.  Is Dr. Guelcher involved
22   in your experimental work on the samples that
23   you're now storing?
24        A.  No.  I mean, I had my own samples.
25   His contribution to this work is that I ask him

Page 276

1    what he's using, or I don't remember exactly how
2    the conversation started, and he said that he's
3    using recipe from that specific paper.
4         Q.  I see.
5         A.  And I used it.  We didn't have
6    exchange of the samples, or testing of each other's
7    samples.
8         Q.  So you have never analyzed the
9    samples that he tested?
10        A.  No, never seen those.
11        Q.  And you know that he's exposed
12   samples to five and six weeks' worth of exposure?
13        A.  I do know that.
14        Q.  Okay.
15        A.  I do know that.
16        Q.  Have you requested to look at
17   those or test those or analyze those in any form?
18        A.  There was a discussion.  I don't
19   know if I said that I don't want to do it because I
20   have my own and I believe it needs to be a year.
21        Or maybe they used all their samples
22   for SEM, and they didn't have anything left.  But
23   at that time the decision was to wait for my
24   samples to become mature.
25        Q.  Okay.  Did you submit this article

Page 277

1    to multiple journals?
2         A.  There was submission to at least
3    two journals and the answer was really quick, next
4    day.  They said no, it's not in our scope.  And I
5    was aiming at really high impact like Nature, so...
6         Q.  Nature turned it down?
7         A.  (Witness nods).
8         Q.  Okay.
9         A.  Are you surprised?
10        Q.  And so is the Journal of
11   Biomedical Materials the only other journal that
12   reviewed it?
13        MR. ORENT:  Objection.
14        THE WITNESS:  Yeah, this is my usual
15   approach.  For all my papers I start really high
16   impact journal, hope for the best, and then go
17   from there.
18        BY MR. THOMAS:
19        Q.  Now, was there a peer-review
20   process of this article?
21        A.  Yes.  They ask for revisions, I
22   did revisions, then we drafted it.
23        Q.  How many drafts did you have of
24   Exhibit 6?
25        A.  We had one revision, one large

70 (Pages 274 to 277)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 278

1    revision. Part of the manuscript removed tables.
2         MR. ORENT:  I object to this whole line
3    of questioning.  It's outside of the scope of the
4    expert testimony, and moreover I think there's a
5    public policy interest in maintaining the integrity
6    of the editorial board process of the journals.
7         BY MR. THOMAS:
8         Q.  Do you still have your first
9    draft?
10        MR. ORENT:  Objection.
11        THE WITNESS:  I can't answer that.
12        BY MR. THOMAS:
13        Q.  You can't?
14        A.  (Nods).
15        Q.  Why?
16        A.  It goes to the issues Mr. Orent
17   just mentioned.
18        Q.  Okay.  So have you maintained a
19   file on the preparation, the data you gathered, the
20   submission process and the peer-review process for
21   Exhibit 6?
22        A.  Did I?
23        Q.  Yes.
24        MR. ORENT:  Objection.
25        THE WITNESS:  Yes, I did.

Page 279

1         BY MR. THOMAS:
2         Q.  I just ask you to maintain that
3    file and either I'll get it or I won't.  Just don't
4    do anything to it; that's all I ask.
5         Just so I can short cut this.  Is it
6    fair to say you're not going to answer any more
7    questions about the generation, drafting, peer
8    review, submission and publication of the article?
9         A.  It was a standard process.  There
10   was nothing unusual about it.
11        Q.  But in terms of the details of it
12   you're not going to answer any questions about
13   that?
14        A.  No.  I can tell you that there was
15   nothing unusual.
16        Q.  I understand.  If you'll turn to
17   page 2, Table 1 is the sample and patient data?
18        A.  Yes.
19        Q.  And under "Slings", it says that
20   you have 28 TVT or TVT-Os; do you see that?
21        A.  That is correct.
22        Q.  Do you know the breakdown between
23   TVT and TVT-O?
24        A.  No.
25        Q.  Okay.  Do you know whether any of

Page 280

1    them are machine cut or laser cut?
2         A.  No.
3         Q.  You have four Prolift products; do
4    you see that?
5         A.  Yes, I do.
6         Q.  And then a number of hernia mesh
7    cases, correct?
8         A.  That is correct.
9         Q.  Of the 69 slings that you
10   analyzed, how many were medical-legal cases?
11        A.  The breakdown was about
12   70 percent.  I cannot tell you exact number.  But
13   roughly, it's for the whole set was 70 percent
14   medical-legal and 30 percent hospital cases.
15        And not necessarily St. Michael's.
16   They were coming from different hospitals.
17        Q.  Okay.  Is it fair to say if
18   they're undetermined that they're not medical-legal
19   cases?
20        A.  At least 70 percent were
21   medical-legal.
22        Q.  I understand that, but I'm trying
23   to break it down further to find out which ones
24   were medical-legal and which ones were not.
25        And you have 45 hernia cases that you

Page 281

1    identify as undetermined.  I'm making an assumption
2    that because they're undetermined hernia cases that
3    they're probably not medical-legal cases; is that a
4    fair assumption?
5         A.  Some of them are medical-legal.
6         Q.  What percentage of the
7    undetermined hernia cases were medical-legal; do
8    you know?
9         A.  The undetermined are probably all
10   non-medical-legal.  I don't think medical-legal is
11   undetermined.
12        Q.  That was my point?
13        A.  Yes.
14        Q.  So when we're making the
15   calculation of the 70 percent, is it safe for us to
16   exclude -- or strike that.
17        Is it safe for us to include the 45
18   undetermined hernia cases in the 30 percent of the
19   non-medical-legal cases?
20        A.  Yes, we can do that right away.
21   Those would be non-medical-legal cases.
22        Q.  Okay.
23        A.  There could be some potentially
24   medical-legal cases when I receive a specimen but I
25   have not received a history.  They say, hold on to

Vladimir Iakovlev, M.D.

Page 282

1   this -- may be medical-legal case later on.
2        Q.  Okay?
3        A.  So it's not hard number.
4        Q.  Right.
5        A.  But it's a ballpark.
6        Q.  For the Ethicon TVT, TVT-O of
7   those 28 how many of them are medical-legal?
8        A.  At least 80 percent.
9        Q.  Perhaps more?
10       A.  Possibly more.
11       Q.  And included within the 28 Ethicon
12  TVT and TVT-O are the cases that you received from
13  Dr. Kreutzer, correct?
14       A.  Yes.  Most of St. Michael's cases,
15  when I had a record, were actually TVT.  So I don't
16  know for whatever reason most of those excised at
17  St. Michael's were TVT.
18       Q.  Okay.  And in addition, you had
19  new TVT and TVT-O cases since Dr. Kreutzer, and
20  those would be included in this article as well?
21       A.  Yes.
22       Q.  So, for example, the Edwards case
23  would probably be in this?
24       A.  Yes, it would be in there.  I
25  received the Edwards case before I received

Page 283

1   specimen from Dr. Kreutzer.
2        Q.  Okay.  Interesting.
3        On page 3 of this study, you talk about
4   measuring the degradation layer's thickness?
5        A.  Yes.
6        Q.  And you say a set of 23
7   mid-urethral slings was the largest uniform group
8   that fulfilled your criteria.  Is that the slings
9   that you got from Dr. Kreutzer?
10       A.  Most of them came in that set of
11  samples.
12       Q.  All right.  Tell me how you
13  physically measure the thickness of the stained
14  layer with the eyepiece micrometer?
15       A.  I would find fibers which are cut
16  as perpendicular as possible and measure bark
17  thickness on at least two occasions.
18       And then measure -- I try to find
19  another fiber, measure again, and then take median
20  number, the most frequent I'm getting.
21       Q.  Do you have the data that you
22  collected on those measurements?
23       A.  Yes, I do.
24       Q.  Okay.
25       A.  I mean, you have it on the --

Page 284

1        Q.  Is it on the thumb drive?
2        A.  It's on the thumb drive.  And you
3   saw it before at various depositions.
4        Q.  Thank you.  I don't want to redo
5   that.
6        And when you do the eyepiece micrometer
7   and you measure, to what level can you measure?
8        A.  Initially, I had one micrometer.
9   It was graded only to one micrometer.  Now, I have
10  little bit better so I can measure up to half a
11  micrometer.
12       Q.  When you were doing this study,
13  were you measuring at one micrometer?
14       A.  I was rounding to one micrometer;
15  it was an older eyepiece.
16       Q.  So the data in the study, you're
17  rounding your findings to the closest micrometer?
18       A.  Yes.  To the full number.
19       Q.  Did you round up always?
20       MR. ORENT:  Objection.
21       THE WITNESS:  No, it depends.  If it's
22  less than a half of the next gradation, it would go
23  to the lower, but that's the usual rule for --
24       BY MR. THOMAS:
25       Q.  Okay, that's fine.  And then when

Page 285

1   you had two together -- so you had a total of four
2   measurements?
3        A.  I would aim at four measurements
4   at least.
5        Q.  And each one of those would go
6   through some rounding process?
7        A.  Yeah, I mean, the accuracy of
8   measurement was within half a micrometer plus or
9   minus.
10       Q.  Okay.  Now --
11       A.  But it would be random, up and
12  down, up and down, so they would constantly change.
13       Q.  Now, in some places in images we
14  looked at today, we didn't find any bark, correct?
15       MR. ORENT:  Objection.
16       THE WITNESS:  This is not correct.  We
17  could not see it in the images.  I can tell you
18  that in some specimens I did not see bark.
19       BY MR. THOMAS:
20       Q.  How do you report that?
21       A.  I report that I don't see it.  I
22  have cases when I reported that I don't see a bark.
23       Q.  And you reported here that you had
24  two specimens where the degradation layer was not
25  visible where a hernia mesh and a sling were

72 (Pages 282 to 285)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 286

1    removed at three and ten months.
2         Are those the only two times you
3    haven't been able to see a bark?
4         A.   At that time, the only two.  Since
5    then I've seen a couple of more cases where I
6    couldn't identify bark.
7         Q.   Any of those medical-legal cases?
8         A.   No, I think it was all hernia
9    meshes, not medical-legal cases.
10        Q.   Do you have those slides
11   available?
12        MR. ORENT:  Objection.
13        THE WITNESS:  Yes, I do, but they are
14   of patients.
15        BY MR. THOMAS:
16        Q.   You can't produce those to me if I
17   asked you for them?
18        A.   I can't produce them.
19        Q.   Did the slides where there was no
20   degradation bark, if you will, present contain
21   inflammation?
22        A.   Yes, they did.
23        Q.   Were they removed because of pain?
24        A.   Yes.  I think one of them was
25   removed for erosion with pain.  The other one, the

Page 287

1    hernia mesh, was removed just for pain.
2         Q.   On page 6 of the study, you
3    describe that you use transmission electron
4    microscopy --
5         A.   That's correct.
6         Q.   -- to study the ultra structural
7    organization of the degraded layer in
8    cross-sections?
9         A.   That's correct.
10        Q.   Did you use the TEM to study any
11   TVT device?
12        A.   One.  It was one Ethicon device,
13   TVT or Prolift, I don't remember.  I think it was a
14   TVT.
15        Q.   Have you produced that work to us
16   before?
17        A.   It's a St. Michael's Hospital
18   patient.
19        Q.   Okay.  So, is it fair to
20   understand that the only transmission electron
21   microscopy analysis that you've done on an Ethicon
22   mesh is the St. Michael's patient that you can't
23   produce to us?
24        A.   Well, it was a part of research.
25   So if it was included in images, it was included as

Page 288

1    part of research project.
2         Q.   Well, have you produced that to us
3    before?
4         A.   I don't know.
5         Q.   Okay.  But just to make sure I got
6    a clean answer.  In all the work that you've done
7    on all the Ethicon meshes, the only Ethicon mesh
8    that you've analyzed by transmission electron
9    microscopy is a mesh of a St. Michael's patient
10   that's either a TVT or a Prolift, you don't know
11   which?
12        A.   Now I'm not sure if it was St.
13   Michael's or it was a medical-legal case.  I don't
14   remember now.
15        Q.   Okay?
16        A.   I would have to check, but if it
17   was, it was the only case.  I could do only one
18   case of Ethicon mesh by transmission electron
19   microscopy.
20        Q.   And why have you not conducted
21   transmission electron microscopy on other meshes?
22        A.   There was no need.  It is a really
23   cumbersome, difficult and --
24        Q.   Does St. Michael's have that kind
25   of equipment?

Page 289

1         A.   Yes, we do.  Otherwise, I wouldn't
2    be able to do it.  It's really expensive to do it
3    somewhere outside.
4         Q.   Did you have to pay St. Michael's
5    to do this?
6         A.   No, it's just part of our academic
7    work.
8         Q.   Are you able to do this yourself
9    or does somebody have to do it for you?
10        A.   I'm trained to do transmission
11   electron microscopy.  I mean, technicians prepare
12   slides.  It's usual, the same as for histology.
13   But I do examination myself.
14        Most of the transmission electron
15   microscopy samples are with hernia meshes.
16        Q.   Page 10 there is a discussion of
17   the clinical significance of polypropylene
18   degradation?
19        MR. ORENT:  Are we going back to the
20   report or saying on the study?
21        MR. THOMAS:  I'm on the study, sorry.
22        THE WITNESS:  Yes.
23        BY MR. THOMAS:
24        Q.   Page 10 on Exhibit 6, "Clinical
25   Significance of Polypropylene Degradation".

73 (Pages 286 to 289)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 290

1    Who drafted this section?
2         A.  Mostly me, partially my coauthors.
3         Q.  Dr. Bendavid?
4         A.  Yes.  And well, mostly Dr.
5    Bendavid.  I mean, I drafted most of it, but I was
6    getting some corrections or changes, and the
7    changes were coming mostly from Dr. Bendavid.
8         Q.  Exhibits 5 and 6, do you stand by the
9    findings stated in each of those articles?
10        A.  Yes, I am.
11        Q.  Do you have depositions scheduled
12   in the next month?
13        A.  I'm not sure if I can disclose
14   that.
15        Q.  Do you have trial responsibilities
16   in the next month?
17        A.  Pardon?
18        Q.  Do you have any trial
19   responsibilities in the next month?
20        A.  No, I don't think so.
21        Q.  Your next trial is a December
22   trial with Ethicon?
23        A.  I'm not sure if I can disclose
24   that either.
25        Q.  Are you choosing not to?

Page 291

1         A.  There might be more and earlier, I
2    don't want to disclose that.  I'm not sure if I
3    can, if I legally can disclose it.
4         I mean, if it's not for Ethicon cases.
5    For Ethicon I would disclose, but if it's not then
6    I cannot disclose.
7         MR. THOMAS:  Counsel, there's no legal
8    prohibition for him saying it?
9         MR. ORENT:  You can answer.
10        THE WITNESS:  They said that --
11        MR. ORENT:  Wait, hold on.  They said
12   is not an answer.  So any communications that
13   you've had are covered by a privilege.  So what
14   he's asking specifically are, if anything is firm
15   in terms of a date that you know of, so --
16        BY MR. THOMAS:
17        Q.  For depositions or trial?
18        MR. ORENT:  For depositions or trial,
19   not any communications about we might do this or
20   might do that.  But anything firm that you know you
21   have a date set for.
22        THE WITNESS:  Then everything is
23   changing.  I have a set date one deposition.  But
24   the rest is still in the air.
25

Page 292

1         BY MR. THOMAS:
2         Q.  Do you have any set dates for any
3    trials between now and the Ethicon trial?
4         A.  No.  Again, nothing set firmly.
5         Q.  Okay.
6         MR. ORENT:  Just a sec.  In addition to
7    that, I think in the Cantrell matter I've been
8    working with Kelly Crawford to schedule, I would
9    imagine that would be within the next month.
10   That's an Ethicon case, obviously.
11        MR. THOMAS:  Yes, I know about that.
12        Hang on.  Getting close to the end.
13        -- OFF THE RECORD DISCUSSION --
14        BY MR. THOMAS:
15        Q.  Doctor, I'm told that the
16   information supplied to us concerning the eyepiece
17   micrometer measurements of the bark layers is
18   expressed in a single value as opposed to the four
19   individual measurements?
20        A.  No, it's a median, I told you
21   that, then I pick median value out of four.
22        Q.  Okay.
23        A.  It is described in the paper.  So
24   the volume which goes for analysis is a median one,
25   which is more frequent.

Page 293

1         Q.  Do you have the four measurements
2    that you made or did you just pick the -- do you
3    have that as a part of your data set?
4         A.  I just measure them and right
5    there I know how frequent is this measurement or
6    that.  So I don't have to put in the paper.
7         Q.  Did you write down or keep a copy
8    of the four individual measurements that you made
9    of the --
10        A.  No, no.  The methodology is check
11   four spots.  I see three, four, four, four, then
12   four is the winner, so then four goes in the
13   record.
14        Q.  Did you produce your bills today
15   for the time that you spent in this case?
16        A.  In this case?
17        Q.  In this case?
18        A.  Oh, in this.  I had billing done
19   for the -- for the report, it's in the folder.
20        Q.  Do you recall how much time and
21   money you've spent on preparing the report in this
22   case, Exhibit 3 and 4?
23        A.  No, I don't.
24        Q.  The invoice that you produced to
25   us on a thumb drive suggests that you have a

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 294

1  balance, professional services August 14th,
2  August 24th for a total of $8,550 --
3        A.  Sounds right.
4        Q.  -- is that right?
5        Doctor, I don't see -- I see general
6  part text revision; what does that mean?
7        A.  Revision of the general part.
8        Q.  General party report?
9        A.  Yes.
10       Q.  This report is the first time that
11  you reviewed any Ethicon documents or Ethicon
12  depositions, true?
13       A.  No, there was another case.
14       Q.  I didn't see it in any of your
15  reports before where you reviewed Ethicon
16  depositions and Ethicon documents?
17       MR. ORENT:  One moment.
18       BY MR. THOMAS:
19       Q.  The only other case it could be
20  would be the Bellew case?
21       MR. ORENT:  The doctor has not
22  testified previously about these issues.  I don't
23  know whether or not there has been another report
24  on another matter disclosed.
25       It may very well be that there is

Page 295

1  something that's still work product and not been
2  disclosed.  So I don't want to get into the details
3  of that other potential matter.
4        BY MR. THOMAS:
5        Q.  Let me just ask it this way:  The
6  bills that you've submitted to counsel in this
7  matter do not reflect any charges for time that
8  you've spent reviewing Ethicon documents or
9  depositions, correct?
10       A.  Partially, they do.  I reviewed
11  some of that again; it's been drafted earlier.
12       MR. ORENT:  Counsel, just to speed this
13  area up to the extent that it's not clear on the
14  bills, I think what we can do is we can supplement
15  by letter.
16       MR. THOMAS:  That would be fine.  I'm
17  not interested in getting anybody.  I just want --
18       MR. ORENT:  I think what we'll do is we
19  can figure out the amount of time.
20       MR. THOMAS:  I just want to make sure
21  you get paid for your time.  You have to send your
22  bills and get paid.
23       Okay, that's all the questions I have,
24  Doctor.  Thank you.
25       THE WITNESS:  Thank you.

Page 296

1        MR. ORENT:  Why don't we take two
2  minutes.  I'll going to have probably about ten
3  minutes worth of questions.
4        -- RECESS TAKEN AT 4:52 --
5        -- UPON RESUMING AT 4:55 --
6        CROSS-EXAMINATION BY MR. ORENT:
7        Q.  Good afternoon, Doctor.
8        A.  Good afternoon.
9        Q.  Earlier today you were asked a
10  number of questions about each of the
11  photomicrographs that we looked at, and one of the
12  predicate questions that you were asked for each
13  one was whether or not it was a TVT or a TVT-O; do
14  you recall being asked that series of questions?
15       A.  Yes, I do.
16       Q.  For purposes of your work does it
17  make any difference whether or not the product is
18  the TVT or TVT-O in terms of your findings as
19  reported here?
20       A.  No, it's the same sling, the same
21  mesh.  The only difference is how it's placed and
22  the other components which come in the kit.
23       Q.  So if I understand your testimony,
24  is it your testimony that the TVT and the TVT-O --
25  the actual mesh device is the exact same?

Page 297

1        A.  Exactly the same.
2        Q.  Okay.  And so in terms of the
3  pathological findings that you make, as reported in
4  your report and your supplement, is there a -- is
5  there any reason for making a distinction between
6  the two devices?
7        MR. THOMAS:  Object to the form of the
8  question.
9        THE WITNESS:  No.  The only difference
10  is there can be more frequent occurrences of
11  striated muscle in the TVT-O samples than in TVT,
12  but it can be seen in both.
13       BY MR. ORENT:
14       Q.  And is that because of the
15  implantation route?
16       A.  That's correct.
17       Q.  And both devices are made of
18  Prolene mesh; is that correct?
19       A.  That is correct.
20       Q.  Now every one of the
21  photomicrographs that appear in Exhibits 1 and 2 to
22  today's deposition, that is your report and
23  supplemental report, did every one of those
24  photomicrographs appear either from prior expert
25  reports in Ethicon litigation, in the specific

75 (Pages 294 to 297)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 298

1    pathology of the consolidated plaintiffs, or in
2    peer-reviewed medical literature written by you?
3            A.  That's correct.  These are the
4    three sources.
5            Q.  And you've been asked questions
6    today about identifying various -- what you called
7    additional TVT cases in your report; do you recall
8    those questions?
9            A.  Yes, I do.
10           Q.  Did you produce photomicrographs
11   of the additional TVT cases in the course of other
12   reports you've provided in TVT cases?
13           A.  Yes, I did.
14           Q.  Now, with regard to the opinions
15   that you express in your expert report in this
16   case, and your supplement, do you use the same
17   methodology that you have previously used when you
18   testified in the western district -- excuse me, in
19   the southern district of West Virginia?
20           A.  Yes, exactly the same methodology.
21           Q.  And is your -- the materials and
22   your methodology that you utilized in this report
23   same methodology that you've used in other
24   courts where you have been allowed to testify at
25   trial?

Page 299

1            A.  That's correct.
2            Q.  Did you use any different
3    techniques in this report?
4            A.  No.
5            Q.  Okay.  Now, the opinions that you
6    testified to in this report, and in the supplement,
7    are they identical to the opinions that you've
8    previously provided in trial in matters before the
9    southern district of West Virginia?
10           A.  Yes.
11           MR. THOMAS:  Object to form.
12           THE WITNESS:  That is correct.  The
13   same opinions.
14           BY MR. ORENT:
15           Q.  Are they, the opinions that you
16   express in your expert report and in the
17   supplement, are they also identical to opinions
18   that you have provided in other courts during
19   trials throughout the country?
20           MR. THOMAS:  Object to form.
21           THE WITNESS:  That is correct.
22           BY MR. ORENT:
23           Q.  And throughout the course of your
24   report you provide just a few examples of a variety
25   of failure modes associated with the TVT and TVT-O

Page 300

1    device; is that correct?
2            MR. THOMAS:  Object to form.
3            THE WITNESS:  That is correct.
4            BY MR. ORENT:
5            Q.  And why is it that you don't list
6    a sample size or rate of error in your report?
7            A.  It's not the purpose.  I'm not
8    analyzing statistically frequency or rate of
9    occurrence.  I showed the changes which can occur.
10   It's binary assessment; either it can occur or
11   cannot occur.  It can occur in one case, it can
12   occur in 100 percent of cases, but it can happen.
13   For a specific patient it either occurs or it
14   doesn't.
15           Q.  In order to show that something
16   can occur, in terms of a failure mode, is there a
17   sample size, a minimum sample size that you have
18   need to show that a failure rate or failure mode
19   can occur?
20           MR. THOMAS:  Object to form.
21           THE WITNESS:  One case is enough.  If
22   it can occur in one case, it can occur again.
23           BY MR. ORENT:
24           Q.  And these concepts of sample size
25   with one being enough to prove capability, is that

Page 301

1    something that's generally accepted in the medical
2    community, in the scientific community?
3            MR. THOMAS:  Object to form.
4            THE WITNESS:  Yes.  If you answer the
5    question if it can occur, one case is enough.
6            BY MR. ORENT:
7            Q.  Same thing with a binary
8    observation; it either occurs or doesn't occur.
9    There's no rate of error associated with that; is
10   that correct?
11           MR. THOMAS:  Object to the form of the
12   question.
13           THE WITNESS:  It's either there or it's
14   not.  It's either zero occurrence or 100 percent.
15           BY MR. ORENT:
16           Q.  When you talk about using large
17   enough sample sizes and large enough rates of
18   error, is that only used when you actually try and
19   extrapolate from a data set to an individual?
20           MR. THOMAS:  Object to the form of the
21   question.
22           THE WITNESS:  That's used to predict
23   specific rates of specific occurrence, and that's
24   used in relation to a cohort of patients and
25   devices.  And it's a different question.

76 (Pages 298 to 301)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 302

1       BY MR. ORENT:
2           Q.   Okay.  And in terms of the
3   opinions that you provided here in your expert
4   report, do you hold each of those opinions to a
5   reasonable degree of medical and professional
6   certainty?
7           A.  Yes, I do.
8           Q.   And with regard to the various
9   staining techniques that you've utilized, are each
10  one of those staining techniques peer-reviewed in
11  their own right?
12          MR. THOMAS:  Object to the form of the
13  question.
14          THE WITNESS:  That is correct, yes.
15          BY MR. ORENT:
16          Q.   Has H&E been utilized as a stain
17  and been peer-reviewed as a proper way of looking
18  at tissue for a significant period of time?
19          A.  Over 100 years, or over the course
20  of 100 years.
21          Q.   How about myeloperoxidase, has
22  that been peer-reviewed as use for staining?
23          MR. THOMAS:  Object to the form of the
24  question.
25          THE WITNESS:  We have several decades

Page 303

1   of use.
2           BY MR. ORENT:
3           Q.   And how about S100?
4           MR. THOMAS:  Object to the form of the
5   question.
6           THE WITNESS:  Same thing.  It's been
7   used since late '70s, early '80s.
8           BY MR. ORENT:
9           Q.   What about the use of polarizing
10  light, is that something that's peer-reviewed and
11  accepted in the identification of crystalline
12  substances?
13          A.  It's been described for histology
14  use from 1920s, and even I saw it's been used in
15  Ethicon studies as well.  Ethicon scientists were
16  using polarized light as well.  Well, let me
17  rephrase that.  Who came to the same conclusions I
18  came.
19          Q.   And with regard to the medical
20  peer-reviewed literature on mesh and mesh
21  complications, in fact, there's a group out of the
22  University of Michigan that published utilizing
23  some of the same techniques that you've described
24  in your report; is that correct?
25          MR. THOMAS:  Object to the form of the

Page 304

1   question.
2           THE WITNESS:  Yes.
3           BY MR. ORENT:
4           Q.   Now, with regard to the work that
5   you've done here, none of these opinions are new;
6   is that right?
7           MR. THOMAS:  Object to the form of the
8   question.
9           THE WITNESS:  That is correct.
10          BY MR. ORENT:
11          Q.   And in terms of the material that
12  you've produced on disk.  Having provided to
13  counsel today, did you produce all non-confidential
14  materials that you could provide?
15          A.  Yes.  I selected that I could
16  safely release.
17          Q.   You were also asked a number of
18  questions about the peer review and peer-review
19  process; do you recall those questions?
20          A.  Yes, I do.
21          Q.   As an academic, do you have
22  concerns about maintaining the integrity of the
23  peer-review process?
24          A.  Could you repeat the question.
25          Q.   Sure.  As an academic, as an

Page 305

1   author and a researcher, are there important
2   reasons why the confidentiality of the
3   peer-review process needs to be maintained?
4           A.  Yes.  I mean, especially when
5   there is an involvement of a manufacturer, because
6   I mean, this is major concern.
7           Most publications -- journals, they
8   require, the first thing they need to have
9   submitted, has it been funded by industry, by
10  manufacturers.  So it's a major concern to try to
11  be independent from manufacturers.
12          MR. ORENT:  All right, Doctor, thank
13  you very much.  I have no further questions.
14          MR. THOMAS:  Thank you, Doctor, for
15  your time.
16
17
18  -- Whereupon the deposition concluded at 5:05 p.m.
19
20
21
22
23
24
25

77 (Pages 302 to 305)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 306

1    REPORTER'S CERTIFICATE
2
3
4         I, JUDITH M. CAPUTO, RPR, CSR, CRR,
5    Registered Professional Reporter, certify;
6         That the foregoing proceedings were
7    taken before me at the time and place therein set
8    forth, at which time the witness was put under oath
9    by me;
10        That the testimony of the witness and
11   all objections made at the time of the examination
12   were recorded stenographically by me and were
13   thereafter transcribed;
14        That the foregoing is a true and
15   correct transcript of my shorthand notes so taken.
16
17
18
19        Dated this 14th day of September, 2015.
20
21
22   _____
23
         PER:  JUDITH CAPUTO, RPR, CSR, CRR
24
25

Page 307

1    CERTIFICATE OF REPORTER
2    CANADA           )
3    PROVINCE OF ONTARIO  )
4
5    I, Judith M. Caputo, the officer before whom the
6    foregoing deposition was taken, do hereby certify
7    that the witness whose testimony appears in the
8    foregoing deposition was duly sworn by me; that the
9    testimony of said witness was taken by me in
10   shorthand, using Computer Aided Realtime, to the
11   best of my ability and thereafter reduced to
12   written format under my direction; that I am
13   neither counsel for, related to, nor employed by
14   any of the parties to the action in which the
15   deposition was taken, and further that I am not
16   related or any employee of any attorney or counsel
17   employed by the parties thereto, nor financially or
18   otherwise interested in the outcome of the action.
19
20
21   _____
22   Judith M. Caputo, RPR, CSR, CRR
23
24   Commissioner for taking
25   Oaths in the Province of Ontario

Page 308

1    INSTRUCTIONS TO WITNESS
2
3         Read your deposition over carefully.
4    It is your right to read your deposition and make
5    changes in form or substance.  You should assign a
6    reason in the appropriate column on the errata
7    sheet for any change made.
8         After making any changes in form or
9    substance, and which have been noted on the
10   following erratum sheet, along with the reason for
11   any change, sign your name on the erratum sheet and
12   date it.
13        Then sign your deposition at the end of
14   Your testimony in the space provided.  You are
15   signing it subject to the changes you have made in
16   the erratum sheet, which will be attached to the
17   deposition before filing.  You must sign it in
18   front of a witness.  The witness need not be a
19   notary public.  Any competent adult may witness
20   your signature.
21        Return the original erratum sheet
22   promptly.  Court rules require filing within 30
23   days after you receive the deposition.
24
25

Page 309

1    * * ERRATA SHEET * *
2
3    NAME OF CASE:  TERRESKI MULLINS, ET AL. V.
4    ETHICON, INC., ET AL.
5    DATE OF DEPOSITION:  SEPTEMBER 14th, 2015
6    NAME OF WITNESS:  VLADIMIR IAKOVLEV
7
8
9    PAGE  LINE    FROM    TO
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17   ____|____|_____|_____
18   ____|____|_____|_____
19   ____|____|_____|_____
20   ____|____|_____|_____
21   ____|____|_____|_____
22
23   _____
24
25        VLADIMIR IAKOVLEV

78 (Pages 306 to 309)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 310

1    PROVINCE OF ONTARIO  )
2    TORONTO REGION       )
3
4
5         I, the undersigned, declare under
6    penalty of perjury that I have read the foregoing
7    transcript, and I have made any corrections,
8    additions or deletions that I was desirous of
9    making;
10        That the foregoing is a true and
11   correct transcript of my testimony contained
12   therein.
13
14   _____
15        VLADIMIR IAKOVLEV, M.D.
16
17
18   Subscribed and sworn to before me this _____
19   Day of _____, 2015 at
20   _____, _____.
21      (City)          (Province)
22
23   _____
24   (Notary Public)
25   My Commission Expires: _____

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

**A**

A-D-S-O-R-P-... 54:7
A-L-D-A-P-E 13:17
A-Z-I-Z-I 239:2
**a.m** 1:25 2:6
**abdomen** 231:8
**abdominal** 157:4
**ability** 91:24 190:20 218:8 307:11
**able** 25:10 29:7 45:11 95:15 127:25 133:16 133:17 136:19 139:10 155:11 162:6,14 170:16 176:19 183:6,12 184:25 187:8 190:2 196:19 198:24 199:3 202:17 223:3 229:14 245:1 286:3 289:2,8
**abnormal** 130:24,25 131:10 137:25 138:4 140:8,20 141:25 142:2 145:8 146:3,4 168:7,10 171:14 175:24 176:10 191:9 191:17 195:14 212:7,10,11,15 224:4 225:1,6
**abnormality** 138:7 164:25 164:25 165:12 191:18
**above-mentio...** 2:3

**absolutely** 179:1
**absorb** 46:8,11
**absorbed** 37:8
**absorbs** 45:16
**academic** 64:10 289:6 304:21 304:25
**accept** 60:4
**Acceptance** 59:9
**accepted** 59:2 59:25 67:2 71:25 89:1 301:1 303:11
**accumulates** 173:12 174:21
**accumulating** 174:23
**accuracy** 285:7
**achieve** 229:24
**acids** 32:6,20
**actin** 189:5 192:7 243:4
**acting** 157:2
**action** 307:14,18
**active** 112:20
**actual** 100:21 102:1 180:10 296:25
**acute** 229:6,9 234:19,21,23 235:5,7,10,21 236:8 244:16 244:22 245:8 245:20
**add** 39:16
**addition** 29:25 114:22 124:23 131:2 282:18 292:6
**additional** 22:8 22:8 23:10 24:7 26:12 27:17 43:22 60:20 107:18 112:6 115:9 136:18 139:2 157:8 164:7

**167:4 168:21
**171:17 179:11
**189:6 192:7
**205:23 212:20
**219:25 222:12
**223:15 225:15
**230:10 234:2
**251:15 252:8
**254:22 298:7
**298:11
**additions** 310:8
**adequate** 55:6
**adherence** 54:8
**adipose** 126:16 126:17,19 128:11
**adjacent** 131:4 134:20 135:17 177:9 180:21 188:1
**adsorbed** 55:7
**adsorption** 54:7 54:16
**adult** 308:19
**advance** 108:21
**advise** 83:12
**affect** 161:4,8
**afferent** 132:4
**affiliated** 14:4,9
**affirmed** 2:4 5:14
**afternoon** 296:7 296:8
**ago** 17:15 27:8 28:15 189:12 241:2
**agree** 136:8 143:4 253:13
**agreed** 133:5 142:1
**agreement** 40:12 226:16
**agreements** 64:11
**Aided** 307:10
**aim** 285:3
**aiming** 277:5

**air** 291:24
**al** 1:11,12 4:23 309:3,4
**albumin** 53:23
**alcohol** 31:4 88:9
**Aldape** 13:17
**allow** 39:14 46:22 249:23 255:13,19
**allowed** 298:24
**allows** 38:24
**alter** 225:7
**altered** 257:18
**aluminum** 46:6 46:7,7
**amendments** 39:1
**American** 67:17
**amount** 295:19
**AMS** 198:10 215:21,22 216:3
**analysis** 4:21 33:18 45:20 55:25 56:7 65:4 258:4 262:15 271:14 271:21 274:22 287:21 292:24
**analytical** 28:5 28:10,17 31:6 31:9 41:11 45:6 55:15 257:16
**analyze** 17:3,7 61:14 77:15 95:16 222:9 276:17
**analyzed** 28:4 28:18 41:12 56:1,6 146:12 152:9 236:19 237:22 276:8 280:10 288:8
**analyzing** 274:14 300:8

**anatomical** 15:3 15:9 79:15 157:1,3,5
**Anderson** 21:1,3 21:7
**ANDREW** 3:19
**andy.snowden...** 3:25
**anesthetize** 88:11
**anesthetized** 88:16
**angled** 101:11 229:3
**animal** 74:18,19
**anodized** 46:6 46:10
**answer** 12:19 38:2 39:15 40:17 59:5 60:1 62:24 72:13 147:23 196:24 209:4 268:11,15 273:3,12 277:3 278:11 279:6 279:12 288:6 291:9,12 301:4
**answered** 72:9 162:19 268:25
**answering** 154:5
**answers** 14:24 183:24
**anticipate** 87:19 88:23
**anticipating** 86:7
**anybody** 36:5,10 43:7 62:11 261:14 270:23 295:17
**anymore** 127:6 227:16
**anytime** 99:6
**anyway** 33:11
**Aperio** 116:23
**apologize** 47:23

Vladimir Iakovlev, M.D.

51:20 173:2
221:4,6 266:11
**apparent** 205:20
246:8
**appear** 68:20
100:22 120:13
235:25 259:24
297:21,24
**appearance**
53:8 128:15
249:8 258:1
**appeared** 65:20
72:22
**appears** 103:14
110:16 121:2
128:5 254:17
259:18 307:7
**application**
67:25 68:9,12
68:18 79:2
**applications**
79:15 187:19
**approach**
237:18 277:15
**appropriate** 9:9
38:16 42:7
57:10 67:5
308:6
**approval** 50:18
64:6 68:10,17
68:19
**approve** 68:2
**approved** 78:15
**approves** 68:4
**approximation**
177:25
**area** 16:15 51:4
53:21 72:2
86:22 87:3,19
87:24 88:8,11
88:15,21,24,25
90:2 103:14,25
104:22 110:5
113:23 114:3,7
114:8,9 117:15
117:19 118:6,9
118:11,23

122:1 135:16
153:16 163:13
163:17 165:3
166:10,12,14
168:20 175:1
177:3 187:1,10
187:17 190:16
202:9 204:2
205:12,13
208:23 209:15
217:21 246:13
248:20 272:20
272:23 273:7
295:13
**areas** 8:4,11,14
120:21 175:13
175:25
**arguing** 38:16
**argumentative**
61:1
**army** 233:22
**arrow** 165:10
250:23
**arrows** 76:23
114:13,14,22
114:23 117:16
140:4 247:22
**arterial** 201:18
202:5
**arteries** 157:20
205:10 246:20
247:13
**artery** 157:20,23
157:24 158:6
158:16 160:7,9
160:13 201:25
202:1,8,19
203:20,23
205:12 245:22
246:1,24,25
247:1
**arthroscopic**
87:6
**article** 4:20
125:25 126:1
260:8,11,17
261:19 271:12

271:19 276:25
277:20 279:8
282:20
**articles** 59:18
62:22 290:9
**artifact** 98:9,10
101:16 102:3,5
102:24 103:15
103:16,16
106:3,7 110:8
110:11 121:4
124:18 208:19
**artifacts** 173:24
207:16
**artificial** 13:11
**asked** 9:21,25
36:21 40:22
41:22 49:17
52:2 73:7 77:5
108:13,20
113:10 170:23
221:5 238:16
269:7,8 286:17
296:9,12,14
298:5 304:17
**asking** 9:20 18:4
19:4 39:19
75:10 123:15
164:24 221:4
239:6 291:14
**asks** 29:12
**aspect** 167:19,20
**aspects** 272:15
**assert** 38:11,18
**asserted** 38:14
**assessing** 97:21
**assessment**
300:10
**assign** 308:5
**associated**
129:16 156:7
299:25 301:9
**association**
156:20
**assume** 263:13
**assuming**
102:15,19

113:17 215:5
245:13
**assumption**
245:16 259:8
281:1,4
**atrophic** 16:12
16:13 130:2
**atrophy** 16:14
17:2,10,14
**attached** 6:19
107:1 114:5,6
174:6 180:9
186:12 308:16
**attack** 203:1
**attempt** 6:25
146:23 147:2
214:11 255:18
**attempted** 7:8
**attitude** 145:16
**attorney** 38:22
307:16
**attorney-client**
38:21
**attorneys** 8:10
**attributed**
151:14
**August** 294:1,2
**author** 239:2
259:18,24
305:1
**Authored** 4:23
**authoritative**
153:16 272:17
272:20,25
**authority**
153:17
**authors** 154:6
261:7,18,20
**autonomous**
167:10,18
**autopsy** 149:23
**available** 59:3
65:3 73:8
258:22 286:11
**Avenue** 3:22
**average** 264:24
265:9

**aware** 46:14,21
57:15 152:8,15
**axon** 134:10
**axons** 16:16
166:4
**Azizi** 239:2

---
**B**

**B** 3:12 48:1
103:5,10,14
126:10,25
178:12 200:20
200:24 211:1
215:16 216:7
216:16
**back** 21:22 40:5
44:17,18 55:24
59:22 63:2
69:7 87:24
88:3 98:14
109:4 118:4
132:5 147:24
159:12,18,19
160:17 161:1
184:14 185:10
200:15 240:1,5
240:11 249:16
260:22 269:6
270:17 289:19
**backed** 173:15
**bacterial** 244:17
244:21 245:19
**bad** 170:23
239:7
**balance** 294:1
**ballpark** 240:10
282:5
**band** 119:11
**Barbolt** 73:23
74:15,25 75:6
75:18 85:2,6
85:11
**Barbolt's** 73:25
**Bard** 198:10
**bare** 22:15
**barely** 33:19
268:24

**bark** 33:20,25
77:1 93:25
94:15,18 111:2
113:11,12,12
113:15,16
114:1,6,16,16
114:23 135:9
135:10,20
136:9,10
138:23 174:1,6
176:25 177:1
243:13 251:24
252:5,12,25
253:18,20,22
254:17 256:3
258:4,11,15
283:16 285:14
285:18,22
286:3,6,20
292:17
**base** 39:18
**based** 33:18
55:22 70:1,18
72:7 77:11
143:16 149:15
156:9 162:20
188:23 196:19
196:24 235:4,5
263:16
**basic** 15:1 16:5
16:8,17 46:12
49:20 87:14
132:16
**basically** 274:3
**basing** 55:20
**basis** 132:14
156:18 207:3
**beginning** 24:15
70:23 155:5
**Behalf** 3:3,11
**belief** 12:22
**believe** 8:3,12
8:15,19 14:1
37:16 40:15
41:6 51:19
58:25 64:19
89:10 95:8,11

114:24 123:8
123:25 126:4
126:11 200:6
206:25 207:3
214:9,15,16
217:16 254:23
254:25 256:4
256:10 276:20
**believes** 72:15
**bell** 239:4
**Bellew** 9:1,11,21
20:22 21:5
22:11 237:14
237:14 294:20
**belong** 66:12
**bendability** 92:3
**Bendavid** 272:1
272:6,9 273:21
274:8,15 290:3
290:5,7
**bending** 91:24
**benefit** 71:12
**bent** 224:6
**best** 59:21 73:21
83:12 94:7,19
124:1 177:25
222:2 240:2,4
240:12 254:16
262:25 266:21
268:16 277:16
307:11
**better** 15:17
102:18 106:12
115:22 227:15
236:21 284:10
**beyond** 72:10
104:25 117:11
121:14 122:24
123:14 141:14
148:20 149:24
178:21 204:6
204:19 208:14
214:24 245:25
**BF** 126:13
**bigger** 123:6,9
**bilateral** 229:2
**billing** 293:18

**bills** 293:14
295:6,14,22
**binary** 300:10
301:7
**bio** 272:22
**Biomedical**
277:11
**bit** 41:8 119:25
126:24 156:12
176:24 177:12
186:4 235:23
284:10
**bizarre** 13:2
**black** 46:8,11
174:11
**bladder** 167:18
186:6,7,21
227:4
**Blaivas** 151:8
260:3,6,8
266:16
**blanket** 64:12
**bleeding** 157:22
**blends** 254:2
**block** 230:20
242:20
**blocks** 61:7 88:9
262:15,19,23
263:10
**blood** 53:22,24
54:3 91:7
173:4,15
202:10 203:21
205:11 246:3
246:10,11
**blue** 77:3 100:17
102:18 105:17
105:19 106:6
109:7,13,17
110:15 111:17
111:18 113:9
120:8,13,18,21
121:2 124:15
125:17 127:17
134:24 158:7
163:17,21,22
173:18 174:5

176:17 207:16
207:17,18,23
207:25 208:18
**board** 10:19,21
14:16 15:2,6
67:15,16,18,21
67:23 278:6
**bodies** 54:17
83:8 155:9
**body** 33:3,4,19
33:20,25 36:15
48:3 49:19
53:6,14,16,20
54:20 78:11
79:13 81:13
83:21 90:25
91:4 93:5 94:4
95:11 98:1,6
98:21,25 99:3
99:6,13,14,15
99:17,22,22,23
104:14,20
107:11,16
117:9 132:12
140:21 143:18
145:11 154:23
155:1 156:7,11
159:13 161:22
165:5,15,17
170:12 190:12
202:10 203:7
206:24 207:1
209:12 213:13
213:19 215:3,6
216:24 218:9
219:9 222:25
243:11 244:9
252:23 255:5
259:10
**bond** 54:20,25
**books** 12:13,15
12:16 14:25
29:15
**border** 163:17
**borders** 187:13
**Boston** 198:10
218:21

**bottom** 53:3
126:25 136:22
177:23 230:23
235:14 264:5
264:15 266:25
**bounces** 59:22
**bound** 144:10
**boundaries**
123:18
**box** 167:10,10
**bracket** 62:16
**brain** 10:8 11:24
**branch** 247:20
247:25
**branches** 86:13
86:17,21 87:2
87:3,10,11,16
133:19 161:12
161:15 171:12
171:15 247:24
250:4
**brand** 190:15
**brands** 147:17
**break** 40:8 69:3
117:24 134:5
178:24 236:13
280:23
**breakdown**
169:16 245:6,9
245:14,18
279:22 280:11
**breaking** 253:6
**breakout** 151:1
**breaks** 93:1
253:5
**bridging** 121:10
122:17 124:22
125:15 126:14
127:10,16
**brittle** 92:24
**broad** 11:3
**broken** 245:19
**brought** 273:23
**brown** 127:13
158:1,4 163:8
163:9,10,11
182:24,24

183:1
**building** 92:23
**builds** 178:16
**bulk** 26:8
**bundle** 157:17
158:10,16
188:3 200:22
210:16 211:16
211:19 212:8
223:14,25
224:3,19 225:7
**bundles** 186:8
186:23 187:4
187:17 193:1
**buried** 87:4,5
**burning** 161:10
**bury** 87:16 88:8
**busy** 255:24
**Butler** 3:20

**C**

**C** 3:1 103:16
178:12 199:15
200:3,4,20
201:1,3
**cabinet** 32:14
**calculation**
281:15
**call** 87:12 96:6
131:22 228:20
228:22,22
**called** 2:2 5:13
14:9 56:5
58:10 86:20
157:16 228:21
236:22 238:24
298:6
**CAMC** 241:5
**camera** 23:22
112:18 169:7
192:14 222:17
**Canada** 15:2
66:5 307:2
**Canada's** 72:15
**Canadian** 67:17
**cancer** 71:6
**Cantrell** 292:7

**capability**
300:25
**capable** 132:12
133:9 147:12
161:18
**capillaries** 205:7
205:13
**capillary** 205:3
205:5,9
**capsule** 119:16
180:9 249:1,1
249:3
**caption** 199:10
**capture** 204:23
**Caputo** 2:9
306:4,23 307:5
307:22
**cardiac** 203:4
**carefully** 308:3
**cascade** 53:24
**case** 1:9,13 5:21
6:2,10,14 8:1
9:1,11,23
11:19,23 12:8
12:11,12 15:16
18:8 20:22
21:5,17 22:11
23:23 24:8
25:20 27:12
29:19 35:13
48:20 49:1
50:6 52:1
55:14 64:25
65:17 69:22
71:8 76:4
108:9 112:14
112:21 115:10
116:1 117:3
120:3,5 122:7
124:1 126:9
136:19,22,23
139:9 144:14
150:21 157:24
164:12 165:2
167:22,24
169:17,20
179:12 181:3

181:14 192:9
192:13 194:4
194:15 195:3
206:2 209:13
211:20 216:4
216:13 217:16
217:17 219:6
219:25 220:4
220:18 221:17
230:19 231:4
232:19 235:14
235:15 237:14
237:14,14
238:12 250:16
257:24,25,25
258:1 270:9,19
282:1,22,25
288:13,17,18
292:10 293:15
293:16,17,22
294:13,19,20
298:16 300:11
300:21,22
301:5 309:3
**cases** 4:13,15
5:3,6 9:4,12,14
9:14 11:2 18:2
20:16,19 22:7
22:8,9,12,21
23:2,5,10,13
23:13,24 24:7
24:10,11,15
26:4,7 27:15
34:1 44:2
45:21 50:16
60:19 61:16,17
61:24 71:6
96:2 97:10,15
98:23 105:14
107:18,20
108:5,23 112:6
112:7,12 116:7
116:11 136:14
136:18,24
139:2,6 148:25
149:3 150:3
154:10 164:8,9

164:14 167:4,5
168:21,22
171:18 179:11
179:13 184:24
189:6 192:7
201:20,22
205:23 206:14
210:17 212:21
212:22 220:1
222:12 223:15
225:15 230:10
232:9,10,10
234:2 236:20
236:25 237:6
237:24 239:23
240:2,19,21
241:16 250:20
251:1,8,14,15
252:8 254:22
258:18 262:17
262:18 280:7
280:10,14,19
280:25 281:2,3
281:7,18,19,21
281:24 282:12
282:14,19
285:22 286:5,7
286:9 291:4
298:7,11,12
300:12
**cassette** 31:2
**catalyst** 33:5,5
238:20
**catalysts** 32:6
**cause** 86:8 87:20
103:21 140:22
142:8,13
145:13,23
146:3 152:5
158:16 159:15
160:22,24
161:3 166:15
166:19 176:10
184:11 186:2
188:7,10
191:25 195:14
195:24 196:1

197:9,12 200:6
249:24
**caused** 103:18
148:7 172:11
196:22 203:8
209:1 210:10
224:20 246:15
**causes** 168:13
172:16 225:6
**causing** 140:15
140:20 141:24
145:9 147:12
154:14 155:12
159:4,6,11
161:24 175:18
175:22 187:6
215:2 224:10
249:10
**ceases** 253:9
**cells** 16:16 53:9
127:6 165:23
166:2
**centimeters**
170:12
**certain** 254:5
**Certainly** 60:23
255:6
**certainty** 160:4
194:19 208:10
245:17 302:6
**CERTIFICA...**
306:1 307:1
**certification**
15:3,6,10
**certified** 10:19
10:22
**certify** 306:5
307:6
**change** 9:16
79:13 210:10
260:22 285:12
308:7,11
**changed** 103:13
118:7 229:16
247:1 260:13
260:21
**changes** 203:7

210:4 246:7
260:22 262:5
290:6,7 300:9
308:5,8,15
**changing** 260:12
291:23
**channels** 208:21
**charge** 266:7
**charges** 295:7
**Charleston** 1:3
3:15
**chart** 58:10
269:7,8,9
**check** 20:6
34:14 35:1
36:2 57:7,8
75:14 185:11
200:15 211:5
255:9 262:4,4
265:6 288:16
293:10
**checking** 71:4
139:11
**chemical** 37:2
42:13 44:15
54:18 79:11
107:3 161:10
238:15 255:19
257:18
**chemically**
54:13 273:9
**chemicals** 43:19
43:24 44:4,8
44:11 47:7
88:8 238:17
**chemistry** 28:5
28:11,17 31:6
31:10 41:11
55:15 257:16
**chest** 91:5
**chloride** 33:7
**choice** 16:21
**choosing** 290:25
**chose** 56:25 57:6
**chosen** 42:6
**chromium** 33:5
238:20

**chronic** 85:24
87:23 88:3
142:11 156:8
191:22 228:4
267:2,13 268:9
**circle** 102:16,23
103:11 190:8
**circles** 89:23
121:23
**circular** 135:16
**circulation**
202:16
**circumstances**
48:22 188:6
**cited** 125:25
**City** 310:21
**claim** 55:21
**clarification**
51:17 67:14
178:8 208:22
240:22 241:9
**clarify** 8:2 37:23
39:25
**clarifying** 39:2
**clean** 52:13
88:24 101:5,8
214:11 288:6
**clear** 100:14,15
100:16,18
103:5 109:11
109:14 114:12
120:15 184:9
199:20 207:21
207:23 295:13
**clearly** 137:10
174:9 182:19
183:20 188:11
189:16 194:24
202:6 222:23
224:7 229:18
244:21 248:24
**client** 39:3
**clinical** 85:3
143:17,17,22
145:9,17 166:7
174:18 195:17
196:5 197:13

197:17 202:20
203:14,17,23
205:16 209:5
242:2 246:4
289:17,24
**clinically** 143:16
205:20 244:23
246:8
**clinicians**
266:17
**close** 103:24
121:23 128:2,6
170:4 185:22
242:3 252:14
254:10 292:12
**closer** 87:8
101:9
**closest** 284:17
**clotting** 53:24
54:3
**cluster** 121:22
**coated** 53:7,14
**coating** 54:4
**coauthors**
274:24 290:2
**Cobalt** 33:7
**coefficient** 57:12
57:13,14
**cohort** 301:24
**collagen** 248:20
**collagenized**
105:2
**collapse** 195:24
**collapsed** 202:3
202:4
**collateral**
202:16
**colleagues** 81:14
**collect** 6:25 9:7
70:4 83:3
109:2 156:1
**collected** 269:21
269:22 275:3
283:22
**collecting**
274:13
**collection**

274:22
**color** 121:1
125:19
**Columbus** 76:18
**column** 308:6
**combination** 6:4
13:7 20:15
103:20 156:16
265:24
**combine** 197:7
**combined** 44:8
109:12 152:1,2
**Combs** 3:13
**come** 23:3 95:24
96:3 120:1
123:2 138:22
139:5,9 145:4
239:12 270:17
296:22
**comes** 14:25
23:12 24:8
108:1 126:8
136:13,20
183:13 250:17
**comfort** 72:11
**comfortable**
39:13 40:16
71:20 72:3,21
81:5 96:17
258:13
**coming** 13:14
17:16 22:6
50:6,7,15,17
80:4 82:23
88:3 105:9
121:1 159:17
172:8,8 208:18
219:1 260:24
280:16 290:7
**commencing** 2:6
**commentary**
98:15
**comments** 59:11
**Commission**
310:25
**Commissioner**
307:24

**common** 89:6
**commonsense**
228:3
**communicating**
226:18
**communication**
7:22 8:3 21:3
**communicatio...**
8:13,15 58:21
59:6,8 291:12
291:19
**community**
301:2,2
**compact** 187:17
**compacted**
248:21
**compare** 90:19
92:9 152:16
186:20 237:22
**compared** 100:7
152:10 153:2,3
**compares** 78:13
**comparing**
152:11 156:13
187:19
**comparison**
125:10
**compartment**
90:2,5,10,13
90:22,24 91:8
211:24 212:4,4
**compartment...**
158:12
**compartment...**
89:17,18
211:25
**compartments**
90:6,8,25 91:5
212:2
**compensated**
61:18,21
**competent**
308:19
**compiled** 75:1
**complain**
144:17 150:17
**complained**

Vladimir Iakovlev, M.D.

Page 316

153:3
complaining
159:24
complaint
143:22 150:15
complaints
143:3
complete 6:9
122:23 188:25
completed 69:12
69:13 237:8
completely
16:13 72:1
90:16 97:14
98:5 100:16
102:5,7,23
122:17 252:13
254:7
complex 89:16
89:19 90:20
122:20 155:21
175:22 189:3
203:17 209:5
224:25 246:17
complexity
145:25 155:24
complication
196:10 265:16
266:19
complications
83:13 148:7
149:25 150:4
209:10 264:1,6
264:10 268:1,6
268:9,18
303:21
complies 103:7
120:17 122:6
component
154:24
components
165:22 296:22
compress 152:6
171:11 178:17
195:24 209:16
compressed
169:15 188:3

compresses
187:4
compressing
158:15 161:10
193:4 194:6
195:22 248:16
compression
151:19,20
187:3 188:20
197:4 209:20
224:15 250:9
compromise
49:14
compromises
91:9
computer 35:10
307:10
concentrate
268:13
concept 91:12
concepts 300:24
concern 160:23
168:13 305:6
305:10
concerned 92:12
concerning
292:16
concerns 168:17
304:22
concluded
305:18
conclusion
79:10
conclusions
274:3,7 303:17
conclusively
77:9
concurrent
212:24
condition
191:13
conditions
191:25
conduct 17:20
18:1 60:20
67:5 138:9,17
249:19

conducted 28:17
41:10 74:15,17
74:22 262:15
288:20
conducting
256:5,13
confidential
1:21 4:7 24:23
39:14,25 40:9
40:14 49:8
50:4 59:1
71:20,21 72:3
96:18 97:1
confidentiality
40:12 48:25
49:14 72:16
305:2
confined 72:15
confirm 9:22
10:1,3
confirmed 16:21
confluent 40:25
conjunction
191:24
connected
218:15
connection 8:25
9:3 11:18,22
12:7 15:12
167:10 210:10
Considerations
4:18 259:16
260:2
consistent
193:22
consolidated 3:3
4:13,15 5:3,6
20:18 22:6,12
22:21 23:2,5
27:16,22 98:23
105:14 112:8
136:14 168:23
179:13 184:24
201:20,22
206:14 210:17
241:16 250:19
251:1 257:25

258:18 298:1
CONSOLIDA...
1:10
constantly
285:12
consult 11:12,17
11:21 12:1,6
14:20 36:10,13
38:25 185:9
260:7,19
consulted 15:12
227:25
consulting 43:7
240:21
contact 21:13,14
186:1
contacted 20:25
contacts 81:17
contain 18:9
23:20 100:22
109:10 286:20
contained 7:1
18:25 19:12,23
20:12 42:24
60:14 65:11
125:13 179:13
274:3 310:11
container 32:17
containers
32:20
containing 78:3
contains 125:4
127:9 189:25
201:13 256:15
content 260:8
context 37:24
continue 154:6
154:25
continues 82:11
continuous
142:12
contract 62:17
186:23
contractile
127:6
contraction
181:16,18

182:6 184:10
190:24
contracts
186:16,19
contribute
188:7 191:16
272:11
contributed
261:21 272:10
274:15,17
contributes
260:19
contributing
260:13 274:16
contribution
261:17 275:25
control 29:17
30:7,18 31:7
195:6
Controlled
238:24
conversation
17:23 49:16
276:2
conversations
17:25 81:16,19
84:23
copies 18:12
copy 171:7
247:21 293:7
cord 10:9 87:8
core 94:23
113:22 114:8,9
251:23 252:12
252:13 253:18
253:19 254:12
corner 114:21
134:24 157:16
163:12 174:11
248:1
corners 204:21
correct 6:3,11
7:11 8:23,24
9:4,5 18:11
19:14 22:22,23
23:6 27:5 31:7
31:10,11 43:15

Vladimir Iakovlev, M.D.

44:20 46:24
47:10 48:16
55:16,18,19,23
56:8,9 61:14
63:6,7 67:12
69:24 71:13
73:4 84:8
90:14 94:10
95:18,25 96:3
99:7 100:4,12
101:6,17
105:15,25
106:9 109:8
110:20,23
112:9,10
114:17 115:1
117:1 118:7,8
119:5 121:19
123:6,7 130:8
130:12,20
131:5,16
134:25 135:1,4
135:5,7,17
136:14,15
142:3 144:16
147:19 149:14
157:10 158:2
159:1,11 162:1
162:23 163:14
163:15 164:1,9
164:13 165:10
165:11 167:7
168:4,23,24
169:22 170:9
170:14,19
171:1,2 173:23
174:12 175:19
176:8,9 178:2
178:19 179:14
180:12,16,22
182:16 184:2
185:24 187:23
189:7,8,13
192:2 193:19
193:20,23
194:14,20
196:20 197:18

197:24 199:1,2
199:14 200:3
202:15,20
203:12,25
204:14 206:17
206:20 208:2,3
208:5 212:23
214:8,12,13
228:20 231:16
231:21 235:12
236:1,2,6,9
242:9,11 243:7
243:12,20
244:11 245:15
245:23 251:2
252:6,10,16
253:14,15
254:15,24
258:19,20
259:13 261:10
262:16 263:3
263:11,14
264:3,12,17,21
265:2,11,22
266:20,23
268:18,20
269:14,18
270:1 271:23
271:24 279:21
280:7,8 282:13
285:14,16
287:5,9 295:9
297:16,18,19
298:3 299:1,12
299:21 300:1,3
301:10 302:14
303:24 304:9
306:15 310:11
**corrections**
290:6 310:7
**correctly** 79:18
120:3,3 128:25
144:7,7 186:23
**correlation**
57:14,18,24
58:5
**could've** 124:20

**counsel** 2:2 5:13
7:5 37:22
43:21 60:16,19
60:25 61:14,18
62:19 73:12,19
75:11 117:23
178:23 291:7
295:6,12
304:13 307:13
307:16
**country** 299:19
**couple** 13:25
14:1 58:16,18
118:19,25
286:5
**course** 18:19
22:10 32:19
68:11 77:25
82:25 83:12
97:2 150:6
152:25 224:8
228:4 298:11
299:23 302:19
**Court** 1:1
308:22
**courts** 298:24
299:18
**cover** 10:14 11:2
32:18 184:15
205:12
**covered** 38:1
64:12 67:3
111:21 170:21
184:20 291:13
**covering** 205:13
**crack** 55:14
**cracked** 76:10
**cracking** 48:2
55:21 92:25
94:16 258:17
**cracks** 55:13
78:4 85:3
254:6,6,22
**cranial** 132:13
132:23
**Crawford** 292:8
**create** 9:8

101:15 181:19
241:7
**created** 77:16
190:12
**creates** 197:2
212:3
**criteria** 283:8
**criticisms** 59:12
**crop** 204:25
**cropped** 128:21
169:8 199:6,7
199:8,17 216:9
**cropping** 128:3
164:5
**cross-coverage**
10:11
**cross-covering**
10:16
**CROSS-EXA...**
4:6 296:6
**cross-section**
103:25 105:18
121:7 177:11
206:13 219:20
222:1,22
**cross-sections**
207:18 287:8
**crosses** 157:3
**CRR** 2:9 306:4
306:23 307:22
**crystalline**
303:11
**CSR** 2:9 306:4
306:23 307:22
**cumbersome**
288:23
**cured** 267:13
**curious** 220:5
237:12
**curl** 92:13
105:23 106:2
106:13,19
206:20 207:5
209:19 211:23
213:6 217:22
218:10,11
219:4,5 222:23

222:24
**curled** 97:13
98:4,6,7
206:12,15,18
206:23,24
207:1 208:12
210:16,21
213:5 214:20
215:1,6,6,7,16
216:17,19
219:7,19
221:14 222:11
223:4,4 224:1
226:1
**curling** 92:6,16
96:12 97:5,9
97:18,18,19,21
97:24 98:1
106:5,6 107:4
107:7 207:9,11
214:15,17,23
214:25 215:3
221:7 222:1
223:11 225:23
225:24 228:15
**curls** 91:18
105:23 106:1
107:7 206:22
211:21 212:3
231:23 232:1
**currently** 93:13
256:11
**curve** 91:16
193:3
**curved** 139:21
158:23 159:3,9
**curvilinear**
109:22 248:15
**Curving** 135:18
**cut** 46:22 47:1,9
47:13 61:7
86:6,9,10 87:2
87:7 88:23
101:5,8 102:21
106:18 107:2
124:11 154:4
218:3 220:20

Vladimir Iakovlev, M.D.

220:21 231:17
231:19,20,25
262:14 279:5
280:1,1 283:15
**cutting** 88:16
101:20 161:10

**D**

**D** 4:1 103:23
178:12 199:16
200:3,4,20
201:5
**damage** 101:19
129:15 130:2,3
130:4 204:6
**damaged** 129:25
130:3 247:14
**damaging** 99:24
**Dameron**
258:19
**dark** 32:14
163:10,10,17
163:22 226:3
**darker** 163:21
**data** 29:14 58:4
58:12 59:24
239:1 274:2,7
274:10,13,21
275:3 278:19
279:17 283:21
284:16 293:3
301:19
**date** 291:15,21
291:23 308:12
309:5
**dated** 78:18
306:19
**dates** 111:13
292:2
**David** 3:12 5:18
11:8
**day** 68:25
260:23 277:4
306:19 310:19
**days** 54:5 74:3,5
241:2 308:23
**deal** 66:4

**dealing** 84:3
94:8 148:6
253:13
**deals** 92:15
**decades** 302:25
**December**
290:21
**decide** 42:4
**decided** 261:10
**decision** 83:7,16
276:23
**decisions** 83:19
**declare** 310:5
**dedicated** 62:14
**deeper** 124:12
230:20
**defect** 88:5
**Defendant** 5:13
**Defendants** 3:11
**Defense** 2:3
**define** 137:18
**defined** 228:19
**definitely**
255:10
**definition** 94:16
**deformation**
145:22 146:20
159:17
**deformed**
131:17 153:11
158:13,20,22
159:7 161:5
163:5,7
**degenerated**
130:2 138:16
166:8 202:6
**degenerating**
166:6
**degeneration**
17:2 164:17,21
165:1,25
272:18
**degradation**
4:20 33:20
44:24 73:2,9
77:1 92:23
93:2 95:13

151:9 176:25
238:24 250:13
251:24 253:9
253:18,23
254:2,17
271:13,20
272:14,20
273:20 274:16
274:20 283:4
285:24 286:20
289:18,25
**degraded**
100:15 113:20
253:11,22
254:3,11 287:7
**degree** 84:4
90:16 97:9
103:1 128:17
145:9,15,21
146:18,19
150:18 152:6
153:13 154:22
156:6 162:25
169:2,5 174:21
179:20 182:4,7
182:7 184:6,12
188:17,20
189:2 191:8
194:19 197:4
197:13 199:6
203:16 204:11
205:17 218:14
224:24 227:23
246:7 253:23
302:5
**degrees** 89:25
**deletions** 310:8
**delicate** 261:6
**deliver** 133:15
161:24 164:22
164:23 166:12
**delivered**
161:15
**demonstrate**
195:1 225:25
**demonstrates**
183:5 198:22

219:18
**demonstrating**
194:5
**denervate** 87:18
88:7
**denervation**
88:15
**dense** 104:20,21
104:22
**densely** 105:2,2
**density** 145:20
248:19,20
**depend** 144:5
188:18
**depends** 10:25
23:21 42:18
54:3 64:22
67:2 87:1 89:9
89:11 93:4,4,9
97:13 104:5
118:16 119:17
130:13 133:18
137:18 145:9
175:15 184:7
263:11 284:21
**depict** 171:15
**depicted** 66:1
70:11 104:14
127:17 138:1
158:10 168:8
198:12 210:19
221:8 258:5
**depicting**
185:13
**depiction**
160:14,20
221:24 224:3
**depictions** 157:9
**depicts** 175:4
**deposed** 58:16
**deposition** 1:7
2:1 4:16 5:7
6:13,14 7:9,20
58:20 73:23,25
74:4,7 75:18
75:23 77:6
259:21,23

271:18,19
291:23 297:22
305:18 307:6,8
307:15 308:3,4
308:13,17,23
309:5
**depositions** 8:22
9:6,24 75:7
236:19 284:3
290:11 291:17
291:18 294:12
294:16 295:9
**describe** 28:20
71:16 96:14
104:6 196:5
287:3
**described** 7:8
12:15 46:16
56:10 63:20
71:14 76:10
78:3,7,14
82:21 92:17
93:3 94:15
95:7,8 98:20
118:5 134:19
157:17 160:12
163:8 175:18
176:6 178:21
185:19 188:7
199:10 207:9
251:11 252:5
254:17 292:23
303:13,23
**describes** 72:7
99:17 199:18
273:13
**describing**
239:25
**description**
30:10 33:12
70:22 78:12,22
104:12 124:21
139:13 230:3
236:21 244:15
**descriptions**
78:24 153:6
**descriptors**

154:8
designate 39:13
designation
  39:25 40:9,16
designed 106:21
desirous 310:8
desmin 182:15
  183:4
destroy 99:23
detach 252:13
detached 114:7
  251:23 252:3
  252:15,19
  253:18,19
details 28:7,8,13
  54:18,21 72:21
  279:11 295:2
detect 42:1
determine 37:7
  42:13 44:13,22
  73:5 84:10
  130:17 174:25
  185:5 197:8
  204:12 205:18
  231:1 239:21
  248:11 256:6
  256:11 257:17
  268:8
determined
  156:13 184:12
develop 267:2
developing
  88:23
deviates 224:7
device 83:23
  109:3 222:9
  287:11,12
  296:25 300:1
devices 79:16
  297:6,17
  301:25
devised 47:3
  255:11
diagnose 196:19
  235:2
diagnosed
  244:19

diagnostic 9:15
  71:7
diagonal 114:22
  114:24 220:20
dictated 70:10
difference 52:19
  58:3 67:20
  70:7 78:23
  102:9 137:9
  156:2 193:9
  296:17,21
  297:9
differences 43:2
different 14:8
  15:25 17:16
  20:19 29:3
  30:15 31:23
  34:17 35:24
  36:1 43:3
  53:15 58:12
  62:16 71:6
  72:2 87:1
  91:17 102:6,21
  102:22 103:20
  106:24 113:23
  124:6,7,9
  126:24 127:1
  128:18 146:19
  153:22 155:10
  156:5 157:1,2
  178:11,11
  182:14 186:22
  189:7 194:23
  198:4 205:22
  208:7,11
  210:18 211:7
  214:1 215:18
  215:20 216:14
  217:7 221:14
  221:23 223:16
  227:6,17 228:8
  232:24,25
  233:2,3,18
  234:22 235:13
  240:5 242:19
  243:21,22
  251:8 257:24

260:24 262:10
  265:5,5 275:7
  280:16 299:2
  301:25
differentiate
  146:24 147:3
difficult 21:21
  24:4 88:4 94:5
  130:17 156:14
  176:24 184:7
  187:12 191:8
  191:16 204:11
  205:18 229:23
  246:19 269:1
  288:23
difficulty 22:15
  109:4
digital 18:17
  116:24
dilatation 172:4
  172:10,17
  173:3 174:19
  175:15 177:15
dilated 175:13
  208:21
dilation 208:24
dimension 212:1
direct 4:5 5:16
  224:15
direction 307:12
directly 162:3
  195:22 250:4,6
disappear 16:13
  16:16 162:11
discern 246:19
disclose 49:4,8
  60:12 82:25
  220:7 290:13
  290:23 291:2,3
  291:5,6
disclosed 50:19
  50:20 82:22
  294:24 295:2
disclosing
  258:13
discomfort
  181:22 182:1

184:1 186:2
  188:8
discoverable
  8:16 39:11
discuss 37:19
  38:4 48:21
  89:15 101:3
  224:23 274:24
  275:6
discussed 40:20
  43:9 49:3
  91:12 103:9
  119:20 134:22
  141:15 178:16
  196:22 230:4
  232:7 272:14
discussing 38:3
  40:15 96:17
  103:10 220:20
  275:11
discussion 83:19
  179:2 216:4
  273:17 276:18
  289:16 292:13
discussions 38:7
  41:19
disk 304:12
displaced
  102:20 103:24
  110:12 120:9
  120:11,23
  121:3 124:15
  124:16 125:17
  208:20 211:12
  252:3 253:1
displacement
  121:8
disregard 98:9
disrupted
  190:14 202:10
  202:13,13
disrupting
  196:6
dissolved 257:11
distance 181:8
  244:5
distend 173:6

distended 172:6
  172:14
distinction
  226:15 297:5
distinguish 98:2
  133:1,8 226:12
distorted 169:10
  170:3
distortion 250:9
distributed
  209:14
distribution
  40:13 209:18
district 1:1,2
  298:18,19
  299:9
divide 220:11,13
divided 220:15
doctor 5:17 8:17
  8:22 9:19 10:4
  11:12 21:4,8
  21:10,13 25:14
  35:2 39:12
  47:17 49:2,16
  51:6,14 58:15
  69:7 71:11
  72:17,25 91:11
  118:4 142:15
  236:18 259:20
  269:6 292:15
  294:5,21
  295:24 296:7
  305:12,14
document 1:9
  68:3 74:8
  199:11 200:8
  201:1 210:22
  262:9
documentation
  237:24
documents 6:19
  7:9,19 29:16
  68:15 73:3,6
  73:13,16,18
  74:19,20 75:4
  75:13 76:4,18
  77:11,25 78:1

78:13,17 96:9
294:11,16
295:8
**dog** 85:4,8
**dogs** 85:13
**doing** 12:13 31:8
37:15 44:12
56:7 69:15
152:12 214:2
237:16 256:17
273:18 284:12
**don'** 218:23
**Dr** 4:12,15,16
5:2,5,8 11:8,17
14:6 15:21,23
16:21 17:6,24
20:14,23,23
21:8,18 28:2,4
28:12 33:9
36:17,25 37:19
38:7 39:6 40:8
40:20 41:19
56:11,19 60:23
66:5 73:25
74:15,25 75:6
75:18 85:2,6
85:11 108:2
112:13 147:16
151:8 153:15
153:19 154:4
259:17 260:3,3
260:6,7 262:14
263:3 266:15
271:25 272:1,6
272:6,9,9,11
272:16,19
273:9,14,21
274:7,8,9,15
274:17 275:6
275:14,21
282:13,19
283:1,9 290:3
290:4,7
**draft** 278:9
**drafted** 277:22
290:1,5 295:11
**drafting** 272:10

272:13 273:16
274:1,18 279:7
**drafts** 260:25
261:3 277:23
**drawn** 114:21
**drew** 190:8
**drive** 4:17 5:9
7:4,7,7,10,18
7:21 18:13,21
19:13 25:10
26:14 29:21,24
29:24 30:8,11
50:1 237:11
239:14 256:23
284:1,2 293:25
**driving** 151:2,11
151:12
**drop** 45:25 46:7
46:10
**dropped** 251:25
**dry** 55:11,11,14
259:1
**drying** 107:3
**dthomas@tcs...**
3:17
**due** 44:14 87:23
124:18 151:20
182:1 191:13
**duly** 307:8
**dye** 45:24 177:6
177:12
**dyes** 77:2
**dysfunction**
151:16,17,18
151:23 152:5
188:23
**dyspareunia**
191:7

_____
**E**
**E** 3:1,1 4:1
**earlier** 15:16
20:15,19 41:9
44:2 51:21
77:5 78:22
79:5 113:10
139:6 148:5

164:24 212:24
235:15 262:7
291:1 295:11
296:9
**early** 33:14,16
33:21 36:22
40:25 41:2,23
51:22 303:7
**edema** 173:10
173:17 174:19
175:15 177:17
178:14,15
**edematous**
175:13 178:14
**edge** 123:22
125:3 228:16
229:3 230:9,17
**edges** 215:16
218:5 221:14
222:12 228:16
231:4
**editorial** 14:16
260:21 261:21
261:24 278:6
**Edwards** 9:4,12
9:21 25:20,25
120:3,5 124:1
169:17,20
206:2 237:13
282:22,25
**effect** 85:18
145:16 257:12
**effecting** 162:4
**effective** 88:10
**efferent** 132:4
**effort** 52:13,20
84:14,20
108:15 260:18
268:17,24
**efforts** 266:21
**eight** 93:9 155:8
**either** 79:1 87:2
87:15 88:8
90:14,22 91:1
109:24 115:15
169:24 186:11
190:23 193:18

198:25 199:19
199:25 201:6
230:19 231:1
262:21 264:2
279:3 288:10
290:24 297:24
300:10,13
301:8,13,14
**elasticity** 91:23
**electron** 51:24
76:7 287:3,20
288:8,18,21
289:11,14
**eliminate** 9:20
**Elizabeth** 27:4,6
**EM1** 241:19
242:14 243:6
**EM2** 242:17
243:5,14
**EM3** 243:19
244:1
**EM4** 244:8
**EM5** 244:13
**EM6** 245:21
**EM7a** 247:18,19
247:20
**embedded** 22:16
24:1 46:25
63:9,11 258:6
258:10
**embedding**
22:16 46:17,23
**employed** 57:1
307:13,17
**employee**
307:16
**empty** 16:15
103:3,14
190:13 251:22
251:24
**encapsulate**
90:11
**encapsulated**
104:21 111:22
149:19
**encapsulates**
242:16

**encapsulating**
122:18 128:9
247:18
**encapsulation**
91:21 95:13
121:10 124:22
223:11
**encapsulations**
127:16
**encased** 117:9
207:12
**encircled** 212:4
**encircling** 181:7
**endings** 162:8
**ends** 162:10
231:16
**engineer** 272:22
**entering** 237:19
**enters** 64:9
**entire** 29:22
98:7 103:22
122:18 175:14
216:11 218:4
**entirety** 64:17
**entitled** 4:18,20
117:2 238:13
259:15 260:1
271:12,20
**entrapment**
155:19 211:19
**entrapped**
211:21
**entry** 245:7
**environment**
33:3,4 36:15
130:6,24,25
131:11
**equipment**
116:13,16,18
288:25
**equivalent**
67:17 241:21
**erode** 226:7,9
**eroded** 194:20
196:4 226:2,10
226:22 227:2
227:15,16

Vladimir Iakovlev, M.D.

eroding 194:10
226:25
erosion 150:15
151:13,14
169:24 194:13
225:25 226:1,5
226:13,19
228:14,18
244:16 245:2
286:25
erosions 232:7
ERRATA 309:1
erratum 308:6
308:10,11,16
308:21
error 149:12
300:6 301:9,18
especially
116:11 191:7
217:21 305:4
Esquire 3:4,12
3:19
established
131:14
estimate 140:19
254:16 266:24
estimated
106:12
et 1:11,12 4:23
309:3,4
Ethicon 1:5,12
3:11 8:23 27:7
28:25 30:16,17
34:21 67:9
73:6,9 74:10
74:15 76:3
77:8,25 78:1
112:21 200:6
220:11,13
282:6,11
287:12,21
288:7,7,18
290:22 291:4,5
292:3,10
294:11,11,15
294:16 295:8
297:25 303:15

303:15 309:4
Ethicon's 73:2
ethics 67:15,16
67:21,23
evaluation
204:14
Eventually
193:15
everybody
51:10 96:5
260:12,19
261:20,21
evidence 83:4
194:12,13
ex-plant 70:11
exact 106:11
191:4 280:12
296:25
exactly 13:12
16:19 17:14
21:2 33:12
68:25 70:24
76:16,20,22,25
77:9 78:21
111:19 123:23
126:9 164:6
169:5 170:11
187:13 195:12
200:10 216:13
232:12,20
246:2 251:11
251:12 276:1
297:1 298:20
examination 2:2
4:5 5:13,16
76:6,10,14
77:15 289:13
306:11
examine 17:2,10
145:7 195:13
examined 5:14
31:25 52:10
55:10 143:1
237:18
examining 10:8
13:5 42:17
69:2

example 101:4
101:13 105:3
107:11 117:6
117:12 162:3
172:21 282:22
examples 205:3
299:24
exception 8:11
exchange 276:6
excised 48:6,9
48:15 64:18
193:5 241:20
282:16
excising 52:3
excision 227:12
227:14
exclude 281:16
excuse 38:22
234:7 264:24
272:18 298:18
exercising 39:4
Exhibit 4:25 5:1
5:4,7,9,25 6:5
6:13,18 7:6
18:7,8 22:4
26:15 27:2
29:9,21 31:21
45:18 50:1
58:5,13,23
73:16,20 74:1
240:25 241:1
256:23 259:15
259:21,23
260:25 261:15
269:6 271:12
271:18,19
272:4,7 273:15
277:24 278:21
289:24 293:22
Exhibits 4:10
5:25 6:8 28:23
290:8 297:21
exist 8:15
148:19 190:5
existing 8:9
262:15 263:2,8
263:9

exists 65:2 72:6
expect 27:21
149:16 154:18
expensive 289:2
experience 15:1
17:17 88:19
144:16,20
149:16 153:12
165:6 228:2
experienced
191:13 227:19
227:22
experiencing
176:7 182:1
205:16
experiment
30:11 32:2
35:15,25 36:6
36:12,21 37:16
37:20 38:8
39:17,18 43:8
43:21 45:9
255:11 257:6,8
experimental
275:22
expert 4:12,14
5:1,4,20 6:1
8:9 19:3,18
22:2,10 38:24
178:1 220:16
259:2 278:4
297:24 298:15
299:16 302:3
experts 251:1
Expires 310:25
explain 39:24
143:21
explained 40:8
explaining
25:14
explant 64:21
explantation
151:12,13,15
155:7,9
explanted 4:22
20:3 29:5
33:19 70:17

72:8 149:24,25
175:11 214:7
271:15,21
exposed 30:7
31:17 43:14,16
45:23 46:15,17
47:7 51:14
52:4 169:15,23
170:1 226:23
228:16,23
229:4 230:8,18
231:15,18,24
242:4 257:10
261:11 276:11
exposing 37:1
44:9 238:18
exposure 29:18
32:4 44:15
169:22 170:5
226:13,19
228:20,22,22
229:5 230:16
230:19 231:23
234:20 245:3
257:7 276:12
exposures 232:7
express 298:15
299:16
expressed 251:9
292:18
expression
224:24
extent 37:25
38:3 39:6,12
54:19,25 55:6
75:6 77:16
115:23 129:3
146:24 147:4
174:24 184:3
188:6,13 197:8
228:1 256:6
257:17 268:8
295:13
extra 33:23
195:23
extract 67:6
extracted 36:14

265:13
**extrapolate**
301:19
**eyepiece** 122:14
136:4,4 283:14
284:6,15
292:16
**eyes** 110:25
214:19

**F**

**facilitate** 240:23
**fact** 109:16
121:3 129:14
131:14 161:21
170:6 179:18
199:18 225:23
225:24 226:4
245:2 249:24
273:11 303:21
**factor** 164:5
175:25 191:19
191:24 197:7
209:8,9 210:6
**factors** 103:21
145:10 155:22
157:2 159:15
184:8 188:18
196:23 197:12
219:6 242:1
**failure** 299:25
300:16,18,18
**faint** 135:12
174:15,15
**fair** 5:21 6:10
14:15 15:13
16:20 23:3
24:5 28:22
38:4 50:10
52:22 65:4
75:6 99:16
105:21 119:3
120:10 121:4,5
125:16 142:18
146:11 147:7
149:15 162:15
162:20 176:5

187:21 196:18
253:16 279:6
280:17 281:4
287:19
**familiar** 28:6
54:10 116:3
**far** 15:11 27:24
72:10 92:11
94:1,25 115:21
119:10 124:4
137:22 175:6
206:3 248:1
254:10 262:19
**favor** 187:20
**FDA** 78:15 79:2
**feature** 101:3
102:14 111:19
155:25 156:3,3
178:6,9,10
239:25 240:3
**featured** 64:14
**features** 109:23
141:19 239:24
240:13
**federal** 8:7,8
39:1
**feel** 166:14,16
166:18,20,21
166:22 181:21
272:24
**feeling** 181:22
235:12
**feels** 178:25
209:12
**fellows** 260:6
**felt** 161:6
**fiber** 63:3,8,16
64:14 89:23
100:18 102:21
104:1 105:19
111:17,20
114:8,9 121:8
122:17 131:7
162:10 177:11
224:6 225:6
248:7,9,15,16
248:25 249:2,3

249:4 283:19
**fibers** 48:3
65:11 77:3
89:22 90:1,9
90:10 91:22,25
92:3 94:23
100:17,17
102:6 103:12
104:19 105:5
109:11 111:18
117:8 119:2
127:10 133:25
133:25 134:8,8
134:13 158:15
166:10,11,13
177:1 181:7
207:22 208:20
218:14 224:14
244:6 248:21
253:2 258:17
270:5 283:15
**fibrin** 54:2
**fibrinogen** 54:1
**fibrosis** 78:11
126:14 203:3,9
246:14,15,16
**fibrous** 121:10
124:22 125:14
127:16 180:9
**field** 12:17 13:5
19:10 84:5
222:23 263:7
272:25 273:7
273:24
**fifth** 27:20
**figure** 23:9,21
25:6,11 48:1
56:5 72:5
88:19 98:20
99:17 101:1
107:10,15
108:15 109:6
111:15 112:5
113:6 114:13
115:21 117:5
119:24 122:16
123:5 130:11

130:19 134:18
141:11 154:13
157:15 167:1
171:5 175:17
175:17 178:10
179:9 180:2
182:13,17
184:5,16,21
187:8,11 189:4
189:14,23
190:1,2 191:3
192:5,19 193:8
193:17 194:2
197:19 199:3
199:23 200:21
200:24 201:1,3
201:5,18
202:18 204:18
205:1,15 206:4
206:11 207:10
208:13 211:17
212:7 213:3,15
213:25 214:1,7
216:3 217:5
221:13 223:10
223:13,23
224:19 225:13
228:6,13 230:8
230:15,23,24
232:23,24
233:10,11,25
234:18 236:4
241:19 242:14
242:17 243:5,6
243:19 244:1,8
244:12 245:21
247:17 250:12
255:1 256:1
258:5,16
295:19
**figures** 6:6
26:17,20 100:6
102:1 112:3
185:6 199:22
201:16 215:15
263:19,20
**filament** 89:23

109:13,13
127:6 207:21
**filaments** 89:22
207:18
**file** 1:5 7:13 25:6
58:9 278:19
279:3
**files** 26:14
185:11 211:5
**filing** 79:1
308:17,22
**fill** 122:19
207:20
**filled** 53:22
121:13,15
125:11,12
180:11 190:15
190:16 214:20
215:1 223:1
**filling** 223:12
**fills** 242:16
**final** 29:14
**finalized** 238:7
**financially**
307:17
**find** 7:10 14:24
25:17 43:5
58:8 60:11
76:13 88:20
146:14 148:16
148:21 153:1
154:9 156:17
239:13,14
280:23 283:15
283:18 285:14
**finding** 146:5
175:10 176:10
181:14 193:8
196:25 203:22
205:18 245:25
246:2
**findings** 69:9
72:7 79:3,4,5
81:14 82:22
137:8 143:21
155:18 175:5
184:15 191:3

249:20 263:14
263:15 284:17
290:9 296:18
297:3
**fine** 47:17 49:11
114:20 267:24
284:25 295:16
**firm** 291:14,20
**firmly** 107:1
114:6 292:4
**firms** 20:20 44:1
**first** 14:2 44:13
79:9 81:22
88:1,17 92:15
103:4,9 140:21
144:1 161:4
167:22 190:3
219:1 231:22
232:9,13
241:18 242:24
250:11 278:8
294:10 305:8
**fit** 110:18
**five** 93:3,6,20
94:10 95:1
121:18 149:2,8
232:13 253:8
254:18 261:2
276:12
**fixation** 97:25
**fixed** 136:5
**flakes** 41:1
**flaking** 40:24
**flat** 90:17 92:10
97:14 106:2,21
106:23 107:3,5
209:17 212:1
213:6 216:18
217:20 218:9
219:9,18
**flexible** 93:1
**flip** 110:3
**floated** 252:13
**floating** 107:8
**floor** 12:24
14:21 146:13
156:22 246:21

**flow** 114:3 195:7
246:10,12
**fluid** 52:23
172:8,8 173:11
173:14,16
174:20 178:16
256:3
**focus** 111:6
243:16 268:14
**focused** 76:5
**fold** 91:16 92:13
**folded** 95:21
105:20 135:2
136:7 177:5,7
177:11
**folder** 26:6,10
139:11 293:19
**folders** 22:2
23:19
**folding** 92:6,16
96:11 97:5
**folds** 91:18
105:23 212:5
**follow** 9:10,16
144:7
**followed** 9:11,22
9:24 10:2
33:12 144:6
**following**
308:10
**follows** 5:15
**force** 253:6,6,7
**foregoing** 306:6
306:14 307:6,8
310:6,10
**foreign** 53:6,20
54:16,20 78:11
98:21,25 99:3
99:6,12,14,17
99:22,23
104:14,20
107:11,16
117:9 154:23
155:1,9 156:7
156:11 243:11
244:9
**forget** 237:21

**form** 12:25 13:1
42:8 47:1
54:20,25 64:11
87:17 90:10
91:5 96:13
101:7 112:22
155:12 224:12
256:2 276:17
297:7 299:11
299:20 300:2
300:20 301:3
301:11,20
302:12,23
303:4,25 304:7
308:5,8
**formalin** 29:18
30:7,13,18,22
30:24 31:1,17
32:4 43:16
48:16 51:8,15
52:4,11 63:5,9
63:10,11 64:25
95:17,25 96:3
96:11 97:16
206:20,21,23
214:8,10 215:2
258:25 259:4,6
**format** 70:24
307:12
**formation** 78:11
98:10 131:12
131:21 250:8
**formed** 205:7
213:19 222:25
**forming** 41:1
142:13
**forms** 89:24
**forth** 132:5
145:2 159:21
209:13 260:23
306:8
**forwarded**
115:5,6
**found** 76:16,16
76:20,21,24,25
77:9,9 78:13
79:3,4 80:20

80:21 82:22,24
148:11 154:14
238:23
**four** 22:14,14,20
23:4 27:15,18
29:18 34:20
35:24 36:1
93:3,6 119:17
121:11,23
128:2,6 164:1
168:20,25
177:22 181:9
199:22 200:12
210:16 234:6
280:3 285:1,3
292:18,21
293:1,8,11,11
293:11,11,12
293:12
**four-micron**
105:24
**fourth** 27:20
**fragment** 110:6
207:25 243:21
**frame** 138:2,12
**frames** 234:6,7
**free** 83:10 114:1
114:3 116:21
181:17
**frequency** 300:8
**frequent** 283:20
292:25 293:5
297:10
**frequently**
179:23
**fresh** 48:19,20
51:25 95:20
96:7,11
**Friday** 2:7
**front** 261:10
308:18
**fulfilled** 283:8
**full** 35:17 62:24
284:18
**fully** 187:24
**function** 14:21
15:1 133:17

134:3,4,11
166:10 186:24
**fund** 43:21
**funded** 60:15,18
62:9 305:9
**funding** 43:23
43:23 60:20
272:3,7
**funds** 62:18
**further** 10:24
72:21 167:23
203:21 280:23
305:13 307:15
**fused** 180:24
181:15
**future** 147:5,6
275:11

---

**G**

**G-H-A-S-E-M-I**
239:3
**game** 38:4
**ganglia** 167:3,8
167:21,23,24
168:7,13
**ganglion** 167:9
167:15
**gather** 274:9
**gathered** 7:3
265:25 278:19
**gathering** 266:6
274:2,7
**general** 12:16
118:14 138:14
201:9 294:5,7
294:8
**generally**
102:13 220:10
301:1
**generated** 26:5
**generation**
279:7
**Genitofemoral**
86:13
**getting** 37:22
62:16 71:20
72:1,2,3,21

Vladimir Iakovlev, M.D.

81:5 131:18
170:4 249:13
283:20 290:6
292:12 295:17
**Ghasemi** 239:2
**give** 6:9 26:24
26:25 51:14
83:9 93:19
102:17,18
113:9 115:17
**given** 7:5 8:22
11:19,23 95:23
95:24 192:13
203:22
**giving** 25:25
258:13
**glass** 32:20
214:18
**glasses** 264:21
**glutaraldehyde**
52:5,7
**go** 10:1 14:23
16:13 19:20
22:3 23:7 25:5
25:17 29:9
40:5 48:24
52:25 55:24
63:2 81:4 87:7
87:10 90:18
96:16 98:11
102:13 104:2
104:11 105:8
107:13 109:14
112:5 119:24
125:23 128:8
129:8 133:19
133:20 134:8
136:11 139:1
141:16 149:23
154:3 155:17
160:17 162:2
162:12 163:2
167:1,18 172:3
179:6 182:13
184:14 185:10
195:11 200:14
205:1 206:11

208:6 210:15
212:19 215:15
228:6 232:18
232:19,23
233:24 235:23
240:1,25
243:18 244:12
247:8 251:20
252:7 254:6
261:1 263:20
269:6 277:16
284:22 285:5
**goes** 10:14
104:23 119:16
146:9 155:5
157:22,23
162:9 165:6
190:14 211:20
231:12 278:16
292:24 293:12
**going** 5:19,24
7:17 9:25
16:12 36:22
38:11 47:6,8
47:12 49:5,11
49:11 66:7
69:7 71:19
86:7,10 87:19
87:24 96:15
98:14 107:9
108:19 117:23
118:4 132:5
133:22 142:8
142:19,20
145:12 159:12
161:1 173:16
189:6 193:13
193:14 196:4
198:25 207:16
220:20 226:25
230:23 231:7
235:1 238:9
259:20 279:6
279:12 289:19
296:2
**good** 5:17
104:17 105:3

110:25 117:12
117:25 122:5
152:19 178:24
214:19 239:15
296:7,8
**gradation**
284:22
**gradations**
214:2
**graded** 284:9
**granules** 77:3
**greater** 93:20
264:2,7,11
265:1,21
269:17
**gross** 70:22
**group** 56:6,16
89:11 112:8
161:7 168:23
178:6 267:25
269:17,20,21
269:23,24
283:7 303:21
**group's** 268:16
**groups** 56:1
156:14,14
161:3
**Grow** 16:7
**growing** 85:25
223:1
**Guelcher** 36:17
36:25 37:19
38:8 40:20
41:20 43:10
271:25 272:6,9
272:11,16,19
273:9,14 274:7
274:9,17 275:7
275:14,21
**Guelcher's** 33:9
**guess** 38:10
76:19 93:9
139:4 237:10
**guidelines** 81:12
83:9,11
**guiding** 83:21
**guy** 96:5

**gynecologist**
80:20,25 81:2
83:25,25 84:23
**gynecologists**
81:23

—————
**H**
—————
**H&E** 17:5,9,12
98:22 107:17
129:11 139:14
168:19 179:10
183:4 184:24
187:12 201:19
206:13 241:21
242:23 243:2,3
302:16
**habits** 89:12
**half** 37:17 41:6
47:8 97:11,12
175:7 207:22
207:23 244:3
255:15,21
284:10,22
285:8
**halo** 117:8
**hammock**
193:18
**hand** 5:24 91:5
176:20 259:20
**handled** 259:13
**Hang** 292:12
**happen** 114:2
159:14 210:3,4
213:12 215:9
225:3 227:1
252:22,23,24
300:12
**happened** 93:22
213:23 215:9
215:11 216:21
216:24 233:13
233:17 247:9
**happens** 42:3,17
117:13 151:19
155:8 173:17
231:22 253:4
256:20 272:15

**happy** 39:13
**hard** 32:11 69:1
75:4 87:25
88:20 93:12
108:11 110:11
113:4 120:24
128:4 139:5,7
141:3 169:5
183:3 213:15
214:17 229:17
230:25 239:14
248:11 282:3
**harder** 92:25
101:19
**harm** 68:1 77:16
**harming** 82:19
**hate** 274:6
**head** 126:1
132:10
**healing** 149:19
**health** 138:14
**healthy** 130:6
138:9,9 249:18
**hear** 8:5 210:25
**heart** 202:25
203:3,4
**heat** 218:7 219:1
219:5,12
**heat-treated**
217:22,24
218:2,5,20
219:3
**help** 52:2 179:19
181:1 214:5
**helped** 274:1
**helping** 233:22
**helps** 179:23
**hemorrhoids**
172:21,23,24
172:25 176:1
**hernia** 79:24
80:2 81:22,24
82:3,4,5 84:6
84:24 85:24
86:10,16,24
94:3,4 150:9
152:12 153:6,7

154:23 156:20
274:17 280:6
280:25 281:2,7
281:18 285:25
286:8 287:1
289:15
**high** 145:20
158:8 277:5,15
**higher** 136:3
155:14 156:6,7
159:6 162:12
169:4 209:17
224:14 253:23
**highly** 1:21 4:7
39:14,24 40:9
40:14
**histo** 43:20 44:7
44:11
**histological**
46:16,21 63:13
63:14,15 65:10
72:8 76:6,9,14
77:2,14 78:2
101:15 106:25
128:12 156:12
219:23 242:25
**histologically**
69:2
**histology** 9:15
31:8 42:21
45:20,23 47:6
65:6 69:10
70:2,10,17
71:13 73:11
145:18 152:11
152:16,21
153:2,4,21,23
154:12,19
155:14,15
176:6 235:18
258:6,10 270:7
270:18,22
274:11,21
289:12 303:13
**histopathologi...**
9:8
**historically** 88:1

**histories** 195:25
**history** 191:4
281:25
**hitting** 171:12
**hold** 47:1 106:25
275:1 281:25
291:11 302:4
**holding** 193:17
**holds** 45:13
**hole** 100:21
102:2 109:9,16
137:19
**holes** 100:22
102:6,8 207:20
**hope** 277:16
**hospital** 9:18
14:9 20:17
49:24 50:5
62:13 63:20
64:10,10,11
66:4 69:16
71:22 82:24
83:22 84:11,21
96:4,16 273:25
280:14 287:17
**hospitals** 280:16
**hour** 50:24 63:4
117:24
**hours** 54:5
**human** 53:7
54:25 90:25
145:11 159:13
**hundred** 106:22
118:17,22
119:15 181:11
**hurt** 228:4
**Huskey** 9:4,12
9:21 237:13
**hydrogen** 32:5,5
33:4 238:19

———— **I** ————
**Iakovlev** 1:18
2:1 4:3,12,15
4:16,23 5:2,5,8
5:12 39:6 40:8
66:5 147:16

154:4 259:17
309:6,25
310:15
**idea** 88:6,15
137:1 274:15
**identical** 299:7
299:17
**identification**
303:11
**identified** 48:1,2
86:18 87:3
109:17 241:19
266:22
**identifies** 23:9
**identify** 24:6,18
27:3,9,10
87:14 95:16
162:14,22
240:12 245:22
255:18 266:19
281:1 286:6
**identifying**
24:25 25:1,2
211:16 266:18
298:6
**image** 22:6
23:12 24:8
52:8 64:8
102:15 105:13
107:17 113:6
114:14 118:4
118:13,15,23
120:8,19
121:18,22
122:22 123:8
123:17 124:5
124:14,23
128:1,12 129:6
129:8,10,11,21
129:25 130:11
131:16,20,23
134:24 136:1,7
138:18,19
140:10,15
141:11,13
158:10,19,25
159:3,9,16,16

160:7,10 163:3
165:9 167:15
167:21,25
168:2,3,5,13
169:3,10,25
170:17,25
171:6 172:1
173:18,21
178:21 182:23
183:7,8,19
185:7,14
187:20 192:23
194:22 198:12
198:21 199:12
201:8,10,24
202:1,18
203:19,24
206:8,9 212:17
216:10 219:17
220:4 222:21
223:4 234:18
235:20,22,25
236:3 241:18
241:22 242:1
243:13,14,20
247:21 248:14
251:23,25
252:1,9 257:22
270:4,13
**images** 18:10,13
18:17,24 19:2
19:11,22 21:16
21:25 22:5,8
22:13 23:2,3
23:10,24 24:6
24:24 28:24
29:1 47:25
52:14,22 69:7
96:9 98:17,22
100:2,7,21
104:8,16 112:6
116:25 119:19
136:13 139:7
139:12 157:8
157:12 160:15
162:7,21
168:25 171:4

171:15 174:2
176:12 178:11
181:25 182:10
197:21 198:3,4
200:5,11,22
208:17,25
210:13 214:1
216:8 221:23
222:3 240:1,2
240:5,14,17,18
240:19,20
245:2 250:25
251:2,3,7,9,15
253:17 256:24
285:13,17
287:25
**imagine** 229:19
292:9
**imaging** 116:4,6
116:13,18
117:1
**immediate** 54:4
**immediately**
48:3,6,15 53:5
53:22 91:15,19
98:9 169:14
270:5
**immerse** 45:23
52:23
**immobilized**
97:23 207:6
**immobilizes**
91:22
**immuglobins**
53:24
**impact** 109:19
166:7 202:20
202:23,24
218:6,8 256:12
257:3 277:5,16
**impacted**
185:17 256:7
**impinge** 158:17
161:4
**impingement**
158:18,21
159:19 160:11

162:4 163:6
implant 99:7
implantation
89:3,7 111:13
142:19 151:3
155:2 297:15
implanted 31:17
85:4,7,13 97:6
97:6 99:18
111:8 137:2
147:9 149:22
209:2 249:25
implying 267:6
important 25:3
79:10 85:23
87:21 167:19
167:20 305:1
in-situ 193:14
inappropriate
66:25 72:22
incidence 86:3
264:8
incidents 97:5
include 7:20
26:16,19 73:20
239:23 281:17
included 7:25
18:15 26:17
29:23 30:4
51:18 201:12
282:11,20
287:25,25
includes 10:23
including 29:13
30:15 126:22
166:20 230:15
239:2
incontinence
80:8 82:12
84:3 94:9 97:7
97:8 142:24
146:14 147:10
148:11 149:18
incorporate
199:19
incorporated
92:2 180:7,22

180:23 181:2
187:22 189:18
189:21 190:23
207:7 213:20
incorporates
186:13
increase 91:20
increased
248:19
increases 92:9
indentation
188:4
independent
67:11 83:2
305:11
independently
76:17
INDEX 4:10
indicate 114:23
140:3 244:15
indicated 62:1
113:13 151:14
201:24
indicates 114:16
114:16 139:18
141:23 165:12
195:21 222:24
indicating
124:17 140:2
174:16 177:4
190:6 191:1
193:4 195:1
200:1 206:6
213:10,11
222:1 231:2,3
indication
129:24 187:5
244:16
indications
153:22
individual 22:13
26:3,9,15 29:5
66:13 67:21
83:18 108:23
133:25 134:10
134:10 148:25
154:10 155:18

155:25 156:2,4
222:10 232:19
260:15 292:19
293:8 301:19
industry 305:9
infarct 203:5
infected 229:5,8
infection 150:16
234:22,24
235:2 244:17
244:19,21,25
245:7
inflammation
99:10,12
104:20,21,24
109:22 111:21
120:25 125:19
154:19,23
155:5,14,20
156:21 163:24
229:6,10
234:19,21,23
235:5,7,10,21
236:8 243:11
244:16,22
245:8,20
286:21
inflammatory
53:8 98:21,25
107:12,16
244:9
influence 179:21
information 7:1
14:3 17:20
24:25 25:1,3
29:20 31:20
36:14 38:13
40:14 49:9,19
49:20 50:5,5
54:24 55:5
60:9 61:9 67:6
71:21 72:4
75:11,12 81:6
83:3,6 95:24
96:10,18 97:1
97:4 109:2
117:3 238:13

261:8 268:5
292:16
ingrown 16:4
inguinal 86:13
initial 91:18
initially 107:2
284:8
injury 160:24
ink 46:8
inner 164:19
innervated
166:13 171:9
250:8
innervates
129:18
innervating
167:12
innervation
86:22 87:15
139:14 141:19
143:1,2 146:18
146:21,25
147:4,11
148:12 149:9
157:12 165:5
168:19 171:21
197:20 200:24
201:8 247:18
insemination
245:19
insert 233:17
inside 90:4
91:23 129:19
131:3,9 137:13
139:21 165:2
168:11 174:20
186:13 190:15
191:6 211:23
223:1 224:1
231:22
insofar 94:7
194:3
institution 10:12
10:25 14:8
67:22
Institutional
67:17

institutions 11:1
11:2 67:22
instruct 38:1
instructing
72:12
INSTRUCTI...
308:1
insufficient
202:10,12,14
203:4
insulate 36:18
intact 247:4
integrated 98:5
integrity 278:5
304:22
intend 45:10
intended 193:25
194:1 233:17
intending 57:8
intention 42:12
intentionally
31:15 37:1,8
41:21 42:14
255:12,14,20
274:25 275:7
interchangeably
226:15
intercourse
186:18 191:7
191:12,19
interest 278:5
interested 51:12
295:17 307:18
Interesting
283:2
interests 39:7
interface 253:10
interfere 186:16
interference
186:24 189:2
interfering
186:22
interim 29:14
interior 94:19
interlocking
89:16,18
Internal 73:3

Vladimir Iakovlev, M.D.

interrupt 92:6
92:19 144:9
interrupted
246:3,11
interruption
205:11
interstitialcy
177:8
introduced 33:2
introduces 90:5
inventory 35:2
investigated
150:20 153:20
investigation
17:21
invoice 293:24
involved 54:3
69:17,19 71:8
81:20 145:19
145:21 179:18
185:16 198:1
261:7,14 263:6
275:21
involvement
153:14 154:2,9
154:14 179:9
180:3,20
182:12 184:23
197:22 198:23
305:5
involving
112:21
irregular 90:20
109:18,21
164:23 224:4
248:23
irrelevant 55:9
irritated 224:14
ischemia 161:11
246:16
Island 3:7
issue 72:18,19
148:21 156:20
159:13 170:10
176:6 189:5
220:19 261:6
272:17

issues 48:25
129:15 242:1
278:16 294:22
items 71:4

J
jar 30:25 31:2
35:4 45:25
46:8 259:4
jars 34:25 35:12
35:12 256:14
256:15
job 74:9
Johnson 199:23
199:23
JONATHAN
3:4
Jordi 28:4
jorent@motle...
3:9
journal 59:20,22
60:15 66:22
67:10 261:13
270:8,10,15
277:10,11,16
journals 14:11
14:16 58:17,21
59:19 60:3,13
61:10 277:1,3
278:6 305:7
Judith 2:9 306:4
306:23 307:5
307:22
Julia 13:21
jump 256:23
jury 104:9
111:16 113:7

K
K-A-L-I-A
13:19
K-A-R-R-A-B-I
239:3
K-I-E-H-L
13:23
Kalia 13:19

KARRABI
239:3
keep 24:14
26:13 36:23
37:16 41:5
42:2,18 106:21
106:23 293:7
Keith 13:21
Kelly 292:8
Kenneth 13:16
kept 24:12 31:1
31:23 33:13
108:12
key 21:23
Kiehl 13:23 14:6
kind 16:5 22:24
30:12,14 31:21
34:24 36:11
42:19,23 53:19
74:14 86:10
99:12 111:20
116:22 130:4
179:22 255:18
288:24
kinds 34:17
53:15 197:25
237:1
kit 296:22
Klinge 20:14,23
21:8,10,14
Klosterhalfen
153:10,15,20
knew 201:12
knife 47:1
101:14
knitting 109:14
knives 106:21
know 13:16 14:2
14:24 20:21
25:9 28:3,7
36:17,20 39:9
41:10 43:6
48:8,10 49:4
51:11 54:6,13
54:17,19 61:22
64:13 66:8
67:18 71:11

74:12,14,17,22
74:25 75:5
78:12 80:12,16
80:21 82:5,10
82:13,14 84:13
84:18 92:24
93:14,16 95:14
107:22 108:7
108:19 111:7
112:16 126:1
131:6,11
135:13 137:17
148:23 149:11
150:6,10,24
153:19 159:23
160:1 165:15
165:17 169:19
170:20 172:12
175:6 176:11
176:16 177:7
183:15 184:3
188:5,13
190:18 192:8
197:16,25
198:11,13,17
199:22 204:22
208:9 209:23
211:3 213:1,14
213:17,18,22
215:10,13,19
216:2 218:17
218:23 219:10
219:11 220:5
220:10 221:5,7
221:19 222:14
222:15,18
223:19 225:16
227:10,13,18
227:21 228:11
229:7,11,20,22
230:11 232:3,4
232:8,16,20
233:7 234:3,8
234:11,14
235:16 241:11
242:5,7 244:18
244:23 245:11

248:7,9,17
250:14,16
251:16 252:18
254:9,12,25
255:2,4 259:5
259:9,12 260:3
260:5 266:14
267:7,21,22,24
276:11,13,15
276:19 279:22
279:25 281:8
282:16 288:4
288:10 291:15
291:20 292:11
293:5 294:23
knowledge
16:17 67:5
71:10 72:6,17
73:21 115:7
132:16
knows 51:10
96:5
Kreutzer 20:24
21:8,9,18 28:2
28:12 56:11,19
60:24 108:2
112:13 262:14
263:3 282:13
282:19 283:1,9

L
lab 9:16 30:1
43:20,24 44:5
44:7,11 51:3
241:10 262:23
label 35:12
labeled 168:3
171:7,7 178:12
247:21
labelled 103:11
labels 36:2
laboratory
29:15
lack 236:21
large 11:1 53:17
64:23 88:5
110:5 133:20

150:1 152:20
205:12 277:25
301:16,17
**larger** 87:11,15
128:4 157:19
173:6 175:1
199:9 209:18
**largest** 93:7,11
94:9 176:23
283:7
**laser** 218:3
280:1
**late** 303:7
**law** 2:4 20:20
21:1,3 44:1
**laws** 66:4 72:16
**lawsuit** 72:18
**lawyers** 7:23
40:10
**lay** 218:9
**layer** 44:24 46:3
46:6,10 91:17
92:23 93:2
94:19 114:1
250:13 253:21
254:11 283:14
285:24 287:7
**layer's** 283:4
**layering** 95:12
95:16 104:18
117:7
**layers** 91:16,16
211:22 292:17
**lead** 239:1
246:16
**leaked** 259:8
**learned** 106:23
275:4
**leave** 88:7 256:1
**left** 6:4 100:2,7,9
109:7 113:14
117:15 118:23
119:8 135:16
138:19 171:7
176:20 177:2
180:10 192:23
206:7 215:22

231:25 252:4
276:22
**left-hand** 114:15
134:24 163:12
**leg** 159:20
**legal** 38:20,20
291:7
**legally** 291:3
**length** 21:5
230:25 251:7
257:23
**lesion** 131:13
**let's** 22:3 29:9
55:24 63:2
69:3 72:11
88:7,23 98:11
102:17 104:2
105:8 107:13
112:5 119:24
119:25 125:23
126:12 129:8
139:1 141:16
142:14 144:1
144:10 146:6
147:22 179:6
182:13 184:13
205:1 206:11
207:24 208:6
212:19 226:17
233:24 240:25
253:12 263:20
269:6
**letter** 68:19
295:15
**letters** 59:9
**level** 72:11
87:13 90:18
124:6 284:7
**LIABILITY** 1:7
**licensed** 83:8
**lifts** 107:8
**light** 45:1,12
63:4 76:8 77:4
77:6 100:23
110:1,3 117:22
132:25 133:9
138:6,14

139:18 140:10
168:6 169:14
249:9 303:10
303:16
**lighter** 105:1
**liked** 233:14
**limited** 29:13
40:13 92:4
95:24 190:20
269:10
**line** 135:12
174:15,15
177:10 208:18
264:4,15
266:25 278:2
309:9
**linear** 135:18
**lines** 114:22,25
**list** 300:5
**listed** 261:19,20
**literature**
152:23 156:20
267:23 268:7
298:2 303:20
**litigation** 1:7
15:13,22 37:24
37:25 38:15
39:5,10 40:10
50:17 60:19
61:25 63:23,24
66:13 70:25,25
93:23 96:2
115:25 297:25
**little** 36:23 41:8
119:25 124:12
126:24 144:24
176:24 177:12
186:4 235:23
284:10
**LLC** 3:5
**LLP** 2:5 3:20
**load** 7:8
**locating** 17:5
**location** 120:9
139:20 140:7,8
140:20 141:25
142:2,22 146:3

168:10 170:7
171:16,20
182:5 184:10
212:10,12
219:15 227:6
**locations** 157:2
**log** 29:15
**Lombard** 2:5
**long** 28:15 49:18
50:21 74:8
93:4 111:7
117:2 137:2
176:20 229:11
255:4 256:1
259:9 262:20
**long-term** 203:2
257:11 265:21
268:8,18
269:16
**longer** 36:23
42:3,18 202:23
203:8,8,11
253:19
**longer-term**
264:1,5
**look** 89:20 98:19
101:21 102:15
103:22 105:16
109:6 110:14
122:22 124:13
136:6 138:18
142:15 145:10
157:7 178:7
187:18 193:13
193:14,15
198:9 207:24
208:17 214:18
241:17 249:1,2
255:13 260:17
268:24 276:16
**looked** 50:22
63:3 147:14,15
147:17,18
148:10 221:15
240:9 265:22
266:1,7 268:1
269:25 271:3,6

285:14 296:11
**looking** 23:15
24:6 100:6,20
101:5,25
112:11 121:22
130:10,18
134:12,13,14
137:1 140:10
140:14 159:3,8
170:24 174:5
175:17 177:3
181:25 202:18
230:21 248:14
248:18 249:7
254:19 265:20
267:25 302:17
**looks** 102:5
105:20 110:18
120:8 135:23
138:8 217:7,7
219:19,20
**loops** 89:24
**loose** 145:13
178:14
**Lorraine** 13:19
**loss** 165:13,13
**lost** 92:2 164:20
**lot** 140:20 221:5
237:13
**low** 174:8
**lower** 114:21
117:17 118:23
119:8 134:24
138:11,19
158:25 163:12
164:1 165:9
169:3,4 174:12
176:20 181:4,6
206:7 236:3
284:23
**lumen** 202:3,4
**lunch** 178:24
**lymph** 173:5
**lymphatic** 173:5
**lymphatics**
173:15

Vladimir Iakovlev, M.D.

Page 329

## M

**M** 2:9 3:19
239:3 306:4
307:5,22
**M-U-N-O-Z**
11:15
**M.D** 1:18 2:1
5:12 310:15
machine 116:22
145:11 159:13
280:1
magnification
121:17,19
124:4 128:1,18
136:2,3 137:4
137:21 139:15
162:12,13,17
162:21,25
164:5 169:2,3
169:6 174:9
177:23,24
181:9 206:14
210:17 241:21
243:6
magnified 124:3
128:13 135:24
magnifying
214:18
mailed 27:8
main 3:6 53:22
58:2 86:12
130:23 151:15
176:9 249:19
maintain 26:2
279:2
maintained
278:18 305:3
maintaining
278:5 304:22
maintains
116:12
major 161:3
305:6,10
making 25:24
63:1 81:12
281:1,14 297:5

308:8 310:9
manage 51:1
manifest 184:4
manifestation
205:17
manifested
203:24
manner 237:22
manufactured
28:25 147:15
manufacturer
29:3 34:20
146:13 216:14
305:5
manufacturers
30:15 35:25
36:3 146:24
198:8,12
218:18,19
305:10,11
manufacturing
218:1,8
manuscript
260:19 272:10
272:12,13
273:16 274:1
274:10,18
275:9 278:1
mark 103:4,4
105:9 120:14
122:5 174:11
marked 5:25
6:12 7:6 26:15
58:7 103:23
259:21 271:17
market 80:4
Marlex 80:3
Master 1:5
match 243:8
matching 23:19
198:7
material 7:15
46:17 64:5
65:3 79:12
106:24 117:3
253:22 254:7
304:11

materials 29:12
31:14 44:6
99:18 239:17
239:18 277:11
298:21 304:14
matter 2:3 25:4
70:3 131:10
292:7 294:24
295:3,7
matters 299:8
mature 127:5
276:24
**MDL** 1:7 5:21
8:23
mean 10:24 12:1
12:15 13:25
23:11 25:22
30:2,14 31:23
32:16 43:4
48:10 51:4
53:12 54:8,11
57:4,11,17
62:12 63:19
66:18 69:19
74:8 92:6,19
97:17 99:4
106:16 107:7
118:13 119:15
120:21 124:7
126:13 130:2
132:2 133:2
134:2 142:12
145:11,13
146:1 151:2
153:7 158:3
162:8,11
164:18 166:19
168:16 169:16
173:10 175:3
178:5 180:5
184:9,17 189:1
195:8 202:7
203:13 217:24
218:25 234:5
238:19 250:22
258:7 260:18
261:5,16 262:2

263:22 264:16
264:20 265:9
268:12 270:18
275:9,24
283:25 285:7
289:11 290:5
291:4 294:6
305:4,6
means 23:12
39:25 46:2
53:13 55:13
128:13,14
132:3 164:22
165:3 166:11
173:11 190:22
202:9 251:24
meant 9:19 22:9
61:5 251:4
measure 118:19
122:12 129:3
254:13 283:13
283:16,18,19
284:7,7,10
293:4
measurement
169:11 285:8
293:5
measurements
283:22 285:2,3
292:17,19
293:1,8
measuring
283:4 284:13
mechanical
161:9 250:9
mechanically
253:3 272:14
mechanism
65:19 92:21
95:14 142:9,10
154:24 159:22
163:5,18
175:24 209:10
225:2,24
228:14 230:16
272:14 274:20
mechanisms

92:14 151:21
161:2,2,3,7,23
175:25
median 283:19
292:20,21,24
mediate 134:6,7
mediating
132:12 133:10
medical 49:21
49:23,24 50:1
194:19 195:25
241:15 298:2
301:1 302:5
303:19
medical-legal
9:14,17 20:16
23:16 49:1
61:10,12,25
69:17,20,22
70:3,4,7 108:9
112:21 126:7
236:20,24
237:23 238:12
262:10 263:7
280:10,14,18
280:21,24
281:3,5,7,10
281:24 282:1,7
286:7,9 288:13
medicals 72:19
Medicine
159:14
medium 46:18
47:1,9 157:20
meetings 10:14
mention 218:22
mentioned 96:5
278:17
merely 52:21
merge 87:11
mesh 9:14 15:13
16:7,11 22:15
22:24 28:18
29:3 30:18
31:23 32:4,9
34:18,20 35:13
35:19,24 36:2

36:3 37:6
39:10 41:11
43:11,12,25
45:23 46:15,22
47:7,12 48:2
48:15 49:22
50:22 52:13
55:8,10 63:3
63:16 64:14,18
64:20 65:2,11
65:25 66:1
68:4 69:22
70:2,4,7,8,11
70:18,25 71:8
72:8 74:18
78:3 79:24
80:2,7 82:1,7
82:11,18 83:17
84:12,22 85:25
86:3,7,7 87:19
87:24,25 88:4
88:7,18,23,25
89:2,7,15,19
89:20,20,22,22
90:5,9,16
91:12,14,17
92:7,9,12,12
93:9,13,21
94:3,6,8 95:8
95:11,17 96:4
96:5,6 97:5,6
97:16 101:1,6
104:1 105:5,17
111:7,20 117:8
118:10,17
119:2,8 121:13
121:15 122:18
122:20,20
123:10,13,18
125:3,3 128:9
129:18,19
131:3,5,11,13
131:17 134:20
137:2,6,13,14
137:19,20
138:4 139:3,14
139:17 141:12

141:20,22
142:7,13,19
143:24 145:4
146:12,20
147:3,9,14,17
148:9,10,11
149:17,22
150:7,11,22
153:2,4,21,23
155:13 157:9
157:13 158:14
168:11,19
169:12,15
170:7 171:9,20
171:25 172:9
175:14 177:1,8
177:9 179:10
179:22 180:4,7
180:7,20,22
181:7,10,15,17
181:20,21
182:3,6,12
183:21,21,25
184:11,24
185:16,23
186:10,12,16
186:22 187:3,6
187:23,25
188:4,15
189:19,20,22
189:24 190:2,6
190:11,12,13
190:14,17,22
190:25 191:6
193:11,18,22
194:6,19
196:11 197:20
197:21,22,25
198:4,14
199:18 201:8
201:19 204:18
204:23 205:4,9
206:4,8,15,18
206:23 208:12
209:1,13,20
210:4,16,21
211:23,25

212:1,3,5
213:4 214:5,6
214:8,15,19
217:7,7,23
218:9 219:19
219:20,21
220:13 222:4
224:6,11,21
225:6 226:23
226:24 227:16
228:7,15,23,24
229:7,15
230:21,22,22
230:24 231:1,7
231:11 232:6
234:3,5 235:21
236:25 241:20
241:24 244:3,4
244:6,16 245:2
245:3 246:16
247:3,19 248:2
248:25 249:10
249:25 250:6
256:19,25,25
257:3,14,16
258:5,17 263:2
263:6 267:16
267:25 270:5
271:14,21
273:24 280:6
285:25 287:1
287:22 288:7,9
288:18 296:21
296:25 297:18
303:20,20
**meshes** 4:22
12:14 16:4
17:21 20:4
30:15 34:21
42:12,24 51:11
51:12,22 55:25
56:6,8,10,11
56:19 68:17
69:12 80:4
81:21 88:2,2
91:24 93:23
94:4 95:20,22

96:3,10 142:21
149:24,25
152:9,10,11,17
152:17 153:7
153:12 154:8
154:19,20,24
155:15 220:11
234:4 237:18
262:10 286:9
288:7,21
289:15
**met** 5:18
**method** 46:14
47:4 57:1,5,5,7
57:10,14 86:2
243:3
**methodology**
9:7 28:19
41:16 68:2
73:11 144:6
265:5 293:10
298:17,20,22
298:23
**methods** 41:25
42:1 57:16
94:24,25 95:5
255:13
**Michael's** 11:5
11:10 20:16
23:17 44:7
48:5,23 49:24
50:5 62:13
63:20 64:10
66:12 71:21
72:4 79:20,23
80:6,17,24
81:11,17,25
82:6,10,24
83:16 84:1,21
96:4,16 97:3
116:14,15,17
258:12 280:15
282:14,17
287:17,22
288:9,13,24
289:4
**Michigan**

303:22
**micro** 27:3 90:6
254:5
**micrographs**
29:16
**micrometer**
122:14 129:3
283:14 284:6,8
284:9,11,13,14
284:17 285:8
292:17
**micron** 135:6
**microns** 93:3,6
93:20 94:2,10
95:1 118:18,22
119:12,15
122:3,8 135:8
175:6 181:11
253:9 254:18
254:20
**microscope** 48:7
50:23 63:21
110:2,3 128:16
129:1 187:15
**microscopic**
4:21 90:18
271:14,21
**microscopy** 45:2
45:12 51:24
63:4 76:8,8
132:25 133:9
138:7,14
139:18 140:11
168:6 249:9
287:4,21 288:9
288:19,21
289:11,15
**microtome** 47:9
**microtoming**
100:4,11
101:14 102:3,5
102:25 103:19
105:21,22
110:7,22 121:4
124:19 135:3
**microtomy**
103:12 110:10

Vladimir Iakovlev, M.D.

**mid-urethral**
283:7
**middle** 218:19
**midpoint** 231:16
**migrate** 170:11
**migrated** 171:1
180:8 189:20
189:24 190:4
242:8
**migrates** 186:13
190:25
**migrating** 194:7
194:9 195:2
**migration**
190:25 213:13
**millimeter**
137:23,24
169:11 244:4,7
**millimeters**
118:19,25
119:16,17
122:10 175:8
**millions** 53:18
**mind** 144:10
**mine** 76:23
**minimal** 266:24
**minimum**
266:25 267:1,5
267:10 300:17
**minus** 135:8
285:9
**minute** 39:23
62:4 142:15
146:7
**minutes** 50:25
54:5 63:4
189:12 296:2,3
**misplaced**
102:23
**missing** 16:9
145:12
**misunderstood**
255:17
**mix** 246:15
**mixed** 132:1,2,3
133:6,21
**mixture** 44:15

151:21 263:1
**mode** 300:16,18
**model** 58:12
275:4
**modes** 299:25
**molecular** 85:7
**moment** 141:3
144:25 294:17
**money** 62:17,25
293:21
**mono** 254:6
**month** 257:9
290:12,16,19
292:9
**months** 29:18
33:23 34:2
41:4 42:6,11
42:20 44:14
286:1
**morning** 5:17
**Motley** 3:5
**motor** 131:25
132:4,23 133:4
133:16 134:4
**move** 49:12
72:11 91:23
106:14 158:14
170:12
**moved** 103:11
103:13 170:18
173:21 189:24
190:4
**movement**
91:25 92:3
106:14 142:12
184:11 197:21
**moving** 107:7
181:21 188:2
**MRI** 159:16
**MTM** 100:21
**mucosa** 167:13
168:19 169:10
169:11,13,14
169:16 170:3,7
170:21 171:8
171:11,21,22
171:24,25

197:20 200:25
226:8,8,10,22
227:2,3 228:17
229:2,3,5
230:9,17 231:5
231:11,21
241:20,24
244:2,3,4
245:6,10,14,18
245:18
**Mullins** 1:11
4:13,15 5:2,6
5:20 6:2,7 9:11
9:23 27:4,6
309:3
**multi** 95:12,16
**multifactorial**
209:5
**multilayering**
105:4
**multiple** 144:19
155:22 184:7
196:22 232:2
232:10 234:3
277:1
**Munoz** 11:8,14
11:17 15:21,23
16:21 17:6,24
**muscle** 87:4,5
127:3,5,9,11
127:12 128:11
179:10,19,24
179:25 180:4,6
180:8,18,20,21
181:7,9,16,16
181:17 182:2,6
182:11,22,25
183:3,5,21,22
184:10,23
185:14,15,17
185:18,22
186:1,5,5,8,9
186:11,13,15
186:21 187:13
187:14,20,22
188:9,11,20
189:5,11,17,18

189:21 190:18
191:6,10 192:6
192:7,22 193:6
193:10,10,12
193:16 195:21
196:4 197:21
198:22,25
199:15,16,19
200:17,19
201:4,5 203:5
243:4 297:11
**muscles** 87:17
127:7 183:25
**MWD** 239:1
**myelin** 164:21
**myelination**
164:20
**myeloperoxid...**
273:19 274:19
302:21
**myofibroblast**
127:4,4

_____
**N**
**N** 3:1 4:1
**name** 5:18 11:7
11:13 14:7
27:10,11 28:6
75:22 211:5
258:1 308:11
309:3,6
**names** 13:24,25
14:2 75:15,22
86:13 185:11
239:7,9
**narrow** 176:20
**Nashville** 3:23
**nature** 49:15
89:17,18
211:25 277:5,6
**near** 230:18
**necessarily**
197:11 216:5
280:15
**necessary** 92:7
129:4
**necrosis** 202:24

203:18
**need** 16:9 25:9
37:16,23 39:16
41:7 43:23
58:13 66:4
100:23 160:17
197:12 199:8
236:13 264:21
288:22 300:18
305:8 308:18
**needed** 51:25
52:4 237:17
**needs** 145:4
190:15 262:3
276:20 305:3
**negative** 162:19
**neither** 307:13
**nerve** 16:14 17:2
17:10 86:9,10
87:7 88:9,11
88:16,18,24
89:2 129:11,14
129:17,25
130:5,11,16,19
130:19,21
131:25,25
132:1,2 133:23
134:15,19
137:10,12
138:1,7,8,12
138:15 140:8
141:4 142:6
146:19 147:4
147:11 149:9
153:11,13
154:2,9,14
155:19 157:21
157:22,22,25
158:1,17 159:3
159:6,10,10
160:11 161:4,6
161:6,12 162:4
162:5,7,8,14
162:22,24
163:5,7 164:20
165:1,4,6,22
166:1,1,5,8

Vladimir Iakovlev, M.D.

171:12,14
224:13,15
247:20,24,25
247:25 250:4
**nerve's** 16:4
**nerves** 12:23
13:8 14:21
15:18 16:6,11
16:22 86:6,12
86:15 88:8,20
91:7,9 130:7
132:7,8,11,12
132:13,20,20
132:22,23,24
133:1,3,4,9
134:5,6,12,14
137:6 139:17
139:19 140:1
140:11,15
141:12,22,23
142:2,20
143:25 145:19
146:14 148:16
149:13,18
154:16 157:9
157:19 160:14
160:20,22,23
161:14 164:18
164:21,22
167:17,22
168:10 171:24
171:25 181:21
247:24 249:7,8
249:18,24
**neural** 165:12
167:3,8,9,15
**neurectomy**
86:1,5,20
87:12,22 88:18
89:2,15
**neuro** 167:11,11
**neuroectomy**
86:25
**neuroma** 87:17
131:15,19,22
154:10
**neuromas**

131:12
**neuropatholo...**
10:4,5,7,13,15
11:5,9,22 12:2
14:20,23 17:19
**neuropatholo...**
14:1,4 15:7,12
18:1
**neuropathology**
10:10,14,16,18
10:20,22,23
12:6,13,14,15
12:22 13:3,6,8
13:9 14:10,16
15:9
**neurovascular**
157:17 158:10
158:15 200:21
210:16 211:16
211:19 212:8
223:14,25
224:3,19
**neutrophils**
235:8 236:7
**never** 43:14,16
62:21,25 93:19
108:22 141:5
147:17,18
220:4 276:8,10
**new** 43:12
190:16 208:14
222:14 240:18
240:20 251:8
256:19,24
262:14,16
282:19 304:5
**newer** 23:24
80:3 136:22
**nice** 117:6
192:20
**nods** 84:17
232:5 277:7
278:14
**non** 70:25
**non-confident...**
304:13
**non-degraded**

176:25 253:11
**non-functional**
202:6
**non-medical-l...**
281:10,19,21
**non-pain** 152:18
153:5,24
154:20 155:15
**non-pathologist**
183:2
**non-research**
39:5
**non-scar** 125:4
126:20
**non-specific**
53:21 99:22
**normal** 99:8,15
105:1 117:11
118:7,11,12,24
119:1,1,9,10
119:13 121:13
121:24 122:19
125:4,9,13
126:20 127:8
127:10,13
128:10 129:17
172:18 189:25
190:21,24
193:24,25
**normally** 99:9
172:13
**Nos** 6:1
**notary** 308:19
310:24
**notations**
111:24
**note** 4:25 44:18
85:23 87:21
148:1 249:16
**notebook** 30:1
**noted** 4:7 308:9
**notes** 29:15
306:15
**notice** 4:16 5:7
6:13 7:9,18,19
58:20
**noticed** 233:12

**notification** 7:13
**noxious** 99:24
99:24
**numb** 165:3,7
166:13
**number** 5:19 8:4
8:8 11:1 17:9
18:9 23:23
24:1 28:23
29:9,12 31:12
53:17 56:2
75:13 144:3,8
150:17 178:10
237:20 239:22
266:25 267:6
267:11 280:6
280:12 282:3
283:20 284:18
296:10 304:17
**NUMBER/DE...**
4:11
**numbered** 185:7
241:18
**numbers** 265:11
268:6

—————————
**O**
**o'clock** 138:23
138:23
**oath** 306:8
**Oaths** 307:25
**object** 99:24
278:2 297:7
299:11,20
300:2,20 301:3
301:11,20
302:12,23
303:4,25 304:7
**objection** 7:13
7:14 12:25
15:14 19:15
24:9 25:13
35:8 36:19
37:3,10,14,21
41:14 42:8
45:4 50:3,12
51:16 55:2

58:24 59:13
60:5,17 61:1
61:19 65:5,14
66:3 70:13,19
75:9,20 77:22
78:16 79:25
80:9 82:20
85:14 89:8
94:11 95:4
96:1,13 99:19
101:7 108:3
110:9,24
112:12 115:8
119:4,22
140:17 141:6
143:6,12
147:13 150:13
151:25 160:2
160:25 164:10
175:20 188:16
191:14 194:21
195:10 196:15
197:10 199:24
200:13 202:21
204:1,15 209:3
209:25 215:12
216:22 221:11
223:6 224:12
224:22 225:18
229:21 232:11
232:17 237:4
238:4 239:5
240:15 242:10
246:6,22
250:18 251:18
252:17 261:4
266:2 267:15
267:19 268:19
270:24 273:1
277:13 278:10
278:24 284:20
285:15 286:12
**objections** 7:15
306:11
**objective** 128:7
128:14,25
136:2 169:7

Vladimir Iakovlev, M.D.

Page 333

241:21
**objects** 53:6
**oblique** 102:15
**obliterate** 247:1
**obliterated**
  201:25 202:2,8
  202:19 203:23
  245:22 246:1
  246:24,25
  247:6
**obliteration**
  158:16 160:7,8
  160:13 201:19
  202:25 246:20
**observation**
  45:12 55:22
  301:8
**observations**
  253:14
**observe** 214:17
**obstruct** 187:2
**obstructed**
  87:25 152:7
  172:7,15
**obstruction**
  188:10,14,25
  196:2 197:2
**obtain** 64:2,7
  265:16
**obtained** 20:14
  263:3
**obturator**
  269:10
**obviously** 123:6
  175:4 201:21
  208:1 259:12
  292:10
**occasionally**
  179:25
**occasions** 263:7
  263:8 283:17
**occupied** 102:2
  103:15,25
**occur** 209:10
  300:9,10,11,11
  300:12,16,19
  300:22,22

301:5,8
**occurred** 98:1,6
  98:10 221:8
  226:1 230:19
**occurrence** 89:6
  300:9 301:14
  301:23
**occurrences**
  297:10
**occurs** 87:24
  91:8 97:25
  159:20 231:23
  300:13 301:8
**offer** 194:18
**offered** 86:2
  88:22 89:4
**office** 93:24
  260:22 261:22
  261:24
**officer** 307:5
**offices** 2:5
**oh** 20:6 47:22
  49:17 51:19
  117:6 148:3
  149:5 174:17
  175:12,21
  177:1 200:7
  218:10 242:20
  248:6 260:18
  293:18
**okay** 7:24 8:18
  16:8 19:7,20
  20:1 23:1
  24:17 26:11
  27:19,21 30:20
  32:1 38:6,14
  41:24 44:3,6
  47:15,22 48:18
  49:15 50:14
  52:25 56:4,25
  58:15 60:8,12
  62:3 63:2,22
  64:17 66:20
  67:10 78:25
  79:8 85:21
  88:22 94:22
  96:20 98:19

99:11 101:13
103:2 104:2
107:6,13
108:17,25
112:2 114:20
115:3,12
116:12,20
117:4 119:18
121:17,21
122:9 123:2,21
124:10,18
125:20,23
126:10 127:22
128:17 131:4,8
132:11,14,18
133:7,12
134:17 135:24
136:11 137:15
138:11 139:25
140:6 141:10
143:3 146:2,17
147:7,21
151:10,17
152:4 156:25
158:1 160:6
161:18 163:25
165:21 166:23
170:2,6 171:17
173:3,18
174:17 175:9
176:11,16
177:3 178:7
180:14 181:8
181:13 183:18
185:3,12,21
188:5 190:7
191:21 192:25
193:21 194:1
194:12 195:19
198:8,20 200:3
201:7 202:12
203:18,22
204:4,10 206:4
206:7,11 207:8
207:13,15,24
208:13 210:8
210:12 211:11

212:16 213:12
213:25 214:7
214:11 215:10
216:6,12 217:2
217:15,19
218:12,16,21
219:10 220:17
222:2 226:3,21
226:24 227:3
231:19 232:6
233:3,5,7,19
235:6 238:14
238:22 239:15
239:21 240:11
240:17 241:14
242:13,17
243:5,18 244:8
245:1 246:10
247:22 249:5
249:22 250:11
252:4 255:1,25
257:2 258:3
259:3 260:7
262:1,3 263:17
265:8,15 267:3
270:3 271:9,11
273:5 274:12
275:14,17
276:14,25
277:8 278:18
279:25 280:17
281:22 282:2
282:18 283:2
283:24 284:25
285:10 287:19
288:5,15 292:5
292:22 295:23
297:2 299:5
302:2
**old** 88:21 120:6
  169:20 222:16
**older** 23:22
  25:17 136:23
  192:9,13
  212:22 222:16
  284:15
**oldest** 153:18

**once** 127:5
  133:19 141:2
  181:24
**ones** 111:24
  116:11 198:5
  207:17 221:15
  235:17 280:23
  280:24
**ongoing** 39:7,8
**onion** 105:4
  111:20 117:7
**Ontario** 2:6
  307:3,25 310:1
**ooze** 16:15
**open** 22:5 23:19
  179:7 228:4
**opened** 12:12
**opening** 90:13
  91:1 103:22
**openings** 90:22
**opinion** 5:20
  25:22,24 26:1
  26:24,25 55:21
  77:8 80:22
  81:14 93:20
  109:19 147:10
  148:18,19
  155:12 156:18
  156:19 165:24
  194:18 224:10
**opinions** 6:9
  11:18,22 12:7
  39:17,18
  147:17 148:4
  181:14 194:3
  240:1 298:24
  299:5,7,13,15
  299:17 302:3,4
  304:5
**opposed** 177:8
  190:3 292:18
**optical** 129:2
**orange** 180:12
**order** 129:3
  195:6 204:14
  231:19 300:15
**Orent** 3:4 4:6

Vladimir Iakovlev, M.D.

7:12 8:2,7,19
12:25 15:14
19:15 24:9
25:13 35:8
36:19 37:3,10
37:14,21 38:19
39:23 40:5
41:14 42:8
45:4 50:3,12
51:16 55:2
58:24 59:13
60:5,17 61:1
61:19 65:5,14
66:3 70:13,19
72:9,14 75:9
75:20 77:22
78:16 79:25
80:9 82:20
85:14 89:8
94:11 95:4
96:1,13 99:19
101:7 108:3
110:9,24
112:22 115:8
115:13,19
117:23 119:4
119:22 140:17
141:6 143:6,12
147:13 150:13
151:25 154:3
160:2,25
164:10 175:20
178:23 188:16
191:14 194:21
195:10 196:15
197:10 199:24
200:13 202:21
204:1,15 209:3
209:25 215:12
216:22 221:11
223:6 224:12
224:22 225:18
229:21 232:11
232:17 237:4
238:4 239:5
240:15 242:10
246:6,22

250:18 251:18
252:17 261:4
266:2 267:15
267:19 268:19
270:24 273:1
277:13 278:2
278:10,16,24
284:20 285:15
286:12 289:19
291:9,11,18
292:6 294:17
294:21 295:12
295:18 296:1,6
297:13 299:14
299:22 300:4
300:23 301:6
301:15 302:1
302:15 303:2,8
304:3,10
305:12
**organ** 186:22
226:9,25
**organization**
287:7
**organs** 167:12
227:5
**orientation**
101:10 102:22
**origin** 199:19
**original** 28:1
34:10,12
308:21
**other's** 276:6
**outcome** 307:18
**outer** 123:18
**outflow** 152:7
172:6,15
173:13 188:10
189:1 195:25
196:1,7
**output** 203:4
**outside** 8:3
63:24 66:13
104:22,23
111:21 122:20
125:6 129:19
131:9 132:23

143:12 168:22
253:24 278:3
289:3
**overall** 155:25
156:6
**overlaps** 121:8
**overlying**
168:19 171:21
**overview** 242:4
**overwhelming**
150:15
**owns** 66:5
**oxidation** 42:7
238:15 272:15
**oxidative** 272:17
272:20 273:20
**oxidize** 44:14
45:11 255:12
255:14,20
273:13 275:7
**oxidized** 31:15
36:18 37:1,8
41:21 42:14
44:23 45:13
254:23
**oxidizes** 273:10
273:12
**oxidizing** 274:25
_____
**P**
_____
**P** 3:1,1
**p.m** 1:25 305:18
**package** 21:2
**page** 4:4,7,11
22:3 23:7,9
25:12 29:19
47:17,20,25
50:2 52:25
53:3 55:24
56:2,11 63:2
65:12 69:8,22
70:11,18 72:25
79:8 85:17,19
85:20,22 98:11
98:15,17,19
104:3,3,4,4
105:8,13 106:7

107:10,13,15
112:3,5 113:6
117:5 118:5
119:19,24
121:18,22
123:1,1,5,9,17
123:24,25
124:5,13,14
125:21,23
128:19 129:8
131:20,25
136:11,17
137:7,8 138:1
139:1,1 141:11
141:16,18
142:15 157:15
159:7,9 160:8
162:2 163:2
164:15 165:25
167:1 168:1,6
168:18 171:17
171:20 172:3
175:17 176:12
178:18,21
179:6 182:14
182:18 184:13
184:21 189:4
197:19 201:16
201:18 205:1
206:12 210:15
211:12 212:7
212:19 215:15
217:3,5 219:17
221:8,13
223:13,25
224:4 225:11
225:25 226:4
228:6 230:8
232:23 233:10
233:25 234:18
242:24 250:11
251:20,22
252:8,8 253:17
254:21 257:20
257:22,23
258:16 263:21
263:23 269:7,8

269:9,10 270:3
279:17 283:3
287:2 289:16
289:24 309:9
**pages** 146:7,8
157:7,8 160:19
162:22 178:11
241:17
**paid** 61:13 62:24
295:21,22
**pain** 85:19,24
86:3,8 87:20
87:23 88:4,12
88:23 130:17
132:12 133:10
133:15,18
134:6,7 138:9
138:17 141:24
142:3,5,8,11
142:11,13
143:3,22 144:4
144:16,21,23
144:25 145:4
145:15,23
146:3 147:12
150:1,7,12,18
151:13,20,21
151:23 152:2,9
152:17,21
153:3,13,22
154:1,8,14,20
154:24,25
155:10,13,19
155:23,23
156:8,21 159:4
159:6,11,20,24
161:2,3,6,11
161:14,16,19
161:22,24,25
163:6 165:5,7
165:13 166:15
166:19,20,22
175:25 176:10
181:23 182:1
184:1 186:3
188:8 191:6,13
191:19,22

227:19,22,23
249:10,19,24
250:3,10 264:1
264:6,11 265:1
265:6,21
266:23 267:2,8
267:13 268:2,9
268:18 269:16
286:23,25
287:1
**painful** 131:13
176:2,2 228:1
**pair** 109:15
**panel** 136:22
137:10 139:24
181:6
**panels** 29:2
216:10
**paper** 29:23,24
30:10 33:2,9
33:10,11,13
34:10,13 35:6
36:16 42:22
59:25 62:1
65:20 66:10
71:23 151:5,7
151:9 262:2
263:19,25
265:18 268:17
274:10,24
275:2,12,15
276:3 292:23
293:6
**papers** 63:1
78:22,22 81:9
251:12 263:16
265:14,23
266:1,6 268:4
269:22 277:15
**paraffin** 47:11
47:13 63:11,12
64:18,21 65:1
65:3,25
**paragraph** 79:9
136:17
**parallel** 157:5
206:13 225:14

**parameters**
237:21
**Pardon** 271:4
290:17
**part** 6:18 13:3,8
13:9 31:23
35:25 39:18
42:15 45:9
65:17 74:20
76:3 82:23
86:15 92:7
100:3,11 101:1
105:21 110:7
110:22 112:7
112:12 113:20
118:16,17,18
121:3 123:6,9
126:10 135:2
145:12 150:21
165:2,4,5
176:23 177:8,9
188:11 189:21
193:2,2,5
208:11 211:11
216:7 227:19
227:22 231:24
232:24 236:25
242:4,18 247:4
252:15 265:20
266:9,12
269:24 273:17
274:5,23 275:5
278:1 287:24
288:1 289:6
293:3 294:6,7
**partially** 188:3
290:2 295:10
**particular** 43:8
**parties** 307:14
307:17
**parts** 180:23
**party** 294:8
**pasted** 233:15
233:16
**patches** 175:12
**path** 225:7
**pathological**

71:12 82:21
146:4 210:4,10
234:25 297:3
**pathologist** 10:8
13:4 15:4
82:17 97:2
102:11 115:5
115:15 140:18
149:16 195:13
239:8
**pathology** 9:16
10:23 12:16
13:4,10 15:10
15:18 69:9,16
69:25 236:21
298:1
**patient** 9:18
24:18 25:11,25
26:22 27:10,11
27:13 48:5
50:2 63:20,24
64:3,8,13,16
65:18,22 68:24
69:16 70:1
71:11,22 72:4
72:18 83:19
108:24 111:12
130:20 139:3,9
140:12,16,23
141:24 151:1
155:23 156:2,5
156:5 159:4,23
176:14 178:5
182:1 183:7,13
185:4,6 189:7
191:5,12 192:8
192:10 202:20
205:16,24,25
208:7,7,8
209:2,11,23
210:11,18
211:10 222:4,6
222:15 223:17
224:25 227:8
227:10 231:25
233:3,20 234:9
235:11 244:18

249:10,25
258:2,18
279:17 287:18
287:22 288:9
300:13
**patients** 4:22 6:5
20:16 26:9,10
66:13 68:1
77:17 82:19
83:12 88:3
96:16 108:1
143:15,23
144:6,15,23,24
145:3 146:22
150:11,17,22
153:3,4,23
176:1,2 211:10
222:10 235:13
237:2,6 238:6
258:13 264:11
264:25 265:22
266:1,22 267:1
270:1 271:15
271:22 286:14
301:24
**pay** 116:17
289:4
**paying** 43:18
**Pearson** 57:12
57:13 58:2
**peer** 59:12 71:25
279:7 304:18
**peer-review**
277:19 278:20
304:18,23
305:3
**peer-reviewed**
65:21 83:3
152:15 298:2
302:10,17,22
303:10,20
**pelvic** 1:6 12:24
14:21 146:13
156:22 246:21
**pelvis** 157:4
**pen** 102:17,18
105:10 113:8,9

**penalty** 310:6
**pending** 5:21
**people** 10:10
51:11 84:5
86:19,21 137:3
150:6 203:3
228:19 233:22
266:18 267:13
268:1
**percent** 34:1
93:13,15
132:21 133:12
133:14,16
143:5,23 144:2
144:5,8,11,15
145:23 146:2,2
153:12 154:1
160:3 199:13
199:14 208:10
221:18 245:17
264:3,9,12,13
264:23 265:1,7
265:10 266:23
267:1,8,10
269:18 280:12
280:13,14,20
281:15,18
282:8 300:12
301:14
**percentage**
61:16,24
150:25 264:10
264:25 266:22
281:6
**perception**
145:6 155:23
**perceptions**
175:23
**perfect** 103:23
**perfectly** 101:5
**perform** 257:16
**performed**
73:10
**performing**
238:16
**period** 257:4
270:23 302:18

peripheral 13:7
132:8,12,20
perjury 310:6
permanent
79:14 88:15
permission 64:2
64:7
peroxide 32:5,6
33:5 238:19,24
perpendicular
101:10 225:14
229:18 283:16
person 64:9
71:17,17 81:7
83:15 111:8
211:1,7,8
224:11,20
239:7 260:24
person's 11:7
personal 81:16
81:17 145:6,15
personally
263:19
perspective 38:7
145:7
pertinent 8:1
73:8
phenomena
196:5 207:9,11
209:6
photo 29:16
photograph
120:6
photographs
27:3 29:15
30:3,4 109:3
photomicrogr...
296:11 297:21
297:24 298:10
physical 79:12
85:12 90:3
95:1 130:3
157:2
physically
283:13
physician 71:15
83:18

physicians
51:10 81:17
83:8,22
pick 161:13
292:21 293:2
picking 158:4
266:7
picture 19:9,9
23:19 26:21
50:6,7 63:25
71:24 72:22
104:17 105:3
111:5 112:17
126:8 127:23
153:11 169:20
182:20 188:19
192:20 201:14
204:6 214:17
221:1,2 223:24
233:18 235:19
250:1 258:11
pictures 29:4
30:9 52:10
96:21,24 121:1
162:16 199:5,9
201:11 220:16
220:24 221:2
221:16 222:16
258:14 271:8,8
piece 30:21 35:5
46:15 64:23
83:5,5 97:13
110:14 120:8
123:23 124:11
206:15 211:12
217:17,20,21
243:22 260:16
260:20,20
pieces 30:22
32:4,9,12 42:2
42:16 120:13
120:18 217:17
243:23
pierced 228:17
229:4
pin 12:21
pinching 248:8

pink 104:22
Pinnacle 3:21
place 3:21 7:13
125:16 170:13
190:3 206:19
213:16 227:17
229:17 231:1
248:25 249:11
252:10 306:7
placed 48:6
64:18 99:13
149:17 170:17
170:25 190:3,6
190:13,13,17
193:23 195:9
206:21 216:20
229:15,16
231:7 242:8
296:21
placement 53:5
91:15,19
170:10 195:12
195:16 196:11
210:5 213:13
213:23 215:7,7
215:11,11
216:21 219:13
219:14 221:9,9
223:4,5 229:24
242:9 247:3,9
places 24:17
48:15 207:19
285:13
plaintiff 26:3,6
26:15 126:6
205:21
plaintiff's 60:15
60:19,24 61:14
61:18 62:19
73:19 115:20
plaintiffs 3:3
22:13,21 27:1
27:16,23
201:22 205:22
236:23 298:1
plan 43:3
planes 157:3,5

214:4
plans 275:11
plastic 92:24
plate 104:25
117:10,12
119:14 121:14
122:21 129:18
137:6 138:6
139:14,17
141:12,20,22
142:7 143:25
146:21,25
147:11 149:13
157:3,9,13
160:21 186:12
201:19 205:4,9
224:5
play 273:14
playing 155:22
156:3
please 22:4 29:9
53:1 55:24
91:14 98:12
119:24 139:23
147:25 179:7
183:18 236:14
249:15 251:20
262:4,4
PLLC 3:13
plural 242:25
plus 135:8 144:5
285:8
point 7:12 27:25
37:21 38:10
41:16 43:4
45:8 90:21
102:16 142:10
144:17 163:19
166:5,5 185:21
203:25 231:14
237:10 250:1,7
253:8,12 254:5
260:10 273:18
281:12
pointed 114:18
174:4 275:19
pointing 135:15

135:15 170:8
230:17 231:5
247:22
polarized 77:4,6
100:23 110:1,3
117:22 303:16
polarizing 303:9
policy 278:5
polypropylene
4:21 29:17
30:7,12 31:16
36:18 37:1,8
41:20 44:9,14
45:11,13 46:3
54:23 55:1
73:2,8 75:2
76:11 80:7,18
81:11 82:1,7
82:11,18 83:17
84:11 85:4
93:10 94:19
95:2,22 100:3
100:10,15,23
101:17,18,22
102:2 105:17
105:19,23,25
106:7,15,24
109:7,10,18,19
109:24 110:5
110:15 111:3
113:18,21
114:25 117:16
117:17,21
118:10,12
119:8,10 120:9
120:19,24
121:3,24
124:15,17
125:17 134:23
134:25 135:10
135:11,15,16
136:7 138:20
163:13 173:19
174:2,5,6
176:17,21
180:15 182:3
185:23 186:1

208:4,19,20
211:13 236:5
238:25 251:25
252:9 254:3,11
254:23 255:12
255:14 256:7
256:12 257:18
271:13,20
272:21 273:10
274:25 275:8
289:17,25
**pool** 156:1 240:1
**pooled** 139:12
**population**
151:1
**pore** 89:25 90:1
90:19 124:25
125:2,4,5,6,9
125:13,14
137:11,15,16
137:19,19
139:21 189:22
190:22 200:22
211:20,21
242:16
**pores** 89:24
119:14 121:12
121:14 122:18
125:10,11
186:14
**porous** 45:16
46:3,6
**portion** 1:21 4:7
39:13 62:13
101:6 110:16
114:15 163:8
163:10 164:19
165:8 218:20
230:22 241:20
243:19
**portions** 219:4
**position** 15:3
39:10 102:22
103:13 171:24
187:5,14 191:5
191:9,18
193:24,25

194:1 195:20
197:1 229:1,1
229:23 230:18
**positioned** 141:4
**positioning**
193:21 195:16
**possession** 68:16
**possible** 16:10
22:11 26:21
184:1 186:2
283:16
**Possibly** 282:10
**potential** 160:12
160:23 295:3
**potentially**
281:23
**pour** 137:13
**power** 121:11
130:1 163:25
206:14
**practically** 51:4
**practice** 69:15
89:11
**practices** 14:8
**practicing** 14:6
15:9
**practitioners**
83:2
**pre-existent**
128:10
**pre-set** 237:20
**precise** 153:20
**predicate**
296:12
**predict** 184:7
191:9,17
301:22
**Prediction**
239:1
**preparation**
45:20 106:4,8
135:3 173:22
252:16 257:15
261:14,19
273:15 274:23
278:19
**prepare** 34:5

46:16 289:11
**prepared** 6:2,9
65:10 70:9
108:24 236:20
**preparing**
293:21
**presence** 12:23
109:17 131:1
134:19 137:6
138:12 139:16
141:12,22
166:1 167:15
171:23 182:2
183:5 212:9
224:5 236:7
**present** 75:2
100:14 109:20
113:19,21
114:25 117:21
129:17 131:2
166:3 174:25
175:10 176:21
176:22 186:5
191:2 286:20
**presentation**
197:14,17
**presentations**
62:6,14,19
63:1
**presented** 75:7
175:1
**presenting**
268:17
**pressing** 174:22
187:3 188:2,11
188:12
**pressure** 71:9
169:14 174:20
174:22,25
178:17 181:23
194:7 195:2,23
196:3 209:14
209:18
**pretty** 46:1,12
62:10 69:18
79:7 138:9
199:21 248:22

**prevent** 181:17
**previous** 22:9
23:13,20
107:20 164:14
171:20 225:22
251:12
**previously** 21:7
23:14 39:10
167:6 256:18
263:1 265:4
294:22 298:17
299:8
**prior** 9:24 25:15
51:17,18 52:13
66:21 67:9
89:2 121:18
124:24 126:23
160:18 236:18
251:7 297:24
**pristine** 29:17
43:12 46:15
256:25 257:3
257:14
**privacy** 66:4
**privilege** 8:9
38:1,12,15,17
38:18 39:3
291:13
**privileged** 38:10
59:1
**privileges** 38:20
**probability**
140:19 145:23
159:5 209:16
**probably** 13:12
13:13 33:8,23
34:16 42:1,15
56:14,18,20
58:18 59:21
60:10 64:25
69:11 80:2
82:8 89:11
94:1,12 96:21
102:21 108:8
120:23 123:25
139:6 141:7
158:4 170:4

174:8 181:12
194:25 206:9
213:10 221:2
224:13 228:15
230:19 233:17
237:5,7 259:7
267:4 281:3,9
282:23 296:2
**problem** 86:1
203:12
**problems**
145:13 197:9
**procedure** 48:14
**procedures** 9:23
9:25
**proceed** 40:16
**proceedings** 2:7
306:6
**process** 9:10,13
31:4 50:17
51:23 61:25
63:24 71:8
93:23 100:4,12
101:14 102:25
103:19 105:21
105:22 106:4,8
110:22 124:19
135:3,4 149:20
155:21 165:13
175:23 203:17
218:8 224:25
234:25 252:16
256:21 257:15
277:20 278:6
278:20,20
279:9 285:6
304:19,23
305:3
**processed** 45:18
**processes** 39:5
92:8
**processing** 31:3
110:10 252:20
256:19 257:6
**produce** 6:19
7:1 18:15 26:8
49:25 59:6

Vladimir Iakovlev, M.D.

Page 338

65:24 73:15
128:15 130:8
130:14,14,22
131:11 141:1
142:5,11 238:9
256:22 286:16
286:18 287:23
293:14 298:10
304:13
**produced** 7:15
19:13 58:22
66:19 96:23
141:5 190:21
220:3,8,8
237:15 240:20
261:8 263:18
287:15 288:2
293:24 304:12
**produces** 151:20
**producing**
130:12,16,20
140:11 141:8
142:3
**product** 26:1,25
38:22 67:11
92:10 93:14,16
109:14 199:23
295:1 296:17
**products** 1:6
147:3 280:3
**professional**
294:1 302:5
306:5
**progress** 31:23
38:9 43:5
261:8
**prohibition**
291:8
**project** 67:2
68:23 82:4
288:1
**Prolene** 30:17
54:24 55:1,7
55:22 75:1
78:14 79:20,23
80:3,6,18
81:11 82:18

84:21,22 85:7
85:12 93:10,21
94:8 97:6
142:24 250:13
255:20 256:7
256:12 297:18
**Prolift** 280:3
287:13 288:10
promptly
115:24 308:22
**pronounced**
155:1
**proper** 302:17
**properly** 195:9
**properties** 79:12
85:12 95:2
238:25
**property** 66:6
**prophylactic**
86:1,5,24
87:22 89:15
**proportion**
132:20 150:1
152:20
**propose** 42:20
45:7
**proprietary**
39:7
**protein** 53:19
54:6,8,16
243:4
**proteins** 53:7,14
53:16,22 54:2
54:15,20,25
55:7
**protocol** 29:13
29:22 32:24
33:1,12 64:5
**protocols** 9:15
**prove** 300:25
**proved** 87:25
**provide** 61:15
73:12 75:11
268:5 274:8
299:24 304:14
**provided** 60:24
75:12 77:12

216:11 262:13
268:6 298:12
299:8,18 302:3
304:12 308:14
**Providence** 3:7
**provides** 191:18
**Province** 307:3
307:25 310:1
310:21
**proximally**
87:10
**proximity**
185:22 242:5
244:2
**public** 66:10
261:9,11 278:5
308:19 310:24
**publication** 50:7
50:9,17,18
60:4,15 64:1
64:14 65:21
71:24 128:5,22
197:23 270:8
279:8
**publications**
29:2 58:22
60:14 81:15
153:7 216:9
305:7
**publicly** 59:3
**published** 33:2
58:16 59:2
66:10,17,19,21
67:1,10 71:23
72:23 83:4
89:5 152:14
156:10,12,17
220:6 251:12
265:4 267:23
268:13,25
303:22
**publishing** 63:1
**pull** 101:14
258:10
**pulled** 110:21
208:1
**pulling** 101:16

181:21
**pulls** 190:24
**pure** 237:24
**Purohit** 260:4
**purpose** 12:5
26:23,24 64:6
108:22 109:1,2
129:10 185:13
194:23 198:20
201:7,10
207:10 210:2
214:2,14,22
219:16 222:8
222:21 223:25
230:14 243:25
273:11 300:7
**purposes** 61:12
113:6,17
155:13 237:25
296:16
**pushing** 119:13
**put** 7:10,23
30:22,23,24
31:2 32:4
35:13,13,19
36:4 44:7
45:19 47:9,12
51:8 52:5,7,9
52:11 53:13
64:21 72:19
86:7 88:2,2,9
94:6 104:8
153:10 159:16
213:8 248:13
256:19 257:14
293:6 306:8
**puts** 260:19,20
**putting** 45:22
52:12
**puzzle** 83:5

_____
**Q**
_____

**quality** 112:17
235:18,19
265:4
**question** 9:19
12:3 13:2 16:1

16:4,5,8 17:4,7
17:22 19:21
25:22 44:16,18
46:20 51:13,17
51:23 59:5
77:19 92:5
100:5 113:23
123:16 140:13
143:20 145:24
147:21,22
148:1 152:19
153:21 154:4
160:18 162:18
162:19 170:23
189:3 195:17
196:24 221:5
249:12,16
255:17 268:12
268:14,23
269:1 273:3,12
297:8 301:5,12
301:21,25
302:13,24
303:5 304:1,8
304:24
**questionable**
144:8
**questioning**
278:3
**questions** 5:19
9:20 12:19
15:17 37:23
39:20 72:10
279:7,12
295:23 296:3
296:10,12,14
298:5,8 304:18
304:19 305:13
**quick** 60:1
178:24 277:3
**quicker** 12:19
**quickly** 51:2
69:18 255:20
**quite** 13:2 28:15
108:12 156:12

_____
**R**
_____

R 3:1
R-E-N-A-U-T
165:18
R-squared
57:23
radiating
159:20
radiologist
159:18
random 285:11
range 11:3
144:4 145:5,14
145:15,19
264:8,17,22
rarely 252:25
Rasmus 13:23
rate 268:17
300:6,8,18
301:9
rates 155:14
156:8 265:16
266:19 301:17
301:23
raw 29:14 58:4
re-stained 61:6
reached 165:24
reacting 249:24
reaction 74:23
78:7,11,14
98:22 99:1,3,6
99:18,22
104:14 107:12
107:17 117:9
155:1 156:7
234:24 243:11
244:10
reacts 209:12
read 12:13
44:17,18 74:6
74:7 79:18
147:24 148:1
244:20 249:16
268:12 274:10
308:3,4 310:6
reading 201:2
reads 53:4
realized 237:17

really 9:19
14:22 29:22
39:19 74:8
76:15 88:20
145:20 158:8
158:12 162:9,9
193:22 229:23
239:7 253:21
277:3,5,15
288:22 289:2
Realtime 307:10
reason 14:19,22
44:12 75:22
93:18 150:23
151:12,13,15
172:14 225:5
282:16 297:5
308:6,10
reasonable
194:18 302:5
reasons 111:4
144:19 150:7
150:11,21
151:2 152:10
152:18 153:5
153:24 154:21
155:16 172:7
219:12 305:2
REB 50:18 64:6
67:3,12,24
68:4,10,21
recall 7:19 15:11
28:13 74:9,11
76:2 78:6
108:11 293:20
296:14 298:7
304:19
receive 27:21
40:14 48:11,19
62:18 80:14
95:19 96:4,6,7
96:15 117:3
246:11 272:3,7
281:24 308:23
received 19:18
20:23 21:6
22:7,10 23:13

28:2,12 50:16
52:10 62:25
75:13 96:11
97:16 108:2
111:13 112:13
112:19 115:14
143:8,15 150:3
240:21 241:4,5
242:25 259:1
262:17,19
281:25 282:12
282:25,25
receiving 51:4
receptors 161:8
161:8,11,13
162:7,8,15,23
162:24 171:12
RECESS 40:3
69:4 118:1
179:3 236:15
269:3 296:4
recipe 34:8 44:8
238:17 239:12
255:19 275:12
275:19 276:3
recognized
196:10
recognizing 8:9
recollect 206:3
recollection
17:19,25 20:25
94:7 108:4
123:4 124:1
183:11 200:4
221:17 222:3
263:1
record 23:23
26:13 40:6,7
103:5 114:11
115:14 118:21
147:8 179:2
282:15 292:13
293:13
recorded 44:19
144:18,20,22
148:2 249:17
306:12

recording 19:17
145:16 236:22
recordings
237:2
records 20:7
21:10,11 24:13
24:14 49:19,21
49:24 50:1
111:10,12
227:25 232:18
232:20 241:16
244:20
recovered
227:14
rectum 227:4
recurrence
155:4
recuts 262:23
263:2,9,9
red 102:17
180:12,13,17
180:18 219:16
redacted 260:14
redo 284:4
reduce 86:2
reduced 246:11
307:11
refer 23:2 73:22
98:14
reference
239:17,18
262:9
referenced
29:19
referred 189:12
referring 8:17
20:21 118:22
118:25 119:1
158:24 165:9
174:10 181:4
reflect 147:8
199:15,16
295:7
reflected 111:24
refractory 264:6
264:11 269:16
regard 39:4

132:15 298:14
302:8 303:19
304:4
regarding 262:6
regardless 9:17
99:12 142:22
146:12
regeneration
190:20
REGION 310:2
Registered
306:5
regular 9:18
14:25 44:11
76:8 109:21
256:19
regulating 81:13
83:8
regulations
64:12
rejected 59:19
rejection 59:23
related 30:6
31:14,21 68:16
70:10 170:7
181:22 242:2
307:13,16
relates 1:9 194:3
241:24
relating 29:16
relation 273:19
301:24
relationship
193:11
relative 171:25
relatively 155:1
255:8
release 64:11
304:16
released 271:22
relevance 216:4
relevant 81:6
reliable 59:24
relied 273:8
rely 73:12
remain 95:2
remained 219:9

Vladimir Iakovlev, M.D.

| | | | | |
|---|---|---|---|---|
| **remaining** 64:20 | 241:13 256:7 | 22:2,4 23:1 | 240:22 241:9 | 64:5,6,12 67:2 |
| 65:25 | 261:25 262:19 | 24:6,19,25 | 306:5 307:1 | 67:4,6,7,11,15 |
| **remains** 94:23 | 276:1 287:13 | 26:5,17 27:11 | **REPORTER'S** | 67:16,23 68:4 |
| 113:22 114:4,5 | 288:14 | 28:23,24 29:19 | 44:18 148:1 | 68:17,21 80:20 |
| **remarkable** | **remnants** 64:24 | 30:9,10 47:18 | 249:16 306:1 | 81:8 82:3,25 |
| 99:5 104:3,9 | **remodeled** | 47:25 53:1 | **reporting** 145:1 | 83:11 154:22 |
| 104:15 111:14 | 127:3 | 61:17 63:25 | 155:23 264:1 | 155:12 156:9 |
| 112:2 113:5 | **removal** 48:3,22 | 65:12,17,19,20 | 265:7 269:25 | 156:10 236:25 |
| 117:4 119:18 | 50:21 217:25 | 66:11,14,17,19 | **reports** 6:1 18:8 | 237:17,25 |
| 122:15 125:20 | 267:16 270:5 | 66:21 67:8 | 23:20 25:15,17 | 261:7 287:24 |
| 134:17 141:13 | **remove** 42:12 | 69:8,9,13,16 | 26:9 42:25 | 288:1 |
| 166:23 172:1 | 55:6 216:10 | 69:23 70:1,12 | 61:15 93:19 | **researcher** 59:1 |
| 177:19 178:20 | **removed** 63:5 | 70:18,23 71:24 | 238:6 251:12 | 81:13 305:1 |
| 182:10 184:15 | 79:17 80:1,14 | 72:23 73:1 | 264:1 294:15 | **researchers** |
| 184:18 192:3 | 100:3,11 150:7 | 79:9 81:6 | 297:25 298:12 | 38:10 116:21 |
| 196:13 210:12 | 150:11,22 | 85:17 87:22 | **represent** 6:8 | 153:18 |
| 212:16 217:2 | 152:9,10,17,17 | 91:11 96:25 | 68:21 114:25 | **researching** |
| 223:9 230:2 | 152:21 153:2,4 | 98:12 108:24 | 123:18 190:10 | 154:15 |
| 236:10 242:13 | 153:7,13,22,23 | 115:4 116:1 | **representation** | **resized** 128:22 |
| 245:24 | 154:1,8,20,20 | 118:5 126:22 | 127:15 | 169:8 |
| **remember** | 154:25 155:3 | 145:1,8 159:18 | **representative** | **resolution** 111:5 |
| 17:14,16,25 | 155:10,13,15 | 179:7 182:18 | 199:12 | 120:25 158:8 |
| 20:7,9 21:2,11 | 188:14,15 | 210:2 218:7 | **represented** | **resolved** 267:9 |
| 21:21 26:7 | 215:3 219:7,8 | 220:3,6 222:9 | 127:13 240:13 | 268:2,9 |
| 28:7,8 36:4 | 229:12 278:1 | 232:19 236:22 | **representing** | **respect** 253:17 |
| 41:15 56:14,21 | 286:1,23,25 | 237:3,7,20 | 240:3 | **response** 6:20 |
| 59:23 60:6 | 287:1 | 238:2 239:19 | **represents** | **responsibilities** |
| 69:14 70:14,21 | **Renaut** 165:15 | 239:23 241:2 | 236:4 | 290:15,19 |
| 70:24 71:18 | 165:17 | 250:12 263:14 | **reprinted** 169:8 | **responsible** |
| 74:3,16,21,24 | **renewal** 68:8 | 263:15 264:11 | **request** 6:19 8:8 | 266:18 |
| 75:4,21,22 | **repair** 1:6 85:25 | 264:25 285:20 | 8:20 28:16 | **responsive** 7:9 |
| 81:22 85:5,9 | 86:4 88:19 | 285:21 289:20 | 31:14 68:16 | 7:19 8:13,20 |
| 85:15 94:1,13 | 153:8 | 293:19,21 | **requested** 8:12 | **rest** 7:25 29:4 |
| 111:9 112:23 | **repeat** 44:16 | 294:8,10,23 | 58:21 115:3,15 | 291:24 |
| 113:10 120:2,3 | 100:5 147:22 | 297:4,22,23 | 276:16 | **restricted** |
| 153:9 156:15 | 249:12,14 | 298:7,15,22 | **requests** 6:21,23 | 184:11 |
| 165:20 170:5 | 304:24 | 299:3,6,16,24 | 7:1 | **results** 29:15 |
| 191:4 194:16 | **repeated** 195:25 | 300:6 302:4 | **require** 305:8 | 40:20 57:16 |
| 198:2,6,16 | **repeatedly** | 303:24 | 308:22 | 89:5 156:19 |
| 200:10 207:22 | 115:16 | **reported** 63:18 | **requirements** | **RESUMING** |
| 210:1 215:21 | **rephrase** 303:17 | 63:21 79:5 | 195:15 | 40:4 69:5 |
| 218:25 220:19 | **replies** 60:10 | 144:4 151:24 | **research** 12:14 | 118:2 179:4 |
| 220:23 223:18 | **report** 4:12,14 | 269:17,19 | 15:16 16:3 | 236:16 269:4 |
| 227:7,24 | 5:1,5 18:15,18 | 285:22,23 | 37:24 38:3,6 | 296:5 |
| 229:13 232:12 | 18:23,25 19:1 | 296:19 297:3 | 38:12,13,17,18 | **retained** 4:25 |
| 233:4,16 | 19:13,23 20:12 | **Reporter** 67:14 | 39:7 43:5 | **retains** 77:2,2 |
| 238:22 239:8,9 | 21:17,24,25 | 178:8 208:22 | 56:24 62:6 | **retention** 196:8 |

Vladimir Iakovlev, M.D.

196:19,21
209:21,24
**retraction**
103:17
**retropubic**
180:1 264:2
265:16 269:9
269:11,13
**retry** 200:9
**Return** 308:21
**reverse** 166:16
**review** 6:23 9:9
67:18,25 69:9
70:1,17 71:12
72:8 73:2,6
75:17 76:3,14
77:25 78:1
115:5 241:15
241:23 259:24
263:16,25
265:3 266:10
266:12 279:8
304:18
**reviewed** 21:7
21:19 27:15
71:25 73:13,16
75:1,8,18 78:2
78:17 112:8
262:4 268:17
277:12 294:11
294:15 295:10
**reviewers** 59:12
**reviewing** 76:3
295:8
**reviews** 199:11
200:8 201:1
210:22 268:4
**revision** 231:24
232:2,9,9,10
232:13 262:3
277:25 278:1
294:6,7
**revisions** 232:14
232:21 277:21
277:22
**Rheological**
238:25 239:1

**Rhode** 3:7
**Rice** 3:5
**right** 6:5 7:18
11:11 32:13
35:23 46:20
60:1 73:22
80:13,16 82:14
89:14 100:8
106:10 110:2
110:18 111:25
113:12,15,16
117:17,20
120:12 121:6,9
124:5,14
127:25 131:7
133:24 136:6,8
156:15 160:8
169:13 171:6
174:12 177:9
180:7,11,19
181:5 182:9
185:8 192:23
193:12 194:6
195:5,20 197:9
202:24 204:21
206:6,10
208:19 210:25
211:4,23
215:17,24
216:15 218:24
220:17 227:7
228:9 231:12
248:5,7,21
251:23 252:7
254:1,4,9
261:9 262:25
265:2 267:5
281:20 282:4
283:12 293:4
294:3,4 302:11
304:6 305:12
308:4
**right-hand**
114:21 120:7
157:16 158:25
165:9 174:11
248:1

**ring** 239:4
**risk** 77:16 191:6
191:18,24
197:2,7 209:8
209:9 242:1
246:20,24
**risks** 209:19
**role** 12:23 156:4
273:14,21
**roll** 206:12
208:16 224:1
225:15
**rolled** 209:14
217:17 223:14
225:13
**room** 32:14,23
**root** 159:17,19
**roped** 216:17
**roping** 217:4
**rotated** 228:15
230:9
**roughly** 122:11
280:13
**round** 101:5
103:23 284:19
**rounded** 102:14
**rounding**
284:14,17
285:6
**route** 297:15
**routine** 257:6,6
**RPR** 2:9 306:4
306:23 307:22
**rule** 8:8 38:22
38:24 87:14
159:8,10 166:1
284:23
**rules** 8:7 38:2
39:1 50:19
308:22
**run** 42:20,24
58:12
**rush** 71:5,7

---

**S**

**S** 3:1
**S-T-A-T-I-S**

173:7
**S100** 16:22,23
17:14 141:20
165:21 168:20
223:14 243:4
247:19 303:3
**safe** 281:15,17
**safely** 79:17
304:16
**safety** 4:18
126:3 259:15
260:1
**salary** 62:13,15
**saline** 52:3,5,9
52:10,12,15,17
52:18,21 55:6
55:12 95:20
**salt** 33:6 238:20
**sample** 45:19
106:4,8 135:3
148:9,15,18
173:22 187:9
228:25 252:16
257:15 279:17
300:6,17,17,24
301:17
**samples** 18:25
19:12 20:2,17
20:24 21:6,15
22:21 23:4
27:22 28:1,3,4
28:11,18 33:22
34:4,6,15
35:20 51:25
52:4 61:12
78:2,7 111:12
111:13 143:1
143:17 151:6
156:17 258:21
273:24 274:14
274:16,17
275:22,24
276:6,7,9,12
276:21,24
283:11 289:15
297:11
**sampling** 148:21

149:12
**sandwiched**
183:22
**save** 7:17 26:6
**saved** 22:1,2
26:10
**saw** 40:22 63:21
74:19 78:10
168:9 200:22
244:22 258:15
275:18 284:3
303:14
**saying** 59:24
61:23 142:6
146:20 173:2
200:18 289:20
291:8
**says** 85:22 128:8
136:17 171:19
179:9 205:3,22
206:12 241:19
242:24 266:3
279:19
**scale** 159:21
205:11
**scanned** 23:25
**scanner** 23:25
**scanning** 51:23
76:7
**scar** 89:15,19
91:21,22 92:1
92:2,16 95:12
97:19,23 98:5
98:8 104:21,23
104:25 111:22
111:23 117:10
117:12 118:5,7
118:10,24
119:9,11,14,15
121:10,13,14
121:16,24
122:16,19,20
122:21 124:22
125:11,12,13
126:25 127:2,3
127:5,16 128:9
129:18,22,23

Golkow Technologies, Inc. - 1.877.370.DEPS

130:5,6,7
131:1,10,13
137:6 138:3,5
138:13 139:14
139:17 141:12
141:20,22
142:7,20
143:25 146:15
146:21,25
147:11 148:12
149:9,13,19,22
157:3,9,13
160:21 168:11
178:14,14
180:24 186:12
190:20,23
201:19 205:4,9
206:24 207:6,7
207:12 212:9
213:20 214:20
215:1 222:24
222:25 223:11
223:12 224:5
242:15 247:18
**scarred** 87:24
88:21 105:2
**scarring** 88:25
203:2 207:11
**scenario** 144:14
167:24
**scenarios** 16:10
**schedule** 292:8
**scheduled**
290:11
**schwann** 16:16
165:23 166:2
**scientific** 198:10
218:21 301:2
**scientist** 82:17
**scientists** 73:9
77:7 78:1
250:22 303:15
**SCM** 41:8
**scope** 37:20
59:21 60:2
143:13 277:4
278:3

**Scott** 43:9
**screen** 90:14,15
104:8
**sealed** 46:9
**search** 152:23
240:2 268:7
**sec** 292:6
**second** 111:5
123:3 157:7
161:7 167:20
167:24 168:2
200:7 217:20
232:9
**secondary** 97:25
211:23 212:3
**section** 63:13
73:1 89:14
121:12 165:12
183:4 212:19
219:19,19
228:19 245:12
260:17 290:1
**sectioned**
225:14
**sectioning**
252:20
**sections** 63:15
63:16 128:12
213:9 219:24
**see** 6:15 16:14
17:8,13 28:20
31:18 33:20
34:3 36:21
41:8 42:3,17
42:18 44:24
45:10,13,15
46:2 53:10
58:8 68:1 76:9
77:14 80:1
83:4 92:24
95:20 100:24
102:19 103:3
105:17 106:18
109:7 110:3
111:2 112:17
113:11,11,22
125:17,17

126:9,25 127:9
128:23 129:1
130:1 131:17
131:19 133:1
134:18 135:9
135:10 137:10
139:20 143:24
149:24 156:1
158:7,11 162:9
162:24 164:19
167:17 171:10
174:1,9,17
176:24 177:1
177:10,13
179:7,24,25
183:3,6,20
185:12 187:13
187:14,24
188:3 189:16
193:3 194:8,17
194:24 199:5,9
199:13 204:13
205:15 206:25
207:15 208:21
212:6 214:19
216:8,18 218:6
220:22,25
222:23 224:7
228:1 229:1,18
238:13 240:4
243:25 244:21
245:7 247:12
247:13 248:6
248:24 252:25
253:12 256:2
258:1 261:9
264:6,13 268:1
269:11 274:25
276:4 279:20
280:4 285:17
285:18,21,22
286:3 293:11
294:5,5,14
**seeing** 101:1
**seek** 39:3
**seen** 6:16,22
28:10,14 93:7

93:8,11,19,19
94:10 104:7
148:24 149:1,4
149:9 154:19
160:22 165:19
220:4 251:10
276:10 286:5
297:12
**seeping** 173:14
**segment** 217:22
219:7,8
**selected** 233:16
304:15
**SEM** 276:22
**send** 73:7 262:2
295:21
**sensation**
130:17 145:15
165:13,14
182:5,7 184:6
184:12 186:17
187:1
**sensations** 145:5
**sense** 161:16
165:4 250:2,10
**sensing** 161:19
161:21
**sensitive** 250:2
**sensory** 132:4
132:21,22
133:4,14 134:4
165:2 166:11
**sent** 95:17
**sentence** 53:4
**separate** 26:6
58:9 136:24
146:1 155:25
**separated**
127:10 247:4
251:24 252:12
253:18
**separately** 18:16
**separation**
13:11 252:12
**September** 1:24
2:7 35:16
306:19 309:5

**series** 149:23
154:11 296:14
**serious** 144:21
144:22
**serum** 53:14,23
**serve** 14:15
**served** 25:15
241:2
**services** 294:1
**set** 6:6 20:13,22
21:5,18 23:9
48:1 50:15
56:5 92:14
98:20 99:17
101:22 102:1
106:7 107:10
107:15 108:1
109:6 110:15
111:15 112:5
112:12 113:6
115:18,22
117:5 119:25
130:11,19
136:11,17
140:15 141:11
157:15 167:1
171:5 175:17
182:18 189:4
189:15 191:3
192:5,11
199:23 201:18
202:18 205:1
205:15 206:5
206:11 207:10
208:6,6,13
215:16 216:7
217:5 221:13
223:10,13,17
224:3,19
225:13 228:6
228:13 230:3,8
230:15 232:23
232:24 233:10
233:11,25
234:18 236:4
240:21,23,23
250:12 255:1

Vladimir Iakovlev, M.D.

256:14 280:13
283:6,10
291:21,23
292:2,4 293:3
301:19 306:7
**sets** 26:2 53:24
**setting** 246:17
262:11
**seven** 85:8,13
93:8 94:1,2
**severe** 145:4
**severely** 163:4,7
**sewed** 175:14
**sexual** 191:12
**shape** 98:6,9
102:14,14
103:23 106:11
109:18,22
193:19 207:5,7
213:5,9,19
215:1,4 222:25
231:2,2 248:15
**share** 27:7 72:17
81:14
**shared** 81:8,9
270:22
**sharply** 146:1
**shear** 253:6,7,8
**shears** 253:10
254:7
**sheath** 164:21
**sheet** 308:7,10
308:11,16,21
309:1
**short** 117:24
202:24 203:6
231:11 279:5
**short-term**
202:23
**shorthand**
306:15 307:10
**shortly** 203:7
**shot** 42:16
**Shouldice**
273:25
**show** 6:12 80:20
96:11 100:2,7

100:8 102:18
118:10 119:8,9
119:9 121:11
124:23 129:14
131:25 155:4
155:14 157:12
159:9 160:8
162:7 169:21
171:18 181:1
185:15,21
201:8,11
208:14 210:3
214:1,14,17,23
214:23 221:22
222:22 223:22
225:22 228:12
230:22 234:17
235:20 240:13
243:11 245:14
250:2 251:22
252:9,9 253:17
254:21 258:22
271:17 300:15
300:18
**showed** 42:22
118:6 154:1,23
169:10 208:14
225:22 300:9
**showing** 98:24
105:4 122:16
129:14 137:5
139:16 141:18
177:14 180:2,3
241:23 244:1,9
247:19
**shown** 123:17
158:18,21
175:14 244:6
**shows** 21:24
100:9 104:18
111:17,17,19
125:10 126:25
129:11 161:16
163:4 165:25
171:8 180:21
188:19 193:9
193:17 200:21

200:24 201:3,5
206:15 213:4
214:4 221:25
233:21 235:7
235:10 236:8
242:5 244:2
**side** 40:13 90:14
90:23 91:2
118:23 120:8
124:5,14 136:6
136:8 145:18
180:10,11
192:23 231:8
**sides** 39:9
183:21
**sideways** 193:17
**sign** 308:11,13
308:17
**signal** 138:17
161:14
**signalling**
161:11
**signals** 132:4
138:10 164:23
166:12
**signature**
308:20
**signed** 40:10
70:23 75:15
237:7
**significance**
85:3 125:8
126:18,21
127:19 129:13
158:9 161:13
163:3,16,19
167:14 169:9
169:12 170:2
171:4 174:18
178:13 181:13
182:17 183:19
192:19 193:7
201:15 205:8
211:15 213:2
216:16 225:21
241:22 246:5
289:17,25

**significant**
97:22 131:21
134:22 137:7
157:11 194:2
216:6 241:25
242:6 302:18
**signing** 308:15
**signs** 64:11
**similar** 13:24
43:1 73:10
185:20,25
200:22 221:2
228:14 248:20
250:21,23
**similarly** 119:7
**simple** 12:3
29:23 68:22,23
143:20 214:23
**simply** 170:6
191:22 212:11
**simulated** 33:3,4
**simulation**
36:15,16 275:4
275:13,15
**single** 25:2
27:12 137:13
149:22 196:20
205:21 223:24
223:24 234:3,5
260:23 292:18
**Siskinds** 2:5
**sit** 185:4 197:17
235:16
**site** 170:5 229:5
234:19
**sites** 79:16
**sits** 97:19 120:12
193:12
**sitting** 29:7
176:25
**situation** 130:22
146:1,4 188:6
263:12
**six** 41:3 94:12
232:13 261:2
264:2,7,12
265:1,6,21

266:23 269:17
276:12
**size** 102:1 128:3
133:18 157:20
300:6,17,17,24
**sizes** 301:17
**skimmed** 74:8
76:6
**skin** 105:4
111:20 167:12
**skinning** 117:7
**slice** 105:25
106:11 177:11
**slices** 106:15
**slide** 25:6,11
29:14 46:17
47:7 101:15
108:1 113:19
115:1,6 116:3
116:6,13,18,25
122:23 123:6,9
123:11,19
124:8,9 125:21
126:5,7,22
135:6 136:16
136:20 175:2,5
175:5 177:20
178:2 180:11
187:12,18
188:7,22,24
194:18 196:14
196:20,25
204:20,24
207:25 208:1
216:16 221:6
224:18 225:22
229:15 233:2
235:2,7,9
236:11 242:18
242:19,22,23
243:2,3,3,4,22
243:24 245:15
252:1,2 258:10
270:3,23
**slides** 9:8,9
18:18 20:22
21:17,18 26:3

| | | | | |
|---|---|---|---|---|
| 31:5 45:18 | 133:19 148:15 | soon 256:2 | 13:6 84:5 | 54:22,23 64:15 |
| 60:23 61:6 | 148:18 162:9 | sorry 8:5 16:6 | specialized | 73:9 75:14,23 |
| 65:11,25 78:2 | 162:17 171:12 | 28:7 47:23 | 10:17 11:2 | 101:2 156:13 |
| 106:20,25 | 205:6,11,13 | 63:10 81:1 | 133:20 134:1 | 258:14 260:16 |
| 111:15 115:4 | 209:14 254:13 | 85:19,20 125:1 | 190:19 | 269:1 291:14 |
| 115:14,18,20 | smaller 87:15 | 172:22 173:1,8 | specializing | specifics 170:5 |
| 115:22 116:25 | 123:6,9 128:22 | 183:1 184:13 | 10:8 | specified 8:4 |
| 122:13 124:24 | 134:9 159:21 | 200:9 230:7 | specialties 84:10 | specify 22:6 |
| 126:23 164:8 | 161:12 205:12 | 240:8 249:13 | specific 10:25 | specimen 6:7 |
| 185:19 224:18 | 253:24,24,24 | 252:2 264:20 | 12:18 15:15 | 9:17 27:4 |
| 225:22 238:2 | 253:25,25 | 270:4 289:21 | 17:18,24 22:2 | 48:23 51:7 |
| 239:8,22 241:5 | smooth 127:2,4 | sort 16:15 23:18 | 24:15 25:25 | 63:10,10 97:18 |
| 241:7 242:25 | 127:7,9,11,12 | 39:11 100:22 | 26:5,9,9,20,21 | 98:7 148:5 |
| 251:3,4 262:13 | 184:23 185:14 | 105:4 169:7 | 26:21,25 27:13 | 217:13 252:20 |
| 262:14,16,18 | 185:15,17,22 | 198:7 212:1 | 28:8,13 36:15 | 281:24 283:1 |
| 262:21,22 | 186:1,5,5,8,9 | sought 67:14 | 54:18,21 59:23 | specimens 9:8 |
| 263:2,8 286:10 | 186:10,13,15 | 178:8 208:22 | 62:12 67:22,23 | 19:18 20:12,13 |
| 286:19 289:12 | 186:20 187:13 | 240:22 241:9 | 68:24 75:11,11 | 20:13 22:15 |
| slightly 103:13 | 189:5,11,17,17 | sounds 28:6 | 75:24 81:5 | 29:6,14 33:19 |
| 120:11 122:25 | 189:21 190:18 | 294:3 | 83:22,23 101:3 | 41:5 48:11 |
| 139:21 158:13 | 191:5,10 192:6 | source 19:22 | 102:8,14,20 | 51:5 70:4,25 |
| 169:3,4 | 192:7 193:10 | 261:18 | 108:23,24 | 82:23 112:19 |
| sling 4:19 126:3 | 193:10 195:21 | sources 17:17 | 114:9 118:13 | 143:7 145:8 |
| 144:15 193:4,5 | 198:22,25 | 246:12 298:4 | 125:13,14 | 148:6 152:13 |
| 195:22 200:25 | 199:19 200:17 | South 3:6,22 | 127:23 128:6 | 152:20 154:1 |
| 206:12 207:22 | 200:19 201:5 | southern 1:2 | 130:16 131:23 | 167:17 263:6 |
| 212:20 215:16 | 243:4 | 173:1 298:19 | 136:1 139:11 | 285:18,24 |
| 215:17 219:7,8 | Snow 3:20 | 299:9 | 141:2,3 142:12 | speed 295:12 |
| 221:14 222:11 | SNOWDEN | space 103:3 | 144:3,25 | spent 62:17 |
| 225:14 227:12 | 3:19 | 109:24 114:2 | 157:24 169:25 | 293:15,21 |
| 229:12 230:9 | soaked 52:18 | 137:20 174:9 | 182:5 185:5 | 295:8 |
| 259:16 260:2 | solely 36:8 | 176:20 177:2 | 187:20 191:5 | spinal 10:9 87:8 |
| 285:25 296:20 | solid 117:10,12 | 177:13 190:5,7 | 194:15 195:3 | split 155:18 |
| slings 142:23,24 | 254:7 | 190:10,11,13 | 195:15 210:9 | 252:14 |
| 142:25 143:4,4 | solution 33:13 | 251:23,24 | 210:11 219:6 | spoken 81:24 |
| 143:18 149:5 | 34:5,9 35:20 | 308:14 | 237:20 239:25 | spot 158:12 |
| 196:1 215:18 | 36:11 37:2 | spaces 121:15 | 240:3 246:18 | spots 293:11 |
| 215:20 240:7 | 42:13 45:24 | Spann 3:13 | 258:9 268:11 | spread 24:2 |
| 264:3 265:17 | 256:20 | speak 82:15 | 270:19,23 | square 204:6 |
| 265:19 269:10 | solutions 31:24 | Spearman 57:20 | 276:3 297:25 | squeeze 161:5 |
| 269:11,13,14 | 32:5,8 257:13 | 57:21 58:2 | 300:13 301:23 | St 11:5,10 20:16 |
| 279:19 280:9 | solvents 32:7 | special 14:10 | 301:23 | 23:17 44:7 |
| 283:7,8 | somebody 28:21 | 53:19 | specifically 6:7 | 48:5,23 49:24 |
| slow 69:12 70:5 | 88:6,14,22 | specialist 273:6 | 8:13 9:14 12:9 | 50:5 62:13 |
| slowly 92:22 | 289:9 | specialization | 16:24 21:13,14 | 63:19 64:10 |
| small 32:12 | someplace 220:6 | 13:13 84:4 | 27:13 38:24 | 66:12 71:21 |
| 110:6 132:19 | somewhat 13:11 | specialize 10:24 | 41:16 52:1 | 72:4 79:20,23 |

80:6,17,23
81:10,17,25
82:6,10,23
83:15 84:1,21
96:4,15 97:3
116:13,15,17
258:12 280:15
282:14,17
287:17,22
288:9,12,24
289:4
**stable** 218:13
**stage** 265:14
**stagnant** 173:12
**stain** 15:17 16:2
16:14,22,24
37:9 41:20
45:14,16 46:5
61:6 120:20
127:1,7,7,11
127:20 129:12
141:20 165:21
182:14,15
183:4 187:12
189:5,12,14
192:7 206:13
223:15 243:2
273:19 274:19
275:1 302:16
**stained** 113:22
115:20 163:8
243:3 262:18
262:22 283:13
**staining** 46:2
162:11 163:18
241:8,10 302:9
302:10,22
**stains** 15:24
17:9,11 46:1
61:5 165:23
**stand** 263:13
290:8
**standard** 9:13
9:15 57:14
64:5 116:15
279:9
**standardized**

237:18
**standing** 220:23
**start** 35:14
42:16 77:24
92:23 142:13
144:1 158:15
194:7 195:2
196:3 277:15
**started** 15:16,22
16:3,10 51:22
88:3 154:5,15
237:16,19
257:7 273:18
275:2,10 276:2
**starts** 92:25
107:4,8 157:22
173:14,16
174:21
**stasis** 173:8,9,9
173:11 176:13
177:15
**state** 148:22
222:1 249:23
**stated** 153:25
290:9
**statement**
113:18 144:14
**states** 1:1 153:11
**statis** 173:7
174:19
**statistical** 55:25
56:7,25 57:15
58:5
**statistically**
300:8
**statistician**
56:22 58:12
**statistics** 56:23
**stay** 106:2 107:3
173:5
**stays** 107:4
173:4 178:16
**steady** 155:1
**stenographica...**
306:12
**Stenotype** 2:8
**step** 91:18,20

**steps** 10:2
**stick** 106:25
150:16
**stiff** 95:9,11
**stiffening** 91:12
92:7,12 95:14
**stiffens** 91:14
**stiffness** 91:21
92:9
**stimulated** 33:3
33:4
**stimulus** 99:24
**stop** 80:18 82:17
83:22 84:16,21
**stopped** 41:9
**stored** 32:7,13
32:22 34:6,15
52:21 63:5
64:24 258:24
**storing** 275:23
**story** 71:7
**straight** 224:7
**straightforward**
69:1
**strategy** 88:10
**streaming** 158:8
**Street** 2:5 3:6,14
**stress** 80:7 82:12
84:3 94:9 97:7
97:8 142:23
146:14 147:9
148:10 149:18
**stretch** 231:7,11
**striated** 179:10
179:19,24,25
180:4,6,8,18
180:20,21
181:6,16 182:2
182:11,22,24
183:3,5,22,25
184:10 185:18
201:3 297:11
**strict** 24:12,14
50:19 262:6
**strictly** 146:20
**strike** 27:6 29:8
42:4 48:12

54:23 75:5
85:11 90:12
126:6 168:1
231:6 258:3
281:16
**strong** 32:6
145:22 151:19
**structural** 287:6
**structure** 89:21
89:21 90:4
91:10,21,25
122:18 137:19
137:20 163:11
173:4 189:25
218:13 223:2
247:5 257:18
**structures** 91:22
166:2 178:17
199:17
**studied** 253:3
257:12
**studies** 58:16
74:23 83:4
143:10,16,22
151:24 152:8
152:15,16
153:1,9 156:12
265:4,5 266:7
266:19 268:13
269:25 270:12
303:15
**study** 4:18 60:21
61:4,17,20
85:4,8 144:4
152:21 238:14
238:16,23
239:11 250:21
259:15,24
266:9 273:22
283:3 284:12
284:16 287:2,6
287:10 289:20
289:21
**stuff** 158:4
**stump** 87:16
**stumps** 87:4
**style** 262:5,6

**sub** 10:24 11:25
**subject** 7:14
75:24 308:15
**submission**
277:2 278:20
279:8
**submit** 52:3
59:20 68:9
270:7 276:25
**submitted** 60:13
61:9 295:6
**subscribe** 14:13
**Subscribed**
310:18
**subsided** 155:9
**subsidize** 62:11
**subspecialty**
10:10
**substance** 308:5
308:9
**substances**
303:12
**subsumed**
151:23
**sufficient**
202:16
**suggest** 114:15
114:16,18
164:17 262:5
**suggested**
273:17 275:12
275:14
**suggesting**
135:19 137:12
151:22 191:11
274:18,19
**suggests** 249:9
293:25
**Suite** 3:6,14,22
**suited** 59:22
**Summers** 3:14
**superficial**
171:20 230:20
**supplement**
295:14 297:4
298:16 299:6

Vladimir Iakovlev, M.D.

299:17
supplemental
    4:14 5:4 6:6
    27:2 28:24
    241:1,19
    242:14,17
    243:5,18 244:1
    244:8,12
    245:21 247:8
    247:17 297:23
supplementary
    201:13
supplemented
    27:13
supplied 18:12
    73:19 164:8
    203:20 273:24
    292:16
supply 87:15
    116:24 202:11
    202:16 205:12
    246:3
supplying 86:21
supposed 195:5
sure 15:8 16:9
    21:1,9,9 33:10
    39:19 48:24
    49:7 56:20
    71:7,19 80:3
    87:9 113:21
    176:15,23
    179:1 198:13
    199:16,21
    221:18 222:7
    229:22 248:12
    262:8 273:2
    288:5,12
    290:13,23
    291:2 295:20
    304:25
surface 40:25
    44:25 46:2,4
    48:2 54:9 85:3
    180:24 218:4
    258:17
surgeon 48:15
    48:22 84:7,24

95:18 170:13
    170:17,25
surgeons 81:23
    81:25 82:3,4,6
    88:17 89:9,10
    170:22
surgeons' 89:11
surgery 4:19
    85:24 86:11,16
    86:24 126:4
    150:9 170:21
    227:16 231:24
    246:21 247:2,5
    247:11 252:19
    259:17 260:2
    268:2,10 270:5
surgical 10:7,22
    12:16 13:4,4
    13:10 24:1
    48:14 89:1
    170:10
surprised 76:15
    277:9
surrounded
    90:3 98:5
    104:19 117:8
    183:22
surrounding
    90:1 128:10
    229:6
surroundings
    212:15
surrounds 53:20
    106:13
suspect 64:23
    114:9 208:8
    248:12 249:3
    252:24
sutures 76:11
    77:15 78:14
    79:21 80:18,19
    84:11,22 85:7
    85:12
switch 167:9
sworn 307:8
    310:18
Symphony 3:21

symptom
    130:22 150:2
    156:4 196:21
    197:12,13
    210:11 246:18
symptomatic
    212:8
symptoms 130:8
    130:12,14,20
    140:12,16
    141:1,5 143:17
    145:9,17
    175:19,22
    176:7 181:19
    187:7 188:18
    191:2,8,16
    195:14 196:22
    203:7,14,17,23
    205:16 209:1,5
    209:12 210:6
    224:10,20,24
    225:2 242:2,2
syndrome 91:8
syndromes 91:4
synoptic 236:22
    237:20
synthetic 4:19
    126:3 259:16
    260:2
system 1:6
    167:11,11

_____

**T**

_____

T 14:9
table 263:22,23
    279:17
tables 278:1
take 13:7 19:9,9
    20:2 25:5,10
    33:14,16,21
    34:2 36:22
    46:15 63:13
    69:3 105:12
    117:24 144:10
    176:1 178:24
    236:13 240:18
    255:16 258:11

271:8 283:19
    296:1
taken 2:4,8
    23:22,22 29:1
    31:24 39:10
    63:14,15
    112:18,20
    169:6 216:8
    222:16 240:20
    296:4 306:7,15
    307:6,9,15
takes 70:6 71:4
talk 80:19,23
    85:17 91:4
    111:15 119:25
    126:12 133:22
    142:14 146:6
    196:6 212:1
    230:5 231:6
    283:3 301:16
talked 18:9
    20:22 124:24
    146:8 160:6
    175:21 191:23
    206:19 238:15
    245:25 251:6,7
    256:4 257:23
talking 11:24,25
    15:1 17:19
    54:4 65:22
    85:18 97:17,19
    97:24,25
    120:16 133:23
    139:22 142:21
    142:23 143:10
    143:14 165:1
    174:14 191:25
    192:22 194:10
    211:18,24
    214:6 218:2
    231:10 248:4
    250:12
tangential 255:9
tape 179:24
    213:6 223:14
    224:1 226:2,4
    229:4 264:3

tapes 180:1
    218:17
tax 62:16
team 260:5,11
    266:15
technical 226:17
technically
    100:20 226:14
    234:24
technicians
    289:11
technique 45:6
    46:12,21 89:2
    254:14
techniques 41:8
    87:2,7 299:3
    302:9,10
    303:23
technology
    73:10 106:20
tell 17:11 23:15
    24:7,11 25:20
    29:7 32:1
    34:12 36:25
    40:23 49:6,6
    49:11,15 51:6
    51:13 57:9
    64:15 81:7,10
    82:16 86:23
    91:14 94:20
    95:1 100:25
    101:21,25
    102:4,9,12
    104:9 107:25
    108:13 109:23
    112:11,15
    113:2 117:20
    121:21 126:5
    127:25 130:10
    130:18,21
    131:24 132:6
    136:19,21
    138:6,14 139:8
    140:10,14
    159:2 163:18
    164:18 168:6
    170:16,24

Vladimir Iakovlev, M.D.

175:9 176:19
179:15 180:5
183:6,12,18
184:25 185:3,8
187:8 189:15
189:23 190:2
192:16 198:24
199:3 202:17
205:15,23
208:25 211:4
213:19 215:5
216:6,13,20
223:3 228:25
229:14 233:1
244:24 245:1,5
245:17 247:9
258:15 273:9
279:14 280:12
283:12 285:17
**telling** 25:8
49:10 93:25
253:19
**tells** 167:16
202:1 204:5
224:18
**TEM** 287:10
**temperature**
32:21,23
166:21
**ten** 124:3 155:8
177:23 286:1
296:2
**tends** 105:23
**Tennessee** 3:23
**term** 54:11
101:8 131:23
165:19 202:23
202:24 203:6,8
203:8,11
**terminal** 124:25
125:2,4,5,9
**terms** 38:20,20
72:16 104:18
117:14 130:3
152:14 226:15
226:17,24
242:1 274:2

279:11 291:15
296:18 297:2
300:16 302:2
304:11
**Terreski** 1:11
309:3
**test** 29:14 30:18
31:22 32:25
40:21 42:7
44:13 45:17
57:16 256:6,13
256:16 276:17
**tested** 29:17
30:13,15 34:18
34:22 43:12
276:9
**testified** 5:15
8:25 9:3,7 21:5
294:22 298:18
299:6
**testify** 104:7
148:4 195:12
298:24
**testimony** 51:18
61:8 73:23
118:6 147:14
278:4 296:23
296:24 306:10
307:7,9 308:14
310:11
**testing** 28:11,17
31:15,21 32:10
33:11 41:11
43:18 73:10
74:14,18,19
75:1,7,8,17
76:2,7 256:11
256:18 257:3,9
276:6
**tests** 42:19,23
**text** 98:17 201:2
294:6
**textbooks** 12:7
132:17
**thank** 18:7
31:12 40:2,19
46:13 55:20

85:1 139:25
163:1 168:18
171:3 184:21
236:3 252:2
268:22 284:4
295:24,25
305:12,14
**That'** 118:8
**thereto** 307:17
**thick** 94:2
105:24 118:9
118:11,18
122:8 135:6
175:6 187:4
254:12 255:8
**thicker** 6:4
86:18 122:7
134:15 186:7
193:1 256:3
**thickest** 93:25
118:18
**thickness** 212:2
255:10 283:4
283:13,17
**thin** 253:21
**thing** 32:3 74:6
78:10 99:15
118:20 126:23
130:23 138:11
138:16 141:10
168:12 176:9
178:15 183:17
196:7 203:3,6
213:18 215:8
216:24 231:15
263:5,18 301:7
303:6 305:8
**things** 39:11
41:17 191:25
197:8 210:3
255:24
**think** 7:25 14:7
15:21 25:13
37:22,22 38:3
38:15 41:3,13
42:6 55:9
64:22 66:3,5

66:23 70:5
71:14 72:9,10
72:21 74:5
77:5,18 78:23
80:10 81:4
83:21 94:3
98:15 104:9
107:19 108:10
119:21 120:5
122:25 123:10
123:20,22
136:17 138:25
147:12,13,16
154:10 159:12
165:19 175:21
198:2 205:25
206:2 208:11
210:24 211:6
213:8 216:10
217:13 220:18
221:16,18
233:19 235:13
236:22 242:22
243:8,21
248:14 250:22
267:22 271:7
275:16 278:4
281:10 286:8
286:24 287:13
290:20 292:7
295:14,18
**thinking** 16:8,10
257:10
**thinner** 254:19
**thinnest** 118:17
**third** 192:8,10
212:1 264:5,15
**Thomas** 3:12,13
4:5,25 5:16,19
7:16 8:5,18,21
13:15 15:19
19:19 24:16
25:18 35:9
36:24 37:5,12
37:18 38:5
39:21 40:2,18
41:18 42:10

44:17,21 45:5
50:8,13 52:6
55:4 59:4,15
60:7,22 61:3
62:2 65:7,15
66:7,15 69:6
70:15 71:1
72:12,24 73:23
75:16 76:1
77:23 78:19
80:5,11 83:14
85:16 89:13
94:14 95:6
96:8,19 100:1
101:12 108:6
110:13 111:1
113:1 115:11
115:17,21
116:2 117:25
118:3 119:6,23
140:24 141:9
143:9,19
147:20,24
148:8 150:19
152:3 154:17
160:5 161:17
164:11 176:3
179:1,5 188:21
191:20 195:4
195:18 196:17
197:15 200:2
200:16 203:10
204:3,17 209:7
210:7 215:14
217:1 221:12
223:8 224:16
225:4,20 230:1
232:15,22
236:13,17
237:9 238:8
239:10 240:16
242:12 246:9
247:7 249:14
249:21 250:24
251:19 252:21
259:19 261:12
266:5 267:17

Vladimir Iakovlev, M.D.

Page 348

267:20 268:21
269:5 271:1,16
273:4 277:18
278:7,12 279:1
284:24 285:19
286:15 289:21
289:23 291:7
291:16 292:1
292:11,14
294:18 295:4
295:16,20
297:7 299:11
299:20 300:2
300:20 301:3
301:11,20
302:12,23
303:4,25 304:7
305:14
**thoroughly**
232:20
**thought** 39:5
47:3 69:21
76:18 210:25
262:12
**thousands** 53:17
139:6
**three** 8:4,11,14
12:17 17:15
22:14,14,20
23:4 24:3
27:14,18 41:4
86:12,17,21
87:3,9 91:16
95:12 119:17
156:14 175:7
286:1 293:11
298:4
**three-dimensi...**
89:21 90:17,18
**thrombi** 205:6
**thrombosis**
202:25 205:4,5
205:9
**thumb** 4:17 5:9
7:4,6,7,10,18
7:20 18:13,20
19:13 25:10

26:14 29:20,24
29:24 30:8,11
49:25 237:11
284:1,2 293:25
**tight** 158:11
**tighter** 208:16
**tightly** 216:18
216:19
**Tim** 13:23
**time** 7:17 12:10
28:9,15 35:21
41:7 42:6
50:22 52:14
55:11,14 59:25
61:21,22 66:19
66:21 67:9
70:6 71:4
78:15 79:1
92:25 93:13,15
96:22 105:11
106:20 112:19
117:25 125:18
130:14,15
141:2,2 143:23
144:6,8 155:7
161:22 171:13
173:13 178:24
185:7 191:11
203:24 239:24
247:3 255:14
256:20 257:4
259:8 262:20
273:8 276:23
286:4 293:15
293:20 294:10
295:7,19,21
302:18 305:15
306:7,8,11
**timeframe** 54:4
**times** 121:11,18
124:3 128:2,6
128:13,16
135:25 136:2,2
137:21 139:15
164:1 168:20
169:1 177:22
177:23 179:10

181:9 184:24
201:19 210:17
260:13 286:2
**timing** 130:13
**tired** 249:13
**tissue** 10:9 11:25
18:24 19:12
20:1 21:24
22:20 23:4
27:7,22 28:1,4
31:3 43:14
74:23 78:2,6
78:14 85:18
92:3 97:20,23
98:6 99:9,10
101:16,19,19
102:19 103:16
103:23 104:14
105:1 106:12
106:13,18
107:4 110:4,6
110:16,18,19
110:22 111:22
111:23 114:4,5
114:7 117:11
118:7,11,12,24
119:1,2,9,11
119:13 121:8
121:13,13,16
121:24,25
122:19,19,24
123:23 125:4,9
125:11,12,13
126:16,17,19
126:20 127:1,2
127:3,5,8,11
127:13 128:11
129:19,22,23
130:5,6,7
131:1,10,13
135:17 138:13
142:20 146:15
148:12 149:9
149:19,22
161:16,18
168:11,20
171:8,21

172:18 173:9
173:14,16
174:19,22
177:17 180:25
187:9 189:20
190:14,16,16
190:19,21,24
204:7,13
206:24 207:6,7
207:12 212:9
213:20 214:21
215:1 222:24
223:1 228:25
242:15 243:23
243:23 246:25
247:18 248:22
250:2,7 253:1
253:1 256:20
258:21 302:18
**tissues** 89:25
128:11 181:22
**title** 121:9
238:14
**titled** 73:1
**today** 6:16 7:2,5
29:8 63:8
107:25 108:21
113:2 152:15
197:17 262:7
285:14 293:14
296:9 298:6
304:13
**today's** 297:22
**told** 17:23 51:9
51:9 69:21
80:17 107:19
117:14 148:5
166:9 210:24
210:25 256:10
292:15,20
**top** 105:16 109:6
110:15 120:7
124:13,14
126:1 136:21
137:9 138:1
169:3,10
177:22 207:15

207:24 208:18
208:18 211:11
226:22 230:23
234:18 235:14
235:20 269:11
**topic** 143:11
**topics** 75:12
**Toronto** 2:6
14:1,5 310:2
**TOT** 265:16
**total** 149:3
239:22 285:1
294:2
**totally** 90:11
**touch** 166:21
169:13 183:25
**trace** 21:21 24:4
26:21 94:6
108:8,22
128:24,25,25
**traced** 24:3
109:5
**tracing** 109:4
**track** 108:12
**trained** 56:22
289:10
**training** 56:24
74:12
**transcribed** 2:8
306:13
**transcript** 39:14
306:15 310:7
310:11
**transect** 87:16
247:2
**transected** 87:4
247:5,10,16
**transection**
88:18
**transferrable**
156:21
**transition** 105:1
**translate** 203:13
246:18
**translation**
203:16
**transmission**

51:24 287:3,20
288:8,18,21
289:10,14
**transmit** 133:17
**transobturator**
179:24 264:3
**transvaginal**
12:1
**trapped** 129:20
129:21,23
149:21 177:5
**trauma** 161:9,10
**traumatic** 87:17
131:12,15,19
131:22 154:9
**traveled** 62:5
**treated** 227:11
**treatment** 80:7
82:12 94:8
97:7 107:4
146:13 147:9
148:10 149:17
219:2,5,12
267:18 268:3
268:10
**trend** 155:4
**trial** 20:18 22:7
24:22 107:9
240:21,23,24
241:16 256:5
258:14 290:15
290:18,21,22
291:17,18
292:3 298:25
299:8
**trials** 292:3
299:19
**tried** 36:17
45:22 265:15
**triggering**
244:22
**triple** 86:20
87:12
**trips** 62:11,25
**true** 14:17,18
65:17 95:3
101:23,24

141:5 181:24
263:5 267:6
294:12 306:14
310:10
**trunk** 87:15
133:21 161:6
162:4
**trunks** 86:19
87:8,12
**try** 71:7 87:7,14
88:7,17 283:18
301:18 305:10
**trying** 12:20
22:18 38:17
41:20 72:5
99:23 154:13
155:18 157:6
170:22 214:23
221:22 223:22
228:12 234:17
243:10 280:22
**tube** 90:16,20,22
90:24 91:6,7
**tube-like** 91:10
**tubes** 90:25
**tug** 181:17 182:6
**tugged** 181:20
**tugging** 184:1
186:2 188:8
**tumors** 11:25
**tunnel** 91:4
**turn** 69:17
279:16
**turned** 123:24
194:25,25
277:6
**TVT** 20:3,5,11
20:24 21:6,16
22:9,25 23:10
23:13 24:7,12
25:3,8,22
26:25 27:15
28:3,11,25
29:5 30:16,19
30:21,22 48:2
50:16 51:7,18
51:19,20 55:25

56:5,8,10 80:8
107:18,20,22
108:11,12
109:3 112:6
136:18 139:2
142:24 143:4
164:8,14 167:4
168:21 171:17
179:11,16
185:1 189:6,9
192:7,16 198:3
198:5,14,17
199:21 200:6
200:10 201:13
205:23 206:1
206:12 212:20
212:20,25
215:16,17,24
216:1,7,11,14
220:1 221:13
221:14,19
222:11,12,19
223:14,15,19
225:13,15,16
228:9 230:9,10
230:11 233:7
234:2,14
239:23 240:2
241:11 250:14
251:15,16
252:8 254:22
255:2 258:17
269:13 270:5
279:20,23
282:6,12,15,17
282:19 287:11
287:13,14
288:10 296:13
296:18,24
297:11 298:7
298:11,12
299:25
**TVT-O** 20:4,8
20:11,24 21:6
21:17 22:9,25
23:13 24:12
25:3,9,23 26:1

26:24 27:15
28:3,25 29:5
50:16 58:10
80:8 107:20,23
108:12 109:3
179:16 185:1
189:9 192:17
198:3,5,18
199:21 200:6
200:10 201:13
206:1 212:25
216:1 221:20
222:19 223:20
225:17 228:10
230:12 233:8
234:15 239:22
240:2 241:12
250:14 251:16
255:2 279:23
282:6,12,19
296:13,18,24
297:11 299:25
**TVT-Os** 240:6,9
279:20
**TVTs** 238:18
240:6,8
**twice** 233:15
**twig** 134:16
**twigs** 133:23
134:5,9,13
171:15
**twist** 213:7
**twisted** 212:20
213:5 214:6
**two** 29:2 33:24
35:22 47:25
74:5 91:16
95:8 109:11
111:4 114:14
114:22,23
119:2 126:23
136:24 139:3,4
140:1,4 145:20
148:16 156:14
157:21 160:18
161:2,3 171:4
175:7 185:19

187:19 198:2,3
200:1 205:22
205:24 210:23
211:9,10,22
215:18,20
217:17 234:7,9
234:12 241:2
244:6 254:20
257:5,9 263:23
277:3 283:17
285:1,24 286:2
286:4 296:1
297:6
**two-block** 223:1
**type** 35:13 36:1
93:9 94:6
98:25 104:20
107:12 133:1,2
155:24 190:19
211:23
**types** 34:20
147:3 191:2
**typical** 99:17,20
172:20
**Typically** 48:14
**typo** 164:2 217:6
217:9

───────────
**U**

**U** 14:9
**U-shape** 193:18
**UHN** 14:7,8,9
**ultimately** 267:8
**ultra** 287:6
**um** 86:13,14
**Um-hum** 98:13
123:12 179:8
**unable** 24:7
175:16
**unaffected**
94:20
**underlying**
241:20
**underneath**
187:10 193:19
195:6 235:23
**undersigned**

Vladimir Iakovlev, M.D.

310:5
understand
  12:18 13:12
  14:20 16:20
  17:22 21:4
  22:18,19 24:5
  25:21 27:24
  28:22 31:9
  35:23 42:5
  46:13 48:12
  54:12 65:16,23
  71:2 75:6
  77:18,20 78:20
  79:22 106:17
  108:21 114:24
  142:18 146:11
  147:8 150:24
  162:20 176:4,5
  196:18 198:25
  214:5 216:12
  231:14 233:24
  236:18 247:15
  247:17 253:16
  262:8 264:16
  265:25 267:12
  279:16 280:22
  287:20 296:23
understanding
  12:23 83:20
  132:15
understood
  262:12
undetermined
  280:18 281:1,2
  281:7,9,11,18
unhealthy
  139:19
uniform 253:23
  283:7
UNITED 1:1
University 14:5
  303:22
unlocked 113:22
unprepared
  46:7
unrelated 61:10
  61:11

unspecified
  201:6
unstained
  242:25 262:18
  262:21
unusual 99:2,4
  160:14 279:10
  279:15
upper 114:14,15
  117:15 139:24
  144:10 157:16
  160:8 163:25
  174:11 248:1,4
urethra 151:20
  152:6 186:6,7
  186:21,25
  187:2,5,10,16
  188:12 193:1,4
  193:11,12,19
  194:6,8,10,13
  194:20 195:6
  195:21,22,24
  197:5 199:1,4
  201:6 209:17
  209:20 231:12
urethral 187:20
  188:9 192:21
  193:6,16
  199:15
urinary 80:8
  82:12 84:3
  94:9 97:7,8
  142:24 146:14
  147:10 148:11
  149:18 187:6
  188:10,23
  189:1 195:24
  196:1,7,19
  209:20,24
urination
  186:25
urine 195:7
urologist 266:13
  266:17 267:25
urologists 260:6
use 15:18 16:2
  17:12 30:17

36:11 45:7
61:2,5 64:5,8
66:20 70:24
79:20,23 80:6
81:11,25 82:11
83:10,16 84:11
99:21 101:8
105:10 116:18
128:15 129:1,2
131:23 148:10
183:4 226:17
262:13,21
263:8,8 287:3
287:10 298:16
299:2 302:22
303:1,9,14
usual 277:14
  284:23 289:12
usually 22:1
  99:8 151:18
utilize 39:3
utilized 298:22
  302:9,16
utilizing 303:22

--- V ---

v 1:11 309:3
vagina 186:17
  187:9 199:1,4
  201:6 226:11
vaginal 127:8
  186:6,8,10,11
  186:15,18
  189:18 193:2,3
  193:10 199:16
  226:8 231:12
  231:20
Vague 89:8
vaguely 220:19
value 292:18,21
variability
  86:19
variables 175:15
varies 146:25
  147:4
variety 299:24
various 240:19

284:3 298:6
302:8
varying 172:7
vascular 172:4
  172:10,17
  173:4 174:19
  177:15 208:21
  208:23
vascularize
  246:12
veins 157:21
versus 70:8
vessel 91:9
  173:5
vessels 91:8
  172:5,6,13
  173:12,15
vial 32:15,16
  35:3
view 153:15
  272:16,19,25
Virginia 1:2
  3:15 5:21
  173:2 298:19
  299:9
visible 33:25
  41:7 97:9
  100:18 136:10
  182:19,21
  285:25
visual 45:12
  55:22 253:13
visually 86:18
vivo 4:21 103:15
  120:12 252:22
  271:13,20
Vladimir 1:18
  2:1 4:3,23 5:2
  5:5,8,12
  259:17 309:6
  309:25 310:15
voicemail 71:17
void 152:5
voiding 151:16
  151:17,18,22
  186:25
volume 90:4

292:24

--- W ---

wait 33:23 66:16
  200:7 276:23
  291:11
wall 127:8 157:4
  186:6,8,10,11
  186:16,18
  189:18 192:21
  193:2,3,10
  202:5 231:13
walls 90:7,10
  121:15 206:13
want 7:12 26:19
  47:21 49:14
  66:8 71:5
  87:18 96:16
  101:3 102:16
  104:5,11
  108:19 145:10
  150:16 154:6
  220:7 228:21
  230:5 262:8
  276:19 284:4
  291:2 295:2,17
  295:20
wanted 58:8,11
  65:24 92:20
  122:12 240:13
wash 52:20
washed 52:15,17
  52:24
wasn't 76:19
  109:1 149:13
  190:3 210:9
  248:12 267:5
  273:11 275:4
waste 33:22 34:4
way 21:25 45:15
  45:17,18 59:24
  62:15 63:25
  95:15 109:11
  114:4,4 115:13
  133:8 157:23
  157:23 173:2
  185:18,20

Vladimir Iakovlev, M.D.

216:21 229:15
249:24 295:5
302:17
**ways** 95:8,10
275:7
**we'll** 12:19 42:3
62:3 105:11,11
123:2 295:18
**we're** 11:24,25
54:4 71:19
72:1 85:18
96:15 97:17,19
101:1 115:18
120:15 143:14
152:12 159:12
164:25 199:20
211:24 214:5
220:20 253:13
281:14
**we've** 5:18
117:23 124:24
141:14 142:1
146:7,8 184:20
191:23 196:21
221:15 245:25
**week** 27:8
**weeks** 35:22
41:3 88:12
264:2,7,12
265:1,6,21
266:23 269:17
**weeks'** 276:12
**weight** 85:7
**weird** 121:1
125:19
**welded** 218:14
**went** 31:3 63:10
63:11 64:25
83:24 239:24
240:5,11
265:15
**weren't** 267:14
**West** 1:2 3:15
5:21 173:1
298:19 299:9
**western** 298:18
**white** 100:7,10

110:5 117:19
138:19 163:13
174:4 176:20
**wide** 119:11
**width** 230:24
**winner** 293:12
**wire** 145:13
**wise** 150:25
**wisps** 186:8
189:17
**withheld** 8:19
**witness** 2:2,4 4:3
5:20 13:1
15:15 19:16
24:10 25:16
36:20 37:4,11
37:15 38:2
39:15,16,24
40:15 41:15
42:9 44:20
50:4 51:21
55:3 58:25
59:14 60:6,18
61:2,20 65:6
66:9 70:14,20
72:20 75:10,21
78:17 80:1,10
82:21 85:15
89:9 94:12
95:5 96:2,14
99:20 101:9
103:7 108:4
110:10,25
112:23 115:9
115:25 119:5
120:17 122:6
140:18 141:7
143:7,14
147:19 148:3
150:14 152:1
154:7 160:3
161:1 175:21
178:25 188:17
191:15 194:22
195:11 196:16
197:11 199:11
199:25 200:8

200:14 201:1
202:22 204:2
204:16 209:4
210:1,22
215:13 216:23
223:7 224:13
224:23 225:19
229:22 232:5
232:12,18
237:5 238:5
239:6 242:11
246:7,23
249:18 250:19
252:18 261:5
266:3 267:16
268:20 270:25
273:2 277:7,14
278:11,25
284:21 285:16
286:13 289:22
291:10,22
295:25 297:9
299:12,21
300:3,21 301:4
301:13,22
302:14,25
303:6 304:2,9
306:8,10 307:7
307:9 308:1,18
308:18,19
309:6
**witnesses** 38:25
**woman** 175:10
175:19 176:5
229:11
**wondering**
178:23
**word** 51:18
99:21 260:23
**work** 12:10
15:13 18:2
22:1,10 36:8
38:9,22 43:4
60:14 61:10
62:9 68:4 70:5
88:12 97:2
102:10 145:12

150:21 152:12
155:12 203:5
220:11,14
260:10,15
261:8,23 262:9
272:4,7,8
274:4 275:22
275:25 287:15
288:6 289:7
295:1 296:16
304:4
**worked** 62:22
156:11 167:6
227:13 271:25
273:25
**working** 22:19
36:5 51:11,22
115:18 210:9
260:6 261:22
266:15 273:18
292:8
**works** 13:13
23:25 54:14,17
157:21 272:22
273:6,7
**world** 62:6
**worse** 144:14
**worth** 145:1
276:12 296:3
**wouldn't** 99:20
195:11 254:12
289:1
**wound** 228:4
**wrinkle** 106:19
**wrinkles** 91:18
**write** 69:8
260:16 293:7
**writing** 71:17
72:6 260:11
**written** 7:14,14
8:20 34:10,25
35:3,4,5,10
36:3 68:3
70:16,21
117:20 275:10
298:2 307:12
**wrong** 47:24

85:19 154:13
239:6 269:7
**wrote** 32:25
260:9

---
**X**
---

**X** 4:1 120:15
164:4,4
**xylene** 31:4
256:5,6,11,12
256:15,17,19
257:1,3,7,17

---
**Y**
---

**yeah** 13:1 19:6
90:15 105:18
135:18 147:19
188:17 197:3
212:24 242:22
260:12 277:14
285:7
**year** 33:14,20,24
33:24 35:17
36:4 37:17
41:6 47:8 62:5
62:20 81:21,21
255:6,10,15,21
276:20
**years** 12:17
17:15 24:3
33:24 76:16
85:8,13 92:22
94:5 102:11
106:22,23
152:20 155:2,8
155:8 302:19
302:20
**yellow** 100:8
118:24 137:22
137:22 180:12
180:13,14
182:23 214:1,3
219:17 230:22
236:4
**Yup** 192:24

---
**Z**
---

Vladimir Iakovlev, M.D.

**zero** 142:10
301:14

**0**

**0** 264:22 265:7
**02903** 3:7

**1**

**1** 4:12 5:1,25 6:1
6:8 18:7 22:4
28:23 33:24
45:19 137:23
169:11 181:11
279:17 297:21
**1.5** 137:23,24
**1.6X** 241:21
**1.8** 269:18
**1/2** 33:24
**1:01** 179:3
**10** 184:24
201:19 289:16
289:24
**10:19** 69:4
**10:26** 69:5
**100** 2:5 34:1
119:12 122:3
145:23 149:7,8
160:3 181:12
199:13,14
208:10 221:18
240:5 245:17
300:12 301:14
302:19,20
**10a** 206:11
207:10 208:15
209:1 210:19
**10b** 208:6,6,14
209:1 210:19
**10c** 211:6,11
212:7 223:25
**10d** 212:19
213:3 217:11
217:12
**10e** 214:7
217:14,18
222:3
**10f** 215:16 216:7

217:3,6,10
219:17 220:14
221:8,24 222:3
**10g** 221:13,23
222:3
**10h** 222:11
223:10,17,23
**10i** 223:13 224:3
224:19
**10j** 225:13
**11** 1:24 2:7
72:25 85:17
**11:27** 118:1
**11:44** 118:2
**11b** 228:6,13
230:3 232:23
**11c** 230:8,15
232:24 233:11
**11e** 233:10
**12** 34:2 85:20,22
94:5 233:25
234:18 236:4
**1380** 3:14
**13a** 250:12
**13i** 255:1
**14** 94:5 98:15,17
**14th** 294:1
306:19 309:5
**15** 29:10,12 56:5
**150** 3:22
**16** 48:1
**1600** 3:22
**164** 151:6
**16a** 258:5
**16b** 258:16
**17** 29:19
**18** 42:6,11,20
44:14
**19** 22:3 31:12
56:15,18 98:11
98:16,19 104:4
104:16
**1920s** 303:14
**1960s** 75:2
**1969** 78:15
**1a** 98:20 99:17
101:1,22 102:1

**1b** 105:16 106:7
107:10
**1c** 23:10 107:15
109:6 110:15
111:15

**2**

**2** 4:14 5:4,25 6:1
6:6,8 18:8 27:2
28:23 45:19
114:13 122:10
181:11 213:25
240:25 241:1
279:17 297:21
**2,328** 269:25
**2.5** 128:12,13,16
163:25 206:14
**2:11** 179:4
**2:12-CV-02952**
1:13
**2:12-MD-02327**
1:6
**20** 32:12 34:16
35:20 56:15,18
104:3 105:8,13
106:7 107:10
135:24 136:2,2
137:21 139:15
**200** 3:6 122:8
**2005** 153:10
**2010** 39:1
**2015** 1:24 2:7
306:19 309:5
310:19
**21** 23:7,9 25:12
107:13,15
112:3
**22** 20:24 21:6
26:7 28:2,11
108:1 112:5
113:6 117:5
118:5 119:19
123:5
**23** 26:7 28:2,11
56:17,18 58:10
119:24 121:22
123:9,17 124:5

283:6
**2327** 1:7
**24** 123:1,25
124:14 125:21
**247** 265:1
**24th** 294:2
**25** 125:23
**259** 4:18
**26** 38:23,24
129:8 131:20
131:25 137:7
142:16 146:8
**27** 6:21 8:4,8
136:11,17
137:8 138:1
142:16 146:8
**271** 4:20
**28** 139:1,1
141:11 142:15
146:8 279:20
282:7,11
**29** 141:16,18
142:15 146:8
**296** 4:6
**2a** 112:6 113:6
117:5 118:4
123:5
**2b** 119:25
122:16

**3**

**3** 4:16 5:7 6:13
6:18 29:9
214:1 283:3
293:22
**3.5** 264:3,12
265:1 266:23
267:1,8,10
**3:19** 236:15
**3:23** 236:16
**30** 76:16 146:9
157:7 160:19
162:7,22
240:10,12
264:9,13,23
265:7 280:14
281:18 308:22

**300** 3:14 93:23
**304.414.1807**
3:16
**31** 146:9 157:7
159:7
**32** 157:7 160:19
**321** 3:6
**33** 146:9 157:8
157:15 159:9
160:8 162:2,7
162:22
**34** 163:2
**35** 164:15
165:25
**36** 167:1 168:1,6
**360** 89:25
**37** 168:18
**37201** 3:23
**38** 171:17
**39** 172:3 175:17
**3a** 129:8 130:11
130:19 131:20
134:18 136:13
**3b** 136:12,17,17
138:19
**3c** 140:15
141:11
**3h** 157:15
**3rd** 3:22

**4**

**4** 4:17,25 5:9 7:6
26:15 29:21
31:21 50:1
58:5,13,23
73:16,20 74:1
135:6,8 167:1
175:6 179:10
256:23 263:21
263:23 269:8,9
293:22
**4.1** 264:8,13,19
264:20 265:10
**4:08** 269:3
**4:15** 269:4
**4:52** 296:4
**4:55** 296:5

Vladimir Iakovlev, M.D.

**40** 4:7 50:25
63:4 144:5,11
164:2,3,4,4
176:12 240:10
240:12
**40X** 98:22
107:17
**41** 178:18,21
**410.457.7700**
3:8
**42** 179:6 182:10
**43** 182:14,18
184:14
**44** 184:13,21
**45** 189:4 192:3
280:25 281:17
**46** 192:5
**47** 197:19
201:16
**48** 201:18
**49** 205:1

—————— 5 ——————
**5** 4:5,12,14,16
4:17,18 52:25
132:21 133:12
133:14,16
143:4,23 144:2
144:5,8 146:2
146:2 171:5
259:15,21,23
260:25 261:15
269:7,7,10
290:8
**5:05** 1:25 305:18
**50** 152:20 164:4
206:12 210:13
**51** 210:13
**52** 210:15
211:12 212:7
223:25
**53** 212:19
**55** 215:15 217:3
**56** 217:5 219:17
221:8
**57** 221:13
**58** 232:7

**59** 223:13 224:4
232:8

—————— 6 ——————
**6** 4:20 138:23
271:12,18,19
272:4,7 273:15
277:24 278:21
287:2 289:24
290:8
**60** 144:15
153:12 154:1
225:11 226:4
232:8
**61** 225:25 226:4
228:6 232:8
**615.651.6700**
3:24
**62** 232:8
**63** 230:8 232:8
233:20
**64** 232:23
**65** 233:10,20
**66** 233:25
234:18
**67** 250:11
**69** 280:9
**6a** 175:17
176:14 178:4
**6b** 176:14,19
178:4
**6c** 178:4,18

—————— 7 ——————
**7,000** 266:1
**7,084** 264:25
265:22
**70** 280:12,13,20
281:15
**70s** 303:7
**72** 251:1,20,22
**73** 251:15 252:8
253:17 254:18
**75** 254:21
**7a** 179:9 180:2
181:25 183:8
183:15,24

185:25 247:21
**7b** 182:13,18
183:7,13,19,24
184:16 185:25
247:20,21

—————— 8 ——————
**8** 72:25 193:17
199:3
**8,550** 294:2
**80** 93:13,15
282:8
**80s** 78:18 79:4
303:7
**82** 47:17,20
55:24 56:3,5
56:11 270:3
**83** 47:23,25 50:2
63:2,3 65:12
66:2 69:8,22
70:11,18
257:23 270:4
**84** 257:20,22
258:16,22
**87** 250:22
**8a** 184:21 187:9
187:11 189:7
**8b** 189:4,15,23
191:3
**8c** 192:5,19
194:2
**8d** 197:19
199:23

—————— 9 ——————
**9** 79:8 138:23
**9:00** 1:25
**9:03** 2:6
**9:42** 40:3
**9:43** 40:4
**9a** 201:18
202:18 204:18
204:24
**9b** 205:1,15
206:5

# EXHIBIT R

Page 612

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

_____

DIANNE M. BELLEW,                           :

        Plaintiff,                       :   CASE NUMBER

   v.                                    :   2:13-cv-22473

ETHICON, INC.,                              :

ETHICON, LLC, and                           :

JOHNSON & JOHNSON,

        Defendants.

_____

TRANSCRIPT OF TRIAL DAY 4

MARCH 05, 2015

BEFORE THE HONORABLE JOSEPH R. GOODWIN,

UNITED STATES DISTRICT JUDGE

Court Reporters:            Carol Farrell, CRR, RMR, CCP, RPR
                           (304)347-3188
                           carol_farrell@wvsd.uscourts.gov

                           Lisa A. Cook, RPR, RMR, CRR, FCRR
                           (304)347-3198
                           lisa_cook@wvsd.uscourts.gov

Proceedings recorded by machine stenography; transcript
produced by computer.

Page 613

```
 1   A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
 4   BRYAN F. AYLSTOCK, ESQUIRE
     DANIEL J. THORNBURGH, ESQUIRE
 5   AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
     17 East Main Street, Suite 200
 6   Pensacola, FL  32502
 7   BENJAMIN H. ANDERSON, ESQUIRE
     ANDERSON LAW OFFICES, LLC
 8   1360 W. 9th Street, Suite 215
     Cleveland, OH  44113
 9
     ADAM M. SLATER, ESQUIRE
10   MAZIE SLATER KATZ & FREEMAN, LLC
     103 Eisenhower Parkway
11   Roseland, NJ  07068
12   JEFFREY S. GRAND, ESQUIRE
     BERNSTEIN LIEBHARD LLP
13   10 East 40th Street, 22nd Floor
     New York, NY  10016
14
15
     FOR THE DEFENDANTS:
16
17   CHRISTY D. JONES, ESQUIRE
     BUTLER, SNOW, OMARA, STEVENS & CANNADA, PLLC
18   1020 Highland Colony Parkway, Suite 1400
     Ridgeland, MS  39157
19
20   DAVID B. THOMAS, ESQUIRE
     THOMAS COMBS & SPANN, PLLC
21   PO Box 3824
     Charleston, WV  25338-3824
22
23
24
25
```

Page 614

```
 1          I N D E X
 2
 3           Direct  Cross  Redirect  Recross
     WITNESSES FOR
 4   THE PLAINTIFF
 5   GENE KAMMERER (video)            616
     (Continued)
 6
     VLADIMIR IAKOVLEV       617  671   705
 7
     VINCENT LUCENTE (video)  709
 8
     SCOTT CIARROCCA (video)   711
 9
     SEAN O'BRYAN (video)    712  712   713
10
     CHARLOTTE OWENS          713   714
11
     KIMBERLY HUNSICKER       715
12
     CAROL DEHASSE           717   718
13
     BRYAN LISA              724
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 615

```
 1       PROCEEDINGS had before The Honorable Joseph R.
 2   Goodwin, District Judge, United States District Court,
 3   Southern District of West Virginia, in Charleston, West
 4   Virginia, on March 05, 2015, as follows:
 5       (The Jury entered the courtroom at 9:06 a.m.)
 6       THE OFFICER:  All rise.
 7       THE COURT:  Good morning.
 8       RESPONSE:  Good morning, Your Honor.
 9       THE COURT:  Can you tell that John has been opening
10   court for more than one time?
11       (Laughter.)
12       THE COURT:  I trust you had a pleasant evening, if
13   not a necessarily pleasant transition from your place of
14   lodging to here.  I knew we could all make it and we all did.
15   I have this theory about -- if I may waste a minute of your
16   time, and, timekeeper, you can deduct this.  I have a theory
17   that if the news media goes crazy and says it's going to be
18   awful and you can't possibly move and go immediately to your
19   homes and hide under the bed, that it's not going to be bad at
20   all; that the times that it's really bad is when it catches us
21   all by surprise and we don't even know it.
22       I just -- some of you are old enough to remember when
23   Governor Rockefeller declared a blizzard was coming and we all
24   went to our homes and there was nothing but blue sky.
25       (Laughter.)
```

Page 616

```
 1       THE COURT:  And he never lived it down.  It was and
 2   will be remembered by anybody old enough as the Rockefeller
 3   blizzard.  I don't think there was a quarter of an inch of
 4   snow.
 5       All right.  We're ready to resume.  Call your next
 6   witness.
 7       MR. THOMAS:  Your Honor, defendants will continue
 8   with the examination of Gene Kammerer.
 9       THE COURT:  Oh, that's right, we've got
10   cross-examination.
11       MR. THOMAS:  Yes, Your Honor.  Thank you.
12       THE COURT:  Very well.
13       (The videotaped cross-examination testimony of
14   Dr. Gene Kammerer was played for the jury from 9:10 a.m. to
15   9:19 a.m.)
16       MR. THOMAS:  That's the cross-examination, Your
17   Honor.
18       THE COURT:  Is there any redirect?
19       MR. SLATER:  There is none, Your Honor.
20       THE COURT:  Any exhibits?
21       MR. THOMAS:  No, Your Honor.
22       THE COURT:  Call your next witness.
23       MR. ANDERSON:  Yes, Your Honor.  At this time
24   plaintiffs called Dr. Vladimir Iakovlev.
25       THE COURT:  Doctor?
```

Page 617

1    THE DEPUTY CLERK: If you'll raise your right hand.
2    (VLADAMIR IAKOVLEV, HAVING BEEN DULY SWORN, TESTIFIED AS
3    FOLLOWS:)
4    THE WITNESS: Yes, I do.
5    THE DEPUTY CLERK: Thank you. Please take the
6    witness stand.
7    (DIRECT EXAMINATION OF VLADIMIR IAKOVLEV BY MR. ANDERSON:)
8    Q.  Good morning.
9    A.  Good morning. Is it on?
10   THE DEPUTY CLERK: Oh, it's over here. No, it's not
11   on.
12   THE WITNESS: I think you just need to increase the
13   volume.
14   THE COURT: No, we need to get the microphone in
15   front of him.
16   THE DEPUTY CLERK: He has a lapel mic on.
17   THE COURT: Well, somebody else can do that. Have
18   you got it? Okay. Got your own microphone, good.
19   BY MR. ANDERSON:
20   Q.  Okay. Take two. Good morning.
21   A.  Good morning.
22   Q.  What is your -- what is your name, please?
23   A.  Vladimir Iakovlev.
24   Q.  And what is your occupation?
25   A.  I am a medical doctor.

Page 618

1    Q.  Do you have a subspecialty?
2    A.  I'm a pathologist.
3    Q.  And what is pathology?
4    A.  Pathology is laboratory medicine. It's in the lab, in
5    the hospital. Pathologists work in the lab and receive
6    samples from the patients. This would be fluids like blood,
7    like urine, and tissue samples like cells and biopsies. We
8    analyze the samples, we come up with the diagnosis, and we
9    report this diagnosis for further treatment of the patients.
10   Q.  Do you have a particular focus within pathology?
11   A.  I am an anatomic pathologist.
12   Q.  Anatomic pathologist?
13   A.  Anatomic pathologist.
14   Q.  And what is anatomic pathology?
15   A.  Anatomic pathology is the field of pathology where we
16   analyze tissue samples, not fluids like blood, but tissue
17   samples, create cells like Pap smears, tissue samples such as
18   biopsies, or large resections, like a breast resection or
19   stomach resection or we do the whole body, we do autopsy.
20   Q.  You are saying resection. What is a resection?
21   A.  Resection, when surgeons cut out part of the organ, part
22   of the colon or part of the stomach or from the breast.
23   Q.  Are you familiar with a term in medicine known as a
24   "differential diagnosis"?
25   A.  Yes.

Page 619

1    Q.  Is that something that you, as an anatomic pathologist,
2    use in your daily practice?
3    A.  Yes.
4    Q.  Can you please explain that to the jury?
5    A.  Differential diagnosis is basic -- basic principle in
6    medicine to arrive at a diagnosis. When the patient comes to
7    the hospital with some problem, medical doctors examine, so
8    they have their differential diagnosis, medical diseases on
9    the differential diagnosis.
10   Q.  Go a little slower, if you would, please.
11   A.  Multiple diseases are differential diagnosis. The
12   differential diagnosis --
13   THE COURT: I couldn't understand you. I'm sorry.
14   Say it again.
15   BY MR. ANDERSON:
16   Q.  Just go a little slower, okay? And a little louder.
17   A.  Differential diagnosis is multiple diseases.
18   When the patient comes to the hospital, they present
19   with a problem, and after -- after examination, clinicians
20   have several diseases in their mind which can cause these
21   problems. And then they order tests, including taking
22   samples, and send them to pathology.
23   When it comes to me, I have my differential diagnosis,
24   depending on what I see in the microscope. And then I do my
25   investigation, like medical investigation, and then I narrow

Page 620

1    down this even further. From many diseases, we go down to
2    one, which is the right one.
3    Q.  Is that something that you do every day in your practice
4    as a pathologist?
5    A.  Yes.
6    Q.  And is that something that you did in arriving at your
7    opinions and your expert conclusions in this matter?
8    A.  Yes.
9    MR. ANDERSON: Your Honor, may I approach?
10   THE COURT: You may.
11   BY MR. ANDERSON:
12   Q.  Dr. Iakovlev, I'm showing you what has been marked as
13   plaintiff's Exhibit P-2258. Can you please just identify that
14   for the record?
15   A.  This is my curriculum vitae.
16   Q.  And what is a curriculum vitae?
17   A.  This is a description of my career or my education or my
18   work and my publications.
19   Q.  Okay. And you have it there in front of you in case you
20   need to refer to it during this part of your testimony, where
21   I'm just going to go through your background and training and
22   education. Okay?
23   A.  Okay.
24   Q.  Where do you currently work?
25   A.  I work at St. Michael's Hospital, that's in Toronto,

Page 621

1    Canada.
2    Q.  What's your current position?
3    A.  I am the director of cytopathology and I am an anatomic
4    pathologist.
5    Q.  How long have you been at St. Michael's?
6    A.  About eight years.
7    Q.  And what is cytopathology?
8    A.  Cytopathology is the part of anatomic pathology where we
9    examine cells.
10   Q.  Slow down a little.
11        Okay.  You examine cells.  Go ahead.
12   A.  Cells.  Not larger pieces of tissue, but cells, which are
13   scraped off like Pap smears or aspirated through a fine,
14   really thin needle.
15   Q.  Explain to the jury what you do on a day-to-day basis at
16   St. Michael's as an anatomic pathologist.
17   A.  As an anatomic pathologist, I examine tissue samples.
18   Surgeons and radiologists and other clinicians take tissue
19   samples from the patient, then they send them to the lab.
20   When we receive them at the lab, we examine them first by
21   naked eye, grossly, and by feeling them with our fingers.
22   Then we take sections from those samples for microscopy, send
23   them to the histotechnologists, they make glass slides like
24   this, and then we examine them under the microscope.
25   Q.  Are you familiar with the term clinicopathological

Page 622

1    correlation?
2    A.  Yes.
3    Q.  Okay.  What is that term to you as a pathologist?
4    A.  Clinicopathological correlation is when I correlate
5    medical history, radiological appearance, and my pathology
6    findings.  I put everything together, like pieces in jigsaw
7    puzzle, to show the big picture and to arrive with a correct
8    diagnosis.
9    Q.  Briefly describe for the jury, please, your education and
10   training that prepared you to work as a pathologist.
11   A.  To become a pathologist, one needs to go through medical
12   school.  I did my medical training in Russia.  At that time
13   the system there was similar to United Kingdom.  You can
14   either go directly from high school or you can do first
15   college degree and then apply to medical school.  I did my
16   volunteer work at the hospital ward, I attended anatomy
17   scientific society, and I passed my entrance exams with high
18   marks, and I was accepted directly from high school.
19        After graduation of the medical school, it was time of
20   great struggle.  That was early '90s.  The government didn't
21   have money, didn't care much, didn't invest money in the
22   medical system.  And we wanted to build our careers to do
23   research.
24        At the same time I remembered how my mother traveled to
25   Canada in early '80s, so the logical thought was to immigrate

Page 623

1    to Canada.  We applied for immigration and we got our
2    immigration papers in a year.
3        When we came to Canada, we took our licensing exams,
4    medical licensing exams in Canada and United States, and I
5    applied for anatomic pathology residency and was accepted at
6    the University of Manitoba.
7    Q.  Where do you hold medical licenses?
8    A.  I hold medical licenses in the Province of Ontario,
9    Toronto, and State of Michigan, U.S.A.
10   Q.  Are you board certified in any fields?
11   A.  Yes.  I am board certified for anatomic pathology, by the
12   Royal College of Physicians and Surgeons of Canada, and by
13   American Board of Pathology.
14   Q.  How does one obtain board certification, just briefly?
15   A.  You submit all your education and training, they evaluate
16   if it's sufficient and then you take exam.  If you pass the
17   exam, you obtain your certification.
18   Q.  Do you have to retake the board certification test?
19   A.  Yes.  I have to retake the American Board of Pathology
20   exam every ten years.  This was a relatively recent decision
21   because the field was changing so fast that if the
22   pathologists were not updating their knowledge, they would not
23   be able to deliver the same standard of care.
24   Q.  Slow down just a little bit if you would.
25        As a current practicing pathologist, are you required

Page 624

1    to complete continuing medical education courses in your
2    field?
3    A.  Yes.  That's another initiative, to stimulate
4    pathologists to update their knowledge.  The American Board of
5    Pathology, I need to submit every two years specific number of
6    hours of courses and conferences and also meeting exams.  And
7    the same thing for Royal College of Physicians and Surgeons of
8    Canada, I have to submit this information every year.
9    Q.  Are you currently a member of any professional societies
10   in your field?
11   A.  I am a fellow of Royal College of Physicians of Canada in
12   Anatomic Pathology, and I'm a fellow of College of American
13   Pathologists.
14   Q.  Do you currently have any teaching responsibilities?
15   A.  Yes.  I am appointed as the director of laboratory
16   medicine at the University of Toronto, I teach medical
17   students, I teach residents, I teach fellows, I teach graduate
18   students, I also teach cytotechnologists, physiotherapists and
19   pathologists.
20   Q.  What do your teaching duties entail?
21   A.  For medical residents and medical students and also
22   fellows, I teach them every day handling the cases.  When we
23   receive the specimens, we examine them together, and I teach
24   them rating the specimens or rating the slides, and then we
25   have formal sessions every week with residents.  We teach them

Page 625

1  during one-hour sessions.
2  Q.  Are those principles of differential diagnosis as well as
3  clinicopathological correlation that you described to the jury
4  something that you teach your students as well as the fellows
5  and residents?
6  A.  Of course, because this is the basis of medicine, we
7  teach it from the very beginning.
8  Q.  And are those principles that you applied in forming your
9  expert conclusions and opinions in this case that you'll
10  present to the Court and jury today?
11  A.  Yes.
12  Q.  Have you written articles that have been published in the
13  scientific literature?
14  A.  Yes.  I published over 20 full-sized papers and over 30
15  abstracts; also presented multiple lectures at national and
16  international meetings.
17  Q.  Do any of those articles or abstracts relate to your
18  examination of explanted surgical meshes made out of
19  polypropylene like the Prolift that we are here for today?
20  A.  Yes.  I published two full papers, three papers had
21  submission, about ten abstracts, and also presented multiple
22  presentations.
23      MR. ANDERSON:  Your Honor, at this time plaintiffs
24  would seek to move P-2258 into evidence.
25      MR. THOMAS:  No objection, Your Honor.

Page 626

1      THE COURT:  It may be received.
2      MR. ANDERSON:  Thank you, Your Honor.
3  (PLAINTIFF EXHIBIT P-2258 WAS RECEIVED IN EVIDENCE.)
4  BY MR. ANDERSON:
5  Q.  Now, as part of your daily practice at St. Michael's, do
6  you routinely receive foreign bodies or foreign materials like
7  medical devices that have been removed from patients for which
8  you have been asked to render medical diagnoses and opinions?
9  A.  Yes, we routinely receive foreign bodies and medical
10  devices.  Foreign bodies can be foreign bodied embedded during
11  trauma, during industrial accidents, and motor vehicle
12  accidents.
13  Q.  Slow down just a little, please, for the court reporter.
14  Okay?
15  A.  And medical devices also are removed when they fail.
16  This would be breast implants, cardiac valves, hips, and knee
17  implants, as well as surgical meshes.
18  Q.  Have those explanted surgical meshes including meshes
19  made of polypropylene for transvaginal repair?
20  A.  Yes.
21  Q.  Have you received surgically removed Prolift mesh to
22  perform pathological analysis as your role as an anatomic
23  pathologist at St. Michael's?
24  A.  Yes.
25  Q.  Are these explants, including transvaginal meshes and

Page 627

1  including the Prolift, typically sent to you by the surgeons
2  who have removed them in the hospital?
3  A.  Yes.
4  Q.  Why do surgeons send explanted foreign bodies like
5  medical devices and transvaginal meshes to you as an anatomic
6  pathologist for your review?
7      THE COURT:  Counsel?
8      MR. THOMAS:  It calls for what the doctor -- I object
9  to the question because he asked why the doctors sent things
10  to him --
11      MR. ANDERSON:  I can rephrase it, Your Honor.
12      THE COURT:  All right.
13  BY MR. ANDERSON:
14  Q.  What is the purpose of your -- strike that.
15      In your role as an anatomic pathologist at
16  St. Michael's, what is the purpose of surgeons within the
17  hospital sending to you explanted medical devices like
18  polypropylene meshes from their patients?
19  A.  Everything which is removed from the human body needs to
20  be sent to pathology.  We document it, describe it, describe
21  gross features, how the device or foreign body looked, and
22  then if we can take microscopic sections, we take microscopic
23  sections and assess what's the state of the device itself and
24  what is the state of the tissue around it, if the device
25  failed on its own or there was another condition like a tumor

Page 628

1  which made the device fail.
2  Q.  At some point in time did I ask you to review materials
3  in this case and to give your expert conclusions with regard
4  to Dianne Bellew?
5  A.  Yes.
6  Q.  Did you do the same thing in this case that you do on a
7  day-to-day, routine basis as an anatomical pathologist at
8  St. Michael's when you receive explanted medical devices from
9  the surgeons?
10  A.  Yes.
11  Q.  Were you provided materials to review specific to Dianne
12  Bellew in this case?
13  A.  Yes.  I received medical records from the clinical chart
14  and I received tissue samples excised from -- from
15  Ms. Bellew's body.
16  Q.  Okay.  And what surgery were those explanted samples
17  from?
18  A.  It was July of 2012, the third surgery.
19  Q.  For the record, just briefly summarize your understanding
20  of Ms. Bellew's clinical course for the jury as it relates to
21  the case and as it relates to your opinions in the case.
22  A.  Ms. Bellew had placement of Prolift medical device in
23  2009 for bladder prolapse.  In about two years, she presented
24  with bleeding and pain during intercourse.  Initially, she was
25  treated conservatively for vaginal dryness and atrophy.  And

## Page 629

1  this changed symptoms to some degree, but she came back in
2  about a month, and the examination showed that there was
3  palpable mesh which was tender on the left which was creating
4  left-sided pelvic pain, and the decision was to excise the
5  painful area.  During surgery, it was found to be sclerotic
6  and hardened.  It was excised, which gave some relief of the
7  symptoms, but Ms. Bellew came back, I think in about October,
8  with recurrence of the symptoms.  There was more excision done
9  at that time, and, again, there was a period of relief or
10  improvement of the symptoms.  But then she came back in a
11  year, and it was the same symptoms.  Examination showed more
12  of hardened tender mesh.  And then Dr. DeHasse proceeded for
13  large excision.
14  Q.  And from that large excision in July, 2012, what's your
15  understanding of how many pieces of Prolift mesh were
16  surgically removed?
17  A.  From the original pathology report, there was seven
18  pieces of the mesh removed.
19  Q.  How many fragments of the mesh from that surgery were
20  made available for you to analyze?
21  A.  Four.
22  Q.  And did you analyze all four of them?
23  A.  Yes, I analyzed all four.
24  Q.  How did you receive the pieces of mesh that you analyzed
25  from Ms. Bellew's surgery in July, 2012?

## Page 630

1  A.  They came in a container with formalin.
2  Q.  And what is formalin?
3  A.  Formalin is basically formaldehyde.  It is natural
4  fixative.  It preserves tissue.  It was discovered about a
5  hundred years ago and became standard preservative for tissue.
6  All those specimens you see in museums are preserved in
7  formalin.  You preserve specimens in time.  They don't
8  degrade, they don't decompose.
9  Q.  And is the use of formalin in order to preserve tissue
10  standard in your industry for the preservation of explants
11  from people's bodies?
12  A.  Yes.
13  Q.  Other than receiving the container in formalin, what else
14  did you receive with -- if anything, with the surgical pieces
15  when you first received them?
16  A.  The chain of custody and medical records.
17  Q.  Did you photograph the explanted fragments that you had
18  available for you to analyze?
19  A.  Yes.
20  MR. ANDERSON:  Okay.  Your Honor, may I approach?
21  THE COURT:  You may.
22  BY MR. ANDERSON:
23  Q.  I'm showing you what has been marked as P-1909.  Can you
24  first, please, just identify that for the record?
25  A.  This is the gross photograph of the specimen I received.

## Page 631

1  Q.  You said gross photograph and gross specimen a couple of
2  times.  I just want to make the jury understands what those
3  terms are for a pathologist.
4  What do you mean by gross specimens, please?
5  A.  Gross means by naked eye enhanced.  Microscopic is what
6  we see in microscopy.
7  Q.  Did you take this photograph?
8  A.  Yes.
9  Q.  Does this photograph that you took fairly and accurately
10  represent the Prolift mesh pieces as you received them?
11  A.  Yes.
12  Q.  Did you rely on this document in forming your opinions in
13  this case?
14  A.  Yes.
15  Q.  Is it significant to your opinions in this case?
16  A.  Yes.
17  MR. ANDERSON:  Your Honor, we would ask that we be
18  able to publish this to the jury and enter plaintiff's P-1909
19  in the record?
20  THE COURT:  It may be admitted and published.
21  MR. ANDERSON:  Thank you.
22  (PLAINTIFF EXHIBIT P-1909 WAS RECEIVED IN EVIDENCE.)
23  (The document was published to the jury.)
24  BY MR. ANDERSON:
25  Q.  Please explain to the jury what we are seeing in

## Page 632

1  plaintiff's 1909 in this photograph, Dr. Iakovlev.
2  A.  There is identification of the surgical number, and I can
3  correlate it with the medical information system of
4  St. Michael's Hospital and can trace it and see this specimen
5  is from Ms. Bellew.
6  Also you can see there are four pieces, and please pay
7  attention here.  There are blue threads inside this piece.  We
8  will come back to these blue threads later.
9  Q.  Can you remove the dots for a moment and can you blow up
10  the left-hand piece?  You need to tap the screen, I think.
11  A.  Yes, we can see the blue threads between the dots.
12  Q.  What are those blue threads from, Dr. Iakovlev?  What are
13  those blue threads from?
14  A.  Those are blue threads of the Prolift device.
15  And another observation here, you see these blue
16  threads are not in line, like this.  They have different
17  orientation, shows that mesh is not flat, even from gross --
18  gross appearance.
19  Q.  As part of your pathological analysis of these pieces of
20  mesh, what did you do next?
21  A.  I examined them with my fingers, I compared them to the
22  normal tissue, which is also fixed in formalin, and I found
23  that these pieces were hardened, and it was much thicker than
24  would be one layer of mesh.  And then I submitted these pieces
25  for microscopic examination.  I sent them to laboratory

1    technicians to produce histological slides.
2    Q.  Did you say pathological slides?
3    A.  Histological slides.
4    Q.  Histological slides, okay.
5        What does histology or histological slides, what does
6    that mean in your field?
7    A.  Histological slides is when the tissue is examined in the
8    microscope.
9    Q.  Did you prepare the slides from Ms. Bellew's explanted
10   mesh material in the same manner that you prepare pathology
11   slides in your normal daily practice?
12   A.  Yes.
13   Q.  Did you prepare the slides in a manner as a standard
14   pathologist would in your field or your industry?
15   A.  Yes.
16   Q.  Can you please explain the process of preparing pathology
17   slides for the jury as you did from Ms. Bellew's explant.
18   A.  When the tissue is submitted to prepare the histological
19   slides, we need to take really thin sections so that the light can
20   shine through and I can see it in the microscope.  So we take
21   sections like sections of slices of the meat in the deli in
22   the grocery store.  We take the sections and these thin
23   slices, then I put on glass slides, and you can see that.  So
24   they are very thin, about five microns thick.  Now the light
25   can shine through and I can see features inside the tissue.

1    Q.  How many slides did you prepare for Ms. Bellew's -- these
2    four explanted pieces?
3    A.  15.
4    Q.  Are you prepared today to offer expert opinions and
5    conclusions for the Court and the jury based on your
6    pathological analysis of Ms. Bellew's explanted Prolift mesh
7    and tissue?
8    A.  Yes.
9    Q.  Will all of your opinions today be stated to a reasonable
10   degree of medical certainty?
11   A.  Yes.
12   Q.  Have you used your knowledge, training, experience as an
13   anatomical pathologist, as well as your review of her medical
14   records and these specimens in examining Ms. Bellew's
15   pathology and arriving at your opinions here in this case?
16   A.  Yes.
17   Q.  What methods did you use to analyze Ms. Bellew's
18   pathology specimens that you received in this case?
19   A.  I used standard methods of staining and using polarizing
20   light.
21   Q.  Okay.  First of all, explain to the jury what staining
22   is.
23   A.  Staining is using dyes, like for fabric, to dye tissue
24   because tissue is so thin, it's transparent.  We cannot see
25   it.  So first we need to stain it with dyes, and then we can

1    see it in the microscopy.
2        There is also another role for stains.  Some stain
3    stain on the specific structures so we can differentiate what
4    type of cells I'm looking at.
5    Q.  Did you use any other standard methods in your industry
6    to analyze Ms. Bellew's explanted tissue to arrive at your
7    opinions today?
8    A.  I used polarized light.
9    Q.  Okay.  Explain to the jury what polarized light on a
10   microscope means in term of analyzing explanted medical
11   devices or explanted mesh.
12   A.  Polarized light, I need to use polarized filter.  These
13   are like polarizing glasses.  These glasses can be used for
14   fishing because when you look at water, the light shines,
15   there is too much light, and it's all in different directions.
16   You can see the surface of the water.  But if you use
17   polarizing glasses, it's only one direction of light going
18   through the glasses, and you can see better if you caught the
19   fish.  So the polarizing filters are like venetian blinds.
20   They let light in one orientation go through, like venetian
21   blinds.
22       So if we have two filters with the same orientation,
23   placed against each other, the light can go through.  But if I
24   take this filter and I turn it, the orientation of filters is
25   perpendicular so the light cannot go through.  But if there is

1    object inside, between this filter, which can change
2    orientation, the light, which is perpendicular, turns through
3    the object and then passes through the next filter and I can
4    see it in the microscope.
5    Q.  What is the application of that in this particular case,
6    and, that is, using polarized light microscopy to arrive at
7    any of your opinions here?
8    A.  It was discovered about a hundred years ago and that
9    using this polarizing filters, we can see objects which are
10   clear or which are foreign, which are synthetic in the
11   microscopy, and it has been used since to identify foreign
12   objects in the histological slides.
13   Q.  So did you use histological staining in the preparation
14   of slides as well as light microscopy with the polarized
15   lenses to examine Ms. Bellew's explants for which you are
16   going to offer opinions here today?
17   A.  Yes.
18   Q.  Okay.  After you did the staining of her slides, what did
19   you do next?
20   A.  I -- first of all, I need to see the history, analyze the
21   history.  I have my differential diagnosis.
22   Q.  When you say the history, what do you mean?  Review the
23   medical records?
24   A.  Yes.
25   Q.  Okay.  The medical records?

Page 637

1   A.  Medical records, clinical history.
2       Then I examine the slides, stained with different
3   stains.  And I could assess if there is mesh only and
4   mesh-related conditions or mesh-related changes in the tissue
5   or there is something else, natural, like a tumor or like a
6   vasculitis, something which would occur without the mesh.  And
7   then I examined the polypropylene properties using polarizing
8   light.
9   Q.  Did you take photographs of the slides while they were
10  under the microscope?
11  A.  Yes.
12  Q.  What's on the top of the microscope there?
13  A.  This is a camera.  I mean this is a standard Canon camera
14  to take pictures.  I took pictures exactly the same way as you
15  take pictures.
16  Q.  What is the purpose of taking photographs of the slides
17  while they're on the microscope?
18  A.  To show it to other people and to document something.
19  Q.  Did you bring Ms. Bellew's pathological slides that you
20  prepared here with you today?
21  A.  Yes.
22  Q.  Are they significant to your opinions in this case?
23  A.  Yes.
24  Q.  Did you rely upon them in forming your opinions in this
25  case?

Page 638

1   A.  Yes.
2       MR. ANDERSON:  Your Honor, could Dr. Iakovlev just
3   step down and show the jury the slides and the types of
4   staining that he did from his slide deck, if he agrees to
5   abide by the court rules of speaking up, facing the court
6   reporter, and continue to make it a Q and A with me?
7       THE COURT:  Yes.
8       MR. ANDERSON:  Thank you.
9   BY MR. ANDERSON:
10  Q.  You may step down.  Make sure your mic is still on.
11  A.  So these are the 15 histological slides I prepared.  And
12  you can see that they are different colors, red and green and
13  brown.  The red color is H&E or hematoxylin and eosin stain,
14  we're using stains protein, and the pink color within is scar
15  tissue because it has a lot of protein, a lot of collagen.
16  This is trichrome stain, it uses green color to stain collagen
17  and you can see it's all green.  And this brown stain, it
18  stains specific proteins, and I will show them later.
19  Q.  What is the significance of -- back up just a little.
20      What is the significance of brown staining in those
21  particular photographs or photographic slides?
22  A.  I could identify proteins such as S100, myeloperoxidase
23  and smooth muscle.
24  Q.  And what is the significance of identifying S100,
25  myeloperoxidase in these slides?

Page 639

1   A.  S100 stains nerves.  I can see nerves easier with S100
2   stain.  Myeloperoxidase is a chemical produced by macrophages
3   like immune cells which are coming in to fight this bacteria,
4   foreign bodies.  So I can see if the macrophages, they are
5   functioning, they are expressing this chemical to destroy the
6   foreign body.
7   Q.  Did you take photographs of her slides, Ms. Bellew's
8   slides while they were on the microscope?
9   A.  Yes.
10  Q.  And did you bring those photomicrographs with you today?
11  A.  Yes.
12  Q.  Okay.  Why don't you put those down.
13      MR. ANDERSON:  Your Honor, if I can --
14      THE COURT:  May the witness resume the stand?
15      MR. ANDERSON:  That's what I was going to ask you
16  about.  He has taken photomicrographs and put them on the
17  boards for the jury.  So if he would be allowed to stand in
18  front of the jury and show those, these are plaintiff's
19  Exhibit 1910, and they were included in his report and --
20      THE COURT:  Did counsel see them?
21      MR. ANDERSON:  Yes, sir.
22      THE COURT:  Have you seen those?
23      MR. THOMAS:  I have, Your Honor.
24      THE COURT:  All right.  Yes.
25      MR. ANDERSON:  And --

Page 640

1       THE COURT:  There are difficulties with the witness's
2   accent and it is helpful if he faces the court reporter so she
3   can see your mouth as you talk.
4       THE WITNESS:  I will.
5       THE COURT:  Thank you.
6       MR. ANDERSON:  We worked this morning to try and --
7       THE COURT:  Yes, Carol?  Just a minute.
8       THE COURT REPORTER:  If I could just move down there,
9   it would be better.
10      THE COURT:  All right.
11      MR. THOMAS:  Your Honor, can I move?
12      THE COURT:  You absolutely may.
13      MR. THOMAS:  Thank you, Your Honor.
14  BY MR. ANDERSON:
15  Q.  Are these photomicrographs that you relied upon in
16  forming your opinions?
17  A.  Yes.
18  Q.  Are they significant to your opinions?
19  A.  Yes.
20      MR. ANDERSON:  Your Honor, we would seek to move 1910
21  into evidence, please.
22      THE COURT:  It may be received.
23      MR. ANDERSON:  Thank you.
24      MR. THOMAS:  Your Honor?
25      THE COURT:  Yes.

Page 641

1    MR. THOMAS:  Some of the exhibits have writing on
2    them.  They are not the exact exhibits or the
3    photomicrographs.  Things have been added by him as
4    descriptive.  I don't think that's appropriate to be received
5    into evidence.
6        THE COURT:  All right.  When we get to that, make
7    that objection.
8        MR. ANDERSON:  And I have a good solution for that,
9    and that is like we have done with some of the PowerPoint
10   slides, we will remove the slides that he has put wording on
11   to be able to explain to the jury.  Fair enough?
12       MR. THOMAS:  That's fine with me.
13       THE COURT:  Very well.
14       MR. ANDERSON:  Thank you.
15   (PLAINTIFF EXHIBIT P-1910 WAS RECEIVED IN EVIDENCE.)
16       MR. THOMAS:  May I sit over here, Your Honor?
17       THE COURT:  Yes.
18       Otherwise, what are the numbers?
19       MR. ANDERSON:  Yes, sir.  So 1910-Z is what's on the
20   left and 1910-Y is on the right.
21   BY MR. ANDERSON:
22   Q.   What is significant about and why did you choose 1910-Z,
23   Dr. Iakovlev?
24   A.   This is a microphotograph of one of the pieces over here.
25   So -- this is exactly from the slide and one of the pieces was

Page 642

1    photographed for these boards.
2    Q.   And what is the jury seeing?  What type of staining are
3    we using -- did you use on the left-hand pathology slide?
4    A.   As I mentioned, this is H&E, hematoxylin and eosin stain.
5    It stains pink color collagen and inflammatory cells purple.
6    Q.   What is the significance of the red or pink that we see
7    in the -- in 1910-Z on the left?
8    A.   Let me first orient the jurors what they see here.  These
9    clear spaces, these are polypropylene filaments because it's
10   like fishing line, it's clear.  We cannot see it when it's in
11   the light microscope, it's transparent.  But remember those
12   blue threads in the gross specimen?  Some of the threads in
13   the Prolift device are colored blue, and you can see them blue
14   here.  See these colors?  This blue, this blue, and this is
15   blue.
16   Q.   Is there anything significant about the orientation of
17   the white and blue fibers as we see it in 1910-Z?
18   A.   As you can see, that there is at least three layers of
19   the mesh here.  It helps it to identify where the mesh is
20   going, and this yellow line shows layers of the mesh.  There
21   are three layers of the folded mesh within this piece, and, as
22   I described, the red color represents collagen.  So these
23   three layers are all fused, glued together, cemented together
24   by the scar tissue.  It's like plywood.  If you have several
25   layers and then you glue them together, they become all as one

Page 643

1    unit.
2    Q.   Do you have an opinion as to whether or not those layers
3    were folded while they were still in Ms. Bellew's body?
4    A.   Yes.  Because as you can see, scar tissue fills
5    completely the entire structure.  This can happen only in the
6    body while tissue can ingrow in all the spaces.
7    Q.   Are you familiar with the term "fibrotic bridging"?
8    A.   Yes.
9    Q.   What does the term "fibrotic bridging" mean to you?
10   A.   Fibrotic bridging is when scar tissue -- scar tissue is
11   fibrous tissue -- bridges between filaments, and you can see
12   the entire piece is fully encased in scar.  This entire
13   specimen is bridging.
14   Q.   Are you familiar with the term "scar plates" and "scar
15   encapsulation"?
16   A.   Yes.  Scar encapsulation is when something encapsulates
17   the object, foreign object.  In this case, you see scar
18   tissues inside the foreign object and outside, encapsulating.
19   And this complex of mesh as a rebar inside the scar is scar
20   plated.  This entire structure is scar plated.
21   Q.   Are you familiar with the term "mesh contraction"?
22   A.   Yes.
23   Q.   Is there -- do you see mesh contraction in plaintiff's
24   1910-Z?
25   A.   So, as we heard this morning, the filaments themselves do

Page 644

1    not contract.  What contracts is when the scar tissue grows
2    in, it tends to contract.  Our body developed this mechanism
3    to minimize the damage.
4        You've probably seen in burn victims when there is
5    scarring and then it contracts the joint, it cannot move.  The
6    scar tries to pull together, become smaller.
7        The same thing happens here.  When the scar tissue
8    grows in, it contracts.  This is physiological.  This happens
9    to any scar tissue, contracts and pulls everything together.
10   And you can see that there is this wrinkling which occurred in
11   the body because it's completely fused by the scar tissue.
12   Q.   Do you have an opinion to a reasonable degree of medical
13   certainty as to what part of Ms. Bellew's body this explanted
14   piece came from?  Do you have an opinion?
15   A.   Yes.
16   Q.   And what is that opinion?
17   A.   My opinion is that it came from the anterior vaginal
18   wall, from between the vagina and the bladder, and from this
19   corner, I can see neuroganglia and nerves.
20   Q.   Okay.  Let's talk about that term real quickly because
21   it's important.  What is neuroganglia?
22   A.   Neuroganglia are part of involuntary nerve system which
23   controls blood.  We know that all nerves come from the outside
24   into the midline.  So they come towards the midline, towards
25   the vagina and the bladder.  So I know that this part is

Page 645

1  further to the outside, towards the arm of the device, the
2  Prolift device, and this part would be closer to the
3  midportion, where you have enough mesh to fold into this
4  folded structure.
5  Q.  Is there anything else significant about the orientation
6  of the fibers on plaintiff's Exhibit 1910-Z?  Near the
7  neuroganglia, is there anything significant about the top
8  portion where you were just referring to?
9  A.  So, when you have a large device, large sheet, it folds.
10  But when you have just an inch, it curls.  So this curling, if
11  it is a narrow arm of tape, occurs on both sides.  So this
12  curling on both sides is like a rolling or roping.  This
13  called roping because it forms this round structure.
14  Q.  And do you see that depicted in 1910-Z?
15  A.  (Indicating.)
16  Q.  Indicating to the top of the board?
17  A.  Yes.
18  Q.  Just for the record.
19  A.  Yes, in this part.  This is an edge which is curled.  So
20  this part would be called roping.  So the edge is roped like
21  this.  (Indicating.)
22  Q.  In your opinion, Doctor, what degree of scarring is shown
23  in the explanted tissue in 1910-Z?
24  A.  As I said, this is all scar tissue.  This is as hard as
25  it gets.  I mean, there is no non-scar tissue in this

Page 646

1  specimen.
2  Q.  And that's the next question.  Is there any healthy
3  tissue that you can see in plaintiff's 1910-Z in and around
4  the fibers of that explant?
5  A.  Not around the fibers.  There is a little corner here,
6  transition, but the mesh was excised right at the scar.
7  Q.  Okay.  Now, anything else significant about those before
8  we move on to the next board?
9  A.  No.
10  Q.  Okay.  Let's look at 1910-NN and MM.
11        First of all, Dr. Iakovlev, let's explain what the jury
12  is seeing on their left in plaintiff's 1910-NN.
13  A.  This is a high magnification of the same section you saw
14  before.  I've zoomed in and took high magnification photograph
15  of the mesh filaments and surrounding tissue.
16  Q.  Why did you do that?
17  A.  To show the changes close up and to help you to identify
18  where the mesh filaments are, because they're clearer.  I
19  filled them with yellow color on this.  This is exactly the
20  same image but just a copy with yellow color representing mesh
21  filaments.
22  Q.  And you have on there foreign body and lymphoplasmacytic
23  chronic inflammation.  Let's just go with chronic inflammation
24  in the foreign body part.  Why do you have those on the board
25  to the right, 1910-MM?

Page 647

1  A.  As I mentioned before, any foreign body placed in the
2  body or which occurs in the body is recognized by the immune
3  system by the body as foreign.  So the body sends white blood
4  cells or macrophages to fight with it, to destroy it.  So the
5  foreign body reaction is an immune response and the body sends
6  fighter cells to express all those chemicals, reactive
7  chemicals, to destroy either bacteria or foreign body.
8  Q.  Now, what is the relationship between a foreign body
9  reaction and foreign body inflammation?
10  A.  It's the same, inflammation, reaction is the same.
11  Q.  And, again, in these photomicrographs, do you see any
12  evidence of the chronic foreign body reaction as well as
13  chronic inflammation?
14  A.  Yes.  Sometimes these terms are used interchangeably.
15  Chronic foreign body reaction includes macrophages which are
16  large cells.  They look kind of purple.  Also, when they come
17  to the object and they feel that they cannot destroy it as one
18  by one, they try to merge together and form a large
19  multinucleated cell, so because the large cells can absorb
20  larger objects and you can see it here.  This is a
21  multinucleated giant cell.  This is multinucleated giant cell.
22  This is multinucleated cell.  There are multiple nuclei.  This
23  is the same macrophage but it's like a battalion of them
24  joined together in an effort to destroy the foreign body.
25  Q.  Is the inflammation that we see in 1910-NM [sic], is any

Page 648

1  of that inflammation transient or temporary?
2  A.  Absolutely not.  The foreign body reaction will stay in
3  the body as long as foreign body stays in the body, until the
4  foreign body is either destroyed or removed.
5  Q.  Do you have an opinion to a reasonable degree of medical
6  certainty, based upon your knowledge, training and experience,
7  all the medical records you reviewed in this case, the
8  specimens you reviewed, and the specimens that you reviewed as
9  a pathologist at St. Michael's, as to whether or not
10  Ms. Bellew's Prolift mesh caused the chronic foreign body
11  reaction and chronic inflammation that we see in plaintiff's
12  Exhibit 1910-NM -- NN?
13  A.  Yes.
14  Q.  And what is that opinion?
15  A.  My opinion is that the mesh placed in Ms. Bellew's body
16  caused this foreign body reaction.
17  Q.  Did it cause a chronic inflammation?
18  A.  Yes, it caused chronic inflammation.
19  Q.  Did you rule out other causes of the chronic
20  inflammation, the chronic foreign body reaction, and any other
21  condition that could cause -- well, first of all, let me go
22  back a minute.
23        What is the structure on the top right?
24  A.  This is a nerve.
25  Q.  Okay.

1    A.  So this nerve goes around the filament, and you can see
2    it's pinched here between the scar tissue and mesh filament.
3    Also, seeing a nerve in the tissue means that the tissue can
4    sense pain because without the nerves, it would feel nothing.
5    Q.  You've heard the term "pinched nerve" in medicine.  Is
6    that what we have in 1910-NN?
7    A.  You can see the shape of the nerve, how it is all
8    squished here.
9    Q.  What's the result to a patient of a pinched nerve in the
10   tissue surrounded by scar tissue?
11   A.  It would cause pain.
12   Q.  Do you have an opinion to a reasonable degree of medical
13   certainty as to whether this nerve that is pinched in
14   plaintiff's 1910-NN caused pain in Ms. Bellew?
15   A.  Yes.
16   Q.  And what is that opinion?
17   A.  My opinion is that this deformation is likely to cause
18   pain.
19   Q.  As part of your coming to your expert conclusions, did
20   you rule out any other causes of the chronic foreign body
21   reaction, the chronic inflammation, or the pinched nerve as we
22   are seeing in these photos?
23   A.  Yes.
24   Q.  What did you do to rule out other causes?
25   A.  Well, when I examined the specimen, I considered all

1    possibilities --
2    Q.  Talk a little bit slower if you could, please.
3    A.  I considered all possibilities.  Is there a natural
4    condition which could cause all these changes, is there
5    another foreign body which could cause all these changes, and
6    I did not see anything.  I saw just Prolift mesh and tissue
7    reaction to it.
8    Q.  Did you rule out any other disease conditions?
9    A.  Yes.  I didn't see, as I mentioned, vasculitis, cancer,
10   or any other systemic conditions.
11   Q.  Okay.  Now, anything else before we leave these?
12   A.  Well, since we were talking about nerves, I wanted to
13   approach how we could sense pain.  There are two ways of
14   sensing pain.
15   Q.  Okay.  What are those?
16   A.  Either we have pinched nerve, nerve itself, or we feel
17   pain through receptors, the receptors are irritated.  We have
18   pain receptors but we also have other receptors like
19   temperature or vibration.  Pain receptors, they send signals
20   of pain only.  Other receptors, they can send different
21   signals.  Like for temperature, when we feel warm, we feel
22   warm, but when there is too much heat, we feel it as pain, as
23   burning pain.  So if the receptors are very much irritated, we
24   can feel it as pain.
25        Now, in the inflamed area, the receptor sensitivity

1    goes up, they become sensitive.  It's like a pimple or like an
2    inflamed area.  It may not hurt if we don't touch it or move
3    it, but the receptors are sensitized already.  Once we touch
4    it or move it, we feel pain.  And if there is a lot of
5    inflammation, we can feel pain at rest, it hurts.  An inflamed
6    knee can hurt or inflamed wound can hurt.
7    Q.  Do you have an opinion, Doctor, as to whether or not the
8    inflamed area around -- first of all, did you see these
9    inflamed areas in other pathological specimens that you looked
10   at from Ms. Bellew?
11   A.  This inflammation was surrounding all filaments.  The
12   entire mesh area was an inflamed area.  So it wasn't just this
13   small area.  You can imagine the device, and the entire device
14   is inflamed.  It's a large area of inflammation.
15   Q.  Okay.  Do you have any other slides with you regarding
16   nerve damage or nerve entrapment for Ms. Bellew?
17   A.  Yes.
18   Q.  Okay.  I think those are 1910-BBB and 1910-AAA.
19        You talked to the jury a little earlier about the
20   different types of staining.  I think you said the first one
21   was H&E; is that correct?
22   A.  Yes.
23   Q.  And what is the staining that they see here?
24   A.  This is the brown stain, and I ordered my lab to do S100
25   stain.  S100 stain stains nerves.  I could see and show nerves

1    easier with this stain.
2    Q.  Okay.  Let's look at the BBB there, 1910-BBB, and explain
3    what you're talking about to the jury.
4    A.  So, as before, the clear spaces are spaces of the
5    filaments of the Prolift device, removed from Ms. Bellew's
6    body.  In this image, it's the same image, a copy.  The empty
7    spaces of polypropylene filaments are filled yellow and the
8    brown color shows nerves in the tissue.
9    Q.  What is the significance of findings of the nerves in
10   this as it relates to any clinical pathological correlation
11   with Ms. Bellew's pain symptoms?
12   A.  Well, first of all, just by orientation.
13   Q.  By orientation, did you say?
14   A.  Orientation.
15   Q.  Okay.
16   A.  And then the nerves, I can identify that this part of the
17   nerve was further away from the midline, from the center.
18   Because, as I explained before, the nerves are coming from
19   outside into inside, so they come out like this and then they
20   go and innervate the vagina and the bladder.  So this piece of
21   mesh was oriented like this, in more lateral or further
22   outside position.  This part was consistent with arm of the
23   Prolift device.  And you can see that there are a number of
24   nerves in this arm of the Prolift device.  Some of them are
25   straight.

Page 653

1    Q.  Is that a normal appearance, as long as they're straight?
2    A.  Yes, this would be normal appearance.  And some of them
3    are bent, and some of them are severely distorted by the
4    Prolift mesh filaments.
5    Q.  Explain what you mean by that.
6    A.  It would be easier if I showed the blowup and
7    magnification of this area.
8    Q.  Okay.  Is that 1910-ZZ?  Yes.
9    A.  Yes.  1910-ZZ and --
10   Q.  1910-L?
11   A.  L.
12   Q.  Okay.
13   A.  So 1910-ZZ is magnification of an area.  1910-BBB,
14   high-powered view.
15   Q.  Explain what the jury is seeing there.
16   A.  This end of the nerve, the nerve fibers are oriented
17   here, and now we can see that the nerve fibers are indicated
18   here as perpendicular.
19   Q.  Is that the area that looks like a fist?
20   A.  Yes.
21   Q.  Okay.  Explain what that is, please.
22   A.  The mesh -- the nerve is distorted by the mesh and it
23   forms this bulbous enlargement and changed the course
24   orientation, and then further down, this nerve is more
25   severely distorted, and the fascicles, the particles inside of

Page 654

1    the nerve, are being separated in the scar tissue.
2    Q.  What is the significance to a patient when the fascicles
3    of the nerve have been separated like they are here around the
4    mesh fiber?
5    A.  This is a pathological process which forms traumatic
6    neuroma.
7    Q.  What is traumatic neuroma?
8    A.  Traumatic neuromas form when the nerve is distorted or
9    when it continues to grow in the scar tissue and it hits an
10   obstacle, it cannot grow further, and what happens when it
11   hits the obstacle, the fascicles separate, and then they kink
12   together and then it forms this bulbous enlargement like a
13   pseudotumor.
14   Q.  In your opinion, what was the clinical impact on patient
15   safety to Ms. Bellew with regard to these distorted nerves and
16   the separated fascicles that we see in 1910-ZZ?
17   A.  It's well established that traumatic neuromas are
18   severely painful lesions.  And it wasn't just one.  I found
19   several traumatic neuromas in the specimens I removed from
20   Ms. Bellew.
21   This is another one, and you can see it has even more
22   severe inflammation, separation of the fascicles, and the
23   fascicles are all in scar tissue, and this is the larger side
24   of the nerve which is distorted and forms traumatic neuroma.
25   Q.  And, again, do you have an opinion as to whether or not

Page 655

1    all of these specimens that you looked at that we saw grossly
2    on the screen and that now we're looking at microscopically
3    were removed during that July, 2012, explant in an area where
4    Ms. Bellew had complained of pain?  Do you have an opinion on
5    that?
6    A.  Yes.
7    Q.  And what is it?
8    A.  It corresponds --
9    Q.  Sorry.
10   A.  Yes.  It corresponds to the location of the pain, the
11   description of the scarred firm mesh, and I concur with the
12   clinical symptoms, with the morphological findings.
13   Q.  You said morphological?  Explain what morphological
14   findings are, please.
15   A.  Morphology is the science of anatomy and histology, is
16   what it is, using microscope and gross appearance.
17   Q.  Okay.  Go ahead.
18   A.  And I found multiple deformations of the nerves, forming
19   traumatic neuromas, excising all the particles of the specimen
20   and I can measure that.  There can be more of these lesions in
21   the remaining mesh.
22   Q.  Okay.  Now, if we could, let's look at plaintiff's
23   Exhibit 1910-KKK and 1910-CC.
24   And, first of all, let's explain to the jury, after you
25   get that one up there, what they're seeing in 1910-KKK.

Page 656

1    A.  This image, it's the same brown type of staining, but I
2    ordered my lab to do smooth muscle stain.  It stains smooth
3    muscle of bladder wall, the muscle which contracts during
4    urination.
5    And in this image I filled polypropylene filaments with
6    yellow color so you can orient.  All this tissue is scar
7    tissue.
8    Q.  Is that the light brown area in between the yellow that
9    you're referring to?
10   A.  Yes.  There is some areas which are brown.  It's blood
11   vessels in the scar tissue because they also have smooth
12   muscle inside the vascular wall.
13   Q.  So if this was an H&E staining, this hematoxylin and
14   eosin, what would the light brown color stain, what color
15   would it stain?
16   A.  This would be all pink.  The entire area would be pink.
17   Q.  Okay.  Now, you have these thick bundles of smooth
18   muscle.  Explain to the jury what you're referring to there
19   and how it relates to the mesh.
20   A.  So to see smooth muscle, I ordered smooth muscle stain,
21   and you can see sharp distinction.  This part was scar, and
22   this part was smooth muscle of the bladder.
23   Q.  Explain to the jury the -- what smooth muscle is in terms
24   of our body.
25   A.  Smooth muscle is muscle inside our organs like bowel,

1   contract bowel, like bladder, when it contracts, we urinate,
2   so this is muscle of the bladder.
3   Q.  So you're pointing to 1910-KKK.  Do you have an opinion
4   as to whether or not this specimen shows Ms. Bellew's mesh up
5   against the detrusor muscle or the smooth muscle of her
6   bladder?
7   A.  Yes.
8   Q.  Do you have an opinion as to whether or not in 1910-KKK,
9   it represents pathological findings that would be consistent
10  with any urinary symptoms?
11  A.  Yes.
12  Q.  And what is that opinion?
13  A.  My opinion is that the scar tissue and the mesh were
14  interfering with the smooth muscle of the bladder.
15  Q.  And what are we seeing in 1910-CC?
16  A.  This is H&E stain, hematoxylin and eosin, as before.
17  This is a blow-up picture of that corner of the -- of the
18  Exhibit Z.  This is this area, enlargement.  As I mentioned
19  before, it contains neuroganglion.  Ganglia is like a center
20  where nerves of the involuntary nervous system connect.  This
21  is the ganglia.  So if I see the ganglia, I know that the
22  nerves, which are connecting to it, are going into the
23  bladder.  So if we look between the vagina and the bladder,
24  some nerves go into the vagina and they innervate the vagina.
25  Q.  What do you mean by innervate?  What does that term mean?

1   A.  They shoot their endings into the vagina so the vagina
2   can feel and the muscle of the vagina can contract.
3   Q.  Okay.  Go ahead, please.
4   A.  And then other nerves which are connecting through the
5   neuroganglia, they go into the bladder, and we feel urge to
6   urinate through work of these ganglia and nerves, and we also
7   urinate, the bladder contracts, through work of these ganglia
8   and nerves.
9   Q.  Anything else significant about these that you wanted to
10  share with the jury?
11  A.  You can see that these nerves are also deformed.  There
12  are four.  The mesh was interfering with bladder innervation.
13  It was interfering with the nerves which were going into the
14  bladder.
15  Q.  In addition to causing urinary problems for the patient,
16  would -- to your opinion, would the scar tissue that we see in
17  CC surrounding the nerve have any implications for
18  Ms. Bellew's condition?
19  A.  Yes.  Because, as we mentioned before, scar tissue adds
20  stiffness and hardness of the folded mesh.
21      The second significance is that scar tissue entraps
22  nerves and pinches them.  So the nerves here are entrapped and
23  pinched between scar tissue and the mesh filaments.
24  Q.  Can that cause chronic pelvic pain in patients?
25  A.  Yes.

1   Q.  Do you have an opinion as to whether or not the
2   entrapment of the nerves that you've seen and the pathological
3   symptoms here were caused by the Prolift mesh?
4   A.  Yes.
5   Q.  Do you have an opinion as to whether or not the Prolift
6   mesh caused chronic pain for Ms. Bellew?
7   A.  Yes.
8   Q.  And what is that opinion?
9   A.  My opinion is that mesh -- Prolift mesh device and tissue
10  reaction to it caused pain for Ms. Bellew.
11  Q.  Do you have an opinion as to whether or not the Prolift
12  mesh caused chronic dyspareunia or sexual problems and sexual
13  pain for Ms. Bellew?
14  A.  Yes, I have opinion.  This pain --
15  Q.  Go ahead.  What's that opinion?
16  A.  This pain symptoms, dyspareunia, has the same basis,
17  because it's the same pain, with external mechanical stimuli,
18  so the mesh and tissue reaction to mesh caused dyspareunia for
19  Ms. Bellew.
20  Q.  And do you have an opinion to a reasonable degree of
21  medical certainty as to whether or not the pathological
22  analysis you've done have shown that Ms. Bellew's urinary
23  symptoms are due -- urinary problems are due to Prolift?
24  A.  My pathological findings show that there was interference
25  with urinary function.

1   Q.  And as to the specific problems that this scar tissue
2   would have caused to her urinary symptoms, do you have an
3   opinion on that or would you defer to a urologist?
4   A.  Specifically what was the urinary symptoms?  I would have
5   to defer to urologist.
6   Q.  Okay.  Ready to take those down?
7       Okay.  Doctor, handing you what has been marked as
8   plaintiff's Exhibits P-1910-G and P-1910-M.  Please explain to
9   the jury what we're seeing in these two images.
10  A.  These are very high magnification images of polypropylene
11  filaments.  When the filaments are cut like salami, we look at
12  them from the cut surface.  If you imagine salami and then
13  it's cut, so this is the filament, very high magnification,
14  about a thousand times magnification.  As I mentioned before,
15  polypropylene is like fishing line, it's clear, so in the
16  microscope, it appears clear, we do not see it.  And the
17  tissue around it --
18  Q.  What are we seeing, the pink and the purple there in the
19  tissue around the polypropylene fiber?
20  A.  This is chronic foreign-body-type inflammation
21  surrounding the filament.
22  Q.  And what is this -- out where you have a line going to
23  the degradation bark, explain what you're trying to show the
24  jury there, please.
25  A.  If you allow me to --

Page 661

1    Q.  Sure.
2    A.  -- take another exhibit.
3    Q.  Sure.
4    A.  I brought this slice of wood which was cut with a chain
5    saw just to explain some things.
6        So the mesh filament is like a tree trunk.  And when we
7    section it, now we're looking at the section like this.  So
8    the core of the wood is homogenous, solid like the core of the
9    filament, but then there is a bark tree [sic] around the tree
10   trunk.
11   Q.  What is the significance of that cracked outer layer that
12   we're seeing in 1910-G?
13   A.  This is the bark layer or outer layer of the degraded
14   polypropylene.  It's the same wood but because it was exposed
15   to the outside environment, it's all cracked.  It has all
16   these crevices, cracks, and cavities.  The same thing happens
17   with the polypropylene.  When it's exposed to the body
18   environment, it cracks and forms these cavities, and the
19   histological dye, it gets trapped in it so it sticks in
20   between.  It's like clothing.  The dye gets in between the
21   fibers in the clothing and that's why it stains.  The
22   non-degraded polypropylene is solid, so it cannot be stained.
23   Q.  What is the significance to the patient in terms of the
24   tissue reaction in and around the degraded bark as we're
25   seeing in 1910-G?

Page 662

1    A.  So, the tissue reaction, as we discussed before, is
2    designed to destroy foreign bodies.  So all these macrophages,
3    they produce chemicals to oxidize, to destroy foreign body.
4    That's what happens.  Polypropylene oxidizes and degrades in
5    the body.  Then --
6    Q.  What is the impact to the patient as a result of this
7    degrading of the polypropylene in the body?
8    A.  As you can see, the bark peeled off here, it cracked
9    here, while the central core didn't crack.  So the outer --
10   the outer bark became brittle, hardened.  We know that if the
11   material is flexible, it would flex.  If the material is
12   harder, it will crack.  You just bend it more, it will crack.
13   And without bending, when it dries up inside, when there is
14   force inside, it pulls it and it cracks.  It's like dry lips
15   or something which is drying and it cracks.  It -- it has
16   cracks on the surface.  So this is continuous tube-like
17   sheaths around all filaments in the mesh.  And this is a tube
18   which is hardened, and the entire mesh becomes stiffer and
19   harder.
20   Q.  Do you have an opinion as to whether or not the Prolift
21   mesh that was implanted in Ms. Dianne Bellew degraded?
22   A.  Yes.
23   Q.  And what is that opinion?
24   A.  My opinion is that the polypropylene of the Prolift
25   device degraded while in the body of Ms. Bellew.

Page 663

1    Q.  Do you have an opinion as to whether or not the degraded
2    polypropylene in Ms. Bellew caused an increased inflammatory
3    response?
4    A.  Yes.
5    Q.  What is that opinion?
6    A.  We all know that if a material doesn't degrade, like
7    high-quality stainless steel hips, there is no degradation,
8    and then the inflammatory reaction goes away.  No degradation,
9    no reaction.  When there is degradation, it's like a feeding
10   frenzy.  There are pieces which go into the tissue and they
11   feed this inflammatory reaction.  It's like birds, when you
12   feed them, more and more come.
13   Q.  What is the jury seeing in 1910-M that you put up here?
14   A.  This is the polarization technique.  This is exactly the
15   same filament.
16   Q.  Did you say polarization?
17   A.  Polarization.
18   Q.  Is that those lenses you were talking about when you go
19   fishing?
20   A.  Yes.
21   Q.  Okay.  Tell us about that.
22   A.  So, to take this photograph, I turned polarizing filter
23   and the light was blocked.  This light of this area is dark.
24   Because tissue doesn't polarize much of the light, it doesn't
25   change orientation.  If it's blocked, it's blocked.  However,

Page 664

1    polypropylene changes orientation.
2    Q.  Changes the orientation of the light?
3    A.  Of the light.
4    Q.  Okay.
5    A.  It's called polarization.  So the light goes through the
6    filter, hits polypropylene, changes orientation, and then
7    processes through the second filter.
8    Q.  So fiberoptic technology, is that where light is passing
9    through something like polypropylene?
10   A.  Yes.
11   Q.  Is it the same idea?
12   A.  Yes.
13   Q.  Okay.  Doctor, what did you do to rule out whether or not
14   there was something else that may have caused the cracking
15   around the degraded core?  Let me ask it a little bit
16   differently.
17       Did you do anything to rule out whether or not this
18   cracking, cracked outer layer, was something other than
19   polypropylene associated with the fiber?
20   A.  Yes.
21   Q.  Okay.  What did you do to rule out that it was something
22   else other than polypropylene that we're seeing here?
23   A.  First of all, I used polarization because this is
24   standard technique, we use polarization --
25   Q.  When you say "we," are you talking about pathologists use

Page 665

1  it?
2  A.  Pathologists.
3  Q.  Okay.  Go ahead.
4  A.  If it lights up, it's foreign body or crystals.
5      As you can see here, all tissue around is dark.  There
6  is very little light going through collagen.  Collagen is the
7  strongest polarizing protein in the body.  When the entire
8  tissue is fixed in formalin, it's cross-linked in formalin,
9  and this is as bright as it gets for all human proteins fixed
10 in formalin.  And you can see the difference between
11 polypropylene and the strongest polarizing protein fixed in
12 formalin.
13 Q.  Do you have an opinion as to whether or not the
14 degraded -- what you have depicted as degraded polypropylene,
15 this cracked outer layer, is biologic material like protein or
16 polypropylene?
17 A.  Yes, I do.
18 Q.  What is that opinion?
19 A.  It is not biologic polypropylene -- it's not biologic
20 material.  It is synthetic polypropylene.
21 Q.  Did you do anything to rule out whether or not the
22 formalin that Ms. Bellew's explant samples came in had
23 anything at all to do with the degradation bark in the cracked
24 outer layer?
25 A.  Yes, I did.

Page 666

1  Q.  What did you do?
2  A.  I took new slices, I put them in formalin, kept them in
3  formalin for up to four months, and then loaded them in the
4  same machine, with the same samples, St. Michael's Hospital, I
5  went through all those chemicals, and then through the same
6  staining, and I did not see degradation of polypropylene after
7  four months of fixation in formalin, and the same process and
8  chemicals and temperature changes.
9  Q.  Did you use operating procedures that are standard in
10 your industry to conduct this formalin testing on pristine
11 mesh that had never been implanted in a body?
12 A.  Yes, they were loaded exactly with the same specimens.
13 Q.  And are those standard operating procedures used at your
14 hospital at St. Michael's and the University of Toronto?
15 A.  Yes.
16 Q.  Now, what else do you have there?  Do you have another
17 slide or two and then we can finish up here?
18     This is 1910-P.  Please tell the jury what we're seeing
19 in 1910-P.
20 A.  As you remember, those blue threads I showed on gross
21 photograph, and also on histological images, these blue
22 threads are manufactured with additional blue dye.  When we go
23 to really high magnification, this blue -- this blue dye looks
24 like blue granules.
25 Q.  And that's the blue fibers that we see running through --

Page 667

1  the jury has seen the Prolift mesh.  Those would be those blue
2  fibers?
3  A.  Yes.
4  Q.  Okay.
5  A.  So this is cross-section of clear filament.  And this is
6  cross-section of blue filament.  So since the granules were
7  embedded during manufacturing in polypropylene, they are like
8  internal markers of polypropylene.  You can see granules here
9  in the filament.  You can see granules --
10 Q.  Why is that significant to your opinions with regard to
11 degradation and the outer layer being polypropylene?
12 A.  It is significant because this is internal marker.  If I
13 see blue granules, it means it's polypropylene which was
14 manufactured, even before it was implanted in the body.  I did
15 not see blue granules beyond the surface.  They were in the
16 non-degraded core of the filaments, they were present in the
17 degraded bark, they were mainly present deeper inside, and
18 then they degrade towards the surface, and they were not
19 present in the tissue.
20 Q.  Okay.  All right.  Before we -- before we sit down,
21 plaintiff's Exhibit 1910-CC, is that -- where you put some
22 arrows and yellow spots, just for the record purposes, is that
23 the same image that is in plaintiff's Exhibit 1910-EE?
24 A.  Yes.
25 Q.  Okay.  Thank you.

Page 668

1      Now, I think you can resume the stand now, Doctor.
2  Anything more about this image?
3  A.  No.
4  Q.  Okay.  I see you brought your microscope with you.
5      THE COURT:  Wait just a second.
6      MR. ANDERSON:  Yes, sir.  I'm sorry.
7      THE COURT:  Go ahead, Mr. Anderson.
8      MR. ANDERSON:  Sorry.  Thank you, Judge.
9  BY MR. ANDERSON:
10 Q.  I see you brought your microscope with you today.  You
11 had been talking about this polarized light microscopy.  Are
12 you prepared to at least show the jury one example of that on
13 one slide before we are through here today?
14 A.  (Nods head.)
15 Q.  Okay.  Did you bring something with you to show them?
16 A.  Yes, I brought those slides.
17 Q.  Okay.  May I approach, Your Honor?
18     THE COURT:  You may.
19     MR. ANDERSON:  Thank you.
20 BY MR. ANDERSON:
21 Q.  What is the jury seeing -- I will let you get oriented.
22 Let me know when you're ready.
23 A.  So, this is the same slide I showed you before, the slide
24 I took pictures of for the boards.  And now I put live slide
25 in the microscope and I am projecting image from this camera.

Page 669

1    Q.  Okay.  And so you were saying that you wanted to use
2    light microscopy.  Are those the lenses that you have in your
3    hand?
4    A.  Yes.  This is one lens.
5    Q.  Okay.
6    A.  And one lens is in between the camera and the object
7    here.
8    Q.  Please demonstrate what the significance would be of
9    using the polarized images for -- in order to identify foreign
10   material.
11   A.  So I'm going to place this filter in the microscope, and
12   you can see that all tissue goes dark.  Polypropylene --
13   Q.  What are the light spots that we're seeing?
14   A.  This is polypropylene.
15   Q.  So is that light being projected down through the image
16   and bending through the polypropylene?
17   A.  Yes.
18   Q.  And what's all the black area?
19   A.  This is all tissue, human tissue, fixed in formalin.
20   Q.  Why is that significant to your opinions in this case, if
21   at all?
22   A.  That's how I identify what is polypropylene and what is
23   human tissue.
24   Q.  Okay.  You can shut that down.
25       Now, Doctor, with my help, did we prepare a slide today

Page 670

1    regarding your clinicopathological findings as they relate to
2    your opinions related to Ms. Bellew?
3    A.  Yes.
4        THE COURT:  All right.  You may proceed.
5        MR. ANDERSON:  Thank you.
6    BY MR. ANDERSON:
7    Q.  So, I want to go through these clinicopathological
8    findings real quickly if I could, Doctor.
9        You see there mesh folding and roping, scar
10   encapsulation, scar plate, fibrotic bridging, mesh
11   contraction, chronic foreign body inflammation, nerve
12   entrapment and deformation, traumatic neuroma, and degradation
13   of polypropylene fibers.
14       Do you have an opinion to a reasonable degree of
15   medical certainty based upon your knowledge, training and
16   experience, your work as a pathologist for 15 years, your work
17   on this case reviewing the medical records of Dianne Bellew,
18   your work reviewing the explanted specimens from Dianne
19   Bellew, as to whether or not all of these clinicopathological
20   findings occurred in Ms. Bellew?
21   A.  Yes.
22   Q.  What's that opinion?
23   A.  My opinion is that all these morphological changes were
24   related to mesh placement in the body and body reaction to it.
25   And these changes caused these clinical symptoms.

Page 671

1    Q.  Can you list those clinical symptoms, please?
2    A.  Chronic pelvic pain, chronic painful sexual intercourse
3    which is dyspareunia, and change of urinary symptoms.
4    Q.  Okay.
5        MR. ANDERSON:  That's all I have for the direct, Your
6    Honor.
7        THE COURT:  All right.  That makes a good time for us
8    to take a morning break before cross-examination.
9        Ladies and gentlemen, during the break, do not
10   discuss the case among yourselves or permit anyone to discuss
11   it with you.  Don't use any social or digital media for any
12   purpose about this case.  I'll call you back in 15 minutes.
13       The witness may step down.  Please don't talk to
14   anybody during the break.  All right.
15       THE OFFICER:  All rise.
16       (The Jury left the courtroom at 10:34 a.m.)
17       (A recess was taken at 10:34 a.m.)
18       (The jury entered the courtroom at 10:52 a.m.)
19       THE COURT:  You may, ladies and gentlemen.
20       If the witness would retake the stand,
21   cross-examination is now in order.
22       MR. THOMAS:  Thank you, Your Honor.
23   (CROSS EXAMINATION OF VLADIMIR IAKOVLEV BY MR. THOMAS:)
24   Q.  Hello, Doctor.
25   A.  Hi.

Page 672

1    Q.  As a part of your work in this case you've not examined
2    Mrs. Bellew; correct?
3    A.  Yes, that's correct.
4    Q.  And you've not talked to Ms. Bellew about the case?
5    A.  That's correct.
6    Q.  And you've not talked to any of her treating physicians;
7    correct?
8    A.  That is correct.
9    Q.  And not reviewed any of their depositions.  Am I right?
10   A.  That's correct.
11   Q.  And you have no opinion in this case about whether the
12   surgeon placed the Prolift properly at the time of the July,
13   2009, implant; correct?
14   A.  I don't have an opinion.
15   Q.  You know the implant date was July 9, 2009?
16   A.  Yes.
17   Q.  And you know that the explant date of the mesh that you
18   analyzed was July 12, 2012?
19   A.  That's correct.
20   Q.  So, the mesh that you looked at was in Ms. Bellew for
21   about three years; correct?
22   A.  That's correct.
23   Q.  And at the time of the explant surgery, the surgeons sent
24   the explants that you reviewed to the hospital pathology
25   department, didn't they?

Page 673

1    A.  That's correct.
2         MR. THOMAS:  Your Honor, may I approach?
3         THE COURT:  You may.
4    BY MR. THOMAS:
5    Q.  Doctor, I've handed you what's been marked as
6    Defendant's Exhibit 10041.  And you recognize this as
7    the surgical pathology report for Northwest Medical
8    Center which is the pathology department that received
9    Ms. Bellew's mesh following her surgery?
10   A.  That's correct.
11   Q.  And the pathologists at the Northwest Medical Center did
12   not conduct the same kind of analysis that you did, did they?
13   A.  You're correct.  They received, documented, and sent the
14   specimen to Steelgate.
15   Q.  At least at that time, the pathologist didn't think it
16   necessary to make slides and analyze them for the purposes
17   that you did.  Fair?
18   A.  I don't know.
19   Q.  But you haven't seen any pathology report analyzing
20   Ms. Bellew's slides beyond what you've done, have you?
21   A.  Could you repeat the question?
22   Q.  Sure.  Have you seen a report from the pathologist at the
23   Northwest Medical Center analyzing this mesh in the same
24   manner that you did?
25   A.  As I stated, this is the report and they received,

Page 674

1    documented, and sent it to Steelgate.  They didn't perform
2    analysis.
3    Q.  Thank you.  Now, when the surgeon removed the mesh in
4    July, 2012, it was placed in formalin; correct?
5    A.  That's correct.
6    Q.  And when the surgeon removed the mesh during this
7    procedure, he used heat to remove the mesh?
8    A.  By the examining of the specimen, it was not enough
9    cautery artifact there.  If it was used, it was used really
10   gently because the beauty of the microscopy is I can see the
11   changes which can be caused by heat or by fixation.  So, for
12   that specific specimen I did not see extensive cautery
13   artifact.
14   Q.  Did you see any evidence of heat?
15   A.  Not to a degree which would prevent me from analysis.
16   Q.  Okay.  Now, after the removal of this mesh explant,
17   you've already testified it was -- you had seven pieces and
18   you showed the jury a picture of that.  Correct?
19   A.  This is not correct.  I had four pieces.
20   Q.  I'm sorry.  But you know that there were seven pieces
21   from the explant?
22   A.  It's not on the boards.
23   Q.  Oh, I'm sorry.  No wonder I can't find it.
24   A.  Are you looking for this photograph?
25   Q.  Thank you.  Have you -- you know there were seven pieces

Page 675

1    removed?
2    A.  Yes, I do.
3    Q.  And you know three of those pieces were sent to an
4    analytical chemist to analyze?
5    A.  I don't know that.
6    Q.  You don't know that.  Okay.  You're not an analytical
7    chemist, are you?
8    A.  No.
9    Q.  And you know that analytical chemists have tools
10   available to them to analyze chemically what's in that mesh,
11   don't you?
12   A.  That's what analytical chemists do.
13   Q.  But you've not done that in your work in this case as any
14   analytical chemistry to determine what is chemically present
15   in the mesh.  True?
16   A.  This is not completely true.  I did my histological
17   analysis using my histological tools to analyze what is
18   chemical composition.
19   Q.  All right.  So, to the extent that you used the dyes as
20   you talked about on your direct examination, that's chemistry
21   as far as you're concerned?
22   A.  Yes.
23   Q.  All right.
24   A.  Dye is a chemical.
25   Q.  Is that the extent of the chemistry that you did?

Page 676

1    A.  Both polarizing light and dyes.  These are histological
2    tools.
3    Q.  Okay.  You received the four samples that you just showed
4    the jury.  You talked about on direct examination this
5    formalin solution.  Correct?
6    A.  That's correct.
7    Q.  And the tissue samples before they were placed in
8    formalin were covered in tissue; correct?  The mesh had tissue
9    on it.
10   A.  Well, the pieces came as mesh with tissue together.
11   Q.  Right.  And do you understand that that's the explant as
12   removed from Ms. Bellew?
13   A.  Yes.
14   Q.  And that's mesh with tissue on it; correct?
15   A.  That's correct.
16   Q.  And then it was placed in the formalin; correct?
17   A.  That's correct.
18   Q.  And you understand that formalin and tissue cross-links;
19   correct?
20   A.  Repeat, please.
21   Q.  You understand that formalin solution cross-links with
22   proteins that are in the tissue; correct?
23   A.  That's correct.  That's how it preserves tissue.
24   Q.  Can you tell the jury the chemical reaction that occurs
25   when formalin cross-links with the tissues?

1   A.  Specific details?

2   Q.  Yes.

3   A.  I don't know specific details.  It cross-links, binds

4   proteins together so they cannot be degraded by bacteria.

5   Q.  And the formalin fixation is important because it

6   preserves the tissue on the mesh so it won't decay; correct?

7   A.  That's correct.

8   Q.  And the preservation of the tissue allows the pathologist

9   to study the tissue sample for potential disease; correct?

10  A.  That's correct.

11  Q.  And the formalin fixation hardens the tissue so it can be

12  sliced into the slides that you've analyzed here today;

13  correct?

14  A.  No, this is not correct.  Hardening or stiffening of the

15  tissues does occur, but it's not done for that purpose.  The

16  purpose of formalin is to preserve tissue.  It stiffens to a

17  degree.

18  Q.  You agree that the formalin and protein cross-linking

19  stiffens the tissue, don't you?

20  A.  That's correct.

21  Q.  Now, you made no effort to clean the tissue or the

22  formalin from the mesh before you conducted -- you prepared

23  your slides in this case; correct?

24  A.  I didn't understand the question.  Did I remove formalin?

25  Q.  Did you make any effort to clean the mesh before you did

1   your slide preparation process?  You didn't do that, did you?

2   A.  What do you mean "clean"?

3   Q.  Did you try to remove any material -- any formalin

4   material from the mesh before you did your slide preparation?

5   A.  Formalin is being washed out.  The processing works as --

6   the formalin is a water soluble substance.  It needs to be

7   washed out of the tissue completely by alcohol.  And then when

8   the tissue is completely dehydrated, then it can be processed

9   for dissection.  So, formalin is removed.  Tissue is not

10  removed.  The formalin is removed.

11  Q.  It's your testimony that the formalin is removed during

12  the sample preparation process?

13  A.  Formalin solution, yes.  The cross-linking molecules stay

14  there, but the formalin solution is being removed during

15  preparation.

16  Q.  Okay.  When you say the cross-linking stays there, the

17  cross-linking is the binding between the formalin and the

18  tissue; correct?

19  A.  That's correct.

20  Q.  And that remains?

21  A.  That remains.

22  Q.  Now, let's talk a little bit about the sample preparation

23  process.  During this sample preparation process when you send

24  the mesh off to the histology department, that's something the

25  technologists, technicians did.  You didn't do.  Correct?

1   A.  That's correct.

2   Q.  And part of that process is to treat this mesh sample

3   with alcohol?

4   A.  That's correct.

5   Q.  And the alcohol that you use to treat this sample

6   sometimes causes the tissue to shrink?

7   A.  To a degree.

8   Q.  And you also treat this mesh sample with a material known

9   as xylene?

10  A.  That's correct.

11  Q.  And xylene is a solvent; correct?

12  A.  Yes.

13  Q.  And you know that xylene is a solvent to polypropylene?

14  A.  I don't know about that.

15  Q.  Okay.  You've never analyzed the extent to which

16  polypropylene -- excuse me -- that xylene can act as a solvent

17  on polypropylene; correct?

18  A.  I did.

19  Q.  You, you --

20  A.  I did place new mesh in xylene.  It's been sitting for

21  eight months.  The mesh didn't change.

22  Q.  Have you analyzed that mesh chemically?

23  A.  No, not chemically.

24  Q.  I want to talk to you for a minute about -- I'll go back

25  to 1910-G.  Do you remember talking to the jury about 1910-G?

1   A.  Yes, I do.

2   Q.  And this is the image that you described of a

3   polypropylene fiber; correct?

4   A.  That's correct.

5   Q.  And just to orient the jury a little bit, you talked

6   about this degradation bark?

7   A.  That's correct.

8   Q.  And that's about five microns thick; correct?

9   A.  That's correct.

10  Q.  And five microns -- how, how thick is a human hair?

11  About 70 microns?

12  A.  That's correct.  However, we cannot --

13  Q.  Excuse me.  I get to ask the questions right now.

14      MR. THOMAS:  I'm sorry, Your Honor.  Can I move to --

15      THE COURT:  Yes.  It's sustained.

16      MR. THOMAS:  Thank you.

17  BY MR. THOMAS:

18  Q.  And, so this bark that's depicted here is about

19  five microns which is about 1/14th the size of a human

20  hair; correct?

21  A.  Yes, but it's pipe-like.

22  Q.  Now, Doctor, this is magnified, I think you told the

23  jury, a thousand times?

24  A.  About a thousand times.

25  Q.  All right.  And this non-degraded core is what you have

1   described as the polypropylene fiber; correct?
2   A.  The non-degraded part of polypropylene fiber.
3   Q.  All right.  Now, we just talked a minute ago about the
4   sample preparation process, and when you use alcohol in the
5   sample preparation process that the tissue sometimes retracts
6   or shrinks.
7   A.  That's correct.
8   Q.  Now, this white area around the bark on Exhibit G is wax,
9   isn't it?
10  A.  In that specific image it's clear space.
11  Q.  Clear space?
12  A.  What is being washed off.
13  Q.  Okay.  So, it's, it's -- meaning that during the sample
14  preparation, the tissue got pulled away from what you've
15  described as the bark.
16  A.  That's correct.
17  Q.  And what causes that to pull away like that?  Tell the
18  jury.
19  A.  Shrinking of the tissue because during formalin fixation
20  and processing, tissue shrinks slightly.  And that's the
21  degree it shrinks.
22  Q.  So, all of this area which is in white is open space?
23  A.  Yes, that's correct.
24  Q.  Now, you understand that the polypropylene fiber is a
25  circle, don't you?

1   A.  Not a circle.  It's a solid rod.
2   Q.  As you look at this, quote, non-degraded core, as you've
3   labeled it, in 1910-G, this should be a circle, shouldn't it?
4   A.  This is close to a circle.
5   Q.  I'm sorry?
6   A.  This is close to a circle.  It's a bit oval, but it's
7   close.
8   Q.  But it's not a circle, is it?
9   A.  It's not a perfect circle.  It's close to circle.
10  Q.  Now, when we, when we make these slices, or when you make
11  these slices, you use a knife?
12  A.  Yeah, a microtome.
13  Q.  A microtome?
14  A.  That's correct.
15  Q.  And you cut these slices that are five microns thick;
16  correct.
17  A.  About three to five microns, that's correct.
18  Q.  That's thinner than a piece of paper, isn't it?
19  A.  Yes.
20  Q.  And once you make those slices, you put them in water and
21  then they're transferred onto a slide and adhered to the slide
22  with a material known as Permount; correct?
23  A.  Permount is poured over to hold the crevices.  Yes,
24  that's the process.
25  Q.  And Permount has toluene in it; correct?

1   A.  That's correct.
2   Q.  And toluene is -- does not behave well with
3   polypropylene.  Do you know that?
4   A.  I don't know.  As I said, I put one mesh in xylene and it
5   stays intact for several months.
6   Q.  But you've not analyzed that chemically, have you?
7   A.  No, I didn't.
8   Q.  So, we have a white area around the polypropylene, that,
9   that open space; correct?
10  A.  That's correct.
11  Q.  And we have an oval polypropylene fiber that should be
12  round; correct?
13  A.  Well, it's -- on this image it's more close to oval.
14  There are multiple -- I can show you that there are perfect
15  round sections.
16  Q.  Okay.  And the reason for that is because it may have
17  been cut at an angle; correct?
18  A.  With a slight angle.  If you can imagine if it's a rod,
19  if you take a tree trunk and angle it slightly, then it
20  becomes oval.  To get it real oval you have to tilt it all the
21  way almost parallel to the section.  So, in this specific
22  image, the filament was slightly tilted.
23  Q.  Okay.  So, is it fair for the jury to understand that
24  this slice, 1910-G, is cut at something at an angle as opposed
25  to straight across?

1   A.  At a small angle.
2   Q.  And that explains the fact that this non-degraded core
3   appears as an oblong as opposed to a circle?
4   A.  That's correct.
5   Q.  All right.  Now, you agree that non-degraded
6   polypropylene does not stain; correct?
7   A.  That's correct.
8   Q.  And tell the jury why it doesn't stain.
9   A.  Because the structure of polypropylene is solid, so it
10  doesn't have cavities to trap dyes.  It's like aluminum.  You
11  cannot stain aluminum.  To stain aluminum, we need to oxidize
12  it, to build this porous layer of oxidation.  And then it can
13  trap dyes, and then we can analyze aluminum parts, all those
14  shiny aluminum parts.  It's the same process.  It's a layer of
15  porous material on a solid surface.
16  Q.  Now, Doctor, isn't it true that typically an H&E stain,
17  hematoxylin and eosin stain leaves their colors by a chemical
18  reaction?
19  A.  Not exactly chemical reaction.  Most of the dyes -- there
20  are different types of dyes.  Most of the dyes are trapped.
21  So, it's not fully chemical reaction when molecules form new
22  molecules.  It's more of a trapping or binding of the dye
23  molecules inside the material.
24  Q.  Let me ask you this.  Do you agree with this statement:
25  That staining is not simply coloring the sections

Page 685

1    randomly, but depends on using differences in the chemistry of
2    the tissues to show the various components and different
3    colors.  This is most commonly done by using dyes that can
4    bind the tissues in a selective way.
5         Do you agree with that?
6    A.  Not entirely.  Some stains are not specific.  They stain
7    everything.  As I said, everything porous will trap those
8    dyes.  And some stains are designed specifically for specific
9    components.  So, you cannot assume that all stains work the
10   same way.  They're different.
11   Q.  Let me ask you if you agree with this statement:
12        The binding of dyes to tissues is no different to any
13   other chemical bound, bonding, so the mechanisms rely on the
14   same binding forces that occur in all other organic compounds.
15   The dyes must form some form of bond or link to the tissue or
16   they will simply rinse out of the tissue when the section is
17   washed in another reagent.
18        Do you agree with that?
19   A.  That was a long sentence.  I can say that there is some
20   process of binding of the dye to the tissue either by chemical
21   or trapping mechanically.  But there is a binding of the dye
22   in the tissue or any other material.
23   Q.  Well, the H&E stain can be broken down into hematoxylin
24   and eosin; correct?
25   A.  That's correct.

Page 686

1    Q.  And hematoxylin stains blue?
2    A.  Yes.
3    Q.  And hematoxylin is also a positively charged ion, isn't
4    it?
5    A.  That's another way of binding with positive or negative
6    charge.
7    Q.  And the hematoxylin, a positive ion, binds with
8    negatively charged substances in the body; correct?
9    A.  Yes.  However, --
10   Q.  Excuse me.  And they stain those blue; correct?
11   A.  You have a different shade.
12   Q.  Is your answer "yes" or "no"?  "Can you answer "yes" or
13   "no"?
14   A.  I cannot answer "yes" or "no" because it's not black and
15   white.  When the hematoxylin is applied to the tissue, it
16   stains all structures.  Then you have to differentiate.  You
17   have to wash it out.  And then there is a second chemical.
18   Then there is water applied.
19        So, it becomes bluer and is being washed from the
20   structures which trap the dye non-specifically.  So, only
21   those dyed molecules which are still holding by electrical
22   charge are holding.  But those molecules which are just
23   trapped in the pores are being washed away.  This is a process
24   of differentiation during staining.
25   Q.  And that's exactly my point, Doctor, is that after the

Page 687

1    hematoxylin stain is applied, you rinse it with water to rinse
2    out any stain that's just on the sample so that you leave the
3    hematoxylin that is bound with the negatively charged tissue
4    materials.
5    A.  To a degree.  It's not completely clear.  It's still
6    purple if you don't do eosin.
7         COURT REPORTER:  Excuse me?
8         THE WITNESS:  If you don't -- it's not -- it doesn't
9    wash away completely.  There is still purple staining if you
10   do not stain it with eosin.  The red color just overwhelms
11   purple on the top of it.
12   Q.  And the same thing is true with eosin.  Eosin stains
13   pink; correct?
14   A.  That's correct.
15   Q.  And eosin is negatively charged and binds with positively
16   charged materials in the body; correct?
17   A.  As far as I remember, that's the mechanism.
18   Q.  Do you know the mechanism?
19   A.  I don't remember exactly what happens with eosin, but I
20   think you're right.
21   Q.  Okay.  Thank you.  And do you know what charge
22   polypropylene has?
23   A.  No.
24   Q.  Polypropylene has no charge, does it?
25   A.  I don't know.

Page 688

1    Q.  And that's why none of these stains bind to
2    polypropylene; correct?
3    A.  To non-degradable polypropylene.
4    Q.  You agree with me the fact that polypropylene has no
5    charge is the reason why neither hematoxylin or eosin bind to
6    polypropylene; correct?
7    A.  I don't know.
8    Q.  You don't know.  You never studied that issue?
9    A.  I see that it doesn't stain when it's not degraded.  When
10   it's degraded, it stains.
11   Q.  Okay.  Now, you have offered the opinion that this is,
12   this degraded, what you call bark is oxidized polypropylene;
13   correct?
14   A.  Degraded polypropylene.
15   Q.  I think you called it oxidized polypropylene.
16   A.  Oxidized polypropylene.
17   Q.  And can you tell the jury the chemical structure of
18   oxidized polypropylene?
19   A.  No, I cannot.
20   Q.  All right.  Do you know the positive or negative
21   components of oxidized polypropylene?
22   A.  No.
23   Q.  Do you know whether there are any materials in oxidized
24   polypropylene for either eosin or hematoxylin to bind?
25   A.  Can you repeat the question?

Page 689

1   Q.  Sure.  Are there any chemical components in oxidized
2   polypropylene that would allow either hematoxylin or eosin to
3   bind?
4   A.  It doesn't bind to chemical components.  It's being
5   trapped in the pores and crevices.
6   Q.  It's fair to say, isn't it, Doctor, that you're not an
7   expert in the direct oxidation of polypropylene?
8   A.  That's correct.
9   Q.  And your opinion is that oxidized polypropylene, this
10  bark, has cracks or crevices in it that retain the stain?
11  A.  That's my opinion.
12  Q.  And, so, in order for that to retain the stain, that
13  means that this material is going to have to hold the stain
14  even during the washing process during the sample preparation
15  process we talked about; correct?
16  A.  That's correct, as long as washing doesn't wash it
17  completely because if you extend washing to a degree when it
18  starts washing, the staining fades.
19  Q.  Now, again, you've used a light microscope here that
20  magnifies up to about a thousand times?
21  A.  That's correct.
22  Q.  And it's your belief that this oxidized polypropylene has
23  cracks in it on the order of ten nanometers?
24  A.  So, I measured them --
25  Q.  Excuse me.  Did you measure Ms. Bellew's mesh?

Page 690

1   A.  No.
2   Q.  You did not?
3   A.  Well, if you as me about cracks, I can tell you what's my
4   opinion about cracks.
5   Q.  It's about ten nanometers, isn't it?
6   A.  It depends on the crack.
7   Q.  Okay.
8   A.  Some of them larger, some of them smaller.
9   Q.  But you've not, you've not measured any cracks in the
10  bark for Mrs. Bellew, have you?
11  A.  No.  I have no purpose for that.
12  Q.  Now, one micron is about the limit of what you can see by
13  light microscopy, isn't it?
14  A.  Or half micron depending how good the lenses are.
15  Q.  And it's fair to say that your light microscope is not
16  able to detect any cracks in the degraded polypropylene that
17  would hold this stain; correct?
18  A.  Those -- the very small pores and crevices which hold?
19  Q.  Yes.
20  A.  That's correct.  I cannot see that.  They are too small.
21  Q.  So, this is something that you have just concluded based
22  upon what you believe must be happening in Ms. Bellew's mesh
23  that these cracks or crevices retain this dye that show up on
24  this slide.  Correct?
25  A.  This is not just conclusion based on this specimen.  This

Page 691

1   is based on my knowledge, training, and experience and
2   examination of this specimen and many others.
3   Q.  Now, Doctor, just so the jury understands, it's your
4   opinion that this polypropylene, Prolene polypropylene -- by
5   the way, you know that Prolene polypropylene has special
6   additives added to it?
7   A.  Yes.  The polypropylene has antioxidants to prevent
8   degradation.  It slows it down but it doesn't stop it.
9   Q.  And that's what makes Prolene different from other
10  polypropylene.  You know that, don't you?
11  A.  You mean other mesh devices?
12  Q.  Other, other polypropylene used in mesh.  You know that's
13  what makes it different, don't you?
14  A.  I do not know the exact difference.  I'm not a material
15  scientist.
16  Q.  And you know the material that makes up polypropylene,
17  Prolene polypropylene is made here in West Virginia, don't
18  you?
19  A.  I don't know.
20  Q.  Okay.  Now, you could have taken a piece of polypropylene
21  and intentionally oxidized it and then washed it with stains
22  to see if there were, in fact, cracks or crevices that held
23  these dyes, couldn't you?
24  A.  Yes, I could.
25  Q.  But you didn't do that, did you?

Page 692

1   A.  It's a work in progress.  I put --
2   Q.  But you haven't done that for this case?
3   A.  It's not finished.  For this case, no.
4   Q.  Okay.  Thank you.  And if you had a piece of oxidized
5   polypropylene that you stained and it held dyes, that would
6   support your opinion, wouldn't it?
7   A.  That's correct.
8   Q.  And you talked before about this formalin control that
9   you did.  And, that is, you took a piece of pristine mesh and
10  you put it in formalin so that you could make sure that this
11  sample preparation process didn't damage the polypropylene as
12  it went through the sample preparation process.  Correct?
13  A.  Formalin fixation and sample preparation process.
14  Q.  Okay.  When you did -- and that's called a controlled
15  experiment?
16  A.  That's correct.
17  Q.  And that's so you can control for anything that might go
18  wrong.  In the sample preparation process, you want to make
19  sure that doesn't confound what you find in your opinions.
20  Correct?
21  A.  That's correct.
22  Q.  And when you did your formalin controlled experiment, you
23  did not include tissue in that formalin controlled experiment,
24  did you?
25  A.  That's correct.  That was the whole purpose.

Page 693

1 Q. And you didn't include any human serum in that formalin
2 controlled experiment; correct?
3 A. That's correct. That's the whole purpose, just formalin.
4 Q. And the, the -- you were unable to tell the impact of the
5 cross-linking of formalin and protein on your control in your
6 sample preparation process; correct?
7 A. That's correct. I wanted to avoid all tissue -- all
8 foreign tissue.
9 Q. Now, Doctor, you testified that the Prolift mesh for
10 Ms. Bellew had folds in it; correct?
11 A. Yes.
12 Q. And you don't know whether those folds formed before or
13 after the operation, do you?
14 A. Which operation?
15 Q. The implant operation.
16 A. Some of them were formed during surgery and some of them,
17 smaller wrinkles, during scar contracture.
18 Q. Doctor, do you remember when you gave a deposition in
19 this case in August, 2014?
20 A. Yes.
21 Q. And on Page 155 do you remember being asked the
22 question -- can I have that please -- 155, lines 5 through 11.
23 You were asked the question:
24     "Are you saying that the surgeon put it in and put
25 folds in there at the time it was planted?"

Page 694

1     "I don't know how, when they formed, intraoperative,
2 post-operative."
3     Did I read that correctly?
4 A. That's correct.
5 Q. And you agree that Mrs. Bellew did not have a mesh
6 erosion. You agree with that, don't you?
7 A. I can only state what I saw in the specimen.
8 Q. Again, let's turn to your deposition again on Page 166,
9 166, lines 3 through 5.
10     "Question: Well, Mrs. Bellew didn't have an erosion."
11     "Answer: No."
12     Did you give that answer at the time of your
13 deposition?
14 A. Yes. I didn't see it on the specimen.
15 Q. And you testified a lot on direct examination about
16 nerves that you saw on the slides?
17 A. That's correct.
18 Q. And you agree that seeing the nerves in these slides does
19 not tell you that any of the pain mechanisms did, in fact,
20 occur in Mrs. Bellew. You agree with that, don't you?
21 A. No, I don't agree.
22 Q. It's true that the feeling of pain is a subjective
23 complaint of a patient. Do you agree with that?
24 A. That's correct.
25 Q. And in order to find pain, the patient has to tell you

Page 695

1 there is pain; is that correct?
2 A. That's correct.
3 Q. Let me direct your attention to Page 172 of your
4 deposition, lines 6 through 13.
5     "Question: But seeing a nerve doesn't tell you that
6 any one of those mechanisms actually did, in fact, occur."
7     Your answer: "Feeling of pain is a subjective
8 sensation of a patient. So, to say there was a pain, it would
9 have to be a patient who tells you that there is a pain.
10 Seeing a nerve in the section, I can only assess a risk of it
11 or possibility."
12     Did I read that correctly?
13 A. That's correct.
14     MR. ANDERSON: Excuse me, Your Honor. I would ask
15 that he read the entire answer by the witness from the
16 deposition. He stopped it off at the middle of his answer.
17     THE COURT: It may be done.
18 BY MR. THOMAS:
19 Q. "For example, on this specific picture, the degree
20 of deformation of these nerves at Page 100 of your
21 report would have a very high probability to be painful.
22 Is it your opinion that those nerves on Page 100 of the
23 report are actually causing her to sense pain?"
24     "My opinion is that these deformation of these nerves
25 carries high degree of probability to cause pain."

Page 696

1     "But you can't say when those nerves were formed. You
2 can't say whether those nerves were pre-existing in that
3 manner."
4     Answer: "No."
5     Is that enough?
6     MR. ANDERSON: Yeah.
7     THE WITNESS: That's correct.
8 BY MR. THOMAS:
9 Q. Now, we decided you're not an analytical chemist.
10 You've not consulted with an analytical chemist in this
11 case; correct?
12 A. That's correct.
13 Q. And there are also scientists who look at the material
14 properties of, of implants; correct? Material scientists?
15 A. Yes, there are material scientists.
16 Q. And, and you're not a material scientist?
17 A. No, I'm not.
18 Q. And you've not consulted with a material scientist in
19 your work in this case; correct?
20 A. That's correct.
21 Q. Now, you used a light microscope that magnifies up to a
22 thousand times?
23 A. That's correct.
24 Q. And you're aware of a technology known as Scanning
25 Electron Microscopy, aren't you?

Page 697

1    A.  That's correct.  I use Transmission Electron Microscopy.
2    Q.  Okay.  But you didn't use Transmission Electron
3    Microscopy in this case; correct?
4    A.  No.  It's very expensive and time consuming.
5    Q.  Okay.  And you didn't use Scanning Electron Microscopy in
6    this case; correct?
7    A.  No.  It's not the standard of care.
8    Q.  And you don't think the Scanning Electron Microscopy
9    answers any questions for degradation analysis; is that
10   correct?
11   A.  If it's used in the right hands, it can answer some
12   questions.
13        MR. THOMAS:  I'm sorry, Your Honor.
14   BY MR. THOMAS:
15   Q.  Now, let's talk a little bit about how these
16   stains -- how these slides are prepared.  Again, this is
17   something that you asked somebody to do for you?
18   A.  Our histotechnologists.
19   Q.  And it's routine for you to refer pathology specimens to
20   your histotechnologists to prepare these slides for you to
21   analyze?
22   A.  This is a routine procedure.  All specimens go through
23   the same routine.
24   Q.  And have you studied the procedure that the
25   histotechnologist goes through in order to put this material

Page 698

1    first in paraffin?
2    A.  I don't understand.
3    Q.  Let me, let me help you a minute.  Let's bring up
4    Defendant's Exhibit 10493.
5        Let me show you what's been marked as Defendant's
6    Exhibit --
7        MR. THOMAS:  I'm sorry.  I gave you the wrong one,
8    Ben.
9        Excuse me, Your Honor.
10   BY MR. THOMAS:
11   Q.  Doctor, I've handed you what's been marked as
12   Defendant's Exhibit 10493 and ask you if you recognize
13   that as the standard protocol for formalin fixed
14   paraffin embedded tissue at your hospital?
15   A.  That's correct.  I provided them to you.
16   Q.  And this describes the process that your
17   histotechnologists use to put the blue samples into paraffin;
18   correct?
19   A.  It's a standard procedure.  It's used all over North
20   America.
21   Q.  Okay.  And if you look --
22        MR. THOMAS:  Your Honor, I offer Defendant's Exhibit
23   10493.
24        THE COURT:  Without objection.
25        MR. ANDERSON:  No objection, Your Honor.

Page 699

1        (DEFENDANT'S EXHIBIT 10493 RECEIVED IN EVIDENCE.)
2    BY MR. THOMAS:
3    Q.  If we look at Paragraph 3.  And this is the process
4    that these mesh explants went through as they were first
5    placed in paraffin before they were cut into slides;
6    correct?
7    A.  That's correct.
8    Q.  And you see that for 16 hours they were exposed to
9    different levels of ethanol and xylene; correct?
10   A.  Correct.
11   Q.  Am I right that the slides that you used and you talked
12   about today went through the sample preparation process?  Am I
13   correct?
14   A.  You are correct.
15   Q.  Thank you.  And the ethanol baths that we've talked about
16   are what caused the tissues to retract?
17   A.  Not just ethanol, but --
18   Q.  I'm sorry?
19   A.  Not just ethanol, but dehydration through ethanol gives a
20   degree of shrinking, and also formalin.
21   Q.  And the point of the ethanol is to remove the water;
22   correct?
23   A.  That's correct.
24   Q.  And then the xylene is designed to remove the ethanol?
25   A.  That's correct.

Page 700

1    Q.  And the xylene is the solvent?
2    A.  That's correct.
3    Q.  You know it's inappropriate to put xylene in a
4    polypropylene container?  Do you know that?
5    A.  I don't know that.
6    Q.  Let's go to Paragraph 4, please.  "Trim paraffin blocks
7    as necessary and cut at three to ten microns (five microns is
8    commonly used.)"
9        And these are the slides that we talked about; correct?
10   A.  Yeah.  Those were cut at three microns.
11   Q.  Three microns.  The slides that you have here?
12   A.  Yes, that's correct.
13   Q.  Okay.  So -- and just so the jury understands, you've
14   testified that this bark is about five microns?
15   A.  Yes.
16   Q.  So, the, the thickness of this slide magnified a thousand
17   times would be something less than the side of the bark?
18   A.  That's correct.
19   Q.  Okay.  And then you cook the slides in an oven overnight?
20   A.  Most of them get dried in 60 degrees.
21   Q.  Okay.  Centigrade?
22   A.  Centigrade, yes.
23   Q.  And that's after you apply toluene to it?
24   A.  Yes.
25   Q.  Do you know the impact of heat, xylene, and toluene on

Page 701

1   polypropylene?
2   A.  Yes, I do.
3   Q.  Have you studied it chemically?
4   A.  As I said, I put pristine mesh and subjected it to the
5   same procedures and it didn't degrade.
6   Q.  Have you studied it chemically?
7   A.  Chemically you mean like a chemical scientist?
8   Q.  Analytical chemist.
9   A.  I'm not analytical chemist.
10  Q.  And you've not asked any analytical chemist to look at
11  that, have you?
12  A.  No.
13  Q.  Then after the slides are prepared, that's when you stain
14  it; correct?
15  A.  That's correct.
16  Q.  Doctor, I've handed you a copy of what's been marked as
17  Defendant's Exhibit 10495.  Do you recognize that as the
18  protocol sheet for the staining of slides at St. Michael's?
19  A.  Yeah.  I provided those to you.
20          MR. THOMAS:  All right.  Your Honor, I move admission
21  of Defendant's Exhibit 10495.
22          MR. ANDERSON:  No objection.
23          THE COURT:  May be admitted.
24          (DEFENDANT'S EXHIBIT 10495 RECEIVED IN EVIDENCE.)
25  BY MR. THOMAS:

Page 702

1   Q.  And you note, Doctor, that the first step of this
2   is to put the slide in an oven at 65 degrees Centigrade?
3   A.  That's correct.
4   Q.  Do you know what temperature that is Fahrenheit?
5   A.  That's a difficult question.
6   Q.  That's okay.
7   A.  Over 100 degrees.
8   Q.  Okay.  And then it's exposed to three separate baths of
9   xylene?
10  A.  That's correct.
11  Q.  And then three separate baths of alcohol?
12  A.  That's correct.
13  Q.  And then you wash it with water?
14  A.  Yes.  It's being saturated with water.  It's the process
15  of re-saturation.
16  Q.  Okay.  And then you add your dye; correct?  The
17  hematoxylin?
18  A.  Then it goes to dye, either hematoxylin or anything else.
19  It depends on what staining that I want.
20  Q.  Well, this one specifically is for hematoxylin and eosin;
21  correct?
22  A.  That's correct.
23  Q.  And step nine on this protocol is for hematoxylin;
24  correct?
25  A.  Yes.  But all steps from one to eight will be the same

Page 703

1   for any other stain.
2   Q.  And then after the hematoxylin is applied, then you go
3   through a series of definition, water, blue buffer, water, and
4   alcohol; correct?
5   A.  That's correct.
6   Q.  And that's to wash off any dye that doesn't chemically
7   bind; correct?
8   A.  Excessive dye, that's correct.
9   Q.  Okay.
10  A.  It's not a perfect washing off.  There's still some
11  remaining.
12  Q.  And the same is true for the next step where you -- in
13  step number 12 -- 16, I'm sorry, where you add the eosin dye;
14  correct?
15  A.  That's correct.
16  Q.  And then you go through three baths of alcohol and two
17  baths of xylene and then you're done?
18  A.  Not yet.
19  Q.  Well, in terms of the staining process.
20  A.  Xylene is not staining anymore.  Xylene is preparation
21  for mounting.
22  Q.  Right.  But in terms -- then you go to the Permount where
23  you put on the cover slip and you put the Permount in order to
24  seal the tissue into place so you can look at it?
25  A.  Yes.  With the formalin you can put water in it and

Page 704

1   you'll get the same appearance.
2   Q.  Okay.  But my point is after you apply the eosin, you
3   rinse with alcohol and rinse with xylene; correct?
4   A.  That's correct.
5   Q.  And the goal there again is to remove any eosin that's
6   not bound to tissue?
7   A.  Alcohol, yes; xylene, no.
8   Q.  Okay.
9          MR. THOMAS:  Your Honor, may I have a minute, please?
10          THE COURT:  Yes.
11          (Pause)
12  BY MR. THOMAS:
13  Q.  Doctor, do you see live patients in your practice?
14  A.  Yes, I do.
15  Q.  Okay.  Do you counsel or treat patients for dyspareunia?
16  A.  No.
17  Q.  Do you know that there are differences among people,
18  among people that have dyspareunia?
19  A.  What do you mean?  What differences?
20  Q.  Do you know that there are any differences?  Do you think
21  dyspareunia is the same in all people?
22  A.  No, I don't believe that.
23  Q.  Okay.  And do you prescribe any kind of medication for
24  pain?
25  A.  No, not anymore.

Page 705

1  Q.  Did you analyze any other tissue removed from Ms. Bellew
2  in this case other than the ones you described, the four?
3  A.  No.
4  Q.  You didn't examine any of the tissue for the adhesions or
5  the scars, scarring that may have been removed from
6  Ms. Bellew, did you?
7  A.  What do you mean?  The whole piece was just scar.
8  Q.  That's all you -- to the extent that she had other tissue
9  removed at other times for scarring or adhesions, you didn't
10  analyze that tissue, did you?
11  A.  No, I didn't analyze anymore tissue.  I analyzed this
12  specimen.
13  Q.  Did you know that adhesions and scarring can cause pain?
14  A.  Yes, it can.
15      MR. THOMAS:  That's all I have.  Thank you, Doctor.
16      THE COURT:  All right.  Next witness, please.  I'm
17  sorry, redirect.  I apologize.
18  (REDIRECT EXAMINATION OF VLADIMIR IAKOVLEV BY MR. ANDERSON:)
19  Q.  Let's pick up with that last question.  You said that you
20  reviewed the medical records of Ms. Bellew?
21  A.  Yes.
22  Q.  What happened every time, from the medical records, that
23  Dr. DeHasse removed a chunk of mesh from Ms. Bellew with
24  regard to her pain?
25  A.  There was improvement and change in symptoms of pelvic

Page 706

1  pain located in the area.
2  Q.  And did you review the medical records about this
3  granulation tissue that counsel just mentioned?
4  A.  Yes.
5  Q.  Did that granulation tissue have any hardened, sclerosed,
6  polypropylene mesh in it?
7  A.  No.
8  Q.  When they removed that, was there any pain noted in the
9  record related to the granulation tissue?
10  A.  There was some discomfort as I understand, but it was
11  transient.  It was removed and it cured.
12  Q.  Counsel talked a lot about degradation.  Even forgetting
13  about degradation, was that the only cause of all the chronic
14  inflammation that you talked about, the fibrotic bridging, the
15  scar plates, the scar encapsulation, the contraction, and the
16  pain in Ms. Bellew?
17      MR. THOMAS:  Your Honor, that's beyond the scope.
18      THE COURT:  Overruled.
19  BY MR. ANDERSON:
20  Q.  Is this the only cause of all the inflammation that
21  we saw in these other images?
22  A.  No.  This is more of an interesting finding.  But the
23  real finding, what I do as a pathologist is scarring,
24  inflammation, nerves, traumatic neuroma.
25  Q.  Did you continue to do expensive Scanning Electron

Page 707

1  Microscopy or this SEM that he talked about or TEM, this
2  Transmission Electron Microscopy, to be able to come in and
3  tell the jury that that's cracked polypropylene?
4  A.  No.
5  Q.  Did you need any of that?
6  A.  I mean, you can see it clearly.
7  Q.  Counsel talked to you a little bit about whether or not
8  you knew that this cracked bark was polypropylene.  Do you
9  recall that part of your testimony?  Do you recall that part
10  of your testimony?
11  A.  Yes.
12  Q.  If this was protein, would it polarize light?
13  A.  Not to that degree.  The strongest protein if it's
14  cross-linked with formalin, in this image you see the darkness
15  of it.
16  Q.  So, if this was protein, would it glow bright purple like
17  that?
18  A.  I have not seen anything in the human body that rises to
19  that degree.  The only object naturally occurring to the body
20  to this degree is crystals.  That's uric acid crystals or
21  pyrophosphate crystals.  That's how we diagnose.
22      Some cell samples also polarize like this.  I performed
23  calcium stain.  I checked for it because calcium will be
24  brittle and won't polarize.  In this calcium stain it was
25  negative.  This material doesn't contain any calcium.

Page 708

1  Q.  Another question for you, Doctor.  You were asked a
2  number of questions about these protocols about xylene,
3  hexylene, benzine, a number of things off these documents by
4  counsel.  Do you remember being asked questions about that?
5  A.  That's correct.
6  Q.  Did you follow standard operating procedures used by
7  pathologists all across North America when you prepared these?
8  A.  Yes.
9  Q.  Would any of these things that counsel listed off and put
10  up there for the jury, xylene, alcohol, hematoxylin, blue
11  buffer, 95 percent alcohol, does that have anything to do with
12  the scarring that we see in Plaintiff's Exhibit 1910-DD?
13  A.  No.  You cannot make nerves grow into the mesh.  You
14  cannot make scar grow into the mesh.  It only happens in the
15  body.  The only thing which can do it is human tissue, again
16  growing the mesh, formed scars around it, formed inflammation
17  around it, and deformed nerves.
18  Q.  Do you need to be a material scientist to tell the jury
19  that?
20  A.  No, because this is my science.  This is what I was
21  trained to do.
22      MR. ANDERSON:  No further questions.
23      THE COURT:  All right.  May the witness be excused?
24      MR. THOMAS:  Yes, Your Honor.
25      THE COURT:  All right.

Page 709

1    Thank you, Doctor.
2    Call your next witness.
3    MR. SLATER:  Thank you, Your Honor.
4    Your Honor, we now call -- it's a brief video --
5    Dr. Vincent Lucente.
6    THE COURT:  Ladies and gentlemen, we will have
7    testimony by videotape.  Remember, this testimony was taken
8    under oath and is to be treated by you in the same way and
9    evaluated by you in the same way as testimony presented here
10    in open court.
11    (The videotaped direct testimony of Vincent Lucente
12    was played from 11:47 a.m. until 11:50 a.m.)
13    MR. SLATER:  Our next witness, Your Honor, would take
14    about 20 minutes, so it's up to the Court.  We tried to time
15    it.  We were estimating.  So, we could -- we're happy to play
16    it if you want to go over about eight or nine minutes past
17    12:00.  Otherwise, it's up to the Court, Your Honor.  That's
18    the one we have cued up and ready to go.
19    THE COURT:  It's 11:50.  We'll take lunch and come
20    back at 12:50.  Don't discuss the case among yourselves or
21    permit anyone to discuss it with you or in your presence.
22    Don't use any digital device, read anything, listen to
23    anything, or watch anything about the case.  Have a great
24    lunch.
25    Court's in recess until 12:50.

Page 710

1    (Luncheon recess taken at 11:50 a.m.)
2    (The Jury entered the courtroom at 12:54 p.m.)
3    THE OFFICER:  All rise.
4    THE COURT:  Good afternoon.  Do you think we need to
5    put a regular chair back up there for the witness?
6    THE DEPUTY CLERK:  Well, do you want the regular
7    chair back up there for the witness?
8    THE COURT:  It's up to --
9    MR. ANDERSON:  I'm happy to do it, Judge.
10    THE COURT:  Well, it doesn't really matter to me.  It
11    just seems like it's easier to sit in than the straight chair.
12    We can do it on the break.
13    MR. ANDERSON:  Okay.  Sorry.
14    THE COURT:  All right.  Call your next witness.
15    Yes, sir?
16    MR. THOMAS:  Thank you, Your Honor.  I neglected to
17    move into evidence defendants' Exhibit 10041 under
18    Dr. Iakovlev's testimony.  I do that now.
19    THE COURT:  I neglected to admit it.  I'll remedy
20    that now.
21    MR. ANDERSON:  No objection, Your Honor.
22    THE DEPUTY CLERK:  Thank you.
23    MR. THOMAS:  Thank you, Your Honor.
24    (DEFENDANTS' EXHIBIT D-10041 WAS RECEIVED IN EVIDENCE.)
25    THE COURT:  Mr. Slater?

Page 711

1    MR. SLATER:  Thank you very much, Your Honor.  We now
2    call by video Scott Ciarrocca, project leader, the Prolift
3    project, Your Honor.
4    THE COURT:  All right.  Ladies and gentlemen, a
5    witness by video deposition.  Treat the testimony and evaluate
6    it in the same way you would live testimony in court.
7    (The videotaped direct testimony of Scott Ciarrocca
8    was played from 12:56 p.m. to 1:19 p.m.)
9    MR. SLATER:  Your Honor, that's all the testimony of
10    Scott Ciarrocca.
11    Plaintiffs will offer into evidence P-2137, P-0968,
12    P-0368, P-0975, and I think we are going to also be moving the
13    clip reports -- we are going to hold the clip reports.  I
14    think they should be marked as an exhibit number, I think, so
15    I'm going to offer these documents and we will reconcile the
16    clip reports at a break.
17    THE COURT:  Is there an objection?
18    MR. THOMAS:  They just gave them to me, Your Honor.
19    I'm sorry.  Let me look at them real quickly.  975, 2137, 968
20    and 368?
21    MR. SLATER:  Yes.
22    MR. THOMAS:  No objection, Your Honor.
23    THE COURT:  Exhibits may be received in evidence.
24    MR. SLATER:  Thank you, Your Honor.
25    (PLAINTIFF EXHIBITS P-2137, P-0968, P-0368, AND P-0975 WERE

Page 712

1    RECEIVED IN EVIDENCE.)
2    THE COURT:  Is there cross-examination?
3    MR. THOMAS:  We reserve cross-examination, Your
4    Honor.
5    THE COURT:  Ladies and gentlemen, the defendants have
6    chosen to wait until their case to take testimony from this
7    witness, if they decide to.
8    Witness?
9    MR. SLATER:  Yes, Your Honor.  We now call Sean
10    O'Bryan who was the regulatory affairs project leader for the
11    Prolift project, Your Honor.
12    (The videotaped direct testimony of Sean O'Bryan was
13    played from 1:21 p.m. to 1:39 p.m.)
14    MR. SLATER:  That's the direct testimony, Your Honor.
15    Plaintiffs will offer into evidence P-0980, P-1010,
16    P-2-112, and P-0678.
17    THE COURT:  May be received.
18    (PLAINTIFF EXHIBITS P-0980, P-1010, P-2-112, and P-0678 WERE
19    RECEIVED IN EVIDENCE.)
20    THE COURT:  Cross-examination?
21    MR. SLATER:  I believe so, Your Honor.
22    MS. JONES:  We do, Your Honor.
23    THE COURT:  All right.
24    (The videotaped cross-examination testimony of Sean
25    O'Bryan was played from 1:39 p.m. to 1:47 p.m.)

Page 713

1       MS. JONES:  That concludes the cross-examination.
2       THE COURT:  Is there redirect?
3       MR. SLATER:  There is a brief redirect, Your Honor.
4       THE COURT:  All right.
5       (The videotaped redirect testimony of Sean O'Bryan
6   was played from 1:47 p.m. to 1:48 p.m.)
7       THE COURT:  All right.  Call your next witness.
8       MR. SLATER:  Your Honor, we call Charlotte Owens who
9   was the worldwide medical director at the time of the launch
10  of the Prolift.
11      THE COURT:  Is that by video?
12      MR. SLATER:  Yes, it is.
13      THE COURT:  Same instruction.  Is that adequate?
14      MR. SLATER:  Everyone was invited; no one wanted to
15  come.
16      THE COURT:  No, I want to make it clear that for
17  reasons, some of which I explained to you, including the power
18  of subpoena, these people are not here, but this testimony was
19  taken under oath and you're to consider it the same as any
20  other testimony.  It's just a little harder to watch.
21      MR. SLATER:  Thank you, Your Honor.
22      (The videotaped direct testimony of Charlotte Owens
23  was played from 1:49 p.m. to 2:15 p.m.)
24      MR. SLATER:  Your Honor, that's the direct.
25      Plaintiff offers Exhibit P-1545, P-2112, P-1010,

Page 714

1   P-0971, P-1507, as exhibits, and for learned treatises,
2   P-2880.
3       THE COURT:  Is there objection?
4       MR. THOMAS:  No objection, Your Honor.
5       THE COURT:  May be received, exhibits as evidence and
6   the learned treatise as a learned treatise.
7       (PLAINTIFF'S EXHIBITS P-1545, P-2112, P-1010, P-0971, AND
8   P-1507 WERE RECEIVED IN EVIDENCE, AND P-2880 AS LEARNED
9   TREATISE.)
10      THE COURT:  Is there cross?
11      MR. THOMAS:  Yes, Your Honor, there is.
12      (The videotaped cross-examination testimony of
13  Charlotte Owens was played from 2:16 p.m. to 2:33 p.m.)
14      MR. THOMAS:  Your Honor, that concludes the
15  examination of Ms. Owens, Dr. Owens.
16      THE COURT:  All right.  Any exhibits?
17      MR. THOMAS:  Defendants offer defendants' Exhibit
18  25867.
19      THE COURT:  Without objection?
20      MR. SLATER:  No objection.
21      (DEFENDANTS' EXHIBIT D-25867 WAS RECEIVED IN EVIDENCE.)
22      MR. SLATER:  Your Honor, we have -- the next cut is
23  five minutes of the next witness if you want to knock it off.
24      THE COURT:  Let's go ahead and do it, and then we
25  will take our afternoon break.

Page 715

1       MR. SLATER:  That would be great for us on
2   scheduling.
3       Our next witness is Kimberly Hunsicker from Ethicon
4   Clinical Affairs.  It's about five minutes.
5       THE COURT:  All right.
6       (The videotaped direct testimony of Kimberly
7   Hunsicker was played from 2:34 p.m. to 2:39 p.m.)
8       MR. SLATER:  That concludes the video.
9       THE COURT:  Is there cross?
10      MS. JONES:  No, Your Honor.
11      THE COURT:  All right, ladies and gentlemen, we'll
12  take our afternoon break.  During the break, don't discuss the
13  case, don't communicate about it in any way.  I'll call you
14  back in 15 minutes.
15      THE DEPUTY CLERK:  Judge, he has an exhibit.
16      THE COURT:  Just one minute.  You have a matter to --
17      MR. SLATER:  I forgot to move the exhibit.
18      THE COURT:  It may be admitted.
19      MR. SLATER:  P-2864.
20  (PLAINTIFF'S EXHIBIT P-2864 WAS RECEIVED IN EVIDENCE.)
21      (The Jury left the courtroom at 2:40 p.m.)
22      THE COURT:  I'll see you in 15 minutes.
23      (A recess was taken at 2:40 p.m.)
24      (The jury entered the courtroom at 2:55 p.m.)
25      THE COURT:  On that "please be seated" business if at

Page 716

1   any time you want to stand up and stretch and so forth, feel
2   free to do that.  You don't need to stay glued to your chairs.
3       MR. SLATER:  Your Honor, it's going to be Dr. Carol
4   DeHasse.  We're just fixing one thing on the computer.
5       THE COURT:  All right.  The next witness is another
6   video witness.  I believe this is the treating physician.
7       MR. ANDERSON:  That's correct, Your Honor.
8       THE COURT:  All right.  Treat the testimony the same
9   as you would any other testimony presented here in the
10  courtroom.
11      You may proceed.
12      MR. AYLSTOCK:  Just another minute, Your Honor.  I
13  apologize.
14      THE COURT:  Sure.
15      MR. SLATER:  I think something froze up and we just
16  had to get the documents.  I would tell a story about a duck
17  but I don't know any.
18      THE COURT:  At least not any you can tell.
19      MR. SLATER:  No, that's true.
20      THE COURT:  I realize that we're working really hard
21  to take short breaks and keep on trucking.  But I've found out
22  over 45 years of doing this that it's a lot easier just to run
23  it on time and keep pressing forward than it is to drag it out
24  over a month.  So, at least that's my theory.  I'm going to
25  stick to it until somebody tells me different.

Page 717

1       (Pause)
2       MR. AYLSTOCK: Your Honor, it appears that we're
3   ready.
4       THE COURT: Here we go.
5       (The videotaped direct testimony of Carol Dehasse was
6   played from 3:02 p.m. until 3:51 p.m.)
7       MR. AYLSTOCK: Your Honor, that concludes the
8   plaintiff's presentation of Dr. Carol DeHasse. I have some
9   exhibits to move in.
10      THE COURT: All right. You may proceed.
11      MR. AYLSTOCK: Your Honor, I'd move into evidence for
12  the record Exhibit P-3404, Exhibit P-2103, Exhibit P-2105,
13  Exhibit P-3396, Exhibit P-1904, Exhibit P-1905, Exhibit
14  P-3405, Exhibit P-1906, Exhibit P-3400, Exhibit P-3401,
15  Exhibit P-2119, Exhibit P-3403, and Exhibit P-3393.
16      MR. THOMAS: I don't have all the ones you had,
17  Bryan. Can I see your stack?
18      MR. AYLSTOCK: Sure.
19      THE COURT: A couple of those have already been
20  admitted.
21      THE CLERK: That's fine.
22      MR. AYLSTOCK: That's okay. I know one of them was a
23  defense exhibit.
24      THE COURT: Before you leave this evening, could you
25  get me the deposition transcripts of the videos we've played

Page 718

1   so far and get them --
2       MR. SLATER: They're all being marked -- we assumed
3   the Court would want them marked.
4       THE COURT: Yes.
5       MR. SLATER: We're having that done so you'll have
6   them, Your Honor.
7       THE COURT: Okay.
8       MR. AYLSTOCK: Perhaps in the interest of expediency,
9   we can just deal with this at a sidebar.
10      MR. THOMAS: There are several I don't have. I just
11  need to make sure --
12      THE COURT: All right. The motion to admit will be
13  left pending.
14      MR. THOMAS: Thank you, Your Honor.
15      THE COURT: Is there cross?
16      MR. THOMAS: Yes, Your Honor, there is.
17      (The videotaped cross-examination testimony of Carol
18  DeHasse was played from 3:55 p.m. until 4:26 p.m.)
19      MR. THOMAS: Your Honor, could we stop for a minute,
20  please? May I confer with plaintiff's counsel, please?
21      THE COURT: Yes.
22      MR. THOMAS: Your Honor, there was a Q and A omitted
23  from the transcript.
24      THE COURT: Okay. How do you want to fix that? Do
25  you want to do a read?

Page 719

1       MR. AYLSTOCK: Why don't you just read it, David.
2       MR. THOMAS: If I can go back, --
3       THE COURT: I'll need to explain this to the jury if
4   that's what you're going to do.
5       MR. THOMAS: Okay. The -- I'm sorry. I'm mistaken I
6   guess.
7       THE COURT: All right.
8       MR. THOMAS: I apologize, Your Honor.
9       THE COURT: Okay. Push play.
10      MR. THOMAS: It's in this one too, Your Honor. It is
11  an omission apparently. Do you mind if I just read it in?
12      THE COURT: No. Let me explain to the jury.
13      As I told you, and I know you understand by now, this
14  was all testimony taken earlier and we took out all the
15  lawyering and the judging and have given you edited
16  videotapes.
17      In that process, apparently we have edited out
18  something that we shouldn't have edited out. And instead of
19  going back and trying to find the snippet of tape with the
20  testimony, I am going to ask counsel to simply read the
21  questions that were posed to this witness and to read her
22  answers. And you are to consider that in the same way you
23  would as if she were testifying from the witness stand.
24      Do you understand?
25      (All jurors indicated an affirmative response.)

Page 720

1       THE COURT: Are we in agreement, counsel?
2       MR. AYLSTOCK: We are, Your Honor. No objection.
3       THE COURT: You may proceed.
4       MR. THOMAS: With permission, I'd like to ask a
5   couple of questions ahead of time to put it in context. Is
6   that all right?
7       THE COURT: Yes.
8       MR. AYLSTOCK: Sure.
9       MR. THOMAS: Beginning at 463, line 25:
10      "She's just -- she's having some spotting, flashes,
11  difficulty sleeping, and mood lability.
12      Answer: Yes.
13      Question: Needs HRT.
14      Answer: Hormone replacement therapy.
15      Question: All right. Was it at this point you're
16  still prescribing the estrogen cream?
17      Answer: Yes.
18      Question: And that would have been important to use?
19      Answer: Yes."
20      That's all, Your Honor.
21      MR. AYLSTOCK: Thank you.
22      THE COURT: All right. Let's continue with the
23  video.
24      (The videotaped cross-examination testimony of Carol
25  DeHasse was resumed and played from 4:29 p.m. until 4:49 p.m.)

Page 721

1    MR. THOMAS:  Your Honor, I've had a chance to review
2    the exhibits tendered by plaintiff at the close of their
3    evidence and we have no objection to the exhibits that they
4    tendered.
5    Defendants offer Defendant's 10141, 10140, 10135, and
6    10116 and ask that those be received into evidence.
7    MR. AYLSTOCK:  I just haven't seen them, Your Honor.
8    I'm sure it's fine.
9    MR. THOMAS:  In addition, Your Honor, in the course
10   of the examination of Dr. DeHasse, she identified and actually
11   brought with her to the deposition a different patient
12   brochure.
13   MR. AYLSTOCK:  Your Honor, could we, could we do this
14   at the sidebar?  This is --
15   THE COURT:  Yes.
16   MR. THOMAS:  We can do it later if you like.
17   THE COURT:  We can do it now.
18   MR. AYLSTOCK:  There's no redirect.
19   MR. THOMAS:  Okay, perhaps now.
20   THE COURT:  Let's do it now.
21   (The following occurred at sidebar:)
22   THE COURT:  All right, sir.
23   MR. THOMAS:  Your Honor, during the deposition of Dr.
24   DeHasse you heard testimony about the 2008 patient brochure
25   that Dr. DeHasse brought with her to the deposition and she

Page 722

1    was questioned about that.  And the questions about it related
2    to whether the 2008 brochure or the 2006 brochure was the one
3    reviewed by the plaintiff in the case.
4    THE COURT:  Uh-huh.
5    MR. THOMAS:  And the testimony from the doctor is --
6    although she brought it with her, she could not be sure which
7    brochure that Ms. Bellew saw.  And I think it's only fair for
8    the jury to have the benefit of that brochure as they
9    deliberate as well.
10   MR. AYLSTOCK:  Your Honor, I don't believe that any
11   testimony from Dr. DeHasse was designated or played about the
12   2008 brochure.  She was simply asked:  Which one?  Does she
13   recall?  And she said, no, she does not.  The testimony in
14   this case from Mrs. Bellew will be she saw the 2006 brochure
15   and only the 2006 brochure.  So, --
16   THE COURT:  All right.  Here's what I remember.  She
17   was asked and, by Ethicon's lawyer, "Isn't it more likely,
18   given the time frame, that she was given the 2008 brochure?"
19   MR. THOMAS:  Exactly right.
20   THE COURT:  And she said, "Not necessarily.  It just
21   kind of depends.  They just --" from an earlier answer she
22   said, "They just add them to the stack."  And without
23   remembering the exact words, she said, "I just can't say which
24   brochure she got."
25   Now, I know from reading the papers that she's going

Page 723

1    to say she had the 2006.  But I didn't see anything where you
2    asked this witness about the 2008 brochure or any discussion
3    about it other than did she or did she not give it to her and
4    she said she didn't know.
5    I'm sure in your case you may find a way to get the
6    2008 brochure in, but I'm not going to let it in right now.
7    MR. AYLSTOCK:  Thank you, Your Honor.
8    MR. THOMAS:  Thank you, Your Honor.
9    (Sidebar concluded.)
10   THE COURT:  Ladies and gentlemen, we're going to keep
11   working.  It's going to be about 13 minutes.  We're going to
12   keep working.  You'll be glad.
13   MR. AYLSTOCK:  Your Honor, the plaintiff's exhibits
14   identified in conjunction with Dr. DeHasse, are those exhibits
15   admitted?
16   THE COURT:  They are.
17   MR. AYLSTOCK:  Thank you, Your Honor.
18   THE COURT:  As are the ones offered by the defendant
19   just now.
20   (PLAINTIFF'S EXHIBITS P-3404, P2103, P-2105, P-3396,
21   P-1904, P-1905, P-3405, P-1906, P-3400, P-3401, P-2119,
22   P-3403, and P-3393 RECEIVED IN EVIDENCE.)
23   (DEFENDANT'S EXHIBITS 10141, 10140, 10135, AND 10116
24   RECEIVED IN EVIDENCE.)
25   THE COURT:  Go ahead and start the television.

Page 724

1    MR. SLATER:  Okay, Your Honor.
2    Your Honor, through the mayhem, plaintiff calls Bryan
3    Lisa who worked at Ethicon Regulatory Affairs during the
4    relevant time period.
5    THE COURT:  All right.
6    (The videotaped direct examination testimony of Bryan
7    Lisa was played from 4:54 p.m. until 5:07 p.m.)
8    MR. AYLSTOCK:  Your Honor, that concludes the
9    testimony of Mr. Bryan Lisa.
10   THE COURT:  I understand there's no cross.
11   MR. SLATER:  There's no cross, Your Honor, and we
12   have a few exhibits to move and we have those transcripts for
13   you as well.
14   We move from this deposition P-160, P-0366, and
15   P-0462, although I think we should confer.  There may be a
16   couple things that we may want to work on, some redactions I
17   just noticed just in case.
18   MS. JONES:  Your Honor, we would have objections to
19   the P-462 and P-366 that we would need to take up.
20   THE COURT:  All right.  Why don't I let the jury go
21   home and let's straighten this out.
22   MR. SLATER:  No problem.
23   THE COURT:  Ladies and gentlemen of the jury, we'll
24   be in recess, be adjourned for the day and start again at 9:00
25   in the morning.  The roads are icy.  So, if you live very far

Page 725

1  away, you probably ought to spend another night in the warmth
2  of your hotel room.  It's up to you entirely.
3      You are serving as jurors, a mandatory duty of
4  citizenship, but I am not adding the additional condition that
5  you be confined.  So, it will be entirely up to your good
6  judgment what you do.  But I'll expect to see all your shining
7  faces here tomorrow at 9:00.  Have a nice evening.
8      Don't discuss the case or communicate about the case
9  in any way, shape, or form.
10      (The jury left the courtroom at 5:09 p.m.)
11      THE COURT:  Of course as you're rattling off those
12  numbers, I have not the slightest idea what you're talking
13  about.  So, you're going to have to tie a number to a subject
14  matter or I won't be able to figure it out.
15      MS. JONES:  May I address our objections because I
16  think it's fairly simple and Your Honor may wish to look at
17  the documents?
18      I object to P-462 about which Mr. Lisa was
19  questioned.  Plaintiffs have identified some of it.  But it
20  is, in fact, a letter to the -- I'm sorry -- the redacted
21  portions of it.  It is, in fact, a letter to the FDA.  It is
22  strictly a regulatory document.
23      And under those circumstances and under Your Honor's
24  rulings thus far, I think it would be inappropriate to be
25  admitted.

Page 726

1      THE COURT:  I had some problem with the testimony.
2      MS. JONES:  Well, so did I.
3      THE COURT:  But it's -- I adopted the rulings.  I'll
4  look at that.
5      MS. JONES:  The second thing, Your Honor, is a
6  similar document, P-366, which is also a regulatory document.
7  It is addressed "To Whom It May Concern" but it's provided
8  that it can be released to the following countries.  And, so,
9  it actually is a foreign regulatory document that --
10      THE COURT:  Can I -- let's go off the record so I can
11  ask a few silly questions.
12      (Discussion off the record after which the following
13  occurred:)
14      MS. JONES:  I have no objection to 160.
15      THE COURT:  160 is received.
16      (PLAINTIFF'S EXHIBIT P-160 RECEIVED IN EVIDENCE.)
17      MR. SLATER:  I also have with Dr. Elliott and we
18  referenced it several times -- I thought I had moved it.
19  Apparently I may not have.  It's P-1593.  It's a document --
20  the professional education dec used at the time Dr. DeHasse
21  said she wanted.  We offer that into evidence.  It's
22  already been utilized in the testimony with Dr. Elliott
23  several times.
24      MS. JONES:  I don't have any objection.  I think
25  that -- my recollection was that we had agreed that a couple

Page 727

1  of pages would be, but I anticipate that it will be all be
2  ultimately.
3      THE COURT:  That's fine.
4      MR. SLATER:  Thank you.
5      THE COURT:  It's got a number on it?
6      MR. SLATER:  It does and it was utilized.
7      THE COURT:  May be admitted.
8      (PLAINTIFF'S EXHIBIT P-1593 RECEIVED IN EVIDENCE.)
9      MR. SLATER:  For the record, I could read in the
10  exhibit numbers and we have the transcript excerpts for you,
11  Your Honor, on all the deposition designations save I told --
12  I looked around because we traded people, so Mr. Lisa's is
13  being stamped right now.  But I have them ready to read the
14  numbers for you, Your Honor, and hand them up.
15      THE COURT:  The deposition exhibits as played today
16  is what you're going to present now?
17      MR. SLATER:  These are the -- I have them all.
18      THE COURT:  Or yesterday or all of the day.
19      MR. SLATER:  These are all of the scripts for what
20  was actually played to the jury, Your Honor.
21      MS. JONES:  By the plaintiffs or by --
22      MR. SLATER:  By the plaintiffs.
23      MR. AYLSTOCK:  And I have a courtesy copy for Your
24  Honor if you'd like them.
25      THE COURT:  Okay.  They're not exhibits.  They're

Page 728

1  filed.
2      MR. SLATER:  They're filed.  Okay.  Shall I identify
3  them for the record?
4      THE COURT:  Yes, please.
5      MR. SLATER:  Okay.  I'll go through them real quick.
6  Paul Parisi, P3414; Piet Hinoul, P-3415; Uwe Klinge,
7  P-3416; Gene Kammerer, P-3417; Vincent Lucente, P-3418; Scott
8  Ciarrocca -- that's C-i-a-r-r-o-c-c-a -- P-3419; Sean O'Bryan,
9  P-3420; Charlotte Owens, P-3421; Kimberly Hunsicker, P-3422;
10  Dr. Carol DeHasse, P-3423; Bryan Lisa, P-3425.
11      They're now identified and I have them here for the
12  Court.
13      And my last piece of housekeeping is -- whether it
14  has to be on the record -- this is probably not an
15  on-the-record kind of thing.
16      THE COURT:  Okay.  These may be filed as exhibits and
17  considered a part of the transcript of the proceedings.
18      MR. SLATER:  Thank you, Your Honor.
19      The only other issue I was going to state, counsel
20  asked when we thought we were going to rest based on where we
21  are.  We have to look at the timing of how we did today.  But
22  we think -- counsel -- based on -- this doesn't have to be for
23  the record frankly.  It's up to you.
24      THE COURT:  No.
25      (Discussion off the record, after which the following

Page 729

1   occurred:)
2       MR. THOMAS:  Your Honor, we filed, pursuant to the
3   Court's direction, some modifications to the Pre-Trial Order
4   and to the jury instructions.
5       THE COURT:  All right.  Anybody else got anything
6   like that?
7       MR. ANDERSON:  Real quickly, Your Honor, just that
8   Your Honor had earlier -- we admitted Plaintiff's Exhibit 1910
9   during Dr. Iakovlev, but it was subject to, it was subject to
10  just pulling out the particular exhibits that did not have
11  writing on them.
12      And so, I've met with Mr. Thomas and we've pulled
13  out which ones of those are going to go into the record.  That
14  would be Plaintiff's Exhibit 1910-Z.  That would be
15  Plaintiff's Exhibit 1910-NN.  That would be Plaintiff's
16  Exhibit 1910-BBB.  That would be Plaintiff's Exhibit 1910-ZZ.
17  That would be Plaintiff's Exhibit 1910-L.  Plaintiff's Exhibit
18  1910-CC, but we have the version that's marked.  And, so,
19  we're going to bring you the one tomorrow morning that doesn't
20  have the marking on it.  It's the exact same photo and it's
21  one that we put on the record at the very end.  But I will
22  replace that for you tomorrow.  Would you like it for now and
23  then I replace it or I just keep it?
24      THE CLERK:  Sure.  That's fine.
25      MR. ANDERSON:  All right.  And I believe that covers

Page 730

1   that bit of housekeeping.  I ask it be admitted.
2       THE COURT:  May be done.
3       MR. ANDERSON:  Thank you, Your Honor.
4       (PLAINTIFF'S EXHIBITS 1910-Z, 1910-NN, 1910-BBB,
5   1910-ZZ, 1910-L, 1910-CC RECEIVED IN EVIDENCE.)
6       MR. AYLSTOCK:  This doesn't need to be on the record.
7       (Discussion off the record, after which the following
8   occurred:)
9       MR. ANDERSON:  I'm so sorry.  I missed one.
10      David, I missed one.  It was the 1910-PP.
11      MR. THOMAS:  No objection.
12      MR. ANDERSON:  I ask that it be admitted, Your Honor.
13      THE COURT:  May be admitted.
14      MR. THOMAS:  No objection, Your Honor.
15      (PLAINTIFF'S EXHIBIT 1910-PP RECEIVED IN EVIDENCE.)
16      MR. ANDERSON:  Thank you.
17      THE COURT:  Let's stay on the record for a minute.
18      You still are talking in your papers filed, the
19  plaintiffs, about fraud and misrepresentation.  Those claims
20  were dismissed.
21      MR. AYLSTOCK:  Your Honor, --
22      MR. SLATER:  The reason -- if I may, Your Honor.
23      THE COURT:  Sure.
24      MR. SLATER:  As I had stated at sidebar the other
25  day, we believe that if the jury finds that there were no

Page 731

1   adequate warnings to the doctor that the learned intermediary
2   defense is gone from the case.  And we would -- we're going to
3   hope to convince Your Honor that an instruction could be
4   fashioned that would be contingent on that finding because I
5   know Your Honor relied on the learned intermediary to say
6   there would not be fraud.  But we believe that if the jury
7   finds failure to warn because there's a lack of adequate
8   warnings, there is by law in Arizona no learned intermediary
9   defense at that point because it's obviously phrased as if an
10  adequate warning is provided to the doctor, then you don't
11  have to warn the plaintiff.
12      But if they haven't adequately warned the doctor,
13  then they would have had the duty to provide accurate
14  information.  They would no longer have that defense anymore,
15  and then fraud would be in play at that point.  That's our
16  position.
17      MR. AYLSTOCK:  Your Honor, -- I'm sorry, Your Honor.
18  This is Eric Walker.  He's writing a responsive brief, so I
19  just wanted to introduce him to Your Honor.
20      MR. WALKER:  One of the briefs that Mr. Aylstock
21  referenced is a very short brief we're filing.  An Arizona
22  Court of Appeals ruled this year, just a couple months ago,
23  that the learned intermediary doctrine does not apply in
24  Arizona anymore.
25      THE COURT:  I read it yesterday afternoon.

Page 732

1       MR. WALKER:  And, so, we're filing a supplemental
2   brief on that.  It's very short.
3       THE COURT:  Okay.  I'm well aware of that case.
4       MR. AYLSTOCK:  Thank you, Your Honor.
5       THE COURT:  You might also address, while you're at
6   it, if there's anything in that case that changes the, in your
7   opinion, the law of punitive damages in Arizona.  Oh, we're
8   going with New Jersey law in this case.  Nevermind.  I don't
9   care what the punitive damage law is in Arizona.
10      MR. ANDERSON:  As you were saying.  Right?
11      THE COURT:  Yeah.  Go ahead and give them that cite
12  now so they can give any response they want to give instead of
13  waiting until the midnight brief.  I've read that case and we
14  did a little work on it yesterday.  So, I'm aware of it.
15  Actually, it's why I asked whether or not anybody was going to
16  file any additional things.
17      See you later.
18      MR. ANDERSON:  Thank you, Judge.
19      MR. AYLSTOCK:  Thank you, Your Honor.
20      MR. SLATER:  Thank you, Your Honor.
21      MS. JONES:  Thank you, Your Honor.
22      (Trial recessed at 5:27 p.m.)
23      - - - - - -
24
25

Page 733

```
 1              REPORTERS' CERTIFICATE
 2
 3      Carol Farrell, CRR, RMR, CCP, RSA, RPR, and Lisa A. Cook,
 4   RPR, RMR, CRR, FCRR, Official Court Reporters of the United
 5   States District Court for the Southern District of West
 6   Virginia, do hereby certify that the foregoing is a true and
 7   accurate transcript, to the best of our ability, of the
 8   proceedings as taken stenographically by and before us at the
 9   time, place, and on the date hereinbefore set forth.
10
11
12   /S/ Carol Farrell, CRR, RMR, CCP, RSA, RPR   03/05/2015

13   _____   _____
        Court Reporter              Date
14
15
     /S/ Lisa A. Cook, RPR, RMR, CRR, FCRR     03/05/2015
16   _____   _____
        Court Reporter              Date
17
18
19
20
21
22
23
24
25
```

# EXHIBIT S

Hernia (2005) 9: 51 55
DOI 10.1007/s10029 004 0281 y

# ORIGINAL ARTICLE

P. Bracco · V. Brunella · L. Trossarelli · A. Coda · F. Botto-Micca

# Comparison of polypropylene and polyethylene terephthalate (Dacron) meshes for abdominal wall hernia repair: A chemical and morphological study

Received: 12 March 2004 / Accepted: 26 July 2004 / Published online: 10 September 2004
© Springer Verlag 2004

**Abstract** For the first time, by scanning electron microscopy (SEM), polypropylene (PP) excised meshes (ethylene oxide sterilized) for abdominal wall hernia repair have been shown to be greatly damaged physically, independently of the implantation time, while the polyethylene terephthalate (PET), or, Dacron, ones (gamma radiation sterilized), did not undergo alterations due to the sterilization process and were not damaged, even after long implantation periods. Fourier-Transform Infrared Spectroscopy (FTIR) study of PP and PET excised meshes, as well as of their extracts with cyclohexane, has shown the presence of species, such as squalene, palmitic and stearic acid, in some cases, cholesterol, transferred from the surrounding tissues to the polymer during the implantation period. In the case of PP meshes, these small organic molecules would reduce physical and mechanical properties of the material. A hypothesis is presented to account for the better behavior (not in the clinical sense) of PET meshes.

**Keywords** Polymeric meshes · Abdominal wall hernia · Scanning electron microscopy · Infrared spectroscopy

## Introduction

In the literature, there are only a few investigations of modifications undergone by meshes [1] after

P. Bracco · V. Brunella (✉) · L. Trossarelli
Dipartimento di Chimica IFM dell'Università di Torino,
Via Pietro Giuria 7, 10125 Torino, Italy
E mail: valentina.brunella@unito.it
Tel.: +39 0116707546
Fax: +39 0116707855

A. Coda
Presidio Sanitario "Gradenigo", U.O.A. di Chirurgia Generale,
Corso Regina Margherita 8, 10153 Torino, Italy

F. Botto Micca
Presidio Sanitario "Gradenigo", Servizio di Anatomia Patologica,
Corso Regina Margherita 8, 10153 Torino, Italy

implantation, mainly carried out on animals [2] or by x-ray in vivo [3], but, as far as we know, only our group [4] reported modifications of polymeric meshes after long periods in the human body.

In previous papers, we have reported modifications undergone by certain polymeric materials for medical use, arising both from the sterilization process, when carried out with high-energy radiations [5, 6], and from their stay in the human body [7].

The subject of the present paper is an investigation by scanning electron microscopy (SEM), infrared (IR) spectroscopy, and gas chromatography (GC) on polyethylenterephthalate, or, Dacron, (PET) and polypropylene (PP) meshes for abdominal wall hernia repair. The aim was to verify for Dacron (PET) meshes, which were gamma sterilized by the manufacturer, if this sterilization process had given rise to some physical damage and had modified their chemical structure (PP meshes were ethylene oxide sterilized by the manufacturer) and for both PET and PP meshes to discover the effect on their structure, due to the stay for long periods in the human body. The results obtained so far are presented and discussed herein.

## Materials and methods

Meshes

During a 6-year period (1996–2002), at the Surgical Division of the Gradenigo Hospital in Turin, Italy, biopsies were performed on hernia meshes of 25 patients (24 male, 1 female), with a mean age of 62 years (range 37–89). The average of implant was 32.5 months (range 2–180). All 25 fragments, from different manufacturers (Table 1), were excised during surgery not programmed nor carried out with this purpose. Polypropylene (PP) fragments were from PP meshes, which were ethylene oxide sterilized at the origin by the manufacturer, while the Dacron (PET) ones were from PET meshes sterilized at the origin with gamma radiations by

52

**Table 1** Excised meshes

| Sample | Sex | Age (years) | Polymeric material | Implantation time (months) |
|---|---|---|---|---|
| 1 | M | 73 | PP | 16 |
| 2 | M | 58 | PP | 13 |
| 3 | M | 37 | PP | 9 |
| 4 | M | 89 | PP | 2 |
| 5 | M | 48 | PP | 8 |
| 6 | M | 67 | PP | 6 |
| 7 | M | 74 | PP | 7 |
| 8 | M | 37 | PP | 9 |
| 9 | M | 58 | PP | 12 |
| 10 | M | 70 | PP | 14 |
| 11 | M | 62 | PP | 34 |
| 12 | M | 64 | PP | 35 |
| 13 | M | 45 | PP | 36 |
| 14 | M | 71 | PP | 47 |
| 15 | M | 78 | PP | 11 |
| 16 | M | 70 | PP | 15 |
| 17 | M | 54 | PP | 24 |
| 18 | M | 59 | PP | 32 |
| 19 | M | 76 | PP | 36 |
| 20 | M | 53 | PP | 45 |
| 21 | M | 53 | PP | 52 |
| 22 | F | 65 | PET | 36 |
| 23 | M | 65 | PET | 96 |
| 24 | M | 69 | PET | 180 |
| 25 | | | PET | 36 |

PP = polypropylene; PET = polyethylene terephthalate

the manufacturer. After biopsy, either PET or PP mesh fragments were fixed in 4% formalin. In order to eliminate any organic residue, the fragments were treated for 24 h with a NaClO solution (Fluka 6–14% active chlorine) at 37°C and washed with distilled water. When fragments 4 cm² or larger (PRO_36, PRO_47, TRE_11, TRE_32, and LI_96) were available, they were extracted for 24 h with boiling cyclohexane. Cyclohexane was removed with a rotating evaporator and the residue recovered with a few drops of cyclohexane.

Scanning electron microscopy

A Leica Stereoscan 420 SEM equipped with a secondary electron detector was used. The samples were previously coated with gold in a Bio Rad, Polarum Division, E 5000 M SEM Coater (120 s at 18 mA).

Infrared spectroscopy

An FT-IR Perkin Elmer AutoImage microscope, with an MCT detector, enabling sampling on surfaces down to 10×10 μm, which can operate both in transmission and in reflection and equipped with a Micro-ATR system, was used. Transmission spectra (resolution 4 cm⁻¹, 32 scans per spectrum) were collected on a 100×100 μm surface area.

IR spectra of cyclohexane extracts were registered (32 scans per spectrum) with an FT-IR Perkin Elmer System

2000 with a resolution of 4 cm⁻¹ from films supported on KBr discs.

Gas chromatography

An Agilent 6890 gas chromatograph with a FID detector was used, carrier gas He (2 ml/min), equipped with a 10 m capillary column Rtx-5MS, 0.32 mm internal diameter, coated with a 0.1 mm layer of 5% phenyl-95% methylarylene polysiloxane, temperature program 20°C/min from 60°C up to 200°C and then 5°C/min up to 360°C.

Stearic acid, palmitic acid, squalene, cholesterol, cholesteryl stearate, and cholesteryl palmitate (Fluka, purity >99%) were used as standards.

## Results

Virgin PET and PP meshes by the same manufacturers of the fragments listed in Table 1, treated in the same manner as the excised ones, were preliminarily studied to see if formalin and NaClO treatments had chemically modified the materials. The IR spectra of virgin PET and PP meshes, before and after the treatment with formalin and then with NaClO, are, respectively, the typical IR spectra of PET and of PP without any additive reported in the literature.

In the SEM image of fragment #24 (PET) (Fig. 1) excised after a 180-month stay in the human body, taken as representative of all the other PET excised mesh fragments listed in Table 1, no defects nor any damage were detectable.

Two SEM images of PP excised mesh fragments were taken as representative of all the other PP excised mesh fragments listed in Table 1 (Fig. 2, and Fig. 3).



**Fig. 1** Scanning electron microscopy (SEM) micrograph (1,000×) of fragment #24 polyethylene terephthalate (PET)



**Fig. 2** Scanning electron microscopy (SEM) micrograph (1,000×) of fragment #20 polypropylene (PP)

In Fig. 4, some representative IR spectra of excised PP mesh fragments listed in Table 1 are collected. Common to all these IR spectra is the new absorption band in the C=O region at 1,728 cm$^{-1}$.

In Fig. 5 are reported the IR spectra of sample #13 (PP) before and after extraction with cyclohexane, taken as representative of all the other PP samples listed in Table 1; it can be observed that the absorption band at 1,728 cm$^{-1}$ practically disappears after cyclohexane extraction.

In Fig. 6, the IR spectrum of the extract with cyclohexane of sample #15 (PP) is reported as an example. Quite similar IR spectra have been obtained for samples #14, #13, and #18 and for sample #23 (PET) listed in Table 1.



**Fig. 3** Scanning electron microscopy (SEM) micrograph (1,000×) of fragment #9 polypropylene (PP)



**Fig. 4** Fourier Transform Infrared Spectroscopy (FTIR) spectra of fragments **a** #9, **b** #14, **c** #13

The gas chromatograms of the cyclohexane extracts of samples #13, #14 (both PP), and #23 (PET) are similar, and so only the GC of sample #13 has been reported (Fig. 7).

## Discussion

The IR spectra of both virgin PET and PP meshes and virgin PET and PP meshes treated with formalin and NaClO show that within the sensibility of our instrument, neither of these reagents modified the chemical structure of the materials. Since the IR spectra of PET and PP meshes do not differ from those reported in the literature for PET and PP without additives, this means that processing did not alter the chemical properties of either material; it also did not alter PP meshes sterilized with EtO. For PET meshes, it should be pointed out that gamma-radiation sterilization did not affect the chemical structure of the polymer, in agreement with what is commonly observed for polymeric materials with aromatic rings when treated with high-energy radiations [8]. SEM images of both virgin PET and PP meshes before



**Fig. 5** Fourier Transform Infrared Spectroscopy (FTIR) spectra of fragment #13 **a** before and **b** after cyclohexane extraction

54



**Fig. 6** Fourier Transform Infrared Spectroscopy (FTIR) spectrum of the cyclohexane extract of fragment #15

and after the treatment with formalin and then with NaClO do not show defects or physical damages, and this means that both these treatments, as well as sterilization with gamma radiation in the case of PET meshes, did not physically modify the fibers.

As previously pointed out, the SEM image of a PET mesh fragment excised after a 180-month stay in the human body (Fig. 1) does not show defects or damage of any kind. Because of the very small sizes of the fragments of excised PET meshes under investigation, we have not been able to investigate whether alterations of molecular weight, molecular weight distribution, crystallinity, and mechanical properties occurred as a consequence of their stay in the human body, as reported in the literature in the case of excised PET arterial prostheses [9, 10]

In all the PP excised mesh fragments listed in Table 1 (Fig. 2 and Fig. 3), independently of the manufacturer or the implantation time, the filaments appear badly

damaged. This seems to be in disagreement with what is clinically observed [11, 12], namely that PP meshes give an inflammatory response and an extraneous body reaction less than the PET ones. A possible explanation of this clinical observation could be a better integration of PP meshes than that of the PET ones with the surrounding tissues.

In the IR spectra of Fig. 4 the lack of absorptions in the regions of CONH groups (3,300, 1,600 cm$^{-1}$) means that the treatment with NaClO has completely removed all tissues adherent to excised mesh fragments. Common to all the IR spectra of excised PP mesh fragments listed in Table 1 is a new absorption band in the C=O region at 1,728 cm$^{-1}$, which is not detectable in the IR spectra of PET excised mesh fragments, being completely overlapped by that of the terephthalic ester. This new absorption band practically disappears (Fig. 5) after cyclohexane extraction, and this emphasizes that it does not arise from a chemical modification of PP due to its stay in the human body, but it arises from chemical species present in the human tissues that have been transferred to the polymer.

IR spectrum of the cyclohexane extract of a PET excised mesh fragment is totally similar to those of the PP ones; this observation confirms the previous hypothesis of the lack of the absorption band at 1,728 cm$^{-1}$ in the excised PET mesh IR spectra. Moreover, the close similarity between the IR spectra of the extracts from PP and PET excised mesh fragments illustrates that gamma sterilization of PET meshes did not alter the chemical structure of the polymer. The absorption at 3,360 cm$^{-1}$ in the IR spectrum of a typical cyclohexane extract could be attributed to the stretching of alcoholic OH and those at 2,956 and 2,871 cm$^{-1}$, at 2,924 and 2,854 cm$^{-1}$, and at 1,462 and 1,378 cm$^{-1}$ could be attributed to CH₃

**Fig. 7** Gas chromatogram of the cyclohexane extract of fragment #13



and to $CH_2$ stretching and to $CH_2$ and $CH_3$ bending, respectively. The absorption band at 1,728 cm$^{-1}$ could be attributed to the $C=O$ stretching of an ester group [13]. Since the ratio 1,728/1,462 is small, this would indicate the presence in the extract of high molecular mass esters.

All gas chromatograms show that in addition to some species, which at the present we have not been able to identify, there is always squalene and palmitic acid, while cholesterol and its derivatives and stearic acid are not present in all the extracts. Squalene and cholesterol in the extracts have been confirmed by gas chromatography-mass spectroscopy, and it should be pointed out that squalene is one of the precursors of cholesterol [14], and so it is always present in organic tissues.

In regard to the extracted products from excised PET and PP mesh fragments, the situation seems to be in some way similar to that already reported by some of us in the case of the products extracted from excised Ultra High Molecular Weight Polyethylene (UHMWPE) hip prostheses, where, in addition to fatty acids, squalene and cholesterol, cholesteryl esters of fatty acids as well were found [15]. IR spectra of the cyclohexane extracts of excised mesh fragments indeed show the presence of some high molecular weight esters, as suggested by IR spectra, for instance triglycerides, which probably cannot be eluted under our gas chromatography operating conditions. Triglycerides, such as tristearine and tripalmitine, which show IR absorption bands in the 1,730 cm$^{-1}$ region, in fact are not eluted under our experimental conditions. Both the composition and the relative concentration of each substance in the extracts from excised PET and PP mesh fragments seem to vary slightly depending on the individual patient, as was already found in the case of the UHMWPE hip prostheses [15].

Diffusion into mesh filaments of the small organic molecules mentioned above could be responsible for the damage observed on PP mesh filaments, since the presence of small foreign molecules could greatly affect their physical and mechanical properties. It is well known that physical and mechanical properties of polymeric materials depend on intermolecular secondary bond forces (van der Waals-London forces) between polymeric chains and on possible hydrogen bonds. In the case of PP and of PET, the physical and mechanical properties of the first, a nonpolar polyhydrocarbon molecule, will essentially depend on van der Waals-London forces of the induced dipole type, while for the second, a polyester molecule with highly polar groups along the chain, van der Waals-London forces of the dipole-dipole type between carbonyl groups are also to be taken into account and the hypothesis of weak hydrogen bonds cannot a priori be refused. It should also be pointed out that the aromatic rings along the PET chains make them stiffer than the PP ones, and it is well known that chain stiffness greatly contributes to increased physical and mechanical properties of polymeric materials [16].

## Conclusions

According to the above considerations, one can conclude that the absorption of small organic molecules by mesh filaments could be the reason for part of the observed shrinkage of mesh pores [4, 7]. As a consequence of the better integration of PP meshes with the surrounding tissues than those of PET, they would be highly damaged during their stay in the human body. The better integration with surrounding tissues of PP meshes than those of PET could also be an explanation of their lower inflammatory response and lower extraneous body reaction as clinically observed [10, 12]. Work is in progress on this subject.

## References

1. Debord JR (2001) Prostheses in hernia surgery: a century of evolution. In: Bendavid R (ed) Abdominal Wall Hernias. Springer, New York, pp 16 32
2. Klinge U, Klosterhalfen B, Muller M, Ottinger AP, Schumpelick V (1998) Shrinking of polypropylene mesh in vivo: an experimental study in dogs. Eur J Surg 164:965 969
3. Amid PK (1997) Classification of biomaterials and their related complications in abdominal wall hernia surgery. Hernia 1:15 21
4. Coda A, Bendavid R, Botto Micca F, Bossotti M, Bona A (2003) Structural alterations of prosthetic meshes in humans. Hernia 7:29 34
5. Costa L, Luda MP, Trossarelli L, Brach del Prever EM, Crova M, Gallinaro P (1998) Oxidation in orthopaedic UHMWPE sterilized by gamma radiation and ethylene oxide. Biomaterials 19:659 668
6. Baccaro S, Brunella V, Cecilia A, Costa L (2003) Gamma irradiation of Poly(Vinyl Chloride) for medical applications. Nucl Instrum Methods Phys Res B: Beam Interact Mater Atoms 208:195 198
7. Costa L, Luda MP, Trossarelli L, Brach del Prever EM, Crova M, Gallinaro P (1998) In vivo UHMWPE biodegradation of retrieved prosthesis. Biomaterials 39:1371 1386
8. Clegg DW, Collyer AA (1991) Irradiation effects on Polymers, Elsevier Applied Science, New York
9. Maarek JM, Guidoin R, Aubin M, Prud'homme RE (1984) Molecular weight characterization of virgin and explanted polyester artherial prostheses. J Biomed Mater Res 18:881 894
10. Vinard E, Eloy R, Descotes J, Brudon JR, Guidicelli H, Magne JL, Patra P, Berruet A, Huc A, Chauchard J (1988) Stability of performances of vascular protheses retrospective study of 22 cases of human implanted prosteses. J Biomed Mater Res 22:633 648
11. Morris Stiff GJ, Hughes LE (1998) The outcomes of nonabsorbable mesh placed within the abdominal cavity: literature review and clinical experience. J Am Coll Surg 186:352 367
12. Coda A, Botto Micca F, Quaglino F, Ramellini G (2000) In vivo tissue reaction to different prosthetic materials in abdominal wall hernia repair. Hernia 4:206 211
13. Lin Vien D, Colthup NB, Fateley WG, Grasselli JG (1991) Handbook of infrared and Raman characteristic frequencies of organic molecules. Academic Press, San Diego
14. Leardini G, Ramonda R (1996) Physical and chemical features of the synovial fluid. Reumatismo 48:43 51
15. Costa L, Bracco P, Brach del Prever EM, Luda M, Trossarelli L (2001) Analysis of products diffused into UHMWPE prosthetic components in vivo. Biomaterials 22:307 315
16. Mark HF (1965) Polymers in material science. J Polym Sci C 9:1 33

# EXHIBIT T



Human Tissues: Chemical Composition and Photon Dosimetry Data
Author(s): Young S. Kim
Source: *Radiation Research*, Vol. 57, No. 1 (Jan., 1974), pp. 38–45
Published by: Radiation Research Society
Stable URL: http://www.jstor.org/stable/3573753
Accessed: 02-02-2017 23:42 UTC

**REFERENCES**

Linked references are available on JSTOR for this article:
http://www.jstor.org/stable/3573753?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at http://about.jstor.org/terms



*Radiation Research Society* is collaborating with JSTOR to digitize, preserve and extend access to
*Radiation Research*

RADIATION RESEARCH **57**, 38–45 (1974)

# Human Tissues: Chemical Composition and Photon Dosimetry Data

YOUNG S. KIM

*Physics Department, The Ohio State University, Columbus, Ohio 43210*

KIM, YOUNG S. Human Tissues: Chemical Compositions and Photon Dosimetry Data. *Radiat. Res.* **57**, 38–45 (1974).

Chemical compositions of bone (femur), bone (rib), brain (whole), spinal cord, heart (whole, auricles, right and left ventricles), kidney, liver, lungs, muscle, ovaries, pancreas, spleen, and tongue are given for an average human adult. Photon mass attenuation coefficient $\mu$ and mass energy absorption coefficient $\mu_{en}$ for these tissues are given for photon energies ranging from 15 KeV to 2 MeV.

## INTRODUCTION

It is known that the chemical composition for striated muscle, commonly used to represent various human tissues, is not actually representative of all human tissues and that several tissues differ significantly in chemical composition from striated muscle (*1–3*). We present chemical compositions of various human tissues and some photon dosimetric data for these tissues in this paper.

Chemical compositions of human tissues are of importance in studying microdosimetric distributions in humans irradiated with radiation; although primary interactions of photons are nearly independent of the chemical composition at high energies (in the Compton region), secondary interactions which are primarily responsible for biological effects do depend on the chemical composition (*4–7*).

Chemical composition of human tissues are usually given in terms of biological molecules (e.g., protein, lipid, vitamins, etc.), and they are not readily amenable to dosimetric calculations. At the usual therapy-machine energies, molecular binding effects are negligible (*6, 7*), and one may represent human tissues by their atomic compositions (% wt by elements). Mean atomic compositions of various biological molecules are readily available (*2, 3, 8*), and the mean atomic compositions of human tissues may be calculated from these data.

Chemical compositions of human tissues depend in general on breed, diet, age, sex, health, etc., and they may vary appreciably (5–10%) among individual human beings. The composition figures given in this paper represent only the averages with estimated standard deviations of about 5–8%.

Our figures include only those elements which constitute at least 0.1% (fractional weight) of the tissues. In the energy range considered in this paper (i.e., 15 KeV–2 MeV), a trace of any element less than 0.1% has negligible effects in

38

Copyright © 1974 by Academic Press, Inc.
All rights of reproduction in any form reserved.

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

dosimetric considerations (1). It should be noted that due to rounding errors and other uncertainties, our composition figures do not always add up to unity.

## CHEMICAL COMPOSITIONS

Our basic composition data were taken from the following three sources: (a) *Biochemists' Handbook* (2), (b) *Handbook of Biological Data* (3), and (c) *Handbook of Chemistry and Physics* (8). Some pertinent data on the basic compositions are given below. Table I gives our results.

The composition of bone (femur) was taken to be 34% water, 18% femur protein, and other traces of elements as shown in Table I. The chemical composition of femur protein is given in Table II. These data were taken from (2). The chemical composition of rib bone was taken to be 71% water and the rest as shown in the table (3).

The composition of whole brain was taken to be 59% water, 10.4% lipids, 10.5% protein, 3.5% cholesterol, and traces of elements as shown in Table I. The brain protein composition was taken to be identical to that of pancreas protein given in Table III (2), and the chemical formula of cholesterol is given by $C_{27}H_{45}OH$ (8). The composition of spinal cord was taken to be 60.9% water, 9.5% protein, 26.6% lipid, and traces of elements as shown in Table I. The lipid composition is assumed to be 11.2% H, 57.3% C, 1.1% N, 30.3% O, and 0.06% S.

The composition of whole heart was taken to be 75.5% water, 16% protein, 8.3% lipids, and other elements as shown in Table I; similarly, auricles (82% water, 16% protein), left ventricle (80% water, 16% protein, 0.8% lipids), and right ventricle (80% water, 16% protein, 2% lipids).

The two main biological components of kidney are water (78.5%) and protein (18%); in addition, kidney contains lipid (5.3%), DNA (0.036%), and traces of other elements (2). Concentrations of K and lipid are somewhat higher in cortex, while the water content and NaCl concentrations are higher in medulla.

The liver composition is subject to large uncertainties due to the fact that liver undergoes rapid changes in size and protein (glycogen in particular) metabolism. The water content, a multiple of the glycogen content, is also subject to rapid changes. We assumed that liver consists of 75% water, 17% protein, 6% lipid, and some other elements as given in Table I.

The lung composition was taken to be 79% water, 15% protein, 3% lipid, and some other elements (3). For lean somatic muscle, we assumed 75% water, 20% protein, and traces of other elements (2, 3). The composition of the ovary is for a nonpregnant woman, and it was taken to be 78.5% water, 6% protein, 0.16% cholesterol, 0.03% ascorbic acid, and 0.012% inositol (2).

The pancreas is made of essentially two components: water (85%) and protein (15%). The composition of pancreas protein is given in Table III (2). A second composition is given for the pancreas in (2), i.e., 66% water, 9.1% lipid, 22.7% protein, 3.7% N, and 0.6% P. Figures given in Table I reflect the first composition.

The spleen is made of three biological components—78.5% water, 17.5% protein, and 3% lipid (3), and the tongue is made of 64% water, 20% lipid, and 18% protein (2).

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

40                                    KIM

## TABLE I

### CHEMICAL COMPOSITIONS OF VARIOUS HUMAN TISSUES

| Tissue name | % Body wt[a] | H | C | N | O | Na | P | Cl | K | Others |
|---|---|---|---|---|---|---|---|---|---|---|
| Bone (femur) | 15.0 | 0.056 | 0.093 | 0.033 | 0.0394 | 0.004 | 0.134 | — | 0.002 | 0.280(Ca); 0.004(Mg) |
| (rib) | | 0.078 | — | 0.050 | 0.617 | — | — | — | 0.005 | 0.002(Mg); 0.250(Ca) |
| Brain (whole) | 1.96 | 0.091 | 0.140 | 0.034 | 0.595 | 0.002 | 0.003 | — | 0.003 | 0.089(Fe); 0.041(Cu) |
| spinal cord | — | 0.106 | 0.192 | 0.037 | 0.065 | 0.002 | 0.006 | 0.002 | 0.004 | 0.001(S) |
| Heart (whole) | 0.42 | 0.106 | 0.124 | 0.025 | 0.744 | — | — | — | — | 0.002(S) |
| auricles | — | 0.106 | 0.051 | 0.025 | 0.817 | — | — | — | — | 0.002(S) |
| right ventricle | — | 0.105 | 0.060 | 0.025 | 0.809 | — | — | — | — | 0.002(S) |
| left ventricle | — | 0.106 | 0.055 | 0.025 | 0.813 | — | — | — | — | 0.002(S) |
| Kidney | 0.41 | 0.091 | 0.029 | 0.116 | 0.692 | 0.019 | 0.015 | 0.019 | 0.019 | — |
| Liver | 2.30 | 0.110 | 0.041 | 0.012 | 0.825 | — | — | 0.012 | — | — |
| Lungs | 0.73 | 0.105 | 0.095 | 0.025 | 0.766 | — | 0.007 | — | — | 0.002(S) |
| Muscle (lean somatic) | 42.8 | 0.103 | 0.099 | 0.032 | 0.757 | 0.001 | 0.002 | 0.001 | 0.003 | 0.003(S) |
| Ovaries | 0.01 | 0.109 | 0.046 | 0.011 | 0.834 | — | — | — | — | — |
| Pancreas | 0.164 | 0.107 | 0.072 | 0.023 | 0.800 | — | — | — | — | 0.002(S) |
| Spleen | 0.25 | 0.105 | 0.101 | 0.027 | 0.765 | — | — | — | — | 0.002(S) |
| Tongue | — | 0.107 | 0.173 | 0.031 | 0.683 | — | 0.002 | — | — | 0.003(S) |

[a] This column gives the percent weight of the tissues per adult human (average), and the other columns give the fractional weight of the elements per tissue.

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

PHOTON DOSIMETRY OF HUMAN TISSUES                    41

### TABLE II
#### CHEMICAL COMPOSITION OF HUMAN BONE (FEMUR) PROTEIN

| Component | % | H | C | N | O | S |
|---|---|---|---|---|---|---|
| Glycine | 19.6 | 1.32 | 7.26 | 3.66 | 8.36 | |
| Valine | 2.52 | 0.24 | 1.29 | 0.3 | 0.69 | |
| Leucine/isoleucine | 4.73 | 0.47 | 2.60 | 0.51 | 1.15 | |
| Proline | 12.9 | 1.02 | 6.73 | 3.59 | 1.57 | |
| Phenylalanine | 2.22 | 0.15 | 1.45 | 0.19 | 0.43 | |
| Tyrosine | 0.77 | 0.05 | 0.46 | 0.06 | 0.20 | |
| Serine | 3.37 | 0.23 | 1.16 | 0.45 | 1.54 | |
| Threonine | 2.00 | 0.15 | 0.81 | 0.24 | 0.81 | |
| Methionine | 0.74 | 0.06 | 0.30 | 0.07 | 0.16 | 0.16 |
| Arginine | 7.90 | 0.64 | 3.27 | 2.54 | 1.45 | |
| Histidine | 0.85 | 0.05 | 0.39 | 0.23 | 0.18 | |
| Lysine | 3.86 | 0.37 | 1.90 | 0.74 | 0.85 | |
| Aspartic acid | 5.80 | 0.31 | 2.09 | 0.61 | 2.79 | |
| Glutamic | 10.00 | 0.62 | 4.08 | 0.95 | 4.35 | |
| Hydroxyproline | 12.20 | 0.84 | 5.59 | 1.30 | 4.47 | |
| Hydroxylysine | 0.55 | 0.05 | 0.24 | 0.10 | 0.16 | |
| Alanine | 8.70 | 0.59 | 3.52 | 1.37 | 3.13 | |
| | Total: | 7.14 | 42.16 | 16.89 | 32.27 | 0.16 |

### TABLE III
#### CHEMICAL COMPOSITION OF HUMAN PANCREAS PROTEIN

| Component | % | H | C | N | O | S |
|---|---|---|---|---|---|---|
| Aspartic acid | 6.80 | 0.36 | 2.46 | 0.72 | 3.27 | |
| Glutamic | 13.70 | 0.85 | 5.59 | 1.30 | 5.96 | |
| Lysine | 8.1 | 0.78 | 3.99 | 1.55 | 1.77 | |
| Arginine | 5.0 | 0.41 | 2.07 | 1.16 | 0.92 | |
| Histidine | 3.7 | 0.22 | 1.72 | 1.00 | 0.76 | |
| Tyrosine | 2.6 | 0.16 | 1.55 | 0.20 | 0.69 | |
| Tryptophan | 2.4 | 0.14 | 1.55 | 0.33 | 0.38 | |
| Phenylalanine | 7.5 | 0.50 | 4.91 | 0.64 | 1.45 | |
| Hydroxyproline | 0.2 | 0.01 | 0.09 | 0.02 | 0.07 | |
| Proline | 6.8 | 0.54 | 3.55 | 1.89 | 0.83 | |
| Cysteine | 3.1 | 0.16 | 0.93 | 0.36 | 0.83 | 0.83 |
| Methionine | 2.1 | 0.16 | 0.85 | 0.20 | 0.45 | 0.45 |
| Leucine/isoleucine | 11.0 | 1.10 | 6.04 | 1.18 | 2.69 | |
| Valine | 8.1 | 0.77 | 4.16 | 0.96 | 2.21 | |
| Glycine | 4.3 | 0.29 | 1.38 | 0.80 | 1.84 | |
| Alanine | 6.7 | 0.46 | 2.71 | 1.05 | 2.41 | |
| Serine | 6.2 | 0.42 | 2.13 | 0.83 | 2.83 | |
| Threonine | 5.0 | 0.38 | 2.02 | 0.59 | 2.02 | |
| | Total | 7.68 | 47.68 | 15.23 | 31.37 | 1.28 |

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

KIM

TABLE IV

Comparison with Previous Results

| Tissue | Reference | H | C | N | O | Na | P | Cl | K | Ca | Mg | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Muscle | This work | 0.103 | 0.099 | 0.032 | 0.757 | 0.001 | 0.002 | 0.001 | 0.003 | — | — | 0.003 |
| | Tipton–Cook (9) | 0.100 | 0.11 | 0.026 | 0.75 | — | 0.002 | 0.002 | 0.003 | — | — | 0.005 |
| | ICRU (10) | 0.102 | 0.123 | 0.035 | 0.729 | 0.001 | 0.002 | — | 0.003 | — | — | 0.002 |
| | Lea (11) | 0.10 | 0.12 | 0.04 | 0.73 | 0.001 | 0.002 | 0.001 | 0.004 | — | — | — |
| Bone | This work | 0.056 | 0.093 | 0.033 | 0.394 | 0.004 | 0.134 | — | 0.002 | 0.280 | 0.004 | — |
| | Tipton–Cook (9) | 0.073 | 0.28 | 0.029 | 0.32 | — | 0.07 | 0.001 | 0.002 | — | 0.001 | 0.002 |
| | ICRU (10) | 0.064 | 0.278 | 0.027 | 0.41 | — | 0.07 | — | — | 0.147 | 0.002 | 0.002 |
| | Jayachandran (11) | 0.034 | 0.155 | 0.04 | 0.441 | — | 0.102 | — | — | 0.222 | 0.002 | 0.003 |

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

PHOTON DOSIMETRY OF HUMAN TISSUES          43

Our results for muscle and bone (femur) are compared with those of other workers in Table IV. In view of the large uncertainties involved in these types of figures, it may be stated that the composition data for *lean somatic muscle* (this paper), *soft tissue (9)*, *striated muscle (10)*, and *wet tissue (11)* are in an

TABLE V

PHOTON MASS ATTENUATION AND MASS ENERGY ABSORPTION COEFFICIENTS (cm²/g)

| $E(MeV)$ | Bone (femur) | | Brain (whole) | | Heart (whole) | | Kidney | |
|---|---|---|---|---|---|---|---|---|
| | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ |
| 0.015 | 10.99 | 10.33 | 9.44 | 7.94 | 1.50 | 1.19 | 2.50 | 2.16 |
| 0.02 | 4.77 | 4.37 | 4.33 | 3.63 | 0.74 | 0.48 | 1.16 | 0.89 |
| 0.03 | 1.55 | 1.28 | 1.49 | 1.17 | 0.36 | 0.14 | 0.48 | 0.26 |
| 0.04 | 0.76 | 0.54 | 0.75 | 0.52 | 0.26 | 0.06 | 0.31 | 0.11 |
| 0.05 | 0.47 | 0.28 | 0.47 | 0.27 | 0.22 | 0.04 | 0.25 | 0.06 |
| 0.06 | 0.35 | 0.17 | 0.35 | 0.17 | 0.20 | 0.03 | 0.22 | 0.044 |
| 0.08 | 0.24 | 0.081 | 0.24 | 0.083 | 0.18 | 0.026 | 0.19 | 0.031 |
| 0.10 | 0.20 | 0.052 | 0.20 | 0.054 | 0.17 | 0.025 | 0.17 | 0.028 |
| 0.15 | 0.15 | 0.034 | 0.16 | 0.036 | 0.15 | 0.027 | 0.15 | 0.028 |
| 0.20 | 0.13 | 0.031 | 0.14 | 0.032 | 0.14 | 0.029 | 0.13 | 0.029 |
| 0.30 | 0.11 | 0.031 | 0.12 | 0.032 | 0.12 | 0.032 | 0.12 | 0.031 |
| 0.40 | 0.01 | 0.031 | 0.10 | 0.032 | 0.11 | 0.033 | 0.10 | 0.032 |
| 0.50 | 0.09 | 0.031 | 0.09 | 0.032 | 0.10 | 0.033 | 0.09 | 0.032 |
| 0.60 | 0.08 | 0.031 | 0.09 | 0.032 | 0.09 | 0.033 | 0.09 | 0.032 |
| 0.80 | 0.07 | 0.030 | 0.08 | 0.031 | 0.08 | 0.032 | 0.08 | 0.031 |
| 1.0 | 0.07 | 0.029 | 0.07 | 0.030 | 0.07 | 0.031 | 0.07 | 0.030 |
| 1.5 | 0.05 | 0.027 | 0.06 | 0.027 | 0.06 | 0.028 | 0.06 | 0.027 |
| 2.0 | 0.05 | 0.025 | 0.05 | 0.025 | 0.05 | 0.026 | 0.05 | 0.025 |

| $E(MeV)$ | Liver | | Lungs | | Muscle | | Ovaries | |
|---|---|---|---|---|---|---|---|---|
| | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ |
| 0.015 | 1.74 | 1.42 | 1.60 | 1.29 | 1.63 | 1.32 | 1.55 | 1.24 |
| 0.02 | 0.84 | 0.57 | 0.78 | 0.52 | 0.79 | 0.53 | 0.76 | 0.49 |
| 0.03 | 0.39 | 0.17 | 0.37 | 0.15 | 0.37 | 0.15 | 0.37 | 0.14 |
| 0.04 | 0.27 | 0.075 | 0.27 | 0.068 | 0.27 | 0.07 | 0.26 | 0.066 |
| 0.05 | 0.23 | 0.045 | 0.22 | 0.042 | 0.22 | 0.043 | 0.22 | 9.041 |
| 0.06 | 0.21 | 0.034 | 0.20 | 0.032 | 0.20 | 0.033 | 0.20 | 0.031 |
| 0.08 | 0.18 | 0.027 | 0.18 | 0.026 | 0.18 | 0.026 | 0.18 | 0.026 |
| 0.10 | 0.17 | 0.026 | 0.17 | 0.025 | 0.17 | 0.026 | 0.17 | 0.025 |
| 0.15 | 0.15 | 0.028 | 0.15 | 0.028 | 0.15 | 0.028 | 0.15 | 0.028 |
| 0.20 | 0.14 | 0.030 | 0.14 | 0.029 | 0.14 | 0.029 | 0.14 | 0.030 |
| 0.30 | 0.12 | 0.032 | 0.12 | 0.032 | 0.12 | 0.032 | 0.12 | 0.032 |
| 0.40 | 0.11 | 0.033 | 0.11 | 0.033 | 0.11 | 0.033 | 0.11 | 0.033 |
| 0.50 | 0.10 | 0.033 | 0.10 | 0.033 | 0.10 | 0.033 | 0.10 | 0.033 |
| 0.60 | 0.09 | 0.033 | 0.09 | 0.033 | 0.09 | 0.033 | 0.09 | 0.033 |
| 0.80 | 0.08 | 0.032 | 0.08 | 0.032 | 0.08 | 0.032 | 0.08 | 0.032 |
| 1.0 | 0.07 | 0.031 | 0.07 | 0.031 | 0.07 | 0.031 | 0.07 | 0.031 |
| 1.5 | 0.06 | 0.038 | 0.06 | 0.028 | 0.06 | 0.028 | 0.06 | 0.028 |
| 2.0 | 0.05 | 0.026 | 0.05 | 0.026 | 0.05 | 0.026 | 0.05 | 0.026 |

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

44                                           KIM

TABLE V—<i>Continued</i>

| E(MeV) | Pancreas | | Spleen | | Tongue | |
|---|---|---|---|---|---|---|
| | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ | $\mu$ | $\mu_{en}$ |
| 0.015 | 1.55 | 1.24 | 1.53 | 1.21 | 1.49 | 1.19 |
| 0.02 | 0.76 | 0.50 | 0.75 | 0.49 | 0.74 | 0.47 |
| 0.03 | 0.36 | 0.14 | 0.36 | 0.14 | 0.36 | 0.14 |
| 0.04 | 0.26 | 0.066 | 0.26 | 0.065 | 0.26 | 0.063 |
| 0.05 | 0.22 | 0.041 | 0.22 | 0.040 | 0.22 | 0.040 |
| 0.06 | 0.20 | 0.031 | 0.20 | 0.031 | 0.20 | 0.031 |
| 0.08 | 0.18 | 0.026 | 0.18 | 0.026 | 0.18 | 0.026 |
| 0.10 | 0.17 | 0.025 | 0.17 | 0.025 | 0.17 | 0.025 |
| 0.15 | 0.15 | 0.028 | 0.15 | 0.027 | 0.15 | 0.028 |
| 0.20 | 0.14 | 0.030 | 0.14 | 0.029 | 0.14 | 0.030 |
| 0.30 | 0.12 | 0.032 | 0.12 | 0.032 | 0.12 | 0.032 |
| 0.40 | 0.11 | 0.033 | 0.11 | 0.033 | 0.11 | 0.033 |
| 0.50 | 0.10 | 0.033 | 0.10 | 0.033 | 0.10 | 0.033 |
| 0.60 | 0.09 | 0.033 | 0.09 | 0.033 | 0.09 | 0.033 |
| 0.80 | 0.08 | 0.032 | 0.08 | 0.032 | 0.08 | 0.032 |
| 1.0 | 0.07 | 0.031 | 0.07 | 0.031 | 3.07 | 0.031 |
| 1.5 | 0.06 | 0.028 | 0.06 | 0.028 | 0.06 | 0.028 |
| 2.0 | 0.05 | 0.026 | 0.05 | 0.026 | 0.05 | 0.026 |

excellent agreement. The Tipton–Cook bone data are for *wet* bones (9) and the rest refer to the femur bones. Our results for bone (femur) are in a good agreement with the Spiers–Woodard data (12), but they differ significantly in the C and Ca contents from the Tipton–Cook (9) and the ICRU data (10). Epp *et al.* (13) give the chemical composition of mouse metaphyseal bone as follows: H (5.59%), C (2.37%), N (3.77%), O (54.66%), P (7.06%), S (0.44%), and Ca (16.1%).

PHOTON DOSIMETRY DATA

The photon mass attenuation coefficient $\mu$ and mass energy absorption coefficient $\mu_{en}$ for our tissue samples are given in Table V. The basic photon data were taken from the Hubbell compilation (5) except for the Cl data which were taken from the Storm–Israel compilation (14). Our $\mu$'s include the coherent scattering effects (4), and the $\mu_{en}$ values are those corrected for the bremsstrahlung losses by secondary electrons.

In the energy range considered here, the molecular binding should have little effect on $\mu$ and $\mu_{en}$ (6, 7), and the effective values of these coefficients for the tissues are obtained merely by adding the atomic coefficients weighted by the chemical compositions. Our values of $\mu$ and $\mu_{en}$ for muscle and bone are in accord with those of Evans (4).

It is evident from Table V that the coefficient $\mu$ and $\mu_{en}$ are essentially the same for all tissues considered in this paper except for low-energy photons. At low energies, an appreciable variation in $\mu$ and $\mu_{en}$ exists among the tissues. It may be stated that photons of a given energy have higher LET in a higher

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

effective $Z$ material than in a lower effective $Z$ material, although the energy loss per gram by the photons may be the same in both materials.

RECEIVED: July 18, 1973

## REFERENCES

1. W. K. SINCLAIR, Radiobiological dosimetry. In *Radiation Dosimetry*, Vol. III, pp. 617–676. Academic Press, New York, 1969.

2. C. LONG (Ed.), *Biochemists' Handbook*, pp. 639–768. D. Van Nostrand Co., Princeton, NJ 1961.

3. W. S. SPECTOR (Ed.), *Handbook of Biological Data*, pp. 50–77, W. B. Saunders Co., Philadelphia, 1956.

4. R. D. EVANS, X-ray and $\gamma$-ray interactions. In *Radiation Dosimetry*, Vol. 1, pp. 93–155. Academic Press, New York, 1969.

5. J. H. HUBBELL, Photon cross sections, attenuation coefficients, and energy absorption coefficients from 10 KeV to 100 GeV. NSRDS-NBS 29, U. S. Government Printing Office, Washington, DC, 1969.

6. R. H. PRATT, A. RON, and H. K. TSENG, Atomic photoelectric effect above 10 KeV. *Rev. Mod. Phys.* **45**, 273–325 (1973).

7. U. FANO and J. W. COOPER, Spectral distribution of atomic oscillator strengths. *Rev. Mod. Phys.* **40**, 441–507 (1968).

8. C. D. HODGMAN (Ed.), *Handbook of Chemistry and Physics*. The Chemical Rubber Co., Cleveland, OH.

9. P. DALTON and J. E. TURNER, New evaluation of mean excitation energies for use in radiation dosimetry. *Health Phys.* **15**, 257–262 (1968).

10. ICRU Report 10b, *Physical Aspects of Irradiation*. Natl. Bur. Std. Handbook 85. U. S. Government Printing Office, Washington, DC, 1964.

11. D. E. A. LEA, *Actions of Radiation on Living Cells*. Cambridge University Press, Cambridge, 1955.

12. C. A. JAYCHANDRAN, Calculated effective atomic number and kerma values for tissue-equivalent and dosimetry materials. *Phys. Med. Biol.* **16**, 617–623 (1971).

13. E. R. EPP, H. Q. WOODWARD, and H. WEISS, Energy absorption by the bone marrow of the mouse receiving whole-body irradiation with 250-Kv x-rays or cobalt-60 gamma rays. *Radiat. Res.* **11**, 184–197 (1959).

14. E. STORM and H. I. ISRAEL, Photon cross sections from 1 KeV to 100 MeV for elements $Z = 1$ to $Z = 100$. *Nuclear Data Tables* **A7**, 565–681 (1970).

This content downloaded from 12.47.62.126 on Thu, 02 Feb 2017 23:42:30 UTC
All use subject to http://about.jstor.org/terms

# EXHIBIT U

# Fibres, Films, Plastics and Rubbers

## A Handbook of Common Polymers

Compiled by

### W. J. ROFF,

B.SC., M.SC.

*formerly at the Shirley Institute, Cotton Silk and Man-made Fibres Research Association, Manchester*

and

### J. R. SCOTT,

PH.D., F.R.I.C., F.INST.P., F.I.R.I.

*Rubber and Plastics Research Association, Shawbury, Shropshire (Director 1940–58)*

with the assistance of

### J. PACITTI,

M.A.

*Rubber and Plastics Research Association*

LONDON
**BUTTERWORTHS**

THE BUTTERWORTH GROUP

ENGLAND
Butterworth & Co (Publishers) Ltd
London: 88 Kingsway, WC2B 6AB

AUSTRALIA
Butterworth & Co (Australia) Ltd
Sydney: 20 Loftus Street
Melbourne: 343 Little Collins Street
Brisbane: 240 Queen Street

CANADA
Butterworth & Co (Canada) Ltd
Toronto: 14 Curity Avenue, 374

NEW ZEALAND
Butterworth & Co (New Zealand) Ltd
Wellington: 49/51 Ballance Street
Auckland: 35 High Street

SOUTH AFRICA
Butterworth & Co (South Africa) (Pty) Ltd
Durban: 33/35 Beach Grove

First published 1971

©

Butterworth & Co (Publishers) Ltd, 1971

Suggested UDC number 678(02)
ISBN 0 408 15960 X

Filmset by Keyspools Ltd, Golborne, Lancashire

Printed in England by C. Tinling and Co. Ltd, London and Prescot

SECTION 41

# SILICONES

## Rubbers and Resins

*With notes on fluids, dispersions, organochlorosilanes, aminosilanes, silicon esters and 'bouncing putty'*

### SYNONYMS AND TRADE NAMES

Organo-silicon oxide polymers, Polysiloxanes. *Rubbers* Adrub, LS-53, LS-63, NSR, Polysil, Silastic, Silastomer, Silcoset, Silicol, Sil-O-Flex, SKT (and variants denoted by extra letters); DP, E, K, KW, MS, S, SE and W followed by numbers. *Resins* Dri-film, Sylgard; DC, DP, R, SR followed by numbers.

### GENERAL CHARACTERISTICS

*Raw silicone rubbers* are transparent, colourless, 'limp', virtually fluid materials (viscosity $10^7$ to $4 \times 10^7$ cSt), not generally miscible with other rubbers. They are marketed (*a*) as the raw 'gums', (*b*) compounded mixes containing fillers, vulcanising agents, etc. (*see* §41.4), (*c*) solutions, and (*d*) spreading pastes, based on low molecular weight 'gums'.

*Vulcanisates* vary little in properties over a wide temperature range, and have exceptional resistance to deterioration during prolonged heating and to oxidation and ozone attack. Chemical resistance is good, and electrical properties are excellent. At normal temperatures their strength is poorer than for organic rubbers, but equal to these at elevated temperatures.

*Uncured silicone resins* are marketed as: (*a*) powder or flake, (*b*) moulding compositions (containing filler, etc.), (*c*) fluids 3500–9000 cP, and (*d*) solutions. They are not miscible with organic resins unless containing a high proportion of phenyl groups (*see* §41.1).

*Cured resins* are very stable to prolonged heating in air (apart from a gradual loss in weight, (*see* §41.32)), resistant to chemical attack (except organic liquids and strong acids), and have good electrical properties and outstanding water-repellance. Their strength is generally inferior to that of organic resins.

## 41.1 STRUCTURE

### Simplest Fundamental Unit

$$\begin{array}{c} R \\ | \\ -Si-O- \\ | \\ R \end{array}$$

where R is an organic substituent (usually $CH_3-$).

Additional to the above difunctional unit (**D**), there are monofunctional (**M**) and trifunctional (**T**) units, i.e.



458

SILICONES

*Note*. The units shown above must be so linked together that there is always *one* oxygen atom between two adjacent silicon atoms; to ensure this condition, the units are sometimes written as follows, the $O_{\frac{1}{2}}$ indicating that an oxygen atom is shared between the two silicon atoms.



monofunctional          difunctional          trifunctional

In *silicone rubbers* the molecule is a substantially linear chain of **D** units with **M** end-units, and R is usually a hydrocarbon radical. The main types are: (i) general-purpose dimethyl or 'methyl' silicone rubber, where R is $CH_3$—; (ii) cold-resistant methylphenyl silicone rubber, with 5–15 mol.% $CH_3$— replaced by $C_6H_5$—; (iii) readily cross-linkable methylvinyl silicone rubber, with 0·1–4·5 mol.% $CH_3$— replaced by $CH_2$=$CH$—; (iv) room-temperature vulcanising or 'RTV' rubber, containing H, OH, alkoxy or acyloxy groups; (v) swelling-resistant silicone rubber, containing cyanoalkyl or fluoro-groups, e.g. $CF_3CH_2CH_2$—.

In *silicone resins* there are more 'T' units, which form branching points or cross-links (by condensation from the —OH groups formed by hydrolysis of a trichlorosilane, *see* §41.21), and thus make possible a higher degree of 'curing'. The R groups are generally alkyl (usually methyl) and phenyl. Methyl groups alone give hard but relatively weak resins; longer alkyl groups make the resin softer, less heat-resistant and more soluble. Phenyl groups increase strength and heat-resistance, but give a brittle resin, hence the best result is obtained with phenyl plus methyl groups.

**Molecular weight** Raw rubbers: mean, normally $4 \times 10^5$ to $1·5 \times 10^6$; extreme values: 2500, $2·8 \times 10^6$. Degree of polymerisation: mean, 4000–20 000.

**X-ray data** Polydimethylsiloxane is amorphous but shows crystallinity when cooled or stretched; the monoclinic cell contains 6 monomer units: $\beta = 60°$, $a = 13·0$ Å, $b$ (identity period) = 8·3 Å; $c = 7·75$ Å.

## 41.2 CHEMISTRY

### 41.21 PREPARATION

*Starting materials*. These are normally organosilicon chlorides or

# EXHIBIT V

RESEARCH ajog.org

## GYNECOLOGY

# Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque

Bryan N. Brown, PhD; Deepa Mani, MBBS; Alexis L. Nolfi, BS; Rui Liang, MD;
Steven D. Abramowitch, PhD; Pamela A. Moalli, MD, PhD

**OBJECTIVE:** We sought to determine the predominant cell type (macrophage, T lymphocyte, B lymphocyte, mast cell) within the area of implantation of the prototypical polypropylene mesh, Gynemesh PS (Ethicon, Somerville, NJ); and to determine the phenotypic profile (M1 proinflammatory, M2 antiinflammatory) of the macrophage response to 3 different polypropylene meshes: Gynemesh PS (Ethicon), and 2 lower-weight, higher-porosity meshes, UltraPro (Ethicon) and Restorelle (Coloplast, Humblebaek, Denmark).

**STUDY DESIGN:** Sacrocolpopexy was performed following hysterectomy in rhesus macaques. Sham-operated animals served as controls. At 12 weeks postsurgery, the vagina-mesh complex was excised and the host inflammatory response was evaluated. Hematoxylin and eosin was used to perform routine histomorphologic evaluation. Identification of leukocyte (CD45$^+$) subsets was performed by immunolabeling for CD68 (macrophage), CD3 (T lymphocyte), CD20 (B lymphocyte), and CD117 (mast cell). M1 and M2 macrophage subsets were identified using immunolabeling (CD86$^+$ and CD206$^+$, respectively), and further evaluation was performed using enzyme-linked immunosorbent assay for 2 M1 (tumor necrosis factor-alpha and interleukin [IL]-12) and 2 M2 (IL-4 and IL-10) cytokines.

**RESULTS:** Histomorphologic evaluation showed a dense cellular response surrounding each mesh fiber. CD45$^+$ leukocytes accounted for 21.4 ± 5.4% of total cells within the perimesh area captured in a ×20 field, with macrophages as the predominant leukocyte subset (10.5 ± 3.9% of total cells) followed by T lymphocytes (7.3 ± 1.7%), B lymphocytes (3.0 ± 1.2%), and mast cells (0.2 ± 0.2%). The response was observed to be more diffuse with increasing distance from the fiber surface. Few leukocytes of any type were observed in sham-operated animals. Immunolabeling revealed polarization of the macrophage response toward the M1 phenotype in all mesh groups. However, the ratio of M2:M1 macrophages was increased in the fiber area in UltraPro ($P = .033$) and Restorelle ($P = .016$) compared to Gynemesh PS. In addition, a shift toward increased expression of the antiinflammatory cytokine IL-10 was observed in Restorelle as compared to Gynemesh PS ($P = .011$).

**CONCLUSION:** The host response to mesh consists predominantly of activated, proinflammatory M1 macrophages at 12 weeks postsurgery. However, this response is attenuated with implantation of lighter-weight, higher-porosity mesh. While additional work is required to establish causal relationships, these results suggest a link among the host inflammatory response, mesh textile properties, and clinical outcomes in the repair of pelvic organ prolapse.

**Key words:** cytokines, inflammatory response, macrophage phenotype, polypropylene mesh, rhesus macaque

Cite this article as: Brown BN, Mani D, Nolfi AL, et al. Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque. Am J Obstet Gynecol 2015;213:668.e1-10.

More than 250,000 women per year in the United States will undergo surgery for the treatment of pelvic organ prolapse, with direct costs totaling >$1 billion.[1-3] Native tissue repair has a recurrence rate of 40% at 2 years[4,5]; therefore, mechanical reinforcement of tissues using synthetic mesh has increased over the last decade.[6] While

From the Departments of Bioengineering (Drs Brown, Abramowitch, and Moalli and Ms Nolfi) and Obstetrics, Gynecology, and Reproductive Sciences (Drs Brown, Liang, Abramowitch, and Moalli), and McGowan Institute for Regenerative Medicine (Drs Brown, Mani, and Moalli), University of Pittsburgh; and Magee—Womens Research Institute (Drs Liang and Moalli), Pittsburgh, PA.

Received April 15, 2015; revised June 21, 2015; accepted Aug. 2, 2015.

This work was supported by National Institutes of Health awards R01 HD061811 (P.A.M.) and K12HD043441 (B.N.B.). The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health. The funding source had no involvement in the study design, collection of data, analysis of data, interpretation of the report, or the decision to submit for publication.

The authors report no conflict of interest.

Presented at the Joint Scientific Meeting of the American Urogynecologic Society and International Urogynecological Association, Washington, DC, July 22-26, 2014.

Corresponding author: Pamela A. Moalli, MD, PhD. pmoalli@mail.magee.edu

0002-9378/$36.00 • © 2015 Elsevier Inc. All rights reserved. • http://dx.doi.org/10.1016/j.ajog.2015.08.002

**TABLE 1**

**Mechanical and structural characteristics associated with each mesh[12,26]**

|  | Gynemesh PS (Ethicon) | UltraPro (Ethicon) | Restorelle (Coloplast) |
|---|---|---|---|
| Weight, g/m$^2$ | 44 | 31 | 19 |
| Pore size, $\mu$m | 2240 | $\geq 4000^a$ | 2370 |
| Porosity, % | $64 \pm 2.1$ | $69 \pm 1.8$ | $78 \pm 3.0$ |
| Stiffness, N/mm | $28 \pm 2.7$ | $22 \pm 2.8$ | $11 \pm 0.89$ |

$^a$ UltraPro contained resorbable component (poliglecaprolactone 25) in addition to polypropylene allowing it to have very large pores (4 mm) when this component is resorbed; values reported with resorbable component dissolved.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

mesh implantation has been shown to improve anatomical outcomes in the anterior and apical compartments, complications are observed, particularly with transvaginal placement,[7-11] including mesh exposure through the vaginal wall, shrinkage, erosion, and pain.

Recent work suggests that mesh exposures may be induced by stress shielding. That is, a mismatch in stiffness between the mesh and tissue lead to degeneration of the underlying vagina and a loss of mechanical integrity over time. This maladaptive remodeling response precipitates atrophy of the smooth muscle layer associated with a decrease in contractility as well as a shift in tissue extracellular matrix composition and a loss of biomechanical integrity.[12-14] Differences in mesh properties (weight, pore size, porosity, stiffness) were shown to be related to the degree to which this degenerative process occurs, with higher-weight, lower-porosity, and increased-stiffness mesh being associated with increased vaginal tissue degradation. Mesh with higher weight, lower porosity, and increased stiffness has also been suggested to result in increased rates of complications in clinical practice.[15,16]

Mesh complications may also be attributable to the inflammatory processes associated with the macrophage-predominated foreign body reaction mounted by the host following implantation. Without question, the long-term presence of activated proinflammatory cells can have a negative impact on the ability of a material to function as intended. However, a number of recent studies have demonstrated that the macrophage response is also an essential component of the process leading to tissue incorporation, and functional remodeling of implanted materials, suggesting the potential for phenotypic dichotomy in the host response.[17,18] Indeed, macrophages have been classified as having diverse and plastic phenotypes along a continuum between M1 (classically activated; proinflammatory) and M2 (alternatively

activated; regulatory, homeostatic) extremes.[19-21] An increasing number of studies in the field of biomaterials have begun to apply these paradigms and concepts, showing that macrophage polarization is a predictor of integration following implantation in multiple applications.[18,22-25] However, the macrophage response following implantation of surgical mesh with varying characteristics has not been described. Moreover, limited studies to date have addressed the impact of mesh implantation on the vagina—an organ with an immunologically distinct environment from that of other tissues in which the host response to mesh has been examined.

The objectives of the present study were 2-fold: (1) to determine the predominant cell type (macrophage, T lymphocyte, B lymphocyte, mast cell) within the area of implantation of the prototypical polypropylene mesh, Gynemesh PS (Ethicon, Sommerville, NJ); and (2) to determine the phenotypic profile (M1 proinflammatory, M2 antiinflammatory) of the macrophage response to 3 different polypropylene meshes: Gynemesh PS, and 2 lower-weight, higher-porosity meshes, UltraPro (Ethicon) and Restorelle (Coloplast, Humblebaek, Denmark).

## MATERIALS AND METHODS
### Meshes
The test articles consisted of 3 polypropylene meshes with varying textile and mechanical characteristics as previously described.[12,26] Briefly, specific weight and pore size were provided by the manufacturer. Porosity was determined using a custom-designed algorithm (Matlab, Version 8.0; Mathworks, Natick, MA) and stiffness was determined by ball burst testing. Table 1 shows the relevant mechanical and structural characteristics associated with each mesh. Of note, UltraPro is manufactured with an absorbable component (poliglecaprolactone 25) in addition to polypropylene allowing it to have very large pores (4 mm) when this component is fully absorbed.

### Animals
The samples for the present study were obtained from a larger study.[12,13]

**TABLE 2**

**Demographic data collected (age, weight, gravidity, and parity)**

| Groups | Age, y$^a$ | Parity$^b$ | Weight, kg$^a$ | POP-Q stage$^b$ |
|---|---|---|---|---|
| Sham | $12.6 \pm 2.8$ | 3 (2, 6) | $7.3 \pm 1.4^c$ | 0 (0, 1) |
| Gynemesh PS | $12.9 \pm 2.2$ | 4 (3.8, 5) | $8.2 \pm 1.6$ | 0 (0, 0) |
| UltraPro | $13.0 \pm 2.2$ | 3.5 (2, 5.8) | $7.8 \pm 1.4$ | 0 (0, 0.25) |
| Restorelle | $13.8 \pm 1.7$ | 5 (3, 5.5) | $10.0 \pm 2.8^c$ | 0.5 (0, 1.3) |
| *P* value$^d$ | .780 | .970 | .042 | .700 |

$^a$ Mean $\pm$ SD; $^b$ Median (first quartile, second quartile); $^c$ Statistical significance between groups ($P < .05$); $^d$ Comparison of overall $P$ value among groups.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*



## FIGURE 1
**Histologic appearance of sham and mesh implanted tissues**



Representative histologic section (hematoxylin and eosin) taken from **A**, sham and **B**, Gynemesh PS groups. Top panels contain full view of histologic section at ×10 original magnification (scale bar = 250 μm). Bottom panels shows higher-magnification images of **A**, subepithelial connective tissues, muscularis layer, and adventitia or **B**, mesh-tissue interface at ×20 original magnification (scale bar = 100 μm). Histomorphologic appearance of response to Gynemesh PS was characteristic of response observed in all mesh-implanted groups. A dense population of mononuclear and multinucleated giant cells can be observed at mesh-tissue interface, decreasing in number with increasing distance from mesh surface. **B**, Box indicates mesh knot and arrow indicates mesh fiber.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

---

A subset of animals from that study was selected based on the availability of sufficient tissue samples for completion of the assays described in the present study. All animals in this study were maintained and treated according to an approved institutional animal care and use committee protocol and in accordance with the National Institutes of Health Guide for the Care and Use of Laboratory Animals. Demographic data of each animal were collected prior to surgery, including age, weight, gravidity, and parity (Table 2). In all, 32 middle-aged parous rhesus macaques underwent implantation with Gynemesh PS (n = 8), UltraPro (n = 8), Restorelle (n = 8), or sham (n = 8). Mesh was implanted by sacrocolpopexy after an abdominal hysterectomy as previously described.[12,13] Sacrocolpopexy was chosen as observational data suggest that complications related to this procedure are less than those following transvaginal implantation.[11,27]

### Sample harvest
At 12 weeks postsurgery, vagina-mesh tissue complexes were harvested as previously described.[12,13] The equivalent tissues were excised in sham-operated animals. A portion of the vagina-mesh complex was embedded in optimal cutting temperature solution (Sakura Finetek USA, Torrence, CA) prior to flash freezing on liquid

## FIGURE 2
**Immunofluorescent labeling of cells participating in the host response to implanted mesh**



Antibodies for CD45 (panleukocyte), CD68 (macrophage), CD3 (T lymphocyte), CD20 (B lymphocyte), and CD117 (mast cell) markers were used (red). DAPI (blue) was used to label nuclei. Positively labeled cells were predominantly located at mesh surface, with fewer cells with increasing distance. All images at ×40 original magnification, scale bar = 100 μm.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

---

## TABLE 3
### Total number of cells and percent surface marker positive cells in ×20 field

| Treatment (Gynemesh PS) | Total no. of cells (per ×20 field) | Positive cells (per ×20 field), % |
|---|---|---|
| CD45 | 514 ± 121 | 21.4 ± 5.4 |
| CD68 | 510 ± 108 | 10.5 ± 3.9[a] |
| CD3 | 510 ± 114 | 7.3 ± 1.7[b] |
| CD20 | 509 ± 109 | 3.0 ± 1.2 |
| CD117 | 508 ± 121 | 0.2 ± 0.2 |
| P value | 1.00[c] | <.001[d] |

[a] Significance seen between CD68 and CD20, and CD68 and CD117; [b] Significance seen between CD3 and CD20, and CD3 and CD117; [c] Comparison of P value among groups, significant difference if P < .05; [d] Comparison among CD68, CD3, CD20, and CD117.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

nitrogen for histologic staining and immunofluorescent labeling. Another portion was harvested and frozen for enzyme-linked immunosorbent assay (ELISA). All samples were stored at −80°C until testing.

### Histologic staining and immunofluorescent labeling

Tissue sections (7 μm) were cut and stored at −80°C until use. Slides were thawed at room temperature and stained with hematoxylin and eosin. Slides were dehydrated through a series of graded ethanol (70-100%) and xylenes prior to coverslipping. The histologic appearance of the tissue sections was then evaluated and imaged using a microscope (E600; Nikon, Melville, NY).

For immunolabeling, sections were fixed in 50:50 methanol/acetone for 10 minutes. Antigen retrieval was performed in 10 mmol/L citric acid monohydrate buffer (pH 6.0) at 95°C for 20 minutes. After cooling, the sections were incubated in copper sulfate with ammonium acetate for 20 minutes at 37°C to reduce autofluorescence. The sections were blocked with 1% normal donkey serum, 2% bovine serum albumin, 0.1% Triton-X100, and 0.1% Tween 20 at room temperature for 1 hour. Consecutive sections were then labeled with antibodies specific for leukocytes (CD45), macrophages (CD68), T lymphocytes (CD3), B lymphocytes

## FIGURE 3
### Immunofluorescent labeling of M1/M2 macrophage response



Immunofluorescent labeling with antibodies to CD68 (panmacrophage [red]), CD86 (M1 macrophage [orange]), CD206 (M2 macrophage [green]), and DAPI (nuclei [blue]). Few positive cells were observed in sham-operated animals (not shown). Predominance of M1 macrophage response was observed in Gynemesh PS, UltraPro, and Restorelle groups. Combined fluorescent (top) and individual (bottom) channels. All images at ×20 original magnification (scale bars = 100 μm).

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

(CD20), and mast cells (CD117). Primary antibodies, diluted in blocking solution, were applied overnight at 4°C, followed by the corresponding secondary antibodies (product information and dilutions for each primary and secondary antibody are listed in Supplemental Table) and then coverslipped using aqueous mounting media containing 4′,6-diamidino-2-phenylindole; (DAPI; Vectashield with DAPI; Vector Laboratories, Burlingame, CA). Localization of staining to the appropriate regions of lung, liver, kidney, spleen, lymph node, and intestine were used to verify appropriate labeling and incubation of slides without primary antibodies was used as a control. Three representative areas of the mesh-tissue interface were imaged for each individual marker using a ×20 objective on an imaging microscope (Eclipse 90i; Nikon). Quantification of cell types was performed using software (ImageJ; National Institutes of Health, Bethesda, MD). Cell counts were averaged for each sample and expressed as a percentage of total cells within a ×20 field.

Additional sections were triple-labeled with antibodies specific for a panmacrophage marker (CD68), an M1 marker (CD86), and an M2 marker (CD206) as above. Slides were imaged using a ×20 objective at the interface with either single fibers (3 images) or mesh knots (3 images) using a standardized protocol.[28] CD68+CD86+ cells were considered to have an M1 phenotype and CD68+CD206+ cells, an M2 phenotype. Cell counts were averaged for each sample and expressed as a percentage of total cells within a ×20 field. Additionally, the ratio of M2:M1 cells was calculated. Because of the scarcity of macrophages in the sham group, the ratio of M2:M1 was not reported. The perimeter of the mesh-tissue interface present in each image was calculated by tracing using ImageJ.

### ELISA assay

Frozen tissues were mechanically pulverized and homogenized in a high salt buffer (50 mmol/L Tris base, 150 mmol/L sodium chloride, and 10 μg/mL Halt protease inhibitor cocktail, Pierce Biotechnology, Rockford, IL). After centrifugation, supernatants were collected. Using the DC protein assay (Bio-Rad, Hercules, CA), protein concentrations of all extracts were determined so that all sample volumes contained 40 μg of protein. Amounts of proinflammatory M1 (tumor necrosis factor-alpha, and interleukin [IL]-12p70) and antiinflammatory M2 (IL-10, IL-4) cytokines were assessed using commercially available ELISA assays (Life Technologies, Carlsbad, CA). Both the concentrations of individual cytokines and the ratio of M2/M1 cytokines ([IL-10 + IL-4]/[tumor necrosis factor-alpha + IL-12]) were calculated.

### Statistical analysis

Statistical comparisons were made using software (SPSS 18.0; SPSS Inc, Chicago, IL). Primate demographic and immunolabeling data were assessed using 1-way analysis of variance with a Tukey post hoc procedure. As cytokine data were nonparametric, a Kruskal–Wallis test with a Bonferroni-adjusted alpha after pairwise comparisons was performed for each group. A Spearman correlation was used to examine the relationship between the number of M1 and M2 cells and mesh perimeter in each image. A $P$ value < .05 was used to determine significance.

### Results

Animals had similar age, parity, and pelvic organ prolapse quantification (POP-Q) stage (Table 2). The POP-Q staging methods utilized were the same as that utilized in human beings adjusted to account for the shorter length of the macaque vagina.[29] Animals in the Restorelle group weighed more than the

---

**TABLE 4**
**Total number of cells, percent of positive cells, and ratio of M2/M1 macrophages seen in ×20 field (fiber)**

| Treatment | Total no. of cells | M1 positive cells, % | M2 positive cells, % | Ratio, M2/M1 |
|---|---|---|---|---|
| Sham | 696 ± 370 | 0.8 ± 0.7[a] | 0.1 ± 0.0[a] | — |
| Gynemesh PS | 642 ± 215 | 6.8 ± 2.8 | 3.5 ± 2.2 | 0.52 ± 0.14[b] |
| UltraPro | 768 ± 232 | 7.3 ± 2.6 | 4.6 ± 1.5 | 0.66 ± 0.08 |
| Restorelle | 610 ± 291 | 7.0 ± 3.7 | 4.6 ± 2.1 | 0.67 ± 0.09 |
| $P$ value[c] | .700 | <.001 | <.001 | <.001 |

[a] Significance seen between sham and Gynemesh PS, sham and UltraPro, and sham and Restorelle; [b] Significance seen between Gynemesh PS and UltraPro, and Gynemesh PS and Restorelle; [c] Comparison of $P$ value among groups, significant difference if $P$ < .05.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

---

**TABLE 5**
**Total number of cells, percent of positive cells, and ratio of M2/M1 macrophages seen in ×20 field (knot)**

| Treatment | Total no. of cells | M1 positive cells, % | M2 positive cells, % | Ratio, M2/M1 |
|---|---|---|---|---|
| Sham | 679 ± 327 | 0.1 ± 0.1[a] | 0.1 ± 0.0[a] | — |
| Gynemesh PS | 630 ± 230 | 8.3 ± 4.7 | 4.4 ± 2.3 | 0.57 ± 0.11 |
| UltraPro | 722 ± 214 | 9.2 ± 2.8 | 5.3 ± 1.0 | 0.61 ± 0.18 |
| Restorelle | 575 ± 104 | 8.4 ± 2.6 | 4.9 ± 1.8 | 0.60 ± 0.11 |
| $P$ value[b] | .620 | <.001 | <.001 | <.001 |

[a] Significance seen between sham and Gynemesh PS, sham and UltraPro, and sham and Restorelle; [b] Comparison of $P$ value among groups, significant difference if $P$ < .05.

*Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

---

> **TABLE 6**
> **Correlation between percentage of positive cells and mesh area in ×20 image**
>
> | | M1 cells vs area, % | | M2 cells vs area, % | |
> |---|---|---|---|---|
> | | Correlation coefficient | P value | Correlation coefficient | P value |
> | Gynemesh PS | 0.39 | .006 | 0.44 | .002 |
> | UltraPro | 0.35 | .015 | 0.23 | .113 |
> | Restorelle | 0.24 | .098 | 0.22 | .136 |
> | All mesh | 0.30 | .001 | 0.23 | .006 |
>
> *Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

other groups ($P = .042$); however, weight did not correlate with any of the measured outcomes ($P > .36$ for all). One animal in the study demonstrated a mesh exposure into the vagina. There were no erosions into adjacent structures.

## Histologic analysis

All samples had an intact and qualitatively normal vaginal epithelium as well as a clearly delineated subepithelium, muscular layer, and adventitia (Figure 1). The subepithelial tissues were histologically similar across all groups, with few differences observed between sham and mesh-implanted animals. The largest differences between samples occurred in the smooth muscle layer as previously described, in which the Gynemesh PS induced the most negative impact.[13] All mesh-implanted animals elicited an inflammatory reaction to individual mesh fibers and around knots consisting of a dense infiltrate of mononuclear cells and

formation of a fibrous capsule. The response was highly localized with fewer cells observed with increasing distance from the mesh. Multinucleated giant cells were observed at the surface of some, but not all, fibers and knots, regardless of mesh type. The cells at the mesh-tissue interface were predominantly mononuclear in appearance and few, if any, polymorphonuclear cells (neutrophils) were observed. The adventitial layer in sham-operated animals was qualitatively normal, consisting of well-organized loose connective tissue.

## Characterization of the immune response to polypropylene mesh

CD45$^+$ cells (panleukocyte) were observed predominantly at the mesh-tissue interface and in the perimesh space in the adventitia with few, if any of these cells within the subepithelium or muscularis of Gynemesh PS—implanted animals indicating a highly localized inflammatory response. CD68$^+$ cells

(macrophage) were the immune cell type found in the greatest density immediately surrounding each mesh fiber, while other cells types were fewer in number and found to be located more distantly from the mesh surface (Figure 2). CD45$^+$ cells accounted for $21.4 \pm 5.4\%$ of total cells within ×20 fields at the mesh-tissue interface. CD68$^+$ cells (macrophages, $10.5 \pm 3.9\%$) were found to be the predominant leukocyte subtype, followed by CD3$^+$ (T lymphocyte, $7.3 \pm 1.7\%$), CD20$^+$ (B lymphocyte, $3.0 \pm 1.2\%$), and CD117$^+$ (mast, $0.2 \pm 0.2\%$) cells. Although the percentage of macrophages was 44% greater than that of T cells, no significant statistical differences were observed between these two. Both the percentage of macrophages and T lymphocytes were significantly higher than the percentage of B lymphocytes or mast cells (all $P < .001$) (Table 3). No differences in the total number of DAPI$^+$ cells were observed between image sets for each antibody. Few positively labeled cells of any type were observed within the sham (<5 per ×20 field) and, therefore, quantitative analysis of immunolabeled slides was not performed for this group.

## Analysis of macrophage phenotype

In all implanted animals, the macrophage response to mesh was observed to be predominantly of the M1 phenotype with fewer cells of either phenotype observed with increasing distance from the mesh surface (Figure 3). In areas with individual fibers, the percentage of M1 cells per ×20 field was increased in mesh-implanted groups (Gynemesh PS

> **TABLE 7**
> **Individual and ratio values of antiinflammatory and proinflammatory cytokines**
>
> | Groups | IL-10[a] | IL-4[a] | TNF-alfa[a] | IL-12p70[a] | (IL-10 + IL-4)/(TNF-alfa + IL-12p70)[b] |
> |---|---|---|---|---|---|
> | Sham | 1.30 ± 0.31 | 0.33 ± 0.01 | 0.38 ± 0.11 | 0.26 ± 0.06 | 2.58 ± 0.52 |
> | Gynemesh PS | 1.03 ± 0.20 | 0.29 ± 0.08 | 0.33 ± 0.12 | 0.27 ± 0.05 | 2.17 ± 0.78[c] |
> | UltraPro | 1.12 ± 0.22 | 0.27 ± 0.11 | 0.28 ± 0.15 | 0.23 ± 0.07 | 3.01 ± 0.90 |
> | Restorelle | 1.27 ± 0.22 | 0.263 ± 0.05 | 0.26 ± 0.05 | 0.30 ± 0.15 | 3.36 ± 0.60[c] |
> | P value[d] | .014 | .358 | .084 | .386 | .004 |
>
> *IL*, interleukin; *TNF*, tumor necrosis factor.
>
> [a] pg/µg Total protein, mean ± SD; [b] Unitless, mean ± SD; [c] Statistical significance between groups ($P < .05$); [d] Comparison of overall $P$ value among groups.
>
> *Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.*

6.7 ± 2.8%, $P = .003$; UltraPro 7.3 ± 2.6%, $P = .002$; Restorelle 7.0 ± 3.7%, $P = .008$) relative to sham (0.8 ± 0.7%). The percentage of M2 cells was also increased in mesh-implanted groups (Gynemesh PS 3.5 ± 2.2%, $P = .046$; UltraPro 4.6 ± 1.5%, $P = .001$; Restorelle 4.6 ± 2.1%, $P = .001$) relative to sham (0.07 ± 0.03%). The percentage of M2 cells around individual fibers was similar in lighter-weight, higher-porosity meshes (UltraPro, $P = .24$; Restorelle, $P = .32$) as compared to Gynemesh PS. However, the M2/M1 ratio around individual fibers was higher for UltraPro ($P = .033$) and Restorelle ($P = .016$) as compared to Gynemesh PS (Table 4). However, the M2/M1 ratio around individual fibers was higher for UltraPro ($P = .033$) and Restorelle ($P = .016$) as compared to Gynemesh PS (Table 4).

M1 macrophages around mesh knots were increased in the presence of mesh (Gynemesh PS 8.3 ± 4.7%, UltraPro 9.2 ± 2.8%, Restorelle 8.4 ± 2.6%) relative to sham (0.09 ± 0.09%) ($P < .001$). M2 macrophages also increased with mesh implantation (Gynemesh PS 4.4 ± 2.3%, UltraPro 5.3 ± 1.0%, Restorelle 4.94 ± 1.8%) as compared to sham (0.09 ± 0.07%) ($P < .001$). However, in contrast to single fibers, no significant differences in the percentage of M1 and M2 cells or the M2/M1 ratio was observed in areas of mesh knots (Table 5).

The total number of cells within a ×20 field was similar in images containing fibers and knots, despite the increased area occupied by knots as compared to fibers. This suggests a more dense inflammatory response around knots as compared to fibers. Though elevated in images with knots, no statistically significant differences in the percentage of M1 and M2 cells was found between images containing fibers and knots for any mesh ($P = .41, .18$, and $.51$ for Gynemesh PS, UltraPro, and Restorelle, respectively). A Spearman rho test was used to determine whether there was a correlation between mesh perimeter and percentage of M1 and M2 cells in a given image. Results varied by mesh (Table 6), however, examination of correlations across all mesh types demonstrated a significant correlation between mesh perimeter and the percentage of M1 ($r = .30, P < .001$) and M2 ($r = 0.23, P = .006$) cells within a given image.

No statistically significant differences were observed between groups for individual cytokines (all $P > .05$) except IL-10 (overall $P = .011$), which was 23% higher in Restorelle as compared to Gynemesh PS ($P = .011$). The ratio of M2/M1 cytokines was also increased in Restorelle-implanted vagina as compared to Gynemesh PS ($P = .003$) (Table 7).

## COMMENT

The present study sought to define the host inflammatory response to 3 polypropylene meshes with distinct textile properties following implantation via sacrocolpopexy in the rhesus macaque. The most significant findings were that, while all mesh materials elicited a predominantly M1 macrophage profile, lower-weight, higher-porosity meshes (UltraPro and Restorelle) elicited a shift in the M2/M1 macrophage ratio in the area around individual mesh fibers. The concentration of antiinflammatory cytokine IL-10 was higher in the Restorelle group as compared to Gynemesh PS, with levels approaching that of the sham-operated group, reflecting differences in the overall local microenvironment associated with the implantation of different mesh types.

This shift in the M2/M1 ratio in the area of individual fibers following the implantation of lighter-weight, higher-porosity meshes, but not following the implantation of a heavier-weight, lower-porosity mesh, is in line with previous observations of abdominal hernia meshes suggesting that "mesh burden," defined as the amount of mesh in contact with tissue, may be a critical factor in the immune response to polypropylene mesh.[30-33] These studies show that polypropylene meshes invariably elicit a foreign body reaction, with the amount of chronic inflammation and scarring proportional to pore size, with an increase in the inflammatory response and scarring over time in meshes with decreased pore size.[32] This phenomenon of increased inflammatory scarring with decreased pore size, termed "bridging fibrosis," suggests that increased fiber density (ie, mesh burden) corresponds to increased inflammatory and fibrotic reactions due to overlap of the host response to multiple individual fibers in close proximity. In the present study, mesh perimeter was found to be positively correlated with the percentage of both M1 and M2 cells within a given image, suggesting a link between mesh burden and the host inflammatory response exists for meshes implanted in the vagina.

The results of the present study also suggest that macrophage phenotype may influence tissue integration and/or degradation following mesh implantation. Indeed, corresponding to previous findings that the lighter, wider-pore, higher-porosity meshes induced fewer negative effects on the vagina than did Gynemesh PS,[12-14] the present study observed a higher ratio of M2 to M1 phenotype (macrophage polarization) and increased antiinflammatory cytokine IL-10 in the lighter but not in the heavier mesh-implanted vagina. Similar findings of improved material integration and remodeling associated with increased M2 macrophage populations have been observed in a number of other studies such as those in cardiac, dermal, and orthopedic applications of implantable materials of both biologic and synthetic origin.[18,22-25] In a recent study,[18] 15 biologically derived surgical meshes were examined for both histologic outcomes and macrophage polarization profile at 14 and 35 days postimplantation in a partial-thickness rodent abdominal wall defect model. The study showed that the number of M2 cells and the M2:M1 ratio at 14 days postimplantation were strongly correlated with semiquantitative scoring of the histomorphologic appearance of the site of implantation at 14 days and were also predictive of the downstream histologic outcome at 35 days postimplantation. Taken together, this suggests that materials that elicit a higher percentage of M2 cells at the tissue interface may be associated with improved tissue integration and fewer complications in the long term.

There were a number of limitations of the present study. First, only 1 time point was examined, representing a cross-sectional snapshot of a highly dynamic inflammatory process. It should also be noted that, due to the presence of an absorbable component (poliglecaprolactone 25), the mesh burden associated with the UltraPro mesh and the local composition of the material is also dynamic. Thus, the host response to UltraPro may have a transient component not present in the other mesh materials. While statistically significant differences were observed between materials at 90 days, the magnitude of these differences was relatively small. Evaluation of macrophage phenotype at earlier times may have yielded larger differences, but is likely not possible in a primate model due to cost and ethical considerations. Second, only 1 marker of M1 and M2 macrophage phenotypes was used in the present study. It is well known that macrophage phenotype occurs along a spectrum between M1 and M2 with multiple intermediate phenotypes.[21] While this represents the first such attempt to measure macrophage polarization in response to material implantation within the vagina, future studies are needed to better define both the phenotype and the function of the cells participating in the host response to implanted mesh to better understand their impact on tissue integration vs degradation and the occurrence of complications in the long term.[34,35] Third, the present study describes a macrophage-centered approach to the evaluation of the host response at the mesh-tissue interface. Future analyses could specifically evaluate the inflammatory reaction as a function of distance from the mesh surface or within pore spaces. This may be particularly important given that additional cell types, including a notable presence of T lymphocytes, was observed with increasing distance from the mesh surface. Lastly, only mesh introduced by sacrocolpopexy was examined in the present study. Future studies should examine whether there are differences in the host response between mesh introduced by sacrocolpopexy vs transvaginally, and attempt to correlate the findings to the differences in rates of complications observed for these 2 procedures.

In conclusion, the host response to polypropylene mesh consists predominantly of macrophages polarized to a proinflammatory M1 phenotype at 12 weeks postsurgery. However, implantation of lighter-weight, higher-porosity mesh generally attenuated the proinflammatory M1 response. These findings correlate with those of a previous study demonstrating that lighter-weight, higher-porosity mesh was also associated with fewer negative effects on vaginal tissue quality. This suggests that the chronic M1 proinflammatory response to mesh may drive tissue degradation eventually leading to mesh exposures over time similar to what is observed clinically; however, additional work is required to establish a causal relationship. An improved scientific understanding of the mechanisms of the host response to synthetic mesh materials placed in the vagina has the potential to significantly affect the design of next-generation mesh materials, inform clinical practices, and improve outcomes in pelvic floor repair. ∎

## REFERENCES

**1.** Subak LL, Waetjen LE, van den Eeden S, Thom DH, Vittinghoff E, Brown JS. Cost of pelvic organ prolapse surgery in the United States. Obstet Gynecol 2001;98:646-51.

**2.** Boyles SH, Weber AM, Meyn L. Procedures for pelvic organ prolapse in the United States, 1979-1997. Am J Obstet Gynecol 2003;188: 108-15.

**3.** Wu JM, Kawasaki A, Hundley AF, Dieter AA, Myers ER, Sung VW. Predicting the number of women who will undergo incontinence and prolapse surgery, 2010 to 2050. Am J Obstet Gynecol 2011;205:230.e1-5.

**4.** Barber MD, Brubaker L, Burgio KL, et al. Comparison of 2 transvaginal surgical approaches and perioperative behavioral therapy for apical vaginal prolapse: the OPTIMAL randomized trial. JAMA 2014;311:1023-34.

**5.** Olsen AL, Smith VJ, Bergstrom JO, Colling JC, Clark AL. Epidemiology of surgically managed pelvic organ prolapse and urinary incontinence. Obstet Gynecol 1997;89:501-6.

**6.** Jonsson Funk M, Edenfield AL, Pate V, Visco AG, Weidner AC, Wu JM. Trends in use of surgical mesh for pelvic organ prolapse. Am J Obstet Gynecol 2013;208:79.e1-7.

**7.** Altman D, Vayrynen T, Engh ME, et al. Anterior colporrhaphy versus transvaginal mesh for pelvic-organ prolapse. N Engl J Med 2011;364: 1826-36.

**8.** Diwadkar GB, Barber MD, Feiner B, Maher C, Jelovsek JE. Complication and reoperation rates after apical vaginal prolapse surgical repair: a systematic review. Obstet Gynecol 2009;113: 367-73.

**9.** Feiner B, Jelovsek JE, Maher C. Efficacy and safety of transvaginal mesh kits in the treatment of prolapse of the vaginal apex: a systematic review. BJOG 2009;116:15-24.

**10.** Maher CM, Feiner B, Baessler K, Glazener CM. Surgical management of pelvic organ prolapse in women: the updated summary version Cochrane review. Int Urogynecol J 2011;22:1445-57.

**11.** Food and Drug Administration. Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse. FDA Administration E. 2001. Available at: http://www.fda.gov/Medical Devices/Safety/AlertsandNotices/ucm262435. htm. Accessed April 1, 2015.

**12.** Feola A, Abramowitch S, Jallah Z, et al. Deterioration in biomechanical properties of the vagina following implantation of a high-stiffness prolapse mesh. BJOG 2013;120: 224-32.

**13.** Liang R, Abramowitch S, Knight K, et al. Vaginal degeneration following implantation of synthetic mesh with increased stiffness. BJOG 2013;120:233-43.

**14.** Liang R, Zong W, Palcsey S, Abramowitch S, Moalli PA. Impact of prolapse meshes on the metabolism of vaginal extracellular matrix in rhesus macaque. Am J Obstet Gynecol 2015;212:174.e1-7.

**15.** Mistrangelo E, Mancuso S, Nadalini C, Lijoi D, Costantini S. Rising use of synthetic mesh in transvaginal pelvic reconstructive surgery: a review of the risk of vaginal erosion. J Minim Invasive Gynecol 2007;14:564-9.

**16.** Kohli N, Walsh PM, Roat TW, Karram MM. Mesh erosion after abdominal sacrocolpopexy. Obstet Gynecol 1998;92:999-1004.

**17.** Brown BN, Badylak SF. Expanded applications, shifting paradigms and an improved understanding of host-biomaterial interactions. Acta Biomater 2013;9:4948-55.

**18.** Brown BN, Londono R, Tottey S, et al. Macrophage phenotype as a predictor of constructive remodeling following the implantation of biologically derived surgical mesh materials. Acta Biomater 2012;8:978-87.

**19.** Mantovani A, Sica A, Sozzani S, Allavena P, Vecchi A, Locati M. The chemokine system in diverse forms of macrophage activation and polarization. Trends Immunol 2004;25:677-86.

**20.** Mills CD, Kincaid K, Alt JM, Heilman MJ, Hill AM. M-1/M-2 macrophages and the Th1/Th2 paradigm. J Immunol 2000;164:6166-73.

**21.** Mosser DM, Edwards JP. Exploring the full spectrum of macrophage activation. Nat Rev Immunol 2008;8:958-69.

**22.** Madden LR, Mortisen DJ, Sussman EM, et al. Proangiogenic scaffolds as functional templates for cardiac tissue engineering. Proc Natl Acad Sci U S A 2010;107:15211-6.

**23.** Rao AJ, Gibon E, Ma T, Yao Z, Smith RL, Goodman SB. Revision joint replacement, wear particles, and macrophage polarization. Acta Biomater 2012;8:2815-23.

**24.** Sussman EM, Halpin MC, Muster J, Moon RT, Ratner BD. Porous implants modulate healing and induce shifts in local macrophage polarization in the foreign body reaction. Ann Biomed Eng 2014;42:1508-16.

**25.** Brown BN, Ratner BD, Goodman SB, Amar S, Badylak SF. Macrophage polarization: an opportunity for improved outcomes in biomaterials and regenerative medicine. Biomaterials 2012;33:3792-802.

**26.** Feola A, Barone W, Moalli P, Abramowitch S. Characterizing the ex vivo textile and structural properties of synthetic prolapse mesh products. Int Urogynecol J 2013;24:559-64.

**27.** Maher C, Feiner B, Baessler K, Schmid C. Surgical management of pelvic organ prolapse in women. Cochrane Database Syst Rev 2013;4:CD004014.

**28.** Wolf MT, Dearth CL, Ranallo CA, et al. Macrophage polarization in response to ECM coated polypropylene mesh. Biomaterials 2014;35:6838-49.

**29.** Feola A, Abramowitch S, Jones K, Stein S, Moalli P. Parity impacts vaginal mechanical properties and collagen structure in rhesus macaques. Am J Obstet Gynecol 2010;203:595.e1-8.

**30.** Conze J, Rosch R, Klinge U, et al. Polypropylene in the intra-abdominal position: influence of pore size and surface area. Hernia 2004;8:365-72.

**31.** Klinge U, Junge K, Stumpf M, Ap AP, Klosterhalfen B. Functional and morphological evaluation of a low-weight, monofilament polypropylene mesh for hernia repair. J Biomed Mater Res 2002;63:129-36.

**32.** Klinge U, Klosterhalfen B, Birkenhauer V, Junge K, Conze J, Schumpelick V. Impact of polymer pore size on the interface scar formation in a rat model. J Surg Res 2002;103:208-14.

**33.** Klinge U, Park JK, Klosterhalfen B. The ideal mesh? Pathobiology 2013;80:169-75.

**34.** Brown BN, Sicari BM, Badylak SF. Rethinking regenerative medicine: a macrophage-centered approach. Front Immunol 2014;5:510.

**35.** Murray PJ, Allen JE, Biswas SK, et al. Macrophage activation and polarization: nomenclature and experimental guidelines. Immunity 2014;41:14-20.

ajog.org **Gynecology** RESEARCH

## APPENDIX

<table>
<tr><td colspan="5"><b>SUPPLEMENTAL TABLE</b><br><b>Antibodies used in immunofluorescence labeling</b></td></tr>
<tr><td colspan="5"><b>Primary antibody</b></td></tr>
<tr><td><b>Name</b></td><td><b>Dilution</b></td><td><b>Catalog no.</b></td><td><b>Clonality</b></td><td><b>Company</b></td></tr>
<tr><td>Rabbit anti-CD45</td><td>1:600</td><td>ab10558</td><td>Polyclonal</td><td>Abcam</td></tr>
<tr><td>Mouse anti-CD68</td><td>1:100</td><td>ab955</td><td>Monoclonal</td><td>Abcam</td></tr>
<tr><td>Rabbit anti-CD3</td><td>1:50</td><td>A0452</td><td>Polyclonal</td><td>DAKO</td></tr>
<tr><td>Rabbit anti-CD20</td><td>1:50</td><td>ab27093</td><td>Polyclonal</td><td>Abcam</td></tr>
<tr><td>Rabbit anti-CD117</td><td>1:50</td><td>ab32363</td><td>Monoclonal</td><td>Abcam</td></tr>
<tr><td>Rabbit anti-CD86</td><td>1:150</td><td>ab53004</td><td>Monoclonal</td><td>Abcam</td></tr>
<tr><td>Goat anti-CD206</td><td>1:150</td><td>sc-34577</td><td>Polyclonal</td><td>Santa Cruz</td></tr>
<tr><td colspan="5"><b>Secondary antibody</b></td></tr>
<tr><td><b>Name</b></td><td><b>Dilution</b></td><td><b>Catalog no.</b></td><td><b>Wavelength (nm)</b></td><td><b>Company</b></td></tr>
<tr><td>Alexa 594 donkey antimouse</td><td>1:100</td><td>A21203</td><td>590/617</td><td>Invitrogen</td></tr>
<tr><td>Alexa 568 donkey antirabbit</td><td>1:50 (CD3, CD20, and CD117)<br>1:200 (CD45)</td><td>A10042</td><td>578/603</td><td>Invitrogen</td></tr>
<tr><td>Alexa 488 donkey antigoat</td><td>1:250 (CD206)</td><td>A11055</td><td>488/519</td><td>Invitrogen</td></tr>
<tr><td>Alexa 647 donkey antirabbit</td><td>1:250 (CD86)</td><td>A31573</td><td>650/668</td><td>Invitrogen</td></tr>
<tr><td colspan="5"><i>Brown. Inflammatory response to prolapse mesh. Am J Obstet Gynecol 2015.</i></td></tr>
</table>

# EXHIBIT W

Int Urogynecol J (2010) 21:261–270
DOI 10.1007/s00192-009-1021-8

## ORIGINAL ARTICLE

# Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants

**Arnaud Clavé · Hannah Yahi · Jean-Claude Hammou · Suzelei Montanari · Pierre Gounon · Henri Clavé**

Received: 15 June 2009 / Accepted: 29 September 2009 / Published online: 6 January 2010
© The International Urogynecological Association 2009

**Abstract**

*Introduction and hypothesis* Currently, most implants used for reinforcement in surgical treatment of pelvic floor disorders are knitted monofilament polypropylene (PP). While previously recognized as inert, PP is associated with high complication rates. Some recent literature suggests polyester prosthetics based on poly(ethylene terephthalate) (PET), which may be more inert in vivo.

*Methods* A sample of 100 implants explanted from patients due to complications was examined to evaluate the relative degradation characteristics of PP and PET prosthetics.

Histological, microscopic (scanning electron microscopy, SEM) and chemical analysis (Fourier transform infrared (FTIR) spectroscopy and differential scanning calorimetry (DSC)) were conducted on these explants.

*Results* Poly(ethylene terephtahlate) explants appeared to sustain less degradation in vivo than the PP explants observed in this cohort.

*Conclusions* This is the first study to evaluate synthetic implants used in a vaginal approach for pelvic floor reinforcement. The study provides evidence contrary to published literature characterizing PP as inert in such applications. Additionally, the study suggests the need for clinical trials comparatively investigating the performance of new types of monofilament prosthetics, such as those comprising PET.

**Keywords** Biomaterials · Histological examination · Pelvic floor disorders · Polyester · Polypropylene · Vaginal surgery

A. Clavé
Service de Chirurgie (Pr Lefèvre),
CHRU Brest Faculté de Médecine,
Université de Bretagne Occidentale,
Brest, France

H. Yahi
Service de Gynécologie (Pr Cosson), CHRU Lille,
Lille, France

J.-C. Hammou
Laboratoire d'Anatomopathologie,
Nice, France

S. Montanari
Research and Development Department, Covidien,
Trévoux, France

P. Gounon
Centre Commun de Microscopie Appliquée (CCMA),
Université de Nice Sophia-Antipolis,
Nice, France

H. Clavé (✉)
Département de Chirurgie Gynécologique, Clinique Saint George,
24, Avenue de Flirey,
06000 Nice, France
e-mail: clave.henri@wanadoo.fr

**Abbreviations**

| | |
|---|---|
| PFD | Pelvic floor disorder |
| PP | Polypropylene |
| PET | Poly(ethylene terephthalate) |
| PPMF | Polypropylene monofilament |
| LDPPMF | Low density polypropylene monofilament |
| HDPPMF | High density polypropylene monofilament |
| NKNW | Nonknitted nonwoven polypropylene |
| PGA | Poly(glycolic acid) |
| FTIR | Fourier transform infrared spectroscopy |
| DSC | Differential scanning calorimetry |
| SEM | Scanning electron microscopy |

## Introduction

Pelvic floor disorder (PFD) treated surgically using autologous tissues have exhibited both high rates of failure and



Springer



recurrence [1–3]. As such, the use of synthetic meshes for this application has gained increasing popularity since the 1980s [2, 4].

The majority of implants for reinforcement of PFD are knitted from polypropylene (PP) [5]. Polypropylene implants have been collectively recognized for good tolerance. Despite some promising results reported in the literature [3, 6–8], complications remain high for an elective surgery [7, 9–11].

Mesh implants are described and classified by material (PP and poly(ethylene terephthalate) (PET) being the most popular), yarn type (monofilament or multifilament), and textile process (knitting or nonwoven techniques). Surface density expressed in weight per square centimeter and/or pore size are critical parameters for predicting the quality of tissue integration. Usually, mesh material with surface density below 50–60 g/cm², and/or pores larger than 1.2 mm are considered low weight and/or high porosity [12, 13].

Both PP and PET are thermoplastic resins. The different yarns obtained from these materials can be prepared using different techniques leading to the following classification:

- When the yarn used to knit the mesh comprises a single thread, the mesh is considered monofilament. Single thread PP defines the prosthetic group polypropylene monofilament (PPMF). The amount and diameter of fiber used during the knitting process allows differentiation of implants between high density monofilament (HDPPMF) and implants of low density monofilament (LDPPMF).
- When the yarn used to knit the mesh consists of a multitude of fibers, the implant is called multifilament. This can be the case for both PET and PP-based materials.
- When the mesh is prepared by thermowelding of a multitude of yarns, it is called nonknitted nonwoven (NKNW) material.
- When an absorbable material is incorporated into the mesh, it results in a composite mesh. The aim of adding these materials is to improve the in vivo tolerance by decreasing the quantity of nonabsorbable material. This class of implants consists of yarns created from composites of PP and poly(glycolic acid) (PP/PGA).

The purpose of this study was to compare the state of alteration of different meshes commonly used in stress urinary incontinence (SUI) or pelvic organ prolapse (POP) surgery, explanted after clinical complication and to investigate potential causes of alteration.

## Materials and methods

### Sample collection

This prospective comparative study included 100 prosthetic explants surgically removed for one (or several) common complications including exposure, infection, and/or shrinkage. The explantation procedures occurred between 2006 and 2007 by vaginal route in 13 collaborating French surgical centers that regularly use synthetic implant reinforcement in PFD surgery. The dimensions of the harvested samples were at least of 1.0 cm×0.5 cm. Each explant was rinsed and placed in a 4% neutral buffer formalin solution and then, sealed.

The samples were sent to the research team within 24 h of fixation. The brand and relevant clinical information for each explant was documented in an accompanying information file. This information file included the age of the patient, clinical indication for prosthetic placement, dates of implantation and explantation, trademark of the explanted prosthesis, reason for removal (exposure, infection, and shrinkage), and results of the bacteriological analysis (if available).

The Ethics Committee of St. George group clinic approved the study design. To protect patient identity, each sample was given a sequential specimen number unrelated to identifiable patient data.

### Histological analysis

Samples were embedded in paraffin wax, sectioned, and then, stained with hematoxylin-eosine-safran for histological analysis.

### Scanning electron microscope analysis

Morphological analysis of explants and pristine control mesh samples of the same trademark was conducted using scanning electron microscopy (SEM, JEOL 6700F). SEM images were collected at low voltage (1–5 kV).

Prior to imaging, explants and pristine samples were fixed and preserved in a 1% glutaradehyde solution in cacodylate buffer (0.1 M, pH 7.5). Samples were rinsed in a cacodylate buffer, then, postfixed by a 1% osmium tetroxide solution, which is added to the cacodylate buffer. Fixation times were adapted to the size of the sample. Samples were further rinsed with distilled water, then, dehydrated with a series of ethanol solutions of increasing concentration. Samples were then dried using hexamethyldisilazane (Carl Roth, Karlsruhe, Germany). Each sample was sputter-coated with a 3-nm gold–palladium coating prior to analysis with the SEM.

### Chemical analysis

Chemical analysis of 32 mesh explants was carried out to characterize the degradation of mesh materials. Samples were divided into four groups (described below). Because of the small sample size and physical condition of the

explanted materials, extensive and complete chemical analysis was difficult.

Group1:  degraded PP explants (as confirmed by SEM); seven LDPPMF, nine HDPPMF, one composite, and one NKNW;
Group2:  nondegraded PP explants consisting of six LDPPMF and four HDPPMF;
Group3:  four PET explants;
Group4:  a control group of pristine implants, which consisted of one pristine LDPPMF implant (Prolene Soft®/Ethicon), one pristine HDPPMF implant (Prolene®/Ethicon), and one pristine PET implant (Parietex®/Covidien).

Fourier transform infrared spectroscopy

Fourier transform infrared (FTIR) spectroscopy is a spectroscopic technique widely used to facilitate determination of chemical functional groups by their absorption frequency. Different functional groups have characteristic infrared (IR) radiation absorption frequencies, generally, presented as absorbance as a function of wave number.

A Spectrum 100 (Perkin Elmer) FTIR spectrometer in attenuated total reflectance mode was used to analyze the samples. The spectra were recorded using 12 scans and 4 cm$^{-1}$ resolution as acquisition conditions.

Baseline IR spectra were recorded for all samples. To eliminate organic residue on explants from groups 1–3, samples were treated for 26 h with NaOCl solution (Chemie plus 12% active chlorine) at room temperature and washed with deionized water. Samples were then extracted with pure cyclohexane (Merck, Darmstadt, Germany) for 24 h at room temperature.

The control group samples (pristine samples of Prolene® and Prolene Soft®) were treated with the same protocol to determine if the cleaning process had chemically modified the material. Spectra from test groups were compared to their specific control spectra.

Differential scanning calorimetry

Differential scanning calorimetry (DSC) aims to identify changes in polymer morphology through observation of changes in glass transition temperature, melting temperature, and heat of fusion.

Thermal characterization of the samples was performed using a jade differential scanning calorimeter (Perkin Elmer). Samples were hermetically sealed in aluminum pans, with an empty pan used as a reference. The samples were heated from 5 to 200°C at 10°C/min. The DSC thermograms of degraded and nondegraded LDPPMF and HDPPMF were compared to their respective pristine control thermograms.

Statistical analyses

All statistical analyses were carried out using Minitab® 15 software. Chi-square or Fisher exact tests were used when relevant in order to compare:

– the histological results according the various families of implants; and
– the degradation rate according to the histological reaction type (infection as type 1/chronic inflammation as type 2/sclerosis as type 3).

The statistical significance level was fixed at $p<0.05$.

**Results**

Sample collection and clinical data

Of 100 explanted samples, the information files were not complete for ten of them while the other six were either too small (<2 mm$^2$) or dried during transportation. The average period before prosthetic removal was 790.6 days (ranging from 16 to 3,295 days).

The causes for removal were distributed as follows: isolated exposures ($n=39$, 46%), isolated infections ($n=14$, 17%), shrinkage or pain ($n=12$, 14%), associated exposure ($n=19$, 22%; exposure+infection ($n=10$ or 11.6%), exposure+shrinkage ($n=9$ or 9.3%)). The sampling of the series is shown in Table 1.

Histological analysis

The histological study revealed three types of periprosthetic tissue reaction.

Type 1 reaction has a characteristic of an infection ($n=37/84$, 44%). The tissue reaction appeared identical to that observed in a periprosthetic abscess. A majority of altered polymorphonuclear neutrophils were found. This suggested an infectious process. There were no signs of periprosthetic colonization.

Type 2 reaction is presented as chronic inflammation ($n=35/84$, 42%) rich in giant cells and mononuclear cells. There could be a minor contamination process confirmed by the presence of some nonaltered polynuclear cells. A partial colonization of the implant was observed.

Type 3 reaction was sclerosis ($n=12/84$, 14%), whereby the implant was set in a pronounced fibrosis. This fibrosis was transformed to hardening with almost complete disappearance of the fibroblasts and maturation of the collagen. Implants were fully colonized, but a low infiltration rate of mononuclear cells without polynuclear cells was observed.

Int Urogynecol J (2010) 21:261–270

**Table 1** Details of the 84 explants' sampling

| Designation | | N | Type | SEM Pictures | Weight (g/m²) | Ø pores (mm) |
|---|---|---|---|---|---|---|
| PPMF N=51 | LDPPMF | 28 | Low Density PolyPropylene Monofilament | | ≤50–60 | ≥ 1,2 |
| | HDPPMF | 23 | High Density PolyPropylene Monofilament | | ≥60 | ≤ 1 |
| Other PP N=12 | NKNW | 8 | Non Knitted Non Woven PolyPropylene | | ≥60 | ≤ 0,5 |
| | PPmultifilament | 4 | PolyPropylene Multifilament | | | |
| Composite: PP/PGA | | 8 | Polypropylene associated to polyglactine | | | |
| PET | | 13 | Polyethylene terephtalate | | | |

All groups of implants showed evidence of type 1 and 2 reactions. A type 3 reaction was observed only in LDPPMF, HDPPMF, and in PET.

The results suggested a significant difference in infection and sclerosis between the type of PP explants. Multifilament PP, NKNW, and composite implants were more frequently associated with infection than PP monofilament implants (LDPPMF and HDPPMF), 70% versus 39%, respectively ($p=0.02$). On the other hand, PP monofilament implants were more frequently associated with sclerosis than other PP and composite implants, 20% versus 0%, respectively ($p=0.05$).

SEM analysis

As expected, SEM analysis of pristine meshes showed no prosthetic damage or alterations of their filaments. An explant was considered degraded if it showed morphological differences in comparison to the corresponding pristine implants. Analysis of different mesh explants showed evidence of damage to the prostheses (Fig.1). Mesh damage included superficial degradation, which appeared as a peeling of the fiber surface, transverse cracks in the implant threads, significant cracks with disintegrated surfaces and partially detached material, and superficial or deep flaking. Fractures were variable in number and depth. Specific deteriorations correlating to implant material were not observed.

SEM revealed that 42% of the implants were degraded ($n=35/84$), and 58% were intact ($n=49/84$; Fig. 2). Degradation was observed only in samples implanted for at least 3 months. Other than the 3-month implantation time, no

correlation between the duration of the implant and prosthetic damage was observed (Fig. 3).

Analysis of the damage observed on the prosthetic explants showed that all types of PP implants exhibited degradation but in an uneven way according to their nature and their manufacturing process. None of the PET implants were found to be altered and degraded (Fig. 2).

A significant difference in percentage of degraded samples between histological reaction in type 1 (infection) and histological reaction in type 3 (sclerosis) was found. Evidences of PP degradation were more frequently observed when the surrounding tissue reaction was classified as infection (59% of degraded PP samples with type 1 reaction versus 20% for type 3 reaction, $p=0.031$).

Chemical analysis

*FTIR analysis*

The FTIR spectra of explanted samples are shown in Fig. 4. The analysis results show that:

– The FTIR spectra of pristine Prolene® and Prolene Soft®, before and after the treatment with NaOCl and cyclohexane, were similar to typical FTIR spectra of PP reported in the literature (Fig. 4a). Therefore, the chemical treatment had little effect on the material.
– FTIR absorption bands between 1,615 and 1,650 cm$^{-1}$ could be attributed either to carboxylate carbonyl or to residual products of biological origin. Therefore, these results cannot confirm the formation of carboxyl groups in vivo.

Int Urogynecol J (2010) 21:261–270                                                          265

**Fig. 1** SEM comparison between intact and degraded explants



– The absorption band at 1,730 cm$^{-1}$ could correspond to the absorption of ester carbonyl groups, which is likely from esterified fatty acids. However, some samples of group 2 also showed that the absorption band at 1,730 cm$^{-1}$, and they were not deemed damaged.

– The FTIR spectra of the PET sample after treatment revealed no change when compared to a typical PET spectrum. Therefore, the treatment had little effect on PET as well.

The DSC thermograms of treated degraded and nondegraded LDPMMF explants were similar to those of treated pristine Prolene Soft®. Additionally, the DSC thermograms of degraded and nondegraded HDPPMF explants were also similar to those of treated pristine Prolene® samples. No modification was observed in the melting temperature or heat of fusion of these samples. Thus, if an oxidation occurs in these prosthetics, it takes place in the amorphous zones, and crystallinity is preserved.

Int Urogynecol J (2010) 21:261–270



| | | Deteriorated | Non Deteriorated | Total | Percentage of degradation |
|---|---|---|---|---|---|
| **PolyPropylene** | **LDPPMF** | 6 | 22 | 28 | 21,43% |
| | **HDPPMF** | 11 | 12 | 23 | 47,83% |
| | **PPMonofilament** | 17 | 34 | 51 | 33,33% |
| | **NKNW** | 8 | 0 | 8 | 100% |
| | **PPMultifilament** | 3 | 1 | 4 | 75% |
| | **Composite** | 7 | 1 | 8 | 87,5% |
| | **Total PP** | 35 | 36 | 71 | 49,3% |
| **Polyester** | **PET** | 0 | 13 | 13 | 0% |

**Fig. 2** Morphological state of explants according to their nature: PP implants did not perform uniformly; PET implants are not deteriorated. **a** Summary table of the morphological state of the various explants. **b** Deteriorated versus nondeteriorated explants (*X axis* categories of explants, *Y axis* number of explants). **c** Percentage of degradation according to the category

## Discussion

The primary objectives of this study were to objectively observe a series of prosthetic explants and to characterize potential degradation, which may occur in vivo.

Those histological, SEM, FTIR, and DSC analysis suggested the following:

a.  There are classifiable histological reactions observed in standard complications of pelvic surgery with prosthetic reinforcement.

Three types of tissue reactions were observed in this study. The correlation analysis between the prosthetics groups and tissue reaction types agreed with and supported those found in the literature: multifilament PP and NKNW implants seemed to present histological reactions of type 1 [14, 15]. The unexpected observation of types 1 and 2 reactions in LDPPMF and HDPPMF prostheses suggested that, contrary to expectations, the monofilament polypropylene prosthetics were not exempt from these complications.

The type 1 reaction may correspond to an active debridement due to the presence of persistent pathogenic agents in great quantities. Type 2 reaction may correspond to an incomplete debridement: the initial pathogenic agent may persist in tissues leading a succession of healing and debridement processes. This may explain the coexistence of partial prosthetic sheathing and the presence of polynuclear cells. Type 3 reaction may correspond to healing and aggravated foreign body reaction with an excessive collagen synthesis.

b.  PP implants are altered in vivo.

PP implants did not perform uniformly. The LDPPMF was least damaged, while 100% of the NKNW was damaged. Generally, it appeared that monofilament explants were more intact than multifilament explants. This was probably due to the more frequent infection in the NKNW group. The duration of implantation did not appear to correlate to the degree of damage for samples implanted more than 3 months. A significant correlation between type 1 and 2 reactions and all degraded polypropylenes were found.

Several hypotheses concerning the degradation of the PP are described below. None of these, particularly direct oxidation, could be confirmed in this study.

Springer

Int Urogynecol J (2010) 21:261–270                                                       267



**Fig. 3** Deterioration of explants is not correlated to in vivo duration (*ND* nondeteriorated, *D* deteriorated, *X axis* categories of explants, *Y axis* number of explants)

i.   Direct oxidation of the PP.

The in vivo oxidation of polypropylene implants has been reported in the literature. This oxidation should create carboxyl groups on the material [16, 17], which can be detected by FTIR analysis. The FTIR analysis neither confirmed nor excluded oxidation of PP in the in vivo environment.

ii.   Fatty acid diffusion.

In previous works [18, 19], the authors suggested that the absorption band at 1,730 cm$^{-1}$ was related to cholesterol and esterified fatty acids that can diffuse in the amorphous zones of the polymer matrix. The diffusion of these organic molecules into the PP mesh filaments could affect the fiber physical and mechanical properties and generate the damage observed in some samples of group 1. Nevertheless, our study shows that some samples not showing evidence of degradation also absorb at 1,730 cm$^{-1}$.

iii.   Oxidation due to free radical attack; radical oxidation without formation of carboxyl groups.

The chronic inflammatory reaction may infer free radical synthesis as peroxide and superoxide ions and hypochlorite acid. Once in contact with the PP implant, these radical species could infer an oxidation of C-H bonds. This oxidation could occur in the absence of oxygen, and the resulting free radicals could recombine and cross-link, altering the physical and mechanical properties of the polymer. These cross-linking reactions could be the origin of the observed damage [20] without formation of carboxyl groups.

This hypothesis may explain the observed degradation occurring only for specimens implanted beyond 3 months: this time would correspond to the necessary period for oxidation to affect the PP structure. This explanation is enhanced by the significant correlation between the reactions of type 1 and 2 and the number of degraded PP samples found in this study.

c.   There was no alteration of the PET implants.

No alterations of PET were found with SEM analysis. The FTIR spectra of the PET samples after treatment



Int Urogynecol J (2010) 21:261–270



**Fig. 4** FTIR Spectra of **a** typical PP spectrum and chemical structure, **b** representative FTIR spectrum of an excised PP sample before cleaning, **c** FTIR spectra of excised PP samples (group 1 and 2) after the cleaning procedure, and **d** typical PET spectrum and chemical structure

revealed no change when compared to a typical PET spectrum. The hydrophilic character of this polymer may limit the diffusion of the previously mentioned organic molecules. PET also appeared more stable regarding radical oxidation [19, 21].

Polypropylene, in particular, LDPPMF, is the most used material in the PFD surgery. It is generally considered an inert material [22].This study contradicts this established fact and confirms the results of other studies on PP materials used in other areas of medical specialization.

A degradation related to the action of UV on PP threads used in ophthalmology has been described [23, 24]. In this study, the degradation of the polypropylene cannot be due to UV. More recently, studies were performed on the analysis of damage caused in implants, which were used in parietal surgery. These studies showed that PP meshes undergo degradation while in vivo, most likely due to fatty acids diffusion [17] or oxidation with formation of carboxyl groups [19, 20]. The main argument for the later one was based on a difference in the thermal transitions, as measured by DSC, between pristine and degraded PP implants [18]. The author advised subsequent researchers to analyze specimens by FTIR for confirmation of the degradation hypothesis. In this study, no difference between DSC thermograms of pristine and degraded samples was found. Additionally, FTIR analysis did not conclusively confirm that the degradation was due to oxidation.

The septic environment and large detachments of the vaginal approach resulting in collection and bruising hematoma could support both the accumulation of fatty acids and an increased risk of infection and makes the environment for the synthetic implants significantly more challenging. In these conditions, it is possible that degradation of PP can occur from mechanisms different from those found, for example, in parietal surgery. In the same



way, it is possible that the PP degradation is due to the association of the various expressed mechanisms and not only to oxidation phenomena.

For obvious ethical reasons, this study did not provide the opportunity to analyze vaginal implants from non-pathological situation. Therefore, prediction of normal in vivo material aging or the range of consequences in the clinical state beyond the observed samples is not possible. Due to small effective sample size, it is not possible to categorically conclude on the basis of statistical analysis even if a clear tendency is present.

A study of mechanical properties and an estimation and comparison of the strength and resistance of the various explants was not possible due to individual specimen size, as well as the degraded state of the samples. Moreover, a full chemical analysis of every sample in this series of explants was not possible for these same reasons. Additional chemical analysis such as thermogravimetric analysis and molecular weight determination, specifically, would further clarify the mode of prosthetic damage.

## Conclusion

For transvaginal surgery, clinical experience indicates the use of low density, large pore implants knitted from a monofilament to facilitate tissue integration, and decrease the inflammatory reactions. This study, however, brings in to question the prevailing understanding of PP as inert when used in vaginal surgery for pelvic floor repair procedures.

In this work, not all types of PP implants degraded equally. The PP implants degraded more in the presence of an acute infection or chronic inflammation.

Several hypotheses persist concerning the nature of PP in vivo degradation. Large detachments and hematomas are one of the characteristics of the vaginal route and ultimately result in the massive accumulation of blood-derived fatty acids. The diffusion of organic molecules into the polymer (especially esterified fatty acids or cholesterol) may be a cause of the polymer structure degradation. Another explanation concerns radical oxidation due to the septic environment that accompanies acute infections and chronic inflammation. This results in an increase in free radicals generation. When radical oxidation occurs in the absence of oxygen, the formed radicals may promote cross-linking, which alters the physical and mechanical properties of the polymer.

PET exhibited greater resistance to radical oxidation. Additionally, the diffusion of nonpolar molecules such as esterified fatty acids or cholesterol appeared unfavorable. These properties may explain the stability of this polymer in the body. This preliminary study points to the need for clinical trials in order to comparatively investigate the performance of new types of monofilament meshes, such as

PET, to existing monofilament devices in various surgical applications.

**Acknowledgement** Many thanks to Jean-Pierre Laugier for his tremendous pedagogic work with SEM at the CCMA.

**Conflicts of interest** The work and research of H. Yahi were supported by a grant from SOFRADIM; S. Montanari is an affiliate of Covidien; Henri Clavé has an educational position for Ethicon Europe.

## References

1. Culligan PJ, Blackwell L, Goldsmith LJ, Graham CA, Rogers A, Heit MH (2005) A randomized controlled trial comparing fascia lata and synthetic mesh for sacral colpopexy. Obstet Gynecol 106:29–37
2. Karlovsky ME, Kushner L, Badlani GH (2005) Synthetic biomaterials for pelvic floor reconstruction. Curr Urol Rep 6:376–384
3. Wu JP (2008) The use of prostheses in pelvic reconstructive surgery: joy or toy? Taiwan J Obstet Gynecol 47:151–156
4. Debodinance P, Berrocal J, Clave H, Cosson M, Garbin O, Jacquetin B et al (2004) Changing attitudes on the surgical treatment of urogenital prolapse: birth of the tension-free vaginal mesh. J Gynecol Obstet Biol Reprod (Paris) 33:577–588
5. Bader G, Fauconnier A, Guyot B, Ville Y (2006) Use of prosthetic materials in reconstructive pelvic floor surgery. An evidence-based analysis. Gynecol Obstet Fertil 34:292–297
6. Caquant F, Collinet P, Debodinance P, Berrocal J, Garbin O, Rosenthal C et al (2008) Safety of trans vaginal mesh procedure: retrospective study of 684 patients. J Obstet Gynaecol Res 34:449–456
7. Deffieux X, de Tayrac R, Huel C, Bottero J, Gervaise A, Bonnet K et al (2007) Vaginal mesh erosion after transvaginal repair of cystocele using gynemesh or gynemesh-soft in 138 women: a comparative study. Int Urogynecol J Pelvic Floor Dysfunct 18:73–79
8. Olsen AL, Smith VJ, Bergstrom JO, Colling JC, Clark AL (1997) Epidemiology of surgically managed pelvic organ prolapse and urinary incontinence. Obstet Gynecol 89:501–506
9. Tsui KP, Ng SC, Tee YT, Yeh GP, Chen GD (2005) Complication of synthetic graft materials used in suburethral sling procedures. Int Urogynecol J Pelvic Floor Dysfunct 16:165–167
10. Jia X, Glazener C, Mowatt G, MacLennan G, Bain C, Fraser C et al (2008) Efficacy and safety of using mesh or grafts in surgery for anterior and/or posterior vaginal wall prolapse: systematic review and meta-analysis. BJOG 115:1350–1361
11. Feiner B, Jelovsek JE, Maher C (2009) Efficacy and safety of transvaginal mesh kits in the treatment of prolapse of the vaginal apex: a systematic review. BJOG 116:15–24
12. Amid PK, Lichtenstein IL (1997) current assessment of lichtenstein tension-free hernia repair. Chirurg 68:959–964
13. Lefranc O, Bayon Y, Montanari S, Gravagna P (in press) Reinforcement materials in Soft Tissue Repair: Key paramaters controlling tolerance and performance-current and future trends in mesh development, in new techniques in genital prolapse surgery. Drs. Theobald P, Zimmerman CW, Davila GW (Eds.)
14. Caquant F, Collinet P, Deruelle P, Lucot JP, Cosson M (2005) Perineal cellulitis following trans-obturator sub-urethral tape uratape. Eur Urol 47:108–110
15. Bafghi A, Valerio L, Benizri EI, Trastour C, Benizri EJ, Bongain A (2005) Comparison between monofilament and multifilament polypropylene tapes in urinary incontinence. Eur J Obstet Gynecol Reprod Biol 122:232–236

16. Martin LK, Yang CQ (1994) Infrared spectroscopy of the photoxidation of a polyethylene nonwoven fabric. J Environ Polym Degrad 2(2):153–159

17. Clayman HM (1981) Polypropylene. Ophthalmology 88:959–964

18. Costa L, Jacobson K, Bracco P, Brach del Prever EM (2002) Oxidation of orthopaedic uhmwpe. Biomaterials 23:1613–1624

19. Bracco P, Brunella V, Trossarelli L, Coda A, Botto-Micca F (2005) Comparison of polypropylene and polyethylene terephthalate (dacron) meshes for abdominal wall hernia repair: a chemical and morphological study. Hernia 9:51–55

20. Costello CR, Bachman SL, Grant SA, Cleveland DS, Loy TS, Ramshaw BJ (2007) Characterization of heavyweight and lightweight polypropylene prosthetic mesh explants from a single patient. Surg Innov. 14:168–176

21. Coda A, Bendavid R, Botto-Micca F, Bossoti M, Bona A (2003) Structural alterations of prosthetic meshes in humans. Hernia 7:44–49

22. Debodinance P, Delporte P, Engrand J, Boulogne M (2002) Development of a better tolerated prosthetic materials: applications in gynecological surgery. J Gynecol Obstet Biol Reprod (Paris) 31:527–540

23. Altman AJ, Gorn RA, Craft J, Albert DM (1986) The breakdown of polypropylene in the human eye: is it clinically significant? Ann Ophthalmol 18:182–185

24. Jongebloed WL, Worst JF (1986) Degradation of polypropylene in the human eye: a SEM-study. Doc Ophthalmol 64:143–152



# EXHIBIT X



# ETHICON, INC.
a Johnson-Johnson company

SOMERVILLE NEW JERSEY · 08876-0151

September 30, 1987

Dr. A. J. Melveger                    cc:  Dr. S. Garg
                                           Dr. R. Kronenthal
                                           Dr. A. Levy
                                           Mr. R. Lilenfeld
                                           Dr. J. McDivitt
                                           Mr. R. Morrissey
                                           Mr. F. Schiller
                                           RDCF

IR MICROSCOPY OF EXPLANTED PROLENE*
RECEIVED FROM PROF. R. GUIDOIN
- - - - - - - - - - - - - - - - - -

Samples of PROLENE* suture carefully removed from human vascular graft
explants received from Prof. R. Guidoin were examined by IR microscopy
"as is".  A PROLENE suture control was examined for comparison.  The
samples are described below:

| Sample | Implant Duration | Microscopy Observations (SEM- F. Schiller) | IR Spectra (Figure #) |
|--------|------------------|--------------------------------------------|-----------------------|
| 83D062 + 83TI9020 | 2 yr. | No cracking | 1,2 |
| 83D035 | 8 yr. | Severe cracking | 3,4,5,6,7 |
| TB2418-Q Sterile Product | Non-implanted control | -- | 8,9 |

The samples were examined "as is" with no special preparation.  Multiple
spectra were obtained at different sites along the explants, especially
for the 8-year severely cracked specimens.  The IR spectra appear
"bottomed out" since the sample thickness is quite significant.

Some samples of 83D035 (8 yr.) were examined optically.  Using a needle,
the cracked surfaces were easily wiped off and deposited on a KBr
window.  The surface "scrapings" had the handling and consistency of a
waxy snow.  The sample was not conducive to IR microscopy in this form
however.  Similar treatment with needles on sterile packaged PROLENE and
the 2-year sample generated no scrapings.

ETHICON, INC.

*Trademark        OCT 16 1987

                  RD-CENTRAL FILE

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 2

The surface scrapings of 83D035 were melted at 147°–156°C on the Mettler hot stage. This is the melting range previously observed for oxidatively degraded polypropylene. IR microscopy of the melted film produced (Figures 10 & 11) yielded good spectra.

Observations

Spectra of samples examined "as is" show remarkable similarity between explanted suture and unimplanted suture. All major polypropylene and pigment bands are observed (Figure 9). The 1740 cm$^{-1}$ band, seen strongest in the sterile product, is due to dilauryl thiodipropionate (DLTDP) additive. The DLTDP appears reduced in the 2-year sample spectra and further reduced in the 8-year sample spectra. DLTDP is not observed in the surface scraping spectra.

The observation of chemical species in the surface scrapings spectra of 83D035, yet not seen in the "bulk" spectra (surface + interior) of the suture explants, suggests that the regions affected by cracking or degradation are very small relative to the entire suture. The surface scraping spectra are very different from the "bulk" spectra, and both types of spectra show no evidence of the presence of protein.

The surface scrapings spectra of 83D035 clearly indicate polypropylene, but also three or four other broadened bands. Table I explains the possible functionalities determined from a library search of the IR bands not normally seen in polypropylene.

Conclusions

The IR data collected for the PROLENE suture explant samples suggest:

1. The amount of DLTDP is reduced in the explanted sutures. No DLTDP is observed in the surface scraped (cracked regions) of 83D035. The observed DLTDP decreases with implant time.

2. No protein is observed in any spectra of the explanted sutures.

3. The surface scraped material from the cracked regions of 83D035 has a melting range indicative of degraded polypropylene. The IR spectra of this scraped material is clearly polypropylene, but it appears to be degraded in an oxidative fashion. There are a number of degradation species possible from the IR data. Hydroxyl and acid/ester functionality are definitely present. Ketone and/or unsaturated species are suggested, but not verified.

4. The degraded portion of the 8-year explant makes up only a minor portion of the entire suture.

D. F. Burkley

rmw
Attachment
1949N/93–95

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

# EXHIBIT Y

# ETHICON, INC.

a *Johnson&Johnson* company

P.O. BOX 151
SOMERVILLE • NEW JERSEY • 08876-0151

October 15, 1992

cc: B. Matlaga
    J. McDivitt
       ↓
    A. Melveger
    RDCF

Mark Cafone

SEVEN YEAR DATA FOR TEN YEAR PROLENE™ STUDY: ERF 85-219
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This report contains a summary of IR, IV, GPC, OM and SEM data
supporting this study.

**IR and IR Microspectroscopy** (D.Burkley)

IR examinations were done for all explants at all sites to verify
the suture identity for each explant.  For all explanted sutures
recovered from all 6 sites for every dog in this study, IR data
showed each suture to be correctly identified.

IR microspectroscopy was used to examine cracked areas in ETHILON,
Novafil and PROLENE™ explants.  IR spectra obtained for cracked
PROLENE specimens (Figure A) showed possible evidence of slight
oxidation (a broadened weak absorbance at about 1650 cm-1).  IR
spectra obtained for cracked areas of ETHILON and Novafil did not
differ from uncracked areas (Figures B and C), but expected IR
absorbances for oxidation would be masked by the strong carbonyl
absorbances normally observed for these sutures.  Figures D and E
show pictures of the areas examined by IR microspectroscopy for
ETHILON and Novafil.

**IV and GPC** (E.Muse)

Gel Permeation Chromatography (GPC) was run on PROLENE sutures
explanted from dogs after seven years.  The GPC data was compared
to data from a current 4/0 PROLENE suture.  The results indicate
that there was no significant difference in molecular weight
between the 4/0 PROLENE control and the seven year explants.

The following PROLENE explant samples were analyzed:

    Dog 1995 - site 3 (SR33853)
    Dog 2007 - sites 1 and 6 (SR34003)
    Dog 2008 - site 2 (SR34066)
    Dog 2019 - sites 2 and 3 (SR34180)

The GPC analysis was run on the Waters 150C GPC at 140°C using
1,2,4 trichlorobenzene as a mobile phase with Waters GPC columns.
The instrument was calibrated with polypropylene standards.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.07690752

Inherent Viscosity (IV) was determined on ETHILON™ and Novafil sutures explanted from dogs after seven years.  The IV data[1] was compared to IV data from one and two year explants.  The following results were found:

1) No significant differences were seen in IV values after one and two years.
2) Seven year IV values ranged from 75% to 93% of the one and two year IV values for ETHILON sutures.
3) Seven year IV values ranged from 75% to 90% of the one and two year values for Novafil.

The dog explant samples examined were from duplicate sites on four dogs for each time period (one, two and seven years).  The IV data was determined using concentrations of 0.1 dl/g with HFIP as a solvent at 25°C.

**OPTICAL MICROSCOPY and SCANNING ELECTRON MICROSCOPY** (E.Lindemann)

<u>Conclusions</u>

- The 7 year in-vivo results generally substantiated the five year findings.  They also closely correspond to the observations of explanted sutures from the dog that died prematurely after 6 years and 10.5 month implantation time.

- Degradation in PROLENE is still increasing and PVDF, even though a few cracks were found, is still by far the most surface resistant in- house made suture in terms of cracking.

- Of the eight explanted ETHILON sutures all showed heavy cracking and, in many cases, abrasion of the dyed surface layer. A decrease in the suture diameter was apparent in several cases.

- Cracks were not found in the seven Novafil explants. However a few longitudinal scratches probably due to mechanical damage and one longitudinal crack were observed.

<u>Introduction</u>

In November 1985 twenty-four dogs had been implanted with sets of ETHILON, PROLENE, PVDF and Novafil sutures for a ten year study. In 1990, after five years, explants from 5 beagle dogs were described in " TEN YEAR IN-VIVO STUDY SCANNING ELECTRON MICROSCOPY FIVE YEAR REPORT" by Elke Lindemann. The next explantation, after 7 years, was to start in June 1992. However, after 6 years and 10.5 months dog #1995 died prematurely.  The microscopical examination of those explants was described in " TEN YEAR IN-VIVO STUDY: SCANNING ELECTRON AND LIGHT MICROSCOPY INTERIM REPORT ON DOG #1995 AFTER 6 YEARS, 10.5 MONTH, SR# 33788 and are included in the conclusion section of this report. In June of 1992 after 7 years, sutures were explanted from another set of 4 dogs.  This report presents the results of the light and scanning electron microscopical examination of those explants.

---

[1]SR33853, SR34003, SR34066, SR34180

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.07690753

**Experimental**

Four dogs had been implanted in November 1985 with the following
5-0 sutures:

|         | Site 1  | Site 2  | Site 3  | Site 4  | Site 5  | Site 6  |
|---------|---------|---------|---------|---------|---------|---------|
| Dog 2001 | PVDF    | ETHILON | Novafil | PROLENE | PROLENE | Novafil |
| Dog 2007 | PROLENE | Novafil | ETHILON | PVDF    | PVDF    | PROLENE |
| Dog 2019 | Novafil | PROLENE | PROLENE | PVDF    | ETHILON | ETHILON |
| Dog 2008 | ETHILON | PROLENE | Novafil | PVDF    | ETHILON | PVDF    |

Starting in June of this year the above dogs were sacrificed in
weekly intervals. Approximately 20cm long sections of the
explanted sutures were received in microscopy in glass vials which
were kept refrigerated until they were examined.

Also the explanted LC 100 clip with about 2cm of each suture bundle
was delivered in the same vial. The clip and the attached sutures
were still deeply embedded in the surrounding tissue. These 'not
cleaned' sutures were supposed to answer the question whether the
process of cleaning and tissue removal might be responsible for an
observed cracking. The primary concern of this study was however
to examine the long pieces of explanted suture. Most of these
specimens were still surrounded with some tissue, fortunately at a
level low enough not to obscure examination in the light microscope
under transmitted light. It was possible to examine the embedded
PROLENE suture where the cracking of the suture was seen through
the tissue. For this reason and time constrains the clip-attached
sutures were not examined at this time.

To show that the drying and coating with a metal under vacuum,
necessary for SEM examination, did not introduce cracking and other
surface defects each strand of each long suture was 100% inspected
in the Olympus Light Microscope in water. Oil, the usual medium
for light microscopical inspection, was not chosen for this
examination in order to eliminate surface changes during sample
preparation. To cut down on lensing effects of the curved suture,
the samples were photographed in polarized light using a 10x phase
condenser with an ordinary transmitted light 20x objective (a 20x
phase condenser was not available). The light diffraction
introduced by the phase condenser was enough to allow an easier
focusing at the focal plane of the largest diameter.
Photomicrographs were prepared at 285x of areas which showed
surface changes.

Strands of the suture including the above areas were then prepared
for SEM observation in the JEOL JSM 840 AII by coating them under
vacuum with gold to provide an electron conductive surface.
Photomicrographs were prepared at 500x magnification.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.07690754

Page 4

## Results

**1) LM and SEM of PROLENE suture explants from seven implantation site.**

In Figure 1A through 1D one area per site from each of the four dogs is shown in transmitted light. Out of seven sites cracking was found on PROLENE sutures from three sites. Notice the cracks observable through the still adhering tissue in Figure 1A in the suture from site 2.

In Figure 1 and 2 SEM views of areas are shown after most of the tissue had been carefully removed. Again out of seven sites sutures from three sites had areas which showed cracking.

**2) LM and SEM of ETHILON suture explants from six implantation sites.**

In Figure 3A through 3C sutures are shown from six different sites. Transmitted light allowed visualization of the differences between the intact dyed surface layer and the underlying colorless layers of the suture. In Figure 3A site 5 and Figure 3C site 3 the colorless area had not only lost its dyed surface layer but was abraded to such a degree that a decrease in suture diameter was found.

In Figures 3 and 4 the cracking and abrasion on sutures from all six sites, as observed with the SEM, is shown. Here also the decrease in diameter is particularly dramatic in Figure 3 site 1.

**3) LM and SEM of PVDF suture explants from six implantation sites.**

Figure 5A through 5C show six sites of PVDF explants as seen with the light microscope. Notice the intact surface on all the sutures.

In Figures 5 and 6 the SEM examination of the PVDF sutures is shown. Only on the suture from one site (Figure 6 site 6) some cracks are found. The surfaces of the sutures from the other five sites show some striations which could be mechanical damage, otherwise the surfaces look intact. The contaminant on the site 4 (Figure 5) suture is tissue which had not been removed completely.

**4) LM and SEM of Novafil suture explants from five implantation sites.**

Figure 7A through 7C show the Novafil sutures as observed with the light microscope. All surfaces from all sites look undamaged. Figure 7 and 8 show the SEM examination of these sutures. A few longitudinal scratches and cracks were found, see sites 1,2,3 (Figure 7,8). Also on the site 2 suture (Figure 8) still adhering tissue is found.

**5) Degradation dependency on implantation site**

To probe the question as to whether one implantation site might be more or less stressful towards the suture, a comparison was made of the six sites.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.07690755

Page 5

|        | Site 1              | Site 2              | Site 3              | Site 4   | Site 5              | Site 6              |
|--------|---------------------|---------------------|---------------------|----------|---------------------|---------------------|
| Dog 1995 | ETHILON cracks    | PVDF                | PROLENE cracks      | Novafil  | Novafil cracks      | ETHILON cracks      |
| Dog 2001 | PVDF              | ETHILON cracks      | Novafil             | PROLENE  | PROLENE cracks      | Novafil             |
| Dog 2007 | PROLENE           | Novafil scratch     | ETHILON cracks      | PVDF     | PVDF                | PROLENE cracks      |
| Dog 2019 | Novafil scratch   | PROLENE             | PROLENE             | PVDF     | ETHILON cracks      | ETHILON cracks      |
| Dog 2008 | ETHILON cracks    | PROLENE cracks      | Novafil cracks      | PVDF     | ETHILON cracks      | PVDF cracks         |

The only site, in the 5 dogs of this study, from which sutures were explanted that showed no surface damage was site 4.  However, of those five sutures three were PVDF and one was Novafil.  Those are the sutures that showed only marginal surface changes in this study.  Therefore this observation can be discounted.

Elke Lindemann

Eugene P. Muse

Daniel F. Burkley

Attachment


7YEAR.DFB

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.07690756

# EXHIBIT Z

Howard C. Jordi, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION
Master File No. 2:12-MD-02327

_____

IN RE: ETHICON, INC.            MDL No. 2327
PELVIC REPAIR SYSTEM,
PRODUCTS LIABILITY
LITIGATION

_____

This Document Relates to:

Carolyn Lewis, Et Al v. Ethicon, Inc.
Case No. 2:12-CV-04301

_____

IN THE DISTRICT COURT, 95th JUDICIAL DISTRICT
DALLAS COUNTY, TEXAS

Linda Batiste,
            Plaintiff,
      v.                          Cause No.
John Robert McNabb, M.D.,         DC-12-14350
Johnson & Johnson and Ethicon, Inc.,
            Defendants.

_____


DEPOSITION OF HOWARD C. JORDI, Ph.D.

Wednesday, October 30th, 2013

9:05 a.m.


      Held At:

            Jordi Lab
            200 Gilbert Street
            Mansfield, Massachusetts


REPORTED BY:

Maureen O'Connor Pollard, RPR, CLR, CSR #149108

Howard C. Jordi, Ph.D.

## Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
3  BY:  BENJAMIN H. ANDERSON, ESQ.
4  ANDERSON LAW OFFICES, LLC
5  1360 West 9th Street, Suite 215
6  Cleveland, Ohio 44113
7  216-589-0256
8  ben@andersonlawoffices.com
9  -and-
10  BY:  DANIEL J. THORNBURGH, ESQ.
11  AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC
12  17 East Main Street, Suite 200
13  Pensacola, Florida 32502
14  850-202-1010
15  dthornburgh@awkolaw.com
16
17  FOR THE DEFENDANTS ETHICON, INC., and JOHNSON &
18  JOHNSON:
19  BY:  DAVID B. THOMAS, ESQ.
20  THOMAS COMBS & SPANN, PLLC
21  300 Summers Street, Suite 1380
22  Charleston, West Virginia 25301
23  304-414-1807
24  dthomas@tcspllc.com
25

## Page 3

1  APPEARANCES VIA SPEAKERPHONE
2  FOR THE PLAINTIFF CAROLYN LEWIS:
3  BY:  CALLE M. MENDENHALL, ESQ.
4  FREESE & GOSS PLLC
5  Regions Harbert Plaza 1901
6  6th Avenue North
7  Birmingham, Alabama 35203
8  205-871-4144
9  calle@freeseandgoss.com
10
11  FOR DEFENDANT DR. JOHN McNABB in the Batiste
12  case:
13  BY:  PHILIPA M. REMINGTON, ESQ. (AM)
14  CHARLES A. ESTEE, ESQ. (PM)
15  THIEBAUD, REMINGTON, THORNTON, BAILEY, LLP
16  1445 Ross Avenue, Suite 4800
17  Dallas, Texas 75202
18  214-954-2210
19  premington@trtblaw.com
20
21
22
23
24
25

## Page 4

1              INDEX
2  EXAMINATION                      PAGE
3  HOWARD C. JORDI, Ph.D.
4   BY MR. THOMAS                    5
5   BY MR. ANDERSON                286
6              EXHIBITS
7  NO.      DESCRIPTION            PAGE
8  1    Rule 26 Expert Report of Howard
9       Jordi, PhD in the Carolyn Lewis
10      case.................................. 6
11  2    Document titled Final Report, Linda
12      Batiste............................. 7
13  3    De Tayrac and Letouzey article
14      titled "Basic science and clinical
15      aspects of mesh infection in pelvic
16      floor reconstructive surgery......... 54
17  4    Liebert, et al study titled
18      Subcutaneous Implants of
19      Polypropylene Filaments.............. 72
20  5    Group of invoices from Jordi Labs....183
21  6    10/30/13 Final Report for Linda
22      Batiste............................209
23  7    Group of films......................267
24
25

## Page 5

1      P R O C E E D I N G S
2
3      HOWARD C. JORDI, Ph.D.,
4  having been first duly identified and sworn, was
5  examined and testified as follows:
6      DIRECT EXAMINATION
7  BY MR. THOMAS:
8      Q.  Good morning, Dr. Jordi.
9      A.  Good morning.
10      Q.  I introduced myself to you before the
11  deposition.  My name is David Thomas, and I
12  represent the Defendants in the case.  And I'm
13  going to take your deposition in two matters,
14  the Carolyn Lewis matter and the Batiste case
15  from Texas.
16      You understand that?
17      A.  I do.
18      Q.  We're here in your offices in
19  Massachusetts?
20      A.  Yes, we are.
21      Q.  And is Massachusetts your home?
22      A.  It is.
23      Q.  Okay.  Would you state your full name
24  for the record, please?
25      A.  Howard Craig Jordi.

Howard C. Jordi, Ph.D.

Page 6

1    Q.  And you're a Dr. Jordi, correct?
2    A.  That's correct.
3    Q.  A Ph.D doctor?
4    A.  A Ph.D doctor.
5    Q.  Not a medical doctor?
6    A.  Not a medical doctor.
7    Q.  And in what area is your Ph.D?
8    A.  Biochemistry.
9    Q.  What is a biochemist?
10   A.  A biochemist is one who studies the
11   reactions of chemicals in the body.
12   Q.  Okay.  Dr. Jordi, I've been provided
13   two reports in this case.  I'm going to mark as
14   deposition Exhibit Number 1 what's been provided
15   to me as your Rule 26 expert report of Howard
16   Jordi, Ph.D in the Carolyn Lewis case.
17   A.  Okay.
18       (Whereupon, Jordi Exhibit Number 1,
19       Rule 26 Expert Report of Howard Jordi,
20       PhD in the Carolyn Lewis case, was
21       marked for identification.)
22       MR. THOMAS:  And I'm going to mark as
23   Exhibit Number 2 what's been provided to me as a
24   document titled Final Report for Linda Batiste.
25

Page 7

1        (Whereupon, Jordi Exhibit Number 2,
2        Document titled Final Report, Linda
3        Batiste, was marked for
4        identification.)
5    BY MR. THOMAS:
6    Q.  Okay.  And let me tell you what I did.
7    Those are double-sided copies because I didn't
8    care to --
9    A.  I was going to say it didn't seem
10   thick enough.
11   Q.  It's half as thick as you expected it
12   to be.
13   A.  Yes.
14   Q.  Because I didn't care to carry all
15   those papers with me.  These are the documents
16   that were provided by counsel in the case.
17       Can you review those quickly, or as
18   much time as you need, and confirm for me that
19   those are complete copies of your expert reports
20   in the case?
21       (Witness reviewing documents.)
22       MR. ANDERSON:  I'd just like for the
23   record to reflect that it's an almost 800 page
24   report, and he's trying to leaf through it as
25   best he can and to try to determine if it's

Page 8

1    final, rather than looking at each and every
2    page, he's trying to do the best he can in the
3    interest of time.
4        MR. THOMAS:  It's 847 pages, and I'll
5    represent to you that we copied it as best we
6    could and produced it for him, and I'm just
7    trying to get him to identify it as best he can.
8        MR. ANDERSON:  So stipulated.
9        MR. THOMAS:  The Batiste report is
10   some 240 pages, and I don't expect him to go
11   through every page, unless he wants to.  But
12   I'll represent that's a copy of what was
13   supplied to me.
14       MR. ANDERSON:  Right.
15       MR. THOMAS:  I'm trying to just get it
16   identified as best we can.
17       MR. ANDERSON:  Right.  I'm just saying
18   he's leafing through it to do the best he can
19   without taking every page and looking at it in
20   detail.
21   A.  It appears to be complete.
22   BY MR. THOMAS:
23   Q.  Okay.  Dr. Jordi, how do you charge
24   for your time?
25   A.  I bill hourly.

Page 9

1    Q.  And what is your hourly rate?
2    A.  350 an hour.
3    Q.  Is your hourly rate the same for
4    whatever work that you do?
5    A.  Yes.
6    Q.  Have you calculated the total amount
7    dollars that you've billed for Exhibit 1, the
8    Lewis report?
9    A.  We'd have to look at the receipts, the
10   billings for that.
11   Q.  Do you have those with you today?
12   A.  I believe we do.
13       MR. ANDERSON:  Yes.
14   BY MR. THOMAS:
15   Q.  And the same for the Batiste matter?
16   A.  Same.
17       MR. THOMAS:  Okay.  Ben, we'll come
18   back to that in a few minutes.
19       MR. ANDERSON:  Sure.
20   BY MR. THOMAS:
21   Q.  Those billing records are readily
22   available, and you can determine how much it
23   cost you to produce Exhibit 1, the report in
24   Carolyn Lewis, and Exhibit 2, the report for
25   Linda Batiste?

3 (Pages 6 to 9)

Howard C. Jordi, Ph.D.

Page 10

1      A.  I don't know if this has been billed
2  yet, but this one should be.  I think we bill
3  monthly, so it hasn't gone out yet.
4      Q.  When you say "this one," you're
5  referring to Exhibit 2, which is Linda Batiste?
6      A.  Yes, sir.
7      Q.  Okay.  And do you have records that
8  you'd be able to get sometime during the day so
9  that I can tell how much time you have into it
10 that hasn't been billed so I know how much cost
11 there was for the Linda Batiste report?
12     MR. ANDERSON:  I might be able to help
13 you.  In response to your notice of subpoena,
14 the 21 categories, we did our best to try to
15 respond to those, the ones that we thought he
16 could respond to, and as part of that we tried
17 to get as up to date a billing as we could for
18 you, and that would include as much of Batiste
19 as possible, at least up until last week.
20     MR. THOMAS:  Okay.
21     MR. ANDERSON:  So that's -- we've
22 tried.  And I think that you'll be able to look
23 at it, and from the dates be able to tell
24 whether or not it includes anything this week or
25 not.

Page 11

1      MR. THOMAS:  Perfect.
2  BY MR. THOMAS:
3      Q.  For the Carolyn Lewis case, your final
4  report in Exhibit Number 1, is that a complete
5  copy of the report of the opinions that you
6  intend to give in the Carolyn Lewis case?
7      A.  It is.
8      Q.  Do you have any intention of doing any
9  additional work prior to testifying in trial in
10 this case in connection with new opinions for
11 the Carolyn Lewis case?
12     MR. ANDERSON:  I'm just going to
13 object, because as counsel knows, we have a
14 right to do rebuttal reports in this case, so he
15 may not even understand that.  And so with that
16 caveat, that as he sits here today.
17     A.  To my knowledge, this is complete, and
18 this is what I will be using.
19 BY MR. THOMAS:
20     Q.  Same question with respect to Linda
21 Batiste, Exhibit Number 2; does Exhibit Number 2
22 represent a complete report of the opinions that
23 you're prepared to give in the Linda Batiste
24 case?
25     A.  Yes.

Page 12

1      Q.  All right.  Do you understand that
2  there are different products that are at issue
3  in the Lewis case and the Batiste case?
4      MR. ANDERSON:  Objection.
5      Go ahead.
6      A.  The samples that I received I just
7  received and ran by identification numbers
8  without regards to -- certainly the pristine
9  materials were identified.
10 BY MR. THOMAS:
11     Q.  Okay.  Do you have any knowledge --
12 what I'm trying to get at, Doctor, is, I'll
13 represent to you, my understanding anyway, is
14 the Carolyn Lewis case involves a product known
15 as a TVT Classic or a TVT Retropubic, and the
16 Batiste case, Exhibit Number 2, I understand,
17 involves a product known as a TVT Obturator or
18 TVT-O.
19     Do you know that?
20     A.  No.  That wasn't represented to us, as
21 far as I'm concerned.
22     Q.  As far as you're concerned --
23     A.  It's an explant.
24     Q.  Okay.  In the work that you did in
25 these matters, does it concern you at all

Page 13

1  whether this is a TVT Classic or a TVT Obturator
2  or a TVT Retropubic or TVT-O?
3      A.  No.  They're all polypropylene, and in
4  that sense, for that reason, no.
5      Q.  Is it fair to understand, Doctor --
6  just trying to do something to make this easier,
7  believe it or not -- is it fair to understand,
8  Doctor, that the work that you did in analyzing
9  the mesh explants and the mesh controls that's
10 represented in Exhibit Number 1 and Exhibit
11 Number 2 do not depend on the type of product
12 that you were analyzing?
13     MR. ANDERSON:  Objection.
14     Go ahead.
15     A.  As a polymer chemist and having
16 studied polypropylene, among others, for my
17 lifetime of work, basically polypropylene is
18 polypropylene is polypropylene, so it's going
19 to -- if it's polypropylene it's going to have
20 the characteristic reactions of polypropylene.
21 BY MR. THOMAS:
22     Q.  Did the work that you did for Exhibit
23 Number 1 differ from the work that you did in
24 Exhibit Number 2 because of the name of the
25 product that was analyzed in each case?

4  (Pages 10 to 13)

Howard C. Jordi, Ph.D.

Page 14

1    A.  Did not.
2    I'm sorry.
3    MR. ANDERSON:  Go ahead.  That's fine.
4  BY MR. THOMAS:
5    Q.  And what were you trying to do when
6  you -- what were you asked to do in Exhibit
7  Number 1?
8    A.  We were asked to compare pristine mesh
9  samples and explant samples and determine
10  whether or not there were differences; and if
11  there were, what they were.
12    Q.  What did you understand to be the
13  differences that you were looking for?
14    A.  I wasn't told to look for any specific
15  differences.  I was told to look for
16  differences, if there were any.
17    Q.  And how did you set out to determine
18  whether there were differences between the
19  explants and the pristine samples that you'd
20  received?
21    A.  Given the knowledge that it was
22  polypropylene, classic tests that we would
23  typically run on any polypropylene would be
24  molecular weight, to see if it degraded in terms
25  of its molecular weight.

Page 15

1    We would look for additive content,
2  because that stabilizes polypropylene.
3    How am I doing speed-wise?
4    So we did additives analysis.
5    We would do DSC to look for
6  crystallinity.
7    We did SEM to look for cracks.
8    We did SEM-EDX to look for elemental
9  composition.  Specifically we were looking for
10  differing oxygen levels which would indicate and
11  correlate with oxidation, if present.
12    We did FTIR analysis to look for
13  presence of carbonyls.  And we specifically
14  there wanted to find out whether the flaking
15  material, once we saw it from the SEM, was
16  polypropylene or not, what was the composition,
17  chemical composition of the flakes that were
18  coming off the polypropylene fibers.  I'm trying
19  to think.
20    So we also ran PYMS.  That's another
21  technique to look for additives, presence of
22  additives.
23    I need to --
24    MR. ANDERSON:  Do you want to
25  reference your report?

Page 16

1  BY MR. THOMAS:
2    Q.  Absolutely.
3    A.  Do I need to reference this one,
4  because it's not marked?
5    MR. ANDERSON:  You can look at
6  anything.
7    A.  It's this.  I just want to make sure I
8  have all of the techniques referenced here that
9  I did.
10    We did optical microscopy as well to
11  see if there were any obvious differences, and
12  to just look at the shape of the fibers.
13    GPC.  I think we got them all.
14    MR. ANDERSON:  Did you say GPC?
15    A.  Gel permeation chromatography.  GPC
16  for molecular weight.
17  BY MR. THOMAS:
18    Q.  How did you determine what tests to
19  conduct on the mesh that you analyzed in Exhibit
20  Number 1?
21    A.  I've analyzed these kinds of materials
22  since 1980.  In this particular business we
23  built -- I founded this company, and so it's
24  just years and years of experience.
25  Polypropylene has to be stabilized because it's

Page 17

1  a reactive polymer.  That information goes back
2  at least to the '60s.  So you've got to look for
3  the antioxidants, the presence or lack thereof.
4  GPC is to determine the molecular weight, as I
5  said.  DSC is to determine the melt point and
6  the FLP at melt, which correlates with percent
7  crystallinity.  SEM is a means of looking at the
8  physical shape of the fibers.  So these are just
9  standard techniques that we used.  So we chose
10  standard techniques that I would use for any
11  such type of analysis.
12    Q.  Type of such analysis, what do you
13  mean by that?
14    A.  Well, in our company we analyze any
15  kind of polymer.  So we analyze polystyrene one
16  day, we analyze contact lens materials another
17  day, we analyze polypropylene, some of which
18  have been implanted in the human bodies, hips
19  and so on on another day.  You could really call
20  us a materials lab.
21    Q.  Okay.  What I'm trying to understand
22  is when you got this request from Mr. Anderson
23  and his associates and they asked you to analyze
24  this polypropylene material both as an explant
25  and as a pristine sample, did you go to the

Howard C. Jordi, Ph.D.

Page 18

1    shelf and pull off a list and say "I'm going to
2    do this list of tests"?
3        A.  No, because I already knew it from
4    experience.
5        Q.  Okay.
6        A.  We would do this type of work for any
7    client.
8        Q.  So the tests that you identified for
9    purposes of your report in both Exhibits 1 and
10   Exhibits 2 are based upon your training,
11   education, and experience, as opposed to any
12   reference guide that you may have looked to to
13   determine what tests you may have run, is that
14   fair?
15       A.  Well, I have reference guides.  I mean
16   I have books.  I do continue to -- reading is an
17   ongoing learning technique I continue to use,
18   and always will.
19       Q.  Sure.
20       A.  But no, I wouldn't need to read those
21   books to pop up with the techniques because
22   they're standard in the industry.
23       Q.  Is there a place where I could go
24   to -- if they came to me and said "Mr. Thomas, I
25   want to have these polypropylene tests run on

Page 19

1    this pristine control and this explant, what
2    tests should I run?"  Is there a place where you
3    could direct me to figure out what would be the
4    appropriate tests to identify the differences
5    between the explants and the controls?
6            MR. ANDERSON:  Objection as to form.
7            Go ahead.
8        A.  There's probably chapters like that,
9    books on chemical analysis that would suggest
10   methodologies.
11           Generally you have a body of
12   experience developed over many years, you
13   just -- at this point in my life, I would know
14   that I need to look up additives, for example,
15   but then I would go to the Dr. Müller text which
16   is in our reference list to look up how
17   additives were used in various materials, and I
18   would look under polypropylene, and I would find
19   what additives are typically used for
20   polypropylene specifically.  So I'd know what to
21   look for.
22   BY MR. THOMAS:
23       Q.  And you're referring to a text cited
24   in your report by a Dr. Müller?
25       A.  Dr. Müller, Society of Plastics

Page 20

1    Engineers, yes.
2        Q.  And for what purpose do you cite
3    Dr. Müller, is that the additives analysis?
4        A.  There would be additives analysis,
5    stabilization of various polymers, polypropylene
6    being one of them.
7        Q.  Are there any other texts or
8    authorities upon which you rely to identify the
9    tests that you need to contact on the explants
10   and the pristine samples?
11       A.  To identify the tests needed?
12       Q.  Yes.
13       A.  Well, reading 400 pages of literature,
14   and part of it is just the body of knowledge
15   that you get from reading all of the literature.
16   Everyone in the last -- starting back -- going
17   back to the '60s has used these techniques.
18       Q.  Okay.
19       A.  Some of them, of course, are more
20   modern today, obviously, than they were in the
21   '60s.  Today we have available FTIR microscopy,
22   which we can look at a tiny sample.  We didn't
23   have that available them.  LCMS didn't exist in
24   the '70s and '60s, does now.  So some of these
25   techniques have come along in terms of

Page 21

1    development that are available today that
2    weren't available prior times.  But, again,
3    today it's just -- every paper you read they
4    use -- we use some of the same methods.  LCMS is
5    one of the bright and shining stars today that's
6    come -- really come on strong in the last
7    20 years, 10 to 20 years.
8        Q.  Real simple question, hopefully it's a
9    simple answer.
10           Can you direct me to any authority,
11   textbook, article, whatever you use in your
12   business and in your expertise, that would
13   identify the tests that you would do to detect
14   the differences between an explanted piece of
15   polypropylene mesh and a pristine control of the
16   mesh?
17           MR. ANDERSON:  Objection.  Asked and
18   answered.
19           Go ahead.
20       A.  I don't know of any such text that
21   just has a single page where it lists -- if I
22   want to know about thermal methods, I'd go to
23   Edith Turi that I've cited.  If I want to know
24   about GPC, I'd go to Modern GPC chromatography
25   text that I have.  I have all these individual.

6 (Pages 18 to 21)

Howard C. Jordi, Ph.D.

Page 22

1    And if you go to -- Odiam, for
2  example, would be another one that's a common
3  text that's used in polymer chemistry training
4  sessions at like University of Connecticut where
5  my son got his doctorate, he took -- he used
6  that text. In that text you will see a chapter
7  on DSC, you will see a chapter on GPC, you'll
8  see a chapter on IR, you'll see all these
9  various techniques.
10    But it might not include every one I
11  used. I don't know that I can say -- I don't
12  think I can say there's any one book that has
13  every single method in it necessarily.
14    Q.  Is it fair to understand, Doctor, that
15  each of these tests that you ran were designed
16  to detect any differences between the control
17  sample of the mesh and the explant sample of the
18  mesh?
19    A.  That was the entire intent of the
20  proceeding, as far as I understood it. It was
21  just to look for differences, if there were any.
22    Q.  Okay. What is degradation?
23    A.  Well, degradation would be the loss of
24  functionality of, in this case, a polymer for
25  its intended purpose.

Page 23

1    Q.  Okay.
2    A.  That could include things like
3  oxidation, or environmental stress cracking. It
4  could include mechanical degradation. For
5  example, when products are -- waste materials in
6  the manufacturing process are re-used, they make
7  pellets out of the re-used material and they
8  call it regrind, and each regrind cycle tends to
9  degrade the polymer, so that's a type of
10  degradation.
11    Q.  Other than degradation as you've just
12  defined it, did you look for any other
13  differences in the polymer in the control sample
14  as compared to the polymer in the explant?
15    A.  Can I have the question repeated,
16  please?
17    Q.  Sure.
18    Other than the degradation as you've
19  just defined it, did you look for any
20  differences -- I'm going to change the question
21  because I'm going to use a different term.
22    Other than degradation as you've just
23  defined it, did you look for any differences in
24  the polypropylene in the control sample as
25  compared to the polypropylene in the explant

Page 24

1  that you analyzed?
2    A.  Well, SEM would be certainly a major
3  methodology. It gives you a visual observation
4  of -- I'd have to add SEM to the term
5  degradation, but it's a visual measurement as
6  opposed to a chemical measurement.
7    Q.  Okay.
8    A.  But it makes it very obvious if
9  something is degrading or not.
10    Q.  Other than degradation as you have
11  just defined it, and the SEM visual observations
12  that you've just described, did you look for any
13  other differences between the polypropylene in
14  the control samples and the polypropylene in the
15  explanted mesh?
16    A.  I'm not sure I understand how to
17  answer that question. We looked for differences
18  which included all the tests that we've
19  discussed; the molecular weight analysis, the
20  additives.
21    Q.  Don't all -- my question is; all the
22  tests that you ran are designed to determine the
23  extent to which the polypropylene degraded, is
24  that fair?
25    A.  Or could degrade. For example, if

Page 25

1  additives, antioxidants come out of the
2  polypropylene, initially it may not be degraded,
3  so I can't say that's degradation in and of
4  itself.
5    However, once the antioxidants are out
6  of the polypropylene, it is now vulnerable to
7  oxidation. So it's a very valid technique in
8  predicting the longevity, the functionalness of
9  the product.
10    Q.  Okay. So can we define it this way;
11  that the tests that you ran, as you've just
12  identified them, were designed to determine the
13  extent to which the polypropylene in the
14  explanted mesh had degraded as compared to the
15  control, and the extent to which it might
16  degrade in the future?
17    A.  I like that better.
18    Yes.
19    Q.  Okay. And you named three kinds, you
20  named oxidation, environmental stress cracking,
21  and mechanical degradation, is that fair?
22    A.  That's correct.
23    Q.  Your paper, your report discusses a
24  bunch of other types of degradation. Can we
25  focus on these three as being those types of

Howard C. Jordi, Ph.D.

Page 26

1    degradation at which you looked for purposes of
2    both Lewis and Batiste?
3        A. Well, right. You would have -- you
4    could have UV light degradation, but that
5    wouldn't be applicable to this case.
6        Q. The answer to my question, can we
7    limit our questions in this case to oxidation,
8    environmental stress cracking, mechanical
9    degradation, and the SEM visual analysis of
10   these meshes?
11       MR. ANDERSON: Objection.
12       Go ahead.
13       A. Well, I want to be able to include
14   FTIR, for example.
15   BY MR. THOMAS:
16       Q. But FTIR is designed to discuss --
17       A. Show oxidation.
18       Q. Right.
19       A. I think we're in pretty good shape
20   there.
21       Q. Okay. All I'm trying to do is make
22   this shorter instead of longer. And so I'm not
23   trying to trick you at all, believe it or not.
24       All right. So you received -- first
25   of all, who hired you in this case?

Page 27

1        A. Mr. Anderson.
2        Q. And you've already described what
3    Mr. Anderson asked you to do. And you
4    determined on your own what battery of tests to
5    conduct in order to evaluate the control mesh
6    against the explanted mesh, correct?
7        A. That's correct.
8        Q. When you received the samples that you
9    were to compare, I'm talking about the control
10   samples and the mesh explant samples, how did
11   you determine how to prepare those samples for
12   testing?
13       MR. ANDERSON: Objection.
14       Do you want to talk about the control
15   or the mesh?
16       MR. THOMAS: Both.
17       MR. ANDERSON: Okay.
18       MR. THOMAS: I'll do it first.
19   BY MR. THOMAS:
20       Q. How did you determine how to prepare
21   your control samples for testing?
22       A. Well, with the control samples we had
23   more material, boxes came in, and we had
24   pictures in here of the process. I think that
25   may be the best place to do, is just go look at

Page 28

1    the --
2        (Witness reviewing documents.)
3        A. So the control samples were received
4    for analysis in sealed packaging.
5    BY MR. THOMAS:
6        Q. My question is pretty simple, I think.
7    Maybe it's not. Page 12, you talk about sample
8    preparation.
9        A. Right.
10       Q. Where did you go to determine how to
11   prepare your sample for preparation for your
12   analysis? Did you consult any text, or are
13   there standard methodologies that you use to
14   prepare your samples for the testing that you're
15   going to do?
16       A. Well, in the case with polymers like
17   this, we have a balance area, we have a standard
18   area with an optical microscope, and we have
19   scalpels, and we have tweezers, and disposable
20   scalpels, and aseptic tweezers, that's just our
21   SOP.
22       And so we would cut the samples, cut
23   off little pieces for various -- because
24   different methods require different amounts of
25   sample.

Page 29

1        Q. Did you rely on your own internal
2    standard operating procedures for your sample
3    preparations for the tests that you conducted?
4        A. Yes.
5        Q. Are the standard operating procedures
6    that you have for Jordi Labs to conduct this
7    analysis in writing?
8        A. Most of them are, yes. As far as -- I
9    don't know if we have an SOP, I have to check on
10   that, for actual cutting of the samples.
11       MR. ANDERSON: He just said
12   "preparation." So I'm not sure --
13       THE WITNESS: That is preparation,
14   yes.
15       MR. ANDERSON: Fair enough.
16   BY MR. THOMAS:
17       Q. And how would you describe the
18   standard operating procedures for Jordi Labs, if
19   I wanted to identify them to get them at a later
20   time, that you did for sample preparation?
21       A. I don't know if we have a written for
22   sample preparation as far as just cutting the
23   samples. We have SOPs like for GPC, how to
24   dissolve the samples, FTIR, how it's put on the
25   instrument for each of those techniques, once

8 (Pages 26 to 29)

Howard C. Jordi, Ph.D.

Page 30

1  the samples are passed to each specific analyst.
2  But as far as -- I have a whole pile of SOPs
3  over here for you for each of those methods.
4      Q.  Okay.  Probably what I'll do during
5  lunch.
6      MR. ANDERSON:  That's why the question
7  is a little tough.  When you're saying sample
8  preparation, there's all these different tests
9  that were done, so the question embodies a lot
10  of things.  I didn't want to keep objecting.
11     MR. THOMAS:  I appreciate that.
12  BY MR. THOMAS:
13     Q.  On Page 12 of your report, under
14  "Sample Preparation," you discuss a "Control
15  Experiment."  It says "The control samples were
16  also used as part of a control experiment
17  designed to provide an indication as to the
18  effects of formalin storage."
19         Why did you conduct a control
20  experiment designed to provide indication as to
21  the effects of formalin storage?
22     A.  The samples received from Steelgate
23  came informally, they were shipped to us that
24  way, and we wanted to know what effect formalin
25  would have on pristine polypropylene, or not, as

Page 31

1  the case might be, so we wanted to rule out any
2  potential oxidation caused by formalin of the
3  explants that were slipped to us, so we tried
4  the controls the same way.
5      Q.  What is it about formalin that caused
6  you to be concerned about potential oxidation to
7  the mesh?
8      A.  Nothing specifically.  It's just good
9  lab practice to make sure that you treat -- if I
10  want to compare a pristine mesh with an explant,
11  I want the pristine mesh that I'm calling a
12  standard to be treated identically, period, as
13  much as I possibly can control it, to the
14  explant material.  Since the explant was in
15  formalin, it's wise to put your control in
16  formalin so they're treated identically.  So any
17  differences then seen can't be attributed to the
18  formalin treatment, if there was any.  I didn't
19  know there was or not.  But that is just good
20  lab practice to me.
21     Q.  As a biochemist, are you aware of any
22  chemical reaction issues associated between
23  formalin and polypropylene that may affect the
24  chemical properties of polypropylene?
25     A.  In general, no.

Page 32

1      Q.  Continuing on Page 12, you discuss
2  taking a sample of each control material, about
3  100 milligrams, placing it in formalin,
4  90 milliliters and heat it at 60 degrees
5  centigrade for 48 hours.  "In my experience,
6  this temperature would be expected to provide an
7  accelerated rate of aging and is consistent with
8  other published methods for this purpose."
9         What does that mean?
10     A.  Well, the samples have been sitting in
11  storage at Steelgate for some time, we don't
12  know how long exactly, at least I don't.  The --
13  so if it had been in Steelgate for a month, and
14  we put it in formalin here for a day, it
15  wouldn't be equivalent treatment.  So to get it
16  as close to being equivalent treatment as we
17  could we tried to -- in effect, we tried to
18  accelerate any potential aging by running it at
19  -- like doing the storage at 60 for 48 hours, so
20  it would be more like the treatment that it
21  would have received for, say, a month, or
22  whatever the time was, from Steelgate.
23     Q.  You cite to two references for this
24  process, it's the ASTM Standard D3045, and the
25  Inoue paper, 1961, the Journal of Polymer

Page 33

1  Science on Page 13 of your report.
2      A.  Correct.
3      Q.  Do those two references support using
4  60 degrees centigrade for 48 hours to replicate
5  the aging process of polymer controls?
6      A.  Well, various methods are used.  But
7  in general the principle -- definitely supports
8  the principle.  Various temperatures and times
9  are given for various polymers, and so this was
10  just trying to follow the principles.
11     Q.  What age of explants in formalin does
12  60 degrees centigrade for 48 hours for the
13  controls represent?
14     A.  As to age at room temperature,
15  specifically I don't know.
16     Q.  Okay.  Why did you choose 60 degrees
17  centigrade for 48 hours?
18     A.  Because that was consistent with these
19  two references that would be recommended.  If it
20  doesn't show -- the point being if it doesn't
21  show up in this temperature in this amount of
22  time, it likely isn't going to react.
23     Q.  Okay.  So is it fair to understand
24  that the 60 degrees centigrade for 48 hours is
25  not designed to reflect any specific time that

9 (Pages 30 to 33)

Howard C. Jordi, Ph.D.

Page 34

1  the explants may have been in formalin, but
2  designed to determine if the formalin would have
3  any degradation on the controls at any time?
4      A.  It was determined -- it was an attempt
5  to determine if formalin would react with
6  polypropylene.
7      Q.  And what did your experiment conclude?
8      A.  All the tests, SEM, and all the rest
9  of the tests, FTIR, showed no change.
10     Q.  So is it your conclusion from that
11 analysis that formalin has no chemical impact on
12 polypropylene?
13     A.  That's correct.
14     Q.  Have you done any research to
15 determine the extent to which formalin has any
16 impact on polypropylene?
17     A.  No, I have not.
18     Q.  Formalin is --
19     A.  Other than the test.
20         MR. ANDERSON:  What did you say?
21     A.  Other than this test, of course.
22 BY MR. THOMAS:
23     Q.  Formalin is a mixture of formaldehyde?
24     A.  Yes.
25     Q.  Did you do any research to determine

Page 35

1  the extent to which formaldehyde had any
2  chemical impact on polypropylene?
3      A.  Well, in all the published literature,
4  I looked at all these articles, I read over 400
5  pages, various authors determined -- did various
6  studies of explanted materials.  Everybody in
7  the world, as far as I can see, treats their
8  samples with -- or essentially everyone uses
9  formaldehyde as a preservative.  If you didn't
10 do that, you would allow for potential bacterial
11 growth and things like that that might degrade
12 the polymer.
13     Q.  My question was different.
14         Dr. Jordi, did you do any research to
15 determine the extent to which formaldehyde can
16 have a chemical reaction with and degrade
17 polypropylene?
18     A.  No.
19         MR. ANDERSON:  Objection.
20 BY MR. THOMAS:
21     Q.  A minute ago you said that everyone
22 uses formaldehyde to preserve their -- what?
23     A.  Their explant samples.
24     Q.  Okay.  And do you have an
25 understanding of why everyone uses formaldehyde

Page 36

1  to preserve their explant samples?
2      A.  Because it's a preservative.
3      Q.  When you say "preservative," does that
4  have a chemical meaning to you?
5      A.  It has a more of a biological meaning.
6  The formaldehyde preserves tissue and preserves
7  anything from anything that's in it, from
8  bacterial growth which would degrade biological
9  materials.
10     Q.  Okay.  You said two things there, as I
11 heard it.  I'm going to do the second one first.
12         You said it prevents bacterial growth.
13 Tell me what that means, please.
14     A.  Well, in tissue, if you have -- by
15 itself it just will pick up bacteria from flies
16 landing on it or just from the air, and then it
17 will begin to degrade.
18     Q.  Okay.  So it would be the influence of
19 the outside bacteria growing on the explant that
20 may have an impact on the chemical composition
21 of the explant, is that fair?
22     A.  That's one piece of it.  But another
23 piece would be if there were bacteria in the
24 tissue -- for example, if there were an
25 infection in the mesh that was taken out, that

Page 37

1  would be bacteria, it could continue to grow as
2  well.  I can't sort that out.
3      Q.  Okay.  The other thing you said, as I
4  wrote it down, is that formaldehyde preserves
5  tissue.
6          How does formaldehyde preserve tissue?
7      A.  It makes for an aseptic environment.
8  Bacteria can't grow in it, so hence, there's no
9  degradation.
10     Q.  So it's actually consistent with your
11 second point, and that is it arrests the
12 development of bacteria to prevent any
13 degradation of the explant, is that correct?
14     A.  That's the intent, yes.
15     Q.  Are you aware of any chemical reaction
16 that formaldehyde has with proteins that may be
17 on explants?
18     A.  Absolutely.  Formaldehyde is an
19 aldehyde, and it will react with any things like
20 amines.  It can react with any other reactor
21 group that typical aldehydes with react with.
22     Q.  As a part of your analysis in this
23 case, did you study the impact of formaldehydes
24 on any proteins that may be on explanted meshes?
25     A.  No, we did not.

10  (Pages 34 to 37)

Howard C. Jordi, Ph.D.

Page 38

1     Q.  Did you consider that issue at all in
2  your analysis?
3     A.  No.
4     Q.  Doctor, you identified three types of
5  degradation which you analyzed in connection
6  with your work in Exhibits 1 and 2, and one was
7  oxidation, the second was environmental stress
8  cracking, and the third was mechanical
9  degradation, correct?
10     A.  Yes.
11     Q.  What evidence in your testing for
12  Exhibit 1 for the Lewis case did you find
13  oxidation?
14     A.  For that we're going to have to go to
15  the report.
16         MR. ANDERSON:  Anything you need to
17  reference in your report you can reference it.
18     A.  Well, the first thing we saw -- that
19  we looked at was SEM, and then that's coupled
20  with SEM-EDX, so we'll look at a couple SEM
21  charts first.
22         Page 26 shows a typical explanted
23  sample.  Figure 16 shows transverse cracks of
24  surface polypropylene.
25  BY MR. THOMAS:

Page 39

1     Q.  Let me stop you there, if I can.  Are
2  you finished?
3     A.  Yes.
4     Q.  I don't want to interrupt you.
5         The surface cracking that you just
6  described on the record, this is your visual
7  observation that you talked about before that
8  you believe is evidence of oxidation, is that
9  correct?
10     A.  This is visual evidence of either
11  oxidation or environmental stress cracking, or
12  both, and by itself it can't tell you the
13  difference.
14     Q.  Got you.
15         But it's strictly visual?
16     A.  This one is visual, yes, sir.
17         Figure 22 is another good example.
18     Q.  What page are we on, please?
19     A.  29.  Flaking polypropylene pieces.
20     Q.  Now, you can do whatever you want to,
21  I'm looking for -- perhaps it would be easier
22  this way.  You don't have to do all the figures
23  that talk about visual observations.  What I'm
24  looking for specifically is each type of
25  oxidation that you found in your report, then

Page 40

1  I'll explore each of those in a little more
2  detail rather than going through the report and
3  finding each one.
4         Does that make sense?
5         MR. ANDERSON:  Your question was all
6  the evidence of oxidation, so that made it a
7  little tougher.
8         MR. THOMAS:  I'm sorry.  I'm not very
9  smart sometimes.
10         MR. ANDERSON:  It's not about smart.
11  I think he wants a more general
12  question to begin with, and then he'll go into
13  the --
14     A.  Well, SEM-EDX, for sample, showed --
15  SEM-EDX showed increased oxygen levels in the
16  cracked region that we just talked about.
17  BY MR. THOMAS:
18     Q.  Okay.
19     A.  And you don't want to talk about
20  figures at this point?
21     Q.  No.
22     A.  Just concepts?
23     Q.  Exactly.  Thank you.
24     A.  All right.  I'll try to do my best,
25  sir.

Page 41

1     Q.  You're doing fine.
2     A.  DSC showed a decrease in the heat
3  effusion, and a decrease in the melt temperature
4  versus non-cracked material.  That correlates
5  with environmental stress cracking, because the
6  Delta H at melt correlates with the amount or
7  the percentage of crystallinity, and hence the
8  percentage of amorphous materials, which allows
9  things like cholesterol and cholesterol esters
10  and fatty acids to get into the cracking.
11         FTIR microscopy dearly showed -- by
12  using the microscopic version of FTIR, coupled,
13  we were able to actually take IRs of each flaked
14  piece, and this flaked piece clearly showed
15  protein and polypropylene.  And since the
16  polypropylene bands are weaker than carbonyl
17  bands, they're alkyl, absorbance bands versus
18  carbonyl, this chart that I'm looking at of this
19  particular flaked piece would be estimated to be
20  about 75 percent or so polypropylene, maybe
21  25 percent protein.
22     Q.  Okay.
23     A.  Because they're both there.
24     Q.  And just generally for now, we'll go
25  specifically to those issues later.

11 (Pages 38 to 41)

Howard C. Jordi, Ph.D.

Page 42

1    A.  Okay.  The molecular weight averages
2  that were determined showed basically no
3  difference between cracked samples and pristine.
4    Q.  Help me there.
5    A.  And formalin treated.
6    Q.  That is not evidence of oxidation, is
7  it, the fact that they're the same?
8    A.  Are you asking only for evidence of
9  oxidation?
10    Q.  Correct.
11    A.  Okay.  We'll skip that.
12    Q.  Just so we're clear --
13    A.  Right.
14    Q.  -- the molecular weight analysis you
15  did is not consistent with oxidation?
16    A.  In and of, and by itself it is not.
17    Q.  Thank you.
18    A.  PYMS showed generally a lack of -- or
19  very great minimization of both Santonox R and
20  lauryl thiodipropionate.
21    Q.  Okay.  And those are antioxidants?
22    A.  Those are the two antioxidants that
23  are in the formulation, in the recipe from
24  Ethicon.
25    Q.  Is it fair to understand, though, that

Page 43

1  the PYMS analysis does not show oxidation, but
2  is part of your earlier analysis about potential
3  future oxidation?
4    A.  That's correct, it is.  Okay.
5    Q.  So the PYMS analysis itself does not
6  show oxidation of the polypropylene in the
7  explants?
8    A.  It shows vulnerability to oxidation is
9  what it shows.
10    Q.  It does not show any oxidation in the
11  explants?
12    A.  In and of itself, no.
13    Q.  Thank you.
14      Have we covered the basics on the
15  oxidation?
16    A.  I think so.
17    Q.  For those places where you found
18  evidence of oxidation, as you've just described
19  and as reflected in your report, were you ever
20  able to measure the extent of antioxidation of
21  the explants that you analyzed?
22    MR. ANDERSON:  Objection.
23      Go ahead.
24    A.  Are you talking about quantitative
25  numbers now?

Page 44

1  BY MR. THOMAS:
2    Q.  Yes.
3    A.  Generally the percentage of oxygen in
4  oxidized polypropylene, at least initially, is
5  in the low percent range.  So it doesn't take
6  very much increase in oxygen in polypropylene to
7  cause embrittlement, rigidity, and those kind of
8  effects.  Those are caused by presence of
9  ketones and aldehydes as the oxidation goes on,
10  carboxylic acids if it goes far enough.
11    Q.  Doctor, my question is a little more
12  specific than that.
13      Did you attempt to measure the extent
14  of oxidation in any of the mesh implants
15  quantitatively?
16    A.  It would be relative quantitation,
17  comparing control versus explant.
18    Q.  Did you express any measurement of
19  oxidation in the explants compared to the
20  controls in your report?
21    A.  I'm sorry, can you repeat the
22  question?
23    Q.  Did you set forth any opinion as to
24  the extent of oxidation from the explants
25  measured quantitatively in your report?

Page 45

1    MR. ANDERSON:  Objection.
2      Go ahead.
3    A.  Again, it was a relative thing, so I
4  don't know that I can say.  It would be
5  quantitative.
6      But, for example, pristine
7  polypropylene didn't show any carbonyl to 1760,
8  1740 that we could see.  But the explants did.
9  BY MR. THOMAS:
10    Q.  Did you attempt to measure in that
11  context the extent to which the carbonyl issue
12  had any impact on the ability of the
13  polypropylene to function for its intended
14  purpose?
15    A.  All oxidation is bad.  It's a relative
16  determination.  So you would hope there wouldn't
17  be any carbonyl observed, is what you would look
18  for if the material is good.
19      Your question, I'm sorry.
20    Q.  Might have been a bad question.  Let
21  me see if I can do it again.
22      In your analysis of oxidation, did you
23  ever measure the extent to which the
24  polypropylene in the explanted meshes was
25  degraded in a quantitative way?

12 (Pages 42 to 45)

Howard C. Jordi, Ph.D.

Page 46

1       A.  In a relative quantitative way is all
2   we did.
3       Q.  And tell me what that means.
4       A.  Well, that means if I have a peak for
5   carbonyl, I have -- like if I had no peak in the
6   pristine and I have a peak, a measurable peak in
7   the explant, then I can say with certainty that
8   the explanted material is more oxidized than the
9   pristine.
10      Q.  Are we talking about oxidation to the
11  extent that it compromises the ability of the
12  polymer to function for its intended purpose?
13      A.  The only way I know to answer this is
14  in science we would pool multiple methods.  I
15  have to look at the SEM photographs and look at
16  the carbonyl levels and try to correlate the
17  carbonyl with the degree of damage actually
18  observed physically in the SEM.  So that's the
19  kind of thing what I mean by "relative."
20      Q.  Do you have an opinion as you sit here
21  today, based on your training, education,
22  experience, and review of the materials in this
23  case, of the extent to which the polypropylene
24  in the mesh explants oxidized in the context of
25  the loss of functionalness for its intended

Page 47

1   purpose?
2       A.  Yes, I do.
3       Q.  Okay.  What is that opinion?
4       A.  The material appears degraded, some of
5   it severely degraded.  There's a range from
6   sample to sample.  And in two cases of 23
7   samples that we ran, we didn't see any damage.
8   91 percent of the time we did.
9       Q.  Are you talking now about your visual
10  observations through the scanning electron
11  microscopy?
12      A.  Yes, correlating that, of course, with
13  the carbonyls.
14      Q.  I'm talking about the analysis that we
15  -- strike that.  Let me come back to that.
16      Doctor, let's go back to your sample
17  preparation.  That's what happens when I find
18  rabbit holes.
19      What steps did you take to prepare the
20  explants that you received for analysis?
21      MR. ANDERSON:  Objection.
22      Go ahead.
23      A.  Well, the samples were received at our
24  receiving area, and then they were -- the boxes
25  were photographed, and they were removed, and

Page 48

1   they were handed to the appropriate technician
2   to do the sampling that's described in the
3   photograph.  They're removed -- now you're
4   talking about the actual --
5       Q.  Explants, correct.
6       A.  -- explant.
7         Received tissue bundles.
8       Q.  You're on page?
9       A.  Now I'm on 16.
10      Q.  Thank you.
11      A.  And little pieces were cut off with
12  disposable scalpel.  And the picture on the
13  right -- I'll wait for you to get there if you
14  want.
15      Q.  I'm fine.  Go ahead.
16      A.  Little pieces were cut off, and that's
17  what was then repackaged in formalin for
18  shipment for SEM.
19      Q.  Okay.  As we look on Page 16, there
20  are four photos there in Figure 2.  The top left
21  photo in Figure 2 is the way that you received
22  the sample?
23      A.  Yes.
24      Q.  Dumped out of container, is that fair?
25      MR. ANDERSON:  Objection.

Page 49

1       A.  Yes.
2   BY MR. THOMAS:
3       Q.  I'm sorry, I'm trying to be casual.
4   Excuse me.  That was a bad question.
5   Mr. Anderson is exactly right.
6       Dr. Jordi, is it fair to understand
7   that the top left on Figure 16 reflects the
8   samples as received before you did anything to
9   them?
10      A.  That's correct.
11      Q.  And how did you separate the mesh in
12  the lower left-hand corner in Figure 2 from the
13  tissue that appears on the lower right-hand
14  corner of Figure 2?
15      A.  We utilized forceps to pull the tissue
16  off of the sample.  As you can see, in the left
17  bottom picture there are little bits of tissue
18  left.
19      Q.  Who did that?  Did you do that?
20      A.  Adi Kulcarni.  Took about an hour a
21  sample.
22      Q.  And did you use forceps in each hand,
23  is that how you do that?  Or how do you do that?
24      A.  He just -- he has to hold it, he has
25  to hold it while he pulls tissue off.

13 (Pages 46 to 49)

Howard C. Jordi, Ph.D.

Page 50

```
 1     Q.  Hold it in his hand?
 2     A.  No.  With forceps.
 3     Q.  So you've got the forceps?
 4     A.  Two, yes.
 5     Q.  Two forceps.
 6         Is there a Jordi standard operating
 7   procedure about how to remove tissue from mesh?
 8     A.  No.
 9     Q.  How was it determined how to remove
10   the tissue from the mesh?
11     A.  Well, the technique was to remove the
12   tissue touching the -- as little as possible the
13   mesh itself so that you wouldn't cause any
14   damage to it.
15     Q.  Did you instruct this technician -- is
16   that the right word?
17     A.  No.  He's a Ph.D.
18     Q.  Did you instruct -- what's his name
19   again?  I'm sorry.
20     A.  Adi Kulcarni.
21     Q.  Did you instruct Dr. Kulcarni on the
22   method to separate the mesh from this tissue?
23     A.  No, I did not.
24     Q.  Do you know what procedure he followed
25   or what -- strike that.
```

Page 51

```
 1         Do you know what methodology he
 2   followed in order to protect the integrity of
 3   the mesh and the tissue as he separated the two?
 4     A.  Well, it was set out, I believe, on a
 5   piece of tissue so it wouldn't be contaminated
 6   with anything in the area.  It was a clean work
 7   area to begin with, and used aseptic forceps.
 8     Q.  Is there a standard methodology, of
 9   which you're aware, that tells Dr. Kulcarni how
10   to properly separate the mesh from the tissue?
11     A.  I don't think so.  I don't think one
12   exists.  I've never seen one.
13     Q.  Did you discuss with Dr. Kulcarni how
14   to appropriately separate the mesh and tissue?
15     A.  Did I discuss with him how to do it?
16     Q.  Yes.
17     A.  We discussed -- yes, we had
18   discussions.  But, you know, he is a very, very
19   careful worker.
20     Q.  What was the purpose of your
21   discussions with Dr. Kulcarni about how to
22   separate the tissue from the mesh?
23     A.  I wanted to see the samples for
24   myself.  That's all.
25     Q.  Did you have any discussions with
```

Page 52

```
 1   Dr. Kulcarni about the methodology to separate
 2   the tissue from the mesh?
 3     A.  No.  It appeared very gentle, as good
 4   as we could possibly do.
 5     Q.  Okay.  Other than separating the
 6   tissue from the mesh, as you've just described
 7   in Figure 2 on Page 16 of your report, which is
 8   Exhibit Number 1, were there any efforts made to
 9   otherwise treat the mesh prior to testing?
10     A.  No.
11     Q.  For the tissue sample that appears in
12   the upper left of Figure 2 on Page 16, was there
13   any discussion about trying to clean that
14   sample?
15     A.  Well, that's what we've just been
16   discussing.  This was how it was cleaned, it was
17   done with forceps.
18     Q.  Okay.  At any time was there a
19   discussion with Dr. Kulcarni about cleaning the
20   mesh that was removed from the tissue to remove
21   proteinaceous material from the mesh?
22     A.  No.
23     Q.  Is it fair to understand, Dr. Jordi,
24   that the mesh that appears on Page 16 in the
25   lower left-hand corner is mesh that has been
```

Page 53

```
 1   separated from the tissue without further
 2   cleaning?
 3     A.  That's correct.
 4     Q.  Did you ever consider cleaning the
 5   mesh that was separated from the tissue in order
 6   to -- strike that.
 7         Did you ever consider cleaning the
 8   mesh that was separated from the tissue prior to
 9   conducting your tests that you did in Exhibit 1?
10     A.  At the time this work was done, no.
11     Q.  Before you did your work in Exhibits 1
12   and 2, did you do any research into analysis by
13   other scientists in the methodology for testing
14   explanted meshes?
15     A.  I did.
16     Q.  And what research did you do?
17     A.  I read a number of articles, Clavé and
18   others.
19     Q.  You read Costello?
20     A.  Costello.
21     Q.  Did you read de Tayrac?
22     A.  Yes.
23     Q.  Before you did your testing in this
24   case?
25     A.  No.  It's recent.
```

14 (Pages 50 to 53)

Howard C. Jordi, Ph.D.

1          (Whereupon, Jordi Exhibit Number 3,
2     de Tayrac and Letouzey article titled
3     "Basic science and clinical aspects of
4          mesh infection in pelvic floor
5          reconstructive surgery, was marked for
6          identification.)
7          A.   Are you going to de Tayrac?
8     BY MR. THOMAS:
9          Q.   Yes.
10          Let me show you what I marked as
11    deposition Exhibit Number 3.  You have Exhibit
12    Number 3 in the materials that you brought with
13    you today?
14          A.   Yes, I do.  I'm looking for it.  Here
15    it is right here, de Tayrac.
16          Q.   When did you obtain your copy of
17    Exhibit Number 3, which is an article published
18    in the -- by Renaud de Tayrac and Vincent
19    Letouzey, it appears in International
20    Urogynecology Journal in 2011?  When did you
21    first receive that?
22          A.   I don't recall exactly, because I
23    receive so many articles.  I remember reading it
24    fairly recently, within the last two weeks.
25          Q.   Did you have a chance to review

1     Exhibit 3 prior to the time that you conducted
2     your work in Exhibits 1 and 2?
3          A.   No.
4          Q.   If you turn to Page 778 of Exhibit 3,
5     read as much as you need to.
6          A.   778?
7          Q.   That's right.  You're on the right
8     page.
9          A.   This is 780 in mine.
10          MR. ANDERSON:  Top right.
11          A.   Got it.  Top left.
12          MR. ANDERSON:  Top left, yes.
13          A.   All right.
14          MR. ANDERSON:  After you finish
15    de Tayrac, can we take a break?
16          MR. THOMAS:  Sure.  Take a break right
17    now if you'd like to.
18          MR. ANDERSON:  Sure.
19          MR. THOMAS:  Let's do that.
20          (Whereupon, a recess was taken from
21    10:13 a.m. to 10:25 o'clock a.m.)
22    BY MR. THOMAS:
23          Q.   Let's go back and make this more
24    clear.  Go to Page 16 of your report.
25          On Page 16 of your report on Figure 2

1     in the lower left-hand corner you have the mesh
2     separated from the tissue, correct?
3          A.   Correct.
4          Q.   And you understand when the mesh is in
5     the body -- was in the body it was surrounded by
6     materials in the body?
7          A.   That's right.
8          Q.   Including proteins?
9          A.   And those materials are shown in the
10    bottom right picture.  That is the material
11    removed.
12          Q.   Okay.  Is it your opinion that after
13    the mesh is separated from the tissue that
14    there's no longer any protein material on the
15    mesh?
16          A.   No, I believe there still is some
17    protein on the mesh.  We can see it, we can see
18    tissue, bits and pieces.
19          Q.   All right.  Are you familiar with the
20    term known as biofilm?
21          A.   Yes.
22          Q.   What do you understand a biofilm to
23    be?
24          A.   Well, biofilm would be a covering
25    material that coats things in the body.  As far

1     as its chemical composition, I've never seen it
2     described in these papers that I've read any
3     more than to say biofilm.  But obviously
4     protein, probably glycoproteins.
5          Q.   Would you expect a biofilm to surround
6     the mesh that is in the explant samples that you
7     analyzed?
8          MR. ANDERSON:  Objection.
9          Go ahead.
10          A.   I think that's a very distinct
11    possibility that would be there.  Whether it
12    would totally surround it or not, I would have
13    to look at a specific SEM.
14    BY MR. THOMAS:
15          Q.   All right.  Did you make any effort in
16    your sample preparation as reflected on Page 16
17    of Exhibit Number 1 to remove all protein
18    materials or biofilms from the mesh before
19    analysis?
20          A.   No, we did not.  We didn't want to
21    take tremendous efforts in -- effort is not the
22    right word.  But we didn't want to do anything
23    that would try to disturb the mesh.
24          So for SEM, for example, looking at
25    the upper right picture, we cut a piece of

Howard C. Jordi, Ph.D.

Page 58

1    tissue off, and the SEM was actually taken on
2    the fibers imbedded in the tissue so that we
3    didn't have to pull the fibers out.  Because we
4    were afraid that with forceps we might cause
5    scarring of the surface, and we didn't want to
6    cause anything like that if we could avoid it.
7    So that was done to -- we didn't even remove the
8    tissue in that case for the SEM work, because we
9    didn't want to risk injuring the fibers.
10         Now, we had to get the fibers clear to
11   do DSC, FTIR, GPC, so that's why the tissue was
12   removed for those studies.
13       Q.  You are aware that using forceps to
14   separate the tissue from the mesh can impact the
15   physical integrity of the mesh?
16       MR. ANDERSON:  Objection.
17       Go ahead.
18       A.  We were very gentle in how we did
19   this, and it's described in our procedure.  We
20   tried every way we possibly could to take great
21   care to not disturb the mesh.  So with forceps
22   we could grab two pieces of tissue and not ever
23   touch the mesh to pull it apart.
24   BY MR. THOMAS:
25       Q.  Okay.  But you made no further effort

Page 59

1    to clean the mesh to remove any protein or
2    biofilm that remained after removing the mesh
3    with the forceps, correct?
4        A.  Correct.
5        Q.  Now, you've now read de Tayrac, and
6    de Tayrac analyzes the results that Clavé found
7    in his study, correct?
8        A.  That's correct.
9        Q.  And they state on Page 778, "We also
10   experimentally tested Clavé's conclusion
11   regarding a correlation between infection and
12   polypropylene 'degradation'."
13       A.  Where are you, sir?
14       Q.  The very first, Page 778.
15       A.  778.
16       Q.  "Using the same method of mesh
17   infection, we also experimentally tested Clavé's
18   conclusion regarding a correlation between
19   infection and polypropylene 'degradation'."
20         And what de Tayrac did was they washed
21   their mesh with dimethyl sulfoxide and used
22   ultrasonic shock, and then analyzed the
23   explanted mesh by electron scanning microscope,
24   correct?
25       A.  Correct.

Page 60

1        Q.  And de Tayrac finds that the
2    degradation is due to the biofilm, correct?
3        A.  That's what the paper says.
4        Q.  Do you disagree with that?
5        A.  I do.
6        Q.  Why?
7        A.  It's best showing you in my picture.
8    Can I show you a figure?
9        Q.  Okay.
10       A.  Go to the FTIR section of my report,
11   I'll give you a page here in a minute, Page 71,
12   for example.  There's a number of pages.  71 is
13   as good as any, I guess.
14         There's protein here, and as evidenced
15   by the 1653, the 1531, amide 1, and amide 2
16   bands.  But there's also polypropylene, 1445,
17   1377, and then the four little atactic bands
18   that are shown to the right of the 1377 band.
19   And since the alkyl bands are less intense than
20   the carbonyl bands of the protein, or any other
21   carbonyl types, this would be about a 75 percent
22   polypropylene, give or take a little, and maybe
23   25 percent protein, or what you would call
24   biofilm.
25         So this is the stuff that they

Page 61

1    actually removed with their dimethyl sulfoxide
2    their sonication treatment, so it was already
3    gone.
4          But what we did was we actually rolled
5    one of the fibers, and then took the pieces that
6    came off, the same pieces they got off in their
7    Figure 1 shown in section B here, Figure 1, we
8    ran the infrared of the pieces that actually
9    came off, and it wasn't biofilm, it was
10   polypropylene.
11       Q.  Dr. Jordi, do you find any
12   methodological flaw in de Tayrac's decision to
13   wash the explants used in his experiment with
14   dimethyl sulfoxide and using ultrasonic shock?
15       A.  If you have -- I certainly do.  If you
16   take a material that's cracked and crazed as we
17   saw in our SEMs, and as he shows here in his
18   Figure A on Page 778, that material is going to
19   be very susceptible to flaking off.
20         When I look at 778, Figure A, I see
21   what probably is biofilm looking like that cloud
22   material on top of the polypropylene, and the
23   polypropylene underlying it, which was then
24   blown off.  Ultrasonic treatment is kind of --
25   is a shock treatment, and it's like putting a

16 (Pages 58 to 61)

Howard C. Jordi, Ph.D.

Page 62

1    bomb on the polypropylene fiber, so it's going
2    to shake off anything that's loose, which it did
3    very beautifully, we know that's what it does,
4    and it did a beautiful job.
5         Unfortunately, the stuff that came off
6    wasn't biofilm, are at least it wasn't totally
7    biofilm, it wasn't even 50 percent, the majority
8    of it was polypropylene.  At least in my case.
9    I can't speak to their -- without actually doing
10   the IR of the flaked materials in theirs, I
11   can't tell you a percentage, or even an
12   estimate.
13        If they had run an IR, which they
14   didn't do -- I'd like to know why they didn't
15   run an IR to see what it was, they just state
16   that it's biofilm with no proof.
17   Q.  Have you attempted to clean a mesh
18   explant and run the same tests that you ran in
19   Exhibit 1 and Exhibit 2 to determine if your
20   findings are consistent with cleaned explanted
21   mesh?
22        A.  Cleaned how?
23        Q.  Let me ask it this way.
24        Is there a way in your training,
25   education, and experience to clean the mesh and

Page 63

1    remove biofilms and proteins to allow for the
2    analysis of the explanted mesh as cleaned?
3         A.  Yes, there is.  I've become aware of
4    this since this original work was done.  It's
5    sodium hypochlorite.
6         Q.  And tell me how you use sodium
7    hypochlorite to clean proteins or mesh before
8    you do the analysis?
9         A.  You just soak the sample, the fiber
10   mesh in this case, in the typically 13 percent
11   chlorine solution of sodium hypochlorite.
12        Q.  Have you done that?
13        A.  We did not do that in this work.
14        Q.  Have you done that at any other time?
15        A.  No.  Not at this point we haven't.
16        Q.  Have you ever gone -- strike that.
17        Have you ever tried to replicate --
18   start over one more time.
19        Dr. Jordi, have you ever tried to take
20   an explanted mesh, remove biofilm or other
21   protein material, and test it to see the extent
22   to which it had degraded?
23        A.  I really didn't need to do that in
24   this case because the SEM photographs were so
25   clear.

Page 64

1    Q.  My question is; have you ever done
2    that?
3         A.  No, not to this point.
4         Q.  And is there any reason other than the
5    FTIR analysis that you've just described on
6    Page 71 and other places in your report --
7         A.  Correct.
8         Q.  -- that supports your opinion that
9    de Tayrac is wrong?
10        MR. ANDERSON:  Objection to form.
11        Go ahead.
12        A.  I think the infrared speaks for
13   itself.  It's -- in my view as a chemist, a
14   polymer chemist, it's pretty locked tight.  You
15   can't get polypropylene infrared bands if
16   polypropylene isn't there.
17   BY MR. THOMAS:
18        Q.  Is that the -- my question is simple.
19   Is that the only information that you have,
20   based on your analysis and work on this case,
21   that confirms for you that de Tayrac is wrong?
22        MR. ANDERSON:  Objection.
23        A.  That de Tayrac is wrong.  I think I
24   would say yes.  I mean we do have other evidence
25   like DSC perhaps, but we have to -- that wasn't

Page 65

1    run here either, so I have no data from the
2    paper with which to judge the question.
3    BY MR. THOMAS:
4         Q.  You rely on the FTIR analysis in your
5    report in Exhibit Number 1 and Exhibit Number 2
6    in support of your belief that de Tayrac's
7    conclusion that what is seen in the SEM is
8    biofilm to be incorrect, is that fair?
9         A.  That's fair.
10        Q.  Back to oxidation.
11        Do you have an opinion about what
12   caused the oxidation that you've identified in
13   your report?
14        A.  I believe there was two major reasons.
15        One was lack of antioxidant, making
16   the polypropylene vulnerable to attack by
17   hydrogen peroxide and other things, from
18   macrophages and so on in the body.
19        And the other was environmental stress
20   cracking, which DSC suggests because of the
21   decrease in the Delta H at melt, and the
22   increase in amorphous content of certain of the
23   polymers, and what seems to happen is some
24   samples seem to have a mix of both, and some
25   would be a preponderance of environmental stress

17 (Pages 62 to 65)

Howard C. Jordi, Ph.D.

Page 66

1    cracking and other damage, and another would be
2    caused by classical oxidation mechanism.  And
3    the majority of samples in this case seemed to
4    have both.  But it's possible to have just one
5    or the other as well.
6        Q.  Do you have an opinion as to whether
7    the polypropylene in the Ethicon mesh -- strike
8    that.
9            What is it about the human body, the
10   biochemistry of the human body, that causes the
11   antioxidants to be depleted from the mesh?
12           MR. ANDERSON:  Objection.
13           Go ahead.
14       A.  I don't know if that's the right
15   question.  If I can explain?
16   BY MR. THOMAS:
17       Q.  Please.
18       A.  If I were to put polypropylene mesh in
19   a solvent like methylene chloride or ethanol or
20   propanol or methanol, or any organic solvent,
21   the antioxidants would bleed out at a certain
22   rate.  And the problem here is the mesh is fine,
23   so it's a relatively small-ish diameter so
24   there's not a lot of distance from the internal
25   part of the fiber to the surface.  So if I put

Page 67

1    it in solvent, it's going to bleed out.  If I
2    put it in the body which is full of lipids,
3    cholesterol, phospholipids, cholesterol,
4    cholesterol esters, fatty acids, it's going to
5    be bleeding out there.  But it would bleed out
6    in either place.  It's not really a phenomenon I
7    see that's unique to the human body, it would
8    happen either place, and so it just bleeds out
9    because of the high -- relative high surface
10   area and small diameter.
11       Q.  Do you have an opinion of what
12   specifically it is about the human body that
13   causes the Ethicon polypropylene mesh to leak,
14   leach its antioxidants?
15       A.  I don't think -- as I say, I don't
16   think that is the right question.  It's going to
17   leach wherever it is in any solvent.
18           It wouldn't leach in water, obviously,
19   because it's not soluble, or not wetted by
20   water.  But anything that will wet it, whether
21   it's a fatty acid or whether it's a solvent,
22   fatty acid in the body or a solvent, is going to
23   cause it to remove, I guess, the fatty -- the
24   antioxidants that are bleeding to the surface.
25       Q.  Let me ask it this way.

Page 68

1        Doctor, do you have an opinion as to
2    what substances in the human body cause the
3    Ethicon polypropylene mesh to lose the
4    antioxidants that you've identified in your
5    report?
6            MR. ANDERSON:  Objection.  Asked and
7    answered.
8            Go ahead.
9        A.  It just bleeds, it bleeds out because
10   of the nature of the -- we call it blooming in
11   the industry.  Materials leach out of the
12   polymers that they're in, even in air to some
13   degree, and then they come on the surface and
14   get wiped away.  So this would be a slow
15   process, which is why I believe the papers
16   typically show no initial oxidation.  It has to
17   be in the body for a while before you see the
18   major amounts of these effects.
19   BY MR. THOMAS:
20       Q.  How long?
21       A.  Some of the papers say three months.
22       Q.  Do you have an opinion about how long
23   a mesh has to be in the body before the
24   antioxidants are depleted to the point where the
25   mesh can degrade?

Page 69

1        A.  No, we would have to do a study, a
2    time study to answer that question, where we
3    actually measured -- right now we've just
4    measured levels of antioxidant in the samples
5    received, the explants and the controls.  We
6    would have to do a time study to answer that
7    question where we'd do three months, six months,
8    nine months, a year, five years, however long we
9    wanted to do the study, and measure the amount
10   of the two antioxidants present as a function of
11   time.
12       Q.  Is the sole basis for your opinion
13   that the Ethicon polypropylene mesh at issue in
14   this litigation leaches its antioxidants the
15   testing that's reflected in Exhibits 1 and 2?
16       A.  Yes.
17       Q.  A moment ago I asked you about the
18   causes, I think, of degradation, and you said
19   oxidation in combination with, in some
20   instances, environmental stress cracking?
21       A.  Correct.
22       Q.  We also talked earlier about
23   mechanical degradation.  Is there any evidence
24   of mechanical degradation in your work in either
25   Exhibits 1 and 2?

18  (Pages 66 to 69)

Howard C. Jordi, Ph.D.

Page 70

1    A.  No.  That's a minor player here.  If
2  any effect, it would have to do during the
3  manufacturing phase.  When the polymer is put
4  through the dye, it will be extruded under
5  stress, that's mechanical force, and that will
6  tend to sheer polymer chains and tend to
7  degrade.  But that's the only application.
8  Certainly in the human body I don't see any
9  major application of stress, mechanical stress.
10    Q.  Okay.  So can we confine our
11  discussion today of degradation in terms of
12  oxidation and environmental stress cracking?
13    A.  I think so.
14    Q.  Dr. Jordi, if the mesh antioxidant
15  additives remained in the mesh, would the mesh
16  be able to perform its function in the body
17  without oxidizing?
18    A.  I think that's suggested in the
19  literature, yes.
20    Q.  Okay.  Do you agree with what the
21  literature says, that is; if the mesh maintains
22  its antioxidants that it's able to perform its
23  function in the body as intended?
24    A.  It certainly would -- I don't know
25  that I can answer the question completely, but

Page 71

1  it certainly would increase the longevity of the
2  product for sure.
3    Q.  Okay.  Do you have an opinion that the
4  mesh with the antioxidants that stay there is
5  unsafe for its intended purpose without more?
6    MR. ANDERSON:  Objection as to form.
7  Go ahead.
8    A.  Without more?
9  BY MR. THOMAS:
10    Q.  I'm just trying to narrow the scope
11  here.  I'm trying to understand.  You've told me
12  that the literature says that if the
13  antioxidants do their job and stay in the mesh,
14  that the mesh then is appropriate for use in the
15  body to perform the function for which it's
16  intended.  Is that fair?
17    MR. ANDERSON:  Objection.
18  Mischaracterizes his testimony.
19  BY MR. THOMAS:
20    Q.  You can answer it if you can.
21    MR. ANDERSON:  Well, my objection
22  stands.  It mischaracterizes his testimony.
23    MR. THOMAS:  I understand.  You said
24  it twice.  Thank you.
25    MR. ANDERSON:  Yes, I did.

Page 72

1  BY MR. THOMAS:
2    Q.  What are you reading?
3    A.  I am looking at -- I'm looking for a
4  paper that shows the -- I don't know whether
5  it's -- it's either Liebert or Turi, Oswald and
6  Turi.
7    Q.  I'll help you here a little bit.
8    (Whereupon, Jordi Exhibit Number 4,
9    Liebert, et al study titled
10    Subcutaneous Implants of Polypropylene
11    Filaments, was marked for
12    identification.)
13  BY MR. THOMAS:
14    Q.  Let me show you what's been marked as
15  Exhibit Number 4.  Exhibit Number 4, is that the
16  Liebert study to which you were just referring?
17    A.  1976, yes, I believe, yes.
18    Q.  And in Liebert they studied meshes
19  that had been treated with oxidants -- excuse
20  me, treated with antioxidants and meshes that
21  had not, correct?
22    A.  Correct.
23    Q.  And found that those that had been --
24  that had antioxidants added to them did not
25  degrade like those that did not have

Page 73

1  antioxidants, correct?
2    A.  That's right, showing that, yes.
3    Q.  Is that the basis -- strike that.
4    Is that the literature upon which you
5  rely for your statement just a minute ago that
6  those meshes with antioxidants in them resist
7  degradation?
8    A.  Well, it's that, and it's my lifetime
9  of experience analyzing polypropylenes, and when
10  they degrade and when they don't.
11    Q.  Do you agree with --
12    MR. ANDERSON:  Are you through with
13  your answer?
14    THE WITNESS:  Not quite.
15  BY MR. THOMAS:
16    Q.  I'm sorry.
17    A.  I'm thinking.  I'm sorry.
18    Q.  You take all the time you need.  Never
19  meant to interrupt you.
20    A.  I analyzed -- these are related, but
21  they're all polypropylene, analyzed two other
22  types of materials over my experience that I can
23  recall.
24    One was a seating material at a
25  stadium, that was involved in a stadium seating

19 (Pages 70 to 73)

Howard C. Jordi, Ph.D.

Page 74

1   in Japan, 100,000 seat stadium.  The seats in
2   one year from installation turned to dust and
3   blew away.  So they had sent me some retains,
4   and I had to analyze it, and the polypropylene
5   was not stabilized.  And so that's part of my
6   lifetime of experience.
7         Another case, the client was suing a
8   motorcycle manufacturer because -- for a
9   defective gas tank.  But he'd hit a brick wall
10  at a very high rate of speed, I don't remember
11  the exact, 75, 80 miles an hour, and the gas
12  tank ruptured and exploded.  And so they were
13  blaming the manufacturer.  So I had to analyze a
14  bit of that.  In that case the stabilizers were
15  present.  And the point was no gas tank is going
16  to survive hitting a brick wall at 75, 80 miles
17  an hour, so -- even though the stabilizer were
18  there.  So it wasn't degraded, molecular
19  weight-wise, it wasn't degraded, the
20  antioxidants were there.
21        And in the other case, it turned to
22  dust and blew away, and the antioxidants were
23  not present.
24        So when I see a lack of antioxidant in
25  essentially basically all these samples, by both

Page 75

1   PYMS and LCMS, it tells me the polymer is
2   exceedingly susceptible to oxidation by hydrogen
3   peroxide, which it would be partially protected
4   from if antioxidants were still there, but
5   they're not there.
6     Q.  Okay.  Is it your opinion that
7   hydrogen peroxide is the material that attacked
8   the mesh that caused it to degrade as is
9   reflected in Exhibits 1 and 2?
10    A.  Well, in the body there are things
11  like ferrous ion, for example, and if -- I can't
12  answer the question with a simple answer
13  because, again, there's multiple causes.
14        If there's any free ferrous ion around
15  you'll get what's called a Fenton reaction,
16  which converts hydrogen peroxide to hydroxyl
17  radicals, which are more damaging than the
18  hydrogen peroxide to begin with in causing
19  degradation of the polypropylene.  It's a free
20  radical initiator step.
21        So if there is, you know, bleeding
22  perhaps, that can be a source of iron, and if
23  there's some ferrous ion around -- of course it
24  has to be free ferrous ion, the body needs
25  protein to bind iron, because it's dangerous in

Page 76

1   their free form.  But the Fenton reaction is
2   well-known.
3     Q.  You call it the Fenton reaction?
4     A.  Fenton reaction, yes.
5     Q.  Okay.  If hydrogen peroxide was the
6   cause of the degradation of the polypropylene
7   mesh, would there be a change in the molecular
8   structure of polypropylene?
9     A.  Repeat the question, please?  I'm
10  sorry.
11    Q.  If the hydrogen peroxide that you
12  described was the cause of the degradation in
13  the polypropylene mesh, would there be a change
14  in the chemical structure of the polypropylene
15  mesh?
16    A.  That's right, there would be.
17    Q.  If there was a free radical that
18  degraded the polypropylene mesh, would there be
19  a change in the chemical construction of the
20  polypropylene mesh?
21    A.  Yes.  You would be inserting oxygen
22  into the chain in the form of either ketone,
23  aldehyde, hydroxide.
24    Q.  And the free ferrous ion which you
25  referred to as the Fenton?

Page 77

1     A.  It's not just a free -- if you would
2   like I'll give you the reaction.  Do you want
3   that?
4     Q.  Yes.
5     A.  $Fe^{2+}$ plus hydrogen peroxide goes to,
6   an arrow, $Fe^{3+} + HO-$ -- that's hydroxide, that's
7   harmless, but here's the problem -- $+HO.$, which
8   is the radical, hydroxy radical, that is many
9   more times damaging to polypropylene than the
10  initial hydrogen peroxide.
11    Q.  Okay.
12    A.  Now, I can't sort out which one is --
13    Q.  That's fine.  You're consulting a
14  paper there.  What's the paper you're
15  consulting?
16    A.  "Mechanisms of polymer degradation in
17  implantable devices" by Williams.
18    Q.  That's David Williams?
19    A.  David Williams.
20    Q.  That's the one cited in your --
21    A.  Yes, sir.
22    Q.  Okay.  The last reaction you described
23  is called the Fenton reaction, is that right?
24    A.  Right.
25    Q.  Does the Fenton reaction causing

20  (Pages 74 to 77)

Howard C. Jordi, Ph.D.

Page 78

1    degradation of polypropylene alter the chemical
2    structure of the polypropylene?
3         A.  Does the hydroxide -- or the Fenton
4    reaction cause, is that what you're asking.
5         Q.  Yes.
6         A.  Sure it does, because that's the
7    production of the hydroxy radicals which causes
8    the actual change.
9         Q.  Any other potential sources of
10   oxidation to the polypropylene mesh given the
11   leaching of antioxidants that you've described?
12             MR. ANDERSON:  Objection as to form.
13             Go ahead.
14        A.  You could also have what's called a
15   more general version of the Fenton reaction,
16   would be the Haber-Weiss, H-A-B-E-R - W-E-I-S-S,
17   reaction.
18   BY MR. THOMAS:
19        Q.  Are you consulting the Williams
20   article again?
21        A.  Yes.  That would be include cuprous
22   ion as well as ferrous ion, could include
23   titanium is another one, titanium 3 or vanadium
24   4 is another possibility.  Those are not
25   commonly found, we're not going to worry about

Page 79

1    those in the body.
2         Q.  Titanium and vanadium aren't going to
3    be found in the body, are they?
4         A.  No.  It's cuprous and ferrous.
5         Q.  Are all of the potential methods of
6    degradation for the polypropylene mesh that
7    you've identified in the human body in the
8    Williams article that you're consulting?
9         A.  Well, they're certainly in there.
10   Other authors describe that as well.
11        Q.  Okay.  Are there any other methods
12   described by other authors?
13        A.  Other methods?
14        Q.  Yes.  Have we covered all the bases in
15   the Williams article?
16        A.  Well, you could get R., which is the
17   radical form of polypropylene, just from heat to
18   some degree, so that's why heat would cause
19   radical formation also.
20        Q.  How much heat would require --
21        A.  I don't think the human body, we'd
22   have to worry too much in the human body.  We're
23   talking processing now.
24        Q.  How much heat does it take to degrade
25   polypropylene, do you know?

Page 80

1         A.  Those are described in actual tests in
2    the Dr. Müller book, timed experiments.
3         Q.  Do you know?
4         A.  Well, it depends on the temperature.
5    And it varies with the environment, the oxygen
6    environment and the temperature actually used.
7    Some are run at 200 degrees, some are run at
8    100 degrees.
9         Q.  Do you know the temperature at which
10   the polypropylene that's used in the Ethicon
11   mesh will degrade?
12        A.  I know in general terms that the
13   higher the temperature, the faster it will
14   degrade.  That's what I know.  Which is
15   uniformly true.
16        Q.  Do you have an opinion as you sit here
17   today of the temperature at which the Ethicon
18   mesh used in the TVT device will degrade?
19        A.  Without testing, no.  And it would
20   depend on whether the antioxidants are there or
21   not, that will affect the temperature.
22        Q.  Is it possible to measure the amount
23   of hydrogen peroxide that is in a person around
24   the mesh implant?
25        A.  We have techniques that will allow us

Page 81

1    to measure hydrogen peroxide.  We have hydrogen
2    peroxide test strips, for example, but you can't
3    stick those into an implant very well.  So I
4    don't know, I've never seen it talked about or
5    done anywhere.
6         Q.  Are you able to test for the presence
7    of hydrogen peroxide on the explants that you
8    analyzed?
9         A.  You could try to use those test strips
10   and see if -- the strips turn blue if -- but
11   likely, it's been stored in the formaldehyde in
12   getting to us, so it's all going to be washed
13   off anyway.
14        Q.  Do you know, as you sit here today,
15   whether you can test the explanted mesh samples
16   that you received to determine the presence of
17   any of the materials that you've just identified
18   that could contribute to the degradation of the
19   mesh?
20        A.  Well, no, I don't think so, not as
21   received.
22        Q.  You don't know, or you don't think you
23   could?
24        A.  You can't, because --
25        Q.  I didn't hear you.  I'm sorry.  You

21 (Pages 78 to 81)

Howard C. Jordi, Ph.D.

Page 82

1    cannot?
2        A. Cannot.
3        Q. Thank you.
4        A. Because it's not there, it's been
5    treated with formaldehyde when we get it, so
6    it's not the way it was in the body --
7        Q. Okay.
8        A. -- at the time of excision.
9        Q. So is it fair to understand that it's
10   your opinion that you're not able to test these
11   mesh explants for materials that may have been
12   in the body that you believe caused or
13   contributed to the degradation of the mesh?
14       MR. ANDERSON: Objection to form.
15       Materials in the body, or chemicals in
16   the body?
17       MR. THOMAS: Thank you, Ben.
18       MR. ANDERSON: Just to be clear.
19   BY MR. THOMAS:
20       Q. Doctor, is it fair to understand it's
21   your opinion that because of the placement of
22   the explants in formaldehyde, that one is unable
23   to test for chemicals in the body that may have
24   caused or contributed to the degradation of the
25   mesh?

Page 83

1        A. That question would require a lot of
2    research. But it's possible, for example, that
3    we could -- certainly we could look for iron in
4    the tissue, or we could look for copper in the
5    tissue, which would be consistent with the
6    Haber-Weiss reaction, which would have produced
7    the hydrogen peroxide in the first place. So we
8    could see telltale signs. In that sense, we
9    might be able to see something.
10       Q. Doctor, as you sit here today, is
11   there a test that you know of that could be
12   performed on these explanted meshes to determine
13   which chemical substance in the body caused or
14   contributed to any degradation of this mesh?
15       A. If it's hydrogen peroxide produced in
16   the macrophages, we can't test for it because
17   it's not there.
18       Q. Okay. Anything else?
19       A. If it's caused by the Fenton reaction
20   or the Haber-Weiss, yes, we could take that
21   tissue, and we could dissolve it, and then run
22   ion chromatography and determine parts per
23   billion levels of iron and the copper.
24       Q. What would that tell you?
25       A. It would tell us the potential levels

Page 84

1    of metals that would be the catalyst for the
2    Haber-Weiss reaction or the Fenton reaction.
3        Q. If you had that information, how would
4    you use that to determine the extent to which
5    those chemicals caused or contributed to the
6    degradation of the mesh?
7        A. Well, the greater the concentration of
8    the iron and copper, copper 2 and iron -- copper
9    1 and iron 2, the greater the damage would be.
10       Q. Okay.
11       A. It should correlate. But it's
12   complicated, because if those metals were tied
13   up by the typical proteins in the body that are
14   supposed to tie up copper and iron so they are
15   not -- they don't kill us, you have to figure
16   out a way to -- and as I sit here, this is just
17   research, I'm unable to answer the question
18   completely, I would have to be sure that the
19   iron we determined was free ferrous ion in the
20   body and free cuprous, or it wouldn't be
21   damaging even if present.
22       Sorry, that's my answer.
23       Q. Okay. Let me see if I can finish
24   this.
25       Is it fair to understand, Doctor, as

Page 85

1    you sit here today you don't know of a test that
2    would enable you to determine which chemicals in
3    the body caused or contributed to any
4    degradation of the mesh explant samples?
5        A. No. We just know that macrophages
6    have been shown to -- in superoxide and hydrogen
7    peroxide.
8        Q. Okay. You said "no" to my question.
9        A. I'm sorry. Correct.
10       Q. Is it true, is it fair to say that, as
11   you sit here today, that you don't know of any
12   tests that would allow you to determine which
13   chemicals in the body may have caused or
14   contributed to any degradation of the mesh
15   explant samples?
16       A. Again, from my reading the literature
17   and seeing the production of hydrogen peroxide
18   and superoxide, that has to be one of the
19   mechanisms, and the other ones could be. I
20   don't know how to answer the question.
21       Q. But the question is; it's fair to
22   understand, as you sit here today, that you do
23   not know of any test that you could perform to
24   determine which chemicals in the body may have
25   caused or contributed to any degradation of the

22 (Pages 82 to 85)

Howard C. Jordi, Ph.D.

Page 86

1    polypropylene mesh in these explants?  You don't
2    know of one?
3        A.  Seeing the oxidation, I couldn't tell
4    you whether it was caused by the Fenton
5    reaction, the Haber-Weiss reaction, or hydrogen
6    peroxide, that's true, if that's what you want.
7        Q.  Thank you.
8            Or any other substance, there's not a
9    test that you can do to tell us what caused it?
10       A.  No.  All I can say is I'm looking at
11   the fact of the degradation.  It had to happen,
12   so I'd be looking for -- as to what specifically
13   caused it, I have to agree.
14       Q.  Thank you.
15       A.  I can't answer.
16           MR. THOMAS:  We can take a quick break
17   if you don't mind.
18           (Whereupon, a recess was taken from
19           11:06 a.m. to 11:15 a.m.)
20   BY MR. THOMAS:
21       Q.  Doctor, what is environmental stress
22   cracking?
23       A.  Environmental stress cracking is the
24   degradation of a polymer from imbibing, or the
25   absorption of materials, in this case like

Page 87

1    cholesterol, cholesterol esters, fatty acids,
2    into the interstitial space between the polymer
3    chains which causes it to swell, creating
4    stress, which eventually ruptures some of the
5    polymer chains, causing degradation.
6        Q.  Is it your opinion in this case that
7    the mesh explants that you analyzed exhibit
8    environmental stress cracking?
9        A.  Sorry.  Repeat the question, please?
10       Q.  Is it your opinion in this case that
11   the mesh explants that you analyzed show
12   environmental stress cracking?
13           MR. ANDERSON:  Objection.  Asked and
14   answered.
15           Go ahead.
16       A.  When I look at SEM photographs and see
17   the cracking, I can't tell just from looking at
18   the cracking whether it was oxidative damage or
19   environmental stress cracking that caused that
20   damage, or a combination of both.
21           DSC is one of the best techniques to
22   suggest that, because we can measure the melt
23   point, and we can measure the Delta H at melt
24   which correlates to the amount of crystallinity.
25   So as the Delta H of melting goes down, the

Page 88

1    amount of crystallinity goes down.  Delta H of
2    melt goes down, the percent crystallinity goes
3    down, the percent amorphous goes up, which then
4    that material, the amorphous material, is what
5    is susceptible to environmental stress cracking.
6    BY MR. THOMAS:
7        Q.  Doctor, do you have an opinion in this
8    case as to whether the mesh explants that you
9    analyzed show environmental stress cracking?
10       A.  I think as one of the components I
11   have an opinion, because we saw a drop in the
12   Delta H at melt, of the explants.
13       Q.  Is it your opinion that the drop in
14   the Delta H in the DSC testing is proof of
15   environmental stress cracking?
16       A.  It's just like the lack of
17   antioxidants.  It's consistent with, it's not by
18   itself proof of.  But it's proof of the
19   susceptibility of the polymer to environmental
20   stress cracking.
21           Then I have to go back still,
22   ultimately back to the SEMs, because the fact is
23   not in question.  It's occurring, we can see it.
24   The question is why, and that way we have to --
25   now we have to look at a series of data to make

Page 89

1    our best judgment.  I think in many cases the
2    damage is caused by both.
3        Q.  So just so I'm clear, your opinion
4    that the mesh that you've analyzed in the
5    explants has undergone environmental stress
6    cracking is due to your visual observation on
7    the SEM images and the DSC data, correct?
8        A.  Right.
9        Q.  Is there any other information that
10   you determined from your report, or your work in
11   this case, that you rely upon for your opinion
12   that the explanted mesh underwent environmental
13   stress cracking?
14       A.  Any other data from my report, that
15   was the question?
16       Q.  Yes.
17       A.  No.
18       Q.  All right.  Do you agree that pelvic
19   organ prolapse is well-known for its high
20   resistance to environmental stress cracking?
21       A.  Yes.  But the fact of the matter is
22   the Delta H is going down, so something is
23   causing that amorphous region to increase.
24       Q.  And the Delta H you're talking about
25   is the melting point as measured by the DSC

23 (Pages 86 to 89)

Howard C. Jordi, Ph.D.

Page 90

1  measurements, correct?
2      A.  The melting point goes down, and the
3  Delta H at melt goes down.  And again, there's
4  variability from sample to sample.  So some
5  samples have more component of potential, I'll
6  describe it as potential environmental stress
7  cracking, and other samples from less potential.
8  The same way I would describe the lack of
9  antioxidant to be potential oxidation.
10     In all cases we are seeing the
11 degradation through SEM of the polypropylene.
12 That's just a fact.  And we know it's
13 polypropylene because the infrared spectrum is
14 that of polypropylene, the flakes.
15     Q.  What's crazing?
16     A.  Small cracks.
17     Q.  What does crazing have to do with
18 environmental stress cracking?
19     A.  Well, it's the start of the process.
20 When you have a little bit of cholesterol ester
21 you have just little cracks, little start, it's
22 moving in, the process is beginning.
23     Q.  Are you familiar with a concept known
24 as crack initiation?
25     A.  That's what crazing does, is initiates

Page 91

1  the forming of the larger cracks.
2      Q.  So when you have smaller cracks and
3  things get in there, then the cracks get bigger?
4      A.  Basically.
5      Q.  What's crack propagation?
6      A.  Once a material starts to crack, it's
7  like a rip in a garment, it's going to just --
8  once the rip starts, it's easier to continue it.
9      Q.  Are you familiar with a concept known
10 as fast crack propagation?
11     A.  No, I'm not.
12     Q.  Do you know the extent to which
13 environmental stress cracking in polypropylene
14 could be expected to be slow or fast, or there
15 in small forms forever?  Do you have any idea of
16 the relative -- strike that.  That's a terrible
17 question.
18     Doctor, do you have any ideas about
19 the expected progress of crack propagation in
20 polymers?
21     MR. ANDERSON:  Objection to form.
22     Go ahead.
23     A.  It would depend on the environment
24 again.  Again, if some patients have more,
25 there's more cholesterol esters that can get in,

Page 92

1  fatty acids and the like, then the process would
2  be more rapid than would if there weren't
3  as much cholesterol, cholesterol esters in a
4  given patient.  That depends on the patient's
5  disease state, for example, their weight.
6  BY MR. THOMAS:
7      Q.  Do you have an opinion in this case
8  about the expected rate of crack propagation in
9  the mesh implanted in Carolyn Lewis?
10     A.  No.
11     Q.  Do you have an opinion about the
12 expected mesh -- excuse me, crack propagation of
13 the mesh implanted in Linda Batiste?
14     A.  Well, the fact of the matter is I can
15 see the cracks, I'm looking at them with SEM.
16 That's all I can say.
17     Q.  Very specific question.
18     Do you have an opinion about the
19 expected time for the crack propagation in Linda
20 Batiste?
21     A.  No, I don't.
22     Q.  Are you able to analyze the mesh
23 explants and determine how long the mesh has
24 been cracked?
25     A.  No.  Just the fact that it is.

Page 93

1      Q.  Are you able to analyze the mesh
2  explants that you've reviewed in this case and
3  determine or measure the extent of the cracking?
4      A.  Well, visually it's quite obvious
5  that --
6      Q.  I'm talking about quantitatively.
7      A.  There is no way to do that short of
8  looking at the pictures, that I'm aware of.  I
9  don't know anybody using a scale.
10     Q.  Do you have an opinion in this case,
11 first of all the Carolyn Lewis case, about the
12 extent to which any degradation in her -- strike
13 that.
14     Do you have an opinion in the Carolyn
15 Lewis case about the extent to which any
16 environmental stress cracking impacts the
17 functionality of the polypropylene mesh for its
18 intended purpose?
19     A.  Let me look at the -- I have to look
20 at the DSC data.
21     Q.  This is very specific.  This is
22 Carolyn Lewis.
23     A.  Correct.
24     (Witness reviewing document.)
25     A.  Okay.  What's the question, please,

24 (Pages 90 to 93)

Howard C. Jordi, Ph.D.

Page 94

1   again?
2   BY MR. THOMAS:
3        Q.  Do you have an opinion in the Carolyn
4   Lewis case about the extent to which any
5   environmental stress cracking impacts the
6   functionality of the polypropylene mesh for its
7   intended purpose?
8        A.  I do not.
9        Q.  Do you have an opinion in the Carolyn
10  Lewis case about the extent to which any
11  oxidation impacts the functionality of the
12  polypropylene mesh for its intended purpose?
13       MR. ANDERSON:  Objection as to form.
14       A.  Of oxidation effects the --
15  BY MR. THOMAS:
16       Q.  Correct.
17       A.  Now I have to go through and look and
18  see if --
19       (Witness reviewing document.)
20       A.  Well, the infrared spectrum on Page 71
21  is a Carolyn Lewis sample.  It has a carbonyl
22  band, so the little band that's in front of the
23  amide 1 is a sign of oxidation.
24  BY MR. THOMAS:
25       Q.  That's not my question, Doctor.  Let

Page 95

1   me ask it again.  Very specific question.
2        Do you have an opinion in the Carolyn
3   Lewis case about the extent to which any
4   oxidation impacts the functionality of the
5   polypropylene mesh for its intended purpose?  Do
6   you have a specific opinion in that regard?
7        A.  My opinion would be it appears
8   oxidized, so yeah, it would be degraded.
9        Q.  Does it have any have oxidation -- do
10  you have an opinion about whether the Carolyn
11  Lewis mesh explant has oxidation that impacts
12  the functionality of the polypropylene mesh for
13  its intended purpose?
14       A.  Any oxidation is bad.  I see carbonyl
15  is oxidation, so yes, my answer is yes, I have
16  an opinion.
17       Q.  What is the opinion?
18       A.  It's damaged.
19       Q.  How does the damage that you observed
20  affect the ability of the polypropylene mesh to
21  function in its intended purpose?
22       A.  Well, something had to cause it to
23  have it removed.  I'm looking at the pictures,
24  it's flaking, I'm looking at the oxidation, it's
25  oxidized.  I don't know how else to answer the

Page 96

1   question.
2        Q.  Based upon your review of the mesh in
3   this case and your analysis in this case, tell
4   me how the oxidation of the mesh in Carolyn
5   Lewis impacts the functionality of the
6   polypropylene mesh for its intended purpose?
7   How does it do it?
8        A.  When you get ketones in the polymer,
9   aldehydes in the polymer as reflected in these
10  carbonyls, you -- that leads to ultimately to
11  chain -- what we call chain beta scission, chain
12  scission, which is degradation.  And besides, it
13  causes embrittlement in its own right.  Very low
14  levels of oxygen incorporated into polypropylene
15  causes a material to become rigid which is
16  classic of this.
17       Q.  What is it about your work in this
18  case that causes you to have the opinion that
19  the oxidation of the mesh in Carolyn Lewis
20  impacts the functionality of that mesh for its
21  intended purpose?
22       A.  Oxidation is bad.  We see it.
23       Q.  Okay.  Are you able to measure the
24  amount of oxidation that occurred in Carolyn
25  Lewis quantitatively?

Page 97

1        A.  No.
2        Q.  Can you tell me anything more than
3   oxidation is bad in support of your opinion that
4   the work in this case shows that the mesh
5   implanted in Ms. Lewis was not able to perform
6   its intended function?
7        A.  The antioxidants were missing.  The
8   material is not protected.  I think we see -- we
9   go over and look at EDX results, if I can
10  find --
11       (Witness reviewing document.)
12  BY MR. THOMAS:
13       Q.  You can look all you want to.  Do you
14  want to continue your answer?  I don't think you
15  answered my question, but you can do whatever
16  you think you need to do.
17       MR. ANDERSON:  He's trying to ask you
18  what about the oxidation in Carolyn Lewis, in
19  your opinion, affects the function of the device
20  for its intended purpose.
21       A.  All oxidation affects the function.
22       MR. ANDERSON:  How is what he's asking
23  you.
24       A.  It makes it more rigid.  It makes it
25  more brittle eventually.  It causes it to flake.

25 (Pages 94 to 97)

Howard C. Jordi, Ph.D.

Page 98

1    BY MR. THOMAS:
2        Q.  How much oxidation is required for the
3    mesh to be more rigid?
4        A.  I can't answer that question sitting
5    here, but it's not very much from reading the
6    literature.  1 percent increased oxygen would
7    probably do it.
8        Q.  How much oxidation is required to make
9    the polypropylene more brittle?
10       A.  It's a process.  It's not a single
11   point.  So I felt this material in my fingers, I
12   could feel the rigidity in it compared to the
13   straight.
14       Q.  Very simple question.  How much
15   oxidation is required, Doctor?
16       A.  I don't know.
17       Q.  How many oxidation is required to
18   cause the polypropylene to flake?
19       A.  Anywhere from none to a lot, because
20   it depends if it was environmental stress
21   cracking you wouldn't necessarily to have
22   oxidation for environmental stress cracking, or
23   it could be totally related to oxidation, or it
24   could be a mix.
25       Q.  Dr. Jordi, you report in Exhibit 1 and

Page 99

1    2 the observation of cracking perpendicular to
2    the extrusion lines in the mesh?
3        A.  Yes.
4        Q.  And what are extrusion lines?
5        A.  Well, you just can see them in the --
6    I think they're little -- probably caused by
7    miniature, if you want to call it, defects in
8    the dye.
9            Page 25 is a typical example.  You can
10   see the lines moving along the line of
11   extrusion.
12       Q.  Extrusion is a process by which the
13   fibers are formed?
14       A.  I believe so, yes.
15       Q.  Are you familiar with the extrusion
16   process?
17       A.  Not a lot.
18       Q.  Okay.
19       A.  I'm more an analyst.
20       Q.  Are you comfortable with calling the
21   extrusion lines the grain of the fiber?
22       A.  Sure.
23       Q.  Okay.  And when we talk about the
24   perpendicular cracks, we're talking about the
25   cracking that you observed being perpendicular

Page 100

1    to the extrusion lines, or the grain of the
2    mesh?
3        A.  Correct.
4        Q.  Have you analyzed the extent to which
5    perpendicular cracking is consistent with the
6    chemical structure of the mesh?
7        A.  Repeat the question, please?
8        Q.  Have you analyzed the extent to which
9    perpendicular cracking is consistent with the
10   chemical structure of the mesh?
11           MR. ANDERSON:  Objection as to form.
12           Go ahead.
13       A.  When you put a material through the
14   dye, you'll be aligning the polymer chains along
15   the line of the fiber so that only -- you
16   basically only have London-London forces of the
17   CH2 groups and CH3 groups in the polymer
18   backbone holding the polymer together, so it
19   will be more easily cracked -- if you bend it
20   it's going to tend to crack vertically to the
21   direction of the fiber.
22   BY MR. THOMAS:
23       Q.  Okay.  Is that something you studied
24   before I asked you the question, or you just
25   answered that question based upon your

Page 101

1    knowledge?
2        A.  Based on my knowledge.
3        Q.  Okay.  Did you study, as a part of
4    your analysis of this case, the extent to which
5    cracking would be expected along the grain or
6    extrusion lines of the mesh as compared to the
7    perpendicular angle that's called out in your
8    report?
9            MR. ANDERSON:  Objection as to form.
10       A.  Again, I have to have it repeated.
11   Sorry.
12   BY MR. THOMAS:
13       Q.  Did you study, as a part of your
14   analysis of this case, the extent to which
15   cracking would be expected along the grain or
16   extrusion lines of the mesh as compared to the
17   perpendicular angle that's called out in your
18   report?
19       A.  Well, what's called out in my report
20   was what we observed.
21           Did I study differences?  It's not a
22   perfect thing.  You can see cracks in other
23   directions, too, sometimes, it's just a majority
24   seems to be in the vertical.
25       Q.  Okay.

26 (Pages 98 to 101)

Howard C. Jordi, Ph.D.

Page 102

1     A.  And furthermore, you can see these --
2  the grain, as you call it, is running right
3  through these cracks, so that's further
4  information to suggest that these -- this
5  cracked region is not biofilm, it's
6  polypropylene, because it's got the same grain
7  in it the original polypropylene did in the
8  cracked pieces.  If it was biofilm, those marks
9  should go away.  They don't, they're there.
10     Q.  Have you analyzed the issue of
11  environmental stress cracking to determine
12  whether environmental stress cracks would run
13  with the extrusion lines or the grain as opposed
14  to the perpendicular manner in which you call it
15  out in your report?
16     A.  Have I analyzed that?  No.
17     Q.  The crazing that you've talked about
18  are the areas in the mesh that are furthest away
19  from the crystals in the mesh, is that fair, in
20  the amorphous regions?
21     A.  In the amorphous regions, yes.
22     Q.  And the crazing that you've talked
23  about is the small cracks that form in this
24  amorphous region, correct?
25     A.  Yes.

Page 103

1     Q.  Knowing what you do about
2  polypropylene, and the chemical structure of it,
3  and the crazing that you've just described,
4  wouldn't it be more likely that any
5  environmental stress cracking would occur with
6  the grain or along the extrusion lines of that
7  mesh as opposed to perpendicular to the mesh?
8     A.  The -- if you -- well, first of all,
9  the fact of the matter is it's vertical to.
10  I mean that's just a fact for the vast majority
11  of them.
12     Q.  I'm asking you based upon your
13  knowledge as a biochemist, your knowledge of
14  polypropylene, and your knowledge of the
15  chemical structure, and the way that you've
16  described the environmental stress cracking as
17  we've been through it, isn't it more logical to
18  conclude that environmental stress cracking
19  would occur along the grain or the extrusion
20  lines as opposed to perpendicular to those
21  lines?
22     A.  If you wanted -- if you picture long
23  chains going this way of polymer, and then you
24  bent it this way, then it's going to tend to
25  crack here because those chains are going to

Page 104

1  come apart in the amorphous region.  They don't
2  have as much force holding them together.  You
3  have to literally rupture chemical bonds.
4     I don't see what you're saying, I'm
5  sorry.
6     Q.  So is it your testimony that to have
7  the oxidation or environmental stress cracking
8  necessary to cause the cracking on Page 40 in
9  Figure 44 of your report, Exhibit 1, requires a
10  rupture of the chemical bond?
11     A.  I would think that would be true on
12  the surface, yes.
13     Q.  Okay.
14     A.  Has to be.
15     Q.  And every place that you see this
16  cracking in the scanning electron microscopy,
17  the images that you've talked about, in order to
18  get the cracking that you describe shown in the
19  SEM images requires a breaking of the chemical
20  bond; fair?
21     A.  I think so.
22     Q.  Let's go to your report, Exhibit
23  Number 1.  Let's go to the PYMS data.
24     MR. ANDERSON:  Page 80 you're showing?
25     MR. THOMAS:  Page 80.

Page 105

1     A.  Okay.
2  BY MR. THOMAS:
3     Q.  Tell me what the PYMS technique is.
4     A.  Stands for pyrolysis mass
5  spectroscopy.  The sample is heated, and until
6  it fractures the bonds in the polymer releasing
7  everything, small molecules and so on, and then
8  those fragments are put through a GC column,
9  then they're monitored by a mass spectrometer.
10     We tend to do a two step method as
11  well where we heat the sample to 300C, which
12  tends not to fragment the polymer, and that
13  releases additives so we can see additives
14  without being overwhelmed by polymer fragments.
15     One of the disadvantages of a PYMS by
16  itself is that when you burn the polymer, in
17  this case polypropylene, you get a massive
18  amount of polypropylene fragment ions which
19  tends to overwhelm the ability of a detector to
20  sense sometimes certain ions, like the
21  antioxidants, like Santonox, at least at the
22  levels that we want to detect it at.
23     Q.  As I understand your report and your
24  earlier discussion, you used the PYMS analytical
25  technique to determine the extent to which

27 (Pages 102 to 105)

Howard C. Jordi, Ph.D.

Page 106

1    additives in the Ethicon polypropylene mesh are
2    present?
3         A.  That's right.  I mean that's one of
4    two.  We use the LCMS as well.
5         Q.  Start with this one.  Tell me how you
6    do that.
7         A.  How you determine --
8         Q.  Right.
9         A.  You -- well, you would first, if
10   you're looking for Santonox R, you would shoot a
11   standard of Santonox R, and then you would look
12   for the ions that you get.  Santonox R gives
13   ions at 358 and 343 atomic mass units, so you
14   would plot those ions and look at them as shown
15   on figure -- well, the ions aren't shown in
16   Figure 82, but the chromatogram is.
17        Q.  Let's back up a minute.
18             When you're doing this test, do you
19   test both the explants and the controls?
20        A.  Absolutely.
21        Q.  And why do you do that?
22        A.  Because you want to look for
23   differences again.  First of all, we want to be
24   sure that the pristine has it in it, and it did.
25   And then we want to see whether or not the

Page 107

1    explants have it in it.
2         Q.  Okay.  Did you test the formalin
3    controls as a part of the PYMS test?
4             (Witness reviewing document.)
5         A.  It's not shown here.  I'm going to
6    have to go in the original data.  A lot of the
7    stuff that was in the original data is not in
8    this part.
9         MR. ANDERSON:  Go to the original
10   data.
11        MR. THOMAS:  Is that all data that's
12   been produced to us already?
13        A.  It's all here, except you've got it on
14   dual sided.  It's all here.  So I have twice as
15   much paper.
16   BY MR. THOMAS:
17        Q.  While you look for that, I'm going to
18   go to the restroom.
19            (Pause.)
20        A.  Repeat the question.  I'm sorry.  I
21   think I've got pretty close.
22   BY MR. THOMAS:
23        Q.  Did you test the formalin control as a
24   part of the PYMS test?
25        A.  I didn't see it, no.

Page 108

1         Q.  Why not?
2         A.  We didn't think it would have any
3    effect on the results.
4         Q.  Why?
5         A.  It's not an extracting solvent.  It's
6    going to dissolve polypropylene, so it's not
7    going to have any rapid effect on an extraction.
8         Q.  Why do you say that?
9         A.  Well, the polypropylene is solid.  It
10   doesn't leach out additives quickly unless you
11   put it in proper solvent extraction methods.  Or
12   this case it was simply there, we didn't do an
13   extraction method, that's the LCMS, we just
14   simply put it in the sample holder and shoot it.
15        Q.  Have you analyzed the extent to which
16   formaldehyde is an oxidant?
17        A.  No.
18        Q.  And to the extent formaldehyde is an
19   oxidant, you'd expect formalin to be an oxidant,
20   wouldn't you?
21        A.  Right.
22        Q.  To the extent that formalin is an
23   oxidant, it would be appropriate to test the
24   polypropylene pristine samples in formalin as a
25   part of your PYMS analysis, wouldn't it?

Page 109

1         A.  It certainly could be done, but we
2    didn't do it.
3         Q.  Because if you found that the
4    antioxidants were substantially reduced in the
5    formalin control sample, that would impact your
6    opinions, wouldn't it?
7         A.  Yes.
8         Q.  Why?
9         A.  Well, then we would imply that the
10   formalin extracted the polypropylene additives
11   out.
12        Q.  Have you analyzed at all in connection
13   with your work in this case the extent to which
14   formalin will extract the antioxidants from the
15   polypropylene mesh used in the TVT device?
16        A.  We didn't do any work with formalin,
17   so no.
18        Q.  So what your findings in the PYMS
19   section of the report show is only the pristine
20   mesh compared to the explanted mesh treated in
21   formalin?
22        A.  That's correct.
23        Q.  Now, the next step you take in the
24   antioxidant analysis is your LCMS work, correct?
25        A.  Correct.

28 (Pages 106 to 109)

Howard C. Jordi, Ph.D.

Page 110

1      Q.   That's on Page 84 of your report.
2      A.   Got it.
3      Q.   And in this work, you did testing on
4   the control samples, didn't you?
5      A.   Yes.
6      Q.   And you did test work on the formalin
7   control samples, didn't you?
8      A.   Yes.
9      Q.   Turn to Page 96, please, of your
10  report. Table 19.
11     A.   19 starts on Page 95, just so you
12  know.
13     Q.   Thank you. Take your time and look at
14  both of them if you want to, both pages.
15     A.   Okay.
16     Q.   Let's just talk about it.
17        Page 95 begins at Table 19, and it's
18  called "Santonox R Relative Quantification," and
19  on the left you show sample, on the right you
20  show peak area.
21        What are you trying to show in this
22  table?
23     A.   The relative amounts of Santonox R in
24  the various fibers.
25     Q.   And Santonox R is one of the

Page 111

1   antioxidants in the mesh?
2      A.   That's correct.
3      Q.   And the Santonox R is put in the mesh
4   to protect against the oxidation that you're
5   critical of in this mesh?
6      A.   Yes.
7      Q.   And it's your opinion that the
8   Santonox R leaches out of the mesh, making it
9   more vulnerable to oxidation and environmental
10  stress cracking, correct?
11     A.   Making it, yeah, more susceptible to
12  oxidation.
13     Q.   All right. So on the left you have
14  the numbers of your samples, correct?
15     A.   Yes.
16     Q.   And on the right you have the peak
17  area of Santonox R. What does the peak area
18  mean?
19     A.   It's just we're plotting -- you can
20  see the photograph here of the peaks for
21  Santonox R right above it, retention time.
22     Q.   Okay. So what does the chart on Page
23  95 represent above this table, the LCMS
24  extracted ion chromatograms, and you have all
25  the numbers of the samples, what does that mean?

Page 112

1      A.   A lot of -- that's overlay of peaks of
2   Santonox R for -- where Santonox R loops at 11.6
3   minutes about.
4        And extracted ion simply means we know
5   we have the 357 ion that shows up, so we tune
6   the instrument to see, or to record only the 357
7   ion, which is specific to Santonox R, ignoring
8   all the other impurities, anything else that
9   might also be co-eluting. So it makes the
10  method specific.
11     Q.   So how does the LCMS work?
12     A.   The liquid is put in from a column
13  into the detector and made into a mist, and a
14  voltage is applied, and you get ions. The ions
15  are put through quadripoles, which bends them.
16  Then it goes through a big tube called a time of
17  flight. When it starts going up the tube, a
18  clock starts, hits the top, starts coming down,
19  and when it reaches the detector at the bottom,
20  it hits the other clock, measures literally the
21  time between the start and the impact on the
22  detector. And then that time is related to the
23  mass. It gives you a very accurate mass, which
24  is the point of CUTO, giving you very accurate
25  mass.

Page 113

1      Q.   What does peak area mean that's
2   reported in Table 19?
3      A.   Just integrate the area under the
4   curve that's observed.
5      Q.   Then you compare the peak area that
6   you found for the explant samples against the
7   control samples to determine the extent to which
8   the Santonox R has been reduced, is that
9   correct?
10     A.   That's correct.
11     Q.   So, for example, in 13674, the peak
12  area is 315,246?
13     A.   Correct.
14     Q.   And you compare that to your control
15  sample, 3398135, of 2,324,899, that's your
16  pristine control sample?
17     A.   That's pristine control. There's some
18  variability there.
19     Q.   And you'd conclude from that that the
20  explant sample has a substantially diminished
21  amount of Santonox R, correct?
22     A.   That's correct.
23     Q.   The ranges in your control samples are
24  as high as 5,418,177, and as low as 2 thousand
25  324,899, correct?

Howard C. Jordi, Ph.D.

Page 114

1    MR. ANDERSON: Objection. Million.
2        MR. THOMAS: Thank you.
3        A. Millions, yes. But you're right.
4    BY MR. THOMAS:
5        Q. If you look at the formalin treated
6    control samples on Page 96 at Table 19, the
7    formalin treated control samples have less
8    Santonox R than the regular control samples,
9    don't they?
10       A. They do.
11       Q. Did you make any analysis to determine
12   why?
13       A. I would assume that that -- you have
14   to assume by the data that that means that
15   the -- because it was the same 3405405 was
16   analyzed before and after the formalin
17   treatment, so formalin treatment extracted some
18   of the antioxidant.
19       Q. Let's look at that, because the
20   formalin treated control sample is 3405405, and
21   it says 2,216,989.
22       A. Right.
23       Q. If you go up to the control sample
24   with the same lot number, that means it's the
25   same material, just with no formalin, correct?

Page 115

1        A. That's right.
2        Q. And the peak area there is 4,012,675,
3    correct?
4        A. Yes.
5        Q. Can't you conclude from that that the
6    formalin is extracting the Santonox R from this
7    mesh sample?
8        A. You can. Not completely, but it is.
9        Q. Okay. Is there any other explanation
10   for what's going on there?
11       A. I don't think so.
12       Q. Now, if you look at the other formalin
13   control sample, lot number 3422128, it shows a
14   peak area of 1,019,604. And if you compare that
15   to the same control sample without formalin, the
16   number is 4,550,748, correct?
17       A. Yes, you're right.
18       Q. And it's more than four times the
19   amount of Santonox in the pristine sample than
20   there is in the formalin sample, correct?
21       A. Correct.
22       Q. And you have to conclude that the
23   reason why there's less in the formalin treated
24   sample is because the formalin extracted out
25   that Santonox R, correct?

Page 116

1        A. That's the only explanation I can
2    think of.
3        Q. But you didn't study the extent to
4    which formalin impacts the antioxidants in the
5    mesh as a part of your analysis in this case,
6    correct?
7        MR. ANDERSON: Objection as to form.
8    Go ahead.
9        A. No.
10   BY MR. THOMAS:
11       Q. It's correct that you did not?
12       A. I did not.
13       Q. Thank you.
14       Now, if you look at the same table,
15   Table 19, you look at lot 3422128.
16       A. Where are we now?
17       Q. Under "Control Samples," same table,
18   Table 19 on Page 96.
19       A. Okay.
20       Q. You see that there's a control sample
21   which is lot number 3422128. Do you see that?
22   And a value of 4,550,748. Do you see that?
23       A. I see it.
24       Q. And then there is another -- a
25   duplicate of that same control sample also

Page 117

1    tested. Do you see that?
2        A. Yes.
3        Q. And for that duplicate, that's the
4    same piece of mesh, isn't it?
5        A. It's a different sample, but it would
6    be the same piece of mesh, yes.
7        Q. And that's a duplicate of the same
8    test with the 4,550,748 test, right?
9        A. Right.
10       Q. And the value that you get for the
11   duplicate sample is 5,418,177, correct?
12       A. Correct.
13       Q. Do you have any explanation for the
14   difference in peak areas between these two, what
15   should be duplicate samples?
16       A. It should be duplicate samples, but
17   it's a different -- it's actually a different
18   region in the mesh. So it could be due to the
19   fact that the antioxidant is not completely
20   evenly distributed in the mesh, so there's
21   regions of higher and lower concentration.
22       Q. Do you know?
23       A. No. I'd have to run a series of
24   tests. That's what it's suggestive of.
25       Q. Does the fact that the control sample

30 (Pages 114 to 117)

1 and the duplicate control sample of the pristine
2 mesh tested almost a million DAs apart, does
3 that cause you any concern at all?
4     A.  Well, if it's different it's
5 different.  I can't control that.
6     Q.  Okay.  Does the fact that the control
7 sample lot 3422128, the duplicate, shows a peak
8 area of 5,418,177, and the formalin treated
9 control sample for the same piece of mesh is
10 less than 20 percent of that value, does that
11 have any concern -- cause you any concern about
12 the opinions you have in the case?
13     A.  Where are we here?  Sorry.
14     Q.  Okay.  We're at Table 19, Page 96.
15 You have --
16     A.  Duplicate.
17     Q.  You have your duplicate lot for
18 3422128, the value is 5,418,177.  And the same
19 piece of mesh treated with formalin is less than
20 20 percent the concentration of Santonox R as
21 you found in your pristine sample.
22     A.  Yes.  It looks like formalin is
23 extracting, as we said before.
24     Q.  Why didn't you note that in your
25 report?

1     MR. ANDERSON:  Objection.
2     A.  I did.  It's in the table.
3 BY MR. THOMAS:
4     Q.  Why didn't you discuss it in your
5 report?
6     A.  Well, there's normally experimental
7 error, I can't -- it's possible that this
8 million is there because -- instead of 2 million
9 because, again, we hit a region of lower
10 concentration of the Santonox R, that could be
11 part of the reason.  Because we see spread in
12 the other control values as well.
13     Q.  Doctor, isn't the best evidence based
14 upon the work that you did in this case that the
15 formalin is extracting the antioxidants from the
16 mesh?
17     MR. ANDERSON:  Objection as to form.
18 Go ahead.
19     A.  Well, it is extracting some of the
20 Santonox R.  However, even at the lowest level
21 for the majority of these samples, like 13416,
22 13418, 13421, there's 67,000 counts to 100,000
23 counts, which is 10 to 15 times less than even
24 the lowest for formalin control.
25 BY MR. THOMAS:

1     Q.  You had samples in the formalin
2 control for how long?  48 hours at 60 degrees
3 centigrade?
4     A.  Yes.
5     Q.  Did you make any effort to correlate
6 the aging by that amount to the samples that are
7 contained in Table 19 to determine whether
8 they're equivalent?
9     A.  No.
10     Q.  It would be appropriate in any
11 scientific analysis to make sure that when
12 you're comparing formalin exposure, you want
13 them to be equal to make sure that they reflect
14 accurate values?
15     A.  Well, the only way to do that, it
16 would be rather impossible in this case, it
17 would have had to have been implanted in tissue,
18 and had to have been implanted and stored in the
19 formaldehyde for -- you know, like we'd have to
20 take controls.  I don't know how we'd put
21 controls in tissue.  There's all kinds of
22 possible requirements to do that technically.
23     Q.  Is it fair to conclude based on the
24 data in your report, at least with respect to
25 lot number 3422128, the duplicate sample, and

1 the formalin control sample, that the formalin
2 is responsible for extracting over 80 percent of
3 the Santonox R?
4     A.  Given the spread on the data, it's
5 certainly -- it is suggestive of that.  But
6 again, it could be 40 percent or 60 percent or
7 50 percent because it could be a different
8 region of the fiber itself.  We have normal
9 spread if we run a duplicate like above.
10     Q.  Let's go above.  It's -- even if you
11 go to the duplicate above --
12     A.  That's what -- that's not 80 percent
13 difference from the duplicate, it's 20 percent.
14     Q.  It's almost 50 percent, isn't it?
15     A.  No.  4,550,000 versus 5,400,000.
16     Q.  But those are not formalin treated?
17     A.  No, but that shows the natural
18 variability of the mesh.
19     Q.  But you only -- okay.
20     The only data that you have on your
21 tests under the LCMS of these explanted meshes
22 are contained in this report, correct?
23     A.  That's correct.
24     Q.  And these are the data upon which you
25 rely for your opinions in this case?

Howard C. Jordi, Ph.D.

Page 122

1    A.  That's correct.
2    Q.  And you could have tested other
3  regions in the mesh to determine the extent to
4  which the antioxidants varied across the mesh,
5  correct?
6    A.  Theoretically.  We did a huge amount
7  of work to begin with, so it's all a relative --
8  what you're capable of doing in the required
9  time and all the rest of it, so it's just a
10  judgment call.
11    Q.  The reason why you did testing was to
12  have the data points upon which you could
13  predicate your opinions?
14    A.  That's right.
15    Q.  And these are the only data points
16  that you have upon which to predicate your
17  opinions?
18    A.  That's right.
19      MR. ANDERSON:  Well, objection to
20  form.
21    A.  Not the only, but it's one of.
22  BY MR. THOMAS:
23    Q.  For this issue, for the LCMS data?
24    A.  For Santonox R for the LCMS data, for
25  the lauryl thiodipropionate, for example.

Page 123

1    Q.  As a scientist who works in
2  biochemistry and uses this type equipment, does
3  the variability in the data in Table 19 on
4  Page 96 suggest to you the need to do additional
5  testing to confirm the extent to which formalin
6  was involved in the extraction of the
7  antioxidants?
8    A.  That would be a good idea, sure.
9    Q.  Because the data as expressed here is
10  not reliable, is it?
11    A.  Well, that's a relative term.  I think
12  we certainly got nowhere near the levels seen in
13  the explants.
14    Q.  Is it still your opinion that to a
15  reasonable degree of scientific certainty that
16  formalin has no impact on the Santonox R in the
17  mesh as implanted in a person?
18    A.  As implanted in a person, I don't --
19    Q.  Bad question.
20      Is it still your opinion to a
21  reasonable degree of scientific certainty that
22  the formalin had no impact on the measurement of
23  antioxidants in the meshes analyzed by you, the
24  explants?
25      MR. ANDERSON:  Objection.

Page 124

1    A.  It did not remove at all.  It didn't
2  remove it to the same levels as seen in the
3  explants.
4  BY MR. THOMAS:
5    Q.  But it's true to a reasonable degree
6  of scientific certainty as reflected by your
7  data that the formalin removed more than
8  80 percent of the antioxidants as expressed in
9  that data?
10      MR. ANDERSON:  Objection.
11    A.  I have to look at the numbers.
12      (Witness reviewing document.)
13    A.  The samples -- that's true.  And in
14  the samples as received, we had like 1, 2 or
15  3 percent left, not 80 percent.  We only had --
16  so it had 97, 98, 99 percent removed in the
17  explants we received.  Still greater.
18  BY MR. THOMAS:
19    Q.  But you don't know how long those
20  explants were exposed to formalin, do you?
21    A.  No, I do not.
22    Q.  And the length of time those explants
23  may have been exposed to formalin would impact
24  the extent to which the formalin extracted the
25  antioxidants, correct?

Page 125

1    A.  Presumably.
2    Q.  Well, absent any testing showing you
3  otherwise, that would be the logical conclusion
4  from this data, wouldn't it?
5    A.  Yes.
6      MR. THOMAS:  Let's eat.
7      (Whereupon, a luncheon recess was
8      taken at 12:15 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 122 to 125)

Howard C. Jordi, Ph.D.

Page 126

1    AFTERNOON SESSION
2         1:12 O'CLOCK P.M.
3
4    BY MR. THOMAS:
5         Q.  Let's spend a little time with your
6    report, Dr. Jordi.
7         A.  Okay.
8         Q.  The report in the Lewis case.  Let's
9    go back to Page 16 again.
10             Table 2 on Page 16, it begins on Table
11   -- on Page 15, I guess, to be fair.
12        A.  Yes.
13        Q.  Table 2 represents what?
14        A.  Table 2 represents a grid of the tests
15   that were run.
16        Q.  There is a number of sample
17   identification numbers beginning with 13400 that
18   run to 13421.  I assume you did all of those
19   tests at once, or about the same time?
20        A.  About the same time.  We received the
21   Lewis case a little bit later, so it was run a
22   little bit later.
23        Q.  Is it your practice to number the
24   testing that you do in your labs sequentially?
25        A.  Yes.

Page 127

1         Q.  Is there any significance to the
2    numbers, other than the time that you do it?
3         A.  I don't believe so.  It's just the
4    standard SOP numbering.
5         Q.  Okay.  When did you do the testing for
6    13400 to 13421, over what period of time.  I
7    don't think you'll find it in your report.  I've
8    got the bills here if that helps.
9             MR. ANDERSON:  Lab notebooks would
10   help, too.
11        A.  Lab notebooks would probably be
12   better.
13   BY MR. THOMAS:
14        Q.  Okay.
15             (Witness reviewing documents.)
16        A.  Looks like about the start was 9/9.
17             MR. ANDERSON:  Look at your lab
18   notebooks instead of saying "about."
19             THE WITNESS:  I did look at the lab
20   notebook there.
21             These were all these samples that are
22   in that grid, so 9/11, 9/13.
23   BY MR. THOMAS:
24        Q.  Just from the bills I looked at, it
25   appears that the work that has been done in this

Page 128

1    case has been done since -- the testing work
2    itself has been done since September.  Does that
3    seem about right?
4         A.  Yes.
5         Q.  Okay.  In Table 2 on Page 15 there's
6    identification of the sample, weight, fibers.
7    Is that molecular -- what is the weight for
8    that?  What does that mean?
9         A.  That was the amount of fibers that
10   were able to be extracted.  So when you look at
11   the picture of the -- on Page 16 at the bottom
12   left, those fibers after they were removed from
13   tissue were weighed.
14        Q.  Okay.  Is there any weight of a tissue
15   that you have?
16        A.  No.  We had no plans for analysis of
17   the tissue.
18        Q.  Did you retain the mesh fibers that
19   are in Figure 2?
20        A.  Well, we would have if there were any
21   to maintain.  There may be tidbits of a couple
22   of them.  But with all the testing that was
23   done, we were extremely sample constrained.
24        Q.  How about the tissue samples, did you
25   retain any of the tissue samples?

Page 129

1         A.  No.  We had no further use for the
2    tissue.
3         Q.  Under the 13674, you understand that
4    to be the Carolyn Lewis sample?
5         A.  Yes, I do.
6         Q.  There's no weight taken there.  Do you
7    know why?
8         A.  It was an oversight.  It's
9    7.62 milligrams.  It's in the book.
10        Q.  Okay.  So it's in your lab notebook,
11   but never made it to your report?
12        A.  That was a glitch.  It should have
13   made it to the report.  It didn't make it to the
14   report.
15        Q.  What's the significance of --
16        A.  It's 7.62 if you want to write it in
17   so you've got the exact number.
18        Q.  What is the significance of that
19   number to your analysis?
20        A.  The milligrams?
21        Q.  Yes, the weight of the fibers that you
22   receive.
23        A.  It's just a fact of what we got.
24        Q.  That's what I figured.
25             As I look at the sample, explant

33 (Pages 126 to 129)

Howard C. Jordi, Ph.D.

Page 130

1  sample analysis chart, it lists the tests done
2  on each sample, correct?
3      A.  Correct.
4      Q.  You didn't do all of the tests on all
5  the samples?
6      A.  Correct.
7      Q.  Why?
8      A.  Some cases there just wasn't enough
9  sample to do them all.  And other cases we --
10  like we ran SEM and optical microscopy on all
11  the samples.  SEM-EDX, once we've seen increased
12  oxygen six times, we didn't feel it was
13  necessary to run them all.  It's already a huge
14  report.  The volume of work was so great that we
15  made choices when we had acquired what we
16  considered a significant level of work.  Once I
17  prove something six times, I don't need to prove
18  it seven, eight, nine, ten times.  Part of it
19  was lack of sample, part of it was we'd run
20  enough to be consistent to show the point of the
21  various analyses.
22      Q.  Did the expense of the test have
23  anything to do with it, the expense of each of
24  the tests?
25      A.  I'm sure that wasn't the overriding --

Page 131

1  that wasn't the overriding thing.
2      Q.  Did you determine which fibers to test
3  with which test, or were you directed in that
4  regard?
5      A.  No.  We discussed that, and we just
6  made a choice of statistical significance.
7      Q.  Who made that decision?
8      A.  Well, my son Mark and I.
9      Q.  Okay.  What considerations did you
10  have in determining, for example, to do all of
11  the OM and SEMs, but only some of the SEM-EDX?
12      MR. ANDERSON:  Objection.  Asked and
13  answered.
14      Go ahead.
15      A.  We just didn't feel it was -- we had
16  showed the point, and we just thought we had
17  done enough work.  And we had a huge work
18  product to begin with.
19  BY MR. THOMAS:
20      Q.  Okay.  Is there a reason -- strike
21  that.
22      Let's go to Page 19.  Page 19 in the
23  middle of the page, it reads this.  "It is my
24  opinion to a reasonable degree of scientific
25  certainty based upon my experience and my

Page 132

1  background in polymer science, this level of
2  degradation will have a strong impact on fiber
3  mechanical properties, including stiffness,
4  elasticity, and resistance to break."
5      What level of degradation are you
6  describing in that sentence?
7      A.  We're describing the very obvious
8  cracking seen in the SEM photographs.
9      Q.  Okay.  So the level that you're
10  describing there relates solely to what you
11  observed in the SEM photographs, images?
12      A.  At this point, yes.
13      Q.  All right.  "Will have a strong impact
14  on fiber mechanical properties."  What does that
15  term mean to you?  How much is strong?
16      A.  Well, we weren't able to run physical
17  testing that we normally would run, because we
18  didn't have enough material, but we could feel,
19  one way is to feel it.  The material explanted
20  material had a much more rigid feeling to it, I
21  guess the best word is rigid, rigid feeling to
22  it than the controls.
23      Q.  Okay.
24      A.  It was very obvious.
25      Q.  Is that the only information that you

Page 133

1  have that the level of degradation that you
2  observed would have a strong impact on fiber
3  mechanical properties?
4      A.  No.  If I looked at the actual flaking
5  and the cracking and so on and so forth, that's
6  got to have a massive effect.  It's a large --
7  it covers the entire region of some of the
8  fibers.
9      Q.  Okay.  You call it strong, you said
10  massive.  What does that mean?
11      A.  Well, the best way I can show it is
12  with a picture.
13      Q.  Okay.
14      A.  Do you want to see one?
15      Q.  You've showed them to me, and I've
16  seen them.
17      In terms of quantifying, placing a
18  number on the impact on the mechanical
19  properties, you're not able to do that, is that
20  fair?
21      A.  I think you could certainly say it was
22  great -- very greatly cracked or moderately
23  cracked, something like that in general.
24  Putting a number score on it would be difficult,
25  yes.  But it certainly is not hard to look at a

34 (Pages 130 to 133)

Page 134

1  sample that's grossly cracked and see that it's
2  grossly cracked.
3      Q.  You say that it's "going to have a
4  strong impact on fiber mechanical properties,
5  including stiffness."
6          What impact will this degradation have
7  on stiffness?
8      A.  Cracking, the cracking to me is
9  indicative of some -- is a form of degradation,
10  at least it's a result of the chemical
11  degradation, results in a physical splintering
12  that we see.  So that when it's largely cracked,
13  that also implies that the material underneath
14  it is probably cracking, too.  And I prove that
15  by showing the SEM-EDX and showing the increased
16  oxygen levels in the level underneath the
17  cracks, that's the next layer that will crack.
18      Q.  Thank you, Doctor.
19          My question is; what level of --
20  strike that.
21          What amount of stiffness is impacted
22  by the level of degradation that you observed in
23  the SEM images?  What's the -- how can you
24  quantify the level of stiffness?
25      A.  I can just feel it.  I'm sorry, I

Page 135

1  can't give you a number.
2      Q.  And just so it's clear, the only thing
3  that you have to go on about the stiffness is
4  holding the explant in your hands?
5      A.  In the gloved hands.
6      Q.  Okay.
7      A.  And -- yes.
8      Q.  Comparing it to --
9      A.  To the control.
10      Q.  -- the control.
11          Did you compare that to the formalin
12  control, or just the control?
13      A.  I think we felt them all.
14      Q.  I didn't see any reference in your
15  report to the formalin control.
16          Do you have a -- is it your practice
17  when you test the formalin controls to reference
18  that in your report?
19      A.  Reference what in the report?
20      Q.  The fact that you did it.
21          If you go on Page 17, it's where you
22  talk about handling it.  Page 17 says "It was
23  noted during sample preparation that a readily
24  apparent difference in fiber stiffness existed
25  between the control samples and the explanted

Page 136

1  fiber mesh."
2          There's nothing in there that I saw
3  that suggested that you compared the formalin
4  control samples.  Do you recall testing the
5  formalin control samples in the same way that
6  you tested the control samples and the explants?
7      A.  It's not specifically mentioned, but
8  we felt them.
9      Q.  Okay.  And it's your recollection and
10  testimony that the explanted samples felt
11  stiffer than the control samples?
12      A.  Most definitely.
13      Q.  And did you arrive at any conclusions
14  about what caused that stiffness?
15      A.  At the time it was done, we hadn't
16  done the other testing, so I had no reason or
17  cause.  After all the work that's done and
18  reported here in this report, the infrared
19  showed oxidation, the SEM-EDX shows oxidation,
20  the lack of antioxidants would suggest
21  susceptibility to oxidation, and so on.
22      Q.  Okay.  The sentence also references
23  elasticity.  Was the elasticity also something
24  that you observed in the handling of the mesh?
25      A.  Right.  If you bent the original --

Page 137

1  the pristine mesh it would come -- pop right
2  back to shape.  And the other, you had to apply
3  more force to get it bent, and it would come
4  back and sometimes would stay partially bent, or
5  sometimes would crack.
6      Q.  Is it the handling of the mesh the
7  only basis for your opinion that the explanted
8  mesh was less elastic than the control?
9      A.  As a comment here, yes, because that's
10  a point where we were running SEM.
11      Q.  And likewise, with the resistance to
12  break, did you observe that in your handling as
13  well?
14      A.  That's right.
15      Q.  And is it fair to understand that it's
16  your handling of the explanted mesh as compared
17  to the control mesh that's the basis for your
18  opinion that the explanted mesh had less
19  resistance to break than the control mesh?
20      A.  Yes.  The control mesh never broke.
21      Q.  Did you ever investigate any
22  alternative potential causes to more stiffness,
23  less elasticity, or more resistance to break?
24      A.  No.  We were going after chemical
25  analysis of the polypropylene and the

Howard C. Jordi, Ph.D.

Page 138

1  differences, if any.
2      Q.  Did you ever consider any other
3  chemical contributions to increased stiffness --
4  strike that.
5      Did you ever consider whether formalin
6  could contribute to increased stiffness, less
7  elasticity, or less resistance to break?
8      A.  We felt it.  The same, it felt the
9  same.
10     Q.  Did you consider that at the time?
11     A.  If it had been different it would have
12  been reported.  The fact that it was a formalin
13  treated control would be part of the control
14  package.
15     Q.  Well, the formalin treated control
16  observations weren't even called out in your
17  report, right?
18     A.  That's right, they weren't.
19     Q.  Okay.  Did you ever consider the
20  extent to which formalin and a chemical reaction
21  with the proteins on the mesh could lead to an
22  increased stiffness, a reduced elasticity, or a
23  reduced resistance to break?
24     A.  No.
25     Q.  Down in the middle of that paragraph

Page 139

1  you say "Sharp or protruding surfaces could
2  result."
3      Do you have an opinion to a reasonable
4  degree of scientific certainty that any sharp or
5  protruding surfaces resulted from any of these
6  pieces of mesh?
7      A.  Where are we reading here?
8      Q.  Right in the middle of that paragraph.
9      MR. ANDERSON:  Page 19.
10     A.  Oh, 17.  All right.  Which paragraph?
11     MR. ANDERSON:  You're on 18.  He
12  wanted 19.  He's going to keep going through
13  this paragraph, so here's where he is right now.
14     A.  "Sharp protruding..."
15     (Witness reviewing document.)
16     A.  Okay.  Question again, please?
17  BY MR. THOMAS:
18     Q.  Do you have an opinion to a reasonable
19  degree of scientific certainty that any sharp or
20  protruding surfaces resulted on any of the mesh
21  explants that you reviewed in vivo?
22     MR. ANDERSON:  Objection to form.
23     A.  We saw the sharp edges in the SEM
24  photos.
25  BY MR. THOMAS:

Page 140

1      Q.  How do you know that's the way it was
2  inside the body?
3      A.  Well, it was in the tissue when it
4  came, and we didn't take it out of the tissue
5  when we sent it -- when we ran the SEM, so we
6  didn't do anything different than it was in the
7  body environmentally.  We did that on purpose.
8      Q.  You didn't do anything differently,
9  but the doctors did something differently when
10  they removed the mesh, didn't they?
11     A.  Well, they took it out of the body,
12  yes.
13     Q.  What else did they do?
14     A.  Put it in formalin.
15     Q.  Okay.  Do you know what impact the
16  formalin has on the proteins and other -- strike
17  that.
18     Do you have any knowledge or
19  information about what formalin does to the
20  materials in the body that surround the mesh?
21     MR. ANDERSON:  Objection to form.
22     A.  It will react with the tissue, but it
23  will not react -- we ran controls in formalin
24  here, and we showed it didn't change the SEM.
25  BY MR. THOMAS:

Page 141

1      Q.  But the ones you ran in formalin
2  didn't have any tissue on them.
3      MR. ANDERSON:  Wait a minute, Dave, in
4  fairness let him finish his answer.
5      MR. THOMAS:  You're right.
6      A.  We ran formalin treated controls here
7  to see if it would do anything obvious to the
8  pristine.  It did not.
9  BY MR. THOMAS:
10     Q.  But the formalin controls that you ran
11  didn't have any tissue on them.
12     A.  That's correct.  So what?
13     Q.  And my question is whether you know
14  whether formalin will react with the tissue on
15  the mesh so as to impact the appearance in the
16  SEM images.  Do you know that?
17     A.  Absolutely not.  It will react with
18  the tissue, absolutely.  It's irrelevant.  It's
19  not going to react with the mesh.  It will
20  react -- not react with the mesh in the tissue,
21  it will react with the tissue which we removed,
22  so it's no longer there when we did the testing.
23     Q.  Is it your testimony there was no --
24     A.  There was tissue on when the SEMs were
25  run.  We didn't want that removed because didn't

36 (Pages 138 to 141)

Howard C. Jordi, Ph.D.

Page 142

1   want to in any way disturb the mesh in any way
2   that we could possibly avoid, so we tried our
3   very best not to cause anything, any changes.
4   So we ran the SEMs in the tissue, which we could
5   do.
6       Q.  What is your area of expertise that
7   allows you to give the opinion that "Prolene
8   mesh in the TVT products degrades, cracks, and
9   releases polypropylene particulates into the
10  surrounding tissue after implantation, causing
11  an increased inflammatory response"?  Are you
12  trained to give that opinion?
13      A.  I certainly am.  I'm a polymer
14  chemist, a biochemist, and we actually saw the
15  shards, we saw how easily the shards came off,
16  and then we actually took an infrared of it to
17  show that they were polypropylene.  So we
18  actually did it and we saw it.
19      Q.  That's not -- that's a good answer.  I
20  should have asked a better question.
21          What's your training, education, and
22  experience that allows you to give the opinion
23  that those pieces that you claim break off
24  caused an increased inflammatory response?
25      A.  What's my basis?

Page 143

1       Q.  Yes.  What's your training?
2       A.  I'm a biochemist.
3       Q.  As a part -- have you analyzed the
4   effect of polymer degradation in humans prior to
5   this litigation?
6       A.  I worked on bio-implantable polymers
7   when I was in the Army at Walter Reed Army
8   Medical Center, polylactic acid, polyglycolic
9   acid copolymers.
10      Q.  Was your work there --
11          MR. ANDERSON:  He's not finished.
12          Go ahead.
13      A.  We were replacing parts of jaws in
14  animals with a goal of being able to replace a
15  blown off jaw on a soldier, put a piece of
16  implantable material in the jaw, and then we
17  wanted the tissue to grow into it, so we put
18  things in the PLA-PG polymer so tissue would
19  tend to grow in, and ultimately the jaw would be
20  replaced with new jaw, and it worked fairly
21  well.
22  BY MR. THOMAS:
23      Q.  Was it your job to determine the
24  extent to which the implant would be accepted by
25  existing tissue?

Page 144

1       A.  That was well understood in that we
2   had very little response.  Because in that case,
3   unlike this case, we had a polymer in polylactic
4   and polyglycolic acid which degraded to lactic
5   acid and glycolic acid, both of which are normal
6   body chemicals that don't cause a tissue
7   response of any consequence.
8       Q.  Was it your job to determine the
9   extent to which the jaw implant would integrate
10  into the tissue?
11      A.  To observe it.
12      Q.  Was it your job to determine the
13  adequacy of the design of the jaw implant to be
14  accepted by the tissue?
15      A.  Well, we worked as a team.  There was
16  a number of us.
17      Q.  But there were other people whose
18  primarily responsibility was to determine the
19  extent to which the implant was compatible with
20  existing tissue, wasn't it?
21      A.  That work had been done prior, it had
22  been shown to be compatible.
23      Q.  But that was not your job?
24      A.  No.
25      Q.  Somebody else did that work?  Another

Page 145

1   expertise was required to make that finding,
2   correct?
3       A.  Right.
4       Q.  And so --
5       A.  But it's not unreasonable to observe
6   polypropylene shards coming off, which are
7   little knives.  They're going to cut the tissue
8   when they come off in it.  You can see it under
9   microscope, and that's going to cause bleeding
10  and an inflammatory response.
11      Q.  How big are these shards you're
12  talking about?
13      A.  Well, let's go look at a picture.
14  We've got a scale on it.  They vary.
15      Q.  How big is that one?  What page are
16  you on?
17      A.  69.
18      Q.  How big is it?
19          MR. ANDERSON:  Which piece?  There's
20  pieces all over the place.
21          MR. THOMAS:  The piece he has
22  highlighted right there.
23          MR. ANDERSON:  Okay.
24      A.  Well, the mesh itself is, what, 70,
25  80 microns, so it's got to be -- this is a good

Howard C. Jordi, Ph.D.

Page 146

1    size piece, so it's probably 20 microns,
2    10 microns, 20 microns, depends on the piece.
3    BY MR. THOMAS:
4        Q.   And it's your opinion that that cuts
5    tissue?
6        A.   Absolutely.  If it's got sharp edges
7    like this and you're moving around and
8    exercising, it's got to drive it into
9    whatever --
10       Q.   What have you done to study the extent
11   to which a shard as depicted on the Page 69 is
12   going to have any impact at all in terms of
13   inflammatory response in a human?
14       A.   I leave that to the doctors, the
15   surgeons, and so on, and the doctors.  I'm not
16   a -- I'm a biochemist and a polymer chemist.
17       Q.   Right.  So the extent to which any of
18   these edges that you've described, cracks that
19   you've described, or platelets or shards that
20   you've described are going to have any health
21   impact on any patient is for somebody else to
22   comment on, is that fair?
23       A.   The doctors have to do that, yes.
24       Q.   Thank you.
25           Let's go to Page 42 of your report,

Page 147

1    please.
2        A.   Got it.
3        Q.   I'm interested in the figure that's on
4    the lower half of the page.  I guess it's Figure
5    48.
6            Based on your work in this case, what
7    does Figure 48 show?
8        A.   It shows a large -- this is atypical.
9    It shows a large longitudinal crack in the
10   underlying polypropylene coated by what appears
11   to be tissue.
12       Q.   Okay.  Which parts -- I look at that
13   and I think of bark on a tree.  And there's
14   areas on either side, and then an interior that
15   I would think of as exposed wood on a tree and
16   the rest would be the bark, and I'm trying to
17   use it as kind of a descriptive thing.
18           Is the area surrounding the interior
19   portion -- that's not going to make any sense at
20   all on the record, I understand that.  Are we
21   talking about the same thing?  Is that the
22   tissue that's surrounding it?
23       A.   Yes.  This would be the polypropylene
24   in here (indicating).
25       Q.   Let me give you a red pen.  Why don't

Page 148

1    you draw a circle around what you've described
2    as the polypropylene.
3           MR. ANDERSON:  On his copy?  Do you
4    want to put it on -- let's put it on the record
5    copy.
6           MR. THOMAS:  That's what I thought he
7    was looking at.  I'm sorry.
8        A.   It would be the same page.
9    BY MR. THOMAS:
10       Q.   So we're on Page 42 of Exhibit 1.
11       A.   Yes.
12           MR. ANDERSON:  You're going to write
13   on this.
14   BY MR. THOMAS:
15       Q.   So why don't you draw a circle around,
16   if you don't mind, those areas --
17       A.   Circle?
18           MR. ANDERSON:  Listen to him.
19   BY MR. THOMAS:
20       Q.   Outline the area that you believe is
21   polypropylene.
22       A.   (Witness complies).
23           I'm having a hard time writing
24   exactly, but you give my drift.
25   BY MR. THOMAS:

Page 149

1        Q.   Doesn't have to be exact.
2        A.   Looks like a crack there.
3        Q.   Okay.
4        A.   Something on that order.
5        Q.   And so thank you for doing that.
6           You've drawn in red the area inside of
7    which is the polypropylene.  Does the area
8    outside of that represent tissue or protein?
9        A.   I believe so.
10       Q.   Okay.
11       A.   It doesn't match -- you can see when
12   polypropylene cracks it gives these sharp sides
13   and jagged edges, whereas this is more -- tissue
14   is more nebulous.
15       Q.   What is it about the polypropylene
16   structure that causes it to crack in the manner
17   you just described?
18           MR. ANDERSON:  Objection to form.
19           Go ahead.
20       A.   It's developed brittleness from lack
21   of antioxidants and oxidation and/or stress
22   cracking.  The two work together in any given
23   sample.
24   BY MR. THOMAS:
25       Q.   Will degradation alter the melting

Howard C. Jordi, Ph.D.

Page 150

1    point of polypropylene?
2        A.  Yes.
3        Q.  Will degradation always alter the
4    melting point of polypropylene?
5        A.  I think it depends on the severity of
6    the oxidation, the degradation.
7        Q.  How much degradation or oxidation is
8    required to alter the melting point of
9    polypropylene?
10       A.  Well, a lot of things affect the
11   melting point of polypropylene.  I'll show you.
12   This is again from one of the books in my --
13   Turi, on thermal methods.  Here's a chart, it
14   details polypropylene, and I've got melt points
15   all the way from 106 to 114 degrees to
16   176 degrees, depending on the percent
17   crystallinity.  Percent crystallinity affects
18   the melt point.
19       Q.  Did you determine the melt point of
20   the mesh that you analyzed in this project?
21       A.  Yes.
22       Q.  What did you determine the melt point
23   to be, do you remember?
24       A.  I'd have to go to the table.  There
25   were different values.

Page 151

1        Q.  We'll get to that.
2            You use a reference point in your
3    report of 175.
4        A.  That's for a typically crystalline
5    polypropylene material.
6        Q.  The actual melting point of the
7    polypropylene you analyzed was lower than that?
8        A.  It was all lower, which tells me it
9    was -- after the manufacturing process it was
10   like 165, I think, roughly, and then it went
11   down from there.
12       Q.  Okay.
13       A.  It varies as a function of molecular
14   weight, it varies as a function of
15   crystallinity.
16           Do you want to keep this together?  Do
17   you know where the start is for this?  This is
18   mine.
19           MR. ANDERSON:  I think he flipped it
20   over, so we'll just have to figure it out.
21           THE WITNESS:  I don't want to get us
22   all mixed up.
23           MR. ANDERSON:  There we go.
24       A.  We've got it ready if we need it for
25   something else.

Page 152

1    BY MR. THOMAS:
2        Q.  We've got too many papers working
3    here.  I apologize.
4            What is a plasticizer?
5        A.  It's generally a low molecular weight
6    material that's put inside of a plastic to make
7    it more flexible.
8        Q.  Do you agree that fat and body tissue
9    will be a plasticizer on polypropylene?
10       A.  Yes, not on, though, in.  Only in.  It
11   has to get in.
12       Q.  What does that mean when the fat and
13   body tissue soften the polypropylene?
14       A.  It just becomes softer, because --
15   that's connected with the environmental stress
16   cracking, that's going to get into the polymer
17   and start swelling the chains.
18       Q.  Are you familiar with the concept
19   known as toughness?
20       A.  Yeah.
21       Q.  What is toughness?
22       A.  It's resistance to wear.
23       Q.  Is implanted mesh tougher than
24   pristine mesh?
25       A.  Not seen the measurements, so I don't

Page 153

1    know.
2        Q.  Have you ever analyzed the question of
3    whether implanted mesh is tougher than pristine
4    mesh?
5        A.  No.
6        Q.  What does it mean if implanted mesh is
7    tougher than pristine mesh?
8        A.  Well, it just means it might be
9    tougher in the sense of, I would use the term --
10   I'm more like using the term rigid in this case,
11   that would probably also be considered as part
12   of this tougher thing.  But it also would make
13   it -- if it's more rigid, it's going to make it
14   more difficult to move in the body, and the
15   patient will have more difficulty doing exercise
16   and the like with that type of thing.
17       Q.  If it's tougher --
18       A.  It's tougher --
19       Q.  -- it's less resistant to be brittle
20   and break, isn't it?
21       A.  Well, we also -- yes, but we also have
22   to consider based on our -- again, back to our
23   SEM photographs, we also have to consider there
24   appears to be two distinctive layers here,
25   there's a surface layer which is cracking and

39 (Pages 150 to 153)

Golkow Technologies, Inc. - 1.877.370.DEPS

Howard C. Jordi, Ph.D.

Page 154

1    there's an underlying layer which is -- has not
2    yet cracked. So the bulk material could be
3    tougher, while the surface layer is more
4    brittle, at the same time.
5        Q. Okay.
6        A. So I don't know what to make of your
7    term because you're lumping it in the bulk, you
8    know, as the entire fiber. And I'm looking at
9    two fibers, the surface region and then the
10   underlying region, which is not cracked yet.
11       Q. Just to be clear, they are both parts
12   of the same fiber, aren't they?
13       A. They almost look like two separate
14   fibers.
15       Q. Okay.
16       A. And there's publications which
17   indicate the same.
18       Q. Did you cite those papers in your
19   report?
20       A. Yes.
21       Q. Which papers are we talking about now?
22       A. Well, let's see if I can find it for
23   you quick. You'll have to bear were me while I
24   find it.
25          (Witness reviewing document.)

Page 155

1        A. I've got it, I think. This is paper
2    ASIO journal, 1998, Page 199, Mary Celine,
3    "Comparison of in vivo behavior of
4    polyvinylidene fluoride and polypropylene
5    sutures used in vascular surgery."
6          She's discussing stress cracking at
7    this point. She says "The reason for stress
8    cracking phenomenon in oriented polypropylene
9    monofilaments has been explained by their
10   pronounced skin/core structure." Those are two
11   phases I'm talking about.
12       Q. Let me stop you there.
13          What is oriented polypropylene
14   monofilaments? What does that mean?
15       A. It means it's gone through the dye and
16   it's oriented longitudinally. We can see those
17   lines where it's been pulled through the dye, or
18   pushed.
19       Q. Does that suggest a stress cracking
20   phenomenon occurs through the extrusion lines?
21       A. Well, her purpose here is not to talk
22   about that at the moment. It's talking about
23   the bi-component structure.
24       Q. I understand that.
25          But as you read that, does that

Page 156

1    suggest that the stress cracking phenomenon is
2    oriented along the extrusion lines?
3        A. No. It doesn't say one way or the
4    other. It just says "stress cracking phenomenon
5    in oriented." She's just discussing oriented
6    polypropylene. She doesn't say where the cracks
7    are.
8        Q. Okay. I understand. Go ahead.
9        A. "Has been explained by their
10   pronounced skin to core structure. This
11   bi-component structure is created by the
12   differential cooling rates between the external
13   and internal layers of the monofilaments." When
14   it comes out of the dye, the surface cools
15   faster than the inner core. The faster cooling
16   outer surface is going to be less crystalline
17   than the inner core which stays warm longer, has
18   more time to form crystals as it's cooling. So
19   you wind up with two structure types in the
20   filament when you're done.
21       Q. Are you suggesting by this testimony,
22   Doctor, that it's only the outside of the
23   polypropylene mesh that's degrading, and the
24   inside is fine?
25          MR. ANDERSON: Objection.

Page 157

1          Go ahead.
2        A. I'm not suggesting any such thing.
3          I'm suggesting that the outer core is
4    chemically less crystalline, and hence more
5    stress cracking susceptible, than the inner
6    part. The inner part would still be susceptible
7    over time depending on the degree of
8    implantation in the body to oxidation.
9          We have two different things going on
10   at the same time, two layers. There are
11   actually two different kinds of polypropylene,
12   although that wasn't the intent in the
13   manufacture I'm sure, but that's what you wind
14   up with.
15   BY MR. THOMAS:
16       Q. Each of which will require a breakdown
17   in the polymer to degrade as described?
18       A. Each of which --
19       Q. Sorry.
20          Each of which would require a
21   breakdown in the polypropylene in order to
22   degrade as described?
23       A. Right. And the surface layer being
24   less crystalline would also bleed out its
25   antioxidants faster, it's more amorphous, and so

40 (Pages 154 to 157)

Howard C. Jordi, Ph.D.

Page 158

1    it's going to tend to degrade first.  And that's
2    what we invariably see in the SEMs, we see a
3    surface cracking and removal.
4        Q.  In your analysis of these explanted
5    meshes, did you ever see a crack all the way
6    through the mesh?
7        A.  I don't think we did.  But I've read
8    about them in the literature, I just never saw
9    one in the 23 samples we ran, 24 with Batiste.
10       Q.  Do you have any recollection -- strike
11   that.
12           Do you know the greatest crack that
13   you observed in any of the meshes that you
14   reviewed?
15       A.  Do I --
16       Q.  Are you able to point to me the
17   biggest crack on any of the meshes and quantify
18   for me how much that crack is compared to the
19   rest of the mesh?  I don't want -- if you don't
20   know it, I don't want you to go down.
21       A.  There is a range, certainly.
22       Q.  Can you quantify in measurement?
23       A.  Standing here without looking at the
24   pictures, no.
25       Q.  Is there anything about the pictures

Page 159

1    that allows you -- strike that.
2            Did you measure the cracks as a part
3    of your work in this case?
4        A.  No.  Actually the entire surface was
5    cracked in many cases, so the entire surface
6    would simply come off.
7        Q.  Let's go to Page 60 of your report,
8    please.
9            This is the differential scanning
10   calorimetry?
11       A.  Calorimetry.
12       Q.  Calorimetry.  Thank you.  We've talked
13   around this a lot today.
14           Would you tell me exactly what this is
15   and what it measures?
16       A.  DSC is a technique that -- where you
17   put energy into a pan, against a standard pan in
18   the other side, and you measure the rate of heat
19   absorption or dissipation of a sample as the
20   temperature rises or drops.  You can both heat
21   and cool it.
22       Q.  Okay.  And tell me how you set out to
23   measure those things with the DSC methodology?
24       A.  Well, a portion of the sample was put
25   into the tube, into the sample pan, and then the

Page 160

1    temperature was raised in a heat cycle which is
2    listed in Table 4, heating conditions.  First
3    heat we went from minus 90C to 200C at 10
4    degrees C per minute.  Then we cooled from 200
5    back to minus 90 at 10 degrees C per minute.
6    And then we reheated a second heat from minus 90
7    to 210 degrees C per minute.
8            The first heating cycle looks at the
9    form of the material as received.  And then the
10   second heating cycle looks at the innate
11   material itself, heat history of the material
12   erased, so all the samples then go to what's
13   called a common heat history.  They may not all
14   have a common heat history in the first heat
15   cycle, but, of course, that's the way they
16   actually are in the body so that's the most
17   important one to look at is the Delta H and the
18   melting point, the first melting point in the
19   first Delta H.
20       Q.  In Table 5, did you provide data for
21   all of your explant samples?
22       A.  Let's see.  No, there's 15 samples, we
23   had 23.  So there were seven that weren't run.
24       Q.  Is there a reason why you didn't test
25   them all?

Page 161

1            MR. ANDERSON:  Objection.  Asked and
2    answered.
3            Go ahead.
4        A.  I remember we didn't need to run all
5    the samples to show the trends, number one.
6            And number two, some of these cases
7    there simply wasn't enough material to run.
8    BY MR. THOMAS:
9        Q.  Let's go to Page 66, please, the FTIR
10   microscopy.  Let's talk about what FTIR
11   microscopy is.  Tell me what that is, please.
12       A.  An FTIR microscope, FTIR instrument,
13   you radiate the sample with infrared radiation.
14   Each type of chemical bond in a molecule will
15   absorb infrared radiation at a different wave
16   length.  So when you run across a range of wave
17   lengths, typically from 4,000 reciprocal
18   centimeters to 5 or 600 reciprocal centimeters
19   you get a picture, a literal picture, to a
20   chemist anyway, a picture of the bonds in the
21   molecule that you're looking at.
22       Q.  Now, when you do FTIR analysis, do you
23   generally have a reference against which to
24   measure what you find to match up?
25       A.  That's always run with references.  We

41 (Pages 158 to 161)

Golkow Technologies, Inc. - 1.877.370.DEPS

Howard C. Jordi, Ph.D.

Page 162

1    always run -- to make sure the instrument is
2    running fine, usually a polystyrene standard is
3    run to make sure all the bands come out where
4    they should come out. And then CO2 is removed
5    with a nitrogen purge so you don't have an
6    artificial CO2 peak. That's SOP. That's all in
7    the SOP.
8        Q. Okay. Do you then have a
9    polypropylene reference point against which to
10   compare your findings that you shoot here to see
11   how they match up?
12       A. Well, we have polystyrene --
13   polypropylene reference spectra, so -- and we
14   run the standard polypropylene mesh, which is,
15   in fact, pure polypropylene. So we compare
16   that.
17       Number one, the polystyrene shows the
18   instrument is behaving good, up to standard, and
19   then the polypropylene is run, it's compared to
20   a known polypropylene spectrum. So if we were
21   to run the mesh and the peaks looked funny we
22   would have caught that. Although that's never
23   happened, because if the polystyrene standard
24   comes out right, it's telling you the machine is
25   working normally.

Page 163

1        But even if it did for some crazy
2    reason, between the time we ran the standard and
3    the time we ran the polypropylene, we'd
4    immediately flag it because we have
5    polypropylene standard spectra around.
6        Q. Is the goal of running the FTIR to
7    determine the extent to which what you're
8    testing matches up against what you're looking
9    for; that is, particularly here that you're
10   testing the explanted mesh to determine the
11   extent to which it's consistent with the
12   polypropylene that's supposed to be in the mesh?
13       A. Yes.
14       Q. And there are standards against which
15   you measure what your findings are?
16       A. Correct.
17       Q. And there will be a standard -- there
18   are a number of different companies that make
19   standard polypropylene spectra against which you
20   could measure your findings?
21       A. Yes. But we don't need that because
22   we use the spectra, or the known spectra from
23   like Sadtler Library of spectra, I will simply
24   look up what I'm getting versus a known
25   standard, and those two have to match. If they

Page 164

1    don't match I know I've got a problem, and I
2    stop and fix it, we don't continue.
3        Q. Believe it or not, I think we're
4    saying the same thing.
5        A. Hopefully so.
6        Q. I don't use the same words you do.
7        A. If you'd like to see the standard,
8    I've got in my book over there. I'll be glad to
9    show it to you.
10       Q. Which standard did you use, the
11   Sadtler?
12       A. The Sadtler.
13       Q. I don't need to see it.
14       Do you call that a standard? What's
15   the technical term for that?
16       A. No, I call it a check. It is a type
17   of -- it's part of our SOP. But the standard is
18   the polystyrene, it's always run.
19       Q. The Sadtler reference that you talked
20   about --
21       A. Is polypropylene.
22       Q. And it would be the same sort of
23   spectrum that appears on Page 67 of your report?
24       A. Exactly.
25       Q. And you would measure the Sadtler

Page 165

1    standard for polypropylene against what you find
2    to see if it matches what you find?
3        A. That's right. In other words, for
4    isotactic polypropylene, which is what Prolene
5    is, we have 841, 973, 997, and 1166 bands, those
6    are the isotactic bands. It's a fingerprint, we
7    call it, of polypropylene, and particularly of
8    isotactic polypropylene.
9        Q. Do you know of any polypropylene
10   standards that have a spectra for oxidized
11   polypropylene?
12       MR. ANDERSON: Objection.
13       Go ahead.
14       A. I've seen them.
15   BY MR. THOMAS:
16       Q. Did you attempt to -- where did you
17   see them?
18       A. The Sadtler Library. There's a
19   chapter on polypropylenes, and some of them are
20   oxidized and some aren't.
21       Q. Okay. Have you read about FTIR
22   spectra for oxidized polypropylene?
23       A. I've just seen them in the Sadtler
24   Library.
25       Q. Did you consider utilizing spectra for

42 (Pages 162 to 165)

Howard C. Jordi, Ph.D.

Page 166

1    oxidized polypropylene when you conducted your
2    FTIR analysis in Lewis and Batiste?
3        A.   No.  I used more of the literature,
4    the Clavés, the Ostergards, and Wood, the
5    current Wood paper and others.  They all run
6    infrared of polypropylene.
7        Q.   Why didn't you use the standards which
8    have oxidized polypropylene against which to
9    measure your findings?
10       A.   Well, those were -- those were bulk
11   polypropylenes, this is fiber.  So I didn't
12   really have any fiber standard spectra to use
13   anyway.  So I guess I could have used them,
14   wouldn't have hurt, wouldn't have made any
15   difference, I don't think.
16       Q.   Why not?
17       A.   Because I already had them from the
18   other literature.
19       Q.   But you are measuring something
20   different with oxidized polypropylene than you
21   are with regular polypropylene by your own
22   definition, correct?
23       A.   Right.  As shown in the literature I
24   already have.
25       Q.   The literature you're talking about is

Page 167

1    Clavé?
2        A.   Yeah, Clavé and there's others.  Wood
3    is another one, that's 2013.
4        Q.   Is that contained in your report?
5            MR. ANDERSON:  Yes.
6        I think so.
7    BY MR. THOMAS:
8        Q.   May I see that, please?
9        A.   Sure.  If you want, I'll make you a
10   copy.
11       Q.   We'll take care of that later.
12           Just for the record, this is the
13   Journal of Material Science, 2013, 24:1113-1122,
14   A.J. Wood, "Materials Characterization,
15   Historical Analysis of Explanted" -- I've seen
16   this before -- "Polypropylene PTFE and PET
17   Hernia Meshes."
18           You're referring to the FTIR spectra
19   on Page 1117, is that correct?
20       A.   Yes, sir.
21       Q.   And 1118?
22       A.   Yes, that's part of the paper.
23       Q.   So you relied on this rather than the
24   standards in Sadtler or others that may have
25   FTIR spectra for oxidized polypropylene,

Page 168

1    correct?
2            MR. ANDERSON:  Objection.  Form.
3        Go ahead.
4        A.   I certainly could have used those.  I
5    don't see it makes any difference.  I'm using
6    published literature, recent published
7    literature here, so I feel very safe.  I mean I
8    could have used the Sadtler Library, sure.
9    BY MR. THOMAS:
10       Q.   Well, if the Sadtler Library gave you
11   a different result, you'd be concerned, wouldn't
12   you?
13       A.   But it's not going to.  I'm confident
14   sitting here it's not going to give me a
15   different result.  I'll go get the spectra and
16   show you, glad to.
17       Q.   The range of absorption regions
18   identified by you as being indicative of
19   oxidation are 1730 to 1680, is that correct?
20       A.   Right.  That would include acids
21   around 1700, ketones around 16 -- 1710, 15, and
22   then aldehydes around 1730, esters around 1740.
23       Q.   Do you have anything -- did you find
24   anything in your FTIR analysis of evidence of
25   oxidation in the range of 1730 to 1680?

Page 169

1        A.   It was covered up by the protein that
2    was in the coating, or part of -- I guess you
3    could say coating the fiber pieces.
4        Q.   So is the answer no?
5        A.   The answer is no.
6        Q.   Now, when you run these FTIR samples,
7    you set the machine, the machine reads it, and
8    then the machine is what identifies those areas
9    that are significant and calls them out with
10   numbers, is that right?
11       A.   The frequencies of each band, yes, the
12   machine calls out, yes.
13       Q.   The frequencies of each band?
14       A.   Yes.
15       Q.   So the numbers that appear, for
16   example, on Page 69, along with the spectra
17   there, those numbers are placed there by the
18   machine based upon your calibration of the
19   machine about what's significant.  Is that fair?
20       A.   Well, it's simply identifying -- the
21   machine identifies the peaks and labels the
22   numbers.  I have to interpret what it means.
23           We also have -- the computer these
24   days can make estimates and look for matches,
25   too.

43 (Pages 166 to 169)

Howard C. Jordi, Ph.D.

Page 170

1    Q.  Okay.  On Page 69, you've identified
2  this area at 1757 as being significant, is that
3  right?
4    A.  Right.  There's also another region
5  I'd like to mention, it's a little bit subtle,
6  is that shoulder that's at the base of the 1656
7  peak, towards the left side of it, that would be
8  the 1740.  The machine didn't pull it out
9  because there's not a baseline, not a valley in
10  there for it to see.  The machine requires a
11  valley to see.  But the human eye can see it.
12    Q.  I see.
13       So that shoulder is something --
14    A.  That's the 1740.
15    Q.  -- that the machine didn't find, but
16  you find?
17    A.  Right.  The human brain can still be a
18  machine occasionally.
19    Q.  I see.
20    A.  And if I had taken this sample and
21  treated it with sodium hypochlorite, for
22  example, then we would have gotten rid of the
23  1656 and the 1541 bands, which are the protein
24  bands, because we have destroyed the protein or
25  the biofilm that was part of the particle or

Page 171

1  coating the particle, the bulk of which was
2  polypropylene.  And then I would have seen only
3  polypropylene, what's left.
4       This figure that's shown here
5  represents -- keep in mind the carbonyl bands
6  are much stronger than alkyl bands.  So the fact
7  that they're roughly the same size suggests to
8  me that this material, as I'm looking at it
9  here, is about 75 percent polypropylene and
10  25 percent protein, thereabouts, plus or minus a
11  little.  And it's oxidized, because I have the
12  1740 and the 1757.  And there may be 1730 and
13  a 1715 that I can't see because it's buried
14  under the 1656 band, which I could see if in the
15  future we choose to do any more -- like sodium
16  hypochlorite.
17    Q.  Page 72.  "Molecular weight is often a
18  crucial factor in determining material
19  properties."
20       Did I read that correctly?
21    A.  Yes, you do.
22    Q.  What is molecular weight?
23    A.  It's really a measure of the number of
24  repeat units in a given polymer molecule.
25  Monomer is the starting material, usually a

Page 172

1  liquid or gas, in the case of polypropylene, and
2  then as they monitor units, fuse together, the
3  chains become longer and longer, and then you
4  have eventually a polymer -- generally the start
5  of what we call a polymers around, it's a bit of
6  a range, but we generally consider anything
7  above 2000-ish molecular weight of daltons to be
8  a polymer, albeit a very low molecular weight
9  polymer.  Most commercial polymers are hundreds
10  of thousands to millions.
11    Q.  Of what significance to molecular
12  weight is a breakdown of the polypropylene
13  polymer, a change in the polypropylene polymer,
14  will it change the molecular weight?
15       MR. ANDERSON:  Objection to form.
16       Go ahead.
17    A.  I'm sorry, can I rehear it again?
18  BY MR. THOMAS:
19    Q.  The polypropylene polymer is broken,
20  the chain is broken.
21    A.  Okay.
22    Q.  Will that change the molecular weight?
23    A.  It will lower it.
24    Q.  Page 80.  After doing your analysis,
25  you conclude in your scientific opinion that

Page 173

1  "The control and explant samples do not show a
2  significant difference in molecular weight."
3       Correct?
4    A.  That's correct.
5    Q.  Doesn't that mean that there's no
6  evidence in your molecular weight analysis that
7  polypropylene is degrading?
8    A.  It might seem so at first
9  consideration.  But remember, the only part of
10  the polymer that seems to be degrading based on
11  the SEM photos is the surface.
12       So GPC is a bulk technique, I had to
13  dissolve the inside undamaged region as well as
14  the broken pieces, but I get one sample.  The
15  total mixture dissolved.
16       So number one, the effect of the
17  damaged surface -- my point here is I think if
18  we could measure the surface we would see a loss
19  in molecular weight, but I had no way to get
20  enough pieces to measure the molecular weight of
21  only the surface pieces like I did for the
22  infrared spectra.
23    Q.  Aren't you speculating what you find?
24    A.  I am.
25    Q.  Until you have the opportunity to test

44 (Pages 170 to 173)

Howard C. Jordi, Ph.D.

Page 174

1    as you've described, the fact that your
2    molecular weight testing does not show a
3    significant difference in molecular weight
4    suggests that there's no degradation of the
5    polypropylene. That's the best scientific
6    conclusion you can reach in this data, isn't
7    that true?
8        A. It's one of the conclusions, yes.
9        Q. It's --
10       A. It's not the only one.
11       Q. It's fair to say -- okay.
12           Now, has Jordi Labs analyzed
13   polypropylene mesh for other manufacturers?
14       A. I don't run the day-to-day operations
15   anymore, so I would have no way to answer that
16   question. I don't know what has come in.
17       Q. Do you know?
18       A. I do not know.
19       Q. Do you know whether Jordi Labs
20   analyzed Bard mesh that was at issue in the West
21   Virginia litigation?
22       A. I don't know.
23       Q. Do you know whether Bard mesh has
24   antioxidants in it?
25       A. I haven't been requested to analyze,

Page 175

1    so I don't know.
2        Q. Do you know whether Bard mesh loses
3    its molecular weight upon testing?
4        A. I haven't seen the Bard mesh, so no.
5        Q. You've not seen the work that Jordi
6    Labs did for Plaintiffs in the Bard litigation
7    where they -- where Jordi Labs, your company,
8    testified the Bard mesh without antioxidants had
9    showed a loss in molecular weight, is that true?
10           MR. ANDERSON: Objection to form.
11   Assumes facts not in evidence.
12       A. Say the same?
13   BY MR. THOMAS:
14       Q. You've not seen the work that Jordi
15   Labs did for Plaintiffs in the Bard litigation
16   where they, where Jordi Labs, your company,
17   testified the Bard mesh without antioxidants
18   showed a loss in molecular weight?
19           MR. ANDERSON: Same objections.
20       A. I'm unaware. I don't know.
21           MR. THOMAS: Are you saying it didn't
22   happen?
23           MR. ANDERSON: I'm saying the way you
24   asked this question, the way you posited it as
25   something that's true rather than asking him if

Page 176

1    he knows it is an inappropriate form of a
2    question.
3            MR. THOMAS: Okay.
4            MR. ANDERSON: If you think somebody
5    from Jordi Labs testified there, then I think
6    that would differ from reality.
7            MR. THOMAS: I wasn't talking about
8    Jordi Labs testifying.
9            MR. ANDERSON: That's what it says.
10           MR. THOMAS: Got you.
11   BY MR. THOMAS:
12       Q. Dr. Jordi, are you aware that Jordi
13   Labs conducted analysis on Bard mesh for use by
14   the Plaintiffs in the Bard mesh litigation?
15           MR. ANDERSON: Objection. Asked and
16   answered.
17       A. I am not.
18   BY MR. THOMAS:
19       Q. If Jordi Labs had analyzed
20   polypropylene mesh used for pelvic floor
21   implants and found a loss of molecular weight in
22   that mesh, would that be relevant to your
23   opinions in this case?
24           MR. ANDERSON: Objection.
25           Go ahead.

Page 177

1        A. I don't have enough information from
2    just that question to answer it. I'd have to
3    know what the antioxidants were, what the levels
4    were, and so on.
5    BY MR. THOMAS:
6        Q. Okay. Are you suggesting by your
7    testimony in this case that the polypropylene in
8    the Ethicon mesh depolymerizes?
9        A. In the Ethicon mesh?
10       Q. Yes.
11       A. It obviously hasn't depolymerized if
12   the molecular weight is the same.
13       Q. So you're not testifying that it's
14   depolymerized?
15           MR. ANDERSON: Objection.
16       A. No. What I think is going on is two
17   effects. I think we have an oxidative
18   phenomenon, which I can show you in my report --
19   I have the report in here somewhere. I can find
20   it quick.
21           (Witness reviewing document.)
22       A. Page 6, it's possible to have -- R
23   prime is the radical form of polypropylene. So
24   if you get two radical polypropylene molecules
25   that physically couple, that will double the

45 (Pages 174 to 177)

Howard C. Jordi, Ph.D.

Page 178

1    molecular weight initially.  It's degradation,
2    but it's actually going to increase the
3    molecular weight.  At the same time we've got
4    beta scission going on, which is decreasing
5    molecular weight.  And initially the two effects
6    can more or less cancel out, and you don't see a
7    net change.
8           Eventually yes, it will depolymerize,
9    but apparently this material hasn't gone that
10   far.
11   BY MR. THOMAS:
12      Q.  It's the same across every sample that
13   you tested?
14      A.  Yes, in this case, in this particular
15   set of samples it was.
16      Q.  And it's the same with the Burkley
17   seven year dog study?
18      A.  Yes.  That's what Dan Burkley said,
19   yes.
20      Q.  Every time you've tested the molecular
21   weight of Ethicon's mesh or gone back and
22   retested the molecular weight of Ethicon's mesh,
23   the molecular weight hasn't changed in a
24   significant manner?
25      A.  No, we don't see it -- it's true, we

Page 179

1    do not see a --
2       Q.  As a matter of fact, there's never
3    been a time where you've analyzed Ethicon mesh
4    used in these TVT products that shows a change
5    in molecular weight?
6           MR. ANDERSON:  Objection.  Asked and
7    answered.
8           But answer it again.
9       A.  That's true.  That's correct.
10   BY MR. THOMAS:
11      Q.  Dr. Jordi, during lunch I was provided
12   with invoices from your office to Mr. Anderson.
13   I'll read these into the record, if you don't
14   mind.
15      A.  That's fine.
16      Q.  Do you want me to do it so you can see
17   so I do it right?
18          MR. ANDERSON:  What are you trying to
19   point out, just amounts?
20          MR. THOMAS:  Just the dates and
21   amounts.
22   BY MR. THOMAS:
23      Q.  On August the 12th, 2013, invoice
24   7783, for $11,250.
25          August the 28th, 2013, invoice number

Page 180

1    7846, amount of $5,000.
2           Invoice number 7881 on September 11,
3    2013, in the amount of $100,418.74.
4           Invoice number 7882 dated
5    September 11, 2013, in the amount of $13,980.42.
6           Invoice 7883, dated September 11,
7    2013, in the amount of $203,470.
8           Invoice number 7918 dated
9    September 23rd, 2013, in the amount of $45,375.
10          Invoice number 7882 dated
11   September 11, 2013, in the amount of $13,980.42.
12          Invoice number 7884 dated
13   September 11, 2013, in the amount of $6,122.94.
14          Invoice number 7984 dated October
15   the 10th, 2013, in the amount of $28,130.
16          And invoice number 8035 dated
17   October 28, 2013, in the amount of $28,876.05.
18      Q.  To the best of your knowledge, is that
19   the total of the billing that you've made in
20   connection with your work in this case?
21      A.  To this point, yes.  There's no other
22   bills.  I'm sure there will be another one
23   coming.
24      Q.  Obviously in your work in this case
25   you've analyzed a number of different explant

Page 181

1    samples?
2       A.  Correct.  23; 24 with Batiste.
3       Q.  Are you able to tell from these
4    invoices the extent to which your work has
5    focused on the Carolyn Lewis case, or is all of
6    this for the Carolyn Lewis case?
7           MR. ANDERSON:  I'm not sure I
8    understand the question.  It could be more legal
9    in nature, so due to that I will object.
10   BY MR. THOMAS:
11      Q.  Are you able to look at these bills
12   and tell me the extent to which you worked on
13   the Lewis specific matter, for example, perhaps
14   the time when you received the Lewis explant
15   separate and apart from the others that you
16   analyzed, and determine the cost that you
17   incurred in analyzing the Lewis explant?  I
18   don't know if you can or not.
19          MR. ANDERSON:  I'm just going to
20   object to the form, because I think you've mixed
21   two different things.  One is you're asking how
22   much of the work was case specific, and he's a
23   general expert as well as looking at the
24   specific matter of Ms. Lewis.
25          So if you want us to look at the bill

46 (Pages 178 to 181)

Howard C. Jordi, Ph.D.

Page 182

1  and see just how much the cost was of the
2  testing and the analysis for just Lewis, we will
3  try to do that.  But to mix that up and to say
4  how much of the cost related to just Ms. Lewis,
5  as you know at the trial he's going to be
6  talking about all of these things.
7      So I just want to make sure we're on
8  the same page and that's clear, because your
9  question was not.
10     MR. THOMAS:  Thank you.  I thought my
11 question was clear, but that's good.
12 BY MR. THOMAS:
13     Q.  Can you tell me the extent to which --
14     MR. ANDERSON:  We agree to disagree.
15     MR. THOMAS:  I understand.  I'm going
16 to try to ask the question better now.
17 BY MR. THOMAS:
18     Q.  Can you look at these invoices,
19 Dr. Jordi, and tell me about the Lewis specific
20 analysis that you did, and the cost of that?
21     MR. ANDERSON:  We'd have to get more
22 material to be able to do that.  We tried to
23 bring everything in here to be able to do that,
24 we've got lab notebooks to when those days would
25 be as opposed to the billing.  The problem is

Page 183

1  the billing is through a time period, so we'd
2  have to try to look and match up the time period
3  in the lab notebook to when it was received with
4  the time period on the invoice.  We're happy to
5  take the time to try to do that.
6      MR. THOMAS:  I'd like to use my time
7  better than that.
8      I'm going to mark these invoices
9  collectively as Exhibit Number 5.
10     MR. ANDERSON:  Sure.
11     (Whereupon, Jordi Exhibit Number 5,
12     Group of invoices from Jordi Labs, was
13     marked for identification.)
14 BY MR. THOMAS:
15     Q.  Dr. Jordi, what are your opinions with
16 respect to the mesh explant of Carolyn Lewis?
17 If you're going to your report, tell me where
18 you're going, please.
19     A.  As soon as I get there and find
20 something, I will.
21     Page 71.  So that's the infrared, one
22 of the shards from Carolyn Lewis.  Sample 13674
23 showing carbonyl band highlighted there in
24 yellow.
25     There's a second shoulder you can see

Page 184

1  there next to it.  That would be the 1740.
2      Q.  Let's go one at a time.
3      The first one you said a minute ago,
4  the carbonyl band where?
5      A.  Around 1759.  Some of these, there's
6  no valley there, so the machine didn't actually
7  label it.  If you go to the next page, 72, it's
8  very similar, you'll see there it does have a
9  slight valley, so the machine calls it 1761.  I
10 think we showed another one that was 1757.  It's
11 in that region, all of them.
12     Q.  Is there any discussion in your report
13 anywhere, specifically text, about your findings
14 with respect to Carolyn Lewis?
15     MR. ANDERSON:  You mean in one place?
16     MR. THOMAS:  Anywhere.
17 BY MR. THOMAS:
18     Q.  About "this is what I find wrong with
19 Carolyn Lewis based on this analysis."
20     MR. ANDERSON:  He's pointing to one
21 right now.  I don't understand.
22     MR. THOMAS:  I understand that, Ben.
23 BY MR. THOMAS:
24     Q.  Do you explain anywhere --
25     A.  I explain the principles in the

Page 185

1  conclusions.  It applies to all the explanted
2  samples, including Carolyn Lewis, but not
3  specifically Carolyn Lewis.
4      Q.  Okay.  So there are no specific
5  opinions in your report that relate to Carolyn
6  Lewis, is that fair?
7      MR. ANDERSON:  Objection to form.
8      THE WITNESS:  Answer?
9      MR. ANDERSON:  You can answer.
10     A.  Not that I -- no.
11 BY MR. THOMAS:
12     Q.  Okay.  So it's correct that there are
13 no specific opinions to Carolyn Lewis in your
14 report, correct?
15     MR. ANDERSON:  Objection.
16     A.  Well, there are.
17     MR. ANDERSON:  That's unfair.
18     Go ahead.
19     A.  There are, because it's the photos.
20 You want it text, but it's in the presence of
21 the printed results.
22 BY MR. THOMAS:
23     Q.  Okay.  But you don't describe anywhere
24 in your report what, for example, Figure 81
25 means to you in your interpretation, correct?

47 (Pages 182 to 185)

Howard C. Jordi, Ph.D.

Page 186

1     A.  I describe in general what all these
2  figures like this mean.  So if it's a carbonyl
3  for Carolyn Lewis, or it's a carbonyl for any of
4  the other explants, it's the same meaning.
5     Q.  I see.
6        So when you point out this shoulder on
7  Page 71 in Figure 81 that's not marked in any
8  way, that's something that you see on the
9  drawing, that you're the one who identifies that
10 and can only testify to that because you can see
11 it; fair?
12       MR. ANDERSON:  Objection to the form
13 of the question.
14       Go ahead.
15    A.  Well, due to my experience reading
16 FTIRs, yes, I can see it.  Anyone else with
17 equivalent experience would see it, too.
18 BY MR. THOMAS:
19    Q.  Well, I'm lawyer and a history major,
20 would you expect me to be able to figure that
21 out?
22       MR. ANDERSON:  No comment.
23    A.  No comment.
24 BY MR. THOMAS:
25    Q.  Okay.  Certainly not apparent to

Page 187

1  somebody without your training as to what is
2  shown in Figure 81.  Would you agree with that?
3     A.  Without training, none of us could
4  read an infrared.  We all have to learn it.
5     Q.  What else do you have specific in your
6  report to Carolyn Lewis?
7     A.  Well, see if I can find the SEM and
8  the SEM-EDX.  See if we can find the SEM.  We
9  can just work our way through.
10       Page 48 is the SEM.
11    Q.  Okay.  Let's stop there.
12       On Page 48 you have Figure 59, and
13 that's -- what does that represent?
14    A.  That's the tissue with the mesh
15 imbedded in the tissue.
16    Q.  Okay.
17    A.  And then the picture 60 is of the
18 actual region that they were -- we were able to
19 get -- I was able to get a photo micrograph of
20 the fiber.
21    Q.  Do you know which part of Figure 59 is
22 depicted in Figure 60?
23    A.  No, not specifically.
24    Q.  What is it about Figure 60 that
25 suggests to you that there's degradation in the

Page 188

1  Carolyn Lewis mesh?
2     A.  The cracking.
3     Q.  That's the perpendicular cracking?
4     A.  The perpendicular cracking.  And then
5  we also have a parallel flaking which you can
6  see at the top, at the bend where it goes --
7  particles getting ready to come off.  And
8  there's also tissue on top of that.
9     Q.  Now, is this the portion of the mesh
10 that you tested with FTIR analysis?
11    A.  It is not.
12    Q.  Okay.
13    A.  Remember, we didn't want to cause any
14 stress or strain on these meshes, so we simply
15 sent it imbedded in tissue.  For the IR you must
16 remove the tissue in order to get the spectrum.
17    Q.  Okay.  What else do you have for
18 Carolyn Lewis:
19    A.  Okay.  SEM-EDX, let's find that chart.
20 58, Page 58.
21    Q.  On Figure 71, you have -- is that a
22 different image still than the one that was on
23 48?
24    A.  Yeah.  It is, yes.
25    Q.  All right.  And the J8041 means what?

Page 189

1     A.  That's the job number.
2     Q.  Okay.
3     A.  13674 is sample number.
4     Q.  And what does this show you?
5     A.  The boxes are the regions that were
6  tested.  So like Spectrum 3, if you go down to
7  the -- you can see the pink box at the top for
8  Spectrum 3, right?  Now, if you go down below
9  you'll see in yellow Spectrum 3, upper right
10 corner of the bottom box.
11       Do you see that?
12    Q.  Yes.
13    A.  That's just telling you that the
14 yellow spectrum is this region of the specimen,
15 region 3.  And so you'll see you have a peak, a
16 fairly large peak for oxygen, a huge peak for
17 carbon, sodium, aluminum which is just a sample
18 pan that doesn't mean anything, phosphorus and
19 sulfur are at fairly large peaks on this region
20 of the spectrum.
21       Now, that's the cracked region, and
22 has a large amount of oxygen.  But we also
23 thought that the cracked region also, well,
24 uniformly showed higher oxygen levels, but it
25 also showed higher, many times, phosphorus and

48 (Pages 186 to 189)

Howard C. Jordi, Ph.D.

Page 190

1  sulfur levels. So that could mean phosphate and
2  sulfate which also contain oxygen, so the
3  increased oxygen in that region could have been
4  from buffers as well as just literally the
5  oxidation type oxygen.
6       So you want to go to region of the
7  polymer that wasn't cracked, there's Spectrum 4.
8  And that is the red one. It's hard to read in
9  in the picture but it's -- the red is Spectrum 4.
10 Now you see -- you still see an oxygen peak,
11 although it's lower in the Spectrum 3, but now
12 the sodium is almost totally gone, and the
13 phosphorus and sulfur are basically gone
14 completely.
15      So what this is telling me is even in
16 the non-cracked region, I have a higher than
17 baseline level of oxygen. If you want to see
18 that in another --
19      Q. Before you do that, may I ask you
20 another question?
21      A. Sure.
22      Q. I don't want to interrupt you.
23      A. Go ahead.
24      Q. Spectrum 4 shown in red, are you
25 suggesting that what you're testing in Spectrum

Page 191

1  4 is pure polypropylene?
2       A. Yes.
3       Q. Okay. Without any kind of
4  contamination at all?
5       A. We got away from the -- you can see
6  this white material here, which would be the
7  polypropylene -- which would be tissue.
8       Q. Okay.
9       A. Which you might call biofilm. We'll
10 have to agree to disagree or agree to agree and
11 use both terms interchangeably. So I wanted to
12 get away from that as much as possible, so we
13 ran a cleaner spectra -- cleaner region that
14 didn't have cracks in it.
15      Now, when I look at this, I see this
16 cracked material in many places is flaked off.
17 You can see the edge over here on the right
18 where the piece has actually come off and it's
19 gone. You can see the edge where it was. And
20 the same is true on the other side. But on this
21 left side of it, it's clean. And then left of
22 it up there's really nothing but straight --
23 pretty much straight clean-ish polypropylene.
24 So we ran a spectrum of that, and we still saw
25 increased oxygen. But no increased phosphorus

Page 192

1  or sulphur. That is the increased oxygen that I
2  call oxidation.
3       Q. Okay. Again, so Spectrum 3 is meant
4  to be testing the oxidized polypropylene,
5  correct?
6       A. Right. That's why we ran it there
7  first.
8       Q. Spectrum 4 is designed to testify --
9  excuse me.
10      Spectrum 4 is designed to test what
11 you believe to be clean polypropylene?
12      A. Let's phrase it this way.
13      Not yet degraded. Not yet cracked.
14 But I didn't know whether -- if it has increased
15 oxygen in it, that means it's on its way to
16 cracking.
17      What I believe is happening is layer
18 after layer after layer of this stuff is going
19 to crack depending on the implantation time.
20 The first layer is going to go quickest because
21 it's -- remember the outer layer is less
22 crystalline, remember the paper I showed you
23 earlier, and so it's going to go first. And
24 when it peels off, as some of it's flaked off
25 here, then we expose more underlying fresh

Page 193

1  surface, which then begins to itself oxidize as
2  reflected in the increased oxygen even in that
3  region, which is the red peak for oxygen.
4       Q. What is Spectrum 2?
5       A. We just didn't show it.
6       Q. Did you run the data?
7       A. Yeah, I could show it. I could get
8  it. I don't have it with me.
9       Q. It's not in your report?
10      A. It might be. Do you want to see if I
11 can find it?
12      Q. Just curious, yes.
13      A. Glad to try. If we don't have it, we
14 certainly can get it.
15      Q. It won't be in the controls, will it?
16      A. That doesn't mean anything, because
17 I've got -- this is LCMS. It's not in exact.
18      Here we go. Now I've got --
19      (Witness reviewing document.)
20      MR. ANDERSON: We'll go off the record
21 while we're looking. Is that okay with you,
22 Dave?
23      MR. THOMAS: Yes.
24      (Off the record discussion.)
25      (Whereupon, a recess was taken from

49 (Pages 190 to 193)

Howard C. Jordi, Ph.D.

Page 194

1          2:47 p.m. to 2:53 p.m.)
2      A.  He's got a box on the Spectrum 2 so
3  I'm almost sure it's run, so we'll just have --
4  if you want that spectrum, I don't see it in
5  the -- number one, the reason it's not there is
6  because it's also on a cracked region just like
7  Spectrum 3 is, so what it's going to look like
8  is the higher -- the one in yellow, it's just a
9  duplicate of the one in yellow.
10 BY MR. THOMAS:
11     Q.  I understand, Doctor.  So for reasons
12 I'm sure you understand, I'd like to have a copy
13 of it.
14         MR. ANDERSON:  Yes.
15 BY MR. THOMAS:
16     Q.  Just so the record is clear, you've
17 searched your files that you brought with you --
18     A.  I can't find it.
19     Q.  -- and you're unable to find the
20 Spectrum 2 data that appears on Page 58 of
21 Exhibit 1?
22         MR. ANDERSON:  Is that correct?
23     A.  That's correct.
24 BY MR. THOMAS:
25     Q.  Thank you.

Page 195

1          Okay.  We were talking about evidence
2  that you had specific to Carolyn Lewis.
3      A.  So the net result here is that we have
4  oxygen in the clean looking, undegraded looking
5  region of the fiber that's under the cracked
6  region suggesting that it's beginning to oxidize
7  as well, but it's not enough yet that it's
8  actually cracked.
9      Q.  Okay.
10     A.  So we'll go to DSC.
11         Okay.  So the first thing you do is
12 look at Table 5, then look at the heat effusion.
13 First heat is 69.77 joules per gram.
14         Do you see that?
15     Q.  No.
16     A.  Table 5, last entry in the table,
17 under heat effusion for TM.
18     Q.  What page are you on?
19     A.  Page 63.
20     Q.  I'm sorry, I was on 62.
21     A.  Go up.  First table, Table 5.
22     Q.  Okay.
23     A.  Last line of that table, and then the
24 middle entry is 69.77.
25     Q.  I have that.  That's on Page 63 at the

Page 196

1  bottom of Table 5 for sample ID number 13674.
2      A.  Correct.  So -- and now we compare
3  that with the first heat effusion for the
4  control samples, you can see that they range
5  from 93, 79, 82, 86.  Table 7 probably says it
6  best.  We do -- for the samples, we had a couple
7  samples that didn't show any cracking on the
8  average of -- FLP for those samples was 86.6
9  kilograms per gram -- or joules per gram, sorry.
10 And moderate cracking at 81.2, and highly
11 cracked at 75.1.  We are at 69.77, so
12 we're in that highly cracked region in terms of
13 this measurement.
14     Q.  Does this DSC testing that you did,
15 which you used to suggest that this is evidence
16 of oxidation, does this also capture the extent
17 to which there are any impurities in the sample?
18     A.  I would say, number one, it doesn't
19 necessarily correlate with oxidation, although
20 it could.  But it also correlates with possible
21 stress cracking.
22     Q.  Okay.
23     A.  Because there's less crystallinity.
24     Q.  Let me ask this question again.
25         You are using this DSC data to suggest

Page 197

1  that the lower melting point reflects either
2  oxidation or stress -- environmental stress
3  cracking.  Does it also capture any impurities
4  that may have been in the sample?
5      A.  If there were impurities in the
6  sample, they would also tend to lower the melt
7  point.
8      Q.  Okay.  Are you able to tell from this
9  DSC testing the extent to which the values
10 reflect oxidation, environmental stress
11 cracking, as opposed to impurities?
12     A.  No.
13     Q.  All right.  Now, what is it about
14 Ms. Lewis's values that suggest to you that
15 there's oxidation or environmental stress
16 cracking going on?
17     A.  The value of her heat effusion is very
18 low, 69.77.
19     Q.  And you're unable to tell me the
20 extent to which that is oxidation and
21 environmental stress cracking as opposed to
22 impurities?
23     A.  Well, I don't think -- we're not
24 talking about oxidation, we're talking about
25 environmental stress cracking.  They're two

50 (Pages 194 to 197)

Howard C. Jordi, Ph.D.

Page 198

1  different, totally different mechanisms for
2  degradation of the polymer.  Both are
3  degradation, but one is physical mechanical
4  degradation where the chains are forced to part
5  and they crack, and the other is actual literal
6  oxidation.  They're different.
7       Q.  Let me ask the question different,
8  because that wasn't what I was trying to get at.
9       It's fair to say you don't know the
10  extent to which impurities in the test sample
11  may have contributed to the low heat effusion
12  values for Carolyn Lewis as reflected on Table 5
13  on Page 63, correct?
14       A.  Correct.
15       Q.  Thank you.
16       What else do you have for Ms. Lewis?
17       A.  FTIR.  Page 71, Figure 81, Figure 82.
18  We have, again, the carbonyl that are on 1760
19  and another one around -- the shoulder is about
20  1740, that's under that large 1653 amide 1 band.
21       Q.  Okay.  Let me stop you here for a
22  second.
23       Figure 81 says "Microscopy images
24  showing particles recovered from explant sample
25  13674 (particle 1)."

Page 199

1       How many particles did you remove from
2  Ms. Lewis's explant?
3       A.  Didn't count them.  Lots.  The surface
4  sluffs off.
5       Q.  Did you analyze any others?  This is
6  noted as particle 1.  That suggests to me that
7  there are others that are identified?
8       A.  Right.
9       No.
10       Q.  No what?  No, you don't know, or no --
11       A.  No, it wasn't the only one analyzed.
12       Q.  Do you still have the others?
13       A.  I don't know.  I have to check.
14       Q.  Was it your practice to keep those
15  things following an experiment like this?
16       A.  If there was anything to keep, yes.
17  It was very, very minimal samples here.
18       Q.  Are you able to tell me how many
19  particles there are --
20       A.  No.
21       Q.  -- from Ms. Lewis's sample?
22       A.  I'm not.
23       Q.  Anything else from Ms. Lewis?
24       (Witness reviewing document.)
25       A.  The amount of lauryl thiodipropionate,

Page 200

1  Table 18, Page 92.  The control samples showed
2  anywhere from 71 million counts to 92 million
3  counts.  In this case, we also ran formalin
4  treated control samples which showed levels that
5  were right in the middle of the controls, some
6  were higher, some were lower, fit the normal
7  range for controls, indicating formalin didn't
8  extract the lauryl thiodipropionate.
9       So the level for Ms. Lewis was 611,000
10  compared to 80 million, so it's about in the 2
11  percent range left for the lauryl
12  thiodipropionate antioxidant compared to the
13  controls, and the formalin controls.
14       Q.  Okay.  Let's talk about Page 92 for a
15  minute.
16       Here you have control samples again?
17       A.  Right.
18       Q.  Why do you do a duplicate control like
19  you do on 3422128?  Do you have do that as a
20  test?
21       A.  Yes.  A test to see how reproducible
22  the material itself might be.
23       Q.  Okay.  Or how reliable your test might
24  be?
25       A.  Well, I suppose that's another way to

Page 201

1  look at it.
2       Q.  And --
3       A.  But we ran standards, and we get the
4  same -- we make the injection standards twice,
5  we get the same area, so that's not --
6       Q.  My point again is that for control
7  sample 3422128, you've got 71,633,460, and then
8  you test exactly the same mesh in a different
9  place in the mesh in the duplicate control and
10  you get 96 thousand 522 --
11       A.  96 million, yes.
12       Q.  Thank you.
13       -- 96,522,909, which is about
14  40 percent more than your other control.
15       A.  We could be extracting regions of the
16  mesh that have flaked off the polypropylene that
17  we see flaked off in the IR, and what we're
18  extracting here is a residual, call it clean
19  mesh.
20       Q.  You don't know why there's a
21  40 percent difference in the test of the same
22  mesh?
23       A.  No.  But I would suspect there's a
24  change in the mesh, either because the mesh
25  itself isn't uniform, or because maybe it's

51 (Pages 198 to 201)

Howard C. Jordi, Ph.D.

Page 202

1  because the polypropylene, the cracked
2  polypropylene is gone in that region at that
3  point, and we are just extracting the enriched
4  area only.
5      Q.  Okay.
6      A.  I think that would easily account for
7  that difference.
8      Q.  But do you have a scientific
9  explanation for the reasons why the same piece
10  of mesh tests differently by some 28 million
11  DAs?
12          MR. ANDERSON:  Other than what he just
13  testified to?
14  BY MR. THOMAS:
15      Q.  Scientific explanations or reasonable
16  scientific certainty, do you have the answer to
17  the question?
18      A.  I think I just gave it, my estimate of
19  the --
20      Q.  Is that your opinion to a reasonable
21  degree of scientific certainty what happened, or
22  are you just positing it as something you need
23  to test?
24      A.  I think it's reasonable, yes.
25      Q.  Reasonable degree of scientific

Page 203

1  certainty, is that the answer to the problem?
2      A.  Yes.  I think it's reasonable degree
3  of scientific certainty with this one.  Because
4  we didn't extract -- the formalin didn't do
5  anything to the polymer in this case, showing me
6  it's not coming out of the polymer -- at least
7  the formalin isn't able to extract it out of the
8  polymer because you're right in the heart of the
9  average.
10      Q.  Well, if you look at 3405405, the
11  control is 79, and the formalin control is 10
12  million less, isn't it?  And the same with
13  3422128, you've got 96,522,000, and the control
14  was 17 million less, isn't it?
15      A.  Do you have any idea, though, what --
16  how the ratios are working out here?  You're
17  talking about a 20 percent change down here, and
18  I'm talking about a 100-fold change up above.
19      Q.  I know that.
20      A.  It's irrelevant.
21      Q.  Except we don't know how long these
22  mesh explants were in formalin, do we?
23      A.  We put these other ones in formalin
24  and nothing happened.
25      Q.  For two days, right?

Page 204

1      A.  True.
2      Q.  Okay.  Anything else on Carolyn Lewis?
3      A.  I think we've pretty well covered it.
4          I think I can show you -- well, one
5  other thing that might be of interest if we look
6  at Table -- go back and look at that table for a
7  minute longer, and just pick arbitrarily 13411,
8  it has 12 million area counts for --
9      Q.  What page are you on, please?
10      A.  Same page, 92.
11      Q.  I put mine away.  I have to figure out
12  the pages.
13      A.  Okay.
14      Q.  Okay.
15      A.  So now that's a relatively higher
16  level than any of the others, isn't it, for the
17  antioxidants, so what would I expect to see?  I
18  would expect to see less cracking in that sample
19  if I went back and my theory is right, my
20  scientific opinion is right.  So let's go look
21  at the SEM photograph for 13411, which will be
22  the actual degree of cracking, and just see if
23  it correlates or not.
24      Q.  What page is it?
25      A.  I'm looking.  I'm getting close.  It's

Page 205

1  37.
2      Q.  Page 37?
3      A.  Right.  I would expect to see a low
4  degree of cracking due to the high level of
5  antioxidant still there, and there it is.  It's
6  minimally cracked.
7      Q.  That's the one photo you have of all
8  this mesh?
9          MR. ANDERSON:  What?
10  BY MR. THOMAS:
11      Q.  Strike that, I'm sorry.
12          So you point to Figure 38 on Page 37
13  as suggesting that -- suggesting what?
14      A.  Minimal, this is what we would call
15  minimal cracking.
16      Q.  Okay.
17      A.  And it correlates with a high level of
18  antioxidant.  So it's being protected, doesn't
19  react, doesn't crack.  Or it doesn't crack as
20  much, it obviously is still cracking some, but
21  it's minimal.
22      Q.  Anything else for Carolyn Lewis?
23      A.  No.
24      Q.  Let's go now to the Batiste report.
25      A.  Okay.

52 (Pages 202 to 205)

Howard C. Jordi, Ph.D.

Page 206

1     Q.  The Batiste report has been marked as
2  Exhibit Number 2.
3     MR. THOMAS:  Just for the record, I
4  just got this late Monday night, and I've had a
5  chance to go through it a little.  We'll reserve
6  on this.  I know you disagree with that, but we
7  may reserve to come back to ask more questions
8  about this report at a later time.
9     MR. ANDERSON:  I mean I do object to
10  it, because there was an agreement made between
11  Christy Jones and Rich Freese, and they agreed
12  that in the -- in order to help both sides,
13  because everyone has a lot going on, that there
14  was an agreement that you guys wanted to take --
15  in fact, your attorneys from -- or the attorneys
16  from Butler Snow -- I have to put this on the
17  record.  If you're going to say you're going to
18  reserve the right, I'm going to object and I'm
19  going to put the reasons on.
20     Attorneys from Butler Snow reached out
21  and said "any of the same experts who are going
22  to be in both Lewis and Batiste, we'd like to
23  try to take their depositions at the same time
24  so we don't have to come back and everybody fly
25  around the country and do them at different

Page 207

1  times."  So we agreed to try to do that.
2     Also the agreement was that within 48
3  hours of the depo we would get -- we said we'd
4  try within 48 hours of the depo, which we did,
5  to send over the Batiste results.
6     And that was the agreement between the
7  parties.
8     MR. THOMAS:  I understand.  I just --
9     MR. ANDERSON:  So I don't see how you
10  can then reserve your right after your side has
11  already made an agreement, and we're doing it
12  exactly the way your side wanted to.
13     MR. THOMAS:  I'm not sure anybody
14  contemplated getting 278 pages, but I get it.  I
15  just need to make that statement.
16     MR. ANDERSON:  After getting a
17  thousand on the others, I would think that would
18  be reasonable.  But go ahead with your
19  questions.
20  BY MR. THOMAS:
21     Q.  Doctor, when did you prepare the final
22  report of Linda Batiste?  It's dated October
23  the 28th, 2013, would that be it?
24     A.  The final date I have is October 30th,
25  2013.  It's the same.  You've got --

Page 208

1     Q.  (Indicating).
2     MR. ANDERSON:  28th.
3     A.  Should be the 28th?  I guess.  We were
4  all -- this was just taken out of the patient, I
5  believe, most recently, so we've been working on
6  it.
7  BY MR. THOMAS:
8     Q.  Please understand I've got to mark
9  that one, too, just in case there's something
10  different.
11     A.  I don't think you're going to be
12  finding any differences.
13     Q.  I'm hopeful I won't.
14     MR. ANDERSON:  Not a lot I would bet
15  on, but that one I will bet you there's
16  absolutely no differences in that report other
17  than that date.
18     MR. THOMAS:  Just for the record, I'm
19  marking as Exhibit Number 6 what Dr. Jordi had
20  in his file as being the final report for Linda
21  Batiste dated October 30th, 2013.  The one that
22  was produced to us that's been marked as
23  Exhibit 2 is October 28th.
24
25

Page 209

1     (Whereupon, Jordi Exhibit Number 6,
2     10/30/13 Final Report for Linda
3     Batiste, was marked for
4     identification.)
5  BY MR. THOMAS:
6     Q.  Mine is two-sided, and it's twice as
7  big as yours.
8     A.  Yes, sir.  No.
9     MR. ANDERSON:  This is the rest of the
10  data.
11     A.  This is the rest of it.
12  BY MR. THOMAS:
13     Q.  Just for the record, I didn't realize
14  there was a second set.  So we have all of it,
15  the data makes it twice as big as mine, as it
16  should be.  Thank you.
17     Okay.  Doctor, do you intend to rely
18  on the testing that you did in the Carolyn Lewis
19  case in support of your opinions in the Batiste
20  case?
21     A.  Yes.  They're the same, the same
22  analyses, yes.
23     Q.  My question is a little different.
24     You did 22 plus, 22 or 23 --
25     A.  23.

53 (Pages 206 to 209)

Howard C. Jordi, Ph.D.

Page 210

```
1        Q.  -- 23 explant analyses of other
2    patients --
3        A.  Yes.
4        Q.  -- that are not included in your
5    analysis in the Batiste case.
6        Do you intend as a part of your
7    opinions in Batiste to rely on your work that
8    you did in Carolyn Lewis?
9        MR. ANDERSON:  I can tell you as his
10   attorney that's exactly what we're going to do,
11   because there is no report requirement in Texas.
12       MR. THOMAS:  Just asking.
13       MR. ANDERSON:  Let me just finish,
14   because he may not understand the legal
15   ramifications and what's going on as between a
16   state court requirement and a Federal Court
17   requirement.  And there is no reporting
18   requirement in Texas state court.
19       But we did agree, even though there is
20   no reporting requirement, that we would provide
21   data to make it easier for you guys to take a
22   deposition, even though we don't have to provide
23   a report.  So we did that, and we gave it to you
24   48 hours before the depo, like you asked.
25       So is he going to rely on all of his
```

Page 211

```
1    opinions in this case in Texas?  You bet.
2        MR. THOMAS:  Thank you.
3    BY MR. THOMAS:
4        Q.  The testing that you did in the
5    Batiste case differs from the testing that you
6    did in the Carolyn Lewis case, I think.
7        A.  In what way?
8        Q.  I don't think you did as much.
9        A.  Let me see.
10       (Witness reviewing document.)
11   BY MR. THOMAS:
12       Q.  I don't think you did the PYMS in
13   Batiste.
14       A.  Yeah, we did, it's right here
15   (indicating).
16       MR. ANDERSON:  Page 44.
17       A.  Page 44.
18   BY MR. THOMAS:
19       Q.  That shows you how close we are.
20   Thank you.  I apologize.
21       A.  We did the GPC.
22       MR. ANDERSON:  There's no question
23   pending right now.
24   BY MR. THOMAS:
25       Q.  Was it your goal, Doctor, to do the
```

Page 212

```
1    same testing for Ms. Batiste as you did for the
2    analysis in Exhibit 1?
3        A.  Yes.
4        Q.  Is it appropriate to use the -- strike
5    that.
6        Can we rely on your analysis in
7    Exhibit Number 1 with respect to the various
8    tests that we've talked about all day today in
9    understanding how you conducted the test for
10   Linda Batiste?
11       A.  It was run the same way.
12       Q.  So any discussions that we've had
13   today about your methodology, your controls,
14   your results in the Carolyn Lewis report,
15   Exhibit Number 1, would apply equally to the
16   Linda Batiste report, Exhibit 2?
17       A.  Yes.
18       Q.  All right.  For Linda Batiste, you
19   have a series of fiber mesh control samples.
20   Are these new mesh control samples different
21   from the mesh control samples you analyzed in
22   Carolyn Lewis?
23       (Witness reviewing documents.)
24       A.  They're the same.
25   BY MR. THOMAS:
```

Page 213

```
1        Q.  Okay.  And how can you tell they're
2    the same; by the test numbers?
3        A.  Same numbers.  Table 1 on both.
4        Q.  All right.
5        A.  Page 6 versus Page 13 in the
6    Exhibit 1.
7        Q.  Not that this makes any difference to
8    the ultimate test, do you know whether they were
9    all TVT Classics or TVT-Os?
10       MR. THOMAS:  Or do you know the answer
11   to that?
12       MR. ANDERSON:  Three TVT, three TVT-O.
13       MR. THOMAS:  Thank you.
14       MR. ANDERSON:  That's borne out in the
15   photographs in some of the extra stuff we
16   haven't gone through, for obvious reasons.
17       MR. THOMAS:  Thank you.
18   BY MR. THOMAS:
19       Q.  I'm looking at the "Summary of
20   Results."
21       A.  Page, please?
22       Q.  Page 3.  It says "A series of mesh
23   control samples and one explant sample received
24   by Jordi Labs."
25       Just for the record, we just
```

54 (Pages 210 to 213)

Howard C. Jordi, Ph.D.

Page 214

1   established that the mesh control samples are
2   the same control samples that you used for your
3   comparisons with Carolyn Lewis in Exhibit 1,
4   correct?
5       A.   Correct.
6       Q.   And the explant sample is for Linda
7   Batiste who is the Plaintiff in the Texas
8   action, right?
9       A.   Correct.
10      Q.   "Upon handling, it was observed that
11   the explant sample showed some decreased
12   elasticity as compared to the control fiber mesh
13   samples."
14          Again, this represents the same
15   reporting that you made in the Carolyn Lewis
16   case about your handling of the mesh explant as
17   compared to the control?
18      A.   That's right.
19      Q.   And do you have any recollection in
20   the Batiste matter for comparing the explant to
21   the formalin control samples?
22      A.   Formalin control sample, no, I don't.
23   I felt the explanted material was rigid, and the
24   pristine felt very friable.
25      Q.   Okay.  Next paragraph, "Cracking in

Page 215

1   the explant sample was observed to propagate in
2   a direction perpendicular to the fiber draw
3   direction.  It was noted to be primarily on the
4   fiber surface."
5          That's the same finding that you made
6   for Carolyn Lewis?
7       A.   Yes, that will be reflected in the
8   photos, SEM graphs.
9       Q.   "Analysis" -- I'm down in next
10   paragraph now -- "analysis of the explanted
11   fiber mesh by GPC-HT indicated that large scale
12   molecular weight degradation had not occurred in
13   the samples."
14          The same finding that you had in
15   Carolyn Lewis?
16      A.   Absolutely.
17      Q.   And when you say "large scale," the
18   fact of the matter is you found no significant
19   change in molecular weight; true?
20      A.   In this sample we didn't see a change
21   in the -- oh, molecular weight you're saying?
22      Q.   Yes.
23      A.   No, no change in molecular weight.
24      Q.   Okay.  Now, here, different from
25   Carolyn Lewis, you find that "the differential

Page 216

1   scanning calorimetry analysis showed no change
2   in crystallinity for the cracked explant sample
3   compared with the control samples."
4          What does that mean?
5       A.   That means that the crystallinity
6   didn't change, and the sample won't be more
7   likely to be subjected to environmental stress
8   cracking.
9       Q.   Okay.
10      A.   Any damage we see would have to be
11   oxidative type damage.
12      Q.   So can we eliminate from the Linda
13   Batiste analysis any environmental stress
14   cracking?
15      A.   Yes, you can eliminate the DSC data if
16   you want, because it's going to say there's no
17   change.
18      Q.   Okay.  So you have no molecular weight
19   change and no DSC change?
20      A.   That's correct.  In this one sample.
21      Q.   I understand.
22          Do you know when Ms. Batiste had her
23   surgery to remove her explant?
24      A.   I don't know the exact date, no.  It
25   was recent, within the last couple weeks,

Page 217

1   something like that.
2       Q.   Last sentence of the last paragraph
3   before you get to the table of contents, "It was
4   found that the explant sample showed
5   significantly less signal for the antioxidants
6   as compared to the control sample, under 2
7   percent for Santonox R and dilauryl
8   thiodipropionate."
9       A.   That's right.
10      Q.   What does that mean?
11      A.   That means that 98 percent of it was
12   gone.
13      Q.   Got it.
14      A.   This time we know for a fact, because
15   the surgery was just performed, that it wasn't
16   sitting in Steelgate for months.
17      Q.   Okay.
18      A.   Because it was -- the surgery was
19   performed, and it was immediately forwarded to
20   us as rapidly as possible.  So it would have
21   just been a matter of days at room temperature
22   before we got it and could start our work, as
23   opposed to I really didn't know how long the
24   other ones, other samples had been at Steelgate
25   when we started that, but here it has to be

55 (Pages 214 to 217)

Howard C. Jordi, Ph.D.

Page 218

1    short.
2        Q.  Do you know the percentage of
3    formaldehyde in which the material was stored?
4        A.  I do not.
5        Q.  Did you follow the same sample
6    preparation methods we've described?
7        A.  Yes, in terms of removal of tissue and
8    using forceps and disposable --
9        Q.  Why did you choose the control samples
10   that you did in Table 1 on Page 6?  Is that the
11   same ones that you chose before?
12       A.  Same ones, yes.
13       Q.  The reason why I asked is because
14   Table 1 on Page 13 shows a number of additional
15   tests being conducted on the other controls.
16       A.  On page what?
17       Q.  Right here.  Compare this chart to
18   this chart.  They should be the same, shouldn't
19   they?
20           MR. ANDERSON:  Yes, they are.
21           MR. THOMAS:  Right here.  All this
22   data is not on this chart.
23           MR. ANDERSON:  Oh, the data, I thought
24   you said the tests that were run.
25       A.  They weren't.  That means that these

Page 219

1    were run again.  And the rest of these were not
2    run again.
3    BY MR. THOMAS:
4        Q.  So --
5        A.  We did another FTIR micro, we did
6    another DSC, another GPCT.
7        Q.  Does this mean you repeated the test
8    for the first two categories, the OM and the
9    SEM?
10       A.  I need to see the billing.
11       Q.  How much of this testing did you do
12   yourself; any of it?
13       A.  I don't -- these days I don't do much
14   myself.  I just supervise the lab personnel.
15       Q.  Is it fair to understand that for both
16   Linda Batiste and Carolyn Lewis that others did
17   the work for you and reported to you and
18   prepared your report, and you're testifying
19   based on other --
20       A.  I prepared the report.  They gave me
21   their individual results.
22       Q.  Okay.  And you are preparing the
23   report and testifying based on the work of
24   others?
25       A.  Correct.

Page 220

1        Q.  And the others would be reflected in
2    the lab notebooks?
3        A.  Lab notebooks.
4        Q.  And billings?
5        A.  Billings.
6        Q.  Do you know the answer to the question
7    about why Page 6 shows in Table 1 the control
8    sample analysis chart is different than it is in
9    Carolyn Lewis which appears on Page 13?
10       A.  I'd have to refer to the lab
11   notebooks.  Maybe it's in the lab notebooks.  Do
12   you want me to do that?
13       Q.  Well, to the extent that there's other
14   testing -- well, strike that.  We'll come back
15   to that.
16           Look at your lab notebooks and see if
17   you did new testing.
18       A.  Let's see.  That would have had to
19   have been --
20           MR. ANDERSON:  That's the old ones.
21           (Witness reviewing documents.)
22       A.  10/29.
23           MR. ANDERSON:  Here you go.  This is
24   Batiste.
25       A.  Scalpel -- yeah, that's Batiste.

Page 221

1            MR. ANDERSON:  You're looking to see
2    about the OM and SEM, I think.
3            MR. THOMAS:  The reason why the
4    difference of charts.
5            MR. ANDERSON:  Yes.
6            (Witness reviewing documents.)
7        A.  So this is all Batiste.  There's no
8    indication of any reruns of those standards, of
9    the controls in here, so...
10   BY MR. THOMAS:
11       Q.  Is it just an omission?
12       A.  I think it may just be an omission.
13       Q.  Okay.
14       A.  3422128.
15           Yeah, I think X is up here, that's
16   correct.  I think it's an omission.  We'll have
17   to correct the table.
18       Q.  Okay.
19       A.  It would have been the same data.
20       Q.  Do you remember, given that this
21   report is dated today --
22       A.  I'll tell you what we can do.  We can
23   pick a control sample here and just see if the
24   picture is identical.
25       Q.  Okay.

56 (Pages 218 to 221)

Howard C. Jordi, Ph.D.

Page 222

1    A.  That will be a good indication.
2       I'm sorry, can we go off the record a
3  second?
4       MR. ANDERSON:  We don't have to go off
5  the record.  Just don't talk while you're
6  looking.
7       (Witness reviewing document.)
8    A.  That picture looks identical, Figure 4
9  looks identical to Figure 5 here, which is the
10 same control.
11 BY MR. THOMAS:
12   Q.  Just for the record, you're referring
13 to Exhibit Number 1, Page 20, Figure 4, to
14 Exhibit Number 2, Page 12, Figure 5?
15   A.  Right.
16   Q.  So it's your best judgment, based upon
17 your review of those documents, that you're
18 using the same control information for both
19 studies?
20   A.  Here would be a more definitive
21 picture.
22      MR. ANDERSON:  Just answer his
23 question.
24   A.  I'm sorry.
25 BY MR. THOMAS:

Page 223

1    Q.  So it's your best judgment, based upon
2  your review of those documents, you're using the
3  same control information for both studies?
4    A.  It looks that way.  159, you see --
5       MR. ANDERSON:  Do you feel like you've
6  answered his question that you're using the same
7  controls?
8       THE WITNESS:  Yes.
9       MR. ANDERSON:  Okay.  Then we'll move
10 on to the next one.
11 BY MR. THOMAS:
12   Q.  Now if you go to Page 9, Page 9,
13 Figure 3, does this depict the Batiste mesh as
14 first received by you and then separated into
15 tissue and mesh as you did with the mesh in
16 Carolyn Lewis?
17   A.  It does.
18   Q.  And did you follow the same
19 procedures?
20   A.  We did.
21   Q.  And did Mr. --
22   A.  Adi Kulcarni.  Yes, I watched him do
23 it.
24   Q.  Okay.  Do you recall making any
25 findings different -- I'm up to Page 11 right

Page 224

1  now -- any findings different for Linda Batiste
2  about your observations of the mesh?
3    A.  Anything different?
4    Q.  From what you found with Carolyn
5  Lewis.
6    A.  Oh, sure, we've already specified one
7  difference.  The DSC didn't show --
8    Q.  That was a bad question.
9    A.  -- the decreased Delta H.
10   Q.  Let me start over again.  Strike that.
11 I better do it the right way.
12      Let's go to Page 8 -- excuse me.  I'm
13 sorry.  Page 14, Figure 8.
14      In a number of places in Exhibits 1
15 and 2 there will be figures with numbers that
16 are shown on there.  Here on Figure 8 there's
17 Figures 1, 2, 3 and 4 in red on the mesh.
18      Do these represent places where, what,
19 scanning electron microscopy was conducted, or
20 do you know?
21   A.  I don't know.
22   Q.  So like on the next page, on Page 15,
23 Figure 10, there are red numbers 1, 2, 3, 4.  Do
24 you know what those represent?
25   A.  Well, I can look at the EDX and see if

Page 225

1  the numbers -- if we have four sites on EDX,
2  that would be the likely -- if there's going to
3  be any correlation, that's what it would be, go
4  find this sample number.
5    Q.  When you say "EDX," the data that you
6  have in your EDX analysis?
7    A.  Yeah.  But I don't know, with a
8  control like this, I don't know why that would
9  -- it would make no sense, so I doubt it.  But
10 we can check one sample.
11   Q.  Check to make sure.
12   A.  13161.
13      It's not here.  I don't know what it
14 means.
15   Q.  Okay.  And just so we're clear, if you
16 go back to Carolyn Lewis, let's go to Page 24 of
17 Carolyn Lewis.  Figure 11, again samples 13162,
18 and there are numbers in red, 1, 2, 3, 4, do you
19 know what those represent?
20   A.  No, I do not.
21   Q.  Okay.  If you go to Page 18, please,
22 of Batiste, Exhibit 2, Figure 16.  Is this the
23 photograph -- strike that.
24      What is that?  What is Figure 16?
25   A.  That's an optical micrograph.

57 (Pages 222 to 225)

Howard C. Jordi, Ph.D.

Page 226

1    Q.   What is that?
2    A.   Photograph of not the SEM, but just a
3  regular optical microscope of the fiber mesh
4  with tissue imbedded in it.
5    Q.   And what is Figure 17?
6    A.   That's a low amplification SEM.
7    Q.   Of the same thing that's depicted in
8  Figure --
9    A.   Right.
10   Q.   Excuse me.
11       Is what's depicted in Figure 17 the
12  same thing that's depicted in Figure 16, just by
13  different medium?
14   A.   By different methods.
15   Q.   Methods.
16   A.   SEM versus optical.
17   Q.   And as you look at Figure 22 on
18  Page 21, and Figure 23, how would you describe
19  what you see in Figure 22?
20   A.   It looks like greatly cracked material
21  where some of the material has actually flaked
22  off, getting clear under regions underneath.
23   Q.   In your cast of characters -- excuse
24  me.
25       In your description that you used in

Page 227

1  Exhibit Number 1 as not cracked, moderately
2  cracked, or cracked, where does this fit?
3    A.   These photos here I would call
4  severely cracked.
5    Q.   Considerably cracked?
6    A.   Considerably or severely, you could
7  use either word.
8    Q.   Okay.  Let me ask this question.
9       You've used a number of different ways
10  today to characterize the cracking that you've
11  seen, and you've broken them down into
12  categories in different places in your report.
13       What categories of cracking do you
14  deem to be relevant to your analysis on a
15  comparative basis across these mesh?
16       MR. ANDERSON:  Objection.  Asked and
17  answered way long ago.
18       But answer the question again.
19   A.   Minimally, not cracked, minimally,
20  moderately, and then major cracking, or
21  extensive cracking.
22  BY MR. THOMAS:
23   Q.   What qualifies -- how would you
24  describe something that's minimally cracked?
25   A.   Where I just would see like -- I did

Page 228

1  show you that one a while ago in the other set
2  where the material was correlated with that
3  large antioxidant level.  Was it 411, 411 or
4  something like that?
5    Q.   That's exactly right.
6    A.   I think it was 411.  Yes, 411.  That's
7  minimally.
8    Q.   What page is that?
9    A.   37.
10   Q.   That's in Exhibit 1.
11       And that's your visual observations,
12  you conclude that the cracking shown on Page 37
13  in Figure 38, sample 13411, is minimal cracking;
14  fair?
15   A.   Fair.
16   Q.   All right.  What is moderately
17  cracked?
18   A.   That might be moderate right there
19  (indicating).
20   Q.   What page?
21   A.   38.
22   Q.   Page 38.  Are we in Exhibit 1?
23   A.   These are arbitrary categories, of
24  course, that's why it's very difficult to put
25  absolute numbers on these.  But that certainly

Page 229

1  is cracked more than the 411 sample.
2    Q.   So on Page 38, sample 13412, you
3  describe as being moderately cracked.
4       What is it about Exhibit 40 on Page 38
5  of Exhibit Number 1 that qualifies that as
6  moderately cracked?
7    A.   Particularly on the right side of the
8  picture, the cracks are somewhat weak looking,
9  they're not deep into the sample.
10       Now, there are a couple of places
11  there, this is what makes this so difficult,
12  there are a couple of places on the left side
13  where I would call it certainly more severe
14  cracking, what they're not -- they don't
15  represent a large portion of the surface.
16   Q.   So the cracks that you're referring to
17  are less than a micron in width?
18   A.   Scale is 100-micron, yes, in that
19  order.
20   Q.   And for Ms. Batiste on Page 21,
21  Figures 21 and 23, how would you describe that
22  cracking?
23   A.   Page what now?
24   Q.   21.
25   A.   Well, you have to look at several of

58 (Pages 226 to 229)

Howard C. Jordi, Ph.D.

Page 230

1    these photos taken together to get kind of like
2    an average.
3        Q.   Okay.
4        A.   If I look at -- if I look at Page 20,
5    I might call it moderate.  But if I look at
6    Page 21, these are different regions of the same
7    sample, I'm going to call that severe, because
8    of flaking.
9        Q.   Is it the flaking that makes it
10   severe?
11       A.   Flaking, yeah, because the actual
12   polymer is degraded so badly it's coming off the
13   surface.
14       Q.   All right.
15       A.   It's also the depth.  If you want to
16   see the depth, Page 23 shows you the deep
17   cracking that hasn't yet flaked, but you can see
18   it's just dying to flake off on Page 23.
19       Q.   Just so the record is clear, that's a
20   higher magnification than the early ones?  It's
21   450 times, right?  Page 23 is 400 times, is that
22   right?
23       A.   Yeah.  So I would call this moderate
24   to severe.
25       Q.   And is it the number of cracks?

Page 231

1        A.   Number of cracks, the depth of the
2    cracks, and whether or not it's flaked all enter
3    into the -- flaking tends to --
4        Q.   How are you able to measure the depth
5    of the cracks?  Or is this just by total
6    eyeballing it?
7        A.   It's total eyeballing at this point,
8    because you can't really -- until you see the
9    pieces come off, and then they look like they're
10   several microns.
11       Q.   As a practical matter, isn't it
12   impossible to measure the depths of these cracks
13   because they're so small?
14       A.   Well, to get an accurate measurement,
15   right, looking at this photograph I can't tell
16   you exactly how many.  But the depth is at least
17   as great, it would appear here, as the width.
18       Q.   So a little less than a micron?
19       A.   Well, I would say that's more like 2
20   microns, that crack.
21       Q.   Okay.
22       A.   Some of -- this one might be 2 to 3,
23   some of them are 1.  They're variable.
24       Q.   Okay.  And you would expect a similar
25   depth to that 1 to 3 microns?

Page 232

1        A.   Somewhat.
2        Q.   And that's for severe cracking?
3        A.   Well, it's severe.  If I just saw one
4    of those cracks and nothing else and it was
5    clean everywhere else, like if all I saw was
6    this --
7        Q.   What you're doing now is you're --
8        A.   I'm covering up the cracks.  But I'm
9    showing you the rest of the fiber.  In this case
10   the whole fiber isn't damaged, just the left
11   side.
12       Q.   That's Figure 26?
13       A.   22 -- Figure 25, sorry.
14       Q.   Figure 25 on Page 22 of Exhibit 2?
15       A.   Correct.
16       Q.   Okay.  Figure 25 on Page 22 of
17   Exhibit 2, the cracks that you see on the left
18   side, again are 1 to 3 microns wide.  That's 600
19   times magnification, that's even higher?
20       A.   But you've got the scale here of --
21       Q.   You changed the page again on me.
22   Which one are you looking at now?
23       A.   Page 23, 26.
24       Q.   Okay.  Figure --
25       A.   450X.

Page 233

1        Q.   Page 23, 450X, Figure 26.
2        A.   So that crack there on the -- the big
3    crack in the middle of the left side of that
4    picture looking at the scale has got to be on
5    the order of --
6        Q.   5 microns?
7        A.   -- 5-micron, something like that.
8        Q.   No way to tell from this how deep it
9    is?
10       A.   You can tell from the -- now you can
11   tell because it's bent upwards.  The actual
12   thickness of the polypropylene piece that's
13   about to break off looks like it's 1 to
14   2 microns.
15       Q.   Okay.  But the depth there is not
16   going to be any more than five microns?
17       A.   No.
18       Q.   Probably less?
19       A.   On that order, yes.
20       Q.   Okay.  So that's severe cracking?
21       A.   Yes, because it runs, covers the
22   entire --
23       Q.   Okay.  Let's go to Page 29, Figure 33.
24            You're conducting the SEM-EDX analysis
25   here, correct?

59 (Pages 230 to 233)

Howard C. Jordi, Ph.D.

Page 234

1    A.  Yes.  Correct.
2    Q.  And how would you describe the
3  cracking that you see in Figure 33?
4    A.  Moderate in that particular piece.
5    Q.  All right.  And Spectrum 2 and
6  Spectrum 3 are shown.
7       Is there a Spectrum 1?
8    A.  No.  Usually just shows two pieces, I
9  don't know why we had three on here.
10   Q.  Do you usually start numbering at 2?
11   A.  I don't know why that was done.  It's
12  2, he may have had a 1 somewhere else, or just
13  didn't renumber them.
14   Q.  If there's a 1, it doesn't show up on
15  the data that appears here, correct?
16   A.  Right.  The box and the number
17  correlates with the spectrum you see below.
18   Q.  Right.
19      What's the difference between 34 and
20  35?
21   A.  Just a scale-up.
22   Q.  Okay.
23   A.  So we can see the minor elements
24  better.
25   Q.  I see.

Page 235

1      DSC, we decided there was no change,
2  so there's no evidence of environmental stress
3  cracking?
4    A.  Let me just look at the numbers, but I
5  believe that's correct.
6    (Witness reviewing document.)
7    A.  That's correct.
8  BY MR. THOMAS:
9    Q.  So any oxidation that's occurring --
10  strike that.
11      So any of the cracks that we see in
12  Linda Batiste is going to be due to straight
13  oxidation?
14   A.  I believe that's correct.
15   Q.  And do you know what caused the
16  oxidation in Linda Batiste's mesh?
17   A.  Well, one cause would be the lack of
18  antioxidant in the fiber, if we find that, which
19  we have to go look at the LCMS analysis
20  primarily.
21      The other would be the IR results for
22  carbonyls to see if we had oxidation there.
23      Those are the two primary -- well, and
24  the third is the one I just showed you was EDX.
25  Because that oxygen in the clean regions by EDX,

Page 236

1  this peak here, that's in the region that isn't
2  cracked.
3    Q.  My question is not what the proof of
4  it is.  My question is what caused it.
5      What caused the oxidation?
6    A.  What caused the oxidation.  Well, that
7  would probably be due to the inflammation, among
8  other things, that's in the human body.  If the
9  material isn't protected by antioxidants and
10  it's exposed to macrophages and hydrogen
11  peroxide and so on, if there was inflammation,
12  and shards were coming off the particle and
13  inflammation is caused to increase that --
14   Q.  Are you guessing, or is that your
15  opinion?
16   A.  That's published literature.
17   Q.  It's your opinion that published
18  literature stands for the proposition that in
19  the face of inflammation, that polypropylene
20  mesh without antioxidants will degrade?
21   A.  Yes.
22   Q.  And what literature is that?
23   A.  Well, it goes back to --
24   Q.  Is that the Liebert article?
25   A.  Liebert article, it goes back to

Page 237

1  Oswald and Turi article, as early as '65.
2    Q.  Okay.
3    A.  Williams talks about it in a number of
4  articles.
5    Q.  It's ultimately premised on the
6  suggestion that the antioxidants in the Ethicon
7  mesh have leached out and are gone, correct?
8    A.  Correct.
9    Q.  Right.
10      And it's only if the antioxidants are
11  leached out and gone that your theory is
12  correct?
13   A.  I don't know that it would mean you
14  couldn't oxidize polypropylene even in the
15  presence of antioxidants.  You certainly can.
16  But it retards it.
17   Q.  But you've not studied that question.
18  Your theory and opinion is that the antioxidants
19  have leached out, therefore the mesh is
20  degraded?  That's your opinion to a reasonable
21  degree of certainty?
22   A.  It would be a fact in my mind, because
23  we're looking at the actual lack thereof.
24   Q.  Okay.
25   A.  Not assuming lack of, I'm looking to

60 (Pages 234 to 237)

Howard C. Jordi, Ph.D.

Page 238

1    see if we see a lack of.
2        Q.  I understand.
3            But that's your opinion to a
4    reasonable degree of scientific certainty how
5    this degradation occurred; that is, that the
6    antioxidants leached out leaving the mesh
7    defenseless, and that is the reason why the mesh
8    degraded?
9        A.  Yes.
10       Q.  Page 34 --
11       A.  Yes, sir.
12       Q.  -- on Exhibit 2.
13           This same value is in Exhibit 1, the
14   typical value for the melt point of
15   polypropylene?
16       A.  Where are you?
17       Q.  I'm right in the middle of the page on
18   Page 34.
19       A.  34.  Okay.  Right.
20       Q.  Is it your opinion that the typical
21   value for polypropylene melting is 175 degrees
22   C?
23       A.  Again, that comes out of the book we
24   looked at earlier this morning, Turi.
25       Q.  Do you know whether that is the

Page 239

1    typical melt point for the polypropylene mesh
2    that Ethicon manufactured and sold?
3        A.  No.  We measured, we measured that as
4    well.  That's the controls.  It's 165-ish.
5        Q.  Okay.  My point is; you're not
6    suggesting because it's 165 instead of 175 from
7    the literature that it's more susceptible to
8    environmental stress cracking or degradation,
9    are you?
10       A.  I'm suggesting it's less crystalline.
11       Q.  Okay.  Are you suggesting it's more
12   susceptible to environmental stress cracking
13   because --
14       A.  Than the native pellet polypropylene
15   from which the fiber was manufactured, yes, I
16   am.
17       Q.  And are you suggesting that it's more
18   susceptible to oxidation because its melting
19   point is 165 as opposed to 175 and 80
20   polypropylene pellets?
21       A.  Yes.
22       Q.  Page 43 in your molecular weight
23   analysis.
24       A.  Okay.
25       Q.  It says in the middle of the

Page 240

1    paragraph, "After you don't find a difference in
2    molecular weight, the environmental stress
3    cracking mechanism does not require a decrease
4    in molecular weight."
5            I think we've already decided that the
6    mesh -- any mesh degradation for Ms. Batiste is
7    not due to environmental stress cracking; fair?
8        A.  Right.
9        Q.  Okay.
10       A.  So that's why I state we observed
11   cracking in the explant samples due to oxidation
12   in the fiber surface, in this particular sample.
13       Q.  In the PYMS analysis on Page 34.
14       A.  Page 34?
15       Q.  I'm sorry, 44.  Thank you.
16       A.  Okay.
17       Q.  Am I correct that there's no analysis
18   of the Santonox antioxidant?
19       A.  Right.
20       Q.  Why not?
21       A.  As I mentioned this morning, in PYMS
22   when you -- if you'll look at Page 45, Figure
23   46, the antioxidants, you'll see a large --
24   you'll see the control is the blue, and you'll
25   see a large red peak righter blue is eluting.

Page 241

1    What that is mostly is polypropylene fragment
2    ions, and it was overwhelming the signal for
3    Santonox R, so we really couldn't get an
4    accurate reading.
5        Q.  Tell me what that means.  I don't know
6    how that works.  I don't understand.
7        A.  Well, in LCMS you extract the
8    additives, and then you shoot a solution of the
9    extract, so you don't have the polymer to worry
10   about at all.
11           In PYMS you put the entire sample in,
12   the solid polypropylene piece, or a bit of
13   actual fiber, and then you burn it basically,
14   pyrolize it, and then the pieces go into the GC
15   system column and get separated.  But there are
16   sometimes hundreds of thousands of pieces, and
17   sometimes for materials you want to analyze they
18   just get overwhelmed, the material I want to
19   analyze for is overwhelmed by the background is
20   what it's called.
21           So any estimate we would have made
22   here, we would have got a large peak, it doesn't
23   mean anything because it's got all these other
24   ions in it, which just is flooding the system in
25   that particular time point.

61 (Pages 238 to 241)

Howard C. Jordi, Ph.D.

Page 242

1          Now, for the other antioxidate, the
2    lauryl thiodipropionate --
3          Q.   Let me just interrupt for a minute.
4          Could you have changed your test or
5    changed your materials to test again for
6    Santonox in an effort to capture the
7    concentration of Santonox?
8          A.   You can run single ion, extracted ion
9    chromatography, we call it, that helps.  In this
10   case it didn't help enough.
11         Q.   Why does it work in the Carolyn Lewis
12   case for all the samples that you've tested
13   there, but doesn't for Linda Batiste?
14         A.   Don't have an answer for that.  I just
15   know this is characteristic of PYMS.  LCMS gives
16   -- in this case because we don't have the
17   background, we don't have the degree of
18   problems.
19         Q.   Just so I understand --
20         A.   It doesn't always not work either,
21   it's a matter of a judgment call.
22         Q.   But you got PYMS testing and results
23   in all but four of the samples you tested in
24   Exhibit 1, correct?  That's on Page 15 and 16.
25         A.   Oh, Exhibit 1?

Page 243

1          Q.   Yes.
2          A.   Well, I know that one thing that's
3    happened since this work was done was a column
4    had to be changed out.
5          Q.   What does that mean?
6          A.   Well, the column eventually goes, and
7    we have to cycle it out.  So another column
8    is -- this is not the same column that was run
9    for the prior samples.  So the selectivity is
10   slightly different.  And I'm telling you that
11   the -- I'm sure of this, that it's being buried
12   under polypropylene fragments.
13         Q.   So are you telling me that the results
14   that you've obtained in Exhibit Number 1 for the
15   PYMS data are different from the results that
16   you obtained for the Linda Batiste sample in
17   Exhibit 2?
18         A.   It's a different column, so the
19   selectivity is a little bit different.
20   Quantitation of additives is much more difficult
21   than PYMS than it is -- it's good for detection
22   and confirming the presence of things, it's not
23   good for quantitating anything.
24         Q.   LCMS --
25         A.   LCMS is much better, in general.

Page 244

1          Q.   All right.  At this time for the LCMS
2    test beginning on Page 46, there's no formalin
3    control data, is there?
4          A.   No.
5          Q.   So the tests that you conducted in
6    LCMS would not show the extent to which formalin
7    may have confounded your findings?
8          A.   For the Santonox R, that would be
9    true.  But for the lauryl thiodipropionate, the
10   standards we've already run clearly were not
11   extracted by the formalin.
12         Q.   You didn't do a formalin control test
13   for Linda Batiste to determine the extent to
14   which formalin would impact your LCMS findings;
15   true?
16         A.   Well, we did it, but it's in reference
17   one.  Remember we're going to use these data
18   together.  Because we already have two formalin
19   controls in the -- what do you call -- the
20   Exhibit 1.
21         Q.   Okay.
22         A.   So yes, we have controls of formalin.
23         Q.   So whatever --
24         A.   Page 92 --
25         Q.   -- whatever conclusions might be drawn

Page 245

1    from the formalin control samples and their
2    impact on the antioxidants that may have been
3    present in the mesh apply equally to your
4    findings for Linda Batiste?
5          A.   That's correct.
6          Q.   Now, the control sample that you
7    choose here on Page 50 is 3422128, and that will
8    be, again, from the controls on Page 96 of
9    Exhibit 1, correct?
10         A.   Okay.  What am I -- on Page 50?
11         Q.   On Page 50, Table 12.
12         A.   Okay.  3422128.
13         Q.   You show that Santonox quantitation,
14   correct?
15         A.   In that table.
16         Q.   Why did you choose the 4,430,284
17   figure as the control against which you compare
18   Santonox?
19         A.   It's in the middle.  Hang on, let me
20   check this again.
21         Q.   I don't see that value in the controls
22   on Page 96.  It should be there, shouldn't it?
23         A.   3422128.
24         Q.   That value is different, isn't it?
25         A.   Yes.

Howard C. Jordi, Ph.D.

Page 246

1    Q.  Do you know why that is?
2    A.  That would indicate to me that he
3  reran the control.  We extracted it.
4    Q.  I thought we decided a moment ago they
5  didn't.
6    A.  Most of the tests they didn't.  I can
7  check that.
8    Q.  Okay.  So what this says is that we
9  have yet a third value for this --
10    A.  Standard.
11    Q.  -- control --
12    A.  Control.
13    Q.  -- test.
14    Not standard, it's a control?
15    A.  Control.
16    Q.  So the value here of 4430284, you
17  think is a new test of mesh tested with Carolyn
18  Lewis?
19    A.  Correct.
20    Q.  As you sit here today, do you know any
21  other new tests that were conducted for Linda
22  Batiste in order to do -- on the controls that
23  were used to compare the Linda Batiste mesh
24  samples?
25    A.  Let's check the control in Table 11

Page 247

1  just to see.  All right.  Let's go back.
2  34221228.
3    Q.  What page are you on, please?
4    A.  92 and 49.  It's the number of -- it's
5  the same standard run for the lauryl
6  thiodipropionate, but the number is different
7  again.  So it's certainly right on the same
8  range, but it means it's rerun, same thing.
9    Q.  So the dilauryl has also been rerun?
10    A.  The standard has, yes, along with the
11  actual sample.
12    Q.  Where are you looking to see that?
13    A.  Table 11, lot 3422128, Page 49.
14    Q.  And that's a value -- you have two of
15  those values from the first one on Page 92, and
16  on Page 92 of Exhibit Number 1 you obtained a
17  value of 71,633,460?
18    A.  Mm-hmm.
19    Q.  And a duplicate result of 96,522,909,
20  and this is a third value for the same piece of
21  mesh at 82,091,505.
22    A.  Right, between the other two.
23    Q.  Okay.  So do you know of any other new
24  control testing conducted for Linda Batiste?
25    A.  I do not.

Page 248

1    Q.  Would it be -- do you know why this
2  new control testing was conducted for Linda
3  Batiste?
4    A.  Well, the response of the detectors,
5  the HPLC type, LCMS detectors can change over
6  time, so it would just be good lab practice,
7  since this was run at a different time from the
8  other samples, to rule out any change that way.
9  Whereas an SEM photograph is an SEM photograph,
10  it wouldn't matter, so there would be no need to
11  rerun those.
12    Q.  Tell me again what it means to change
13  the column.
14    A.  Well, when you're doing
15  chromatography, columns wear out, and you have
16  to periodically change them.  The peaks get
17  broad, they get narrower, materials start to
18  bleed into -- peaks start to bleed into one
19  another, and it's just time to change the
20  column.  It's just normal -- what we call normal
21  maintenance, like changing the oil in a car.
22    Q.  How do you determine when it's
23  appropriate to change the column?
24    A.  You have standards that you run, and
25  you look for resolution standards.  And when the

Page 249

1  resolution no longer meets the minimum standard,
2  it's time to change it.  It's part of the SOP.
3    Q.  How often do you change the column?
4    A.  When?  I don't know how to answer
5  that.
6    Q.  Every 2,000 miles?
7    A.  It's when it fails, when it fails a
8  test.
9    Q.  Okay.
10    A.  It's checked every time we run samples
11  to see that the minimum resolution is there, or
12  it's changed.
13    Q.  Before you sat down to give your
14  deposition today, did you realize that the
15  controls had had additional testing conducted on
16  them?
17    A.  These controls here?
18    Q.  In Exhibit 2 for Linda Batiste.
19    A.  No.  In all honesty, no.
20    Q.  Okay.  Fair to understand that a
21  doctor would have to give any opinion about the
22  extent to which any degradation in the mesh that
23  you have found would cause Ms. Batiste any
24  physical harm or other health problems?
25    A.  No, I would defer to them for the

63 (Pages 246 to 249)

Howard C. Jordi, Ph.D.

Page 250

1    actual physical type damage, it's not -- it's
2    beyond, out of my field.
3         MR. THOMAS:  I'm going to want copies
4    of everything but the Burkley deposition.  The
5    lab notebooks, the articles, and the SOPs.
6         MR. ANDERSON:  Just leave them all
7    there for right now.
8         MR. THOMAS:  What's the best way to do
9    that, Ben?
10        MR. ANDERSON:  Good question.  The lab
11   notebooks obviously can't leave, so we would
12   just have to run copies of those for you.  All
13   the other things we can run copies for you.  Or
14   we can give them to madame court reporter and
15   have her run some copies.
16        MR. THOMAS:  I don't care just as long
17   as I get them.  Whatever makes sense.  I think
18   you and I can figure this out.
19        MR. ANDERSON:  Okay.
20   BY MR. THOMAS:
21        Q.  Doctor, you brought a number of things
22   with you to the deposition today including a
23   number of books, a copy of the deposition of Dan
24   Burkley.
25        I have here three laboratory

Page 251

1    notebooks.  What are these?
2         A.  These are the laboratory notebooks
3    telling the sample preparation and what was done
4    to the samples, and by who, and on what date.
5         Q.  What's the purpose of a laboratory
6    notebook?  What are you trying to capture in a
7    laboratory notebook?
8         A.  We're trying to capture when things
9    were done so that we know who did what so we can
10   go ask questions of proper people so we have a
11   paper trail for the way the sample was handled.
12        Q.  Is it fair to understand one of the
13   goals of a lab notebook is to provide enough
14   information so that somebody coming behind you
15   can understand what you did and recreate it if
16   necessary?
17        A.  Yes.  Absolutely.
18        Q.  And the lab notebook has a number of
19   names in here.  Are these the people who's
20   samples were tested, do you know?
21        A.  You'll have to show me the specifics.
22        (Witness reviewing document.)
23        A.  Yes, those are the sample --
24        MR. ANDERSON:  Hand it back to him.
25   "Yes" answers the question.

Page 252

1    BY MR. THOMAS:
2         Q.  Do you know whether all of the samples
3    were tested?
4         A.  No.  Some of the samples weren't
5    tested.
6         Q.  Do you know why some weren't tested?
7         A.  There were several that weren't, two
8    or three maybe that weren't tested because they
9    were mixtures of multiple products, and we
10   didn't want to run those.
11        Q.  Okay.  Is there any way to tell from
12   the entries in the lab notebook, to your
13   knowledge, about the reasons why certain ones
14   weren't tested?
15        A.  Here's one that wasn't run and it
16   wasn't run because -- I'm assuming it wasn't run
17   because sample received with no formalin.  We
18   didn't run it.  We didn't know what would happen
19   to the sample in the absence of preservatives so
20   we just didn't run it.
21        Q.  And who was that?
22        A.  We have several here.  Cynthia
23   Simpson, and Alma Sarcia.
24        MR. ANDERSON:  Garcia.
25        A.  Garcia.  Sorry.  JPG240-241,

Page 253

1    JPG1362-1363.
2    BY MR. THOMAS:
3         Q.  And did you have anything to do with
4    the decision not to test those products?
5         A.  Well, it would be standard operating
6    procedure that if something comes in in a
7    non-standard format in a situation as -- well,
8    any situation, we wouldn't run it without the
9    client's approval.  We'd have to go back to them
10   and see if they still wanted to run it, because
11   otherwise --
12        Q.  Did you, in fact, raise that issue
13   with anybody about whether the sample should be
14   tested because it did not come in formalin?
15        A.  I think the analysts probably got
16   together and discussed it, yeah.
17        Q.  Did you have any role in the
18   decision --
19        A.  No, I didn't.  That's standard
20   operating procedure.
21        Q.  Let me finish my question, please.
22        Did you ever any role in the decision
23   not to test the mesh samples that did not come
24   in formalin?
25        A.  No.

64 (Pages 250 to 253)

Howard C. Jordi, Ph.D.

Page 254

1    Q.  Were you aware before reading the
2  laboratory notebook today during your deposition
3  that a decision was made not to test some of the
4  mesh samples because they didn't have formalin?
5    A.  Yeah, we've discussed that.
6    Q.  Who have you discussed it with?
7    A.  Adi Kulcarni who has been involved in
8  this, and my son Mark.
9    Q.  What did you discuss about that?
10    A.  Just that we didn't feel it was fit to
11  run because they were different, they didn't
12  match normal composition.
13    Q.  Why?  They looked different?
14    A.  They were dry, yeah.
15    Q.  Okay.  Do you know if they'd ever been
16  in formalin?
17    A.  I assume they had, but I have no way
18  to know that.  They're supposed to send them to
19  us in formalin, so you've got to assume they
20  were sent in formalin at some point.
21    Q.  Okay.
22    A.  And it was lost.  We don't know when.
23    MR. ANDERSON:  Don't assume things
24  that you don't know.  If you know the answer,
25  then you say I know the answer.

Page 255

1    THE WITNESS:  I don't know the answer.
2    MR. ANDERSON:  If you don't know the
3  answer, please say I don't know the answer,
4  okay?
5  BY MR. THOMAS:
6    Q.  How many samples did you receive
7  without formalin that you didn't test?
8    (Witness reviewing document.)
9    A.  Looks like two.
10  BY MR. THOMAS:
11    Q.  And you identified one of them.
12  What's the other one?  Can you identify that for
13  me, please?
14    MR. ANDERSON:  He said both those
15  names.
16    A.  I said both.
17  BY MR. THOMAS:
18    Q.  I'm sorry.  Thank you.
19    Who runs your lab?
20    A.  My son and his business partner.
21    Q.  What's his business partner's name?
22    A.  Patrick Burke.
23    Q.  Is he the person -- is your son the
24  person responsible for all testing conducted by
25  Jordi Labs?

Page 256

1    A.  Today he is, yes.
2    Q.  Has he been for the last two years?
3    A.  Yes.
4    Q.  So any testing that would have come in
5  Jordi Labs to test polypropylene mesh would have
6  been overseen by your son Mark?  Is that his
7  name?
8    A.  Yes.
9    Q.  To the extent that questions I asked
10  you before about other mesh that has been
11  analyzed by Jordi Labs, the person who would
12  know about that is your son Mark?
13    A.  Yes.  Not me.
14    Q.  How long has it been since you've had
15  hands-on responsibility in the lab?
16    A.  Four, five years now.
17    Q.  And what do you do here at Jordi Labs?
18    A.  I'm involved in R&D.  And I act as an
19  expert witness.  I review jobs as requested.  We
20  try to have three or four or five people review
21  every job that goes out to look for errors, that
22  kind of thing.  I'm working in developing new
23  products.
24    Q.  How much of your time is spent
25  consulting as an expert witness?

Page 257

1    A.  Well, generally it's a sideline, this
2  case being a little bigger than most that we've
3  seen.
4    Q.  In the last three months, how much of
5  your time has been occupied by this case?
6    A.  Three months, probably 50 percent.
7    Q.  Okay.  What have you done the other 50
8  percent of the time?
9    A.  Well, as I said, I'm reviewing jobs,
10  I'm working on developing new products, which
11  I've been doing for years.
12    Q.  In the last two years, have you had
13  any responsibility for supervising the
14  activities in the lab?
15    A.  In the last two years?
16    Q.  Yes.
17    A.  No.
18    Q.  All right.  And you rely on your son
19  to make sure that that goes off and the work
20  gets done as it needs to get done?
21    A.  Right.
22    Q.  Is Jordi Labs privately held?
23    A.  Yes, it is.
24    Q.  How many shareholders in Jordi Labs?
25    A.  Two.

Howard C. Jordi, Ph.D.

Page 258

1      Q.   Who are they?
2      A.   My son and his business partner.
3      Q.   You no longer are an owner of Jordi
4   Labs?
5      A.   No.  My son.  I wanted to get out in
6   time from the ownership situation.
7      Q.   Okay.  And when did that happen?
8      A.   I don't remember exactly.  It's four
9   or five years.
10      Q.   How many employees does Jordi Labs
11   have now?
12      A.   Again, I don't know exactly.  It
13   changes every day.  I'd say 25, 26, around
14   there.
15      Q.   Do you know what percentage of the
16   Jordi Labs work is legal consulting on legal
17   cases?
18      A.   Well, generally it's a small
19   percentage.  As I say, right now it's a bigger
20   percentage because of the nature of this case,
21   but it's an unusual situation.
22      Q.   In this stack of documents are a
23   number of reports from an Evans Analytical
24   Group.
25      A.   Right.

Page 259

1      Q.   Tell me what those are, please.
2      A.   The FTIR microscope work was done by
3   Evans in California, and the SEM, SEM-EDX was
4   done by Evans Group in Minnesota.
5      Q.   Is that because you don't have the --
6      A.   We don't have those instruments.
7      Q.   How did you happen to choose the Evans
8   Analytical Group to perform this testing?
9      A.   We've worked with a company called
10   Chemir in the past, they were bought out by
11   Evans, and they're, I think, about a $7 billion
12   company, and they're a very well respected lab,
13   so we utilize their technique that we don't
14   have.
15      Q.   Is it the FTIR data --
16      A.   FTIR microscope.
17      Q.   Okay.  So for the FTIR and the
18   scanning electron microscope work, you ship that
19   out?
20      A.   That's correct.
21      Q.   And how did you transport the samples?
22      A.   They were sent by our office staff
23   following the regulations that we -- procedures
24   that were set up and described to us to handle
25   and to keep chain of custody.

Page 260

1      Q.   Do you specifically know how that
2   happened?
3      A.   Not exactly, I don't.
4      Q.   Okay.  That's fine.
5      And what did you do to assure that
6   Evans Analytical Group and -- what's the other
7   company?
8      MR. ANDERSON:  They're both Evans.
9      A.   They're both Evans, different
10   divisions.
11   BY MR. THOMAS:
12      Q.   Sorry.  Strike that.
13      What did you do to assure that the
14   Evans Analytical Group was capable of performing
15   the work that you asked them to do?
16      A.   We've been working with a gentleman at
17   Chemir, and we've been referring jobs back and
18   forth for years at various times, and he is --
19   he's really our contact with Evans.  We've had
20   tremendous results for a number of years working
21   with -- both ways, he sends a lot of work here,
22   we send some -- we send a lot of work his way.
23      Q.   So the FTIR -- strike that.
24      So all of the data done by Evans was
25   added to your report without change or input

Page 261

1   from you?
2      A.   Yes.  Basically you have those
3   results.  Any changes you can see there.  I'm
4   sure there were a few verbal changes, but
5   essentially it's the IR spectra, the IR spectra.
6   We certainly wouldn't have -- we wouldn't even
7   have the capability of changing those spectra.
8      Q.   Okay.  Has Jordi Labs ever had an
9   electron microscope?
10      A.   No.
11      Q.   Has Jordi Labs ever had the capability
12   to do the FTIR analysis?
13      A.   Yes.
14      Q.   When did you have that?
15      A.   Oh, probably -- well, we've had it
16   since basically day one of the company at
17   various units.  Classical FTIR.  Now we have the
18   Diamond ATR system.
19      Q.   You still have it?
20      A.   Absolutely.
21      Q.   Why do you ship this out to Evans?
22      MR. ANDERSON:  Micro.
23      A.   Micro.
24   BY MR. THOMAS:
25      Q.   I'm sorry.  Okay.

66 (Pages 258 to 261)

Howard C. Jordi, Ph.D.

Page 262

1        Has Jordi ever had the capability to
2   do the kind of work that Evans did on the FTIR?
3        A.  No, we have never had an FTIR
4   microscope system.
5        Q.  Who is Scott Bowman?
6        A.  He's the gentlemen that transfers jobs
7   back and between us and Evans, or he sends us
8   work, we send him work.
9        Q.  Does he work for Jordi or work for
10  Evans?
11       A.  He works for himself.
12       Q.  Pretty good gig.
13       A.  It's worked out extremely well for us
14  and extremely well for him.  We love his
15  expertise and his ability to get us in touch
16  with the best people.
17       Q.  He's not a -- is he a technical guy?
18       A.  Absolutely is.
19       Q.  Does he do any technical work?
20       A.  No, he just basically is --
21       Q.  He's a broker?
22       A.  He's a broker, a very good one.
23       Q.  So on these SEM analysis reports here
24  that you got apparently from Evans --
25       A.  He may --

Page 263

1        MR. ANDERSON:  Hold on.
2   BY MR. THOMAS:
3        Q.  -- the numbers appear that I asked you
4   about, you didn't know where they came from?
5        A.  Right.
6        Q.  Is it likely that the numbers that I
7   asked you about in both reports on the SEM
8   images, likely those were put on there by Evans,
9   or do you know?
10       A.  They would have had to have been put
11  on by Evans because we couldn't have done it.
12       Q.  Okay.
13       A.  It's their pictures.
14       Q.  Do you have these in an electronic
15  format?  I'm sure you do.  Digital format?
16       A.  I'm sure we can get them.  Adi, again,
17  would know, handles that kind of thing for me.
18       Q.  Did you do all the other testing
19  in-house?
20       A.  Yes, we did.
21       Q.  The documents that I'm going through
22  now are Jordi SOPs, is that correct?
23       A.  Yes.
24       Q.  And these would be the internal
25  procedures that you have that instruct folks in

Page 264

1   how to conduct the tests that you did?
2        A.  That's right.
3        Q.  Diamond Shamrock Corporation, is this
4   a standard for polypropylene, or can you tell by
5   looking at it?
6        A.  Let me take a look.  I can't read it
7   from there.
8        Q.  (Handing.)
9        A.  Yes, that's the polypropylene standard
10  spectrum.  Isotactic.
11       Q.  When we talked before, I thought we
12  decided you didn't use a standard against which
13  to compare your results, that you used your own
14  training, education, literature.
15       A.  There's no way for me to keep track of
16  everything these people are doing out here now.
17  I'm telling you the polystyrene is the one
18  that's used.
19       Q.  Do you know the extent to which the
20  people in the lab used that Diamond Shamrock
21  standard for polypropylene in connection with
22  their work on the opinions in Exhibit 1 or 2?
23  Do you know?
24       A.  No, because these -- this isn't an SOP
25  anyway.  This is just a bunch of spectra.  I'm

Page 265

1   not sure why that's even in there, it's not SOP.
2        Q.  Okay.  Just for the record, it's a
3   multi-page document copyrighted 1980, 1981, 1993
4   for Sadtler, and it's Diamond Shamrock
5   Polypropylene.
6        What's the document I just gave you
7   there, do you know?  Do you recognize that?
8        A.  It's another polypropylene spectrum,
9   J7904.
10       Oh, let me see the other one again,
11  please.
12       Q.  (Handing.)
13       (Witness reviewing document.)
14       A.  These appear to be spectra of the
15  explants done on our instrument which were
16  polypropylene.  We saw lots of noise.  This is
17  why we chose to go with the FTIR microscope
18  route.  We had to look at the total samples,
19  number one.
20       Number two, the samples wouldn't lay
21  flat on our Diamond, and they tended to want to
22  bounce around because they were rigid, and so it
23  was difficult to get a good spectrum, it was
24  lots of noise, so we went to where we could go
25  to a high sensitivity technique where we could,

67 (Pages 262 to 265)

Howard C. Jordi, Ph.D.

Page 266

1   number one, hone in on the cracked regions.
2   When you run a sample with an instrument like
3   this, you're running can the total sample, so
4   you're diluting the effect on the cracked
5   regions, you'd be running a combination of
6   cracked and uncracked regions.  When we use the
7   IR microscope, you can hone in on any specific
8   region of the fiber we want, that's the
9   advantage.  So we decided to go with that
10  technique because it offered us -- for what we
11  needed for this work, it's a far better
12  methodology.
13      Q.  Before I showed you these documents,
14  were you aware that Jordi Labs had tried to
15  analyze in-house --
16      A.  Yes, I was.
17      Q.  -- the FTIR spectra for these
18  explants?
19      A.  Yes, I was.
20      Q.  Okay.  And you tried it, and the
21  documents you just looked at are the documents
22  that you generated in-house from your results of
23  your analysis, correct?
24      A.  That's -- I'm sorry, go ahead, ask the
25  question again.  I'm sorry.

Page 267

1       Q.  I will mark as Exhibit Number 7 the
2   documents you've just been looking at.
3           (Whereupon, Jordi Exhibit Number 7,
4           Group of films, was marked for
5           identification.)
6   BY MR. THOMAS:
7       Q.  And the first page is the Diamond
8   Shamrock standard from Sadtler, S-A-D-T-L-E-R,
9   and then attached to that are FTIR spectra that
10  you all ran in-house with your own capability,
11  at which point you determined that you weren't
12  generating the specificity of the data you
13  needed to make your analysis so you contracted
14  it out for microscopic FTIR?
15      A.  That's correct.
16      Q.  Is that fair?
17      A.  That's fair.
18      Q.  Mark that as Exhibit Number 7.
19      MR. THOMAS:  I won't mark the lab
20  notebooks.
21          The rest of what I have here are
22  miscellaneous SOPs, the Evans reports, and the
23  Evans reports.  Do you want the court reporter
24  to have those, or how do you want to do this?
25      MR. ANDERSON:  What we can do is we

Page 268

1   can find out if those are extra copies.  If
2   those are extra copies, she can take them with
3   her.  If they're not, then we'd like to leave
4   them here so that we can make copies, or we can
5   have you take them and make copies.  I think I
6   need to make sure they're not originals.
7       MR. THOMAS:  Here's what I'd like to
8   have, you tell me if I can have it.  I'd like to
9   have a hard copy and a digital copy.
10      MR. ANDERSON:  Well, I'd like to have
11  a million bucks and retire tomorrow, so if you
12  can deliver I will.
13      MR. THOMAS:  You can't retire on a
14  million dollars, I know you.
15      MR. ANDERSON:  It will last me a
16  couple months.
17      MR. THOMAS:  That wouldn't keep you in
18  Red Bull.
19      MR. ANDERSON:  If you're getting
20  digital -- well, hopefully they have it in
21  digital, then we'll give it to madame court
22  reporter and it will be an exhibit to the depo.
23  If -- that will still be in digital for you, so
24  you need a hard copy.  We'll do the best we can.
25  If it's digital --

Page 269

1       MR. THOMAS:  Digital is my first
2   choice, I'll print my own copy.  The hard copy
3   allows me to know I have everything.  Not
4   because I'm suggesting you're going to do
5   anything with it.
6       MR. ANDERSON:  No, it's easier.  I'm a
7   hard copy guy, too.  Why don't we figure that
8   out after the depo.
9   BY MR. THOMAS:
10      Q.  I'd also like a color copy of your
11  studies that you have.
12      A.  You'd like a what, sir?
13      Q.  Color copy so I can capture the
14  highlighting in your studies.  Because you
15  brought with you today a notebook of studies
16  upon which you rely for your opinions in the
17  case.
18      A.  Articles, yes.
19      Q.  And you have highlighting and writing
20  on them, correct?
21      A.  Mostly highlighting, yes.
22      Q.  I want versions of those that capture
23  the highlighting.
24      MR. ANDERSON:  Absolutely.
25      A.  Fair enough.

68 (Pages 266 to 269)

Howard C. Jordi, Ph.D.

Page 270

1     MR. ANDERSON: We need to take a
2  break. Let's take a break.
3     (Whereupon, a recess was taken from
4     4:39 p.m. to 4:56 p.m.)
5  BY MR. THOMAS:
6     Q. Doctor, attached to Exhibit 1 is a
7  part of -- oh, right after your primary report,
8  is your CV. I'm just going to ask you some
9  questions about your career. You can look at
10 the CV if you want to. I imagine you know it
11 pretty well.
12    A. Where is it here? What page?
13    Q. It's after Page 102. I bet you it's
14 in the back of that.
15    A. Appendix. Conclusion.
16    MR. ANDERSON: After Page 102?
17    MR. THOMAS: That's where I have it.
18 It will be in that copy right there.
19    A. All right. That's fine.
20    MR. THOMAS: We've got it here, Ben.
21    A. Okay.
22 BY MR. THOMAS:
23    Q. All right. Tell me about your
24 education after college, Dr. Jordi. I mean
25 after high school.

Page 271

1     A. I went to Northern Illinois University
2  in DeKalb, Illinois, worked on my bachelor's
3  degree in chemistry, graduated in the summer of
4  1967.
5     Was offered a graduate position there,
6  an NIH fellowship, so I stayed there and worked
7  on my doctorate degree. I finished that in
8  1973, and actually officially graduated in
9  January of '74, but I'd already left and was
10 already in the US Army at Walter Reed by that
11 point.
12    Q. You worked at Walter Reed for how many
13 years?
14    A. A little over three years.
15    Q. What did you do at Walter Reed?
16    A. It was a lab tech chemist position. I
17 worked with, as I mentioned, the biodegradable
18 implants, polylactic and glycolic acid
19 copolymers. We had an another project for
20 purification of eugenol, which is used by
21 dentists. I worked on developing methods of
22 purifying eugenol.
23    Q. You were employed at this time as an
24 analytical chemist?
25    A. Basically.

Page 272

1     Q. And your job as an analytical chemist
2  was to do the lab work associated with any
3  issues that might arise?
4     A. Whatever came up. Whatever projects
5  they wanted support for.
6     Q. All right. And the extent to which
7  any of these products may be appropriate for use
8  in humans would be something beyond what you
9  were doing in the lab on the bench?
10    A. Yes.
11    Q. Okay. What did you do -- you were
12 next employed for six months at Waters
13 Associates. What were you have doing there;
14 more of the same analytic chemist group?
15    A. Basically Waters at that time was,
16 still is a great company, but by my standards,
17 my personality, I like a company that's
18 personable with their customers. They had a
19 philosophy at that time that they would work to
20 solve the customer's separation need and earn
21 the sale of the HPLC instrument through
22 providing the solution of their separations
23 problem, and so my job was to develop those
24 methods. The sales rep would come in and say
25 "this guy wants to separate such and such, and

Page 273

1  get me a method so we can sell the instrument."
2     Q. Okay.
3     A. At that time liquid chromatography was
4  nowhere near as advanced as it is now, so if a
5  guy wanted to separate something, likely there
6  was no published methods available many times,
7  so then we would get involved.
8     Q. So were your years -- or your time at
9  Waters dealing primarily with liquid
10 chromatography?
11    A. Yes, or columns.
12    Q. Or columns.
13    Does that include your entire time at
14 Waters up until February, 1980?
15    A. Yes. Developed amino acid, worked on
16 developing an amino acid analyzer, first
17 generation amino acid analyzer. And then they
18 sent me places to install amino acid analyzers,
19 like they sent me to Germany, they sent me to
20 Chicago.
21    Q. Continuing in the analytical chemistry
22 area?
23    A. Yeah, it was amino acid analysis at
24 this point, that was the specialty at that point
25 in time. It always kept changing depending on

69 (Pages 270 to 273)

Howard C. Jordi, Ph.D.

Page 274

1    the needs of the company, of course.
2        Q.  Then you went for a short time to LC
3    Laboratories?
4        A.  I'm looking at the order of these
5    pages here.
6        Q.  You go back to front, I think.
7        A.  There's Army.  The pages aren't
8    listed.
9            MR. ANDERSON:  Is this it here?
10       A.  Where are we here?
11   BY MR. THOMAS:
12       Q.  Hopefully February, 1980 to September,
13   1980, it looks like you were employed by LC
14   Laboratories as a senior chemist?
15       A.  That's right.
16       Q.  You managed the complete polymer GPC
17   program?
18       A.  Right.  I was working at the time with
19   a Waters 150C, which is a high temperature GPC
20   system running high temperature samples, among
21   other things, and I was responsible for
22   maintaining that instrument.
23           And we also were a contract lab, so we
24   got all kinds of projects.  Whatever the
25   customers sent in they wanted us to do, we did,

Page 275

1    just like we have here now.
2        Q.  Same kind of internal analytical work?
3        A.  Yes.
4        Q.  Okay.
5        A.  It might be prep, it might be
6    developing analytical method, it might be
7    polymer formulation, whatever, whatever it was.
8        Q.  And then from October of 1980 until
9    July, 2008 you ran your own show?
10       A.  That's right.  Remember I told you
11   four or five years, that's where it is.  2008 we
12   turned it over to Mark.
13       Q.  Has the business of Jordi Labs largely
14   been the same over the time frame it's operated?
15       A.  Yes.  But we're continuing to add
16   instrumentation.  So some of the instruments we
17   don't have now, if you come back in a few years,
18   lord willing, we will have.  Like we're thinking
19   about an FTIR microscope system, we're thinking
20   about an SEM system.  We just invested in a QTOF
21   GC system which should be in within the next few
22   months to match the LCMS QTOF system, which
23   gives you more accurate mass and better ability
24   to get more accurate mass and more accurate
25   identification of unknowns.

Page 276

1        Q.  How would you describe the business of
2    Jordi Labs today?
3        A.  We're an analytical testing lab,
4    material science, some expert witness testimony,
5    it's not the major thrust by any stretch,
6    product development.  Because the other side of
7    the business that I developed during my time is
8    several dozen products, fluorinated gel that I
9    patented that's selling.
10       Q.  What does a fluorinated gel do?
11       A.  Well, in chromatography, as you run
12   fast -- liquid chromatography, or any
13   chromatography, as you run faster you'll tend to
14   get less efficient plates.  Plates is a
15   narrowness of the peaks coming off, and the
16   narrower they are the better, the more things
17   separated the narrower they are.
18           So with the fluorinated gel, solvents,
19   it's like Teflon surface chemistry, solvents
20   tend not to wet it.  Since solvents don't wet
21   surface, they don't create drag, and that's what
22   broadens the peaks.  And so now I can run
23   something at 10 mils a minute instead of one mil
24   a minute, I can run at one-tenth the time on
25   that kind of column.

Page 277

1            I developed a polyamide type column,
2    we call it Extreme.  It's a column that runs
3    things in water, polar solvents, so today our
4    polyamides, nylons, proteins, can be run on the
5    Extreme material.
6            I have a standard line of DVD resins
7    that I've developed.  Those are selling well.
8            And basically there's a whole product
9    line.  There's SFE product, solid face
10   extraction cartridges.
11       Q.  Is it fair to describe your business
12   as a lab that offers analytical chemistry
13   services to those who might need it?
14       A.  Yes.
15       Q.  And whatever other products you all
16   might develop on your own?
17       A.  The products we developed are no
18   like -- I would say we probably have a million
19   dollar column inventory here, if we had to go
20   out and buy them all, but we save a good portion
21   of that money by making them ourselves.  And as
22   a side bonus, we sell them on the side and make
23   money from the sale of them, too, as products.
24   That was my business model.
25           And when I successfully developed

70 (Pages 274 to 277)

Howard C. Jordi, Ph.D.

Page 278

1    methods for clients, then they would say -- they
2    might say "okay, now you run $100,000 or
3    $200,000 worth of samples, I want to take that
4    in-house, sell me the column, turn-key method."
5    They've already seen my methods here, they've
6    seen the results, they just take the column and
7    start running.  But now I don't use the total
8    business, I have a column customer instead of a
9    sample customer.
10        Q.  So when you talk about the methods,
11    you're talking about methods of analytical
12    chemistry that you come up with for your
13    customers?
14        A.  Yes.
15        Q.  Prior to your deposition today, have
16    you ever testified or consulted in a medical
17    device case?
18        A.  I have testified.  I don't think, I
19    don't recall -- well, I have been involved with
20    polypropylene implants, artificial hips,
21    artificial knees, polyethylene, I believe.  I've
22    been involved with contact lenses.  I don't --
23    I've been involved in the legal cases, many
24    times they don't go to court, they settle, so
25    you say testify, testifying has been less, of

Page 279

1    course, than the work for -- because people will
2    come to me and not even tell me it's a legal
3    case, then they'll see the results and then tell
4    me they want to do more and now they'll tell me
5    it's a legal case.
6        Q.  What did you do in connection with
7    knee implants?
8        A.  I just ran GPC, additives.
9        Q.  Analytical testing?
10        A.  Just to see if the polymer was
11    degraded over periods of time, if the additives
12    were still there, just like we're doing now.
13        Q.  Did you give any deposition testimony
14    in any cases involving knee implants?
15        A.  It's been 20 years ago.  I don't
16    recall.  I remember running the work, but I
17    don't remember what -- how deep into it we got.
18        Q.  Did you work for the Plaintiff or the
19    Defendant?
20        A.  I worked for the manufacturer,
21    whether --
22        Q.  Do you remember who that was?
23        A.  No, I don't.
24        Q.  What about hip implants, what work did
25    you do on hip implants?

Page 280

1        A.  The same type of thing, molecular
2    weight, additives.
3        Q.  How long ago did you do the hip
4    implant work?
5        A.  The same thing.
6        Q.  20 years ago?
7        A.  20 years ago-ish.
8        Q.  Have you done anything in the last ten
9    years in hip implants?
10        A.  No, I haven't seen it recently.
11        Q.  Do you remember who you worked with on
12    hip implants?
13        A.  No.
14        Q.  Did you give any depositions in hip
15    implant litigation?
16        A.  I don't think so.
17        Q.  Do you know whether Jordi Labs works
18    on any current hip implant litigation?
19        A.  No.  No, I shouldn't say -- I have to
20    say I don't know because I really don't know
21    what the current workflow is.  I don't talk to
22    the customers anymore directly.  I used to know
23    that intimately, but I don't now.
24        Q.  Contact lenses, have you done any work
25    on contact lenses in the last 15 years?

Page 281

1        A.  I couldn't name the customers.  I
2    suspect we have because we've worked on
3    methacrylate type gels, and hemetype gels which
4    are used in that kind of product.
5        Q.  In a litigation context?
6        A.  No, just analysis.
7        Q.  For the knees, hips, and contact
8    lenses that you just identified, do you recall
9    giving any deposition testimony in any of those
10    cases?
11        A.  No.
12        Q.  Have you ever testified as an expert
13    in a medical device case before today?
14        A.  I don't believe so.
15        Q.  Have you ever done any work for the
16    FDA?
17        A.  No.
18        Q.  Ever done any work for Johnson &
19    Johnson?
20        A.  I think we probably have, because
21    we've worked for almost all the major
22    corporations over the years.
23        Q.  Do you have a specific recollection of
24    working for Johnson & Johnson or any of its
25    subsidiaries?

71 (Pages 278 to 281)

Howard C. Jordi, Ph.D.

Page 282

1      A.  I have a recollection, but I couldn't
2   even tell you what we did.
3      Q.  Are you familiar with a company known
4   as Ethicon?
5      A.  Yes.
6      Q.  Do you have any recollection of ever
7   working with Ethicon?
8      A.  The name sure sounds familiar.
9      Q.  Do you know the business of Ethicon?
10     A.  Well, I do, I mean I know one part of
11  it at least now, these meshes.  I don't know, I
12  don't know what else they might be involved in.
13     Q.  Do you know any business interests
14  that Ethicon has beyond the mesh that's involved
15  in the litigation about which you're testifying
16  today?
17     A.  Other than the mesh?
18     Q.  Right.
19     A.  No.
20     Q.  And the only reason you know about the
21  mesh and its relationship to Ethicon is because
22  you're involved in this case, is that fair?
23     A.  That's right.
24     Q.  We talked earlier about work that
25  Jordi Labs may be doing in litigation involving

Page 283

1   Bard.  Do you know whether Jordi Labs is doing
2   work involving the meshes of any other
3   manufacturer?
4      A.  I don't have any idea.
5      Q.  Do you have an engagement letter with
6   the Plaintiffs in this case?
7      A.  No.
8      Q.  Do you know whether Jordi Labs has an
9   engagement letter with the Plaintiffs in the
10  case?
11     A.  Well, we have -- we send out
12  quotations, and those have to be signed.
13     Q.  Okay.
14     A.  Somehow.
15     Q.  For work that's been done in this
16  case, you should have on your file a contract or
17  agreement?
18     A.  That would be -- the way the work is
19  handled is it goes through a project manager,
20  and the project manager would have that quote.
21  He generates the quotes, and then it's approved
22  by Mark and others.
23     Q.  Do you know who the project manager
24  is --
25     A.  Greg.

Page 284

1      Q.  -- for this work?
2      A.  What's Greg's last name?  I can look
3   it up.
4         MR. ANDERSON:  Elsdon.
5      A.  Elsdon.
6   BY MR. THOMAS:
7      Q.  And what kind of file materials would
8   the company typically keep that would govern the
9   relationship that it has with a customer, an
10  engagement or purchase order or a contract of
11  some sort outlining the work you're going to do?
12     A.  There has to be some kind of
13  paperwork, otherwise we wouldn't begin work.
14     Q.  Anything else?
15     A.  Not very formal, other than that.
16     Q.  On the invoices we talked about
17  earlier that I marked as an exhibit, there were
18  a number of surcharges for rush work.  Are you
19  familiar with those?
20     A.  Yes.
21     Q.  What happened?  Why were the
22  surcharges made?
23     A.  Well, like in the Batiste case, the
24  sample was explanted recently, and we had to be
25  ready for the deposition today, so in order to

Page 285

1   do that it had to be done on a rush basis or it
2   wouldn't be ready.  Normal turnaround is ten
3   days.
4      Q.  Do you have a pricing policy that
5   determines the extent to which you markup work
6   for surcharges?
7      A.  Yeah, they do.  It's maybe double.  I
8   don't -- again, I don't control that.  But I'm
9   familiar with it.
10     Q.  For example, on invoice 7881, there's
11  a surcharge for rush analytical surfaces of
12  $35,000.
13        Would that be a charge in addition to
14  what it ordinarily costs?
15     A.  Yes.
16     Q.  And again on 7883, 9/11/2013, there's
17  another surcharge for $67,813?
18     A.  Yes.
19        We're basically set up --
20        MR. ANDERSON:  There's no question.
21        THE WITNESS:  Sorry.
22        MR. ANDERSON:  No question pending.
23        MR. THOMAS:  I'm finished.  Thank you.
24        MR. ANDERSON:  All right.  I need to
25  take a break, take a few minutes and sit and

72 (Pages 282 to 285)

Howard C. Jordi, Ph.D.

Page 286

1    talk, and we'll be back on here as soon as we
2    can.
3          (Whereupon, a recess was taken from
4          5:16 p.m. to 5:49 p.m.)
5          CROSS EXAMINATION
6    BY MR. ANDERSON:
7          Q.   Dr. Jordi, I'm just going to ask you a
8    few questions.  I know it's been a long day, but
9    I just have a few follow-up questions to some of
10   the things Mr. Thomas asked you.  Okay?
11         A.   Okay.
12         Q.   Doctor, all of the testing that we've
13   been discussing all day long that was performed
14   by Jordi Labs, are all those tests industry
15   standard?
16         A.   Yes.  Routine.
17         Q.   In performing these tests, the ones
18   that were done at Jordi Labs, were standard
19   operating procedures here at Jordi Labs
20   followed?
21         A.   Yes.
22         Q.   Were lab notebooks carefully collected
23   and each step written down by --
24         A.   Yes.
25         Q.   Let me finish.

Page 287

1          -- by Jordi Labs?
2          A.   Yes.
3          Q.   And was all of the testing that we've
4    described today done at your direction?
5          A.   Yes, I requested these tests.
6          Q.   Is it standard or non-standard in your
7    industry for someone to assign work or to send
8    work of this nature, this type of testing, to
9    someone else to perform the testing?
10         A.   It's standard procedure because
11   nobody, almost nobody has enough, except the
12   giants, has enough money to have all the
13   instruments.
14         Q.   So when Mr. Thomas was questioning you
15   about some of the jobs you sent to Evans, and
16   you said sometimes Evans sends jobs to you, is
17   that standard in your industry?
18         A.   Absolutely.
19         Q.   Therefore, was it standard for you to
20   send some of the FTIR microscopy and other tests
21   out to Evans to have them send you the results?
22         A.   Yes.
23         Q.   In preparing your report in this case
24   and providing your opinions, is it fair to say
25   that you assigned these projects to folks at

Page 288

1    Jordi Labs, and they brought results back to
2    you, and you interpreted those results?
3          A.   That's right.
4          Q.   Is that also standard in your
5    industry?
6          A.   Absolutely.
7          Q.   In talking about your opinions
8    regarding the degradation of the meshes from
9    Ms. Batiste, Ms. Lewis, and the other women
10   whose explant samples you reviewed today, do you
11   have an opinion as to whether or not those
12   meshes would degrade even if there were
13   antioxidants present in the polypropylene?
14         MR. THOMAS:  Object to the form of the
15   question.
16         A.   It's possible that they could if the
17   amount of peroxide, superoxide, other oxidants,
18   the irritation, the inflammation was great
19   enough in a given patient.
20   BY MR. ANDERSON:
21         Q.   You said "possible," so we have to
22   correct that.
23         Do you have an opinion to a reasonable
24   degree of medical certainty as to whether or not
25   the meshes in Ms. Batiste, Ms. Lewis, and others

Page 289

1    could still degrade showing the cracking on SEM
2    and showing SEM-EDX analysis of the particles to
3    be polypropylene even if there was antioxidants
4    present in the mesh?
5          MR. THOMAS:  Object to the form of the
6    question.
7          MR. ESTEE:  Object to form.
8          A.   It's certainly -- the antioxidants can
9    be overcome if you throw enough oxidant at the
10   polymer.
11   BY MR. ANDERSON:
12         Q.   Is the sole basis for stating that
13   antioxidants can leach from polypropylene just
14   your work done in this case, or are there other
15   bases for that opinion?
16         MR. THOMAS:  Object to the form of the
17   question.
18         A.   Certainly additives bloom at varying
19   rates depending on their compatibility with the
20   polymer system they're put in.  So Santonox R
21   can bloom, most any additive can bloom at some
22   rate, and the less compatible it is with the
23   polymer the faster it will bloom, and hence the
24   faster it will be lost.  So polymers can lose
25   their antioxidants even if they're stabilized

73 (Pages 286 to 289)

Howard C. Jordi, Ph.D.

Page 290

1    initially.  In fact, they all do at some rate.
2    BY MR. ANDERSON:
3         Q.  And is that knowledge that you just
4    expressed based only upon the studies that you
5    did here, or is that something that you brought
6    with you before this litigation?
7              MR. THOMAS:  Object to the form of the
8    question.
9         A.  No, the -- over 30 years of experience
10   and articles I've read, books I've read, other
11   samples I've analyzed, it can be -- they can
12   lose their antioxidants, as well as we showed it
13   in the study.  But that certainly isn't the only
14   reason I believe they're lost.
15   BY MR. ANDERSON:
16        Q.  Right at the end of some of the
17   questioning there was some -- Mr. Thomas asked
18   you some questions about some rush charges on
19   the bills.
20             Do you remember those?  Do you
21   remember those questions?
22        A.  Yes, sir.
23        Q.  Is it standard in your industry if
24   someone asks you to do a quick turnaround on
25   testing that you charge a rush charge?

Page 291

1         A.  Absolutely is.
2         Q.  So that wasn't something just special
3    to me, that's something your company does all
4    the time?
5         A.  We -- yes.  Absolutely.
6         Q.  Do other companies in your industry do
7    the same thing?
8         A.  Absolutely.
9         Q.  Does your dry cleaners do it, too?
10   Withdraw the question.
11             And why is it that your company would
12   charge a rush fee?
13        A.  We have to turn away other work, we
14   have to put other projects on hold, potentially
15   if we get enough of this type of thing, angering
16   some clients.  So it's a difficult management
17   decision on how to handle it.
18        Q.  Does it put an increase on your
19   workload for your employees?
20        A.  Absolutely.
21        Q.  Let me take you back to a part of your
22   testimony regarding cleaning the material or,
23   let's call it, preparing the fibers prior to
24   certain testing being done at Jordi Labs.
25             Do you remember that part of your

Page 292

1    questioning?
2         A.  Mm-hmm.
3         Q.  Yes?
4         A.  Yes.
5         Q.  There was some question by Mr. Thomas
6    as to whether or not you should have used sodium
7    hypochlorite in order to clean the materials.
8              Do you remember that part of the
9    questioning?
10        A.  Yes.
11             MR. THOMAS:  Object to the form of the
12   question.
13             MR. ANDERSON:  I'm trying to redirect
14   the witness back to that area of the
15   questioning.
16   BY MR. ANDERSON:
17        Q.  By not applying sodium hypochlorite to
18   the fibers in order to remove some of the
19   proteins, would that change any of your opinions
20   with regard to whether or not the meshes in
21   Ms. Lewis, Ms. Batiste, and the other women
22   whose explanted meshes you looked at degraded on
23   SEM analysis?
24        A.  No.  The fact is that you could
25   clearly see the degradation, it had no bearing

Page 293

1    whatsoever.
2         Q.  What change, if any, would applying
3    sodium hypochlorite have to any of the test
4    results that you obtained for Ms. Lewis,
5    Ms. Batiste, and the other women?
6         A.  It would have removed the protein from
7    the surface of the mesh so that the infrared
8    spectrum would -- the protein bands in the
9    infrared spectrum would have gone away.
10        Q.  Whether or not those bands are present
11   or not present, can you still see other evidence
12   of oxidation on those bands?
13        A.  We still saw the 1760 band and the
14   1740 shoulder in spite of that.  So they're both
15   still there, both of which indicate oxidation.
16        Q.  You were shown by Mr. Thomas Jordi
17   Exhibit 3, that was this Renaud de Tayrac and
18   Letouzey article.
19             Do you recall that?
20        A.  Yes, I do.
21        Q.  Were the meshes that were --
22        A.  I got it.
23        Q.  Were the meshes that were explanted
24   and analyzed in that study coming from women?
25        A.  No, it says in Figure 1 they were

74 (Pages 290 to 293)

Howard C. Jordi, Ph.D.

Page 294

1  coming from Wistar rats.
2      Q.  From rats, is that what you said?
3      A.  Yes.  Wistar rats.
4      Q.  And when animal studies are used in a
5  preclinical model, do they typically use healthy
6  rats?
7      A.  Yes.
8      Q.  Was the explanted tissue coming from
9  these women coming from healthy tissue?
10         MR. THOMAS:  Object to the form of the
11  question.
12      A.  From here, from this figure?
13  BY MR. ANDERSON:
14      Q.  From the women whose explanted meshes
15  you looked at.  I'll withdraw -- that's okay,
16  I'll withdraw the question.
17         He used D -- well, these authors used
18  DMSO as well as ultrasonic treatment in order to
19  remove what they claim to be just the proteins
20  from the fibers.
21         Do you recall that?
22      A.  I do.
23      Q.  Do you believe that's a scientifically
24  valid method in which to determine what is
25  flaking off of the meshes?

Page 295

1      A.  I do not.
2      Q.  And why is that?
3      A.  If you use sonication you're using a
4  battering ram to knock the cracked material off,
5  and so if you knock the material off you're
6  removing the very thing that you want to look
7  at.  They did not -- now, if they had run
8  infrared or some other technique to look at the
9  structure of the material coming off chemically,
10  it would have been helpful, but none of that was
11  done.  So it was just blasted clean, and say it
12  never was polypropylene, but we know it was
13  polypropylene because we looked at it in our
14  particles, and we saw that it was polypropylene.
15  Of course it did have some protein in it, but it
16  was mostly polypropylene.
17      Q.  So do you find this article to be
18  scientifically reliable with regard to whether
19  or not TVT mesh degrades in women?  Do you find
20  this article to be scientifically valid with
21  regard to whether or not the TVT meshes degrade
22  in women?
23      A.  I do not.  I think -- I'm surprised it
24  was published without some requirement to do
25  structural analysis to prove their claim.

Page 296

1  There's no proof there by any chemical testing.
2      Q.  Do you recall during part of the --
3  during part of the questioning by Mr. Thomas, he
4  was asking you whether or not you or someone at
5  Jordi Labs performed any analysis on hydrogen
6  peroxide or any other products of inflammation
7  that may have occurred in the women's tissue
8  before these meshes were explanted?  Do you
9  remember that part of your testimony?
10      A.  I do.
11      Q.  Are you aware of any test out there
12  that would allow you to look at the products of
13  inflammation in and around mesh fibers that have
14  been explanted and put into formalin and shipped
15  to you for analysis?
16      A.  Absolutely not, because it's been
17  washed away.
18      Q.  Would it matter to your opinions
19  regarding the degradation of these meshes in
20  this case whether or not hydrogen peroxide was
21  present in the body at that time?
22      A.  No, it would not, because the damage
23  was observed in SEM and other techniques, like
24  IR.
25      Q.  Do you, to a reasonable degree of

Page 297

1  medical -- to a reasonable degree of medical
2  certainty --
3         MR. THOMAS:  Scientific certainty.
4  BY MR. ANDERSON:
5      Q.  What did I say?  Medical?  It's been a
6  long day.
7         Doctor, do you have an opinion to a
8  reasonable degree of scientific certainty as to
9  whether or not you need to know whether hydrogen
10  peroxide, superoxides, or any other mediators or
11  inflammatory products that would have been
12  produced in the body were present on the meshes
13  by the time you analyzed them in order to
14  determine whether or not these meshes degraded?
15      A.  I don't see why we'd need to determine
16  that.
17      Q.  And why is that?
18      A.  It wouldn't matter.  We see the
19  degradation, the oxidation has already occurred,
20  we don't need to say hydrogen peroxide or
21  hydroxide radicals at this point, we need to see
22  the chemical damage that's been done to the
23  material.  It either has or has not occurred.
24      Q.  Do you recall some questioning by
25  Mr. Thomas where you were looking at the FTIR

75 (Pages 294 to 297)

Howard C. Jordi, Ph.D.

Page 298

1 microscopy, and there was a picture of one of
2 the shards of polypropylene that had come off
3 one of the meshes?
4     A.  Yes.
5     Q.  Do you recall that?  Don't cut me off
6 if you can.
7         Do you recall that?
8     A.  Yes.
9     Q.  Do you recall that he asked you how
10 many of these particles came off of the fibers?
11 Do you remember that?
12     A.  Yes.
13     Q.  Did you feel the need to count each
14 and every particle that came off of those fibers
15 in order to allow you to make an opinion as to
16 whether or not those FTIR microscopy analyses
17 showed that the shards contained polypropylene?
18     A.  I saw no need, because you can look at
19 the cracked region, and if it came off in bits
20 and pieces, each piece would be the same.  It
21 all looks identical.
22     Q.  And just give us an estimate of how
23 many of these particles were falling off just
24 one of these small pieces of fibers; are we
25 talking tens, twenties, dozens?

Page 299

1     A.  I have no idea.
2     Q.  It's that many?
3         MR. THOMAS:  Object to form.
4     A.  In some cases, like this case, this
5 article --
6 BY MR. ANDERSON:
7     Q.  No, we're going to focus on in this
8 case.
9     A.  Okay.
10     Q.  The amount of material.  Let's focus
11 on that.
12         In the photographs that were done by
13 Evans on the FTIR microscopy when they showed
14 the various pieces, did you need to test 10, 20,
15 30 of those pieces to confirm the results that
16 you had on your FTIR microscopy?
17         MR. THOMAS:  Object to the form of the
18 question.
19     A.  No.  I mean they're all the same.
20 BY MR. ANDERSON:
21     Q.  Do you recall being asked a question
22 as to how much oxidation is required to cause
23 the polypropylene fibers to begin to flake?  Do
24 you recall that part of your questioning?
25     A.  Yes.

Page 300

1     Q.  How much oxidation was required for
2 Ms. Lewis, Ms. Batiste, and these other 21
3 women?
4     A.  Enough to cause the flaking that was
5 observed.
6         MR. THOMAS:  Object to form of the
7 question.  Move to strike.
8         MR. ESTEE:  Object to form.
9 BY MR. ANDERSON:
10     Q.  How much oxidation was required for
11 the mesh samples for Linda Batiste, Carolyn
12 Lewis, and all the other women whose meshes you
13 observed in order to flake?
14         MR. THOMAS:  Object to the form of the
15 question.
16         MR. ESTEE:  Form.
17     A.  That's an impossible question for me
18 to answer.  I know that there was enough because
19 it did flake and it was observed in the SEM.
20 BY MR. ANDERSON:
21     Q.  If polypropylene fibers flake in the
22 manner in which those that you observed in this
23 testing flaked and peeled off, would that allow
24 this mesh to function for its intended purpose?
25         MR. THOMAS:  Object to form of the

Page 301

1 question.
2         MR. ESTEE:  Object to form.
3     A.  I would think it would cause
4 irritation in the body, so I would think not.
5 That is a question primarily for the medical
6 doctors to answer as far as the damage it might
7 or might not do.  But it certainly can't be good
8 to be putting knife edges in tissue.
9 BY MR. ANDERSON:
10     Q.  Is it your understanding that these
11 are supposed to be permanently implanted in a
12 woman's pelvic tissues?
13     A.  Yes.
14     Q.  Given the amount of degradation that
15 you've seen in your testing, do you believe that
16 it would perform its intended purpose of being
17 permanently implanted in these women's bodies
18 without causing some problems with the polymer
19 structures?
20         MR. THOMAS:  Object to the form of the
21 question.
22     A.  Absolutely not.
23 BY MR. ANDERSON:
24     Q.  Explain what you mean by that.
25     A.  Well, these shards come off, they're

76 (Pages 298 to 301)

Howard C. Jordi, Ph.D.

Page 302

1  going to cause inflammation, and it's going to
2  be a problem.
3        MR. THOMAS:  Move to strike.
4  BY MR. ANDERSON:
5      Q.  Had these meshes continued to be in
6  these women's bodies, would you -- strike that.
7        Is degradation of polymer, like you've
8  seen in this testing, progressive?
9        MR. THOMAS:  Object to form of the
10  question.
11     A.  Yes.  It definitely is.  It starts on
12  the surface and apparently works its way in, as
13  we've seen by SEM-EDX presence of oxygen in the
14  second underlying layer.
15  BY MR. ANDERSON:
16     Q.  So do you have an opinion to a
17  reasonable degree of scientific certainty as to
18  whether or not the longer these mesh fibers are
19  in the body the more degradation will occur?  Do
20  you have an opinion on that?
21     A.  I think the data shows that it's going
22  to degrade like the layers of an onion, layer
23  after layer.
24     Q.  You were asked some questions about --
25  from Mr. Thomas as to whether or not you used a

Page 303

1  standard over here for polypropylene, for FTIR,
2  or a standard over here.  Do you remember that
3  part of your questioning?
4      A.  Right.
5      Q.  Do you need an FTIR for polypropylene
6  -- sorry.  Strike that.
7        Do you need an FTIR standard for
8  polypropylene in order to determine whether or
9  not the polypropylene in these meshes oxidized
10  and degraded?
11     A.  Absolutely not.
12     Q.  Please explain that.
13     A.  Because we have -- the carbonyl is
14  going to show up at 1740, 1730, 17 whatever, 15,
15  or 1700 depending on the form, or a mix of all
16  of those, and that's going to be there in a
17  polypropylene.  So if the carbonyl shows up,
18  it's going to be separate from the bands of the
19  polypropylene.  Polypropylene doesn't have any
20  bands there.
21     Q.  Do you recall, if you could just turn
22  to Pages 67 and 69 of your report, you were
23  looking at some FTIR micro with Mr. Thomas?
24     A.  Yes.
25     Q.  And you were asked some questions as

Page 304

1  to whether or not you found anything in the
2  FTIR, evidence of oxidation at band 1730 to
3  1680.
4        Do you recall that?
5      A.  Yes.
6      Q.  Does it matter to you whether or not
7  you can find evidence of oxidation in the FTIR
8  at 1730 to 1680 in order to hold the opinion
9  that this mesh degraded in this woman's body?
10     A.  Not really, because the fact is it did
11  degrade and we saw it in the SEM.  That's just
12  simply a fact.
13     Q.  Is all of the testing that was done
14  for Carolyn Lewis and Linda Batiste contained in
15  the reports that you've provided?
16     A.  Was all of the testing?
17     Q.  Is all of the testing that was done at
18  your direction provided in the reports that
19  you've given today for both Linda Batiste and
20  Carolyn Lewis?
21     A.  Well, with the possible exception of
22  the --
23     Q.  Let me see if I can withdraw that.
24        Is all the testing that forms the
25  basis of your opinions that the mesh degraded in

Page 305

1  Linda Batiste and Carolyn Lewis available in the
2  reports that you've provided today?
3      A.  Yes.
4        MR. THOMAS:  Object to the form of the
5  question.
6  BY MR. ANDERSON:
7      Q.  In other words, if you wanted to speak
8  to the results for all of the testing that was
9  done showing degradation as you've described
10  previously here for the jury for Carolyn Lewis
11  and Linda Batiste, you'd be able to point us to
12  each one of those testing as Mr. Thomas went
13  through with you today, correct?
14        MR. THOMAS:  Object to form.
15        MR. ESTEE:  Form.
16        MR. ANDERSON:  Form.
17     A.  That's correct.
18  BY MR. ANDERSON:
19     Q.  Based on your knowledge, training,
20  background, experience, your work history with
21  polymers as you described it here today, your
22  work as a biochemist and a polymer chemist, and
23  all of the materials that you reviewed in this
24  case, including the testing that was done at
25  your direction, do you have an opinion to a

Howard C. Jordi, Ph.D.

Page 306

1   reasonable degree of scientific certainty as to
2   whether or not the polypropylene mesh, Prolene
3   mesh TVT implanted in Carolyn Lewis, degraded
4   while in her body?
5           MR. THOMAS:  Object to the form of the
6   question.
7           MR. ESTEE:  Object to form.
8   BY MR. ANDERSON:
9       Q.  Do you have an opinion?
10      A.  I absolutely do.
11      Q.  What is that opinion?
12          MR. THOMAS:  Objection to form.
13          MR. ESTEE:  Form.
14      A.  It's obvious, you can see the
15  cracking.
16  BY MR. ANDERSON:
17      Q.  And do you have an opinion to a
18  reasonable degree of scientific certainty based
19  upon your knowledge, training, background,
20  education, all of your work history for greater
21  than 30 years, 40 years, your work here at Jordi
22  Labs, as well as all of the materials that
23  you've reviewed in this case, including the
24  testing that was done for the explant sample for
25  Linda Batiste, as to whether or not the mesh in

Page 307

1   Linda Batiste degraded in her body?
2           MR. THOMAS:  Objection.
3           MR. ESTEE:  Form.
4       A.  It did degrade.  I saw the damage.
5   BY MR. ANDERSON:
6       Q.  And what is the basis for that, the
7   damage that you saw, the testing that you saw?
8           MR. THOMAS:  Objection.
9       A.  We saw increased carbonyls in the
10  infrared.  We saw the increased oxygen in
11  SEM-EDX.  We saw the lack of antioxidants, which
12  would predispose the polymer to oxidation.
13  BY MR. ANDERSON:
14      Q.  Did the SEM photos also support your
15  opinions in that regard?
16      A.  They were the -- they were proof
17  positive really.  That just shows it's fact, it
18  happened.  We can argue about how it happened,
19  but it's definitely a fact that it did happen.
20          MR. ANDERSON:  I don't have anything
21  further.
22          MR. THOMAS:  Anybody on the phone?
23          MR. ESTEE:  I'm sorry?
24          MR. THOMAS:  Do you have any
25  questions?

Page 308

1           MR. ESTEE:  No.  We will reserve any
2   questions until the time of trial.
3           MR. THOMAS:  Thank you.
4           (Whereupon, the deposition was
5           concluded at 6:11 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 309

1   COMMONWEALTH OF MASSACHUSETTS )
2   SUFFOLK, SS.              )
3       I, MAUREEN O'CONNOR POLLARD, RPR, CLR,
4   and Notary Public in and for the Commonwealth of
5   Massachusetts, do certify that on the 30th day
6   of October, 2013, at 9:05 o'clock, the person
7   above-named was duly sworn to testify to the
8   truth of their knowledge, and examined, and such
9   examination reduced to typewriting under my
10  direction, and is a true record of the testimony
11  given by the witness.  I further certify that I
12  am neither attorney, related or employed by any
13  of the parties to this action, and that I am not
14  a relative or employee of any attorney employed
15  by the parties hereto, or financially interested
16  in the action.
17      In witness whereof, I have hereunto
18  set my hand this 1st day of November, 2013.
19
20  _____
21  MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22  Realtime Systems Administrator
23  CSR #149108
24
25

78 (Pages 306 to 309)

Howard C. Jordi, Ph.D.

Page 310

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.  It will be
10  attached to your deposition.
11         It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 312

ACKNOWLEDGMENT OF DEPONENT

1
2
        I,_____, do
3   hereby certify that I have read the
    foregoing pages, and that the same
4   is a correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7
    _____
8   HOWARD C. JORDI, PH.D.        DATE
9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
25

Page 311

1          - - - - - -
            E R R A T A
2          - - - - - -
3   PAGE  LINE  CHANGE
4   ____ ____ _____
5   REASON: _____
6   ____ ____ _____
7   REASON: _____
8   ____ ____ _____
9   REASON: _____
10  ____ ____ _____
11  REASON: _____
12  ____ ____ _____
13  REASON: _____
14  ____ ____ _____
15  REASON: _____
16  ____ ____ _____
17  REASON: _____
18  ____ ____ _____
19  REASON: _____
20  ____ ____ _____
21  REASON: _____
22  ____ ____ _____
23  REASON: _____
24  ____ ____ _____
25  REASON: _____

Page 313

1          LAWYER'S NOTES
2   PAGE LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____

79 (Pages 310 to 313)