# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | **Master File No. 2:12-MD-02327** **MDL No. 2327** |
| **THIS DOCUMENT RELATES TO: ETHICON WAVE 5 CASES** | **JOSEPH R. GOODWIN** **U.S. DISTRICT JUDGE** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN GENERAL OPINIONS OF DANIEL ELLIOTT, M.D.**

Dr. Elliott has been the target of multiple *Daubert* motions over the past three years. In that time, his opinions have largely remained the same. In fact, his reports in these Wave cases have not materially changed. In Wave 1, Ethicon challenged all of his opinions and the Court ruled on those challenges. (Doc. No. 2666). In Wave 2 Ethicon adopted its Wave 1 challenges and the Court adopted its earlier rulings. (Doc. No. 3528). For Wave 3, Ethicon decided it was unhappy with the Court's earlier rulings and it levied another scattershot attack on most of Dr. Elliott's opinions. The Court rejected Ethicon's attempt to get a second bite at the apple and adopted its earlier Order reserving for trial any new or newly nuanced attacks. (Doc. No. 4152). Now, Ethicon has decided it is still unhappy with the Court's rulings and is trying to get a third bite at the apple. Notably, Ethicon does not argue that Dr. Elliott materially modified his report or his opinions -- he did not. Ethicon does not argue there is some new testimony undermining Dr. Elliott's opinions – there is not. Ethicon just wants another bite. The Court should summarily deny Ethicon's Motion seeking to revisit issues the parties have fully briefed and this Court has already decided. The Court should adopt its earlier rulings in Wave 1 and Wave 3 and move these cases toward trial.

## BACKGROUND

The Court is well acquainted with Dr. Elliott's *bona fides*. Dr. Daniel S. Elliott is an associate professor of urology in the section of Female Urology and Reconstructive Surgery at the Mayo Clinic Graduate School of Medicine in Rochester, Minnesota. He has treated hundreds of patients with mesh-related complications. For over 15 years, he has specialized in treating urinary incontinence in women. He has delivered numerous lectures on treatment options for stress urinary incontinence (SUI) in women, including the limitations of each. He is an editor or reviewer for 15 urologic and gynecologic journals and has reviewed all readily available medical literature on SUI treatment options. He has also reviewed an extensive number of internal Ethicon documents and depositions of its personnel in developing his opinions in these cases.

Dr. Elliott has extensive experience implanting both naturally made and synthetic slings to treat SUI, including polypropylene slings. In fact, synthetic slings were his primary treatment for SUI prior to August, 2013. He implanted several hundred synthetic slings during that time period.

## ARGUMENT

**I.     Ethicon Is Simply Regurgitating Its Previous Attacks on Dr. Elliott (as it did in Wave 3) and the Court Should Deny Ethicon's Motion and Adopt Its Earlier Rulings.**

This Court has expressly informed the parties that it does not desire *Daubert* do-overs and that such motions waste the Court's and parties' time. In its Wave 3 *Daubert* Order concerning Dr. Elliott, the Court simply adopted its prior Wave 1 ruling noting "the court will refrain from engaging in the extremely inefficient practice of continuously reexamining qualifications, reliability, and relevance of dozens of experts and their numerous opinions." (Doc. 4152 at 2).

Here, Ethicon's Wave 5 *Daubert* Motion is essentially a wholesale regurgitation of its Wave 1 and Wave 3 motions. In fact, large portions of the Motion are a word-for-word recitation

of Ethicon's Wave 1 and Wave 3 motions. In instances where the present Motion differs from earlier briefs, the "new" issues raised are either wholly irrelevant or are being raised for the first time after years of litigation.

Notably, Ethicon does not allege that Dr. Elliott has materially changed any of his opinions – he has not – nor that there is any new testimony from Dr. Elliott undermining this Court's previous rulings – there is not. Instead, Ethicon largely seeks to have the Court reconsider its earlier rulings with which it disagrees or to attack whole new portions of Dr. Elliott's opinions despite the fact that these opinions have not materially changed for years.

On August 26, 2016, this Court issued its Wave 1 Memorandum Opinion and Order on *Daubert* Motion re: Daniel Elliott, M.D. In this Order, the Court thoroughly assessed Dr. Elliott's qualifications and the reliability and relevance of the opinions he sought to offer. The Court determined that Dr. Elliott could offer some opinions, could not offer others, and, that certain decisions were best reserved for determination at the time of trial. (Doc. No. 2666).

For Wave 2 cases, the parties adopted their Wave 1 briefing and the Court simply adopted its Wave 1 Order. (Dkt. 3528). This reflected the Court's desired approach when dealing with the same expert who had issued a similar report in earlier Waves.

In Wave 3, apparently becoming dissatisfied with the Court's Wave 1 ruling, Ethicon filed a new *Daubert* challenge against Dr. Elliott. On July 20, 2017, this Court issued an Order regarding Dr. Elliott's opinions in Wave 3. (Doc. No. 4152). The Court noted that "the expert opinions proffered [by Dr. Elliott] in Wave 1 are in almost every respect identical to those proffered here [in Wave 3]." *Id.* Recognizing that "these refreshed *Daubert* challenges are different from previous arguments by only the very slightest of degrees," the Court adopted its earlier Wave 1 Order on all previously determined issues and reserved ruling on any new issues

holding that "the trial judge may easily resolve these issues at trial without the need for further briefing or evidentiary hearing." *Id.* at 2.

Now, Ethicon seeks once again to reopen issues the parties have fully briefed and this Court has thoroughly addressed in both Waves 1 and 3 or which it failed to raise in its Wave 1-4 briefing. In essence, Ethicon seeks a third bite at the apple. Ethicon even admits that its Wave 5 Motion largely mirrors their earlier motions. *Memorandum in Support of Defendants' Motion to Exclude Certain General Opinions of Daniel Elliott, M.D.* at 1 (Doc. No. 4367) ("Ethicon's brief in this wave of cases is very similar to its brief submitted for the Wave 3 cases….") (hereinafter, "Motion"). Ethicon concedes that Dr. Elliott has not issued a materially new report or that he has any new opinions. Instead, Ethicon admits it wants the Court to revisit earlier rulings or consider Ethicon's new arguments that Ethicon failed to raise in the past. *Motion* at 1 ("Ethicon presents the following arguments that have not previously been argued and/or that have been supplemented with additional authorities…."). Ethicon's attempt to relitigate Dr. Elliott's opinions is wholly improper and an inefficient use of judicial resources. Accordingly, the Court should summarily deny Ethicon's Motion and adopt its earlier rulings.[1] Out of an abundance of caution, Plaintiffs address Ethicon's individual claims.

## II. Dr. Elliott is Qualified to Testify Regarding Product Warnings.

In every one of his experts reports from Wave 1 through *Mullins* and this Wave 5 report, Dr. Elliott has consistently opined about the risks of implanting mesh, whether or not those risks

---

[1] Ethicon's Motion is effectively an improper motion to reconsider this Court's earlier rulings. As this Court noted in *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 649 (S.D.W. Va. 2013), "it is improper to file a motion for reconsideration simply to ask the Court to rethink what the Court had already thought through—rightly or wrongly." *Id.* (quoting *Mt. Hawley Ins. Co. v. Felman Production, Inc.,* No. 3:09–cv–00481, 2010 WL 1404107, at *2 (S.D.W.Va. Mar. 30, 2010)).

appeared in the various instructions for use ("IFUs"), and whether the undisclosed risks should have appeared in the IFUs. In fact, the language he used in all of those reports is essentially identical and Ethicon does not identify any new opinions. Now, for the first time, Ethicon insists that Dr. Elliott's testimony should be "confined" to exclude testimony about "what information should or should not be included in an IFU." *Motion* at 3.

To be clear, Ethicon had the opportunity to raise this issue in earlier briefing – yet, it has never done so. In fact, the terms "IFU", "instructions for use" or "warning" do not appear anywhere in Ethicon's Wave 1 or Wave 3 *Daubert* motions against Dr. Elliott. Especially considering the magnitude and complexity of this MDL, the Court should not permit Ethicon to serially relitigate Dr. Elliot's opinions after multiple briefs have been completed and the Court has issued multiple opinions. Ethicon waived its right to challenge Dr. Elliott's IFU/Warnings opinions. On this basis alone, the Motion should be denied.

Assuming the Court wishes to assess the substance of Ethicon's reconsideration Motion and new arguments, it is evident that Dr. Elliott is qualified to testify regarding warnings and the IFU. In fact, Defendants admit that Dr. Elliott is qualified to testify regarding the risks of implanting mesh and "whether specific risks appeared in the IFUs." *See Motion* at 3 (quoting this Court: "[A]n expert who is an obstetrician and gynecologist may testify about the specific risk of implanting mesh and whether those risks appeared in the relevant IFU…."). This is also consistent with this Court's ruling concerning Dr. Elliott in the *Cook MDL* where this Court held that Dr. Elliott was indeed qualified to identify the risks associated with the use of a mesh product and "explain[] that the IFU and defendant's product literature fails to disclose these risks." This Court held as follows:

> Cook contends Dr. Elliott is not qualified to opine on product warnings or labels….
> "Dr. Elliott's report identifies particular risks with SIS biomaterials and explains

that the IFU and defendant's product literature fails to disclose these risks." (Id.). I agree with the plaintiff that a urologist like Dr. Elliott is qualified to make this comparison. *See Wise v. C.R. Bard, Inc.*, No. 2:12–cv–01378, 2015 WL 521202, at *9–10 (S.D.W.Va. Feb.7, 2015) (finding a urogynecologist qualified to opine on product labeling based on his knowledge and clinical experience); *see also Huskey v. Ethicon, Inc.*, 29 F.Supp.3d 691, 719 (S.D.W.Va.2014) (finding a urologist qualified to opine on the risks of implanting a product and whether those risks were adequately expressed on the product's IFU.)

*Watkins v. Cook Inc.*, No. 2:13-CV-20370, 2015 WL 1395773, at *10 (S.D.W. Va. Mar. 25, 2015).

Hence, the only relief Ethicon seeks is to prevent Dr. Elliott from opining on "whether other risks should or should not be included in an IFU." *Motion* at 3 & 17 (internal quotations omitted). As noted above, Dr. Elliott's reports have consistently contained opinions on these very issues and have never been challenged before. For example, in his TVT report, Dr. Elliott opines as follows:

The IFU's Adverse Reactions section says that over correcting, i.e. too much tension applied to the tape, may cause temporary or permanent lower urinary tract obstruction, yet the surgeon has been previously provided with five conflicting and confusing instructions to place the tape with (1) minimal tension, (2) tension free, (3) loosely, (4) without tension, and (5) to adjust the tail of the TVT mesh until leakage is limited. This leaves the physician with no clear, articulable standard on how to avoid the serious adverse reaction of urinary retention or urinary obstruction.

(attached as Ex. C to Ethicon's Motion (Doc. No. 4364-3) at 31-32). Similarly, in his Prolift report, Dr. Elliott discusses the adequacy of the IFU as it relates to the surgical perspective and the practical impact it has on the implanting surgeon. He opines as follows:

Hydrodissection is a surgical step used to create a space between the vagina and the rectum and/or bladder. The purpose of this step is to identify and surgically enter the rectovaginal/vesicovaginal space more easily and to reduce the risk of injury to the adjacent rectum and/or bladder. This step would seem even more important given the differences between vaginal dissections in Prolift procedures versus traditional procedures. However, the Prolift IFU makes no mention of vaginal wall hydrodissection.

(attached as Ex. F to Ethicon's Motion (Doc. No. 4364-6) at 43). Ethicon has never challenged these opinions as beyond Dr. Elliott's qualifications. There is a reason for that – he is qualified to give them.

Ethicon argues that Dr. Elliott's "curriculum vitae does not identify any additional expertise to render an opinion about the adequacy of Ethicon's IFU…." However, as reflected in Dr. Elliott's resume, he has extensive experience in the testing and development of medical devices. Dr. Elliott work on the initial animal studies and the clinical design for a male incontinence device. He also developed a rectus fascial harvester medical device for which he owns the patent. *See Dr. Elliott's Curriculum Vitae* at 22 (attached as Ex. B to Ethicon's Motion (Doc. No. 4364-2). Dr. Elliott testified concerning his experience in the development of these devices:

> Well…if you look at my CV, I was involved in transurethral enzymatic ablation of the prostate, which I worked with a researcher and the founder of the company and working with the FDA as far as getting it approved, that's when I was a resident. I worked with the design of a new artificially designed urinary sphincter for males …, so we were working on the standards with the companies, and then my own patent.

*See* Ex. 1, *Hammons Depo.* at 256:14-22. Accordingly, Dr. Elliott has direct experience with product design and development and the related FDA approval processes.

Moreover, Dr. Elliott has testified that he has extensive experience teaching residents about the intricacies of an IFU. In *Hammons,* he testified as follows:

Q. As part of your training and teaching of residents, do you have occasion to teach with regard to IFUs, the instructions for use for medical devices?

A. It would be on a daily basis with residents, especially new residents who are coming on my service, we go over the IFUs, if we're using a medical device, and then if there's a new product that comes out, we'll review those.

Q. When you teach residents about the IFU, what are the types of things you focus on when you're actually teaching day-to-day?

A. Well, we go over everything. It depends upon if it's a new resident or not. Let's take a new resident, typical one, it's every six weeks I have a new

> resident on my service. We sit down, we go over the IFU, we go over the procedure, how it's described and then the various different warnings or potential complications.
>
> Q.    As part of that process, have you learned what it is that you're looking for in an IFU and what needs to be taught to physicians to look for?
>
> A.    Oh, absolutely…

Ex. 1, *Hammons Depo*. at 10:12-11:9. This experience clearly permits Dr. Elliott to opine about what should or should not have been in an IFU. Finally, in *Bellew v. Ethicon, Inc.,* No. 13-cv-22473, Mem. Op. & Order, Dkt. No. 265, (Nov. 20, 2014)*,* this Court held that Dr. Elliot should be permitted to testify regarding "whether Ethicon provided **sufficient guidance** to surgeons through the Prolift [IFU], the Surgical Guide, and any training programs offered." *Id.* at 24 (emphasis added).

Accordingly, the Court should refuse to entertain Ethicon's late attack on Dr. Elliott's warning opinions. Moreover, even if the Court does entertain Ethicon's new arguments, the Motion should still be denied. In addition to his training and experience as a Urogynecologist, Dr. Elliott has unique expertise in medical device development and training other physicians regarding IFUs which permits him to testify on whether certain warnings should or should not have been included in the IFUs. Finally, in the context of the Prolift litigation, this Court has already determined that Dr. Elliot was qualified to do so. Ethicon's Motion should be denied.

## III.    This Court Has Already Ruled That, Whether Dr. Elliott May Testify About Non-Synthetic Mesh Procedures Should Be Determined on A Case-By-Case Basis.

Defendants seek a blanket ruling preventing Dr. Elliott from testifying about non-synthetic mesh products and procedures. Defendants argue such testimony is not relevant for purposes of a design defect claim and that, even if relevant, Dr. Elliott's opinions are unreliable. Defendants' argument concerning Dr. Elliott's testimony is yet another rehash of their Wave 1 *and* Wave 3 motions. Apparently, Ethicon is not happy with the Court's previous rulings on this issue and, as

8

they admit in their motion, they believe "that this should be revisited." *Motion* at 4. Absent

extenuating circumstances, which do not exist here, the Court should not countenance Ethicon's

attempt at a belated motion for reconsideration. The Court has previously rejected these precise

arguments and should do so again by adopting its Wave 1 and Wave 3 orders on these issues.

> A. **The Court should not issue a categorical exclusion of testimony about non-mesh alternatives when such evidence is relevant to numerous claims, including failure to warn, negligence,, impeachment, and potentially design defect.**

Ethicon argues that evidence concerning non-mesh alternative treatments is irrelevant.

However, the Court previously rejected Ethicon's argument during Wave 1, and the Court should

not now backtrack from its sound conclusion.

Ethicon asks that this Court hold that Dr. Elliott's opinions regarding the safety of non-

mesh procedures should be universally declared as irrelevant to all trials in all cases in Wave 5—

regardless of the applicable state law and regardless of the evidence, claims, and arguments in a

particular case. When faced with this issue previously, the Court wrote:

> *First*, Ethicon argues that Dr. Elliott should not be permitted to testify that
> alternative procedures are safer than Ethicon's mesh products. Expert testimony on
> this subject, Ethicon claims, is not relevant. The relevance of this expert testimony
> is better decided on a case-by-case basis. Accordingly, I **RESERVE** ruling until
> trial.

*Wave 1 Memorandum Opinion and Order* (Doc. No. 2666) at 8. This was then, and still is, the

correct conclusion to reach when assessing the relevance of evidence. Under Rule 401, the

standard for relevance is not high. To be relevant, evidence must have "any tendency to make a

fact more or less probable than it would be without the evidence," and the fact must be "of

consequence in determining the action." Fed. R. Evid. 401(a)-(b). Relevance is more

appropriately addressed through motions in limine by the trial court as an evidentiary issue

depending on the facts of the specific case and the applicable law.

In *Mullins*, this Court applied West Virginia law and held that "evidence that a surgical procedure should have been used in place of a device is not an alternative, feasible design in relation to the TVT." *Mullins v. Johnson & Johnson*, No. 2:12-CV-02952, 2017 WL 711766, at *2 (S.D. W. Va. Feb. 23, 2017). However, *Mullins* should not be read so broadly as to categorically exclude this evidence from all cases. For example, not all states require evidence of a safer alternative design or that such evidence be from another similar product. Moreover, at the time of the Court's ruling, *Mullins* had been limited to solely defective design claims. Clearly, such evidence may be relevant when assessing failure to warn claims, negligence claims, warranty claims or as impeachment evidence against Ethicon's contentions that its products are the "gold standard." A recent ruling from the Northern District of Illinois provides an important example of why the Court should not issue a blanket ruling prohibiting such testimony, but should instead adopt its Wave 1 ruling that this should be decided on a case-by-case basis.

In *Herrera-Nevarez v. Ethicon, Inc.*, No. 12-C-2404, 2017 WL 3381718, at *7 (N.D. Ill. Aug. 6, 2017), Ethicon requested that the court adopt the *Mullins'* ruling to exclude Dr. Elliott's testimony regarding non-mesh alternate procedures for treatment of SUI. In analyzing Ethicon's Motion, the Court noted that, under Illinois law and the particular facts of the case, the decision in *Mullins* could not simply be applied in a blanket fashion to bar all such testimony. While the court noted that the evidence may not come in to demonstrate the availability of substitute products, the court noted that, under Illinois' risk/utility test, such testimony was clearly relevant and admissible. In addition, the court held that the testimony would also be relevant to impeach Ethicon's claims that its products were the "gold standard". The court held as follows:

> Under Illinois product liability law, a plaintiff may attempt to prove that the design of a product is unreasonably dangerous using the "risk-utility" test. Factors considered when applying this test include:

    (1)    the utility of the product to the user and the public;

        …

    (3)    the availability of a substitute product that would meet the same need, more safely;

Defendants argue that other surgical procedures are not "substitute products" whose utility and safety is relevant under factor 3, and the Court agrees. **But the availability of other safe and effective procedures to treat the same condition is relevant and admissible, as plaintiffs contend, to show the utility of the defendants' product (factor 1)—a point not addressed in the other cases upon which defendants rely. The Court also notes that this evidence is admissible to rebut defendants' contention that the TVT-O and similar products are the "gold standard" for treating SUI**.

*Id.* at *7 (emphasis added).

In its *Motion*, Ethicon relies upon a different Illinois remand case addressing the opinions of Dr. Shull, not Dr. Elliott. *Motion* at 5 (citing *Walker v. Ethicon, Inc.*, No. 12-CV-1801, 2017 WL 2992301, at *3 (N.D. Ill. June 22, 2017)). In *Walker*, the court held that Dr. Shull would not be permitted to testify regarding non-synthetic mesh alternatives. The different outcomes in these two cases only further confirms this Court's original ruling -- the relevance of this evidence should be determined on a case-by-case basis by the court examining the specific facts and law to be applied in a given case. Ethicon's Motion should be denied and the Court should adopt its original ruling reserving this decision for trial.

    **B.**    **Dr. Elliott's opinions regarding non-synthetic mesh alternatives are based on a detailed analysis backed by reliable evidence.**

Ethicon again repeats, essentially word for word, the same arguments that it leveled against Dr. Elliott in Waves 1 and 3. Ethicon does not cite to any new opinions or testimony on the subject – instead it simply seeks reconsideration of this Court's earlier ruling without meeting the standards for reconsideration outlined above. For this reason alone, the Court should deny Ethicon's repetitive, wasteful *Motion*.

In its Wave 1 Order, the Court appropriately reserved ruling on this issue until the time of trial when Dr. Elliott's clinical experience could be appropriately tested. The Court held as follows:

> Ethicon objects to the reliability of Dr. Elliott's expert testimony about whether alternative procedures are safer than Ethicon's mesh products. In my view, the reliability of this expert testimony is heavily dependent on Dr. Elliott's clinical experiences. In the abstract, experience-on its own or accompanies by little else-is a reliable basis for expert testimony. But the reliability inquiry must probe into the relationship between the experience and the expert testimony…. Here, the court does not have enough information to judge the reliability or relevance of D.r. Elliott's particular experience.
>
> In this specific context, I am without sufficient information at this time to draw the fine line between reliable and unreliable expert testimony based primarily on an expert's clinical experiences. Accordingly, I **RESERVE** ruling until further testimony may be offered and evaluated firsthand at trial.

*Wave 1 Memorandum Opinion and Order* (Doc. No. 2666) at 8-9. The Court then adopted this ruling in its Wave 3 Order. (Doc. No. 4152) at 1.

There has been no new evidence, no further testimony from Dr. Elliott, and no trial. Hence, Ethicon's attempted redo on this issue should be denied. The Court should, as it did in Wave 3, adopt its earlier ruling reserving this issue for trial.[2]

## IV.	Dr. Elliott's Testimony Properly Explains the Superiority of Other Synthetic Products, Notwithstanding His Claim That Synthetic Products Overall Are Inferior.

In its Motion, Defendants state that Dr. Elliott should not be permitted to suggest that other mesh products, such as TVT-R and TVT-O, offer a safer alternative to the TVT-S. Motion at 11. Admittedly, Dr. Elliott is not an advocate for any synthetic mesh, finding all of them to pose inherent dangers. But that general opinion does not detract from the reliability of his testimony that mesh products configured differently than the TVT-S are safer. *See Nease v. Ford Motor Co.*

---

[2] To the extent necessary, Plaintiffs incorporate their arguments on this issue as set forth in their Wave 3 Response brief. (Doc. No. 2952, Section II).

Civ. Act. No. 3:13-29840, 2015 WL 4508691, at *5 (S.D.W. Va. July 24, 2015) (Chambers, J.) ("If a product can be made safer and the danger may be reduced by an alternative design at no substantial increase in price, then the manufacturer has a duty to adopt such a design."). Indeed, an alternative design must only be a "safer alternative." "It need not eliminate all potential risks to be safer." *Thomas v. CMI Terex Corp.*, Civ. No. 07-3597 (JBS/KMW), 2009 WL 3068242, at *16 n. 15 (D.N.J. Sept. 21, 2009). The alternative must "not be as unsafe" as the product at issue, not "safe" in the abstract. *Wolfe v. McNeil-PPC, Inc.*, 773 F. Supp. 2d 561, 573 (E.D. Pa. 2011).

When faced with a similar argument in the Wave 1 briefing this Court specifically held that Dr. Elliot was qualified to testify regarding the comparative safety of other mesh products. The Court held as follows:

> Considering Dr. Elliott's medical education and background and his vast experience treating patients with mesh complications, he is qualified to testify about whether one mesh product is safer than another. Ethicon's Motion is **DENIED** on this point.

*Wave 1 Memorandum Opinion and Order* (Doc. No. 2666) at 9. This is consistent with a decision in a recently remanded case.

In *Herrera-Nevarez*, the court held that Dr. Elliott's opinions were admissible despite the fact that "he does not believe that any such devices are safe…." There, the court held as follows:

> The Court also overrules defendants' contention that Dr. Elliott should not be permitted to testify that other synthetic mesh devices are safer than the TVT-O. The fact that he evidently does not believe that any such devices are safe does not preclude him from ranking them on a comparative basis. This affects only the weight to be given to Dr. Elliott's testimony on this point, not its admissibility. Defendants are, of course, free to cross-examine Dr. Elliott regarding his views of mesh devices generally and regarding any inconsistent testimony or statements he has given.

*Herrera-Nevarez v. Ethicon, Inc.*, No. 12 C 2404, 2017 WL 3381718, at *7 (N.D. Ill. Aug. 6, 2017). Ethicon's Motion should be denied.

## V. Dr. Elliott's Opinions Concerning Lighter Weight/Larger Pore Size Mesh Are Reliable.

Ethicon adopted its Wave 3 argument on this issue. Plaintiffs, in turn, adopt their Wave 3 response set forth in Section III.C of Doc. No. 2952.

## VI. Dr. Elliott's Opinions Concerning Mechanical Cut vs. Laser Cut Are Reliable.

Ethicon adopted its Wave 3 argument on this issue. Plaintiffs, in turn, adopt their Wave 3 response set forth in Section IV of Doc. No. 2952.

## VII. This Court Has Already Reserved Ruling on Whether or Not Dr. Elliott May Offer Opinions Regarding Testing, Adverse Events and Training.

Defendants claim Dr. Elliott should not be permitted to testify regarding Ethicon's failure to test its devices, adverse event reporting and training. Motion at 13-17. Again, Defendants have made these precise arguments since Wave 1. Importantly, in Wave 1, this Court correctly reserved ruling on these issues "because the scope of relevant testimony may vary according to differences in state products liability law" and the facts of the particular case. This Court concluded as follows:

> I **RESERVE** ruling on such matters until they may be evaluated in proper context at a hearing before the trial court before or at trial.

*Wave 1 Memorandum Opinion and Order* (Doc. No. 2666) at 13. This Court later adopted this holding in its Wave 3 Order noting, "the Court will refrain from engaging in the extremely inefficient practice of continuously reexamining the qualifications, reliability, and relevance of dozens of experts and their numerous opinions." *Wave 3 Memorandum Opinion and Order* (Doc. No. 4152) at 2. The Court should again adopt this reasoning and deny Ethicon's *Motion*.

As noted, Ethicon's briefing on this issue is identical to its briefing in Wave 1 and Wave 3. The only change Ethicon identifies since its earlier briefing is a trial court decision in Illinois regarding an entirely different expert. *See Motion* at 15 (discussing *Walker v. Ethicon Inc.*, 2017 WL 2992301 (N.D. Ill. June 22, 2017) (addressing Dr. Shull)). However, *Walker* only adds

14

additional support to the Court's decision to allow the appropriate trial court to apply the laws and facts of the case before it when determining the relevance of this testimony. *Walker* demonstrates that the Court's approach to reserve ruling actually works.

As Ethicon's briefing on this, with the exception of its citation to *Walker*, mirrors its earlier briefing, Plaintiffs will not burden the Court with a re-recitation of its opposition to these points. Instead, Plaintiffs, acknowledging the Court's admonishments about inefficiencies, adopt their Response to these issues from their Wave 3 brief. *See* Section V of Doc. No. 2952.

**VIII. Dr. Elliott's Testimony Regarding Problems With the TVT Mesh Are Reliable.**

Ethicon adopted its Wave 3 argument on this issue. Plaintiffs, in turn, adopt their Wave 3 response set forth in Section VI of Doc. No. 2952.

**IX. Dr. Elliott Will Not Offer Opinions Related to the TVT-Exact.**

Ethicon argues that Dr. Elliott, never having issued a TVT-Exact report, should not be permitted to provide opinions regarding the TVT-Exact. Plaintiffs agree. Dr. Elliott will not offer any opinions regarding the TVT-Exact device.

**X. This Court Has Already Held That Dr. Elliott's "Marketing" Opinions Are Proper.**

Ethicon adopted its Wave 3 argument on this issue. Plaintiffs, in turn, adopt their Wave 3 response set forth in Section VII of Doc. No. 2952.

**CONCLUSION**

To the extent Ethicon refused to adopt its earlier arguments and chose instead to make new arguments or tweak old arguments, the Court should decline to engage in Ethicon's patent attempt at reconsideration. As noted, Dr. Elliott's reports have not materially changed and Ethicon fails to identify any new opinions or testimony. The Court should reject Ethicon's attempt at a third bite at the apple and simply adopt its earlier Wave 3 rulings.

Date: August 29, 2017

Respectfully submitted,

*/s/ Joseph J. Zonies*
Joseph J. Zonies (CO #29539)
ZONIES LAW LLC
1900 Wazee St., Suite 203
Denver, CO 80202
Telephone:     (720) 464-5300
Facsimile:     (720) 961-9252
jzonies@zonieslaw.com


/s/ *D. Renee Baggett*
Bryan F. Aylstock, Esq.
Renee Baggett, Esq.
Aylstock, Witkin, Kreis and Overholtz, PLC
17 East Main Street, Suite 200
Pensacola, Florida  32563
(850) 202-1010
(850) 916-7449 (fax)
rbaggett@awkolaw.com
baylstock@awkolaw.com


*/s/ Thomas P. Cartmell*
Thomas P. Cartmell, Esq.
Jeffrey M. Kuntz, Esq.
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 701-1102
(816) 531-2372 (fax)
tcartmell@wcllp.com
jkuntz@wcllp.com


*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 29, 2017 I electronically filed the foregoing **PLAINTIFFS'
RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN
GENERAL OPINIONS OF DANIEL ELLIOTT, M.D.** with the Clerk of the Court using the
CM/ECF system which will send notification of such filing to the CM/ECF participants registered
to receive service in this MDL.

*/s/ Jenelle Cox*
Jenelle Cox

# EXHIBIT 1

Daniel S. Elliott, M.D.

Page 1

```
        ------------------------------
        IN RE:  PELVIC MESH/GYNECARE  :
                LITIGATION            :
        ------------------------------
        PATRICIA L. HAMMONS,          :COURT OF COMMON PLEAS
                                      :PHILADELPHIA COUNTY
                  Plaintiff,          :MAY TERM, 2013
        vs.                           :
                                      :
        ETHICON, INC., et al.,        :
                                      :
                  Defendants.         :No. 003913
        ------------------------------
```

November 21, 2015

Oral sworn videotaped de bene esse

at deposition of DANIEL S. ELLIOTT, M.D.,

held MAZIE SLATER KATZ & FREEMAN, LLC, 103

Eisenhower Parkway, 2nd Floor, Roseland, New

Jersey, before Margaret M. Reihl, RPR, CCR,

CRR, CLR and Notary Public, on the above date,

commencing at 9:20 a.m.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Daniel S. Elliott, M.D.

Page 2

APPEARANCES:

MAZIE SLATER KATZ & FREEMAN, LLC
BY: ADAM M. SLATER, ESQUIRE
103 Eisenhower Parkway, 2nd Floor
Roseland, New Jersey 07068
(973) 228-9898
aslater@mskf.net
Counsel for Plaintiff

KLINE & SPECTER, P.C.
BY: SHANIN SPECTER, ESQUIRE
1525 Locust Street, 19th Floor
Philadelphia, Pennsylvania 19102
(215) 772-1000
shanin.specter@klinespecter.com
Counsel for Plaintiff

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
BY: TAREK ISMAIL, ESQUIRE
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
(312) 881-5970
tismail@goldmanismail.com
-AND-
BY: JOE W. TOMASELLI, JR., ESQUIRE
3131 Turtle Creek, Suite 1210
Dallas, Texas 75219
(214) 880-9903
jtomaselli@goldmanismail.com
Representing Johnson & Johnson and Ethicon

Also Present: Thomas Keighley, Videographer

Page 3

INDEX

WITNESS:                                      Page
DANIEL S. ELLIOTT, M.D.
   By Mr. Slater                          7, 304
   By Mr. Ismail                       178, 326

                --- 

EXHIBITS

DEFENSE DEPOSITION EXHIBIT          MARKED

No. 1    Article, "Long-term quality of
         life outcomes and retreatment
         rates after robotic sacrocolpopexy"    241

                ---

PLAINTIFFS' TRIAL EXHIBITS-(previously marked)   PAGE

PLT0011   ACOG Practice Bulletin,
          Clinical Management Guidelines
          for Obstetrician-Gynecologists
          Number 79, February 2007        105
P0049     Clinical Study Report
          [ETH.MESH.00012009 through
          12089]                          77
PLT0062   Journal De Gynecologie
          Obstetrique, Conceptual advances
          in the surgical management of
          genital prolapse
          November 2004                    42
PLT0067   Article, "Complications from
          vaginally placed mesh in pelvic
          reconstructive surgery"           89

Page 4

PLT0108   Article, "Transvaginal mesh technique
          for pelvic organ prolapse repair:
          mesh exposure management and
          risk factors"
          [ETH-02794 through 02799]        101
PLT0139   Article, "Les protheses synthetiques
          dans la cure de prolapsus genitaux
          par la voie vaginale : bilan
          en 2005"                         109
PLT0302   Article, "Does the Prolift system
          cause dyspareunia?"              310
P0980     E-mail string, top one dated 1/13/05
          [ETH.MESH.02286052 through 02286053]   162
PLT0516   Article, "Trocar-Guided Mesh Compared
          With Conventional Vaginal Repair in
          Recurrent Prolapse"              159
P1005     Brochure, Gynecare Prolift®
          [ETH.MESH.02341454 through 02341459]   148
PLT1093   Article, "Incidence and risk
          factors for reoperation of surgically
          treated pelvic organ prolapse"   69
PLT1095   Article, "Surgical management of
          mesh-related complications after
          prior pelvic floor reconstructive
          surgery with mesh"               119
PLT1096   Journal of Pelvic Medicine & Surgery
          volume 14, Number 2, March/April
          2008, excerpt                    311
P1306     Brochure, Pelvic Organ Prolapse
          "Get the Facts, Be Informed,
          Make YOUR Best Decision"         19
P1557     E-mail dated 10/28/05
          [ETH-80249]                      166

Page 5

P1593     Slide deck, "Gynecare Prolift,
          Pelvic Floor Repair Systems"     31
P2227     E-mail dated 9/3/09
          [ETH.MESH.00086463 through
          86465]                           64
P2239     Curriculum Vitae and Bibliography
          Daniel S. Elliott, MD            7
P2402     Material Safety Data Sheet,
          Marlex® HGX-030-01 Polypropylene  315
P2452     FDA Letter dated 7/9/12
          [ETH.MESH.04474808 through
          04474809]                        323
P2503     FDA Letter dated April 2012
          [ETH.MESH.04474308 through
          04474312]                        320
P2731     The New England Journal of
          Medicine, "Corrections"          127
                ---

PRIOR TESTIMONY OF DR. ELLIOTT REFERENCED:

TRANSCRIPT OF BELLEW TRIAL DAY 2, March 3, 2015

TRANSCRIPT OF BELLEW TRIAL DAY 3, March 4, 2015

TRANSCRIPT OF DEPOSITION November 15, 2012

TRANSCRIPT OF DEPOSITION November 16, 2012
                ---

## Daniel S. Elliott, M.D.

| Page 6 | Page 8 |
|---|---|

**Page 6**

1    THE VIDEOGRAPHER: All right. We are now
2  on the record. My name is Thomas Keighley, and
3  I am a videographer for Golkow Technologies.
4  Today's date is November 21st, 2015. The time
5  is approximately 9:20 a.m. This video
6  deposition is being held in Roseland, New
7  Jersey at 103 Eisenhower Parkway at the offices
8  of Mazie Slater Katz & Freeman. We are here in
9  the matter of Pelvic Mesh, specifically Hammons
10  versus Ethicon, Inc., et al. This is for the
11  Court of Common Pleas, Lehigh County. The
12  deponent is Dr. Daniel Elliott.
13    Counsel, your appearances will be noted on
14  the stenographic record, and the court reporter
15  is Peg Reihl, if she could swear in the witness
16  and we can proceed.
17    ... DANIEL S. ELLIOTT, M.D., having been
18  duly sworn as a witness, was examined and
19  testified as follows ...
20    MR. ISMAIL: Just if I can note for the
21  stenographic record, I guess now for the video
22  as well, there was a cross-notice filed for
23  this notice -- of this deposition in the MDL to
24  which Ethicon filed a motion to quash. That

**Page 7**

1  motion is still pending. I just want to make
2  sure that objection was preserved and noted on
3  this record.
4    MR. SLATER: My understanding is just from
5  seeing some correspondence that the plaintiffs
6  maintained their cross-notice, and I guess that
7  will be decided by the federal judges.
8    MR. ISMAIL: Yes, thank you.
9  BY MR. SLATER:
10    Q. You can look at me when you speak,
11  Dr. Elliott. It's actually fine either way, okay?
12    A. Okay.
13    MR. SLATER: Are we ready to proceed? Did
14  you swear the witness? You swore him in?
15    Okay, great. Okay. Let's proceed.
16       - - -
17        DIRECT EXAMINATION
18       - - -
19  BY MR. SLATER:
20    Q. Good morning, Dr. Elliott.
21    A. Good morning.
22    Q. Dr. Elliott, we've marked for
23  identification a document P2239. Can you tell us what
24  that document is?

**Page 8**

1    A. This is my current Curriculum Vitae.
2    Q. That's a list of your background, your
3  education, your qualifications, that type of thing?
4    A. That's correct.
5    Q. Would you tell the jury what your
6  profession is, please.
7    A. I am a urologic reconstructive surgeon at
8  the Mayo Clinic.
9    Q. And tell the jury where you're a licensed
10  physician.
11    A. In the state of Minnesota.
12    Q. What is the Mayo Clinic where you work?
13    A. It's a large tertiary care medical center,
14  meaning -- tertiary care just means the end of the line
15  type thing, you don't get referred on from there, which
16  is a multi-specialty practice.
17    Q. And where is that located?
18    A. In Rochester, Minnesota.
19    Q. Tell the jury a little bit about your
20  educational background, where you went to medical
21  school, your residency, the training you did from that
22  point forward briefly.
23    A. Medical school was in southern California
24  at Loma Linda University School of Medicine. Then I

**Page 9**

1  did a one-year general surgery at the Mayo Clinic in
2  Rochester, Minnesota, followed by five years of
3  urologic surgery training at Mayo Clinic. I was asked
4  to come on staff and then did a one-year advanced
5  surgical fellowship at the Baylor College of Medicine
6  in Houston.
7    Q. Would you tell the jury about your medical
8  practice, what you do day to day?
9    A. It's the reconstructive urology means
10  we're taking care of problems that are occurring in the
11  pelvis, complications dealing with males and females.
12  Majority of my practice, probably roughly two-thirds is
13  female, one-third is male.
14    Q. What are the types of conditions you
15  treat?
16    A. Breaking down into stress incontinence,
17  both male and female, pelvic organ prolapse for females
18  and then the complications arising from those
19  treatments.
20    Q. Do you teach, do you have any teaching
21  appointments?
22    A. Yes. I'm a teacher at Mayo as far as
23  teaching residents, rotations on my service, lectures
24  for medical students. Also, I guess you could call it

3 (Pages 6 to 9)

Daniel S. Elliott, M.D.

---

**Page 10**

1  an educator with the SUFU, which is Society of
2  Urodynamics & Female Urology, I'm on the education --
3  Q.  Say that a little slower.  What is SUFU?
4  A.  Society of Urodynamics & Female Urology,
5  that's the large, arguably the most elite in the United
6  States society dealing with female urology and pelvic
7  floor function, and so I'm on the education committee
8  for that.  So that there's education as far as future
9  education for both residents, though, mainly for
10 individuals who have already graduated and are in
11 practice.
12 Q.  As part of your training and teaching of
13 residents, do you have occasion to teach with regard to
14 IFUs, the instructions for use for medical devices?
15 A.  It would be on a daily basis with
16 residents, especially new residents who are coming on
17 my service, we go over the IFUs, if we're using a
18 medical device, and then if there's a new product that
19 comes out, we'll review those.
20 Q.  When you teach residents about the IFU,
21 what are the types of things you focus on when you're
22 actually teaching day-to-day?
23 A.  Well, we go over everything.  It depends
24 upon if it's a new resident or not.  Let's take a new

---

**Page 11**

1  resident, typical one, it's every six weeks I have a
2  new resident on my service.  We sit down, we go over
3  the IFU, we go over the procedure, how it's described
4  and then the various different warnings or potential
5  complications.
6  Q.  As part of that process, have you learned
7  what it is that you're looking for in an IFU and what
8  needs to be taught to physicians to look for?
9  A.  Oh, absolutely, but that's not just with
10 IFUs.  That's also as far as paper writing and
11 reviewing of manuscripts.
12 Q.  Do you have involvement with the
13 peer-reviewed literature?
14 A.  Yes.
15 Q.  Tell the jury your involvement -- first of
16 all, what is the peer-reviewed medical literature?
17 A.  Peer reviewed for any article coming out
18 in a reputable journal, it will be reviewed by multiple
19 individuals within your peer group, so that's why it's
20 peer reviewed.  So I'm a reviewer for some 16 different
21 journals, more or less, and so your responsibility is
22 to obtain a manuscript, look at it critically.  The
23 goal is to find weaknesses in the paper, strengths in
24 the paper, what is lacking, where it can be improved.

---

**Page 12**

1  Q.  Do you act as a peer reviewer?
2  A.  Yes, for I say roughly 16 journals.
3  Q.  Have you published articles in the
4  peer-reviewed medical literature yourself?
5  A.  Yes, I have.
6  Q.  Do you have experience treating prolapse
7  with mesh?
8  A.  Yes.
9  Q.  Tell the jury that experience.
10 A.  Surgically treating prolapse is dealing
11 with only transabdominal or robotic.  I have never
12 placed transvaginal mesh for prolapse.
13 Q.  Do you perform procedures to treat
14 prolapse that do not involve mesh?
15 A.  Yes.
16 Q.  Tell the jury about that.
17 A.  Well, there's going to be a spectrum of
18 different conditions, bladder, rectum or enterocele
19 where the intestines fall down, and I have been trained
20 and daily or every other day perform transvaginal
21 prolapse repairs, but not with mesh.
22 Q.  What do you use to do those procedures?
23 A.  It's the traditional colporrhaphy is the
24 name of it using sutures, absorbable sutures.

---

**Page 13**

1  Q.  Have you attended at any point training
2  with regard to mesh kits like the Prolift®?
3  A.  Yes.
4  Q.  Tell us about that.
5  A.  It was with AMS, I was an instructor, they
6  had combined incontinence and prolapse.  I taught the
7  incontinence part, but also the cadavers right next to
8  me were where the instructors were teaching the
9  transvaginal prolapse repair, so I went over and then
10 did that with those instructors.
11 Q.  And that was for the AMS Apogee and
12 Perigee?
13 A.  Correct.
14 Q.  Is that a similar product to the Prolift®?
15 A.  Very similar, yes.
16 Q.  Over the years have you become involved in
17 treating patients who had Prolifts® placed by other
18 doctors at other locations where they've had
19 complications?
20 A.  Correct, yes, I have.
21 Q.  Tell us about your treatment of women with
22 Prolift® complications or other mesh complications as
23 well.
24 A.  That began roughly 2006, 2007, in that

---

4  (Pages 10 to 13)

Daniel S. Elliott, M.D.

1    time frame, I don't remember the exact time, but that
2    was the ballpark that we started seeing various
3    different complications like vaginal extrusion, organ
4    erosion and more commonly pelvic pain.
5        Q.  In your practice, have you treated
6    patients who have had complications from the Prolift®?
7        A.  Yes.
8        Q.  And is that what you were just describing?
9    Is that among the patients that you've treated with
10   those conditions?
11       A.  Correct.
12       Q.  As part of your treatment of patients with
13   Prolift® complications, did you become familiar with
14   the Prolift® system?
15       A.  Yes.
16       Q.  What did you do?
17       A.  Well, initially, besides just when these
18   complications would come in, you know, I'm attending
19   meetings, national, international meetings, we would be
20   discussing it with colleagues in the field,
21   urogynecology colleagues, my institution.  We would go
22   back online and look at the product, because, remember,
23   I chose not to place the product, so we had to learn
24   about how is this put in, reviewing of manuscripts.  We

1    always do that, a PubMed search, which is the largest
2    search engine looking for articles about this and
3    management of complications.
4        Q.  Did you have the opportunity to see the
5    IFU at some point as part of your practice as well?
6        A.  Yes, with the Prolift®, yes.
7        Q.  Was it helpful to you in treating the
8    complications to learn about the Prolift® system?
9        A.  From the IFU?
10       Q.  The IFU and the other material and
11   conversations you had, did you find that was helpful to
12   you in treating the complications?
13       A.  Discussing with colleagues and review of
14   manuscripts was.  I'd have to say that the IFU for the
15   procedure was helpful, how it was going, the management
16   of the complications, no.
17       Q.  How prevalent has been your treatment of
18   mesh complications, including Prolift® complications,
19   in your practice?
20       A.  Well, it depends what time frame you're
21   talking about.  2005, uncommon; as the time goes on,
22   more and more common, such that in any given week I'm
23   seeing three to five or maybe more patients with
24   various different mesh complications, including the

1    Prolift®.
2        Q.  Have you actually spoken at any national
3    meetings to other physicians about the treatment of
4    mesh complications?
5        A.  Well, numerous times, most -- numerous
6    times and most recently in February, again, at that
7    SUFU meeting, Society of Urodynamics & Female Urology,
8    where I was the invited lecturer on management of
9    complications of the mesh.
10       Q.  Have you previously been qualified as an
11   expert in a Federal Court case with regard to the
12   Prolift®?
13       A.  Yes.
14           MR. ISMAIL:  Objection, 403.
15           MR. SLATER:  We offer Dr. Elliott as an
16       expert in the fields of urology and female
17       pelvic medicine and reconstructive surgery.
18           MR. ISMAIL:  We'll reserve for our
19       qualifications for cross.
20   BY MR. SLATER:
21       Q.  Doctor, in the course of your testimony,
22   I'll be asking you to -- if you have opinions on
23   certain issues.
24       You realize that, right?

1        A.  Yes.
2        Q.  In the course of your testimony, do you
3    understand that if you offer an opinion, whether I ask
4    you for an opinion or if you offer it in the course of
5    your testimony, that it must be to a reasonable degree
6    of medical certainty?
7        A.  Correct.
8        Q.  So that I don't have to keep repeating
9    that phrase over and over, can we have an understanding
10   that if you offer an opinion, it will be to a
11   reasonable degree of medical certainty, or you will
12   tell us otherwise?
13       A.  Yes.
14       Q.  Okay.  What I'd like to do now is you have
15   a list of materials reviewed, correct?
16       A.  Yes, I do.
17       Q.  And just tell us what that list is.
18       A.  It's a fairly brief summary of all the
19   materials that I've reviewed pertaining to the mesh and
20   specifically Prolift®.  Number one was the medical
21   literature that I reviewed, that would have been mainly
22   through PubMed, which is the largest search engine for
23   medical literature, clinical and preclinical studies.
24   Ethicon and J&J internal documents and videos, surgical

Daniel S. Elliott, M.D.

1  videos usually. Ethicon and J&J current and former
2  employees' depositions, which there's a large number of
3  those, which we did not glean out each one, but there's
4  a large number. Depositions of the Ethicon consultants
5  and the New England Journal of Medicine editors and,
6  lastly, Ethicon and J&J product labeling and marketing
7  documents, like the IFU and patient brochures.
8      Q. Those categories of information, you've
9  set forth a reliance list of what you've relied on in
10 this case?
11     A. Yes.
12     Q. Okay. With regard to the Johnson &
13 Johnson and Ethicon internal documents that were not
14 publicly available, was that significant information to
15 you in forming your opinions in this case?
16     A. Very much so, yes.
17     Q. Why is that?
18     A. Because as a surgeon active in practice,
19 attending meetings, reviewing of the medical
20 literature, that gives me one side of complications or
21 what is known. What I was unaware of prior to this
22 litigation is what was the degree, severity of the
23 complications that were known prior to that and was not
24 available to the -- say, the average doctor in the

1  street.
2      Q. Let's go to an exhibit that's on the top
3  of your pile there P1306, which is Prolift® patient
4  brochure.
5      Is this a document you're familiar with?
6      A. Yes, it is.
7      Q. Is this a document you've relied on in
8  part in forming your opinions in this matter?
9      A. That is correct.
10     Q. What I'd like to do is just for
11 illustrative purposes turn to Page 5, please, and there
12 is a diagram of normal pelvic anatomy.
13     And the jury will have this up on their screen
14 to see. Can you just tell the jury very simply what of
15 significance is shown in this simple illustration?
16     A. Well, it's a cartoon or a schematic of the
17 female pelvis in a coronal or going down the middle,
18 and it's just showing the anatomy with the bladder,
19 urethra, vagina and uterus. It's quite simplified
20 anatomy view for a patient.
21     Q. Now, let's turn to the next page, Page 6,
22 and there's an illustration of a cystocele, and can you
23 tell the jury what they're seeing there?
24     A. Yes, this in comparison to the first

1  picture, which was normal anatomy, the second one now
2  has a schematic -- again, understand it's in a very
3  simplified form, which there's nothing wrong with that,
4  but it's just showing the anterior bladder wall falling
5  down, which is called a cystocele.
6      Q. Why does that happen? What is it
7  physiologically that happens that allows the bladder to
8  bulge down into the vagina?
9      A. Be multiple different factors, increasing
10 age, childbirth, possibly hysterectomy, obesity,
11 chronic cough, factors like that that increase the
12 strain on the pelvis that would have the tissue weaken
13 over time and then fall down.
14     Q. When you refer to the tissue, you're
15 talking about the tissue of the pelvic floor?
16     A. That's correct, the vaginal tissue,
17 though, technically, it's the tissue underneath the
18 vagina that's holding things up and it's weakened
19 because of those aforementioned factors.
20     Q. Let's turn to the next page. Let's turn
21 to Page 7 of the patient brochure. There's an
22 illustration of a rectocele. Can you just tell us
23 simply what that is showing.
24     A. Yeah, a rectocele, think of it as just the

1  opposite of what I described of where the bladder is
2  falling down, as we say, into the vagina, this is where
3  the rectum is ballooning up into the vagina, again,
4  because of those other issues of pregnancy, childbirth
5  and weakening of the tissues.
6      Q. There's a diagram on Page 7 of uterine
7  prolapse. Very simply, what is that?
8      A. Again, similar to the other issues, this
9  is where the uterus is falling down, again, due to lack
10 of support or weakened support.
11     Q. Is surgery required for all pelvic organ
12 prolapse?
13     A. No.
14     Q. Is it an elective surgery or a surgery
15 that must be done in the vast majority of cases?
16     A. It is a quality -- it's very important to
17 emphasize this, it's a quality of life problem, meaning
18 the patient is really in charge as far as the
19 decision-making. So for the majority of individuals in
20 my practice, observation or conservative therapies are
21 done. It is very rarely in the United States a
22 necessity that surgery has to be done.
23     Q. Let's turn to the list of treatment
24 options. It would be the second PowerPoint slide,

6 (Pages 18 to 21)

Daniel S. Elliott, M.D.

Page 22

1  treatment options for pelvic organ prolapse, and I'll
2  ask you to briefly go through the list and tell us what
3  each of them -- what each of these options are?
4      A.  It's a summary that made up of options or
5  historical options for treatment of pelvic organ
6  prolapse in women.  As I mentioned, it's a quality of
7  life problem.  So the first option is observation and
8  being conservative, just reassuring the patient that if
9  it's not bothering them, don't do anything.  If it's
10  minimally bothersome, you know, you may or may not
11  choose to do something.
12      Next option is a pessary, which is a -- kind of
13  think of it like a plug, a silicone or a plastic plug
14  being placed in the vagina to help hold things up.
15  Historically, that was done a lot, now a little bit
16  less so, but still it's a conservative, nonsurgical
17  option.
18      Q.  Basically, it would be placed under the
19  bladder to hold the bladder up?
20      A.  It's placed in the vagina underneath the
21  bladder to either hold up the bladder, hold up the
22  uterus or hold up the rectum, dependent upon what
23  problem they're trying to fix.
24      The next one is the traditional sutured

Page 23

1  repairs, like the colporrhaphy.  Colporrhaphy just
2  means repair of the vagina, so you can have an anterior
3  colporrhaphy of the bladder, posterior colporrhaphy for
4  rectum, and that's using sutures, the traditional type
5  of repair, which I do very commonly.
6      We also mentioned briefly here the sacrospinous
7  ligament fixation and uterosacral ligament fixation.
8  Those are for what's called vault prolapses, where the
9  whole vagina is falling out, so through the vagina, you
10  can suture it to various different structures to
11  provide support.
12      And then you have the transabdominal
13  sacrocolpopexy.  This is a procedure that can be done
14  either with an incision or done laparoscopically or
15  done with a robot, which is my preferred route.
16      Q.  What does that mean laparoscopically or
17  with a robot?
18      A.  The procedure is fixing the vagina up to
19  the sacrum.  It can be done with an incision, where
20  it's opened up, or using a laparoscope, which is
21  cameras through little ports, four or five ports or
22  using a robot, which is basically a robot attached to
23  the cameras looking in.  It's a different way of doing
24  it.

Page 24

1      The next is biologic grafts.  This is where you
2  can use either tissue from a tissue bank, like
3  cadaveric tissue, which is not the patient's, but it's
4  human, or you can use xenografts, which is coming from
5  a different source, like pig or cow.  And then you also
6  have synthetic grafts, which is a mesh that's placed in
7  the vagina.
8      Last on the list is the mesh kit, in this
9  particular case the Prolift®, but it can be multiple
10  other mesh kits out there.
11      Q.  What are the most prevalent surgical
12  procedures for the treatment of prolapse?
13      A.  Currently as far -- well, again, it
14  depends upon what type of prolapse you're talking
15  about, because there's going to be a lot of different
16  ones.
17      Q.  Let's talk about, for example, a
18  cystocele.
19      A.  Cystocele would be an anterior
20  colporrhaphy.  The traditional nonsutured repair would
21  be most common.
22      Q.  Are the various abdominal sacrocolpopexies
23  that you described both open and laparoscopic or
24  robotic prevalent as well?

Page 25

1      A.  They're very common, but, again, that's
2  for total vaginal vault prolapse, yes, and depending on
3  the various different regions, like in the south, it is
4  the most common procedure performed for that common
5  problem.
6      Q.  Doctor, I'm going to now hand across the
7  table to you what we are marking as P2810, and this
8  would be the actual Prolift® anterior repair kit, and
9  what I'll ask you to do first is just to show the jury
10  what the Prolift® kit is.  We've obviously started to
11  open it to save time, and the camera will show the
12  instruments and tell the jury what we're seeing there.
13      A.  Well, important probably, let's go back to
14  the basics.  It comes as a kit.  So what the surgeon
15  gets is a kit in a box.
16      Q.  And I'll hand you the box, which also has
17  the booklet in it as well.
18      A.  Which the nurse brings this to you, takes
19  it out of the box.  The surgeon opens it up, and so
20  it's a contained kit, as opposed to multiple different
21  pieces.  It's a self-contained operation, a kit.
22      So then you're going to have the various
23  different components of the kit, which you will have
24  the trocar, however long that is, 15 inches or so

7 (Pages 22 to 25)

Daniel S. Elliott, M.D.

Page 26

1    curved. It's curved for gaining access, we can go into
2    it later, as far as through the obturator foramen or
3    how this goes in, so it goes in through it and --
4        Q.  What does that mean?  If you're going to
5    say something technical, you might as well tell the
6    jury, obturator foramen.
7        A.  You have the pelvis, male or female,
8    doesn't matter, you have the obturator foramen, which
9    are the holes off to the side, kind of look like this.
10   As I explain it to residents, I go like this is how it
11   is.  So you have the vagina here and then these
12   obturator foramen which are the big bones attached to
13   it with overlying muscles, gracilis, abductor longus, a
14   bunch of -- four or five different muscles overlying
15   this.
16       So when you're gaining access to the vagina,
17   you will go through the obturator foramen from the
18   outside in and go down to the vagina.  So there will be
19   a surgeon's hand in the vagina to grab this.  Again,
20   this is the trocar gaining access going through those
21   muscles, through the obturator foramen into the vagina.
22   You should have this loaded up here, then there's the
23   cannula that actually goes over this.
24       So when the surgeon goes in, then he pulls it

Page 27

1    on out, so we don't have to go into detail now, but a
2    cannula is another part of it.  And then the -- you'll
3    have a retrieval system here, and then, lastly, you'll
4    also have the mesh.  Now, again this is an anterior
5    mesh.
6        Q.  What is that used to treat?
7        A.  This is to treat anterior prolapse, okay,
8    the bladder, a cystocele, okay.
9        Q.  So if the bladder is dropping down on to
10   the vagina or into the vagina, this is for the
11   treatment of that condition?
12       A.  Correct.  There will be three different
13   types of meshes predesigned, precut meshes, one for
14   anterior like this one here.  This will show up very
15   well, may show up a little better like this that can be
16   seen with arms on it, four arms going out those
17   obturator foramen, which I had mentioned.  The
18   posterior will have a different configuration, and then
19   the total will be a combination of the anterior and
20   posterior.
21       Q.  When you showed the guide and the cannula,
22   is that ultimately to set the tunnels to pull the arms
23   back out of the body?
24       A.  Correct, correct, yeah.

Page 28

1        So this will go from the outside through the
2    obturator foramen into the vagina.  This is pulled out.
3    The retrieval device is placed through it and then the
4    mesh is pulled through it.  So at the at the end of the
5    procedure, this is very important, all of these, the
6    trocar, the retrieval device and the cannula are no
7    longer with the patient.  The only thing that's
8    remaining is the mesh.
9        Q.  Now, we have here -- we've marked this as
10   Exhibit 2292, a total repair kit, and what I'll ask you
11   to do, keep it separate, I really just want you to be
12   able to -- to pull out the mesh part.
13           MR. ISMAIL:  Objection to the relevance.
14   BY MR. SLATER:
15       Q.  If you could, please show the jury the
16   total Prolift® implant.
17       A.  I'll just keep it in the plastic here,
18   actually show it a little better here.
19       So you have the total Prolift®, where you have
20   the anterior component of it or part right here, that's
21   what I showed just a second ago (indicating).
22       Q.  That's for treatment of a bladder
23   prolapse?
24       A.  Bladder or anterior prolapse, a cystocele.

Page 29

1    Then you have the posterior aspect up here with the
2    various different arms, again, the arms are configured
3    differently because they're exiting out the -- they're
4    not going through the obturator foramen, they're
5    actually going through the buttocks.  So you can get an
6    idea of the volume of the meshes and the arms and the
7    shape.  This is treating a total vaginal vault
8    prolapse.
9        Q.  And the posterior part of the Prolift®,
10   that's to treat a rectocele or rectal prolapse?
11       A.  The posterior is for rectocele, that is
12   correct, yes.  The total would be for anterior
13   cystocele, enterocele like the intestines are pushing
14   down and rectocele, so it's treating the whole vault.
15       Q.  I'll take that.
16       Doctor, in your career have you ever used the
17   Prolift®?
18       A.  No, I have not, by choice.
19       Q.  Do the other doctors at the Mayo Clinic
20   use the Prolift®?
21           MR. ISMAIL:  Objection, lack of
22   foundation.
23           MR. SLATER:  Rephrase.
24   BY MR. SLATER:

8 (Pages 26 to 29)

## Daniel S. Elliott, M.D.

Page 30

1    Q.  Did the other doctors at the Mayo Clinic
2  use the Prolift®?
3         MR. ISMAIL:  Objection, lack of
4  foundation, hearsay, 403.
5         THE WITNESS:  No, all by choice
6  separately, just chose back in 2005 in that
7  time frame not to use it.
8  BY MR. SLATER:
9    Q.  Why did you chose not to use the Prolift®?
10   A.  I didn't see a need for it.
11   Q.  What do you mean by that?
12   A.  In my practice we had good success, good
13  quality of life, low recurrence rate, and I didn't see
14  a purpose for it.
15   Q.  When the Prolift® first came out, did you
16  look to see if there was data to support the use of the
17  Prolift®?
18   A.  Right when it first came out, no.  We're
19  going back a lot of years now.  I remember looking and
20  reviewing it because there was a lot of interest in
21  female urology.  This is my first year -- five years in
22  practice, and it was new, it was different, and so I
23  looked into it.  I don't recall the literature I
24  reviewed at that point in time, but, again, I just

Page 31

1  decided I didn't see a need.
2    Q.  Okay.  I'd like you to look now at Exhibit
3  1593 and this is a Prolift® professional education
4  PowerPoint slide deck.
5         Are you familiar with this document?
6    A.  Yes, I am.
7    Q.  Is this something you've relied on in
8  forming your opinions?
9    A.  Yes, it is.
10   Q.  What I'd like to do is turn you towards
11  the back, actually, about seven or eight pages from the
12  back, there's an illustration of the anterior implant
13  position.
14        Do you have that?
15   A.  This one?
16   Q.  Yes.  Great.
17   A.  Doesn't look like we have a page number on
18  it.
19   Q.  There's no page numbers on it but --
20   A.  That one.
21   Q.  Great.  It will certainly be up on the
22  screen for the jury.
23        Can you tell the jury what this is showing,
24  this simple schematic?

Page 32

1    A.  This is, assuming we're on the same
2  page -- we are on the same page, correct?
3    Q.  Yes.
4    A.  Okay.  This is a schematic, again, a
5  cartoon or a simplified version of the actual anterior
6  mesh in-situ, meaning in the patient and where it goes,
7  where the arms go and things.
8    Q.  What are the structures that we see, just
9  to orient us?
10   A.  Well, it's quite simplified because a lot
11  of the important things are not there.  But you can see
12  the bladder, you can see underneath it the mesh and
13  then under that you can see the vagina.  And then you
14  see the rectum and you see the obturator foramen and
15  various different ligaments around the pelvis, but,
16  again, it's quite simplified.
17   Q.  The bladder would be to the front, the
18  rectum would be to the back as the jury sees this?
19   A.  As you go down you have bladder, mesh,
20  vagina, rectum from top to bottom.
21   Q.  If you turn -- this is actually the 55th
22  page of the slide deck, just for the record.  If you
23  turn back one page to the -- actually turn forward one
24  page, okay, on the 54th page of the slide deck, I

Page 33

1  believe it is -- it says Gynecare Prolift® Total
2  Implant Position.
3         What is that showing us?
4         MR. ISMAIL:  Objection, relevance, 403.
5         THE WITNESS:  Okay.  That's showing --
6  it's a continuation of the volume of mesh
7  that's put in.  It shows the anterior and
8  posterior mesh in place as it would
9  theoretically be supporting the bladder, the
10  apex of the vagina and then the posterior
11  aspect which is where the rectum would be.
12  BY MR. SLATER:
13   Q.  Okay.  Now, what I'd like to do, if we
14  could, is go through some animation video clips.  Are
15  these video clips that you have selected and that you
16  have reviewed as part of your review of this case?
17   A.  That is correct, yes.
18   Q.  Are these animation videos something
19  you've relied on in forming your opinions?
20   A.  Yes.
21   Q.  Do you, in your opinion, feel they would
22  be useful to you in demonstrating aspects of the
23  procedure and illustrating your opinions in this case?
24   A.  Very much so, yes.

9 (Pages 30 to 33)

Daniel S. Elliott, M.D.

Page 34

1    Q.  Okay.  We are going to play the video
2  clips with no sound, and they are short video clips,
3  and the first one is a short one.  It's 501 for the
4  record.
5         MR. ISMAIL:  Just we object under 403 to
6  the playing or showing to the jury of any of
7  the video of the actual surgery itself.
8         MR. SLATER:  Okay.  We're starting with
9  the animation clips.
10        MR. ISMAIL:  Fair enough.
11        MR. SLATER:  Is there an objection to the
12  animations?
13        MR. ISMAIL:  Depends what you show.
14        MR. SLATER:  There's not a blanket
15  objection, initially?
16        MR. ISMAIL:  Not a blanket objection.
17  BY MR. SLATER:
18    Q.  Okay.  Doctor, what we're going to do,
19  before we show this, clip 501 we're going to put it up
20  on the screen, and then you'll just tell the jury,
21  we'll pause it about halfway through when it gets set
22  up, and then you can tell the jury what they see, okay.
23        (Video played.)
24  BY MR. SLATER:

Page 35

1    Q.  What is that showing us?
2    A.  Okay.  Again, it's just showing the
3  anterior Prolift® mesh, as it would be placed in the
4  patient as far as somewhat of its orientation, and then
5  the female pelvis in what's called the dorsal lithotomy
6  position, just the way you operate, a woman on her
7  back, legs up in stirrup and then access to the vagina.
8  And then you can see underneath it is the pelvic bones,
9  how they would be in the woman when she's on her back.
10    Q.  Just for the record, you're turned a
11  little to the side because you're looking at a screen
12  on the wall?
13    A.  Yes, I am.  There's a screen over here.
14    Q.  Okay.  We're going to now go to clip 502.
15  What are we going to see here?
16    A.  On 502?
17    Q.  Yeah, let's play -- actually, let's play
18  it and then if you want to have him pause it or you
19  certainly can tell him to pause it at a certain time
20  and explain what we're seeing.
21    A.  Yeah, it's just describing -- you can
22  pause it a second there very quickly.  It initially
23  highlighted the arms, which is a very key component to
24  the Prolift® mesh, which makes it unique compared to

Page 36

1  the other operations I discussed, where the arms would
2  be going through the obturator foramen.  That's why it
3  highlighted the more out -- proximal vagina and then
4  deep vagina.  So those arms go in different locations.
5    Q.  What I actually want to do now is I want
6  to go back to the start on this clip.
7    A.  Okay.
8    Q.  Let's go back.  We're not going to be able
9  to pause it because it's going to be played in other
10  courts potentially, and they're not going to be able to
11  know when you paused it.  So what I'm going to do is
12  I'm just going to have the clip played.
13    A.  Okay.
14    Q.  And this is -- I'm just saying this for
15  everyone in the room, probably realize that was kind of
16  silly what I just did, hope everybody had a good giggle
17  out of it.  We're just going to show it from the
18  beginning when I'm ready to start, and then you'll just
19  narrate as it goes, and then when it's done, you can
20  explain if there's anything else you have to explain.
21        So let me start over.  That was just for
22  everyone in the room to know -- get their jollies here.
23        Doctor, we're now going to show animation clip
24  502.  As it plays, would you please explain to the jury

Page 37

1  what they're seeing.
2    A.  Sure.  It's a schematic again showing the
3  mesh with highlighting the various different arms that
4  go through the obturator foramen, which I've discussed
5  just a little earlier and then place it in the vagina
6  how it will be done, with an incision.  They described
7  there a fairly small incision.  Now you've turned
8  sideways, and then they'll place the mesh through that.
9    Q.  And the mesh is placed through the vagina
10  through a vaginal incision?
11    A.  Correct.
12    Q.  Next we're going to go to clip 504A, and
13  what we'll do is, again, we'll show it and please tell
14  the jury what of significance they're seeing, please.
15    A.  Okay.  Now, this is a surgeon with a
16  finger placed through the vagina through the vagina
17  incision, now, those trocars, which I showed just a
18  little while ago, going through the obturator foramen
19  through multiple different muscles, there they show one
20  of the muscles.  There's other ones.  Again, there's
21  four or five different large muscle groups that it goes
22  through, through the vagina, on to the surgeon's index
23  finger, and then they will first place the distal most,
24  see there, toward the opening of the vagina.  There's

Daniel S. Elliott, M.D.

| Page 38 | Page 40 |
|---|---|

**Page 38**

1  where the first one goes through, ideally through the
2  arcus tendineus, which is an anatomical strong
3  structure.
4      Q.  Okay.  Now, let's go to animation clip
5  505, please, and just again narrate through for the
6  jury what is significant to you.
7      A.  Again, we have the schematic and now the
8  arms are already placed through.  We've actually missed
9  a step.  There's another video in there describing how
10  they placed the other ones, but this is how the mesh
11  wraps through the retrieval device and then will be
12  pulled out through the skin, through the vagina,
13  through the skin and out.
14      Q.  And I think -- well, rephrase.
15      Let's go to clip 506 now, and can you tell the
16  jury what they're seeing there?
17      A.  Okay.  Again, this is the placement
18  through the retrieval devices of all the four arms that
19  will go through the vagina and out the obturator
20  foramen through those cannula that I described earlier,
21  and now the cannulas are being removed and the mesh is
22  then being slid into place.  The cannulas then are
23  removed.  Here's where it shows the mesh lying flat in
24  there, again, in the cartoon fashion.

**Page 39**

1      Q.  Doctor, we're not going to go through the
2  total or posterior Prolift® procedures in the interest
3  of time.
4      The video animation clips that we just showed
5  for the anterior procedure, are they a fair
6  demonstration of those steps of the procedure in a
7  general sense of what is done to get the mesh into the
8  body and the arms out?
9      A.  Well, it's very -- it's a schematic.  I
10  don't know -- I would argue on the word fair, but it's
11  showing how it goes through because it's very
12  simplified form of it, yes, let's put it that way.
13      Q.  What I meant is does it, in a general
14  sense, demonstrate what would happen in the posterior
15  or total procedures as well?
16      A.  Yes, in a very general sense, but I'd say
17  it would be misleading, though.
18      MR. ISMAIL:  Objection, move to strike,
19      nonresponsive.
20  BY MR. SLATER:
21      Q.  Doctor, the clip that we just -- the clips
22  that we just saw of the anterior procedure, do they
23  generally show how the mesh in an animated, simple form
24  is placed into the body and the arms are pulled out?

**Page 40**

1      A.  Yes.
2      Q.  Doctor, what is the mesh material in the
3  Prolift®, what is it called?
4      A.  It's -- well, the basic is polypropylene
5  mesh.
6      Q.  And what is it called, what's the name of
7  the mesh?
8      A.  Gynemesh®.
9      Q.  And was that originally developed to be
10  used in the pelvis or for another use?
11      A.  Another use.
12      Q.  What's that?
13      A.  For hernia repair, abdominal hernia
14  repair.
15      Q.  And that was called Prolene Soft when it
16  was developed for hernia?
17      A.  That is correct.
18      Q.  When Gynemesh® mesh started -- Prolene
19  Soft mesh started to be marketed for use in the pelvis,
20  it was first marketed in about 2003; is that correct?
21      A.  Roughly in that time frame, yes.
22      Q.  And when it was first sold as Gynemesh®
23  PS, was it sold in a kit like this or was it sold
24  differently?

**Page 41**

1      A.  No, it was not in a kit, it was just a
2  sheet of polypropylene.
3      Q.  And what did doctors do with that mesh
4  when it was first sold as Gynemesh® PS?
5      A.  The surgeon would trim it, tailor it to
6  the given patient and place it through the vagina.
7      Q.  And just would use a portion of the mesh
8  to help support a suture repair as-needed?
9      A.  That is correct.  It would be to tailor,
10  to repair whatever they're repairing.
11      Q.  We're going to talk more about this a
12  little later, but do you have an opinion as to whether
13  the use of Gynemesh®, just cutting a portion of it and
14  placing it in the vagina for a particular patient's
15  needs, whether or not that is a safer alternative than
16  the Prolift® with the larger amount of mesh and the
17  arms that we've seen?
18      MR. ISMAIL:  Objection, lack of
19      foundation.  I don't believe this is a
20      disclosed opinion.
21  BY MR. SLATER:
22      Q.  You can answer.
23      A.  I would be very careful what I say -- I
24  would say it would be a safer procedure.  I do not

11 (Pages 38 to 41)

Daniel S. Elliott, M.D.

Page 42

1  agree with it being safe, but it is safer than the kit
2  with arms, et cetera.
3      Q.  And we'll talk more about it later, but
4  very succinctly, what's the reason why?
5          MR. ISMAIL:  Objection, lack of
6      foundation, undisclosed opinion.
7          THE WITNESS:  There would be multiple
8      factors.  The largest one would be the sheer
9      volume of mesh, but then also the trocars with
10     the arms going through the various different
11     muscle groups, because that is going to fix
12     this mesh in a completely different way.
13 BY MR. SLATER:
14     Q.  Doctor, next exhibit is PLT0062, not a
15 PowerPoint, but it's an actual document.
16         MR. ISMAIL:  Copy.  While you're at it,
17     can I have the other one.  I didn't want to
18     interrupt while you did the video.  Thank you.
19     These are the 504s and the 506s?
20         MR. SLATER:  They are, and we can -- we'll
21     get you the actual clips if you don't have
22     them.  They're exactly the same as what was
23     utilized in Bellew, so you guys should have
24     them, but we can have them Dropboxed or sent

Page 43

1      over to you.
2          MR. ISMAIL:  Thank you.
3  BY MR. SLATER:
4      Q.  Okay.  Doctor, I've handed you PLT0062.
5  Is this a medical journal article you are
6  familiar with?
7      A.  Yes, it is.
8      Q.  Is this an article that you feel and
9  believe to be medically reliable in the field?
10     A.  Yes, it is, yes.
11     Q.  Is this something you've relied on in
12 forming your opinions?
13     A.  Yes.
14     Q.  First of all, who wrote this article?
15     A.  Well, it's a TVM group, as they call them.
16 There's multiple different authors involved, six, I
17 believe.
18     Q.  What was the role of the TVM group, this
19 group of doctors from France, what was their -- very
20 simply their role with the Prolift®?
21     A.  Well, a group of physicians got together,
22 these surgeons that are mentioned here, in France, as
23 you stated, to devise this new technique for prolapse
24 repair using the polypropylene mesh.

Page 44

1      Q.  If you could, turn to the fourth page is
2  Page 579, and what I want to focus on in the bottom
3  right corner, there's a -- I guess a blowup of a
4  microscopic picture of the -- or a close-up picture of
5  the soft Prolene mesh.  That's the mesh in the
6  Prolift®?
7      A.  That is correct.
8          MR. ISMAIL:  Objection, hearsay.
9          THE WITNESS:  Yes, that's correct.
10 BY MR. SLATER:
11     Q.  And just focusing on that one box that
12 says soft Prolene on it, what are we seeing there?
13 What's of significance?
14         MR. ISMAIL:  Objection, hearsay.  I don't
15     want to keep interrupting.  I have a standing
16     objection to hearsay to the use of this
17     article.  Okay.  I'll keep objecting.
18     Objection, hearsay.  Sorry, I didn't mean to
19     interrupt.
20         MR. SLATER:  Let me just ask, I don't
21     understand your hearsay objection.  It's a
22     medical literature.
23         MR. ISMAIL:  Objection, hearsay.
24         MR. SLATER:  You think they're not useful,

Page 45

1  you can't use medical literature in a trial?
2          MR. ISMAIL:  This article is hearsay.
3          MR. SLATER:  You don't have to object to
4      the use of my articles on the hearsay basis
5      anymore during this deposition.  That's
6      preserved.
7          MR. ISMAIL:  I'm probably going to, given
8      that I think we have a disagreement as to
9      whether learned treatises are hearsay or not.
10         MR. SLATER:  All right.  But I'm saying
11     I'm granting you a standing objection to my use
12     of learned treatises as hearsay that is
13     inadmissible, so you don't have to object it
14     because you can -- every time I use medical
15     literature, you can object to it and say it was
16     hearsay and shouldn't be allowed to be used, so
17     that way we can move through, is that okay?  It
18     will help me to not have you objecting when I'm
19     already agreeing you have a preserved
20     objection.
21         MR. ISMAIL:  I appreciate that.  What I'll
22     do is every time you introduce a new article,
23     I'll object to that one as being hearsay, and
24     if I have a standing objection to the use of

12  (Pages 42 to 45)

Daniel S. Elliott, M.D.

| Page 46 |
| --- |

1    that particular article, I won't keep
2    interrupting.
3         MR. SLATER:  You have a standing objection
4    to my use of medical journal articles.
5         MR. ISMAIL:  I have an objection to this
6    article, Exhibit 62, Plaintiffs' Exhibit 62, as
7    hearsay, and I appreciate the standing
8    objection to the use of this article.
9         MR. SLATER:  Sure, and it's for the record
10    PLT0062.
11         MR. ISMAIL:  Yes.  Thank you.
12    BY MR. SLATER:
13         Q.  Okay.  Doctor, I'm going to start over.
14         On Page 579 of this article, there is an
15    illustration and a close-up picture of soft Prolene
16    mesh.
17         Do you see that?
18         A.  That is correct, yes.
19         Q.  Is that the mesh material in the Prolift®?
20         A.  Yes, it is.
21         Q.  What is of significance that we're seeing
22    here?
23         A.  Well, they're just showing -- you have to
24    take it in all -- there's four different photographs.

| Page 47 |
| --- |

1         Q.  We're only looking at the soft Prolene
2    picture.
3         A.  They're just showing the mesh, the weave
4    of the mesh, the space of the meshes.
5         Q.  What do they call -- what are those spaces
6    referred to as?
7         A.  The pore size would be the easiest one,
8    the gate in between them, the space in between the
9    various meshes.
10         Q.  We have -- you see there's some larger
11    spaces and they have a thread right through the middle.
12         Do you see those?
13         A.  Yes, I do.
14         Q.  There's also knots and spaces there.  What
15    are those referred to as?
16         A.  Well, again, there's a -- all the meshes
17    have a different weave to them.  So this is the weave
18    of the mesh and the areas where it's all knotted, as
19    you mentioned.
20         Q.  So it's showing the actual appearance of
21    the pores and the interstices between the mesh?
22         A.  Correct, on a relatively microscopic or
23    magnified view.
24         Q.  When the mesh is in the body after the

| Page 48 |
| --- |

1    surgery, and now that this incision is closed, what is
2    supposed to happen?  What was intended to happen with
3    the healing process and with the mesh in the body?
4         A.  Well, theoretically, as you see here, the
5    picture has large pores, now, again, this is magnified,
6    so we have to take that, but, theoretically, you are
7    going to have the tissues grow through those to get
8    nice healthy tissue in between those pores, that's in
9    theory.  It would be like a scar net is the kind of
10    phrase that was used.  But, again, that's in theory
11    what would happen.
12         Q.  What actually occurs in practice based on
13    your review of the materials, the medical literature,
14    your medical experience, all the materials you
15    reviewed, what is it that actually occurs?
16         MR. ISMAIL:  Objection, lack of
17    foundation, 705.
18         THE WITNESS:  Okay.  In my daily practice
19    on physical exams in people with Prolift®, what
20    actually happens when that Prolift® gets in
21    there, or any mesh, for that matter, not just
22    Prolift®, but let's just talk specific to
23    Prolift®, the mesh is going to be pulled, the
24    pore size is going to decrease, and then

| Page 49 |
| --- |

1    instead of getting this intergrowth through the
2    holes of the mesh and have nice healthy tissue,
3    you then get a scar plate.  So the scar forms
4    around this.
5         So where it's important for me is then on
6    physical exam, when you do a pelvic exam, you
7    feel this fibrotic or wooden, what kind of
8    describe it as, again, this firmness within the
9    vagina.
10    BY MR. SLATER:
11         Q.  What is it that leads to the development
12    of scar tissue, what is it about the interaction of the
13    mesh in the body that leads to that?
14         A.  Well, it's a long, drawn out
15    conversation because what you've got, you've got a
16    foreign body --
17         Q.  Let's do it not the long, drawn out
18    conversation version.
19         A.  All right, we'll be specific.  Mesh is not
20    human, it's foreign.  You put it in the body, the body
21    perceives it as foreign.  The body's natural response
22    is to try to get rid of it, and the process starts to
23    create this foreign body reaction, which increases the
24    scar tissue, that causes the mesh to contract or the

13 (Pages 46 to 49)

Daniel S. Elliott, M.D.

Page 50

```
 1   tissue to contract around it, which then perpetuates
 2   the problem.  That's why it's a progressive problem.
 3   So it's a long, drawn out conversation.  That's very
 4   succinct answer.
 5       Q.  As part of the foreign body reaction, is
 6   there any inflammatory response as well?
 7       A.  Well, that is part of it, okay.  The body
 8   perceives the mesh as foreign, which it is.  The
 9   response of the body is to create inflammatory
10   response.  So as long as that foreign body is in there,
11   you're going to have an inflammatory process.
12       Q.  With regard to the size of the pores in
13   the Prolift® mesh or any mesh, is there an
14   understanding as to whether or not larger spaces or
15   smaller spaces are better in terms of the healing
16   process?
17       A.  The larger the space, the space in between
18   the mesh, the reduced inflammatory and foreign body
19   reaction you're going to have.
20       Q.  There's been reference, and tell me if
21   you're familiar with it, to a 1 millimeter pore size in
22   all directions under strain.
23       Is that a concept that's of any significance to
24   you?
```

Page 51

```
 1       A.  Yeah, it's a very important concept.
 2       Q.  Why is that?
 3       A.  Saying that -- again, you made a very good
 4   point that as far as when it's in the body, under
 5   strain.  It doesn't matter what it's doing on the
 6   table.  As I hold up this mesh, that doesn't matter.
 7   What matters is when it's in the body and when it's
 8   being pulled on when the woman is walking, coughing,
 9   doing activities, what those pores do.  Those pores
10   contract down, then you're going to start this whole
11   cascade, the scar plate, the inflammatory response,
12   foreign body reaction.
13       Q.  What happens to the pores when the
14   Prolift®, as we've seen in those schematics, gets put
15   into the body, what happens to the pores?
16       A.  Collapses.
17       Q.  What do you mean by that?
18       A.  Means, again, we have this picture of
19   these large pores, okay, when you start to pull on it,
20   when you place it, just the arms, you're going to have
21   to pull on those arms, you're going to have to tension
22   this, and then those pores go from this to collapsed
23   down like this (indicating).  When that happens, now
24   the body can't grow through it, like that scar net I
```

Page 52

```
 1   described.  Now you get that caking, and we can feel it
 2   when we do physical exams on Prolift®, the banding we
 3   call it, feel out lateral in the vagina, and you feel
 4   this rod, for lack of a better phrase, you touch it, it
 5   hurts.  It's a whole cascade of everything I've
 6   mentioned several times now.
 7       Q.  What is contraction or shrinkage, what
 8   does that mean?
 9       A.  That's when, again, we go back to this
10   foreign body reaction, inflammatory response, the body
11   is trying to healing itself.  The only way it can is by
12   creating scar.  When that happens, the scar contracts
13   down, pulling the mesh.  The mesh is the ultimate
14   responsibility, but it pulls on it, okay, and the
15   significance of mesh contraction is pain, because, like
16   I mentioned in that video, where these trocars are
17   going through all those muscles and mesh is going
18   through those muscles, muscles hurt when you start to
19   pull on them.  So as the mesh contracts, pulls
20   together, pulls on those muscles of the pelvis and it
21   causes the pain.
22       Q.  Doctor, if you could go back to the
23   professional education PowerPoint, 1593, it's the
24   larger one right there, top left, and it's about the
```

Page 53

```
 1   tenth page in, and actually I counted them, I think
 2   it's the tenth page, and there is a slide that says
 3   "Mesh Use in Hernia Surgery" and has a picture of
 4   rebar.
 5       A.  Yes.
 6       Q.  Is this of significance to you, this
 7   illustration and the language next to it?
 8       A.  Yes.
 9       Q.  Tell the jury, first of all, it says,
10   "Much like rebar in concrete, the stress at any one
11   point is distributed over the entire area of the
12   graft."
13       Do you see that?
14       A.  Yes, I do.
15       Q.  Now, have you seen anything in any medical
16   literature or any material you've ever seen that shows
17   that when the Prolift® is placed, it actually has this
18   distribution of stress across the entire mesh, like
19   they say in the engineering rebar?
20       A.  Well, no, it's the exact opposite,
21   actually.
22       Q.  And so using this diagram, what's the
23   significance of this picture of rebar?
24       MR. ISMAIL:  Objection, lack of
```

14 (Pages 50 to 53)

Daniel S. Elliott, M.D.

Page 54

1 foundation, 705.
2 THE WITNESS: Well, the rebar analogy is
3 accurate and completely inaccurate at the same
4 time. Yes, I agree, it's a very strong
5 substance, unbending, but when it's placed in
6 the human body, that's not what you want. You
7 need to have something dynamic that can move,
8 and so that's why I say it's correct and it's
9 incorrect. It's very, very strong, but that's
10 not what you want having placed in the vagina.
11 BY MR. SLATER:
12 Q. If rebar has to be removed from the
13 sidewalk, you take the jackhammers and chop down into
14 the concrete and get it out?
15 MR. ISMAIL: Objection, 403.
16 THE WITNESS: Which I have done in between
17 high school and college, and it is a bear.
18 That's why I never do it anymore. Did it once
19 and that's it.
20 BY MR. SLATER:
21 Q. When mesh has to be removed, how does that
22 analogy apply to the human body?
23 A. Well, I don't have the luxury of not being
24 able to do that, like I can do with rebar concrete. It

Page 55

1 is very similar. You have to cut, you have to use big
2 scissors. We just did one two or three days ago, large
3 scissors to cut through this. It's very stuck, and
4 it's very tedious surgery because it can be fixed to
5 the bladder, very difficult -- the bladder is thin, get
6 into it, you got a mess. Posteriorly on the rectum or
7 up top on the intestines, and you can't get it all out.
8 It's a very tedious -- we call it a train wreck because
9 it's very difficult to get out.
10 MR. ISMAIL: Objection, move to strike,
11 nonresponsive, 403.
12 BY MR. SLATER:
13 Q. Doctor, with regard to the difficulty in
14 removing the mesh, do you have an opinion as to whether
15 or not that is medically safe or unsafe aspect of the
16 Prolift® system?
17 A. It's quite unsafe.
18 Q. Doctor, with regard to the reaction of
19 this large mesh implant that you've shown us with the
20 human tissue, the foreign body reaction, the
21 inflammatory response, do you have an opinion as to
22 whether that is medically safe or unsafe?
23 A. It's unsafe.
24 Q. We're now, Doctor, going to go to some two

Page 56

1 clips of video from actual surgical videos from Ethicon
2 from their professional education department, correct?
3 A. That is correct.
4 Q. Now, have you reviewed and selected these
5 short clips to help illustrate your opinions?
6 A. Yes, I have.
7 Q. Would they be helpful to you in
8 demonstrating relative aspects of the Prolift®
9 procedure?
10 A. Definitely.
11 Q. The first one that we're going to use is
12 5701, and what we'll do is we'll show the video and
13 while it's playing, please, just as you did before with
14 the animations, narrate and tell us what is of
15 significance to you in explaining your opinions on the
16 Prolift®.
17 MR. ISMAIL: Objection, 403, to showing
18 the video.
19 THE WITNESS: It's going to be a surgical
20 video. It's going to be sort of graphic for
21 people not used to this, but it's showing the
22 mesh trying to be put through the vagina.
23 They're doing actually a stay stitch there
24 first. And now they've got the retrieval

Page 57

1 devices already in there, and there they're
2 actually stuffing the mesh in there, because,
3 remember, I showed you the mesh, it's a large
4 volume of mesh, the vagina is small. You have
5 to stuff it in there. So that was actually a
6 very good description or visual image for
7 everybody to just kind of see how you have to
8 push it through there.
9 BY MR. SLATER:
10 Q. When the mesh gets pushed in that way,
11 what impact does that have on the mesh itself?
12 A. Well, there can be multiple different
13 factors. You're pushing it through vagina, which can
14 cause infection of it, contamination of it. You can
15 distort the meshes if you're pulling on it, and it's
16 not going to lay flat.
17 Q. Let's go to clip -- and one other thing,
18 in that image, in that video there were -- did we see
19 the cannulas actually coming out that were placed for
20 an anterior procedure?
21 A. Yeah, we saw on that one the retrieval
22 devices were already in. The cannulas had already been
23 removed. The retrieval devices were there on the mesh
24 arms, they hadn't been pulled through yet.

15 (Pages 54 to 57)

Daniel S. Elliott, M.D.

| Page 58 |
|---|

1  Q. Let me ask you this: In the image we
2  could actually see the white cannulas. Were they still
3  in the body, not the next clip, but the clip we just
4  saw?
5  A. I thought the cannulas had been removed
6  already. I'd have to look at it then. If the cannulas
7  were removed, then just the -- yeah, the cannulas are
8  still there, yes.
9  Q. Let's go to clip 5702, the next clip, and
10  tell us as it plays what we're seeing and what's
11  significant, please.
12  MR. ISMAIL: Objection, 403.
13  THE WITNESS: Okay. So now we see he's
14  pulling out the cannula and then the mesh arms
15  extending out through the obturator foramen,
16  and, again, what's important to note about that
17  as we saw earlier the size of the mesh arms,
18  which are about one centimeter, a little larger
19  going through those cannulas, which are just a
20  couple millimeters and they're rolled, so it
21  will cause the mesh to roll, the arm meshes to
22  roll.
23  BY MR. SLATER:
24  Q. And what we'll do now is go to the next

| Page 59 |
|---|

1  PowerPoint slide, which is a side by side comparison of
2  a still shot from the animation and from the video we
3  just saw, and can you tell the jury what of
4  significance this shows?
5  MR. ISMAIL: Objection, 403.
6  THE WITNESS: Okay. The biggest thing to
7  me is if you look at the cartoon first, for me
8  it's on the left, that the mesh arms are laying
9  flat, but then, in reality, when it goes into
10  the human, you can't have a 1 to 1.5 centimeter
11  mesh arm go through a cannula that's a couple
12  millimeters and not get it to roll. So if you
13  were able to zoom in there where it comes out
14  of the skin, it's going to be rolled. That's
15  going to also collapse those pores and start
16  that whole cascade of inflammation, foreign
17  body reaction, scarring.
18  BY MR. SLATER:
19  Q. When the mesh is pulled through the
20  cannulas, as we see illustrated on these still shots,
21  what happens to the mesh when it's being pulled through
22  the cannulas, what happens to the pores and the mesh
23  itself?
24  A. It can collapse, it will collapse. If

| Page 60 |
|---|

1  you're pulling on it with more than, what, 2.3-kilos,
2  which is roughly 12 pounds of force, which is not much,
3  and you'll pull on it, those pores -- remember, they
4  start like this, you pull on them and they'll collapse
5  on you. Again, that increases the foreign body,
6  prevents that growth through the interspaces and starts
7  that whole foreign body cascade I talked about.
8  Q. With regard to the amount of force you
9  just stated, was that confirmed to be the amount of
10  force used during the procedure by Scott Ciarracca?
11  A. Correct.
12  MR. ISMAIL: Objection, lack of
13  foundation.
14  BY MR. SLATER:
15  Q. Do you have an opinion -- and we can take
16  that down now.
17  Do you have an opinion, Doctor, as to whether
18  or not the arms and the cannulas are necessary to treat
19  pelvic organ prolapse?
20  A. I have an opinion, yes.
21  Q. What's your opinion?
22  A. They're absolutely not essential. They're
23  counterproductive.
24  Q. And do you have an opinion as to whether

| Page 61 |
|---|

1  or not the use of the arms and the cannulas, as we've
2  seen, is medically safe or unsafe?
3  A. It's unsafe.
4  Q. Why is that?
5  A. Again, like I've mentioned, as far as just
6  multiple different issues. Number one, the rolling
7  going through the muscles, which will cause contraction
8  and pain. Then also it fixes the vagina. The vagina
9  is a dynamic organ. As a woman stands, lays down,
10  coughs, it's going to move. Those arms are going to
11  cause it to be fixed, and then so when she does
12  activity, that's what causes the pain, so pull on the
13  muscles and other structures.
14  Q. Let's go to the next PowerPoint slide. We
15  have in front of you a slide we've titled tension free
16  and, first of all, we have little footnotes there with
17  respect to the deposition testimony where these pieces
18  of information came from.
19  Have you read those depositions?
20  A. Yes, I have.
21  Q. And have you relied on those depositions
22  in part in forming your opinions?
23  A. Yes.
24  Q. What is tension free? In the context of

16 (Pages 58 to 61)

## Daniel S. Elliott, M.D.

Page 62

1  Prolift® and the concept of the Prolift®, what was the
2  concept of tension free?
3      A.  Well, tension free, if we're talking about
4  the mesh just sitting on the table versus the mesh in
5  real life, okay, I deal with real life.  I don't care
6  what it's like on the table.  I care what's in the
7  patient.
8      So as it sits on the table, it's going to be
9  tension free, there's no pulling on it.  But in order
10  for you to put it in the woman, it's impossible to have
11  something be tension free.  If there's no tension, the
12  prolapse still exists, so it's -- you can't have it in
13  real life in the patient.
14      Q.  Now, the first thing we have on this, on
15  documents, I'm just going to ask you about a phrase
16  tension free, meaning the mesh is in unstretched
17  condition as if laying on a table, okay.
18      Do you have an opinion as to whether or not in
19  actual use in the body, the mesh can be placed tension
20  free, as described there?
21      A.  It cannot be.
22      Q.  And just very simply why?  I think you
23  might have talked about this already, but just very
24  simply.

Page 63

1      A.  Again, like we've talked about that the
2  human vagina is not a table, okay.  It's going to be
3  moving, lifting, walking, and it's going to -- in order
4  to hold a prolapse, which is everything is falling
5  down, you've got to hold it up; therefore, there's
6  going to be tension on that device.  Placing it through
7  the body is going to require tension.  You've got to
8  pull it through and adjust it.
9      Q.  And we saw the video of how it was pushed
10  through the vagina and then how the arms were used.
11  Does that impact on that opinion as well?
12      A.  Again, that's consistent with my opinion.
13      Q.  Tension on the mesh plus contraction
14  equals pain.  What is the significance of that?
15      A.  That's what I referred to earlier, that if
16  mesh is pulled with a minimal amount of force,
17  12 pounds of pressure, those pores will collapse.  That
18  will cause this foreign body reaction, inflammation and
19  scarring, that causes the mesh to contract, article
20  like by Tunn, et al., 65, 80% mesh contraction.  When
21  that happens, structures are pulled on, specifically
22  muscles or nerve intergrowth, and that causes pain.
23      MR. ISMAIL:  Objection, move to strike,
24      hearsay.

Page 64

1  BY MR. SLATER:
2      Q.  Doctor, look at the next exhibit on the
3  pile.  Take that slide down.
4      It's Exhibit P2227, and it's an e-mail written
5  by Piet Hinoul, medical affairs director, September 3,
6  2009.
7      Is this an e-mail you're familiar with?
8      A.  Yes, it is.
9      Q.  What I'd like to do is turn to the second
10  page.  There are a series of asterisked bullet points.
11  We're going to go to the last one on the page, which
12  starts there is an issue.
13      Do you see where I'm reading?  It's the last
14  asterisk.
15      A.  I'm there, yes.
16      Q.  I'm going to just read it for the record,
17  and then I want to ask you about this, okay?
18      A.  All right.
19      Q.  "There is the issue of being able to
20  adjust, fine tune the position of a Prolift® mesh.
21  This must also be addressed up front; the mesh and
22  Prolift® can indeed be adjusted, but that is because
23  one overcorrects (surgeons not adjusting by loosening
24  after having pulled it too tight have all the problems

Page 65

1  with pain, incontinence, obstructed defecation), again
2  we adjust to make it tension free not the other way
3  around."
4      And then reading a little further, this tension
5  free concept is something we own, we must also use it
6  here.  Doctors like the sound of it (despite the fact
7  that most do not understand it).
8      Now, is that language I just read written by a
9  medical affairs director, Piet Hinoul, of significance
10  to you?
11      A.  Yes.
12      Q.  Why?
13      A.  Well, they acknowledge multiple different
14  things in here.  Number one that surgeons don't know
15  how to tension this, and, number two, the tension free
16  concept is something that sounds very good.  The
17  company wants to protect that marketing aspect.  That's
18  a different story here, but the biggest one is that the
19  surgeons don't know how to tension this.
20      MR. ISMAIL:  Objection, move to strike,
21      nonresponsive.
22  BY MR. SLATER:
23      Q.  Let me ask you this question:  I just want
24  to clean something up in case -- that was a great

17 (Pages 62 to 65)

## Daniel S. Elliott, M.D.

Page 66

1    objection, just got to always hedge against that.
2    Doctor, this language that I just read, why
3    is -- well, let me just say something right now. When
4    you answer this question, don't talk about marketing at
5    all, okay. So I'm going to ask the question again.
6    Doctor, I just read language written by Piet
7    Hinoul, medical affairs director. Why is that language
8    significant to you with regard to the tension free
9    concept?
10            MR. ISMAIL: Objection, lack of
11        foundation.
12    BY MR. SLATER:
13        Q. From a medical standpoint, why is that
14    important?
15        A. From a medical standpoint, you know,
16    again, multiple different aspects of the tendency of
17    surgeons to tighten this up too much. They don't
18    understand how to tighten this. It hasn't been
19    explained to them well enough. And so -- and that
20    tensioning problem is one of the root sources for all
21    the various different complications, pain, obstruction,
22    incontinence, et cetera.
23        Q. When the mesh is placed under tension, in
24    your opinion, does that lead to any negative side

Page 67

1    effects?
2        A. Yes.
3        Q. What is that?
4        A. Again, that's going back to this issue,
5    it's the root source of the problem that tensioning
6    causes the pores to collapse, can cause the tissue
7    integration, which then leads to scarring, inflammatory
8    response and subsequently pain.
9        Q. Doctor, we'll take that document down.
10    Doctor, there was a theory that this large mesh
11    implant would result in a more durable, longer lasting
12    anatomic repair than with a suture repair.
13        Was that part of the concept?
14        A. Correct.
15        Q. When we say the focus was on an
16    anatomic -- correction, the anatomic positioning, what
17    does that mean?
18        A. It means we have to kind of go back almost
19    a certain step. When you have a woman with prolapse,
20    it means the bladder or structure has fallen down to
21    the wrong spot. So you have anatomy is can you restore
22    it to a normal position, okay. So that's where we talk
23    about anatomical repair, putting it back up to where it
24    should be.

Page 68

1        Q. Now, over time I've seen reference to
2    functional outcomes, quality of life outcomes.
3        What does that mean?
4        A. That's the other aspect of prolapse,
5    just -- and it's a quality of life problem. Just
6    because you have an organ that's fallen down, say the
7    bladder, articles like Whiteside, et al. 2004 talk
8    about what we're really after here is this woman's
9    quality of life, is she happy, is the support, the
10    surgery provided an improvement of quality of life.
11            MR. ISMAIL: Objection, move to strike,
12        hearsay.
13    BY MR. SLATER:
14        Q. Doctor, I'm going to ask you the question
15    again. Don't refer to in, in case the objection was well
16    done, the Whiteside article in answering the question.
17            MR. SLATER: I assume that's your
18        objection, right?
19            MR. ISMAIL: Yes.
20            MR. SLATER: Okay. Trying to move this
21        along.
22    BY MR. SLATER:
23        Q. Doctor, when we talk about functional
24    outcomes, quality of life outcomes as opposed to

Page 69

1    anatomic, what's the distinction?
2        A. Anatomy is just looking at has that
3    prolapse been repaired or not. It's not taking into
4    account a patient's quality of life, sexual function or
5    just symptoms of prolapse, fullness, pressure.
6        Functional outcomes are looking at if you do
7    this surgery is the woman pleased with the outcome as
8    far as the improvement of the prolapse symptoms.
9        Q. Doctor, please look at the next exhibit,
10    which is PLT1093. This is an article titled "Incidence
11    and risk factors for reoperation of surgically treated
12    pelvic organ prolapse" authored by Dällenbach and some
13    other authors in 2011.
14        Are you familiar with this article?
15        A. Yes, I am.
16        Q. Is this article, in your opinion,
17    medically reliable and authoritative in the field?
18        A. Yes, it is.
19        Q. Is this an article you've relied on in
20    forming your opinions?
21        A. Yes.
22        Q. Why is this article important, in general
23    terms?
24            MR. ISMAIL: Objection, hearsay.

18 (Pages 66 to 69)

Daniel S. Elliott, M.D.

Page 70

1   BY MR. SLATER:
2       Q.  Rephrase.  Why is this article of
3   significance to you?
4       MR. ISMAIL:  Objection, hearsay.
5       THE WITNESS:  Because what it's doing is
6   looking at and trying to correct somewhat of
7   the incorrect thinking we have as far as the
8   true recurrence rate and reoperation rate
9   following prolapse repairs.  So what this is
10  doing is breaking it down and looking at the
11  true incidence, which records it at roughly --
12  I think their conclusion is like 6 to 12%
13  reoperation for prolapse.
14  BY MR. SLATER:
15      Q.  Doctor, if you turn to the page that has
16  the discussion on it, I'm not seeing the page numbers.
17  It's the third page from the end.
18      A.  Okay, I'm there.
19      Q.  And it says -- you see discussion?
20      A.  Yes, I do.
21      Q.  Okay.  It says in the first sentence, our
22  study suggests that the risk of reoperation after
23  prolapse surgery is relatively low and associated with
24  variables indicating pre-existing weakness of pelvic

Page 71

1   floor tissues.
2       What is that -- is that of significance to you?
3       MR. ISMAIL:  Objection, hearsay.  Do I
4   have a standing objection to Exhibit 1093?
5       MR. SLATER:  You have a standing objection
6   to every one of my articles as hearsay and any
7   questions on them.
8       MR. ISMAIL:  I understand, but I'm going
9   to identify each one to which I have the
10  hearsay objection, and then I won't interrupt
11  your exam on this article.
12      MR. SLATER:  Yeah, please don't.
13      MR. ISMAIL:  Standing objection to 1093 on
14  hearsay.
15      MR. SLATER:  I'll start again.
16      THE WITNESS:  And can you -- I'm trying to
17  track exactly where you are.
18  BY MR. SLATER:
19      Q.  You see Discussion?
20      A.  Yes, I am under Discussion.
21      Q.  Okay.  I'm going to actually go now to the
22  second paragraph.  You see it says, "we
23  systematically"?
24      A.  Yes, I'm there.

Page 72

1       Q.  I want to read this and ask you what, if
2   any, significance this has to you.
3       We systematically searched Medline, (search
4   terms: "reoperation for surgically treated/managed
5   pelvic organ prolapse, recurrent pelvic organ prolapse,
6   follow-up studies," all languages, from 1966 to 2010)
7   and found few studies reporting the incidence of
8   reoperation for recurrent prolapse.  Most authors
9   measured the combined risk of reoperation for
10  surgically treated prolapse and urinary incontinence,
11  thus overestimating the rate for pelvic organ prolapse
12  reoperation alone.  The risk of reoperation for
13  prolapse or urinary incontinence of 29.2% frequently
14  quoted as a reference in further studies results in a
15  retrospective cohort study of 384 women.  It goes on to
16  talk about following them prospectively, and at five to
17  ten years their reoperation rate was 13% and 17%.  And
18  then says the risk of re-operation for prolapse alone
19  during a five-year follow-up was much lower (1.5%) in
20  another study.
21      Do you see that?
22      A.  Yes, I do.
23      Q.  Is that of significance to you?
24      A.  Yes.

Page 73

1       Q.  Why is that significant to you in forming
2   your opinions?
3       A.  Number one, you cannot describe the
4   reoperation of prolapse if you're also combining it
5   with stress incontinence, they're two separate
6   problems, okay.  So it's going to falsely elevate both
7   of them in reality, and so that's why they're talking
8   about the common report of 29.2%, which I've actually
9   rooted my studies, so it's not accurate.  So what they
10  did then is look at the true reoperation rate, and so
11  for this one, you know, they are down to 1.5% at
12  five-year follow-up, which is obviously a very small
13  number.
14      Q.  Now, they're talking about treating
15  patients with suture repairs, correct; that's what they
16  did?
17      A.  That's correct.
18      Q.  Okay.  Turn to the next page, please.  And
19  it's actually the second to last page of the article,
20  there is a Table 6 at the top left corner, and if you
21  come down that left column, about two-thirds of the way
22  down the page, there's a sentence that says, "The
23  anatomical recurrence rate in our cohort is probably
24  higher; but, in most cases, women are asymptomatic and

19 (Pages 70 to 73)

## Daniel S. Elliott, M.D.

| Page 74 | Page 76 |
|---|---|

**Page 74**

1  do not require surgery."
2       Is that significant to you?
3       A.  That is correct.
4       Q.  Why?
5       A.  Because, again, when you have -- this is a
6  prolapse is a quality of life problem, okay.  So what
7  you want to do and what success is is the woman
8  asymptomatic and her symptoms of prolapse cured.  So
9  they're saying as the anatomy may have come down, but
10  the women are fine.
11      Q.  On the right-hand column almost directly
12  across the page, it says based on previous reports, we
13  would expect a high right of reoperation, which is not
14  the case.  Our study supports the idea that
15  conventional vaginal surgery is effective to treat
16  pelvic organ prolapse.
17      Is that of significance to you?
18      A.  Yes.
19      Q.  Why?
20      A.  Because it's showing that the traditional
21  types of repairs actually work to relieve the patient's
22  symptoms.
23      Q.  And, finally, on the last page in the last
24  paragraph, based on our data and recent studies, we

**Page 75**

1  believe the risk of reoperation for recurrence after
2  pelvic organ prolapse reconstructive surgery to be
3  between 6% and 12% rather than 30% as previously
4  described.
5       Is that significant?
6       A.  Yes.
7       Q.  Why?
8       A.  Again, it's stating that the 29.2 or 30%,
9  as they state here, reoperation rate is much higher
10  than in reality, it's down to around 6 to 12%.
11      Q.  Based on the Dällenbach article, your
12  understanding of the overall medical literature, your
13  experience and your knowledge in the field, do you have
14  an opinion as to whether or not the Prolift® was
15  necessary in order to treat pelvic organ prolapse as
16  compared to the existing traditional alternatives?
17      MR. ISMAIL:  Objection, hearsay,
18      cumulative.
19      THE WITNESS:  Based upon this study and
20      others and my own personal experience, it was
21      not needed.
22  BY MR. SLATER:
23      Q.  Meaning that the alternatives were
24  adequate?

**Page 76**

1       A.  Correct.
2       MR. ISMAIL:  Objection, same, cumulative,
3  sorry.
4       MR. SLATER:  Go off for a second.
5       THE VIDEOGRAPHER:  Off the record.  The
6  time is 10:32, we are off the record.
7       (Brief recess.)
8       THE VIDEOGRAPHER:  The time is 10:41, and
9  we are back on the record.
10  BY MR. SLATER:
11      Q.  Doctor, in the course of asking you about
12  your background, I neglected to ask you one question.
13      Are you a board certified physician?
14      A.  Yes, I am.
15      Q.  Who are you board certified by?
16      A.  By urology, American Urologic Association
17  and then also by combined boards of urology and GYN for
18  female pelvic medicine and reconstructive surgery.
19      Q.  And what is the significance of those
20  board certifications?
21      A.  The first one is stating that you have
22  gone through -- for me it was six years of urologic
23  training, including general surgery, and that the board
24  recognizes you having taken three different exams that

**Page 77**

1  you are a qualified urologist.
2       The second one is subspecializing in female
3  urology and pelvic floor reconstruction, so the boards
4  of GYN, urology came together because we have a lot of
5  overlap, and I've had this certificate available since
6  2013.
7       Q.  Okay.  Doctor, we're now going to go to
8  the next exhibit, which we've marked P0049, and if you
9  could, first looking at the front page, what is this
10  document?
11      A.  This is just the -- as it states at the
12  top, the Evaluation of the TVM technique for Ethicon.
13      Q.  It says clinical study report dated
14  June 27, 2006, and it says the principal investigator
15  was Michel Cosson, Dr. Cosson.  Is that what this
16  technically is, is this clinical study report for the
17  French TVM study?
18      A.  That is correct and their 12-month data.
19      Q.  And let's now turn to Page 4.  There's a
20  section that says -- and just very, very briefly and
21  simply, what was the French TVM study; what were they
22  doing?
23      A.  They were looking at the feasibility and
24  the results and the complications, efficacy of the TVM

Daniel S. Elliott, M.D.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1 technique.
2       Q.   And when you say the TVM technique, that's
3 what ultimately became the Prolift® procedure?
4       A.   That is correct, yes.
5       Q.   And we look at the statistical methods
6 section, and I'm going to try to avoid much of the
7 statistical jargon and let you explain it simply, but
8 about six or eight lines down, there's a sentence that
9 says, the criterion for success was that the upper 90%
10 two-tailed confidence interval (same as the tail on a
11 one tail 95% confidence interval) did not exceed 20%.
12 Otherwise, the study would be deemed a failure, as it
13 would not show that the prolapse rate was less than
14 20%.
15       In layman's terms, what is that telling us?
16       A.   Any time you set up a study you establish
17 criteria beforehand of what you expect is defining as
18 success, so they're doing a very good job of that.
19       Then they get into a bunch of statistical
20 stuff, the two-tailed confidence interval, et cetera.
21 It's detailed statistics of how they prove something is
22 a success or not, and then their bottom line saying
23 that if they have a prolapse recurrence greater than
24 20%, that they deemed the procedure as a failure.

**Page 79**

1       Q.   And when they see -- well, I'll withdraw
2 it.  Let me move forward.  Let's go down to the results
3 and conclusions section, the actual results now.  It
4 says, the primary effectiveness variable was recurrence
5 of prolapse at 12 months post-procedure (failure of
6 procedure), with failure being defined as a prolapse of
7 International Continence Society Stage II or more or a
8 surgical re-intervention.
9       So that's telling us the criteria for success
10 or failure?
11       A.   Again, they're going on -- they're
12 defining what we define, the studiers, the researchers
13 as a success or failure.  So they're saying the
14 International -- ICS, International Continence Society
15 Stage II or more or surgical re-intervention is
16 failure.
17       Q.   When they say recurrence of prolapse, does
18 that just mean after you've treated it does it come
19 back at some level?
20       A.   Correct, that's anatomic recurrence, yes.
21       Q.   And they call Stage II being a recurrence.
22 What does that mean?
23       A.   That just means that you grade prolapses.
24 There's multiple different grading systems, but you

**Page 80**

1 grade them.  Easiest way is grade 1 is essentially
2 completely normal.  Grade 2 is little bit of prolapse,
3 grade 3 is more, grade 4 is coming all the way out.
4 That's just a brief way of describing it.  So they're
5 saying Stage II where it's dropped down a fair bit is a
6 failure.
7       Q.   I'm reading now further in the results and
8 conclusions section.  The results show a failure rate
9 at 12 months of 18.4% with a 90% confidence interval of
10 -- I'm going to start over.
11       I'm going to read now within the results and
12 conclusions section.  The results show a failure rate
13 at 12 months of 18.4% with a 90% confidence interval of
14 11.9 to 26.6.  Thus the study did not meet the
15 predefined criteria of a failure rate of less than 20%.
16       What does that mean?
17       A.   It means that at 12 months, which is the
18 absolute minimum you would want to do a study for
19 prolapse, 12 months would be very, very minimum, that
20 based upon the statistical analysis they were above the
21 20% predefined failure rate.  So, subsequently, based
22 upon this data, the TVM system, which became Prolift®
23 did not make anatomical success, did not reach their
24 criteria.

**Page 81**

1       Q.   And just to be clear, they gave a range of
2 11.9 to 26.6, that's the confidence interval where
3 they're saying we can take these results and apply them
4 more broadly, and that's the statistical range?
5       A.   Correct.  That's when statistics --
6 advanced people with biostatistics come in and do their
7 math, and so I have to trust their math on that one.
8 So they're telling me it did not meet the success of
9 the procedure.
10       Q.   The second paragraph of the results and
11 conclusions says the secondary effectiveness parameters
12 show a failure rate at six months of 12.6%, 90%
13 confidence interval, 7.3 to 20.1%.
14       What is that telling us?
15       A.   Again, they're just saying at the short
16 term at six months, the raw number of 12.6 had already
17 recurred, so it was a fast recurrence.
18       Q.   And the 20.1% with the confidence
19 interval, it was already over 20%?
20       A.   Yes, I'm sorry.  Yes, at six months
21 already they had exceeded their predefined success or
22 failure number.
23       Q.   Turn to Page 5, please, the very top of,
24 again, the results and conclusions section, moderate or

21 (Pages 78 to 81)

Daniel S. Elliott, M.D.

Page 82

1 severe vaginal retraction was reported in 11 (12.6%)
2 patients.
3     What is that telling us?
4     A. Vaginal retraction is what we've already
5 mentioned earlier on scarring of the mesh. They happen
6 to use the word retraction. It's the same thing, but
7 in these surgeon's hands, high volume surgeons, they
8 had 12.6 of moderate or severe contraction, mesh
9 contraction.
10     Q. Based on the results of the TVM study, do
11 you have an opinion as to whether or not the Prolift®
12 was a safe and effective procedure to be marketed on
13 the widespread basis it was?
14     A. Let's break it down in two. You said safe
15 and effective. So, number one, effective, no. These
16 researchers, it failed. It did not meet the
17 effectiveness, which is purely anatomic.
18     Safety-wise, that was addressed in the second
19 one, that 12.6, so not a small number, had vaginal
20 retraction that was visible or palpable.
21     So on both those aspects, no.
22     Q. Did you see Axel Arnaud's deposition
23 testimony where he testified that the French TVM study
24 showed a 20.7% exposure rate at one year?

Page 83

1     MR. ISMAIL: Objection, leading, lack of
2 foundation.
3     THE WITNESS: Yes, I read that.
4 BY MR. SLATER:
5     Q. Is that of significance to you?
6     A. Very much so, yes.
7     Q. Why?
8     A. Because he stated what the true incidence
9 of the vaginal mesh exposure was in the study at 20.7,
10 which the study itself quotes a lower number.
11     MR. ISMAIL: Objection, lack of
12 foundation.
13 BY MR. SLATER:
14     Q. Is a 20.7% exposure rate, in your opinion,
15 a safe rate for that complication?
16     A. No.
17     Q. Why not?
18     A. Well, not just my opinion, my colleagues,
19 internal documentation say, you know, that is a very
20 common number. It is a very high number, and that
21 ultimately leads to reoperation, which is increased
22 risks there, so, no, it's not a safe number.
23     Q. Okay. Let's go to the next PowerPoint
24 slide. I want to ask you about design challenge is a

Page 84

1 controlled foreign body reaction, and we cite to Piet
2 Hinoul.
3     Do you have an opinion as to whether or not the
4 Prolift® achieved the design challenge of a controlled
5 foreign body reaction in women?
6     MR. ISMAIL: Objection to the use of the
7 slide.
8     THE WITNESS: It did not.
9 BY MR. SLATER:
10     Q. And what's your basis for that?
11     A. The basis is going to be multifactorial.
12 My personal experience day-to-day examining patients,
13 operating on patients, review of the medical
14 literature, a review of internal documentation,
15 attendance at national, international meetings,
16 discussion with colleagues, that the mesh did not have
17 a controlled foreign body reaction and had
18 complications associated with it.
19 BY MR. SLATER:
20     Q. The concept of a fine balance, if there's
21 too much fibrosis, it would be unsafe, as testified to
22 by Piet Hinoul.
23     Do you have an opinion as to whether or not the
24 Prolift® achieved that fine balance?

Page 85

1     MR. ISMAIL: Objection, argumentative,
2 705.
3     THE WITNESS: It did not meet that fine
4 balance.
5 BY MR. SLATER:
6     Q. And what's your basis for that opinion?
7     A. Again, just like I just mentioned, all
8 those aforementioned criteria. No small issue is my
9 daily or weekly examination of patients with Prolift®,
10 medical literature, review or our attendance at
11 meetings, international, national colleagues,
12 discussing those issues.
13     Q. And with regard to the concept of too much
14 fibrosis would be unsafe, why is that? I think you've
15 talked about it, but let's just make it clear for the
16 record right now.
17     A. Again, fibrosis is a response to the mesh
18 and the decrease in pore size, the small pore size,
19 which causes foreign body reaction, chronic
20 inflammation, which the body responds naturally, just
21 causing scarring.
22     So too much fibrosis is a result of all those
23 other issues, okay, come together, and that's what
24 causes the pain, the vaginal extrusion, et cetera.

22 (Pages 82 to 85)

Daniel S. Elliott, M.D.

Page 86

1    Q.  There's a concept of scar plating or
2  bridging fibrosis.  You may have -- I think you talked
3  about it earlier, but is that relevant in this context?
4    A.  Yes, that's what I'm referring to, the
5  scar plating is the result of the implantation of the
6  device, the decreased pore size, inflammation, foreign
7  body reaction, more scarring, and then you get that
8  plate.  Remember, I keep going like this.  This is
9  where it goes -- theoretically goes through the tissues
10  versus plating and scarring.
11    Q.  Let's go to the next PowerPoint slide.
12       With regard to the concept of design
13  requirements, are you familiar with testimony from
14  Ethicon witnesses about their design requirements?
15       MR. ISMAIL:  Objection as argumentative,
16    use of the slide, leading, lack of foundation.
17       THE WITNESS:  Yes, I've read all those
18    depositions.
19  BY MR. SLATER:
20    Q.  I want to ask you about a specific design
21  requirement.  The mesh lays flat.  Assuming that the
22  mesh laying flat is a design requirement for the
23  Prolift®, do you have an opinion as to whether or not
24  the Prolift® met that design requirement?

Page 87

1    A.  It did not meet that requirement.
2    Q.  And what's your basis for that?
3    A.  Okay.  Basis, again, goes down the line of
4  my physical exam of these patients on a weekly basis,
5  including those with Prolift®, the medical literature,
6  internal documentation, national/international
7  meetings, discussion with colleagues.
8    Q.  With regard to whether the mesh lays flat,
9  we've seen some materials and some videos here today,
10  does that enter into your opinion on that?
11    A.  Yes.
12    Q.  Why is that?
13    A.  The mesh, the Prolift® kit, when the mesh
14  comes it's a one size fits all, okay.  It's analogous
15  to saying everybody should fit in the same size of
16  shoe, doesn't happen.  So if that mesh is, let's say,
17  this long and you have a woman who is shorter or the
18  surgeon does not place it in the correct location or
19  the sufficient location, that mesh is going to bunch
20  up, it's not going to lay flat.  It can't.
21    Q.  With regard to the arms and the use of the
22  cannulas, does that impact on your opinion?
23    A.  Yes, see, the arms, see, that's also
24  another aspect, the arms are going to be pulling on

Page 88

1  this.  The pelvis is a dynamic structure, okay.  It's
2  not just like always laying down at the time of
3  surgery.  A woman is going to be getting up, she's
4  going to be moving, she's going to go right, she's to
5  go left, she's going to lean over, and that's going to
6  make the vagina have to move.
7       The pelvis is an incredibly complicated
8  structure, and so these internal organs have to move.
9  Now if they're anchored in and have these arms going
10  out, going through muscles and that's anchored in
11  because of the scarring, foreign body reaction, et
12  cetera, it can't do that.  So when those mesh arms
13  pull, it's going to be causing the pain and also the
14  vaginal extrusion and other factors -- other issues,
15  excuse me.
16    Q.  When the mesh arms came through the
17  cannulas and they come through the cannulas in the
18  body, are they flat or has the shape been changed?
19    A.  No, just like I pointed out, that's why
20  the video was so important, that's why I said the
21  original cartoon is not fair because it shows them
22  laying flat.  You cannot have a flat piece of mesh this
23  wide go through a cannula -- a cannula this big, you
24  can't have a one centimeter thing come out flat, it

Page 89

1  won't be, can't do it, physically impossible.
2    Q.  Okay.  A design requirement of the mesh
3  incorporated safely into the woman's pelvis.
4       Assuming that to be one of the design
5  requirements, do you have an opinion as to whether that
6  design requirement was met with the Prolift®?
7    A.  It was not met.
8    Q.  Why is that?
9    A.  Again, that goes back to everything we've
10  said over and over.  The mesh has to be safely
11  incorporated in the pelvis, so no scarring, no
12  extrusion, no fibrosis, no pain, and that was not
13  achieved.
14    Q.  Doctor, we're going to take that slide
15  down.  We're going to go to the next exhibit.  Please
16  look at Exhibit PLT0067 titled "Complications from
17  vaginally placed mesh in pelvic reconstructive
18  surgery."
19       Are you familiar with this article?
20    A.  Very much so, yes.
21    Q.  Is this article, in your opinion,
22  medically reliable and authoritative in the field?
23    A.  Yes, it is.
24    Q.  Is this an article that you've relied on

23 (Pages 86 to 89)

Daniel S. Elliott, M.D.

**Page 90**

1  in forming your opinions?
2      A.  Yes.
3      Q.  Okay.  What is this article?
4      MR. ISMAIL:  Objection, hearsay.
5      THE WITNESS:  This is written with my
6  colleagues in the urogynecology department at
7  Mayo.  Roberta Blandon, she was a resident.  I
8  didn't know her, but I know Gebhart, Trabuco
9  and Klingele well.  I operate every other week
10  with three of -- two of those.
11      And so this is summarizing -- this is in
12  the very early days, it was published in 2009,
13  submitted I think probably prior to that in the
14  early days of the mesh complications.  It's one
15  of the first papers out there talking about
16  those complications.
17  BY MR. SLATER:
18      Q.  And I just want to ask you a question
19  because we're going to talk a little bit more about the
20  complications described in this paper.  Rephrase.
21      I want to ask you something baseline before we
22  talk about -- rephrase.
23      I want to ask you a baseline question.
24      When contracted Prolift® mesh is explanted,

**Page 91**

1  when that's being done and when it's taken out, what
2  is -- we've seen what it looks like out of the box and
3  how it feels.  How is it -- is it any different when
4  you're actually removing it from the body?
5      A.  It's a mess.
6      Q.  What do you mean by that?
7      A.  It's a very difficult surgery.  The
8  mesh -- there is actually a picture of explanted mesh
9  here.  Here we go.
10      The picture that they show on Page 529 is
11  explanted mesh, okay.  I, as a surgeon, look at this
12  and that is a human's body attached to that mesh.  They
13  had to use big scissors to cut through this, and you
14  look at the burned edges, that means they're using a
15  cautery to burn through this mesh, okay.  That is mesh,
16  just like the analogous to the rebar, okay, rebar in
17  concrete, okay.  You got to get that out of there.
18  It's a train wreck.  You have to use a jackhammer to
19  get it out.  Obviously, in the human body you don't
20  have to use that, but it's stuck in there because this
21  is caked in scar.
22      MR. ISMAIL:  I'm sorry.  Move to strike,
23  hearsay, 403, nonresponsive.
24  BY MR. SLATER:

**Page 92**

1      Q.  Is the mesh soft when it's coming out when
2  you're taking it out from these complications, or does
3  it have -- what does it feel like?
4      A.  It's encased in scar, you can feel it.  If
5  you want to say a nice thing about mesh is when you can
6  feel it, because it's firm in there, okay.  Normal
7  human body, it's not firm, okay.  And so when you try
8  and get rid of autologous slings, they're very actually
9  difficult to find, but the meshes you can rub back and
10  forth, I tell the residents, I say, feel right here
11  because a lot of times we're working deep down in the
12  pelvis.  We can't see it.  You have to go by
13  proprioception, feel this, feel this band, feel where
14  this is going through the obturator foramen.  So, no,
15  it's not soft at all.
16      Q.  Let's go to Page 529 of this article, and
17  in the left-hand column, the second full paragraph, I
18  want to read a sentence, a short portion of it, and ask
19  you a question.  "One of our most important findings is
20  that only 14% of patients were referred by the original
21  surgeon, which suggests a lack of awareness of these
22  complications by the original treating physician and
23  the potential for underreporting of the rate and extent
24  of these complications due to nonrespondent/volunteer

**Page 93**

1  bias."
2      Is that significant to you?
3      MR. ISMAIL:  Objection, hearsay.
4      THE WITNESS:  Yes.
5  BY MR. SLATER:
6      Q.  Why?
7      A.  This mirrors my practice.  Let's just
8  focus on this data here, but the majority, especially
9  in here, of these patients are not being referred by
10  their doctor back home.  Their doctor back home is
11  unaware of the level and the severity of the
12  complication, and the patient is seeking care
13  elsewhere, which, again, that mirrors my practice.
14      MR. ISMAIL:  Again, I assume we have a
15  standing objection on Plaintiff Exhibit 67 use
16  of hearsay.
17      MR. SLATER:  You have your standing
18  hearsay objection.
19      MR. ISMAIL:  Thank you.
20  BY MR. SLATER:
21      Q.  Let's go to the top of page -- of the
22  right hand column on Page 529, about four lines down.
23  I want to read the sentence and ask you a question or
24  two sentences.

24  (Pages 90 to 93)

Daniel S. Elliott, M.D.

Page 94

1    With the growing popularity of mesh insertion
2  kits, in which a large surface area of synthetic
3  material is placed, the vaginal surgeon is faced with
4  the challenges of very complex surgical dissections.
5  If mesh excision is warranted, tissue fibrosis,
6  scarring, bleeding, and urinary tract and anorectal
7  injury are easily encountered, which add to patient
8  morbidity.
9    Is that of significance to you?
10   A.  Yes.
11   Q.  Why?
12   A.  Well, that mirrors my weekly practice.
13 This is complicated surgery.  You have arguably three
14 of the top urogynecologists in the nation, there's
15 going to be others who are good, but these are top
16 notch guys, highly experienced at a high volume
17 tertiary care center, and they're saying they struggle
18 to do this.  I struggle when I'm getting these things
19 out.  It's a bear.
20   Q.  Let's go to the bottom of that column, the
21 right-hand column on Page 529.  I want to read a
22 sentence and ask you a question.
23   "It is important to remember that a percentage
24 of patients who undergo pelvic reconstructive surgery

Page 95

1  with vaginally placed mesh will have life-changing
2  complications.  Moreover, whereas minor complications
3  such as small vaginal mesh erosions are simple and easy
4  to manage, incapacitating pelvic pain, dyspareunia, and
5  large-scare erosions can be exceedingly complex and not
6  easily resolved."
7    Is that significant to you?
8    A.  Yes, it is.
9    Q.  Why is that?
10   A.  Well, again, there's a focus on the
11 vaginal extrusion, which the data from other
12 individuals would say that is a much more recurrent
13 problem than we knew at this point in time, but we're
14 saying these are some life-changing, severe,
15 life-altering problems that occurs as a result of the
16 Prolift® mesh.
17   Q.  And this article, the description of these
18 various complications, in your opinion, do they apply
19 to the Prolift®?
20   A.  Absolutely.
21   Q.  I want to go to the bottom of the first
22 full paragraph on Page 530, the last sentence.  This
23 was February 2009, correct?
24   A.  Correct.

Page 96

1    Q.  "The widespread marketing of these
2  technologies should be avoided until level I evidence
3  becomes available demonstrating their superiority over
4  traditional repairs, with acceptable rates of
5  morbidity."
6    Is that significant to you?
7    A.  Yes, it is.
8    Q.  And why is that?
9    A.  They're stating here that basically this
10 product is out without high quality studies showing
11 that it's worked and it's safe, and they're saying it
12 should not have been accepted, it should not be
13 performed.
14   Q.  With regard to the Prolift®, do you have
15 an opinion as to whether what I just read is accurate?
16   A.  It is accurate, yes, I support it
17 completely.
18   Q.  Did they -- did Ethicon have level I
19 evidence demonstrating superiority of the Prolift® over
20 traditional repairs with acceptable rates of morbidity
21 before it was marketed, in your opinion?
22   A.  There were no studies, no.
23   Q.  Did such studies ever exist, in your
24 opinion, level I evidence showing the superiority of

Page 97

1  the Prolift® over traditional repairs with acceptable
2  rates of morbidity, was that ever produced for the
3  Prolift®?
4    A.  No.  There are studies out there showing
5  efficacy, anatomical success, but we've already talked
6  about that.  That's not quality of life.  So to answer
7  your question specifically, no, that has not been done.
8    Q.  Let's go to the next PowerPoint slide.
9    Doctor, I want to ask you about testimony from
10 David Robinson where he testified that gynecology had
11 not adopted the routine use of meshes due to
12 unacceptably high mesh complication rates.
13   Are you familiar with that testimony?
14   A.  Yes, I am --
15     MR. ISMAIL:  Objection, argumentative,
16   lack of foundation.
17 BY MR. SLATER:
18   Q.  David Robinson, who was the medical
19 affairs director, listed what he perceived to be
20 unacceptably high mesh complication rates, 6 to 25%, 3
21 to 12% and 6 to 12% from various studies.
22   Are you familiar with that?
23   A.  Yes.
24     MR. ISMAIL:  Sorry.  Objection to the use

25 (Pages 94 to 97)

Daniel S. Elliott, M.D.

| Page 98 | Page 100 |
|---|---|

**Page 98**

1    of the slide, 403, argumentative.

2    BY MR. SLATER:

3    Q.  With regard to the use, the routine use of

4    meshes and the nature of the complications one sees

5    with the Prolift®, do you agree or disagree with the

6    medical affairs director that these types -- these

7    rates of complications with the Prolift® whether that

8    would be acceptable or unacceptable?

9    MR. ISMAIL:  Same objection.

10    BY MR. SLATER:

11    Q.  You can answer.

12    A.  I have yet to answer any of the questions

13    yet.

14    Q.  You can answer.

15    A.  Yes, I am familiar with this document,

16    these are the depositions which I read, so I am very

17    familiar with this, and I agree with him that the -- it

18    has not been accepted due to high complication rates,

19    and these are the numbers that he quoted.

20    Q.  Let's go to the next slide.

21    Doctor, we have a PowerPoint slide here

22    entitled "Prolift® TVM Complication Rates."

23    What is this showing us?

24    MR. ISMAIL:  Objection, hearsay.

**Page 99**

1    THE WITNESS:  These are multiple different

2    studies, I reviewed all of these studies.

3    They're listed here.  There are some --

4    BY MR. SLATER:

5    Q.  Let me ask you -- let me stop you.  These

6    studies, are these studies medically reliable and

7    authoritative in the field?

8    A.  Yes, these are good quality studies.

9    Q.  And did you rely on them for forming your

10    opinions in this case?

11    A.  Yes, I did.

12    Q.  Okay.  Go ahead, tell us what we're seeing

13    here.

14    MR. ISMAIL:  Objection, hearsay.

15    THE WITNESS:  Basically, these are a

16    combination of all the complications reported

17    in these various different studies from these

18    various different surgeons, going from as low

19    of 15.6 to up to 33.6.

20    BY MR. SLATER:

21    Q.  Now let's go to the next slide.  Where we

22    have side by side the rates of complications David

23    Robinson had described as unacceptable versus the rates

24    of complications for various studies of the Prolift®.

**Page 100**

1    Why did you want to have this slide put

2    together comparing these rates?

3    MR. ISMAIL:  Objection, hearsay to slides

4    15 and 16.

5    THE WITNESS:  I put them in here

6    specifically because David Robinson, a person

7    of authority within Ethicon, had stated various

8    different unacceptable rates as listed there

9    from 3% up to 25%, as it states, and then we

10    compare it to the available literature of these

11    selected articles of stating complication rates

12    much higher than that.

13    BY MR. SLATER:

14    Q.  Do you have an opinion when you look at

15    the rates of complications for these various studies of

16    the Prolift® whether or not those rates are acceptable

17    from a medical safety standpoint or not, in your

18    opinion?

19    A.  From my opinion, based upon my daily

20    experience or weekly experience with these individuals

21    is that each one of those complications represent a

22    human being's life who has potentially been devastated,

23    so these are unacceptable rates.

24    Q.  And do you base your opinion also on your

**Page 101**

1    reading of that literature and other associated

2    literature?

3    A.  These are just six to eight selected

4    articles.  There's many more articles -- and that's

5    also not including my attendance at national,

6    international meetings about this exact subject or --

7    and lecturing on them.

8    MR. ISMAIL:  Objection, move to strike,

9    hearsay.

10    BY MR. SLATER:

11    Q.  Let's go to the next exhibit, take the

12    PowerPoint down.  PLT0108, the next exhibit.

13    Doctor, I provided you Exhibit PLT0108.  This

14    is an article by various doctors, including Dr. Cosson.

15    Is this an article that you have relied on for

16    your opinions?

17    A.  Yes, I have.

18    Q.  And is this article, in your opinion,

19    medically reliable and authoritative?

20    A.  Yes, it is.

21    Q.  And this was dated as an accepted date of

22    July 25, 2005, just a few months after the Prolift®

23    went on the market?

24    A.  Correct.

26 (Pages 98 to 101)

Daniel S. Elliott, M.D.

| Page 102 | Page 104 |
|---|---|
| 1     Q.  And, again, Cosson, he's the one who was<br>2 named in the final study report for the TVM study, he<br>3 was the lead investigator for the Prolift® prototype<br>4 study?<br>5     A.  That is correct, yes.<br>6     Q.  If we look in the abstract section in the<br>7 beginning, about halfway down that abstract, they say<br>8 that 34 cases of mesh exposure were observed within the<br>9 two months following surgery, which represents an<br>10 incidence of 12.27%.<br>11     Do you see that?<br>12     A.  Yes, I do.<br>13        MR. ISMAIL:  Objection, hearsay, standing<br>14 objection to 108, please.<br>15        MR. SLATER:  Yeah, you have a standing<br>16 objection to them all.<br>17        MR. ISMAIL:  I know, but I feel like I<br>18 have to identify which ones are the<br>19 inappropriate hearsay for the record.<br>20        MR. SLATER:  No problem.  You don't have<br>21 to object again to this article.<br>22        THE WITNESS:  Yes, I do, I see that.<br>23 BY MR. SLATER:<br>24     Q.  Now, what I'd like to do is turn to the | 1     "Nowadays, based on these data, we can only<br>2 advise that caution be exercised when carrying out this<br>3 new surgical procedure. In fact, experimental studies<br>4 and clinical trials seem necessary in order to reduce<br>5 the level of exposure to less than 5% of cases."<br>6     Is that statement of significance to you?<br>7     A.  Very much so, yes.<br>8     Q.  Why is that?<br>9     A.  Well, because you have one of the<br>10 highest -- at this point in time, one of the highest<br>11 volume surgeons, Dr. Cosson, who is involved in the<br>12 original studies of this, who knows it probably better<br>13 than most -- well, much greater than most surgeons, and<br>14 he, in his opinion, is saying that we have -- are<br>15 having basically an unacceptably high complication<br>16 rate.  This should be reserved as an experimental<br>17 procedure, meaning not widely accepted, until we can<br>18 get that exposure rate down to he says 5%.<br>19     Q.  Was the exposure rate across the board in<br>20 general in the medical community, when you look at the<br>21 medical literature, ever brought below 5% for the<br>22 Prolift®?<br>23        MR. ISMAIL:  Objection, hearsay.<br>24        THE WITNESS:  No. |
| Page 103 | Page 105 |
| 1 last page -- before I do that, just for the record, you<br>2 may have talked about it before, what is mesh exposure?<br>3     A.  Mesh exposure, I have to be very careful<br>4 on the nomenclature, good you point that out, mesh<br>5 exposure now is defined as mesh that's coming through<br>6 the vagina.  If you look back at older report, they may<br>7 talk about mesh erosion.  Now mesh erosion is reserved<br>8 for when mesh is eroding into another organ, bladder,<br>9 rectum or somewhere else.<br>10     Q.  That's a strict definition you apply in<br>11 your clinical and academic practice, correct?<br>12     A.  That is correct, yes.<br>13     Q.  Do people still interchangeably use those<br>14 terms?<br>15     A.  Routinely the terms are used<br>16 interchangeably, but in academic presentations and in<br>17 papers now, it's very well-defined.<br>18     Q.  Looking at the last page, the conclusion<br>19 to the article written by -- the last author listed is<br>20 the senior author, that would be Cosson, right?<br>21     A.  Correct.<br>22     Q.  Looking at the conclusion, the last<br>23 paragraph, I want to read something and ask you a<br>24 question about it. | 1 BY MR. SLATER:<br>2     Q.  We had gone through an exhibit just a few<br>3 minutes ago listing exposure rates for various Prolift®<br>4 studies.  Were they below or above 5%?<br>5        MR. ISMAIL:  Objection, hearsay.<br>6        THE WITNESS:  All those are above, and any<br>7 studies I've ever reviewed which hint at lower,<br>8 they're always short-term studies.<br>9 BY MR. SLATER:<br>10     Q.  Let's go to the next exhibit.<br>11     Doctor, I've handed you what we've marked as<br>12 Exhibit PLT0011.  It's an a ACOG Practice Bulletin with<br>13 regard to Clinical Management Guidelines for<br>14 Obstetricians-Gynecologists, February 2007, and it says<br>15 in the left column it was authored with the assistance<br>16 of Dr. Scott Smilen and Dr. Anne Weber.<br>17     Are you familiar with this document?<br>18     A.  Yes, I am.<br>19     Q.  Is this something you've relied on for<br>20 your opinions?<br>21     A.  Yes, I have.<br>22     Q.  Do you find this to be medically reliable<br>23 and authoritative in the field?<br>24     A.  Yes. |

## Daniel S. Elliott, M.D.

Page 106

1  Q.  I want to now draw your attention in this
2  practice guideline, this is just -- these are
3  recommendations to gynecologists in day-to-day practice
4  for things they should consider and how they should
5  practice routinely?
6  A.  Correct.  It's a bulletin that ACOG, which
7  is the American College of OB-GYN puts out periodically
8  on a routine basis of just updates for people to get a
9  synopsis of what's going on.
10  Q.  If you look at Page 468, the top
11  right-hand portion, the last -- the first full
12  paragraph in the right column, I'm going to read it and
13  ask you a question.
14      MR. ISMAIL:  Before do you, standing
15      objection as hearsay to Exhibit -- Plaintiff
16      Exhibit 11.
17      MR. SLATER:  You have a standing or a
18      sitting objection.
19      MR. ISMAIL:  Thank you.
20  BY MR. SLATER:
21  Q.  I'm going to read the first full paragraph
22  in the right-hand column on Page 468.
23  "Given the limited data and frequent changes in
24  the marketed products (particularly with regard to type

Page 107

1  of mesh material itself, which is most closely
2  associated with several of the postoperative risks,
3  especially mesh erosion), the procedures should be
4  considered experimental and patients should consent to
5  surgery with that understanding."
6  Is that significant to you?
7  A.  Yes.
8  Q.  And why is that?
9  A.  That this -- the ACOG board following
10  review of the literature, has come with the opinion
11  that the procedure is experimental, which means it
12  should not be used in widespread for every patient.
13  Q.  Do you have an opinion as to whether or
14  not the Prolift® should or should not have been
15  considered and actually utilized as an experimental
16  procedure?
17      MR. ISMAIL:  Objection, cumulative.
18      THE WITNESS:  I have an opinion and it
19      should have stayed as an experimental.
20  BY MR. SLATER:
21  Q.  When something is experimental, what does
22  that mean?
23  A.  Experimental puts it in a completely
24  different class of surgeries.  The standard anterior

Page 108

1  colporrhaphy, the traditional repair is not
2  experimental.  A procedure that is experimental means
3  that it has not been proven safe and efficacious.  It
4  has to be both, can't just be one or the other, and so
5  until it is proven safe, it cannot be for every surgeon
6  to be doing it.  It has to be under very close study
7  guidelines with a highly informed and consented
8  patient.
9  Q.  Are you familiar with the fact that later
10  in 2007, ACOG modified the bulletin to remove the word
11  experimental?
12  A.  Yes, I read that.
13  Q.  Do you know why that was done?
14      MR. ISMAIL:  Objection, first, relevance,
15      403, lack of foundation.
16      THE WITNESS:  I have read the internal
17      documentation e-mails of how that came about,
18      yes.
19  BY MR. SLATER:
20  Q.  In very simple terms, what happened?
21      MR. ISMAIL:  Same objection, also improper
22      expert testimony, doesn't aid the jury.
23      THE WITNESS:  There was pressure put on
24      the ACOG bulletin, the committee that does

Page 109

1  this, by individuals paid by Ethicon to
2  change -- get rid of the experimental.
3  BY MR. SLATER:
4  Q.  Do you have an opinion as to whether or
5  not the word experimental should have remained in that
6  bulletin or not?
7      MR. ISMAIL:  Same objections.
8      THE WITNESS:  Absolutely should have.
9  BY MR. SLATER:
10  Q.  Should have remained?
11  A.  Should have remain -- absolutely, it
12  should have remained there as experimental.
13  Q.  Let me ask you a question, we just saw an
14  ACOG bulletin in February 2007 saying that these mesh
15  kit procedures should be experimental.
16  Is that the same thing that Cosson, the
17  developer of the procedure, said in 2005?
18      MR. ISMAIL:  Objection, leading.
19      THE WITNESS:  That is what he stated, yes.
20  BY MR. SLATER:
21  Q.  Let's go to the next exhibit, and it is an
22  article that we've marked as PLT0139.
23  Is this an article that you are familiar with?
24  A.  Yes, sir.

28 (Pages 106 to 109)

## Daniel S. Elliott, M.D.

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  Q.  Is this an article that you believe to be
2  medically reliable and authoritative?
3  A.  Yes, as it pertains to the abstract.  The
4  remainder of the article is in French, so I have read
5  it and I can (speaking in French), I can read a bit,
6  but I can't read in detail here.
7  Q.  With regard to the English abstract on the
8  second page, is that medically reliable and
9  authoritative?
10  A.  Yes.
11  Q.  And that's something you relied on for
12  your opinions?
13  A.  Definitely, yes.
14  Q.  And this was written by various doctors
15  from the TVM group, including Cosson?
16  A.  Yes.
17  Q.  And let's look at the abstract, let's look
18  at the summary of the study they did?
19      MR. ISMAIL:  Standing objection, hearsay,
20  Plaintiff Exhibit 139.
21      MR. SLATER:  Standing objection.
22      MR. ISMAIL:  Thank you.
23  BY MR. SLATER:
24  Q.  And what I want to do is go through this

**Page 112**

1      In the middle of the section of the summary it
2  says, "Proposed to improve these phenomena, soft
3  Prolene recently used by several authors does not
4  appear to fulfill expectations."
5      Is that significant to you?
6  A.  Yes, it does.
7  Q.  Why is that?
8  A.  Because you have to look at, you know,
9  that's why I mentioned the first part of this.  They're
10  talking about the historical things, the Marlexes and
11  the Gortexes and the complication rates that were found
12  with those; therefore, individuals said, let's use a
13  different mesh.  Let's use Prolene soft, okay.  And
14  then when they did that, and, again, this is the early
15  days, these are the highest volume surgeons probably in
16  the world at that time, and they said the Prolene soft
17  did not meet -- reach the expectations they had hoped
18  it would.
19  Q.  And when they talk about the authors, that
20  includes Cosson, who developed the Prolift®?
21  A.  Yes, Cosson, among others, yes.
22  Q.  And soft Prolene, just to be clear, that's
23  the mesh in the Prolift®?
24  A.  Correct.

| Page 111 | Page 113 |
|---|---|

**Page 111**

1  in the first sentence, actually, the second sentence,
2  it says, "In light of the growing number of proposed
3  techniques and materials we reviewed the experience of
4  the pioneers in order to provide surgeons with the most
5  objective information available," and they're talking
6  about the use of transvaginal mesh?
7  A.  Correct.
8  Q.  In the body of the article, they talk
9  about certain complication rates with the use of
10  synthetic mesh to treat prolapse, and about halfway
11  down it says, "The rate of erosion was also quite
12  variable, as high as 45%," and then two lines down it
13  says, "the rate of dyspareunia has reached as high as
14  60%.  Here again grades of prosthetic retraction should
15  be better defined."
16      So stopping there, is that information
17  significant to you?
18  A.  Yes, it is.
19  Q.  Why is that?
20  A.  Well, they're reviewing, you know, all the
21  synthetic meshes around, saying there's a high rate of
22  complication specifically when they're talking about
23  the retraction.
24  Q.  The next -- rephrase.

**Page 113**

1  Q.  Go down towards the bottom, the last
2  paragraph, and it says in part, "The lack of data on
3  the rate of complications and patient quality of life
4  is unacceptable for this functional surgery.  We still
5  have reservations about widespread use of synthetic
6  meshes."
7      Is that significant to you?
8  A.  Yes, very much so.
9  Q.  Why?
10  A.  Okay.  Again, that's what I've been
11  stating all along.  This is a quality of life problem,
12  okay.  And these surgeons when they say functional,
13  that means quality of life.  And so they address what I
14  already mentioned multiple times.
15  Q.  Let's go to the next exhibit PLT0696.
16      Doctor, Exhibit 0696, PLT0696, is an article
17  titled "Evaluation and management of complications from
18  synthetic mesh after pelvic reconstructive surgery: a
19  multicenter study" by Dr. Abbott, et al.
20      Are you familiar with this article?
21  A.  Yes, I am, very much so.
22  Q.  And is this article medically reliable and
23  authoritative in the field, in your opinion?
24  A.  It's a very good article, yes.

29 (Pages 110 to 113)

## Daniel S. Elliott, M.D.

| Page 114 | Page 116 |
|---|---|

**Page 114**

1  Q. Is this an article you've relied on in
2  forming your opinions?
3  A. Yes, I have.
4  Q. What I would like to do first is turn to
5  -- well, rephrase.
6  Very simply, what is this article about; what
7  are they talking about?
8  MR. ISMAIL: Objection, hearsay, Exhibit
9  696, standing objection.
10  MR. SLATER: Yep.
11  BY MR. SLATER:
12  Q. Let me ask the question again. What is
13  this article about? Let's start in general, and then
14  we'll go to specifics real quick.
15  A. The article, as it states, which is
16  important, it's a multicenter study, so it's not just
17  one institution. So it's experience of multiple
18  different doctors, high volume, high profile, top notch
19  surgeons, and they're evaluating the -- their
20  complications that they have seen and referred in to
21  their institution from meshes and then the outcome
22  following these. So it's much more advanced study than
23  the original Blandon one. Blandon one is early is.
24  This is now late with multiple studies looking at this

**Page 116**

1  what does this tell us about whether smoking, in your
2  opinion, factors into that?
3  A. Well, it's not just my opinion, but the
4  opinion of these authors that smoking was not a factor
5  because if you look at never smoked, 61%. If you add
6  in there the previous but current nonsmokers, that
7  equals a total of 82% nonsmokers. So 82% of the people
8  weren't currently smoking and they had complications.
9  Q. Let's go to page e5, if we could. And
10  what I would like to do is draw your attention to the
11  middle column, and the first full paragraph, about
12  halfway down, and they're talking about the patients
13  and some statistics on them, and it says, the most
14  common complaints were mesh erosion (42.7%), pelvic
15  pain (34.6%), and dyspareunia (30%), although most
16  women (70.3%) had with greater than one distinct
17  symptom or complaint.
18  What is significant, if anything, about that?
19  A. It means you have, to be basic, a bunch of
20  problems to fix. 70% were coming in with more than
21  just one problem, and then it breaks it down what those
22  various different problems are, but, I mean, it's not
23  just one thing you have to try and fix.
24  Q. Turn to the next page, the Comment

| Page 115 | Page 117 |
|---|---|

**Page 115**

1  problem.
2  Q. The concepts that we're going to talk
3  about in this article, do they apply to the Prolift®,
4  in your opinion?
5  A. Yes.
6  Q. Okay. Let's first turn to Page e3, and
7  there's a Table 2.
8  Do you see that?
9  A. Yes, I do.
10  Q. And first at the top it says, there were
11  347 patients?
12  A. Correct.
13  Q. And if you go down further it says,
14  "smoking status." What is that telling us?
15  A. As it states, did the patient smoke, have
16  they never smoked, past smoker or a lifetime nonsmoker.
17  Q. And what was the statistics on the 347
18  patients?
19  A. Well, just reading it right off of there,
20  never smoked was 61%, past smoker 21%, current smoker
21  was 12.4%.
22  Q. And with regard to the concept of mesh
23  erosion and complications that are discussed in this
24  article, and we're going to get to them in a second,

**Page 117**

1  section, please, Page e6, and it says a little down
2  from the beginning of the comment section,
3  approximately one half of the women who sought
4  treatment of a mesh-related complication at a tertiary
5  referral center actually underwent their index
6  procedure, or their first procedure, at another
7  facility. This trend has been reported in other
8  studies as well. This raises the potential concern
9  that physicians who perform these mesh procedures may
10  not be aware of the complications their patients
11  experience and that these providers may be responsible
12  for future mesh-related complications, with no
13  awareness of the existing magnitude of the issue.
14  Is that significant to you?
15  A. Yes, it is.
16  Q. Why is that?
17  A. Well, for two different reasons. Number
18  one, 50% of the procedures -- let's break it up into
19  50/50. 50% of these procedures, these complications
20  they're facing were done by high volume, high qualified
21  surgeons, okay, so that raises a problem right there.
22  Number two, the other 50% were done by surgeons
23  who are unaware that this complication is even
24  existing, so it's multiple problems with that statement

Daniel S. Elliott, M.D.

| Page 118 | Page 120 |
|---|---|

**Page 118**

1  right there.
2      Q.  Let's look at the right-hand column on
3  page e6, almost halfway down the page, there's a
4  sentence that starts, "Furthermore, complications after
5  TVM tend to be more severe, are more chronic in nature
6  and can be more difficult to treat.  For instance, mesh
7  erosion, pelvic pain, dyspareunia, vaginal
8  constriction, vaginal spotting and obstructive
9  defecation were all significantly more common after
10 index surgery with TVM than 1 with sling only."
11     Is that significant to you?
12     A.  Oh, absolutely.  They're describing here
13 that this is a problem that we can't fix.  In medical
14 school, residency and advanced training, we are trained
15 to fix problems.  That's what doctors are supposed to
16 do, and they're stating we can't fix it.
17     Q.  Let's go down further on the third column
18 on Page e6, almost to the bottom, about eight lines up,
19 it says, "Most patients (60%) received 2 or more unique
20 interventions; even then, there was no guarantee of
21 symptom resolution."
22     What, if any, significance is that?
23     A.  Okay.  It's that there used to be this
24 dogma of oh, treat a mesh exposure, that's it, it's

**Page 120**

1          MR. SLATER:  Yes.
2          MR. ISMAIL:  Thank you.
3  BY MR. SLATER:
4      Q.  Doctor, Exhibit PLT1095 is an article
5  titled "Surgical management of mesh-related
6  complications after prior pelvic floor reconstructive
7  surgery with mesh."  There's a few authors,
8  including -- is it Heesakkers?
9      A.  John Heesakkers.
10     Q.  Heesakkers and Mariëlla Withagen from
11 2011.
12     Are you familiar with this article?
13     A.  Yes, I am.
14     Q.  Is this article medically reliable and
15 authoritative in the field, in your opinion?
16     A.  Yes, it is.
17     Q.  Is this an article you relied on?
18     A.  Yes.
19     Q.  And do you know any of these authors?
20     A.  I've heard Withagen speak.  John
21 Heesakkers, he is the chair of the European Urology
22 Reconstructive Surgery, which I am a board member of,
23 so I've talked to him, I've talked to him about mesh
24 complications, so I know him personally.

| Page 119 | Page 121 |
|---|---|

**Page 119**

1  gone, no big deal.
2      What they're saying is it requires multiple --
3  60% of their patients required two or more, and I think
4  later on they say there's something like 12% required
5  up to five or six, so it's a much larger number.  I
6  don't have any specifics right here.  So but bottom
7  line, it's a problem that continues to create more
8  problems, and it can't just be resolved quickly.
9      Q.  The description of complications and the
10 issues with treating the complications in this article,
11 in your opinion, do these concepts apply to the
12 Prolift®?
13     A.  Absolutely, yes.
14     Q.  Do you have an opinion as to whether or
15 not this profile of complications is medically safe or
16 unsafe for patients?
17         MR. ISMAIL:  Objection, cumulative.
18 BY MR. SLATER:
19     Q.  What's your opinion?
20     A.  It's unsafe.
21     Q.  Let's go to the next exhibit, which is
22 PLT1095, which I did give you before.
23         MR. ISMAIL:  When we came in first thing
24     the morning?

**Page 121**

1      Q.  Let's turn -- this is a paper about the
2  treatment of mesh complications, including Prolift®?
3      A.  That's correct.
4          MR. ISMAIL:  Objection to hearsay, Exhibit
5      1095, also, on not disclosed previously as a
6      reliance material for this witness.
7          Standing objection?
8          MR. SLATER:  Standing objection.
9          MR. ISMAIL:  Thank you.
10 BY MR. SLATER:
11     Q.  Let's turn to the fourth page, Page 1398,
12 and first I want to read something in the right-hand
13 column.  About halfway down the right-hand column it
14 says, a distinct difference in frequency of
15 mesh-related symptoms existed between the different
16 types of mesh insertion procedure, especially in
17 sacrocolpopexy compared to the other procedures.  Pain
18 and dyspareunia are mainly seen after mesh insertion
19 and vaginal bleeding and discharge after
20 sacrocolpopexy.
21     Is that significant to you?
22     A.  Yes.
23     Q.  Why is that?
24     A.  Because then they're going back to this

31 (Pages 118 to 121)

Daniel S. Elliott, M.D.

<table>
<tr><td>

Page 122

1    issue of this being a quality of life problem and this
2    patient having with the mesh kits, transvaginal mesh
3    kits having the vaginal pain.
4       Q. I'm going to ask you to do something. Can
5    you just grab the mesh from the anterior kit real
6    quick.
7       With the abdominal sacrocolpopexy, is mesh
8    used, where it's put in through the abdomen?
9       A. Yes, through the abdomen, which is
10   different than through the vagina.
11      Q. And can you illustrate for the jury
12   holding up the Prolift® how much mesh would be used in
13   a abdominal sacrocolpopexy and give the jury some idea
14   of the difference.
15      A. Well, you have to break it down so we can
16   see it here. So this is the mesh for the anterior
17   prolapse, anterior Prolift® and then the --
18      Q. Hold it up more.
19      A. The amount in contact with the vagina,
20   we're not talking about the arms, just the vagina is
21   going to be this part here, okay. And then you also
22   have the arms, okay, which go through the muscles what
23   I've already referred to.
24      Now, for the sacrocolpopexy, the robotic

</td><td>

Page 124

1    as between abdominal sacrocolpopexy and the Prolift®
2    procedure as to which one has a more or less acceptable
3    safety and efficacy profile overall?
4       MR. ISMAIL: Objection, cumulative.
5       THE WITNESS: Yeah, the data will show the
6    abdominal sacrocolpopexy, whether it be done
7    robotically, laparoscopically or with an
8    incision is a much safer procedure, with lower
9    incidence of dyspareunia, chronic problems
10   associated with Prolift®. So it's a -- you
11   can't compare the two. They're apples and
12   oranges as far as the procedure goes.
13   BY MR. SLATER:
14      Q. Let's turn now to Page 1402 of the article
15   that we are discussing here. The Heesakkers-Withagen
16   article and in the right-hand column, towards the top
17   right, top paragraph, last sentence, it says, also, the
18   urologist is always involved in the treatment of
19   patients with (suspected) mesh complications affecting
20   the bladder.
21      Is that significant to you?
22      A. Yes.
23      Q. Why is that?
24      A. Because what Withagen, who's a, you know,

</td></tr>
<tr><td>

Page 123

1    sacrocolpopexy or the open procedure, the amount in
2    contact with the vagina is going to be about that much,
3    okay, maybe a little bit more, maybe a little bit less,
4    and you'll be able to have it lie flat anteriorly, and
5    there may be also a piece that size going posteriorly.
6    In direct contact with the vagina is significantly
7    less.
8       Q. That size difference, what's the size of
9    the amount of mesh, can you estimate the size of what's
10   used with the abdominal procedure?
11      A. Okay. It's going to be anteriorly, what's
12   that, 2, maybe 3 centimeters, and also what I do is,
13   and most people do, is you trim the top so it's a
14   little more curved so it would actually be less than
15   this. Let's just say 2 by 2 anteriorly, posteriorly
16   maybe 2 by 3 centimeters, which is going to be
17   significantly less, you can just visualize it,
18   significantly less than the volume of mesh put in
19   otherwise for the Prolift®.
20      Q. So that's about an inch, 2 centimeters?
21      A. 2.54 centimeters in an inch.
22      Q. So a little less.
23      A. That's why I just said, just look at this.
24      Q. Okay. Do you have an opinion as within --

</td><td>

Page 125

1    highly trained, very good pelvic surgeon is what she's
2    saying, and she gets another expert involved in the
3    bladder, because these are so difficult to get out.
4       Q. Let's go down further in that column to
5    the last -- the second to last -- really, the last full
6    paragraph and about halfway down through that it says,
7    "Of the patients included in this study, 20 underwent
8    insertion of Prolift® at our hospital between halfway
9    of 2005 and end of 2009. In this period, 180 Prolift®
10   meshes were inserted. So, 20 out of 180, (11%)
11   patients with Prolift® inserted at our center developed
12   complications that required excision."
13      Is that significant to you?
14      A. Yes, it is, especially given the probably
15   relatively short amount of follow-ups, that's a very
16   high number.
17      Q. Having over 10% reoperations to remove
18   mesh?
19      A. It's quite -- that's a very high number,
20   yes.
21      Q. Finally, I want to go to the last page of
22   the text. The Conclusion, the very bottom of the left
23   column over to the top, I want to read something and
24   ask you a question. So we're at the bottom of the left

</td></tr>
</table>

32 (Pages 122 to 125)

Daniel S. Elliott, M.D.

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  column under the Conclusion, the last paragraph.
2      A.  I'm there.
3      Q.  It says, "The increasing number of
4  inserted meshes for SUI and POP raises concerns.  Mesh
5  is successfully used for repair of prolapse, but when
6  complications arise, they may be severe in nature and
7  result in a decrease in quality of life.  New meshes
8  are introduced into clinical practice, despite the lack
9  of proper studies showing their safety and
10  effectiveness.  Moreover, the use of easy-to-do mesh
11  kits lowers the threshold for inexperienced surgeons to
12  start operating with meshes.  This can only lead to
13  more complications, which is harmful for the patients."
14      Is that significant to you?
15      A.  Very much so, yes.
16      Q.  Why is that?
17      A.  Well, you go point by point through here
18  is -- in the first line, mesh is successfully used to
19  repair prolapse.  You know, I agree with that, that
20  they can repair prolapses.  Now we had a high failure
21  rate, it's 20% or so, but that's not the issue.  It's
22  that these complications are the problem.  That's the
23  life-changing aspect of it and that they're introduced
24  without any studies, okay.  There were no human studies

**Page 127**

1  on Prolift® prior to release, okay.  To my opinion that
2  is unethical and unacceptable.
3      And then, number three, this gets into more of
4  a discussion, these easy kits allow inexperienced
5  to start -- inexperienced surgeon, to allow them to
6  operate, that's beyond the scope of this here.  But it
7  raises the ability for people who are not advanced
8  surgeons of doing these things.  Again, that's, to a
9  certain degree, a different issue here.
10      MR. ISMAIL:  In addition to hearsay, which
11      has been preserved, move to strike as
12      nonresponsive and not proper grounds for expert
13      testimony.
14  BY MR. SLATER:
15      Q.  Let's go to the next exhibit.
16      Doctor, I've handed you what we've marked as
17  Exhibit -- actually, what number is on that?
18      A.  P2731.
19      Q.  Is it P or PLT?
20      A.  P.
21      Q.  Just P, okay.  Okay.  Let me start over.
22      Doctor, I've handed you Exhibit P2731, and this
23  is a page from the New England Journal of Medicine?
24      A.  That is correct.

**Page 128**

1      Q.  And in the bottom right-hand column
2  there's a set of corrections.
3      Do you see that?
4      A.  Yes, I do.
5      Q.  And the bottom one says that there was a
6  correction to an article titled "Anterior Colporrhaphy
7  versus Transvaginal Mesh for Pelvic Organ Prolapse,"
8  published in the New England Journal of Medicine,
9  May 12, 2011.
10      And are you familiar with that article?
11      MR. ISMAIL:  Objection, hearsay.
12      THE WITNESS:  Yes, I am, the Altman study,
13      I'm familiar.
14  BY MR. SLATER:
15      Q.  And they talk about a correction that was
16  made to some language in the Altman study of the
17  Prolift®?
18      A.  That is correct.
19      MR. ISMAIL:  Objection, hearsay.
20      Standing objection 2731.
21  BY MR. SLATER:
22      Q.  If somebody in this courtroom were to have
23  relied on the Altman study to say that that is proof of
24  the safety or efficacy or that the Prolift® is a

**Page 129**

1  suitable device or system, what would be your response
2  to that based on the correction and the information you
3  have available to you from the depositions of the
4  editors of the New England Journal of Medicine and the
5  internal documents you've seen from the company?
6      MR. ISMAIL:  Objection, hearsay, 403.
7  BY MR. SLATER:
8      Q.  You can answer.
9      A.  Based upon what I have read, as you
10  mentioned, the depositions from the journal -- New
11  England Journal of Medicine editors, what I've read of
12  internal documentation, of correspondence going back
13  and forth between the author and key people, three or
14  four within Ethicon, that the author originally stated
15  that this data was not -- had no industry involvement.
16  And then we come to find out that roughly, what, 100 or
17  so changes were made by Ethicon in this document.
18      Subsequently, there's no disclosure of bias,
19  which is the reason why rules exist is to declare if
20  there's a potential bias.  So that Altman study, along
21  with other errors that were pointed out on POP-Q scores
22  makes that study unreliable and false.
23      Q.  When you talk about errors with POP-Q
24  scores, what are you talking about, and why is that

33 (Pages 126 to 129)

Daniel S. Elliott, M.D.

| Page 130 | Page 132 |
|---|---|

**Page 130**

1 significant in assessing the validity of the Altman
2 study?
3              MR. ISMAIL:  Objection, 403, hearsay.
4              THE WITNESS:  POP-Q is a grading system,
5 POP-Q, pelvic organ prolapse quantification of
6 the prolapse, okay.  It's basic numbers and
7 certain POP-Q scores, we should abbreviate
8 POP-Q, because it's just easier.  It's a very
9 logical system, and so in my review of those
10 internal documents, e-mails back and forth and
11 depositions, we find out that those POP-Q
12 scores are not possible, not physically
13 possible, so, therefore, that data is false.
14 That's why I have been privy to information the
15 average doctor on the street has not been.  So,
16 again that's why it's a major because it
17 undermines the very core and validity of that
18 information.
19              MR. ISMAIL:  Objection, move to strike,
20 nonresponsive.
21 BY MR. SLATER:
22      Q.  Let's go to the next PowerPoint slide.
23 Doctor, I want to ask you about some
24 characteristics of the Prolift® and ask you a question

**Page 131**

1 about them, okay?
2      A.  Okay.
3      Q.  First of all, did you compile a list of
4 what you believe to be medically unsafe Prolift®
5 characteristics?
6      A.  Yes, in an abbreviated form listed here,
7 yes.
8      Q.  The first one, "tension is unavoidable/no
9 'tension free'"
10              MR. ISMAIL:  Object to the -- sorry.
11 BY MR. SLATER:
12      Q.  You've talked about these things, some of
13 them at length, but I just want you to briefly just
14 tell us why you include that in the list?
15              MR. ISMAIL:  Object to the slide as
16 argumentative, object to the testimony as
17 cumulative.
18              THE WITNESS:  Tension free is not
19 physically possible within the female pelvis.
20 So that's why it's tension free is -- tension
21 is going to happen, which then goes down to one
22 of the root sources of problems, where you get
23 tension, you get the pore size collapse, then
24 you cause that inflammation, foreign body

**Page 132**

1 reaction, scarring and pain.
2 BY MR. SLATER:
3      Q.  Number 2, mesh does not lay flat in an
4 unstretched condition.
5      Why do you say that?
6              MR. ISMAIL:  Objection, cumulative.
7              THE WITNESS:  As I stated earlier, you
8 can't get that mesh to lie flat.  If it doesn't
9 lie flat, it bunches, it curls, ropes and then
10 that causes, again, that cascade of the
11 problem, pore size decrease, foreign body
12 reaction, inflammation, pain.
13 BY MR. SLATER:
14      Q.  With regard to the arms, roping, curling
15 and banding, location in obturator space and deep
16 pelvis, why do you include that?
17              MR. ISMAIL:  Objection, cumulative.
18              THE WITNESS:  The roping, curling and
19 banding, we showed multiple times here, that's
20 going to cause that -- those arms to roll up,
21 scar.  They band, you can feel them on physical
22 exam.  Going through the obturator foramen
23 space and deep pelvis, the significance of that
24 is it's going to anchor it in and those

**Page 133**

1 muscles, those multiple muscles that have been
2 pierced will then contract with pain -- excuse
3 me -- with activity causing pain.
4 BY MR. SLATER:
5      Q.  Mesh does not incorporate safely in the
6 pelvis.
7      What does that mean?
8              MR. ISMAIL:  Objection, cumulative.
9              THE WITNESS:  That's what we've been
10 stating multiple times.  This mesh is not a
11 safe product to be placed in the female pelvis
12 transvaginally.
13 BY MR. SLATER:
14      Q.  Difficult/impossible to safely and
15 effectively remove the mesh.
16      Why do you say that?
17              MR. ISMAIL:  Objection, cumulative.
18              THE WITNESS:  Because the product when put
19 in for a quality of life issue, it is
20 impossible to get that mesh out completely.
21 You can leave behind or do severe damage to the
22 pelvic structures in trying to take it out.
23 BY MR. SLATER:
24      Q.  Do you hold those opinions to a reasonable

34 (Pages 130 to 133)

Daniel S. Elliott, M.D.

<table>
<tr><td>

Page 134

1  degree of medical certainty?
2       A.  Yes, those are based upon my personal
3  experience, review of the literature, internal
4  documentations, everything.
5       Q.  Based upon the list of medically unsafe
6  Prolift® characteristics that you have compiled, do you
7  have an opinion as to whether or not the Prolift®
8  system is a defective -- defectively designed system
9  and procedure for the treatment of pelvic organ
10  prolapse?
11       MR. ISMAIL:  Objection, cumulative, lack
12       of foundation, lack of qualifications.
13       THE WITNESS:  As I've mentioned, based
14       upon my experience in taking care of these
15       complications, my experience performing the
16       traditional repairs without mesh, that this was
17       an unsafe, poorly designed product that has no
18       role being placed in the female pelvis.
19  BY MR. SLATER:
20       Q.  Let's go to the next slide.
21       Doctor, did you compile a list of injuries
22  caused by medically unsafe Prolift® characteristics,
23  meaning what the consequences are of the list of
24  characteristics you listed on the prior slide?

</td><td>

Page 136

1       THE WITNESS:  Because you're treating a
2       quality of life problem, prolapse, and if you
3       place a device in there that has chronic,
4       severe, permanent and progressive inflammation,
5       it's unacceptable to trade a quality of life
6       problem with a viable, acceptable alternative
7       and trade it for a chronic, permanent problem.
8  BY MR. SLATER:
9       Q.  Contraction of the mesh, and then you have
10  the term excessive.  Tell us what that means and why
11  that is, in your opinion, applicable?
12       MR. ISMAIL:  Objection, 403, cumulative.
13       THE WITNESS:  The key with that is, number
14       one, contraction, so the mesh shrinks down as a
15       result of the scarring and inflammation, but
16       then excessive, so it's pulling on the muscles,
17       causing the pain, causing banding, rolling and
18       subsequently causing mesh exposure, so it
19       causes multiple different problems.
20  BY MR. SLATER:
21       Q.  Scar plating and fibrotic bridging,
22  explain that, why that is a result of the Prolift®?
23       MR. ISMAIL:  Objection, 403, cumulative.
24  BY MR. SLATER:

</td></tr>
<tr><td>

Page 135

1       MR. ISMAIL:  Objection.  Sorry.
2       Objection, the slide is argumentative, also 403
3       as being -- many of these being irrelevant to
4       the plaintiff at issue.
5       MR. SLATER:  I'm going to ask the question
6       differently.
7  BY MR. SLATER:
8       Q.  Doctor, I'd like to talk about a list of
9  injuries caused by medically unsafe Prolift®
10  characteristics, a list that we have here to talk
11  through, okay?
12       A.  Okay.
13       Q.  Is this list applicable to the Prolift® in
14  those issues that you just went through on the prior
15  slide?
16       MR. ISMAIL:  Same objection.
17       THE WITNESS:  Yes.
18  BY MR. SLATER:
19       Q.  Doctor, I'm going to walk through these
20  one at a time.
21       Chronic, severe inflammation, why is that, in
22  your opinion, a result of a medically unsafe
23  characteristic of the Prolift®?
24       MR. ISMAIL:  Objection, 403.

</td><td>

Page 137

1       Q.  And what you've called medically unsafe
2  Prolift® characteristics?
3       MR. ISMAIL:  Cumulative.
4  BY MR. SLATER:
5       Q.  Scar plating, fibrotic bridging, Number 3.
6       A.  Thank you.  Again, this goes back to the
7  fundamental problem with the mesh of causing that
8  plating.  It doesn't cause tissue integration, where it
9  goes through those pores.  It causes that plating,
10  which then causes the mesh to contract; bridging, which
11  causes pain for both the partner -- excuse me -- for
12  the patient in sexual activity with the partner also,
13  along with other as far as just ambulation.
14       Q.  Extrusion/exposure/erosion of mesh -
15  complex/recurrent.  What are you talking about there,
16  and why is that an injury caused by a medically unsafe
17  Prolift® characteristic?
18       MR. ISMAIL:  Objection, 403, cumulative.
19       THE WITNESS:  Due to the design of this
20       product, what I see in my daily practice,
21       because those pores constrict, because you get
22       this fibrosis or persistent infection, you can
23       get extrusion of the mesh, exposure, and the
24       key here is complex and recurrent, meaning it's

</td></tr>
</table>

35 (Pages 134 to 137)

Daniel S. Elliott, M.D.

| Page 138 | Page 140 |
|---|---|
| 1   not just one quick little procedure and it's | 1   Q.  Urinary dysfunction, which can be chronic, |
| 2   done.  As that Abbott study showed it comes | 2   why is that a result of medically unsafe Prolift® |
| 3   back multiple times. | 3   characteristics, in your opinion? |
| 4        MR. ISMAIL:  Objection, move to strike, | 4        MR. ISMAIL:  Objection, 403, cumulative. |
| 5   hearsay. | 5        THE WITNESS:  Okay.  Due to the placement |
| 6   BY MR. SLATER: | 6   where this is placed, in the vesicovaginal |
| 7        Q.  Vaginal pelvic pain, which can be chronic. | 7   space, in between the bladder and the vagina, |
| 8   Why is that the result of a medically unsafe Prolift® | 8   where all the nerves for bladder function come |
| 9   characteristic? | 9   in like this, you now have created that foreign |
| 10       MR. ISMAIL:  Objection, 403, cumulative. | 10  body, which is going to cause contraction, |
| 11       THE WITNESS:  This is one of the biggest | 11  erosion, inflammation, and it's going to |
| 12  issues which I see in my clinic on a weekly | 12  affecting those nerves causing permanent |
| 13  basis is that we now have a quality of life | 13  bladder dysfunction, which you can't fix. |
| 14  problem of this pelvic organ prolapse.  Woman | 14  BY MR. SLATER: |
| 15  has fullness, pressure, and then now we've | 15       Q.  Mesh removal operations, why do you |
| 16  traded it for a chronic, progressive, | 16  include that as injuries caused by medically unsafe |
| 17  permanent, unfixable problem, okay.  So the | 17  Prolift® characteristics? |
| 18  women's quality of life, these are the patients | 18       MR. ISMAIL:  Objection, 403, cumulative. |
| 19  that I have in my clinic, they and their | 19       THE WITNESS:  Every surgery has risks to |
| 20  spouse, they're crying because they are ruined | 20  it, especially as the individual becomes older, |
| 21  because of a quality of life problem when there | 21  there's data out there showing mentation |
| 22  was a viable other option available. | 22  issues, et cetera.  So if the patient undergoes |
| 23       MR. ISMAIL:  Move to strike, | 23  multiple surgeries to try and fix this, besides |
| 24  nonresponsive. | 24  just the expense of it, the wear and tear on |

| Page 139 | Page 141 |
|---|---|
| 1   BY MR. SLATER: | 1   the human body, it's not just a one and done, |
| 2        Q.  Dyspareunia, which can be chronic, why is | 2   easy fix, office procedure. |
| 3   that a result of a medically unsafe Prolift® | 3   BY MR. SLATER: |
| 4   characteristic? | 4        Q.  Doctor, you said earlier, and I'll just |
| 5        MR. ISMAIL:  Objection, cumulative. | 5   confirm it, you said you're familiar with the IFU for |
| 6        THE WITNESS:  That's just the same thing | 6   the Prolift®? |
| 7   as what I just mentioned as far as with the | 7        A.  Yes, I am. |
| 8   vaginal pain, pelvic pain.  Quality of life | 8        Q.  This profile of injuries, complications |
| 9   problem for permanent progressive problem is | 9   that can be caused by the Prolift®, in your opinion, is |
| 10  not fixable. | 10  that adequately warned of in any IFU for the Prolift® |
| 11  BY MR. SLATER: | 11  that you've ever seen? |
| 12       Q.  Pelvic floor myalgia, otherwise known as | 12       MR. ISMAIL:  Objection, lack of |
| 13  muscle spasms, which can be chronic, why does that | 13  foundation, lack of qualifications. |
| 14  result from medically unsafe Prolift® characteristics, | 14       THE WITNESS:  No. |
| 15  in your opinion? | 15  BY MR. SLATER: |
| 16       MR. ISMAIL:  Objection, 403, cumulative. | 16       Q.  Is the medical information that is set |
| 17       THE WITNESS:  This is due to those mesh | 17  forth in this list that you have compiled found in the |
| 18  arms going through all those muscles that I | 18  Prolift® IFU, in your opinion? |
| 19  mentioned.  When they pull, they tug, the | 19       MR. ISMAIL:  Same objections. |
| 20  pelvic musculature becomes irritated and | 20       THE WITNESS:  No. |
| 21  painful, and so it's directly due to the | 21  BY MR. SLATER: |
| 22  presence of that foreign body and the arms in | 22       Q.  Is it important to not only warn of |
| 23  the product. | 23  specific individual risks but also of the entire full |
| 24  BY MR. SLATER: | 24  spectrum of the risks at the same time? |

Daniel S. Elliott, M.D.

| Page 142 | Page 144 |
|---|---|

**Page 142**

1 　A.　Yes.

2 　Q.　Why does that matter?

3 　A.　The IFU needs to warn about all the known

4 complications, their severity, their frequency, so you

5 got to -- and the ability to change it. So you've got

6 to warn for all of those potential factors, which were

7 all known.

8 　　　MR. ISMAIL: Objection, move to strike

9 under 705. Sorry.

10 BY MR. SLATER:

11 　Q.　Let me ask you this: Is it important for

12 the entire risk profile and the most severe

13 complications to be fully disclosed to the doctor?

14 　A.　Yes.

15 　Q.　Why is that?

16 　　　MR. ISMAIL: Same objection.

17 　　　THE WITNESS: The doctor, as a surgeon

18 　　　myself, I need to know so I can relay

19 　　　accurately to the patient, a human being that's

20 　　　sitting in my office, I have to be able to tell

21 　　　them, here's what we can expect, I have to be

22 　　　told all known complications, severity and

23 　　　their nature, what is known, so I can

24 　　　accurately consent my patient.

**Page 143**

1 BY MR. SLATER:

2 　Q.　Does that also enter into the risk-benefit

3 analysis and what recommendations are made and how

4 they're made?

5 　A.　Absolutely.

6 　Q.　Let's go to the next slide, "Treatment of

7 Prolift® Complications."

8 　　　Doctor, this list of treatment of Prolift®

9 complications, I'll let you just walk through it and

10 just quickly tell us, first of all, are these

11 treatments that are known to be, in your opinion, to be

12 necessary to treat various complications from a

13 Prolift®?

14 　　　MR. ISMAIL: Objection, cumulative and

15 403.

16 　　　THE WITNESS: Many times, yes.

17 BY MR. SLATER:

18 　Q.　Okay. Just go through them one at a time.

19 Tell us what you're specifically talking about and just

20 tell us so we understand what they are.

21 　A.　Sure. I did not list the --

22 　　　MR. ISMAIL: Objection. Sorry, doctor.

23 I'll let you restart, but objection, cumulative

24 and 403.

**Page 144**

1 　　　THE WITNESS: I did not list these in

2 level of complexity, which I probably should

3 have, but starting off with mesh removal

4 operation, this is to remove the mesh, that can

5 be removal of an exposure, it's outpatient type

6 procedure versus the complete removal of the

7 mesh, which is a major transabdominal belly

8 procedure, highly complicated thing. So that

9 falls in the next point of just surgical care.

10 These are complicated procedures requiring

11 multiple office visits, multiple follow-up,

12 multiple effect upon the individual's usual

13 lifestyle, okay.

14 　　　Pain management/injections, another option

15 for treating pelvic pain. This is the majority

16 of what I see. Unfortunately, I have yet to

17 have, in my experience now, since meshes have

18 come out, so now it's, what, ten years now, I

19 have yet to have a successful pain management

20 patient with meshes, I can't fix them. I have

21 a physical therapy team. I have a nurse who

22 works in biofeedback. I have an anesthesia

23 pain clinic, can't fix them. So it's a

24 permanent problem.

**Page 145**

1 　　　Pelvic floor physical therapy, that's what

2 I just mentioned, biofeedback, again, an

3 option. I have had zero success.

4 　　　Spinal --

5 　Q.　Let me just stop you there. Were you

6 talking about success in terms of completely treating

7 the condition and making the person completely better?

8 　A.　No. I'm talking about a significant

9 reduction in their symptoms. I'm not -- I do not try

10 to make -- let me back up.

11 　　　I would love to be able to make someone pain

12 free. I'm realistic, I can't. I am happy if I can get

13 a significant reduction in their pain. I can't even

14 get that, and I've got arguably some of the best people

15 around to help me out, and I can't do it. I wish I

16 could.

17 　Q.　Let's go on, spinal stimulator.

18 　　　MR. ISMAIL: Objection, 403, cumulative.

19 　　　THE WITNESS: The spinal stimulator

20 evolved with our pain clinic. It's just

21 another way of injecting pain medication to the

22 spine or locally.

23 　　　Catheterization is dealing for bladder

24 dysfunction that occurs afterwards, where the

37 (Pages 142 to 145)

## Daniel S. Elliott, M.D.

|  | Page 146 |
|---|---|
| 1 | woman is in retention and can't urinate because |
| 2 | of contraction. |
| 3 | Medication is again going down the lines |
| 4 | of bladder spasm medication or pain medication, |
| 5 | which I allow my pain clinic colleagues to deal |
| 6 | with that. |
| 7 | BY MR. SLATER: |
| 8 | Q.  Okay.  Let's go to the next PowerPoint |
| 9 | slide.  Doctor, I want to ask you about a statement |
| 10 | made by David Robinson in his deposition of March 13, |
| 11 | 2012, Page 52, Line 11 to 15 and ask you a question |
| 12 | about it. |
| 13 | First of all, you read that deposition; you |
| 14 | know this testimony? |
| 15 | A.  Yes, I did. |
| 16 | Q.  "Data should establish that the benefits |
| 17 | far outweigh the risks before the product is sold for |
| 18 | widespread use." |
| 19 | Did Ethicon ever establish data that would |
| 20 | satisfy that criteria? |
| 21 | MR. ISMAIL:  Objection to the use of the |
| 22 | slide as argumentative, and testimony is |
| 23 | cumulative, lack of foundation. |
| 24 | THE WITNESS:  No. |

|  | Page 147 |
|---|---|
| 1 | BY MR. SLATER: |
| 2 | Q.  Do you have an opinion to a reasonable |
| 3 | degree of medical certainty as to whether or not the |
| 4 | overall risk-benefit profile for the Prolift® was |
| 5 | medically acceptable? |
| 6 | MR. ISMAIL:  Objection, cumulative. |
| 7 | THE WITNESS:  It was not medically |
| 8 | acceptable. |
| 9 | BY MR. SLATER: |
| 10 | Q.  And is that for the reasons you've stated |
| 11 | throughout your testimony? |
| 12 | MR. ISMAIL:  Same objection. |
| 13 | THE WITNESS:  Yes. |
| 14 | BY MR. SLATER: |
| 15 | Q.  Let's go to the next PowerPoint slide.  I |
| 16 | want to ask you about some testimony that Ethicon |
| 17 | medical affairs directors gave regarding the criteria |
| 18 | they described for what the warnings of risks needed to |
| 19 | communicate. |
| 20 | Are you familiar with what that testimony was? |
| 21 | A.  Yes, I've read all those deposition. |
| 22 | Q.  And is that testimony something that |
| 23 | you've relied on in forming your opinions? |
| 24 | A.  Yes. |

|  | Page 148 |
|---|---|
| 1 | Q.  And do you agree with the descriptions of |
| 2 | the criteria for what warnings needed to communicate |
| 3 | regarding risks as testified to by the medical affairs |
| 4 | directors; do you agree with that testimony? |
| 5 | MR. ISMAIL:  Objection to the slide as 403 |
| 6 | and argumentative and to the testimony as 403, |
| 7 | argumentative and without qualification. |
| 8 | THE WITNESS:  Yes, I agree to each of |
| 9 | those five points I pointed out. |
| 10 | BY MR. SLATER: |
| 11 | Q.  And just to be clear, Doctor, to meet any |
| 12 | objection, in your practice, you have utilized and not |
| 13 | only utilized but taught residents the use of the IFU, |
| 14 | including risk information? |
| 15 | A.  Oh, absolutely, yes. |
| 16 | Q.  And, in your experience, is it necessary |
| 17 | for you to understand how to read an IFU and literature |
| 18 | from a manufacturer to determine how to use that risk |
| 19 | information in treating patients? |
| 20 | A.  Absolutely.  I have to trust what I read |
| 21 | on the IFU, so that's why I relay on to the patients |
| 22 | and relay on to my residents during education. |
| 23 | Q.  Let's go to the next exhibit, Exhibit |
| 24 | P1005. |

|  | Page 149 |
|---|---|
| 1 | Doctor, let me start over.  Get a drink of |
| 2 | water. |
| 3 | Doctor, looking at Exhibit P1005, this is an |
| 4 | IFU that Ethicon has advised us was in effect from 2007 |
| 5 | until, I believe, September 2009. |
| 6 | Are you familiar with this IFU? |
| 7 | A.  Yes, I am. |
| 8 | Q.  And you've talked about it before.  You're |
| 9 | familiar with the document and the various bits of |
| 10 | information in there? |
| 11 | A.  Yes. |
| 12 | Q.  I want to just ask you to just run through |
| 13 | a few things and ask you brief questions about them. |
| 14 | Let's go to the second page.  There is a heading |
| 15 | halfway down just below the table that says "Gynecare |
| 16 | Gynemesh® PS," and that's the name of the mesh material |
| 17 | in the Prolift®? |
| 18 | A.  That is correct. |
| 19 | Q.  The last sentence of that section says, |
| 20 | "The bi-directional elastic property allows adaptation |
| 21 | to various stresses encountered in the body." |
| 22 | Are you familiar with that statement in this |
| 23 | IFU? |
| 24 | A.  Yes. |

38 (Pages 146 to 149)

## Daniel S. Elliott, M.D.

Page 150

1    Q.  Have you in all the materials you've
2  reviewed seen whether Ethicon had any data to support
3  making that claim in the IFU?
4    A.  They had none.
5    Q.  Do you have an opinion as to whether or
6  not it was appropriate or inappropriate for Ethicon to
7  make that statement in the IFU?
8       MR. ISMAIL:  Objection, improper expert
9       testimony.
10      THE WITNESS:  It would be inappropriate
11      and misleading to the surgeon.
12      MR. ISMAIL:  Move to strike,
13      nonresponsive.
14  BY MR. SLATER:
15    Q.  Based on your knowledge and experience and
16  familiarity with the literature and the use of IFUs, do
17  you have an opinion as to whether surgeons expect that
18  the information in an IFU is accurate?
19      MR. ISMAIL:  Objection, improper expert
20      testimony.
21      THE WITNESS:  You expect and I used to
22      expect it to be honest and truthful.
23  BY MR. SLATER:
24    Q.  What do you mean by used to?

Page 151

1       MR. ISMAIL:  Objection, 403, improper
2       testimony for an expert.
3       THE WITNESS:  In my daily practice as a
4       surgeon, and I had reviewed these, I had
5       expected in the past to have it be an honest
6       representation of what was known, so that I
7       could relay honestly to my patients, people
8       that I care for and am trained to care for, and
9       now I do not believe that is true anymore.
10      MR. ISMAIL:  Objection, move to strike.
11  BY MR. SLATER:
12    Q.  Let's go to Page 5 of the IFU, and there's
13  a section under Performance, and it indicates at the
14  very bottom Page 5.  Let's start over.
15      Let's go to Page 5 of the IFU, Doctor.  There's
16  a little number 5 in the bottom right.
17      You see it?
18    A.  Yes.
19    Q.  And at the bottom of the page there is a
20  section that says Performance.
21    A.  Yes.
22    Q.  And in that section regarding the mesh
23  material and the Prolift® it says that it "elicits a
24  minimum to slight inflammatory reaction, which is

Page 152

1  transient."  I want to stop there.
2       Do you have an opinion as to whether that is an
3  accurate statement or not?
4    A.  I have an opinion, yes.
5    Q.  And what is your opinion?
6    A.  It is wrong.
7    Q.  Why do you say that?
8    A.  Because the foreign body reaction as
9  documented in the literature what I've seen in my
10  personal experience and the internal documentation is
11  not minimum to slight, and it is permanent and
12  progressive.
13      MR. ISMAIL:  Objection, move to strike,
14      hearsay.
15  BY MR. SLATER:
16    Q.  It indicates in the Performance section
17  that there will be "a minimum to slight inflammatory
18  reaction, which is transient, and is followed by the
19  deposition of a thin, fibrous layer of tissue which can
20  grow through the interstices of the mesh."
21      Do you have an opinion as to whether or not
22  that is a fully accurate and fully fair disclosure of
23  what occurs?
24    A.  I have an opinion, yes.

Page 153

1    Q.  What's your opinion?
2    A.  That it is incorrect.
3    Q.  Why?
4    A.  Based upon my experience, my physical exam
5  of hundreds of women, it is not a thin, fibrous layer.
6  It's thick, it's bunched up, it's firm.
7       MR. ISMAIL:  Move to strike under 403.
8  BY MR. SLATER:
9    Q.  In the Performance section, about halfway
10  down through that it says, "the mesh remains soft and
11  pliable."
12      Do you see that statement?  Do you have an
13  opinion as to whether that is accurate?
14    A.  It is false.
15    Q.  Why do you say that?
16    A.  That's based upon my own physical exams on
17  patients, review of the literature, review of internal
18  documents.  It gets firm and fixed, rigid.
19      MR. ISMAIL:  Objection, move to strike as
20      hearsay, 403.
21  BY MR. SLATER:
22    Q.  Did you see testimony of Axel Arnaud, the
23  medical affairs director in France with regard to
24  whether the mesh stays soft?

39 (Pages 150 to 153)

## Daniel S. Elliott, M.D.

| Page 154 |
|---|

1    A.  I saw his and other people's depositions,
2   yes.
3    Q.  And what did he say about whether it stays
4   soft over time?
5    A.  It does not.
6    Q.  Now, there are statements in the IFU
7   regarding the indications or contraindications, and I
8   want to ask you a question -- and we'll have to go back
9   to an exhibit we used previously.  I want to ask you a
10  question about who the appropriate patients are for the
11  Prolift® as stated in the IFU.
12   So, first of all, PLT0062 was one of the first
13  exhibits we used.  If you just put that aside, we're
14  going to need that -- let me start over.
15   Doctor, on Page 2 of the IFU it says
16  Indications right towards the top and it says it's
17  indicated for tissue reinforcement and long-lasting
18  stabilization of the fascial structures of the pelvic
19  floor, et cetera.
20   You see that?
21   A.  Yes, I do.
22   Q.  And then on Page 6 there are
23  contraindications listed at the very top.
24   You see that, the very top of the page?

| Page 155 |
|---|

1    A.  Yep.
2    Q.  Is there anywhere in this IFU where it's
3   indicated that the Prolift® is intended only for
4   advanced prolapse Stage III or IV?
5        MR. ISMAIL:  Objection, lack of relevance,
6       403.
7        THE WITNESS:  It does not state anything
8       in regard to indication of a prolapse stage.
9   BY MR. SLATER:
10   Q.  And let's go now in Exhibit PLT0062 to
11  Page 587, the second to last page of that exhibit, and
12  this is the article by the TVM group, the doctors who
13  developed the Prolift®?
14   A.  Yes, by the inventors of the product, yes.
15   Q.  And right in the middle of the conclusion
16  it says, "this technique should be reserved to the
17  management of grade 3 and 4 prolapse, possibly as
18  first-line treatment."
19   Do you see that?
20        MR. ISMAIL:  Objection, hearsay, lack of
21       relevance, 403.
22        THE WITNESS:  Yes, I do.
23   BY MR. SLATER:
24   Q.  Is that of significance to you?

| Page 156 |
|---|

1        MR. ISMAIL:  Same objections.
2        THE WITNESS:  Yes.
3   BY MR. SLATER:
4    Q.  Why?
5        MR. ISMAIL:  Same objection.
6        THE WITNESS:  The surgeons who at this
7       point in time have the largest experience about
8       this product and what it'd be indicated for and
9       including the complications felt that it should
10      be reserved only for the more severe prolapses.
11  BY MR. SLATER:
12   Q.  And when they say possibly as first-line
13  treatment, what does that mean?
14        MR. ISMAIL:  Same objections.
15        THE WITNESS:  It means that for an
16      individual who comes in who has never had a
17      previous prolapse repair, that may be in their
18      opinion for the higher grade prolapses, it can
19      be used as first-line treatment.
20  BY MR. SLATER:
21   Q.  And is that significant to you?
22        MR. ISMAIL:  Same objections.
23        THE WITNESS:  Very much so, as a surgeon.
24  BY MR. SLATER:

| Page 157 |
|---|

1    Q.  With regard to the information in the IFU,
2   is that significant to you?
3        MR. ISMAIL:  Same objections.
4        THE WITNESS:  Well, absolutely.  As a
5       surgeon who when papers originally come out,
6       you look to the original authors to say, help
7       me, guide me through this and when this is
8       indicated.  So, yeah, it's a very important
9       statement for me.
10  BY MR. SLATER:
11   Q.  Do you have an opinion as to whether that
12  information should have been included in the Prolift®
13  IFU?
14   A.  The surgeons --
15        MR. ISMAIL:  Objection.
16  BY MR. SLATER:
17   Q.  Do you have an opinion on that?
18   A.  Yes.
19   Q.  What is your opinion as to whether that
20  information should have been provided?
21        MR. ISMAIL:  Objection, lack of relevance,
22       403.
23        THE WITNESS:  It should have been.
24  BY MR. SLATER:

Daniel S. Elliott, M.D.

Page 158

1    Q.  Why is that?
2        MR. ISMAIL:  Same objections.
3        THE WITNESS:  Because these surgeons are
4    the authority at this point in time.  They have
5    the most experience.  They know the good and
6    the bad of this product, and so they're saying
7    be careful, only put this in high grade
8    prolapses, maybe as a first line treatment.
9    They're not recommending that.  So that's the
10   kind of information I want relayed on by an
11   industry.
12       MR. ISMAIL:  Objection, hearsay, move to
13   strike.
14   BY MR. SLATER:
15       Q.  And when you give that opinion, you're not
16   just talking about for yourself, you're giving that
17   opinion as to what surgeons, in general, would need?
18       MR. ISMAIL:  Same objections.
19       THE WITNESS:  Absolutely, I'm an educator.
20   I'm teaching the next generation of surgeons.
21   I'm also involved in SUFU, the Society of
22   Urodynamics and Female Urology, where we're
23   trying to teach all those out in private
24   practice.  So, yeah, we have to rely on these

Page 159

1    guidelines to help us point at the best way to
2    treat patients.
3    BY MR. SLATER:
4        Q.  Okay.  We'll go to next exhibit now,
5    PLT0516.  This is an article by Dr. Withagen,
6    "Trocar-Guided Mesh Compared With Conventional Vaginal
7    Repair in Recurrent Prolapse, A Randomized Controlled
8    Trial."
9        Are you familiar with this article?
10       A.  Yes.  And this should be pointed out that
11   this was first study where she's doing this work and
12   then we had a follow-up study that we've already
13   reviewed with the complications as a result of this
14   procedure.
15       Q.  All right.  Let me ask you the question
16   again.
17       Doctor, are you familiar with this article?
18       A.  Yes, I am.
19       Q.  Is this article medically reliable and
20   authoritative?
21       A.  Yes, it is.
22       Q.  Is this something you've relied on in
23   forming your opinions?
24       A.  Definitely.

Page 160

1        Q.  Right on the front it talks about the fact
2    that we with these Prolift® patients, the bottom of the
3    results section, "Mesh exposure was detected in 14 of
4    83 patients (16.9%)."
5        Is that significant to you?
6        MR. ISMAIL:  Objection, hearsay.  Standing
7    objection, please.
8        MR. SLATER:  Yes.
9        THE WITNESS:  Yes.
10   BY MR. SLATER:
11       Q.  Why?
12       A.  Because in this high volume, talented
13   individual or these surgeons, they had essentially 17%,
14   to be specific, 16.9% risk of mesh exposure at only 12
15   months.  Remember, this is a device that's going to be
16   in a woman forever, and at one year already 16.9% have
17   exposure.
18       Q.  Do you have an opinion as to whether that
19   level of a mesh exposure rate is acceptable or
20   unacceptable from a medical standpoint?
21       A.  It is unacceptable, yeah, absolutely it's
22   unacceptable.
23       Q.  Let's go to the last page of the article,
24   Page 250, the last paragraph.  And the second sentence

Page 161

1    of the last paragraph says, "Because the long-term
2    effects and safety of mesh-reinforced repairs are not
3    yet fully known, surgeons may consider these procedures
4    primarily for recurrent vaginal prolapse after
5    counseling patients on the risks and benefits."
6        Is that statement significant to you?
7        A.  Yes.
8        Q.  Why?
9        A.  Once again, in this high volume surgeon,
10   they're saying that even as of 2011, we still don't
11   know the true complications that can occur with this,
12   and so it only should be reserved for individuals with
13   a recurrent prolapse.  They have already had a surgery
14   and it's failed and it needs surgery again.  So it's
15   reserving it for a very small subgroup.
16       Q.  And, in your opinion, do you think --
17   rephrase.
18       Do you have an opinion as to whether the IFU
19   should have limited the scope of patients who would be
20   acceptable, candidates as listed in that article by
21   Withagen?
22       MR. ISMAIL:  Objection, sorry.  In
23   addition to hearsay, cumulative, 403.
24       THE WITNESS:  Absolutely, I have an

41 (Pages 158 to 161)

## Daniel S. Elliott, M.D.

Page 162

1 opinion about it.
2 BY MR. SLATER:
3 Q. What is that?
4 MR. ISMAIL: Same objection.
5 THE WITNESS: It should have been listed.
6 BY MR. SLATER:
7 Q. Let's go to the next exhibit.
8 Doctor, looking at Exhibit P980, it's some
9 e-mails, January of 2005, about two months before the
10 Prolift® went on the market.
11 Are you familiar with this e-mail chain?
12 A. Yes, I've seen it.
13 Q. What I'd like to do is turn to the second
14 page, e-mail from Axel Arnaud, the medical affairs
15 director at Ethicon in France, and he's proposing a
16 warning.
17 And have you seen this e-mail and this proposed
18 warning?
19 A. Yes, I have.
20 Q. And just for the record, I'll read it and
21 then I have to ask you a question.
22 "Warning: Early clinical experience has shown
23 that the use of mesh through a vaginal approach can
24 occasionally/uncommonly lead to complications such as

Page 163

1 vaginal erosion and retraction which can result in
2 anatomical distortion of the vaginal cavity which can
3 interfere with sexual intercourse. Clinical data
4 suggest the risk of such a complication is increased
5 in the case of associated hysterectomy. This must be
6 taken in consideration when the procedure is planned in
7 a sexually active woman."
8 Now, do you have an opinion as to whether or
9 not that warning should or should not have been
10 provided in the Prolift® IFU?
11 A. I have an opinion on it, yes.
12 Q. What is your opinion?
13 A. Absolutely, it should have been.
14 Q. Why do you say that?
15 A. Well, you have an individual, Arnaud, who
16 knows the data, has seen what's happened with internal
17 documentation, and he is warning -- he saw the problems
18 that were occurring, knew about the problems and wants
19 to put in the IFU a warning to doctors saying patients
20 need to be told about this.
21 MR. ISMAIL: Objection, move to strike,
22 improper expert testimony.
23 BY MR. SLATER:
24 Q. With regard to sexually active women, do

Page 164

1 you have an opinion as to whether or not a warning was
2 needed to cull out the specific risks for sexually
3 active women?
4 A. Absolutely, because of the risk of
5 dyspareunia, yeah. You need to be able to tell them,
6 you have a potential for problem and not be able to
7 have intercourse without pain in the future.
8 Q. Doctor, let's go back to the IFU, Exhibit
9 P1005. You have it right there. Okay. Start over.
10 Doctor, looking at the IFU, let's look at the
11 last page, and it has a list of adverse reactions.
12 Do you see that?
13 A. Yes, I do.
14 Q. And it says, "Potential adverse reactions
15 are those typically associated with surgically
16 implantable materials." I want to stop there.
17 Surgically implantable materials, is that
18 limited -- is that group of materials just mesh, or is
19 that a bigger group?
20 A. Well, as they state there, surgically
21 implantable materials is anything, that can be a heart
22 valve, knee joint, hip joint. It could be anything.
23 Q. In your opinion, is it accurate, medically
24 accurate to say that for mesh, the Prolift® mesh in

Page 165

1 actual use that the potential adverse reactions are
2 those typically associated with surgically implantable
3 materials in general?
4 A. No, not at all.
5 Q. Why do you say that?
6 A. I mean, the type of complication, the
7 severity, the chronic nature, the progressive nature is
8 different than in other types of implants. I do
9 implants on different types of things in males. I'm
10 the number one implanter in the United States, and we
11 don't see what we're seeing with these females. So you
12 can't -- you can't compare all surgical implants.
13 We're dealing with a vaginal mesh.
14 Q. Let me read in the adverse reactions,
15 there's certain language. They mention erosion and
16 extrusion.
17 Do you see those? They're listed in that list
18 of adverse reactions typically associated with
19 surgically implantable materials?
20 A. Yes, I do.
21 Q. Is it adequate, in your opinion, from a
22 medical standpoint to simply list erosion and
23 extrusion, as done there, to communicate the risks of
24 erosion and extrusion?

42 (Pages 162 to 165)

Daniel S. Elliott, M.D.

| Page 166 | Page 168 |
|---|---|
| 1   A.  No, it's wholly inadequate. | 1   BY MR. SLATER: |
| 2   Q.  Why? | 2      Q.  From your standpoint as a physician in |
| 3   A.  It's insufficient, it gives us no idea of | 3   clinical practice and teaching residents and an author |
| 4   the frequency, the severity, recurrent nature, the | 4   of articles, is that of significance to you? |
| 5   lifelong risk of erosions and extrusions. | 5      MR. ISMAIL:  Objection, hearsay, improper |
| 6   Q.  It says with regard to potential adverse | 6      grounds for expert testimony. |
| 7   reactions typically associated with surgically | 7      THE WITNESS:  Absolutely, yes. |
| 8   implantable materials "scarring that results in implant | 8   BY MR. SLATER: |
| 9   contraction." | 9      Q.  Why is that significant to you? |
| 10      Do you see that? | 10      MR. ISMAIL:  Same objections. |
| 11   A.  Yes, I do. | 11      THE WITNESS:  Because it's true.  We're |
| 12   Q.  Is that an adequate description of the | 12      trained not to harm people, make them worse. |
| 13   risk of scarring and implant contraction? | 13      That's the whole goal of medicine.  So now |
| 14   A.  No. | 14      they're saying now they're trying to cover up a |
| 15   Q.  Why is that? | 15      potential complication. |
| 16   A.  Again, like I mentioned, it has no idea of | 16      MR. ISMAIL:  Move to strike, |
| 17   the ramifications, the severity of it, the progressive | 17      nonresponsive, 403, improper grounds for |
| 18   nature of it, the life-changing disability and the | 18      testimony. |
| 19   inability to fix it. | 19   BY MR. SLATER: |
| 20   Q.  Doctor, let's go to the next Exhibit | 20      Q.  Let me ask you this question:  Where it |
| 21   P1557.  This is an e-mail written by David Robinson, | 21   says that if this starts getting reported that people |
| 22   October 28, 2005. | 22   were having the inability to void, they were having |
| 23      Are you familiar with this e-mail? | 23   urinary retention that was lasting for a year or more |
| 24   A.  Yes, I am. | 24   and if it gets reported it's going to scare the |

| Page 167 | Page 169 |
|---|---|
| 1   Q.  In this e-mail, David Robinson says he is | 1   daylights out of doctors, why, in your opinion, is that |
| 2   aware of four cases of Prolift®s done in folks with | 2   significant? |
| 3   normal preoperative voiding function who post Prolift® | 3      MR. ISMAIL:  403, cumulative, hearsay, |
| 4   can't void. | 4      improper grounds for expert testimony. |
| 5      Do you see that? | 5      THE WITNESS:  It's a unique complication |
| 6   A.  Yes, I do. | 6      that would not necessarily be seen.  You don't |
| 7   Q.  He says a little further down, some have | 7      see this with traditional repairs.  So this is |
| 8   resolved spontaneously but have taken as long as a year | 8      a unique thing.  They're talking bladder atony, |
| 9   to do so and asks the person he's writing to if they've | 9      which means there's no function to the bladder, |
| 10   seen the -- this complication, this is right before he | 10      so the nerves going to the bladder have been |
| 11   joined the company as medical director? | 11      disrupted by this procedure. |
| 12      MR. ISMAIL:  Objection to the use of this | 12   BY MR. SLATER: |
| 13      document as hearsay. | 13      Q.  Does the IFU adverse reactions list warn |
| 14   BY MR. SLATER: | 14   of urinary complications, such as retention or urinary |
| 15   Q.  Correct? | 15   dysfunction due to the Prolift® itself? |
| 16   A.  Yes. | 16   A.  No. |
| 17   Q.  And David Robinson says -- and it's | 17   Q.  Do you have an opinion as to whether or |
| 18   actually addressed to Marty, that would be Marty | 18   not it should have? |
| 19   Weisberg, medical director, if this starts getting | 19   A.  Absolutely it should have. |
| 20   reported, it's going to scare the daylights out of | 20   Q.  Okay.  Let's go back to Exhibit P1306, |
| 21   doctors. | 21   patient brochure.  You have it up there from beginning |
| 22      Do you see that? | 22   of the dep, it's right there, and I think -- let me |
| 23      MR. ISMAIL:  Same objection. | 23   take a step back. |
| 24      THE WITNESS:  Yes, I do. | 24      Have you in your practice seen and used patient |

43 (Pages 166 to 169)

Daniel S. Elliott, M.D.

| Page 170 | Page 172 |
|---|---|

**Page 170**

1  brochures?
2      A.  Yes.
3      Q.  You understand or do you understand the
4  use for which they're supposed to be made?
5      A.  Yes, I do, and I give them out daily.
6      Q.  I want to pull up a slide, the last slide,
7  Prolift® patient brochure, and what we'll do is with
8  the brochure in hand, we'll go through certain things
9  that the brochure says.
10         MR. ISMAIL:  Objection.
11  BY MR. SLATER:
12      Q.  In the interest of time.
13         MR. ISMAIL:  Objection, to the use of the
14         document, 403, lack of relevance in this case.
15  BY MR. SLATER:
16      Q.  Let's do this, looking at the brochure
17  itself, Page 10.  Let's take down the slide -- let me
18  stop.  Let's leave the slide up for a second.  I want
19  to ask you a question about the slide, Doctor.
20      Is this a summary of issues you have with the
21  information provided in the brochure?
22      A.  Yes.
23      Q.  And are we going to now go through those
24  issues specifically within the brochure?

**Page 171**

1      A.  Yes.
2      Q.  Now let's go to the brochure.
3         MR. ISMAIL:  Object to use of the slide on
4         the same grounds.
5  BY MR. SLATER:
6      Q.  Page 10, let me ask you this about the
7  slide that we have up.
8      Do you have an opinion -- well, rephrase.
9  We'll come back to it.  Stop.  Let me clean this up.
10  Looking at the patient brochure, Page 10, it
11  says "What is Gynecare Prolift®" at the very top.  "A
12  revolutionary surgical procedure using Gynecare
13  Prolift® employs a specially designed soft mesh placed
14  in the pelvis to restore pelvic support."
15      Do you have an opinion as to whether or not
16  that is adequate and accurate information regarding the
17  Prolift®?
18         MR. ISMAIL:  Objection, lack of relevance,
19         403.
20         THE WITNESS:  Well, it's a long sentence.
21         Certain parts of it are correct, other parts
22         are incorrect.
23  BY MR. SLATER:
24      Q.  Let's talk about it.  Let's talk about

**Page 172**

1  calling it a revolutionary surgical procedure.  Is that
2  statement, in your opinion, something that should be
3  included here?
4         MR. ISMAIL:  Objection, lack of relevance,
5         403.
6         THE WITNESS:  I think that is actually an
7         acceptable statement.  It was new, it was
8         different, no one had done it before, and it
9         was revolutionary, and therein lies the problem
10        that many doctors don't know a thing about it,
11        and so they have to be taught.
12  BY MR. SLATER:
13      Q.  It says it was a specially designed
14  supportive soft mesh.
15      Was that an accurate statement, to your
16  knowledge?
17         MR. ISMAIL:  Objection, 403, lack of
18         relevance.
19         THE WITNESS:  It's false.
20  BY MR. SLATER:
21      Q.  And why is that?
22      A.  Because it was designed for hernias, not
23  vaginal meshes.
24      Q.  When it refers to it as being soft mesh,

**Page 173**

1  in actual use, does the mesh remain soft?
2         MR. ISMAIL:  Objection, cumulative, 403,
3         lack of relevance.
4         THE WITNESS:  Well, that's what we
5         discussed, in my own personal experience and
6         review of the internal documents and papers,
7         manuscripts, it does not stay soft.  It gets
8         firm, rigid.
9  BY MR. SLATER:
10      Q.  On Page 10 under "What is Gynecare
11  Prolift®," towards the bottom it says, it's "performed
12  through very small incisions inside the vagina."
13      Do you see that?  First paragraph right there
14  under "What is Gynecare Prolift®," the second sentence.
15      A.  Yes, I see it.
16      Q.  Is the Prolift® only placed through very
17  small incisions, or does that accurately describe the
18  trocars and the cannulas?
19         MR. ISMAIL:  Objection, lack of relevance,
20         403.
21         THE WITNESS:  Well, no, it's not only
22         performed through the vagina.  There are also
23         obturator incisions, and the incision is
24         variable from 2 to 4 to 5 centimeters, so it

44 (Pages 170 to 173)

Daniel S. Elliott, M.D.

| Page 174 | Page 176 |
|---|---|
| 1     depends how you want to define very small. | 1     Q. And what is your opinion? |
| 2  BY MR. SLATER: | 2     MR. ISMAIL: Same objection. |
| 3     Q. Doctor, with regard to the brochure, let's | 3     THE WITNESS: It's incorrect based upon |
| 4  go to Page 13, and it says, "What are the risks? All | 4  the medical literature. |
| 5  surgical procedures present some risks. Although | 5  BY MR. SLATER: |
| 6  rare," and I'm going to stop there. | 6     Q. Why do you say that? |
| 7     Do you have an opinion as to whether or not it | 7     A. Because the inventors of the product and |
| 8  is accurate to describe the risks with the Prolift® as | 8  other researchers coming out saying it needs to be for |
| 9  rare? | 9  high grade and recurrent prolapse. |
| 10     MR. ISMAIL: Objection, lack of relevance, | 10     MR. ISMAIL: Move to strike, hearsay. |
| 11  403. | 11  BY MR. SLATER: |
| 12     THE WITNESS: It is wrong, incorrect. | 12     Q. Doctor, do you have an opinion as to |
| 13  BY MR. SLATER: | 13  whether or not the Prolift® patient brochure provides |
| 14     Q. Why do you say that? | 14  an accurate picture of the risk-benefit profile for the |
| 15     MR. ISMAIL: Same objection. | 15  Prolift® for a doctor or a patient? |
| 16     THE WITNESS: It's just not my opinion, | 16     MR. ISMAIL: Objection, lack of relevance, |
| 17  that's also Axel Arnaud. He says it's rather | 17  403. |
| 18  common. | 18     THE WITNESS: I have an opinion, yes. |
| 19     MR. ISMAIL: Objection, move to strike, | 19  BY MR. SLATER: |
| 20  improper testimony. | 20     Q. And what is your opinion? |
| 21  BY MR. SLATER: | 21     MR. ISMAIL: Same objection. |
| 22     Q. It says at the bottom of the section What | 22     THE WITNESS: It is insufficient and |
| 23  are the risks, there is a small risk of the mesh | 23  inadequate. |
| 24  material becoming exposed into the vaginal canal." | 24  BY MR. SLATER: |

| Page 175 | Page 177 |
|---|---|
| 1     Do you have an opinion as to whether or not | 1     Q. Doctor, with regard to the Prolift® IFU, |
| 2  that is an accurate statement? | 2  do you have an opinion to a reasonable degree of |
| 3     MR. ISMAIL: Objection, 403, lack of | 3  medical certainty as to whether the IFU provides an |
| 4  relevance. | 4  adequate and accurate picture of the risk-benefit |
| 5     THE WITNESS: Yes, I do. | 5  profile for the use of the Prolift®? |
| 6  BY MR. SLATER: | 6     MR. ISMAIL: Cumulative. |
| 7     Q. And what is your opinion? | 7     THE WITNESS: I have an opinion, yes. |
| 8     A. False. | 8  BY MR. SLATER: |
| 9     Q. Why do you say that? | 9     Q. What is your opinion? |
| 10     MR. ISMAIL: Same objections. | 10     MR. ISMAIL: Same objection. |
| 11     THE WITNESS: Based upon my clinical | 11     THE WITNESS: It is insufficient and |
| 12  experience, the review of the medical | 12  inadequate. |
| 13  literature and internal documents, the risk is | 13  BY MR. SLATER: |
| 14  actually very common. | 14     Q. And is that for with regard to the patient |
| 15  BY MR. SLATER: | 15  brochure, your opinion, is that based upon all the |
| 16     Q. On Page 13, towards the bottom, under "Is | 16  things you've told us during your testimony with regard |
| 17  Gynecare Prolift® right for me?" It says, "Pelvic | 17  to the nature of the Prolift® and the risks? |
| 18  floor repair procedures with Gynecare Prolift® are | 18     A. Absolutely. |
| 19  appropriate for most patients." I want to stop there. | 19     Q. With regard to the IFU, is your opinion |
| 20     Do you have an opinion as to whether that is an | 20  based upon the information you've given us throughout |
| 21  accurate statement? | 21  your testimony regarding the nature of the procedure, |
| 22     MR. ISMAIL: Lack of relevance, 403. | 22  the risks and the other things you've told us about the |
| 23     THE WITNESS: Yes, I do. | 23  Prolift®? |
| 24  BY MR. SLATER: | 24     A. Yes. |

45 (Pages 174 to 177)

# Daniel S. Elliott, M.D.

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  MR. SLATER: Let's go off.
2  THE VIDEOGRAPHER: The time is 12:24, and
3  we're off the record.
4  (Brief recess.)
5  THE VIDEOGRAPHER: The time is 12:40 and
6  we are back on the record.
7  MR. SLATER: Dr. Elliott, thank you very
8  much. I think there will be some
9  cross-examination from defense counsel.
10  CROSS-EXAMINATION
11  BY MR. ISMAIL:
12  Q. Good afternoon, Doctor.
13  A. Good afternoon.
14  Q. Are you prepared to proceed with
15  cross-examination at this time?
16  A. Yes, I am.
17  Q. Doctor, you testified this morning about
18  potential complications you believe that are associated
19  with the use of transvaginal mesh for treatment of
20  organ prolapse, correct?
21  A. Correct.
22  Q. Now, I will get to your general views
23  later but, can you confirm that not every patient who
24  received transvaginal mesh for treatment of prolapse

**Page 179**

1  experienced one of the complications you described this
2  morning?
3  MR. SLATER: Objection. You can answer.
4  THE WITNESS: At this point in time, as of
5  November 21st, 2015, those patients -- not all
6  patients have experienced all those
7  complications.
8  BY MR. ISMAIL:
9  Q. And that's true for the Prolift® as well,
10  right?
11  A. That is correct.
12  Q. Before anyone can conclude that a patient
13  experienced any of the complications from a Prolift®
14  device you would need to consider the specifics of that
15  patient, correct?
16  A. You have to look at the entire patient,
17  all the medical history and their surgical procedures,
18  yes.
19  Q. Okay. So let's just make sure we're
20  making ourselves clear here. So what you would want to
21  look at to know whether a patient has experienced a
22  complication from a Prolift®, you would want to look at
23  patient medical records, correct?
24  A. That would be part of it, yes.

**Page 180**

1  Q. You would want to consider what symptoms
2  the patient reported and when, correct?
3  A. Chronology of onset of symptoms, yeah,
4  that would be an important factor.
5  Q. You would want to consider, in this
6  analysis that we're describing, what other procedures
7  or surgeries that patient had in the relevant time
8  frame, correct?
9  A. Yeah, you would want to look at the
10  concurrent surgeries and past surgeries, yeah, that's
11  right.
12  Q. You would want to consider the findings of
13  that patient's healthcare provider with respect to the
14  patient's symptoms and complaints, correct?
15  A. Well, that would be the medical records,
16  yeah, with the caring physician's report, yes.
17  Q. And you have done none of that with
18  respect to Patricia Hammons, correct?
19  A. Incorrect.
20  Q. Let me rephrase.
21  You did not disclose anywhere in your expert
22  report any opinions relating to Ms. Hammons, correct?
23  A. I did -- not specific to Ms. Hammons, no.
24  Q. You did not disclose anywhere in your

**Page 181**

1  expert report having reviewed Ms. Hammons' medical
2  records, correct?
3  A. I don't recall if I have reviewed her
4  records but I didn't -- not in the expert report I
5  don't believe.
6  Q. You didn't disclose anywhere in your
7  expert report that you reviewed the sworn testimony in
8  this case, correct?
9  MR. SLATER: Objection.
10  BY MR. ISMAIL:
11  Q. The sworn testimony in Ms. Hammons' case,
12  correct?
13  A. You mean her --
14  MR. SLATER: Let me just clarify. When
15  you say in Ms. Hammons' case, you are talking
16  about of her or --
17  MR. ISMAIL: I'll clarify.
18  THE WITNESS: Sworn testimony, you mean
19  her deposition?
20  MR. ISMAIL: I will rephrase, Doctor.
21  THE WITNESS: Okay.
22  BY MR. ISMAIL:
23  Q. Nowhere in your expert report do you
24  disclose that you reviewed the sworn testimony of

46 (Pages 178 to 181)

Daniel S. Elliott, M.D.

| Page 182 | Page 184 |
|---|---|
| 1  Ms. Hammons, correct? | 1    A.  That is correct. |
| 2    A.  I don't recall disclosing that, no. | 2    Q.  You were first contacted in September of |
| 3    Q.  Nowhere in your expert report did you | 3  2011; do you recall that? |
| 4  disclose reading the sworn testimony of Ms. Hammons' | 4    A.  August, September of '11, yes. |
| 5  healthcare providers, correct? | 5    Q.  Okay.  So I want the jury to understand |
| 6    A.  I don't believe so.  Again, I'd have to | 6  your experience with Prolift® before the time that you |
| 7  look at the report.  I don't recall making that | 7  were hired by the plaintiff lawyers in this litigation, |
| 8  statement one way or the other actually. | 8  okay? |
| 9    Q.  Nowhere in your expert report do you | 9    A.  Okay. |
| 10  disclose doing a physical exam on Ms. Hammons, correct? | 10    Q.  Now, you, yourself, have never performed a |
| 11    A.  That would be correct, yes. | 11  Prolift® surgery for the implantation of a Prolift®, |
| 12    Q.  And you have not done a physical exam on | 12  correct? |
| 13  Ms. Hammons, correct? | 13    A.  By choice, you are correct, yes. |
| 14    A.  No, I have not, no. | 14    Q.  So when you were walking the jury through |
| 15    Q.  So my statement is correct? | 15  this morning, in the event that video is shown at |
| 16    A.  Yes. | 16  trial, the surgery of a Prolift® being implanted in a |
| 17    Q.  And you have previously said, Doctor, that | 17  patient, you never have done that yourself, correct? |
| 18  a physical examination is one of the most important | 18    A.  That is correct, by choice I did not, yes. |
| 19  pieces of the puzzle in understanding what happened to | 19    Q.  And that surgical video you never saw |
| 20  a patient, correct? | 20  prior to being retained by the plaintiff lawyers in |
| 21    A.  That's a fair statement, yes. | 21  this litigation, correct? |
| 22    Q.  And certainly, Doctor, you can confirm | 22    A.  That specific video I did not, you are |
| 23  that in some patients Prolift® was effective in | 23  correct. |
| 24  relieving symptoms of the patient's pelvic organ | 24    Q.  In fact, Doctor, you never received any |

| Page 183 | Page 185 |
|---|---|
| 1  prolapse, correct? | 1  training whatsoever on Prolift®, true? |
| 2    A.  That does happen at times, yes. | 2    A.  That would be correct, yes. |
| 3    Q.  And not just an improvement in the | 3    Q.  You walked through or at least referenced |
| 4  patient's symptoms, but, actually, a Prolift® can | 4  a -- something that Mr. Slater introduced as a |
| 5  improve a patient's quality of life, that has been | 5  professional education PowerPoint. |
| 6  reported, correct? | 6  Do you recall seeing that this morning? |
| 7    A.  That has been reported, yes. | 7    A.  Yes, I do. |
| 8    Q.  And before you can determine whether a | 8    Q.  Prior to being hired by the plaintiff |
| 9  patient has had an improvement in her quality of life | 9  lawyers in this case you had never seen any |
| 10  you would want to look at the same things we have | 10  professional education materials submitted by Ethicon |
| 11  already discussed; the medical records, the timing of | 11  on Prolift®, correct? |
| 12  her symptoms, findings of her healthcare providers, et | 12    A.  Not that I recall but I've been to |
| 13  cetera, correct? | 13  their -- their Ethicon booth when this first came out, |
| 14    A.  That is correct. | 14  so I don't recall what I saw back then. |
| 15    Q.  And nowhere in your expert report do you | 15    Q.  When you say you went to the Ethicon |
| 16  disclose doing any of that analysis for Ms. Hammons, | 16  booth, you are saying to the extent Ethicon had a booth |
| 17  true? | 17  at a medical conference, you might have stopped by -- |
| 18    A.  I don't disclose that, you are correct. | 18    A.  Yeah. |
| 19    Q.  Now, you have discussed your views on | 19    Q.  -- and you can't recall whether you saw |
| 20  Prolift® in response to questions from Mr. Slater this | 20  anything on Prolift® in such visit; is that fair? |
| 21  morning, right? | 21    A.  No.  We would have seen it on the |
| 22    A.  Yes. | 22  Prolift®.  I don't recall what I saw.  It was a long |
| 23    Q.  And you did so as a paid witness on behalf | 23  time ago.  It was when it first came out. |
| 24  of the plaintiff lawyers, correct? | 24    Q.  All right.  Let me rephrase my question |

47 (Pages 182 to 185)

Daniel S. Elliott, M.D.

Page 186

1  then.
2      You never attended any type of professional
3  education courses that Ethicon sponsored for Prolift®,
4  true?
5      A.  You are correct, yes.
6      Q.  Now, you never participated in any
7  professional education courses sponsored by any
8  manufacturer of a transvaginal mesh for treatment of
9  pelvic organ prolapse, correct?
10     A.  Well, that -- that's what we clarified
11 earlier.  I was in attendance and an instructor AMS as
12 far as with the sling and then went over and implanted
13 their device on the cadaver.  I was not a formal
14 student because I was an instructor for slings, but,
15 again, I just walked over to the next cadaver and did
16 it.
17     Q.  All right.  Let's make sure the jury
18 understands what you are saying.  When you are saying
19 that's something that I clarified earlier, you recall
20 saying something different in your sworn deposition
21 testimony in this case?
22     A.  My deposition in 2011 or 2012 maybe the
23 year was, I stated I was never a formal student in any
24 class, which is correct.  I was not a formal student.

Page 187

1  That's why how do we define it?  I was not a formal
2  student, I did not take a formal class but I have
3  implanted with the instructor there so I don't know how
4  we define myself, to be clear.
5      Q.  All right.  Let me just break that down
6  into chunks if you don't mind, Doctor.
7      Previously when you were asked whether you
8  attended any professional education training for a
9  transvaginal mesh for pelvic organ prolapse your answer
10 was that you had not, correct?
11     A.  Which would be correct, yes.
12     Q.  And what you are trying to clarify is that
13 while you were at a training for a different medical
14 device, you went over to some training happening on a
15 transvaginal kit for -- by a different manufacturer?
16     A.  By AMS, that's correct.
17     Q.  Okay.  So even with the clarification that
18 you have added today, it's still true that you have
19 never attended any professional education for Prolift®?
20     A.  Correct.
21     Q.  And your answer you referenced cadaver
22 training.  Can you please tell us what cadaver training
23 is?
24     A.  It would be a workshop using a non-live

Page 188

1  human cadaver, fresh frozen cadaver, where you just
2  have the pelvis to work with to insert the trocars
3  through the obturator foramen, vaginal dissection and
4  those types of things.
5      Q.  And cadaver training is sometimes used for
6  surgeons to gain familiarity with a new surgical
7  procedure?
8      A.  Correct.
9      Q.  And you had never done any cadaver
10 training on Prolift®, correct?
11     A.  Correct.
12     Q.  Now -- one second, Doctor.
13     Here's my question, at the time of your
14 deposition you testified that you never underwent any
15 cadaver lab training with respect to transvaginal
16 placement of mesh, and you still stand behind that
17 comment, true?
18     A.  That's correct.  Again, it's a matter of
19 defining how we define what I did.
20     Q.  Now, before being hired by the plaintiff
21 lawyers in this case you had never observed a surgery
22 involving Prolift®, correct?
23     A.  Probably would be accurate, yes.
24     Q.  Now, you have no research experience on

Page 189

1  Prolift® as well; isn't that true, Doctor?
2      A.  Correct.
3      Q.  You have never participated in any
4  clinical trials that relate to Prolift®, true?
5      A.  Specific Prolift®, you are correct, yes.
6      Q.  You haven't participated in any clinical
7  trials relating to transvaginal mesh or the use of
8  transvaginal mesh in the treatment of pelvic organ
9  prolapse; isn't that correct, Doctor?
10     A.  Correct.
11     Q.  You have never done any -- withdrawn.
12     You referenced earlier something called Level 1
13 evidence; do you recall making that reference?
14     A.  I don't recall but I don't doubt I said
15 it.
16     Q.  Is randomized controlled clinical trials
17 an example of Level 1 evidence?
18     A.  Yes.
19     Q.  You have never been involved in any
20 randomized controlled clinical trials involving the use
21 of mesh in any application, correct, Doctor?
22     A.  Meshes, you would be correct, yes.
23     Q.  You've never been involved in any clinical
24 study that used transvaginal mesh to treat pelvic organ

48 (Pages 186 to 189)

## Daniel S. Elliott, M.D.

| Page 190 | Page 192 |
|---|---|

**Page 190**

1  prolapse, true?
2      A.  Transvaginal meshes, I don't recall.  No,
3  I don't believe so.
4      Q.  So my statement is correct?
5      A.  Yes.
6      Q.  You've never been involved in any
7  prospective studies involving the use of mesh, correct?
8      A.  Correct.
9      Q.  You have never been involved in a clinical
10  trial designed to evaluate the safety and efficacy of a
11  transvaginal mesh in any application, correct?
12      A.  Correct.
13      Q.  Are you familiar with meta-analyses,
14  Doctor?
15      A.  Yes.
16      Q.  Can you please tell us what they are?
17      A.  Meta-analysis is just a statistical way of
18  analyzing multiple different studies, studies you have
19  not performed but using other people's datas and
20  analyzing them.
21      Q.  Are meta-analyses a way that researchers
22  can summarize the clinical evidence that have been
23  published on a surgery?
24      A.  Possibly.

**Page 191**

1      Q.  You have not done any meta-analyses
2  involving the use of transvaginal mesh, true?
3      A.  Correct.
4      Q.  You indicated, Doctor, a couple times that
5  you currently practice at Mayo in Minnesota?
6      A.  Correct.
7      Q.  You're not here today testifying as a
8  representative of the Mayo Clinic; isn't that correct,
9  Doctor?
10      A.  That would be -- I guess accurate, yes.
11      Q.  Mayo has not sanctioned your activities
12  working as a paid witness on behalf of the plaintiff
13  lawyers in this case, true?
14          MR. SLATER:  Objection.
15          THE WITNESS:  No, this is on my private
16      time.
17  BY MR. ISMAIL:
18      Q.  In fact, the Mayo Clinic does not even
19  know that you are serving as an expert for the
20  plaintiffs in this case, correct?
21      A.  As I stated, it's all in my private time.
22      Q.  So the answer to my question is what, sir?
23      A.  That is correct, it's all in my private
24  time.

**Page 192**

1      Q.  I'm trying to make a distinction, Doctor,
2  between you saying it's on your private time and
3  whether your hospital even knows you are doing this
4  activity, so let me restate the question so you have it
5  in mind.
6          The Mayo Clinic does not even know that you are
7  serving as an expert on behalf of the plaintiffs in
8  this litigation, true?
9      A.  That is correct, it is all done in my
10  private time.
11      Q.  Have you disclosed to the Mayo Clinic the
12  money you have received from the plaintiff lawyers in
13  this litigation?
14      A.  No, I have not.
15      Q.  But you have, in fact, received money from
16  the plaintiff lawyers in this case, correct?
17      A.  That is true.
18      Q.  How much per hour are you being paid, sir?
19      A.  700.
20      Q.  When you say "700", that's $700 per hour?
21      A.  Correct.
22      Q.  How much has Mr. Slater paid you thus far?
23          MR. SLATER:  You are talking about in this
24  case?

**Page 193**

1  BY MR. ISMAIL:
2      Q.  I'm asking how much Mr. Slater has paid
3  you since the time Mr. Slater began paying you.
4      A.  I have no idea.  I don't even bill
5  Mr. Slater.
6      Q.  Whom do you bill?
7      A.  Mr. --
8          MR. SLATER:  Let's take a step back here.
9      There's an understanding that witnesses are to
10      be questioned about the fees they're paid in a
11      particular case and that's how it's been done
12      throughout and that's been our understanding in
13      this case.  You may not be aware of that but
14      it's been how it's been handled in the
15      depositions and that was our understanding.
16          So if you are asking about in the Hammons
17      case, you know, that's fine, but to start
18      talking about overall litigation or other
19      cases, it's understood and it's on the record,
20      probably in the deposition of Dr. Weber, that
21      we were not going to get into billing outside
22      the specific case.
23          MR. ISMAIL:  Well --
24          MR. SLATER:  And, in fact, that's how it

## Daniel S. Elliott, M.D.

|  | Page 194 |
|---|---|

1   was handled in the Bellew trial in the MDL and
2   I think that's the understanding everybody has
3   about how we're handling this on both sides.
4           MR. ISMAIL:  So how about he gives the
5   answer -- since we're not going to call him
6   back here and redo this, he gives the answer
7   and if we don't play it to the jury, we don't
8   play it to the jury.
9           MR. SLATER:  I'm not going to allow him to
10  testify beyond what he's been paid in this case
11  because we have an agreement between counsel
12  and I'm not going to have someone walk in on
13  cross-examination and change the ground rules
14  in the middle of cross.
15          MR. ISMAIL:  That's not an agreement to
16  which I am privy.
17          MR. SLATER:  You are bound to it though,
18  co-counsel --
19          MR. ISMAIL:  Can I finish my statement?
20  Not an agreement to which I -- that I've heard
21  of and so I'm going to ask the question and
22  it's up to you as to whether you are going to
23  let him answer.
24          MR. SLATER:  I will only allow him to

|  | Page 195 |
|---|---|

1   answer questions about what he's been paid in
2   this case, so you don't need to ask the
3   questions as a formality because I'm not going
4   to allow him to answer them because we have an
5   agreement with counsel.
6           MR. ISMAIL:  I'm going to ask the question
7   and you can do what you want.
8   BY MR. ISMAIL:
9       Q.  Dr. Elliott, how much have you been paid
10  by the plaintiff lawyers who are suing Ethicon?
11          MR. SLATER:  Don't answer the question and
12  the question is improper anyway.
13  BY MR. ISMAIL:
14      Q.  Are you going to refuse to answer the
15  question, Doctor?
16          MR. SLATER:  No, no, you are not even
17  going to ask him that --
18          MR. ISMAIL:  Yes.
19          MR. SLATER:  -- because I have instructed
20  him not to.
21          MR. ISMAIL:  He has to right to -- you
22  have given your instruction, he can still
23  answer the question if he wants.
24          THE WITNESS:  I'm following Mr. Slater's

|  | Page 196 |
|---|---|

1   advice to not answer the question.
2           MR. ISMAIL:  I will limit my question.
3   BY MR. ISMAIL:
4       Q.  How much have you been paid with respect
5   to your work on behalf of the plaintiff lawyers in the
6   Prolift® litigation?
7           MR. SLATER:  Objection, same thing, don't
8   answer.
9   BY MR. ISMAIL:
10      Q.  Are you going to refuse to answer my
11  question, Doctor?
12      A.  I'm not going to answer based on
13  Mr. Slater's recommendation.
14      Q.  Isn't it true, Doctor, you submit an
15  invoice every month for your work on behalf of the
16  plaintiffs' lawyers and you have since 2011?
17          MR. SLATER:  Objection.
18          THE WITNESS:  Well, not every month, only
19  if work is done.
20  BY MR. ISMAIL:
21      Q.  How many of the months since 2011 have you
22  submitted an invoice?
23          MR. SLATER:  Objection.  All these
24  questions he's -- obviously, these are back

|  | Page 197 |
|---|---|

1   door -- I'm going to object to the whole line
2   of questions.  I mean, it's generalized about
3   how often he submits invoices is fine, but I
4   object to this.
5           I mean, sir, there's an agreement between
6   counsel.  It's a little frustrating when
7   someone walks in and says, well, sorry, I
8   wasn't there.  Maybe they need to prep you
9   better.
10  BY MR. ISMAIL:
11      Q.  And your answer, sir?
12      A.  Oh, I have no idea, looking back, of how
13  many times I do and don't because there are sometimes I
14  don't do any work for months.
15      Q.  Doctor, have you estimated that you have
16  on average spent 20 to 30 hours a month working on
17  behalf of the plaintiff lawyers in this litigation?
18          MR. SLATER:  Objection.  Now --
19          MR. SPECTER:  What's "this litigation"?
20  Beyond that.
21          MR. ISMAIL:  You can state your objection,
22  you can instruct him not to answer.  We don't
23  have to argue about it.  If it doesn't get
24  played, it doesn't get played.

Daniel S. Elliott, M.D.

| Page 198 |
| --- |

1      MR. SLATER: But it's not the point
2  because if it doesn't get played, it doesn't
3  get played is not really a legitimate answer to
4  that because you are creating a record of
5  things that we had an agreement were not going
6  to be asked about.
7      MR. ISMAIL: And if you're right what's
8  the --
9      MR. SLATER: And it goes both ways, by the
10  way.  Your experts don't want to be asked these
11  questions either.
12      MR. ISMAIL: If you're right, you're
13  right.  I still don't understand what the --
14  you make your objection and instruct him not to
15  answer.  I don't understand why we're even
16  arguing about it.
17      MR. SLATER: Well, because it's
18  frustrating that -- you know, you are
19  pretending you don't know there was an
20  agreement.
21  BY MR. ISMAIL:
22      Q.  So let me restate the question so you have
23  it in mind, Doctor.
24      A.  Thank you.

| Page 199 |
| --- |

1      Q.  Have you worked on average 20 to 30 hours
2  a month on behalf of the plaintiff lawyers since
3  approximately 2011?
4      MR. SLATER: Objection.
5      MR. SPECTER: Can I ask you to clarify
6  though, counsel.  Are you asking about the
7  Hammons litigation or are you asking about the
8  litigation in general?
9      MR. ISMAIL: Well, since the Hammons
10  litigation wasn't filed in 2011, I suspect that
11  would be difficult.
12      MR. SLATER: Yeah, well, no one knows
13  that.
14      MR. SPECTER: The jurists know that,
15  counsel.  Please.
16      MR. ISMAIL: So the question is there.  If
17  you don't want him to answer --
18      MR. SPECTER: I'm just asking you to
19  clarify your question, counsel.  Are you asking
20  about the Hammons litigation or are you asking
21  about litigation in general?
22      MR. ISMAIL: My question goes to the issue
23  of bias, the amount of money the witness has
24  been paid and if you don't want him to answer

| Page 200 |
| --- |

1  the question, tell him not to answer the
2  question.
3      MR. SPECTER: I'm not asking about what
4  the question goes to.  I'm simply asking
5  whether the question goes to the Hammons
6  litigation or the TVM litigation in general.
7      I take it from what you are saying you are
8  asking about the TVM litigation in general?
9      MR. ISMAIL: I'll rephrase.
10  BY MR. ISMAIL:
11      Q.  Doctor, the report that you submitted in
12  this case, in Ms. Hammons' case, does that date back to
13  work that you started doing on behalf of the plaintiff
14  lawyers when you were first retained in 2011?
15      MR. SLATER: Objection.  You can answer.
16      THE WITNESS: I don't quite know how to
17  answer that question.  Not to be evasive by any
18  means, I've been doing work for the past 20
19  years on prolapse and complications so that
20  specific document, I probably have done work
21  earlier that was translated to it as far as the
22  background and those types of things, but,
23  again, I can't be specific.  I just don't know.
24  BY MR. ISMAIL:

| Page 201 |
| --- |

1      Q.  I'll rephrase.
2      You have looked at materials that were sent to
3  you by the plaintiff lawyers in this case, correct?
4      A.  Correct.
5      Q.  Mr. Slater has sent you materials,
6  correct?
7      A.  Yes.
8      Q.  You have looked at some internal
9  depositions and documents about the Ethicon employees,
10  correct?
11      A.  Yes.
12      Q.  And you have referenced them during your
13  testimony today?
14      A.  That is correct.
15      Q.  And you have included them in your expert
16  report submitted in this case?
17      A.  That is correct.
18      Q.  Some of the work that you did that
19  resulted in the expert report submitted in Ms. Hammons'
20  case dates back to 2011/2012 time frame, correct?
21      A.  That would be correct, yes.
22      Q.  So with that understanding, Doctor, can
23  you tell me the amount of money that you have been paid
24  by the plaintiff lawyers for that work?

51 (Pages 198 to 201)

## Daniel S. Elliott, M.D.

| Page 202 | Page 204 |
|---|---|

Page 202

1    MR. SLATER: Objection. Don't answer the
2  question.
3    THE WITNESS: I'm not going to answer the
4  question based on Mr. Slater's recommendation.
5  BY MR. ISMAIL:
6    Q. Doctor, Prolift® was designed to treat
7  pelvic organ prolapse, correct?
8    A. That is correct.
9    Q. Since we're not exactly sure when the jury
10  is going to see this video, I don't know if this has
11  been defined for them yet, but for the benefit of the
12  jury, pelvic organ prolapse, in a general sense, when
13  one or more of the patient's internal organs drop into
14  the vagina?
15    A. Correct.
16    Q. Their internal organs most often involved
17  include the bladder, the rectum, the uterus and the
18  small bowel, correct?
19    A. Yes, that would be correct.
20    Q. And I think you told us earlier that what
21  leads to a pelvic organ prolapse is a weakening of the
22  patient's tissues in the pelvic floor, correct?
23    A. A weakening, a stretching of the tissues
24  that hold it up, yes.

Page 204

1  is the age?
2    A. Correct.
3    Q. Repeated lifting can be a risk factor for
4  pelvic organ prolapse?
5    A. That's correct.
6    Q. Smoking has been reported as a risk factor
7  for pelvic organ prolapse?
8    A. Again, there is going to be studies out
9  there maybe yes, maybe no, but it's possible.
10    Q. And, of course, a woman can develop pelvic
11  organ prolapse with just one or even none of the risk
12  factors we've just described, correct?
13    A. That is correct, yeah, with just one, yes.
14  With none it's rare, but it does occur.
15    Q. Now, pelvic organ prolapse is assessed on
16  a grading scale for how severe the prolapse is,
17  correct?
18    A. Yeah, how severe the anatomical prolapse
19  is, yes.
20    Q. And there -- I think you reference there's
21  a few different grading systems that are out there for
22  clinicians to use, right?
23    A. There's three or four, yes.
24    Q. One of which I think you reference was

| Page 203 | Page 205 |
|---|---|

Page 203

1    Q. Now, there are many risk factors that can
2  lead to pelvic organ prolapse, correct?
3    A. There are several, yes.
4    Q. These include age, that's a risk factor,
5  right?
6    A. Yes.
7    Q. Obesity I think you told us earlier was a
8  risk factor?
9    A. Yes.
10    Q. Childbirth is a risk factor?
11    A. Correct.
12    Q. Previous surgery for prolapse is a risk
13  factor?
14    A. Yes.
15    Q. Previous hysterectomy is a risk factor?
16    A. Possible, yes.
17    Q. Menopause?
18    A. Menopause would be questionable. It's
19  going to be tough to delineate that data because we
20  also have age and menopause, so it's -- it's not
21  helpful, let's put it that way.
22    Q. Fair enough. And what you are saying is
23  age and menopause often go hand-in-hand and it's
24  difficult to tease out which is the menopause and which

Page 205

1  called the POP-Q system?
2    A. Correct.
3    Q. Have you ever used the POP-Q system
4  yourself?
5    A. I use it not as commonly as the
6  Baden-Walker.
7    Q. Does the POP-Q system assess how far the
8  woman's internal organs have descended into or beyond
9  the opening of the vagina?
10    A. That's part of it, yes.
11    Q. What are the grading -- I don't need the
12  definitions yet, but is it -- it's grades 1 through 4,
13  correct?
14    A. Yeah, but then you are looking at each
15  component, whether it's anterior, posterior, apical,
16  vaginal length, so it's -- yeah, you can do the 1, 2,
17  3, 4 but that's gonna -- simplified form of the POP-Q.
18    Q. And 4 is the most severe grade of pelvic
19  organ prolapse?
20    A. That is correct.
21    Q. The other system you reference is the
22  Baden-Walker system; is that correct?
23    A. There's Baden-Walker and there's also
24  International Continence Society stages. They're all

52 (Pages 202 to 205)

Daniel S. Elliott, M.D.

| Page 206 | Page 208 |
|---|---|

**Page 206**

1  somewhat similar with different bells and whistles one
2  way or the other.
3      Q.  And the Baden-Walker, again, is grades 1
4  through 4, with 4 being the worst?
5      A.  That's correct.
6      Q.  And that's the one that you prefer in your
7  clinical practice?
8      A.  Correct.
9      Q.  What is the criteria for grade 4 under the
10  Baden-Walker system?
11      A.  Same as for the POP-Q, it's complete
12  eversion out of the vagina.
13      Q.  When you say "eversion" --
14      A.  Means that the vagina has -- everted
15  means -- think of the vagina like a tube sock; somebody
16  reaches in, grabs it and everts out, eversion of the
17  vagina.
18      Q.  And in a grade 4, that is the most severe
19  pelvic organ prolapse a physician can grade for a
20  patient?
21      A.  That is correct, yes.
22      Q.  And in clinical application that means the
23  prolapse is actually visible in the vaginal opening,
24  correct?

**Page 207**

1      A.  Correct.  It can also be visible in stage
2  2 also, but, yes, it's like a baby's head coming out of
3  the vagina, basically.
4      Q.  Prolapse can be a serious condition for a
5  woman, correct?
6      A.  It depends how you define serious.  It can
7  be bothersome.  It's very rarely in the United States
8  life-threatening, so it's not along the lines of a
9  cardiac problem that's life and death.  Very rarely,
10  I've never seen that.
11      Q.  You used the description several times
12  today of prolapse being a quality of life condition?
13      A.  Correct.
14      Q.  Meaning that a pelvic organ prolapse can
15  negatively affect a woman's quality of life?
16      A.  That is correct, it can.
17      Q.  A pelvic organ prolapse can be
18  debilitating and troublesome to a woman?
19      A.  Yeah, again, debilitating, yes, that can
20  happen.  It can be bothersome.  I think it's fair to
21  say it's bothersome.
22      Q.  The symptoms that a woman can report
23  include feelings heaviness or pressure, correct?
24      A.  That is something they can feel, yes.

**Page 208**

1      Q.  You've heard of reports of a woman feeling
2  a bulge or seeing the protrusion from the vagina as a
3  result of the pelvic organ prolapse, correct?
4      A.  That is correct, yes.
5      Q.  Difficulty with walking or sitting have
6  been described in women with pelvic organ prolapse,
7  correct?
8      A.  In severe cases, yes, that does happen.
9      Q.  And what we're describing here can be
10  distressing to many women?
11      A.  Yeah, depends how you want to define many,
12  but a lot of women it can be bothersome, I won't deny
13  that at all.  I agree with you.
14      Q.  Let me put it this way, Doctor, you would
15  agree that prolapse can be significant enough that the
16  patient doesn't want to deal with it?
17      A.  That is correct, yes.
18      Q.  You've used this term, dyspareunia, in
19  your testimony.  That, in a general sense, means pain
20  with sexual intercourse, correct?
21      A.  That is correct.
22      Q.  There are some women for whom pelvic organ
23  prolapse can actually cause dyspareunia, correct?
24      A.  That is correct.  We have to define how

**Page 209**

1  severe that dyspareunia is.  There's not just --
2  dyspareunia means only one thing, it can be severity,
3  so I agree with you.
4      Q.  So seeing the description of a patient as
5  having dyspareunia doesn't tell you how severe the
6  dyspareunia is, correct?
7      A.  All it says is like you drive a car, we
8  have no idea of the specifics of it, but it states that
9  there is discomfort with sexual activity.
10      Q.  And, again, without regard to severity,
11  you've confirmed for us already that women with pelvic
12  organ prolapse can have dyspareunia, correct?
13      A.  To a certain degree, yes, they can.
14      Q.  Now, there are I guess a couple different
15  reasons why a woman may not be sexually active who is
16  experiencing pelvic organ prolapse, one of which can be
17  just the pain that pelvic organ prolapse may result for
18  dyspareunia, correct?
19      A.  Correct.
20      Q.  And the prolapsing organ in a woman can
21  actually interfere with sexual activity, correct?
22      A.  It can block it, yes.
23      Q.  But, also, you are aware, Doctor, that for
24  some women the prolapse effects how they feel about

53 (Pages 206 to 209)

## Daniel S. Elliott, M.D.

Page 210

1    themselves and embarrassment being with their partner
2    or their desire to have sexual intercourse, correct?
3        A.  I agree, the psychological aspect of
4    embarrassment can be a significant issue.
5        Q.  And you are aware, Doctor, that apart from
6    the dyspareunia and the interference with sexual
7    activity, pelvic organ prolapse symptoms can include
8    pelvic pain or voiding problems?
9        A.  It can and -- yeah, the voiding problems,
10   in severe cases, it can do that.  The other aspect of
11   it you said is --
12       Q.  Pelvic pain?
13       A.  Pelvic pain, yeah, that can -- the usual
14   thing I get is described as an aching, even a low back
15   pain because of the prolapse.
16       Q.  And when we say voiding complaints, that
17   would include difficulty urination?
18       A.  In severe cases of anterior prolapse,
19   yeah, you can trouble as far as emptying the bladder.
20   I very rarely see that but it has been described, yes.
21       Q.  And so as you and I just went over for the
22   jury a variety of complications that a woman can
23   experience from a pelvic organ prolapse can result in a
24   woman seeking out medical care to get that repaired,

Page 211

1    correct?
2        A.  That is correct, yes.
3        Q.  And, in fact, I think you've told us
4    before pelvic organ prolapse is a condition for which
5    women have sought treatment for thousands of years?
6        A.  I think I stated before as long as women
7    have been having babies, they have been having problems
8    with this, yes.
9        Q.  And as long as there have been doctors who
10   are concerned about caring for women, doctors have been
11   trying to come up with good, satisfactory ways to treat
12   a woman's pelvic organ prolapse, correct?
13       A.  That is correct, yes, sir.
14       Q.  And I think you told us that the treatment
15   options for pelvic organ prolapse include conservative
16   measures and surgical options as well, right?
17       A.  Correct.
18       Q.  One conservative measure you told us about
19   was a wait and see approach?
20       A.  Correct, observation, yeah.
21       Q.  Another -- you used this term -- a
22   pessary, right?
23       A.  That's correct.
24       Q.  And I think you told us that was a plastic

Page 212

1    device that can be inserted into the vagina as a way to
2    sort of prop up the falling organ?
3        A.  Correct.
4        Q.  Now, pessaries are not appropriate for all
5    patients, you agree with that, right?
6        A.  They might not work in all patients.  As
7    far as it being appropriate or not, in the rare case of
8    some vaginal erosion, you wouldn't want to put anything
9    in there.  I would think the better statement would be
10   they don't work in all patients.
11       Q.  Fair enough.  So the distinction you are
12   drawing is a doctor, when considering how to treat a
13   woman with a prolapse, would include a pessary on the
14   list and then make a decision whether it's a good or
15   bad idea here?
16       A.  That would be fair to state, yes.
17       Q.  Some women don't want to use a pessary,
18   right?
19       A.  Correct.
20       Q.  If a woman receives a pessary, she has to
21   be followed up periodically with her physician,
22   correct?
23       A.  Correct, yes.
24       Q.  You have seen reports of vaginal discharge

Page 213

1    with a pessary, right?
2        A.  That is correct.
3        Q.  You've seen reports of vaginal odor with a
4    pessary?
5        A.  Correct.
6        Q.  There have been reports of ulceration with
7    pessaries, correct?
8        A.  That's correct.
9        Q.  Obviously, that can lead to pain for the
10   patient?
11       A.  It could be, which you take out the
12   pessary and that resolves itself.
13       Q.  There can be bleeding associated with a
14   pessary?
15       A.  Along, yeah, with vaginal erosion that can
16   happen.
17       Q.  Tissue erosion?
18       A.  It can, all those things, yeah.
19       Q.  The symptoms that we've just described
20   that can result from a pessary may lead a woman to
21   discontinue the use of the pessary, right?
22       A.  That is correct, yes.
23       Q.  Of course, it's reasonable to believe that
24   or to expect that a woman who has had a problematic

54 (Pages 210 to 213)

Daniel S. Elliott, M.D.

Page 214

1  experience with a pessary that caused her
2  complications, she would be less likely to accept that
3  treatment again in the future?
4      A.  I agree with you.
5      Q.  And you don't actually even deal with
6  pessaries yourself in your clinical practice, correct?
7      A.  Yeah, you're correct.  We discuss it.  If
8  we feel a patient is a good candidate for it, I send
9  them to my GYN colleagues.
10     Q.  We've been discussing a pessary as one of
11 the conservative ways to treat a prolapse but you would
12 agree that most of the time prolapse cases treated
13 conservatively, the condition does not get better?
14     A.  Yeah, though it -- prolapse does not
15 frequently or rarely would get better.  It usually
16 stays the same or worsens.
17     Q.  So you would agree, Doctor, with the
18 statement that absent surgery, pelvic organ prolapse
19 tends not to improve?
20     A.  In general, that would be a fair
21 statement.
22     Q.  Now, there have been multiple types of
23 surgeries trying to fix the problem of a prolapse,
24 right?

Page 215

1      A.  Correct.
2      Q.  Some of those surgeries have been around a
3  long, long time?
4      A.  That is correct.
5      Q.  And over the years some surgeries have
6  been more effective than others?
7      A.  Correct.
8      Q.  Different doctors use different approaches
9  depending on their own experience, skill level, their
10 comfort level as to which surgical option that
11 physician prefers, correct?
12     A.  That's correct.
13     Q.  Transvaginal mesh was developed as one of
14 the options for doctors to use to treat women with
15 pelvic organ prolapse?
16         MR. SLATER:  Objection.
17         THE WITNESS:  Correct, yes.
18 BY MR. ISMAIL:
19     Q.  One of the surgeries you described for us
20 earlier as one of the surgical options was native
21 tissue repair surgeries; do you recall making reference
22 to that?
23     A.  Correct, that's traditional colporrhaphy,
24 yes.

Page 216

1      Q.  So there are different types of
2  colporrhaphy procedures depending on which type of
3  prolapse the patient has, correct?
4      A.  Dependent upon the anatomical location,
5  yes.
6      Q.  So if --
7      A.  Well, it's only going to be anterior and
8  posterior, that's the only colporrhaphies.
9      Q.  So anterior being a bladder prolapse?
10     A.  Correct.
11     Q.  And posterior being a rectal prolapse?
12     A.  Correct.
13     Q.  And the idea behind a colporrhaphy is that
14 the surgeon is using the patient's own tissues and
15 sutures as a way to prop up the descending organ,
16 correct?
17     A.  Yeah, you are correct, it's a plication or
18 a bringing together of the tissues that have separated
19 or thinned.
20     Q.  One of the perceived problems with that
21 type of surgery, the native tissue surgery, going back
22 to say the 1990s, was that there were recurrences or
23 failures of that type of surgery, correct?
24     A.  Yeah, recurrence or failure can happen

Page 217

1  with any surgery, it can happen with those, yes.
2      Q.  And particularly, Doctor, my question is
3  more of a historical one.  If you go back to the period
4  of time in the 1990s there was a feeling in the medical
5  community that native tissue surgeries for treatment of
6  prolapse had a high rate of failure?
7      A.  I think the best way to say it is we
8  didn't want to have any failure.  I was a resident
9  during that time, in training.  We didn't want to have
10 any failure so there was the pursuit of trying to find
11 something that had a less failure rate.
12     Q.  The -- historically the assessment of what
13 was a success or a failure focused on the anatomical
14 outcome, correct?
15     A.  Historically that was one of the main
16 features of it, yes.
17     Q.  And I think you described for us today
18 that the success or failure of a prolapse surgery can
19 be measured either anatomically or by a review of the
20 patient's symptoms, correct?
21     A.  It depends, yeah.  When you are doing a
22 study you are going to say this is an anatomical study
23 or a functional study or both.  But, yeah, there's
24 different ways of looking at it, but the tradition --

55 (Pages 214 to 217)

Daniel S. Elliott, M.D.

| Page 218 | Page 220 |
|---|---|

**Page 218**

1  now you've got to look at function.
2      Q.  And my question wasn't just in the context
3  of a study but also with regard to a doctor treating a
4  patient, the doctor can and will assess anatomic
5  function and can and will assess symptomatic function,
6  correct?
7      A.  Yeah, you can assess it but what you care
8  about is the patient happy or not.
9      Q.  And when we're talking anatomic recurrence
10  of a prolapse, we mean the surgeon can -- in examining
11  the patient, has assessed that the prolapsed organ has
12  redescended to a certain degree following the surgery,
13  correct?
14      A.  That's part of the assessment, yes.
15      Q.  And anatomic recurrence of the prolapse
16  was a concern because it exposed women to the risk of
17  incurring the same prolapse symptoms again, right?
18      A.  Possibly, yes.
19      Q.  And I think just so we're focusing on the
20  period of time before Prolift® was developed, you would
21  agree that historically anatomic recurrence was a
22  concern to doctors treating women with pelvic organ
23  prolapse?
24      A.  I think initially, yes, you are right and

**Page 219**

1  then there became the shift overlooking at is the happy
2  patient, quality of life.
3      Q.  It was the recurrence concern that led
4  doctors and surgeons to begin to experiment with the
5  use of mesh to reinforce the pelvic floor, correct?
6      A.  I think that's fair, yes.
7      Q.  And at the time that Prolift® was under
8  development you were familiar with the reports that
9  nonmesh surgical repairs of prolapse had failures up to
10  30 to 40%?
11      A.  Yeah, but, again, you got to look at what
12  paper that is.  Are they looking at stage 2 being
13  abnormal, you know, there is a debate now that is
14  within the realm of normal, so you have to look at the
15  specific studies, but those reports are out there.  I
16  don't agree with them and we don't now agree with it,
17  but I agree there are reports out there.
18      Q.  So, again, this question is going back to
19  the time before the Prolift® was developed, you're
20  aware that there was a concern that there was an
21  unacceptably high failure rate with native tissue
22  surgeries?
23      A.  I think some people had those.  Again, I
24  didn't have those concerns.

**Page 220**

1      Q.  You were in training at the time, right?
2      A.  Yeah.  Well.  Depends when you are
3  talking.
4      Q.  1990s?
5      A.  Yeah, '93 to '99 -- '93 to 2000.
6      Q.  And some of the work that was done that
7  assessed the success or failure of native tissue
8  surgery was actually under the direction of the NIH,
9  right?
10      A.  Correct, you know, A lot of people were
11  looking at it, yes.
12      Q.  And so by that I mean there were
13  researchers who were concerned about the failure rate
14  of native tissue surgery outside of industry or
15  manufacturers, that's fair to say?
16      A.  Oh, yeah, I mean, doctors were very
17  concerned about it.  We wanted to get that recurrence
18  rate down to zero.
19      Q.  So one of the initial uses of mesh in the
20  treatment of pelvic organ prolapse was through an
21  abdominal surgery, correct?
22      A.  The sacrocolpopexy has been around a long
23  time, yes.
24      Q.  And I think you told us earlier that the

**Page 221**

1  mesh used in Prolift® is a polypropylene mesh?
2      A.  Correct.
3      Q.  And mesh used in the abdominal
4  sacrocolpopexy also is polypropylene mesh, correct?
5      A.  It can be and the one I use is.
6      Q.  Most often the mesh used in abdominal
7  sacrocolpopexy, is it polypropylene mesh?
8      A.  I can't speak to everyone out there, some
9  people have used cadaveric tissue and that is becoming
10  more common now but it's -- again, I don't know.  I
11  would suspect there's more polypropylenes than anything
12  else.
13      Q.  Polypropylene has been used in surgical
14  procedures for decades, correct?
15      A.  That is correct.
16      Q.  Polypropylene is used in sutures, some
17  sutures, correct?
18      A.  That is correct.
19      Q.  And the use of polypropylene sutures goes
20  back many decades, true?
21      A.  Correct.
22      Q.  You indicated that polypropylene was used
23  in a hernia mesh; do you recall saying that earlier?
24      A.  That's correct.

56 (Pages 218 to 221)

## Daniel S. Elliott, M.D.

Page 222

1 Q. The use of polypropylene hernia meshes
2 goes back many decades as well, correct?
3 A. It's been around a long time, yes. Has a
4 well-established track record.
5 Q. Historically the abdominal sacrocolpopexy
6 was an open abdominal procedure, correct?
7 A. That is correct.
8 Q. Where a long incision would be made into
9 the abdomen?
10 A. Well, it depends how you define long.
11 From the umbilicus to -- the belly button to the pubic
12 bone, so roughly -- however long that is.
13 Q. And the surgeon would then have to
14 navigate through the abdominal cavity and work their
15 way to place the mesh to repair the organ that was
16 being prolapsed?
17 A. Correct, it was stated in a very colorful
18 way, navigate through. Just go down there and get the
19 job done, but, yes, you are right.
20 Q. And you don't mean to minimize the
21 invasiveness of an open abdominal mesh repair of
22 prolapse, are you, Doctor?
23 A. No. It's -- you know, there is an
24 abdominal incision made, there are risks with that and

Page 223

1 so I'm not going to say it's a minimally invasive
2 nature compared to doing it robotically, no.
3 Q. The abdominal sacrocolpopexy performed
4 with mesh has had a high success rate for vaginal vault
5 prolapse, correct?
6 A. It would be arguably the best, yes.
7 Q. The use of polypropylene mesh in abdominal
8 sacrocolpopexy was viewed as a advancement in the
9 surgical treatment of pelvic organ prolapse, correct?
10 A. I think that's correct. The studies going
11 back looking at cadaveric tissue found a higher failure
12 rate with it. So polypropylene, through the abdominal
13 route, has been shown with good and acceptable risk
14 versus benefit ratio.
15 Q. The abdominal surgery for the placement of
16 mesh can be a complicated surgery?
17 A. Well, I don't know what you mean by -- I
18 mean, I do it routinely, overnight stay in the hospital
19 and they're home. So complications can occur, I
20 suppose.
21 Q. The open abdominal placement of mesh can
22 be a surgery that lasts many hours?
23 A. Better not. I do it hour and 15 minutes,
24 two days -- last Friday.

Page 224

1 Q. Can it?
2 A. Well, not in my hands. I can't speak for
3 other surgeons. I don't mess around.
4 Q. Do you agree that transabdominal surgery
5 is associated with increased morbidity compared with
6 vaginal repairs?
7 A. You have to define what you mean by
8 vaginal repairs. Transvaginal nonmesh repairs
9 traditionally have been associated with a lower
10 morbidity, perioperative morbidity, but, again, it has
11 to be balanced as far as with success, but now if you
12 are talking about Prolift® meshes, that becomes a
13 different story, which we'll get to later I'm sure.
14 So I think it's fair when you compare
15 abdominal, transabdominal with an incision versus
16 transvaginal without meshes, it's fair to say that the
17 transvaginal without mesh would be a less morbid
18 procedure.
19 Q. When you say "morbid" in that context,
20 what do you mean?
21 A. Perioperative, intraoperative
22 complications.
23 Q. Perioperative means during the procedure?
24 A. Perioperative -- well, perioperative means

Page 225

1 just around the time of the surgery.
2 Q. And due to the morbidity of the open
3 transabdominal procedure, many patients were unable to
4 tolerate that procedure, correct?
5 A. Some patients wouldn't. I mean, my
6 practice is not many, but some don't want to undergo
7 that big of a surgery.
8 Q. So going back to this period in the 1990s
9 and the early 2000s, researchers were reporting high --
10 higher than desirable failure rates for nonmesh
11 repairs, correct?
12 A. Done through the vagina.
13 Q. And there was a recognition that the use
14 of mesh through the transabdominal route resulted in a
15 more stable or durable repair, correct?
16 A. Correct.
17 Q. And there was some concern or desire to
18 lower the morbidity of the transabdominal procedure,
19 correct?
20 A. Correct.
21 Q. And so you agree, Doctor, it was a
22 worthwhile research objective to investigate whether
23 improvements could be made to the surgical devices and
24 techniques for the treatment of pelvic organ prolapse,

Daniel S. Elliott, M.D.

| Page 226 | Page 228 |
|---|---|
| 1  correct? | 1  pelvic organ prolapse, that turned out to be a |
| 2      A.  I am an advocate of innovation so if | 2  worthwhile and useful innovation in the treatment of |
| 3  there's a way of making something better, I am for it, | 3  patients who have pelvic organ prolapse? |
| 4  but it has to be a safe advancement. | 4      A.  I think as we can state right now the use |
| 5      Q.  So you agree that even today it's still a | 5  of transabdominal polypropylene meshes has improved the |
| 6  worthwhile research objective to find improved ways to | 6  outcome as far as we know right now. |
| 7  surgically repair pelvic organ prolapse, correct? | 7      Q.  There was another hypothesis that the use |
| 8      A.  Until we get to the day of 100% success | 8  of a transvaginal mesh could cut down on the morbidity |
| 9  and no complications, it's a worthwhile venture. | 9  of the abdominal surgeries, correct, that was the idea |
| 10     Q.  Scientists, whether they're affiliated | 10  at the time? |
| 11  with universities or manufacturers or whatever, always | 11      A.  Well, the idea at the time was to blend |
| 12  are looking for ways to improve the surgical treatment | 12  meshes and avoid the potential issues of going through |
| 13  of pelvic organ prolapse, correct? | 13  the abdomen, so that was their theory, but I can't |
| 14     A.  I can't agree with that, no. | 14  speak to exactly what they were thinking.  I wouldn't |
| 15     Q.  Then let me rephrase. | 15  know. |
| 16     The research into the improvements of the | 16      Q.  Let me just say it this way, Doctor, the |
| 17  surgical techniques for pelvic organ prolapse has been | 17  reason and purpose behind the development of |
| 18  going on several decades? | 18  transvaginal mesh was to reduce the morbidity seen with |
| 19     A.  Yeah, longer than that, yes, I agree. | 19  the abdominal sacrocolpopexy approach, true? |
| 20     Q.  Fair enough.  You agree that it was | 20      A.  That would be part of it. |
| 21  admirable to search for a way to make pelvic organ | 21      Q.  And you agree that that was a laudable |
| 22  prolapse recurrence -- withdrawn.  Let me start over. | 22  goal, to search for a different way of doing the |
| 23     You agree it's admirable or it was admirable to | 23  surgical procedure? |
| 24  search for a way to make the surgical repair of pelvic | 24      A.  I will never criticize the pursuit of |

| Page 227 | Page 229 |
|---|---|
| 1  organ prolapse result in fewer recurrences of the | 1  innovation in improvement, as long as it's balanced and |
| 2  prolapse? | 2  thought through. |
| 3      A.  I feel it is a very worthwhile endeavor -- | 3      Q.  When the Prolift® was developed it was not |
| 4  if you want to use the word admirable that's okay -- to | 4  the first time that surgeons implanted mesh |
| 5  make a more efficacious and safe prolapse repair. | 5  transvaginally, correct? |
| 6      Q.  Now, we've already discussed the | 6      A.  No, mesh has been done -- not mesh, excuse |
| 7  hypothesis that polypropylene mesh might allow for a | 7  me -- foreign body synthetics, manmade products have |
| 8  more stable or durable repair of the prolapse, correct? | 8  been used transvaginally at other times, yes. |
| 9      A.  Well, depends if you are talking about | 9      Q.  And even before the Prolene was developed, |
| 10  transabdominal or transvaginal. | 10  polypropylene mesh had been implanted transvaginally, |
| 11     Q.  Well, the hypothesis that led to the use | 11  correct? |
| 12  of mesh in transabdominal surgery as resulting in a | 12      A.  Before the Prolift, yes, the Gynemesh® had |
| 13  more stable repair, that was actually borne out, | 13  been used, yes. |
| 14  correct? | 14      Q.  And even before Gynemesh® transvaginal |
| 15     A.  That's true. | 15  mesh was used in surgery for other applications, |
| 16     Q.  And so you agree that that was a | 16  correct? |
| 17  legitimate hypothesis? | 17      A.  Well, you have to show me exactly what you |
| 18     A.  Legitimate hypothesis? | 18  are talking about.  I mean, Marlex has been used, other |
| 19     Q.  If you are having trouble with that word, | 19  products have been used, it had unacceptably high |
| 20  I'll rephrase. | 20  complication rates.  I have to see exactly what product |
| 21     A.  Yeah, let's -- can you use a different | 21  you are talking about. |
| 22  word? | 22      Q.  I'll rephrase. |
| 23     Q.  The research initiative that resulted in | 23      Prior to the use of transvaginal mesh in pelvic |
| 24  the use of mesh for the abdominal surgery to repair | 24  organ prolapse, was transvaginal mesh used for |

58 (Pages 226 to 229)

Daniel S. Elliott, M.D.

| Page 230 | Page 232 |
|---|---|

**Page 230**

1   treatment of other conditions?
2       A.   Transvaginal mesh for other conditions?
3   Oh, are we talking about like incontinence or something
4   like that?  I guess, yes, for incontinence.
5       Q.   Before you were -- withdrawn.
6       Now, with respect to the Prolift® you're aware
7   that there have been several randomized controlled
8   clinical trials comparing the use of Prolift® to other
9   surgical approaches, correct?
10      A.   Yes, there have been quite a number of
11  studies out there, yes.
12      Q.   So I don't think this has been done yet
13  for the benefit of the jury, but let's just explain
14  what randomized controlled clinical trials are, okay?
15      A.   Okay.
16      Q.   So there's a variety of ways that
17  scientists can undertake research, correct?
18      A.   Yes.
19      Q.   Sometimes you will have animal research,
20  sometimes you have laboratory research and sometimes
21  you have clinical research?
22      A.   Correct.
23      Q.   And one form of clinical research is what
24  we call randomized controlled clinical trials?

**Page 231**

1       A.   That's correct.
2       Q.   And in randomized controlled clinical
3   trials you have two groups of patients that you try to
4   have evenly matched?
5       A.   Yes.
6       Q.   And one group receives a treatment method
7   and a different group either receives no treatment or
8   sometimes a different treatment method?
9       A.   Correct.
10      Q.   And then the researchers follow those
11  patients over time and see how they do both from a
12  effectiveness perspective and a safety perspective?
13      A.   Correct.
14      Q.   And you would agree that randomized
15  controlled clinical trials are some of the best quality
16  research that can be done on a surgical procedure?
17      A.   They can be if the study is run correctly,
18  but they're one part of the information that's
19  available.
20      Q.   Now, there have been many randomized
21  controlled studies done on the safety and effectiveness
22  of Prolift®, correct?
23      A.   Again, there have been studies done.
24  There have been a number done.

**Page 232**

1       Q.   And there have been randomized controlled
2   clinical studies done comparing the Prolift® to the
3   older native tissue surgery, correct?
4       A.   Correct.
5       Q.   And that's something you looked at before
6   you came to talk to the jury about your opinions on
7   Prolift®, correct?
8       A.   Correct.
9       Q.   Some of those randomized controlled
10  clinical trials looked to the relative success of the
11  native tissue surgery compared to the Prolift® in
12  repairing the woman's prolapse, correct?
13      A.   As far as anatomical repairs, yes, that
14  was looked at.
15      Q.   And many of those high quality randomized
16  controlled clinical studies demonstrated that women
17  treated with a Prolift® experienced a lower rate of
18  anatomical recurrence compared to the native tissue?
19      A.   Well, again, you said "many".  There are
20  some that show anatomy success, there are also many
21  that show equivocal results, but, again, anatomy is not
22  what we look at.
23      Q.   Well, Doctor, you're aware that there have
24  been several studies done that -- and again we're

**Page 233**

1   talk -- withdrawn.
2       When we're talking anatomic success we're
3   talking has the surgery been effective in returning the
4   woman's internal organs to a more anatomically correct
5   position?
6       A.   That's what anatomical studies are about,
7   but the woman doesn't care about that.
8       Q.   And --
9           MR. ISMAIL:  Move to strike as
10  nonresponsive.
11  BY MR. ISMAIL:
12      Q.   Can you answer the question I asked,
13  Doctor?
14      A.   I thought I did.
15      The anatomical studies look at the anatomy of
16  the patient, not the psyche.
17      Q.   Thank you.
18      And several randomized controlled clinical
19  trials have demonstrated that Prolift® has a -- results
20  in a better anatomical fix of the prolapse compared to
21  the native tissue surgery, true?
22      A.   Well, number one, I'd have to see those
23  studies.  Number two, we have to talk about which
24  compartment they're talking about, anterior --

59 (Pages 230 to 233)

Daniel S. Elliott, M.D.

Page 234

1    Q. I appreciate the distinction and I'll
2    clarify.
3         When we talked about -- you've used the times
4    anterior and posterior at times in your testimony?
5    A. Right.
6    Q. And just, again, because those aren't
7    terms that laypeople often use, just to define them,
8    anterior we're talking about, essentially, a bladder
9    prolapse, correct?
10   A. Correct.
11   Q. And a posterior, we're talking about a
12   rectal prolapse?
13   A. Correct.
14   Q. So let me focus on the anterior prolapse,
15   okay.
16        Many randomized controlled clinical trials have
17   demonstrated that surgery with a Prolift® results in a
18   better anatomical repair of an anterior prolapse
19   compared to a native tissue surgery, true?
20   A. Well, I'd have to somewhat disagree.
21   There are going to be some studies out there that show
22   better anatomy, but I have to look at those specific
23   studies, but they also show equivocal. So, again, how
24   do you want to define many? You know, say 100, five,

Page 235

1    one? So I just have to see.
2    Q. Okay. How many are you aware of?
3    A. I have reviewed 450 manuscripts, I can't,
4    off the top of my head, come up with them.
5    Q. Certainly, Doctor, you wouldn't dispute
6    that Prolift® has been shown to result in a better
7    anatomical repair of an anterior prolapse compared to a
8    native tissue surgery?
9    A. You know, I've never really argued against
10   anatomic repair, that's not an issue for me, it's the
11   patient's quality of life is. So an anterior, you can
12   find studies that show better or equivocal in anatomic
13   repair. Posterior and apical, it's a different story.
14   Q. Agree that nobody -- you agree that
15   nobody, including you, would dispute anatomic success
16   with mesh is very strong?
17   A. I would agree with you that it has been
18   shown to work, again, but that's not the issue that I'm
19   concerned about in our patients.
20   Q. Thus far, Doctor, we've been talking about
21   anatomic success of the surgery and you, as you just
22   did, want to make reference to another measure of
23   success and that is symptomatic --
24   A. Correct.

Page 236

1    Q. -- outcomes, correct?
2    A. You are correct.
3    Q. Symptomatic outcomes have been measured as
4    well in some of these studies that we've discussed,
5    correct?
6    A. Correct.
7    Q. Including in some randomized controlled
8    clinical trials, correct?
9    A. Correct.
10   Q. Patients with a Prolift® surgery have
11   demonstrated improvement in symptomatic results,
12   correct?
13   A. Yes, that has happened, yes.
14   Q. Patients implanted with a Prolift® have
15   demonstrated improvements in quality of life, correct?
16   A. That has been demonstrated, yes.
17   Q. You referenced earlier biologic or cadaver
18   tissue being used in pelvic organ prolapse; is that
19   right?
20   A. Correct.
21   Q. Surgical experience with those techniques
22   revealed the biological or cadaver tissue in
23   sacrocolpopexy had a high failure rate?
24   A. With specifically sacrocolpopexy it --

Page 237

1    several different studies have shown it was not as
2    strong.
3    Q. So the biologic tissues that you
4    referenced in your testimony are not as strong as the
5    polypropylene mesh for repair, right?
6    A. Well, we're talking about transabdominal.
7    Transabdominal I agree with you.
8    Q. Now, there were other polypropylene
9    transvaginal mesh kits developed other than the
10   Prolift®, correct?
11   A. That is correct.
12   Q. Developed by different manufacturers?
13   A. Correct.
14   Q. What are some of the other manufacturers
15   who have developed polypropylene transvaginal mesh kits
16   for prolapse repair?
17   A. Coloplast, AMS, Bard, Boston Scientific,
18   and there may be some more in there. Those are the
19   ones I see the most.
20   Q. And do you believe, Doctor, you have done
21   a comprehensive review of the scientific literature on
22   the randomized controlled trials involving transvaginal
23   mesh for all these products?
24   A. I reviewed the PubMed, which is the

## Daniel S. Elliott, M.D.

<table>
<tr><td valign="top" width="50%">

Page 238

1 world's largest search engine, 24 million articles I
2 recall, and I have reviewed -- you know, it's as
3 comprehensive as I'm going to be able to get.
4     Q.  Can you confirm, Doctor, that the Prolift®
5 has been studied in more randomized controlled clinical
6 trials than any other transvaginal mesh used in
7 prolapse repair?
8     A.  I don't doubt that, no.
9     Q.  Doctor, you made some comments earlier
10 about the amount of clinical trials that had been done
11 on the Prolift® at various points in time; do you
12 recall that in your testimony?
13     A.  I don't recall that.
14     Q.  You don't?
15     A.  I'm sure I've been asked that question,
16 yes.
17     Q.  One of the procedures that you described
18 that you are aware of at your institution is the
19 robotic abdominal sacrocolpopexy?
20     A.  Correct.
21     Q.  Now, at the time that you participated in
22 that surgery, when you first started doing that
23 surgery, you were not aware of any randomized
24 controlled trial anywhere in the world, correct?

</td><td valign="top" width="50%">

Page 240

1 sacrocolpopexy procedure that you participate in, do
2 you use polypropylene mesh?
3     A.  Yes.
4     Q.  And you continue to use mesh in that
5 procedure, correct?
6     A.  For that specific procedure, yes.
7     Q.  And you have for the last ten years?
8     A.  Longer than that.  Probably 2003 with the
9 robotically and then prior to that was transabdominal.
10     Q.  The mesh that you use in your practice is
11 called InterPro?
12     A.  InterPro by AMS.
13     Q.  The InterPro mesh that you use in your
14 practice you believe is a large pore mesh, correct?
15     A.  No.
16     Q.  Do you believe the InterPro mesh that you
17 use in your clinical practice is a lightweight mesh?
18     A.  No.  It would probably be -- I would have
19 to look up the specific numbers, it would probably be a
20 moderate weight.  I don't recall the exact numbers.
21 They're quite similar to Gynemesh®.
22     MR. ISMAIL:  I'm going to mark this as
23 Exhibit 1 and we'll remark it for trial
24 purposes later.

</td></tr>
<tr><td valign="top" width="50%">

Page 239

1     A.  I and my colleague were the first in the
2 world to do it, so there's no way of having a
3 randomized controlled trial.
4     Q.  And even today there is not a randomized
5 controlled clinical trial on the use of robotic
6 abdominal sacrocolpopexy for the treatment of prolapse,
7 correct?
8     A.  No, there's been laparoscopic versus
9 robotic, I have reviewed those papers, those papers are
10 out there.
11     Q.  When did those come out?
12     A.  Oh, those came out years ago.
13     Q.  When?
14     A.  I reviewed -- I have no idea.  I reviewed
15 them, they asked me to review it because of my
16 expertise so there are going to be those trials out
17 there.  I don't -- right now as I sit here can't think
18 of one robotic versus open.
19     Q.  Let me -- by the way, with respect to the
20 robotic procedure you just described, you don't operate
21 the robot in that procedure?
22     A.  No, my colleague does.
23     Q.  See how we're doing on time, Doctor.
24     Now, with respect to this robotic abdominal

</td><td valign="top" width="50%">

Page 241

1     (Document marked for identification as
2 Deposition Exhibit No. 1.)
3 BY MR. ISMAIL:
4     Q.  First of all, Doctor, you indicated in
5 your last answer that the mesh you use in your clinical
6 practice is a polypropylene mesh that's very similar to
7 the mesh that's used in the Prolift®, correct?
8     A.  I didn't say very similar.  I said it's
9 similar to.
10     Q.  Okay.  I will rephrase.
11     You agree, Doctor, that the mesh you use in
12 your clinical practice is a mesh that's very --
13 withdrawn.
14     The mesh you use in your clinical practice is
15 similar to the polypropylene mesh used in the Prolift®,
16 correct?
17     A.  Correct.
18     Q.  I've handed you what we've marked for
19 identification as Exhibit 1.
20     Is this an article that you are listed as an
21 author on?
22     A.  That's correct.
23     Q.  And it is on the use of robotic
24 sacrocolpopexy in prolapse repair?

</td></tr>
</table>

61 (Pages 238 to 241)

Daniel S. Elliott, M.D.

Page 242

1    A.  That is correct.
2    Q.  And in this article, Doctor, do you tell
3  the medical community what materials you use in the
4  procedure?
5    A.  Yes, we do.
6    Q.  And do you describe the polypropylene mesh
7  that you use in your procedure?
8    A.  Yes.
9    Q.  If you turn to Page 2 of the article, in
10  the left column.
11    A.  Yes.
12    Q.  And in there you inform the medical
13  community on the technique for this robotic procedure
14  that you are describing in the article, right?
15    A.  That is correct, yes.
16    Q.  And if you work your way down in that left
17  column, above the anatomical cartoon there, you make
18  specific reference to the polypropylene mesh that you
19  use in your procedure, right?
20    A.  That is correct.
21    Q.  Do you say, quote, Next, a Y-shaped large
22  pore, lightweight polypropylene graft (InterPro;
23  American Medical Systems) is sutured into the vagina?
24    A.  That's what we state, yes.

Page 243

1    Q.  So you, in your article that you published
2  to the medical community, describe InterPro as a large
3  pore lightweight polypropylene mesh, correct?
4    A.  That is correct.
5    Q.  The date of this article, sir, was -- is
6  what?
7    A.  2015.
8    Q.  In fact, it was submitted and received by
9  the journal on May 26, 2015, correct?
10    A.  That's correct.
11    Q.  That's some -- that's several years after
12  you had begun work already on behalf of the plaintiff
13  lawyers in this case?
14    A.  That is correct.
15    Q.  It's after you formed your opinions about
16  Gynemesh®, correct?
17    A.  That's correct.
18    Q.  So when you published for the medical
19  community -- withdrawn.
20      You published in the medical community that
21  InterPro, the mesh you use, is large pore, right?
22    A.  That's correct.
23    Q.  You talked about pore size with Mr. Slater
24  several times earlier today, correct?

Page 244

1    A.  Correct.
2    Q.  You agree that the porosity of the mesh
3  used in Prolift® is similar to InterPro, correct?
4    A.  Well, Prolift® is only a transvaginal
5  procedure.  So transvaginal versus transabdominal,
6  we're talking different procedures there.
7      MR. ISMAIL:  Move to strike as
8      nonresponsive.
9  BY MR. ISMAIL:
10    Q.  Do you remember my question, Doctor?
11    A.  No, I do not.
12    Q.  I'll restate it.
13      The polypropylene mesh you use, InterPro, has a
14  porosity similar to Gynemesh®?
15    A.  That is correct.
16    Q.  The porosity of Gynemesh® is similar to
17  the mesh used in the Prolift® kit, correct?
18    A.  Should be the same.
19    Q.  So the answer to that is yes?
20    A.  Yes.
21    Q.  And you described your -- mesh you use
22  as large pore, correct?
23    A.  That is correct.
24    Q.  You also described the mesh you use as

Page 245

1  lightweight, correct?
2    A.  Correct.
3    Q.  The mesh -- the polypropylene mesh you use
4  is -- has a similar weight to the Gynemesh®, correct?
5    A.  That is correct.
6    Q.  And the Gynemesh® would have a similar
7  weight to that used -- the mesh used in the Prolift®
8  kit, correct?
9    A.  That's correct.
10    Q.  By the way, Doctor, do you know whether
11  the mesh you use in your practice has bi-directional
12  elasticity?
13    A.  It doesn't.
14    Q.  It does not?
15    A.  No.
16    Q.  So the missing characteristic of
17  bi-directional elasticity hasn't stopped you from using
18  InterPro mesh in your practice, right?
19      MR. SLATER:  Objection, lack of
20      foundation, mischaracterization of direct.
21      THE WITNESS:  Because I'm using it through
22      an abdominal route, just like Gynemesh® is
23      still available for abdominal route, so you
24      can't compare the two surgeries.

62 (Pages 242 to 245)

Daniel S. Elliott, M.D.

Page 246

1  BY MR. ISMAIL:
2      Q.  I haven't compared anything, Doctor.  My
3  question was different.  Do you remember it or do you
4  want me to restate it?
5      A.  Please restate it.
6      Q.  The missing characteristic of
7  bi-directional elasticity has not stopped you from
8  using InterPro mesh in your procedures, correct?
9          MR. SLATER:  Objection,
10      mischaracterization and lack of foundation.
11  BY MR. ISMAIL:
12      Q.  You can answer the question.
13      A.  Yeah, I can't give you -- I think it would
14  be unfair to give you a yes or no.  I have to say I'm
15  doing it through a different route.
16      If I were doing it through the vagina,
17  absolutely.  Through the abdomen I have not seen that
18  issue.
19          MR. ISMAIL:  Move to strike as
20      nonresponsive.
21  BY MR. ISMAIL:
22      Q.  Again, it's not -- I have not compared it
23  to transvaginal surgery or not.  It's a very simple
24  question, Doctor.

Page 247

1      A.  And I feel I need to explain it to be
2  accurate.
3          MR. ISMAIL:  Move to strike as
4      nonresponsive.
5  BY MR. ISMAIL:
6      Q.  Do you have my question in mind?
7      A.  No, I still do.
8      Q.  Well, let me restate it, just for the
9  benefit of the record.
10      The mesh that you use in your clinical practice
11  you believe does not have bi-directional elasticity,
12  correct?
13      A.  Correct.
14      Q.  And that has not stopped you from using
15  that mesh in your abdominal sacrocolpopexy procedure,
16  correct?
17      A.  As you are specifically stating there, you
18  are correct, through the abdomen, I agree with you.
19          MR. ISMAIL:  Okay.  When did we start,
20      12:40.  Everyone doing okay?
21          THE WITNESS:  Can I get something to
22      drink?
23          MR. SLATER:  Take five minutes.
24          MR. ISMAIL:  Sure.

Page 248

1          THE WITNESS:  I can get something.  I'm
2      out of fluid here.
3          THE VIDEOGRAPHER:  The time is 1:47 and we
4      are off the record.
5          (Brief recess.)
6          THE VIDEOGRAPHER:  The time is 1:53.  And
7      we are back on the record.
8  BY MR. ISMAIL:
9      Q.  Doctor, I want to turn now to something in
10  your prior testimony regarding the instructions for use
11  that you offered.
12      Now, prior to being retained by the plaintiff
13  lawyers, you had never before looked at a
14  manufacturer's internal standards for what to include
15  in the instructions for use, correct?
16      A.  That is correct.
17      Q.  And if we were to consider your articles
18  that you've published in the literature, you've never
19  before published on the standards that a manufacturer
20  uses for instruction for use, correct?
21      A.  Correct.
22      Q.  With respect to the Prolift® instructions
23  for use, before you got involved in this case you had
24  never even read the Prolift® instruction for use,

Page 249

1  correct?
2      A.  Well, again, I know I did not read the
3  Gynemesh®, I know that, but I visited the booth at
4  Ethicon and, as I recall, looked at the IFU, looking at
5  it online.  I can't recall specific dates.
6      Q.  One moment, Doctor.
7          MR. SLATER:  If you are going to pull a
8      transcript or something just let me know so I
9      can look for it.  Is it the Bellew transcript
10      or something else?
11          MR. ISMAIL:  This will be the witness'
12      deposition.  I have a copy for you if you'd
13      like.
14          MR. SPECTER:  That would be great.  Thank
15      you.
16          MR. SLATER:  Yeah, sure.  Splendid.
17          MR. ISMAIL:  I'll give one to you too in a
18      minute, Doctor.
19      Doctor -- ready to proceed everyone?  I'll
20  give you page and line when we get there.
21  Adam.
22          MR. SLATER:  What's that?
23          MR. ISMAIL:  Ready to proceed?
24          MR. SLATER:  Oh, yeah.  I figured you

63 (Pages 246 to 249)

## Daniel S. Elliott, M.D.

| Page 250 | Page 252 |

**Page 250**

1  would tell us the page and line before you --
2      MR. ISMAIL: I will.
3  BY MR. ISMAIL:
4      Q. Doctor, you referenced earlier you gave a
5  deposition in this case, correct?
6      A. Correct.
7      Q. And when you gave that deposition you took
8  an oath to tell the truth, correct?
9      A. That's correct.
10      Q. Same type of oath that you took today?
11      A. Correct.
12      Q. And you understood when you took that oath
13  that it was as if you were in court?
14      A. Correct.
15      Q. There was a court reporter there who was
16  taking down the questions that were asked and the
17  answers that you gave, correct?
18      A. Correct.
19      Q. I ask, Doctor, if you turn to Page 391 of
20  your deposition.
21      MR. SLATER: Just one thing for the
22      record, I just -- I'm looking what you asked,
23      just -- well, actually, I'll withdraw it. You
24      go ahead. What page did you say?

**Page 251**

1      MR. ISMAIL: 391, Line 1.
2  BY MR. ISMAIL:
3      Q. Doctor, were you asked this question:
4      "Before becoming engaged in this litigation,
5  had you ever reviewed the Prolift® instructions for
6  use?"
7      Is that the question you were asked?
8      A. Before I -- you're on Line 9?
9      Q. Line 1.
10      A. Oh, Line 1. I'm sorry.
11      Q. Let me begin again.
12      A. I'm sorry.
13      Q. Doctor, were you asked this question and
14  did you give this answer:
15      "Question: Before becoming engaged in this
16  litigation, had you ever reviewed the Prolift®
17  instructions for use?
18      Answer: No, I had not."
19      Was that your sworn testimony, sir?
20      A. That's what I gave then, yes.
21      Q. Before being involved in this litigation
22  had you ever read the instruction for use for
23  Gynemesh®?
24      A. Gynemesh®, I don't recall ever reading

**Page 252**

1  that, no.
2      Q. So when you discussed earlier that you had
3  used instructions for use in your interaction with
4  residents, do you recall giving testimony to that
5  effect?
6      A. Yes.
7      Q. That was a more general statement
8  regarding how using instructions for use in other
9  contexts besides the Prolift®, correct?
10      A. Correct.
11      Q. So you never taught or interacted with
12  residents before this litigation on the Prolift®
13  instruction for use, correct?
14      A. I think that would be fair. We looked it
15  up online, what was available, but it was not a formal
16  teaching. It was more of an idea of what happens with
17  the procedure.
18      Q. Now, you're not suggesting, Doctor, that
19  the instruction for use is the only way surgeons obtain
20  information about the surgeries they perform, are you?
21      A. It is not the only way. It is one of the
22  ways.
23      Q. Surgeons obtain information pertinent to
24  surgery from numerous sources, right?

**Page 253**

1      A. Possibly. It depends upon the surgeon.
2      Q. So surgeons obtain information relevant to
3  surgery from their own education, right?
4      A. Well, I can't speak for all surgeons out
5  there. Everybody is different. There are different
6  levels of surgeons and different levels of motivation
7  and different levels of quality delivered, so I can't
8  speak for everybody.
9      For me, at an institution I am in and the
10  ability to travel all over the world for meetings, the
11  IFU takes less of a meaning. If I'm out in the middle
12  of USA somewhere, they become more important. So,
13  again, I can't speak for everybody.
14      Q. Let me rephrase.
15      You are aware, Doctor, that surgeons can rely
16  on their education and training to understand the risks
17  and benefits of surgeries that they perform?
18      A. They can, yes.
19      Q. Surgeons can rely on the medical
20  literature to understand the risks and benefits of the
21  surgeries they perform?
22      A. That is another avenue for it, yes.
23      Q. Surgeons can look to medical conferences
24  as another source of information about the risks and

Daniel S. Elliott, M.D.

1   benefits of surgeries they perform, correct?
2         A.   Possibly, if they're able to go to the
3   meetings, yes.
4         Q.   Surgeons can rely on their own clinical
5   experience when understanding the risk and benefits of
6   the surgeries they perform, correct?
7         A.   Possibly, if they performed the procedure
8   before.
9         Q.   Surgeons -- have you ever heard --
10  withdrawn.
11        Have you ever heard of a surgical guide?
12        A.   Yes.
13        Q.   Surgical guides have been prepared in
14  addition to instructions for use, correct?
15        A.   That's a generic statement for everything,
16  but there are surgical guides available for some
17  procedures.
18        Q.   And surgeons can look to a surgical guide
19  or a monograph to learn information about the risks and
20  benefits of a surgery they can perform?
21        A.   If that's available, they can do that,
22  yes.
23        Q.   When you were on direct examination with
24  Mr. Slater you did not discuss the surgical guides or

1   monographs with Prolift®, correct?
2         MR. SLATER:  Objection.
3         THE WITNESS:  I wasn't asked.
4   BY MR. ISMAIL:
5         Q.   So the answer to my question is correct?
6         A.   Yes, you are correct.
7         Q.   Mr. Slater asked you some questions about
8   design standards; do you recall that?
9         A.   Correct.
10        MR. SLATER:  Objection,
11  mischaracterization.
12  BY MR. ISMAIL:
13        Q.   Prior to being retained by the plaintiff
14  lawyers in this case had you ever been aware of the
15  internal design standards that a manufacturer uses to
16  develop a new surgical device?
17        A.   Specifically that?  I mean, I have patents
18  of my own on a product, was involved in the early
19  stages of designing of a product as a resident, but as
20  you narrow it down there are specific industry
21  standards, my level of knowledge would be not as much
22  as it is now.
23        Q.   When you say "not as much as it is now,"
24  you mean through your work as a paid witness on behalf

1   of the plaintiffs, right?
2         A.   Yes and no to that.  It's through my work,
3   yes, definitely through the litigation, but also as my
4   internal curiosities, what are the standards industry
5   is required to do, because I'm a surgeon implanting
6   devices and I kind of want to know what really goes on
7   behind the scenes.
8         Q.   Okay.  So if we focus on the period of
9   time as of when you were first retained by the
10  plaintiff lawyers, you would agree that you did not
11  have experience with the internal design standards a
12  manufacturer uses to develop a new surgical device,
13  correct?
14        A.   Well, no, if you look at my CV, I was
15  involved in transurethral enzymatic ablation of the
16  prostate, which I worked with a researcher and the
17  founder of the company and working with the FDA as far
18  as getting it approved, that's when I was a resident.
19        I worked with the design of a new artificially
20  designed urinary sphincter for males by Timm, T-i-m-m
21  is the name of him, so we were working on the standards
22  with the companies, and then my own patent.  And so it
23  depends how extensive a level of knowledge.
24        I'm not an FDA -- I'm not employed by the FDA.

1   I didn't design any FDA regulations but I have working
2   knowledge of what would be required.
3         Q.   Let me rephrase my question.  And I'm
4   talking about internal --
5         MR. SLATER:  Can I -- I'm sorry, I just
6   got a text and I have to call somebody back
7   really quick.  I don't want to -- if it's a bad
8   spot, I just -- it has nothing to do with work.
9         MR. ISMAIL:  Off the record.
10        MR. SLATER:  Thanks.
11        MR. ISMAIL:  Sure.
12        THE VIDEOGRAPHER:  The time is 2:03 and we
13  are off the record.
14        (Brief recess.)
15        THE VIDEOGRAPHER:  The time is 2:07 and we
16  are back on the record.
17  BY MR. ISMAIL:
18        Q.   Doctor, let me rephrase my prior question
19  to make it more specific.
20        Prior to being retained by the plaintiff
21  lawyers in this litigation you had no experience on the
22  internal design standards a manufacturer uses for the
23  development of a new surgical device for treatment of
24  pelvic organ prolapse, correct?

65 (Pages 254 to 257)

## Daniel S. Elliott, M.D.

Page 258

1    A. I don't know. I would have to say that is
2  only partially correct. As I mentioned previously, as
3  far as my experience designing, as far as the
4  transenzymatic ablation of the prostate, which was
5  going through the FDA, we had FDA people come in,
6  working in with them, the -- an artificially made
7  sphincter for male incontinence with Dr. Timm, working
8  and designing to the point of implanting in humans.
9  And then with my patent, working with it. So those are
10  all looking at safety, complications, ramifications.
11    MR. ISMAIL: Move to strike as
12  nonresponsive.
13  BY MR. ISMAIL:
14    Q. Doctor, I'm not intending to ask anything
15  about the FDA in my question, okay?
16    A. Okay.
17    Q. And you agree you are not an FDA expert,
18  right?
19    A. I know what the standards they are going
20  after, but I have not been employed by the FDA.
21    Q. So my question is very specific. I would
22  ask that you only answer that question.
23    Prior to being retained by the plaintiffs in
24  this litigation, you did not have experience on the

Page 259

1  internal design standards a company used to develop a
2  new surgical device for pelvic organ prolapse, true?
3    A. Correct, I have never been an employee of
4  any industry designing those issues.
5    Q. You earlier referenced, Doctor, the
6  results of the TVM group in France; do you recall that,
7  in the early development work on the Prolift®?
8    A. Yeah, we discussed two or three earlier
9  studies.
10    Q. And you used the clinical study report in
11  reference to the results of their success rate in the
12  surgical use of the Prolift®, correct?
13    A. That is correct. As long as we're
14  talking, it was Plaintiff Exhibit P0049, I assume we're
15  talking about that one.
16    Q. Yes. And there were two arms to the TVM
17  study, correct, one in Europe and one in the United
18  States?
19    A. Oh, yes, yes. I'm sorry, I misunderstood,
20  yes.
21    Q. And the data that you went over with
22  Mr. Slater only related to the European TVM data?
23    A. That is correct, yes, not the American.
24    Q. Doctor, do you agree that pelvic organ

Page 260

1  prolapse surgeries -- withdrawn.
2    I think you told us earlier that all surgeries
3  have risks associated with them, correct?
4    A. Well, all surgeries have their unique
5  complications of it, severity, frequency, but surgeries
6  can have some complications. Again, we have to define
7  what surgery we're talking about.
8    Q. All right. Let's break it down.
9    All surgeries have sort of general risks
10  related to surgery; anesthesia, potential infection,
11  any time you are cutting tissue there is a potential
12  risk, right?
13    A. Again, if you are talking about -- I'm not
14  trying to be difficult, but I don't want to make a
15  general statement. If we're talking about a skin
16  biopsy in a dermatologist's office is different than
17  cardiac surgery. So, again, that's why -- as a surgeon
18  I have to define what I'm talking about, what
19  procedure.
20    Q. Then we'll be specific.
21    With any pelvic organ prolapse surgery, even in
22  the hands of the most skilled surgeon, there can be
23  complications, correct?
24    A. Each surgery has its own unique

Page 261

1  complications, frequency and ability to treat those
2  complications.
3    Q. And even yourself, Doctor, you would never
4  guarantee a patient that a surgery you performed will
5  be free of complications, correct?
6    A. You are correct.
7    Q. With any surgery in -- for pelvic
8  reconstruction you have potential problems with
9  bleeding, right?
10    A. It can happen. Certain procedures have
11  higher risk, others have lower risk, but it can happen.
12    Q. Any surgery for pelvic reconstruction has
13  risks associated with the use of anesthesia, correct?
14    A. Yeah, unless you are using a local
15  anesthetic for biopsy, yeah, but, again, I don't like
16  making a general statement. A procedure takes three
17  hours versus one that takes ten minutes, there's
18  different risks so everything is -- again, I don't want
19  to be difficult by any means, but I'm a surgeon so we
20  look at each specific procedure.
21    Q. The potential surgeries that could be used
22  for repair of pelvic organ prolapse all carry a
23  potential risk of infection, correct?
24    A. It depends. If you are using a foreign

66 (Pages 258 to 261)

Daniel S. Elliott, M.D.

Page 262

1    product, foreign body, the risk goes up.  If you are
2    not, I have -- I have, in my experience, never had a
3    transvaginal procedure using native repair get
4    infected.
5        Q.  Do you have the -- I guess this is a
6    different.  Sorry, forgot to give you the other day but
7    feel free to hold on to that.  Not to add to your
8    paper, Doctor, but here you go.
9        Doctor, I've handed you a transcript of
10   testimony you gave on March 4, 2015; is that correct?
11       A.  March -- you gave me March 3rd and
12   March 4.
13       Q.  I would like you to focus on March 4,
14   please.
15       A.  Okay.
16       Q.  And you swore to tell the truth in that
17   deposition, correct?
18       A.  That is correct.
19       Q.  I'm going to ask you to turn to Page 513
20   of your testimony.
21       A.  Okay, I'm there.
22       Q.  Line 21.  Was this your question -- it was
23   a question asked of you and was this your answer under
24   oath:

Page 263

1        "And with any surgery, no matter what it is,
2    you've got problems of -- potential problems with
3    bleeding or infection or anesthesia problems, and so
4    forth; correct?
5        Answer:  In a general sense, yes."
6        Were you asked that question and did you give
7    that answer under oath?
8        A.  Yeah, and I agree with that answer still.
9        Q.  And once you go on to the specific surgery
10   at issue, there are potential complications with each
11   specific surgery, correct?
12       A.  Each surgery has its own unique
13   complications.
14       Q.  And that's true with surgeries in the
15   pelvic floor, correct.
16       A.  That is correct.
17       Q.  There is a potential of serious injury
18   with sacrocolpopexy, correct?
19       A.  Well, it depends on when you are talking
20   about injury to what?  Again, that's not to be
21   difficult but injury to the heart?  No.  Injury to the
22   organs --
23       Q.  To the patient?
24       A.  To the patient in general, there is the

Page 264

1    potential for -- yeah, there is potential risk there.
2        Q.  There is a potential risk of serious
3    injury to the patient with a colporrhaphy procedure?
4        A.  Not in my experience there hasn't been,
5    but, I mean, again, I need to know what kind of
6    complication you are talking about.  I think we need to
7    be clear.
8        Q.  Doctor, I ask that you turn to transcript
9    that I gave you earlier of your deposition taken on
10   November 16th.
11       MR. SLATER:  Objection.
12   BY MR. ISMAIL:
13       Q.  First transcript I gave you, Doctor.
14       A.  I have it, yes.
15       Q.  Page 244.
16       A.  344?
17       Q.  244.
18       A.  I don't have a 2 -- mine starts at 200
19   something.
20       Q.  I'll give you that.
21       MR. SLATER:  Stingy with the transcripts.
22       MR. ISMAIL:  There you go.
23       MR. SLATER:  That's what I heard about
24   you.

Page 265

1        THE WITNESS:  244.
2    BY MR. ISMAIL:
3        Q.  Yes, sir.
4        A.  244, I'm there.
5        Q.  All right, Doctor.  This, again, was sworn
6    testimony you gave and the date of this was
7    November 16, 2012; is that correct?
8        A.  Correct.
9        Q.  I'm sorry, 243, Doctor.
10       A.  Okay.  I'm there.
11       Q.  Line 11.
12       "Question:  Would you agree that there's a
13   potential risk of serious --
14       Sorry, Line 7.
15       "Would you agree that there is a potential risk
16   of serious injury with the sacrocolpopexy?
17       Answer:  Yes."
18       Is that the question you were asked and answer
19   you had given?
20       A.  Yes, and I agree with that.
21       Q.  Were you also asked is there "... a
22   potential risk of serious injury with the sacrospinous
23   ligament fixation?"
24       Your answer, "In a magnitude and frequency and

67 (Pages 262 to 265)

Daniel S. Elliott, M.D.

Page 266

1  intensity and delayed onset difference but, yes,
2  there's a risk."
3      And then you were asked at Line 19:
4      "Would you agree that there's a potential risk
5  of serious injury with a sacrospinous ligament
6  fixation?
7      Answer: There is -- there is a risk there for
8  serious injury, yes."
9      Were you asked that question and were you
10  giving that answer under oath?
11      A.  Yes, and I agree with that.
12      Q.  And then on Page 244, what I really
13  intended to direct you to in the first place, Line 2,
14  would you agree that there's a serious risk with
15  colporrhaphy?
16      What was your answer under oath?
17      A.  "Yes."
18      Q.  There are risks with hysterectomies,
19  correct, Doctor?
20      A.  Yes.
21      Q.  All prolapse surgeries have -- carry the
22  risk to other organs, correct?
23      A.  Again, yes.  We have to define what organ
24  but --

Page 267

1      Q.  Right, I'm not talking about the heart.
2  I'm talking about the organs near the surgery that
3  you're performing.
4      A.  Correct, that -- that is an inherent risk
5  with operating in that region, yes.
6      Q.  There is an inherent risk of operating in
7  that region of injuries to the nerves of the patient,
8  correct?
9      A.  Well, it depends what nerves you are
10  talking about and it depends what prolapse surgery,
11  that's why sacrospinous fixation I was very specific
12  on, okay, or semi-specific.
13      The risks of sacrospinous fixation are comp --
14  significantly different than abdominal sacrocolpopexy
15  or more significant than anterior colporrhaphy.
16      So, again, as far as nerve injury, it depends
17  what nerves that we're talking about.
18      Q.  Page 89 of the November 15, 2012
19  testimony.
20      A.  Okay.  I'm there.
21      Q.  Line 21, were you asked this question:
22  "All prolapse surgeries have a risk to nerves?"
23      What was your sworn answer, Doctor?
24      A.  You know, yeah, I see that, I say --

Page 268

1      Q.  My question is what was your sworn answer,
2  Doctor?
3      A.  "Yes."
4      Q.  Thank you.
5      All prolapse surgeries have a risk of pain,
6  correct?
7      A.  Again, I'd have to define the severity,
8  the frequency, et cetera, but pain, to a certain
9  degree, is a risk of all prolapse surgeries.
10      Q.  That's inherent to the surgery, right?
11      A.  That's inherent to that specific surgery,
12  correct.
13      Q.  All prolapse surgeries have a potential
14  risk of pain with sexual intercourse, correct?
15      A.  Yes.  Again, as I'll state over and over,
16  it depends upon the severity, the frequency, the
17  progressive nature, but, yes, dyspareunia, pain with
18  intercourse, can't happen with all of them, but they
19  might not all have the severity of the pain.
20      Q.  Page 90 of your testimony, Doctor, Line 2:
21  "Question:  All prolapse surgeries have a
22  potential risk of dyspareunia; correct?"
23      What was your answer, sir?  Line 4.
24      A.  Yeah, yes, I state it that there, as I've

Page 269

1  clarified today.
2      Q.  All prolapse surgeries have a potential
3  risk of pelvic pain, correct?
4      A.  Again, dependent upon the procedure and
5  the severity, they can be different, but they can all
6  have pain, but, again, it depends upon that specific
7  procedure.
8      Q.  Line 5 of Page 90 of your testimony:
9  "Question:  All prolapse surgeries have a
10  potential risk of pelvic pain; correct?"
11      What was your sworn answer under oath, sir?
12      A.  "Yes," with the clarifier I just did.
13      Q.  In fact, persistent pain is a complication
14  of prolapse surgeries other than the Prolift®, correct?
15      A.  Again, that depends upon the severity and
16  frequency.  There's clarifiers.
17      Q.  Turn to page -- of the November 16
18  testimony, Doctor.  Line 21.
19      A.  What page?
20      Q.  I'm sorry.  454.
21      A.  454, Line 21, okay, I'm there.
22      Q.  "Question:  Persistent pain is a potential
23  complication with other prolapse surgeries besides
24  Prolift®, correct?"

68 (Pages 266 to 269)

## Daniel S. Elliott, M.D.

Page 270

1   What was your sworn testimony under oath, sir?
2   A.  Yeah, as I said --
3   Q.  What was your testimony, sir?
4   A.  I agree with that statement, yes, with the
5   clarifiers I added today.
6   Q.  You didn't add those clarifiers at the
7   time when you were giving your sworn testimony, true?
8   A.  I did not, no, you are correct.
9   Q.  As a surgeon any time you perform a
10  prolapse surgery, re-operation is a potential risk
11  going into the surgery, correct?
12  A.  That is correct, yes.
13  Q.  And just like you've never guaranteed a
14  patient that a surgery will be complication-free,
15  you've never guaranteed a patient that a surgery
16  necessarily will be effective, correct?
17  A.  Effective as far as treating the symptoms
18  and the anatomical occurrence, I agree with you, yes.
19  Q.  There can be re-operation because of a
20  failure of the prolapse surgery in doing its intended
21  job of fixing the prolapsing problem, correct?
22  A.  That is a risk, yes.
23  Q.  And that's inherent to all prolapse
24  surgeries, correct?

Page 271

1   A.  I don't know of any procedure that is 100%
2   perfect.
3   Q.  There could also be a need for
4   re-operation to -- because a complication has occurred,
5   that necessitates some surgical intervention, correct?
6   A.  Well, again, re-operation can occur, but,
7   again, we have to look at what type of complication it
8   is, how severe it is and can we fix it, but, yes, in a
9   general sense, I agree with you.
10  Q.  And that's inherent to all prolapse repair
11  surgeries, correct?
12  A.  Yes, as I mentioned with all those
13  different qualifiers on there.
14  Q.  You testified this morning about the term
15  mesh exposure; do you recall?
16  A.  Yes.
17  Q.  And you indicated that sometimes the
18  terminology in this area can get -- get confusing
19  because folks use different terms to describe different
20  things?
21  A.  That is correct.
22  Q.  And so whenever you're reviewing any
23  document that talks about complications for mesh
24  surgery, you want to make sure you understand whether

Page 272

1   the author -- what the author means by a mesh exposure
2   versus mesh erosion, et cetera?
3   A.  That is correct, including the term
4   palpable.
5   Q.  Mesh exposure is a well known risk of any
6   surgery involving mesh, correct?
7   A.  That is true.
8   Q.  Whether the mesh is placed transvaginally
9   or transabdominally, correct?
10  A.  Correct.  Again, there is going to be
11  differences in frequency and severity, but, yes.
12  Q.  And so when we're talking about mesh
13  exposure we're talking about when the implanted mesh
14  becomes visible or palpable?
15  A.  In the vagina, correct, not in the bladder
16  or another organ, that's different.
17  Q.  Correct.
18  And that's called a mesh erosion, right?
19  A.  It should be called that but there will be
20  different terms, that's why it gets confusing for
21  everybody.
22  Q.  So that goes back to how we started this
23  part of our discussion, the terms exposure and erosion
24  sometimes are used interchangeably, but, in your view,

Page 273

1   there's a clear distinction between them?
2   A.  Correct.  You would have to look, when
3   going through medical records, of what the doctor is
4   actually really describing, what they actually saw.
5   Q.  The amount of mesh exposed can be small,
6   correct?
7   A.  It can be, yes.
8   Q.  Mesh exposure actually can be
9   asymptomatic, right?
10  A.  It can be, yes.
11  Q.  When we say "asymptomatic," that means the
12  patient is not experiencing any symptoms from the mesh
13  exposure, correct?
14  A.  That is correct, yes.
15  Q.  When dealing with a mesh exposure the
16  physician can try conservative measures to treat it,
17  right?
18  A.  That is one of the options, yes.
19  Q.  And you certainly advocate conservative
20  methods to treat a mesh exposure, correct?
21  A.  It depends on the severity of the mesh
22  exposure.  If it's large, highly symptomatic, then, no.
23  If it's small, asymptomatic, then, yes, as initial
24  treatment.

69  (Pages 270 to 273)

Daniel S. Elliott, M.D.

Page 274

1    Q. Okay. I appreciate the clarification but
2  just so it's clear, a doctor should consider, in the
3  first instance, whether conservative treatment of a
4  mesh exposure is warranted or whether something more
5  invasive would be appropriate; is that fair to say?
6    A. That is correct, yes.
7    Q. Now, with regard to the Prolift®, you
8  agree that approximately 50% of mesh exposures can be
9  treated conservatively?
10    A. That is, I'd say, old data. If you look
11  at Abbott, et.al., no, they disagree with that, but of
12  those 50% treated conservatively, 50% of those went on
13  to surgery. So the old data, yes, but not the new
14  data.
15    MR. ISMAIL: Move to strike as
16    nonresponsive.
17  BY MR. ISMAIL:
18    Q. If you have your November 15 --
19    A. 2012, yeah, because that's old.
20    Q. All right. Well, let me make sure we're
21  clear.
22    A. Sure.
23    Q. At the time you gave your sworn testimony
24  in this case you agreed that approximately 50% of mesh

Page 275

1  exposures can be treated conservatively, true?
2    MR. SPECTER: Counsel -- pardon me,
3    counsel. I object. When you say "in this
4    case" are you talking about the Hammons case or
5    the transvaginal mesh litigation generally?
6    MR. ISMAIL: I will rephrase.
7    MR. SPECTER: Thank you.
8  BY MR. ISMAIL:
9    Q. At the time of your November 2012
10  deposition did you agree, Doctor, that approximately
11  50% of mesh exposures can be treated conservatively?
12    A. Yes, I agree with you specifically in
13  2012, but that's what I'm saying, new data has come out
14  to say that I was incorrect at that time.
15    MR. ISMAIL: Move to strike as
16    nonresponsive and hearsay everything after
17    "yes."
18  BY MR. ISMAIL:
19    Q. The conservative ways of treating a mesh
20  exposure with Prolift® would include just watching and
21  observing the patient to see how she is doing?
22    A. It has to be a case by case situation.
23    Q. We've described that conservative
24  treatment of a mesh exposure is sometimes available for

Page 276

1  a physician and patient, correct?
2    A. Correct.
3    Q. And I'm trying to define for the jury what
4  that means when we say "conservative treatment," okay?
5    A. Okay.
6    Q. When we say conservative treatment of a
7  mesh exposure, what we're saying is the physician and
8  patient can do nothing but observation to see if the
9  problem improves, correct?
10    A. That is a treatment option based upon a
11  case by case situation. You have to evaluate all the
12  variables.
13    Q. And sometimes a conservative treatment
14  option would include use of a topical estrogen cream,
15  correct?
16    A. That is one of the options, yes.
17    Q. Less conservative treatment would include
18  excising the exposed mesh, correct?
19    A. That is correct.
20    Q. The -- if a -- withdrawn.
21    Sometimes an excision of exposed mesh can be
22  done in a ten or 15 minute procedure, correct?
23    A. I can't speak to that. I have not done
24  that.

Page 277

1    Q. You're aware, Doctor, that some exposed
2  meshes that have gone on to excision can be done in a
3  ten or 15 minute procedure?
4    A. I don't doubt that it can be done. The
5  question is how effective it is.
6    Q. Now, this other term that you used,
7  erosion, that was a term that you used with Mr. Slater
8  this morning, correct?
9    A. That is correct.
10    Q. And you've defined a mesh erosion to mean
11  when the mesh enters an adjacent organ, correct?
12    A. Correct, that would be the current
13  terminology.
14    Q. And that's different than a vaginal
15  exposure of mesh, correct?
16    A. That is correct, yes, but we have to be
17  careful on who is doing the defining on medical records
18  and things, but, yeah.
19    Q. Mesh erosion is a well-known risk of any
20  mesh surgery using -- withdrawn.
21    Mesh erosion is a well-known risk of any mesh
22  surgery, correct?
23    A. Yeah, but, again, it's going to depend
24  upon which -- you are talking anti-incontinence

70 (Pages 274 to 277)

Daniel S. Elliott, M.D.

| Page 278 | Page 280 |
|---|---|
| 1 procedure, prolapse, transabdominal, robotic. There is | 1 at the questioning in the other depositions. |
| 2 going to be different risks, severity of the risk of | 2     MR. ISMAIL: Wait. So you are saying that |
| 3 frequency, but, yes, I agree with you. | 3 in our examination of Dr. Weber we agreed not |
| 4     Q. You mentioned urinary dysfunction this | 4 to ask Dr. Weber -- |
| 5 morning in some of your answers to Mr. Slater; do you | 5     MR. SLATER: Total amount she was paid |
| 6 recall that? | 6 outside the case, yes. She was only asked |
| 7     A. Yes, I do. | 7 about what she was paid in this case. |
| 8     Q. Urinary dysfunction can be a complication | 8     MR. ISMAIL: And the agreement was inn |
| 9 of numerous prolapse surgeries other than with a | 9 exchange for what? |
| 10 Prolift®, correct? | 10     MR. SLATER: We would do the same with |
| 11     A. Again, as I've mentioned, severity, | 11 your experts. |
| 12 frequency, ability to treat it is going to be | 12     MR. ISMAIL: But did you ask our experts |
| 13 different, but it can occur. | 13 about how much they were paid? |
| 14     Q. In fact, a woman can have voiding | 14     MR. SLATER: I didn't. |
| 15 dysfunction just from a prolapse in her bladder, | 15     Yeah, in this case. |
| 16 correct? | 16     MR. ISMAIL: No, no, in other cases. |
| 17     A. That can occur. It's relatively rare, | 17     MR. TOMASELLI: Ms. Baldwin. |
| 18 but, yes, it can occur. | 18     MR. SLATER: Well, I don't know what to |
| 19     MR. ISMAIL: Mr. Slater, during the course | 19 tell you about that. Someone should have |
| 20 of my examination we have sought clarification | 20 objected, but, you know, I can just tell you |
| 21 for the agreement that you say exists regarding | 21 that -- |
| 22 payments to witnesses and the feedback that | 22     MR. ISMAIL: Okay. So -- |
| 23 we've gotten -- that I've gotten is that my | 23     MR. SLATER: I don't know why you are |
| 24 line of question is perfectly appropriate. | 24 shaking your head. This is the agreement. If |

| Page 279 | Page 281 |
|---|---|
| 1     MR. SLATER: Who did you speak to? You | 1 she asked a question like that, maybe someone |
| 2 want to do this on the record? | 2 in the room could have said to her, hey, did |
| 3     MR. ISMAIL: Do I want to -- say what now? | 3 you forget about the deal? And then she -- if |
| 4     MR. SLATER: Do you want to have this | 4 she forgot she would have said okay, but I'm |
| 5 conversation on the record? | 5 not going to change, okay. |
| 6     MR. ISMAIL: I'm telling you that I'm -- | 6     Dr. Elliott didn't prepare to talk about |
| 7     MR. SLATER: Who did you talk to? | 7 total amounts he was paid and that's not what |
| 8     MR. ISMAIL: We've been doing it by | 8 we're going to get into today. That was the |
| 9 e-mail. | 9 agreement in this litigation. In the |
| 10     MR. SLATER: With who? | 10 conversations I was in and with the experts I'm |
| 11     MR. ISMAIL: With the -- I think you | 11 handling, that's how it's been done. If |
| 12 called them national folks. | 12 Ms. Baldwin went beyond because she forgot, |
| 13     MR. SLATER: No, the national folks | 13 someone on your side should have been awake and |
| 14 weren't in the room when it was made so -- | 14 said, hey, we have an agreement, and I'm sure |
| 15     MR. ISMAIL: Well, who -- okay, then | 15 she would have said, oh, I forgot. |
| 16 perhaps. | 16     MR. ISMAIL: Or that's not the agreement. |
| 17     MR. SLATER: It was during the deposition | 17     MR. SLATER: I think that it clearly was. |
| 18 of Dr. Weber, the Tucker Ellis lawyers. | 18 Did you look at Dr. Weber's transcript? |
| 19     MR. ISMAIL: That what? | 19     MR. ISMAIL: I actually have had a chance |
| 20     MR. SLATER: Look, I don't know what | 20 to read Dr. Weber's transcript. |
| 21 they're telling you so -- | 21     MR. SLATER: Did you see what she was |
| 22     MR. ISMAIL: Wait a minute. | 22 asked about? |
| 23     MR. SLATER: That was what was agreed and | 23     MR. ISMAIL: I know what she was asked |
| 24 look at what they questioned Dr. Weber on, look | 24 about. Whether Dr. Weber was asked or not does |

71 (Pages 278 to 281)

## Daniel S. Elliott, M.D.

|  |  |
|---|---|
| Page 282 | Page 284 |

**Page 282**

1  not make it an agreement.

2  MR. SLATER:  Was it placed on the record,

3  on the transcript or was it just agreed with me

4  and Mr. Moriarity and he's not telling you what

5  we talked about?  I mean, you think he didn't

6  ask her about what she's been paid in total

7  because he didn't feel like it?

8  MR. ISMAIL:  So I'm just --

9  MR. SLATER:  I know for a fact we made

10  this agreement.

11  MR. ISMAIL:  Okay.

12  MR. SLATER:  So I'm not going to change my

13  position because when I make a deal with

14  somebody, I abide by it and I expect them too

15  also and not send two new lawyers in to pretend

16  they didn't know about it.

17  MR. ISMAIL:  Okay.  We have --

18  Mr. Moriarity is one of the lawyers with whom

19  we checked.

20  MR. SLATER:  He is the one I reached the

21  deal with so I will be happy to speak to him

22  directly.

23  MR. ISMAIL:  Terrific.  So my reference

24  to --

**Page 283**

1  MR. SLATER:  Want to take a break and put

2  him on the telephone?

3  MR. ISMAIL:  Jesus, can I actually finish

4  my statement?

5  MR. SLATER:  I don't know, can you?

6  MR. ISMAIL:  You keep interrupting me.

7  MR. SLATER:  Sorry.

8  MR. ISMAIL:  So our understanding of what

9  you describe as a deal regarding expert

10  payments and bias is different.  Your

11  colleagues in this litigation have not acted as

12  if there is an agreement to that issue.  You

13  have asked and your team has asked those

14  questions so we don't think your standing on

15  some blanket objection to covering this with

16  Dr. Elliott is appropriate and to the extent

17  you are correct and some time down the line the

18  Court agrees with you, then that won't get

19  played, but we're all here on a Saturday to

20  accommodate Dr. Elliott's schedule --

21  MR. SLATER:  We're not doing it.

22  MR. ISMAIL:  -- and the appropriate thing

23  to do is to let him answer the question so that

24  we don't have to reconvene testimony of

**Page 284**

1  Dr. Elliott to get what would be bias

2  information because you don't want to do it

3  now, and if you're right, then it doesn't get

4  played to the jury so you are not prejudiced.

5  MR. SLATER:  We're not doing it.  In fact,

6  if you talk to national counsel in the MDL you

7  will find that is the agreement throughout the

8  national litigation on both sides.

9  Have you spoken to them?

10  MR. ISMAIL:  Who is the national counsel

11  in the MDL?

12  MR. SLATER:  Butler Snow.

13  MR. ISMAIL:  Yeah, we've checked with them

14  too.

15  MR. SLATER:  And there's -- in the MDL

16  people are not limiting it to the amount you

17  were paid in that case?

18  Judge Goodman ruled that when a witness

19  testifies in these trials it's not to be asked

20  about.

21  MR. ISMAIL:  I understand, but the rules

22  in Pennsylvania are different.

23  MR. SPECTER:  Actually, counsel, the rules

24  in Pennsylvania are informed by Maughan versus

**Page 285**

1  Hahnemann, which I suggest you read.

2  MR. ISMAIL:  I did check the rules on

3  whether bias can be -- and whether a witness

4  has been -- has received a significant amount

5  of income testifying on behalf of a certain

6  side, that information is relevant and goes to

7  the jury.

8  So I'm offering these observations and

9  inviting you to do the sensible thing here and

10  let the witness answer and we can fuss later

11  what gets played to the jury.  If we're right,

12  it gets played; if you're right, it doesn't get

13  played.

14  MR. SLATER:  We abide by our agreements,

15  nor do we fabricate different agreements.

16  MR. ISMAIL:  Okay.

17  MR. SLATER:  I once heard someone say

18  that.

19  MR. ISMAIL:  So for the purposes of

20  preserving my record, you're going to instruct

21  Dr. Elliott to refuse to answer any questions

22  about the amount of money he has been paid,

23  other than the time relating to Ms. Hammons,

24  correct?

72 (Pages 282 to 285)

## Daniel S. Elliott, M.D.

Page 286

1    MR. SLATER: Exactly, because that's the
2 agreement we have in this litigation.
3    MR. ISMAIL: All right. And so no matter
4 how I phrase the question as to the amount of
5 money that Dr. Elliott has been paid by the
6 plaintiffs to testify against Ethicon in
7 particular or other manufacturers, you are
8 going to instruct him not to answer, correct?
9    MR. SLATER: If you ask him beyond
10 Hammons, he's not going to answer.
11    MR. ISMAIL: When did he begin working on
12 Hammons, so I know how to phrase the question?
13    MR. SLATER: I have no idea. Why don't
14 you ask him?
15    MR. ISMAIL: Well, I don't think he knows
16 either.
17    As of what date are you going to let him
18 answer the question?
19    MR. SLATER: Why don't you ask him "how
20 much money have you been paid in this case to
21 your knowledge," and he will do his best to
22 answer the question.
23    MR. SPECTER: You are talking about the
24 Hammons case, Adam?

Page 287

1    MR. SLATER: Yeah, in the Hammons case.
2    MR. ISMAIL: I suspect we're going on --
3 never mind. Okay. We can go back on the
4 record.
5    THE VIDEOGRAPHER: Never off.
6    MR. ISMAIL: We have been on the record
7 this whole time?
8    THE VIDEOGRAPHER: Yes.
9    MR. ISMAIL: Excellent. Glad all that was
10 on the record.
11 BY MR. ISMAIL:
12    Q. Okay. Now we can go back with the
13 questioning, Doctor.
14    Among the specific risks that are well known
15 with any pelvic floor surgery is the risk of
16 dyspareunia following the surgery, correct?
17    A. Again, as I've mentioned, the severity,
18 frequency and ability to treat is going to be different
19 between the procedures, but there is a known risk with
20 each procedure.
21    Q. During your fellowship you were aware that
22 there was a risk of dyspareunia with prolapse surgeries
23 you were being trained on, correct?
24    A. Again, as I mentioned, severity and

Page 288

1 frequency and ability to treat is going to be different
2 between each procedure.
3    Q. So the answer to that is yes?
4    A. Well, again, I have to -- I can't just
5 give a yes or no because it's dependent upon each
6 specific procedure. Sacrospinous ligament fixation is
7 different than uterosacral, it's different than
8 anterior colporrhaphy and posterior colporrhaphy.
9    Q. So let's focus on the colporrhaphy
10 procedure. Those are the native tissue surgeries
11 that -- some of the older surgeries that were used to
12 treat a prolapse, correct?
13    A. Correct.
14    Q. You were aware -- withdrawn.
15    You acknowledge that women with -- who have
16 anterior colporrhaphy can suffer from pain with sexual
17 intercourse after they've had the surgery, correct?
18    A. Again, with the issue of the severity,
19 frequency and ability to treat it, yes.
20    Q. During your residency you were aware that
21 there was a potential risk of painful sexual
22 intercourse with colporrhaphy surgeries, correct?
23    A. I don't know. We're going back a long
24 time there. I didn't learn much in residency on

Page 289

1 prolapse, that's why I did a fellowship.
2    Q. All right.
3    A. So I can't speak with accuracy of what I
4 knew then. Fellowship is a different story.
5    Q. Let me rephrase my question so -- to make
6 it easier for you.
7    During your medical training you were aware
8 that there was a potential risk of dyspareunia, painful
9 intercourse with colporrhaphy surgeries, true?
10    A. Again, I was aware of that issue
11 occurring, but, again, the severity, frequency and
12 ability to treat it is going to be different, but, yes.
13    Q. When it comes to posterior colporrhaphy
14 the risk of painful sexual intercourse is actually
15 higher than with the anterior repair, correct?
16    A. You can have papers saying both ways as
17 far as higher and lower, depending upon are you doing a
18 spot repair, are you doing a standard plication, are
19 you using -- so, again, if you compare anterior versus
20 posterior, posterior is going to have a potentially
21 higher risk.
22    Q. Now, there are many factors that can lead
23 to dyspareunia, correct?
24    A. Multifactorial is a correct answer, yes.

73 (Pages 286 to 289)

Daniel S. Elliott, M.D.

Page 290

1    Q.  There are many different things that have
2  to be and should be considered when evaluating a woman
3  for dyspareunia, correct?
4    A.  Multiple factors should be considered,
5  yes, that's true.
6    Q.  We talked earlier about the fact that
7  women can have dyspareunia from a prolapse itself,
8  correct?
9    A.  That can happen.  It's going to be a
10 different type of dyspareunia but dyspareunia, again,
11 it's a generic term.  We're talking if they have a
12 major vault prolapse, they are going to have a
13 different level of discomfort than a sacrospinous
14 fixation or more specific prolapse.
15   Q.  Vaginal atrophy can lead to dyspareunia,
16 correct?
17   A.  Yeah, and usually it's treatable or
18 reducible.
19   Q.  One of the -- and just so we explain to
20 the jury what we mean by vaginal atrophy, one of the
21 things that can occur as a result of menopause is that
22 the woman doesn't make as much estrogen following
23 menopause, correct?
24   A.  Correct.

Page 291

1    Q.  And the decline or decrease in estrogen
2  can lead to vaginal atrophy, correct?
3    A.  Correct.
4    Q.  And vaginal atrophy is something that is
5  associated with menopause, correct?
6    A.  Correct.
7    Q.  And vaginal atrophy is a condition that
8  women have that can progress or get worse as women age,
9  correct?
10   A.  If left untreated, yes.
11   Q.  A vaginal hysterectomy carries the risk of
12 dyspareunia, correct?
13   A.  Yeah.  Again, it depends upon the
14 condition being treated.  If it's a uterine prolapse,
15 dyspareunia goes -- or is reduced.  If it's for some
16 other reason, it could be increased.  So, again, we
17 have to look at the specifics.
18   Q.  I just want to make sure you have my
19 question in mind because I'm not sure -- it seemed like
20 you are answering a different question.
21   The question is, Doctor, a vaginal hysterectomy
22 carries the risk of dyspareunia, true?
23   A.  Yeah, I was being -- I was being more
24 specific as the cause, the etiology of the prolapse.

Page 292

1  If you just took a generic hysterectomy, can
2  dyspareunia be associated with that?  To some extent
3  the answer to that is yes.
4    Q.  Now, let me ask it this way:  You would
5  agree that there's a background rate of women who have
6  dyspareunia who have never had any prolapse surgery,
7  correct?
8    A.  That is correct, there is a given
9  percentage that probably increases with age, but,
10 again, we don't know the severity of that and ability
11 to treat it.
12   Q.  The question of whether dyspareunia is
13 associated with prolapse surgery, is something that has
14 been evaluated in randomized controlled clinical
15 trials, correct?
16   A.  Off the top of my head I can't think of
17 the study that has looked at that, but, yeah, I mean,
18 that is a very -- or it should be a very common thing
19 to look at.
20   Q.  You are aware, Doctor, for your work in
21 this litigation that randomized controlled clinical
22 trials have considered whether patients who are
23 surgically -- had prolapse surgically repaired develop
24 dyspareunia, correct?

Page 293

1    MR. SLATER:  Objection.
2    THE WITNESS:  Correct, I would want to
3  look at those specific studies because you have
4  to look at how they are framed, but there are
5  studies out there.  I think Lowman, et.al.
6  perhaps is the name.  There's going to be
7  others.
8  BY MR. ISMAIL:
9    Q.  I'm not referring to a specific article
10 now, Doctor, I'm just asking whether you are aware, as
11 part of your work in this case, that randomized
12 controlled clinical trials, some of them, have looked
13 at whether a patient who had a surgical repair of
14 prolapse developed dyspareunia?
15   MR. SLATER:  Objection to this, vague
16 types of questioning.  Subject to tie up, you
17 can answer it.
18   THE WITNESS:  You know, looking at the
19 totality of studies out there, yeah, there are
20 studies out there which dyspareunia is a
21 component what they look at.  If you are
22 looking at one specifically on dyspareunia and
23 long term, those are going to be fewer.
24 BY MR. ISMAIL:

74 (Pages 290 to 293)

Daniel S. Elliott, M.D.

Page 294

1    Q.  You're aware that there are randomized
2   controlled clinical studies that have compared the
3   development of dyspareunia following surgery with a
4   group of patients who have had a Prolift® and a group
5   of patients who had native tissue repair?
6    A.  Those studies have been done, yes.
7    Q.  And what those studies allow you to do is
8   see whether -- which group of patients developed
9   dyspareunia and at what rates, correct?
10   A.  Yes and no.  During that study period,
11  yes, but it doesn't say anything beyond that.
12   Q.  Then let me rephrase.
13   One of the things that randomized controlled
14  clinical studies can do in this context that we've been
15  discussing is see, for example, whether during the
16  study period more patients who had the native tissue
17  surgery developed dyspareunia compared to the Prolift®,
18  correct?
19   A.  Yes, as you phrased it there, during the
20  study period, I agree with you.
21   Q.  And you are familiar that those kinds of
22  studies have been done comparing Prolift® to native
23  tissue surgery, true?
24   A.  There have been several studies out there

Page 295

1   along those lines, yeah.
2    Q.  Certain randomized controlled clinical
3   studies have also assessed whether patients reported an
4   improvement in sexual function following prolapse
5   surgery, correct?
6    A.  Again, I'd want to see the specific study
7   we're referring to.
8    Q.  I'm just asking about your awareness of
9   the body of scientific information when you came to
10  testify today.
11   A.  I'm aware of many studies looking at many
12  things, but each study has to be analyzed very
13  specifically.
14   Q.  I'm just asking generally, Doctor, whether
15  you're aware whether there are randomized controlled
16  clinical studies that have examined whether women have
17  reported improvements in sexual function following
18  prolapse surgery?
19   A.  Yeah, there are studies out there that
20  looked at sexual function following surgery, whether
21  they improve or are worsened.
22   Q.  And you're aware, Doctor, that certain
23  women report improvement in sexual function following
24  surgery with a Prolift®, right?

Page 296

1    A.  Yeah.  Again, we have -- I need to see
2   specifics, but in a very general sense that has been
3   reported during that study period.  I can't speak to
4   afterwards though.
5    Q.  You earlier, Doctor, read some portion
6   of -- withdrawn.
7    You made some -- withdrawn.
8    As you come here today having considered the
9   information that you've described for us earlier with
10  respect to the Prolift® or the Gynemesh® you have not
11  seen any study that has shown a dyspareunia rate of 60%
12  in women using the Prolift®, true?
13   A.  60%?  I mean, I'm not going to be --
14   Q.  That's the number you used earlier in your
15  testimony which is why I asked.
16    MR. SLATER:  Objection,
17  mischaracterization and foundation.
18    THE WITNESS:  Yeah, I'd have to see what I
19  said.  I don't know what we're -- it's been a
20  long day so I don't recall those specifics.
21  I'd have to see what I said.
22  BY MR. ISMAIL:
23   Q.  Then let's clarify.
24   As you sit here now, Doctor, you are not trying

Page 297

1   to suggest to the jury that there are studies that
2   report a 60% dyspareunia rate with Prolift®, are you?
3    A.  I'm not prepared -- without looking at the
4   literature, I can't say one way or the other it was
5   60%, no.
6    Q.  I want to make -- I think we had a double
7   negative in there.
8    You agree, as you sit here today, you are not
9   suggesting to the jury that there are studies reporting
10  a 60% dyspareunia rate with Prolift®, true?
11   A.  Yeah, right now as I sit here, I can't
12  recall that study.
13   Q.  And, Doctor, you're aware of randomized
14  controlled clinical studies that have shown during the
15  study period that Prolift® has no higher rate of
16  dyspareunia compared to native tissue surgery, true?
17   A.  Well, again --
18    MR. SLATER:  Objection.
19    MR. SPECTER:  Pardon me, counsel.
20    MR. SLATER:  Objection.
21    MR. SPECTER:  Let me just interpose an
22  objection if I may, counsel.  You have several
23  times now made reference to literature without
24  showing it to the witness, without asking if

75 (Pages 294 to 297)

Daniel S. Elliott, M.D.

| Page 298 | Page 300 |
|---|---|
| 1  it's authoritative.  That can't be evaluated by | 1  A.  539, Line 4.  I'm there. |
| 2  the witness or by opposing counsel so I object | 2  Q.  Sorry, Line 23. |
| 3  to all those questions, including that past | 3  A.  Oh, I'm sorry.  23, yes. |
| 4  one, for that reason. | 4  Q.  "Question:  And as reported in the |
| 5  MR. SLATER:  That was part of my objection | 5  studies, am I correct that there has been no difference |
| 6  previously too, when I asked about tie up | 6  or no showing among the studies we've talked about to |
| 7  because I don't think it's appropriate. | 7  suggest that Prolift® has a higher rate of dyspareunia |
| 8  MR. ISMAIL:  Well, first of all, I'm not | 8  than the native tissue? |
| 9  sure who is objecting and who isn't anymore | 9  Answer:  I agree with -- as you stated that |
| 10  but -- | 10  question, I agree with the caveat as I mentioned |
| 11  MR. SPECTER:  We both were. | 11  before." |
| 12  MR. ISMAIL:  Clearly. | 12  And then you were asked to answer that question |
| 13  BY MR. ISMAIL: | 13  yes or no. |
| 14  Q.  Doctor, here is my question and if you | 14  And at Line 13 you said, I agree with you as |
| 15  tell me you don't know, then you tell me you don't | 15  stated, yes. |
| 16  know. | 16  Is that your sworn testimony? |
| 17  Are you aware of randomized controlled clinical | 17  A.  That's what I state there.  I don't know |
| 18  trials that have shown that for the study period | 18  what studies we're referring to. |
| 19  Prolift® was not associated with an increased risk of | 19  Q.  So you can put that aside, Doctor, and let |
| 20  dyspareunia? | 20  me ask it this way: without reference to the testimony, |
| 21  MR. SLATER:  Objection, same reasons | 21  do you now recall, Doctor, that there are randomized |
| 22  previously stated and -- | 22  controlled clinical trials that have demonstrated for |
| 23  THE WITNESS:  Again -- | 23  the study period that Prolift® is not associated with |
| 24  MR. SLATER:  And one second -- and we're | 24  an increased rate of dyspareunia compared to native |

| Page 299 | Page 301 |
|---|---|
| 1  going to move to strike all these questions at | 1  tissue surgeries? |
| 2  the appropriate time because they're | 2  A.  Again, I was very specific with that |
| 3  inappropriate. | 3  testimony and being consistent, you know, there are a |
| 4  THE WITNESS:  Again, this is very | 4  lot of clarifiers you have on there.  During the study |
| 5  frustrating for me because I need to see these | 5  period, randomized control, I would want to see those |
| 6  papers and whenever I bring up a paper's name, | 6  studies.  We can talk about each one individually, but |
| 7  you move to strike it and so now when you are | 7  that's what I stated on March 4.  I stand by that. |
| 8  asking, I ask for the paper so I can't see | 8  Q.  My question is different, Doctor.  I'm not |
| 9  it.  So I need to look at the paper, the | 9  asking with regard to the testimony.  I'm asking about |
| 10  quality of the paper and let's discuss each | 10  your recollection now. |
| 11  paper. | 11  A.  Okay. |
| 12  MR. ISMAIL:  Move to strike as | 12  Q.  My ques -- my purpose was to refresh your |
| 13  nonresponsive. | 13  recollection, okay? |
| 14  BY MR. ISMAIL: | 14  A.  Okay. |
| 15  Q.  You can't answer my question, Doctor? | 15  Q.  So here's my question:  Do you recall, as |
| 16  A.  I just did.  I can't -- you are correct, | 16  you sit here today, that there are randomized |
| 17  as you are phrasing it, I can't.  I want to see those | 17  controlled clinical trials that have shown for the |
| 18  papers. | 18  study period that Prolift® is not associated with an |
| 19  Q.  All right.  Do you have your testimony | 19  increased risk of dyspareunia compared to native |
| 20  that you gave on March 4, 2015, sir? | 20  tissues? |
| 21  A.  Yes, I do. | 21  MR. SLATER:  Objection, it's the same |
| 22  Q.  Page 539, Line 24. | 22  objection.  And I just want to say one other |
| 23  A.  539. | 23  thing, I've looked at the testimony now, your |
| 24  Q.  Yes, sir. | 24  foundation is -- it's a mischaracterization and |

76 (Pages 298 to 301)

## Daniel S. Elliott, M.D.

| Page 302 | Page 304 |
|---|---|

**Page 302**

1  lack of foundation for this line of questioning
2  about RCTs versus the testimony you read.  You
3  should look at the line of questioning.  It's
4  not based on an RCT, but go ahead.
5      MR. ISMAIL:  So I will restate my question
6  so you have it in mind.
7      THE WITNESS:  Well, no --
8      MR. ISMAIL:  No, I will and to address
9  Mr. Slater, I have the option of refreshing the
10  witness' recollection without showing the
11  testimony and that's what this question is,
12  okay?
13      MR. SLATER:  Without showing the
14  testimony?
15      MR. ISMAIL:  Yes, on the screen to the
16  jury, that's what refreshing recollection is.
17  You don't publish it to the jury.  So which
18  I --
19      MR. SLATER:  No, I'm just telling you that
20  what you did was, in my opinion, inappropriate
21  and a mischaracterization of what actually was
22  going on there.
23      MR. ISMAIL:  I got your question -- I got
24  your objection, so here's my question.

**Page 303**

1  BY MR. ISMAIL:
2      Q.  Doctor, without reference to the
3  testimony, let me start over, okay.  You can put it
4  aside.
5      As you sit here today, sir, do you have a
6  recollection that there are randomized controlled
7  clinical studies that have shown for the study period
8  that Prolift® is not associated with an increased
9  increase of dyspareunia compared to native tissue
10  surgeries?
11      A.  Okay.  With my hands being somewhat tied,
12  because I can't look at these studies, I do have a
13  recollection of there being studies, in the short term,
14  that can show it being equivocal or not statistically
15  different between Prolift® and the native repairs.
16      Q.  Okay.  And when you say "not statistically
17  different" in your last answer, just so that the jury
18  is clear, researchers perform a statistical
19  significance test often when doing clinical research,
20  correct?
21      MR. SLATER:  Objection,
22  mischaracterization, lack of foundation.
23      THE WITNESS:  Correct.
24  BY MR. ISMAIL:

**Page 304**

1      Q.  And when we talk about statistical
2  significance in clinical research, that is a process by
3  which you say is the observation we're looking at
4  potentially by chance or is it -- you know, fairly
5  represent what the outcomes with the treatment being
6  offered, correct?
7      A.  Correct, if it's by chance or if it's a
8  real finding.
9      Q.  And your last answer was -- withdrawn.
10  One second.  Let's break for one minute.
11      THE VIDEOGRAPHER:  Off the record.  2:52
12  and we are off the record.
13      (Brief recess.)
14      THE VIDEOGRAPHER:  The time is 3:16 and we
15  are back on the record.
16  BY MR. SLATER:
17      Q.  Dr. Elliott, you were just asked some
18  questions about whether or not one can attribute
19  complications to a Prolift® where a woman has issues
20  after a Prolift® surgery, do you remember you were
21  asked about that by defense counsel a while back?
22      A.  Yes.
23      Q.  If a patient as a mesh erosion, are you
24  able to say, just knowing that, that the Prolift® is a

**Page 305**

1  factor in that complication?
2      MR. ISMAIL:  Objection, incomplete
3  hypothetical.
4      THE WITNESS:  Yes.
5  BY MR. SLATER:
6      Q.  And why is that?
7      A.  Without mesh there would be no erosion.
8      Q.  If a patient has mesh contraction and that
9  is causing symptoms, are you able to say that the mesh
10  and the Prolift® itself is a part of a factor in
11  causing that complication?
12      A.  Yes, without mesh there's no contraction.
13      Q.  During the questioning by defense counsel
14  you were asked several questions about the risks of the
15  Prolift® through the vagina versus the other types of
16  surgery, for example, abdominal sacrocolpopexy, and I
17  think you were trying to draw some distinctions.  I'd
18  like to give you an opportunity now to explain what the
19  distinctions are in terms of the various complications
20  or issues that can arise from these different
21  surgeries?
22      A.  Okay.  Just in general?
23      Q.  Sure.
24      MR. ISMAIL:  Objection to the narrative.

## Daniel S. Elliott, M.D.

|  | Page 306 |
|---|---|

1      THE WITNESS:  You have to look at the --
2  what is done during the two procedures, Number
3  one, abdominal versus going through the vagina,
4  so the risk of contamination of the mesh is
5  going to be different.  You have to look at the
6  shape of the mesh.
7      There are no arms for sacrocolpopexy, not
8  going through any muscles, so you can't have
9  that contraction pulling on muscles.
10     You can get the mesh to lay flat because,
11  again, it's not being pulled like we talked
12  about earlier with the mesh arms.
13     The volume of mesh is significantly
14  different, like when we showed -- when I picked
15  up the mesh.  In general, those are the
16  specifics.
17  BY MR. SLATER:
18     Q.  You were asked by defense counsel if there
19  are some patients who have had some improvements in
20  their quality of life and you acknowledged, yes, some
21  patients have had improvement with the Prolift®.
22     Do you remember that?
23     A.  Yes.
24     Q.  Have there been patients who have had

|  | Page 308 |
|---|---|

1  continue to be done.
2      Q.  Is anybody performing Prolifts® today?
3      MR. ISMAIL:  Objection, 403, subsequent
4  remedial measure.
5      THE WITNESS:  No.
6  BY MR. SLATER:
7      Q.  You were asked about studies, RCTs in
8  particular that study dyspareunia.
9      Are you familiar with the fact that in the
10  Altman RCT they found a 7% de novo dyspareunia rate
11  with the Prolift® and only 2% with colporrhaphy?
12     MR. ISMAIL:  Objection, hearsay, leading.
13     THE WITNESS:  That's what they state in
14  the report, yes.
15  BY MR. SLATER:
16     Q.  You were asked if there were some women
17  who report improvement in sexual function after the
18  Prolift®?
19     A.  Correct.
20     Q.  Are there some women who report quite
21  different results with their sexual function after the
22  Prolift®?
23     A.  Yes.
24     Q.  For example?

|  | Page 307 |
|---|---|

1  complications with the Prolift®?
2      A.  Oh, yes, yeah.
3      Q.  Have there been patients who have had
4  severe life-changing complications with the Prolift®?
5      A.  Yeah.
6      MR. ISMAIL:  Objection, lack of
7  foundation, repeating direct.
8      THE WITNESS:  Devastating complications.
9  BY MR. SLATER:
10     Q.  You were asked multiple questions about
11  suture surgeries and suture repairs.
12     Do suture surgeries have mesh-related risks?
13     A.  No.
14     Q.  You were asked a question a few minutes
15  ago and I think counsel said something about older
16  procedures that were used to treat prolapse and he
17  mentioned colporrhaphy I think a few minutes ago.
18     Is colporrhaphy done today?
19     A.  It's the most common procedure done today.
20     Q.  So it's not an older procedure in the
21  sense that it's something people used to do but don't
22  do anymore; is that fair?
23     A.  No, it's considered what we say is the
24  traditional surgery, been done for many years and will

|  | Page 309 |
|---|---|

1      A.  Worsening, devastated or gone, that's what
2  I see in my clinic.
3      MR. ISMAIL:  Objection, move to strike.
4  BY MR. SLATER:
5      Q.  Doctor, do you have handy the transcript
6  that counsel asked you about from March 4, 2015?
7      A.  Yes, I have it right here.
8      Q.  What I'm going to do is go back and look
9  at it a little bit and let's see what you were actually
10  asked about at that time.  And if you look at Page 536,
11  Line 9, the article that was identified --
12     A.  I'm sorry.  I'm sorry, let me just get
13  there.
14     Q.  Sure.  Page 436, Line 9, the article that
15  was identified is the Lowman article?
16     A.  That is correct.
17     Q.  You know that study, you are familiar with
18  that?
19     A.  Yes.
20     MR. ISMAIL:  Objection, hearsay.
21     MR. SLATER:  I'm sorry, didn't you
22  question him about it, sir?
23     MR. ISMAIL:  No, I didn't question him
24  about 536.  I was his own transcript and asking

## Daniel S. Elliott, M.D.

Page 310

1    him a question about it, and said here's a
2    statement of him.
3    BY MR. SLATER:
4        Q.  If you read forward, and you can scan
5    forward from Page 536 where it was identified and if
6    you get to this testimony you were actually asked about
7    by defense counsel, Page 539, Page 540, that's all
8    asking about the Lowman article, correct?
9        A.  Yes, that is all the Lowman article.
10       Q.  All right.  Well, we happen to have that
11   here --
12           MR. ISMAIL:  Objection, hearsay.
13           MR. SLATER:  And here it is, PLT302.  Here
14   you go, counsel.
15           MR. ISMAIL:  Thank you.
16   BY MR. SLATER:
17       Q.  And I'm just going to try to do this
18   fairly quickly.  This is the published article where
19   they in the results say there was a de novo rate of
20   dyspareunia of 16.7%.
21       You see that?
22           MR. ISMAIL:  Objection, hearsay.
23           THE WITNESS:  Correct, that's what they
24   state.

Page 311

1    BY MR. SLATER:
2        Q.  Now, let's look at Exhibit PLT1096, which
3    is the abstract that predated the published article.
4    And in the abstract look at the conclusion --
5            MR. ISMAIL:  Sorry.  Objection, hearsay
6        and this is not a material that Dr. Elliott
7        disclosed.  It's beyond the scope of his
8        disclosure so it's improper.
9            MR. SLATER:  Okay.  Well, you brought it
10       up.
11           MR. ISMAIL:  No, I didn't actually, but go
12       ahead.  The objection is hearsay and improper
13       disclosure of material.
14   BY MR. SLATER:
15       Q.  Doctor, the conclusion to the abstract by
16   Lowman about whether the Prolift® causes dyspareunia,
17   just read for me the first sentence, please --
18           MR. ISMAIL:  Objection, hearsay.
19           MR. SLATER:  -- of the conclusion.
20           MR. ISMAIL:  Improper disclosure.
21           THE WITNESS:  The abstract which was
22       presented at the --
23   BY MR. SLATER:
24       Q.  I'm not -- Doctor, I'm talking about the

Page 312

1    abstract I just handed to you.
2        A.  Yeah, no, and I can say it was presented
3    at the GYN surgeons meeting in 2008.  Just so we're
4    clear what I'm reading here, under conclusion, "The
5    Prolift® procedure may be associated with a high (24%)
6    de novo dyspareunia rate..."
7        Q.  So when they presented it originally they
8    said 24%, a high rate, and then when they published
9    they went down to 16.7%?
10           MR. ISMAIL:  Objection, leading, improper
11       disclosure, hearsay.
12           THE WITNESS:  That is correct.
13   BY MR. SLATER:
14       Q.  And in the article if you turn to page e5?
15       A.  Okay, I'm there.
16       Q.  And in the center column, if you just read
17   through it, they assess dyspareunia by two different
18   methods, by a validated questionnaire versus a chart
19   review.
20           MR. ISMAIL:  Objection.
21   BY MR. SLATER:
22       Q.  Do you see that?
23           MR. ISMAIL:  I'm sorry.  Objection,
24       hearsay.

Page 313

1            THE WITNESS:  Yes, and a telephone
2        interview.
3    BY MR. SLATER:
4        Q.  And, ultimately, if you read through this
5    they say they ultimately chose the chart review, which
6    gave them the 16.7% rate instead of the validated
7    questionnaires that they reported at 24%, didn't they?
8            MR. ISMAIL:  Objection, leading and
9        hearsay.
10           THE WITNESS:  That's what they state in
11       there, yes.
12   BY MR. SLATER:
13       Q.  These validated questionnaires, these are
14   validated through professional societies and academics
15   and people who know a lot in this field; aren't they?
16           MR. ISMAIL:  Objection, leading, hearsay.
17           THE WITNESS:  That is correct, yes.
18   BY MR. SLATER:
19       Q.  Okay.  Now, you were asked a bunch of
20   questions by counsel about the use of polypropylene to
21   treat pelvic conditions, you remember he asked you
22   about that, it's been used in a lot of products by
23   different ways?
24       A.  Correct.

79 (Pages 310 to 313)

## Daniel S. Elliott, M.D.

| Page 314 | Page 316 |
|---|---|

**Page 314**

1  Q. And he asked you about Bard Marlex; do you
2  remember that?
3  A. Correct.
4  Q. Are you familiar with the Bard Avaulta?
5  A. Oh, yes.
6  MR. ISMAIL: Objection, beyond the scope.
7  I didn't ask him anything about Marlex.
8  MR. SLATER: You mentioned it.
9  MR. ISMAIL: No, I didn't. He did. He
10  misunderstood my question.
11  THE WITNESS: No, I did not misunderstand.
12  I understood it, but I did bring it up.
13  BY MR. SLATER:
14  Q. Remember you were asked by counsel about
15  Marlex and that that was one of the materials used to
16  treat patients?
17  MR. ISMAIL: Objection, actually misstates
18  the record, beyond the scope.
19  THE WITNESS: I remember the discussion.
20  BY MR. SLATER:
21  Q. You were asked about the use of mesh
22  transvaginally?
23  A. Correct.
24  Q. All right. And one of the ways that's

**Page 315**

1  done -- was done was by the Bard Avaulta, right?
2  MR. ISMAIL: Object, leading.
3  THE WITNESS: Correct.
4  BY MR. SLATER:
5  Q. And I've given you now the MSDS, the
6  Material Safety Data Sheet, for the Marlex material in
7  the Bard Avaulta and on the -- and you've seen this
8  before, right?
9  A. Yes, I have.
10  Q. Marked as Plaintiff's Trial Exhibit P2402
11  and if you look right on the front page -- let me start
12  again.
13  If you look on the front page of this Exhibit
14  P2402, what does it say? There is a medical
15  application caution, what does that say?
16  MR. ISMAIL: Objection, hearsay, beyond
17  the scope, not disclosed in this case by the
18  witness.
19  BY MR. SLATER:
20  Q. What does that say?
21  A. It says "Medical Application Caution: Do
22  not use this Phillips Sumika Polypropylene Company
23  material in medical application involving permanent
24  implantation in the human body or permanent contact

**Page 316**

1  with internal body fluids or tissues."
2  Q. And then what does it say in the next --
3  MR. ISMAIL: Objection --
4  BY MR. SLATER:
5  Q. -- paragraph?
6  MR. ISMAIL: I'm sorry. Objection, 403,
7  hearsay, beyond the scope.
8  MR. SLATER: Sure.
9  BY MR. SLATER:
10  Q. Does it basically say that, again, don't
11  use this polypropylene material in the human body for
12  medical applications?
13  MR. ISMAIL: Same objections and now
14  leading.
15  THE WITNESS: Yes, but it goes on saying
16  "involving brief or temporary implantation in
17  the human body."
18  BY MR. SLATER:
19  Q. Okay. And that's -- this is the
20  polypropylene used in one of those mesh devices used
21  transvaginally that counsel asked you about, correct?
22  MR. ISMAIL: Objection, leading, hearsay,
23  403, beyond the scope.
24  THE WITNESS: It's one of the meshes used

**Page 317**

1  in one of the products, yes.
2  BY MR. SLATER:
3  Q. Okay. Now, you were asked by counsel
4  about conservative treatment of exposure erosion,
5  remember that, counsel asked you a bunch of questions?
6  A. Yes, I do.
7  Q. Do you have handy or can you get handy
8  PLT1095, it's the article by Heesakkers and Withagen.
9  I actually have another copy of it here, if it will
10  save time.
11  MR. ISMAIL: Which one?
12  MR. SLATER: It's the one I gave you at
13  the start of the day today.
14  MR. ISMAIL: Thank you.
15  BY MR. SLATER:
16  Q. And what I want to do -- this is the
17  article by that urologist that you said you knew from
18  SUFU.
19  A. Yeah, John Heesakkers. Not from SUFU,
20  from European Urology Association.
21  Q. Ah, sorry. And if we look now at Page
22  1399 of this article which you already testified
23  about --
24  MR. ISMAIL: Objection, hearsay, 403. I

Daniel S. Elliott, M.D.

| Page 318 | Page 320 |
|---|---|

**Page 318**

1  didn't ask him about the article, you did.

2      So beyond the scope, 403, hearsay and this

3  is the article that, as we pointed out before,

4  was not disclosed by the witness before today.

5  BY MR. SLATER:

6      Q.  Okay.  Doctor, during the

7  cross-examination counsel asked you about the efficacy

8  of using conservative treatments to treat mesh

9  erosions; do you remember that?

10      A.  Correct.

11      Q.  And if we look at Page 1399 of this

12  article, and you look at the left-hand column, first

13  full paragraph it says, "Mesh-related complications

14  were unsuccessfully treated conservatively with

15  estrogen cream, antibiotics and/or physiotherapy prior

16  to mesh excision in 63% of patients."

17      Is that significant --

18      MR. ISMAIL:  Objection, hearsay --

19  BY MR. SLATER:

20      Q.  -- to you?

21      MR. ISMAIL:  Sorry.  Objection, hearsay,

22  403, improper disclosure.

23      MR. SLATER:  You have a standing objection

24  for hearsay, counsel.

**Page 319**

1      MR. ISMAIL:  Okay.  Thank you.  I'm

2  actually adding to the objection, but thank

3  you.  Did I get them all?

4      403, improper disclosure, beyond the

5  scope.  Thank you.

6      THE WITNESS:  Yes, it's quite significant.

7  BY MR. SLATER:

8      Q.  Why is that?

9      MR. ISMAIL:  Same objections.

10      THE WITNESS:  Traditionally, and if you

11  look at what I answered in 2012 deposition, is

12  that 50% of these mesh extrusions can be

13  treated conservatively and that's it.

14      Researchers like this Dutch group, along

15  with Abbott, are now saying that 50% of those

16  which are treated conservatively ultimately go

17  on to surgery, and this one actually says 63%,

18  so it's actually a higher percent than Abbott,

19  et.al.

20  BY MR. SLATER:

21      Q.  Okay.  Now, you were asked a bunch of

22  questions by counsel about RCTs and how many studies

23  there are of the Prolift®; do you remember that

24  questioning?

**Page 320**

1      A.  Yes, I do.

2      MR. SPECTER:  RCT.

3  BY MR. SLATER:

4      Q.  Randomized controlled trials, right?

5      A.  Correct.

6      Q.  That's when they take a few different

7  procedures and they compare them, basically.

8      A.  A two-armed study, yes.

9      Q.  Okay.  And are you -- well, let me hand

10  you this.  This is going to be Exhibit 2503.

11      And this is a letter from the FDA to Mr. Brian

12  Kanerviko, a worldwide director of regulatory at

13  Ethicon.

14      You see this?

15      A.  Yes, I do.

16      Q.  Okay.  And you are familiar -- are you

17  familiar or not with the interaction between Ethicon

18  and the FDA regarding the 522 studies?

19      A.  Yes, I've read those.

20      Q.  Okay.  And what I'd like to do is to cut

21  to the chase, let's turn to Page 4 of this letter.

22      MR. ISMAIL:  Counsel, if you wouldn't mind

23  giving me a second when you hand me an exhibit

24  to see what it is.

**Page 321**

1      I object to this exhibit as beyond the

2  scope, 403, beyond the time period at issue in

3  this case and potentially subject to a

4  stipulation that you proposed.

5  BY MR. SLATER:

6      Q.  In Paragraph 10 of this letter to the FDA

7  I just want to read a little bit and then I'm going to

8  ask you a few questions.  It says, "For GYNECARE

9  PROLIFT® Pelvic Floor Repair Systems, you provided 2

10  published articles with the clinical data collected

11  under two randomized controlled trials to satisfy the

12  522 orders.  However, these studies do not address

13  several questions in the 522 order."

14      Do you see that?

15      A.  Yes I do.

16      MR. ISMAIL:  Same objections and also

17  hearsay.

18  BY MR. SLATER:

19      Q.  And just simply, the 522 orders were where

20  the FDA wrote and told Ethicon you need to do some very

21  high level studies in order to prove these are -- this

22  is a safe product, the Prolift®?

23      MR. ISMAIL:  Same objections and now with

24  leading.

81 (Pages 318 to 321)

Daniel S. Elliott, M.D.

| Page 322 | Page 324 |

**Page 322**

1    THE WITNESS: Right, it's a response
2  saying there's an application and here's where
3  we have concerns.
4  BY MR. SLATER:
5    Q.  And the FDA talks about which two RCTs
6  they're talking about and it's Withagen and Altman,
7  correct?
8    MR. ISMAIL: Objection, leading, hearsay.
9  403.
10    THE WITNESS: Yes.
11  BY MR. SLATER:
12    Q.  Let me ask the question differently.
13    THE COURT REPORTER: One at a time,
14  please.
15  BY MR. SLATER:
16    Q.  Rephrase.
17    Which of the two articles, if you look in the
18  body of these two bullet points that the FDA is
19  describing that Ethicon had submitted to try to satisfy
20  the 522?
21    MR. ISMAIL: Just let me make my
22  objections noted which didn't get last time,
23  because it was talked over.
24    Hearsay, 403, beyond the scope and

**Page 323**

1  improper disclosure. Thank you.
2    THE WITNESS: Withagen, et.al. and Altman,
3  et.al.
4  BY MR. SLATER:
5    Q.  And according to this did the FDA accept
6  those articles as satisfying the FDA's concerns and
7  need for a 522 order, study?
8    MR. ISMAIL: Objection, hearsay, 403,
9  beyond the scope and improper subject for
10  expert testimony.
11  BY MR. SLATER:
12    Q.  What did they say at the bottom of that
13  section? It says "Based on these limitations ..."
14    MR. ISMAIL: Same objections.
15    THE WITNESS: To answer your question
16  initially, no, they did not say it was
17  satisfying. And then, "Based on these
18  limitations, the publications provided are not
19  adequate to satisfy the 522 order."
20  BY MR. SLATER:
21    Q.  And now I'll hand you exhibit we marked as
22  P2452 and this is a letter from the FDA to Brian
23  Kanerviko, worldwide director regulatory in Ethicon,
24  July 9, 2012.

**Page 324**

1  And you've seen this before?
2    A.  Yes.
3    Q.  And it says in the letter that the FDA had
4  completed its review of Ethicon's response to the 522
5  order requesting that the study be suspended, and they
6  say, "This request is based on the plan to discontinue
7  manufacture and marketing of the device in the United
8  States within 120 days of the date of your letter. We
9  agree to your request and will place the 522 order on
10  hold until September 7, 2012 with the following
11  conditions:"
12    Is that what the letter says?
13    MR. ISMAIL: Objection, hearsay, 403,
14  beyond the scope, subsequent remedial measure,
15  improper subject of expert testimony.
16    THE WITNESS: That's what it states.
17  BY MR. SLATER:
18    Q.  And the first condition there is "Cease
19  marketing by September 7, 2012."
20    Is that what it says?
21    MR. ISMAIL: Please note the same
22  objections.
23    THE WITNESS: That what it states.
24  BY MR. SLATER:

**Page 325**

1    Q.  And then just below the conditions, it
2  says, "FDA reminds you that you are obligated, under
3  Section 522 of the act, to complete a postmarket
4  surveillance study of your device to address the issues
5  cited in FDA's letter dated January 3, 2012.
6  Accordingly, you must submit us new study plan to your
7  PS study informing" -- meaning post market surveillance
8  study -- "informing FDA if commercial distribution of
9  your device begins."
10    Is that what the letter says?
11    MR. ISMAIL: Please note the same
12  objections.
13    THE WITNESS: That's what it states, yes.
14  BY MR. SLATER:
15    Q.  And is it consistent with your
16  understanding that after Ethicon said they weren't
17  going to do the 522 studies and withdraw the products,
18  that they actually withdrew the Prolift® from the
19  market and no longer sell it?
20    MR. ISMAIL: Objection, leading, 403,
21  beyond the scope, subsequent remedial measure,
22  lack of foundation.
23    THE WITNESS: Yes, it was --
24    MR. ISMAIL: Sorry. Improper subject for

82 (Pages 322 to 325)

Daniel S. Elliott, M.D.

Page 326

```
 1     expert testimony.  Sorry, Doctor.
 2          THE WITNESS:  It was pulled from the
 3     market, yes.
 4          MR. ISMAIL:  Move to strike as
 5     nonresponsive.
 6          MR. SLATER:  No other questions.
 7     BY MR. ISMAIL:
 8     Q.  Doctor, just briefly.
 9          You were asked -- earlier I showed you your
10     sworn testimony from 2012 and you indicated that 50% of
11     mesh exposures can be treated conservatively, correct?
12     A.  Correct.
13     Q.  What was the date of the article that
14     counsel showed you just now in response to that
15     testimony, Exhibit 1095?
16     A.  Looks like it was published in 2011.
17     Q.  In the event counsel's question regarding
18     the Altman study on redirect -- redirect is allowed, I
19     have some follow-up on that provisionally.
20          You were asked to -- he provided you what he
21     characterized as the data on dyspareunia between
22     Prolift® surgery and the native tissue surgery in that
23     study, correct?
24     A.  Correct.
```

Page 327

```
 1     Q.  And he gave you some data points where
 2     numerically the rate of dyspareunia was higher with
 3     Prolift®.
 4          Do you recall that was the information he gave
 5     you?
 6     A.  That is correct.
 7     Q.  Do you recall from your own memory, sir,
 8     that the dyspareunia rate between Prolift® and native
 9     tissue surgery in that Altman study was not
10     statistically significant?
11     A.  In the Altman study?
12     Q.  Yes.
13     A.  I don't have the Altman study in front of
14     me.  If you are telling me it's statistically equal, I
15     have no reason to doubt you.
16     Q.  Okay.  So let me ask it this way:  When
17     you were answering Mr. Slater's questions when he gave
18     you data points regarding that study, you did not
19     recall, from your own recollection, whether the data he
20     was giving you was at all accurate, correct?
21          MR. SLATER:  Objection.  By the way, I
22     just want to preserve my objections on this
23     line of questioning.
24          THE WITNESS:  With -- actually, I'm sorry,
```

Page 328

```
 1     could you repeat your question.
 2     BY MR. ISMAIL:
 3     Q.  Just so everything is clear as to where
 4     this is coming from, just now, a few minutes ago
 5     Mr. Slater represented to you certain data from a study
 6     known as Altman, correct?
 7     A.  Correct.
 8     Q.  He gave you the numbers from that study in
 9     his question, but would I be fair to assume you didn't
10     recall them yourself?
11     A.  No, I -- no, you are correct, I don't
12     recall them, but the Altman study has major issues
13     that --
14     Q.  I didn't bring it up.
15          MR. SLATER:  Don't interrupt him in the
16     middle of the answer, please.  Let him finish.
17     BY MR. ISMAIL:
18     Q.  Doctor, I just want to make sure --
19          MR. SLATER:  No, no, hang on, hang on, he
20     was talking.  Let him finish.  He is going to
21     finish.
22          MR. ISMAIL:  Then I will move to strike
23     and we try again.
24          MR. SLATER:  That's fine but you should
```

Page 329

```
 1     let him finish his answer.
 2          MR. ISMAIL:  Okay, okay, calm down.
 3          THE WITNESS:  Point well-taken.
 4          But as I mentioned earlier, the Altman
 5     studies have major ethical issues, which I
 6     questioned the data.  But to answer your
 7     question, I do not recall off the top of my
 8     head those numbers.
 9          MR. ISMAIL:  Move to strike.
10     BY MR. ISMAIL:
11     Q.  Doctor, quite simply, when Mr. Slater
12     represented to you what the data were from the Altman
13     study, you did not, and still as you sit here now, do
14     not know whether that data he gave you was the true
15     reported data from that study, correct?
16     A.  I don't recall those specific numbers out
17     of the hundreds of studies I read, no.
18     Q.  That's fine, and I'm not -- withdrawn.
19          And as you sit here today you can't recall
20     whether the rate of dyspareunia comparing Prolift® to
21     native tissue repair in the Altman study, if there was
22     a numerical difference, whether that was statistically
23     significant or not, true?
24     A.  As I recall it was not statistically
```

83 (Pages 326 to 329)

Daniel S. Elliott, M.D.

| Page 330 | Page 332 |
|---|---|
| 1   different. | 1   study does not show an increased risk of dyspareunia |
| 2     Q. Okay. And so the proper interpretation of | 2   comparing Prolift® to native tissue surgery, true? |
| 3   a study where there are comparison between one surgical | 3     MR. SLATER: Same objection. |
| 4   treatment and another surgical treatment, if it's not | 4     THE WITNESS: As I review any study, not |
| 5   statistically significant, the proper interpretation of | 5   just this, not just for this litigation, you |
| 6   that is you would say the study does not show a | 6   have to look at the percentage, the true |
| 7   difference for that outcome, correct? | 7   numbers and then the statistical significance |
| 8     A. Yeah, the proper way to state it is there | 8   and you cannot -- if they're statistically |
| 9   was a percentage difference but not a statistical | 9   equal, then you have to state that |
| 10   difference. | 10   statistically they were equal. |
| 11     Q. Right. | 11   BY MR. ISMAIL: |
| 12     And when you say there is not a statistical | 12     Q. And that was true with respect to the risk |
| 13   difference, earlier when we were talking about | 13   of dyspareunia in the Altman study that Mr. Slater gave |
| 14   statistical significance, that's a way researchers can | 14   you just now, correct? |
| 15   assess whether the observed difference is real or due | 15     A. That is correct, yes. |
| 16   to chance, correct? | 16     MR. ISMAIL: Thank you. No further |
| 17     A. That is correct. | 17   questions. |
| 18     Q. And if there's no statistically | 18     MR. SLATER: Just for the record, make it |
| 19   significant difference, one would conclude that there | 19   very clear, the questioning on Altman was |
| 20   is -- that any observed difference between the two | 20   conditional in case any of the vague |
| 21   groups of patients in this study is potentially due to | 21   questioning on cross-examination regarding |
| 22   chance, correct? | 22   studies, without establishing them as being |
| 23     A. Correct, during the frame of -- time frame | 23   authoritative, would be permitted in any way. |
| 24   of that study, that is correct. | 24     I have no other questions. |

| Page 331 | Page 333 |
|---|---|
| 1     Q. And in the Altman study, as you've just | 1     THE VIDEOGRAPHER: The time is 3:41 and |
| 2   confirmed, where there's no statistically significant | 2   this concludes the videotape deposition of |
| 3   difference in the outcome of dyspareunia, the proper | 3   Dr. Daniel Elliott. |
| 4   interpretation of that study is that the Altman study | 4     (Witness excused.) |
| 5   does not establish -- withdrawn. | 5     (Mr. Slater leaves the deposition room.) |
| 6     The proper interpretation of the Altman study | 6     MR. ISMAIL: We have requested the |
| 7   is that there was no statistical difference shown in | 7   stenographic record note that the deposition |
| 8   the risk of dyspareunia comparing Prolift® to native | 8   remains open due to the instructions not to |
| 9   tissue surgery, true? | 9   answer. Mr. Slater was advised but was outside |
| 10     MR. SLATER: Just for the record, I've | 10   the deposition room. |
| 11   clearly stated an objection to this whole line | 11        --- |
| 12   of questioning. | 12 |
| 13     THE WITNESS: To answer your question, you | 13 |
| 14   are correct as it is stated in the document, | 14 |
| 15   with the reservations I've had as far as the -- | 15 |
| 16   is it a true study. | 16 |
| 17   BY MR. ISMAIL: | 17 |
| 18     Q. Okay. But as to the data that Mr. Slater | 18 |
| 19   gave you, it wasn't -- I didn't give you that data, he | 19 |
| 20   gave you that data, right? | 20 |
| 21     A. Correct. | 21 |
| 22     Q. And if you were going to interpret the | 22 |
| 23   data he gave you, where there was an absence of | 23 |
| 24   statistical significance, you would conclude the Altman | 24 |

84 (Pages 330 to 333)

Daniel S. Elliott, M.D.

Page 334

```
 1          C E R T I F I C A T I O N
 2          I, MARGARET M. REIHL, a Registered
 3  Professional Reporter, Certified Realtime
 4  Reporter, Certified Shorthand Reporter,
 5  Certified LiveNote Reporter and Notary Public,
 6  do hereby certify that the foregoing is a true
 7  and accurate transcript of the testimony as
 8  taken stenographically by and before me at the
 9  time, place, and on the date hereinbefore set
10  forth.
11          I DO FURTHER CERTIFY that I am
12  neither a relative nor employee nor attorney
13  nor counsel of any of the parties to this
14  action, and that I am neither a relative nor
15  employee of such attorney or counsel, and that
16  I am not financially interested in the action.
17
18
19          -------------------------------
            Margaret M. Reihl, RPR, CRR, CLR
20          CSR #XI01497  Notary Public
21
22
23
24
```

Page 336

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
          I,_____, do
 3  hereby certify that I have read the
    foregoing pages, and that the same
 4  is a correct transcription of the answers
    given by me to the questions therein
 5  propounded, except for the corrections or
    changes in form or substance, if any,
 6  noted in the attached Errata Sheet.
 7
        _____
 8  DANIEL S. ELLIOTT, M.D.        DATE
 9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
```

Page 335

```
 1          - - - - - -
            E R R A T A
 2          - - - - - -
 3  PAGE  LINE  CHANGE
 4  ____  ____  _____
 5          REASON: _____
 6  ____  ____  _____
 7          REASON: _____
 8  ____  ____  _____
 9          REASON: _____
10  ____  ____  _____
11          REASON: _____
12  ____  ____  _____
13          REASON: _____
14  ____  ____  _____
15          REASON: _____
16  ____  ____  _____
17          REASON: _____
18  ____  ____  _____
19          REASON: _____
20  ____  ____  _____
21          REASON: _____
22  ____  ____  _____
23          REASON: _____
24  ____  ____  _____
```

85 (Pages 334 to 336)